# EXHIBIT 1

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

**Page 1**

```
1              VOLUME:   I
            PAGES:  1-248
2           EXHIBITS: 1-11
3
         PHILADELPHIA COUNTY
4        COURT OF COMMON PLEAS
         C.A. JUNE TERM 2004
5            NO. 1819
6                    )
7  GREGORY CLARK AND LINDA    )
   MEASHEY, individually and on  )
8  behalf of others similarly   )
   situated,              )
9       Plaintiffs,        )
                          )
10  vs.                    )
                          )
11  PFIZER, INC., and        )
   WARNER-LAMBERT COMPANY, LLC,  )
12  `  Defendants.         )
13
14
15      VIDEOTAPED DEPOSITION OF MEREDITH B.
16  ROSENTHAL, Ph.D., a witness called on behalf
17  of the Defendants, pursuant to the
18  provisions of the Philadelphia Rules of
19  Civil Procedure, before Jill Shepherd,
20  Registered Professional Reporter, CSR, CLR
21  and Notary Public, in and for the
22  Commonwealth of Massachusetts, at the
23  offices of Hare & Chaffin, 160 Federal
24  Street, Boston, Massachusetts, on Wednesday,
25  July 9, 2008, commencing at 8:50 a.m.
```

**Page 2**

```
1  APPEARANCES:
2  SACKS & WESTON
   By:  John K. Weston, Esquire
3        -- and --
        Charles E. Mangan, Esquire
4  114 Old York Road
   Jenkintown, Pennsylvania 19046
5  Tel: 215.925.8200
   E-mail: jweston@sackslaw.com
6  Attorney for the Plaintiff.
7
8  HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
   By:  Edward Notargiacomo, Esquire
9  One Main Street
   Cambridge, Massachusetts  02142
10  Tel:  617.782.3700
   Attorney for the Plaintiff.
11
12
   DAVIS POLK & WARDWELL
13  By:  Paul S. Mishkin, Esquire
        -- and --
14      James P. Rouhendeh, Esquire
   450 Lexington Avenue
15  New York, NY 10017
   Tel:  212.450.4000
16  E-mail: paul.mishkin@dpw.com
   Attorney for the Defendant.
17
18
19  ALSO PRESENT:  Ralph Scopa, Videographer
20
21
22
23
24
25
```

**Page 3**

```
1              I N D E X
2  WITNESS                  PAGE
3  MEREDITH B. ROSENTHAL, Ph.D.
4  Examination by Mr. Mishkin      6
5
6            E X H I B I T S
7  NO.   DESCRIPTION          PAGE
8  1    Declaration of Meredith B.   5
9        Rosenthal
10  2    Revision to Declaration of   5
11       Meredith B. Rosenthal
12  3    Declaration of Meredith B.   5
13       Rosenthal in Support of Class
14       Certification
15  4    Detail Spending by Specialty  78
16  5    Using Econometrics (Fifth   143
17       Edition)
18  6    Chapter 7 "Specification:   144
19       Choosing a Functional Form"
20  7    Article (J. Donohue)    155
21  8    Article         174
22  9    Textbook        185
23  10   Chapter 10.5 Trends &    185
24       Seasonality
```

**Page 4**

```
1  11   Estimation and Inference in   211
2       Econometrics
```

Unsigned

Page  1 - 4

5

1        P R O C E E D I N G S
2     (Exhibit Nos. 1-3 marked.)
3       THE VIDEOGRAPHER:  Good morning.
4  My name is Ralph Scopa of Veritext Court
5  Reporting Services.  Today's date is July 9,
6  2008.  The time is 8:56 a.m.
7     This deposition is being taken at the
8  office of Hare & Chaffin, located at
9  160 Federal Street, Boston, Mass,.  The
10  caption of this case is Clark versus Pfizer,
11  Philadelphia Court [sic], Court of Common
12  Pleas -- I'm sorry, that's Philadelphia
13  County, case number 1819.  The name of this
14  witness is Meredith Rosenthal.
15     At this time, the attorneys will
16  identify themselves and the party they
17  represent, after which, our court reporter,
18  Jill Shepherd, of G&M Court Reporting, will
19  swear in the witness and we can proceed.
20     MR. MISHKIN:  Paul Mishkin from
21  Davis, Polk & Wardwell for the defendant.
22     MR. ROUHANDEH:  Jim Rouhandeh of
23  Davis, Polk & Wardwell for the defendant.
24     MR. WESTON:  John Weston of Sacks &
25  Weston for the plaintiffs.

6

1     MR. MANGAN:  Charles Mangan of
2  Sacks & Weston for the plaintiffs.
3     * * * * *
4     MEREDITH B. ROSENTHAL, Ph.D., a
5  witness, called for examination by counsel
6  for Defendants, having been satisfactorily
7  identified by the production of her
8  Massachusetts driver's license, being first
9  sworn by the Notary Public, was examined and
10  testified as follows:
11     * * * * *
12   EXAMINATION BY MR. MISHKIN:
13  Q.  Good morning.
14  A.  Good morning.
15  Q.  Could you state your full name, please.
16  A.  Meredith B. Rosenthal.
17  Q.  Professor Rosenthal, we've premarked three
18  exhibits which have been put in front of
19  you, and we'll talk about them one at a
20  time.
21     If you could find Exhibit 1, that's a
22  document entitled, "Estimate of Neurontin
23  Units Paid For by Pennsylvania Consumers
24  Caused by Alleged Off-Label Promotion,
25  Declaration of Meredith Rosenthal."

7

1     Is this a copy of the most recent
2  declaration that you have filed in this
3  case?
4  A.  Yes, it is.
5  Q.  Can you turn to page 19.
6  A.  (Witness complies.)
7  Q.  Let me know when you have found that.
8  A.  Yes, I have it.
9  Q.  Do you see that your name appears on the
10  signature line here above the date March 31,
11  2008?
12  A.  That's correct.
13  Q.  Is this an electronic signature reflecting
14  your approval and sign-off on the
15  declaration?
16  A.  That's right.
17  Q.  And March 31, 2008, is that the date that
18  you gave that approval and sign-off and the
19  date on which the declaration became final?
20  A.  That's correct.
21  Q.  Okay.  Let's take a look at Exhibit 2.  This
22  is a document entitled, "The Revision to the
23  March 31, 2008 Declaration of Meredith
24  Rosenthal, Revised Estimate of Neurontin
25  Units Paid For by Pennsylvania Consumers

8

1  Caused By Alleged Off-Label Promotion."
2     Is this a copy of a revision that you
3  filed to the March 2008 declaration we were
4  just looking at?
5  A.  That's correct.
6  Q.  And then at the bottom of the first page
7  here on Exhibit 2, this document also has an
8  electronic signature reflecting your
9  approval and sign-off on this revision; is
10  that right?
11  A.  That's correct.
12  Q.  April 8, 2008, is that the date that you
13  provided that approval and sign-off and the
14  date that this revision became final?
15  A.  That's correct.
16  Q.  Throughout the deposition, I'm going to
17  refer collectively to Exhibits 1 and 2 as
18  your 2008 declaration or report.  I may also
19  call it your current declaration or report.
20     Can we agree that by those names, I'm
21  referring collectively to Exhibits 1 and 2?
22  A.  Yes.
23  Q.  And if there's ever any confusion as to
24  whether I'm referring more specifically to
25  Exhibit 1 or Exhibit 2, just let me know; is

9

1    that okay?
2    A. Yes, I will.
3    Q. Great. Let's look at Exhibit 3. This is a
4    document entitled, "Declaration of
5    Meredith B. Rosenthal in Support of Class
6    Certification For Pennsylvania Consumers of
7    Neurontin."
8        Is this a copy of a declaration that
9    you previously filed in this case in support
10   of class certification?
11   A. That's correct.
12   Q. And could you turn to page eight of this
13   document.
14   A. (Witness complies.)
15   Q. Let me know when you are there.
16   A. I am.
17   Q. You signed this declaration on August 31,
18   2005; is that correct?
19   A. That's correct.
20   Q. Okay. I'm going to refer to this document
21   as your 2005 report or also maybe your class
22   certification report. I may also use the
23   word "declaration."
24        Can we agree that by all those terms
25   that I'm meaning to refer to this document,

10

1        Exhibit 3?
2    A. Yes.
3    Q. Together, do your 2008 and 2005 declarations
4    in this case provide an accurate description
5    of the opinions that you intend to offer in
6    this case?
7    A. They do.
8    Q. Are you intending to offer in this case any
9    opinions that are not contained in either of
10   these declarations?
11   A. Not at this time. If asked by counsel to
12   augment my opinions, I would do so; but at
13   this time, I do not know that I will be
14   filing anything additional.
15   Q. As of this point, you haven't been given any
16   instructions to offer any additional
17   opinions; is that correct?
18   A. As of this point.
19   Q. Okay. I'd like to talk about the materials
20   that you've reviewed in connection with your
21   work on this case. Why don't we start with
22   your 2005 declaration, that's Exhibit 3.
23   And can you find for me Attachment A2, which
24   is towards the back of this document. If
25   you flip through it, I think it's about five

11

1    pages from the end.
2    A. I'm sorry. We're in Exhibit 3?
3    Q. That's correct.
4        (Pause.)
5    Q. So if you could find Attachment A2, which is
6    towards the back of that document about five
7    pages from the end.
8    A. Yes.
9    Q. Now, this lists documents that you relied on
10   in connection with your 2005 declaration,
11   correct?
12   A. That's correct.
13   Q. And if you take a look at this document,
14   this list that we're looking at here in
15   Attachment A2, this was actually an
16   attachment to your Neurontin declaration
17   that you filed in the Federal MDL matter; is
18   that correct?
19   A. That's correct.
20   Q. And the documents listed here in
21   Attachment A2, these were documents that you
22   had relied upon for purposes of your MDL
23   declaration; is that correct?
24   A. That's correct.
25   Q. And you also relied on these documents

12

1    listed here in Attachment A2 for purposes of
2    your 2005 declaration in this case?
3    A. That's correct.
4    Q. You attached your whole MDL declaration to
5    your 2005 class declaration in this case,
6    correct?
7    A. That's correct.
8    Q. And that was because the analysis you were
9    proposing in this case was based on the
10   analysis that you proposed in the MDL?
11   A. That's -- so what I was proposing was
12   essentially to take the same approach as I
13   proposed in the MDL and use it for
14   Pennsylvania. And so, as you know, there
15   were some additional issues related to
16   calculating uses for the specific
17   Pennsylvania class as opposed to the
18   national class, but essentially to take the
19   same set of methods and use them in
20   Pennsylvania.
21   Q. You were going to take the same set of
22   methods and apply certain specific
23   adaptations for Pennsylvania?
24   A. That's correct.
25   Q. If we look again at Attachment A2, you see

13

1   that it continues for four pages, I think.
2       And then if you flip past those four pages
3       to the very last page of this document --
4   A. Um-hum.
5   Q. -- there's a page entitled, "Attachment
6       PAB," and it's entitled, "Additional
7       Materials Relied Upon"; is that right?
8   A. That's correct.
9   Q. This page contains two documents that are
10      not included in Attachment A2. It's the
11      amended Clark complaint and the declaration
12      that Dr. Hartman filed in Clark; is that
13      correct?
14  A. That's correct.
15  Q. Now, these were the only Clark specific
16      documents that you relied upon for purposes
17      of your 2005 declaration in this case; is
18      that correct?
19  A. That's correct.
20  Q. Other than the documents listed in
21      Attachment A2, that we were just looking at,
22      also the documents listed here in attachment
23      PAB, were there any other documents that you
24      relied upon for purposes of your 2005
25      declaration in this case?

14

1   A. No, there were not.
2   Q. Let's look now at your 2008 declaration in
3       this case, that's going to be Exhibit 1.
4       Let me ask you to find Attachment B,
5       which I think is pretty much in the middle
6       of the document.
7   A. Um-hum. I have it.
8   Q. Great. Now, Attachment B is entitled,
9       "Documents Relied Upon."
10      Does Attachment B contain a complete
11      list of the documents that you relied upon
12      for purposes of your 2008 declaration?
13  A. That's my belief, yes.
14  Q. All right. Let's look at the different
15      categories here. The first category here is
16      entitled, "Legal Documents." The first
17      document listed here is the amended Clark
18      complaint; is that correct?
19  A. That's correct.
20  Q. And the second document is your 2005
21      declaration in this case that we were
22      previously looking at, correct?
23  A. That's correct.
24  Q. In what way did you rely upon your 2005
25      declaration for purposes of your 2008

15

1   declaration?
2   A. Well, of course, in my 2005 declaration, I
3       summarize the allegations, I summarize the
4       literature and the general approach that I
5       would take, and so that was my starting
6       point for this report.
7   Q. So would it be fair to say that you had laid
8       out sort of a general methodology in your
9       2005 declaration, and that the 2008
10      declaration is a specific implementation of
11      that general methodology?
12  A. That's correct.
13  Q. Let's look at the third document in this
14      list, and that's your MDL declaration, the
15      one that you had attached your 2005
16      declaration in this case, correct?
17  A. Yes.
18  Q. In what way did you rely upon your MDL
19      declaration for purposes of your 2008
20      declaration in this case?
21  A. Again, the declaration contains information
22      about specific facts of the matter and the
23      allegations and citations to various
24      discovery materials, as well as the review
25      of the relevant literature, which provides

16

1   the basis for the implementation of the
2       analysis. So the same as the statement that
3       I just made, that this is the starting point
4       for doing the analysis in practice.
5   Q. Your MDL declaration lays out a methodology
6       that represents the starting point for the
7       model that you've implemented specifically
8       in your 2008 declaration?
9   A. That's correct.
10  Q. Let's look at the fourth document in this
11      list here in Attachment B, that's the
12      deposition of John Marino, correct?
13  A. Correct.
14  Q. And that's in the MDL matter?
15  A. Um-hum. Yes.
16  Q. How did you choose the John Marino MDL
17      deposition to rely upon for purposes of your
18      2008 declaration?
19  A. I'd have to go and look at specifically
20      what's cited. My recollection is that that
21      deposition contains some specifics about the
22      strategies with regard to Neurontin. So if
23      you'd like me to take a look I can tell you
24      specifically, but I believe that deposition
25      was found by -- at the instruction of my

17

1      staff.  I said, I need to look in the
2      discovery materials for this type of
3      information and they sought it out and found
4      it through looking through those
5      depositions.
6    Q. You didn't personally specifically request
7      to see -- in the first instance, you weren't
8      requesting to see the John Marino
9      deposition; you gave a more general
10     instruction?
11   A. No, that's correct, a more general
12     instruction.
13   Q. Do you have a sense of the approximate
14     number of depositions that there have been
15     in the Neurontin MDL matter?
16   A. I do not, no.
17   Q. Have you read any of them besides the John
18     Marino deposition?
19   A. I don't believe any of them are referenced
20     here and so I don't think that -- I'm trying
21     to think back to 2005 whether -- I believe
22     that some of the depositions from the
23     Franklin matter are cited in there, but I
24     have not read through individual depositions
25     myself, no.

18

1    Q. Have you read the John Marino deposition?
2    A. I looked at the specific areas of the text
3      that I cited, yes.
4    Q. Other than those specific areas of text in
5      the John Marino deposition, you haven't read
6      other depositions in the MDL matter?
7    A. No, I have not.
8    Q. Have you read any of the depositions in the
9      Clark case?
10   A. No, I have not.
11   Q. Have you read any depositions of any
12     Pennsylvania doctors?
13   A. No, I have not.
14   Q. Have you read any depositions of any
15     Pennsylvania sales representatives?
16   A. No, I have not.
17   Q. Let's look, again, at Attachment B, and
18     let's move to the next category, which is
19     entitled, Bates documents.  These are
20     documents produced by defendants during
21     discovery, I take it?
22   A. That's correct.
23   Q. And you list seven documents under this
24     category?
25   A. Yes, that's correct.

19

1    Q. You didn't rely on any other documents
2      produced by defendants for purposes of your
3      2008 declaration, correct?
4    A. I did not rely on other documents, no.
5      Excuse me.  Just one clarification.  Under
6      the next category, The Electronic Files, the
7      Neurontin U.S. Market Updates, they also
8      came from defendants.  They were a set of
9      reports that were produced for Pfizer-Parke
10     Davis.
11   Q. Understood.  Okay.  But other than the
12     Neurontin U.S. market updates produced by
13     defendants and the seven Bates documents
14     listed here under the heading, Bates
15     documents, there are no other documents
16     produced by defendants that you relied upon
17     for purposes of your 2008 declaration?
18   A. That's correct.
19   Q. Have you communicated in any way with either
20     of the named plaintiffs in this case?
21   A. No, I have not.
22   Q. Have you communicated at all with their
23     doctors?
24   A. No, I have not.
25   Q. In the context of your work on this case or

20

1      in the related MDL matter, have you
2      communicated with any doctors at all who've
3      ever prescribed Neurontin?
4    A. No, I have not.
5    Q. In the context of your work on this case, or
6      the related MDL case, have you communicated
7      with any third party payor that reimburses
8      prescriptions in Pennsylvania?
9    A. In the context of the MDL matter, we have
10     had some conversations with opt-out
11     third-party payors.  I'm not sure if that's
12     relevant.  Those would include third-party
13     payors that reimburse for Neurontin in
14     Pennsylvania.
15   Q. You had those conversations within the
16     context of the work that you are doing in
17     the MDL matter?
18   A. That's correct.
19   Q. Did you personally participate in those
20     communications?
21   A. They were conference calls, yes.
22   Q. Can we -- let's take those one at a time, or
23     how many in -- approximately have there been
24     of these conference calls?
25       MR. WESTON:  Wait.  I'm going to

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

21

1    object at this point as not relevant to this
2    case, unless you can tell me why it is.
3           MR. MISHKIN:  Are you going to
4    instruct her not to answer the question?
5           MR. WESTON:  I'd like a response
6    first.
7           MR. MISHKIN:  Well, I'm going to
8    continue.  She did reference that some of
9    these may reimburse prescriptions in
10   Pennsylvania.
11          MR. WESTON:  Right.  But she hasn't
12   said that she relied on those in making her
13   declaration.
14          MR. MISHKIN:  Well, let's see how
15   this goes.  I'm going to continue with my
16   questions, and if you want to instruct her
17   not to answer; obviously, something you can
18   choose to do.
19   Q.  Let's talk about the -- approximately how
20   many of these communications were there?
21   A.  There were two conversation calls.
22   Q.  Let's take the first one.
23          When did that occur?
24   A.  I'm afraid --
25          MR. WESTON:  Without more, I'm

22

1    going to instruct you not to answer that,
2    unless there's some foundation for this
3    being relevant to the Pennsylvania case, you
4    are doing discovery on the MDL.
5    Q.  Did any of the third-party payors with which
6    you communicated, do any of them reimburse
7    prescriptions in Pennsylvania to your
8    knowledge?
9    A.  I guess I've been instructed not to answer.
10   Q.  Well, I think this is a different question.
11          MR. WESTON:  This is a different
12   question.
13   Q.  If you get a separate instruction, we'll
14   deal with that.
15          Do you have the question in mind?
16   A.  I believe that at least one of them does,
17   that they're national insurers.  One of them
18   is Kaiser, and I don't believe that they
19   operate in Pennsylvania.  But I believe -- I
20   believe the others may.
21   Q.  Which are the others that you are referring
22   to that may?
23   A.  Well, I know the Guardian is one of them.
24   And I believe Aetna may be another.
25   Q.  And were there representatives from both

23

1    Guardian and Aetna on the conference call
2    that you participated in?
3    A.  That's correct.  Or counsel for, actually.
4    They were counsel for the third-party
5    payors, not the third-party payor reps
6    themselves.
7    Q.  And I don't know if you already told me
8    this, but when did that conversation take
9    place?
10          MR. WESTON:  We're done with this.
11   Don't answer that.
12          THE WITNESS:  Okay.
13          MR. WESTON:  You are not telling me
14   what this has to do with Pennsylvania.
15   There aren't any claims of any third-party
16   payors in this case.
17          MR. MISHKIN:  I understand your
18   objection.
19   Q.  Professor Rosenthal, did you rely in any way
20   upon these conversations for purposes of
21   your 2008 declaration in this case?
22   A.  No, I did not.
23   Q.  You are aware, I take it, that defendants
24   have requested all backup materials for your
25   2008 declaration; is that right?

24

1    A.  That's right.
2    Q.  To your knowledge, have all such materials
3    been produced?
4    A.  To my knowledge, they have, yes.
5    Q.  Final question here:  To your knowledge,
6    have you ever communicated with any class
7    members in this case, in the Clark case?
8    A.  Not to my knowledge, no.
9    Q.  Let's turn, now, to the work that you've
10   done in Clark since you submitted your 2005
11   class certification declaration, sort of
12   moving chronologically up to the present.
13          I think we saw earlier that you signed
14   your first Clark declaration in August 2005;
15   is that correct?
16   A.  That's correct.
17   Q.  Did you do any work in the Clark case
18   subsequent to submitting your 2005
19   declaration but before you started working
20   on your 2008 declaration in this case?
21   A.  I confess, I should check, but I believe
22   that there -- I've been deposed twice in the
23   MDL.  I confess I get a little confused
24   between the two cases.
25   Q.  I see.

25

1  A.  There was a response to Argon-Bright
2      [phonetic] report, but I believe that was
3      only for the MDL.  There was a clinical
4      expert, and so -- so in the Clark matter, I
5      believe that, subsequent to the August 2005
6      report, nothing was filed by me before this
7      report, the 2008 report.
8  Q.  When did you begin working on your 2008
9      declaration in this case?
10 A.  I believe the work would have begun in the
11     latter part of 2007.  I'd have to look at
12     the billing records to say specifically, but
13     I would -- it would be my judgment that we
14     started in November/December 2007.
15 Q.  What were the circumstances of your
16     starting; do you remember the first contact?
17     Who told you to start, in other words?
18 A.  Well, my recollection is that there -- the
19     date that this report was going to be due
20     moved at some point in time, so we may have
21     started and stopped and started again.  But
22     I think we would have been in communication
23     with Mr. Weston about the date the report
24     was due and we -- that would have initiated
25     data collection, the beginning of setting up

26

1      the analyses.
2  Q.  Would Mr. Weston have been the person who
3      told you to start working on your 2008
4      declaration?
5  A.  Well, not per se.  I guess he would have
6      told us when the deadline was and we would
7      have worked backwards and decided, given
8      other cases, other matters and how much time
9      we thought we needed to work on this matter,
10     we would have started at an appropriate
11     date.
12 Q.  What were you told to do?
13 A.  Well, in essence, to implement the proposed
14     analysis, and, in particular, my 2008 report
15     was to look at impact and quantify the
16     number of units that were affected by the
17     alleged off-label promotion.
18 Q.  Who worked with you on the 2008 report?
19 A.  I worked with the staff at Greylock McKinnon
20     Associates as well as in consultation with
21     Dr. Hartman.
22 Q.  Could you list for me, as best as you can,
23     the staff members at Greylock McKinnon
24     Associates who assisted with your 2008
25     declaration?

27

1  A.  As best I can, I would say Forrest McClure,
2      who's a Ph.D. economist there, did much of
3      the implementation work around the analysis.
4      Mike Augusteijn also played a role
5      particularly in gathering the data, and I
6      believe Josh Peteet probably also worked on
7      it.
8  Q.  And any others you can think of?
9  A.  Renee Rushnawitz helped with some of the --
10     sort of put bringing together all the
11     information of the report, not the
12     analytical aspects of it, but tracking down
13     sites, that sort of thing.
14 Q.  Okay.  Anybody else?
15 A.  I think that would be everyone; certainly
16     everyone with any substantial role.
17 Q.  The group that you've just mentioned, how
18     does that group compare to the group that
19     assisted you on the 2005 declaration?
20 A.  It's probably somewhat similar, although the
21     2005 declaration, because it doesn't involve
22     analysis, would have much less staff time on
23     it and much less, in particular, Forrest
24     McClure.  To be honest, I can't remember if
25     he was actually employed by Greylock

28

1      McKinnon as of 2005.  He would have come to
2      the company around that time.
3  Q.  Can you give me some more detail as to what
4      Forrest McClure did to help with your 2008
5      declaration?
6  A.  He ran the analyses in E-Views; sort of how
7      it sounds.
8  Q.  Were you in communication with Forrest
9      McClure throughout the period that you were
10     working on your 2008 declaration?
11 A.  Absolutely.
12 Q.  What did you discuss with him in general
13     terms?
14 A.  We discussed every aspect of the analysis,
15     which variables to use, how to specify them.
16     You know, we were constantly looking at data
17     and analyses together and discussing all
18     aspects of it.
19 Q.  Would you get feedback from Forrest McClure
20     as to the analysis that was going on, or was
21     he simply implementing instructions that you
22     were giving to him?
23 A.  Well, as I mentioned, he has a Ph.D. in
24     economics as well, so he was largely
25     implementing the analyses at my direction,

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

29

1    but not passively.  We certainly discussed
2    the issues together.
3    Q.  Okay.  We may come back to that more later.
4        You mentioned Dr. Hartman.  In what
5    ways did you work with Dr. Hartman on your
6    2008 declaration?
7    A.  Again, I consulted with him on the analysis.
8    As you know, he is a well-known
9    econometrician.  He has a lot of experience
10   working with time series data, in
11   particular, and so we discussed all of the
12   analyses.
13   Q.  Are there any other areas which he gave you
14   more feedback than in other areas?
15   A.  I'm not sure if I could say specifically,
16   but he was certainly involved in most
17   aspects of the process of developing these
18   analyses.
19   Q.  Any particular topic that comes to mind as
20   one that you spent a particular amount of
21   time on with Dr. Hartman as compared to
22   other topics?
23   A.  Again, I think his expertise in time series
24   analysis was an area that he contributed in
25   particular.

30

1    Q.  Did you have any discussions with Dr. Conte
2    [phonetic] in the context of your 2008
3    declaration in this case?
4    A.  I don't -- I don't believe anything related
5    to this, no.
6    Q.  Did you have discussions with anyone that we
7    haven't yet talked about regarding your work
8    on your 2008 declaration?
9    A.  I don't believe so, no.
10   Q.  I assume you had communications with counsel
11   regarding the 2008 declaration?
12   A.  Certainly.
13   Q.  Did you write the report yourself?
14   A.  I did, yes.
15   Q.  What kind of input did others provide in
16   terms of the drafting of the report?
17   A.  The drafting of the report was primarily
18   done by me.  Renee Rushnawitz, as I noted
19   earlier, helped with, for example, finding
20   appropriate citations, finding appropriate
21   references to discovery materials, but the
22   drafting is largely my own.
23   Q.  When did the drafting start, as best as you
24   recall?
25   A.  Well, I would have to look at my time logs

31

1    to be sure, but I believe, again, the
2    drafting starting at an early point, and
3    then we focused on the analysis for a while;
4    and then I came back to it, to finish the
5    writing very close to the last week, I would
6    say, before the declaration was submitted.
7    Q.  Did you generate drafts of your declaration
8    as you were working on it?
9    A.  As I started the writing before, then went
10   back to that draft and augmented it.  We
11   don't routinely save drafts for the purpose
12   of being worried about confusion of what is
13   the operative draft.  So -- so the draft
14   that you see is the only draft that I had at
15   the time of the submission, but I did start
16   it at some point before that.
17   Q.  Did you circulate interim drafts to anybody
18   on your staff or anybody else for comment?
19   A.  I think, again, primarily that would be to
20   Renee where I might have sent her a copy and
21   said, I have these open footnotes, can you
22   help me find the right documents for them.
23   Q.  Would you have distributed a draft to
24   Dr. Hartman?
25   A.  To be honest, I can't remember.  I recall

32

1    largely consulting with him on the
2    econometric analysis.  I don't believe that
3    he saw early drafts of my report in any
4    form.
5    Q.  Would he have ever provided a markup for you
6    of your draft, for example?
7    A.  He may have looked at the final draft and
8    made comments.  That's not uncommon,
9    particularly, because our reports are being
10   filed together.  I don't recall, in this
11   case, whether he did that.  But, again, I
12   could check my logs to be sure.  It's not
13   impossible that he would have made some
14   suggestions.  I don't recall it in this
15   case.
16   Q.  Do you recall what any of those particular
17   suggestions would have been?
18   A.  Generally, Dr. Hartman, when he's looked at
19   my drafts before, he doesn't make
20   substantial comments.  He has a tendency to
21   believe that one should be more complete and
22   I tend to be briefer, as you may know, from
23   knowing us both.  But -- so, occasionally,
24   he suggests explication of sections; that's
25   largely the nature of his comments.

