# EXHIBIT 5

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

### Page 1

```
 1      AMY FITZSIMMONS, M.D.
 2         IN THE COURT OF COMMON PLEAS
         PHILADELPHIA COUNTY, PENNSYLVANIA
 3              - - -
         GREGORY CLARK and    : JUNE TERM, 2004
 4       LINDA MEASHEY,       :
         Individually and on  :
 5       behalf of others     :
         similarly situated,  :
 6                            :
             Plaintiffs,      :
 7                            :
             vs.              :
 8                            :
         PFIZER INC. and      :
 9       WARNER-LAMBERT       :
         COMPANY LLC          :
10                            :
             Defendant.       : NO. 1819
11              - - -
12          Monday, September 22, 2008
13              - - -
14          Videotaped deposition of AMY
15       FITZSIMMONS, M.D., held in the offices of Amy
16       Fitzsimmons, M.D., 44 Second Street Pike,
17       Southampton, Pennsylvania, commencing at 10:30
18       a.m., on the above date, before Linda Rossi
19       Rios, RPR, CCR and Notary Public.
20
21              * * *
22
23
24
25
```

### Page 2

```
 1      AMY FITZSIMMONS, M.D.
 2  APPEARANCES:
 3
        SACKS & WESTON
 4      BY:  JOHN K. WESTON, ESQUIRE
        114 Old York Road
 5      Jenkintown, Pennsylvania 19046
        (215) 925-8200
 6      jweston@sackslaw.com
        Counsel for the Plaintiffs
 7
 8
        DAVIS POLK & WARDWELL
 9      BY:  EDMUND POLUBINSKI, III, ESQUIRE
              and
10      PAUL S. MISHKIN, ESQUIRE
        450 Lexington Avenue
11      New York, NY 10017
        (212) 450-4000
12      polubinski@dpw.com
        paul.mishkin@dpw.com
13      Counsel for the Defendant
14  ALSO PRESENT:
15
16      Robert Kowalchik, Videographer
17
18
19
20
21
22
23
24
25
```

### Page 3

```
 1      AMY FITZSIMMONS, M.D.
 2              - - -
 3           I N D E X
 4              - - -
 5   TESTIMONY OF:  AMY FITZSIMMONS, M.D.
 6
     By Mr. Polubinski.....................6, 41
 7
     By Mr. Weston........................25, 45
 8
 9              - - -
           E X H I B I T S
10
                - - -
11
     EXHIBIT NO.   DESCRIPTION    PAGE MARKED
12
     (None marked)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### Page 4

```
 1      AMY FITZSIMMONS, M.D.
 2           DEPOSITION SUPPORT INDEX
 3
     Direction to Witness Not To Answer
 4   Page  Line  Page  Line
 5   None
 6
 7
 8
 9   Request For Production of Documents
     Page  Line  Page  Line
10
     None
11
12
13
     Stipulations
14   Page  Line  Page  Line
15   None
16
17
     Questions Marked
18   Page  Line  Page  Line
19
     None
20
21
22
23
24
25
```

## 5

```
1        AMY FITZSIMMONS, M.D.
2             VIDEOGRAPHER:  We are now on the
3    record.  The time is 10:36 a.m.  My
4    name is Robert Kowalchick, Veritext New
5    Jersey.  The date today is
6    September 22, 2008.  This deposition is
7    being held in the office of Amy
8    Fitzsimmons, M.D., located 44 Second
9    Street Pike, Southampton, Pennsylvania.
10   The caption of this case is Gregory
11   Clark and Linda Measkey, individually
12   and on behalf of others similarly
13   situated, versus Pfizer, Inc. and
14   Warner-Lambert Company LLC in the
15   Philadelphia County Court of Common
16   Pleas, June term, 2004, number 1819.
17   The name of the witness is Dr. Amy
18   Fitzsimmons.
19        At this time the attorneys will
20   identify themselves and the parties
21   they represent after which our court
22   reporter, Linda Rossi of Veritext, will
23   swear in the witness and we can
24   proceed.
25           MR. POLUBINSKI:  Ted Polubinski
```

## 6

```
1        AMY FITZSIMMONS, M.D.
2    from Davis Polk & Wardwell, here for
3    defendants Pfizer and Warner-Lambert.
4    With me today is my colleague Paul
5    Mishkin.
6           MR. WESTON:  John Weston
7    representing the plaintiff class.
8                   - - -
9           AMY FITZSIMMONS, M.D., after
10   having been duly sworn, was examined
11   and testified as follows:
12                  - - -
13               EXAMINATION
14                  - - -
15   BY MR. POLUBINSKI:
16   Q.    Good morning, Dr. Fitzsimmons.
17   A.    Good morning.
18   Q.    Just to start here, I'm going to
19   take a few minutes now just to give you a
20   little bit of background about what we're doing
21   here today.
22        We, as you just heard, represent
23   the defendants in this case.  The defendants
24   are Pfizer and Warner-Lambert.
25        The plaintiffs have filed a
```

## 7

