# EXHIBIT 6

Ahlstrom, Brian, MD  9/30/2008  12:00:00 PM

**1**

```
 1        IN THE COURT OF COMMON PLEAS OF
              PHILADELPHIA COUNTY, PENNSYLVANIA
 2
 3   GREGORY CLARK and LINDA  ) CIVIL DIVISION
     MEASHEY, individually    )
 4   and on behalf of others  )
     similarly situated,      )
 5                            ) No. 1819
 6       Plaintiffs,          )
                              )
 7       - vs -               ) VIDEOTAPE
                              ) DEPOSITION OF:
 8   PFIZER INC., and         ) BRIAN AHLSTROM, M.D.
     WARNER-LAMBERT COMPANY,  )
 9   LLC,                     )
                              )
10                            ) DEPOSITION DATE:
         Defendants.          ) September 30, 2008
11                              Tuesday, 12:52 p.m.
12
13               FILED ON BEHALF OF:
                 Defendants
14
15
                 COUNSEL OF RECORD FOR
16               THIS PARTY:
                 Paul S. Mishkin, Esq.
17               DAVIS POLK & WARDWELL
                 450 Lexington Avenue
18               New York, NY  10017
                 212-450-4000
19
20
                 REPORTED BY:
21               Tammie Elias, RPR
                 Notary Public
22               Ref. No. TE09295
23
24
25
```

**2**

```
 1       VIDEOTAPE DEPOSITION OF BRIAN AHLSTROM, M.D.,
     a witness, called by the Defendants for examination,
 2   in accordance with the Pennsylvania Rules of Civil
     Procedure, taken by and before Tammie Elias, RPR and
 3   Notary Public in and for the Commonwealth of
     Pennsylvania, at the offices of Dr. Ahlstrom, 353
 4   Market Street, Johnstown, Pennsylvania, on Tuesday,
     September 30, 2008, commencing at 12:52 p.m.
 5
 6   APPEARANCES:
 7       FOR THE PLAINTIFFS:
           John K. Weston, Esq.
 8         SACKS & WESTON
           114 Old York Road
 9         Jenkintown, PA  19046
           215-925-8200
10
11       FOR THE DEFENDANTS:
           Paul S. Mishkin, Esq.
12         DAVIS POLK & WARDWELL
           450 Lexington Avenue
13         New York, NY  10017
           212-450-4000
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1              EXAMINATION INDEX
 2
     BRIAN P. AHLSTROM, M.D
 3     BY MR. MISHKIN . . . . . . . . .  5
       BY MR. WESTON  . . . . . . . . . 25
 4
 5
 6
 7
     CERTIFICATE OF REPORTER . . . . . . . 49
 8
 9
10
11
12       (No Exhibits were marked.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                    - - - -
 2            VIDEOGRAPHER:  My name is Carrie
 3   Molitierno, certified legal video specialist
 4   on behalf of Veritext in New Jersey.  The date
 5   today is September 30th, 2008 and the time is
 6   approximately 12:52 p.m.  This deposition is
 7   being held in the office of Dr. Brian P.
 8   Ahlstrom, located at 353 Market Street,
 9   Johnstown, Pennsylvania, 15901.
10            The caption of this case is Gregory
11   Clark and Linda Meashey, individually, and on
12   behalf of the others similarly situated versus
13   Pfizer, Incorporated and Warner-Lambert
14   Company, LLC, in the Philadelphia County Court
15   of Common Pleas.  The name of the witness is
16   Dr. Brian P. Ahlstrom.  At this time the
17   attorneys will identify themselves and the
18   parties they represent after which our Court
19   Reporter, Tammie Elias, of Veritext, New
20   Jersey, will swear in the witness and we can
21   proceed.
22            MR. MISHKIN:  Paul Mishkin from
23   Davis Polk & Wardwell for the Defendants
24   Pfizer and Warner-Lambert.
25            MR. WESTON:  And John Weston of
```

**Page 5**

1  Sacks & Weston for the plaintiff class.
2  - - - -
3  BRIAN P. AHLSTROM, M.D.,
4  having been duly sworn,
5  was examined and testified as follows:
6  - - - -
7  EXAMINATION
8  - - - -
9  BY MR. MISHKIN:
10  Q.  Good afternoon, Dr. Ahlstrom.
11  A.  Nice to meet you.
12  Q.  Let me just take a few moments to give a
13  little background about what we're doing here
14  today.  As you just heard, my name is Paul
15  Mishkin, I represent the Defendants in this
16  case, Pfizer and Warner-Lambert.  Plaintiffs
17  have filed a class action lawsuit against the
18  Defendants involving the marketing of the drug
19  Neurontin and, as you heard, Mr. Weston
20  represents the plaintiffs here.
21  A.  Uh-huh.
22  Q.  I'm going to be focusing with you on your
23  general experience using Neurontin,
24  prescribing Neurontin and more specifically,
25  your experience prescribing Neurontin for off

**Page 6**

1  label conditions.  Just a couple points of
2  clarification on that, I'm going to be
3  focusing, like I said, on your general
4  experience.  I'm not going to be asking you
5  any questions and I don't want to hear any
6  information about your specific patients, any
7  names or identifying information like that, is
8  that understood?
9  A.  Understood.
10  Q.  And a couple notes on terminology.  I'm going
11  to use the term Neurontin in its broad sense.
12  It would be great if you could understand me
13  by Neurontin to mean both brand Neurontin and
14  also generic Gabapentin.  In other words, I'm
15  not trying to distinguish between the two of
16  those when I use the term Neurontin, is that
17  okay?
18  A.  Quite right.
19  Q.  And I note on the term off label use, I
20  imagine that's a term that's very familiar to
21  you, but just so the record is clear, when I
22  refer to an off label use of a drug, I'm
23  talking about a use of that drug that has not
24  been specifically approved of by the FDA, is
25  that clear?

