# EXHIBIT 8

IN THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY, PENNSYLVANIA
CIVIL DIVISION
- - -
GREGORY CLARK and LINDA : Civil Action
MEASHEY, et al., :
Plaintiffs, :
:
vs. :
:
PFIZER, INC., and : JUNE TERM, 2004
WARNER-LAMBERT, LLC, :
Defendants. : No. 1819
- - -
Tuesday, October 7, 2008
- - -

Videotaped deposition of KENNETH D. HOELLEIN, M.D., taken at the law offices of Dechert LLP, Cira Centre, 21st Floor, 2929 Arch Street, Philadelphia, Pennsylvania, commencing at 9:26 a.m., before Jennifer S. Walker, a Federally Approved Registered Professional Reporter and Notary Public.

- - -

- - -



APPEARANCES:

SACKS & WESTON
BY: JOHN K. WESTON, ESQUIRE
BY: CHARLES E. MANGAN, ESQUIRE
114 Old York Road
Jenkintown, Pennsylvania 19046
(215) 925-8200
jweston@sackslaw.com
cmangan@sackslaw.com
Representing the Plaintiffs

DAVIS POLK & WARDWELL
BY: PAUL S. MISHKIN, ESQUIRE
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
paul.mishkin@dpw.com
Representing the Defendants

ALSO PRESENT: RYAN PENNY, Video Specialist

- - -



- - -
I N D E X
- - -

Testimony of: KENNETH D. HOELLEIN, M.D.
By Mr. Mishkin .....................5, 46
By Mr. Weston ......................17, 47

- - -
E X H I B I T S
- - -

EXHIBIT NUMBER DESCRIPTION PAGE MARKED

(None marked.)

- - -



KENNETH D. HOELLEIN, M.D.

VIDEO SPECIALIST: My name is Ryan Penny of Veritext. The date today is October 7th, 2008. And the time is approximately 9:26 a.m.

This deposition is being taken at the law office of Dechert LLP located at 2929 Arch Street in Philadelphia, Pennsylvania.

The caption of this case is "Clark, et al., vs. Pfizer, Incorporated, et al." It's filed in the Court of Common Pleas of Philadelphia, Pennsylvania, June Term, 2004, Number 1819.

The name of the witness is Dr. Kenneth D. Hoellein, M.D.

At this time, the attorneys will identify themselves and the parties they represent, after which our court reporter, Jennifer Walker of Veritext, will swear in the witness, and we may proceed.

MR. MISHKIN: Paul Mishkin from Davis Polk & Wardwell for the

KENNETH D. HOELLEIN, M.D.
defendants Pfizer and Warner-Lambert.
MR. WESTON: John Weston and Charles Mangan from Sacks & Weston representing the plaintiff class.
- - -
KENNETH D. HOELLEIN, M.D., having been first duly sworn, was examined and testified as follows:
- - -
EXAMINATION
- - -
BY MR. MISHKIN:
Q. Good morning, Doctor.
A. Good morning.
Q. Thank you for taking the time to be here. Let me give you a little bit of background before we start just to let you know what we're doing here today.
As you heard, my name is Paul Mishkin. I represent the defendants in this case. The plaintiffs have filed a class-action lawsuit regarding the marketing of the drug Neurontin. And as you just heard, Mr. Weston and Mr. Mangan represent the



KENNETH D. HOELLEIN, M.D.
plaintiffs.
I'm going to be focusing with you on your general experience using Neurontin, more specifically, your experience using Neurontin to treat off-label conditions.
And let me just go over a couple more points before we begin. I'm not going to be asking you any questions about specific patients. I'm not looking for any information about specific patients, just your general experience.
A note on what I mean by Neurontin, I'm going to be using that in a broad sense. And it would be great if you could understand, when I use "Neurontin," understand me to be referring both to branded Neurontin and also generic gabapentin. I'm not trying to draw any distinction between those two when I use the term "Neurontin." Is that okay?
A. That is okay.
Q. Great.
And then why don't we just go over briefly the definition of "off-label



