IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION    ) Pages 1 - 103


MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 20, 2008, 2:05 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

826c5e44-c406-4628-94bf-5f750fedf4b0

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3

          ANDREW G. FINKELSTEIN, ESQ. and KEITH L. ALTMAN, ESQ.,
4    Finkelstein & Partners, LLP, 436 Robinson Avenue, Newburgh,
     New York, 12550.

5

          KENNETH B. FROMSON, ESQ., Finkelstein & Partners, LLP,
6    785 Broadway, 3rd Floor, Kingston, New York, 12401.

7         MARSHALL P. RICHER, ESQ., Finkelstein & Partners, LLP,
     80 Wolf Road, Suite 503, Albany, New York, 12205.

8

          THOMAS M. GREENE, ESQ., Greene & Hoffman, P.C.,
9    125 Summer Street, Suite 1410, Boston, Massachusetts, 02110.

10

11   FOR THE DEFENDANTS:

12        DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
     160 Federal Street, 23rd Floor, Boston, Massachusetts,
13   02110-1701.

14        JAMES P. ROUHANDEH, ESQ., ESQ., Davis, Polk & Wardwell,
     450 Lexington Avenue, New York, New York, 10017.

15

          DOUGLAS B. MADDOCK, JR., ESQ. and SCOTT W. SAYLER,
16   ESQ., Shook, Hardy & Bacon, LLP, 2555 Grand Boulevard,
     Kansas City, Missouri, 64108-2613.

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Neurontin Marketing, Sales

3   Practices and Product Liability Litigation, Civil

4   Action 04-10981, will now be heard before this Court.  Will

5   counsel please identify themselves for the record.

6          MR. FROMSON:  Good afternoon, Judge.  For the

7   plaintiffs, Kenneth Fromson from the law firm of

8   Finkelstein --

9          THE COURT:  Did you all fill in that form that we

10  usually have?  Robert, did you distribute that?

11         MR. FROMSON:  I did give a card to the reporter.

12         THE COURT:  Anyway, so go ahead.  What's your name

13  again?

14         MR. FROMSON:  Last name is Fromson, first name is

15  Kenneth, for the plaintiff.

16         MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein

17  & Partners, on behalf of the plaintiffs.

18         MR. RICHER:  Marshall Richer, R-i-c-h-e-r,

19  Finkelstein & Partners, for the the plaintiffs.

20         MR. ALTMAN:  Keith Altman, A-l-t-m-a-n, for the

21  plaintiffs.

22         MR. ROUHANDEH:  Good afternoon, your Honor.  Jim

23  Rouhandeh, Davis Polk, for the defendants.

24         MR. MADDOCK:  Good afternoon, your Honor.  Doug

25  Maddock, Shook, Hardy & Bacon, for the defendants.

1          MR. SAYLER:  Good afternoon.  Scott Sayler, Shook,

2     Hardy & Bacon, for the defendants.

3          MR. CHAFFIN:  Good afternoon, your Honor.  David

4     Chaffin for the defendants.

5          THE COURT:  All right, so we have two things on

6     today, motions to dismiss and the motions for summary

7     judgment in the products cases, right?

8          MR. ROUHANDEH:  That's correct, your Honor.

9          THE COURT:  There's a bunch of new information

10    that has come in on the sales and marketing side, but that

11    is, as far as I can tell, irrelevant, or at least not what's

12    at issue here today.

13         MR. ROUHANDEH:  That's correct.

14         THE COURT:  Not directly irrelevant but not -- at

15    the end of this, I'm going to ask you, actually, to what

16    extent you feel that there is some overlap.  You all, have

17    you been coordinating with the other side, not the other

18    side but the sales and marketing?

19         MR. FINKELSTEIN:  Sales and marketing?

20         THE COURT:  Yes.

21         MR. FINKELSTEIN:  Not particularly.

22         THE COURT:  Because actually some of the issues

23    are starting to overlap, and so I -- is anyone here from the

24    other -- do you coordinate with the other side, the sales

25    and marketing side as well, Mr. Greene?

826c5e44-c406-4628-94bf-5f750fedf4b0

1            MR. GREENE:  I am the sales and marketing side.

2            THE COURT:  You are exclusively?

3            MR. GREENE:  Yes.

4            THE COURT:  Have you read the briefs in this case?

5            MR. GREENE:  I have been following them, yes.

6            THE COURT:  There is some overlap.

7            MR. GREENE:  There is.

8            THE COURT:  So, all right.  So I'm glad you're

9    here because I think we need to address certain things, and

10   I know that defense counsel is the exact same, right, both

11   sides?

12           MR. ROUHANDEH:  Yes.

13           THE COURT:  All right.  So what are we doing

14   first?

15           MR. ROUHANDEH:  The motion to dismiss, your Honor.

16           THE COURT:  Okay.

17           MR. ROUHANDEH:  The motion to dismiss is a simple

18   motion.  It's very straightforward.  Actually, this is one

19   instance where I think the parties kept within the page

20   limits of your Honor.  We had moved to dismiss the claims,

21   the fraud claims in the product liability cases pursuant to

22   9(b) now a couple of years ago, and the Court agreed with us

23   in a ruling that was issued on February 23, 2007, which is

24   Docket No. 646.  And the Court agreed that the fraud

25   allegations were, and I quote here, "These complaints are

1    clearly deficient."  What the plaintiffs had failed to plead

2    is specific misrepresentations made to each doctor that

3    caused those doctors to write Neurontin to the plaintiffs.

4    But the Court gave the plaintiffs a second chance, and

5    that's why we're here today.

6             Looking at the issue back in 2007, the Court said,

7    the information that the plaintiffs need to determine

8    whether they have a cause of action, whether they can plead

9    a cause of action, is in the hands of doctors; and the

10   plaintiffs had argued it's in the hands of the defendants.

11   The Court agreed with the defendants, said "no," it was in

12   the hands of the doctors because those are the only

13   individuals who could say what was represented to them and

14   how it affected them, if at all.

15            And the Court in addressing that issue said that

16   the plaintiffs could not plead this on information and

17   belief; they should then instead go out and take the doctor

18   depositions.  And that was interesting because what the

19   Court did is said, "Well, look, if you go out and take the

20   depositions in all the cases, we'll be here for years and

21   years and years," and because we had a set of pilot cases or

22   Track One cases, the Court said, "Go take the doctor

23   depositions in those cases, come back and try to replead."

24            THE COURT:  How many are we down to in Federal

25   Court?  I've been dismissing them as we've gone pursuant to

1    a procedure that I guess Judge Sorokin implemented.

2         MR. ROUHANDEH:  I think about 20 percent of the

3    Finkelstein cases were dismissed, if I'm correct.  And as to

4    the others, it's kind of complicated because a lot of those

5    cases are -- there's a handful of cases with hundreds of

6    plaintiffs embedded in them, so lots and lots of those

7    plaintiffs embedded in three cases brought by other

8    plaintiffs' counsel have been dismissed.

9         THE COURT:  Were the twelve cases that were

10   selected all of your cases, Mr. Finkelstein?

11        MR. FINKELSTEIN:  Yes.

12        THE COURT:  So to the extent that I view this as

13   somewhat of a bellwether trial, it may or may not affect

14   these other cases?

15        MR. ROUHANDEH:  No, there are two cases among

16   the -- there are now fourteen Track One cases because what

17   Magistrate Sorokin did is, he said, let's take the cases

18   pending in the District of Massachusetts and add them to the

19   ten Track One cases.

20        THE COURT:  Which are the two that are mine?

21        MR. ROUHANDEH:  The two that are yours that

22   Finkelstein & Partners are not the counsel are Dorsey and

23   Huberman.  And Huberman actually never pled a fraud claim,

24   so they're not really at issue here, and Dorsey I don't

25   believe attempted to replead the fraud claim.

1          MR. CHAFFIN:  No, no.

2          MR. ROUHANDEH:  Only Finkelstein & Partners has

3     attempted to replead this fraud claim.

4          MR. FINKELSTEIN:  I just don't want the Court

5     to -- we are not counsel for those two cases.

6          THE COURT:  Well, it struck me in reading the

7     materials, at least the ones that you've briefed, I've got

8     the two big binders on, they're very nicely put into two big

9     categories:  One is where there was some detailing to the

10    doctors and one where there was no known interaction between

11    Pfizer or Parke-Davis and the doctors, right?

12         MR. ROUHANDEH:  Right.  And that's critical here.

13    But just one more word on the Court's decision.  The Court

14    said that "In the interest of justice, the Court will allow

15    the plaintiffs to amend the complaint to allege fraud with

16    particularity, including specific misrepresentations that

17    the plaintiffs' doctors allegedly relied upon."  That's what

18    the plaintiffs were charged with doing.  They did take

19    doctor depositions in each of these Track One or pilot

20    cases, and then they amended in twelve of the fourteen all

21    of the ones in which Finkelstein & Partners are counsel, and

22    the other two -- well, in Dorsey there was no attempt to

23    amend, and in Huberman there was no fraud claim.

24              But in those twelve cases, the plaintiffs have not

25    pled the necessary facts.  Instead what they've done is,

1    they have impermissibly and inexplicably at this stage

2    continued to try to plead on information and belief.  And in

3    only -- I think your Honor mentioned that in some cases

4    there was an attempt to talk about specific conversations

5    with the doctor, and in others there were not.  By our

6    count, in only five of the twelve cases at issue do the

7    plaintiffs even attempt to allege a communication between

8    the company's sales reps and the plaintiffs' prescribing

9    doctors, and in those five cases the allegations really

10   follow the same pattern.  What they do allege is that there

11   was a contact.  So they say, "Well, a doctor was called upon

12   by a company sales rep."  Typically they don't allege that

13   on information and belief.

14           THE COURT:  Right.

15           MR. ROUHANDEH:  But then they allege on

16   information and belief that the sales rep detailed the

17   doctor on off-label uses, and that just does not cut it at

18   this stage.  They've taken the doctors' depositions.

19   They've had the ability to take sales reps' depositions.

20   They've had the sales rep call notes that tell them how many

21   times doctors were visited by sales reps, and they can't at

22   this late stage continue to rely on information and belief.

23   And what --

24           THE COURT:  But isn't it a reasonable inference

25   that if you went to visit a psychiatrist, it wasn't about

1   antiepileptic medications?

2          MR. ROUHANDEH:  Well, most of these doctors are

3   not in fact -- I don't have the count -- are not

4   psychiatrists.

5          THE COURT:  Suppose they're back doctors.  They

6   typically wouldn't treat epilepsy, so isn't there a

7   reasonable inference, not as to what was said, fair enough,

8   but that it was for an off-label use?

9          MR. ROUHANDEH:  No, I don't think so because

10  typically what happens is, a lot of what the sales reps will

11  do is simply drop samples off.  Sometimes what the sales rep

12  will do is detail the person on the approved use because the

13  doctor wants to see a sales rep and wants to know what all

14  the safety information is.  It's then up to the doctor to go

15  and say, "Well, I want to use it for this other off-label

16  use."  Plus you have to realize that there's not only an

17  epilepsy indication, but there's also a PHN indication,

18  which is a type of pain.

19         THE COURT:  After 2002, right?

20         MR. ROUHANDEH:  After 2002.

21         THE COURT:  So that's post -- what is it,

22  postherpetic syndrome, right?

23         MR. ROUHANDEH:  Postherpetic neuralgia.  It's the

24  pain one gets after having shingles, which a lot of them get

25  later in life --

826c5e44-c406-4628-94bf-5f750fedf4b0

1          THE COURT:  So an orthopedic guy normally might

2     not.

3          MR. ROUHANDEH:  Well, people see all sorts of

4     doctors for all sorts of reasons, but in this case I think

5     largely you see the general practitioners, you see

6     anesthesiologists, you see a lot of neurologists.

7          THE COURT:  Let me just give you both my first cut

8     through, as I often do.  I don't see how the plaintiffs can

9     show enough if there's absolutely no visit to the doctor,

10    okay.  You're going to have that upward battle with me.  But

11    with respect to you, why isn't it simply a matter for

12    summary judgment?  In other words, you now have a

13    deposition, what was said, what wasn't said.  The specific

14    misrepresentation had to do with -- you know, it's really a

15    suppression case -- failure to disclose information

16    allegedly available to Pfizer regarding depression.  And how

17    can I do that on -- that's what they're claiming the misrep

18    is, failing to disclose the information that Pfizer had

19    about depression.  So why wouldn't that be enough to at

20    least get you to summary judgment?

21         MR. ROUHANDEH:  Well, first is, there is an

22    important pleading requirement, and they shouldn't be

23    allowed to go forward at this stage if they haven't met

24    that, and they can't meet it by information and belief.

25         THE COURT:  But they say that the

1   misrepresentation is failure to disclose the impact on

2   depression.  Isn't that what they're alleging?

3           MR. ROUHANDEH:  Well, actually what they're

4   alleging largely is just simply a vague allegation that

5   off-label uses were detailed.

6           THE COURT:  I stopped trying to read the

7   impossible complaints.  They're just too thick, they're too

8   burdensome, and I wasn't going to spend my whole weekend

9   reading twelve 200-page complaints.  So to some extent, I

10  may turn to you and ask, exactly where is this?  But at

11  least the briefing suggests that they're specifically

12  arguing that it was a failure to disclose the fact that

13  Neurontin increases depression.

14          MR. ROUHANDEH:  I do want to --

15          THE COURT:  Is that not in the complaints?

16          MR. ROUHANDEH:  That is in the complaints, but

17  their primary argument is actually a different argument that

18  I just want to put to rest.

19          THE COURT:  Okay.

20          MR. ROUHANDEH:  And that is, on Pages 8 to 11 of

21  their brief, they go through in single-space block

22  paragraphs allegations of communications between doctors and

23  sales reps.

24          THE COURT:  That they did do, right.

25          MR. ROUHANDEH:  Yes, and that is highly misleading

1    because in all of these three pages of very small print,

2    you'd have no idea, until you went back and actually looked

3    at the complaint, that the relevant important allegations

4    are actually on information and belief.  You can't tell that

5    from looking at the complaint.  There are simply --

6              THE COURT:  Well, were those not backed up by the

7    depositions?

8              MR. ROUHANDEH:  No, they were not backed up by the

9    depositions.  If they had something from the deposition

10   where the doctor said, "Look, I was detailed on off-label

11   uses," they would have put it in their complaint, and they

12   didn't and they can't.

13             THE COURT:  Were there depositions taken of every

14   one of these doctors?

15             MR. ROUHANDEH:  For each of the prescribers, I

16   believe there was at least one doctor's deposition taken for

17   each of the twelve cases.

18             THE COURT:  For the ones that are the five, didn't

19   they say they were visited or detailed?

20             MR. ROUHANDEH:  They said they were detailed.

21   They did not say they were detailed on off-label uses.  And

22   that's the point.  Absent that, they shouldn't be able to go

23   forward on a theory that says every time --

24             THE COURT:  See, this is what I don't have, which

25   is why in my mind I decided I would wait for summary

Page 14

1    judgment, since you've now completed discovery, right?

2              MR. ROUHANDEH:  It's not complete.

3              THE COURT:  So why don't I just do this on a full

4    record?

5              MR. ROUHANDEH:  Well, one thing is, it's a huge

6    effort to undertake to get it to complete discovery.  We're

7    not at that point.  All that's been done is the doctor

8    depositions and sales rep discovery and things like that.

