# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING,
        SALES PRACTICES AND PRODUCTS
        LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

    PRODUCTS LIABILITY ACTIONS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: MDL Docket No. 1629
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T. Sorokin
:
:
:
:

**PROPOSED REPLY MEMORANDUM IN SUPPORT OF MOTION
FOR LEAVE TO SUPPLEMENT RECORD ON *DAUBERT* AND SUMMARY
JUDGMENT MOTIONS WITH NOVEMBER 2008 SUPPLEMENTAL
EXPERT REPORT OF ROBERT D. GIBBONS Ph.D.**

Defendants Pfizer Inc. and Warner-Lambert Company submit this reply memorandum in

further support of their motion for leave to supplement the record on their pending motions to

exclude the testimony of plaintiffs' experts and for summary judgment with the Supplemental

Expert Report of Robert D. Gibbons Ph.D.

**Preliminary Statement**

Defendants acknowledge that the Court ruled that Dr. Gibbons could testify at the

Daubert hearing only about the FDA Alert.  They also acknowledge that the portion of Dr.

Gibbons' supplemental report that is at issue – his recent pharmacoepidemiologic study – is not

about the FDA Alert *per se* (although it clearly is about whether there is an association between

Neurontin and suicidal behavior).  They acknowledge that, at least insofar as the pending

motions are concerned, they are asking the Court to revisit its ruling.

Plaintiffs, on the other hand, argue that Dr. Gibbons' recent pharmacoepidemiologic study (the "Study") is late and that it should be excluded because "they have a right to be assured that the orders of this Court are to be abided and the establishment of discovery schedules are to be adhered to and respected." (Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Motion for Leave to Supplement Record on *Daubert* and Summary Judgment Motions with November 2008 Supplemental Report of Robert D. Gibbons Ph.D. ("Plaintiffs' Memo") at 5.)  This argument is the height of irony because plaintiffs themselves have ignored multiple deadlines [including the very deadline they seek to enforce] and recently offered a new general causation opinion.[1]

Plaintiffs are strenuously seeking to prevent the Study from seeing the light of day even though it is powerful evidence that is critical to the outcome of the pending motions.  The Study erases any doubt that may linger due to the FDA Alert.  It is concrete proof rather than fanciful theory.  It is careful science based on extensive data, not speculation based on hand-picked, unreliable case reports.  It is, in fact, the very sort of study that plaintiffs' own experts have said suffices as solid proof on the general causation issue.  It is not surprising that one will find in plaintiffs' memorandum no suggestion that the Study is irrelevant or unimportant.[2]

The truth is that the Study is so compelling and so damaging to plaintiffs' case that they do not want the Court to consider it..  But they have only one arrow in their quiver – a claim that the Study is late.  It is not, both because it was served before the deadline for expert disclosures on all issues in *Smith* and *Bulger* and because it was served right after the Study was completed.

---

[1]     On the virtual eve of his recent deposition in *Smith* and *Bulger*, plaintiffs served a supplemental expert report by Dr. Ronald Maris, a suicidologist.  In this supplemental report, Dr. Maris opines as to general causation with an entirely new general causation theory, despite that he has never been identified by plaintiffs as an expert on any issues other than specific causation.

[2]     Plaintiffs have never challenged on *Daubert* grounds the admissibility of Dr. Gibbons' opinions (or the general causation opinion of any other defense expert).  Hence, the fact that Dr. Gibbons has <u>additional</u> support for his opinions should in no way provide a basis for a *Daubert* challenge that was never asserted in the first place.

Moreover, plaintiffs have the law wrong.  They argue late disclosure and demand exclusion.  In this circuit, the extreme sanction plaintiffs seek is appropriate only under circumstances that do not exist here:  Plaintiffs can show no cognizable harm because defendants promptly will supply the data on which Dr. Gibbons relied, will make him available for deposition, and will not oppose plaintiffs' submission of their own epidemiologic study (should they at long last conduct the study that they should have done long ago because they bear the burden).  Nor can plaintiffs show a pattern of dilatoriness, much less dilatoriness with respect to the Study itself.  Dr. Gibbons just completed the Study (and just submitted a related article for publication[3]), and, plaintiffs' claim to the contrary notwithstanding, defendants did not have the data on which it is based or any reason to conduct such a study before.  Nor can plaintiffs show that the admission of Dr. Gibbons' supplemental report will disrupt the Court's docket or slow the progress of this case.

Defendants have demonstrated that the "gold standard" studies show no association between Neurontin and suicidal behavior, and plaintiffs do not dispute this fact.  Instead, plaintiffs say that there have not been enough studies or that the studies are "underpowered." Plaintiffs and their experts even fault defendants for not conducting an epidemiologic study. Well, such a study has been done, and the results are in.  And as soon as the results came in, plaintiffs changed their tune.  Now the only thing that interests them is a deadline.

The ultimate goal of discovery and the justice system is to ascertain the truth.  *See, e.g., United States v. Kattar,* 191 F.R.D. 33, 38 (D.N.H. 1999); *Big Top U.S.A. v. Wittern Group,* 183

---

[3]   Based on additional data, Dr. Gibbons and three co-authors prepared a manuscript on the subject of whether there is an association between anti-epileptic drugs and suicide attempt.  The manuscript, a copy of which is attached hereto as Exhibit A, has been submitted for publication. Thus, even if the Court were to exclude Dr. Gibbons' supplemental opinions, they probably would not be out of the case.  If the manuscript is published, defendants could always use it to cross-examine plaintiffs' experts.

F.R.D. 331, 343 (D. Mass. 1998); *Loinaz v. EG & G, Inc.*, 910 F.2d 1, [  ] (1st Cir. 1990) *United States  v. Ahmed*, 2006 WL 3210037 at *6 (D. Mass.); *Nexxus Products Co. v. New York, Inc.*, 188 F.R.D. 7, 10-11 (D. Mass. 1999); *Unanue-Casal v. Unanue-Casal*, 898 F.2d 839, 942 (1st Cir. 1990); *Polansky v. CNA Ins. Co.*, 852 F.2d 626, 632 (1st Cir. 1988).  This is defendants' goal as well, and to promote it they urge the Court to consider Dr. Gibbons' Study in connection with the *Daubert* and summary judgment motions.  The Study **will** assist the Court in resolving the *Daubert* and summary judgment motions because, other than the "gold standard" study data, it represents the most important evidence on the issue of general causation.  Plaintiffs' effort to prevent the Court from considering the Study reveals that they have a very different goal in mind.

