UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------ x
In re: NEURONTIN MARKETING,
SALES PRACTICES AND PRODUCTS
LIABILITY LITIGATION

------------------------------------------------------------ x
THIS DOCUMENT RELATES TO:


PRODUCTS LIABILITY ACTIONS

------------------------------------------------------------ x

: MDL Docket No. 1629
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T.
: Sorokin
:
: **LEAVE TO FILE**
: **GRANTED:**
: **DECEMBER 15, 2008**

**REPLY MEMORANDUM IN SUPPORT OF MOTION
FOR LEAVE TO SUPPLEMENT RECORD ON *DAUBERT* AND SUMMARY
JUDGMENT MOTIONS WITH NOVEMBER 2008 SUPPLEMENTAL
EXPERT REPORT OF ROBERT D. GIBBONS Ph.D.**

Defendants Pfizer Inc. and Warner-Lambert Company submit this reply memorandum in further support of their motion for leave to supplement the record on their pending motions to exclude the testimony of plaintiffs' experts and for summary judgment with the Supplemental Expert Report of Robert D. Gibbons Ph.D.

**Preliminary Statement**

Defendants acknowledge that the Court ruled that Dr. Gibbons could testify at the Daubert hearing only about the FDA Alert. They also acknowledge that the portion of Dr. Gibbons' supplemental report that is at issue – his recent pharmacoepidemiologic study – is not about the FDA Alert *per se* (although it clearly is about whether there is an association between Neurontin and suicidal behavior). They acknowledge that, at least insofar as the pending motions are concerned, they are asking the Court to revisit its ruling.

Plaintiffs, on the other hand, argue that Dr. Gibbons' recent study (the "Study") is late and that it should be excluded because "they have a right to be assured that the orders of this Court are to be abided and the establishment of discovery schedules are to be adhered to and respected." (Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Motion for Leave to Supplement Record on *Daubert* and Summary Judgment Motions with November 2008 Supplemental Report of Robert D. Gibbons Ph.D. ("Plaintiffs' Memo") at 5.) This argument is the height of irony because plaintiffs themselves have ignored multiple deadlines [including the very deadline they seek to enforce] and recently offered a new general causation opinion[1].

Plaintiffs are strenuously seeking to prevent the Study from seeing the light of day even though it is powerful evidence that is critical to the outcome of the pending motions. The Study erases any doubt that may linger due to the FDA Alert. It is concrete proof rather than fanciful theory. It is careful science based on extensive data, not speculation based on hand-picked, unreliable case reports. It is, in fact, the very sort of study that plaintiffs' own experts have said suffices as solid proof on the general causation issue. It is not surprising that one will find in plaintiffs' memorandum no suggestion that the Study is irrelevant or unimportant.[2]

The truth is that the Study is so compelling and so damaging to plaintiffs' case that they do not want the Court to consider it.. But they have only one arrow in their quiver – a claim that the Study is late. It is not, both because it was served before the deadline for expert disclosures on all issues in *Smith* and *Bulger* and because it was served right after the Study was completed.

---

[1] On the virtual eve of his recent deposition in *Smith* and *Bulger*, plaintiffs served a supplemental expert report by Dr. Ronald Maris, a suicidologist. In this supplemental report, Dr. Maris opines as to general causation, which he had never done before.

[2] Plaintiffs have never challenged on *Daubert* grounds the admissibility of Dr. Gibbons' opinions (or the general causation opinion of any other defense expert). Hence, the fact that Dr. Gibbons has <u>additional</u> support for his opinions should in no way provide a basis for a *Daubert* challenge that was never asserted in the first place.

Moreover, plaintiffs have the law wrong. They argue late disclosure and demand exclusion. In this circuit, the extreme sanction plaintiffs seek is appropriate only under circumstances that do not exist here: Plaintiffs can show no cognizable harm because defendants promptly will supply the data on which Dr. Gibbons relied, will make him available for deposition, and will not oppose plaintiffs' submission of their own epidemiologic study (should they at long last conduct the study that they should have done long ago because they bear the burden). Nor can plaintiffs show a pattern of dilatoriness, much less dilatoriness with respect to the Study itself. Dr. Gibbons just completed the Study (and just submitted the related article for publication[3]), and, plaintiffs' claim to the contrary notwithstanding, defendants did **not** have the data on which it is based or any reason to conduct such a study before. Nor can plaintiffs show that the admission of Dr. Gibbons' supplemental report will disrupt the Court's docket or slow the progress of this case.

