Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) |

MDL Docket No. 1629
Master File No. 04-10981
Judge Patti B. Saris
Mag. Judge Leo T. Sorokin

**REPLY TO DEFENDANTS' OPPOSITION TO CLASS PLAINTIFFS'
MOTION FOR LEAVE TO SERVE SUPPLEMENTAL EXPERT REPORTS**

The proposed expert reports of Dr. Barkin and Dr. Furberg are highly relevant to Class Plaintiffs' fraudulent marketing claims that Defendants marketed Neurontin as effective for bipolar and other mood disorders while suppressing evidence that it was ineffective. Moreover, they directly support the certification of both consumer and third-party payer classes beginning in November 1995. Defendants overstated procedural hurdles and arguments of prejudice are not persuasive and should be set aside.

I.   THE PROFFERED REPORTS ARE HIGHLY RELEVANT TO CLASS PLAINTIFFS'
     CLAIMS

The proffered reports of Dr. Barkin and Dr. Furberg ("Expert Reports") establish that Defendants, beginning in November 1995, suppressed negative material evidence from their marketing claims that Neurontin was an effective drug for the treatment of bipolar and other mood disorders. The Expert Reports demonstrate that Class Plaintiffs' do not seek damages for the mere off-label marketing of Neurontin, but rather for the fraudulent marketing of Neurontin, beginning in November 1995.

The Expert Reports do not represent "a new theory of liability," as Defendants inaccurately claim (See Opposition To Class Plaintiffs' Motion For Leave To Serve Supplemental Expert Reports ("Opposition"), Docket No. 1517), rather they are consistent with Class Plaintiffs' claim that Defendants continually suppressed evidence of Neurontin's inefficacy. The suppression of evidence of lack of efficacy was the hallmark of Defendants' fraudulent marketing of Neurontin for bipolar and other mood disorders from the very beginning of their deceitful marketing campaign.[1]

In his proposed report, Dr. Furberg opines that "[t]he off-label promotion of a drug when the Sponsor conceals evidence that directly contradicts the promotional claims is fraud on the medical and scientific communities and the patients they treat."[2] Among Dr. Furberg's conclusions is the finding that Defendants made statements to physicians of Neurontin's beneficial effects on mood while failing to disclose critical data that "contradicted claims of beneficial effects on mood."[3] Specifically, Dr. Furberg reviews an article authored by Defendants ("Dimond Article") and finds that the article makes "unsubstantiated claims" including that Neurontin is free from adverse effects on mental functioning, "a false claim

---

[1] In their opposition, Defendants draw a distinction between mood data obtained from multiple epilepsy trials and mood data obtained from bipolar trials.  This distinction is not one to which Defendants adhere.  Defendants have based promotional claims that Neurontin was an effective therapy for mood disorders on mood data obtained from epilepsy trials.  Defendants' employees even authored a journal article, based on mood data from the epilepsy trials, entitled "Effect of Gabapentin (Neurontin®) on Mood and Well-Being in Patients with Epilepsy," in which they claimed that their findings "suggest a *beneficial effect* of gabapentin on mood" and "support gabapentin's *lack of adverse effects on mental functioning*."  See Dimond KR, Pande AC, LaMoreaux L, Pierce MW. Effect of Gabapentin (Neurontin) on Mood and Well-Being in Patients with Epilepsy. *Prog Neuropsychopharmacol Biol Psychiatry* 1996;20:407-17 attached as Exhibit 1 (emphasis added).  Defendants now claim that the suppression of mood data obtained from epilepsy trials, which contradict these claims of efficacy, is not relevant to Class Plaintiffs' claims that Defendants suppressed evidence of Neurontin's inefficacy.

[2] Class Plaintiffs' Motion For Leave to Serve Supplemental Expert Reports, Exhibit B (Docket No. 1503-3), Expert Report of Curt Daniel Furberg, M.D., Ph.D. ("Furberg Report") at 18.

[3] Id. at 8.

directly contradicted by the FDA's medical review."[4]  Finally, Dr. Furberg states that Defendants "engaged in the fraudulent off-label promotion of gabapentin for indications, including bipolar and other mood disorders, even when there was no evidence of treatment benefit and *despite the existence of evidence of treatment worsening.*"[5]  Dr. Furberg's expert report fully supports Class Plaintiffs' fraud claims that Defendants marketed Neurontin beginning in November 1995 as an effective therapy for mood disorders while suppressing evidence that it was actually ineffective.

