# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3
 4                   MDL DOCKET NO. 1629
 5                 MASTER FILE NO. 04-10981
 6
 7   IN RE:   NEURONTIN MARKETING, SALES       )
 8   PRACTICES, AND PRODUCTS LIABILITY         )
 9   LITIGATION                                )
10   ------------------------------------------
11   THIS DOCUMENT RELATES TO:                 )
12   ALL ACTIONS                               )
13
14
15           Videotaped Deposition of RAYMOND S.
16   HARTMAN, taken before GREG S. WEILAND, CSR, RMR,
17   CRR, Notary Public, pursuant to the Federal Rules of
18   Civil Procedure for the United States District Court
19   pertaining to the taking of depositions, at
20   Suite 3800, One South Dearborn Street, in the City
21   of Chicago, Cook County, Illinois, commencing at
22   9:19 o'clock a.m., on the 13th day of December,
23   2006.
24
```

**54**

1 final document.
2    Q. During the course of your preparation of
3 your draft of your report in this matter, I gather
4 you sent drafts of the declaration to other members
5 of your team by e-mail; is that correct?
6    A. I doubt it.
7    Q. Did you ever share a copy of your report
8 in any way with anyone else on your team?
9    A. Certainly if -- with staff that I -- let
10 me look through this because each declaration is a
11 little different, but let me describe generally what
12 would be going on. I may be writing a declaration
13 and laying it out, and then I might say, oh, here's
14 a section where I need -- I know I need IMS data,
15 and I will tell one of my staff members, you know,
16 call up the IMS rep and tell us, tell me again,
17 remind me what we can get there and things.
18         So they might write several sentences for
19 me saying, okay, here is what IMS will deliver now,
20 they've changed their product over time, and so
21 that -- there may be some staff interaction in that
22 way where I'll say that.
23         I no doubt discussed my declaration with
24 Dr. Rosenthal since I was designing it so that it

**55**

1 would take the results of her analysis and develop
2 damage measures using the results of her analysis,
3 so there were discussions.
4         That's -- I don't -- I can't recall that I
5 would let myself send an e-mail of the document to
6 anyone.
7    Q. You're -- well, let me I guess ask it this
8 way.
9         Are you aware that Professor Rosenthal
10 testified that she received a draft of your report
11 by e-mail?
12    A. I have not reviewed her testimony. No.
13    Q. Do you have any reason to believe that her
14 testimony on that point might be inaccurate or
15 untruthful?
16    A. Well, I have no reason to believe that she
17 would be untruthful. Whether at the -- at what
18 stage she saw the draft, I mean, at some stage my
19 draft was ready for -- it was in its final stages to
20 be sent to counsel, and at that stage, it wouldn't
21 surprise me that she saw -- she may have seen the
22 draft. I mean, when the draft is close to final,
23 yes, there will be -- I will send it to counsel.
24    Q. When you send it to counsel when it's

**56**

1 close to final, what form do you send it? Do you
2 send it by e-mail, or do you print a hard copy to
3 send to them?
4    A. I think it varies. I don't recall.
5    Q. In this case do you have any specific
6 recollection?
7    A. No, I don't.
8    Q. Aside from -- withdrawn.
9         Did you communicate with people on your
10 team in this matter by e-mail?
11    A. Probably.
12    Q. With whom would -- with whom would you
13 have communicated by e-mail?
14    A. Well, as I say, there may have been times
15 when I say, I've said, look, we need this from the
16 Red Book or we need this from the First DataBank, we
17 need this from IMS, we need this from NAMCS, we need
18 this from, you know, the NDTI data, and I may have
19 sent an e-mail to the people, it could be
20 Renee Rushnawitz, it could be Michael Augustine, it
21 could be Andrew Bechtel where I'd say, you know,
22 look, what's the most recent changes in IMS as to
23 how they send the National Prescription Audit data,
24 and he will tell me.

**57**

1         And so it would be the e-mails of that
2 sort.
3    Q. Would you or any of the others at GMA with
4 whom you might have communicated by e-mail during
5 that period still have copies of those e-mails?
6    A. I doubt we have e-mails going that far
7 back.
8    Q. What would have happened to them?
9    A. Just at the ends -- we don't save e-mails
10 forever, so, you know, it's -- going back to 2005,
11 you know, I'd have to check, but, you know, we don't
12 back up our e-mails going back years. The computer
13 would just end up being clogged up with stuff.
