# EXHIBIT G

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3    MDL Docket No. 1629

4    Master File No. 04-10981

5

6    * * * * * * * * * * * * * *

7    IN RE: NEURONTIN MARKETING, SALES          *

8    PRACTICES, AND PRODUCTS LIABILITY          *

9    LITIGATION                                 *

10   ----------------------------------------   *

11   THIS DOCUMENT RELATES TO:                  *

12   ALL MARKETING AND SALES PRACTICES          *

13   ACTIONS                                    *

14   * * * * * * * * * * * * * *

15

16              VOLUME I

17              PAGES 1-311

18

19

20         VIDEOTAPED DEPOSITION OF

21       MEREDITH B. ROSENTHAL, Ph.D.

22   DATE: TUESDAY, OCTOBER 24, 2006

23   TIME: 9:12 A.M. TO 5:01 P.M.

24

25

Page 58

| | | |
|---|---|---|
| 1 | Q. And do you recall in this case ever having | 10:08:29 |
| 2 | printed drafts to review them? | 10:08:34 |
| 3 | A. Could you please repeat the question? | 10:08:37 |
| 4 | Q. Sure. And maybe I'll break it up. It | 10:08:41 |
| 5 | sounds like you typed the report yourself | 10:08:44 |
| 6 | presumably on your computer or your laptop | 10:08:46 |
| 7 | or something else; is that correct? | 10:08:48 |
| 8 | A. That's correct. | 10:08:50 |
| 9 | Q. Okay. In order to review it, did you always | 10:08:50 |
| 10 | review it on the screen, or did you print | 10:08:55 |
| 11 | out copies of the report, interim drafts and | 10:08:57 |
| 12 | bring them home and mark them up, that sort | 10:09:00 |
| 13 | of thing? | 10:09:01 |
| 14 | A. I believe I worked on the screen. I usually | 10:09:02 |
| 15 | do. | 10:09:04 |
| 16 | Q. Did you share drafts of the report with | 10:09:05 |
| 17 | other people on your team at all? | 10:09:07 |
| 18 | A. Again, I consulted with Richard. I may have | 10:09:09 |
| 19 | shown him parts of the document, asked his | 10:09:12 |
| 20 | opinion about them. | 10:09:16 |
| 21 | Q. Would you have sent in drafts of the | 10:09:16 |
| 22 | document by e-mail? | 10:09:18 |
| 23 | A. I may have. | 10:09:19 |
| 24 | Q. Other than Richard Frank, is there anybody | 10:09:25 |
| 25 | else with whom you would have shared drafts? | 10:09:28 |

Page 59

| | | |
|---|---|---|
| 1 | A. I would have shared drafts -- the staff | 10:09:29 |
| 2 | would have helped with the footnote, so I | 10:09:33 |
| 3 | would have shared a draft with Greylock | 10:09:35 |
| 4 | McKinnon so that they could fill in case | 10:09:37 |
| 5 | numbers, that sort of thing. | 10:09:39 |
| 6 | Q. And so would you have e-mailed them a copy | 10:09:41 |
| 7 | or printed them out a copy? | 10:09:42 |
| 8 | A. I would have e-mailed a copy. | 10:09:44 |
| 9 | Q. Do you know if those e-mails still exist? | 10:09:57 |
| 10 | A. I do not. On my outbound end we have very | 10:09:58 |
| 11 | limited space, so I wouldn't have the | 10:10:03 |
| 12 | outbound e-mail. | 10:10:05 |
| 13 | Q. So other than an e-mail that you may have | 10:10:06 |
| 14 | sent to Richard Frank and an e-mail that you | 10:10:14 |
| 15 | may have sent with a draft of the document | 10:10:16 |
| 16 | to Greylock McKinnon, are there others with | 10:10:18 |
| 17 | whom you would have shared drafts? | 10:10:20 |
| 18 | A. No. | 10:10:21 |
| 19 | Q. Would you have sent more than one draft to | 10:10:22 |
| 20 | any of these groups of people? | 10:10:23 |
| 21 | A. It's possible that I would have sent an | 10:10:24 |
| 22 | early draft and a later draft. | 10:10:27 |
| 23 | Q. Did you receive comments on the drafts of | 10:10:32 |
| 24 | your declaration? | 10:10:36 |
| 25 | A. Yes, I did. | 10:10:38 |

