UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | :: | MDL Docket No. 1629 |
| In re:  NEURONTIN MARKETING, | : | |
|   SALES PRACTICES AND PRODUCTS | : | Master File No. 04-10981 |
|   LIABILITY LITIGATION | : | |
|  | | Judge Patti B. Saris |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | :: | Magistrate Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO: | : | |
|  | : | |
|   PRODUCTS LIABILITY ACTIONS | : | |
|  | : | |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER WITH RESPECT TO DISCOVERY OF CO-AUTHORS OF
UNPUBLISHED MANUSCRIPT ON ANTI-EPILEPTIC DRUGS**

Defendants Pfizer Inc. and Warner-Lambert Company submit this memorandum in

support of their motion for a protective order with respect to plaintiffs' plan to conduct discovery

of the three scientists who, with Dr. Robert Gibbons, co-authored an unpublished manuscript

relating to the association between anti-epileptic drugs ("AEDs") and suicide.

**Preliminary Statement**

On November 25, 2008, the Court indicated that it would permit "expert discovery"

concerning Dr. Gibbons' supplemental expert report.  (Electronic Order, November 25, 2008.)

That discovery is nearing completion:  On November 26, defendants produced all materials

requested by plaintiffs on which Dr. Gibbons relied in forming the opinions expressed in the

report, and they will produce Dr. Gibbons for deposition on February 3rd and 4th.  Moreover,

nothing (other than science) is stopping plaintiffs from conducting their own study like the one

Dr. Gibbons conducted – using either the database Dr. Gibbons has supplied or by obtaining

their own database -- and supplementing their expert case.  All this, unfortunately, is not enough

for plaintiffs. Based on the Court's grant of permission to conduct limited "expert discovery," plaintiffs have issued subpoenas to three scientists, seeking their testimony and documents concerning the unpublished manuscript that they co-authored with Dr. Gibbons. None of these scientists has had any involvement in this case, and none has been named an expert witness in this case. What plaintiffs are attempting, therefore, is not the "expert discovery" permitted by the Court's November 25 Order, but unsanctioned third-party discovery.

Further, none of Dr. Gibbons' co-authors is involved in or knows the details of the expert issues in this case, and all of them wish not to be deposed or to be forced to produce their personal records relating to the manuscript. Nevertheless, plaintiffs admit that they intend to elicit opinions from the co-authors, including for impeachment purposes. Rule 45(c)(3)(B)(ii) and the cases under it frown on such attempts to co-opt unwilling experts, and the cases make clear that the probative value of such impeachment material is limited, at best.

Moreover, that which plaintiffs propose is fundamentally unfair. Plaintiffs are attempting not only to admit new expert testimony through the "back door," but to do so in a way that could distort the experts' opinions and deny defendants an opportunity to present to the jury the scientists' full opinions.

For these reasons, defendants respectfully request that the Court issue a protective order prohibiting plaintiffs from conducting the depositions of Dr. Gibbons' co-authors. In the alternative, plaintiffs should be (1) permitted to depose the co-authors only with respect to any facts on which Dr. Gibbons' report relies as to which Dr. Gibbons is incapable of testifying at his upcoming deposition, and (2) prohibited from seeking any opinions of any sort from the co-authors unless defendants are permitted to make full use at trial of all of the co-authors' opinions.

## Background

On November 11, 2008, defendants filed a Motion for Leave to Supplement Record on

*Daubert* and Summary Judgment Motions with November 2008 Supplemental Expert Report of

Robert D. Gibbons.  (Docket # 1489.)  The new opinions expressed by Dr. Gibbons in the

supplemental expert report relate to his recent pharmacoepidemiologic study on whether there is

an association between Neurontin and suicide.  (Docket #1489  Ex. A, ¶¶ 11-19.)  Dr. Gibbons

reported that he had obtained data on over 130,000 Neurontin-treated patients from,

PHARMetrics, and analyzed the data for the risk of suicide behavior following treatment with

Neurontin.  He reported:

> These findings clearly reveal that in this cohort of over 130,000 patients treated
> with gabapentin, there is no overall increased risk of suicide attempt associated
> with gabapentin treatment.  Gabapentin does not increase the likelihood of suicide
> attempts, and the suicide attempts considered here were of sufficient severity to
> make it into the medical record.  However, among patients with a psychiatric
> disorder, who are at increased suicidal risk, statistically significant protective
> effects of gabapentin were clearly demonstrated. . . . [T]hese findings suggest
> that among those patients at increased risk of serious suicide attempts, gabapentin
> significantly decreases their risk of making a suicide attempt.  Whether this
> protective effect is based on reducing the symptoms of the psychiatric disorder or
> by treating the concomitant pain disorder that is present in many of these patients
> remains an open question.

