# EXHIBIT D

12/22/2008 Weiss-Smith, Sheila

```
 1           IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   In re:  NEURONTIN MARKETING,
 5   SALES PRACTICES AND PRODUCTS
 6   LIABILITY LITIGATION
 7   _____/
 8   THIS DOCUMENT RELATES TO:    MDL Docket No. 1629
 9   Bulger v. Pfizer, et al.    Master File No. 04-10981
10   07-11426-PBS
11
12   Smith v. Pfizer, et al.
13   05-CV-11515-PBS
14   Crone v. California State Court
15   _____/
16
17           The videotaped deposition of SHEILA WEISS
18   SMITH, PH.D. was held on Monday, December 22, 2008,
19   commencing at 9:17 A.M., at the Law Offices of Goodell,
20   DeVries, Leech & Dann, LLP, 20th Floor Commerce Place,
21   One South Street, Baltimore, Maryland  21202,
22   before Ronda J. Thomas, a Notary Public.
23
24   Job No.: 183061
25   REPORTED BY:  Ronda J. Thomas, RPR, CLR
```

```
 1   APPEARANCES:
 2
 3       ON BEHALF OF THE PLAINTIFFS, PRODUCTS LIABILITY
 4       STEERING COMMITTE AND CRONE:
 5         KEITH ALTMAN, ESQUIRE
 6         Finkelstein & Partners
 7         436 Robinson Avenue
 8         Newburgh, New York 12550
 9         Telephone:  845.562.0203
10         Facsimile:  845.562.3492
11         Email:  Kaltman@lawampmmt.com
12
13       ON BEHALF OF PFIZER AND MDL:
14         RICHARD M. BARNES, ESQUIRE
15         MICHAEL J. WASICKO, ESQUIRE
16         Goodell, DeVries, Leech & Dann, LLP
17         One South Street, 20th Floor
18         Baltimore, Maryland 21202
19         Telephone:  410.783.4000
20         Facsimile:  410.783.4040
21         Email:  Rmb@gdldlaw.com, mjw@gdldlaw.com
22
23
24
25   (APPEARANCES continued on next page.)
```

```
 1   (APPEARANCES continued.)
 2
 3       ON BEHALF OF RAYMOND JENNINGS, M.D.:
 4         ELANA GOLD, ESQUIRE (via teleconference)
 5         Law Offices of Steven D. Hillyard, APC
 6         345 California Street, Suite 1770
 7         San Francisco, California 94104
 8         Telephone:  415.334.6880
 9         Facsimile:  415.334.6967
10         Email:  Egold@hdmlaw.com
11
12   ALSO PRESENT:  Robert Kowalchik, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        INDEX
 2       Deposition of SHEILA WEISS SMITH, Ph.D.
 3               December 22, 2008
 4
 5   EXAMINATION BY:                              PAGE
 6   Mr. Altman                                    6
 7   Mr. Barnes                                   329
 8   Mr. Altman                                   331
 9
10   EXHIBIT NUMBER:                             MARKED
11   18    Supplemental Report                     5
12   19    Materials considered                    5
13   20    Current CV                              5
14   21    Materials relied on by Dr. Weiss Smith  5
15   22    Gabapentin Related Clinical Study Cases 155
16   23    Statement by Janet Woodcock, M.D.      195
17   24    3 page document Pfizer_MHauben_0000123-125  210
18   25    Cumulative Percentage Reports of
19         Suicidal and Self-Injurious Behavior  228
20   26    FDA letter                             265
21   27    Chart - Percentage of Serious Reports  280
22   28    Invoices                               328
23   29-32 CD's (retained)                       332
24
25
```

1          P R O C E E D I N G S

2          (Whereupon, documents were premarked as

3     Deposition Exhibit Number 18, 19, 20 and 21.)

4          THE VIDEOGRAPHER:  We are on the record.

5     The time is 9:17 a.m.  My name is Robert Kowalchik of

6     Nationwide Video Production.  The date today is

7     December 22, 2008.  This deposition is being held in

8     the office of Goodell DeVries located at One South

9     Street, Baltimore, Maryland.

10         The caption of the case is in Re: Neurontin

11    Marketing Practices and Products Liability

12    Litigation in the United States District Court,

13    District of Massachusetts.  MDL Docket No. 1629 Master

14    File No. 04-10981.

15         This document relates to Bulger v. Pfizer,

16    et al. 07-11426-PBS and Smith v. Pfizer, et al.

17    05-CV-11515-PBS and cross noticed in the case of Crone

18    v. Pfizer.

19         The name of the witness is Sheila Weiss

20    Smith.  At this time the attorneys will identify

21    themselves and the parties they represent, after which

22    our court reporter, Ronda Thomas of Doerner and

23    Goldberg, will swear in the witness and we can proceed.

24         MR. ALTMAN:  Keith Altman on behalf of

25    Finkelstein & Partners for the Plaintiffs Products

5

1     Liability Steering Committee, as well as the Crone

2     Plaintiffs.

3          MR. BARNES:  Richard M. Barnes on behalf of

4     Pfizer and MDL in the Smith and Bulger cases as well as

5     the Crone case in California.

6          MR. WASICKO:  This is Michael Wasicko from

7     Goodell DeVries on behalf of the Pfizer Defendants.

8          MS. GOLD:  Elana Gold for Raymond Jennings,

9     M.D., in the case of Crone versus Pfizer.

10    Whereupon,

11         SHEILA WEISS SMITH, PH.D.,

12    called as a witness, having been first duly sworn to

13    tell the truth, the whole truth, and nothing but the

14    truth, was examined and testified as follows:

15         THE VIDEOGRAPHER:  We're on the record.

16    The time is 9:21 a.m.

17         EXAMINATION BY MR. ALTMAN:

18    Q     Dr. Weiss Smith, how are you today?

19    A     Fine, thank you.

20         MR. BARNES:  Counsel, before you begin, I

21    think we all agree that this deposition is not only

22    Smith and Bulger but is applicable to all pending cases

23    in the MDL.

24         MR. ALTMAN:  I think we're in agreement on

25    that.  One other thing I want to put on the record

6

since this case has been noticed in the Crone matter,

2     we are not under the same time constraints as in the

3     federal MDL which allows for two days of seven hours.

4     We have scheduled one day.  I will do everything in my

5     power to conclude my examination in the one day of

6     seven hours but reserve the right to adjourn the

7     deposition and complete it at a later date if I'm

8     unable to do so.

9          MR. BARNES:  I do not believe that the

10    California deposition notice provides you the leeway

11    you seek but as to time we'll take it up at a later

12    date.  Why don't you begin.

13         MR. ALTMAN:  Okay.

14         EXAMINATION BY MR. ALTMAN:

15    Q     Dr. Weiss Smith, before we begin I've

16    marked -- we're continuing the numbering from your last

17    deposition, which was I believe in January of this

18    year, 11 months ago, the deposition exhibit numbering,

19    starting with no. 18.

20         I'd like to hand you what I've marked as

21    Exhibits 18, 19, 20 and 21 which I'd like you to take a

22    quick look at to see if they are, in fact, your

23    supplemental report, your materials considered and your

24    CV as well as the materials considered from your

25    original deposition.

7

1     A     That looks right.

2     Q     By that you mean Exhibit 18 and your

3     supplemental report, correct?

4     A     Yeah, Exhibit 18 looks like it's the same

5     as what I have.  Exhibit 1.  Exhibit 19 is the same as

6     what I have, yes.  The supplement.

7     Q     By Exhibit 1 you mean what I've marked as

8     Exhibit 19 which is a list of materials considered

9     marked as Exhibit 1 to your supplemental report,

10    correct?

11    A     Exhibit 1 materials considered you wrote

12    Deposition Exhibit 19.

13         Exhibit 20 is a short CV.

14    Q     That is your current CV; is that correct?

15    A     Yes, it's my short CV.

16    Q     That was provided as part of your

17    supplemental report, correct?

18    A     Was it a part of my supplemental report?  I

19    believe so.

20         MR. WASICKO:  Yes.

21    A     What's 21?

22    Q     21 is, I believe, your materials considered

23    from your original expert report from December of last

24    year.

25         (Witness reading.)

8

1      A      Yes.  A lot of work.  Yes.  That is
2  correct.
3      Q      In preparation of your deposition for
4  today, what materials did you review to prepare for
5  this deposition?  And I don't mean for creating your
6  expert report.  I mean specifically getting ready for
7  today's deposition.  Strike that.
8             When were you first notified of today's
9  deposition?
10     A      Earlier this month.
11     Q      Okay.  What did you do from the time you
12 were notified of your deposition today and today in
13 preparation of your deposition?
14     A      Can you narrow that question?  What do you
15 want.
16     Q      What did you do to prepare for today's
17 deposition between the time you received notice of the
18 deposition and today?
19     A      Went over my report.  Went over the FDA
20 analysis, reviewed some of the materials that are in
21 here.  Just --
22     Q      Did you meet with counsel at all?
23     A      Yes, I did.
24     Q      How many times?
25     A      Once or twice.

9

1      Q      About how much time did you spend with
2  counsel?
3      A      Not much.  We met a couple days ago.
4  Friday, we met Friday.  Then I don't know if we met
5  before I went to Taiwan.  Did we meet before?  I don't
6  think so.
7      Q      Did you talk with anybody from Pfizer in
8  the intervening period?
9      A      Did I speak with anyone from Pfizer?  Yes.
10     Q      Who did you talk to from Pfizer?
11            MR. BARNES:  About this deposition.
12     A      Oh, about this, no, of course not.
13     Q      I meant in relation to preparing for this
14 deposition?
15     A      Oh no, no.  Just business.
16     Q      You say you've reviewed your report.  Are
17 there any -- is your report accurate?  Are there any
18 corrections you would like to make to your supplemental
19 report at this time?
20     A      I think I found a typo this morning, but
21 otherwise no.
22     Q      Nothing substantive?
23     A      Absolutely not.
24     Q      When you reviewed your original report, are
25 there any changes you want to make to your original

10

1  report?
2      A      Same thing.  Nothing substantive.  No.
3      Q      Have you ever spoken to anybody in
4  preparation for your reports -- either the original or
5  the supplement report.  Have you ever had any
6  conversations with anybody from Pfizer specifically to
7  the topic of Neurontin or anything that is the subject
8  of your expert reports?
9      A      No.
10     Q      Your list of materials reviewed there, I
11 believe they're marked as exhibits -- as exhibits -- is
12 it 19 and 21?  Does this contain all of the materials
13 that you reviewed in preparation of this expert report?
14     A      Yes, I believe it does.
15     Q      Did you ever request any materials from --
16 you say you had no direct contact with anybody from
17 Pfizer, so any materials you received or would have
18 asked for would have been through counsel, correct?
19     A      That is correct.
20     Q      Were there any materials you specifically
21 requested from counsel either in preparation of your
22 supplemental report?  Just so we don't have to say it
23 every time.  When I say your report, it means your
24 supplemental report or your original report, if there's
25 something specific to one I'll draw the distinction.

11

1             So in preparation of either of your
2  reports, did you ever request anything, any documents
3  of counsel?
4      A      Yes.
5      Q      What documents did you request?
6      A      I had requested for them to let me know if
7  Pfizer had a waiver for reporting periodic reports,
8  individual periodic reports.  And I mentioned that in
9  my report.
10     Q      Okay.
11     A      I asked them to tell me that.  I might
12 have -- I think I asked them to see if they could track
13 down a couple of articles in the literature --
14     Q      Okay.
15     A      -- that I couldn't get ahold of.  And I
16 kept asking them if the FDA came up with anymore
17 material, if they had heard anything.  That's it.
18     Q      Now, as part of your original report, were
19 there any materials you asked for?
20            MR. BARNES:  If you recall.
21     A      I think the only thing I recall is asking,
22 again, for some literature.
23     Q      Okay.  There's a lot of literature listed
24 on your materials considered.
25     A      Yes.

12

12/22/2008 Weiss-Smith, Sheila

**Page 13**

```
 1      Q      Did you do all of that research yourself or
 2   was that all literature that was provided to you by
 3   counsel?
 4      A      A lot of it is what I found in the
 5   literature and I did literature searches and I would
 6   ask them for material.
 7      Q      Okay.
 8      A      Some I pulled myself but I asked them to do
 9   the leg work.
10      Q      Was there literature provided to you by
11   counsel on their own?  They just gave you here's some
12   literature you might want to review for example?
13      A      Yes.
14      Q      Did you ask for any company documents to
15   review?  Do you understand what I mean by company
16   documents?
17      A      Yes.  None that I recall.
18      Q      Were you aware that something on the order
19   of between 2 and 3 million pages of documents were
20   produced by counsel to plaintiffs in this case as part
21   of the document production?
22      A      Excuse me?
23      Q      As part of the document production?
24      A      I don't believe I'm aware of the total
25   number, no.
```

**Page 15**

```
 1      Q      So you were not provided with a hard drive
 2   of documents representing substantial -- all or most of
 3   the document production in this case, were you?
 4      A      I don't know what subset of documents I was
 5   provided.
 6      Q      How did you receive the documents provided,
 7   produced to you by counsel?
 8      A      I believe they handed them to me, they
 9   mailed it to me, or they e-mailed it to me.  Depending
10   on what it was.
11      Q      Do you have any idea what volume of
12   material, how many boxes?
13      A      I believe it's all here.
14      MR. BARNES:  We produced -- in the original
15   deposition we produced the boxes of documents that she
16   had -- in response to the original deposition notice
17   that were available at the first deposition.  That was
18   covered at the first deposition by Mr. Fromson as to
19   what she had.
20         So I think what she's prepared to speak
21   about is the supplemental report.  The question as to
22   historically what was done last year, that was amply
23   covered.  We had the opportunity to cover it regarding
24   the first report.
25         I would ask you to focus on the
```

12/22/2008 Weiss-Smith, Sheila

**Page 14**

```
 1      Q      Were you aware that a large number were
 2   produced to plaintiff's counsel?
 3      A      What's a large number?
 4      Q      Did you know that -- did you know that
 5   defendant's counsel in this case produced a number of
 6   documents to plaintiffs?
 7      A      I would assume so.
 8      Q      Do you have any idea how many documents
 9   were produced to plaintiffs?
10      A      No.
11      Q      Are you aware whether those documents were
12   available on a hard drive?
13      A      What documents?
14      Q      The documents that were produced by counsel
15   to plaintiffs.  Were you aware that those were
16   available on a hard drive?
17      A      I'm not quite sure what you're talking
18   about.
19      Q      Are you aware that defendants produced a
20   number of documents to plaintiffs, correct?
21      MR. BARNES:  She said she assumed so.
22      Q      You assume so?
23      A      I would have to assume that.  I'm not privy
24   to what's going on between the plaintiffs and the
25   lawyers.
```

**Page 16**

```
 1   supplemental report because she's not prepared to
 2   address the substance of the earlier report.
 3   Especially the questions that were discussed with
 4   Mr. Fromson last January.
 5         So if you want to focus on the supplemental
 6   report I think she's much more prepared to talk about
 7   that as to the materials she would have considered and
 8   relied upon.
 9      Q      Notwithstanding counsel's objection, I
10   point out that -- we'll discuss this later -- you say
11   in your report, I also offer opinions regarding
12   Pfizer's conduct in the development, testing and
13   labeling of Neurontin which were not part of my general
14   causation opinions in my first report --
15      MR. BARNES:  As set forth in her report,
16   counsel.  As set forth in the report.
17      Q      Correct.  Which means you would have
18   reviewed some of the materials originally produced to
19   you?
20      MR. BARNES:  That may or may not be the
21   case.  You might want to establish that first.  I don't
22   believe that's the case.  I think you're assuming
23   things.  Lay a foundation first.
24      Q      Notwithstanding anything, you were not
25   given a hard drive?  You do know what I mean by a
```

**Page 17**

```
1    computer hard drive, correct?
2        A    Yes.
3        Q    You were not given a hard drive of
4    documents in this case; is that correct?
5        A    That is correct.
6        Q    If you took all of the materials and you
7    printed it out, do you think you had 10 boxes of
8    materials, is that the order of magnitude in terms of
9    documents you received?
10       A    To tell you the truth I don't know.  I
11   didn't print things out.  I kept most of them on disk.
12       Q    Is that how most of the materials were
13   provided to you?
14       A    Some on hard copy, some on disk, some
15   e-mailed.
16       Q    What materials did you bring with you today
17   to this deposition?
18       A    What is -- I believe it's what is listed on
19   materials considered for the supplemental report.
20       Q    Was that in paper or was that electronic?
21       A    Yes.  Some each.
22       Q    We'll take a look at that stuff on a break.
23   Do you have copies of the disk, whatever, for me?
24            MR. WASICKO:  Yes.
25            MR. ALTMAN:  Okay.
```

**Page 18**

```
1        Q    I notice in your report that you adopt the
2    opinions of Dr. Robert Gibbons; is that correct?
3        A    That is correct.
4        Q    Have you done any independent review of any
5    of the underlying materials that form the basis of his
6    opinions?
7        A    What do you mean by underlying materials?
8        Q    Have you reviewed -- he did a -- he did
9    various pharmacoepidemiologic studies within his expert
10   report.  Did you, yourself, review the underlying data
11   that he used in doing those studies?
12       A    Yes and no.
13       Q    Could you explain, please.
14       A    I did look at -- it's in my report, the
15   AERS data and the sales data for Neurontin, that's in
16   my first report.  And some of my subsequent report,
17   which is the same data he used for his signal detection
18   work.
19            On the other one, where he does
20   pharmametrics study, I did not have access to the
21   pharmametrics raw data, but I did have access to the
22   full draft of the manuscript.  So I did read that.
23       Q    So in other words you read the manuscript
24   and for example if there was an error in the
25   manuscript, you did not have any independent way of
```

**Page 19**

```
1    verifying whether there was an error or not.  You're
2    relying upon Dr. Gibbons to have been correct in his
3    manuscript; is that right?
4        A    I rely on evaluating the study that he did.
5        Q    But if he made a mistake in his underlying
6    data analysis or computations or anything like that,
7    you, yourself, did not do anything to verify his work,
8    correct?
9        A    I did not repeat his analysis.  I read the
10   paper.
11       Q    Okay.  And so your opinions in adopting it
12   are obviously limited by the accuracy of his opinions,
13   correct?
14       A    The accuracy of his opinions?
15       Q    Yes.  If his opinion is wrong because he
16   did something wrong with the data analysis, then you've
17   just simply adopted his erroneous opinion of erroneous
18   data analysis?
19            MR. BARNES:  Objection.  Assumes facts not
20   in evidence.  You may answer.
21       A    You're taking a leap that I don't
22   understand.
23       Q    Okay.  We'll move on.
24            From the time we took your deposition in
25   January, when was the next time you did anything with
```

**Page 20**

```
1    respect to this case?
2        A    I was given documents as they came in so I
3    would read things over the months.  You, I believe,
4    have my invoices.  So over the last year I've read
5    things.  Then when the FDA report came out, I read
6    that.  Then just preparing, preparing for this
7    deposition.
8        Q    When did you begin preparing the
9    supplemental report?
10       A    When did I begin?  I believe it was a few
11   months ago.  Maybe in September.
12       Q    So between January and September your
13   activity was basically just reading materials as they
14   came in and everything like that?
15       A    Excuse me?
16       Q    Was just pretty much reading materials as
17   they came -- new materials as they came in, correct?
18       A    That's correct.
19       Q    You were not, let's say, doing substantive
20   analysis of information or research or anything like
21   that?  It was mostly responsive to those materials,
22   correct?
23       A    Responsive?
24       Q    Yeah, you were just pretty much reviewing
25   materials as they came to you.  You weren't doing your
```

**Page 21**

```
 1  own active research in that period of time, were you?
 2      A     That's correct.
 3      Q     In terms of working with the AERS data with
 4  respect to this case, did you do any work with the AERS
 5  data either on your own or through Q Scan between the
 6  time we took your deposition in January and when you
 7  began working on this supplemental report?
 8      A     I'm continuously doing analysis in the AERS
 9  data.
10      Q     For this case?
11      A     For this case.
12      Q     For Neurontin?
13      A     Not specifically for this case.
14      Q     For anything involving Neurontin?
15      A     I've been working in the AERS data.
16  Neurontin is one of the drugs.  I did look generally at
17  suicide.
18      Q     When you say generally at suicide, what --
19  when did you do that?
20      A     Over the past year.
21      Q     Did you do any of that analysis between
22  January and September when you started working on your
23  supplemental report?
24      A     I may have.  I've been working pretty
25  continuously on AERS and trends and AERS reporting.
```

**Page 22**

```
 1          MR. BARNES:  She, just to be precise, on
 2  her own professional work she is constantly in AERS.
 3  Some of the stuff -- almost all the time I'm assuming,
 4  your questions are open-ended.  You've not been precise
 5  as to on behalf of Pfizer or counsel or on behalf of
 6  your other professional work.
 7          So objection as to the -- your question is
 8  vague as to scope.
 9          MR. ALTMAN:  Well, when I ask Neurontin, I
10  mean Neurontin whether in this case or any other
11  context.  So specific --
12      Q     I understand that you use AERS every day.
13      A     That's what I'm trying to tell you.
14          MR. BARNES:  You're asking very broad
15  questions and I'm going to start jumping in because I
16  think your questions are very broad.  I just want to
17  make sure you understand what he's asking.  So go
18  ahead.  I think you do now.  So go ahead.
19          THE WITNESS:  Thank you.
20      Q     I haven't seen your invoices yet but do you
21  have a ballpark idea what you billed in the interim
22  between January and when you started working on the
23  report?
24      A     Ballpark from January?
25      Q     From after the deposition?
```

**Page 23**

```
 1      A     I do have the invoices.  I never did add
 2  them up.
 3          MR. BARNES:  The answer is, do you have a
 4  ballpark?  If it's yes or no.
 5      A     No, I don't have a ballpark.
 6      Q     That's fine.  We'll look at -- we'll look
 7  at that later.
 8          When you wrote both reports, did you use
 9  the same scientific vigor as you would use if you were
10  submitting these reports for publication in a
11  scientific journal?
12      A     They're totally different purposes.  But
13  I -- that's what I was hired to do is to look at the
14  science.
15      Q     I understand that.  But when I mean
16  scientific vigor, I mean checking citations, checking
17  batch error, math is accurate, checking your charts to
18  make sure that they're accurate.  Being sure that, you
19  know, all of those things -- those are the kinds of
20  things you would do if you were submitting a paper to a
21  journal, correct?
22      A     If I was submitting a paper to a journal,
23  yes.
24      Q     Did you do those same things here?
25      A     Not to the same degree checking references
```

**Page 24**

```
 1  and verifying.  I didn't have as many hands, but yes, I
 2  made sure that my analysis was right and the numbers
 3  that I put in are correct, yes.
 4      Q     Is it important that your references are
 5  correct in a scientific paper?
 6      A     Yes, it is.
 7      Q     Is it important in your reports here that
 8  your references would be correct?
 9      A     Yes, it is.
10      Q     What would happen if your references --
11  what are some of the consequences of not having
12  accurate references?
13      A     Excuse me?
14      Q     What are some of the consequences of not
15  having accurate references?
16      A     In what context?
17      Q     For somebody who is reading your -- reading
18  your scientific paper or reading these expert reports?
19      A     Well, in the scientific paper it goes
20  through editorial process and it goes through a number
21  of hands.  So it would be corrected.
22          MR. BARNES:  She's saying the editorial
23  process in scientific journals is not the same as with
24  here to be precise.  Go ahead.
25      Q     If somebody were reading your paper and you
```

1    cite to a reference, when I say your paper, I mean your

2    expert reports here, and you cite to a reference and

3    that reference was not correct, they could be led to

4    believe that a reference -- a particular reference may

5    have said something that's in your report that they

6    didn't actually say, correct?

7        MR. BARNES:  Objection.  Vague calls for

8    speculation.

9        A    I don't know what they would assume.

10       Q    If you put a -- if you put a statement in

11   your expert report --

12       MR. BARNES:  The supplemental or the

13   original?

14       MR. ALTMAN:  In either report.  This is a

15   general concept.

16       Q    If you put a citation in either one of your

17   reports and you put a sentence there and after you put

18   Joe Smith and the name of an article and the, you know,

19   the journal and the citation to that article, you are

20   telling a reader that that is where that citation --

21   that statement came from, correct?

22       A    You're attributing it to somebody, yes.

23       Q    And if that citation was incorrect, wasn't

24   that person who said it, you could lead somebody

25   reading your report to believe that one person said

---

1        A    I have no expectations of how it's going to

2    be used.  That's up to the lawyers.

3        Q    Do you have an expectation that readers of

4    your reports will sit and review every single one of

5    your references in there to see if they're actually

6    correct?

7        A    I don't know what they're going to do with

8    the report.

9        Q    But you were -- when you put a reference in

10   there, you were intending to tell the reader that

11   that's where that particular statement came from,

12   correct?

13       A    Yes, to properly give attribution to the

14   person who made that finding.

15       Q    And would it be misleading if that

16   particular person didn't actually make that statement?

17       MR. BARNES:  Objection.  Calls for

18   speculation and legal conclusion, you may answer.

19       A    I believe and I went through everything to

20   make sure I properly attributed the correct person to

21   the statements that are in there and that I accurately

22   reflected what was in the reference.

23       Q    And if you put a -- you attribute something

24   to a reference and that information is not contained

25   anywhere in the reference, could that mislead a reader

---

1    this when it isn't true that they actually said that,

2    correct?

3        A    I don't believe that's how people

4    interpret.

5        Q    What's your belief of how people -- when

6    somebody reading your expert reports would interpret

7    when you cite to a particular author, paper, et cetera?

8        MR. BARNES:  If you know.

9        A    I don't know what people assume.  When I

10   see something I -- that I can't find it, I assume that

11   it's a typo or something.  I might go and look if I

12   need to find the original reference or I might contact

13   the author and ask them if I can't track it down

14   myself.

15       Q    Did you have an expectation that anybody

16   reading your -- well, strike that.

17       Do you have an understanding that your

18   expert reports here will be used and reviewed by other

19   experts within this case?

20       A    I believe so, yes.

21       Q    Do you have an understanding that this will

22   be -- and reviewed by attorneys in this case?

23       A    Obviously it was, yes.

24       Q    Do you have an expectation that the court

25   may review your expert report here in this case?

---

1    that the reference actually said that?

2        MR. BARNES:  Objection.  Calls for

3    speculation.

4        A    Could you show me what you're referring to?

5        Q    I'm just asking as a general concept?

6        MR. BARNES:  If you have an opinion on

7    that, you can answer.  If you have no opinion, that's

8    fine, too.

9        A    I don't want to speculate.

10       Q    Do you know overall about what your

11   billings were since January, not necessarily for any

12   given time, just once again general ballpark?

13       A    It varied by month.  I never added them up.

14   I haven't done my taxes yet.

15       Q    You say you never spoke with anybody at

16   Pfizer related to this particular litigation; is that

17   correct?

18       A    That is correct.

19       Q    Are there people at Pfizer in which you

20   regularly interact with outside of the context of this

21   litigation but within the areas of your expertise?

22       A    What do you mean regularly?

23       Q    Are there individuals at Pfizer that you

24   correspond with, communicate with, speak to regarding

25   areas of your expertise?

| | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    Who are they? |
| 3 | A    One of the people I know is Manfred Hauben |
| 4 | at Pfizer.  Lester Reich I know less so.  I believe Bob |
| 5 | Reynolds also works at Pfizer, I believe. |
| 6 | Q    Have you ever spoken to Dr. Hauben about |
| 7 | Neurontin? |
| 8 | A    No.  We specifically do not speak about it. |
| 9 | Q    Do you consider yourself an expert in |
| 10 | pharmaceutical product labeling? |
| 11 | A    An expert? |
| 12 | Q    An expert? |
| 13 | MR. BARNES:  Would you repeat the question? |
| 14 | Q    Do you consider yourself an expert in |
| 15 | pharmaceutical product labeling? |
| 16 | A    I am knowledgeable about labeling, but I am |
| 17 | not one of the preeminent experts in labeling, no. |
| 18 | Q    What is the basis for your -- strike that. |
| 19 | In your research do you hold yourself out |
| 20 | as somebody that people should go to if they have |
| 21 | questions about pharmaceutical labels? |
| 22 | A    On the epidemiology and |
| 23 | pharmacoepidemiology that's put into the labels on |
| 24 | issues that -- that type of issue, so yes, to that |
| 25 | extent.  The science that I work on as it goes into the |

| | |
|---|---|
| 1 | MR. ALTMAN:  No.  Outside of that -- |
| 2 | outside of the FDA. |
| 3 | MR. BARNES:  Outside of your work with the |
| 4 | FDA, have you corresponded with the FDA about labeling? |
| 5 | A    That hasn't been my position to be the |
| 6 | correspondent.  I worked and advised the FDA and I've |
| 7 | worked for companies that have been working on labeling |
| 8 | issues, but I'm on an advisory role, not as a person |
| 9 | that would be the contact person. |
| 10 | Q    And I think you said your advisory role is |
| 11 | limited to epidemiology and pharmacoepidemiology |
| 12 | issues? |
| 13 | MR. BARNES:  As it relates to label. |
| 14 | Q    With respect to labeling? |
| 15 | A    As it relates to labeling, some organ risk |
| 16 | management.  So I'm using the broad drug safety issues. |
| 17 | Q    But they would all have in commonality, |
| 18 | they would be epidemiologic or pharmacoepidemiologic |
| 19 | issues, correct? |
| 20 | A    Based on those issues, yes. |
| 21 | Q    Have you ever reviewed a label to decide |
| 22 | whether the label had a -- was accurate from a clinical |
| 23 | perspective? |
| 24 | MR. BARNES:  What do you mean by clinical |
| 25 | perspective? |

| | |
|---|---|
| 1 | label. |
| 2 | Q    You're not a clinician? |
| 3 | MR. BARNES:  Are you finished your answer? |
| 4 | A    But I think that's where I'm narrowing it |
| 5 | to that.  So not the whole label.  I also did a lot of |
| 6 | work in pregnancy registries and the labeling for drugs |
| 7 | and pregnancy. |
| 8 | Q    Okay.  You're not a clinician, correct? |
| 9 | A    That is correct. |
| 10 | Q    Have you ever written a pharmaceutical |
| 11 | label from scratch? |
| 12 | A    No, I have not. |
| 13 | Q    Have you ever written any portion of a |
| 14 | pharmaceutical label? |
| 15 | A    No. |
| 16 | Q    Have you ever corresponded with the FDA |
| 17 | concerning a label? |
| 18 | A    What do you mean by corresponded? |
| 19 | Q    Have you ever, in any of your work, have |
| 20 | you ever been responsible for corresponding with the |
| 21 | FDA about the adequacy of the label or whether a label |
| 22 | needs to be changed or anything concerning a product |
| 23 | label? |
| 24 | MR. BARNES:  Does your question concern her |
| 25 | work on Pfizer committees as well to correspond -- |

| | |
|---|---|
| 1 | Q    To a doctor? |
| 2 | A    Isn't it all the same thing? |
| 3 | A    No, it's not all the same thing. |
| 4 | MR. BARNES:  Objection.  Assuming facts not |
| 5 | in evidence.  Vague. |
| 6 | Q    Are you qualified to take a look at a label |
| 7 | and decide whether the label accurately represents all |
| 8 | of the -- all of the risks known about the product? |
| 9 | MR. BARNES:  Objection. |
| 10 | A    I'm not sure any one person can know if one |
| 11 | label has every single thing in there.  Those labels |
| 12 | are huge and there's not one person with all the |
| 13 | expertise. |
| 14 | Q    Have you ever written to the FDA suggesting |
| 15 | the labeling change? |
| 16 | A    No, I don't typically write to the FDA. |
| 17 | Q    Have you ever been part of a group |
| 18 | assessing whether a label should be changed? |
| 19 | A    Yes, I have. |
| 20 | Q    When was that? |
| 21 | A    On a number of occasions I have served |
| 22 | either on an advisory committee or worked as a |
| 23 | consultant to the FDA.  On a couple occasions for |
| 24 | companies dealing with particular risks and risk |
| 25 | management programs.  So I've worked on both sides |

1  consulting with them about the risks.
2      Q      Do you know about how many times you've
3  done this?  And I don't mean, like, I'm not asking you
4  if a project involved, you know, 20 different
5  interactions.  I mean, let's break them up into
6  projects.  Do you know about how many projects you
7  worked on in that capacity?
8      A      Probably about a dozen.
9      Q      When you were on the advisory committee,
10  how many of those products involved you being on the
11  FDA advisory committee?
12      A      I probably been on about six or eight
13  advisory committees.
14      Q      When you were on the advisory committee --
15  were you ever on the advisory committee for the
16  approval of a product?
17      A      Yes, I was.
18      Q      Which products?
19      A      The most recent one, which was before I
20  started on this case, was a -- it was a antiviral drug,
21  it was a Pfizer antiviral drug, Maraviroc.
22      Q      Okay.  Before that?
23      A      Before I started any of this.
24      Q      And before that?
25      A      MT100.

33

1      Q      Which is?
2      A      Which was a combination product for
3  migraine.  Never got a name, I believe.
4      Q      What was the chemical compounds?
5      A      I can't remember.  There were two drugs
6  that were already approved.
7      Q      Before that?
8      A      I know I was on the committee for Clozapine
9  to look at the monitoring.
10      Q      Do you consider yourself to be a regulatory
11  expert?  When I mean regulatory, I mean pharmaceutical
12  regulatory?
13      A      To some extent.
14      Q      What is the basis of that expertise?
15      A      I did a post doctoral fellowship at the
16  FDA in pharmacoepidemiology in regulatory sciences.  We
17  took courses taught by regulatory experts at the FDA.
18  I worked there a total of two and a half years and I
19  continually study the FDA process, regulatory
20  process --
21          THE COURT REPORTER:  Please keep your voice
22  up.
23          MR. BARNES:  Yes, you have to keep your
24  voice up.
25      A      I'm sorry -- and I continually work within

34

1  the FDA regulatory processing and continue to monitor
2  and study it.
3      Q      Have you ever worked in regulatory affairs
4  for a pharmaceutical company?
5      A      No, I have not.
6      Q      When you were at the FDA in your fellowship
7  that touched upon regulatory issues, what did you do in
8  terms of regulatory affairs at the FDA?
9      A      In addition to taking courses I worked on
10  the guidance documents.  So developing guidance for
11  industry.  Guidance for FDA medical reviewers.  I
12  taught at their staff college on the use of these
13  regulatory guidance and methods, particularly in the
14  drug use in pregnancy issue, reproductive toxicology.
15  Other issues at FDA for regulatory affairs.
16      Q      While at the FDA did you ever review the
17  regulatory activities of a pharmaceutical company?
18          MR. BARNES:  Objection.  Vague as to
19  regulatory activities.
20      Q      Strike that.  I'll ask it.
21          Did you ever correspond with pharmaceutical
22  companies on regulatory matters while you were at the
23  FDA?
24      A      I never corresponded directly.
25      Q      Did you correspond indirectly?

35

1          MR. BARNES:  Are you asking if some of the
2  work she did at FDA was used by others at the FDA in
3  drafting and preparing regulatory correspondence with
4  pharmaceutical companies?  Your questions are very
5  vague.
6      A      I'm not quite sure I understand what you're
7  asking me.
8      Q      While at the FDA did you ever work on
9  specific projects that you knew were involved in a
10  particular pharmaceutical company?
11      A      All the projects we worked on at the FDA
12  dealt with the regulated products.
13      Q      I understand that.  But were you aware --
14  when you were at the FDA were you working on a
15  particular -- let's ask a couple different questions.
16          Have you ever been involved in the review
17  of a new drug application, outside of the context of an
18  advisory committee?
19      A      I might have worked on things at the FDA,
20  but I don't recall anything specific right now.
21      Q      And to be clear with one thing in terms of
22  an advisory committee, the advisory committee does not
23  actually review the massive several hundred thousand
24  page submission from a manufacturer, correct?
25      A      We get a lot for the advisory committee.

36

1 But I don't believe we get the full original

2 submission.

3 Q You typically get -- my understanding is

4 you get a number of reviews that would be done by FDA

5 staff members, a clinical review, a medical review, a

6 statistical review, a toxicology review, et cetera; is

7 that correct?

8 A That's the one side. But we also get

9 documents from the company directly. So both the FDA

10 and the company submit documents to the advisory

11 committee to review and it's all available on the web.

12 Q Sure. But they're typically summaries of

13 the material. You're not reviewing -- you're not

14 reviewing all of the detailed case report forms for,

15 you know, clinical trials; is that correct?

16 A It's typically the summary. Often there

17 will be case report information on there for particular

18 events that they're of concern.

19 MR. BARNES: So -- did you finish your

20 answer?

21 A So it's a combination of summary data but

22 also some of the key individual cases, yes.

23 Q So I understand what you're saying, you've

24 never actually taken -- received the massive volumes

25 produced by a pharmaceutical company and had

1 responsibility for reviewing any portion of the raw

2 volumes as submitted by the manufacturer; is that

3 correct?

4 A That is correct.

5 Q Do you consider yourself an expert in

6 pharmacology?

7 A No.

8 Q Do you consider yourself an expert in

9 computer databases?

10 A I'm not a computer programmer, if that's

11 what you mean.

12 Q Okay. Do you have the technical

13 capabilities to download the FDA AERS data?

14 A Yes.

15 Q Do you have the technical capabilities to

16 load that into some kind of a database tool?

17 A Of course.

18 Q Do you have the technical capabilities to

19 clean the data, link it together because it's spread in

20 multiple different tables?

21 A I believe you can't truly clean that

22 without clinical expertise because of the way that the

23 drugs and the events are coded. So that's an issue.

24 Q But when I say clean, I mean just clean

25 from an objective manner. There are obvious

1 considerations that need to be taken when using AERS

2 data that do not require clinical expertise; is that

3 correct?

4 MR. BARNES: Objection. Assumes facts not

5 in evidence. You may answer.

6 A There's a lot of clinical issues with the

7 coding of the drugs and the coding of the events that I

8 believe requires clinical expertise. So it would take

9 a phenomenal amount of time and effort to truly clean

10 the data to the point that it needs to be cleaned to

11 use it for research.

12 Q Are you aware that you cannot get the

13 narratives through the AERS download? And AERS is

14 A-E-R-S. Through the AERS download?

15 A The FOI information does not include

16 narratives. That's correct. Though you can request

17 them.

18 Q Can you request them in bulk for all

19 reports?

20 MR. BARNES: Take your time. You guys are

21 right on the edge of each other. Finish your answer

22 completely. He jumps right in at the end of your

23 answer. I'm not saying he's cut you off. He may be

24 cutting you off so if you guys will just slow it down a

25 bit. Finish your answer and you can ask your next

1 question. Go ahead.

2 A Will you repeat that, please.

3 Q Is it possible to get the AERS data in

4 bulk, including the narratives? Do you know what I

5 mean by when I say in bulk?

6 A No.

7 Q You can request for specific report numbers

8 the full MedWatch forms including the narratives,

9 correct?

10 A I'm aware that you can request them.

11 Q Can you say to the FDA I'd like the entire

12 AERS database including the narratives?

13 A They do not release the entire database of

14 narratives from my understanding.

15 Q And you would need those narratives in

16 order to review the accuracy or adequacy of the coding

17 within the AERS database, correct?

18 A That's very broad. I don't think I can

19 agree with that.

20 Q With each adverse narrative report there's

21 a number of adverse event terms associated with it,

22 correct?

23 A There can be as little -- or as few as one

24 and right now currently can be infinite.

25 Q And somebody decides what adverse event

1  terms to assign to a particular report, correct?
2      A      Somebody codes them, yes.
3      Q      And they do that based on the narrative
4  information, et cetera, correct?
5      A      Not necessarily.
6          MR. BARNES:  Objection.
7      Q      What information would they use to do that
8  that's not part of the narrative?
9      A      There are actually a field for adverse
10 event terms.
11     Q      I understand that, but in deciding what
12 adverse event terms to assign to a report, somebody has
13 to review the narrative information for that report,
14 correct?
15     A      If there is a narrative.  Not all reports
16 have narratives.
17     Q      Are you talking about in the AERS database
18 or at the ultimate -- the original source of the data
19 that goes into the AERS database?
20     A      The original source data.  Not all of it
21 has narratives.
22     Q      Okay.  How does somebody decide what terms
23 to assign to a particular adverse event report?
24         MR. BARNES:  Say it again?
25     Q      How does somebody decide what terms to

41

1  assign to an adverse event report?
2          MR. BARNES:  Objection.  Vague.  Calls for
3  speculation and you can answer what your understanding
4  of the process is.  Go ahead.  Do you understand the
5  question?
6      A      It's huge.  I don't think I can go into the
7  protocol.
8          MR. BARNES:  If anyone knows how a specific
9  person codes is a little bit broad.
10     A      Hopefully they're trained and they're
11 accurately reflecting what's in the report.
12     Q      And the report contains some kind of
13 narrative information as to what happened to this
14 person, correct, some kind of a description of what
15 happened; is that correct?
16     A      It's my understanding that not all reports
17 contain narratives.
18     Q      For a report that doesn't contain a
19 narrative, do you have any idea what the source of the
20 adverse event terms would be?
21     A      There's a field that says what were the
22 events that happened, what are you reporting.  That's
23 separate from the narrative.
24     Q      So is it your understanding that somebody
25 would decide what terms to use without knowing anything

42

1  about the report?
2      A      I don't make any assumptions on who fills
3  in what and why.
4      Q      Did you review Pfizer's procedures for
5  submitting adverse event reports to the FDA?
6      A      No, I did not.
7      Q      And I think I asked you this the last time,
8  you were provided a disk of the ARIS G database,
9  correct?
10     A      Yes.
11     Q      As of the last time you had not actually
12 reviewed the ARIS G data; is that correct?
13     A      I looked at the -- I opened the cases.
14     Q      You looked at it briefly, you opened it
15 up --
16         MR. BARNES:  Objection.  Let her finish her
17 answer.  You're jumping on her, Counsel.  You need to
18 make sure you're finished your answer and then he'll
19 ask you a question.  You're not doing anything wrong.
20 He's jumping on your answer.  But go ahead.
21     A      Yes, I have the disk.  I believe it's in
22 this box and I've looked at the case reports.
23     Q      When you say you've looked at the case
24 reports, what do you mean there?
25     A      Reports in the ARIS G database.  I've

43

1  looked at the reports.
2      Q      There's something on the order of 100
3  tables of data within the ARIS G database.  Did you
4  actually look at those individual tables to put a case
5  report together or were the case reports provided to
6  you kind of as a completed report?
7          MR. BARNES:  Objection.  Assumes facts not
8  in evidence.  You may answer.
9      A      I had both.  I had the original data
10 tables, which I looked at and I also had reports pulled
11 from that in a summary of reports.
12     Q      So that's something different that you
13 didn't have the last time; is that correct?
14     A      The summary, that is correct.
15     Q      Have you ever done anything other than
16 briefly glance at the tables with respect to the
17 original ARIS G database produced to you?
18         MR. BARNES:  Counsel, if you're going to
19 modify her prior testimony with modifiers, I wish you
20 would use her statements and not your qualifications.
21 You're not accurately summarizing the prior answers.
22 If you're going to do that, you should do it accurately
23 or not at all.
24         Would you please reask the question.
25     Q      Did you do anything with the original ARIS

44

12/22/2008 Weiss-Smith, Sheila

1  G database other than open it up, take a brief look at
2  it?
3          MR. BARNES:  Objection.  You may answer.
4      A   I did nothing more with it than I had
5  stated in the original deposition.
6      Q   Do you know what the source of the adverse
7  event report you were asked to look at?  What I mean
8  was, were they a -- strike that.
9          You received an additional disk that had
10 case reports, correct?
11     A   Yes.
12     Q   Did you ask for that disk?
13         MR. BARNES:  If you recall.
14     A   I can't recall.  I got so much stuff.  We
15 were going back and forth.  So I don't know.
16     Q   Okay.
17     A   Within the context why I got that.
18     Q   Were there any particular reports, are they
19 all of the reports, are they a subset of the reports?
20     A   What I saw was a subset of reports that are
21 the suicidality.  So the completed suicide, suicide
22 attempt.
23     Q   Did that also include suicidal ideation?
24     A   I don't recall.
25     Q   For the purposes of this -- strike that.

45

12/22/2008 Weiss-Smith, Sheila

1          I understand that you use the Q Scan system
2  for your AERS analysis; is that correct?
3      A   Q Scan FDA, that's correct.
4      Q   Do you do --
5          MR. BARNES:  You have to keep your voice
6  up.
7      Q   Do you have the FDA data in your own
8  database?
9      A   I have some of the FOI AERS data on my
10 computer, if that's what you mean, subset of it.
11     Q   What do you have that data in?  Is it in a
12 database program?
13         MR. BARNES:  If you recall.  You don't have
14 to guess.
15     A   I don't know.  I know I have the raw data.
16 I don't know if I saved it in any kind of file.
17     Q   Have you done any of your own analysis of
18 that raw FDA data outside of the context of Q Scan FDA?
19     A   Yes.  I was looking at the raw data and
20 comparing it to Q Scan because I was looking for lawyer
21 reports and I wanted to understand what was going on.
22     Q   Did you do that for this particular case?
23     A   No.
24     Q   When did you do that?
25     A   Oh, about a month ago, I believe.

46

12/22/2008 Weiss-Smith, Sheila

1      Q   Are you familiar with the concept within
2  the FDA AERS database of last best case?
3      A   Yes.
4      Q   What does that mean to you?
5      A   The most current and most complete case.
6  So if there are follow-up reports, it's the report that
7  has the most current and complete information in the
8  series.
9      Q   So does that mean that the FDA database
10 contains more than one version of an adverse event
11 report?
12     A   What do you mean?
13     Q   Does the FDA AERS data contain multiple
14 versions of a particular adverse event report?
15     A   What do you mean versions?
16     Q   When a report is first -- let's just say
17 from a manufacturer to the FDA.  When the manufacturer
18 first submits a report to the FDA, that's version 1.
19 Six months later they get some new information about
20 that particular report and that particular version to the
21 FDA; is that correct?  Or may send a revision to the
22 FDA?
23     A   Are you talking about follow-up reports?
24     Q   Follow-up report.
25     A   Okay.  There may be follow-up reports.  If

47

12/22/2008 Weiss-Smith, Sheila

1  the company gets more information, they can provide
2  follow-ups and they're sequentially numbered.
3      Q   Is there any limit to the number of
4  follow-up reports a manufacturer can send to the FDA?
5      A   Not that I'm aware of.
6      Q   Do you know how Q Scan computes with the
7  last best cases for a particular report?
8      A   We have talked about this.  It is supposed
9  to be the most current and most complete case.
10 However, all the information is retained.  So if you
11 drill down to the case you'll get all the follow-up
12 reports.  So it's all in the database.  Nothing goes
13 away.
14     Q   If you were going to look at time trends
15 within the database, it would be important to know the
16 date that a report came in, correct?
17         MR. BARNES:  Objection.  You may answer.
18     A   Time trends based on report dates.
19     Q   Based on dates received by the FDA?
20     A   Yes.
21     Q   Do you know how Q Scan deals with the date
22 of a particular adverse event term within a report with
23 respect to multiple versions?
24         MR. BARNES:  Repeat the question for me.
25     A   Okay.  Let me give you a little bit of a

48

12/22/2008 Weiss-Smith, Sheila

1  hypothetical.

2          The initial report comes in on January 1st,

3  1998 and has the word -- the term headache.  You with

4  me so far?

5      A   Sure.

6      Q   On June 1st of 1998, a followup report

7  comes in --

8          MR. BARNES:  99 or '98?

9      Q   -- 1998, June 1st, five months later, comes

10  in and changes that to migraine, okay.  On June 1st of

11  2004, another followup report comes in which also

12  contains the term migraine.  Which date should you

13  assign to the term migraine?

14          MR. BARNES:  Which date should she assign

15  or which date did the Q Scan assign?

16      Q   Which date would you assign?

17          MR. BARNES:  Okay.  That's fine.

18      A   Which date would I assign?

19      Q   Yes.

20      A   I don't know.  Is it a headache that turned

21  into a migraine?  Or was it originally a migraine and

22  it's being recoded?

23      Q   It was not originally -- migraine was not

24  part of the original report.  Migraine was not showed

25  up on version 2 of the report?

49

---

1          MR. BARNES:  Objection.  Assumes

2  insufficient facts to answer a hypothetical.

3      A   I'm not quite sure of the timeline.  I

4  understand you said the migraine showed up on the

5  second followup report, but is it a correction or is it

6  a new adverse event and why would migraine even be in

7  there if it's not serious.  So I'm not quite sure I

8  understand.

9          MR. BARNES:  That's fine.

10          MR. ALTMAN:  Okay.  We need to take a

11  break.

12          THE WITNESS:  Great.

13          MR. ALTMAN:  Change tapes.

14          THE VIDEOGRAPHER:  Going off the record.

15  The time is 10:17 a.m.  This is the end of tape number

16  1.

17          (Off the record.)

18          THE VIDEOGRAPHER:  We're on the record.

19  The time is 10:31 a.m.  This is the beginning of tape

20  number 2.

21  BY MR. ALTMAN:

22      Q   Dr. Weiss Smith, before the break you had

23  said a statement that migraine, even if it's not

24  serious.  Implying that migraine was not serious; is

25  that correct?

50

---

1      A   I'm not saying migraine is serious or not

2  serious.  I'm using the definition of serious from the

3  FDA regulations is based not on the event but on the

4  patient outcome.

5      Q   So migraine could be serious or it might

6  not be serious, it would depend on that particular

7  report, correct?

8      A   It depends on the patient outcome.

9      Q   I don't think we got to where I was -- the

10  answer to my hypothetical.  What I really want to know

11  is there were three versions of the report and migraine

12  didn't show up until the second version of the report.

13  Which version of the report should you attribute the

14  date of the migraine --

15          MR. BARNES:  Objection.

16      Q   -- the migraine was first reported?

17          MR. BARNES:  Objection.  Asked and

18  answered.

19      A   As I said earlier -- excuse me, as I said

20  earlier it's going to depend on the situation and I

21  can't just guess what the situation is.

22          Is it correction of a code that was wrong

23  and it was at the same time that they wanted to code

24  migraine and not headache or was it something that

25  developed over time?  It was originally a headache and

51

---

1  now has become a migraine?  I don't know with your

2  hypothetical.

3      Q   When you do data mining, which I'm sure

4  we're going to talk some more about, before you do your

5  analyses do you sit and review every single adverse

6  event report up front to see whether it's accurate, to

7  see whether it should have been coded a certain way, to

8  see whether the dates are correct or do you use the

9  database as it exists?

10      A   Data mining, by it's very nature, is mining

11  large quantities of data.  And, therefore, you don't go

12  and evaluate all 3 million reports in the AERS database

13  to do data mining.  Absolutely not.

14      Q   So if I was going to do data mining off of

15  that database, which version of the report should I

16  attribute the migraine to in terms of its date?

17      A   Again, you don't give me enough information

18  to make sense of that question.

19      Q   It does not show up in version 1, it shows

20  up on version 2 and it also shows up on version 3?

21      A   Again, with your hypothetical I don't know

22  if it's a correction or if it is a newly emerging

23  condition.

24      Q   But from a data mining perspective, you

25  wouldn't have any way to know that and you wouldn't be

52

1  looking at it at that level, would you?

2      A      By nature data mining is not looking at the

3  individual cases.  It's looking at trends and reporting

4  rates.

5      Q      If I'm looking at the dates attributed to a

6  particular term on a particular report, I have to pick

7  a date.  So which date do I pick?

8      MR. BARNES:  Objection.  Assumes facts not

9  in evidence.  Argumentative.  You may answer.

10     A      Well, I don't know what you're doing.  So

11 it depends on what you're doing and what the purpose of

12 it is.  You might not even use a database at all.

13     Q      If I was interested in knowing how many

14 reports of migraine came in over time to the FDA's

15 database, which date should I use?

16     A      Again, based on what you told me I can't

17 make it -- I can't make a determination.

18     Q      Do you know what date Q Scan does when you

19 did your time trends?

20     A      Time trends?

21     Q      Let's take a step back.  In your reports

22 you did some analyses of reports and things over time.

23 Correct?

24     A      That is correct.

25     Q      Do you know for a report that has multiple

1  you look at a year time span.

2      Q      Did you look at that influence for this

3  particular report?

4      A      I did not consider your hypothetical for my

5  analysis.

6      Q      Did you ever work in the pharmaceutical

7  industry?

8      A      I have consulted to the pharmaceutical

9  industry.

10     Q      Did you ever work directly for a

11 pharmaceutical company as an employee?

12     A      As a regular employee, no, as a consultant.

13 But I've worked, for example, for Hoffmann-La Roche.  I

14 worked for them as a consultant for three months full

15 time but that's it.

16     Q      When you were consulting for industry, did

17 you ever directly work on a new drug application?

18     A      I've never written a new drug application.

19 I worked on information that might go into a new drug

20 application, yes.

21     Q      You say might go into it.  Do you have any

22 specific knowledge of a particular project you may have

23 done for a pharmaceutical company that was used as part

24 of a new drug application or an SMDA or an ANDA?

25     A      I never saw the application so I'd have to

1  versions which date Q Scan uses?

2      A      I would have to go back and check.  I

3  believe it's the original date of the report.  But I'll

4  have to go and verify that.

5      Q      If it's not the original date, if it's

6  let's say the last date or some date in between, that

7  could have some influence over the time trends,

8  correct?

9      MR. BARNES:  Objection.

10     A      That's making assumption that all reports

11 have follow-ups and the follow-ups are quite different

12 from the original date.  So I would have to say no, I

13 don't believe that's usually the case.

14     There's not that many follow-ups.  Every

15 report does not have a follow-up and if they do, they

16 don't necessarily come months and years later.  So when

17 I look over a year period, as long as it falls within

18 the same year, they're still going to be the same time

19 period.

20     Q      But you don't know as you sit here what

21 influence that would have over any particular analysis

22 you did, correct?

23     MR. BARNES:  Objection.

24     A      Based on what I know, I would assume that

25 it is little, very small, if any.  Particularly when

1  assume and I don't want to do that here.

2      Q      Did anybody ever come to you and say, we

3  would like you to analyze the post-marketing data for a

4  particular new drug application we're going to be

5  doing?

6      A      No.  If they asked me to analyze data, that

7  would be just in the general context of doing a study.

8  I don't go and do data analyst -- analyzing for people

9  as a consultant.  I look at the big picture and I --

10     MR. BARNES:  Did you finish your answer?

11     A      No, that was it.

12     I look at the big picture.  I don't do ad

13 hoc analysis necessarily.

14     Q      Have you ever been asked to write any

15 portion of an NDA?

16     A      No, I don't do that.

17     Q      Have you ever helped write any report of

18 integrated summary safety?

19     A      No.

20     Q      Have you ever done the analysis of data

21 that goes into an integrated summary safety?

22     MR. BARNES:  At what point in time?  Before

23 or after the final NDA?  Vague as to time.

24     Q      At any point in time.

25     A      My work is generally for drugs that are

1   already on the market.  My specialty is post-marketing
2   safety and adverse events.  So that's the majority of
3   my work is looking at drugs that are on the market
4   particularly for safety concerns and newly evolving
5   signals.
6        Q    I noticed in your report you write some
7   fairly extensive comments on the FDA's -- well, strike
8   that.
9            The FDA in January, just about three weeks
10  after we took your deposition last time, came out with
11  an alert of antiepileptic drugs and suicidality,
12  correct?
13       A    Yes, they did.
14       Q    And you reviewed that alert, correct?
15       A    I read the alert, yes.
16       Q    And you reviewed the statistical review
17  that the FDA made available dated I believe it's
18  May 23rd, 2008, and made publicly available?
19       Yes, I read that version and then I believe
20  they had a later version in June that they gave to the
21  advisory committee.
22       Q    Were you aware that Pfizer submitted an
23  analysis of data to the FDA prior to the advisory
24  committee hearing?
25       A    Which analysis?

1        Q    Are you aware that Pfizer produced any --
2   provided any analysis to the FDA of the clinical trial
3   data with respect to Neurontin in the records?
4        A    Well, I believe the report from Patel is
5   exactly that.  We talked about that at my last
6   deposition.  The FDA submitted their data in summary of
7   their data to the FDA which was what went into the FDA
8   analysis.
9        Q    Are you aware of any submission that Pfizer
10  made to the FDA shortly before the advisory committee
11  hearing that took place July 10th of 2008?
12       A    No, not that I can remember.
13       Q    Did you -- so it's safe to say you didn't
14  review that analysis that Pfizer provided to the FDA?
15       A    I'm not sure.  I'd have to go and look.  I
16  don't know.
17       Q    Did you review the transcript of the FDA --
18  of the FDA advisory committee hearing?
19       A    Yes, I did.
20       Q    Were you aware that Pfizer made a
21  presentation to the FDA at that hearing?
22       A    Yes.
23       Q    The analysis that I was referring to is the
24  same that Pfizer discussed at that hearing, does that
25  refresh your recollection at all?

1        A    Yes, a little bit.
2        Q    Do you remember reading that now?
3            MR. BARNES:  If you do, you do.
4        A    I'd have to see it, yeah.
5        Q    Were you asked by Pfizer to participate in
6   any documents which they might be submitting to the FDA
7   in preparation of the advisory committee hearing?
8        A    No.
9        Q    Were you at the advisory committee hearing?
10       A    No.
11       Q    Were you asked to be at the advisory
12  committee hearing?
13       A    No.
14       Q    It's relatively close to here, so it
15  wouldn't have been a particularly long trip for you to
16  go to the advisory committee hearing, correct?
17           MR. BARNES:  Objection.
18       A    I'm very busy.
19       Q    But it's not distance-wise very far,
20  correct?
21       A    From my house, it's a couple of hours.  So,
22  yes, it's quite a trek.
23       Q    Were you aware that Pfizer made a
24  presentation to the FDA before the advisory committee
25  hearing?

1        A    Not that I recall.
2        Q    Safe to say you didn't participate in the
3   development of any materials for such a meeting,
4   correct?
5        A    No.
6        Q    Okay.  Are you qualified to review the
7   FDA's statistical analysis in the advisory committee
8   transcript?
9        A    Excuse me?
10       Q    Do you believe that you are qualified to
11  have reviewed the FDA statistical review in the
12  advisory committee and render opinions?
13       A    Absolutely.  That's what I do for the FDA.
14  I often sit on these type of advisory committees.  I
15  couldn't sit on this one because I had already been
16  retained on this case.
17       Q    Do you believe that you were qualified to
18  do so in January when we took your deposition last?
19       A    Excuse me?
20       Q    Your qualifications to review this
21  information, is that a new found qualification or is
22  that something that you possessed back in January when
23  we took your deposition last time?
24       A    I believe I was qualified in January to sit
25  on the advisory committee and review the materials.

12/22/2008 Weiss-Smith, Sheila

1   Yes.  I think I've been qualified for years to do so.

2        Q        Were you asked by Pfizer to review those

3   materials within January -- in the January timeframe

4   right after it came out?

5        A        I was provided by --

6             MR. BARNES:  Answer the question.

7        A        By Pfizer?  Pfizer didn't -- I didn't

8   directly talk to anyone at Pfizer about this case.

9   Period.

10       Q        Were you asked by counsel to review that

11  FDA and render an opinion?

12       A        They provided me with the alert and the

13  information.

14       Q        Did they ask you to do anything with it?

15       A        Just to reread it.

16       Q        When the statistical review -- when did you

17  first see the FDA statistical review?

18       A        When did I see it?  When it was -- after it

19  was made available to the public on their web site.

20       Q        So you didn't see it before then?

21       A        No, I only saw it when it was made

22  available.

23       Q        Do you know if Pfizer had that document

24  before it was made publicly available?

25       A        I'm not aware.

61

1        Q        Were you asked to ever review it at that

2   time?

3             MR. BARNES:  What time?

4        Q        At the time it became publicly available.

5   When we're talking about the FDA statistical review?

6        A        Was I asked to look at it?  I think I had

7   already looked at it as soon as it became available

8   because I wanted to put the alert in January in

9   context.  So I was very interested in what they said.

10       Q        When was the first time you were asked to

11  put down on a piece of paper an opinion based upon the

12  FDA alert?

13             MR. BARNES:  Objection.  We have a

14  stipulation in this case where drafting of expert

15  reports is not the subject of examination.  So I'll

16  instruct her not to answer that question.

17             MR. ALTMAN:  I'm not asking about the

18  drafting.  I'm asking when she was asked to do it.

19  That's not the drafting.

20             MR. BARNES:  That's a different question.

21             MR. ALTMAN:  I asked when was the first

22  time you were asked to opine upon the FDA alert.

23             MR. BARNES:  That's a different question.

24  You may answer that one.

25       A        I believe it was in early fall.

62

1        Q        Okay.  When was the first time you were

2   asked to render any opinions on the advisory committee

3   meeting and the transcript and the discussions that

4   took place?

5        A        I believe it was around the same time.

6        Q        Have you ever had any direct discussions

7   with Dr. Robert Gibbons?

8        A        No.

9        Q        Do you believe that you are -- you're aware

10  that Dr. Gibbons did a pharmacoepidemiologic study of

11  the pharmetrics data, correct?

12       A        Yes, I'm aware of it.

13       Q        If you had been given that raw data as he

14  was, do you believe you could have done a similar

15  study?

16       A        Yes.

17       Q        So you pretty much see yourself as kind of

18  colleagues, same general qualifications?

19       A        I consider us colleagues.  He's a

20  biostatistician and I'm an epidemiologist.  We

21  typically work together on teams.

22       Q        We talked before about the AIRS G database

23  in this case.  Have you ever received similar data from

24  a company in the past?  What I mean by that a CD, et

25  cetera, that has their adverse event database or an

63

1   extract for a particular drug?

2        A        Yes.

3        Q        Did you use that, make use of that data,

4   did you load it into a database?  Did you use it in any

5   way yourself or did you do just a quick cursory review

6   of it and put it aside?

7        A        That's a general question for many

8   different situations.  So I can't answer just one

9   thing.

10       Q        Have you ever done more with a company's

11  internal adverse event database than you did in this

12  particular case?

13       A        Yes, I have.

14       Q        Did you do that work yourself and did you

15  have people working with you to do that?

16       A        Depends on the situation.

17       Q        Have you ever done it all by yourself?

18       A        Yes.

19       Q        What tools would you typically use to do

20  that?

21       A        Again, it depends on the situation.

22       Q        What tools have you used in the past to do

23  that?

24       A        You mean what software?

25       Q        What software?

64

**Page 65**

```
 1      A      I've used D Base, starting with 2, 3, 4.
 2   Okay.  I've used Excel.  I've used sets, Epicure,
 3   Epi-Info.  I've used SPSS.  Statistical packages,
 4   database packages, access.  Sometimes I've already been
 5   set up in a database.  It really depends on what time,
 6   the decade, and what I'm doing and how big the database
 7   is and where it's located.
 8      Q      Is there any technical impediment that
 9   would have kept you from doing work with the AIRS G
10   database produced in this particular litigation loaded
11   up into one of those packages and doing computations or
12   analysis or time trending of that data?
13      A      No, it's just a question of time and
14   necessity.
15      Q      Are all reports, strike that.
16             Does the company have to submit every
17   single adverse event reported received to the FDA?
18      A      It's my understanding that they do not
19   submit every report.  There's no need.
20      Q      So there could be and likely would be
21   adverse event data in a company's database that
22   wouldn't be in the FDA's database, correct?
23      A      That is correct.  They follow the federal
24   regulations.
25      Q      Do you know what junk science is when I use
```

---

**Page 66**

```
 1   the term junk science?
 2             MR. BARNES:  Objection.  Vague.
 3      A      No.
 4      Q      Have you ever heard the term junk science
 5   before?
 6      A      I've heard it thrown around.
 7      Q      Do you have any understanding what junk
 8   science means?
 9             MR. BARNES:  Objection.  In what context?
10      Q      Does it mean anything to you?  In any
11   context that you've heard it, do you have any
12   understanding what junk science means?
13      A      It can really mean anything.  I mean,
14   what --
15             MR. BARNES:  You've answered the question.
16      A      -- what do you mean?
17      Q      So junk science doesn't have any particular
18   meaning to you?  Is junk science sometimes used when
19   people don't follow sound scientific methodologies and
20   just make statements that they can't back up with sound
21   scientific methodology?
22      A      That could be considered junk science.
23      Q      Have you ever heard it used in that
24   particular context?
25      A      Like the earth is flat?  That type of
```

---

**Page 67**

```
 1   statement?
 2      Q      That could be.
 3             MR. BARNES:  The question is:  Have you
 4   ever heard junk science specifically as he asked the
 5   question?  Yes or no?  If you haven't, the answer is
 6   no.
 7      A      I've only seen the term on the internet.  I
 8   don't use that term, so I'm really not familiar with
 9   it.
10             MR. BARNES:  That's responsive.
11      Q      If a scientist comes out with, you know,
12   purportedly research that really isn't, you know --
13   didn't use sound scientific principles.  They just come
14   out with, you know, statements that have no scientific
15   support whatsoever, what do they -- what would you call
16   that?
17      A      I wouldn't call it science necessarily.
18      Q      Well, I'm just looking for a term that we
19   can agree upon to use for that particular kind of
20   practice, your term?
21             MR. BARNES:  If you have one.
22      A      I don't.  Depends on the situation.
23      Q      When the FDA makes a statement associated
24   with the approval of a drug that says the drug is safe
25   and effective when used in accordance with the label,
```

---

**Page 68**

```
 1   do you rely upon that?
 2      A      I'm not a clinician so I don't treat
 3   patients so I don't need to rely on it.
 4      Q      Do you question, as somebody who interacts
 5   with the FDA, do you question whether the FDA was
 6   reasonable in making that statement?
 7      A      In some circumstances, yes, I do.
 8      Q      And I think you have written in the past
 9   that you don't always agree with what the FDA has done,
10   correct?
11      A      That is correct.
12      Q      And I think what you just said is you can't
13   always take what the FDA says at face value?
14             MR. BARNES:  Objection.  Misstates her
15   prior testimony.
16      A      I think the label is a complicated thing
17   and science is not always so easy to understand.  I
18   think you need to understand the context of what the
19   label is and what they're trying to do with the label.
20   And what the label isn't.  I think that's very
21   important to put everything into context.
22      Q      What does the term suicidal mean?
23      A      That's been thrown around a lot here.  The
24   FDA has used the definition of suicidality based on the
25   Posner classification scheme and there's a number of
```

1 terms. I have to go look and make sure I get them all
2 right. There's a number of terms that they included in
3 the report. So within that context we'll go with the
4 FDA's.
5 Q So if the FDA includes terms like suicidal
6 ideation in the concept of suicidality, you don't have
7 any basis to question that, do you?
8 A As an epidemiologist we question
9 everything. So, I mean, just put it that way.
10 Q I'm sorry.
11 A So within the context of the FDA analysis
12 they define the term suicidality and so I'm going, for
13 that analysis, I'm using the term as they defined it.
14 Q And that includes suicidal ideation,
15 correct?
16 A That is what is in there.
17 Q Do you know what suicide gesture means?
18 A Yes, I do.
19 Q Are you an expert in suicidology?
20 A Absolutely not.
21 Q What is your understanding what the term
22 suicide gesture means?
23 A My understanding is it is making some type
24 of action that suggest that there is -- the patient was
25 considering suicide but not something that would have

1 reached the level of an attempt. So it didn't have
2 potential to be lethal.
3 Q And what is the basis of your
4 understanding?
5 A I borrowed a book called Suicide from one
6 of my colleagues to try and understand the whole
7 concept of suicide and suicidality.
8 Q So I think what you said, if I understand
9 right, is that suicide gesture does not include suicide
10 attempt?
11 A That is my understanding. It does not
12 reach that level.
13 Q So --
14 MR. BARNES: Speaking in terms of -- in
15 what context? In terms of are you talking about
16 coding? Are you talking about generally how the
17 clinician would use it in the textbooks? It's vague.
18 MR. ALTMAN: I'm asking what she -- she
19 defined what suicide gesture is.
20 A That's my understanding what it is. Now,
21 I'm not a nosologist. I'm not coding for the FDA. If
22 they have other terms or clinical descriptions, that's
23 not what I'm doing. I'm saying from what I understand.
24 Q By the way, we talk about FDA coding.
25 Putting electronic submissions to the FDA, which is a

1 relatively recent occurrence. Let's say within the
2 last three or four years or so, correct, from
3 manufacturers to the FDA?
4 A I believe there are pilot studies going on
5 a lot longer than that.
6 Q As a general the prop -- putting electronic
7 submissions away. Do you know if the FDA uses --
8 strike that.
9 On a MedWatch form there's a box where the
10 manufacturer can put the adverse event terms that they
11 would like to assign to that particular report,
12 correct?
13 A This is a place for them to write the
14 terms, yes.
15 Q Do you know if the FDA uses those terms as
16 selected by the manufacturer?
17 A It is my understanding that they can use
18 those terms. It's my understanding sometimes they also
19 change or put their own terms in. It's quite variable.
20 Q Have you ever studied how often the FDA
21 coding is different than that of the manufacturer?
22 MR. BARNES: At what time period? Today,
23 10 years ago?
24 Q Let her answer.
25 At any time period have you ever studied?

1 A I do not study coding of the FDA.
2 Q Well --
3 A It's a general field of study. Only within
4 context.
5 Q Well, do you know if it would be difficult
6 if you had a company's internal adverse event database
7 and you had the FDA's database, do you know if it would
8 be difficult to compare the coding between a subset of
9 reports that you could match up?
10 A It depends on the situation. It could be
11 quite simple and it could be quite difficult.
12 Q Have you ever done --
13 A Yes.
14 Q -- such an analysis?
15 A Yes, I have.
16 Q In what context?
17 A In a different case.
18 Q Was it for a legal case?
19 A Yes.
20 Q Did you find -- we don't have to talk
21 specifically about the case, but did you find that
22 there were differences between the two?
23 A I did.
24 Q Do you know about what percentage? Do you
25 have any recollection of how frequently they were

1    different?

2        A    I was looking at a particular adverse

3    event.

4        Q    So as a general proposition you wouldn't

5    know?

6        A    So for the entire database, no.

7        Q    Okay.  If suicide gesture doesn't include

8    suicide attempt, it clearly wouldn't include the term

9    suicide; is that correct?

10            MR. BARNES:  Objection.  In terms of

11   clinician, general, coding?  You have to have context.

12            MR. ALTMAN:  Her definition.

13            MR. BARNES:  Her definition for what

14   purpose?

15            MR. ALTMAN:  According to her own

16   definition.

17       Q    You defined what suicide gesture meant to

18   you.  I'm asking you does suicide gesture include the

19   term suicide?

20       A    If you're talking about a case report, they

21   could have all the terms.  I don't understand what

22   you're asking me.

23       Q    Does suicide gesture -- you said it doesn't

24   include a suicide attempt, is not a suicide gesture.

25   Is completed suicide suicide gesture?

73

---

1            MR. BARNES:  Objection.  Again, clinically,

2    labeling, coding?  It depends on the context.

3            MR. ALTMAN:  Rick, it's her own definition.

4    She defined that suicide gesture did not include up to

5    the suicide attempt.  Then I asked her did suicide

6    attempt include a suicide gesture.  She said no.

7            Now I'm asking if completed suicide --

8            THE WITNESS:  I didn't --

9            MR. BARNES:  I don't think she stated --

10           THE WITNESS:  I don't think so.

11           MR. BARNES:  You may answer.

12   BY MR. ALTMAN:

13       Q    Let's go back.  You said suicide gesture is

14   up to suicide attempt; correct?

15       A    No, I don't believe I said it like that.

16       Q    Let's check what you did say so we're sure.

17   I want to get it right.

18            You said my understanding is it is making

19   some type of action that suggest that there is, the

20   patient was considering suicide but not something that

21   would have reached the level of an attempt so it didn't

22   have the potential to be lethal?

23       A    Right.  It didn't have the potential to be

24   lethal.  That's what I understand suicide gesture to

25   mean.

74

---

1        Q    Then I asked you, you can only tell me what

2    your understanding is, I asked you it does not include

3    suicide attempt.  You said, that is my understanding it

4    does not reach that level.

5        A    That's my understanding that a suicide

6    gesture is not identical to a suicide attempt.

7    Otherwise they would just call it the same thing.

8        Q    Now I'm asking, does it also mean a

9    completed suicide?  Just like in the same context of

10   suicide attempt?

11       A    I believe that completed suicide has a

12   different definition than suicide gesture.

13       Q    So does everybody who has a suicide gesture

14   complete suicide?

15            MR. BARNES:  Say that again?

16       Q    Does everybody who simply has a suicide

17   gesture, as an adverse event, do they also all complete

18   suicide?

19       A    I believe many people who have -- from my

20   understanding the numbers -- I don't know particularly

21   for suicide gesture but I know for suicide attempt

22   there's many more attempts than there are completed

23   suicides.  So I would have to assume that the same

24   situation is true for suicide gestures.  But that's an

25   assumption.

75

---

1        Q    Would the term completed suicide be more

2    specific if we were talking about suicidality and

3    suicide issues?  Is the term completed suicide more

4    specific than suicide gesture?

5        A    From the terms of accurately measuring,

6    from an epidemiologic standpoint, yes, I believe it

7    would be a more concrete term.

8        Q    Okay.  Do you have any opinion as to

9    whether a doctor is qualified to determine that a

10   particular drug is working for that particular patient?

11   When I mean working, providing the benefit that they

12   expect it to have?

13       A    That's really too broad to answer.

14            MR. BARNES:  Actually that's no.

15       A    No.

16       Q    So --

17       A    Not in that context.

18       Q    If a doctor prescribes a drug to his

19   patient, is he qualified to tell whether the drug is

20   helping that patient?

21       A    Maybe.

22       Q    When would he be qualified and when

23   wouldn't he?

24            MR. BARNES:  Objection.  Calls for

25   speculation.  If you know.  If you're qualified to

76

1  assess that.

2      A      One, I can't make the assumption that every

3  doctor is qualified to practice. One. Two, I can't

4  make the assumption that every doctor monitors and can

5  tell whether a drug is working or not. Some it's very

6  easy to tell and some it's much more difficult.

7      Q      So what I think you're saying is sometimes

8  a doctor can tell that the drug is actually working for

9  their patient?

10     A      Sometimes. Depending on the drug it's very

11 obvious and sometimes it's not very obvious.

12     Q      Can sometimes a doctor tell that the drug

13 is harming their patient?

14     A      Sometimes it's obvious and sometimes it's

15 not so obvious.

16     Q      Are you aware of whether there are any

17 drugs that have been approved for indications which the

18 efficacy was demonstrated by subjective patient

19 statements?

20     A      Could you explain what you mean by that?

21     Q      Sure. Take depression. Is there a

22 scientific method that you can objectively determine

23 how depressed somebody is?

24     A      There's are a number of scales that are

25 used.

1      Q      Are they objective in that you can hook up

2  a machine to somebody and you can tell how depressed

3  they are, or does it require some kind of subjective

4  input from the patient to provide the data for the

5  scale?

6      A      My understanding that it requires some

7  input from the patient.

8      Q      Do you know of any studies out there that

9  can measure somebody's depression without subjective

10 input from the patient?

11     A      Not that I'm aware of.

12     Q      And there are drugs that are approved for

13 the treatment of depression, correct?

14     A      Yes, there are.

15     Q      And so they're approved based on subjective

16 input from the patient, correct?

17             MR. BARNES: Objection. If you know.

18     A      Not in the context you're using the word

19 subjective.

20     Q      Okay. The very lowest level of whether the

21 drug is working is a subjective statement from the

22 patient, correct?

23     A      No.

24     Q      How --

25     A      When you're talking about scales, it's not

1  just hey, is a drug working or not. They're validated,

2  they're tested. There's not just one question.

3  There's a series of questions. There's a series of

4  measurements. They're objectively defined. They're

5  set up in advance.

6      So it's a very stringent criteria using a

7  scale that's validated. So it's not just have a mere

8  subjective outcome.

9      Q      But the source data to feed into the

10 instruments is subjective data from the patient,

11 correct?

12     A      I can't say it's all subjective. There can

13 be some objective. Some very concrete yes, no, did

14 this occur.

15     Q      Okay.

16     A      So I don't want to have a blanket

17 statement.

18     Q      Does subjective information form part of

19 the basis of those instruments, of the data for those

20 instruments?

21     A      The patient's self-assessment of their

22 feelings?

23     Q      Yes.

24     A      That's what I understand it's part of the

25 overall measure.

1      Q      Okay. So drugs for depression are approved

2  in part based upon, at its very lowest level, patient's

3  self-assessments of how they're feeling, correct?

4      A      That is a very broad statement. So in its

5  totality it's not correct.

6      Q      The instruments that are used to measure

7  efficacy rely upon patient's self-assessments?

8      A      In part. Same with pain. We ask people on

9  an objective scale to rate their pain. So there are

10 definitely measures where you ask a patient to

11 objectively rate what's going on. But they're

12 collected in such a way that they -- it's not just a

13 subjective -- I feel better type measure. There's

14 definitely different components of depression that are

15 measured and put together into a scale.

16     Q      But in part those rely upon subjective

17 self-assessments, depression, pain, any of those

18 things, correct?

19     A      In part they rely on the patient's

20 self-assessment.

21     Q      So, in part, the demonstration of efficacy

22 of a particular antidepressant drug is based in part

23 upon patient's self-assessments?

24             MR. BARNES: Objection. Asked and

25 answered. You may answer again.

1     A     I said part of the scale may be a patient
2  assessment.  Yes.
3     Q     Can a patient's self-assessment reporting
4  harm also be part of the basis of concluding that a
5  drug causes harm?
6     A     Without any context I can't answer that.
7     Q     How do you demonstrate efficacy for a drug?
8     A     Based on the federal register there's a
9  standard of well-controlled studies to present
10 efficacy.  So there's standards and regulations and
11 guidance with the FDA to show what needs to be done to
12 show efficacy.
13    Q     Companies, besides randomized
14 well-controlled trials, also do open label studies,
15 correct?
16    A     That's my understanding.
17    Q     And it's part of the basis that they use to
18 support their new drug applications, correct?
19    A     It's not part of the basis for efficacy.
20    Q     But do you know why companies do open label
21 studies?
22    A     I think it varies by drug.
23    Q     Do they submit these open label studies as
24 part of their new drug application?
25    A     My understanding the FDA requires them to

81

1  submit all experiences from -- in clinical experiences
2  as part of the application.
3     Q     And open label studies are typically not
4  controlled in the context of an epidemiologic study,
5  correct?
6     A     It depends again within the study and
7  what's being done.  So they can be controlled or they
8  can be uncontrolled.
9     Q     Are they done with any less scientific
10 rigor than a randomized controlled trial?
11    A     Again, I think it would depend on the
12 context of the trial.
13    Q     Do you understand what I mean by rigor?  I
14 mean, do they carefully track their patients in
15 inclusion and exclusion criteria?
16    A     Again, I don't want to make a blanket
17 statement.  I assume in some cases, yes, and probably
18 in some cases not as rigorous as a clinical trial.  So
19 again it would be very situational dependent.
20    Q     Did you review the new drug application for
21 Neurontin?  The original new drug application from
22 1994?
23    A     I know I saw some things, but I don't know
24 if -- I don't believe I saw the entire dossier.  I can
25 look.  I did see Dr. McCormick's review and evaluation

82

1  of the safety update in 1993.
2     Q     I'll ask a different question.  Why don't
3  we -- strike that.
4           It appears from your first list of
5  materials considered you looked at about four or five
6  Pfizer research reports.  Does that sound about right?
7           MR. BARNES:  Can you refer to what you're
8  looking at?
9     Q     If you take a look at your first -- I
10 believe it's Exhibit 21.  On page one I see towards the
11 middle column, do you see RR reg 7230135PH and
12 integrated summary?
13    A     Yes.
14    Q     Then I see numerous papers listed and then
15 it looks like on about page eight you list three more
16 research reports?
17    A     Okay.
18    Q     And I don't see any in your new reports.
19 So it looks like you reviewed about three or four
20 research reports in this case.  Does that appear to be
21 correct?
22    A     That appears to be correct.
23    Q     Do you have any understanding of how many
24 research reports Pfizer has on Neurontin?
25    A     No, I'm not aware.

83

1     Q     Did you review, aside from the bi-polar
2  studies, the psychiatric studies listed on page eight
3  which I believe were -- it says bi-polar panic disorder
4  and social phobia.  Did you review any other individual
5  research reports for individual trials?
6     A     Everything I reviewed is on one of the two
7  lists.  So nothing that is not listed.
8     Q     Are you aware of whether depression has any
9  kind of periodic nature to its severity for a given
10 patient, all things being equal?
11    A     Not being a clinician, I don't want to
12 speak as a clinician, but as a lay person and from the
13 research that I've done, yes, I'm aware that depression
14 can be episodic.
15    Q     Is that the same thing with pain?
16    A     Some people have chronic pain.  Some people
17 have acute pain.  It can be episodic.  Again, it
18 varies.
19    Q     In a clinical trial that's based on
20 subjective feelings, it's possible that somebody comes
21 in and is feeling better that day because it's
22 episodic, you know, the episodic nature of their
23 disease and has nothing to do with the drug that
24 particular day, correct?
25           MR. BARNES:  Objection.  You may answer if

84

1    you know.

2    A    Again, we talked about the fact that it is

3    not purely subjective.  So I don't want to be boxed in

4    saying that it's only subjective.

5         Two, that's why they have controlled

6    clinical trials.  There's something called the placebo

7    effect.  Also people can just feel better, yes, and it

8    can be episodic.

9    Q    Okay.  Now, there's obviously some

10   terminology issues in the use of the term signal in a

11   pharmacoepidemiologic concept.  So I think we should

12   clarify so we can talk the same language for the rest

13   of the deposition because you use the term signal and

14   there's also the term signal of disproportional

15   reporting, we'll call it SDR.  I think that's your

16   definition or that's conventionally used.

17        Is there a difference between signal and

18   SDR?

19   A    Yes.  And actually it's not my term.  I

20   spent a few days with Ralph Edwards two weeks ago and

21   he told me that that SDR is Manfred Hauben's term which

22   he objects to and that he only likes disproportional

23   reporting.

24        Alert and signal of disproportional

25   reporting or disproportional reporting, depending on

85

1    which side of the ocean you're at, all of those terms

2    are synonymous.  Signal is not synonymous.

3    Q    Okay.  The terms that refer to

4    disproportional reporting, what does that mean?

5    A    I'm using them within the context of data

6    mining.

7    Q    Okay.

8    A    The term alert or signal of disproportional

9    reporting or disproportional reporting is purely

10   statistical that you established a threshold and

11   defined a test statistic based on whatever algorithm

12   you're choosing to use and you've defined that as what

13   is statistically elevated.

14        So an alert would be any time you have a

15   term that is seen, disproportionally reported, above

16   that threshold, whatever it would be, that would be

17   called an alert.  It's purely statistical.

18        That differs from what we would call a

19   signal, which is once you take those and you triage

20   them and you evaluate them within the clinical context,

21   again, this is usually the clinical evaluation of the

22   statistical alerts.  If there's something that is

23   clinically relevant or meaningful, that becomes then a

24   signal.  At that point one could form a hypothesis and

25   follow the signal up by doing a study to see if there

86

1    is indeed a statistical association.

2    Q    Which term would you prefer to use for the

3    purpose of this deposition referring to

4    disproportionality?

5    A    Why don't we stick with alert and keep it

6    simple.

7    Q    That's fine.  We'll use the term alert.

8         If you detect, you said something about

9    algorithm.  We'll talk about them later.  It doesn't

10   really matter.

11        You see an alert, is it appropriate to

12   simply do nothing about that alert?

13   A    In what --

14   Q    To just simply say, ahh, this appears to be

15   an alert, it meets my threshold, I'm going to ignore

16   it.  Is that appropriate?

17   A    In what context?

18   Q    In the context of data mining?

19   A    In what context?

20   Q    I've done some kind of data mining and I

21   see an alert, for whatever the threshold that

22   particular person defined in that particular

23   methodology, I see an alert, is it appropriate to

24   simply ignore it?

25   A    It depends on the context.  I do data

87

1    mining all the time.  I don't act on every single thing

2    that goes above the threshold.  Do you?

3         MR. BARNES:  You don't ask.

4    A    Sorry.

5         MR. BARNES:  You answered the question.

6    Q    When you choose not to do something,

7    though, are you using some other knowledge that you

8    have that that alert may be spurious, may be

9    unimportant, not clinically meaningful?  You put some

10   context around that alert before you decide not to

11   follow it up, correct?

12   A    Again, it depends on the context of which

13   one is working.

14   Q    All right.  We'll come back to this.

15        We have talked about pharmacovigilance and

16   pharmacoepidemiological.  Are the two terms synonymous?

17   A    Some people think they are.  I tend to

18   consider them complementary but not synonymous.

19   Q    So is it a reasonable statement to say that

20   one of the tools of conducting pharmacovigilance is

21   pharmacoepidemiology?

22   A    I believe so.  And vice versa.

23   Q    Pharmacoepidemiology is a relatively new

24   field, isn't it?

25   A    Well, as I get older, it gets older.  So I

88

1 think it's been around for a couple of decades now.

2 Q      And data mining is a relatively new

3 process?

4 A      For pharmacovigilance it's only being

5 adopted now and it's a recent development.  But it's

6 been used in other fields for many years.

7 Q      In conducting pharmacovigilance we have

8 said one of the tools is pharmacoepidemiology.  Is

9 reviewing individual case reports part of

10 pharmacovigilance?

11 A      That is a classic part of

12 pharmacovigilance, yes, to do individual case report

13 reviews.

14 Q      Do you always, as part of

15 pharmacovigilance, do you always do a

16 pharmacoepidemiologic study when you see a possible

17 signal?

18 MR. BARNES:  Objection.

19 A      Do I personally?

20 Q      Do you personally?

21 A      If I don't have funding to do a study, I

22 don't do it.  I don't always have the staffing to do

23 that.

24 Q      You've talked with a lot of people in the

25 industry about how to conduct pharmacovigilance and

89

1 pharmacoepidemiology, correct?

2 A      Yes.  We have had a conference most recent.

3 Q      And, in fact, I think you did a pretty

4 extensive study on how companies are using

5 pharmacoepidemiology and data mining and things like

6 that, correct?

7 A      It wasn't that inclusive, no.

8 Q      But it was a study of trends and what

9 people are doing these days, correct?

10 A      It was specifically looking at data mining.

11 Not the whole pharmacovigilance process.

12 Q      Before data mining people still conducted

13 pharmacovigilance, correct?

14 A      That is correct.  It is only a tool.

15 Q      And people do pharmacovigilance in the

16 absence of pharmacoepidemiologic studies, correct?

17 A      I don't believe so.

18 Q      Does every time somebody sees an alert, do

19 they go out and do a pharmacoepidemiologic study?  Sees

20 a signal -- sees an alert?

21 MR. BARNES:  Objection.  Vague as to who

22 somebody is, what the context is.  Overbroad.  If you

23 understand that question, you may answer.

24 A      I don't understand it.

25 Q      I'll ask a different question.  Does a

90

1 company go out and do a pharmacoepidemiological study

2 every time they see an alert?

3 MR. BARNES:  To your knowledge.  If you

4 know.

5 A      I don't know the SOPs for every company.  I

6 don't even think every company data mines from what I

7 understand.

8 Q      I wasn't talking about data mining.  I was

9 talking about pharmacoepidemiologic study?

10 A      You said alert.

11 Q      From an alert?

12 A      That's assuming people data mine because we

13 said in the context we would use alert to be a signal

14 of disproportional reporting.

15 Q      You're right.  All right.  That's fine.

16 Are there things other than alerts that

17 could trigger your need to do a pharmacoepidemiologic

18 study in the absence of data mining?

19 A      That's my understanding.

20 Q      Could a series of cases of a particular

21 adverse event trigger that you need to look at it

22 further?

23 A      Who is you?

24 Q      A pharmaceutical company?

25 A      Potentially.

91

1 Q      Is it possible that a single adverse event

2 report could trigger that the company might need to

3 investigate to understand that adverse event better?

4 A      It would be unusual.  But anything is

5 possible in that context.

6 Q      Has that happened?

7 A      Not that I know of personally.  I can't say

8 this case triggered a pharmacoepic study, no.

9 Q      Do you always have to do a pharmacoepi

10 study before you take -- make labeling decisions?

11 A      Not necessarily.

12 Q      So we're getting back and talking about

13 alerts.  What do you think is the appropriate response

14 to an alert?  I've seen an alert.  What do I do next?

15 MR. BARNES:  Objection.  Overbroad.  Lack

16 of foundation.  Go ahead.

17 A      Are you talking about the company

18 perspective?  FDA perspective?

19 Q      From a company perspective.

20 A      I think all companies, before they

21 institute data mining, should develop SOPs on how

22 they're going to triage signals of disproportional

23 reporting.

24 Q      In your experience what do you recommend a

25 company does in response to an alert?

92

**Page 93**

1      MR. BARNES:  At what period of time, today?

2      Q    Today.

3      A    I recommend that every company establish

4  standard operating procedures on how they're going to

5  deal with it.

6           I think it very much depends on the

7  company, on the drug, on what they're data mining in,

8  what the purpose is.  So they really need to set up a

9  system.

10          Uppsala has a wonderful triage system that

11 they actually publish and one can look at as an idea.

12 But again the company has a different perspective than

13 a regulatory agency.  So it's going to depend on who

14 you are, what your drugs are, what you're doing.

15     Q    Before data mining, I don't want to use the

16 term alert, but there could be other information that

17 could kind of take you to the same place as you would

18 have been if you had gotten an alert through data

19 mining, what can we call that?

20     A    Are you talking about alert or a signal?

21     Q    I see something through -- I'm not doing

22 data mining.  I see something either through a few case

23 reports or something like that that causes me concern

24 that I want to follow-up.

25          So it's, you know, it's not an alert

**Page 94**

1  because we have agreed that that only comes from data

2  mining.  But what do you call that in the old way

3  before you had data mining?  What can we call that?

4      A    I thought we were calling that a signal.

5  Because that has some clinical relevance.

6      Q    So if there is --

7      A    Why else would you want --

8           MR. BARNES:  You answered the question.

9      A    Okay, sorry.

10     Q    So just to make sure that I understand.  If

11 I'm not using data mining, I can kind of shortcut the

12 process if I see a number of case reports that cause me

13 concern, is that a signal?

14          MR. BARNES:  Objection.  Overbroad.  Vague.

15     A    Why -- it depends on why it's causing you

16 concern.

17     Q    I don't expect -- through my routine

18 post-marketing safety surveillance a number of reports

19 come in for a particular adverse event I don't expect

20 to see.  Okay.  I think that that needs to be

21 followed-up.  Is that a signal?

22     A    It depends on why it is of concern.

23     Q    I've decided -- if -- I'm in post-marketing

24 advance.  I decided I need to evaluate it.  I've

25 already made that decision.  Do I have a signal?

**Page 95**

1           MR. BARNES:  Objection.  Overbroad.  Vague.

2      A    Again, it depends on the context of why one

3  has decided that it's important to go to the next step.

4      Q    Okay.  Are there circumstances where I

5  would go to the next step that it would not be a

6  signal?

7      A    I don't know.  That's a good question.

8           MR. BARNES:  You answered.

9      A    I mean, hypothetically who knows why

10 someone, you know, would have a reason to go if there's

11 something that's not clinically relevant.

12          It's very expensive to do an epidemiologic

13 study but you never know.  There might be something

14 that's so important that somebody wants to follow it up

15 even if they don't see something.  I can't imagine, but

16 it could be.

17     Q    What is the difference between -- strike

18 that.

19          So to make sure that I understand.  Our two

20 paths to signal are through some kind of alert, which I

21 do some follow-up on.  Maybe I find some case reports.

22 I do some literature research, whatever, and I decide

23 that it's a signal.  Or, I kind of don't deal with the

24 alert process and the data mining there's something

25 catches my eye.  Clinically, I'm a, you know, I'm a

**Page 96**

1  doctor and I'm a clinician within the pharmaceutical

2  company and reviewing spontaneous reports and I see

3  something that catches my eye and I do some further

4  research and some follow-up through the literature.

5           I can get to the same place through either

6  path, correct?

7           MR. BARNES:  Objection.  Overbroad.  Vague.

8      A    As we said signal is something that has

9  clinical relevance.  So if it has clinical relevance

10 that might be one of the criteria to follow-up.

11 Potentially.

12     Q    Were you done?

13     A    Yes.

14     Q    What is the difference between a signal and

15 an association?

16     A    Within pharmacovigilance we use the term

17 signal for data mining is the -- an alert,

18 disproportional reporting plus some clinical relevance.

19 That's it.

20          If you do an epidemiologic study you might

21 look and do an analysis to see is there a statistical

22 association between an exposure and an outcome.  So

23 that's based on a research study.

24     Q    Do you have to have a statistical

25 association in order to take regulatory action in terms

1  of changing the label?

2          MR. BARNES:  If you know.

3      A    It is my understanding that FDA does not

4  always have epidemiologic data and can act on changing

5  a label within any context.

6      Q    You say FDA can act, but a company also

7  could act on changing a label, correct?

8          MR. BARNES:  Objection.  If you know.

9      A    I'm not as familiar with the thresholds of

10 the company needs to change their label.  But it -- it

11 always -- they always have to work with FDA to do so.

12         MR. ALTMAN:  I think we need to change

13 tapes.

14         THE VIDEOGRAPHER:  Going off the record.

15 The time is 11:29 a.m.  This is the end of tape number

16 2.

17              (Off the record.)

18         THE VIDEOGRAPHER:  We are on the record.

19 The time is 11:49 a.m.  This is the beginning of tape

20 number 3.

21 BY MR. ALTMAN:

22     Q    Before data mining and in the absence of

23 data mining even today, what are the general steps a

24 company should be implementing in terms of

25 post-marketing monitoring for the safety of their

97

---

1  relevance and then we have matched them up and down a

2  validation study, in that context only, with a full

3  team of experts.

4      Q    Have you ever designed a post market --

5  have you ever designed post-marketing safety

6  surveillance for any pharmaceutical company?

7      A    No, I've not developed pharmaceutical SOPs.

8  I've developed guidance from industry from the FDA

9  perspective, I've worked on those.  But not within

10 companies.

11     Q    Which guidance did you work on that would

12 be relevant to pharmacovigilance and safety

13 surveillance?

14     A    I've worked on -- actually, I was the

15 co-author of the original draft of the pregnancy

16 registry guidance document.  I started that while I was

17 at the FDA and then they paid me as a consultant

18 afterwards.

19         I also worked at the very beginning on the

20 original concept and drafts of the good

21 pharmacovigilance -- what became the good

22 pharmacovigilance and pharmacoepi guidance document.

23     Q    That's the guidance from 2005?

24     A    Right.  I worked way early on the very,

25 very beginning of that document.

99

---

1  drugs?

2          MR. BARNES:  Objection.  Vague as to time.

3  Are you talking about today or 1999, 2005?  I mean,

4  there's -- it may change over time.  There's not -- you

5  should put it in context.

6      Q    In the absence of data mining, has

7  pharmacovigilance changed over the last 10 years shall

8  we say?

9      A    I can't really say.  The clinical

10 pharmacovigilance function outside of data mining is

11 not my expertise.  I'm not testifying on that.

12     Q    So let me ask you a question:  Have you

13 ever, putting any data mining aside, have you,

14 yourself, ever determined that there was a signal that

15 needed to be followed-up in the context of

16 post-marketing safety surveillance?

17     A    That's a clinical decision.  So no, that is

18 not what I do.

19     Q    Have you ever taken an alert and done the

20 research that goes along with finding the clinical

21 information or the other stuff to put the alert into

22 context to conclude that there was a signal?

23     A    At this point, no.  I look at the data

24 mining alerts.  I've had a study where I've had a

25 clinical staff go through and look at the clinical

98

---

1      Q    When was that?

2      A    When I was at the FDA in the late '90s.  It

3  was much smaller then.  It kind of took on a life of

4  its own.

5      Q    Yeah, I'm quite sure.  Regulatory agency

6  calls a pharmaceutical company and says, hey, we need

7  to evaluate a particular safety issue.  Is that a

8  signal?

9          MR. BARNES:  Excuse me.  Objection.  Please

10 repeat.  That I didn't hear.

11     Q    I said, if a regulatory agency called a

12 pharmaceutical company and says, we would like you to

13 evaluate a particular safety issue, does that

14 constitute a signal?

15         MR. BARNES:  Objection.  If you know.

16     A    From my perspective?  That's not how --

17 what I use as a signal, no.  From my perspective it is

18 not a signal.

19     Q    I think you said before -- this is where I

20 get confused -- we talked about evaluating something

21 seen clinically means that you have a signal and I

22 don't think you could give me an instance where it

23 would not be a signal.  I think I asked you that?

24         MR. BARNES:  Objection.  Misstates prior

25 testimony.  Go ahead.

100

1    A    You didn't tell me anything in your
2    question about clinical relevance.  You just said the
3    FDA tells a company to do something.  I don't know in
4    what context the FDA would tell the company to do
5    something.  I could be many, many reasons.  I don't
6    want to speculate on that.
7    Q    What reasons would you think the FDA would
8    call a company and ask them to evaluate the safety of a
9    particular issue with a particular drug?
10   A    There could be many situations, many
11   reasons.
12   Q    Okay.  Can you give me some that you can
13   think of?
14        MR. BARNES:  Objection.  Calls for
15   speculation.
16   A    I mean, it's huge.
17        MR. BARNES:  Go ahead.
18   A    I mean, it's huge.
19   Q    Can you give me one?
20   A    One.  The FDA reviews a new drug
21   application for a different drug in the class and finds
22   something in the clinical trial, they might want to
23   know if the other companies had seen that in previous
24   work.  So they might ask the companies to follow-up.
25   Q    Would you consider that to be a signal?

1    A    For which drug?
2    Q    For the -- not the NDA they're approving,
3    for the company that called asking them to research the
4    issue?
5    A    Not in the context that we're using the
6    term signal, no.
7    Q    What would you call it?
8    A    That the company asked them to follow-up on
9    something.
10   Q    Okay.  If the FDA has a safety concern and
11   calls the company and specifically asked them to review
12   a particular issue, does that constitute a signal?
13        MR. BARNES:  Objection.  Asked and
14   answered.  Go ahead.
15   A    We use the definition of signal here which
16   was data mining which was there was a statistical
17   finding of disproportional reporting for a drug and
18   event pair and then that was reviewed and then was
19   found to have some clinical meaning or relevance and
20   those two combined became a signal.  But we're speaking
21   of a specific drug.  You're just talking in
22   generalities.
23   Q    There's no data mining.  You said you could
24   also get to the same point without data mining through
25   a clinical review of information.  You could see

1    something clinically that causes you a concern that you
2    choose to follow-up to see if there's some relevance to
3    it, correct?
4         MR. BARNES:  Objection.  Misstates her
5    prior testimony.
6    A    Companies are required to have in place
7    standard operating procedures to review the data that
8    comes in.  So they should follow their SOPs and follow
9    those.
10        So I talked about signals just in the
11   context of data mining with the alert and then clinical
12   relevance to differentiate between an alert and a
13   signal.
14   Q    Well, we talked a bit before that you could
15   get to the same place, you could get to a signal
16   without data mining, correct?
17   A    Not in the way I'm using the term signal in
18   this context.
19   Q    Before there was data mining people still
20   found signals, correct?
21   A    People reviewed adverse event data, is that
22   what you're talking about?
23   Q    People reviewed information and found
24   signals even before we had data mining or today even if
25   they don't use data mining, correct?

1    A    That's using the term signal in a different
2    context from the way I've been using it in this report.
3         MR. BARNES:  So you --
4         MR. ALTMAN:  Hold on.
5    Q    We talked about alert as an SDR and then
6    you said alert plus clinical information equals --
7    potentially equals a signal, correct?
8    A    Alert with clinical relevance would then
9    go --
10   Q    Reviewing case reports, doing literature
11   searches, other analyses and things like that, correct?
12        MR. BARNES:  Objection.  Misstates her
13   prior testimony.
14   Q    Okay.
15        MR. BARNES:  I mean, I think you're trying
16   to -- you're talking either past each other or she's
17   defined the signal very precisely how she uses it in
18   this case and this report.  You keep trying to have --
19   ask her --
20        MR. ALTMAN:  We're missing each other.  I'm
21   utterly confused as we're using the term.  And it's
22   very important.
23        MR. BARNES:  She stated it several times
24   what she considers to be a signal in the context of
25   this case and her work, which was the alert plus

**Page 105**

```
 1    clinical relevance, right?
 2              THE WITNESS:  Right.
 3              MR. BARNES:  The alert being on
 4    disproportionality basis, right?
 5              MR. ALTMAN:  Rick, I understand that.
 6    That's not my concern right now.
 7    BY MR. ALTMAN:
 8        Q    I'm asking about can you get to signals in
 9    the absence of data mining.  I believe I asked that
10    already.
11        A    That's a whole different process that I'm
12    not -- I haven't reviewed anyone's work in it.  I don't
13    want to make a judgment about it because that's really
14    outside the realm of what I do.
15              That's a clinical issue and that's -- I
16    don't want to even guess on how a clinician forms a
17    decision that something is a signal and is not a
18    signal.  It's beyond what I do.
19        Q    I'm not asking you to do that.
20        A    Right.
21        Q    What I'm saying is that you can get -- you
22    can find signals without data mining, correct?
23        A    I don't want to say what it is that does
24    and does not make a signal.
25        Q    I'm not asking you what it is.  I said as a
```

**Page 106**

```
 1    general proposition have people in the past, in other
 2    context, found signals of potential problems in a drug
 3    that they didn't know about without using data mining?
 4        A    I defined signal here in this context
 5    within data mining.  So I --
 6              MR. BARNES:  You'll have to explain what
 7    you think about a signal.
 8        A    Right.  What are you --
 9              MR. BARNES:  She's using signal very
10    specifically as to the context of the alert process.
11    There's a disproportional reporting or some sort of
12    signal of disproportionality and then having reviewed
13    in the context of clinical relevance.  That's what a
14    signal is.
15              Now if you want to have -- you can't get to
16    a signal unless you do those two steps.  Now, you're
17    talking about another type of signal.
18              MR. ALTMAN:  Rick, Rick --
19              MR. BARNES:  That's why you're talking past
20    each other.
21    BY MR. ALTMAN:
22        Q    You've been working with
23    pharmacoepidemiologic and pharmacovigilance for many
24    years, correct?
25        A    That is correct.
```

**Page 107**

```
 1        Q    You were doing that before there was data
 2    mining, correct?
 3        A    Yes.
 4        Q    People did pharmacovigilance before data
 5    mining?
 6        A    But I didn't do pharmacovigilance.  I did
 7    pharmacoepidemiology.
 8        Q    So one of the things I want to understand
 9    with the -- in your report, you are not expressing any
10    opinions on any of the pharmacovigilance activities
11    that the company did or didn't do outside of the
12    context of data mining; is that correct?
13              MR. BARNES:  Objection.
14        A    I go beyond data mining because I also look
15    at the clinical trials, the database into the FDA, the
16    FDA reports, so I look at the epidemiology in the
17    literature.  So I have looked well beyond just data
18    mining.
19        Q    But you didn't look at all the clinical
20    trial reports, correct?
21        A    I looked at the summaries of all the
22    clinical trials; the analysis that was based on the
23    trials.
24              When you say the analysis, are you
25    referring to the company's response to the FDA in terms
```

**Page 108**

```
 1    of the FDA's inquiries in the 2004, 2005 timeframe?
 2              MR. BARNES:  2006 timeframe.
 3        Q    2004 to 2006, I'm sorry.
 4        A    Yes.  As specified in my materials
 5    reviewed.
 6        Q    Did you review any company SOPs for
 7    pharmacovigilance at all?
 8        A    No, I did not.
 9        Q    Do you have any knowledge as to what --
10    you're aware that before Pfizer purchased Parke-Davis
11    Warner-Lambert back in, I think, about 2000 or 2001,
12    correct?
13        A    I was made aware of it as I was reviewing
14    the documents.
15        Q    Okay.  Do you have any knowledge as to what
16    Parke-Davis, Warner-Lambert did in terms of
17    pharmacovigilance in the period before Pfizer purchased
18    them?
19        A    No, I do not.
20        Q    So your opinions do not affect anything
21    that Parke-Davis Warner-Lambert did, correct?
22        A    My opinions are purely based on the -- for
23    the alert is -- is there or is there not a statistical
24    alert.  I'm not talking about what their process is for
25    pharmacovigilance.
```

**Page 109**

```
 1     Q     That's why I want to be very precise and
 2  where there's a difficulty in the word signal.  When
 3  you say, as you do many times in your report, there was
 4  no signal, you are making that in the context of a
 5  signal that would be dependent upon some kind of a data
 6  mining alert, correct?
 7     A     I'll have to go through my report and see
 8  where I use the term signal.  Can you --
 9     Q     We're going to -- just as a general
10  proposition.  You're not referring to whether in the
11  absence of data mining whether some clinician should
12  have seen that there was some potential problem that
13  was uncharacterized in Neurontin, correct?
14     A     I'm not making any clinical judgments
15  because I'm not a clinician.
16     Q     Okay.  So I just want -- I want to be very
17  precise about as you use the term signal.  So you are
18  only -- whenever you use the word signal in your report
19  you are talking about what you have defined as a alert
20  plus clinical significance, correct?
21           MR. BARNES:  Before you answer that you
22  better read your report.
23     A     I need to go and make sure.
24           MR. BARNES:  Make sure.
25     Q     Well, you can do that during lunch.  I
```

109

**Page 110**

```
 1  don't want to spend a lot of time doing it right now.
 2           MR. BARNES:  We can come back.  Well, she's
 3  submitted several pages of a report.  If you want to
 4  ask that question about specifically, she needs --
 5           MR. ALTMAN:  I'll withdraw the question.
 6  I'll ask the question differently.
 7           MR. BARNES:  Okay.
 8     Q     Just to make sure and we can put it to bed.
 9           You use the term signal to only mean data
10  mining -- alert plus clinical significance, correct?
11     A     That is how we just defined it for the
12  purposes of our discussion here today, yes.
13     Q     And that's the context in which your
14  opinions are, we're talking about Neurontin, we're
15  talking about your opinions related to Neurontin, that
16  is the context in which you're using the word signal
17  within this case, correct?
18     A     Within this conversation.  I need to go
19  back and review if you want to -- me to answer that
20  past question.  I want to make sure --
21     Q     Frankly, I don't know how you're going to
22  review 50 pages of report.
23           MR. BARNES:  Well, in order to answer your
24  question accurately she will need to review her report.
25  You asked her about the report.  She'll have to go
```

110

**Page 111**

```
 1  back.  She may have referred to Dr. Blume's discussion
 2  of the signal.  She would be using the context of that.
 3           There's any number of context in which the
 4  word signal could appear in her report.  You've asked
 5  her a very broad question.  She's had two reports in
 6  this case.  If you want her to actually answer the
 7  question, she needs to see how it was used.  That's
 8  what's fair.  You've withdrawn the question.
 9           MR. ALTMAN:  I'll withdraw the question,
10  that's fine.
11     Q     But as you sit here today, I think you've
12  told me, you are not qualified to determine whether
13  there was a signal absence of data mining or anything
14  like that from a clinical perspective, correct?
15           MR. BARNES:  Objection.  Misstates her
16  prior testimony.  State your qualifications, as best
17  what your qualifications are.
18     A     I'm an epidemiologist.  I do work in
19  pharmacoepidemiology.  So that includes research on
20  identifying new signals, following up on potential
21  problems.  Also risk management of known problems.
22           What I did in this case is review the
23  epidemiologic literature, reviewed the FDA analysis and
24  I did some independent data mining of the FDA FOI
25  database.  So all of my opinions are based on that
```

111

**Page 112**

```
 1  work.
 2     Q     That's fine.  Does a company have to prove
 3  a causal relationship to change a label?
 4           MR. BARNES:  Objection.  If you know.  Does
 5  a company have to prove a causal relationship?
 6  Objection.  Vague.
 7           MR. ALTMAN:  It's not a vague question and
 8  she's put herself forth as a regulatory expert.
 9           MR. BARNES:  You may answer the question if
10  you understand the question.
11     A     Could you repeat that?
12     Q     Does a company have to prove a causal
13  relationship to change a label?
14     A     To change a label?  It is my understanding
15  that there are many things on the label not all of
16  which are definitively proven from scientific research
17  to be causally related.  As for changing the label, I
18  have no opinion on that.  I have to review the
19  regulations.
20     Q     I believe, I don't have it here, we can
21  check it, that the FDA's statistical review they
22  concluded the relative risks for Neurontin and
23  suicidality was 1.57 with a confidence of interval of
24  .12 to 47.66.  Does that sound -- comport with your
25  memory -- and it's not -- the precise numbers are not
```

112

1    important to you.

2                MR. BARNES:  I think --

3        A    I'd like to see the report if we're going

4    to talk about the report.

5        Q    This is the only question I'm going to ask

6    about it so I don't think you need to -- I'll ask the

7    question differently.

8             You have a relative risk of 1.5 with a

9    confidence interval of 0.1 to 10?

10               MR. BARNES:  Zero point to 10.

11       Q    Does that allow you to conclude that the

12   relative risk is not 0.2?

13               MR. BARNES:  Objection.  Vague.

14       A    In what context.

15       Q    Does that -- what does the confidence

16   interval mean?

17       A    A confidence interval, with -- depending on

18   the width of the confidence interval, what limits

19   you've set it at, it would tell you within that

20   specified probability the likelihood that you would

21   have a result that falls within that.

22            So it's if 95, 95 percent confidence, if

23   you repeated the study 100 times, the results would

24   fall within those limits.  So based on statistical

25   theory.

                                                    113

1        Q    So given a 1.5 with a confidence interval

2    of 0.1 to 10, does that allow one to conclude that the

3    relative risk is not 0.2?

4        A    Your question just doesn't make any sense.

5                MR. BARNES:  Why don't you repeat the

6    question.

7        Q    I'll ask it differently.  We'll come back

8    to it a different way.

9             I'm not asking what is the most likely

10   value.  Strike that.

11       A    Aren't you, though?

12               MR. BARNES:  Don't --

13       Q    That's not what I'm asking.  Strike that.

14            Confidence interval -- the relative risk of

15   1.57 with a confidence interval of 0.1 to 10 says that

16   you would expect that your true relative risk lies,

17   assuming it's at the 95 percent level, gives you some

18   comfort saying your true relative risk probably lies

19   between 0.1 and 10, correct?

20       A    Not clear from what you're asking me if I

21   can answer that.

22       Q    Okay.  What does 1.5, a relative risk of

23   1.5 with a confidence interval of 0.1 to 10 mean at a

24   95 percent level?

25       A    95 percent level, okay.  1.57 would be your

                                                    114

1    point estimate.

2        Q    Okay.

3        A    But I'm not clear what -- your point

4    estimate you're referring to.  It depends within the

5    internal and external validity of the study.  So you

6    have to put things into perspective what kind of study

7    and what you've done.

8        Q    Putting all of that aside.  I'm talking

9    about the interpretation of this particular number, if

10   that's a relative risk.  All I'm trying to understand

11   is that that confidence interval allow you to

12   exclude any number between the confidence interval and

13   say it can't be that number?

14       A    It is all based on probabilities and it

15   doesn't mean that they're all equally likely.

16       Q    I understand that.  I'm just --

17               MR. BARNES:  Did you finish your answer?

18       A    Sure.

19               MR. BARNES:  Next question, please.

20       Q    You say they're not all equally likely, but

21   does it allow you to exclude any value between those

22   confidence intervals and saying it can't possibly be

23   this, the probability is zero that it is this?

24       A    It's only saying that there's 95 percent

25   likelihood that it would fall within the range.  So you

                                                    115

1    still have likelihood that it could fall outside that

2    range, too.

3        Q    That's not what I'm asking.  Does it allow

4    you to say that any value between that confidence

5    interval has a probability of zero for being the true

6    relative risk?

7        A    You're 95 percent confidence -- within the

8    95 percent confidence interval so the probability would

9    not be zero for any one data point within there.

10       Q    So 1.5 with confidence interval of .1 to

11   10, the true relative risk could be .2 or it could be

12   .8 or it could be 1 or it could be 5 or it could be 9,

13   correct?

14       A    It could be any number within the

15   confidence interval or outside of the confidence

16   interval.

17       Q    So you can't say that the absence -- the

18   fact that 1 is included in that number there means it

19   cannot be greater than 1, correct?

20               MR. BARNES:  Objection.  Vague.  Can you

21   repeat the question?

22       Q    I'll it ask a little different.  1 is

23   included in a confidence of .1 to 10?

24       A    That is correct.  Number 1 is included.

25       Q    Does that -- can you say definitively given

                                                    116

**Page 117**

```
 1   that relative risk and that confidence interval that
 2   the relative risk is less than 1?
 3       A    In the context of an epidemiologic study
 4   with such a broad confidence interval and such a small
 5   relative risk, you're very hard pressed to say that
 6   there's any effect at all.  But that's how I'm
 7   interpreting it as an epidemiologist.
 8           MR. ALTMAN:  Objection, nonresponsive.
 9       Q    Can you say that it cannot be less than 1?
10       A    As I said it could be any number at all,
11   the confidence tells you the likelihood of certain
12   numbers.
13           MR. ALTMAN:  Objection.  Nonresponsive.
14           MR. BARNES:  You're saying that the point
15   estimate is 1.5 but it encompasses a relative risk of
16   1, correct, and it goes up --
17       Q    It's .1 to 10.  All I'm simply asking is
18   can you say that the probability that it is less than 1
19   is zero.
20       A    If you're stating the confidence intervals
21   you cannot say that there's no possibility that it
22   doesn't fall anywhere in those confidence intervals.
23           MR. ALTMAN:  Objection.  Nonresponsive.
24       Q    It's just can you say that the probability
25   it is less than one is zero?
```

---

**Page 119**

```
 1   statistical theory, I can't say what the truth would
 2   be.  It depends on the study and the context of the
 3   study and how well it was done and confounding and
 4   bias.  So you have to put all of that into
 5   consideration.
 6       Q    But the interpretation of just this number,
 7   can you say that the relative risk cannot be less than
 8   1?
 9           MR. BARNES:  Objection.  Vague.  If you can
10   answer that question.  If you can't tell him you can't
11   answer it, tell him why.
12       Q    It's not really a trick question.
13       A    I just don't understand what you're -- what
14   you're asking me.  I thought I answered it.
15           MR. BARNES:  Let him ask it again.
16       Q    Can you -- with a relative risk of 1.5 and
17   a confidence interval of 0.1 to 10, can you say that
18   the probability that the relative risk is less than one
19   is zero?
20           MR. BARNES:  You have to -- if you can
21   answer that question as stated, tell him.  If you
22   can't, tell him you can't answer it.
23       A    There's -- I would have to look and do some
24   calculations.  I can't tell you what the probability of
25   any one number is.  It's just statistical theory.
```

---

**Page 118**

```
 1           MR. BARNES:  All you can say is it's
 2   statistically significant.
 3       Q    It's a yes or no question.  Can you say
 4   that the probability less than one is zero?
 5       A    Probability that it's less than one that's
 6   it's protective --
 7       Q    Is zero.  That there's no chance that it is
 8   protective?
 9       A    Based on the study, if you believe --
10       Q    Forgetting about that.  You believe the
11   numbers.  Can you say it is not protective?
12       A    With those confidence intervals you cannot
13   say much of anything.
14       Q    Can you say it is not protective?
15       A    I mean that's -- can you say it is not
16   protective?
17       Q    Can you say that the relative risk cannot
18   be less than one?
19       A    The relative risk is 1.5.
20       Q    Can you say that -- but that's your point
21   estimate, right?
22       A    Right.
23       Q    And you expect your true relative risk to
24   be somewhere in that confidence interval, correct?
25       A    If I repeated the study, based on
```

---

**Page 120**

```
 1       Q    I'm not asking what the probability is.
 2   I'm asking is it zero.  Is it impossible that it's less
 3   than one?
 4       A    It's not impossible.
 5       Q    Is it impossible it is greater than one?
 6       A    It is not impossible.
 7       Q    So in other words that confidence interval
 8   does not allow you to draw a conclusion one way or the
 9   other as to whether there was a protectful or harmful
10   effect, correct?
11       A    The confidence interval tells us what is
12   the 95 percent probability of range if you repeated the
13   study.  That's all it does.
14           MR. ALTMAN:  Objection.  Nonresponsive.
15       Q    That confidence interval does not allow you
16   to make a conclusion one way or the other whether it is
17   protective or harmful, correct?
18       A    Again, I have to know the context of what
19   you're talk about.
20       Q    We'll move on.
21           You're familiar with MedDRA, correct?
22       A    I'm somewhat familiar with MedDRA.
23       Q    Are you a licensee of MedDRA?
24       A    No, I am not.
25       Q    Do you have access to MedDRA license
```

1  through somebody?

2      A      I have access to MedDRA through my work

3  with Q Scan, FDA, and then also one of the guys at

4  MedDRA gave me the MedDRA dictionary and then I'm also

5  on the -- through National Library of Medicine one can

6  get access to MedDRA.

7      Q      How many levels to MedDRA are there?

8      A      Lower level, preferred, higher level term

9  five.

10     Q      And a given -- putting low level terms out

11 of the picture.  The FDA does not code at the lower

12 level term level, correct?

13     A      I can't answer that.  I'm not sure.

14     Q      I'll represent to you that the FDA when you

15 get the data is at the preferred term level and they

16 don't provide it at lower level terms.  Do you have any

17 reason to dispute that?

18            MR. BARNES:  Do you have any basis upon

19 which to accept or reject Mr. Altman's assertion.

20            THE WITNESS:  No, I don't.

21     Q      Okay.  MedDRA is a hierarchical

22 classification; is that correct?

23     A      Yes.

24     Q      I believe the highest level is system organ

25 class, correct?

121

---

1      A      That's my understanding.

2      Q      Then you have high level group term

3  underneath that, correct?

4      A      I always mix them up.  I have to look.

5  Higher level term, higher level group term, preferred

6  term, lower level term.  I always mix them.

7      Q      It's higher level group term and then high

8  level term is my understanding.

9             Are you aware whether preferred terms can

10 exist at more than one place in the hierarchy?

11     A      It's my understanding that each preferred

12 term is unique.

13     Q      Do you know if the FDA does any comparisons

14 using the MedDRA dictionary at levels higher than the

15 preferred term?

16     A      I am not privy to everything the FDA does.

17 I wouldn't know.

18     Q      Have you ever seen them do it at a higher

19 level than the preferred term?  I'm not asking do you

20 know if they always do it.  Have you ever seen it been

21 done?

22     A      The FDA does not release their protocol.

23 I'm not sure what they do.  There's a lot of people

24 there.

25     Q      Have you ever seen the FDA make anything

122

---

1  publicly available that shows analyses that have been

2  done at levels different than the preferred term?

3      A      I don't follow every single thing the FDA

4  does so I really couldn't say.

5      Q      Have you ever done analyses using AERS at

6  levels other than the preferred term level?

7      A      Yes.

8      Q      Do several preferred terms fall under one

9  high level term?

10     A      Sometimes.

11     Q      Can they fall under more than one high

12 level term?

13     A      It's my understanding that each preferred

14 term only maps up one way.

15     Q      Then several high level terms would

16 accumulate to one high level group term?

17     A      Sometimes.

18     Q      Can they go to more than one high level

19 group term?

20     A      No.

21     Q      So, I mean, if we look at it, we have got a

22 bunch of preferred terms.  There's a high level term

23 that's going to cover those particular preferred terms.

24 Let's go from the time table.

25            You have a system organ class.  There's

123

---

1  going to be a number of high level group terms under

2  system of organ class, correct?

3      A      Yes.

4      Q      If we take any one of those high level

5  group terms, there will be a number of high level terms

6  that will exist under it, correct?

7      A      Not necessarily, it could be one.

8      Q      A number, it could be one or more?

9      A      Sure.

10     Q      If we go down to the high level term level,

11 there will be one or more preferred terms under each

12 high level term, correct?

13     A      That's my understanding.

14     Q      Do you think this is a -- is this a

15 random -- strike that.

16            Do you know how many preferred terms there

17 are?

18            MR. BARNES:  Yes or no.

19     A      Exactly, no.

20     Q      Approximately?

21     A      Yes.  Approximately 30,000 plus preferred

22 terms.

23     Q      Is there- -- and MedDra is used by

24 regulatory agencies around the world, correct?

25     A      Not all of them.

124

```
 1     Q     Is it used by the FDA?

 2     A     It is used by the FDA.

 3     Q     Is it used by the Uppsala Monitory Center,

 4  the World Health Organization?

 5     A     I thought they used WHO-ART.

 6     Q     Is it used by the EMEA?

 7     A     I'm not sure.

 8     Q     Is the arrangement of preferred terms

 9  within MedDRA random?

10     A     Is it random?  I don't believe it's random.

11     Q     Was there some body who tried to take these

12  preferred terms and put them into logical groupings?

13     A     Yes, I believe that there's a body that

14  decided on the terminology and how it would -- how it

15  would work.

16     Q     So there's at least in some opinion if a

17  given high level term has let's say five preferred

18  terms underneath it, in that body's opinion there was a

19  reason for putting those five terms under the same high

20  level term, correct?

21     A     I really wasn't privy to the design and

22  development of MedDRA coding so I haven't studied it.

23     Q     Have you ever read any of the MedDRA

24  documentation that comes with the MedDRA license?

25     A     Yes.
```

125

```
 1     Q     Do you know if there are any drugs that

 2  have been withdrawn in the absence of any

 3  placebo-controlled studies demonstrating an increased

 4  risk?

 5     A     Say that again?

 6     Q     Do you know if there are any drugs that

 7  have been withdrawn in the absence of any

 8  placebo-controlled studies showing an increased risk?

 9     A     Yes.

10     Q     What drugs can you think of?

11     A     One of them I can think of is

12  Phenylpropanolamine.

13     Q     Okay.  Can you think of any others?

14     A     Potentially Rezulin.

15     Q     Are you familiar with Fenfluramine and

16  Dexfenfluramine?

17     A     Yes, I am.

18     Q     Do you know if they were placebo-controlled

19  trials for Fenfluramine and Dexfenfluramine --

20     A     For approval, yes, they were.

21     Q     I'm not quite finished -- that showed there

22  was an increased risk of valvular heart disease?

23     A     Clinical trials?  I'm not aware of clinical

24  trials that found that.

25     Q     Do you know whether any
```

126

```
 1  pharmacoepidemiologic study was done prior to its

 2  withdraw to support the withdraw of Fenfluramine and

 3  Dexfenfluramine?

 4     A     Yes, I'm aware of the literature.

 5     Q     So when you say aware of the literature,

 6  would you say there was a study?

 7     MR. BARNES:  Don't guess.  If you want to

 8  look at the literature.  Don't guess as to what

 9  happened.  As long as you know.  I'm just saying, as

10  long as you know.

11     THE WITNESS:  But, I mean, I really

12  shouldn't talk about them, right, because I worked on

13  the lawsuits.

14     MR. BARNES:  Well, are you currently

15  engaged in litigation consulting on Fenfluramine or

16  Dexfenfluramine?

17     THE WITNESS:  Not now.

18     MR. BARNES:  Why don't you -- this isn't

19  necessary to your examination rather than put her in a

20  protection conflict or confidential relationship she

21  has with parties who are not presently with us here

22  today.

23     MR. ALTMAN:  I mean, if she's aware of

24  literature.  I'm not asking for company internal

25  documents.  If she's aware of literature that was a
```

127

```
 1  pharmacoepidemiological study?

 2     MR. BARNES:  You can answer that question.

 3     A     Yeah, I reviewed all the

 4  pharmacoepidemiology on those drugs.

 5     Q     Do you know that there was an announcement

 6  from the Mayo Clinic about three months before the drug

 7  was withdrawn?

 8     A     Yes, I'm aware of that.

 9     Q     Do you know what that announcement, in sum

10  and substance, was about?

11     A     I can't remember exactly to date, but yes,

12  I remember the work that they did on working valvular

13  heart disease.

14     Q     If I told you that was the Mayo Clinic

15  announcing that they had discovered a number of

16  patients with particular kind of valvular heart

17  disease, does that refresh your recollection at all?

18     MR. BARNES:  Objection.

19     A     Yes, I remember the study.

20     Q     Was that a pharmacoepidemiological study?

21     A     Which announcement?

22     Q     The announcement from the Mayo Clinic about

23  those particular case reports?

24     A     The case report itself was not a

25  pharmacoepidemiology study.
```

128

1    Q     This was the announcement by the Mayo
2  Clinic in July of 1997, correct?
3    A     I can't remember offhand.
4    Q     Did you do anything -- there were a number
5  of charts that existed in various reports, the
6  experience or other declarations that you reviewed, I
7  think you've commented upon.
8          Did you do any independent review of that
9  data to determine whether those charts are accurate or
10  inaccurate?  I'm not talking about interpretations of
11  the data, which you may disagree with.
12         Do you have any basis for saying that a
13  particular chart within the report was not correct, was
14  wrong?
15   A     For different charts in different reports,
16  yes, actually I do say that some of them are wrong or
17  inaccurate.
18   Q     That the underlying data is wrong, that if
19  it says there was a certain percentage, you've done
20  review that says that it really wasn't that percentage?
21   A     I've looked at some of the numbers and
22  found some of the numbers, for example in the FDA
23  report, are just wrong.
24   Q     I don't understand what you -- the FDA
25  report?

129

1  talking about.
2    Q     Aside from mislabeling, have you done any
3  of the work that says if at one point the chart said it
4  was 6 percent that it wasn't really 6 percent?
5    A     Can you show me where you're --
6          MR. ALTMAN:  This isn't --
7          MR. BARNES:  Well, did you actually go
8  back.  If Mr. Altman's charts that were put into
9  Dr. Blume's report said there were 19 migraines in the
10  fourth quarter of 1996, did you go back and recount the
11  19 headaches in the report that he attributes to being
12  the fourth quarter of 1996?  Did you do that sort of
13  review of Dr. Blume's report?
14         THE WITNESS:  No, I did not.
15         MR. BARNES:  Is that what you were asking?
16         MR. ALTMAN:  That's what I'm trying to --
17   Q     So you have no basis to say that any of the
18  charts, aside from mislabeling and aside from
19  interpretation --
20         MR. BARNES:  You're talking about numerical
21  values.
22   Q     Numerical values, do you have any basis for
23  saying any of the numerical values in any of those
24  charts are not inaccurate?
25   A     I can't say that because I do an analysis

131

1    A     The FDA says they did an analysis and this
2  was the number of cases and this is the number of
3  non-cases and the numbers are wrong based on what they
4  said they did.  Is that what you're saying?
5    Q     I think we're talking about two different
6  things.  I'm not talking about FDA's analysis.
7          In Dr. Blume's expert report there were a
8  number of charts which you comment upon in your expert
9  reports, correct?  In your original?
10   A     In my original report, yes.
11   Q     You've also done -- there were also some
12  charts attached as part of a declaration by Dr. Blume,
13  which you also reviewed for your supplemental report,
14  correct?
15   A     Yes.
16   Q     And you commented upon those charts,
17  correct?
18   A     Yes.
19   Q     Did you do, aside from its interpretation
20  which I'm not asking you about, did you do any kind of
21  a review of the underlying data to conclude that those
22  charts are not accurate?
23   A     I don't have to go to the underlying data
24  in some of these charts to find that they're inaccurate
25  because they're mislabeled.  And that's what I'm

130

1  and I find the signal detection analysis and I find
2  nothing and then there's a report that I believe you
3  did the signal detection analysis and say there's
4  something.  So I've done the analysis with my numbers
5  and I guess in some ways, yes, I do confirm those by
6  doing my own analysis.
7    Q     But you didn't actually take and try to
8  replicate the charts exactly as Dr. Blume has them in
9  her report, correct?
10   A     No, I did not go to the raw data and give
11  clinical judgment as to any of the data that she did.
12   Q     I'm not talking about clinical judgment.
13  I'm talking simply the fact that you didn't go to the
14  chart as Mr. Barnes said and if Dr. Blume has in her
15  report that there were 19 reports of migraine in the
16  fourth quarter of 2003, do you have any basis for
17  saying that there were not really 19 reports of
18  migraine in the fourth quarter of 2003?
19   A     I did not go and replicate her work, no.
20   Q     So you have no basis for saying that any of
21  those charts are inaccurate, other than some
22  disagreements of interpretation or labelings: is that
23  correct?
24         MR. BARNES:  Other than what's stated in
25  her reports.

132

1    Q    Correct.  You didn't use the same tool, you
2  used a different tool than what Dr. Blume used,
3  correct?
4    A    I believe so, yes.
5    Q    And if Q Scan did some things one way that
6  was different than what Dr. Blume requested, you could
7  see different results that may be because of the method
8  that was used and having nothing to do with the
9  accuracy of the computation, shall we say; is that
10 correct?
11   A    No, that's not correct.
12   Q    Okay.  How is that not correct?
13   A    I did data mining.  Dr. Blume didn't do
14 data mining.
15   Q    Let me give you a different example.
16        We talked about the date issue before.
17 What date to attribute to a particular report and you
18 were not aware how Q Scan dealt with the multiple
19 versions of a report; is that correct?
20   A    They do the last best case for the data,
21 but all the data is retained.
22   Q    I understand that, but when you do data
23 mining, you only want to use one -- you only want to
24 count a report one time, correct?
25   A    That's correct.  That's why they do that

133

1  last best case so each report is only counted one time.
2    Q    But if the last best case was six years
3  after the FDA actually learned about a particular term;
4  isn't that not accurate?
5    A    I don't believe that they used the last
6  date.  I believe they used the first date of the
7  report.  But I would have to go back and verify that.
8  I thought I did that earlier.
9    Q    I'm sorry.  If the first date of the report
10 didn't contain the term and it only showed up in the
11 last best case, wouldn't that also be inaccurate?
12   A    Not necessarily.
13   Q    But it could be.  You wouldn't know, right?
14   A    Such as the nature of data mining.
15   Q    Correct.  So you don't know what influence
16 that might have on the report, correct?
17   A    These are all such hypotheticals.  It's
18 hard to put this into any meaningful context.
19   Q    What I'm getting at is if Q Scan used one
20 mechanism for attributing the date, which was different
21 than what Dr. Blume used, you could see different
22 results based upon that, correct?  Without either one
23 of them being wrong?
24   A    That's assuming that we did the same thing,
25 which we did not do.

134

1    Q    Understood.  But if you did the same thing
2  and you used different ways of assigning the date, you
3  could see different results without either one of them
4  being wrong, it's just the convention that was
5  selected; is that correct?
6        MR. BARNES:  Objection.  Vague.  If you can
7  answer that.
8    A    In the hypothetical situation that we
9  actually both did the same thing, which we didn't do,
10 any change in protocol or use of different data could
11 get different results.
12   Q    Okay.  Have you ever designed a clinical
13 trial?
14   A    No.
15   Q    Have you ever done the power
16 calculations -- are you aware what power calculations
17 are typically done with the design of a clinical trial?
18        MR. BARNES:  We covered this in some
19 significant detail last year.  So with Dr. Weiss and
20 Mr. Fromson and you, so you should ask a new question.
21 That was covered in great detail a year ago.
22        MR. ALTMAN:  I'm sorry.  It was 10 months
23 ago and I have some questions that are relevant to this
24 and she rendered some new opinions so.
25        MR. BARNES:  Ask a different question and

135

1  we'll go forward.  She was asked for probably an hour's
2  worth of questions on power calculations last time.
3        MR. ALTMAN:  Are you going to instruct her
4  not to answer?
5        MR. BARNES:  That last question was asked
6  and answered.  You can ask another question.
7        MR. ALTMAN:  I'm asking that question.
8        MR. BARNES:  Ask it again.  What's the
9  question?
10   Q    Are you aware that power calculations is
11 typically done with the design of a clinical trial?
12        MR. BARNES:  Answer that question.
13   A    Yes, I am aware that they typically do
14 clinical trial power calculations.
15   Q    What is the purpose of doing those power
16 calculations?
17   A    The purpose is to estimate how many people
18 they will need to enroll to complete the study.
19   Q    Is that -- to complete the study but to see
20 or not see a particular effect, correct?
21   A    That's the whole -- whatever the purpose of
22 doing the study is.
23   Q    And the study that's not adequately powered
24 may fail to see an effect even though it actually
25 exists, correct?

136

1     A     Well, the whole idea of doing this study is
2   to see a clinically significant effect, so usually if
3   it's not feasible to get adequate sample size, you
4   wouldn't do the study.
5     Q     I understand that.  But if you don't have
6   enough power in the study to see the -- to see a
7   particular effect, you may not observe it even though
8   there really is an effect, correct?
9     A     You probably will have a point estimate but
10  your confidence intervals will be too wide to have a
11  statistically significant effect.
12    Q     Is it also possible you may not see an
13  effect at all because there isn't enough people in the
14  study?
15    A     Then why would you do a study in the first
16  place.  I don't understand.
17    Q     Let's say you're looking for -- you're not
18  looking for an effect, but to see an adverse effect
19  that is very rare.  If the study is not adequately
20  powered, you may not actually see an effect, even
21  though there actually is an effect, correct?
22    A     Clinical trials are typically not designed
23  to look at rare adverse events.
24    Q     So the absence of a rare adverse event in
25  the clinical trial doesn't really speak whether there

137

1   need to have this discussion.
2         MR. BARNES:  You're not going to ask the
3   same questions over and over again.  Use the
4   supplemental report.  If you have something directly to
5   the supplemental report, fine.
6         You've asked her hypotheticals.  You've
7   asked her what if it's 1 in 10,000, what if it's this,
8   what if it's that.
9         Again, I'm not trying to limit you.  Her
10  testimony -- your firm has had the opportunity to
11  question her on this exact point and you did and so,
12  you know, I would appreciate your asking a different
13  question other than what was covered in the last
14  deposition.
15        MR. ALTMAN:  I'm sorry, Rick, I need this
16  in the context of my examination.  If you're going to
17  instruct her not to answer, go ahead and do that.
18        MR. BARNES:  Ask the next question.
19        MR. ALTMAN:  I've asked the question that's
20  on the table.
21        MR. BARNES:  Ask it.  I want to hear it
22  again.
23  BY MR. ALTMAN:
24    Q     And if you did not see an adverse effect,
25  this was in the context of the clinical trial that -- I

139

1   is -- that drug causes that particular adverse event,
2   correct?
3     A     That's reverse logic from my standpoint if
4   you --
5     Q     If an event happens one in a thousand
6   patient years and you have five patient years of
7   exposure, would you expect to see even one of those
8   adverse events in that clinical trial?
9     A     Based on probability theory, the
10  probability would be very low.
11    Q     And if you did not see an adverse effect,
12  could you make a conclusion as to whether the drug
13  causes that adverse effect or not?
14        MR. BARNES:  Counsel, at pages 210 to 216
15  you went over this exact hypothetical and your counsel.
16  And you were scribbling down the questions for
17  Mr. Fromson.
18        I want you to look at page 210 to 216.  You
19  went through this exact same examples.  She's not here
20  to be re-examined on areas in which you've actually
21  spent sufficient time covering.  If you have a new
22  question.
23        MR. ALTMAN:  Rick, I'll point out to you
24  she is cross noticed in Crone which is a new case.  And
25  I can ask her anything from start in Crone.  We don't

138

1   have to go back.
2         If an event happens one in a thousand
3   patient years and you have five patient years of
4   exposure, would you expect to see even one of those
5   adverse events in that clinical trial?  Your answer was
6   based on probability theory, the probability would be
7   very low.  And if you did not see an adverse effect
8   could you make a conclusion as to whether the drug
9   causes that adverse effect or not?  That's the question
10  on the table.
11        MR. BARNES:  If you have an opinion on
12  that, you can answer that question.  Do you understand
13  the question?
14    A     It's an odd question.  I wouldn't even
15  think that way.  The issue is if you see something,
16  what does it mean.  Not what does it mean to not see
17  something.
18    Q     Okay.  So then would it be -- in that
19  particular context, would it be a fair statement to say
20  that because I did not see that adverse event that
21  proves that the drug cannot cause that adverse event?
22        MR. BARNES:  Objection.  Vague.  You may
23  answer.
24    A     It shows that there is no evidence for that
25  event.

140

1      MR. ALTMAN:  Objection.  Nonresponsive.

2      MR. BARNES:  Objection to the colloquy.

3  Ask the next question.

4      MR. ALTMAN:  Objection.  Nonresponsive.

5      Q     In that particular context, would it be a

6  fair statement to say that because I did not see that

7  adverse event that proves that the drug cannot cause

8  the adverse event?

9      MR. BARNES:  Objection as to fair, vague.

10 You may answer.

11     A     I wouldn't say that as a

12 pharmacoepidemiologist.  That's just not something I

13 would say.

14     Q     That wouldn't be a true statement, would

15 it?

16     MR. BARNES:  What?

17     A     It's just not accurate.

18     Q     Okay.  That's fine.

19     MR. ALTMAN:  I think we have five minutes

20 left on the tape.  This is a good a time to take a

21 break as any.  I don't know how long you need.  I'm

22 staying here, so.

23     MR. BARNES:  Why don't we go off the record

24 and take a short lunch break and be back between half

25 an hour, 45 minutes.  Depending how long it takes.

141

---

1      THE VIDEOGRAPHER:  Going off the record.

2  The time is 12:43 p.m.  This is the end of tape number

3  3.

4      (Break for lunch.)

5      THE VIDEOGRAPHER:  We are on the record,

6  the time is 1:42 p.m.  This is the beginning of tape

7  number 4.

8  BY MR. ALTMAN:

9      MR. ALTMAN:  Before we continue, I just

10 want to put something on the record with respect to the

11 Q Scan system.  At Dr. Weiss Smith's first deposition

12 and at this deposition and in her report she made

13 extensive use of the system from a third-party vendor

14 called Q Scan.

15     We have not had an opportunity to evaluate

16 the Q Scan system.  We don't have an opportunity to run

17 inquiries on the Q Scan system and to evaluate what

18 other kind of analyses could have been done on the Q

19 Scan system and we have asked to be provided access in

20 a similar capacity to that which has been made

21 available to Dr. Weiss Smith.

22     At this point we have not been provided

23 with that capability and have requested that be

24 provided that capability and we'll have to resolve that

25 issue going forward.  But as of this point we have not

142

---

1  had any opportunity to evaluate any of Dr. Weiss

2  Smith's analyses.

3      MR. BARNES:  Well, I disagree that you've

4  had no opportunity to evaluate Dr. Weiss Smith's

5  analyses and we'll take your request under advisement

6  and we will respond following the deposition.

7      MR. ALTMAN:  That's fine.

8  BY MR. ALTMAN:

9      Dr. Weiss Smith, I wanted to ask you

10 briefly about the Society of Epidemiologists.  You are

11 a member?

12     A     Yes.

13     Q     You are a fellow?

14     A     Yes.

15     Q     Are you on the board?

16     A     I have been on the board.

17     Q     Is that the main conference for

18 pharmacoepidemiologists worldwide?

19     A     It's the main professional association for

20 pharmacoepidemiologists, yes.

21     Q     And they have basically an annual meeting

22 every year, correct?

23     A     They have an annual meeting, a mid-year

24 meeting.  A few others.

25     Q     At the annual meeting there's typically

143

---

1  lots of posters presented, correct?

2      A     There are quite a number of posters.

3      Q     Those posters are submitted to the society

4  for review by its members to decide whether it should

5  be -- the poster should be posted at the annual

6  meeting, correct?

7      MR. BARNES:  Objection.  Assumes facts not

8  in evidence, if you know.  The abstracts are reviewed

9  by volunteers among the membership and they are scored

10 and then evaluated for potential to go into oral

11 presentations and/or posters.

12     Q     As you said, some of those posters are

13 selected for oral presentations, correct?

14     A     Some of the abstracts are selected.

15     Q     Some of the abstracts are selected for oral

16 presentations, correct?

17     A     Some of them are.

18     Q     There's a much smaller number of oral

19 presentations than there are posters, correct?

20     A     Yes, the number of oral presentations is

21 limited.

22     Q     And you've given oral, you've given oral

23 presentations at asbe (phonetic), correct?

24     A     Yes, I have.

25     Q     It's a different group of people who select

144

1    abstracts for -- strike that.

2         It is not the same group of people who

3    select the abstracts that will be allowed to have oral

4    presentations as grade the abstracts, correct?

5    A    That's not exactly true.  There's a lot of

6    overlap.

7    Q    There's a lot of overlap.  But it's not the

8    same thing.  When the abstracts are scored by the

9    reviewers do those people, as part of that scoring,

10   decide whether they should be an oral presentation or

11   not?

12   A    All the abstracts and all the scores goes

13   to the scientific committee at mid-year.

14   Q    Okay.

15   A    They determine along with the committee in

16   charge of the meeting what is going to be presented,

17   what are the topics, what sessions are going to be run

18   and what's going to be in the different sessions.

19   Q    That will then decide which abstracts

20   should be accepted for oral presentations, correct?

21   A    That's typically where they make most of

22   the decisions.  Not the final decision but the

23   recommendations.

24   Q    I'm not going to mark it as an exhibit, but

25   I know that you have it.  I'd like you to go to your

---

1    Q    And 2001?

2    A    Again, about the same as 1999.

3    Q    Which was?

4    A    About 2000.

5    Q    And in 2002?

6    A    About 2,200.

7    Q    Now in 2003, how many in 2003?

8    A    Oh, just under 3,000.

9    Q    Would it be, based on what you see here,

10   would it be an unreasonable approximation to say that

11   there probably was about 1,500 reports in the first

12   half of 2003?

13        MR. BARNES:  Objection.  Calls for

14   speculation.

15   A    Based on this scale you can't tell what

16   happened in any one quarter.  This is full year.

17   Q    I understand, but given the trends of what

18   you see there, do you expect that it was more -- that

19   it's probably about half the number of reports?

20        MR. BARNES:  Objection.  Asked and

21   answered.  You may answer.

22   A    You cannot say anything because these

23   reports don't necessarily come in random order.  So no,

24   I wouldn't speculate in one quarter or the other based

25   on an annual total.

---

1    original report for one second.

2         MR. BARNES:  That's an exhibit in the prior

3    deposition.  Do you recall which deposition exhibit it

4    was?

5         MR. ALTMAN:  I believe it was Deposition

6    Exhibit 1.

7         MR. BARNES:  So referring to Exhibit 1 from

8    the prior deposition.

9    Q    I'd like you to go to page 16 of your

10   report.  Do you see that?

11   A    Okay.

12   Q    It's a little bit difficult with the scale

13   but in 1998 can you tell me in the top chart which is

14   entitled GABA Benton Spontaneous Reports, can you tell

15   me how many reports there were in 1998, and I'm not

16   asking you for precision.  I'm asking you within the

17   scale of your chart as you do it there, approximate

18   number?

19   A    In 1998?

20   Q    Yes.

21   A    Somewhere between 500 and 700.

22   Q    Okay.  And in 1999 approximately how many?

23   A    About 2000.

24   Q    In 2000 about how many?

25   A    Approximately 1,500.

---

1    Q    Taking a look at the bottom chart entitled

2    total prescriptions?

3    A    Okay.

4    Q    About how many in 1998?

5    A    4 million.

6    Q    And in 1999?

7    A    Just under 8 million.

8    Q    In 2000?

9    A    Looks like 10 million.  Slightly more.

10   Q    In 2001?

11   A    A lot of zeros here.  More than 12 million

12   prescriptions.

13   Q    When you say more than 12 million, can you

14   be a little bit more precise than that?

15   A    It's a big box in a little chart, so.

16   Q    Well, the line above is 14 million,

17   correct?

18   A    It's more than 12 million, it's less than

19   13 million, how's that.

20   Q    That's perfectly fine.  In 2002?

21   A    Slightly more than 14 million.

22   Q    And in 2003?

23   A    It jumps to 16 million.

24   Q    Now, with this chart do you think you'd be

25   in a better position to estimate whether about how many

12/22/2008 Weiss-Smith, Sheila

1   prescriptions there were in the first half of 2003?

2          MR. BARNES:  Objection.

3     A    Again, I wouldn't speculate within a full

4   year how that goes.  If there's seasonal variations or

5   if it's increasing over time.  So no.

6     Q    Do you ever do interpolation between data

7   points?

8     A    I try not to.  I like to work with the data

9   that I have as opposed to doing prediction.

10     Q    Do you have any knowledge that would

11   suggest that there is something that happened in 2003

12   that would say that it's not a pretty smooth usage

13   throughout 2003?

14          MR. BARNES:  Objection.  Calls for

15   speculation.

16     A    I don't have any basis to comment on your

17   question.

18     Q    So you don't -- I'm just asking, do you

19   know of anything that might have caused there to be a

20   change in prescribing patterns in 2003?

21          MR. BARNES:  Objection.  You may answer.

22     A    I don't remember the timeline of the

23   different indications.  I know it had some additional

24   indications, but I just don't remember the timeline.

25     Q    If they were -- if the new indication was

12/22/2008 Weiss-Smith, Sheila

1   in the 2001/2002 time frame, does that help your

2   recollection?

3     A    The one thing I see is in 2003 between 2003

4   and 2004 the generic drug was approved and quite

5   quickly dominated the market.

6     Q    Going back to the spontaneous reports.  Do

7   you know of any events in 2003 that could have caused a

8   change in the adverse event reporting associated with

9   Gabapentin or Neurontin?

10          MR. BARNES:  If you want to look at your

11   report, go ahead because you've not reviewed your

12   report as extensively as your supplemental, so.

13          MR. ALTMAN:  I just asked.

14          MR. BARNES:  I know, but this is discussed

15   in her report.  Perhaps if you want to look at the

16   report, that's fine.

17     Q    As you sit here right now, do you know?

18     A    There are constantly things going on that

19   change and affect reporting rates.  It is absolutely

20   not static and the use of the drug increased

21   substantially.  It's used in different indications.

22   There's a lot of things going on.

23     Q    Okay.  I'm going, I want to read to you a

24   statement and see if you'll agree with the statement.

25   Pharmacovigilance is dependent on astute clinical

1   recognition of an unusual or unexpected pattern of

2   events or a pattern of events that is consistent with a

3   biologically plausible explanation either within a

4   single case or across a series of cases.  Do you agree

5   with that statement?

6          MR. BARNES:  Would you read it again more

7   slowly.

8     Q    Pharmacovigilance is dependent on astute

9   clinical recognition of an unusual or unexpected

10   pattern of events or a pattern of events that is

11   consistent with a biologically plausible explanation

12   either within a single case or across a series of

13   cases?

14     A    I agree with the sentence but I do not

15   believe it's complete.

16     Q    As in I didn't read the whole sentence or

17   that --

18     A    It's not a complete description of what

19   pharmacovigilance is.

20     Q    Okay.  The next sentence, "Such clinical

21   pharmacological knowledge-based approaches have been

22   referred to as traditional methods of signal

23   detection."  Do you agree with that statement?

24          MR. BARNES:  Objection.

25     A    Say it again.

1     Q    Such clinical pharmacological

2   knowledge-based approaches have been referred to as

3   traditional methods of signal detection.

4     A    I'm not sure I agree with that.

5     Q    Okay.  I'd like to read you another

6   statement.  We can data mine on Gabapentin but I don't

7   think that negative data mining findings would make a

8   strong counter-argument to a signal that may have

9   arisen from clinical observations.

10     A    Can you please put that in context?

11     Q    You can agree or disagree with the

12   sentence?

13          MR. BARNES:  Objection.  She's asked you

14   to -- can you answer the question as stated.  If you

15   agree or disagree.  If you can't, you can't.

16     A    Can you repeat it?

17     Q    Sure.  We can data mine on Gabapentin but I

18   don't think that negative data mining findings would

19   make a strong counter-argument to a signal that may

20   have arisen from clinical observations.

21     A    To really answer that I need to understand

22   the context in which it's said.  It doesn't make sense

23   standing alone.

24     Q    If a person concludes that there was a

25   signal without using data mining and then you go and do

1  some data mining and for the data mining you don't see
2  a signal, does that mean that the person, the clinical
3  reviewer, was wrong when they thought there was a
4  signal there?
5        MR. BARNES:  Objection.  If you know.
6     A     Data mining is a signal of disproportional
7  reporting.  There's a lot of reasons why things may
8  signal that are true may signal and things that are
9  false may signal and vice versa.  I don't understand --
10    Q     So I think what -- I let her finish.  Did
11 you finish your answer?
12    A     I don't understand how you're putting these
13 two things together, data mining and --
14    Q     I received a -- I'm in pharmacovigilance
15 for a pharmaceutical company and I've received a number
16 of case reports that I believe constitutes a signal,
17 okay, I decide that I need to do some followup along
18 those lines.
19        One of the thing I choose to do is some
20 data mining.  When I do the data mining I don't find
21 any signal in the data mining.  Does that mean there's
22 no signal that -- from my clinical judgment?
23        MR. BARNES:  You're a doctor?  The person
24 doing the data mining, the person that's doing the
25 pharmacovigilance --

153

1        MR. ALTMAN:  I'm in pharmacovigilance, it
2  doesn't matter.
3     Q     The person working in the pharmaceutical
4  company in the pharmacovigilance department has
5  concluded based on case reports that there is a signal.
6  If you then go do some data mining and you don't see
7  any signal in the data mining, does that mean the
8  person was wrong?
9     A     I don't know.
10    Q     Okay.  So the absence?
11    A     From what you've given me, I don't know.  I
12 don't know -- it's going to depend on the circumstance
13 whether what they think is a signal ends up being a
14 true association or not or causal or not.  That's a
15 long way off from what you're asking.
16    Q     But the absence of a signal in data mining
17 does not mean everything is a okay; is that correct?
18    A     That can be the case.  Not everything will
19 signal in data mining, it's only proportional
20 reporting.
21    Q     That's all I'm trying to get at.
22        Dr. Weiss Smith, I'm going to hand you a
23 document, I'm not going to mark it as an exhibit -- it
24 was marked.  We can mark it if you want.  I only have
25 one copy?

154

1        MR. BARNES:  Let's try to mark it.
2        MR. ALTMAN:  I only have one copy.
3        MR. BARNES:  I can do that quickly.
4        MR. BARNES:  Okay.
5        MR. BARNES:  Two seconds I'll get this
6  copied.
7        MR. ALTMAN:  I don't need a copy.  If you
8  want to just mark that one.
9        MR. BARNES:  Let's mark this one as the
10 next exhibit in the deposition.
11        (Whereupon, a document was marked as
12 Deposition Exhibit Number 22.)
13        (Witness reading.)
14    Q     I just want you to take a look at that
15 quickly.
16        MR. BARNES:  The date on it, let me say
17 what it is for the record.  It's a printout, Serious
18 Adverse Events, Gabapentin Related Clinical Studies
19 cases 1/1/1980 to 31/12/2003.
20    Q     Which is the European date?
21        MR. BARNES:  Yes.
22    Q     It appears to be run on 5th of February,
23 2004, correct?  If you look all the way on the
24 right-hand -- all the way on the right-hand side?
25        MR. BARNES:  Yeah.

155

1     Q     It's also marked as Pfizer, underscore,
2  THO, underscore, 00007 -- I'm sorry, 793.
3        MR. BARNES:  Thank you.  That's good
4  enough.
5     Q     I'd like you to go to page four of the
6  document.  First of all, does this appear to be a
7  listing of serious adverse event reports from the
8  Gabapentin related clinical studies cases?
9     A     That's the title.
10    Q     Okay.  On page four, the second item down,
11 do you see that one?  It's a got number of
12 001-0945-9600035.  Did I read that correctly?
13    A     Which number down?
14    Q     The second report.  I'm sorry it's --
15        MR. BARNES:  Is it the one --
16    Q     I'm sorry, it's the third page of the
17 document.
18    A     The second report down?  Say the number
19 again.
20    Q     Under the event term, it says psychosis,
21 are we talking about same page now?
22        MR. BARNES:  0010945960035.  Is that the
23 one?
24    Q     Yes, do you see that one there?  It should
25 be the second one on the page.  Did I read that report

156

1  number there correctly?  Did I read that report
2  correctly?
3      A   Rick just did.
4      Q   I just want to make sure I read it
5  correctly.  Did you review this adverse effect report,
6  this MedWatch report?
7      A   No.  I didn't.
8      Q   Under country it says USA, did I read that
9  correctly?
10     A   Okay.
11     Q   Under sex it says M, correct?
12     A   Yes.
13     Q   And that would appear to mean male.  Is
14 that a reasonable interpretation, even though it
15 doesn't appear to be indicated in the chart?
16     A   There's no key, we can make that assumption
17 I guess.
18     Q   Under age it says 26?
19     A   Okay.
20     Q   Under weight it says 58.5-kilogram,
21 correct?
22     A   That's what it has here.
23     Q   And event onset date, it 434?
24     A   434, yes.
25     Q   Under event term it says psychosis,

1  correct?
2      A   Okay.
3      Q   And the action taken, it says permanently
4  discontinued, correct?
5      A   That's what it says here also.
6      Q   And under investigator causality it says
7  related, correct?
8      A   That's what they wrote.
9      Q   You have no basis, as you sit here, for
10 questioning whether the investigator thought this was
11 causally related, do you?
12         MR. BARNES:  Objection.  The word causally
13 related.  It says related.  But go ahead.
14     A   There is a great difference between the
15 causality assessment that clinicians do in this context
16 and what we consider causal in the epidemiologic
17 context.
18         MR. ALTMAN:  Objection.  Nonresponsive.
19     Q   Do you have any basis for questioning
20 whether the clinical investigator said causality
21 related?
22         MR. BARNES:  Objection.  She was asked that
23 question.
24     A   I thought I did answer that.  It says here
25 investigator causality related.  So however they define

1  causality in this context, that is what the clinician
2  wrote.
3      Q   And you have no basis --
4          MR. BARNES:  Let her finish her answer.
5      A   My caveat is I want to be very clear that
6  this causality assessment is not the same as saying
7  this -- the drug and the event were causally related
8  from an epidemiologic point of view.
9          MR. ALTMAN:  Objection.
10     A   This is very narrow.
11         MR. ALTMAN:  Objection to everything after
12 my caveat is as nonresponsive.
13         MR. BARNES:  Don't worry about it.  That's
14 meaningless.  Go ahead.
15     Q   You have no basis to conclude that this
16 patient did not have psychosis, correct?
17     A   That's a clinical judgment that I don't
18 feel qualified to make.
19     Q   But even if you were qualified, there is --
20 is there sufficient information on this line item here
21 for you to question whether this person actually had
22 psychosis or not?
23     A   There's not enough information here to make
24 a clinical judgment.
25     Q   Other than somebody made a clinical

1  judgment that it was psychosis, correct?
2          MR. BARNES:  Objection.  If you know.
3      A   I don't know how they labeled the term.
4      Q   This document came out of the company --
5  this document was produced by the company?
6      A   Right.
7      Q   Somebody at the company put down psychosis
8  for this, correct?
9      A   Probably not.
10     Q   Who do you think put down psychosis?
11     A   Most likely the clinical investigator or
12 someone in their staff wrote that.
13     Q   That would be a doctor presumably, correct?
14         MR. BARNES:  Objection.
15     A   Probably somebody clinical, not necessarily
16 the doctor.  It could be a study nurse.  It could be
17 anything.
18     Q   And that person is a clinician, though,
19 correct?
20     A   I don't know.  I don't have -- I don't have
21 anything to base that on.
22     Q   Okay.  That's fine.  You can put that
23 document aside.
24         All right.  The moment you thought we'd
25 never get to.  Why don't we pull out your report.

12/22/2008 Weiss-Smith, Sheila

1    Do you have your supplemental report in
2  front of you?
3    A    Now I do.
4    Q    I believe it's Exhibit 18; is that correct?
5    A    Yes.
6    Q    Opinion one you say FDA conducted a
7  meta-analysis of clinical trial data across 11
8  antiepileptic drugs.  Did I read that correctly?
9    A    That is correct.
10   Q    In my review of FDA's report the transcript
11 of the FDA advisory committee meeting and other related
12 materials have found that there was inadequate bases to
13 reliably assert that Neurontin was associated with
14 suicidality.  Did I read that correctly?
15   A    Yes.
16   Q    Pfizer was correct in concluding that based
17 upon the available data there was no signal for
18 suicidality with Neurontin.  Did I read that correct?
19   A    Yes.
20   Q    I think we defined that association and
21 signal are not the same thing, correct?
22   A    That is correct.
23   Q    So is that last sentence of your opinion
24 there, is that related to the sentence before which is
25 talking about association or is that a completely

161

1  committee, based on all of the available data that they
2  looked at, there was no statistical association, there
3  was no signal of disproportional reporting, there was
4  no significant -- I already said that statistically
5  significant elevation.
6    Therefore, there was nothing for them to
7  make a hypothesis that with clinical relevance that
8  Neurontin would be associated with suicidality.
9    Q    The advisory committee hearing, did they
10 discuss post-marketing safety data?
11   A    Did they discuss it?  I'd have to go back
12 in the transcript.  But I believe there was some
13 information in the report.
14   Q    But you're talking Pfizer was correct in
15 concluding that based upon the available data, there
16 was no signal for suicidality with Neurontin and that's
17 where I'm confused.
18   You just were talking about the FDA did an
19 analysis purely of clinical trial data and it was only
20 a statistical analysis, correct?
21   A    Yes.
22   Q    So you're limiting your opinion there to
23 whether the statistical data demonstrated a signal; is
24 that correct?
25   A    If you don't have an association that's

163

1  distinct sentence?
2    A    It's distinct.
3    Q    When you use the term there, no signal for
4  suicidality with Neurontin, are you using that in the
5  context of a data mining perspective as we discussed
6  earlier?
7    A    No, this is a different context.  This is
8  the context of what the FDA advisory committee use of
9  the term signal.
10   Q    You say Pfizer was correct in concluding
11 that based upon the value data there was no signal.
12 That's not the FDA's conclusion, is it?
13   A    Excuse me.
14   Q    Your opinion here was Pfizer was correct in
15 concluding that based upon the available data there was
16 no signal for suicidality with Neurontin?
17   A    People throw around the term signal.  And
18 we defined it in the context of data mining, we talked
19 about an alert.  We're no longer talking about context
20 of data mining here; is that correct?
21   Q    You wrote -- this is your opinion, I don't
22 know what you mean?
23   A    The advisory committee kept going back and
24 forth and saying is there a signal, is there a signal,
25 is there a signal.  I'm saying, within the advisory

162

1  higher than not having a signal.  A signal is more of a
2  hypothesis.
3    Q    So you could have a signal and later
4  there's no association found, correct?
5    A    That's correct.
6    Q    Here's what I'm totally confused about.
7  You say Pfizer was correct in concluding that based
8  upon the available data.  So you're talking about
9  Pfizer's conclusion that there was no signal.  That
10 sentence has nothing to do with whether there was an
11 association, correct, we discussed that before?
12   A    Opinion one is specifically talking about
13 the meta-analysis and the information there.  I have
14 separate opinions for the different types of data.
15   Q    So when you say Pfizer was correct in
16 concluding that based upon the available data there was
17 no signal with supplemental report for Neurontin, that
18 opinion is limited to a statistical analysis of the
19 data, correct?
20   A    Not limited to a statistical analysis.
21   Q    Well, did FDA do any other analysis, other
22 than a statistical analysis?
23   A    But it's not just the analysis.
24   Q    What else is there?
25   A    It's also the interpretation of the

164

1   analysis.

2   Q       Okay.  But at its core the FDA didn't

3   discuss open label studies, correct?

4   A       The FDA based their analysis on the control

5   clinical trials.

6   Q       Correct.  So your statement here is limited

7   to the analysis of the controlled clinical trials or

8   any interpretation of that analysis, correct?

9   A       Yes, in this opinion I'm specifically

10  limiting it to the meta-analysis and all the associated

11  documents with that one, yes.

12  Q       So you're not saying here that there might

13  not have been a signal from other source or some other

14  way that Pfizer might have known about it, correct?

15  A       The rest of my documents do talk to that,

16  that there is no signal in the epidemiologic

17  literature, in the spontaneous reports.  Specifically

18  here I'm addressing that one issue.

19  Q       When you say there's no signal, that's

20  limited to an alert plus clinical data, correct?

21          MR. BARNES:  Clinical relevance.

22  Q       Clinical relevance, I'm sorry.

23  A       For the data mining.

24  Q       Well, you say -- when you say that there

25  was no signal in the spontaneous data, that's based

1   upon data mining, correct?

2   A       In the spontaneous reports, data mining and

3   the evaluation of the safety summaries from the

4   company, relying on those also.

5   Q       On the safety summaries you're talking

6   about are those that were done in conjunction with the

7   new drug application?

8   A       They're in my first list of exhibits.

9   Q       Just take a brief look at them.  I don't

10  see listed in your materials here periodic reports.

11  Did you review any periodic reports in this case?  You

12  know what I mean by periodic reports, correct?

13  A       Yes, I do.  That I don't recall.

14  Q       I don't see any listed here, so if -- I'm

15  assuming that you did not review periodic reports?

16  A       Whatever I relied on I gave you.

17  Q       You just said relied on or reviewed.  Is

18  there any material that you reviewed that is not on

19  this list here?

20  A       I don't believe so.

21  Q       So this should be the complete list of

22  everything you looked at in this case, correct?

23  A       I believe that it is.

24  Q       When I say this, I mean this plus the new

25  supplemental report?

1   Q       Yeah, Exhibits 19 and 21.

2   Q       I'd like you to go to page 16.

3   A       (Witness complies.)

4   Q       In your review of the FDA materials, did

5   you see any evidence that the FDA took off-label use of

6   any of the drugs into consideration in evaluating the

7   data?

8   A       Say that again.

9   Q       In reviewing the FDA materials, when I say

10  the FDA materials I'm talking about, you know, based

11  upon the alert, did you see any evidence that the FDA

12  reviewed the information in the context of off-label

13  use of the drugs -- strike that.

14          Do you know what the term off-label use

15  means?

16  A       Yes.

17  Q       You're aware that many of the drugs that --

18  were the subject of the FDA alert were used off-label,

19  correct?

20  A       It's my understanding.

21  Q       Are you aware that approximately 80 to

22  90 percent of the usage of Neurontin is for off-label

23  purposes?

24          MR. BARNES:  Objection.

25  A       I did not have the exact figures on

1   off-label use for Neurontin but I recently read that

2   bi-polar disease is very commonly treated with drugs

3   that are not prescribed -- that are not labeled for it.

4   So there's a lot of off-label use in that condition.

5          MR. ALTMAN:  Objection.  Nonresponsive.

6   Q       At the time of the -- do you have an

7   understanding of whether labels are written for the

8   indication in which the drug is going to be approved?

9   A       It's my understanding that the labels are

10  very specifically written and the studies, clinical

11  studies, are done for the indication for which the drug

12  is being approved.

13  Q       At the time -- do you know when the

14  Neurontin was first approved?

15  A       I believe it was '93 or '94.  Right in

16  there.

17  Q       Do you know what the indication was at the

18  time it was approved?

19  A       I know it was for epilepsy in adult but I

20  don't know the specific subtype of epilepsy.

21  Q       If I told you it was adjunct therapy for

22  seizure control, does that refresh your recollection?

23  A       No, but I know it was for adults.

24  Q       In 1994, do you know whether there were any

25  clinical studies that had been done on bi-polar

1  patients?

2      A    I don't know the dates when they started

3  doing the other studies, no.

4      Q    I'll represent to you there were no studies

5  of bi-polar -- there was no specific study of efficacy

6  for bi-polar at the time of the original approval.  At

7  that point in time what did the company know about the

8  safety of Neurontin for use in a bi-polar population?

9      A    At which time?

10      Q    At the time of the original approval?

11      A    At the time of the original approval I

12  don't know what the company knew about the safety of

13  the drug for other indications, other than the ones

14  that they studied.

15      Q    Would it be a scientifically valid

16  statement to say that the drug was safe for use in a

17  population which had never been studied?

18      MR. BARNES:  Objection.  From a clinical

19  point of view or in terms of epilepsy?

20      Q    From an epidemiologic point of view.

21      MR. BARNES:  If you have an opinion.  You

22  don't have to have an opinion.

23      A    The benefits and risks of each treatment

24  need to be considered within the context.  That's my

25  opinion.

169

---

1      Q    If the drug had not been studied for a

2  particular use, what do you know about the risks

3  associated with using it in those patients?

4      A    Personally me, I'm not a clinician.

5      Q    What would the company have known?

6      MR. BARNES:  Objection.  If you know.

7      A    I don't know what the company knew when it

8  was approved.

9      Q    If they had never studied it in a bi-polar

10  population, could they have responsibly said it safe

11  for use in bi-polar population?

12      MR. BARNES:  Objection.

13      A    Potentially.

14      Q    What would be the basis?

15      A    Basis on the safety data that they did

16  collect in humans and of course the animal studies.  So

17  they know what the risks are.  It's a question of

18  balancing those risks against a different disease

19  state.

20      Q    So even though they weren't never tested in

21  that population, you could automatically extend

22  everything they knew about one population to another?

23      MR. BARNES:  Objection.

24      A    That's not what I said.

25      Q    Were you aware that Pfizer pled guilty to

170

---

1  crimes?  And when I say Pfizer, I mean Pfizer,

2  Warner-Lambert, Parke-Davis, this entity?

3      MR. BARNES:  Objection.  That was asked at

4  the prior deposition, Counselor.  Do you want to just,

5  you know, put it in the context of this case.

6      Q    Were you aware of that?

7      MR. BARNES:  If you were aware.

8      A    Yeah, I heard about it.

9      Q    Were you aware one of the items that was

10  pled guilty to is that the drugs lacked adequate

11  instructions for use in off-labeled populations?

12      MR. BARNES:  Don't answer that yet.  Repeat

13  the question, please.

14      Q    Were you aware that one of the items that

15  was pled guilty to is that the drugs lacked adequate

16  instructions for use in off-label populations?

17      A    No.

18      Q    As part of -- would you consider yourself

19  knowledgeable on good pharmacovigilance practices?

20      A    I'm not an expert on good pharmacovigilance

21  practices, no.

22      Q    Do you think it's important as part of your

23  pharmacovigilance practices to look at the populations

24  that are actually using your drug?

25      A    That's part of the guidance document from

171

---

1  the FDA, yes.

2      Q    Do you agree with that?

3      A    Yes, I do.

4      Q    So if a company knows that a population is

5  using their drug in substantial numbers that's

6  different than what they studied in the clinical

7  trials, should the company take steps to specifically

8  look at that population's adverse events?

9      MR. BARNES:  Objection.  Vague.  Overbroad.

10      Q    You can answer.  Unless you don't

11  understand?

12      MR. BARNES:  If you have an opinion or you

13  don't understand.

14      A    I don't know.  Say it again.  Maybe I

15  can --

16      Q    If a company becomes aware that a

17  substantial portion of the use of their drug is in an

18  off-label population for which they have not performed

19  little, if any, studies.  Should the company take steps

20  to specifically monitor the safety of the drug when

21  used in that particular population?

22      MR. BARNES:  Objection.  She's not

23  expressed any -- named as an expert in the company's

24  conduct of pharmacovigilance.  So if you have formed an

25  opinion separate from this engagement, you can answer.

172

1   But you've not been asked to do so in this case.
2        A       From my perspective the companies do
3   pharmacovigilance regardless of indication.  They look
4   at all events that are reported to them.
5        Q       I understand that, but do you think they
6   should separate out the events from one indication
7   versus another indication to see if there are
8   differences or disproportional reporting between those
9   indications?
10       MR. BARNES:  Objection.  Beyond the scope
11  of her report.  Overbroad if you haven't formed the
12  opinion, you don't have to give an opinion on it.
13       A       I don't have an opinion about how they
14  should conduct their pharmacovigilance in that regard.
15       Q       Bottom of page 16 you say, I am not aware
16  of the FDA's grading all or parts of NDAs like an
17  examine nor summarily rejecting an NDA based on errors,
18  omissions or inappropriate methods with this one
19  section.  How many NDAs -- first of all, did I read
20  that correctly?
21       A       Yes.
22       Q       How many NDAs have you reviewed while at
23  the FDA?
24       A       I never had to review a completed NDA.
25       Q       How many post-marketing safety sections of

173

1   an NDA did you review while at the FDA?
2        A       I don't do clinical reviews.  Those are
3   done in the review division.
4        Q       How many, I think I asked this, you've not
5   ever developed a post-marketing safety section of an
6   NDA, correct?
7        A       That's correct.  But nothing I've heard of,
8   discussed, nothing I've learned in any of my regulatory
9   courses had anything to do with how the FDA grades an
10  NDA or sections of it.  I've never heard of that.
11       Q       You say nor is there any evidence that the
12  FDA accepted their methodology.  What is your basis for
13  that statement?
14       A       What I understand is the FDA does their own
15  analysis.
16       Q       That's based on general instinct, but
17  you've not actually done that analysis, correct?
18       A       No.
19       Q       Have you ever spoken to anybody at the FDA
20  and asked them what they do with the post-marketing
21  safety surveillance section provided to them by a
22  manufacturer?
23       A       We have talked about it.  I've looked at
24  some of them in legal cases, other legal cases.  I've
25  worked within a review division for some period of my

174

1   time there so I'm familiar, somewhat, with what they at
2   least in the past have done.
3        Q       Do you know if the FDA has ever gone back
4   to a manufacturer submitting an NDA and asked them to
5   do additional analysis in their post-marketing section?
6        A       Yes.
7        Q       Page 17.  Are you aware of any times that a
8   black box has been required for a drug without an
9   epidemiologic study of some kind?
10       A       Could you say that again, please.
11       Q       Sure.  It's a bad question.
12               You said this gives the FDA the regulatory
13  authority to require a boxed warning based on animal
14  data alone when human data are not available.
15               Did I read that correctly?
16       A       Yes, this is directly -- and the quote is
17  directly taken from the CFR.
18       Q       I understand.  Thus in some situations the
19  FDA may decide to warn about a particular risk
20  identified in animal data even if there is no evidence
21  that is applicable in humans when they believe that
22  such a warning will serve the public health.  Did I
23  read that correctly?
24       A       Yes.
25       Q       Do you know of any times when the FDA has

175

1   required a black box without animal data and without --
2        MR. BARNES:  Without animal data.
3        Q       Without animal data and without
4   epidemiology or epidemiologic studies?
5        A       Do you include clinical trials within
6   epidemiologic studies?
7        Q       Yes.
8        A       So you're saying a black box warning with
9   no human data and animal data.
10       Q       No, based on post-marketing?
11       MR. BARNES:  Why don't you ask your
12  question.
13       Q       Do you know of the FDA ever required a
14  black box based solely upon case reports?
15       A       I believe they did for Felbamate.  There's
16  one example.  It had a very rare and unique adverse
17  event.
18       Q       What about Fenfluramine?
19       A       Fenfluramine.
20       MR. BARNES:  If you know.
21       A       I'm not really sure.
22       Q       What about Baycol?
23       A       I'm not up on that one.
24       Q       Section C.  Last sentence, there is ample
25  evidence in this case that FDA would only consider

176

1    randomized clinical trial data to assess whether AEDs
2    are associated with supplemental report?
3              MR. BARNES:  Page?
4        Q    Same page.
5        A    Right here.
6              MR. BARNES:  Reading.  I'm sorry.  Go
7    ahead.
8        Q    What is the basis of that sentence?
9        A    The basis of that is if you go and look at
10   the transcript, you'll see Katz very specifically say
11   that we couldn't use the data from the spontaneous
12   reports and they specifically ask the companies not
13   just for clinical trial data but for the
14   placebo-controlled, the controlled clinical trial data.
15       Q    Okay.  Page 18.  By the way, 201.57(e)
16   here, which version did you use?
17       A    201.57.
18       Q    Page 17?
19             MR. BARNES:  If you know.
20       A    I think it should be in the reference list.
21   I tried to be very specific.
22       Q    I think you say here the April 1st, 2008
23   edition, correct?
24       A    I'm looking.
25       Q    The first item?

177

1        A    Yes.
2        Q    Were you aware there was substantial
3    changes to section 201 in June of 2006?
4        A    I didn't go into a historical evaluation,
5    no.  I just looked at the most recent version.
6        Q    In 2017.57(e) I think we discussed this
7    earlier whether a statistical association was required
8    in order to change the label, do you remember that
9    earlier?
10       A    Excuse me?
11       Q    Do you remember discussing earlier whether
12   a statistical association was required in order to
13   change a label?
14       A    That was one of the questions you posed to
15   me.  Yes, I do remember that.
16       Q    You said you did not think you had to have
17   a statistical association to change the label; is that
18   correct?
19       A    Based on what I read, FDA has quite a bit
20   of discretion on what it is that they can use as a --
21   evidence to ask for a labeling change.
22       Q    What about for the company to change the
23   label?
24       A    I'm not as familiar with what the company's
25   rules are for labeling changes and the regulatory

178

1    issues.
2        Q    Are you aware that there are certain
3    obligations and certain times that the company must
4    change the label?
5        A    Like I said I'm really not an expert on
6    that regulations for labeling.
7        Q    Okay.  So when you quote Dr. Blume, it is
8    not universally necessary to employ the various methods
9    of epidemiology to establish whether there's an
10   association between a drug and a risk.  That
11   association there could be in the context in which the
12   FDA uses it within the regulations, correct?
13             MR. BARNES:  Objection.  Vague.  Lack of
14   evidentiary foundation.
15       A    All I'm saying here is that in Blume she
16   misquotes and misstates what the Federal Register
17   actually says.
18       Q    Federal Register or Federal Regulations?
19       A    Code of Federal Regulations.
20       Q    Bear with me a second here.  Let's make
21   sure we get this right.
22             In the CFR prior to the changes in 2006,
23   the sentence says --
24             MR. BARNES:  Wait, changes prior to 2006?
25             MR. ALTMAN:  Prior to June of 2006 the

179

1    language changed.
2        Q    Part of the regulation says:  In accordance
3    with 314.70 and 601.12 of this chapter, the labeling
4    must be revised to include a warning about a clinically
5    significant hazard as soon as there is reasonable
6    evidence -- I'm sorry, I'm reading the wrong one.
7    Strike that.  Let me read you the correct one.
8              MR. BARNES:  You may want to just -- you
9    may want to have her read it rather than read it to
10   her.  It's very difficult to follow reading it.  Try
11   your best.  We can pull it for you, if you want.
12       Q    The labeling shall --
13             MR. BARNES:  Would you tell me what you're
14   reading from and the date of the regulation, please.
15   She says she hasn't gone back and done a history, we'll
16   have to listen to what it is.
17       Q    This is the 4/1/2006 edition of 201.57?
18             MR. BARNES:  Subsection.
19             MR. ALTMAN:  It's 201.57(e).
20             MR. BARNES:  4 April 2006.
21       Q    Correct.  The labeling shall be revised to
22   include a warning as soon as there is reasonable
23   evidence of an association of a serious hazard with a
24   drug.  A causal relationship need not have been proved.
25             Do you understand what they say here?

180

| | |
|---|---|
| 1    A    Uh-huh. | 1  within a regulatory context as the FDA has it here, it |
| 2    Q    Is the word statistical association | 2  does not necessary imply there's a statistical |
| 3  anywhere? | 3  association required, correct? |
| 4    A    There's word association, yes. | 4    A    No, that's not correct. |
| 5    Q    There's not the word statistical | 5    Q    So is it your opinion that the FDA requires |
| 6  association, correct? | 6  a statistical association to make a labeling change? |
| 7    A    What else is an association? | 7        MR. BARNES:  How much time do you have? |
| 8    Q    There are -- the FDA has required changes | 8        THE VIDEOGRAPHER:  Two minutes. |
| 9  to the warning without any kind of statistical | 9        MR. BARNES:  Take a break now. |
| 10  analysis, correct? | 10    Q    We have a question on the table first so |
| 11        MR. BARNES:  Objection.  If you know. | 11  why don't we -- |
| 12    A    I don't know if the changes were devoid of | 12    A    Repeat the question. |
| 13  any type of statistical analysis.  I can't make that | 13        MR. BARNES:  Repeat the question.  I'm |
| 14  assumption.  But that's not what I'm talking about here | 14  sorry. |
| 15  on page 17 of my report.  I'm talking about the fact | 15    Q    Okay.  So is it your opinion that the FDA |
| 16  that Dr. Blume quoted it out of context. | 16  requires a statistical association to make a labeling |
| 17    Q    Well, Dr. Blume says it is not universally | 17  change? |
| 18  necessary to employ the various methods of epidemiology | 18    A    I already said that there have been |
| 19  to establish that there is an association between a | 19  labeling changes based on things other than statistical |
| 20  drug and a risk? | 20  associations. |
| 21    A    How else do you know if there's a | 21        However, Dr. Blume is saying it's not |
| 22  statistical association.  Association means, | 22  necessary to use epi to establish whether or not |
| 23  statistical association between a drug and a risk if | 23  there's an association between a drug and a risk. |
| 24  you don't do a study.  Whether it be a clinical trial | 24        I don't know how the heck you can do that |
| 25  or an observational study.  And the CFR doesn't talk | 25  without using some type of epidemiologic method, be it |

| | |
|---|---|
| 1  about that.  It talks about labeled warnings and | 1  experimental or observational.  That's different from a |
| 2  clinical versus, i.e. human data, versus animal data. | 2  label. |
| 3  So it makes -- it's a non sequitur as far as I'm | 3    Q    Okay. |
| 4  concerned. | 4        MR. BARNES:  We should probably break. |
| 5    Q    I'm sorry, we're on page 18 that we're now | 5        THE VIDEOGRAPHER:  Going off the record. |
| 6  talking about. | 6  The time is 2:42 p.m.  This is the end of tape number |
| 7    A    17, right? | 7  4. |
| 8    Q    No, we're on 18. | 8            (Off the record.) |
| 9        MR. BARNES:  Why don't -- you jumped from | 9        THE VIDEOGRAPHER:  We're on the record. |
| 10  17 to 18 now.  Why don't you direct her where you are. | 10  The time is 2:57 p.m.  This is the beginning of tape |
| 11    Q    On page 18 there is, it is not universally | 11  number 5. |
| 12  necessary to employ the various methods of epidemiology | 12  BY MR. ALTMAN: |
| 13  to establish whether there is an association between a | 13    Q    We were talking about the meaning of the |
| 14  drug and a risk. | 14  word association and one of the things I want to get |
| 15        We talked before about companies have | 15  some clarification on I guess right above the double |
| 16  changed labels in the absence of any kind of a | 16  quotes, the case reports.  You have a sentence, to test |
| 17  statistical analysis based upon case reports, correct? | 17  for an, and in parentheses, statistical association |
| 18    A    That is what I address in number -- in page | 18  requires statistical test? |
| 19  17. | 19    A    Where are you? |
| 20    Q    We're not talking about black boxes.  We're | 20    Q    I'm on page 18 towards the bottom.  Right |
| 21  talking about labels have been changed based upon case | 21  above the big quote.  The sentence right above the big |
| 22  reports, correct? | 22  quote. |
| 23    A    Labeling has been changed in some cases | 23    A    To test for statistical association |
| 24  based on case reports, yes. | 24  requires a statistical test.  Yes. |
| 25    Q    So when Dr. Blume uses the word association | 25    Q    And you were pretty clear -- you didn't |

1   just say to test for a statistical association, you put

2   statistical in parentheses, correct?

3      A   Yes.  Because the word association has been

4   thrown out without putting statistical in front of it,

5   I wanted to make that point, yes.

6      Q   You have a citation there from Strom, which

7   is I believe Dr. Brian Strom, correct?

8      A   That is correct.

9      Q   And I guess that's Pharmacoepidemiology,

10   the fourth edition we're probably talking about here,

11   2005?

12      A   It's in the back.  It's the most recent

13   version.

14      Q   The quotation that you put there is:

15   Certainly one cannot usually determine whether the

16   adverse event outcome was due to the drug exposure or

17   would have happened anyway.  Did I read that correctly?

18      A   That is correct.

19      Q   What he's saying there is that sometimes

20   you can tell, correct?

21      MR. BARNES:  Objection.  Misstates what it

22   says.

23      A   It says, usually that is not the case.

24      Q   That doesn't mean always, correct?

25      A   There are rare, unique circumstances in

185

---

1   which you may be able to link a drug to a disease.

2   They're usually very unique events that are very, very

3   rare, like one in a million, that often they're almost

4   always associated with a drug effect.  They have very

5   low background rates.  Like Steven Johnson syndrome.

6   But otherwise it's -- we like to find the one unique

7   case, but in the most part he is correct, it is usually

8   not the case.

9      Q   So with all of those your answer is yes,

10   sometimes -- usually does not mean always, correct?

11      MR. BARNES:  Objection.  Asked and

12   answered.  She's responded.  Answer it again.

13      Q   That's okay.  I'll move on.

14      Page 19.  Third paragraph you say:

15   Individual case reports involving patients who were

16   dechallenged, parentheses, taken off the medication,

17   closed parentheses, and the reaction resolved and

18   subsequently rechallenged, put back on the

19   medication and the reaction occurred, closed

20   parentheses, may in rare circumstances provide evidence

21   of a causal relationship between the drug and an

22   adverse effect.  Did I read that correctly?

23      A   Yes.

24      Q   Did you actually review any of the case

25   report forms from any of the clinical trials as part of

186

---

1   your review of materials in this case?

2      A   No, I did not.

3      Q   The bottom paragraph that starts in

4   paragraph 29.  I believe it's the fourth line, it says:

5   Because there is no placebo group, there is no basis to

6   evaluate benefits and risks.  Did I read that

7   correctly?

8      A   Yes.

9      Q   Are you aware that the FDA will not allow

10   you to use open label uncontrolled studies to

11   demonstrate efficacy but does use uncontrolled studies

12   to evaluate risks?

13      MR. BARNES:  Objection.

14      A   Can you repeat that, please.

15      Q   Are you aware as to whether the FDA will

16   allow you to use uncontrolled studies to evaluate

17   risks?

18      A   It is my understanding that all the

19   clinical data, controlled and uncontrolled, gets put

20   into a safety summary for an NDA.  So both -- all

21   clinical data is discussed and looked at for potential

22   events.

23      Q   Well, you say here because there is no

24   placebo group there is no basis to evaluate benefits

25   and risks and we're talking about uncontrolled studies,

187

---

1   correct?

2      A   Right.  There is no way to see if there's

3   statistical association between the certain outcome, be

4   it beneficial or harmful and drug exposure.

5      Q   Is it your position the only way to assess

6   whether there's a risk in a drug is through a

7   statistical association?

8      A   That's not what I said.  I said there's no

9   way to test for a statistical association if you don't

10   have a comparison group, an unexposed group.

11      Q   Okay.  Page 20.  Opinion four.  Using the

12   published and accepted methods for calculating PRR,

13   there was no signal of disproportional reporting, SDR,

14   for reports of completed suicide with Neurontin until

15   2005 and suicide attempt until 2006.

16      Did I read that correctly?

17      A   Yes, that's what I wrote.

18      Q   This is consistent whether compared to a

19   background rate of all drugs or the antiepileptic drugs

20   in the FDA analysis.  Did I read that correctly?

21      A   Uh-huh.

22      Q   There was no SDR for suicide attempt when

23   compared to other ADEs to date.  Did I read that

24   correctly?

25      A   That's correct.

188

1     Q     Based on my analysis of the evidence,
2  Pfizer is correct in concluding that it did not see a
3  signal for suicidality with Neurontin in the adverse
4  event reports.  Did I read that correctly?
5     A     Yes.
6     Q     Let's take that last sentence there.
7           MR. BARNES:  This is like the first
8  sentence we talked about earlier?
9           MR. ALTMAN:  No.  This is a different
10 sentence and a different opinion.
11          MR. BARNES:  Okay.  This is separate from
12 the question one, okay.
13          MR. ALTMAN:  This is different opinion.
14    A     Can I clarify --
15    Q     Sure.
16    A     -- that opinion one also?
17    Q     Sure.
18    A     I want to make sure before we go into very
19 similar issue.  Where is opinion one.  Opinion one I'm
20 addressing FDA meta-analysis which I had said are the
21 FDA meta-analysis does not show a significant
22 association for Neurontin.
23          So what I'm saying is taking that and all
24 the previous information, which I cover in my first
25 report, there's no basis for saying that there's an

189

1  association or signal with Neurontin and suicidality.
2           So adding, what I'm trying to explain is
3  adding the FDA meta-analysis does not give you anything
4  new.  So I want to clarify that because it also relates
5  to this.
6     Q     I still want to clarify, though, that your
7  statement as to signal is related to data mining,
8  correct?
9     A     In which one?
10    Q     Either one.
11    A     There's is nothing in data mining, there's
12 nothing in the meta-analysis.  I can't find any in the
13 clinical trials.  I can't find anything in the
14 epi-literature that would suggest that there's a
15 signal.  There's definitely no statistical
16 associations.
17    Q     But you didn't review the case report forms
18 from the clinical trials, correct?
19    A     No, but I understand they were reviewed by
20 experts and then submitted to the FDA for their
21 meta-analysis.
22    Q     But once again, though, what I'm getting at
23 is you did not -- your statement, though, is limited to
24 a data mine review of the spontaneous adverse event
25 reports of an FDA meta-analysis, correct?

190

1     A     And also all the other reports and
2  literature, for example, the Patel, I relied on that,
3  EMEA report.  There's a number of other reports of
4  clinicians who have evaluated the individual case
5  reports.
6     Q     Well, those were all done in response to
7  the FDA suicide inquiry, correct?
8     A     I'm not sure why they were all done.  So I
9  can't make that assumption.
10    Q     Are any of the reports from the
11 Warner-Lambert, Parke-Davis, did you review any
12 documents from Warner-Lambert, Parke-Davis?
13    A     I don't recall who was the author or what
14 period of time at this point.  I can't remember.  I
15 don't recall.
16    Q     Did you review -- just appearing from your
17 list here I don't see that you reviewed -- strike that.
18          The response to the EMEA was substantially
19 the same as the response to the FDA, correct?
20          MR. BARNES:  Which one, the Parson's report
21 in '04?
22    Q     We're all talking about reports
23 from '04, '05, '06, correct?
24          MR. BARNES:  That's what I'm making sure.
25    Q     That's what I'm trying to get at.  We're

191

1  not talking about some analysis that was done before
2  the FDA first called Pfizer, correct?
3     A     Well, we're talking about adverse event
4  reports that were coming in since the beginning of the
5  drug approval, so.
6     Q     I understand but did you read --
7     A     They're summarizing all the data from day
8  one.
9     Q     Did you read any -- what I'm interested in,
10 did you read any particular document that shows the
11 company had reviewed suicidality overall in a time
12 period before the FDA first called them in the
13 beginning of 2004?
14    A     In 2004.  I'd have to go back.  I don't
15 recall.
16          MR. BARNES:  Certainly to the extent that
17 she relied on or considered it would be in her
18 references reviewed.  Certainly 2004, 2005, 2006 time
19 period she has cited those and discussed them at length
20 in her first report.
21    Q     I mean, frankly, what I'm trying to get at
22 is if there was something in let's say 1995 or 1996
23 timeframe that was not related to a data mining
24 evaluation that suggested there was a problem, you
25 didn't review any of that information, correct?

192

| | |
|---|---|
| 1    A    I didn't see anything. | 1    Did I read that correctly? |

**Column 1 (page 193):**

1    A    I didn't see anything.

2    Q    Did you look?

3    A    Did I look?  Did I go through boxes of

4    company documents?  No, I did not go through boxes of

5    company documents.  I don't recall seeing any

6    information at all.

7    Q    And you also, I think, said in the --

8    outside of the context of a data mining finding or a

9    statistical meta-analysis and things like that you're

10   not qualified to review the clinical information to see

11   if there's something there suggestive that there's a

12   problem, correct?

13   A    I can review the epidemiology and tell you

14   about the study.  I can look at the data mining, but I

15   am not a clinician.

16        (Conference call interruption.)

17   Q    So, for example, if there was a case series

18   in 1994 or 1995 that suggested there could be a

19   problem, you didn't review a case series to see if

20   there was really a problem there, correct?

21        MR. BARNES:  Objection.  Assumes facts not

22   in evidence.  You may answer.

23   A    If hypothetically there were such a series,

24   I would not be evaluating it.

25   Q    Okay.

193

**Column 2 (page 195):**

1    Did I read that correctly?

2    A    Yes.

3    Q    You cite there to a document Woodcock J.

4    2002, correct?

5    A    Yeah, Janet Woodcock gave the talk about

6    the periodic.

7    Q    Once again, the way you've done it here is

8    would a reasonable reader conclude that the FDA

9    sentence comes from Janet Woodcock's report?

10   A    I didn't put quotes on it.

11   Q    But the concept of that, you're citing to

12   something, you're attributing that to something.  What

13   part of what I just read are you attributing to Janet

14   Woodcock?

15   A    That they stopped entering manufacturer's

16   periodic reports.

17   Q    Well, you say nonserious adverse event

18   reports?

19   A    Yes.  The nonserious periodic.  It's very

20   unclear from the FDA if there's any rhyme or reason to

21   what they do and don't when they started AERS.

22   Q    I'm going to mark the next exhibit which I

23   believe is 23.

24        (Whereupon, a document was marked as

25   Deposition Exhibit Number 23.)

195

---

12/22/2008 Weiss-Smith, Sheila

**Column 1 (page 194):**

1    A    Clinically, that's not my expertise.

2    Q    And that's why I'm just trying to

3    understand.  When you say there was no signal, you're

4    basing that just upon the adverse event, a data mining

5    finding or the meta-analysis kind of thing?

6        MR. BARNES:  Or the 2004, 2005, 2006

7    reports to the FDA.

8    Q    Correct.

9    A    I'm basing it on my review of all the

10   information that I reviewed from the reports of the

11   safety summary, my evaluation of the AERS data, the

12   epidemiological literature, the FDA meta-analysis.

13   There's quite a lot of documents I reviewed.  So all of

14   these.

15   Q    Okay.  That's fine.

16        The first paragraph there?

17        MR. BARNES:  Page 18 again?

18   A    No, we're on page 20.  First full

19   paragraph.  You make the statement:  These include, but

20   not limited to, a change in the dictionaries used to

21   code adverse events from COSTART to MedDra, a lifting

22   of limits on the number of adverse event terms that

23   could be listed on each adverse event report, and not

24   entering periodic manufacturers nonserious adverse

25   event reports into the database.

194

**Column 2 (page 196):**

1        MR. ALTMAN:  It's really not necessary to

2    read the whole thing.

3        MR. BARNES:  Well, if she feels like she

4    needs to read it, she can read it.

5        MR. ALTMAN:  I just want to point her to

6    one particular paragraph which is where her citation

7    comes from.

8        MR. BARNES:  I'm not sure she's cited a

9    precise page.

10   BY MR. ALTMAN:

11   Q    Well, could you please go to page five of

12   nine.  Do you see where it says adverse event reports?

13   A    Hang on.  I'm getting there.  Okay.

14   Q    She talks about the adverse event reporting

15   system, correct?

16   A    Yes.

17   Q    There's the sentence about five lines down

18   that says presently, do you see that?

19   A    Yes.

20   Q    It says:  Presently all manufacturer

21   reports of serious events and all direct reports are

22   entered into AERS database.  Did I read that correctly?

23   A    Yes.

24   Q    It says:  Nonserious manufacturer reports

25   are not usually entered into AERS.  Did I read that

196

1    correctly?

2         A    Yes.

3         Q    Is that the same as saying they're not

4    entered into AERS?

5         A    I could have been a tad more precise.  I

6    have been trying for quite awhile now to see if there's

7    any specific, what do you call it, system that they've

8    set up on what gets entered and what doesn't get

9    entered.

10        It appears to me that they just stopped

11   with AERS entering reports because they just didn't

12   have the resources.  So it's not clear what they're

13   entering and what they're not.  But they are not

14   entering usually, so I'm not quite sure usually means,

15   they're not entering every periodic manufacturer's

16   report.

17        Q    Did you ever run an inquiry through Q Scan

18   on your own to see if there are any periodic nonserious

19   reports in the FDA database?

20        A    There are.

21        Q    If I told you that there were several

22   hundred thousand periodic nonserious adverse event

23   reports, do you have any basis to dispute that?

24        A    Under what time period?

25        Q    In the AERS era?

197

1         A    In the AERS --

2         Q    AERS.

3         A    -- there are.

4         Q    -- several hundred thousand?

5         A    There are, exactly.  So it's not that they

6    don't enter -- they enter some of them.  They don't

7    enter all of them.

8         In fact, it's changed where the periodic

9    reports used to be the majority of reports and now

10   there are significantly less periodic reports than

11   there are expedited reports.

12        It's actually shifted.  I don't mean to say

13   that they don't enter any individual periodic reports.

14   But they don't enter all of them.

15        Q    That's a reasonable interpretation what you

16   wrote in your expert report, correct?

17        MR. BARNES:  What is a reasonable

18   interpretation?

19        Q    That they don't, when you say and not

20   entering periodic manufacturer's nonserious adverse

21   event reports into the database.  Somebody reading that

22   would take that they don't enter nonserious reports in

23   the database, correct?

24        MR. BARNES:  Objection.  Calls for

25   speculation.  It's a state of mind of others.

198

1         Q    Is that a reasonable interpretation --

2         A    No.

3         Q    -- of that sentence?

4         A    That's not what I meant.  I could have been

5    more explicit.  But no, I did not say they don't enter

6    any.

7         Q    Would somebody reading this know that you

8    didn't mean that they don't enter any?

9         MR. BARNES:  Same objection as to the state

10   of mind.

11        A    I don't know.  I don't know what someone

12   would interpret.

13        Q    But we can agree that the nonserious

14   reports that are in there -- it's not consistent as to

15   when they go in?  You said yourself you haven't been

16   able to find the pattern of when they go in and when

17   they don't go in?

18        A    I know they stopped entering them and then

19   they started encouraging companies to ask for waivers

20   for having to report individual reports.  So many

21   companies now have waivers by NDA to not have to give

22   individual reports.  They just give periodic safety

23   summaries of the reports.

24        Now, the FDA might also get reports from

25   companies that don't have waivers and choose not to

199

1    enter it.  It doesn't seem to be a hard fast rule.  I

2    believe they tried to enter the ones for newer drugs

3    and leave the ones for the older drugs.  It's been

4    prioritized.  But, again, there is no published hard

5    and fast rule of what they're entering and what they're

6    not entering.

7         Q    So if one was going to do an analysis of --

8    that could involve proportional reporting, could it

9    substantially bias the analysis by including nonserious

10   reports when it's completely unclear as to some

11   companies send in nonserious reports, some companies

12   don't send in nonserious reports that may come from

13   different sources?

14        A    There are so many sources of bias in

15   evaluating AERS data that may be, depending on what

16   the outcome is that you're looking at.

17        MR. ALTMAN:  Objection.  Nonresponsive.

18        Q    I'm asking going to ask you very

19   specifically.

20        If some companies send in nonserious

21   reports and some companies don't -- if one company

22   sends in nonserious reports and another company didn't

23   send in the nonserious reports, and you calculated the

24   percentage of -- of a particular adverse event over the

25   total number of reports, that could substantially bias

200

1  those findings if companies had differential reporting,
2  correct?
3      A       What you are doing with the percentages, I
4  think that's going to depend on whether or not you're
5  going to see a bias.
6      Q       If you're comparing the percentage of a
7  certain adverse event report from one drug to that of
8  another drug and one manufacturer submits nonserious
9  reports and the other one does not submit nonserious
10  reports, can that alter what you see?
11     A       Depending on many issues, including what is
12  the event that you're looking at.  So if you're looking
13  at a serious event this may be moot.
14     Q       But if you're comparing the total number of
15  adverse events, won't you have more potentially more
16  adverse events for one, including all the nonserious
17  reports than for the other?
18     A       There's many more things that impact
19  reporting and reporting rates that can give you bias.
20  Including how long the drug has been on the market, for
21  example.  Whether there's notoriety bias.  How the drug
22  is used, the population, the sales.  So there's so many
23  issues.  Anything can bias.  I don't say anything, but
24  there's so many things that can bias the numbers.
25          MR. ALTMAN:  Objection.  Nonresponsive.

201

1      Q       Let's do a concrete example.
2          Drug A has 10 reports of suicide out of
3  100, serious reports.  Drug B has 10 reports out of --
4  of suicide out of a thousand reports?
5          MR. BARNES:  Serious reports.
6      Q       Of which 900 of them are nonserious.
7  What's the percentage for the first drug, 10 out of
8  100, what's that percentage?
9          MR. BARNES:  Objection.  Assumes facts not
10  in evidence.  Incomplete hypothetical.  If you can
11  answer that, go ahead.
12     A       You're losing me here.
13     Q       If 10 out of 100 serious reports are
14  suicide for one drug, what's that percentage of reports
15  that are suicide?
16     A       10 divided by -- what did you say 100?
17     Q       100.
18     A       So you're talking about 10 percent of the
19  reports.
20     Q       Now, if another drug has a thousand -- 10
21  suicides also but has a thousand reports of which 900
22  of them are nonserious, but you don't take that into
23  account, what percentage is 10 out of a thousand?
24          MR. BARNES:  Objection to the --
25     A       That doesn't make sense because then I

202

1  would be comparing apples and oranges.
2      Q       It's the same -- I'm sorry.
3          MR. BARNES:  Go ahead.  I have an
4  objection.  The objection is, are you stating that
5  there are -- there were nonserious reports of suicide
6  which by definition is death?
7      A       No.  Total number of reports for that
8  particular drug there's a thousand of them, of which
9  900 of them are nonserious and 100 of them are serious
10  because they send in nonserious reports.  If you don't
11  take the serious and nonserious issue into account,
12  what percentage of the reports, 10 out of a thousand,
13  do you get?
14          MR. BARNES:  Objection.  Assumes facts not
15  in evidence.  Incomplete hypothetical.
16     A       But the thing is it doesn't make sense
17  because you haven't told me anything else.  What about
18  direct reports.  You're going to get serious and
19  nonserious direct reports.
20     Q       There's a total of a thousand reports for
21  that particular drug, 100 of which are serious and 900
22  are nonserious.  If you have 10 suicides and you look
23  at the total number of reports, what percentage of the
24  reports is 10 over a thousand?
25     A       10 over a thousand, very specifically, is

203

1  one percent.
2      Q       Now, if you only looked at serious reports
3  it's 10 over 100, what percentage is that?
4      A       I can tell you the percentage, the number,
5  you mean just do 10.  10 out of 100 is 10 percent.
6      Q       So if I compare drug A, which was
7  10 percent, to drug B when I don't take -- when I leave
8  the nonserious reports in, it looks like drug A has
9  10 percent of its reports are suicide and drug B has
10  1 percent of its reports are suicide, correct?
11     A       Wait a second.  This is very hypothetical.
12  I can tell you 10 divided by is 100 is 10 percent.  One
13  divided by a thousand -- 10 divided by a thousand is
14  1 percent.
15          I'm not comparing drugs.  You're comparing
16  drugs.  I wouldn't just do that.  That's why I have to
17  say that's why I did my PRR for the entire background
18  because I don't -- then you have it all averaged out
19  across all the drugs.  So that gives you the more
20  stability.
21          That's why you don't necessarily present
22  this proportion and this proportion.  You do
23  proportional reporting rate.  So you know your numbers
24  are off.  You hope that you have bias is random bias.
25  And therefore you divide and you have a stable estimate

204

1 of the effect.  That's why you don't present

2 proportions.

3          MR. ALTMAN:  Objection.  Nonresponsive.

4 I'll ask it a different way.

5      Q      If a drug has a thousand adverse event

6 reports, 900 of which are nonserious and 100 of which

7 are serious and has 10 suicides, overall what

8 percentage of the adverse event reports is that 10 out

9 of a thousand?

10     A      10 out of a thousand is 1 percent.

11     Q      If you only look at the serious reports of

12 10 out of 100, what percentage of that?

13     A      10 out of 100 is 10 percent.

14     Q      There's a difference between those two

15 things whether you look at the nonserious reports or

16 not, correct?

17     A      This is all very hypothetical --

18     Q      If you include the nonserious reports, does

19 that change the percentage?

20          MR. BARNES:  Objection.  Completely

21 hypothetical.  Go ahead.

22     A      It's so hypothetical.  I mean, the context

23 of which you're comparing two drugs is really,

24 really -- I wouldn't just say oh, I'm going to compare

25 these two drugs.  It's -- there's so many other factors

205

1 that need to be taken into consideration and I would be

2 really suspect to compare two drugs.  Were they

3 approved in the same time period, are they used for the

4 same use, do they have the same indications, do they

5 have the same type of populations using the drugs.

6 There's so many issues.

7          MR. ALTMAN:  Objection.  Nonresponsive.

8      Q      If you include the nonserious reports for

9 that particular drug, does it change the percentage?

10     A      If you include --

11     Q      If you find the percentage of all reports,

12 including the nonserious reports, do you get a

13 different percentage and if you only get the percentage

14 just using the serious reports?

15     A      How can you use the serious reports if

16 they're not in the -- the nonserious reports if they're

17 not available.

18     Q      I'm not asking, this hasn't got anything to

19 do with the FDA.  I'm just telling you for a given

20 drug, there's a thousand reports, 900 -- let's try it

21 one more time.

22          Drug has 900 nonserious reports and 100

23 serious reports and 10 suicides.  If you take the

24 percentage of all reports, what percentage do you get?

25     A      We just said that, 10 divided by a

206

1 thousand.

2      Q      Is?

3      A      Is -- now I'm getting tired, 1 percent.

4      Q      If we only use the serious reports, we have

5 10 over 100, correct?

6      A      Wonderful.

7      Q      What percentage is that?

8      A      That's 10 percent.

9      Q      And 10 percent is different than 1 percent,

10 correct?

11     A      I would agree with you there.  10 percent

12 is not 1 percent.

13     Q      So including the nonserious reports in your

14 calculation changes the percentage, correct?

15     A      I would assume that all suicides are

16 serious.

17          But if you calculate --

18          MR. BARNES:  Let her finish her answer.  Go

19 ahead.

20     A      That's all.  All suicides are serious.

21     Q      We're not talking about the numerator,

22 we're talking about the denominator.

23          If you change your denominator, your

24 numbers will change, that is correct.

25     Q      So if you don't use the nonserious reports

207

1 you get a different percentage than if you use the

2 nonserious reports, correct?

3      A      If you use them and if you don't use them.

4 They're either there or they're not there.

5      Q      Well, suicide is serious?

6      A      Absolutely.

7      Q      Getting rid of the nonserious reports is

8 not going to change your numerator, correct?

9      A      I don't believe it would.

10     Q      So you're going to get a difference whether

11 you include the nonserious reports or not?

12     A      If you change your denominator you'll get a

13 different number.

14     Q      Now, if you're comparing groupings of

15 drugs, if you want, not individual drugs.  If your

16 denominator sometimes contains nonserious reports and

17 sometimes does -- sometimes contains nonserious reports

18 and sometimes doesn't contain nonserious reports, can

19 that bias your comparisons between the two because of

20 that?

21          MR. BARNES:  Objection.  Vague.

22     Q      Purely because of the existence of

23 nonserious reports in the database?

24          MR. BARNES:  Objection.

25     Q      I'm not talking about any other biases?

208

| | |
|---|---|
| 1    MR. BARNES:  Objection.  Vague.  If you can | 1    an e-mail dated March 15th, 2001 from Lester Reich to |
| 2    answer that, go ahead. | 2    Manfred Hauben. |
| 3        A    I'm not sure I can.  There's just so many | 3        Q    You're obviously taking some time to review |
| 4    things that are happening in the data and this is just | 4    it.  Why don't you go ahead and do that. |
| 5    one of many, many things in the data that can, you | 5        (Witness reading.) |
| 6    know, anything can change the numbers.  That's why it's | 6        A    Okay. |
| 7    called data mining. | 7        Q    Have you had a chance to review this |
| 8        Q    Okay.  Do you have any evidence that | 8    document? |
| 9    Pfizer, Parke-Davis or Warner-Lambert before Pfizer, | 9        A    Sure. |
| 10   purchased or did any kind of data mining? | 10       Q    Have you ever seen this document before? |
| 11       A    I haven't reviewed any of their SOPs.  I'm | 11       A    No, I haven't. |
| 12   not quite sure what they did. | 12       Q    Do you know whether any of the other |
| 13       Q    Aside from SOPs, did you see any evidence | 13   experts in this case were provided with this document? |
| 14   in any documents that they did any data mining? | 14       A    I don't know. |
| 15       MR. BARNES:  Vague as to data mining.  This | 15       Q    Would you please read in -- I'd like you to |
| 16   is using mining a FDA database or their own database. | 16   read for the record the first sentence under objective. |
| 17       A    Data mining.  We have been talking about | 17       A    With the post marketing use of Gabapentin |
| 18   data mining all day. | 18   in patients other than with epilepsy it is important to |
| 19       A    The only one I'm aware of is I know Manfred | 19   identify whether these new populations may be |
| 20   Hauben is very well-respected in the field of data | 20   particularly susceptible to specific adverse drug |
| 21   mining.  He's published extensively and he works for | 21   effects both labeled and unlabeled and to identify |
| 22   Pfizer so, therefore, I would assume -- | 22   conditions under which specific adverse events may be |
| 23       MR. BARNES:  Don't assume. | 23   more likely to occur in these new patient populations. |
| 24       A    -- that he does data mining, but I don't | 24       Q    Do you agree with that statement? |
| 25   know within any one drug what they do.  I'm not privy | 25       A    Yes. |

| | |
|---|---|
| 1    to their protocol. | 1        Q    Were you aware that at this time the |
| 2        Q    Did you see any documents that suggested | 2    company was in the process of seeking approval for its |
| 3    Pfizer had done any data mining? | 3    neuropathic pain indication? |
| 4        A    In this case, no, I have not. | 4        A    I don't have any date on this.  I don't |
| 5        Q    I'm going to mark Exhibit No. 24. | 5    know what the time period is. |
| 6        (Whereupon, a document was marked as | 6        Q    It's March of 2001? |
| 7    Deposition Exhibit Number 24.) | 7        MR. BARNES:  What's your question again, |
| 8        MR. BARNES:  Counsel, if you could, this is | 8    Counselor? |
| 9    an incomplete document.  Do you have the full document | 9        Q    Were you aware that at this time the |
| 10   for us to review? | 10   company was in the process of seeking approval for its |
| 11       MR. ALTMAN:  This is a complete document, I | 11   neuropathic pain indication? |
| 12   believe. | 12       A    I wasn't involved in this in 2001. |
| 13       MR. BARNES:  Are you sure? | 13       MR. BARNES:  No, the question is:  Were you |
| 14       MR. ALTMAN:  I'm pretty sure it is.  It's a | 14   aware that at this time the company was seeking |
| 15   document marked Manfred.  It's a three-page document | 15   approval for a neuropathic pain evaluation.  If you're |
| 16   marked Pfizer, underscore, MHauben, H-A-U-B-E-N, | 16   aware. |
| 17   underscore 0000123. | 17       A    No, not necessarily, no. |
| 18       Q    Do you have a date on this | 18       Q    Why don't you go down, skip the next |
| 19   document?  It's a document without a date. | 19   sentence.  Why don't you read the next -- well, you |
| 20       MR. BARNES:  I can probably look to the | 20   know what, read the next sentence.  Why don't we read |
| 21   document before. | 21   the next two sentences, that will take care of it |
| 22       MR. BARNES:  I think it's probably a | 22   starting with the development. |
| 23   document that comes with other documents.  It should | 23       A    The development of the safety profile of |
| 24   give us a reference to a date and time. | 24   any drug product is an evolving process. |
| 25       MR. ALTMAN:  It appears to be attached to | 25       Q    Do you agree with that sentence? |

12/22/2008 Weiss-Smith, Sheila

1    A    Sure.

2    Q    Read the next sentence.

3    A    As with any marketed drug in order to

4  provide guidance for the safe and judicious use of

5  Gabapentin for the specific clinical application which

6  we are seeking in the United States, neuropathic pain,

7  accumulation and analysis of the broader population's

8  safety experience is critical for the ongoing

9  development of an accurate safety profile.

10    Q    Why don't you read the next sentence.

11    A    The intent of this review is to summarize

12  the experience of the overall population using the ICH

13  pharmacovigilance safety update report format with

14  additional focused reviews of selected events for

15  potential signals which might be of particular

16  relevance to the neuropathic pain population.

17    Q    Does this document stand for the

18  proposition that there may be adverse events that will

19  affect certain populations differently than other

20  populations?

21         MR. BARNES:  Objection.  If you know.

22    A    I don't see that in what I read.

23    Q    Were they expressing a concern that maybe

24  there are signals that may be particular to a certain

25  population using their drug?

---

1    A    Say that again, please.

2    Q    Does this document suggest that they wanted

3  to review to see if there were potential signals which

4  might be of particular relevance to the neuropathic

5  pain population?

6         MR. BARNES:  Take your time and read it.

7    A    Not necessarily.  They're looking for, as

8  they say here, potential signals that might be of

9  particular relevance to the neuropathic pain

10  population.

11    Q    The first sentence, these new populations

12  may be particularly susceptible to specific adverse

13  drug effects?

14    A    Where are you?

15    Q    The first sentence, about the middle of the

16  second line.

17    A    Okay, I see that.

18    Q    So they were looking at potentially seeing

19  whether Neurontin could affect the neuropathic pain

20  population differently than the epilepsy population,

21  correct?

22         MR. BARNES:  Objection.  Document speaks

23  for itself.

24    A    Yeah, I can't speculate beyond what's

25  written here.  This is the first time I've seen it and

---

1  it's not with much context.

2    Q    Go to the second page, please.  I'd like

3  you to -- you see where it says psychiatric, nervous

4  system?

5    A    Yes.

6    Q    Under section 5.  It says:  Review of

7  events of relevance to the neuropathic pain population.

8  Did I read that correctly?

9    A    Excuse me?

10    Q    It says:  Review of events of relevance to

11  the neuropathic pain population.  Did I read that

12  correctly?

13    A    Under E, section 5, yes.

14    Q    The intent would be to note whether there

15  were possible signals of specific adverse events in the

16  neuropathic pain population that may be diluted by the

17  overall population to assess the strength of any

18  signal.  Did I read that correctly?

19    A    Yes.

20    Q    The last sentence:  The intent of the

21  review of these events is to satisfy ourselves that the

22  neuropathic pain population is not at an increased risk

23  to develop these specific events.  Did I read that

24  correctly?

25    A    Uh-huh.

---

1    Q    Then underneath that it says:  Psychiatric

2  and parentheses nervous system, correct?

3    A    Okay.

4    Q    It says:  Patients with chronic neuropathic

5  pain may represent a population with significant amount

6  of co-morbid depression, in parentheses 150 cases, and

7  suicide 15.  Therefore these cases will be looked at to

8  include or exclude any significant signal of drug

9  induced depression/worsening.  Did I read it correctly?

10         MR. BARNES:  Well.  You didn't read it

11  correctly.  You said 15 cases after suicide and it just

12  says paren 15.

13         THE WITNESS:  15, yeah, that's true.

14         MR. ALTMAN:  I stand corrected.

15         MR. BARNES:  Well, I mean.

16         MR. ALTMAN:  I understand.  That's fine.

17    A    Depression, slash, worsening.

18    Q    Depression, okay.

19         Does this suggest that they felt that there

20  could be -- they wanted to investigate whether there

21  was a difference in the neuropathic pain population

22  with respect to depression?

23         MR. BARNES:  Objection.  Document speaks

24  for itself.  You can answer if you know.

25    A    It doesn't say that.

12/22/2008 Weiss-Smith, Sheila

1    Q    They wanted to review events of relevance
2  to the neuropathic pain population, correct?
3    A    That's correct.
4    Q    This is part of that section for which I
5  just reread the first sentence, correct?
6    A    This is a section under section 5, yes.
7    Q    Okay.
8    A    But it doesn't appear that they're
9  comparing it to anything.  They're just looking between
10 the population.
11   Q    I didn't say they were comparing it.  I
12 just said they wanted to see if there were any
13 potential signals, correct?
14   A    Can we read what you said.
15   Q    I'll read:  The intent would be to note
16 whether there are possible signals of specific adverse
17 events in the neuropathic pain population.  Did I read
18 that correctly?
19   A    That might be diluted by the overall
20 population.
21   Q    And to assess the strength of any signal.
22 Did I read that correctly?
23   A    That is correct.
24   Q    Do you know what they were going to compare
25 it to to do that?

217

1          MR. BARNES:  Objection.  Assumes facts not
2  in evidence.
3    A    It doesn't say.
4    Q    It doesn't say.  So it's not clear that
5  they were going to compare that to anything, is it?
6    A    I can't make guesses on what they were
7  going to do and not do.
8    Q    Okay.  Would you agree with the following:
9  Do you agree or disagree with that section on the
10 psychiatric as started with patients with chronic
11 neuropathic pain that I read before?
12         MR. BARNES:  I'm not sure I follow.
13   Q    Do you agree with the statement, patients
14 with chronic neuropathic pain may represent a
15 population with a significant amount of co-morbid
16 depression and suicide.  Did I read that correctly?
17   A    That's what the document says.
18   Q    Do you agree with that sentence?
19   A    From the readings that I've done that is
20 what I have seen in the literature, yes.
21   Q    Would you agree with the following
22 sentence:  Patients with bi-polar disorder may
23 represent a population with a significant amount of
24 co-morbid depression and suicide?
25   A    Where is this?

218

1    Q    I'm just asking if you agree with that
2  sentence?
3          MR. BARNES:  Are you representing to her
4  that it's in this document or is it a new question?
5    A    It's a new question.  It's not in the
6  document?
7    A    Oh.
8          MR. BARNES:  It's late in the day.  If
9  you're switching back and forth you should tell her.
10 Go ahead.  She was looking for the sentence.
11   Q    Sorry.  Do you agree patients with bi-polar
12 disorder may represent a population with a significant
13 amount of co-morbid depression and suicide?
14   A    That is what I understand from the
15 literature that I reviewed.
16   Q    Does the document suggest that they were
17 going to look at psychiatric -- reports of depression
18 and suicide in the neuropathic pain population to see
19 if there was a signal?
20         MR. BARNES:  Objection.  If you know.
21 Suggest to her?
22   Q    Does it suggest to you that that's what
23 they were going to do?
24   A    It says are very specifically cases will be
25 looked at to include or exclude any significant signal

219

1  of drug induced depression or worsening depression.
2    Q    Nowhere in what we read here did they talk
3  about doing any kind of data mining along those lines,
4  correct?
5          MR. BARNES:  In 2001, right?
6    Q    In this document do they discuss data
7  mining?
8    A    They don't discuss what type of analysis
9  they're using in this document.
10   Q    But if they were going to review -- but
11 they talk about reviewing individual case reports,
12 correct?
13         MR. BARNES:  Do you want to point her out
14 so you can find it.
15   A    Where are you talking about?
16   Q    Same sentence we just read under
17 psychiatric.  It says:  Therefore these cases will be
18 looked at to include or exclude.  Does that suggest
19 they're looking at cases?
20   A    I assume so.  I'm not quite sure what
21 they're doing.
22   Q    Did you see any evidence that they ever did
23 an analysis of psychiatric adverse events associated
24 with the neuropathic pain population?
25         MR. BARNES:  Objection.  Lack of

220

1    foundation.  Lack of predicate.  You might want to ask
2    her if she looked to determine this.  I think she told
3    you she has not looked at these materials in her
4    report.
5        Q    I'm not asking if it's material.  I'm
6    asking did you see any evidence that Pfizer -- in the
7    period before the suicidality review in 2004 -- that
8    Pfizer or Warner-Lambert or Parke-Davis ever conducted
9    such an analysis?
10        MR. BARNES:  Prior to 2004?
11        Q    Prior to 2004.
12        A    That was not part of the data that I
13    reviewed.
14        Q    Do you see anything in here, going back to
15    page one of this document under overall description of
16    post-marketing data set.  Section one.  Total number of
17    cases and events.  Is that really a data mining chart
18    that they were going to create or is that more just
19    simple counts of adverse events?
20        MR. BARNES:  If you know.
21        A    I don't really know what this is.  This is
22    the first time I've seen it and it's with very little
23    context.  So I'm not quite sure what this is and what
24    it means.  Beyond telling you what it says again,
25    that's about all I can say.

221

1        Q    Does this suggest that they were going to
2    produce some kind of a line listing?
3        A    I don't know what they were going to do.  I
4    could only tell you what it says.
5        Q    If the company was -- if the intention here
6    was that the company was going to do a line listing, do
7    you think there was anything -- is that a -- do you
8    know what a line listing is in terms of adverse events?
9        A    Within -- maybe you better define the
10    context you're using it in.
11        Q    In the context of adverse events, have you
12    ever seen a line listing that's similar to what we
13    looked at earlier, that one chart of that listing of
14    adverse events.  You know, it had the adverse event
15    number and the date and the age and what the events
16    were, et cetera.  You've seen those before, correct?
17        MR. BARNES:  Objection.  Vague as to line
18    listing.
19        A    I've seen MedWatch reports.
20        Q    It's not a MedWatch report.  Have you ever
21    seen a document -- that right there.
22        MR. BARNES:  Are you representing this is
23    known in the industry as a line listing, I wouldn't
24    accept that.
25        Q    Have you ever seen a document similar to

222

1    this before that lists adverse events?
2        A    There were appendices in one of the reports
3    that had similar listings, yes.
4        Q    You've seen that in this case and what
5    about outside of the context of this case.  Have you
6    ever seen a listing of adverse events similar to that
7    particular report we just looked at?
8        A    I may have.  I'm not a clinician so I don't
9    review that type of data.
10        Q    Have you ever prepared one?
11        A    No, I haven't.
12        Q    Do you think it takes a clinician to
13    prepare a line listing like that from the adverse event
14    database?
15        MR. BARNES:  What do you mean by prepare?
16        Q    To write a report of the adverse events in
17    the adverse event database?
18        A    I think it takes a clinician to select the
19    relevant terms to --
20        A    But if I --
21        A    -- study.
22        Q    I'm sorry.  But if I gave you a list of
23    terms and said please provide me a listing of all the
24    adverse events in this period of time with these terms,
25    does that require a clinician to do that?

223

1        A    To just pull data?
2        Q    Yes.
3        A    Probably not.
4        Q    Is that something you've ever done before
5    in the past?
6        A    Yes, I have.
7        Q    Can you remember the first time you did
8    something like that, approximately?  Did you do that in
9    the early 1990s?
10        A    (No answer.)
11        Q    I'll ask the question a different way.  Was
12    there any new found technology that didn't exist in the
13    early 1990s that would have prevented somebody from
14    creating a line listing like that, to your knowledge?
15        A    Only that the technology was slow when
16    things took a lot longer, more difficult to work with
17    larger databases in the 90's.  Absolutely.
18        But aside from that, they could have
19    generated a volume listing like that in the early
20    1990s, correct?
21        A    I don't know what systems were in place in
22    the 1990s.  I'm not familiar with them.
23        Q    Suffice to say, you didn't see any
24    evidence that the company ever did an analysis similar
25    to Exhibit 24 for any off-label indication, correct?

224

12/22/2008 Weiss-Smith, Sheila
12/22/2008 Weiss-Smith, Sheila

1    MR. BARNES:  Objection.  Asked and
2  answered.
3    Q    By off-label indication?
4    MR. BARNES:  I think she said --
5    A    I didn't look for any.
6    MR. BARNES:  She didn't look for it and she
7  has put in her materials considered.  You've ask for
8  that three different ways.  She doesn't know what they
9  did.
10    Q    Well, you haven't seen it in any
11  document -- not the document itself, but you didn't see
12  a reference to it in some document, correct?
13    MR. BARNES:  That was also before the
14  Parson's report in 2004.
15    MR. ALTMAN:  Before the Parson's report.
16    MR. BARNES:  So before the Parson's report
17  and after March 2001 did you see anything in regard to
18  analysis that was based on the report like this?
19    Q    At any time before the Parson's report.
20    A    Just the summary of the data that was in
21  the Parson's report.  I didn't ask for anything and I
22  didn't get anything.
23    Q    Did you see any evidence in the Parson's
24  report that they referred to that they had done a
25  similar analysis at an earlier point in time?

225

1    MR. BARNES:  Objection.
2    Q    -- comparing individual drugs?
3    MR. BARNES:  Objection.  Assumes facts not
4  in evidence.  You may answer.
5    A    It is my understanding from what I read
6  from Dr. Blume's report that she never did any
7  disproportional reporting analysis.
8    Q    But she calculated percentages of adverse
9  event reports, correct?
10    A    She calculated percentages of higher level
11  term over reports for a number of different drugs.
12  That's what -- I have to look at the original report.
13    Q    That's fine.  You said that it was
14  inappropriate to do that and I think that you should do
15  this against the background of all drugs, correct?  And
16  you actually did that in your original report, correct?
17    MR. BARNES:  Is your question that a PRR
18  should be prepared the drug of interest against the
19  background of all drugs in the database.  Is that your
20  question?  It was unclear.
21    Q    Yes, that's what I think you said in your
22  original report.
23    A    Could you please show me where you're
24  talking about?
25    Q    Okay.  Let's do this a little differently.

227

12/22/2008 Weiss-Smith, Sheila
12/22/2008 Weiss-Smith, Sheila

1    A    I believe the Parson's report referred to
2  their safety summaries that had been done and reported
3  to the FDA.
4    Q    Talking about part of the FDA, correct?
5    A    As part of the legal requirements of having
6  a marketed drug, yes.
7    Q    You were, in your original report, you were
8  critical of Dr. Blume for having compared individual
9  drugs and complained, for lack of a better term, that
10  she had said this was actually a proportional reporting
11  rate analysis when it was not.  Do you recall that?
12    A    Which page are you on?
13    Q    Just generally.  This happened in the
14  deposition we discussed this.  It's a general
15  proposition.
16    A    It's a big report.  There's quite a few
17  pages.  What specifically are you talking about?
18    Q    Let's do this a little different.
19    In your original report you did a PRR
20  analysis of Neurontin against all drugs, correct?
21    A    I calculated the PRR for suicide and
22  suicide attempt with Neurontin compared to the rest of
23  the FDA data.
24    Q    Do you recall that Dr. Blume did a
25  disproportionality analysis --

226

1  When you did your original report, you calculated the
2  PRR of Neurontin against all drugs other than Neurontin
3  in the database, correct?
4    A    In the FOI AERS database for those two
5  events that I mentioned.
6    Q    Why did you use the background of all
7  drugs?
8    A    Because for a basic signal detection that's
9  what I typically use in my practice, yes.
10    Q    Okay.  And you -- but this time you did it
11  against a subset of drugs, correct?
12    A    I did.
13    Q    So it's not inappropriate to use a subset
14  of drugs when you do comparisons, correct?
15    MR. BARNES:  Objection.  Vague.
16    A    In data mining it would not necessarily be
17  inappropriate.  Depends on your protocol and what
18  you're doing.  But you need to have an appropriate
19  comparison calculated test statistic.  I think that's
20  an important difference of what I did and what
21  Dr. Blume did.  One of the many differences.
22    Q    I'm going to mark as Exhibit 25.
23    (Whereupon, a document was marked as
24  Deposition Exhibit Number 25.)
25    Q    This is a chart entitled:  Cumulative

228

12/22/2008 Weiss-Smith, Sheila

1   Percentage Reports of Suicidal and Self-Injurious
2   Behavior for Neurontin versus Background of All Other
3   Drugs.  Did I read that correctly?
4        A     Okay.
5        Q     This is a chart that was contained in
6   Dr. Blume's report, correct?
7        MR. BARNES:  The report or her declaration?
8        Q     I'm sorry.  Her declaration.
9        A     I believe so, I believe so.
10       Q     Now, I'd like you to look at the first
11  quarter of 2000.  Can you see that?  It's about two
12  dots to the right of the arrow on the -- do you see
13  where I'm talking about?
14       MR. BARNES:  I can't tell.
15       Q     Two dots to the right of the arrow.
16       A     When it hits 3 percent?
17       Q     Correct.
18       A     Okay.
19       Q     Can you read what the background is
20  approximately there?
21       A     What is the background here?
22       Q     Background is all other drugs, other than
23  Neurontin.  At that point in time what's the percentage
24  of the background of all other drugs approximately?
25       A     Oh, I don't know, just over 1 percent.

1        Q     And it's your position that you can't tell
2   what the ratio is by looking at these two lines?
3        A     I didn't say that.
4        Q     If this was .03 percent and .01 percent,
5   what would the ratio be?
6        A     It would be the same.
7        Q     That might mean something different to
8   somebody who is reading this chart than 3 percent and
9   1 percent, right?
10       A     Potentially.
11       Q     Something that occurs at .03 percent of the
12  reports versus 3 percent of the reports is quite a bit
13  of a difference, isn't it?
14       A     That's a whole different issue, irrelevant
15  absolute differences.
16       Q     So in providing the percentages and
17  allowing the reader to do the ratio if they choose to,
18  there's actually more information here than simply
19  providing the ratio of 3, correct?
20       A     It depends on what you're doing.
21       Q     To be able to put what that ratio means in
22  context, the magnitude of the reports giving you the
23  percentages gives you more information than simply the
24  ratio, correct?
25       MR. BARNES:  Objection.

1   Somewhere.
2        Q     Are you able to calculate what the ratio
3   between those two things are based on what you see
4   here?
5        A     Can I calculate a ratio?
6        Q     Yes.
7        A     Yes.
8        Q     What's that ratio?
9        A     3 divided by 1 would be 3.
10       Q     So your criticism of Dr. Blume is that she
11  says 3 percent and 1 percent, it doesn't simply say 3;
12  is that correct?
13       A     I'm critical in other parts where I said
14  she says she calculates a PRR and then doesn't.
15       Q     So it's only -- so it's only the labeling
16  issue.  It's not as if you cannot figure out what the
17  PRR is; is that correct?
18       A     No, I have a lot of criticisms besides
19  that.  That's just one of the many criticisms I have of
20  the work she put forth.
21       Q     That's fine.
22       A     I just want to understand.  One of the many
23  criticisms, many of her charts were mislabeled and she
24  purports to do a PRR or at least some measure of
25  disproportionality and doesn't and that's just wrong.

1        A     It gives you different information.
2        Q     Well, it gives you the ratio as well,
3   doesn't it?
4        A     You have to calculate it.  It's not there.
5        Q     Okay.  But on -- is that difficult to do?
6        A     It would be nice to have the numbers.
7        Q     But is that difficult to do?
8        A     Maybe.  Maybe not.
9        Q     As you look at this chart right now at any
10  particular point in time, would you have any particular
11  difficulty in calculating what the ratio is at that
12  particular point in time?
13       A     I could estimate it.
14       Q     You could estimate it pretty closely,
15  couldn't you?
16       A     Depends.  Some of them are a little hard to
17  divide than others, but yes, I can estimate the ratio.
18       MR. ALTMAN:  Why don't we take a break.
19       THE VIDEOGRAPHER:  Going off the record.
20  The time is 3:57 p.m.  This is the end of tape number
21  5.
22       (Off the record.)
23       THE VIDEOGRAPHER:  We're on the record.
24  The time is 4:16 p.m.  This is the beginning of tape
25  number 6.

1    BY MR. ALTMAN:

2    Q.    Dr. Weiss Smith, looking at Exhibit 25.

3    Have you done anything to verify whether any of these

4    percentages are correct or not?

5    A.    Did I verify these percentages?  No.

6    Q.    Do you have any evidence that they're not

7    correct, that the data is not correct?

8    MR. BARNES:  As applied or as plotted?

9    Q.    As plotted.

10    A.    The underlying data?

11    Q.    Yes.

12    A.    I did not verify yes or no.

13    Q.    Does this chart, as it stands, show an

14    alert?

15    A.    This chart as it stands.

16    Q.    As it stands, as it is right here, show an

17    alert?

18    A.    As we define an alert, absolutely not.

19    Q.    What's the basis for saying it's not an

20    alert?

21    MR. BARNES:  If you need to read the

22    report, you can.

23    A.    One, you need to do data mining, signal of

24    disproportional reporting, you actually have to

25    establish what algorithm and what threshold a priori is

233

---

1    going to be, meaning be called statistically

2    significant.  Because there is no standard, you

3    actually have to establish it ahead of time.

4    Q.    What threshold do you use for -- take a

5    step back.  Basic proportional reporting rate

6    computations effectively take 1 percentage divide it by

7    another percentage or one fraction divided by another

8    fraction, correct?

9    MR. BARNES:  Objection.

10    A.    Which statistic are you talking about?

11    Q.    PRRs basically compare the fraction of the

12    event over the total -- of a particular event over the

13    total number of reports of that drug divided by the

14    same thing for some background which you define,

15    correct?

16    A.    That is the basic calculation for a PRR.

17    Q.    Okay.  What is the common -- is there a

18    commonly used threshold for a signal used in the

19    context of PRRs?

20    MR. BARNES:  Signal or alert?

21    Q.    Alert, sorry.  Alert.

22    A.    There are actually quite a wide variety in

23    the literature.  We have just -- we have a paper under

24    review looking at that.  We looked at the literature in

25    the different kinds.

234

---

1    So for all the different data mining

2    algorithm there's quite a range for what people

3    defined.  But the key is you must define it up front

4    before you do the analysis.

5    Q.    Is a ratio of two with a chi-square of four

6    and more than three reports frequently used as a

7    threshold with respect to PRR?

8    A.    I don't know the frequency of use.  It is

9    often available and published in the literature that

10    that is one of the thresholds that people use.  So I

11    have seen it published.

12    Q.    What other thresholds have you seen people

13    use for PRRs?

14    A.    PRR greater than 2, PRR greater than 1.5,

15    with and without N, with and without chi-squared,

16    chi-square greater than 3 --

17    THE COURT REPORTER:  Slow down a little

18    bit.

19    A.    Okay.  I have a whole paper.  But a number

20    of variations of the test statistic, the chi-squared,

21    variations in the number of case reports between one

22    and four.  I've also seen people look at confidence

23    intervals.  So quite a variety.

24    Q.    With respect to ratio chi-square and N,

25    have you seen people use a ratio greater than 2?

235

---

1    A.    Yes.

2    Q.    Is it often that people use a ratio greater

3    than 2?

4    A.    I don't have an idea of how often people

5    use it.  I could only tell you whether or not we have

6    seen it in publication.  Because no one really knows

7    what people are actually using.

8    Q.    In reviewing the data that you reviewed for

9    your publication, did you see anybody using a

10    chi-square greater than 2 as a threshold, a ratio

11    greater than 2 as a threshold?

12    A.    I believe we did have somebody but I'd have

13    to go back to the paper and look.

14    Q.    How many different people did you -- how

15    many different cites did you review as part of your

16    paper?

17    A.    Oh, about, we reviewed over 100, but not

18    all of them are accepted and based on our inclusion and

19    exclusive criteria.

20    Q.    So of the 100 you saw one that you used a

21    ratio greater than 2, correct?

22    MR. BARNES:  Objection.  Misstates her

23    testimony.

24    A.    You have to be very careful about the

25    difference between how many times it was published and

236

12/22/2008 Weiss-Smith, Sheila

1   how often it's used.  So you have a group that's very
2   prolific publication, you could see something published
3   many, many times.  And it didn't get the false
4   impression that it's used.  But I just want to clarify
5   that.  That's very important.
6        Q    But is it frequent that a ratio greater
7   than 2 is used?
8        A    I don't know the frequency of which anyone
9   uses anything.
10       Q    Within your study was it frequent that a
11  ratio greater than 2 was used?
12       A    A ratio of PRR greater than 2 and/or
13  greater than equal to 2 were published quite often in
14  the literature.
15       Q    Greater than -- the ratio greater than 2?
16       A    PRR greater than 2 --
17       Q    Was the threshold --
18            MR. BARNES:  Whoa, whoa, let her finish.
19  Go ahead.
20       A    Or PRR greater than or equal to 2 were
21  often published in the literature as thresholds with or
22  without the N's and chi-squared.
23       Q    Did you see anybody in your study use a
24  chi-square greater than 4?
25       A    That I don't remember.

237

1        Q    Did you see anybody using an N and greater
2   than 4?
3        A    There were some cases that said N greater
4   than or equal to 4.
5        Q    Greater than or equal to 4?
6        A    Yes.
7        Q    Did anybody say greater than 4?
8        A    I don't recall that.
9        Q    At the third quarter of 2003 in this chart
10  what's the approximate percentage for Neurontin?
11            MR. BARNES:  Third quarter of?
12       A    2003.  I'm sorry, third quarter of 1999.
13  With the arrow pointed right to it.
14            MR. BARNES:  Do you want to suggest,
15  Mr. Altman, what you think that rate is, since the left
16  axis is --
17       Q    Is that approximately 2.5?
18            MR. BARNES:  Or less.
19       A    Looks a little less than that.
20       Q    2.4, 2.5, somewhere there.  Greater than 2?
21       A    Greater than 2 percent.
22       Q    2 percent.
23       A    As opposed to a PRR.
24       Q    I'm not talking PRR.  Greater than 2
25  percent.  About 2.4 percent?

238

1        A    Yes, it's greater than 2 percent.
2        Q    And the background, is it about 1 or
3   1.1 percent?
4        A    It's about 1.1 percent.  Of serious suspect
5   reports with HLT of Neurontin.
6        Q    That's correct.  I understand.
7             What is that ratio at that particular point
8   in time, is it greater than 2?
9        A    The ratio would be just barely above 2.
10  Somewhere around there.
11       Q    And you see the chi-square there is 6.7,
12  correct?
13       A    So help me here.  Where did you -- do you
14  have a chi-squared for each data point?
15       Q    There's a chi-square for that data point.
16  The chi-square there is 6.7?
17       A    And that is comparing what, because there
18  was no protocol --
19       Q    Comparing those two percentages?
20       A    Comparing these two percentages for the
21  HLT.
22       Q    For this chart as it is, the chi-squared is
23  6.7?  Do you see that on the chart?
24       A    I see that.
25       Q    Do you have any basis for saying it's not

239

1   6.7?
2        A    I didn't redo your analysis.  I don't do an
3   analysis like this.  I don't think this is an
4   appropriate analysis.
5        Q    Is that because it doesn't show the actual
6   ratio?
7        A    For many reasons.  I disagree with the use
8   of the higher level term because it is such a broad
9   group of terms from suicide ideation and all the way to
10  attempts.
11            Even though you say serious suspect
12  reports, I have to make -- there's no protocol.  So I'm
13  making the assumption that you're limiting it to those
14  which Neurontin or Gabapentin was labeled as suspect,
15  primary concomitant suspect drug.  I'm sorry, primary
16  or secondary suspect drug because it's not just primary
17  suspect.  There's deviation.
18       Q    Understood.
19       A    That's an assumption, though, but there's
20  no protocol.  So I'm not quite sure what you did.
21       Q    Okay.
22       A    Then you say serious.  Just because it says
23  serious, a suicide gesture, for example, or suicide
24  ideation wouldn't meet the FDA definition of a serious
25  adverse event.

240

12/22/2008 Weiss-Smith, Sheila

| | |
|---|---|
| 1 | Q    Did you actually do a study of whether |
| 2 | that's true or not? |
| 3 | A    Excuse me? |
| 4 | Q    Do you know if there are reports in the |
| 5 | database where suicidal ideation is the only term which |
| 6 | are marked as serious? |
| 7 | A    I did not find one like that.  But I did |
| 8 | look at terms where there were suicide ideations and |
| 9 | that they were serious and the drug Neurontin was |
| 10 | suspect and I found there was quite a grab bag and it |
| 11 | was pretty clear from review that the report wasn't a |
| 12 | report of suicide ideation.  It was reports of other |
| 13 | events that wouldn't require hospitalization or meet |
| 14 | the FDA regulatory definition of serious. |
| 15 | So this is really a grab bag of events that |
| 16 | aren't necessarily related to the suspect or the |
| 17 | serious classification.  That's why I have some serious |
| 18 | problems with using HLT. |
| 19 | Q    When you said I did not find one like that, |
| 20 | and that being a suicidal ideation report where that |
| 21 | was the only term and that report had been sent in as |
| 22 | serious, did you actually look to see if that happened? |
| 23 | A    I did not look for that specific |
| 24 | circumstance, no. |
| 25 | Q    So there could be reports in the database |

241

12/22/2008 Weiss-Smith, Sheila

| | |
|---|---|
| 1 | of a signal.  For generating hypothesis. |
| 2 | Q    Where did it say that? |
| 3 | A    Well, in Mosholder.  Andy Mosholder's paper |
| 4 | with Palmer they talk about that.  I quote -- I |
| 5 | reference that.  Also in the adverse event report, |
| 6 | Dr. Katz's letter to the advisory committee talks about |
| 7 | the problems with spontaneous reports. |
| 8 | Q    But he doesn't say you can't use it for |
| 9 | signaling, did he? |
| 10 | A    He said in this case that it was not of |
| 11 | value. |
| 12 | Q    The other terms that you complain about |
| 13 | that are in the HLT, did you happen to look at how many |
| 14 | times those other terms actually occur? |
| 15 | A    Did I look?  I might have looked briefly at |
| 16 | the numbers on the HLT.  But I didn't do any analysis |
| 17 | on them, yes. |
| 18 | Q    I'm not talking about HLT itself, but there |
| 19 | are -- the HLT I believe is completed suicide, correct? |
| 20 | A    That is there. |
| 21 | Q    Suicide attempt, correct? |
| 22 | A    Yes. |
| 23 | Q    Suicidal ideation, correct? |
| 24 | A    Yes. |
| 25 | Q    Depression suicidal, correct? |

243

12/22/2008 Weiss-Smith, Sheila

| | |
|---|---|
| 1 | where suicide ideation is the only adverse event term |
| 2 | that are marked as serious, correct? |
| 3 | MR. BARNES:  Objection. |
| 4 | A    I cannot see how that would meet the |
| 5 | definition of serious by the Code of Federal |
| 6 | Regulations. |
| 7 | Q    But in analyzing and doing data mining, |
| 8 | you're not looking at the individual reports, you are |
| 9 | taking the data as it is as provided by the regulatory |
| 10 | agencies, correct? |
| 11 | A    With some cleaning.  But that's why it's |
| 12 | very good to base it on terms that make sense, not on |
| 13 | just groupings of terms because they happen to be in |
| 14 | the same HLT. |
| 15 | Q    Did the FDA include suicide ideation in its |
| 16 | meta-analysis? |
| 17 | A    Did they include in the meta-analysis? |
| 18 | Yes.  They also said they wouldn't use the |
| 19 | spontaneous report data because for this drug and in |
| 20 | this population it was not going to give them any |
| 21 | information. |
| 22 | Q    Were they talking about in the context of a |
| 23 | causal -- making a causal assessment or were they |
| 24 | talking about for any purpose whatsoever? |
| 25 | A    They were talking about even for the case |

242

12/22/2008 Weiss-Smith, Sheila

| | |
|---|---|
| 1 | A    I don't believe that's in there, no.  I |
| 2 | think that's in a different HLT. |
| 3 | Q    I think you're right.  Suicidal behavior, |
| 4 | I'm sorry? |
| 5 | A    Now I need to see it.  But I believe it |
| 6 | might be.  It's five or six terms. |
| 7 | Q    I believe it's top of page 24. |
| 8 | A    Completed suicide, intentional self-injury, |
| 9 | self-injurious behavior, self-injurious ideation, |
| 10 | suicidal behavior, suicidal ideation and suicide |
| 11 | attempt. |
| 12 | Q    First of all, you say it's a mistake to |
| 13 | include these intentional self injuries, correct? |
| 14 | A    For the purposes of data mining I believe |
| 15 | it should be done at the preferred term level and only |
| 16 | look at events for the definition for serious.  That's |
| 17 | what I believe makes sense professionally. |
| 18 | Q    So if a clinician thought that suicide |
| 19 | ideation as the whole term in the report was a serious |
| 20 | event, they were wrong then, correct? |
| 21 | A    Are they using the FDA definition of |
| 22 | serious?  I mean, there's regulatory definition of what |
| 23 | serious is. |
| 24 | Q    If there are reports in the adverse event |
| 25 | database submitted by manufacturers where the only term |

244

**Page 245**

```
1   is suicidal ideation marked serious, with one of the
2   serious criteria, then are you saying those people are
3   wrong?
4        A      Again, if it met the FDA definition of
5   serious, based on the legal definition of serious,
6   that's amazing.  I mean, I'm just surprised.
7               It would be, you know, require death,
8   hospitalization, initial prolonged, congenital anomaly,
9   life threatening.  So I mean, these are the issues.
10  Maybe there is a case, but I'm not going to hypothesize
11  that.
12       Q      Do you know if there are a lot of cases?
13       A      A lot of cases in FDA --
14       Q      In the FDA database where suicidal ideation
15  is the only term marked as serious?
16       A      I'm not aware of the number of cases or if
17  there are any.  That's hypothetical.
18       Q      And you didn't look at Gabapentin to see if
19  there were any cases of suicide ideation as the only
20  event marked serious, correct?
21       A      I looked at suicide ideation with
22  Gabapentin.  I didn't look for ones that just had that
23  one term in them.  I did find quite a few that had many
24  terms, like 20 to 40 terms of which it was one of many
25  terms.
```

**Page 247**

```
1   lay person.
2        Q      Well, is it an attempt?
3        A      Again, I don't know.  There's a fine
4   degradation between these and I don't want to sit there
5   and make a clinical judgment.
6        Q      So somebody, a clinician, could consider
7   that suicide ideation, correct?
8        A      I don't want to make a clinical judgment.
9        Q      I'm not asking you.  I'm saying a
10  clinician, who is there?
11       A      That's a clinical judgment.
12       Q      And they could call it a suicidal ideation,
13  correct?
14              MR. BARNES:  Objection.  You may answer.
15       A      That is a clinical judgment.
16       Q      Okay.  But you're making a judgment here
17  that suicidal ideation is never serious and there
18  you're willing to make that statement that it's never
19  serious, but you're not willing to make a statement
20  that it could be serious.  I don't understand why it
21  isn't a two way street?
22              MR. BARNES:  Objection.  Two different
23  questions.  You may answer again.
24       A      In one case I'm talking about a report has
25  a term.  The term is not how seriousness or
```

**Page 246**

```
1        Q      Okay.  But you cannot tell, just by looking
2   at the terms selected, as to which one of the events
3   caused the event -- which one of the terms caused the
4   overall event to be considered serious, correct?
5               MR. BARNES:  Objection.  If you know, you
6   can answer.
7        A      In my report I go through a couple of cases
8   where I found that there were some events which really
9   by definition would be serious because they're life
10  threatening like QT prolongation.  Do I know the intent
11  of the reporter?  No.  But it makes a lot of sense that
12  that would be the reason of someone having a heart
13  attack, a QT prolongation would meet the serious all
14  the time.
15              But suicide ideation would not by itself
16  meet the definition of a serious event.
17       Q      If somebody put a gun up to their head and
18  said I think I want to blow my brains out, is that a
19  suicide attempt?
20              MR. BARNES:  Objection.  If you know.
21       A      I'm not a clinical doctor.  I believe it
22  probably could be.  Depending on the circumstances.
23       Q      It could also be just suicide ideation,
24  correct?
25       A      I think it goes beyond ideation, even for a
```

**Page 248**

```
1   non-seriousness is defined.  It is defined by CFR that
2   it is defined by the outcome; what happened to the
3   patient.  Not by what the event was.  So there are some
4   events that are, by their nature, serious.
5   Particularly those events like suicide that result in
6   death.
7        Q      Isn't there also a category for where they
8   reported things, while it doesn't meet one of those
9   explicit definitions, they think it could lead to one
10  of those outcomes?
11              MR. BARNES:  Objection.  Calls for
12  speculation.
13       A      What are you --
14       Q      Do you know if there's a box on the
15  MedWatch form for other?
16       A      There is a box for other.
17       Q      And that that box is to be used when in the
18  opinion of the reporter the event, while not meeting
19  one of the other conditions, death, et cetera, could
20  lead to one of those conditions, correct?
21       A      Box other does not have that clear a
22  definition of how it's used.  I find that it's used
23  pretty broadly for just about anything.
24       Q      Have you read the instructions to the
25  MedWatch form?
```

**249**

| | |
|---|---|
| 1 | A   Yes. |
| 2 | Q   MedWatch form specifically says that when |
| 3 | the reviewer thinks that it could lead to one of those |
| 4 | things, they can mark the other box, correct? |
| 5 | A   Yes, other serious events. |
| 6 | Q   So to make the statement that suicidal |
| 7 | ideation is nonserious is not necessarily a true |
| 8 | statement, is it? |
| 9 | MR. BARNES:  Objection.  Asked and |
| 10 | answered.  You can answer it again. |
| 11 | A   By itself the term suicidal ideation does |
| 12 | not mean that the patient had an event that met the FDA |
| 13 | definition of serious.  Conversely, if someone commits |
| 14 | suicide, that does, by itself, just that term, |
| 15 | automatically meet the definition of serious.  That's |
| 16 | what I'm telling you. |
| 17 | Q   Okay.  That's fine. |
| 18 | Would you look at how many reports of |
| 19 | intentional self-injury were in the database? |
| 20 | A   Did I look at -- |
| 21 | Q   For all drugs? |
| 22 | A   I did not analyze those because I don't |
| 23 | believe that those are going to tell me anything when I |
| 24 | do a data mining exercise. |
| 25 | Q   So it's your suggestion that intentional |

**250**

| | |
|---|---|
| 1 | self-injury has nothing whatsoever to do with |
| 2 | suicidality? |
| 3 | MR. BARNES:  Objection.  You may answer. |
| 4 | A   I'm not making a clinical definition.  I'm |
| 5 | not making clinical judgment.  I'm data mining on two |
| 6 | event terms that are used in the epidemiologic |
| 7 | literature that are by definition serious. |
| 8 | Q   Who picked those terms to use? |
| 9 | A   I based it on the work done by Bentson |
| 10 | McFarland who did an epidemiological study suicide and |
| 11 | suicide attempt. |
| 12 | Q   Did anybody tell you not to use suicidal |
| 13 | ideation? |
| 14 | A   No one told me what to do.  I set my own |
| 15 | protocol. |
| 16 | Q   So if somebody with clinical experience |
| 17 | felt that suicidal ideation should be looked at, as |
| 18 | someone who is not a clinician and not a suicide |
| 19 | expert, would you have the experience to dispute that? |
| 20 | MR. BARNES:  For data mining purposes? |
| 21 | Q   For data mining purposes. |
| 22 | A   For data mining purposes I would talk to |
| 23 | them and say that I want to make sure that the events |
| 24 | that I look at are considered by themselves serious and |
| 25 | if you're going to start putting together constellation |

**251**

| | |
|---|---|
| 1 | of terms, like this HLT, then there's just -- you've |
| 2 | got to include all the terms. |
| 3 | So there's other -- there's other preferred |
| 4 | terms under other system organ classes, under other |
| 5 | HLTs that are for example in the data capture rate that |
| 6 | are suicide related.  But they are not all -- depends, |
| 7 | they're not all by definition serious.  And again you |
| 8 | need to make sure that a priori they're established, |
| 9 | which a protocol is.  It has to make sense.  This |
| 10 | doesn't make sense to me. |
| 11 | Q   But if a clinician thought so, they could |
| 12 | have good reason, correct? |
| 13 | MR. BARNES:  Objection. |
| 14 | A   In data mining and spontaneous report, I |
| 15 | would have to say that might not -- I wouldn't |
| 16 | necessarily agree.  No. |
| 17 | Q   Okay.  You may object -- aside from |
| 18 | disagreeing with whether it's HLT or not, whether you |
| 19 | should use the HLT or not, does the data in between the |
| 20 | black bars of Exhibit 25 suggest that there is a ratio |
| 21 | greater than two, a chi-squared greater than 4 and you |
| 22 | don't know the number of reports but assume for the |
| 23 | sake of argument that anything that is 1 percent of the |
| 24 | entire background of all events has to be greater than |
| 25 | 4 reports? |

**252**

| | |
|---|---|
| 1 | A   Why does it have to be greater than four |
| 2 | reports? |
| 3 | Q   How many reports are there -- how many |
| 4 | reports are there in the AERS database? |
| 5 | MR. BARNES:  These are cumulative, correct? |
| 6 | MR. ALTMAN:  Yeah. |
| 7 | Q   At the point in time we're talking about, |
| 8 | how many reports are there in the AERS database? |
| 9 | A   Currently over 3 million. |
| 10 | Q   What's 1 percent of 3 million?  In '99, |
| 11 | just between '97 and '99 would you say there's at least |
| 12 | a million reports? |
| 13 | MR. BARNES:  If you know. |
| 14 | A   Probably about that because it's really |
| 15 | grown over time. |
| 16 | Q   What's 1 percent of a million, about |
| 17 | 10,000? |
| 18 | A   Okay. |
| 19 | Q   That's a lot more than four, right? |
| 20 | A   That's for the -- for all the drugs, right. |
| 21 | Q   For all the drugs.  So you don't have any |
| 22 | real worry that 1 percent of the background is more |
| 23 | than four reports here, right? |
| 24 | A   I mean, it would be an assumption.  But a |
| 25 | reasonable assumption potentially. |

1    Q     I think we talked about the number of

2   adverse event reports that the company got in '98

3   and '99.  We looked at that earlier.  It was in your

4   report.  Do you have any doubt that 2 percent of the

5   reports is more than four reports?

6    A     2 percent of the reports?

7    Q     For Gabapentin in 1999 represents more than

8   four reports?

9    A     Of serious suspect reports?  I'd have to go

10  look at the data.  The numbers were pretty low at the

11  beginning of marketing.

12   Q     That's not the beginning of marketing,

13  we're already five years into it?

14       MR. BARNES:  She said she would have to go

15  look.

16   A     I'd have to go look.

17   Q     Why don't you pull up in your original

18  report, we talked about this earlier.  We talked about

19  how many -- I believe it is on page 16.  I think we

20  show in here in '98 you showed something about 700

21  reports?

22   A     1998.

23   Q     I think we talked about was 700 reports; is

24  that correct?

25   A     Okay.  About, yeah, between 5 and 600

253

1   probably.

2    Q     And in '99 there's about 2,000 reports,

3   right?

4    A     Yes.

5    Q     About 2,700 reports, right?

6    A     In which year?

7    Q     Between '98 and '99?

8    A     In 1999 is about 2,000.

9    Q     Do you have any doubt that 2 percent of

10  those reports are more than four, any real concern that

11  it could be less than four?

12   A     But this is an apple and this is an orange,

13  so.  This is all reports that listed Gabapentin as

14  either suspect or concomitant by year.  That's not the

15  same as what you have here.  There's limited --

16       MR. BARNES:  In Exhibit 25.

17   Q     I agree.

18   A     You have a limited subset and I don't want

19  to speculate what the basic numbers are for your

20  subset.

21   Q     That's fine.  Not a problem.

22       Top of page 21.

23   A     Original report or supplement.

24   Q     I'm sorry.  Supplemental report.  Top page.

25  Only with careful clinical interpretation, considered

254

1   within the context of why the drug is being used, the

2   extent of drug use, and background rates of the event,

3   can a statistical alert be turned into what is

4   considered a signal potential risk.  Did I read that

5   correctly?

6    A     Yes.

7    Q     Then you say at the bottom:  I see no

8   evidence that Dr. Blume or Mr. Altman enlisted proper

9   medical experts to interpret their purported signal.

10       What's the basis of that sentence?

11   A     There's nothing in the report that says

12  that any clinical expert was enlisted to work with

13  Dr. Blume to evaluate whether this chi-squared 6.70 P

14  less than .01 with the Yates correction, whether or not

15  that is clinically meaningful.

16   Q     Did you review Dr. Blume's qualifications?

17   A     Yes, I did.

18   Q     Is it your opinion that Dr. Blume is not

19  qualified to exercise clinical judgment?

20   A     It is my opinion that she's not a

21  clinician.  I didn't see any medical degree, any

22  nursing degree, any pharmacy degree.  No clinical

23  health professional degree in her CV.

24   Q     And is it your opinion that only somebody

25  with those degrees could possibly exercise clinical

255

1   judgment with respect to how to interpret safety data?

2    A     I think someone for a clinical judgment,

3   which is what we're doing, taking an alert for what you

4   find as significant chi-squared value and you're saying

5   that is something, which I disagree with.  But taking

6   that and making a clinical judgment I think requires a

7   person with clinical expertise and expertise in AERS,

8   yes, absolutely.

9    Q     Do you know whether Dr. Blume felt there

10  were signals long before 1997 with AERS?

11   A     I only saw what she wrote in her report.  I

12  wasn't familiar with what she thought prior to 1997.

13   Q     Did you read her report?

14   A     Yes, I did.

15   Q     Were you aware that a substantial portion

16  of her report discusses what was seen in the clinical

17  trials, did you review that information?

18   A     I read everything in her report.

19   Q     If Dr. Blume believed that there was

20  information within the clinical trials themselves

21  suggestive of a problem that should be investigated and

22  monitored, do you have any basis to dispute that?

23   A     I have no basis to agree with her.  She

24  has, as far as I can read, she has no clinical

25  qualifications and so therefore I don't believe she is

256

12/22/2008 Weiss-Smith, Sheila

1  qualified to make such judgments.  She's not a clinical
2  expert.
3      Q    You say at the bottom of page 21 in the
4  paragraph below that.  Oh, actually, when we get above
5  that.  I'm not going to beat a dead horse over this.
6           But when you put -- I just want to be clear
7  that I understand in your original chart there was some
8  criticism in the original report that you were showing
9  in the PRR as suicide and you showed it as zero.  We
10  had discussed that briefly and now I think you said
11  that zero is the software's default value, is that
12  correct?  When it cannot calculate a PRR?
13      A    Right.  So in other words until it moves
14  above zero there's not a calculated PRR.  But I wanted
15  to make sure that it was clear that I looked at that
16  time period because if you noticed I graphed both
17  completed suicide and suicide attempt together.  And
18  there were cases of suicide attempt in that early time
19  period.  I didn't want to mislead people looking at the
20  graph and that's why it's at zero.
21      Q    But somebody looking at that graph would be
22  misled to believe that there were no suicides in
23  Neurontin at the same time there were suicides in the
24  background, correct, which is the only way you could
25  get a PRR of zero?

257

1      A    You could get -- based on the way that it's
2  a default, you could get a zero if there's nothing in
3  the foreground or in the background.  That's the
4  default.  If you can't calculate it, it's a zero.
5      Q    Forget about Q Scan.  Somebody looking at
6  that chart who says this is the PRR as graphed, you
7  graphed the PRR as zero, the PRR was not actually zero,
8  correct?
9      A    The PRR was zero as far as I'm concerned.
10  There was no calculatable PRR.  It is not misleading.
11  I think it would have been misleading to not put
12  something there because it would look like I hadn't
13  started my calculations at time zero.
14      Q    If there were no reports for the drug, no
15  suicide reports for the drug, but some suicide reports
16  for the background, wouldn't that also give you a PRR
17  of zero?
18      MR. BARNES:  Objection.  Do you understand
19  the question?
20      A    Yeah, I'm thinking.
21      MR. BARNES:  Ask it again.
22      A    I'm thinking, I'm thinking calculation
23  here.  Nothing for the drug.  It's not calculatable if
24  you don't have something for the drug.
25      Q    Why is it not calculatable?  You have some

258

1  reports of suicide in the background but no reports for
2  the drug of interest.  What percentage of the reports
3  for the drug would be if there was zero reports for
4  suicide?
5      A    Excuse me?
6      Q    If there were zero reports of suicide for
7  the drug, what percentage of reports would that be?
8      A    If there was zero?
9      Q    Right.
10      A    Zero.
11      Q    If there were some reports in the
12  background, regardless of what the background is, that
13  would not be zero, correct?
14      A    Right.  Something divided into zero.
15      MR. BARNES:  Zero into X, is what you're
16  saying, right?  It has to be some value greater than
17  zero.
18      Q    Which is zero, correct?
19      A    Okay.
20      Q    But that's not the same thing as undefined,
21  is it?
22      MR. BARNES:  Under what program and what
23  assumptions?
24      Q    Not any program.  If you show somebody a
25  PRR of zero, the only way you can get to zero when you

259

1  truly calculate a PRR is if there are no events for the
2  drug versus some events for the background, correct?
3  It's the only way zero can come up in the calculations?
4      A    As I stated here, I state in the report,
5  the zero on my chart was that there was nothing there.
6  It's the default for not calculatable or not
7  calculatable.  That's all it is.  I want to make it
8  very clear for the record that that is what it is.  If
9  you misinterpreted it, I'm very sorry, but that was not
10  the intent.
11      Q    So you're saying that somebody looking at
12  that chart would understand that it was zero because it
13  was a default value with the absence of your
14  supplemental report?
15      A    I believe they would or if they didn't,
16  they would ask.
17      Q    You say in the last full paragraph, the
18  suicides and suicides attempts --
19      MR. BARNES:  What page?
20      MR. ALTMAN:  I'm sorry, we're on 21.
21      Q    It says:  The suicides and suicide attempts
22  from COSTART were mapped to the major PT suicide
23  attempt.  Did I read that correctly?
24      A    Yes.
25      Q    That means that some of the suicides, and

260

1  just to go back, there was no term for suicide back in
2  the COSTART era prior to the AERS, correct?
3       MR. BARNES:  I don't think that's right.
4    Q    There was no term for completed -- there
5  was no term for completed suicide in the COSTART
6  dictionary, correct?
7       MR. BARNES:  Don't guess.  If you don't
8  recall.
9    A    I'd have to go back and look at the HL in
10  my code.  I believe it's in my -- it's in one of my
11  exhibits that I looked at, the COSTART coding
12  dictionary.
13   Q    Okay.  Well, we discussed this last time.
14  I'll represent to you there is no term for completed
15  suicide in the COSTART dictionary.
16      MR. BARNES:  Objection.
17   Q    You show evidence of that because you say
18  the suicides and suicide attempts from COSTART were
19  mapped to the major term suicide attempt.  Why would
20  you map.  If it was a completed suicide, why would you
21  map that to suicide attempt if you could tell that it
22  was a completed suicide?
23   A    There are many situations in the mapping of
24  COSTART to MedDra where a term in COSTART is coded to a
25  more generic term in MedDra.

261

1    Q    Okay.  On 24 when we were talking before
2  about the HLT, did you happen to look at what effect of
3  the numbers including intentional self-injury,
4  self-injurious behavior, self-injurious ideation in the
5  HLT had on the percentages and calculations using the
6  HLT?
7    A    I didn't look at percentages.
8    Q    Did you have any impact -- do you have any
9  understanding of how that impacted the PRR as you
10  calculated it?
11   A    Can you repeat that?
12      MR. BARNES:  She used preferred terms.
13      MR. ALTMAN:  She also said that she
14  calculated HLTs.  But I'm asking how it would have
15  impacted.
16   Q    Do you know what percentage, if you take
17  suicidal and self-injurious behaviors and HLT, do you
18  have any idea what percentage of those reports are
19  distinctly intentional self-injury, self-injurious
20  behavior or self-injurious ideation?
21      MR. BARNES:  Objection, if you know.
22   A    No, I don't.
23   Q    If I told you it was between 2 and
24  3 percent of the reports, would you have any basis to
25  dispute that?

262

1       MR. BARNES:  Objection.  Calls for
2  speculation.  You either have personal knowledge or you
3  don't.
4    A    Percentage of what reports?
5    Q    If you take all of the reports of suicidal
6  and self-injurious behavior in the entire FDA database
7  and you look at how many of those reports only have
8  self-injurious behavior, self-injurious ideation or
9  intentional self-injury, that represents about
10  3 percent of all of the reports of suicidal and
11  self-injurious behavior.  Do you have any basis to
12  dispute that?
13      MR. BARNES:  One way or the other she says
14  she hasn't looked at it.
15   A    I have no basis at all.  I haven't looked
16  at that.
17   Q    Do you think that 3 percent of the reports
18  that may or may not be related could substantially
19  alter --
20   A    I don't understand what you're talking
21  about.
22      MR. BARNES:  Objection.
23   A    It makes no sense.
24   Q    We'll move on.
25       See at the top of page 25.  You say, even

263

1  if there were a signal in 1994, and I just want to
2  verify you did not do anything to review whether there
3  was or was not a signal in 1994, correct?
4    A    That's incorrect.  I did the data mining to
5  go back from day one.
6    Q    So once again --
7    A    So there was no statistical alert.  If
8  there's no statistical alert it doesn't take you to the
9  next step to see if there's a signal.
10   Q    But as we said that's assuming that you
11  have to use data mining to determine signals.  So
12  you're not saying the general proposition that there
13  might not have been a signal based on case reports or
14  clinical judgment, correct?
15   A    If there was nothing on the Parson's
16  report, then it's a pretty good assumption there was
17  nothing prior to the Parson's report because they
18  looked at all of the data from the beginning of
19  marketing, so.
20   Q    They only looked at data on suicide,
21  suicide attempt and suicidal ideation, correct?
22      MR. BARNES:  Do you need to see the report?
23   A    I would have to go back to the original
24  report.
25   Q    I'm going to mark as an exhibit -- I

264

1  believe we're at 26.

2        (Whereupon, a document was marked as

3  Deposition Exhibit Number 26.)

4     Q    This is a really, really new document that

5  frankly was just made available probably on Tuesday of

6  last week which represents the FDA's -- the letter that

7  the FDA is sending to all the manufacturers of

8  antiepileptic drugs in response to the analysis in the

9  advisory committee.  Have you had to see this document

10 prior to today?

11    A    Not this version of it.

12        MR. BARNES:  Why don't you take some time

13 and read through it.

14    Q    I'm going to ask you very little about it.

15 We're not going to get into the gory details of it.

16        Really what I'm going to ask you about is

17 on page 8 in the proposed medication guide.  It's not

18 proposed, I think this is the medication guide.

19        MR. BARNES:  The medication guide prepared

20 by FDA.

21        MR. ALTMAN:  Prepared by FDA which I

22 believe is what will be required of all manufacturers.

23        (Witness reading.)

24        MR. BARNES:  We'll object to this as being

25 a unspecified document sent out to -- I guess publicly,

265

1  which is not specifically been proposed on Neurontin or

2  gabapentin.  Although I'm not denying it wasn't sent to

3  them.  But I'm not accepting your assertion that this

4  is what the FDA will require at this point.

5        MR. ALTMAN:  That's fine.

6        THE WITNESS:  I haven't seen this document

7  before.

8        MR. BARNES:  We're not stipulating as to

9  actually any aspect of this medication.

10        MR. ALTMAN:  I will represent this is what

11 is publicly available on the FDA web site which I

12 personally downloaded and provided to you.

13        MR. BARNES:  What I'm saying -- I'm just

14 saying we're not accepting the information in here is

15 specifically applicable to Neurontin.

16        It's a medication guide that's on the web,

17 but this may not be the medication guide for Neurontin

18 because the numbers in this don't even relate to

19 anything that has to do with Neurontin as far as I can

20 tell.  I haven't seen this before.

21        MR. ALTMAN:  That's fine.  I understand

22 your concern.

23 BY MR. ALTMAN:

24    Q    On page eight --

25    A    Page eight?

266

1     Q    Yes.

2     A    Okay.  There's page three, here's page

3  numbers.

4     Q    It's the medication guide.

5     A    Okay.  Page eight.

6     Q    Call a healthcare -- point 2 it says:  Call

7  a healthcare provider right away if you have any of

8  these symptoms.  Especially if they are new, worse or

9  worrying you.  Did I read that correctly?

10    A    Yep.

11    Q    Would you please read in that list?

12    A    Thoughts about suicide or dying; attempts

13 to commit suicide; new or worse anxiety; feeling

14 agitated or restless; panic attacks; trouble sleeping;

15 insomnia; new or worse irritability; acting

16 aggressively, being angry or violent; acting on

17 dangerous impulses; an extreme increase in activity or

18 talking, mania; other unusual changes in behavior or

19 mood.

20    Q    Does this document list things other than

21 simply suicidal ideation or attempts?

22    A    Yes.  It's quite a long list.

23    Q    So according to the FDA new or worse

24 depression should also be looked at, correct?

25        MR. BARNES:  Objection.  That's not what it

267

1  says.

2     Q    Okay.  Is it correct, that's what it says?

3        MR. BARNES:  No, it says call a healthcare

4  provider.

5     A    Call a healthcare provider.

6     Q    If you have symptoms of new or worse

7  depression, correct?

8     A    If you have any of these symptoms,

9  especially if they're new, worse or worry you.

10    Q    And one of them is new or worse depression,

11 right?

12    A    That's on the list.

13    Q    So according to the FDA and this is an

14 alert talking about suicidality, correct, the entire

15 document?

16        MR. BARNES:  It's a medication guide.  It's

17 not an alert.

18    Q    It's a medication guide.  But the whole

19 topic of this medication guide and the documents here

20 are talking about suicidality associated with

21 antiepileptic drugs, correct?

22        MR. BARNES:  Objection.  Misstates and

23 mischaracterizes the document.  And you're asking her

24 to assume what FDA's intent was.

25        MR. ALTMAN:  I'm not asking her to assume

268

12/22/2008 Weiss-Smith, Sheila

1    anything.
2            MR. BARNES:  Yes.  Reask your question and
3    listen to it again.
4        Q     Go to the bottom of the first page.
5            MR. BARNES:  The medication guide?
6        Q     No, the first page of the entire document.
7        A     Okay.
8        Q     It says:  After considering all relevant
9    information, including the new safety information, we
10   believe that the new safety information --
11       A     Where are you?
12       Q     At the bottom -- we believe that the new
13   safety information should be included in the labeling
14   of, insert name, and we have determined that a REMS is
15   necessary for the drug to ensure that the benefits of,
16   insert name, outweigh the risks.
17           Did I read that correctly?
18       A     You read it correctly, but it doesn't make
19   sense in light of the safety information, the study
20   that they did.  This is not supported by the data.
21       Q     So you disagree with the FDA, correct?
22       A     I disagree with this one on the FDA.  I
23   think they've misinterpreted their study and it has
24   some flaws.  Seriously misinterpreted it.
25       Q     That's fine.  But this is what the FDA has

269

12/22/2008 Weiss-Smith, Sheila

1    decided, correct?
2        A     I don't know.  I haven't seen this document
3    that you've given us today.  I don't know what stage
4    it's at.
5        Q     If this document is being sent out to all
6    manufacturers of antiepileptics, this is the FDA's
7    decision, correct?
8        A     I don't know if this is the document that's
9    finally getting sent out.  I don't know what stage it's
10   in.
11       Q     If the FDA has it on their web site and
12   says this is what we're sending out to manufacturers,
13   do you have any basis to dispute that?
14       A     I have no basis either way.  I haven't seen
15   it before today.
16       Q     Okay.  Assuming that this is the document
17   that the FDA is sending out, which I will represent to
18   you is what they have told the world in making it a
19   public record, does it appear that on the medication
20   guide page two there are other symptoms that the FDA
21   has decided is relevant to the question of whether
22   somebody will commit suicide?
23           MR. BARNES:  Objection.  Assumes facts not
24   in evidence as to what FDA decides.
25       A     I don't know in what context they've

270

1    included this large list of symptoms.
2        Q     Is that the first time the FDA ever used a
3    list like this?
4        A     I do not know offhand.
5        Q     Do you know if in the original alert there
6    was a listing of symptoms that were of concern?
7        A     I'd have to go back and refresh my memory.
8        Q     Okay.  Before we move off this, would you
9    consider an intentional self-injury to be a dangerous
10   impulse?
11       A     I don't want to make a clinical judgment.
12       Q     Okay.  But just to be sure, you did make a
13   clinical judgment in deciding not to include
14   intentional self-injury in the terms for data mining,
15   correct?
16       A     That wasn't a clinical judgment.  That was
17   a methodologic decision based on adverse event
18   reporting.
19       Q     So I'm not sure I understand why you didn't
20   include intentional self-injury then?
21           MR. BARNES:  Objection.  Asked and
22   answered.  Tell him again.
23       A     Again, I limited to those events that were
24   A, by themselves serious by definition and that those
25   are the two.  I didn't want to include a grab bag

271

1    events.  I wanted to be very specific.
2        Q     Do you know?
3            MR. BARNES:  Let her finish her answer.
4        Q     I'm sorry.  I thought you were done.
5        A     That's very important with this because
6    it's adverse event reporting.  There's a lot of
7    inherent biases.
8        Q     Do you know if when you did your
9    calculations, your charts here, as we have discussed
10   before, you calculated one ratio and another ratio and
11   the two were divided together, that's how you got your
12   PRR; is that right?
13       A     That's essentially what it is.
14       Q     Your denominator you were very important
15   you wanted to use serious reports, correct?
16           MR. BARNES:  Objection.
17       A     I didn't limit it to serious reports.
18       Q     Well, suicide and suicide attempt?
19       A     I limited it to those serious events.  So
20   those two events.
21           MR. BARNES:  For the denominator or
22   numerator?
23           MR. ALTMAN:  For the numerator.
24           MR. BARNES:  Your question is denominator.
25       Q     I'm sorry.  Your numerator was limited to

272

1   serious events, correct?

2       A    My numerator was limited to suicide and

3   suicide attempt.

4       Q    By the way, do you know if there were any

5   suicide attempts that were marked as nonserious?

6       A    Didn't look at that.

7       Q    But presumably -- did you presume that

8   suicide attempt would be serious?

9       A    I presumed that it would be clearly

10  reported more so than some of these more nefarious kind

11  of terms.  So yes, that is why I used it.

12           And, two, it's also used in the literature.

13  It was part of Bentson McFarland's paper, Suicide and

14  Suicide Attempt.  Those are two reports that were

15  reasonable to get from large databases.  So I believe

16  they're reasonable to look at.

17      Q    Are suicide attempts serious?

18      A    I believe they can be.

19      Q    Are they always?

20      A    Clinically, I don't know about every single

21  scenario.  So I'm not going to make that judgment.  But

22  I would assume that it probably is very serious when

23  someone makes an attempt to kill themselves.

24      Q    In your denominator did you include

25  nonserious reports?

273

---

1       A    I included all reports in my denominator.

2       Q    Top of page 25.  I think we were talking

3   about, let's see, even if there was a signal in 1994,

4   we looked at in the letter from the FDA that there are

5   other terms listed there in the medication guide

6   concerning suicidality and antiepileptic drugs.  We

7   looked at that before.

8            Do you know if there were issues with other

9   adverse event terms besides suicide and suicidal

10  ideation from a clinical perspective in that timeframe?

11      A    I'm not quite there I understand what

12  you're saying.

13      Q    You refer to the Parson's report which only

14  looked at suicide, suicide reports and suicidal

15  ideation.  Parson's report didn't look at depression,

16  correct?

17      A    I don't believe it did.  I have to go and

18  refresh my memory.

19      Q    It didn't look at anxiety, correct.  Is

20  that correct?

21      A    Do you have a copy of it?

22      Q    I don't.

23      A    I'd like to see it.

24      Q    I don't.

25           MR. BARNES:  If you know, please answer.

274

---

1       A    I can't remember.  I would have to actually

2   look at the report.  It's been a while.  We did this a

3   year ago.

4       Q    Okay.  That's fine.

5            We talk about the gabapentin data capture

6   rate and you said it wasn't feasible to use the

7   gabapentin data capture rate back in 1994; is that

8   correct?

9       A    I don't believe it was feasible, yes.

10      Q    Could you have done -- used something like

11  the gabapentin data capture rate using terms that were

12  in use in 1994?

13      A    It's my understanding that this concept

14  didn't exist in 1994.  A lot of this came out of the

15  work out of Columbia University which was published

16  much later.  It didn't come out until they were doing

17  the studies of suicidality and SSRI.  So this concept

18  of suicidality didn't exist way back when in the way it

19  does today.

20      Q    The company was coding reports as completed

21  suicide back in 1994, correct?

22           MR. BARNES:  Objection.

23      Q    Internally?

24           MR. BARNES:  Objection.  If you know.

25      A    I did see reports that were coded with

275

---

1   completed suicide in them.

2       Q    So they were not limited by, internally,

3   the company was not limited by COSTART, correct?

4       A    I don't want to make an assumption.  I

5   don't know what the limits were on the company in 1994.

6       Q    Do you know if the company was required to

7   use any particular dictionary in conducting it's

8   pharmacovigilance activities?

9            MR. BARNES:  What time period?

10      Q    In 1994.

11      A    If they were required?  I'm not aware of

12  what the requirements were in 1994.

13      Q    Have you ever reviewed the guidance for

14  industry on post-marketing safety for guidance

15  reporting?

16      A    Yes, I have.

17      Q    Could the company have used a different set

18  of terms if they wanted to monitor psychiatric,

19  concerns of psychiatric adverse event associated with

20  use of Neurontin?

21           MR. BARNES:  Different from what, Keith?

22           MR. ALTMAN:  Can I finish?

23      Q    And done conceptually the same things they

24  were talking about doing with the data capture rate,

25  which was to look at a collection of terms together?

276

1     MR. BARNES:  Objection.  Assumes facts not
2  in evidence as to what the gabapentin capture rate was
3  supposed to -- its purpose.  You can answer.
4     A     I'm saying this specific data capture rate
5  involves concepts that weren't, in terms that weren't
6  in use in 1994.  What else they could have done, I
7  don't want to surmise.
8     Q     You also mentioned that she didn't include
9  intentional overdose when she did her analysis.  I
10  believe that's on page 24.  Is that correct?  You say
11  two additional terms which she missed were intentional
12  overdose and deliberate poisoning.  Do you see that?
13  It's about the middle of the paragraph?
14     A     Uh-huh.  I do see that.
15     Q     Would it have made sense to look for
16  disproportionalities with Neurontin using the term
17  intentional overdose at the PT level?
18     MR. BARNES:  For what purpose?
19     A     In what context?
20     Q     Are you aware that many people who used
21  Neurontin used it at a higher dosage than was approved
22  by the FDA?
23     A     No, I'm not aware.
24     Q     I want you to assume that the evidence will
25  show that that's, in fact, true.  Would some of those

1  potentially have an adverse event associated
2  potentially have included --
3     THE COURT REPORTER:  You have to repeat
4  that question again.
5     MR. ALTMAN:  Sorry.
6     Q     I want you to assume that the evidence will
7  show that is in fact true that many people used
8  Neurontin at dosages higher than approved by the FDA.
9  If an adverse event occurred associated with that use,
10  might the reviewer -- might the company have coded it
11  also as intentional overdose because they took a dosage
12  greater than that approved by the FDA?
13     MR. BARNES:  Objection.  Vague as to many.
14  Assumes facts not in evidence.  Lack of foundation.  If
15  you can answer that, go ahead.
16     A     I don't know how I could answer that
17  question.
18     Q     Okay.  So you don't know whether there was
19  good reason to not use the term intentional overdose in
20  performing data mining activities?
21     A     You're taking my words out of context.
22  Here what I'm talking about is Dr. Blume justifies her
23  use of the HLT by saying it's exactly the same thing as
24  in the data capture rate which is just everything I
25  use, plus a few other terms.  But it's more than that.

1  She only uses 60 percent of the terms.
2     So I wanted to be very clear to say that
3  the premise that she's basing her statement on is in
4  fact incorrect.  It is not the same thing.
5     Q     Okay.
6     A     Six out of 10 terms is not the same thing
7  as 100 percent of the terms.
8     Q     Let's go to page 27.  Bottom paragraph,
9  second sentence.  Mr. Altman states that PRR analysis
10  can generate a "signal of a safety problem that when
11  combined with other information supports the conclusion
12  that Neurontin has the biological capacity to cause
13  patients who take it to commit or attempt suicide."
14  Altman declaration 2008 paragraph 27.  Did I read that
15  correctly?
16     A     That's what I wrote here.
17     Q     In putting that in double quotes, are you
18  telling the reader that Mr. Altman, who is me, makes
19  that statement as if it is his statement?
20     A     I'm putting quotes that is what I got out
21  of your declaration on paragraph 27.
22     Q     And you would lead a reader to believe that
23  that is what I, Mr. Altman, states as if it is my
24  statement, correct?
25     MR. BARNES:  Objection.  Misstates her

1  testimony.
2     Q     Let's go off the record.  Change the tape.
3     THE VIDEOGRAPHER:  We're going off the
4  record.  The time is 5:14 p.m.  This is the end of tape
5  number 6.
6          (Off the record.)
7     THE VIDEOGRAPHER:  We are on the record.
8  The time is 5:26 p.m.  This is the beginning of tape
9  number 7.
10  BY MR. ALTMAN:
11     Q     Okay.  I'm going to mark what's Exhibit 27.
12     (Whereupon, a document was marked as
13  Deposition Exhibit Number 27.)
14     Q     Have you seen Exhibit 27 before?
15     A     It looks familiar.
16     Q     I believe that's what you're talking about
17  at the top of page 28; is that correct?
18     MR. BARNES:  The supplemental report.
19     Q     The supplemental report, sorry.
20     A     Is this Exhibit C?  Can you verify that?
21  Altman Declaration 2008.
22     MR. BARNES:  I'll take Mr. Altman's --
23     MR. ALTMAN:  Let's be sure.
24     MR. BARNES:  -- reference to that.  I
25  believe it's Exhibit C.  He can tell you.  I'll take

1  his representation as to --

2         MR. ALTMAN:  Yes.  It's Exhibit C.

3         MR. BARNES:  Page 28 at this point.

4         MR. ALTMAN:  That's correct.

5         MR. BARNES:  Okay.

6  BY MR. ALTMAN:

7      Q     Now, you comment -- first of all, have you

8  ever seen any analysis ever performed by the company of

9  any kind at any point in time that reviewed adverse

10  events broken out specifically by different occasions?

11     A     I don't recall.

12     Q     Okay.  You suggest here that this is an

13  example -- this graph purportedly shows an increase in

14  the percentage of serious adverse event reports for

15  suicidal and self-injurious behavior associated with

16  psychiatric indications; is that correct?

17     A     Say that again.

18     Q     That this graph graphs the percentage of

19  serious adverse event reports of suicidal and

20  self-injurious behavior for various different

21  indications, correct?

22     A     Purported that's what it says.

23     Q     You comment upon the fact that there is an

24  increase in the psychiatric curve and you say his work

25  clearly illustrates -- his work clearly illustrates the

---

1      A     Yes.

2      Q     Now --

3      A     That's based on the literature, not based

4  on your graph.

5      Q     Understood.  The question is, is that, if

6  there's an increase in the percentage of suicidal and

7  self-injurious reports for psychiatric conditions,

8  there are many explanations as to why you might see

9  that, correct?

10         MR. BARNES:  You mean hypotheses or

11  explanations?

12     A     Could you repeat that?

13     Q     Possible explanations as to why you see

14  this graph, correct?

15     A     There are many possible explanations.  You

16  have to go back and first say is this true and if it's

17  true.

18     Q     I'd like you to assume for the purpose of

19  our discussion that this chart is accurate?

20     A     Of what data?

21     Q     Of -- this is of companies -- companies'

22  internal AIRS G data, which you didn't look at, but

23  that these percentages are accurate based upon the

24  data?

25     A     I'd have to make an assumption.  I don't

---

1  importance of considering confounding by indication.

2  Suicidal behaviors expected to be higher among patients

3  who are being treated for psychiatric conditions than

4  epilepsy and other indications.  Did I read that

5  correctly?

6      A     Yes.

7      Q     Is one possible explanation for that

8  increase that people who take Neurontin for psychiatric

9  conditions use the drug and it has no efficacy and that

10  the person just did what someone -- an untreated person

11  might do if they don't receive treatment?

12         MR. BARNES:  Objection.

13     A     I'm not making those assumptions.

14     Q     Is that a possible explanation of why you

15  see that increase?

16     A     I have a lot of questions about this graph

17  before I would actually be able to interpret it.

18     Q     You comment upon the increase in the curve

19  for psychiatric conditions, right?  You say that shows

20  demonstrates confounding, correct?

21     A     I said, your work clearly illustrates the

22  importance of considering confounding by indication.

23     Q     And then you say -- you say suicidal

24  behavior is expected to be higher amongst patients,

25  correct, who are -- psychiatric conditions, right?

---

1  know.

2      Q     I'd like you to assume that, but you have

3  no basis for saying that that's not true because you

4  didn't look at the data, correct?

5         MR. BARNES:  You're asking her -- say what

6  you want her to assume again.

7      Q     I just want you to assume that the numbers

8  here are numerically correct?

9         MR. BARNES:  Okay.

10     A     I'll make an assumption.

11     Q     And that's fine.  This chart does show that

12  the percentage of reports of suicidality, suicidal and

13  self-injurious behavior for people who took Neurontin

14  for psychiatric conditions is higher than the other

15  indications, correct?

16         MR. BARNES:  It's a greater percentage.

17     Q     It's a greater percentage, correct?

18     A     Percentages of serious report --

19         (Witness reading.)

20     A     Now is this only amongst serious reports?

21     Q     Yes.

22     A     Are these the denominator and the numerator

23  or just the numerator?

24     Q     This is only serious reports.

25     A     Among all the serious reports?

1    Q    -- of serious reports, correct.  So, for
2    example, if you take June 30th, 2006, the chart shows
3    that about 9 percent of the serious reports for people
4    who took Neurontin for -- where psychiatric conditions
5    were indicated with suicidal and self-injurious
6    behavior --
7    A    What time point?
8    Q    June 30th of 2000, I'm sorry 2000, 6/30.
9    June 30 of 2000.  9 percent.
10    Q    Okay.  And?
11    Q    Does this chart show that a higher
12    percentage of people taking the Neurontin for
13    psychiatric conditions had an event of suicidal and
14    self-injurious behavior?
15    A    No, it does not.
16    Q    A higher percentage of reports were of
17    suicidal and self-injurious behavior?
18    A    Could you repeat the question, please?
19    Q    Does this chart show that a higher
20    percentage of reports of people taking Neurontin for
21    psychiatric conditions had an event of suicidal and
22    self-injurious behavior?
23    A    One more time.
24    Q    Does this chart show that a higher
25    percentage of reports of people taking Neurontin for

285

1    I'm telling you that at 2000, 6/30,
2    June 30, 2000, 9 percent of the serious adverse event
3    reports where the indication was a psychiatric
4    condition contained a term for suicidal and
5    self-injurious behavior.  Okay?
6    A    In which the indication was specified as
7    psychiatric.
8    Q    As psychiatric?
9    A    That is what I believe this is telling me.
10    Q    And for antiepileptic at the same time in
11    point it appears to be about 1.6 percent; is that
12    correct?
13    A    Antiepileptic?  It's hard to say, but yeah,
14    somewhere about 1 percent maybe.
15    Q    I'm sorry, you're right, a little above
16    1 percent, correct?
17    A    1 percent of the serious reports had HL --
18    one of these HLTs in there.
19    Q    Right.
20    A    Among those who specified an outcome,
21    antiepilepsy.
22    Q    Right.
23    Q    Okay.
24    Q    Now if you look at this chart, what it
25    shows is that the percentage for psychiatric conditions

287

1    psychiatric conditions had an event of suicidal and
2    self-injurious behavior?
3    A    Higher than what?
4    Q    Than the other indications on this chart?
5    MR. BARNES:  The issue here, maybe you can
6    help us, just for the record, when you look up -- all
7    the percentages here do not add up to 100 percent.  So
8    it's difficult for -- to answer that question.  When
9    you look at it, you only have, like, 25 percent of
10    the -- you add up all these things and you've got much
11    less than --
12    Q    I'll go at it a different way.  If you take
13    a look at 2000 June 30, 6/30?
14    A    Okay.
15    Q    This chart shows that 9 percent of the
16    serious reports where the indication was psychiatric
17    conditions with suicidal and self-injurious behavior.
18    Were these only among the psychiatric
19    conditions?
20    Q    9 percent of the people who took it for
21    psychiatric indications, where that was indicated in
22    the database, is for a psychiatric condition.  Okay?
23    A    Not yet.
24    Q    All right.
25    A    Not yet.

286

1    is higher than any of the other conditions, correct?
2    A    Well, because I don't know the N's and --
3    Q    Just the percentage, I'm not asking about
4    N's.  The percentage is higher, correct?
5    A    But it could be one out of 2 or 1 out of
6    10.  So it may not be meaningful.
7    Q    But the percentages are higher?
8    A    The percentage are different.  I don't know
9    how meaningful they are because I don't have access.
10    Q    But is the percentage higher for
11    psychiatric conditions than the other conditions?
12    A    The percentage is different, yes.
13    Q    Are they higher?
14    A    9 percent is higher than 1 percent, yes.
15    Q    And at the data point before is it also
16    higher at June 30th of '99?
17    A    Again, I'm not sure about the significance
18    of it.  Whether it's statistically significant, the
19    underlying N's.  We could be talking about three cases
20    here.  But the numbers -- the percentages are
21    different.
22    Q    And, in fact, at every point after 1999 on
23    this chart the psychiatric conditions is higher than
24    the other curves, correct?
25    A    Was this zero over zero or?  You have some

288

12/22/2008 Weiss-Smith, Sheila

1  zeros here.  Zero percentages.

2     Q     No, that means there are no suicidal and

3  self-injurious reports -- no serious for psychiatric

4  conditions at that point in time?

5     A     Thank you.

6     Q     It's zero.  It's not zero over zero.  It

7  means zero.  It's not undefined.  It's zero.

8           Anyway, but at every point after 1999 the

9  percentage for psychiatric conditions is higher,

10 correct, than any of the other indications?

11    A     After 1999?

12    Q     June 30th of '99, that data point.

13 Everything is higher, correct?

14    A     The percentages are higher for that

15 subgroup.

16    Q     Now, is one explanation for that

17 observation that these are people with psychiatric

18 conditions and people with psychiatric conditions tend

19 to commit suicide more than people with these other

20 conditions?

21    A     I would say very strong possibility.

22    Q     That's one possibility?

23    A     That they have a lot of underlying

24 conditions.  They may be treated because of that very

25 reason.

289

---

12/22/2008 Weiss-Smith, Sheila

1     Q     That's correct.

2     A     High risk.

3     Q     That's what we talk about with confounding

4  indication, correct, confounding by indication; is that

5  correct?  That's what you were talking about?

6     A     Yes.

7     Q     Now, is another possible explanation that

8  Neurontin had no efficacy for these people and so

9  basically you were dealing with people who had

10 psychiatric conditions who were not receiving any

11 treatment and they committed suicide?

12          MR. BARNES:  Objection.  Assumes facts not

13 in evidence and --

14    A     It's way beyond what I can take from this

15 chart.  We don't have anything about efficacy.  We

16 don't have anything about whether they're on other

17 treatments.  And I would expect a lot of them are on

18 other drugs, from what I've seen.

19    Q     I just asked if one possibility is that

20 Neurontin is not efficacious for these people?

21    A     It's so far beyond what this shows, that's

22 a real big leap.

23    Q     Is it a possibility?

24          MR. BARNES:  If you --

25    A     For everybody?  I can't imagine.

290

---

1     Q     Is it a possible that that's what's going

2  on, that Neurontin has no efficacy?

3           MR. BARNES:  Objection.

4     A     It's not a reasonable assumption based on

5  this chart.

6     Q     Is it possible that Neurontin actually is

7  causing harm?

8           MR. BARNES:  Objection.

9     A     Based on all of the data that I've seen,

10 there is no evidence at all that Neurontin is causing

11 harm.

12    Q     But you've never looked at the data by

13 indication, correct?

14    A     I looked at the FDA analysis which they

15 looked at the indications for the trial and this is

16 absolutely not what they saw.

17    Q     They did not look at spontaneous data,

18 correct?

19    A     Right, because they don't believe that the

20 spontaneous data has any validity for looking at this

21 outcome because of the confounding indication which is

22 probably what you're seeing here.

23    Q     But that's speculation --

24          MR. BARNES:  Objection.

25    Q     -- that's probably what you've seen,

291

---

1  correct?

2     A     Confounding by indication is the biggest

3  problem we have in pharmacoepidemiology, and it's the

4  first thing one considers when they're looking at

5  spontaneous data or observational data in general.  So

6  it's a pretty good guess.  This looks pretty clear.

7     Q     Is it also possible that the drug is

8  actually causing people to commit suicide based on this

9  chart?

10          MR. BARNES:  Objection.

11    A     Based on this chart, you can't take that

12 leap.

13    Q     But you can take the leap that it's

14 confounding by indication?

15    A     That is the first explanation that I would

16 consider when I look at this because if it's biological

17 you would expect the rates to be up on all the groups.

18    Q     What?

19    A     You would expect the rates to be elevated

20 on all the groups.  Why would you expect --

21    Q     So is it your opinion that drugs affect

22 every population of people the same way.  That they

23 don't have different effects depending on a particular

24 population?

25    A     Can you clarify that.

292

1    Q    Sure.  Are some drugs contraindicated to
2  people are who allergic to a substance within the drug?
3    A    They can be.
4    Q    So for that particular population, there is
5  a risk that is different in using the drug than for
6  people who are not allergic to the drug, correct?
7    A    An allergic response, yeah.
8    Q    The risk is different for that population,
9  right?
10    A    The risk of having an allergic response is
11  different.  It's not zero in the people that haven't
12  had a previous allergy, but it is lower.
13    Q    But there's a different risk, correct,
14  there's a risk differential?
15    A    Right.  Everyone has the risk, but the
16  likelihood may be different.
17    Q    How do you know that people who are
18  bi-polar don't have a different risk in using Neurontin
19  than people who are epileptic?
20         MR. BARNES:  Objection.
21    A    I have no evidence to base that on.
22    Q    But you don't know one way or the other,
23  correct?
24         MR. BARNES:  Objection.
25    A    I know from the literature that there's

293

1  differential baseline risks regardless of treatment.
2  But there's no evidence that Neurontin changes the
3  risk.  There's some evidence actually that may decrease
4  the risk of suicidality.
5    Q    But in the clinical trials, there was only
6  about 10 or 12 patient years of exposure, correct?
7    A    10 or 12?
8    Q    10 or 12 patient years of exposure for
9  bi-polar, correct?
10    A    I don't recall the numbers of patients with
11  exposure.
12    Q    If I told you 945209 that there was seven
13  years of patient exposure, this was listed in the
14  Parson's report, do you have any reason to dispute
15  that?
16    A    I just have to go back and verify it.
17    Q    Would you consider seven patient years of
18  exposure adequate exposure to determine whether
19  Neurontin presents a risk of suicide to a bi-polar
20  population?
21    A    Just that of itself?
22    Q    Well, if there's -- that's the only
23  clinical trial in bi-polar in randomized clinical trial
24  in a bi-polar population and you have seven patient
25  years of exposure, is that adequate exposure to

294

1  determine that Neurontin does not have a risk of
2  suicidality to a bi-polar population?
3    A    It's not adequate to show that it does.  It
4  doesn't show anything.
5    Q    And can you conclude from that that there
6  is not a differential risk for people who are bi-polar
7  in using Neurontin and for people who are not bi-polar?
8    A    But if there isn't a risk, how can there be
9  a differential risk?
10    Q    Differential risk generally.  Not just of
11  suicidality.  In seven patient years of exposure, would
12  you be able to determine that Neurontin is safely being
13  used in a bi-polar population?
14    A    I don't know that.  It's based on FDA
15  regulations and what is an adequate and well-controlled
16  trial.  I don't want to make suppositions of what was
17  and wasn't adequate well-controlled trials.
18    Q    But you're aware that Neurontin does not
19  have a bi-polar indication, correct?
20    A    I'm aware of that.
21    Q    And that they never submitted an
22  application for bi-polar, correct?
23    A    I don't know whether or not they ever
24  submitted an application.  I'm aware it does not have a
25  labeled indication.

295

1    Q    And therefore the FDA has never said that
2  Neurontin is safe and effective for use in the bi-polar
3  population, correct?
4    A    It is, from what I've learned and there was
5  of a wonderful article just published this month, that
6  there are quite a few drugs that are used in bi-polar
7  that are not labeled and they suggested that bi-polar
8  disease is -- and the drugs being used are one of the
9  priorities for research.
10         MR. ALTMAN:  Objection.  Nonresponsive.
11    Q    Therefore, the FDA has never said that
12  Neurontin is safe and effective for use in the bi-polar
13  population, correct?
14    A    I don't know if the FDA has ever evaluated
15  Neurontin for bi-polar population.
16    Q    How much is 100 percent increase from 10?
17    A    Oh, I'm tired.
18         MR. BARNES:  Take your time.  It's been a
19  long day.
20    A    Yes.  A relative risk.
21    Q    We're not talking relative risk.
22         MR. BARNES:  Reask the question.
23    Q    How much is a 100 percent increase from 10?
24    A    It doesn't make sense.
25         MR. BARNES:  Why don't you put it in

296

```
 1    context.
 2         Q    10 increased by 100 percent is how much?
 3         A    Add two zeros.
 4         Q    Not multiplied.  10 increased by
 5    100 percent?
 6         A    10 or 10 percent?
 7         Q    If 10 is increased by 100 percent, is that
 8    equal to 20?
 9         A    10 doubled, yeah.
10         Q    On paragraph three of your report on page
11    28 you say that a 174 percent increase from 212,978 to
12    370,898.  Did I read that correctly?
13         A    Uh-huh.
14         Q    Is that 174 percent increase?
15         A    Do I get a calculator?
16         MR. BARNES:  Do you want to give her a
17    calculator?
18         A    It's late.
19         Q    174 percent increase would be more than
20    doubled, correct?
21         A    Can I get my calculator.  I'm not doing
22    this --
23         Q    That's fine.
24         A    It's not working.
25         Q    174 percent increase implies more than
```

```
 1    doubling, correct, based on what we just discussed?
 2         A    I want to check my numbers.  But I can't do
 3    it, I apologize.
 4         Q    I'll represent to you it's a 74 percent
 5    increase and --
 6         MR. BARNES:  Probably a typo.
 7         Q    -- not 174 percent increase.  Does that
 8    seem reasonable?
 9         A    Yeah, I mean, like I said, I want to check
10    my numbers.
11         Q    If it's a 74 percent increase, then you're
12    off by 100 percent?
13         A    Okay.  I apologize for the typo.  Thank you
14    for pointing that out.  I'll have to doublecheck that
15    number.
16         Q    Do we know whether there are other mistakes
17    like that within this report and within the
18    computations?
19         A    I try and be very careful.  It's a big
20    report and you tell me.  You probably went over it with
21    a fine tooth comb.
22         Q    That's my job.
23         A    Yep.
24         Q    Second paragraph, page 28.  You say:
25    Suicide events reported from 1997 to 2002, correct,
```

```
 1    you're aware that that point in time is actually
 2    November of 1997?  Are you aware of that?
 3         MR. BARNES:  Where are you?
 4         Q    You say:  Mr. Altman compares the number of
 5    completed suicide event reports from 1997 to 2002.  Did
 6    I read that correctly?
 7         A    Yes.
 8         Q    I'll represent to you that was really from
 9    1998?
10         A    I believe you started in 1997 when AERS
11    started; is that correct?  November 1st of 1997.
12         Q    November of '97, okay.  Given that, that's
13    about a -- just over a five-year period of time,
14    correct?
15         A    Yes.
16         Q    And if there were eight reports, how many
17    reports per year is that to the FDA, so 1.6 --
18         A    One and a fraction each year.
19         Q    1.6, does that sound right?
20         A    About that.
21         Q    First half of 2003 there were 17 reports to
22    the FDA, correct, or that's what it says?
23         A    That's what you purport, yes.
24         Q    And that's 34 per year, correct, 17 and a
25    half a year is 34 per year?
```

```
 1         MR. BARNES:  Objection.
 2         A    I think I made it very are clear in my
 3    report that the numbers of events -- the reports were
 4    not constant in that year.  That it was significant
 5    increase from the first half to the second half of the
 6    year.
 7         Q    But we're only talking about the first half
 8    of the year?
 9         A    Right, but you actually doubled it in your
10    calculation and assumed that it was constant over the
11    year, which was not a reasonable assumption.
12         Q    Well, it was much more than 17 the second
13    half of the year, wasn't it?
14         A    I can't remember what the numbers are.  I'd
15    have to look in the report.
16         Q    But if there was something that changed in
17    the second half of 2003 that could have biased the
18    reports, would you want to exclude that period of time
19    so that you might be able to take that bias into
20    account?
21         A    That's if you can definitively say when the
22    notoriety bias began and I would say that you can't
23    because there's all sorts of issues, particularly with
24    suicidality, with all the publicity with the SSRIs for
25    the two years before that.
```

1    Q    That's pure speculation whether that
2  affected gabapentin, isn't it?
3    A    No, a lot of the drug use for gabapentin
4  includes concomitant use of SSRIs. People use
5  antidepressants and other drugs. So it's not
6  speculative that they would be used concomitantly.
7    Q    But in terms of reporting to Pfizer, you're
8  assuming that that's influence reports being reported
9  to Pfizer, correct, and not to the SSRI manufacturer?
10   A    I think it affects adverse event reporting
11 in general.
12   Q    Do you know what the source of the 17
13 reports were?
14   A    I believe these were poison center reports
15 from the literature.
16   Q    Do you think those were affected by notary
17 bias?
18   A    I think they were accumulated over a long
19 length of time.
20   Q    Because Pfizer didn't look at reports --
21       MR. BARNES: Objection.
22   Q    -- they looked at all of those reports at
23 one point in time, right?
24       MR. BARNES: Objection. Assumes facts not
25 in evidence.

301

1    Q    Was Pfizer -- these reports were
2  accumulated over a period of time, correct?
3       MR. BARNES: By whom? By the poison
4  center?
5    Q    By the poison control?
6       MR. BARNES: That's a different question.
7    Q    These reports didn't all come from one
8  annual report of the poison control centers, right?
9       MR. BARNES: If you know.
10   A    I can't remember whether they came from
11 just one report or several reports.
12   Q    I'd like you to assume that they came from
13 multiple reports, multiple annual reports that were
14 looked at at a period of time. Do you have any
15 evidence that those were influenced by your SSRI bias?
16   A    These specific reports?
17   Q    Yes.
18   A    No, and I don't have any evidence that they
19 weren't separately reported to the drug companies.
20   Q    But we're talking about what Pfizer knew
21 and not what went to other companies. This is only in
22 terms of Pfizer's own data?
23   A    This isn't Pfizer's data, this was in the
24 medical literature.
25   Q    But this is data that was reported by

302

1  Pfizer to the FDA?
2    A    Right, because they're required to monitor
3  the literature.
4    Q    Understood. So Pfizer became aware in the
5  first half of 2003 there were 17 suicide reports from
6  the poison control centers; is that correct?
7       MR. BARNES: If you know.
8    A    I believe that is correct. I have to look
9  at the reports.
10   Q    And you don't have any evidence that those
11 reports were influenced by this SSRI bias you
12 discussed, correct?
13       MR. BARNES: Objection. If you know.
14   A    I don't know. Personally.
15   Q    I want to read you some statements and see
16 if you agree with them. Risk assessment during product
17 development should be conducted in a thorough and
18 rigorous manner. However, it is impossible to identify
19 all safety concerns during clinical trials. Do you
20 agree with that?
21   A    Yes, I do.
22   Q    Therefore post-marketing safety data
23 collection and risk assessment based on observational
24 data are critical for evaluating and characterizing a
25 products risk profile and for making informed decisions

303

1  from risk minimization. Do you agree with that?
2    A    Yeah, I believe that's from the FDA
3  guidance document.
4    Q    This guidance document focuses on
5  pharmacovigilance activities in the post approval
6  period. This guidance uses the term pharmacovigilance
7  to mean all scientific and data gathering activities
8  related to the detection, assessment, and understanding
9  of adverse events. Do you agree with that?
10   A    I use it a little differently, but that's
11 fine. They define it within context.
12   Q    Let me ask you a question: Do you know
13 this document pretty well?
14   A    Yes.
15   Q    Is there anything in it that you disagree
16 with?
17   A    Some things, yes.
18   Q    What do you disagree with?
19   A    I mean, I can't say offhand.
20   Q    Conceptually what do you agree with?
21   A    It's a very good document and it's nice to
22 have that, something that people can look at and refer
23 to.
24   Q    They talk a lot --
25   A    I use it in my class.

304

1    Q    They talk a lot about pharmacovigilance and
2  the absence of data mining, correct, and even talk
3  about how data mining is not required, correct?
4    A    Yes, there's a statement in there about
5  data mining is not a required part of
6  pharmacovigilance.
7    Q    Do you agree with that?
8    A    Yes.
9    Q    So signals can be found without data
10  mining, correct?
11    A    As a signal -- how are you going to define
12  that in its context.
13    Q    I mean, signal as in we have a real concern
14  here, clinical meaning, everything?
15    A    A clinical concern.
16    Q    Clinical signal, a clinical concern that
17  needs to be evaluated, followed-up, potentially lead to
18  a labeling change.  You don't have to have data mining
19  for that?
20    A    That's correct.
21    Q    I think we talked about you don't have to
22  have epidemiology for that either?
23        MR. BARNES:  Objection.
24    A    To work up the signal you would need to do
25  epidemiology or experiments.  You need to do something

1  to work it up.
2    Q    But you don't have to -- you can make a
3  labeling change before that, correct?
4        MR. BARNES:  Objection.  You're replowing
5  old ground, Counsel.
6    Q    I just want to clarify we're talking about
7  a document.  I want to clarify.
8        MR. BARNES:  Why don't you show her the
9  documents.
10        MR. ALTMAN:  She knows the documents.
11        MR. BARNES:  Well she said --
12        MR. ALTMAN:  I'm not reading something from
13  the documents, how can I refer to the documents?
14        THE WITNESS:  I'm not going to make
15  comments on the labeling changes.  That's a whole
16  different animal from this document.
17  BY MR. ALTMAN:
18    Q    Do you know if there was anything that
19  would have prevented the company from tuning its data
20  collection practices in 1994 and 1995 when they first
21  started getting post-marketing events for psychiatric
22  conditions?
23        MR. BARNES:  Objection.  Assumes facts not
24  in evidence.  So if you can answer that go ahead.
25    A    I'm not going to talk about their -- the

1  data collection process.  I'm not privy to what they
2  were doing.
3    Q    I didn't ask you what they were doing.  I
4  asked you do you know of any technical reason they
5  could not have had a specific protocol for collecting
6  data related to the psychiatric adverse events in the
7  1994 timeframe?
8    A    I don't know if they did or didn't or could
9  or couldn't.  I don't have an opinion on that.
10    Q    You were doing -- dealing with drug safety
11  issues back in 1994, correct?
12    A    But not SOPs for data collection and
13  pharmacovigilance, no.
14    Q    Okay.  I'll read you a couple statements
15  and see if you agree or disagree with them.  Because no
16  pharmacologically active drug substance is entirely
17  free of risk, the conclusion that a drug has been shown
18  to be safe for use is actually no more than an opinion,
19  albeit one offered by an individual reasonably
20  knowledgeable in the management of that condition, that
21  the intended target of treatment and the benefits
22  associated with the use of the drug are sufficient to
23  outweigh its known risks of use.
24        MR. BARNES:  Objection.  You read that very
25  fast out and of context.

1        MR. ALTMAN:  Do you want me to read it
2  again?
3        MR. BARNES:  Can you show her the document?
4        MR. ALTMAN:  No.
5        MR. BARNES:  Well, if you can't answer him
6  reading from a document and out of context, just tell
7  him that.
8    A    I really would like that in context.  It's
9  kind of --
10    Q    I'm just asking if you can't agree,
11  disagree, that's fine.
12        MR. BARNES:  Why don't you reread it.
13    Q    I'll break it up.  Because no
14  pharmacologically active drug substance is entirely
15  free of risk.  Do you agree with that?
16    A    Risk is, I mean, people drink too much
17  water and have died from that.
18    Q    I just asked do you agree that no
19  pharmacologically active drug substance is entirely
20  free of risk?
21    A    Possibly, that's potentially true.  Any
22  chemical that one puts in one's body can have risks.
23    Q    The conclusion that a drug has been shown
24  to be safe for use is actually no more than an opinion.
25  Do you agree with that?

```
 1        A     I disagree with that.  It's an educated and
 2   informed evaluation.  I don't believe it is purely an
 3   opinion.
 4        Q     It's still somebody's clinical judgment
 5   that that is in fact a true statement, correct?
 6        A     I don't believe it's one person's clinical
 7   judgment.  I think it's -- it's much more than just an
 8   opinion.  I think that really --
 9        Q     It's a clinical judgment of a group of
10   people that conclude that that's true?
11        A     Based on a wealth of information.
12        Q     It's clinical judgment, though, correct?
13   It's someone's judgment?
14        A     Based on data.
15        Q     It's still a judgment call, correct?
16        A     The benefits?  No, they're clearly
17   identified in clinical trials.
18        Q     That the benefits outweigh the risks?
19        A     That is a process based on data.
20        Q     And that's a judgment call, correct?
21        A     But it's not just purely an opinion.  A
22   clinical judgment based on well controlled studies is
23   much more than just an opinion.
24        Q     That's fine.  Accordingly, risk to benefit
25   assessments are inherently arguable.  Do you agree with
```

309

```
 1   that?
 2        A     No.  I believe they're within context.
 3        Q     So there's no -- so you've been on an
 4   advisory committee, is there not usually disagreement
 5   before a drug is approved or whether a drug should be
 6   approved or not?
 7        A     It varies.
 8        Q     But it's not rare that there's disagreement
 9   amongst members of an advisory committee, correct?
10        A     Yes, I think it's more usual that there's
11   agreement on the approval decision, but sometimes there
12   can be disagreement.
13        Q     So whether the benefits outweigh the risks
14   is something that is reviewed and considered by the
15   advisory committee, correct?
16        A     When there's an advisory committee convened
17   to do so, they would consider the benefits and risks.
18        Q     And you sometimes have discussion and
19   debate over whether the benefits outweigh the risks,
20   correct?
21        A     Sometimes.  Sometimes there's discussion
22   about what the risks are, what the benefits are.  This
23   is all -- discussion of all the points that are brought
24   up.
25        Q     And sometimes the FDA will recommend that
```

310

```
 1   the drug be approved and the advisory committee doesn't
 2   agree with the FDA, correct?
 3               MR. BARNES:  If you know that.
 4        A     From my work it's very uncommon.
 5        Q     But it does happen, correct?
 6        A     I don't know when it's happened in recent
 7   history.
 8        Q     Does it go the other way around, too,
 9   sometimes some of the people at the FDA are not sure.
10   There's some disagreement amongst the reviewers at the
11   FDA as to whether the drug should be approved or not
12   and the advisory committee is asked to take a look at
13   everything and render an opinion?
14        A     For approval decisions?
15        Q     For approval.  Well, for recommendation as
16   to whether the drug should be approved.  It's always up
17   to the FDA, correct?
18               MR. BARNES:  Say it again.
19        Q     The final approval decision is always up
20   the FDA, correct?
21        A     That is correct.  The FDA makes the
22   regulatory decision to prove or disprove a drug.
23        Q     And the advisory committee is brought in
24   there to advise the FDA on what their opinion is,
25   correct?
```

311

12/22/2008 Weiss-Smith, Sheila

```
 1        A     If the FDA convenes an advisory committee
 2   they ask them specific questions.  It's not always as
 3   straightforward as yes or no.
 4        Q     Understood.
 5        A     There's many questions they might ask.
 6        Q     Sometimes there's disagreement within the
 7   FDA.  Within the clinical reviewers you may have some
 8   person -- some people say I don't think this should be
 9   approved and other people say I think it should be
10   approved, it's okay with me.  Correct?
11               MR. BARNES:  Objection.  Calls for
12   speculation.  If you know.
13        A     I've seen in the newspaper a couple of
14   cases, but I haven't heard that that is a normal
15   circumstance at the FDA.
16        Q     So in the couple of drugs that you
17   approved, the FDA was all on board, everybody at the
18   FDA universally said this drug should be approved?
19        A     Could you repeat that?
20        Q     You were on the advisory committee to
21   review a potential new drug application a couple times
22   you said, correct?
23        A     That's correct.
24        Q     And those times the FDA made a presentation
25   to the advisory committee, correct?
```

312

1    A    Yes.

2    Q    And the FDA gave its opinion on whether

3  they thought the drug should be approved, correct?

4    A    Not always.

5    Q    But they looked to the advisory committee

6  to render its opinion on whether the drug should be

7  approved or not, correct?

8    A    In some cases, yes.

9    Q    Do you agree or disagree with the

10  following:  Given the average duration of randomized

11  trials, often months to one or two years, and the

12  average number of patients in randomized trials, often

13  dozens to a few hundred, such trials are at most able

14  to detect and quantify frequent adverse events that

15  occur early only during treatment?

16    A    Jerry Avore (phonetic).

17    Q    No.

18    A    No.  Okay.

19         MR. BARNES:  What's your question?

20    Q    Do you agree with that statement?

21         MR. BARNES:  Does she agree with that

22  statement.

23    A    Say it again.

24    Q    Given the average duration of randomized

25  trials, often months to one or two years, and the

313

1  average number of patients in randomized trials, often

2  dozens to a few hundred, such trials are at most able

3  to detect and quantify frequent adverse events that

4  occur early only during treatment?

5         MR. BARNES:  Objection.

6    A    That's a very general statement.  I think

7  it would need to have a number of qualifiers in there.

8    Q    Moreover, the adverse effect has to be

9  known beforehand or anticipated to be recorded

10  systematically in the trials?

11    A    I don't agree with that statement.

12    Q    The study population in trials which often

13  includes young persons with a single diagnosis and

14  without concurrent disease is often not representative

15  of those who eventually use the drug in the community.

16  Do you agree with that?

17         MR. BARNES:  Objection.

18    A    What's your question?

19    Q    The study population in trials, which often

20  includes young persons with a single diagnosis and

21  without concurrent disease is often not representative

22  of those who will eventually use the drug in the

23  community?

24         MR. BARNES:  For Neurontin or just

25  generally?

314

1    Q    Do you agree with that statement?

2    A    As a general blanket statement, no, I have

3  to have more context for that.

4    Q    It follows that:  Systematic reviews of

5  drug treatments must include not only the results of

6  randomized trials on benefits, but also evidence from

7  observational research on harms.  Do you agree with

8  that statement?

9    A    Say that again.

10    Q    It follows that:  Systematic reviews of

11  drug treatments must include not only the results of

12  randomized trials on benefits but also evidence from

13  observational research on harms?

14    A    I mean that's -- in what context, what

15  reviews?  I mean, meta-analysis?

16         MR. BARNES:  If he doesn't give you enough

17  information you can't answer.

18    A    Yeah, I can't answer it.

19    Q    That's fine.

20         MR. BARNES:  If you show her the document

21  you're reading from, it's a medical article.

22    Q    That's okay.

23         MR. BARNES:  Okay.  If you can't answer,

24  you can't answer.

25    Q    If you can't answer it, you can't answer

315

1  it.  It's totally fine.

2         In contrast data from routine medical

3  practice may very well be used to investigate adverse

4  effects of drugs.  Adverse effects of new drugs are

5  often unknown and unanticipated when those drugs enter

6  the markets.  Do you agree with that?

7    A    These statements are so general that they

8  could be true or not true given the correct context.

9  So I don't want to speculate what they're trying to

10  say.

11    Q    That's fine.  Do you agree with the

12  following statement:  Data mining processes are not

13  able to account for inaccurate or missing data and if a

14  signal is not detected, it is impossible to determine

15  whether no ADE exists or the data are insufficient?

16         MR. BARNES:  Reread that.  It's late and

17  it's --

18    Q    Data mining processes are not able to

19  account for inaccurate or missing data and if a signal

20  is not detected is impossible to determine whether no

21  ADE exists or the data are insufficient.  Do you agree

22  with that?

23    A    Whether not as written, there's a problem

24  with that sentence.

25    Q    Do you agree with the following sentence:

316

| 1 | A signal may consist of only a few case reports and not |
|---|---|

**Page 317**

1  A signal may consist of only a few case reports and not
2  be statistically prominent and nevertheless herald a
3  true adverse reaction?
4     A   Yes, I agree with that.
5     Q   Once a signal has been recognized and
6  assessed, it needs to be followed how it evolves over
7  time in the database.  For example, as regards absolute
8  numbers of cases, the statistical parameters, exposure
9  to the drug and the persistence of the characteristics
10 and consistency of the reports.  Do you agree with that
11 sentence?
12    A   In what context?
13    Q   In the context of signals and
14 pharmacovigilance?
15    A   Repeat it, please.
16    Q   Once a signal has been recognized and
17 assessed, it needs to be followed how it evolves over
18 time in the database.  For example, as regards absolute
19 numbers of cases, the statistical parameters, exposure
20 to the drug and the persistence of the characteristics
21 and consistency of the reporting pattern.
22    MR. BARNES:  And signal as she has defined
23 it for the purpose of her report or a signal based upon
24 another data collection?  Is this data mining or
25 observational or clinical?

---

**Page 318**

1     MR. ALTMAN:  This is a signal.
2     MR. BARNES:  Well, objection.  Vague.
3     A   Yeah, within the context, I'm not quite
4  sure what you're talking about.
5     Q   That's fine.  Do you agree with spontaneous
6  reporting has been designed as a system for hypothesis
7  generation in the first place.  As a rule for the study
8  using the most appropriate and usually different method
9  is needed to put the hypothesis to the test?
10    A   Let's break it up.  I agree with the first
11 sentence.  What's the second sentence.
12    Q   As a rule further study using the most
13 appropriate and usually different method used is needed
14 to put the hypothesis to the test?
15    A   I agree that if you see an alert, or
16 clinically relevant signal, you need to follow-up with
17 another method to test the hypothesis in almost every
18 case.
19    Q   I think one thing we never finally finished
20 up this morning.  And I think I asked you.  If you
21 observe an alert, under what conditions is it okay to
22 do nothing with the alert.  Can you give me some
23 examples of when it would be okay?
24    A   An alert is purely statistic.
25    Q   Okay.  Does an alert need to be evaluated

---

**Page 319**

1  whether it has clinical significance?
2     A   There are and there should be, within the
3  company and within the FDA, protocol beforehand on how
4  one deals with statistical alerts from data mining and
5  what the triage procedure would be.
6     Q   Understood.  Does there have to be some
7  triage procedure?
8     MR. BARNES:  At what time?  As of today's
9  standards?  As of today or different times?  You're
10 talking about a period of time here that is long.  So
11 if it's as presently defined or as understood in 2001.
12 I mean, it's a completely vague as to time.
13    MR. ALTMAN:  I'm asking her opinion on
14 that.
15    Q   Whether an alert needs to be followed up?
16 Does something need to be done with an alert or is it
17 okay to simply ignore it?
18    MR. BARNES:  Objection.  She's testified
19 that you don't even have to do -- you're not even
20 required to do anything with an alert under your own
21 premise.
22    MR. ALTMAN:  You're messing up the
23 question.
24    Q   If you see an alert, is it acceptable to do
25 nothing?

---

**Page 320**

1     A   In what context?
2     Q   To do simply nothing.  You observe an
3  alert.  You run some kind of data mining analysis, you
4  come up with an alert as we have discussed.
5     A   For me or you?
6     Q   I'm not asking for me or you.  A company --
7     A   A company.
8     Q   -- defines an alert.
9     A   For their drug?
10    Q   For their drug.  Is it okay to do simply
11 nothing?
12    A   I don't know what their SOPs are or their
13 legal requirements.  Is the alert evaluated clinically
14 immediately?  Is it separate?  So, I mean, it really
15 would depend on what's going on.
16    Q   Does some kind of evaluation need to take
17 place on the alert to decide whether to go further?
18    A   I believe that it needs some clinical
19 evaluation to see if the alert is actually a signal or
20 if it is something that uninterpretable or something
21 that may not be relevant.
22    Q   Okay.  So something has to happen.  You see
23 an alert.  You got to do something.  You may conclude
24 that it's not relevant, you may conclude it's
25 uninterpretable, you may do something.  But what's not

1  okay is run your data mining and simply put your stuff
2  on the shelf --
3          MR. BARNES:  If you have an opinion.
4          A    I can't make an opinion like that because
5  you're talking in general and things are evolving even
6  as we speak on how data mining is best used.
7          So things are evolving now and that's a
8  good question that I don't think we have been able to
9  answer yet as an industry on how to deal with data
10  mining.
11          Q    For your -- when you access Q Scan, is that
12  through a web site?  Do you go into your log-in and you
13  can run your analyses?
14          A    That's correct.
15          Q    And you can download some of that data or
16  computations or whatever that it produces?
17          A    It's an application.  It has software on it
18  to do statistics, that's all it is.
19          Q    How is the output given to you?
20          A    It depends on what you're looking at.
21          Q    The first time you provided us some Excel
22  spreadsheets of data that formed part of the basis of
23  your report, do you recall that?
24          A    I believe I gave you the raw counts that
25  were used to calculate the PRRs, yes.

1          Q    Did you generate charts similar to that
2  when you did your analyses in your supplemental report?
3          A    Did I for here?  No.
4          Q    For your supplemental report?
5          A    No, I didn't.  Raw data.
6          Q    How did you actually -- the charts that are
7  in your supplemental report, did those come straight
8  from Q Scan or do you actually have to make those
9  charts?  I'm talking about ones on the PRR?
10          A    Which -- give me an example, which one?
11          Q    Your supplemental report.  Let's take on
12  page 22?
13          A    Figure 1?
14          Q    Figure 1, yes.
15          A    So I get the statistic, the PRR statistic,
16  and I put it in an Excel spreadsheet and I plotted it
17  in Excel.
18          Q    I mean, did you hand write that stuff from
19  Q Scan or did you download a chart or something?
20          A    I believe I downloaded a delimited file to
21  a data file.
22          Q    Do you still have those files?
23          A    Probably not.  They're raw files.  I would
24  just recalculate it.
25          Q    Okay.  Did you write out a formal protocol

1  when you did these analyses?
2          A    I put the protocol in my report.  So yes, I
3  decided beforehand what I was going to do.
4          Q    Do you know whether Dr. Blume did a similar
5  thing before she had analyses run?
6          A    Based on the number of tables and runs that
7  you did that were available on the CD that I reviewed,
8  I suspect not.
9          Q    Do you know if Dr. Blume said to run all
10  adverse event terms at all MedDra levels?
11          A    That's what it looks like to me that was
12  done.
13          Q    Is there something wrong with doing that,
14  running all adverse event terms on all MedDra levels?
15          A    Depends on what context.
16          Q    Well, in this context here you make the
17  suggestion that -- frankly, I think you make the
18  suggestion that there's something wrong with doing
19  that.
20          If the practice is to run every single
21  adverse event term that actually occurs at all four
22  MedDra levels, is there something fundamentally wrong
23  with doing every possible term and generating those
24  data?
25          A    But what you -- you can look at whatever

1  you want to look at.  But what is the intent and if
2  you're going to do statistical analysis, you have to
3  predefine what is your threshold.
4          I don't think it's a legitimate exercise to
5  do the analysis and then afterwards to say, okay,
6  here's my cut off.  I like this cut off because this
7  gives me what I want.  You have to define your cut off
8  threshold, algorithm statistic ahead of time.
9          Q    Do you know whether Dr. Blume did that or
10  not?
11          A    She mentioned nothing about any statistic,
12  any threshold, any significance level.  I saw nothing
13  in any report.
14          Q    But that doesn't mean that she didn't do
15  that, correct?
16          MR. BARNES:  Objection.
17          A    If I saw nothing in all the pages of all of
18  these reports that she put together, she didn't bother
19  to mention that and she mentioned everything else, I
20  would assume that she didn't do it.
21          Q    Did you put your thresholds in here?
22          A    Yes, I did.
23          Q    Where are they?  Is that what you used on
24  page 21?
25          MR. BARNES:  Take your time.  Maybe in your

| | |
|---|---|
| 1  first report. | 1      Q    I'm talking about in 1994 when the drug was |
| 2      A    That's what I'm looking at. | 2  first put on the market.  You wouldn't have had |
| 3      Q    I'm looking at page 21 of your supplemental | 3  spontaneous reports and you wouldn't have had |
| 4  report. | 4  epidemiologic data? |
| 5      A    I'm looking at page 21 of my first report | 5          MR. BARNES:  Objection.  Asked and |
| 6  using the full data set as a background, I calculated | 6  answered. |
| 7  accumulated series of proportional reporting rates with | 7      A    Based on all the information I reviewed, |
| 8  a threshold PRR of greater than 2 with a chi-squared | 8  even today, I do not see any signal, any signal of |
| 9  greater than equal to 2 commonly cited -- | 9  disproportional reporting, any statistical |
| 10          THE COURT REPORTER:  Say that again. | 10  associations, even today.  So I cannot imagine that |
| 11          THE WITNESS:  Can I just reference you | 11  there would be anything available into 1994 if there's |
| 12  where it is? | 12  nothing available even to this point after it's been |
| 13          THE COURT REPORTER:  Whatever you'd like. | 13  used so extensively. |
| 14          THE WITNESS:  This is the first report.  Do | 14      Q    Once again, your opinion is limited to not |
| 15  you know what it's labeled? | 15  involving somebody's clinical judgment that there is |
| 16          MR. BARNES:  I don't think he marked it an | 16  something that should be monitored, correct? |
| 17  exhibit. | 17          MR. BARNES:  Objection.  She stated several |
| 18          THE WITNESS:  Okay.  I apologize.  In my | 18  times what she's based her opinion on, so state it |
| 19  original report on page 21 I state the criteria that I | 19  again. |
| 20  used to do my analysis.  The threshold that I used. | 20      A    I relied on the clinical judgment of the |
| 21  BY MR. ALTMAN: | 21  experts that put together the reports, the Parson's |
| 22      Q    If somebody decides to monitor specific | 22  report, the FDA analysis which had a number of clinical |
| 23  adverse event information going forward for some | 23  experts on it, the medical literature which has |
| 24  reason, is that still data -- would you still consider | 24  clinical experts writing paper. |
| 25  that to be data mining? | 25          So based on the preponderance of evidence |

| | |
|---|---|
| 1      A    It depends on how they're monitoring it. | 1  that I reviewed, the epidemiological literature and the |
| 2      Q    If I want to -- if I decide that I'm | 2  clinical literature, I do not see any information even |
| 3  concerned about a particular adverse event based on for | 3  today that would make one believe or even suggest that |
| 4  whatever reason.  I've done some review.  I've made | 4  there would be a statistical association with Neurontin |
| 5  clinical judgment that these particular adverse events | 5  and suicidality. |
| 6  are of concern to me, and I want to monitor those going | 6      Q    Just quickly, I have these invoices here. |
| 7  forward and see what I see.  Do you still consider that | 7  I'll mark these.  This is the only copy.  I guess we'll |
| 8  to be data mining in terms of looking at particular | 8  just mark it as an exhibit.  I just want you to review |
| 9  adverse events going forward? | 9  this and see if these appear to be your invoices in |
| 10      A    Not necessarily. | 10  this case? |
| 11      Q    So that's more of a data -- can we call | 11          MR. BARNES:  Up through today or? |
| 12  that a data -- can we call that monitoring, I mean | 12          MR. ALTMAN:  Up to today.  I mean, those |
| 13  simply a directed monitoring? | 13  are the invoices I was handed.  I have no basis of |
| 14      A    It's some form of post-marketing | 14  knowing anything else. |
| 15  surveillance. | 15      A    These are the invoices from the last -- the |
| 16      Q    Do you have any opinion whether there was | 16  deposition, the last deposition.  It's not prior to |
| 17  any information in the possession of the company in | 17  that.  Except for this one because they didn't pay |
| 18  1994 that said it should have suggested to the company | 18  until afterwards.  So this is things received in 2008. |
| 19  that they should perform any kind of enhanced | 19      Q    Let's mark that as the next exhibit. |
| 20  monitoring of any particular adverse events associated | 20          (Whereupon, a document was marked as |
| 21  with the use of Neurontin? | 21  Deposition Exhibit Number 28.) |
| 22      A    Based on my review of the clinical trials | 22      Q    I guess we'll mark as -- these are the |
| 23  that they submit to the FDA and the epidemiological | 23  disks that you brought with you today? |
| 24  literature and the spontaneous reports, I don't see | 24      A    Yes, I brought those with me today. |
| 25  that at all. | 25      Q    Why don't we mark these as 29 through 32. |

1   And I believe we are out of time much to your chagrin.
2   I thank you for your time and I just want to put on the
3   record that, once again, I did not have the opportunity
4   to access Q Scan data.  I don't know what that access
5   would do in terms of my desire to ask questions of this
6   witness and so under the MDL we're entitled to two days
7   and under the California rules there's no time limit.
8   And therefore I'll hold this deposition for now pending my review of that
9   this deposition for now pending my review of that
10  information which may require some further examination
11  of this witness.
12          MR. BARNES:  Okay.  Well, I think what I
13  would ask you to do is put your request -- precise
14  request to us in writing and we will respond as to the
15  Q Scan data, what your current request is and we'll are
16  consider it and go from there.
17          MR. ALTMAN:  That's good.
18          EXAMINATION BY MR. BARNES:
19      Q     One question of the witness before we
20  conclude.  Very early in the deposition Mr. Altman
21  asked you a question regarding the scientific rigor in
22  which you prepared your report and you stated that you
23  used the same, I'll paraphrase, the same scientific
24  rigor that you would use in doing your other
25  professional work except you didn't have as many hands

1   to look at the references, what did that mean?
2       A     It means that this did not go through a
3   formal peer review process.  So if I write a paper,
4   one, I'll have usually many co-authors.  So everyone
5   gets to review that and then I have a -- an editor
6   in-house that will go through and edit.  And then when
7   I submit it to a journal for publication, it gets sent
8   out to at least two, three, four peers that go through
9   every aspect of the paper.
10      Q     In that process from time to time do they
11  find typos and errors within the draft manuscript?
12      A     No matter how many times you write and
13  rewrite it, there's always something, yes.  They are
14  noticed.  Then also if it's accepted the journal has
15  editorial staff that again go through it and sometimes
16  you'll find them.
17      Q     So that's the difference?
18      A     And then proofs.  There's many, many steps
19  in the process to make sure.
20      Q     So the error that Mr. Altman pointed out
21  this afternoon is something that would perhaps come to
22  light during the normal peer review and editing process
23  that you do in your normal scientific and research
24  activities, correct?
25      A     Absolutely.  Very minor typos or things

1   like that would be caught and corrected.  Absolutely.
2           MR. BARNES:  Thank you.  No further
3   questions.
4           EXAMINATION BY MR. ALTMAN:
5       Q     I have to ask a brief follow-up.  You don't
6   know how many errors there are in either your
7   supplemental report or your original report if you
8   didn't go through that process, correct?
9       A     I went and did this as thoroughly and as
10  carefully as I could.  I found errors in everybody's
11  reports on this case, including a couple of typos on my
12  own report.
13      Q     But you don't know if there are other
14  errors in your report, correct?
15      A     I know there's a couple of typos.
16      Q     I'm not talking typos, numerical errors?
17          MR. BARNES:  She said that was a typo.
18      A     I know there's some typos in it.
19      Q     Is that --
20      A     But, I mean, I am going to assume that
21  there are not unless I find something.  I've gone
22  through and worked this very hard to make sure that
23  this is accurate and correct.
24      Q     Okay.
25          MR. BARNES:  No further questions.  Thank

1   you.  We will read and sign.
2           (Whereupon, CD's were marked as Deposition
3   Exhibit Numbers 29 through 32.)
4           (Deposition concluded at 6:30 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

12/22/2008 Weiss-Smith, Sheila

```
 1          CERTIFICATE OF DEPONENT

 2

 3          I hereby certify that I have read and

 4  examined the foregoing transcript, and the same is a

 5  true and accurate record of the testimony given by me.

 6

 7          Any additions or corrections that I feel

 8  are necessary, I will attach on a separate sheet of

 9  paper to the original transcript.

10

11

12          _____

13          SHEILA WEISS SMITH, Ph.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

**12/22/2008  Weiss-Smith, Sheila**

```
 1  State of Maryland,

 2  County of Baltimore, to wit:

 3

 4          I, RONDA J. THOMAS, a Notary Public of the

 5  State of Maryland, Baltimore County, do hereby certify

 6  that the within-named witness personally appeared

 7  before me at the time and place herein set out, and

 8  after having been duly sworn by me, according to law,

 9  was examined by counsel.

10          I further certify that the examination was

11  recorded stenographically by me and this transcript is

12  a true record of the proceedings.

13          I further certify that I am not of counsel

14  to any of the parties, nor in any way interested in the

15  outcome of this action.

16          As witness my hand and notarial seal this

17  5th day of January, 2009.

18

19

20          _____

21          RONDA J. THOMAS

22          Notary Public

23

24  My Commission Expires:

25  October 1, 2009
```