UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

*Smith v. Pfizer Inc., et al., 1:05-cv-11515-PBS*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:  MDL Docket No. 1629
:
:  Master File No. 04-10981
:
:  Judge Patti B. Saris
:
:  Magistrate Judge Leo T.
:  Sorokin
:
:
:
:

**MEMORANDUM IN SUPPORT OF PFIZER INC. AND WARNER-LAMBERT
COMPANY LLC'S MOTION TO EXCLUDE THE SPECIFIC CAUSATION
TESTIMONY OF DOCTOR MARIS AND PROFESSOR TRIMBLE**

# **TABLE OF CONTENTS**

Preliminary Statement ................................................................................................ 1

Factual Background .................................................................................................... 2

Law and Argument ..................................................................................................... 3

I.    The Specific Causation Testimony of Plaintiff's Expert Dr. Maris Is  Unreliable and
      Inadmissible ..................................................................................................... 5

      A.    Dr. Maris Cannot Rule Out Alternative Causes of Mr. Smith's Suicide. ............... 5

      B.    Dr. Maris Cannot Identify an Objective "Hallmark" or Test of Neurontin-Induced
            Suicides, Rendering His Attempt To Rule Out Other Possible Causes
            Unreliable. ............................................................................................... 6

      C.    Dr. Maris Blames Neurontin By Applying the Logical Fallacy of Post Hoc Ergo
            Propter Hoc. .............................................................................................. 7

      D.    Dr. Maris Uses Unreliable Methods ..................................................................... 9

            1. Dr. Maris Does Not Use the Psychological Autopsy Method Reliably In This
               Case. ..................................................................................................... 9

            2. Dr. Maris' New Suicide Model Is Unreliable. ................................................. 13

II.   The Specific Causation Testimony of Plaintiff's Expert Professor Trimble Is Unreliable
      and Inadmissible and Professor Trimble is Not Qualified to Give a Specific Causation
      Opinion .................................................................................................................. 15

      A.    Professor Trimble Unreasonably Ignores Scientifically Reliable and Generally
            Accepted Risk Factors for Suicide. .................................................................. 16

      B.    Professor Trimble's Ignorance of Certain Facts Demonstrate that His Inquiry
            Lacked Scientific Objectivity ........................................................................... 16

      C.    Professor Trimble Unreasonably Rules Out Risk Factors That Apply To Mr.
            Smith. ........................................................................................................ 17

      D.    Professor Trimble Admits He Cannot Rule Out Other Risk Factors. .................... 18

      E.    Professor Trimble Is Not Qualified To Offer a Specific Causation Opinion ........ 18

Conclusion .................................................................................................................. 20

Defendants, Pfizer Inc. and Warner-Lambert Company LLC ("defendants"), respectfully submit this memorandum in support of their motion to exclude the specific causation testimony of Dr. Ronald William Maris and Professor Michael Trimble.

## PRELIMINARY STATEMENT

Plaintiff Ruth Smith seeks to recover damages for the death of her husband Richard Smith. She alleges that Mr. Smith's use of the prescription medication Neurontin caused his suicide. Plaintiff has the burden of proving, among other things, specific causation, *i.e.*, that Mr. Smith's ingestion of Neurontin caused his suicide.

Plaintiff has designated two expert witnesses, Dr. Ronald William Maris and Professor Michael Trimble, who offer specific causation opinions. The specific causation opinions of these experts should be excluded. Dr. Maris' opinion is unreliable and inadmissible because: (1) he did not and cannot rule out alternative causes of Mr. Smith's suicide; (2) he cannot identify a "hallmark" for suicides caused by Neurontin; (3) he relies instead on speculation and logical fallacy to differentiate a suicide caused by Neurontin from a suicide caused by any number of established suicide risk factors; and (4) he uses unreliable methods.

Professor Trimble's specific causation opinion suffers from similar flaws; he (1) ignores scientifically reliable and generally accepted risk factors for suicide, thus failing to consider numerous alternative causes of Mr. Smith's suicide; (2) unreasonably rules out other potential alternative causes; and (3) admits he cannot in fact rule out certain possible causes of Mr. Smith's suicide—all in contravention of the established methodology for determining specific causation. In addition, Professor Trimble is not qualified to opine on the cause of Mr. Smith's suicide because he lacks expertise in suicidology and an understanding of scientific data and information regarding suicide in the United States.

## FACTUAL BACKGROUND

Suicide is a leading public health problem in the United States. *See Washington v. Glucksberg*, 521 U.S. 702, 730 (1997).  Approximately 30,000 patients die by suicide in the United States each year. Sayler Decl., Ex. 1 at 1.  Despite its prevalence, suicide is still not well-understood.  Suicide is extremely difficult to predict beforehand, Sayler Decl., Ex. 3 at 780:6-12, and to understand afterwards. *See Yanco v. U.S.*, 45 Fed. Cl. 782, 794 (2000) (quoting *Grief After Suicide* (1981)).  Still, the medical and scientific community recognizes established "risk factors" associated with suicide. Sayler Decl., Ex. 2 at 12.  The factors put people at an increased risk of suicide, as compared to the general population. Sayler Decl., Ex. 6 at 453:14-23.

