UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
                                                                       :      MDL Docket No. 1629

In re:  NEURONTIN MARKETING,        :
           SALES PRACTICES AND           :      Master File No. 04-10981
           PRODUCTS LIABILITY LITIGATION  :
                                                        :      Judge Patti B. Saris
---------------------------------------------------------------x
                                                                 :      Magistrate Judge Leo T. Sorokin

THIS DOCUMENT RELATES TO:          :

*Bulger v. Pfizer Inc., et al.*, 07-CV-11426-PBS  :

*Smith v. Pfizer Inc., et al.*, 05-CV-11515-PBS   :

---------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF PRODUCTS LIABILITY PLAINTIFFS'
MOTION TO COMPEL THE PRODUCTION OF, OR REASONABLE
ACCESS TO, THE UNDERLYING ELECTRONIC DATA UPON WHICH
DR. WEISS SMITH RELIED IN FORMING HER EXPERT OPINIONS, OR
TO PRECLUDE ANY OPINIONS BASED UPON THE UNDERLYING DATA**

    This Memorandum is submitted in support of Products Liability Plaintiffs' motion pursuant to Rule 37 of the Federal Rules of Civil Procedure, for an Order (1) compelling Defendants to provide Plaintiffs, within 30 days of this Court's Order, with (a) all data via the Qscan software utilized by Dr. Weiss Smith, or (b) access to the data via Qscan software in the same online-internet manner that Dr. Weiss Smith utilized, and (2) precluding any of Dr. Weiss Smith's opinions that were based upon any of her work with Qscan software for which the raw data or analyses were destroyed by her and not provided to Plaintiffs.

**PROCEDURAL HISTORY**

    On November 10, 2008, Defendants Pfizer, Inc., and Warner Lambert, LLC, ("Defendants") designated Sheila Weiss Smith, Ph.D., as an expert in the above referenced case-specific actions *Bulger v. Pfizer Inc., et al.*, 07-CV-11426-PBS, and *Smith v. Pfizer Inc., et al.*,

05-CV-11515-PBS.  *See* Declaration of Kenneth B. Fromson, Esq., Exhibit A.  The designation included Dr. Weiss Smith's new expert report, dated November 7, 2008.  Fromson Decl., Ex. B.  Plaintiffs have deposed Dr. Weiss Smith on two occasions, once during the generic discovery phase of the MDL on January 9, 2008, and again after her disclosure in the case-specific actions herein, on December 22, 2008.  In short, Dr. Weiss Smith opines:  "Based upon my review of the available data it is my opinion that Pfizer has correctly determined that there was no signal of suicidality associated with Neurontin."  Fromson Decl., Ex. B.

     As a practical matter, Dr. Weiss Smith relies upon data to form demonstrative charts (much in the same way that Plaintiffs' expert, Dr. Cheryl Blume, has done related to her review of the publicly available FDA adverse event database).  In this case, via her expert reports, Dr. Weiss Smith has disclosed various charts and compilations demonstrative of her opinions in this case.  Fromson Decl., Ex. C at 16-22; Fromson Decl., Ex. B at 22, 23, 29.  For example, on page 22 and 23 of the supplemental report, Dr. Weiss Smith has charts for completed suicide and suicide attempt that according to her demonstrate that there was no signal for suicidality until after 2005.  This issue is hotly contested by experts on both sides.

     As it pertains to underlying data available for her review, Dr. Weiss Smith explained that she relied upon the services of an outside vendor, DrugLogic, in using its Qscan software to gain access to electronic data related to adverse events with Neurontin.  Plaintiffs seek a fair opportunity to examine the underlying data from Qscan — whether used or ignored by Dr. Weiss Smith — so as to test the accuracy and veracity of Dr. Weiss Smith's opinions and charts.

