EXHIBIT E

```
 1        UNITED STATES DISTRICT COURT
 2          DISTRICT OF MASSACHUSETTS
 3   -----------------------------x
 4   In re: NEURONTIN MARKETING,SALES
 5   PRACTICES AND PRODUCTS LIABILITY
 6   LITIGATION              MDL Docket No. 1629
 7   -----------------------------x   No. 04-10981
 8   THIS DOCUMENT RELATES TO:
 9   PRODUCTS LIABILITY LITIGATION
10   -----------------------------x
11       SUPREME COURT OF THE STATE OF NEW YORK
12                COUNTY OF NEW YORK
13   -----------------------------x
14   IN RE: NEW YORK NEURONTIN
15   PRODUCTS LIABILITY LITIGATION
16   -----------------------------x
17   THIS DOCUMENT APPLIES TO:
18       ALL CASES
19   -----------------------------x     CONTAINS CONFIDENTAIL INFORMATION
20         The Videotaped deposition of SHEILA WEISS
21   SMITH, PhD., was held on Wednesday, January 9, 2008,
22   commencing at 9:12 a.m., at the Law Offices of Goodell,
23   DeVries, Leech & Dann, LLP, One South Street, Baltimore,
24   Maryland, before Ronald E. Bennett, Notary Public.
25   Reported By: Ronald E. Bennett
```

```
 1   APPEARANCES:
 2
 3        ON BEHALF OF PLAINTIFF CLASS:
 4        KENNETH B. FROMSON, ESQUIRE
 5        MARSHALL P. RICHER, ESQUIRE
 6           Finkelstein & Partners
 7           785 Broadway, 3rd Floor
 8           Kingston, New York 12401
 9           Tel:  1-800-LAW-AMPM
10           Fax:  (845) 339-5825
11
12        ON BEHALF OF PFIZER:
13        RICHARD M. BARNES, ESQUIRE
14        MICHAEL J. WASICKO, ESQUIRE
15           Goodell, DeVries, Leech & Dann, LLP
16           One South Street, 20th Floor
17           Baltimore, Maryland  21202
18           Tel:  (410)783-4004
19           Fax:  (410)783-4040
20
21   ALSO PRESENT:  HANS JORGENSEN, Videographer
22                  KEITH ALTMAN, Complex Litigation
23                  VIJAY V. BONDADA, Counsel, Litigation
24                  ELANA GOLD, ESQUIRE (Telephonically)
25
```

```
 1                        INDEX
 2           Deposition of SHEILA WEISS SMITH, Ph.D.
 3                    January 9, 2008
 4   Examination by:                              Page
 5   Mr. Fromson                                    4
 6   Mr. Barnes                                   259
 7
 8                       EXHIBITS
 9   No.        Description                     Marked
10   1-5    Documents                              4
11   6      Vilhjalmsson article                  43
12   7      Dermatology                           52
13   8      Disc                                  79
14   9      FDA Alert                            117
15   10     Avandia Report                       176
16   11     MedWatch Form                        191
17   12     Data                                 198
18   13     Correspondence                       249
19   14     Letter                               255
20   15     Index                                259
21   16     Disc                                 259
22   17     Disc                                 259
```

```
 1                  - - - - - - -
 2        (Deposition Exhibits Number 1-5 marked for
 3   purposes of identification.)
 4   Whereupon,
 5            SHEILA WEISS SMITH, Ph.D.,
 6   called as a witness, having been first duly sworn to
 7   tell the truth, the whole truth, and nothing but the
 8   truth, was examined and testified as follows:
 9         EXAMINATION BY COUNSEL FOR PLAINTIFF
10         BY MR. FROMSON:
11       Q.   Is it Dr. Weiss?  Dr. Weiss-Smith or Dr.
12   Smith?  How would you like to be addressed this
13   morning?
14       A.   It's Dr. Weiss-Smith.
15       Q.   Thank you.  Dr. Weiss-Smith, good-morning.
16       A.   Good morning.
17       Q.   My name is Ken Fromson.  I'm going to ask
18   you a series of questions involving the report that
19   you have provided on behalf of defendants in this
20   case, the drug companies, Park-Davis, Warner-Lambert
21   and Pfizer.  Do you understand that?
22       A.   Yes, I do.
23       Q.   And I would ask, if you could, this
24   morning to keep your voice up so that we can make
25   sure that the court reporter can understand what you
```

