# EXHIBIT 5
# (PART IV)

Page 341

1  APPEARANCES:
2
3  FINKELSTEIN & PARTNERS
   436 Robinson Avenue
4  Newburgh, New York 12550
   BY: ANDREW G. FINKELSTEIN, ESQ.
5  For the Plaintiff
   800 634-1212
6
7  THE LANIER LAW FIRM
   Tower 56
8  126 East 56th Street, 6th Floor
   New York, New York 10022
9  BY: KENNETH SOH, ESQ.
   For the Plaintiff
10 212 421-2800
11
   SHOOK, HARDY & BACON, LLP
12 2555 Grand Boulevard
   Kansas City, Missouri 64108-2613
13 BY: LORI CONNORS McGRODER, ESQ.
   For the Defendant
14 816 474-6550
15
16
17 ALSO PRESENT:
18   Adam DiCola, Videographer
19
20
21
22
23
24
25

Page 342

1
2          INDEX
3
4  WITNESS              DIRECT
5  PROFESSOR MICHAEL TRIMBLE
6
7  Ms. McGroder          344
8
9          EXHIBITS
10
11 NUMBER   DESCRIPTION        PAGE
12 TRIMBLE
13
14 EXHIBIT 19   Shell report         352
15 EXHIBIT 20   Neurogurgical records   399
16 EXHIBIT 21   UMC notes           404
17 EXHIBIT 22   Juurlink article      455
18 EXHIBIT 23   Police report        482
19 EXHIBIT 24   Medical examiner's report   489
20 EXHIBIT 25   Suicide note        497
21 EXHIBIT 26   Photo              508
22 EXHIBIT 27   Wood letter         539
23
24
25

Page 343

1  PROF. MICHAEL TRIMBLE,
2  Institute of Neurology
   Queen Square
3  London WCIN3CB,
   having been previously sworn, was
4  examined and testified as follows:
5
6      THE VIDEO OPERATOR:  Please standby.
7      We are on the record.  My name is
8  Adam DiCola of Veritext Corporate
9  Services.  The date today is September 3,
10 2008, and the time is approximately
11 9:16 a.m.  This deposition is being held
12 in the office of Lanier Law Firm, located
13 at 126 East 56th Street, New York, New
14 York.
15     The caption of this case is Smith, et
16 al., versus Pfizer, et al., in the United
17 States District Court, District of
18 Massachusetts, Case Number
19 05-CV-11515-PBS.
20     The name of the witness is Professor
21 Michael Trimble.
22     At this time the attorneys will
23 identify themselves and the parties they
24 represent, after which our court reporter,
25 Patricia Sands, will swear in the witness

Page 344

1  and we can proceed.
2      MR. FINKELSTEIN:  Andrew Finkelstein,
3  on behalf of the Smith family.
4      MR. SOH:  Ken Soh, on behalf of the
5  Smith family as well.
6      MS. McGRODER:  Lori McGroder, of
7  Shook, Hardy & Bacon, on behalf of Pfizer.
8      MS. STEVENSON:  Jennifer Stevenson,
9  of Shook, Hardy & Bacon, also on behalf of
10 Pfizer.
11     THE WITNESS:  We did this yesterday.
12
13 CONTINUED DIRECT EXAMINATION
14 BY MS. McGRODER:
15    Q   Professor Trimble, you know you're
16 still under oath; correct?
17    A   Correct.
18    Q   Did you do anything last night to
19 prepare for the continuation of your deposition
20 this morning?
21    A   Last night and this morning I read
22 through my bundle of Mr. Smith's notes.
23    Q   And those would be the medical
24 records marked as Exhibit --
25    A   The ones that you had yesterday.

2 (Pages 341 to 344)

Page 393

1    in a blue pen.
2        A    That's correct.
3        Q    When did you write the first notes in
4    black pen, and when did you write the notes in
5    blue pen?
6        A    The first notes, which represent four
7    occasions when Mr. Smith reported to either his
8    dentist or members of the family that there was
9    something wrong with his mental state, were
10   written before I reached America, probably on
11   the plane, although that might have been the
12   day before I got on the plane.
13       The fifth notation -- so this is the fifth
14   quote of somebody saying that Mr. Smith's
15   mental state was abnormal, was when I read the
16   deposition on Sunday from daughter Cindy.
17       Q    Okay.
18       A    So it was an extra quotation from the
19   family about Mr. Smith's abnormal mental state.
20       Q    So you wrote that after you read
21   Cindy's deposition?
22       A    So I wrote that after I read the
23   deposition. And then the numbering, 1, 2, 3,
24   4, 5, was obviously in the same pen, because I
25   had had a different pen than I did when I was

Page 394

1    in England or on the airplane.
2        Q    If you could put the page to 12.
3        A    Yes.
4        Q    You have a list of differential
5    diagnosis.
6        A    Yes.
7        Q    With two underlines under it. And
8    that appears to be in the same blue pen. Were
9    those -- well, first, when did you create that
10   list?
11       A    This was going through my report on
12   the Monday, and I just write down here
13   differential diagnosis, as I had seen it in my
14   report. These are the differential -- this is
15   the differential diagnosis that I went through,
16   and I ruled out in the last two pages of my
17   report.
18       Q    And so this is the differential
19   diagnosis you conducted to form your opinions
20   in this case, because those are contained in
21   your report; correct?
22       A    These are in my report, yes.
23       Q    And if you look at the next page,
24   12a.
25       A    Yes.

Page 395

1        Q    Again, is -- are the notations made
2    on 12a and 13, are those after you got to the
3    United States and met with plaintiff's lawyers?
4        A    No -- well, there is two different
5    questions there.
6        Q    Well --
7        A    If you would like to place them
8    separately.
9        Q    You did not meet with plaintiffs
10   lawyers until you got to the United States,
11   right?
12       A    Correct.
13       Q    So are the notes on 12a and 13
14   prepared after you met with plaintiffs's
15   lawyers?
16       A    That's correct. But misleading.
17       Q    Okay, what's misleading about it?
18       A    Well, when I met with plaintiff's
19   lawyers, they gave me a collection, a bundle of
20   depositions which I then took away and read and
21   made some further notes.
22       Q    Okay.
23       A    So.
24       Q    All right, now going back to the
25   medical records in Exhibit 18.

