# EXHIBIT 6
# (PART II)

Page 190

1  report based on your calculations, did you do those
2  calculations yourself?
3     A. Sure.
4     Q. Doctor, apart from the adverse events that
5  are reported in the package insert for Neurontin, is
6  there any peer-reviewed scientific literature that
7  you could cite to me today that says Neurontin causes
8  depression, dysphoria, depersonalization, agitation,
9  aggression, suicidal behaviors and completed
10 suicides?
11    A. Well, I have relied on the PDR, so there
12 may be, but I don't know that without having to go
13 look at all the literature again.
14    Q. As you sit here today, you cannot cite me a
15 single study that states gabapentin causes
16 depression, dysphoria, depersonalization, agitation,
17 aggression, suicidal behaviors and completed
18 suicides, correct?
19    A. Well, I've cited several studies in my
20 report.
21    Q. No, you've cited the expert report of
22 Dr. Trimble and the expert report of Dr. Kruszewski,
23 correct?
24    A. Right.
25    Q. And those are not scientific articles in

Page 191

1  the peer-reviewed literature, are they?
2     A. They're not.
3     Q. Okay. So can you cite to me, as you sit
4  here today, any scientific article in the
5  peer-reviewed published literature that says
6  gabapentin causes that list of adverse events that we
7  just went over?
8     A. Well, as I say, I took them from the PDR,
9  which is advisors on clinical trials.
10    Q. That's not peer-reviewed scientific
11 literature, is it?
12    A. It's not.
13    Q. So the answer to my question is no?
14    A. No.
15    Q. Are you familiar with the book Biological
16 Psychiatry, which was authored by Dr. Trimble?
17    A. I think that's the book that I went out
18 and bought.
19    Q. How much did you have to pay for that baby?
20    A. Pretty expensive.
21    Q. Did you read it?
22    A. I read parts of it.
23    Q. Are you aware that Dr. Trimble stated in
24 this book, which is, of course, outside the context
25 of a litigation opinion: Gabapentin has a novel

Page 192

1  mechanism of action not influencing directly the GABA
2  system and having its own CNS binding site.
3        Did you read that in Dr. Trimble's
4  textbook?
5     A. I am not sure that I read that specific
6  part of the book.
7     Q. Do you disagree with Dr. Trimble's citation
8  in the -- in the textbook that gabapentin has a novel
9  mechanism of action not influencing directly the GABA
10 system?
11       MR. SOH: Do you have a copy of the book
12    for the witness?
13       MR. ROSENKRANZ: Yes.
14    Q. Do you disagree with that?
15    A. I really don't have enough information to
16 agree or disagree. You're pulling a very technical
17 reference out of a book that I said I skimmed, and
18 something that's outside my expertise.
19       (Exhibit 11: Photocopy of a book entitled
20    Biological Pschiatry Second Edition Michael R.
21    Trimble marked for identification, as of this
22    date.)
23       (Exhibit 12: Photocopy of a book entitled
24    Textbook of Psycopharmacology by Alan
25    Schatzberg marked for identification, as of

Page 193

1  this date.)
2     Q. I'm handing you now what's been marked as
3  Exhibit 11, which is the relevant pages of
4  Dr. Trimble's biological psychiatry book, and I'm
5  going to refer you to that, probably about the third
6  or fourth paragraph on the left-hand side.
7        MR. SOH: What do you mean by relevant
8     pages? Are these just --
9        MS. McGRODER: It's the relevant pages.
10       MR. SOH: Is this an entire chapter? Is
11    this one page out of the book?
12       MS. McGRODER: Sure. Did you want me to
13    mark the whole book?
14       MR. SOH: Yeah, it's your depo.
15       MS. McGRODER: Why don't you bring your
16    copy, and we'll mark it.
17       MR. SOH: It's your depo. I'm just
18    verifying for the record it's one page out of
19    a book.
20    A. I'm really not competent to have an
21 opinion on this kind of stuff.
22    Q. Well, you've referenced and relied on
23 throughout the first opinion in your report that the
24 expert report in litigation of Dr. Trimble, correct?
25    A. Correct.

## Page 198

1  report in the Smith case, in that middle paragraph --
2  are you there?
3    A. Yes.
4    Q. In your second sentence you state:
5  Increase in brain GABA leads to negative effects on
6  mood and behavior.
7       And you cite Trimble 2007, right?
8    A. Yes.
9    Q. Again, that's Trimble's expert report in
10 this litigation, right?
11   A. Yes.
12   Q. That's not a peer-reviewed published
13 scientific article, is it?
14   A. No.
15   Q. Can you cite to me any peer-reviewed
16 published literature that says gabapentin increases
17 brain GABA and leads to negative effects on mood and
18 behavior?
19   A. I'm -- I'm relying solely on Trimble and
20 Roth and Kruszewski.
21   Q. You don't cite Roth and Kruszewski there,
22 do you?
23   A. Well, in this case I'm relying just on
24 Trimble.
25   Q. Okay.

## Page 199

1    A. I cite them in other parts of this.
2    Q. So you can't cite to me, as you sit here
3  today, any peer-reviewed published literature that
4  states: Increase in brain GABA leads to negative
5  effects on mood and behavior, correct?
6    A. I -- I cannot, but I possibly could if I
7  felt they were not going to be accepted as experts.
8  But so far I've assumed that they are going to be
9  accepted. And I could probably try to do that. I
10 haven't done that. I felt that that was
11 sufficient, that if they believed that this was
12 true, that I was going to rely on them.
13   Q. So as you sit here today, you're not in a
14 position to tell me that you know of any
15 peer-reviewed scientific literature that supports
16 this proposition in your report that increase in
17 brain GABA leads to negative effects on mood and
18 behavior, correct?
19   A. Correct.
20   Q. Are you familiar with the APA's textbook of
21 psychopharmacology?
22   A. No.
23   Q. Do you know who Dr. Schatzberg is?
24   A. No.
25   Q. Dr. Alan Schatzberg?

