# EXHIBIT 6
# (PART IV)

Page 498

1  A. It's so crucial to my testimony.
2  Q. Well, before you leave here today, though --
3
4  A. And vice versa. Anything you've got in
5  there that's original, I need a copy of it.
6  Q. Absolutely. I promise.
7     MR. ROSENKRANZ: And we need copies of
8  those items as well.
9  Q. Also at the top left corner of your notes
10 marked as Exhibit 20 you have a note that says Bob
11 Leone, jury consultant.
12    Tell me what that's about.
13 A. I think I already discussed this. Bob
14 Leone is a jury consultant for Finkelstein who came
15 on Friday, last Friday and met with me, told me to
16 look directly into the camera. Basically said
17 expert-witnessing kinds of questions.
18 Q. Did he ask you questions?
19 A. Not really. When I made comments, he
20 responded but he didn't -- he seemed to basically
21 just sit there and listen.
22 Q. Who else was in that meeting?
23 A. Ken Soh and Ron Rosenkranz.
24 Q. And did anybody participate by phone?
25 A. I don't think so. I think they may have

Page 499

1  called somebody while they were there but --
2  Q. And where -- where is Bob Leone's jury
3  consulting office located?
4  A. I have no idea. I met him for the first
5  time on Friday.
6  Q. Had you ever done that before, have a jury
7  consultant come to one of your deposition preparation
8  sessions?
9  A. Sure.
10 Q. How many times?
11 A. Not very often. I'd say maybe 5 percent
12 of the time.
13 Q. Whose idea was it to have Bob Leone come
14 and meet with you?
15 A. You'd have to ask the plaintiff
16 attorneys.
17 Q. Was it helpful?
18 A. I would say it was basically neutral.
19 Q. And what -- what did he tell you?
20    What did he tell you?
21 A. I was sitting there in Bermuda shorts.
22 He said wear a suit and tie.
23 Q. What else?
24 A. Look directly into the camera, make sure
25 your socks cover your calf.

Page 500

1     And he -- I did sometimes explain to the
2  three of them some of my analogies of a scale
3  tipper and just noticeable difference. And I think
4  he may have commented on those analogies.
5  Q. What comment did he make on the scale
6  tipper analogy?
7  A. He liked it.
8  Q. What about the noticeable difference maker?
9  A. I don't remember.
10 Q. What about your analogy to peanuts and
11 shellfish causing an allergic reaction, did you run
12 that by him?
13 A. No.
14 Q. How long was the meeting?
15 A. Three hours.
16 Q. And so other than talking about your socks
17 and your suit and running these analogies by him,
18 what else occurred in the three-hour meeting that
19 included the jury consultant?
20 A. Well, let's see, he petted my pet dog for
21 a while and said what a nice dog this is.
22 Q. Anything substantive?
23 A. That was pretty substantive. My dog
24 liked it.
25    No.

Page 501

1  Q. Do you have any other meetings set up with
2  the jury consultant for purposes of your testimony in
3  Neurontin litigation?
4  A. As far as I know, I do not. It wasn't my
5  idea in the first place.
6  Q. I think you told me last night right before
7  we broke for the day that when I asked you why you
8  created Exhibit 20 -- I'm so sorry, did you say
9  you're calling it a supplemental opinion or an
10 addendum? I'm sorry, I just forgot.
11 A. I'm calling it an addendum to my expert
12 report of 12/3/2007.
13 Q. And so when I asked you why you created
14 this addendum, I think you said because you wanted to
15 talk about your own possible mechanism for Neurontin
16 and suicide, right?
17    MR. ROSENKRANZ: Objection, asked and
18    answered.
19 A. That's right. And because earlier when
20 you talked to Trimble, you used the phrase this is
21 just theory, and I wanted to comment on theories.
22 Q. Okay. And you created this last Friday
23 after you met with the lawyers and the jury
24 consultant, right?
25 A. Right.

Page 526

1  do a crucial experiment in humans.
2       For example, we had a -- I'm sorry -- if
3  we had a series of human beings we thought
4  Neurontin caused suicide, we couldn't -- and we had
5  a strong suspicion that was true, we couldn't give
6  them to the experimental group and not to the
7  control group because that would be unethical.
8    Q.  Now, we talked yesterday about Dr. Roth's
9  opinion that there are no animal models that you can
10 extrapolate to humans on the issue of suicide,
11 correct?
12   A.  I -- I disagree with that opinion.
13   Q.  You disagree with Dr. Roth from Yale, who
14 is a bench scientist and --
15   A.  I don't care where he's from --
16       MR. ROSENKRANZ:  Objection.
17       MR. SOH:  Objection.
18   Q.  -- neurobiologist on whether there are
19 animal models that predict suicide in humans?
20       MR. ROSENKRANZ:  Objection.  It's
21    argumentative.
22   A.  He's not a suicidologist, so yes I
23 disagree.
24   Q.  Okay.  And then you say, challenge,
25 dechallenge, rechallenge is more differentiated?

Page 527

1    A.  Let me just make sure I can read my own
2  writing.  Definitive.
3    Q.  Oh, definitive?
4    A.  More -- a more definitive test than a
5  random clinical trial, but is inhumane.
6    Q.  Okay.
7    A.  Random clinical trials require such large
8  samples.  Results for rare events like suicide are
9  almost always inclusive.
10   Q.  Okay.  Can you stop there?
11   A.  Um-hum.
12   Q.  Okay.  Go ahead.
13   A.  Finally, if you were allergic to peanuts
14 or shellfish, only one dose could send you into
15 anaphylactic shock and death.  Don't get hung up on
16 Richard Smith's dose response.  He took a lot of
17 Neurontin.
18   Q.  Okay.  And so part of your opinion is don't
19 get hung up on dose response.
20       What does that mean?
21   A.  That means that we really can't say
22 exactly how much Neurontin that Richard Smith took.
23 I know there was 67 days.  I don't know for a fact
24 that he took it every day.  I know that in Bigg's
25 investigation there's a big bottle sitting on his

Page 528

1  dresser which looks like it's full of Neurontin.
2       I also know that there were nine boxes,
3  sample boxes of Neurontin left over.  It's almost
4  impossible to know exactly how many of those
5  67 days he ingested Neurontin.  We know that for a
6  while he was prescribed 600 milligrams, BID, that's
7  300 and 300.  Then later he was prescribed 900 for
8  the latter part of his life.  How much he actually
9  ingested, I don't think anybody knows for sure.
10 But there's no -- there's probably no doubt that he
11 was on Neurontin.
12      Incidentally, even if you did an autopsy,
13 you wouldn't detect Neurontin in the toxicology
14 report because the standardized tests don't test
15 for it.
16   Q.  What's your basis for saying there were
17 nine boxes of samples?
18      Where do you get that?
19   A.  I was told that by Finkelstein -- not by
20 Finkelstein, but the firm.  I asked specifically --
21 let me finish my answer.  I'm not sure that those
22 pills on the dresser were Neurontin.  And I was
23 confused because, you know, doing some
24 calculations, it's possible that he could have run
25 out of Neurontin in those 67 days.  And I was told

Page 529

1  they found at least nine sample boxes of Neurontin.
2       So the point was be assured that there's
3  ample Neurontin, that he could have taken it, that
4  he had it left over.  Do we know in fact every day
5  that he took it?  I don't think we know that.  Did
6  he take it?  Yes, many people -- Ruth said she
7  witnessed him take it.
8    Q.  Dr. Maris, can I ask a question?
9    A.  Sure.
10   Q.  Okay.  The basis for your statement there
11 were nine sample boxes is the Finkelstein law firm,
12 correct?
13   A.  Correct.
14   Q.  And when you say you can't -- there's no
15 way to know how much Neurontin he took, it's true,
16 isn't it, that no family member personally observed
17 him taking Neurontin on the day of his suicide; is
18 that correct?
19   A.  On the day of his suicide?
20   Q.  Yes.
21   A.  I think that is true.
22   Q.  Okay.  What about the day before, what
23 about the 11th of May 2004, did any family member
24 personally observe Mr. Smith take Neurontin on that
25 day?

