# EXHIBIT 6
# (PART V)

1  Sorry that took so long.
2       If you look at this -- this is Exhibit 36.
3  These are the McCombs records. And if you look at
4  the note on March 24, 2004, at the bottom of the
5  first paragraph Nurse Krancer writes, haven't -- she
6  -- she writes that he should have an epidural steroid
7  injection and start Neurontin, correct?
8       A. Right. Let me make sure I read it
9  better. Okay. I see it. He is taking Advil,
10  Neurontin, Lortab.
11      Q. Right. But you're looking at the May 5
12  note. If you look up at the very top of that page --
13      A. Oh, typed?
14      Q. Yes, at end of her first paragraph there?
15      A. Yes.
16      Q. And you see that's -- that note is signed
17  by Nurse Krancer, at least the initials are --
18      A. Right.
19      Q. -- P.K.?
20      A. And isn't she like an advanced practice
21  nurse and has the ability to prescribe?
22      Q. Yeah, she's a nurse practitioner with the
23  ability to prescribe.
24          And it says, you know, something about
25  having an epidural steroid injection. Sorry, I can't

1  find my copy of the note.
2          It says: I have discussed at length a
3  treatment plan. He will have an epidural steroid
4  injection and start Neurontin 300-milligram PO/TID.
5  He will follow up with Dr. McCombs. And he will also
6  have an EMG per Dr. Clinton.
7          You see that note?
8       A. I do.
9       Q. I think that you discussed yesterday your
10  belief that he started Neurontin on March 9, 2004,
11  right?
12      A. At a certain dose, yes.
13      Q. Okay. And -- and is it -- is it your
14  belief that at this point Nurse Krancer is having him
15  start Neurontin?
16      A. No, she's increasing it 300 milligrams a
17  day. I mean, the --
18      Q. TID?
19      A. TID, from BID to TID.
20      Q. Okay.
21      A. My understanding was that on March 4th,
22  Dr. Mackey gave him a script for 300 milligrams
23  BID, that the family drove straight to Eckerd's per
24  Ruth's testimony. He filled it and he took it
25  until March 24th in which case Krancer and McCombs

1  said we want you to take 300 milligrams TID.
2       Q. Okay.
3       A. That's my understanding.
4       Q. All right. And if you look in the middle
5  of this paragraph, same paragraph, it says -- excuse
6  me -- he went to see Dr. Mackey and Dr. Howell.
7          Both Dr. Mackey and Dr. Howell are
8  surgeons, right?
9       A. Right.
10      Q. And it says after they worked him up, they
11  would not see him, because he would not let them do
12  his initial surgery, right?
13      A. Right.
14      Q. Is it your understanding that that is the
15  information that Mr. Smith is reporting to Nurse
16  Krancer on this visit?
17      A. Somebody is. I'm not sure if his wife is
18  there, but somebody told Nurse Krancer this.
19      Q. Okay?
20      A. And he was accused of doctor shopping,
21  and some of the doctors said we're not going to
22  treat you if you keep doing this. You made an
23  appointment -- we talked about this yesterday --
24  you canceled it, you rescheduled it, we can't keep
25  having this happen. So it sounds like something

1  that Ruth and he both could have talked about.
2       Q. Okay. And do you think at this point when
3  he's told that -- or at least somebody in the family,
4  and Mr. Smith is obviously present, is reporting that
5  these surgeons wouldn't see him because he wouldn't
6  let them do his initial surgery, that -- that that
7  contributed to a feeling of hopelessness for
8  Mr. Smith?
9       A. It's possible. I mean, you know, he
10  still said, I don't want any surgeon to cut on my
11  body in his note. So he was not -- he was not
12  feeling hopeless because of not being able to get
13  surgery. He, in fact, said I don't want anymore
14  surgery.
15          So it's hard to know exactly what he was
16  thinking. I don't think he felt frustrated that he
17  couldn't get more surgery. Although, in fact, he
18  had -- some of his providers would not provide
19  surgical solutions.
20      Q. Do you think the family felt frustrated
21  that he -- that he wasn't able to see surgeons at
22  this time?
23      A. I think there's some notes in the
24  depositions that they felt that the surgery was the
25  only thing that would really make him feel better.

Page 681

1  So they probably did feel frustrated.
2     Q. You think they were encouraging him to try
3  to get in the with the surgeon and see if this could
4  resolve him of his pain issues?
5     A. I suspect so from what I read in the
6  depositions.
7     Q. And so after Nurse Krancer recommends that
8  Mr. Smith come back to see Dr. McCombs in a week
9  because he was hurting so badly, he comes back on
10 March 31, 2004, correct?
11    A. Right.
12    Q. And he sees Dr. McCombs on this visit,
13 right?
14    A. Right.
15    Q. And Dr. McCombs states in the record: The
16 patient returns to the office today in follow up. He
17 was seen by an orthopedist who sent him to Dr. Mackey
18 who ordered a myelogram study --
19    A. Right.
20    Q. -- and Dr. Mackey did not feel that the
21 patient needed additional surgery?
22    A. Right.
23    Q. And further down this note says: He is not
24 a candidate for any type of operative intervention,
25 right?

Page 682

1     A. Right.
2     Q. And -- and it says he will be treated
3  conservatively?
4     A. Right.
5     Q. And then he is instructed to take
6  ibuprofen, 600 milligrams TID, and got a prescription
7  for Lortab --
8     A. Right.
9     Q. -- which is the hydrocodone we've talked
10 about, right?
11    A. Right.
12    Q. In the past, in 2003, before his lumbar
13 laminectomy surgery, when Mr. Smith took Lortab, it
14 didn't help him, did it?
15    A. No.
16    Q. Do you -- do you agree that when Mr. Smith
17 is told at this time that he's no longer a candidate
18 for any type of operative intervention that -- well,
19 first, do you agree that's different from what
20 occurred in 2003?
21    A. Yes, and certainly is different.
22    Q. Do you believe that at this time when he's
23 told, you know, surgery to help resolve your pain is
24 not an option for you, that that contributed to a
25 feeling of hopelessness in Mr. Smith?

Page 683

1     A. It could. On the other hand, the record
2  clearly shows that he had another appointment the
3  day of his death with a neurosurgeon. So he hadn't
4  given up hope of getting a surgical resolution.
5     Q. Well, is your opinion in this case that he
6  wanted to have surgery or he didn't want to have
7  surgery?
8     A. I think he wanted to -- to get rid of the
9  pain, and he was highly ambivalent, because the
10 speculation was either that he'd never get rid of
11 the pain or that he'd have to have surgery. And as
12 he said in his suicide note, I talked to got God,
13 and I don't want anybody to cut on my body, which
14 is the holy temple anymore.
15       And that's one of the reasons -- main
16 reasons they didn't do the autopsy. But the fact
17 is he did have another appointment with a
18 neurosurgeon at Vanderbilt the day that he died
19 from suicide. So if he was totally hopeless, I
20 don't know why he would have made that appointment.
21    Q. Well, you know, given what he wrote in his
22 suicide note, I don't want to be cut on anymore, do
23 you think at some point leading up to the suicide he
24 resolved in his mind that he did not want to have
25 surgery?

Page 684

1     A. Well, certainly that's what it says. He
2  says I've -- I've got all -- he goes through a
3  laundry list of where he hurts.
4     Q. Yeah, and we'll go over it.
5     A. Yeah. And basically, he says I need
6  surgery for this stuff, but I don't want to be cut
7  on anymore. But then why did he make the
8  appointment with Cheng.
9     Q. Well, would you agree with me that at least
10 on May 12th when he -- or the early hours of May 13
11 when he wrote the suicide note, he resolved in his
12 mind that he didn't want to have surgery anymore?
13    A. He said he needed it and he didn't want
14 it, yes.
15    Q. Excuse me.
16       The next appointment that Mr. Smith --
17 well, do you -- do you recall reading in the
18 testimony of Ruth Smith that Mr. Smith was told at
19 this time that he was going to have to learn to
20 manage his pain?
21    A. I remember something very -- like that,
22 yes.
23    Q. Would you agree with me that learning to
24 manage -- that the concept of learning to manage pain
25 for Mr. Smith was difficult?

