# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  NEURONTIN MARKETING, SALES     )
PRACTICES AND PRODUCTS LIABILITY       )
LITIGATION                             )
                                       )
                                       )
_____    )
                                       )
                                       )
                                       ) CASE NO.
                                       ) 04-10981
THIS DOCUMENT RELATES TO:              )
                                       )
RUTH SMITH, Individually and as        )
Widow for the use and benefit of       )
herself and the next of kin of         )
Richard Smith, deceased.               )
                                       )
05-CV-11515                            )
                                       )


VIDEOTAPED DEPOSITION OF

CHRIS L. WOOD, DDS

Taken on Behalf of the Defendant

June 7, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  NEURONTIN MARKETING, SALES )
PRACTICES AND PRODUCTS LIABILITY   )
LITIGATION                         )
                                   )
_____)
                                   )
                                   )
                                   ) CASE NO.
                                   ) 04-10981
THIS DOCUMENT RELATES TO:          )
                                   )
RUTH SMITH, Individually and as    )
Widow for the use and benefit of   )
herself and the next of kin of     )
Richard Smith, deceased.           )
                                   )
05-CV-11515                        )
                                   )


VIDEOTAPED DEPOSITION OF

CHRIS L. WOOD, DDS

Taken on Behalf of the Defendant

June 7, 2007

### Page 2

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3     MARK LANIER
        DARA HEGAR
 4     PATRICK O'HARA
        Lanier Law Firm
 5     6810 F.M. 1960 West
        Houston, Texas  77069
 6     713.659.5200
        713.659.6416
 7     wml@lanierlawfirm.com
 8     ANDREW G. FINKELSTEIN
        Finkelstein & Partners
 9     436 Robinson Avenue
        Newburgh, New York  12550
10     800.634.1212
        afinkelstein@lawampm.com
11
12  For the Defendant:
13     KENNETH J. FERGUSON
        Clark, Thomas & Winters
14     P.O. Box 1148
        Austin, Texas  78767
15     512.472.8800
        512.474.1129
16      kjf@ctw.com
17
    Also Present:  Sheldon Singh, Videographer
18
19
20
21
22
23
24
25
```

### Page 3

```
 1            I N D E X
 2  WITNESS: CHRIS L. WOOD
 3         INDEX OF EXAMINATIONS
 4                 Page/Line
 5  By Mr. Ferguson ................   6  10
 6  By Mr. Lanier ..................  30   2
 7  By Mr. Ferguson ................  46   3
 8  By Mr. Lanier ..................  48  11
 9  By Mr. Ferguson ................  49  16
10  By Mr. Lanier ..................  50  10
11         INDEX OF EXHIBITS
12                 Page/Line
13  No. 1 ..........................   7  17
14  No. 2 ..........................   8   2
15
```

### Page 4

```
 1
 2            The videotaped deposition of CHRIS L.
 3  WOOD, DDS, taken on behalf of the Defendant, on
 4  the 7th day of June, 2007, in the offices of Chris
 5  L. Wood, DDS, 1502 17th Avenue South, Nashville,
 6  Tennessee, for all purposes under the Federal
 7  Rules of Civil Procedure.
 8            The formalities as to notice,
 9  caption, certificate, et cetera, are waived.  All
10  objections, except as to the form of the
11  questions, are reserved to the hearing.
12            It is agreed that Elisabeth A.
13  Miller, being a Notary Public and Court Reporter
14  for the State of Tennessee, may swear the witness,
15  and that the reading and signing of the completed
16  deposition by the witness are waived.
17
18
19
20              * * *
21
22
23
24
25
```

### Page 5

