# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN MARKETING, SALES )
PRACTICES AND PRODUCTS LIABILITY  )
LITIGATION                        )
                                  )
_____)
                                  )
                                  )
                                  )
                                  ) CASE NO.
                                  ) 04-10981
THIS DOCUMENT RELATES TO:         )
                                  )
RUTH SMITH, Individually and as   )
Widow for the use and benefit of  )
herself and the next of kin of    )
Richard Smith, deceased.          )
                                  )
05-CV-11515                       )
                                  )


DEPOSITION OF

PAMELA KRANCER, APN

Taken on Behalf of the Plaintiffs

June 8, 2007

Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3       MARK LANIER
         DARA HEGAR
 4       PATRICK O'HARA
         Lanier Law Firm
 5       6810 F.M. 1960 West
         Houston, Texas 77069
 6       713.659.5200
         713.659.6416
 7       wml@lanierlawfirm.com
 8       ANDREW G. FINKELSTEIN
         Finkelstein & Partners
 9       436 Robinson Avenue
         Newburgh, New York 12550
10       800.634.1212
         afinkelstein@lawampm.com
11
12   For the Defendant:
13       KENNETH J. FERGUSON
         Clark, Thomas & Winters
14       P.O. Box 1148
         Austin, Texas 78767
15       512.472.8800
         512.474.1129
16       kjf@ctw.com
17
     Also Present: Jason Powers, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   WITNESS: PAMELA KRANCER
 3          INDEX OF EXAMINATIONS
 4                Page/Line
 5   By Mr. Lanier .................  6   2
 6   By Mr. Ferguson .............. 18   3
 7   By Mr. Lanier ................ 32  11
 8   By Mr. Ferguson .............. 36  12
 9           INDEX OF EXHIBITS
10                Page/Line
11   No. 1 ........................ 10  18
12   No. 2 ........................ 19   3
```

Page 4

```
 2         The deposition of PAMELA KRANCER,
 3   APN, taken on behalf of the Plaintiffs, on the 8th
 4   day of June, 2007, in the offices of Howell Allen
 5   Clinic, 2011 Murphy Avenue, Suite 401, Nashville,
 6   Tennessee, for all purposes under the Federal
 7   Rules of Civil Procedure.
 8         The formalities as to notice,
 9   caption, certificate, et cetera, are waived. All
10   objections, except as to the form of the
11   questions, are reserved to the hearing.
12         It is agreed that Elisabeth A.
13   Miller, being a Notary Public and Court Reporter
14   for the State of Tennessee, may swear the witness,
15   and that the reading and signing of the completed
16   deposition by the witness are waived.
20                    * * *
```

Page 5

```
 1         PAMELA KRANCER, APN,
 2   was called as a witness, and after having been
 3   first duly sworn, testified as follows:
```

Page 22

1  seen in the office at the request of his wife --
2  A.    Uh-huh.
3  Q.    -- is that right?
4        And can you tell -- and, again, I realize
5  it is a while back, but was that his wife called
6  and made the appointment, or he came in and said,
7  my wife asked me to come and see you?
8  A.    No, to me, that means that the patient's
9  wife called and asked for an appointment.
10 Q.    It says, he is again having bilateral leg
11 pain that radiates down his buttocks, perineal
12 area, interior part of his thigh, and down his
13 knee, correct?
14 A.    Yes, sir.
15 Q.    And is that what's called sciatica?
16 A.    Yes, sir.
17 Q.    And you noted he had seen Dr. Mackey and
18 Dr. Howell. Are they neurosurgeons, or are they
19 orthopedic surgeons?
20 A.    Dr. Mackey is an orthopedic surgeon here
21 in town, and Dr. Howell is another neurosurgeon
22 here in town.
23 Q.    And then you say, after they worked him
24 up, they would not see him because he would not
25 let them do the initial surgery -- do his initial

Page 23

1  surgery. Can you give me any more information
2  about what that means?
3  A.    Probably because a lot of -- the way it is
4  in this -- in -- in Nashville, I'm afraid, is that
5  if you have a doctor do your operation, that most
6  of the time -- this surgery was in 4-1-03, so this
7  was less than a year later. They will not see you
8  in their office for at least a year following your
9  operation. That is pretty common practice.
10 Q.    Is that because they want to leave the
11 follow-up to the physician who did surgery?
12 A.    Yes, sir.
13 Q.    Is that how y'all prefer it anyway?
14 A.    Yes, sir.
15 Q.    One sentence you say there, I have
16 discussed at length a treatment plan?
17 A.    Uh-huh.
18 Q.    That was a treatment plan that --
19 A.    What are his options as far as, you know,
20 medication regimes, epidural steroid injections,
21 and what we -- you know, what the plan needs to be
22 for his further treatment, because Dr. McCombs saw
23 him -- I felt it was necessary for him to come
24 back fairly soon, just because he was hurting so
25 badly that I scheduled him a follow-up appointment

Page 24

1  with Dr. McCombs within a week, because I felt he
2  needed to be seen by a physician of the group.
3  Q.    Tell me -- you mentioned the severity of
4  his pain. Can you describe that at all for us, as
5  far as what he was saying?
6  A.    I can't remember, no.
7  Q.    You note -- and in your discussion with
8  him, did you discuss surgery as an option in this
9  treatment plan, or was it a treatment plan
10 including conservative measures?
11 A.    I always tell them conservative measures.
12 And when I look at their scans, I also tell them
13 that I need -- I reserve the right that the
14 physicians will review the x-rays also in case
15 that they do not agree with what I have to say.
16 Q.    And, ultimately, a decision to go to
17 surgery or not, would you defer to Dr. McCombs?
18 A.    Oh, most definitely.
19 Q.    And then you go on to say you started
20 Neurontin?
21 A.    Uh-huh. And like I said, he had
22 previously been on Neurontin and had previously
23 had epidural steroid injections, which had helped
24 him.
25 Q.    So both of those types of conservative

Page 25

1  therapy were follow ups on what Dr. McCombs had
2  already recommended for him?
3  A.    Previously, yes, sir.
4  Q.    And then you indicated because of the
5  severity of his pain, you set an appointment with
6  Dr. McCombs for about a week after?
7  A.    Yes, sir. He saw Dr. McCombs on March 31
8  of '04, which was exactly a week after I saw him.
9  Q.    And were you present there at all?
10 A.    No, sir.
11 Q.    Do you review the chart afterwards to see
12 what Dr. McCombs said?
13 A.    Well, Dr. McCombs has to sign my notes.
14 And if you -- when you get a copy of the chart,
15 you'll see that under my note where I -- from my
16 office visit, Dr. -- that little scribble is
17 Dr. McCombs' initials.
18 Q.    So he is constantly reviewing your records
19 and your visits as well?
20 A.    Yes, sir. It's state law that they have
21 to do that.
22 Q.    Plus, it keeps them fully informed about
23 the patient?
24 A.    Yes, sir.
25 Q.    There's some handwriting. I have a