UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :  MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                                        :
        SALES PRACTICES AND                                         :  Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  Judge Patti B. Saris
                                                                    :
THIS DOCUMENT RELATES TO:                                           :
                                                                    :  Magistrate Judge Leo T.
                                                                    :  Sorokin
                                                                    :
*Bulger v. Pfizer Inc., et al.*                                     :
*Case No. 05-cv-11515-PBS*                                          :
                                                                    :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM IN SUPPORT OF PFIZER INC. AND WARNER-LAMBERT
COMPANY LLC'S MOTION TO EXCLUDE THE SPECIFIC CAUSATION
TESTIMONY OF DOCTORS WILLIAM MARIS AND STEFAN KRUSZEWSKI**

## **TABLE OF CONTENTS**

Preliminary statement ........................................................................................................ 1

Factual Background .......................................................................................................... 1

Law and Argument ........................................................................................................... 3

I.  The Specific Causation Testimony of Plaintiff's Expert Dr. Maris Is Unreliable and
    Inadmissible ........................................................................................................... 5

    A.  Dr. Maris Cannot Rule Out Alternative Causes of Mrs. Bulger's Suicide. ............ 5

    B.  Dr. Maris Cannot Identify an Objective "Hallmark" or Test of Neurontin-
    Induced Suicides, Rendering His Attempt to Rule Out Other Possible Causes
    Unreliable. ........................................................................................................ 6

    C.  Dr. Maris Blames Neurontin By Applying the Logical Fallacy of Post Hoc Ergo
    Propter Hoc ...................................................................................................... 7

    D.  Dr. Maris Uses Unreliable Methodologies ........................................................ 9

        1.  Dr. Maris does not use the psychological autopsy method reliably in this
        case .......................................................................................................... 10

        2.  Dr. Maris' New Suicide Model Is Unreliable. .......................................... 13

II. The Specific Causation Testimony of Plaintiff's Expert, Dr. Kruszewski, Is Unreliable
    and Inadmissible ..................................................................................................... 15

    A.  Dr. Kruszewski  Unreasonably Ignores Scientifically Reliable and Generally
    Accepted Risk Factors for Suicide. ................................................................... 16

    B.  Dr. Kruszewski's Ad Hoc Consideration and Ruling Out of Certain Facts
    Demonstrate that His Inquiry Lacked Scientific Objectivity. ............................... 17

    C.  Dr. Kruszewski Has No Basis for Ruling Out Other Risk Factors and Isolating
    Neurontin Except by Resort to Logical Fallacy .................................................. 19

Defendants, Pfizer Inc. and Warner-Lambert Company LLC ("defendants"), respectfully submit this memorandum in support of their motion to exclude the specific causation testimony of Drs. William Maris and Stefan Kruszewski.

## PRELIMINARY STATEMENT

Plaintiff Ron Bulger seeks to recover damages for the death of his wife Mrs. Bulger.  He alleges that Mrs. Bulger's use of the prescription medication Neurontin caused her suicide. Plaintiff has the burden of proving, among other things, specific causation, *i.e*, that Mrs. Bulger's ingestion of Neurontin caused her suicide.

Plaintiff has designated two expert witnesses, Dr. Ronald William Maris and Dr. Stefan Kruszewski, who offer specific causation opinions. The specific causation opinions of these experts should be excluded.  Dr. Maris' opinion is unreliable and inadmissible because: (1) he did not and cannot rule out alternative causes of Mr. Smith's suicide; (2) he cannot identify a "hallmark" for suicides caused by Neurontin; (3) he relies instead on speculation and logical fallacy to differentiate a suicide caused by Neurontin from a suicide caused by any number of established suicide risk factors; and (4) he uses unreliable methods.

Professor Kruszewski's specific causation opinion suffers from similar flaws; he (1) ignores scientifically reliable and generally accepted risk factors for suicide, thus failing to consider numerous alternative causes of Mr. Smith's suicide; (2)  unreasonably rules out other potential alternative causes; and (3) "rules in" Neurontin as a cause of Mrs. Bugler's suicide on the basis of pure speculation—all in contravention of the established methodology for determining specific causation.

## FACTUAL BACKGROUND

Suicide is a leading public health problem in the United States. *See Washington v. Glucksberg*, 521 U.S. 702, 730 (1997).  Approximately 30,000 patients die by suicide in the

United States each year. Sayler Decl., Ex. 1 at 1. Despite its prevalence, suicide is still not well-understood. Suicide is extremely difficult to predict beforehand, Sayler Decl., Ex. 3 at 780:6-12, and to understand afterwards. *See Yanco v. U.S.*, 45 Fed. Cl. 782, 794 (2000) (quoting *Grief After Suicide* (1981)). Still, the medical and scientific community recognizes established "risk factors" associated with suicide. Sayler Decl., Ex. 2 at 12. The factors put people at an increased risk of suicide, as compared to the general population. Sayler Decl., Ex. 3 at 453:14-23.

Mrs. Bulger was a 39-year old woman with a significant history of mental disorders, health problems, and substance abuse. Most notably, Mrs. Bulger attempted suicide multiple times before ever ingesting Neurontin. *Id.* at 878:25-879:3. In 1978 at the age 14, she attempted to cut her own wrists. Sayler Decl., Ex. 19 at 10. On June 5, 1990, Mrs. Bulger was admitted to the emergency room after she overdosed on pills and cut her wrists. Sayler Decl., Ex. 3 at 984:3-14. In 1993, she attempted to overdose on Elavil, went into cardiac arrest and required resuscitation. *Id.* at 993:17-994:12. As a result, she spent four days in a coma. *Id.* The stated reason for attempting suicide was: "physician became aware of the fact that she was abusing narcotics and was cutting her off from those." *Id.* At another point, she attempted suicide by driving her car off a cliff. *Id.* at 980:24-981:3.

