# EXHIBIT 3
# (PART I)

1

1        UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS

3    _____
                                    )
4    In re: NEURONTIN MARKETING,    )
     SALES PRACTICES, AND PRODUCTS)
5    LIABILITY LITIGATION,          )
     _____)
6

7

8      VIDEOTAPED DEPOSITION OF RONALD Wm. MARIS, Ph.D.

9            (Taken by Defendant)

10          Columbia, South Carolina

11          Monday, September 29, 2008

12

13

14

15

16

17

18

19

20

21

22

23

24          Reported in Stenotype by
          V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription

**2**

```
1        APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3      RON ROSENKRANZ, Esquire
       Finkelstein & Partners
4      1279 Route 300
       Newburgh, New York 12551
5      (845) 563-9442
       rrosenkranz@lawampm.com
6
       and
7
       KENNTH S. SOH, Esquire
8      The Lanier Law Firm
       6810 FM 1960 West
9      Houston, Texas 77069
       (713) 659-5200
10     kss@lanierlawfirm.com
11
   ON BEHALF OF THE DEFENDANT PFIZER:
12
       LORI CONNORS McGRODER, Esquire
13     JENNIFER M. STEVENSON, Esquire
       ANGELA M. SEATON, Esquire
14     LORI SCHULTZ, Esquire
       (Appearing Via Telephone)
15     Shook, Hardy & Bacon, L.L.P.
       2555 Grand Boulevard
16     Kansas City, Missouri 64108
       (816) 474-6550
17     lmcgroder@shb.com
       jstevenson@shb.com
18     aseaton@shb.com
       lschultz@shb.com
19
   Also Present:
20
       JAMES DOWNIE, CLVS, Videographer
21
22
23
24
25
```

**3**

```
1        VIDEOTAPED DEPOSITION OF RONALD Wm.
2  MARIS, Ph.D., a witness called on behalf of the
3  Defendant, before V. Dario Stanziola, CSR, RPR,
4  CRR, held at the Columbia Marriott, 1200 Hampton
5  Street, Columbia, South Carolina, on Monday,
6  September 29, 2008, commencing at 9:25 a.m.
```

**4**

```
1        INDEX OF EXAMINATIONS
2
3
   By Ms. McGroder            PAGE 8
4
5
       INDEX OF EXHIBITS
6
   NUMBER    EXHIBIT              MARKED
7  Exhibit 1: Photocopy of PowerPoint    46
   presentation entitled Suicide and SSRIs
8  Ronald Wm. Maris, Ph.D. AAFS Annual
   Conference 11 a.m. to 12 p.m. Tuesday,
9  February 20, 2007, San Antonio, Texas
10 Exhibit 2: Dr. Maris' Curriculum Vitae   75
11 Exhibit 3: A letter dated 12/3/07 to   118
   Andrew Finkelstein and Kenneth B.
12 Fromson from Ronald Maris, Ph.D.
13 Exhibit 4: A letter dated 7/18/08 to   118
   Andrew Finkelstein and Kenneth B.
14 Fromson from Ronald Wm. Maris, Ph.D.
15 Exhibit 5: A letter to Angela Seaton   118
   from Kenneth B. Fromson dated 9/17/08
16
   Exhibit 6: A letter to Andrew         121
17 Finkelstein and Kenneth B. Fromson dated
   12/3/07 from Ronald William Maris, Ph.D.
18
   Exhibit 7: A document entitled        130
19 Gabapentin: Mechanism of Mood-Altering
   Action
20
   Exhibit 8: A document entitled        133
21 Gabapentin Data Capture Aid
22 Exhibit 9: A article entitled Selected  160
   CSF Biochemistry and Gabapentin
23 Concentrations in the CSF and Plasma in
   Patients with Partial Seizures After a
24 Single Oral Dose of Gabapentin
25
```

**5**

```
1  Exhibit 10: An article entitled Seizure  166
   Frequency and CSF Parameters in a Double
2  Blind Placebo Controlled Trial of
   Gabapentin in Patients with Intractable
3  Complex Partial Seizures
4  Exhibit 11: Photocopy of a book entitled  192
   Biological Pschiatry Second Edition
5  Michael R. Trimble
6  Exhibit 12: Photocopy of a book entitled  192
   Textbook of Psycopharmacology by Alan
7  Schatzberg
8  Exhibit 13: An article entitled Yoga   205
   Asana Sessions Increase Brain GABA
9  Levels: A Pilot Study
10 Exhibit 14: An article entitled Suicide  208
   by Ronald W. Maris
11
   Exhibit 15: A letter to Russell G. Katz  242
12 dated 6/22/06 from Mary Ann Coronel
   Evertsz
13
   Exhibit 16: An article entitled        246
14 Increased Cortical GABA Concentrations
   in Depressed Patients Receiving ECT by
15 Gerard Sanacora
16 Exhibit 17: A document entitled        248
   Statistical Review and Evaluation
17 Antiepileptic Drugs and Suicidality
18 Exhibit 18: A article entitled         281
   Divalproex, Lithium and Suicide Among
19 Medicaid Patients with Bipolar Disorder
   by Collins and McFarland
20
   Exhibit 19: A handwritten document with  295
21 attachments entitled Notes, dated
   9/26/08
22
23
24
25
```

2 (Pages 2 to 5)

6

1    THE VIDEOGRAPHER: My name is James
2   Downie of Veritext -- Veritext Deposition
3   Services. Today is September the 29th, 2008,
4   and the time on the monitor is 9:25 a.m.
5        This deposition is being held at the
6   Marriott Hotel located at 1200 Hampton Street
7   in Columbia, South Carolina.
8        The caption of the case is In Re:
9   Neurontin Marketing Sales Practices and
10   Products Liability Litigation in the United
11   States District Court, District of
12   Massachusetts.
13        Name of the witness is Dr. Ronald W.
14   Maris.
15        At this time will the attorneys please
16   identify themselves and the parties they
17   represent, after which we will swear in the
18   witness.
19        MR. ROSENKRANZ: Ron Rosenkranz and Ken
20   Soh for the plaintiffs.
21        MS. McGRODER: Lori McGroder of Shook,
22   Hardy & Bacon for the Pfizer defendants.
23        MS. STEVENSON: Jennifer Stevenson of
24   Shook, Hardy & Bacon for Pfizer.
25        MS. TURNER: Would you please raise your

7

1   right hand --
2        MR. SOH: Are we going to take
3   appearances on the phone?
4        MS. SCHULTZ: Yes, this is Lori Schultz,
5   Shook, Hardy & Bacon for Pfizer.
6        MS. TUCKER: Raise your right hand.
7        RONALD W. MARIS, Ph.D.,
8   having been duly sworn, was examined and testified
9   as follows:
10        MS. McGRODER: Good morning, Dr. Maris.
11        THE WITNESS: Good morning.
12        MS. McGRODER: Let's take a two-second
13   break and get you a chair that's comfortable.
14        MR. ROSENKRANZ: This is the best I could
15   do for you. It's directly from my own room.
16        THE WITNESS: Does it go any higher?
17        MR. ROSENKRANZ: I don't -- I don't know.
18        THE WITNESS: Because it looks lower than
19   what I've got.
20        MS. McGRODER: Let's go off the record.
21        THE VIDEOGRAPHER: Time is 9:26 a.m.
22   We're now off the record.
23        (A DISCUSSION WAS HELD OFF THE RECORD.)
24        THE VIDEOGRAPHER: The time is 9:27 a.m.
25   We're back on the record.

