# EXHIBIT 3
# (PART II)

190

1   report based on your calculations, did you do those
2   calculations yourself?
3       A. Sure.
4       Q. Doctor, apart from the adverse events that
5   are reported in the package insert for Neurontin, is
6   there any peer-reviewed scientific literature that
7   you could cite to me today that says Neurontin causes
8   depression, dysphoria, depersonalization, agitation,
9   aggression, suicidal behaviors and completed
10  suicides?
11      A. Well, I have relied on the PDR, so there
12  may be, but I don't know that without having to go
13  look at all the literature again.
14      Q. As you sit here today, you cannot cite me a
15  single study that states gabapentin causes
16  depression, dysphoria, depersonalization, agitation,
17  aggression, suicidal behaviors and completed
18  suicides, correct?
19      A. Well, I've cited several studies in my
20  report.
21      Q. No, you've cited the expert report of
22  Dr. Trimble and the expert report of Dr. Kruszewski,
23  correct?
24      A. Right.
25      Q. And those are not scientific articles in

191

1   the peer-reviewed literature, are they?
2       A. They're not.
3       Q. Okay. So can you cite to me, as you sit
4   here today, any scientific article in the
5   peer-reviewed published literature that says
6   gabapentin causes that list of adverse events that we
7   just went over?
8       A. Well, as I say, I took them from the PDR,
9   which is advisors on clinical trials.
10      Q. That's not peer-reviewed scientific
11  literature, is it?
12      A. It's not.
13      Q. So the answer to my question is no?
14      A. No.
15      Q. Are you familiar with the book Biological
16  Psychiatry, which was authored by Dr. Trimble?
17      A. I think that's the book that I went out
18  and bought.
19      Q. How much did you have to pay for that baby?
20      A. Pretty expensive.
21      Q. Did you read it?
22      A. I read parts of it.
23      Q. Are you aware that Dr. Trimble stated in
24  this book, which is, of course, outside the context
25  of a litigation opinion:  Gabapentin has a novel

192

1   mechanism of action not influencing directly the GABA
2   system and having its own CNS binding site.
3           Did you read that in Dr. Trimble's
4   textbook?
5       A. I am not sure that I read that specific
6   part of the book.
7       Q. Do you disagree with Dr. Trimble's citation
8   in the -- in the textbook that gabapentin has a novel
9   mechanism of action not influencing directly the GABA
10  system?
11          MR. SOH:  Do you have a copy of the book
12      for the witness?
13          MR. ROSENKRANZ:  Yes.
14      Q. Do you disagree with that?
15      A. I really don't have enough information to
16  agree or disagree.  You're pulling a very technical
17  reference out of a book that I said I skimmed, and
18  something that's outside my expertise.
19          (Exhibit 11: Photocopy of a book entitled
20      Biological Pschiatry Second Edition Michael R.
21      Trimble marked for identification, as of this
22      date.)
23          (Exhibit 12: Photocopy of a book entitled
24      Textbook of Psycopharmacology by Alan
25      Schatzberg marked for identification, as of

193

1       this date.)
2       Q. I'm handing you now what's been marked as
3   Exhibit 11, which is the relevant pages of
4   Dr. Trimble's biological psychiatry book, and I'm
5   going to refer you to that, probably about the third
6   or fourth paragraph on the left-hand side.
7           MR. SOH:  What do you mean by relevant
8       pages?  Are these just --
9           MS. McGRODER:  It's the relevant pages.
10          MR. SOH:  Is this an entire chapter?  Is
11      this one page out of the book?
12          MS. McGRODER:  Sure.  Did you want me to
13      mark the whole book?
14          MR. SOH:  Yeah, it's your depo.
15          MS. McGRODER:  Why don't you bring your
16      copy, and we'll mark it.
17          MR. SOH:  It's your depo.  I'm just
18      verifying for the record it's one page out of
19      a book.
20      A. I'm really not competent to have an
21  opinion on this kind of stuff.
22      Q. Well, you've referenced and relied on
23  throughout the first opinion in your report that the
24  expert report in litigation of Dr. Trimble, correct?
25      A. Correct.

49 (Pages 190 to 193)

## 198

1  report in the Smith case, in that middle paragraph --
2  are you there?
3      A. Yes.
4      Q. In your second sentence you state:
5  Increase in brain GABA leads to negative effects on
6  mood and behavior.
7          And you cite Trimble 2007, right?
8      A. Yes.
9      Q. Again, that's Trimble's expert report in
10  this litigation, right?
11     A. Yes.
12     Q. That's not a peer-reviewed published
13  scientific article, is it?
14     A. No.
15     Q. Can you cite to me any peer-reviewed
16  published literature that says gabapentin increases
17  brain GABA and leads to negative effects on mood and
18  behavior?
19     A. I'm -- I'm relying solely on Trimble and
20  Roth and Kruszewski.
21     Q. You don't cite Roth and Kruszewski there,
22  do you?
23     A. Well, in this case I'm relying just on
24  Trimble.
25     Q. Okay.

## 199

1      A. I cite them in other parts of this.
2      Q. So you can't cite to me, as you sit here
3  today, any peer-reviewed published literature that
4  states: Increase in brain GABA leads to negative
5  effects on mood and behavior, correct?
6      A. I -- I cannot, but I possibly could if I
7  felt they were not going to be accepted as experts.
8  But so far I've assumed that they are going to be
9  accepted. And I could probably try to do that. I
10  haven't done that. I felt that that was
11  sufficient, that if they believed that this was
12  true, that I was going to rely on them.
13     Q. So as you sit here today, you're not in a
14  position to tell me that you know of any
15  peer-reviewed scientific literature that supports
16  this proposition in your report that increase in
17  brain GABA leads to negative effects on mood and
18  behavior, correct?
19     A. Correct.
20     Q. Are you familiar with the APA's textbook of
21  psychopharmacology?
22     A. No.
23     Q. Do you know who Dr. Schatzberg is?
24     A. No.
25     Q. Dr. Alan Schatzberg?

## 200

1      A. No.
2      Q. Do you know who Dr. Nemeroff is?
3      A. Yes. He's at Emory.
4      Q. And is he a neuropsychopharmacologist?
5      A. He's a psychiatrist with a specialty in
6  pharmacology, yes.
7      Q. I want to show you a passage from the APA
8  textbook of psychopharmacology. And I'll point you
9  right to the page, which is 736, okay? I want to
10  start with that first paragraph on the -- the second
11  full paragraph on the right-hand side, right-hand
12  column.
13         Do you see where it says: B.I. Gold --
14     A. Yes.
15     Q. -- and colleagues reported that cerebral
16  spinal fluid GABA concentrations in depressed
17  patients were significantly lower than in
18  non-depressed control subjects.
19         Do you see that?
20     A. Yes.
21     Q. And that this finding has been replicated
22  in several studies?
23     A. I see that.
24     Q. Is -- well, are studies that show lower CSF
25  GABA concentrations in depressed patients, are those

## 201

1  studies opposite the theories proposed by
2  Drs. Trimble and Kruszewski in this case?
3          MR. ROSENKRANZ: Objection.
4      A. I don't know. It's outside my expertise.
5      Q. Well, do Drs. Trimble and Kruszewski opine
6  in this case -- you rely on their opinions, that
7  gabapentin causes an increase in GABA which results
8  in depression and suicidal behavior?
9      A. It's a GABA agonist, yes.
10     Q. Okay. So -- so studies that show
11  gabapentin is lowered in depressed patients are
12  contrary to the opinions of Drs. Trimble and
13  Kruszewski in this case, correct?
14         MR. ROSENKRANZ: Objection.
15     A. It could be. I'm not competent to say.
16     Q. Dr. Schatzberg also states in this passage
17  -- where is this -- on the bottom part of that same
18  paragraph: Healthy subjects who have a first-degree
19  relative with a history of major depression also
20  appear to show an inverse correlation between GABA
21  levels and aggressiveness.
22         Do you see that?
23     A. I see that.
24     Q. Is that -- or are those studies that show
25  an inverse relationship between GABA levels and

51 (Pages 198 to 201)

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____
                                      )
4    In re: NEURONTIN MARKETING,      )
     SALES PRACTICES, AND PRODUCTS)
5    LIABILITY LITIGATION,            )
                                      )
6    _____)

