# EXHIBIT 3
# (PART III)

Page 494

1    A.  A book that I use for my class.
2    Q.  Okay.  And it's a book that Dr. Trimble
3 relied on, right?
4    A.  I'm not sure, I think so.  He said Simon,
5 but he didn't give the full citation.
6         And then I had some articles -- or I have
7 one article and something off the Internet about
8 chronic pain and suicide.
9    Q.  Okay.  May I see those?
10   A.  Sure.
11   Q.  Thanks.
12        MS. McGRODER:  Let's go ahead and mark
13   this.  That would be Exhibit 32.
14        (Exhibit 32: A document entitled The
15   American Psychiatric Textbook of Suicide
16   Assessment and Management marked for
17   identification, as of this date.)
18   Q.  So Exhibit 32 is a -- is a combination of
19 materials on chronic pain that you looked up in
20 preparation for your deposition today, correct?
21   A.  Yes.
22   Q.  Okay.  Thanks.
23        I'm going to hand you Exhibit 20, which is
24 your -- what are you calling this, a new report?
25   A.  I'm calling it another point, an

Page 495

1 additional opinion as an addendum to my 12/3/07
2 expert report.
3    Q.  Okay.  And I noticed that the pagination at
4 the top starts with 44?
5    A.  It's because I have many other notes.
6    Q.  Where are your other notes?
7    A.  In my file.
8    Q.  May I see them, please?
9         Thank you.
10        Are these all about the Smith case?
11   A.  Yes.  There may be some generic stuff in
12 there, but it's all about Neurontin and Smith.
13   Q.  And can you tell me the circumstances under
14 which you prepared these notes?
15   A.  Sometimes I talk to the plaintiffs'
16 attorneys on the phone, sometimes I read
17 depositions, I take notes.  Sometimes I -- in
18 reading something, I want to make a note of it, of
19 just what they say.  They're handwritten notes on
20 evidence that I've considered in this trial that
21 may or may not be admitted formally as evidence.
22        MR. ROSENKRANZ:  Have copies of that
23   addendum report been made for the two of us?
24        MS. McGRODER:  No.
25        MR. ROSENKRANZ:  Oh.

Page 496

1         MS. McGRODER:  It was your expert
2    witness.  You don't have a copy of his report?
3         MR. SOH:  You don't need to get snippy,
4    Lori.
5         MR. ROSENKRANZ:  I told you the other day
6    when you inquired that we did not have it.  We
7    had never gotten it.  We didn't know about it
8    until we got here.  So in answer to your
9    question, no.
10   Q.  Doctor, we're going to mark this as an
11 exhibit.  And, of course, we'll make a copy and give
12 you back the original.
13   A.  I was going to say, you've got to give me
14 the original back.
15   Q.  Of course we would.
16        (Exhibit 33: A handwritten document
17   entitled Notes (Specific) dated 6/13/07 marked
18   for identification, as of this date.)
19   Q.  This is Exhibit No. 33, and these are the
20 remainder of your notes from pages 1 through --
21   A.  43.
22   Q.  -- 43.
23        The back, after page 43, you have several
24 copies of your suicide model.
25   A.  Which I've already given to you.

Page 497

1    Q.  Right.
2         Which is -- was -- this is the model that
3 was published in the Comprehensive Textbook of
4 Suicide?
5    A.  It was published originally in 1992 in
6 the Assessment and Prediction book.
7    Q.  Okay.
8    A.  But I think -- I think it may not be in
9 the Comprehensive Textbook.  It's just in the '92
10 book.
11   Q.  In the Assessment and Prediction book?
12   A.  Correct.
13   Q.  Okay.
14   A.  And it's also in Lancet, in the Lancet
15 article.
16   Q.  In your 2002 article?
17   A.  Yeah.
18   Q.  And has this model changed at all over time
19 or is it the same as it was in your 1992 publication?
20   A.  It's basically the same.  And if you look
21 at the page, it would be identical.
22   Q.  Identical to your 1992 publication?
23   A.  Yes, yes.
24        May I put this on my stack?
25   Q.  Oh, sure.

48 (Pages 494 to 497)

Page 498

1    A.  It's so crucial to my testimony.
2    Q.  Well, before you leave here today, though
3  --
4    A.  And vice versa. Anything you've got in
5  there that's original, I need a copy of it.
6    Q.  Absolutely. I promise.
7        MR. ROSENKRANZ:  And we need copies of
8     those items as well.
9    Q.  Also at the top left corner of your notes
10  marked as Exhibit 20 you have a note that says Bob
11  Leone, jury consultant.
12       Tell me what that's about.
13    A.  I think I already discussed this. Bob
14  Leone is a jury consultant for Finkelstein who came
15  on Friday, last Friday and met with me, told me to
16  look directly into the camera. Basically said
17  expert-witnessing kinds of questions.
18    Q.  Did he ask you questions?
19    A.  Not really. When I made comments, he
20  responded but he didn't -- he seemed to basically
21  just sit there and listen.
22    Q.  Who else was in that meeting?
23    A.  Ken Soh and Ron Rosenkranz.
24    Q.  And did anybody participate by phone?
25    A.  I don't think so. I think they may have

Page 499

1  called somebody while they were there but --
2    Q.  And where -- where is Bob Leone's jury
3  consulting office located?
4    A.  I have no idea. I met him for the first
5  time on Friday.
6    Q.  Had you ever done that before, have a jury
7  consultant come to one of your deposition preparation
8  sessions?
9    A.  Sure.
10    Q.  How many times?
11    A.  Not very often. I'd say maybe 5 percent
12  of the time.
13    Q.  Whose idea was it to have Bob Leone come
14  and meet with you?
15    A.  You'd have to ask the plaintiff
16  attorneys.
17    Q.  Was it helpful?
18    A.  I would say it was basically neutral.
19    Q.  And what -- what did he tell you?
20       What did he tell you?
21    A.  I was sitting there in Bermuda shorts.
22  He said wear a suit and tie.
23    Q.  What else?
24    A.  Look directly into the camera, make sure
25  your socks cover your calf.

Page 500

1        And he -- I did sometimes explain to the
2  three of them some of my analogies of a scale
3  tipper and just noticeable difference. And I think
4  he may have commented on those analogies.
5    Q.  What comment did he make on the scale
6  tipper analogy?
7    A.  He liked it.
8    Q.  What about the noticeable difference maker?
9    A.  I don't remember.
10    Q.  What about your analogy to peanuts and
11  shellfish causing an allergic reaction, did you run
12  that by him?
13    A.  No.
14    Q.  How long was the meeting?
15    A.  Three hours.
16    Q.  And so other than talking about your socks
17  and your suit and running these analogies by him,
18  what else occurred in the three-hour meeting that
19  included the jury consultant?
20    A.  Well, let's see, he petted my pet dog for
21  a while and said what a nice dog this is.
22    Q.  Anything substantive?
23    A.  That was pretty substantive. My dog
24  liked it.
25       No.

Page 501

1    Q.  Do you have any other meetings set up with
2  the jury consultant for purposes of your testimony in
3  Neurontin litigation?
4    A.  As far as I know, I do not. It wasn't my
5  idea in the first place.
6    Q.  I think you told me last night right before
7  we broke for the day that when I asked you why you
8  created Exhibit 20 -- I'm so sorry, did you say
9  you're calling it a supplemental opinion or an
10  addendum? I'm sorry, I just forgot.
11    A.  I'm calling it an addendum to my expert
12  report of 12/3/2007.
13    Q.  And so when I asked you why you created
14  this addendum, I think you said because you wanted to
15  talk about your own possible mechanism for Neurontin
16  and suicide, right?
17       MR. ROSENKRANZ:  Objection, asked and
18     answered.
19    A.  That's right. And because earlier when
20  you talked to Trimble, you used the phrase this is
21  just theory, and I wanted to comment on theories.
22    Q.  Okay. And you created this last Friday
23  after you met with the lawyers and the jury
24  consultant, right?
25    A.  Right.

49 (Pages 498 to 501)

Page 648

1                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

2

3     _____

                          )
4    In re: NEURONTIN MARKETING,  )
     SALES PRACTICES, AND PRODUCTS)
5    LIABILITY LITIGATION,      )
     _____)
6

7                   VOLUME III

8

9          CONTINUED VIDEOTAPED DEPOSITION OF

10            RONALD Wm. MARIS, Ph.D.

11             (Taken by Defendant)

12            Columbia, South Carolina

13           Wednesday, October 1, 2008

14

15

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
         V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription

Page 649

1      APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3      RON ROSENKRANZ, Esquire
       Finkelstein & Partners
4      1279 Route 300
       Newburgh, New York 12551
5      (845) 563-9442
       rrosenkranz@lawampm.com
6
       and
7
       KENNETH S. SOH, Esquire
8      The Lanier Law Firm
       6810 FM 1960 West
9      Houston, Texas 77069
       (713) 659-5200
10     kss@lanierlawfirm.com
11
   ON BEHALF OF THE DEFENDANT PFIZER:
12
       LORI CONNORS McGRODER, Esquire
13     JENNIFER M. STEVENSON, Esquire
       ANGELA M. SEATON, Esquire
14     LORI SCHULTZ, Esquire
       IAN LOSASSO, Esquire
15     (Appearing Via Telephone)
       Shook, Hardy & Bacon, L.L.P.
16     2555 Grand Boulevard
       Kansas City, Missouri 64108
17     (816) 474-6550
       lmcgroder@shb.com
18     jstevenson@shb.com
       aseaton@shb.com
19     lschultz@shb.com
       ilosasso@shb.com
20
   Also Present:
21
       JAMES DOWNIE, CLVS, Videographer
22
23
24
25

Page 650

1      CONTINUED VIDEOTAPED DEPOSITION OF RONALD
2  Wm. MARIS, Ph.D., a witness called on behalf of the
3  Defendant, before V. Dario Stanziola, CSR, RPR,
4  CRR, held at the Columbia Marriott, 1200 Hampton
5  Street, Columbia, South Carolina, on Wednesday,
6  October 1, 2008, commencing at 9:54 a.m.

