**EXHIBIT 5**

```
                                                                    1
               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


 In re:  NEURONTIN              : MDL DOCKET NO. 1629
 MARKETING, SALES               :
 PRACTICES AND PRODUCTS         :
 LIABILITY LITIGATION           :
 -----------------------------  : MASTER FILE NO.
 THIS DOCUMENT RELATES TO:      : 04-10981
                                :
 Bulger, v. Pfizer, Inc.,       :
 et al.                         :
 Case No. 05-CV-11515-PBS       :


    VIDEOTAPE DEPOSITION OF STEFAN P. KRUSZEWSKI, M.D.

              VOLUME I (Page 1 - 344)

          Taken in the Harrisburg Hilton,
located at 1 North Second Street, Harrisburg,
Pennsylvania, on Wednesday, October 15, 2008,
commencing at 9:07 a.m. before Sally A. Slifer,
Registered Merit Reporter, Certified Realtime
Reporter, and Robert Cowalchik, Videographer.

APPEARANCES:

                    FINKELSTEIN & PARTNERS, L.L.P.
                    BY:  KENNETH FROMSON, ESQ.
                    785 Broadway, 3rd Floor
                    Kingston, NY  12401
                      -- For the Plaintiff
```

Page 2

1  APPEARANCES: (Continued)
2
                 SHOOK, HARDY & BACON, L.L.P.
3            BY: LORI McGRODER, ESQ.
                 LORI SCHULTZ, ESQ.
4                JENNIFER M. STEVENSON, ESQ.
             2555 Grand Boulevard
5            Kansas City, MO  64108
             -- For Defendants

Page 3

1          INDEX TO WITNESSES.
2
   WITNESS                          PAGE
3
   STEFAN P. KRUSZEWSKI
4
     By Ms. McGroder                  4
5

7          INDEX TO EXHIBITS
8
                                     PAGE
9  EXHIBIT    DESCRIPTION          MARKED
10   1    Medical Examiner Report      47
11   2    Dr. Kruszewski's report      61
12   3    Agenda for the Sheraton Hotel
             Meeting April 29th, 2008    144
13
     4    CV                           148
14
     5    FDA Statistical Review Chart
15         May 23, 2008, Odds Ratio    241

Page 4

1          THE OPERATOR: We are on the record.
2  The time is 9:07 a.m. My name is Robert Cowalchik of
3  Veritext Corporate Services. The date today is
4  October 15th, 2008. This deposition is being held in
5  the Harrisburg Hilton, located at One North Second
6  Street, Harrisburg, Pennsylvania.
7          The caption of this case is, in re,
8  Neurontin Marketing Sales Practices and Products
9  Liability Litigation. This document relates as to
10 Bulger v. Pfizer, Inc., et al. Case Number
11 05-CV-11515-PBS in the United States District Court,
12 District of Massachusetts.
13         At this time the attorneys will
14 identify themselves and the parties they represent
15 after which our court reporter will swear in the
16 witness and we can proceed. The name of the witness
17 is Stefan P. Kruszewski.
18         MR. FROMSON: For the Bulger family,
19 my name is Kenneth Fromson.
20         MS. McGRODER: Lori McGroder on
21 behalf of Pfizer defendants.
22         MS. STEVENSON: Jennifer Stevenson
23 on behalf of Pfizer.
24         MS. SCHULTZ: Lori Schultz on behalf
25 of Pfizer.

Page 5

1          STEFAN P. KRUSZEWSKI, having been
2  duly sworn, was examined and testified as follows:
3                      * * *
4                  EXAMINATION
5  BY MS. McGRODER:
6  Q.   Good morning, Dr. Kruszewski.
7  A.   Good morning.
8  Q.   Good to see you again. We last met in
9  February of this year, correct, for a deposition?
10 A.   That's correct.
11 Q.   And then I guess you could say we met in June
12 and July again of this year for the Daubert hearing,
13 correct?
14 A.   We did.
15 Q.   Then we were here, as you know, on September
16 8th for a deposition that was scheduled in the Bulger
17 matter for which you were unable to appear, correct?
18 A.   That's correct.
19 Q.   Since the time that we last met in July of
20 2008, have you published your opinion in any peer
21 review journal that Neurontin is capable of causing
22 suicide?
23 A.   I have not.
24 Q.   Have you ever submitted for publication your
25 opinion in this litigation in a peer review journal --

**Page 6**

1  let me rephrase. Have you ever submitted for
2  publication in a peer review journal your opinion in
3  this litigation that Neurontin is capable of causing
4  suicide?
5  A.     I have not.
6  Q.     And we are here today to talk about your
7  opinions in the case of Susan Bulger versus Pfizer,
8  correct?
9  A.     That's correct.
10 Q.     I think you told us last December -- let's go
11 off the record for a second.
12         THE OPERATOR: Going off the record.
13 The time is 9:10 a.m.
14         (Brief recess was had.)
15         THE OPERATOR: We are on the record
16 the time is 9:17 a.m.
17 MS. McGRODER:
18 Q.     I believe you told us in December of 2000
19 that certain employees at Kruszewski and Associates
20 assisted you in the preparation of your general
21 causation report, is that correct?
22         MR. FROMSON: Objection, form. You
23 can answer.
24 A.     That's correct.
25 Q.     You recall that testimony?

**Page 7**

1  A.     Yes, I do.
2  Q.     Were any of your staff at Kruszewski and
3  Associates involved in helping you prepare your report
4  in the Bulger matter?
5         MR. FROMSON: Note my objection as
6  to form. You can answer.
7  A.     Yes.
8  Q.     Who?
9  A.     Couple of people. First one was John Ronayne
10 R-O-N-A-Y-N-E. The second was David Tobiasz,
11 T-O-B-I-A-S-Z. The third one was Wendy Crane,
12 C-R-A-N-E. The fourth one was Jason Christ,
13 C-H-R-I-S-T.
14 Q.     What did John Ronayne do to help you prepare
15 your report in the Bulger case?
16 A.     I asked him to help with the references at
17 the end, so he facilitated finding the references that
18 supported my general causality report and made sure
19 they were attached to this report.
20 Q.     So did he actually prepare the appendix that
21 contains your references that is attached to the
22 Bulger report?
23 A.     He actually did not prepare the appendices,
24 because there were multiple ones where I am citing
25 specific comments from different exhibits, but in the

**Page 8**

1  overall references at the end, one of the things he
2  did, the only thing that I can remember as I sit here
3  today is that he copied and pasted some of the
4  references that I used to support my general causality
5  report to this report.
6  Q.     The references you are referring to are
7  located at page 29 of the Bulger report under addendum
8  C bibliography, is that correct?
9  A.     That's what I am referring to, yes.
10 Q.     And he cut and pasted some of the references
11 that were contained in your original general causation
12 report?
13 A.     That's correct.
14 Q.     How did he know which ones to cut and paste?
15 A.     I probably went over which ones I wanted with
16 him.
17 Q.     Do you know as you sit here today that you in
18 fact went over some of the ones you wanted with him?
19 A.     I don't think I could recall that as I sit
20 here today, which specific ones.
21 Q.     Well, how were the references, and I believe
22 the list goes from one to 94, identified for inclusion
23 in your Bulger report?
24 A.     We had a list as you know on the general
25 causality report, and what I thought was pertinent to

**Page 9**

1  this case I asked him to cut and paste. And that was
2  most of the -- most of the references. I believe -- I
3  can check my document here.
4  Q.     You are now looking at a copy of your report
5  in the Bulger case?
6  A.     I am. I am looking at a copy of the Bulger
7  report. I don't think I'm going to be able to tell
8  you which ones. What we could do if you wanted is to
9  look at the general causality report since I did bring
10 a copy and compare that. I could try to remember why
11 I didn't include whatever I did not include.
12 Q.     Do you recall how many references are
13 included in your general causation report?
14 A.     I do not.
15 Q.     Are there more than 94?
16 A.     I don't remember.
17 Q.     It looks like there are approximately 126
18 references in your general causation report and 94 in
19 your Bulger report.
20         How did you define which references
21 were, I think you said, quote, unquote, pertinent to
22 the Bulger matter from your original list?
23 A.     Yeah. I didn't have a specific guideline.
24 What I did do was where I thought there was particular
25 points of references from my general causality report

