# EXHIBIT 5 PART II

418

1  A. Correct.
2  Q. Doctor, what I see is missing from
3  this list of issues that increased her risk
4  of suicide is any mention of prior suicide
5  attempts, correct?
6  A. I believe I did not include that here.
7  Q. And you did not include suicidal
8  ideation, correct?
9  A. I did not include that here.
10 Q. And you did not include suicide
11 intent?
12 A. Suicide intent?
13 Q. Correct.
14 A. I did not include that in that
15 paragraph.
16 Q. And you did not include suicidal
17 planning, correct?
18 A. That's correct, I did not include
19 suicidal planning in that paragraph.
20 Q. And just so we're clear, that
21 paragraph that you're referring to is the
22 paragraph that identifies the issues that
23 increased Mrs. Bulger's risk of suicide,
24 correct?
25 A. That's correct, or it provides

419

1  protective factors against her suicide in
2  the latter part of the paragraph.
3  Q. So the paragraph says, "I examined the
4  issues that increased Mrs. Bulger's risk of
5  suicide," and then you list those risks,
6  correct?
7  A. Correct.
8  Q. And then you also list the factors
9  that you think protected her from suicide,
10 correct?
11 A. That's correct.
12 Q. Doctor, why wouldn't you list
13 Mrs. Bulger's prior suicide attempts as
14 risk -- as issues that increased her risk
15 for suicide?
16 A. I addressed that yesterday and I'll be
17 happy to repeat my response.
18    I am aware and did consider that
19 there is evidence in her medical records
20 that Mrs. Bulger made attempts to hurt
21 herself. There is an episode when she is a
22 young woman where she drives off a cliff.
23 There are episodes that are documented in
24 her records as early as Salem Hospital in
25 1988, and subsequently, that she attempted

420

1  to overdose on one, two or three occasions,
2  and may have also hurt herself by slicing
3  her wrists, I believe.
4     There is also conflicting
5  evidence in the deposition transcripts about
6  whether any of those represented, in fact,
7  suicide attempts or something other, some
8  attempt at calling attention to herself or
9  an attempt to ask for help or something else
10 entirely.
11    The conflicted evidence about
12 that was highlighted for me, and I believe I
13 put this in my report, in the CAB initial
14 evaluations that were done -- that's the
15 Center for Addictive Behaviors, I believe,
16 in Massachusetts -- where at one time she
17 says that the -- or the person who fills out
18 the form says that she has not had any
19 previous attempts and another form says that
20 she has. So even the same institution has
21 conflicted evidence.
22    And I believe that I quoted her
23 sister, Linda Landry, who has stated in her
24 deposition that she was not suicidal
25 previously.

421

1     The evidence that I just cited
2  about the reports were the -- sorry -- the
3  forms signed by Dr. Medwid on May 31st,
4  2002, where they were signed differently,
5  and the information -- I can't find it at
6  the moment, but there's information, I
7  believe, from Linda Landry, which I again
8  suggested yesterday that says that she was
9  not specifically trying to kill herself.
10    But, nonetheless, again, I
11 didn't list that, I absolutely could have,
12 because I considered that in my overall
13 assessment.
14 Q. Well, first of all, a prior suicide
15 attempt is one of the number one risk
16 factors for suicide, correct?
17 A. Correct.
18 Q. So if you had concluded that she had
19 attempted suicide previously, that would
20 surely be included as one of the issues that
21 increased her risk of suicide in your
22 conclusion, correct?
23 A. As I said, I did mention it in my
24 report, but there was conflicting evidence
25 as to whether or not she was actually trying

20 (Pages 418 to 421)

Page 422

1  to hurt herself -- trying to kill herself.
2  Q.  But, Doctor, you agree that you did
3  not list prior suicide attempts as an issue
4  that increased Mrs. Bulger's risk of
5  suicide, correct?
6       MR. FROMSON:  Objection.
7  Asked and answered.
8       THE WITNESS:  In that
9  paragraph, I did not.
10 BY MS. SCHULTZ:
11 Q.  Doctor, show me in your report where
12 you listed prior suicide attempts as a risk
13 factor that increased Mrs. Bulger's risk for
14 suicide.
15      MR. FROMSON:  Objection.
16      THE WITNESS:  I don't believe
17 that I did.  What I'm saying verbally is
18 that I accept and did and gave evidence
19 in the exhibits that she had previous
20 attempts at hurting herself and comments
21 on that, but I thought the evidence was
22 so conflicted that I just didn't put it
23 in my conclusionary assessment.
24 BY MS. SCHULTZ:
25 Q.  Is it your conclusion that she had

Page 423

1  previous attempts at harming herself or your
2  conclusion that she had previous suicide
3  attempts?
4       MR. FROMSON:  Objection as to
5  form.
6       THE WITNESS:  She clearly had
7  attempts at harming herself.
8  BY MS. SCHULTZ:
9  Q.  Do you conclude that she had previous
10 suicide attempts?
11 A.  My answer to that is the same.  I have
12 accepted the fact that there is enough
13 evidence that she had prior suicide
14 attempts, including running her car off the
15 cliff.
16      However, the evidentiary basis
17 for that in the report is conflicted, and
18 it's the reason I did not put it in that
19 concluding statement, but --
20 Q.  So because you think the evidence as
21 to whether there were prior suicide attempts
22 is conflicted, you chose not to consider
23 that as a factor that increased
24 Mrs. Bulger's risk for suicide, correct?
25      MR. FROMSON:  Objection as to

Page 424

1  form.  Misstates his testimony.
2       THE WITNESS:  That's not
3  exactly accurate.
4       As I said, I considered it.  I
5  did not write it in that summary.  I
6  certainly could have.
7  BY MS. SCHULTZ:
8  Q.  But you didn't list prior suicide
9  attempts as an issue that increased
10 Mrs. Bulger's risk for suicide, correct?
11      MR. FROMSON:  Objection.
12 Asked and answered.
13      THE WITNESS:  That is
14 correct, because I was not convinced from
15 the information that I had available and
16 some of the information that I just cited
17 that, in fact, those attempts at hurting
18 herself and driving her car off the cliff
19 represented suicide attempts.
20 BY MS. SCHULTZ:
21 Q.  If, in fact, Mrs. Bulger had attempted
22 suicide, and you concluded that there were,
23 in fact, prior suicide attempts, that would
24 be something that you would have included as
25 a risk factor for suicide -- her suicide,

Page 425

1  correct?
2       THE WITNESS:  May I ask you
3  to read that back to me?
4       MS. SCHULTZ:  I'll restate
5  the question.
6  BY MS. SCHULTZ:
7  Q.  If you had, in fact, concluded that
8  Mrs. Bulger did, in fact, have prior suicide
9  attempts, then that would have been
10 something that you would have considered to
11 be a high risk for suicide, correct?
12      MR. FROMSON:  Objection as to
13 form.
14      THE WITNESS:  Yes.
15 BY MS. SCHULTZ:
16 Q.  Doctor, you also state that were it
17 not for the prescription of Neurontin,
18 Mrs. Bulger's mental status would not have
19 deteriorated to the point that suicide
20 became an option for her.
21      Do you recall stating that in
22 your report?
23 A.  I do.
24 Q.  Is it your opinion that Susan Bulger's
25 mental status had not previously ever

VERITEXT CORPORATE SERVICES (800) 567-8658

**Page 426**

1  deteriorated to the point that suicide
2  became an option for her prior to taking
3  Neurontin?
4  A. It is not.
5  Q. It is your opinion that her mental
6  status had deteriorated to the point that
7  suicide became an option for her prior to
8  taking Neurontin?
9      MR. FROMSON: Objection as to
10 form.
11     THE WITNESS: That would not
12 be correct either.
13     It is my testimony that there
14 were periods in her life where she
15 appeared to be severely disabled and
16 depressed and hopeless and having other
17 problems related or unrelated to
18 Neurontin.
19     However, the only time that
20 she committed suicide successfully was
21 the time that she committed suicide
22 successfully, and that analysis of why
23 that happened can only be done
24 retrospectively, as done.
25     I hope that was clear.

