# EXHIBIT 5 PART III

618

my overall thinking and assessment that form the basis of my conclusions.

So that when I concluded that this patient had been on Neurontin for a long period of time, that that increased her GABA levels in her brain, that increased GABA levels in short or long periods of time can increase the likelihood of suicide, that, in a reflection of all of the risk factors and all of the protective factors that this woman demonstrated, that, in my opinion, based upon my conclusion as referenced by all the facts and all the information that I've had to examine, that that was the significant contributing factor, being on Gabapentin for a protracted period of time, and acutely on the day that she committed suicide.

MS. SCHULTZ: Object and move to strike the entire answer.

BY MS. SCHULTZ:

Q. My questions are very simple, and I understand you don't want to answer them. But I'm asking you -- you've attached a list of exhibits to your report, correct, Doctor?

619

MR. FROMSON: Hold on, Doctor.

Objection to the colloquy. It's argumentative.

BY MS. SCHULTZ:

Q. You've attached a list of exhibits to your report, correct?

A. Yes, that's correct.

Q. And in that list of exhibits, and the list is what, some-twenty pages long, approximately?

A. I think we said Page 13 to 27.

Q. Okay. And in that list, you cite portions of deposition testimony, correct?

A. That is correct.

Q. And you cite portions of medical records, correct?

A. That's correct.

Q. And you cite portions of prescription records, correct?

A. Yes.

Q. And you testified that you included the facts as exhibits to your report that you felt were important to your opinion, correct?

620

MR. FROMSON: Objection. Asked and answered.

THE WITNESS: Yes.

BY MS. SCHULTZ:

Q. And so when I ask you if you included a specific portion of a record in your appendix, all I need is a yes or no answer.

A. And I've answered that, and I'll be happy to repeat my answer.

Q. I don't want you to repeat your answer. I'm going to ask you the next question. I just want you to be clear with the question I'm asking you. I'm not asking you what you considered with all of the documents you reviewed. I am asking you, is it one of the facts that you pulled out and placed in your appendix? That's all I'm asking you on these questions. Okay?

A. And as I said very simply, I did not inscribe that in my report. I included that --

Q. That's fine. That's all I want to know. Yes or no.

A. It's not a yes --

Q. Did you include it in the appendix?

621

MR. FROMSON: Why don't we wait for the next question.

MS. SCHULTZ: It is a yes or no answer.

MR. FROMSON: Is that a question?

BY MS. SCHULTZ:

Q. Are you aware, Doctor, that Ron Bulger interfered with Susan Bulger's attempts at detoxification?

MR. FROMSON: Objection as to form.

THE WITNESS: Yes.

BY MS. SCHULTZ:

Q. Did you cite any facts in any of the exhibits attached to your report that reflect that Ron Bulger interfered with Susan Bulger's attempts at detoxification?

A. I do not believe that I did.

Q. Are you aware that Susan Bulger left AMA, against medical advice, in July of 1997 and was convinced to leave by her husband and refused to allow any follow-up intervention?

A. I am aware of that, yes.

Q. Do you agree that you did not place that fact in the exhibits to your report?
A. That is not in my report.
Q. Are you aware that she left Somerville Hospital on October 16th, 1997, and left on the third day of her treatment on a nonscheduled discharge?
A. I am aware of that.
Q. Did you include that fact in the exhibits to your report?
A. That fact is not in my report.
Q. Are you aware that she entered Salem Hospital in November 1997 and was discharged for noncompliance and failure to attend sessions?
A. I did mention earlier about her Salem hospitalization. And, therefore, I am aware of it.
Q. How did you rule out Susan Bulger's failed attempts at detoxification and rehabilitation in forming your opinion in this case?
A. I considered them all, and I ruled it out because of her failed treatments -- failed attempts at treatment and her

recidivistic and relapsive behavior and her drug use was consistent with every known -- it was consistent with the usual and customary behavior of someone who is addicted to substances.

As such, I reflected that on my report that she had a significant risk factor for substance abuse and all of the behaviors subsumed under substance abuse that I listed in my conclusions by using that as two words, substance abuse, and as well included the protective factors that I've talked about previously.
Q. You listed as a protective factor at the time of her death, recovery from substance abuse, correct?
A. Yes.
Q. When did she recover from substance abuse?
A. Her brother, James Gibbons, says that she did not use substances after 1997 or 1998.
Q. Well, doesn't James Gibbons actually say that she stopped in 1998, and then he didn't see her after that?

