# EXHIBIT 15

# PROFESSIONAL PSYCHIATRIC ASSOCIATES

ONE WASHINGTON STREET, SUITE 304
WELLESLEY HILLS, MASSACHUSETTS 02481-1706
TEL (781) 239-0071
FAX (781) 235-6390

Douglas G. Jacobs, M.D.
E-mail: drj@djacobsmd.com

November 3, 2008

Ms. Lori McGroder
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, MO  64108

Re:  *Bulger v. Pfizer*

Dear Ms. McGroder,

At your request, I have reviewed the following information in the above named case (see attachment A).

In addition, these are the materials previously reviewed for report of Dec 20, 2007:

FDA Alert: Suicidality and Epileptic Drugs – 01/31/08

Supplemental Expert Report of Robert D Gibbons, PhD 07/11/08 and 11/05/08

Daubert Hearing, Days 1, 2 & 3 July 2008

FDA Advisory Committee – 07/10/08

Relevant Literature

## SUMMARY OF OPINIONS

1.) There is no reliable scientific evidence that Neurontin causes or contributes to suicidal thinking and behavior.  The FDA Alert and the Advisory Committee proceedings do not change my opinions that Neurontin is safe and effective as labeled and that Neurontin

*Bulger v. Pfizer*

does not increase the risk of suicidal thinking and behavior. In fact, the FDA's meta-analysis as it relates to Neurontin data demonstrates that there is no statistically significant increased risk of suicidality for Neurontin. Consequently, there was no basis on which Pfizer should have added a warning related to suicide with Neurontin. It is my opinion that the labeling for Neurontin is adequate to advise doctors of the risk associated with its use.

2.) Susan Bulger had multiple risk factors for suicide that pre-dated her use of Neurontin and that substantially contributed to and resulted in her suicide. Neurontin did not cause or contribute to Mrs. Bulger's suicide. Susan Bulger's Risk Factors for suicide included:

1. Comorbid Psychiatric Disorders including; depression, substance abuse, personality disorder, anxiety, panic disorder, posttraumatic stress disorder, and possible bipolar disorder.

2. Physical Illness: Severe and disabling Rheumatoid Arthritis.

3. Chronic Pain.

4. Suicidal Behavior: Susan Bulger had documented suicidal behavior that included a near-fatal suicide attempt in 1993, driving her car off a cliff resulting in physical injuries, wrist cutting and overdose.

5. Multiple psychosocial stressors including being raised in a foster home, childhood physical and mental abuse, having a discordant marriage with physical and mental abuse from her spouse, multiple involvements of DSS and chronic financial problems, including bankruptcy.

6. Treatment Non-Compliance: There are multiple reports of failed detoxifications, drug-seeking behavior and indications that prescription medication (opiates) were not used but rather sold.

7. Lack of social support, hopelessness, and unemployment.

It was the combination of these risk factors, not Neurontin that resulted in the suicide of Susan Bulger.

*Bulger v. Pfizer*

## QUALIFICATIONS

I am an Associate Clinical Professor of Psychiatry at Harvard Medical School.  I maintain an active clinical psychiatric practice in Wellesley, Massachusetts, suburbs of Boston.  I have edited three books and numerous papers on suicide.  I am the editor of the textbook, the <u>Harvard Medical School Guide to Suicide Assessment and Intervention</u>, which was published in 1999.  I have organized and have led academic seminars, locally for Harvard faculty and nationally for other mental health professionals, on the subject of suicide and related psychiatric subjects (*e.g.*, depression).  I currently teach Harvard medical students, who are pursuing careers in nonpsychiatric disciplines.  In addition, I established a unique non-profit organization, Screening for Mental Health, Inc. (SMH), which is devoted to screening for, and providing education about, a variety of mental health disorders, including depression.  The programs of SMH are offered to a variety of healthcare clinicians, mental health professionals, and primary care clinicians.

I received my undergraduate degree from Trinity College in Hartford, Connecticut, in 1967.  I received my medical degree from the University Of Pennsylvania School Of Medicine in 1971.  Next, I completed a three-year residency (1972-75) in adult psychiatry at the Massachusetts Mental Health Center, a Harvard Medical School teaching program.  I was board certified by the American Board of Psychiatry and Neurology in 1977.

As part of my clinical practice, I am on the staff of several psychiatric hospitals in the greater Boston area, including McLean Hospital in Belmont, Massachusetts.  I have been a member of the Harvard Medical School faculty since 1975.  I am a member of several professional organizations, including the American Psychiatric Association and the American Association of Suicidology.

I have more than 30 years experience evaluating, treating and consulting on suicidal patients.  Between 1975 and 1983, I served as Director of Psychiatric Emergency Services at The Cambridge Hospital, where I was responsible for evaluating and supervising 3,000 psychiatric emergencies per year. In this patient group, there was approximately one suicide attempt per day.  In my hospital experience and private practice since 1975, I have developed expertise in examining, understanding, and treating a diverse range of suicidal patients.

I am the founder of the Harvard Medical School Suicide Symposium (1981), and directed that symposium for seven years. This symposium remains Harvard Medical School's Department of Continuing Education only postgraduate symposium specifically on the subject of suicide. In 2005, I was the keynote speaker on the subject of Adolescent Suicide.

I am the founder of National Depression Screening Day (NDSD) and its sister mental health screening programs, which are endorsed by the American Psychiatric Association. National Depression Screening Day is held each October during Mental Illness Awareness Week, which was established by the U.S. Congress. Since 1991, numerous hospitals, health centers, libraries, schools, primary care offices, and other practitioners have provided free depression screenings across the country on the designated day. As one of the programs of the non-profit Screening for Mental Health organization, this screening program is funded by federal and state government agencies, corporations, foundations, as well as by registration fees from our participating healthcare facilities and organizations. When I initiated the program fifteen years ago, it was the first time that the concept of large-scale mental health screening had been attempted. The program has been recognized by mental health professionals, the media, mental health advocacy groups and the federal government for its success in reaching people with depression and other disorders who can benefit from treatment, but who had not sought it in the past.

In terms of the primary care program, relevant professional organizations that serve as sponsors to this program are: the American Chronic Pain Association, the American College of Physicians, and the American Medical Association.

I was appointed by the American Psychiatric Association as Chairperson of the Workgroup to develop practice guidelines for the assessment and treatment of the patient with suicidal behaviors. The guidelines were published in 2003 and 2004.

In terms of awards, I received the Massachusetts Psychiatric Society Outstanding Psychiatrist Award in 2004 for advancement of the profession. In 2007, I received a commendation from the Massachusetts House of Representatives for my work on National Depression Screening Day.

I have been asked by clinicians, hospitals, and school systems to consult when there is a suicidal crisis or in the aftermath of a suicide. The American Psychiatric Association regularly refers

*Bulger v. Pfizer*

media representatives who request information about suicide and other mental health topics to me for comment and analysis.

