# EXHIBIT 3

1

1               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

2

3   ―――――――――――――――――――――――――――――
                          )

4   In re: NEURONTIN MARKETING,  )
   SALES PRACTICES, AND PRODUCTS )

5   LIABILITY LITIGATION,       )
   ―――――――――――――――――――――――――――――)

6

7

8    VIDEOTAPED DEPOSITION OF RONALD Wm. MARIS, Ph.D.

9              (Taken by Defendant)

10            Columbia, South Carolina

11         Monday, September 29, 2008

12

13

14

15

16

17

18

19

20

21

22

23

24             Reported in Stenotype by
        V. Dario Stanziola, CSR, RPR, CRR

25  Transcript produced by computer-aided transcription

**Page 2**

```
1        APPEARANCES
2   ON BEHALF OF THE PLAINTIFFS:
3        RON ROSENKRANZ, Esquire
         Finkelstein & Partners
4        1279 Route 300
         Newburgh, New York 12551
5        (845) 563-9442
         rrosenkranz@lawampm.com
6
         and
7
         KENNITH S. SOH, Esquire
8        The Lanier Law Firm
         6810 FM 1960 West
9        Houston, Texas 77069
         (713) 659-5200
10       kss@lanierlawfirm.com
11
    ON BEHALF OF THE DEFENDANT PFIZER:
12
         LORI CONNORS McGRODER, Esquire
13       JENNIFER M. STEVENSON, Esquire
         ANGELA M. SEATON, Esquire
14       LORI SCHULTZ, Esquire
         (Appearing Via Telephone)
15       Shook, Hardy & Bacon, L.L.P.
         2555 Grand Boulvard
16       Kansas City, Missouri 64108
         (816) 474-6550
17       lmcgroder@shb.com
         jstevenson@shb.com
18       aseaton@shb.com
         lschultz@shb.com
19
    Also Present:
20
         JAMES DOWNIE, CLVS, Videographer
21
22
23
24
25
```

**Page 3**

```
1        VIDEOTAPED DEPOSITION OF RONALD Wm.
2   MARIS, Ph.D., a witness called on behalf of the
3   Defendant, before V. Dario Stanziola, CSR, RPR,
4   CRR, held at the Columbia Marriott, 1200 Hampton
5   Street, Columbia, South Carolina, on Monday,
6   September 29, 2008, commencing at 9:25 a.m.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1               INDEX OF EXAMINATIONS
2
3   By Ms. McGroder              PAGE 8
4
5
6              INDEX OF EXHIBITS
7   NUMBER        EXHIBIT              MARKED
    Exhibit 1: Photocopy of PowerPoint      46
    presentation entitled Suicide and SSRIs
8   Ronald Wm. Maris, Ph.D. AAFS Annual
    Conference 11 a.m. to 12 p.m. Tuesday,
9   February 20, 2007, San Antonio, Texas
10  Exhibit 2: Dr. Maris' Curriculum Vitae     75
11  Exhibit 3: A letter dated 12/3/07 to      118
    Andrew Finkelstein and Kenneth B.
12  Fromson from Ronald Maris, Ph.D.
13  Exhibit 4: A letter dated 7/18/08 to      118
    Andrew Finkelstein and Kenneth B.
14  Fromson from Ronald Wm. Maris, Ph.D.
15  Exhibit 5: A letter to Angela Seaton      118
    from Kenneth B. Fromson dated 9/17/08
16
    Exhibit 6: A letter to Andrew             121
17  Finkelstein and Kenneth B. Fromson dated
    12/3/07 from Ronald William Maris, Ph.D.
18
    Exhibit 7: A document entitled            130
19  Gabapentin: Mechanism of Mood-Altering
    Action
20
    Exhibit 8: A document entitled            133
21  Gabapentin Data Capture Aid
22  Exhibit 9: A article entitled Selected    160
    CSF Biochemistry and Gabapentin
23  Concentrations in the CSF and Plasma in
    Patients with Partial Seizures After a
24  Single Oral Dose of Gabapentin
25
```

**Page 5**

```
1   Exhibit 10: An article entitled Seizure   166
    Frequency and CSF Parameters in a Double
2   Blind Placebo Controlled Trial of
    Gabapentin in Patients with Intractable
3   Complex Partial Seizures
4   Exhibit 11: Photocopy of a book entitled  192
    Biological Pschiatry Second Edition
5   Michael R. Trimble
6   Exhibit 12: Photocopy of a book entitled  192
    Textbook of Psycopharmacology by Alan
7   Schatzberg
8   Exhibit 13: A article entitled Yoga       205
    Asana Sessions Increase Brain GABA
9   Levels: A Pilot Study
10  Exhibit 14: An article entitled Suicide   208
    by Ronald W. Maris
11
    Exhibit 15: A letter to Russell G. Katz   242
12  dated 6/22/06 from Mary Ann Coronel
    Evertsz
13
    Exhibit 16: An article entitled           246
14  Increased Cortical GABA Concentrations
    in Depressed Patients Receiving ECT by
15  Gerard Sanacora
16  Exhibit 17: A document entitled           248
    Statistical Review and Evaluation
17  Antiepileptic Drugs and Suicidality
18  Exhibit 18: A article entitled            281
    Divalproex, Lithium and Suicide Among
19  Medicaid Patients with Bipolar Disorder
    by Collins and McFarland
20
    Exhibit 19: A handwritten document with   295
21  attachments entitled Notes, dated
    9/26/08
22
23
24
25
```

2 (Pages 2 to 5)

6

1     THE VIDEOGRAPHER: My name is James
2   Downie of Veritext -- Veritext Deposition
3   Services. Today is September the 29th, 2008,
4   and the time on the monitor is 9:25 a.m.
5     This deposition is being held at the
6   Marriott Hotel located at 1200 Hampton Street
7   in Columbia, South Carolina.
8     The caption of the case is In Re:
9   Neurontin Marketing Sales Practices and
10  Products Liability Litigation in the United
11  States District Court, District of
12  Massachusetts.
13    Name of the witness is Dr. Ronald W.
14  Maris.
15    At this time will the attorneys please
16  identify themselves and the parties they
17  represent, after which we will swear in the
18  witness.
19    MR. ROSENKRANZ: Ron Rosenkranz and Ken
20  Soh for the plaintiffs.
21    MS. McGRODER: Lori McGroder of Shook,
22  Hardy & Bacon for the Pfizer defendants.
23    MS. STEVENSON: Jennifer Stevenson of
24  Shook, Hardy & Bacon for Pfizer.
25    MS. TURNER: Would you please raise your

7

1   right hand --
2     MR. SOH: Are we going to take
3   appearances on the phone?
4     MS. SCHULTZ: Yes, this is Lori Schultz,
5   Shook, Hardy & Bacon for Pfizer.
6     MS. TUCKER: Raise your right hand.
7     RONALD W. MARIS, Ph.D.,
8   having been duly sworn, was examined and testified
9   as follows:
10    MS. McGRODER: Good morning, Dr. Maris.
11    THE WITNESS: Good morning.
12    MS. McGRODER: Let's take a two-second
13  break and get you a chair that's comfortable.
14    MR. ROSENKRANZ: This is the best I could
15  do for you. It's directly from my own room.
16    THE WITNESS: Does it go any higher?
17    MR. ROSENKRANZ: I don't -- I don't know.
18    THE WITNESS: Because it looks lower than
19  what I've got.
20    MS. McGRODER: Let's go off the record.
21    THE VIDEOGRAPHER: Time is 9:26 a.m.
22  We're now off the record.
23    (A DISCUSSION WAS HELD OFF THE RECORD.)
24    THE VIDEOGRAPHER: The time is 9:27 a.m.
25  We're back on the record.

8

1     MR. SOH: Before we start on the record,
2   today is Rosh Hashanah, and Dr. -- Dr. Maris
3   was not exactly consulted on the end times
4   when we were scheduling these depositions.
5   He'd like to leave a little bit after 5:00
6   today so he can go celebrate Rosh Hashanah
7   today.
8     And just -- I'll put on the record, he is
9   recovering from hip surgery, hip replacement
10  surgery. He might need some accommodations to
11  go, especially at the end of the day in his
12  recovery.
13    Go ahead, start.
14    EXAMINATION
15  BY MS. McGRODER:
16    Q. Dr. Maris, you've given many depositions in
17  your professional career; is that correct?
18    A. That's correct.
19    Q. And so I take it you know the rules of a
20  deposition; is that correct?
21    A. I do.
22    Q. If there's anything I ask you that you
23  don't understand or that doesn't make sense to you,
24  please tell me that you don't understand it.
25  Otherwise, we'll assume that you did when you

9

1   answered, okay?
2     A. Okay.
3     Q. Also, I understand that you've had recent
4   hip surgery. We can take as many breaks as you like,
5   okay?
6     A. Sure. I appreciate that.
7     Q. Sure. Just let me know when you need one.
8     You do not hold an advanced degree in
9   pharmacology; is that correct?
10    A. Correct.
11    Q. You don't hold an advanced degree in
12  neuropharmacology, correct?
13    A. Correct.
14    Q. Nor in neuropsychopharmacology, correct?
15    A. Correct.
16    Q. You've never previously testified -- excuse
17  me, you have previously testified under oath that
18  you're not an expert in neuropharmacology, correct?
19    A. That's correct.
20    Q. Do you agree that you are not competent to
21  examine questions about detailed pharmacological
22  reactions and the chemistry of drugs?
23    A. I agree with the caveat that I don't know
24  what you mean by details. I mean, I certainly know
25  a lot about serotonin and neurotransmitters. I was

3 (Pages 6 to 9)

Page 309

1          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2

3    _____
                                    )
4    In re: NEURONTIN MARKETING,    )
     SALES PRACTICES, AND PRODUCTS  )
5    LIABILITY LITIGATION,          )
     _____)
6

7                    VOLUME II

8

9         CONTINUED VIDEOTAPED DEPOSITION OF

10              RONALD Wm. MARIS, Ph.D.

11                (Taken by Defendant)

12             Columbia, South Carolina

13            Tuesday, September 30, 2008

14

15

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
              V. Dario Stanziola, CSR, RPR, CRR
25    Transcript produced by computer-aided transcription

Page 310

```
1          APPEARANCES
2   ON BEHALF OF THE PLAINTIFFS:
3          RON ROSENKRANZ, Esquire
           Finkelstein & Partners
4          1279 Route 300
           Newburgh, New York 12551
5          (845) 563-9442
           rrosenkranz@lawampm.com
6
           and
7
           KENNTH S. SOH, Esquire
8          The Lanier Law Firm
           6810 FM 1960 West
9          Houston, Texas 77069
           (713) 659-5200
10         kss@lanierlawfirm.com
11
    ON BEHALF OF THE DEFENDANT PFIZER:
12
           LORI CONNORS McGRODER, Esquire
13         JENNIFER M. STEVENSON, Esquire
           ANGELA M. SEATON, Esquire
14         LORI SCHULTZ, Esquire
           (Appearing Via Telephone)
15         Shook, Hardy & Bacon, L.L.P.
           2555 Grand Boulvard
16         Kansas City, Missouri 64108
           (816) 474-6550
17         imcgroder@shb.com
           jstevenson@shb.com
18         aseaton@shb.com
           lschultz@shb.com
19
    Also Present:
20
           JAMES DOWNIE, CLVS, Videographer
21
22
23
24
25
```

Page 311

```
1      CONTINUED VIDEOTAPED DEPOSITION OF RONALD
2   Wm. MARIS, Ph.D., a witness called on behalf of the
3   Defendant, before V. Dario Stanziola, CSR, RPR,
4   CRR, held at the Columbia Marriott, 1200 Hampton
5   Street, Columbia, South Carolina, on Tuesday,
6   September 30, 2008, commencing at 9:12 a.m.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 312

