# EXHIBIT 6

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5  IN RE:  NEURONTIN          )  CASE NO. 04-10981
    MARKETING, SALES           )
 6  PRACTICES AND              )
    PRODUCTS LIABILITY         )
 7  LITIGATION                 )
                               )
 8  THIS DOCUMENT RELATES      )
    TO:                        )
 9                             )
    RUTH SMITH, Individually)
10  and as Widow for the use)  05-CV-11515
    and benefit of herself   )
11  and the next of kin of   )
    Richard Smith, deceased.)
12  _____)

13

14

15             VIDEOTAPED DEPOSITION OF:
               DETECTIVE DANNY SATTERFIELD
16             Taken On Behalf of the Defendant
               February 7, 2008
17

18

19

20

21

22

23

24

25
```

*Condensed Copy*

**Page 2**

```
 1  APPEARANCES:
 2    FOR THE PLAINTIFF:
 3       CLARK, THOMAS & WINTERS
         BY CEDRIC E. EVANS, ESQ.
 4       300 West 6th Street
         15th Floor
 5       Austin, Texas 78701
         (512) 472-8800
 6       cee@ctw.com
 7
 8    FOR DEFENDANT:
 9       THE LANIER LAW FIRM
         KENNETH S. SOH, ESQ.
10       6810 FM 1960 West
         Houston, Texas 77069
11       (713) 659-5200
         kss@lanierlawfirm.com
12
13
14
      ALSO PRESENT:
15
         AMANDA MARTIN, Videographer
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            I N D E X
 2  WITNESS                        PAGE
 3  Detective Danny Satterfield
 4    Exam by Mr. Evans            5, 46
      Exam by Mr. Soh              32, 52
 5
 6  EXHIBITS                       PAGE
 7  Exhibit 1                      11
 8  Exhibit 2                      28
 9  Exhibit 3                      29
10  Exhibit 4                      43
```

**Page 4**

1  The videotaped deposition of
2  DETECTIVE DANNY SATTERFIELD, taken on behalf of
3  the defendants, on the 7th day of February,
4  2008, in the Metropolitan Police Department of
5  Nashville and Davidson County, 2231 26th Avenue
6  North, Nashville, Tennessee, for all purposes
7  under the Tennessee Rules of Civil Procedure.
8       The formalities as to notice,
9  caption, certificate, et cetera, are waived.
10  All objections, except as to the form of the
11  questions, are reserved to the hearing.
12       It is agreed that Katherine Gale
13  being a Notary Public and Court Reporter for the
14  State of Tennessee, may swear the witness and
15  that the reading and signing of the completed
16  deposition by the witness are waived.
17
18
19
20
21
22
23       DETECTIVE DANNY SATTERFIELD
24  was called as a witness, and after having been
25  first duly sworn, testified as follows:

**Page 5**

1       THE VIDEOGRAPHER: Going on record.
2  The time is 12:50. Read-in has been waived.
3       Will the reporter please swear in the
4  witness.
5       DEPOSITION OFFICER: Do you solemnly
6  swear that the testimony you shall give in this
7  matter shall be the truth, the whole truth, and
8  nothing but the truth, so help you God?
9       THE WITNESS: I do.
10
11       E X A M I N A T I O N
12  BY MR. EVANS:
13  Q  Detective Satterfield, my name is Cedric
14  Evans, and I represent Pfizer in a lawsuit that
15  has been filed by the family of a gentleman
16  named Richard Smith, a gentleman who took his
17  own life on May 13, 2004. And I believe you had
18  a role in the investigation of Mr. Smith's
19  suicide, so we're here today to take your
20  deposition to ask some questions about your
21  investigation of Mr. Smith's suicide.
22       Do you understand that?
23  A  Yes, I do.
24  Q  Have you ever given a deposition before?
25  A  Yes, I have.

2 (Pages 2 to 5)

Page 6

1  Q  Approximately how many times?
2  A  Actually, I think it's only been one time.
3  Q  And was that in your capacity as a police
4  officer?
5  A  Yes, it was.
6  Q  About how long ago was it?
7  A  It's been some few years ago.
8  Q  Okay. All right. Well, let me just kind
9  of go over for you again how this deposition
10 process works.
11      As you can see, the court reporter is
12 taking down everything that's said in the room,
13 your -- my questions, your responses, and any
14 comments by Mr. Soh. It's important, because
15 she's trying to take down everything that's
16 said, that just some ground rules.
17      If you could always make sure you
18 answer questions audibly, either "yes" or "no,"
19 or a narrative response if that's what the
20 question calls for and avoid just shaking your
21 head up and down or side to side.
22      Also, if we could try to not talk
23 over each other because, again, that makes it
24 difficult for the court reporter to figure out
25 who is talking and what was said. I'll let you

Page 7

1  finish answering a question before I start
2  asking a new one if you could let me get a
3  question out before you start answering.
4       If at some point in time you don't
5  understand a question that's been asked --
6  sometimes I'm not quite as clear in the question
7  as I think I am -- just say so, and I'll do my
8  best to restate it in a way that you can
9  understand it.
10      If you need to take care of a -- some
11 official matter and take a break to do that --
12 hopefully we won't be here that long for that
13 situation to arise, but if you need to do it,