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

33

1    Q. Do you recall, in this case, any areas of
2       your report where he suggested to you that
3       you provide a fuller explanation?
4    A. I don't.  In this case, I -- in thinking
5       back, I don't recall getting a markup copy
6       from him.  It is routine for us to share
7       each either's drafts with one another.  So
8       it may have happened, but I don't recall
9       anything in this report that he suggested
10      adding.
11   Q. Let's talk about the model that you've
12      implemented in this case, and if you want to
13      get Exhibit 1 in front of you, I'm going to
14      start with some general questions --
15   A. Okay.
16   Q. -- and we'll get into this more
17      specifically.
18   A. That's fine.
19   Q. As a general matter, as I understand it,
20      your model seeks to estimate the number of
21      Neurontin and Gabapentin prescriptions
22      filled by class members that were caused by
23      defendants' alleged improper promotion; is
24      that correct?
25   A. That's correct.

34

1    Q. And you are including in that estimate
2       prescriptions written for dosages in excess
3       of 1800 milligrams per day regardless of
4       indication; is that correct?
5    A. That's correct.
6    Q. You call those high-dose prescriptions, the
7       prescriptions in excess of 1800 milligrams
8       per day?
9    A. I did.
10   Q. And you're not looking at any issues of
11      efficacy in developing your estimates of
12      off-label prescriptions caused by alleged
13      improper promotion, correct?
14   A. That's correct.
15   Q. Your model doesn't consider whether a
16      particular prescription might or might not
17      have been efficacious, for example?
18   A. I'm not sure how one would know that, but it
19      does not consider that, no.
20   Q. So in other words, you don't attempt to
21      carve out from your estimates prescriptions
22      of Neurontin and Gabapentin that might have
23      effectively treated the conditions for which
24      they were prescribed?
25   A. As you know, the allegations suggest that

35

1       there is no such evidence for these
2       indications, and I know -- I have not seen
3       such evidence, but I was asked to assume
4       that the allegations are true in my
5       analysis, and I do so, and I have not seen
6       contradictory evidence to that.
7    Q. You've been told to assume that all of the
8       prescriptions were ineffective; is that
9       correct?
10   A. I've been asked to assume, again, as the
11      complaint suggests, that there is no
12      scientific evidence to support the
13      effectiveness of Neurontin for the treatment
14      of these off-label uses.
15   Q. To the extent that some of the prescriptions
16      were effective, your model doesn't seek to
17      carve those out of your estimates, correct?
18   A. I do not address that issue, no.
19   Q. Let me ask you a couple of questions about
20      terminology.
21         You refer to the number of off-label
22      prescriptions that you estimate would have
23      been filled by class members in the absence
24      of any alleged improper promotion as the,
25      quote, but-for number of prescriptions; is

36

1       that correct?
2    A. That's correct.
3    Q. And then also as a matter of terminology, I
4       understand you present two scenarios in your
5       report.  There's scenario one and scenario
6       two, under which you make different
7       assumptions about the levels of alleged
8       improper promotion; is that correct?
9    A. In essence, yes, that's correct.
10   Q. And scenario two, I think you've referred
11      throughout your report to -- you refer to
12      that as the more conservative scenario; is
13      that correct?
14   A. That's correct.
15   Q. Okay.  Well, we'll return to those scenarios
16      in a little bit.
17         Question about the time period:  What
18      is the time period that you use for purposes
19      of your estimate?
20   A. The time period that I look at is from
21      launch, and if you will allow me just to
22      check the final month of data.
23   Q. Of course.
24   A. It's from launch through the end of 2007.
25   Q. By "launch," do you mean --

37

1   A.  Sorry.  January of 1994, the beginning of
2       Neurontin.
3   Q.  Right.  Now, the class period, though,
4       actually starts in 1995; is that correct?
5   A.  I believe that the damages actually begin --
6       the analysis, because we look at the entire
7       life cycle of Neurontin, begins in
8       January 1994.  But you're right, in the
9       classes definition, the class period begins
10      in 1995.
11  Q.  Okay.  I know this is an issue that came up
12      before --
13          MR. MISHKIN:  And John, if you want
14      to jump in, that's fine.
15  Q.  But were you given instructions to calculate
16      damages beginning -- I'm sorry.  Were you
17      given instructions to calculate the number
18      of prescriptions -- let me rephrase it.
19          Were you instructed to include in your
20      calculations prescriptions that would have
21      been written prior to the start of the class
22      period?
23  A.  My instructions were to look at the units
24      that were caused by the alleged wrongdoing,
25      so I looked at the full period.  I wasn't

38

1       calculating damages, per se.  I was
2       calculating the impact that was associated
3       with the specific promotional streams that
4       I'm sure we'll talk about.  And so I looked
5       at over the entire period, so...
6   Q.  Do you have an understanding, though, as to
7       whether the prescriptions from 1994, prior
8       to the start of the class period, are
9       subject to liability in some way in this
10      case?
11  A.  I believe, by the current class definition,
12      that only after 1995.
13  Q.  Okay.
14  A.  That's certainly how I read it looking at
15      the current class definition.
16  Q.  So the prescriptions that you've calculated
17      from 1994, though, shouldn't be included in
18      the damages calculation, as far as you
19      understand?
20  A.  That's certainly the way the class
21      definition reads now.
22  Q.  All right.  Let's look at page 17, and
23      paragraph 45, in particular.  Let me know
24      when you're with me there.
25  A.  45, yes.

39

1   Q.  The first sentence reads, "The analysis
2       suggests the majority, at least 93 percent,
3       as shown in my more conservative alternative
4       but-for calculations, scenario two, of
5       off-label prescriptions filled by the class
6       were caused by defendants allegedly illegal
7       marketing."
8           Did I read that right?
9   A.  Yes, you did.
10  Q.  In other words, if I understand this, your
11      model suggests that at least 93 percent of
12      off-label prescriptions filled by class
13      members would not have occurred in the
14      absence of the promotion that's alleged to
15      be illegal?
16  A.  That's correct.
17  Q.  You say, quote, at least in this sentence;
18      is that correct?
19  A.  Yes, that's right.  Yes.
20  Q.  And is that because the 93 percent is
21      derived from what you call your more
22      conservative, scenario two?
23  A.  That's correct.
24  Q.  I don't see it in your report, but do you
25      know what the percentage would be, under

40

1       your scenario, the percentage that would be
2       analogous to the 93 percent that you include
3       here?
4   A.  I guess it wasn't calculated in the report.
5       I don't.  I could calculate it from the
6       numbers that are in the report, but I don't
7       know offhand what the percentage is.
8   Q.  Presumably --
9   A.  I don't recall.
10  Q.  -- it would be something higher than
11      93 percent, I take it?
12  A.  That's correct.
13  Q.  Can you ballpark it in any way for me how
14      much higher than 93 percent that would be?
15  A.  If you give me a chance to look, I can.
16  Q.  Sure.
17          MR. WESTON:  Do you want to go off
18      while she's looking?
19          MR. MISHKIN:  Up to you.  Why don't
20      you take another minute.  If you need more
21      time, we'll go off.
22          (Pause.)
23  A.  Sorry.  I'm just looking for the relevant
24      numbers.
25  Q.  Professor Rosenthal, what might be easier

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

41

1     for now, can you tell me how one would go
2     calculating it from the numbers that you put
3     forward here in the attachments?
4     A.  Absolutely.  Sorry.
5     Q.  Okay.
6     A.  I'm just looking for where the -- the
7     scenario one and scenario two numbers are
8     totaled, and I don't see it in the report.
9     But, in essence, you know, in scenario
10    two, I add back a share of the prescriptions
11    that were caused by promotion to
12    neurologists after April 1995; that's equal
13    to the on-label share.
14         And so the difference would simply be
15    that number, which my recollection is that
16    it's a relatively small percentage, as you
17    know; the on-label share of Neurontin is
18    quite low.  Over the time period, it's only
19    about ten percent of prescriptions, so --
20    so, in effect, would only change that
21    increment by ten percent.
22         So I believe it would be two or three
23    percentage points.
24    Q.  Above the 93 in scenario one?
25    A.  Above the 93, yes.

42

1     Q.  Let's go back to the sentence at the
2     beginning of paragraph 45.
3          You write that the analysis suggests
4     that 93 percent or more of the off-label
5     prescriptions were caused by alleged
6     improper promotion.
7          What do you mean by the term
8     "suggests" in this sentence?
9     A.  Well, as an academic economist, I confess
10    that I use words that are a little less
11    determinant than one might use in the legal
12    situation, but within a reasonable degree of
13    scientific certainty, I interpret my model
14    results as telling us that the majority of
15    prescriptions of off-label prescriptions
16    were caused by the promotions that we've
17    identified as being associated with the
18    allegations.
19    Q.  How does your level of confidence compare
20    between the 93 percent conclusion here and
21    the higher percent conclusion that you have
22    under scenario one?
23    A.  I don't think it's a question of the level
24    of confidence.  It's a question of
25    interpreting what -- how best to translate

43

1     the allegations in the empirical data.
2          So the two scenarios, I think they
3     differ in that the second one allows for
4     promotion that had an effect on on-label
5     uses; it allows those legitimate uses back
6     in.
7          Now, one could perhaps make a legal
8     argument that if the promotion is tainted,
9     even if there are benefits for on-label
10    uses, that those should be counted in
11    damages.  So my view of the two sets of
12    estimates were these were different ways of
13    capturing the allegations.  It's not so much
14    of a level of confidence in what happened.
15    Q.  Question about your scenario two:  You just
16    testified, I think, that the difference
17    between scenario one and scenario two is
18    that you allow back in under scenario two
19    some amount of on-label prescriptions; is
20    that your understanding?
21    A.  That may have been caused by that promotion
22    from post-1995 to neurologists, that's
23    correct.  I add back a share to say, Let's
24    assume that this total promotion, the amount
25    that -- I look at the share of prescriptions

44

1     during that period by neurologists and I see
2     that there's an on-label share.  And to be
3     conservative about assessing the but-for
4     promotional scenario, I allow that those
5     prescriptions may have been caused by the
6     promotion that occurred during that period.
7     Whether or not that was a spillover, a
8     positive spillover effect, of the allegedly
9     illegal actions, it's unclear to me what is
10    the appropriate legal treatment of that.
11         So, again, by separating those out,
12    I'm being conservative about saying what's
13    the effect of the allegedly illegal
14    off-label promotion.
15    Q.  Okay.  Let me -- just to make sure I
16    understand.
17         Embedded in that, are you assuming
18    that on-label promotion would tend to cause
19    only on-label prescriptions?
20    A.  No.  I think, in essence, what I'm saying in
21    the second scenario is that it's possible
22    that off-label promotion may cause on-label
23    uses.  And so that's -- in that scenario, I
24    allow for the possibility that off-label
25    promotion raises awareness, for example,

45

1    about Neurontin and causes some of these
2    on-label uses.
3    Q.  Do you allow for the possibilities under
4        your scenario two that on-label promotion
5        could lead to off-label prescriptions?
6    A.  That is certainly possible in the model.
7    Q.  As I understand your scenario two, though,
8        you've kept that at the share of approved
9        uses; is that correct?
10   A.  I've quantified that as a constant share.
11       So that's the assumption, essentially, that
12       the productivity of marketing is similar for
13       on- and off-label uses.  I believe perhaps
14       that's what you meant.
15   Q.  I'm not -- I'm still not sure I'm clear.
16           Does your scenario two allow for the
17       possibility that on-label promotion could
18       cause a larger share of off-label
19       prescriptions than what -- than how you've
20       defined your scenario two?
21   A.  I think -- I don't mean to be vague.  In
22       essence, by taking the share of uses that
23       are on-label and taking them out, I've made
24       one assumption there, which is that for a
25       set of promotional dollars that they're

46

1        equally effective on on- and off-label use,
2        and, therefore, when we observe that ten
3        percent of uses are on-label by assumption
4        then, we're saying that in essence, ten
5        percent of those promotional expenditures
6        were for on-label use.  So they have
7        equivalent productivity.  But there could be
8        spillover effects in both directions.
9        That's certainly possible.
10   Q.  Okay.  It may be easier to come back to this
11       after we've laid a little more groundwork,
12       and we'll do that.  Let me ask you about
13       some more terminological basic points here.
14           Am I correct that a regression will
15       typically include two categories of
16       variables, explanatory or independent
17       variables on the one hand, and so-called
18       dependent or explained variable on the other
19       hand?
20   A.  That's correct.
21   Q.  Could you give me just a basic layperson's
22       definition of what an explanatory variable
23       is?
24   A.  So those explanatory variables as -- by the
25       way that you've called them, suggest they

47

1        are there to explain variation in that
2        dependent variable; so to what extent do
3        changes in promotion explain changes in the
4        use of Neurontin, as an example.  And so --
5        so those variables that we include as
6        explanatory variables are the ones that we
7        think are the most important economic
8        determinants of whatever that left-hand side
9        variable is, the dependent variable.
10   Q.  And by "economic determinants," you mean the
11       factors that are likely to cause or have an
12       impact on the dependent variable?
13   A.  The factors that economic theory suggest
14       would have an impact, yes.
15   Q.  Okay.  Your declaration presents two
16       regression models, as I understand it.
17       There's one for total Neurontin and
18       Gabapentin prescriptions and there's another
19       one for high-dose prescriptions, or share of
20       high-dose prescriptions; is that correct?
21   A.  That's correct.
22   Q.  In the first model, that I just mentioned,
23       your dependent variable would be the total
24       monthly Neurontin and Gabapentin
25       prescriptions; is that right?

48

1    A.  That's correct.
2    Q.  And then in the second model, your dependent
3        variable would be the share or the
4        proportion of Neurontin and Gabapentin
5        prescriptions that are high dose each month;
6        is that correct?
7    A.  That's correct.
8    Q.  Let's turn now to the explanatory variables.
9           You use the same set of explanatory
10       variables for both models; is that correct?
11   A.  That's correct.
12   Q.  Let's look at page 12 of your report,
13       paragraph 30 and the second to last
14       sentence, you write that, "The key
15       explanatory variable in both models is the
16       level of Parke Davis' spending on promotion
17       of Neurontin."
18           Did I read that right?
19   A.  That's correct.
20   Q.  What do you mean when you say that this
21       promotional spending is the key explanatory
22       variable in your regression model?
23   A.  In economic terms, when we look at the
24       pharmaceutical market, we think that the
25       most important determinant of the sales of

49

1  the drug will be the manufacturer's
2  promotion.  Because brand name drugs are
3  essentially monopolies, they are largely
4  subject to what economists call "non-price
5  competition."  And in this context, that
6  non-price competition is essentially
7  determined by their promotional efforts.
8  Q.  When you say that it's the most important
9  determinant, are there any particular
10  articles that you were referring to or other
11  sources that you have in mind for that
12  proposition?
13  A.  All the economic literature on the
14  pharmaceutical industry would point to that
15  issue that I just noted, that brand name
16  drugs compete largely based on non-price
17  competition.  So many of the citations that
18  I include in my 2005 report would support
19  that; papers by Professor Berndt and others.
20  Q.  I'm asking you, though, specifically.  I
21  think what you said was that these sources
22  say that advertising is the most important
23  determinant.
24      Specifically for that proposition, can
25  you point me to a source for that?

50

1  A.  Again, I would go back to citations such as
2  Professor Berndt's articles on prices and
3  quantities in prescription drugs.  They may
4  not have the words that say, "advertising is
5  the most important determinant," but to an
6  economist, what they say is:  That
7  competition based on marketing the features
8  of a prescription drug is that's the way
9  these drugs compete.
10  Q.  Apart from the way they compete, though, are
11  you -- do you understand Berndt to be saying
12  that advertising, as compared to other
13  factors that impact prescribing a drug, that
14  advertising is more important than all of
15  those other factors?
16  A.  Well, I guess I think you need to be
17  careful, or we need to be careful, in being
18  clear on whether we're talking about looking
19  at changes over time and prescribing
20  patterns or looking cross-sectionally.
21      So I believe that you are suggesting
22  that other drug features, let's say, side
23  effects, for example, are going to be
24  important determinants of sales.  This is
25  true, but when we're looking at sales over

51

1  time, as I am in this regression, we want to
2  think about factors that vary over time, and
3  promotion is the one that is most important.
4  Q.  And that's what you understood Berndt to be
5  saying in his antiulcer articles?
6  A.  Not so much the antiulcer articles.  I could
7  be clearer and point to it.  He has some
8  general articles about the pharmaceutical
9  industry.  One that I reviewed is called,
10  "Prices and Quantities in the Pharmaceutical
11  Market," is one that appears in the Journal
12  of Economic Perspectives and one around the
13  same time that appears in the Journal of
14  Health Affairs; and they are both intended
15  to describe what is happening in the
16  prescription drug market in the U.S. from an
17  economic and policy perspective.
18  Q.  Any other Berndt articles that you would
19  point to other than the ones that you've
20  just identified?
21  A.  Those would be the most salient.
22  Q.  Okay.  Are there other articles besides
23  those written by Berndt that would support
24  this notion that you've been describing?
25  A.  I think that I site in my 2005 report a

52

1  paper or chapter by Scherer on the
2  pharmaceutical industry -- yes, in the
3  Handbook on Health Economics -- that would
4  also discuss this issue of non-price
5  competition.
6  Q.  Okay.  But, again, I'm asking specifically
7  about this notion that advertising is more
8  important than any other -- any other
9  determinant of prescribing.  I'm asking for
10  examples of sources that would support that
11  particular proposition.
12  A.  Those sources would support that
13  proposition.  Again, to an economist,
14  non-price competition, we're talking about
15  marketing.  When we talk about things over
16  time, certainly at drug launch, a product's
17  characteristics and indications are also
18  elements of non-price competition.  But over
19  time, it's promotional spending that
20  economists mean when they say non-price
21  competition.
22  Q.  Let's look back at this sentence that we've
23  been looking at here.
24      You refer to Parke Davis' spending on
25  promotion of Neurontin.  You are referring

53

1    here specifically to defendants'
2    expenditures on detailing and journal
3    advertising for Neurontin; is that correct?
4    A.  That's correct.
5    Q.  Now, journal advertising, that makes up only
6    a small portion of those expenditures; is
7    that correct?
8    A.  That's correct.
9    Q.  And your understanding is that journal
10   advertising is not subject to the
11   allegations in this case?
12   A.  That's my understanding, yes.
13   Q.  So when you refer to promotional
14   expenditures, you are concerned primarily
15   with detailing expenditures?
16   A.  That's correct.
17   Q.  Let's talk about the explanatory variables
18   in your model, other than detailing and
19   journal ad expenditures.  I think that the
20   easiest way to do that is turn to Appendix E
21   of your report; so if you could turn to that
22   for me.
23   A.  (Witness complies.)
24   Q.  If you could look at paragraph four in
25   particular.

54

1    A.  (Witness reviewing document.)
2    Q.  Let me know when you're with me there.
3    A.  I am.
4    Q.  Does this paragraph provide a complete list
5    of the explanatory variables that you used
6    in your regression models?
7    A.  I believe it does, yes.
8    Q.  Now, I see in this paragraph that you refer
9    a couple of times to the "natural log" of
10   certain of these variables.  For the sake of
11   just keeping things a little bit less
12   technical, as I talk about these, I may not
13   every time refer to the "natural log."  But
14   can we understand that if I refer to one of
15   the sort of underlying variables, that I am
16   meaning to refer to the explanatory
17   variables that you include in paragraph
18   four?
19   A.  Absolutely.
20   Q.  Great.  So you list promotion, we've already
21   talked about.  Let's focus on your
22   explanatory variables, other than promotion,
23   and let me just take those one at a time.
24        The first is a price index reflecting
25   the price of Gabapentin after generic entry;

55

1    is that correct?
2    A.  That's correct.
3    Q.  And the second is a dummy variable for PHN
4    approval; is that correct?
5    A.  That's correct.
6    Q.  The third is a dummy variable for pediatric
7    approval; is that correct?
8    A.  Correct.
9    Q.  And the fourth is a dummy variable for
10   generic entry; is that correct?
11   A.  Correct.
12   Q.  Are there any other explanatory variables,
13   other than promotional expenditures, that I
14   have not included in that list that you
15   included in your model?
16   A.  No.
17   Q.  So maybe just because I garbled that
18   question slightly, let me ask it again.
19        Do you include any other explanatory
20   variables in your model, other than
21   promotional expenditures and the four that
22   we've just talked about?
23   A.  No.
24   Q.  To be clear on terminology, a dummy
25   variable, is that a variable that takes on a

56

1    value of zero or one?
2    A.  That's correct.
3    Q.  Now, the four explanatory variables that you
4    include besides promotional expenditures,
5    they take on zero value -- the value of zero
6    for the first several years of the class
7    period; is that correct?
8    A.  That's correct.
9    Q.  So looking at these, I think it's the dummy
10   variable for the pediatric indication,
11   that's the first one to change from zero to
12   one; is that correct?
13   A.  I believe that's right, yes.
14   Q.  And that occurs in October 2000; is that
15   right?
16   A.  That's right.
17   Q.  Prior to October 2000, all of the
18   explanatory variables, other than
19   promotional expenditures, are set to zero;
20   is that right?
21   A.  That's right.
22   Q.  And so the only explanatory variables
23   included in the regression that takes on
24   non-zero values from the start of the class
25   period up through October 2000 is

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

57

1    promotional expenditures; is that correct?
2    A.  That's correct.
3    Q.  Now, the dependent variable in your first
4       equation, which would be total Neurontin
5       prescriptions, total Neurontin and
6       Gabapentin prescriptions, that was, of
7       course, changing, wasn't it, during the 1995
8       through October time period?
9    A.  Yes, it was.
10   Q.  The only explanatory variable that you've
11      included in your model that could
12      potentially be explaining that variation in
13      the dependent variable during that time
14      period, 1995 through October 2000, that
15      would just be promotional expenditures; is
16      that correct?
17   A.  That's correct.
18   Q.  Now, in October 2000, when the pediatric
19      indications on the variable changes from
20      zero to one, the other non-promotional
21      explanatory variables are still equal to
22      zero at that point; is that correct?
23   A.  That's correct.
24   Q.  The next one, as I understand it, to change
25      from zero to one is the PHN indication

58

1       variable; is that right?
2    A.  That's correct.
3    Q.  And that happens in May 2002?
4    A.  Correct.
5    Q.  And then in November 2004, the generic entry
6       variable changes from zero to one for the
7       first time; is that right?
8    A.  That's correct.
9    Q.  And also in November 2004, that's when the
10      price index starts taking on non-zero values
11      for the first time; is that correct?
12   A.  That's correct.
13   Q.  Okay.  Let me try to walk through the steps
14      that you use to calculate the but-for
15      quantities of off-label Neurontin and
16      Gabapentin prescriptions as I understand
17      them.  And I'd like you to just let me know
18      if I have them right, and if I don't have
19      them right, you can correct me.
20   A.  Okay.
21   Q.  Professor Rosenthal, let's look again at
22      your dummy variables.
23   A.  Yes.
24   Q.  Can you explain for me why they change in
25      value on the particular dates that they do,

59

1       and maybe we'll take them one at a time.
2    A.  Okay.
3    Q.  So the first one -- let's do them in
4       chronological order.  So the pediatric
5       indication dummy variable, if you could just
6       explain, what's the significance of the date
7       and the change on that date?
8    A.  My understanding is that's the date that the
9       pediatric approval was obtained for
10      Neurontin, and the notion is that an
11      additional indication would expand the size
12      of the market.
13   Q.  So the purpose of the dummy variable is to
14      reflect the indication for pediatric
15      approval?
16   A.  That's correct.
17   Q.  And then the next one, the dummy variable
18      for PHN, can you just explain that one and
19      the associated date?
20   A.  Again, that dummy variable indicates the
21      receipt of approval for PHN for Neurontin
22      and potential market expansion.
23   Q.  Specifically, though, in terms of what's
24      being depicted by that dummy variable, it
25      intends to capture the approval of PHN in

60

1       May 2002; is that correct?
2    A.  It does intend to capture it, yes.
3    Q.  Okay.  And the dummy variable for generic
4       entry, that's in a precise and analogous
5       way, I take it?
6    A.  So in that case, as you know, once a generic
7       enters, there's a substantial change in the
8       market.  There's suddenly a competitor
9       that's within the same molecule.  And so
10      that dummy variable captures that shift in
11      the nature of competition.
12   Q.  It's intended to reflect generic entry as of
13      that date?
14   A.  That's correct.
15   Q.  All right.  Let's go back to the steps for
16      -- that I was starting to ask you about for
17      calculating the but-for quantities.
18   A.  Yes.
19   Q.  So I understand, basically, the first step
20      would be to run your regression models and
21      basically estimate the coefficients for the
22      explanatory variables, including the
23      coefficients for -- coefficient for
24      promotional expenditures; is that right?
25   A.  That's correct.

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

61

1 Q. And then after you've done that, the result
2 is essentially that you have a formula, sort
3 of, that allows you to plug in values for
4 the explanatory variables in a particular
5 month, and then the model would return a
6 predicted value of the number of
7 prescriptions for that month based on the
8 inputs; is that right?
9 A. That's correct.
10 Q. And then for each month, you have different
11 predictions of the number of prescriptions
12 depending on whether you've plugged in the
13 full amount of real world detailing
14 expenditures or whether you've plugged in
15 some reduced amounts to reflect the assumed
16 but-for amount of detailing; is that
17 correct?
18 A. That's correct.
19 Q. And then you would look at the differences
20 between the two predicted values. There
21 would be the one that would be based on full
22 detailing and one based on but-for
23 detailing, and that would provide you an
24 estimate of the number of prescriptions in
25 each month that were caused by the detailing

62

1 assumed to be illegal; is that correct?
2 A. That's correct.
3 Q. And then, I take it, you would add up those
4 differences across all of the months to
5 arrive at sort of an overall total number of
6 prescriptions that your model is telling you
7 were caused by the detailing that's assumed
8 to be illegal?
9 A. That's correct.
10 Q. Now, to calculate the percentage of
11 off-label prescriptions attributable to
12 alleged improper detailing, you need to
13 divide the total number of off-label
14 prescriptions estimated to be caused by
15 alleged improper detailing by the total
16 number of off-label prescriptions?
17 A. That's correct.
18 Q. I just want to be clear on where the
19 numerator and the denominator for that
20 division come from.
21 The numerator, would that be the
22 aggregate number of prescriptions that we
23 arrived at based on the methodology that we
24 already walked through?
25 A. That's correct.