```
1        AMY FITZSIMMONS, M.D.
2    class action lawsuit against Pfizer and
3    Warner-Lambert relating to the marketing of the
4    medicine Neurontin.  Mr. Weston, as you heard,
5    represents the plaintiffs.
6         I will be focusing today on your
7    experience in prescribing Neurontin.
8    A.    Okay.
9    Q.    In particular prescribing
10   Neurontin for off label uses, which is to say
11   uses or indications which have not been
12   approved by the FDA.  When I say Neurontin, it
13   would be great if you could understand me to
14   mean either branded Neurontin or generic
15   gabapentin.  I don't mean to distinguish
16   between the two at all in my question.  Is that
17   okay?
18   A.    That's fine.
19   Q.    And then one other point of
20   clarification.  I don't want to hear or I'm not
21   going to ask about any individual details or
22   names of any of your individual patients.  I'm
23   just asking you about your own general
24   knowledge and experience with respect to
25   Neurontin.  Okay?
```

## 8

```
1        AMY FITZSIMMONS, M.D.
2    A.    Okay.
3    Q.    Have you ever been deposed
4    before?
5    A.    Yes.
6    Q.    Okay.  I'm sorry to hear that.
7    Some of this will then be familiar to you, but
8    just a couple of ground rules to start just to
9    remind you.  One of them is that you and I
10   can't talk at the same time, so I'll try to
11   allow you to finish your answers before I speak
12   up and ask my questions.  And then if you can
13   do the same for me and let me finish my
14   questions, even if I'm mumbling or trailing
15   off, that would be great as well.  Does that
16   work?
17   A.    That works.
18   Q.    On the same note, as you
19   probably may recall, occasionally Mr. Weston or
20   I will object to a question that one or the
21   other of us asks and then in very, very rare
22   instances there may be some discussions between
23   the two of us.
24        Generally speaking, though,
25   whether or not Mr. Weston or I objects to a
```

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

### Page 9

1       AMY FITZSIMMONS, M.D.
2   question, the objection is for the record and
3   then you can proceed to answer.  Is that okay?
4       A.   That's okay.
5       Q.   Great.  A couple of other
6   things.  If you need a break at any point in
7   time at all, please just let me know and we'll
8   take it.
9       A.   Okay.
10      Q.   And then if you don't understand
11  a question, will you please let me know that as
12  well?
13      A.   Sure.
14      Q.   Terrific.  And I guess the last
15  thing is that if at any point you want to
16  correct or add to a previous answer that you've
17  given to me or to Mr. Weston, you shouldn't
18  hesitate to do that.  We want to make sure that
19  the written record here as well as the
20  videotape record is absolutely clear.
21      A.   Okay.
22      Q.   Great.  Okay.  So for the
23  record, can you tell us what your full name is?
24      A.   Amy Fitzsimmons.
25      Q.   And you're a medical doctor.  Is

### Page 10

1       AMY FITZSIMMONS, M.D.
2   that correct?
3       A.   I am an M.D.
4       Q.   Where is your practice located?
5       A.   In Southampton, Pennsylvania.
6       Q.   And what is the general nature
7   of your practice?
8       A.   I'm in physical medicine and
9   rehabilitation.
10      Q.   Can you tell us just in very
11  general terms what physical medicine and
12  rehabilitation is?
13      A.   Physical medicine and
14  rehabilitation is a specialty in which we work
15  with function.  I do a lot of pain management.
16  I'm also board certified in spinal cord injury
17  as well.
18      Q.   How many patients do you see in
19  a typical week?
20      A.   I do both inpatient and
21  outpatient work.  I would say if I looked at
22  just visits, it's probably over a hundred
23  visits per week.  Some of those are duplicative
24  because I have to see them daily in the
25  hospital.

### Page 11

1       AMY FITZSIMMONS, M.D.
2       Q.   Are you -- are you affiliated
3   with a particular hospital?
4       A.   I'm affiliated with Holy
5   Redeemer Hospital.
6       Q.   As part of your practice, do you
7   write prescriptions?
8       A.   I do.
9       Q.   Are some of the prescriptions
10  that you write sometimes off label, which is to
11  say for use or indications that the FDA hasn't
12  approved a specific medicine for?
13      A.   Yes.
14      Q.   To the best of your
15  understanding as a doctor, does the FDA put any
16  limitations on you in terms of your ability to
17  prescribe medicines for off label uses within
18  the limits of your own medical judgment?
19      A.   I don't think so.
20      Q.   Would you agree with me that
21  doctors do commonly prescribe certain medicines
22  for uses for which they haven't been approved
23  by the FDA?
24      A.   Yes.
25      Q.   A little more background about

### Page 12

1       AMY FITZSIMMONS, M.D.
2   you.  Where did you attend medical school?
3       A.   I went to Medical College of
4   Pennsylvania.
5       Q.   Did part of your education at
6   the Medical College of Pennsylvania include
7   training that qualified you to prescribe
8   medicines?
9       A.   Yes.
10      Q.   Did you do a residency after
11  your medical school?
12      A.   I did an internship and a
13  residency.  My internship was at Albert
14  Einstein Northern Medical Center in internal
15  medicine and a three-year residency in physical
16  medicine and rehabilitation at Graduate
17  Hospital in Philadelphia.
18      Q.   Did part of your training as an
19  intern and then as a resident also include
20  training that related to the prescription of
21  medicines?
22      A.   Yes.
23      Q.   Okay.  You mentioned a board
24  certification that you have -- that you have.
25  What is your board certification in?

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

**13**

1    AMY FITZSIMMONS, M.D.
2    A.   I have two board certifications;
3    one is in physical medicine and rehabilitation
4    and the other is in spinal cord injury.
5    Q.   In total, how long have you been
6    practicing medicine?
7    A.   Well, it's since 19 -- I
8    graduated residency in 1993.