**Page 7**

1  A.  It is.
2  Q.  Great.
3       MR. MISHKIN:  And I think before we
4  begin, I understand Mr. Weston has a general
5  statement that he'd like to make.
6       MR. WESTON:  I have two general
7  objections that I'd like to make, which I'll
8  make now so as to not to interrupt the flow of
9  the deposition.  But Dr. Ahlstrom is not a
10  fact witness in this case, he hasn't been
11  designated as an expert.  He hasn't submitted
12  a report, which an expert is required to
13  submit under the Pennsylvania rules, and so I
14  object to this testimony.
15       MR. MISHKIN:  I'll just note that
16  Defendants obviously disagree with that.  We
17  think that the court has expressly permitted
18  us to take this type of deposition and I also
19  note that Dr. Ahlstrom is not being offered as
20  a retained expert witness.
21  BY MR. MISHKIN:
22  Q.  Dr. Ahlstrom, just a few more preliminaries
23  before we get started.  Have you ever been
24  deposed before?
25  A.  Yes.

**Page 8**

1  Q.  Because of that, I'm not going to go into an
2  elaborate speech about the rules of
3  depositions, but let me give you a few
4  reminders.  The basic point is that we
5  shouldn't talk at the same time in order to
6  allow the Court Reporter to get down
7  everything that we're saying.  I'll do my best
8  to wait for you to finish your answers before
9  I begin my questions and it would be great if
10  you could reciprocate and wait for me to
11  completely finish --
12  A.  I'll do my best.
13  Q.  There's an example.  If you could just wait
14  for me to finish my questions completely
15  before you begin your answer, that would be
16  great, is that okay?
17  A.  Yeah.
18  Q.  If you need a break at any time, just let me
19  know that and we can certainly accommodate
20  that.  And if there's any questions that I ask
21  that you don't understand, please just let me
22  know and I'll do my best to rephrase them, is
23  that okay?
24  A.  Okay.
25  Q.  Perfect.  And then one last thing, is that you

Page 9

1   may hear some objections as we go along and
2   perhaps even some back and forth between
3   Mr. Weston and myself, but generally speaking,
4   those comments and objections are just for the
5   record and you should still go ahead and
6   answer the question that's posed, does that
7   make sense?
8   A.  Okay, yeah.
9   Q.  Perfect.  Could you state your full name,
10      please?
11  A.  Brian, B-R-I-A-N, Patrick, P-A-T-R-I-C-K,
12      Ahlstrom, A-H-L-S-T-R-O-M, like mother.
13  Q.  And you're a medical doctor; is that correct?
14  A.  Yes, it is.
15  Q.  Where is your practice located?
16  A.  We're seated in my office here at 353 Market
17      Street, Pennsylvania.
18  Q.  What part of Pennsylvania is that?
19  A.  Johnstown, Pennsylvania.
20  Q.  How long has your practice been here at this
21      location?
22  A.  Since 1987.
23  Q.  What is the general nature of your practice?
24  A.  This is a general neurology practice.  We see
25      patients from birth on and we see a broad

Page 10

1   variety of complaints including common
2   neurological problems such as multiple
3   sclerosis, Parkinson's, neuropathy, seizures,
4   pain complaints, migraine headaches and
5   others, but that gives you a flavor for what
6   we do.
7   Q.  How many patients do you see in a typical
8       week?
9   A.  About 100.
10  Q.  As part of your practice, do you write
11      prescriptions?
12  A.  Yes.
13  Q.  Are some of those prescriptions off label
14      prescriptions?
15  A.  It's often said that the practice of
16      neurology, and particularly the practice of
17      child neurology, would be impossible without
18      off label prescribing.
19  Q.  And why is that?
20  A.  Well, specifically for child neurologies,
21      there are often no studies done on children
22      for drugs that are commonly used in the adult
23      population.  And in the adult neurology
24      population, we will commonly take drugs that
25      are useful in one context and use them in

Page 11

1   patients who have failed other therapies.
2   Q.  So I guess you would agree that it's common
3       for doctors to prescribe certain medications
4       for indications that have not been approved of
5       by the FDA?
6   A.  Yes.
7   Q.  A little bit more about your own background.
8       Where did you attend medical school?
9   A.  I went to school in Brussels, Belgium in the
10      Free University of Brussels there.
11  Q.  And did part of your education include
12      training that qualifies you to prescribe
13      medications?
14  A.  Yes.
15  Q.  Did you later after medical school do any type
16      of residency or internship?
17  A.  Yes, I did two residencies.  I did a residency
18      in pediatrics at the Lenox Hill Hospital in
19      New York City.  And then I did a pediatric
20      neurology fellowship in University of Medicine
21      and Dentistry of New Jersey.  And then I went
22      to the University of Maryland on faculty there
23      for three years with an appointment both in
24      child neurology and neurology.
25  Q.  Did part of the training that you received in

Page 12

1   your residency and fellowship and later at
2   Maryland, did part of that training relate to
3   the prescription of medications?
4   A.  Yes.
5   Q.  Do you have any board certifications?
6   A.  Yes, I'm board certified in pediatrics and I'm
7      board certified in neurology with special
8      confidence in child neurology.
9   Q.  And in total how long approximately have you
10      been practicing medicine?
11  A.  I graduated medical school in '78 and I
12      completed my fellowship training in '84 and
13      came here to Johnstown in '87.
14  Q.  So it sounds like you graduated from medical
15      school about 30 years ago?
16  A.  Yeah, almost exactly.
17  Q.  And if you start your practice after the
18      fellowship and internship, you have been
19      practicing for more than 20 years I guess we
20      can safely say?
21  A.  Easily.
22  Q.  Let's talk a little bit more about off label
23      prescribing, about how frequently do you
24      prescribe medications in general for off label
25      uses?