KENNETH D. HOELLEIN, M.D.
use." I imagine that's a very familiar term to you, but just to be clear, when I refer to an off-label use, I'm talking about a use of a drug that hasn't been specifically approved of by the FDA.
Mr. Weston, I think, may want to state something at this point.
MR. WESTON: Right. As we have done with this entire series of depositions so far, I make my objection at the beginning of the deposition, and that objection basically is that this doctor has not been identified as an expert in interrogatories or otherwise.
I have no report from the doctor. He is expressing expert opinions -- or he will, I expect -- and I object to this deposition and to all of the questions in it on that basis.
MR. MISHKIN: Defendants have already explained on other occasions why they don't agree with that



KENNETH D. HOELLEIN, M.D.
briefly. We think that this deposition is permissible, that it's been expressly permitted by the judge. And I'd also note that we're not offering the doctor as a retained expert witness.
BY MR. MISHKIN:
Q. Doctor, just a couple more preliminaries before we get into this. Have you ever been deposed before?
A. Yes.
Q. Let me just go over some basic rules which may already be familiar to you. I think a basic one is that we should just do our best not to speak at the same time so that the court reporter can take down fully what we're both saying. Is that okay?
A. Yes.
Q. Great. And if I ask a question, and it doesn't make sense to you, if you need any kind of clarification, just let me know that, and I'll rephrase the question. If you need a break at any time, just let me know that, and we can certainly accommodate

KENNETH D. HOELLEIN, M.D.
that.
And I think the final thing I'll mention is, that you may hear some objections over the course -- over the course of the deposition, but, generally speaking, you should still go ahead and answer the question. The objections generally are just for the record, and you should still go ahead and give a response.
Let's start with some background about you. Could you just state for the record your full name, please?
A. Kenneth Donald Hoellein.
Q. And you're a medical doctor. Is that correct?
A. Yes, sir.
Q. Where is your practice located?
A. Northeast Philadelphia.
Q. And how long has your practice been in Northeast Philadelphia?
A. 1981.
Q. Since 1981, it's been there?
A. Yes. July 1st, 1981.
Q. Can you tell me what the



KENNETH D. HOELLEIN, M.D.
general nature of your practice is?
A. Primary care internal medicine.
Q. And if you were going to describe your specialty, how would you do that?
A. Well, primary care, so we take care of the adult population with all their medical problems.
Q. How many patients do you see in a typical week?
A. 250 outpatients and about 50 to 60 inpatients.
Q. By "inpatients," you're referring, I assume, to patients in hospitals?
A. In a hospital.
Q. Is there a particular hospital or set of hospitals that you're affiliated with?
A. Currently, I'm admitting to Albert Einstein Medical Center in north Philadelphia and Chestnut Hill Hospital in northwest Philadelphia.
Q. As part of your practice, Doctor, you write prescriptions, I take it?



KENNETH D. HOELLEIN, M.D.
A. Yes.
Q. Are some of the prescriptions that you write for off-label uses?
A. Yes.
Q. Is that a common practice for doctors to prescribe certain medications for indications that have not been approved of by the FDA?
A. Yes.
Q. Let's go back now and do a little bit more of your own background. Where did you attend medical school?
A. Thomas Jefferson University.
Q. Did part of that education include training that qualifies you to prescribe medications?
A. Yes.
Q. And after medical school, did you do a residency or an internship?
A. Yes.
Q. Tell me a little bit about that.
A. Three years internal medicine resident Pennsylvania Hospital.



KENNETH D. HOELLEIN, M.D.
Q. And did part of the training that you received as a resident also relate to the prescription of medications?
A. Yes, sir.
Q. Do you have any particular board certifications?
A. Internal medicine.
Q. And if you could approximate it for me, about how long have you been practicing medicine in total?
A. Graduated medical school in '78, opened my practice -- did three years of residency, and then have been in practice since 1981.
Q. If I'm doing the math correctly, maybe about 27 years?
A. As a primary-care physician, yes.
Q. Okay. Let's talk a bit more about off-label prescribing -- you mentioned that you do prescribe drugs off label?
A. Yes.
Q. Could you tell me approximately how frequently you would prescribe a drug off