9    We'd have to move all of those cases --

10             THE COURT:  I just don't know how I'm going to do

11   it on the four corners of this where they're claiming this

12   is what was said.  As I understand it, they're claiming

13   misrepresentation, failure to disclose depression; B, there

14   was actually a detailing; C, that there's a reasonable

15   inference it was for off-label.  Why isn't that good enough

16   for 9(b)?

17             MR. ROUHANDEH:  It's clearly not good -- the part

18   about they were detailed on off-label uses is clearly not

19   good enough to simply do it on information and belief.  It's

20   clearly not good enough under 9(b) for all the cases.

21             THE COURT:  Before 2002, why wouldn't it be?

22             MR. ROUHANDEH:  Well, I don't think these cases go

23   back to 2002.

24             THE COURT:  You're saying none of them go back

25   before 2002?

1    MR. ROUHANDEH:  I don't think these at issue, I'd

2 have to look, I'm not sure, was pre-2002.  In any event,

3 it's absolutely permissible to visit doctors.  These doctors

4 are visited on multiple drugs, and there's nothing wrong

5 with a visit on a physician to talk about a drug as long as

6 you stay on-label.

7    THE COURT:  Are you saying that the Pfizer people

8 were also selling other drugs simultaneously?

9    MR. ROUHANDEH:  Yes.

10    THE COURT:  So this could have been on a

11 legitimate --

12    MR. ROUHANDEH:  It could be related to another

13 drug, and they say, okay, there was a sample dropped off on

14 Neurontin, there was something else; but nothing, nothing in

15 the record, no evidence, no allegation, forget the evidence,

16 no allegation --

17    THE COURT:  Not one doctor said that they talked

18 about off-label use?

19    THE COURT:  Right.  And then the second issue here

20 is the failure-to-disclose issue, and that's the one you've

21 raised a couple of times, failure to disclose, you know,

22 that it increases depression.  That's a failure-to-warn

23 claim.  That is not a fraud claim.

24    THE COURT:  But you have a duty once you start

25 speaking to tell the whole truth.  I mean, it's not -- it

1  doesn't conflate.  It does sometimes, but here -- duty to

2  warn is different, but here, you know that notion that you

3  can't disclose -- start talking and then not disclose

4  material information that would cast a different light on

5  what you disclosed.

6          MR. ROUHANDEH:  Right.

7          THE COURT:  So if you're selling, let's say,

8  Neurontin for back pain, a lot of people, as you keep

9  pointing out in the other case, including the plaintiffs'

10  expert, use it for back pain, right?  So do you also then

11  have a duty to disclose, "And, by the way, it increases

12  depression"?

13          MR. ROUHANDEH:  Well, that's an interesting thing,

14  and I'm sure we'll get into that a lot more in connection

15  with the preemption argument, but, no, absolutely not,

16  because the company at the relevant time had no information

17  that it increased depression or suicide.

18          THE COURT:  And I do understand that's your

19  position, and we've got the Daubert hearing and all that,

20  but I'm just simply saying, for a 9(b), why isn't it enough?

21  Because I'm just looking at a pretty narrow prism right now.

22          MR. ROUHANDEH:  Yes, and what you have to do on

23  9(b) is, you have to have -- remember, there are two things

24  they have to plead:  One is, they have to plead the

25  misrepresentation; second, they have to plead reliance.

1    This is not a situation where -- if you look at the brief,

2    what the plaintiffs say is that -- and they say this on

3    Page 7 of their brief -- the most they say about this

4    alleged failure to disclose information about risks of the

5    product is, "The doctors would have liked to know the

6    information they were asked about."  That's not enough.

7    They have to allege they relied upon it.

8            THE COURT:  Some of the doctor depositions

9    actually say that.

10           MR. ROUHANDEH:  Yes, but what they have to do for

11   reliance is, they have to say the doctor would have made a

12   different decision had they known that information.  That

13   you don't see pled in these complaints.  If you simply

14   say -- any doctor, most people, if you say, "If this were

15   true, if that were true, if that were true, would you have

16   liked to know?"  Sure, people say, "I'd like to know more

17   information than less."

18           THE COURT:  What else do you do in a suppression

19   case?

20           MR. ROUHANDEH:  You have to actually ask the next

21   question, which is, "Had you known the information that the

22   plaintiffs say is true," and, again, which we say is not

23   true and we think undisputed, you have to ask the next

24   question, which is, "Well, if that information were true,

25   would you still have prescribed it or would you not have

1    prescribed it?"

2              THE COURT:  And you're saying that that's just not

3    asked?

4              MR. ROUHANDEH:  No.  Well, they might have asked

5    it on some -- I can't remember all twelve of the relevant

6    depositions, but they haven't come back and said, no, that's

7    in fact what the doctors did say, that the doctors said, "I

8    would have never prescribed it had I known that risk."  In

9    fact doctors are continuing to prescribe it after the FDA

10   alert, so these same doctors --

11             THE COURT:  Maybe, maybe.  So at least for

12   pleading purposes, you're saying nowhere in there, if I ask

13   them to specify the paragraphs, will they say that the

14   doctors relied on it?

15             MR. ROUHANDEH:  Right, and on Page 7 of their

16   brief, they address this issue, and they say that the

17   doctors would have liked to have known this information.

18   So, again, we're only talking about these five cases.  In

19   the other seven cases -- well, first, in the five cases

20   where they --

21             THE COURT:  Don't even go to the other seven.  You

22   can come back and reply if they say something.

23             MR. ROUHANDEH:  Okay.

24             THE COURT:  So you're big argument is "would have

25   liked to have known" is not good enough for --

1          MR. ROUHANDEH:  That's correct.  Of course, I

2     would argue that, and there are a number of courts, and

3     we've cited the decisions in our case where they've said,

4     look, where there's a parallel between the failure to warn

5     and the fraud claim, they typically dismiss the fraud claim

6     and say that's a failure-to-warn claim, proceed as if it's a

7     failure-to-warn claim.

8          THE COURT:  I'm not going to do that.  I mean,

9     there are two different causes of action.  I mean, it's much

10    harder to prove fraud.  You have to have an intent to

11    deceive; whereas a failure to warn is a prudential

12    reasonableness standard.  So if they can prove it, it's a

13    whole other thing.  I'm not going to do that.  But what

14    you're saying is, if I went on a plain old common law fraud

15    material misrepresentation upon which he reasonably relied

16    and it caused you damages, just the classic -- I guess I'll

17    add with an intent to deceive -- you're saying that there

18    isn't enough to show that the doctor relied on the failure

19    to disclose?

20         MR. ROUHANDEH:  That's correct, and there's a

21    second argument, which is, to take that failure-to-warn

22    claim and to make it into a fraud claim -- and I understand

23    your Honor is saying maybe there are parallel claims, you

24    can address both -- to make it into a fraud claim, there's

25    an additional element, which is, they have to plead that the

1   defendant actually knew the information that they say wasn't

2   disclosed.

3          THE COURT:  I think they have.

4          MR. ROUHANDEH:  I don't think they did, and I

5   don't think they can plead it.

6          THE COURT:  Although I confuse the two cases

7   sometimes, so -- but I think they have said, and in fact

8   we've heard it in Daubert, that at a certain point that guy

9   from England said it, so -- what's his name?

10          MR. ROUHANDEH:  Trimble.  Actually, if we look

11   back at what he said, he didn't say that this drug is

12   associated with a risk of suicide and you should warn that.

13          THE COURT:  No.  I'm talking about depression.  In

14   any event, it's a 9(b) standard right now.

15          MR. ROUHANDEH:  It's a 9(b) standard, that's

16   right.  And what they have to allege here is that at some

17   point, and we'll get into this in the preemption argument --

18   I don't think they're even saying it in connection with the

19   preemption argument or the summary judgment argument.  I

20   don't think they're even purporting to say, yes, the company

21   knew that there was an association between suicide and

22   Neurontin prior to the time these plaintiffs took this

23   product.

24          THE COURT:  You know the case so much better than

25   I do, but you've got to be careful to make sure I don't get

1  confused.  I had thought the issue here was depression, not

2  suicide.

3          MR. ROUHANDEH:  The issue here is suicide

4  actually.  The issue here is suicide.  That's what they're

5  all alleging.

6          THE COURT:  But I'm just saying, so that the claim

7  is that Pfizer knew about an increase in depression.  Maybe

8  I'll ask them that.

9          MR. ROUHANDEH:  Yes, I mean, I always thought that

10 the allegation was they knew about an increase in --

11 whatever it is, I don't think that they have pled that or

12 they have facts to support that, you know, whether you look

13 at it on a motion to dismiss or summary judgment.

14         Just one other thing because --

15         THE COURT:  I'll ask them that.  I have this

16 little checklist of things I'm going to ask you.

17         MR. ROUHANDEH:  There's one other thing that they

18 knew, and I think it's important because it really sheds

19 light on these two other arguments they're making, and that

20 is, they say, well, at some point a doctor from the company,

21 a Dr. Clarey, went on NPR and made a statement that no

22 evidence --

23         THE COURT:  Don't worry about that.

24         MR. ROUHANDEH:  That's just a fraud-on-the-market

25 claim like --

1          THE COURT:  Right, don't worry about that.

2          So let me just move to you right now, and you'll

3   come back.  All right, so your claim here is common law

4   fraud, right?

5          MR. RICHER:  That's correct, at its heart, your

6   Honor.

7          THE COURT:  First of all, I found it incredibly

8   difficult to read these complaints.

9          MR. RICHER:  So did I, your Honor.  I was doing it

10  all weekend.

11         THE COURT:  I just found it impossible, and I'm

12  not doing it, okay?  I started with the first one in there

13  and started trying to read through from beginning to end.

14  It took me five pages to get through the corporate

15  chronology from Parke-Davis.  It's not a readable complaint.

16         So you tried to do some things in your brief to

17  hone me in, but I think what I'm going to need at the very

18  least from you within a day or two is which paragraphs you

19  want me to look at because I'm not going to cold read them

20  all, okay?  So you've read them all through, so now I'm sure

21  you're right on top of it.

22         All right, so if the common law fraud is

23  intentional misrepresentation, right, of a material fact,

24  someone reasonably relied on it and caused you damages -- is

25  that pretty standard cookie-cutter fraud?

826c5e44-c406-4628-94bf-5f750fedf4b0

Page 23

1          MR. RICHER:  Yes, it is.

2          THE COURT:  All right, so start off with the

3     first.  What was the intentional material misrepresentation?

4          MR. RICHER:  Your Honor, this entire case, all

5     approximately 140 complaints, and certainly the twelve we're

6     talking about here, there are only two representations.  If

7     you take all the many paragraphs in the complaint, they all

8     boil down, as far as fraud we're talking about, to two

9     material representations:  "Neurontin is safe and effective

10    for the treatment of bipolar disorder."  And when I say

11    bipolar disorder, you can have a blank there into which any

12    off-label use is inserted.  That's the first representation.

13    They all boil down to that.  And in cases where doctors were

14    provided with samples, the misrepresentation is:  "This

15    package insert is effective for your use," and when I say

16    "your," I mean the doctor, "your use in prescribing

17    Neurontin for the treatment of bipolar disorder or any other

18    off-label use."  Those are the two misrepresentations.

19         THE COURT:  All right, so then you would say I'm

20    wrong, this is not a suppression case.  By suppression, I

21    mean -- and, as I say, there are multiple facets of this --

22    as I understood it, the key, and I didn't bring the brief

23    down with me, but as I was reading it in the last few days,

24    was that there was a suppression of negative information

25    that came out about either depression or suicide, depending

Page 24

1    on how you read it.

2          MR. RICHER:  It is that, but it is not solely

3    that.  It's our position that those two misrepresentations

4    can be achieved two ways:  They can be achieved

5    affirmatively.  I can go to a doctor and I can literally

6    say -- and, for instance, counsel has slightly

7    mischaracterized the nature of these complaints.  There is

8    one complaint, for instance, where the doctor is deposed and

9    says the sales rep tells him "hush-hush" and under the

10   table, Neurontin is useful for treating off-label uses.

11   This is an affirmative statement.

12         THE COURT:  I remember that.  So does that mean

13   that is the only claim that survives?  Because while I might

14   be willing to reasonably infer that if you go to a

15   non-neurologist, you're trying to sell for off-label, that

16   doesn't mean that I can infer that someone said, "This is

17   safe and effective for bipolar."  Why would it be fraudulent

18   to say, "Some doctors have tried this out, and it's worked

19   on some of their patients," if that's true?

20         MR. RICHER:  Because during all the depositions,

21   the defendant's employees and officers themselves had said

22   that that statement would be inappropriate per se, that they

23   are not allowed to do that.

24         THE COURT:  Excuse me.  Do you have anywhere in

25   all the discovery you've done -- this is why I allowed the

1    discovery -- have any doctor who says that someone said this

2    is safe and effective for bipolar or migraine or nociceptive

3    pain, or any of the other indications?

4           MR. RICHER:  In the cases we are talking about

5    here -- and, remember, we've only done discovery in twelve

6    cases -- not for a specific use but in --

7           THE COURT:  Then why is that going to pass muster

8    unless this is a suppression case?  I don't have one doctor

9    other than the "hush-hush" comment.  "Hush-hush," maybe that

10   one survives.  So other than "hush-hush," why -- I

11   specifically allowed depositions and discovery because I was

12   very concerned, as I've made no secret about, of the

13   off-label campaign.  But I've also been really clear that

14   off-label cannot be the cause of action here.  There is

15   nothing inherently fraudulent about off-label marketing.

16   It's criminal and it's against the law, but it doesn't mean

17   it's fraudulent.  So I don't remember if you were here, I've

18   been saying this now since Mr. Greene brought the case back

19   in 1995.  You've got to -- when was it you brought it?

20          MR. GREENE:  August, '96, your Honor.

21          THE COURT:  August, '96.  It's got to be a fraud,

22   a specific comment that you plead with particularity, and I

23   don't have it other than the suppression piece of it that

24   you didn't disclose X.

25          MR. RICHER:  I would respond to that in two ways.

1    First, I would say that the totality of the evidence creates

2    a strong circumstantial case that in certain cases, that

3    fraud was communicated.  Putting that to one side because

4    your Honor is emphasizing the other aspect of our argument,

5    it is our position that information, material information

6    was suppressed, was intentionally not communicated to

7    physicians, and that this constitutes fraud.  And in that

8    regard, I would direct the Court respectfully to the case of

9    Michael V. Shiley, 46 F. 3rd 1316, and at Page 1333 of that

10   case, the Third Circuit Court of Appeals pointed out that

11   "The concealment of a material fact can amount to a culpable

12   misrepresentation, no less than does an intentional false

13   statement."

14          THE COURT:  And what -- see, you've got to put me

15   into common law fraud.  You haven't yet told me what that

16   misrepresentation is and what was specifically pleaded in

17   your complaint.  What is the material fact that was omitted?

18          MR. RICHER:  Oh, the complaint contains many, many

19   details.  For instance --

20          THE COURT:  What is it?  I haven't read them

21   because I got frustrated.

22          MR. RICHER:  Well, let me give you the easiest

23   example, your Honor.