## Background

As the Court will recall, the landscape changed when the Alert was issued early this year.  So did plaintiffs' theory of general causation.  Plaintiffs' experts previously had acknowledged that the clinical data concerning Neurontin show no signal of an association between Neurontin and suicide.  (Docket #  1218 at 2.)  But when the FDA issued the Alert, plaintiffs seized on it, via supplemental expert disclosures, as support for their position with respect to general causation.  (Docket # 1218 at 3.)  Thus, **after the deadline for expert disclosures on general causation**, plaintiffs disclosed a new and different basis for their experts' positions on the subject, to wit, that the clinical data analyzed by the FDA purportedly supported their position that Neurontin causes suicidal behavior.

Defendants asked Dr. Gibbons to try to make sense of the Alert.  The Court will recall his findings, including that the Neurontin-specific data from the "gold standard" studies do not show any association between Neurontin and suicidal behavior, and that the FDA's finding of an

increased risk was based on the exclusion of most of the Neurontin data and was driven by the data for two drugs other than Neurontin. (*See, e.g.,* Transcript of proceedings of June 20, 2008, at 325-27 ) (The Court will also recall that Dr. Gibbons reached some of his opinions on the eve of the hearing because the data concerning the other drugs covered by the Alert had just become available. (*Id.* at 314-17.))[4]

Plaintiffs were not deterred by Dr. Gibbons' analysis. At the *Daubert* hearing, some of their experts claimed that the Alert vindicated them, while one, Dr. Blume, acknowledged the lack of a signal in the gold standard studies on Neurontin, but said (incorrectly) that the studies were underpowered. She went on to list the other types of evidence based on which, according to her, a causation determination can be made in the absence of the alleged insufficiency of randomized controlled clinical studies. (*Id.* at 125-27.) She erred in most respects, because she included types of evidence that neither the FDA nor experts view as reliable proof of causation (e.g., case reports). But she was correct insofar as she suggested that proper epidemiologic studies are solid evidence. (*Id.* at 126.) In fact, she not only confirmed the reliability of such studies, she faulted defendants for not having conducted one. (*Id.* at 175-77) Even now, plaintiffs argue that, notwithstanding the demonstrable lack of any signal in the "gold standard" studies, defendants should have conducted an epidemiologic study. (Plaintiffs' Memo at 6-7.) Of course, they have no valid explanation for this position, which ignores that the burden of proof is theirs.

After the hearing, Dr. Gibbons conducted such a study. He did precisely that which Dr. Blume claimed (without justification) defendants should have done before. The study and its results are described in paragraphs 11 through 19 of Dr. Gibbons' supplemental report. (Docket

---

[4]    Plaintiffs attempted to prevent Dr. Gibbons from testifying with respect to his findings on the data as to all 11 anti-epileptic drugs, even though it had just been made available by the FDA. Plaintiffs revealed then, as they do now, that they are not interested in what the facts really are.

# 1489, Ex. A, ¶¶ 11-19.)

Dr. Gibbons obtained data on over 130,000 Neurontin-treated plaintiffs.  He obtained the data not from defendants, who do not have such data, but from a third-party, PHARMetrics. (Plaintiffs' claim that defendants have such data is unsupported and simply incorrect.)  He analyzed the data for the risk of suicide behavior following treatment with Neurontin.  He concluded:

> These findings clearly reveal that in this cohort of over 130,000 patients treated with gabapentin, there is no overall increased risk of suicide attempt associated with gabapentin treatment.  Gabapentin does not increase the likelihood of suicide attempts, and the suicide attempts considered here were of sufficient severity to make it into the medical record.  However, among patients with a psychiatric disorder, who are at increased suicidal risk, statistically significant protective effects of gabapentin were clearly demonstrated. . . .  [T]hese findings suggest that among those patients at increased risk of serious suicide attempts, gabapentin significantly decreases their risk of making a suicide attempt.  Whether this protective effect is based on reducing the symptoms of the psychiatric disorder or by treating the concomitant pain disorder that is present in many of these patients remains an open question.

(Docket # 1489, Ex. A, ¶ 19.)  In short, Dr. Gibbons has concluded, based on a study of data relating to over 130,000 patients, that **there is no overall increased risk of suicide attempt associated with Neurontin and that, in certain patient groups (*e.g.,* patients with psychiatric disorders), Neurontin is actually protective against suicidality.**  It could not be any more obvious why plaintiffs do not want the Court to consider the Study.

Dr. Gibbons' supplemental expert report was served on plaintiffs on November 10, 2008, the date by which defendants were required for the first time in this litigation to designate experts and serve expert reports on issues other than general causation.  The supplemental report responds not only to plaintiffs' experts' general causation opinions, but to other issues as well, such as plaintiffs' experts' failure to warn opinions.  Dr. Gibbons' just-completed pharmacoepidemiologic analysis is directly responsive to plaintiffs' assertion that defendants

should have conducted an epidemiologic study and, in turn, issued a suicidality warning.  It is

indisputable that these opinions and the grounds for these opinions were timely served on

November 10, 2008.  At the same time, Dr. Gibbons' pharmacoepidemiologic analysis is

powerful additional support for defendants' *Daubert* challenge and should be considered in

ruling on defendants' *Daubert* motion.  For that reason, defendants filed the instant motion.

## Argument

## DR. GIBBONS' STUDY SHOULD NOT BE EXCLUDED

### A.    Legal Principles

Under Rule 26(a)(1), expert disclosures are required "at the times and in the sequence

that the court orders . . .," and, in the absence of a stipulation or order, "at least 90 days before

the date set for trial or for the case to be ready for trial . . .."  Overlaying these obligations is the

duty to supplement:  "The parties must supplement these disclosures when required under Rule

26(e)."

Rule 26(e)(1) requires a party to supplement its disclosures "if the party learns that in

some material respect the information disclosed is incomplete or incorrect and if the additional or

corrective information has not otherwise been made known to the other parties during the

discovery process or in writing."  Rule 26(e)(2) establishes specific supplementation obligations

with respect to expert disclosures:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's
> duty to supplement extends both to information included in the report and to
> information given during the expert's deposition.  Any additions or changes to this
> information must be disclosed by the time the party's pretrial disclosures under
> Rule 26(a)(3) are due.