Defendants have demonstrated that the "gold standard" studies show no association between Neurontin and suicidal behavior, and plaintiffs do not dispute this fact. Instead, plaintiffs say that there have not been enough studies or that the studies are "underpowered." Plaintiffs and their experts even fault defendants for not conducting an epidemiologic study. Well, such a study has been done, and the results are in. And as soon as the results came in, plaintiffs changed their tune. Now the only thing that interests them is a deadline.

The ultimate goal of discovery and the justice system is to ascertain the truth. *See, e.g., United States v. Kattar,* 191 F.R.D. 33, 38 (D.N.H. 1999); *Big Top U.S.A. v. Wittern Group,* 183

---

[3]   Based on the work on the Study, Dr. Gibbons and three co-authors prepared a manuscript on the subject of whether there is an association between anti-epileptic drugs and suicide. The manuscript, a copy of which is attached hereto as Exhibit A, has been submitted for publication. Thus, even if the Court were to exclude Dr. Gibbons' supplemental opinions, they probably would not be out of the case. If the manuscript is published, defendants could always use it to cross-examine plaintiffs' experts.

F.R.D. 331, 343 (D. Mass. 1998); *Loinaz v. EG & G, Inc.*, 910 F.2d 1, [ ] (1st Cir. 1990) *United States v. Ahmed*, 2006 WL 3210037 at *6 (D. Mass.); *Nexxus Products Co. v. New York, Inc.*, 188 F.R.D. 7, 10-11 (D. Mass. 1999); *Unanue-Casal v. Unanue-Casal*, 898 F.2d 839, 942 (1st Cir. 1990); *Polansky v. CNA Ins. Co.*, 852 F.2d 626, 632 (1st Cir. 1988). This is defendants' goal as well, and to promote it they urge the Court to consider Dr. Gibbons' Study in connection with the *Daubert* and summary judgment motions. The Study **will** assist the Court in resolving the *Daubert* and summary judgment motions because, other than the "gold standard" study data, it represents the most important evidence on the issue of general causation. Plaintiffs' effort to keep the Study out reveals that they have a very different goal in mind.

## Background

As the Court will recall, the landscape changed when the Alert was issued early this year. So did plaintiffs' theory of general causation. Plaintiffs' experts previously had acknowledged that the clinical data concerning Neurontin show no signal of an association between Neurontin and suicide. (Docket # 1218 at 2.) But when the FDA issued the Alert, plaintiffs seized on it, via supplemental expert disclosures, as support for their position with respect to general causation. (Docket # 1218 at 3.) Thus, **after the deadline for expert disclosures on general causation**, plaintiffs disclosed a new and different basis for their experts' positions on the subject, to wit, that the clinical data purportedly supported their position that Neurontin causes suicidal behavior.

Defendants asked Dr. Gibbons to try to make sense of the Alert. The Court will recall his findings, including that the Neurontin-specific data from the "gold standard" studies do not show any association between Neurontin and suicidal behavior, and that the FDA's finding of an increased risk was based on the exclusion of most of the Neurontin data and was driven by the

data with respect to two drugs other than Neurontin. (*See, e.g.,* Transcript of proceedings of June 20, 2008, at 325-27 ) (The Court will also recall that Dr. Gibbons reached some of his opinions on the eve of the hearing because the data concerning the other drugs covered by the Alert had just become available. (*Id.* at 314-17.))[4]

Plaintiffs were not deterred by Dr. Gibbons' analysis. At the *Daubert* hearing, some of their experts claimed that the Alert vindicated them, while one, Dr. Blume, acknowledged the lack of a signal in the gold standard studies on Neurontin, but said (incorrectly) that the studies were underpowered. She went on to list the other types of evidence based on which, according to her, a causation determination can be made in the absence of the alleged insufficiency of gold standard studies. (*Id.* at 125-27.) She erred in most respects, because she included types of evidence that neither the FDA nor experts view as reliable proof of causation (e.g., case reports). But she was correct insofar as she suggested that proper epidemiologic studies are solid evidence. (*Id.* at 126.) In fact, she not only confirmed the reliability of such studies, she faulted defendants for not having conducted one. (*Id.* at 175-77) Even now, plaintiffs argue that, notwithstanding the demonstrable lack of any signal in the "gold standard" studies, defendants should have conducted an epidemiologic study. (Plaintiffs' Memo at 6-7.) Of course, they have no valid explanation for this position, which ignores that the burden of proof is theirs.