Similarly, Dr. Barkin states quite clearly in his introduction that: "documents reviewed in the course of preparing this supplemental report bolster my core opinions that gabapentin is an ineffective medication for the treatment of mood disorders that was misleadingly marketed as effective by Defendants who *continually* suppressed negative evidence."[6]  Dr. Barkin opines that once "Defendants decided to market gabapentin as an effective treatment for mood disorders, including bipolar disorder, what was a safety signal noted in the epilepsy trials, became evidence that contradicted their marketing message."[7]  After reviewing Defendants' documents related to promotional teleconferences that commenced in November 1995, Dr. Barkin concludes that the negative evidence of Neurontin's effect on mood, contained in the FDA's 1992 review, was not disclosed.   He also reviews the Dimond Article concluding "that the FDA's finding were omitted misleading the reader to believe that gabapentin had both a beneficial effect on mood and was free of adverse effects on mood."[8]  In his conclusion, Dr. Barkin states that the FDA's

---

[4] Id. at 17.

[5] Id. at 19 (emphasis added).

[6] Class Plaintiffs' Motion For Leave to Serve Supplemental Expert Reports, Exhibit A (Docket No. 1503-2), Supplemental Report On The Use of Neurontin For Bipolar And Other Mood Disorders ("Barkin Report") at 1 (emphasis added).

[7] Id. at 2.

[8] Id. at 5.

medical review "provide[s] early evidence of gabapentin's lack of beneficial, and possible

worsening, effect on mood,"[9] evidence which Dr. Barkin repeatedly recounts as suppressed from

promotional materials.   Finally, Dr. Barkin writes that:

> The suppression of the FDA's medical review, the safety signal contained therein
> and the underlying data concerning effect on mood, allowed the company to
> promote gabapentin as an effective and safe treatment for mood disorders, based
> solely on anecdotal reports and free from the impairment on sales that disclosure
> of this negative data would have created.[10]

The foregoing demonstrates that the Expert Reports have direct relevance to the

Class Plaintiffs' fraud claims and the certification of bipolar and other mood disorders

classes.

## II.   DEFENDANTS' PROCEDURAL ARGUMENTS LACK MERIT

Defendants argue that where a party has proffered expert testimony after the original date

set for the disclosure of expert testimony, the "required sanction in the ordinary course is

mandatory preclusion," citing Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 191 (1st Cir.

2006).   Defendants overstate the holding in Gagnon.   Gagnon, indeed, makes it clear that

preclusion cannot be invoked merely because a party fails to meet a deadline, 437 F.3d at 197-

199[11]; the Court must first find that the delay was "substantially unjustified" and that the late

disclosure was not "harmless."   This Court has discretion in making such findings, but several

factors, other than tardiness, must be considered.   Among them:

---

[9] Id.

[10] Id.

[11] Even though the First Circuit agreed that the plaintiffs in Gagnon were not substantially justified in filing their
experts' reports after the Court's deadline, and that the late disclosure might not be harmless under the
circumstances, it still vacated the District Court's preclusion order given the severity of the sanction and the ability
of the Defendants to respond to the Plaintiffs' late disclosure.  437 F.3d at 198.

the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's ability to overcome its adverse effects.  Surprise and prejudice are important integers in this calculation.  So too is an assessment of what the late disclosure portends for the court's docket.

Macaulay v. Anas, 321 F.3d 45, 51 (1st Cir. 2003).  In making these determinations, a Court

must always keep in mind that "preclusion of expert testimony is a grave step, not to be

undertaken lightly."  Primus v. United States, 389 F.3d 231, 234-35 (1st Cir. 2004); Thibeault v.

Square D Co., 960 F.2d 239, 247 (1st Cir. 1992).

### A.    Defendants Omit Critical Facts Supporting Plaintiffs' Justification For Seeking Leave To File Supplemental Reports

Defendants' arguments relating to lack of timeliness and justification are

defective.  Defendants attempt to draw an inapposite parallel between Class Plaintiffs'

current efforts to supplement their expert opinions for their case-in-chief with their own

unsuccessful attempt to supplement the Daubert and summary judgment records in the

Products Liability actions.  (See Motion for Leave to Supplement Record on Daubert and

Summary Judgment Motions with November 2008 Supplemental Expert Report of

Robert D. Gibbons, PhD ("Gibbons Motion"), Docket No. 1489).  Putting aside that

Defendants did not seem so concerned about timeliness when they filed their motion to

supplement their expert opinions, Class Plaintiffs' pending motion is thoroughly

distinguishable based on a variety of factors that Defendants fail to mention.   First,

Defendants in the Products Liability action sought to supplement the record in relation to

a Daubert motion after the motion had been fully briefed and oral argument heard.   Here,

no Daubert motions have even been filed.  Class Plaintiffs are merely seeking to

supplement the expert testimony in support of their case-in-chief.  To the extent that all of

the Class Plaintiffs' expert reports are part of the record for the pending motion for class

certification, it is noteworthy that none of them (except for the report of Dr. Conti) were prepared prior to the Court's hearings on class certification.  Additionally, motions for summary judgment in this case are not due until March 2, 2009, further rendering the comparison to the Gibbons Motion inappropriate, since a summary judgment motion in the Products Liability actions has already been fully briefed.