14    Q. So I gather then no effort would have been
15 made in this case to preserve e-mails that you would
16 have written related to your work in this case?
17    A. Well, as a standard practice, we don't
18 destroy anything, but we don't keep things that are
19 beyond usage. I mean, there's, you know, there's
20 some analysis that I may have done with this, but I
21 didn't save analysis once the work is done.
22 Otherwise, our storage fees would be astronomical
23 given the size of databases we use and given the
24 cases we're working on.

Page 58

1  So, you know, I don't -- we -- normally
2 that's the standard procedure. We don't continue to
3 save things going years back, you know. Obviously
4 if I have e-mails from last month, they're probably
5 still there, but at some point we have our
6 information management person just purge the, you
7 know, the stuff that's junk that's past use.
8    Q.  And no special effort was made in this
9 case to save those e-mails?
10     MR. MATTHEWS: Objection.
11     THE WITNESS: No special effort was made
12 to do anything differently in this case than we do
13 for all our cases.
14 BY MR. POLUBINSKI:
15    Q.  Did you print drafts at all of your report
16 in this case prior to the final version?
17    A.  As a standard practice, I do not.
18    Q.  Would you have done it in this case?
19    A.  I don't see why I would have.
20    Q.  Would you have done it to share with
21 plaintiffs' counsel or with Professor Rosenthal or
22 with others who were working on your team even just
23 to proofread the document?
24    A.  Well, at the end of -- when the final

Page 59

1 document was -- when we got to the final week or so,
2 the standard practice would be to be printing it out
3 and then reading it and checking it for things
4 beyond what you'd normally see on the screen. I
5 mean, normally what I'll do is I'll be writing the
6 document, I'll be reviewing it on the screen and
7 work directly from the computer, and just rather
8 than proliferating drafts day to day to day to day,
9 I save in the same draft.
10     At some point we have to read it and print
11 it out, and at some point that draft is reviewed,
12 either I've sent electronically or reviewed in hard
13 copy by counsel, and my staff would be reviewing it
14 to correct it and for any type of formatting
15 problems and any kinds of data issues that are seen,
16 and at that point I would assume I had sent one to
17 Professor Rosenthal also. I don't recall doing
18 that.
19    Q.  Do you know if you still have those hard
20 copy drafts that you would have printed?
21    A.  The draft that was the final draft prior
22 to this being finalized, no, I -- we don't -- it's
23 not a practice of our firm to save the penultimate
24 draft.

Page 60

1    Q.  What would you have done with the
2 penultimate drafts?
3    A.  We would have just disposed of them.
4    Q.  Let's turn back to the documents that
5 we've marked as Hartman Exhibit 3 and Hartman
6 Exhibit 4.
7     You had mentioned when we first looked at
8 Hartman Exhibit 3 that the date on this document on
9 the first page of this document, which is denoted as
10 GMA54, struck you as being unusual.
11     Is the date on GMA54 April 28th, 2004?
12    A.  Is the date --
13    Q.  At the top of the first page.
14    A.  It certainly is.
15    Q.  And your name appears on this first page
16 as well, correct?
17    A.  That's correct.
18    Q.  And the date underneath your name is,
19 appears to be March 1st of 2004; is that right?
20    A.  That's correct.
21    Q.  Is that an accurate date as far as you
22 know?
23    A.  As far as I know, it is.
24    Q.  I take it you hadn't been formally

Page 61

1 retained at that point, correct?
2    A.  That's certainly what -- that's certainly
3 what -- under the retention letter, that would be
4 correct.
5    Q.  Here's a quick question for you about the
6 conventions that you use in preparing these
7 invoices.
8     Does the March 1st, 2004 date here mean
9 that the activities covered by this entry would have
10 occurred on that exact date, or is it something more
11 general?
12    A.  I think it's probably idiosyncratic in the
13 following sense, that I -- this is an invoice sent
14 out for March, and so it was time in March. I see
15 that it's all on March 1st. I doubt we received
16 the IMS data on March 1st on Page 2. I think this
17 was probably an early request for some data
18 analysis, and this was not even at this point not
19 even a case yet. There was some interest in data
20 analysis, and by convention, perhaps it just says
21 the 3/1/2004 through the end of the month, because
22 as you will note in later invoices, say the second
23 invoice dated April 26th, there are specific dates
24 or for the experts or the affiliates,

16 (Pages 58 to 61)