Page 60

| | | |
|---|---|---|
| 1 | Q. From whom? | 10:10:38 |
| 2 | A. I certainly received comments from Richard, | 10:10:39 |
| 3 | and I received comments from Ray Hartman at | 10:10:47 |
| 4 | Greylock McKinnon. | 10:10:52 |
| 5 | Q. Anyone else? | 10:10:53 |
| 6 | A. I'm not certain, but I think Renee | 10:10:54 |
| 7 | Rushnawitz, she often provides comments as | 10:10:58 |
| 8 | to form. | 10:11:02 |
| 9 | Q. Were they -- well, let's go through them one | 10:11:07 |
| 10 | at a time. With respect to Professor | 10:11:09 |
| 11 | Frank's comments -- | 10:11:12 |
| 12 | A. Uh-huh. | 10:11:13 |
| 13 | Q. -- would they have been conveyed in a | 10:11:13 |
| 14 | handwritten markup or orally or some other | 10:11:15 |
| 15 | way? | 10:11:17 |
| 16 | A. Orally. | 10:11:17 |
| 17 | Q. Do you remember what his comments were? | 10:11:19 |
| 18 | A. I remember largely that his comments related | 10:11:20 |
| 19 | to where the Dorfman-Steiner theory applied, | 10:11:28 |
| 20 | its relevance. That's -- I remember a lot | 10:11:34 |
| 21 | of our discussion was about that. | 10:11:38 |
| 22 | Q. Can you tell me what the Dorfman-Steiner | 10:11:49 |
| 23 | theory is? | 10:11:51 |
| 24 | A. It has to do with the underpinnings of | 10:11:51 |
| 25 | advertising and the economics of | 10:11:53 |

Page 61

| | | |
|---|---|---|
| 1 | advertising. Why do firms advertise, and | 10:11:54 |
| 2 | why don't we expect that advertising is | 10:11:57 |
| 3 | important in particular in the | 10:12:00 |
| 4 | pharmaceutical industry. Excuse me. | 10:12:02 |
| 5 | Q. When you say "important," what do you mean? | 10:12:05 |
| 6 | A. Why will it be substantial? Because of the | 10:12:07 |
| 7 | fact that there are substantial price | 10:12:15 |
| 8 | margins. | 10:12:18 |
| 9 | Q. When you say "substantial," do you mean | 10:12:21 |
| 10 | substantial in a monetary way? | 10:12:24 |
| 11 | A. I do. That it'll be a significant activity. | 10:12:25 |
| 12 | So just to clarify, in industries where the | 10:12:30 |
| 13 | goods are commodities and essentially | 10:12:35 |
| 14 | they're interchangeable, they're very small | 10:12:38 |
| 15 | profit margins on those commodities. We | 10:12:42 |
| 16 | expect to find little advertising. | 10:12:44 |
| 17 | Pharmaceuticals, they're -- for a variety of | 10:12:46 |
| 18 | reasons are higher profit margins, and we | 10:12:52 |
| 19 | would expect to find more advertising. | 10:12:54 |
| 20 | Q. And how did you respond to the comments that | 10:12:55 |
| 21 | you received from Professor Frank on the | 10:12:58 |
| 22 | subject? | 10:13:00 |
| 23 | A. I think I clarified and edited that section. | 10:13:00 |
| 24 | Q. Okay. How about Dr. Hartman; were his | 10:13:07 |
| 25 | comments conveyed to you orally or in a | 10:13:11 |

Page 62

```
 1   handwritten markup or some combination of        10:13:13
 2   the two?                                          10:13:15
 3 A. I believe they were oral.                        10:13:15
 4 Q. What were the substance of his comments?         10:13:17
 5 A. The substance of his comments largely were       10:13:22
 6   about expanding some of the descriptions,         10:13:26
 7   providing more examples in the empirical          10:13:29
 8   section.                                          10:13:34
 9 Q. And the empirical section of your report, if     10:13:37
10   you can direct us to that --                      10:13:42
11 A. Yes. Sure.                                       10:13:43
12 Q. -- so I know that we're on the same page.        10:13:43
13 A. The section -- Section 6 in particular           10:13:46
14   around Paragraph 30 --                            10:13:55
15 Q. Section -- I'm sorry.                            10:13:56
16 A. Sorry. Section 6.                                10:13:57
17      MR. NOTARGIACOMO: Page 13.                     10:13:59
18 Q. Roman numeral VI?                                10:14:00
19 A. Roman numeral VI, yes, Page 13, but in           10:14:02
20   particular the section with the formulas          10:14:03
21   that follows.                                     10:14:05
22 Q. Right. How did you respond to his comments?      10:14:09
23 A. I expanded the examples I used and provided      10:14:10
24   more description about how the models might       10:14:15
25   actually be implemented.                          10:14:19
```