(Docket # 1489, Ex. A, ¶ 19.)  Dr. Gibbons' pharmacoepidemiologic study of whether there is an

association between Neurontin and suicide attempt in all patients, is the subject of his

supplemental disclosures.  Indeed, this study was defined as the "Study" in defendants' reply

memorandum in support of their motion to supplement the record.  (Docket # 1518 at 2.)

In a footnote to their reply memorandum, defendants mentioned that Dr. Gibbons and

three co-authors had prepared an unpublished manuscript on a different, but obviously related

subject -- whether there is an association between AEDs generally and suicide attempts in

patients treated for bipolar disorder.  (Docket # 1518 at 2 n. 3.)  A copy of the unpublished

3

manuscript was submitted as Exhibit A to the reply memorandum.  (Docket #1492, Ex. A.)  Dr.

Gibbons references the manuscript in his supplemental report, and he relies on its findings.

(Docket #1489, Ex. A, ¶ 19.)  The manuscript is at once both broader and narrower than the

Study to which Dr. Gibbons refers in his supplemental report.  It is broader in that it relates to all

AEDs, not just Neurontin, and it is narrower in that it relates only to patients with bipolar

disorder, not all patients studied taking Neurontin.  (Compare Docket #1489, Ex. A with Docket

# 1492, Ex. A.)

On November 25, 2008, the Court issued an Electronic Order on defendants' motion for

leave to supplement.  The Order provides:

> Denied on the ground that the supplemental expert report of Dr. Gibbons is
> untimely and beyond the scope of this Court's order.  However, if the Daubert and
> summary judgment motions do not resolve the case, the Court will permit
> defendant to introduce the **study** at trial.  Accordingly, the Court will permit
> **expert discovery** on the **report**.

(Electronic Order, November 25, 2008 (emphasis added).)  The Court did not open the door to

anything other than "expert discovery on the report."

The very next day, defendants produced to plaintiffs all of the material on which Dr.

Gibbons relied in conducting his "Study," and more.  Specifically, plaintiffs received, among

other documents and materials they requested, (1) a CD with the PHARMetrics data sets, (2) a

CD showing the SAS programs with the analyses conducted, and (3) the PHARMetrics license

agreement signed by Dr. Gibbons.  Although defendants offered to make him available earlier,

Dr. Gibbons is to be deposed on February 3-4.

Believing, apparently, that the Court had thrown the discovery door wide open, in late

December, plaintiffs served notices of deposition and subpoenas on Dr. Gibbons' co-authors of

the manuscript, C. Hendricks Brown, J. John Mann, and Kwan Hur.  Dr. Brown is Professor of

Epidemiology and Biostatistics and directs the Prevention Science and Methodology Group at

the College of Public Health, University of South Florida.  He also holds adjunct professor

positions in the Department of Biostatistics and the Department of Mental Health at the Johns

Hopkins Bloomberg School of Public Health.  He also is a Senior Research Scholar at the

American Institute for Research and a Collaborating Senior Scientist at the Oregon Center for

Research to Practice.  Dr. Mann is The Paul Janssen Professor of Translational Neuroscience (in

Psychiatry and in Radiology) at Columbia University.  He also is Chief of the Department of

Molecular Imaging and Neuropathology at the New York State Psychiatric Institute.  He also is

the Director of the NIMH Conte Center for the Neuroscience of Mental Disorders.  Dr. Hur is a

Senior Biostatistician at the Cooperative Studies Program Coordinating Center at Hines Veterans

Affairs Hospital in Hines, Illinois.  He also is an Adjunct Assistant Professor of Psychiatry at the

University of Illinois at Chicago.  (Brown Dec., ¶¶ 2-5; Mann Dec., ¶ 2; Hur Dec., ¶¶ 3, 4.)

The subpoenas to Drs. Brown, Mann, and Hur purport to require each of them to appear

for deposition and also to produce "[a]ll documents concerning" the manuscript.  Dr. Brown is

directed to appear for deposition testimony on January 29 in Tampa, Florida.  Dr. Mann is

directed to appear on February 4 in New York City.  Dr. Hur is directed to appear on February 6

in Chicago.  (Brown Dec., ¶ 10; Mann Dec., ¶ 8; Hur Dec., ¶ 9.)