Mr. Smith committed suicide on May 13, 2004 at 79 years of age.  During his life, he suffered from many well-established suicide risk factors.  For instance, his chronic joint and spine abnormalities required numerous replacement surgeries and caused him severe pain, Sayler Decl., Ex. 3 at 12-14; Sayler Decl., Ex. 4 at 23:17-24:2, which continued unrelentingly until his suicide. *See* Sayler Decl., Ex. 5 at 446:15-19.  In May 2003, after spinal surgery, Mr. Smith "wished he could die because of pain and lack of sleep." Sayler Decl., Ex. 6 at 607:13-608:18. He was diagnosed with anxiety and depression and treated with Lexapro, an antidepressant, for a sub-therapeutic duration.[1]  Mr. Smith's daughter said that he again contemplated suicide on March 1, 2004. *Id.* at 583:8-584:10.  Doctors twice gave Mr. Smith unheeded referrals for psychological evaluations.[2]  Sleep problems came with Mr. Smith's increasing pain and the

---

[1] Sayler Decl., Ex. 6 at 554:13-555:8; Sayler Decl., Ex. 4 at 56:22−25, 62:3-6 (Dr. Cato ran out of samples); Sayler Decl., Ex. 3 at 17.

[2] Sayler Decl., Ex. 8 at 17:13-23; Sayler Decl., Ex. 6 at 608:19-22 (Dr. McCombs). Sayler Decl., Ex. 6 at 667:4-12, 670:22-671:19 (Dr. Mackey). Sayler Decl., Ex. 7 at 135:21−136:6.

Smiths began sleeping in separate bedrooms because of his restlessness. *Id.* at 669:6-13.  Mr. Smith had all of these suicide risk factors before ever filling a Neurontin prescription.[3]

By April and May of 2004, Mr. Smith described his pain as "excruciating." Sayler Decl., Ex. 5 at 424:10-427:8.  He spent most of the day "lying around" because of pain. Sayler Decl., Ex. 7 at 164:9-10.  Yet, by this time, several surgeons had concluded that he was not a candidate for further surgical intervention.[4]  In a handwritten note, Mr. Smith stated that the doctors had "nothing to offer him" besides steroid injections, medication, and physical therapy, none of which helped his pain. Sayler Decl., Ex. 5 at 445:9-17, 448:11-21, 450:2-24.  Three days before committing suicide, Mr. Smith told his dentist and long-time family friend, Dr. Wood, that an end to his pain seemed "hopeless." Sayler Decl., Ex. 10 at 15:24-16:3.  Mr. Smith told Dr. Wood that he had tried to get second opinions, but that every physician he saw seemed to tune him out after hearing he already had back surgery. *Id.* at 16:16-22.  Mr. Smith told Dr. Wood, "Now I am almost useless," because he could no longer do things he enjoyed like cutting the grass. *Id.* at 19:13-24.  Three days later, Mr. Smith committed suicide.  He left a suicide note that states:

> "Pain has taken over my mind and body! I need back surgery, left and right rotator cuffs, right bicep torn, back surgery to correct pain in legs. Forgive me; I cannot go on like this.  I cannot have my body, the temple of the Holy Spirit, cut on anymore.  I have talked to God all night and he understands."

Sayler Decl., Ex. 5, 497:4-498:4 (emphasis in original).

## LAW AND ARGUMENT

"Expert evidence can be both powerful and quite misleading because of the [jury's] difficulty in evaluating it." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993).  Thus,

---

[3] Mr. Smith filled his first and only thirty day Neurontin prescription on March 9, 2004, more than two months before his suicide. Sayler Decl., Ex. 9 at No. 14, p. 22.  A bottle of Neurontin—which Dr. Maris described as "full"—was found on Mr. Smith's dresser following his death. Sayler Decl., Ex. 6 at 527:18-528:15.

[4] Sayler Decl., Ex. 6 at 666:3-667:3 (Dr. Mackey). *Id.* at 675:7-24, 678:2-8, 679:4-680:1 (nurse practitioner Krancer); Sayler Decl., Ex. 11 at 24 (same). Sayler Decl., Ex. 6 at 676:10-14 (Dr. McCombs). Sayler Decl., Ex. 5 at 398:5-399:4, 402:19-403:4 (Drs. Berklacich and Hampf).

Federal Rule of Evidence 702 requires judges to act as gatekeepers, screening expert testimony for reliability. *Id.* at 589. The court must ensure that experts employ in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The expert must ground his testimony in the methods of science and apply those methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-95. Relevant factors in determining reliability include whether the method can or has been tested, has been subjected to peer review and publication, has a known or potential rate of error, and has general scientific acceptance. *Daubert*, 509 U.S. at 593-95.[5]

At a minimum, courts analyzing specific causation expert testimony require that the experts consider and rule out alternative causes of the alleged injury. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("At the core of differential diagnosis is a requirement that the experts at least consider alternative causes—this almost has to be true of any technique that tries to find a cause of something"). As the court explained in *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779 (D. N.J. 1996), "[c]ourts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis—that is the process of eliminating other potential diagnoses." *Id.* at 786. An expert's failure to consider or rule out alternative causes is grounds for exclusion. *Cloud v. Pfizer,* 198 F. Supp. 2d 1118, 1136 (D. Ariz. 2001) (excluding expert opinion based on failure to consider alternative causes); *Haggerty v. Upjohn*, 950 F. Supp. 1160, 1166-67 (S.D. Fla. 1996) (excluding expert opinion based on failure to rule out alternative causes).

---

[5] Other relevant factors include: whether the expert's testimony grows naturally and directly out of the expert's non-litigation dependent research or was developed expressly for the purpose of testifying, *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); whether the expert has made an unacceptable inferential leap from an accepted premise to an unfounded conclusion, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); and, whether the expert has adequately accounted for obvious alternative explanations. *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). Ultimately, the proponent must prove by a preponderance of the evidence that the expert testimony is admissible under *Daubert. Kumho*, 526 U.S. at 147.