     To this end, Plaintiffs requested that Dr. Weiss Smith produce the underlying raw and processed electronic data reviewed, considered and/or relied upon in reaching opinions related to Neurontin.  Prior to her deposition, Plaintiffs served Defendants with a Notice of Deposition of

2

Dr. Weiss Smith.  Fromson Decl., Ex. D.  Importantly, the Notice included a request for documents the terms of which had previously been agreed upon by Plaintiffs and Defendants. The Notice advised that Dr. Weiss Smith was to produce at her deposition, *inter alia*:

> All writings, documents, notes, reports, summaries, **raw data**, or other materials reflecting or relating to analyses, calculations, evaluation of any adverse event data or databases conducted and/or considered by you . . . . that you have reviewed or relied on in forming your opinions in this case, along with any database used for such analyses and the applicable software to conduct the analyses.  [Emphasis added.]

Fromson Decl., Ex. D at ¶ 14.

As it pertains to underlying data available for her review with Qscan software, Dr. Weiss Smith explained that the software tool allows a user to perform various analyses of data from the U.S. Food & Drug Administration's (FDA) Adverse Event Reporting System (AERS) electronic database, and that DrugLogic "cleans" and codes the data.  Fromson Decl., Ex. E at 131-134. She utilized the software for the purpose of calculating a Proportional Reporting Ratio (PRR). (Fromson Decl., Ex. B at 138.).  A PRR is but one way to evaluate and detect safety signals related to adverse drug reactions reported to the FDA.  Dr. Weiss Smith admitted that she did not do anything to verify the adequacy of DrugLogic's cleaning, etc., of the data prior to utilizing same.  Fromson Decl., Ex. E at 134.

> Q.   I understand your answer.  I just want to see if I can break it down so it's even more simple for me.  An individual like yourself can get the data directly from the FDA?
>
> A.   Yes, I can.
>
> Q.   You choose to get it from QLogic?
>
> A.   DrugLogic.
>
> Q.   Scan software owned by DrugLogic, right?
>
> A.   That is correct.

3

> Q. You choose to get the data from DrugLogic and not directly from the FDA, correct?
>
> A. Yes.
>
> Q. You trust or put faith in DrugLogic to clean the data, as you indicate, and then provide it to you in some format?
>
> A. Yes, myself and many others who use it in the field. Absolutely.
>
> Q. And you rely upon what they do with it, correct, you and whoever else you believe uses it, you have to rely upon what they do to the data?
>
> A. Yes, that's correct.

Fromson Decl., Ex. E at 133-134.

At her deposition, Dr. Weiss Smith provided Plaintiffs with an incomplete collection of spreadsheets that she had created by hand from the system. For example, she stated the following regarding incomplete information provided:

> Q. My question for you then is, where is the data for the background?
>
> A. Excuse me?
>
> Q. Where is the data that reflects the background information?
>
> A. This is just the threshold information. So it's just the output for the PRR and the other statistics that one needs to see whether or not it hits the threshold. It doesn't have any information of all events for either Gabapentin or for all events in the data. It's purely the raw output of the analysis.

Fromson Decl., Ex. E at 199.

Although Plaintiffs requested that Dr. Weiss Smith provide access to the database and the applicable software utilized to conduct the data analyses performed so that the analyses could be replicated, she advised that she was unable to provide access to the required software due to her contract with DrugLogic. Fromson Decl., Ex. E at 251, 252. Plaintiffs' counsel advised Defendants of the inadequacy in production concerning this expert and recommended that the

4

parties meet with Dr. Weiss Smith for the purposes of a discovery-inspection of the software and data, at which time the software possessed by the witness could be utilized to verify and replicate the respective data application. Fromson Decl., Ex. F.

On December 22, 2008, Dr. Weiss Smith again testified that she relied upon the Qscan software for electronic data in forming her opinions:

> Q. For your -- when you access Qscan, is that through a web site? Do you go into your log-in and you can run your analyses?
>
> A. That's correct.
>
> Q, And you can download some of that data or computations or whatever that it produces?
>
> A. It's an application. It has software on it to do statistics, that's all it is.
>
> Q. How is the output given to you?
>
> A. It depends on what you're looking at.
>
> Q. The first time you provided us some Excel spreadsheets of data that formed part of the basis of your report, do you recall that?
>
> A. I believe I gave you the raw counts that were used to calculate the PRRs, yes.
>
> Q. Did you generate charts similar to that when you did your analyses in your supplemental report.
>
> A. Did I for here? No.
>
> Q. For your supplemental report?
>
> A. No, I didn't. Raw data.
>
> Q. How did you actually -- the charts that are in your supplemental report, did those come straight from Qscan or do you actually have to make those charts? I'm talking about ones on the PRR?
>
> A. Which -- give me an example, which one?
>
> Q. Your supplemental report. Let's take on page 22.