1  events that appear in the clinical trials?  Would
2  you agree with me on that?
3      A.  Not in this manner.  We are talking about
4  clinical trial experimental data.
5      Q.  I'm talking about clinical trial of
6  Neurontin for indications under Park-Davis,
7  Warner-Lambert, did you know what method for
8  causality assessment the investigators utilized
9  during the clinical trial?
10     A.  I did not read or aware of how they
11 conducted clinical trial.
12     Q.  Okay.  So it's fair to say you did not
13 take steps to verify the accuracy of any causal
14 assessment they made?
15     A.  Within the clinical trials, no.
16     Q.  Do you have an opinion as to whether
17 application of the Lasogna's method is a sound
18 methodology for causal assessment?
19     A.  I don't have an opinion on that.
20     Q.  Okay.  Let me ask you questions now
21 regarding the FDA's spontaneous reporting system.
22 You have a section in your paper entitled AERS, data
23 mining analysis at page 15.  Am I correct?
24     A.  Yes, AERS data mining analysis.
25     Q.  You indicate that you were asked to

129

1  conduct an evaluation of the Freedom of Information
2  Act version of the FDA's spontaneous reporting
3  system database.  Correct?
4      A.  Yes.
5      Q.  You were asked to determine if there was a
6  statistical signal of suicide or suicide attempt
7  with Gabapentin, correct?
8      A.  Yes, that is correct.
9      Q.  We established today you did not review
10 any other terms for a statistical signal, correct?
11     A.  That is correct.
12     Q.  Did you consider whether any other term
13 could be probative of determining a signal for
14 suicidality?
15         MR. BARNES:  Objection.
16         THE WITNESS:  Probative?
17     Q.  Well, important, meaningful.  Did you
18 think it would be important to utilize any other
19 term other than suicide and suicide attempt to
20 address whether there was any statistical signal
21 with Neurontin and suicidality?
22     A.  I considered but I didn't see any terms
23 that were either specific enough or serious enough
24 that they would be consistently reported in AERS and
25 provide any valuable and valid information.

130

1      Q.  Were you provided directly with the FDA
2  AERS data?
3      A.  I have it and use it in the AERS data
4  using Q Scan in the regular course of my work, my
5  research my teaching.
6      Q.  Okay.  I'm sorry.  I didn't understand
7  your answer.
8      A.  It's something I have available to me as
9  part of my work at the University in my research and
10 teaching.  I was not provided by the counsel or
11 Pfizer that information.  I have that independently.
12     Q.  Because it's publicly available people can
13 get access to the actual data and import it to their
14 own computers?
15     A.  It's available on the FDA's website.
16     Q.  So you did possess the actual data from
17 the FDA on your own computer?
18     A.  That is not entirely correct.
19     Q.  Okay.  What data did you actually obtain
20 regarding the FDA AERS data that's referenced here
21 in your report, given you were asked to conduct an
22 evaluation of it?
23     A.  I didn't physically obtain on my computer
24 any of the data.
25     Q.  You accessed it on line?

131

1      A.  I accessed it through the internet, yes.
2      Q.  Did you load the information into a
3  database of your own?
4      A.  No.  I accessed it through a software
5  application.
6      Q.  Q Scan?
7      A.  Through Q Scan owned by Drug Logic.  I
8  have a contract with them to use it.
9      Q.  Do you get quarterly data from the FDA?
10     A.  They download the quarterly abstracts and
11 add them to the dataset.  So it is as current as any
12 other publicly available data.
13     Q.  When you utilize the data for this case,
14 did you update the data and get the most current
15 up-to-date data?
16     A.  I used the dataset after they have taken
17 it, cleaned it and loaded it onto the system.
18     Q.  You mean they -- who are you referring to?
19     A.  Q Scan.  So in other words, I'm sorry.
20 Drug Logic takes the publicly available data, cleans
21 it, codes it, loads it to their, on with software
22 application.  I access it through the internet.
23     Q.  So your evaluation of the data was
24 completely dependent on the data that was utilized
25 by Q Logic and then filtered to you?