Page 396

1        Do you still have that in front of you?
2        A    (Referring to document.) Yes, I have
3    it.
4        Q    Are you aware that Dr. McCombs told
5    Mr. Smith that he needed to learn how to manage
6    his pain?
7        A    I'm not aware of that directly, but
8    that's implied in the suggestion that he should
9    have a pain management program.
10       Q    You didn't read that in Ruth Smith's
11   deposition?
12       A    I don't -- I remember it. It may
13   well have been, but I don't remember it.
14       Q    And the fact that Mr. Smith is not a
15   candidate for any type of operative
16   intervention in March of 2004, that's different
17   from what Mr. Smith experienced in the spring
18   of 2003; correct?
19           MR. FINKELSTEIN: Objection.
20           THE WITNESS:  In what way?
21   BY MS. McGRODER:
22       Q    Well, in 2003 he was a candidate for
23   surgery and he had surgery; correct?
24       A    That's correct.
25       Q    In 2004 he is not a candidate for

15 (Pages 393 to 396)

Page 397

1  surgery and he can't have surgery?
2      MR. FINKELSTEIN: Objection.
3      THE WITNESS: According to
4  Dr. Mackey, that is correct.
5  BY MS. McGRODER:
6    Q   And Dr. McCombs?
7    A   Yes, and McCombs, that is correct.
8    Q   Did you consider the fact that
9  Mr. Smith was no longer a candidate for surgery
10 to help his pain in 2004 when you formed your
11 opinions in this case?
12   A   My understanding is that he was
13 actually scheduled to see yet another surgeon
14 the day after he died, Dr. Chang, I think it
15 was. So his searching for another opinion had
16 not ceased.
17   Q   Okay. That wasn't my question. My
18 question was: Did you consider the fact that
19 Mr. Smith was told by two surgeons in March
20 of 2004 that he was no longer a candidate for
21 surgery to help him with his pain when you
22 formed the opinions that you came to in this
23 case?
24   A   Not especially, no.
25   Q   That wasn't important to your

Page 398

1  opinion?
2      MR. FINKELSTEIN: Objection.
3      THE WITNESS: Not especially, no.
4  BY MS. McGRODER:
5    Q   Okay, if you go to Exhibit 15, page
6  FMB 52, which is an April 15, 2004 note.
7    A   Right.
8    Q   Let me give you the actual exhibit.
9  Here, use this.
10   A   Yeah. I'll give you that back.
11   Q   These are the medical records of
12 Dr. Berklacich.
13   A   Right.
14   Q   I'm sure we're butchering that name,
15 but that's the best I can do.
16   A   Okay.
17   Q   And look for April 15, 2004.
18     MR. FINKELSTEIN: What's the Bates
19 number?
20     MS. McGRODER: It is FMB 52, actually
21 it's the last page.
22     THE WITNESS: Oh, the very bottom.
23 BY MS. McGRODER:
24   Q   Yes.
25   A   15 4 04, yes.

Page 399

1    Q   Yes, April 15, 2004. The note says:
2  "Per Dr. Berklacich, do not --"
3    A   Reschedule.
4    Q   "-- reschedule appointment".
5    A   Yes.
6    Q   Do you know what that's about?
7    A   No.
8    Q   If you -- did you read the deposition
9  of Dr. Berklacich?
10   A   Yes.
11   Q   Did you take any notes other than the
12 notes in Exhibit 2 on the basis of your review
13 of depositions?
14   A   No.
15   Q   Did you make notes in the depositions
16 themselves?
17   A   No.
18     (Exhibit 20 marked for
19 identification.)
20   Q   I'm going to hand you now, Professor
21 Trimble, what we're marking as Exhibit 20 to
22 your deposition.
23   A   Okay.
24   Q   If you would look the third to the
25 last page.

Page 400

1      MR. FINKLESTEIN: Just so --
2      MS. McGRODER: I'm getting there.
3      MR. FINKELSTEIN: I mean, all I want
4  you to do is establish it was already an
5  exhibit. That's all.
6  BY MS. McGRODER:
7    Q   These are records of Neurosurgical
8  Associates. Do you see that?
9    A   I do.
10   Q   And there is an exhibit reference at
11 the top on the front page that says Exhibit 1,
12 if you look on the very front.
13   A   Yes.
14   Q   And that exhibit reference does not
15 relate to this deposition?
16   A   Okay.
17   Q   Just for the record, that relates to
18 the deposition of Ruth Smith where this exhibit
19 was used.
20   A   Okay.
21   Q   Okay. And turning to the third to
22 the last page, you will see that this is a copy
23 of Dr. McCombs record.
24   A   Yes. Yes, I have that.
25   Q   Okay.

16 (Pages 397 to 400)

Page 401

1    A   We discuss discussed this already.
2    Q   Yes, yes, we did.
3    A   Yes.
4    Q   And this copy has handwriting on it?
5    A   Yes.
6    Q   That we've been told is Mr. Smith's
7  handwriting; right?
8    A   Correct.
9    Q   And we talked about that a little
10 yesterday, do you recall?
11   A   Correct.
12   Q   That there was some medical records,
13 and I think you your testimony you don't know
14 why Mr. Smith got his medical records or wrote
15 on them?
16   A   Correct.
17   Q   And in this record, it says -- there
18 is a circle around the word Dr. Howell.
19   A   Correct.
20   Q   And then there is an arrow that goes
21 down to the handwritten note.
22   A   That's correct.
23   Q   By Mr. Smith. And the note says,
24 which is consistent with your testimony, "I
25 have never seen Dr. Howell"; right?