## Page 200

1    A. No.
2    Q. Do you know who Dr. Nemeroff is?
3    A. Yes. He's at Emory.
4    Q. And is he a neuropsychopharmacologist?
5    A. He's a psychiatrist with a specialty in
6  pharmacology, yes.
7    Q. I want to show you a passage from the APA
8  textbook of psychopharmacology. And I'll point you
9  right to the page, which is 736, okay? I want to
10 start with that first paragraph on the -- the second
11 full paragraph on the right-hand side, right-hand
12 column.
13      Do you see where it says: B.I. Gold --
14   A. Yes.
15   Q. -- and colleagues reported that cerebral
16 spinal fluid GABA concentrations in depressed
17 patients were significantly lower than in
18 non-depressed control subjects.
19      Do you see that?
20   A. Yes.
21   Q. And that this finding has been replicated
22 in several studies?
23   A. I see that.
24   Q. Is -- well, are studies that show lower CSF
25 GABA concentrations in depressed patients, are those

## Page 201

1  studies opposite the theories proposed by
2  Drs. Trimble and Kruszewski in this case?
3       MR. ROSENKRANZ: Objection.
4    A. I don't know. It's outside my expertise.
5    Q. Well, do Drs. Trimble and Kruszewski opine
6  in this case -- you rely on their opinions, that
7  gabapentin causes an increase in GABA which results
8  in depression and suicidal behavior?
9    A. It's a GABA agonist, yes.
10   Q. Okay. So -- so studies that show
11 gabapentin is lowered in depressed patients are
12 contrary to the opinions of Drs. Trimble and
13 Kruszewski in this case, correct?
14      MR. ROSENKRANZ: Objection.
15   A. It could be. I'm not competent to say.
16   Q. Dr. Schatzberg also states in this passage
17 -- where is this -- on the bottom part of that same
18 paragraph: Healthy subjects who have a first-degree
19 relative with a history of major depression also
20 appear to show an inverse correlation between GABA
21 levels and aggressiveness.
22      Do you see that?
23   A. I see that.
24   Q. Is that -- or are those studies that show
25 an inverse relationship between GABA levels and

254

1  believe these factors were relevant. He said they
2  were outside his area of expertise. That's how I
3  took it.
4      Q. I think my question wasn't very clear, and
5  it's my fault. What I meant is, in terms of giving
6  an opinion about the mechanism of Neurontin, the
7  mechanistic explanation that they opine results in
8  suicide from Neurontin.
9         Is it your understanding that that opinion
10 about Neurontin's mechanism is that it is the cause
11 of suicide in these cases?
12        MR. ROSENKRANZ: Objection to the form of
13     the question. I don't understand.
14     A. I don't think they're saying that. I
15 think what they're saying is I am a neurobiologist,
16 I'm a neuropsychiatrist, that's all I'm going to
17 talk about. And as far as my area goes, that's
18 what happens mechanistically.
19        And I think I even said in my general
20 theory that they have a part of the mechanism.
21 They don't have all the mechanism. And the reason
22 he had a disclaimer was hey, I'm not a
23 suicidologist.
24     Q. Right.
25        Do you think Dr. Trimble's qualified to

255

1  give an opinion on specific causation in the Smith
2  case on suicidology?
3         MR. ROSENKRANZ: Objection.
4      A. I don't have any opinion.
5         MR. ROSENKRANZ: An opinion on
6      suicidology or -- or on the cause of suicide
7      met in this case?
8      Q. Do you understand my question, Dr. Maris?
9      A. I think so, but say it again.
10     Q. Do you think that Dr. Trimble is not
11 qualified to give an opinion about whether any
12 particular plaintiff's suicide was caused by
13 Neurontin because he's not a suicidologist?
14        MR. ROSENKRANZ: Objection.
15     A. I think he is qualified to give, as all
16 experts are, their opinions within their special
17 area of expertise. I do not think he's qualified
18 to talk about suicidology and neither does he. He
19 said repeatedly, I'm not a suicidologist, you'll
20 have to ask Dr. Maris that.
21     Q. And is the same true of Dr. Kruszewski in
22 the Bulger case?
23     A. I would say so, yes. I'd see them pretty
24 much the same, as -- as pharmacology experts.
25     Q. I'm going to hand you -- oh, I already did

256

1  hand you Exhibit 17, which is the FDA statistical
2  review. And if you'll turn to page 24.
3         This diagram or Forest plot shows the odds
4  ratio of the 11 different drugs included in the FDA's
5  analysis, correct?
6      A. Right.
7      Q. Have you ever seen this before?
8      A. I've not seen this document, no. I've
9  seen --
10     Q. Have you ever seen a chart --
11     A. I've seen --
12     Q. -- of the these odds ratios?
13     A. I've seen similar charts like that in my
14 earlier reports, to my recollection, yes.
15     Q. From earlier reports involving
16 antiepileptic drugs?
17     A. Yes.
18        You think this is the only one? Because
19 I remember seeing this.
20     Q. I think this is the only one.
21     A. Then I may have gotten it and just can't
22 find it.
23     Q. Okay.
24     A. In fact, let me look one other place.
25     Q. All right.

257

1      A. I still can't find it, but I -- I -- I
2  have a suspicion that I may have gotten this and
3  just can't find it. Let me look in here, because
4  there's some stuff I stuck in Trimble.
5         I -- I don't know where it is. But I'm
6  almost --
7      Q. Okay.
8      A. -- almost sure I've seen a table like
9  this or a figure like this.
10     Q. If you look at the figure for gabapentin --
11     A. Yes.
12     Q. -- it shows an odds ratio of 1.57, correct?
13     A. Right.
14     Q. And that doesn't reach the threshold of 2
15 that you discuss in your PowerPoint, correct?
16     A. That's not a magic number. It's more
17 than 1 and sometimes it can be less than 2, but
18 you're right. Yes, it does not reach the magic
19 number.
20     Q. And does it matter in terms of whether the
21 odds ratio or relative risk meets the threshold of 2?
22        Does it matter what the statistical
23 significance or statistical insignificance is of the
24 finding to you?
25     A. We had the same problem with the

1        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
2

3    _____
                                        )
4    In re: NEURONTIN MARKETING,        )
     SALES PRACTICES, AND PRODUCTS      )
5    LIABILITY LITIGATION,              )
     _____)
6