Page 530

1  A. I don't think there's any evidence one
2  way or the other.
3  Q. And what about the day before that on
4  5/10/2004, is there any evidence that any family
5  member personally observed Mr. Smith take Neurontin
6  on that day?
7  A. I don't think there's any evidence on any
8  specific day. So if you go to day four, I'm going
9  to say also the same thing.
10 Q. Okay. So as you sit here today, there's no
11 affirmative evidence that Mr. Smith took Neurontin on
12 any day, correct?
13    There's no personal observation of that,
14 correct?
15 A. Well, the psych autopsy refers to an
16 exhibit where Ruth Smith says she saw him take his
17 Neurontin. Doesn't say when.
18 Q. Okay.
19 A. And she also said --
20 Q. So --
21 A. Let me finish.
22    She also said that his regular habit was
23 to follow the doctor's directions.
24 Q. Okay. And we'll talk about that later.
25    There's -- still, because Mrs. Smith does

Page 531

1  not say when she saw him take Neurontin, there's no
2  evidence of any personal observation of him taking
3  Neurontin on any particular day; is that true?
4  A. That's true.
5     MS. McGRODER: We'd better change the
6  tape.
7     THE VIDEOGRAPHER: This is the end of
8  Tape No. 4 in the deposition of the Dr. Ronald
9  Maris, Volume II. The time is 2:55 p.m.
10    (A BRIEF RECESS WAS TAKEN.)
11    THE VIDEOGRAPHER: This is the beginning
12 of Tape No. 5 in the deposition of Dr. Ronald
13 Maris, Volume II. The time is 3:14 p.m.
14    We're back on the record.
15 Q. Dr. Maris, in Exhibit 20 in the last line
16 on page 47 where you say don't get hung up on Richard
17 Smith's dose response, tell me what you mean by that.
18 I don't understand that.
19    What were you concerned about getting hung
20 up on?
21 A. Well, precisely this kind of question,
22 did he take it the last day, did he take it the day
23 before last? What's the dose response gradient for
24 Neurontin look like?
25    I mean, we already know that it has a --

Page 532

1  it can have an effect in 30 minutes to an hour,
2  that it's two to three hours for peak plasma, and
3  that if you continue to take it, you probably have
4  a steady plasma state after several hours.
5     So we -- we don't want to get hung up on
6  it. Ideally, I'd like to have somebody watch him
7  every day, and I don't think we have that kind of
8  evidence. We do know, for example, that three days
9  before, his doctor said he was taking it and it
10 made him feel weird.
11 Q. And so you're saying three days before,
12 that would be the -- what day are you referring to?
13 A. Three -- three days before when he saw
14 Dentist Woods.
15 Q. So on May 10 when he saw his dentist, not
16 his doctor, right?
17 A. That's one of his doctors though.
18 They're also doctors.
19 Q. Yeah. Well, his dentist isn't his family
20 practitioner?
21 A. DDS, Doctor of Dental Science.
22 Q. You recognize that, right?
23 A. Of course.
24 Q. And you recognize his dentist, Dr. Wood,
25 did not perform any sort of mental status examination

Page 533

1  or psychiatric evaluation of Mr Smith on --
2  A. Sure. I know what he was told, though.
3  It makes me feel weird, I'm taking Neurontin.
4  Q. Doctor, you've got to let me finish my
5  question before you answer.
6  A. Okay. You said did I recognize what he
7  was told.
8  Q. And my question was the remainder of the
9  sentence was on May 10, 2004.
10    Okay. Now you can answer.
11 A. Okay. On May 10th, 2004 he told his
12 dentist, Dr. Woods, that he was taking Neurontin --
13 not had taken it -- he was taking, present tense,
14 and that it made him feel weird.
15    He also had recently told his son-in-law,
16 Wes Carnahan, that he was taking Neurontin and it
17 made him feel, quote, loopy.
18 Q. Okay. We're going to go over all of that.
19 A. Okay.
20 Q. I'm going to give you a chance to talk
21 about all those things. If you'll just wait until I
22 ask you a question, we can go a lot quicker, okay?
23 A. You just asked me a question.
24 Q. I asked -- asked you a question that was
25 did Dr. Wood perform a mental status exam, and the

Page 554

1  as instructed?
2      A.  I think that's possible. I think it's
3  unlikely.
4      Q.  But you agree it's possible?
5      A.  It's certainly possible.
6      Q.  Would you agree it's a reasonable
7  inference?
8      A.  I don't think so. I think it's a
9  stretch.
10     Q.  You agree that Mr. Smith had depression
11 before he ever took Neurontin, correct?
12     A.  A mild depression.
13     Q.  Well, you know that in May of 2003 he was
14 diagnosed with depression and anxiety, correct?
15     A.  He was diagnosed -- he was -- he took
16 Elavil in May of 2001 from Dr. Cato. He also in
17 May 2nd of 2003 was given -- it was noted that he
18 was depressed and anxious.
19         By May 15th, 2003 he was diagnosed with
20 anxiety and depression by Dr. Cato, and he -- it
21 was noted in the record that he was taking Lexapro
22 and Desipramine, 25 milligrams, HS.
23     Q.  Now, where is that in your report?
24         I don't see that.
25     A.  I've got handwriting.

Page 555

1      Q.  All right. Then may I borrow that?
2      A.  I'll probably never get it back.
3      Q.  Now, that's something you went -- you
4  didn't include information about Mr. Smith's
5  diagnosed anxiety and depression in May of 2003 in
6  your original report, correct?
7      A.  I kept working from December to now, so
8  it is correct.
9      Q.  And what did you look at to conclude that,
10 in fact, Mr. Smith was diagnosed with anxiety and
11 depression in May of 2003?
12     A.  The medical records.
13     Q.  Of whom?
14     A.  Probably Cato, yes.
15     Q.  Okay. Did you make these notes on your
16 report in pencil here after you read the deposition
17 of Dr. Trimble?
18     A.  Possibly. I don't know exactly when I
19 made them. I know that they were including the --
20 I think it was the Exhibit 5 addendum of evidence,
21 after I read all of that, which included Dr.
22 Trimble. But I don't know if it was specifically
23 after Trimble.
24         I have no idea when I made those. I
25 mean, they were made between December and probably

Page 556

1  fairly recently.
2      Q.  Well, when's the first time you learned
3  that Mr. Smith was diagnosed with anxiety and
4  depression in May of 2003?
5      A.  I think it was always in the medical
6  records.
7      Q.  Yeah, but I'm asking you when's the first
8  time you read those medical records and learned that?
9      A.  I -- I'm not sure. If what your
10 suggesting is that I read Dr. Trimble's deposition
11 and that jogged my memory to go look it up, that's
12 quite possible. The fact is I got it right.
13     Q.  Is it significant to your opinion that Mr.
14 Smith was diagnosed with depression and anxiety in
15 May of 2003 and was prescribed an antidepressant for
16 major depressive disorder and generalized anxiety
17 disorder at that time?
18     A.  It's a compound --
19         MR. SOH: Objection, form, foundation.
20     A.  Yeah, compound question. And the problem
21 is --
22     Q.  Are you asserting an objection, Dr. Maris?
23     A.  No, I'm saying that I can't answer your
24 question as stated.
25     Q.  Okay. Let me restate it.