10 (Pages 681 to 684)

Page 689

1  many now --
2    A.  Can I answer some of them?
3    Q.  Yes, yeah exactly.
4        Can you answer the one I just asked you
5  about the difference between a trigger and a tipping
6  factor?  And then we'll get back to the hypothetical.
7    A.  I don't think there is any significant
8  difference.  I think when I say trigger and tipping
9  factor, I mean the same thing.  But I'm just saying
10 that I don't using use tipping just for drugs and
11 trigger for other things.  They're both -- you
12 know, there could be a drug trigger factor.
13   Q.  Okay.  But in -- in the information you
14 published on triggers, you have a broad category of
15 triggers, right?
16   A.  Let's be really clear on the record.  I
17 don't particularly believe in triggers.  I think
18 that a very small number of suicides, for example,
19 drug cases, are exceptions.  Most people like you
20 described would not kill themselves.  And, for
21 example, when I read Doug Jacobs' expert report,
22 it's true, most people on gabapentin don't kill
23 themselves.
24       Most of the people who have chronic pain
25 don't kill themselves.  Most people who have all

Page 690

1  the risk factors, all 15 of my risk factors, do not
2  kill themselves.  So in some case, the vast
3  majority of suicides do not have a trigger.  It's
4  only that this kind of background or set of
5  suicidal career risk factors and protective factors
6  makes a person be part of that vulnerable minority
7  or subset of patients who are vulnerable to some
8  sort of a trigger.
9    Q.  Okay.  I have so many questions about that.
10   A.  Okay.
11   Q.  But before we go there, let's get back to
12 the hypothetical.  Well -- well, first, let me back
13 up.
14       What you just said, when you said only that
15 this set of factors makes a person be part of a
16 vulnerable minority or subset of people who do commit
17 suicide, your reference there is to a prescription
18 medication, right?  Your reference there --
19   A.  Not necessarily.
20   Q.  Okay.
21   A.  That's one of the kinds of things that
22 can push -- I'm trying to create an image of a
23 person on the edge of a suicidal precipice.  What
24 could knock them off could be -- I had a case up in
25 Asheville where a guy shot himself, lost his face,

Page 691

1  recovered.  And they came in and said you're --
2  you're okay, you're going to live, but you've got
3  two brain tumors and we have to take those out.
4        COURT REPORTER:  He's got what?
5        THE WITNESS:  Two brain tumors.
6    A.  And he got his belt out and hung himself
7  later that day.  I mean, it wasn't a drug reaction.
8  It was two brain tumors on top of I blew my face
9  away and thought I was going to die.  That kind of
10 thing could also be a trigger.
11   Q.  When that gentleman shot himself in the
12 head but lived, was he on a prescription medication
13 that you blamed for the suicide?
14   A.  His -- his name was John, and I don't
15 remember the details enough.  I think -- I think he
16 -- I hate to misspeak, because it's been many years
17 ago.  But I know he had an elevated depression
18 score on MMPI-2.  Whether or not they actually
19 treated it is unclear, and that's important if they
20 tried to treat his depression.
21   Q.  Because if he hadn't had treatment for
22 depression, that would increase his risk of suicide,
23 right?
24   A.  Sure, sure.
25   Q.  Okay.  So what are these -- I mean, when

Page 692

1  you say you're trying to create an image of a person
2  on the edge of a suicidal precipice, let's say that
3  person who's on the edge of a suicidal precipice is
4  not taking Neurontin.
5        What -- what are -- what are those factors
6  that are going to put push that person over the edge?
7    A.  There are a number of factors.  Sometimes
8  just the set that you listed in your hypothetical
9  are sufficient themselves to push him over the
10 edge.  So I'm not denying that all the risk
11 factors, that both the hypothetical and Richard
12 Smith had, could be enough.
13   Q.  It's just that in Mr. Smith's case he was
14 on Neurontin, so that was the tipping factor?
15   A.  Well, it wasn't just that.  It was a
16 dramatic demonstrated, in my mind, trigger which
17 has a causal mechanism, which affects depression,
18 which is a major correlate of suicide outcome and
19 in a person who had lived with these risk factors
20 for many years.  You have to ask yourself, why now?
21 Why now?  Why not -- why not earlier when he had a
22 laminectomy and it didn't work?  So --
23   Q.  And so the -- and so the "why now" question
24 is the reason why you would attribute the suicide to
25 Neurontin?

12 (Pages 689 to 692)

Page 693

1    A.  That's certainly one of the major
2    factors.  You know the law, post hoc ergo propter
3    hoc.  It was just after he took the Neurontin and a
4    significant amount of that, before he had all these
5    risk factors that you described before his
6    laminectomy in '03, and he didn't kill himself.
7        Q.  Now, I want to ask you, you said twice.
8    You said once he had a large amount of Neurontin
9    before he killed himself, and now you just said he
10   had a significant amount of Neurontin before he just
11   killed himself.
12       You're not suggesting he took a lot of
13   Neurontin on the day before he killed himself?
14       A.  Not at all.
15       Q.  You're talking about normal usage?
16       A.  I'm talking about the normal usage that I
17   described.  My best estimate of how much Neurontin
18   he had is in my report, 67 days, some of those days
19   BID, near the end TID, leftover samples, wife saw
20   him take it, maybe missed a couple of times.
21       So I don't know exactly, but he had a
22   significant opportunity to have a new factor, which
23   I think is suicidogenic, which could easily, could
24   easily make him unable to cope, could easily make
25   him write a suicide note like that.

Page 694

1        Q.  Is your testimony that Neurontin made
2    Mr. Smith write his suicide note?
3        A.  That's a little much of a stretch, but I
4    think certainly it causes impulse control
5    deregulation.
6        Q.  Is your testimony that Neurontin caused his
7    suicide and his suicide was impulsive?
8        A.  I think it was partly impulsive, because
9    I think that in the literature that I looked up --
10   for example, I had Brown, et al., in my -- in my --
11   in my Assessment and Prediction of Suicide book, I
12   asked them to address this question:  What happens
13   in animals and in human beings if you have
14   serotonergic dysfunction?  Do they become more
15   impulsive?  Do they become more aggressive?  Do
16   they become more suicidal?  And the answer was an
17   unequivocal yes.  So that any drug that disrupts
18   the serotonergic system contributes to impulsivity.
19       Q.  Doctor, first, we talked yesterday for a
20   long time about Mr. Smith's Neurontin ingestion and
21   what you wrote in your report about it and whether
22   there was evidence that the family ever observed
23   Mr. Smith actually take his drugs.  And you answered
24   questions for a long time yesterday about that.
25       The answer you just gave is not meant to

Page 695

1    replace or change the answers you gave yesterday, is
2    it?
3        A.  No, I think it -- I think I said the same
4    thing I said yesterday.
5        Q.  Okay.  But -- but what I want -- yesterday
6    you said that -- well, I'm not going to debate with
7    you what you said.
8        All I want to know is, is the answer that
9    you just gave right now, that is not meant to replace
10   the answers you gave yesterday when we went over the
11   -- at length your opinion about Mr. Smith's ingestion
12   of Neurontin?
13       MR. ROSENKRANZ:  Objection to form.
14       A.  Correct.
15       Q.  Okay.
16       A.  I stand by what I said yesterday, and
17   it's all in my report.
18       Q.  Okay.  And if you turn to page 22 of your
19   report, this is your -- these are your 15 factors
20   that you mentioned in your answer just a bit ago?
21       A.  Yes.
22       Q.  And number 13 is anger, aggression,
23   impulsivity and irritability, correct?
24       A.  Right.
25       Q.  And you write no?