```
 1            P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  Here begins
 3  Volume 1, Videotape No. 1 in the video deposition
 4  of Dr. Chris L. Wood in the matter in regarding
 5  Neurontin marketing, sales practices and products
 6  liability litigation in the United States District
 7  Court for the District of Massachusetts, MDL
 8  Docket No. 1629, master file No. 04-10981.
 9            Today's date is Thursday, June 7,
10  2007.  Time on the video monitor is 10:17.  The
11  videographer today is Sheldon Singh of Vowell &
12  Jennings, located at 214 Second Avenue North,
13  Nashville, Tennessee.
14            This video deposition is taking place
15  at 1502 17th Avenue South, Nashville, Tennessee.
16            Counsel, please identify yourselves
17  and state for the record whom you represent.
18            MR. LANIER:  Yeah, my name is Mark
19  Lanier.  I represent Ruth Smith and the Smith
20  family.  I'm here with Dara Hegar from my office,
21  Patrick O'Hara from my office, and Andrew
22  Finkelstein with Andrew's office.
23            MR. FERGUSON:  Ken Ferguson.  I
24  represent Pfizer, Warner-Lambert, and Parke-Davis;
25  and I'm here by myself.
```

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3       MARK LANIER
         DARA HEGAR
 4       PATRICK O'HARA
         Lanier Law Firm
 5       6810 F.M. 1960 West
         Houston, Texas 77069
 6       713.659.5200
         713.659.6416
 7       wml@lanierlawfirm.com
 8       ANDREW G. FINKELSTEIN
         Finkelstein & Partners
 9       436 Robinson Avenue
         Newburgh, New York 12550
10       800.634.1212
         afinkelstein@lawampm.com
11
12   For the Defendant:
13       KENNETH J. FERGUSON
         Clark, Thomas & Winters
14       P.O. Box 1148
         Austin, Texas 78767
15       512.472.8800
         512.474.1129
16       kjf@ctw.com
17
     Also Present: Sheldon Singh, Videographer
18
```

Page 3

```
 1              INDEX
 2   WITNESS: CHRIS L. WOOD
 3           INDEX OF EXAMINATIONS
 4                    Page/Line
 5   By Mr. Ferguson ..................   6   10
 6   By Mr. Lanier .......................  30    2
 7   By Mr. Ferguson ..................  46    3
 8   By Mr. Lanier .......................  48   11
 9   By Mr. Ferguson ..................  49   16
10   By Mr. Lanier .......................  50   10
11           INDEX OF EXHIBITS
12                    Page/Line
13   No. 1 ...............................   7   17
14   No. 2 ...............................   8    2
```

Page 4

 2  The videotaped deposition of CHRIS L.
 3  WOOD, DDS, taken on behalf of the Defendant, on
 4  the 7th day of June, 2007, in the offices of Chris
 5  L. Wood, DDS, 1502 17th Avenue South, Nashville,
 6  Tennessee, for all purposes under the Federal
 7  Rules of Civil Procedure.
 8      The formalities as to notice,
 9  caption, certificate, et cetera, are waived. All
10  objections, except as to the form of the
11  questions, are reserved to the hearing.
12      It is agreed that Elisabeth A.
13  Miller, being a Notary Public and Court Reporter
14  for the State of Tennessee, may swear the witness,
15  and that the reading and signing of the completed
16  deposition by the witness are waived.

20           * * *

Page 5

 1           PROCEEDINGS
 2      THE VIDEOGRAPHER: Here begins
 3  Volume 1, Videotape No. 1 in the video deposition
 4  of Dr. Chris L. Wood in the matter in regarding
 5  Neurontin marketing, sales practices and products
 6  liability litigation in the United States District
 7  Court for the District of Massachusetts, MDL
 8  Docket No. 1629, master file No. 04-10981.
 9      Today's date is Thursday, June 7,
10  2007. Time on the video monitor is 10:17. The
11  videographer today is Sheldon Singh of Vowell &
12  Jennings, located at 214 Second Avenue North,
13  Nashville, Tennessee.
14      This video deposition is taking place
15  at 1502 17th Avenue South, Nashville, Tennessee.
16      Counsel, please identify yourselves
17  and state for the record whom you represent.
18      MR. LANIER: Yeah, my name is Mark
19  Lanier. I represent Ruth Smith and the Smith
20  family. I'm here with Dara Hegar from my office,
21  Patrick O'Hara from my office, and Andrew
22  Finkelstein with Andrew's office.
23      MR. FERGUSON: Ken Ferguson. I
24  represent Pfizer, Warner-Lambert, and Parke-Davis;
25  and I'm here by myself.