At one time or another, Mrs. Bulger was described as suffering from: bipolar disorder II, borderline personality disorder, anxiety disorder with panic attacks and period of agoraphobia, post-traumatic stress disorder, depression with suicidal ideation and multiple suicide attempts, rheumatoid arthritis, cervical subluxation with associated neck pain, low back pain, psychogenic pain, hepatitis C, and gastro-esophageal reflux disease. Sayler Decl., Ex. 4 at 7-8.

From the time of her diagnosis with rheumatoid arthritis in 1982 until the time of her suicide on August 4, 2004, she suffered from chronic, severe pain, commenting as early as 1993:

"this disease has totally taken the life out of me. . . Now I just exist.  I have no desire whatsoever." Sayler Decl., Ex. 5 at 333:17-25, 688:11-19. By 1998, she had undergone multiple orthopedic operations and replacements and was on disability. Sayler Decl., Ex. 6 at 70:24-71:10.  Her pain was not relieved.

Mrs. Bulger's life was also fraught with psycho-social stressors, including physical and mental abuse, long-term substance abuse, and addiction to cocaine, heroin, Methadone, and OxyContin. *Id.* at 73:4-8, 99:4-17, 104:14-107:6; Sayler Decl., Ex. 3 at 874:18-875:3, 950:20-951:21.  Plaintiff himself abused heroin and sold his wife's prescription medications. Sayler Decl., Ex. 3 at 891:3-21. Plaintiff's experts conclude that Mr. Bulger sold his wife's prescription medications and forced her to "doctor shop" to obtain more medication for him to sell. *Id.* at 886:3-6, 1006:24-07:2, 1069:6-17; Sayler Decl., Ex. 7 at 25:6-11.  Six months before her suicide, Mrs. Bulger was caught buying cocaine on the street. *Id.* at 27:23-29:17. According to her sister, Mrs. Bulger was planning on leaving plaintiff. *Id.* at 75:10-76:3. Plaintiff overheard this phone conversation and forbade his wife from contact with her sister. *Id.* at 86:13-21.  As a result, Mrs. Bulger never spoke to her sister again—this occurred about four months before her suicide. *Id.* In addition, in the month prior to her death, Mrs. Bulger reported to her physician, Dr. Goldman, that she was experiencing a flare-up of her arthritis and that she had run out of Methadone, but Dr. Goldman refused to give her more. Sayler Decl., Ex. 8 at 138:1-139:24. Also, on the day of her suicide, she refilled her prescription-strength Ibuprofen. Sayler Decl., Ex. 3 at 1006:21-1007:14.  She left no suicide note, but wrote in the dust by her body, "Ron RI." Sayler Decl., Ex. 9 at 35:20-24.

## LAW AND ARGUMENT

"Expert evidence can be both powerful and quite misleading because of the [jury's] difficulty in evaluating it." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 595 (1993).  Thus,

Federal Rule of Evidence 702 requires judges to act as gatekeepers, screening expert testimony for reliability. *Id.* at 589. The court must ensure that experts employ in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The expert must ground his testimony in the methods of science and apply those methods reliably to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592, 595. Relevant factors in determining reliability include whether the method can or has been tested, has been subjected to peer review and publication, has a known or potential rate of error, and has general scientific acceptance. *Daubert*, 509 U.S. at 593-95.[1]

At a minimum, courts analyzing specific causation expert testimony require that the experts consider and rule out alternative causes of the alleged injury. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("At the core of differential diagnosis is a requirement that the experts at least consider alternative causes—this almost has to be true of any technique that tries to find a cause of something"). As the court explained in *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779 (D.N.J. 1996), "Courts have insisted time and time again that an expert may not give opinion testimony to a jury regarding specific causation if the expert has not engaged in the process of differential diagnosis—that is the process of eliminating other potential diagnoses." *Id.* at 786. An expert's failure to consider or rule out alternative causes of the alleged injury is grounds for exclusion. *Cloud v. Pfizer,* 198 F. Supp. 2d 1118, 1136 (D. Ariz. 2001) (failure to consider alternative causes); *Haggerty v. Upjohn*, 950 F. Supp. 1160, 1166-67 (S.D. Fla. 1996) (failure to rule out alternative causes).

---

[1] Other relevant factors include: whether the expert's testimony grows naturally and directly out of the expert's non-litigation dependent research or was developed expressly for the purpose of testifying, *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert II*"); whether the expert has made an unacceptable inferential leap from an accepted premise to an unfounded conclusion, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); and, whether the expert has adequately accounted for obvious alternative explanations. *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502 (9th Cir. 1994). Ultimately, the proponent must prove by a preponderance of the evidence that the expert testimony is admissible under *Daubert. Kumho*, 526 U.S. at 147.

I.   **THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT DR. MARIS IS UNRELIABLE AND INADMISSIBLE**

Plaintiff has the burden of proving specific causation through admissible expert testimony. *Canavan's Case*, 432 Mass. 304, 315-16, 753 N.E.2d 1042 (2000) (noting that expert opinion is required to prove medical causation).   For the reasons explained below, plaintiff cannot meet this burden because he has failed to produce admissible expert opinions on this element of specific causation.

Dr. Maris freely admits that Mrs. Bulger had a number of risk factors for suicide, but contends that she was "coping" with these risk factors before Neurontin pushed her over the edge.[2]  This conclusion is based on unsound methodology and is therefore inadmissible.  First, Dr. Maris did not rule out alternative causes of Mrs. Bulger's suicide.   Nor can he identify a "hallmark" for suicides caused by Neurontin.   He, thus, has no sound methodological basis— apart from speculation and logical fallacy—to differentiate a suicide caused by Neurontin from a suicide caused by any number of established suicide risk factors.   In addition, Dr. Maris uses faulty methods; his psychological autopsy in this case is litigation-driven and biased, and violates his own standards, while his "model" for suicide is not generally accepted or reliable.