8

1        MR. SOH: Before we start on the record,
2   today is Rosh Hashanah, and Dr. -- Dr. Maris
3   was not exactly consulted on the end times
4   when we were scheduling these depositions.
5   He'd like to leave a little bit after 5:00
6   today so he can go celebrate Rosh Hashanah
7   today.
8        And just -- I'll put on the record, he is
9   recovering from hip surgery, hip replacement
10   surgery. He might need some accommodations to
11   go, especially at the end of the day in his
12   recovery.
13        Go ahead, start.
14        EXAMINATION
15   BY MS. McGRODER:
16        Q. Dr. Maris, you've given many depositions in
17   your professional career; is that correct?
18        A. That's correct.
19        Q. And so I take it you know the rules of a
20   deposition; is that correct?
21        A. I do.
22        Q. If there's anything I ask you that you
23   don't understand or that doesn't make sense to you,
24   please tell me that you don't understand it.
25   Otherwise, we'll assume that you did when you

9

1   answered, okay?
2        A. Okay.
3        Q. Also, I understand that you've had recent
4   hip surgery. We can take as many breaks as you like,
5   okay?
6        A. Sure. I appreciate that.
7        Q. Sure. Just let me know when you need one.
8        You do not hold an advanced degree in
9   pharmacology; is that correct?
10        A. Correct.
11        Q. You don't hold an advanced degree in
12   neuropharmacology, correct?
13        A. Correct.
14        Q. Nor in neuropsychopharmacology, correct?
15        A. Correct.
16        Q. You've never previously testified -- excuse
17   me, you have previously testified under oath that
18   you're not an expert in neuropharmacology, correct?
19        A. That's correct.
20        Q. Do you agree that you are not competent to
21   examine questions about detailed pharmacological
22   reactions and the chemistry of drugs?
23        A. I agree with the caveat that I don't know
24   what you mean by details. I mean, I certainly know
25   a lot about serotonin and neurotransmitters. I was

3 (Pages 6 to 9)

**10**

1  on the FDA committee that reviewed the
2  antidepressant drugs for the black box warning. So
3  I know a great deal about certain mechanisms, but I
4  certainly am not an expert like, let's say,
5  Dr. Trimble is.
6      Q.  You're not an expert in antiepileptic drugs
7  and the neuropharmacology of the antiepileptic drugs,
8  correct?
9      A.  Correct.
10      Q.  Do you recall your testimony in the Sorg
11  case?
12      A.  Yes.  It was a long time ago.  That was
13  Sandra Sorg in Madison, Wisconsin.
14      Q.  Okay.  And you were asked in that
15  deposition -- well, your testimony was that you --
16  let me just read it to you --
17          MR. SOH:  You have a transcript for him?
18          MS. McGRODER:  Somewhere I do.
19      Q.  The question was -- your answer to a
20  question was:  It's because I feel that there are
21  some understandable questions going to be raised that
22  fall outside of my suicidological expertise.
23          And the question was put to you:  Which
24  ones?
25          And your answer was:  If you start asking

**11**

1  me the line of questions that we did this morning
2  about some of the, quote, detailed pharmacological
3  reactions and the chemistry and so on, I am not
4  competent to examine those questions.
5          MR. ROSENKRANZ:  Objection.
6      Q.  Do you remember that testimony?
7          MR. SOH:  Objection.
8      A.  Sure.  And I remember this case.  This
9  was a young woman who was a nurse who had
10  akathisia.  She was taking Prozac and she managed
11  -- she -- at night she requested to be put in a
12  straitjacket so she wouldn't attempt suicide.  She
13  managed to climb up the top of a bookcase and dive
14  off head first and break -- broke her neck.  So she
15  was one of my early Prozac cases.
16          MS. McGRODER:  Object and move to strike
17      that response after the word yes.
18      Q.  You do recall the testimony, right,
19  Dr. Maris?
20      A.  I do.
21      Q.  And it's true that you aren't competent to
22  examine questions of detailed pharmacological
23  reactions and chemistry of antiepileptic drugs; is
24  that correct?
25          MR. ROSENKRANZ:  Objection.

**12**

1      A.  With -- the answer is yes, but within the
2  context of the broad generic statement that I made
3  in my report, I certainly am competent to make
4  those broad generic statements.  I'm just not a
5  neuropharmacologist.
6      Q.  Okay.  And when you say broad generic
7  statements, are you referring to the general
8  causation opinion that's included in your expert
9  reports?
10      A.  I am.
11      Q.  Do you intend to give an opinion about
12  whether Neurontin is capable of causing suicide in
13  any Neurontin case?
14      A.  Yes, I am.  In fact, I have to -- since I
15  gave my report in -- I believe it was December of
16  '07, since that time I've gotten a lot more
17  evidence.  And I've -- there have been FDA
18  committee meetings, and I've actually added a full
19  opinion on the mechanism by which Neurontin could
20  cause specific suicidality, yes.
21      Q.  Are you saying you've added a full opinion
22  to what is written in your expert report --
23      A.  Exactly.
24      Q.  -- in the Smith and Bulger cases?
25      A.  Exactly.

**13**

1      Q.  And you have written that down?
2      A.  Yes.
3      Q.  Where is that written down?
4      A.  It's right here.
5      Q.  Right here where?
6      A.  In my file.
7          MS. McGRODER:  All right.  And that
8      opinion, Mr. Rosenkranz, hasn't been provided
9      to us.
10          MR. ROSENKRANZ:  He just told you where
11      it is.  It wasn't provided to me either.
12          MS. McGRODER:  Well --
13          MR. SOH:  Ask him -- ask him when he
14      formed it.
15          MR. ROSENKRANZ:  Yeah.
16          MS. McGRODER:  Well, that's irrelevant.
17      I mean, his opinions under Rule 26 are
18      supposed to be included in his expert report,
19      which you provided us by the deadline.
20      Pursuant to the case management order --
21          MR. SOH:  Lori, ask your questions.  Save
22      the posturing for later.  Ask the questions.
23      Ask him if you have --
24          MS. McGRODER:  I don't have any questions
25      about it.  I object to it.

4 (Pages 10 to 13)

**26**

1  case-controlled study was -- was the Pathways to
2  Suicide in 1981. That was my most major, you know,
3  NIH-funded project, yes.
4      MS. McGRODER: Object and move to strike.
5      Q.  My question was, is it true that you have
6  not published in any peer-reviewed journal a study in
7  which you collected and analyzed original data since
8  your survey on suicides that occurred in Chicago
9  during the 1960s?
10     MR. SOH: Objection, form, data, vague.
11     A.  Well, obviously '81 is way after '60.
12     Q.  Your publication in '81, Pathways to
13  Suicide, that was a textbook, correct?
14     A.  No, that was a research monograph.
15     Q.  Was that published in a peer-reviewed
16  journal?
17     A.  It was published by Johns Hopkins
18  University Press.
19     Q.  Well, was it published in a peer-reviewed
20  medical journal?
21     A.  It was a book.
22     Q.  Right.
23     A.  Can't be in a journal.
24     Q.  Right.
25     So a book doesn't undergo the same peer

**27**

1  review process as a journal article?
2      A.  Oh, yes, it does.  Yes, it does.
3      Q.  The data that that Pathways to Suicide book
4  reflects, that data came from your research in the
5  Chicago area in the 1960's, correct?
6      A.  And subsequently -- it was two things I
7  did in Chicago.  I did a book in 1969 called Social
8  Forces in Urban Suicide.  And then I went -- that
9  was based on a National Science Foundation grant.
10 Then I went back and got a National Institute of
11 Mental Health grant, and that was a second Chicago
12 survey where I actually used the psychological
13 autopsy form that I'm using in this case.  And that
14 -- those together in the second book was Pathways
15 to Suicide.
16     So there were two books based on a
17 Chicago analysis.  One was -- the first one was
18 strictly epidemiological.  The second one involved
19 interviews and, you know, was a, quote, a survey as
20 opposed to death records.
21     Q.  So my understanding -- understanding you
22 correctly that the first publication was based on
23 data, death records, as you stated, collected from
24 the Chicago area, correct?
25     A.  And coroners inquest records.