7                          VOLUME II

8

9          CONTINUED VIDEOTAPED DEPOSITION OF

10                RONALD Wm. MARIS, Ph.D.

11                   (Taken by Defendant)

12              Columbia, South Carolina

13              Tuesday, September 30, 2008

14

15

16

17

18

19

20

21

22

23

24                 Reported in Stenotype by
                V. Dario Stanziola, CSR, RPR, CRR
25    Transcript produced by computer-aided transcription

Page 310

```
1        APPEARANCES
2   ON BEHALF OF THE PLAINTIFFS:
3        RON ROSENKRANZ, Esquire
         Finkelstein & Partners
4        1279 Route 300
         Newburgh, New York 12551
5        (845) 563-9442
         rrosenkranz@lawampm.com
6
    and
7
         KENNTH S. SOH, Esquire
8        The Lanier Law Firm
         6810 FM 1960 West
9        Houston, Texas 77069
         (713) 659-5200
10       kss@lanierlawfirm.com
11
    ON BEHALF OF THE DEFENDANT PFIZER:
12
         LORI CONNORS McGRODER, Esquire
13       JENNIFER M. STEVENSON, Esquire
         ANGELA M. SEATON, Esquire
14       LORI SCHULTZ, Esquire
         (Appearing Via Telephone)
15       Shook, Hardy & Bacon, L.L.P.
         2555 Grand Boulvard
16       Kansas City, Missouri 64108
         (816) 474-6550
17       lmcgroder@shb.com
         jstevenson@shb.com
18       aseaton@shb.com
         lschultz@shb.com
19
    Also Present:
20
         JAMES DOWNIE, CLVS, Videographer
21
22
23
24
25
```

Page 311

```
1    CONTINUED VIDEOTAPED DEPOSITION OF RONALD
2    Wm. MARIS, Ph.D., a witness called on behalf of the
3    Defendant, before V. Dario Stanziola, CSR, RPR,
4    CRR, held at the Columbia Marriott, 1200 Hampton
5    Street, Columbia, South Carolina, on Tuesday,
6    September 30, 2008, commencing at 9:12 a.m.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 312

```
1              INDEX OF EXAMINATIONS
2
3    By Ms. McGroder          PAGE    314
4
              INDEX OF EXHIBITS
5
    NUMBER      EXHIBIT            MARKED
6   Exhibit 20: Handwritten document with   314
    attachments entitled Notes dated 9/26/08
7                                  322
    Exhibit 21: A document entitled Rates Of
8   Depression Reported As An Adverse Event
    In Neurontin Placebo-Controlled
9   Neuropathy And Epilepsy Clinical Trials
                                   322
10  Exhibit 22: A document entitled
    Neurontin Gabapentin Capsules; Neurontin
11  Gabapentin Tablets; Neurontin Gabapentin
    Oral Solution
12                                 3392
    Exhibit 23: A document entitled an FDA
13  Center for Drug Evaluation and Research
    Document entitled Review and Evaluation
14  of Clinical Data
                                   342
15  Exhibit 24: A document entitled Rates Of
    Depression Reported As An Adverse Event
16  In Neurontin Placebo-Controlled
    Neuropathy And Epilepsy Clinical Trials
17                                 354
    Exhibit 25: A letter dated 5/29/92 to
18  Paul D. Leber from Janeth L. Turner
                                   356
19  Exhibit 26: A document entitled Appendix
    C.11. Summary of Adverse Events By Body
20  System
                                   370
21  Exhibit 27: A document entitled Summary
    Of All Adverse Events In <1 Percent Of
22  Patients With Partial Seizures Treated
    With Gabapentin Or Placebo During
23  Controlled Clinical Studies, By Body
    System And Double-Blind Treatment Group
24
25
```

Page 313