Page 651

1           INDEX OF EXAMINATIONS
2
3
By Ms. McGroder          PAGE    652
4
           INDEX OF EXHIBITS
5
   NUMBER      EXHIBIT            MARKED
6  Exhibit 39: A photocopy of a Medline    672
   Plus article
7
   Exhibit 41: A fax cover sheet to John S.  757
8  Allen, subject Richard Smith dated
   9/23/08 with attachment
9
   Exhibit 42: Photocopy of Mr. Smith's     764
10 suicide note
11 Exhibit 43: Photocopy of a journal       770
   article entitled Suicide As Psychache: A
12 Clinical Approach to Self-Destructive
   Behavior by Edwin Shneidman, Ph.D.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 652

1      THE VIDEOGRAPHER:  This is beginning of
2  Tape No. 1 in the deposition of Dr. Ronald
3  Maris, Volume III.  Today's date is October
4  the 1st, 2008.  The time on the monitor is
5  9:54 a.m.  We're now on the record.
6  BY MS. McGRODER:
7      Q.  Good morning, Dr. Maris.
8      A.  Good morning.
9      Q.  We're going to continue with the Smith case
10 today, and in a minute we're going to go back to the
11 record.  Remember yesterday we started looking at his
12 medical records, and we'll go back to that in a short
13 second.
14      Dr. Maris, do you agree or disagree that it
15 is unreliable to make a retrospective diagnosis of
16 depression after suicide occurs?
17      A.  I wouldn't say it's unreliable.  I would
18 say it's less reliable than doing it in the
19 present.  The problem, of course, with suicide is
20 you have to have a person die before they become a
21 suicide.  And then you usually base your judgment,
22 your diagnosis and the best available information,
23 which is things like medical records.
24      But ideally, you want a living person in
25 front of you answering questions rather than

2 (Pages 649 to 652)

Page 689

1    many now --
2        A.  Can I answer some of them?
3        Q.  Yes, yeah exactly.
4            Can you answer the one I just asked you
5    about the difference between a trigger and a tipping
6    factor? And then we'll get back to the hypothetical.
7        A.  I don't think there is any significant
8    difference. I think when I say trigger and tipping
9    factor, I mean the same thing. But I'm just saying
10   that I don't using use tipping just for drugs and
11   trigger for other things. They're both -- you
12   know, there could be a drug trigger factor.
13       Q.  Okay. But in -- in the information you
14   published on triggers, you have a broad category of
15   triggers, right?
16       A.  Let's be really clear on the record. I
17   don't particularly believe in triggers. I think
18   that a very small number of suicides, for example,
19   drug cases, are exceptions. Most people like you
20   described would not kill themselves. And, for
21   example, when I read Doug Jacobs' expert report,
22   it's true, most people on gabapentin don't kill
23   themselves.
24          Most of the people who have chronic pain
25   don't kill themselves. Most people who have all

Page 690

1    the risk factors, all 15 of my risk factors, do not
2    kill themselves. So in some case, the vast
3    majority of suicides do not have a trigger. It's
4    only that this kind of background or set of
5    suicidal career risk factors and protective factors
6    makes a person be part of that vulnerable minority
7    or subset of patients who are vulnerable to some
8    sort of a trigger.
9        Q.  Okay. I have so many questions about that.
10       A.  Okay.
11       Q.  But before we go there, let's get back to
12   the hypothetical. Well -- well, first, let me back
13   up.
14          What you just said, when you said only that
15   this set of factors makes a person be part of a
16   vulnerable minority or subset of people who do commit
17   suicide, your reference there is to a prescription
18   medication, right? Your reference there --
19       A.  Not necessarily.
20       Q.  Okay.
21       A.  That's one of the kinds of things that
22   can push -- I'm trying to create an image of a
23   person on the edge of a suicidal precipice. What
24   could knock them off could be -- I had a case up in
25   Asheville where a guy shot himself, lost his face,

Page 691

1    recovered. And they came in and said you're --
2    you're okay, you're going to live, but you've got
3    two brain tumors and we have to take those out.
4            COURT REPORTER: He's got what?
5            THE WITNESS: Two brain tumors.
6        A.  And he got his belt out and hung himself
7    later that day. I mean, it wasn't a drug reaction.
8    It was two brain tumors on top of I blew my face
9    away and thought I was going to die. That kind of
10   thing could also be a trigger.
11       Q.  When that gentleman shot himself in the
12   head but lived, was he on a prescription medication
13   that you blamed for the suicide?
14       A.  His -- his name was John, and I don't
15   remember the details enough. I think -- I think he
16   -- I hate to misspeak, because it's been many years
17   ago. But I know he had an elevated depression
18   score an MMPI-2. Whether or not they actually
19   treated it is unclear, and that's important if they
20   tried to treat his depression.
21       Q.  Because if he hadn't had treatment for
22   depression, that would increase his risk of suicide,
23   right?
24       A.  Sure, sure.
25       Q.  Okay. So what are these -- I mean, when

Page 692

1    you say you're trying to create an image of a person
2    on the edge of a suicidal precipice, let's say that
3    person who's on the edge of a suicidal precipice is
4    not taking Neurontin.
5            What -- what are -- what are those factors
6    that are going to put push that person over the edge?
7        A.  There are a number of factors. Sometimes
8    just the set that you listed in your hypothetical
9    are sufficient themselves to push him over the
10   edge. So I'm not denying that all the risk
11   factors, that both the hypothetical and Richard
12   Smith had, could be enough.
13       Q.  It's just that in Mr. Smith's case he was
14   on Neurontin, so that was the tipping factor?
15       A.  Well, it wasn't just that. It was a
16   dramatic demonstrated, in my mind, trigger which
17   has a causal mechanism, which affects depression,
18   which is a major correlate of suicide outcome and
19   in a person who had lived with these risk factors
20   for many years. You have to ask yourself, why now?
21   Why now? Why not -- why not earlier when he had a
22   laminectomy and it didn't work? So --
23       Q.  And so the -- and so the "why now" question
24   is the reason why you would attribute the suicide to
25   Neurontin?

12 (Pages 689 to 692)

Page 693

1 A. That's certainly one of the major
2 factors. You know the law, post hoc ergo propter
3 hoc. It was just after he took the Neurontin and a
4 significant amount of that, before he had all these
5 risk factors that you described before his
6 laminectomy in '03, and he didn't kill himself.
7 Q. Now, I want to ask you, you said twice.
8 You said once he had a large amount of Neurontin
9 before he killed himself, and now you just said he
10 had a significant amount of Neurontin before he just
11 killed himself.
12 You're not suggesting he took a lot of
13 Neurontin on the day before he killed himself?
14 A. Not at all.
15 Q. You're talking about normal usage?
16 A. I'm talking about the normal usage that I
17 described. My best estimate of how much Neurontin
18 he had is in my report, 67 days, some of those days
19 BID, near the end TID, leftover samples, wife saw
20 him take it, maybe missed a couple of times.
21 So I don't know exactly, but he had a
22 significant opportunity to have a new factor, which
23 I think is suicidogenic, which could easily, could
24 easily make him unable to cope, could easily make
25 him write a suicide note like that.

Page 694

1 Q. Is your testimony that Neurontin made
2 Mr. Smith write his suicide note?
3 A. That's a little much of a stretch, but I
4 think certainly it causes impulse control
5 deregulation.
6 Q. Is your testimony that Neurontin caused his
7 suicide and his suicide was impulsive?
8 A. I think it was partly impulsive, because
9 I think that in the literature that I looked up --
10 for example, I had Brown, et al., in my -- in my --
11 in my Assessment and Prediction of Suicide book, I
12 asked them to address this question: What happens
13 in animals and in human beings if you have
14 serotonergic dysfunction? Do they become more
15 impulsive? Do they become more aggressive? Do
16 they become more suicidal? And the answer was an
17 unequivocal yes. So that any drug that disrupts
18 the serotonergic system contributes to impulsivity.
19 Q. Doctor, first, we talked yesterday for a
20 long time about Mr. Smith's Neurontin ingestion and
21 what you wrote in your report about it and whether
22 there was evidence that the family ever observed
23 Mr. Smith actually take his drugs. And you answered
24 questions for a long time yesterday about that.
25 The answer you just gave is not meant to

Page 695

1 replace or change the answers you gave yesterday, is
2 it?
3 A. No, I think it -- I think I said the same
4 thing I said yesterday.
5 Q. Okay. But -- but what I want -- yesterday
6 you said that -- well, I'm not going to debate with
7 you what you said.
8 All I want to know is, is the answer that
9 you just gave right now, that is not meant to replace
10 the answers you gave yesterday when we went over the
11 -- at length your opinion about Mr. Smith's ingestion
12 of Neurontin?
13 MR. ROSENKRANZ: Objection to form.
14 A. Correct.
15 Q. Okay.
16 A. I stand by what I said yesterday, and
17 it's all in my report.
18 Q. Okay. And if you turn to page 22 of your
19 report, this is your -- these are your 15 factors
20 that you mentioned in your answer just a bit ago?
21 A. Yes.
22 Q. And number 13 is anger, aggression,
23 impulsivity and irritability, correct?
24 A. Right.
25 Q. And you write no?