**Page 26**

1 aggravation of pre-diabetic or diabetic states.
2 Q. Is he conducting any original research in
3 connection with that paper?
4 A. Yes, it's all original, that's correct.
5 Q. So he's conducting original clinical research
6 such as a randomized controlled clinic study?
7 A. It's not a randomized controlled clinical
8 study. It is a meta-analysis of the psychiatric
9 literature spanning a period from approximately 1905
10 to 1955.
11 Q. He's actually doing a review of the
12 literature, right?
13 A. Well, there's also a significant amount of
14 analysis of fasting blood glucoses and a re-analysis
15 of all of the data, so it's not just a research
16 literature review.
17 Q. And are you co-authoring that paper with him?
18 A. Yes, I am.
19 Q. Why did Wendy Crane leave the employ of
20 Kruszewski and Associates?
21 A. I didn't have enough work for her to keep her
22 at the time so she was laid off.
23 Q. Did you replace her?
24 A. She is currently replaced, yes.
25 Q. Who is that person, that replaced Wendy

**Page 27**

1 Crane?
2 A. Two people are working on her function at the
3 moment. One who is at her desk is a young man named
4 Jerry Angelo.
5 Q. And the other?
6 A. Elizabeth Bradwin, sorry.
7 Q. They perform administrative secretarial
8 function at Kruszewski and Associates?
9 A. They do, yes.
10 Q. Anything else?
11 A. That's it.
12 Q. Has Dr. Paczynski read any of the medical
13 file in the Bulger case?
14 A. No.
15 Q. You testified in March of this year in the
16 Bertetto matter which involved the prescription
17 medication bupropion?
18 A. That's correct.
19 Q. That bupropion caused suicidal thinking and
20 suicide behavior, correct?
21 A. Yes.
22 Q. You also testified that you thought it was
23 important in that case to meet with the family
24 members, correct?
25 A. I did.

**Page 28**

1 Q. And you did meet with the family members in
2 that case, correct?
3 A. Yes, I did.
4 Q. Did you meet with any of the family members
5 in the Bulger case?
6 A. I did not.
7 Q. Did you speak with any of them on the
8 telephone?
9 A. No.
10 Q. Did you conduct to any extent what has been
11 referred generally -- although it may differ from
12 person to person -- as a psychological autopsy in the
13 Bulger case?
14 A. Did I conduct one?
15 Q. Yes, did you?
16 A. Only to the extent that I reviewed Dr.
17 Maris's psychological autopsy and for the purposes of
18 any report where I have been asked to review all of
19 the medical records where someone has been injured or
20 someone has psychiatric issues as a potential result
21 of the medication or as a suicide or homicide, then I
22 conduct my own psychological autopsy. I do not
23 however do it in the discriminating analytic way that
24 Dr. Maris does it.
25 Q. So you yourself did not conduct a

**Page 29**

1 psychological autopsy in this case, you relied on Dr.
2 Maris's psychological autopsy?
3         MR. FROMSON: Objection as to the
4 form. Again it goes to how you define what
5 psychological autopsy is.
6 Q. Did you call up any family members in the
7 Bulger case?
8 A. No, but --
9 Q. Did you interview any family members in the
10 Bulger case?
11 A. No.
12 Q. Did you talk to any fact witnesses whose
13 depositions were taken in the Bulger case?
14 A. I did not review depositions. I did not talk
15 to anybody who gave them.
16 Q. Did you do any kind of follow-up after you
17 read the depositions in the Bulger case to contact and
18 conduct interviews of any witness whose deposition you
19 read?
20 A. I did not.
21 Q. Did you use a psychological autopsy form
22 prepared by Dr. Maris to conduct your own
23 psychological autopsy?
24 A. No. I did not. As I would just be repeating
25 my psychological autopsy. It's not a specific

8 (Pages 26 to 29)

### Page 30

1 itemized survey or analysis. It is however a
2 comprehensive review of the medical records in this
3 case, deposition transcripts in this case of the North
4 Shore ambulance reports of the Peabody Police
5 Department and the Massachusetts State Police of the
6 death certificate of the forensic toxicology reports,
7 and all of the other data I already enumerated in my
8 specific Bulger causality report.
9 Q. You looked at medical records in the Bulger
10 case, correct?
11 A. Correct.
12 Q. You looked at the depositions in the Bulger
13 case, is that correct?
14 A. That's correct.
15 Q. You looked at any other records you got from
16 the Finkelstein law firm in the Bulger case, correct?
17 A. Correct.
18 Q. And that's what you are calling a
19 psychological autopsy?
20 A. Yes.
21 Q. And your review of all those materials were
22 to prepare to give your opinions and testimony in
23 litigation in the Bulger case, correct?
24 A. Yes. I elaborated and enumerated all of the
25 specific items, and what I relied upon was what I used

### Page 31

1 to make my conclusions.
2 Q. Sure. We will get to that. Did you not
3 think it was important to personally interview or talk
4 with Mr. Bulger?
5 A. I don't think I thought it was important or
6 unimportant. I already had his -- the information, I
7 already had his deposition in this case, and I had the
8 information that was how other people saw him, James
9 Gibbon and Linda Landry and people who apparently knew
10 him.
11 Q. Well, Mr. Bulger is the plaintiff in this
12 case alleging that Susan Bulger's suicide was caused
13 by Neurontin, correct?
14 A. That's correct.
15 Q. And you didn't think it was important to
16 contact him yourself and interview him to understand
17 why Susan Bulger committed suicide, correct?
18 A. Well, I believe I had that information.
19 Q. Well, you had what was in his deposition --
20   MR. FROMSON: Let him finish his
21 answer, please.
22 Q. You had what was in his deposition, correct?
23   MR. FROMSON: Would you let him
24 finish his answer, please.
25   Dr. Kruszewski, did you finish your

### Page 32

1 answer before?
2   (The reporter read the referred-to
3 portion of the record.)
4 A. As I said, I didn't believe it was important
5 or not important because I don't think I spent a lot
6 of time thinking about it.
7 Q. You just didn't do it?
8   MR. FROMSON: Would you please let
9 him finish his answer before you cut him off?
10   MS. McGRODER: I just want him to
11 answer my question, Ken, or we are going to stretch
12 this deposition to three days.
13   MR. FROMSON: If we don't stop for
14 coffee breaks --
15   MS. McGRODER: -- answer the
16 question I ask.
17   MR. FROMSON: Did you finish your
18 answer, Dr. Kruszewski?
19   THE WITNESS: I don't think I did.
20   MR. FROMSON: Please complete your
21 answer.
22 A. The answer is again I did not interview Ron
23 Bulger, Sr., nor Jr., and I don't believe I thought it
24 was unimportant or important to do that. I do believe
25 I had ample information from his own testimony in this

### Page 33

1 case already.
2   I also believe my involvement in
3 this case started after July of 2008 so there was also
4 a time limitation.
5 Q. You were not asked to prepare an opinion in
6 the Bulger matter until July of 2008?
7 A. That's correct.
8 Q. The first time you looked at any records or
9 materials in connection with the Bulger case was after
10 July of 2008?
11   MR. FROMSON: Objection as to form.
12 A. Yes, June or July of 2008, that's correct.
13 Q. I think you said you didn't think it was
14 important or unimportant to speak with Mr. Bulger.
15   The fact is you didn't speak with
16 Mr. Bulger, did you?
17 A. I did not.
18 Q. Did you ever even think about it, did you
19 think about calling him up?
20 A. I did not.
21 Q. Do you rely on the psychological autopsy
22 conducted by Dr. Maris for your opinions in this case?
23 A. I reviewed his opinions and I agree with
24 them. My opinions and conclusions as I have reported
25 them are my own and are also separate from his.