**Page 427**

1  BY MS. SCHULTZ:
2  Q. Is it your opinion that prior to her
3  ever taking Neurontin, Mrs. Bulger's mental
4  status deteriorated to the point that
5  suicide became an option for her?
6      MR. FROMSON: Objection to
7  form.
8      THE WITNESS: I certainly
9  don't know the answer to that. I can
10 answer, since it's a large question, her
11 mental status had seriously deteriorated
12 previously from a number of different
13 reasons that we've discussed here over
14 the past two days and I've discussed in
15 my report. She, however, did not commit
16 suicide before the event in question.
17 BY MS. SCHULTZ:
18 Q. She did not commit suicide?
19 A. Correct.
20 Q. Now, you will agree that a history of
21 past suicide attempts is one of the most
22 significant risk factors for suicide,
23 correct?
24     MR. FROMSON: Objection.
25 Asked and answered.

**Page 428**

1      THE WITNESS: I do agree with
2  that.
3  BY MS. SCHULTZ:
4  Q. Are you aware that a suicide attempt
5  by any method is associated with a 38-fold
6  increase in suicide risk?
7      MR. FROMSON: Objection.
8  Lack of foundation.
9      THE WITNESS: I don't know
10 the specific numbers as I sit here today,
11 but it's certainly a heightened risk.
12 BY MS. SCHULTZ:
13 Q. Do you agree or disagree that an
14 additional increase in risk may be
15 associated with aborted suicide attempts or
16 repeated suicide attempts?
17 A. Can I rephrase that? Are you asking
18 me is an aborted risk or an incomplete
19 suicide attempt increased risk?
20 Q. Yes.
21 A. Both do.
22 Q. Now, you referred to the fact that you
23 mentioned conflicted evidence concerning
24 prior suicide attempts in your report,
25 correct?

**Page 429**

1  A. That's correct.
2  Q. Let's take a look at the only place in
3  your report that you refer to suicide
4  history. Okay? Can you look with me at
5  page 8, the bottom of page 8?
6  A. (Witness complies.) Yes.
7  Q. And I'm going to read this into the
8  record.
9      "Conflicted evidence also exists
10 about her suicide history. (Exhibit O).
11 For example, the reports from CAB, (Center
12 For Addictive Behaviors) noted on their
13 intake sheets that she both answered yes and
14 no to the same question re: Previous
15 suicide attempts (Exhibits JJJ, KKK).
16     Her sister, Linda Landry,
17 testify that none of Mrs.~Bulger's previous
18 attempts were, in fact, actual suicide
19 attempts at all, but, rather, either
20 accidents or cries for attention and help."
21     Did I read that correctly?
22 A. Yes, you did.
23 Q. And you do not cite any exhibit or
24 reference to the record, correct, when you
25 state that her sister, Linda Landry,

22 (Pages 426 to 429)

### Page 438

```
 1   rest exclusively on the testimony of Ron
 2   Bulger, who says he gave her four Neurontin?
 3          MR. FROMSON: Objection as to
 4   form.
 5          THE WITNESS: That piece I
 6   certainly did reference.
 7   BY MS. SCHULTZ:
 8   Q.   What do you mean you referenced it?
 9   A.   And considered it.
10   Q.   And you relied on it, correct?
11   A.   I did rely on it.
12   Q.   And you determined that that statement
13   by Ron Bulger was truthful, correct?
14   A.   I believed it to be accurate.
15   Q.   And that is the only evidence you
16   relied on for your conclusion that Susan
17   Bulger took four Neurontin before she went
18   downstairs, correct?
19   A.   Well, the other evidence I -- that's
20   not quite correct.
21          The other evidence I relied on
22   was that she was actively taking Neurontin,
23   that the pill fragments -- the pills were
24   missing from the prescription bottles that
25   were found in the subsequent investigation.
```

### Page 439

```
 1   Q.   Well, the fact that she was actively
 2   taking Neurontin and that pills were missing
 3   is not evidence at all that she took four
 4   Neurontin before going downstairs at 6:00,
 5   correct?
 6   A.   That is correct.
 7   Q.   So the only evidence that you rely on
 8   for your opinion that Mrs.~Bulger took four
 9   Neurontin before she went downstairs is the
10   testimony of Ron Bulger, correct?
11   A.   That is correct.
12   Q.   So for purposes of your conclusion in
13   this case, you certainly aren't minimizing
14   the testimony of Ron Bulger. Do you agree?
15   A.   No, I am minimizing it. I tried to
16   use it where I thought it was significant.
17   When there was other evidence that was
18   compelling from other sources, I used that
19   evidence.
20   Q.   So you used his testimony when it was
21   important to your opinion, correct?
22   A.   Yes. You know, part of this came
23   about when --
24   Q.   Answer that question first.
25          You used his testimony when it
```

### Page 440

```
 1   was important to your opinion, correct?
 2   A.   I used the testimony that I had. He
 3   was the only eyewitness to her ingestion of
 4   Neurontin.
 5   Q.   Why did you minimize Ron Bulger's
 6   testimony on other occasions?
 7   A.   I wanted to provide as best that I
 8   could a fair and balanced report using the
 9   other witnesses in the case. So I wanted to
10   rely on Dr. Crognale, Dr. Goldman, Linda
11   Landry, James Gibbons, and the police and
12   medical investigations.
13   Q.   Did you have any concern about the
14   truthfulness of Ron Bulger?
15   A.   There is, as you're probably aware,
16   very damaging evidence in this litigation
17   about Mr. Bulger, and I certainly had to
18   take that into consideration from -- do you
19   want me to continue?
20   Q.   But you didn't consider that damaging
21   evidence when you decided that you were
22   going to rely on his statement that he gave
23   Ms. Bulger four Neurontin before she went
24   downstairs, correct?
25          MR. FROMSON: Objection as to
```

### Page 441

```
 1   form. Misstates his testimony.
 2          THE WITNESS: He was the only
 3   eyewitness to her getting that Neurontin.
 4   So it was the only piece of information
 5   about that.
 6   BY MS. SCHULTZ:
 7   Q.   And because he was the only one
 8   present, you relied on his testimony as
 9   though it were true, correct?
10   A.   That's correct.
11   Q.   Now, when you say you did not -- you
12   minimized it in other respects because there
13   was damaging evidence about Mr. Bulger, what
14   did you mean?
15          MR. FROMSON: Objection as to
16   form. Misstates his testimony.
17          THE WITNESS: I think that
18   his credibility and his truthfulness has
19   come into question, particularly in
20   regard to his selling drugs or selling
21   the prescriptions of his wife. There's
22   testimony to that effect both from
23   Linda Landry and from James Gibbons.
24   BY MS. SCHULTZ:
25   Q.   And you questioned his credibility,
```

**Page 442**

1  correct?
2  A.  I had to question his credibility,
3  yes.
4  Q.  But you didn't question his
5  credibility when he testified that he gave
6  Ms. Bulger four Neurontin to go downstairs,
7  correct?
8      MR. FROMSON: Objection as to
9  form.
10      THE WITNESS: I used that
11  because, again, he was the only
12  eyewitness to that. There's no other
13  source I could rely on in terms of what
14  had happened that night.
15  BY MS. SCHULTZ:
16  Q.  Did that concern you, to rely solely
17  on Ron Bulger with respect to what happened
18  that night when you questioned his
19  credibility?
20      MR. FROMSON: Objection as to
21  form.
22      THE WITNESS: It was a
23  consideration.
24      Very often in suicide
25  assessments and psychological autopsies,

**Page 443**

1  there is no eyewitness of what the person
2  did, how they did it, or where they got
3  the pills, or when they took them. Here
4  is reasonable -- it was a reasonable idea
5  for me to rely on that as a piece of
6  information that was consistent with
7  Susan Bulger's prior history of taking
8  Neurontin in the timeframes that we've
9  already talked about, in 1999 and 2000,
10  and her filling the prescriptions from
11  April of 2003 -- or April, May of 2003
12  until her death.
13      MS. SCHULTZ: Can you read
14  back that answer?
15      (The record was read as
16  requested.)
17  BY MS. SCHULTZ:
18  Q.  Now, you said it was a piece of
19  information, correct?
20  A.  Correct.
21  Q.  But, truly, it was the only
22  information that you relied upon to conclude
23  that Susan Bulger took four Neurontin before
24  she went downstairs, correct?
25      MR. FROMSON: Objection to