A. He did say that as well.
Q. So James Gibbons gave no testimony as to whether she used illegal substances between 1998 and August 4, 2004, did he?
A. He said, the best I'm paraphrasing it, he believed that that was the end of her substance abuse in 1997 and 1998.
Q. Because that was the last time he saw her, correct?
A. I'm not sure he put it in those words, but we can look at the evidence if you would like.
Q. So is it your opinion that she recovered from substance abuse in 1998 based on that statement of James Gibbons?
A. No, that is not. My opinion is that she probably had relapsive and recidivistic substance abuse behavior up until the end of her life.
Q. So you believe she would have relapsed on illicit drugs up until the day she killed herself?
A. I just don't know.
Q. So she could have relapsed the day before she killed herself, correct?

A. She could have.
Q. She could have relapsed the day she killed herself, correct?
A. Correct.
Q. So how did you rule that out as a cause for her suicide, Doctor?
A. We don't have any evidence to rule it in, specifically. The toxicology reports, as you know, which were not comprehensive in this case, only have her with a body fluid positive for benzodiazepines.

We have her history of treatment, failed treatment, substance abuse, lack of substance abuse. We don't have any specific information available at the time of her death that she was actively abusing substances.
Q. Well, the tox report wouldn't have shown whether or not she had any illegal substances in her at the time of her death, would it?
A. Actually, let me check that. It may be Exhibit E. I'm trying to find what the forensic toxicology tested for and did not test for. I've already stated that it did

Q. But it could account or explain her decision to commit suicide, correct?

MR. FROMSON: Objection. Asked and answered.

THE WITNESS: It could, if that evidence were available.

BY MS. SCHULTZ:

Q. Are you aware that Susan Bulger was caught buying cocaine off the streets six months before her suicide?

MR. FROMSON: Objection as to form.

THE WITNESS: I do not recall that.

BY MS. SCHULTZ:

Q. Wouldn't that be an important factor to consider in determining there was no onset of reutilization of illicit substances?

A. That would not explain the cause of her death, and it was not at the time of her death, as you had just reported.

As I have stated earlier, my assumption in my overall conclusions in this case is that she was -- had relapsive and

recidivistic behavior to substances of choice, which I previously described as cocaine, opiates, and alcohol.

Q. So you place no significance on the fact that Susan Bulger was caught buying cocaine off the streets six months before her suicide?

MR. FROMSON: Objection as to form. Asked and answered.

THE WITNESS: I believe I've answered that. I do not see that as a -- let me start again.

I believe that any relapsive behavior on drugs and alcohol is an increased -- increases your risk factor for suicide. That relapsive behavior, as you've just testified to me, occurred six months before her death. I do not have any evidence that she was actively abusing cocaine on the day of her death or the day before her death. It was not tested for. And a history of using cocaine six months prior would no longer be a significant contributing factor because of the very, very short half-life

of the cocaine metabolites.

BY MS. SCHULTZ:

Q. Well, if you have a drug addict that has been clean for a long period of time, and then starts using drugs six months before their suicide, are you telling me that that has no significance to a suicide that occurred six months later?

MR. FROMSON: Objection as to form. Lack of foundation. And improper hypothetical.

THE WITNESS: Obviously, I'm saying what -- I'll reiterate what I've already said. I believe that Susan Bulger, with the limited information we have about her substance use and abuse throughout her lifetime, was likely abusing substances right up to the time that she committed suicide. We don't have any specific evidence that she was using at the time of her suicide to explain in my retrospective analysis that that was a specific cause of her death. That, indeed, it was a risk factor, I have no argument with.

BY MS. SCHULTZ:

Q. And I'm making a distinction here between her being on cocaine at the time of her suicide and the cocaine she's on actually causing that suicide, okay --

A. Okay.

Q. -- to having a drug addict who has been trying to stay clean but then relapses and starts using cocaine again.

A. Yes.

Q. So tell me your opinion. If Susan Bulger had gone clean for a while, and then relapsed six months before her suicide on cocaine, and used cocaine up until the day before her death, are you saying that could not be a precipitating factor to her suicide the next day?

MR. FROMSON: Objection as to form.

THE WITNESS: I'm not saying -- before I respond to that, I'm going to ask you to read that back to me, if you would.

(The record was read as requested.)

634

THE WITNESS: I'm saying that, like any person who abuses substances, including Susan Bulger, that the relapsive and recidivistic behaviors associated with substance abuse are chronic risk factors.

The separate issue is the use of cocaine six months before her death. I do not believe that that was a risk factor. I do not believe that was a significant contributing factor to explain her decision to submit suicide.

It is hypothetical because I have no evidence that she was abusing cocaine immediately before her death to help explain her cause of death.

BY MS. SCHULTZ:

Q. How soon prior to her death would she have had to use cocaine for it to account or explain her decision to commit suicide?

MR. FROMSON: Objection as to form.

THE WITNESS: Can you repeat that?

BY MS. SCHULTZ:

635

Q. How soon prior to her suicide would she have had to use cocaine in order for it to account or explain her decision to commit suicide?