In the area of legal matters involving psychiatric disorders, suicide, or murder, I have been qualified by a number of courts as an expert in the specialty of psychiatry, specifically in the field of suicide and the medical treatment of psychiatric disorders and symptoms. I have testified in both civil and criminal court proceedings and have reviewed cases on behalf of both plaintiffs and defendants. I have also testified before Congress and the FDA on the subject of suicide, principles of causation, and the relationship to pharmaceuticals.

In terms of fees, I charge $500.00 per hour for record review, etc.

### BACKGROUND OF SUICIDE

"Suicide represents a major national and international public health problem with over 30,000 suicide deaths in the United States and 1 million deaths worldwide each year and every year. The estimated cost to this nation in lost income alone is 11.8 billion dollars per year." (Reference 1)  Suicide is the 11th leading cause of death within the general population (Reference 2) and representing approximately 1.4% of all deaths on an annual basis. (Reference 3) Internationally, there are 1 million suicide deaths every year.  (Reference 3)

Suicide is a multi-factorial event with a variety of conditions and stressors contributing to increased risk.  The majority of persons who commit suicide have known risk factors for suicide. (Reference 4)  Recognized risk factors for adult suicide include having psychiatric and medical conditions which make every day life more difficult (e.g. affective illness, alcohol / substance use, functional impairment, chronic pain), previous history of suicidal ideation and behavior, and having comorbid psychiatric conditions. (Reference 5)  In general, the more risk factors an individual has, the higher their risk of suicide. Persons with substance abuse disorders have an increased risk for suicide ranging from 14 to 20 times the general population. (Reference 6)  Pain syndromes have been identified as an independent risk factor having an increased risk for suicide varying from 2 to 5 times. (Reference 7)  Persons with functional limitations due to physical illness are known to have an increased risk of suicide. (Reference 8)  The number one factor

*Bulger v. Pfizer*

associated with an increased lifetime risk of suicide is suicidal behavior. 27% of persons with a suicide attempt will die by suicide. (Reference 6)

Approximately 75% of persons who die by suicide have seen a physician within six months; while 60% have visited a physician within 30 days of their suicide.  These findings suggest that suicidal individuals appreciate the issues troubling them and make an effort to see a clinician, but do not or cannot communicate their suicidal thoughts.  (Reference 3)

### FDA ANALYSIS OF AEDS

On January 31, 2008 the FDA issued an Alert on suicidality and epileptic drugs; "In the FDAs analysis patients receiving anti-epileptic drugs had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%) … the results were generally consistent among the 11 drugs."

The supplemental expert reports of Dr Gibbons specifically responds to this Alert highlighting that for Neurontin there were no suicides, no suicide attempts and the relative risk was 1.57 with a confidence interval that demonstrated that the relevant risk was not statistically significant. This relative risk is important given that Dr Maris in his report refers to the gold standard of 2.0 as being a relative risk that is significant. Furthermore, the FDA has not determined that there is a causal mechanism between the anti-epileptic drugs and its findings. I am relying upon the expert reports of Dr Gibbons, particularly the analyses that he conducted in his November 5, 2008 report, that demonstrate that there is no scientific evidence indicating that Neurontin has an increased risk of suicidal ideation, suicide attempts or completed suicides.  In particular, in Dr. Gibbons' pharmacoepidemiologic analysis, the findings indicate that not only is there no increased risk of suicide attempt with Neurontin, but Neurontin may be protective in some treatment groups.

*Bulger v. Pfizer*

### THE ISSUE OF CAUSATION

I have previously submitted a report regarding my opinions as to general causation. My opinions remain the same and include my opinion that there is no new evidence that indicates a causative relationship between Neurontin and suicide.

### THE SUICIDE OF SUSAN BULGER-A CASE OF PSYCHIATRIC COMORBIDITY, PREVIOUS SUICIDAL BEHAVIOR, MULTIPLE PSYCHOSOCIAL STRESSORS AND TREATMENT NON-COMPLIANCE

Susan Bulger was a 39 year old married white female, mother of two, who had an extensive psychiatric history dating from 1978 when she reportedly slit her wrists at age 14, and medical history dating from 1982, when she was diagnosed with Rheumatoid Arthritis as an 18-year-old. Over the ensuing years, Susan Bulger manifested an extensive and serious substance abuse history with psychiatric comorbidity and multiple psychosocial stressors that resulted in suicidal behavior on numerous occasions prior to ever taking Neurontin, including a near-fatal suicide attempt in 1993, driving her car off of a cliff, wrist-cutting and overdose. The ongoing and increasing stress of her psychosocial condition, comorbid psychiatric disorders, substance abuse and addiction, treatment noncompliance, chronic pain and additional numerous suicide risk factors resulted in the suicide of Susan Bulger on August 4, 2004. Neurontin did not cause or contribute to her suicide. There exists no scientific evidence that indicates a causative relationship between Neurontin and suicide. Susan Bulger did not have suicidal ideation or suicide attempts during the many years she took Neurontin and instead, had improvement in both her pain and mood. For these reasons, Neurontin can be ruled out as a contributing factor.

### THE SUICIDE RISK FACTORS OF SUSAN BULGER

In order to understand the suicide of Susan Bulger, it is important to emphasize the numerous suicide risk factors that Susan Bulger possessed prior to ever taking Neurontin. The primary suicide risk factors were; suicidality, recurrent depression, substance abuse, personality disorder, and psychosocial stressors. Additional factors included treatment non-compliance and multiple hospitalizations for her comorbid psychiatric and substance abuse conditions.

## SUICIDALITY AND PSYCHIATRIC AND SUBSTANCE ABUSE HISTORY WHILE NOT TAKING NEURONTIN

Susan Bulger had a long and complicated psychiatric and substance abuse history. As such, only a portion of that history is set forth below. It began at the age of 14 when Susan Bulger slit her wrists. Susan Bulger was first psychiatrically hospitalized in 1988 at the age of 24, receiving a diagnosis of major depression and substance abuse. In and of itself comorbidity increases the risk of suicide. The substances abused at that time were alcohol and cocaine. At that time she reported feeling depressed and anxious and having had "a three day run where she consumed over 3 grams of cocaine and a case of beer." She had experienced a seizure for the first time 2 weeks earlier while using cocaine. She had been prescribed Ativan prior to the hospitalization and was noted to be in counseling at Jewish Family Services. Her depressive symptoms included anxiety, weight loss, insomnia and lack of enthusiasm. In addition, during this hospitalization Susan Bulger reported that her mother-in-law had threatened to take her son away because of the recent drug abuse (parenthetically it should be noted that Patricia Bulger, the mother-in-law, testified that she knew nothing about Susan Bulger's drug abuse). Her discharge diagnosis included Major Depression Single Type, Generalized Anxiety and Cocaine Abuse.