```
1           INDEX OF EXAMINATIONS
2
3   By Ms. McGroder       PAGE   314
4
           INDEX OF EXHIBITS
5
    NUMBER      EXHIBIT            MARKED
6   Exhibit 20: Handwritten document with    314
       attachments entitled Notes dated 9/26/08
7                                       322
    Exhibit 21: A document entitled Rates Of
8      Depression Reported As An Adverse Event
       In Neurontin Placebo-Controlled
9   Neuropathy And Epilepsy Clinical Trials
                                        322
10  Exhibit 22: A document entitled
       Neurontin Gabapentin Capsules; Neurontin
11     Gabapentin Tablets; Neurontin Gabapentin
       Oral Solution
12                                      3392
    Exhibit 23: A document entitled an FDA
13     Center for Drug Evaluation and Research
       Document entitled Review and Evaluation
14  of Clinical Data
                                        342
15  Exhibit 24: A document entitled Rates Of
       Depression Reported As An Adverse Event
16     In Neurontin Placebo-Controlled
       Neuropathy And Epilepsy Clinical Trials
17                                      354
    Exhibit 25: A letter dated 5/29/92 to
18     Paul D. Leber from Janeth L. Turner
                                        356
19  Exhibit 26: A document entitled Appendix
       C.11. Summary of Adverse Events By Body
20  System
                                        370
21  Exhibit 27: A document entitled Summary
       Of All Adverse Events In <1 Percent Of
22     Patients With Partial Seizures Treated
       With Gabapentin Or Placebo During
23     Controlled Clinical Studies, By Body
       System And Double-Blind Treatment Group
24
25
```

Page 313