14 just let us know and we can take a break.
15      And lastly, there may be occasions
16 where either Ken or myself may make an objection
17 and we are doing that for the record. Most
18 likely it would be an objection to form. If you
19 could just let that objection, you know -- you
20 know, let us get the objection out, and unless
21 one of us indicates that you shouldn't answer a
22 question, you can go ahead and answer the
23 question after the objection.
24      Okay?
25 A  Yes.

Page 8

1  Q  Okay.
2      Can you state your full name for the
3  record, please?
4  A  Danny Satterfield.
5  Q  Okay. And what is your current
6  occupation?
7  A  Police officer of the Metro Nashville
8  Police Department.
9  Q  All right. And how long have you been a
10 police officer with the Metro Nashville Police
11 Department?
12 A  A few months more than 15 years.
13 Q  And you're a detective?
14 A  That's correct.
15 Q  Okay. And how long have you been a
16 detective?
17 A  I went into the investigation unit in 1994
18 in the domestic violence division, so that began
19 my investigations -- my career in the criminal
20 investigation field here.
21 Q  So you've been a detective since 1994?
22 A  In Nashville, yes.
23 Q  In Nashville, okay.
24      Were you with another police
25 department prior to your time with the

Page 9

1  Metropolitan Nashville Police Department?
2  A  Yes, I was.
3  Q  Okay. Who were you -- who were you with
4  before?
5  A  Immediately prior to coming to work in
6  Nashville, I was with the Sumner County
7  Sheriff's Department. Prior to that I was with
8  the Gallatin Police Department.
9  Q  And so how many years total have you been
10 in law enforcement?
11 A  I started with the Gallatin Police
12 Department in 1972, so that's going to be 35
13 years -- a little over 35 years.
14 Q  And what unit within the Metropolitan
15 Nashville Police Department do you work for?
16 A  I'm assigned to the North Precinct
17 Investigative Unit.
18 Q  Okay. And what sort of investigative
19 matters fall under the purview of the
20 investigative unit?
21 A  We work everything from assaults,
22 aggravated assaults, theft cases, burglary
23 cases, homicide cases. It's kind of like a
24 general detective assignment.
25 Q  All right. And also, how long have you

**Page 22**

1  Q   Okay. And I just want to kind of walk
2  through now your -- your report.
3       Now, your report indicates -- it
4  says, "I immediately" --
5         "On 5-13-04 at 0620
6         hours I arrived at 1443 Janie
7         Avenue in response to the above
8         victim being deceased due to a
9         gunshot wound. I immediately
10        interviewed the victim's wife,
11        Ruth Brown Smith."
12       Are you -- are you able to tell me
13 why one of the first things you did would have
14 been to interview Ruth Brown Smith?
15 A   I don't know that I can tell why I did. I
16 think that's just a matter of procedure, one of
17 those things that's necessary to do to get the
18 information from her. I think it states in the
19 report somewhere also that there was no one in
20 the house with the exception of her and
21 Mr. Smith, so she would have been logically the
22 only person to talk to to gather information
23 about what actually had transpired.
24 Q   Is it important to the investigative
25 process to interview witnesses or potential

**Page 23**

1  witnesses as soon as possible?
2  A   I think so, yes, sir.
3  Q   Why is that?
4  A   Partially because the events will be fresh
5  on their minds and they can recollect the chain
6  of events more clearly, I think.
7  Q   Now, you state here in your report,
8         "Mrs. Smith states that
9         about one year ago, the victim
10        had knee replacement surgery and
11        has been in constant pain since
12        that time."
13       MR. SOH: You forgot "hip" too.
14       MR. EVANS: I'm sorry. I'm sorry.
15 I'll reread it. I apologize.
16        "Mrs. Smith states that
17        about one year ago the victim
18        had hip and knee replacement
19        surgery and has been in constant
20        pain since that time."
21 Q   Again, would that have been information
22 that you would have -- and it's maybe obvious,
23 and I apologize to the extent that some of these
24 questions are obvious.
25       But would that have been information

**Page 24**

1  that you obtained directly from Ruth Brown
2  Smith?
3  A   As I recall, I believe that is correct.
4  By the way, I put in the report that Mrs. Smith
5  stated that, so I think that's probably correct,
6  yes, sir.
7  Q   Any reason you think you would have said
8  Mrs. Smith states if Mrs. Smith didn't state?
9  Does that make sense?
10       Is there any reason you can think
11 that you would have said that Mrs. Smith stated
12 something that she didn't actually state?
13 A   Putting false information in here; is that
14 what I understand?
15 Q   Yeah.
16 A   Absolutely not.
17 Q   Okay. All right.
18       Do you -- and you note here that
19 Mrs. Smith stated that Mr. Smith had been in
20 constant pain since the time of his hip and knee
21 replacement surgery.
22       Do you have any -- any recollection
23 of whether or not at that time Mrs. Smith drew