63

1 Q. Now, do you limit that number in some way to
2 off-label prescriptions?
3 A. The number, as calculated, is associated
4 with off-label prescriptions.
5 Q. And how do you know that?
6 A. Based, again, on the translation of the
7 allegations in terms of what promotion is
8 identified as being associated with the
9 alleged illegal off-label promotion. So one
10 part of that is promotion to specialties
11 that do not prescribe for the approved
12 conditions of Neurontin, specialities like
13 psychiatry. So clearly, the effect there is
14 associated with off-label use.
15 And then, again, in scenario -- the
16 scenario one, we take all the prescriptions
17 caused by the allegedly illegal promotion,
18 and scenario two, make that adjustment to
19 suggest that -- that to account for the
20 possibility that the allegedly illegal
21 promotional activities had a positive effect
22 on on-label use. So it differs between the
23 two scenarios.
24 Q. Okay. Just so that I understand, the
25 aggregate number that you calculate using

64

1 the regression coefficients in the way we
2 talked about, you understand that to produce
3 for you a number of off-label prescriptions
4 caused by allegedly improper promotion?
5 A. That's correct.
6 Q. And that's your numerator for the division
7 that we're about to do?
8 A. Yes.
9 Q. Okay. And the denominator, how do you get
10 that?
11 A. The denominator comes from separate data
12 that we have that indicate the diagnoses
13 associated with prescriptions of Neurontin.
14 Q. Can you describe it in a little bit more
15 detail; how do you arrive at a total number
16 of off-label prescriptions?
17 A. Sure. So as you saw in some of the charts
18 that are presented in the report, there's an
19 IMS data product that is called the
20 NDTI, the National Disease and Therapeutic
21 Index, which contains quarterly estimates of
22 drug uses by diagnosis code.
23 Those diagnosis codes are then mapped
24 to the approved indications of Neurontin and
25 the residual are the other approved

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

65

1    indications for Neurontin.  And that allows
2    us to estimate on- and off-label uses over
3    time.
4    Q.  So do you get a percentage from NDTI, then
5    you multiply against the pharmacy-based
6    data?
7    A.  That's correct.
8    Q.  The procedure that we've just discussed, is
9    that the same procedure that you would use
10   to estimate the number of high-dose
11   prescriptions caused by improper detailing?
12   A.  I'm sorry.  The procedure going back to the
13   but-for scenarios?  Which procedure?
14   Q.  Yes.  The procedure that involved estimating
15   the regression model in calculating real
16   world and but-for estimates; is that, in
17   general terms, the same procedure you went
18   through to get your high-dose estimates?
19   A.  In general, the same procedure; as you know,
20   the but-for scenario is somewhat different.
21   Q.  How is it different?
22   A.  The but-for scenario for the high-dose
23   estimate is that all the effect of promotion
24   on dosing is subject to the allegations, so,
25   in essence, we estimate the model by

66

1    eliminating promotion.
2    Q.  Okay.  And just to understand the procedure
3    a little bit better, let me confirm your --
4    with the high dose, you're not estimating a
5    sort of raw number of high-dose
6    prescriptions; instead, you are calculating
7    a but-for percentage of high-dose
8    prescriptions; is that correct?
9    A.  That's correct.
10   Q.  And I'm going to make up some numbers, but
11   just for the purposes of illustrating this.
12       So if your analysis was telling you
13   that, in the real world, ten percent of the
14   prescriptions were high dose, but under your
15   but-for scenario only six percent, for
16   example, would have been high dose, do you
17   conclude, then, that the four percent is the
18   percentage attributable to the alleged
19   off-label promotion?
20   A.  Right.  And how you get to the six percent
21   and the ten percent hypotheticals comes from
22   the model.  So, in essence, the model tells
23   us what percent are associated with
24   promotion.
25       And, as you know, just as a note here,

67

1    that we then back out those prescriptions
2    that are for off-label uses that we're
3    counting in the other part of the
4    calculation so that we don't double count.
5    Q.  I want to ask a little bit more about that,
6    so let's keep going with my hypothetical.
7       So the four percent, let's say, is the
8    increment that you've determined in this
9    hypothetical?  Are you with me still on
10   that?
11   A.  I am.
12   Q.  And you would take that incremental
13   percentage for four in my example and you
14   would multiply it by the but-for number of
15   prescriptions that you had previously
16   calculated would have been written in the
17   absence of alleged improper detailing?
18   A.  That's correct.
19   Q.  And that would give you an additional number
20   of high-dose prescriptions that you, I
21   suppose, would subtract from the but-for
22   number on the theory that they would not
23   have occurred absent the alleged improper
24   promotion?
25   A.  In this situation, I simply identify them,

68

1    and then that can be used by Dr. Hartman's
2    analysis.
3    Q.  I see.  And you understand that his analysis
4    would -- he would be calculating damages for
5    this additional increment, the four percent
6    in my example?
7    A.  The four percent of the but-for, right.  We
8    just said that you took four percent,
9    multiplied it by the but-for number.
10   Q.  The but-for number of off-label
11   prescriptions?
12   A.  That's correct.
13   Q.  I see.
14   A.  Or -- but-for number, I believe, of total
15   prescriptions.  So, again, I could just
16   check the notes, but the idea, again, is to
17   not double count.  So the difference between
18   actual and but-for prescriptions, those are
19   the prescriptions that are subject to the
20   off-label notion.  So we don't want to look
21   at high-dose prescriptions in that set;
22   instead, we just want to look at high-dose
23   prescriptions in the set of prescriptions
24   that are untouched by the off-label
25   advertising allegations.

69

1   Q.  I'm just asking a mathematical question.  I
2       think I have it straight, but just one more
3       time.
4           You have a number of but-for
5       prescriptions that are without regard to
6       high dose; that's what we talked about
7       first?
8   A.  Right.
9   Q.  And then you take that amount and you
10      multiply it by this incremental percentage
11      that you've derived from the procedures we
12      more recently spoke about?
13  A.  That's correct.
14  Q.  And that gives you what you are treating as
15      an additional number of prescriptions that
16      would be subject to damages?
17  A.  That's correct.
18  Q.  Okay.  Let's talk about data sources.
19          For the dependent variable in your
20      first regression model, that's monthly
21      prescriptions of Neurontin and Gabapentin,
22      you used Verispan Vona, V-O-N-A -- all caps
23      -- data; and for the dependent variable in
24      your second regression model, proportion of
25      high-dose prescriptions, you relied on IMS

70

1       and NDTI data; is that correct?
2   A.  That's correct.
3   Q.  And you also used NDTI data in the way that
4       you previously described to identify
5       off-label prescriptions in general?
6   A.  That's correct.
7   Q.  For the expenditures on detailing and
8       journal advertising, you used IMS IPS data?
9   A.  Yes, that's correct.
10  Q.  You didn't use any data from defendants own
11      promotional expenditures as inputs for the
12      model; is that correct?
13  A.  No, I did not.
14  Q.  Can you describe the IMS IPS data source for
15      me?
16  A.  Sure.  The IMS IPS data source, as I show in
17      some of the charts, contains detailed
18      information monthly on promotional efforts
19      by drug.  The individual items that they
20      look at include detailing valued in dollars;
21      advertising, journal advertising, also
22      valued in dollars; they have a series for
23      the retail value of samples as well, and
24      direct consumer advertising.  Those last two
25      series are only collected over a portion of

71

1       the period that we're looking at.
2   Q.  Let's focus on the portion of the data that
3       you used.
4           Can you describe that portion and how
5       the data is developed.
6   A.  So there are two pieces.  One is journal
7       advertising.
8   Q.  And sorry -- why don't we put that to the
9       side --
10  A.  Okay.
11  Q.  -- and focus on the detailing
12      expenditures --
13  A.  Okay.
14  Q.  -- tell me about that portion of the data.
15  A.  The detailing expenditures come from reports
16      from physician offices about detailing
17      visits and the drugs that were featured in
18      those detailing visits.  From that
19      information, IMS constructs detailing
20      efforts that they used to just measure in
21      context, but they've subsequently developed
22      a method for valuing that detailed
23      information.
24  Q.  How do they value it; how do they assign
25      dollar amounts?

72

1   A.  They essentially assign a fully-loaded cost
2       per hour to the detailing data that they
3       collect.  So they calculate it; they back
4       into it.
5   Q.  By cost per hour, you mean cost per hour
6       spent detailing; is that right?
7   A.  For the sales staff, yes.
8   Q.  Do you know whether this IMS detailing data
9       includes visits by sales representatives
10      where they would have simply dropped off a
11      sample and not had any oral communications
12      with the doctor at all?
13  A.  I don't know to what extent those visits are
14      treated differently.  I believe those are
15      included in the data, but I don't know the
16      specific formula for treating those visits,
17      no.
18  Q.  What is your understanding as to whether
19      pure sampling by sales representatives
20      without any oral communications with doctors
21      would be subject to allegations in this
22      case?
23  A.  If you mean if there was no communication,
24      that only samples were dropped off with no
25      indication, I guess it would depend if those

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

73

1   samples were delivered to psychiatrists, for
2   example, then I would imagine those would be
3   subject to the allegations in this matter.
4   Q.  What is your basis for that last statement
5   regarding sampling of psychiatrists?
6   A.  Well, as you know, psychiatrists don't
7   primarily treat epilepsy or PHN, the two
8   approved indications for Neurontin, and
9   certainly samples are mentioned in the
10  complaint as one of the mechanisms by which
11  Pfizer-Parke Davis promoted Neurontin.
12  Q.  You don't have any expertise yourself, do
13  you, in what types of promotional conduct
14  constitute violations of off-label promotion
15  roles?
16  A.  Certainly not, no.
17  Q.  You wouldn't consider yourself an expert in
18  that?
19  A.  That sounds like a legal issue to me.
20  Q.  So the answer is no, you are not an expert
21  in that area?
22  A.  No.
23  Q.  Okay.  Let's turn to the categories of
24  detailing expenditures that your model
25  assumes were improper.

74

1       So as I understand it, you've got two
2   different sets of assumptions regarding the
3   amount of detailing that's alleged to be off
4   label and improper; is that correct?
5   A.  That's correct.
6   Q.  And you call those scenarios one and two?
7   A.  Correct.
8   Q.  Under both scenarios, you've categorized
9   detailing expenditures into permissible and
10  allegedly impermissible based on the
11  specialty of the physician who received the
12  detailing according to the IPS data; is that
13  correct?
14  A.  That's correct.
15  Q.  And under both scenarios, you're assuming
16  that all detailing specialists, other than
17  neurologists and pediatricians after
18  pediatric approval, was off label and
19  subject to the allegations in this case; is
20  that correct?
21  A.  That's correct.
22  Q.  And that's an assumption that counsel has
23  asked you to make here for purposes of your
24  analysis?
25  A.  That's correct.

75

1   Q.  Okay.  Let's compare your scenarios one and
2   two.
3       As I understand it, the two scenarios,
4   they only differ with respect to the amount
5   of detailing to neurologists that you would
6   assume to be improper; is that correct?
7   A.  That's correct.
8   Q.  Under scenario one, you're assuming that all
9   of the detailing to neurologists after
10  April 1995 was improper; is that correct?
11  A.  That's correct.
12  Q.  What's your basis for that assumption?
13  A.  Again, that's the assumption I was asked to
14  assume by counsel.  Based on my review of
15  the complaint, the documents associated with
16  it, as well as the data, the assumption can
17  be justified simply by looking at the data;
18  after 1995, there's no change in effect
19  on-label use of Neurontin.  All the increase
20  in sales comes from off-label use.  That
21  seems to back up that assumption.
22  Q.  Let me ask you:  Are you offering your own
23  independent opinion that all detailing to
24  neurologists after April 1995 was improper?
25  A.  No, I'm not.

76

1   Q.  That's just an assumption that counsel has
2   asked you to make?
3   A.  It's an assumption counsel has asked me to
4   make.  I've looked at the data.  In order to
5   make that assumption, I made sure that it
6   made some sense, but it's not an independent
7   opinion.
8   Q.  And the data you looked at wouldn't allow
9   you to offer an independent opinion on that,
10  I take it?
11  A.  They wouldn't allow one to document
12  specifically what happened in each detailing
13  visit.  Again, there are discovery
14  materials, as you know, that are brought
15  forward in the complaint that suggest that
16  there was detailing for off-label uses.
17  Q.  I'm talking specifically about an assumption
18  that all detailing -- 100 percent of
19  detailing -- after April 1995 to
20  neurologists throughout the class period was
21  improper; are you aware of any documents
22  that would allow you to reach that
23  conclusion?
24  A.  No, I'm not.
25  Q.  Do you know, in percentage terms, how much

77

1  of total detailing expenditures over the
2  class period you've assumed to be improper
3  under scenario one?
4  A. I am not 100 percent sure that I could
5  calculate that. I don't know. I could
6  check that number. I don't believe it's --
7  is that number in my text?
8  Q. I don't believe it is; that's why I'm asking
9  you.
10  A. I know that detailing to neurologists is
11  approximately a third of detailing over the
12  entire period. So it would be at least
13  60 percent, 65 percent, but a number in
14  excess of that then.
15  Q. Let me ask you: Are you aware that
16  Dr. Keeley has since performed that
17  calculation?
18  A. Yes, perhaps I do recall seeing it in his
19  report. I just don't remember the number;
20  I'm sorry.
21  Q. Have you reviewed his work to verify the
22  number that he comes up with?
23  A. I didn't check his calculations, no.
24  Q. All right. Let me mark the next exhibit.
25     MR. MISHKIN: This is going to be

78

1     Exhibit 4.
2       (Exhibit No. 4 marked.)
3  Q. Professor Rosenthal, we've marked as
4  Exhibit 4 documents entitled, in small
5  lettering at the top, "Neurontin Detail
6  Spending By Specialty." It says,
7  "Attachments D1, D2, D3, promo.xls." This
8  is a spreadsheet that came from backup that
9  was provided to defendants.
10     First of all, do you recognize this
11  document?
12  A. I do.
13  Q. Does this depict estimates of detailing
14  expenditures broken down by specialty
15  according to IMS?
16  A. That's correct.
17  Q. I'd like to see if we could use this
18  spreadsheet to do the calculation we were
19  just talking about; that is, to determine
20  the percentage of detailing expenditures
21  that you've assumed to be improper under
22  scenario one.
23     If you turn to the last page that's
24  page 12 of 12, do you see that there's a
25  total detailing expenditures figure reported

79

1  there?
2  A. I do.
3  Q. And that's approximately 122 million?
4  A. Yes.
5  Q. So if we do this calculation, that would be
6  the denominator for the calculation?
7  A. That's correct.
8  Q. I think it's probably easiest to go back and
9  just try to add up the detailing dollars
10  that you treat as permissible.
11  A. Right.
12  Q. You know what I mean?
13  A. Yes, I do.
14  Q. Let's start first with neurology.
15     You treat expenditures on detailing to
16  neurologists prior to April 1995 as
17  permissible, correct?
18  A. That's correct.
19  Q. So if you look at page five of 12 of the
20  spreadsheet, do you see the column for
21  neurology?
22  A. I do.
23  Q. So it would be the first, I think it's 16
24  rows starting January 1994 through
25  April 1995. Those would be the dollar

80

1  amounts that you would treat as permissible
2  under scenario one that would be included in
3  the permissible amount?
4  A. That's correct.
5  Q. So I have a calculator here, which you are
6  welcome to use. We've added those up and
7  we've gotten about $4 million. And I'm
8  wondering if you can either eyeball it and
9  let us know whether you think that's right,
10  or if you would like to calculate it
11  yourself, please go ahead.
12  A. If you like, I will calculate it. Eyeball
13  doesn't work so well for a number this big.
14       (Pause.)
15  A. I'm not sure if I am reading it across
16  correctly. Roughly $4 million is what you
17  got?
18  Q. Does that sound right to you?
19  A. I'm about there. I'm just not sure if April
20  is in or out, that would take me to just
21  about $4 million.
22  Q. Understood. All right. Let's look at the
23  other category which would be for
24  pediatricians.
25  A. Right.

81

1  Q. I think those expenditures are listed
2     starting on page ten.
3  A. Right.  Or -- right for post -- what's the
4     date for pediatricians, October 2000?
5  Q. Right.  So I understand that we would start
6     with November 2000 --
7  A. Right.
8  Q. -- and go through the end.  We've
9        Now, this is a longer list.  We've
10    added up these numbers and have gotten about
11    1.5 million; does that sound right to you?
12 A. It does.  It's obviously a smaller share.
13 Q. Are there any expenditures on detailing
14    under your scenario one that you've treated
15    as permissible other than the ones we've
16    just looked at here on these pages?
17 A. No.
18 Q. And the total, then, of the expenditures
19    that you've treated as permissible under
20    scenario one would be about $5.5 million;
21    does that sound about right?
22 A. Yes.
23 Q. So why don't we just do the division now to
24    see what the overall percentage would be.
25        That would be 5.5 million divided by

82

1     the 120 million total; is that right?
2  A. So off the top of my head, I can say it's
3     about four percent, but --
4  Q. Okay.  So -- approximately 96 percent of the
5     detailing expenditures were improper under
6     your scenario one?
7  A. That's correct.
8  Q. Okay.
9        MR. MISHKIN:  We've been going for
10    a little over an hour.  Do you want to take
11    a brief break?
12        MR. WESTON:  Please.
13        MR. MISHKIN:  Okay.  Why don't we
14    go off the record.
15        THE VIDEOGRAPHER:  The time is
16    10:21.  This is the end of cassette one and
17    we are off the record.
18        (Short recess.)
19        (Mr. Notargiacomo present.)
20        THE VIDEOGRAPHER:  The time is
21    10:37.  This is the beginning of cassette
22    two in the deposition of Meredith Rosenthal.
23    We are on the record.
24 Q. Professor Rosenthal, I want to go briefly to
25    the IMS data that we were talking about.

83

1  A. Yes.
2  Q. To clarify, the IMS detailing data that
3     you've relied on, that's confined to
4     contacts by sales representatives with
5     doctors' offices; is that correct?
6  A. That's correct.
7  Q. There's no other kind of promotional
8     activity embedded in that data; is that
9     right?
10 A. No.
11 Q. There's not?  Sorry.
12 A. No, there's not.
13 Q. Okay.  And we had talked earlier about the
14    assumption that you have in common between
15    scenarios one and two that detailing to
16    specialities other than neurologists and
17    detailing to pediatricians prior to
18    pediatric approval are improper; you recall
19    that?
20 A. Yes.
21 Q. That specific set of assumptions, I think
22    you had told me that counsel had asked you
23    to make that particular assumption; is that
24    right?
25 A. That's correct.

84

1  Q. And that's something you are not offering
2     your own independent opinion on; is that
3     right?
4  A. That's correct.
5  Q. All right.  Let's talk a little bit more
6     about scenario two.
7        As I think we've already discussed,
8     scenario two differs from scenario one with
9     respect to the amount of detailing to
10    neurologists, specifically, that you assumed
11    to have been off label; is that right?
12 A. That's correct.
13 Q. Why did you propose a scenario two in
14    addition to your scenario one?
15 A. I think there's some question, if one looks
16    at the data, as we discussed, the level of
17    on-label approved -- level of prescriptions
18    for approved indications is essentially flat
19    after 1995.  And so without being able to
20    tease apart what effect the allegedly
21    illegal promotional efforts might have had
22    in terms of spillover effects onto this
23    on-label use, one could make the assumption
24    that that level of prescribing, which
25    doesn't change after 1995, is simply, it's

85

1    not being affected by promotion at all; or a
2    more conservative assumption would be to
3    suggest that some portion of the promotion
4    sustained that stasis level of prescribing.
5        So, it, again, would relate to the
6    understanding of the relative impacts of
7    promotion of on- and off-label uses, which I
8    can't entirely separate here because I have
9    total detailing to neurologists.  And so the
10   scenario two is, as I noted, a more
11   conservative view that, in fact, some of
12   that allegedly illegal promotion really was
13   concerned with these approved uses and
14   maintaining sales for those.
15   Q.  Do you have a view as to which scenario is
16   more accurate?
17   A.  I don't.  Without -- without some additional
18   data, I don't have a view as to which is
19   more accurate.  I believe they provide a
20   very narrow, but bounded, approach.  So,
21   often in my profession, there may be
22   multiple estimates based on some uncertainty
23   and one provides a range of estimates.  So
24   these two scenarios, in my view, are a
25   reasonable range of estimates.

86

1    Q.  Under scenario two, you are allowing for
2    some detailing to neurologists after
3    April 1995 to have been on-label; is that
4    correct?
5    A.  That's correct.
6    Q.  Can you tell me what portion that is?
7    A.  Well, in essence, the portion is assumed to
8    be the same as the portion of prescriptions
9    that were on-label.
10   Q.  Just to be clear, what we're talking about
11   in terms of proportion, if we're looking at
12   the proportion of the detailing dollars that
13   you are assuming to be improper under
14   scenario two, can you give me any more idea
15   about that specifically?
16   A.  So the assumption in scenario two, again, is
17   that whatever portion of the promotional
18   dollars were targeted towards the on-label
19   uses, the impact is the same as the overall
20   portion of prescriptions that are for
21   on-label uses.  And so there are actually
22   two factors at work:  one is the portion of
23   dollars that let us, if I may, call them --
24   that are unchallenged, the proportion of
25   promotional spending that would be

87

1    unchallenged.  There's another parameter
2    that says how effective those dollars are.
3    What I look at is the product of those two
4    forces; that is, the proportion of
5    prescriptions that are on-label.  So I don't
6    separately estimate the two factors.
7    Q.  Are you able to separately estimate them,
8    and to be more specific, could you give me
9    an estimate of what portion of detailing to
10   neurologists after April 1995 you're
11   assuming to be permissible under your
12   scenario two?  Is that a figure you could
13   give me?
14   A.  If one assumes that there were equal
15   productivity for on and off-label promotion,
16   then it would be the same as the proportion
17   of prescriptions.  But I haven't
18   separately -- I haven't tried to estimate
19   that.
20   Q.  If we take that assumption that you've just
21   given -- let me actually ask you first about
22   that.
23       What's your basis for that assumption?
24   A.  Well, again, I don't have the ability to
25   break out the detailing to neurologists if

88

1    there were any on-label detailing.  I'm
2    working based on the assumption that I've
3    been given.  So there's simply no way in
4    these data to estimate that number that
5    we're talking about.
6        So instead, again, I look at the
7    outcomes, the actual prescriptions for
8    approved uses, and take that to be the
9    product of some undefined set of promotional
10   dollars that would be unchallenged.  So I
11   don't back out a specific number, I simply
12   back out the prescriptions.
13   Q.  The assumption that you referenced about the
14   equal effects of the on label and the off
15   label, that's not an assumption that you are
16   able to support with the data that you have;
17   is that right?
18   A.  I'm not able to test that assumption, no.
19   Q.  You reference spillover effects, and I think
20   you were talking about spillover effects of
21   off-label promotion onto on-label
22   prescriptions; is that what you referenced?
23   A.  So, indeed, if -- the assumption that was
24   asked by counsel to make, which is that all
25   promotion to neurologists after April 1995

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

89

```
1    is subject to the allegations is improper,
2    if I may.  Then, if there's some effect of
3    going out and promoting, for example,
4    Neurontin, let's say, for pain, an awareness
5    for physicians of the existence of Neurontin
6    and its side effects, then that would be a
7    spillover effect in the manner that I'm
8    discussing.
9    Q.  What about a spillover effect that would
10   work in the opposite way?  So if you had
11   on-label promotion that had a spillover
12   effect and led to off-label prescriptions,
13   how does your model take account of that?
14   A.  Well, so, again, in the case of the but-for
15   scenario with regard to neurologists, my
16   understanding is that the legal assumptions
17   are such that, that in scenario one, all of
18   that challenged promotion and the
19   prescriptions caused by it are subject to
20   damages -- subject to recovery in this
21   matter.  And so, again, in scenario one,
22   those spillover effects are not accounted
23   for.
24       In scenario two, those spillover
25   effects are accounted for.
```

90

```
1    Q.  Can you tell me more specifically, how does
2    scenario two account for spillover from
3    on-label promotion to off-label
4    prescriptions?
5    A.  Well, again, scenario two, it is an
6    adjustment to the prescriptions and not to
7    the promotion, so I don't specifically
8    identify where those additional on-label
9    prescriptions are coming from.  It could
10   either be spillover, or it could be this
11   notion that some percentage of the promotion
12   is actually targeted at on label.  So those
13   two things are mixed together.
14   Q.  Are you able to tell me based on your
15   analysis how much spillover effect there
16   was?
17   A.  No, I don't believe that you could see that
18   in this analysis, no.
19   Q.  How does your scenario two account for a
20   situation where some portion of on-label
21   detailing is causing a disproportionately
22   larger amount of off-label prescriptions?
23   A.  So you are saying this notion that on-label
24   promotion has a different level of
25   productivity?  Again, if we're talking about
```

91

```
1    the -- particularly with regard to
2    neurologists, so I'd like to distinguish,
3    now, the assumption about detailing to other
4    specialities is somewhat different.
5        As we discussed before, the spillover
6    effects can only really happen if those
7    physicians are actively prescribing for the
8    approved conditions.
9        So when we're talking about
10   neurologists, then scenario two essentially
11   -- scenario two gives credit to either
12   spillover effects or active promotion for
13   approved uses that gives credit to the total
14   share of on-label uses without specifically
15   identifying those two factors.
16       If, as you are saying there's some
17   on-label promotion and it's more productive
18   both in terms of direct and indirect
19   effects, that's captured to the extent that
20   I make that adjustment in scenario two, that
21   the adjustment has built into it a combined
22   assumption about the share of promotion that
23   is either is not challenged or the spillover
24   effect, but doesn't try to separate them
25   out.
```

92

```
1    Q.  To the extent that on-label promotion is
2    more productive, to use your terminology,
3    that's not something that's allowed for or
4    reflected in your scenario two; is that
5    correct?
6    A.  I guess -- it could be.  So -- I'm sorry if
7    I'm not being clear.  But -- so by making
8    the adjustment in terms of the number of
9    prescriptions, there are two things that
10   could lead to that effect.  One has to do
11   with the level of promotion that's actually
12   targeting on-label uses and the other has to
13   do with the productivity of that promotion.
14       So it could be that I see this share
15   of prescriptions that occur after May
16   of 1995, and that has to do with a very
17   small level of promotion that's very
18   productive.  So I don't separately estimate
19   those two effects.  I look only at their
20   outcome.  So it could be that the
21   productivity differs.
22       I make the assumption that what I see
23   in terms of the percentage of prescribing is
24   commensurate with the product of the level
25   of promotion for those approved uses and
```

93

1    their effectiveness.
2    Q.  Putting aside this issue of productivity,
3       how do you know under scenario two that, for
4       example, the majority of the detailing to
5       neurologists wasn't totally proper and yet
6       that is what was giving rise to the
7       off-label prescriptions that the data shows?
8    A.  Well, again, I've been asked to assume that
9       that promotion was improper, and as we
10      discussed before, I look at the data and I
11      see no change in monthly prescribing for
12      approved uses and very dramatic growth in
13      monthly prescribing for off-label uses.  The
14      logical conclusion is that the promotion was
15      aimed at off-label uses.
16   Q.  Okay.  But the growth that you are
17      describing, that would be also consistent
18      with -- with a situation where the majority
19      of the promotion was permissible and yet it
20      was leading to increases in off-label
21      prescribing; isn't that right?
22   A.  It would be consistent with a scenario in
23      which promotion had the inadvertent effect
24      of driving something other than what it was
25      targeted at.  I guess -- I mean, you could

94

1       imagine the spillover effect -- when we say
2       "spillover effect," we think of it being a
3       few drips on the side.  This is the entire
4       effectiveness of that promotion during that
5       period is on off-label uses and not on
6       approved uses.
7    Q.  Well, you know, you need to be a little more
8       concrete about that.
9          Did you analyze the question of
10      whether on-label promotional messages, for
11      example, messages about Neurontin's safety
12      or drug interaction profile, whether that
13      could have led to any significant amount of
14      off-label prescribing?
15   A.  Well, again, I don't have data that I can
16      sort of quantify, which messages were given
17      and which detail.  I can't quantify that.
18         In my model, for the uncontested
19      promotion, promotion to neurologists through
20      1995, there it allows for those kinds of
21      spillover effects.
22         But if you are asking did I run a
23      model to test whether approved or --
24      sorry -- the promotion for approved uses had
25      this spillover effect, not separately, I did

95

1       not test it.
2    Q.  I'm not asking you just about whether you
3       ran a model.  I'm asking whether you did any
4       analysis at all of the extent to which
5       on-label promotional messages are capable of
6       causing off-label prescriptions?
7    A.  Well, certainly, I think that notion is
8       inherent in some way in the data.  So in
9       those early periods, we see off-label use
10      even when we're talking about a promotional
11      stream that is unchallenged in this matter.
12   Q.  Do you have any basis for saying that
13      on-label promotion would only lead to a
14      relatively small number of off-label
15      prescriptions; and if so, what is the basis
16      for that?
17   A.  Well, I guess, again, it's the patterns of
18      the data and what I understand the
19      allegations to be.  So the level of
20      off-label use is relatively low up to the
21      point at which I understand that
22      Pfizer-Parke Davis Warner Lambert began this
23      campaign of promoting Neurontin for
24      off-label use.
25         So I think the data support that

96

1       notion.
2    Q.  Other than looking at data, have you
3       reviewed anything else that would inform
4       your own views as to the ability of on-label
5       promotion to cause off-label prescriptions?
6    A.  Not in terms of specifically being able to
7       quantify that from something other than
8       these data, no.
9    Q.  Any materials at all that you've looked at
10      that would inform your view specifically as
11      to the extent to which on-label promotional
12      messages could lead to off-label
13      prescribing?
14   A.  I guess I just want to be clear.  There's
15      some papers that I certainly reviewed that
16      talk about off-label use.  The Radley
17      [phonetic] paper you may be familiar with.
18      But I don't think there's sort of a
19      discussion in general about off-label use
20      and the extent to which promotion versus
21      other factors drives it.
22         I don't know of anyone sort of
23      quantifying this, for example, is the
24      typical spillover effect of promotion, and
25      this is something else, parsing out that

97

1     natural spillover effect.
2   Q.  Putting aside the data you looked at, did
3     you do any Neurontin-specific work or
4     research or analysis of any kind to inform
5     yourself about the extent to which on-label
6     promotional messages about Neurontin can
7     cause off-label prescriptions?
8   A.  Do you mean reviewing discovery documents?
9   Q.  Any documents at all that were specific to
10     Neurontin that would inform you about that
11     specific question.
12   A.  Well, certainly, I looked at discovery
13     documents, and, again, they are cited in the
14     complaint, as well as in my reports, documents
15     that suggest the deliberate strategy of
16     off-label promotion.  But I'm not sure I can
17     say that there are any documents that talked
18     about the spillover effect and its
19     magnitude.
20   Q.  I think we're almost through this, but let
21     me try to make this more -- are you
22     expressing an opinion as to the amount of
23     off-label prescriptions that were caused by
24     on-label prescribing?
25        You know, I may have garbled that.