9    Q.   Okay.  So about 15 years total
10   if I'm doing the math right?
11   A.   Yeah.  I mean, I could write
12   prescriptions when I was a resident and even an
13   intern, but since 1993 I've been, you know, out
14   of residency and on my own.
15   Q.   Okay.  In your practice today --
16   withdrawn.
17        You mentioned that you sometimes
18   prescribe drugs off label.  Is that correct?
19   A.   That's correct.
20   Q.   How frequently do you do so in
21   your daily practice?
22   A.   You know, sometimes it's hard
23   because, you know, the literature speaks of a
24   medication that -- you know, I don't always go
25   back to the Physicians' Desk Reference to

**14**

1    AMY FITZSIMMONS, M.D.
2    understand what it was originally considered on
3    label for.  But, you know, Neurontin is one of
4    the common ones.  There is several other common
5    drugs I believe I -- you know, it's got to be
6    at least a couple of times a week.
7    Q.   As a general matter, we'll talk
8    about Neurontin specifically in a minute, but
9    why would you typically prescribe a drug off
10   label if there's a way to generalize it?
11   A.   Because it's had proven efficacy
12   and it's generally accepted among my peers and
13   colleagues.
14   Q.   How typical in your field is it
15   to prescribe drugs off label?
16   A.   I think it's very common for
17   some of them.
18   Q.   I assume you would say that a
19   doctor has an obligation to exercise her own
20   medical judgment in deciding which medicines to
21   prescribe?  Is that correct?
22   A.   Can you restate that?
23   Q.   Yeah, sure.  Would you agree
24   that a doctor has an obligation to exercise her
25   own medical judgment in prescribing medicines

**15**

1    AMY FITZSIMMONS, M.D.
2    to patients?
3    A.   Yeah, I think it's our
4    responsibility.
5    Q.   And you do that in your
6    practice.  Right?
7    A.   Yes.
8    Q.   And in exercising your
9    independent medical judgment on what to
10   prescribe, do you consider the potential
11   benefits of the medicine and also the potential
12   risks associated with it?
13   A.   Yes.
14   Q.   Okay.  Let's talk about
15   Neurontin that you mentioned before.  You do
16   prescribe Neurontin.  Is that correct?
17   A.   Yes.
18   Q.   You understand, I assume, that
19   Neurontin has been approved for adjunctive
20   treatment of epilepsy and then also for
21   postherpetic neuralgia.  Is that right?
22   A.   That's correct.
23   Q.   What conditions have you
24   prescribed Neurontin to treat to the best of
25   your recollection?

**16**

1    AMY FITZSIMMONS, M.D.
2        MR. WESTON:  Objection.
3    BY MR. POLUBINSKI:
4    Q.   You can answer.
5    A.   Most commonly it's for some sort
6    of nerve pain.  I don't think I've ever written
7    it for an adjunct to epilepsy or seizure
8    disorder.  I also -- I may have written it for
9    postherpetic neuralgia.  I see that less
10   commonly than I see chronic pain conditions or
11   nerve pain conditions.
12   Q.   When you say "nerve pain," is
13   that the same thing as neuropathic pain or is
14   it something different?
15   A.   It's the same thing.
16   Q.   Okay.  In your experience, has
17   Neurontin been effective for treating some --
18        MR. WESTON:  Object again.
19        MR. POLUBINSKI:  Please let me
20   finish the question, John.
21   BY MR. POLUBINSKI:
22   Q.   Has Neurontin been effective for
23   treating neuropathic pain in your patients?
24        MR. WESTON:  Object again.
25        THE WITNESS:  Yes, it's been

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

**17**

1    AMY FITZSIMMONS, M.D.
2    very effective.
3    BY MR. POLUBINSKI:
4    Q.   Do you recall when the first
5    time was that you prescribed Neurontin to treat
6    neuropathic pain off label?
7    A.   I don't, but it's been a long
8    time.
9    Q.   Okay.  By a long time, more than
10   five years would you say?
11   A.   Certainly more than five.  It
12   may have been since residency, I just don't
13   recall.
14   Q.   Do you recall what would have
15   initially led you to prescribe Neurontin off
16   label for neuropathic pain?
17       MR. WESTON:  Object again.
18       THE WITNESS:  It's very commonly
19       used in the pathway for nerve pain
20       among my colleagues, my peers and my
21       guess is among the physicians that
22       helped train me.
23   BY MR. POLUBINSKI:
24   Q.   Do you continue to prescribe
25   Neurontin for off label use of neuropathic

**18**

1    AMY FITZSIMMONS, M.D.
2    pain?
3    A.   I do.
4    Q.   Why do you continue to prescribe
5    Neurontin for off label uses of neuropathic
6    pain?
7        MR. WESTON:  Perhaps we should
8        just have a continuing objection to
9        asking her questions unrelated to the
10       plaintiffs in this case.  I mean, she's
11       not a treating physician.  She's not an
12       expert.  So I'll object to any
13       questions -- that will keep me from
14       having to object every time you ask her
15       a question.  That's why I'm doing this
16       now.
17       MR. POLUBINSKI:  That's fine.
18       Just so the record is clear, I believe
19       it's clear in the judge's recent orders
20       that it's perfectly permissible for us
21       to ask about efficacy generally.
22       MR. WESTON:  You haven't
23       submitted an expert report.
24       MR. POLUBINSKI:  Please let me
25       finish what I'm saying, John.

**19**

1    AMY FITZSIMMONS, M.D.
2        I assume that we have a
3        disagreement with you on the extent to
4        that is what the judge has ruled, but
5        it's our view that this is perfectly
6        permissible.
7        MR. WESTON:  My turn?  It's my
8        view that I don't have an expert report
9        from this doctor, you haven't
10       supplemented your Interrogatories to
11       say that the testimony is today.  And
12       so I object on those bases as well as
13       the other ones that you just mentioned.
14       MR. POLUBINSKI:  Fair enough.
15       Again, just so the record is clear,
16       sorry to take your time with this,
17       Doctor, we're not -- we're not offering
18       Dr. Fitzsimmons' testimony as a