Ahlstrom, Brian, MD  9/30/2008  12:00:00 PM

13

1  A.  Difficult question, but frequently.
2  Q.  And I think you have already said but just to
3      be clear, that's something typical to do in
4      your field, right, to prescribe drugs off
5      label?
6  A.  Right.  And as I said previously in child
7      neurology in particular, that branch of my
8      practice is very often off label.
9  Q.  Let me ask you a general question, would you
10     say that you have an obligation as a doctor to
11     exercise your own independent medical judgment
12     when you treat your patients?
13 A.  Yeah, I think that's in keeping -- the greater
14     call is to treat the patient for his or her
15     benefit, that you're not treating for your own
16     benefit, and the notion that you deal off
17     label is within certain guidelines.  You don't
18     take off easily as a maverick.  There are
19     revolutionary thinkers, but few of us qualify
20     for that.
21 Q.  And I take it that when you make the decision
22     to prescribe a medication for an off label
23     use, that's because in your independent
24     medical judgment, that's an appropriate
25     medication to prescribe?

14

1  A.  Oh, yes.  Yes.
2  Q.  And let me ask you, when you're exercising
3      that independent medical judgment in making
4      prescription decisions, do you weigh the
5      potential benefits of the medication against
6      its potential risks?
7  A.  You do that on label or off label because even
8      off label medicines have risks.
9  Q.  Let's talk specifically about Neurontin.  Am I
10     correct that you prescribe Neurontin in your
11     practice?
12 A.  Yes.
13 Q.  And you understand that Neurontin has been
14     approved for adjunctive treatment of epilepsy
15     and for treatment of postherpetic neuralgia?
16 A.  Right, those are its two on label indications.
17 Q.  Do you prescribe Neurontin for any off label
18     conditions?
19 A.  Yes.
20 Q.  Which ones?
21 A.  I used it for painful neuropathies.  I have
22     used it in the prevention of migraines.  And I
23     have used it for other painful complaints,
24     which appear to have either myofascial or
25     neuropathic components, again in chronic use

15

1      trying to relieve the suffering.
2  Q.  You mentioned pain I think that has
3      neuropathic components, is that type of pain
4      sometimes referred to as neuropathic pain?
5  A.  Yes.  It's more of a description offered by
6      the patient, either burning, sharp stinging,
7      uncomfortable discomfort.
8  Q.  And can you be a little bit more specific,
9      what are some types of neuropathic pain that
10     you have used Neurontin to treat?
11 A.  Well, diabetic neuropathic pain comes
12     immediately to mind.  Posttraumatic
13     neuropathies, people who have been injured and
14     then develop pain in the area of a nerve
15     injury.  Even sometimes carpal tunnel syndrome
16     before surgery, we'll use it to bridge the
17     treatment of pain.
18 Q.  I'd like to walk through some of these
19     different uses that you have mentioned.  Does
20     it work for you if we start with one group and
21     call it neuropathic pain, does that make
22     sense?
23 A.  Right.
24 Q.  Let's talk about neuropathic pain.  Have you
25     found Neurontin to be effective for treating

16

1      neuropathic pain?
2  A.  In certain patients, yes.
3  Q.  And I guess that's not a surprising thing
4      that -- well, withdrawn.
5          Let's me actually take a step back.  Do you
6      recall when the first time would have been
7      that you prescribed Neurontin for neuropathic
8      pain?
9  A.  Years ago.  I can't remember now.
10 Q.  More than 10 years, would that be fair?
11 A.  Oh, yeah, more than ten years.
12 Q.  Do you recall what lead you to prescribe
13     Neurontin for neuropathic pain for the first
14     time?
15 A.  Yes, in neurology practice, neuropathic pain
16     often responds to a class of drugs known as
17     the antiepileptic drugs.  These drugs usually
18     work by modifying the membrane excitability
19     and these include Tegretol, Dilantin and
20     Neurontin belongs to that same general
21     category.  So we felt that by extension and by
22     reasonable inference, it would be worth
23     exploring its application to neuropathic pain.
24 Q.  And I take it today you continue to prescribe
25     Neurontin for neuropathic pain?

Ahlstrom, Brian, MD  9/30/2008  12:00:00 PM

17

1   A.   Yes, I do.
2   Q.   Why do you continue to prescribe Neurontin for
3        neuropathic pain?
4   A.   In some patients it proves to be an effective
5        adjunctive therapy.
6   Q.   And what have you heard from patients about --
7        patients to whom you have prescribed Neurontin
8        for neuropathic pain, what have you heard from
9        them in general terms about Neurontin?
10            MR. WESTON:  Object as hearsay.
11  A.   Yeah, the general report in the successful
12       patients is that at surprisingly low doses, it
13       alleviates the pain and they are difficult to
14       persuade to come off it as all pain patients.
15       If they find a use for it, they don't want to
16       be taken off of it.
17  BY MR. MISHKIN:
18  Q.   Since you've started prescribing Neurontin for
19       neuropathic pain, how many times or
20       approximately for how many patients have you
21       prescribed Neurontin for that condition?
22  A.   50 to 60 over the 10 years that I -- and more
23       that I have been using it, yes.
24  Q.   And after you first prescribed Neurontin for
25       neuropathic pain, was your observation of its

18

1        performance with prior patients a basis on
2        which you evaluated it for future
3        prescriptions?
4   A.   Yes.  I tend to whenever I'm introducing or
5        using a medicine that has just been released,
6        I reserve judgment until I have got a group of
7        at least 20 to 30 patients unless I have
8        horrific results in the first few.  But, yeah,
9        I build my like or dislike of the medicine on
10       my own pattern of practice.
11  Q.   And based on your experience, you continue to
12       believe that Neurontin can be a safe and
13       effective treatment for neuropathic pain?
14  A.   Yeah.  To be frank, since the introduction of
15       other medicines, it has fallen in my
16       prescription batting list, so to speak, but I
17       continue to use it, yes.
18  Q.   You mentioned some other uses that you have
19       prescribed Neurontin for, maybe you can help
20       me again with the list, outside of neuropathic
21       pain?
22  A.   Right, for prevention of migraine was a use.
23       And again I insist since the introduction of
24       other medicines, Neurontin is not called on as
25       often in this capacity.  But the neurologist