label in your practice?
A. Every day.
Q. And why, as a general matter, would you prescribe a drug off label?
A. Expect benefit to the patient.
Q. A general question, Doctor: Would you say that you have an obligation, as a doctor, to exercise your own independent medical judgment in treating your patients?
A. Yes.
Q. And that's something you do in your practice?
A. Yes.
Q. A little more specifically, do you exercise your own independent medical judgment in prescribing medications for your patients?
A. Yes.
Q. And when you're exercising that independent medical judgment in deciding what to prescribe, would you -- or do you weigh the potential benefits of a particular treatment against the potential risks of that treatment?
A. The decision is made every day,





yes.
Q. Let's turn now to Neurontin. Am I correct that you prescribe Neurontin?
A. Yes, I do.
Q. You understand that Neurontin has been approved for adjunctive treatment of epilepsy and also for treatment of postherpetic neuralgia?
A. Yes, I do.
Q. Do you prescribe Neurontin for any off-label uses?
A. Yes.
Q. Can you tell me what those are?
A. Mainly diabetic peripheral neuropathy and other causes of neuropathic pain.
Q. Does it work if I refer generally to that category, that is, neuropathic pain?
A. Yes.
Q. Have you found that Neurontin can be an effective treatment for neuropathic pain?
A. Yes, I have.





Q. Do you recall approximately when the first time would have been that you prescribed Neurontin for neuropathic pain?
A. No, I'm sorry, I don't exactly know how long it's been.
Q. If you could ballpark it for me, would it have been, for example, before -- you know, before the drug went generic or any other --
A. Well, before the drug went generic, yes.
Q. And a note of clarification here, when we're talking about neuropathic pain for which you've used Neurontin, that would include neuropathic pain other than postherpetic neuralgia?
A. Yes, sir.
Q. Do you recall, in general terms, what led you originally to prescribe Neurontin for neuropathic pain?
A. The success with postherpetic neuralgia and, therefore, the same pathophysiology and other neuropathic pain syndromes.





Q. You continue today to prescribe Neurontin for neuropathic pain?
A. Yes.
Q. And why is that?
A. There's benefit to the patient.
Q. Let me ask you, Doctor: Since you've started prescribing Neurontin for neuropathic pain -- well, withdrawn. Let me just ask it more simply.
About how many patients have you prescribed Neurontin for neuropathic pain?
A. That's hard to say. Hundreds and hundreds probably.
Q. And after you first began prescribing Neurontin for neuropathic pain, was your observation of Neurontin's performance with prior patients a basis on which you evaluated it going forward for future prescriptions?
A. Yes.
Q. And if Neurontin hadn't been effective at all for neuropathic pain in your prior patients, would you continue to prescribe it for neuropathic pain?

KENNETH D. HOELLEIN, M.D.
A. Absolutely not.
Q. When you prescribe Neurontin for neuropathic pain, is that based on your independent medical judgment that it's an appropriate treatment for neuropathic pain?
A. Yes.
Q. And you continue to believe that Neurontin can be a safe and effective treatment for neuropathic pain?
A. Yes.
Q. Doctor, just a couple more questions.
If you recall, have you ever been detailed by Pfizer or Warner-Lambert's sales representatives regarding Neurontin?
A. Yes.
Q. And did any of that detailing focus on off-label uses?
A. Never.
MR. MISHKIN: Doctor, that's all I'm going to have for you at this point.
BY MR. WESTON:
Q. Hi, Doctor, I'm John Weston.



KENNETH D. HOELLEIN, M.D.
Did you speak to any of the lawyers from Pfizer before today?
A. Yes.
Q. Tell me something about that. How did you -- when did they first call you about this deposition?
A. When? I don't recall. A month or so, six weeks maybe.
Q. All right. And do you remember who it was who called you?
A. Yes. I have a message in my office. I don't remember the exact name. Maybe Roche. Does that sound familiar?
Q. Chris Roche.
And you spoke to Mr. Roche?
A. On the phone.
Q. And what did he say?
A. He just asked me some general questions about my use of Neurontin.
Q. What kind of questions?
A. Do I use it, do I have experience with it, have I used it for off-label reasons.
Q. And you responded to his