24          THE COURT:  Good.

25          MR. RICHER:  And I'll --

1          THE COURT:  The easiest.  If I were you, this is

2     your case because we're not repleading at this point.  It's

3     been too long.  What have you alleged with specificity that

4     was not disclosed?  I completely agree with that statement

5     of law in that Third Circuit case, but you've got to plead

6     it with particularity.

7          MR. RICHER:  For instance, in the complaint in

8     Shearer, this is the amended complaint 1208 beginning at

9     Paragraph 243 on Page 59, it is alleged that on

10    December 15, 1992 --

11         THE COURT:  Wait a minute, let me get there.  This

12    is where the rubber hits the road.  243?

13         MR. RICHER:  Your Honor, go to Paragraph 241,

14    please, on Page 58.

15         THE COURT:  I may have the wrong -- which tab are

16    we talking about?  Tab 2, okay.  Which paragraph?

17         MR. RICHER:  241, your Honor.

18         THE COURT:  All right, what does it allege?

19         MR. RICHER:  It alleges that "Parke-Davis and

20    Warner-Lambert had specific knowledge on or about

21    December 7, 1992, by the FDA's 1992 review, that Neurontin's

22    widespread usefulness was limited because of the occurrence

23    of depression and suicide attempts during clinical trials.

24    Parke-Davis and Warner-Lambert had knowledge of Neurontin's

25    capacity to contribute to mood and behavioral disturbances,

1    including depression and suicidality."

2              THE COURT:  All right, so, now, where does it say

3    that that was not disclosed to the physicians?

4              MR. RICHER:  It is alleged in subsequent

5    paragraphs.  For instance, if you go down to the next page,

6    this concern on the part of the FDA was communicated to

7    specific employees of the defendants, including

8    Dr. Spivey --

9              THE COURT:  It may be that you don't have it now,

10   okay.  What I want to know is, where does it say that this

11   is the specific misrepresentation that was suppressed or not

12   relied upon?  You do say it in your brief, but where I got

13   frustrated was trying to find stuff in the complaint.

14             MR. RICHER:  Paragraph 247 at Page 60, your Honor.

15             THE COURT:  All right.  Okay, you do.  All right,

16   now, that's very specific.  Is that in every single one of

17   the complaints?

18             MR. RICHER:  Yes, it is, your Honor.

19             THE COURT:  Mirror image kinds of paragraphs?

20             MR. RICHER:  Yes, your Honor.  They're not always

21   enumerated exactly the same because the length of the

22   complaints are somewhat different, but that allegation is in

23   all of the complaints we're dealing with today, and in fact

24   all of the amended complaints.

25             THE COURT:  So do you have any similar paragraphs

1  that specifically say that the prescribing physicians were

2  told that something was safe and effective for bipolar or

3  safe and effective for the sample?

4           MR. RICHER:  In the cases we are talking about, we

5  do not have testimony of a doctor who says that "I was told

6  it was safe and effective for a specific off-label use."

7           THE COURT:  So you essentially want me to draw the

8  inference that that must have happened?  Is that essentially

9  what we're talking about?

10          MR. RICHER:  That is correct.  There is --

11          THE COURT:  There is a fraud?

12          MR. RICHER:  There is strong circumstantial

13  evidence, as described earlier today by your Honor, that

14  given the circumstances, and as your Honor pointed out in

15  your decision in Document 646, that the Court acknowledges

16  that there is strong evidence of the defendant's general

17  scheme to illegally off-label market the drug.  And in the

18  individual circumstances we detail, particularly in these

19  five cases where there are extensive marketing efforts

20  directed at doctors who would not be expected to prescribe

21  Neurontin to their patients for an indicated use, that --

22          THE COURT:  I agree so far with everything you've

23  said, but now I've given you as much time and opportunity as

24  you want to depose the doctors and the members of their

25  offices, whatever you wanted to do.  Do you have any

1    specific information that any one of these salespeople

2    stated to the doctor, "This is safe and effective for this

3    particular use"?

4            MR. RICHER:  Not for a specific use.  The most

5    detailed is the statement to Dr. Arias.

6            THE COURT:  Which?  That's the "hush-hush"?

7            MR. RICHER:  That is the "hush-hush" under the

8    table.

9            THE COURT:  Whose complaint is that?  That's --

10           MR. RICHER:  Your Honor, that is in the Valentine

11   case.

12           THE COURT:  All right, so other than Valentine,

13   you have no such statement?

14           MR. RICHER:  Not a direct statement, not a direct

15   detailed statement, your Honor.

16           THE COURT:  All right, so, now, assume for a

17   minute other than Valentine --

18           MR. RICHER:  Let me insert here that in the bulk

19   of these depositions, the testimony is not that such a

20   statement was not made.  It is almost always the physician's

21   testimony that he simply does not recall the contents of

22   these discussions.

23           THE COURT:  Fair enough, but as we've gone

24   through -- and I've had so many off-label cases not

25   involving Pfizer, Temodar, I mean, I've just had so many --

Page 31

1    it seemed to have been an epidemic for a while -- there's

2    nothing inherently fraudulent about off-label marketing.

3    It's against the law because of the way the federal statute

4    is written.  So I need a fraudulent statement, or you don't

5    meet 9(b).  That's the crux of it.

6           So as far as I see, I've got, unless you tell me

7    otherwise, I've got Dr. Arias in the Valentine complaint and

8    what you've alleged on failure to disclose the depressive

9    effects.  Okay, so I at this point am going to rely on those

10   two as the intentional misrepresentations.  And I will at

11   least for purposes of 9(b), I think that at least with

12   respect to the depression/suicide, that's material.  But

13   then we've got the position that there's no evidence or

14   allegation that the doctor would have done something

15   differently if they had known of the possible depression or

16   suicide, so just help me through that.

17          MR. RICHER:  Your Honor, you have helped yourself

18   through that.  The lead case cited in your decision of

19   February 23, 2007, Document 646, is the case of United

20   States and Karvelas, and Karvelas is a case --

21          THE COURT:  The First Circuit case?

22          MR. RICHER:  Yes.

23          THE COURT:  Karvelas V. Melrose Hospital or

24   something?

25          MR. RICHER:  Karvelas V. Melrose-Wakefield

1   Hospital.  It is in the context of a qui tam action, a

2   federal False Claims Act, FCA proceeding.  Karvelas stands

3   for two very important things, both brought up by counsel:

4   One is that malice, intent, knowledge, and other conditions

5   of mind may be averred generally for the purposes of

6   Rule 9(b).  Reliance in this context is just such a thing.

7            THE COURT:  Well, wait.  I think you're conflating

8   two concepts.  I agree, intent to deceive, I think you've

9   alleged it.  I hope you have.  I haven't specifically read

10  through every single complaint, but I'm assuming you've

11  alleged it, and they're not fighting that.  But reliance is

12  different.  Where does Karvelas say that reliance can be

13  averred generally?  Does it?

14           MR. RICHER:  No, I -- it is the plaintiffs'

15  position that reliance in this context, where what we're

16  trying to do is trying to find out not what the physician

17  did but why did the physician do it, it is our position that

18  that is a matter --

19           THE COURT:  Yes, why did the physician do it?  All

20  right, fair enough, why did the physician buy it?  Is there

21  any of these physicians who said, "I wouldn't have bought it

22  if I had known it increased the risk for suicide or

23  depression"?

24           MR. RICHER:  There are doctors who said they would

25  have wanted to know various items of this information that

826c5e44-c406-4628-94bf-5f750fedf4b0

1    was not disclosed to them.

2             THE COURT:  And then would have done what?

3             MR. RICHER:  They would have taken that into

4    account in their decision.

5             THE COURT:  In their prescribing.

6             MR. RICHER:  In their prescribing decision.  Now,

7    doctors as an almost universal rule when they're deposed do

8    not say, looking retroactively, "I would have done something

9    differently or not differently."  Nor are they willing to

10   admit that anything other than their completely independent

11   medical judgment entered into any decision that they made.

12   In looking at what the doctor did in prescribing this

13   medication, what a jury is asked to do is decide what was in

14   the doctor's mind?  Was that his simple independent

15   judgment?  Was it her judgment influenced by the activities

16   of the defendants?  And it is our position that this is a

17   matter of knowledge, a condition of mind that for Rule 9(b)

18   purposes can be averred generally.

19            THE COURT:  So, actually, so the reason you rely

20   on Karvelas is not so much the direct holding, but you're

21   asking me to extend it to say reliance can be averred

22   generally?

23            MR. RICHER:  I am asking your Honor to say that

24   reliance is an example of those items detailed by the court

25   in Karvelas.

1          THE COURT:  Okay, I think I -- now, I have not

2     read all these complaints, so what would be useful to me

3     is -- you've done a little bit of it in those single-spaced

4     paragraphs -- because I don't plan to sit and read them, is

5     every paragraph I should read that hits the common law

6     elements with respect to that particular plaintiff.  In

7     other words, I'm not going to sit and read -- the kickbacks,

8     as far as I'm concerned, are irrelevant, the conventions and

9     the consulting fees and all of that.  I just want to know

10    what paragraph alleges a specific intentional

11    misrepresentation, where it says that the doctor got

12    detailed and where it says that the doctor would have wanted

13    to know.  I guess that's the best you get.

14          MR. RICHER:  Well, your Honor, at this moment I'm

15    not able to explain every paragraph that would actually be

16    relevant --

17          THE COURT:  I know you're not.  That's why you're

18    going to send me a two-page memo telling me which paragraphs

19    to look at because that's all I'm going to read, okay?  I'm

20    not going to sit and -- the complaint only does it with

21    respect to some pieces but not others.  All right, just no

22    new briefing, nothing.  Just "In Valentine, read these five

23    paragraphs."  Okay, so that's useful.

24          Now, let me come back to you all for a minute.

25    Assume for a minute that he's claiming failure to disclose

Page 35

1   depression or suicide, and that the doctor says, "I would

2   have wanted to have known it."  Perhaps, as I'm thinking

3   about it, reliance isn't just "I wouldn't have bought it."

4   It's "I would have monitored the guy better."

5               MR. ROUHANDEH:  They don't allege that either.

6               THE COURT:  I know, but --

7               MR. ROUHANDEH:  Well, I mean, they've taken the

8   depositions.  I mean, that's how this case should be played

9   out, which is they take the depositions; they come back and

10  plead what they can from the depositions.

11              But here's the problem.  Just the first issue is

12  this -- Mr. Richer said there's two misrepresentations.

13  We've now got that set, what they're alleging to be the

14  fraud.  They say safe and effective for an off-label use.

15  Your Honor asked point-blank, I think three times -- I tried

16  to write it down every time -- "Well, have you alleged that

17  those statements were made?" and they said "no" --

18              THE COURT:  Right.

19              MR. ROUHANDEH:  -- with the possible exception of

20  the Valentine case and this "hush-hush" statement.  And

21  there -- and, again, even if there was a statement that was

22  off-label, as your Honor made clear, it doesn't mean it's

23  necessarily fraud.  But there, the allegation of "hush-hush"

24  and "off the record" in Paragraph 126 is on information and

25  belief.

1          THE COURT:  By the way, was that in the

2  deposition, "hush-hush"?

3          MR. FROMSON:  Yes.  I took that deposition, Judge.

4          THE COURT:  That was in the deposition?

5          MR. FROMSON:  That was in the deposition, and I

6  asked the doctor if this is what they said.

7          MR. ROUHANDEH:  Here's the exchange --

8          THE COURT:  They don't cite the transcript page.

9          MR. ROUHANDEH:  They cite the transcript the next

10  time, the next paragraph, 127, they cite the transcript:

11  "Question:  Okay.  Has any Pfizer rep ever detailed

12  Neurontin off-label to you personally?  Answer:  There was

13  a -- there was a period of time that there was, you know, a

14  lot of physicians talking and a lot of people talking; and

15  there was probably a couple times that a couple of -- of --

16  of -- of drug reps says off -- you know, off -- off -- off

17  the record, you know, they say, this and this and this and

18  that.  That's about it. . .  As much recollection as I would

19  have probably being not where everybody is at, not at where

20  they're serving food or anything like that, but kind of like

21  in the medication area as I'm signing, going, by the way,

22  so-and-so, you know that they're using this, and that this

23  is happening, and there's some -- you know, this might be

24  good for this and that, something like that."

25          And then they go on and ask another question about

1    what they're referencing.

2           THE COURT:  So there's no reference to

3    "hush-hush"?

4           MR. ROUHANDEH:  I don't think so, but there's also

5    no -- I mean, it boggles my mind to say there was a

6    misrepresentation made that it was safe and effective for an

7    off-label use, certainly even one that this doctor was

8    prescribing, but that's the best they have on that issue.

9           THE COURT:  Were the words "hush-hush" in the

10   transcript?

11          MR. FROMSON:  Your Honor, to the extent that we

12   didn't put the words "hush-hush" in the complaint, it really

13   would be quite easy to replead those words.  I was there.  I

14   spoke with the physician and I deposed him, and the words

15   "hush-hush" was what was used in the context of the way

16   Mr. Rouhandeh says it.  The detailer would accompany the

17   doctor --

18          THE COURT:  Were the words "hush-hush" in the

19   transcript?

20          MR. FROMSON:  I believe so, I believe so.

21          THE COURT:  So you'll go back and you'll find

22   where it is, and you'll give it to me.

23          MR. ROUHANDEH:  And my point here is that even if

24   that is an allegation, "hush-hush, off the record," and even

25   if you can construe this to say that a Pfizer drug rep or

1    Warner-Lambert drug rep said it's effective for some use,

2    that's not enough.  That's not enough to plead fraud as your

3    Honor laid out.

4         THE COURT:  Well, I'll think about it.  I'll see.

5    It's the more serious one because it's the one that cuts

6    across more cases, and it's the one that's more difficult

7    for Pfizer, an allegation that going back to 1992 -- and, of

8    course, I had Dr. Trimble that went back to 1995-ish -- that

9    there was information Pfizer had that Neurontin increased

10   depression.  And I don't know about suicide.  I know that's

11   hotly debated.  We've had a hearing on it.  That's a problem

12   because wouldn't the doctor at the very least, if he

13   prescribed it, have monitored someone better?

14        MR. ROUHANDEH:  You know, I think that's a

15   question that they should ask the doctor.  I don't know.

16   These people are probably monitored.  It's likely that many,

17   many of the plaintiffs here had attempted suicide, thought

18   about suicide, were being treated for depression.  They were

19   being monitored, and they were being monitored very closely.

20   I'm not sure that they could even allege in good faith some

21   additional or additional monitoring would take place.  But I

22   think this is the second misrepresentation where Mr. Richer

23   said the package insert left out some info, and you asked

24   him what information it was, and he read from a complaint

25   which really was talking about a -- it was -- it was

826c5e44-c406-4628-94bf-5f750fedf4b0

1    absolutely clear from that reference they were talking about

2    an FDA medical reviewer's report.