These "supplement requirement[s] help[] a party avoid the burden of responding to unexpected

and last-minute changes in its opponent's expert testimony . . . and promote[] the broader

purpose of discovery, which is 'the narrowing of issues and the elimination of surprise.'" *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 693-94 (1st Cir. 2000) (internal citation omitted).

Where a party fails properly to disclose and to supplement with respect to an expert's opinions as required by Rule 26(a)(2)(B) and Rule 26(e), the party may be precluded from offering the opinion unless the party demonstrates "substantial justification" for the failure **or** that the failure was "harmless." Fed. R. Civ. P. 37(c)(1). Preclusion of an expert's opinion is, however, a "grave step, not to be undertaken lightly . . .." *Thibeault v. Square D Co.*, 960 F.2d 239, 247 (1st Cir. 1992). A court therefore must give careful consideration to whether substantial justification or harmlessness exists. *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 198 (1st Cir. 2006). And it "must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets . . .," meaning that

> [A court] must consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation. So too is an assessment of what the late disclosure portends for the court's docket.

*Macaulay v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003) (internal citations omitted).

## B.    The Supplemental Report Is Timely

The deadline for defendants' expert disclosures in *Bulger* and *Smith* was November 10, 2008. That day, defendants served Dr. Gibbons' supplemental report, along with the reports of the other experts whom defendants expect to call if *Bulger* and/or *Smith* go to trial. (The parties are in the process of scheduling the depositions of these experts.) The reports were timely, and, naturally, they cover the full gamut of opinions that the experts would offer at any trial, including incorporating their original opinions as to general causation. (If they did not, plaintiffs undoubtedly would be making a different preclusion argument come trial.) Dr. Gibbons' Study

forms part of the basis for his opinion on general causation in *Bulger* and *Smith and part of the basis for his other opinions.*  The Study is in.

Plaintiffs appear to be arguing that anything having to do with general causation that appears in any of the reports served on November 10 and that did not appear in reports served before the December 2007 deadline is off limits, even in *Bulger* and *Smith*.  This argument does not hold water.  Logically, it would mean that none of defendants' experts, save Dr. Gibbons, could testify concerning the FDA Alert, while plaintiffs' experts would have free rein to do so because they offered a supplemental reliance list **after the December 2007 deadline**.  It would mean that all of defendants' experts would have to ignore all other relevant developments since the December 2007 deadline, e.g., new literature, additional pronouncements by the FDA, and new studies.  Plaintiffs' position is unfair, unworkable, and inconsistent with their own behavior and, most important, the goal of ascertaining the truth.

Moreover, defendants certainly are permitted – actually, required – to supplement, and the Study qualifies as appropriate supplementation.  The Study did not exist before, and it was not even a gleam in defendants' eye in December 2007.  Indeed, what prompted defendants to conduct the Study was principally plaintiffs' insistence at expert depositions and the *Daubert* hearing that defendants should have conducted such a study and their admission that such a study would be, in the alleged absence of sufficiently powered "gold standard" studies, the next best evidence with respect to general causation.  Plaintiffs themselves were arguing that the scientific record was incomplete, and they should not be heard to complain about defendants' plugging of the alleged gap on which plaintiffs intended to capitalize.

This is not to say that Dr. Blume's claims that defendants should and easily could have conducted such a study are true.  Given the demonstrated absence of any signal in the extensive

data from the placebo-controlled studies of Neurontin, defendants had no reason or obligation to undertake an epidemiological study.  Further, defendants simply did not have on hand the data for such a study.[5]  Dr. Gibbons had to obtain it from a third party.  Further still, plaintiffs bear the burden of proof.

Nevertheless, defendants' expert ventured into the epidemiologic waters, doing that which plaintiffs, the burden bearers, should have done.  Plaintiffs' experts, not defendants', should be faulted for not conducting an epidemiologic study before.  To grant plaintiffs the relief they seek would allow them to gain from a calculated decision to stick their heads in the sand in the hope that a patchwork of unreliable evidence and fanciful theories would suffice.  And to grant them the relief they seek would deny the Court critical evidence.

## C.    Exclusion is Unwarranted

Even assuming that the Study is neither timely nor proper supplementation, it should not be stricken.  Defendants' disclosure of the Study on November 10 was both "substantial[ly] justified" and "harmless," Fed. R. Civ. P. 37(c)(1).  Further, the factors that must be considered, e.g., the need for the evidence, weigh against the "grave step" that plaintiffs demand.

Defendants were substantially justified in not disclosing the Study before the December 2007 deadline.  It did not exist before then, and defendants had neither an obligation nor a reason nor the data to conduct such a study before it was conducted.  Things changed after December 2007.  Plaintiffs claimed at the hearing that defendants should have conducted an epidemiologic study, implying, through their ill-conceived case report analyses, that the epidemiologic evidence

---

[5]      Plaintiffs repeatedly refer to the Study as "manufactured," but do not explain what they mean by this pejorative term.  It should be disregarded.  They also argue, citing *Dufresne v. Microsoft Corp.*, 2006 U.S. Dist. LEXIS 57243 (D. Mass. 2006), and *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42 (1st Cir. 1991), that the Study should be excluded because the data on which the Study is based are old and defendants therefore must have had (and withheld) it.  This argument is insupportable and based on the flawed factual premise that defendants had the data.  As noted above, they did not.  Dr. Gibbons recently obtained it for his Study.

would support their causation claim.  Moreover, the Alert had muddied the waters, and plaintiffs were attempting to capitalize on the confusion.  It was the confluence of these claims, events, and circumstances that induced defendants to ask Dr. Gibbons to consider conducting the Study. Thus, defendants were substantially justified in not disclosing the Study before it ever existed and for not causing it to come into existence before it did.  Indeed, defendants should be lauded for having commissioned the Study when they did, thereby advancing the science on the general causation issue.