After the hearing, Dr. Gibbons conducted such a study. He did precisely that which Dr. Blume claimed (without justification) defendants should have done before. The study and its results are described in paragraphs 11 through 19 of Dr. Gibbons' supplemental report. (Docket # 1489, Ex. A, ¶¶ 11-19.)

Dr. Gibbons obtained data on over 130,000 Neurontin-treated plaintiffs. He obtained the

---

[4] Plaintiffs attempted to prevent Dr. Gibbons from testifying with respect to his findings on the data as to all 11 anti-epileptic drugs, even though it had just been made available by the FDA. Plaintiffs revealed then, as they do now, that they are not interested in what the facts really are.

5

data not from defendants, who do not have such data, but from a third-party, PHARMetrics. (Plaintiffs' claim that defendants have such data is unsupported and simply incorrect.) He analyzed the data for the risk of suicide behavior following treatment with Neurontin. He concluded:

> These findings clearly reveal that in this cohort of over 130,000 patients treated with gabapentin, there is no overall increased risk of suicide attempt associated with gabapentin treatment. Gabapentin does not increase the likelihood of suicide attempts, and the suicide attempts considered here were of sufficient severity to make it into the medical record. However, among patients with a psychiatric disorder, who are at increased suicidal risk, statistically significant protective effects of gabapentin were clearly demonstrated. . . . [T]hese findings suggest that among those patients at increased risk of serious suicide attempts, gabapentin significantly decreases their risk of making a suicide attempt. Whether this protective effect is based on reducing the symptoms of the psychiatric disorder or by treating the concomitant pain disorder that is present in many of these patients remains an open question.

(Docket # 1489, Ex. A, ¶ 19.) In short, Dr. Gibbons has concluded, based on a study of data relating to over 130,000 patients, that **there is no overall increased risk of suicide attempt associated with Neurontin and that, in certain patient groups (*e.g.*, patients with psychiatric disorders), Neurontin is actually protective against suicidality.** It could not be any more obvious why plaintiffs do not want the Court to consider the Study.

Dr. Gibbons' supplemental expert report was served on plaintiffs on November 10, 2008, the date by which defendants were required for the first time in this litigation to designate experts and serve expert reports on issues other than general causation. The supplemental report responds not only to plaintiffs' experts' general causation opinions, but to other issues as well, such as plaintiffs' experts' failure to warn opinions. Dr. Gibbons' just-completed pharmacoepidemiologic analysis is directly responsive to plaintiffs' assertion that defendants should have conducted an epidemiologic study and, in turn, issued a suicidality warning. It is indisputable that these opinions and the grounds for these opinions were timely served on

6

November 10, 2008. At the same time, Dr. Gibbons' pharmacoepidemiologic analysis is powerful additional support for defendants' *Daubert* challenge and should be considered in ruling on defendants' *Daubert* motion. For that reason, defendants filed the instant motion.

## Argument

## DR. GIBBONS' STUDY SHOULD NOT BE EXCLUDED

### A.  Legal Principles

Under Rule 26(a)(1), expert disclosures are required "at the times and in the sequence that the court orders . . .," and, in the absence of a stipulation or order, "at least 90 days before the date set for trial or for the case to be ready for trial . . . ." Overlaying these obligations is the duty to supplement: "The parties must supplement these disclosures when required under Rule 26(e)."

Rule 26(e)(1) requires a party to supplement its disclosures "if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(2) establishes specific supplementation obligations with respect to expert disclosures:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

These "supplement requirement[s] help[] a party avoid the burden of responding to unexpected and last-minute changes in its opponent's expert testimony . . . and promote[] the broader purpose of discovery, which is 'the narrowing of issues and the elimination of surprise.'" *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 693-94 (1st Cir. 2000) (internal citation omitted).