Second, the supplemental report of Dr. Gibbons was proffered in the Products Liability actions <u>well after both sides</u> had served their expert reports, and <u>after both sides</u> had conducted expert discovery and depositions.  Here, disclosure of the supplemental Expert Reports was made prior to Defendants' disclosure of their expert reports, and no deposition has been conducted <u>by either side</u> on a final expert report (again with the exception of Dr. Conti).

Finally, Defendants do not even accurately summarize the outcome of the Gibbons Motion.  While it is true that the Court denied the Gibbons Motion, Defendants, incredibly, leave out the most relevant part of the order, which stated: "the Court will <u>permit</u> defendant to introduce the study at trial. Accordingly, the Court will <u>permit</u> expert discovery on the report."  (<u>See</u> Electronic Order dated December 2, 2008) (emphasis added).  Rather than mandating a denial of Class Plaintiffs' motion, the Court's order on the Gibbons Motion actually supports allowance of this instant motion.

Defendants' argument for lack of justification is similarly unavailing.  The argument that Class Plaintiffs lack "credible justification for delay" is based entirely on the supposition that Class Plaintiffs have known or should have known of Neurontin's association with depression for "years."  Even if Class Plaintiffs should have known prior to the October hearing that the fraud claims of Products Liability plaintiffs were

6

analogous to those of Sales and Marketing plaintiffs, until July 2008, there was simply no independent, scientific evidence upon which Class Plaintiffs could have relied to make that determination.  While it is correct that Class Plaintiffs were aware of <u>allegations</u> of the connection between suicide and depression since anecdotes of suicide first became publicized, the earliest possible time when Class Plaintiffs could have been aware of a <u>demonstrated association</u> was in July 2008 when the FDA's Advisory Committee found that one existed—only two weeks before Dr. Barkin's original report was completed.

**B.     Defendants' Claim of Prejudice Rings Hollow**

Defendants cannot credibly claim to be genuinely surprised by evidence that has already been hotly litigated in the Products Liability actions.  (<u>See</u> Class Plaintiffs' Motion For Leave To Serve Supplemental Reports, Docket No. 1503, ¶6.)  Nor can Defendants' suggestion that the burden of additional discovery will be insurmountable be taken seriously.  (<u>Id.</u>, ¶7).  Defendants argue that they have been deprived of the opportunity to address the supplemental reports of Dr. Barkin and Dr. Furberg in their own expert reports that were served two days ago.  Given the narrow scope of these supplemental expert reports,[12] Class Plaintiffs believe the case can go forward with expert discovery as planned and would have no objection to Defendants serving a narrowly-tailored report in response to the Expert Reports within 30 days from allowance of this motion.  Moreover, if Defendants need to identify a new expert for this purpose, Class Plaintiffs would agree to waive any opportunity to depose such expert.

---

[12] Dr. Barkin's proposed supplemental report is a mere six pages, a small fraction of *any* of the expert reports served by either side.

7

III.     DEFENDANTS AGREE THAT THE COURT SHOULD RESOLVE THESE
         CASES ON THEIR MERITS BY ALLOWING THE COURT AND THE FACT
         FINDER TO HEAR THE MOST RELEVANT EXPERT TESTIMONY

        Defendants themselves have set forth the most important reason why the Class

Plaintiffs should be allowed to serve the supplemental Expert Reports.  As they stated in

a reply memorandum filed in the MDL only yesterday, "[t]he ultimate goal of discovery

and the justice system is to ascertain the truth.  This is defendants' goal as well…"  (See

Reply Memorandum in Support of Motion for Leave to Supplement Record on Daubert

and Summary Judgment Motions with November 2008 Supplemental Expert Report of

Robert D. Gibbons Ph.D. (Docket No. 1518) at 3-4).  Granting leave to serve the Expert

Reports will allow the best evidence and the most complete record to be put before the

trier of fact in order to determine whether consumer and TPP classes were victimized by

a pervasive fraud.  For the reasons described above, Defendants will have the full ability

to present a defense with their best and most complete evidence.  Whether the Class

Plaintiffs win or lose, the interests of the justice system will be best served if this motion

is allowed.