Page 63

```
 1 Q. And how about Renee Rushnawitz; how were her     10:14:20
 2   comments conveyed, if you remember?               10:14:28
 3 A. I think Renee may have actually provided         10:14:30
 4   suggestions either on a hard copy or              10:14:33
 5   redline, and, again, she generally worries        10:14:39
 6   about things like appropriate footnoting and      10:14:48
 7   appropriate reference to what's in the            10:14:53
 8   complaint, so she would have provided some        10:14:56
 9   technical, essentially editorial, comments.       10:14:58
10 Q. Do you still have the hard copy markup that      10:15:07
11   she did, or redline, whichever the case may       10:15:09
12   be?                                               10:15:09
13 A. I don't believe I do, no.                        10:15:13
14 Q. Do you know what you would have done with        10:15:14
15   it?                                               10:15:17
16 A. I don't think I would have saved it. I           10:15:17
17   would have had it shredded, I guess.              10:15:19
18 Q. Okay. Other than Professor Frank, Dr.            10:15:23
19   Hartman, and Dr. Rushnawitz, Ms.                  10:15:30
20   Rushnawitz --                                     10:15:34
21 A. Ms.                                              10:15:34
22 Q. -- Ms. Rushnawitz, did anybody else receive      10:15:35
23   drafts of your declaration prior to its           10:15:38
24   being finalized?                                  10:15:40
25 A. I'm sure I sent a draft to the lawyers.          10:15:41
```

Page 64

```
 1 Q. How far in advance of the filing would you       10:15:43
 2   have done that?                                   10:15:53
 3 A. I'm sorry, I don't know, but I don't             10:15:53
 4   think -- I don't think it would have been         10:15:55
 5   very long in advance. I teach during this         10:16:01
 6   period in the summer, and so it's a very          10:16:03
 7   tight -- would have been a very tight             10:16:07
 8   timeline for me.                                  10:16:10
 9 Q. Sure. And how would you have sent the draft      10:16:11
10   to the lawyers?                                   10:16:16
11 A. I would have sent it by e-mail.                  10:16:17
12 Q. Did you receive comments from them?              10:16:19
13 A. I spoke with Tom Sobol.                          10:16:21
14 Q. Anybody else?                                    10:16:27
15 A. That's all that I recall.                        10:16:28
16 Q. Would you have received written comments         10:16:30
17   from Mr. Sobol or oral comments?                  10:16:34
18 A. They would have been oral.                       10:16:36
19 Q. Do you recall the substance of his comments?     10:16:37
20 A. I don't. I recall that he did not have           10:16:42
21   specific comments about the declaration. I        10:16:50
22   don't recall any direct comments. I know          10:16:57
23   that we had a conversation about it, but I        10:16:59
24   don't -- I don't recall anything specific         10:17:06
25   that he suggested or any changes that I made      10:17:07
```

Page 65

```
 1   subsequent to that conversation.                  10:17:10
 2 Q. Do you remember whether you did make changes     10:17:12
 3   subsequent to the conversation?                   10:17:14
 4 A. I don't recall making changes subsequent to      10:17:16
 5   the conversation, no.                             10:17:19
 6 Q. Would that have been because you disagreed       10:17:24
 7   with comments that he made?                       10:17:25
 8 A. No, that was not what happened.                  10:17:26
 9 Q. When you say you don't recall making changes     10:17:33
10   in response to your conversation with him,        10:17:36
11   is it that you don't have a recollection one      10:17:38
12   way or the other as to whether you did, or        10:17:40
13   is it your best recollection that you             10:17:43
14   didn't?                                           10:17:45
15 A. My best recollection is that I didn't. It        10:17:45
16   was a year ago.                                   10:17:47
17 Q. Sure.                                            10:17:48
18 A. I recall a conversation, and I don't believe     10:17:49
19   that there were specific recommendations.         10:17:52
20 Q. Okay. When did you complete your                 10:17:55
21   declaration?                                      10:18:11
22      MR. NOTARGIACOMO: Objection. You               10:18:11
23   can answer.                                       10:18:12
24 A. I'm sorry, I don't know the exact date. I        10:18:12
25   know the date it was filed, but I don't --        10:18:18
```