Drs. Brown, Mann, and Hur do not wish to be deposed by either side.  None of them is

familiar with these proceedings.  None of them is a witness to the facts of any of the product

liability cases.  All of them are extraordinarily busy, and it would be a hardship for each to be

distracted from their important work.  Each of them believes that Dr. Gibbons is fully equipped

to testify concerning all aspects of the unpublished manuscript, including what data was

analyzed, how the data was analyzed, and what findings resulted from the analyses.  (Brown

Dec., ¶¶ 11-16; Mann Dec., ¶¶ 9-14; Hur Dec., ¶¶ 10-15.)  Dr. Gibbons confirms these beliefs: He is fully prepared to describe and explain every aspect of the manuscript, including the data sets involved and all analyses underlying its findings during his forthcoming deposition on February 3 and 4.  (Gibbons Dec., ¶¶ 9, 10.)  Indeed, Dr. Gibbons, as the lead author on the manuscript, is fully equipped to answer all questions plaintiffs will have about the manuscript; there is nothing the co-authors would know independent of his own knowledge of the manuscript.  (Gibbons Dec., ¶¶ 9-11.)

On January 13, defendants and plaintiffs conferred concerning the subpoenas. Defendants asked plaintiffs not to proceed with the depositions.  In summary, plaintiffs (1) insisted on the depositions; (2) while agreeing that they cannot force Drs. Brown, Mann, and Hur to provide opinions, admitted that they will ask them for their opinions; (3) declined to depose Drs. Brown, Mann, and Hur only if Dr. Gibbons were unable to testify fully as to the factual basis for the opinions he has expressed; and (4) indicated that they want (or hope) to obtain from Drs. Brown, Mann, and Hur opinions and information that they can use to impeach Dr. Gibbons. (Chaffin Dec., ¶¶ 2, 3.)

## Argument

## A PROTECTIVE ORDER SHOULD ISSUE

### A.    The Court Did Not Authorize Far-Ranging Discovery

In the Electronic Order, the Court indicated that if the *Daubert* and summary judgment motions were not to dispose of plaintiffs' claims, it would allow defendants to offer the "study" at trial.  "Accordingly," the Court permitted "expert discovery on the report."  (Electronic Order, November 25, 2008.)

The discovery plaintiffs seek of Drs. Brown, Mann, and Hur is not "expert discovery," and it is not limited to "the report." Plaintiffs are entitled under the Electronic Order to obtain the materials on which Dr. Gibbons relied in forming the opinions expressed in his supplemental report, and defendants have produced them. Plaintiffs also are entitled to depose Dr. Gibbons about the supplemental report, and they will have ample opportunity to do so.[1]

But they are not entitled under the guise of "expert discovery" to depose three very busy strangers to this case. These depositions would not be "expert discovery." Expert discovery is discovery of the experts in the case; Drs. Brown, Mann, and Hur are not experts in this case and have never been asked to form (and have not formed) opinions about the allegations brought by plaintiffs in this litigation.

Nor would the discovery plaintiffs seek be limited to "the report." The Court permitted "expert discovery" only as to Dr. Gibbons' supplemental report, which covers his "Study" on Neurontin. The manuscript on which plaintiffs seek discovery from Drs. Brown, Mann, and Hur addresses in some respects much more than, and in others much less than, Dr. Gibbons' Study on Neurontin. The discovery plaintiffs seek is, therefore, to some extent off point because the manuscript covers all AEDs, not just Neurontin, and it relates only to bipolar patients, not all the patients who were studied by Dr. Gibbons.

---

[1]    Truth be told, in the more than six years in which Dr. Blume and Keith Altman have worked for the Finkelstein law firm on Neurontin litigation, plaintiffs' experts have never shown any interest at all in conducting a study of the type Dr. Gibbons has completed. And now, rather than conduct their own study, plaintiffs' strategy is to attack Dr. Gibbons through his co-authors and thus to muddy the pharmacoepidemiologic waters. Plaintiffs should focus their attention where it belongs – on Dr. Gibbons.

Because the discovery plaintiffs seeks is beyond the scope of discovery the Court authorized on November 25, a protective order prohibiting plaintiffs from deposing Drs. Brown, Mann, and Hur should issue.[2]

**B.    In The Alternative, Plaintiffs Should Be Permitted To Depose Drs. Brown, Mann, And Hur Only Upon A Showing Of Need, i.e., That Dr. Gibbons Lacks Some Relevant Factual Knowledge, And Then Only As To Facts Relating To Dr. Gibbons' Supplemental Opinions**

In the alternative, plaintiffs should be prohibited from deposing and seeking documents from Drs. Brown, Mann, and Hur absent a showing that Dr. Gibbons cannot testify as to material factual underpinnings of the Study, and any examination and production should be limited to facts about which Dr. Gibbons is unable to testify, if any.