## I.      THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT DR. MARIS IS UNRELIABLE AND INADMISSIBLE

In a prescription drug case, the plaintiff has the burden of proving specific causation through admissible expert testimony. *Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863, 871 (W.D. Tenn. 2006) (granting summary judgment motion because expert testimony failed to establish that an antidepressant caused plaintiff's suicide attempts). Here, plaintiff must prove that Neurontin was a substantial factor in the decedent's suicide. *Id.* She cannot meet this burden because she offers no admissible expert opinion on this element of specific causation.

Dr. Maris freely admits that Mr. Smith had a number of risk factors for suicide, but contends that he was "coping" with these risk factors before Neurontin pushed him over the edge.[6] This conclusion is based on unsound methodology and is therefore inadmissible. First, Dr. Maris did not rule out alternative causes of Mr. Smith's suicide, most notably severe chronic pain and hopelessness. Nor can Dr. Maris identify a "hallmark" for suicides caused by Neurontin. He thus has no sound methodological basis—apart from speculation and logical fallacy—to differentiate a suicide caused by Neurontin from a suicide caused by any number of established suicide risk factors. In addition, Dr. Maris uses faulty methods; his psychological autopsy in this case is litigation-driven and biased, and violates his own standards, while his "model" for suicide is not generally accepted or reliable.

### A.      *Dr. Maris Cannot Rule Out Alternative Causes of Mr. Smith's Suicide.*

---

[6] In his 50-year history as a plaintiff expert witness, Dr. Maris has consistently testified that the prescription drug at issue was "the scale tipper," "the just noticeable difference maker," or "that without which not," and that the plaintiff was "coping" despite any number of devastating risk factors before taking the drug. *See, e.g.*, Sayler Decl., Ex. 6 at 75:18-92:10 (in *Williamson, Sorg, Forsyth, Giles, Routhier, Crone*, Dr. Maris testified Prozac/Effexor/Wellbutrin/Neurontin were "scale-tippers"). Dr. Maris admits that he uses the same language—phrases that he has work-shopped with a jury consultant, *id.* at 498:13-500:9—and the same conclusion in all his prescription drug cases. *Id.* at 76:18-77:1, 94:8-17. Dr. Maris' verbatim language in every prescription drug case suggests that he has a pre-ordained conclusion and retro-fits the facts to the conclusion, which is the precise opposite of the scientific method. *See Cloud*, 198 F. Supp. 2d at 1135 (rejecting expert's testimony in part because he came to a conclusion without a full review of the records and accurate knowledge of the facts) (citing *Claar*, 29 F.3d at 502-03). *See also In Re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 618, 629 (S.D. Tex. 2005) (expressing concern about verbatim sentences in expert's examinations).

Dr. Maris has failed to rule out numerous potential causes of Mr. Smith's suicide. For instance, Dr. Maris admits that chronic pain, physical illness, depressive symptoms, absence of mental health treatment, feelings of hopelessness, suicidal ideation, the inability to do pleasurable life activities, and owning a firearm are all risk factors for suicide. Sayler Decl., Ex. 6 at 457:1-479:21. He further admits that Mr. Smith had these risk factors and that he cannot rule them out as substantial causes of Mr. Smith's suicide. *Id.* at 778:20-779:6, 574:17-20; 588:3-7; Sayler Decl., Ex. 12 at 46. Notably, Dr. Maris could not rule out Mr. Smith's hopelessness and excruciating chronic pain—which he described as "highly suicidogenic" and "important factors." Sayler Decl., Ex. 6 at 781:13-17, 783:19-784:2. Dr. Maris even goes so far as to opine that Mr. Smith probably would not have committed suicide but for his chronic pain: "Q. If Richard Smith had not been suffering from excruciating chronic pain, would he still have committed suicide? A. Probably not." *Id.* at 781:13-17. Dr. Maris' failure to rule out established suicide risk factors as causes of Mr. Smith's suicide—particularly coupled with his testimony that Mr. Smith probably would not have committed suicide absent his chronic pain—renders his specific causation conclusion inadmissible. *See Rutigliano*, 929 F. Supp. at 787 ("A meaningful diagnosis of specific causation must specifically negate other possible causes.").

Dr. Maris admits that a multitude of factors could have caused Mr. Smith's suicide, and that he could not rule out many of these factors, including two "highly suicidogenic" ones. In fact, Dr. Maris even suggests that, but for his chronic pain, Mr. Smith probably would not have committed suicide. Dr. Maris' failure to exclude other causes renders his opinion unreliable and inadmissible. *Id. See also Haggerty*, 950 F. Supp. at 1166-67.

**B.**   *Dr. Maris Cannot Identify an Objective "Hallmark" of Neurontin-Induced Suicides, Rendering His Attempt to Rule Out Other Causes Unreliable.*

In cases where the injury alleged may be caused by any number of possible causes, courts demand some objective indicia distinct to injuries caused by the suspected agent or more certainty in ruling out other possible causes. *Nat'l Bank of Commerce v. Dow*, 965 F. Supp. 1490, 1513-14 (E.D. Ark. 1996) (expert must rule out alternative causes with more certainty when testifying that asbestos caused colon cancer, a disease with multiple risk factors). When asked to identify the hallmark of a Neurontin-induced suicide, Dr. Maris testified that in Neurontin-induced suicides, there are "acute factors of ingestion of Neurontin." Sayler Decl., Ex. 6 at 706:21-707:11. In other words, the only unique hallmark of a Neurontin-induced suicide is that the decedent ingested Neurontin. *Id.* at 707:21-708:14.