5

> A. Figure 1?
>
> Q. Figure 1, yes.
>
> A. So I get the statistic, the PRR statistic and I put it in an Excel spreadsheet and I plotted it in Excel.
>
> Q. I mean, did you hand write that stuff from Qscan or did you download a chart or something?
>
> A. I believe I downloaded a delimited file to a data file.
>
> Q. Do you still have those files?
>
> A. Probably not.  They're raw files.  I would just recalculate it.

Fromson Decl., Ex. G at 321, 322.  As noted in the exchange above, in response to Plaintiffs' request for the raw and processed data upon which Dr. Weiss Smith relied in her second, new expert report, Dr. Weiss Smith advised that she did not save any of her work.  *Id.*  Consequently, the data has never been produced.

After Dr. Weiss Smith's deposition on December 22, 2008, Plaintiffs again requested that Defendants provide discovery of the electronic data so that Plaintiffs would be on an equal footing.  Unless the situation was remedied, Plaintiffs indicated their intention to make the appropriate motion to this Court.  Fromson Decl., Ex. H.

In response to Plaintiffs' request for equal access to the underlying data available to Dr. Weiss Smith for her review and consideration, Defendants claim that because Dr. Weiss Smith did not "consider, as part of her opinions in this matter, how Qscan cleans the [data]" at issue, Plaintiffs are therefore not entitled to have access to the entirety of data from which Dr. Weiss Smith culled a subset of data:

> Dr. Weiss did not "consider," as part of her opinions in this matter, how cleans the FDA AERS data.  Because the inner workings of the program were not considered by Dr. Weiss and did not form the basis of her opinions, you are not

6

entitled to perform your own queries of the FDA AERS database through Dr. Weiss's license to Qscan.

Fromson Decl., Ex. I. Instead, Defendants have offered only to provide a CD of the <u>smaller subset</u> of raw data that Dr. Weiss Smith culled from the entirety of underlying data available to her, as well as the manual.

Defendants' assertion is also inaccurate because Dr. Weiss Smith did rely upon the "inner workings" of Qscan. Dr. Weiss Smith testified as follows:

> Q. I understand your answer. I just want to see if I can break it down so it's even more simple for me. An individual like yourself can get the data directly from the FDA?
>
> A. Yes, I can.
>
> Q. You choose to get it from QLogic?
>
> A. DrugLogic.
>
> Q. Qscan software owned by DrugLogic, right?
>
> A. That is correct.
>
> Q. You choose to get the data from DrugLogic and not directly from the FDA, correct?
>
> A. Yes.
>
> Q. You trust or put faith in DrugLogic to clean the data, as you indicate, and then provide it to you in some format?
>
> A. Yes, myself and many others who use it in the field. Absolutely.
>
> Q. And you rely upon what they do with it, correct, you and whoever else you believe uses it, you have to rely upon what they do to the data?
>
> A. Yes, that's correct.

Fromson Decl., Ex. E at 133-134.

As to the manual, it does not provide information on how the data is prepared for use with the software. Thus, Plaintiffs have no way of replicating or refuting the work of Dr. Weiss Smith.

## ARGUMENT

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, where a party "fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Rule 26(a)(2)(B)(ii), regarding expert opinions, provides that an expert is required to produce "the data or other information considered by the witness in forming them." Further, pursuant to Rule 37(c)(1), "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *See, e.g.*, *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 693-94 (1st Cir. 2000) (affirming trial court's decision to strike portions of expert's testimony for failure to comply with the mandates of Rule 26 in regard to the expert disclosure in question).

A District Judge exercises broad discretion when supervising the discovery process. *Arzuaga-Perello v. Shell Co. (Puerto Rico)*, 1999 U.S. App. LEXIS 2162 (1st Cir. 1999); *Cruden v. Bank of New York,* 957 F.2d 961, 972 (2d Cir. 1992). The First Circuit has stated that it will intervene concerning the trial court's discretion "'…only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party.'" *Arzuaga-Perello* at *2 (citing to *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 91 (1st Cir. 1996)).