132

```
 1        MR. BARNES: Objection. You may answer.
 2        A.   It's available to anyone that has a
 3   contract with them. It is the FDA AERS data cleaned
 4   that's available. So I use their application to
 5   analyze it.
 6        Q.   I understand your answer. I just want to
 7   see if I can break it down so it's even more simple
 8   for me. An individual like yourself can get the
 9   data directly from the FDA?
10        A.   Yes, I can.
11        Q.   You choose to get it from Q Logic?
12        A.   Drug Logic.
13        Q.   Q Scan software owned by Drug Logic,
14   right?
15        A.   That is correct.
16        Q.   You choose to get the data from Drug Logic
17   and not directly from the FDA, correct?
18        A.   Yes.
19        Q.   You trust or put faith in Drug Logic to
20   clean the data, as you indicate, and then provide it
21   to you in some format?
22        A.   Yes, myself and many others who use it in
23   the field. Absolutely.
24        Q.   And you rely upon what they do with it,
25   correct, you and whoever else you believe uses it,
```

133

```
 1   you have to rely upon what they do to the data?
 2        A.   Yes, that's correct.
 3        Q.   Did you, as an expert in this case
 4   offering opinions about an evaluation of the data,
 5   did you do anything personally to oversee whether
 6   the data was cleaned correctly, as you have
 7   indicated?
 8        A.   Say that one more time, please.
 9        Q.   Sure. You're an expert in this case
10   providing an opinion regarding your evaluations of
11   the AERS data that came out of the FDA. You got it
12   from Drug Logic. Did you do anything, as an expert
13   in this litigation, to verify the accuracy of what
14   Drug Logic did?
15        A.   For this litigation, no. In the course of
16   my research, yes.
17        Q.   In the course of your research outside the
18   context of Neurontin you have done work to verify
19   the accuracy of data provided to you from Drug
20   Logic?
21        A.   Yes, that is correct.
22        Q.   And in past experiences I presume you have
23   found they have done a good job?
24        A.   I found the data to be clean and accurate
25   and reflective of what is in FOI AERS.
```

134

```
 1        Q.   How did you do that?
 2        A.   One, I have extracts of AERS that I've
 3   looked at. Two, I compared it to what the FDA
 4   reports have, FDA reports have been perceived. In
 5   fact, I presented that at the International Study
 6   from Grubby meeting in August of this past year,
 7   2007.
 8        Q.   And is it fair to say you relied upon past
 9   experience with Drug Logic in putting faith in the
10   work they provided to you in this case?
11        A.   Yes.
12        Q.   What is interesting in this case is, you
13   have the ARISg database, correct?
14        A.   Yes, I did get a copy of it.
15        Q.   So you could have compared the data in the
16   ARISg database to the data in the FDA database
17   coming through Drug Logic to see if there was
18   something in the ARISg database that had not been
19   given to the FDA. Couldn't you have done that
20   physically yourself?
21        MR. BARNES: Objection.
22        A.   I may be able to match case for case, but
23   to decide what goes into the FDA, what is reported
24   to the FDA is a clinical judgment. So it wouldn't
25   necessarily be something I could make sense of
```

135

```
 1   necessarily.
 2        Q.   Well, you are familiar with the Code of
 3   Federal Regulations to a certain extent. You listed
 4   on your materials relied upon and considered,
 5   correct?
 6        A.   Yes.
 7        Q.   So you are familiar as to what safety
 8   surveillance requirements are in terms of reporting
 9   adverse events, whether it is 15 days reports,
10   serious and non-serious reports. You're familiar
11   with that, aren't you?
12        MR. BARNES: Objection.
13        A.   I have some familiarity with that.
14        Q.   With respect to those issues of the safety
15   surveillance regulations in the Code of Federal
16   Regulations and the reporting of serious reports or
17   non-serious reports or the issue of getting waivers
18   so you don't have to give reports, did you go and
19   make any comparison of the ARISg database with the
20   FDA database to see if there are any differences?
21        MR. BARNES: Objection.
22        A.   I believe I told you before I didn't use
23   the ARISg database. For many reasons.
24        Q.   What other reasons?
25        A.   Well, I wanted all the reports. And if I
```