Page 402

1    A   That's correct.
2    Q   And then it says: "Dr. Mackey called
3  and said that Dr. Howell would not see me,
4  because I had seen Dr. Hampf, February 27th,
5  2003, and did not let him do my surgery".
6      Do you see that?
7    A   Yes, I do.
8    Q   And then the next note is: "I pray
9  that Dr. Hampf will consider seeing me and
10 giving me his opinion".
11     Do you see that?
12   A   That's correct.
13   Q   Did you know that Dr. Hampf was
14 affiliated with Dr. Berklacich?
15   A   No.
16   Q   Dr. Hampf is Dr. Berklacich's
17 partner, did you know that?
18   A   I didn't know that.
19   Q   So looking back now to Exhibit 15, on
20 the last page. The record that we were looking
21 at that says --
22   A   Yes.
23   Q   "Do not reschedule an appointment".
24   A   Yes.
25   Q   Are you aware that refers to

Page 403

1  Dr. Hampf and Dr. Berklacich stating in the
2  record they will not reschedule an appointment
3  with Mr. Smith?
4    A   That's correct.
5    Q   Do you know what Mr. Smith's reaction
6  was to that?
7    A   No.
8    Q   Based on the handwritten note of
9  Mr. Smith, do you think he wanted to see
10 Dr. Hampf?
11       MR. FINKELSTEIN: Objection.
12       THE WITNESS: He was seeking more, he
13       was still seeking more opinions and he
14       does discuss Dr. Hampf in that handwritten
15       note.
16 BY MS. McGRODER:
17   Q   And Dr. Hampf is a surgeon; right?
18   A   I do not know. I accept that he may
19 be, but I do not know.
20   Q   Okay. And this also is different
21 from Mr. Smith's experience in the spring of
22 2003; correct?
23   A   In the sense that --
24   Q   In the sense that in 2003 Mr. Smith
25 did have the opportunity to go and see

Page 404

1  Dr. Berklacich and Dr. Hampf to get an opinion
2  about surgery; right?
3    A   That's correct.
4    Q   Now, in 2004, Mr. Smith is still
5  experiencing severe pain, and he does not have
6  the opportunity to go in and see Dr. Hampf and
7  Dr. Berklacich for an opinion about surgery;
8  correct?
9        MR. FINKELSTEIN: Objection.
10       THE WITNESS: That's correct.
11       MS. McGRODER: We are now marking,
12       Professor Trimble, notes from the
13       University Medical Center as Exhibit 21.
14       (Exhibit 21 marked for
15       identification.)
16 BY MS. McGRODER:
17   Q   Do you recognize these notes?
18   A   (Referring to document.) They have a
19 familiarity.
20   Q   Do you think you have seen these
21 before?
22   A   I only said that because there's a
23 lot of them look the same.
24   Q   Format?
25   A   If you would like to take me to the

17 (Pages 401 to 404)

Page 405

1   date.
2   Q   Sure.
3   A   It would help me, I think.
4   Q   Just start at the beginning.
5   A   Okay.
6   Q   And date on this note is April 14,
7   2004.
8   A   Okay, I have that.
9   Q   And here Mr. Smith is reporting pain,
10  tingling from lumbar to ankles and left groin;
11  right?
12  A   That's correct.
13  Q   And it also says under "Mechanism of
14  Injury and Progression" on the front page:
15     "Patient feels pain related to back
16  surgery. Initially following 4/03 surgery,
17  pain 3, then in December of '03 pain began in
18  buttocks and down legs to ankles. Now, in
19  addition to above pain, pain is in left groin".
20  A   Correct.
21  Q   Do you see that?
22  A   That's correct.
23  Q   So in April of 2004, Mr. Smith is
24  reporting additional symptoms of pain; right?
25  A   That's correct.

Page 406

1   Q   And if you turn the page to page 012,
2   012.
3   A   Uh hum.
4   Q   The question is -- well, up at the
5   top third, it says: "Please mark the areas
6   where your symptoms are constant."
7      Do you see that?
8   A   (Referring to document.)
9   Q   One more page. Go to the next.
10  A   He marks on the page before a scale
11  of his pain as 6 out of 10.
12  Q   Okay.
13  A   Which is, you will recall that
14  yesterday he was rating -- well, the suggestion
15  was that if he had severe pain it would be 9
16  out of 10.
17  Q   Okay, actually he marks his worse
18  pain level as a 7 out of 10.
19  A   Yes.
20  Q   Do you see the W by the 7?
21  A   That's correct.
22  Q   He marks his present level of pain
23  during his visit as a 6, and he marks his pain
24  when its at its best, as a 4.
25  A   Yes.

Page 407

1   Q   And then underneath that it says
2   "with medication"; right?
3   A   That's correct.
4   Q   Okay. Turning to the next page. It
5   says "When did your pain begin" at the top.
6   A   Yes.
7   Q   It says December 2003, following
8   April 2003 lumbar surgery; right?
9   A   Yes.
10  Q   Okay. So Mr. Smith, ah, Mr. Smith is
11  a reporter on this note; correct?
12     MR. FINKELSTEIN: Objection.
13     THE WITNESS: I don't -- well, I
14     imagine, but I don't know for certain.
15  BY MS. McGRODER:
16  Q   At the bottom of page 012, do you see
17  Mr. Smith's signature?
18  A   Yes, but who did the writing is
19  not --
20  Q   Correct, but the information is
21  coming from Mr. Smith; right?
22  A   Oh, I see. I'm sorry, I
23  misunderstood you. Yes, that's correct.
24  Q   He is reporting information contained
25  in his note?

Page 408

1   A   That's correct.
2   Q   And then it says at the top third:
3   "Please mark the areas where your symptoms are
4   constant".
5      Do you see that?
6   A   Correct.
7   Q   And it says: "Back, buttocks, hips
8   and leg"; right?
9   A   Correct.
10  Q   And "Mark any of the following that
11  make your pain worse", I mean, the next entry
12  he doesn't fill out, and then the next one that
13  is filled out it says "Mark any of the
14  following that make your pain worse" and he
15  says "sitting"; right?
16  A   He doesn't talk about standing or
17  walking or turning or bending.
18  Q   Right, but he marks "sitting";
19  correct?
20  A   He does, yes.
21  Q   And then "Mark any of the following
22  that make your pain better" and he writes
23  "lying".
24  A   Yes.
25  Q   Okay, or the therapist writes, checks

Page 409

1  lying for him.
2    A  Correct.
3    Q  Are you aware that Ms. Smith
4  testified that Mr. Smith was lying around on
5  the sofa a lot in April and May of 2004 trying
6  to be out of pain?
7    A  That would make sense.
8    Q  Makes sense; right?
9    A  Yes.
10   Q  He feels less pain while he is lying
11 down?
12   A  Yes.
13   Q  Or he attempts to control his pain by
14 lying down?
15   A  That's correct.
16   Q  "Does your current problem affect
17 your sleeping patterns?"  Yes, is checked;
18 right?
19   A  Correct.
20   Q  The fact that Mr. Smith has
21 difficulty sleeping as a result of pain, that's
22 fairly constant every time Mr. Smith has to
23 bear pain; right?
24     MR. FINKELSTEIN:  Objection.
25     THE WITNESS:  I think that's well

Page 410

1    reported.
2  BY MS. McGRODER:
3    Q  Both in 2003 and in 2004?
4    A  That is correct.
5    Q  Does he ever receive any hypnotic or
6  any medication for sleep?
7    A  Well, that was my understanding as to
8  why he was given the antidepressant medication,
9  the amitriptyline, because it was given in such
10 a low dose.
11   Q  Okay.
12   A  And that was my understanding why he
13 received that.  And possibly why he was given
14 the escitalopram.
15   Q  What is the brand name of
16 escitalopram?
17   A  Excuse me?
18   Q  What is the brand name of
19 escitalopram?
20   A  Well, it's the one that I had to go
21 look up yesterday.
22   Q  Well, that's Lexapro.
23   A  Lexapro, that's correct.
24   Q  Well, Lexapro is indicated for the
25 treatment of major depressive disorder.