7                    VOLUME II

8

9       CONTINUED VIDEOTAPED DEPOSITION OF

10            RONALD Wm. MARIS, Ph.D.

11              (Taken by Defendant)

12            Columbia, South Carolina

13          Tuesday, September 30, 2008

24              Reported in Stenotype by
         V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

RON ROSENKRANZ, Esquire
Finkelstein & Partners
1279 Route 300
Newburgh, New York 12551
(845) 563-9442
rrosenkranz@lawampm.com

and

KENNTH S. SOH, Esquire
The Lanier Law Firm
6810 FM 1960 West
Houston, Texas 77069
(713) 659-5200
kss@lanierlawfirm.com

ON BEHALF OF THE DEFENDANT PFIZER:

LORI CONNORS McGRODER, Esquire
JENNIFER M. STEVENSON, Esquire
ANGELA M. SEATON, Esquire
LORI SCHULTZ, Esquire
(Appearing Via Telephone)
Shook, Hardy & Bacon, L.L.P.
2555 Grand Boulvard
Kansas City, Missouri 64108
(816) 474-6550
lmcgroder@shb.com
jstevenson@shb.com
aseaton@shb.com
lschultz@shb.com

Also Present:

JAMES DOWNIE, CLVS, Videographer

CONTINUED VIDEOTAPED DEPOSITION OF RONALD Wm. MARIS, Ph.D., a witness called on behalf of the Defendant, before V. Dario Stanziola, CSR, RPR, CRR, held at the Columbia Marriott, 1200 Hampton Street, Columbia, South Carolina, on Tuesday, September 30, 2008, commencing at 9:12 a.m.

INDEX OF EXAMINATIONS

By Ms. McGroder PAGE 314

INDEX OF EXHIBITS

| NUMBER EXHIBIT | MARKED |
|---|---|
| Exhibit 20: Handwritten document with attachments entitled Notes dated 9/26/08 | 314 |
| Exhibit 21: A document entitled Rates Of Depression Reported As An Adverse Event In Neurontin Placebo-Controlled Neuropathy And Epilepsy Clinical Trials | 322 |
| Exhibit 22: A document entitled Neurontin Gabapentin Capsules; Neurontin Gabapentin Tablets; Neurontin Gabapentin Oral Solution | 322 |
| Exhibit 23: A document entitled an FDA Center for Drug Evaluation and Research Document entitled Review and Evaluation of Clinical Data | 3392 |
| Exhibit 24: A document entitled Rates Of Depression Reported As An Adverse Event In Neurontin Placebo-Controlled Neuropathy And Epilepsy Clinical Trials | 342 |
| Exhibit 25: A letter dated 5/29/92 to Paul D. Leber from Janeth L. Turner | 354 |
| Exhibit 26: A document entitled Appendix C.11. Summary of Adverse Events By Body System | 356 |
| Exhibit 27: A document entitled Summary Of All Adverse Events In <1 Percent Of Patients With Partial Seizures Treated With Gabapentin Or Placebo During Controlled Clinical Studies, By Body System And Double-Blind Treatment Group | 370 |

| | |
|---|---|
| Exhibit 28: A document entitled Practice Guideline For the Assessment and Treatment of Patients with Suicidal Behaviors | 382 |
| Exhibit 29: A document entitled SSRI Psychological Autopsy and Death Investigation by Ronald Wm. Maris, Ph.D. and Arnold Anderson Vickery, J.D. | 399 |
| Exhibit 30: A document entitled Psychological Autopsy and Death Investigation, File Name Richard H. Smith | 428 |
| Exhibit 31: A document entitled Smith Index | 490 |
| Exhibit 32: A document entitled The American Psychiatric Textbook of Suicide Assessment and Management | 494 |
| Exhibit 33: A handwritten document entitled Notes (Specific) dated 6/13/07 | 496 |
| Exhibit 34: A letter from Christopher L. Wood, DDS dated 5/19/04 with attachments | 534 |
| Exhibit 35: A document entitled New Patient Medical Questionaire | 576 |
| Exhibit 36: A document from Neurological Associates dated 3/3/03 to Dr. James Cato from Paul R. McCombs, M.D. with attachments | 603 |
| Exhibit 37: A article entitled Columbia Classification Algorithm of Suicide Assessment (C-CASA): Classification of Suicidal Events in the FDA's Pediatric Suicidal Risk Analysis of Antidepressants | 610 |
| Exhibit 38: A document entitled Beck Scale of Suicidal Ideation | 617 |
| Exhibit 40: A photocopy of Neurological Associates with patient Richard H. Smith clinical record | 631 |

Page 314

1  (Exhibit 20: Handwritten document with
2  attachments entitled Notes dated 9/26/08
3  marked for identification, as of this date.)
4  THE VIDEOGRAPHER: This is the beginning
5  of Tape No. 1, Volume II of Dr. Ronald Maris.
6  Today is September 30th, 2008. The time on
7  the monitor is 9:12 a.m.
8  We're now on the record.
9  CONTINUED EXAMINATION
10  BY MS. McGRODER:
11  Q. Good morning, Dr. Maris.
12  A. Good morning.
13  Q. We're here today for the continuation of
14  your deposition in the Smith and Bulger matters.
15  Do you understand that, correct?
16  A. Yes.
17  Q. And you're still under oath.
18  A. Yes.
19  Q. We marked yesterday as Exhibit 19 a copy of
20  your -- what you called yesterday your new report.
21  Remember that?
22  A. I called it an addendum to my old report.
23  Q. Oh, okay. I misunderstood you then.
24  We are going to mark this morning as
25  Exhibit 20 the original copy of your addendum because

Page 315

1  Exhibit 19 is missing some of the -- some of the
2  words on the page, okay?
3  So we're not going to talk about this right
4  now, but I wanted to let you know that we're using
5  your original copies.
6  A. Does that mean I'm not going to get it
7  back?
8  Q. No, you'll get it back.
9  Could you please turn to page 18 of your
10  report in the Smith case.
11  MS. McGRODER: Oh, you know, for the
12  record, we used five hours and 37 minutes
13  yesterday. As you know, under the CMO, we're
14  entitled to a seven-hour deposition day. I
15  recognize we got started late and had several
16  breaks. But just for the record --
17  MR. SOH: You're entitled to four days.
18  We owe you an hour because we shut it down an
19  hour for Rosh Hashanah.
20  Please continue.
21  MS. McGRODER: Well, we're entitled to
22  seven hours --
23  MR. SOH: I made my objection, Lori.
24  Please move on. Now you keep burning up your
25  time. Keep talking and burn your own clock, I