Page 557

1          Is it significant to your opinion that Mr.
2  Smith was diagnosed in May of 2003 with depression
3  and anxiety for which he was prescribed Lexapro,
4  which is indicated for the use of major depressive
5  disorder and generalized anxiety disorder?
6      A.  I can say yes, but I can't say a simple
7  yes because Lexapro is also for other things than
8  major depression.
9      Q.  Okay. Do you think he was prescribed
10 Lexapro for depression?
11     A.  Yes. But we don't know if it was major
12 depression, which is a technical category within
13 the DSM, which I've never seen him given that
14 diagnosis.
15     Q.  Did you go back and try to determine
16 whether Mr. Smith had a major depressive disorder in
17 May of 2003?
18     A.  I think it's in my report.
19     Q.  Where is it in your report?
20         Okay. I have your report.
21     A.  I'm not sure. It says 2003. I think I
22 said it -- by the time that we reached 2004,
23 there's an explicit section in my report on the
24 question that you're asking me, which is the
25 depression level of Richard Smith. And it starts

Page 566

1 terminal insomnia that demonstrates he didn't sleep
2 for one night, correct?
3     A. That's correct.
4     Q. Okay. And then underneath that for
5 psychomotor retardation, criteria No. 5, you checked
6 yes, he had it. And then you put B at 13, inactive.
7         What does that mean?
8     A. To tell you the truth, I can't remember
9 what B means. I'd have to go back and look.
10    Q. And where would you go to find that?
11    A. I'd see what the various sources of
12 evidence were and see what started with B.
13    Q. Well, what are the various sources of
14 evidence?
15    A. Right now the answer is I don't know.
16    Q. Okay.
17    A. I'd have to go look through the records.
18    Q. And so you would go back to the medical
19 records to look for that?
20        That's what I'm -- that's what I'm trying
21 to find out.
22    A. I'm not sure where I would go. I don't
23 have any idea as I sit here what B means. Maybe if
24 I thought about it for a minute, it would come to
25 me. But right now it's not coming to me.

Page 567

1     Q. So you just don't know?
2     A. Don't know.
3     Q. Okay. Under No. 7, feelings of
4 worthlessness and excessive guilt, I don't see a
5 reference on that one.
6     A. Well, in my own thing it says felt
7 useless. He said that to Wood, and also his
8 suicide note says that.
9     Q. Okay. So you went back in later and wrote
10 -- I'm sorry, useless to Wood and suicide note?
11    A. Right.
12    Q. Okay. And that's -- is there any other
13 evidence to support that criteria?
14    A. No, there are two sources.
15    Q. Okay. And then I do want --
16    A. It does say in one place I can't do
17 anything I used to do. I can't work on cars, I
18 can't cut the grass, I can't repair office
19 machines. I'm working part time.
20        So he did say that, so that's a third
21 source.
22    Q. And my -- okay. And my question is over
23 what period of time were those feelings of
24 worthlessness or excessive guilt; can you tell me
25 that?

Page 568

1     A. Well, some of the examples are particular
2 points in time, like suicide note and three days
3 before. But the feeling useless in terms of not
4 doing what he used to were a few months before.
5     Q. Okay.
6     A. So there are different times.
7     Q. Okay. And then I would -- I would like you
8 to look at your psychological autopsy, question No.
9 75, and just tell me what is the evidence in that
10 source that you rely on for his depressed mood most
11 of the day nearly every day?
12    A. The question is on page -- it's actually
13 on mine page 26, 15 predictors, No. 75. Question:
14 Did the decedent have a depressive or other mental
15 disorder at or just prior to their death?
16        And then it goes through instructions on
17 how to answer that question. And the only answer
18 was Dr. Hampf in Exhibit 1, page 4: New patient
19 questionnaire notes that he is, quote, depressed
20 because of pain and lack of sleep.
21        Incidentally, that's another reference to
22 sleep that I left off.
23    Q. Okay.
24    A. However, he was never -- well, that's not
25 right. It said he was never diagnosed or treated

Page 569

1 for depression. That's Michelle Faye and that's
2 not right. He was treated and diagnosed.
3        So she was wrong in that and I didn't
4 catch it.
5     Q. And so you've now -- so Michelle Faye is
6 wrong in the psychological autopsy that he was never
7 diagnosed or treated for depression, right?
8     A. Right. She misread the record.
9        And that's fair because some of these
10 drugs like Amitriptyline -- let me tell you why
11 it's fair.
12    Q. Doctor, I didn't ask you if it was fair.
13 All I want to know is did she get it wrong, okay, and
14 then we can move on.
15    A. I can't tell you without letting me
16 explain my answer.
17    Q. The fact is she got it wrong because you've
18 now X'd it out on the --
19        MR. ROSENKRANZ: Objection,
20    argumentative.
21        MR. SOH: Argumentative.
22    Q. -- and we'll move on, okay?
23        MR. ROSENKRANZ: And now you're
24    testifying.
25    A. If you want me to --

Page 570

1  Q.  Did you just X out on the document of the
2  psychological autopsy, which is Exhibit 30, the
3  portion of the sentence that says however, decedent
4  was never diagnosed nor treated for depression?
5       You X'd out never diagnosed nor, and you
6  wrote in diagnosed --
7  A.  And.
8  Q.  -- and.
9       Okay.  So now is that corrected?
10  A.  Yes.
11  Q.  Thank you.
12       If you could turn to page 18 of your
13  report.  On the very top --
14  A.  Yes.
15  Q.  -- you say Richard never saw any
16  psychiatrist nor received any DSM diagnosis for
17  depression or mood disorder.
18       Is that also incorrect?
19  A.  That's probably incorrect.  The problem
20  is I -- what I mean by DSM diagnosis is something
21  like 296.23, which is a code in the DSM which means
22  major depression, first episode, serious without
23  psychosis.
24       He did give a word depression so that to
25  that extent, it's not right.  But I never saw any

Page 571

1  DSM diagnostic code which is required for insurance
2  purposes.
3  Q.  Okay.  So if -- if Dr. Cato had actually
4  listed a DSM diagnostic code alongside his reference
5  to depression and anxiety, then this statement in
6  your report would be wrong?
7  A.  That's correct.
8  Q.  Okay.  Going back to your psychological
9  autopsy on page 26, okay?  Now, let me just remind
10  you we're talking about your major depressive
11  disorder diagnosis on page 19 of your report, and you
12  say you rely on psychological autopsy question 1
13  related to Dr. Hampf's new patient questionnaire,
14  right?
15  A.  Yes.
16  Q.  What is the date of Dr. Hampf's new patient
17  questionnaire where the decedent notes he is
18  depressed because of lack of pain -- because of pain
19  and lack of sleep?
20  A.  The one I have in my treatment history
21  was from Dr. Berklacich, Berklacich, however you
22  pronounce his name.
23  Q.  You know, I still to this day don't know.
24       MS. SEATON:  It's Berklacich.
25  Q.  Berklacich.