Page 696

1        A.  That's wrong.  That -- that was from the
2    psych autopsy.  I didn't -- I'm -- I'd be
3    interested to go back and look at the psych autopsy
4    and see if I didn't correct Michelle Faye, because
5    she wrote that, and I went on her evidence.  But
6    that's absolutely wrong.  It should have another
7    risk factor based on that.  That's wrong.
8        Q.  So that's wrong.  Today, your testimony
9    today, you want to change that answer?
10       A.  It's wrong.
11       Q.  What else is wrong in your report,
12   Dr. Maris?
13       MR. SOH:  Objection.  Argumentative.
14       A.  How would I know?  Let me look at the
15   autopsy and make sure I didn't question it in the
16   autopsy.
17       Q.  So you wrote this --
18       A.  One thing at a time.  You're rushing me.
19       Q.  Can I ask you while you're looking?
20       A.  I'd rather you wouldn't.  I'd like to
21   concentrate.
22       THE VIDEOGRAPHER:  Five minutes.
23       A.  Okay.  I see what the problem is here.
24   And page 32, question 7513 of the autopsy, the
25   questions related to impulsivity were not related

13 (Pages 693 to 696)

Page 697

1  to Neurontin. They were: Does the decedent
2  typically have a temper and be angry? The answer
3  is no. Is the person aggressive, typically? No.
4       Does the person meet the criteria for a
5  DSM-IV impulse control disorder, intermittent
6  explosive disorder, cleptomania, pyromania,
7  pathological gambling, trichotillomania or not
8  otherwise specified? No.
9       So the answer based on that evidence had
10  to be no. But since this issue was raised, and it
11  was raised specifically in Trimble's deposition, I
12  went out and got some more literature from my study
13  of serotonergic dysfunction. And based on that,
14  and I can give you a copy of the article, it's yes.
15      Q. Well, so let me get this straight.
16      You wrote your report in December of 2007,
17  right?
18      A. Right.
19      Q. And on the front of your psychological --
20  psychological autopsy, you -- you reviewed that in
21  June of 2007, right? You reviewed the psychological
22  autopsy --
23      A. Yes.
24      Q. -- in June of 2007, right?
25      A. Yes, yes, yes, yes.

Page 698

1      Q. Then you wrote your report in December of
2  2007 relying on that psychological -- psychological
3  autopsy, right?
4      A. Right.
5      Q. Then yesterday you told me you went back
6  over that psychological autopsy and you made changes
7  in it and you corrected all the things that were
8  wrong in the psychological autopsy, correct?
9      A. I didn't say that. I said I corrected
10  many of the things that I found were wrong. This
11  is one I missed.
12      Q. Okay. So now you -- do you want to correct
13  some more things in the psychological autopsy?
14      A. I just did.
15      Q. Is there anything else that you want to
16  change in your psychological autopsy as we sit here,
17  because I need to know what your opinions are. Two
18  things, Dr. Maris, I need to know every change you
19  want to make to your psychological autopsy today and
20  -- so let's get it out.
21      A. Well, this is it. And this is -- this is
22  a big one. This is something that I did after I
23  read Trimble, which was very recent. Here's the
24  article I'm referring to.
25      Q. That article doesn't even relate to

Page 699

1  Neurontin?
2      A. Sure does.
3      Q. What's the name of the article?
4      A. Impulsivity, Aggression, and Associated
5  Affects. Some literature suggests a serotonergic
6  trait. This trait includes --
7      Q. Well, who's the author of that article,
8  Dr. Maris?
9      A. Gerald Brown, Frederick Goodwin, and
10  Markku Linnoila at NIH.
11      Q. Does the word Neurontin appear in the
12  article by Brown and Goodwin?
13      A. No.
14      Q. Right.
15      And -- and so after you --
16      A. You going to tell me what's relevant to
17  -- to my testimony?
18      Q. Are you asking me a question?
19      A. Yes.
20      Q. Would you like to take my deposition?
21      A. No, but I'm saying I think this is
22  relevant.
23      Q. Well, all I'm telling -- all I'm asking
24  you, Dr. Maris, is does the word Neurontin appear in
25  the article that you just cited from Brown and

Page 700

1  Goodwin?
2      A. No, it does not.
3      Q. Okay. And the reason why you want to
4  change your answer on impulsivity in your report is
5  because you read the deposition of Dr. Trimble where
6  he suggests that the suicide of Mr. Smith was
7  impulsive, correct?
8      A. That's part of it. I read a whole host
9  of evidence since December, and there were new
10  issues that evolved. I would have been totally
11  derelict if I didn't update my report to be
12  consistent with the new evidence and facts that I
13  read. Why read it if it -- if it isn't relevant.
14      Q. Let's talk about that.
15      MS. McGRODER: First, object and move to
16  strike everything after "that's part of it."
17      Q. You had the opportunity after you wrote
18  your original report in December to reread it and
19  make changes on it and make notes all over it before
20  you came to this deposition today, right?
21      A. Which I did.
22      Q. And you did that.
23      And you didn't change the impulsivity
24  answer that you gave with respect to your 15 risk
25  factors until this very moment when I asked you the

14 (Pages 697 to 700)

Page 701

1  question, right?
2      A.  Right.  This was --
3      Q.  You also had a chance --
4          MR. SOH:  He didn't finished.  He didn't
5  finish.
6      A.  I'm not finished.  This was received
7  September 24, 2008.
8      Q.  This being Trimble's deposition?
9      A.  Yes.
10     Q.  Okay.  Fine.
11     A.  This is where the issue came up.
12     Q.  I'm moving on now.  I'm asking you a new
13  question.
14         And the question is, you also took the
15  opportunity before your deposition today, last
16  Friday, to create an addendum to your report,
17  correct?
18     A.  That's correct.
19     Q.  Yeah.  And did you -- did you decide on
20  Friday of last week that Mr. Smith's suicide was
21  impulsive?
22     A.  I always thought it was impulsive.  This
23  was another dimension of the issue.
24     Q.  Tell me where else in your report, which is
25  marked as Exhibit 6, where else do you say in that

Page 702

1  report that Mr. Smith's suicide was impulsive?  Is
2  there anywhere in that report aside from the change
3  you just made now where you say that Mr. Smith's
4  suicide was impulsive?
5      A.  The question was whether or not I always
6  thought it was impulsive, not what I wrote in my
7  report.
8      Q.  I didn't ask you that question.  My
9  question --
10     A.  That's what I said.
11     Q.  -- well, my question isn't about what you
12  thought.  My question is about what you wrote.
13         Show me in your report where you wrote that
14  Mr. Smith's suicide was impulsive.
15     A.  I didn't.  I wrote other things that
16  indicate that.
17     Q.  What did you write that indicates that in
18  your report?
19     A.  Suicides are often under the influence of
20  the depressive disorder.
21     Q.  Now, you're not looking at your report, Dr.
22  Maris.  I'm talking about Exhibit 6.
23     A.  Depressive disorder.
24     Q.  Excuse me.
25         Do the words impulsivity or impulse appear

Page 703

1  in the line number 1 under your risk factors on page
2  22 of your report that says depressive mental
3  affective disorder?
4      A.  No.
5      Q.  Now, I would like for you to get out your
6  psychological autopsy.
7          THE VIDEOGRAPHER:  Three minutes.
8          MS. McGRODER:  And we're going to take a
9  short break to change the tape.  I'd like for
10  you to look at that psychological autopsy
11  during the break.  When we come back --
12         THE WITNESS:  So I can't take a break.
13         MS. McGRODER:  No.  No, we are taking a
14  break.  And I want you to tell me anything
15  else that you want to change in that
16  psychological autopsy after the break, okay.
17         THE WITNESS:  Okay.
18         MS. McGRODER:  Thanks.
19         THE VIDEOGRAPHER:  This is the end of
20  Tape No. 1 to the deposition of Dr. Ronald
21  Maris, Volume III.  The time is 10:55 a.m.
22  We're now off the record.
23         (A BRIEF RECESS WAS TAKEN.)
24         THE VIDEOGRAPHER:  This is the beginning
25  of Tape No. 2 in the deposition of Dr. Ronald