Page 6

```
 1        THE VIDEOGRAPHER: The court reporter
 2   today is Elisabeth Miller of Vowell & Jennings.
 3        Would the reporter please swear in
 4   the witness.
 5        CHRIS L. WOOD, DDS,
 6   was called as a witness, and after having been
 7   first duly sworn, testified as follows:
 8        THE VIDEOGRAPHER: You may proceed.
 9        E X A M I N A T I O N
10   BY MR. FERGUSON:
11   Q.   Would you state your name for the record,
12   please, sir?
13   A.   Christopher L. Wood, Lehmann Wood, DDS.
14   Q.   What is your profession?
15   A.   I'm a dentist. I'm a dentist.
16   Q.   And how -- how long have you been
17   practicing as a dentist?
18   A.   It is 29 years, almost 30.
19   Q.   How long have you been practicing in the
20   Nashville area?
21   A.   In Nashville? Same. Same. My father was
22   a dentist, so I came back to Nashville.
23   Q.   What is your office address, please?
24   ████████████████████████████
25   Q.   Dr. Wood, you're aware that we're here
```

Page 7

```
 1   in -- in a matter relating to Ruth Smith and
 2   Richard Smith?
 3   A.   Right.
 4   Q.   Do you understand that?
 5   A.   Yes, sir.
 6   Q.   First of all, before we get into that, you
 7   have in front of you, really, I guess, two sets of
 8   documents. One is a folder which contains your
 9   notes on your treatment and care of Richard Smith;
10   is that correct?
11   A.   Correct.
12   Q.   What I'd like to do -- and we can mark it
13   afterwards. I'd like to mark that as Exhibit 1
14   and get a copy of that to attach to the
15   deposition. Would that be okay, Doctor?
16   A.   Sure, sure.
17        (Marked Exhibit No. 1.)
18   BY MR. FERGUSON:
19   Q.   You also have in front of you something
20   that may or may not be contained in what we've
21   identified as Exhibit 1. But you have a letter on
22   your letterhead that relates to Mr. Smith and a
23   visit on Monday, May 10 with him; is that correct?
24   A.   Correct, yes, sir. Yes, sir.
25        MR. FERGUSON: And why don't we mark
```

Page 8

```
 1   that as Exhibit 2 to your deposition.
 2        (Marked Exhibit No. 2.)
 3   BY MR. FERGUSON:
 4   Q.   Let me ask you first, Doctor, how long
 5   have you known the Smith family?
 6   A.   It dates back quite a few years. We've --
 7   we -- my wife and I were in school with some of
 8   his -- some of his kids, some of his girls, and
 9   are -- are personal friends with them. And so
10   it -- it really can date back to college days,
11   quite a -- quite a while in the -- in the '70s,
12   actually.
13   Q.   So it goes beyond your career as a
14   dentist; before --
15   A.   Yes.
16   Q.   -- your career as a dentist --
17   A.   Yes.
18   Q.   -- right?
19   A.   Yes.
20   Q.   And then once you started practicing as a
21   dentist, did you see the members of the Smith
22   family?
23   A.   We did, yes. We did when I came -- came
24   into Nashville. I don't, you know, recall the
25   exact time of the daughters and all, but -- but
```

Page 9

```
 1   the whole family we were privileged to see.
 2   Q.   Do you know about how many years you would
 3   have treated Richard Smith, give or take?
 4   A.   It -- early '80s. From the early '80s up
 5   until -- up until when we last saw him in 2004.
 6   Q.   And -- and we don't -- we don't need to
 7   talk about all the dental care that he -- he was
 8   seen for during that period of time. But was
 9   there anything unusual? I mean, was it generally
10   maintenance dentistry, et cetera? Any- --
11   anything significant?
12   A.   For the -- for the most part, nothing --
13   nothing really out of the ordinary. Nothing out
14   of the ordinary.
15   Q.   Okay. Let me ask you about the -- this
16   letter dated May 19, 2004, that you have in front
17   of you that we've identified as Exhibit 2. Do you
18   have that in front of you?
19   A.   Yes, sir. Yes, sir.
20   Q.   Let me ask you first how you came to write
21   this letter. Why did you write this letter?
22   A.   I wrote that because, at the funeral,
23   Cindy, his daughter, and I talked, and it -- it
24   came up. I don't recall exactly why, but it came
25   up, and she said just for sentimental --
```