A.   *Dr. Maris Cannot Rule Out Alternative Causes of Mrs. Bulger's Suicide.*

---

[2] In his 50-year history as a plaintiff expert witness, Dr. Maris has consistently testified that the prescription drug at issue was "the scale tipper," "the just noticeable difference maker," or "that without which not," and that the plaintiff was "coping" despite any number of devastating risk factors before taking the drug. *See, e.g.*, Sayler Decl., Ex. 3 at 75:18-92:10 (in *Williamson, Sorg, Forsyth, Giles, Routhier, Crone*, Dr. Maris testified Prozac/Effexor/Wellbutrin/ Neurontin were "scale-tippers").   Dr. Maris admits that he uses the same language—phrases that he has work-shopped with a jury consultant, *id.* at 498:13-500:9—and the same conclusion in all his prescription drug cases. *Id.* at 76:18-77:1, 94:8-17.   Dr. Maris' verbatim language in every prescription drug case suggests that he has a pre-ordained conclusion and retro-fits the facts into that conclusion, which is the precise opposite of the scientific method. *See Cloud*, 198 F. Supp. 2d at 1135 (rejecting expert's testimony in part because he came to a conclusion without a full review of the records and accurate knowledge of the facts) (citing *Claar*, 29 F.3d at 502-03). *See also In Re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 618, 629 (S.D. Tex. 2005) (expressing concern about verbatim sentences in expert's examinations).

Dr. Maris has failed to rule out numerous potential causes of Mrs. Bulger's suicide.  For instance, Dr. Maris will not deny that there were other "substantial" factors in Mrs. Bulger's suicide. *E.g.*, Sayler Decl., Ex. 10 at 32.   Dr. Maris <u>refuses</u> to use the word "cause" in testifying about Neurontin's role in Mrs. Bulger's suicide. *E.g.*, Sayler Decl., Ex. 3 at 1068:13-22 (Mr. Rosencranz:. . .I don't think he's used the term cause for even Neurontin. A. Right. I used substantial factor. . . Because I think there are many substantial factors"). *See also id.* at 867:5-7 ("Do I think it's as clear that Neurontin caused her suicide; you know, caused substantial proximate factor? No. . ."); Sayler Decl., Ex. 10 at 28 ("Is this the best 'Neurontin-causing-suicide-case' that I have ever investigated?  Obviously not.").   Dr. Maris' failure to rule out established suicide risk factors as causes of Mrs. Bulger's suicide—particularly coupled with his refusal to use the word "cause" with respect to Neurontin—renders his specific causation conclusion inadmissible. *See Rutigliano*, 929 F. Supp. at 787 ("A meaningful diagnosis of specific causation must specifically negate other possible causes.").

Dr. Maris cannot rule out alternate causes of Mrs. Bulger's suicide and he admits that those factors were "substantial proximate factors" in Mrs. Bulger's suicide. Dr. Maris' failure to exclude other causes renders his opinion unreliable and inadmissible. *Id. See also Haggerty*, 950 F. Supp. at 1166-67.

**B.**     ***Dr. Maris Cannot Identify an Objective "Hallmark" of Neurontin-Induced Suicides, Rendering His Attempt to Rule Out Other  Causes Unreliable.***

In cases where the injury alleged may be caused by any number of possible causes, courts have demanded some objective indicia unique to injuries caused by the suspected cause or more certainty in the ruling out of other possible causes. *Nat'l Bank of Commerce v. Dow*, 965 F. Supp. 1490, 1513-14 (E.D. Ark. 1996) (expert must rule out alternative causes with more certainty when testifying that asbestos caused colon cancer, a disease with multiple risk factors).

When asked to identify the hallmark of a Neurontin-induced suicide, Dr. Maris testified that in Neurontin-induced suicides, there are "acute factors of ingestion of Neurontin." Sayler Decl., Ex. 3 at 706:21-707:11.  In other words, the only unique hallmark of a Neurontin-induced suicide is that the decedent ingested Neurontin. *Id.* at 707:21-708:14.

Recognizing that not all people who take Neurontin commit suicide or do so because of Neurontin, *see id.* at 720:12-721:4, Dr. Maris tried to narrow his test further.  When asked how to objectively observe or identify whether a person who took Neurontin and committed suicide did so because of Neurontin, Dr. Maris admitted that one could look at the drug's adverse side effects, but "it's a somewhat circuitous line of reasoning, because it involves many risk factors and many adverse events." *Id.*  In other words, Dr. Maris, in his expert report and sworn deposition testimony, does not  identify any unique, observable "hallmark" of a Neurontin-induced suicide other than that the decedent ingested Neurontin.  His failure to do so in light of the many other possible causes of Mrs. Bulger's suicide—which he himself admits exist—renders his specific causation conclusion unduly speculative and unreliable. *See Nat'l Bank of Commerce v. Dow*, 965 F. Supp. at 1513-15, 1521-23 (experts' opinions unreliable, in part because they could not identify the injury as a "signature" of the suspected agent and could not rule out other causes).

**C.**      ***Dr. Maris Blames Neurontin By Applying the Logical Fallacy of Post Hoc Ergo Propter Hoc***

Because Dr. Maris can neither eliminate possible alternative cause nor point to a hallmark of a "Neurontin-induced" suicide, he unscientifically applies the principle of "*post hoc ergo propter hoc*" to reach his conclusion that Neurontin was a substantial factor in Mrs. Bulger's suicide. Sayler Decl., Ex. 3 at 692:23-693:6.  He reasons that, because Mrs. Bulger committed suicide after allegedly taking Neurontin, her suicide must have been caused by Neurontin.  But,

as the court explained in *McClain v. Metabolife*, 401 F.3d. 1233 (11th Cir. 2005), "because a person takes drugs and then suffers an injury does not show causation. Drawing such a conclusion from temporal relationships leads to the blunder of the *post hoc ergo propter hoc* fallacy." *Id.* at 1243. Other courts have also found that specific causation opinions based on "*post hoc ergo propter hoc*" are unreliable and inadmissible. *See, e.g., Ervin v. Johnson & Johnson*, 492 F.3d 901, 904-05 (7th Cir. 2007); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 23 n.52 (D. Mass. 1995).