**28**

1      Q.  Okay.  And the second set of data was
2  different from the death records?
3      A.  Sure.  What I did was I took a list of
4  all the suicides in Chicago, and I went back and
5  interviewed two or three people per case
6  face-to-face.
7      Q.  Is it important to interview more than one
8  person per case face-to-face in that analysis?
9      A.  Yeah, I can see where this is going.
10 Yes, it is.
11     Q.  Okay.
12     A.  You do -- you do your best to interview
13 as many as you can, but in terms of most of my
14 legal cases, I'm provided with usually one
15 informant.  Sometimes I'll go out and do original
16 interviews.  I did not do them in this case.
17     MS. McGRODER: Object and move to strike.
18     Q.  My question was simply, is it important to
19 interview more than one person when you are
20 collecting data to investigate the cause of a
21 suicide?
22     A.  As a rule, it is, yes.
23     Q.  Now, you mentioned that you collected
24 narratives and rated them using the Columbia
25 classification suicidality scale; is that true?

**29**

1      A.  Yes.
2      Q.  Did you, yourself, review narratives and
3  apply the criteria from the Columbia classification
4  system project?
5      A.  Yes.
6      Q.  And in what context did you do that?
7      A.  I was a consultant to Kelly Posner, John
8  Mahon (ph) and Madelyn Gould and Barbara Stanley,
9  all of whom were at Columbia, who devised the
10 project and got funded for the project.
11     They asked probably a dozen suicide
12 experts throughout the country to rate the
13 narratives that the drug companies provided on this
14 7-point suicidality scale and to use that data for
15 them to calculate whether or not there was a
16 relative risk of, you know, greater than one.
17     Q.  What years or year did you actually review
18 narratives and apply the Columbia classification
19 system criteria and rate adverse events provided by
20 drug manufacturers?
21     A.  It's been a couple of years ago.  I'm
22 trying to remember the exact time.  Let me look at
23 my CV.  It says on my -- on page 14 of my
24 Curriculum Vitae it says: 2006, invited scientific
25 panel member for the FDA/Columbia University

8 (Pages 26 to 29)

74

1  usually once a year, is to give a grand rounds
2  presentation at lunchtime.
3      Q.  To students in what department?
4      A.  To doctors and residents in the
5  Department of Psychiatry and also in family
6  medicine. I also supervise their residents.
7      Q.  Okay. Well, I didn't ask you about that.
8      A.  Well, I do.
9      Q.  I asked you about the presentation. I know
10  you want to talk about that, and there can be a time
11  where we can talk about that. I'm asking about the
12  presentation.
13      The -- the PowerPoint presentation that we
14  went over that is Exhibit 1, you've also given that
15  to students as part of your adjunct professorship; is
16  that correct?
17      A.  They're mainly staff. They're not
18  students. They're mainly the clinical staff of the
19  psychiatry department or family medicine plus some
20  residents. They're not medical students.
21      Q.  Okay. And so in terms of staff, what --
22  how are they qualified? What are their
23  qualifications?
24      A.  They're psychiatrists.
25      Q.  Okay. And they're a staff of what?

75

1      A.  Of the -- of the psychiatric department
2  at the University of South Carolina Medical School.
3      Q.  Okay. And when did you give that
4  presentation?
5      A.  I'd have to look it up in my -- in my CV.
6  All my presentations are dated in my CV.
7      Q.  Okay.
8      A.  So I don't remember it, but it's in
9  there. If you got my CV, you'll find it.
10      Q.  And was the content of that presentation
11  the same as the content in Exhibit 1?
12      A.  Yes.
13      Q.  I'll hand this back to you, and we're going
14  to mark that as Exhibit 2 to your deposition. And
15  we'll make a copy of it on the break.
16      (Exhibit 2: Dr. Maris' Curriculum Vitae
17      marked for identification, as of this date.)
18      Q.  Now, you do recall that you testified in a
19  case called Sorg versus Lilly, correct?
20      A.  Right.
21      Q.  And that's a Prozac case, right?
22      A.  Right.
23      Q.  And do you recall that your opinion in the
24  Sorg case was that -- and I'm quoting your deposition
25  from Sorg. I believe that in Sorg's case Prozac was

76

1  the just noticeable difference-maker or scale tipper
2  without which Sorg's suicide attempt would not have
3  occurred; is that correct?
4      A.  Says like -- yes, it is.
5      Q.  And was part of your opinion in Sorg that
6  Sorg was coping with the existing suicide risk
7  factors until ingestion of Prozac which pushed her
8  over the edge?
9      A.  What was the year of that case?
10      Q.  I believe that case was 1991.
11      A.  So it's really unfair to ask me to
12  remember great details about something that
13  happened that long ago.
14      Q.  Well, I'm not really asking you details --
15      A.  But you're reading my deposition.
16      Q.  Was your opinion that -- Dr. Maris --
17      A.  That's not fair.
18      Q.  -- you told me that your opinions in cases
19  involving prescription medications and suicide are
20  that the drug is a noticeable different --
21  difference-maker, a scale tipper.
22      And is your opinion also, typically, that
23  the individual is coping with all the suicide risk
24  factors until they take the drug and that's what
25  pushes them over the edge?

77

1      A.  I think that's fair and that's typical.
2      Q.  Do you recall your testimony in Gianguilio
3  versus Lilly? That's G-I-A-N --
4      A.  Again, long, long time ago. Let me look
5  it up.
6      Q.  -- G-I-U-L-I-O (sic)?
7      A.  What year was that?
8      Q.  That's also a Prozac case.
9      Do you remember?
10      A.  I do remember. But I'm asking you what
11  year it is.
12      Q.  That was 1997.
13      Have you found your reference to
14  Gianguilio?
15      A.  I have.
16      Q.  Is it correct that in Gianguilio, you
17  testified that although the decedent had definite
18  suicide risk factors related to his wife's affair
19  with a neighboring doctor, the wife transferred
20  herpes from this doctor to Gianguilio and the wife
21  served divorce papers weeks before the suicide? Your
22  opinion was: I think he was coping with all this
23  stuff until he came unglued due to Prozac.
24      Is that your opinion in Gianguilio?
25      MR. SOH:  You have a depo transcript or

VERITEXT CORPORATE SERVICES (800) 567-8658

78

1  are you citing from a depo before? Do you
2  have a copy of it --
3        MS. McGRODER: I'm citing his deposition
4  at page 91.
5        MR. SOH: Do you have a copy of it for
6  Dr. -- Dr. Maris?
7     A.  I mean, in a sense, unless you're asking
8  me generic questions, that's an awful long time
9  ago.
10    Q.  Okay. Well, we can get it out.
11        Doctor, there is your deposition in the
12  Gianguilio case. If you'll look at page 75.
13    A.  Give me just one second.
14    Q.  Sure.
15    A.  Okay. Go ahead. Ask a question.
16    Q.  Do you testify at page 75 of this case of
17  -- in your deposition of Gianguilio, that Prozac is
18  the just noticeable difference-maker or scale tipper?
19    A.  Yes, I do.
20    Q.  And if you'll turn to page 91 of that
21  transcript.
22    A.  Unfortunately, the paper clip came out.
23    Q.  Well, I can help you fix it if you'd like.
24    A.  Here, you can find that.
25    Q.  Sure.