```
1   Exhibit 28: A document entitled Practice   382
    Guideline For the Assessment and
2   Treatment of Patients with Suicidal
    Behaviors
3                                  399
    Exhibit 29: A document entitled SSRI
4   Psychological Autopsy and Death
    Investigation by Ronald Wm. Maris, Ph.D.
5   and Arnold Anderson Vickery, J.D.
                                   428
6   Exhibit 30: A document entitled
    Psychological Autopsy and Death
7   Investigation, File Name Richard H.
    Smith
8                                  490
    Exhibit 31: A document entitled Smith
9   Index
                                   494
10  Exhibit 32: A document entitled The
    American Psychiatric Textbook of Suicide
11  Assessment and Management
                                   496
12  Exhibit 33: A handwritten document
    entitled Notes (Specific) dated 6/13/07
13                                 534
    Exhibit 34: A letter from Christopher L.
14  Wood, DDS dated 5/19/04 with attachments
                                   576
15  Exhibit 35: A document entitled New
    Patient Medical Questionaire
16                                 603
    Exhibit 36: A document from Neurological
17  Associates dated 3/3/03 to Dr. James
    Cato from Paul R. McCombs, M.D. with
18  attachments
                                   610
19  Exhibit 37: A article entitled Columbia
    Classification Algorithm of Suicide
20  Assessment (C-CASA): Classification of
    Suicidal Events in the FDA's Pediatric
21  Suicidal Risk Analysis of
    Antidepressants
22                                 617
    Exhibit 38: A document entitled Beck
23  Scale of Suicidal Ideation
                                   631
24  Exhibit 40: A photocopy of Neurological
    Associates with patient Richard H. Smith
25  clinical record
```

2 (Pages 310 to 313)

Page 314

1      (Exhibit 20: Handwritten document with
2   attachments entitled Notes dated 9/26/08
3   marked for identification, as of this date.)
4      THE VIDEOGRAPHER:  This is the beginning
5   of Tape No. 1, Volume II of Dr. Ronald Maris.
6   Today is September 30th, 2008.  The time on
7   the monitor is 9:12 a.m.
8      We're now on the record.
9         CONTINUED EXAMINATION
10  BY MS. McGRODER:
11  Q.  Good morning, Dr. Maris.
12  A.  Good morning.
13  Q.  We're here today for the continuation of
14  your deposition in the Smith and Bulger matters.
15     Do you understand that, correct?
16  A.  Yes.
17  Q.  And you're still under oath.
18  A.  Yes.
19  Q.  We marked yesterday as Exhibit 19 a copy of
20  your -- what you called yesterday your new report.
21  Remember that?
22  A.  I called it an addendum to my old report.
23  Q.  Oh, okay.  I misunderstood you then.
24     We are going to mark this morning as
25  Exhibit 20 the original copy of your addendum because

Page 315

1   Exhibit 19 is missing some of the -- some of the
2   words on the page, okay?
3      So we're not going to talk about this right
4   now, but I wanted to let you know that we're using
5   your original copies.
6   A.  Does that mean I'm not going to get it
7   back?
8   Q.  No, you'll get it back.
9      Could you please turn to page 18 of your
10  report in the Smith case.
11     MS. McGRODER:  Oh, you know, for the
12  record, we used five hours and 37 minutes
13  yesterday.  As you know, under the CMO, we're
14  entitled to a seven-hour deposition day.  I
15  recognize we got started late and had several
16  breaks.  But just for the record --
17     MR. SOH:  You're entitled to four days.
18  We owe you an hour because we shut it down an
19  hour for Rosh Hashanah.
20     Please continue.
21     MS. McGRODER:  Well, we're entitled to
22  seven hours --
23     MR. SOH:  I made my objection, Lori.
24  Please move on.  Now you keep burning up your
25  time.  Keep talking and burn your own clock, I

Page 316

1   don't care.  I made our position.  Go ahead,
2   you may ask him your questions.
3      MS. McGRODER:  I shall.  This morning I'm
4   going to state on the record that under the
5   CMO, we're entitled to a seven-hour deposition
6   day.  So hopefully we can complete the
7   deposition in four days.  But if not, you
8   recognize that we have additional time on the
9   record due to us.
10     MR. SOH:  I do not -- let me --
11  Q.  Dr. Maris --
12     MR. SOH:  Lori, you made a statement, I'm
13  going to respond to your statement, Lori.  I
14  recognize that --
15     MS. McGRODER:  You don't to have to freak
16  out.
17     MR. SOH:  9:00 to 6:00 -- you are
18  entitled to go 9:00 to 6:00.  We shut down an
19  hour early, and you're entitled to an hour.
20     Please continue.
21     MS. McGRODER:  I'll continue when I'm
22  good and ready, and you don't have to --
23     MR. SOH:  Who's freaking out now?
24     MS. McGRODER:  You don't have to be so
25  obstructive and angry.  It's 9:15 a.m.  We're

Page 317

1   just getting started.  We have a long day
2   together.  Let's calm down and --
3      MR. SOH:  I'm perfectly calm, Ms.
4   McGroder.
5      MS. McGRODER:  Really?
6      MR. SOH:  You seem to have gotten up on
7   the wrong side of the pillow this morning, but
8   go ahead.
9      Please continue.
10  Q.  I'm in the middle of page 18 of your
11  deposition -- or your report in the Smith matter.
12  There's a paragraph that starts the PDR; do you see
13  that?
14  A.  Yes.
15  Q.  And that same paragraph appears in the
16  Bulger report, correct?
17  A.  That's what?
18  Q.  That same paragraph also appears in your
19  report in the Bulger matter, true?
20  A.  I -- I believe so.  I'd have to check my
21  Bulger, which I didn't bring today.
22  Q.  Okay.  And you state that the PDR lists
23  only two nervous system SAEs.
24     And what do you mean by SAEs?
25  A.  Sometimes it's called serious adverse

3 (Pages 314 to 317)

**Page 402**

1    Q.  Has anybody on earth ever used this
2  Psychological Autopsy and Death Investigation form
3  other than you and Attorney Vickery?
4        MR. SOH:  Objection, argumentative.
5        MR. ROSENKRANZ:  Objection.
6    A.  No.
7    Q.  Have you ever used this Psychological
8  Autopsy and Death Investigation form in this format
9  outside the context of testifying in litigation
10  against pharmaceutical companies?
11    A.  Yes, I've used it for other cases where
12  litigation was not involved where I was gathering
13  data on a particular patient.
14    Q.  And that was for what purpose?
15    A.  Psychological autopsy can be used for any
16  suicide where you're trying to determine the manner
17  of death, where you're trying to look at the
18  social/psychological factors in addition to the
19  medical examiner physical autopsy that may be
20  contributing to that suicide.
21        So it's a research instrument that's been
22  used since 19 -- late 1950s by my mentor, Dr. Edwin
23  Shneidman, from Los Angeles.  It's a common
24  research instrument in various forms by different
25  investigators.

**Page 403**

1    Q.  Well, I'm not asking you about a common
2  research instrument.  I'm asking about this one that
3  you created with Mr. Vickery.
4        Has this instrument -- have you ever used
5  this instrument, the SSRI Psychological Autopsy and
6  Death Investigation, outside the context of a lawsuit
7  in which you were testifying against pharmaceutical
8  companies?
9    A.  I said yes.
10    Q.  And so tell me the circumstances under
11  which you used your SSRI psychological autopsy
12  outside the context of litigation.
13    A.  I've used it in teaching where there was
14  patient files.  I've used it as a supervisor of
15  residents in psychiatry and family practice.  I've
16  used it in my looking at cases for workshops and
17  for -- probably for some of the papers I've
18  written.  I've used it many times.
19    Q.  You don't know whether you've used it for
20  some of the papers you've written?
21    A.  I think -- I think I did.
22        The problem is you're going -- the next
23  question is going to be which papers, and I don't
24  remember.  But I've certainly --
25    Q.  Can you cite to me any papers that you've

**Page 404**

1  written in which you have identified the SSRI
2  Psychological Autopsy and Death Investigation as a
3  basis for whatever you're reporting in your paper?
4    A.  Well, certainly the Pathways of Suicide
5  book.  In 1981 I went back to Chicago, and I had an
6  interview questionnaire which had a very similar
7  form to this which I gave to all the survivors in a
8  random sample of Chicago suicides.  That was part
9  of my research.
10    Q.  Dr. Maris, I didn't ask you about any other
11  psychological autopsy format or form that you've used
12  in the past.
13        I'm asking you about this document, SSRI
14  Psychological Autopsy and Death Investigation.  Has
15  this document ever been cited in a paper that you
16  published in a peer reviewed journal?
17    A.  I don't know if it's been cited in a peer
18  reviewed journal.
19        But the answer, to repeat myself, is yes,
20  I have used it in many other occasions.  May have
21  been in slightly different form.  So I would say
22  probably I've used that, but I'd have to go back
23  and look at the particular publications and
24  teaching situations.
25        But it was not designed for litigation.

**Page 405**

1  It was designed to do a psychological autopsy with
2  a completed suicide.  This particular version added
3  stuff on SSRIs because that's what Andy Vickery and
4  I needed.  But the psychological autopsy has been
5  around for years.
6    Q.  Yeah, but I'm not asking you about the
7  psychological autopsy that's been around for years.