Page 696

1 A. That's wrong. That -- that was from the
2 psych autopsy. I didn't -- I'm -- I'd be
3 interested to go back and look at the psych autopsy
4 and see if I didn't correct Michelle Faye, because
5 she wrote that, and I went on her evidence. But
6 that's absolutely wrong. It should have another
7 risk factor based on that. That's wrong.
8 Q. So that's wrong. Today, your testimony
9 today, you want to change that answer?
10 A. It's wrong.
11 Q. What else is wrong in your report,
12 Dr. Maris?
13 MR. SOH: Objection. Argumentative.
14 A. How would I know? Let me look at the
15 autopsy and make sure I didn't question it in the
16 autopsy.
17 Q. So you wrote this --
18 A. One thing at a time. You're rushing me.
19 Q. Can I ask you while you're looking?
20 A. I'd rather you wouldn't. I'd like to
21 concentrate.
22 THE VIDEOGRAPHER: Five minutes.
23 A. Okay. I see what the problem is here.
24 And page 32, question 7513 of the autopsy, the
25 questions related to impulsivity were not related

13 (Pages 693 to 696)

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 705

1  hallmarks based on four litigation cases. I've
2  looked, as you know, at Smith and Bulger and
3  Shearer and Crone.
4        I realize there are many other cases, but
5  I haven't been provided with those case files. So
6  I'd -- I'd be reluctant to generalize based on a
7  few non-random cases. However, I can talk about
8  the traits of Neurontin as a GABA being an
9  inhibitor of serotonin and norepinephrine, and I am
10  relying on Trimble and Kruszewski and the other
11  peer-reviewed journal articles that I've provided
12  you.
13       Q.  Are those the ones we talked about
14  yesterday?
15       A.  Yes, they are.
16       Q.  The stack where I identified the list of
17  articles that you brought yesterday, right?
18       A.  That's correct.
19       Q.  Okay.
20       A.  And also, in my general model, I'm adding
21  mechanisms of non-neurobiological/neurochemical
22  relations of certainly Richard Smith who was taking
23  Neurontin, and looking at social factors and
24  psychological factors and psychiatric factors in
25  addition to biochemical mechanisms.

Page 706

1        So I'm -- I'm prepared to talk about what
2  I think Neurontin did in the case of the ones I've
3  looked at in detail, but I think it would be
4  premature and unscientific to try to talk about a
5  hallmark in Neurontin cases.
6        Q.  Well, the fact is, Dr. Maris, that you've
7  been looking at Neurontin as an -- as an issue in
8  terms of generally can Neurontin cause suicide since
9  2004.
10        That's what you told me yesterday, right?
11       A.  Yes, I've been looking at the issue for
12  that long, sure.
13       Q.  And in all of that time since -- in 2004,
14  in 2005, in 2006, in 2007, and now we're in
15  October 2008, you've not been able to identify any
16  sort of hallmark or signature element to a suicide
17  with Neurontin, have you?
18       A.  I have not attempted to do that and I
19  have -- I have looked at some unique features in
20  the cases that I have looked at in detail.
21       Q.  And - and tell me today, Dr. Maris, do you
22  believe there are unique features or hallmark
23  elements to suicides by Neurontin, suicides caused by
24  Neurontin?
25       A.  I think it tends to be a -- more of a --

Page 707

1  an acute factor as opposed to the chronic suicidal
2  career. So it tends to be the hallmark -- one of
3  the hallmark characteristics as being acute.
4        Q.  And so the person would not have a suicidal
5  career and that's -- that's the hallmark element of
6  suicide by Neurontin?
7        A.  That's not what I said. What I said was
8  in addition to a long chronic suicidal career, you
9  have acute factors of -- I'm saying it right now.
10       Q.  Yeah, but that's not what you said.
11       A.  Acute factors of ingestion of Neurontin.
12       MS. McGRODER:  Okay. Can you read back
13  his answer?  Not that one, but the one before.
14       (THE ANSWER WAS READ BACK.)
15       MR. SOH:  That doesn't sound right. What
16  do those dashes mean?  I'm sorry. What do
17  those dashes mean?
18       COURT REPORTER:  When he changes his
19  thought.
20       MR SOH:  Oh. Oh, okay.
21       Q.  Are there any other acute factors other
22  than ingestion of Neurontin that are of the hallmark
23  or the unique feature of a Neurontin -- a suicide
24  caused by Neurontin?
25       A.  Well, again, with the caveat that I --

Page 708

1  I'm only talking about this because you've asked me
2  to talk about it. I said it was somewhat
3  inappropriate based on four cases. But in the
4  cases that I have seen, this most significant
5  thing, of course, is that there is the context of a
6  long suicidal career, superimposed -- which are
7  chronic factors, risk and protective factors.
8        Superimposed on that is the recent
9  ingestion of Neurontin, which I argue affects
10  depression, affects impulse control, because of its
11  consequences on the monoamines of serotonin and its
12  metabolites and norepinephrine.
13       Q.  Anything else?
14       A.  No.
15       Q.  Couple of follow-up questions.
16        When you say long suicidal career, what is
17  long?
18       A.  Well, of course, long is a relative term,
19  but I'm saying that most suicides, for example, are
20  older white males in the West in the United States.
21  They tend to suicide in their 60s and 70s. So
22  there are at least decades involved. Can a
23  adolescent have a suicidal career? Sure, but it's
24  usually shorter and there often are more acute
25  factors rather than chronic factors.

16 (Pages 705 to 708)

Page 717

1 than there would be in the healthy -- sometimes
2 they use the phrase healthy volunteers.
3        They wouldn't have depression. They
4 wouldn't have prior suicide attempts. They
5 wouldn't have chronic pain and physical illness.
6 So I think it's very clear to the jury that some
7 people can be more likely to suicide completely
8 apart from Neurontin and that their coping can be
9 fairly fragile and their equilibrium can be fairly
10 fragile.
11        MS. McGRODER: Object and move to strike
12     as non-responsive.
13        MR. ROSENKRANZ: I thought it was exactly
14     responsive.
15     Q. Is your answer -- does your answer mean I
16 won't know who the vulnerable subpopulation is until
17 they actually commit suicide and bring a lawsuit in
18 which you're testifying?
19        MR. SOH: Objection.
20        MR. ROSENKRANZ: Objection.
21     Argumentative --
22        MR. SOH: Argumentative.
23        MR. ROSENKRANZ: -- and to form.
24     A. No, that's not my position. And I
25 thought my position was very clear.

Page 718

1     Q. It's not clear.
2        MR. ROSENKRANZ: Objection.
3     Q. I don't know, as I sit here, based on your
4 answer, Dr. Maris, how I'm going to identify, or
5 anyone would, the individuals that -- and you've used
6 this term all day yesterday, all day the day before,
7 vulnerable subpopulation of individuals or vulnerable
8 minority of individuals.
9        I won't -- how am I to know who they are?
10 And as I understand your answer, you're saying
11 they're anyone who has suicide risk factors and who
12 takes Neurontin?
13        MR. ROSENKRANZ: Are we summing up --
14     Q. Is that -- is that correct or incorrect?
15        MR. ROSENKRANZ: Objection to the form.
16     Argumentative, and I don't know what else,
17     just a whole number of factors.
18        MS. McGRODER: Objection to form is fine.
19        MR. ROSENKRANZ: A whole slew -- at least
20     15 factors that I can think of as to why that
21     question was objectionable.
22        MS. McGRODER: Objection to form is fine.
23     You may answer the question.
24     A. I -- I think I have answered the
25 question. The best you can do hypothetically and

Page 719

1 generically is to talk about risk and protective
2 factors. People that have a lot of risk factors
3 within their population subset, and they vary, and
4 few protective factors are more vulnerable. And,
5 of course, there could be -- there could be
6 specific things like enzyme abnormalities where
7 you're a slow and fast metabolizer. There are lots
8 of things that can go into specifying who's
9 vulnerable.
10     Q. Could you actually identify which
11 individuals who take Neurontin are vulnerable?
12     A. I can certainly put people in high risk
13 groups.
14     Q. And on what basis would you put them in a
15 high risk group?
16     A. Risk factors.
17     Q. Your 15 risk factors?
18     A. And plus others. I would use others.
19 Fifteen is not magical. This happens to be the top
20 empirical factors.
21        MS. McGRODER: Let's take a break.
22        THE WITNESS: We just took a break.
23        MS. McGRODER: We're taking another one.
24        THE VIDEOGRAPHER: The time is 11:32 a.m.
25     We're now off the record.

Page 720

1        (A BRIEF RECESS WAS TAKEN.)
2        THE VIDEOGRAPHER: The time is 11:44 a.m.
3     We're back on the record.
4 BY MS. McGRODER:
5     Q. Doctor, are you comparing an anaphylactic
6 shock reaction from eating peanuts or shellfish,
7 which are known to be highly allergenic to some
8 people and, of course, resulted in a immediately,
9 objectively, observable response to suicide caused by
10 Neurontin?
11     A. No.
12     Q. Are there any objective signs --
13 objectively, observable signs that would indicate
14 whether a suicide is caused by Neurontin other than
15 that the person took Neurontin?
16        MR. ROSENKRANZ: Objection to the form.
17     A. Well, I mean, I think the way to get at
18 that question is to look at the -- the listed side
19 effects in the PDR and see which side effects are
20 correlated with suicide. It's -- it's a somewhat
21 circuitous line of reasoning, because it involves
22 many risk factors and many adverse events.
23        But I can say, for example, just to pick
24 one, that if it's clear that Neurontin worsens
25 depression, preexisting depression, then that would

19 (Pages 717 to 720)

Page 721

1  be something we would -- and you can measure that.
2  You can somebody, a Hamilton or a Beck Depression
3  Inventory and see if they have a different score
4  just like we did with the pain scale.
5      Q.  Is there any evidence from a randomized
6  controlled study or all of the randomized controlled
7  studies ever conducted on Neurontin that Neurontin
8  increases the risk of depression
9  statistically/significantly over patients taking
10 placebo?
11     A.  I think the data are inconclusive.  I
12 think we -- we -- we decided that they were -- many
13 of those risks were in the direction of increasing,
14 but many of them were not statistically
15 significant.  So I would say the jury is out on
16 whether or not it's a statistical change.
17     But there's certainly a trend.  If you
18 look at depression in all of these symptoms
19 compared with the placebo, they're almost always in
20 the direction of increasing depression.
21     Q.  Doctor, I'm going to hand you again what we
22 marked yesterday as Exhibit 24 to your deposition,
23 and this is the rate of depression reported in all
24 the randomized controlled studies of Neurontin in
25 both neuropathy and epilepsy patients.