Page 214

1   MR. FROMSON: Objection as to form.
2   A.   There are a couple of issues here all of
3   which are obviously important. Are you asking me
4   about the decision to commit suicide?
5   Q.   Yes. Because your testimony was, when I
6   asked you what is the hallmark of a Neurontin suicide,
7   you said it's an acute or abrupt decision to commit
8   suicide.
9   A.   Yes, I believe that.
10  Q.   Good. Now I want to know what is the period
11  of acuity, how close to the suicide is the decision
12  made so I can see whether it has the hallmark of a
13  Neurontin suicide?
14       MR. FROMSON: Objection as to form.
15  A.   In the cases that I have seen or reviewed, I
16  believe that it occurs in a 24 hour period.
17  Q.   Now let's talk about those cases.
18  A.   But the important thing about that is that I
19  do also believe that that 24 hour period can occur
20  days before the suicide, before the actual behavioral
21  manifestations of the suicide?
22  Q.   So let me get this straight. The hallmark of
23  a Neurontin suicide is that it's acute or an abrupt
24  decision to commit suicide, right?
25  A.   Yes.

Page 215

1   Q.   And the acuity is as little as a -- the
2   decision is made as little as an hour before the
3   suicide or up to 24 hours before the suicide, are you
4   with me, according to your testimony?
5   A.   I am with you, yes.
6   Q.   And -- but that decision could be made in
7   advance of the actual suicide?
8   A.   Yes.
9   Q.   So would it help to talk about the cases you
10  reviewed?
11  A.   I can give you an example. I am just --
12  Q.   Here is what I want to know, how would I know
13  that's a hallmark suicide then? If I make a decision
14  nine days before the suicide to commit suicide and
15  then I don't do it until nine days later, how is --
16  how is that an acute or abrupt decision?
17  A.   Well, it's still -- the act of committing
18  suicide is still a process. And we are talking about
19  trigger functions and what gives rise to the acute or
20  impulsive decision, the cognitive intellectual
21  decision with or without emotional factors.
22  Q.   So how can I objectively determine whether
23  the decision is made acutely or abruptly, if it
24  happens in advance of the actual event of suicide?
25       How can you, Dr. Kruszewski look at

Page 216

1   a suicide and objectively determine that there was an
2   acute or abrupt decision made to commit suicide as a
3   hallmark of a Neurontin suicide?
4        MR. FROMSON: Objection as to form.
5   A.   The best answer to that is the retrospective
6   analysis. You have to use what facts are available to
7   you.
8   Q.   Let me ask you this, anytime a person takes
9   Neurontin and makes a decision to commit suicide, is
10  that an observable -- or does that demonstrate the
11  hallmark of a Neurontin suicide?
12  A.   Two things about that question. You are
13  using the word hallmark and I may have used that in
14  response to your question.
15  Q.   I understand that.
16  A.   I am not sure there's a hallmark of a
17  Neurontin suicide as I described it. I believe,
18  particularly reinforced by the cases I have known
19  about or the cases involved in this litigation, that
20  the decision to commit suicide is abrupt or acute. I
21  am using that word interchangeably right now to
22  describe the decision made within a 24 hour period.
23       Now, the behavioral manifestations
24  of carrying out that suicidal act may not occur for a
25  while.

Page 217

1   Q.   Then how do you know the decision is acute or
2   abrupt that's my question?
3   A.   You have to review the records and do again a
4   retrospective analysis.
5   Q.   What are you going to look for when you
6   review the records in your retrospective analysis,
7   what are you looking for to determine whether the
8   decision was acute or abrupt?
9   A.   Any elements of what the patient said, any
10  changes in behavior, any elements of hopelessness, any
11  elements of depression, of despondency, changes in
12  sleep, changes in eating, changes in reading material,
13  changes in libido, changes in interactions with family
14  or friends, and all of that covered with anybody who
15  has information about that individual proximate to the
16  time of the event.
17  Q.   And how do you differentiate that, the
18  description you just gave, for all of these changes
19  from a regular ole suicide when the person is not
20  taking Neurontin?
21       MR. FROMSON: Objection to form.
22  Q.   Those are the same risk factors or events
23  that occur in any suicide, correct?
24       MR. FROMSON: Objection to form.
25  A.   Yes.

### Page 270

1 downstairs?
2 A. As I said, I can only give you a reasonable
3 possibility of when and where she made the decision.
4 I don't have any specific evidence to support a belief
5 she made the decision before she asked for the
6 Neurontin pills. As a matter of fact, most of what
7 happened before that period is unknown to me.
8     And I am just making a supposition
9 here that she asked for the pills, she went
10 downstairs, that something likely happened at that
11 point because an hour later roughly we knew she was
12 dead.
13 Q. I want to make sure I understand this.
14 A. Yes.
15 Q. Is your opinion that she made the decision
16 after she went downstairs because that's when she took
17 the Neurontin, or is your opinion that you don't know,
18 you don't know when she made the decision?
19 A. More of the latter. My opinion is I don't
20 specifically know when she made the decision.
21 Q. Is it possible she made the decision a week
22 before?
23 A. There's no evidence to support that.
24 Q. Is it possible she made the decision a month
25 before?

### Page 271

1 A. Again, there's no evidence to support that.
2 The best we have from the retrospective review was
3 that she was alive, she was planning to move away from
4 her husband, she was excited about ▇▇▇▇ her child
5 in her house. As far as we know things at least were
6 quiescence at home between her and Ron Bulger.
7 Q. Things were what at home?
8 A. Quiescent, Q-U-I-E-S-C-E-N-T.
9 Q. What do you mean by quiescent?
10 A. They have had a marriage with significant
11 marital problems and strife in the past, but at that
12 moment and those days before her death we don't have
13 any acute events that have occurred to otherwise
14 suggest that something had happened a week ago or two
15 days earlier between her and her husband.
16 Q. What about on that day, do we have any
17 evidence of anything happening between her and Ron on
18 that day that might have led to her decision to commit
19 suicide?
20 A. I don't recall that as I sit here.
21 Q. What evidence do you have that she made the
22 decision to commit suicide after she went downstairs
23 as opposed to before she went downstairs?
24 A. As I said just supposition on my part.
25 Q. By supposition, do you mean speculation?

### Page 272

1 A. It is speculation. The decision on
2 speculating, supposing that somewhere after she
3 received the four Neurontin tablets, which she
4 normally took at night, that the acute, abrupt,
5 impulsive, unplanned decision to end her life
6 occurred.
7     MS. McGRODER: Let's take a short
8 break.
9     THE OPERATOR: We are going off the
10 record. The time is 4:10.
11     (Brief recess was had.)
12     THE OPERATOR: We are on the record.
13 The time is 4:25 p.m. This is the beginning of tape
14 number seven.
15 MS. McGRODER:
16 Q. What was Susan Bulger's active serotonin
17 level in her brain at the time she committed suicide?
18 A. I have no idea.
19 Q. You don't know?
20 A. No.
21 Q. What was her GABA level at the time she
22 committed suicide?
23 A. Not measured and I have no clue.
24 Q. You have no way to determine whether she
25 actually had an increased level of GABA in her brain,

### Page 273

1 do you?
2 A. No.
3 Q. You have no way to determine whether she
4 actually had a reduced level of serotonin, do you?
5 A. I do not.
6 Q. What is the dose of Neurontin required to
7 induce suicidality in any patient?
8 A. I don't believe the specific dose is known.
9 The best evidence we have of the enhanced GABAergic
10 effects of a dose of Neurontin is that it can occur
11 within one hour after ingestion.
12 Q. Are you relying on the Petrof study for that
13 statement?
14 A. Petrof and Kuzniecky studies, yes.
15 Q. The Kuzniecky study is not in human beings,
16 is it?
17 A. No. Kuzniecky is K-U-Z-N-I-E-C-K-Y.
18 Q. When you say the best evidence we have, who
19 is we? Is we you and Dr. Trimble and Dr. Blume?
20 A. No.
21 Q. Who is we?
22 A. I guess the best evidence that I have is
23 evidence I already reported in my general causality
24 report, that after a single dose of gabapentin you can
25 increase cortical levels of GABA up to forty percent.