**Page 444**

1  form.
2      THE WITNESS: Yes, that is
3  accurate.
4  BY MS. SCHULTZ:
5  Q.  And you have concluded in this case
6  that it is the four Neurontin that she took
7  before she went downstairs that was the
8  precipitating event for her suicide,
9  correct?
10      MR. FROMSON: Objection as to
11  form. Misstates the testimony.
12      THE WITNESS: Yes.
13  BY MS. SCHULTZ:
14  Q.  So that statement by Ron Bulger forms
15  the foundation for your opinion in this
16  case, correct?
17      MR. FROMSON: Objection as to
18  form.
19      THE WITNESS: It is certainly
20  a piece of information.
21      I was aware, as I have
22  already stated, that Susan Bulger had
23  been prescribed Neurontin previously and
24  had filled her last prescription on July
25  12th of 2004, and that most of that

**Page 445**

1  prescription had been consumed,
2  presumably by her, because we have the
3  medical evidence of the bottle that was
4  left over.
5      To the specific timing on
6  that day, the only evidence that I relied
7  on the timing of the day was Mr. Bulger's
8  report.
9  BY MS. SCHULTZ:
10  Q.  And when you say timing of the day,
11  actually, the only evidence you relied on
12  that she took Neurontin at any time that day
13  was Ron Bulger's testimony, correct?
14      MR. FROMSON: Objection.
15  Asked and answered.
16      THE WITNESS: That's correct.
17  BY MS. SCHULTZ:
18  Q.  Do you think it's true what Ron Bulger
19  has testified to, that he gave her four
20  Neurontin before she went downstairs?
21  A.  I believe it to be true.
22  Q.  Why do you believe that statement to
23  be true when you say you question his
24  credibility?
25  A.  I question his credibility, as I

**Page 470**

1  you leave the day after you check in and do
2  not complete the detoxification and
3  rehabilitation?
4  A.  Any treatment, we believe, diminishes
5  harm. So in terms of harm reduction and in
6  terms of how that relates to suicide, we
7  believe that's a protective factor.
8  Q.  But not getting the treatment you need
9  would be a risk factor, correct?
10 A.  That's correct.
11 Q.  And leaving a rehabilitation facility
12 before you have detox'd from drug abuse
13 would be a risk factor, correct?
14 A.  Yes.
15 Q.  And you don't list those in your
16 report though, right?
17 A.  In my summary I listed what I listed,
18 which is that she had a significant drug and
19 alcohol history. She had received
20 treatment. It may or may not have been
21 successful. James Gibbons says, for
22 example, she didn't use drugs after 1998. I
23 don't believe that to be true. So there's a
24 lot of evidence. You know, what I had
25 available to me, I tried to put in the

**Page 471**

1  report.
2  Q.  Was it important to you the fact that
3  Susan Bulger attempted suicide a few times
4  when the child was at home? Was that an
5  important fact to you?
6  A.  Any history of hurting herself in any
7  circumstance is an important factor to me.
8  Q.  What about the history of her hurting
9  herself in the home while her child was at
10 home? Is that an important factor?
11 A.  Yes.
12 Q.  Now, you indicated that you did read
13 Ron Bulger's deposition prior to preparing
14 your report, correct?
15 A.  That is correct.
16 Q.  And you were aware that he testified
17 that Susan Bulger had attempted suicide by
18 overdose and had ended up in a coma for four
19 days?
20 A.  Yes.
21 Q.  But you chose not to select that
22 testimony to include in your report,
23 correct?
24 A.  I did not include it, that's correct.
25 Q.  You've also reviewed the police

**Page 472**

1  records from the day of Susan Bulger's
2  suicide, correct?
3  A.  Yes.
4  Q.  And you're aware that Ron Bulger told
5  authorities in those police records that,
6  "Sue had severe depression, bipolar
7  disorder, she tried to kill herself seven
8  years ago, and I found her, it was in this
9  room, pointing to the first floor bedroom.
10 I found her kind of cold. They saved her at
11 the hospital. Plus a psychiatric for a
12 week. It was in Lin -- she shook pills."
13       Do you agree he said that took
14 place?
15 A.  I do.
16 Q.  But you've quoted other portions of
17 the police report in your exhibits, correct?
18 A.  Yes.
19 Q.  But you chose not to include
20 Ron Bulger's statements concerning her prior
21 suicide attempt in the police -- in your
22 exhibits, correct?
23 A.  I did not include that statement,
24 that's correct.
25 Q.  Why was that statement not important

**Page 473**

1  evidence to you that Susan Bulger had
2  attempted suicide seven years earlier?
3       MR. FROMSON: Objection to
4  form.
5       THE WITNESS: I believe,
6  personally, that I accurately reflected
7  in my report that she had a suicide
8  history. And that, as I have already
9  stated, that the statement from her
10 sister is that she made attempts to hurt
11 herself.
12      And as I've already stated
13 here today and yesterday, I certainly
14 considered that in all of the factors
15 that increased her risk for suicide. I
16 believe that without question,
17 Susan Bulger was a very high suicide
18 risk. I believe that Neurontin tipped it
19 over.
20 BY MS. SCHULTZ:
21 Q.  Well, she had been a very high suicide
22 risk before and was tipped over the edge
23 when never having taken Neurontin, correct?
24 A.  She never had a successful completed
25 suicide prior to the time that she was on

33 (Pages 470 to 473)

Page 474

1  Neurontin.
2  Q. And you need to answer my question.
3  A. Yes.
4  Q. She had attempted suicide before when
5  she was -- she had gone over the edge before
6  when she was not taking Neurontin, correct?
7  A. She certainly tried to hurt herself.
8  It's not mincing words whether I accepted it
9  as a suicide attempt prior to her ever being
10 on Neurontin.
11 Q. Well, if you accepted it as a suicide
12 attempt, then you'll agree that she
13 attempted suicide prior to being on
14 Neurontin, correct?
15 A. Yes.
16 Q. So something pushed her over the edge
17 to attempt suicide prior to being on
18 Neurontin, correct?
19 A. To attempt -- to attempt to hurt
20 herself or to attempt suicide, yes.
21 Q. But now you're saying that on her
22 fifth attempt, it was Neurontin that pushed
23 her over the edge, correct?
24 A. Yes.
25 Q. But in the prior four attempts,

Page 475

1  something else pushed her over the edge,
2  correct?
3  A. Well, whatever those attempts were and
4  how they manifested themselves, we only have
5  one completed attempt. So, certainly, there
6  are a bunch of factors in a very high risk
7  individual for suicide that caused her to
8  hurt herself or to make suicide attempts.
9        In the respective analysis and
10 in understanding of, in fact, why she
11 committed suicide, there is only one drug
12 that I believe is implicated in that. And
13 that, of course, is Neurontin.
14 Q. Well, completed suicide is not a risk
15 factor for suicide, correct?
16 A. That's correct.
17 Q. It can't be, right?
18 A. It cannot be.
19 Q. So are you making a distinction based
20 on the fact that she was not successful in
21 her prior attempts?
22 A. Yes, I am.
23 Q. Well, isn't it often just a matter of
24 chance as to whether someone successfully
25 completes a suicide?