A. I don't have a specific timeframe. Again, the cocaine and it's metabolites are very short lived. So that's probably the best response that I have.

Q. Well, can't the fact, just the fact that someone has relapsed be a risk factor for suicide?

A. It absolutely is, as I've already stated.

Q. And can't just the fact that someone relapsed account for or explain a suicide even if there's no drug left in the individual's system at the time they commit suicide?

A. Yes.

Q. So why isn't Susan Bulger's relapse to using cocaine six months prior to her death considered a recent reutilization of elicit substances that accounts or explains for her precipitous decision to commit suicide?

MR. FROMSON: Objection as to

636

form. Lack of foundation. Assumes facts not in the record.

THE WITNESS: My response would be the same. It's still six months out in my overall assessment of risk factors, risk factor is always when someone relapses on substance abuse or alcohol.

However, in my determination of what was etiologically related to her decision to commit suicide and my explanation and my conclusions, I did not believe that that was a significant contributing factor, because there was furthermore no evidence that she was using cocaine at the time of her suicide.

BY MS. SCHULTZ:

Q. Well, you didn't even consider her use of cocaine six months before in your conclusions because you didn't know about it?

MR. FROMSON: Objection as to form. Lack of foundation. Assumes facts not in the record.

MS. SCHULTZ: Right?

637

THE WITNESS: No. As I've said today, I don't remember the specific episode that you're talking about from the records. What I did say, however, is that I assumed that she likely had recidivistic and relapsive behavior on her substances of choice which were cocaine, opioids, and alcohol throughout her history, and that was elevated -- that elevated her risk factor for suicide.

BY MS. SCHULTZ:

Q. Do you agree that you did not rule out her cocaine use six months prior to her suicide as a cause for her suicide?

MR. FROMSON: Objection as to form. Lack of foundation.

THE WITNESS: I believe I've answered that already.

BY MS. SCHULTZ:

Q. Well, you couldn't have ruled it out if you weren't aware of it, correct?

A. As I've I said -- I've already said it.

Q. Were you aware of the fact that

Susan Bulger was caught buying cocaine off of the street six months before her suicide? Yes or no?

MR. FROMSON: Objection. Asked and answered. Lack of foundation. Assumes facts not in the record.

Go ahead and answer again.

THE WITNESS: As I said, I did not specifically remember that until you reintroduced it into this conversation. That does not mean that I did not consider it, because I actively considered, as reflected in my specific causality report, that she was using substances of choice, which included cocaine, opioids, and alcohol.

BY MS. SCHULTZ:

Q. Did you include that fact anywhere in the facts you set out in your appendix to your report; the fact that she was caught buying cocaine off the street six months before her suicide?

A. I did not include that in my appendices.

Q. Did Susan Bulger enter any

detoxification center at any time from the point that she was buying cocaine off the street six months prior to her suicide and the date of her suicide, to your knowledge?

MR. FROMSON: Objection as to form. Lack of foundation.

THE WITNESS: Not to my knowledge.

BY MS. SCHULTZ:

Q. Did you consider the testimony of Linda Landry concerning the statements made by Ron Bulger's family at Susan Bulger's funeral regarding her drug use?

A. I remember reading it and, therefore, I considered it, yes.

Q. And what was it that you read?

A. I don't remember the specifics as I sit here. I remember there was discussion of people who attended her funeral.

Q. Well, did you consider what was told to Linda Landry at the funeral about Susan Bulger's drug use, in your opinion, that withdrawal did not cause her suicide?

A. I do not remember that I did that.

Q. Well, do you recall anything that was

said to Linda Landry at the funeral about Susan Bulger's drug use?

A. As I just said, I do not recall that as I sit here today. So if you can tell me exactly what was said, I'll tell you how I considered it and what I did with the information.

Q. Well, you can't tell me how you considered it if you were never aware of it, correct?

A. No. I said I recollect that I read about it. As I sit here today, I cannot specifically tell you what was said. Because the records, again, were voluminous, there's no possible way for me to do that. If you want to me speculate about my consideration, please show me the evidence in the medical record, and I'll be happy to tell you how I considered the information.

Q. And all I'm asking you is: What was it that you did consider? You don't know?

A. How could I possibly answer what I did or didn't consider if I don't remember the specifics as I sit here today?

Q. Just tell me, generally, if you

remember what was said at the funeral.

A. I don't recall what was said at the funeral. So if you want for me to describe and opine on what was said and how I considered it in my overall assessment of this case, I'll be happy to do that. Just, please, show me the evidence.

Q. Yes. I'll tell you the deposition testimony. But what has been transpiring throughout this deposition is you say that. Then I show you the deposition testimony, and you say, "Oh, yes. I considered that. Of course, it's not in my report, but I considered it and ruled it out."