Five years later, in 1993, Susan Bulger had her second psychiatric hospitalization following a near-fatal suicide attempt by intentional massive overdose. Susan Bulger was admitted to Atlantic Care Medical Center after being found unresponsive in the home by Ron Bulger. When the EMT's arrived at the home, Susan Bulger was in respiratory arrest and went quickly into cardiac arrest. She was without a pulse for two minutes while the EMTs administered CPR. She was admitted comatose to Union Hospital where she was noted to have blood levels of Amitriptyline and Nortriptyline totaling 4,189[1]. A toxic blood level of over 4,000 is consistent with a massive intentional overdose. The therapeutic range for the blood level of Amitriptyline plus Nortriptyline is 80-250. CNS toxicity is demonstrated at serum concentrations greater than 450 ug/L. Therefore this massive intentional overdose of Susan Bulger in 1993 was 10 times the recognized toxic level. Amitriptyline is not a drug used to "get high," but is a drug implicated in fatal suicide attempts. Given this magnitude, it is my opinion that this was a serious suicide

---

[1] Tox Screen was positive for Cocaine and Opioids.

*Bulger v. Pfizer*

attempt by intentional overdose with an intent to die. This overdose would not be consistent with what is known in the field as a low lethality or accidental overdose. (Reference 11)

This inpatient admission highlights the degree of psychopathology of Susan Bulger and its significance in understanding her ultimate suicide. Although Susan Bulger initially denied suicide intent during this hospitalization, she reported that her "physician became aware of the fact that she was abusing narcotics and was cutting her off from those," and she acknowledged at subsequent hospitalizations that her overdose was indeed suicidal behavior. Moreover, in the probate family court records there is an affidavit signed by Ron Bulger in 1996 in which he writes "also suffering from mental illness, she tried to commit suicide 3 or 4 times and was rushed to hospitals. Last time she was 4 days on life support." Susan Bulger was receiving the Amitriptyline from the Lahey Clinic, according to the records. At that time there were several stressors reported, including impending disc surgery of the husband, anxiety over access to narcotics, and the potential foreclosure on their home. These stressors were repeated issues for the Bulger family and were present at the time of Susan Bulger's August 4, 2004 suicide. Moreover, the behavior of both Ron and Susan Bulger during this hospitalization is noteworthy. In terms of Ron Bulger, it was noted that *"he made abusive and threatening phone calls to social workers and left messages with foul language and threats on their voicemail and seemed to be out of control. Staff and I met with him along with security for our protection as he seemed to have very poor behavioral controls. I set limits with him that we were going to treat his wife and that he should not interfere. He re-iterated that his wife was very abusive with her medications and later she confirmed that she would take all of her Ativan right after getting her monthly refill."* This observation is significant given that it was a harbinger of later statements in the records where her physicians would note that Susan Bulger was non-compliant with medications and that Ron Bulger interfered with her treatment, clearly demonstrating a non-supportive, counter-productive marital relationship. This will be discussed at a later point regarding the records of her family physician Dr Crognale. It was during this hospitalization that the diagnosis of Borderline Personality Disorder was made.

Although this may be the only time in Susan Bulger's medical records that a diagnosis of Borderline Personality Disorder was made, it is my opinion that Susan Bulger satisfied the

criteria of Borderline Personality Disorder including; unstable emotional relationships, problems with impulsivity (specifically drug abuse), unstable interpersonal relationships, recurrent suicidal behavior, affective instability and inappropriate anger. The diagnosis of Borderline Personality Disorder is consistent with many of the features that are observed in Susan Bulger's psychiatric history including but not limited to; treatment non-compliance, problems with DSS and chronic interpersonal turmoil. However the major significance is the correlation between Borderline Personality Disorder and the risk of suicide. It is known that 30% of all suicides have a diagnosis of personality disorder and that the lifetime risk of suicide in BPD is 4-8%. (Reference 9) Moreover it is known that comorbidity in women with Borderline Personality Disorder significantly increases the risk of suicide. (Reference 10)

Between 1993 and 1997 there are records in the probate and family court that disclose significant turmoil at the Bulger home. In affidavits signed by Ron Bulger, he describes multiple suicide attempts by Susan Bulger, states that "Sue has threatened to kill me many times with a knife," and voices multiple concerns where he indicates that he is afraid for the welfare of his son, and requests custody of his son. Ronald Bulger makes reference to "Sue has destroyed personal property like my sons toys for no reason, and destroyed my bike, $7,000 in damage." The plea by Ronald Bulger was always the same - that Susan Bulger needed long term help.

In 1997 Susan Bulger was admitted to the Spaulding Rehabilitation Hospital where her extensive and very serious substance abuse history is noted. There is a history of IV heroin use for the past 3 months, previous use via snorting since 1993. Patient uses 20 bags per day and last use was about 6am today. She also has used cocaine since 1993, about $120 per day. As the affidavits of Ron Bulger indicate, Sue Bulger would not cooperate with substance abuse treatment. In the Spaulding Rehabilitation Hospital, it indicates "has had 7 detoxifications, the most recent at Somerville Hospital." Reports indicate that she did not stay sober for one day. The impression during this hospitalization was "32-year-old female with polysubstance abuse, here for yet another attempt at detoxification. Patient is at risk for relapse. Although she had connections with NA and had a sponsor, Sue Bulger could not maintain sobriety." It was also noted that she was on Fluoxetine (Prozac for depression). During this hospitalization Susan Bulger developed a withdrawal symptom from Methadone. Most significantly, Susan Bulger was discharged from

this hospitalization due to non-compliance. Although non-compliance is not listed among the formal suicide risk factors (Reference 6), in the case of Susan Bulger, non-compliance is relevant given the multiple attempts at detoxification and physicians concerns about proper utilization of opioids that were prescribed over the years.

In 1998, Susan Bulger was seen at the Union Hospital Emergency Room, having reported "cut left arm with razor this AM after fight with husband." Susan Bulger reported that she was unhappy with her husband and "has cabin fever." This behavior and display of suicidality are significant given the long history of discord between Susan and Ronald Bulger. This is relevant in understanding the suicide of Susan Bulger. Although Ronald denies that there was a fight at the time of Susan Bulger's suicide, and hastily volunteered this information to the police upon their arrival at the scene of the suicide: "She went downstairs. We weren't having any arguments." An altercation/fight/discord just prior to Susan Bulger's suicide would be totally reasonable from the facts of this case.

There are DSS child abuse and neglect reports, *"Reporter stated that the couple, Susan Bulger and husband, were shooting cocaine and at one point Susan actually went into cardiac arrest. Reporter stated that an ambulance was not called and hotel staff was told that mom had had a grand mall seizure. Reporter claims that parents went through about $800 of cocaine this weekend. Reporter also indicated that parents are getting prescription pills from 5 or more different doctors and selling them to buy the cocaine... Reporter stated that parents are also 5 months behind on their mortgage and are at risk of losing their home."* On March 23, 1998 a Child Abuse and Neglect Investigation Report by the Lynn Police indicated that Susan Bulger had been arrested on 2/21/98 for prostitution and Class B Violation (Cocaine, Intent to buy/sell). Susan Bulger also had 2 warrants outstanding. There is another report on April 20, 1998 in which Ronald Bulger was noted to be high on heroin and cocaine and was demanding money from Susan Bulger; there was a report of Ron Bulger hitting Susan Bulger. There is further corroboration in this report that "the parents blow all their SSI on drugs." The reporter used the hotline to report alleged neglect of the son Ronald Jr.