```
1   Exhibit 28: A document entitled Practice   382
       Guideline For the Assessment and
2   Treatment of Patients with Suicidal
    Behaviors
3                                        399
    Exhibit 29: A document entitled SSRI
4      Psychological Autopsy and Death
       Investigation by Ronald Wm. Maris, Ph.D.
5   and Arnold Anderson Vickery, J.D.
                                        428
6   Exhibit 30: A document entitled
       Psychological Autopsy and Death
7   Investigation, File Name Richard H.
    Smith
8                                        490
    Exhibit 31: A document entitled Smith
9   Index
                                        494
10  Exhibit 32: A document entitled The
       American Psychiatric Textbook of Suicide
11  Assessment and Management
                                        496
12  Exhibit 33: A handwritten document
       entitled Notes (Specific) dated 6/13/07
13                                      534
    Exhibit 34: A letter from Christopher L.
14  Wood, DDS dated 5/19/04 with attachments
                                        576
15  Exhibit 35: A document entitled New
       Patient Medical Questionaire
16                                      603
    Exhibit 36: A document from Neurological
17  Associates dated 3/3/03 to Dr. James
    Cato from Paul R. McCombs, M.D. with
18  attachments
                                        610
19  Exhibit 37: A article entitled Columbia
       Classification Algorithm of Suicide
20  Assessment (C-CASA): Classification of
       Suicidal Events in the FDA's Pediatric
21  Suicidal Risk Analysis of
       Antidepressants
22                                      617
    Exhibit 38: A document entitled Beck
23  Scale of Suicidal Ideation
                                        631
24  Exhibit 40: A photocopy of Neurological
       Associates with patient Richard H. Smith
25  clinical record
```

2 (Pages 310 to 313)

Page 314

1     (Exhibit 20: Handwritten document with
2   attachments entitled Notes dated 9/26/08
3   marked for identification, as of this date.)
4     THE VIDEOGRAPHER: This is the beginning
5   of Tape No. 1, Volume II of Dr. Ronald Maris.
6   Today is September 30th, 2008. The time on
7   the monitor is 9:12 a.m.
8     We're now on the record.
9         CONTINUED EXAMINATION
10  BY MS. McGRODER:
11    Q.  Good morning, Dr. Maris.
12    A.  Good morning.
13    Q.  We're here today for the continuation of
14  your deposition in the Smith and Bulger matters.
15    Do you understand that, correct?
16    A.  Yes.
17    Q.  And you're still under oath.
18    A.  Yes.
19    Q.  We marked yesterday as Exhibit 19 a copy of
20  your -- what you called yesterday your new report.
21  Remember that?
22    A.  I called it an addendum to my old report.
23    Q.  Oh, okay. I misunderstood you then.
24    We are going to mark this morning as
25  Exhibit 20 the original copy of your addendum because

Page 315

1   Exhibit 19 is missing some of the -- some of the
2   words on the page, okay?
3     So we're not going to talk about this right
4   now, but I wanted to let you know that we're using
5   your original copies.
6     A.  Does that mean I'm not going to get it
7   back?
8     Q.  No, you'll get it back.
9     Could you please turn to page 18 of your
10  report in the Smith case.
11    MS. McGRODER: Oh, you know, for the
12  record, we used five hours and 37 minutes
13  yesterday. As you know, under the CMO, we're
14  entitled to a seven-hour deposition day. I
15  recognize we got started late and had several
16  breaks. But just for the record --
17    MR. SOH: You're entitled to four days.
18  We owe you an hour because we shut it down an
19  hour for Rosh Hashanah.
20    Please continue.
21    MS. McGRODER: Well, we're entitled to
22  seven hours --
23    MR. SOH: I made my objection, Lori.
24  Please move on. Now you keep burning up your
25  time. Keep talking and burn your own clock, I

Page 316

1   don't care. I made our position. Go ahead,
2   you may ask him your questions.
3     MS. McGRODER: I shall. This morning I'm
4   going to state on the record that under the
5   CMO, we're entitled to a seven-hour deposition
6   day. So hopefully we can complete the
7   deposition in four days. But if not, you
8   recognize that we have additional time on the
9   record due to us.
10    MR. SOH: I do not -- let me --
11    Q.  Dr. Maris --
12    MR. SOH: Lori, you made a statement, I'm
13  going to respond to your statement, Lori. I
14  recognize that --
15    MS. McGRODER: You don't to have to freak
16  out.
17    MR. SOH: 9:00 to 6:00 -- you are
18  entitled to go 9:00 to 6:00. We shut down an
19  hour early, and you're entitled to an hour.
20    Please continue.
21    MS. McGRODER: I'll continue when I'm
22  good and ready, and you don't have to --
23    MR. SOH: Who's freaking out now?
24    MS. McGRODER: You don't have to be so
25  obstructive and angry. It's 9:15 a.m. We're

Page 317

1   just getting started. We have a long day
2   together. Let's calm down and --
3     MR. SOH: I'm perfectly calm, Ms.
4   McGroder.
5     MS. McGRODER: Really?
6     MR. SOH: You seem to have gotten up on
7   the wrong side of the pillow this morning, but
8   go ahead.
9     Please continue.
10    Q.  I'm in the middle of page 18 of your
11  deposition -- or your report in the Smith matter.
12  There's a paragraph that starts the PDR; do you see
13  that?
14    A.  Yes.
15    Q.  And that same paragraph appears in the
16  Bulger report, correct?
17    A.  That's what?
18    Q.  That same paragraph also appears in your
19  report in the Bulger matter, true?
20    A.  I -- I believe so. I'd have to check my
21  Bulger, which I didn't bring today.
22    Q.  Okay. And you state that the PDR lists
23  only two nervous system SAEs.
24    And what do you mean by SAEs?
25    A.  Sometimes it's called serious adverse

3 (Pages 314 to 317)

Page 526

1  do a crucial experiment in humans.
2      For example, we had a -- I'm sorry -- if
3  we had a series of human beings we thought
4  Neurontin caused suicide, we couldn't -- and we had
5  a strong suspicion that was true, we couldn't give
6  them to the experimental group and not to the
7  control group because that would be unethical.
8      Q.  Now, we talked yesterday about Dr. Roth's
9  opinion that there are no animal models that you can
10 extrapolate to humans on the issue of suicide,
11 correct?
12     A.  I -- I disagree with that opinion.
13     Q.  You disagree with Dr. Roth from Yale, who
14 is a bench scientist and --
15     A.  I don't care where he's from --
16         MR. ROSENKRANZ:  Objection.
17         MR. SOH:  Objection.
18     Q.  -- neurobiologist on whether there are
19 animal models that predict suicide in humans?
20         MR. ROSENKRANZ:  Objection.  It's
21 argumentative.
22     A.  He's not a suicidologist, so yes I
23 disagree.
24     Q.  Okay.  And then you say, challenge,
25 dechallenge, rechallenge is more differentiated?

Page 527

1      A.  Let me just make sure I can read my own
2  writing.  Definitive.
3      Q.  Oh, definitive?
4      A.  More -- a more definitive test than a
5  random clinical trial, but is inhumane.
6      Q.  Okay.
7      A.  Random clinical trials require such large
8  samples.  Results for rare events like suicide are
9  almost always inclusive.
10     Q.  Okay.  Can you stop there?
11     A.  Um-hum.
12     Q.  Okay.  Go ahead.
13     A.  Finally, if you were allergic to peanuts
14 or shellfish, only one dose could send you into
15 anaphylactic shock and death.  Don't get hung up on
16 Richard Smith's dose response.  He took a lot of
17 Neurontin.
18     Q.  Okay.  And so part of your opinion is don't
19 get hung up on dose response.
20         What does that mean?
21     A.  That means that we really can't say
22 exactly how much Neurontin that Richard Smith took.
23 I know there was 67 days.  I don't know for a fact
24 that he took it every day.  I know that in Bigg's
25 investigation there's a big bottle sitting on his

Page 528

1  dresser which looks like it's full of Neurontin.
2      I also know that there were nine boxes,
3  sample boxes of Neurontin left over.  It's almost
4  impossible to know exactly how many of those
5  67 days he ingested Neurontin.  We know that for a
6  while he was prescribed 600 milligrams, BID, that's
7  300 and 300.  Then later he was prescribed 900 for
8  the latter part of his life.  How much he actually
9  ingested, I don't think anybody knows for sure.
10 But there's no -- there's probably no doubt that he
11 was on Neurontin.
12     Incidentally, even if you did an autopsy,
13 you wouldn't detect Neurontin in the toxicology
14 report because the standardized tests don't test
15 for it.
16     Q.  What's your basis for saying there were
17 nine boxes of samples?
18     Where do you get that?
19     A.  I was told that by Finkelstein -- not by
20 Finkelstein, but the firm.  I asked specifically --
21 let me finish my answer.  I'm not sure that those
22 pills on the dresser were Neurontin.  And I was
23 confused because, you know, doing some
24 calculations, it's possible that he could have run
25 out of Neurontin in those 67 days.  And I was told

Page 529

1  they found at least nine sample boxes of Neurontin.
2      So the point was to be assured that there's
3  ample Neurontin, that he could have taken it, that
4  he had it left over.  Do we know in fact every day
5  that he took it?  I don't think we know that.  Did
6  he take it?  Yes, many people -- Ruth said she
7  witnessed him take it.
8      Q.  Dr. Maris, can I ask a question?
9      A.  Sure.
10     Q.  Okay.  The basis for your statement there
11 were nine sample boxes is the Finkelstein law firm,
12 correct?
13     A.  Correct.
14     Q.  And when you say you can't -- there's no
15 way to know how much Neurontin he took, it's true,
16 isn't it, that no family member personally observed
17 him taking Neurontin on the day of his suicide; is
18 that correct?
19     A.  On the day of his suicide?
20     Q.  Yes.
21     A.  I think that is true.
22     Q.  Okay.  What about the day before, what
23 about the 11th of May 2004, did any family member
24 personally observe Mr. Smith take Neurontin on that
25 day?

Page 530

1    A. I don't think there's any evidence one
2  way or the other.
3    Q. And what about the day before that on
4  5/10/2004, is there any evidence that any family
5  member personally observed Mr. Smith take Neurontin
6  on that day?
7    A. I don't think there's any evidence on any
8  specific day. So if you go to day four, I'm going
9  to say also the same thing.
10   Q. Okay. So as you sit here today, there's no
11 affirmative evidence that Mr. Smith took Neurontin on
12 any day, correct?
13      There's no personal observation of that,
14 correct?
15   A. Well, the psych autopsy refers to an
16 exhibit where Ruth Smith says she saw him take his
17 Neurontin. Doesn't say when.
18   Q. Okay.
19   A. And she also said --
20   Q. So --
21   A. Let me finish.
22      She also said that his regular habit was
23 to follow the doctor's directions.
24   Q. Okay. And we'll talk about that later.
25      There's -- still, because Mrs. Smith does

Page 531

1  not say when she saw him take Neurontin, there's no
2  evidence of any personal observation of him taking
3  Neurontin on any particular day; is that true?
4    A. That's true.
5    MS. McGRODER: We'd better change the
6  tape.
7      THE VIDEOGRAPHER: This is the end of
8  Tape No. 4 in the deposition of the Dr. Ronald
9  Maris, Volume II. The time is 2:55 p.m.
10     (A BRIEF RECESS WAS TAKEN.)
11     THE VIDEOGRAPHER: This is the beginning
12 of Tape No. 5 in the deposition of Dr. Ronald
13 Maris, Volume II. The time is 3:14 p.m.
14     We're back on the record.
15   Q. Dr. Maris, in Exhibit 20 in the last line
16 on page 47 where you say don't get hung up on Richard
17 Smith's dose response, tell me what you mean by that.
18 I don't understand that.
19     What were you concerned about getting hung
20 up on?
21   A. Well, precisely this kind of question,
22 did he take it the last day, did he take it the day
23 before last? What's the dose response gradient for
24 Neurontin look like?
25     I mean, we already know that it has a --

Page 532

1  it can have an effect in 30 minutes to an hour,
2  that it's two to three hours for peak plasma, and
3  that if you continue to take it, you probably have
4  a steady plasma state after several hours.
5      So we -- we don't want to get hung up on
6  it. Ideally, I'd like to have somebody watch him
7  every day, and I don't think we have that kind of
8  evidence. We do know, for example, that three days
9  before, his doctor said he was taking it and it
10 made him feel weird.
11   Q. And so you're saying three days before,
12 that would be the -- what day are you referring to?
13   A. Three -- three days before when he saw
14 Dentist Woods.
15   Q. So on May 10 when he saw his dentist, not
16 his doctor, right?
17   A. That's one of his doctors though.
18 They're also doctors.
19   Q. Yeah. Well, his dentist isn't his family
20 practitioner?
21   A. DDS, Doctor of Dental Science.
22   Q. You recognize that, right?
23   A. Of course.
24   Q. And you recognize his dentist, Dr. Wood,
25 did not perform any sort of mental status examination

Page 533

1  or psychiatric evaluation of Mr Smith on --
2    A. Sure. I know what he was told, though.
3  It makes me feel weird, I'm taking Neurontin.
4    Q. Doctor, you've got to let me finish my
5  question before you answer.
6    A. Okay. You said did I recognize what he
7  was told.
8    Q. And my question was the remainder of the
9  sentence was on May 10, 2004.
10     Okay. Now you can answer.
11   A. Okay. On May 10th, 2004 he told his
12 dentist, Dr. Woods, that he was taking Neurontin --
13 not had taken it -- he was taking, present tense,
14 and that it made him feel weird.
15     He also had recently told his son-in-law,
16 Wes Carnahan, that he was taking Neurontin and it