24 any connection between the constant pain that
25 she indicated Mr. Smith was in and his suicide?

**Page 25**

1  A   I don't think I can draw a conclusion one
2  way or the other about what she made as far as
3  any connection. If you read the statement
4  there, it states that he's been in constant pain
5  since his knee and hip replacement surgery. I
6  don't know how to explain that any more than
7  that.
8  Q   Okay. All right.
9       You then go on to note that,
10        "On 3-1-04, the victim
11        mentioned to his daughter, Cindy
12        Smith, that he might take his
13        own life."
14       Now, your report doesn't indicate
15 that you -- that you spoke directly to Cindy
16 Smith.
17 A   That's correct.
18 Q   All right. So the information that's
19 contained there about Mr. Smith wanting to take
20 his own life, would that information have come
21 from Ruth Brown Smith?
22 A   I think that's possible. And I'm going by
23 the way that I typed this report. I think I
24 would have said that his -- had I got that
25 information from his daughter, that she had

Page 26

1  stated that. And the fact of that information
2  being with the information where I interviewed
3  Mrs. Smith -- and I hate to make assumptions --
4  I think it's possible that I got that from
5  Mrs. Smith.
6  Q    Do you think it's likely that you got it
7  from Mrs. Smith?
8  A    It's likely, yes, sir.
9  Q    Okay. All right. And in your report
10 you're pretty specific about the date because it
11 says 3-1-04, it doesn't say something like the
12 1st of March or the beginning of March.
13      So can we also take away from that
14 that it is likely that you were given the
15 specific date by Mrs. Smith?
16 A    I would have had to have been given a
17 specific date for me to put a specific date in
18 there.
19 Q    Okay. Now, you --
20 A    I would like to say here, back to that
21 question on 3-1 of '04 that the victim mentioned
22 to his daughter he may take his own life. It
23 looks like that that would have come from
24 Mrs. Smith based on the fact if you read
25 further, that I'm still talking to Mrs. Smith

Page 27

1  and she's giving me the sequence of events that
2  night. The only way I could see it any
3  differently would be if Cindy Smith had been
4  sitting right there while I was talking to
5  Mrs. Smith and made that statement. So that's
6  possible, but I don't know that it did happen.
7  Q    You don't have a recollection of --
8  A    No, I don't, no, sir.
9  Q    And I don't want to go through this whole
10 thing, and I'm sure Ken may have some other
11 things that he wants to ask you about.
12      But there's -- you note here -- kind
13 of in the second paragraph, you note that there
14 was a note on the dresser that indicates that
15 the victim had caused his own death.
16      Do you have a recollection of that --
17 of that note as you sit here right now?
18 A    Yes, sir. I do remember that there was a
19 note there.
20 Q    Okay. Let me do this. There are some
21 photographs that we managed to get from the
22 medical examiner's office. Our efforts to get
23 photographs that may have been taken by the
24 identification officer from the Metropolitan
25 Nashville Police Department were unsuccessful.

Page 28

1  But we do have these photographs that were taken
2  from -- by the medical examiner.
3       I want to show you -- Ken, this is
4  just a --
5       MR. SOH: Sure.
6       MR. EVANS: This is just, for the
7  record, it's photograph -- it's scene photograph
8  005 that we're going to mark as Deposition
9  Exhibit No. 2.
10      (Marked Exhibit 2.)
11 BY MR. EVANS:
12 Q    Take a look at what I've marked as
13 Deposition Exhibit No. 2 and tell me if that's
14 the note that you referred to in your report.
15 A    If I remember correctly, this would be a
16 copy of the note that was found in Mr. Smith's
17 bedroom. It sounds familiar.
18 Q    Okay. All right. And you also -- I'm
19 kind of reading down a little bit further, kind
20 of in the middle it says, "It appears that the
21 victim had placed" -- I should be fair here.
22      You note earlier in that paragraph,
23 you said,
24      "There was a white
25 plastic bag on the bed and a

Page 29

1       large amount of blood on the bed
2  and floor near the bed."
3       And then later on you say,
4       "It appears that the
5  victim had placed the plastic
6  bag on the bed to prevent the
7  soiling of the bed with
8  biohazard material."
9       Do you see that part?
10 A    Yes, I read this a little while ago. I
11 think prevent soiling of the bed with
12 biohazardous material, I think he put a plastic
13 bag there on the bed where he was to keep from
14 messing the bed up with blood.
15 Q    Okay. And let me show you -- mark as
16 Deposition Exhibit No. 3 -- and again, this is
17 a -- a photograph from the collection of scene
18 photographs that were obtained from the medical
19 examiner's office. And this is photograph 008.
20      (Marked Exhibit 3.)
21 BY MR. EVANS:
22 Q    Can you take a look at that. Does that
23 appear to be a scene that shows the plastic bag
24 that was placed on Mr. Smith's bed that you
25 reference in your report?

8 (Pages 26 to 29)