98

1     Let me try that one more time.
2        Are you expressing an opinion as to
3     the amount of off-label prescriptions that
4     were caused by on-label detailing?
5   A.  Well, in essence, as I've been told what to
6     identify as allegedly illegal promotion,
7     I -- in the period after 1995, that
8     constitutes all of promotion to
9     neurologists.  So to the extent that that
10     promotion caused off-label prescribing,
11     that's what I have identified.  So I think
12     in the model, there's not room for that kind
13     of spillover there.
14        However, in the period before May
15     of 1995, promotion to neurologists does have
16     associated with it off-label use, and that
17     off-label use persists, to some degree, in
18     the later period.  So I have allowed for
19     legitimate promotion to have an effect on
20     off-label use in the model.  I don't
21     separately estimate the magnitude of the
22     spillover.
23   Q.  So I take it the answer is no, then, that
24     you are not offering an opinion on the
25     amounts of off-label --

99

1       MR. WESTON:  She just offered her
2     opinion on that.
3       MR. MISHKIN:  I think we finally
4     got to the answer.  No, and I think it was a
5     yes-or-no question.
6   A.  I just want to be clear that the model
7     doesn't assume one thing or another.  The
8     model inherently picks up some spillover
9     effect.  I haven't -- I haven't identified
10     what that is in my report and put it
11     forward.
12   Q.  Understood.  To the extent your model
13     addresses this topic at all, I think what
14     you've said is it's based on an assumption
15     that you were given about the amount of
16     detailing that was allegedly off label in
17     the first place; is that correct?
18   A.  That's correct.
19   Q.  And you're not expressing your own
20     independent opinion about the amount of off
21     label -- the amount of the detailing that
22     was off label in nature?
23   A.  That's correct.
24   Q.  All right.  I take it, that the accuracy of
25     your model's results, it obviously depends

100

1     on the accuracy of your inputs; is that
2     correct?
3   A.  That's correct.
4   Q.  And your inputs would include all of the
5     assumptions about alleged off-label
6     detailing that we've been describing?
7   A.  That's correct.
8   Q.  So if the assumptions regarding the portion
9     of alleged improper detailing proved to be
10     incorrect, I take it that the results you've
11     put forward would also be incorrect?
12   A.  If the Court, for example, were to find that
13     something different could be proven and not
14     this, then my model could account for that.
15     But these specific results would not be
16     appropriate to other assumptions.
17   Q.  Okay.  You say your model could account for
18     that.  Tell me a little bit more than that.
19   A.  Well, let's say, for example, that the Court
20     finds that -- that what can be proven only
21     relates to a different time period, only
22     relates to up through the period through
23     2004, for example, then I could adjust my
24     model as appropriate.
25   Q.  Have you tested your model at all using any

101

1    different assumptions about levels of
2    alleged off-label detailing?
3    A.  Other than scenario one and scenario two,
4    no.
5    Q.  Okay.  So let's say, as an example, that
6    instead of assuming that 96 percent of
7    detailing was improper as you do under
8    scenario one, that you assume, for example,
9    that 75 percent of detailing was improper.
10        Can you give me a general sense of how
11   that might impact your results?
12   A.  Sure.  In fact, the estimate of interest,
13   the coefficient on promotion from my
14   regression model, tells you most of what you
15   need to do.
16   Q.  Okay.
17   A.  So the number is very close to one, and,
18   therefore, there is approximately a --
19   one-to-one percentage relationship between
20   the change in promotion and the change in
21   units.
22        So if 75 percent were challenged, then
23   about 75 percent of units would be backed
24   out.
25   Q.  That's helpful.  So just -- and I think this

102

1    is obvious from your answer, but if it
2    turned out that less than 50 percent of
3    detailing was improper, then your model
4    would tell you that fewer than 50 percent
5    approximately of the off-label prescriptions
6    would have been caused by the alleged
7    improper detailing?
8    A.  If that were the hypothetical, yes.
9    Q.  Let's look at page 16 back in your report.
10       MR. WESTON:  This is Exhibit 1?
11       MR. MISHKIN:  Yeah, this is
12   Exhibit 1.
13       MR. WESTON:  Okay.
14   Q.  Paragraph 41, and the first sentence in
15   particular is what I'm going to be focusing
16   on.
17   A.  Okay.  I'm there.
18   Q.  Okay.  The first sentence reads, "The
19   analysis of high-dose prescribing of
20   Neurontin is based on the premise that all
21   promotion of Neurontin that can be shown to
22   cause an increase in high-dose prescriptions
23   would be subject to the allegations."
24       Did I read that right?
25   A.  Yes, you did.

103

1    Q.  And that's an assumption that counsel has
2    asked you to make?
3    A.  That's correct.
4    Q.  You are not offering your own opinion as to
5    the validity of that assumption; is that
6    right?
7    A.  No, I'm not.
8    Q.  Okay.  And how would it impact your analysis
9    if that assumption regarding high-dose
10   prescriptions proved to not be true, what
11   impact would that have on your model?
12   A.  Well, again, the model could be adjusted to
13   other assumptions, but, as you know, the --
14   when we're talking about high-dose
15   prescribing here, I'm only estimating the
16   extent to which changes are associated with
17   changes in the level of detailing, and I
18   guess I'm not sure what you are suggesting
19   another scenario would be.  It's a little
20   different than the off-label promotion
21   scenario.  So there, of course, is some
22   high-dose prescribing of Neurontin that is
23   not caused by promotion, that's separate.
24   Q.  Okay.  I think I understand.  If it turned
25   out that the assumptions we were just

104

1    talking about were not correct, then the
2    results that you've presented in the report
3    now would also not be correct?
4    A.  If that could not be proven, then that's
5    correct.
6    Q.  Okay.  Let's talk again about the
7    explanatory variables.
8        Did you consider any explanatory
9    variables for potential inclusion in your
10   model that you ultimately decided not to
11   include?
12   A.  Certainly.
13   Q.  So I didn't mean to cut you off, but maybe
14   what we can do is just sort of go through
15   them one by one.
16   A.  That's fine.
17   Q.  Okay.  Go ahead.
18   A.  So the one that I mention in my class
19   certification report that I considered was
20   promotional spending by competitors.
21   Q.  Okay.  That was a variable that at some
22   point you thought you might include in the
23   equation?
24   A.  That's correct.
25   Q.  And what did you do to investigate

105

1    promotional spending by competitors?
2    A.  So when I was able to look at Neurontin
3        prescribing by indication, as you probably
4        know, there are hundreds of diagnoses for
5        which Neurontin is prescribed and each set
6        of them is associated with a separate set of
7        competitors.  And as I began to look at the
8        competitive context for Neurontin, I
9        realized that it would be infeasible to look
10       at all competitors.  And there, actually, if
11       you slice Neurontin use by market, there --
12       it's not clear that there is any one leading
13       set of competitors.  Given that most of
14       Neurontin's use is off label and not for
15       approved indications, it's not clear that it
16       makes sense to compare it, for example, to
17       the AEDs.  And so I stepped away from that
18       for feasibility reasons.
19           As you may also know, having reviewed
20       the literature, many studies choose not to
21       include competitor promotion.  Often for
22       data reasons, but also it's what we would
23       call a second order effect.  We think
24       competitor promotion might have some effect,
25       but for a brand named drug, they largely run

106

1        in their own markets.
2    Q.  Can you tell me more about what you did to
3        inform yourself about promotional spending
4        by competitors specifically in this case?
5    A.  I didn't obtain data on promotional
6        spending.  I began to look at the diagnoses
7        for which Neurontin is prescribed and
8        realized there were hundreds of them.  And
9        they are not that terribly concentrated.
10       And so to begin to look at competitor
11       promotion, one would have to identify each
12       of those submarkets.  And I realized that it
13       would be infeasible, and in all likelihood,
14       because there would be so many different
15       competitors, this variable, it wouldn't be
16       useful if we created this index of
17       competitor promotion.  It would be pure
18       noise.  All of these things would be going
19       in different directions and result in sort
20       of no signal.
21   Q.  So you decided that you wouldn't look
22       specifically -- you wouldn't try to, for
23       example, identify competitors, right?
24   A.  It certainly began to look into competitors
25       and found that the number is very, very

107

1        long.
2           If one looks in the Physician's Desk
3        Reference for all the conditions that
4        Neurontin is used to treat and has allegedly
5        been marketed for, there are tens of drugs
6        for each of them.
7    Q.  All right.  And as a result of that, you
8        didn't try to, for example, make a list of
9        what the promotional spending was by any
10       competitors for Neurontin; is that correct?
11   A.  That's correct.
12   Q.  Did you have any discussions with people
13       about your decision to exclude promotional
14       spending by competitors?
15   A.  Well, I certainly discussed it with
16       Dr. Hartman.
17   Q.  What did you discuss with him about that?
18   A.  Well, we discussed, again, this question of
19       feasibility and how important it would be to
20       capture those effects.  And looking at the
21       literature and using economic theory, we
22       decided, A, we were unlikely to obtain any
23       results in this instance where there are so
24       many competitors and so many different
25       submarkets; and, B, that, in any event, it

108

1        was unlikely to have a first order effect on
2        our coefficient estimates.
3    Q.  Did you run any statistical tests of any
4        kind that would have informed your decision
5        to not include promotional spending by
6        competitors?
7    A.  Well, it wouldn't really be possible without
8        actually obtaining all the data to do the
9        analysis itself.
10   Q.  So I take it, you didn't do that because you
11       didn't have data?  You didn't collect data
12       on that?
13   A.  That's correct.
14   Q.  Let's talk about other factors, were there
15       additional factors.
16   A.  (No audible response.)
17   Q.  Final question on that:  Is there data
18       available on promotional spending by
19       competitors?
20   A.  One could obtain the IPS data for a price,
21       yes.
22   Q.  Okay.  And that's not something that you
23       did?
24   A.  No.
25   Q.  Let's talk about other factors that you

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

109

1      consider for potential inclusion.
2          What would another one of those
3      factors be?
4   A.  I'm trying to remember anything else.  I
5      believe that I looked at the FDA black box
6      warning as another dummy variable, but it
7      was insignificant and so not included in the
8      final model.
9   Q.  What black box are you referring to?
10  A.  Now, I'm afraid I'm trying to think back.
11     Perhaps it was an FDA letter to Pfizer with
12     regard to off-label promotion.  I think that
13     that was actually it.  I could check for
14     you.  It was an FDA warning letter.  I
15     recall that the variable being an FDA
16     warning.  I believe it was actually the
17     letter to Pfizer with regard to off-label
18     promotion.  I had theorized that at that
19     point there might be a change in
20     prescribing, but seeing none, left it out.
21  Q.  Do you know the approximate date of the
22     letter or the time range?
23  A.  I don't, but I could check it.
24  Q.  Did you run a version of your model with a
25     dummy variable included for this FDA letter?

110

1   A.  I'm not sure if we actually ran the model.
2      I looked at the graphs in the data.  So
3      looking at changes in prescriptions over
4      time, I looked to see, Well, is this another
5      important market event to include, and
6      concluded that there didn't seem to be any
7      change in prescribing around that, and so it
8      was not included in the final model.
9   Q.  "There was no changing in prescribing around
10     that," can you tell me more what you mean?
11  A.  If you look at the prescribing trends over
12     time, we're sort of looking for any
13     indication of real shifts.  So for example,
14     when generic entry occurs, one can see clear
15     effects on prescriptions.  So simultaneous
16     with generic entry, you can see a break in
17     the trend of prescribing.
18         Shall we look at the chart?
19  Q.  Maybe in a second.  Yeah.  You mentioned
20     generic entry, and did you find that to be
21     statistically significant in your -- in your
22     calculations?
23  A.  I can't remember in the final model.  Which
24     model are you looking at, the --
25  Q.  Yeah.

111

1   A.  -- the share model or --
2   Q.  If you look at, now, your total prescription
3      model.
4   A.  In this final model, that one is not
5      statistically significant, but it's an
6      important factor in terms of price here.  So
7      there's certain economic variables we know
8      need to be in the model:  price, promotion.
9          In this final model, we include those
10     that economic theory really requires we
11     include.  In terms of those other market
12     events, we didn't know for sure what effect
13     they are going to have, and so those ones I
14     looked at separately.  Indications are
15     clearly important.  This FDA warning letter
16     I had thought might have some effect, but it
17     doesn't seem to.  It wouldn't affect the
18     results.
19  Q.  And your conclusion that it wouldn't affect
20     the results, is that based simply on looking
21     at the -- at what the data -- what
22     prescriptions were doing at that point in
23     time?
24  A.  That's correct.
25  Q.  Any other possible explanatory variables

112

1      that you considered for inclusion?
2   A.  I don't think so, unless you want to talk
3      about the time trend.
4   Q.  Maybe we'll save that for later.
5   A.  Okay.
6   Q.  Any other, for example, dummy variables that
7      you considered for inclusion that you
8      ultimately didn't include?
9   A.  I don't think so.  I think just that FDA
10     letter.
11  Q.  Another question about promotional spending
12     by competitors, to the extent there was an
13     effect on off-label prescriptions of
14     Neurontin and Gabapentin because of
15     promotional spending by competitors, your
16     model wouldn't account for that?
17  A.  You are saying, to the extent that that had
18     a spillover -- a positive spillover effect
19     or --
20  Q.  I didn't know I wasn't characterizing as
21     spillover.  To the extent that there was --
22     to the extent promotional efforts by
23     competitors had some impact on Neurontin
24     prescriptions, is that something that your
25     model -- I take it that's something your

113

1    model does not take account of; am I right?
2    A.  That's correct, and the relevant point here,
3         however, is the extent to which that effect
4         would be picked up in my promotional
5         variable, the one that is important for
6         these calculations.  So omitted variables
7         may have some effect, but they are only
8         relevant to the results to the extent that
9         that effect is in some way correlated with
10        the effective interest.
11   Q.  Did you do any analysis of the extent to
12        which spending by promotional efforts by
13        competitors would have been correlated with
14        the detailing that you were looking at?
15   A.  Again, I didn't have the data, so no.
16   Q.  Okay.  Does your model include any
17        explanatory variable or variables that would
18        account for the effect on prescriptions of
19        publications regarding Neurontin?
20   A.  Publications don't directly enter into the
21        model.  To the extent that they were used,
22        for example, in detailing, that would get
23        picked up in the detailing estimates.
24   Q.  You would agree, I take it, that published
25        clinical trials could have an independent

114

1    effect on off-label prescribing independent
2    from any promotion -- pardon -- independent
3    from any detailing?
4    A.  They could.  As you know, the allegations in
5         this matter pertain also to those scientific
6         publications, to funding for targeted
7         research that was aimed at promoting
8         Neurontin for off-label uses, suppression of
9         negative results that can influence the way
10        those results that are published affect
11        prescribing.
12             So I would say, that may be true, but
13        it's not clear that that's a variable that
14        one would want to control for, per se, in
15        the sense of taking it out of the effects
16        that we're looking to characterize here.
17   Q.  Were you told to assume that any
18        publications regarding Neurontin would be
19        subject to the allegations?
20   A.  Well, I don't think I was told specifically
21        to assume that they were all associated with
22        the allegations.  They are certainly in the
23        complaint and I have assumed that the
24        allegations, as presented in the complaint,
25        are true.  So, in that sense, yes, but not

115

1    specifically told to incorporate that into
2    my analysis.
3    Q.  To the extent that there are publications
4         that had an impact on prescribing that's
5         independent from the detailing, your model
6         wouldn't account for that?
7    A.  Again, yes, that's true, but it's not clear
8         to me that one would want to control for
9         that.
10   Q.  Okay.  Did you or anyone working for you do
11        a literature search for articles on
12        Neurontin?
13   A.  I don't believe so, no.
14   Q.  Did you or anyone working for you, for
15        example, do a Pub Med search on Neurontin
16        articles?
17   A.  That would be what I would consider to be a
18        literature search, no.
19   Q.  Did anyone look for any articles on -- that
20        would pertain to potential substitutes for
21        Neurontin?
22   A.  Well, those would be the competitors that I
23        discussed with regard to promotion.  And,
24        again, we began to look at the diagnoses and
25        to consider what it would take to identify

116

1    all the competitors to Neurontin.  And so in
2    that sense, those are therapeutic
3    substitutes.
4    Q.  But, ultimately, you decided not to research
5         into that?
6    A.  Decided that it was both infeasible and
7         unlikely to be useful.
8    Q.  Okay.  Does your model include any
9         explanatory variables that would take
10        account of the effects on prescriptions of
11        meetings or CMEs or other types of events
12        pertaining to Neurontin?
13   A.  Not directly.  Again, to the extent that
14        those are correlated with detailing, the
15        model will pick them up.  So, as we know,
16        from the marketing literature, that
17        marketing strategies are often deliberately
18        coordinated, and so those meetings and
19        events, which, of course, are subject to
20        significant allegations, we weren't able to
21        capture them for this model.  And so by
22        leaving them out, we're probably being
23        conservative, although, I would expect that
24        the meetings and events would be highly
25        correlated with detailing.

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

117

1  Q.  But you didn't do any research that would
2     allow you to say whether or not they were
3     correlated with detailing; is that right?
4  A.  That's correct.  In the document reviews
5     that I conducted, I tried to find data from
6     the discovery materials that would allow me
7     to create a time series for these challenged
8     events -- the Jupiter Beach meeting, other
9     meetings that are mentioned in the
10    complaint -- but the data are too incomplete
11    to get that full-time series.
12 Q.  So, as a result, you didn't make a time
13    series of events corresponding to Neurontin;
14    is that correct?
15 A.  I did not.
16 Q.  Did you contact any medical societies
17    regarding, for example, any CME events
18    during the class period?
19 A.  I did not.
20 Q.  Did you have any contact with the medical
21    education staff at any -- in any of those
22    societies?
23 A.  No, I did not.
24 Q.  Does your model include any explanatory
25    variables that would account for the effect

118

1     on prescriptions of formulary changes
2     throughout the class period pertinent to
3     Neurontin and Gabapentin?
4  A.  No, it does not.  Excuse me, one exception.
5     Generic entry is likely the biggest
6     formulary change.  As you know, when
7     generics become available, a brand name drug
8     is typically moved into a different
9     formulary tier, and so that's the one place
10    where that effect might enter.
11 Q.  It might, but you don't know for sure?
12 A.  Well, it almost surely is part of what the
13    generic entry variable picks up.
14 Q.  Let me ask you:  Did you investigate how
15    Neurontin or Gabapentin were placed on
16    incentive formularies and whether that
17    changed over time?
18 A.  I did not, although, I believe in my
19    original 2005 report that I cite some
20    discovery documents that suggest that
21    Neurontin was typically in the preferred
22    tier of formularies.  I'd have to go back to
23    check that.  I'm afraid that's a somewhat
24    vague recollection.
25 Q.  You didn't do any work specific for your

119

1     2008 declaration regarding changes in
2     formulary status of Neurontin and Gabapentin
3     over time?
4  A.  No, I did not.
5  Q.  To the extent that there were formulary
6     changes at other points during the class
7     period besides the generic entry, those
8     wouldn't be accounted for by your model --
9     in your model?
10 A.  There's no reason to believe that those
11    formulary changes would be correlated with
12    the variable of interest, that is Neurontin
13    promotion, so I -- it may be true.  It's
14    very unlikely to bias the coefficient of
15    interest.
16 Q.  But you didn't make any study to look at the
17    degree to which formulary changes would have
18    been correlated with your detailing
19    variable; is that correct?
20 A.  That's correct.
21 Q.  Does your model include any explanatory
22    variables that account for the effect on
23    prescriptions of physician's changing
24    knowledge and experience with respect to
25    Neurontin's safety and efficacy?

120

1  A.  Well, I guess this is, again, sort of gets
2     at the question of what you mean by that.
3     So if you mean by, did I go out and measure
4     physician knowledge?  No.  The model is a
5     time series model that inherently picks up
6     correlations in the structure of the data
7     over time.  These correlations, the utter
8     regressive terms in particular, capture
9     those kinds of effects.
10 Q.  We will talk about that AR analysis later.
11    Other than the AR analysis, is there
12    any way in which your model would capture
13    changing experience and knowledge of
14    physicians and how that impacted Neurontin
15    prescriptions?
16 A.  Other than through AR process, no.  No
17    econometric model I know of looks at that.
18 Q.  And maybe the answer will be the same, but
19    did you have explanatory variables that
20    account for overall trends or developments,
21    say, in the basic science relating to
22    treatment of conditions for which Neurontin
23    is prescribed?
24 A.  I think the answer is the same, as I just
25    said.  There is a time pattern, but other

121

1     than --
2     Q.  Other than the AR now?
3          Does your model include any
4     explanatory variables that account for the
5     effect on prescriptions of practice
6     guidelines within institutions and how those
7     changed?
8     A.  I'm not sure how one would measure practice
9     guidelines over time in this instance, but,
10    no, it does not.
11    Q.  Did you do any research into practice
12    guidelines of institutions during the class
13    period insofar as they related to Neurontin?
14    A.  No, I did not.
15    Q.  Does your model include any explanatory
16    variables that account for the effect on
17    prescriptions of foreign approvals?
18    A.  No, it does not.
19    Q.  Did you do any research into the timing of
20    foreign approvals of Neurontin?
21    A.  Not for this model.  I know that those
22    foreign approvals are discussed in the
23    complaint.
24    Q.  Did you -- let me rephrase.
25         Does your model include any

122

1     explanatory variables that would account for
2     the effect of approvals of drugs other than
3     Neurontin on Neurontin prescriptions?
4     A.  The generic entry variable, of course,
5     accounts for the launch of those generics,
6     so in that sense, approvals, but if you mean
7     other brand-named drugs, no.
8     Q.  Did you look into -- did you do any research
9     into approvals of other drugs for conditions
10    for which Neurontin is prescribed?
11    A.  Well, again, as I mentioned, in terms of
12    competitor promotion, the same general set
13    of considerations:  I looked at the set of
14    drugs that treat the major conditions for
15    which Neurontin is prescribed, and there are
16    hundreds of them.  So I did not try to map
17    out those launches during the period to put
18    in the equation.  I knew that it would be
19    impossible to do so.
20    Q.  I understand that, of course, you didn't do
21    that for hundreds, but did you do that for
22    any other drug?
23    A.  I did not include those, no.
24    Q.  Now, your model attempts to estimate the
25    impact specifically of detailing on

123

1     Neurontin and Gabapentin prescriptions; is
2     that right?
3     A.  I use detailing to capture the effect of the
4     alleged off-label promotion.  So what I
5     measure is detailing.  But as we discussed
6     earlier, I believe it's likely to pick up
7     the related allegations with regard to
8     meetings and events and other spending
9     that's correlated with detailing.
10    Q.  Well, you haven't done any specific analysis
11    of the impact on prescriptions of any other
12    types of alleged improper promotion besides
13    detailing; is that correct?
14    A.  That's correct.
15    Q.  So you're not expressing any opinion as to
16    the effect that, you know, alleged improper
17    promotion, other than detailing, may have
18    had on off-label Neurontin and Gabapentin
19    prescriptions?
20    A.  Well, again, I guess I believe that the
21    inclusion of the detailing measure here,
22    which is the best available measure I have,
23    captures the overall effect of the
24    allegations.  I believe that my report
25    essentially says that.  It doesn't say that

124

1     I haven't estimated other effects.  So I
2     know it to be true that some of these
3     variables are correlated.
4          For example, the samples, I don't have
5     sampling data for the whole period so I
6     can't include it my model.  But I can see,
7     over the period I do have it, as I reported
8     in the document, that there's a .75
9     correlation between the two series, and,
10    therefore, the detailing variable picks up
11    some of the effect of free samples.
12    Q.  Have you analyzed the pattern over time of
13    defendants' promotional activities other
14    than detailing?
15    A.  In sampling, as I just discussed --
16    Q.  Right.  I'm sorry.
17    A.  -- and advertising, journal advertising,
18    which is not subject to the allegations.
19    Q.  Other than those that you just mentioned,
20    have you done any analysis of defendants'
21    promotional activities?
22    A.  Again, I only have piecemeal data that are
23    to be found in the discovery materials,
24    including those materials that I cited in my
25    2005 report, but I don't have a complete

125

1    trend data to analyze those, no.
2  Q.  So you haven't, for example, in any
3      systematic way analyzed how much defendants
4      were spending on other types of detailing at
5      different points -- I'm sorry.  Let me
6      rephrase that.
7        You haven't analyzed in any systemic
8      way the amounts of money the defendants were
9      spending on other types of promotional
10     activities besides detailing?
11 A.  Not in the same systematic way we were just
12     discussing, no.
13 Q.  So as you sit here, you don't have a sense
14     of when those expenditures, other than on
15     detailing, would have been increasing or
16     decreasing; is that correct?
17 A.  Other than by inference from the
18     allegations?  For example, that these
19     activities were increasing from April 1995
20     forward, the specific discovery documents
21     related to the off-label campaign, so other
22     than that, I don't have a full-time series
23     by which I could plot that relationship.
24 Q.  And you don't know how the patterns compare,
25     for example?