19       retained expert or an expert retained
20       by the defendants.  Just, again, so the
21       evidence -- so the record is clear on
22       that point.
23       MR. WESTON:  What are you
24       offering her as?
25       MR. POLUBINSKI:  We're taking

**20**

1    AMY FITZSIMMONS, M.D.
2    her deposition.  I'm certainly not
3    disputing that she has specialized
4    knowledge that can assist the trier of
5    fact, we can probably agree on that,
6    but we have not retained her as an
7    expert on behalf of the defendants.
8        Could you read back the last
9    question, Linda?
10          - - -
11       (The court reporter read the
12   pertinent part of the record.)
13          - - -
14       THE WITNESS:  It works.  It is
15       an effective use that is paid for by
16       the prescription plans.  Some of the
17       newer agents aren't.  And so we
18       usually -- I usually start there.
19   BY MR. POLUBINSKI:
20   Q.   Without reference to specific
21   patients at all, what have you heard from your
22   patients about whether they find Neurontin to
23   be effective in treating neuropathic pain off
24   label?
25       MR. WESTON:  I'll object to that

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

**21**

1  AMY FITZSIMMONS, M.D.
2  in addition as hearsay.
3      THE WITNESS: It's a mix. What
4  patients say is -- you know, some
5  people have side effects and if the
6  side effects are intolerable, we take
7  them off it. If it works, and they can
8  tolerate the side effects, the side
9  effects begin to go away, we keep them
10  on it or titrate up until symptoms or
11  side effects -- symptoms go away or
12  side effects are intolerable.
13  BY MR. POLUBINSKI:
14      Q.  What have you heard about the
15  efficacy of Neurontin from your -- from your
16  patients?
17      A.  It works very well for some of
18  my patients.
19      Q.  When you prescribe Neurontin to
20  treat neuropathic pain, how long does a patient
21  typically take the medicine?
22      A.  It can be forever.
23      Q.  For what proportion of your
24  patients that take Neurontin for off label uses
25  or neuropathic pain do you prescribe refills?

**22**

1  AMY FITZSIMMONS, M.D.
2      A.  For what percentage?
3      Q.  Approximately.
4      A.  I'm a specialist, so if someone
5  comes to me and we get their pain under control
6  and they're stable, I can turn that care back
7  over to a primary care physician. If they stay
8  with me, I'll continue writing for it for as
9  long as they see me.
10      Q.  Since you first started
11  prescribing Neurontin to treat neuropathic pain
12  off label, approximately how many patients
13  would you say you prescribed Neurontin to for
14  that condition?
15      A.  It's got to be hundreds since I
16  started, I think.
17      Q.  After you first prescribed
18  Neurontin for off label treatment of
19  neuropathic pain, was your observation of its
20  performance with prior patients a basis on
21  which you decided whether to prescribe it to
22  future patients?
23      A.  I think that's a fair assessment
24  of all my -- all the drugs I use.
25      Q.  Would you say that your

**23**

1  AMY FITZSIMMONS, M.D.
2  knowledge of Neurontin and its efficacy have
3  grown over the years?
4      A.  Yes.
5      Q.  So I take it that you know more
6  about Neurontin and its efficacy today than you
7  did in, say, 1995?
8      A.  I think that's fair.
9      Q.  And that information would be
10  based in part on your personal experience with
11  your patients. Is that correct?
12      A.  Correct.
13      Q.  And then based also at least in
14  part on discussions that you had with
15  colleagues about their experiences with
16  Neurontin. Correct?
17      A.  Yes.
18      Q.  So when you prescribe Neurontin
19  for treatment of neuropathic pain off label,
20  it's based on your independent medical judgment
21  that it's an appropriate treatment. Is that
22  correct?
23      A.  Yes.
24      Q.  And so do you continue to
25  believe that Neurontin can be a safe and

**24**

1  AMY FITZSIMMONS, M.D.
2  effective treatment for off label use of
3  neuropathic pain?
4      A.  I do.
5      Q.  Have you ever been detailed by a
6  Pfizer or Warner-Lambert sales representative
7  about Neurontin?
8      A.  I don't believe so. We don't
9  get samples. It's now a generic. We very
10  rarely get detailed on generic items.
11      Q.  Looking back in time, have you
12  ever in the past, to the best of your
13  recollection, been detailed?
14      A.  I don't recall ever being
15  detailed on that.
16      MR. POLUBINSKI: Let's take a
17  quick break. Off the record for one
18  second.
19      VIDEOGRAPHER: Going off the
20  record. The time is 10:54 a.m.
21      - - -
22      (A discussion off the record
23  occurred.)
24      - - -
25      VIDEOGRAPHER: We are on the

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

**25**

1   AMY FITZSIMMONS, M.D.
2   record.  The time is 10:54 a.m.
3   MR. POLUBINSKI:  Dr.
4   Fitzsimmons, I don't have any further
5   questions at this time.  I may have
6   questions after whatever Mr. Weston
7   chooses to ask you, but thank you very
8   much.
9           - - -
10          EXAMINATION
11          - - -
12  BY MR. WESTON:
13  Q.    My turn.
14  A.    Okay.
15  Q.    I'm John Weston.  How are you,
16  Doctor?
17  A.    Good.
18  Q.    Are you testifying free today?
19  A.    No.
20  Q.    You got paid.  Who paid you?
21  A.    I got paid $5 so far.
22  Q.    Really?  How were you -- are you
23  going to get paid more than $5?
24  A.    My understanding is that the
25  time lost from my practice, it would be an

**26**

1   AMY FITZSIMMONS, M.D.
2   equivalent amount that I would lose from seeing
3   my patients or doing hospital work.
4   Q.    How are you going to calculate
5   that?
6   A.    I have -- based on EMGs which I
7   would usually do, it will be -- depending on
8   how much time is taken today.  It will take --
9   what I usually get reimbursed for that.
10  Q.    What do you usually get
11  reimbursed for that, do you know?
12  A.    It's around -- I have to ask,
13  but it's around five, six hundred bucks for an
14  EMG.
15  Q.    Okay.  Did you speak to Mr.