19

1        sees people who have either severe or frequent
2        migraines that have not responded to
3        conventional treatment and Neurontin again in
4        surprisingly low doses can be effective in
5        reducing --
6            MR. MISHKIN:  Why don't we go off
7        the record a moment.
8            VIDEOGRAPHER:  We are off the
9        record.  The time is 1:09 p.m.
10           - - - -
11       (There was a discussion off the record.)
12           - - - -
13           VIDEOGRAPHER:  We are on the
14       record.  The time is 1:13 p.m.
15  BY MR. MISHKIN:
16  Q.   Doctor, I think we might have gotten cut off
17       in the middle of your last response, so maybe
18       it makes sense to just have that question read
19       back and go from where we were.
20           - - - -
21       (The record was read back by the
22       Reporter.)
23           - - - -
24  A.   -- the frequency and severity of migraine
25       headaches.

20

1   BY MR. MISHKIN:
2   Q.   Doctor, just so that the record is clear, your
3        testimony is that Neurontin can be effective
4        in reducing the frequency and severity of
5        migraine headaches?
6   A.   Right, it's used as a preventive medicine.
7        It's of little use during a migraine attack.
8   Q.   You mention I believe myofascial pain; is that
9        correct?
10  A.   Yes.
11  Q.   And have you found that Neurontin can be an
12       effective treatment for some patients for
13       myofascial pain?
14  A.   Right.  Myofascial pain, fibromyalgia, these
15       ill-defined pain complaints, reflex
16       sympathetic dystrophy, these are challenging
17       problems and I have used Neurontin as
18       adjunctive therapy for these patients.
19  Q.   And you found that at least in some patients
20       Neurontin was effective?
21  A.   Yes, it was.
22  Q.   Any other conditions, off label conditions,
23       that you prescribe Neurontin for that we
24       haven't yet spoken about?
25  A.   I did try to use it for restless legs, but I

Ahlstrom, Brian, MD  9/30/2008  12:00:00 PM

**21**

1   wasn't very pleased with the results in
2   restless legs.
3   Q.  Any others?
4   A.  No.
5   Q.  Let me ask you this, Doctor, when you
6       prescribe Neurontin for the off label uses
7       that you have been discussing --
8           MR. MISHKIN:  Why don't we go off
9       the record.
10          VIDEOGRAPHER:  We're off the
11      record.  The time is 1:16 p.m.
12              - - - -
13      (There was a discussion off the record.)
14              - - - -
15          VIDEOGRAPHER:  We are on the
16      record.  The time is 1:19 p.m.
17  BY MR. MISHKIN:
18  Q.  Doctor, I think again you might have gotten
19      cut off in the middle of an answer, so I'm
20      going to have the question read back to you
21      and then we can try to do a full question and
22      answer to get your full testimony in.
23  A.  Okay.
24              - - - -
25      (The record was read back by the

**22**

1       Reporter.)
2               - - - -
3           MR. MISHKIN:  Let me restate the
4       question then.
5   BY MR. MISHKIN:
6   Q.  Doctor, when you prescribe Neurontin for the
7       off label uses that we have been discussing,
8       approximately how long do you keep your
9       patients on Neurontin?
10  A.  That depends very clearly on how well they are
11      doing.  The procedure is always to start low
12      and build up, being cautious with possible --
13      the emergence of side effects and if
14      successful, we'll stay on it for sometime.
15      When do we declare that the trial has been a
16      failure, I usually do two to three months
17      before I'll give up entirely.
18  Q.  In certain cases I assume you prescribe
19      refills of Neurontin?
20  A.  Yes.
21  Q.  And have you found in some cases that symptoms
22      of the off label conditions we have been
23      talking about return if a patient is taken off
24      Neurontin?
25  A.  That has happened.  Yeah, that has happened.

**23**

1   Q.  Let me ask you a more general question.  I
2       take it that it's not unusual for a
3       prescription medication to work for some
4       people and not for others, is that a fair
5       statement?
6   A.  It is.
7   Q.  And if you had to go back and make a
8       determination as to whether Neurontin
9       effectively treated one of your patients off
10      label conditions, I take it you would have to
11      do some inquiry into that person's specific
12      history?
13  A.  You'll have to state that one again.
14  Q.  Sure.  Let me try that one again.
15  A.  I don't understand.
16  Q.  If you needed to find out or try the best you
17      could to figure out in retrospect whether
18      Neurontin effectively treated one of your
19      patients off label conditions, what would that
20      exercise consist of?
21  A.  Well, it returns to the question you asked a
22      moment ago.  Medicines cost money, even in the
23      generic form and patients by and large are not
24      thrilled about taking medicine at all.  So the
25      pressure comes often from them to cut back on

**24**

1       the medicine and, as you said, when we cut
2       back on the medicine, the symptoms may
3       reappear in which case we can only conclude
4       that the Neurontin is controlling or aiding to
5       control the symptoms.
6   Q.  And as you said, that's something specifically
7       that you have seen in some of your patients
8       who have taken Neurontin for off label uses?
9   A.  Yes.
10  Q.  Doctor, just a couple more questions.  Have
11      you ever been detailed by Pfizer or Warner-
12      Lambert regarding Neurontin?
13  A.  In the past, yes.  It's been sometime since
14      they have been by.
15  Q.  Did any of that detailing focus on off label
16      uses?
17  A.  I recall very specifically the reps telling me
18      that they themselves could not discuss off
19      label uses and if I was interested in
20      information about that, I should call the
21      medical department and that they would release
22      what studies they had to me, but that as reps
23      they were incapable of answering.
24          MR. MISHKIN:  Doctor, thank you.
25      That's all I have for right now.