KENNETH D. HOELLEIN, M.D.
questions?
A. Yes.
Q. And then he asked you if you would like to do a deposition?
A. He asked me if I would do a deposition, and I agreed.
Q. All right. And, now, are you doing this deposition for free?
A. Yes, I am.
Q. You're not getting paid for this?
A. No, I am not.
Q. You're not being compensated in any way for doing this deposition?
A. No, I am not.
Q. Why are you doing it for free?
A. Because I believe in the drug.
Q. And so because you believe in the drug, you have devoted your time today to this deposition?
A. I haven't thought about all my motivations. I just agreed to do it.
Q. You're not going to be compensated for the time that you've lost at



KENNETH D. HOELLEIN, M.D.
your practice?
A. Not to my knowledge.
Q. Other than Mr. Roche's first phone call, did you speak to anyone from Pfizer after that about this deposition?
A. No. The only contact I've had was with Mr. Roche.
Q. Do you happen to own stock in either Pfizer or the old Warner-Lambert?
A. Not to my knowledge.
Q. Now, if I understood your testimony correctly, you first prescribed Neurontin for an off-label use because you had prescribed it for postherpetic neuralgia. Is that correct?
A. That is correct.
Q. Did you prescribe it for postherpetic neuralgia that first time after the FDA had approved it for that indication or -- I mean, for that condition or before the FDA had approved it for that condition?
A. It would have been after the FDA approved it.
Q. Do you remember when it was

that the FDA approved it?
A. No, I do not know exactly.
Q. But since that date, you have prescribed it to hundreds and hundreds of patients?
A. Yes.
Q. Would you tell us what your thought process was that would make you believe that Neurontin would be effective for off-label conditions other than postherpetic neuralgia?
A. Same pathophysiology. For instance, diabetic peripheral neuropathy.
Q. I'm sorry?
A. The same pathophysiology of nerve damage. So, for instance, postherpetic neuralgia being the nerve being damaged by the zoster virus. And in diabetes, the nerve being damaged by the diabetic state. The pathophysiologies are very similar.
Q. All right. Mr. Mishkin this morning asked you about your independent medical judgment, and I'd like to go into that just a little bit.





Before you prescribed Neurontin the first time, you did it for an off-label use other than -- well, for an off-label use. You did not conduct your own double-blind placebo-controlled study to see if it would work for an off-label use, did you?
A. No, I did not.
Q. Did you read any studies or other literature about how Neurontin could be effective for off-label use?
A. Specifically, I can't answer that. I don't remember that. Generally, there's lots of articles, lots of journal articles, so there's a good chance that I did.
Q. But you don't remember whether you did?
A. I don't remember specifically. It would have been a while ago.
Q. Did one -- did one of your colleagues recommend Neurontin to you even for the postherpetic neuralgia, which was not an off-label use at the time?
A. I don't recall. I probably made an independent medical judgment.





Q. Well, that's -- that's what we're talking about, is what goes into your independent medical judgment.
A. Multiple things.
Q. Tell me what they are.
A. Could be discussions with specialists, could be journals, could be my own experience. I'm sure all three apply here. But if you're asking me that far long ago which one was the most important at that time, I do not recall.
Q. Have you kept up with the literature on Neurontin since that time?
A. I hope so.
Q. Well, have you or haven't you?
A. Yes.
Q. What have you read?
A. Well, the main -- the most recent thing was actually Lyrica versus Neurontin when Lyrica was being approved as a seizure drug, postherpetic neuralgia drug and a diabetic peripheral neuropathy drug. So that's the most recent thing that I've kept up with, Lyrica versus Neurontin head-to-head





data.
Q. What studies are you aware of that have shown that Neurontin is effective for neuropathic pain as opposed to what studies showed it's not effective for neuropathic pain?
A. I don't know --
MR. MISHKIN: Objection.
You can answer the question if you understand it.
THE WITNESS: Yeah, I don't know which -- any specific studies saying that.
BY MR. WESTON:
Q. So you don't remember either type of study?
A. No.
Q. Have you heard about the FDA's consideration of the suicide side effects of AEDs?
MR. MISHKIN: Objection.
Go ahead.
THE WITNESS: Not specifically, no.

BY MR. WESTON:

Q. Now, no one knows the mechanism of action of Neurontin. Is that correct?

A. I'm not sure I would agree with that.

Q. Isn't it true that the label insert that comes with Neurontin now explicitly says that the mechanism of action is unknown?