3            THE COURT:  You know, I just missed what you said.

4    What paragraph are we talking about here now?

5            MR. ROUHANDEH:  It's 241 of the Shearer complaint.

6    And when you asked Mr. Richer, okay, what was left out of

7    the package insert, he said, well, this information in

8    Paragraph 241 about, you know, "Review of less common but

9    more serious events may limit the drug's widespread

10   usefulness.  Depression, while it may not be an infrequent

11   occurrence in the epileptic population, may become worse --"

12           THE COURT:  What Paragraph?

13           MR. ROUHANDEH:  Paragraph 241, Page 58.

14           THE COURT:  Oh, I see, all right.

15           MR. ROUHANDEH:  That's from an FDA medical

16   reviewer.  It would have been illegal for the company to

17   have put that information in the package insert.  The FDA --

18           THE COURT:  That I can't do on a motion to dismiss

19   because if the company knew it and wasn't disclosing it, we

20   may run into your preemption issue, but --

21           MR. ROUHANDEH:  It is exactly -- well, I think as

22   a legal matter, you can hold that that that information --

23   and we are running into preemption argument because, and we

24   will explain in greater detail there, you can't put that

25   information in.  The label was formed after that date it was

1   approved for epilepsy.

2           THE COURT:  Can't the salespeople say, "By the

3   way --" I don't understand why the salespeople can't say,

4   "And, by the way, there is some indication it increases

5   depression," since the company knew that.  Put aside

6   suicidality, the company had information that it increased

7   the likelihood of depression.

8           MR. ROUHANDEH:  But that actually would be illegal

9   as well.  That's labeling.  You can't just simply go out and

10  make statements that are off-label.

11          THE COURT:  But your problem is, you can't have

12  your cake and eat it too.  You can't market off-label and

13  then live with the protection of the label.  I mean, I know

14  we're morphing into the next issue, but it's a problem for

15  you.

16          MR. ROUHANDEH:  I don't think that it is a problem

17  because, one, we're not really talking about off-label

18  promotion; we're not talking about the sales and marketing

19  cases.  Here we're talking about fraudulent, we're talking

20  about misrepresentations.

21          THE COURT:  I'm just not sure you get protected by

22  the preemption argument, which is what we're moving into, if

23  you are selling off-label.

24          MR. ROUHANDEH:  Well, we can get into that

25  argument.  I think that that's -- I think we are entitled to

Page 41

1    live by the label.  We're entitled to the protection of the

2    label.  Preemption I think does apply.  But my point here

3    is, if what they're saying is, "You should have gone out and

4    said that there's this risk of depression," it was

5    absolutely clear, and under federal regulation the FDA tells

6    the company, "You have to use this label verbatim and you

7    can't vary from it."  And it doesn't mean that you can go

8    out and just say it orally and not in the actual label or

9    hand it out.  You can't do that.

10          THE COURT:  Moving on, I mean, I read the FDA's

11   statement that you gave me, and basically what the FDA's

12   position was before some House committee was, "Look, we

13   should be the ones doing the balancing between the risks and

14   benefits of the drug, so we are the ones who should decide

15   what's in the label and not what's in the label," and that

16   had some compelling force to it, but not when you -- but

17   that's when you were marketing to epileptics, the benefit of

18   it outweighed the cost of the depression.  When you're

19   marketing bipolar people or somebody with profound migraines

20   or something like that, it may be a different cost/benefit

21   analysis.

22          MR. ROUHANDEH:  Well, again, two points on that.

23   One is, the FDA did their analysis.  They didn't find a

24   statistically significant association between Neurontin and

25   suicide.  And, in addition, when they looked at off-label

Page 42

1   uses, the off-label populations, the uses other than

2   epilepsy, that the difference between placebo and treatment,

3   it was greater for epilepsy than for the other uses.  It's

4   not true that there is some greater risk of suicide or

5   depression among people who are taking -- that's just not

6   correct.

7              THE COURT:  I understand that's your position,

8   which may end up being true eventually, I've got so many

9   Neurontin balls in the air; but at least for 9(b), the issue

10  is, they pled it, and they've done it with specificity.  And

11  now you've raised a good point, which is whether or not

12  relying, "would have liked to have known" is good enough for

13  relying, but --

14             MR. ROUHANDEH:  Right, and that will be my last

15  point.  I don't think they have pled that with

16  particularity.  In fact, they've pled something quite

17  different from that, which is doctors would like to have

18  known the --

19             THE COURT:  What about that you only have to

20  allege that generally?

21             MR. ROUHANDEH:  Well, the doctor's deposition was

22  taken.  It's not like the record is going to change any more

23  on that.

24             THE COURT:  It just means a procedural thing:  Do

25  I do it on summary judgment, or do I do it on motion to

1   dismiss?  But, anyway, I --

2          MR. ROUHANDEH:  Well, the thing about that is,

3   millions of dollars are going to be spent doing other

4   discovery in the cases that won't affect that issue.  That

5   issue, what the doctor had to say about that and whether it

6   affected, that's been done.  They took the deposition, and

7   they pled the best they can.  If it's not good enough, the

8   defendants would say that your Honor should dismiss.

9          THE COURT:  They took depositions of the doctors

10  generally or just on this issue?

11         MR. ROUHANDEH:  On every issue.

12         THE COURT:  On every issue.  Okay, well, let me

13  come back to you on the harder case for you because I think

14  I've got the lay of the land on the -- how many is it, five?

15  You've at least put Pfizer into the office.

16         I've got really big problems with the other seven

17  because, as I understand it, without having read all the

18  complaints, you're basically alleging a fraud on the market;

19  you know, if you throw a feather pillowcase out there, all

20  the feathers scatter, and they must have caught one of them.

21         MR. RICHER:  I wouldn't use that phrase because

22  that phrase has a specific legal meaning; and as pointed out

23  in their opposition papers, that it wouldn't be appropriate

24  to use it in the context of individual wrongful death

25  lawsuits, which is what we have brought, not a class action.

Page 44

1    And so --

2              THE COURT:  Well, how do I -- if nobody detailed

3    these doctors and you can't put it into one of these

4    conferences or a ghost-written article into their hands, how

5    do you survive a 9(b) motion?

6              MR. RICHER:  Well, one, our suppression argument.

7              THE COURT:  But you don't know that they -- the

8    suppression argument only works if you get someone in there

9    saying wonderful things about a drug, even truthful, and

10   then you don't disclose material other information.  You

11   don't know that these doctors ever talked to anyone from

12   Pfizer or saw anything fraudulent from Pfizer.

13             MR. RICHER:  It's our position that the defendants

14   would have an affirmative duty to communicate this to the

15   medical community generally.

16             THE COURT:  I think I would be reversed in a

17   millisecond.  I think that's a wrong statement of fraud law.

18   You've got to get these individual doctors to be relying on

19   it; and if you haven't got it, it could just be that -- you

20   know, I've seen other cases.  Half my prisoners are on

21   Neurontin, and I see other cases where people are on

22   Neurontin.  It's a well-sold drug.  It could just be that

23   some doctors tried everything else for the migraine and they

24   tried this.  I don't think I can draw the inference.

25             MR. RICHER:  That may be, your Honor, but I

1    believe there is sufficient information for the Court to

2    find, and the discovery has produced a great deal of

3    information about the efforts undertaken by the defendants

4    to reach out in an educational and we believe also a

5    marketing sense to doctors, not individually but through

6    forums, medical journal articles, and written literature.

7    And this information, all the doctors that we deposed, and

8    to a varying extent and to various varying journals or

9    sources, said, "This is information that I in general take

10   in.  I read these journal articles.  I go to these

11   conferences."

12           THE COURT:  Well, do any of these doctors that you

13   deposed, these other seven, say, "I read positive articles

14   about Neurontin, and I would have read a negative"?

15           MR. RICHER:  Well, we're talking now about the

16   suppression argument.

17           THE COURT:  I'm absolutely talking about the

18   suppression argument.  Did any of them read one of these

19   so-called ghost-written articles so that they were misled,

20   and then they could have been curatively reeducated if they

21   had read the other one?

22           MR. RICHER:  I think the general testimony has

23   been that while they admitted that they read particular

24   journal articles and that some of them may have generally

25   said, "I do remember reading things about Neurontin," they

1    were not able to testify to specific articles --

2              THE COURT:  To the ghost-written ones?

3              MR. RICHER:  Of any kind.

4              THE COURT:  I see.  Okay.  Now, let me just ask

5    you this very practical question:  Suppose I denied the

6    motion to dismiss on the five and allowed it on the seven,

7    what does that do for the other cases?  Do you know now as

8    you sit here which fall into which bucket?

9              MR. RICHER:  No.  No, we do not.  We're only

10   able -- whatever the Court's ruling is, it's based upon a

11   record that we've only been able to generate based on doing

12   that additional discovery in these twelve cases.

13             THE COURT:  What is a practical way of triaging to

14   figure out which doctors fall into which bucket?

15             MR. RICHER:  There is only one way, your Honor,

16   and let me at this point direct the Court's attention to a

17   second holding in the Karvelas case, which is that you are

18   allowed to plead fraud upon information and belief, and

19   there's an extensive discussion in Karvelas about that fact.

20   You have to basically explain how and why you believe it,

21   but you're allowed to allege fraud upon information and

22   belief.

23             THE COURT:  I suppose the answer might be that you

24   can't, but if I issue these legal rulings, as you go forward

25   to do discovery in these other cases, you can figure it out.

1          MR. RICHER:  Well --

2          THE COURT:  Because all these other cases have

3    these other, product liability, negligence, and on and on,

4    right?  So it's not as if it somehow eliminates the case if

5    fraud goes out, so that it would just be a way of figuring

6    out what your likelihood of success is on the claim when I

7    or some other court eventually hits the issue, right?

8          MR. RICHER:  Well, there's two ways to preserve

9    it, your Honor.  First of all, we believe that you do have

10   the power to let us plead fraud upon information and belief

11   right now in these cases in the amended complaint.

12         THE COURT:  I'm categorically not doing it.

13   That's why I did this.  You know, you don't have it.  In

14   fact the majority of these people actually never saw a sales

15   rep, so you couldn't even do it in good faith.

16         MR. RICHER:  Then there are two solutions.  The

17   first solution is one hinted at in your Honor's decision,

18   your original decision, which is to allow us to continue to

19   plead fraud in the cases where discovery has not been done

20   of the physicians upon information and belief, and let us

21   amend once we have, or -- or the Court can fashion an order,

22   if it so chooses, dismissing those claims without prejudice

23   to be repled after that discovery has taken place.  That

24   would preserve those claims.

25         THE COURT:  Now, on Pfizer's grander argument,

1    they won't concede, I'm sure, that they haven't met 9(b);

2    but as it plays out, they've got a serious motion for

3    summary judgment.  So does it make sense, as a practical

4    matter, to take a few of these where actually Pfizer got in

5    the front door of the office or somehow or other exposed

6    one, and do a summary judgment on them?  Is there a

7    Massachusetts case I could just try, just a pilot case, a

8    bellwether case?

9                MR. RICHER:  One of these cases that we're talking

10   about is the case Shearer, your Honor, which is a

11   Massachusetts case.

12               THE COURT:  Shearer is Massachusetts?  I mean,

13   would it make -- I'm asking you both this because --

14               MR. ROUHANDEH:  They don't like the Massachusetts

15   case that the defendants have selected, which is the Bulger

16   case, which is --

17               THE COURT:  What's it called?

18               MR. ROUHANDEH:  The Bulger case.  It's one of the

19   Track One --

20               THE COURT:  Bulger is a well-known name.

21               MR. ROUHANDEH:  It is.  I believe it's a

22   different --

23               MR. RICHER:  Your Honor, there's almost no

24   evidence -- this issue is not really implicated in that

25   case.  There's little or no evidence of marketing to the

Page 49

1   doctor in that case.

2          THE COURT:  So, I mean, just so I understand it,

3   so that would fall within the bucket of, there was nobody

4   who walked in the front door.  So that would be a pure

5   product liability case, is that it?

6          MR. FINKELSTEIN:  That's the Bulger case.

7          THE COURT:  Yes, okay.

8          MR. ROUHANDEH:  Your Honor, among the Track One

9   cases, there are some that have been fronted for early

10  trial.

11         THE COURT:  Yes.

12         MR. ROUHANDEH:  Two of those cases, Bulger and

13  Smith, which are two of these cases that we've been talking

14  about, those cases are going to be -- there's a schedule set

15  for summary judgment on those cases, and --

16         THE COURT:  Is Smith Massachusetts or Tennessee?

17         MR. ROUHANDEH:  Tennessee.

18         THE COURT:  That's the one that someone suggested

19  to Judge Sorokin I move to Nashville?

20         MR. ROUHANDEH:  Not us, not this side of the

21  table.

22         THE COURT:  All right, so I suppose for a

23  week-long trial, but I still have a kid at home, so I'm not

24  going to be doing some big stay-over there.  All right, so I

25  think -- but if we took Shearer, for example, and Bulger, if

1    I took those two -- they're my cases, or are they another

2    judge's in this court?  Do you remember?

3              MR. ROUHANDEH:  They're yours.

4              THE COURT:  So that might be one way to at least

5    get some -- I'm trying to look at some way of getting some

6    bellwether trials going as to whether or not any of these

7    would fly if they passed summary judgment.

8              MR. ROUHANDEH:  And your Honor has already done

9    that in two cases.  One is Bulger and one is the Smith case,

10   which was their selection of a case.

11             THE COURT:  Yes, but I don't have them, and I

12   don't think --

13             MR. ROUHANDEH:  Then it's Bulger.

14             THE COURT:  -- maybe take three of them.

15             MR. ROUHANDEH:  That would mean that we'd have to

16   start a -- I mean, there's a very careful balance that

17   Magistrate Sorokin knows about this going back a long way

18   about who's going to select what cases.  If you throw in a

19   case like Shearer, it's way behind the Bulger case and the

20   Smith case.  It actually puts the schedule off more to do

21   that.  If there's a bellwether case to be tried in front of

22   your Honor, it should be Bulger.  That's the way it's set

23   up, and I would --

24             THE COURT:  How many more months would it take to

25   get Shearer up to speed?

1          MR. CHAFFIN:  Your Honor, if Bulger is any

2     indication, it's six to nine months.

3          THE COURT:  Is it someone who killed himself?

4          MR. CHAFFIN:  I'm sorry?

5          THE COURT:  Is Shearer involving suicide?

6          MR. FINKELSTEIN:  Yes.  It's a professor, I forget

7     at which university, who did kill himself, Williams College,

8     who killed himself.

9          THE COURT:  So it was a psychiatrist out there, is

10    that it?

11         MR. FINKELSTEIN:  Yes.

12         THE COURT:  Should that go out to the Western

13    District out there?  Is that more --

14         MR. CHAFFIN:  Your Honor, if your concern is

15    getting the marketing issues before the jury, the fraud

16    issues --

17         THE COURT:  No.  The whole shebang is what I'm

18    looking at.

19         MR. CHAFFIN:  Bulger presents it, Judge.  I think

20    that was the suggestion --

21         THE COURT:  Well, Bulger doesn't present it

22    because my guess is I will throw out the fraud claim, so it

23    doesn't really tee up that issue, my guess is.  I mean, I --

24         MR. CHAFFIN:  I'll sit down.

25         THE COURT:  But, anyway, let me be thinking about

826c5e44-c406-4628-94bf-5f750fedf4b0

1    that because we need to move on to preemption.

2              MR. ROUHANDEH:  Your Honor, actually Bulger is one

3    of the five cases that they said they could plead fraud

4    specifically on.  On Pages 8 to 11 of their brief, it's one

5    of the five that they break out.  Bulger is one of those

6    five.