Further, plaintiffs have not been harmed.  To begin, the part of Dr. Gibbons' supplemental report that relates to the Study is only nine paragraphs long, and the Study is quite straightforward.  Further, plaintiffs have requested, and defendants have agreed to provide, the materials on which Dr. Gibbons relied in conducting the Study, and more.  Specifically, plaintiffs shortly will receive (1) a CD with the PHARMetrics data sets; (2) a CD showing the SAS programs with the analyses Dr. Gibbons conducted; (3) the manuscript that Dr. Gibbons has submitted for publication; (4) the PHARMetrics license agreement signed by Dr. Gibbons; and (5) Dr. Gibbons' letter of retention with defendants' counsel.  Plaintiffs will have an opportunity to depose Dr. Gibbons and ample time to prepare for the deposition.  Plaintiffs could even conduct their own epidemiologic study, and, if they were to offer it, defendants would not object that it is untimely.[6]

Moreover, when the factors that must be weighed are weighed, the scale tips decidedly against exclusion.

The "history of the litigation" weighs against exclusion.  The relevant history, particularly the genesis of the Study and its import to the pending motions, is described above. Nothing in that history suggests any bad faith or dilatoriness on the part of defendants.

---

[6]        The parade of horribles that plaintiffs suggest will not occur.

Everything in that history points toward a good faith effort to plug an alleged hole based on which plaintiffs, despite their burden, hoped to capitalize, and toward a pressing need for the admission of all competent evidence relating to whether there is an association between Neurontin and suicidal behavior.

Defendants' "need" for the Study weighs against exclusion. Needless to say, the Court's decision will have major ramifications. While defendants believe that the Court can and should rule in their favor based solely on the placebo-controlled, double blind studies, it may not. If it does not, it will be absolutely critical that the Court have the benefit of the Study. It is compelling evidence.

Plaintiffs will be able to overcome any alleged "adverse effects." They will have every opportunity to scrutinize Dr. Gibbons' work and to cross-examine him. They will have every opportunity to conduct their own study. Indeed, defendants encourage them to do so.

While it may be true that plaintiffs were surprised to receive the Study, they should not have been too surprised. In fact, the Study probably represented less a surprise than their worst fears coming true.

The "prejudice" factor also weighs against exclusion, for the reasons discussed above. Plaintiffs will have ample opportunity to evaluate, cross-examine, and respond.

Finally, admission of the Study will not affect the Court's docket. Plaintiffs' claim to the contrary notwithstanding, the admission of nine paragraphs of a single report will not slow any proceedings. In fact, if the Study and any response thereto end up being the evidence that convinces the Court that there is no reliable scientific evidence of an association between Neurontin and suicide, the Court's docket will be substantially lightened.

**Conclusion**

For the foregoing reasons and those previously stated, defendants respectfully request that their motion be granted and that the Court consider Dr. Gibbons' Study in connection with the pending *Daubert* and summary judgment motions.

Dated: November 18, 2008

DAVIS POLK & WARDWELL

By:     /s/ James P. Rouhandeh
        James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

SHOOK, HARDY & BACON L.L.P.

By:     /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

-and-

HARE & CHAFFIN

By:     /s/ David B. Chaffin
        David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

# EXHIBIT  A

Word Count: 3421
Tables: 2
Figures: 1

## The Relationship Between Antiepileptics and Suicide Attempts

Robert D. Gibbons[1]
Kwan Hur[1,2]
C. Hendricks Brown[1,3]
J. John Mann[4]

[1]Center for Health Statistics, University of Illinois at Chicago
Rooms 455-457 (MC 912), 1601 W. Taylor, Chicago, IL 60612, USA

[2]Cooporate Studies Program Coordinating Center,
Hines VA Hospital, Hines, IL 60141

[3]Prevention Science and Methodology Group,
Department of Epidemiology and Biostatistics, College of Public Health MDC-56
University of South Florida, 13201 Bruce B Downs Blvd Tampa, FL 33612

[4]Department of Neuroscience, New York State Psychiatric Institute
Department of Psychiatry, Columbia University College of Physicians & Surgeons
1051 Riverside Drive, New York, NY 10032, USA

September 2008

**Corresponding Author**:
Robert D. Gibbons, Ph.D.
Director, Center for Health Statistics
University of Illinois at Chicago
1601 W. Taylor
Chicago, IL 60614
Phone: (312) 413-7755
Fax:    (312) 996-2113
Email: rdgib@uic.edu

**Acknowledgements:** This work was supported by NIMH grants MH062185 (JJM) and R56 MH078580 (RDG and CHB), and MH40859 (CHB) and AHRQ grant 1U18HS016973.  Dr. Gibbons has served as an expert witness for the U.S. Department of Justice, and Wyeth and Pfizer Pharmaceuticals, the latter involving gabapentin, one of the drugs considered in this paper.  Dr. Mann has received research support from GlaxoSmithKline and has served as an adviser to Eli Lilly and Lundbeck Pharmaceuticals.  Dr. Brown directs a suicide prevention program at the University of South Florida that is funded by JDS Pharmaceuticals.  Dr. Hur reports no competing interests.  Dr. Gibbons had full access to all of the data in the study and takes

responsibility for the integrity of the data and the accuracy of the data analysis.  The data were obtained from PHARMetrics with assistance of a grant-in-aid from Pfizer.  Pfizer was not involved in any of the research and did not review the results or the manuscript prior to submission for publication.

# ABSTRACT

**Context:** On January 31, 2008, FDA issued an alert regarding increased risk of suicidal thoughts and behavior with antiepileptic drugs (AED) (1). On July 10, 2008, an FDA scientific advisory committee voted yes that there was a significant positive association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality. **Objective:** To determine if AEDs increase risk of suicide attempt in patients with bipolar disorder. **Design:** A pharmacoepidemiologic study in which suicide attempt rates were compared before and after treatment and to a no medication control group. Analyses were restricted to AED and lithium monotherapy. **Setting:** We used the PharMetrics medical claims database to study the relationship between the 11 AEDs identified in the FDA alert and lithium to suicide attempts. **Main Outcome Measure:** Suicide attempts. **Patients:** A cohort of 47,918 patients with bipolar disorder with a minimum of a one-year window of information before and after the index date of their illness. **Results:** Overall, there was no significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000). In subjects treated with an AED, the rate of suicide attempts was significantly higher prior to treatment (72/1000) than after treatment (13/1000). In patients receiving no concomitant treatment with an antidepressant or antipsychotic, AEDs were significantly protective relative to no pharmacologic treatment (3/1000 versus 15/1000). **Conclusions:** Despite FDA reports regarding increased risk of suicidality associated with AED treatment, the current study reveals that as a class, AEDs do not increase risk of suicide attempts in patients with bipolar disorder relative to patients not treated with an AED or lithium. AEDs reduce suicide attempt rates both

relative to patients not receiving any psychotropic medication and relative to their own pre-treatment levels.