Where a party fails properly to disclose and to supplement with respect to an expert's opinions as required by Rule 26(a)(2)(B) and Rule 26(e), the party may be precluded from offering the opinion unless the party demonstrates "substantial justification" for the failure **or** that the failure was "harmless." Fed. R. Civ. P. 37(c)(1). Preclusion of an expert's opinion is, however, a "grave step, not to be undertaken lightly . . . ." *Thibeault v. Square D Co.*, 960 F.2d 239, 247 (1st Cir. 1992). A court therefore must give careful consideration to whether substantial justification or harmlessness exists. *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 198 (1st Cir. 2006). And it "must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets . . .," meaning that

> [A court] must consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation. So too is an assessment of what the late disclosure portends for the court's docket.

*Macaulay v. Anas*, 321 F.3d 45, 51 (1st Cir. 2003) (internal citations omitted).

**B.     The Supplemental Report Is Timely**

The deadline for defendants' expert disclosures in *Bulger* and *Smith* was November 10, 2008. That day, defendants served Dr. Gibbons' supplemental report, along with the reports of the other experts whom defendants expect to call if *Bulger* and/or *Smith* go to trial. (The parties are in the process of scheduling the depositions of these experts.) The reports were timely, and, naturally, they cover the full gamut of opinions that the experts would offer at any trial, including opinions as to general causation. (If they did not, plaintiffs undoubtedly would be making a different preclusion argument come trial.) Dr. Gibbons' Study forms part of the basis for his opinion on general causation in *Bulger* and *Smith and part of the basis for his other opinions.* The Study is in.

8

Plaintiffs appear to be arguing that anything having to do with general causation that appears in any of the reports served on November 10 and that did not appear in reports served before the December 2007 deadline is off limits, even in *Bulger* and *Smith*. This argument does not hold water. Logically, it would mean that none of defendants' experts, save Dr. Gibbons, could testify concerning the FDA Alert, while plaintiffs' experts would have free rein to do so because they supplemented **after the December 2007 deadline**. It would mean that all of defendants' experts would have to ignore all other relevant developments since the December 2007 deadline, e.g., new literature, additional pronouncements by the FDA, and new studies. Plaintiffs' position is unfair, unworkable, and inconsistent with their own behavior and, most important, the goal of ascertaining the truth.

Moreover, defendants certainly are permitted – actually, required – to supplement, and the Study qualifies as appropriate supplementation. The Study did not exist before, and it was not even a gleam in defendants' eye in December 2007. Indeed, what prompted defendants to conduct the Study was principally plaintiffs' insistence at the *Daubert* hearing that defendants should have conducted such a study and their admission that such a study would be, in the alleged absence of sufficiently powered "gold standard" studies, the next best evidence with respect to general causation. Plaintiffs themselves were arguing that the scientific record was incomplete, and they should not be heard to complain about defendants' plugging of the alleged gap on which plaintiffs intended to capitalize.

This is not to say that Dr. Blume's claims that defendants should and easily could have conducted such a study are true. Given the demonstrated absence of any signal in the extensive data from the placebo-controlled studies of Neurontin, defendants had no reason or obligation to undertake an epidemiological study. Further, defendants simply did not have on hand the data

for such a study.[5] Dr. Gibbons had to obtain it from a third party. Further still, plaintiffs bear the burden of proof.

Nevertheless, defendants' expert ventured into the epidemiologic waters, doing that which plaintiffs, the burden bearers, should have done. Plaintiffs' experts, not defendants', should be faulted for not conducting an epidemiologic study before. To grant plaintiffs the relief they seek would allow them to gain from a calculated decision to stick their heads in the sand in the hope that a patchwork of unreliable evidence and fanciful theories would suffice. And to grant them the relief they seek would deny the Court critical evidence.

## C. Exclusion is Unwarranted

Even assuming that the Study is neither timely nor proper supplementation, it should not be stricken. Defendants' disclosure of the Study on November 10 was both "substantial[ly] justified" and "harmless," Fed. R. Civ. P. 37(c)(1). Further, the factors that must be considered, e.g., the need to for the evidence, weigh against the "grave step" that plaintiffs demand.