                                    CONCLUSION

        For the reasons set forth herein, Class Plaintiffs respectfully request that the Court grant

leave to serve upon the Defendants the Supplemental Report on the Use of Neurontin For

Bipolar and Other Mood Disorders, by Dr. Jeffrey S. Barkin, and the Expert Report of Curt

Daniel Furberg, M.D., Ph.D.

Dated: December 17, 2008

*Members of the Class Plaintiffs' Steering Committee*

By:     */s/ Thomas Greene*
        Thomas Greene
        Greene & Hoffman, P.C.
        33 Broad Street, 5th Floor
        Boston, MA 02109

By:     */s/ Don Barrett*
        Don Barrett
        Barrett Law Office
        404 Court Square North
        P.O. Box 987
        Lexington, MS 39095

By:     */s/ Barry Himmelstein*
        Barry Himmelstein
        Lieff Cabraser Heimann &
        Bernstein, LLP
        Embarcadero Center West
        275 Battery Street, 30th Floor
        San Francisco, CA 94111-3339

By:     */s/ James Dugan*
        James Dugan
        Dugan & Browne, PLC
        650 Poydras Street, Suite 2150
        New Orleans, LA 70130

By:     */s/ Thomas M. Sobol*
        Thomas M. Sobol
        Edward Notargiacomo
        Hagens Berman Sobol Shapiro LLP
        One Main Street, 4th Floor
        Cambridge, MA 02142

By:     */s/ Daniel Becnel*
        Daniel Becnel, Jr.
        Law Offices of Daniel Becnel, Jr.
        106 W. Seventh Street
        P.O. Drawer H
        Reserve, LA 70084

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on December 17, 2008.

/s/Ilyas J. Rona
Ilyas J. Rona

# Exhibit 1



*Prog. Neuro-Psychopharmacol. & Biol. Psychiat.* 1996. Vol. 20, pp. 407–417
Copyright © 1996 Elsevier Science Inc.
All rights reserved
0278 – 5846/96 $32.00

PII S0278-5846(96)00005-X

# EFFECT OF GABAPENTIN (NEUROTONIN®) ON MOOD AND WELL-BEING IN PATIENTS WITH EPILEPSY

KATE R. DIMOND, ATUL C. PANDE, LINDA LAMOREAUX, MARK W. PIERCE

CNS Clinical Research and Development, Parke-Davis Pharmaceutical Research,

Division of Warner-Lambert Company, Ann Arbor, MI, U.S.A.

(Final form, February 1996)

## Abstract

Dimond, Kate R., Atul C. Pande, Linda LaMoreaux and Mark W. Pierce: Effect of gabapentin (Neurontin®) on mood and well-being in patients with epilepsy. Prog. Neuro-Psychopharmacol. & Biol. Psychiat. 1996, <u>20</u>.

1.  Global improvement data from five double-blind clinical trials of gabapentin as add-on therapy in patients with epilepsy were reviewed to assess the effects of gabapentin on mood.

2.  One hundred and ninety-four (46%) of 423 gabapentin-treated patients reported improvements in general well-being as compared with 79 (29%) of the 271 placebo-treated patients.

3.  Findings support anecdotal reports of improved affective status among patients taking gabapentin and suggest that the study of gabapentin in psychiatric populations may be warranted.

<u>Keywords</u>:     anti-convulsant, gabapentin, mood, well-being

<u>Abbreviations</u>:  anti-epileptic drug (AED), Gabapentin (GBP), placebo (PBO), Quality of Life (QOL)

K.R. Dimond *et al.*

<u>Introduction</u>

Certain anticonvulsants have gained an important place in psychiatry due to their beneficial effects on mood and well-being. Valproate and carbamazepine have been shown to stabilize mood in patients with bipolar disorder (Dilsaver et. al., 1993; McElroy et. al., 1992), and a number of reports have suggested that valproate and carbamazepine may also help to relieve anxiety (Primeau et. al., 1990; Roy-Byrne et al., 1989; Galpern et. al., 1991; Schweizer et al., 1991). In addition, benzodiazepines have long been accepted as effective treatment for both seizure and anxiety disorders. Though effective in epilepsy, the older anti-convulsants, phenytoin, ethosuximide, and the barbiturates, do not seem to have useful psychotropic properties.