74

```
 1    Pages -- Page 77 to the entries for August      10:47:35
 2    1st, 2nd, 3rd, 4th, 5th and 8th. The            10:47:41
 3    description under these time entries reads      10:47:50
 4    "Hartman and Rosenthal affidavits."             10:47:53
 5 A. I see that.                                     10:47:56
 6 Q. Would you have been aware that Mr.              10:48:00
 7    Augusteijn was spending somewhere in the        10:48:01
 8    range of 30, 35 hours in that first week of     10:48:03
 9    August on your report and Dr. Hartman's?        10:48:06
10 A. I wouldn't have been aware of what his time    10:48:12
11    was since he works in a separate office. I     10:48:15
12    would have been aware that he was helping to   10:48:18
13    support my report.                              10:48:19
14 Q. You don't have -- do you have any sense         10:48:22
15    specifically for what he might have been        10:48:24
16    doing in those days?                            10:48:26
17 A. I can't say precisely. Often one of the         10:48:28
18    things they do is essentially check every       10:48:33
19    statement, check every footnote to make sure   10:48:36
20    that it can be backed up.                       10:48:39
21 Q. Did you ever receive comments directly from     10:48:42
22    Mr. Augusteijn on your declaration?             10:48:46
23 A. You know, I can't be certain. It is             10:48:48
24    possible -- again, I might have sent a          10:48:52
25    document, for example, that was missing a      10:48:55
```

75

```
 1    complete footnote, and he would be filling     10:48:58
 2    in the complete footnote, that kind of         10:49:01
 3    thing. That might have happened in a           10:49:04
 4    redlined document. It would have been          10:49:05
 5    purely of that kind of editorial nature.       10:49:09
 6 Q. When you say a redlined document, tell me      10:49:11
 7    what you mean. Would he have sent back a       10:49:16
 8    version of the document redlined to reflect    10:49:18
 9    changes that me might have made in it?         10:49:21
10 A. That's correct. Again, pursuant                10:49:24
11    specifically to my instructions, "I need the   10:49:26
12    correct volume number for this," for           10:49:29
13    example.                                       10:49:31
14 Q. How would you have communicated your           10:49:34
15    instructions to him? Would you have sent       10:49:35
16    him an e-mail with the instructions            10:49:36
17    attaching the document?                        10:49:39
18 A. I believe so.                                  10:49:40
19 Q. Would you still have a copy of any e-mail      10:49:40
20    that you would have sent like that?            10:49:46
21 A. I would not. Again, we have very limited       10:49:47
22    space that we're allocated through the         10:49:53
23    e-mail that I use through Harvard, and so my   10:49:56
24    sent mail is only about a month old, maybe     10:50:01
25    less.                                          10:50:04
```

76

```
 1 Q. And so you would have -- well, I guess just    10:50:05
 2    to back up, with respect to all of the         10:50:08
 3    various e-mails, the sending of drafts by      10:50:13
 4    e-mail that we've discussed over the course    10:50:15
 5    of the past hour or so, less than that         10:50:17
 6    really, all of that e-mail would have been     10:50:19
 7    sent by you and to you at your Harvard         10:50:23
 8    e-mail address?                                 10:50:27
 9 A. That's correct.                                 10:50:27
10 Q. Do you have a personal e-mail address, too?    10:50:28
11 A. I don't use another e-mail address.            10:50:30
12 Q. Okay. All right. The next name is Andrew       10:50:33
13    Bechtel?                                        10:50:39
14 A. B-E-C-H-T-E-L.                                  10:50:43
15 Q. Thank you. Do you know Mr. Bechtel?            10:50:46
16 A. I do. He's another staff person at Greylock    10:50:49
17    McKinnon.                                      10:50:51
18 Q. Did he work with you on your declaration?      10:50:53
19 A. Yes, I believe he did.                         10:50:55
20 Q. Do you know what he did?                       10:50:56
21 A. The same kind of thing that Michael would      10:50:57
22    have done.                                     10:51:00
23 Q. So would you have sent drafts of your          10:51:00
24    declaration to Mr. Bechtel as well with        10:51:09
25    instructions to fill in parts of it or to      10:51:11
```