Plaintiffs concede that they intend to examine Drs. Brown, Mann, and Hur as to their opinions. This they should not be permitted to do. Rule 45(c)(3)(B)(ii) permits a court to quash a subpoena issued to a third party if it "requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party." Fed. R. Civ. P. 45(c)(3)(B)(ii). Rule 45(c)(3)(B)(ii) is intended to provide "appropriate protection for the intellectual property of the non-party witness," and to address the growing problem of the use of subpoenas in an "attempt to extract expert testimony from a non-party witness." Advisory Committee's Note (1991 Amendment, Subdivision (c)(3)(B)(ii)). *See, e.g., In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation,* 249 F.R.D. 8, 13 (D. Mass. 2008) (rejecting attempt to co-opt expertise of un-retained experts). The rule is based in part on the principle that compelling unretained experts to testify "unfairly denies them 'the opportunity to bargain for the

---

[2]    Defendants would add that the depositions would be costly and disruptive at a time when no disruption can be afforded. Summary judgment motions are due soon in *Bulger*, *Smith*, and the sales and marketing cases.

value of their services.'" *In re Public Offering PLE Antitrust Litigation*, 233 F.R.D. 70, 76 (D.

Mass. 2006) (quoting Fed. R. Civ. P. 45(c)(3)(B)(ii) advisory committee's note); *see also Chavez*

*v. Board of Education of Tularosa Municipal High School*, 2007 WL 1306734 at *4 (D.N.M.)

("[i]n short, rule 45(c)(3)(B)(ii) was designed to protect experts from being required to provide

expert advice or assistance without proper compensation"). Rule 45 thus permits unretained

experts to "withhold their expertise." *In re Public Offering PLE Antitrust Litigation*, 233 F.R.D.

at 76.

Accordingly, unless an unretained expert can provide testimony based on his or her

personal knowledge of facts relevant to the case, a court may exercise its discretion to quash a

subpoena calculated to elicit the unretained expert's opinions. *See id.* (noting that court should

assess the "'degree to which the expert is being called because of his knowledge of *facts relevant*

*to the case* rather than in order to give opinion testimony'"(quoting *Kaufman v. Edelstein*, 539

F.2d 811, 822 (2d Cir. 1976)) (emphasis in original); *see also Glaxosmithkline Consumer*

*Healthcare, L.P. v. Merix Pharmaceutical Corp.*, 2007 WL 1051759 at *3 (D. Utah) (finding

witness who worked as a researcher, and not as a pharmaceutical industry participant, could not

describe events pertinent to the lawsuit).

As unretained, non-party witnesses, Drs. Brown, Mann, and Hur are entitled to the

protection afforded their intellectual property,  Fed. R.Civ. P. 45(c)(3)(b)(ii).  They are not

witnesses to the events pertinent to plaintiffs' allegations about Neurontin in these cases.

Plaintiffs' attempt to co-opt expert opinions from these unretained witnesses should not be

allowed.

Moreover, any opinions plaintiffs obtained from Drs. Brown, Mann, and Hur would have

limited, if any, value, and plaintiffs' approach would be fundamentally unfair.  Drs. Brown,

Mann, and Hur could – and, in view of the manuscript, probably would – provide opinions that support defendants' position on general causation. Plaintiffs cannot be interested in these opinions, and they undoubtedly would resist (based on Rule 26(a)(2)(C)) defendants' use of them at any trial. Clearly, plaintiffs' hope is to elicit an opinion that supports their position and attempt to use it at least to impeach Dr. Gibbons. But as a tool for impeachment, such an opinion would have, at best, limited probative value. *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation,* 249 F.R.D. at 12 (citing *Cusimano v. Microsoft Corp.*, 162 F.3d 708, 712 (1st Cir. 1998); and *Plough, Inc. v. Nat'l Academy of Sciences,* 530 A.2d 1152, 1160 (D.C. 1987)). Moreover, it would be fundamentally unfair to permit plaintiffs to utilize for impeachment or any other purpose an opinion obtained from Drs. Brown, Mann, and Hur, but to prohibit defendants from using their opinions in support of defendants' case.