Recognizing that not all people who take Neurontin commit suicide or do so because of Neurontin, *see id.* at 720:12-721:4, Dr. Maris tried to narrow his test further. When asked how to objectively observe or identify whether a person who took Neurontin and committed suicide did so because of Neurontin, Dr. Maris admitted that one could look at the drug's adverse side effects, but "it's a somewhat circuitous line of reasoning, because it involves many risk factors and many adverse events." *Id.* In other words, Dr. Maris, in his expert report and sworn deposition testimony, does not identify any "hallmark" of a Neurontin-induced suicide other than that the decedent ingested Neurontin. His failure to do so in light of the many other possible causes of Mr. Smith's suicide—which he himself admits exist—renders his specific causation conclusion unduly speculative and unreliable. *See Nat'l Bank of Commerce*, 965 F. Supp. at 1513-15, 1521-23 (experts' opinions unreliable in part because they could not identify the injury as a "signature" of the suspected agent and could not rule out other causes).

**C.** *Dr. Maris Blames Neurontin by Applying the Logical Fallacy of Post Hoc Ergo Propter Hoc.*

Because Dr. Maris can neither eliminate possible alternative causes nor point to a hallmark of a "Neurontin-induced" suicide, he unscientifically applies the principle of *"post hoc ergo propter hoc"* to reach his conclusion that Neurontin caused Mr. Smith's suicide. Sayler Decl., Ex. 6 at 692:13-693:6. He reasons that, because Mr. Smith committed suicide after allegedly taking Neurontin, his suicide must have been caused by Neurontin. But, as the court explained in *McClain v. Metabolife*, 401 F.3d. 1233 (11th Cir. 2005), "because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy." *Id.* at 1243. Other courts have also found that specific causation opinions based on *"post hoc ergo propter hoc"* are unreliable and inadmissible. *See, e.g., Ervin v. Johnson & Johnson*, 492 F.3d 901, 904-05 (7th Cir. 2007); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 23 n.52 (D. Mass. 1995).

Despite well-established case law, Dr. Maris boldly proclaims his reliance on this logical fallacy. He testified that he applies the principle of *post hoc ergo propter hoc* by taking into consideration all of a decedent's risk factors and that the decedent was "coping"[7] and did not commit suicide before. Sayler Decl., Ex. 6 at 692:13-22. Then, Dr. Maris asks, "Why now?"[8] *Id.*

> Q. And so the--and so the 'why now' question is the reason why you would attribute the suicide to Neurontin?
>
> A. That's certainly one of the major factors. You know the law, *post hoc ergo propter hoc*. It was just after he took Neurontin and a significant amount of that, before he had all these risk factors that you described before his laminectomy in '03, and he didn't kill himself.

*Id.* at 692:23-693:6.

---

[7] What Dr. Maris means by "coping" is not obvious given that Mr. Smith was depressed, talking about suicide, unable to work, and suffering severe chronic pain during the period before he was on Neurontin.

[8] Dr. Maris' "Why now?" inquiry is also arbitrary and litigation-driven. He applies a different inquiry outside of litigation, asking, "What are they fleeing from?" Gene Weingarten and David Von Drehle, *A Death Better Than Fate's*, Washington Post, Sept. 13, 2001, at C01 (quoting Dr. Maris). That inquiry addresses the most common motive of suicide: "[P]robably about 70 percent of all suicides are escape, escape from an intolerable life situation." Sayler Decl., Ex. 6 at 804:3-5. The only evident explanation for Dr. Maris' asking "Why now?" instead of "What was Mr. Smith trying to escape?" is that the latter inquiry points to chronic pain, and not Neurontin.

As it turns out, Dr. Maris does not know the law (or the facts).[9]  And because Dr. Maris relies on the *post hoc ergo propter hoc* fallacy as a "major factor" in attributing Mr. Smith's suicide to Neurontin, his specific causation opinion is unreliable and should be excluded as a matter of law. *See, e.g., Whiting*, 891 F. Supp. at 23 n.52; *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996); *Metabolife*, 401 F.3d. at 1243.

Even assuming *arguendo* that the *post hoc ergo propter hoc* fallacy were a reliable basis for Dr. Maris' specific causation opinion, Neurontin is not even the most proximate trigger present in this case.  Using Dr. Maris' own reasoning—*i.e.*, that Mr. Smith was coping with his risk factors until Neurontin pushed him over the edge—the fact is that Mr. Smith was "coping" with Neurontin until he was told on March 31, 2004 that he was no longer a candidate for further surgical intervention, making the lack of surgical intervention more proximate in time[10] than Mr. Smith's Neurontin use and thus the "tipping factor" in Mr. Smith's suicide.  Thus, not only has Dr. Maris resorted to logical fallacy, he has applied that fallacy arbitrarily.  The only explanation for Dr. Maris singling out Neurontin is that doing so is advantageous to plaintiff's claim, making his opinion inadmissible. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).[11]

### D.    *Dr. Maris Uses Unreliable Methods.*

To support his specific causation opinion, Dr. Maris purports to use a psychological autopsy and a suicide model, but those methods do not provide a reliable basis for his opinions.

### 1.    Dr. Maris Does Not Use the Psychological Autopsy Method Reliably In This Case.

---

[9] No one observed Mr. Smith ingest Neurontin on May 13, 2004 nor in the preceding week. *Id.* at 529:22-530:2.

[10] An opinion reiterated by another neurosurgeon April 15, 2004. Sayler Decl., Ex. 5 at 398:5-399:4, 402:13-403:5.