**A.    Plaintiffs Are Entitled to Discovery of Underlying Data or Should Otherwise Have Access to Underlying Data Available to Dr. Weiss Smith and Considered by Dr. Weiss Smith in Reaching Opinions.**

Plaintiffs require discovery of the aforementioned underlying data in order to test the reliability and accuracy of Dr. Weiss Smith's opinions. Alternatively, Plaintiffs should be given equal access to the very Qscan software that Dr. Weiss Smith utilized so Plaintiffs may have the opportunity to review and replicate the data analysis on which Dr. Weiss Smith based her opinions. Access to the Qscan software is required because the data in this particular software, by Dr. Weiss Smith's own admission, has been "cleaned" in a particular fashion unbeknownst to Plaintiffs or Dr. Weiss Smith, and this makes the analyses impossible to replicate without the software possessed and easily accessible by Dr. Weiss Smith via the internet at her office. Unlike Defendants, Plaintiffs have provided all underlying data that formed the basis of charts used by Plaintiffs, thus allowing Defendants to review and test the veracity of Plaintiffs' experts' opinions.

Defendants may suggest that Plaintiffs should have to incur the cost of their own Qscan software license; such argument should be rejected. Dr. Weiss Smith unilaterally chose the Qscan software as the vehicle through which to perform her analyses. Plaintiffs should not have to incur costs, both unnecessary and avoidable, to have the right to reasonable discovery of the underlying data available, considered and relied upon by Dr. Weiss Smith. Plaintiffs are willing to travel to Dr. Weiss Smith's offices so as to have supervised access to the software.

To date, Defendants have simply provided the numbers that were plotted on Dr. Weiss-Smith's charts with little, if any, information as to how the numbers were generated. While Defendants did produce a copy of the Qscan manual at Dr. Weiss-Smith's December 2008 deposition, this manual does not provide sufficient information as to the methods by which

9

DrugLogic prepares or "cleans" the data for use. As evidenced below, in her December 2008 deposition, Dr. Weiss-Smith admits that different protocols for compiling the data could yield different results:

> Q. What I'm getting at is if Qscan used one mechanism for attributing the date, which was different than what Dr. Blume used, you could see different results based upon that, correct? Without either one of them being wrong?
>
> A. That's assuming that we did the same thing, which we did not do.
>
> Q. Understood. But if you did the same thing and you used different ways of assigning the date, you could see different results without either one of them being wrong, it's just the convention that was selected; is that correct?
>
> MR. BARNES: Objection. Vague. If you can answer that.
>
> A. In the hypothetical situation that we actually both did the same thing, which we didn't do, any change in protocol or use of different data could get different results.

Fromson Decl., Ex. G at 134-135.

Plaintiffs will be severely prejudiced in prosecuting these actions if they are denied the right to discovery of the underlying data utilized — or ignored — by Dr. Weiss Smith via the Qscan software, or alternatively, <u>access</u> to the software. Plaintiffs should have the opportunity to examine and analyze the data that formed the very basis of Dr. Weiss Smith's expert opinions in the same form and fashion as performed by Dr. Weiss Smith.

This can be analogized in a legal context familiar to attorneys: One party expresses an opinion based upon review and reliance upon headnotes from Lexis®, a well known electronic research tool. Another party has access only to Westlaw®. Even though both parties might find their way to review the same caselaw, the underlying headnotes would not be the same from both

10

electronic research tools.  How Lexis® prepares ("cleans") its headnotes as compared to the way that Westlaw® prepares its headnotes could lead the parties down different paths.

Here, Defendants are taking the position that since the raw data is available to all parties, how DrugLogic prepares the data for use in the Qscan software is irrelevant.  Plaintiffs submit that it is critical to the proper cross-examination of Dr. Weiss Smith that Plaintiffs have not only the underlying data, but an understanding of how the data was prepared, given her reliance upon how the data was prepared.