136

```
 1   looked at ARISg, those would just be the reports
 2   that were sent into the company.  And the AERS data
 3   include direct reports that come into the FDA and
 4   wouldn't necessarily go through the company.  So
 5   it's more complete in that manner.
 6        Q.   But it also would not -- the FDA database
 7   would be incomplete for anything that Pfizer chose
 8   not to send.  Isn't that also the truth?
 9             MR. BARNES:  Objection.  Assumes facts not
10   in evidence.  You may answer.
11             THE WITNESS:  It would not include what
12   based on the clinical evaluation, as you said,
13   waivers or other information that were not
14   reportable.
15        Q.   What, if any, steps did you take to review
16   the adverse events in the post marketing database
17   from Drug Logic by indication?
18        A.   I did not go to that step, because there
19   was no signal at all of the first steps.  So there
20   was no reason for me to go beyond that to start
21   making sense of a signal since there was no signal
22   of disproportionately reporting until 2005.
23        Q.   If there was a signal in your mind before
24   2005, would have been a reason to go and analyze or
25   review the adverse events by indication?
```

137

```
 1        A.   If there had been a signal before the
 2   dumping of reports that created it artificially, I
 3   wouldn't go further and see if I could understand
 4   more about the signal.  But that's hypothetical
 5   because it didn't exist.
 6        Q.   Would you have required a PRR of 2 or
 7   greater from the post marketing evaluation to go and
 8   review those adverse events by indication, also
 9   assuming that that PRR was observed before this
10   notariety bias that you referenced?
11        A.   Would I have required for what?
12        Q.   You would have gone back and you would
13   have seen a signal before the dumping of the
14   information, as you phrased it, right?
15        A.   If I saw something, I would have done some
16   more analysis potentially, yes.
17        Q.   If you saw something.  What is threshold
18   for something?
19        A.   The threshold that I used here is very,
20   concerned PRR greater to or equal to -- let me make
21   sure I get this right.  There is a lot of thresholds
22   that were used.  Said it explicitly -- PRR greater
23   than 2, a ky square greater than or equal to 4 and
24   greater than 2.  That is threshold that I used in
25   this analysis.
```

138

```
 1        Q.   Equal or greater than 2?
 2        A.   PRR greater than 2.
 3        Q.   All right.  When you reference this
 4   notariety bias, you say so quite specifically in
 5   your report, by 2003 you are of the opinion that
 6   there was notariety bias, right?
 7        A.   That was stated by Cheryl Blume in her
 8   deposition that by 2003 there was notariety bias.
 9        Q.   When do you think the notariety bias
10   started, if at all?
11        A.   I have no opinion on when it started.  I
12   know it was very clearly evident in first quarter
13   2005. (sic)
14        Q.   Okay.  So --
15        A.   I base it on that deposition.
16        Q.   Do you know what portion of 2003 Dr. Blume
17   was acknowledging?
18        A.   I'll go back to her deposition, if you
19   would like.
20        Q.   Do you know when lawyer advertising
21   started regarding potential solicitation of cases
22   where people may allege they suffered adverse events
23   as a result of ingesting Neurontin?
24        A.   I read some things.  I don't know the day
25   or date that the advertising started specifically.
```

139

```
 1        Q.   When do you think the dumping occurred,
 2   the dumping of adverse, that records in the system.
 3   You are thinking that of 2000 when?
 4        A.   I specifically found in first quarter 2005
 5   that the FDA received a large number of reports, I
 6   believe, from your law firm.  And I don't know and
 7   hadn't looked.  There may be going back years before
 8   then, I don't know.  Maybe someone else here could
 9   tell me when it started.  But I can say definitively
10   on that date it's been very clear that there was
11   stimulated reporting on, I believe it's about four
12   days in March 2005.
13        Q.   Let's wipe them out of the picture.  Don't
14   count 2005.  For purposes of the deposition and
15   hypothetical we would agree with you that that is
16   stimulation.
17             What would happen if you were able to
18   take that out of the picture?  When did you observe
19   a signal, if at all?
20        A.   None.
21        Q.   From a statistical standpoint you did not
22   observe any signal?
23        A.   Not until March 2005.
24        Q.   Is it your opinion that there can never
25   been this signal, if the PRR is less than 2 with the
```