Page 411

1    A  But, it also aids sleep as well.
2    Q  Yes, and it's also indicated for the
3  treatment of general anxiety disorder?
4    A  That's correct.
5    Q  Those are the two indicated uses.
6    A  Yes, that --
7    Q  It doesn't have an indication for the
8  treatment of insomnia; does it?
9    A  I don't want to backtrack on that,
10 I'm merely saying that he was given medications
11 that in clinical practice aids sleep and, in
12 particular, the amitriptyline.
13   Q  Sure.  And so one clinical benefit of
14 Lexapro may be that it helps sleep; right?
15   A  It does.
16   Q  Sure.  But it's used to treat major
17 depressive disorder; right?
18   A  It's used to treat depression.
19   Q  You don't dispute that?
20   A  No, no.
21   Q  And it was prescribed by Dr. Cato to
22 treat Mr. Smith's depression?
23   A  That I have -- that is new knowledge
24 to me, which I have now understood.
25   Q  Okay.  And you do understand that?

Page 412

1    A  I was previously unaware of
2  Dr. Cato's acronyms.
3    Q  But my question is now you do
4  understand?
5    A  Oh, I do, yes.  I do understand that.
6    Q  If you go to page 13.
7    A  Yes.
8    Q  Which is the next page.  These are a
9  list of conditions.  And the question is "If
10 you've ever been treated or diagnosed with the
11 following, please mark and provide information
12 in the space provided".
13   Do you see that?
14   A  Yes.
15   Q  And this appears to be filled out by
16 Richard Smith.  Do you see that at the top,
17 "Patient name Richard Smith"?
18   A  Again, whether he filled it out or
19 somebody else did, I don't know.
20   Q  Okay.  Well, it says:  "If you have
21 ever been treated, please mark" would that
22 indicate that the patient is being requested to
23 fill out this form?
24     MR. FINKELSTEIN:  Objection.
25     THE WITNESS:  I mean, I just don't

Page 413

1  know. I mean, the form before we've
2  agreed was filled out by somebody else.
3  BY MS. McGRODER:
4  Q  Okay, that's fine. In any event,
5  again Mr. Smith is the reporter of this
6  information?
7  A  Yes, that's correct.
8  Q  And there is a check mark next to
9  "arthritis"; correct?
10  A  Correct.
11  Q  And there is a check mark next to
12  "depression, anxiety" and "other"; correct?
13  A  That's correct.
14  Q  So Mr. Smith believes that he has
15  been treated or diagnosed with depression and
16  anxiety; correct?
17  A  That is correct.
18  Q  In April of 2004, that's when this
19  note is filled out?
20  A  That is correct.
21  Q  Now, if you will turn to page 69 in
22  the same set of records.
23  A  (Referring to document.)
24  Q  It's page 7 of 7 for this form.
25  A  Of the same form we are looking at?

Page 414

1  Q  Right. And Bates number is 069.
2  A  069, I have that, yes.
3  Q  Okay. And at the top there are
4  problems listed and boxes that can be checked.
5  A  That's correct.
6  Q  And I just want to go over with you
7  the problems that are identified here on this
8  record, okay?
9  A  Correct.
10  Q  And "pain" has a check mark next to
11  it?
12  A  Yes.
13  Q  "Myo-facial irritation" has a check
14  mark next to it?
15  A  Correct.
16  Q  "Muscle spasm" has a check mark?
17  A  Correct.
18  Q  "Trigger points" has a check mark?
19  A  Correct.
20  Q  "Difficulty sleeping" is checked?
21  A  That's correct.
22  Q  "Decreased range of motion" checked?
23  A  Correct.
24  Q  "Decreased strength" is checked?
25  A  That's correct.

Page 415

1  Q  "Decreased endurance" is checked?
2  A  That's correct.
3  Q  "Radicular symptoms" is checked?
4  A  That's correct.
5  Q  "Difficulty with activities of daily
6  living" is checked?
7  A  That's correct.
8  Q  "Pelvic asymmetry" is checked?
9  A  Correct.
10  Q  "Posture" is checked with a circle
11  between the lines fair and poor; right?
12  A  That's correct, yes.
13  Q  And "lacks HEP and/or self management
14  techniques", that's checked also; right?
15  A  Yes.
16  Q  What is HEP and/or self management
17  techniques?
18  A  I do not know.
19  Q  Do those relate to ability to cope
20  with your pain?
21  A  Possibly.
22  Q  Did you look that up?
23  A  No.
24  Q  So when you wrote that Mr. Smith was
25  coping fairly well with his pain in your

Page 416

1  report, you didn't see this record where there
2  is a check mark next to lacks HEP and/or self
3  management techniques?
4  A  My comments come from the
5  depositions.
6  Q  Well, your comments in your report
7  could only come from one deposition, and that
8  would be Ruth Smith; right?
9  A  That is correct.
10  Q  That's the only deposition you read
11  before --
12  A  That is correct.
13  Q  -- you wrote your report?
14  A  That is correct.
15  Q  So your reference in your report to
16  Mr. Smith coping well is not accurate in light
17  of this record; correct?
18  MR. FINKELSTEIN: Objection.
19  THE WITNESS: In the light of this
20  record, he was having difficulties, but we
21  are going to go on to look at other
22  records, which suggest he was coping. I
23  assume. But on this particular record, he
24  is having difficulty.
25

20 (Pages 413 to 416)