Page 316

1  don't care. I made our position. Go ahead,
2  you may ask him your questions.
3  MS. McGRODER: I shall. This morning I'm
4  going to state on the record that under the
5  CMO, we're entitled to a seven-hour deposition
6  day. So hopefully we can complete the
7  deposition in four days. But if not, you
8  recognize that we have additional time on the
9  record due to us.
10  MR. SOH: I do not -- let me --
11  Q. Dr. Maris --
12  MR. SOH: Lori, you made a statement, I'm
13  going to respond to your statement, Lori. I
14  recognize that --
15  MS. McGRODER: You don't to have to freak
16  out.
17  MR. SOH: 9:00 to 6:00 -- you are
18  entitled to go 9:00 to 6:00. We shut down an
19  hour early, and you're entitled to an hour.
20  Please continue.
21  MS. McGRODER: I'll continue when I'm
22  good and ready, and you don't have to --
23  MR. SOH: Who's freaking out now?
24  MS. McGRODER: You don't have to be so
25  obstructive and angry. It's 9:15 a.m. We're

Page 317

1  just getting started. We have a long day
2  together. Let's calm down and --
3  MR. SOH: I'm perfectly calm, Ms.
4  McGroder.
5  MS. McGRODER: Really?
6  MR. SOH: You seem to have gotten up on
7  the wrong side of the pillow this morning, but
8  go ahead.
9  Please continue.
10  Q. I'm in the middle of page 18 of your
11  deposition -- or your report in the Smith matter.
12  There's a paragraph that starts the PDR; do you see
13  that?
14  A. Yes.
15  Q. And that same paragraph appears in the
16  Bulger report, correct?
17  A. That's what?
18  Q. That same paragraph also appears in your
19  report in the Bulger matter, true?
20  A. I -- I believe so. I'd have to check my
21  Bulger, which I didn't bring today.
22  Q. Okay. And you state that the PDR lists
23  only two nervous system SAEs.
24  And what do you mean by SAEs?
25  A. Sometimes it's called serious adverse

Page 402

1  Q. Has anybody on earth ever used this
2  Psychological Autopsy and Death Investigation form
3  other than you and Attorney Vickery?
4      MR. SOH: Objection, argumentative.
5      MR. ROSENKRANZ: Objection.
6  A. No.
7  Q. Have you ever used this Psychological
8  Autopsy and Death Investigation form in this format
9  outside the context of testifying in litigation
10 against pharmaceutical companies?
11 A. Yes, I've used it for other cases where
12 litigation was not involved where I was gathering
13 data on a particular patient.
14 Q. And that was for what purpose?
15 A. Psychological autopsy can be used for any
16 suicide where you're trying to determine the manner
17 of death, where you're trying to look at the
18 social/psychological factors in addition to the
19 medical examiner physical autopsy that may be
20 contributing to that suicide.
21     So it's a research instrument that's been
22 used since 19 -- late 1950s by my mentor, Dr. Edwin
23 Shneidman, from Los Angeles. It's a common
24 research instrument in various forms by different
25 investigators.

Page 403

1  Q. Well, I'm not asking you about a common
2  research instrument. I'm asking about this one that
3  you created with Mr. Vickery.
4      Has this instrument -- have you ever used
5  this instrument, the SSRI Psychological Autopsy and
6  Death Investigation, outside the context of a lawsuit
7  in which you were testifying against pharmaceutical
8  companies?
9  A. I said yes.
10 Q. And so tell me the circumstances under
11 which you used your SSRI psychological autopsy
12 outside the context of litigation.
13 A. I've used it in teaching where there was
14 patient files. I've used it as a supervisor of
15 residents in psychiatry and family practice. I've
16 used it in my looking at cases for workshops and
17 for -- probably for some of the papers I've
18 written. I've used it many times.
19 Q. You don't know whether you've used it for
20 some of the papers you've written?
21 A. I think -- I think I did.
22     The problem is you're going -- the next
23 question is going to be which papers, and I don't
24 remember. But I've certainly --
25 Q. Can you cite to me any papers that you've

Page 404

1  written in which you have identified the SSRI
2  Psychological Autopsy and Death Investigation as a
3  basis for whatever you're reporting in your paper?
4  A. Well, certainly the Pathways of Suicide
5  book. In 1981 I went back to Chicago, and I had an
6  interview questionnaire which had a very similar
7  form to this which I gave to all the survivors in a
8  random sample of Chicago suicides. That was part
9  of my research.
10 Q. Dr. Maris, I didn't ask you about any other
11 psychological autopsy format or form that you've used
12 in the past.
13     I'm asking you about this document, SSRI
14 Psychological Autopsy and Death Investigation. Has
15 this document ever been cited in a paper that you
16 published in a peer reviewed journal?
17 A. I don't know if it's been cited in a peer
18 reviewed journal.
19     But the answer, to repeat myself, is yes,
20 I have used it in many other occasions. May have
21 been in slightly different form. So I would say
22 probably I've used that, but I'd have to go back
23 and look at the particular publications and
24 teaching situations.
25     But it was not designed for litigation.