Page 572

1  A.  Berklacich.  It's 2/27, 28, '03.  And it
2  diagnosed -- under the new patient questionnaire it
3  mentioned depression, pain, and again another
4  reference to sleep disorder.
5  Q.  And so that's 2/27 of 2003, correct?
6  A.  Right.
7       This reference to new patient
8  questionnaires confused me because it probably
9  wasn't Dr. Hampf because he also did one.
10  Q.  Okay.
11  A.  But the one I have is a reference to
12  2/27, 28 of '03.
13  Q.  Okay.  And so I just want to understand
14  this.  For depressed mood most of the day nearly
15  every day, your diagnosis on page 19 of your report,
16  you're referring to a 2003 record of depression
17  because of pain and lack of sleep?
18  A.  And plus the other references that I've
19  already given you to Cato.
20  Q.  Okay.  And -- and you understand the 2003
21  record is pre-Neurontin, correct?
22  A.  Correct.
23  Q.  Okay.
24  A.  Incidentally, when he started taking
25  Neurontin, they wanted him to get tested for a

Page 573

1  psychiatric disorder.
2  Q.  Right.
3       Why do you think that is?
4  A.  I don't know why.  You can ask Dr.
5  Mackey.  Apparently, he showed signs -- you know,
6  when you have somebody who's elderly, you often
7  suspect -- that is to say, Rule 65, you often
8  suspect that there may be dementia involved because
9  it's so common, and usually it's Alzheimer's type.
10       But I don't know why.  You'd have to ask
11  him.  Maybe he looked confused.  Maybe he was
12  forgetting things.
13  Q.  We'll come back to that.
14       Okay.  Also in your report on page 19 you
15  say after taking Neurontin, Smith had all nine
16  criteria required for a DSM diagnosis of major
17  depressive disorder.
18       And then you cite to some DSM-IV codes,
19  right?
20  A.  Yes.
21  Q.  And one of the codes is 296.33, correct?
22  A.  Right.
23  Q.  And you know what that code is for, right?
24  A.  Of course, that's why I wrote it.
25  Q.  Yeah.

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 574

1  What is that code for?
2  A. It's for -- the specifiers after the
3  decimal point are for major depression. 2 is first
4  episode, 3 is two or more episodes.
5  Q. So it's your opinion in this case that
6  Richard Smith either had a first episode of major
7  depressive disorder or a recurrent episode of major
8  depressive disorder in the spring of 2004 after
9  taking Neurontin, correct?
10 A. Right. And I said that I think it's most
11 likely that he had a first major depressive
12 episode, but I admit the possibility that the
13 earlier depression and anxiety, if it had been done
14 by a psychiatrist who used the DSM, we might have
15 been able to determine that he had a prior major
16 depressive episode.
17 Q. And so you weren't able to rule out the
18 possibility of a prior major depressive episode prior
19 to taking Neurontin, correct?
20 A. Correct.
21 Q. If, in fact, Mr. Smith did have recurrent
22 major depressive episode in the spring of 2004, does
23 that increase his risk over the risk he would have
24 had if it had been a first-time episode of major
25 depressive disorder?

Page 575

1  A. Without specifying particulars and
2  circumstances, the short answer is yes.
3  Q. Do you agree that as a general principle,
4  depression can wax and wane?
5  A. It in fact does.
6  Q. Are you aware that studies suggest that one
7  year after the diagnosis of a major depressive
8  episode, 40 percent of individuals still have
9  symptoms of depression that are sufficiently severe
10 to meet criteria for a full major depressive episode?
11 A. It's hard to disagree with the quote
12 without the source and the citation.
13 Q. Well, the source is the DSM-IV. Do you
14 want to see it?
15 A. No, I agree with that.
16 Q. Do you agree that chronic general medical
17 conditions are also a risk factor for persistent
18 episodes as reported in the DSM-IV?
19 A. Depends on the kind of chronic medical
20 condition.
21 Q. Is chronic pain a risk factor for
22 persistent episodes of major depressive disorder?
23 A. I think so.
24 Q. Let's look back in 2003 and do the analysis
25 of the kind of depression that Mr. Smith experienced

Page 576

1  at that time, okay?
2  A. Can't do it.
3  Q. You can't do it?
4  A. Don't have the data.
5  Q. All right.
6     (Exhibit 35: A document entitled New
7     Patient Medical Questionaire marked for
8     identification, as of this date.)
9  Q. I'm going to hand you now what is marked as
10 Exhibit 35, and you've seen these records before,
11 correct?
12 A. I've already cited this particular
13 record, yes.
14 Q. And the date on the front page of this is
15 February 28, 2003, right?
16 A. Yes.
17 Q. And Mr. Smith reports in this record his
18 chief complaint is severe pain in the hip area, down
19 the back of the thighs, down the calves into the
20 ankles and heels, right?
21 A. Right.
22 Q. Tingling and hard to walk, correct?
23 A. Correct.
24 Q. And he says in February 2003, under No. 7
25 on the front page, that he's retired, right?

Page 577

1  A. Yes.
2  Q. Okay. And you knew he was retired at this
3  time, right?
4  A. Yes.
5  Q. If you turn to, yes, page 37, Bates stamp
6  at the bottom page 37. Mr. Smith reports here under
7  gastrointestinal, under change in weight or appetite,
8  he checks that yes, right?
9  A. He says some. He doesn't say how much.
10 Q. Well, first -- my first question is there's
11 a check mark next to change in weight or appetite,
12 right?
13 A. Yes.
14 Q. Then what he writes is some loss of
15 appetite and pain in legs, correct?
16 A. Correct.
17 Q. And then he also puts a check mark in front
18 of diarrhea, correct?
19 A. Yes.
20 Q. And he says it seems like pain has changed
21 my bowel movements, right?
22 A. Right.
23 Q. And if you turn the page under general,
24 there's a question that says any change in mood,
25 correct?

68 (Pages 574 to 577)

Page 578

1  A. Yes.
2  Q. He checks that, right?
3  A. Yes.
4  Q. And he writes depressed because of pain and
5  lack of sleep, right?
6  A. Yes.
7  Q. That's the record we just talked about?
8  A. Which, incidentally, is another reference
9  to sleep problems early on.
10 Q. Okay. In 2003, right?
11 A. Right.
12 Q. Do you think he had difficulty sleeping
13 from 2003 up through 2004?
14 A. You want me to speculate?
15 Q. No, I want to know if that's your opinion.
16 A. My -- I can't say definitively, so I'll
17 say don't know.
18 Q. Okay. It's possible?
19 A. It's certainly possible with all the pain
20 he had.
21 Q. And then the next line down there on the
22 same page, which is FMB 0038, he checks trouble
23 sleeping, right?
24 A. Yes. Which, incidentally, is bizarre
25 because he said that's why Dr. Cato gave me

Page 579

1  hydrocodone, which is not a sleep aid.
2      So it sounds like he doesn't know what
3  he's talking --
4  Q. Do you think he was confused?
5  A. Possible. He certainly doesn't know what
6  hydrocodone is for. It does make you sleep, but
7  that's not what it's for.
8      THE VIDEOGRAPHER: Five minutes.
9      MS. McGRODER: Okay. Let's take a break.
10 I need one, don't you?
11     THE VIDEOGRAPHER: This is the end of
12 Tape No. 5 in the deposition of Dr. Ronald
13 Maris. The time is 4:11 p.m.
14     (A BRIEF RECESS WAS TAKEN.)
15     THE VIDEOGRAPHER: This is the beginning
16 of Tape No. 6 in the deposition of Dr. Ronald
17 Maris, Volume II. The time is 4:32 p.m.
18     We're back on the record.
19 Q. Dr. Maris, I was just noticing in
20 Exhibit 6, which is your copy of the Smith expert
21 report, you have an additional page or two that I
22 don't have. And one is a summary of the medical
23 records you reviewed along with highlighting and
24 handwritten notes, correct?
25 A. Correct.