Page 704

1  Maris, Volume III.  The time is 11:13 a.m.
2  We're back on the record.
3  BY MS. McGRODER:
4      Q.  Dr. Maris, did you look at your
5  psychological autopsy over the break?
6      A.  No, there's nothing else I want to
7  change.
8      Q.  So your psychological autopsy is now in
9  it's final form, and you will not be making any more
10  changes to it?
11     A.  Correct.
12     Q.  Okay.  And are you relying on that
13  psychological autopsy for your opinions in this case?
14     A.  Sure.
15     Q.  Now, is there any kind of hallmark or
16  signature element to a suicide with Neurontin?
17         MR. ROSENKRANZ:  Objection.
18     Q.  Let -- let me rephrase.
19         Is there any hallmark or signature element
20  to a suicide that is, in your belief, caused by
21  Neurontin?
22     A.  Well, I think the -- first of all, it's
23  very early in the -- in the consideration of this
24  issue.  I've only looked at four cases.  So it
25  would be somewhat unscientific for me to talk about

Page 705

1  hallmarks based on four litigation cases. I've
2  looked, as you know, at Smith and Bulger and
3  Shearer and Crone.
4      I realize there are many other cases, but
5  I haven't been provided with those case files. So
6  I'd -- I'd be reluctant to generalize based on a
7  few non-random cases. However, I can talk about
8  the traits of Neurontin as a GABA being an
9  inhibitor of serotonin and norepinephrine, and I am
10  relying on Trimble and Kruszewski and the other
11  peer-reviewed journal articles that I've provided
12  you.
13      Q.  Are those the ones we talked about
14  yesterday?
15      A.  Yes, they are.
16      Q.  The stack where I identified the list of
17  articles that you brought yesterday, right?
18      A.  That's correct.
19      Q.  Okay.
20      A.  And also, in my general model, I'm adding
21  mechanisms of non-neurobiological/neurochemical
22  relations of certainly Richard Smith who was taking
23  Neurontin, and looking at social factors and
24  psychological factors and psychiatric factors in
25  addition to biochemical mechanisms.

Page 706

1      So I'm -- I'm prepared to talk about what
2  I think Neurontin did in the case of the ones I've
3  looked at in detail, but I think it would be
4  premature and unscientific to try to talk about a
5  hallmark in Neurontin cases.
6      Q.  Well, the fact is, Dr. Maris, that you've
7  been looking at Neurontin as an -- as an issue in
8  terms of generally can Neurontin cause suicide since
9  2004.
10      That's what you told me yesterday, right?
11      A.  Yes, I've been looking at the issue for
12  that long, sure.
13      Q.  And in all of that time since -- in 2004,
14  in 2005, in 2006, in 2007, and now we're in
15  October 2008, you've not been able to identify any
16  sort of hallmark or signature element to a suicide
17  with Neurontin, have you?
18      A.  I have not attempted to do that and I
19  have -- I have looked at some unique features in
20  the cases that I have looked at in detail.
21      Q.  And -- and tell me today, Dr. Maris, do you
22  believe there are unique features or hallmark
23  elements to suicides by Neurontin, suicides caused by
24  Neurontin?
25      A.  I think it tends to be a -- more of a --

Page 707

1  an acute factor as opposed to the chronic suicidal
2  career. So it tends to be the hallmark -- one of
3  the hallmark characteristics as being acute.
4      Q.  And so the person would not have a suicidal
5  career and that's -- that's the hallmark element of
6  suicide by Neurontin?
7      A.  That's not what I said. What I said was
8  in addition to a long chronic suicidal career, you
9  have acute factors of -- I'm saying it right now.
10      Q.  Yeah, but that's not what you said.
11      A.  Acute factors of ingestion of Neurontin.
12      MS. McGRODER: Okay. Can you read back
13  his answer? Not that one, but the one before.
14      (THE ANSWER WAS READ BACK.)
15      MR. SOH: That doesn't sound right. What
16  do those dashes mean? I'm sorry. What do
17  those dashes mean?
18      COURT REPORTER: When he changes his
19  thought.
20      MR SOH: Oh. Oh, okay.
21      Q.  Are there any other acute factors other
22  than ingestion of Neurontin that are of the hallmark
23  or the unique feature of a Neurontin -- a suicide
24  caused by Neurontin?
25      A.  Well, again, with the caveat that I --

Page 708

1  I'm only talking about this because you've asked me
2  to talk about it. I said it was somewhat
3  inappropriate based on four cases. But in the
4  cases that I have seen, this most significant
5  thing, of course, is that there is the context of a
6  long suicidal career, superimposed -- which are
7  chronic factors, risk and protective factors.
8      Superimposed on that is the recent
9  ingestion of Neurontin, which I argue affects
10  depression, affects impulse control, because of its
11  consequences on the monoamines of serotonin and its
12  metabolites and norepinephrine.
13      Q.  Anything else?
14      A.  No.
15      Q.  Couple of follow-up questions.
16      When you say long suicidal career, what is
17  long?
18      A.  Well, of course, long is a relative term,
19  but I'm saying that most suicides, for example, are
20  older white males in the West in the United States.
21  They tend to suicide in their 60s and 70s. So
22  there are at least decades involved. Can a
23  adolescent have a suicidal career? Sure, but it's
24  usually shorter and there often are more acute
25  factors rather than chronic factors.

16 (Pages 705 to 708)

Page 717

1  than there would be in the healthy -- sometimes
2  they use the phrase healthy volunteers.
3        They wouldn't have depression. They
4  wouldn't have prior suicide attempts. They
5  wouldn't have chronic pain and physical illness.
6  So I think it's very clear to the jury that some
7  people can be more likely to suicide completely
8  apart from Neurontin and that their coping can be
9  fairly fragile and their equilibrium can be fairly
10  fragile.
11        MS. McGRODER: Object and move to strike
12  as non-responsive.
13        MR. ROSENKRANZ: I thought it was exactly
14  responsive.
15        Q.  Is your answer -- does your answer mean I
16  won't know who the vulnerable subpopulation is until
17  they actually commit suicide and bring a lawsuit in
18  which you're testifying?
19        MR. SOH: Objection.
20        MR. ROSENKRANZ: Objection.
21  Argumentative --
22        MR. SOH: Argumentative.
23        MR. ROSENKRANZ: -- and to form.
24        A.  No, that's not my position. And I
25  thought my position was very clear.

Page 718

1        Q.  It's not clear.
2        MR. ROSENKRANZ: Objection.
3        Q.  I don't know, as I sit here, based on your
4  answer, Dr. Maris, how I'm going to identify, or
5  anyone would, the individuals that -- and you've used
6  this term all day yesterday, all day the day before,
7  vulnerable subpopulation of individuals or vulnerable
8  minority of individuals.
9        I won't -- how am I to know who they are?
10  And as I understand your answer, you're saying
11  they're anyone who has suicide risk factors and who
12  takes Neurontin?
13        MR. ROSENKRANZ: Are we summing up --
14        Q.  Is that -- is that correct or incorrect?
15        MR. ROSENKRANZ: Objection to the form.
16  Argumentative, and I don't know what else,
17  just a whole number of factors.
18        MS. McGRODER: Objection to form is fine.
19        MR. ROSENKRANZ: A whole slew -- at least
20  15 factors that I can think of as to why that
21  question was objectionable.
22        MS. McGRODER: Objection to form is fine.
23        You may answer the question.
24        A.  I -- I think I have answered the
25  question. The best you can do hypothetically and

Page 719

1  generically is to talk about risk and protective
2  factors. People that have a lot of risk factors
3  within their population subset, and they vary, and
4  few protective factors, are more vulnerable. And,
5  of course, there could be -- there could be
6  specific things like enzyme abnormalities where
7  you're a slow and fast metabolizer. There are lots
8  of things that can go into specifying who's
9  vulnerable.
10        Q.  Could you actually identify which
11  individuals who take Neurontin are vulnerable?
12        A.  I can certainly put people in high risk
13  groups.
14        Q.  And on what basis would you put them in a
15  high risk group?
16        A.  Risk factors.
17        Q.  Your 15 risk factors?
18        A.  And plus others. I would use others.
19  Fifteen is not magical. This happens to be the top
20  empirical factors.
21        MS. McGRODER: Let's take a break.
22        THE WITNESS: We just took a break.
23        MS. McGRODER: We're taking another one.
24        THE VIDEOGRAPHER: The time is 11:32 a.m.
25  We're now off the record.