Page 14

1  strange it was not mentioned, referring to the
2  fact that he hadn't been able to reach you.
3       Can -- can you tell us what you mean by
4  that sentence?
5  A.    Mr. Smith had a fun sense of humor, and he
6  always interacted with people. And if he thought
7  he could kind of pull one on you or one-up you,
8  then he -- he would, and it -- it would sometimes
9  put you a little off step. You would be without
10 words, and he seemed to enjoy that.
11      But when he came in that day, now reading
12 the -- the letter, he was -- that wasn't -- that
13 wasn't brought up, which -- which, you know, in
14 all the years, I thought that was an opportunity
15 that was allowed to go by.
16 Q.    So you considered that a bit unusual that
17 day?
18 A.    I do. I do.
19 Q.    Did -- did -- did you think it was unusual
20 at the time on that day, or was it something that,
21 after his death, you said, well, now, thinking
22 back on that, that was a little unusual that he
23 didn't joke about that?
24 A.    I don't remember really when it occurred,
25 but, obviously, when I wrote the letter, it was --

Page 15

1  I was thinking, trying to -- to go back over my
2  mind and all the things that happened, and that
3  just sort of jumped out.
4       But I don't think it was an issue that
5  really caught my attention. And, frankly, I
6  was -- I was more concerned about what was going
7  on and why he was there than -- than to -- to try
8  and come up with a reason for that.
9  Q.    The next paragraph, you apparently are
10 referring to -- to some other pain problems,
11 nondental pain problems he was -- he was having.
12 You noted that he was still troubled by back pain.
13      And did he specifically tell you that that
14 day?
15 A.    Yes. We talked about it later, toward the
16 end of the appointment.
17      Basically, the appointment ended without
18 ex- -- you know, a definitive treatment being
19 prescribed for him. It's one of those
20 idiosyncrasies that you could -- you couldn't say
21 what his problem was for sure, but -- but that
22 issue came up in just talking to him as a -- as a
23 friend.
24 Q.    And -- and you indicated that immediately
25 he told you that an end to pain seemed to be

Page 16

1  hopeless. Is that pretty much an exact quote, as
2  best you recall it?
3  A.    Yes, yes.
4  Q.    Was there any other discussion -- further
5  discussion about that idea that -- that the end to
6  pain seemed to be hopeless, or was that the drop
7  after he said that?
8  A.    I think it was. I came -- and as the
9  letter, perhaps, will reveal a little later, I
10 asked why he hadn't, you know, sought other
11 physicians to see if there was some answer to it
12 or something that could be done.
13 Q.    And that really -- you go to that in the
14 next sentence.
15 A.    Right.
16 Q.    You say, he mentioned trying to get second
17 opinions, but each orthopedic physician he saw
18 seemed to tune him out after hearing he already
19 had surgery. And then you had a -- in quotes, it
20 was like they were all protecting each other,
21 correct?
22 A.    That's what he said, yes.
23 Q.    Okay.
24 A.    I do remember him, you know --
25 Q.    Again, was there any further discussion

Page 17

1  about that -- and I know we're going back several
2  years. And -- but if you can recall any other
3  discussion about this issue that -- that, at least
4  according to this, he perceived that the
5  orthopedic physicians were tuning him out when
6  they found out he had had surgery?
7  A.    I think that's pretty much it, but -- but,
8  you know, the voice and the -- the body language
9  sort of -- well, it seemed to -- it seemed to
10 underline that. And I think that's why I said
11 that, because he was -- you could tell it was
12 bothering him. It was...
13 Q.    And then you indicated you suggested to
14 him that he consider clinics outside of Tennessee,
15 correct?
16 A.    Right, right.
17 Q.    But you noted he didn't respond to that?
18 A.    He didn't say anything. I don't know
19 whether he did or not.
20 Q.    And then you say, he simply said, I wish I
21 had never had the surgery in the first place, and
22 you have that in quotes?
23 A.    Right, right.
24 Q.    Again, any further discussion about that?
25 Did you ask him why or anything else, you talked