Despite well-established case law, Dr. Maris boldly proclaims his reliance on this logical fallacy. He testified that he applies the principle of *post hoc ergo propter hoc* by taking into consideration all of a decedent's risk factors and the fact that the decedent "coping"[3] and did not commit suicide before. Sayler Decl., Ex. 3 at 692:13-22. Then, Dr. Maris asks, "Why now?" *Id.* The "why now?" factor is a major part of his inquiry. *Id.* at 692:23-693:6.[4] He explains, confusingly:

> Q. Is Neurontin the only risk factor she had to have?
> . . .
> A. Right. I mean, I think I said earlier that if she had killed herself before she was taking Neurontin; obviously, she could have killed herself without Neurontin. But in terms of her history, that was there. And I think it was a "difference maker" is the term I use.

*Id.* at 1302:16-1303:2 (objection omitted). "You know the law, *post hoc ergo propter hoc*." *Id.* at 693:2-3. This inquiry is especially dubious given that Mrs. Bulger attempted to kill herself

---

[3] What Dr. Maris means by "coping" is not obvious given that Mrs. Bulger was attempting suicide, abusing hardcore street drugs, and fighting serious mental health issues during the period before she was on Neurontin.

[4] Dr. Maris' "Why now?" inquiry is also arbitrary and litigation-driven. He applies a different inquiry outside of litigation, asking, "What are they fleeing from?" Gene Weingarten and David Von Drehle, *A Death Better Than Fate's*, Washington Post, Sept. 13, 2001, at C01 (quoting Dr. Maris). That inquiry addresses the most common motive of suicide: "[P]robably about 70 percent of all suicides are escape, escape from an intolerable life situation." Sayler Decl., Ex. 3 at 804:3-5. The only evident explanation for Dr. Maris' asking "Why now?" instead of "What was Mr. Smith trying to escape?" is that the latter inquiry points to chronic pain, and not Neurontin.

several times before, while not taking Neurontin, and given that Dr. Maris made no attempt to determine, "Why then?"[5]

As it turns out, Dr. Maris does not know the law (or the facts).[6]  And because Dr. Maris relies on the *post hoc ergo propter hoc* fallacy as a "major factor" in attributing a suicide to Neurontin, his specific causation opinion is unreliable and should be excluded as a matter of law. *See, e.g., Whiting*, 891 F. Supp. at 23 n.52; *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996); *Metabolife*, 401 F.3d. at 1243.

Even assuming *arguendo* that the *post hoc ergo propter hoc* fallacy were a reliable basis for Dr. Maris' specific causation opinion, Neurontin is not even the most proximate trigger present in this case.  Using Dr. Maris' own reasoning—*i.e.*, that Mrs. Bulger was coping with her risk factors until Neurontin pushed her over the edge—the fact is that Mrs. Bulger was "coping" with Neurontin until she ran out of Methadone, making her Methadone withdrawal more proximate in time than Mrs. Bulger's Neurontin use and thus the "tipping factor" in Mrs. Bulger's suicide.  Thus, not only has Dr. Maris resorted to logical fallacy, he has applied that fallacy arbitrarily.  The only explanation for Dr. Maris singling out Neurontin is that doing so is advantageous to plaintiff's claim, making his opinion inadmissible.[7]

### D.     *Dr. Maris Uses Unreliable Methodologies*

To support his specific causation opinion, Dr. Maris purports to use a psychological autopsy and a suicide model, but those methods do not provide a reliable basis for his opinions.

---

[5] Dr. Maris did not analyze Mrs. Bulger's previous attempts, in terms of intent or precipitating events. Sayler Decl., Ex. 3 at 980:11-17, 984:18-21 (first attempt: overdose and wrist cutting), 983:3-9, 15-19 (second attempt: cliff), 986:2-12 (third attempt: overdose), 997:8-11 (fourth attempt: wrist-cutting).

[6] Plaintiff has no toxicological evidence that Mrs. Bulger ever took Neurontin, let alone took Neurontin shortly before committing suicide. *Infra* § II (C).

[7] *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Here, however, Dr. Johnson has admitted that [plaintiff's] symptoms could have numerous causes and, without support save [plaintiff's] oral history, simply picks the cause that is most advantageous to [plaintiff's] claim. Indeed, Dr. Johnson's testimony is no more than [plaintiff's] testimony dressed up and sanctified as the opinion of an expert. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

### 1. Dr. Maris does not use the psychological autopsy method reliably in this case

Dr. Maris described the psychological autopsy form as "an attempt in a more systematic, unbiased way to make sure I get all the information I need to form and defend an opinion." Sayler Decl., Ex. 3 at 860:20-861:13. Dr. Maris further testified that he designed the psychological autopsy form "to gather information which may or may not have been asked before in order to help me as a scientist to look objectively at the factors that I think are related usually to a suicide outcome." *Id.* A close examination of the psychological autopsy used in this case reveals that it is not objective, unbiased, or reliable and hence, renders Dr. Maris' opinions inadmissible.