79

1        There's page 91, Doctor.
2     A.  Okay. Go ahead.
3     Q.  Do you state on page 91 in your deposition
4  testimony in this case that you think that
5  Mr. Gianguilio was coping with all this stuff until
6  he kind of, as it were, came unglued?
7     A.  Yes.
8     Q.  And is the reason -- was your opinion in
9  the Gianguilio case that he came unglued because of
10  Prozac?
11    A.  Yes.
12    Q.  Thank you. We're finished with that one.
13        Is it correct that you opined in the
14  Forsyth matter, also a Prozac case in 1997, that
15  Mr. Forsyth was -- well, I'll give you the direct
16  quote from your testimony.
17        Do you want to review it along with me?
18    A.  I think I remember that case pretty well,
19  because it went to trial.
20    Q.  Okay. Did you testify that you think of
21  Forsyth's life as a real -- he was coping and moving
22  along. Supportive spokes had been weakened through
23  retirement, depression, marital conflict, aging, et
24  cetera. What Prozac removed was the last spoke that
25  previously held Forsyth's fragile life together.

80

1  Before Prozac, Forsyth's life had been balanced. Ten
2  days after ingesting Prozac, Bob's impulse control
3  was lowered, the last spoke holding his life
4  together, and he quite literally fell violently
5  apart.
6        Do you recall giving that opinion in the
7  Forsyth case?
8     A.  Yes, I do.
9     Q.  And you -- and you said that Forsyth did
10  have some non-Prozac suicide predictors or life
11  stressors. However, by themselves, these stressors
12  were tolerable and manageable. In my opinion,
13  fluoxetine -- that's Prozac, right?
14    A.  Yes, it is.
15    Q.  -- was a scale tipper without which the
16  violent homicidal and suicidal acts would not have
17  occurred.
18        Do you recall that testimony?
19    A.  Yes.
20    Q.  Do you recall your testimony in the
21  Williamson case, the 1998 Prozac matter?
22    A.  Yes.
23    Q.  Do you recall -- in your expert report in
24  Williamson, you wrote: I think of Williamson's life
25  as a wheel. Before taking Prozac, she was coping and

81

1  moving along. Supported spokes had been weakened
2  through her divorce in 1975, her prior history of
3  depression off and on since 1976, her difficulty with
4  aging, her -- and her physical appearance, the
5  suicidal death of her son in 1983, and the AIDS death
6  of her brother and of a cousin.
7        What Prozac removed was the last spoke that
8  previously held her life together. Before Prozac,
9  Williamson's life had been balanced. Six days after
10  ingesting Prozac, her impulse control was lowered,
11  the last spoke holding her life together, and she
12  quite literally fell violently apart.
13        Do you recall that opinion in the
14  Williamson matter?
15    A.  Yes, I do.
16    Q.  Did you also say in that case in your
17  expert report that: Clearly Williamson did have some
18  non-Prozac suicide predictors or life stressors.
19  However, by themselves these stressors were modest,
20  five on a scale of ten, tolerable and manageable. In
21  my opinion, fluoxetine was a scale tipper, that
22  without which, the violent suicidal act would not
23  have occurred.
24        Was that your opinion in Williamson?
25    A.  It was.

21 (Pages 78 to 81)

82

1    Q.  Do you recall the Coburn versus SmithKline
2  Beecham case in 2001?
3    A.  Let me look at it.
4      Yes, I've got it.
5    Q.  Did you opine the following during your
6  deposition in the Coburn case?
7      ANSWER:  So I am of the opinion -- I've
8  said this in -- particularly in my 1981 book,
9  Pathways to Suicide, that there is in most suicides
10  an accumulation or what I call a suicidal career,
11  such that when a particular stressor comes along,
12  sometimes it's the thing that tips the scale.
13      You know, we all have life and death
14  forces, and you may be in kind of a delicate or
15  precarious equilibrium.  And you take -- I don't
16  know, let's take a case in point.  You take Paxil,
17  and it's just enough to tip your life balance and
18  make you go over the edge of that threshold.
19      Do you recall that testimony?
20    A.  Yes, I do.
21    Q.  You were also asked:  Do you believe Paxil
22  was a trigger in this case?
23      Do you recall your answer?
24    A.  I -- can you show it to me?  It's some
25  time ago.

83

1    Q.  Well, do you think you said it wasn't?
2    A.  What I usually say is that the trigger
3  versus chronic is complex, that you have to be
4  vulnerable before you could be triggered.  So in
5  other words, I don't believe that a drug in and of
6  itself triggers a suicide in most cases.  There are
7  a few exceptions.
8      So you have to have this suicidogenic,
9  suicidal career, and then and only then, when
10  you're in that vulnerable minority of people who
11  are at great risk for suicide, the drug can be a
12  trigger, but usually I argue against a trigger.
13    Q.  Did you argue --
14    A.  Hey, I don't remember.  Show me the
15  deposition.
16    Q.  All right.  This is page 409 of your
17  deposition testimony in the Coburn case.
18    A.  I've read it, yes.
19    Q.  And did you testify in the Coburn versus
20  SmithKline case that Paxil was the trigger?
21    A.  Yes.  But then I went on and qualified
22  what I just said before.
23    Q.  And did you qualify it by saying Paxil
24  isn't a sufficient condition in and of itself?
25    A.  That's what I said, I don't think Paxil

84

1  was the one and only proximate cause.
2    Q.  And that's what you say in all of the
3  suicide cases in which you testify, right?
4    A.  If that's true, and it usually is, that's
5  why they're drug cases.  That's why they share a
6  lot of similarities.
7    Q.  And do I understand correctly that when you
8  said in the Coburn case that we may be in a kind of a
9  delicate or precarious equilibrium, is that the same
10  thing as saying, you know, we were coping up until a
11  certain event?
12    A.  The thing is rooted in my '81 book, the
13  Pathways to Suicide, and in my general model, which
14  I'll make clear later, if you let me elaborate my
15  last opinion in this case, that usually you have to
16  be in a vulnerable minority of population before
17  you'll have a drug push you over the suicidal edge.
18      So almost all these patients have other
19  risk factors.  They may have previous suicide
20  attempts.  They may have a previous psychiatric
21  disorder.  They may even be on multiple drugs,
22  which is sometimes hard to sort out.
23      MS. McGRODER:  With due respect, object
24    and move to strike.
25    Q.  My question --

85

1      MR. SOH:  Will you let him finish his
2    answer?  That's the third time you interrupted
3    him.
4      MS. McGRODER:  Actually, he paused and I
5    thought he was finished.  I do apologize.
6    A.  I was -- I was going to say a summary
7  statement that -- that these so-called triggers
8  don't come out of the blue.  They're always in the
9  context of a fragile equilibrium and vulnerable
10  individuals who have other risk factors that are
11  operating, but they're coping.  They don't make,
12  you know, for example, a serious suicide attempt
13  until after taking the drug.
14    Q.  Two questions.  One is, is the delicate or
15  precarious equilibrium pretty much the same thing as
16  saying the person's coping?
17    A.  No.  I mean, you know, it's not quite the
18  same thing, because obviously people that are not
19  in delicate, fragile equilibrium are really coping,
20  okay?  So it's not the same thing.
21    Q.  So people in a delicate and precarious
22  equilibrium, they're sort of coping?
23    A.  They're on the edge.
24    Q.  Okay.
25    A.  They're vulnerable.