8  I'm asking you, as you know, specifically about the
9  SSRI psychological autopsy and death investigation.
10        And parts of this, you've given testimony
11  in the past were, in fact, developed by Attorney
12  Vickery, correct?
13    A.  There's one part.
14    Q.  And -- and this form, this document,
15  Exhibit 29, including the part that Mr. Vickery
16  developed, has this ever been cited by you in any
17  peer reviewed published literature?
18    A.  I don't know off the top of my head
19  without going home and doing a search.
20    Q.  As you sit here today, you can't identify a
21  single piece of published literature in a peer
22  reviewed journal in which you have cited the SSRI
23  Psychological Autopsy and Death Investigation,
24  correct?
25    A.  In this -- if you're going to stick me to

Page 406

1  this particular version of it?
2      Q.  I am.
3      A.  Then I say I'd have to go do a search. I
4  can't do that off the top of my head.
5      Q.  Yes.
6          And my question to you was as you sit here
7  today then, you cannot identify for me any peer
8  reviewed published article by you in which you have
9  cited the SSRI Psychological Autopsy and Death
10  Investigation; is that correct?
11         MR. ROSENKRANZ: Objection, asked and
12  answered.
13     A.  Not off the top of my head, I can't do
14  it.
15     Q.  So as you sit here today, you cannot do it,
16  correct?
17     A.  Correct.
18     Q.  Thank you.
19         Do you agree that reliability and validity
20  of the psychological autopsy you developed with
21  Attorney Vickery is uncertain?
22     A.  There are two questions there. Andy
23  Vickery did not develop this. I developed it and
24  he paid for my time.
25         The second question is reliability and

Page 407

1  validity. Yes, but you can only do that after
2  you've done a large number of these and you've done
3  the psychometric testing that is suggested at the
4  back of the psych autopsy.
5          So validity and reliability have not been
6  established for this autopsy.
7      Q.  And you've never done the psychometric
8  testing listed at the back of this SSRI psychological
9  autopsy to establish its validity or reliability,
10  correct?
11     A.  Have not, not yet.
12     Q.  And the same would be true of the
13  psychological autopsy you used in the Smith and
14  Bulger cases, correct?
15     A.  It's correct.
16     Q.  You've actually used your psychological
17  autopsy that you developed with Mr. Vickery in a
18  number of cases in which you've testified, correct?
19     A.  Yeah, I always do a psychological
20  autopsy.
21     Q.  So would you say you've done about 200
22  psychological autopsies because you've testified in
23  about 200 cases?
24     A.  You're misinterpreting my CV. My CV said
25  I've had 200 cases. If you go back and read page

Page 408

1  17, I've only testified about 30 some times.
2      Q.  Okay. Well, setting that aside, have you
3  taken about 200 cases?
4      A.  I've had over a long period of time,
5  since the 1970s about 200 litigation cases.
6      Q.  And you always do a psychological autopsy
7  on the cases you take, correct?
8      A.  Almost always. I wouldn't say always.
9      Q.  Okay. And so have you done about 200
10  psychological autopsies?
11     A.  Well, this hasn't even been fully
12  developed until more recently, so no.
13     Q.  And so you have not -- well, can you tell
14  me as you sit here today what sample size would be
15  required for you to subject this psychological
16  autopsy to the testing that would be required to
17  determine its reliability and validity?
18     A.  I would say, just as a rough
19  approximation, at least a hundred cases. And I've
20  testified in about -- anybody have my CV handy?
21     Q.  I think it's Exhibit 6.
22     A.  Here it is right here.
23         If you look on page 17, it says I've
24  testified or given a deposition 26 times out of
25  those 200.

Page 409

1      Q.  But you haven't limited the use of your
2  psychological autopsy only to the times that you've
3  testified, correct?
4      A.  Probably not, but it's possible that I
5  don't know the exact answer. I know it's not the
6  full 200, and I know that usually when I go to
7  trial, I need more complete data.
8          So it's someplace between 26 and 200, and
9  it's not even close to 200. And I think you
10  probably need at least a hundred to answer your
11  question.
12     Q.  And so is your testimony today that you've
13  not used the psychological autopsy a hundred times?
14     A.  Probably not.
15     Q.  You don't know?
16     A.  I don't know without going and counting
17  all my cases.
18     Q.  And have you ever attempted to actually
19  determine the true sample size that would be required
20  in order to test the validity and reliability of your
21  psychological autopsy?
22     A.  Well, there's a rule in statistics called
23  the law of large numbers. And it says as you draw
24  simple -- repeated simple random samples, as the
25  number approaches about a hundred, then you have a

26 (Pages 406 to 409)

**Page 410**

1 representative sample. So that's where the hundred
2 came from.
3    Q. Have you ever called up a statistician to
4 ask what is the appropriate sample size in order to
5 test the reliability and validity of my psychological
6 autopsy instrument?
7    A. No.
8    Q. Has your psychological -- excuse me. Has
9 your psychological autopsy that's in the form used in
10 the Smith and Bulger cases ever been accepted for
11 publication in a peer reviewed journal?
12    A. Never been accepted, never been
13 submitted.
14    Q. Which part of the psychological autopsy was
15 developed by Mr. Vickery?
16    A. He put in section 17, which is one page.
17    Q. Is section 17 included in the Smith
18 psychological autopsy?
19    A. Yes, it is.
20    Q. And how many pages is it?
21    A. Two pages.
22    Q. Is section 17 included in the Bulger
23 psychological autopsy?
24    A. Yes.
25    Q. Okay. Is your estimation it's about the

**Page 411**

1 same number of pages?
2    A. Exactly the same number of pages. It's
3 the same pages, 41 and 42.
4    Q. Well, as I look at the psychological
5 autopsy form in the Smith case, you fill in narrative
6 responses, correct?
7    On page 41 there are a number of them.
8    A. You're saying the narratives could be a
9 different length so it might be different pages?
10    Q. Yes, exactly.
11    A. Yeah, of course, of course. Without
12 looking at the original, we don't know.
13    Q. Which is why we need the original?
14    A. We need it tomorrow.
15    Q. We need it today.
16    And what is the name of the section that's
17 developed by Attorney Vickery?
18    A. He calls it a Puzzling Paradox Paradigm.
19    COURT REPORTER: I'm sorry, I didn't hear
20 you.
21    THE WITNESS: Puzzling Paradox Paradigm.
22    Q. How much did Mr. Vickery pay you to create
23 the SSRI psychological autopsy evaluation?
24    A. I have no idea without going back. I'm
25 not even sure I saved those records.

**Page 412**

1    Q. And did Mr. Vickery pay you every time you
2 used it to evaluate and do a death investigation in
3 an SSRI case?
4    A. Just for my regular consulting time, not
5 for the autopsy.
6    Q. Is the Finkelstein law firm paying you
7 every time you use your psychological autopsy to
8 evaluate a Neurontin case?
9    A. Not for the autopsy, just for my time.
10 So --
11    Q. How much time have you spent on the
12 Neurontin litigation since 2004?
13    A. I have no way of knowing. I have to look
14 at my files. I have four different files and I
15 have the billing record, and you're welcome to look
16 at those. But without looking at those, I really
17 don't know.
18    Q. And do you have those with you here today?
19    A. I have the ones for Smith today, sure.
20 You're welcome to look at that. I mean, four years
21 is a long time.
22    Q. Have you worked on the Smith case for four
23 years?
24    A. Oh, no.
25    Q. Okay. So what's your total time on the

**Page 413**

1 Smith case and how much have you billed for the Smith
2 case?
3    A. Okay. I worked on the Smith case from
4 5/22/07 until today, and I -- I'm going to have to
5 add this up.
6    Let's see here. It's hard to say without
7 being more careful than I can be right now because
8 there's certain times that I billed and I added
9 everything up.
10    Q. And you're looking at your folder for
11 Smith, right?
12    A. Right, the billing record over the last
13 year, year and four months.
14    Q. And so the notes on your folder are your
15 billing records?
16    A. Yeah, they're the -- they start with the
17 topic -- like here it says read Pfizer's RCT
18 response to the FDA about suicide and suicide
19 attempts. And then it has the date, 6/27/07. It
20 has the hours and minutes, and then it has in
21 parentheses what time of day I did it. And then it
22 has the cost per hour and the charge for that one
23 item.
24    Q. Okay. And you have a similar folder for
25 Bulger, correct?

27 (Pages 410 to 413)

Page 414

1    A.  Sure do.
2    Q.  You got one for Crone?
3    A.  Yes.
4    Q.  Do you have one for Shearer?
5    A.  Yes.
6    Q.  Do you have a general folder?
7    A.  I have a general folder for generics,
8  Neurontin.
9        As I say, early on before I ever got any
10  cases, they sent me a CD-ROM disk which had a lot
11  of generic information, and I had to get up to
12  speed on Neurontin.  And so I had some work that I
13  did.  And as I say, the CD is on my laptop.  It has
14  all the documents I reviewed.
15       Some of it I charged for particular cases