Page 722

1      And you'll notice that the -- for the
2  neuropathy patients, the rate of depression is higher
3  in patients not taking Neurontin than patients taking
4  Neurontin, correct?
5      MR. ROSENKRANZ:  Objection.  This is the
6  same PowerPoint that we objected to yesterday,
7  this document.
8      A.  I've seen this before, and I've commented
9  on it before.
10     Q.  Yeah, and I'm asking you now.
11     Is the rate of depression or the incidence
12 of depression reported in the neuropathy studies, the
13 randomized control studies for Neurontin, higher in
14 the patients taking Neurontin than patients not
15 taking Neurontin?
16     MR. SOH:  Objection.  Form.  Foundation.
17     A.  It seems to be -- you mean 1.7 versus
18 1.5?
19     Q.  Right.  Now I'm talking about 2.3 on
20 placebo --
21     A.  2.2.
22     Q.  I'm sorry, 2.2 placebo and 1.3 on
23 gabapentin.
24     Do you see that?
25     A.  I do.

Page 723

1      Q.  That rate is -- that incidence is higher in
2  placebo than Neurontin for the event depression,
3  correct?
4      A.  Correct.
5      Q.  And there is a difference.  It's not
6  statistically significant for epilepsy, right?  And
7  we talked about that yesterday?
8      A.  Right.
9      Q.  And the difference is that on placebo,
10 depression is reported at 1.1 percent, and on
11 gabapentin, it's reported at 1.8 percent, correct?
12     A.  Right.  And then the combined studies,
13 it's 1.5 on Neurontin and 1.7 on placebo.
14     Q.  Right.  It's higher on placebo than it is
15 on Neurontin?
16     A.  There's no difference.
17     Q.  So when you say that the direction is in
18 the trend of increased risk of -- when you say that
19 -- that the information from randomized controlled
20 studies regarding depression and Neurontin is in the
21 direction of a trend toward increased depression,
22 that's not right, is it?
23     MR. ROSENKRANZ:  Objection.
24     A.  It's not right only based on that one
25 document.

Page 724

1      Q.  And this document summarizes all the
2  randomized controlled studies involving Neurontin.
3      You understand that, correct?
4      MR. ROSENKRANZ:  Objection.  That
5      document is a PowerPoint presentation provided
6      by the defendants in the Daubert hearing.
7      That's all we know about that document.
8      Q.  Dr. Maris, I direct your attention to the
9  source of the information contained in this document.
10 You see this table right here.  This is the table I
11 showed you yesterday.  And the source is the FDA's
12 clinical review of the neuropathy studies.
13     Do you want me to show you the table,
14 because I can get it back out.
15     A.  No, I've seen this before.
16     Q.  Okay.
17     A.  This is something we commented on before.
18     MR. ROSENKRANZ:  May I ask, Counselor,
19     what the date of that study is?
20     MS. McGRODER:  This is the 2001, Sharon
21     Hertz from the FDA, clinical review of the
22     neuropathy studies combined with the epilepsy
23     studies.
24     MR. ROSENKRANZ:  So that was seven years
25     ago.

20 (Pages 721 to 724)

Page 777

1   A.   Well, yeah, that's what he says.  It's
2   not saying they're ambivalence.
3       Q.   Yeah, I wanted to ask you about that,
4   because I think he's saying -- isn't he saying that
5   they have a state of relatively fixed purpose, paren,
6   not gainsaying their ambivalence.
7           In other words, resolving their
8   ambivalence, correct?
9           MR. SOH:  Objection to form.
10      A.   No, he's saying -- he saying they can
11  have a relatively fixed purpose and be ambivalent
12  is what he said.
13      Q.   So your interpretation of not gainsaying
14  his ambivalence means they are ambivalent?
15      A.   That they do still.  They still have
16  ambivalence, yes.  It's a hallmark of all suicide
17  notes.
18      Q.   Do you put a lot of weight into the fact
19  that the Smith family was surprised about Richard
20  Smith's suicide note?
21      A.   No, because I think he acted out of
22  character.
23      Q.   And so when Mr. Smith says in his note
24  forgive me, I can't go on like this, you think that's
25  out of character?

Page 778

1   A.   The fact that he couldn't go on?
2   Q.   Um-hum.
3   A.   Oh, yeah, because he'd been going on, and
4   he'd been keeping on and keeping on, and all of a
5   sudden for some reason he couldn't go on.
6   Q.   And -- and it's for some -- for some reason
7   in your view is because of Neurontin?
8   A.   That was certainly one of -- of a
9   proximate factor, a substantial proximate factor,
10  in my opinion.
11  Q.   Are there any other substantial proximate
12  -- proximate factors that you think might provide an
13  explanation for a statement by Mr. Smith?  Pain has
14  taken over my mind and body.  Forgive me, I cannot go
15  on like this.  Anything else that would explain that
16  --
17          MR. SOH:  Objection.  Form.
18  Q.   -- besides Neurontin?
19          MR. SOH:  Objection.  Form.
20  A.   You know, we've been here for almost
21  three days now, and you still don't really give my
22  theory the credit that it's due, which is no one
23  factor causes suicide.  So I've already admitted in
24  the last three days that partial explanation,
25  chronic pain.

Page 779

1       Partial explanation, continuing
2   depression, which got worse when he took Neurontin.
3   Partial explanation, he's an older white male,
4   which puts him in a higher risk group.  Partial
5   explanation, he had previous suicide ideation.  So
6   all of these are partial explanations.
7       Q.   So you've acknowledged that suicide has
8   many causes, usually not just drug causes, correct?
9       A.   It has many causes.
10      Q.   Usually not just drug causes, correct?
11          MR. SOH:  Objection.  Form.
12      Q.   Isn't that what you wrote in your
13  PowerPoint?
14      A.   Hold on.  You want to answer for me?
15      Q.   I'm asking you.
16      A.   No, you're not.  You're giving me the
17  answer.
18      Q.   Did you write that in the PowerPoint?
19          MR. SOH:  You asked two questions after
20      that, Lori.
21      A.   You asked two question before I could
22  answer the first one.
23          I think most suicides are not drug
24  reactions.
25      Q.   That wasn't my question.

Page 780

1       A.   Well, what was it?
2           MR. SOH:  That was the first one.
3       Q.   Have you, yourself, written that suicide
4   has causes usually not just drug causes?
5       A.   That's what I believe, yes.
6       Q.   You agree you cannot predict prospectively
7   who will commit suicide, correct?
8       A.   Not with any degree of accuracy,
9   scientifically.  What you predict are high risk
10  groups over long time frames, not individual
11  suicides over short time frames.  It's very
12  difficult scientifically.
13      Q.   If Richard Smith had not had a gun in the
14  home, would he still have committed suicide?
15      A.   Hypothetical?  He actually had three guns
16  in the home.  You're aware of that?
17      Q.   If Richard Smith had not had any guns in
18  the home, would he have still committed suicide?
19          MR. ROSENKRANZ:  Objection.
20      Hypothetical.
21      Q.   No, I'm asking for your opinion.  It's not
22  a hypothetical.  I'm asking for your opinion.
23          MR. ROSENKRANZ:  No, you're asking for a
24      hypothetical opinion.
25      A.   You said if.

34 (Pages 777 to 780)

Page 781

1    Q. Can you answer the question?
2    A. No, I can't, because I -- I mean, some
3  people would argue that if you're -- we know, for
4  example, David Brent at Pittsburgh says if you're
5  an adolescent, your suicide is ten times more
6  likely solely on whether or not you have any guns
7  in your home. So there's no doubt that having a
8  gun in the home greatly increases your suicide
9  rate. Some people will use hanging. Some people
10  will use other methods. But you're asking about a
11  specific case for something that didn't, in fact,
12  happen. So I'm -- I'm not going to speculate.
13    Q. If Richard Smith had not been suffering
14  from excruciating chronic pain, would he still have
15  committed suicide?
16    MR. SOH: Objection. Form.
17    A. Probably not.
18    Q. If Richard Smith's chronic pain had not
19  been physically debilitating, would he still have
20  committed suicide?
21    MR. SOH: Objection. Form.
22    A. Yeah, I'm not exactly sure what you mean
23  by physically debilitating -- debilitating. Is
24  that one category? Is there a degree of how
25  debilitating it is?

Page 782

1    Q. Would you like me to restate the question?
2    A. Yes, it's not -- not very precise.
3    Q. If Richard Smith's chronic pain had not
4  interfered with his functioning and his ability to
5  conduct activities of daily living, would he still
6  have committed suicide?
7    MR. SOH: Objection. Form.
8    A. Again, it requires speculation, a
9  hypothetical, but I think it's hard to say I
10  acknowledge that chronic pain in Richard Smith's
11  case was a major risk factor. I have never denied
12  that.
13    Q. If Richard Smith had not been forced to
14  quit working due to his pain and functional
15  limitations, would he have committed suicide?
16    MR. SOH: Objection to form.
17    MR. ROSENKRANZ: Objection.
18    A. Again, I don't know how to answer a
19  hypothetical about an actual case. I don't think
20  work is as important as chronic pain.
21    Q. If Richard Smith had not been told that
22  surgery was no longer an option for him and he would
23  have to learn to live with his pain, would he still
24  have committed suicide?
25    MR. SOH: Objection. Objection.

Page 783

1    A. I can't answer that, because once again,
2  my theory requires looking at multiple risks and
3  protective factors, not two at a time. And you're
4  asking me about two at a time.
5    Q. If Richard Smith had not been told that
6  surgery was no longer an option for him, would he
7  have still committed suicide?
8    MR. SOH: Objection. Form.
9    A. I don't know.
10    Q. You don't have an opinion on that?
11    A. That's why I said don't know.
12    Q. If Richard Smith had not been told that he
13  would have to learn to live to manage his pain, would
14  he still have committed suicide?
15    MR. SOH: Objection. Form.
16    A. I --I don't know.
17    Q. No opinion?
18    A. No opinion.
19    Q. If Richard Smith had not been hopeless,
20  would he have committed suicide?
21    MR. SOH: Objection. Form.
22    A. My theory says that hopelessness and
23  chronic pain are highly suicidogenic, so I'm -- I
24  think that they are important factors, and I think
25  probably hopelessness is something that was an

Page 784

1  important risk factor that I would expect to be
2  present if he killed himself.
3    Q. The support that you cite in your report
4  for ego dystonia is a deposition of Dr. Beasley and
5  an expert report of Dr. Glenmullen in the Prozac
6  litigation, correct?
7    A. Right. And Ken Fromson called me and
8  says what's the original reference, and I gave it
9  to him, and you should have it.
10    Q. And none of those expert depositions or
11  reports in the Prozac litigation discuss Neurontin,
12  correct?
13    A. Right. They refer to another set of
14  drugs.
15    Q. I take it, based on your testimony earlier,
16  that you have never seen a transcript of the 911
17  tape, that you have never listened to the 911 tape
18  either?
19    A. Right.
20    Q. But you know there was a 911 call by
21  Mrs. Smith, correct --
22    A. I do.
23    Q. -- immediately after Mr. Smith shot
24  himself?
25    A. Right.