69 (Pages 270 to 273)

**Page 326**

1  Q. And do you know when she was prescribed or
2  took 300 milligrams, for what period of time?
3  A. Sometime in the period from '99 to 2003.
4  Q. Were you aware that in August of 2003 Ms.
5  Bulger's records show that she was taking Lexapro in
6  combination with Neurontin 300 milligrams at bedtime
7  and it seemed to be improving her mood stability, did
8  you read that in the records?
9  A. Yes.
10 Q. And were you aware that she reported or the
11 doctor observed her feeling less depressed and
12 anxious, feels more even?
13 A. Yes, I believe that may be in my report as
14 well.
15 Q. And that's while she is on Neurontin?
16 A. Yes.
17 Q. And it also -- the record also states in
18 August of 2003, August 11, 2003, that she has -- she's
19 having no significant side effects, Neurontin is also
20 helping her sleep better, you were aware of that,
21 correct?
22 A. Yes.
23 Q. Did you factor that into your opinion in this
24 case, that Neurontin was the cause of her suicide?
25 A. I did factor it in. I testified earlier

**Page 327**

1  today that -- of the beneficial effects that she
2  previously experienced from Neurontin.
3       Sleep benefit and elevation of mood
4  were two of the three that I think I reported earlier,
5  and it was as well in my report that she experienced
6  beneficial effects of the Neurontin before Neurontin
7  precipitously caused her suicide in August of 2004.
8  Q. Is it your opinion in this case that
9  Neurontin precipitously caused her suicide, that she
10 took it and had some benefits from it and then at one
11 point it just precipitated her suicide?
12 A. In this case, yes.
13 Q. And at what point did it precipitate her
14 suicide, was that the night of her suicide?
15 A. That was the precipitating event. The fact
16 she had been on Neurontin prior to that time may have
17 also aggravated her condition.
18 Q. Is there any evidence observable from the
19 record that Neurontin aggravated her condition apart
20 from the things we have just discussed in terms of her
21 report of feeling out of it and moody on Neurontin and
22 then also the reports by Ron of her depression in the
23 spring of 2002?
24 A. I believe we covered them from at least Dr.
25 Crognale's position.

**Page 328**

1  Q. And I just want to make sure I understand, if
2  you don't know, that's fine, you don't know. But at
3  what point did Neurontin precipitously cause her
4  suicide?
5  A. I don't know the specific moment. What I am
6  aware of is that she was taking the Neurontin, and she
7  took apparently four 300 milligrams capsules at
8  approximately 6 p.m. on the night she committed
9  suicide and was dead roughly an hour to an hour and a
10 half later.
11 Q. But my question is at what point in your
12 opinion did Neurontin precipitously -- excuse me,
13 precipitously cause her suicide, was it after she took
14 the four Neurontin that night or some other time?
15 A. I don't think that I know the answer to that.
16 Q. You don't have an opinion?
17 A. I have an opinion only on what I just said,
18 that the Neurontin that she took at roughly 6 p.m. on
19 the night of her death was the responsible
20 precipitating event to push her over the edge and
21 cause her to commit suicide.
22 Q. Why, Dr. Kruszewski, did her ingestion of
23 Neurontin for the two years leading up to that not
24 precipitously cause her suicide at any earlier time?
25      MR. FROMSON: Objection as to form.

**Page 329**

1  A. Like a lot of other drugs, Neurontin is not
2  dissimilar, that people can get beneficial effects at
3  certain points in their life and adverse effects at
4  other points, and sometimes they can experience both
5  of those together.
6       So as I have already stated in my
7  general causality report and I had briefly elaborated
8  here, Mrs. Bulger had beneficial effects from
9  Neurontin. She had adverse experiences from
10 Neurontin. And we know from evidence, including the
11 evidence from the FDA, for example, that Neurontin can
12 increase the risk of suicide.
13      See we have an inciting agent. Why
14 that may not happen at other times is absolutely pure
15 speculation. A person -- and for example and this is
16 probably a good place for me to elaborate about the
17 anti-depressants --
18 Q. I didn't ask about anti-depressants. I'm
19 sorry, we don't have time for you to elaborate on
20 those?
21      Let's just stick to Neurontin at
22 this point, all right?
23 A. Yes.
24 Q. So is the answer -- first of all, I object
25 and move to strike the references to the FDA alert

**330**

1  showing an association.
2        Is your answer to my question about
3  why she -- why Neurontin did not at any time before
4  the night of her suicide precipitously cause her to
5  commit suicide that you don't know?
6  A.    I don't know. It's a retrospective analysis
7  of what happened in the terms of causal factors, risk
8  factors associated with the actual act.
9        She had not committed suicide
10 before. Why she did not commit suicide, I have no
11 idea.
12 Q.    In order for you to explain why the Neurontin
13 never before until that night caused her to commit
14 suicide, you would be speculating, correct?
15 A.    I'm sorry, you have to repeat that.
16 Q.    In order for you to explain why the two plus
17 years prior to her suicide that she took Neurontin did
18 not result in a precipitous suicide, you would be
19 speculating, is that correct?
20       MR. FROMSON: Objection as to form.
21 A.    It's not speculating that she did not commit
22 suicide, we know that.
23 Q.    Right.
24 A.    We know that Neurontin, like a lot of other
25 drugs, anti-seizure drugs, anti-psychotics,

**331**

1  anti-depressants can at times cause suicidal behavior
2  as well as completed suicide.
3        No one has the answer to the
4  question that you are asking, including me.
5        MS. McGRODER: Object, to strike
6  everything except the last sentence, no one has the
7  answer to the question that you are asking me,
8  including me.
9  Q.    I want to talk to you briefly about Mrs.
10 Bulger's reports of depression prior to December
11 of '99 when she first ingested Neurontin, okay?
12 A.    Yes.
13 Q.    Do you have that period in mind?
14 A.    Yes.
15 Q.    During the time period prior to December
16 of '99, do you agree that Miss Bulger attempted
17 suicide on at least four occasions, correct?
18 A.    Incorrect.
19 Q.    Why do you say that's incorrect?
20 A.    The evidence that I reviewed is questionable
21 about whether she intended to actually hurt herself.
22 So -- and the evidence from the medical records is
23 also questionable.
24       We know that she drove off a cliff
25 at some point, and she may have been intoxicated, may

**332**

1  have been involved in youthful frivolity, who knows.
2  Q.    Is it your testimony that when Miss Bulger
3  drove off a cliff she was involved in youthful
4  frivolity?
5  A.    I don't know what she was involved in.
6  Q.    You don't have any basis for that statement
7  at all, do you?
8  A.    I will give you the basis. The basis is
9  there's conflicting testimony about what that meant.
10 As I sit here today, I don't know if it was Linda
11 Landry or James Gibbon who stated in, I believe, their
12 deposition that they are not really sure that that was
13 indeed a suicide attempt.
14       There was also evidence that her
15 previous slashing of wrists or overdosing may or may
16 not have been suicide attempts.
17 Q.    Do you believe that prior to December of '99
18 Miss Bulger had any suicide attempts, or is it your
19 testimony she had no suicide attempts prior to
20 December of '99?
21 A.    Here is what I did, which is totally
22 consistent with what I just said. I believed she had
23 -- all those represent suicide attempts.
24       There is, however, conflicting
25 evidence and would take time to conclude that. But

**333**

1  when I looked at all the evidence in this report, we
2  know that those were not completed suicides because
3  she continued to live. We know that she took --
4  overdosed, we know she was treated psychiatrically
5  starting in I believe '98 in Salem Hospital.
6        We know she had a long history of
7  psychiatric treatment, drug and alcohol treatment, and
8  my opinion about those suicide attempts is in fact I
9  treated them as suicide attempts --
10 Q.    Thank you.
11 A.    -- including running her car off the cliff.
12 Whether in fact any of those were suicide attempts,
13 there's evidence that's conflicting.
14 Q.    For purposes of your opinion in this case you
15 assumed they were, correct?
16 A.    I assumed they were, yes.
17 Q.    Were you aware that Miss Bulger reported to
18 the Brigham & Women's Hospital in March of '93, I am
19 always depressed because this disease has taken the
20 life right out of me.
21       Do you recall that statement in her
22 medical record?
23 A.    I do, yes.
24 Q.    She was not on Neurontin in '93, correct?
25 A.    She was not until '99.