Page 476

1  A. There is some chance in it. We also
2  believe -- when I say "we," I think I speak
3  for suicidologists and Dr. Maris, in
4  particular -- that people make a specific
5  decision in their suicide careers when they,
6  in fact, are going to end their life.
7  Before that time, it may -- their decisions
8  to hurt themselves, their decisions to make
9  some attempt may be less than fully engaged,
10 if you will.
11       So I make the same distinction
12 as the Physician Desk Reference does when it
13 lists side affects associated with drugs and
14 list suicidal thoughts, suicidal ideations,
15 attempted suicides, and completed suicides.
16 They're all somewhat different.
17 Q. Is it your opinion that Susan Bulger
18 was not attempting to commit suicide on
19 these prior four attempts?
20 A. I didn't evaluate those attempts and
21 did not do a retrospective analysis, some of
22 the information, obviously, I only became
23 aware of two days ago. I did accept as a
24 risk factor that she was trying to hurt
25 herself and/or made suicide attempts. As I

Page 477

1  already stated, I accepted that.
2  Q. But, Doctor, isn't the important
3  factor the individual's intent, whether or
4  not they intend to kill themselves as
5  opposed to whether or not their attempt is
6  successful?
7  A. I ask you to rephrase that question,
8  because measuring intent is a very difficult
9  thing to. You can do it tediologically,
10 because she committed suicide, and then we
11 assume that her intent was -- I think that's
12 an accurate assumption that we can assume
13 that she intended to commit suicide, because
14 she did commit suicide. And if I accept
15 that as logic, though, then I'm also saying
16 that it was not her intent to commit suicide
17 previously regardless of the circumstances,
18 because she was unsuccessful.
19 Q. Well, you can't accept that logically
20 though, can you, Doctor?
21       MR. FROMSON: Objection to
22 form.
23 BY MS. SCHULTZ:
24 Q. In other words, aren't there
25 situations where an individual intends to

34 (Pages 474 to 477)

502

1  already answered that. I have included
2  it in my overall assessment of risk
3  factors for her.
4  BY MS. SCHULTZ:
5  Q.  Did you do anything to try to
6  determine what precipitated that action?
7  A.  I did not do any determination of
8  intent.
9  Q.  Okay. Did you do any determination of
10 intent with respect to her 1993 overdose?
11 A.  I did not.
12 Q.  Did you do any determination of her
13 intent with respect to her slicing her
14 wrists?
15 A.  No.
16 Q.  Now, Susan Bulger's brother,
17 James Gibbons, also testified that
18 Susan Bulger driving her car off the cliff
19 was a suicide attempt, correct?
20 A.  I believe that's accurate, yes.
21 Q.  And you don't include that testimony
22 in your report either, do you?
23 A.  I don't think that's in the body of
24 the report. I need to check what I
25 reflected of his specific comments in the

503

1  exhibits.
2  Q.  And, Doctor, you're looking to see if
3  you included James Gibbons' testimony that
4  Susan Bulger attempted suicide by driving
5  her car off the cliff?
6  A.  Right. I remember reading that, but I
7  can't find it.
8  Q.  Okay. Were you aware, Doctor, that
9  Susan Bulger was admitted to the emergency
10 room at Atlantic Care Medical Center on
11 June 5, 1990 after she overdosed on pills
12 and lacerated her left wrist?
13 A.  I believe I was aware of that.
14 Q.  Did you consider it in reaching your
15 opinion in this case?
16 A.  As I have said, yes. Because I
17 considered her overdoses, her wrist slicing,
18 and her driving her car off a cliff.
19 Q.  Was Ms. Bulger taking Neurontin in
20 1990?
21 A.  No.
22 Q.  Was her overdose and slicing of her
23 wrist in 1990 abrupt, do you know, an abrupt
24 decision to do that?
25 A.  As I sit here today, I don't know if

504

1  that was abrupt or not.
2  Q.  Did you do anything to determine
3  whether any of Susan Bulger's prior suicide
4  attempts were abrupt and unplanned?
5  A.  Nothing more than I have already
6  reflected.
7  Q.  Let's talk, Doctor, about her overdose
8  in 1993. You are aware of that overdose,
9  correct?
10 A.  Yes.
11 Q.  And there's no reference in your
12 report to that 1993 overdose; do you agree?
13 A.  I do agree.
14 Q.  Are you aware that Mrs. Bulger was
15 found unresponsive in her home by
16 Ron Bulger?
17       MR. FROMSON: Can you give us
18 a timeframe?
19       MS. SCHULTZ: At the time of
20 this 1993 overdose.
21       MR. FROMSON: Okay. Thank
22 you.
23       THE WITNESS: He testified to
24 that in his deposition.
25 BY MS. SCHULTZ:

505

1  Q.  And Ms. Bulger was not taking
2  Neurontin at that time, correct?
3  A.  Correct.
4  Q.  Are you aware that when the EMTs went
5  to the home they found her in respiratory
6  arrest?
7  A.  Yes.
8  Q.  And are you aware that she quickly
9  went into cardiac arrest?
10 A.  I don't remember that specifically,
11 but I accept your --
12 Q.  Are you aware that the EMTs had to
13 initiate CPR, and for two minutes she had no
14 pulse?
15 A.  I'm aware that it was very serious.
16 Q.  And you aware that she was in a coma
17 secondary to respiratory arrest?
18 A.  For several days.
19 Q.  And are you aware that she did not
20 awake for three days?
21 A.  Already answered.
22       (Document was marked as
23 Exhibit 13 for the purposes of
24 identification.)
25 BY MS. SCHULTZ:

**Page 506**

1  Q. Let's take a look at
2  Defendants Exhibit 13. And this is the
3  Atlantic Care Medical Center report of
4  consultation, correct?
5  A. It is.
6  Q. From May, 1993, correct?
7  A. Yes.
8  Q. And this references her overdose we've
9  been discussing, correct?
10 A. It does.
11 Q. And this states that when the EMTs --
12 that the patient was found unresponsive by
13 her husband, correct?
14 A. Correct.
15 Q. If Ron Bulger had not found
16 Susan Bulger when she overdosed in
17 May of 1993, she would have died, correct?
18 A. It's possible.
19 Q. Well, it's very likely she would have
20 died, correct?
21 A. It's certainly possible.
22 Q. Because when he found her, she was
23 already in respiratory arrest, correct?
24 A. Correct.
25 Q. And then, she quickly went into

**Page 507**

1  cardiac arrest, correct?
2        MR. FROMSON: Objection.
3  Asked and answered.
4        THE WITNESS: That's correct.
5  BY MS. SCHULTZ:
6  Q. And she had no pulse, correct?
7        MR. FROMSON: Objection.
8  Asked and answered.
9        THE WITNESS: That's correct.
10 BY MS. SCHULTZ:
11 Q. So if Ron Bulger had not found her and
12 called the EMTs to come back and resuscitate
13 her, she would have died, correct?
14       MR. FROMSON: Objection.
15 Asked and answered.
16       THE WITNESS: Yes. The
17 question is, we don't know how and why
18 she overdosed on drugs. In my practice
19 in particular, I see people who are
20 rushed to the emergency room and are
21 resuscitated because of massive
22 unintentional overdoses because of their
23 very significant history of substance
24 abuse.
25 BY MS. SCHULTZ:

**Page 508**

1  Q. But you'll agree that Ms. Bulger has
2  stated in the medical records that this was
3  a suicide attempt. We just read that,
4  correct, her overdose?
5        MR. FROMSON: Objection as to
6  form of the question.
7        THE WITNESS: I wasn't
8  specifically aware that we had just read
9  into the record that she referred to this
10 particular admission as a suicide
11 attempt.
12 BY MS. SCHULTZ:
13 Q. But you are aware that she refers to
14 an overdose where she attempted suicide,
15 correct?
16       MR. FROMSON: Note my
17 objection as to form. Are we talking
18 about Exhibit 13, that Mrs. Bulger said
19 something --
20       MS. SCHULTZ: No. These are
21 the medical records later.
22       MR. FROMSON: Note my
23 objection as to form.
24       MS. SCHULTZ: What was the
25 question? Sorry.

**Page 509**

1        (The record was read as
2  requested.)
3        THE WITNESS: I'm aware of
4  her statements and reflected those in my
5  report that she had overdosed.
6  BY MS. SCHULTZ:
7  Q. You didn't reflect her statements in
8  your report, did you, Doctor?
9        MR. FROMSON: Objection as to
10 form.
11       THE WITNESS: I've already
12 read the statement in the exhibits that
13 talk about her overdosing and slicing her
14 wrists.
15 BY MS. SCHULTZ:
16 Q. That was a statement by Linda Landry,
17 correct?
18 A. Yes.
19 Q. But you haven't included anything in
20 your report that reflects a statement by
21 Susan Bulger, correct?
22 A. Only inasmuch as her statements are
23 reflected by Crognale's notes or
24 Dr. Goldman's notes. Once I reflected in
25 this relatively short report that, indeed, I

42 (Pages 506 to 509)

## Page 510

1  accept the fact that she has overdosed, and
2  that she has slit her wrists, and that she
3  has driven her car off a cliff. I don't
4  need to say it again.
5  BY MS. SCHULTZ:
6  Q. Well, Doctor, you testified earlier
7  that the difference between her prior
8  suicide attempts and the one in 2004 was the
9  fact that she died in 2004, correct?
10 A. Yes.
11 Q. Well, the one in 1993, she came about
12 as close to dying as is humanly possible,
13 correct?
14 A. Yes.
15 Q. And it was only a matter of chance
16 that Ron Bulger happened to find her and
17 call the EMTs, correct?
18 A. I'll accept that.
19 Q. So there's really no difference
20 between her suicide attempt in 1993 where
21 she came so, so close to dying and her
22 attempt in 2004 that was successful; do you
23 agree?
24        MR. FROMSON: Objection as to
25 the form of the question.