So I'm trying to ask you what it was that you ruled out. That's my question. And I guess you can't answer that, correct?

MR. FROMSON: Objection to the colloquy. Objection to the form of question.

THE WITNESS: There's thousands of pages of documents in this case. If you show me what it is, as I've already stated, I considered all of the information that I reviewed in this case.

There is no possibility that I can remember specific elements and tell you what happened and how I considered that.

If you show me the evidence, I'll be happy to tell you what it is I remember about the consideration.

BY MS. SCHULTZ:

Q. Let me ask you about this deposition testimony in Linda Landry's deposition.

"QUESTION: Let me just get back on the -- you mentioned a second ago that the family told you at the funeral that she was back on the drugs?

"ANSWER: Yes, that she had a relapse.

"QUESTION: Who told you that?

"ANSWER: The mother. And my son was there outside. He can testify to that. My [redacted] was sitting right there."

Did you rule out that testimony concerning the fact that she was on drugs at the time of her death in reaching your

opinion that she had not relapsed on drugs?

MR. FROMSON: Objection as to form.

THE WITNESS: Can I see the exhibit, please?

MS. SCHULTZ: Yes. Let's go ahead and mark it.

(Document was marked as Exhibit 14 for the purposes of identification.)

THE WITNESS: Yes. I can tell you exactly now that I've reviewed this why I didn't consider it an important factor.

There's no mention here in this report of Mr. Chaffin asking questions to Linda Landry about when that relapse occurred. In my estimation, and what I've already said over the last two days, is that relapses and recidivistic behavior occur chronically in people who abuse substances.

This does not give me any more information to have reported this specifically.

BY MS. SCHULTZ:

Q. So if Ron Bulger's family is telling Linda Landry at Susan Bulger's funeral that Susan Bulger was quote, Back on the drugs, unquote, that has no significance to you?

A. Do you have another page that I didn't read just now? I have Page 22. I'm sorry. I did read that. That was, again, this does not specifically say when she relapsed and when she was back on the drugs. That could have been specifically that she had abused cocaine and what we've already described in the scenario six months before her death.

Q. So you're saying that statement to Linda Landry at the funeral that Susan Bulger was back on the drugs is not significant because you're not sure if they meant at the time she died, correct?

A. That's exactly right. This could have been a year before her death. This could have been six months before her death. This was a family that did not stay in touch. As we've already said, James Gibbons had not seen her for a long time. Linda Landry had long periods of time --

Q. Doctor, the mother is the one that made the statement to Linda Landry. Do you see that in the deposition testimony?

A. Yes, I do.

Q. And the mother testified that she had just talked to Susan Bulger the week of her suicide, correct?

A. Let's read this back into the record.

Q. No. I'm asking you, did you read Pat Bulger's deposition testimony?

A. Yes.

Q. So you're aware that Pat Bulger testified that she spoke to Susan Bulger the week before her death, correct?

A. Yes.

Q. And you're aware, aren't you, that Ron Bulger identified Pat Bulger, the mother, as one of the people closest to Susan Bulger, right?

A. Yes.

Q. In fact, he only listed three people -- Ron Bulger, Ron Bulger, Jr., and Pat Bulger, the mother, correct?

A. In terms of what?

Q. The people that were closest to

650

consistent with what I've been stating, that we have evidence from the records, and as we've just described from family members, that Susan Bulger had recidivistic and relapsive behavior.

We do not have any objective evidence that she was consuming any illicit drugs at the time of her death.

BY MS. SCHULTZ:

Q. Doctor, did you consider possible withdrawal from any of medication Susan Bulger was taking as a potential cause for her suicide?

A. Yes. We've already discussed that I did.

Q. And that's because you list substance abuse under the risk factors you considered, right?

A. You were asking me just now about withdrawal from any substances?

Q. Yes.

A. So there could be withdrawal from substance abuse. And there could be withdrawal from serotonin reuptake inhibitors and neuro adrenergic serotonin

651

reuptake inhibitors if she were not taking the Effexor which we talked about earlier. So I considered all of those.

Q. And did you determine that she was not in a state of withdrawal at the time of her suicide?

A. I did not determine that she was not in a state of withdrawal or in a state of withdrawal.

Q. You didn't rule that in or out one way or the other, correct?

A. That's correct.

Q. You will agree, however, that withdrawal can be the precipitating factor for a suicide, correct?

A. I do believe that, yes.

Q. And are you aware of the effect that running out of OxyContin reportedly had on Susan Bulger when that occurred?

A. Can I ask you to re-ask that? I can reframe it. Are you asking me, is there evidence from the medical records that she suffered withdrawal from previous nonuse of OxyContin or other opioids?