Susan Bulger disclosed her history of suicidal behavior during the next hospital admission at Bay Ridge Hospital. During intake it was noted that "client has a long history of polysubstance

abuse, polysubstance dependence and depression.  Client has been suicidal in the past and once drove her car off a cliff receiving numerous injuries… client states she has been tried on many other medications; antidepressants, mood stabilizers and benzodiazepines.  Has had blackouts, detoxifications, does not follow through with after-care.  In terms of suicidal behavior… has overdosed, has driven car off cliff, attempted to cut her wrists."  There was a reference to criminal behavior where she reported having outstanding warrants regarding Assault and Battery and Trespassing.  Again, Susan Bulger attended 2 of the scheduled 4 days of treatment and was discharged for non-compliance.  In addition, she appeared under the influence and a urine screen was positive for benzodiazepines.  Ron Bulger admitted to his drug use of over 10 years to a probation officer.  Ron Bulger's sister, Nancy Scialdone, stated on April 28, 1998 during a DSS office visit that she believed that the Bulger's were selling their Methadone.

As previously stated, the issue of non-compliance and outright diversion of medication emerges as a significant issue in the case. In May of 1998, there is a record of the Psychiatric Group of the North Shore, where it was noted that *"Susan Bulger and her husband were on SSDI and their monthly income was $2,300… Despite this, they were heavily involved in cocaine use. Their house became a crack house and things got out of hand and they spent a great deal of money on drugs and their gas and telephone has been turned off. Their son is now living with a relative. Susan Bulger and her husband have had much discord. He has apparently attacked and hit her 4 times. DSS has been involved."* This entry highlights a number of relevant issues including involvement with illicit substances and violence in the home and placement of the son outside of the home. Furthermore, there is a DSS record on June 16, 1998 in which there is reference to concerns about Susan and Ronald's drug abuse and the belief that it is "a particularly glaring case of misuse of resources."

There is a record of Dr Robinson on June 23, 1998 in which it was noted that Susan Bulger had had surgery on her foot because of an infection, and following discharge "she had an altercation with her husband leading to physical abuse. DSS took her son and she's (Susan) left the home to live with her brother when her husband became violent." In terms of drug dependence, there is reference to the patient wanting excessive doses of Percocet and having gone through a month's supply of 240 in two weeks. "I refuse to prescribe further medication until she was seen by

*Bulger v. Pfizer*

APS."(Psychiatric Emergency Service at Massachusetts General Hospital) Dr. Robinson discharged Susan Bulger from his practice. The MGH records contain his letter where he discharges Susan Bulger for drug seeking behavior in which Ron was heavily involved.

There are records from Bay Cove Treatment Center (a substance abuse facility) where Susan Bulger received substance abuse treatment prior to being referred to the Center for Addictive Behaviors ("CAB"). Significantly, during this period of time her extensive substance abuse, both historical and current use are indicated. It is noted that there are multiple references to Susan Bulger having symptoms of withdrawal and that she would attempt to relieve the symptoms by "use of her husband's valium." This is significant in that it offers a reasonable probability that at the end of her life, Susan Bulger had run out of Methadone, had been using benzodiazepines and that the possibility of withdrawal would be likely. In June of 2000, Susan Bulger began Methadone maintenance through the Center for Addictive Behaviors. During that same month it was noted in the Danvers Family Practice Records that there were 4 different prescriptions for either Roxycodone or Oxycontin which would be consistent with the concern that Susan Bulger was not using the medication as prescribed. Also in June 2000, there were DSS individual assessments of the Bulgers. It does not appear that Susan Bulger was on Neurontin at this time. This is significant because in the Danvers Family Practice records of Dr Crognale, Susan Bulger reported "feeling significantly depressed – lack of motivation, anhedonia, mood lability, poor sleep, and crying jags." There was a consideration of bipolar disorder. The plan was to try Prozac and continue Oxycontin for pain. Thus, in the absence of Neurontin, Susan Bulger reported being significantly depressed. There is a notation in the CAB notes where the patient was reporting panic attacks and was being referred to see whether or not benzodiazepines would be useful. Dr Crognale on November 30, 2000, notes that "Prozac has improved things." In February 2001, Dr Crognale notes that depression is now moderately controlled, Prozac will be increased to 80mg and there is reference to patient also having panic and chronic pain. One month later it was noted by Dr Crognale that depression was poorly controlled by Prozac and that plan was to change to Serzone (another antidepressant).

In April 2001 there is a notation that Susan Bulger had called Dr Crognale office asking for an early refill of Klonopin, apparently her speech was slurred and Dr Crognale indicated that he

would deny refills on both medications (Oxycontin and Klonopin). In August of 2001, there is a CAB note in which there is reference to possible diversion of Oxycontin given that the urines were negative for Opioids. Several months later in October, there is a note by Dr Crognale that he is still having concerns about proper use of medications and is trying to keep an open communication with Susan and her husband.

### NEURONTIN USE

Susan Bulger did not have suicidal ideation or suicide attempts during the more than 2 total years that she took Neurontin. Rather, there is evidence that Neurontin improved her pain and mood

In the Psychiatric Group of the North Shore in December of 1999 there is reference to the first prescription of Neurontin. During the visit of January 6, 2000, Susan Bulger's Neurontin was increased to 400mg TID. This is almost 4 ½ years before the suicide. This entry is extremely relevant given that both of the plaintiff experts, Dr Maris and Dr Kruszewski, indicate that the cause of Susan Bulger's suicide was her taking 1200 mg of Neurontin on August 4, 2004, leading to her suicide. Moreover, she was prescribed 2700mg per day (900 mg twice/day and at bedtime) by Dr. Crognale on 12/20/2002, although the only record of a prescription filled at Walgreens was for 300 mg-3 caps twice/day=1800mg on 12/22/2002.

It appears that Dr Crognale first prescribed Neurontin on May 14, 2002. Dr Crognale was aware that Susan Bulger had told him in October of 2000, when she was not taking Neurontin, that her previous use of Neurontin had made her feel out of it, although there is no contemporaneous report in the records. Dr Crognale took this into consideration when he prescribed Neurontin on May 15, 2002. The next visit to Dr Crognale is July of 2002, when Ronald Bulger accompanied Susan and made complaints to Dr Crognale about Susan's level of depression over a 2-3 month period. However, it should be noted that Susan Bulger had discontinued her anti-depressant and her complaints were no different than her previous complaints of depression. At this visit, it states that Susan Bulger "self-discontinue Paxil 1 wk. ago, as she felt not helping". Dr Crognale saw Susan 2 weeks later and noted that her feeling of emptiness was slightly improved. Prozac had been increased to 60mg and the patient's anxiety was being helped by Klonopin. Approximately 1 month later on August 14, it was noted by Dr Crognale that both Susan

Bulger's depression and chronic pain were under reasonable control. This is an important observation since plaintiff experts, particularly Dr Maris, refer to this time period as a time in which "Susan Bulger's depression was worsened." The records simply do not support this as is evidenced by the medical record of August 14, 2002 which shows improvement in depression while the patient is still taking Neurontin. The entry by Dr Crognale on December 2, 2002, is interesting. Susan Bulger had reported to Dr Crognale that she had stopped Neurontin because she felt it was making her more moody, however, her complaint during this visit was depression. Dr. Crognale decided to increase the Prozac to 80mg and to place the patient back on Neurontin.