17 made him feel, quote, loopy.
18   Q. Okay. We're going to go over all of that.
19   A. Okay.
20   Q. I'm going to give you a chance to talk
21 about all those things. If you'll just wait until I
22 ask you a question, we can go a lot quicker, okay?
23   A. You just asked me a question.
24   Q. I asked -- asked you a question that was
25 did Dr. Wood perform a mental status exam, and the

57 (Pages 530 to 533)

Page 534

1  answer you gave me was very far removed from that.
2      MR. ROSENKRANZ: Objection.
3      A. Actually, the question you asked me was
4  what about -- how do we know he was taking
5  Neurontin and whether we should get hung up on how
6  much he took. That's what I was trying to answer.
7          (Exhibit 34: A letter from Christopher L.
8      Wood, DDS dated 5/19/04 with attachments
9      marked for identification, as of this date.)
10     Q. We're marking as Exhibit 34 both the
11  dentist, Dr. Wood's, letter dated May 19, 2004, as
12  well as his medical records. Just attached there are
13  his dental records.
14         What I want to ask you is if you look at
15  the letter drafted by Chris Wood, tell me where in
16  this letter it says I'm taking Neurontin or where Dr.
17  Wood reports that Mr. Smith told him he was presently
18  taking Neurontin.
19     A. Also mentioned drugs. With that, Mr.
20  Smith said, well, I am -- that is, currently -- on
21  a lot of drugs. Do you know anything about
22  Neurontin? He said that he had gone on-line
23  looking it up. It was extremely powerful with
24  numerous side effects, plus it makes me feel weird
25  and it isn't helping me.

Page 535

1      That's the precise quote.
2      Q. Yeah. And that quote that you just gave
3  us, that's -- that's your answer to my question show
4  me where it says Mr. Smith is presently taking
5  Neurontin. And that's your answer, right?
6      A. Yes, I have a lot of drugs and he --
7      Q. I am on a lot of drugs, right.
8      A. Right.
9      Q. It doesn't say anything about Neurontin,
10  correct?
11     A. The very next sentence is Neurontin.
12     Q. And he asks him do you know anything about
13  Neurontin?
14     A. Right, after he mentioned drugs.
15     Q. Would you agree with me at best, that's an
16  indirect reference?
17     A. It is.
18     Q. Okay. Thank you.
19         What dose of Neurontin was Mr. Smith taking
20  at the time of -- what was he prescribed at the time
21  of his suicide?
22     A. 300 milligrams, TID.
23     Q. Okay. And TID, for the jury, is three
24  times a day, correct?
25     A. Three times a day.

Page 536

1      Q. What's the maximum dose that Mr. Smith was
2  ever prescribed?
3      A. I don't know without looking at the
4  records. I know you can -- you can take up to
5  2400 milligrams. I think most of the time he was
6  on 600. I would say the average was 600 to 900,
7  but he could have been on 1200. And I can't tell
8  you without looking at his medical records, which I
9  can do.
10     Q. Could you, please?
11     A. Okay. He starts taking Neurontin on
12  March 9th, 2004. Mackey gives him a Neurontin
13  script for 300 milligrams, BID. Then on March 24
14  McCombs gives samples and tells him to take it
15  300 milligrams, TID.
16         So it looks like he was never on more
17  than 1200 -- I'm sorry, 900 milligrams.
18     Q. Okay. And what you're using as a reference
19  is?
20     A. My medical treatment history.
21     Q. Is that part of your expert report or is
22  that something different?
23     A. I believe it's in my expert report, sure.
24     Q. Is it numbered 1 through 46?
25     A. It's page 7 and 8 -- 7, actually.

Page 537

1      Q. Okay.
2      A. 7 and 8.
3      Q. Okay. Thank you.
4          And you -- you said, I think, that Mr.
5  Smith started taking Neurontin on March 9th. What's
6  your evidence for that?
7          What's the basis for that statement that he
8  started actually taking it on March 9th?
9      A. The only other reference I saw to
10  Neurontin in the whole record, and I went through
11  them carefully, was that on January 5th, 2004 Dr.
12  Brent recommended -- Brent, B-R-E-N-T --
13  recommended Neurontin. And the note is the patient
14  wants to wait.
15         So he was -- it was discussed earlier.
16  But as far as I can tell from the medical records,
17  it was never actually prescribed until March 9th.
18  And I don't see anybody in the records who
19  disagrees with the fact that it was March 9th that
20  he started.
21     Q. Well, is there any direct evidence that he
22  actually began taking Neurontin on March 9th?
23     A. I think they said he went out -- drove to
24  Eckerds and got it the same day, she said.
25     Q. So that's the basis for your opinion that

Page 534

1  answer you gave me was very far removed from that.
2      MR. ROSENKRANZ: Objection.
3      A. Actually, the question you asked me was
4  what about -- how do we know he was taking
5  Neurontin and whether we should get hung up on how
6  much he took. That's what I was trying to answer.
7      (Exhibit 34: A letter from Christopher L.
8      Wood, DDS dated 5/19/04 with attachments
9      marked for identification, as of this date.)
10     Q. We're marking as Exhibit 34 both the
11 dentist, Dr. Wood's, letter dated May 19, 2004, as
12 well as his medical records. Just attached there are
13 his dental records.
14     What I want to ask you is if you look at
15 the letter drafted by Chris Wood, tell me where in
16 this letter it says I'm taking Neurontin or where Dr.
17 Wood reports that Mr. Smith told him he was presently
18 taking Neurontin.
19     A. Also mentioned drugs. With that, Mr.
20 Smith said, well, I am -- that is, currently -- on
21 a lot of drugs. Do you know anything about
22 Neurontin? He said that he had gone on-line
23 looking it up. It was extremely powerful with
24 numerous side effects, plus it makes me feel weird
25 and it isn't helping me.

Page 535

1      That's the precise quote.
2      Q. Yeah. And that quote that you just gave
3  us, that's -- that's your answer to my question show
4  me where it says Mr. Smith is presently taking
5  Neurontin. And that's your answer, right?
6      A. Yes, I have a lot of drugs and he --
7      Q. I am on a lot of drugs, right.
8      A. Right.
9      Q. It doesn't say anything about Neurontin,
10 correct?
11     A. The very next sentence is Neurontin.
12     Q. And he asks him do you know anything about
13 Neurontin?
14     A. Right, after he mentioned drugs.
15     Q. Would you agree with me at best, that's an
16 indirect reference?
17     A. It is.
18     Q. Okay. Thank you.
19     What dose of Neurontin was Mr. Smith taking
20 at the time of -- what was he prescribed at the time
21 of his suicide?
22     A. 300 milligrams, TID.
23     Q. Okay. And TID, for the jury, is three
24 times a day, correct?
25     A. Three times a day.

Page 536

1      Q. What's the maximum dose that Mr. Smith was
2  ever prescribed?
3      A. I don't know without looking at the
4  records. I know you can -- you can take up to
5  2400 milligrams. I think most of the time he was
6  on 600. I would say the average was 600 to 900,
7  but he could have been on 1200. And I can't tell
8  you without looking at his medical records, which I
9  can do.
10     Q. Could you, please?
11     A. Okay. He starts taking Neurontin on
12 March 9th, 2004. Mackey gives him a Neurontin
13 script for 300 milligrams, BID. Then on March 24
14 McCombs gives samples and tells him to take it
15 300 milligrams, TID.
16     So it looks like he was never on more
17 than 1200 -- I'm sorry, 900 milligrams.
18     Q. Okay. And what you're using as a reference
19 is?
20     A. My medical treatment history.
21     Q. Is that part of your expert report or is
22 that something different?
23     A. I believe it's in my expert report, sure.
24     Q. Is it numbered 1 through 46?
25     A. It's page 7 and 8 -- 7, actually.

Page 537

1      Q. Okay.
2      A. 7 and 8.
3      Q. Okay. Thank you.
4      And you -- you said, I think, that Mr.
5  Smith started taking Neurontin on March 9th. What's
6  your evidence for that?
7      What's the basis for that statement that he
8  started actually taking it on March 9th?
9      A. The only other reference I saw to
10 Neurontin in the whole record, and I went through
11 them carefully, was that on January 5th, 2004 Dr.
12 Brent recommended -- Brent, B-R-E-N-T --
13 recommended Neurontin. And the note is the patient
14 wants to wait.
15     So he was -- it was discussed earlier.
16 But as far as I can tell from the medical records,
17 it was never actually prescribed until March 9th.
18 And I don't see anybody in the records who
19 disagrees with the fact that it was March 9th that
20 he started.
21     Q. Well, is there any direct evidence that he
22 actually began taking Neurontin on March 9th?
23     A. I think they said he went out -- drove to
24 Eckerds and got it the same day, she said.
25     Q. So that's the basis for your opinion that

| | Page 538 | | Page 540 |
|---|---|---|---|
| 1 | he started taking it on March 9th? | 1 | So you could -- I made an estimate in my |
| 2 | A. Yes. | 2 | report based on the information I had. |
| 3 | Q. Okay. Do you know how many Neurontin pills | 3 | MS. McGRODER: Object and move to strike |
| 4 | were in the bottle found on the dresser after his | 4 | everything after the word no. |
| 5 | suicide by Officer Biggs? | 5 | Q. If you turn to your report at page 14, you |
| 6 | A. No. | 6 | say that Mr. Smith may have skipped a few doses or |
| 7 | Q. Have you ever seen any of the sample packs | 7 | days, but then you go on to say and did ingest a |
| 8 | that Mr. Finkelstein's law firm told you about? | 8 | minimum of 42,200 milligrams before he died on |
| 9 | A. The actual ones that were confiscated | 9 | May 13, 2004. |
| 10 | after his death? | 10 | You don't know that for a fact, right, that |
| 11 | Q. Yes. | 11 | he consumed 42 -- |
| 12 | A. No, I haven't seen those. | 12 | A. Why would you say I know that? |
| 13 | Q. And when you say confiscated, I'm just not | 13 | Q. Pardon me? |
| 14 | sure what you mean. I'm hung up on that word. | 14 | A. Why would you say I know what? |
| 15 | A. Well, Biggs went in as a forensic | 15 | Q. My question to you is you don't know that, |
| 16 | investigator and apparently made notes of things | 16 | do you? |
| 17 | and collected pills and pill samples. And I'm not | 17 | A. I said right here he may have skipped a |
| 18 | sure if he -- and sample boxes. And I think that | 18 | few doses. |
| 19 | they were not just left there, but they were taken | 19 | Q. But you go on to say and he did ingest a |
| 20 | by Biggs, and there was some recording, which I | 20 | minimum of. You don't know that, do you? |
| 21 | have been unable to determine for sure. | 21 | A. When I say 67 days and he may have |
| 22 | The estimate that I was given, again, by | 22 | skipped a few, that's perfectly clear on the face |
| 23 | Finkelstein's firm is that there were nine samples | 23 | of it. |
| 24 | boxes of Neurontin left. That's the best estimate | 24 | Q. Well, I'm not arguing with you, Dr. Maris. |
| 25 | I have. | 25 | I'm asking you is it true that you don't know that as |

| | Page 539 | | Page 541 |
|---|---|---|---|
| 1 | And there's also some question about | 1 | a fact he consumed 42,200 milligrams? |
| 2 | whether the pills that are in the Biggs forensic | 2 | A. And that's in fact what I say right here. |
| 3 | photographs of the dresser were actually Neurontin. | 3 | Q. What's the significance of that calculation |
| 4 | Q. Do you know who has the sample packs that | 4 | in your report to your opinion if you don't know for |
| 5 | were left at the home after Mr. Smith's suicide? | 5 | a fact that he took that many pills? |
| 6 | A. No. | 6 | A. Because that's a maximum number that he |
| 7 | Q. Do you know whether any of the sample packs | 7 | could have taken, and there was a high probability |
| 8 | that were left at the home were actually unopened | 8 | based on the testimony that he took it as |
| 9 | samples? | 9 | instructed. |
| 10 | A. I don't know the number of those that | 10 | Q. And what's the basis for your statement |
| 11 | were unopened. | 11 | that there's a high probability he took it as |
| 12 | Q. You don't know the number of samples Mr. | 12 | instructed? |
| 13 | Smith took, correct? | 13 | A. Testimony of his wife, Ruth. |
| 14 | A. I don't know. | 14 | Q. Ruth Smith, who's the plaintiff in this |
| 15 | Q. You don't know the actual number of pills | 15 | lawsuit, correct? |
| 16 | Mr. Smith took, correct? | 16 | A. Correct. A christian minister's faithful |
| 17 | A. No. All I know is that he theoretically | 17 | wife for many, many years. |
| 18 | had 67 days from March 9th until his death. | 18 | MS. McGRODER: Object and move to strike |
| 19 | Whether he took them every day, how much he took | 19 | everything after the word correct. |
| 20 | every day, could have been variable. | 20 | MR. SOH: Sounded responsive to me. |
| 21 | But the expectation is, if you believe | 21 | Q. What is the dose of Neurontin that is |
| 22 | his wife, that he followed the doctor's directions | 22 | required to induce suicidality in any given patient? |
| 23 | and took them every day starting March 9th, which | 23 | A. There is no magic dose. |
| 24 | would be 600 milligrams until he got the McCombs | 24 | Q. The answer is you don't know, do you? |
| 25 | prescription or samples and then 900 thereafter. | 25 | A. The answer is nobody knows. |

VERITEXT CORPORATE SERVICES (800) 567-8658

|  | Page 542 |
|---|---|
| 1 | MR. SOH: Objection, argumentative. |
| 2 | Q. Nobody knows, do they? |
| 3 | A. Nobody knows. |
| 4 | Q. How do you know there is one? |
| 5 | A. All I know is that Neurontin is |
| 6 | suicidogenic, and I know you reach complete plasma |
| 7 | level within three hours, two to three hours. |
| 8 | Q. And I think you said earlier that you know |
| 9 | that Neurontin has a clinical effect within, I think |