126

1  A.  That's correct.
2  Q.  What about in terms of relative magnitude,
3      do you know how defendants' expenditures on
4      detailing in journal ads compare to
5      defendants' expenditures on other types of
6      promotion?
7  A.  Not in any precise way, no.
8  Q.  So I take it you haven't done any analysis
9      to determine the extent to which your model
10     might or might not be picking up the effects
11     of promotional activities other than
12     detailing?
13 A.  No.  Although, if you look at my estimates,
14     as we describe, they suggest that more than
15     90 percent of off-label prescriptions were
16     caused by the promotion that I contract
17     there.  So I think that it's likely that
18     I've captured a substantial portion of the
19     effect.
20 Q.  But the extent to which you've done that,
21     that's just not something you've analyzed?
22 A.  I just don't have the data to do that.
23 Q.  You said it's possible that your model is
24     picking up the effects of other types of
25     alleged improper promotion.

127

1        Is it possible that your model is also
2      picking up the effects of promotional
3      activities that are not alleged to be
4      improper?
5  A.  I'm not sure to which you are referring.
6        Can you give me an example?
7  Q.  Well, I mean, I think I'd like to first ask
8      the question generally.  I mean but can you
9      think of any -- there are types of
10     promotional activities, as you understand
11     it, that are not subject to the allegations?
12     Is that your understanding?
13 A.  Like the journal advertising, for example?
14 Q.  Okay.  Are there -- and so I mean, as you
15     sit here -- let me rephrase that.
16       What analysis have you done to assure
17     yourself that your detailing measure is not
18     picking up the effects of something
19     permissible -- is not picking up the effects
20     of some type of permissible promotion?
21 A.  Well, I used all the data that I had that
22     were complete for this time series.  So that
23     I've done -- is included in those variables
24     to the best of my ability given feasibility
25     constraints.  So one could always say that

128

1      there's something that's not included in a
2      model.  But there's nothing that I know of
3      that I am worried about that's not included
4      in the model.
5  Q.  Did you ever make a list either based on
6      your own research or with input from counsel
7      of types of promotional activity that would
8      not be subject to the allegations here?
9  A.  That would not be subject -- no.
10 Q.  Okay.  Let's talk about constant terms.
11       What is a constant term?
12 A.  A constant term picks up a baseline level.
13     We have all these other explanatory
14     variables, and the constant terms says, What
15     would the level of the dependent variable be
16     if all those other terms were zero?
17 Q.  And is a constant term also known as an
18     intercept term?
19 A.  That's right.  So it's a sort of level
20     setting variable.
21 Q.  And the model that you put forward in your
22     2008 declaration does not include a constant
23     term; is that correct?
24 A.  That's correct.
25 Q.  You had originally planned to include a

129

1    constant term in your model; is that
2    correct?
3    A.  I certainly considered doing that.  And, in
4    fact, considered using the constant.  The
5    constant, when added to my model, is not
6    statistically significant.  Moreover, it's
7    not altogether clear that it makes sense in
8    the context where we have the baseline for
9    Neurontin is essentially its launch, where
10   all those other variables would be zero.  So
11   the question you have to ask yourself is:
12   Would there be any prescriptions of
13   Neurontin if Parke Davis had never promoted
14   it?  So not only was it statistically
15   insignificant, but it also doesn't have a
16   very good economic interpretation here.
17   Q.  So you've assumed that the level of
18   prescriptions would have been zero in the
19   absence of promotion?
20   A.  That's essentially what the no constant --
21   the no constant model says.
22   Q.  Yeah.  You said that you had originally
23   thought about using a constant term.
24        Am I correct that on the various
25   occasions where you've written down your

130

1    general equation for the model, you've
2    always included a constant term in all of
3    those; is that right?
4    A.  That's frequently the default for the
5    econometric models.  As you may know, once
6    we got into the time series aspects of the
7    model, terms like constants become somewhat
8    more problematic.
9    Q.  I guess, including the equation that you
10   included in Attachment E to your 2008
11   declaration, that equation includes a
12   reference to a constant term; is that
13   correct?
14   A.  That's correct, yes.
15   Q.  Now, you referred to some testing that you
16   did a constant term.
17        Tell me more about that.
18   A.  If you take my model and add a constant into
19   it, the constant is not statistically
20   significant.
21   Q.  Did you run any kind of test specifically on
22   the constant?
23   A.  One can look at the T statistic, the P value
24   associated with the T statistic for the
25   constant.

131

1    Q.  Did you do that?
2    A.  Yes, I did.
3    Q.  First of all, I don't know whether you are
4    aware of this, defendants never received any
5    documents reflecting any of these
6    calculations.  I take it, the documents
7    exist reflecting the testing that you're
8    describing?
9    A.  Testing -- when we're developing the model,
10   as I mentioned, we put in -- tried this --
11   looked at other variables, but we don't
12   include them in the final data that we save
13   and sent to you, because when you're
14   developing an econometric model,
15   particularly in a time series setting like
16   this, we may have done tens, maybe even a
17   hundred runs that would include, for
18   example, different functional forms,
19   different structures of the data over time.
20   So we sent you what we saved in the end, and
21   so those -- we don't have those.  I can
22   recreate those tests for you, but we didn't
23   send them because they weren't relevant to
24   the final model.
25   Q.  The test that you did to inform your

132

1    decision not to include a constant term in
2    the model, you don't have the results of
3    those anymore?
4    A.  It's essentially just the same model added
5    in the constant term and then one can look
6    at those results as similar to the results
7    that are in Attachment E here, and look at
8    the P value directly.
9        So it's not a separate test; it's just
10   a version of the model with the constant.
11   Q.  What about the T-test that is referenced, is
12   that a separate test?
13   A.  No, sorry.  It's the same thing.  So there's
14   a T statistic and a P value associated with
15   it, but that just comes from the standard
16   regression output.
17   Q.  Is it standard practice to omit from
18   regression models variables that are not
19   statistically significant?
20   A.  Well, there are two things that economists
21   consider when doing an analysis.  The first
22   is always what is the economic theory that
23   we're trying to test?  And so variables that
24   the theory suggests are essential to the
25   model -- price, promotion -- those variables

133

1  are included.  Because of power concerns, we
2  can't simply throw in all other variables.
3  And in those cases, one does look closely at
4  significance as well as the effects on the
5  whole model of including a variable.
6      So it's really a combination of those
7  two things.  Economic theory really has to
8  come first, but second, one does often look
9  at significance and include or exclude
10  variables on that basis.
11  Q.  You've included variables in your regression
12  model here that turned out to be
13  insignificant, right?
14  A.  That's correct.
15  Q.  Let me ask you more about what the model
16  showed when you put the constant term in.
17      You said that the constant term itself
18  was insignificant?
19  A.  That's correct.
20  Q.  When you did that test, did you make any
21  other changes to the model besides putting a
22  constant term in?
23  A.  That's all I'm talking about is just the
24  inclusion of the constant alone in the same
25  model.

134

1  Q.  Did including the constant term have any
2  effects on the other coefficients?
3  A.  I'm afraid I can't recall, but -- I could
4  reproduce those results, but I can't recall.
5  Q.  Do you know, under the model where you
6  included the constant term, what percentage
7  of off-label prescriptions according to that
8  model would have been caused by improper
9  promotion?
10  A.  I can't recall now.
11  Q.  As a general matter in econometrics work,
12  it's more common to include a constant term
13  rather than omit it; is that correct?
14  A.  I don't know if that is true in time series
15  work.  Again, in time series work, the
16  models tend to be very sensitive to the
17  inclusion of this sort of starting value as
18  well as the way the process is accounted for
19  over time.  So I can't say for certain that
20  constants are usually included in time
21  series work.
22  Q.  Define "time series" work for me.
23  A.  So these are models that look at a set of
24  variables that change together over time.
25  Often these are aggregate analyses like this

135

1  one, as opposed to cross-sectional analysis
2  looks at a population at a point in time, or
3  a panel data analysis looking at a
4  population over time.  And the data has very
5  different structures.
6  Q.  The literature that you are aware of on
7  impacts of pharmaceutical promotion, is that
8  generally -- does that consistent of time
9  series models?
10  A.  Largely, although most of the literature
11  does not address serial correlation in the
12  relatively sophisticated way we did so here.
13  Q.  Do you have an understanding for why that
14  would be?
15  A.  I do not actually.
16  Q.  You've brought up now the serial
17  correlation; how does that relate to the
18  constant term?
19  A.  Well, again, when we have -- in this
20  situation, we have a couple of series that
21  are correlated over time.  There is this
22  problem of serial correlation where -- that
23  can be driving essentially our findings.
24  Without using too technical terms, we worry
25  about this systematic relationship over time

136

1  biassing our results.  And so this is why we
2  include those you autoregressive terms to
3  try to pull that and unbias the estimates in
4  effect.  But these models are inherently
5  very sensitive, and so inclusion of
6  variables like a constant term can affect
7  the results in a way that it doesn't make
8  sense.
9  Q.  Is it your understanding that where you're
10  using an autoregressive method, that it's
11  less appropriate to include a constant term?
12  A.  I'm not saying that entirely, but I do
13  believe it's more common in time series
14  analysis to worry about the effect of these
15  terms, because there's this sort of effect
16  that gets carried through over time, and so
17  these analyses just tend to be much more
18  sensitive than, for example, a
19  cross-sectional analysis, there would be no
20  controversy of including a constant term.
21      It doesn't have the same
22  interpretation either.  In a cross-sectional
23  analysis, the constant term reflects the
24  level of the dependent variable for the
25  individual that is -- sort of has the

137

1  default characteristics by the way the model
2  is specified.  And in that case, it would
3  almost surely make sense to have a constant
4  term because that individual isn't presumed.
5  For example, to have zero income if that
6  were the variable of interest.
7      In this time series model where we
8  really have a world that starts at zero, it
9  may make sense to exclude the constant term
10  both in economic rationale and also based on
11  the fact in my experience that the constant
12  term was not significant here.
13  Q.  Did you list for me all published articles
14  that you are aware of that have omitted a
15  constant term from a regression model
16  analyzing the impact of pharmaceutical
17  promotion?
18  A.  I can't, no.
19  Q.  Can you think of one example?
20  A.  I have not gone back to look, no.
21  Q.  So as you sit here today, you are not aware
22  of an article that analyzes pharmaceutical
23  promotion and omits a constant term?
24  A.  I'm not aware of an article that
25  specifically looks at a single drug from

139

1  take it, from what you've told me, that the
2  model itself has an ability to tell you
3  whether the constant term should be there or
4  not; is that a fair statement?
5  A.  Whether it matters statistically, yes.
6  Q.  Okay.  And if the model had told you that it
7  was statistically significant, then it would
8  have been more appropriate to leave it in
9  the model; is that a fair statement?
10  A.  Potentially.  So, again, there are two
11  things that an econometrician thinks about
12  in including variables in a model.  One is
13  this statistical consideration.  Given power
14  constraints, one wants to include the most
15  important variable, but also, the economics.
16  And so, for example, there may be variables
17  that are statistically significant, but are
18  simply picking up some spurious effect and
19  one doesn't necessarily want to include
20  those variables.
21  Q.  Let me ask it like this:  If you had put the
22  constant term in and it had turned out to be
23  significant, would you have omitted it?
24  A.  I think probably I would have left it in if
25  it were significant.  But, again, I think

138

1  launch through the time period that we look
2  at it.  These other pharmaceutical analyses
3  that I know of are panel data studies, so a
4  constant term would have a different
5  interpretation there.  So I'm not aware of
6  whether or not they include them.  I would
7  have to look.
8  Q.  You wouldn't characterize including a
9  constant term in a model as any sort of
10  assumption about the magnitude or
11  statistical significance of the constant
12  term; is that correct?  I'm referring to the
13  act of including in that, including a
14  constant term, does that amount to some sort
15  of an assumption?
16  A.  I think -- I mean, it's likely a passive
17  assumption that one includes a constant term
18  often by default because there is some
19  notion that there is a level of whatever the
20  dependent variable of interest is that is
21  not accounted for by the explanatory
22  variables.  So it's, in effect, an
23  assumption, but I don't think people tend to
24  make it actively.
25  Q.  I guess to be more specific, the model, I

140

1  both considerations are relevant.  And in
2  this case, there is a fairly convincing
3  economic story for why there should be no
4  constant.
5  Q.  Does your report discuss anywhere this work
6  that you did to inform your decision to omit
7  a constant term?
8  A.  No, it does not.
9  Q.  Any particular reason why it doesn't discuss
10  that?
11  A.  Well, in creating a model like that, there
12  are a host of things that we thought about
13  and we -- what we produced is the final
14  model that made the most economic and
15  statistical sense.  We describe that.
16  We don't describe all the other things we
17  considered.
18  Q.  Can you give me any examples from your own
19  work, unpublished work, where you've
20  excluded a constant term from a regression
21  model on the same basis that you did here?
22  A.  I would have to look.  I can't think of any.
23  I don't do much work in time series, so
24  these autoregressive models in particular.
25  Q.  Anything besides what you've -- anything in

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

141

1  addition to what you've already described
2  that supported your decision to exclude a
3  constant term?
4  A.  No.
5  Q.  All right.  Let me mark the next exhibit.
6      MR. MISHKIN:  I tell you what,
7  let's take a brief break here.
8      MR. WESTON:  Sure.
9      MR. MISHKIN:  We can go off the
10  record.
11      THE VIDEOGRAPHER:  Off the record
12  at 11:47.
13      (Short recess.)
14      THE VIDEOGRAPHER:  On the record,
15  11:59.
16  Q.  Professor Rosenthal, I wanted to go back
17  briefly to our discussion of the explanatory
18  variables that you had included.  You know,
19  the explanatory variables that you had
20  included -- the explanatory variables that
21  you considered for potential inclusion.  In
22  that context, I had asked you about some
23  things that you had done.
24      Following up on that:  Did you do any
25  investigation of Neurontin's drug

143

1  to mark now an exhibit which is going to be
2  from a textbook, a little econometrics
3  lesson maybe for me, so here's the textbook
4  and here's what I'd like to mark.
5      (Exhibit No. 5 marked.)
6  Q.  Professor Rosenthal, I've marked as
7  Exhibit 5 an excerpt from a textbook by
8  A.H. Studenmund called, "Using Econometrics,
9  A Practical Guide," Fifth Edition.
10      The excerpt that has been put in front
11  of you, that contains the title page and the
12  preface of the textbook.  I've also given
13  you a full copy of the textbook, and you
14  should feel free to look at that.
15  A.  Okay.
16  Q.  First, are you familiar with this textbook?
17  A.  I'm not actually, not this one.
18  Q.  Okay.  Do you know -- you don't know if it's
19  a textbook that's used in colleges or
20  universities?
21  A.  I don't.  I teach in a professional school,
22  so I'm not familiar with this one.
23  Q.  Fair enough.  Let me actually mark another
24  excerpt.  This is going to be the same
25  textbook, so we have something for the

142

1  interaction profile compared with other
2  drugs in any way as part of your work in
3  this case?
4  A.  And whether that changed over time?  Again,
5  this is a time series model, so anything
6  that's constant over time wouldn't show up
7  in the model.
8  Q.  Just to be clear, you didn't do any analysis
9  of that area?
10  A.  I did not.
11  Q.  Did you consult with a clinical expert at
12  all regarding any Neurontin product-specific
13  attributes?
14  A.  No, I did not.
15  Q.  Did you review any information posted on
16  medical information sites on the Internet
17  related to the use of Neurontin for
18  off-label uses?
19  A.  I did not.
20  Q.  Did you consult a clinical expert regarding
21  any clinical findings that may have been
22  significant to Neurontin during the class
23  period?
24  A.  No, I did not.
25  Q.  Let's return to constant terms, and I want

144

1  record.
2  A.  Okay.
3      (Exhibit No. 6 marked.)
4  Q.  Professor Rosenthal, I've marked another
5  excerpt from the Studenmund textbook.  This
6  contains pages from Chapter seven, and the
7  title at the top of this document is,
8  "Specification Choosing a Functional Form."
9  And again, please, as I ask these questions,
10  please feel free to refer to the whole
11  textbook.
12  A.  Okay.
13  Q.  But for now, my questions are going to be
14  confined to this excerpt that I've put in
15  front of you.
16      MR. WESTON:  Why don't I object
17  right here before you ask your questions you
18  are going to ask.  She has testified that
19  she's not familiar with this book, so it
20  would be improper under any Rules of
21  Evidence that I know to attempt to impeach
22  her with it unless you can establish that it
23  is some sort of an authentic book.
24      MR. MISHKIN:  I think it's proper
25  for me to continue now.  You're able

145

1    obviously to make that objection.
2         MR. WESTON:  I made the objection.
3         MR. MISHKIN:  Fair enough.
4    Q.  I'd like to look at section 7.1.1, which
5    begins on page 205.
6         So are you with me there at the
7    heading 7.1.1?
8    A.  I am.
9    Q.  And can you read the title of that section.
10   A.  It says, "Do not suppress the constant term
11   suppress."
12   Q.  Okay.  Feel free to take a look through the
13   section 7.1.1, but I'm going to ask a couple
14   of questions on the first two paragraphs --
15   A.  Sure.
16   Q.  -- but if you want to take a moment to flip
17   through this page or so on this section,
18   please feel free to do that.
19   A.  Why don't you start with your questions, and
20   then I will see it.
21   Q.  Okay.  Do you see the first sentence of the
22   section, it says, "Suppressing the constant
23   term leads to a violation of the classical
24   assumptions."
25        Did I read that right?

146

1    A.  Yes, you did.
2    Q.  And then if we look at the start of the
3    second paragraph, the first sentence reads,
4    "The consequence of suppressing the constant
5    term is that the slop coefficient estimates
6    are potentially biased and their T scores
7    are potentially inflated."
8         Did I read that right?
9    A.  Yes, you did.
10   Q.  And then the next immediately following
11   sentence refers to a graphical illustration
12   of the issues that's being talked about and
13   that appears in figure 7.1 which is on the
14   next page; is that right?
15   A.  I see that, yes.
16   Q.  So would you agree with me that basic point
17   of the point of 7.1.1 in the Studenmund book
18   is that one should not omit a constant from
19   a regression model?
20   A.  Again, I think the point here is on the
21   assumption that there's an economic
22   rationale for a constant term, then one
23   should not omit it.  If, in fact, the
24   regression line goes through the origin as
25   depicted in this steeper sloped line, then,

147

1    in fact, one should include the origin as a
2    possibility in the regression model.
3         So, certainly, in the origin is not
4    conceptually appropriate, then one should
5    include a constant term.  As I've described
6    it, the origin should be part of the model
7    in economic reasoning.
8    Q.  Your opinion is that if there's a
9    theoretical justification for keeping the
10   constant term out, then it's appropriate to
11   do that?
12   A.  That's my opinion, yes.
13   Q.  Okay.  If you look at page 206, do you see
14   the paragraph just before section 7.1.2?
15   A.  I do.
16   Q.  And I will just read that, it says, "Thus,
17   even though some regression packages allow
18   the constant term to be suppressed (set to
19   zero), the general rule is don't, even if
20   theory specifically calls for it."
21        Did I read that right?
22   A.  I see that, yes.
23   Q.  Okay.  You disagree with that statement?
24   A.  I think it's -- they are putting it as a
25   general rule, but, obviously, it's a rule

148

1    that is violated or, in fact, the software
2    package wouldn't allow for the suppression
3    of the constant if it were hard-and-fast
4    rule.  But I believe it's justified in my
5    case.
6    Q.  Okay.  Let's look at page 207.
7         Do you see the first full paragraph on
8    that page?
9    A.  Beginning the word "first"?
10   Q.  Correct.
11   A.  Um-hum.
12   Q.  Let me read the last sentence, which says,
13   "As a result, it's meaningless to run a
14   T-test on beta nought."
15        First, did I read that correctly?
16   A.  Yes, you did.
17   Q.  Do you understand beta nought here to be
18   referring to a constant term?
19   A.  That's correct, yes.
20   Q.  Do you disagree with this sentence?
21   A.  I don't disagree with it.  I think it's
22   standard practice to look at those T-tests.
23   I think at what he's saying -- I've assumed
24   it was a E -- what A.H. is saying here, is
25   that, in general, the constant term is

149

1     picking up a set of omitted variables.  So
2     the assumption there is that there are
3     omitted variables that would affect the
4     level of sales.  So I think what he's saying
5     is that it can't be interpreted in any sort
6     of meaningful economic terms.  I think,
7     again, that if there's no economic rationale
8     for that term, in practice, many
9     econometricians omit the constant.
10    Q.  Okay.  You can put that aside.
11    A.  Okay.
12    Q.  Let's talk about time trends.  You mentioned
13    it, I think, a couple of times and we're
14    going to get into it now.
15         First, what is a time trend?
16    A.  A time trend, like the constant, is, to use
17    the language from the textbook, somewhat of
18    a garbage collector.  It's a variable that
19    doesn't have a direct economic
20    interpretation, but is meant to capture
21    forces that affect the dependent variable
22    over time.  Typically, time trends are
23    entered either linearly or in a quadratic
24    form, which is the linear version and
25    squared version together.

150

1     Q.  This may be embedded in your answer, but any
2     other sort of information in lay terms about
3     what a time trend is supposed to do -- what
4     it's supposed to do in a model?
5     A.  Well, again, it's sort of picking up all
6     those things that we're not measuring
7     directly, but we think we know that they
8     have this pattern over time.  The functional
9     form, that is the subject of Chapter seven
10    here, is a set of assumptions about what
11    that pattern is like.  So when I mentioned
12    linear versus quadratic, one has to assume
13    that one knows how these factors progress
14    over time in terms of their effect on the
15    dependent variable.  But it's a catchall.
16    Q.  The model you've put forward in your 2008
17    declaration does not include time trend; is
18    that correct?
19    A.  That's correct.
20    Q.  You had originally planned to include a time
21    trend in your model; is that correct?
22    A.  That's correct.
23    Q.  And, for example, on the various occasions
24    where you've written down the equation
25    describing your model, you've included a

151

1     time trend in those equations; is that
2     correct?
3     A.  That's correct.  And again, when I wrote
4     down those models, I didn't write them down
5     in terms of this autoregressive model, and
6     there's a relationship between the choice of
7     model and the appropriateness of the time
8     trend.
9     Q.  Did you ever run a version of your model
10    with a time trend in it?
11    A.  I did.
12    Q.  When did you do that?
13    A.  Probably very early on.  As we talked about,
14    I used my class cert as the starting point
15    for my analysis, and included the time trend
16    based on what I thought would be the place
17    to start.
18    Q.  What were the results of the model when you
19    put the time trend in?
20    A.  I think as Mr. Keeley -- Dr. Keeley, excuse
21    me, his report shows that the time trend
22    essentially washes out the effect of
23    promotion in some models, not in every
24    model; but it is possible to put in time, in
25    particular, in the way that he did, which is

152

1     quadratic to nullify the promotional
2     results.
3     Q.  Did you run any versions with the time trend
4     where the effects were not washed out?
5     A.  I can't recall, but I believe with -- in
6     some of the linear models the time trend
7     doesn't have that effect, but it's --
8     clearly, any version of the time trend
9     clearly suggests that that inclusion of the
10    time trend is highly correlated with the
11    promotional spending variable.  Those two
12    variables are very highly correlated and,
13    therefore, they sort of wash one another
14    out.  The time trend picks up all the effect
15    that is otherwise attributable to promotion.
16    Q.  As a general matter, I take it time trends
17    are commonly included in regression models
18    specifically in the context of analysis of
19    impacts of pharmaceutical promotion?
20    A.  They can be or not.  There are some papers
21    that don't include this kind of time trend.
22    Certainly, our direct consumer advertising
23    paper included a variable -- there are
24    multiple drugs in that paper.  It included a
25    variable of time on the market, which is not

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

153

1    the same as a common time trend.
2       But if one thinks that there are
3    independent forces over time that can be
4    effectively captured by a time trend, then
5    it's not infrequently included.  I can't
6    tell you -- I don't believe there's a time
7    trend in every pharmaceutical promotion
8    papers, but I'd have to look back and check.
9    Q.  You said that time on the market is not the
10    same as a common time trend; what did you
11    mean by that?
12    A.  In the paper to which I'm referring, the one
13    I'm a co-author and know best, there are
14    five classes of drugs; and within those
15    classes, there are individual drugs, and
16    every drug in that case has a different time
17    on the market.  It's not perfectly
18    correlated with other key determining
19    factors; because the analysis is done at a
20    snapshot in time, for example, some drugs
21    have been on the market for 12 years, and so
22    there, specific time on market variable is
23    different for each drug, and, therefore,
24    it's not quite the same as a market-wide
25    common time trend which is what would be the

154

1    case here.
2    Q.  I see.  But putting aside that the age would
3    be different for each drug, is a time trend
4    -- does a time trend essentially measure the
5    passage of the number of months since the
6    start of your analysis?
7    A.  In this case, it does, yes.
8    Q.  That's what a time trend is, what we're --
9    A.  Yes, I'm sorry.  I was just explaining how
10    in these other models something that's
11    related to time, but is not specifically
12    this kind of time trend.  It's time since
13    launch for individual drugs -- time since
14    launch for individual drugs so that you can
15    separately identify the effect of the
16    calendar year from the age of the drug;
17    whereas, those two things are essentially
18    confounded here because there's only this
19    one drug.
20       Does that make sense?
21    Q.  I think so.  I may want to come back to it.
22       Let me ask you about another one of
23    your articles.
24       You are familiar with, obviously, the
25    one that looked at the effects of

155

1    pharmaceutical promotion on adherence to the
2    treatment guidelines of depression?  Did you
3    use a time trend in that article?
4    A.  I can't recall if that's a time since the
5    market or time trend, but I could look, if
6    you'd like me to, or if you'd like me to
7    tell what it is [sic].
8    Q.  Yeah, why don't we actually --
9    A.  That's fine.
10    Q.  -- take a look at that.
11    A.  Okay.
12       (Exhibit No. 7 marked.)
13    Q.  So we've marked as Exhibit 7, a document
14    entitled, "Effects of Pharmaceutical
15    Promotion on Adherence to the Treatment
16    Guidelines for Depression."
17       This is an article you co-authored,
18    correct?
19    A.  That's correct.
20    Q.  Is this the article that we were just
21    referring to?
22    A.  Actually, I was referring to one that's
23    related, but it is called, "Demand Effects."
24    They were from the same project; the same
25    co-authors.