16  Polubinski or any other lawyers about this
17  deposition before today?
18  A.    Yes, I did.
19  Q.    And tell me something about
20  that.  What was the conversation about?
21  A.    I spoke with somebody, it was
22  about five minutes I think, about -- they asked
23  me some of the questions I think I've been
24  asked today, like had I used it and am I
25  familiar with it.  Those kind of questions.

**27**

1   AMY FITZSIMMONS, M.D.
2   Q.    Did they tell you why they
3   picked you to do this deposition?
4   A.    I don't recall that
5   specifically.
6   Q.    Did you do any preparation for
7   today's deposition other than that $5 phone --
8   5-minute phone call?
9   A.    No.
10  Q.    You don't own any stock in
11  Pfizer or the old Warner-Lambert Company, do
12  you?
13  A.    I don't believe so.  I have some
14  funds with companies, but...
15  Q.    You prescribe Neurontin
16  principally for pain.  Is that my
17  understanding?  Is that correct?
18  A.    That's correct.
19  Q.    No one, including Pfizer, knows
20  what the mechanism of action of Neurontin is.
21  Is that right?
22  A.    I don't know that I can answer
23  that with assuredness, the mechanism of action.
24  Q.    Do you know what the mechanism
25  of action is for Neurontin?

**28**

1   AMY FITZSIMMONS, M.D.
2   A.    Not off the top of my head.
3   Q.    What sort of side effects does
4   Neurontin have and do you see in your patients?
5   A.    I think the most common is --
6   there's a couple.  I see -- some people say
7   dizziness.  Edema, swelling of the legs.  They
8   would be the most common that I would have
9   complaints of.
10  Q.    Have you followed the FDA
11  hearings over the suicide side effects of the
12  AEDs?
13  A.    No.
14          MR. POLUBINSKI:  Objection.
15  BY MR. WESTON:
16  Q.    Pain, there are generally no
17  objective symptoms, though.  Is that right?
18  A.    Pain is a subjective report.
19  Q.    Meaning -- when you say it's a
20  subjective symptom, what does that mean?
21  A.    Pain is an essential
22  interpretation of what is going on in the body.
23  It's the brain's interpretation of something
24  that is amiss.
25  Q.    And the difference between a

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

**29**

1      AMY FITZSIMMONS, M.D.
2  subjective symptom and an objective symptom is
3  the third party can't tell whether you're
4  really feeling it or not.  Is that right?
5      A.    I would -- I would switch that
6  around a little bit.  I would say that there
7  may be very clear, you know -- you know, if you
8  had got a cut across the leg, I may see that
9  cut and feel that you might have pain.  Your
10 assessment of what that pain feels like is all
11 your own and I can't begin to understanding
12 that.  It might make sense to me putting it
13 together with other things; you know, if I know
14 you have a stenosis of your low back, it might
15 make sense to me.  But I can't really see
16 whether it's stab and sharp, dull, hot, cold,
17 you know, eight out of ten or two out of ten.
18     Q.    Right.  If I tell you right now
19 that I'm feeling crushing pain, you have no way
20 of knowing whether I'm telling you the truth or
21 not?
22     A.    I can't measure it.
23     Q.    You wouldn't prescribe
24 gabapentin to anyone if you knew that it was no
25 better than a placebo, would you?

**30**

1      AMY FITZSIMMONS, M.D.
2          MR. POLUBINSKI:  Objection.
3          THE WITNESS:  No, that's not
4      true.
5  BY MR. WESTON:
6      Q.    You would?
7      A.    I think that placebo effect is
8  30 percent.  And there are things -- there are
9  things that we use that in my estimation if
10 someone gets -- if they're one of the
11 30 percent of the people who get relief and
12 their relief seems to be coming at a cost
13 without much in the way of harm, then I am not
14 opposed to that.
15     Q.    Okay.  So if I understand you
16 correctly, if you thought that the classic
17 sugar pill placebo might make the patient feel
18 better, you would prescribe it for them?
19     A.    Absolutely.
20          MR. POLUBINSKI:  Objection.  Go
21     ahead.
22 BY MR. WESTON:
23     Q.    Mr. Polubinski asked you about
24 your independent medical judgment.  I'd like to
25 ask you a couple of questions about that.

**31**

1      AMY FITZSIMMONS, M.D.
2          When you first decided to
3  prescribe Neurontin for a patient, you didn't
4  conduct your own double blind placebo
5  controlled study before you prescribed the
6  Neurontin, did you?
7      A.    I can't recall the first time,
8  but I really never do that with any drug.
9      Q.    Of course not.  And so your
10 informed judgment is based upon other factors
11 other than you conducting a study.  Can we
12 agree on that?
13     A.    Correct.
14     Q.    You would rely on what your
15 peers tell you about the drug?
16     A.    That's one of the things.
17     Q.    You would rely on articles that
18 you read about the drug?
19     A.    Correct.
20     Q.    You would rely on what else?
21     A.    If I attend meetings where I
22 have colleagues or peers.  You know, if it's
23 the first time, I have no experience, but other
24 times it's based on my experience with a drug.
25     Q.    So after that first time, and I

**32**

1      AMY FITZSIMMONS, M.D.
2  think you testified to this, after that first
3  time that you prescribed it, your subsequent
4  prescription behavior is based principally on
5  your own experience?
6          MR. POLUBINSKI:  Objection.  Go
7      ahead.
8          THE WITNESS:  I think it's a mix
9      because things come along.  I read a
10     lot in the pain journals.  So it will
11     be a mix and it will be also
12     unfortunately these days on what
13     prescription plans allow patients to
14     afford.  So if it's the only affordable
15     option, that's often what we do as
16     well.
17 BY MR. WESTON:
18     Q.    You take -- you go to continuing
19 medical education sessions?
20     A.    Or I do them online or in
21 journals.
22     Q.    Have you ever talked to a drug
23 company's medical liaison?  Do you know what
24 those people are?
25     A.    Yes.

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

### 33