Page 25

```
 1              - - - -
 2            EXAMINATION
 3              - - - -
 4   BY MR. WESTON:
 5   Q.   Hello, Doctor, I'm John Weston.
 6   A.   Good morning, Mr. -- good afternoon,
 7        Mr. Weston.
 8   Q.   Good afternoon, Dr. Ahlstrom. Dr. Ahlstrom,
 9        did you speak to Pfizer's lawyers, either Paul
10        or someone else before today?
11   A.   Well, yes.
12   Q.   Would you tell me something about that, how
13        did they pick you, do you know?
14   A.   I don't know. I had a message through my
15        office staff saying that Mr. Mishkin from New
16        York wanted to speak to me about Neurontin.
17        Eventually I returned the call. He described
18        that there was a class action suit in
19        Pennsylvania and that he knew that I had
20        prescribed Neurontin and asked what my
21        experience was and would I be willing to
22        testify concerning my experiences with
23        Neurontin.
24   Q.   Did you tell him what your experience was in
25        that phone call?
```

Page 26

```
 1   A.   There were several calls. I don't recall if
 2        it was on the initial call or on a follow-up
 3        call that we discussed specifically as we went
 4        through the neuropathic pain and migraine. I
 5        think that was in a later call.
 6   Q.   How many calls did you have, do you remember?
 7   A.   Two or three.
 8   Q.   Did you meet with Mr. Mishkin today before
 9        today's deposition?
10   A.   Briefly, yeah.
11   Q.   Are you doing this deposition for free,
12        Doctor?
13   A.   No. I was told that I would not receive
14        expert witness compensation, but I would be
15        made whole for the time that was made -- that
16        was given to the deposition as pro rata as if
17        I was involved in my other professional
18        capacity, seeing patients, how much money I
19        would earn in an hour working here in the
20        office.
21   Q.   And have you calculated that sum?
22   A.   Yeah, that would be about $200 an hour.
23   Q.   Do you own stock in Pfizer or did you own it
24        in Warner-Lambert?
25   A.   I probably did through the various mutual
```

Page 27

```
 1        funds or stock conglomerates, but I never
 2        purchased specifically on the market that. I
 3        have most of my stock holdings are through
 4        TIAA-CREF, which is a large organization which
 5        purchases stocks of all sorts and manages my
 6        portfolio completely for me, so I never chose
 7        Warner-Lambert or Pfizer as an investment
 8        opportunity.
 9   Q.   Do you happen to know how they knew, when I
10        say they, how Pfizer's attorney knew that you
11        had prescribed Neurontin?
12   A.   I was never told that. I presume that in the
13        great pharmaceutical marketing world we live
14        in, and in the information that's available
15        through pharmacies, they have my name as a
16        person who has written scripts for Neurontin.
17        I get things from the various healthcare
18        organizations who know very well what I'm
19        prescribing and tell me how I should do it.
20   Q.   Do they really?
21   A.   Right.
22   Q.   Well, let's just go over some of the earlier
23        things, Doctor. Correct me if I'm wrong, but
24        when you first started to prescribe Neurontin,
25        your theory was that Neurontin was an
```

Page 28

```
 1        antiepileptic drug?
 2   A.   Uh-huh.
 3   Q.   That other antiepileptic drugs had been proven
 4        effective in treating neuropathic pain and
 5        migraines and so Neurontin might be as well;
 6        is that correct?
 7   A.   Yes, that's the substance of the reasoning.
 8   Q.   Neurontin's mechanism of action to this day is
 9        unknown; is that correct?
10   A.   That is correct. It's thought to be a calcium
11        channel blocker, but how it really affects it,
12        its work, is not clear. But in point of fact,
13        even how the antiepileptic drugs work is not
14        entirely proven.
15   Q.   Well, we know that for Neurontin at least the
16        instructions, the insert in the package, of
17        Neurontin and of Gabapentin explicitly states
18        that its mechanism of action is not known; is
19        that right?
20   A.   Uh-huh.
21   Q.   So then it's certainly possible that Neurontin
22        if it works at all, works a different way from
23        the other antiepileptic drugs?
24          MR. MISHKIN: Objection.
25   BY MR. WESTON:
```

**29**

1  Q.  Is that correct?
2  A.  Well, we don't know how it works, so we don't
3      know how it works.
4  Q.  What are the side effects of Neurontin that
5      you have observed?
6  A.  Well, again much in parallel with what you --
7      we know from the package insert, dizziness,
8      sleepiness, nausea.  Much was made when it
9      first came out about weight gain, but I didn't
10     see a lot of weight gain.  But those three,
11     dizziness and somnolence were the ones that
12     were most frequent.  And I found with
13     experience, that my policy of starting at
14     lower doses was useful.  There were people who
15     were symptomatic at very low doses and I was
16     sure glad I didn't start at higher doses.
17 Q.  Do you know what the on label dosages that the
18     FDA has approved are, maximum?
19 A.  Maximum, in extreme I would think 2,400
20     milligrams.
21 Q.  You said that when you were talking about
22     neuropathic pain, that Neurontin has been
23     effective in certain patients you have
24     observed, and you said in some patients it
25     proves to be an active adjunctive therapy,

**30**

1      now, what's an adjunctive therapy?
2  A.  It's a term used to distinguish it from
3      monotherapy.  When this medication alone does
4      the task, Neurontin will be given with
5      something else.  And the word adjunctive
6      therapy may mean that the patient is getting
7      physical therapy, massage, maybe using over-
8      the-counter painkillers, but it's the notion
9      that it's part of a number of things together
10     being used.
11 Q.  There's some other treatment that the patient
12     is getting in addition to the Neurontin?
13 A.  Right, and that's what I'm saying.
14 Q.  That's what adjunctive means?
15 A.  That's what I'm saying.
16 Q.  And you say they respond some of them at
17     surprisingly low doses and once they respond,
18     they don't want to be taken off; is that
19     correct?
20 A.  Well, yeah.  Yes.
21 Q.  Neuropathic pain is a subjective symptom,
22     isn't it, Doctor?
23 A.  Yeah, that makes it -- I would agree.  Often
24     we have reason or I'll say objective evidence
25     to subtend it.  If I have an EMG that shows