A. Yes, but I think common sense would tell you it would work similar to Lyrica, and I think we know how Lyrica works.

Q. Well, they should change the label, then, probably.

MR. MISHKIN: Objection.

BY MR. WESTON:

Q. You have been detailed, you testified, by salespeople from either Warner-Lambert or Pfizer on Neurontin. Is that right?

A. Yes, many years ago.

Q. Tell us about that. Did you meet with the salesmen?

A. Generally, you do. I don't





know if you know how primary-care offices work. We meet with sales representatives, but basically it's a fairly short interaction. "Here's my medication. Here's the study showing the efficacy and FDA approval. Here's the -- in this day and age, here's the most important concept, is it covered on the prescription plans."

That's pretty much it. If that's what you mean by "tell you about it," I don't know if that answers your question.

Q. That's a good start.

Do you remember having such meetings with Pfizer or Warner-Lambert salespeople regarding Neurontin?

A. I don't remember specifically. It's been many years. I haven't detailed Neurontin for quite a while.

Q. Would this have been before or after Neurontin -- the first such sales call, would it have been before or after Neurontin was approved for postherpetic neuralgia?

A. I don't recall specifically.

Q. You also testified that the





salespeople did not say -- well, they did not detail you on off-label uses of Neurontin. Is that accurate?

A. That is accurate.

Q. Did you ever ask them about off-label uses of Neurontin?

A. No, I did not. My experience with salespeople is, they're taught to stick to the FDA approval. That has been my experience.

Q. Did you ever have questions for them about off-label use?

A. No, nor would I ask them. I would find that out and deal with that myself.

Q. How would you deal with it if you had questions?

A. Medical inquiry, look it up.

Q. You say a "medical inquiry." What would that be?

A. In this day and age, you can go to UpToDate and look for references.

Q. You mean on a computer search, for example?

A. Yes.





Q. All right. Do you know what a -- are you familiar with the term "medical liaison"?

A. Yes.

Q. What is a medical liaison?

A. Are you referring to specifically pharmaceutical companies?

Q. Yes, I am.

A. Generally, they're scientific-based trained and -- or is a liaison between the physician and sales representatives with more detailed and scientific explanations of certain medication.

Q. And they are employed by the pharmaceutical companies to answer questions that physicians such as yourself might have about a drug's use --

A. Yes, they are.

Q. -- is that accurate?

A. Yes, they are.

Q. Have you ever consulted with a pharmaceutical company's medical liaison?

A. Yes.

Q. Have you ever consulted with

KENNETH D. HOELLEIN, M.D.
either Warner-Lambert or Pfizer's medical liaisons?
A. No, I have not.
Q. So you have not consulted a medical liaison regarding Neurontin. Right?
A. No, I have not.
Q. Have you ever had any questions about Neurontin that you can recall that you needed to consult someone or something else about?
A. No. I have a great deal of experience with the drug.
Q. And just so that my understanding is clear, your experience with the drug is based solely on the fact that you used it for an approved use and deduced that it could successfully be used for similar unapproved uses. Is that right?
MR. MISHKIN: Objection.
THE WITNESS: If you mean it's based on my clinical experience, is that what you're --
MR. WESTON: No, no.
THE WITNESS: Yes, it is based



KENNETH D. HOELLEIN, M.D.
on my clinical experience.
MR. WESTON: That's not the question I'm asking you.
BY MR. WESTON:
Q. The first time that you prescribed Neurontin, you prescribed it for an approved use, diabetic neuropathy?
A. Postherpetic neuralgia.
Q. Postherpetic neuralgia, I'm sorry. That was an approved use when you prescribed it?
A. That's correct.
Q. You decided after that that you could prescribe it for off-label unapproved uses?
A. That's correct.
Q. And that was based, as I understood your testimony, solely upon the fact that it worked, it was efficacious for that first patient?
A. Well, you're asking me to remember many, many, many years ago, but it could have been based for other reasons as well; speaking with other physicians or for



KENNETH D. HOELLEIN, M.D.
certain studies it may have been. I can't give you exact details. You're asking me to remember a fairly long time ago.
Q. I am, but that's, I guess, my point. It could have been one of those other things?
A. It could have been, yes.
Q. It could have been more than one of those other things?
A. That's correct.
Q. All right.
Do you know what a speaker's bureau is?
A. Yes.
Q. What is it?
A. You -- a speaker's bureau is when you get signed by pharmaceutical companies to speak for a certain product after training.
Q. Have you ever been a speaker?
A. Oh, yes, I have.
Q. Have you? Have you ever been a speaker for Warner-Lambert or Pfizer?
A. Yes.