7              THE COURT:  Is that right?

8              MR. RICHER:  Your Honor, the evidence in Bulger is

9    part of the group we discussed in which there is evidence of

10   detailing, off-label detailing, not of the specific content

11   or the statements; and the evidence we have is generally

12   that Dr. Goldman, a physician, was detailed on at least four

13   specific dated occasions.  That's the extent that we have.

14   We don't have statements about the nature of those.

15             THE COURT:  Right, it's a suppression case.

16             MR. ROUHANDEH:  It's one of the five cases where

17   they allege that there were specific communications, and in

18   fact it's the Pages 8 through 11, it's on Page 9 of their

19   complaint where they say, "Prior to plaintiff's (decedent's}

20   suicide, Dr. Goldman treated, prescribed, or directed dosage

21   levels of Neurontin to plaintiff (decedent) for off-level

22   indication, and prior to plaintiff's (decedent's) suicide

23   and on any of four specifically dated occasions, defendant's

24   sales reps detailed and promoted Neurontin for off-label

25   uses to Dr. Goldman."  They just don't like the case.

1          THE COURT:  Why isn't that case a break for you?

2     Isn't that one of the bingo cases then?

3          MR. FINKELSTEIN:  That together with the Smith

4     case.  We can bring the Smith case here and try them both.

5          THE COURT:  I don't know if you can bring them

6     Smith, can you, after Lexicon?  I'm not sure you can.  I'm

7     not sure you can actually.  I think I'd have to go there,

8     and my guess is, it would be a -- I've got Saturdays.  I

9     mean --

10          MR. ROUHANDEH:  I'm in the same boat.

11          THE COURT:  I don't know if I'm going to do that,

12     but, in any event, maybe we'll find one or two.  Would

13     Bulger be a decent case?

14          MR. FROMSON:  It's the defendant's selection.

15          THE COURT:  I see.  So maybe you get Shearer up to

16     speed.  But let me worry about, first, whether we get past

17     this hurdle and --

18          MR. RICHER:  In this regard, I would just raise

19     the issue -- and I don't know if it's been discussed -- that

20     at some point, because it's ready, if it cannot be tried

21     here, Smith should be remanded to its home district.

22          THE COURT:  I'm happy to do it.

23          MR. RICHER:  And get it on a trial calendar.

24          THE COURT:  But I need to get past 9(b).  I need

25     to get past summary judgment.  There are certain things I

826c5e44-c406-4628-94bf-5f750fedf4b0

Page 54

1  need to do.  But let me now move on to preemption, and I'm

2  going to ask Lee if she wants --

3           MR. ROUHANDEH:  Well, can I just, because

4  Mr. Richer did make a couple of points, I just want to

5  respond two minutes, I'll be brief on this, five of the set

6  of cases.  The five cases -- first of all, on the seven

7  cases, I think it's absolutely clear that those don't

8  satisfy 9(b).  They have to be dismissed.  You can't simply

9  say, well, doctors read stuff and talk to people.

10           THE COURT:  All right.

11           MR. ROUHANDEH:  But on the five cases, just so

12  it's clear, they have to plead the statement that was made,

13  what we knew that was inconsistent with that statement, and

14  that the doctor relied on that, and I don't think they've

15  done any of those three.

16           THE COURT:  All right, so I've got that.  I at

17  least understand it, and it's very helpful.  And the only

18  thing I was going to ask is if you could just let me know on

19  the five cases what specific paragraph I should be reading.

20  I'm not going to ask you to amend the complaint again, but

21  you've got to understand, essentially, I think what you did

22  is, you took the old boilerplate complaint, for want of a

23  better word, and you must have injected in certain specific

24  allegations.  It's just too hard to follow.

25           MR. FINKELSTEIN:  And is satisfactory to the

1  Court, we simply give you the paragraph numbers with --

2          THE COURT:  That's all I want, no briefs.  That's

3  all I want.

4          MR. FINKELSTEIN:  A road map, your Honor.

5          THE COURT:  A road map for each of the complaints.

6  And I guarantee you, if it's somewhere else, I won't read

7  it, unless my law clerk is really diligent, I mean, so --

8  okay?  But I personally read the paragraphs you shoot me to,

9  but don't do too many because at some point -- you know,

10  just the very narrow specifics to this person.

11          MR. RICHER:  A succinct road map, your Honor.

12          THE COURT:  A very succinct road map, the

13  shortest, you know, when you do the Mapquest, the shortest

14  route.  Okay, so let's -- do you want to take a break?  Yes,

15  so maybe a ten-minute break, and we're going to do

16  preemption?

17          MR. ROUHANDEH:  Yes.

18          THE COURT:  And as I understand, one big piece of

19  the motion for summary judgment really does hinge on

20  whatever I do with the Daubert motion, so we're only talking

21  preemption.

22          MR. ROUHANDEH:  Right.  Well, and there's a

23  related failure to warn, but we're not going to go over the

24  Daubert issue again.

25          THE COURT:  Perfect.  And so let's just do that.

1    And I don't want Mr. Greene to leave.

2            MR. GREENE:  No, I'll stay, your Honor.

3            THE COURT:  Okay, because I actually have a

4    question for the two of you, Rouhandeh and yourself, about

5    what to do next on class cert.  We can do this off the

6    record.

7            (Discussion off the record.)

8            (A recess was taken, 3:10 p.m.)

9            (Resumed, 3:25 p.m.)

10           MR. ROUHANDEH:  Thank you, your Honor.  As we said

11   a few minutes ago, on the motion for summary judgment, we're

12   not going to go through and deal with the implications of

13   what happens if the Court strikes the plaintiffs' experts.

14   Instead we're going to talk today about two other grounds

15   for summary judgment:  One is preemption, and another is the

16   failure to warn, a summary judgment on a failure-to-warn

17   theory.

18           The preemption argument really starts with an

19   amendment to the Food, Drug and Cosmetic Act of 1962 that

20   says state law is preempted where there is a direct and

21   positive conflict with the FDCA.  And the Supreme Court has

22   said there are two types of conflict preemption, and we

23   believe both apply here.  The first is where a party cannot

24   comply with both the federal and the state law, and the

25   second is where the state law stands as an obstacle to the

1    accomplishment of the full objectives and purposes of

2    Congress.  And again I'll --

3            THE COURT:  Putting aside the off-label point for

4    a minute, is this the exact issue that is before the Supreme

5    Court right now?

6            MR. ROUHANDEH:  It's very similar, and that's

7    going to be argued in the Wyeth case that's going to be

8    argued in a couple of weeks.  It should shed light.  You

9    never know with what the Supreme Court might do, but, yes,

10   they are looking at federal preemption.

11           THE COURT:  So if the Supreme Court rules it's

12   preemption -- put aside the off-label points -- basically it

13   takes care of your argument, and then we're to the point of

14   trying to understand whether off-label makes a difference?

15           MR. ROUHANDEH:  I'm not sure -- I guess -- I guess

16   that assumes that the Supreme Court is not going to

17   address -- that its decision wouldn't encompass all drug

18   labeling and all --

19           THE COURT:  Well, I don't know.  Maybe it will.

20           MR. ROUHANDEH:  I mean, I don't know that it will.

21           THE COURT:  Is off-label part of the Supreme Court

22   case?

23           MR. FROMSON:  No, your Honor.

24           THE COURT:  Are any of the amicus briefs

25   addressing off-label?

1    MR. ROUHANDEH:  I don't believe so, but I think

2  the question presented is probably broad enough because it

3  says -- the question is "Whether the prescription drug

4  labeling judgments imposed on manufacturers by the FDA,

5  pursuant to FDA's comprehensive safety and efficacy

6  authority under the FDCA, preempts state law product

7  liability claims, premised on the theory that different

8  labeling judgments were necessary to make drugs reasonably

9  safe for use."  And I think it's going to shed light on that

10  issue, but you're right, it may -- one way or the other, it

11  may not answer the question.

12    THE COURT:  Well, clearly if they say there's no

13  preemptive force, this argument fails; but even it says

14  there is preemptive force, we would be back here trying to

15  figure out what to do with off-label.

16    MR. ROUHANDEH:  Depending on what the Court's

17  decision says.  I don't think so because I actually think

18  that we would be back here because a lot of the same

19  arguments apply whether it's an on-label or an off-label use

20  at issue, and I'll address those.  But the first issue here

21  is that on the first type of conflict preemption where you

22  can't comply with both state and federal law, it's important

23  to see, first, what it is that the FDA -- the Congress

24  requires in terms of the Food, Drug and Cosmetic Act and

25  what the FDA did here.  The FDA repeatedly reviewed and

1   approved the Neurontin label, and that's absolutely

2   undisputed.  They never required a suicide warning.  That's

3   undisputed.  And they told the company not to deviate from

4   the exact wording on the label that they approved, as they

5   always do.  They're mandated by federal law.

6           And so then the question is, well, could the

7   company have added some suicide warning without the FDA

8   approval?  And, again, the law is absolutely clear and

9   there's no dispute here, and both sides recognize it, it's

10  governed by 21 CFR 314.70; and that basically says you can

11  only change the label without FDA approval if there is new

12  and scientifically valid information that exists, and that

13  that new information demonstrates an association between the

14  drug and the safety hazard.

15          So, now, just looking at the chronology of what

16  happened here, we start with 1992 when the drug gets

17  approved.  The company submits all the information it's

18  required to submit.  The FDA looks at it, analyzes it.  They

19  look at the depression issue and they look at suicide,

20  adverse events, and they don't require a suicide warning on

21  the label when the product is approved.

22          Now, Mr. Finkelstein used to say that -- well, now

23  he says in 1992 that the FDA really didn't consider the

24  suicide risk for purposes of this preemption argument, but

25  he used to wave it around like a smoking gun and say, "Look,

1    back then in 1992, the FDA had looked at this issue, and why

2    didn't the company disclose it?"  And he's not really saying

3    that anymore.  Now the argument is:  Well, if the FDA looked

4    at the issue and didn't include it in the label, that is a

5    decision that requires preemption of a state law claim that

6    says you should have put it in the label.  And that's what

7    we were talking about --

8              THE COURT:  So you believe that the FDA expressly

9    considered depression and expressly rejected putting that in

10   the label?

11             MR. ROUHANDEH:  Yes.  Yes, they did.  They talked

12   about it.  They talked about the issue.  I mean, in other

13   words, it's not like -- and these preemption cases fall into

14   different buckets -- it's not like -- this is not one of

15   those cases where you can say, well, there's nothing

16   anywhere in what the FDA did that indicates they ever looked

17   at the issue, and maybe preemption shouldn't apply, and

18   there are some courts that say that; you know, never came

19   up, so we're not going to use a failure to make a decision

20   as preemption.  Whether that's right or wrong, a correct

21   statement of law, maybe we'll learn from the Supreme Court,

22   but that's not the case here.  In the case here, I think the

23   Court can issue a decision on preemption that is pretty

24   narrowly tailored to the facts that are present here, and

25   the facts that are present here that in fact the FDA did

1    look at that issue in 1992 and looked at suicide and

2    depression, and specifically they look at all of the

3    warnings for all of the health risks.  That's their

4    statutory obligation to do, to do it, and they looked at

5    depression and suicide.  Then they do it again in 2002 when

6    the company submits for a different indication, submits for

7    the PHN approval.  Again the FDA looks at it, says, "Here is

8    the label.  Use it exactly verbatim."

9            If you just stop there, maybe we could argue about

10   whether the FDA laid enough of a decision and whether they

11   really fully considered it.  I think you could make a very

12   strong, persuasive argument and we think we'd be entitled to

13   summary judgment just based on what happened in '92 and

14   2002.

15           But if you look at what happened in 2004, the FDA

16   specifically says, "We're going to look at suicide in

17   connection with Neurontin."  And they asked the company to

18   give all of its clinical trial data and to give all of its

19   spontaneous adverse event data to the FDA.  It gets

20   submitted in September and November of 2004.  The FDA looks

21   at it, and what do they do?  In December, 2005, they tell

22   the company, "We want you to change the label and make a few

23   wording changes in the adverse events section," and they

24   tell them, "Use this label verbatim."  They do not say, you

25   know, "Put some suicide warning in the label."  And this is

1    after receiving all of this information about clinical

2    trials, 90 or some clinical trials, lots of information

3    about the spontaneous adverse events, no suicide warning.

4         So now then the next step -- and I'm almost done

5    with this chronology -- is 2008, and let's just ask about

6    what happens with the FDA alert process.  The first and most

7    important thing to know about this process is, it starts

8    after the company has already given all of the clinical

9    trial and spontaneous event reports to the FDA in 2004, and

10   it starts after the FDA has already approved a new label

11   that doesn't have a suicide warning in it.

12        The second thing to know is that the FDA asks

13   Pfizer in 2006 to submit a subset of what it submitted in

14   2004.  It's not even asking for all of the information that

15   was -- it's no longer really asking for spontaneous adverse

16   event reports because you can't tell anything from them, and

17   they say that specifically.  And they're asking even for

18   fewer than all of the clinical trials, and there was

19   argument on that on Daubert in terms of what specifically

20   they asked for, but they only wanted clinical trials.  They

21   wanted less, not more data.  And, third, and this is the

22   other crucial thing of what happened in connection with that

23   process is, they asked the other true makers of

24   antiepileptic drugs to give the same type of information as

25   to their antiepileptic drugs.

826c5e44-c406-4628-94bf-5f750fedf4b0

1        And so what happens?  Well, the same Neurontin

2   clinical trial data that in 2004 didn't show any association

3   between suicide and the drug doesn't show an association

4   now.  Everyone has agreed upon that; the Neurontin clinical

5   trial data doesn't show an association.  They've said it in

6   their papers before and after the FDA alert came out.

7            THE COURT:  Doesn't show an association with what?

8            MR. ROUHANDEH:  Between Neurontin and suicide.

9            THE COURT:  But there's always that other issue,

10   which is Neurontin and depression.

11            MR. ROUHANDEH:  Well, I don't think they've --

12   that either.  There's been no statement that it causes or is

13   associated with --

14            THE COURT:  I understand the debate on the

15   suicide, but I thought there was a mechanism and evidence

16   that it led to increased depression.  I thought that wasn't

17   even disputed.

18            MR. ROUHANDEH:  Well, that, there is, and it's

19   contained in the papers.  I wasn't going to spend a lot of

20   time on that, but one of the things that the FDA looks at is

21   the mechanism of action, and the FDA looks at how it is that

22   the drug's mechanism of action should be described in the

23   labeling.  And they don't put in what the plaintiffs say.

24   They don't put in what Dr. Trimble or any of the other

25   plaintiffs' experts say.  They specifically consider

Page 64

1    language, and they say in essence, "We don't know how it

2    works."  So that argument, that's preempted as well, any

3    argument that we should have told the --

4           THE COURT:  Well, what is the evidence on

5    increased incidence of depression?

6           MR. ROUHANDEH:  Well, I don't think there's been

7    any finding, including the FDA alert --

8           THE COURT:  The doctor I heard said, in 1995 -- I

9    don't know that he correlated it with suicide, but he did

10   correlate it with depression, right?