## INTRODUCTION

Anticonvulsant medications are life saving in the treatment of seizure disorders and are also extensively used for other indications such as mood disorders and trigeminal neuralgia. In March of 2005, The Food and Drug Administration in the United States (FDA) sent letters to sponsors of 11 antiepileptic drugs (AEDs) requesting the submission of suicidality data from placebo-controlled randomized clinical trials (RCTs). The data consisted of suicide-related adverse event reports and a search for suicide-related terms in electronic data bases related to the studies. The 11 AEDs included gabapentin, divalproex, felbamate, lamotrigine, levetiracetam, oxcarbazepine, pregabalin, tiagabine, topiramate, zonisamide, and carbamazepine. FDA conducted a meta-analysis of 199 placebo-controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs (2). They found that 0.43% of the patients in drug treatment groups reported suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who reported suicidal behavior or ideation than in the placebo treatment groups. Based on these findings, on January 31, 2008, FDA issued an alert to health care providers warning of increased risk of suicidal thoughts and behavior with AEDs (1). On July 10, 2008 FDA convened a meeting of two of their scientific advisory committees to determine the type and extent of the warning that FDA would promulgate regarding AEDs and suicidality. The committee voted that yes there was a significant association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality.

There have been two previous pharmacoepidemiologic studies of the relationship between antiepileptic drugs and suicide in bipolar patients where the suicide rate is clearly elevated to begin with and where a treatment effect may be easier to detect (3,4). One study (3) compared suicide completion and attempt rates between lithium, gabapentin, divalproex, and carbamazepine in a cohort of 12,662 bipolar patients from an Oregon Medicaid medical claims database. There were 11 suicides and 79 attempts. Relative to lithium, divalproex had higher suicide attempt rates and gabapentin had higher rates of suicide completion. The authors concluded that lithium may have protective effects with regard to suicide attempts among Medicaid patients with bipolar disorder, however it remains unclear whether or not lithium protects these patients against suicide completion. They also note that the difference between lithium and gabapentin in suicide rates could be due to confounding by indication, where "completed suicide among gabapentin users may well be related to prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk of suicide. In addition, the study did not control for previous suicide attempts or previous treatment with lithium. It may be the case that more severely ill patients who did not respond to lithium were then prescribed gabapentin, and it is this lack of treatment response that is related to increased suicide incidence. Of course, the study was based on only 11 suicides, and these results have not been confirmed by replication in other studies.

The second study (4) involved 20,638 bipolar disorder patients from two large integrated health plans from California and Washington. Suicide attempt rates were 31.3/1000

person years for divalproex versus 10.8/1000 for lithium, a significant difference following adjustment for age, sex, comorbid medical and psychiatric conditions and concomitant use of other psychotropic drugs. Completed suicide rates were also higher for divalproex versus lithium (1.7/1000 versus 0.7/1000). Again, there was no adjustment for previous suicide attempts or comparison to patients that were not treated with either lithium or an AED.

Completed suicide and attempted suicide are major concerns for people with bipolar disorder (5-8). In the absence of treatment, approximately 10 per thousand individuals with bipolar disorder complete suicide annually and about 40 per thousand attempt suicide (5). These risks are approximately one hundred-fold higher (completed suicide) and ten-fold greater (suicide attempts) than those for the general population (5). That makes this a population of interest in detecting the effect on suicide risk of AEDs in comparison to a no-treatment group. Further, the FDA warning implicated all 11 AEDs as a whole, which is surprising given their often quite different modes of action. This paper examines the effect on risk of different types of AEDs on a full population of bipolar patients. Therefore the purpose of this study is to both replicate and expand the previous findings of the Collins and McFarland and Goodwin studies. First, we examined a much larger cohort of bipolar patients than the previous studies. Second, we investigated a much larger set of AEDs, i.e., the 11 AEDs in the FDA analysis. Third, with respect to the 11 AEDs and lithium, we considered monotherapy only, thereby reducing the confounding effect of treatment resistance from the analysis. Fourth, we adjusted for concomitant therapy including antidepressants, anticonvulsants, and other

AEDs (beyond the 11 considered by FDA) in the analysis (or completely eliminated in a sensitivity analysis). Fifth, suicide attempt prior to the index episode was adjusted for in the analysis. Sixth, we examined differences in suicide attempt rates between individuals who did or did not received AED or lithium treatment and within individuals before and after initiation of treatment. Seventh, we examined the possibility of selection effects by comparing suicide attempt rates between patients not receiving treatment with one of the 11 AEDs or lithium to pretreatment levels in those patients who ultimately received treatment with an AED or lithium. Eighth, using a Poisson regression model we were able to include patients with multiple attempts before and after initiation of treatment in the analysis.

**METHODS**

Data for this study came from the PharMetrics Patient Centric Database, the largest national patient-centric database of longitudinal integrated health care claims data commercially available from PHARMetrics®, Inc., under unrestricted license. These national data are not statistically different from the 2000 U.S. Census distributions of age, gender, and region.  The universe of data are comprised of medical, specialty, facility, and pharmacy paid claims from more than 85 managed care plans nationally, representing more than 47 million covered lives.

Data were collected during fiscal years 2000 through 2006.  All patients with an ICD 9 diagnosis of bipolar disorder (ICD-9 codes: 296.0x, 296.1x, and 296.4x-296.8x) who were continuously enrolled in the same health care plan for at least one year before and after the index diagnosis date were included in the sample.   A total of 47,918 patients met these criteria, and there were 1,226 patients with at least one suicide attempt.   The ICD 9 codes used to identify suicide attempts were E950-E959, where subcategories are E950-E952 (self-inflicted poisoning), E953 (self-inflicted injury by hanging), E954 (drowning), E955 (self-inflicted injury by firearms), E956 (self-inflicted injury by cutting), E957 (self-inflicted injury by jumping from high places), E958 (other/unspecified self-inflicted injury), and E959 (late effects of self- inflicted injury).