Defendants were substantially justified in not disclosing the Study before the December 2007 deadline. It did not exist before then, and defendants had neither an obligation nor a reason nor the data to conduct such a study before it was conducted. Things changed after December 2007. Plaintiffs claimed at the hearing that defendants should have conducted an epidemiologic study, implying, through their ill-conceived case report analyses, that the epidemiologic evidence would support their causation claim. Moreover, the Alert had muddied the waters, and plaintiffs were attempting to capitalize on the confusion. It was the confluence of these claims, events,

---

[5] Plaintiffs repeatedly refer to the Study as "manufactured," but do not explain what they mean by this pejorative term. It should be disregarded. They also argue, citing *Dufresne v. Microsoft Corp.*, 2006 U.S. Dist. LEXIS 57243 (D. Mass. 2006), and *Lubanski v. Coleco Indus., Inc.*, 929 F.2d 42 (1st Cir. 1991), that the Study should be excluded because the data on which the Study is based are old and defendants therefore must have had (and withheld) it. This argument is based on the flawed factual premise that defendants had the data. As noted above, they did not. Dr. Gibbons recently obtained it for his Study.

10

and circumstances that induced defendants to have Dr. Gibbons do the Study. Thus, defendants were substantially justified in not disclosing the Study before it ever existed and for not causing it to come into existence before it did. Indeed, defendants should be lauded for having commissioned the study when they did, thereby advancing the science on the general causation issue.

Further, plaintiffs have not been harmed. To begin, the part of Dr. Gibbons' supplemental report that relates to the Study is only nine paragraphs long, and the Study is quite straightforward. Further, plaintiffs have requested, and defendants have agreed to provide, the materials on which Dr. Gibbons relied in conducting the Study, and more. Specifically, plaintiffs shortly will receive (1) a CD with the PHARMetrics data sets; (2) a CD showing the SAS programs with the analyses Dr. Gibbons conducted; (3) the manuscript that Dr. Gibbons has submitted for publication; (4) the PHARMetrics license agreement signed by Dr. Gibbons; and (5) Dr. Gibbons' letter of retention with defendants' counsel. Plaintiffs will have an opportunity to depose Dr. Gibbons and ample time to prepare for the deposition. Plaintiffs could even conduct their own epidemiologic study, and, if they were to offer it, defendants would not object that it is untimely.[6]

Moreover, when the factors that must be weighed are weighed, the scale tips decidedly against exclusion.

The "history of the litigation" weighs against exclusion. The relevant history, particularly the genesis of the Study and its import to the pending motions, is described above. Nothing in that history suggests any bad faith or dilatoriness on the part of defendants. Everything in that history points toward a good faith effort to plug an alleged hole based on which plaintiffs, despite their burden, hoped to capitalize, and toward a pressing need for the

---

[6] The parade of horrible that plaintiffs suggest will not occur.

admission of all competent evidence relating to whether there is an association between Neurontin and suicidal behavior.

Defendants' "need" for the Study weighs against exclusion. Needless to say, the Court's decision will have major ramifications. While defendants believe that the Court can and should rule in their favor based solely on the placebo-controlled, double blind studies, it may not. If it does not, it will be absolutely critical that the Court have the benefit of the Study. It is compelling evidence.

Plaintiffs will be able to overcome any alleged "adverse effects." They will have every opportunity to scrutinize Dr. Gibbons' work and to cross-examine him. They will have every opportunity to conduct their own study. Indeed, defendants encourage them to do so.

While it may be true that plaintiffs were surprised to receive the Study, they should not have been too surprised. In fact, the Study probably represented less a surprise than their worst fears coming true.

The "prejudice" factor also weighs against exclusion, for the reasons discussed above. Plaintiffs will have ample opportunity to evaluate, cross-examine, and respond.

Finally, admission of the Study will not affect the Court's docket. Plaintiffs' claim to the contrary notwithstanding, the admission of nine paragraphs of a single report will not slow any proceedings. In fact, if the Study and any response thereto end up being the evidence that convinces the Court that there is no reliable scientific evidence of an association between Neurontin and suicide, the Court's docket will be substantially lightened.

## Conclusion

For the foregoing reasons and those previously stated, defendants respectfully request that their motion be granted and that the Court consider Dr. Gibbons' Study in connection with the pending *Daubert* and summary judgment motions.

Dated: December 16, 2008                    DAVIS POLK & WARDWELL

                                         By:     /s/ James P. Rouhandeh
                                                    James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

SHOOK, HARDY & BACON L.L.P.

By:     /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

-and-

HARE & CHAFFIN

By:     /s/ David B. Chaffin
        David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on December 16, 2008.

/s/ David B. Chaffin<br>
David B. Chaffin