The variable efficacy of anticonvulsants in the treatment of psychiatric disorders is likely a function of their different mechanisms of action. While phenytoin and carbamazepine are thought to inhibit seizures by voltage-dependent blockade of sodium channels in brain (Ragsdale et. al., 1991; MacDonald, 1995a), both compounds have additional pharmacological actions. In particular, carbamazepine modulates responses to adenosine and the glutamate agonist N-methyl-D-aspartate, which may explain its effects on mood and behavior (MacDonald, 1995a). Benzodiazepines (MacDonald, 1995b) and valproic acid (Fariello et. al., 1995) modulate inhibitory GABA systems in the brain, which may account for their efficacy as anti-epileptic and psychiatric agents. Not only are measures of GABA activity abnormal in many psychiatric patients (Enna, 1984; Cross et al., 1988; Petty et. al., 1993; Kasa et al., 1982; Petty and Sherman, 1981), but numerous anxiolytic and antidepressant compounds have been shown to interact with the GABA system (Lloyd et. al., 1985; Breslow et. al., 1989; Motohashi, 1992).

Although originally developed to enhance the actions of GABA (Satzinger, 1994), the pharmacology of gabapentin (Neurontin®) is not completely understood (Taylor, 1995). Gabapentin is shown to increase the enzyme activity of glutamic acid decarboxylase in vitro (Taylor et. al., 1992), GABA turnover in vivo (Loescher et. al., 1991) and non-synaptic GABA responses in vitro (Kocsis and Honmou, 1994; Honmou et. al., 1994). While gabapentin increases GABA release (Goetz et. al., 1993), it reduces the potassium-induced release of several mono-amine neurotransmitters (noradrenaline, dopamine, serotonin) from brain tissue in vitro (Reimann, 1983; Schlicker et. al., 1985). Interaction with GABA and/or mono-amine neurotransmitter systems may explain the anxiolytic-like actions of gabapentin in several

animal models (G. Woodruff, T. Heffner, personal communication).

In human subjects, gabapentin has been shown to increase whole blood serotonin (Rao et. al., 1988), lengthen sleep stages 3 and 4 without change in REM sleep, augment delta and theta activity in electroencephalogram, and to produce subtle psychotropic effects (Saletu et. al., 1986). Animal and clinical studies suggest that gabapentin may have useful psychotropic actions similar to the other anticonvulsants used in psychiatry today. This retrospective analysis attempts to examine the effect of gabapentin on mood in epilepsy patients who were treated with gabapentin added to a regimen of other anti-epileptic drugs.

## Methods

### Included studies

Data from patients (N=705) with refractory partial seizures who took part in five placebo-controlled, multi-centered double-blind studies in the United Kingdom, the United States and Europe, were pooled.  These studies were similar in design, hence, pooling data appeared justified. Studies were conducted under the principles of the Declaration of Helsinki; thus, voluntary informed consent was obtained from patients prior to their participation.

In each study, gabapentin was administered as add-on therapy to patients who were receiving one or more concurrent anti-epileptic drugs (AEDs), without adequate seizure control. Baseline data were collected for all patients for 3 months prior to treatment with study medication. In the subsequent 12-week treatment phase, patients were randomized to receive either placebo (pbo) or gabapentin (gbp) at a dosage of 600 mg/day, 900 mg/day, 1200 mg/day, or 1800 mg/day TID.

### Assessment of Seizure Control

The effect of GBP on seizures was assessed using the response ratio (RRatio), derived by the formula $(T-B)/T+B)$, where T and B represent the frequency of seizures on treatment and at baseline.  The RRatio signifies a reduction in seizure frequency when negative and an increase when positive.

### Global Assessment of Well-being

Global assessments were collected for 694 (98%) of the 705 epilepsy patients who took part

410                                              K.R. Dimond *et al.*

in the gabapentin add-on therapy trials. In the first trial, patients used a four point scale to

Table 1.

Summary of Global Assessments

| Study | 877-210P | 945-5*, -6, -9, -10 |
|---|---|---|
| Dose (mg/day) | 1200 | 600, 900, 1200, 1800 |
| Assessment | Global improvement in patients' general condition<br><br>Global improvement in patients' seizures | Improvement in activities of daily living (ADLs) |
| Anchor Points | Marked/Slight<br>No change<br>Worse | Better<br>Same<br>Worse |
| Methods of defining assessment | Percentage of patients with global improvement in general condition but not seizures | Percentage of patients with improvement in ADLs but not seizures (positive RRatio)<br><br>Physician comments |

*Beneficial effects on quality of life were rated by investigators in Study 945-5; all other global assessments summarized here were made by patients.

evaluate both improvement in General Condition, defined as well-being by the study protocol, and improvement in Seizures at every visit after treatment began. In the four studies that followed, patients' rated their ability to perform the Activities of Daily Living (ADLs) on a three point scale at the end of double-blind treatment as compared with before study entry (Table 1). The ADLs rating was interpreted by patients and investigators as a global measure of "well-being" in three of the studies that used this measure, as recorded in regulatory records. In the fourth ADLs study (945-5), an additional measure of global improvement, Beneficial Effects on Quality of Life (QOL), was introduced half-way through the trial at the suggestion of investigators who noted that patients' affective, cognitive, and social improvements were not being adequately captured by the ADLs rating.