77

```
 1    make specific changes?                          10:51:14
 2 A. More likely, Michael would have delegated      10:51:15
 3    some work to him. Michael is senior to him.    10:51:17
 4 Q. And I would like you to turn to Page 79.        10:51:22
 5    You may already be there.                       10:51:29
 6 A. Yes, I am.                                     10:51:32
 7 Q. And I would like to direct your attention to   10:51:32
 8    the time entries on that page for August       10:51:34
 9    4th, 5th, 7th and 8th. The description for     10:51:38
10    each of those entries reads "Neurontin         10:51:44
11    reports and backup," correct?                  10:51:48
12 A. That's correct.                                10:51:50
13 Q. Do you know what Mr. Bechtel would have been   10:51:50
14    doing during those days?                       10:51:55
15 A. Well, he would have been working on backup     10:51:57
16    for my report, as well as Dr. Hartman's; you   10:52:04
17    know, Dr. Hartman had a report filed at the    10:52:06
18    same time. And, again, they try to verify      10:52:09
19    every claim, every statement with some         10:52:13
20    documentation, the appropriate footnote, and   10:52:16
21    gather those documents to make sure that       10:52:19
22    everything can be backed up.                   10:52:28
23 Q. So Neurontin reports would have been your      10:52:30
24    declaration and Dr. Hartman's declaration --   10:52:32
25 A. That's --                                      10:52:32
```

20 (Pages 74 to 77)

Page 82

```
1    consulted with you on this matter?              10:57:10
2  A. We may have had conversations subsequently     10:57:14
3    that he did not bill. To be honest, I am        10:57:16
4    not certain.                                    10:57:20
5  Q. But five hours of consultation would be        10:57:24
6    within the realm of what you would have         10:57:27
7    expected that he would have spent on that,      10:57:29
8    on the engagement with you?                     10:57:31
9  A. I think that sounds reasonable, yes.           10:57:32
10 Q. Why did you consult with Professor Frank?      10:57:42
11 A. Professor Frank has significant experience     10:57:45
12   in looking at pharmaceutical promotion, in      10:57:49
13   particular, and its effects. As you may         10:57:53
14   know, he has a very long CV and some            10:58:03
15   important papers in the literature related      10:58:05
16   to pharmaceutical promotion.                    10:58:08
17 Q. Did you rely on his advice for any of your     10:58:13
18   work or any of his conclusions?                 10:58:15
19 A. No. The conclusions are my own. The work       10:58:17
20   is my own. We discussed it, again, as I         10:58:18
21   mentioned earlier, yes, in particular, the      10:58:22
22   theoretical underpinnings.                      10:58:24
23 Q. Are there any particular parts of your         10:58:26
24   declaration that you would attribute more to    10:58:30
25   him than others?                                10:58:31
```

Page 83

```
1  A. As I mentioned before, I recall a particular   10:58:32
2    discussion about the theoretical                10:58:37
3    underpinnings and how to frame that most        10:58:41
4    usefully in the document, but the work is my    10:58:43
5    own.                                            10:58:47
6  Q. How did you generally communicate with         10:58:53
7    Professor Frank on this engagement?             10:58:55
8  A. I believe that -- as you see here, I believe   10:58:57
9    that he might have been in one of the early     10:59:01
10   face-to-face meetings, and then I spoke with    10:59:04
11   him on the phone.                               10:59:07
12 Q. Would you have sent e-mail back and forth      10:59:10
13   with him on the subject of your engagement      10:59:12
14   in this matter?                                 10:59:14
15 A. It's possible.                                 10:59:15
16 Q. But it sounds like you wouldn't have e-mails   10:59:18
17   still from that time period on your system?     10:59:21
18 A. I would not.                                   10:59:23
19 Q. Would you have taken notes from any of your    10:59:24
20   meetings with him?                              10:59:31
21 A. I don't believe so, no.                        10:59:32
22 Q. Would you have taken notes more generally in   10:59:35
23   any of the other meetings that you had in       10:59:36
24   this matter either with counsel or with         10:59:39
25   others at Greylock McKinnon?                    10:59:41
```