Assuming, counter-factually, that plaintiffs are seeking just facts from Drs. Brown, Mann, and Hur, the considerations under 26(b)(2)(c) apply. Under the rule,

> the court must limit the frequency or extent of discovery otherwise allowed by
> these rules or by local rule if it determines that: (i) the discovery sought . . . can be
> obtained from some other source that is more convenient, less burdensome, or less
> expensive . . . [or] (iii) the burden or expense of the proposed discovery
> outweighs its likely benefit, considering the needs of the case, the amount in
> controversy, the parties' resources, the importance of the issues at stake in the
> action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(c). The balancing test set forth in Rule 26(b)(2)(c) requires a party seeking the production of an academic researcher's pre-publication materials to "first make a *prima facie* showing that its 'claim of need and relevance is not frivolous.'" *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation,* 249 F.R.D. at 12 (citing *Cusimano*, 162 F.3d at 716). Where there is an objection to providing such pre-publication materials and information, the Court is required to balance the need for the information against

"the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends. . . ." *Cusimano*, 162 F.3d at 716 (citing *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597-98 (1st Cir. 1980)).  Indeed, even after publication, pre-publication materials such as confidential peer reviews continue to require protection. *See id.* (noting danger of "casually" allowing production of even nonconfidential information of a journalist or researcher).  In addition, when balancing these factors, the Court is required to grant "special weight" to the fact that the academic researcher is a non-party stranger to the litigation. *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation,* 249 F.R.D. at 12 (citing *Cusimano,* 162 F.3d at 717).  The placement of an "unwanted burden" upon a non-party stranger thus must not be made absent the showing of a compelling need. *Cusimano,* 162 F.3d at 717.

Here, plaintiffs not only "can . . . obtain," but have obtained and will obtain, the discovery to which they are entitled – "expert discovery on the report" – from some other source that is more convenient, less burdensome, and less expensive.  They have already scheduled the deposition of Dr. Gibbons; they have already received from Dr. Gibbons all of his reliance materials;  and they are aware from Dr. Gibbons' declaration that he is ready to be examined at length by plaintiffs, fully capable of – and indeed in the best position to – answer plaintiffs' questions about the manuscript as well as the Study, which is the primary issue in his report as it relates specifically to Neurontin.  This "source" is far more convenient, less burdensome, and less expensive for all concerned than multiple depositions in multiple states of unretained non-party witnesses during a critical period in this case.

Here, the burden outweighs the benefit.  Given the number, locations, and timing of the proposed depositions, the burden is significant – not only to the parties, but to the witnesses, as

11

set forth in their declarations.  But the potential benefit is small, if not completely absent. Indeed, plaintiffs cannot identify – and have not identified -- any facts on which Dr. Gibbons relies that have been denied to plaintiffs, much less any facts that plaintiffs could use to impeach Dr. Gibbons and that they could obtain only by deposing Drs. Brown, Mann, and Hur.

This being said, it is conceivable that plaintiffs could identify during Dr. Gibbons' deposition facts that are relevant to his "report" (the only subject as to which discovery is permitted) as to which he cannot speak but one or more of Drs. Brown, Mann, and Hur could.  If this were to occur, plaintiffs would be entitled, based on a specific showing of need, to depose whichever of Drs. Brown, Mann, and Hur could supply the missing facts.  Plaintiffs do not need, and are not entitled to, more than this.

### Conclusion

For the foregoing reasons, defendants respectfully request that the Court enter an order prohibiting plaintiffs from seeking the deposition testimony of, or documents from, Drs. Brown, Mann, and Hur.  In the alternative, plaintiffs should be (a) permitted to depose Drs. Brown, Mann, and Hur only with respect to facts underlying Dr. Gibbons' report that have not been otherwise provided to plaintiffs through Dr. Gibbons' testimony and Dr. Gibbons's reliance materials, and then only after a specific showing of need, and (b) prohibited from seeking any opinions from Drs. Brown, Mann, and Hur (absent an express indication from the Court that defendants will be permitted to make full use at trial of any of the doctors' opinions).

Dated: December 19, 2009                    DAVIS POLK & WARDWELL

                                            By:     /s/ James P. Rouhandeh
                                                    James P. Rouhandeh

                                            450 Lexington Avenue
                                            New York, New York 10017
                                            (212) 450-4000

SHOOK, HARDY & BACON L.L.P.

By:     /s/ Scott W. Sayler
         Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

-and-

HARE & CHAFFIN

By:     /s/ David B. Chaffin
         David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 22, 2009.

/s/ David B. Chaffin
David B. Chaffin