[11] "Here, however, Dr. Johnson has admitted that [plaintiff's] symptoms could have numerous causes and, without support save [plaintiff's] oral history, simply picks the cause that is most advantageous to [plaintiff's] claim. Indeed, Dr. Johnson's testimony is no more than [plaintiff's] testimony dressed up and sanctified as the opinion of an expert. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."

Dr. Maris described the psychological autopsy form as "an attempt in a more systematic, unbiased way to make sure I get all the information I need to form and defend an opinion." Sayler Decl., Ex. 6 at 860:20-861:13.   Dr. Maris further testified that he designed the psychological autopsy "to gather information which may or may not have been asked before in order to help me as a scientist to look objectively at the factors that I think are related usually to a suicide outcome." *Id.*   A close examination of the psychological autopsy used in this case reveals that it is not objective, unbiased, or reliable and hence, should be excluded as inadmissible.

**a.    Dr. Maris developed his psychological autopsy tool solely in the context of a different litigation.**

Far from objective and unbiased, Dr. Maris' psychological autopsy form was funded and partially written by a plaintiff's attorney in the antidepressant litigation.   An entire section of Dr. Maris' form was written by Andy Vickery, a plaintiff's attorney, and Dr. Maris developed the rest of the form during the period he was retained by Mr. Vickery to provide litigation opinions. *Id.* at 405:6-13, 416:12-17.   Dr. Maris even admitted that he does not put "much stock in" the portion of the psychological autopsy drafted by plaintiff's counsel, but that he included that section because Mr. Vickery was paying him. *Id.* at 418:6-20.   Nevertheless, this admittedly unreliable section of the psychological autopsy developed by attorney Vickery is used and relied on by Dr. Maris in this case.[12]

**b.    Dr. Maris failed to follow his own methodological standards in a non-litigation context, infecting his analysis with mistakes and biases.**

---

[12] In fact, the Smith psychological autopsy still contains criteria specifically developed for Dr. Maris' testimony in the SSRI litigation.  For instance, the questions about whether adverse events occur "within 30 days of ingestion of Neurontin" is based on allegations that antidepressants continued to exert an effect for this period of time.  No scientific evidence has ever been produced establishing a causal connection between Neurontin and suicides occurring within 30 days of ingestion, a fact that Dr. Maris admits. *Id.* at 422:12-16.  Instead, Dr. Maris' adoption of this time frame is purely speculative —it is difficult to fathom a more litigation-driven methodology.

Not only does Dr. Maris use a tool developed in litigation, but he admits that he failed to follow his own methodology outside of the courtroom in this case. Dr. Maris has defined his psychological autopsy as:

> A standardized, systematic checklist which could be used to assemble and organize information so that a qualified suicidologist or other appropriate healthcare professional would have the information necessary to consider all of the various risk factors which may or may not have contributed in a material way to any person's suicide or suicide attempt.

Sayler Decl., Ex. 13 at *1. He has stressed in prior litigation that he did not want individuals he did not know conducting the psychological autopsy because "a lot of them were not really probing the way I would like my trained interviewers to probe." Sayler Decl., Ex. 14 at *73-74. Dr. Maris has also stated that in order to publish an article outside the context of litigation based on a psychological autopsy that produces sufficiently reliable results, he would conduct a face-to-face interview of two to three people. Sayler Decl., Ex. 6 at 445:23-446:4, 27:21-28:22.

But, despite suggestions to the contrary in his report, Sayler Decl., Ex. 15 at 2, the psychological autopsy in this case was not conducted by Dr. Maris, or any other "appropriate healthcare professional." Dr. Maris did not conduct any face-to-face interviews or even fill out the psychological autopsy form. In fact, he did nothing other than send the form to plaintiff's law firm to fill it out. *Id.* at 424:20-426:1. The law firm employee who completed the form is neither a suicidologist nor an "appropriate healthcare professional," but in fact, has no medical background whatsoever and was not provided any sort of training by Dr. Maris. *Id.* at 428:18-23. The paralegal's utter lack of training and expertise became obvious at Dr. Maris' deposition, as Dr. Maris continuously made corrections to the psychological autopsy form as new facts became

known to him based on defense counsel's cross examination.[13] *Id.* at 568:7-569:8, 570:1-10, Sayler Decl., Ex. 16 at 26. *Id.* at 426:21-25.

Even worse, the mistakes in the psychological autopsy bleed into Dr. Maris' report. Much like his psychological autopsy, Dr. Maris continued to correct a multitude of mistakes in his report throughout his deposition, including such items as the number of suicide risk factors he believed Mr. Smith had, and whether Mr. Smith was depressed prior to Neurontin use. Sayler Decl., Ex. 6 at 568:7-569:8, 570:1-571:11. Amazingly, Dr. Maris testified that he did not even know what else might be wrong in his report. *Id.* at 696:11-14 (Q. What else is wrong in your report, Dr. Maris?. . .A. How would I know?"). Such methodology is the antithesis of the scientific method. *See Cloud*, 198 F. Supp. 2d at 1135-36 (expert's specific causation methodology unreliable in part because his report contained mistakes of fact).

In addition to the unreliability of the psychological autopsy and Dr. Maris' report because of these mistakes, the psychological autopsy is also unreliable due to the obvious biases it introduces. The psychological autopsy used in this case is a far cry from the "objective" and "unbiased" method Dr. Maris described during his deposition. Sayler Decl., Ex. 6 at 860:20-861:13. By allowing plaintiff's law firm to fill out the psychological autopsy form, Dr. Maris let the law firm subjectively decide which facts were and were not pertinent to the case.[14]  It cannot be disputed that the plaintiff's law firm has a large financial incentive in this litigation. *Id.* at 860:11-14. Numerous courts have held that forms completed by individuals closely affiliated with plaintiff's law firm are unreliable; this Court should do the same. *See Silica*, 398 F. Supp.