> **B.   Because Dr. Weiss Smith Did Not Save Her Work or Data Demonstrative of Her Analyses Set Forth in Her New Report Disclosed in These Case-Specific Actions, the Court Should Preclude Any Opinions Based Upon This Work or Analyses.**

Dr. Weiss Smith's new report, dated  November 7, 2008, that was disclosed in the two case-specific actions herein was based in part upon her utilization of the Qscan software.  Indeed, the bases of her opinions are the <u>result</u> of various searches and reviews of raw data via the Qscan software.  However, she failed to save any of her work or raw data in regard to her analyses as discussed *supra*.  Fromson Decl., Ex. G at 321-322.

Dr. Weiss Smith's failure to save her work may be analogized to spoliation.  The Supreme Court of Massachusetts has "implicitly recognized that persons who are actually involved in litigation (or know that they will likely be involved) have a duty to preserve **evidence** for use by others who will also be involved in that litigation. Where **evidence** has been destroyed or altered by persons who are parties to the litigation, or by persons affiliated with a party (in particular, their **expert** witnesses), and another party's ability to prosecute or defend the claim has been prejudiced as a result, we have held that a judge may exclude **evidence** to remedy that unfairness."  *Fletcher v. Dorchester Mut. Ins. Co.*, 437 Mass. 544, 550, 773 N.E.2d 420 (2002).  The Supreme Court further explained that exclusion of an expert's testimony would

11

serve to remedy in instances where the expert in question "would not have the unfair advantage of posing as 'the only **expert** with first-hand knowledge' of the item." *Id.* at 550. (citing to *Nally v. Volkswagen of Am., Inc.*, 405 Mass. 191, 537 N.E.2d 1017 (1989). "The rule excluding evidence as a remedy for spoliation is based on both the unfair prejudice that would otherwise result and the fact of a negligent or intentional destruction of physical evidence." *Kippenhan v. Chaulk Servs.*, 428 Mass. 124, 127, 697 N.E.2d 527 (1998).

Plaintiffs require discovery of the aforementioned underlying data, searches and reviews in order to test the reliability and accuracy of Dr. Weiss Smith's opinions. Because of her actions, Plaintiffs will be prejudiced because they will not be in the position to replicate the data analyses on which she based her expert opinions. Therefore, Plaintiffs will not be able to adequately cross-examine Dr. Weiss Smith regarding her opinions concerning her analyses. Allowing Dr. Weiss Smith to provide opinions based upon analyses that Plaintiffs are unable to replicate or test would provide a jury the appearance that only Defendants' expert has this first-hand knowledge or is able to perform such calculations. Plaintiffs submit that the only remedy to rectify the prejudice that Plaintiffs would suffer due to Dr. Weiss Smith's failure to save and disclose her underlying data, searches and reviews is preclusion. Therefore, Plaintiffs request that this Court preclude any of Dr. Weiss Smith's opinions that were based upon any of her work with software for which the raw data or analyses were not saved by her and not provided to Plaintiffs.

## CONCLUSION

Plaintiffs therefore respectfully request that the Court issue an Order (1) compelling Defendants to provide Plaintiffs, within 30 days of this Court's Order, with (a) all data via the Qscan software utilized by Dr. Weiss Smith, or (b) access to the data via Qscan software in the

same online-internet manner that Dr. Weiss Smith utilized, and (2) precluding any of Dr. Weiss Smith's opinions that were based upon any of her work with software for which the raw data or analyses were not saved by her and not provided to Plaintiffs.

Dated: January 23, 2009                                    Respectfully submitted,

*Members of Products Liability
Plaintiffs' Steering Committee*

By:     **/s/ Andrew G. Finkelstein**
          Andrew G. Finkelstein, Esquire
          Finkelstein & Partners, LLP
          1279 Route 300, P.O. Box 1111
          Newburgh, NY  12551

By:     **/s/ Jack W. London**
          Jack W. London, Esquire
          Law Offices of Jack W. London
              & Associates
          3701 Bee Cave Road, Suite 200
          Austin-Westlake, TX  78746

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on January 23, 2009.

   **/s/ Andrew G. Finkelstein**
   Andrew G. Finkelstein, Esquire