140

```
 1   You know what I'm talking?                              1   PRRRAWDATA.XLS, to the best of your knowledge?
 2      A.  Yeah, I know we talked about that.  I have       2      A.  Yes.
 3   to go back and find that cite.  I didn't find the       3      Q.  My question for you then is, where is the
 4   cite readily.                                           4   data for the background?
 5      Q.  Now back to our line of questioning about        5      A.  Excuse me?
 6   the Code of Federal Regulations.  I want you to         6      Q.  Where is the data that reflects the
 7   assume the following as if it is the Code of Federal    7   background information?
 8   Regulations regarding post marketing 15-day alert       8      A.  This is just the threshold information.
 9   reports.  I want you to assume this is in fact what     9   So it's just the output for the PRR and the other
10   it says.                                               10   statistics that one needs to see whether or not it
11           The applicant shall report each               11   hits the threshold.  It doesn't have any information
12   adverse drug experience that is both serious and      12   of all events for either Gabapentin or for all
13   unexpected, whether foreign or domestic, as soon as   13   events in the data.  It's purely the raw output of
14   possible, but in no case later than 15 calendar days  14   the analysis.
15   of initial receipt of the information by the          15      Q.  So how can we replicate your chart, your
16   applicant.                                            16   PRR chart without having that data?
17           That is the definition of post               17      A.  The data is available on the FDA website.
18   marketing 15-day alert report in its entirety.        18   So you could recreate what I've done from the FDA
19   Assuming that is in fact the case, do you have any    19   AERS database by doing the same calculations.
20   reason to dispute that, that that is the definition?  20      Q.  How do we calculate what you have done by
21      A.  I have no opinion either way.                  21   using the same set of data you received from Drug
22      Q.  When you were -- no opinion either way.        22   Logic and utilized the Q Scan?
23   All right.                                            23      A.  You could go through -- either have a
24      A.  I would rather see it.                         24   contract with them or you could go through the same
25      Q.  I can't print it.  I'm sure, we are in a       25   steps that they use to clean the data, which anyone
```

197                                                                                    199

```
 1   law office.  Counsel could probably pull it, if you    1   would need to do to properly analyze the data.
 2   want.                                                  2      Q.  Just to be clear, you don't know what they
 3           (Pause)                                        3   did to clean the data?
 4   BY MR. FROMSON:                                        4      A.  Do you want me to go into --
 5      Q.  Let me show you what we are going to mark       5      Q.  Can you personally account for what they
 6   as Exhibit 12.  I only have one copy.  It was          6   did or are you basically surmising what you believe
 7   printed as a courtesy by your counsel.  And --         7   they did?
 8           (Deposition Exhibit Number 12 marked for       8      A.  I work very closely with the CEO,
 9   purposes of identification.)                           9   president and founder of Drug Logic, Dick Gogolack,
10   BY MR. FROMSON:                                      10   he's a Co-PI of mine on a project.  We have been
11      Q.  Doctor, I'm showing you what's been marked    11   writing up the results of our analysis and
12   as Exhibit No. 12.  I would submit to you that this  12   investigation.  So I am familiar with the process
13   exhibit is essentially data that's been exported     13   that they take the AERS data through.
14   from a CD that was provided to us by defense counsel 14      Q.  What we want to know is what the
15   for the drug company Warner-Lambert, Parke-Davis.  I 15   background was at each point in time in your PRR and
16   would ask you to take a look at the exhibit and see  16   with the data that you provided to us or rather the
17   if you can match up the data and basically           17   data that you provided to your counsel, and then
18   authenticate what it is.                             18   which was provided to us, are we capable of doing
19      A.  Okay.                                         19   that solely with the disc that you have provided to
20      Q.  Did you authenticate the document in terms    20   us?
21   of what it is?                                       21      A.  I don't believe I gave you the total
22      A.  This is the PRR analysis for suicide and      22   number of reports that were in AERS.  But all you
23   suicide attempt that I did.  So these are the        23   need to do is get total number of unique reports in
24   results of that analysis.                            24   AERS and how many suicides in AERS.  So it could we
25      Q.  This would be included in a file called       25   readily calculated from the FOI data.
```