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 417

1    BY MS. McGRODER:
2        Q    What record are we going to go on to
3    look at after April 14 of 2004 that's going to
4    show us that he was coping?
5        A    That he was improving.
6        Q    No, that he was coping with his pain.
7    The question now is about whether Mr. Smith had
8    the ability to cope with his pain?
9        A    (Referring to document.) If you
10   would like me to outline them.
11       Q    Yes, I would.
12       A    The report from the, from the, ah,
13   physical therapy services dated the 30th of
14   April.
15       Q    And what page are you on?
16       A    I'm looking at Mr. Smith's medical
17   reports.
18       Q    Yes.
19       A    But --
20       Q    And these exhibits are Mr. Smith's
21   medical reports, so --
22       A    This is Defendant's Exhibit 12.
23       Q    Okay, so are you on page 080 of UMC
24   records?
25       A    There is no notation number on my

Page 418

1    mine. These are my own reports.
2        Q    May I borrow it briefly. Okay, so
3    for the record, the page that you're referring
4    to is UMC 080, okay.
5        And what on this page tells us that
6    Mr. Smith was coping with his pain on
7    April 30th of 2004?
8        A    Well, this tells us that his pain had
9    decreased by that time.
10       Q    And does that tell us anything about
11   how Mr. Smith is coping with his pain?
12       A    If we refer on two pages later.
13       Q    No, now -- now I'm talking about UMC
14   080.
15       A    Well, I think it's the same report.
16       Q    I want to ask you about this page
17   now.
18       A    Well, that --
19       Q    This page doesn't say anything about
20   coping with pain; does it?
21       A    It tells me that his pain has
22   decreased.
23       Q    Right. And are the words "coping" on
24   this page?
25       A    No.

Page 419

1        Q    Is there any assessment of
2    Mr. Smith's ability to self manage and cope
3    with his pain on this page?
4        A    Well, not on that page.
5        Q    Okay.
6        A    But if you can stick with the same
7    report and move on two pages, and the comment
8    is pain report following today's treatment much
9    better.
10       Q    Now, let's see. What page are you
11   on?
12       A    Oh, two pages later I guess.
13       Q    Is the date 4/30/04?
14       A    It's this page here.
15       Q    Okay, and let me get there. Under
16   "Assessment". Okay, for the record, that is
17   UMC 079. Okay, and that assessment says --
18       A    "Much better."
19       Q    "Patient tolerated today's
20   treatment --"
21       A    "Much better."
22       Q    "Good." Am I on a different page
23   than you?
24       A    Oh, I don't know. (Handing over
25   document.)

Page 420

1        Q    Yes, I am on a different page. What
2    is the date of this page?
3        A    Well, it's within the -- it's in the
4    same bundle of the 26th of April.
5        Q    I don't think that's part of the
6    April 30 record that we were referring to.
7        A    Okay. Certainly this is 26 April,
8    now I'm 26 April.
9        Q    Of '04?
10       A    '04.
11       Q    Okay, here we are. For the record,
12   now the corrected Bates number is UMC 082.
13   Okay.
14       And this says "Assessment. Patient
15   tolerated today's treatment good. Patient
16   report following today's treatment, much
17   better".
18       A    Okay.
19       Q    "Myo-facial irritation, muscle spasms
20   trigger points --" do you know what that says?
21       A    (Reviewing document.) You're saying
22   like mobility, increased mobility noted. Or
23   something like this.
24       Q    Okay. And does this record on page
25   UMC 082 does this say anything about

21 (Pages 417 to 420)

**Page 421**

1 Mr. Smith's ability to self manage his pain, or
2 cope with his pain?
3   A   Well, it tells me that he is moving
4 in the right direction and getting better.  If
5 I could refer back.
6   Q   Well, this is talking about how he
7 felt after today's treatment in terms of his
8 pain; right?
9   A   And it says that he's mobilizing
10 better.
11   Q   Where does it say that?
12   A   Didn't we just read that?
13   Q   Well, after ROM mobility, what does
14 that say?
15   A   I thought this said that his mobility
16 was --
17   Q   I simply don't know.
18   A   Increased -- there is an arrow which
19 says increased.
20   Q   I see that.
21   A   And then "mobility noted".
22   Q   What is the word after "increased"?
23   A   I think it says "dressing".
24   Q   Increased dressing?
25   A   Could be.

**Page 422**

1   Q   Mobility noted?  So he might be able
2 to dress himself after this physical therapy
3 treatment?
4   A   That suggests to me that he is moving
5 forwards and getting better.
6   Q   Now, my question to you, before you
7 move on is:  Is there anything on UMC 082 that
8 talks about Mr. Smith's ability to cope with
9 his pain?
10   A   Well, may I just --
11   Q   First you need to answer my question
12 about UMC 082, then you can talk about what you
13 want to talk about, but first answer my
14 question.
15   A   There's nothing about coping there.
16   Q   Okay.
17   A   But I'm just looking for the word
18 "coping" in the reference that you previously
19 showed me.
20   Q   Well, we already discussed what HEP
21 stood for; right?
22   A   Well, it's help; isn't it?  But I
23 don't see the word "coping" on that page.
24   Q   Okay.
25   A   That's what I'm saying.

**Page 423**

1   Q   Okay, that's my question.  So this
2 page, UMC 082, doesn't address -- well, first
3 it doesn't say that Mr. Smith is not having
4 pain; right?
5   It just says his pain has improved after
6 this physical therapy treatment?
7   A   Correct.
8   Q   And secondly, it doesn't say anything
9 about his ability to cope with his pain;
10 correct?
11   A   That is correct.  That is correct.
12   Q   Anything else?
13   A   Thirtieth of April.  Fourth of May,
14 Pain Center physiotherapy services.
15   MS. McGRODER:  Professor Trimble,
16 before we discuss this record we are about
17 to run out of videotape.
18   THE WITNESS:  Okay.
19   MS. McGRODER:  Let's just take a
20 short break.
21   MR. FINKELSTEIN:  We're running an
22 hour and fifteen, why don't we just take a
23 break?
24   MS. McGRODER:  Perfect.
25   THE VIDEO OPERATOR:  Please standby.