Page 405

1  It was designed to do a psychological autopsy with
2  a completed suicide. This particular version added
3  stuff on SSRIs because that's what Andy Vickery and
4  I needed. But the psychological autopsy has been
5  around for years.
6  Q. Yeah, but I'm not asking you about the
7  psychological autopsy that's been around for years.
8  I'm asking you, as you know, specifically about the
9  SSRI psychological autopsy and death investigation.
10     And parts of this, you've given testimony
11 in the past were, in fact, developed by Attorney
12 Vickery, correct?
13 A. There's one part.
14 Q. And -- and this form, this document,
15 Exhibit 29, including the part that Mr. Vickery
16 developed, has this ever been cited by you in any
17 peer reviewed published literature?
18 A. I don't know off the top of my head
19 without going home and doing a search.
20 Q. As you sit here today, you can't identify a
21 single piece of published literature in a peer
22 reviewed journal in which you have cited the SSRI
23 Psychological Autopsy and Death Investigation,
24 correct?
25 A. In this -- if you're going to stick me to

Page 406

1  this particular version of it?
2     Q.  I am.
3     A.  Then I say I'd have to go do a search. I
4  can't do that off the top of my head.
5     Q.  Yes.
6        And my question to you was as you sit here
7  today then, you cannot identify for me any peer
8  reviewed published article by you in which you have
9  cited the SSRI Psychological Autopsy and Death
10 Investigation; is that correct?
11       MR. ROSENKRANZ: Objection, asked and
12    answered.
13    A.  Not off the top of my head, I can't do
14 it.
15    Q.  So as you sit here today, you cannot do it,
16 correct?
17    A.  Correct.
18    Q.  Thank you.
19       Do you agree that reliability and validity
20 of the psychological autopsy you developed with
21 Attorney Vickery is uncertain?
22    A.  There are two questions there. Andy
23 Vickery did not develop this. I developed it and
24 he paid for my time.
25       The second question is reliability and

Page 407

1  validity. Yes, but you can only do that after
2  you've done a large number of these and you've done
3  the psychometric testing that is suggested at the
4  back of the psych autopsy.
5        So validity and reliability have not been
6  established for this autopsy.
7     Q.  And you've never done the psychometric
8  testing listed at the back of this SSRI psychological
9  autopsy to establish its validity or reliability,
10 correct?
11    A.  Have not, not yet.
12    Q.  And the same would be true of the
13 psychological autopsy you used in the Smith and
14 Bulger cases, correct?
15    A.  It's correct.
16    Q.  You've actually used your psychological
17 autopsy that you developed with Mr. Vickery in a
18 number of cases in which you've testified, correct?
19    A.  Yeah, I always do a psychological
20 autopsy.
21    Q.  So would you say you've done about 200
22 psychological autopsies because you've testified in
23 about 200 cases?
24    A.  You're misinterpreting my CV. My CV said
25 I've had 200 cases. If you go back and read page

Page 408

1  17, I've only testified about 30 some times.
2     Q.  Okay. Well, setting that aside, have you
3  taken about 200 cases?
4     A.  I've had over a long period of time,
5  since the 1970s about 200 litigation cases.
6     Q.  And you always do a psychological autopsy
7  on the cases you take, correct?
8     A.  Almost always. I wouldn't say always.
9     Q.  Okay. And so have you done about 200
10 psychological autopsies?
11    A.  Well, this hasn't even been fully
12 developed until more recently, so no.
13    Q.  And so you have not -- well, can you tell
14 me as you sit here today what sample size would be
15 required for you to subject this psychological
16 autopsy to the testing that would be required to
17 determine its reliability and validity?
18    A.  I would say, just as a rough
19 approximation, at least a hundred cases. And I've
20 testified in about -- anybody have my CV handy?
21    Q.  I think it's Exhibit 6.
22    A.  Here it is right here.
23       If you look on page 17, it says I've
24 testified or given a deposition 26 times out of
25 those 200.

Page 409

1     Q.  But you haven't limited the use of your
2  psychological autopsy only to the times that you've
3  testified, correct?
4     A.  Probably not, but it's possible that I
5  don't know the exact answer. I know it's not the
6  full 200, and I know that usually when I go to
7  trial, I need more complete data.
8        So it's someplace between 26 and 200, and
9  it's not even close to 200. And I think you
10 probably need at least a hundred to answer your
11 question.
12    Q.  And so is your testimony today that you've
13 not used the psychological autopsy a hundred times?
14    A.  Probably not.
15    Q.  You don't know?
16    A.  I don't know without going and counting
17 all my cases.
18    Q.  And have you ever attempted to actually
19 determine the true sample size that would be required
20 in order to test the validity and reliability of your
21 psychological autopsy?
22    A.  Well, there's a rule in statistics called
23 the law of large numbers. And it says as you draw
24 simple -- repeated simple random samples, as the
25 number approaches about a hundred, then you have a

26 (Pages 406 to 409)

Page 410

1  representative sample. So that's where the hundred
2  came from.
3      Q. Have you ever called up a statistician to
4  ask what is the appropriate sample size in order to
5  test the reliability and validity of my psychological
6  autopsy instrument?
7      A. No.
8      Q. Has your psychological -- excuse me. Has
9  your psychological autopsy that's in the form used in
10 the Smith and Bulger cases ever been accepted for
11 publication in a peer reviewed journal?
12     A. Never been accepted, never been
13 submitted.
14     Q. Which part of the psychological autopsy was
15 developed by Mr. Vickery?
16     A. He put in section 17, which is one page.
17     Q. Is section 17 included in the Smith
18 psychological autopsy?
19     A. Yes, it is.
20     Q. And how many pages is it?
21     A. Two pages.
22     Q. Is section 17 included in the Bulger
23 psychological autopsy?
24     A. Yes.
25     Q. Okay. Is your estimation it's about the

Page 411

1  same number of pages?
2      A. Exactly the same number of pages. It's
3  the same pages, 41 and 42.
4      Q. Well, as I look at the psychological
5  autopsy form in the Smith case, you fill in narrative
6  responses, correct?
7          On page 41 there are a number of them.
8      A. You're saying the narratives could be a
9  different length so it might be different pages?
10     Q. Yes, exactly.
11     A. Yeah, of course, of course. Without
12 looking at the original, we don't know.
13     Q. Which is why we need the original?
14     A. We need it tomorrow.
15     Q. We need it today.
16         And what is the name of the section that's
17 developed by Attorney Vickery?
18     A. He calls it a Puzzling Paradox Paradigm.
19         COURT REPORTER: I'm sorry, I didn't hear
20     you.
21         THE WITNESS: Puzzling Paradox Paradigm.
22     Q. How much did Mr. Vickery pay you to create
23 the SSRI psychological autopsy evaluation?
24     A. I have no idea without going back. I'm
25 not even sure I saved those records.