Page 580

1  Q. And the title of it is Richard H. Smith
2  recent medical treatment history, right?
3  A. Correct.
4  Q. And is that different from the treatment
5  history you have in your report at page 7 and 8?
6  A. It is. And the reason for that is that
7  since December of 2007, I've received new
8  information. I've also read -- including Dr.
9  Trimble's deposition where various issues were
10 raised. And so I amended it after my report was
11 done.
12 Q. Okay. And when did you amend it?
13 A. Over the -- I mean, I don't know exactly.
14 But over the whatever it is, nine months since I
15 did my report, with most of that being recent.
16 Q. Did you do that amended summary of the
17 medical history in preparation for this deposition?
18 A. Well, I constantly amended it as I read
19 new information. But, of course, there was an eye
20 towards being prepared for this deposition and
21 particularly reading Dr. Trimble's deposition where
22 there were questions raised that I hadn't really
23 tried to address.
24 Q. So you went back after you read Dr.
25 Trimble's deposition and tried to address some of the

Page 581

1  issues that were raised with him by creating this new
2  treatment history summary?
3  A. It was new for me, but it was already in
4  the records. I just hadn't highlighted it
5  properly.
6  Q. Okay. Did you learn new things when you
7  read the deposition of Dr. Trimble about Mr. Smith's
8  treatment history?
9  A. Yes.
10 Q. And can you just tell me what they are?
11 A. The ones that I wrote in?
12 Q. Sure.
13     What are the new items there that you
14 learned after you read Dr. Trimble's deposition?
15 A. Well, for example, I had been aware that
16 there was Amitriptyline in '01, but I had not been
17 aware that there was Lexapro in May 15th of '03.
18 So that was a new addition.
19 Q. Okay. So at the time you wrote your
20 original report, did you know that Mr. Smith had been
21 diagnosed with depression and anxiety in May of 2003?
22 A. I did, but I didn't know he had gotten
23 Lexapro. I had missed that somehow.
24 Q. Okay. So -- wait, I've got to ask you one
25 more thing.

Page 582

1   And so you didn't consider the fact that
2   Mr. Smith was on Lexapro at the time you formed the
3   opinions that are contained in your original report;
4   is that correct?
5       A.   That's correct.
6       And let me be clear about this.   He
7   started the Lexapro 5/15/03, and apparently he
8   stopped it 6/27/03 because the records from Dr.
9   Cato say off Lexapro, quote, overall improved.
10      So he was not continuously on it after he
11  started it.   He was on it for the time that I had
12  mentioned.
13      Q.   Okay.   All right.   And is the -- is the fact
14  that he was on Lexapro in 2003, does that factor into
15  any of the opinions that you put in the addendum
16  dated September 26, '08 to your report?
17      A.   Well, one of my opinions was that he had
18  relatively -- he had depression off and on since
19  2001.   So it certainly had a bearing on that, that
20  he actually took Lexapro.   It was bad enough that
21  he got a prescription.
22      Q.   Okay.   So it -- if it impacted your opinion
23  to the extent that it made you aware that his
24  depression was bad enough to take an antidepressant?
25      A.   Right.

Page 583

1   And before that, of course, there was
2   evidence in the record that Amitriptyline could be
3   for sleep.   Desipramine could be for something
4   other than depression.   But once you put Lexapro,
5   it's clear that there was some preexisting
6   depression.
7       Q.   Okay.   All right.   Continue, please.
8       A.   Somehow I had forgotten to put on here
9   between 30 and 31, Nos. 30 and 31, I forgot to put
10  that on March 1st of '04, that Cindy, the daughter,
11  had mentioned suicide.
12      Q.   Okay.   That is in your original report, and
13  it says Cindy says Richard contemplated suicide,
14  3/1/04.
15      A.   Somehow --
16      Q.   So you had that in your original report.
17      A.   I do?
18      Q.   You have it in the copy I have.
19      A.   Wow.
20      Q.   It's No. 36 in my copy.
21      A.   Oh, 36, 36.
22      Q.   What number is it in your copy?
23      A.   It doesn't say Cindy.   It says daughter.
24      Q.   Okay.   So you modi --
25      A.   I have here that -- let's see -- that

Page 584

1   that was 5/2/03 and that on March 1st of '04, the
2   police supplement said that Cindy mentioned on that
3   date that he had mentioned.   They're two different
4   days.
5       Q.   Okay.   And that's something you didn't
6   realize before you read the deposition of Mr. --
7   Professor Trimble?
8       A.   I didn't remember that.   Although I had
9   read it, I didn't remember that until I had read
10  Trimble.
11      Q.   And so if I understand you, the fact that
12  he reported or that he experienced suicidal ideation
13  in 2003 and then again on March 1 of 2004, that had
14  significance to your opinions so you put it in this
15  treatment summary?
16          MR. SOH:   Objection.
17      A.   Yes.
18      Q.   Okay.   And is that also something that you
19  factored into the addendum to your report?
20      A.   To the degree that there was fairly
21  consistent or episodic depression, yes.   It gave me
22  another instance or two of it.
23      Q.   And suicidal ideation, correct?
24      A.   Yeah, I think I mentioned suicide
25  ideation in the report, which I've now lost.

Page 585

1       Q.   Uh-oh.   I think you had that.
2       A.   I've got it.
3       Q.   There you go.
4       I think it might be on page 46 at the
5   bottom where you say Neurontin tipped the scale in
6   the direction --
7       A.   Yeah, even suicide ideation.
8       Q.   Where he had prior pain and depression,
9   even suicide ideation?
10      A.   Right, so it bore on that.
11      Q.   Okay.   All right.   Anything else new on
12  your treatment summary?
13      A.   Apparently, in 4/9/04 when he was asked
14  about treatment, he checked the box that said he
15  had been treated for depression and anxiety.   He
16  checked the box that he had been treated between 33
17  and 34.   So that's another --
18      Q.   Okay.   So that's an addition that you
19  handwrote in, right?
20      A.   Right.
21      Q.   Can I see this?   Some of these look like
22  they're highlighted right on the computer.
23          Who did that?
24      A.   I did.
25      Q.   Okay.   And then some of them are highlighted

Page 586

1  just with a highlighter.
2      Did you also do that?
3   A.  I did that as a follow-up.
4   Q.  Okay. And so you added a reference to the
5  March -- I mean, I'm sorry, the April 9, '04 record
6  where he says he in the past was diagnosed with
7  depression and anxiety?
8   A.  Right. It was a check he made.
9   Q.  Okay. And is that significant to your
10 opinion?
11  A.  Just continuing evidence that he in fact
12 did have depression and anxiety before he took
13 Neurontin.
14  Q.  Okay. And that's also reflected in your
15 addendum Exhibit 20, correct?
16  A.  Right.
17  Q.  Okay. Anything else new?
18  A.  I don't think so. Apparently, on 5/2/03
19 he didn't say pain and depression just, he said
20 also anxiety, according to Dr. Cato.
21      So I added -- in addition to pain and
22 depression, I added anxiety, question. I think Dr.
23 Cato said also depression and anxiety.
24  Q.  Oh, okay. And 5/2/03 when it says he
25 wishes he could die, pain and depression, you would