Page 720

1        (A BRIEF RECESS WAS TAKEN.)
2        THE VIDEOGRAPHER: The time is 11:44 a.m.
3  We're back on the record.
4  BY MS. McGRODER:
5        Q.  Doctor, are you comparing an anaphylactic
6  shock reaction from eating peanuts or shellfish,
7  which are known to be highly allergenic to some
8  people and, of course, resulted in a immediately,
9  objectively, observable response to suicide caused by
10  Neurontin?
11        A.  No.
12        Q.  Are there any objective signs --
13  objectively, observable signs that would indicate
14  whether a suicide is caused by Neurontin other than
15  that the person took Neurontin?
16        MR. ROSENKRANZ: Objection to the form.
17        A.  Well, I mean, I think the way to get at
18  that question is to look at the -- the listed side
19  effects in the PDR and see which side effects are
20  correlated with suicide. It's -- it's a somewhat
21  circuitous line of reasoning, because it involves
22  many risk factors and many adverse events.
23        But I can say, for example, just to pick
24  one, that if it's clear that Neurontin worsens
25  depression, preexisting depression, then that would

Page 721

1  be something we would -- and you can measure that.
2  You can somebody, a Hamilton or a Beck Depression
3  Inventory and see if they have a different score
4  just like we did with the pain scale.
5     Q.  Is there any evidence from a randomized
6  controlled study or all of the randomized controlled
7  studies ever conducted on Neurontin that Neurontin
8  increases the risk of depression
9  statistically/significantly over patients taking
10 placebo?
11    A.  I think the data are inconclusive. I
12 think we -- we -- we decided that they were -- many
13 of those risks were in the direction of increasing,
14 but many of them were not statistically
15 significant. So I would say the jury is out on
16 whether or not it's a statistical change.
17    But there's certainly a trend. If you
18 look at depression in all of these symptoms
19 compared with the placebo, they're almost always in
20 the direction of increasing depression.
21    Q.  Doctor, I'm going to hand you again what we
22 marked yesterday as Exhibit 24 to your deposition,
23 and this is the rate of depression reported in all
24 the randomized controlled studies of Neurontin in
25 both neuropathy and epilepsy patients.

Page 722

1     And you'll notice that the -- for the
2  neuropathy patients, the rate of depression is higher
3  in patients not taking Neurontin than patients taking
4  Neurontin, correct?
5        MR. ROSENKRANZ: Objection. This is the
6     same PowerPoint that we objected to yesterday,
7     this document.
8     A.  I've seen this before, and I've commented
9  on it before.
10    Q.  Yeah, and I'm asking you now.
11    Is the rate of depression or the incidence
12 of depression reported in the neuropathy studies, the
13 randomized control studies for Neurontin, higher in
14 the patients taking Neurontin than patients not
15 taking Neurontin?
16        MR. SOH: Objection. Form. Foundation.
17    A.  It seems to be -- you mean 1.7 versus
18 1.5?
19    Q.  Right. Now I'm talking about 2.3 on
20 placebo --
21    A.  2.2.
22    Q.  I'm sorry, 2.2 placebo and 1.3 on
23 gabapentin.
24    Do you see that?
25    A.  I do.

Page 723

1     Q.  That rate is -- that incidence is higher in
2  placebo than Neurontin for the event depression,
3  correct?
4     A.  Correct.
5     Q.  And there is a difference. It's not
6  statistically significant for epilepsy, right? And
7  we talked about that yesterday?
8     A.  Right.
9     Q.  And the difference is that on placebo,
10 depression is reported at 1.1 percent, and on
11 gabapentin, it's reported at 1.8 percent, correct?
12    A.  Right. And then the combined studies,
13 it's 1.5 on Neurontin and 1.7 on placebo.
14    Q.  Right. It's higher on placebo than it is
15 on Neurontin?
16    A.  There's no difference.
17    Q.  So when you say that the direction is in
18 the trend of increased risk of -- when you say that
19 -- that the information from randomized controlled
20 studies regarding depression and Neurontin is in the
21 direction of a trend toward increased depression,
22 that's not right, is it?
23        MR. ROSENKRANZ: Objection.
24    A.  It's not right only based on that one
25 document.

Page 724

1     Q.  And this document summarizes all the
2  randomized controlled studies involving Neurontin.
3     You understand that, correct?
4        MR. ROSENKRANZ: Objection. That
5     document is a PowerPoint presentation provided
6     by the defendants in the Daubert hearing.
7     That's all we know about that document.
8     Q.  Dr. Maris, I direct your attention to the
9  source of the information contained in this document.
10 You see this table right here. This is the table I
11 showed you yesterday. And the source is the FDA's
12 clinical review of the neuropathy studies.
13    Do you want me to show you the table,
14 because I can get it back out.
15    A.  No, I've seen this before.
16    Q.  Okay.
17    A.  This is something we commented on before.
18        MR. ROSENKRANZ: May I ask, Counselor,
19     what the date of that study is?
20        MS. McGRODER: This is the 2001, Sharon
21     Hertz from the FDA, clinical review of the
22     neuropathy studies combined with the epilepsy
23     studies.
24        MR. ROSENKRANZ: So that was seven years
25     ago.

20 (Pages 721 to 724)

Page 777

1     A.  Well, yeah, that's what he says.  It's
2  not saying they're ambivalence.
3     Q.  Yeah, I wanted to ask you about that,
4  because I think he's saying -- isn't he saying that
5  they have a state of relatively fixed purpose, paren,
6  not gainsaying their ambivalence.
7        In other words, resolving their
8  ambivalence, correct?
9        MR. SOH:  Objection to form.
10    A.  No, he's saying -- he saying they can
11  have a relatively fixed purpose and be ambivalent
12  is what he said.
13    Q.  So your interpretation of not gainsaying
14  his ambivalence means they are ambivalent?
15    A.  That they do still.  They still have
16  ambivalence, yes.  It's a hallmark of all suicide
17  notes.
18    Q.  Do you put a lot of weight into the fact
19  that the Smith family was surprised about Richard
20  Smith's suicide note?
21    A.  No, because I think he acted out of
22  character.
23    Q.  And so when Mr. Smith says in his note
24  forgive me, I can't go on like this, you think that's
25  out of character?

Page 778

1     A.  The fact that he couldn't go on?
2     Q.  Um-hum.
3     A.  Oh, yeah, because he'd been going on, and
4  he'd been keeping on and keeping on, and all of a
5  sudden for some reason he couldn't go on.
6     Q.  And -- and it's for some -- for some reason
7  in your view is because of Neurontin?
8     A.  That was certainly one of -- of a
9  proximate factor, a substantial proximate factor,
10  in my opinion.
11    Q.  Are there any other substantial proximate
12  -- proximate factors that you think might provide an
13  explanation for a statement by Mr. Smith?  Pain has
14  taken over my mind and body.  Forgive me, I cannot go
15  on like this.  Anything else that would explain that
16  --
17        MR. SOH:  Objection.  Form.
18    Q.  -- besides Neurontin?
19        MR. SOH:  Objection.  Form.
20    A.  You know, we've been here for almost
21  three days now, and you still don't really give my
22  theory the credit that it's due, which is no one
23  factor causes suicide.  So I've already admitted in
24  the last three days that partial explanation,
25  chronic pain.

Page 779

1        Partial explanation, continuing
2  depression, which got worse when he took Neurontin.
3  Partial explanation, he's an older white male,
4  which puts him in a higher risk group.  Partial
5  explanation, he had previous suicide ideation.  So
6  all of these are partial explanations.
7     Q.  So you've acknowledged that suicide has
8  many causes, usually not just drug causes, correct?
9     A.  It has many causes.
10    Q.  Usually not just drug causes, correct?
11        MR. SOH:  Objection.  Form.
12    Q.  Isn't that what you wrote in your
13  PowerPoint?
14    A.  Hold on.  You want to answer for me?
15    Q.  I'm asking you.
16    A.  No, you're not.  You're giving me the
17  answer.
18    Q.  Did you write that in the PowerPoint?
19        MR. SOH:  You asked two questions after
20     that, Lori.
21    A.  You asked two question before I could
22  answer the first one.
23        I think most suicides are not drug
24  reactions.
25    Q.  That wasn't my question.