Page 18

1  to him about him wishing he had never had the
2  surgery in the first place?
3  A.    I think that pretty well speaks for
4  itself. I don't know the legal term for that;
5  y'all do, but --
6  Q.    I know it, but I don't want to --
7  A.    Yeah, the --
8  Q.    -- recite it, because --
9  A.    The --
10 Q.    -- I don't want to --
11 A.    The Latin --
12 Q.    -- remember those days.
13 A.    Those Latin terms, yeah. It truly did
14 pretty well represent that, so...
15 Q.    And -- and the discussions we've been
16 talking about, including, I wish I never had the
17 surgery in the first place, was referring to the
18 back surgery that he had, correct?
19 A.    Yes, yes.
20 Q.    Were you aware that he had had a number of
21 orthopedic surgeries, including replacement of
22 several joints?
23 A.    Yes, yes. That's important to us, because
24 we have to premedicate patients that have had
25 that, so we try to stay up on -- on those things.

Page 19

1  Q.    And then he went on to -- to say the
2  things that he could not do. Why don't you go
3  ahead -- instead of me reading it, why don't you
4  tell us what he -- he indicated to you about what
5  he -- he could not do.
6  A.    Well, we sort of shared interest in -- in
7  working on cars and things like that, cutting the
8  grass, doing things around the house. And it
9  was -- that was just -- in addition to the pain,
10 that was something I could tell that -- that
11 bothered him. It -- it had to for someone to --
12 to bring that up, especially in a dental setting.
13 Q.    And you indicate -- again, I think this is
14 in quotes -- I cannot cut the grass, work on cars.
15 You know, I used to like you do all the time.
16 A.    Yeah.
17 Q.    So he was sharing --
18 A.    We were --
19 Q.    Talking about your shared interest in
20 working on cars?
21 A.    Right, right.
22 Q.    And -- and then, again in quotes, you have
23 that he said, now I am almost useless, correct?
24 A.    Yes, yes.
25 Q.    I mean, what was his demeanor when he was

Page 20

1  talking to you about these -- these issues about
2  things he couldn't do?
3  A.    He was -- he was pretty depressed about
4  that. He was -- well, that -- without playing on
5  words, that really was it. He -- he -- his -- his
6  spark, his kind of smile that -- that you could
7  tell he was kidding with you a little bit was
8  pretty well gone at that point.
9  Q.    The next paragraph, it seems that you are
10 talking about actually the dental consultation
11 that day, right?
12 A.    Right, right.
13 Q.    And -- and you noted, as you said before,
14 that -- that his wife, Ruth, thought his gums were
15 infected when she looked, and he complained they
16 seemed to burn, correct?
17 A.    Right.
18 Q.    And you thought that he was concerned
19 about cancer or some other pathology, right?
20 A.    Correct.
21 Q.    Did he -- did he express that, that he was
22 concerned about cancer, or was that sort of your
23 assumption given the questions he was asking?
24 A.    He expressed it. I think it was more from
25 Ruth's concern than his about the cancer,

Page 21

1  possible.
2  Q.    And -- and as I read the letter -- and
3  correct me if I'm wrong -- just to summarize it,
4  he -- you reassured him that his gums were --
5  appeared to be normal?
6  A.    Correct.
7  Q.    And he asked why they would be burning,
8  and you suggested potentially food allergy or
9  certain toothpaste, right?
10 A.    Yeah. There's sort of a scenario that you
11 go over with food allergies, drugs. Younger
12 people that are going through, you know, hormonal
13 changes and that sort of thing deal with that.
14 And there's some other neurological things that --
15 that occur that -- that can cause that.
16 Q.    And you recommended that maybe he change
17 toothpastes and see if it helps?
18 A.    That would be a good conservative thing,
19 yes, sir.
20 Q.    And then you have a sentence -- I just
21 want to make sure I understand what you're saying.
22 It says, recounted past occurrences, and he seemed
23 interested and would do that. When it says
24 recounted past occurrences, was that you
25 recounting past occurrences of someone who had had