#### a) *Dr. Maris developed his psychological autopsy tool solely in the context of a different litigation.*

Far from objective and unbiased, Dr. Maris' psychological autopsy form was funded and partially written by a plaintiff's attorney in the antidepressant litigation. An entire section of Dr. Maris' form was written by Andy Vickery, a plaintiff's attorney, and Dr. Maris developed the rest of the form during the period he was retained by Mr. Vickery to provide litigation opinions. *Id.* at 405:6-13, 416:12-17. Dr. Maris even admitted that he does not put "much stock in" the portion of the psychological autopsy drafted by plaintiff's counsel, but that he included that section because Mr. Vickery was paying him. *Id.* at 418:6-20. Nevertheless, this admittedly unreliable section of the psychological autopsy developed by attorney Vickery is used and relied on by Dr. Maris in this case.[8]

---

[8] In fact, the Smith psychological autopsy still contains criteria specifically developed for Dr. Maris' testimony in the SSRI litigation. For instance, the questions about whether adverse events occur "within 30 days of ingestion of Neurontin" is based on allegations that antidepressants continued to exert an effect for this period of time. No scientific evidence has ever been produced establishing a causal connection between Neurontin and suicides occurring within 30 days of ingestion, a fact that Dr. Maris admits. *Id.* at 422:12-16. Instead, Dr. Maris' adoption of this time frame is purely speculative —it is difficult to fathom a more litigation-driven methodology.

    **b)**    *Dr. Maris failed to follow his own methodological standards in a*
*non-litigation context, infecting his analysis with mistakes and*
*biases.*

Not only does Dr. Maris use a tool developed in litigation, but he admits that he failed to follow his own methodology outside of the court room in this case. Dr. Maris has defined his psychological autopsy as:

> A standardized, systematic checklist which could be used to assemble and organize information so that <u>a qualified suicidologist or other appropriate healthcare professional</u> would have the information necessary to consider all of the various risk factors which may or may not have contributed in a material way to any person's suicide or suicide attempt.

Sayler Decl., Ex. 13 at *1. He has stressed in prior litigation that he did not want individuals he did not know conducting the psychological autopsy because "a lot of them were not really probing the way I would like my trained interviewers to probe." Sayler Decl., Ex. 14 at *73-4. Dr. Maris has also stated that in order to publish an article outside the context of litigation based on a psychological autopsy that produces sufficiently reliable results, he would conduct a face-to-face interview of two to three people. Sayler Decl., Ex. 3 at 445:23-446:4, 27:21-28:22.

But, despite suggestions to the contrary in his report, Sayler Decl., Ex. 10 at 1-2, the psychological autopsy in this case was <u>not</u> conducted by Dr. Maris, or any other "appropriate healthcare professional." Dr. Maris did not conduct any face-to-face interviews or even fill out the psychological autopsy form. In fact, he did nothing other than send the form to plaintiff's law firm to fill out. Sayler Decl., Ex. 3 at 424:20-426:1. The law firm employee[9] who completed the form is neither a suicidologist nor an "appropriate healthcare professional," but in fact, has no medical background whatsoever and was not provided any sort of training by Dr. Maris. *Id.* at 428:18-23. The employee's utter lack of training and expertise became obvious at Dr. Maris' deposition. He testified, "In fact, I insisted that *Bulger* be redone, I thought it was so

---

[9] Dr. Maris testified that Michelle Faye, a paralegal at plaintiff's law firm, completed the form.

much incomplete." *Id.* at 428:11-17. However, Dr. Maris did not revise the psychological autopsy; he just had plaintiff's law firm go back and "do it again." *Id.* at 854:2-855:3. Yet throughout his deposition, Dr. Maris admitted that there are still mistakes in the psychological autopsy. *E.g.*, *id.* at 855:5-12 (Mrs. Bulger had a family history of mental illness; her mother was schizophrenic). *See also* Sayler Decl., Ex. 15 at 23-25 (listing multiple errors). These errors render Dr. Maris' specific causation opinions unreliable and inadmissible. *See Cloud*, 198 F. Supp. 2d at 1135-36.

The psychological autopsy is also unreliable due to the obvious biases it introduces. The psychological autopsy used in this case is a far cry from the "objective" and "unbiased" method Dr. Maris described during his deposition. Sayler Decl., Ex. 3 at 860:20-861:13. By allowing plaintiff's law firm to fill out the psychological autopsy form, Dr. Maris let the law firm subjectively decide which facts were and were not pertinent to the case. *See Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1068 (D. Kan. 2001) (excluding expert who relied on "preselected evidence from interested parties"). Numerous courts have held that forms completed by individuals closely affiliated with plaintiff's law firm are unreliable; this Court should do the same. *See Silica*, 398 F. Supp. 2d at 600, 635–36 (criticizing diagnoses by physicians closely affiliated with plaintiff law firms and the completion of physician's blank forms by non-physicians).[10]

In addition, in both his psychological autopsy and his expert report, Dr. Maris relies heavily on Ron Bulger's self-interested deposition testimony. Sayler Decl., Ex. 10 at 22–27. Courts have rejected expert testimony depending on the oral medical history of the plaintiff to prove that that symptoms were caused by the suspected cause rather than numerous other causes,

---

[10] *See also In re Agent Orange*, 61 F. Supp. 1223, 1246 (E.D.N.Y. 1985) (excluding physician's differential diagnosis where evidence of the patient's illness came from a self-completed checklist because the "usual inducement to candor with a physician . . . was wholly lacking" and "plaintiffs had every incentive to be over inclusive in describing their symptoms."); *In re Diet Drugs Prods. Liab. Litig.*, 236 F. Supp. 2d 445, 457 (E.D. Pa. 2002) (criticizing completion of form containing medical history questions by non-physicians).

calling it "no more than [the plaintiff's] testimony dressed up and sanctified as the opinion of the expert." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987).  Dr. Maris himself admits that there is no way to quantify the degree of distortion introduced into the psychological autopsy process by relying on deposition testimony. Sayler Decl., Ex. 3 at 449:10-14.  There is especially good reason to reject Dr. Maris' use of interested deposition testimony in this case because this plaintiff <u>exemplifies</u> credibility problems, as both plaintiff's experts admit.[11]

Dr. Maris' use of a psychological autopsy performed by an employee of plaintiff's law firm and without any face-to-face interviews and reliance on selective records chosen by interested parties clearly violates his <u>own</u> methodological standards expressed outside the context of litigation. *Id.* at 861:14-863:16.  That Dr. Maris set aside his own professional scruples renders his opinions unreliable. *See Cooper v. Smith & Nephew*, 259 F.3d 194, 203 (4th Cir. 2001) (excluding opinion, in part because the expert did not follow his methodological standards outside the courtroom).  As Judge Posner has stated, "Why should a court rely on the sort of exposition the scholar would not tolerate in his professional life?" *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996).