22 (Pages 82 to 85)

86

1  Q. Does any suicide come out of the blue?
2  A. Out of the blue?
3  Q. Uh-huh.
4  A. I would say almost never, but I almost
5  hate to say never because -- I would say almost
6  never. That would be my answer.
7  Q. Okay. Have you ever given testimony -- have
8  you ever given opinion testimony in any legal matter
9  that the suicide came, quote, out of the blue, end
10  quote?
11  A. It's possible that I have, because I just
12  said almost never. There are some cases where
13  things are inexplicable where there's a --
14  something really bizarre going on which doesn't fit
15  the pattern. So it's possible, and it's possible
16  that I did say that.
17  Q. In cases where there are identifiable
18  concomitant risk factors for suicide, would you agree
19  with me those kinds of cases -- in those kinds of
20  cases, a suicide would not come out of the blue?
21  A. Probably not.
22  Q. Do you recall your testimony in the Lown v.
23  Lilly matter in 2002?
24  A. I do.
25  Q. And that's also a Prozac case?

87

1  A. Yes.
2  Q. Is it correct you gave the opinion in that
3  case that one of the things -- do you need to -- oh,
4  thank you.
5  Do you need to go along with me with the
6  deposition testimony?
7  A. I remember Jeremy Lown. He was a west
8  Columbia kid who hung himself, so I remember him
9  pretty well.
10  Q. Okay. And you gave testimony in that case
11  that one of the things you felt about him: He's
12  going along over the last year or two of his life.
13  He has Tourette's. He's had some depression, which
14  is reflected in his journal, but he's still coping.
15  Then he starts taking Prozac, and boom, he dies.
16  Do you recall that?
17  A. Um-hum.
18  Q. And you also gave the answer: His life was
19  in a delicate equilibrium up until the time he
20  started taking Prozac. He had been managing with his
21  depression, with his Tourette's, with his acne,
22  whatever else you want to throw in there. The
23  condition which was necessary without which this
24  suicide would not have occurred was the ingestion of
25  Prozac for two weeks.

88

1  Was that your opinion in the Lown matter?
2  A. You just read it correctly, yeah.
3  Q. What about the Giles case, do you recall
4  your testimony in that case last year?
5  A. Yes.
6  Q. And that case involved Effexor, correct?
7  A. Yes. Let me just look it up real
8  quickly.
9  Q. Sure.
10  A. That was 2'07?
11  Q. Yes.
12  A. Give me a second. I'm not finding it.
13  Q. Sure.
14  A. Did it start in 2'07 or did it start
15  earlier?
16  Q. I believe so. I think your deposition was
17  in 2007.
18  A. Okay. Well, I can't find it, but go
19  ahead and ask me the questions.
20  Q. Okay. If you need to see the deposition,
21  I'll give it to you.
22  In your report in that case, you opined
23  that absent Effexor -- Effexor is an antidepressant,
24  right?
25  A. Right.

89

1  Q. Is it an SNRI or is it an SSRI?
2  A. I think it's an SNRI, my recollection.
3  Q. Jeff had stoically managed years of
4  injuries, work disruptions and physical pain without
5  attempting or even thinking about suicide.
6  Do you recall that opinion?
7  A. Yes. I'm trying -- I'm starting to
8  remember now. This -- this was the guy who was --
9  was the guy from southern Illinois who was a
10  blue-collar worker, shot himself with a shotgun.
11  Maybe I got the wrong case, but -- okay.
12  Q. Is stoically managed another way of saying
13  sort of coping?
14  A. Yeah, he managed to hold it together on
15  the surface. He looked like he was under control.
16  Q. And your testimony was: I'm not arguing
17  that Effexor was the one and only cause. Clearly
18  depressive disorder, physical injuries, family
19  history of depression, chronic pain, unemployment
20  were all suicidogenic too. However, Jeff lived with
21  these stressors for many years. It was after
22  starting Effexor that Effexor was the scale tipper.
23  It was the just noticeable difference-maker pushing
24  him over the edge.
25  Do you recall that -- that opinion?

23 (Pages 86 to 89)

90

1    A. Yes.
2    Q. And is it correct that you opined this
3 during your deposition in Giles: I want to be
4 completely above board that I agree that there are
5 other suicidogenic forces in the life of Giles. I
6 think, however, that it's pretty clear to me that he
7 had these factors for some time and he managed to
8 cope with them, right?
9    A. Right.
10    Q. What about Routhier versus GlaxoSmithKline,
11 do you recall your testimony in that case?
12    A. That's -- I think that's a Wellbutrin
13 case --
14    Q. That's correct.
15    A. -- in Massachusetts.
16    Q. 2007, right?
17    A. Right. In fact, I've got a trial in a
18 month for that case.
19    Q. Okay. Well, then this will be a refresher.
20    A. Yes, it will.
21    Q. Did you give the following opinion in the
22 Routhier case: In my opinion, Wellbutrin was
23 probably more likely than not a scale tipper or
24 noticeable difference-maker for Routhier's suicide.
25 Wellbutrin put her over the edge. It was a

91

1 necessary, that without which not condition for
2 suicide. For example, Diane had been able to cope
3 with her stomach problems until after she took
4 Wellbutrin.
5    Correct, that's your opinion in the
6 Routhier case?
7    A. It is.
8    Q. What about the Crone case, do you recall
9 your expert opinion in the Crone matter?
10    A. Yes.
11    Q. That involves Neurontin, right?
12    A. Right.
13    Q. And you -- and in your expert report you
14 said: I'm not arguing that gabapentin was the one
15 and only cause of Crone's suicide, in other words,
16 that it was a sufficient condition. Clearly his
17 depressive disorder, previous physical injuries and
18 chronic pain, having to take care for a virtually
19 quadriplegic wife, having a son who was acting out
20 and possible other suicide risk factors, paren, guns
21 in the home, aging white male, closed paren, were all
22 suicidogenic too. However, he lived with all of
23 these risk factors for many years without even
24 attempting suicide once. It was only after
25 gabapentin was doubled on March 20, 2002 that his

92

1 behavior changed dramatically and he committed
2 suicide, right?
3    A. Right.
4    Q. When you say he lived with all these risk
5 factors for many years, are you saying that he was
6 coping with them until the ingestion of gabapentin?
7    A. Yes.
8    Q. And that gabapentin was the noticeable
9 difference-maker or the scale tipper?
10    A. Yes.
11    Q. That's your opinion in the Smith case also,
12 isn't it --
13    A. Yes.
14    Q. -- that gabapentin is the noticeable
15 difference-maker, that without which not pushed
16 Richard over the edge into a violent fatal suicide
17 attempt?
18    A. A violent what?
19    Q. Fatal suicide attempt.
20    A. What are we talking about here? The last
21 one was obviously not failed.
22    Q. I'm sorry?
23    MR. SOH: Are you talking about Smith or
24    the Routhier case?
25    MS. McGRODER: We're talking about Smith.