16  because I read them for particular cases.  So --
17  but I did do some generic work in addition to the
18  four cases.
19   Q.  Okay.  And I take it you have already
20  billed the Finkelstein law firm for your time in
21  2004, 2005, 2006, 2007 respectively, right?
22   A.  Yes.
23   Q.  And you'd be in a position to identify what
24  amount was billed the Finkelstein law -- I'm sorry,
25  the Finkelstein law firm for your time on the

Page 415

1  Neurontin cases in general for those years, correct?
2    A.  I could calculate that or you could
3  simply make a copy of all my manila folders and add
4  it up yourself.
5    Q.  Okay.  And the Bulger folder I take it is
6  with your Bulger materials, right?
7    A.  Right.  And I'd have to bring the other
8  two.
9    Q.  Do you have the general folder with you?
10   A.  No.
11   Q.  But you could bring that tomorrow?
12   A.  The general folder is -- is really --
13  just say that I got the CD.  There's -- there's no
14  -- there's a list of everything I read.
15       But the problem was I tended to charge it
16  to particular cases as I read.  So there's not like
17  a fifth set of charges, as I recall.
18   Q.  Well, if I ask you tomorrow or on Friday
19  what your total billings were for these years --
20   A.  I can figure it out.
21   Q.  -- you'd be in a position to tell me?
22   A.  I could do that.
23   Q.  Okay.
24   A.  Yeah, let me make a note of that.
25   Q.  Thanks.

Page 416

1        THE VIDEOGRAPHER:  You have about five
2    minutes.
3    A.  I'm going to write down Friday because
4  it's going to take me a while to do that.
5    Q.  Okay.  That will be fine.
6        Is the -- I've got to ask you one more
7  thing about that, Dr. Maris.  Have you billed both
8  the Finkelstein law firm and the Lanier law firm or
9  just the Finkelstein law firm?
10   A.  I send my bills all to Ken Fromson, and I
11  don't know what he does with them.
12   Q.  Okay.  Was the Puzzling Paradox Paradigm
13  created by Attorney Vickery designed as a protocol to
14  determine whether factors in a given case demonstrate
15  an SSRI-induced death?
16   A.  What they were -- the short answer is
17  yes.
18       And what he did, he's done a lot of trial
19  litigation for psychiatric drugs, primarily SSRIs,
20  but not limited to SSRIs.  Some SNRIs, some -- as
21  you know, many of these cases involve an
22  antipsychotic or an antianxiety.
23       So they have been used to test that.  And
24  based on all those cases, he developed -- he
25  actually has a little, wood block puzzle with eight

Page 417

1  pieces and he says how do we -- what have I learned
2  in all my experience working in these drug cases.
3  And he puts down one piece -- he's got a PowerPoint
4  that you could get from him, I'm sure -- another
5  piece, and when you get all the pieces together, it
6  suggests a suicidogenic pattern.  And if you have
7  more of the pieces of the drug adverse event
8  causing a self-destructive behavior, the more
9  likely you are to make a suicidal or suicidality
10  kind of response.
11       So it's a kind of clinical based,
12  experiential based, nonstatistical, anecdotal way
13  of him summarizing the pieces of the puzzle to when
14  you give somebody a drug and, you know, weeks or
15  days or a couple -- usually as he says is within
16  30 days, that's one of the puzzles.  Let's say
17  within 30 days out of character they kill
18  themselves, what are some of the common traits that
19  precede and antecede that.  So that's what it is.
20   Q.  And Andy Vickery is not a medical doctor,
21  right?
22   A.  He's an attorney.
23   Q.  So when you say it's built on his clinical
24  experience or something to that effect, you wouldn't
25  be indicating that he has some medical experience?

28 (Pages 414 to 417)

Page 418

1    A.  I think I corrected myself when I said
2  that.  I said or his experience.
3    Q.  All right.  Because he has no medical
4  experience at all, right?
5    A.  I don't know for a fact about that.
6    Q.  Do you see any problem in having a lawyer
7  who represents plaintiffs come up with a protocol to
8  determine whether his clients should win in the case
9  if his theory is right?
10    MR. ROSENKRANZ:  Objection to the form of
11  the question.
12    A.  I mean, this is not something that --
13  this is something he wanted and he wanted the data.
14  It was not something that I insisted be there.  And
15  since he was paying me, I said let's put it in
16  there; and if you want to use it, fine.
17    I don't put a lot of stock in it because
18  it's kind of anecdotal.  But I do put stock in the
19  rest of the autopsy, which is, I think, empirically
20  based.
21    Q.  And what's your basis for saying it's
22  empirically based if it's never been subjected to
23  peer review or published in any peer reviewed journal
24  or tested for reliability or validity?
25    A.  Same thing that Doug Jacobs and his

Page 419

1  committee used, review of the scientific
2  literature, which is peer reviewed, having done
3  several empirically-based studies of suicide over
4  45 years.  It's based on that.
5    Q.  Basically it's based on your experience,
6  right?
7    A.  Based on my experience.
8    You also have to remember that I was the
9  editor in chief of the only journal on suicide for
10  16 years in the United States.  So I was privy to
11  all of the refereed journal articles and actually
12  made decisions about what got published.  And so I
13  was sitting in a pretty good place based on my
14  experience to know what should be in here.
15    MS. McGRODER:  Object and move to strike.
16    Q.  There's no -- there's no empirical data
17  that supports this psychological autopsy, is there?
18    A.  That's not true.
19    MS. McGRODER:  Let's take a break.
20    THE VIDEOGRAPHER:  This is the end of
21  Tape No. 2 in the deposition of Dr. Ronald
22  Maris, Volume II.  The time is 11:25 a.m.
23    (A BRIEF RECESS WAS TAKEN.)
24    THE VIDEOGRAPHER:  This is the beginning
25  of Tape No. 3 in the deposition of Dr. Ronald

Page 420

1  Maris, Volume II.  The time is 11:48 a.m.
2    We're back on the record.
3    Q.  Doctor, can you identify for me the
4  empirically-based data that supports your
5  psychological autopsy?
6    A.  I have not done what Doug Jacobs and his
7  committee did where I added an addendum and went
8  through all the literature.  But the short answer
9  would be to see my textbook which I relied heavily
10  on in terms of designing the questions.  My
11  textbook would be the Comprehensive Textbook of
12  Suicidology in 2000.  It covers all the risk
13  factors and gives citations for each of them.  So
14  that's the short answer.
15    Q.  Okay.  Just so I understand, do you or do
16  you not acknowledge risk factors identified outside
17  the context of your own work?
18    A.  Sure, I do.  For example, in my 1992
19  book, I actually have two chapters on risk factors.
20  One is by Dr. Bloutchik, B-L-O-U-T-C-H-I-K, who has
21  a hundred risk factors, and that's his chapter.
22  And he has a different list, and I obviously
23  acknowledge him because I included him in my book.
24    Q.  Is there overlap between the Bloutchik risk
25  factors and the APA guideline risk factors for

Page 421

1  suicide?
2    A.  Yes.
3    Q.  Okay.  Is there anything unscientific about
4  an expert testifying on behalf of plaintiffs and
5  basing his opinions on a tool that was developed at
6  least in part with the help of a plaintiff's lawyer
7  for use in cases brought by plaintiffs?
8    MR. ROSENKRANZ:  Objection.
9    A.  That's a generic question.  And I think
10  in my case it was almost -- Andy Vickery, for
11  example, gave me some money.  He didn't write
12  except one little tiny, teeny section of two pages.
13  So I don't think that's unethical, no.
14    Q.  Okay.  My question wasn't about ethics, and
15  my question wasn't specifically related to your
16  psychological autopsy, although I can see how you
17  could apply that.
18    My question is do you see any problem with
19  an expert testifying on behalf of plaintiffs and
20  basing opinions on a tool developed with the help of
21  a plaintiff's lawyer for use in cases brought by
22  plaintiffs?
23    A.  No.
24    Q.  There's nothing unscientific about that, in
25  your opinion?

29 (Pages 418 to 421)

Page 422

1    A.   That's correct.
2         MR. ROSENKRANZ:  Objection,
3    argumentative.
4    Q.   Now, in the Puzzling Paradox Paradigm
5    created by Mr. Vickery, I think you mentioned there's
6    a question that asked whether the suicide occurred
7    within 30 days of ingestion of an SSRI, right?
8    A.   Right.
9    Q.   And that same question is in the
10   psychological autopsy for the Smith case, correct?
11   A.   Right.
12   Q.   Is there any reliable scientific data that
13   support use of criteria suggesting that if the
14   suicide occurs within 30 days of Neurontin ingestion,
15   Neurontin is a cause of the suicide?
16   A.   No.
17        And can I just say no but?
18   Q.   Sure, you can say whatever you want.  I
19   mean, I'm not going to object to it, but go ahead.
20   A.   There are some cases where people who
21   take any drug or any food and have an almost
22   immediate reaction, like peanuts or shellfish.
23        So that's part of the empirical basis, is
24   that one would suspect that if it's truly an
25   allergic reaction and not a -- let's say, a slow

Page 423

1    change in mood, that it might be shorter rather
2    than longer.  However, I was aware that Doug
3    Jacobs, in his expert report, went through the 10