35 (Pages 781 to 784)

Page 801

1   A.  But he may have some more, but I know the
2   ones that I've got in there.
3       Q.  And when you say the ones that you've got,
4   you're referring to the ones on page 23 of your
5   report in the Smith case?
6       A.  Right.  Being religious, having a
7   supportive wife, having a family, having a calm
8   mood, strong sense of self-worth, maybe -- it may
9   not seem musical in Doug Jacobs.  I doubt that it
10  says that, but he was certainly life-affirming.  So
11  I have some doubts about the last one.
12      Q.  Okay.  You -- you are aware that one of
13  Mr. Smith's daughters had been diagnosed with breast
14  cancer before the time that Mr. Smith committed
15  suicide, correct?
16      A.  Yes.
17      Q.  And will you agree with me that Mr. Smith
18  was very concerned about Donna and her diagnosis of
19  breast cancer?
20      A.  Sure.  Three days before when he talked
21  to Dr. Wood, he mentioned let's pray for Donna.
22      Q.  Would you consider the diagnosis of breast
23  cancer in a close family member such as Mr. Smith's
24  daughter a stressful life event?
25      A.  Yes, but notice it cuts both ways.  As a

Page 802

1   father, I would want to be there for my daughter.
2   I wouldn't want to abandon her.  She died after he
3   did.  So I would never do that to my daughter if I
4   could help it.
5       Q.  So do you think that the fact that Donna
6   had breast cancer was not part of the set of risk
7   factors for -- well, let me restate that.
8       Do you think that the fact that Donna had
9   breast cancer and Mr. Smith was concerned about it
10  was not part of the set of risk factors for his
11  suicide?
12      A.  I think it was probably both a risk
13  factor and a protective factor.  I think he -- he
14  was concerned about her and it was -- you never
15  want to lose a child before you die.  And on the
16  other hand, if your child has got a terminal
17  illness, you want to be there for them.  So my
18  guess is both a risk factor and a protective
19  factor.
20      Q.  Okay.  I don't mean to sound unscientific
21  or unmedical, but if that happens and a risk factor
22  -- or a factor is both a protective and a risk
23  factor, do they cancel each other out?
24      A.  Depends on the weight.  All these risk
25  factors have weights, like depression is heavily

Page 803

1   weighted.  And I'm not sure that I could sit here
2   today and tell you how the protective and risk
3   factor would be weighted, which would be a crucial
4   determination in canceling each other out or not.
5       I suspect wanting to hang around if he
6   were under control of himself would be a stronger
7   factor than wanting to go die, which is pretty
8   selfish.  So I just don't know.  The answer is
9   don't know.  I can't establish the weight of the
10  two.
11      Q.  Do you think wanting to die when you're in
12  extreme pain is extremely selfish?
13      A.  It's still selfish.  It's still like I
14  hurt so bad I can't think about other things.
15      Q.  Is every suicide selfish in your opinion?
16      A.  No, of course not.  There are suicides
17  that are the exact opposite, you know, you die for
18  your country, soldiers, where you die to save your
19  kids, where you die for a higher cause.
20      Q.  And are you referring to suicides there as
21  a soldier?  I'm not sure I understand that.  If
22  you're a soldier -- I guess I don't get the
23  connection with suicide.
24      A.  Okay.  Okay.  Okay.  In this book there's
25  a discussion of the type -- this book is the 2000

Page 804

1   Comprehensive Textbook of Suicidology.  I say that
2   in my opinion based on my work in thousands of
3   cases I've reviewed, that probably about 70 percent
4   of all suicides are escape, escape from an
5   intolerable life situation.
6       Probably 20 percent are revenge suicides
7   to get even with some other person.  But then there
8   are what I call altruistic suicides, which are to
9   die for the sake of somebody else or a higher
10  cause.  And often you say that of soldiers, that
11  they gave their life, you know, for our country.
12      Q.  Okay.  But they're not actually
13  intentionally committing suicide?
14      A.  Some of them are, Jehad.
15      Q.  Oh, well, that's what I wanted to ask you.
16      A.  Sure.
17      Q.  Are you -- are you referring to, like, a
18  kamikaze or a -- or a Jehad terrorist?
19      A.  Sure.  I'm referring to all soldiers, and
20  some of them are more explicitly for the country
21  than others.  I mean, a kamikaze would be an
22  obvious for the sake of Japan and the emperor.
23      Q.  Okay.
24      A.  But they're -- they're all somewhat
25  altruistic.  They're not just dying for selfish

1          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3       _____
                                       )
4    In re: NEURONTIN MARKETING,   )
       SALES PRACTICES, AND PRODUCTS)
5    LIABILITY LITIGATION,          )
        _____)
6

7                     VOLUME IV

8

9          CONTINUED VIDEOTAPED DEPOSITION OF

10            RONALD Wm. MARIS, Ph.D.

11              (Taken by Defendant)

12           Columbia, South Carolina

13           Monday, October 20, 2008

14

15

16

17

18

19

20

21

22

23

24          Reported in Stenotype by
          V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription

Page 826

```
1              APPEARANCES
2  ON BEHALF OF THE PLAINTIFFS:
3         RON ROSENKRANZ, Esquire
          Finkelstein & Partners
4         1279 Route 300
          Newburgh, New York 12551
5         (845) 563-9442
          rrosenkranz@lawampm.com
6
7  ON BEHALF OF THE DEFENDANT PFIZER:
8         ANGELA M. SEATON, Esquire
          IAN LOSASSO, Esquire
9         LORI SCHULTZ, Esquire
          (Appearing Via Telephone)
10        Shook, Hardy & Bacon, L.L.P.
          2555 Grand Boulevard
11        Kansas City, Missouri 64108
          (816) 474-6550
12        aseaton@shb.com
          ilosasso@shb.com
13        lschultz@shb.com
14  Also Present:
15        JAMES DOWNIE, CLVS, Videographer
16
17
18
19
20        CONTINUED VIDEOTAPED DEPOSITION OF RONALD
21  Wm. MARIS, Ph.D., a witness called on behalf of the
22  Defendant, before V. Dario Stanziola, CSR, RPR,
23  CRR, held at the Columbia Marriott, 1200 Hampton
24  Street, Columbia, South Carolina, on Monday,
25  October 20, 2008, commencing at 9:01 a.m.
```

Page 827

```
1          INDEX OF EXAMINATIONS
2
3
   By Ms. Seaton          PAGE   832
4
          INDEX OF EXHIBITS
5
   NUMBER      EXHIBIT            MARKED
6  Exhibit 44: Plaintiff's Expert      832
   Disclosure On Specific Causation
7
   Exhibit 45: Document entitled Appendix   833
8  A, New Evidence For Bulger v. Pfizer
   Received After July 18, 2008, Ronald Wm.
9  Maris, Ph.D. October 8, 2008
10 Exhibit 46: Report of Ronald Wm. Maris,  834
   Ph.D.
11
   Exhibit 47: First Amended Notice of   837
12 Videotaped Deposition Duces Tecum of
   Professor Ronald W. Maris, Ph.D.
13
   Exhibit 48: Handwritten notes      840
14
   Exhibit 49: Manilla folder containing  841
15 billing record of Ronald Wm. Maris,
   Ph.D.
16
   Exhibit 50: Ronald W. Maris, Ph.D.    843
17 Curriculum Vitae September 2008
18 Exhibit 51: Psychological Autopsy and  853
   Death Investigation, File Name Susan
19 Bulger
20 Exhibit 52: Photocopy of videotaped   890
   deposition of Ronald J. Bulger, Sr.
21
   Exhibit 53: Office visit note for Susan  903
22 Bulger dated 1/6/00
23 Exhibit 54: Progress notes for Susan   909
   Bulger dated 12/20/02
24
25
```

Page 828

```
1  Exhibit 55: Document entitled       951
   Commonwealth of Massachusetts Department
2  of Social Services Child Abuse/Neglect
   Report
3
   Exhibit 56: Document entitled       952
4  Commonwealth of Massachusetts Department
   of Social Services FamilyNet dictation
5  report
6  Exhibit 57: Photocopy of a PowerPoint   953
   presentation entitled Suicide and SSRIs
7  Ronald Wm. Maris, Ph.D. AAFS Annual
   Conference 11 a.m. - 12 p.m. Tuesday
8  February 20, 2007 San Antonio, Texas
9  Exhibit 58: Document entitled Beverly   988
   Hospital D/B/A BayRidge Hospital Intake
10 Evaluation
11 Exhibit 59: AtlantiCare Progress Notes  990
   dated 5/25/93
12
   Exhibit 60: AtlantiCare Medical Center  993
13 Report of Consultation dated 5/17/93
14 Exhibit 61: A document entitled Past    999
   Psychiatric History
15
   Exhibit 62: AtlantiCare Medical Center  1001
16 medical record
17 Exhibit 63: A document entitled Patient 1006
   Messages Susan E. Bulger
18
   Exhibit 64: A medical record       1015
19
   Exhibit 65: A photocopy of videotaped   1016
20 deposition of Yoshiharu Akabane, M.D.
21 Exhibit 66: A medical record Salem     1017
   Hospital dated 8/17/88
22
   Exhibit 67: AtlantiCare Medical Center  1018
23 report of consultation dated 6/5/90
24 Exhibit 68: Brigham and Women's Hospital 1019
   nursing history questionnaire
25
```