84 (Pages 330 to 333)

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 2
    RONALD J. BULGER, SR.,      :  NO.
 3  as Administrator of         :  07-CA-11426-PBS
    the Estate of               :
 4  SUSAN BULGER,               :
    Deceased,                   :
 5           Plaintiff          :
         vs.                    :
 6  PFIZER, INC., et al.,       :
             Defendants         :
 7                              :

 8            VIDEOTAPE DEPOSITION OF

 9         STEFAN P. KRUSZEWSKI, M.D.

10          VOLUME II, (Page 345-699)

11

12            Taken in the Harrisburg

13  Hilton, located at 1 North Second Street,

14  Harrisburg, Pennsylvania, on Thursday,

15  October 16, 2008, commencing at

16  8:42 a.m., before Linda Beyerle, Court

17  Reporter.

18
    APPEARANCES:
19
        FINKELSTEIN & PARTNERS, L.L.P.
20      BY:  KENNETH FROMSON, ESQ.
        785 Broadway, 3rd Floor
21      Kingston, NY  12401
          -- For the Plaintiff
22
                   *  *  *
23

24

25
```

**Page 346**

```
 1  APPEARANCES: (Continued)
 2
    SHOOK, HARDY & BACON, L.L.P.
 3  BY: LORI McGRODER, ESQ.
        LORI SCHULTZ, ESQ.
 4      JENNIFER M. STEVENSON, ESQ.
    2555 Grand Boulevard
 5  Kansas City, MO 64108
    -- For Defendants
```

**Page 347**

INDEX TO WITNESSES

| WITNESS | PAGE |
|---|---|
| STEFAN P. KRUSZEWSKI, M.D. | |
| By Ms. McGroder | 348 |
| By Ms. Schultz | 415 |

INDEX TO EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE MARKED |
|---|---|---|
| EXHIBIT 6 | Billing records | 350 |
| EXHIBIT 7 | 8/21/08 memo | 412 |
| EXHIBIT 8 | CAB Medical history form | 431 |
| EXHIBIT 9 | Affidavit from R. Bulger | 450 |
| EXHIBIT 10 | Motion for custody | 459 |
| EXHIBIT 11 | Affidavit from R. Bulger | 467 |
| EXHIBIT 12 | Intake evaluation | 490 |
| EXHIBIT 13 | Neurology consultation | 505 |
| EXHIBIT 14 | Deposition testimony | 643 |

\* \* \*

**Page 348**

 1  THE VIDEOGRAPHER: We're on
 2  the record. The time is 8:42 a.m. My
 3  name is Robert Cowalchik of Veritext
 4  Corporate Services. The date today is
 5  October 16th, 2008. This deposition is
 6  being held in the Harrisburg Hilton,
 7  located at 1 North Second Street,
 8  Harrisburg, Pennsylvania.
 9      The caption of this case is
10  In Re: Neurontin Marketing Sales
11  Practices and Products Liability
12  Litigation, in the United States District
13  Court, District of Massachusetts, MDL
14  Docket Number 1629. This document
15  relates to Bulger v. Pfizer, Inc., et
16  al., Case Number 05-CV-11515-PVS.
17      The name of the witness is
18  Stefan P. Kruszewski, and this is Volume
19  2 of this deposition.
20      At this time, Linda Beyerle
21  of Veritext Corporate Services will swear
22  in the witness and we can proceed.
23      (Witness has been previously
24  sworn.)
25  BY MS. McGRODER:

**Page 349**

 1  Q.  Good morning, Dr. Kruszewski. How are
 2  you?
 3  A.  Good morning. I'm good. Thank you.
 4  Q.  Just a small administrative item
 5  before we get to the substance this morning.
 6      These are the billing records
 7  that you brought in response to the
 8  deposition notice, correct?
 9  A.  That's correct.
10  Q.  And they span from 2004 to 2008?
11  A.  I believe so.
12  Q.  And they're current up through --
13  A.  I think they're current through the
14  end of September.
15  Q.  Okay. Would that be right? Is that a
16  September bill?
17  A.  That was September, yes.
18  Q.  Okay. And I would like to mark these
19  for the record.
20      Are these extra copies that you
21  brought that we can mark or do you need us
22  to make copies of these for you?
23  A.  I don't know the answer to that.
24  Q.  Well, we'll mark the whole file right
25  now as Exhibit 6.

2 (Pages 346 to 349)

354

publications from the British Medical Journal, because I rely on that publication often, and I believe there had been a citation in there which brought me to the Naranjo criteria, which I thought were just simple and easy to use.
Q. And so maybe I just didn't understand your answer.
So in what context were you first looking for those criteria? In part litigation, in part something else?
A. Yes. As I said, it was not litigation initially. In the context of the writing that I do in publishing, I just wanted to see what quantitative method was out in the published literature to determine causal relationships between an event and a side effect.
Q. And what were you writing at the time? Was that one of your articles on conflict of interest or --
A. Yes, it was one of those articles. And I'm not sure that this is it, but there were a couple letters I had submitted where I was critical of at least two publications

355

in the American Journal of Psychiatry, and I believe it was in the preparation for the submission of those that I evaluated the criteria.
Q. And in connection with what prescription medication?
A. I don't think there was any prescription medicine at the time. I know one of the articles we are talking about and, again, this is just estimating here and supposing, was about Citalopram, C-I-T-A-L-O-P-R-A-M, an SSRI antidepressant.
Q. And were you trying to determine whether a certain adverse event was caused by Citalopram so that you could publish a letter to the editor on that?
A. Well, I didn't use that in the publication. I just was looking in general to quantify risks associated with adverse events and causality.
Q. What adverse event were you looking at?
A. Again, I don't know what specific adverse event. I wanted to see what was in the literature.

356

The British Medical Journal, I would say about three years ago, had published a very brief either letter or report that one could determine causality from a single event and a single case report. I thought that was unusual and difficult to believe, because it just didn't quantitate any of the measures, so I wanted to see again what was in the literature.
Q. Do you think the -- well, sorry, I call it Naranjo.
Do you think the Naranjo scale --
A. It probably is a silent J.
Q. Do you think it can be used to determine on a single case report that a drug can cause an event in general?
MR. FROMSON: Objection as to form.
THE WITNESS: I do not. I believe only that it can be helpful in the overall evaluation of adverse events.
BY MS. McGRODER:
Q. Do you believe that -- well, I take it from your answer you don't believe that the

357

Naranjo scale can be used to determine causality specifically in a specific individual, either, do you?
MR. FROMSON: Objection to form.
THE WITNESS: The causality of an adverse event in a specific individual?
BY MS. McGRODER:
Q. Yes.
A. My answer is I don't. It's only a helpful gauge, along with other information available on any specific case.
N-A-R-A-N-J-O. That's...
Q. In any peer review-published literature that you've seen, has the Naranjo scale ever been endorsed as a method to determine specific causation, that is, whether an adverse event was caused by a prescription medication in an individual?
MR. FROMSON: Objection to form.
THE WITNESS: Read that back to me, if you would.
(The record was read as

**Page 358**

1  requested.)
2      THE WITNESS: I am not sure I
3  can answer that. I'm not sure if it's
4  been endorsed. It's been cited. And as
5  much as citation represents an
6  endorsement, yes. But, again, even if it
7  has or hasn't, I only use it as a
8  guidepost, the same way I use
9  Bradford Hill criteria.
10 BY MS. McGRODER:
11 Q.   When you say as a guidepost, do you
12 just mean one factor that influences your
13 decision about whether a drug can cause an
14 event?
15 A.   That's correct.
16 Q.   Has it -- have the Naranjo criteria --
17 well, strike that.
18      Can you cite for me any peer
19 reviewed-published literature stating that
20 the Naranjo scale is an appropriate
21 methodology for assessing whether a suicide
22 was caused by a prescription drug?
23 A.   I don't believe that that exists. And
24 I say that with some amount of certainty
25 because the scale, in my opinion, is usually

**Page 359**

1  used to confirm specific adverse
2  pharmaceutical events that don't necessarily
3  have behavioral manifestations.
4      I did reference in my report a
5  partial citation where someone -- and I
6  don't remember the author -- is saying that
7  you possibly can use this criteria for