## Page 511

1         THE WITNESS: Absolutely not.
2  It's all the difference in the world, and
3  it's the difference between life and
4  death. In 2004, she had a successfully
5  completed suicide and had ingested
6  Neurontin before that action in an
7  abrupt, impulsive, unplanned decision to
8  kill herself.
9  BY MS. SCHULTZ:
10 Q. And how is that different from 1993?
11 A. She was not taking Neurontin at that
12 time. She did not successfully complete
13 suicide.
14 Q. So the fact that Ron Bulger found her
15 in time in 1993, but didn't find her in time
16 in 2004 forms the basis for your opinion?
17        MR. FROMSON: Objection.
18 Misstates testimony.
19        THE WITNESS: I don't believe
20 that's an accurate reflection of my
21 opinion.
22 BY MS. SCHULTZ:
23 Q. Well, had Ron Bulger gone downstairs
24 and found Susan Bulger in respiratory arrest
25 or cardiac arrest and called the EMTs and

## Page 512

1  they saved her, there'd be no difference,
2  correct?
3         MR. FROMSON: Objection as to
4  the form of the question.
5         THE WITNESS: There would be
6  still an enormous difference.
7  BY MS. SCHULTZ:
8  Q. What's the enormous difference?
9  A. It would be wonderful if she had been
10 found in time and resuscitated. However, in
11 the retrospective analysis that I did, when
12 people hurt themselves, and in this case,
13 when she was taking Neurontin, that analysis
14 reflected that she was taking Neurontin, and
15 precipitously hurt herself following that.
16 That is not the situation that occurred in
17 1993 or any other time when she hurt herself
18 or did whatever she did to overdose.
19        And again, we don't know the
20 intent of her overdose in this specific
21 event, because it could have been an
22 unintentional overdose, because she was
23 abusing cocaine, alcohol, and opioids.
24 Q. So you still say it could have been
25 unintentional, even though Susan Bulger,

## Page 513

1  herself, says she previously attempted
2  suicide by overdose? Is that right?
3         MR. FROMSON: Objection as to
4  form.
5         THE WITNESS: We do not have
6  a statement from Susan Bulger that, I
7  intentionally tried to kill myself in
8  1993 or 1998.
9  BY MS. SCHULTZ:
10 Q. Do we have that in 2004? Do we have a
11 statement from Susan Bulger that says, I
12 intentionally tried to kill myself on
13 August 4, 2004?
14 A. We do not.
15 Q. And we don't know if she thought that
16 Ron Bulger may come find her, as she was
17 leaning against her rope, correct?
18 A. That's correct.
19 Q. So what is the difference between her
20 attempt in 1993 where she was seconds away
21 from death and her attempt in 2004 where
22 Ron Bulger didn't find her in time?
23        MR. FROMSON: Objection as to
24 form. Asked and answered.
25        THE WITNESS: The situation

Page 514

1  and the circumstances were different.
2  BY MS. SCHULTZ:
3  Q. And how were they different?
4  A. She was taking Neurontin in 2004. She
5  was not taking Neurontin in 1993. She was
6  actively abusing substances and prior to
7  1998 specifically, and we don't have
8  evidence that she was actively abusing
9  substances in 2004. And the final outcome
10 was radically different, the difference
11 between life and death. She was dead in
12 2004. She was alive and lived to talk about
13 it, whatever happened in 1993.
14 Q. And the only difference in the outcome
15 was because Ron Bulger found her in time in
16 1993 but not in 2004, correct?
17     MR. FROMSON: Objection.
18 Asked and answered.
19     THE WITNESS: I don't believe
20 that's the only difference. That's in
21 supposition. That is a difference. It's
22 a hypothetical statement that you're
23 asking me to opine upon.
24     If, in fact, Ron Bulger had
25 found her in time, he may have been able

Page 515

1  to save her life, or help assist in the
2  facilitation of saving her life. That is
3  supposition.
4  BY MS. SCHULTZ:
5  Q. Why is it supposition? If he came
6  downstairs and she was rigging up her cord,
7  or was leaning against her cord, why
8  couldn't he have saved her?
9     MR. FROMSON: Objection as to
10 form.
11    THE WITNESS: Well, he could
12 have saved her.
13    MS. SCHULTZ: Exactly.
14    THE WITNESS: Yes. We just
15 don't know.
16 BY MS. SCHULTZ:
17 Q. And you say that the other difference
18 is that she was actively abusing substances
19 in '93, but there's no evidence of that in
20 2004?
21    MR. FROMSON: Objection.
22    THE WITNESS: At the time of
23 her death, I don't have any evidence that
24 she was actively abusing opioids or
25 cocaine or alcohol.

Page 516

1  BY MS. SCHULTZ:
2  Q. And you said the other difference is
3  she's taking Neurontin?
4  A. Yes.
5     MS. SCHULTZ: We need to wrap
6  up, because we're running out of tape.
7     THE VIDEOGRAPHER: We're
8  going off the record. The time is
9  11:59 a.m. End of tape Number 3.
10    (A recess was taken at this
11 time.)
12    THE VIDEOGRAPHER: We are on
13 the record. The time is 12:09 p.m. This
14 is the beginning of tape Number 4.
15 BY MS. SCHULTZ:
16 Q. Were you aware that in 1998
17 Susan Bulger was admitted to the emergency
18 room after slicing her wrists with a razor?
19 A. Yes.
20 Q. And are you aware that she did that
21 after a fight with Ron Bulger?
22 A. Yes.
23 Q. Doctor, would you agree that from the
24 standpoint of suicide risk assessment, the
25 strength of a patient's intent to die and

Page 517

1  his or her subjective belief about the
2  lethality of a method are more relevant than
3  the objective lethality of the chosen
4  method?
5  A. Can you do that a little more slowly?
6  Q. I'll reread it.
7     Do you agree from the standpoint
8  of suicide risk assessment the strength of
9  the patient's intent to die and his or her
10 subjective belief about the lethality of a
11 method are more relative than the objective
12 lethality of the chosen method?
13 A. Let me just rephrase it and, just --
14 not to reframe it in any way, but you are
15 asking me if I believe that in the suicide
16 risk assessment whether the intention of the
17 person performing some suicidal act is more
18 relevant than the objective findings of any
19 kind of lethality?
20 Q. Yes.
21 A. Yes.
22 Q. Do you agree that although
23 self-injurious behaviors are sometimes
24 characterized as gestures aimed at achieving
25 secondary gains, such as receiving

44 (Pages 514 to 517)

**Page 518**

1  attention, patient's motivations for such
2  behaviors are quite different?
3  A.  Yes.
4  Q.  Doctor, we've talked about
5  Ron Bulger's testimony that he gave
6  Susan Bulger the Neurontin the evening of
7  her suicide, correct?
8  A.  Yes.
9  Q.  What is the evidence that you rely on
10 that Susan Bulger actually consumed the four
11 Neurontin pills?
12     MR. FROMSON:  Objection as to
13 form to the extent it's already been
14 asked and answered.
15     THE WITNESS:  Yes.  I did
16 answer that yesterday as well.  I'm not
17 sure if in the same form of the question.
18 But the only evidence that I have that
19 she specifically took four pills of
20 Neurontin is from his testimony that was
21 contemporaneous and discussed with the
22 North Shore Ambulance, the Peabody Police
23 Department, the fire department and the
24 state patrol officers at the time.
25     There is no toxicology report