Q. Is there evidence that she suffered

652

withdrawal effects when she ran out of her OxyContin early and, therefore, stopped taking it?

A. I don't remember that specific citation.

Q. Did you consider whether Susan Bulger may have run out of her OxyContin medication prior to committing suicide?

A. I didn't have enough information to know whether or not she had been taking her OxyContin and methadone or not taking her OxyContin and methadone. And, therefore, the speculation that she was in withdrawal from not having it or not taking it was too far removed from the actual information that I used to form my opinions.

Q. If she was taking the medication and ran out of the medication prior to her suicide, then she would be in a withdrawal state, correct?

A. That's correct.

Q. If she was not taking the medication and selling it instead, no withdrawal effect, correct?

A. Correct.

653

Q. And we know from -- all we know from the police report is that Ron Bulger did not tell the police that Susan Bulger was taking OxyContin, correct?

A. That's correct.

Q. Did you consider the fact that Susan Bulger ran out of methadone prior to her suicide?

A. As I've already testified, I considered both her possible use of both opioids, her possible nonuse of both opioids, her vacillating use of opioids, and the possibility of withdrawal from opioids.

Q. Well, you're aware that at her June 14th appointment, she had a discussion with Dr. Goldman about her use of methadone -- Methadose, right?

A. I don't recall as I sit here, but entirely possible.

Q. But the month before, Dr. Goldman had temporarily increased her methadone, correct?

A. From fourteen to fifteen tablets a day, yes.

Q. And at the June 14 appointment, he

654

kept that methadone dose the same, correct?
A. Yes.
Q. But at the June 14th appointment, she told Dr. Goldman that she was running out early of her methadone, correct?
A. Yes, she did.
Q. And at her July appointment, Dr. Goldman reduced her methadone from fifteen to fourteen tablets a day, correct?
A. That's correct.
Q. And then on July 30, four days before her suicide, she he called Dr. Goldman and asked if she could increase her dosage, correct?
A. I believe that's accurate, yes.
Q. And we know that there was no methadone provided by Ron Bulger to the police, correct?
MR. FROMSON: Objection. Asked and answered.
THE WITNESS: Yes, we know that.
BY MS. SCHULTZ:
Q. So it would be reasonable to conclude that Susan Bulger had run out of her

655

methadone as of August 4th, 2004, correct?
MR. FROMSON: Objection.
THE WITNESS: Well, that's not necessarily a correct assumption based upon what we've been discussing in the last few minutes.
BY MS. SCHULTZ:
Q. The only other assumption would be that Ron Bulger lied, correct?
A. Well, the assumptions are: That she, one, ran out of the medication, as you just indicated; that she was taking some of the medication, but not all of it; and that she was taking it variably at different times; or that there was medicine left over, and Ron Bulger was not giving that medicine to the police; or that there was no medicine and that she had not been taking a significant amount of medicine because the medicine had already been sold, or had been diverted in some other way.
Q. Well, there's nothing to base a statement that she was taking some but not all of the methadone, is there?
A. I'm just giving you the hypotheticals

656

to respond to your hypothetical.
Q. But what evidence is there that she was taking some but not all of the methadone, or taking it variably, as you said?
A. As I've said, I'm trying to cover all of the possible bases. She was either taking all of her medicine or none of her medicine or anything in between at variable times, and we don't know what happened to that medicine.
Q. Well, we know on the day of her suicide that either she had run out of her medicine or she had sold her medicine, or Ron Bulger had sold her medicine, or Ron Bulger just didn't give it to the police because he wanted to keep it, right?
MR. FROMSON: Objection. Form.
THE WITNESS: Yes.
BY MS. SCHULTZ:
Q. So on the day of, those are the three alternatives, correct?
MR. FROMSON: Objection to form.

657

THE WITNESS: Yes.
BY MS. SCHULTZ:
Q. And alternative one, that she had run out, would mean that she was in withdrawal, correct?
A. It could mean that, yes.
Q. And alternatives two and three require an assumption that Ron Bulger was lying, correct?
MR. FROMSON: Objection to form.
THE WITNESS: They require more assumptions, that she was not in withdrawal because either she was not taking all of her medicine, or it had already been diverted and she was using less medicine and, therefore, not in significant withdrawal or not in any withdrawal.
BY MS. SCHULTZ:
Q. Well, no. If there's no medicine in the house that day, either she has run out of it or Ron has sold it, correct?
MR. FROMSON: Objection to form. Lack of foundation.