There is an entry in the pain management records of Dr Walter Jacobs where he decided to discontinue pain management treatment due to positive urine screens secondary to non-compliance with contract and questionable mis-use of Oxycodone. In the next office visit by Dr Crognale, as noted previously, he increased the Neurontin dosage to 2700 mg.

By March of 2003, Susan Bulger's focus for treatment with Dr Crognale was the tapering of the methadone at the CAB clinic. Importantly Susan Bulger had no complaints of depression during this office visit. Again this is contrary to the plaintiff experts, particularly Dr Maris, who opines that once Susan Bulger was placed on Neurontin her depression worsened. The records do not support this opinion. In terms of Neurontin dosages it appears that Susan Bulger was on 1800mg in March and April of 2003. In terms of non-compliance it is noted on April 22, 2003 that Susan Bulger had discontinued her Prozac. Dr Crognale decided to change to Lexapro and importantly the explanation for the return of Susan Bulger's depression again appears to be the discontinuation of an antidepressant. Dr Crognale notes in his next note that it was his opinion that Neurontin (1800mg/day) was helping her significantly regarding both her affective disorder and her pain syndrome. By August of 2003 Susan Bulger's depression was observed to be stable with a combination of Lexapro and Neurontin. This clinical observation by Dr Crognale is in contra distinction to Dr Maris opinion that the addition of Neurontin worsened Susan Bulger's depression. In September of 2003 Susan Bulger discontinued her treatment at CAB. Susan Bulger was discharged from the clinic because she was a no show.

It appears that as of May 2003 Susan Bulger believed that Neurontin was being of benefit to her. She had expressed to Dr Crognale her concern that Mass Health was not covering her Neurontin.

*Bulger v. Pfizer*

Dr Crognale facilitated her receiving Neurontin. Significantly, at this time Dr Crognale prescribed Neuronin 300mg 3 tabs po BID. This dosage of 1800mg is significant given the plaintiff's criticism about the dosage of 1200mg. Moreover, given Susan Bulger's erratic taking of medication, it would be reasonable to assume that there were times that Susan Bulger would have taken 4 Neurontin at a time. In particular, Dr. Maris in his deposition is very inconsistent in his testimony. On the one hand he had stated that Susan Bulger did not take her medication as prescribed, yet when asked questions about Methadone, he stated that Susan Bulger followed the doctors' directions.

## THE LAST YEAR OF SUSAN BULGER'S LIFE

Susan Bulger transferred her care from Dr Crognale to Dr Goldman, who had a concierge practice, which may have been due to Dr Crognale's firm limits of not refilling narcotics prescriptions earlier than specified and the fact that Dr Goldman prescribed Methadone to her. It appears that Dr Crognale would not prescribe Methadone and had left that to the substance abuse facility. On the discharge summary from CAB under Axis 4 (which is the category for psychosocial stressors); is indicated **lack** of sober supports. Also, there is a note that the patient was changing physicians to receive Methadone as pain management under a different physician. When Susan Bulger left CAB and transferred to Dr. Goldman, she was no longer receiving any type of counseling.

Dr. Goldman indicated that he was treating Susan Bulger for chronic pain, Rheumatoid Arthritis and esophageal reflux. Although Dr Goldman continued to prescribe antidepressants, he indicated that he did not assess Susan Bulger for depression and/or suicidality. On the one hand, although this would be questionable practice for a primary care physician, another aspect of this is that Susan Bulger did not complain to him about symptoms of depression. This would counter Dr Maris' opinion that Neurontin worsened Susan Bulger's depression. Dr Goldman does not recollect discussing with Susan Bulger her withdrawal from the substance abuse program or that Susan Bulger had attempted 10 detoxification programs. It should be noted that the Eaton Apothecary records on November 28, 2003 indicate a prescription that was filled for Neurontin 300mg, authorized by Dr Goldman for 15 tablets. Dr Goldman's previous prescription was for

Neurontin 300mg TID. This certainly suggests that as of November 28th, Susan Bulger would have been on at least 1200mg, 4 tablets a day.

On December 3, 2003, Dr Goldman's records indicate that the Lexapro had been stopped and that the patient was now on Effexor which he had increased to 150mg to help with depression. Dr Goldman does not recollect as to why he changed to Effexor, nor does he acknowledge assessing the patient regarding her depression. Throughout Susan Bulger's psychiatric history, she had been on a variety of antidepressants for a period of time and then would be changed to a different antidepressant. This pharmacologic history is consistent with chronic, recurrent depression.

On January 27, 2004, Dr Goldman testified that Susan Bulger had had a "tough month because her 5-year-old daughter had been bitten in the face by their pitbull and needed to be hospitalized. She had run out of her Effexor and took more Methadone." Dr Goldman testified that he communicated to Susan Bulger that he would refill her meds "a little early, this one time." It is noteworthy that Dr Goldman testified that when Susan Bulger ran out of Effexor she "felt lousy." This is significant in this case given that the lack of Effexor is correlated with Susan Bulger's mood change rather than the presence of Neurontin.

Dr Goldman testified that on April 21, 2004 he added 300mg of Neurontin in the morning to the 900mg at night because Susan Bulger thought that the pain medication was not working as well and she was also stressed. Testimony from family members regarding this time period indicate that Susan Bulger was trying to leave Ronald Sr. but felt "in his grasp." The stress at home is corroborated in the medical record of Dr Goldman pertaining to the visit of June 14 and his deposition testimony in which he refers to the stress at home.

Susan Bulger did not complain about depression to Dr Goldman, and the medical records reflecting her treatment during the months prior to her suicide state that she is "doing well overall" and is "not having any new problems at this time." Her only complaints were that her pain medications were not working as well, that she had a history of developing tolerance to opiates and methadone, and that she was worried about the planned decrease in her methadone prescription. There was much discussion about methadone; she was concerned about whether or

*Bulger v. Pfizer*

not she was going to have enough and that Klonopin had been increased to 3mg/day. Susan Bulger called Dr Goldman's office after the last visit on July 17 asking for an increase in methadone. This was to be discussed at the next appointment on August 6, 2004. Moreover there is evidence that Susan Bulger filled a prescription for Ibuprofen on the day of her suicide.

Ron Bulger testified that on the night of her suicide Susan Bulger called to him to get her Neurontin - she was going to bed. He testified that he gave her 4 Neurontin pills. It is unknown whether she ingested any Neurontin that evening. Susan Bulger committed suicide that night, by hanging.

Ronald Bulger Sr. testified that Susan Bulger complained to him about feelings of guilt and worthlessness during the months prior to her suicide. He testified that he did not contact any health care providers; rather he said to her, "Don't talk like an idiot." His testimony is contrary to the medical records of Dr. Goldman, and contrary to his statements to the police the night of her suicide that her last suicide attempt "was the same, she never said a word." Ronald Bulger denied that there were any specific changes in the home at that time, although there is evidence that Susan Bulger attempted to buy cocaine off the street six months prior to her suicide and family members testified that Susan Bulger had relapsed on drugs at the time of her death and was considering taking out a restraining order on Ronald Bulger. Likewise, Ron Bulger told the police on the evening of her suicide that his first thought when Susan Bulger was not in her room was that she "was off on a bender."