| 10 | -- did you say one hour of taking it? |
| 11 | A. Some of the documents, some of which I |
| 12 | brought in the new articles, say 30 minutes. Other |
| 13 | documents say within an hour that there is a |
| 14 | significant effect of the Neurontin. |
| 15 | Q. Well -- |
| 16 | A. All -- and the PDR says within two to |
| 17 | three hours you reach peak plasma level. |
| 18 | Q. Do any of the documents that you're |
| 19 | referring to state that Neurontin has a clinical |
| 20 | effect within an hour of ingestion? |
| 21 | A. No, that it has -- and there's usually |
| 22 | gradients of how many -- what the dosage is and so |
| 23 | on. But there's a noticeable effect within an |
| 24 | hour, and there's -- |
| 25 | Q. Wait, I'm sorry. |

|  | Page 544 |
|---|---|
| 1 | something noticeable on a gradient that's in some |
| 2 | of the articles that I gave you. |
| 3 | Q. Okay. Can you show me which articles? |
| 4 | A. I'm not sure I could find it right now. |
| 5 | In fact, everything is hard for me to find right |
| 6 | now. |
| 7 | Q. Well, the only articles you've pulled out |
| 8 | are those right there in front of you. |
| 9 | A. Yeah, let me look at them. Here's one. |
| 10 | Q. Okay. |
| 11 | A. This is the Petroff paper, university |
| 12 | professor. This says, and there's a gradient, |
| 13 | hours since 200-milligram oral gabapentin. |
| 14 | And you can see that there is a -- after, |
| 15 | in this case it looks like about one hour, there's |
| 16 | a noticeable difference. But there is an elevation |
| 17 | after about 30 minutes. And certainly by two or |
| 18 | three hours, it's a steady state. |
| 19 | And this is just one 200 -- |
| 20 | 1200-milligram ingestion. |
| 21 | Q. And -- and what -- what does this line |
| 22 | represent? |
| 23 | What is the increase there that you're |
| 24 | referring to? |
| 25 | A. Brain GABA millimeters. |

|  | Page 543 |
|---|---|
| 1 | A. -- a peak plasma effect -- |
| 2 | Q. You told me that. Effect on what, though, |
| 3 | that's my question? |
| 4 | What is the effect that you're attempting |
| 5 | to describe? |
| 6 | A. Well, when we have drugs, as you well |
| 7 | know, we often look at therapeutic thresholds. |
| 8 | And, for example, with antidepressant drugs, it may |
| 9 | take six to eight weeks before a therapeutic dose |
| 10 | is handled. |
| 11 | But Neurontin, it's much quicker. |
| 12 | Neurontin is -- reaches a -- has some therapeutic |
| 13 | effect certainly within two or three hours of |
| 14 | taking it. |
| 15 | Q. And the basis for that statement is the |
| 16 | package insert language about the area under the |
| 17 | curve within two to three hours of ingestion, |
| 18 | correct? |
| 19 | A. Exactly. |
| 20 | Q. Okay. And so your statement about |
| 21 | Neurontin having an effect at any time before the |
| 22 | peak plasma concentration within two to three hours, |
| 23 | that's what I'm trying to get at. What is that based |
| 24 | on? |
| 25 | A. That's based on going from zero to |

|  | Page 545 |
|---|---|
| 1 | Q. Okay. And so you're relying for your |
| 2 | opinion that gabapentin has an effect -- I think you |
| 3 | said in about an hour; is that fair? |
| 4 | A. Yes. |
| 5 | Q. Is that your testimony? |
| 6 | A. And certainly within two to three. |
| 7 | Q. Okay. On the Petroff study published in |
| 8 | 2002, correct? |
| 9 | A. Correct. |
| 10 | Q. Okay. Anything else? |
| 11 | A. There's so much data here. |
| 12 | Q. There's so much data in those four |
| 13 | articles? |
| 14 | A. In all the stuff that I got. |
| 15 | That's not necessary. Obviously, I'm |
| 16 | referring to everything. |
| 17 | Q. Well, everything over there, Dr. Maris, |
| 18 | you'll acknowledge is about the Smith case. Those |
| 19 | are Smith medical records. Certainly, there's not |
| 20 | data about peak plasma concentration of Neurontin in |
| 21 | those materials, correct? |
| 22 | A. What if I find it? |
| 23 | Q. That would be great. |
| 24 | A. We haven't even talked about Trimble at |
| 25 | all, as you know, of course. |

60 (Pages 542 to 545)


Page 546

1 Well, for example, Trimble in his
2 deposition says on page 246 -- the question that
3 you asked him was: How soon after a patient takes
4 Neurontin are they at an increased risk for suicide
5 according to your opinion? And the answer from Dr.
6 Trimble was: Changes in the central nervous system
7 were seen very early on after taking the drug,
8 actually within a few hours.
9     Q. Do you agree with Dr. Trimble that it's a
10 few hours and not within an hour?
11    A. I think I said within two or three hours.
12    Q. Yeah, but you also said there's an effect
13 in an hour.
14    A. There's another paper that says one hour,
15 and I'm not sure I can put my hands on it right
16 now.
17        So that's a reference that Trimble gives
18 which supports my opinion.
19    Q. Okay. So you rely on the Petroff 2000
20 study, and you rely on deposition testimony of
21 Professor Trimble. Anything else?
22    A. I'm looking. That should be right here.
23 There is one other record that I'm having trouble
24 finding it.
25        I can't find it right now, but there's

Page 547

1 another article which I may be able to find
2 overnight that says one hour. I can't put my hands
3 on it right now.
4     Q. Okay. So as you sit here right now, you
5 can identify for me the Petroff 2000 study and
6 testimony by Professor Trimble at page 246 of his
7 deposition on which you rely for your testimony about
8 the effect of GABA within an hour, right?
9     A. Right.
10    Q. And I think my original question was really
11 what's the dose of Neurontin that's required to
12 induce suicidality, correct?
13        So are these the materials you're relying
14 for that subject?
15    A. I think the answer to that question was
16 nobody knows.
17    Q. Okay. I'm sorry, you're right.
18        In this Petroff 2000 study, is it true that
19 no patients experienced suicidality?
20    A. Sure, the title of the article is
21 Gabapentin Raises Human Brain Gaba Within
22 30 Minutes. That's all it talks about. It doesn't
23 talk about suicide.
24    Q. Would it be fair to say the fact that this
25 study suggests that gabapentin raises brain GABA

Page 548

1 levels within 30 minutes does not indicate that there
2 is any clinical effect as a result of that increased
3 brain GABA level in 30 minutes?
4     A. It says at the very end, the last -- this
5 is only two pages -- page 2 says: Therefore,
6 gabapentin could be used to stop flurries of
7 seizure on an as-needed basis.
8        In other words, if your patient is
9 starting to have seizures, you can give it to him
10 30 minutes later and it will have a clinical
11 effect.
12    Q. That's your understanding of that
13 conclusion?
14    A. That's what it says, almost.
15    Q. It doesn't really say that, does it, Dr.
16 Maris?
17    A. No, it doesn't really say that.
18    Q. Okay.
19    A. But that's what it indicates, that you
20 use it on an as-needed basis, that it works quickly
21 and that if you have a flurry of seizures, quote,
22 it's effective within 30 minutes is what my
23 conclusion is.
24    Q. Well, that's not what the article states,
25 is it?

Page 549

1        The article doesn't state that gabapentin
2 works within 30 minutes and has a clinical effect to
3 reduce seizures within 30 minutes. It doesn't say
4 that, does it?
5     A. It doesn't say -- it says it can be used
6 as needed, which would -- which would mean that you
7 already had a need for it and that you could take
8 it like an aspirin for a headache. That's what it
9 seems to suggest.
10    Q. But would you agree with me this article
11 does not state that gabapentin has a clinical effect
12 to reduce seizures within 30 minutes; would you agree
13 with that?
14    A. It doesn't explicitly say that.
15    Q. How many consecutive days of Neurontin
16 administration does it take to get a steady state?
17    A. That's beyond my expertise. I've given
18 you all the references I have.
19    Q. Okay.
20    A. If it gets a steady state in two to three
21 hours and you keep taking it, I would say one day.
22    Q. Okay. But you don't know?
23    A. I don't know.
24    Q. Do you know how many hours following
25 administration of a single dose of gabapentin there

61 (Pages 546 to 549)

Page 550

1  is no appreciable drug left in the system?
2     A. According to Petroff, it doesn't really
3  say. We know what the half life is. You know,
4  that would not be -- that would be a rough
5  approximation of how much.
6     Q. Okay.
7     A. So I previously testified to that. It's
8  also in the package insert.
9     Q. The half life is in the package insert?
10    A. The half life is mentioned. It says half
11  life is five to seven hours.
12        So as you know, the half life is not
13  doubled. You know, it's not like -- if it's a half
14  life of seven, it's not 14. But it sounds to me
15  like it would be within 24 hours based on the half
16  life if you didn't take anymore.
17    Q. Okay. Prior to a suicide, within what
18  period of time must a person take Neurontin for it to
19  be a significant factor in the suicide?
20    A. I don't think there's an exact time. I
21  don't think anybody knows, again.
22    Q. Do you know Mr. Smith's GABA level at the
23  time of his death?
24    A. No.
25    Q. Do you know Ms. Bulger's GABA level at the

Page 551

1  time of her death?
2     A. No.
3        And may I say this? The medical examiner
4  doesn't typically check for Neurontin. They check
5  for other panels. So that even if you had a
6  toxicology report, there would not be any medical
7  examiner evidence.
8     Q. Okay. I -- I was actually not asking you
9  about a gabapentin level. I was asking you about a
10  brain GABA level.
11    A. That's even more complicated because
12  you'd have to take a central spinal tap, which
13  nobody does, almost nobody.
14    Q. So you don't know the brain GABA level at
15  the time of death of either Ms. Bulger or Mr. Smith,
16  correct?
17    A. True.
18    Q. And you don't know the serotonin level in
19  the cerebrospinal fluid of either Mr. Smith or Ms.
20  Bulger at the time of their deaths, correct?
21    A. That's correct.
22    Q. I really need to break that up. I'm sorry.
23  I have to ask it in two questions.
24        You don't know the serotonin level of Mr.
25  Smith at the time of his death, correct?

Page 552

1     A. Correct.
2     Q. And you don't know the serotonin level of
3  Ms. Bulger at the time of her death, correct?
4     A. Correct.
5     Q. The same would be true for dopamine and
6  norepinephrine levels, correct?
7     A. Correct.
8     Q. The same would be true for glutamine
9  levels, correct?
10    A. And for acetylcholine and histamine and
11  every other neurotransmitter they weren't checked
12  for.
13    Q. And so the answer is correct?
14    A. Correct.
15    Q. I think you said that one of the things
16  that you base your opinion on about Mr. Smith's
17  ingestion is that Ruth Smith testified that he took
18  his medications as prescribed by the doctor, correct?
19    A. Correct.
20    Q. Were you aware that Dr. Mackey instructed
21  Mr. Smith that if his medication was not working, he
22  should discontinue it?
23    A. No.
24    Q. Is there any evidence in this record that
25  Mr. Smith believed that Neurontin was not helping

Page 553

1  him?
2     A. Yes.
3     Q. And where is that?
4     A. I think he told Dr. Woods that.
5     Q. And in the Wood letter Mr. Smith --
6     A. Is it Wood or Woods?
7     Q. I think it's Wood, singular. Wood with no
8  S.
9     A. Okay.
10    Q. Not singular, but with no S.
11        In the Wood letter, which we just
12  discussed, Exhibit 34, he says, Plus it makes me feel
13  weird and isn't helping me, correct?
14    A. Correct.
15    Q. You also note in your -- in your report, I
16  believe, that Dr. -- oh, on the bottom of page 15.
17    A. Yes.
18    Q. That Dr. McCombs wrote on May 5, 2004,
19  quote, patient states he is taking Neurontin with no
20  relief, correct?
21    A. Correct.
22    Q. If you believe Mrs. Smith that Mr. Smith
23  took his medications as prescribed by the doctor,
24  would one reasonable inference be that Mr. Smith
25  stopped taking Neurontin when it stopped helping him

Page 554

1  as instructed?
2      A.  I think that's possible.  I think it's
3  unlikely.
4      Q.  But you agree it's possible?
5      A.  It's certainly possible.
6      Q.  Would you agree it's a reasonable
7  inference?
8      A.  I don't think so.  I think it's a
9  stretch.
10      Q.  You agree that Mr. Smith had depression
11  before he ever took Neurontin, correct?
12      A.  A mild depression.
13      Q.  Well, you know that in May of 2003 he was
14  diagnosed with depression and anxiety, correct?
15      A.  He was diagnosed -- he was -- he took
16  Elavil in May of 2001 from Dr. Cato.  He also in
17  May 2nd of 2003 was given -- it was noted that he
18  was depressed and anxious.
19          By May 15th, 2003 he was diagnosed with
20  anxiety and depression by Dr. Cato, and he -- it
21  was noted in the record that he was taking Lexapro
22  and Desipramine, 25 milligrams, HS.
23      Q.  Now, where is that in your report?
24      I don't see that.
25      A.  I've got handwriting.

Page 555

1      Q.  All right.  Then may I borrow that?
2      A.  I'll probably never get it back.
3      Q.  Now, that's something you went -- you
4  didn't include information about Mr. Smith's
5  diagnosed anxiety and depression in May of 2003 in
6  your original report, correct?
7      A.  I kept working from December to now, so
8  it is correct.
9      Q.  And what did you look at to conclude that,
10  in fact, Mr. Smith was diagnosed with anxiety and
11  depression in May of 2003?
12      A.  The medical records.
13      Q.  Of whom?
14      A.  Probably Cato, yes.
15      Q.  Okay.  Did you make these notes on your
16  report in pencil here after you read the deposition