156

1    Q.  Okay.  Let's look at page 1178 of this
2    article.  Let me direct you specifically to
3    the right column on this page and it's the
4    first full paragraph --
5    A.  Um-hum.
6    Q.  -- the second to last sentence.  I will read
7    it, it says, "Given that our analytical
8    strategy relied on temporal variation and
9    promotional spending and treatment patterns,
10    we included linear and quadratic monthly
11    time trends in the analyses to adjust for
12    secular trends in the treatment of
13    depression."
14       Did I read that right?
15    A.  That's correct.
16    Q.  Let me ask you first:  What's a "secular
17    trend"?
18    A.  "Secular trend" is anything that is varying
19    over time.  In the case -- we sort of say
20    "secular" in the sense of being independent
21    of the things that we're looking at.
22    Q.  Okay.
23    A.  So changes in treatment of depression for
24    other reasons.
25    Q.  This, I take it, refreshes your recollection

157

1    that you did, in fact, use a time trend for
2    the purposes of this analysis you did?
3    A.  Sorry.
4    Q.  It's okay.
5    A.  Doesn't surprise me at all that I might have
6    used a time trend in such an analysis.
7    Every model is different and certainly time
8    trends, as I noted, are used in the
9    literature in some analyses, but I don't
10   believe all of them.
11   Q.  Now, it says here in the sentence that we
12   were just reading, that your use of a time
13   trend resulted from the fact that your
14   analytical strategy relied on temporal
15   variation in promotional spending and
16   treatment patterns; is that correct?
17   A.  That's correct.
18   Q.  Your analysis, here, for your 2008
19   declaration, that also relies on temporal
20   variation and variation in promotional
21   spending and treatment patterns?
22   A.  That's correct.  Again, we use a more
23   sophisticated time series model that
24   accounts for these temporal patterns by
25   looking at the association between

158

1    unexplained variation in the current period
2    and unexplained variation in previous
3    periods.  So it also is a way of addressing
4    these time series relationships that are
5    inherent in both the dependent and
6    independent variables.  It's a different
7    approach.
8    Q.  You are referring to your AR or
9    autoregressive analysis?
10   A.  That's correct.
11   Q.  Did you use an AR analysis in "Effects of
12   Pharmaceutical Promotion on Adherence to the
13   Treatment Guidelines for Depression," your
14   own article that we were just looking at?
15   A.  No.  So this was estimated in generalized
16   estimating equations.  It's a panel data
17   model; unlike the model for Neurontin, this
18   has a set of products over time.
19   Q.  Okay.  Are there other papers where you've
20   used an AR method that you've published?
21   A.  There are other papers where I've included
22   AR properties in a panel data analysis, so
23   without putting too fine a point on it, one
24   can look at data like these, which looks at
25   populations over time and still account for

159

1    the autoregressive nature of the model.
2    It's slightly different, but it's an
3    adjustment that actually happens after the
4    fact, as opposed to the full AR model.  So I
5    think, in terms of this specific full AR
6    model, I don't believe anything I've
7    published uses this kind of analysis.
8    Q.  The papers that you were just referring to,
9    can you give me some more specific
10   information about them so I might be able to
11   identify them?
12   A.  Sure.  Absolutely.  Well, the one that I was
13   thinking of in particular is a paper called
14   "From Concept to Practice," and it looks at
15   the effects of pay for performance on the
16   quality of medical care.  It also is a panel
17   data analysis that looks at a set of medical
18   groups over time and, again, it's an
19   analysis of their performance relative to an
20   intervention.  And because there is this
21   autoregressive nature of the data, we
22   correct the standard errors using an ex-post
23   estimator.
24   Q.  Okay.  Anything besides from "Concept to
25   Practice"?

160

1    A.  That's the one that comes to mind.  I'd have
2    to review, but I think that that's likely to
3    be the only one that I can think of.
4    Q.  Now, if I have understood you correctly, you
5    said that it's your AR analysis that
6    accounts for factors that in other
7    situations a time trend would account for;
8    is that correct?
9    A.  It's not that they are exactly the same
10   thing, but in an AR model, one explicitly
11   looks at functional form in a -- in the
12   sense of the stochastic process in the data
13   over time.  And so it's focusing on the
14   unexplained variation and the correlation of
15   those errors over time, and that's what the
16   AR terms do.
17        So for data like these, the first
18   thing that one wants to look at is in a
19   basic model, do we see these autoregression
20   properties?  Do we see that the errors are
21   correlated over time?  You see it in my
22   results.  I report a unit root test which
23   says something about these two processes
24   over time that suggests a problem in
25   modeling this without the AR terms included.

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

161

1  Because the errors essentially -- we don't
2  get white noise, which is what the
3  assumption in regression models is about
4  those errors.  And so we include the
5  autoregressive terms and then that strips
6  out this -- this problem so we get random
7  errors again.  And so that's the first thing
8  we do to account for those patterns over
9  time.  One could conceptually include a time
10  trend as well.
11  Q.  If you had not employed this AR method,
12  would you have needed to include a time
13  trend?
14  A.  Well, I guess, again, when we looked at
15  these data and it was fairly obvious from
16  the series that we were going to have this
17  problem with serial correlation, we started
18  out with the AR model, so I didn't test
19  models with and without the AR process
20  because I knew that I had this unit root
21  problem.  So I don't know exactly how to
22  answer your question.
23  Q.  Well, let me try this like this:  I take
24  it -- are there background factors of the
25  type that are sometimes picked up by time

162

1  trends that you feel you would need to take
2  account of for your model that you've put
3  forward?
4  A.  Well, certainly, again, as I approach the
5  problem, I thought, Okay.  There may be
6  these time factors, and one would want to
7  put in a time trend potentially to address
8  them.  And as I mentioned, when we put the
9  time trend in, the effective promotion goes
10  to zero.  They are obviously, and one can do
11  a test and show that they are quite highly
12  correlated.  But you and I can both look at
13  the data and see that the stock of promotion
14  is very highly correlated with a quadratic
15  time trend.  That is, it looks like that
16  [indicating].  And so if you put two
17  variables that have exactly the same
18  pattern, you can't separate them.
19  Q.  You refer to time factors that you realized
20  from the outset you might want to take
21  account of; can you give me some specific
22  examples of those.
23  A.  Well, I think the kinds of things that you
24  mentioned, which would be changes in
25  scientific awareness, I think would be the

163

1  general category that one would put on this.
2  And, again, to the extent that those are
3  omitted, which they obviously are, they get
4  picked up to some degree in the functional
5  form that the AR process is intended to
6  recreate.
7  Q.  Any other examples of time factors that you
8  have in mind?
9  A.  I think that that's sort of the most
10  important one.
11  Q.  Is there any other aspect of your model
12  besides the AR process that has an ability
13  to account for the types of time factors
14  that you've referred to?
15  A.  Obviously, the biggest thing that I think is
16  happening over time is promotion, and so
17  that is picking up efforts by Parke
18  Davis-Pfizer to disseminate the drug.  So
19  then we say, Well, over time, there's
20  changing awareness about the drug.  I'm
21  capturing that level of changing awareness
22  about the drug that is perpetuated through
23  promotion.
24      If there are other kinds of mechanisms
25  for diffusion -- I use the drug; I tell you

164

1  about the drug -- those are just picked up
2  in the error term.
3  Q.  By "the error term," you mean the AR
4  analysis that you've done?
5  A.  That's correct.  The entire error term of
6  which the error -- the AR terms attempt to
7  move that to a place where we do have
8  meaningful standard errors and a meaningful
9  interpretation of the coefficients.
10  Q.  Okay.  I think I understand you, but the
11  types of time factors that are not included
12  as explanatory variables in your model, for
13  example, the word of mouth that you just
14  referred to, the talking, those sorts of
15  factors that are not included as explanatory
16  variables, your model addresses those using
17  an AR analysis, but not in any other way; is
18  that correct?
19  A.  That's correct.
20  Q.  All right.  Let's go off the record.
21      THE VIDEOGRAPHER:  The time is
22  12:29.  This is the end of cassette two.  We
23  are off the record.
24      (Lunch recess.)
25      THE VIDEOGRAPHER:  The time is

165

1    1:23. This is the beginning of cassette
2    three in the deposition of Professor
3    Rosenthal.  We are on the record.
4    Q.  Professor Rosenthal, we were talking about
5        time trends before lunch.
6            Here is a question:  If a time trend
7        does not help to explain changes in the
8        dependent variable, won't the regression
9        model itself tell you that by returning an
10       insignificant coefficient on the time trend?
11   A.  If you are saying if it's not important,
12       doesn't pick up any effects, it will be
13       insignificant; that's true, although, as I
14       think we'll probably proceed to discuss,
15       because a time trend is a catch-all
16       variable, there may be other reasons for
17       excluding it that don't have to do with
18       insignificance.
19           But right, if there were no
20       time pattern that was either linear or
21       quadratic as however you specified that time
22       trend, then it would be insignificant.
23   Q.  When you put the time trend in the versions
24       of the model that you ran that included the
25       time trend, did the model tell you that they

166

1        were statistically significant?
2    A.  In some models it was and in some it wasn't.
3    Q.  Why did you decide not to include it?
4    A.  So in the main model that we have used here
5        with the AR terms, AR-2 terms in the model
6        of total prescriptions, when you put a time
7        trend in, particularly a quadratic time
8        trend as Mr. Keeley -- Dr. Keeley has done,
9        all the other coefficients go to zero in
10       effect.  All of the effect is picked up by
11       that assumption that what you're capturing
12       in the time trend is something unrelated to
13       what you're interested in.
14           And so that's an obvious sign that the
15       time trend as specified is very highly
16       correlated with the variables you've
17       included.  They are significant.  You add
18       it.  Everything else goes away.
19           And so, it was clear to me that one
20       could not simultaneously estimate a time
21       trend which is based on an assumption about
22       unmeasured variables and the variable we
23       actually care about, promotion, which we
24       have quantified and measured and included.
25       The two things were incompatible.

167

1    Q.  And the reason you concluded that they were
2        incompatible is because the coefficient on
3        detailing went away when you put in the time
4        trend?
5    A.  That's correct.  So, again, the time trend
6        is a catch-all variable, and you run the
7        risk of putting in two things that are
8        perfectly correlated.  If they were two
9        measured variables, for example, we had
10       promotion and some measure of, let's say
11       scientific articles and they were perfectly
12       correlated, we would agree that because of a
13       problem called multicollinearity, that you
14       couldn't include them both in the regression
15       and interpret them both.  The same way with
16       this time trend, it precludes this
17       interpretation because promotion is the
18       variable that we understand it comes from an
19       economic model; we have measured it.  We
20       include that one and we don't include the
21       time trend.
22   Q.  Picking up on that topic of
23       multicollinearity, did you determine that
24       your promotional variable was multicollinear
25       with the time trend?

168

1    A.  Not a specific test, but, again, the general
2        intuition, when you put in the time trend,
3        we can see that the promotional data, the
4        promotional stock looks like a quadratic
5        time trend.  When we put in the time trend,
6        the significant effect that we found with
7        promotion goes away, so that's
8        an obvious sign of collinearity.
9    Q.  Did you do any other testing of the extent
10       of collinearity between promotional
11       expenditures and the time trend?
12   A.  I didn't do a formal test, no.  It wasn't
13       necessary.
14   Q.  Is it fair to say that as a general matter
15       that your promotion variable and your
16       dependent prescriptions quantity variable
17       both trend up over time?
18   A.  That's true, absolutely.
19   Q.  Okay.  Now, a question on this correlation:
20       Isn't another way to put you are not
21       able to separate out the effects on the
22       dependent variable of the promotion from the
23       time trend because of the correlation that
24       you determined was there?
25   A.  In a sense, although, again, because the

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

169

1    time trend is -- that variable is based on
2    what we would call a functional form
3    assumption, which is to say that whatever it
4    is that is happening over time follows this
5    quadratic pattern.  It increases at a
6    decreasing rate.  That's an assumption.
7    Frequently made one, but it's untestable.
8    And so the inclusion of an untestable
9    variable in this case, it would make no
10   sense to let that variable tell the story of
11   the regression rather than a variable with
12   economic meaning.
13        So it's a little different than the
14   situation where we have two variables we
15   know are important and they're very highly
16   correlated and so we have to figure out what
17   to do, include one, include an index of the
18   two.  In this case, the variable that
19   promotion is highly correlated with, isn't
20   really a variable at all.  It's an
21   assumption about time patterns.  And so it's
22   impossible to testify the extent to which
23   that is getting picked up in our promotional
24   variable.
25   Q.  Looking at just what the model was telling

170

1    you in terms of the econometric results when
2    you had the time trend and the promotional
3    expenditures in there, did the econometrics
4    tell you that the time trend had more
5    explanatory power than the detailing
6    expenditures?
7    A.  Well, it's not entirely clear how one should
8    interpret those coefficient results when we
9    have this problem.  You're correct in
10   suggesting that the quadratic trend in some
11   models was statistically significant in the
12   sense that one would do what's called an
13   F-test on the two pieces of the quadratic
14   trend and say that it has a statistically
15   significant effect.
16        But, again, one has to think about
17   what we're doing here, and if I looked at a
18   data series, I could always fit a functional
19   form to it.  I could say, Well, that looks
20   like it's exponential, or, That looks like
21   it's quadratic; and one can always fit a
22   trend and find that it's significant.  But
23   to do so in this case is to suggest that
24   some other factors unrelated to promotion
25   are driving all of the change in sales in

171

1    effect of Neurontin and that all the
2    billions of dollars that Pfizer and Parke
3    Davis spent on promotion has no effect,
4    which is clearly not correct.
5    Q.  So if I understand you, then, the concern
6    with leaving the time trend in is that the
7    time trend is picking up to some extent the
8    effects of the promotional expenditures; is
9    that correct?
10   A.  That's correct.  More or less by design a
11   quadratic time trend fitted to a quadratic
12   set of total prescriptions is going to pick
13   up some of the those effects; and, again,
14   because of the correlation between
15   promotion, which has the cumulative effect
16   that looks very much like that quadratic
17   trend, the two things are very hard to
18   separate and, in effect, including the time
19   trend gives the nonsensical result that
20   promotion doesn't matter.
21   Q.  So your decision to exclude the time trend
22   was based on the results that you got when
23   the time trend was in it; is that fair to
24   say?
25   A.  It's based on the good practice of

172

1    econometrics, which is we don't just try to
2    get a -- put a model with nonsense
3    variables.  Time trends can be useful, but
4    if we pick a time trend that perfectly fits
5    the data and makes all the economic
6    variables meaningless, then we haven't
7    accomplished anything.  We haven't increased
8    our understanding of the processes at work.
9    Q.  Now, your solution to this issue of not
10   being able to separate out the effects of
11   the time trend and promotional variable was
12   to exclude the time trend completely; is
13   that correct?
14   A.  That's correct.
15   Q.  And given the difficulty in separating out
16   the effects of the two of them, how do you
17   know that by eliminating the time trend you
18   don't have the promotional variable picking
19   up the effects of some of these time
20   factors?
21   A.  Well, it's an untestable question, because,
22   by definition, that time variable is
23   undefined except by some functional form
24   assumption.  It's inherently untestable.
25   Q.  So you're not -- I guess what I'm saying is

173

```
 1     you don't know one way or the other sitting
 2     here now, or at any point, you haven't been
 3     able to determine the extent to which your
 4     promotional variable may be picking up some
 5     of these time factors that you've discussed?
 6  A. To the extent that one could measure some
 7     factor that's moving over time in the same
 8     way that promotion, that would be true, that
 9     that coefficient would pick up the effect of
10     that variable.
11  Q. And you are not able to say to what extent
12     it is doing that?
13  A. If I could measure those variables, I would
14     include them in the model, so, no, I'm not
15     able to say the extent to which that's true.
16  Q. And by "those variables," you are referring
17     to the time factors that we discussed before
18     that might have an independent effect on
19     prescriptions apart from promotion?
20  A. That's correct.
21  Q. We talked earlier about a couple of your
22     articles where you've employed time trends
23     before; is that right?
24  A. Yes, that's right.
25  Q. Did you face any issue in either of those
```

174

```
 1     articles regarding correlations between one
 2     of your promotional variables and the time
 3     trend?
 4  A. Well, these articles are over five years
 5     ago, but I have a recollection that the
 6     "Demand Effects" article includes results
 7     with and without the time trend. But I may
 8     be incorrect, I'd need to take a look at
 9     that one.
10  Q. Is that the article we were just looking at
11     before?
12  A. It's in the "Frontiers in Health Policy."
13     It predates this article by a little bit.
14  Q. I have a copy of that so let's look -- mark
15     that.
16  A. That's fine.
17     (Exhibit No. 8 marked.)
18  A. Okay. I have it now.
19  Q. Okay. Just for the record, this is a
20     document entitled, "Frontiers in Health
21     Policy Research, VI," and is that the name
22     of a book in which an article of yours
23     appeared in?
24  A. That's correct. It's an edited volume that
25     comes out every year.
```

175

```
 1  Q. And if we turn to page three of this
 2     document, there's an article here entitled,
 3     "Demand Effects of Recent Changes in
 4     Prescription Drug Promotion"; is that the
 5     article that you co-authored that you've
 6     been referring to?
 7  A. That's correct.
 8  Q. All right. Well, with this in front of you,
 9     why don't you refresh your recollection on
10     that issue of the time trend and we'll
11     proceed with those questions. Go ahead.
12  A. I beg your pardon. I get worse as the day
13     wears on.
14         I'm looking at table 1.3 on page 17 as
15     marked on the article itself. And you will
16     see that in the class demand models, we have
17     some in which we include the time trend and
18     some in which we do not.
19  Q. Right. And why did you report it both ways
20     in this article?
21  A. Again, because there's some question as to
22     whether it's appropriate to let functional
23     form assumptions drive your results and we
24     wanted to see them both ways.
25  Q. And what was your conclusion in this
```

176

```
 1     article?
 2  A. In this case, again, we're looking across
 3     multiple classes, the time trend inclusion
 4     doesn't affect the variables of interest
 5     very much at all. As you look across, for
 6     example, the direct consumer advertising
 7     coefficients there, they are quite similar.
 8     The same is true for detailing; they simply
 9     don't have that effect.
10  Q. Did you face any issue here, though, of
11     potential correlation between a time trend
12     and your promotional expenditures variable?
13  A. So because of the fact that we had these
14     separate trends in detailing and --
15     direct-to-consumer advertising for the
16     class, we're able to separate out the effect
17     of promotion from the general time trend
18     because we have cross-sectional variation
19     that helps us identify. It's a little hard
20     to explain, but it's a slightly richer
21     problem because there are different patterns
22     within each class, and because they don't --
23     they are not simultaneous, we can then
24     separately identify that time trend effect.
25  Q. Let's look at that other article of yours
```

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

177

1     that we were talking about.
2         Do you still have that in front of
3     you?
4     A. Exhibit 7?
5     Q. Correct. That's the "Demand Effects"?
6     A. Sorry.
7     Q. Pardon. I may be misspeaking. What is the
8     title of the other article?
9     A. "Effective Pharmaceutical Promotion on
10    Adherence to Treatment Guidelines for
11    Depression."
12    Q. Right. Now, in this article you use the
13    time trend as well; is that right?
14    A. That's correct.
15    Q. And that was just a single variable that
16    measured the -- a counter that told you how
17    far into the time period you were?
18    A. Let me just take a look to see whether it's
19    a quadratic trend or a linear trend which
20    sounds like what you're describing.
21    Q. Right.
22    A. It has been some time. (Witness reviewing
23    document.) So that's linear and quadratic
24    time trends.
25    Q. Okay. So in this article, did you face any

178

1     issue of potential correlation between your
2     time trends and your promotional variables?
3     A. Possibly. Again, this article is a panel
4     data analysis where we look at a set of
5     patients, and so it's a much richer model.
6     We don't have the same kind of time series
7     problem where we're looking at these
8     aggregate time series and trying to parse
9     out the effect. We have variation at the
10    individual patient level. We have a variety
11    of other sources of variation that lead to
12    an ability to identify the effects of time
13    separately from promotion.
14    Q. Was there any degree of correlation between
15    your promotional variable and the time
16    trends in this article?
17    A. I can't recall.
18    Q. Was that -- would that have been something
19    you would have looked into though?
20    A. I think, again, as in the paper we talked
21    about in Exhibit 8, we would have looked at
22    models with and without a time trend. And
23    if we found this effect that I described,
24    where the time trend simply eliminated the
25    effect of promotion, then I think we would

179

1     probably have debated whether or not to
2     include the time trend. I can't recall if
3     that were true in this case.
4     Q. That's the debate as you called it? Did you
5     have a debate in the context of this case
6     here in your --
7     A. Certainly.
8     Q. -- work here. With whom --
9         MR. WESTON: Which case?
10        MR. MISHKIN: I'm sorry.
11    Q. I'm talking about Clark and your --
12    specifically in connection with 2008
13    declaration in this case.
14        Did you have a debate, as you called
15    it, regarding whether to leave the time
16    trend or take it out?
17    A. We considered what would be appropriate to
18    do. And, clearly, the results, including
19    the quadratic time trend, made no sense, and
20    therefore we excluded it.
21    Q. With whom did you have those discussions?
22    A. In all likelihood, it would have been both
23    Dr. Hartman and Dr. McClure.
24    Q. Did either one express any concerns with
25    omitting a time trend from the equation?

180

1     A. Not that I recall, no.
2     Q. Can I ask you: In your general work, your
3     work, generally, outside the context of this
4     case, could you site for me examples where
5     you decided to omit a time trend because of
6     the correlation problem that you've been
7     talking about here?
8     A. Well, I would say, again, the "Demand
9     Effects" article, we felt that it was
10    important to present the results with and
11    without the time trend because of the
12    possibility that we could be essentially
13    washing out the true effect by putting in
14    this functional form assumption, and that's
15    what motivated showing both of those
16    results. In that case, it made little
17    difference.
18        But, certainly, that's the same kind
19    of thinking here that one wants to --
20    particularly in a time series case, any
21    assumptions around functional form, that is,
22    what is the underlying shape of this
23    relationship; those assumptions are
24    untestable and often can drive results, and
25    so we're always cautious about that.

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

181

1   Q. Can you give me an example in your work
2      where inclusion of a time trend led you to
3      appreciably different results and, yet, you
4      decided that those results were not
5      appropriate and that, in fact, the time
6      trend should come out?
7   A. I can't recall in the case of that specific
8      variable.  Certainly -- we certainly have
9      run models where inclusion of a variable,
10     for example, obtains economically
11     unreasonable results.  You put prices in and
12     we find that high price leads to high
13     quantity.  Clearly, there's a problem with
14     that model, and one would then leave price
15     out.  I've certainly been in that kind of
16     situation.  I can't recall specifically with
17     respect to a time trend.
18  Q. Are you aware of any other articles in the
19     area of pharmaceutical promotion, articles
20     that have employed regression models to
21     analyze the impact of pharmaceutical
22     promotion that have made a decision to omit
23     a time trend for the reasons you've applied
24     here?
25  A. I'm not sure it would ever be clear from the

182

1      article.  I do know that some of the models
2      have not included a time trend, but I don't
3      know why.
4   Q. All right.  And for those articles that you
5      are thinking of, you don't know what impact
6      it would have had on the results if the time
7      trend had been included; is that correct?
8   A. That's correct.
9   Q. Let's talk a little bit more about the AR
10     process.  I'm not sure I'm fully
11     understanding it.  I know that it's a bit
12     technical, maybe if you could help me just
13     in some more basic terms.  I do understand
14     that it has to do with correlation among the
15     error terms; is that correct?
16  A. That's correct.
17  Q. How does it help to account for these sort
18     of background trends or time markets that
19     you referenced; could you explain that to me
20     again?
21  A. So if you think conceptually about what one
22     uses a time trend for, it's for something
23     that is happening over time that you can't
24     measure through other economic variables.
25     And so in the case of the AR, we're looking

183

1      at the residuals from the current period and
2      saying, whatever it is that's in those
3      residuals is the same kind of thing; it's
4      what I'm not measuring in my explanatory
5      variables.  But the basic assumption of
6      regression modeling is that those residuals,
7      that they are random.  But if, in fact, what
8      I'm not measuring today has an effect on the
9      error tomorrow, then that assumption is
10     wrong.
11        And so it's, in essence, talking about
12     a time pattern among unmeasured factors.
13     It's not exactly the same as -- it's
14     somewhat less parametric than the time trend
15     that we were talking about before, where I
16     say, This is a variable that increases in
17     this particular way.  In the linear case,
18     the simplest case, it increases in
19     increments of -- constant increments over
20     whatever measure of time I have.
21        The AR process is -- talks about the
22     correlation among the -- that error from one
23     period to the next.  And in our model, we
24     say that it's correlated with the last
25     period and the period before that, and then

184

1      the correlation goes to zero.
2   Q. Is AR analysis used to address omitted
3      variable bias?
4   A. It's -- not in that way, no.  Again, it's
5      really about the pattern of the errors.
6   Q. Does your report discuss anywhere the
7      ability of the AR analysis to account for --
8      I'll start over.
9         Does your report discuss anywhere the
10     ability of the AR analysis to account for
11     the time factors that we've been talking
12     about?
13  A. I'm not sure exactly how it is written.  I
14     think it probably is couched more in terms
15     of the, as we say, the stochastic process,
16     but I don't think it explicitly says, This
17     is intended to capture unmeasured factors
18     that vary over time, no.
19  Q. You mentioned before that you've used an AR
20     analysis on another occasion, at least one
21     other occasion?
22  A. Um-hum.
23  Q. Have you ever used an AR analysis on another
24     occasion instead of a time trend to account
25     for time factors?

185

1  A.  No.
2  Q.  Are you aware of any published econometric
3      analyses of pharmaceutical promotion that
4      have used an AR analysis of the type that
5      you use here instead of a time trend to
6      account for time factors?
7  A.  No, I am not aware of any of those, no.
8  Q.  Let me mark the next exhibit.  I'm going to
9      give you another textbook.
10  A.  This one I think I've seen.
11  Q.  We'll see.
12  A.  I guess there's one more.  I do know this
13      one too.
14          (Exhibit No. 9-10 marked.)
15  Q.  Professor Rosenthal, I've marked first an
16      excerpt from a textbook by Jeffrey
17      Wooldridge, called "Introductory Economics:
18      A Modern Approach," Third Edition.  The
19      exhibit that you have in front of you
20      consists of the title page and the preface
21      to the book.
22  A.  Okay.
23  Q.  I've also put in front of you the complete
24      textbook which you should feel free to refer
25      to if you'd like.

186

1          I think you already said, but just
2      again for the record, are you familiar with
3      this textbook?
4  A.  I am familiar with this textbook, yes.
5  Q.  What is the basis of that familiarity?
6  A.  I may or may not own a copy, but I've
7      certainly referenced it before.  This is a
8      more standard econometrics textbook.
9  Q.  Would you consider it to be reliable?
10  A.  Certainly.
11  Q.  All right.  Let's look at the next exhibit,
12      which has been premarked, and that's an
13      additional excerpt from the same Wooldridge
14      textbook, and it contains some pages from
15      section 10.5 of the textbook.
16  A.  I see it.
17  Q.  Are you with me there?
18  A.  Yes.
19  Q.  And section 10.5 is entitled, "Trends and
20      Seasonality"; is that correct?
21  A.  That's correct.
22  Q.  All right.  So looking at the first page of
23      the excerpt, that's page 363, let's look at
24      the third sentence.  It reads, "Ignoring the
25      fact that two sequences are trending in the

187

1      same or opposite directions can lead us to
2      falsely conclude that changes in one
3      variable are actually caused by changes in
4      another variable."
5          Did I read that right?
6  A.  Yes.
7  Q.  And let's also look at the next sentence,
8      which states that, "In many cases, two time
9      series processes appear to be correlated
10      only because they are both trending over
11      time for reasons related to other unobserved
12      factors."
13          Did I read that right?
14  A.  Correct.
15  Q.  Do you agree with these statements in the
16      book?
17  A.  Certainly.  That's the central problem that
18      we're dealing with in the time series
19      analysis.
20  Q.  Let's look at page 366.  And here we're in
21      another subsection of the same general
22      section that we've been in, and this
23      subsection is called, "Using Trending
24      Variables in Regression Analysis."
25          Do you see the last sentence of the

188

1      first paragraph, it reads, "The phenomenon
2      of finding a relationship between two or
3      more trending variables simply because each
4      is growing over time is an example of a
5      spurious regression problem, fortunately,
6      adding a time trend eliminates this
7      problem."
8          Did I read those sentences correct
9  [sic]?
10  A.  That's correct.
11  Q.  Do you agree with those statements?
12  A.  Spurious regression is a situation where
13      these two factors, as explained here, are
14      trending over time and there's no
15      relationship between them.  The increase in
16      promotion by economic theory causes
17      increases in sales and so that's not a
18      spurious relationship; it's a causal one.
19      So it is certainly true that one can put
20      variables together that simply move with
21      time.  That doesn't mean that it's always
22      appropriate to put a time trend in if
23      there's indeed a causal relationship
24      positive between them.
25  Q.  Let's take a look at page 369.