```
1         AMY FITZSIMMONS, M.D.
2    Q.   What are they?
3    A.   They're people that interface
4    with the medical community from a drug company.
5    Q.   Have you ever consulted with
6    one?
7    A.   About any drug?
8    Q.   About any drug.
9    A.   Yes.
10   Q.   Have you ever consulted with one
11   about gabapentin?
12   A.   I don't think so.  I don't
13   recall that.
14   Q.   Have you ever -- do you know
15   what a speakers bureau is?
16   A.   Yes.
17   Q.   What is it?
18   A.   It's a group of people that are
19   asked to speak on behalf of a drug.
20   Q.   Have you ever been to one of
21   those?
22   A.   I've been to one and given.  I'm
23   on speakers bureaus.
24   Q.   Are you really?
25   A.   Yes.
```

### 34

```
1         AMY FITZSIMMONS, M.D.
2    Q.   What speakers bureaus are you
3    on?
4    A.   I'm on ones for -- I have been
5    on ones for different narcotic pain
6    medications.  Kadian in the past.  I've been in
7    Avinza.  In the distant past, Duragesic which
8    is a fentanyl patch.  And on a couple of
9    occasions Provigil.
10   Q.   How do you get selected to be a
11   speaker?
12        MR. POLUBINSKI:  Objection.
13        THE WITNESS:  I'm not exactly
14   sure, but I think it's based on my
15   experience with the drug and you attend
16   meetings on, you know, if -- on how to
17   give the talks and what the science is
18   behind it.
19   BY MR. WESTON:
20   Q.   Who tells you how to -- the
21   background that you just gave, who tells you
22   those things?
23        MR. POLUBINSKI:  Objection,
24   again.  John, are we talking about --
25        MR. WESTON:  Right now we're
```

### 35