**31**

1      neuropathy and the patient offers me a
2      neuropathic complaint, I'm very convinced that
3      there's an organic basis.  But sometimes the
4      complaint has a less clear organic or
5      structural basis.
6  Q.  A subjective symptom is one that you can't
7      determine other than through the patient's own
8      telling you he's got it; is that right?
9  A.  Well, I think -- I don't want to fence with
10     you.  The symptom is always what the patient
11     just says, so it's always subjective.  The
12     signs, I think when you say an objective
13     symptom, it would be a sign that there's a
14     physical sign to go with the symptom, but if I
15     come to you and I have chest pain, there's no
16     way I can share that experience.  The symptom
17     is necessarily always subjective.
18 Q.  Well, a cut is objective though, is that
19     correct, can you see that?
20 A.  Yeah, that's a sign.  The medical mind always
21     accepts the patient's symptom firsthand and
22     then only later will we withdraw belief and
23     think it's some other origin, but we always
24     accept symptom first.
25 Q.  Now, you have prescribed Neurontin for 50 to

**32**

1      60 patients over the entire length of your
2      practice; is that correct?
3          MR. MISHKIN:  Objection.
4          MR. WESTON:  What's the objection, I
5      maybe able to cure it?
6          MR. MISHKIN:  I think you're
7      misstating his testimony, but the Doctor can
8      speak for himself.
9  BY MR. WESTON:
10 Q.  Is that your testimony, Doctor?
11 A.  No, I have prescribed it for more than that.
12     I thought I was addressing off label uses.
13 Q.  Well, that's an excellent point and let me
14     rephrase the question and ask, you have
15     prescribed Neurontin off label for 50 to 60
16     patients over the entire length of your
17     practice?
18 A.  Yes.
19 Q.  Thank you.  You said that Neurontin has fallen
20     in your prescription batting list, why is
21     that?
22 A.  Well, for some specific indications, for
23     example, migraine, I use Topamax, which is
24     another antiepileptic drug with very high
25     frequency and I can't recall the last time I

**33**

1  wrote a Neurontin script for prevention of
2  migraine.  And in the fibromyalgia world, I
3  have new medicines, such as Lyrica, which also
4  is an antiepileptic, which have risen in the
5  batting list.  And Neurontin, though I still
6  have some patients that I have started with
7  Neurontin, has fallen dramatically.
8  Q. You said that you tried using Neurontin for
9     restless leg but you weren't pleased?
10 A. It didn't work.
11 Q. How many patients did you try it on?
12 A. Eight to ten, but it was zero for eight to
13    ten, so I gave it up.
14 Q. Have you tried it for any other condition off
15    label that you determined it didn't work for?
16 A. None that comes to mind right now.
17 Q. Mr. Mishkin asked you if you had been detailed
18    by Pfizer or Warner-Lambert representatives,
19    by detailed, what do you understand?
20 A. They come to the office and my policy is that
21    if I'm going to see reps, I don't like them
22    coming in and out and disrupting patient
23    flow.  They make an appointment for the lunch
24    hour, we sit down and we talk about their
25    product and then they go home.

**34**

1  Q. And you very specifically recalled that the
2     representatives told you that they couldn't
3     talk to you about off label use?
4  A. Uh-huh.
5  Q. But that you could call the medical
6     department?
7  A. Right.
8  Q. What medical department?
9  A. Of Pfizer or Warner-Lambert in the day and
10    they would often give me numbers or they would
11    promise to forward the request to the
12    department for me.
13 Q. Did anyone from the department ever get back
14    to you?
15 A. Not as an individual.  I would get mailings
16    with usually the package insert and then
17    information about which off label use I was
18    requesting.  And this I must say has been a
19    pretty industry-wide behavior.  And so that my
20    recollection as it turns out, the
21    representative of Pfizer at this time had
22    known me back in the Warner-Lambert days, so I
23    can recall his behavior pretty clearly because
24    I know the individual face comes to mind.
25 Q. So he said -- you asked him to get in touch

**35**

1  with the medical department to send you more
2  information; is that right?
3  A. Yes.
4  Q. And the medical department did send you more
5     information?
6  A. Right.
7  Q. And that happened more than once?
8  A. Yes.
9  Q. Do you have any notion how many times that
10    occurred?
11 A. A handful.  Not terribly frequent.
12 Q. Doctor, would you prescribe Gabapentin if you
13    knew it was no better than the placebo?
14    MR. MISHKIN: Objection.
15    MR. WESTON: The objection is a good
16    one in the sense the question wasn't clear.
17 BY MR. WESTON:
18 Q. Would you prescribe Neurontin if you knew that
19    it had no more chemical reason to cure an off
20    label condition than a placebo would?
21    MR. MISHKIN: Objection.
22 A. The chemical reason, this sounds very much
23    like evidence-based medicine versus
24    experience-based medicine.  I have often been
25    confronted with studies that show in general,

**36**

1  quote, non-significant effects, but in certain
2  subpopulations they maybe of value.  And the
3  vice-versa is true, I find that some medicines
4  that are thought to be effective in my
5  population here, which is not comparable to
6  the American standard, it doesn't have as much
7  impact as described in the studies.  In the
8  use of off label meds, we are sort of by
9  extension at our wit's end, these are
10 medicines that we're not going to get the
11 information we want.
12 BY MR. WESTON:
13 Q. Let's talk about that a little bit.  Your
14    population is not representative of the
15    American population, did I understand that
16    correct?
17 A. No, certainly not, no.
18 Q. Why is that?
19 A. We have virtually no Hispanics here, very low
20    incidents of whites, very high incidents of
21    geriatric patients, much older than the
22    national average and, hence, we're not like
23    the -- you know, if you look at the
24    statistics, we're different.
25 Q. You mentioned evidentiary-based medicine and