KENNETH D. HOELLEIN, M.D.
Q. How many times have you been a speaker for Warner-Lambert or Pfizer?
A. I don't know how many times. Several.
Q. Would it have been --
A. Are you talking about individual speeches or...?
Q. Individual speeches.
A. Several.
Q. More than 20?
A. I don't know if it's been that many, but I can count it.
Q. Do you remember when you were first retained as a speaker for -- by Neurontin -- I mean, by Warner-Lambert or Pfizer?
A. My first was with probably either Lyrica or Relpax, when those drugs came out.
Q. Were you ever a speaker for Neurontin?
A. No, I was not.
Q. When you were a speaker -- well, what other drugs have you been a speaker

for?
A. Lipitor, Lyrica and Relpax.
Q. Just those three?
A. Yes.
Q. Those are all Pfizer or Warner-Lambert?
A. Yes.
Q. Have you ever been a speaker for another pharmaceutical company?
A. Yes.
Q. Which one?
A. Abbott and, prior to that, Kos. For Niaspan.
Q. Could you spell "Kos"?
A. K-O-S.
Q. And what drugs for those companies?
A. Niaspan. Niaspan and now SIM -- now SIMCOR.
Q. Now, when you said that you had been a speaker possibly as many as 20 times, does that include when you were a speaker for those pharmaceutical companies?
A. No, it's been much more for





Niaspan.
Q. How much --
REPORTER: I'm sorry, repeat your answer.
THE WITNESS: I'm sorry?
REPORTER: Repeat your answer.
THE WITNESS: No, it's been many more times for Niaspan than it has been for Pfizer.
BY MR. WESTON:
Q. So a hundred times for Niaspan?
A. I don't think that many.
Q. Let's go back to when you were a speaker for Pfizer. When was the most recent time that you've spoken for Pfizer?
A. Probably about three months ago, for Lyrica.
Q. Where did you speak?
A. I spoke at a restaurant.
Q. In Philadelphia?
A. In Philadelphia, Chestnut Hill.
Q. What sort of training or background information, whatever, does Pfizer give you to be a speaker?





MR. MISHKIN: I'm going to object here. I think we're getting, obviously, away from Neurontin. You're asking about his own experience with training for the other drugs you've spoken of?
MR. WESTON: I am.
MR. MISHKIN: Okay. I maintain my objection, but go ahead.
THE WITNESS: Generally, you go, and they present all the data.
BY MR. WESTON:
Q. Who presents all the data?
A. Usually, two groups of people; the people who did the original studies, the scientific basic research people, and then they bring in clinicians who have either recruited patients or worked with some of the studies.
Q. And clinicians would be physicians such as yourself?
A. Yes.
Q. Primary-care physicians, for example?





A. Or specialists depending on what the drug -- the medications.
Q. How long does such a training session typically last?
MR. MISHKIN: Let me just make a general objection, a continuing objection to these questions that don't have to do with Neurontin.
Go ahead.
THE WITNESS: Depends on the medication. If it's a fairly straightforward head-to-head study like Relpax versus Imitrex, for instance, it would be four hours.
If it's a more complicated outcome-based, significant outcome-based study like Lipitor, it would be a couple of days.
BY MR. WESTON:
Q. This training occurs at Pfizer's office?
A. No. Most of the training occurs in a hotel setting or conference setting.