11          MR. ROUHANDEH:  The actual, the data there on

12   that, the controlled clinical data, which is what the FDA

13   looks at -- these are studies where there's a placebo and

14   people on placebo and people on drug -- the depression

15   events are higher in the placebo than they are in the

16   treatment group for Neurontin.  I don't think they're really

17   arguing that there is some undisclosed depression risk, and

18   certainly they have no basis from anything that happened in

19   the FDA alert or anything that happened before to suggest

20   that's the case.  That theory I think is sort of a

21   mechanism-of-action theory, which is a hypothesis upon

22   hypothesis that we think would be preempted as well.

23          And just so it's clear, there are three buckets of

24   sort of evidence here, and I've really been focusing on and

25   intend to focus on the clinical trial data, but the other

1   two buckets are this sort of a theory based on the mechanism

2   of action, which, as I said, is preempted.

3          The other is, and this is what Dr. Bloom testified

4   about, is look at all the adverse event reports that just --

5   situations where doctors report to the FDA or the company

6   reports to the FDA that "Hey, I had a patient on a drug and

7   they had this event," and you put in a MedWatch form.  That

8   type of evidence, absolutely clear, and the FDA has said it;

9   the FDA has said it to, you know, the FDA Advisory

10  Committee; they've said it to one of our experts actually in

11  a written letter; they've told Mr. Finkelstein this:  You

12  can't tell anything from the spontaneous adverse event

13  reports because this drug is used in populations where

14  there's a background rate of depression and suicide, so you

15  need to study this issue with a control, a placebo as a

16  control.  So that's the second bucket; it doesn't tell you

17  anything.

18         What we're really talking about here is controlled

19  clinical trial data, and we're talking about that because

20  the plaintiffs didn't do the fourth thing that they could

21  have done.  They could have gone out and said, "Let's do a

22  big massive epidemiological study."  And Dr. Givens

23  testified about this, and he said:  Here's the difference

24  between controlled clinical data and epidemiology, where you

25  go buy some massive set of data from Medicaid, and you just

1    look at instances and occurrences in people who take this

2    drug as opposed to that drug, or who don't take the drug at

3    all, and try to form some conclusion.

4           But we're really talking about the Neurontin

5    clinical trial data, and the important thing here is, it

6    doesn't show an association, and that is absolutely

7    undisputed.  You can see that in the data that the FDA

8    released after they put out the alert.  They said it in the

9    Advisory Committee.  Our Notice of Supplemental Authority

10   which we put in last week with some of the transcripts of

11   the Advisory Committee meetings, sort of just for ease of

12   use, in the cover notice it quotes the portions that we

13   wanted to bring to the Court's attention.

14          So what does all this mean?  It means that the FDA

15   repeatedly looked at this issue of Neurontin and suicide,

16   and --

17          THE COURT:  Every time you say "suicide," do you

18   mean depression too?

19          MR. ROUHANDEH:  Sure.

20          THE COURT:  Because I view those as two separate

21   things.

22          MR. ROUHANDEH:  Yes, absolutely, suicide,

23   depression, adverse events related to suicide and depression

24   they've looked at repeatedly.  And it means that the FDA

25   didn't find an association, and the company could not have

1   added a warning, the warning that the plaintiffs want, which

2   is that there is a greater risk of depression or suicide

3   among patients taking Neurontin.

4           And so here's where this first conflict comes in.

5   As I said, there were two types of conflicts.  The first

6   conflict comes in and says:  Well, now, if a court, whether

7   it's a Federal Court or a state court, comes in, applies

8   state law, and if it were to say that the company is liable

9   for not adding a warning, that that warning and adding that

10  warning would have conflicted with federal law because

11  federal law says you can't add a warning to the label unless

12  the FDA approves it, or unless there's new information that

13  shows a statistical increase in association.  And that

14  exception doesn't apply here because we were absolutely

15  required to accept the FDA's label, and we had no ability --

16  we were prohibited by that 314.70 from revising the label to

17  say, "Hey, there's an association between Neurontin and

18  depression or Neurontin and suicide."

19          THE COURT:  Just to move things along here, so are

20  there any cases that -- assume you win the show, you're the

21  happiest man in America, the Supreme Court goes your way --

22  so are there any cases that address this argument of

23  preemption in the context of off-label marketing?

24          MR. ROUHANDEH:  I don't think either side has

25  cited any, but there is -- the same argument applies where

1   you talk about off-label or on-label.  It's not as if the

2   FDA studies the drug only for the approved use.  I mean --

3              THE COURT:  Excuse me.  Do you have a bad back?

4              MR. FROMSON:  Yes.  Sorry, Judge.

5              THE COURT:  Just stand out back.

6              MR. FROMSON:  Yes, your Honor, thank you.

7              MR. ROUHANDEH:  The FDA looks at all of the safety

8   information.  They first start out, you know, looking at it

9   in healthy adults.  So it's not as if the FDA when they

10  approve a label they're saying, you know, it's only safe in

11  this population used at this level.  They do general

12  analysis of safety doc information, and they look at that.

13  And here all along the way the FDA had information about

14  off-label uses.  The information from clinical trials in

15  off-label populations was reported to the FDA.  They looked

16  at it in 2002.  They certainly looked at --

17             THE COURT:  But if you went to your two theories

18  of, it either has to be a direct and positive conflict with

19  federal policy or be an obstacle to federal policy,

20  off-label marketing is criminal.  So I'm just trying to --

21  under either of those theories, why would you be preempting

22  state causes of action for off-label?

23             MR. ROUHANDEH:  Well, the only similarity

24  between -- I mean, the first important thing is, the plea

25  had nothing to do with safety issues.  The plea about

1   off-label promotion had nothing to do --

2            THE COURT:  I understand, but it's nonetheless a

3   violation of federal law to off-label market.

4            MR. ROUHANDEH:  Yes, because you misband the

5   product, and it's in violation of federal law on the theory

6   that the product is misbranded if you make a statement of

7   safety or effectiveness for a use that's not on the label.

8   The misbranding statute is actually a very, very broad

9   statute.  Misbranding actually also says, you can't put in a

10  warning that's not approved by the FDA or justified by

11  information that's new and that's not scientifically valid.

12  You can't go around, whether it's good information or bad

13  information, and start changing that label.  And if you do

14  that, you have misbranded the product.  As a technical

15  matter, you've misbranded the product.  And there's a very

16  significant concern here because the FDA doesn't want

17  overwarning.  They're actually worried about --

18            THE COURT:  For uses that they approve.

19            MR. ROUHANDEH:  Generally they don't want

20  overwarning because they're very worried about -- I mean,

21  first of all, the FDA doesn't say, "Don't use it for

22  off-label uses."  I mean, that's one of the primary things.

23  They say, "We do not practice medicine."  It's left to the

24  doctors to prescribe medication.  They don't want

25  overwarning that's going to inhibit the use of important

1  medications.

2          THE COURT:  But suppose, as I imagine happened,

3  the sales team goes into these offices and says to this

4  general practitioner, "Why don't you try Neurontin if other

5  things fail for migraines.  You know, some doctors have had

6  a good experience with it," which might be totally true,

7  right?  You would take the position that's true, right, some

8  doctors have had a good experience with it?

9          MR. ROUHANDEH:  Yes.

10          THE COURT:  Why would it be banned to say, "You

11  know, it's not approved yet for this, but some have had a

12  good experience, but watch for -- some people have also seen

13  some depression"?

14          MR. ROUHANDEH:  Because there's no evidence --

15          THE COURT:  That wouldn't be against the law --

16  I mean, first of all, the whole thing is against the law,

17  but assuming you get through one portal, why would it be

18  somehow misbranding or mislabeling to give the whole mix of

19  evolving information?

20          MR. ROUHANDEH:  Well, because you can't give that

21  statement, whether it's about efficacy or safety, if it's

22  not in the label.  You can't put in information about safety

23  and say --

24          THE COURT:  But you would take the position they

25  could say, "Well, some doctors are having a good experience

Page  71

1    with it on migraines or bad backs," right?

2            MR. ROUHANDEH:  Well, you could no more say it's

3    safe for migraine than you could say it's unsafe for

4    migraine.  You can't talk about it.  You can't do either

5    one.  You can't --

6            THE COURT:  But that we do have lots of sales reps

7    who are going in and saying, "Try it out for migraines, some

8    people --" assume it's truthful, okay, not fraud -- "some

9    people have had good experience with it."  But as soon as

10   you provide that information, aren't you also going to have

11   to say what the downside is?

12           MR. ROUHANDEH:  Well, actually, I'm not sure that

13   we have lots of information about that.  I mean, the plea is

14   very specific about the conduct that it relates to.  It's

15   back in 1995 and '96.  It only talks about two instances of

16   physicians and sales reps talking about off-label uses.  So

17   I'm not sure that it can be said that there's some

18   widespread, even in '95 and '96.

19           But, secondly, that is the point:  You cannot say,

20   whether it's good or bad, and there's a very important

21   reason for that, because the FDA doesn't want you to talk

22   about things that aren't in the label.  They don't want the

23   company to talk about things that aren't on the label

24   because there's a concern, actually, at the FDA that -- and

25   this is stated in this preamble that they put out when they

826c5e44-c406-4628-94bf-5f750fedf4b0

1    revised the whole labeling regulations, it's very clear --

2    if you warn too much about certain uses, the drug won't be

3    utilized.

4              THE COURT:  Good.  This is off-label, though.

5              MR. ROUHANDEH:  No.  Well, no, because it's not

6    that they don't want doctors to use it for the off-label

7    issue.  They don't want to interfere with that.  They want

8    to let doctors decide whether it's going to be used

9    off-label.  They're not --

10             THE COURT:  All right, I think I've got the point.

11   So your point is that regardless of whether it's on- or

12   off-label, whatever the Supreme Court does should apply?

13             MR. ROUHANDEH:  Yes.  And the FDA when it talks

14   about off-label promotion, when the government talks about

15   off-label promotion, it's not intended to discourage the

16   off-label use.

17             THE COURT:  Okay, I understand your position.

18             MR. ROUHANDEH:  So the second form of the

19   conflict --

20             THE COURT:  We've got to just move it along.

21             MR. ROUHANDEH:  Yes, the second form -- and I'll

22   just touch on this briefly -- I said there were two types of

23   conflict.  One is where we can't comply with both federal

24   and state law.  The second is where it stands as an obstacle

25   to the accomplishment of the full objectives that Congress

1    put forward.

2              And here, and I'll be brief about this, putting in

3    the warning that they're talking about relating to

4    depression and suicide would interfere with the full

5    purposes and objectives of Congress because it's the FDA

6    that's the body that regulates drug labeling.  They're the

7    ones that balance the risks and benefits.  They say when

8    there's enough evidence to merit a warning and when there's

9    not enough evidence to merit a warning.  And we can't have

10   courts doing that, and different courts doing that, or

11   juries doing that, because if you look at what would happen

12   if you were to apply state law instead of or in addition to

13   federal law, you could have a ruling or a verdict under

14   state law that would say -- that in effect is going to

15   interfere with that uniform application of federal law which

16   was intended by Congress, you know.  And you would also, I

17   think, have potentially inconsistent verdicts; one court or

18   one jury saying, yes, you had to warn, another one saying no

19   warning is required.  You would have a situation where

20   manufacturers might overwarn to attempt to avoid lawsuits.

21   And so this is the type of conflict that merits preemption

22   as well.

23             And the FDA has taken a very strong position on

24   preemption in that FDA preamble to their recent -- and this

25   is cited in the briefs -- to the recent revision of rules on

1    drug labeling and in the amicus brief.  And what the

2    plaintiffs are saying is, they don't like that position.

3    You know, they're saying that -- you know, and that's fine

4    for them not to like the position, but this isn't the forum

5    for them to reject what the FDA is saying, to reject what

6    the government is saying.  When that FDA alert came out, the

7    Court asked for the FDA's views on that, and now what the

8    plaintiffs are doing is saying, you know, the Court should

9    reverse course and just reject or ignore what the FDA has to

10   say in the labeling --

11             THE COURT:  Okay, I've got the gist of it.

12             MR. ROUHANDEH:  Okay, that's the preemption

13   argument.  And the failure-to-warn argument I think is

14   absolutely critical because it's an independent argument

15   here.  It's a separate ground for summary judgment, and it

16   all comes back to the FDA alert.  And there are two really

17   critical points here, and one is that there is no

18   association between -- if you look at the clinical trial

19   data, there's no association between Neurontin and suicide

20   or depression.  It's only when you look at the Neurontin

21   data and the data from other antiepileptic drugs that you

22   see an association.  That's the first point.

23             And the second point is, the company didn't have

24   and could not have gotten that data from other companies.

25   So under these circumstances, they can't be liable for

1  negligence or a failure to warn about things that they can't

2  know and could not have through the exercise of reasonable

3  diligence have known.

4          THE COURT:  This is completely different from

5  preemption.

6          MR. ROUHANDEH:  It is.

7          THE COURT:  This is sufficiency of the evidence.

8          MR. ROUHANDEH:  Well, it's really these critical

9  points, that if --

10         THE COURT:  All right, maybe, so I'll jump to them

11  because you're saying -- so let me just -- I'm not going to

12  decide preemption, I just have to tell you, until the

13  Supreme Court rules, so that's just going to stay on my deep

14  burner.

15         MR. ROUHANDEH:  I thought that might be the case.

16         THE COURT:  I mean, I'd want to read what they had

17  to say first, so that may be what, a long time, right, six

18  months?

19         MR. ROUHANDEH:  It could be three months.  The

20  last one, preemption issue, they ruled pretty quickly.

21  They're familiar with preemption.  It could be quicker.

22         THE COURT:  Okay.  But you would say, apart from

23  the preemption issue, that there would be no evidence in

24  this record to show that the company had the data to

25  demonstrate an association at the time that these plaintiffs

Page 76

1    killed themselves, to have known that there was this

2    association?

3              MR. ROUHANDEH:  That's right, and that's two

4    critical points.  One is, you can only get there by folding

5    in the other company's data, and, second, the company only

6    learns about this in 2008 with the FDA alert.

7              THE COURT:  Well, the first point is too tied in

8    with the Daubert motion, but the second point is that you

9    couldn't have known it because you didn't have the other

10   data.

11             MR. ROUHANDEH:  Absolutely, couldn't have known

12   it, and all these cases predate 2008, so it came well after

13   the plaintiffs took Neurontin.

14             THE COURT:  All right, good.  I've got to get to

15   the other side, go.  So preemption, who's arguing?

16             MR. FROMSON:  I am, your Honor.

17             THE COURT:  Do you want to stay seated or stand?

18             MR. FROMSON:  I was just trying to plug into the

19   computer system.

20             (Discussion off the record.)

21             THE COURT:  Do you have slides for me?

22             MR. FROMSON:  I was actually working on this this

23   morning, and I doubt I'll show every slide, and so I will

24   endeavor to --

25             THE COURT:  You'll mail me them?

1          MR. FROMSON:  Yes.  Yes, your Honor.

2          THE COURT:  Good, thank you.

3          MR. FROMSON:  Okay.  There are three points as to

4    why the defendants' motion for summary judgment should be

5    denied.  The first one is that there is no preemption of

6    plaintiffs' claims.  The second is that the defendants did

7    in fact fail to warn, and there are genuine issues of

8    material fact in dispute about that.  And, third, there is

9    general causation, which we've already agreed we're not

10   going to be discussing today, but we believe the motion

11   should be denied as to that matter.