Analysis of these data was based on Poisson regression models using the number of patient exposure days as an offset.   The method of generalized estimating equations

(GEE) was used for the within-subject analyses which compared suicide attempt rates before and after initiation of therapy. Traditional maximum likelihood Poisson regression analysis was used for between subject comparisons of no medication (i.e., 11 AEDs and lithium) to pre-treatment and post-treatment AED and lithium conditions respectively. Comparing no AED/lithium treatment to the pre-treatment exposure period allows us to examine selection effects in which more severely ill patients at higher risk for suicide attempts may be preferentially selected for AED or lithium treatment. To adjust for other potential confounders, all models included concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006) as covariates. Results were expressed as event rate ratios (ERR) and associated confidence intervals (CI), which are the exponential of the estimated treatment effect (and confidence interval) in the Poisson regression model. The ERR is a rate multiplier which reflects the increased rate associated with treatment versus no treatment. An ERR of 2.0 reflects double the rate of suicide attempts in treated versus untreated patients (or pre versus post treatment exposure period in a within-subject analysis), whereas an ERR of 0.5 reflects one-half the rate of suicide attempts in treated patients relative to untreated patients (or post versus pre treatment exposure periods in a within-subject analysis).

**RESULTS**

Table 1 presents number of patients at risk, number of suicide attempts, person years of exposure and rate of suicide attempts per 1000 person years of exposure before and after initiation of treatment during the one year observation period following the index date of the bipolar disorder diagnosis.  These summary statistics are provided for each of the 11 AEDs, lithium, the combination of all AEDs and the no medication condition, which consists of subjects not treated with any of the 11 AEDs or lithium.  Table 1 also presents results for treatment with one of the 11 AEDs only and no pharmacologic treatment (i.e., no antidepressant, or antipsychotic or second AED).  Table 1 reveals that there were a total of 13,385 patients who received either one of the 11 AEDs or lithium and 25,432 patients that did not receive any of the 11 AEDs or lithium.  Post treatment suicide attempt  rates for AEDs (13/1000 person years) and lithium (18/1000 person years) were comparable to no treatment rates (13/1000 person years).  Of the 25,432 patients who did not receive any of the 11 AEDs or lithium, 11,207 (44%) also did not receive any other AED, antidepressant or antipsychotic medication.  The rate of suicide attempts in this group was 15/1000 person years, slightly higher than those who did not receive one of the 11 AEDs or lithium.   Table 1 reveals that for five of the drugs there was an insufficient number of cases for a meaningful individual drug-level statistical analysis (felbamate, levetiracetam, pregabalin, tiagabine, and zonisamide).   Figure 1 presents a graphical summary of suicide rates by treatment type, before and after treatment.

**Table 1**
**Suicide Attempt Rate per 1,000 Person Years Before and After Treatment by AED,
Lithium and No Treatment**

| Drug Use | # at Risk | # Attempts Before tx | Person Years | Rate before Tx per 1,000 Person Years | # Attempts After tx | Person Years | Rate after Tx per 1,000 Person Years |
|---|---|---|---|---|---|---|---|
| Gabapentin | 1,229 | 13 | 213 | 61 | 13 | 1,016 | 13 |
| Divalproex | 4,581 | 40 | 412 | 97 | 38 | 4,169 | 9 |
| Felbamate | na | | | | | | |
| Lamotrigine | 4,412 | 24 | 613 | 39 | 50 | 3,799 | 13 |
| Levetiracetam | 42 | 0 | 6 | 0 | 0 | 36 | 0 |
| Oxcarbazepine | 1,463 | 30 | 164 | 183 | 20 | 1,299 | 15 |
| Pregabalin | 85 | 0 | 29 | 0 | 0 | 56 | 0 |
| Tiagabine | 80 | 0 | 16 | 0 | 0 | 64 | 0 |
| Topiramate | 1,063 | 11 | 184 | 60 | 24 | 879 | 27 |
| Zonisamide | 84 | 2 | 11 | 182 | 0 | 73 | 0 |
| Carbamazepine | 346 | 2 | 40 | 50 | 9 | 306 | 29 |
| Any of 11 AEDs | 13,385 | 122 | 1,688 | 72 | 154 | 11,697 | 13 |
| 11 AEDs only | 1,910 | 9 | 204 | 44 | 5 | 1,706 | 3 |
| Lithium | 2,518 | 23 | 233 | 99 | 40 | 2,285 | 18 |
| No AED or Li+ | 25,432 | 334 | 25,432 | 13 | | | |
| No Medication | 11,207 | 170 | 11,207 | 15 | | | |

Following treatment there was no overall significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000 person years), adjusted event rate ratio (ERR) = 0.88, (CI: 0.72-1.08), p<0.22 (see rates in final column of Table 1). Similar effects were seen for the individual AEDs, with the exception of topiramate (27/1000 person years ERR=1.87, (CI: 1.22-2.87), p<0.004) and carbamazepine (29/1000 person years, ERR=2.37, (CI:1.21-4.61), p<0.01) which had significantly greater post-treatment risk relative to no treatment (see Table 2). A small but significant post-treatment increase for lithium versus no treatment was also found (ERR=1.46, (CI: 1.04-2.03), p<0.03). Overall, AEDs

were associated with lower suicide attempt rates than lithium (13/1000 versus 18/1000, ERR=0.62, (CI: 0.44-0.89), p<0.008); however, pre-treatment suicide attempt rates were not significantly higher for patients treated with lithium (99/1000 person years) relative to AEDs (72/1000 person years; adjusted ERR is 0.80, (0.51-1.25), p = 0.325).   While not statistically significant, the increased rate of suicide attempts observed before treatment for lithium might account for the modestly higher post treatment rate for lithium relative to AEDs.

In our within-subject analyses comparing attempts before and after receiving treatment with an AED, the rate of suicide attempts was significantly greater prior to treatment (72/1000 person years) than after treatment (13/1000 person years), ERR=0.19, (CI: 0.11-0.26), p<.0001.  Similar protective effects of AEDs were seen for the individual drugs and lithium, although the effects of topiramate (60/1000 vs. 27/1000, ERR=0.52, (CI: 0.18-1.48), p<0.22) and carbamazepine (50/1000 vs. 29/1000, ERR=0.76, (CI: 0.10-6.01), p<0.80) were not statistically significant (see Table 2).   The pre-treatment rate of suicide attempts in patients who ultimately received AED treatment was significantly higher than the no treatment suicide attempt rate (ERR=4.88, (CI: 3.91-6.09), p<0.0001) suggesting that patients who receive AED treatment  are more severely impaired.  A similar result was found for lithium (see Table 2).