Data Reduction and Analysis

  Global improvement differences between gabapentin- and placebo-treated patients were assessed using a chi-square test. Data for the four studies in which ADLs were rated were combined for analysis, while final visit ratings of General Condition made from the first study were assessed separately. The four point scale used to evaluate General Condition was condensed to three-points, to facilitate comparison with the global evaluations made on the three-point ADLs rating scale.

  To interpret the global assessments made in each of the epilepsy trials, global ratings from patients who experienced no improvement in epileptic activity were assessed by treatment group. Patients were considered to have experienced increased well-being that was unrelated to seizure control if (a) in the first trial, they reported improved general condition in spite of unchanged to worsened seizure activity, or, (b) in the four following trials, they reported improvement on the ADLs global assessment, but demonstrated no decrease in seizure frequency (positive RRatios). Chi-square tests were performed to assess differences between gabapentin- and placebo-treated patents within this subset.

  Because cognitive, social and affective improvements were not systematically recorded in Study 945-5, the QOL measure was assessed using descriptive statistics only. In addition, the optional physician comments which accompanied many of the global ratings were reviewed.

## Results

  As shown in Figs 1 and 2, more patients treated with gabapentin reported global improvement than those treated with placebo in all five add-on therapy trials. The frequency of global improvement as reported by patients with unchanged or worsened seizure activity is displayed in Table 2. In study 877-210P, improvements in general condition were seen with gabapentin but not placebo in this subset (p=0.013). In the ADLs studies (945-5, -6, -9, -10), over a quarter of all gabapentin-treated patients whose seizures did not improve considered themselves improved on a global level, but this effect was similar to the placebo group.

  Improvements in affective, cognitive and social function on study 945-5's QOL measure were most commonly recorded by physicians for patients who received gabapentin at the highest study dose (Figure 3).



Fig 1. Improvement in General Condition (Study 877-210)



Fig 2. Improvement in ADLs (Studies 945-5, -6, -9, -10)

In study 945-6, physician comments accompanied 120 (49%) of the 245 ADLS ratings collected. Nineteen (24%) of 78 comments among gabapentin-treated patients described improvements in mental well-being as compared with 6 (14%) of the 42 physician comments among placebo-treated patients. No physician comments accompanied patient

ratings of general condition in study 877-210P and too few accompanied ADLS ratings in
studies 945-5, -9 and -10 [11(3%) of 385 ratings] for meaningful evaluation.

Table 2
Patients with Unchanged or Worsened Seizure Activity who Reported Global Improvement

| Studies | Placebo | Gabapentin |
|---|---|---|
| 877-210P | 0/45 (0%) | 4/31 (13%) |
| 945-5, -6, -9, -10 | 24/106 (23%) | 30/ 109 (28%) |



Fig 3. Beneficial Effects on Quality of Life (Study 945-5)

Discussion

In agreement with anecdotal reports of improved mood and cognition in gabapentin-
treated epileptics (Dodrill, 1991; Dodrill et. al, 1992; Handforth and Treiman, 1994; Abou-
Khalil et. al., 1990), present data suggest a beneficial effect of gabapentin on mood and

414                                          K.R. Dimond *et al.*

ratings, the physician comments and the cognitive, affective, and social aspects of the QOL measure. Further, preliminary data from an epilepsy trial using the Profile of Mood States show reduced anxiety, depression, and hostility in patients on gabapentin (Berent and Giordani, unpublished data).

Since the present study is a retrospective examination of data from trials in epilepsy where psychiatric effects were not the primary focus, only cautious conclusions must be drawn. This analysis is also limited by inadequately defined measures of "well-being" such as the global ratings, physician comments and the QOL measure. Though these measures may be susceptible to many biases, their general agreement in favor of gabapentin bears thought. On no measure was placebo rated better than gabapentin.

It may be argued that successfully treated epilepsy patients would experience improved well-being as a result of reduced seizure activity. However, many patients reported global improvements even when seizure control was not improved. Non-specific benefit due solely to clinical trial participation is also an unlikely explanation for the present findings, since physician comments detailing improved mood, lower anxiety and increased sociability, were nearly twice as frequent among gabapentin patients than placebo patients.