Page 84

```
1  A. I may have taken some notes to jog my memory   10:59:42
2    about things to follow up on.                   10:59:45
3  Q. Do you still have them?                        10:59:47
4  A. I'm not sure.                                  10:59:50
5  Q. Have you looked for them?                      10:59:55
6  A. I looked for everything that I could find      10:59:57
7    that was relevant to the case. I can't be       11:00:00
8    certain that there's not a piece of             11:00:02
9    notepaper somewhere, but I don't take           11:00:03
10   extensive notes.                                11:00:05
11 Q. You mentioned Dr. Frank, or Professor Frank,   11:00:09
12   by name in your declaration, correct --         11:00:15
13 A. That's correct.                                11:00:19
14 Q. -- in Paragraph 5 which is on Page 3?          11:00:20
15   Why did you decide to mention him in            11:00:25
16   the declaration but none of the other           11:00:27
17   individuals at Greylock McKinnon who appear     11:00:29
18   to have spent time on your report?              11:00:31
19 A. Dr. Frank is -- Professor Frank, to be         11:00:33
20   consistent, is an expert in this area, and,     11:00:37
21   again, our discussions were at a pretty high    11:00:40
22   level, talking about the theory here which      11:00:44
23   is particularly relevant, and so I decided      11:00:49
24   to mention him because he was an important      11:00:51
25   source of information, just like looking at     11:00:53
```

Page 85

```
1    the literature.                                 11:00:56
2  Q. Was he a more important source for             11:01:04
3    information than other folks with whom you      11:01:06
4    might have consulted?                           11:01:10
5  A. I believe so. I believe he's a reference in    11:01:10
6    and of himself just like the published          11:01:13
7    literature is.                                  11:01:14
8  Q. The next name is Joshua Peteet?                11:01:16
9  A. P-E-T-E-E-T.                                   11:01:19
10 Q. Thank you. Do you know Mr. Peteet?             11:01:21
11 A. I do.                                          11:01:25
12 Q. Did he work on your report?                    11:01:31
13 A. I believe he's provided support, and I know    11:01:32
14   he's provided support over the subsequent       11:01:34
15   months in preparation, for example, for this    11:01:36
16   meeting.                                        11:01:42
17 Q. What sorts of support would he have provided   11:01:43
18   in the subsequent months?                       11:01:45
19 A. Again, finding additional documents, that      11:01:48
20   kind of thing.                                  11:01:51
21 Q. If we could look at his time on Pages GMA84    11:02:03
22   and 85.                                         11:02:08
23 A. Uh-huh.                                        11:02:13
24 Q. He appears to have spent a fairly              11:02:13
25   substantial amount of time in July and into     11:02:16
```

### Page 110

1  once?  11:29:56
2  A.  I don't know. I would think only once.  11:29:56
3  Q.  Now, you mentioned before, I think, and if  11:30:08
4      I'm mischaracterizing your testimony in any  11:30:11
5      way, feel free to correct me, but I think  11:30:13
6      you mentioned before that he had suggested  11:30:15
7      that you expand descriptions or provide more  11:30:17
8      examples in the empirical section of your  11:30:20
9      report.  11:30:22
10 A.  That's right.  11:30:24
11 Q.  Am I getting it right?  11:30:25
12 A.  Yes, that's correct.  11:30:26
13 Q.  Can you be any more specific about the ways  11:30:27
14     he suggested that you do those things?  11:30:29
15 A.  Specifically around expressing those  11:30:31
16     equations and all the variations in how the  11:30:33
17     models might be estimated, so there's quite  11:30:39
18     a lot of description in that section, as you  11:30:41
19     see now, about the different considerations  11:30:43
20     about variables to include, about the way  11:30:46
21     that the time patterns of promotional  11:30:51
22     effects would be modeled specifically.  11:30:54
23 Q.  Did he suggest additional variables to  11:30:58
24     include that may not have been mentioned in  11:31:00
25     the original draft that you had sent to him?  11:31:01