---

[13] Sayler Decl., Ex. 6 at 570:1-10 ("Q. Did you just X out on the document of the psychological autopsy, which is Exhibit 30, the portion of the sentence that says however, decedent was never diagnosed nor treated for depression? You X'd out never diagnosed Nor, and you wrote in diagnosed. A. And. Q – and. Okay, so now is that corrected? A. Yes."), 434:6–435:4 (hopelessness was not unique). *See also* Sayler Decl., Ex. 16 at 13.

[14] *See Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1068 (D. Kan. 2001) (excluding expert's opinion that Zoloft caused the plaintiff to commit suicide due to his reliance on "preselected evidence from interested parties, to the exclusion of reliable evidence" and failure to "[obtain] information from sources that support, refute, or are neutral regarding the hypothesis is appropriate to minimize the likelihood of a false conclusion.").

2d at 600, 635-36 (criticizing diagnoses by physicians closely affiliated with plaintiff law firms and the completion of physician's blank forms by non-physicians).[15]

Dr. Maris' use of a psychological autopsy performed by an employee of plaintiff's law firm, relying on evidence pre-selected by interested parties without any face-to-face interviews clearly violates his <u>own</u> methodological standards expressed outside the context of litigation. Sayler Decl., Ex. 6 at 440:18-442:4, 445:16-24. That Dr. Maris set aside his own professional scruples renders his opinions unreliable. *See Cooper v. Smith & Nephew*, 259 F.3d 194, 203 (4th Cir. 2001) (excluding opinion, in part because expert did not follow his standards outside the courtroom). As Judge Posner has stated, "Why should a court rely on the sort of exposition the scholar would not tolerate in his professional life?" *Rosen*, 78 F.3d at 319.

## 2. Dr. Maris' New Suicide Model Is Unreliable.

In addition to his psychological autopsy, Dr. Maris relies on a chart that he describes as his new "suicide model." Dr. Maris suggested that the chart is a general causation model, addressing mechanism of action. Sayler Decl., Ex. 6 at 12:11-20. Under the federal rules, <u>an expert must produce</u> a written report disclosing the expert's complete opinion, the reasons for them, as well as any exhibits that will be used to support them <u>at the time ordered by the court</u>. Fed. R. Civ. Pro. 26(a)(2). Pursuant to Discovery Order 13, (docket number 801), plaintiff's general causation expert reports were due on October 22, 2007, more than eleven months before Dr. Maris disclosed his new suicide model, created on the eve of his deposition. Sayler Decl., Ex. 6 at 495:22-496:9. The time has long since passed for disclosing general causation opinions and Dr. Maris should be precluded from doing so now.

---

[15] *See also In re Agent Orange*, 611 F. Supp. 1223, 1246 (E.D.N.Y. 1985) (excluding physician's differential diagnosis where evidence of the patient's illness came from a self-completed checklist because "plaintiffs had every incentive to be over inclusive in describing their symptoms."); *In re Diet Drugs Prods Liab. Litig.*, 236 F. Supp. 2d 445, 457 (E.D. Pa. 2002) (criticizing completion of form containing medical history questions by non-physicians).

Second, Dr. Maris admitted that he is not qualified to opine on general causation, repeatedly stating that he was "not competent" to answer questions regarding Neurontin's mechanism of action. Sayler Decl., Ex. 6 at 152:18-23, 162:18-25, 163:24-164:21, 179:11-20, 193:2-21, 201:10-15. He testified that he relied entirely on Drs. Trimble, Kruszewski, and Roth—plaintiffs' timely designated general causation experts—even stating, "If they fall, I fall." *Id.* at 181:16-184:2. He cannot now attempt to offer a general causation theory.

But independent of the model's problems with respect to general causation, it is also not a reliable or generally accepted method on which to base a specific causation opinion. Dr. Maris' suicide model has not been published in its present form. Sayler Decl., Ex. 17 at 438:15-439:24. In fact, the new chart is the exact opposite of the model Dr. Maris published twice before. *See* Sayler Decl., Ex. 6 at 496:16-497:23. In the published model, "medication" appears in the column for factors protective against suicide. Sayler Decl., Ex. 17 at 444:22-445:2. Dr. Maris' "new" model moves medication—previously a protective factor—to the column labeled "trigger" by drawing a red arrow from one column to the next. Sayler Decl., Ex. 12 at 46; Sayler Decl., Ex. 17 at 441:13-442:12, 443:1-9.

Dr. Maris has provided no scientific basis for this 180° change of opinion. He never lists "medication" as a risk factor for suicide in his report, Sayler Decl., Ex. 6 at 456:18-25, nor can he cite any scientific evidence that medication is a trigger for suicide (as opposed to a treatment for acutely suicidal patients). Further demonstrating the non-scientific nature of Dr. Maris' new model, he admits that he could substitute any medication for Neurontin to support his litigation opinions in other pharmaceutical cases. *Id.* at 443:21-444:19. Lacking any reliable scientific support or validating testing for the drastic alteration in his published model, Sayler Decl., Ex. 17 at 446:12-447:17, Dr. Maris' modification appears to have been made expressly for the purpose

of testifying and is, hence, inadmissible. *See Daubert II*, 43 F.3d at 1318-19 (excluding expert testimony without peer-review and publication and developed in litigation).