198                                                                                    200

1  litigation?
2  A. I provided all of it to the attorneys.
3  Q. Is all of the correspondence to or from
4  you regarding this litigation available to me today?
5  MR. BARNES: Subject to our stipulation,
6  yes.
7  MR. FROMSON: Can you identify, Counsel,
8  what correspondence is not being made available to
9  me today?
10 MR. BARNES: I don't know there is any
11 subject to the stipulation. Here is the
12 correspondence I have available for you, which I
13 showed you earlier.
14 MR. FROMSON: Can we mark the Redwell.
15 That reflects the documents you did show me this
16 morning. Mark it simply as a document that's been
17 photocopied today. Give copies to the reporter.
18 MR. BARNES: Let me do this. One of two
19 ways. We can -- let's mark it. Clip it. And we
20 can copy, I'm not going to do it now because the
21 staff isn't here. I can do it tomorrow morning.
22 (Deposition Exhibit Number 13 marked for
23 purposes of identification.)
24 BY MR. FROMSON:
25 Q. Doctor, do you maintain any copy of -- is

249

1  there a fee agreement in writing between you and
2  defense counsel?
3  A. No, I don't believe there is.
4  Q. Do you maintain any billing in writing or
5  on your computer to demonstrate the work you've
6  undertaken and time spent, the activity or amount
7  billed?
8  A. I do keep track of my hours, yes.
9  Q. And have you brought those, have you
10 provided those to your counsel?
11 MR. BARNES: She has them but subject to
12 ongoing negotiations you're having with the firm of
13 Shook, Hardy, Bacon we're not producing them.
14 Q. Do those billing statements reflect any
15 work -- do those billing statements include
16 substantive information regarding your opinions in
17 this case, as opposed to just billing information?
18 A. No, they just give the date and the hours
19 worked.
20 Q. Okay. Have you provided all written
21 studies, reports, records, opinions, notes and
22 calculations or other documentation prepared or
23 reviewed by you in connection with this litigation?
24 MR. BARNES: Number 7. I believe we have
25 a disc for you.

250

1  MR. FROMSON: I have been given a disc
2  earlier this morning with the Goodell, DeVries,
3  Leech & Dann logos on them. One is entitled,
4  Electronic Document. One is entitled, Neurontin
5  Material.
6  Counsel, can you identify what these are?
7  MR. RICHER: We actually have an index for
8  the one --
9  (Pause)
10 Q. The Neurontin material has an index.
11 Doctor, are you familiar with the Neurontin material
12 CD?
13 A. May I see the materials list. I can't do
14 anything with it without a computer. Okay. This is
15 the material that was provided to me for this case.
16 Q. With respect to number 14 on the list, it
17 requests any database used for analyses and the
18 applicable software to conduct the data analyses.
19 Do you see that in writing on number 14, the last
20 clause of number 14?
21 A. Yes, I see it.
22 Q. You acknowledge there's Q Scan software,
23 correct?
24 A. Excuse me?
25 Q. There is Q Scan software that you have or

251

1  possess or to which you have access to via
2  subscription?
3  A. I have access via subscription, yes.
4  Q. So you have not brought that with you to
5  the deposition. Is that correct?
6  A. Well, I haven't. The data that I used is
7  publicly available and it's a simple calculation
8  that could be done on any hand-held calculator.
9  Q. Just move to strike that portion as not
10 responsive.
11 One of the reasons why you have not
12 brought it is a claim, the fact it is proprietary,
13 you have contract for the subscription and you can't
14 share it, right?
15 A. That's correct.
16 Q. At page 14 of your report you indicate
17 that the FDA has not concluded that Neurontin
18 increases the risk for suicide or suicide attempt,
19 correct?
20 A. That's what I wrote, yes.
21 Q. Isn't it true that the FDA has not
22 concluded one way or the other whether Neurontin
23 increases risk for suicide or suicide attempt?
24 A. No, they have not concluded that there is
25 an association. And, therefore, there is no

252