**Page 424**

1   We are going off the record, the time
2 is 10:37 a.m.  This concludes videotape
3 number 1.
4   (Recess.)
5   THE VIDEO OPERATOR:  Please standby.
6   We are back on the record, the time
7 is 10:59 a.m.  This is the beginning of
8 tape number 2.
9 BY MS. McGRODER:
10   Q   Professor Trimble, we left off
11 talking about the physical therapy records from
12 the University Medical Center in Exhibit 21.
13   Were you able to find any record among
14 this set that states Mr. Smith did not -- that
15 states Mr. Smith was coping well with his pain?
16   A   Well, the word "coping" does not
17 appear in any of these records.
18   Q   Okay.  If I could turn your attention
19 to UMC 0076.
20   A   (Referring to document.)
21   Q   That would be about three pages from
22 the back.  You know what, use the exhibit, if
23 you don't mind.
24   A   Yes.
25   Q   That might be easier.

22 (Pages 421 to 424)

Page 425

1    A   Yes.
2    Q   Use this one. And using your set of
3  records.
4    A   Sorry, which was this number?
5    Q   0076 -- no, I'm sorry, 076.
6    A   Yes.
7    Q   This record is dated May 4, 2004.
8    A   Yes.
9    Q   And at the top right, you see that
10  there is a pain scale there of 0 to 10?
11    A   That's correct.
12    Q   And 7-8 says "excruciating"; right?
13    A   Yes.
14    Q   And 7-8 on the pain scale is checked
15  marked; correct?
16    A   That's correct.
17    Q   Okay, so the assessment of Mr. Smith
18  on May 4, 2004 is excruciating pain?
19    A   That's correct.
20    Q   And the quality of his pain is
21  checked as sharp; right?
22    A   Correct.
23    Q   And then there is an arrow that says
24  "down to knee".
25    A   Correct.

Page 426

1    Q   And if you look at the little diagram
2  of the human body to the left, it says "knees
3  and ankles hurt left and right".
4    A   That's correct.
5    Q   You know what, maybe that's left is
6  greater than right?
7    A   It's probably left greater than
8  right, yes.
9    Q   In any event, they apparently both
10  hurt?
11    A   That's correct.
12    Q   And then on other -- it appears to
13  say doing backbends?
14    A   That's correct.
15    Q   Okay. And then it says: "No
16  triangle in pain". That triangle means change;
17  correct?
18    A   I take this to mean that he gets no
19  change in his pain when he does backbends.
20    Q   Right. And would that be the pain
21  that's reported as excruciating in the box on
22  the upper right?
23    A   Yes.
24    Q   Okay.
25    A   Well, I accept that's probably right.

Page 427

1    Q   Okay. And if you turn two more
2  pages.
3    A   Well, can we finish that notation?
4  "Felt good."
5    Q   Right, "after last visit".
6    A   "After last visit".
7    Q   Difficult to sleep.
8    A   Difficulty to sleep.
9    Q   Okay, anything else you want to talk
10  about on that?
11    A   Not on that page.
12    Q   All right. Then let's turn to
13  page 74, go two more pages.
14    A   (Referring to document.) This is
15  moving on a bit in time.
16    Q   Yes, it is. And we'll come back and
17  fill in the blanks, but on this physical
18  therapy note, this is actually two days later,
19  it's dated May 6, 2004?
20    A   Uhm hum.
21    Q   And it says "no change in pain";
22  right?
23    A   Correct.
24    Q   So we can assume that since he was
25  seen on May 4, and now it's two days later on

Page 428

1  May 6th and the note says "no change in pain"
2  that Mr. Smith is still experiencing
3  excruciating pain?
4    A   That's one interpretation. The other
5  interpretation is that his pain had been
6  getting better because of what we have just
7  read. His flexibility was getting better.
8        And that he was, if we look at page 00077,
9  "Pain tolerated by today's treatment good".
10  His irritation is said to be moderate. His
11  mobility is said to be increasing with increase
12  lumbar extension noted. Pelvic alignment good.
13  And his strength and endurance, I read that as
14  good, but it's a little unclear what it is.
15    Q   I read that as down arrow apostrophe
16  D, decreased?
17    A   I don't read it as that. I don't see
18  an arrow.
19    Q   You don't see that first line as an
20  arrow pointing down?
21    A   No.
22    Q   Well, it certainly doesn't say the
23  word "good"?
24    A   You see, I accept -- well, I think
25  we'll have to accept an ambiguity. The other

Page 429

1 bits are good. Pelvic alignment, good.
2 Q After RX after therapy; right?
3 A Yes.
4 Q And then again -- I'm sorry -- but
5 under range of motion and mobility, increased
6 lumbar extension noted after treatment; right?
7 A Yes.
8 Q Okay.
9 A Yes.
10 Q All right.
11 A So at that point --
12 Q On the preceding page where,
13 Mr. Smith describes his pain, we are on the
14 same record, May 4, 2004, he is in excruciating
15 pain; right?
16 A There is no doubt that this man has
17 pain, and it's reported.
18 Q As excruciating?
19 A It's reported as excruciating, but
20 improving.
21 Q Well, it's improved after, after this
22 physical therapy treatment?
23 A Felt good since last visit, so there
24 is an improvement since the visit before.
25 Q Felt good after last visit, not

Page 430

1 since. The note on page 076 says felt good
2 after last visit, difficult to sleep; right?
3 A Yeah, he felt good. Feeling good
4 means --
5 Q After the visit?
6 A Yeah, he had his therapy and he was
7 feeling good.
8 Q He felt good after the visit; right?
9 A Exactly.
10 Q Okay. And so turn to UMC 074.
11 A Yes.
12 Q And that's a record dated May 6,
13 2004. We started, we started here after the
14 break; right?
15 A That's correct.
16 Q And it says no change in pain.
17 A Yes.
18 Q And the pain, the last report of pain
19 that we have by the therapist on the pain scale
20 is excruciating; you don't disagree with that?
21 A No.
22 Q And then it says "Feel better when
23 leave, but not getting any carry over". Do you
24 see that?
25 A I see that.