Page 412

1      Q. And did Mr. Vickery pay you every time you
2  used it to evaluate and do a death investigation in
3  an SSRI case?
4      A. Just for my regular consulting time, not
5  for the autopsy.
6      Q. Is the Finkelstein law firm paying you
7  every time you use your psychological autopsy to
8  evaluate a Neurontin case?
9      A. Not for the autopsy, just for my time.
10 So --
11     Q. How much time have you spent on the
12 Neurontin litigation since 2004?
13     A. I have no way of knowing. I have to look
14 at my files. I have four different files and I
15 have the billing record, and you're welcome to look
16 at those. But without looking at those, I really
17 don't know.
18     Q. And do you have those with you here today?
19     A. I have the ones for Smith today, sure.
20 You're welcome to look at that. I mean, four years
21 is a long time.
22     Q. Have you worked on the Smith case for four
23 years?
24     A. Oh, no.
25     Q. Okay. So what's your total time on the

Page 413

1  Smith case and how much have you billed for the Smith
2  case?
3      A. Okay. I worked on the Smith case from
4  5/22/07 until today, and I -- I'm going to have to
5  add this up.
6          Let's see here. It's hard to say without
7  being more careful than I can be right now because
8  there's certain times that I billed and I added
9  everything up.
10     Q. And you're looking at your folder for
11 Smith, right?
12     A. Right, the billing record over the last
13 year, year and four months.
14     Q. And so the notes on your folder are your
15 billing records?
16     A. Yeah, they're the -- they start with the
17 topic -- like here it says read Pfizer's RCT
18 response to the FDA about suicide and suicide
19 attempts. And then it has the date, 6/27/07. It
20 has the hours and minutes, and then it has in
21 parentheses what time of day I did it. And then it
22 has the cost per hour and the charge for that one
23 item.
24     Q. Okay. And you have a similar folder for
25 Bulger, correct?

Page 414

1    A.  Sure do.
2    Q.  You got one for Crone?
3    A.  Yes.
4    Q.  Do you have one for Shearer?
5    A.  Yes.
6    Q.  Do you have a general folder?
7    A.  I have a general folder for generics,
8  Neurontin.
9        As I say, early on before I ever got any
10 cases, they sent me a CD-ROM disk which had a lot
11 of generic information, and I had to get up to
12 speed on Neurontin. And so I had some work that I
13 did. And as I say, the CD is on my laptop. It has
14 all the documents I reviewed.
15       Some of it I charged for particular cases
16 because I read them for particular cases. So --
17 but I did do some generic work in addition to the
18 four cases.
19   Q.  Okay. And I take it you have already
20 billed the Finkelstein law firm for your time in
21 2004, 2005, 2006, 2007 respectively, right?
22   A.  Yes.
23   Q.  And you'd be in a position to identify what
24 amount was billed the Finkelstein law -- I'm sorry,
25 the Finkelstein law firm for your time on the

Page 415

1  Neurontin cases in general for those years, correct?
2    A.  I could calculate that or you could
3  simply make a copy of all my manila folders and add
4  it up yourself.
5    Q.  Okay. And the Bulger folder I take it is
6  with your Bulger materials, right?
7    A.  Right. And I'd have to bring the other
8  two.
9    Q.  Do you have the general folder with you?
10   A.  No.
11   Q.  But you could bring that tomorrow?
12   A.  The general folder is -- is really --
13 just say that I got the CD. There's -- there's no
14 -- there's a list of everything I read.
15       But the problem was I tended to charge it
16 to particular cases as I read. So there's not like
17 a fifth set of charges, as I recall.
18   Q.  Well, if I ask you tomorrow or on Friday
19 what your total billings were for these years --
20   A.  I can figure it out.
21   Q.  -- you'd be in a position to tell me?
22   A.  I could do that.
23   Q.  Okay.
24   A.  Yeah, let me make a note of that.
25   Q.  Thanks.

Page 416

1        THE VIDEOGRAPHER: You have about five
2   minutes.
3    A.  I'm going to write down Friday because
4  it's going to take me a while to do that.
5    Q.  Okay. That will be fine.
6        Is the -- I've got to ask you one more
7  thing about that, Dr. Maris. Have you billed both
8  the Finkelstein law firm and the Lanier law firm or
9  just the Finkelstein law firm?
10   A.  I send my bills all to Ken Fromson, and I
11 don't know what he does with them.
12   Q.  Okay. Was the Puzzling Paradox Paradigm
13 created by Attorney Vickery designed as a protocol to
14 determine whether factors in a given case demonstrate
15 an SSRI-induced death?
16   A.  What they were -- the short answer is
17 yes.
18       And what he did, he's done a lot of trial
19 litigation for psychiatric drugs, primarily SSRIs,
20 but not limited to SSRIs. Some SNRIs, some -- as
21 you know, many of these cases involve an
22 antipsychotic or an antianxiety.
23       So they have been used to test that. And
24 based on all those cases, he developed -- he
25 actually has a little, wood block puzzle with eight

Page 417

1  pieces and he says how do we -- what have I learned
2  in all my experience working in these drug cases.
3  And he puts down one piece -- he's got a PowerPoint
4  that you could get from him, I'm sure -- another
5  piece, and when you get all the pieces together, it
6  suggests a suicidogenic pattern. And if you have
7  more of the pieces of the drug adverse event
8  causing a self-destructive behavior, the more
9  likely you are to make a suicidal or suicidality
10 kind of response.
11       So it's a kind of clinical based,
12 experiential based, nonstatistical, anecdotal way
13 of him summarizing the pieces of the puzzle to when
14 you give somebody a drug and, you know, weeks or
15 days or a couple -- usually as he says is within
16 30 days, that's one of the puzzles. Let's say
17 within 30 days out of character they kill
18 themselves, what are some of the common traits that
19 precede and antecede that. So that's what it is.
20   Q.  And Andy Vickery is not a medical doctor,
21 right?
22   A.  He's an attorney.
23   Q.  So when you say it's built on his clinical
24 experience or something to that effect, you wouldn't
25 be indicating that he has some medical experience?