Page 587

1  add anxiety to that pursuant to Dr. Cato's records?
2   A.  I would.
3   Q.  Okay. And, again, is that something that
4  formed the basis for your addendum?
5   A.  Yes, because he had not just depression,
6  but he also had anxiety. And I'm not sure I
7  specifically mention anxiety, but usually
8  depression and anxiety overlap considerably. And
9  the question often comes up when you treat the
10 depression, are you treating the anxiety?
11     As I recall, he was just on Neurontin and
12 Lortabs at the time of his death, Lortab. But
13 usually when you get, let's say, Lexapro, you'll
14 also get some sort of benzodiazapine minor
15 tranquilizer. I did not see any evidence that he
16 was treated for anxiety, even though it's
17 mentioned.
18     Now, you can use an antidepressant for
19 anxiety. Sometimes they do. But often you'll get,
20 let's say, Lexapro and -- I'll just pick something
21 -- Restoril, Lorazepam, Xanax. And I didn't see
22 any minor tranquilizers that he got.
23  Q.  And so during the entire period that he was
24 taking Neurontin, it's correct, isn't it, that he was
25 not prescribed any antidepressants or any antianxiety

Page 588

1  medications?
2   A.  Correct.
3   Q.  Okay. And did that increase his risk of
4  suicide?
5   A.  It could, sure, because as we've already
6  established, undiagnosed and untreated depression
7  are one of the major causes of suicide.
8   Q.  Do you think he would have benefitted from,
9  for example, a prescription of Lexapro during that
10 period that would treat both depression and anxiety?
11  A.  I mean, the simple answer is yes.
12  Q.  If you had been on a treatment team
13 treating Mr. Smith between March and May when he
14 committed suicide, would you have recommended that he
15 be put on an antidepressant or anxiolytic or both?
16  A.  Probably both.
17  Q.  And what about in the time leading up to
18 that, what about in the period between January and
19 March of 2004 when he is reporting increased pain and
20 difficulty sleeping, would you have recommended then
21 that he take an antidepressant or an anxiolytic?
22  A.  Well, for the record, he was on
23 Desipramine on 6/3/03.
24  Q.  I'm sorry, I'm talking about 2004.
25  A.  I'm sorry. Okay.

Page 589

1      Between what dates?
2   Q.  Between January and March when he's
3  reporting more pain and trouble sleeping and March 1
4  he's report -- contemplating suicide, according to
5  the police records. Do you believe he would have
6  benefitted from an antidepressant and anxiolytic at
7  that time?
8   A.  I don't see any diagnosis of depression,
9  and the only reference I see to something that
10 would require treatment is the daughter, Cindy,
11 mentioning suicide on March 1st.
12     So up until March 1st, I don't see any
13 evidence in the medical record that he was
14 depressed or that he -- at least they didn't record
15 it.
16  Q.  Yeah.
17     And I was going to say for that, you're
18 relying on your summary of the treatment records,
19 right?
20  A.  Right. And all the records that I read.
21 I mean -- and obviously I would have a flag for
22 anything that said depression. And I went back and
23 checked and double-checked and added some
24 depression/anxiety entries. I didn't see anything
25 in the first three months of 2004.

Page 606

1  MR. SOH: Objection. What date?
2  MS. McGRODER: The same date as the
3  preceding question, spring of 2003.
4  MR. SOH: Okay.
5  Q. He reported losing weight and a decreased
6  appetite, right?
7  A. Right.
8  Q. And his wife reports that she thinks he's
9  out of his mind with pain, correct?
10  A. Yes.
11  Q. And that's what the medical records state,
12  correct?
13  A. Correct.
14  Q. And do you agree that one of the options
15  for treatment of pain available to Mr. Smith in the
16  spring of 2003 was surgical intervention?
17  A. Yes.
18  Q. And Mr. Smith did have surgery following
19  his complaints of pain, depression, and anxiety,
20  right?
21  A. By Dr. McCombs on 4/1/03.
22  Q. Okay. When is the first time after surgery
23  on April 1, 2003 that Mr. Smith complained again of
24  pain?
25  A. About a month later, 4/30/03.

Page 607

1  Q. Okay. On April --
2  A. I'm sorry, 4/28 he also says severe leg
3  pain after church.
4  Q. Right.
5  And did you review the records of Dr.
6  McCombs with respect to that -- that call where he
7  reports pain after church?
8  A. Yes.
9  Q. And so -- did you note -- did you note in
10  that medical record that Mr. Smith said he was very
11  concerned about his pain?
12  A. Yes.
13  Q. And a few days later Mr. Smith's daughter
14  calls Dr. McCombs' office, right?
15  A. I don't know what the date was. I don't
16  have that down.
17  Q. I'm going to hand you now the -- the
18  records you've already got.
19  Look again at 36, McCombs.
20  A. Which page?
21  Q. They're in chronological order so you might
22  have turned to it. It's page 9, but I don't think
23  they're in Bates number order. It might not help
24  you.
25  A. Oh, okay.

Page 608

1  Q. If you start from the back, it's about five
2  pages in.
3  A. Okay.
4  Q. And down there in the bottom in the
5  handwriting it says -- these are the notes of Dr.
6  McCombs, right?
7  A. Right.
8  Q. Okay. It says May 2, 2003.
9  Do you see that?
10  A. Right.
11  Q. Spoke with patient's daughter. States
12  patient wishes he could die because of pain and
13  depression.
14  A. Right.
15  I've got that in my report.
16  Q. Okay. You just didn't have a date for it?
17  A. I have a date. I just didn't have it was
18  by the daughter.
19  Q. Okay. And the office tells the patient's
20  daughter to take the patient to the emergency room
21  for a psychiatric evaluation and treatment?
22  A. Right.
23  Q. Okay. And you noted that in your treatment
24  summary, right?
25  A. Right.

Page 609

1  Q. And that is significant to your opinions,
2  isn't it?
3  A. Right. They were concerned that he
4  mentioned depression, and they wanted him to get
5  evaluated.
6  Q. Well, they were concerned that he mentioned
7  that he wished he could die because of depression,
8  right?
9  A. Sure, depression and wished to die, which
10  is not clear that it's suicide, but it's certainly
11  a wish to die.
12  Q. You believe that's suicidal ideation, don't
13  you?
14  A. Not necessarily. I mean, maybe he wishes
15  his natural life would come to an end.
16  Q. If a patient wishes that his natural life
17  would come to an end and the way to make that happen
18  is by committing suicide, is that suicidal ideation?
19  A. Obviously, if that's the way to make it
20  happen.
21  Q. Well, can you think of any other way to
22  make it happen?
23  A. Live a little bit longer and you'll die
24  naturally, which is going to happen to everybody in
25  this room.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                   )
In re: NEURONTIN MARKETING,        )
SALES PRACTICES, AND PRODUCTS      )
LIABILITY LITIGATION,              )
_____)

VOLUME III

CONTINUED VIDEOTAPED DEPOSITION OF

RONALD Wm. MARIS, Ph.D.