Page 780

1     A.  Well, what was it?
2        MR. SOH:  That was the first one.
3     Q.  Have you, yourself, written that suicide
4  has many causes usually not just drug causes?
5     A.  That's what I believe, yes.
6     Q.  You agree you cannot predict prospectively
7  who will commit suicide, correct?
8     A.  Not with any degree of accuracy,
9  scientifically.  What you predict are high risk
10  groups over long time frames, not individual
11  suicides over short time frames.  It's very
12  difficult scientifically.
13    Q.  If Richard Smith had not had a gun in the
14  home, would he still have committed suicide?
15    A.  Hypothetical?  He actually had three guns
16  in the home.  You're aware of that?
17    Q.  If Richard Smith had not had any guns in
18  the home, would he have still committed suicide?
19        MR. ROSENKRANZ:  Objection.
20     Hypothetical.
21    Q.  No, I'm asking for your opinion.  It's not
22  a hypothetical.  I'm asking for your opinion.
23        MR. ROSENKRANZ:  No, you're asking for a
24     hypothetical opinion.
25    A.  You said if.

34 (Pages 777 to 780)

Page 781

1    Q.  Can you answer the question?
2    A.  No, I can't, because I -- I mean, some
3    people would argue that if you're -- we know, for
4    example, David Brent at Pittsburgh says if you're
5    an adolescent, your suicide is ten times more
6    likely solely on whether or not you have any guns
7    in your home.  So there's no doubt that having a
8    gun in the home greatly increases your suicide
9    rate.  Some people will use hanging.  Some people
10   will use other methods.  But you're asking about a
11   specific case for something that didn't, in fact,
12   happen.  So I'm -- I'm not going to speculate.
13   Q.  If Richard Smith had not been suffering
14   from excruciating chronic pain, would he still have
15   committed suicide?
16       MR. SOH:  Objection.  Form.
17   A.  Probably not.
18   Q.  If Richard Smith's chronic pain had not
19   been physically debilitating, would he still have
20   committed suicide?
21       MR. SOH:  Objection.  Form.
22   A.  Yeah, I'm not exactly sure what you mean
23   by physically debilitating -- debilitating.  Is
24   that one category?  Is there a degree of how
25   debilitating it is?

Page 782

1    Q.  Would you like me to restate the question?
2    A.  Yes, it's not -- not very precise.
3    Q.  If Richard Smith's chronic pain had not
4    interfered with his functioning and his ability to
5    conduct activities of daily living, would he still
6    have committed suicide?
7        MR. SOH:  Objection.  Form.
8    A.  Again, it requires speculation, a
9    hypothetical, but I think it's hard to say I
10   acknowledge that chronic pain in Richard Smith's
11   case was a major risk factor.  I have never denied
12   that.
13   Q.  If Richard Smith had not been forced to
14   quit working due to his pain and functional
15   limitations, would he have committed suicide?
16       MR. SOH:  Objection to form.
17       MR. ROSENKRANZ:  Objection.
18   A.  Again, I don't know how to answer a
19   hypothetical about an actual case.  I don't think
20   work is as important as chronic pain.
21   Q.  If Richard Smith had not been told that
22   surgery was no longer an option for him and he would
23   have to learn to live with his pain, would he still
24   have committed suicide?
25       MR. SOH:  Objection.  Form.

Page 783

1    A.  I can't answer that, because once again,
2    my theory requires looking at multiple risks and
3    protective factors, not two at a time.  And you're
4    asking me about two at a time.
5    Q.  If Richard Smith had not been told that
6    surgery was no longer an option for him, would he
7    have still committed suicide?
8        MR. SOH:  Objection.  Form.
9    A.  I don't know.
10   Q.  You don't have an opinion on that?
11   A.  That's why I said don't know.
12   Q.  If Richard Smith had not been told that he
13   would have to learn to live to manage his pain, would
14   he still have committed suicide?
15       MR. SOH:  Objection.  Form.
16   A.  I -- I don't know.
17   Q.  No opinion?
18   A.  No opinion.
19   Q.  If Richard Smith had not been hopeless,
20   would he still have committed suicide?
21       MR. SOH:  Objection.  Form.
22   A.  My theory says that hopelessness and
23   chronic pain are highly suicidogenic, so I'm -- I
24   think that they are important factors, and I think
25   probably hopelessness is something that was an

Page 784

1    important risk factor that I would expect to be
2    present if he killed himself.
3    Q.  The support that you cite in your report
4    for ego dystonia is a deposition of Dr. Beasley and
5    an expert report of Dr. Glenmullen in the Prozac
6    litigation, correct?
7    A.  Right.  And Ken Fromson called me and
8    says what's the original reference, and I gave it
9    to him, and you should have it.
10   Q.  And none of those expert depositions or
11   reports in the Prozac litigation discuss Neurontin,
12   correct?
13   A.  Right.  They refer to another set of
14   drugs.
15   Q.  I take it, based on your testimony earlier,
16   that you have never seen a transcript of the 911
17   tape, that you have never listened to the 911 tape
18   either?
19   A.  Right.
20   Q.  But you know there was a 911 call by
21   Mrs. Smith, correct --
22   A.  I do.
23   Q.  -- immediately after Mr. Smith shot
24   himself?
25   A.  Right.

Page 801

1    A.  But he may have some more, but I know the
2  ones that I've got are in there.
3    Q.  And when you say the ones that you've got,
4  you're referring to the ones on page 23 of your
5  report in the Smith case?
6    A.  Right.  Being religious, having a
7  supportive wife, having a family, having a calm
8  mood, strong sense of self-worth, maybe -- it may
9  not seem musical in Doug Jacobs.  I doubt that it
10  says that, but he was certainly life-affirming.  So
11  I have some doubts about the last one.
12    Q.  Okay.  You -- you are aware that one of
13  Mr. Smith's daughters had been diagnosed with breast
14  cancer before the time that Mr. Smith committed
15  suicide, correct?
16    A.  Yes.
17    Q.  And will you agree with me that Mr. Smith
18  was very concerned about Donna and her diagnosis of
19  breast cancer?
20    A.  Sure.  Three days before when he talked
21  to Dr. Wood, he mentioned let's pray for Donna.
22    Q.  Would you consider the diagnosis of breast
23  cancer in a close family member such as Mr. Smith's
24  daughter a stressful life event?
25    A.  Yes, but notice it cuts both ways.  As a

Page 802

1  father, I would want to be there for my daughter.
2  I wouldn't want to abandon her.  She died after he
3  did.  So I would never do that to my daughter if I
4  could help it.
5    Q.  So do you think that the fact that Donna
6  had breast cancer was not part of the set of risk
7  factors for -- well, let me restate that.
8    Do you think that the fact that Donna had
9  breast cancer and Mr. Smith was concerned about it
10  was not part of the set of risk factors for his
11  suicide?
12    A.  I think it was probably both a risk
13  factor and a protective factor.  I think he -- he
14  was concerned about her and it was -- you never
15  want to lose a child before you die.  And on the
16  other hand, if your child has got a terminal
17  illness, you want to be there for them.  So my
18  guess is both a risk factor and a protective
19  factor.
20    Q.  Okay.  I don't mean to sound unscientific
21  or unmedical, but if that happens and a risk factor
22  -- or a factor is both a protective and a risk
23  factor, do they cancel each other out?
24    A.  Depends on the weight.  All these risk
25  factors have weights, like depression is heavily

Page 803

1  weighted.  And I'm not sure that I could sit here
2  today and tell you how the protective and risk
3  factor would be weighted, which would be a crucial
4  determination in canceling each other out or not.
5    I suspect wanting to hang around if he
6  were under control of himself would be a stronger
7  factor than wanting to go die, which is pretty
8  selfish.  So I just don't know.  The answer is
9  don't know.  I can't establish the weight of the
10  two.
11    Q.  Do you think wanting to die when you're in
12  extreme pain is extremely selfish?
13    A.  It's still selfish.  It's still like I
14  hurt so bad I can't think about other things.
15    Q.  Is every suicide selfish in your opinion?
16    A.  No, of course not.  There are suicides
17  that are the exact opposite, you know, you die for
18  your country, soldiers, where you die to save your
19  kids, where you die for a higher cause.
20    Q.  And are you referring to suicides there as
21  a soldier?  I'm not sure I understand that.  If
22  you're a soldier -- I guess I don't get the
23  connection with suicide.
24    A.  Okay.  Okay.  Okay.  In this book there's
25  a discussion of the type -- this book is the 2000