### 2.   Dr. Maris' New Suicide Model Is Unreliable.

In addition to his psychological autopsy, Dr. Maris relies on a chart that he describes as his new "suicide model." Dr. Maris suggested that the chart is a general causation model, addressing mechanism of action. Sayler Decl., Ex. 3 at 12:11-20.  Under the federal rules, <u>an expert must produce</u> a written report disclosing the expert's complete opinion, the reasons for them, as well

---

[11] Sayler Decl., Ex. 5 at 441:11–442:3. Dr. Maris has already acknowledged that Ron Bulger Sr. lied in his deposition when he said Mrs. Bulger never saw a psychiatrist, Sayler Decl., Ex. 10 at 8, that he illegally sold his wife's medically necessary prescription drugs and other narcotics on the street, *id.* at 10, that he is regarded as a "con artist" who allegedly faked his own motorcycle accident to buy things, *id.*, and that at least one relative thinks he killed his wife. *Id.* at 11. Indeed, Ron Bulger Sr. told infinitely more lies in his deposition. Sayler Decl., Ex. 3 at 889:12-19 (Ron Bulger Sr. lied that he never abused drugs )(citing Ron Bulger Sr. Dep. 164, annexed as Sayler Decl., Ex. 16), 891:22-894:24 (he lied that he never abused his wife).

as any exhibits that will be used to support them <u>at the time ordered by the court</u>.  Fed. R. Civ.

Pro. 26(a)(2).  Pursuant to Discovery Order 13 (docket number 801), plaintiff's general causation

expert reports were due on October 22, 2007, more than eleven months before Dr. Maris

disclosed his suicide model, created on the eve of his deposition. Sayler Decl., Ex. 3 at 495:22-

496:9. The time has long since passed for disclosing general causation opinions and Dr. Maris

should be precluded from doing so now.

Second, Dr. Maris admitted that he is not qualified to opine on general causation,

repeatedly stating that he was "not competent" to answer questions regarding Neurontin's

mechanism of action. Sayler Decl., Ex. 3 at 152:18-23, 162:18-25, 163:24-164:21, 179:11-20,

193:2-21, 201:10-15.  He testified that he relied entirely on Drs. Trimble, Kruszewski, and

Roth—plaintiffs' timely designated general causation experts—even stating, "If they fall, I fall."

*Id.* at 181:16-184:2.  He cannot now attempt to offer a general causation theory.

But independent of the model's problems with respect to general causation, it is also not a

reliable or generally accepted method on which to base a specific causation opinion.  Dr. Maris

admits that his suicide model has not been published in its present form. Sayler Decl., Ex. 17 at

438:15-439:24.  In fact, the new chart is the exact opposite of the model Dr. Maris published

twice before. *See* Sayler Decl., Ex. 3 at 496:16-497:23.  In the published model, "medication"

appears in the column for factors <u>protective</u> against suicide. Sayler Decl., Ex. 17 at 444:22-

445:2.  Dr. Maris "new" model by moves medication—previously a protective factor—to the

column labeled "<u>trigger</u>" by drawing a red arrow from one column to the next. Sayler Decl., Ex.

18 at 46; Sayler Decl., Ex. 17 at 441:13-442:12, 443:1-9.

Dr. Maris has provided no scientific basis for this 180° change of opinion.  He never lists

"medication" as a risk factor for suicide in his report, Sayler Decl., Ex. 3 at 456:18-25, and

cannot cite any scientific evidence that medication is a trigger for suicide (as opposed to a treatment for acutely suicidal patients). Further demonstrating the non-scientific nature of Dr. Maris' new model, he admits that he could substitute any medication for Neurontin to support his litigation opinions in other pharmaceutical cases. *Id.* at 443:21-444:19. Lacking any reliable scientific support or validating testing for the drastic alteration in his published model, Sayler Decl., Ex. 17 at 446:12-447:17, Dr. Maris' modification appears to have been made expressly for the purpose of testifying and is, hence, inadmissible. *See Daubert II*, 43 F.3d at 1318-19 (excluding expert testimony without peer-review and publication and developed in litigation).

## II.   THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT, DR. KRUSZEWSKI, IS UNRELIABLE AND INADMISSIBLE

Much like Dr. Maris, Dr. Kruszewski freely admits that Mrs. Bulger suffered numerous suicide risk factors, but contends that Neurontin was, nonetheless, a substantial factor in Mrs. Bulger's suicide. Dr. Kruszewski's specific causation opinion is based on unsound methodology and is therefore inadmissible.[12]   First, Dr. Kruszewski ignored numerous risk factors in his report.   Second, Dr. Kruszewski's *ad hoc* consideration and ruling out of pertinent facts demonstrate an absence of scientific objectivity.  Third, he has no basis for ruling out other risk factors and isolating Neurontin except an alleged temporal connection.