93

1    A. Okay. When he shot himself, it wasn't
2 failed. He died.
3    Q. It was fatal.
4    A. Fatal. I thought you said failed.
5    Q. No, no, no, fatal. I'm sorry.
6    A. Yeah, that's right. It's correct.
7    Q. Let's try that again.
8    Is it your opinion in the Smith case also
9 that gabapentin was the, quote/unquote, noticeable
10 difference-maker, that without which not that pushed
11 Richard over the edge into a violent fatal suicide
12 attempt?
13    A. Yes.
14    Q. And in Bulger your opinion is the same,
15 right?
16    A. Yes.
17    Q. I opine that gabapentin was a noticeable
18 difference-maker, that without -- that without which
19 not, that pushed Susan over the edge of her fragile
20 coping into a violent fatal suicide attempt, correct?
21    A. Correct.
22    Q. And you also say in your expert report in
23 Bulger that before Susan began taking Neurontin, she
24 coped with her suicide risk factors without a fatal
25 suicide attempt, just a few, low, risk-cutting

24 (Pages 90 to 93)

94

1    overdose attempts, correct?
2        A.   And one, driving off a bridge.
3        COURT REPORTER:  I'm sorry, one --
4        THE WITNESS:  She drove off a cliff as
5    well.  There were four.
6        Q.   Is that in your report?
7        A.   Yes.
8        Q.   Okay.  So your opinion in every case
9    involving a prescription medication is that while the
10   drug may not be the only factor, it's the
11   quote/unquote noticeable difference-maker, the factor
12   that pushed the plaintiff over the edge, correct?
13       A.   Yes.
14       Q.   The only difference here is that you're
15   expanding your repertoire of opinions beyond
16   antidepressants into antiepileptic drugs, right?
17       A.   That's correct.
18       Q.   There's never been a time when you offered
19   the opinion that a prescription drug was not a cause
20   of the plaintiff's suicide event, correct?
21       A.   I mean, I'm not exactly sure what that
22   question means.  I mean, the answer is yes, that's
23   true, but I have never had a case like that.
24       Q.   In every case --
25       A.   In every case that I've had that I took.

95

1        Q.   -- you believe that the drug induced this
2    suicidal act, correct?
3        A.   In every case that I accepted that I --
4    that I felt that was the mechanism.  They were very
5    similar, and they had similar etiologies, but there
6    were other cases I did not take, which I did not
7    think the drug was a causal factor.
8        Q.   Are there any Neurontin cases that you have
9    looked at that you haven't taken?
10       A.   That's a little harder to say, because
11   I've only had four.
12       Q.   And you took all four of them?
13       A.   I did.
14       Q.   And so they are Crone, Smith, Bulger and
15   what?
16       A.   Shearer.
17       Q.   You've reviewed the records in the Shearer
18   case?
19       A.   I have.
20       Q.   Have you written a report in the Shearer
21   case?
22       A.   I don't believe so.  I believe that's
23   been on the back burner.  They said not to continue
24   working on it.
25       Q.   And Mr. Finkelstein's law firm told you not

96

1    to continue working on it?
2        A.   For the time being, yes.
3        Q.   Did you formulate opinions in Shearer
4    before you stopped working on it?
5        A.   I don't think so.  I think I was in the
6    middle of doing so.
7        Q.   And did you come to a preliminary opinion
8    in the Shearer matter?
9        A.   I honestly don't remember.  It's been
10   some time ago.  And they've told me to stop looking
11   at it, I have stopped looking at it.  I remember
12   the case.
13       Q.   You didn't tell them that you didn't -- you
14   didn't tell them that you would not offer an opinion
15   that Neurontin did not cause the drug in the Shearer
16   matter -- excuse me.
17       You did not tell the Finkelstein law firm
18   that you wouldn't take the Shearer case because
19   Neurontin did not cause the suicide event in that
20   case?
21       MR. SOH:  Objection.  That's a quadruple
22   negative, Lori.
23       A.   I think --
24       MS. McGRODER:  Yeah, let me fix it.  Let
25   me fix it.

97

1        Q.   You told the Finkelstein law firm that you
2    would take the Shearer case because you believe
3    Neurontin causes suicide in that case too, right?
4        A.   I told them I would take it, and I
5    haven't decided whether I think it caused it,
6    because I haven't made my opinion yet.
7        Q.   So to date, every case that the Finkelstein
8    law firm has asked you to look at, you've accepted to
9    offer an opinion that Neurontin caused the suicide,
10   correct?
11       A.   That's correct.
12       THE VIDEOGRAPHER:  We have about five
13   minutes of tape left.
14       MS. McGRODER:  Let's take a break.
15       THE VIDEOGRAPHER:  This is the end of
16   Tape No. 2 in the deposition of Dr. Ronald
17   Maris.  The time is 11:16 a.m.
18       (A BRIEF RECESS WAS TAKEN.)
19       THE VIDEOGRAPHER:  This is the beginning
20   of Tape No. 3 in the deposition of Dr. Ronald
21   Maris.  The time is 11:30 a.m.  We're back on
22   the record.
23   BY MS. McGRODER:
24       Q.   Dr. Maris, were you aware that the
25   Finkelstein law firm designated you, and I quote from

25 (Pages 94 to 97)

VERITEXT CORPORATE SERVICES (800) 567-8658

150

1   Q.  Okay.  So you haven't read the deposition
2   testimony either of any of defendant's experts?
3   A.  Correct.
4   Q.  Nor have you read the testimony of
5   defendant's experts who testified at the Daubert
6   hearing in this matter in the MDL, correct?
7   A.  Correct.
8   Q.  Have you reviewed all of the literature
9   that Drs. Trimble and Kruszewski cite in their
10  reports?
11  A.  Probably not all of it.  Probably just
12  the stuff that's cited in my report.
13  Q.  Have you reviewed all the literature cited
14  by defense -- defendant's experts which contradict
15  the general causation opinions of Drs. Trimble and
16  Kruszewski?
17  A.  No.
18  Q.  So it would be fair to say that you have
19  not reviewed scientific evidence that contradicts the
20  opinions of Drs. Trimble and Kruszewski with respect
21  to general causation --
22  A.  Well, certainly not --
23  Q.  -- regarding Neurontin?
24  A.  Certainly not the defense experts.  I'm
25  sure there was some other questions raised in the

151

1   general literature.  For example, at the FDA
2   hearing, one person abstained because he did not
3   believe causation had been established.  And there
4   was some other remarks about causation.  But as far
5   as the defense experts are concerned, the answer is
6   no, I haven't read any of their opinions.
7   Q.  So you did read in conjunction with the
8   transcript of the FDA advisory committee related to
9   AED's, some contradictory testimony or evidence with
10  respect to general causation opinions of Drs. Trimble
11  and Kruszewski?
12  A.  I don't know if they were talking about
13  Trimble and Kruszewski, but they were talking about
14  the fact that a correlation is not causation.
15  Q.  Okay.  Would it be fair to say that you
16  relied on the opinion testimony or the opinions of
17  Drs. Trimble and Kruszewski with respect to general
18  causation at face value?
19  MR. SOH:  Objection.
20  MR. ROSENKRANZ:  Objection to the form.
21  A.  I'm not quite sure what that means.  I
22  mean, I always read things critically.  And of
23  course, as I said, I read a large number of generic
24  statements on Neurontin other than those by Trimble
25  and Kruszewski.  So I have read information