4    index cases and showed that there was a variety of
5    times, far more than 30 days, which many of the
6    Neurontin patients were on before they either
7    completed or attempted suicide.
8         So the short answer is no.
9    Q.   Okay.
10        MS. McGRODER:  Object and move to strike
11   everything except no.
12   Q.   Did you read the expert report of Doug
13   Jacobs?
14   A.   I did.
15   Q.   Did you read it last night?
16   A.   Yes.
17   Q.   Okay.  What else did you read last night?
18   A.   I went back and looked at all of my
19   scientific literature and found examples outside of
20   Trimble, Kruszewski, and Roth that supported the
21   Trimble interpretation of the effects of
22   gabapentin.  And I copied those and underlined
23   them.
24   Q.   And were those among the materials provided
25   to you by the Finkelstein law firm; is that what you

Page 424

1    went back to?
2    A.   Yes, they were the package that I had of
3    all the stuff from Finkelstein law firm.
4    Q.   And do you know as you sit here whether
5    that package of materials and literature from the
6    Finkelstein law firm are the references cited in the
7    Trimble and Dr. Kruszewski reports?
8    A.   I don't know that without making a
9    line-by-line comparison, but I did bring them with
10   me.
11   Q.   Did you create a list of them?
12   A.   No, I just brought -- like you did
13   yesterday, I brought the peer reviewed articles and
14   highlighted them.
15   Q.   Okay.
16   A.   So I have a number of them which I'm --
17   Q.   Okay.  How about we just set those there
18   and we'll come back to them.  That would be great.
19   Thank you.
20        When you conducted the -- well, first of
21   all, who conducted the Psychological Autopsy and
22   Death Investigation in the Smith case?
23   A.   I sent them to Ken Fromson, and he asked
24   a case manager named Michelle Faye to review all
25   the evidence and to send them to me.  And then when

Page 425

1    I -- when I got them, in some cases I sent them
2    back because I felt like they were incomplete.
3         But the short answer is I did not do them
4    myself.  I sent the form to Fromson, and he had one
5    of his case managers, who was most familiar with
6    all the evidence, to look at the evidence and fill
7    them out for me.
8    Q.   And Ken Fromson obviously is a plaintiff's
9    lawyer who represents individuals bringing lawsuits
10   against Pfizer involving Neurontin, correct?
11   A.   That's some of the stuff he does, yes.
12   Q.   And Michelle Faye, does she work for Ken
13   Fromson?
14   A.   She works for Finkelstein, and she's a
15   case manager for the Neurontin cases.
16   Q.   So case manager doesn't imply that Ms. Faye
17   has any sort of medical background, correct?
18   A.   No, she simply abstracted the data.  She
19   didn't edit it in any way.
20   Q.   So she's an employee of the law firm
21   representing plaintiffs?
22   A.   She is.
23   Q.   And who was interviewed -- well, the same
24   question then for the Bulger report?
25   A.   She did the same thing in the Bulger

Page 426

1  report.
2      Q.  Okay.
3      A.  In other words, I wanted the information.
4  And you'll notice when you go through my autopsy,
5  that there are -- there are questions where I
6  disagree with her conclusions and I actually
7  corrected them. For example, here's a place here
8  where she said no -- yes, and I said no.
9          So, in other words, I didn't just take it
10  lock, stock, and barrel. I actually proofread
11  everything based on my knowledge of the case.
12      Q.  So the -- the efforts that you've made to
13  go back through and correct things that Michelle Faye
14  did when she conducted the psychological autopsy,
15  those are handwritten notes you made in that Smith
16  psychological autopsy report?
17      A.  Yes.
18      Q.  When did you do that?
19      A.  As soon as I got -- I got it on 5/26/07,
20  and I did it when I read it on June 13th, '07.
21      Q.  And you were pointing, I think, at page 42
22  where you showed me where you crossed out a yes on
23  question 108?
24      A.  Right.
25      Q.  And you made it a no?

Page 427

1      A.  Right.
2      Q.  Okay. I don't have that version.
3      A.  Well, I'm sure you'll get a copy of this.
4  You're welcome to have it.
5          MR. ROSENKRANZ: We'll make a copy of it
6  now.
7          THE WITNESS: Yeah, it's not a big deal.
8          MS. McGRODER: No, I'm just going -- I'm
9  just going to make an objection on the record
10  that he's actually changed the information --
11  the substantive information in the
12  psychological autopsy over a year ago, and
13  that wasn't provided to us. So now I've
14  relied on the version that was provided to us,
15  which is substantially different because he's
16  changed the answers. That's a problem.
17          MR. ROSENKRANZ: Well, I don't believe
18  that that was provided to us either. So we
19  couldn't have possibly provided it to you.
20      A.  That's true. I changed it, but I didn't
21  send it back to them. And you want me to get it
22  right, don't you?
23      Q.  Well, what I want is to understand your
24  opinions, and there's a deadline by which your
25  opinions are to be provided to us in this litigation.

Page 428

1      A.  You can take that up to them.
2          MR. SOH: Those questions are directed to
3  --
4      Q.  Can I mark this as an exhibit, please?
5      A.  As long as you give it back to me because
6  I've got to look at it.
7          (Exhibit 30: A document entitled
8          Psychological Autopsy and Death Investigation,
9          File Name Richard H. Smith marked for
10          identification, as of this date.)
11      Q.  Did you do the same analysis in Bulger to
12  go through and --
13      A.  I did it particularly in Bulger. I
14  thought Bulger had a lot more errors in it.
15      Q.  Oh, okay.
16      A.  In fact, I insisted that Bulger be
17  redone, I thought it was so much incomplete.
18      Q.  Did you give Ms. Faye any sort of training
19  in how to conduct a psychological autopsy?
20      A.  No. I mean, there are instructions and I
21  -- basically they say -- they're basically factual
22  questions.
23      Q.  So the instructions are contained within
24  the document itself?
25      A.  Yeah. And I also told her if you have

Page 429

1  any questions whatsoever to call me and I'll
2  interpret the questions; I mean, how tall was he.
3      Q.  Did you actually talk to her or did you
4  tell that to Ken Fromson?
5      A.  No, I actually talked to her because she
6  was the one doing it.
7      Q.  How many times did you talk to her?
8      A.  I've talked to her probably a dozen
9  times.
10      Q.  And, you know, without belaboring this and
11  taking too much time, can you tell me approximately
12  how many times you changed your answer in the Smith
13  report?
14          MR. ROSENKRANZ: You want to know how
15          many times he changed it or how many changes
16          he made? He may have only changed it once,
17          then made ten changes in the one time he did
18          it.
19          MS. McGRODER: Well, that's a good point.
20          MR. ROSENKRANZ: That's two different
21          questions.
22          MS. McGRODER: Your question's better.
23      Q.  How many changes did you make?
24      A.  You want them all? I can give them to
25  you right --

Page 438

1   A.  So this was not a usual guise for a guy
2   who was a Christian minister for 57 years.
3       Q.  And where -- from what data did you derive
4   the 53 plus 4?
5       A.  I obviously looked 47 to 204, and I'm not
6   sure where I got the plus 4.  I'd have to go back
7   and think about that.
8       Q.  Okay.
9       A.  Page 41, this is Andy Vickery's Puzzling
10  Paradox, which incidentally, admittedly, was made
11  for SSRIs initially.  But this is also a question
12  in drug reaction so I kept them in.
13      Q.  And so is it your opinion that the drug
14  reaction questions that Andy Vickery made up for
15  SSRIs would apply to any prescription drug in which
16  you're testifying as an expert against a
17  pharmaceutical company?
18      A.  I think the short answer is no, but I
19  thought there was nothing to be lost from -- lost
20  from getting the information.
21          So probably not.  If you pushed me, I
22  would eliminate those.
23      Q.  Okay.  And is your testimony that you're not
24  relying on section 17 or you are relying on section
25  17?

Page 439

1       A.  Well, I did get some data and I think the
2   data speaks for itself whether or not it's part of
3   the Puzzling Paradox.  I think -- I think it's
4   relevant, yes.
5       Q.  So you're relying on the Puzzling Paradox?
6       A.  Yes.
7       Q.  Okay.
8       A.  And, for example, on page 103 -- I'm
9   sorry, 41, question 103, Ruth said that he thought
10  -- he asked if God would forgive me if I just do
11  away with myself.  He had said this three weeks
12  prior to his death.  And I cross-referenced that to
13  her deposition, Ruth at 1:45, so I'd have a double
14  citation for that.
15          And then the bottom of page 42, question
16  108, did the decedent commit suicide or homicide,
17  et cetera, within 30 days of ingesting Neurontin?
18  Michelle Faye said yes and it's wrong.  So I
19  crossed it off and put no.  By my estimate it was
20  67 days.
21          And, of course, I know we'll get to this,
22  there's always a question about did he take it
23  every day?  How about the sample boxes?  So there's
24  a lot of questions still around this.  But I