Page 829

```
1  Exhibit 69: AtlantiCare Medical Center  1022
   Discharge Summary, discharge date
2  5/25/93
3  Exhibit 70: Beverly Hospital d/b/a     1024
   BayRidge Hospital Intake Evaluation
4
   Exhibit 71: Medical record, alcohol and 1026
5  other drug use
6  Exhibit 72: BayRidge Hospital a        1026
   satellite facility of Beverly Hospital
7  medical record dated 4/30/98
8  Exhibit 73: A medical evaluation and/or 1028
   psychotherapy of Susan Bulger dated
9  5/20/98
10 Exhibit 74: A letter dated 6/22/98 to   1029
   Gerald Perlow from William Lloyd
11
   Exhibit 75: Commonwealth of            1029
12 Massachusetts Department of Social
   Services Assessment Worksheet with an
13 assigned date of 4/23/98
14 Exhibit 76: A Progress Note of Susan   1034
   Bulger dated 10/30/00
15
   Exhibit 77: A Progress Note of Susan   1036
16 Bulger dated 11/30/00
17 Exhibit 78: CAB Health and Recovery    1037
   Services, Inc. Dated 12/14/00
18
   Exhibit 79: Progress Notes of Susan    1039
19 Bulger dated 2/6/01
20 Exhibit 80: Progress Notes of Susan    1041
   Bulger dated 3/7/01
21
   Exhibit 81: Progress Notes of Susan    1042
22 Bulger dated 4/25/01
23 Exhibit 82: Progress Notes of Susan    1043
   Bulger dated 5/30/01
24
   Exhibit 83: Progress Notes of Susan    1044
25 Bulger dated 6/7/01
```

2 (Pages 826 to 829)

Page 830

```
1   Exhibit 84: Progress Notes of Susan      1045
    Bulger dated 9/18/01
2
    Exhibit 85: Progress Notes of Susan      1057
3   Bulger dated 4/9/02
4   Exhibit 86: Progress Notes of Susan      1059
    Bulger dated 5/14/02
5
    Exhibit 87: Progress Notes of Susan      1061
6   Bulger dated 8/14/03
7   Exhibit 88: A Encounter Note by Dr.      1081
    Richard S. Goldman, M.D. of Susan E.
8   Bulger
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 831

```
1        THE VIDEOGRAPHER: My name is James Downie
2   of Veritext Litigation Services. Today's date
3   is the October 20th, 2008, and the time is
4   approximately 9:01 a.m.
5        This deposition is being held at the
6   Marriott Hotel located at 1200 Hampton Street
7   in Columbia, South Carolina.
8        The caption of this case is Ronald
9   Bulger, et al. versus Pfizer, Inc., et al.
10       The name of the witness is Dr. Ronald
11  Maris, Volume I.
12       At this time the attorneys please
13  introduce themselves for the record and we may
14  begin.
15       MR. ROSENKRANZ: Ron Rosenkranz,
16  Finkelstein & Partners for the plaintiffs.
17       MS. SEATON: Angela Seton, Shook, Hardy &
18  Bacon on behalf of -- oh, where is my
19  microphone?
20       Angela Seton, Shook, Hardy & Bacon on
21  behalf of the Pfizer defendants.
22       MR. LOSASSO: Ian Losasso, Shook, Hardy &
23  Bacon on behalf of Pfizer, the defendants.
24       CONTINUED EXAMINATION
25  BY MS. SEATON:
```

Page 832

```
1    Q.  Good morning, Dr. Maris.
2    A.  Good morning.
3    Q.  We have met before, correct?
4    A.  We have.
5    Q.  We are here for the continuation of your
6   deposition, and I would just remind you that you
7   remain under oath as you were before.
8    A.  That's fine.
9    Q.  Okay. And I assume we don't need to go
10  over the ground rules, you've been deposed many times
11  before; if you need a break, if you don't understand
12  a question, et cetera, et cetera?
13   A.  That's fair.
14   Q.  Okay. I am going to mark as deposition
15  Exhibit 44 your original report in this case. And
16  when I say this case, I'm referring to the Bulger
17  case. You understand that we're going to be talking
18  about the Bulger case today, correct?
19   A.  Yes.
20       (Exhibit 44: Plaintiff's Expert
21       Disclosure On Specific Causation marked for
22       identification, as of this date.)
23   Q.  Okay. I'm handing you what we've marked as
24  deposition Exhibit No. 44. Do you recognize that
25  document?
```

Page 833