8  behavioral events. Let me finish the
9  sentence.
10 Q.   Sure. Can you show me where that is
11 in your report? I'm looking at page 29.
12 A.   Yes.
13 Q.   And is that the part of your report
14 that you're referring to?
15 A.   Yes. I think that -- hold on a
16 second.
17      No. Perhaps I didn't cite it.
18 I was aware of it and I have it in the -- in
19 a behavioral health -- and I see what I did
20 here now. I complained that it's not
21 usually used in a behavioral health context.
22      I do have a publication, I do
23 not know if it's peer reviewed, which says
24 that it might be helpful and be useable in
25 behavioral health situations, and all I did

**Page 360**

1  was describe it.
2  Q.   Can you tell me what that publication
3  is?
4  A.   I can't. I can supply it to you, but
5  I don't remember the reference here. I
6  thought I put it in here.
7  Q.   Do you disagree with it?
8  A.   Disagree with the --
9  Q.   With the publication that suggests you
10 could use the Naranjo scale to evaluate
11 whether a behavioral event is caused by a
12 prescription drug.
13 A.   No. I agreed with it. I believe that
14 you can use those questions and accommodate
15 them for a behavioral event. But, again,
16 it's only a guidepost.
17 Q.   But it's true you can't cite to me any
18 peer-reviewed published literature saying
19 that the Naranjo scale is a good method for
20 evaluating whether a suicide is caused by a
21 prescription drug, correct?
22 A.   That's correct, and I don't believe
23 that that exists.
24 Q.   When you say in your report on page
25 29 -- and I'm referring to that paragraph

**Page 361**

1  under the citation to dermatology.
2  A.   Yes.
3  Q.   You have a parenthetical there that
4  says with the assumption that an adverse
5  reaction to a drug may differ from an
6  adverse behavioral response to a medication.
7      Is that -- is what we've just
8  been discussing what you're referring to
9  there?
10 A.   It is.
11 Q.   So did you assume on the basis of the
12 article that you're unable to cite to me
13 right now that it's okay to apply the
14 Naranjo scale to a behavioral event?
15 A.   I said that I am applying it, and I
16 think that it can be applicable as a
17 guidepost because it describes specific
18 reactions to an adverse event from a
19 pharmaceutical agent, for example. And the
20 extrapolation is not a difficult one to
21 make.
22 Q.   It's really important to me to see
23 that article.
24 A.   Sure.
25 Q.   So if you can at any time today think

5 (Pages 358 to 361)

**Page 362**

1 of the author of that article or where it's
2 published and provide that information, that
3 would be very helpful, or we can follow up
4 after the deposition, too. Okay?
5 A. We might actually be able to find it
6 on -- I didn't bring my computer, but
7 online. I mean, that's how --
8 Q. How did you search for it?
9 A. I think I put in Naranjo and
10 behavioral health, something like that, or
11 Naranjo and mental health reaction,
12 something like that.
13 Q. Okay.
14 A. Do you want me to keep a list of that
15 request or will you make a formal request?
16 Q. Sure, I can follow up with
17 Mr. Fromson. Thank you.
18 A. Okay.
19 Q. You also say on page 29 that the score
20 that you give places the adverse event of
21 suicide from Neurontin for Mrs. Bulger in
22 the mid range of a probable causative
23 association, correct? Do you see that?
24 A. That's correct.
25 Q. Was the adverse event that you

**Page 363**

1 analyzed in your Naranjo scale suicide?
2 A. Yes.
3 Q. And you used the adverse event of
4 suicide consistently in response to every
5 one of the ten questions?
6 A. Where it was applicable. That's what
7 I supplied to you on page 28.
8 Q. So in places where you say N/A, that
9 just means that suicide didn't fit in your
10 mind?
11 A. Or the question wasn't appropriate.
12 Like question number 7, did the
13 reaction appear when a placebo was given, it
14 just has no relevance to what we're talking
15 about.
16 Q. And just briefly -- well, let me ask
17 you this: Is there any peer-reviewed
18 publication that states it is appropriate to
19 use the Naranjo scale outside the context of
20 a placebo-controlled clinical trial?
21 A. I don't know the answer to that.
22 Q. Did you look?
23 A. I did not look.
24 Q. You numbered these differently from in
25 the original Naranjo article. Your

**Page 364**

1 questions are numbered differently. Were
2 you aware of that?
3 A. You know, I've seen them numbered
4 differently, so it would not surprise me.
5 Q. Okay. I wanted to ask you that.
6     Did you review the original
7 Naranjo article, or did you rely on this
8 article in dermatology?
9 A. I did review on the original Naranjo
10 article, and I took this, however, from the
11 dermatology citation.
12 Q. Why did you not use the scale as
13 presented in the original Naranjo article?
14 A. I don't know.
15 Q. Okay. Did you also review and apply
16 the instructions for the Naranjo scale that
17 are attached as an appendix to the original
18 Naranjo article in 1981?
19 A. I don't remember that I did or didn't
20 do that.
21 Q. Do you remember reviewing the appendix
22 to the original 1981 Naranjo article?
23 A. I believe that I did, but as I sit
24 here today, I just can't remember.
25 Q. So it's your testimony you don't know

**Page 365**

1 one way or the other whether you followed
2 the instructions in the original Naranjo
3 publication or --
4 A. That's true. Since it was an
5 adaptation, and clearly I stated it was
6 going to be an adaptation, it was just a
7 quantitative tool to support other
8 information in the report.
9 Q. So it would be fair to say you didn't
10 follow the letter of the law in terms of the
11 instructions provided by Naranjo in the
12 appendix to the original article?
13 A. Right. And I couldn't have. You
14 know, what I had read about Naranjo is that
15 if somebody takes Accutane and develops
16 erythema multiforme, or something like that,
17 a significant skin reaction, and then the
18 drug is withdrawn and the person is
19 rechallenged and rechallenged with a
20 placebo, that's going to fit exactly the
21 Naranjo criteria. What I'm describing does
22 not.
23     However, there is a citation,
24 and I can provide it to you, about its
25 possible usefulness in behavioral health

6 (Pages 362 to 365)

366

1  reactions.
2  Q.  Okay. And I would like to see that
3  when you think of it.
4      Is the difference that with a
5  skin reaction, as you described, that's an
6  observable, objective sign of a reaction
7  that you can't really get with a behavioral
8  effect?
9  A.  As you know, the retrospective and
10 prospective analysis of determination of
11 suicidality and even homicidality is always
12 subjective.
13 Q.  So you agree with my statement?
14 A.  I do.
15 Q.  You described yesterday a couple of
16 suicide events, one a completed and one a
17 suicide attempt in individuals whose medical
18 records you were reviewing in the context of
19 Capital Blue Cross or some another analysis
20 outside the context of litigation, correct?
21 Do you remember that?
22 A.  Yes.
23 Q.  I wanted to ask you, did you in your
24 analysis with respect to those two
25 individuals, one who committed suicide and

367

1  one who attempted suicide, did you use the
2  Naranjo scale to analyze whether any
3  prescription medication had any causal
4  attribution to those events?
5      MR. FROMSON: Objection,
6  form.
7      THE WITNESS: No.
8  BY MS. McGRODER:
9  Q.  Have you ever in a clinical setting
10 used the Naranjo scale to determine whether
11 an adverse event experienced by any one of
12 your patients was caused by a prescription
13 medication?
14 A.  I used it twice that I can recall.
15 Once -- do you want me to continue?
16 Q.  Sure. Yes.
17 A.  Once was a young woman I treated
18 probably a year ago, who was -- I think she
19 was 21 at that time, and she had a number of
20 psychiatric problems for which I
21 prescribed -- one of the medicines was
22 Depakote or valproic acid. And she
23 experienced significant hair loss.
24     And then we stopped the drug,
25 and she experienced a relapse of some of her

368

1  symptomatology, including -- she
2  mutilated -- self-mutilated herself, along
3  with her affective disorder. And I just