**Page 519**

1  that suggests that Neurontin was in her
2  system.  So I have no other evidence to
3  know or to dispute whether, in fact,
4  Neurontin was inside of her.
5  BY MS. SCHULTZ:
6  Q.  Well, Ron Bulger says that he handed
7  her pills to her over the railing, correct?
8  A.  Yes, that is correct.
9  Q.  And then she took them from him?
10 A.  She was going downstairs, yes.
11 Q.  Right.  But what evidence do you have
12 that she actually swallowed the four
13 Neurontin pills when she got downstairs?
14 A.  I do not have any.
15 Q.  It's quite possible that she went
16 downstairs and started planning her suicide,
17 or started attempting her suicide before she
18 ever consumed the four pills, isn't it?
19     MR. FROMSON:  Objection as to
20 form.
21     THE WITNESS:  It's
22 supposition, but it is possible.
23 BY MS. SCHULTZ:
24 Q.  But your opinion depends first on
25 Ron Bulger's testimony that he handed her

**Page 520**

1  the pills, correct?
2  A.  Yes.
3  Q.  And second, upon your supposition that
4  when she got downstairs she actually took
5  the four pills, correct?
6      MR. FROMSON:  Objection.
7  Form.
8      THE WITNESS:  That is an
9  assumption that I've made in my overall
10 conclusions, yes.
11 BY MS. SCHULTZ:
12 Q.  And on what did you base the
13 assumption that once she got downstairs she
14 took those four Neurontin pills?
15     MR. FROMSON:  Objection.
16 Form.  It's already been asked and
17 answered.
18     THE WITNESS:  That she had a
19 history of taking Neurontin, that she had
20 been prescribed Neurontin, that she had
21 refilled the prescriptions for Neurontin,
22 that doctors that we've already
23 discussed, Goldman and Crognale, said
24 that she was taking her Neurontin, and
25 that there were pills missing from the

**Page 521**

1  Neurontin bottles in the medical
2  examiner's report, and Ron Bulger's
3  testimony.  There's no other evidence
4  that I'm aware of.
5  BY MS. SCHULTZ:
6  Q.  But that's not evidence that she
7  actually consumed the four Neurontin pills,
8  correct?
9  A.  That is correct.
10 Q.  Because she could have gone
11 downstairs, decided she wanted to read a
12 book or something else, and then take her
13 Neurontin before she was actually ready to
14 go to sleep, correct?
15     MR. FROMSON:  Objection.
16 Form.
17     THE WITNESS:  Ready to go to
18 sleep?  I don't think there's any
19 evidence that we have that she wanted to
20 go to sleep that day in question.
21 BY MS. SCHULTZ:
22 Q.  Exactly.  But didn't she take them in
23 order to be able to go to sleep?
24 A.  That was the primary reason, yes.
25 Q.  So it is just as likely that she took

Page 522

1 the pills from him and went downstairs, did
2 not take them, because she was going to wait
3 to take them until she went to sleep,
4 correct?
5     MR. FROMSON: Objection.
6 Form.
7     THE WITNESS: I don't recall.
8 It could be accurate. I just don't
9 recall. The usual time, if there was
10 one, when she took her Neurontin -- it's
11 been prescribed variously over a time
12 period, at night and during the day.
13 BY MS. SCHULTZ:
14 Q. But the reliability of your opinion
15 rests upon the assumption that she was
16 handed the Neurontin by Ron Bulger, and then
17 when she went downstairs, she actually took
18 them, correct?
19     MR. FROMSON: Objection as to
20 form.
21     THE WITNESS: Yes.
22 BY MS. SCHULTZ:
23 Q. And only Susan Bulger knows if she
24 actually took Neurontin that evening; do you
25 agree with that?

Page 523

1 A. I do agree that nobody knows, and the
2 only person that would have known is
3 Susan Bulger.
4 Q. You referred several times to the
5 missing pills from the Neurontin bottle,
6 correct?
7 A. Correct.
8 Q. And you testified yesterday that the
9 bottle contained forty-four of 120 tablets,
10 correct?
11 A. Correct.
12 Q. The prescription for Neurontin was
13 dated July 12th, 2004, correct?
14 A. That is correct.
15 Q. So if we assume that she took her
16 first dose on July 12, and her last four on
17 August 4, that would be 24 days, right?
18 A. Correct.
19 Q. So if she took them as prescribed, as
20 you've been saying, she would have taken 96
21 pills, correct?
22 A. Correct.
23 Q. Then there should be only be 24 left,
24 not 44, correct?
25 A. That's correct.

Page 524

1 Q. So, we know she was not taking her
2 Neurontin as prescribed, correct?
3 A. Correct. Unless she had other
4 sources.
5 Q. Because she would have failed to take
6 the Neurontin for five days worth, correct?
7 A. Yes. We just don't have an answer to
8 that.
9 Q. And we don't know if she had failed to
10 take Neurontin for the five days prior to
11 her suicide, correct?
12 A. That's correct.
13 Q. And we don't have any evidence that
14 she, actually, ever ingested any Neurontin,
15 do we?
16 A. In terms of toxicology reports, urine
17 or blood studies, we do not have any
18 evidence that she ever ingested a Neurontin
19 pill in her lifetime. We only have medical
20 reports, progress notes, and her own reports
21 that -- and, of course, Mr. Bulger's reports
22 that she took Neurontin.
23 Q. Mr. Bulger has never testified that
24 he, actually, saw her taking the Neurontin
25 pills regularly, has he?

Page 525

1 A. I don't believe that was in his
2 testimony.
3 Q. And you say what you would base that
4 opinion on are the progress notes and her
5 own reports? Is that what you said?
6 A. Yes. As much as her progress notes by
7 Dr. Crognale and Goldman and the Medical
8 Center reflect the fact that she was
9 taking -- that she was given Neurontin and
10 suffered side effects from it and benefits
11 from it.
12 Q. So because she commented on the
13 Neurontin in her progress reports, is that
14 what you're talking about?
15 A. Yes.
16 Q. Well, she commented on a lot of the
17 drugs prescribed for her to her doctors,
18 correct?
19 A. She did.
20 Q. She commented on the Methadone a lot,
21 correct?
22 A. Yes.
23 Q. And is it your opinion that she was
24 regularly taking her Methadone as
25 prescribed?

**526**

1  A.  I did not have an opinion on that, but
2  I do not believe that she was.
3  Q.  Well, but if she was prescribed the
4  Methadone and she told her doctors -- made
5  comments to her doctors about the Methadone
6  and its effects, why wouldn't you assume,
7  like you do with Neurontin, that she was
8  actually taking the Methadone regularly as
9  prescribed?
10  A.  There's conflicting evidence about
11  what happened to her use of opiates.  And I
12  tried to reflect that in my report, that the
13  testimony of Linda Landry and James Gibbons
14  is that many of those pills were given over
15  to Mr. Bulger to sell on the street for
16  financial gain.
17  Q.  Many of which pills?
18  A.  The opioids.
19  Q.  And what are the opioids?
20  A.  Methadone and OxyContin.  She also
21  received Percodan, which is Oxycodone and
22  aspirin.
23  Q.  Now, much of that evidence just refers
24  to him selling her prescription medications,
25  correct?

**527**

1  A.  That's correct.
2  Q.  It doesn't limit it to Methadone and
3  OxyContin, correct?
4  A.  That's correct.
5  Q.  So he could have been selling her
6  Neurontin as well, right?
7  A.  It's possible.  The only -- as we
8  discussed before -- the only thing that
9  rules against that is the street value for
10  Effexor and the street value for Neurontin
11  is de minimis.
12  Q.  What is the street value for
13  Neurontin?
14  A.  Pennies compared to significant dollar
15  amounts for Methadone and OxyContin.
16  Q.  But what is the street value for
17  Neurontin?
18  A.  Depends where you live.  I think I
19  described in Philadelphia that Seroquel and
20  Neurontin doses go for about a dollar.
21  Q.  A dollar for what dose?
22  A.  Probably 300 milligrams of Neurontin
23  or 25 milligrams of Seroquel.
24  Q.  So a $1 for 300 milligrams in
25  Pennsylvania?