THE WITNESS: That's not correct.
BY MS. SCHULTZ:
Q. Well, where would it be?
A. It could certainly be in the house and Mr. Bulger just didn't turn it over to the police.
Q. But my question was, if there's no methadone in the house that day, then either she had run out of it, or Ron Bulger had sold it, correct?
MR. FROMSON: Objection as to form.
THE WITNESS: Yes.
BY MS. SCHULTZ:
Q. The only other option would be that there was methadone in the house and Ron Bulger did not provide it to the police, correct?
MR. FROMSON: Objection to form. Lack of foundation.
THE WITNESS: Yes.
BY MS. SCHULTZ:
Q. But did you reach a determination, Doctor, that Susan Bulger was not in

withdrawal from methadone on the day of her suicide?
MR. FROMSON: Objection. Asked and answered.
THE WITNESS: My same response. I did not reach an opinion that she was or was not in withdrawal because there was not adequate evidence to suggest either.
BY MS. SCHULTZ:
Q. Did you include on your list of issues that increased Mrs. Bulger's risk of suicide a lack or loss of social support at the time of her death? I'm looking, again, at Page 12 of your list of issues that increase her risk of suicide. It's not there, correct?
A. It's not there, correct.
Q. Loss of a social support network is a risk factor for suicide, correct?
A. It is, yes.
Q. Did you rule out that risk factor as being a cause for Susan Bulger's death?
A. I did, and did not include it because she had a variable social support system for

a long period of time. She had, as you've described, great love of her child, [redacted], great love of [redacted], a variable relationship with her husband, a relationship that's not well quantified for me with Pat Bulger, and off again/on again relationship with Linda Landry and a previous relationship with James Gibbons.
And she also had the support, which we've talked about, of CAB and outpatient counseling and whatnot.
Q. Well, she didn't have any support of CAB and outpatient counseling at the time of her death, correct?
A. She did not.
Q. In fact, that was what we talked about before as being a potential risk factor not having the mental health counseling, correct?
A. That's correct.
Q. Now, were you aware that she had no friends, none at all, at the time of her death?
A. I was aware that she had virtually no friends.

Q. Are you aware that she did not have the support of a father or mother?
A. I am aware of that.
Q. Are you aware that she had no support from her siblings at the time of her death?
A. I'm not aware of that because Linda Landry had testified that she was planning to move in with Linda and move away from Ron Bulger, Sr., that the children were the love of her life, and she could not wait to move on, particularly with Regina, and out of the confines of Mr. Bulger.
Q. In fact, you list forward future outlook and supportive sister as a protective factor at the time of her suicide, right?
A. Yes.
Q. Doctor, are you aware that Ron Bulger did not allow Susan Bulger to speak with her sister for the five-month period prior to her death?
MR. FROMSON: Objection as to form.
THE WITNESS: I am aware, and I have already spoken about that, that

662

that relationship was variable.

Ron Bulger -- I didn't testify to this before -- but it's adequately reflected in the records, that he stood between Linda Landry and Mrs. Bulger.

However, it was also the testimony of Linda Landry that Mrs. Bulger intended to move out with her and they were planning for a future.

BY MS. SCHULTZ:

Q. But are you aware that that forward future outlook that you're describing had actually turned into a -- had actually failed as of the time of Susan Bulger's death?

MR. FROMSON: Objection as to form.

THE WITNESS: There's no evidence that it failed.

BY MS. SCHULTZ:

Q. Did you read Linda Landry's deposition, Doctor?

A. Yes.

Q. Are you aware that she testified that she had a plan that Susan Bulger was going

663

to leave Ron Bulger and move in with her, correct?

A. That's correct.

Q. And they were going to do this when she went into the hospital, correct?

A. I don't remember the specific circumstances, but --

Q. Because she was going to come stay at Linda Landry's house, correct?

A. Yes.

Q. Are you aware that when Linda Landry went into the hospital, she kept trying to call Susan Bulger's house and Ron Bulger wouldn't let her speak to Susan?

A. I am aware of that.

Q. So are you aware that that plan never carried through?

A. I am aware that the plan did not carry through at that point. There's no evidence that that plan was then terminated for the future.

Q. Well, Doctor, there was zero discussion from that point on for the next five months between Linda Landry and Susan Bulger. Are you aware of that factor?

664

MR. FROMSON: Objection as to form.

THE WITNESS: I am aware of that. I'm also aware of the fact, as I've reflected in my report, that Linda Landry believed that Susan would absolutely not hang herself and not commit suicide because she was going to move in with her.

BY MS. SCHULTZ:

Q. But Doctor, are you still considering that Susan Bulger had a forward future outlook of moving in with Linda Landry, her sister, when she had not spoken to her for the five months prior to her death?

A. Yes. There's no reason to believe otherwise.

Q. Other than the fact that the plan didn't carry through as Susan and Linda had planned?

A. Like any plans, some of them do not carry through at a specific point in time. But that does not eliminate the plan for future consideration. And it was certainly in Linda Landry's assessment in her

665

deposition that she expected that Susan Bulger would eventually move in with her.