## RESPONSE TO PLAINTIFF EXPERTS

There are numerous points made, and conclusions drawn, by Drs. Kruszewski and Maris upon which I disagree and upon which I may also opine. Certain of those points and conclusions are set forth below.

A major thrust of the plaintiff experts is focused on the 4 Neurontin tablets that Ronald Bulger Sr. testifies he gave Susan Bulger prior to her suicide. Dr Maris repeatedly refers to this as a "trigger or noticeable difference maker." Notably, both Drs. Maris and Kruszewski acknowledge that they do not know whether Susan Bulger ingested any Neurontin the evening of her suicide.

Dr Kruszewski testified that he could not say whether the magnitude of risk from Neurontin, independently, was greater than the magnitude of risk from the combination of Susan Bulger's other suicide risk factors. Notably, he excludes and fails to consider her prior suicide attempts as a suicide risk factor of Susan Bulger, even though the number one factor associated with an increased lifetime risk of suicide is suicidal behavior. Dr. Kruszewski opined that the only difference between Susan Bulger's 1993 attempt (wherein he acknowledges her survival was due solely to the good fortune of having been found and resuscitated prior to an imminent death) and her August 2004 suicide was that fact that she did not die in 1993 and she was not taking Neurontin in 1993. Thus, he concludes that it must have been the 4 Neurontin tablets that caused her suicide. From the standpoint of a suicide risk assessment, the failure of a suicide attempt does not correlate with the strength of a patient's intent to die, especially where a patient's survival was the result of good timing and successful CPR. Moreover, Dr. Kruszewski admits that Susan Bulger was not taking her Neurontin as prescribed and that it was possible that Ron Bulger was selling her Neurontin. Furthermore, he acknowledged that there is no evidence that Susan Bulger actually ingested any Neurontin on the day of her death, and he has no knowledge as to whether Susan Bulger decided to commit suicide before or after she received the 4 Neurontin tablets Ron Bulger claims to have given her. There are many additional risk factors, confirmed diagnoses, conditions, and psychosocial stressors of Susan Bugler that Dr. Kruszewski summarily dismissed or failed to even recognize or consider in reaching his opinion, and his report does not provide a reliable scientific basis for his conclusion that Neurontin is associated with an increased risk of suicidality or that Neurontin caused or contributed to Susan Bulger's suicide. Dr Maris does acknowledge that Susan Bulger had made at least 3-5 suicide attempts; however, he minimizes the significance of the 1993 overdose, referring to it as a low lethality attempt. Dr Maris' reasoning is fallacious given that 38% of white females age 39 committed suicide by overdose in 2004 (Reference 2). Dr Maris confuses the concept of reversible method with low lethality. It is true that overdose is considered as a reversible method. However, because a method is reversible does not mean that a specific attempt was low lethality. The experts are hinging their opinion on Susan Bulger taking 1200mg at one time, claiming that it is this dosage of Neurontin that caused the suicide. In terms of Dr Maris, this opinion would be outside the scope of his expertise. Dr Maris goes to great lengths to provide a theory or as he says, an explanation, for a mechanism of suicide. Yet the essence of his testimony is a biologic

or pharmacologic one. Given that Susan Bulger was at best erratic with her medication, and at worst diverting much or all of it, as previously stated, it would be more than likely that on a number of occasions she would have taken at least 4 (300mg) Neurontin or no Neurontin at all. Moreover, there is no scientific basis, nor evidence-based study, that indicates that 1200mg of Neurontin or any other dose would be causally linked to a suicide. Susan Bulger had been taking 1200mg of Neurontin since at least mid-April. Moreover, the records indicate that Susan Bulger was on 1200mg or greater for a significant period of time. Thus the claim that the dosage of 1200mg would have been a noticeable difference maker is spurious at best. Dr Maris ironically supports the multiple risk factors that Susan Bulger possessed. Specifically, he acknowledges that she had an affective disorder, alcohol and drug abuse, impulsivity, anger, suicidal ideas and attempts, marital disruption and work problems. Moreover, he indicates that she had a long suicidal career, that included Rheumatoid Arthritis and relatively chronic pain, physical illness and multiple orthopedic surgeries, 3-5 suicide attempts, depressive episodes, feelings of hopelessness, a Schizophrenic mother, alcohol and street drug abuse, recurring anger at her husband, repeated stress, and loss of custody of son. His testimony is confusing in this regard, given that he is basically offering an alternative explanation as to the cause of Susan Bulger's suicide. It is the combination of extensive suicide risk factors with ongoing psychosocial stress, the return of suicidal ideas and lack of response by a family member or communication with a treating physician that explains the suicide of Susan Bulger. Dr Maris' other opinions have to do with Neurontin worsening Susan Bugler's depression and causing de novo suicidality. In terms of worsening depression, the records are clear that Susan Bulger had severe depression prior to the prescription of Neurontin. Moreover, other than the one entry in July 2002 in the records of Dr Crognale about Susan Bulger's depression as described by Ronald Bulger, Neurontin appears to have either stabilized or improved Susan Bulger's depression. The reports of depression after May 2002 (when Neurontin was re-introduced by Dr Crognale), appear to be related to non-compliance with antidepressants.

## THE ISSUE OF DE NOVO SUICIDALITY

Dr Maris makes reference to a 1990 paper by Dr Martin Teicher entitled "Emergence of Intense Suicidal Preoccupation during Fluoxetine Treatment." (Reference 11) This is not a study but rather a case report of 6 cases. Importantly, these are case reports about an SSRI not Neurontin.

*Bulger v. Pfizer*

Moreover, the case reports involve the emergence of intense suicidal preoccupation when the SSRI in question (Fluoxetine) was recently prescribed, an average of 26 days. Susan Bulger had been on Neurontin for a period of time from 1999-2000 and then from May 2002 up to the time of her death. To compare Susan Bulger's case with the 6 case reports deserves no merit. Dr Maris indicates in his report that the de novo suicidality began after the prescription on June 4 2002. However records indicate that Dr Goldman increased Neurontin on April 23, 2004 to 1200mg. As previously stated, Susan Bulger had been on this dosage or greater dosages on and off since 2004. As happens with persons who have chronic depression, substance abuse, personality disorder; suicidality can wax and wane. Suicidal thinking began to develop in the last month of her life and there was no attempt to contact health care providers by Susan Bulger, Ronald Bulger or other family members. The suicide is explained by the outcome of the development of suicidal ideation when it goes untreated.