17  of Dr. Trimble?
18      A.  Possibly.  I don't know exactly when I
19  made them.  I know that they were including the --
20  I think it was the Exhibit 5 addendum of evidence,
21  after I read all of that, which included Dr.
22  Trimble.  But I don't know if it was specifically
23  after Trimble.
24      I have no idea when I made those.  I
25  mean, they were made between December and probably

Page 556

1  fairly recently.
2      Q.  Well, when's the first time you learned
3  that Mr. Smith was diagnosed with anxiety and
4  depression in May of 2003?
5      A.  I think it was always in the medical
6  records.
7      Q.  Yeah, but I'm asking you when's the first
8  time you read those medical records and learned that?
9      A.  I -- I'm not sure.  If what your
10  suggesting is that I read Dr. Trimble's deposition
11  and that jogged my memory to go look it up, that's
12  quite possible.  The fact is I got it right.
13      Q.  Is it significant to your opinion that Mr.
14  Smith was diagnosed with depression and anxiety in
15  May of 2003 and was prescribed an antidepressant for
16  major depressive disorder and generalized anxiety
17  disorder at that time?
18      A.  It's a compound --
19          MR. SOH:  Objection, form, foundation.
20      A.  Yeah, compound question.  And the problem
21  is --
22      Q.  Are you asserting an objection, Dr. Maris?
23      A.  No, I'm saying that I can't answer your
24  question as stated.
25      Q.  Okay.  Let me restate it.

Page 557

1          Is it significant to your opinion that Mr.
2  Smith was diagnosed in May of 2003 with depression
3  and anxiety for which he was prescribed Lexapro,
4  which is indicated for the use of major depressive
5  disorder and generalized anxiety disorder?
6      A.  I can say yes, but I can't say a simple
7  yes because Lexapro is also for other things than
8  major depression.
9      Q.  Okay.  Do you think he was prescribed
10  Lexapro for depression?
11      A.  Yes.  But we don't know if it was major
12  depression, which is a technical category within
13  the DSM, which I've never seen him given that
14  diagnosis.
15      Q.  Did you go back and try to determine
16  whether Mr. Smith had a major depressive disorder in
17  May of 2003?
18      A.  I think it's in my report.
19      Q.  Where is it in your report?
20          Okay.  I have your report.
21      A.  I'm not sure.  It says 2003.  I think I
22  said it -- by the time that we reached 2004,
23  there's an explicit section in my report on the
24  question that you're asking me, which is the
25  depression level of Richard Smith.  And it starts

Page 582

1    And so you didn't consider the fact that
2 Mr. Smith was on Lexapro at the time you formed the
3 opinions that are contained in your original report;
4 is that correct?
5    A. That's correct.
6       And let me be clear about this. He
7 started the Lexapro 5/15/03, and apparently he
8 stopped it 6/27/03 because the records from Dr.
9 Cato say off Lexapro, quote, overall improved.
10      So he was not continuously on it after he
11 started it. He was on it for the time that I had
12 mentioned.
13   Q. Okay. All right. And is the -- is the fact
14 that he was on Lexapro in 2003, does that factor into
15 any of the opinions that you put in the addendum
16 dated September 26, '08 to your report?
17   A. Well, one of my opinions was that he had
18 relatively -- he had depression off and on since
19 2001. So it certainly had a bearing on that, that
20 he actually took Lexapro. It was bad enough that
21 he got a prescription.
22   Q. Okay. So it -- if it impacted your opinion
23 to the extent that it made you aware that his
24 depression was bad enough to take an antidepressant?
25   A. Right.

Page 583

1       And before that, of course, there was
2 evidence in the record that Amitriptyline could be
3 for sleep. Desipramine could be for something
4 other than depression. But once you put Lexapro,
5 it's clear that there was some preexisting
6 depression.
7    Q. Okay. All right. Continue, please.
8    A. Somehow I had forgotten to put on here
9 between 30 and 31, Nos. 30 and 31, I forgot to put
10 that on March 1st of '04, that Cindy, the daughter,
11 had mentioned suicide.
12   Q. Okay. That is in your original report, and
13 it says Cindy says Richard contemplated suicide,
14 3/1/04.
15   A. Somehow --
16   Q. So you had that in your original report.
17   A. I do?
18   Q. You have it in the copy I have.
19   A. Wow.
20   Q. It's No. 36 in my copy.
21   A. Oh, 36, 36.
22   Q. What number is it in your copy?
23   A. It doesn't say Cindy. It says daughter.
24   Q. Okay. So you modi --
25   A. I have here that -- let's see -- that

Page 584

1 that was 5/2/03 and that on March 1st of '04, the
2 police supplement said that Cindy mentioned on that
3 date that he had mentioned. They're two different
4 days.
5    Q. Okay. And that's something you didn't
6 realize before you read the deposition of Mr. --
7 Professor Trimble?
8    A. I didn't remember that. Although I had
9 read it, I didn't remember that until I had read
10 Trimble.
11   Q. And so if I understand you, the fact that
12 he reported or that he experienced suicidal ideation
13 in 2003 and then again on March 1 of 2004, that had
14 significance to your opinions so you put it in this
15 treatment summary?
16      MR. SOH: Objection.
17   A. Yes.
18   Q. Okay. And is that also something that you
19 factored into the addendum to your report?
20   A. To the degree that there was fairly
21 consistent or episodic depression, yes. It gave me
22 another instance or two of it.
23   Q. And suicidal ideation, correct?
24   A. Yeah, I think I mentioned suicide
25 ideation in the report, which I've now lost.

Page 585

1    Q. Uh-oh. I think you had that.
2    A. I've got it.
3    Q. There you go.
4       I think it might be on page 46 at the
5 bottom where you say Neurontin tipped the scale in
6 the direction --
7    A. Yeah, even suicide ideation.
8    Q. Where he had prior pain and depression,
9 even suicide ideation?
10   A. Right, so it bore on that.
11   Q. Okay. All right. Anything else new on
12 your treatment summary?
13   A. Apparently, in 4/9/04 when he was asked
14 about treatment, he checked the box that said he
15 had been treated for depression and anxiety. He
16 checked the box that he had been treated between 33
17 and 34. So that's another --
18   Q. Okay. So that's an addition that you
19 handwrote in, right?
20   A. Right.
21   Q. Can I see this? Some of these look like
22 they're highlighted right on the computer.
23      Who did that?
24   A. I did.
25   Q. Okay. And then some of them are highlighted

Page 586

1   just with a highlighter.
2        Did you also do that?
3    A.   I did that as a follow-up.
4    Q.   Okay. And so you added a reference to the
5   March -- I mean, I'm sorry, the April 9, '04 record
6   where he says he in the past was diagnosed with
7   depression and anxiety?
8    A.   Right. It was a check he made.
9    Q.   Okay. And is that significant to your
10  opinion?
11   A.   Just continuing evidence that he in fact
12  did have depression and anxiety before he took
13  Neurontin.
14   Q.   Okay. And that's also reflected in your
15  addendum Exhibit 20, correct?
16   A.   Right.
17   Q.   Okay. Anything else new?
18   A.   I don't think so. Apparently, on 5/2/03
19  he didn't say pain and depression just, he said
20  also anxiety, according to Dr. Cato.
21        So I added -- in addition to pain and
22  depression, I added anxiety, question. I think Dr.
23  Cato said also depression and anxiety.
24   Q.   Oh, okay. And 5/2/03 when it says he
25  wishes he could die, pain and depression, you would

Page 587

1   add anxiety to that pursuant to Dr. Cato's records?
2    A.   I would.
3    Q.   Okay. And, again, is that something that
4   formed the basis for your addendum?
5    A.   Yes, because he had not just depression,
6   but he also had anxiety. And I'm not sure I
7   specifically mention anxiety, but usually
8   depression and anxiety overlap considerably. And
9   the question often comes up when you treat the
10  depression, are you treating the anxiety?
11        As I recall, he was just on Neurontin and
12  Lortabs at the time of his death, Lortab. But
13  usually when you get, let's say, Lexapro, you'll
14  also get some sort of benzodiazapine minor
15  tranquilizer. I did not see any evidence that he
16  was treated for anxiety, even though it's
17  mentioned.
18        Now, you can use an antidepressant for
19  anxiety. Sometimes they do. But often you'll get,
20  let's say, Lexapro and -- I'll just pick something
21  -- Restoril, Lorazepam, Xanax. And I didn't see
22  any minor tranquilizers that he got.
23   Q.   And so during the entire period that he was
24  taking Neurontin, it's correct, isn't it, that he was
25  not prescribed any antidepressants or any antianxiety

Page 588

1   medications?
2    A.   Correct.
3    Q.   Okay. And did that increase his risk of
4   suicide?
5    A.   It could, sure, because as we've already
6   established, undiagnosed and untreated depression
7   are one of the major causes of suicide.
8    Q.   Do you think he would have benefitted from,
9   for example, a prescription of Lexapro during that
10  period that would treat both depression and anxiety?
11   A.   I mean, the simple answer is yes.
12   Q.   If you had been on a treatment team
13  treating Mr. Smith between March and May when he
14  committed suicide, would you have recommended that he
15  be put on an antidepressant or anxiolytic or both?
16   A.   Probably both.
17   Q.   And what about in the time leading up to
18  that, what about in the period between January and
19  March of 2004 when he is reporting increased pain and
20  difficulty sleeping, would you have recommended then
21  that he take an antidepressant or an anxiolytic?
22   A.   Well, for the record, he was on
23  Desipramine on 6/3/03.
24   Q.   I'm sorry, I'm talking about 2004.
25   A.   I'm sorry. Okay.

Page 589

1        Between what dates?
2    Q.   Between January and March when he's
3   reporting more pain and trouble sleeping and March 1
4   he's report -- contemplating suicide, according to
5   the police records. Do you believe he would have
6   benefitted from an antidepressant and anxiolytic at
7   that time?
8    A.   I don't see any diagnosis of depression,
9   and the only reference I see to something that
10  would require treatment is the daughter, Cindy,
11  mentioning suicide on March 1st.
12        So up until March 1st, I don't see any
13  evidence in the medical record that he was
14  depressed or that he -- at least they didn't record
15  it.
16   Q.   Yeah.
17        And I was going to say for that, you're
18  relying on your summary of the treatment records,
19  right?
20   A.   Right. And all the records that I read.
21  I mean -- and obviously I would have a flag for
22  anything that said depression. And I went back and
23  checked and double-checked and added some
24  depression/anxiety entries. I didn't see anything
25  in the first three months of 2004.

Page 590

Q. Well, let's say he was having severe pain and difficulty sleeping and -- and, you know, loss of activities of daily living, you know, functional impairment between January and March 9 of '04, and during that period he also is reported to have suicidal ideation. Do you think he would have benefitted from an antidepressant or an anxiolytic during that time period?
MR. SOH: Objection as to time frame, hypothetical.
A. Yeah, it's hard for me to say yes or no. But if I was forced, I would say yes.
Q. And certainly by March 1 when he's reporting suicide ideation, you believe he would have benefitted from an antidepressant or an anxiolytic, true?
A. I would think so, yes.
Q. If you'd been on a treatment team and you had the opportunity to recommend to a psychiatrist that he be prescribed, for example, Lexapro on March 1, 2004, would you have recommended that?
A. Probably.
Q. Okay. Let's go back to Exhibit 35. If you turn to page 41, at the bottom you can see that Mr. Smith reports on various pain scales he experienced

Page 591

pain as an 8 out of 10.
A. All right.
Q. And 10 is marked as unbearable pain, correct?
A. Right. I think 7 or 8 was previously identified as excruciating.
Q. Okay. And so in February of 2003, he's in excruciating pain. And if you look at the notes on the right-hand side, it says he wants surgery ASAP.
Do you see that?
A. I'm sorry, where is that?
Q. Right there on the right-hand side, the handwritten note.
A. I see that, yes.
Q. Okay. And Dr. Hampf said the surgery can be done in the next few weeks.
And then it talks about other symptoms that have been reported in the same questionnaire.
A. Right, right.
Q. Okay. You see that?
A. Right. And I also noticed a few days after that he is getting a recommendation for epidural steroid injections on the 3rd of March.
Q. Okay. And if you turn to the next page, this is really just a summary of his pain, right?

Page 592

A. That's page 42?
Q. Yes, page 42.
A. Right.
Q. So he checks that he has weakness, problems walking, numbness, tingling, bowel and bladder problems, morning stiffness, correct?
A. Right.
Q. And then he checks a number of things that make his pain feel worse. It's coughing, sneezing, sitting, standing, lying down, walking --
A. Just about everything.
Q. -- physical activity. Just about everything, right?
And then he says his pain is always about the same, right?
A. Right.
Q. Which is excruciating, according to --
A. He says that before when he checked pain is always the same, above.
Q. Okay. And so you agree he's in a great deal of pain during this period, right?
A. Yes. His self-report would indicate that.
Q. And if you turn to the top of the next page, page 43, he says none of these things help his

Page 593

pain feel better, relaxing, sitting, standing, lying down, medications, or walking, right?
A. Yes.
Q. And pain interrupts his sleep, yes?
A. Right.