189

1      Do you see the second full paragraph
2   on this page, more specifically, the second
3   sentence, it reads, "If the trend term is
4   statistically significant and the results
5   change in important ways when a time trend
6   is added to a regression, then the initial
7   results without a trend should be treated
8   with suspicion."
9      Did I read that right?
10  A. You did.
11  Q. Do you agree with that statement?
12  A. I think, again, one can't simply look at
13  these variables as if they had no meaning.
14  If we know, by economics, there's a causal
15  relationship and adding the time trend
16  removes that relationship and we don't know
17  what we're picking up with the time trend,
18  it would not make sense to interpret the
19  time trend and not interpret the economic
20  variable of interest.
21  Q. When you add the time trend, would you agree
22  that the -- your root results do change in
23  important ways?
24  A. That is true.
25  Q. All right.  You can put that aside.

190

1      Let's go back to Exhibit 1, which is
2   your 2008 declaration.
3   A. Okay.
4   Q. Why don't you turn to page 14 and take a
5   look at paragraph 34.
6   A. (Witness complies.)
7   Q. Do you see that the third sentence of this
8   paragraph states that your model accounts
9   for the fact that price and promotion are
10  codetermined with the quantity of Neurontin?
11  A. Yes, I do.
12  Q. What do you mean "that price and promotion
13  are codetermined with the quantity of
14  Neurontin"?
15  A. We understand, by economic theory, that
16  those same factors that might lead a company
17  to set a price in a certain way, also
18  knowing that, for example, that a product is
19  going to have a big market opportunity will
20  lead to different strategies about promotion
21  and pricing.  And so there is a relationship
22  whereby the dependent variable prescriptions
23  and these two independent explanatory
24  variables actually cause one another in both
25  directions.

191

1   Q. Can you tell me about that more specifically
2   with respect to the promotions variable, how
3   that might work?
4   A. So, for example, a product that is believed
5   to have a larger market opportunity will be
6   promoted more heavily.
7   Q. And is the failure of -- withdraw that.
8      The consequences of failing to address
9   endogeneity is that your results may not be
10  reliable?
11  A. They may be biased, yes.
12  Q. And by "biased," what would a layperson's
13  understanding of what "biased" means?
14  A. Depending on what that specific relationship
15  between the causation that happens in the
16  other direction from sales to promotion,
17  depending on the nature of that, they may be
18  either too high or too low.
19  Q. Fair enough.  So your results could be too
20  high or too low, but -- withdrawn.  Let me
21  try this again.
22      Is it fair to say in simplistic terms
23  that your results may be incorrect if you
24  fail to address endogeneity appropriately?
25  A. That's true.

192

1   Q. Okay.  You use the technique known as
2   instrumental variables to attempt to address
3   endogenity in your model?
4   A. That's true.
5   Q. Was that your idea to employ variables?
6   A. Yes.
7   Q. Did you employ any other technique besides
8   instrumental variables to address
9   endogeneity in your model?
10  A. No, that's the way economists address
11  endogeneity.
12  Q. Did you run any other tests to look at the
13  issue of endogeneity in any way?
14  A. We ran a Haussman test to the original model
15  to ascertain that, in fact, there was reason
16  to believe that there was endogeneity to
17  begin with.  As I noted, theory suggests to
18  us that this should be a problem, and, in
19  fact, the test shows that.
20  Q. When did you run the Hausmann test?
21  A. When we were first starting -- it was my
22  assumption that we would need to use an
23  instrumental variable model, but it made
24  sense to test that assumption first, and we
25  did that very early and then ran these

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

193

1    instrumental variable models right away.
2    Q.  Did you -- had you already selected your
3        instruments when you ran the Hausmann test?
4    A.  You need to have a set of instruments in
5        order to run the Hausmann test.  The
6        Hausmann test is what economists call a
7        relatively weak test.  It's dependent on a
8        certain set of untestable assumptions
9        itself, and, in particular, to test whether
10       there's an endogeneity, you have to have
11       something exogenous to begin with and that's
12       what those instruments are.
13   Q.  So you mentioned untestable assumptions,
14       what are those assumptions that the Hausmann
15       is based on?
16   A.  That the instruments that you are using to
17       test it are good ones.
18   Q.  I see.  Did you run any other tests besides
19       the Hausmann -- let me withdraw that.
20          Did you do any statistical analysis
21       other than running the Hausmann test and
22       performing an IV that addressed in any way
23       the issue of endogeneity?
24   A.  So the other statistical test that we looked
25       at in doing the IV is a sort of an intuitive

194

1    one.  There's a problem in instrumental
2    variables estimation called the problem of
3    weak instruments, and that is if your
4    instruments don't explain enough of the
5    variation in the endogenous variable, then
6    you can get falsely positive results.
7       And so, I looked at that, which, in
8    essence, looks -- I'm trying not to use the
9    technical term.  It looks at the percent of
10   the variation in the variable, we're looking
11   at promotion here, that's explained by the
12   instruments.  It's the incremental R-squared
13   that's explained by the instruments.
14   Q.  Are you talking about the R-squared in your
15       first stage --
16   A.  In the first stage regression, yes.  Thank
17       you for saving me.
18   Q.  Okay.  Other than looking at the R-squared
19       from your first stage regression results,
20       running the Hausmann test and employing IV
21       overall, did you do anything else to look at
22       or address the issue of endogeneity?
23   A.  No.  Not specifically statistical tests, no.
24   Q.  All right.  I'd like to discuss the
25       instruments that you used, and I think the

195

1    easiest way to do that is to go to
2    Attachment E of your report.
3    A.  Yes.
4    Q.  I'm on page two, paragraph five.
5    A.  Okay.  I'm with you.
6    Q.  Do you see the second sentence, which
7        begins, "The following variables were used
8        as instruments"?
9    A.  Yes.
10   Q.  Does the list that follows here in paragraph
11       five represent a complete list of the
12       instruments that you used?
13   A.  It does in the sense -- E-Views, again, it's
14       the letter E before the word views, it's the
15       software, time series software.  Based on
16       the theory, E-Views automatically includes
17       these variables, but also the lags, that is
18       last month's -- a measure of last month's
19       value of the same set of variables as
20       instruments as well.
21   Q.  When you say that E-Views automatically
22       includes these, you don't mean to say that
23       E-Views automatically includes the specific
24       instruments that you've included here?
25   A.  So we put the instruments in and they

196

1    automatically include not the only current
2    values but the last month's values.  So just
3    to be clear, these are the variables that
4    are the instruments, but, technically, their
5    last month's version is included in the
6    instruments list as well.
7    Q.  Okay.  So apart from the lagged values that
8        you are talking about, does paragraph five
9        give a complete list of the instruments you
10       used?
11   A.  It does, yes.
12   Q.  Let's walk through them.
13          The first instrument is the CPI index
14       for all urban consumers; is that correct?
15   A.  That's correct.
16   Q.  The second one is the CPI index for
17       prescription drugs and medical supplies; is
18       that correct?
19   A.  Correct.
20   Q.  The third instrument is the PPI index for
21       specialized business and professional
22       periodicals; is that correct?
23   A.  Correct.
24   Q.  What is it fourth instrument?  I see the
25       words "advertising," but I'm not sure in

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

197

1   context here what that means.
2   A. I'm sorry. That's actually not the fourth
3       instrument. That's a modifier to the one
4       that just precedes. So it's the PPI index
5       for specialized business and professional
6       periodicals and advertising.
7   Q. Understood.
8   A. So it's part of the PPI. I apologize for
9       that.
10  Q. That's fine. And then the fifth instrument
11      is the PPI index for pharmaceutical
12      preparation manufacturing; is that correct?
13  A. That's correct.
14  Q. And the last instrument is average weekly
15      earnings of production workers in the
16      pharmacy industry; is that correct?
17  A. That's correct.
18  Q. Any others besides what I've mentioned and
19      also the lagged values that we've talked
20      about?
21  A. No.
22  Q. Did you ever consider using any other
23      instruments besides these ones listed here
24      in paragraph five?
25  A. Well, we looked at the literature and --

198

1       which I imagine you've done as well, and you
2       will see that this same set of instruments
3       is very typically used in these
4       pharmaceutical promotion studies. So I
5       believe that these are the only ones that we
6       contemplated.
7           Perhaps I should say a little bit
8       about how one goes about selecting an
9       instrument. We're looking for variables
10      that are associated with the variable of
11      interest, that is promotion in this case.
12      Let's just talk about promotion and not
13      price. We want variables that are
14      associated with that, but only effect sales
15      in this case, through that promotion
16      variable.
17          And so it's, again, an exercise in
18      economic theory first and foremost, because
19      some of these assumptions are inherently
20      untestable so one must use good economic
21      sense.
22  Q. Is one of the assumptions that would be
23      untestable whether or not your instruments
24      are valid?
25  A. There are tests like the Hausmann test and

199

1       the Stock/Stagger test, which is that
2       R-squared test, but all those tests required
3       certain assumptions. We can only test
4       instruments against a regression that
5       includes other instruments that we think are
6       valid.
7   Q. The two tests that you just referenced,
8       those both assume that your instruments are
9       valid to begin with; is that correct?
10  A. In some sense.
11  Q. And in what sense do they not?
12  A. So the Stock/Stagger test is just looking at
13      the incremental R-squared, and so that's
14      trying to test this notion that the
15      instrument actually has an effect on the
16      thing being instrumented for. But it's not
17      simultaneously testing whether or not that
18      instrument only affects sales through
19      promotion.
20          So the Hausmann test tries to say, Do
21      these things affect sales only through
22      promotion, and to do so, one has to include
23      a set of instruments that one thinks to be
24      valid in order to get a set of residuals
25      that are meaningful for the purpose of the

200

1       Hausmann test.
2   Q. The Hausmann test doesn't have any ability
3       to tell you whether your instruments are
4       valid; is that correct?
5   A. I think inherently it does so with a set of
6       assumptions. But I think most economists
7       recognize that these tests are not perfect,
8       so --
9   Q. I'm just unclear when you say that it does
10      so with a set of assumptions --
11  A. It tests whether the residuals from your
12      equation are uncorrelated with the
13      instrument, but that test is only meaningful
14      if the equation you're testing it against is
15      the right one.
16  Q. And by the right equation, do you mean
17      whether you have valid instruments?
18  A. The other ones that you are including,
19      whether they are valid, yes.
20  Q. So as to that question, whether the
21      instruments are valid, the Hausmann test
22      takes it as its starting point that those
23      instruments are valid?
24  A. Right.
25  Q. Okay. Do any of your instruments that

201

1    you've included in your model here vary
2    across pharmaceutical companies?
3    A. These are all time variant.  They are not --
4    they wouldn't vary across pharmaceutical
5    companies, no.
6    Q. Did you ever consider using any instruments
7    that would vary across pharmaceutical
8    companies?
9    A. Not in this context.  Again, if I had
10   cross-sectional variation in the model, I
11   would want to be sure to use an instrument
12   that also had cross-sectional variation.
13   But since there are -- there's only time
14   series variation in this model, then that's
15   what I'm trying to pick up.
16   Q. You started listing some of the criteria
17   that valid instruments need to have.
18        Are there in -- why don't we just do
19   that again to make sure I understand that.
20   A. Okay.
21   Q. Can you just list for me what the criteria
22   are for valid instruments?
23   A. Sure.  There are basically two.  The first
24   one is that the instrument has a
25   statistically significant relationship with

202

1    the variable that we're instrumenting for.
2    So that is does the instrument predict this
3    other variable in terms of the R-squared
4    that I mentioned.
5        The second one is that it's
6    plausibly -- this usually is based on
7    economic intuition, economic theory, it's
8    plausibly not directly related to the
9    dependent variable.
10   Q. Are there any other criteria for valid
11   instruments?
12   A. Those are the two basic criteria for valid
13   instruments.
14   Q. Is it true that instruments shouldn't be
15   correlated with any of -- any omitted
16   variables?
17   A. Again, that's actually another way of
18   rephrasing that -- the second one.
19   Q. I see.
20   A. But yes, you're right, that's another way of
21   looking at it.  So when I mention the
22   Hausmann test, that's what that tests.
23   That's -- you are looking at the residuals,
24   which include the effects of omitted
25   variable, and see if they are correlated

203

1    with your instrument.
2    Q. You're saying that the Hausmann test,
3    though, how does that -- withdrawn.
4        The Hausmann test gives you some
5    information about whether your instruments
6    are correlated with omitted variables?
7    A. It tests whether they are correlated with
8    the residuals from the equation and the
9    residuals include the effects of omitted
10   variables.
11   Q. Okay.  But we already discussed, the
12   Hausmann test does take as its starting
13   point that the instruments themselves are --
14   are valid?
15   A. That's true, so --
16   Q. And that's why I'm confused.
17   A. Yeah.  Well, it takes as its starting point
18   the other -- so let's say we have three
19   instruments.  We can teach each one by
20   including the first two testing the third,
21   including the second two testing the first.
22   So -- but the test only is meaningful if the
23   ones you're testing against are effective.
24        But, in general, you're right, this
25   exogeneity [sic] concern is about, in

204

1    essence, about whether you are picking up
2    some other -- any time you have these
3    instruments, you want them to not be
4    correlated with what's left out of the
5    regression.  That's why in this first stage
6    where we're doing -- looking at the effect
7    of the instruments on the instrumented
8    variable, we also include all the other
9    co-variants from the model.  They are not
10   instruments, but they are included because
11   what you want to get at the end of the day
12   is something that's then not going to be
13   correlated with those variables.
14   Q. Question about the Hausmann test:  Do you
15   report the results of the Hausmann test
16   anywhere in what you've presented with your
17   report?
18   A. I don't believe so.  I don't believe so.
19   Q. Do you have those results?
20   A. I could recreate them.  They are essentially
21   just running the model with these -- with
22   the direct values of price and promotion in
23   it, and then doing the test after that.  So
24   I could recreate them, but we didn't save
25   them.  We assumed, if you read my 2005

205

1    record, that this would be almost certainly
2    the case.
3    Q.  I'm sorry.  That what would almost certainly
4        be the case?
5    A.  That price and promotion would be
6        endogenous.
7    Q.  Are you aware of any other tests besides the
8        ones that we've spoken about for testing the
9        validity of instruments?
10   A.  Well, I imagine what you're talking about is
11       the overidentification test that Dr. Keeley
12       raises, which is, in essence, the same thing
13       as the Hausmann test that I described.
14           It's, again, looking at the
15       correlation between the set of instruments
16       and the residuals.
17   Q.  Any other tests besides that one?
18   A.  Those are the most common instrumental
19       variable tests that I know of, yes.
20   Q.  I'd like to compare, if we could, the test
21       of overidentifying restrictions to the
22       Hausmann test.
23           Does the test of overidentifying
24       restrictions take as its starting point the
25       premise that the instruments are valid?

206

1    A.  Well, in essence, it's looking at whether --
2        whether the instruments uniquely identify a
3        solution to the problem that that first
4        stage system address.  I think -- I'm trying
5        to think exactly -- I mean, the test is,
6        again, it looks at the residuals from the
7        main regression to see if they are
8        correlated then with the set of instruments,
9        so I don't -- it's not based on exactly the
10       same assumptions, but it's a very similar
11       test in terms of seeing if there's anything
12       in the residuals, that is the omitted
13       variables, that's correlated.
14   Q.  Is the test of overidentifying restrictions
15       a standard test in the area of endogeneity?
16   A.  I think it's standard in the sense that it's
17       in the textbooks.  If you look at the
18       literature in instrumental variables and
19       applied microeconomics, mostly what you see
20       is the Hausman test that we did initially
21       and this concern about weak instruments.
22           Generally speaking, people encounter
23       problems with having too few and too weak
24       instruments, and so that's been the subject
25       of quite a lot of literature, particularly

207

1    in industrial organization.
2        I'm not sure that I have seen the test
3    of overidentifying -- the overidentification
4    test used in instrumental variables papers
5    very often.  It's certainly in the
6    textbooks.
7    Q.  Do you have an understanding for why you
8        haven't seen it in the literature?
9    A.  I don't.  If you see the papers that where
10       we used instrumental variables, we don't
11       report an overidentification test, and I
12       don't believe we used one in those papers.
13       So I'm not entirely sure.
14   Q.  Have you run the test of overidentifying
15       restrictions on your instrumental variables
16       here?
17   A.  Since reading Dr. Keeley's report, I did go
18       back and look at those results, and of
19       course, what's unclear is how one
20       effectively adapts the test to the AR
21       context.  So Dr. Keeley reports that the
22       test fails.  Whether or not it needs to be
23       adapted to the fact that we have this time
24       series structure, I need to look into
25       further.

208

1        But since seeing his results, I've
2    gone and looked at the individual
3    instruments, and, in fact, wages fails that
4    Hausmann test that we discussed.  And so I
5    can run the model excluding that, and I get
6    the item effective results.  But I need to
7    look into further how to test for
8    overidentification in the AR context.  The
9    references that he uses are the standard
10   references.  They don't reference the
11   autoregressive context where implementing
12   instrumental variables is somewhat more
13   implicated.
14   Q.  Are you aware of any authority that would
15       say that in a context where you are using AR
16       that the test of overidentifying
17       restrictions does not apply as it normally
18       would?
19   A.  I don't.  I have begun to look for
20       references to understand how appropriately
21       to apply that same test; and I haven't found
22       one yet.
23   Q.  You said that when you ran the test on your
24       instrumental variables here that wages
25       failed the test?

209

1   A.  When I -- sorry.
2   Q.  That's okay.
3   A.  I beg your pardon.  When I look at this
4      Hausmann test, so essentially putting the
5      other instruments in, seeing whether the
6      residuals from that regression are
7      correlated with wages, I do find this; and
8      so wages fails that Hausmann test and,
9      therefore, should be probably be excluded.
10  Q.  I'm sorry, you said it fails the Hausmann
11     test?  Oh, okay.
12  A.  It's -- essentially, it's looking at that
13     individual variable that wages -- appears to
14     be endogenous as well.  And so I've tried
15     the model taking wages out as in the
16     instrumental variable stage.
17  Q.  So you understand then -- your understanding
18     is that this test of overidentifying
19     restrictions is only identifying a problem
20     with your wages instrument?
21  A.  It appears.  Again, I'm not sure how to
22     interpret the overidentification test in
23     this context, but -- so then I went back and
24     looked at each individual instrument keeping
25     the others in, and wages, now I see, fails

210

1      that Hausmann test.  And so when I exclude
2      it, I rerun my model, I get largely the same
3      results.  They are off by a slight degree,
4      but they're essentially quite similar.  And
5      so it may be that wages is causing the
6      problems that the overidentification test
7      picked up, but I need to do further work to
8      understand how to apply that test
9      appropriately given the autoregressive
10     terms.
11  Q.  As you sit here now, though, you are not
12     sure that wages -- that the wages instrument
13     is the only problem that's leading the
14     overall approach to fail the
15     overidentification restrictions test?
16  A.  I'm not entirely sure.  I'm looking into
17     this further.
18  Q.  What past experience do you have with the
19     test of overidentification restrictions?
20  A.  Honestly, I don't believe I have used it in
21     practice myself.  I'm certainly aware of it,
22     learned it in a textbook like this one.  But
23     I don't believe -- I've used instrumental
24     variables a fair amount, but have not used
25     that specific test.  I have used the

211

1      Hausmann test instrument by instrument, but
2      I have not used that overidentification
3      test.
4         MR. MISHKIN:  I'm going to mark the
5      next exhibit.
6   Q.  I'm going to give you one more textbook.
7   A.  This is Davidson McKinnon.
8   Q.  Yes.
9         (Exhibit No. 11 marked.)
10  Q.  So Professor Rosenthal, we've marked as
11     Exhibit 11 an excerpt from another textbook;
12     this is a textbook by Russell Davidson and
13     James McKinnon.
14        Are you familiar with this textbook?
15  A.  I am, yes.
16  Q.  What's the nature of that familiarity?
17  A.  It's on my bookshelf and it's a very
18     standard reference in econometrics.
19  Q.  You consider it to be reliable?
20  A.  I would.
21  Q.  So feel free to refer to the actual
22     textbook, but I'm going to ask you
23     specifically about pages 236 to 237.  Let's
24     look first at the bottom of page 236.
25        Do you see at the very bottom, it's

212

1      three lines up from the bottom, there's a
2      sentence that reads, "Tests of
3      overidentifying restrictions should be
4      calculated routinely whenever one computes
5      IV estimates."
6         Did I read that right?
7   A.  Yes, you did.
8   Q.  And IV estimates, I take it that means
9      instrumental variables --
10  A.  That's correct.
11  Q.  Do you agree with this sentence?
12  A.  This book obviously contains admonitions of
13     this sort in every chapter.  Not every
14     econometric analysis follows each and every
15     one of them.
16        You certainly -- we looked at the
17     value of each of our instruments in terms
18     of, again, their -- the economic premise
19     that they were both predictive and
20     exogenous.  We did not do this test.  And,
21     again, as I've mentioned, I've gone back to
22     explore it, but we did not do the test.  And
23     in the past when I have done instrumental
24     variable analyses, I have not done it.
25  Q.  Do you have any basis to say that the test

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

213

1    of overidentifying restrictions should not
2    be calculated routinely when doing IV
3    estimates?
4    A. No.  I wouldn't say that, no.
5    Q. Let's go back to your report, Exhibit 1.
6    Exhibit 1.  Let's look again at
7    Attachment E, specifically paragraph seven.
8    A. Yes.
9    Q. First sentence reads, "I observed an unusual
10   pattern of promotional detailing and
11   advertising expenses."
12       Did I read that right?
13   A. Yes, you did.
14   Q. What do you mean in that sentence?
15   A. Well, if you look at the chart, you will see
16   that at a certain point in time in 2002
17   detailing, in particular, shoots up, and
18   does so until roughly generic entry when it
19   comes back down.  So it's very different
20   from the pattern over the rest of the
21   period.
22   Q. And that's what you mean by "unusual"?
23   A. Well, the other thing that's unusual about
24   it is that it's quite late in the life cycle
25   of Neurontin.  We don't expect to see a

214

1    manufacturer promoting a drug just before
2    generic entry.
3    Q. Did you do any investigation that informed
4    you as to one way or the other as to why
5    there was promotion going on at that time?
6    A. I did search through discovery documents and
7    a number of things seemed to come up in the
8    documents.  It is impossible for me,
9    certainly by deposition, one could perhaps
10   get this information, but from the documents
11   I can't tell for certain what causes it.
12   There were two things that happened in time.
13   One is the approval of PHN around that same
14   time.  And the second is the anticipation of
15   the launch of a drug called Lyrica, which I
16   understand to be, in essence, the descendant
17   of Neurontin.
18   Q. As a result of this pattern that you
19   observed, you created two separate
20   promotional variables; is that correct?
21   A. Essentially allowed for the data to fit a
22   different relationship over that period.  I
23   just gave it flexibility rather than
24   requiring a constant elasticity between the
25   two periods.

215

1    Q. I'm not sure I totally get that.  In more
2    basic terms, is it correct to say that you
3    have two separate promotional variables, one
4    for baseline promotion, that would be the
5    promotion that happens before the spike that
6    you've described, and then another
7    promotional variable called spike promotion?
8    A. That's correct.  So economists frequently do
9    analyses that we call "splines," which is a
10   sort of a piece-wise linear model.  This
11   model is essentially piece-wise.  We say
12   that there's some relationship that pertains
13   over that first period and then something
14   different is going on in the second period.
15   We allow the model to tell us whether or not
16   there's a different relationship, but
17   indeed, as you see, the coefficient on spike
18   promotion is quite different from the
19   coefficient on promotion before the spike.
20   Q. And how are they different?
21   A. The --
22   Q. Those two coefficients?
23   A. The coefficient on spike promotion is very
24   small.
25   Q. Is it statistically significant?

216

1    A. I actually have to check.
2    Q. I may be able to answer my own questions.
3    A. Sorry, on the share of high-dose
4    prescriptions, it's not.  It's not -- it's
5    close, but it's not quite statistically
6    significant.  The P value, the probability
7    is .11 and generally the level of
8    significance we look for is .10.
9    Q. This spike period of promotion, can you give
10   me the exact date range of that, or as best
11   as you can approximate it for me.
12   A. I believe it says August 2002 to the
13   August 2004, which is the time of generic
14   entry.
15   Q. So the promotion from August 2002 through
16   October 2004, your model has predicted that
17   it didn't have a statistically significant
18   effect on prescriptions; is that correct?
19   A. In essence, yes.
20   Q. You called it "spline," is that right, this
21   technique you've used here?
22   A. In effect, it's a way of not forcing the
23   same relationship over the entire span of,
24   in this case, the independent variable
25   promotion.

217

1  Q. Can you list for me examples from your own
2     articles where you've employed this
3     technique?
4  A. I'd have to look. I'm not sure if it's
5     actually employed in my own articles. It's
6     quite frequent. As you can imagine, if
7     we're looking over a wide range of the
8     variable, we can assume that there's some
9     kind of relationship like a quadratic; or we
10    can break up the variable, for example, when
11    we're looking at the effective age on
12    healthcare spending, very often we put in
13    age in these chunks and assume the
14    relationship over one period from between
15    ten and 21 is the same, but that it's not
16    the same -- that ten-year difference isn't
17    the same between 65 and 75. But we don't
18    say that we know it's quadratic or
19    exponential, we just allow for different
20    coefficients over different pieces of it.
21    It's a very common method of analysis.
22 Q. Okay. Just getting back to my question. As
23    you sit here now, can you think of any
24    examples from your own work where you've
25    employed the method?