```
1         AMY FITZSIMMONS, M.D.
2    talking about all of the different
3    speakers bureaus she's been on.
4         MR. POLUBINSKI:  Fair enough.  I
5    think we're getting a little far afield
6    here.  Obviously Dr. Fitzsimmons can
7    answer.  We don't want to waste a lot
8    of her time on things unrelated to the
9    case.
10        MR. WESTON:  Your objection is
11   noted.
12        THE WITNESS:  Okay, you know
13   there -- my understanding of the way
14   that it works now is there is a very
15   narrow set of what is to be
16   communicated to an audience such as
17   other physicians, nurse practitioners
18   and whoever else is in the audience.
19   Those slides are -- it's usually given
20   as a slide set or first given to us in
21   an education manner, like we sit as,
22   you know, students of people who
23   usually participated in the studies.
24   Or, you know, and it's a panel usually
25   that are informing the speakers
```

### 36

```
1         AMY FITZSIMMONS, M.D.
2    initially.
3    BY MR. WESTON:
4    Q.   Who is the panel composed of?
5         MR. POLUBINSKI:  Objection,
6    again.
7         THE WITNESS:  I think it's
8    people on the company, the medical
9    directors, the people who did the
10   original studies.  They're usually
11   multicenter studies.  That's my
12   understanding usually of who is
13   educating us.
14   BY MR. WESTON:
15   Q.   Now, you have not done one of
16   these speakers bureau talks for gabapentin?
17   A.   No.
18   Q.   Have you ever been to one for
19   gabapentin?
20   A.   I don't think so because it's
21   been generic for so long that I don't think
22   that -- I haven't recalled being to one that is
23   for generic medicines or medicines that are now
24   generic.
25   Q.   Gabapentin -- gabapentin went
```

**37**

1    AMY FITZSIMMONS, M.D.
2    generic in 2004, didn't it?
3         MR. POLUBINSKI:  Objection.
4         THE WITNESS:  I don't know.
5    BY MR. WESTON:
6    Q.   Had you been to speakers bureau
7    talks before 2004?
8    A.   Yes.
9    Q.   You don't remember whether any
10   of those were for gabapentin.  Is that correct?
11   A.   I don't.
12   Q.   But they could have been?
13        MR. POLUBINSKI:  Objection.
14        Speculation.  I think she said she
15        doesn't remember.
16        THE WITNESS:  You know, this is
17        what my lifestyle is.  I work full time
18        which is more than 40 hours a week.  I
19        have three children and I'm very
20        selective about what I attend because I
21        can't afford the time.
22        I don't think in 2004 when my
23        kids were small and in day care, I
24        would have been trekking down to
25        Philadelphia to go to a Neurontin talk

**38**

1    AMY FITZSIMMONS, M.D.
2        because it was so mainstream.  I
3        think --
4    BY MR. WESTON:
5    Q.   When did you start practicing?
6    A.   1993.
7    Q.   So you had been practicing for
8    ten years before it went generic.  You could
9    have gone to speakers bureau before your kids
10   were young?
11   A.   I guess it's possible, but I
12   really have no recollection of that.
13   Q.   That's fine.  Did you see the
14   Dateline show on Neurontin?
15   A.   I have not.
16   Q.   What is pharmacology?
17   A.   The study of medicines and
18   chemicals.
19   Q.   And how they work?
20   A.   Yes.
21   Q.   What is your training in
22   pharmacology?
23   A.   From medical school.
24   Q.   What training did you get in
25   medical school in pharmacology?

**39**

1    AMY FITZSIMMONS, M.D.
2    A.   We had a course in pharmacology.
3    That's -- you know, that's it.
4    Q.   Okay.  That was what I wanted to
5    know.
6        Have you -- have you taken other
7    courses in pharmacology since med school?
8    A.   Not specifically in
9    pharmacology.
10   Q.   Now, you said that Neurontin
11   works.  What do you base that on?
12   A.   The patients' reports.  Pain is
13   subjective.  If someone is coming -- we always
14   take -- or I always take a pain level.  What
15   they're functionally doing, if they could do
16   more, if people are reporting less pain and the
17   only difference since the last time I saw them
18   is the gabapentin, then it works.  The same way
19   I judge all medicines for pain that I use or
20   for any medicine that I use for anything.
21   Q.   So to exclude things, you're not
22   basing your conclusion that Neurontin works on
23   studies that you've read.  Is that right?
24        MR. POLUBINSKI:  Objection.
25        THE WITNESS:  No.  On a

**40**

1    AMY FITZSIMMONS, M.D.
2        day-to-day basis, it's based on the
3        individuals that I see.
4    BY MR. WESTON:
5    Q.   Your patients telling you how
6    they feel?
7    A.   Correct.
8    Q.   And that is virtually the sole
9    basis of your opinion --
10        MR. POLUBINSKI:  Objection.
11   BY MR. WESTON:
12   Q.   -- that Neurontin works?
13   A.   It is the strongest basis of my
14   opinion.  Plus the fact that I have all my
15   colleagues telling me it works.  And when you
16   go to meetings, you know.  That, you know, it
17   is one of the first things you do before you
18   move into the narcotic arena if it's nerve
19   pain.
20   Q.   I'm only trying to get the
21   foundations of your opinion.  The strongest is
22   your patient response to you?
23   A.   Correct.
24   Q.   Your colleagues speaking to you?
25   A.   Uh-huh.

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

### Page 41

1  AMY FITZSIMMONS, M.D.
2  Q.  Is there anything else?
3  A.  On whether it works?  No, I
4  think that's pretty much what I use.
5  Q.  When you prescribe Neurontin off
6  label for pain, do you tell your patients that
7  it's for off label use and it hasn't been
8  approved by the FDA?
9  A.  I don't.
10       MR. WESTON:  I don't have any
11    other questions for you, Doctor.
12       - - -
13       FURTHER EXAMINATION
14       - - -
15  BY MR. POLUBINSKI:
16  Q.  I just have a few more
17  questions, Doctor, just to follow up on a
18  couple of things that Mr. Weston asked you
19  about.
20       It's correct that you took time
21  out of your practice today to sit for this
22  deposition.  Right?
23  A.  Correct.
24  Q.  And you could have been seeing
25  patients during this time.  Is that right?

### Page 42

1  AMY FITZSIMMONS, M.D.
2  A.  That's correct.
3  Q.  And you would have received
4  compensation to do so?
5  A.  Correct.
6  Q.  Is it your understanding that
7  you will receive any more than the amount you
8  would have received if you had been seeing
9  patients instead of Mr. Weston and me in
10  connection with this deposition?
11  A.  That's my understanding.
12  Q.  Mr. Weston also asked you about
13  the placebo effect.  In your experience, does
14  the placebo effect last indefinitely or does it
15  tend to fade over weeks or months?
16  A.  You know, I'm not sure I'm
17  really good at putting my hands around a
18  placebo effect because the placebo effect my
19  understanding is about 30 percent.  Like if
20  something is 30 percent effective, we can say
21  that that is often equivalent to a placebo
22  effect.
23       I'm not sure that if I think
24  someone is improved and they're improved for my
25  intervention, that I'm, you know, likely to

### Page 43

1  AMY FITZSIMMONS, M.D.
2  just pull it off because I think it's a placebo
3  effect.  In the future, at times, I will try to
4  wean someone down to see if it's still
5  efficacious, and then if it's not, withdraw.
6  And if it seems with withdrawing that pain
7  increases, I'll return them to that drug.
8  Q.  Have you ever done what you just
9  described with Neurontin before?
10  A.  Correct, I have.
11  Q.  What did you find, what did you
12  experience?
13  A.  It's varied because some
14  people's underlying -- like if someone comes to
15  me and has nerve pain from a low back
16  condition, it's conceivable sometimes that
17  whatever is causing that nerve pain may go
18  away.  So it's reasonable with some amount of
19  frequency that you try -- you wean down seeing
20  if someone still needs the drug, whatever it
21  is, whether it's a narcotic, or Neurontin or
22  whatever.  And then if the pain returns, you
23  know, the consideration is to return the
24  patient to that drug.
25  Q.  Okay.  So have you ever seen

### Page 44

1  AMY FITZSIMMONS, M.D.
2  experiences -- withdrawn.
3       Did you ever see patients who
4  experienced the benefit on Neurontin feel worse
5  after they came off of it?
6  A.  Yes.
7  Q.  Did you put them back on?
8  A.  In a lot of those instances,
9  yes.
10  Q.  And did their symptoms improve
11  when you put them back on Neurontin in some of
12  those cases?
13  A.  Yes.  If it doesn't, then we
14  take it off, but, you know, I've certainly seen
15  that scenario.
16  Q.  Now, seeing that scenario, what
17  does that tell you about the possibility --
18  withdrawn.
19       Let me just cut to the chase and
20  ask you how likely in your mind is it that the
21  efficacy that you've seen over the course of
22  the past 10, 15 years of your practice and the
23  hundreds of patients that you've treated with
24  Neurontin for nerve pain is due solely to the
25  placebo effect?

Fitzsimmons, Amy, MD  9/22/2008  12:00:00 PM