### 37

1  experienced-based medicine?
2  A.  Evidence-based medicine.
3  Q.  Evidence-based medicine, what do you mean by
4  those two terms?
5  A.  Well, evidence-based medicine is what appears
6  in the journals.  These are often based on
7  results of double blind controlled studies
8  showing with statistical strength certain
9  desired effects.  Evidence-based medicine is
10  what happens out in the real world.  Like the
11  example that brings to mind is treatment of a
12  uncomplicated urinary tract infection.
13  If you study the literature and then you go
14  to your average family practice clinic, only
15  about 30 to 33 percent of the patients who
16  present with a urinary tract infection, mostly
17  women, of course, will conform to the study
18  population in the designed experiment.  So in
19  the remaining 70 percent, the doctor has to
20  shade the judgment by the associated context.
21  For example, in most studies they'll include
22  people with alcoholism, they'll exclude people
23  with mental diseases, they'll exclude those
24  with terminal conditions, they'll exclude
25  other aggravating problems, they'll exclude

### 38

1  patients who are taking certain medicines and
2  yet any practice will have plenty of them.
3  So evidence-based medicine is based on -- is
4  good, it gives you a lot of knowledge, but
5  experience-based medicine is what Mr. Mishkin
6  was talking about, independent medical
7  judgment is based on what happens in your own
8  practice.
9  Q.  So experience-based medicine then would I be
10  accurately describing what you're talking
11  about, if I said I try it, my patients seem to
12  respond positively and so I keep using it?
13  MR. MISHKIN:  Objection.
14  A.  Right.  I think that's part of it.  We love to
15  have at least an understanding of what we're
16  doing.  We all have a black box, by that I
17  mean if I drive a car, I don't pretend to know
18  where the carburetor is, but I know where the
19  gas pedal and brake is.
20  When I give medicines, I hope to have some
21  understanding where the carburetor and the
22  generator are, but I certainly don't
23  understand, for example, the fluid dynamics of
24  oil or how the combustion engine really does
25  work.  There is a certain amount of empiric

### 39

1  behavior.  If it works, I'll continue to do
2  it, but I am very cautious.  I try not to
3  become a saucer's apprentice.
4  BY MR. WESTON:
5  Q.  Then I suppose getting back to the question
6  that launched us on this path, if you tried a
7  sugar pill on a patient and the patient said I
8  feel better, you would continue to give the
9  patient sugar pills, wouldn't you?
10  MR. MISHKIN:  Objection.
11  A.  Well, it's a form of placebo therapy and I
12  would continue to do it, yes.
13  BY MR. WESTON:
14  Q.  Do you consider yourself familiar, Doctor,
15  with the medical literature on Neurontin?
16  A.  Not really.  I have ceased following it.  I
17  knew a good amount about it, but I have
18  yet -- I have not kept up with any new data
19  that maybe available on it.
20  Q.  You did not participate in any Neurontin
21  studies, did you, Doctor?
22  A.  No.
23  Q.  Have you learned anything about Neurontin from
24  medical journals?
25  A.  Yes.

### 40

1  Q.  What?
2  A.  Well, when it was being used in pediatrics,
3  there was a liberalization of the dose that we
4  were talking about, the higher end, there was
5  a feeling that if it wasn't working at lower
6  doses, you might push it to 3,600 or higher.
7  I never did that, but I remember seeing and
8  reading kind of interesting that, wow, that's
9  pretty courageous.
10  I know that there's been in the literature
11  again that people have attacked it as to
12  whether it is really useful or not and I never
13  got to the end of that debate.  Literature is
14  filled with controversy.
15  Q.  Did you happen to see the Dateline TV show
16  about Neurontin?
17  A.  Never.  I don't have a TV in the house.
18  Q.  Did you ever hear about it, the show I mean,
19  not the TV?
20  A.  Yes, I have heard about the show.
21  Q.  You have?
22  A.  Yeah.
23  Q.  What's your understanding of it?
24  A.  It's a hard hitting or self-styled hard
25  hitting factual find out what's going on out

Ahlstrom, Brian, MD  9/30/2008  12:00:00 PM

**41**

1   there type of show.
2   Q. My question was a bad one. Did you ever hear
3      about the Dateline show about Neurontin?
4   A. Well, let me say what I think you're saying.
5      There's a situation in California where the
6      medication had been promoted deliberately by
7      representatives for off label uses, is that
8      the case you're referring to?
9   Q. There have been different cases?
10  A. I don't know if that made it to Dateline, but
11     that case I heard of and I understand that
12     they were found guilty and there were fines
13     paid for that.
14  Q. Mr. Mishkin asked you about your independent
15     professional judgment and, of course, one
16     expects a doctor to use his independent
17     professional judgment when he prescribes a
18     medicine. I'd like to ask you though
19     something about what you base your independent
20     professional judgment on?
21  A. Uh-huh.
22  Q. You have already explained the reasoning that
23     caused you to prescribe Neurontin, did you
24     come to that understanding on your own or in
25     conjunction with speaking to other physicians?

**42**

1          MR. MISHKIN: Objection. I'm just
2      not sure that I understand the question. Come
3      to what understanding?
4   BY MR. WESTON:
5   Q. So that we're all on the same page here,
6      earlier you said that antiepileptic drugs
7      other than Neurontin had been effective in
8      treating some of these off label conditions,
9      Neurontin was an antiepileptic drug and so and
10     I believe your testimony is exactly this, you
11     said we reasoned that Neurontin might be
12     effective for these off label conditions; is
13     that correct?
14  A. Uh-huh.
15  Q. Who's the we?
16  A. The we is, as you suggested, reports from
17     other physicians as well as readings and then
18     whatever goes on in my dark little mind, yes.
19  Q. Do you attend continuing medical education
20     programs, Doctor?
21  A. Yes. I do most of my continuing medical
22     education by online or mail, but I do attend.
23  Q. Do you know what a speaker's bureau is?
24  A. Yes.
25  Q. What is it?