KENNETH D. HOELLEIN, M.D.
Q. Pfizer subsequently arranges for your speeches?
A. Yes.
Q. How much do you get paid for those?
A. Generally --
MR. MISHKIN: Another continuing objection.
THE WITNESS: -- $500.
BY MR. WESTON:
Q. Per speech?
A. (Nodding.)
Q. What's pharmacology, Doctor?
A. What's pharmacology? It's the study of pharmacologic substances.
Q. Study of how drugs work. Would that be accurate?
A. I'm not sure that's an exact definition, but that's as good as the next one.
Q. What's been your formal pharmacological training?
A. Medical school.
Q. How much pharmacology did you



KENNETH D. HOELLEIN, M.D.
get in med school?
A. I'm not sure how to answer that question because it's sprinkled throughout the entire training both from a basic science standpoint to a clinical standpoint to the specific etiologies of each disease state, whether it be cardiology, pulmonology. Pharmacology goes throughout the entire...
Q. Did you have a course entitled "Pharmacology"?
A. There was a specific course in pharmacology, but that's why your question's vague because it goes throughout -- it keeps coming back when you talk about a disease state.
Q. The topic of pharmacology comes up frequently. I understand that.
A. Yes, sir.
Q. My question was: Basically, how many courses did you have in it?
A. That's not what you asked me, but the -- one course in pharmacology.
Q. Have you had any continuing medical-education courses in pharmacology



KENNETH D. HOELLEIN, M.D.
since then?
A. Again, it's a vague question. The continuing medical-education course is not in pharmacology, it's in disease states. And there's therapeutic interventions that have been looked at and studied. It's not specifically pharmacology. I'm not sure that's a fair question.
Q. Have you gone to a course -- continuing medical-education course since med school that was entitled "Pharmacology"?
A. No, nor do I think they offer one.
Q. Have you ever conducted a double-blind placebo-controlled study?
A. No.
Q. Have you ever participated in a double-blind placebo-controlled study?
A. With patient recruitment.
Q. What's that?
A. That means you sign up patients for it, but you don't conduct it.
Q. When you sign up patients for a study, do you receive any financial benefit



KENNETH D. HOELLEIN, M.D.
from the pharmaceutical company for signing up the patients?
A. Not the couple that I did, no.
Q. Did you see the "Dateline" show on Neurontin?
A. No, I did not.
Q. Have you heard about it?
A. Yes.
Q. What did you hear about it?
MR. MISHKIN: Objection.
Go ahead.
THE WITNESS: Is there a problem with Neurontin for other people.
BY MR. WESTON:
Q. How did you hear about it?
A. Patients.
Q. What did you respond when they asked you?
MR. MISHKIN: Continuing objection to this line of questioning.
Go ahead.
THE WITNESS: My answer is, I have not had that experience, and the

FDA has not approval -- approval of the drug.
BY MR. WESTON:
Q. When you prescribe Neurontin for an off-label use, do you tell your patients that it's an off-label use?
A. Sometimes yes, and sometimes no.
Q. What would -- what would make you do it in one instance and not in another?
A. The interest level of the patient.
Q. Do you know, Doctor, why they have double-blind placebo-controlled studies?
A. Yes.
Q. Why?
A. Prove an outcome.
Q. Okay. What's the purpose of doing it double-blind and placebo-controlled?
A. No bias.
Q. To filter out other factors that might be causing a positive response?
A. Yes.
MR. WESTON: Let's go off the




record for just a second.
VIDEO SPECIALIST: The time is 9:58. We're going off the video record.
- - -
(Recess 9:58-10:04 a.m.)
- - -
VIDEO SPECIALIST: One moment, please. The time is 10:04. We're back on the video record.
BY MR. WESTON:
Q. Doctor, I have just a few very disconnected additional questions to ask you, if I may.
You did mention that you had been deposed on other occasions. Do you recall that?
A. Yes.
Q. How often have you been deposed?
A. Twice.
Q. What were the cases? Do you recall?
A. Yes.




Q. Would you tell us?
MR. MISHKIN: I'm going to object. I'm not sure of the relevance, but go ahead.
THE WITNESS: Malpractice cases.
BY MR. WESTON:
Q. Were they testifying as an expert or as a party?
A. As a party.
Q. Was it yourself that you were defending in those cases?
A. Yes.
Q. Were they in Philadelphia County courts, federal courts or some other courts?
MR. MISHKIN: I'm going to object again. I really don't see the relevance of this.
THE WITNESS: Philadelphia County.
BY MR. WESTON:
Q. How long ago were the depositions?