12          I would like to embrace the supplemental authority

13   that defendants provided to this Court just the other day.

14   They submitted the FDA written statement for the record on

15   May 14, 2008, which actually provided a litmus test for

16   preemption.  In that FDA statement it states, "If a

17   plaintiff claims to have been harmed by a sponsor's failure

18   to meet the conditions of FDA's approval of a drug. . .

19   essentially there's no preemption."  That's the test as of

20   May 14, 2008, submitted by the defendants on October 16 of

21   2008.

22          And, again, I will embrace that for purposes of

23   this preemption argument, and I say the plaintiffs have

24   passed the test.  Tracking the language of that statement,

25   the defendants have in fact failed to meet conditions for

Page 78

1  Neurontin's approval, and we set forth the very failed

2  conditions.  These conditions are set forth in our brief.

3  They're succinct, they're simple to understand.

4         21 CFR 314.80 is a negligence safety surveillance

5  regulation.  They have to evaluate, review, and analyze

6  adverse events associated with clinical trials and postmark

7  the events.  CFR 201 is the action they should take in

8  response to their due diligence, their pharmacovigilance,

9  which is set forth in 314.80, which means they should change

10  their label.

11         And, third, 314.70 is a condition that involves

12  their ability and their own authority to change a label,

13  when necessary, without prior FDA approval, and then get it

14  afterwards.

15         And, fourth, each time they provide a submission

16  of some kind to the FDA -- and I'm being general -- they

17  submit a Form 356h certification, which incorporates an

18  acknowledgment that they followed these very conditions.

19  And I submit to you that when you apply the facts of this

20  case to these issues of law, you will find there is no

21  preemption.  Once again, we tracked the language of the

22  FDA's statement.  We passed that litmus test because we

23  claim that our clients were harmed by their failure to meet

24  those conditions, those four conditions.  There are many

25  more, but those four wipe out the preemption argument from

826c5e44-c406-4628-94bf-5f750fedf4b0

Page 79

1    the get-go.

2         With respect to the Form 356h certification, what

3    this slide does is really explain to you what they're

4    acknowledging, and when I said they incorporate the three

5    other conditions --

6         THE COURT:  Well, you just described them to me.

7    So what is it that they should have done in terms of -- they

8    claim that just these spontaneous adverse reports do not

9    necessitate them changing their label.

10        MR. FROMSON:  Respectfully, I would like to answer

11   that question.  It's part of the failure-to-warn argument,

12   and if I go to that, I just want to be able to come back to

13   the preemption argument.

14        THE COURT:  All right.

15        MR. FROMSON:  But it's important to understand

16   what that 356h certification is and how they failed to meet

17   the condition.  Every time, from the day it was first

18   approved up until today, it's a continuing obligation to

19   keep your approval.  So they signed -- and this particular

20   certification is from 1997, after the agreed-upon guilt of

21   the company, they're signing a document that says they agree

22   to update the application with new safety information.  They

23   are indicating that if this application is approved, "I

24   agree to comply with all applicable laws and regulations,"

25   and then it lists them.  It states the 21 CFR 201.  It sets

1    forth the 314.80.  Again, we claim they failed to meet those

2    conditions.

3              THE COURT:  But why?  How?

4              MR. FROMSON:  As part of failure to warn, Judge.

5              THE COURT:  All right, so it does move --

6              MR. FROMSON:  Yes, but for preemption purposes, we

7    make the claim, so there's no preemption when you make a

8    claim.  Obviously, the claim is detailed and complex and has

9    many elements of the claim in terms of what they did wrong

10   which I'm happy to share with you; but the claims have been

11   made, so there's no preemption once those claims have been

12   made, and I will detail for you those claims.

13             THE COURT:  No, I don't buy that.  You've got to

14   show some evidence that the claims have some validity.

15             MR. FROMSON:  Yes, your Honor.  Yes, your Honor,

16   and I have that validity.

17             THE COURT:  Not just that you've alleged it.

18             MR. FROMSON:  We allege it with particularity, and

19   I believe we will show --

20             THE COURT:  But we're at summary judgment.  You've

21   got to prove it up.

22             MR. FROMSON:  We will.

23             THE COURT:  All right.

24             MR. FROMSON:  We will, and we have thus far.  I'll

25   go past the hornbook law basic presumption of preemption.

1    We understand this is not express or field preemption; it's

2    conflict preemption.  The question, as Mr. Rouhandeh put it

3    is, is it impossible for the defendants to comply with state

4    and federal requirements?  Do the plaintiffs' claims stand

5    as an obstacle?  The answer is "no."

6           Why?  This is why:  The state common law claims

7    and the state statutory violation claims complement and

8    advance the purpose of the FDCA.  They parallel the federal

9    regulations.  And, second, the FDA has never concluded that

10   Neurontin is safe and effective for any off-label use, so

11   there is no conflict between a decision by the FDA and a

12   decision in a state court.  And if I now go through each

13   one, I explain in the third point here that they failed to

14   comply with their common law duty of 314.80, 314.70, and

15   201.57.

16          The preamble that Mr. Rouhandeh sets forth, even

17   if this Court accepts the preamble, there is still no

18   preemption because even in the preamble, it states that what

19   is preempted are those things that the FDA has considered

20   and found scientifically unsubstantiated.  Indeed it's the

21   contrary.  The FDA, as a matter of fact, as of 2008 is

22   finding in our favor.

23          THE COURT:  No, but that would be unfair.  You'd

24   have to go back to the actual time period.

25          MR. FROMSON:  Which we will.  If you look to the

1    actual time period, there is no proof that the FDA ever

2    reviewed and considered the issue of suicidality or

3    depression in an off-label population, all right?  They only

4    did it in the large uncontrolled trial of the refractory

5    epilepsy patients in 1993.  When they approved this drug in

6    1993, it did so and said so, that Gabapentin is safe for use

7    and effective in use as basically the epileptic indication,

8    and is approvable provided that Neurontin is marketed under

9    the conditions of use described.  It falls in line with

10   exactly what you have been saying.  With an off-label use,

11   there has been no review and consideration, and certainly

12   was none at any approval stage of this drug.

13          Even if you look to the postherpetic neuralgia

14   phase in approximately 2002, their own 30(b)(6) witness

15   testified in response to a question of whether "Have you

16   been given to the FDA these issues of psychiatric uses and

17   the adverse events?"  The question was posed:  "Do you have

18   any reason to believe that Pfizer provided any information

19   regarding the efficacy of gabapentin in relation to

20   indications that were not proposed; in particular, those

21   that would pertain to psychiatric indications as part of its

22   postherpetic neuralgia submission?"  The answer was, "I do

23   not believe that those data were included in that

24   submission, that is correct."

25          There was no analysis of any such off-label uses

1   in the information given to the FDA; hence, the reason why

2   the FDA have never had a reason to review and consider the

3   issue.

4          In terms of case law, recent case law, the

5   Colacicco decision coming out of the Third Circuit applied

6   the preamble and stated specifically that their holding was

7   ". . .limited to circumstances in which the FDA publicly

8   rejected the need for a warning that plaintiffs argue state

9   law requires."  That is not our case.  Our case is factually

10  dissimilar to that.  There is not a case similar to ours.

11         I will skip over why the preamble is not entitled

12  to deference.  It's a hornbook law argument.  It's not law.

13  The preamble is advisory at most.  We don't believe that's

14  thorough or valid or that it's consistent with what the FDA

15  or the rules have said since 1962; and, with the hope of not

16  sounding disrespectful to the Court, it's really only become

17  an issue with the George Bush administration that this has

18  changed completely to the opposite side.

19              THE COURT:  Well, I can't. . .

20              MR. FROMSON:  With respect to the failure-to-warn

21  argument, your Honor -- oh, I believe I forgot.  There's no

22  preemption here because they pled guilty.  You can't have

23  preemption, considering they've already pled guilty to the

24  introduction of an unapproved new drug into interstate

25  commerce.  They can't claim protection via preemption when

1    they've never sought approval in the first place.  It's not

2    fair to make me demonstrate they have failed to comply with

3    the condition --

4             THE COURT:  So move beyond preemption.  Get to

5    what he says, which is the --

6             MR. FROMSON:  Failure to warn, your Honor.

7             THE COURT:  -- that there's actually no evidence

8    to suggest that they really knew this stuff at the time

9    these various people unfortunately hurt themselves.

10            MR. FROMSON:  Well, respectfully to Mr. Rouhandeh,

11   he's wrong, okay?

12            THE COURT:  That's where you need --

13            MR. FROMSON:  All right?  Let's start with the

14   fact that he is confusing causation with association.  What

15   is necessary for this company to change its label?  You do

16   not have to show causation to change your label, your Honor.

17            THE COURT:  So you agree with Mr. Rouhandeh that

18   it's basically, failure to warn equates with changing your

19   label?

20            MR. FROMSON:  Failure to warn equates -- well,

21   they failed to warn because they did not revise, strengthen,

22   or change their label, nor did they provide "Dear Doctor"

23   letters to physicians or communicate in any way whatsoever

24   the public --

25            THE COURT:  This is actually a fairly important

1  point because I've been assuming somewhat that failure to

2  warn could also include what a sales representative did or

3  didn't say when they walked into the office, but you both

4  seem to actually be saying it's primarily about what's in

5  the label.

6        MR. FROMSON:  Your Honor, it is all of the above.

7  It is what they said in the "Dear Doctor" letter.  It is

8  what they do in a label.

9        THE COURT:  Do they have a "Dear Doctor" letter?

10        MR. FROMSON:  No, your Honor.  They have yet to

11  send out a "Dear Doctor" letter regarding the suicidality.

12        THE COURT:  Is there any case that says you're

13  required to send out a "Dear Doctor" letter?

14        MR. FROMSON:  The "Dear Doctor" letter, I don't

15  have a specific case that says you're required.  The case

16  law does say that they are authorized to do so.  They can if

17  they believe it's reasonable, and we believe it would have

18  been diligent to do so.  That's an example of how they

19  failed to warn.  Having their detail sales reps, detailers,

20  come into a doctor's office and not explain that issue to

21  them, that is a failure to warn, in as much as the sales rep

22  represents the company, and what he is saying is promotional

23  and needs to give fair and impartial unbiased information.

24  So, yes, it's not in the label, it's not in a "Dear Doctor"

25  letter, and it's not communicated in any way.  It's not even

1    communicated through their medical communications department

2    in response to a phone call.

3            THE COURT:  What evidence did they have that it

4    caused suicidality until this recent pooling of information

5    from the FDA?

6            MR. FROMSON:  The evidence that they had, your

7    Honor, was five different sources of information,

8    information they've had dating back to 1990.  The

9    information is in the animal data in vitro studies which

10   document decrease in serotonin.  The information is in the

11   human data clinical trials, whether controlled or

12   uncontrolled, or open label.  In other words, they gave it

13   to human beings, and human beings experienced depression

14   with suicidal ideation.  They also --

15           THE COURT:  I thought that was highly controverted

16   about suicide.

17           MR. FROMSON:  Well, your Honor, the issue is

18   causation versus reasonable evidence of association.  To

19   change a label --

20           THE COURT:  I don't understand that.

21           MR. FROMSON:  I'm very happy to explain it to you

22   because there's an extremely important distinction.  This

23   slide demonstrates that causation is not required to change

24   a label.  We had a Daubert hearing on whether there is

25   general causation, and there's a legal standard to

1    demonstrate whether Neurontin has the capacity to cause

2    suicide, depression.

3           THE COURT:  But that's based on pooled data on all

4    sorts of antiepileptic drugs, which strikes me that's a

5    different question than what they knew and when they knew it

6    in terms of their own drug.

7           MR. FROMSON:  And whether what they knew reached

8    the level, the threshold to warn people.  That threshold

9    does not require the epidemiological pooling meta-analysis.

10   It can be less.  It does not have to reach --

11          THE COURT:  Where does it say that?

12          MR. FROMSON:  This legislative history, this is

13   quoted from the Federal Register.  This document was

14   actually submitted by the defendants last week.  This

15   document explains to you in part why causation is not

16   necessary.  To change a label with respect to Section 201,

17   your Honor, that section states that causation need not have

18   been definitely established.  There need only be reasonable

19   evidence of a causal association with the drug, a standard

20   that can be met by a wide range of evidence.  Below it even

21   says you don't have to reach the preponderance of evidence

22   in order to change the label.

23          And, importantly, your Honor, the statute that is

24   in effect during the majority of our client's cases, okay,

25   is 21 CFR.  This is the rule that that legislative history

1    is talking about, your Honor.  If you read the statute

2    verbatim, it says, "You can include a warning as soon as

3    there is reasonable evidence of an association of a serious

4    hazard. . .a causal relationship need not have been proved."

5              Now, the question is, what is the evidence that

6    they had?  And remember, your Honor, you don't have to prove

7    causation to change a label.  Have I made that clear?

8              THE COURT:  Yes.

9              MR. FROMSON:  And what I mean is, if you have a

10   question on that issue, if you make -- I'm trying to be

11   heard, I'm sorry.

12             THE COURT:  So what is -- I understand your point,

13   there is reasonable evidence of an association.  So what was

14   the reasonable evidence of an association between Neurontin

15   and, A, depression, and, B, suicide, and how should I make

16   that distinction in my own mind?

17             MR. FROMSON:  Okay, for starters, you can start

18   with --

19             THE COURT:  Was this all briefed, by the way?

20             MR. FROMSON:  Yes, your Honor.

21             THE COURT:  This level of information on what they

22   had and when they had it?

23             MR. FROMSON:  Yes, your Honor.  It's obviously in

24   sum and substance in our Daubert briefs and then stated

25   summarily in the motion for summary judgment opposition.

1          THE COURT:  But the Daubert briefs were different.

2     That's a different issue.

3          MR. FROMSON:  They are, but the evidence that

4     supports the Daubert in part is based upon evidence that

5     shows an association as well as evidence that should

6     demonstrate causation, and --

7          THE COURT:  In my view, since I have read all the

8     Daubert briefing, it's a different spot focus in time, and

9     it's a different level -- it's different from whether

10    actually now you can say it's associated with because with

11    this pooled data, you have a decent argument; the FDA

12    thought it was associated with.

13         MR. FROMSON:  I agree.

14         THE COURT:  But it's different from what they knew

15    and when they knew it based on their own data.

16         MR. FROMSON:  Right, and if I may ask, what is the

17    threshold that you're holding them to?  Are you holding

18    me --

19         THE COURT:  Well, what are you holding them to?

20         MR. FROMSON:  Well, I don't have to prove that

21    they knew Neurontin caused suicide from a legal standard

22    back -- I don't have to prove that to make them change their

23    label.  I only have to prove that there's reasonable

24    evidence of an association.

25         THE COURT:  Fine, give me what was the reasonable

1    evidence.

2          MR. FROMSON:  First, as early as 1990, their own

3    clinical trials were demonstrating that there were acute

4    severe depression and suicidal ideation, and they were

5    acknowledging them as expected adverse events, and they were

6    defining it as being possibly associated with Neurontin.

7    That is their language in their adverse event analysis of

8    clinical trials of people taking their drug in their

9    clinical trials in 1990.  And the date of this document was

10   issued in 2001, but it ranges all the way back from 1981,

11   your Honor, to periods covered.  And what this document is,

12   it's a summary of the animal studies in which it was

13   demonstrated that Neurontin was decreasing serotonin in the

14   brain.