**Table 2**
**Event Rate Ratios (Confidence Intervals) Comparing Suicide Rates Before and After Treatment with AED and Lithium and Against No Drug**

| Drug | Post-Drug vs. No Drug | | Pre-Drug vs. No Drug | | Post-Drug vs. Pre-Drug | |
|---|---|---|---|---|---|---|
| | ERR (CI) | p | ERR (CI) | p | ERR (CI) | p |
| Gabapentin | 1.16 (0.66-2.05) | .60 | 6.11 (3.46-10.79) | .0001 | 0.15 (0.05-0.47) | .001 |
| Divalproex | 0.72 (0.51-1.02) | .06 | 7.27 (5.16-10.25) | .0001 | 0.10 (0.05-0.19) | .0001 |
| Lamotragine | 0.85 (0.62-1.16) | .31 | 2.49 (1.63-3.81) | .0001 | 0.33 (0.19-0.59) | .0001 |
| Oxcarbazepine | 0.98 (0.62-1.56) | .94 | 10.78 (7.31-15.86) | .0001 | 0.09 (0.04-0.24) | .0001 |
| Topiramate | 1.87 (1.22-2.87) | .004 | 3.96 (2.15-7.29) | .0001 | 0.52 (0.18-1.48) | .22 |
| Carbamazepine | 2.37 (1.21-4.61) | .01 | 3.21 (0.80-12.94) | .10 | 0.76 (0.10-6.01) | .80 |
| Lithium | 1.46 (1.04-2.03) | .03 | 7.19 (4.65-11.11) | .0001 | 0.23 (0.11-0.49) | .0001 |
| Any AED | 0.88 (0.72-1.08) | .22 | 4.88 (3.91-6.09) | .0001 | 0.19 (0.11-0.26) | .0001 |
| AED only | 0.19 (0.08-0.47) | .0003 | 2.85 (1.46-5.57) | .002 | 0.05 (0.02-0.18) | .0001 |

ERR – Event Rate Ratio – ERR=2.0 indicates a doubling of the rate, ERR=0.5 indicates a halving of the rate. These are adjusted for concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006).

Finally, we compared suicide attempt rates for patients treated with no drugs (i.e., no AED, antidepressant, or antipsychotic) versus monotherapy with one of the 11 AEDs only (i.e., no concomitant psychotropic medication). The rate of suicide attempts was 15/1000 person years for no treatment versus 3/1000 for patients treated with one of the 11 AEDs alone (ERR=0.19, (CI: 0.08-0.47), p<0.0003), see Figure 1. This finding indicates that among those patients who received no concomitant AED, antidepressant, or antipsychotic treatment, the 11 AEDs were significantly protective in terms of suicide

attempt rates relative to those patients with a diagnosis of bipolar disorder that received
no pharmacologic treatment.  This finding is further highlighted by the fact that the pre-
treatment suicide rate among those treated exclusively with one of the 11 AEDs, was
significantly higher relative to the "pre-treatment" rate in those not pharmacologically
treated (44/1000 versus 15/1000, ERR=2.85, (CI: 1.46-5.57), p<0.002).  Within
individuals treated exclusively with one of the 11 AEDs, significant protective effects of
treatment were also observed (44/1000 versus 3/1000, ERR=0.05, (CI: 0.02-0.18),
p<0.0001).   This finding indicates that following treatment with one of the 11 AEDs
alone, the covariate adjusted rate of suicide attempts was approximately one twentieth of
the suicide rate before treatment in those patients that were previously diagnosed as
having bipolar disorder.



Figure 1: Suicide Attempt Rates Before and After Treatment

## DISCUSSION

The current study in patients with bipolar disorder reveals that as a class, AEDs do not increase risk of suicide attempts relative to patients not treated with an AED or lithium. In fact, among those patients not receiving any concomitant treatment with another AED, lithium, antidepressants, or antipsychotics, the rate of post AED treatment suicide attempts was 3/1000 patient years versus 44/1000 patient years prior to treatment and versus 13/1000 patient years for those who were not pharmacologically treated. These results reveal that AED monotherapy with one of the 11 AEDs results in a statistically and clinically significant reduction in suicide attempt rates relative to both pre-treatment rates (i.e., within patients) and no treatment rates (i.e., between patients), in patients with bipolar disorder.

Our analysis also reveals that there is a selection effect in that the pre-treatment rate of suicide attempts are almost 5 times higher is patients who are ultimately treated with an AED and 7 times higher in patients who are ultimately treated with lithium relative to patients not receiving pharmacologic treatment with one of these drugs. If pretreatment suicide attempt rates reflect severity of illness, it is the more severely impaired patients who are more likely to receive treatment with an AED or lithium relative to those less impaired. Nevertheless, post treatment suicide rates are significantly reduced in those patients treated with an AED or lithium from their elevated pre-treatment levels to the level found at or below patients not receiving treatment (slightly higher for lithium). This finding suggests a protective effect of AED or lithium treatment on suicidality in contrast to FDA's report of an increase in suicidality associated with AED treatment.

Since prior suicide attempt greatly increases the risk of future suicide, that effect would favor higher post-treatment suicide attempt rates in the AED-treated group, an effect that was outweighed by the apparent therapeutic effect of this treatment.

Possible exceptions are topiramate and carbamazepine which did not show significant reduction in suicide attempt rates with treatment and had post treatment suicide attempt rates significantly higher than no treatment levels. Nevertheless, even for these two AEDs, there was no evidence that they increased suicide rates, just that they did not appear to significantly reduce the already elevated pre-treatment suicide attempt rate.

The question arises as to the source of the difference between the results reported here and the findings of the FDA meta-analysis of RCTs. There are several possibilities. First, FDA's analysis was based on adverse events reports of suicidal thoughts and behavior, whereas our analysis is based exclusively on suicide attempts. Suicidal thinking and suicide attempts that are of sufficient magnitude to make it into the medical claims record reflect quite different levels of suicidal intent and may have different relationships to AED treatment. Second, FDA's meta-analysis combined several indications including psychiatric, pain, and epilepsy, but that may not be important because their sub-analysis for psychiatric indications did not provide evidence of significantly increased risk with AED treatment (OR=1.51, CI=0.95-2.45). Third, the majority of the suicidality events in the FDA analyses were observed for only 2 of the 11 AEDs, lamotragine and topiramate. Sixty-one percent of all of the events were observed for these two drugs, despite the fact that these two drugs account for only 38%

of the suicide-related adverse event reports. These two drugs were the only drugs that individually had statistically significant effects on suicidality (lamotragine OR=2.08, CI=1.03-4.40; topiramate, OR=2.53, CI=1.21-5.85) and in the risk difference (RD) analysis that included data from all studies (lamotragine RD=5.40 per 1000, CI=0.24-10.57; topiramate RD=3.05, CI=0.98-5.11). By contrast, the other 9 drugs showed no significant association with suicidality either individually or in combination (OR=1.127, CI=0.652-1.948, p=0.78). These results reveal that FDA's meta-analysis was driven by lamotragine and topiramate, and had these two drugs (that already have suicidality warnings in their labels) been excluded from the analysis, there would have been no remaining signal of an association between AEDs and suicidality. Fourth, the results of FDA's analysis could be affected by two different ascertainment biases. Patients treated with a drug will have more side effects than patients on placebo and therefore more opportunity to report their suicidal thoughts (9). Suicide attempts made by taking an overdose of study medication will result in contact with the health care system (e.g., an emergency room) and therefore have a greater likelihood of being detected than an overdose on placebo (10).

With respect to the previous report by Collins and McFarland (3), their study was restricted to lithium, divalproex, gabapentin, and carbamazapine. For these four drugs, they identified 79 suicide attempts in 7017 person years whereas we identified 100 attempts in 7776 person years, so the overall incidence rate for these four drugs was slightly higher in our study. In terms of suicide attempt rates, they found rates of 6, 19, 10, and 17 per 1000 person years for lithium, divalproex, gabapentin, and carbamazapine

respectively, whereas our post-treatment incidence rates were 18, 9, 13, and 29

respectively.    Rates reported by Goodwin and colleagues (4) were generally higher than

those found by Collins and McFarland (3) and somewhat closer to our study with the

exception of divalproex: 11, 31, and 22 per 1000 person years for lithium, divalproex,

and carbamazapine respectively.

The major differences between our study and the two previous studies are that (a) we

were able to adjust for pre-treatment suicide attempts, (b) we considered AEDs and

lithium monotherapy whereas they designated patients in terms of their first treatment, (c)

we included a no treatment comparator group, and (d) we had pre-treatment data which

permitted a within-subject analysis.

Finally, our estimates of the untreated suicide attempt rate of 13 per 1000 person years

for no treatment with any of the 11 AEDs or lithium and 15 per 1000 person years for no

treatment with any AED, antidepressant, or antipsychotic medication is considerably

below the rate of 40 per 1000 reported by Baldessarini and colleagues (5).    Note

however, that among those bipolar patients who go on to be treated with an AED, the rate

is 72 suicide attempts per 1000 patient years and for those who are ultimately treated with

lithium, the suicide attempt rate is 99 per 1000 patient years.    As such their reported rate

of 40 per 1000 may be a reasonable estimate of the overall rate of suicide attempts in

untreated bipolar patients averaging over the entire range of severity of illness.

There are several limitations of our study. First, our results are based on medical claims data and there is likely to be under-reporting of suicide attempts. Second, we do not have access to information on completed suicides in this population. Third, our analyses do not incorporate intensity of treatment. Fourth, patients were not randomized to treatment, and there may be other factors that play a significant role in the process by which specific treatments are selected for patients. Fifth, diagnoses were obtained from electronic data systems and not from structured psychiatric interviews.

In summary, the present analysis provides no evidence that AEDs increase risk of suicide attempts among patients with bipolar disorder. If anything, the effects of most AEDs and lithium are to reduce suicide attempt rates relative to pre-treatment levels in those patients who are ultimately prescribed these drugs. In patients treated with no other psychotropic medication, the group of 11 AEDs as a whole significantly reduced the suicide attempt rate below that of patients who received no pharmacological treatment, despite the fact that their pre-treatment suicide attempt rate was almost 3 times higher than those who did not receive treatment.

## REFERENCES

1. Information for Healthcare Professionals Suicidality and Antiepileptic Drugs. http://www.fda.gov/CDER/Drug/InfoSheets/HCP/antiepilepticsHCP.htm, January 31, 2008.

2. Statistical review and evaluation. http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4372b1-01-FDA.pdf, May 23, 2008.

3. Collins JC, & McFarland BH. Divalproex, lithium, and suicide among Medicaid patients with bipolar disorder. *Journal of Affective Disorders.* 2008;107:23-28.

4. Goodwin, FK, Fireman, B, Simon, GE, Hunkeler, EM, Lee, J, Revicki, D. Suicide risk in bipolar disorder during treatment with lithium and divalproex. *JAMA.* 2003; 290:1467–1473.

5. Baldessarini RJ, Pompili M, Tondo L. Suicide in bipolar disorder: risks and management. *CNS Spectr.* 2006;11:465–471.

6. Goodwin FK. 1999. Anticonvulsant therapy and suicide risk in affective disorders. *J. Clin. Psychiatry.* 1999;60 (Suppl 2):89–93.

7. Baldessarini, RJ, Tondo, L. Suicide risk and treatments for patients with bipolar disorder. *JAMA.* 2003;290:1517–1519.

8. Müller-Oerlinghausen, B, Berghöfer, A, Bauer, M. Bipolar disorder. *Lancet.* 2002;359:241–247.

9. Posner K, Oquendo MA, Gould M, Stanley B, Davies M: Columbia classification algorithm of suicide assessment (C-CASA): Classification of suicidal events in the FDA's pediatric suicidal risk analysis of antidepressants. *American Journal of Psychiatry.* 2007;164:1035-1043.

10. Gibbons R.D., Brown C.H., Hur K., Marcus S., Bhaumik D.K., Mann J.J. The relationship between antidepressants and suicide: Results of analysis of the Veterans Health Administration datasets. *American Journal of Psychiatry*, 2007;164:1044-1049:2007.