Gabapentin's beneficial effects on mental function in add-on therapy trials differs from usual reports of the negative influence of anti-epileptic polytherapy on attention, concentration, drive, mood, and sociability (Ludgate et. al., 1985). Although the specific effect of gabapentin on mood and cognition await monotherapy trials, the present analysis of general well-being with add-on gabapentin therapy suggests that not only did gabapentin-treated patients not fare any worse than placebo patients, they showed enhanced well-being. At the very least, these findings support gabapentin's lack of adverse effects on mental functioning. The possibility that gabapentin may possess beneficial psychotropic effects which could have utility in the psychiatric disorders can only be clarified through further studies in the appropriate patient populations.

## Conclusions

This retrospective analysis of clinical trial data on gabapentin and placebo in epilepsy suggests potentially beneficial effects of gabapentin on mood and well-being. Given the

efficacy of other anti-convulsants in major psychiatric illness, an exploration of the psychiatric uses of gabapentin is warranted.


## Acknowledgements

The authors acknowledge Elizabeth Garofalo, MD; Deborah Leiderman, MD; and the Parke-Davis Gabapentin Group for their contributions to the gabapentin clinical program.


## References

ABOU-KHALIL, B., MCLEAN, M., CASTRO, O., and COURVILLE, K. (1990) Gabapentin in the treatment of refractory partial seizures. Epilepsia 31(5): 644 (abstract)

BRESLOW, M.F., FANKHAUSER, M.P., POTTER, R.L., MEREDITH, K.E., MISIASZEK, J. and HOPE, D.G. (1989) Role of gamma-aminobutyric acid in antipanic drug efficacy. Am. J. Psychiatry 146(3):353-356.

CROSS, J.A., CHEETHAM, S.C., CROMPTON, M.R., KATONA, C.L.E. and HORTON, R.W. (1988) Brain GABA binding sites in depressed suicide victims. Psychiatry Res. 26: 119-129.

DILSAVER, S.C., SWANN, A.C., SHOAIB, A.M. and BOWER, T.C. (1993) The manic syndrome: factors which may predict a patient's response to lithium, carbamazepine and valproate. J. Psych. Neurosci. 18(2): 61-66.

DODRILL, C.B. (1991) Behavioral effects of anti-epileptic drugs. In: Neurobehavioral Problems in Epilepsy, D.B. Smith, D.M. Treiman, M.R. Trimble, (Eds.). New York: Raven Press.

DODRILL, C.B., WILENSKY, A.J., OJEMANN, L.M. and TEMKIN, N.R. (1992) Neuropsychological, mood, and psychosocial effects of gabapentin. Epilepsia 33 (Suppl 3):117-8.

ENNA, S.J. (1984) The role of gamma-aminobutyric acid in anxiety. Psychopathology 17: 15-24.

FARIELLO, R.G., VARASI, M. and SMITH, M.C. (1995) Valproic acid: Mechanisms of Action. In: Antiepileptic Drugs, R.H. Levy, R.H. Mattson, B.S. Meldrum, (Eds), pp. 581-588, 4th Ed. Raven Press, New York.

GALPERN, W.R., MILLER, L.G., GREENBLATT, D.J., SZABO, G.K., BROWNE, T.R. and SHADER, R.I. (1991) Attenuation of alprazolam discontinuation effects by carbamazepine. Biochem. Pharmacol. 42S: S99-S104.

GOETZ, E., FEURERSTEIN, T.J. and MEYER, D.K. (1993) Effects of gabapentin on release of gamma-aminobutyric acid-induced GABA accumulation in several regions of rat brain.

Artz.-Forschung (Drug Research) 43:636-638.

HANDFORTH, A. and TREIMAN, D.M. (1994) Efficacy and tolerance of long-term, high-dose gabapentin: additional observations. Epilepsia 35(5): 1032-1037.

HONMOU, O., OVELESE, A. and KOCSIS, J.D. (1994) The novel antiepileptic gabapentin enhances promoted release of GABA in hippocampus. Soc. for Neurosci. Abstracts 20: 1640. (abstract)

KASA, K., OTSUKI, S., YAMAMOTO, M., SATO, M., KURODA, H. and OGAWA, N. (1982) Cerebrospinal fluid gamma-amino-butyric acid and homovanillic acid in depressive disorders. Biol. Psychiat. 17: 877-883.

KOCSIS, J.D. and HONMOU, O. (1994) Gabapentin increases GABA-induced depolarization in rat neonatal optic nerve. Neurosci. Lett. 169(1-2): 181-184.

LLOYD, K.G., THURET, F. and PILC, A. (1985) Upregulation of GABA-B binding sites in rat frontal cortex: a common action of repeated administration of different classes of antidepressants and electroshock. J. Pharmacol. Exp. Ther. 235:191-199.

LOESCHER, W., HONACK, D. and TAYLOR, C.P. (1991) Gabapentin increases amino-oxyacetic acid-induced GABA accumulation in several regions of rat brain. Neurosci. Lett. 128: 150-154.

LUDGATE, J., KEATING, J., O'DWYER, R. and CALLAGHAN, N. (1985) An improvement in cognitive function following polypharmacy reduction in a group of epileptic patients. Acta Neurolog. Scand. 71:448-452.

MACDONALD, R.L. (1995a) Carbamazepine: Mechanism of Action. In:  Antiepileptic Drugs, R.H. Levy, R.H. Mattson, B.S. Meldrum, (Eds), pp. 491-498, 4th Ed. Raven Press, New York.

MACDONALD, R.L. (1995b) Benzodiazepines: Mechanisms of Action. In:  Antiepileptic Drugs, R.H. Levy, R.H. Mattson, B.S. Meldrum, (Eds),  pp. 695-704, 4th Ed. Raven Press, New York.

MCELROY, S.L., KECK, P.E., POPE, H.G. and HUDSON, J.I. (1992) Valproate in the treatment of bipolar disorder: literature review and clinical guidelines. J. Clin. Psychopharm. 12: 42S-52S.

MOTOHASHI, N. (1992) GABA receptor alterations after chronic lithium administration. Comparison with carbamazepine and sodium valproate. Prog Neuropsychopharmacol Biol. Psychiatry 16(4): 571-579.

PETTY, F., KRAMER, G.L., FULTON, M., MOELLER, F.G. and RUSH, A.J.  (1993) Low plasma GABA is a trait-like marker for bipolar illness. Neuropsychopharmacol. 9(2):125-132.

PETTY, F. and SHERMAN, A.D. (1981) GABAergic modulation of learned helplessness. Pharmacol. Biochem. Behav. 15:567-570.

PRIMEAU, F., FONTAINE, R. and BEAUCLAIR, L. (1990) Valproic acid and panic disorder.

Can. J. Psych. 35(3): 249-250.

RAGSDALE, D.S., SCHEUER, T. and CATTERALL, W.A. (1991) Frequency and voltage-dependent inhibition of type IIA Na+ channels, expressed in a mammalian cell line, by local anesthetic, antiarrhythmic, and anticonvulsant drugs. Molec. Pharmacol. 40: 756-765.

RAO, M.L., CLARENBACH, P., VAHLENSIECK, M. and KRATZSCHMAR, S. (1988) Gabapentin augments whole blood serotonin in healthy young men. J. Neural Transm. 73: 129-134.

REIMANN, W. (1983) Inhibition by GABA, baclofen, and gabapentin of dopamine release from rabbit caudate nucleus: Are there common or different sites of action? Eur. J. Pharmacol. 94:341-344.

ROY-BYRNE, P.P., WARD, N.G. and DONNELLY, P.J. (1989) Valproate in anxiety and withdrawal syndromes. J. Clin. Psych. 50S:44-48.

SALETU, B., GRUNBERGER, J. and LINZMAYER, L. (1986) Evaluation of encephalotropic and psychotropic properties of gabapentin in man by pharmaco-EEG and psychometry. Int. J. Clin. Pharmacol. Ther. Toxicol. 24: 362-373.

SATZINGER, G. (1994) Antiepileptics from gamma-aminobutyric acid. Artz-Forsch. (Drug Res) 44: 261-266.

SCHLICKER, E., REIMANN, W. and GOTHERT, M. (1985) Gabapentin decreases monoamine release without affecting acetylcholine release in the brain. Drug Res. 35: 1347 - 1349.

SCHWEIZER, E., RICKELS, K., CASE, W.G. and GREENBLATT, D.J. (1991) Carbamazepine treatment in patients discontinuing long-term benzodiazepine therapy. Effects on withdrawal severity and outcome. Arch. Gen. Psychiatry 48: 448-452.

TAYLOR, C.P., VARTANIAN, M.G., ANDRUSZKIEWICZ, R. and SILVERMAN, R.B. (1992) 3- Alkyl GABA and 3-alkylglutamic acid analogues: two new classes of anticonvulsant agents. Epilepsy Res. 11: 103-110.

TAYLOR, C.P. (1995) Gabapentin: Mechanisms of Action. In: Antiepileptic Drugs, R.H. Levy, R.H. Mattson, B.S. Meldrum, (Eds), pp. 829-842, 4th Ed. Raven Press, New York.

Inquiries and reprint requests should be addressed to:

Atul C. Pande, M.D., FRCPC
Parke-Davis Pharmaceutical Research
2800 Plymouth Road
Ann Arbor, MI 48105
U.S.A.