### Page 111

1  A.  He may have suggested examples of additional  11:31:03
2      variables or categories.  11:31:07
3  Q.  Aside from the suggestions that he made to  11:31:15
4      you that we've just discussed about the  11:31:19
5      empirical section of your report, are there  11:31:22
6      other suggestions that he would have made in  11:31:24
7      the context of his providing comments?  11:31:25
8  A.  I'm sure there were other places. I can't  11:31:27
9      remember exactly what those comments were.  11:31:29
10     I remember specifically it was around  11:31:31
11     expanding the empirical section, but I don't  11:31:34
12     know that there weren't other comments.  11:31:37
13 Q.  Okay. And just to ask you once more, the  11:31:39
14     redlined markups that he would have sent  11:31:49
15     back to you, do you still have copies of  11:31:52
16     those?  11:31:53
17 A.  I wouldn't have copies of those. I would  11:31:54
18     have then decided which comments to act on  11:31:58
19     and done an edited version which became the  11:32:03
20     final version.  11:32:07
21 Q.  What would you have done with the copies?  11:32:09
22     Excuse me, withdrawn.  11:32:12
23     What would you have done with the  11:32:13
24     redline comments that he would have sent  11:32:14
25     you?  11:32:16

### Page 112

1  A.  They would essentially have been saved over.  11:32:16
2  Q.  When you say "saved over," what do you mean?  11:32:21
3  A.  Can I -- so if there's a comment, "Expand  11:32:26
4      this here, consider discussing X, Y and Z,"  11:32:30
5      I would have either decided not to or  11:32:35
6      decided to expand here, and then I would  11:32:37
7      have deleted the comment, revised, and it  11:32:39
8      would form a new saved document.  11:32:42
9  Q.  And so you would have taken the attachment  11:32:44
10     that he sent to you, used that attachment as  11:32:47
11     your working document and then saved over  11:32:49
12     the document that was saved on your system?  11:32:52
13 A.  Not necessarily. I may have gone to the --  11:32:54
14     back to the document that was in my system.  11:32:58
15 Q.  In which case what would have happened to  11:33:00
16     the attachment that he sent you?  11:33:03
17 A.  It just would have been deleted with the  11:33:04
18     rest of my e-mail.  11:33:07
19 Q.  Let's look again at Rosenthal Exhibit 7,  11:33:18
20     again at Page 75, GMA75.  11:33:22
21 A.  Uh-huh. Yes.  11:33:26
22 Q.  That's a time entry that's immediately above  11:33:26
23     the one we just discussed, the time entry  11:33:29
24     that begins on July 1st of 2005. The  11:33:31
25     description there reads, "Review documents;  11:33:34

### Page 113

1      write damage declaration; edit Frank-  11:33:37
2      Rosenthal white paper."  11:33:40
3      Did I read that correctly?  11:33:42
4  A.  That's correct.  11:33:43
5  Q.  Are you familiar with the Frank-Rosenthal  11:33:43
6      white paper that's referred to in this time  11:33:53
7      entry?  11:33:55
8  A.  That was an early draft of what became my  11:33:55
9      declaration. At the time it wasn't clear  11:33:58
10     who was going to take the lead on this work.  11:34:00
11 Q.  When you say "it wasn't clear who was going  11:34:03
12     to take the lead," do you mean as between  11:34:06
13     you and Professor Frank?  11:34:08
14 A.  That's correct.  11:34:10
15 Q.  Who drafted the Frank-Rosenthal white paper  11:34:10
16     such as it is?  11:34:12
17 A.  I did.  11:34:13
18 Q.  Would Professor Frank have provided comments  11:34:14
19     on that document?  11:34:21
20 A.  Ultimately. When it was drafted, he was in  11:34:22
21     Europe.  11:34:25
22 Q.  So to what extent -- was it truly a Frank-  11:34:30
23     Rosenthal white paper and not just a  11:34:33
24     Rosenthal white paper?  11:34:35
25 A.  Originally it was just a Rosenthal white  11:34:36

## Page 122

1  deposition today are documents that you  11:42:59
2  would have listed as documents you  11:43:01
3  considered when you first wrote the  11:43:03
4  declaration in the case, correct?  11:43:05
5  A. That's correct.  11:43:06
6  Q. There are -- you also reviewed the new  11:43:06
7  complaint in the case, correct?  11:43:11
8  A. That's correct.  11:43:12
9  Q. Which is not listed --  11:43:13
10 A. That's correct.  11:43:14
11 Q. -- in your report?  11:43:14
12    You also reviewed Professor Fisher-  11:43:16
13 Ellison's report in the Clark case which is  11:43:19
14 also not listed as a document that you've  11:43:20
15 considered in your declaration in this case,  11:43:22
16 correct?  11:43:24
17 A. Yes, that's correct.  11:43:24
18 Q. Other than those two documents, the new  11:43:25
19 complaint, Professor Fisher-Ellison's  11:43:29
20 report, are there any other documents that  11:43:31
21 you reviewed in your preparation for this  11:43:32
22 deposition that do not appear as documents  11:43:34
23 that you've considered in your declaration?  11:43:37
24 A. I don't believe there's anything else.  11:43:39
25 Q. Okay.  11:43:41

## Page 123

1     MR. POLUBINSKI: Let's mark the  11:43:54
2  next exhibit.  11:43:55
3     (Exhibit No. 9, Notice of  11:43:55
4  Deposition, marked for identification.)  11:44:16
5  Q. I'm handing you a document that we've marked  11:44:16
6  as Rosenthal Exhibit 9. I assume that  11:44:18
7  you've seen this before?  11:44:27
8  A. I have seen this before.  11:44:27
9  Q. If you look three pages into the document,  11:44:33
10 you'll see the subpoena pursuant to which  11:44:36
11 you're testifying today, correct?  11:44:39
12 A. That's correct.  11:44:41
13 Q. Now, the subpoena also requests documents  11:44:41
14 from you; is that right?  11:44:45
15 A. That's correct.  11:44:47
16 Q. And you were aware of that, right?  11:44:48
17 A. I was aware of that.  11:44:50
18 Q. What, if anything, did you do to locate the  11:44:51
19 documents that are described in the document  11:44:59
20 request?  11:45:01
21 A. The document request was responded to by  11:45:01
22 Greylock McKinnon, obviously with my input,  11:45:03
23 but they pulled together the documents to  11:45:06
24 respond to this.  11:45:09
25 Q. Now, you mentioned that they did it with  11:45:11

## Page 124

1  your input?  11:45:13
2  A. Uh-huh.  11:45:14
3  Q. To what extent did you have input in that  11:45:14
4  process?  11:45:17
5  A. Well, again, the documents that are listed  11:45:18
6  in my declaration, that are referenced in my  11:45:23
7  declaration, I obviously made that list, so  11:45:26
8  that is the primary place where they drew  11:45:33
9  from in terms of the documents to be  11:45:36
10 produced. And I tried to be complete about  11:45:37
11 anything that I looked at for the  11:45:41
12 declaration, and so I believe that that's  11:45:44
13 what was sent, unless it was publicly  11:45:47
14 available and then they traditionally don't  11:45:49
15 send those publicly available documents.  11:45:51
16 Q. So am I right that the extent of your input  11:45:53
17 into the process of searching for the  11:45:56
18 documents would have been your having put  11:45:58
19 together the list of documents that you  11:46:00
20 considered when you first wrote the  11:46:01
21 declaration; is that correct?  11:46:03
22 A. That's correct.  11:46:04
23 Q. Did you do anything else specifically to  11:46:04
24 assist people at GMA, Greylock McKinnon, in  11:46:07
25 responding to the documentary portion of  11:46:12

## Page 125

1  your subpoena?  11:46:14
2  A. Again, I would have -- I looked to see if I  11:46:15
3  had drafts, which I did not, to produce, so  11:46:17
4  what was on my hard drive.  11:46:22
5  Q. Did you look for notes at all that I would  11:46:26
6  have taken?  11:46:28
7  A. I did look for notes, but -- yes.  11:46:28
8  Q. Did you look through your office for any  11:46:31
9  other materials that you might have had in  11:46:33
10 connection with this case?  11:46:36
11 A. I did, and I don't have any other documents  11:46:36
12 in my office that I could locate.  11:46:41
13 Q. And that includes -- well, just to circle  11:46:44
14 back to the last question, I take it you  11:46:46
15 didn't find notes when you looked for them?  11:46:49
16 A. I didn't find notes, no.  11:46:51
17 Q. All right. We've been talking about  11:47:12
18 Attachment A.2 to your declaration, which is  11:47:13
19 Exhibit 1, which is described as "Documents  11:47:15
20 Relied Upon." Do you see that?  11:47:20
21 A. I do see that.  11:47:28
22 Q. Now, aside from -- well, let me just ask it  11:47:29
23 more cleanly. Have you since -- since the  11:47:35
24 time you prepared this, sometime on or prior  11:47:40
25 to August 8th, 2005, have you since reviewed  11:47:43

VERITEXT NEW YORK REPORTING COMPANY
212-267-6868
516-608-2400