## II. THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT PROFESSOR TRIMBLE IS UNRELIABLE AND INADMISSIBLE AND PROFESSOR TRIMBLE IS NOT QUALIFIED TO GIVE A SPECIFIC CAUSATION OPINION

Much like Dr. Maris, Professor Trimble admits that Mr. Smith suffered numerous suicide risk factors, but contends that Neurontin was, nonetheless, part of the cause of Mr. Smith's death. Professor Trimble's specific causation opinion is based on unsound methodology and is therefore inadmissible.[16]  First, Professor Trimble ignores scientifically reliable risk factors for suicide. Second, he unreasonably rules out risk factors that apply to Mr. Smith.   Third, Professor Trimble's ignorance of important facts demonstrates an absence of scientific objectivity in his inquiry.  Fourth, he admits that he cannot rule out some risk factors as causes of Mr. Smith's suicide. Fifth, Professor Trimble is not qualified to give a specific causation opinion.

Professor Trimble claims to rely on a "differential diagnosis" methodology to reach his opinion that Neurontin caused Mr. Smith's suicide. Sayler Decl., Ex. 5 at 209:13-210:7.   A proper differential diagnosis requires that the expert initially consider all possible causes and then exclude causes based on a review of the evidence in the case. *Clausen v. M/V CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003). The process is often described as "ruling in" and "ruling out." *Glatstetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).  Failure to take serious account of other possible causes demonstrates unreliability in the expert's methodology. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999).  Failure to rule out a possible cause also demonstrates unreliability. *Clausen*, 339 F.3d at 1058.  Failure to explain why a possible cause was ruled out is likewise justification for excluding the expert opinion.

---

[16] Defendants have also moved to exclude Professor Trimble's general causation opinion for reasons stated in the *Daubert* general causation record.

*Cooper*, 259 F.3d at 202.   The reasons for ruling out other possible causes must be founded on more than "subjective beliefs or unsupported speculation," but instead must be based on "scientific methods and procedures." *Claar*, 29 F.3d at 502.

### A.   *Professor Trimble Unreasonably Ignores Established Risk Factors for Suicide.*

As set forth above, a proper differential diagnosis requires that the expert initially consider all possible causes in a reliable manner. Sayler Decl., Ex. 5 at 229:25-230:6; *Clausen*, 339 F.3d at 1058.   Professor Trimble's report fails to identify numerous risk factors that explain Mr. Smith's suicide.  His report does not even mention Mr. Smith's risk factors such as: white, male, and elderly demographics; access to firearms; prior suicidal ideation; hopelessness; absence of mental health treatment; difficulty coping; functional limitations; and recent stressful life events, Sayler Decl., Ex. 18 at 1-13, despite his admission—and testimony from Dr. Maris, —that each of these factors increased Mr. Smith's risk of suicide. Sayler Decl., Ex. 5 at 541:20-24 (functional limitations), 188:3-12 (difficulty coping), 200:8-10 (recent, stressful life event), 222:1-4 (white, elderly male), 224:1-6 (access to firearms); Sayler Decl., Ex. 6 at 457:1-479:25. He brusquely dismisses facts pertinent to those risk factors. Sayler Decl., Ex. 5 at 397:17-398:3 (Mr. Smith's unsuitability for further surgery), 550:16-23 (Mr. Smith's daughter's cancer), 533:11-535:6 (prior suicidal ideation and lack of mental health care), 517:17-518:4 (same). Professor Trimble's failure to consider all possible causes of Mr. Smith's suicide renders his opinions inadmissible. *See Cloud*, 198 F. Supp. 2d at 1136 (finding that the expert "did not fully explore other potential causes of [the decedent's] suicide," including his alcohol use and family problems and the role that other medications might have played in the suicide. *See also Miller*, 196 F. Supp. 2d at 1068 (excluding expert that opined drug caused suicide because "the exclusion of evidence is not generally accepted medical practice.").

### B.   *Professor Trimble's Inquiry Lacked Scientific Objectivity.*

Objectivity is essential to the scientific method. *See Cloud*, 198 F. Supp. 2d at 1135. An expert who has come to conclusions without a full review of the evidence or who has come to a pre-ordained conclusion first and then tried to make the facts fit his conclusion, has violated the scientific method and is inadmissible. *Id.* (citing *Claar*, 29 F.3d at 502-03).   In *Cloud*, 198 F. Supp. 2d at 1135-36, the court discovered that the expert had made an error of fact and had made his conclusion before he completely reviewed the medical records. *Id.* On this basis and others, the court excluded the expert's specific causation opinion. *Id.* at 1136-37.

As in *Cloud*, Professor Trimble's speculative and litigation-driven approach became obvious because his conclusion preceded his knowledge of important facts.   For example, Professor Trimble did not know "what Lexapro is," Sayler Decl., Ex. 5 at 289:13-290:2, or of its indication for <u>major</u> depressive disorder. *Id.*  He did not know that "/p" means "post," *id.* at 431:1-17, and, thus, did not understand that Mr. Smith felt good after physical therapy, but that "it did not carry over." *Id.* at 430:18-432:21.  His willingness to aver under oath to a conclusion without having looked into important facts suggests that Professor Trimble's conclusions were pre-ordained, another basis for his exclusion. *See also Claar*, 29 F.3d at 502-05 (expert inadmissible who had not reviewed records indicating that injury pre-dated exposure).

## C.   *Professor Trimble Unreasonably Rules Out Relevant Risk Factors.*

In addition to his complete failure to consider known and accepted alternative explanations for Mr. Smith's suicide, Professor Trimble improperly "ruled out" other potential causes.  As noted above, when an expert rules out a possible cause in his differential diagnosis, the reasons for doing so must be based on science rather than speculation. *Claar*, 29 F.3d at 502. Professor Trimble, in contrast, testified that he ruled out a history of psychiatric illness as a cause of Mr. Smith's suicide, but he could not provide any basis for doing so. Sayler Decl., Ex. 5 at 175:16-21.  In fact, he conceded that Mr. Smith may have been depressed, *id.* at 92:11-16, and

that depression was a "possible additional factor" in Mr. Smith's death, which Professor Trimble was "ambivalent about." *Id.* at 559:10-13. Professor Trimble's "ambivalence" about whether Mr. Smith did or did not have depression may speak to his complete inexperience in suicidology, *Infra* § II (E), but it is no excuse. Depression is a leading risk factor for suicide, especially in Mr. Smith's demographic. Sayler Decl., Ex. 2 at 14, 20. Professor Trimble's inability to provide a basis for ruling out psychiatric history as a cause in Mr. Smith's suicide despite its presence in the factual record demonstrates that his conclusions are unscientific convictions, sounding in "subjective beliefs and unsupported speculation," and hence inadmissible. *Claar*, 29 F.3d at 502.

### D.   *Professor Trimble Admits He Cannot Rule Out Other Risk Factors.*

As even Professor Trimble recognizes, an expert must rule out all potential causes until he arrives at one cause in order to conduct a proper differential diagnosis. Sayler Decl., Ex. 5 at 229:25-230:14. But Professor Trimble admits that he <u>cannot</u> rule out a number of the burdens of Mr. Smith's life that fully explain Mr. Smith committing suicide. *Id.* at 557:4-10 (white, elderly male and access to firearms), 516:11-517:16 (despair and hopelessness), 539:9-540:15 (same), 516:7-10 (chronic pain). His failure to rule out these other potential alternative causes for Mr. Smith's suicide renders his opinion unreliable and inadmissible. *See Nat'l Bank of Commerce*, 965 F. Supp. at 1513-14 (excluding expert opinion testimony based on the differential diagnosis method in part because the expert could not rule out other potential causes); *Rutigliano*, 929 F. Supp. at 786-87; *Haggerty*, 950 F. Supp. at 1166-67.

### E.   *Professor Trimble Is Not Qualified To Offer a Specific Causation Opinion.*

In addition to its reliability requirement, Rule 702 also requires experts to be sufficiently qualified. "To be sufficiently qualified to testify as an expert, a witness needs to have knowledge, skill, experience, training, or education in the <u>specific</u> subject for which his testimony is offered." *Sutera v. The Perrier Group of Am., Inc.*, 986 F. Supp. 655, 661 (D. Mass.

1997) (citing *Whiting*, 891 F. Supp. at 24 (emphasis added)). Experts are thus prohibited from testifying outside the scope of their expertise. *E.g., Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1476, 1479-80 (D.V.I. 1994); *Christerophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1112-13 (5th Cir. 1991) (that expert "has an M.D. degree . . . is not enough to qualify him to give an opinion on every conceivable medical issue.").

Professor Trimble is admittedly not a suicidologist. Sayler Decl., Ex. 5 at 23:18-20.  He has no formal education or training in the area of suicidology, *id.* at 146:7-13, and has not authored any peer-reviewed, published articles regarding suicide or the potential causes of or risk factors for suicide. *Id.* at 152:17-20.[17]

Professor Trimble is also not qualified to practice psychiatry and could not treat patients in the United States. Sayler Decl., Ex. 5 at 180:3-10.  Despite the fact that Mr. Smith was diagnosed and treated in the United States, he lacks knowledge of suicidogenic conditions in the United States.  For instance, he testified that he can only perform "guesswork" about the rate of suicidal ideation in the United States because "[t]hose kinds of figures I don't bother my head with." *Id.* at 168:19-25.  He is likewise ignorant of the rate of suicide in patients with chronic pain, or whether chronic pain is itself a risk factor for suicide.[18] *Id.* at 167:19-169:22.  He did not know the percentage of depressed and suicidal patients in the United States that actually receive treatment, *id.* at 162:20-163:18, nor did he know what percentage of the elderly population contact their primary care providers prior to suicide, stating "This is United States data, I have no idea at all." *Id.* at 164:3-8.[19]  Without an understanding of scientific data and information

---

[17] Even Dr. Maris does not "think [Professor Trimble] is qualified to talk about suicidology. . ." Sayler Decl., Ex. 6 at 255:10-20.

[18] Dr. Trimble's flippancy is somewhat astonishing given that Mr. Smith himself cites chronic pain as the reason for his suicide: "Pain has taken over my mind and body."

[19] Professor Trimble also did not know that firearms are the weapon of choice for suicides by elderly people in the United States: "Well, in the United Kingdom people don't have firearms, so it wouldn't be the case. Q. Okay what about the United States? A. That I don't know." Sayler Decl., Ex. 5 at 199:8-18.

regarding suicide in the United States, Professor Trimble's opinions do not assist a United States jury in a United States court, and demonstrate, moreover, that he lacks the requisite expertise to opine that Neurontin—rather than Mr. Smith's other suicide risk factors—caused his suicide.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court grant their motion to exclude the testimony of Dr. Maris and Professor Trimble.

Dated: January 23, 2009

DAVIS POLK & WARDWELL

By:   /s/ James P. Rouhandeh
       James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

SHOOK, HARDY & BACON L.L.P.

By:   /s/ Scott W. Sayler
       Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

-and-

HARE & CHAFFIN

By:   /s/ David B. Chaffin
       David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 23, 2009.

/s/ David B. Chaffin
David B. Chaffin