Page 431

1 Q Does that mean that while Mr. Smith
2 may feel better after treatment when he goes
3 home, he's not getting any carry over of the
4 pain relief?
5 A That statement, the statement before,
6 when it says felt good it says, I thought it
7 said since last -- well, I'm not sure what the
8 notation is.
9 Q Well --
10 A P, P.
11 Q P with a line on top?
12 A Yes.
13 Q Is it after?
14 A Post, afterwards. So afterwards.
15 Okay, so after he has been.
16 Q After the last visit --
17 A He feels good.
18 Q He felt good?
19 A Yeah.
20 Q But he is not getting any carry over;
21 right?
22 A Well, it doesn't say it there that he
23 is not getting carry over.
24 Q Well, two days later, it says --
25 A Two days later he says --

Page 432

1 Q He feels better when he leaves the
2 therapy, but he not getting any carry over.
3 A So he is getting -- he is getting
4 benefit from the therapy.
5 Q But it's not lasting. He is not
6 getting any carry over, he's not getting
7 continuous pain relief following the therapy;
8 correct?
9 A That is what the implication of that
10 statement is.
11 Q And you wouldn't disagree -- well,
12 you're not suggesting, are you, Professor
13 Trimble, that Mr. Smith has pain relief?
14 A I am suggesting that Mr. Smith is
15 having pain relief from his current treatment,
16 as documented in these records some 10 to 15
17 days before he kills himself.
18 Q Right. And then the relief he's
19 getting is short lived. Are you disagreeing
20 with that?
21 A It may well be short lived.
22 Q Okay. And if you turn to -- now,
23 we're going, we are heading backwards where we
24 started. It's 069.
25 A 069.

24 (Pages 429 to 432)

Page 445

1   A   Yes.
2   Q   May 5, 2004?
3   A   Yes.
4   Q   That's the same date as the record we
5   just read --
6   A   That's correct.
7   Q   -- from Dr. McComb's office; correct?
8   A   That's correct.
9   Q   And it says "Called to Gloria at
10  McCombs about pricking.  She called back, they
11  have nothing to offer but injections at White
12  Bridge Road".
13  A   Correct.
14  Q   So Mr. Smith understood that the
15  doctor's office had nothing to offer him except
16  these steroid injections?
17  A   That's correct.
18  Q   And so this note is written on
19  5/5/04, the same day he makes the phone call.
20  And if you go to the preceding page, it's
21  written after the March 31, 2004 note; correct?
22  A   That's correct.
23  Q   So would you assume from this that
24  Mr. Smith obtained his medical record at some
25  point after March 31, 2004?

Page 446

1   A   Yes.
2   Q   Okay.  And then the last note he
3   makes, is the same day he makes the phone call
4   to McComb's office?
5   A   That's correct.
6   Q   And the McCombs record isn't included
7   in this set in Exhibit 20; right?
8   A   That's correct.
9   Q   Did you consider when you formed your
10  causation opinion in this case about Neurontin,
11  that Mr. Smith learned on May 5, 2004 that
12  McCombs office has nothing to offer him except
13  epidural steroid injections?
14  A   I did.
15  Q   Do you believe, do you have the
16  opinion today that Mr. Smith had severe chronic
17  pain on May 5, 2004?
18  A   He was continuing to suffer from
19  chronic pain, that's correct.
20  Q   Had Mr. Smith had epidural steroid
21  injections in the past?
22  A   I don't believe so, but I may be
23  incorrect.  I don't believe he had.
24  Q   Did you go back to look to see
25  whether the epidural steroid injections

Page 447

1   Mr. Smith had in the past were helpful to him?
2       MR. FINKELSTEIN:  Objection.
3       THE WITNESS:  Being not orthopaedic
4   and not even being certain of the exact
5   meaning of those terms, I do not have a
6   comment to make about his epidural steroid
7   injections.
8   BY MS. McGRODER:
9   Q   Well, you did not go and look up what
10  an epidural steroid injection is before you
11  gave your opinions in this case?
12  A   I know what they are, but I'm not an
13  orthopaedic expert, and I have no idea of the
14  expectations of those treatments, or, indeed,
15  how they are given.
16  Q   Did you look through the medical
17  records of Mr. Smith to determine whether he
18  ever got any relief whatsoever from an epidural
19  steroid injection?
20  A   I do not know if he ever had any
21  relief from an ESI.
22  Q   And that was not important to your
23  consideration of what the cause was of
24  Mr. Smith's suicide?
25  A   No.

Page 448

1   Q   Again, at this point, in 2004, this
2   can be differentiated from Mr. Smith's
3   experience in 2003, because at this time
4   there's nothing, Mr. Smith reports there is
5   nothing that can help him; right?
6   A   He has made appointment to see
7   another neurologist.  Which he would not have
8   done if he did not think there was another
9   avenue to explore.  So I don't agree there was
10  nothing.
11  Q   Well, in Mr. Smith's perception on
12  May 5, 2004, he says they have nothing to offer
13  but injections; right?
14  A   That particular office had nothing to
15  offer but injections.
16  Q   And he didn't want injections; right?
17  A   He did not want any further
18  injections.
19  Q   And surgery is not an option for him
20  at this point; correct?
21  A   That appears to be the case.
22  Q   Do you know who made the appointment
23  for Mr. Smith with Dr. Chang?
24  A   No.
25  Q   Do you know whether Mr. Smith made

28 (Pages 445 to 448)

Page 449

1  that appointment?
2     A   I do not know who made the
3  appointment.
4     Q   Do you know whether Mr. Smith wanted
5  to go to the appointment?
6     A   I do not know whether Mr. Smith
7  wanted to go to the appointment.
8     Q   Do you know who found the
9  neurosurgeon, Dr. Chang, for Mr. Smith to see?
10    A   I think it was a family member, but I
11 do not know exactly who it was.  In the
12 depositions that I read, I remember somebody
13 referring to it, but I don't know which family
14 member it was.
15    Q   You were not aware, then, that it was
16 his daughter, Gail, who identified Dr. Chang as
17 a possible physician for Mr. Smith to see?
18    A   I have just said it was within the
19 depositions that I read the other day, and it
20 was a family member, one of his daughters.
21 Maybe she had heard of this person from
22 somebody else. Does that sound right?  It was
23 a family member anyway.
24    Q   Do you know whether it was Gail who
25 made the appointment with Dr. Chang?

Page 450

1     A   No, I don't.
2     Q   On May 5, 2004, when Mr. Smith makes
3  this handwritten notation, you agree that his
4  understanding was he was not a candidate for
5  surgery?
6     A   That's correct.
7     Q   In the past, at any time when
8  Mr. Smith had orthopaedic or neuropathic joint
9  and pain problems, did he ever find relief from
10 conservative therapy?
11       MR. FINKELSTEIN: Objection.
12       THE WITNESS: Well, I have just taken
13    you through some references where he was
14    getting relief from his physical therapy
15    in the two weeks prior to his death.
16 BY MS. McGRODER:
17    Q   And those are the records that we
18 just talked about --
19    A   Correct.
20    Q   -- where Mr. Smith in the end said
21 you know what, these don't help me after I
22 leave here, and so I want to discontinue;
23 correct?
24    A   That is correct.
25    Q   Okay.  And so now I'm talking, you

Page 451

1  know, think back on Mr. Smith's medical
2  history, when he --
3     A   Yes.
4     Q   -- has full knee replacements, full
5  hip replacements, lumbar surgery, surgery on,
6  ah, a hernia repair, in Mr. Smith's medical
7  history, would you agree would me that the best
8  treatment Mr. Smith had and the ones he found
9  most effective were surgical?
10       MR. FINKELSTEIN: Objection.
11       THE WITNESS: He got relief from his
12    surgical interventions, that is correct.
13 BY MS. McGRODER:
14    Q   Would you agree with me that
15 Mr. Smith felt hopeless after he learned that
16 surgery was not an option?
17       MR. FINKELSTEIN: Objection.
18       THE WITNESS: The term "hopeless" is
19    reflecting on Mr. Smith's mental state,
20    and it may well be that he had an
21    alteration of his mental state at this
22    time, and that helplessness was a part of
23    that.
24 BY MS. McGRODER:
25    Q   Would you agree with me that

Page 452

1  Mr. Smith believed or perceived his pain to be
2  severe and unrelenting between January of 2004
3  and May 13, 2004?
4     A   I have emphasized that there were
5  fluctuations in the way that he perceived his
6  treatments, and also there were fluctuations in
7  the severity of his pain.
8     Q   Would you agree with me that
9  Mr. Smith considered his pain as excruciating
10 on the last medical record in which his pain is
11 described?
12    A   That is correct.
13    Q   And the date of that record is May 4,
14 2004?
15    A   That is correct.
16    Q   Are you aware, Professor Trimble,
17 that the peer reviewed literature states that
18 the presence of one or more chronic pain
19 conditions is uniquely associated with suicide
20 ideation and suicide attempts?
21       MR. FINKELSTEIN: Objection.
22       THE WITNESS: I think yesterday I
23    have made it clear that pain, in and of
24    itself, cannot be considered a risk factor
25    for suicide.

29 (Pages 449 to 452)

Page 497

1    MS. McGRODER: I'm handing you now
2  what we have marked as Exhibit 25, which
3  is the suicide note.
4    (Exhibit 25 marked for
5  identification.)
6    THE WITNESS: Thank you.
7  BY MS. McGRODER:
8    Q   Could you please read the suicide
9  note into the record.
10   A   The first sentence has most of the
11 letters underlined. "Pain has taken over my
12 mind and body".
13   Q   Can I stop you, I'm sorry, Professor
14 Trimble. Can you just hold that suicide letter
15 up, and show the jury. Just next to your face,
16 so they can see it, that's fine.
17   A   (Witness complies.)
18   Q   Thank you. And so that they can see
19 how that first sentence "Pain has taken over my
20 mind and body" is underlined. Okay, thank
21 you.?
22       MR. FINKELSTEIN: Okay, you can read.
23   A   "I need back surgery. Left and right
24 rotator cuffs, right bicep torn, back surgery
25 to correct pain in the legs. Forgive me, I

Page 498

1  cannot go on like this. I cannot have my body,
2  the temple of the holy spirit, cut on any more.
3  I have talked to God all night, and he
4  understands".
5    Q   Does the fact that Mr. Smith wrote a
6  suicide note suggest absence of impulsivity or
7  presence of impulsivity?
8        MR. FINKELSTEIN: Objection.
9        THE WITNESS: In terms of the timing
10 of it, it implies that he wrote this in
11 the morning of his suicide. It was done
12 immediately prior to his suicide. So that
13 would suggest the impulsivity of it all.
14 BY MS. McGRODER:
15   Q   And how do you know that he did it
16 immediately prior to his suicide?
17   A   Well, he had talked to God all night,
18 and his suicide was in the very early morning.
19   Q   So is it possible he wrote the
20 suicide note at 4:00 a.m.?
21   A   It's possible.
22   Q   Is that early in the morning?
23   A   It's early in the morning.
24   Q   What about 3:00 a.m., is 3:00 a.m.
25 early in the morning?

Page 499

1    A   It depends on what time you're used
2  to getting out of bed. But my understanding is
3  this family were early risers.
4    Q   So Mr. Smith might have written this
5  note at 3:00 a.m.?
6    A   He might have written it at 3:00 a.m.
7    Q   Might he have written it at 2:00
8  a.m.?
9    A   He says I have talked to God all
10 night.
11   Q   So maybe 2:00 a.m. is too early?
12   A   I would have thought so.
13   Q   So Mr. Smith committed suicide at
14 approximately 5:00 a.m.; correct?
15   A   Correct.
16   Q   So it's possible that Mr. Smith, you
17 would agree with me, wrote this note as much as
18 two hours before he committed suicide?
19   A   That's possible.
20   Q   If he wrote the note two hours before
21 the suicide, does that suggest the presence of
22 impulsivity or absence of impulsivity?
23   A   Presence, I would consider.
24   Q   So an impulsive suicide can be
25 considered, in your opinion, for two hours

Page 500

1  prior to the suicide?
2    A   Well, he -- that's a time scale you
3  have given me, two hours would be fine. To
4  assume that things were reaching a peak, and he
5  writes the suicide note, and --
6    Q   Well, how long -- I'm sorry. Were
7  you finished?
8    A   Then he goes on and does it.
9    Q   How long before a suicide --
10 withdrawn.
11   If a person who is contemplating
12 suicide -- withdrawn.
13   With a person who is contemplating
14 suicide, how long before the suicide can the
15 impulse last, in your opinion?
16       MR. FINKELSTEIN: Objection.
17       THE WITNESS: I really don't know.
18       Impulsivity implies actions coming
19 out of the blue, but it doesn't
20 necessarily imply an immediate time.
21 Obviously, it implies some time
22 restriction, but the word "impulsive"
23 doesn't necessarily imply everything
24 happens instantaneously within 5 minutes.
25

41 (Pages 497 to 500)