28 (Pages 414 to 417)

Page 418

1  A. I think I corrected myself when I said
2  that. I said or his experience.
3  Q. All right. Because he has no medical
4  experience at all, right?
5  A. I don't know for a fact about that.
6  Q. Do you see any problem in having a lawyer
7  who represents plaintiffs come up with a protocol to
8  determine whether his clients should win in the case
9  if his theory is right?
10      MR. ROSENKRANZ: Objection to the form of
11  the question.
12  A. I mean, this is not something that --
13  this is something he wanted and he wanted the data.
14  It was not something that I insisted be there. And
15  since he was paying me, I said let's put it in
16  there; and if you want to use it, fine.
17      I don't put a lot of stock in it because
18  it's kind of anecdotal. But I do put stock in the
19  rest of the autopsy, which is, I think, empirically
20  based.
21  Q. And what's your basis for saying it's
22  empirically based if it's never been subjected to
23  peer review or published in any peer reviewed journal
24  or tested for reliability or validity?
25  A. Same thing that Doug Jacobs and his

Page 419

1  committee used, review of the scientific
2  literature, which is peer reviewed, having done
3  several empirically-based studies of suicide over
4  45 years. It's based on that.
5  Q. Basically it's based on your experience,
6  right?
7  A. Based on my experience.
8      You also have to remember that I was the
9  editor in chief of the only journal on suicide for
10  16 years in the United States. So I was privy to
11  all of the refereed journal articles and actually
12  made decisions about what got published. And so I
13  was sitting in a pretty good place based on my
14  experience to know what should be in here.
15      MS. McGRODER: Object and move to strike.
16  Q. There's no -- there's no empirical data
17  that supports this psychological autopsy, is there?
18  A. That's not true.
19      MS. McGRODER: Let's take a break.
20      THE VIDEOGRAPHER: This is the end of
21  Tape No. 2 in the deposition of Dr. Ronald
22  Maris, Volume II. The time is 11:25 a.m.
23      (A BRIEF RECESS WAS TAKEN.)
24      THE VIDEOGRAPHER: This is the beginning
25  of Tape No. 3 in the deposition of Dr. Ronald

Page 420

1  Maris, Volume II. The time is 11:48 a.m.
2      We're back on the record.
3  Q. Doctor, can you identify for me the
4  empirically-based data that supports your
5  psychological autopsy?
6  A. I have not done what Doug Jacobs and his
7  committee did where I added an addendum and went
8  through all the literature. But the short answer
9  would be to see my textbook which I relied heavily
10  on in terms of designing the questions. My
11  textbook would be the Comprehensive Textbook of
12  Suicidology in 2000. It covers all the risk
13  factors and gives citations for each of them. So
14  that's the short answer.
15  Q. Okay. Just so I understand, do you or do
16  you not acknowledge risk factors identified outside
17  the context of your own work?
18  A. Sure, I do. For example, in my 1992
19  book, I actually have two chapters on risk factors.
20  One is by Dr. Bloutchik, B-L-O-U-T-C-H-I-K, who has
21  a hundred risk factors, and that's his chapter.
22  And he has a different list, and I obviously
23  acknowledge him because I included him in my book.
24  Q. Is there overlap between the Bloutchik risk
25  factors and the APA guideline risk factors for

Page 421

1  suicide?
2  A. Yes.
3  Q. Okay. Is there anything unscientific about
4  an expert testifying on behalf of plaintiffs and
5  basing his opinions on a tool that was developed at
6  least in part with the help of a plaintiff's lawyer
7  for use in cases brought by plaintiffs?
8      MR. ROSENKRANZ: Objection.
9  A. That's a generic question. And I think
10  in my case it was almost -- Andy Vickery, for
11  example, gave me some money. He didn't write
12  except one little tiny, teeny section of two pages.
13  So I don't think that's unethical, no.
14  Q. Okay. My question wasn't about ethics, and
15  my question wasn't specifically related to your
16  psychological autopsy, although I can see how you
17  could apply that.
18      My question is do you see any problem with
19  an expert testifying on behalf of plaintiffs and
20  basing opinions on a tool developed with the help of
21  a plaintiff's lawyer for use in cases brought by
22  plaintiffs?
23  A. No.
24  Q. There's nothing unscientific about that, in
25  your opinion?

### Page 422

1  A. That's correct.
2     MR. ROSENKRANZ: Objection,
3  argumentative.
4  Q. Now, in the Puzzling Paradox Paradigm
5  created by Mr. Vickery, I think you mentioned there's
6  a question that asked whether the suicide occurred
7  within 30 days of ingestion of an SSRI, right?
8  A. Right.
9  Q. And that same question is in the
10 psychological autopsy for the Smith case, correct?
11 A. Right.
12 Q. Is there any reliable scientific data that
13 support use of criteria suggesting that if the
14 suicide occurs within 30 days of Neurontin ingestion,
15 Neurontin is a cause of the suicide?
16 A. No.
17    And can I just say no but?
18 Q. Sure, you can say whatever you want. I
19 mean, I'm not going to object to it, but go ahead.
20 A. There are some cases where people who
21 take any drug or any food and have an almost
22 immediate reaction, like peanuts or shellfish.
23    So that's part of the empirical basis, is
24 that one would suspect that if it's truly an
25 allergic reaction and not a -- let's say, a slow

### Page 423

1  change in mood, that it might be shorter rather
2  than longer. However, I'm well aware that Doug
3  Jacobs, in his expert report, went through the 10
4  index cases and showed that there was a variety of
5  times, far more than 30 days, which many of the
6  Neurontin patients were on before they either
7  completed or attempted suicide.
8     So the short answer is no.
9  Q. Okay.
10    MS. McGRODER: Object and move to strike
11 everything except no.
12 Q. Did you read the expert report of Doug
13 Jacobs?
14 A. I did.
15 Q. Did you read it last night?
16 A. Yes.
17 Q. Okay. What else did you read last night?
18 A. I went back and looked at all of my
19 scientific literature and found examples outside of
20 Trimble, Kruszewski, and Roth that supported the
21 Trimble interpretation of the effects of
22 gabapentin. And I copied those and underlined
23 them.
24 Q. And were those among the materials provided
25 to you by the Finkelstein law firm; is that what you

### Page 424

1  went back to?
2  A. Yes, they were the package that I had of
3  all the stuff from Finkelstein law firm.
4  Q. And do you know as you sit here whether
5  that package of materials and literature from the
6  Finkelstein law firm are the references cited in the
7  Trimble and Dr. Kruszewski reports?
8  A. I don't know that without making a
9  line-by-line comparison, but I did bring them with
10 me.
11 Q. Did you create a list of them?
12 A. No, I just brought -- like you did
13 yesterday, I brought the peer reviewed articles and
14 highlighted them.
15 Q. Okay.
16 A. So I have a number of them which I'm --
17 Q. Okay. How about we just set those there
18 and we'll come back to them. That would be great.
19 Thank you.
20    When you conducted the -- well, first of
21 all, who conducted the Psychological Autopsy and
22 Death Investigation in the Smith case?
23 A. I sent them to Ken Fromson, and he asked
24 a case manager named Michelle Faye to review all
25 the evidence and to send them to me. And then when

### Page 425

1  I -- when I got them, in some cases I sent them
2  back because I felt like they were incomplete.
3     But the short answer is I did not do them
4  myself. I sent the form to Fromson, and he had one
5  of his case managers, who was most familiar with
6  all the evidence, to look at the evidence and fill
7  them out for me.
8  Q. And Ken Fromson obviously is a plaintiff's
9  lawyer who represents individuals bringing lawsuits
10 against Pfizer involving Neurontin, correct?
11 A. That's some of the stuff he does, yes.
12 Q. And Michelle Faye, does she work for Ken
13 Fromson?
14 A. She works for Finkelstein, and she's a
15 case manager for the Neurontin cases.
16 Q. So case manager doesn't imply that Ms. Faye
17 has any sort of medical background, correct?
18 A. No, she simply abstracted the data. She
19 didn't edit it in any way.
20 Q. So she's an employee of the law firm
21 representing plaintiffs?
22 A. She is.
23 Q. And who was interviewed -- well, the same
24 question then for the Bulger report?
25 A. She did the same thing in the Bulger

Page 426

1  report.
2      Q.  Okay.
3      A.  In other words, I wanted the information.
4  And you'll notice when you go through my autopsy,
5  that there are -- there are questions where I
6  disagree with her conclusions and I actually
7  corrected them. For example, here's a place here
8  where she said no -- yes, and I said no.
9          So, in other words, I didn't just take it
10 lock, stock, and barrel. I actually proofread
11 everything based on my knowledge of the case.
12     Q.  So the -- the efforts that you've made to
13 go back through and correct things that Michelle Faye
14 did when she conducted the psychological autopsy,
15 those are handwritten notes you made in that Smith
16 psychological autopsy report?
17     A.  Yes.
18     Q.  When did you do that?
19     A.  As soon as I got -- I got it on 5/26/07,
20 and I did it when I read it on June 13th, '07.
21     Q.  And you were pointing, I think, at page 42
22 where you showed me where you crossed out a yes on
23 question 108?
24     A.  Right.
25     Q.  And you made it a no?

Page 427

1      A.  Right.
2      Q.  Okay. I don't have that version.
3      A.  Well, I'm sure you'll get a copy of this.
4  You're welcome to have it.
5          MR. ROSENKRANZ: We'll make a copy of it
6      now.
7          THE WITNESS: Yeah, it's not a big deal.
8          MS. McGRODER: No, I'm just going -- I'm
9      just going to make an objection on the record
10     that he's actually changed the information --
11     the substantive information in the
12     psychological autopsy over a year ago, and
13     that wasn't provided to us. So now I've
14     relied on the version that was provided to us,
15     which is substantially different because he's
16     changed the answers. That's a problem.
17         MR. ROSENKRANZ: Well, I don't believe
18     that that was provided to us either. So we
19     couldn't have possibly provided it to you.
20     A.  That's true. I changed it, but I didn't
21 send it back to them. And you want me to get it
22 right, don't you?
23     Q.  Well, what I want is to understand your
24 opinions, and there's a deadline by which your
25 opinions are to be provided to us in this litigation.

Page 428

1      A.  You can take that up to them.
2          MR. SOH: Those questions are directed to
3      --
4      Q.  Can I mark this as an exhibit, please?
5      A.  As long as you give it back to me because
6  I've got to look at it.
7          (Exhibit 30: A document entitled
8      Psychological Autopsy and Death Investigation,
9      File Name Richard H. Smith marked for
10     identification, as of this date.)
11     Q.  Did you do the same analysis in Bulger to
12 go through and --
13     A.  I did it particularly in Bulger. I
14 thought Bulger had a lot more errors in it.
15     Q.  Oh, okay.
16     A.  In fact, I insisted that Bulger be
17 redone, I thought it was so much incomplete.
18     Q.  Did you give Ms. Faye any sort of training
19 in how to conduct a psychological autopsy?
20     A.  No. I mean, there are instructions and I
21 -- basically they say -- they're basically factual
22 questions.
23     Q.  So the instructions are contained within
24 the document itself?
25     A.  Yeah. And I also told her if you have

Page 429

1  any questions whatsoever to call me and I'll
2  interpret the questions; I mean, how tall was he.
3      Q.  Did you actually talk to her or did you
4  tell that to Ken Fromson?
5      A.  No, I actually talked to her because she
6  was the one doing it.
7      Q.  How many times did you talk to her?
8      A.  I've talked to her probably a dozen
9  times.
10     Q.  And, you know, without belaboring this and
11 taking too much time, can you tell me approximately
12 how many times you changed your answer in the Smith
13 report?
14         MR. ROSENKRANZ: You want to know how
15     many times he changed it or how many changes
16     he made? He may have only changed it once,
17     then made ten changes in the one time he did
18     it.
19         MS. McGRODER: Well, that's a good point.
20         MR. ROSENKRANZ: That's two different
21     questions.
22         MS. McGRODER: Your question's better.
23     Q.  How many changes did you make?
24     A.  You want them all? I can give them to
25 you right --