(Taken by Defendant)

Columbia, South Carolina

Wednesday, October 1, 2008

Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR
Transcript produced by computer-aided transcription

## Page 649

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

RON ROSENKRANZ, Esquire
Finkelstein & Partners
1279 Route 300
Newburgh, New York 12551
(845) 563-9442
rrosenkranz@lawampm.com

and

KENNETH S. SOH, Esquire
The Lanier Law Firm
6810 FM 1960 West
Houston, Texas 77069
(713) 659-5200
kss@lanierlawfirm.com

ON BEHALF OF THE DEFENDANT PFIZER:

LORI CONNORS McGRODER, Esquire
JENNIFER M. STEVENSON, Esquire
ANGELA M. SEATON, Esquire
LORI SCHULTZ, Esquire
IAN LOSASSO, Esquire
(Appearing Via Telephone)
Shook, Hardy & Bacon, L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550
lmcgroder@shb.com
jstevenson@shb.com
aseaton@shb.com
lschultz@shb.com
ilosasso@shb.com

Also Present:

JAMES DOWNIE, CLVS, Videographer

## Page 650

CONTINUED VIDEOTAPED DEPOSITION OF RONALD Wm. MARIS, Ph.D., a witness called on behalf of the Defendant, before V. Dario Stanziola, CSR, RPR, CRR, held at the Columbia Marriott, 1200 Hampton Street, Columbia, South Carolina, on Wednesday, October 1, 2008, commencing at 9:54 a.m.

## Page 651

INDEX OF EXAMINATIONS

By Ms. McGroder                PAGE   652

INDEX OF EXHIBITS

| NUMBER | EXHIBIT | MARKED |
|---|---|---|
| Exhibit 39: | A photocopy of a Medline Plus article | 672 |
| Exhibit 41: | A fax cover sheet to John S. Allen, subject Richard Smith dated 9/23/08 with attachment | 757 |
| Exhibit 42: | Photocopy of Mr. Smith's suicide note | 764 |
| Exhibit 43: | Photocopy of a journal article entitled Suicide As Psychache: A Clinical Approach to Self-Destructive Behavior by Edwin Shneidman, Ph.D. | 770 |

## Page 652

THE VIDEOGRAPHER: This is beginning of Tape No. 1 in the deposition of Dr. Ronald Maris, Volume III. Today's date is October the 1st, 2008. The time on the monitor is 9:54 a.m. We're now on the record.

BY MS. McGRODER:

Q. Good morning, Dr. Maris.

A. Good morning.

Q. We're going to continue with the Smith case today, and in a minute we're going to go back to the record. Remember yesterday we started looking at his medical records, and we'll go back to that in a short second.

Dr. Maris, do you agree or disagree that it is unreliable to make a retrospective diagnosis of depression after suicide occurs?

A. I wouldn't say it's unreliable. I would say it's less reliable than doing it in the present. The problem, of course, with suicide is you have to have a person die before they become a suicide. And then you usually base your judgment, your diagnosis and the best available information, which is things like medical records.

But ideally, you want a living person in front of you answering questions rather than

Page 665

1  Do you remember that?
2  A. Yes, and I should say that what he just
3  said is what we've been hypothesizing,
4  stress-related pain.
5  Q. Okay. And at -- at this point, did you --
6  did you note whether Dr. Cato prescribes him an
7  antihypertensive medication?
8  A. I don't remember, but I wouldn't be
9  surprised. Can -- can you tell me so I know?
10 Q. Yes. Hold on.
11    MR. SOH: Dr. Maris, we've been trying to
12 move the deposition along a lot faster by not
13 having to pull out each individual medical
14 record when there's nothing in dispute, but if
15 you would like to look at a record, please
16 tell Ms. McGroder if you would like to look at
17 a record and she will provide it for you, but
18 we're trying to move this thing along.
19    THE WITNESS: And I've been trying to say
20 yes and no.
21    MR. SOH: Okay. Thank you, thank you,
22 Dr. Maris.
23 Q. If Dr. Cato's records reflect on
24 February 23 that he prescribed hydrochlorothiazide,
25 that you'd have no -- you'd agree that he was

Page 666

1  prescribing that for increased blood pressure, right?
2  A. I believe so.
3  Q. Okay. On February 25, 2004, Mr. Smith then
4  goes to see Dr. Mackey, right? No, I'm sorry. It's
5  a phone call he has with Dr. Mackey's office?
6  A. I'm sorry, which date?
7  Q. Excuse me. February 25, 2004?
8  A. Right, right.
9  Q. Okay. And in that phone discussion, they
10 talk about recent myelogram that Mr. Smith had,
11 right?
12 A. And a, quote, nonunion of the lumbar 4-5
13 discs.
14 Q. Okay. And is it your understanding that
15 that nonunion of the discs following the lumbar
16 laminectomy was one of the causes of Mr. Smith's
17 pain?
18 A. Of his sciatic pain, yes.
19 Q. Okay. And at that time the note reflects
20 that Mr. Smith is still having a lot of back and
21 radicular pain, right?
22 A. Right --
23 Q. Okay.
24 A. -- and knee pain.
25 Q. Okay. And he's also having pain in the

Page 667

1  legs, pain in the back, nerve pain, pain in the left
2  shoulder, and pain in his knees, right?
3  A. Right.
4  Q. Okay. The next visit is to -- again, to
5  Dr. Mackey on March 9th where Mr. Smith complains of
6  severe pain again, right?
7  A. Yes, I think that's the time he's in a
8  wheelchair.
9  Q. Okay. And you've made a note of that in
10 your treatment summary?
11 A. I did.
12 Q. Okay. And so Mr. Smith comes into see Mr.
13 -- Dr. Mackey with knee pain and worsening bilateral
14 leg pain, right? And -- and Dr. Mackey notes: The
15 pain has gotten to the point that he is getting
16 around in a wheelchair, right?
17 A. Right. As I read the depositions of the
18 family, that was at their insistence. He didn't
19 want to use a wheelchair. They were in a parking
20 lot. There was one right there. He was in a lot
21 of pain, so they said look, Dad, get in a
22 wheelchair. And so it was something fairly
23 transitory, but it was not something that he
24 particularly was doing all the time.
25 Q. Right. Well, do you think -- I mean, is

Page 668

1  your belief that Mr. Smith had a lot of pride?
2  A. Sure. I think -- I mean, I've been
3  there, done that myself. You don't want to go
4  around the airport in a wheelchair --
5  Q. Right.
6  A. -- around the parking garage. You want
7  to be your old self.
8  Q. And that bothered him to be in a
9  wheelchair?
10 A. Sure it did.
11 Q. And -- and he basically, according to the
12 deposition testimony, accepted the ride in a
13 wheelchair because his family, you know, encouraged
14 him to do that, right?
15 A. Exactly.
16 Q. Mr. Smith also reported at this visit that
17 he wasn't sleeping well, correct?
18 A. Right.
19 Q. Is it fair to say that his sleeping
20 problems had occurred at some point in advance of
21 this visit where he's reporting that he's been having
22 trouble sleeping?
23 A. Yes, I think I argued myself that there
24 was a long history of sleep disorder and cited
25 probably at least six to eight instances wherein

Page 669

1  the medical records he reports sleep disorder.
2  Q. And Dr. Mackey actually testified that
3  insomnia is typical of people with chronic pain,
4  right? Do you remember that testimony?
5  A. Yes.
6  Q. And Ruth Smith testified that Richard
7  Smith's problems sleeping came on in connection with
8  the increasing pain he had, right? Do you remember
9  that testimony?
10  A. And to the point that they started
11  sleeping in separate bedrooms because he was up --
12  he was so restless at night that she couldn't sleep
13  with him.
14  Q. Okay. Do you know when it was that they
15  started sleeping in separate bedrooms?
16  A. I don't remember, but I could go back and
17  look at the record.
18  Q. Okay. You would agree that Mr. Smith's
19  pain at -- at this time, on March 9th, was extremely
20  severe, correct?
21  A. Gosh, I wish I had that pain scale, but
22  it certainly was -- I don't know if I'd say
23  extremely severe, because that sounds like a nine
24  or ten instead of a seven or eight, and I don't
25  know if I have the evidence for that.

Page 670

1  Q. How about severe?
2  A. It was severe.
3  Q. Okay. And on the pain scale that you
4  looked at and perhaps made a note of, a seven was
5  excruciating pain, right?
6  A. Right, seven, eight is excruciating.
7  Q. Do you know whether Dr. Mackey raised the
8  possibility of surgery at this visit?
9  A. He said consider surgery and get a psych
10  evaluation for dementia, both.
11  Q. Okay. And so let's talk about the surgery
12  first. The note says that we discussed the
13  possibility of surgery. We are going to go ahead and
14  make him an appointment to see Dr. Everette Howell.
15  And you're -- you're aware that Dr. Howell
16  is a surgeon, right?
17  A. Yes.
18  Q. Okay. So at this point would you agree
19  that Mr. Smith had an expectation that surgery was a
20  possibility?
21  A. Yes.
22  Q. His daughter -- the note says that his
23  daughter, quote, raised the concern about whether or
24  not there are some other issues going on. And on the
25  basis of her concerns, Dr. Mackey recommended a

Page 671

1  psychiatric evaluation, right?
2  A. Right. She had actually called March 1st
3  and mentioned suicide ideation, which she
4  interpreted as suicide ideation. She called
5  Mackey's office for this March 9th visit, and that
6  was probably part of his phone records that the
7  daughter was concerned about him. And -- and any
8  time you mention suicide, they tend to get you to a
9  psychiatrist.
10  Q. And we talked about that yesterday, right?
11  A. Yes.
12  Q. And so Dr. Mackey's note -- or Dr. Mackey
13  in his deposition said that he made an appointment
14  for Mr. Smith to see a Dr. West.
15  Do you remember that testimony?
16  A. Yes, I do.
17  Q. And that Mr. Smith did not keep that
18  appointment or -- or go -- go to see Dr. West?
19  A. That's correct.
20  Q. Okay. Do you think that Mr. Smith had
21  reluctance to visit a psychiatrist at this time
22  because of the factors we talked about yesterday,
23  being an elderly white male, having pride, and maybe
24  being somewhat reluctant to get psychiatric care?
25  A. You know, it's hard to know. I think

Page 672

1  we're probably only speculating, because all we
2  know for a fact is that he was resistant to
3  psychiatric treatment. We have -- I have no way of
4  getting in his mind. I mean, I can speculate that
5  people don't want to be thought of as having
6  dementia or being unable to control their suicidal
7  impulses or whatever that he may have been
8  thinking. But I have no direct evidence what was
9  in his mind, just the fact that he didn't keep the
10  appointment.
11  Q. Okay. That's fair.
12  Do you believe that the recommendation to
13  see a psychiatrist at this point was based on both
14  suicidal ideation and concern about possible
15  dementia?
16  A. Yes.
17  Q. And what are some of the symptoms of
18  dementia, if you know?
19  A. Well, of course, I know. The most common
20  type of dementia is Alzheimer's type. And the
21  prominent characteristic of Alzheimer's type
22  dementia is memory impairment.
23  (Exhibit 39: A photocopy of a Medline
24  Plus article marked for identification, as of
25  this date.)

Page 673

1  Q.  We're marking as Exhibit 39 a Medline Plus
2  reference to the symptoms and definition of dementia,
3  just for your reference, Dr. Maris. And I just kind
4  of wanted to ask you about a couple of these. If you
5  -- if you turn to page 2, it gives a list of
6  symptoms, and the first one is progressive memory
7  loss.
8      That's what you just talked about, right?
9  A.  Right.
10  Q.  And some of the others listed here are
11  inability to concentrate, correct?
12  A.  Correct.
13  Q.  Decrease in problem-solving skills and
14  judgment capability?
15  A.  True.
16  Q.  Confusion, severe, correct?
17  A.  True.
18  Q.  Further down it says altered sleep
19  patterns, insomnia, right?
20  A.  Right.
21  Q.  And motor system impairment, right?
22  A.  Right.
23  Q.  You know this lists apraxia.
24      What is apraxia?
25  A.  It just says, impaired motor function.

Page 674

1  Q.  Oh, overall?
2  A.  Yeah --
3  Q.  Okay.
4  A.  -- impaired skilled motor function.
5  Q.  Okay. And -- and down below there it says
6  inappropriate movements, right --
7  A.  Yes.
8  Q.  -- under gait changes?
9  A.  Right.
10  Q.  Gait means ability to stand and walk.
11      Would that be accurate?
12  A.  Sure. We used to say that the hospital
13  patients on Thorazine did the Thorazine shuffle
14  because they walked -- their gait was different.
15  Q.  Yep.
16      I've -- I've seen that too.
17  A.  Have you seen it?
18  Q.  Um-hum, back in my nursing days.
19      Disorientation is one of the symptoms
20  reported with dementia, right --
21  A.  Yes.
22  Q.  -- and disorders of problem-solving or
23  learning, right?
24  A.  Right.
25  Q.  Okay. Anyway, is your understanding that

Page 675

1  something in the nature of these symptoms were being
2  reported on March 9th and that's why Dr. Mackey made
3  the note that he ought to have a psych consult and
4  used the term dementia?
5  A.  It certainly covers a lot of issues that
6  could be of concern.
7  Q.  Okay. The next visit is on March 24, 2004,
8  to Dr. McCombs, correct?
9  A.  Correct.
10  Q.  And at this point Dr. -- or the nurse
11  practitioner Krancer sees Mr. Smith, correct?
12  A.  Right.
13  Q.  And she recommends that he come back in a
14  week and see Dr. McCombs because he's in so much
15  pain, right?
16  A.  Right.
17  Q.  And the note says that he's again having
18  bilateral leg pain that radiates down his buttocks,
19  perennial area, anterior part of thigh and down to
20  his knee, right?
21  A.  Right.
22  Q.  And it also says he's having difficulty
23  with standing and ambulation, right?
24  A.  Right.
25  Q.  And I see that you're making a few notes.

Page 676

1  A.  Sure.
2  Q.  I'm glad we didn't already copy that for
3  the record.
4      What are you -- what are you adding there?
5  A.  I just added leg -- leg pain.
6  Q.  Oh, okay.
7      And was there any discussion of surgery
8  that you -- that you remember at this -- at this
9  point?
10  A.  Well, the very next note I have is more
11  surgery is not helpful. So shortly thereafter
12  there was a determination, even though they thought
13  about it for a week that he was not a candidate for
14  surgery.
15  Q.  The fact at this visit on March 24th that
16  Mr. Smith is having difficulty with standing and
17  ambulation and, you know, continuing pain, is that an
18  indication to you that the conservative treatment he
19  had really wasn't working for him?
20  A.  Yes.
21  Q.  I just wanted to show you one thing in the
22  McCombs record, if I can find it, and then we can
23  move on.
24      This is a demonstration of why I didn't
25  want to go through each of the records one by one.