Page 804

1  Comprehensive Textbook of Suicidology.  I say that
2  in my opinion based on my work in thousands of
3  cases I've reviewed, that probably about 70 percent
4  of all suicides are escape, escape from an
5  intolerable life situation.
6    Probably 20 percent are revenge suicides
7  to get even with some other person.  But then there
8  are what I call altruistic suicides, which are to
9  die for the sake of somebody else or a higher
10  cause.  And often you say that of soldiers, that
11  they gave their life, you know, for our country.
12    Q.  Okay.  But they're not actually
13  intentionally committing suicide?
14    A.  Some of them are, Jehad.
15    Q.  Oh, well, that's what I wanted to ask you.
16    A.  Sure.
17    Q.  Are you -- are you referring to, like, a
18  kamikaze or a -- or a Jehad terrorist?
19    A.  Sure.  I'm referring to all soldiers, and
20  some of them are more explicitly for the country
21  than others.  I mean, a kamikaze would be an
22  obvious for the sake of Japan and the emperor.
23    Q.  Okay.
24    A.  But they're -- they're all somewhat
25  altruistic.  They're not just dying for selfish

40 (Pages 801 to 804)

1               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

2

3      _____

                            )

4    In re: NEURONTIN MARKETING,   )
      SALES PRACTICES, AND PRODUCTS)

5    LIABILITY LITIGATION,       )

      _____)

6

7                     VOLUME IV

8

9           CONTINUED VIDEOTAPED DEPOSITION OF

10             RONALD Wm. MARIS, Ph.D.

11               (Taken by Defendant)

12            Columbia, South Carolina

13            Monday, October 20, 2008

14

15

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
           V. Dario Stanziola, CSR, RPR, CRR

25   Transcript produced by computer-aided transcription

**Page 826**

```
 1           APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
 3       RON ROSENKRANZ, Esquire
         Finkelstein & Partners
 4       1279 Route 300
         Newburgh, New York 12551
 5       (845) 563-9442
         rrosenkranz@lawampm.com
 6
 7  ON BEHALF OF THE DEFENDANT PFIZER:
 8       ANGELA M. SEATON, Esquire
         IAN LOSASSO, Esquire
 9       LORI SCHULTZ, Esquire
         (Appearing Via Telephone)
10       Shook, Hardy & Bacon, L.L.P.
         2555 Grand Boulevard
11       Kansas City, Missouri 64108
         (816) 474-6550
12       aseaton@shb.com
         ilosasso@shb.com
13       lschultz@shb.com
14  Also Present:
15       JAMES DOWNIE, CLVS, Videographer
16
17
18
19
20          CONTINUED VIDEOTAPED DEPOSITION OF RONALD
21  Wm. MARIS, Ph.D., a witness called on behalf of the
22  Defendant, before V. Dario Stanziola, CSR, RPR,
23  CRR, held at the Columbia Marriott, 1200 Hampton
24  Street, Columbia, South Carolina, on Monday,
25  October 20, 2008, commencing at 9:01 a.m.
```

**Page 828**

```
 1  Exhibit 55: Document entitled        951
    Commonwealth of Massachusetts Department
 2  of Social Services Child Abuse/Neglect
    Report
 3
 4  Exhibit 56: Document entitled        952
    Commonwealth of Massachusetts Department
 5  of Social Services FamilyNet dictation
    report
 6  Exhibit 57: Photocopy of a PowerPoint    953
    presentation entitled Suicide and SSRIs
 7  Ronald Wm. Maris, Ph.D. AAFS Annual
    Conference 11 a.m. - 12 p.m. Tuesday
 8  February 20, 2007 San Antonio, Texas
 9  Exhibit 58: Document entitled Beverly    988
    Hospital D/B/A BayRidge Hospital Intake
10  Evaluation
11  Exhibit 59: AtlantiCare Progress Notes   990
    dated 5/25/93
12
    Exhibit 60: AtlantiCare Medical Center   993
13  Report of Consultation dated 5/17/93
14  Exhibit 61: A document entitled Past     999
    Psychiatric History
15
    Exhibit 62: AtlantiCare Medical Center   1001
16  medical record
17  Exhibit 63: A document entitled Patient  1006
    Messages Susan E. Bulger
18
    Exhibit 64: A medical record         1015
19
    Exhibit 65: A photocopy of videotaped    1016
20  deposition of Yoshiharu Akabane, M.D.
21  Exhibit 66: A medical record Salem       1017
    Hospital dated 8/17/88
22
    Exhibit 67: AtlantiCare Medical Center   1018
23  report of consultation dated 6/5/90
24  Exhibit 68: Brigham and Women's Hospital 1019
    nursing history questionnaire
25
```

**Page 827**

```
 1       INDEX OF EXAMINATIONS
 2
 3  By Ms. Seaton        PAGE   832
 4       INDEX OF EXHIBITS
 5  NUMBER    EXHIBIT        MARKED
 6  Exhibit 44: Plaintiff's Expert    832
    Disclosure On Specific Causation
 7
    Exhibit 45: Document entitled Appendix  833
 8  A, New Evidence For Bulger v. Pfizer
    Received After July 18, 2008, Ronald Wm.
 9  Maris, Ph.D. October 8, 2008
10  Exhibit 46: Report of Ronald Wm. Maris,  834
    Ph.D.
11
    Exhibit 47: First Amended Notice of   837
12  Videotaped Deposition Duces Tecum of
    Professor Ronald W. Maris, Ph.D.
13
14  Exhibit 48: Handwritten notes       840
15  Exhibit 49: Manilla folder containing  841
    billing record of Ronald Wm. Maris,
16  Ph.D.
17  Exhibit 50: Ronald W. Maris, Ph.D.     843
18  Curriculum Vitae September 2008
    Exhibit 51: Psychological Autopsy and   853
19  Death Investigation, File Name Susan
20  Bulger
    Exhibit 52: Photocopy of videotaped    890
21  deposition of Ronald J. Bulger, Sr.
22  Exhibit 53: Office visit note for Susan  903
23  Bulger dated 1/6/00
    Exhibit 54: Progress notes for Susan    909
24  Bulger dated 12/20/02
25
```

**Page 829**

```
 1  Exhibit 69: AtlantiCare Medical Center   1022
    Discharge Summary, discharge date
 2  5/25/93
 3  Exhibit 70: Beverly Hospital d/b/a       1024
    BayRidge Hospital Intake Evaluation
 4
    Exhibit 71: Medical record, alcohol and  1026
 5  other drug use
 6  Exhibit 72: BayRidge Hospital a          1026
    satellite facility of Beverly Hospital
 7  medical record dated 4/30/98
 8  Exhibit 73: A medical evaluation and/or  1028
    psychotherapy of Susan Bulger dated
 9  5/20/98
10  Exhibit 74: A letter dated 6/22/98 to    1029
    Gerald Perlow from William Lloyd
11
    Exhibit 75: Commonwealth of              1029
12  Massachusetts Department of Social
    Services Assessment Worksheet with an
13  assigned date of 4/23/98
14  Exhibit 76: A Progress Note of Susan     1034
    Bulger dated 10/30/00
15
    Exhibit 77: A Progress Note of Susan     1036
16  Bulger dated 11/30/00
17  Exhibit 78: CAB Health and Recovery      1037
    Services, Inc. Dated 12/14/00
18
    Exhibit 79: Progress Notes of Susan      1039
19  Bulger dated 2/6/01
20  Exhibit 80: Progress Notes of Susan      1041
    Bulger dated 3/7/01
21
    Exhibit 81: Progress Notes of Susan      1042
22  Bulger dated 4/25/01
23  Exhibit 82: Progress Notes of Susan      1043
    Bulger dated 5/30/01
24
    Exhibit 83: Progress Notes of Susan      1044
25  Bulger dated 6/7/01
```

Page 830

| | | |
|---|---|---|
| 1 | Exhibit 84: Progress Notes of Susan Bulger dated 9/18/01 | 1045 |
| 2 | | |
| 3 | Exhibit 85: Progress Notes of Susan Bulger dated 4/9/02 | 1057 |
| 4 | Exhibit 86: Progress Notes of Susan Bulger dated 5/14/02 | 1059 |
| 5 | | |
| 6 | Exhibit 87: Progress Notes of Susan Bulger dated 8/14/03 | 1061 |
| 7 | Exhibit 88: A Encounter Note by Dr. Richard S. Goldman, M.D. of Susan E. | 1081 |
| 8 | Bulger | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 831

1    THE VIDEOGRAPHER: My name is James Downie
2  of Veritext Litigation Services. Today's date
3  is the October 20th, 2008, and the time is
4  approximately 9:01 a.m.
5    This deposition is being held at the
6  Marriott Hotel located at 1200 Hampton Street
7  in Columbia, South Carolina.
8    The caption of this case is Ronald
9  Bulger, et al. versus Pfizer, Inc., et al.
10   The name of the witness is Dr. Ronald
11 Maris, Volume I.
12   At this time the attorneys please
13 introduce themselves for the record and we may
14 begin.
15   MR. ROSENKRANZ: Ron Rosenkranz,
16 Finkelstein & Partners for the plaintiffs.
17   MS. SEATON: Angela Seton, Shook, Hardy &
18 Bacon on behalf of -- oh, where is my
19 microphone?
20   Angela Seton, Shook, Hardy & Bacon on
21 behalf of the Pfizer defendants.
22   MR. LOSASSO: Ian Losasso, Shook, Hardy &
23 Bacon on behalf of Pfizer, the defendants.
24   CONTINUED EXAMINATION
25 BY MS. SEATON:

Page 832

1    Q.  Good morning, Dr. Maris.
2    A.  Good morning.
3    Q.  We have met before, correct?
4    A.  We have.
5    Q.  We are here for the continuation of your
6  deposition, and I would just remind you that you
7  remain under oath as you were before.
8    A.  That's fine.
9    Q.  Okay. And I assume we don't need to go
10 over the ground rules, you've been deposed many times
11 before; if you need a break, if you don't understand
12 a question, et cetera, et cetera?
13   A.  That's fair.
14   Q.  Okay. I am going to mark as deposition
15 Exhibit 44 your original report in this case. And
16 when I say this case, I'm referring to the Bulger
17 case. You understand that we're going to be talking
18 about the Bulger case today, correct?
19   A.  Yes.
20     (Exhibit 44: Plaintiff's Expert
21     Disclosure On Specific Causation marked for
22     identification, as of this date.)
23   Q.  Okay. I'm handing you what we've marked as
24 deposition Exhibit No. 44. Do you recognize that
25 document?

Page 833

1    A.  Yes, I do.
2    Q.  Okay. And that is the original expert
3  report that you prepared in connection with the
4  Bulger case, correct?
5    A.  Correct.
6     (Exhibit 45: Document entitled Appendix
7     A, New Evidence For Bulger v. Pfizer Received
8     After July 18, 2008, Ronald Wm. Maris, Ph.D.
9     October 8, 2008 marked for identification, as
10    of this date.)
11   Q.  Okay. I am going to mark as deposition
12 Exhibit No. 45 a document that I received from the
13 law offices of Finkelstein & Partners last week. And
14 I understand that this is your supplemental report;
15 is that correct?
16   A.  Right.
17     There should be two -- two parts,
18 Appendix A and Appendix B.
19   Q.  Okay.
20   A.  So, yes, it is.
21   Q.  Okay. And Appendix A is a list of
22 additional materials that you reviewed, correct?
23   A.  Correct.
24   Q.  And Appendix B contains your supplemental
25 opinions in this case, correct?

3 (Pages 830 to 833)

Page 858

1  investigator's ability to compare and contrast
2  informant responses with results for previous
3  psychological autopsy studies.
4      Fourth, and finally, in the deposition
5  process, the consulting clinical expert has few means
6  for assessing bias and censorship in the selection of
7  informants. The questions posed, the forms of those
8  questions and the information made available are not
9  available for case review. Once again, there are no
10  empirical studies quantifying the degree of
11  distortion introduced by these serious confounds.
12      Agree or disagree?
13      A. Can I say I agree and then make a couple
14  comments?
15      Q. No.
16      A. So you're testifying?
17      Q. I'm not testifying. But the deposition
18  will go quicker if we -- if I put questions to you.
19      A. I agree.
20      Q. Okay. Do you -- do you see any problem with
21  the fact that Michelle Faye is the one who prepared
22  the psychological autopsy?
23      A. In a perfect world, I would do all my
24  original data gathering. But I can just say that
25  the norm in all the 200 cases I've done is to not

Page 859

1  do original interviews. The norm for the vast
2  majority of cases, partly because of cost, partly
3  because the distortion probably is estimated not to
4  be that great, somebody else can gather the facts.
5      So in point of fact, the routine is to
6  let somebody else, be it a deposition or interview
7  or somebody doing a psych autopsy, that's the way
8  it's almost always done. In a perfect world, I
9  would go do all my original interviews. But there
10  are depositions there.
11      I mean, think of all the information in
12  this case, if I had to go out and gather all that
13  myself, it would be impractical and it would also
14  be prohibitively expensive and it would not be
15  calculated in terms of marginal utility to have a
16  sufficient gain to be worth that kind of investment
17  of energy. So yeah, in a perfect world, I would do
18  my own psychological autopsies and sometimes I do.
19  But most of the time I usually rely on information
20  provided me. Michelle Faye is probably one of the
21  most knowledgeable people in this case because she
22  is a case coordinator for all this data.
23      Q. Okay. You would agree with me, though,
24  that Michelle Faye has a financial interest in this
25  case is in the fact that this case comes out in favor

Page 860

1  of plaintiff, correct?
2      MR. ROSENKRANZ: Objection.
3      A. She's really not going to get any profit
4  sharing or anything. She just has a 8:00 to 5:00
5  job and she's doing her job. So I don't think she
6  has a financial interest. I think she does work
7  for Finkelstein, but she's not an attorney and
8  she's simply trying to do the best job that I ask
9  her to do. So I don't think she's going to have a
10  financial gain depending on how this turns out.
11      Q. Would you agree with me that the law firm
12  of Finkelstein & Partners has a financial stake in
13  this litigation?
14      A. Sure.
15      Q. Okay. In terms of methodology, do you rely
16  on this psychological autopsy?
17      A. Well, I'm not quite sure what that
18  question means.
19      Q. Okay. Just a second.
20      What's the purpose of the psychological
21  autopsy?
22      A. Well, as Dr. Kruszewski said, he
23  described it as kind of elegant and systematic. I
24  mean, it's an attempt in a more systematic,
25  unbiased way to make sure that I get all the

Page 861

1  information I need to form and defend an opinion.
2  Often when I look at the records, many of these
3  questions in my psych autopsy have never been
4  asked.
5      And, for example, the risk factors, do I
6  have sufficient information on each case about the
7  suicide risk factors in order to form an opinion?
8  So all of these sections in here are designed to
9  gather information which may or may not have been
10  asked before in order to help me as a scientist to
11  look objectively at the factors that I think are
12  related usually to a suicide outcome, in some cases
13  through the causes of the suicide outcome.
14      Q. But fair to say that this psychological
15  autopsy was compiled and put together by plaintiffs'
16  lawyers?
17      In other words, it was plaintiffs who
18  decided what information to include in the
19  psychological autopsy, you didn't do that?
20      A. That's not true.
21      Q. Okay. Tell me why that's not true.
22      A. We went over this last time. Andy
23  Vickery originally had his name on this. All Andy
24  Vickery in Houston did was to provide me with money
25  for me to do a hundred percent of the work with one

10 (Pages 858 to 861)