Dr. Kruszewski claims to rely on a "differential diagnosis" methodology to reach his opinion that Neurontin caused Mrs. Bulger's suicide. Sayler Decl., Ex. 12 at 12 (purporting to consider various risk and protective factors).[13]   A proper differential diagnosis requires that the

---

[12] Defendants have also moved to exclude Dr. Kruszewski's general causation opinion for reasons stated in the *Daubert* general causation record.

[13] Dr. Kruszewski admits that the Bradford Hill and Naranjo criteria he sets forth in his Report cannot provide the basis for a specific causation opinion. *Id.* at 356:15-357:13 (Naranjo), 379:1-20 (Bradford Hill). Dr. Kruszewski could not cite peer-reviewed published literature supporting the use of those methods to determine whether a drug caused an individual to commit suicide. *Id.* at 358:18-359:17 (Naranjo), 376:13-20 (Bradford Hill). In addition, psychiatrists in the field do not use the Naranjo criteria, *id.* at 368:25-369:7, and he did not analyze every medication that Mrs. Bulger was taking at the time of her death, contrary to the method's standards. *Id.* at 373:11-374:1.

expert initially consider all possible causes and then exclude causes based on a review of the evidence in the case. *Clausen v. M/V CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003).   The process is often described as "ruling in" and "ruling out." *Glatstetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).   Failure to take serious account of other possible causes demonstrates unreliability in the expert's methodology. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999).   Failure to rule out a possible cause also demonstrates unreliability. *Clausen,* 339 F.3d at 1058. Failure to explain why a possible cause was ruled out is also justification for excluding the expert opinion. *Cooper*, 259 F.3d at 202.   The reasons for ruling out other possible causes must be founded on more than "subjective beliefs or unsupported speculation," but instead must be based on "scientific methods and procedures." *Claar*, 29 F.3d at 502.

## A.   *Dr. Kruszewski Unreasonably Ignores Established Risk Factors for Suicide.*

As set forth above, a proper differential diagnosis requires that the expert initially consider all possible causes. Dr. Kruszewski failed to do so.  In his report, he purports to identify Mrs. Bulger's suicide risk factors: ". . . her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports." Sayler Decl., Ex. 12 at 12.

Dr. Kruszewski's report <u>fails to identify</u> numerous risk factors that explain Mrs. Bulger's suicide.  These factors, each of which Dr. Kruszewski admits are associated with increased suicide risk, Sayler Decl., Ex. 2 at 12, include, but are not limited to: (1) prior suicide attempts; (2) suicidal ideation, intent, or planning, Sayler Decl., Ex. 5 at 418:2–19; (3) withdrawal from methadone, 651:4–12; (4) loss of social support, 659:11–21; (5) hopelessness, 669:5–16; (6)

tragic life events, 669:17–670:11; (7) unemployment, 670:12–671:3; (8) aggression, 671:4–10; (9) borderline personality disorder, 371:1–24; (10) discontinuance of mental health treatment, 602:3–609:14; and (11) failed detoxification from illicit drugs, 621:15–622:18.

Dr. Kruszewski does not even mention Mrs. Bulger's prior suicide attempts.  His report's failure to even mention her prior suicide attempts indicate a failure to reliably rule out her prior suicide attempts—each of which occurred before she allegedly ingested any Neurontin—as an explanation for her suicide.   Dr. Kruszewski's omission is significant, demonstrating the inadmissibility of his opinion, because prior suicide attempts are the highest risk factor for suicide. Sayler Decl., Ex. 3 at 966:23-967:3. *See also* Sayler Decl., Ex. 2 at 8, 21-22 (associated with a 38 fold increase in suicide risk).  Additionally, as the closest approximation of her suicide, the experts had much to gain by investigating her prior attempts.  And yet, Dr. Kruszewski, like Dr. Maris, did not inquire into Mrs. Bulger's previous attempts, her intent, and how serious she thought the attempts were. Sayler Decl., Ex. 5 at 502:5–15, 504:2–6.   Dr. Kruszewski's admission that he did not investigate Mrs. Bulger's history of suicide attempts—which predated her use of Neurontin—and what caused them, renders his opinion that Neurontin caused her suicide unreliable and hence inadmissible. *See Cloud,* 198 F. Supp. 2d at 1118, 1136 (excluding expert who "did not fully explore other potential causes of [the decedent's] suicide.").

**B.     *Dr. Kruszewski's Inquiry Lacked Scientific Objectivity.***

Objectivity is essential to the scientific method. *See Cloud*, 198 F. Supp. 2d at 1135.  An expert who has come to conclusions without a full review of the evidence or who has come to a pre-ordained conclusion first and then tried to make the facts fit his conclusion, is employing the precise opposite of the objective, scientific method. *Id.* (citing *Claar*, 29 F.3d at 502-03). In *Cloud*, 198 F. Supp. 2d at 1135-36, the court discovered that the expert had made an error of fact

and had made his conclusion before he completely reviewed the medical records. *Id.* On this basis and others, the court excluded the expert's specific causation opinion. *Id.* at 1136-37.

As in *Cloud*, Dr. Kruszewski's speculative and litigation-driven approach became obvious because his conclusion preceded his knowledge of important facts. Whereas his report makes no mention of Mrs. Bulger's prior suicide attempts, Dr. Kruszewski attempted to explain during his deposition (on an *ad hoc* basis) that he failed to identify these attempts because they were "non-lethal." Sayler Decl., Ex. 5 at 426:5–24, 473:21–475:22. Of course, this "non-lethal distinction" does not excuse Dr. Kruszewski's ignorance of Mrs. Bulger's prior suicide attempts. Suicide attempts are non-lethal by definition; they are nonetheless the highest risk factor for completed suicide. Dr. Kruszewski's failure to consider Mrs. Bulger's multiple previous suicide attempts points to the kind of fact-shaping to pre-ordained conclusions that the *Cloud* court found methodologically unreliable.

In the end, Dr. Kruszewski ultimately admitted that it was just a matter of "chance" that Mrs. Bulger was not successful in her prior attempts.[14] Sayler Decl., Ex. 5 at 510:6–18. His inability to objectively and scientifically differentiate Mrs. Bulger's prior attempts from her ultimate suicide, resorting to "chance," is the epitome of unscientific speculation. *See Claar*, 29 F.3d at 502 (excluding expert opinion based on speculation, rather than science).

Dr. Kruszewski's treatment of other risk factors that he failed to identify or consider further confirms that his conclusions are pre-ordained and speculative. During his deposition, Dr. Kruszewski purported to rule out facts as they became known to him based on defense counsel's cross examination. Sayler Decl., Ex. 5 at 630:8–22, 636:18–638:24 (recent street drug

---

[14] Dr. Kruszewski testified that after Susan overdosed and went into cardiac arrest in 1993, she could have died if plaintiff had not come home or the CPR had not been successful. Sayler Decl., Ex. 5 at 507:11–16. Conversely, Dr. Kruszewski admitted that, had plaintiff come downstairs earlier on August 4, 2004, Mrs. Bulger could have lived. He even admitted that Mrs. Bulger might have thought plaintiff would come down and find her. *Id.* at 513:15–18.

buy), 576:10–578:25 (Mrs. Bulger hitting her son six days before committing suicide). Until he was finally caught in his farce, Dr. Kruszewski testified that he had considered and ruled out a number of facts during his deposition. When tested, however, Dr. Kruszewski could not independently recall the substance of a fact he had purported to rule out only moments earlier. *See, e.g., id.* at 639:10–641:17. How could he testify under oath that he had ruled out a fact that he could not actually remember? That Dr. Kruszewski purported to rule out unknown facts demonstrates that he came to a subjective conclusion first and then made the facts fit his conclusion, flouting the objectivity crucial to the scientific method. *See Cloud*, 198 F. Supp. 2d at 1135.

## C.   *Dr. Kruszewski Blames Neurontin by Resort to Logical Fallacy*

As noted above, where the injury alleged has many possible causes, courts have demanded some signature of the injury or more certainty in the ruling out of other possible causes. *See Nat'l Bank of Commerce v. Dow*, 965 F. Supp. at 1513-14. Dr. Kruszewski neither rules out potential causes of Mrs. Bulger's suicide, nor can point to a hallmark of "Neurontin-induced" suicides. He cannot prospectively identify members of the vulnerable minority of people in whom Neurontin can cause suicide. Sayler Decl., Ex. 5 at 382:15-384:8. The markers he retrospectively analyzes to determine whether Neurontin caused a person to commit suicide are the same risk factors that appear in any suicide. *Id.* at 217:5–25. He thus has no basis to differentiae a suicide caused by Neurontin from one caused by any other risk factor, which renders his opinions unreliable. *See Nat'l Bank of Commerce v. Dow*, 965 F. Supp. at 1513-14.

Lacking this basis, he improperly resorts to the temporal connection between Mrs. Bulger's suicide and her alleged ingestion of Neurontin. Indeed, he goes so far as to opine: "I have an opinion . . . that the Neurontin that she took at roughly 6 p.m. on the night of her death was the responsible precipitating event to push her over the edge and cause her to commit

suicide." Sayler Decl., Ex. 5 at 328:11-21.   Dr. Kruszewski's attempt to conflate a temporal connection with causation is nothing more than a logical fallacy rendering his opinion inadmissible. *E.g.*, *Whiting v. Boston Edison Co.*, 891 F. Supp. at 23 n.52.   Dr. Kruszewski's reliance on that fallacy renders his testimony inadmissible.

Additionally, Dr. Kruszewski has no direct evidence that Mrs. Bulger even ingested Neurontin at any time temporally related to her suicide, and therefore improperly and unscientifically ruled Neurontin in as a potential cause.   There is absolutely no toxicological evidence that Mrs. Bulger ingested Neurontin at a time temporally related to her death.   There is substantial evidence that Mrs. Bulger obtained Neurontin, and other medications, for plaintiff to sell on the street. Sayler Decl., Ex. 5 at 526:23-527:4.   Plaintiff's only evidence of Neurontin ingestion is his self-serving and uncorroborated testimony that he handed Mrs. Bulger four Neurontin pills shortly before her death; however, there is no corroborating evidence whatsoever that she actually ingested the pills—a fact that Dr. Kruszewski admits. *Id.* at 519:6-14, 524:9-12.[15]   Regardless, Dr. Kruszewski admits that any opinion about when Mrs. Bulger decided to commit suicide—after she allegedly took four Neurontin or any time before—is pure speculation, *id.* at 270:15–272:6, making his opinion inadmissible. *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (excluding expert without direct evidence of plaintiff's exposure to suspected cause).

## CONCLUSION

As set forth above, the specific causation expert opinions of Drs. Maris and Kruszewski are unreliable and should be excluded pursuant to Rule 702 and *Daubert*.

---

[15] A Neurontin prescription bottle was found after Mrs. Bulger's death.   The bottle had substantially more pills than it should have contained if Mrs. Bulger were taking her Neurontin as prescribed. Sayler Decl., Ex. 5 at 524:1-8. Dr. Kruszewski admitted that it is possible that plaintiff was selling Mrs. Bulger's Neurontin, *id.* at 527:5-7, which could have netted the Bulgers (who were both on a fixed income) approximately $120 a month. *Id.* at 527:14-529:25.

Dated: January 23, 2009

DAVIS POLK & WARDWELL

By:   /s/ James P. Rouhandeh
       James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

SHOOK, HARDY & BACON L.L.P.

By:   /s/ Scott W. Sayler
       Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

-and-

HARE & CHAFFIN

By:   /s/ David B. Chaffin
       David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 23, 2009.

/s/ David B. Chaffin
David B. Chaffin