152

1   critically, and I have seen some descent, yes.
2   Q.  What descent have you seen?
3   A.  I guess, you know, in a nutshell, it
4   would be some questions about whether Neurontin
5   affects suicidality.  And it's hard for me to say
6   it more specifically, because I have not seen the
7   reports of the -- of the defense experts, nor their
8   depositions.
9   And, you know, in a general paper, they
10  wouldn't specifically try to refute somebody's
11  position that was being taken in a litigation.  So
12  most of the things I saw were fairly benign.  They
13  were just talking in general about Neurontin, side
14  effects, common side effects, relative risks.
15  Q.  Hopefully, I didn't ask you this already.
16  If I did, I'm sure your very fine lawyers will tell
17  me.
18  You didn't do anything to test the theories
19  that Dr. Trimble and Dr. Kruszewski put forth with
20  respect to their opinions about the mechanism of
21  Neurontin, correct?
22  A.  I did not, and I'm not competent.  It's
23  outside my expertise.
24  Q.  One of your opinions expressed in your
25  report in both Smith and Bulger -- well, let's just

153

1   do this first.  If you look at Exhibits 3 and 4 --
2   MS. McGRODER:  Thank you, Ron.
3   Q.  -- these are --
4   A.  You've got my report now?
5   Q.  Yeah, this is your copy of your report.
6   It's Smith.
7   A.  I want to make sure that I can look at
8   it.
9   Q.  What I want to ask you is, the first
10  opinion that you give, the one related to the
11  psychopharmacologic properties of Neurontin --
12  A.  Right.
13  Q.  -- which I believe is on page --
14  A.  Twelve.
15  Q.  Thank you.
16  Is that identical in the Smith and Bulger
17  reports?
18  A.  I believe it is.  Let me just check and
19  make sure.  This is a little -- little different
20  pagination.  Hold on a second.  Well, it's not --
21  it's not completely identical.
22  For example, in Bulger, I have an opinion
23  Prolog, which says -- which is not in the Smith
24  opinion, which says, quote, A lot could be made of
25  the behavior of Ronald Bulger, Sr.  I want to be

39 (Pages 150 to 153)

162

1  Q.  A special investigation was performed as
2  part of a placebo-controlled add-on study of
3  gabapentin in partial epilepsy, right?
4  A.  Right.
5  Q.  So you understand that samples of cerebral
6  spinal fluid were collected from living humans as
7  opposed to animals in this study, right?
8  A.  Right.
9  Q.  And this is a placebo-controlled study,
10  correct?
11  A.  Yes.  Seems to be, yes.
12  Q.  If you look at the bottom sentence of the
13  abstract, Dr. Ben-Menachem finds in this study that
14  free and total GABA concentrations did not change,
15  but cerebral spinal fluid, 5-HIAA and HVA increased
16  at 24 and 72 hours post dose of gabapentin, correct?
17  A.  Yes.
18  Q.  This controlled clinical study does not
19  support the opinions of Drs. Trimble and Kruszewski
20  that in humans gabapentin increases GABA
21  concentration, correct?
22  MR. ROSENKRANZ:  Objection.
23  A.  It would seem to say that.  However,
24  again, I can't really offer an informed opinion.
25  My answer is I'm not competent to answer this.

163

1  Q.  Okay.  But from the face of the document,
2  you can see that free and total GABA concentrations
3  in living humans did not change after administration
4  of a single dose of gabapentin, correct?
5  A.  Right.
6  Q.  Are you aware that this study also looked
7  at the by-product or the metabolite of serotonin?
8  A.  It says it does, yes.
9  Q.  Right.
10  And it says that the serotonin by-product,
11  5-HIAA, actually increased in the cerebral spinal
12  fluid of living humans after administration of
13  gabapentin, correct?
14  A.  It says that --
15  MR. ROSENKRANZ:  Objection.
16  A.  -- but again, two comments.  One is that
17  the critical thing in a drug being administered is
18  not decrease or increase.  It's serotonergic
19  dysfunction.  So even though most of the literature
20  says that GABA leads to a depletion of serotonin
21  and its metabolites, any drug which changes the
22  serotonin level could cause a serotonergic
23  dysfunction, not just that which depletes it.
24  Q.  I'm going to give you a second, because I
25  want you to look at this study and tell me, is there

164

1  any evidence in this article, which is a
2  placebo-controlled study of gabapentin in living
3  humans, that there was any serotonergic dysfunction
4  as a result of administration of gabapentin?
5  A.  It's hard to do on the spot, to read an
6  article and --
7  Q.  Take your time.
8  A.  One of the things I'm reading is that
9  whole question about the brain blood barrier.  And
10  I think Trimble addressed this in his deposition,
11  was that you've got to be real careful about the
12  changes in -- in the, let's say the blood versus
13  crossing the brain blood barrier, which is what the
14  central spinal fluid would indicate.
15  And so there's -- there's at least a
16  couple of issues here about the timing and the
17  effect on two different parts of the -- of the
18  human body, the blood versus the central spinal
19  fluid.  So that's another issue.  You know, I feel
20  really uncomfortable trying to interpret this.  My
21  answer is I'm not competent to do it.
22  Q.  Okay.  As far as you know, as you sit here
23  today, there's no evidence in this article that
24  gabapentin caused any serotonergic dysfunction in
25  living humans, correct?

165

1  MR. ROSENKRANZ:  Objection.
2  A.  I don't think that's what I said.  I said
3  it increased at 24 and 72 hours post dose, so it
4  did cause a change in the -- in the serotonin.
5  Q.  It sure did.  It went up, didn't it?
6  A.  Yeah.
7  Q.  And isn't the theory by Drs. Trimble and
8  Kruszewski that GABA causes serotonin to go down?
9  A.  It does.
10  MR. ROSENKRANZ:  Objection.  Asked and
11  answered.
12  A.  It does.
13  Q.  Okay.  So the Ben-Menachem 1992 paper
14  directly refutes the theory proposed by Drs. Trimble
15  and Kruszewski in this case, correct?
16  MR. ROSENKRANZ:  Objection.  Objection.
17  A.  I can't answer that, because I don't know
18  enough about the details.  I don't know -- I'm not
19  sure what the dose was.  It says a single dose.
20  I'm not sure how long they were on it.
21  Q.  Sure.  Because you --
22  A.  I mean, we're talking --
23  Q.  -- because you didn't read the study,
24  right?
25  A.  I just read it.  You just asked me to

42 (Pages 162 to 165)

178

1    What does the remainder of the sentence say
2  of the labeling for Neurontin?
3    A.  But it does not modify GABA A or GABA B
4  radioligand binding.  It is not converted
5  metabolically into GABA or GABA agonist, and it is
6  not an inhibitor of GABA uptake or degradation.
7    Q.  In other words, the rest of the sentence
8  says that gabapentin does not affect GABA A or B
9  receptors, it's not converted into GABA -- or a GABA
10  agonist, right?
11    A.  That's what it says, yes.
12    Q.  So the package labeling for Neurontin
13  doesn't support your opinion that gabapentin is a
14  GABA agonist, does it?
15    A.  Well, that's not what -- that's not what
16  the first sentence says.  The first sentence says:
17  The structure related to GABA, which is a verbatim
18  quote.  So there's nothing wrong with my -- except
19  that it's incomplete.
20    Q.  Except that you didn't complete the
21  sentence, right?
22    A.  That's right.
23    Q.  And you left out the part that suggests
24  gabapentin has no effect on GABA receptors and it's
25  not a GABA agonist, right?

179

1    MR. ROSENKRANZ:  Objection.  Asked and
2  answered.
3    A.  Yeah, I did not include the rest of the
4  sentence.
5    Q.  And structural relationship is not
6  determinative of the psychopharmacologic effects of a
7  drug, right?
8    MR. ROSENKRANZ:  Objection.
9    A.  I'm not exactly sure how to answer that,
10  because it goes beyond my expertise.
11    Q.  Well, at least here the structural
12  relationship of gabapentin doesn't have anything to
13  do with whether gabapentin affects GABA receptors or
14  not, correct?
15    MR. ROSENKRANZ:  Objection.
16    A.  Again, I can't really make that comment,
17  because it talks about technicalities that I'm not
18  competent to talk about with GABA sub-A, sub-B,
19  radioligand.  I'm not a generic expert, and I
20  really wouldn't try to interpret that sentence.
21    Q.  Well, but this information is in your
22  expert report on pages 12, 13 and 14, isn't it?
23    A.  Everything that I've seen in my report is
24  verbatim taken out of the PDR.  There's nothing
25  wrong with my report.

180

1    Q.  Well, but when you're telling me, Dr.
2  Maris, that you don't have the expertise to talk
3  about this, I'm asking you why is this stuff in your
4  report at pages 12, 13 and 14?
5    A.  Well, let's look at 13 and 14, because
6  you're getting a blank check there.  What's in 13?
7    Q.  Well, 13 is your opinion that it's a GABA
8  agonist that affects glutamate, that it affects
9  serotonin, that it depletes monoamines --
10    A.  You're going a little too fast.  Where
11  are you reading from?
12    Q.  I'm just skimming through page 13.
13    A.  That's not appropriate.  Tell me exactly
14  what you're reading.
15    Q.  Well, are you telling me, Dr. Maris, that
16  you do or do not have the expertise to offer an
17  opinion that gabapentin is -- has pharmacologic
18  properties that are suicidogenic?
19    A.  Oh, I certainly do.  And they're --
20    MR. ROSENKRANZ:  Objection.
21    Q.  All right.  Then I'm asking you questions
22  about that.
23    A.  Okay.  But you're not asking me complete
24  questions.  For example --
25    Q.  Well, every time I ask you a question about

181

1  this, you tell me you're not qualified to answer it.
2    A.  No --
3    MR. ROSENKRANZ:  Objection.
4    A.  -- you're -- you're having it both ways.
5  I say that and you keep asking the question.
6    MR. SOH:  Don't answer that question.
7    That's argumentative, Doctor.  Don't answer
8    that question.
9    A.  Okay.  But there are, for example, many
10  relative risks and serious adverse events that are
11  related to the ingestion of gabapentin, which are
12  suicidogenic.  For example, under the same PDR that
13  we're looking at on page 25, it says under nervous
14  system, frequent, and the only one that's there is
15  depression.
16    Q.  Right now, Dr. Maris, we're talking about
17  your first opinion, which is the pharmacologic
18  properties of gabapentin.  And your opinion that
19  gabapentin is a GABA agonist in the middle of page
20  13, okay?  We've talked about that, haven't we?
21    A.  Hold on a minute.  Hold on.  And I -- and
22  I cite Trimble and Roth.  If they don't -- if they
23  fall, I fall.
24    Q.  Okay.  And the same is true with your
25  opinion that gabapentin affects serotonin through

VERITEXT CORPORATE SERVICES (800) 567-8658

182

1  serotonin reduction.
2      You're relying exclusively on Kruszewski
3  and Trimble, correct?
4      A.  Where are we looking at now?
5      Q.  The paragraph right above that on page 13:
6  Gabapentin has an inhibiting effect on the
7  transmission of other neurotransmissions --
8  transmitters, particularly monoamines such as
9  serotonin and norepinephrine.
10     A.  And again, I cite Trimble and Roth.
11     Q.  And if they fall, you fall?
12     A.  Yes.
13     Q.  And then you say gabapentin impairs the
14  function of glutamine.  And you cite Trimble.
15     A.  Right.
16     Q.  If Trimble's wrong, you're wrong, right?
17     A.  Yes.
18     Q.  Okay.  And then you say:  Gabapentin
19  treatment may shift the relative balance of
20  neurotransmitters from excitatory to inhibiting, and
21  you cite Trimble, correct?
22     A.  Correct.
23     Q.  And if Trimble's wrong, you're wrong?
24     A.  Right.  Let me -- it may be right.
25  That's all I'm relying on here.  I have not tried

183

1  to go beyond these reports, because I didn't think
2  I was supposed to be a generic expert.
3      Q.  Okay.  And then you say:  Thus, gabapentin
4  decreases the release of serotonin, norepinephrine
5  and Dopamine, and you cite Trimble?
6      A.  Right.
7      Q.  And if Trimble's wrong, you're wrong?
8      A.  Right.  Unless I find some other source.
9  I assumed he was accepted, that there was a Daubert
10  hearing and he was accepted.  That's what I was
11  assuming.
12     Q.  Okay.  And you say gabapentin is a GABA
13  agonist and you cite Trimble and Roth, correct?
14     A.  There's no secret about it.  That's what
15  I'm relying on.
16     Q.  And if Trimble and Roth are wrong, you're
17  wrong, right?
18     A.  Unless I find some other source, yes.
19     Q.  Okay.  Well, today do you have in mind
20  another source?
21     A.  No, I because I think they're right.
22     Q.  Okay.  But you don't have any evidence that
23  they're right, correct?
24     MR. SOH:  Objection.
25     MR. ROSENKRANZ:  Objection.

184

1      A.  I don't have definitive evidence that
2  they're correct at this point.
3      Q.  Can you cite to me any peer-reviewed
4  published study that suggests gabapentin depletes
5  monoamines?
6      A.  No.
7      Q.  Can you cite to me any peer-reviewed
8  published study that suggests because of gabapentin's
9  effect in depleting monoamines, it causes an
10  increased risk of depression, dysphoria,
11  depersonalization, agitation, aggression and suicidal
12  behaviors and completed suicides?
13     A.  Certainly the PDR lists those as relative
14  risks for people on Neurontin versus placebo as
15  having a higher relative risk.  It doesn't specify
16  the mechanism, but it just says in the clinical
17  trials we found that dizziness, somnolence,
18  depression, all the things that are listed in the
19  PDR had significant relative risks like three or
20  four times higher in the -- in the Neurontin group.
21  These adverse events were there.  And I think these
22  adverse events are related to suicide outcomes.
23     Q.  Are you finished?
24     A.  No.  Depression, for example, on page 20
25  has a relative risk of causing -- being correlated

185

1  with a depressive outcome in the Neurontin patients
2  of 1.6 versus the placebo.  Hostility was 3.3 times
3  higher in the Neurontin patients.  Emotional
4  lability was 2.6 times higher.  So these are all
5  adverse events admitted in the PDR that to me are
6  suicidogenic completely apart from Trimble and
7  Roth.
8      Q.  Now are you finished?
9      A.  I think so.
10     MS. McGRODER:  Object and move to strike
11  the entire response as non-responsive.
12     Q.  My question was, Dr. Maris, can you cite to
13  me any peer-reviewed published study that says
14  because Neurontin depletes monoamines such as
15  serotonin and norepinephrine, it causes depression,
16  dysphoria, depersonalization, agitation, aggression,
17  suicidal behaviors and completed suicides?
18     Can you cite to me any peer-reviewed
19  published study that says that?
20     A.  The mechanism is not specified.  The
21  outcome is specified.
22     Q.  Well, you're talking about the package
23  insert.  I didn't ask you you about the package
24  insert.  I'm asking about peer-reviewed published
25  studies --

47 (Pages 182 to 185)

VERITEXT CORPORATE SERVICES (800) 567-8658