25  thought rather than yes, it was no, at least in my

Page 440

1   judgment 60-some days.
2       Q.  And so question 108 is really not a matter
3   of signifying whether the ingestion is within
4   30 days.  In your view, it's really how long was the
5   ingestion?
6       A.  Yes.
7       Q.  Okay.
8       A.  And I'm taking 3/9/04 as the start date.
9       Q.  All right.
10      A.  Next page, how many pieces of the puzzle
11  did he have?  I said on top of page 43, which
12  Michelle Faye left blank, five or six.  I couldn't
13  be sure whether he had five or six, but it was not
14  none.  It was probably either five or six pieces of
15  the puzzle.
16      Q.  Okay.
17      A.  And then I think that's it.
18      Q.  Okay.  If you look on page 44, section 21
19  is blank.  I -- I guess -- the question I have about
20  this is if you -- when you gave this form to Mr.
21  Fromson to give to Ms. Faye, who was interviewed to
22  provide this form or did she just look at the records
23  and fill in the form?
24      A.  Just looked at the records.  I mean, as
25  you -- as you're probably guessing, usually I

Page 441

1   interview a living person, a witness.  And when I
2   get finished with any survey, I say, look, I asked
3   you a lot of questions that I thought were relevant
4   but did I miss something?  What do you want to tell
5   me?
6           So that's an open-ended question.  She
7   couldn't answer that because she would not have any
8   basis to answer that.
9       Q.  So no member of the Smith family was
10  interviewed for the psychological autopsy?
11      A.  Not directly, only indirectly through
12  deposition and through medical records, but not
13  directly.
14      Q.  Well, not at all, right?
15          I mean, the materials that were relied on
16  to fill out the form came from documents,
17  depositions, and other medical records?
18      A.  True.  And indirectly many of those
19  documents were interviews with the family and with
20  the doctors and so on.  So it's once removed.
21      Q.  Well -- but where are there interviews of
22  the family in the records that Michelle Faye looked
23  at?
24      A.  Depositions.
25      Q.  Oh, you're calling those interviews?

34 (Pages 438 to 441)

Page 442

1    A. Yeah, sure. I mean, they're close.
2    Q. Okay. Anything else that constitutes in
3 your mind an interview of the family?
4    A. No, those would be what I would rely on.
5    Q. Is the same true in Bulger, that no member
6 of the Bulger family was interviewed for purposes of
7 the psychological autopsy?
8    A. Yes.
9    Q. And did Ms. Faye also fill out the Bulger
10 form?
11    A. Yes.
12    Q. Anybody else involved in the preparation of
13 the psychological autopsy forms for Smith and Bulger?
14    A. No.
15    Q. Did Mr. Fromson fill out any portion of
16 this form or the Bulger form?
17    A. No.
18    Q. Did you tell Ms. Faye which depositions to
19 review in order to complete the psychological
20 autopsy?
21    A. No.
22    Q. Did Mr. Fromson, to your knowledge?
23    A. To my knowledge, I don't know.
24    Q. Do you have a comprehensive list of
25 everything Ms. Faye looked at in order to complete

Page 443

1 the form for Smith and Bulger?
2    A. The short is answer is no, but we could
3 look at all our citations in the psych autopsy and
4 make a list.
5    Q. I'll look for this because I'm afraid you
6 won't be able to answer in the abstract, but we were
7 provided an index that I think goes with the
8 psychological autopsy. Have you ever seen that?
9    A. No.
10    Q. Okay. Is it true that when you -- is it
11 true that when you review for purposes of your
12 psychological autopsy deposition testimony of
13 witnesses involved in litigation, that may introduce
14 some bias into the process of the autopsy?
15    A. Yes. But it is the standard procedure.
16 I mean, very seldom do I actually go out and
17 interview the people myself. And usually both
18 sides object to that because they want to be
19 present. Both plaintiff and defense tend to object
20 to that.
21    Q. Do you agree that the potential for bias
22 and distortion in a psychological autopsy is greater
23 when family members who are principal sources of
24 information have a lawsuit?
25    A. I think -- I think in principle, it could

Page 444

1 be biased, yes.
2    Q. Well, do you recall testifying in the Giles
3 case that you agreed with that?
4    A. I just said yes.
5    Q. Did you co-edit a text entitled Assessment
6 and Prediction of Suicide?
7    A. You mean the book in 1992?
8    Q. Sure, a text called Assessment and
9 Prediction of Suicide?
10    A. Well, I didn't really think of it as a
11 text, but I did --
12    MR. SOH: Objection, vague.
13    A. I was the primary originator and chief
14 editor and wrote several sections and chapters of
15 that book, yes.
16    Q. Did you write Chapter 8 on assessment in
17 absentia, the value of the psychological autopsy
18 method for studying antecedents of suicide in
19 predicting future suicide?
20    A. No, David Clark of the University of
21 Chicago wrote that chapter, along with one of his
22 graduate students.
23    Q. And then you would have edited it?
24    A. Yeah, I read everything over. In fact, I
25 insisted. He left some of my own stuff out, and I

Page 445

1 made him put it in.
2    Q. And so you consider that text or that book,
3 as you call it, a reliable source of information on
4 the psychological autopsy?
5    A. Sure. Does that mean I agree a hundred
6 percent with David Clark? No. And I think it's
7 certainly something that I read and edited and
8 published, but David Clark wrote it.
9    Q. Okay. Agree or disagree that the hallmark
10 of a psychological autopsy method is the use of
11 structured face-to-face interviews with knowledgeable
12 informants within several months of death to gather
13 data and that studies not employing this method
14 should be called something other than psychological
15 autopsy studies?
16    A. I certainly don't agree with that. I
17 think that practically speaking, I would say almost
18 never in a legal case, let's say the 200 that I've
19 had, do I actually do face-to-face interviews.
20 It's prohibitively expensive. It's difficult to
21 arrange. Most of the time the lawyers take the
22 depositions, not me. And so it's impractical.
23    In a research situation, I would almost
24 always do face-to-face interviews.
25    Q. So in order to publish something that

Page 446

1  produces results that you would hope would be
2  sufficiently reliable to be published, you would
3  actually conduct a face-to-face interview?
4      A.  I would certainly prefer to.
5          MR. ROSENKRANZ:  Objection.
6      Q.  Is it your testimony that you never do
7  face-to-face interviews in the context of a
8  psychological autopsy in litigation?
9      A.  No, I -- I do that occasionally.  There
10 are times when it seems mandated.  But the vast
11 majority of the time it's prohibitively expensive,
12 and there's not enough marginal gain from my doing
13 it versus the attorneys doing it.  What I'll often
14 do is write a list of questions for the attorneys
15 to be sure they ask.
16     Q.  Well, here no attorney even conducted an
17 interview, correct?
18     A.  No, I'm talking about depositions.
19     Q.  Okay.  Well, I'm talking about interviews,
20 face-to-face interviews.
21     A.  No.  As far as I know, none of those were
22 done.
23     Q.  Okay.  What about a telephonic interview,
24 was any sort of telephonic interview done with either
25 the Bulger or the Smith family?

Page 447

1      A.  Honestly, I can't remember.  I think --
2  I'm pretty sure with Bulger there were none.  I
3  vaguely remember talking to the wife once, but I'm
4  not even sure that I did that.
5      Q.  You think you talked to Mrs. Smith?
6      A.  I think it's possible.
7      Q.  And you don't know for sure one way or the
8  other?
9      A.  I'd have to go back and look at my
10 records to see if I can determine that.
11     Q.  Well, do you have those records here?
12     A.  I have my billing.  I mean, we can take a
13 minute and look.
14     Q.  That would be good.
15     A.  I did not talk to Ruth Smith.
16     Q.  Okay.  Still referring to Chapter 8 of the
17 book Assessment and Prediction of Suicide, the
18 authors note the following:  The situation is
19 markedly different when a consulting expert is not
20 contacted until months or years after a death for an
21 opinion about an unfamiliar case.  In these
22 situations information available to the expert
23 witness is usually in the form of depositions
24 collected many months or years after the suicide.
25 This kind of data is suspect for scientific purposes

Page 448

1  because of the passage of time and memory decay.
2          Agree or disagree with that?
3      A.  I agree with that.  I mean, it's the
4  ideal optimum situation that you would do it
5  immediately.  For example, when I'm working for the
6  medical examiner, I try to get out there while the
7  body is still in the house.  I try to talk to the
8  wife and the kids and so on.  But a lot of times
9  it's just not practical because we don't learn
10 about it until many months or years later.
11         So ideally, I would -- I think it's
12 better to get out there as soon as possible.
13     Q.  Also in the book Assessment of Prediction
14 of Suicide at Chapter 8, there are identified several
15 problems with relying on depositions for a
16 psychological autopsy, and I just want to ask you
17 about one of those, okay?  And the quote is:  Fourth
18 and finally, in the deposition process, the
19 consulting clinical expert has few means for
20 assessing bias and censorship in the selection of
21 informants, the questions posed, the forms of those
22 questions, and the information made available or not
23 available for case review.  Once again, there are no
24 empirical studies quantifying the degree of
25 distortion introduced by these serious confounds.

Page 449

1          Agree or disagree?
2      A.  Well, there's many, many things in there,
3  so it's hard to say.
4      Q.  Okay.  How about this one --
5          MR. SOH:  Do you have a copy of the
6      chapter for Dr. Maris?
7          THE WITNESS:  No, I know the chapter by
8      heart.
9          MR. SOH:  Okay.
10     Q.  Agree or disagree that there's no way to
11 quantify the degree of distortion introduced into the
12 psychological autopsy process by relying on
13 deposition testimony?
14     A.  Yes.
15     Q.  Thank you.
16         I hope I didn't ask you this already.  If I
17 did, I'm sorry.  But this psychological autopsy form
18 then was not ever provided to a family member in
19 either the Smith or Bulger case, correct?
20     A.  You're correct.
21     Q.  Or do you know for sure?
22     A.  I know for sure.
23     Q.  Okay.  Did you tell Ms. Faye not to provide
24 this form to any member of the Smith family?
25     A.  No.

36 (Pages 446 to 449)

Page 450

1    Q.  How do you know she didn't?
2    A.  Because she told me and she cited only
3  exhibits and depositions. She told me she only
4  relied on the evidence cited.
5    Q.  You've given testimony that survivors of
6  suicides feel a tremendous sense of guilt; do you
7  recall?
8    A.  I don't recall which case it was or which
9  book it was, but I recall saying that.
10    Q.  Agree with that?
11    A.  I agree with that. Often, I mean, not
12  always.
13    Q.  You've also testified in the past that the
14  guilt could be intensified if the survivor treated
15  the decedent badly or felt that they treated the
16  decedent badly?
17    A.  Sure.
18    Q.  You agree with that?
19    A.  I do.
20    Q.  Agree that guilt can sometimes overwhelm a
21  survivor and tempt that survivor to affix blame
22  elsewhere?
23    A.  I'm tempted to elaborate, yes. But I'm
24  afraid I'll get in trouble if I elaborate that.
25    Q.  Agree that litigation brought by a suicide

Page 451

1  survivor can amount to displacement of guilt?
2    MR. SOH: Dr. Maris -- again, do you have
3    the references you're reading from for Dr.
4    Maris?
5    MS. McGRODER: I'm asking a question if
6    he agrees with it or not.
7    A.  Is it from a specific reference?
8    Q.  It's from your testimony in the Routhier
9  case.
10    A.  Oh, okay.
11    MR. SOH: Dr. Maris, if you need to --
12    A.  That's important to know.
13    Q.  Sure.
14    MR. SOH: -- need that testimony, you can
15    ask for it.
16    A.  Well, I'm familiar with Routhier because
17  it's going to be a trial next month. So I'm fairly
18  familiar with that.
19    Q.  So can litigation brought by a suicide
20  survivor amount to displacement of guilt, in your
21  opinion?
22    A.  It's often -- yes, and it can be a
23  confounder.
24    Q.  It is natural to try to avoid grief through
25  activity, whether it's litigation or rallies or

Page 452

1  demonstrations.
2    Agreed?
3    A.  It's certainly one possible thing that
4  can happen, yes.
5    Q.  Do you think that litigation can postpone
6  or avoid working through loss or grief?
7    A.  It can, yes.
8    Q.  What about just the effect of surprise, do
9  you think that surprise over a suicide can lead a
10  survivor in a sequence of feelings of betrayal,
11  anger, distrust, blame, and ultimately litigation?
12    MR. SOH: Objection, foundation.
13    Is that the same deposition you're
14    reading from?
15    A.  Is that from Routhier?
16    Q.  No, it's just a question.
17    A.  Oh. No source? No source for your
18  question?
19    Q.  Well, I just want you to answer the
20  question, Doctor.
21    MR. SOH: Objection, foundation.
22    A.  Okay. But some of the questions have
23  tied to particular documents, and I was just asking
24  you if this was tied to a particular document.
25    Q.  What's your answer?

Page 453

1    A.  Restate the question, please.
2    MS. McGRODER: Can you read back my
3    question?
4    (THE QUESTION WAS READ BACK.)
5    MR. SOH: Objection, foundation.
6    A.  The short answer is yes.
7    Q.  Now, Doctor, I want to talk with you about
8  suicide risk factors generally. And to be completely
9  candid, we don't have a lot of time. So I'm going to
10  kind -- I'm going to try to tick through these, okay?
11    A.  Really?
12    Q.  Is that okay with you?
13    A.  Yes.
14    Q.  Okay. What's a risk factor?
15    A.  Risk factor is an empirically-derived
16  condition which, of course, can be something
17  categorized as age, gender, social, biological,
18  which is elevated in the outcome population, for
19  example, the completed suicide compared to the
20  control population.
21    Q.  And empirically derived would indicate that
22  there's some data to back it up, correct?
23    A.  Yes.
24    Q.  And you would like to see statistically
25  significant association between the event and the

37 (Pages 450 to 453)

**Page 454**

1   suicide for it to be a reliable risk factor, correct?
2      A.  Sure.  I mean, I'm not interested in the
3   wind velocity in India.  It's obviously irrelevant.
4   So I try to review the literature, I try to do
5   original research.  And based on that review of
6   peer reviewed literature, my education, training,
7   and experience and my own original research, I try
8   to derive pertinent relevant factors that are risk
9   -- increase the risk for suicide.
10      Q.  Okay.  In the 15 risk factors you
11  identified, there is no reference to prescription
12  medications as a risk factor for suicide on your
13  list, correct?
14      A.  Well, certainly you'll notice it's on my
15  general model that I gave you yesterday in my new
16  opinion.
17      Q.  Yeah, and I'm not talking about that.  I'm
18  asking about your 15 risk factors.
19      A.  Well, that's one of my --
20      Q.  Are prescription medications identified on
21  your list of 15 risk factors that you've testified
22  are empirically based?
23      A.  Well, certainly I've asked about
24  medications and prescription medications in my
25  psych autopsy, and I published peer reviewed

**Page 455**

1   articles and books.  So yes.
2      Q.  Dr. Maris, did I ask you about your
3   psychological autopsy?  I didn't, did I?
4      A.  I'm sorry, you asked me about --
5      Q.  Your 15 risk factors.
6         Do prescription medications appear as a
7   reference on your list of 15 risk factors for
8   suicide?
9      A.  I'm sorry, I wasn't paying attention.
10     Q.  That's okay.
11     A.  Let me just turn to my report.  The list
12  is there so I can be sure that I'm not misspeaking.
13     Q.  I think it's on about page 22.  Yeah, 22.
14     A.  The short answer is no.  But on some of
15  the lists of these, this list is incomplete.
16        If you go back and look at the list in my
17  publications, 13 includes altered serotonergic
18  dysfunction.  So that's the closest that comes to
19  it.
20     Q.  And what publication is that; is that
21  Pathways to Suicide?
22     A.  That, and also in the Assessment
23  Prediction, the comprehensive textbook on page 80
24  there's a list which includes low 5-HIAA.
25     Q.  And low 5-HIAA is not prescription

**Page 456**

1   medications, correct?
2      A.  It's related to it, but it's not directly
3   that.
4         I mean, one of the things that happens
5   with many SSRIs, and I'm arguing with Neurontin, is
6   alteration in serotonergic dysfunction.  So it's
7   only obliquely referenced through serotonergic
8   dysfunction.  It's not an item on my risk factor.
9         And the reason for that is obvious, is
10  that it's only a small minority of people who are
11  taking medication.  I'm looking at general samples
12  of suicides.  And most people who are suicidal who
13  are depressed or who have chronic pain are not
14  having drug reactions.  It's only in a small
15  vulnerable minority that I claim this happens, so
16  it shouldn't be on my list.
17        MS. McGRODER:  Object and move to strike.
18     Q.  Doctor, do the words prescription
19  medications appear on your list of 15 risk factors --
20        MR. ROSENKRANZ:  Objection.
21     Q.  -- in your report in the Smith case or in
22  any textbook or book that you've authored?
23        MR. ROSENKRANZ:  Objection, asked and
24     answered.
25     A.  No.

**Page 457**

1      Q.  Agree that persons with suicidal ideas are
2   at a greater risk for suicide?
3      A.  Yes.
4      Q.  Agree that persons who have suicidal plans
5   are at a greater risk of suicide?
6      A.  Yes.
7      Q.  Agree that persons who have attempted
8   suicide are at a greater risk for suicide?
9      A.  Except for older, white males.
10     Q.  Agree that prior suicide attempts are as
11  significant a risk factor for suicide as depression?
12     A.  Only for females.
13     Q.  Aware that a past -- a history of past
14  suicide attempts is one of the most significant risk
15  factors for suicide as reported by the APA
16  guidelines?
17     A.  It's wrong.
18     Q.  So you disagree with that?
19     A.  I disagree with that because it's got to
20  be specified for gender.
21     Q.  Aware that a suicide attempt by any method
22  is associated with a 38-fold increase in suicide
23  risk.
24        Agree with that?
25     A.  What's the context of the citation?

38 (Pages 454 to 457)