```
1    A.  Yes, I do.
2    Q.  Okay. And that is the original expert
3   report that you prepared in connection with the
4   Bulger case, correct?
5    A.  Correct.
6       (Exhibit 45: Document entitled Appendix
7       A, New Evidence For Bulger v. Pfizer Received
8       After July 18, 2008, Ronald Wm. Maris, Ph.D.
9       October 8, 2008 marked for identification, as
10      of this date.)
11   Q.  Okay. I am going to mark as deposition
12  Exhibit No. 45 a document that I received from the
13  law offices of Finkelstein & Partners last week. And
14  I understand that this is your supplemental report;
15  is that correct?
16   A.  Right.
17       There should be two -- two parts,
18  Appendix A and Appendix B.
19   Q.  Okay.
20   A.  So, yes, it is.
21   Q.  Okay. And Appendix A is a list of
22  additional materials that you reviewed, correct?
23   A.  Correct.
24   Q.  And Appendix B contains your supplemental
25  opinions in this case, correct?
```

3 (Pages 830 to 833)

Page 850

1  got off the ground. I remember Gene Brooks not
2  following up on this. So I didn't include it on
3  purpose because I never really -- never really was
4  one that I was actively involved with. There was
5  some initial consultation. But I never really did
6  anything with the case that I can recall. It's
7  been a while.
8      Q.  Okay. Are you aware that the Finkelstein
9  law firm previously represented a plaintiff whose
10 name was Strickland and that they dismissed that case
11 at some point?
12     A.  No, I wasn't aware of that.
13     Q.  Okay. Did you have an opinion in this
14 Strickland versus Pfizer case about causation?
15     A.  I don't believe so since -- as far as I
16 can remember, again, I'd have to go back and try to
17 dig out the file. Part of the problem is I don't
18 save files after so long, I shred them. But my
19 recollection was it's never -- I never developed an
20 opinion in this case.
21     Q.  Okay. All right. And then if you go down a
22 little ways, there's another 2005 highlighted that
23 says Pittman. I don't have any questions about that.
24 And then there's 2005 highlighted and it says Kim,
25 Eugene Brooks, Savannah, Georgia, and product liability,

Page 851

1  Lexapro, plaintiff. And you've handwritten teenage
2  Neurontin case. Do you see where I'm's reading?
3      A.  Right.
4      Q.  Okay. Tell me what that case was about.
5      A.  I believe it's the same thing as the
6  other Gene Brooks case. It's something that he
7  discussed with me, but I never actually got
8  involved in. They're both in the same attorney.
9  And I don't remember the details other than what I
10 wrote there.
11     Q.  Did you -- did you tell Gene Brooks that
12 you didn't think these were good cases?
13     A.  I don't remember what the details were,
14 to be honest. I'd have to go back and dig it out.
15     Q.  Okay. Who is Gene Brooks?
16     A.  I don't know. He's an attorney in
17 Savannah. I don't know him.
18     Q.  Okay.
19     A.  A lot of attorneys contact me and I've
20 never met them before, they get my name from some
21 other attorney.
22     Q.  Okay. You also have 2005 In Re: Neurontin,
23 and then I see where you've drawn a line and you've
24 written in that 14 cases?
25     A.  I think so at the time. That was one of

Page 852

1  my initial contacts. And I know that there were
2  more than 14. But at the time I think they -- they
3  identified 14 cases of which, you know, we have
4  some now that I am actually involved in.
5      Q.  Okay. So did you review 14 cases?
6      A.  No. They were saying -- I think they
7  said the only one they were going to send me -- I
8  think that's supposed to say Crone and they were
9  going to send me Crone. Crone, incidentally, was
10 the very first Neurontin case that I ever got.
11     Q.  Okay. So it's still your testimony that the
12 only Neurontin cases you've reviewed are Shearer,
13 Bulger, Smith, and Crone; is that correct?
14     A.  Right. The only ones that I've actually
15 read the file and developed an opinion.
16     Q.  Okay.
17     A.  I don't think I have -- in the Brooks
18 cases I never gave a report or anything like that.
19 I just talked with them about it. I've got this
20 case and then for some reason, I don't think he
21 ever sent them to me.
22     Q.  Okay. I want to reconfirm, Dr. Maris, you
23 are here today as an expert in this case. You didn't
24 provide any care or treatment for Susan Bulger; is
25 that correct?

Page 853

1      A.  Correct.
2      Q.  You never examined Susan Bulger?
3      A.  Correct.
4      Q.  And you never spoke with or met Susan
5  Bulger?
6      A.  Right.
7          (Exhibit 51: Psychological Autopsy and
8          Death Investigation, File Name Susan Bulger
9          marked for identification, as of this date.)
10     Q.  Okay. I am going to mark as deposition
11 Exhibit No. 51 a document which is titled
12 Psychological Autopsy and Death Investigation. And I
13 will represent to you that this document was provided
14 to my office by the Finkelstein law firm last week.
15 And my understanding is that you prepared an initial
16 Psychological Autopsy and Death Investigation at some
17 point and then at a later point you either prepared a
18 new one or you made notes on it, correct?
19     A.  Well, partly correct. I didn't ever
20 prepare this. I did the form. And then as you
21 see, Michael -- Michelle Faye actually filled it
22 out.
23     Q.  Okay. Tell me why we have two different
24 psychological autopsies?
25         MR. ROSENKRANZ: Objection.

8 (Pages 850 to 853)

Page 854

1    Q. Okay. Let me rephrase my question.
2       At some point it became necessary to update
3  the psychological autopsy?
4       In other words, the copy that was provided
5  to us originally wasn't a full and complete copy; is
6  that correct?
7    A. Right.
8       In fact, I made some notes on the front
9  page.
10   Q. Okay.
11      Okay. So when was this the psychological
12 autopsy originally done?
13   A. It was -- I got it back February 12th,
14 2008.
15   Q. You received it from the Finkelstein law
16 firm?
17   A. Right.
18   Q. Okay. And then it says revisions 4/17/08?
19   A. That's when I got the current copy back.
20   Q. Okay. So did Michelle Faye go back and get
21 additional information or did you make revisions
22 yourself on 4/17/08?
23   A. I think mainly Michelle Faye. I'm
24 looking at this -- I have to be quite honest with
25 you, when I first read it, it was very incomplete.

Page 855

1  And I had the feeling that it just hadn't been done
2  right. So I basically sent it back and said do it
3  again.
4    Q. Okay.
5    A. Now, since then did I make any additions?
6  I mean, I made a few additions which I noted on
7  here. For example, on 29 she said there was no
8  history of suicide or mental illness in the family,
9  and I said well, the mother was schizophrenic. So
10 I made a few additions. But most of the additions
11 were made by Michelle Faye. And when I made the
12 additions, I usually initialed them.
13   Q. Okay. Fair to say that when you first
14 received this back from Michelle Faye, it was
15 incomplete and contained errors?
16   A. I found that it was incomplete. I'm not
17 sure it contained very many errors. I found a
18 couple of errors myself, but mainly it was
19 incomplete.
20   Q. Okay. Does Michelle Faye have any medical
21 training?
22   A. No, she's a -- I think she's a paralegal,
23 right? For the Finkelstein firm.
24   Q. Michelle Faye is employed by Finkelstein &
25 Partners; is that correct?

Page 856

1    A. Right.
2    Q. I -- you co-edited a text entitled
3  Assessment and Prediction of Suicide, correct?
4    A. Actually, I was the chief editor on it,
5  not just the co -- it was my book and everybody
6  else co-edited it.
7    Q. Okay. I meant to bring that with me, but I
8  didn't. So I'm not trying to trick you or not
9  provide something to you. And I'm going to go
10 through it real slowly so that I don't -- I don't
11 confuse you. Chapter eight of your Assessment and
12 Prediction of Suicide book is entitled Assessment in
13 Absentia, the Value of the Psychological Autopsy
14 Method For Studying Antecedents of Suicide and
15 Predicting Future Suicides, yes?
16   A. Right. That's written by David Clark,
17 not by me. But I was editor of the whole book.
18   Q. Okay. I'm going to read you a couple
19 sentences and when I'm done I want you to tell me
20 whether you either agree or disagree with this
21 statement.
22      The situation is markedly different when a
23 consulting expert is not contacted until months or
24 years after a death for an opinion about an
25 unfamiliar case. In these situations information

Page 857

1  available to the expert witness is usually in the
2  form of depositions collected many months or years
3  after the suicide. This kind of data is suspect for
4  scientific purposes because the passage of time and
5  memory decay.
6       You agree with that or disagree?
7    A. I agree with that.
8    Q. Okay. I'm going to read a few more
9  sentences and, again, the question will be do you
10 either agree with this or disagree.
11      There are four other serious problems when
12 the primary database for a case review consists of
13 depositions.
14      First, depositions are elicited in the
15 context of an -- in the context of an adversarial,
16 sometimes antagonistic examination and cross
17 examination.
18      Second, the expert witness is rarely
19 familiar with the interview skills of the deposer and
20 so is distant from the behavioral observations and
21 nuances of raw data in a way that is not true when
22 the expert or his own research team has conducted the
23 interviews.
24      Third, in a deposition informants are not
25 interviewed in a standardized fashion to optimize

9 (Pages 854 to 857)

1  investigator's ability to compare and contrast
2  informant responses with results for previous
3  psychological autopsy studies.
4       Fourth, and finally, in the deposition
5  process, the consulting clinical expert has few means
6  for assessing bias and censorship in the selection of
7  informants. The questions posed, the forms of those
8  questions and the information made available are not
9  available for case review. Once again, there are no
10 empirical studies quantifying the degree of
11 distortion introduced by these serious confounds.
12       Agree or disagree?
13    A.  Can I say I agree and then make a couple
14 comments?
15    Q.  No.
16    A.  So you're testifying?
17    Q.  I'm not testifying. But the deposition
18 will go quicker if we -- if I put questions to you.
19    A.  I agree.
20    Q.  Okay. Do you -- do you see any problem with
21 the fact that Michelle Faye is the one who prepared
22 the psychological autopsy?
23    A.  In a perfect world, I would do all my
24 original data gathering. But I can just say that
25 the norm in all the 200 cases I've done is to not

1  do original interviews. The norm for the vast
2  majority of cases, partly because of cost, partly
3  because the distortion probably is estimated not to
4  be that great, somebody else can gather the facts.
5       So in point of fact, the routine is to
6  let somebody else, be it a deposition or interview
7  or somebody doing a psych autopsy, that's the way
8  it's almost always done. In a perfect world, I
9  would go do all my original interviews. But there
10 are depositions there.
11       I mean, think of all the information in
12 this case, if I had to go out and gather all that
13 myself, it would be impractical and it would also
14 be prohibitively expensive and it would not be
15 calculated in terms of marginal utility to have a
16 sufficient gain to be worth that kind of investment
17 of energy. So yeah, in a perfect world, I would do
18 my own psychological autopsies and sometimes I do.
19 But most of the time I usually rely on information
20 provided me. Michelle Faye is probably one of the
21 most knowledgeable people in this case because she
22 is a case coordinator for all this data.
23    Q.  Okay. You would agree with me, though,
24 that Michelle Faye has a financial interest in this
25 case is in the fact that this case comes out in favor

1  of plaintiff, correct?
2       MR. ROSENKRANZ:  Objection.
3    A.  She's really not going to get any profit
4  sharing or anything. She just has a 8:00 to 5:00
5  job and she's doing her job. So I don't think she
6  has a financial interest. I think she does work
7  for Finkelstein, but she's not an attorney and
8  she's simply trying to do the best job that I ask
9  her to do. So I don't think she's going to have a
10 financial gain depending on how this turns out.
11    Q.  Would you agree with me that the law firm
12 of Finkelstein & Partners has a financial stake in
13 this litigation?
14    A.  Sure.
15    Q.  Okay. In terms of methodology, do you rely
16 on this psychological autopsy?
17    A.  Well, I'm not quite sure what that
18 question means.
19    Q.  Okay. Just a second.
20       What's the purpose of the psychological
21 autopsy?
22    A.  Well, as Dr. Kruszewski said, he
23 described it as kind of elegant and systematic. I
24 mean, it's an attempt in a more systematic,
25 unbiased way to make sure that I get all the

1  information I need to form and defend an opinion.
2  Often when I look at the records, many of these
3  questions in my psych autopsy have never been
4  asked.
5       And, for example, the risk factors, do I
6  have sufficient information on each case about the
7  suicide risk factors in order to form an opinion?
8  So all of these sections in here are designed to
9  gather information which may or may not have been
10 asked before in order to help me as a scientist to
11 look objectively at the factors that I think are
12 related usually to a suicide outcome, in some cases
13 through the causes of the suicide outcome.
14    Q.  But fair to say that this psychological
15 autopsy was compiled and put together by plaintiffs'
16 lawyers?
17       In other words, it was plaintiffs who
18 decided what information to include in the
19 psychological autopsy, you didn't do that?
20    A.  That's not true.
21    Q.  Okay. Tell me why that's not true.
22    A.  We went over this last time. Andy
23 Vickery originally had his name on this. All Andy
24 Vickery in Houston did was to provide me with money
25 for me to do a hundred percent of the work with one

Page 862

1  exception, which I pointed out in the Smith case,
2  which was the section 17, the Puzzling Paradox. He
3  wanted to gather information on that and see how
4  many cases that that was actually his theory.
5      But everything else, all 23 of the items
6  are things that I wrote all by myself. All he did
7  was provide the money, I provided the time and the
8  expertise and experience.
9      Q.  No, and I understand that. That's actually
10  not the point that I'm trying to get at. The point
11  I'm trying to get at is that you as an independent
12  expert and no one of your staff actually gathered the
13  information that is contained in the psychological
14  autopsy. Instead, plaintiffs' counsel is the one who
15  went through and prepared the responses to these
16  questions, correct?
17     A.  Sure. And I -- like I do with all my
18  books, I went through and looked at it and when I
19  thought that it -- I read the record, of course,
20  just like Michelle Faye does. And when I thought
21  that she had missed something, I corrected it. So
22  I -- I don't know what the word would be vetted it.
23  I -- I stated after I made corrections that this
24  was consistent with my own reading of the record.
25  So in a sense, we both did it.

Page 863

1      Q.  Okay. Did it ever occur to you to interview
2  Ron Bulger?
3      A.  Yes, it did. And I have been -- in my
4  past experience is that it's very problematic to
5  interview witnesses.
6      Q.  Why?
7      A.  Because the defense always demands it,
8  they get to be there when the interview takes
9  place. And if you do, they're circumspect, they
10  don't trust you. So I have found that often, even
11  though sometimes I do, it's so problematic, it's
12  almost like an end run that I go and talk to one of
13  the witnesses without the other side being there.
14  And I often get into trouble if I try to do that.
15  So, for the most part, I rely on the depositions
16  and the file.
17     Q.  Okay. I'd like to ask you some questions
18  about some notes that you made on this psychological
19  autopsy. If you would, turn to page ten. And
20  actually, the question begins on page nine, it's
21  question number 36. When you get there, let me know.
22     A.  Okay.
23     Q.  Okay. It says, DCD, and I assume that
24  stands for decedent. Decedent had two sisters, one
25  brother and multiple half siblings. Decedent had

Page 864

1  very little contact with family and was not close to
2  her parents, siblings or extended family. Husband
3  has no additional information concerning decedent's
4  family. Decedent spent time in foster care.
5      You highlighted decedent spent time in
6  foster care, correct?
7      A.  I did.
8      Q.  Why is that important to you? Or why was
9  that important to you?
10     A.  Well, one of the theories about suicide
11  is what we sometimes call early trauma or
12  multi-problem family of origin. And so I saw this
13  as evidence that she -- that her father was gone,
14  her mother was schizophrenic and she was unable --
15  her family was unable to raise her. So she was put
16  in a surrogate home, in a foster care home. In
17  fact, that's where Ron Bulger met her, in a foster
18  care home. So evidence of multi-problem family and
19  early trauma.
20     Q.  Okay. And I would assume then that that's
21  also why you've highlighted the fact that Susan
22  Bulger's mother was diagnosed with schizophrenia,
23  that she had an abusive family relationship growing
24  up with her mom. And then I see your handwritten
25  note where you say, mother beat her with tennis

Page 865

1  racquet. Is that -- am I reading that correctly?
2      A.  That's what Ron Bulger said. Her sister
3  denied that.
4      Q.  Okay.
5      A.  Landry said that's not true. But Ron
6  Bulger said it was true.
7      Q.  Okay.
8      A.  And there are examples of where I've
9  tried to refine a psych autopsy. I didn't take it
10  lock, stock and barrel. I went through things and
11  highlighted them and made additions and added
12  additional notes. So I didn't just have Michelle
13  Faye do it.
14     Q.  Let's go back to your report in this case.
15     If you would, turn to page 28.
16     A.  Yes.
17     Q.  About midway down, it says is this the
18  best, quote, Neurontin causing suicide case, end
19  quote, that I have ever investigated? Obviously not.
20  For example, in some of my other Neurontin suicide
21  cases the decedent had fewer non-Neurontin suicide
22  risk factors and a more prominent role in causing
23  suicide was played by Neurontin. Nevertheless, I
24  still opine that Neurontin was a substantial
25  contributing factor in Susan Bulger's suicide.

Page 866

1    Did I read that correctly?
2    A.  Yes, you did.
3    Q.  Tell me, what other Neurontin cases have
4  you investigated? What other Neurontin cases have you
5  investigated?
6    A.  Well, we've already discussed this,
7  Smith, Shearer and Crone.
8    Q.  Can you rank those for me in terms of which
9  one's the best one and which one's the worst one?
10    MR. ROSENKRANZ:  Objection.
11    A.  Well, Shearer is in process and I've been
12  told not to continue working on that, so I've never
13  written a report for that.  I am not as well
14  prepared.  And Crone was years ago. I'm going to
15  have to go out to San Francisco, there's going to
16  be a deposition soon in November, I believe.  But
17  of the two that I'm familiar with, I think Smith
18  was the best and probably Bulger was the weakest.
19    Q.  Okay. Do you consider yourself an advocate
20  for plaintiffs?
21    A.  No, of course not.
22    Q.  Okay. Why then do you use the term best?
23    What do you mean when you say the best
24  case?
25    A.  Only that I read both of them and if I

Page 867

1  did exactly what you asked me to do, how -- in
2  other words, I can say yes, I believe Neurontin was
3  a substantial factor in -- a substantial proximate
4  factor in let's say Susan Bulger's suicide.  And I
5  do.  Do I think it's as clear that Neurontin caused
6  her suicide; you know, quote, caused substantial
7  proximate factor?  No, because I think Richard
8  Smith, he was a Christian minister, he had -- he
9  had lots of protective factors, he didn't have a
10  history of psychological -- so in that I sense,
11  even though I think both of them were acceptably
12  caused by Neurontin, I thought my opinion was
13  stronger.  And so by best, I mean my opinion in
14  Smith is a little stronger than it is in Susan's,
15  the confidence that I have in my opinion.
16    Q.  I understand.
17    Tell me -- tell me all the things that make
18  the Susan Bulger case a bad case?
19    MR. ROSENKRANZ:  Objection.
20    A.  A weak case.
21    Q.  A weak case.  Fair.
22    A.  Well, obviously the fact that she has a
23  long history of psychiatric disorder, substance
24  abuse, family trauma, you know, childhood
25  socialization problems, the fact that she had many

Page 868

1  suicide attempts which, you know, wasn't the case
2  in Smith.  In other words, she had a lot -- to make
3  it short, she had a lot more suicide risk factors
4  than Richard Smith did.
5    Q.  Okay.
6    A.  And all of those, of course, as you know,
7  are potential alternative explanations for why she
8  killed herself.
9    Q.  Right.
10    Is -- no matter what risk factors somebody
11  has, if they took Neurontin prior to their death and
12  then committed suicide, would you opine that it was
13  the Neurontin that caused the suicide?
14    A.  Probably not.  I mean, that's -- the
15  problem with that is that's a hypothetical and a
16  generic statement and we're talking about specific
17  cases, and, of course, in specific cases there are
18  always facts that are relevant that are absent in
19  that question.  But the short answer is no, I
20  wouldn't say just because they had risk factors and
21  took Neurontin that the Neurontin did it.  I mean,
22  there are sometimes when the risk factors are so
23  dramatic that they overpower the -- you know, and
24  most people who take Neurontin never become
25  suicidal.

Page 869

1    Q.  Okay. Tell me what a -- tell me what a case
2  would look like where somebody has a bunch of risk
3  factors and they take Neurontin and they kill
4  themselves but you would say Neurontin had nothing to
5  do with it?
6    MR. ROSENKRANZ:  Objection.
7    A.  Well, you know, you're asking me to
8  fabricate a case to make your point.
9    Q.  That's exactly what I'm asking you to do.
10    A.  You know, we could take any one of the
11  risk factors, let's just pick one that's possible,
12  like depression.
13    Q.  Okay.
14    A.  And one of the things we know is we've
15  established this last time in Smith, is that
16  approximately 90 percent of all suicide cases have
17  some significant mental disorder and maybe, you
18  know, at least half of them have a major
19  depression.
20    So if somebody had a prominent history of
21  depression with a recent exacerbation where they've
22  been hospitalized, where they said to their doctor
23  and their family, I can't keep going back to the
24  hospital for depression, my medicine's not working
25  and they had been sort of constantly on Neurontin

12 (Pages 866 to 869)

Page 870

1  with no real variation, I might opine that the
2  depression did it, not the Neurontin. But again,
3  it's a hypothetical and they're not worth too much.
4      Q. Well, I mean, the case you just described
5  to me sounds just like Susan Bulger. What about the
6  facts that you described -- what about the facts
7  that you just described make it different from the
8  Susan Bulger case?
9          MR. ROSENKRANZ: Objection to the
10  characterization.
11     A. Yeah, I don't agree with that. I think
12  Susan Bulger had -- she had depression, she was
13  treated for depression, but she, for example, was
14  not in and out of psychiatric hospitals, she wasn't
15  getting shock treatment, she wasn't, you know -- I
16  thought her depression was fairly constant over
17  time. I didn't think it was particularly
18  exacerbated, even though she was on Effexor and
19  Lexapro near the end of her life. I didn't think
20  that she was having acute episodes of depression.
21         And the other thing -- the other thing.
22  that's pretty dramatic that both Kruszewski and I
23  say is that the night that she killed herself, she
24  apparently ingested four 300-milligram Neurontin
25  within an hour of her death. So I think that makes

Page 871

1  a difference.
2      Q. Okay. So that's important to you, the fact
3  that she took the Neurontin an hour before she killed
4  herself?
5      A. Sure. And the fact that before in the
6  record when she goes to go to Dr. Crognale's
7  record, C-R --
8      Q. Crognale.
9      A. Crognale. Is that how you pronounce it?
10     Q. Um-hum.
11     A. He had said that when he gave it to her,
12  be specific about this, in the treatment history
13  attached to my report, he says, for example, on
14  6/24/02, this is the first Neurontin script that he
15  wrote for Susan Bulger and about a week later he
16  enters into the record devoid of life, anhedonic.
17  So that she seemed in terms of time -- he doesn't
18  attribute it to the Neurontin, that's -- I'll give
19  you that. But he does say a week after she's
20  taking it, that she has traits that I know are
21  often associated with Neurontin.
22     Q. Okay.
23     A. So there. And then earlier in 10/30
24  Neurontin made her completely out of it. So based
25  on her history and her previous reactions, then she

Page 872

1  takes notice that you're not supposed to take four
2  at once.
3      Q. Wait, wait, okay. Let me interrupt you.
4  You say you're not supposed to take four at once.
5  Who says you're not supposed to take four at once?
6      A. The prescription is three during the day
7  and one at night. You know, the drug, as I recall,
8  her drug was either TID or QID, which means three
9  or four times a day. It didn't say take them all
10  HS at hours of sleep.
11         She was not prescribed to take 200 -- I'm
12  sorry, 1,200 milligrams of Neurontin when she goes
13  to bed. That was her own little variation on
14  having gotten the pills. She was prescribed -- she
15  was prescribed at various times -- she was
16  prescribed 300 at hours -- hours of sleep, which
17  means at bedtime. But at other times she had BID.
18     Q. Okay. Let me stop you. Let me ask you a
19  question.
20         Is it your testimony -- for how long of a
21  period did Susan Bulger take her Neurontin all at one
22  time? In other words, four pills at once.
23     A. It's not known.
24     Q. Okay.
25         Okay. We're going to go back and we're

Page 873

1  going to talk about this time line.
2      A. Sure.
3      Q. But what I want to do right now is refer
4  earlier in your report. You prepared a case summary
5  in connection with this report, correct?
6      A. I did.
7      Q. And it's part of your report?
8      A. Yes.
9      Q. And in this -- in this case summary, you
10  recognize that Susan Bulger suffered from rheumatoid
11  arthritis?
12     A. Right.
13     Q. Is that a risk factor for suicide?
14     A. It's not a very powerful risk factor, no.
15     Q. Okay.
16     A. No, it isn't.
17     Q. Okay.
18     A. You can go back and look at my book where
19  I talk about physical illness. It's -- you know,
20  pain can be a risk factor, but most people who have
21  pain and arthritis never kill themselves.
22     Q. Okay. You recognize in your case summary
23  that Susan Bulger had been treated for depression,
24  anxiety and cocaine abuse as early as 1988, right?
25     A. Right.

13 (Pages 870 to 873)