4  wanted to see how this would apply. And so
5  it applied pretty well, because we restarted
6  the drug and eventually I had to treat her
7  with something else because her hair loss
8  started again after the drug was
9  reinitiated.
10 Q.  So that's a bit of just a
11 dechallenge/rechallenge analysis, correct?
12 A.  Yes.
13 Q.  Did you actually get out the scale and
14 rate her and score her using the Naranjo
15 scale or did you just do the
16 dechallenge/rechallenge?
17 A.  I think in her case, I actually put
18 the scale in her chart.
19 Q.  With a score?
20 A.  Yes. And I can only think of two
21 times when I did that.
22 Q.  Did you discuss with her your scoring
23 mechanism?
24 A.  I don't think I did.
25 Q.  Are you aware of any Board certified

369

1  psychiatrist who routinely or regularly
2  applies the Naranjo scale in clinical
3  practice to determine whether adverse events
4  experienced in that patient population have
5  any causal association with a prescription
6  medication?
7  A.  I do not.
8  Q.  One of the criteria -- or one of the
9  questions in the Naranjo scale is, are there
10 any other nondrug causes, right?
11 A.  Right.
12 Q.  And I think in this instance with
13 Mr. Bulger you said yes, there are, right?
14 A.  Yes, I did.
15 Q.  Can you just list for me what the
16 nondrug causes are that you considered when
17 you answered that question?
18     MR. FROMSON: Objection as to
19 form.
20     THE WITNESS: Yes. If I
21 could use my report to help answer that.
22     The considerations that I
23 used as other risk factors or other
24 explanations or contributing factors for
25 Mrs. Bulger's suicide included her

7 (Pages 366 to 369)

Page 370

history of — I'm taking this exactly from page 12.

BY MS. McGRODER:

Q. Okay. We'll — okay. Go ahead. We will just try to keep it quick.

A. Yes. Her purported history of emotional trauma as a youngster, her absent or negative parenting — we discussed that yesterday — from her schizophrenic mother and absent father, her placement in foster care, the placement of her son in foster care when he was in 5th and 6th grade because of her substance use, her substance use, her rheumatoid arthritis, which she had for a very long time, other medical problems which we've described, most of which have relationships to her diagnosis of RA, her history of chronic pain, history of marital problems, history of financial problems, her history of depression, anxiety and posttraumatic stress.

I did not list, by the way, bipolar disorder only because there was too much conflicted evidence in the record about whether indeed she was or was not bipolar.

Page 371

Q. What about borderline personality disorder? Did you identify that on page 12?

A. I did not identify that, I believe, on page 12.

Q. Is that something you considered as an alternative explanation for her suicide when you answered question — the question in the Naranjo scale? You have it listed as question 6 in your scale.

A. Yes. I just want to check something on this first — page 7 and 8.

I don't remember putting personality disorder in here. I know that you mentioned it a number of times, and we talked yesterday a lot about borderline, and I mentioned a lot about histrionic personality disorder.

I don't remember reviewing enough evidence that indeed she had a personality disorder, but in retrospect, it would not surprise me.

Q. Is that something you would add to your list?

A. I probably would, yes.

Q. Anything else we talked about

Page 372

yesterday in terms of alternative explanations for her suicide that you would add to that list besides borderline personality disorder and — well, is bipolar disorder something that you would add to the list as an alternative explanation?

A. I would not add bipolar. It wasn't — for a couple of reasons. It's been mentioned in the literature. It's been denied — it's mentioned in the medical records. It's opposed in the medical records. And for a person, particularly from my view and my specialty as an addictionologist, is that she had a long-term career of using cocaine and opiates. And the expectation for me is that someone who has that significantly in their background has by definition mood swings as a result.

So a non-addictionologist would more likely make the diagnosis of bipolar. But, in fact, the APA DSM-4 TR criteria say that you can't make the diagnosis of bipolar disorder without considering and eliminating the background of substance abuse.

Page 373

MS. McGRODER: Let's go off the record for a second.

THE VIDEOGRAPHER: We're going off the record. The time is 9:10 a.m.

(A brief recess was taken at this time.)

THE VIDEOGRAPHER: We are on the record. The time is 9:14 a.m.

BY MS. McGRODER:

Q. Dr. Kruszewski, are you aware that the instructions for application of the Naranjo scale state that you should apply the scale to every prescription medication that the clinical trial subject is on at the time of the adverse event in order to evaluate and compare each?

A. Yes.

Q. Okay. Did you apply the Naranjo scale in this context — I recognize we are in the context of litigation and not a controlled clinical study. But did you apply the Naranjo scale to the other medications that you believe she was on at the time of her death?

8 (Pages 370 to 373)

**374**

1  A.  I did not.
2  Q.  Okay. And so you don't have scores,
3  for example, for --
4  A.  Effexor.
5  Q.  -- Effexor, correct?
6  A.  Correct.
7  Q.  And you don't have a scale for
8  OxyContin, correct?
9  A.  That was a question mark. We don't
10 have specific evidence that she was taking
11 an opioid at the time of her death.
12 Q.  And you didn't do a score for
13 Klonopin, correct?
14 A.  Right. Those are the two that I
15 considered and did not do.
16 Q.  Okay. Let's move on to Bradford Hill.
17      Bradford Hill is a subject that
18 you also discussed with Mr. Egilman before
19 you prepared your report in this case,
20 correct?
21      MR. FROMSON: Objection as to
22 the form. Is it the report, or are you
23 talking about the Daubert hearing?
24      MS. McGRODER: I'm talking
25 about his report.

**375**

1       MR. FROMSON: Okay. I don't
2  believe that was -- okay, fine. Asked
3  and answer.
4       MS. McGRODER: I don't
5  believe I have asked that.
6  BY MS. McGRODER:
7  Q.  Bradford Hill is not a --
8       MS. McGRODER: Can you repeat
9  my question?
10      (The record was read as
11 requested.)
12      MR. FROMSON: Note my
13 objection as to form.
14      THE WITNESS: As I said
15 yesterday, Dr. Egilman and I discussed
16 Bradford Hill guideposts. We did not
17 ever talk about Susan Bulger.
18 BY MS. McGRODER:
19 Q.  Sure. But your discussion with -- is
20 it Mr. or Dr. Egilman?
21 A.  Dr. --
22      MR. FROMSON: That's been
23 asked and answered.
24      MS. McGRODER: Nice
25 objection, Ken.

**376**

1  BY MS. McGRODER:
2  Q.  Your discussion with Dr. Egilman about
3  the Bradford Hill criteria occurred prior to
4  the time that you prepared your report in
5  the Bulger case dated August 7th, 2008,
6  correct?
7  A.  It was. Since we determined that I
8  was in Boston in June and only in Boston
9  once, that's the only time I've ever met
10 Dr. Egilman, that's when we discussed the
11 Bradford Hill criteria, which was before I
12 did this report.
13 Q.  Right. Can you cite for me all
14 peer-reviewed published literature that
15 states the Bradford Hill criteria can be
16 used to demonstrate specific causation, that
17 is, whether a drug caused an adverse event
18 in a specific individual?
19 A.  I don't believe that that information
20 exists.
21 Q.  You don't believe there are any
22 peer-reviewed studies that state that,
23 correct?
24 A.  There may be peer-reviewed review
25 articles about the utility of using

**377**

1  Bradford Hill criteria as guideposts to
2  determine causality, but in terms of the way
3  you asked the question, I don't believe that
4  that exists.
5  Q.  Okay. And the literature to which
6  you're referring addresses the use of
7  Bradford Hill criteria to determine
8  causality in a general sense, correct?
9  A.  Yes.
10 Q.  You're not aware of any literature
11 that suggests that Bradford Hill criteria
12 can or should be used to determine whether
13 specific causation exists, that is, whether
14 a drug caused an adverse event in a specific
15 person, correct?
16      THE WITNESS: I'll ask you to
17 read that back. I'm not sure that that's
18 correct.
19      (The record was read as
20 requested.)
21      THE WITNESS: Here is the
22 best I can answer that.
23      In my discussion with
24 Dr. Egilman, he had, the best of my
25 recollection, mentioned a paper, I

9 (Pages 374 to 377)

## Page 378

1  believe, about the adverse events
2  associated with isotretinoin or Retin A.
3  And I believe that the Bradford Hill
4  criteria were used, at least in a
5  population, to describe that possible
6  causality related to the side effects
7  associated with Retin A. But other than
8  that -- and I have not read that article,
9  so...
10 Q. You anticipated my next question.
11     After you spoke to Dr. Egilman,
12 did you go get the article to which he
13 referred about using Bradford Hill criteria
14 in the context of analyzing causality with
15 isotretinoin?
16 A. To be honest, I have the article, I
17 have gotten it, and I have not read it.
18 Q. So you can't tell me today that that
19 article suggests that Bradford Hill criteria
20 should be used in the context of determining
21 specific causation rather than general
22 causation, correct?
23 A. That's my understanding. I believe
24 that it's an approximation and utility in
25 general causality, not specific causality.

## Page 379

1  Q. So when you included Bradford Hill
2  criteria in your report in the Bulger case,
3  you were really talking about your opinions
4  related to general causation, correct?
5  A. General causation as is applicable to
6  Mrs. Bulger.
7  Q. Well, we don't need to get into a
8  legal debate. But general causation, as you
9  know, Dr. Kruszewski, relates to whether
10 Neurontin can cause suicidal thinking and
11 behavior, correct?
12 A. Correct.
13 Q. Specific causation is a question of
14 whether Neurontin did, in fact, cause
15 suicidal thinking and behavior in
16 Mrs. Bulger, correct?
17 A. Correct.
18 Q. And the Bradford Hill criteria are
19 reserved for the question of general
20 causation. You understand that, right?
21 A. I do.
22 Q. So your opinions about Bradford Hill
23 that are contained in your Bulger report
24 really relate to your opinion about general
25 causation, correct?

## Page 380

1  A. Well, they're -- yes, in part.
2  They're exactly as I put on pages 9 and 10
3  of my report in response to my asking myself
4  the question was Neurontin a significant
5  contributory factor in Mrs. Bulger's
6  suicidal behavior and completed suicide.
7      So, again, using a guidepost of
8  criteria -- a guidepost of Bradford Hill
9  suggestions and recommendations about
10 causality, I applied them in this case. And
11 then I -- so, again, it was a guidepost --
12 Q. Well, let me just ask you: You don't
13 talk about Susan Bulger in any of your
14 discussion of the Bradford Hill criteria on
15 pages 9 and 10 of your report, do you?
16 A. Let me just --
17 Q. In other words, when you discuss
18 strength of association, you don't talk
19 about an association in connection with
20 Susan Bulger, correct? You are talking
21 about what you believe is a general
22 association based on population data,
23 correct?
24 A. That's correct.
25 Q. Okay. Same is true for the rest of

## Page 381

1  these, right?
2  A. Yes -- like for the next one, I see
3  what you're getting at. I have, obviously,
4  referenced my own expert report in the
5  consistency of results related for GABAergic
6  and anti-glutaminergic effects of Neurontin,
7  and then using that as a way to describe
8  what happened --
9  Q. Right. Thank you.
10     So the discussion of
11 Bradford Hill criteria that you include here
12 relating to the question of general
13 causation did not appear in your original
14 report regarding general causation in this
15 case from last fall in 2007, correct?
16 A. That's correct.
17 Q. So the first time you have offered an
18 opinion that incorporates your analysis of
19 the Bradford Hill criteria is August 7, 2008
20 in connection with your specific causation
21 report in the Bulger case, correct?
22 A. No. The first time that I referenced
23 Bradford Hill criteria was in the federal
24 court hearings in Boston in June.
25 Q. But you didn't submit a written

10 (Pages 378 to 381)

**Page 382**

1  opinion about Bradford Hill criteria at any
2  time before your written report in the
3  Bulger case, correct?
4  A.  That's correct.
5  Q.  You have mentioned a few times in this
6  deposition and also in the past that there's
7  a susceptible minority of consumers who are
8  vulnerable to the adverse effects to
9  Neurontin. That's your opinion, right?
10 A.  Yes.
11 Q.  We talked before last December in your
12 deposition about who comprises that
13 susceptible minority of individuals, right?
14 A.  That's correct.
15 Q.  And I'm going to ask you again today
16 because I'm still unclear based on your
17 testimony how you define the susceptible
18 minority of individuals who you believe will
19 experience suicidal thinking and behavior as
20 a result of Neurontin use.
21     MR. FROMSON: Note my
22 objection to the form.
23     THE WITNESS: A long
24 question. Let me answer it in two parts.
25     I believe that when you first

**Page 383**

1  deposed me in general causality, I said
2  that it was not possible to specifically
3  identify any person who was going to have
4  side effects secondary to Neurontin.
5     The second part was that that
6  does not preclude the next response that
7  I have, which is that there is a minority
8  of individuals who take Neurontin and
9  suffer side effects.
10    Thirdly, we did talk about, I
11 think both with yourself and Mr. Hooper,
12 that the susceptible minority would
13 likely include individuals with
14 preexisting psychiatric conditions,
15 preexisting social conditions, like a
16 history of abuse and negligence,
17 preexisting social circumstances that
18 were adverse. I think we -- I believe
19 that I enumerated multiple different
20 psychiatric diagnoses that may give rise
21 to the susceptible minority population.
22    But the final point that I
23 would make is that there is still no
24 specific ability for I believe me or
25 anyone else to determine who that

**Page 384**

1  minority of individuals is who are
2  susceptible to the side effects.
3  BY MS. McGRODER:
4  Q.  So today in a patient population, you
5  cannot identify who are the individuals who
6  might be susceptible to the adverse effects
7  of Neurontin, true?
8  A.  True.
9  Q.  And there aren't even any identifiable
10 criteria or mix of criteria of who the
11 patient population is who might be
12 susceptible to the adverse effects of
13 Neurontin, in your view?
14 A.  Before I answer that, let me just --
15 what I said true to and responded to in the
16 last question is that is true prospectively;
17 that if we had a population sitting here and
18 all of us were given Neurontin, it's
19 possible that we would all suffer side
20 effects, it's possible that none of us would
21 have side effects, it's possible that one of
22 us or more would have side effects. There's
23 no way of knowing. Now, that's not true
24 with a retrospective analysis.
25 Q.  So when you sit down and look at a

**Page 385**

1  lawsuit and retrospectively analyze whether
2  the adverse event, or the suicide in this
3  instance, was caused by Neurontin, that's
4  when you can tell who the susceptible
5  minority is, right?
6  A.  Well, they become potentially the
7  susceptible minority if after a careful
8  review of the medical records and all of the
9  other ancillary information suggests or
10 gives rise to the likelihood that Neurontin
11 was the causative factor in their death.
12 Q.  Well, would you agree with me if you
13 can't prospectively determine who is in the
14 susceptible minority, it would be impossible
15 to provide a warning to physicians about who
16 to look for in their patient population to,
17 you know, steer clear of Neurontin to avoid
18 suicidal thinking and behavior adverse
19 effects?
20     MR. FROMSON: Objection as to
21 form.
22     THE WITNESS: No, not at all.
23 BY MS. McGRODER:
24 Q.  Well, how can you warn about it if you
25 don't know who they are?

11 (Pages 382 to 385)