**528**

1  A.  In Philadelphia.  It's cheaper in
2  Harrisburg.
3  Q.  Do you know what the street value
4  of -- was for Neurontin in the area that
5  Ms. Bulger was living?
6  A.  I do not.
7  Q.  Do you know if it would be higher or
8  lower?  And I'm talking about Peabody,
9  Massachusetts.
10  A.  I'm assume Peabody is somewhere
11  between Harrisburg -- I mean, the value is
12  somewhere between what Harrisburg and
13  Philadelphia's street value would be.
14  Q.  Do you think the street value for
15  Neurontin in Harrisburg and Philadelphia
16  would be $1 per 300 milligrams?
17  A.  It could be.  I just don't know.
18  Q.  And so if Ms. Bulger was being
19  prescribed 1,200 milligrams at the time of
20  her death, she could have sold those pills
21  for $4 a day, or $4 per day's worth,
22  correct?
23  A.  It's a possibility.
24  Q.  And so for a month's worth, she could
25  have sold those pills for $120 per month,

**529**

1  correct?
2  A.  Yes, your additions are correct.
3  Q.  And for someone who is on Social
4  Security $120 a month wouldn't be
5  necessarily de minimis, would it?
6       MR. FROMSON:  Objection to
7  form.
8       THE WITNESS:  It's only
9  de minimis in comparison to selling
10  prescriptions like Methadone and
11  OxyContin on the street.
12  BY MS. SCHULTZ:
13  Q.  And if you're selling prescriptions
14  like Methadone and OxyContin is there a
15  reason why you wouldn't want to make the
16  extra money and sell the Neurontin as well
17  for the extra $120?
18       MR. FROMSON:  Objection to
19  form.
20       THE WITNESS:  You could.  I
21  have no evidence that she did.
22  BY MS. SCHULTZ:
23  Q.  But you also have no evidence that she
24  didn't sell her Neurontin, correct?
25  A.  That's true.

```
                                                              574
 1   be, I thought she was off on a bender?
 2   A.   Yes.
 3   Q.   Even if she hadn't been using drugs;
 4   is that your testimony?
 5        MR. FROMSON:  Objection as to
 6   form.
 7        THE WITNESS:  It is my
 8   testimony that it doesn't surprise me at
 9   all.  I'll just give you a clinical
10   example of the multiple doctors and
11   dentists that I monitor who are in
12   otherwise stable marital relationships
13   and have been in recovery five, six,
14   seven, eight, nine, ten years.  If the
15   partner who had previously been abusing
16   drugs disappears, or does almost anything
17   out of the ordinary, the first comment I
18   get from the spouse or I hear about is,
19   Oh, my God, is he using or is she using
20   again.
21   BY MS. SCHULTZ:
22   Q.   Well, Susan Bulger hadn't disappeared,
23   had she?
24   A.   No.
25   Q.   And she hadn't been gone missing for
```

```
                                                              575
 1   the night, had she?
 2   A.   No.
 3   Q.   In fact, he had simply walked
 4   downstairs, couldn't find her in her room,
 5   and his first thought was, She's off on a
 6   bender, right?
 7        MR. FROMSON:  Objection as to
 8   form.
 9        THE WITNESS:  Yes.
10   BY MS. SCHULTZ:
11   Q.   Did you take that statement into
12   consideration when reaching your conclusion
13   that she was no longer using illicit drugs?
14   A.   Yes.  It didn't give me evidence that
15   she was.  It's a statement that I fully
16   anticipated that someone who is the spouse
17   of someone abusing drugs in the past could
18   say something like that.
19   Q.   Simply because his wife wasn't in her
20   bedroom?
21   A.   Absolutely.
22   Q.   And how long prior to her death do you
23   contend it was since she had used illicit
24   drugs?
25   A.   I don't know the answer to that.
```

```
                                                              576
 1   Q.   But you can still testify that that
 2   would be a normal statement for Ron Bulger
 3   to make, even if she hadn't been using
 4   illicit drugs for five years?
 5        MR. FROMSON:  Objection as to
 6   form.  Argumentative.  Asked and
 7   answered.
 8        THE WITNESS:  Yes.
 9   BY MS. SCHULTZ:
10   Q.   Did you take into consideration the
11   fact that Susan Bulger hit her son,
12   Ron Bulger, Jr., five to six days before her
13   suicide?
14   A.   I don't recall that.
15   Q.   Did you rule out the fact that that
16   could have been a precipitating event for
17   her suicide?
18   A.   That she hit him?
19   Q.   Yes.
20   A.   I'm not aware that hitting what would
21   have been a 17-year-old child is a likely
22   precipitating event for suicide.
23   Q.   Well, what if she hit him across the
24   head?
25   A.   My response would be the same.
```

```
                                                              577
 1   Q.   Well, if you have been abused as a
 2   child, physically abused, and you are
 3   concerned that you are becoming your mother
 4   and abusing your own child, can that not be
 5   a precipitating event to her suicide?
 6   A.   That could be a precipitating event.
 7   There's just not enough evidence that I have
 8   available to add that as a high on my list
 9   of risk factors for her.
10   Q.   Well, did you rule it out?
11   A.   I ruled it out.
12   Q.   And how did you rule it out?
13   A.   I didn't think it was high on the list
14   of risk factors for her suicide.
15   Q.   You didn't even think that fact was
16   important, correct?
17   A.   I did not think it was important.
18   Q.   Were you aware of the fact that
19   Susan Bulger struck her son, Ron Bulger, in
20   the head until I told you today?
21   A.   As I said, I don't recall that.
22   Q.   How could you have ruled it out then?
23   A.   I just did.
24   Q.   As you're sitting here today?
25   A.   Yes.
```

**578**

1  Q. So you didn't actually go through a
2  determination that it wasn't important
3  enough to put in your report, because you
4  just ruled it out as you were sitting here,
5  right?
6  A. It's not in my report, as I said. I
7  don't recall it. And as I sit here today, I
8  don't consider it a significant contributing
9  factor to her suicide.
10 Q. And you did not rule it out when you
11 prepared your report, however?
12 A. Not at the time. I'm ruling it out
13 right now.
14 Q. Now, we've already discussed the fact
15 that your opinion depends upon the
16 conclusion that Susan Bulger actually
17 ingested the four Neurontin before she went
18 downstairs. So let's just assume that for
19 this next line of question. Okay?
20 A. Got it.
21     MR. FROMSON: Hold on.
22 Objection to the form. Objection to the
23 colloquy. And his entire opinion did not
24 depend on that. Objection.
25 BY MS. SCHULTZ:

**579**

1  Q. Assuming that Susan Bulger took the
2  four Neurontin, how much time expired
3  between the time she took the Neurontin and
4  the time she decided to commit suicide?
5      MR. FROMSON: Objection.
6  Asked and answered yesterday.
7      Go ahead.
8      THE WITNESS: The best of my
9  estimation is sixty minutes.
10 BY MS. SCHULTZ:
11 Q. So your estimation is that -- first of
12 all, today you're saying that she made that
13 decision for sure after she went downstairs?
14 Is that what you're telling me?
15     MR. FROMSON: Objection as to
16 form.
17     THE WITNESS: She made the
18 decision to kill herself after she went
19 downstairs after she ingested the
20 Neurontin.
21 BY MS. SCHULTZ:
22 Q. Is that what you're telling me?
23 A. Yes.
24 Q. And it's your opinion that she made
25 the decision sixty minutes after she

**580**

1  ingested the Neurontin?
2  A. Somewhere in that time period, because
3  she went downstairs somewhere around 6:00,
4  and somewhere around 7:00 she was discovered
5  dead. So there's variability on both sides.
6  What I said yesterday, and what I would
7  repeat today, is that we have sort of a
8  forty-five-minute to ninety-minute period
9  where she committed suicide.
10 Q. And where do you come up with the
11 ninety-minute period?
12 A. Well, if, in fact, it was 5:30 and not
13 6:00 p.m. that she went downstairs and
14 swallowed the Neurontin while she was going
15 down the stairs and she died at 7:00 p.m.,
16 we have ninety minutes.
17 Q. I believe yesterday you testified that
18 it was your opinion that she took the
19 Neurontin at about 6:00. Is that correct?
20 A. That continues to be.
21 Q. And the evidence shows that Ron Bulger
22 called the police a few minutes after 7:00
23 correct?
24 A. Yes.
25 Q. And you already testified that

**581**

1  Dr. Rowe testified that it took Susan Bulger
2  ten to twenty minutes to actually die once
3  she started hanging her, correct?
4  A. Yes.
5  Q. So, you'll agree with me that she
6  couldn't have made the decision to kill
7  herself during that ten- to twenty-minute
8  period; is that what you're saying? Would
9  you agree with that?
10 A. I would agree with that.
11 Q. Now, so is it your testimony that her
12 decision to commit suicide occurred
13 somewhere between 6:00 when you think she
14 took the Neurontin and sometime prior to
15 7:00?
16 A. Yes. Given I just want to add the
17 caveat, it's approximately 6:00 p.m. The
18 death process was approximately ten to
19 twenty minutes. It was approximately
20 7:00 p.m. So taking all of that into
21 consideration, we have a rough and
22 approximate timeframe of about an hour with
23 the evidence that's been provided. It could
24 have been an hour and-a-half it could have
25 been forty-five minutes.

60 (Pages 578 to 581)

Page 602

```
 1  correct?
 2  A.  I believe that's correct.
 3  Q.  Doctor, I want you to take a look back
 4  to your report to Page 12. And I want to go
 5  back to the list of issues that you
 6  identified as having increased Mrs. Bulger's
 7  risk of suicide.
 8       Did you identify Mrs. Bulger's
 9  discontinuation of her mental health
10  counseling as an issue that increased her
11  risk of suicide?
12  A.  Only inasmuch as I would have included
13  that under the broad umbrella of her metal
14  health issues and substance abuse.
15  Q.  Where are you referring to the broad
16  umbrella of mental health issues and
17  substance abuse?
18  A.  On Line 3 of Paragraph 3 under
19  conclusions, I use the words "substance
20  abuse." And on Line 4, I use the words
21  "depression," "anxiety," and "posttraumatic
22  stress."
23  Q.  And you identify those as issues that
24  increased her risk of suicide, correct?
25  A.  That's correct.
```

Page 603

```
 1  Q.  But you don't identify her
 2  discontinuation of her mental health
 3  counseling as a risk, correct?
 4  A.  I did not put it in that paragraph,
 5  that's correct.
 6  Q.  Well, do you have it anywhere in your
 7  report?
 8  A.  I'll have to look for it. Hold on.
 9  Do you want me to take the time to try to
10  find it?
11  Q.  Well, you didn't list it as an issue
12  that increased her risk of suicide, correct?
13  A.  I did not in that paragraph, that's
14  correct. Whether I listed it in any other
15  part of my report or it appears in the
16  exhibits, I can't tell you because I do not
17  remember.
18  Q.  Well, it appears nowhere in your
19  conclusions, does it?
20  A.  It does not. Except as it's reflected
21  in just her overall history of substance
22  abuse, and as I've already reported, her
23  psychological counseling, her psychiatric
24  assessments, her seeing psychiatrists.
25  Q.  Well, those aren't in your list of
```

Page 604

```
 1  risk factors either. You have substance
 2  abuse as a risk factor, correct?
 3  A.  Right. I have --
 4  Q.  But you have not listed lack of mental
 5  health counseling as a risk factor, correct?
 6  A.  I did not list that.
 7  Q.  And, in fact, you listed as a
 8  protective factor intermittently successful
 9  treatment for psychiatric symptoms, correct?
10  A.  Yes. Actually, thank you for finding
11  that. That is, in part, my reflection that
12  it is a factor.
13  Q.  Well, you listed it as a protective
14  factor instead of a risk factor though.
15  There's a big difference there, correct?
16  A.  Yes. But even partial mental health
17  counseling and treatment is better than
18  none. So even if her treatment was
19  variable, I believe it is more of a
20  protective factor than an adverse event that
21  would increase her risk.
22  Q.  So it's your opinion that any amount
23  of treatment becomes a protective factor,
24  and the lack of mental health counseling is
25  no longer a suicide risk?
```

Page 605

```
 1       MR. FROMSON: Objection as to
 2  form.
 3       THE WITNESS: I believe that
 4  both of those -- I don't think I've --
 5  let me hear the question again, please.
 6       MS. SCHULTZ: Let me lay a
 7  little groundwork here.
 8       THE WITNESS: Sure.
 9  BY MS. SCHULTZ:
10  Q.  You are aware that Susan Bulger was
11  receiving counseling through CAB for many
12  years, correct?
13  A.  Correct.
14  Q.  And she was going there because that's
15  where she was getting her methadone,
16  correct?
17  A.  Correct.
18  Q.  The only place she could find to get
19  methadone, correct?
20  A.  That's correct.
21  Q.  And as part of her attending CAB, she
22  was also required to attend counseling
23  sessions, correct?
24  A.  Yes.
25  Q.  And you've seen records reflecting
```

66 (Pages 602 to 605)

**606**

1  those counseling sessions, correct?
2  A.  That's correct.
3  Q.  And you've seen records where she
4  discusses the way she feels about being a
5  mother, about her abusive husband, her
6  relationship, and that's all in the
7  counseling records, correct?
8  A.  That's correct.
9  Q.  And you've seen in those counseling
10  records that she receives support from the
11  other members of that counseling group,
12  correct?
13  A.  Yes.
14  Q.  Then Susan Bulger found Dr. Goldman,
15  correct?
16  A.  That is correct.
17  Q.  And Dr. Goldman agreed to prescribe
18  methadone to her, right?
19  A.  Yes.
20  Q.  So she stopped going to CAB, right?
21  A.  Yes.
22  Q.  And she stopped receiving any kind of
23  mental health counseling after she stopped
24  seeing Dr. Goldman, correct?
25  A.  I believe that's accurate, yes.

**607**

1  Q.  And, Doctor, did you rule out the fact
2  that she had discontinued her mental health
3  counseling as a potential cause of her
4  suicide?
5  A.  I did not include it as a potential
6  cause of her suicide. In my overall
7  consideration, I did rule it out at the time
8  I was spending time thinking about this
9  case.
10  Q.  Well, did you even consider it?
11  A.  I did consider it.
12  Q.  Well, why isn't it anywhere in your
13  report?
14  A.  I didn't think it was significant
15  enough to place in that paragraph.
16  Q.  Well, there is nothing about the fact
17  that she stopped getting counseling from CAB
18  and was receiving no other mental health
19  counseling anywhere in your report, in the
20  appendix or any other part, is there?
21  A.  There's mention of counseling from
22  CAB.
23  Q.  In what manner? And where?
24  A.  We described it somewhat earlier
25  today. Do you want me to find that?

**608**

1  Q.  Well, let me ask you this: Is there
2  any mention in your report about the fact
3  that she stopped receiving mental health
4  counseling from CAB prior to her suicide?
5  A.  I did not, as I've already reported,
6  specifically mention that. On Page 8 of my
7  report, I did include that I was aware, by
8  virtue of my inclusion, that she had been
9  receiving treatment at the Center for
10  Addictive Behaviors.
11  Q.  But nowhere do you mention that she
12  stopped receiving the treatment, do you?
13  A.  I've already said that I did not
14  mention that.
15  Q.  Well, if you didn't consider that
16  important enough to include anywhere in your
17  report, then how can you sit here today and
18  say you ruled it out as a factor that could
19  have caused her suicide?
20  A.  There are many things that I ruled out
21  and did not reflect in my report.
22  Obviously, my report in a few pages, is a
23  summation of my opinions and conclusions
24  based upon reasonable assessments and
25  evidence. I did not include in my -- for

**609**

1  example, even though the death of a dog is a
2  risk factor for people to hurt themselves
3  and a risk factor for depression, I did not
4  include that in my summary conclusions as a
5  significant risk factor for suicide.
6  Q.  Well, Doctor, would you agree that
7  discontinuation of mental health counseling
8  is a significant risk factor for suicide?
9      MR. FROMSON: Objection.
10  Asked and answered.
11      MS. SCHULTZ: Do you agree
12  with that statement?
13      THE WITNESS: I would agree
14  that it can be a significant risk factor.
15  BY MS. SCHULTZ:
16  Q.  And how did you conclude that it was
17  not a risk factor for Mrs. Bulger?
18  A.  The same way that I concluded that any
19  risk factor may or may not be important. I
20  was aware of her previous history of
21  counseling. I was aware of all of the
22  factors I reported in here. I was aware of
23  many more factors as well.
24      By virtue of my not listing them
25  does not mean, and the record should so