Q. No. Didn't Linda Landry actually testify that the reason the plan foiled was because Ron Bulger was standing behind Susan Bulger the last time they talked about the plan and overheard it? Wasn't that her testimony?

A. She did testify, and that's why the plan failed at that point in time.

Q. And that's why, in Linda Landry's opinion, the plan failed from that point forward, correct?

A. That's not correct, to my knowledge.

Q. Now, you list in your list of issues that increased Mrs. Bulger's risk of suicide marital problems?

A. Yes.

Q. And I take it you are going to tell me that included in marital problems is physical and mental abuse by a spouse?

A. Yes.

Q. Is there a difference in a risk factor for suicide if someone is having marital

666

problems versus someone that is physically and mentally abused by their husband? Is one situation a higher risk factor than the other?
A. Depends how you define marital problems. If you subsume under marital problems that there's any domestic conflict of any kind, including physical, emotional, or sexual abuse, as I do, then it is subsumed and they are the same.
Q. And you will agree that Ron Bulger was physically abusive to Susan Bulger, correct?
A. I agree that there is evidence in the record to support that he was physically abusive.
Q. Well, you'll agree that close to the time of her death he told her she was nothing but a mental maniac like her mother and the rest of her family, correct?
A. Yes.
Q. And you'll agree that Susan Bulger told her treating physicians that he had beat her up on multiple occasions, correct?
A. Yes.
Q. But you still can say that you think

667

there's conflicting evidence as to whether there was a physical abuse by Ron Bulger to Susan Bulger?
A. I said there's conflicting evidence about her use of substances and her substance abuse treatment. I do not believe that I used the word conflicting evidence about the abusive nature of her relationship to Ron Bulger. I do believe that that was an abusive relationship at times. It was also a relationship in which she left the house and came back to him and stayed with him for a long period of time and decided to have another child after her first one from 1987, another one in 1999.
Q. Well, that's not unusual that a woman that's being physically abused may return home, correct?
A. That's correct.
Q. And you would agree that Susan Bulger didn't think she had much of any place else to go, correct?
A. I don't know what she was thinking.
Q. Do you agree that Susan Bulger worried that if she did leave Ron Bulger that she

668

would lose custody of [redacted]d Ron, Jr.?
A. I don't remember that being specifically cited. It would be something that I would suppose and suggest was likely because she had already lost Ron Bulger once previously and would be fearful of losing custody of what's described as the love of her life, Regina.
Q. Well, Ron Bulger told her that, didn't he? Didn't Ron Bulger tell her if she left that she would never get custody of the kids because of her past drug abuse?
A. Yes, he did.
MS. SCHULTZ: We need to change the tape. We have to take a break.
THE VIDEOGRAPHER: We're going off the record. The time is 3:47 p.m. This is end of tape Number 6.
(A brief recess was taken at this time.)
THE VIDEOGRAPHER: We are on the record. The time is 3:55 p.m. This is the beginning of tape Number 7.
BY MS. SCHULTZ:

669

Q. Doctor, I'm going to run through a few more risk factors as quickly as possible. Okay?
A. Yes.
Q. Hopelessness is a risk factor for suicide, correct?
A. Yes.
Q. And will you agree that you did not list hopelessness in your report as one of the issues that increased Mrs. Bulger's risk of suicide?
A. I agree that I did not list it separately.
Q. Well, did you list it in combination with another risk factor?
A. No.
Q. Are tragic events in one's life a risk factor for suicide?
A. Yes.
Q. Did you list tragic events that had occurred in Mrs. Bulger's adult life as one of the issues that increased Mrs. Bulger's risk of suicide?
A. Only inasmuch as it would be subsumed under my shorthand version of marital

problems, for example.
Q. So, for example, her mother dying in a house fire, that's not subsumed under marital problems, correct?
A. That's correct.
Q. Or her brother being murdered. That's not subsumed under marital problems, is it?
A. I considered that but, again, I did not believe that that was a significant contributing factor to explain her death at the time that it occurred.
Q. Unemployment is a risk factor for suicide, correct?
A. Yes.
Q. And you'll agree that Susan Bulger had no gainful employment or potential for future gainful employment, correct?
A. I don't think I opined or concluded about future employment. I was aware, however, that she was on disability and had been on disability for several years; and that her rheumatoid arthritis was advancing which made her an unlikely candidate to assume future employment.
Q. Did you list unemployment as an issue

that increased Mrs. Bulger's risk of suicide on Page 12 of your report?
A. I did not.
Q. Is aggression a risk factor for suicide?
A. Yes, it is.
Q. Did you list aggression as an issue that increased Mrs. Bulger's risk of suicide?
A. I did not separately list that.
Q. Well, did you list it in combination somehow with one of these other factors?
A. Only so much as it's subsumed in the symptomatic complaints of depression and posttraumatic stress.
Q. Subsumed in the systematic (sic) complaints? What do you mean by that?
A. There are many signs and symptoms associated with her multiple psychiatric diagnoses. I did not separately list any of the specifically emotional signs and symptoms, but I did list her extensive psychiatric history, and I tried to give a shorthand version of the three diagnoses that I thought were most relevant as risk

factors for her suicide.
Q. Now, I want to run briefly through the risk factors that you list here in your report as issues that increased Mrs. Bulger's risk of suicide. Okay?
A. Okay.
Q. First you have emotional trauma as a youngster?
A. Yes.
Q. But you ruled out that as the precipitating factor for her suicide, correct?
A. That's correct.
Q. You list placement of son in foster care as a risk factor, correct?
A. Yes.
Q. But you ruled that out, correct?
A. I ruled it in, but did not consider it a significant contributing factor for her suicide at the time that it occurred.
Q. Okay. Depression -- let me go in your order. I'm sorry.
Absent or negative parenting and foster care. You determined that those were not precipitating causes to her suicide,

correct?
A. Yes.
Q. Substance abuse, you determined that was not the precipitating cause of her suicide, correct?
A. That's correct.
Q. With respect to the risk factors we've already discussed that you determined were not the precipitating factors to her suicide, are there any other reasons for that opinion that we've not already discussed today or yesterday in your deposition?
THE WITNESS: Let me hear that question again.
MR. FROMSON: Note my objection as to the form of the question. Overbroad.
(The record was read as requested.)
MS. SCHULTZ: Let me just ask it quickly this way instead.
BY MS. SCHULTZ:
Q. Have we already discussed the reasons why you would have ruled out emotional

686

I referred to. It was not only picking up anonymous men at bars, but also being physically abused by them.
Q. Did she have any prior suicide attempts?
A. I don't think I know the answer to that.
Q. Was she abused as a child?
A. I do not know.
Q. Did she abuse prescription drugs?
A. No.
Q. Did she abuse illicit drugs?
A. No.
Q. Was she in chronic pain?
A. No.
Q. Did she suffer from marital discord?
A. She was single.
Q. Did she have financial problems?
A. Yes.
Q. Did she suffer from depression?
A. Yes.
Q. And anxiety?
A. Yes.
Q. Did she have posttraumatic stress disorder?

687

A. Not that I recall.
Q. Let me ask you about the risk factor of chronic pain. I think I skipped over that. So hold on one moment.
Doctor, you agree that chronic pain is a risk factor for suicide, correct?
A. As I said yesterday, I agreed that when chronic or intractable pain leads to depression and hopelessness, that becomes a significant risk factor for suicide.
Q. And you listed chronic pain as an issue that increased Mrs. Bulger's risk of suicide, correct?
A. Yes.
Q. Does the severity of pain contribute to whether it's chronic pain? Or is chronic pain an issue of duration? Or both?
A. Say that again. I'm sorry.
Q. Is it the severity of the pain that would cause you to classify something as chronic pain? Or would it be the duration of the pain that would cause you to classify it as chronic pain?
A. I believe that both factors can be responsible. Again, my overall response to

688

chronic pain is that in and of itself, regardless of the duration, and as long as it's not intractable pain, for the most part, that when that gives rise to hopelessness and a sense of desperation and depression, that that becomes a very significant risk factor.
Q. Do you agree that Susan Bulger suffered from chronic pain?
A. I do.
Q. And are you aware that she told her physicians, "I'm always depressed because this disease has taken the life right out of me. Before I got arthritis, I was very active. Now I just exist. I feel I have no desire whatsoever"?
MR. FROMSON: Objection as to form.
THE WITNESS: Yes.
BY MS. SCHULTZ:
Q. Are you aware that she told her physicians that she is pretty down, that she is never without pain?
A. Yes.
Q. How did you go about ruling out

689

chronic pain as the precipitating event for her suicide?
A. Because I considered it and because I was aware that she had lived with chronic pain successfully. And I use the word "successfully" because she had not, to my knowledge, tried to hurt herself because of the chronic pain. And, therefore, it was not a significant contributing factor when she did commit suicide, all factors considered.
Q. Well, does chronic pain as a risk factor, does the importance of that risk factor increase over time? In other words, is someone that has chronic pain for six months less likely to commit suicide than someone who has been living in chronic pain for twenty-five years?
A. I believe so.
Q. Does a person in chronic pain ever get to the point, once they've been in chronic pain for a long period of time, where they simple say, I can't live with this anymore?
A. I believe they can get to that point, yes.