## RESPONSE TO DR MARIS CHART

In his supplemental report, Dr Maris presents his explanation for a mechanism for the suicide of Susan Bulger. This chart was originally published in Dr Maris' book in 1992 and then republished in the exact format in a *Lancet* article in 2002. This model is not accepted in the field of psychiatry as a method for determining suicide causation or a mechanism for a suicide. As the editor of the American Psychiatric Associations Practice Guidelines for the Assessment and Treatment of Suicidal Behaviors we reviewed over 3,000 articles and included approximately 850 as references. Dr Maris' model was not mentioned nor referred to in the Guidelines. Moreover, it is noteworthy that in the diagram under protective factors, Dr Maris lists treatment and medication. In his supplemental report, which is offered during the litigation process, medication is no longer a protective factor. Medication has been converted to not only a "trigger factor" but a "but-for" factor. The conversion of medication from a protective factor to a trigger factor is without scientific basis and appears to be motivated by Dr Maris' participation in this legal matter.

### DR MARIS' USE OF THE PSYCHOLOGICAL AUTOPSY FORM

The psychological autopsy method has a long history in the fields of psychiatry and suicidology dating back to the 1950s. I have developed a special expertise in the methodology of the psychological autopsy method having employed it in a number of legal cases (Reference 12) and have testified before the House Armed Services Committee (Reference 13). The critical issue in a product liability case is determining the but-for (proximal causation) as opposed to temporal relationship. First, Dr Maris' psychological autopsy form was prepared with the specific support of a known plaintiff attorney involved in SSRI cases. Dr Maris has attempted to adapt that form to Neurontin/Gabapentin cases. Before I critique Dr. Maris' application of his psychological autopsy in the Bulger case, it is important to emphasize that the first threshold in a product liability case has not been established here. In terms of general causation there is no scientific evidence supporting a causative link between Neurontin/Gabapentin and suicide. The FDA alert does not state that there is a causative relationship between anti-epileptic drugs and suicide and more specifically the FDA analysis does not indicate that Neurontin/Gabapentin is associated with an increased risk of suicidality or suicide.

Secondly, and equally important, is that Dr Maris indicates on the cover page of the psychological autopsy and death investigation form that "this instrument is intended for the retrospective investigation of **scientific evidence** relative to manner of death determination with a special focus on a causal relationship of Neurontin/Gabapentin to death outcome." During the course of discovery it was learned that a legal assistant in the plaintiff attorneys' firm, not Dr Maris, completed the psychological autopsy form. There is no accepted methodology in the field of suicidology in which an employee of the law firm bringing the litigation conducts the psychological autopsy, which obviously introduces bias which cannot be corrected. Not only did Dr. Maris not conduct the psychological autopsy himself, neither he nor the plaintiff's attorneys' agent contacted any family or conducted any interviews at all. Furthermore, Dr. Maris failed to even carefully review the work of the legal assistant for accuracy or completeness. There are issues in the psychological autopsy form that are either incomplete or incorrectly filled out. For example:

*Bulger v. Pfizer*

- Page 7, Question #19-there is no evidence in Dr Goldman's records or Dr Goldman's deposition testimony that there was a plan for Susan Bulger to discuss changes in her Neurontin dosages in the two weeks prior to her suicide.

- Section 4-which refers to decedent's treatment history, is grossly inadequate.

- Question #40-lists five medications. A careful review of the records reveals that Susan Bulger was on the following medications; in 1993 Amitriptyline and Ativan, in 1997 Valium, Fluoxetine and Methadone, in 1999 Zoloft, Thorazine, Depakote, Lithium and Xanax, in 2000 Trazadone, Oxycontin, Methadone and Klonopin, in 2001 Prozac, Paxil, Serzone and Effexor. The significance of inadequately reporting the number of psychotropic medications that Susan Bulger was on is that it fails to depict the chronic nature of Susan Bulger's depression. The medical records indicate that Susan Bulger was on antidepressants continuously from 1993 until her death in 2004. By not reporting the medications in the psychological autopsy form. Dr Maris has failed to depict the true nature of Susan Bulger's affective disorder.

- Question #41-is also completed in a grossly inadequate fashion, particularly given that the 1993 admission to Atlantic Care Medical Center was not included. This admission has particular relevance since it contains the massive intentional overdose of Amitriptyline by Susan Bulger. There is also a subsequent admission to Salem Hospital which reflects 7 previous detoxifications. Her treatment at the Psychiatric Group of the North Shore is not reflected in this section. Her treatments at the Bay Cove substance abuse facility as well as the Center for Addictive Behavior are not included. The failure to include the extensive nature of Susan Bulger's psychiatric and substance abuse treatment history grossly mischaracterizes the chronicity of Susan Bulger's comorbid psychiatric conditions.

- Question #44-should have Major Depressive Disorder, severe dysthymia and substance abuse. Also under Axis 2 should be listed Borderline Personality Disorder.

*Bulger v. Pfizer*

- Question #49-"Did the decedent have any reaction/allergies to the above medications?" Importantly, all of the responses to this question come from the deposition testimony of Ronald Bulger; there is no corroboration in the medical records nor in deposition testimony of a health care provider. Dr Maris was questioned extensively about Ronald Bulger and he acknowledged that Ronald Bulger would "misremember." It clearly is unscientific to rely upon this material in this psychological autopsy form, given that the preamble on the cover page of the form states that "this is a retrospective examination of scientific evidence."

- Section #7- "Possible Drug Mechanisms in Suicidology." This section has no scientific basis. In the FDA's analyses of the antidepressant and antiepileptic drug trials which examine the relationship between these medications and suicidality, the FDA repeatedly stated that no causal mechanism has been established. Therefore this entire section would fail to meet any Frye/Daubert criteria. Moreover, for depression to be checked as positive in this case as occurring after the ingestion of Neurontin totally negates the facts in this case. Susan Bulger was first diagnosed with Major Depressive Disorder in 1988. There are repeated references to major depression in Susan Bulger's records up until the time of her death. To claim that depression only occurred after the ingestion of Neurontin is simply wrong. Section #8, "Other Changes after Ingesting Neurontin." The responses here basically repeat what is on the previous page.

- Page 22, Question #61-"Did the decedent become violent, aggressive, irritable or snappy after ingesting Neurontin in a way that they were not before taking the Neurontin?" Again, the responses come from statements of Ronald Bulger. There is no mention in this section of the multiple affidavits completed by Ronald Bulger in the 1990s in the probate family court. In these affidavits there are references to Ronald Bulger's characterization of Susan Bulger's violent tendencies.

- Page 27, Question #75-under the 15 predictors, Item #1 is inadequately completed. Records indicate that Susan Bulger had comorbid Axis 1 diagnosis; Major Depressive Disorder, Severe Dysthymia and Substance Abuse. 22-J it is indicated that "the decedent had not used drugs of alcohol for approximately 2 years prior to her suicide. This again

*Bulger v. Pfizer*

is an inadequate response; there is no reference to the relapse on cocaine that occurred approximately 6 months prior to her suicide. Under suicide ideation, the references to suicidality pre-Neurontin are not included. Significantly in predictor #4 the Amitriptyline overdose is not mentioned. This is a critical omission that again grossly mischaracterizes and underestimates Susan Bulger's psychopathology.

- Section #4-DSM IV criteria for Major Depressive Disorder, it is not clear when these responses are indicating that Susan Bulger had Major Depressive Disorder. It is important in understanding Susan Bulger's psychopathology that she suffered from recurrent Major Depressive Disorder and Severe Dysthymia since at least 1988. This is evidenced by the number of psychiatric and substance abuse admissions, her involvement with multiple psychiatric and substance abuse providers and particularly the extensive number of antidepressants that she was tried on over an 11 year period.

This form, which was filled out by a legal assistant, is grossly incomplete, inaccurate and in no way would satisfy a standard for scientific evidence.

**THE ISSUE OF WARNINGS**

Dr Kruszewski, during his deposition, opined about the type of warnings that he "would like to see for anyone who receives a prescription for Neurontin." In particular he believes that the warning should "include everything that's in the current warning but to make sure that the label says that there is an increased risk for suicidal ideation, suicidal thoughts and completed suicides in a minority of individuals and that that information has been confirmed in the US FDA studies of 199 clinical trials that were analyzes by the FDA." He also would like to see that the label states that there are precursors and that there is a heightened risk for those people who have psychiatric comorbidity, substance abuse comorbidity, history of abuse and neglect and any other domestic and circumstantial problems in their history. In response to Dr Kruszewski's testimony, I disagree with his recommendations and the basis for them. In particular, on July 10, 2008, the advisory committee specifically voted against revising a label in terms of a black box warning. In addition, the FDA alert and analysis by the FDA did not include any evidence of increased risk of completed suicide. Specifically for Neurontin, as previously stated by Dr Gibbons, the odds

*Bulger v. Pfizer*

ratio was not statistically significant, nor were there any reports of suicidal behavior at all in the Neurontin trials. Most importantly, there is the issue of a susceptible minority of individuals. Dr. Maris also makes reference to Dr Kruszewski's statement about the susceptible minority of individuals. It is discussed in the advisory committee and in the analyses that the evidence for the increased risk of suicidality was only in the epileptic population and not in the pain or psychiatric population of clinical trials. By referring to the FDA analysis of the 199 clinical trials as a basis for his opinion, Dr Kruszewski has effectively eliminated his own "minority of susceptible individuals" since there were no statistically significant findings in the psychiatric population. Finally, Dr Gibbons, in his report (November 5, 2008), has demonstrated that there is no scientific basis to claim that Neurontin increases the risk of suicidal ideation, suicidal attempts or complete suicide.

**SUMMARY**

It is my opinion to a reasonable degree of medical certainty that the suicide of Susan Bulger was not caused by nor contributed to by Neurontin. Susan Bulger was an extremely high risk suicide for a female due to the combination of her multiple suicide risk factors, tumultuous psycho-social condition and dysfunctional family. Susan Bulger grew up in a family where there was mental illness in the mother, and substance abuse in the father. There are reports of physical and emotional abuse resulting in Susan Bulger having to live in foster homes. At an early age she engaged in self-mutilation. By the age of 18 she had the onset of rheumatoid arthritis which was to plague her throughout her life resulting in functional limitations and severe pain. Subsequently, addiction to narcotics developed, as well as involvement with illicit substances. She suffered from several significant Axis I syndromes including recurrent major depressive disorder, substance abuse, and PTSD. In terms of Axis II, she was diagnosed and satisfied criteria for borderline personality disorder. In and of itself, the combination of these Axis I and Axis II risk factors would place Susan Bulger at a high risk. However, in addition to these risk factors she had several suicide attempts, one of which was nearly lethal in 1993. Prior suicidal behavior is the number one risk factor correlated with completed suicide. Importantly, all of these risk factors existed prior to the ingestion of Neurontin. In terms of her psycho-social condition, the evidence indicates that there was a discordant marital relationship that resulted in multiple DSS investigations, pleadings before the probate family court, episodes of violence and

*Bulger v. Pfizer*

temporary loss of custody of her son. The relationship was compounded by financial difficulties including fear of foreclosure and bankruptcy. Evidence indicates that Ron Bulger sold Susan Bulger's prescriptions. Susan Bulger had a fear of not having access to narcotics and a history of withdrawal symptoms from narcotics. Susan Bulger was on Neurontin during two periods–from late 1999 to early 2000, and from May of 2002 through August of 2004. It is important to emphasize that records do not support any claim that Neurontin worsened Susan Bulger's recurrent depression, nor induced suicidal ideation nor behavior. In terms of dosages, records indicate that Susan Bulger was on 1200 mgs, or at least exceeded that dosage on multiple occasions in both periods of time she was on Neurontin. Near the end of her life, Susan Bulger most likely had relapsed on drugs, was concerned about access to narcotics, and was still in the throes of a discordant marriage. The suicide of Susan Bulger was a result of the combination of these risk factors and chaotic life situation, and not her ingestion of Neurontin.

I reserve the right to amend or supplement this report based on additional material that becomes available.

Signed:

Douglas G. Jacobs, M.D.

*Bulger v. Pfizer*

# References

1.  Goldsmith SK, Pellmar TC, Kleinman AM, Bunney WE (Eds). Reducing Suicide: A National Imperative (2002). Washington, DC: National Academies Press.

2.  Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) [online] (2004 Data Analysis) Available from URL: www.cdc.gov/ncipc/wisqars.

3.  Jacobs DG. A 52-Year-Old Suicidal Man. JAMA 2000; 283(20):2693-2699.

4.  Harris EC, Barraclough B. Suicide as an Outcome for Mental Disorders. A Meta-Analysis. Br. J. Psychiatry 1997; 170:205-228.

5.  Jacobs DG (Ed.) The Harvard Medical School Guide to Suicide Assessment and Intervention (1999). Jossey-Bass: New York, New York.

6.  American Psychiatric Association. APA Practice Guidelines for the Assessment and Treatment of Patients with Suicidal Behaviors. American Journal of Psychiatry 2004; 160 (11).

7.  Tang NK, Crane C. Suicidality in Chronic Pain: A Review of the Prevalence, Risk Factors and Psychological Links. Psychological Medicine 2006; 36(5), 575-586.

8.  Kaplan MS, McFarland BH, Huguet N, Newsom JT. Physical Illness, Functional Limitations and Suicide Risk: A Population-Based Study. American Journal of Orthopyshiatry 2007; 77(1):56-60.

9.  Linehan MM, Rizvi SL, Welch SS, Page B. Psychiatric Aspects of Suicidal Behaviour: Personality Disorders, in the International Handbook of Suicide and Attempted Suicide. Edited by Hawton K, van Heeringen K. Chichester, England, John Wiley & Sons, 2000.

10. Stone MH, Stone DK, Hurt SW. Natural History of Borderline Patients Treated by Intensive Hospitalization. Psychiatric Clinincs of North America 1987; 10:185-178.

11. Orsulak PJ. Therapeutic Monitoring of Antidepressant Drugs: Guidelines Updated. Therapeutic Drug Monitoring 1989; 11:497-507.

12. Teicher MH, Glod C, Cole JO. Emergence of Intense Suicidal Preoccupation during Fluoxetine Treatment. American Journal of Psychiatry 1990; 147:207-210.