Q. Okay. And then at the bottom it says is he able to cope, and he marks 5 on a scale of 1 to 10, right?
A. So he's coping modestly or moderately.
Q. Moderately coping?
A. Yep.
Q. Okay. And going to page 44, he reports -- at the bottom, he checks that he's unable to work because of pain, right?
A. Right.
Q. And that he stopped working because of pain, right?
A. Right.
Q. Do you know whether he ever worked after February of 2003 because of the pain he was in?
A. I don't think he did.
Q. Now, let's go to the back part of this record to page 49.
A. Yes.
Q. And the front page summarizes really what

1    Q. Is the fact that Mrs. Smith reported that
2    Mr. Smith was out of his mind with pain in March of
3    2003, is that reported anywhere in your expert report
4    in this case?
5    A. Well, it is now.
6    Q. Well, I mean, was it before I just read it
7    to you?
8    A. No, I did not -- I did not put that in
9    before. Not that I didn't know about it; it's just
10   that I didn't put it in there.
11   Q. You did know about it?
12   A. Sure.
13   Q. But you didn't put it in your report?
14   A. That's right.
15       I didn't put everything in. If I put
16   everything in my report, this would be not one page
17   but a hundred pages.
18   Q. Do you agree that a diminished ability to
19   think or concentrate is listed in your report as one
20   of the criteria for major depressive disorder?
21   A. Yes.
22   Q. And do you know what Mr. -- I'm sorry, Dr.
23   McCombs recommended to treat Mr. Smith's pain when he
24   met with him during the same time period in March of
25   2003?

1    A. I recall that there was a discussion of
2    the steroid injections. Neurontin was also
3    mentioned as a possibility. On 5/3/03, Neurontin
4    script mentioned. This is Dr. McCombs' record.
5    Q. Okay. Do you know why Mr. Smith did not
6    take Neurontin in May of 2003?
7    A. No. I know -- we do know from stuff
8    we've talked about the last two days that he at one
9    point or another looked it up on the Internet and
10   was concerned with the adverse events. But I don't
11   know if he'd done it at that time. It's possible
12   he'd looked up Neurontin on his -- on his web and
13   found out that it could be problematic and so he
14   decided not to take the chance.
15       I don't know. The answer is I don't
16   know.
17   Q. It's possible he looked up Neurontin on the
18   Internet in the spring of 2003 and that may be an
19   explanation for why he didn't take it then; is that
20   your testimony?
21   A. I'm just speculating. There's no
22   evidence that I found as to specifically why he
23   refused to get the script -- prescription filled.
24   It only says that he decided not to.
25   Q. Do you think he was resistant to taking

1    Neurontin at that time?
2    A. I don't know if he was resistant. He in
3    fact did not take it. If you want to call that
4    resistant, yes.
5    Q. Well, again, it's prescribed or offered as
6    a prescription for him in January of 2004 and, again,
7    he doesn't get it filled, correct?
8        Do you have that noted in your treatment
9    history?
10   A. I'm sorry, what date are we looking at?
11   Q. January of 2004.
12   A. 1/5/04, Brent recommends Neurontin and,
13   patient wants to wait.
14   Q. Yeah.
15       Do you know why he wanted to wait?
16   A. No.
17   Q. You never talked to the family about that?
18   A. It may be in the depositions, but I would
19   have to go through them line by line. I don't
20   remember.
21   Q. No, my question was did you ever talk to
22   the family about that?
23   A. I never talked to the family, period.
24   Q. Okay. I want you to look on page -- on the
25   front page of the record we were just looking at,

1    Exhibit 35, I think. Yeah.
2        Up at the top there, see where it gives his
3    weight as 220 pounds?
4    A. Right.
5    Q. On February 28, 2003?
6    A. Right.
7    Q. Now, if you go back to page 47 of the same
8    record.
9    A. Right. Well, I can't find it quickly.
10   These things are not in order. Mine goes from 46
11   to 49 for some reason.
12   Q. I'll just hand you my copy there. It says
13   physical exam up at the top.
14       Do you see that?
15   A. Yes.
16   Q. And it says he weighs 205 pounds.
17       Do you see that?
18   A. Right.
19   Q. Mr. Smith lost weight in the spring of
20   2003, correct?
21   A. Yes, he did.
22   Q. About 15 pounds, right?
23   A. Yes.
24   Q. Okay. Was Mrs. Smith concerned about Mr.
25   Smith when she reported that he was out of his mind

Page 602

1  with pain?
2      A.  Sure.  Otherwise, why would she say that?
3      Q.  You think she was concerned about his
4  mentation and his ability to think?
5      A.  I mean, all I know is what the record
6  says.  I mean, I don't know.  He was obviously
7  sufficiently complaining and exhibiting symptoms of
8  pain that she made a very extreme comment:  Out of
9  his mind with pain.
10     Q.  Well, is it your understanding she made
11 that comment with respect to the fact that he had
12 scheduled the surgery -- scheduled the surgery and
13 then canceled it the very next day, and then she
14 called the doctor and said no, no, we want the
15 surgery?
16         Do you think that her statement, I don't
17 know what's wrong with Richard, he's in so much pain,
18 he's out of his mind, referred to that behavior?
19     A.  That's possible.
20         MR. SOH:  Objection, compound.
21     A.  That's obviously speculative.
22     Q.  That's not your take on that record?
23     A.  Well, it could be.  I mean, I don't know.
24 I'd only be to be speculating.  All we know is that
25 he scheduled it and he unscheduled it, and she

Page 603

1  wanted to reschedule it.  Which sounds kind of
2  inconsistent.  But I don't know if that's why she
3  said he was out of his mind with pain.
4         (Exhibit 36: A document from Neurological
5         Associates dated 3/3/03 to Dr. James Cato from
6         Paul R. McCombs, M.D. with attachments marked
7         for identification, as of this date.)
8      Q.  During the same time period -- I'm going to
9  hand you Exhibit 36.  Those are the records of
10 Neurosurgical Associates, Dr. McCombs.
11         During the same time period, as reflected
12 in the records we just read, Mr. Smith goes to see
13 Dr. McCombs, doesn't he?
14     A.  Okay.  This -- yeah, this is dated
15 March 3rd, '03.
16     Q.  Right.
17     A.  And apparently he's getting ready for his
18 laminectomy, and that's what the consult is about.
19     Q.  Well, before he gets ready for the
20 laminectomy, he goes to see Dr. McCombs.  And if you
21 look at the front page of this record --
22     A.  Yes.
23     Q.  -- Dr. McCombs says I'm going to recommend
24 a course of conservative management to include
25 epidural steroid injection and Vioxx, right?

Page 604

1      A.  That's on my record, 3/03 recommends ESI.
2      Q.  Right.
3      A.  So yes, it's true.  I've got it down
4  already.
5      Q.  You've got that right?
6      A.  I've got it down.  That's what the record
7  says.
8      Q.  And then it says, he will return to see me
9  in follow-up in three weeks, right?
10     A.  Right.
11     Q.  And per the recommendations will depend on
12 how he's doing at that time.
13     A.  Correct.
14     Q.  That's what the record states, right?
15     A.  Correct.
16     Q.  So that's March 3rd?
17     A.  Right.
18     Q.  On March 10th on the next page of this
19 record, that's seven days, right, not three weeks?
20     A.  Right.
21     Q.  He comes back and says his symptoms are
22 unchanged despite the conservative management to
23 date, and Dr. McCombs recommends operative
24 intervention in the form of the laminectomy, right?
25     A.  Correct.

Page 605

1      Q.  And then if you turn the page one more time
2  to -- yes, Bates No. 17.  On 3/20/03, the note for
3  history and physical says this is a 78-year-old white
4  male who has failed conservative treatment, right?
5      A.  Yes.
6      Q.  And so he's admitted for surgical
7  treatment?
8      A.  Yes.
9      Q.  All -- options include doing nothing,
10 continued conservative treatment and surgery have
11 been discussed, right?
12     A.  Right.
13     Q.  So the three options he had at that time
14 were do nothing, continue with the conservative
15 treatment or have surgery, correct?
16     A.  Yes.
17     Q.  Okay.  Based on the reports of Mr. and Mrs.
18 Smith and these medical records in the spring of
19 2003, agree that Mr. Smith was experiencing severe
20 pain that interfered with his activities of daily
21 living, right?
22     A.  Right.
23     Q.  He was reporting that he was depressed and
24 had trouble sleeping, right?
25     A.  Right.

Page 606

1    MR. SOH: Objection. What date?
2    MS. McGRODER: The same date as the
3  preceding question, spring of 2003.
4    MR. SOH: Okay.
5    Q. He reported losing weight and a decreased
6  appetite, right?
7    A. Right.
8    Q. And his wife reports that she thinks he's
9  out of his mind with pain, correct?
10   A. Yes.
11   Q. And that's what the medical records state,
12  correct?
13   A. Correct.
14   Q. And do you agree that one of the options
15  for treatment of pain available to Mr. Smith in the
16  spring of 2003 was surgical intervention?
17   A. Yes.
18   Q. And Mr. Smith did have surgery following
19  his complaints of pain, depression, and anxiety,
20  right?
21   A. By Dr. McCombs on 4/1/03.
22   Q. Okay. When is the first time after surgery
23  on April 1, 2003 that Mr. Smith complained again of
24  pain?
25   A. About a month later, 4/30/03.

Page 607

1    Q. Okay. On April --
2    A. I'm sorry, 4/28 he also says severe leg
3  pain after church.
4    Q. Right.
5    And did you review the records of Dr.
6  McCombs with respect to that -- that call where he
7  reports pain after church?
8    A. Yes.
9    Q. And so -- did you note -- did you note in
10  that medical record that Mr. Smith said he was very
11  concerned about his pain?
12   A. Yes.
13   Q. And a few days later Mr. Smith's daughter
14  calls Dr. McCombs' office, right?
15   A. I don't know what the date was. I don't
16  have that down.
17   Q. I'm going to hand you now the -- the
18  records you've already got.
19   Look again at 36, McCombs.
20   A. Which page?
21   Q. They're in chronological order so you might
22  have turned to it. It's page 9, but I don't think
23  they're in Bates number order. It might not help
24  you.
25   A. Oh, okay.

Page 608

1    Q. If you start from the back, it's about five
2  pages in.
3    A. Okay.
4    Q. And down there in the bottom in the
5  handwriting it says -- these are the notes of Dr.
6  McCombs, right?
7    A. Right.
8    Q. Okay. It says May 2, 2003.
9    Do you see that?
10   A. Right.
11   Q. Spoke with patient's daughter. States
12  patient wishes he could die because of pain and
13  depression.
14   A. Right.
15   I've got that in my report.
16   Q. Okay. You just didn't have a date for it?
17   A. I have a date. I just didn't have it was
18  by the daughter.
19   Q. Okay. And the office tells the patient's
20  daughter to take the patient to the emergency room
21  for a psychiatric evaluation and treatment?
22   A. Right.
23   Q. Okay. And you noted that in your treatment
24  summary, right?
25   A. Right.

Page 609

1    Q. And that is significant to your opinions,
2  isn't it?
3    A. Right. They were concerned that he
4  mentioned depression, and they wanted him to get
5  evaluated.
6    Q. Well, they were concerned that he mentioned
7  that he wished he could die because of depression,
8  right?
9    A. Sure, depression and wished to die, which
10  is not clear that it's suicide, but it's certainly
11  a wish to die.
12   Q. You believe that's suicidal ideation, don't
13  you?
14   A. Not necessarily. I mean, maybe he wishes
15  his natural life would come to an end.
16   Q. If a patient wishes that his natural life
17  would come to an end and the way to make that happen
18  is by committing suicide, is that suicidal ideation?
19   A. Obviously, if that's the way to make it
20  happen.
21   Q. Well, can you think of any other way to
22  make it happen?
23   A. Live a little bit longer and you'll die
24  naturally, which is going to happen to everybody in
25  this room.

Page 648

1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3        _____
                                          )
4    In re: NEURONTIN MARKETING,   )
     SALES PRACTICES, AND PRODUCTS)
5    LIABILITY LITIGATION,              )
         _____)
6

7                       VOLUME III

8

9         CONTINUED VIDEOTAPED DEPOSITION OF

10              RONALD Wm. MARIS, Ph.D.

11               (Taken by Defendant)

12             Columbia, South Carolina

13            Wednesday, October 1, 2008

14

15

16

17

18

19

20

21

22

23

24            Reported in Stenotype by
          V. Dario Stanziola, CSR, RPR, CRR
25    Transcript produced by computer-aided transcription

Page 649

1        APPEARANCES
2 ON BEHALF OF THE PLAINTIFFS:
3        RON ROSENKRANZ, Esquire
         Finkelstein & Partners
4        1279 Route 300
         Newburgh, New York 12551
5        (845) 563-9442
         rrosenkranz@lawampm.com
6
         and
7
         KENNETH S. SOH, Esquire
8        The Lanier Law Firm
         6810 FM 1960 West
9        Houston, Texas 77069
         (713) 659-5200
10       kss@lanierlawfirm.com
11
   ON BEHALF OF THE DEFENDANT PFIZER:
12
         LORI CONNORS McGRODER, Esquire
13       JENNIFER M. STEVENSON, Esquire
         ANGELA M. SEATON, Esquire
14       LORI SCHULTZ, Esquire
         IAN LOSASSO, Esquire
15       (Appearing Via Telephone)
         Shook, Hardy & Bacon, L.L.P.
16       2555 Grand Boulevard
         Kansas City, Missouri 64108
17       (816) 474-6550
         lmcgroder@shb.com
18       jstevenson@shb.com
         aseaton@shb.com
19       lschultz@shb.com
         llosasso@shb.com
20
   Also Present:
21
         JAMES DOWNIE, CLVS, Videographer
22
23
24
25

Page 650

1          CONTINUED VIDEOTAPED DEPOSITION OF RONALD
2  Wm. MARIS, Ph.D., a witness called on behalf of the
3  Defendant, before V. Dario Stanziola, CSR, RPR,
4  CRR, held at the Columbia Marriott, 1200 Hampton
5  Street, Columbia, South Carolina, on Wednesday,
6  October 1, 2008, commencing at 9:54 a.m.

Page 651

1              INDEX OF EXAMINATIONS
2
3
   By Ms. McGRODER              PAGE     652
4
5              INDEX OF EXHIBITS

   NUMBER       EXHIBIT            MARKED
6  Exhibit 39: A photocopy of a Medline     672
   Plus article
7
   Exhibit 41: A fax cover sheet to John S.  757
8  Allen, subject Richard Smith dated
   9/23/08 with attachment
9
   Exhibit 42: Photocopy of Mr. Smith's    764
10 suicide note
11 Exhibit 43: Photocopy of a journal      770
   article entitled Suicide As Psychache: A
12 Clinical Approach to Self-Destructive
   Behavior by Edwin Shneidman, Ph.D.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 652

1          THE VIDEOGRAPHER: This is beginning of
2      Tape No. 1 in the deposition of Dr. Ronald
3      Maris, Volume III. Today's date is October
4      the 1st, 2008. The time on the monitor is
5      9:54 a.m. We're now on the record.
6  BY MS. McGRODER:
7      Q.  Good morning, Dr. Maris.
8      A.  Good morning.
9      Q.  We're going to continue with the Smith case
10 today, and in a minute we're going to go back to the
11 record. Remember yesterday we started looking at his
12 medical records, and we'll go back to that in a short
13 second.
14          Dr. Maris, do you agree or disagree that it
15 is unreliable to make a retrospective diagnosis of
16 depression after suicide occurs?
17     A.  I wouldn't say it's unreliable. I would
18 say it's less reliable than doing it in the
19 present. The problem, of course, with suicide is
20 you have to have a person die before they become a
21 suicide. And then you usually base your judgment,
22 your diagnosis and the best available information,
23 which is things like medical records.
24          But ideally, you want a living person in
25 front of you answering questions rather than

2 (Pages 649 to 652)

Page 669

1  the medical records he reports sleep disorder.
2    Q. And Dr. Mackey actually testified that
3  insomnia is typical of people with chronic pain,
4  right? Do you remember that testimony?
5    A. Yes.
6    Q. And Ruth Smith testified that Richard
7  Smith's problems sleeping came on in connection with
8  the increasing pain he had, right? Do you remember
9  that testimony?
10   A. And to the point that they started
11  sleeping in separate bedrooms because he was up --
12  he was so restless at night that she couldn't sleep
13  with him.
14   Q. Okay. Do you know when it was that they
15  started sleeping in separate bedrooms?
16   A. I don't remember, but I could go back and
17  look at the record.
18   Q. Okay. You would agree that Mr. Smith's
19  pain at -- at this time, on March 9th, was extremely
20  severe, correct?
21   A. Gosh, I wish I had that pain scale, but
22  it certainly was -- I don't know if I'd say
23  extremely severe, because that sounds like a nine
24  or ten instead of a seven or eight, and I don't
25  know if I have the evidence for that.

Page 670

1    Q. How about severe?
2    A. It was severe.
3    Q. Okay. And on the pain scale that you
4  looked at and perhaps made a note of, a seven was
5  excruciating pain, right?
6    A. Right, seven, eight is excruciating.
7    Q. Do you know whether Dr. Mackey raised the
8  possibility of surgery at this visit?
9    A. He said consider surgery and get a psych
10  evaluation for dementia, both.
11   Q. Okay. And so let's talk about the surgery
12  first. The note says that we discussed the
13  possibility of surgery. We are going to go ahead and
14  make him an appointment to see Dr. Everette Howell.
15       And you're -- you're aware that Dr. Howell
16  is a surgeon, right?
17   A. Yes.
18   Q. Okay. So at this point would you agree
19  that Mr. Smith had an expectation that surgery was a
20  possibility?
21   A. Yes.
22   Q. His daughter -- the note says that his
23  daughter, quote, raised the concern about whether or
24  not there are some other issues going on. And on the
25  basis of her concerns, Dr. Mackey recommended a

Page 671

1  psychiatric evaluation, right?
2    A. Right. She had actually called March 1st
3  and mentioned suicide ideation, which she
4  interpreted as suicide ideation. She called
5  Mackey's office for this March 9th visit, and that
6  was probably part of his phone records that the
7  daughter was concerned about him. And -- and any
8  time you mention suicide, they tend to get you to a
9  psychiatrist.
10   Q. And we talked about that yesterday, right?
11   A. Yes.
12   Q. And so Dr. Mackey's note -- or Dr. Mackey
13  in his deposition said that he made an appointment
14  for Mr. Smith to see a Dr. West.
15       Do you remember that testimony?
16   A. Yes, I do.
17   Q. And that Mr. Smith did not keep that
18  appointment or -- or go -- go to see Dr. West?
19   A. That's correct.
20   Q. Okay. Do you think that Mr. Smith had
21  reluctance to visit a psychiatrist at this time
22  because of the factors we talked about yesterday,
23  being an elderly white male, having pride, and maybe
24  being somewhat reluctant to get psychiatric care?
25   A. You know, it's hard to know. I think

Page 672

1  we're probably only speculating, because all we
2  know for a fact is that he was resistant to
3  psychiatric treatment. We have -- I have no way of
4  getting in his mind. I mean, I can speculate that
5  people don't want to be thought of as having
6  dementia or being unable to control their suicidal
7  impulses or whatever that he may have been
8  thinking. But I have no direct evidence what was
9  in his mind, just the fact that he didn't keep the
10  appointment.
11   Q. Okay. That's fair.
12       Do you believe that the recommendation to
13  see a psychiatrist at this point was based on both
14  suicidal ideation and concern about possible
15  dementia?
16   A. Yes.
17   Q. And what are some of the symptoms of
18  dementia, if you know?
19   A. Well, of course, I know. The most common
20  type of dementia is Alzheimer's type. And the
21  prominent characteristic of Alzheimer's type
22  dementia is memory impairment.
23       (Exhibit 39: A photocopy of a Medline
24       Plus article marked for identification, as of
25       this date.)

7 (Pages 669 to 672)

Page 673

1    Q.  We're marking as Exhibit 39 a Medline Plus
2  reference to the symptoms and definition of dementia,
3  just for your reference, Dr. Maris. And I just kind
4  of wanted to ask you about a couple of these. If you
5  -- if you turn to page 2, it gives a list of
6  symptoms, and the first one is progressive memory
7  loss.
8           That's what you just talked about, right?
9    A.  Right.
10   Q.  And some of the others listed here are
11  inability to concentrate, correct?
12   A.  Correct.
13   Q.  Decrease in problem-solving skills and
14  judgment capability?
15   A.  True.
16   Q.  Confusion, severe, correct?
17   A.  True.
18   Q.  Further down it says altered sleep
19  patterns, insomnia, right?
20   A.  Right.
21   Q.  And motor system impairment, right?
22   A.  Right.
23   Q.  You know this lists apraxia.
24      What is apraxia?
25   A.  It just says, impaired motor function.

Page 674

1    Q.  Oh, overall?
2    A.  Yeah --
3    Q.  Okay.
4    A.  -- impaired skilled motor function.
5    Q.  Okay. And -- and down below there it says
6  inappropriate movements, right --
7    A.  Yes.
8    Q.  -- under gait changes?
9    A.  Right.
10   Q.  Gait means ability to stand and walk.
11      Would that be accurate?
12   A.  Sure. We used to say that the hospital
13  patients on Thorazine did the Thorazine shuffle
14  because they walked -- their gait was different.
15   Q.  Yep.
16      I've -- I've seen that too.
17   A.  Have you seen it?
18   Q.  Um-hum, back in my nursing days.
19      Disorientation is one of the symptoms
20  reported with dementia, right --
21   A.  Yes.
22   Q.  -- and disorders of problem-solving or
23  learning, right?
24   A.  Right.
25   Q.  Okay. Anyway, is your understanding that

Page 675

1  something in the nature of these symptoms were being
2  reported on March 9th and that's why Dr. Mackey made
3  the note that he ought to have a psych consult and
4  used the term dementia?
5    A.  It certainly covers a lot of issues that
6  could be of concern.
7    Q.  Okay. The next visit is on March 24, 2004,
8  to Dr. McCombs, correct?
9    A.  Correct.
10   Q.  And at this point Dr. -- or the nurse
11  practitioner Krancer sees Mr. Smith, correct?
12   A.  Right.
13   Q.  And she recommends that he come back in a
14  week and see Dr. McCombs because he's in so much
15  pain, right?
16   A.  Right.
17   Q.  And the note says that he's again having
18  bilateral leg pain that radiates down his buttocks,
19  perennial area, anterior part of thigh and down to
20  his knee, right?
21   A.  Right.
22   Q.  And it also says he's having difficulty
23  with standing and ambulation, right?
24   A.  Right.
25   Q.  And I see that you're making a few notes.

Page 676

1    A.  Sure.
2    Q.  I'm glad we didn't already copy that for
3  the record.
4       What are you -- what are you adding there?
5    A.  I just added leg -- leg pain.
6    Q.  Oh, okay.
7       And was there any discussion of surgery
8  that you -- that you remember at this -- at this
9  point?
10   A.  Well, the very next note I have is more
11  surgery is not helpful. So shortly thereafter
12  there was a determination, even though they thought
13  about it for a week that he was not a candidate for
14  surgery.
15   Q.  The fact at this visit on March 24th that
16  Mr. Smith is having difficulty with standing and
17  ambulation and, you know, continuing pain, is that an
18  indication to you that the conservative treatment he
19  had really wasn't working for him?
20   A.  Yes.
21   Q.  I just wanted to show you one thing in the
22  McCombs record, if I can find it, and then we can
23  move on.
24       This is a demonstration of why I didn't
25  want to go through each of the records one by one.

Page 677

Sorry that took so long.
If you look at this -- this is Exhibit 36. These are the McCombs records. And if you look at the note on March 24, 2004, at the bottom of the first paragraph Nurse Krancer writes, haven't -- she -- she writes that he should have an epidural steroid injection and start Neurontin, correct?
A. Right. Let me make sure I read it better. Okay. I see it. He is taking Advil, Neurontin, Lortab.
Q. Right. But you're looking at the May 5 note. If you look up at the very top of that page --
A. Oh, typed?
Q. Yes, at end of her first paragraph there?
A. Yes.
Q. And you see that's -- that note is signed by Nurse Krancer, at least the initials are --
A. Right.
Q. -- P.K.?
A. And isn't she like an advanced practice nurse and has the ability to prescribe?
Q. Yeah, she's a nurse practitioner with the ability to prescribe.
And it says, you know, something about having an epidural steroid injection. Sorry, I can't

Page 678

find my copy of the note.
It says: I have discussed at length a treatment plan. He will have an epidural steroid injection and start Neurontin 300-milligram PO/TID. He will follow up with Dr. McCombs. And he will also have an EMG per Dr. Clinton.
You see that note?
A. I do.
Q. I think that you discussed yesterday your belief that he started Neurontin on March 9, 2004, right?
A. At a certain dose, yes.
Q. Okay. And -- and is it -- is it your belief that at this point Nurse Krancer is having him start Neurontin?
A. No, she's increasing it 300 milligrams a day. I mean, the --
Q. TID?
A. TID, from BID to TID.
Q. Okay.
A. My understanding was that on March 4th, Dr. Mackey gave him a script for 300 milligrams BID, that the family drove straight to Eckerd's per Ruth's testimony. He filled it and he took it until March 24th in which case Krancer and McCombs

Page 679

said we want you to take 300 milligrams TID.
Q. Okay.
A. That's my understanding.
Q. All right. And if you look in the middle of this paragraph, same paragraph, it says -- excuse me -- he went to see Dr. Mackey and Dr. Howell.
Both Dr. Mackey and Dr. Howell are surgeons, right?
A. Right.
Q. And it says after they worked him up, they would not see him, because he would not let them do his initial surgery, right?
A. Right.
Q. Is it your understanding that that is the information that Mr. Smith is reporting to Nurse Krancer on this visit?
A. Somebody is. I'm not sure if his wife is there, but somebody told Nurse Krancer this.
Q. Okay?
A. And he was accused of doctor shopping, and some of the doctors said we're not going to treat you if you keep doing this. You made an appointment -- we talked about this yesterday -- you canceled it, you rescheduled it, we can't keep having this happen. So it sounds like something

Page 680

that Ruth and he both could have talked about.
Q. Okay. And do you think at this point when he's told that -- or at least somebody in the family, and Mr. Smith is obviously present, is reporting that these surgeons wouldn't see him because he wouldn't let them do his initial surgery, that -- that that contributed to a feeling of hopelessness for Mr. Smith?
A. It's possible. I mean, you know, he still said, I don't want any surgeon to cut on my body in his note. So he was not -- he was not feeling hopeless because of not being able to get surgery. He, in fact, said I don't want anymore surgery.
So it's hard to know exactly what he was thinking. I don't think he felt frustrated that he couldn't get more surgery. Although, in fact, he had -- some of his providers would not provide surgical solutions.
Q. Do you think the family felt frustrated that he -- that he wasn't able to see surgeons at this time?
A. I think there's some notes in the depositions that they felt that the surgery was the only thing that would really make him feel better.