218

1  A. Well, I've certainly used those age ranges
2     in precisely that kind of work looking at
3     spending, for example, by age range and so
4     looked at age in those kinds of splines.
5  Q. Could you give me a specific site or a
6     specific --
7  A. Yeah, why don't I look at my CV.
8  Q. Go ahead.
9  A. Perhaps -- actually, let me take a look at
10    this article. That would help. (Witness
11    reviewing document.)
12       In effect, if you look in this
13    article, "The Effects of Pharmaceutical
14    Promotion on Adherence," Exhibit 7, you will
15    see the way the right-hand side variables
16    are entered there are in these lumps. They
17    are splines. So for own product detailing
18    spending, those are entered in ranges, 37 to
19    40 million; 40 to 44 million. That's
20    precisely the same motion.
21 Q. Okay. Are there other examples where you've
22    used the spline technique?
23 A. I think without the articles in front of me,
24    I couldn't say for sure, but it's very
25    common to put in explanatory variables in

219

1     that way.
2  Q. Could you list for me any articles, other
3     than your own, but in the area of -- in the
4     area of pharmaceutical promotion that have
5     used this type of spline technique?
6  A. Not as I sit here, I couldn't.
7  Q. Did you ever consider doing an interaction
8     between the two types of promotion that your
9     model treats?
10 A. I didn't. I can't think of a reason why
11    there would be an interaction effect.
12 Q. Would that have been another way of
13    addressing this issue you've been talking
14    about?
15 A. Again, I may be missing something, but an
16    interaction generally, for example, if we
17    think detailing and consumer advertising
18    operate in a way where it's more than the
19    sum of the parts, then we put in an
20    interaction; or, for example, if there's
21    some negative effect of having two things in
22    going in opposite directions, then we put in
23    an interaction. But it seems just looking
24    at the data that whatever happened during
25    this period was just fundamentally different

220

1     activity.
2  Q. Did you ever run a version of your model
3     where you treated promotion as just a single
4     variable instead of breaking it up into the
5     spike and baseline?
6  A. We did initially, and the reason we added
7     the spike, when we did that and plotted the
8     predicted values against the actual data, it
9     looked terrible. So it wasn't fitting the
10    data very well. There was a lot of variance
11    from the actual values; whereas, when we put
12    in the spike, it fits the data.
13 Q. Okay. Other than what we've already talked
14    about today, are there ways in which you've
15    tested your model? It's a broad question,
16    but can you think of sort of any testing
17    work you've done on the model that we
18    haven't talked about here today?
19 A. I think the -- what I just said about
20    looking at predicted values was one of the
21    ways that we tested the model, just -- just
22    to be clear that we did that. Not just for
23    the spike, but, for example, when we were
24    including the AR terms, we looked at the
25    predicted values, we also looked at the

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

221

1    pattern of the residuals, which is one of
2    the things one does to make sure we have
3    stochastic process model correctly and that
4    unit root test which, in essence, is looking
5    at the pattern of those residuals.
6    Q.  Are there any results of this testing that
7        still exist?
8    A.  The unit root tests, they are here
9        [indicating]; they are in Attachment E.
10   Q.  Are there any tests that still exist that
11       have not been provided to defendants?
12   A.  No.
13   Q.  Have you implemented or tested any other
14       specifications of your model besides what
15       we've already discussed today?
16   A.  No, I believe we've discussed everything
17       today.
18   Q.  Have you done testing to see if your results
19       are stable across different specifications?
20   A.  Well, in fact, the results -- with the
21       exception of the time trend issue, the
22       results were quite robust to other
23       specifications.  As I mentioned, I looked at
24       that FDA warning variable.  The basic
25       results held up.  The basic results held up

223

1    specification test.  I'm not sure you had
2    talked about that before.
3    A.  Sorry.  Perhaps I just wasn't very clear.
4        When we included promotion as a single
5        variable and went and did our predictions,
6        they were -- they deviated quite a lot from
7        the actual variables.  That's the error I'm
8        talking about; that's essentially the error
9        of the prediction.  That has to do with how
10       much noise there is.  And so that model
11       didn't capture the variability very well,
12       and, therefore, we had bigger errors there.
13   Q.  I see.
14   A.  Take a little break?
15   Q.  Yes, why don't we do that.
16   A.  Fine.
17           THE VIDEOGRAPHER:  Off the record
18       at 2:36.
19           (Short recess.)
20           THE VIDEOGRAPHER:  On the record,
21       2:56.
22   Q.  Professor Rosenthal, I take it you've
23       reviewed Dr. Keeley's report?
24   A.  I have, yes.
25   Q.  Have you done any additional work in this

222

1    with other AR terms, although,
2    statistically, we find that AR 1 and AR 4
3    respectively, are correct stochastic
4    assumptions.
5    Q.  This may be an issue of terminology, what's
6        meant by a specification and what's not, but
7        could you list for me what you have in mind
8        with the alternative specifications that you
9        -- that you tested --
10   A.  So, again --
11   Q.  -- in addition to the one -- why don't you
12       just go ahead.
13   A.  The dummy variable with and without the
14       spike, again, there was much more error in
15       those predictions, but, in fact, the general
16       results were quite similar.  As I recall,
17       our results were fairly invariant, other
18       than the issue around the time trend, fairly
19       invariant to specification choices we made.
20   Q.  Are there any other specification changes
21       that you made other than the ones you've
22       described?
23   A.  No.
24   Q.  I think you referenced in your last answer
25       that the error got larger under a certain

224

1    matter since reviewing Dr. Keeley's report?
2    A.  So I mentioned the instrumental variables
3        that I've been looking at, those variables.
4        The other thing that I've taken a look at is
5        the question of deflating the dollar values
6        she [sic] raises in the report.
7    Q.  Any other work that you've done since
8        getting Dr. Keeley's report?
9    A.  I'm trying to think if there was anything
10       else we checked.  I think that's it.  I
11       guess the only other thing is to note the
12       issue he raised with regard to the mail
13       order share in Dr. Hartman's report led to a
14       change in the mail order share that
15       Dr. Hartman uses that I've taken a look at,
16       reflecting back in my own results, and if
17       asked by the lawyers, I will do that
18       calculation and present that to you.
19           Are you familiar with the issue?
20   Q.  I may be.  You understand that this is a
21       change that Dr. Hartman was going to make?
22   A.  Yes, so Dr. Keeley noted that Dr. Hartman
23       uses a single mail order share in creating
24       his weighted average prices.  And that share
25       came from my calculations where, to be

225

1  conservative, I used a low -- I used a
2  single value of the mail order percentage to
3  adjust -- to account for mail order, which
4  doesn't otherwise enter the quantity data
5  that I have.  I have an outside mail order
6  share that I used to adjust that.  There are
7  a couple of years of missing data, so I made
8  a very conservative assumption which was
9  over the whole period, the mail order share
10  was the same as the lowest value in the
11  series that I had, which was 11 percent.
12       Based on discussions with Dr. -- with
13  the lawyers, Dr. Hartman has revised -- has
14  done some calculations to revise his
15  estimates with mail order shares that now
16  vary year to year.  And so I am going -- it
17  makes sense for me to incorporate the same
18  numbers in my estimates.
19  Q.  Have you done that?
20  A.  We've started to look at it.  I haven't
21  produced anything yet.
22  Q.  Do you have a sense, yet, of what the
23  results might be?
24  A.  You know, I don't.  I think it essentially
25  raises the number.  As I mentioned, I used

226

1  the lowest possible value that I had found
2  in the data for every year because I was
3  concerned about -- I wasn't sure where the
4  missing data, what the right imputation
5  would be.  So they've gathered some
6  additional data, and those numbers are
7  higher than the numbers that I used.
8  Q.  Do you have a sense order of magnitude-wise
9  how it might impact your results?
10  A.  I think it would be small, a couple of
11  percent.
12  Q.  Are you planning on submitting some sort of
13  new iteration of your report as a result of
14  this?
15  A.  I'm asking for direction from counsel as to
16  whether I should submit some supplemental
17  results with those --
18       MR. WESTON:  But the answer to that
19  will be, yes.
20       MR. MISHKIN:  Okay.
21       MR. WESTON:  You're entitled to see
22  the corrections that your own guy has caused
23  us to make.
24       MR. MISHKIN:  Any anticipation as
25  to when you will be filing that -- directed

227

1  at both of you?
2       MR. WESTON:  I don't know.  They've
3  got to do it first.
4  Q.  Assuming you were given the instruction
5  today to do it, do you have an estimate as
6  to how long it would take you to --
7  A.  I think it would be in the next couple of
8  days.
9  Q.  And this revised version, would it make any
10  other changes besides addressing the mail
11  order issue?
12  A.  I think after today, I will discuss with
13  counsel whether it's appropriate to make any
14  other adjustments based on our conversation
15  today.  I can't say for sure if there would
16  be anything else.  That's the one analysis
17  that we've started.
18  Q.  Okay.  Are there any other potential
19  adjustments that you have in mind right now
20  that you might propose to counsel to be
21  included in the revision?
22  A.  Well, we talked about the potential
23  rewriting the model, excluding the wages
24  instrument.  Again, I'm trying to get some
25  more information on making sure that I'm

228

1  using the test right in the AR context.  But
2  -- so that might be another potential
3  revision to exclude that instrument as
4  appropriate.
5  Q.  You also mentioned this issue of deflating
6  the dollar values; what are you looking at
7  in that connection?
8  A.  So the model here, the primary purpose is
9  forecasting, in essence, and so because I'm
10  looking at nominal dollars in the model, and
11  when I go to construct my but-for world, I'm
12  also using nominal dollars.  It doesn't
13  really matter whether those are deflated or
14  not.  If we deflated the dollars in the
15  regression, in fact, I tried this, but if we
16  deflate those dollars, we get a slightly
17  different coefficient.  But there's an
18  offsetting effect when you go to do the --
19  you get the same predicted quantities, when
20  we look at the but-for, they are essentially
21  offsetting.
22       So when I put promotional spending in
23  constant dollars, the coefficient is
24  slightly higher.  But the dollars, because
25  they are deflated, the change between the

229

1    but-for and the actual world is slightly
2    smaller.  The product of them is --
3    maintains roughly constant units in terms of
4    what the prediction is.
5        So I don't think it's necessary or
6    appropriate to make an adjustment there.
7    Q. Is your analysis complete on that issue?
8    A. Again, I've been mostly focused on preparing
9       for today, so we've started to look at that
10      issue.  I've seen the coefficient estimates
11      and it's a really, really small increase in
12      the coefficient.  And I may look at it
13      again, but I believe that it's complete and,
14      again, if directed by counsel, I may provide
15      that analysis so that it's clear what the
16      results are.  Dr. Keeley talks about the
17      issue, but he doesn't present any results so
18      it's not clear from his report of material
19      effect.  So I may provide those results to
20      demonstrate that there's no material effect.
21   Q. Could you take me through a little bit more
22      slowly what you've done to deflate the
23      dollar values, if that's the right term?
24   A. Sure.  Using the consumer price index, I put
25      them on all constant dollar terms.

230

1    Q. And what is the compensating effect that you
2       referenced before?
3    A. Well, so, essentially, you can imagine the
4       promotional spending trend.  When I deflate
5       it, as you know, the inflation rate's been
6       quite low over the last ten years, so it
7       doesn't have a big effect, but it
8       essentially flattens it out a little bit.
9       But the model, when we estimate the model,
10      then the model gives us a lightly higher
11      coefficient.
12   Q. On which variable?
13   A. On promotion.
14   Q. I see.
15   A. So it would have the same effect by
16      deflating any of the spending variables the
17      coefficient would offset.  It would be
18      slightly larger because we've diminished the
19      variation in the promotional variable.
20   Q. Do you know what effect it has on any of the
21      other coefficients, this process of
22      deflating?
23   A. It has almost no effect on the other
24      coefficients.  Again, like a hundredth of a
25      -- second decimal place.

231

1    Q. Okay.  Any additional work not presented in
2       your 2008 declaration besides what we've
3       spoken about that you were either currently
4       working on or anticipate working on?
5    A. Not that I know of now, no.
6    Q. Now, I think -- well, withdrawn.
7        Have you begun work on implementing a
8       model for use in the MDL matter?
9        MR. WESTON:  At this point, I will
10      object and say, how is that relevant to this
11      case?
12       MR. MISHKIN:  Well, I'm going to
13      ask whether there are any differences, in
14      general terms, in what she's doing in the
15      MDL, and given the similarities in the
16      methodologies, I think that's very relevant
17      if there are other ways of doing this
18      analysis.
19       MR. WESTON:  You can get started.
20      The MDL is a significantly different case
21      from the Pennsylvania case.
22   Q. Well, let me ask you this general question:
23      I take it you started working on an MDL
24      analysis; is that fair?
25   A. That's correct.

232

1    Q. Can you tell me, in general terms, whether
2       you're going to be using any different ways
3       of implementing this methodology in the MDL
4       as compared to what you've done in your
5       Clark report?
6    A. As you may know, in the MDL matter the Court
7       has asked for the analysis to go indication
8       by indication, and so it's a somewhat
9       different set of data and models, but it
10      shares the AR common time series framework,
11      but it's indication by indication.
12   Q. Other than being indication by indication,
13      are there other ways in which the methods
14      that you're employing there differ from what
15      you've employed in your 2008 declaration in
16      the Clark case?
17   A. At this point, I would say they are quite
18      similar.  We don't have all the final data
19      or models, so I can't say for sure, but at
20      this point, we are approaching it with what
21      we learned from doing the aggregate analysis
22      in Pennsylvania.
23   Q. Let's go back to Exhibit 1.  If I could ask
24      you to find Attachment A.  Let me know when
25      you are with me.

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

233

1    A.  I'm with you.
2    Q.  This is your CV; is that correct?
3    A.  That's correct.
4    Q.  Is this an up-to-date version of your CV?
5    A.  This was up to date at the time it was
6         filed.
7    Q.  Fair enough.  If you look at the first page
8         of the CV, you see that it provides your
9         educational background?
10   A.  That's correct.
11   Q.  So just to confirm, your undergraduate
12        degree was in international relations with a
13        commerce focus; is that correct?
14   A.  Right.  So, in essence, I had set of
15        economics classes within the international
16        relations framework.
17   Q.  Okay.  And that's what the commerce is
18        meaning to denote?
19   A.  Commerce applies essentially that I
20        essentially specialized in economics with
21        international relations, but it had to do
22        with a set of requirements taking
23        microeconomics, macroeconomics,
24        international trade, international finance,
25        those kinds of courses.

234

1    Q.  And your Ph.D. is in health policy and you
2         pursued the economics track?
3    A.  Yes.
4    Q.  What is health policy?
5    A.  Health policy, at Harvard, is interfaculty
6         Ph.D. program.  Each of the tracks is a
7         disciplinary subject, so in the economics
8         track, one takes all the courses to get a
9         Ph.D. in economics with the exception of
10        macroeconomic theory and economic history.
11        All the other requirements for the Ph.D. in
12        economics are incorporated into this Ph.D.
13        in addition to a set of courses in public
14        policy, health policy and public health.
15   Q.  More generally though, how would you define
16        health policy?  I took your answer to be
17        talking about kind of how the program is set
18        up at Harvard, but more, generally, what is
19        health policy?
20   A.  It's an interdisciplinary field of study --
21   Q.  Okay.
22   A.  -- that is focused on a set of problem areas
23        and typically brings to bear social science
24        methods to look at those problem areas.
25   Q.  If you look a little bit lower on your CV,

235

1         there's a category here called "Academic
2         Appointments," right?
3    A.  Yes.
4    Q.  Just to confirm, you're currently an
5         associate professor of health economics and
6         policy at the Harvard School of Public
7         Health?
8    A.  That's correct.
9    Q.  You've held that position since 2006,
10        correct?
11   A.  Correct?
12   Q.  And prior to that, you were an assistant
13        professor in the same subject area?
14   A.  Yes.
15   Q.  Yes.  Have you held any other teaching
16        positions that are not listed here?
17   A.  No.
18   Q.  Let's look at page three.
19        Do you see at the top, there's a
20        section on teaching experience?
21   A.  Yes.
22   Q.  Two classes are listed here:  Mental Health
23        Economics and Policy in the United States,
24        and also Economics For Health Policy,
25        correct?

236

1    A.  That's correct.
2    Q.  Have you taught any classes besides the two
3         that are listed here?
4    A.  Those are the two courses I lead.  I
5         occasionally lecture in other people's
6         courses, but these are two that I lead.
7    Q.  What are those other courses that you
8         occasionally lecture in?
9    A.  Those are mentioned in the little
10        introductory material, but there's a reading
11        course in health economics for our doctoral
12        students.  It's a -- each faculty member who
13        participates selects a subject and brings a
14        series of typically kenotical readings in
15        health economics; and I also teach in the
16        core course in health policy, again, a
17        doctoral student seminar.  I occasionally
18        lecture in courses at the Harvard Medical
19        School as well.
20   Q.  Before we get to those at the Harvard
21        Medical School, is there anything else in
22        the public health school where you would be
23        lecturing in?
24   A.  Aside from occasional sort of general
25        lectures for student consumption, there's a

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

237

1 health policy society, for example, that
2 I've lectured at, but those are the courses
3 that I participate in.
4 Q. Does that additional lecturing you've just
5 referenced, that would be in the area, I
6 take it, of the health policy?
7 A. Absolutely.
8 Q. Okay.  And then the courses you've
9 referenced at the medical school, what
10 courses are those?
11 A. There's a required course in health policy
12 for the medical students, and I've lectured
13 in that course on physician payment,
14 Massachusetts healthcare reform and
15 consumerism, consumer directed health plans.
16 Q. Any other courses in the medical school that
17 you've lectured in?
18 A. No.  I --
19 Q. Go ahead.
20 A. I teach -- I have, for the last several
21 years, taught in a course of pharmaceutical
22 economics at the University of Lausanne.
23 It's just a guest lecture situation, invited
24 to give three lectures to students getting a
25 master's in pharmaceutical economics.

238

1 Q. This is something that you've already done?
2 A. (No audible response.)
3     MR. WESTON:  You need to answer
4     that.
5 A. I'm sorry, yes.
6 Q. And if I understood you correctly, it was on
7 three separate occasions when you gave this
8 lecture?
9 A. There are three lectures that I have given,
10 I think now, on three occasions.  As a
11 guest, I've been invited to give these same
12 three lectures.  One of them is on
13 pharmaceutical price competition, one of
14 them is on promotion of prescription drugs,
15 and the other is on regulation of
16 prescription drugs.
17 Q. Do you intend to do more lectures there?
18 A. This is an annual program.  If they invite
19 me back -- in all likelihood, I would go
20 back.
21 Q. Okay.  Further below on your CV, there's a
22 section entitled, "Peer-Reviewed Articles,"
23 correct?
24 A. That's correct.
25 Q. There's no need to look at every entry.  I'm

239

1 just wondering if this is more or less a
2 complete list of your publications.
3 A. I make every effort to make it complete,
4 yes.
5 Q. You are not aware of any articles, as you
6 sit here now, that you've authored or
7 co-authored that wouldn't be on this list?
8 A. No, I am not aware of anything.  Again,
9 these are peer-reviewed.  Just so you know,
10 there's another section for articles for
11 other than peer reviewed.
12 Q. Right.
13 A. That comes later, but everything that's been
14 published in a peer-reviewed publication is
15 on that list.
16 Q. Have you published any articles in any
17 marketing journals?
18 A. You know, I don't believe so.  I'm trying to
19 think of any of these direct consumer
20 advertising.  No, I don't believe so.
21 Q. You don't consider yourself an expert in the
22 area of marketing, would you?
23 A. As you know, I have published in the area of
24 pharmaceutical promotions specifically, but
25 marketing as a field, no.  I am not an

240

1 expert in marketing.
2 Q. Just a couple more questions here.
3     I think we already discussed you're an
4     associate professor; is that correct?
5 A. That's correct.
6 Q. And your on the tenure track?
7 A. That's correct.
8 Q. How does the tenure process work?
9 A. At the Harvard School of Public Health, we
10 have a model that is somewhat unique to the
11 Harvard medical area.  There's an 11-year
12 tenure track.  The appointments to assistant
13 generally only lasts six years.  Appointment
14 to an associate lasts up to five years, but
15 one can get one year for each child born or
16 adopted during that period of which I have
17 two.
18 Q. Okay.
19 A. So I'm essentially on a 13-year tenure
20 track.  I will come up for promotion next
21 year, and then it's an up-or-out situation.
22 That is, if I don't get promoted, I don't
23 have an appointment anymore.
24 Q. And who makes those decisions about
25 promotion?

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

241

1    A.  Well, it's a good question.  It's a series
2       of decisions.  So the senior faculty in my
3       department have to agree to put me up for
4       promotion and my chair has to support it.
5       And then the dean of my school and a
6       committee within my school has to agree that
7       I should be put up.
8          At that point, my case goes to the
9       university level, to the provost's office
10      and an ad hoc committee is formed from
11      outside experts in my field.  They review
12      all the materials that have been put
13      together for these previous levels and
14      recommend to the provost whether or not I
15      should be tenured.
16   Q.  What types of materials would they be
17      considering?
18   A.  The materials they consider are first and
19      foremost my publication record.  Second,
20      outside letters from people in my field.
21   Q.  Anything else?
22   A.  There are essentially three components to
23      the tenure packet.  Research is far and away
24      the most important, so that's your CV and
25      the letters.  And second, would be teaching,

242

1       very low down on the list, but teaching
2       matters, and, finally, service, both to the
3       school, the university, but also more
4       broadly.
5    Q.  These committees, I guess, primarily they're
6       focused on your published work; is that a
7       fair statement?
8    A.  That's high understanding.
9    Q.  What about litigation related work, would
10      these committees review reports that you
11      filed in the litigation context?
12   A.  Not to my knowledge.  The litigation work
13      goes under the category of service, in fact.
14   Q.  Okay.  So just to make it more concrete,
15      would you be providing your 2008 declaration
16      in this case, for example, to these
17      committees?
18   A.  Certainly not, no.
19   Q.  Would you have any objection if John or I
20      provided your 2008 declaration to any of
21      these committees?
22   A.  No, not at all.
23   Q.  Let me ask you to pick up, I think what we
24      marked as Exhibit 2; that's your revision to
25      the 2008 report.

243

1    A.  Revision, yes.  Can I give you these back?
2    Q.  Yeah, that's fine.
3    A.  I'm sorry, I have quite a stack here.
4    Q.  So do I.
5    A.  Okay.  I have it.
6    Q.  I just want to talk a little bit about the
7       error that was identified and is the subject
8       of this revision?
9    A.  Yes.
10   Q.  Am I correct, that basically this has to do
11      with an error that had originally been
12      present in your calculation of the but-for
13      high-dose share?
14   A.  That's correct.
15   Q.  And if I understand it correctly, you had
16      intended to calculate the but-for high-dose
17      share by reducing detailing expenditures to
18      zero while retaining journal advertising
19      expenditures at their actual level?
20   A.  Yes, that's correct.
21   Q.  And is that because journal advertising
22      wouldn't be subject to the allegations in
23      this case?
24   A.  That's my understanding, yes.
25   Q.  Okay.  And the error that you identified was

244

1       that you set journal advertising to zero?
2    A.  That's correct.
3    Q.  When did you discover that error?
4    A.  Soon after filing the declaration in looking
5       through it.
6    Q.  Who discovered the error?
7    A.  It's a good question.  I'm not sure
8       precisely who discovered it.  It wasn't me.
9       I believe it might have been Dr. McClure.
10   Q.  How was it brought to your attention?
11   A.  I think he got in touch with me right away
12      and said, I realized that this was done.
13   Q.  Okay.  Do you have an understanding of
14      whether it was an error in the computer code
15      or some other type of problem?
16   A.  I don't.
17   Q.  Did you ever have any discussions with
18      anyone about doing any reduction of journal
19      advertising expenditures as part of your
20      but-for calculations?
21   A.  No, I didn't.
22      MR. MISHKIN:  Okay.  Let's go off
23      the record.
24      THE VIDEOGRAPHER:  Time is 3:21.
25      This is the end of cassette three.  We are

Rosenthal, Meredith (Clark)  7/9/2008  12:00:00 PM

245

1    off the record.
2        (Short recess.)
3        THE VIDEOGRAPHER:  The time is
4    3:27.  This is the beginning of cassette
5    four.  We are on the record.
6        MR. MISHKIN:  Professor Rosenthal,
7    I have no further questions from you, so as
8    far as defendants are concerned, the
9    deposition is concluded.
10        MR. WESTON:  Thank you.  I have no
11   questions for you.
12        THE WITNESS:  Thank you.
13        THE VIDEOGRAPHER:  The time is
14   3:27.  This deposition is concluded.  This
15   is the end of cassette four.  We are off the
16   record.
17        (Whereby the proceedings were
18   concluded at 3:28 p.m.)
19            * * * *
20
21
22
23
24
25

247

1        DEPONENT'S ERRATA SHEET AND
         SIGNATURE INSTRUCTIONS
2
         The original of the Errata Sheet
3    has been delivered to Mr. Weston.
         When the Errata Sheet has been
4    completed by the deponent and signed, a copy
     thereof should be delivered to each party of
5    record and the original delivered to
     Mr. Mishkin to whom the original deposition
6    transcript was delivered.
7
8
         INSTRUCTIONS TO DEPONENT
9
         After reading this volume of your
10   deposition, indicate any corrections or
     changes to your testimony and the reasons
11   therefor on the Errata Sheet supplied to you
     and sign it.  DO NOT make marks or notations
12   on the transcript volume itself.
13
14   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
15   COMPLETED AND SIGNED ERRATA SHEET WHEN
16   RECEIVED.
17
18
19
20
21
22
23
24
25

246

1
2        C E R T I F I C A T E
3    COMMONWEALTH OF MASSACHUSETTS
4    MIDDLESEX, SS.
5
6        I, Jill Shepherd, Registered
     Professional Reporter and Notary Public, in
7    and for the Commonwealth of Massachusetts,
     do hereby certify that:
8        MEREDITH B. ROSENTHAL, Ph.D., the
     witness whose deposition is hereinbefore set
9    forth, was satisfactorily identified by
     means of Massachusetts driver's license, and
10   was duly sworn by me and that the foregoing
     transcript is a true and accurate record of
11   the testimony given by such witness and such
     testimony is a true and accurate
12   transcription of my stenotype notes to the
     best of my knowledge, skill, and ability.
13       I further certify that I am not
     related to any of the parties in this matter
14   by blood or marriage and that I am in no way
     interested in the outcome of this matter.
15       IN WITNESS WHEREOF, I have hereunto
     set my hand and notarial seal this 13th day
16   of July, 2008.
17
18        Jill Shepherd, RPR
          Notary Public
19
     My Commission expires:  April 18, 2014
20
21
22   THE FOREGOING CERTIFICATION OF THIS
23   TRANSCRIPT DOES NOT APPLY TO ANY
     REPRODUCTION OF THE SAME BY ANY MEANS UNLESS
24   UNDER THE DIRECT CONTROL AND/OR DIRECTION OF
     THE CERTIFYING REPORTER.
25

248

1    ATTACH TO THE DEPOSITION OF
         MEREDITH B. ROSENTHAL, Ph.D.
2    CASE NAME: CLARK, ET AL. VS. PFIZER, ET AL.
3    DATE:    July 9, 2008
4        ERRATA SHEET
5    INSTRUCTIONS:  After reading the transcript
6    of your deposition, note any change or
     correction to your testimony and the reason
7    therefor on this sheet.  DO NOT make any
     marks or notations on the transcript volume
8    itself.  Sign and date this Errata Sheet
     (before a Notary Public, if required).
9    Refer to Page 247 of the transcript for
     Errata Sheet distribution instructions.
10   PAGE  LINE
11        CHANGE: _____
          REASON: _____
12        CHANGE: _____
          REASON: _____
13        CHANGE: _____
          REASON: _____
14        CHANGE: _____
          REASON: _____
15        CHANGE: _____
          REASON: _____
16        CHANGE: _____
          REASON: _____
17        CHANGE: _____
          REASON: _____
18        CHANGE: _____
          REASON: _____
19        I have read the foregoing
20   transcript of my deposition, and except for
     any corrections or changes noted above, I
21   hereby subscribe to the transcript as an
     accurate record of the statements made by
22   me.
         Signed under the pains and penalties
23   of perjury this _____ day of _____,
     2008.
24
25        MEREDITH B. ROSENTHAL, Ph.D.

Unsigned                    Page  245 - 248