```
                                                    45
 1       AMY FITZSIMMONS, M.D.
 2    A.    I don't think so.
 3    Q.    Why not?
 4    A.    It's too common.  I mean,
 5  Neurontin just too commonly helps people with
 6  nerve pain.
 7         MR. POLUBINSKI:  I have no
 8     further questions.
 9             - - -
10         FURTHER EXAMINATION
11             - - -
12  BY MR. WESTON:
13    Q.    Doctor, did you cancel a patient
14  for today to do this deposition?
15    A.    I have patients at the hospital
16  that I saw yesterday in lieu of today.
17         MR. WESTON:  I don't have any
18     more questions.
19         MR. POLUBINSKI:  I think we're
20     done.
21         VIDEOGRAPHER:  We're going off
22     the record.  The time is 11:12 a.m.
23     This is the end of tape number one.  We
24     are concluded.
25             - - -
```

```
                                                    46
 1       AMY FITZSIMMONS, M.D.
 2         (Witness excused.)
 3         (Deposition concluded at
 4     approximately 11:12 a.m.)
 5
 ...
25
```

```
                                                    47
 1       AMY FITZSIMMONS, M.D.
 2
 3         CERTIFICATE
 4
 5
 6         I HEREBY CERTIFY that the
 7  witness was duly sworn by me and that the
 8  deposition is a true record of the testimony
 9  given by the witness.
10
11
12
            Linda Rossi Rios, RPR, CSR
13          and Notary Public
            Dated:  September 22, 2008
14
15
16
17
18
19         (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24
25
```