**43**

1   A. It's a group of people who have contracted
2      with the company to speak on their behalf.
3      They usually undergo some training to become
4      familiar with the medication and what is known
5      about it and then they usually travel in some
6      area to promote the drug. These are medical
7      promotions, yeah.
8   Q. Have you ever been to one of those -- are they
9      lectures?
10  A. Yes.
11  Q. Have you ever been to one?
12  A. Uh-huh.
13  Q. Do you know if you have ever been to one for
14     Neurontin?
15  A. Yes, I know I never went to one for Neurontin.
16  Q. Have you ever been to a drug company dinner,
17     by that I mean a dinner sponsored by a drug
18     company?
19  A. Yes.
20  Q. Was that more than one or just one?
21  A. A few. No, I have been to a few.
22  Q. Any sponsored by Warner-Lambert or Pfizer?
23  A. What are some of the drugs that Pfizer is
24     currently promoting?
25  Q. You're the doctor, not me.

**44**

1   A. Well, yeah, I don't know. I don't think so.
2      Maybe I have. Can we go off record and find
3      out what Pfizer is -- what are the Pfizer
4      drugs?
5   Q. It's not that important, Doctor. Do you
6      recall if any of those dinners included
7      discussions on Neurontin or Gabapentin, any of
8      the ones that you have been to?
9   A. In the small talk, yes, but not from the chair
10     speaking to us, so to speak. The speaker
11     bureau person would come, but I don't recall
12     hearing information from the speaker bureau
13     person, but it would be amongst the other
14     neurologists in attendance we would talk about
15     it.
16  Q. All right. What's pharmacology, Doctor?
17  A. It is the study of drugs.
18  Q. What formal training have you had in
19     pharmacology?
20  A. Well, I had training in medical school wherein
21     and since then, as Mr. Mishkin was talking
22     about, in training you're taught concepts such
23     as half-life and the importance of considering
24     various drug interactions and how to manage
25     that. Those I recall specifically weren't

**45**

1  terribly well covered in medical school, they
2  were post graduate issues.
3  Q.  And how were they covered post graduate?
4  A.  Well, you would be taught by your attendings
5     and they would say this is what a half-life is
6     and that such drug needs to be dosed several
7     times a day, such another drug would be given
8     once a day.  They would say things that if
9     you're giving Dilantin and a blood thinner at
10    the same time, you should be aware that the
11    blood thinner's action will be greater.  Or
12    they would say things that if you're giving
13    two other drugs together, the action will be
14    less.  They will interfere with each other
15    such as Lamictal and Depakene.
16 Q.  Can you estimate for us, Doctor, how many
17    hours of pharmacological training you have
18    had?
19 A.  No way.  It's --
20 Q.  Okay.  You mentioned double blind placebo
21    controlled studies, what's the usefulness of
22    those?
23 A.  We'll take the terms in order.  Double blind
24    means that neither the physician, nor the
25    patient, knows who's getting the drug that's

**46**

1  being tested.  So this avoids the patient bias
2  that you talked about that a sugar pill might
3  feel good to take just because the doctor gave
4  it to you.  And then it avoids the physician
5  bias that he knows that the study drug is
6  being given and so he wants to rate it either
7  higher or lower depending on whether he's on
8  the drug side or against drug side.  And so
9  that's double blind.
10    Control means that you try to have a
11 population who's getting the drug and a
12 population that's not getting the drug who are
13 comparable in every conceivable aspect, age,
14 associated conditions, gender and so forth so
15 that you have no spurious influence that
16 causes the difference between the two groups
17 and you can attribute any difference between
18 the outcome and the two groups due to the use
19 of the drug by itself.
20 Q.  That sort of a study would be what you refer
21    to as evidence-based?
22 A.  Yes.
23 Q.  Doctor, do you tell your patients that
24    Neurontin hasn't been approved by the FDA for
25    off label uses?

**47**

1  A.  Yeah.
2  Q.  And I forgot to ask you at the beginning, so
3     I'll ask you at the end, have you ever been
4     deposed before?
5  A.  Yes.
6  Q.  Have you ever been deposed before by Pfizer or
7     Warner-Lambert?
8  A.  Never.
9  Q.  Or any other drug company?
10 A.  No.
11     MR. WESTON:  Then that concludes my
12 questions at this point, Doctor.  Thank you
13 very much.
14     MR. MISHKIN:  Why don't we go off
15 the record.
16     VIDEOGRAPHER:  We are off the
17 record.  The time is 1:52 p.m.
18           - - - -
19     (There was a discussion off the record.)
20           - - - -
21     VIDEOGRAPHER:  We are on the
22 record.  The time is 1:57 p.m.
23     MR. MISHKIN:  Doctor, thank you for
24 your time.  Defendants have no further
25 questions.

**48**

1     THE WITNESS:  Thank you.
2     VIDEOGRAPHER:  This ends the
3  deposition.  The time is 1:57 p.m.  We are off
4  the record.
5           - - - -
6     (Thereupon, the deposition was
7  concluded at 1:57 p.m.)
8           - - - -

Ahlstrom, Brian, MD  9/30/2008  12:00:00 PM

```
                                              49
1    COMMONWEALTH OF PENNSYLVANIA)    CERTIFICATE
2    COUNTY OF ALLEGHENY        )  SS:
3         I, Tammie Elias, RPR and Notary Public in and
4    for the Commonwealth of Pennsylvania, do hereby
5    certify that the witness, BRIAN AHLSTROM, M.D., was
6    by me first duly sworn to testify to the truth, the
7    whole truth, and nothing but the truth; that the
8    foregoing deposition was taken at the time and place
9    stated herein; and that the said deposition was
10   recorded stenographically by me and then reduced to
11   printing under my direction, and constitutes a true
12   record of the testimony given by said witness.
13        I further certify that the inspection, reading
14   and signing of said deposition were waived by
15   counsel for the respective parties and by the
16   witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or
19   employee of either counsel, and that I am in no way
20   interested directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my
22   hand and affixed my seal of office this 8th day of
23   October, 2008.
24                  _____
25                       Notary Public
```