A. One was just recently, and one was about ten years ago.
Q. Is the recent case concluded?
A. No.
Q. Did the one ten years ago conclude?
A. Yes.
Q. You testified throughout this deposition that you prescribed Neurontin for neuropathic pain. Have you prescribed it for any other off-label use?
A. No.
Q. Have you prescribed it for any approved use?
A. Postherpetic neuralgia.
Q. Besides postherpetic neuralgia.
A. A couple patients who are on it as adjunctive treatment in a seizure disorder.
Q. Which is what it was originally approved for?
A. (Nodding.)
Q. Do you know what doses you prescribed it to those patients at?
A. Which condition?

KENNETH D. HOELLEIN, M.D.

Q. The adjunctive use for epileptic seizures.
A. 1,800 milligram.
Q. Have you prescribed it for any approved or unapproved use at dosages higher than that?
A. Higher than 1,800 milligram?
Q. Yes.
A. Yes, I have.
Q. Would you tell us for which uses and what dosages?
A. Mainly for the neuralgia, for neuropathic pain cases. I've gone as high as 3,200.
Q. Have your patients shown any side effects at 3,200?
A. No.
Q. Have you ever taken a patient off Neurontin once you've placed him on it, Doctor?
A. Yes.
Q. Why?
A. Usual reasons; economics in this day and age, lack of effectiveness, some



KENNETH D. HOELLEIN, M.D.

patients complain of some side effects.
Q. Do you still prescribe Neurontin as frequently as you did before Lyrica came out?
A. Unfortunately, yes.
Q. Why is that unfortunate?
A. Because I can't get the coverage for Lyrica. Keystone Mercy Health Partners.
MR. WESTON: All right. I don't have any other questions for the doctor.
MR. MISHKIN: Doctor, just -- just a couple follow-ups.
BY MR. MISHKIN:
Q. You mentioned sometimes prescribing Neurontin at dosages of 3,200 milligrams?
A. Yes.
Q. Why would you sometimes prescribe Neurontin at dosages of 3,200 milligrams for neuropathic pain?
A. They're better, but not a hundred percent better than 1,800 milligrams,



KENNETH D. HOELLEIN, M.D.

which is probably my average dose.
Q. Have you found in your experience that, for some patients, it's more appropriate to prescribe in excess of 1,800 milligrams a day?
A. Absolutely. Absolutely.
Q. And those decisions to prescribe in excess of 1,800 milligrams per day, is that based on your past experience seeing, in some cases, increased efficacy above 1,800 milligrams per day?
A. Yes.
Q. And your decision to prescribe in excess of 1,800 milligrams per day are based on your own independent medical judgment?
A. Yes.
MR. MISHKIN: Doctor, thanks. That's all I've got.
MR. WESTON: One more question, if I may, Doctor.
BY MR. WESTON:
Q. When you prescribe Neurontin for pain, do you prescribe it as monotherapy



KENNETH D. HOELLEIN, M.D.

or as adjunctive therapy?
A. That's a hard question to answer. If you're talking about postherpetic neuralgia or diabetic peripheral neuropathy, I would consider it as monotherapy. Now, many times, these patients are also on other medications, like nonsteroidals or narcotics. So that's a hard question to answer.
Q. So they're taking more than one drug simultaneously?
A. I'm internal medicine. All my patients are taking more than one drug.
MR. WESTON: All right. Thank you, Doctor.
MR. MISHKIN: I think we're done.
VIDEO SPECIALIST: The time is 10:10. That concludes the videotaped deposition of Dr. Kenneth Hoellein.
- - -
(Witness excused.)
- - -
(Deposition concluded at 10:10 a.m.)

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

______________________________
Jennifer S. Walker, RPR
Dated: October 7, 2008

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)



INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.



- - -
E R R A T A
- - -

| PAGE | LINE | CHANGE |
|---|---|---|
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |
| _____ | _____ | ___________________________ |



ACKNOWLEDGEMENT OF DEPONENT

I, KENNETH D. HOELLEIN, M.D., do hereby certify that I have read the foregoing pages _____ to _____ and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_______________ _________________________
DATE SIGNATURE

Subscribed and sworn to before me this
____________ day of __________________, 200__.

My commission expires: _______________________

_________________________________
Notary Public