15         And why is that important?  Because if you know

16   that gabapentin is decreasing serotonin and you acknowledge

17   it -- and you have to also realize that the decrease in

18   serotonin has been associated with, it is not novel, that

19   it's associated with increases in suicidality and

20   depression.  That is not in dispute.  Their own experts

21   would say that that's a reasonable hypothesis.  And so

22   that's the second argument, that biologic plausibility is

23   there.  The mechanism of action of the drug was known to

24   this company from as early as 1981.

25         Then you look back to additional clinical trials

1   where they were finding positive dechallenges and

2   rechallenges, which can make isolated reports conclusive as

3   to a product event association.  This is another example.

4   From their own clinical trials for the epilepsy approval,

5   they had patients, okay, this patient particularly had

6   depression and suicidal ideation, which their own

7   investigators reviewed and analyzed, and their own

8   investigators said that that adverse event --

9              THE COURT:  What year was that?

10             MR. FROMSON:  This was -- I believe this was

11  preapproval for their 1993 epileptic indication, okay?  So I

12  do know that, that this was their clinical trial prior to

13  their original approval --

14             THE COURT:  And that's one with one woman?

15             MR. FROMSON:  This is one particular patient, and

16  I have a wealth of information for you for adverse events,

17  but this is one -- you said, what do they have?  This is

18  what they had, and this is what they had.  And this is their

19  investigators saying it's probably related to gabapentin

20  therapy.  What else?  Other than that, it's a smoking gun.

21  They're having the clinical trials and the results, and

22  they're associating it.

23             THE COURT:  So one could make the argument that's

24  one person out of thousands.  Is there any clinical data

25  that shows a relationship -- I understand the biological

1    mechanism.  You explained that all to me in the Daubert

2    hearing with the serotonin, but is there anything that would

3    show -- it's hotly debated and in fact it was persuasively

4    debated that just Neurontin alone did not show an increase

5    in suicidality; you have to pool it with the others.

6              MR. FROMSON:  I disagree with that.

7              THE COURT:  I know you disagree, but, anyway, the

8    big issue is whether you can pool it legitimately, and the

9    FDA said you could, which is a big arrow in your quiver.

10   But the bottom line is, you've got to be able to show that

11   it's more than just one person.

12             MR. FROMSON:  I have it, your Honor.  Right here

13   on that slide is the Neurontin data by itself.  The

14   Neurontin data by itself had an odds ratio of 1.57, which

15   meant that Neurontin had a 57 percent greater risk of

16   suicidality.  What the defendants will tell you is that that

17   number isn't statistically significant, meaning it won't

18   reach the threshold for legal causation.  But I don't need

19   to reach the level of legal causation to show why a label

20   should be changed.

21             THE COURT:  Right, and this is data that was

22   generated when?

23             MR. FROMSON:  This data generates back to their

24   original pool date of 1993 going forward.

25             THE COURT:  This is from 1993 data, or was it all

Page 93

1    way from 1993 to 2003?

2             MR. FROMSON:  2003, it goes forward to --

3             THE COURT:  It's a decade.

4             MR. FROMSON:  Correct.

5             THE COURT:  So but when did they know it?

6             MR. FROMSON:  Well, the question is, why didn't

7    they know it sooner?

8             THE COURT:  I don't know when all this -- so your

9    argument is, they didn't know it, but they should have?

10            MR. FROMSON:  Yes, and they should have done

11   something about it in response to -- they should have done

12   something in response to the adverse events that I have been

13   describing.

14            THE COURT:  When should they have known that there

15   was a correlation or an association?

16            MR. FROMSON:  Well, they had an increase -- they

17   had a correlation, reasonable evidence of increase of

18   depression with Neurontin in their clinical trials in

19   epilepsy.  We know that depression was 1.8 versus 1.1,

20   Neurontin versus placebo, for the epileptic population, as

21   is set forth in their labeling for the epileptic indication.

22   So they've known since way back when that there's evidence

23   of an association that should have made them have a

24   strengthened label.  That information back in the epileptic

25   time frame should have made them do something.  For example,

1    why didn't they --

2             THE COURT:  What's the "something" because the FDA

3    did reject that label?

4             MR. FROMSON:  The FDA did not reject the 1.8

5    versus 1.1 in the label, your Honor.

6             THE COURT:  Right, but they rejected doing any

7    more.  So that would be something that actually was directly

8    covered if you talk about the epileptic population.

9             MR. FROMSON:  I'm not familiar with anything the

10   FDA has rejected.  They didn't reject any label proposed by

11   the -- sorry.

12            THE COURT:  Excuse me, excuse me.  The FDA saw

13   that data, right?

14            MR. FROMSON:  Yes.

15            THE COURT:  And the FDA did not require any

16   stronger labeling, right?

17            MR. FROMSON:  Not for an epileptic population.

18            THE COURT:  Right.  So what is it you think?  So

19   there's that little warning flag, little red flag, little

20   warning flag which gets you to possible.  How do you get

21   from possible to probable?

22            MR. FROMSON:  How do I get from possible to

23   probable?  So you're saying, if I understand you correctly,

24   for them to have strengthened their label, I have to

25   demonstrate a probable association?

1          THE COURT:  A reasonable association, probable,

2     you use your word, but something that's got more than

3     possible.

4          MR. FROMSON:  I'm -- something more than possible

5     is reasonable.

6          THE COURT:  Well, what if it's reasonable,

7     probable, but not possible?

8          MR. FROMSON:  Okay, what they should have done

9     was, they should have done a data capturing for Neurontin,

10    your Honor, at the very least, because under 314.80, the

11    pharmacovigilance standard, they're supposed to go and do

12    things that a reasonable company would do.  And I'm going to

13    show you the slide that says that they didn't do anything

14    because as of 2006, they did do a gabapentin capturing.

15         THE COURT:  I suppose it doesn't matter I'm

16    getting carsick?

17         MR. FROMSON:  Yes, I apologize, your Honor, but

18    it's important to show you, when you said, well, what is it

19    they could have done?  And I'm going to show you what they

20    could have done because they did it -- this is what they

21    could have done, all right?  When they knew or when they

22    acknowledged that they knew that there's a potential danger

23    with Neurontin and suicidality, they went and did a data

24    capturing.  The problem is, they waited until 2006 to do it.

25    And if you look at the language in this document, the

1    purpose of this document is to insure an accurate and timely

2    characterization of the adverse events, including the

3    contributions of potential etiological factors.

4         THE COURT:  And have you given all of this to me

5    in a briefing on preemption?

6         MR. FROMSON:  I believe the gabapentin data

7    capturing might not have been given to you because it was

8    only given to us after the briefing, but it may have been in

9    a supplemental submission, so, yes.

10        THE COURT:  This little angel whispering over your

11   shoulder?

12        MR. FROMSON:  Yes.  Fortunately, Mr. Alba had a

13   good handle on the wealth of millions of documents that we

14   have.

15        This data capturing is exactly what 314.80

16   encompasses.  314.80 is the safety surveillance regulation

17   that says they're supposed to develop written procedures and

18   analyze adverse events.  Your Honor, they didn't do that.

19   They didn't analyze the data as they should have, as we

20   argue they should have.  And when they finally began to

21   do --

22        THE COURT:  So is this what this boils down to is,

23   they had all sorts of red flags about a possible

24   association, possible?  And so you would say that if they

25   had actually taken those red flags and done one of these

1    statistical analyses -- this is the negligence claim

2    really --

3              MR. FROMSON:  Yes.

4              THE COURT:  -- that they would have found the

5    correlation?

6              MR. FROMSON:  We argue that, yes.

7              THE COURT:  So this is different from fraud.  This

8    is really --

9              MR. FROMSON:  Correct, your Honor.

10             THE COURT:  -- you had the red flags.  A

11   reasonable pharmaceutical manufacturer having these flags

12   would have gone and checked it out?

13             MR. FROMSON:  Correct.

14             THE COURT:  So is this what it boils down to?

15             MR. FROMSON:  That's what it boils down to.  It's

16   about the possible association means change the label.  It

17   doesn't mean you have to prove causation to change the

18   label.  And it's negligence, not fraud.

19             THE COURT:  So what you're saying is, maybe they

20   only knew that there was a possible correlation; but given

21   the red flag, they should have gone, and if they had gone,

22   they would have found what they eventually did find in that

23   decade's review?

24             MR. FROMSON:  Yes, your Honor.

25             THE COURT:  Thank you.

Page 98

1          MR. FROMSON:  And, further, unless you --

2          THE COURT:  Do you have more here?

3          MR. FROMSON:  Well, there is a question as to this

4   term "newly acquired information" that Mr. Rouhandeh was

5   explaining.  And if you look at the definition of what is

6   the term "newly acquired," as in the very document that

7   defendants provided to you on October 16 just last week,

8   what is newly acquired information?  I would --

9          THE COURT:  This is the proposed rule?

10         MR. FROMSON:  Well, this is the rule now.  The

11  rule is done, and the question is, how are we supposed to

12  understand what is meant by "newly acquired information"?

13         THE COURT:  But is it retroactively effective?

14         MR. FROMSON:  Well, it's really just explaining

15  what has been meant by newly acquired information.

16         THE COURT:  It's a lawyer's argument.

17         MR. FROMSON:  And newly acquired information means

18  you have new information that can be based upon new data, or

19  it can be old data.  And that goes right into what you said:

20  If they would have taken the information in '93 --

21         THE COURT:  -- revised to clarify, so your

22  position is, it's just clarifying the preexisting --

23         MR. FROMSON:  Correct, your Honor.  So to come

24  here and say, "We didn't know until 2008," is not accurate.

25  They would have known if they would have taken the time to

Page 99

1    correlate the data and analyze the data sooner.

2          THE COURT:  All right, I've got it.  All right,

3    thank you.  Don't sit down.  Stay standing.

4          MR. FROMSON:  And, last, the guilty plea --

5          THE COURT:  I know about the guilty plea.

6          MR. FROMSON:  And it's an inadequate warning by

7    virtue of --

8          THE COURT:  I know the guilty plea, been there

9    myself, percipient witness.  Okay.

10          MR. FROMSON:  Thank you, Judge.

11          MR. ROUHANDEH:  Your Honor, I do want to correct

12    one thing I said because you asked about any of these

13    preemption cases, whether they dealt with off-label.

14    Actually, I think the Supreme Court case in Regal, which was

15    the medical device company, the medical device case,

16    involved the off-label use of that medical device.

17          THE COURT:  Does it?

18          MR. ROUHANDEH:  I don't know that there was a

19    discussion on that issue.  It's also true of the O'Neil case

20    which we cite.  That was the pediatric use of Paxil, which I

21    believe was off-label.  I think we've also cited the

22    Conte V. Wyeth case, and, again, that was off-label.

23          THE COURT:  But did any of these cases

24    specifically discuss that issue?

25          MR. ROUHANDEH:  That's the difference.  I'm not

1    sure that they actually had a discussion of the issue, but

2    certainly the Supreme Court applied it in a case in which

3    there were --

4            THE COURT:  I can't wait until you both are

5    arguing it in the Supreme Court.

6            MR. ROUHANDEH:  The second point is that I think

7    Mr. Fromson was really arguing -- and I've only said this

8    once, I think, in my career -- it's a complete red herring.

9    He said I was arguing all about causation.  I don't think I

10   ever said "causation" if my entire argument.  My entire

11   argument was about an association.

12           The argument here is not, there wasn't evidence of

13   causation; therefore the label couldn't be changed.  It was,

14   there wasn't evidence of a reasonable association between

15   the drug and the suicide risk.  And if there is, and we

16   dispute that there is, but if there is such evidence now,

17   it's only because of information that was newly obtained

18   after the FDA --

19           THE COURT:  What about the argument, though,

20   assuming this is not a fraud claim but a negligence claim,

21   that there were all these red flags -- not red herrings, red

22   flags -- you know, some mechanism, decreases in serotonin,

23   right, some -- what do you call them, the challenge/

24   dechallenge issues and the like, there were some red flags,

25   and that you really, it was a violation of your duty of care

1   not to check it out better?

2          MR. ROUHANDEH:  Well, that again goes back to

3   314.70 in which we said there are two things that have to be

4   satisfied before you can change the label that the FDA has

5   already approved, one of which is, there has to be

6   scientific evidence that demonstrates the association, and,

7   second, it has to be new.  Most of what they're talking

8   about, I think all of what they're talking about the FDA

9   had, had that information.  Or if the FDA didn't have it, it

10  was obviously not evidence of an association because the FDA

11  has specifically said, for example, they talked about some

12  adverse events.  Well, the FDA said, well, these adverse

13  events -- I mean, he says, well, there's some adverse events

14  reported during some study.  That's not evidence of an

15  association because there's a background --

16         THE COURT:  So isn't it a red flag to make you go

17  back and look at the data?

18         MR. ROUHANDEH:  Well, no.  Two things:  One is, if

19  it's a red flag, it's information that the FDA had; and,

20  two, it's not evidence of an association.  None of what he

21  talked about, the mechanism of action, the company tried to

22  change the label on the mechanism of action, and the FDA

23  said, "No, we're not going to change it.  We don't think

24  there is evidence that you know, sufficient evidence that

25  anyone knows what the mechanism of action is."

1       They want to argue and come here in court and

2  bring an expert in that says, "Well, I think the mechanism

3  of action means X, Y, and Z."  Well, the FDA has said, no,

4  it's unknown how the product works.  And they've approved

5  that label twice, even with a possible change.

6       So what's important is, and Mr. Fromson, you know,

7  touched on it at the very end, he said, "Well, okay, you

8  know, it wasn't new."  Well, it's got to be new, and it's

9  got to be evidence of an association, and they didn't come

10 up with anything.

11      THE COURT:  All right.

12      MR. ROUHANDEH:  I just want to mention one other

13 thing --

14      THE COURT:  I've got the jury coming back in two

15 minutes, and I need to talk with Mr. Greene and you, so I

16 think we need to wrap that up.  Okay, so I take it under

17 advisement.  I guarantee you I will not have a preemption

18 opinion until I see what the Supreme Court does, in stark

19 contrast to the motions to dismiss where I will issue a

20 ruling.

21      Let me just see Mr. Greene.  We're done with this

22 at this point.  I've been going straight since 2:00.  So,

23 Mr. Greene, so I've got now all the supplemental --

24      MR. ROUHANDEH:  Your Honor, would it be possible

25 to go off the record?

1          THE COURT:  Yes, with the two of you?  Yes.  With

2    all of you?  Yes.  Can he be here?

3          MR. ROUHANDEH:  Any counsel in the case can be.

4          (Discussion off the record.)

5          (Adjourned, 4:40 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 104

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )


        I, Lee A. Marzilli, Official Federal Court

Reporter, do hereby certify that the foregoing transcript,

Pages 1 through 103 inclusive, was recorded by me

stenographically at the time and place aforesaid in Civil

Action No. 04-10981-PBS, In Re:  Neurontin Marketing and

Sales Practices Litigation, and thereafter by me reduced to

typewriting and is a true and accurate record of the

proceedings.

        In witness whereof I have hereunto set my hand

this 30th day of October, 2008.




            /s/ Lee A. Marzilli
            _____
            LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER