# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: NEURONTIN            MDL Docket No. 1629
MARKETING, SALES            Master File No.
PRACTICES and PRODUCTS               04-10981
LIABILITY LITIGATION        Judge Patti B. Saris
                            Magistrate Judge
                            Leo T. Sorokin

RUTH SMITH,

    Plaintiff,           C. A. No.  05-11515

V.

PFIZER, INC., et al.,

    Defendants.


    Videotaped Deposition of:

    EDWARD MACKEY, M.D.

    Wednesday, May 23, 2007

## Page 2

```
 1
 2           STIPULATIONS
 3        It is stipulated and agreed, by
 4   and between the parties through their
 5   respective counsel, that the videotaped
 6   deposition of:
 7        EDWARD MACKEY, M.D., may be
 8   taken before Fred W. Jeske, court reporter and
 9   Tennessee Notary Public, at the offices of
10   Miller & Martin, 1200 US Bank Tower, 150 Fourth
11   Avenue, North, Nashville, Tennessee, on
12   Wednesday, May 23, 2007, commencing at
13   approximately 8:40 a.m.
14        It is further stipulated and
15   agreed that the signature to and reading of the
16   deposition by the witness is waived, the
17   deposition to have the same force and effect as
18   if full compliance had been had with all laws
19   and rules of Court relating to the taking of
20   depositions.
21
22
23
24
25
```

## Page 3

```
 1
 2        It is further stipulated and
 3   agreed that it shall not be necessary for any
 4   objections to be made by counsel to any
 5   questions, except as to form or leading
 6   questions, and that counsel for the parties may
 7   make objections and assign grounds at the time
 8   of the trial, or at the time said deposition is
 9   offered in evidence, or prior thereto.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1   APPEARANCES:
 2   For the Plaintiff:
         ANDREW G. FINKELSTEIN
 3       KEITH ALTMAN
         Finkelstein & Partners
 4       436 Robinson Avenue
         Newburgh, New York  12550
 5       (800) 634-1212
         afinkelstein@lawampm.com
 6   -and-
         W. MARK LANIER
 7       ROBERT LEONE
         DARA HEGAR
 8       PATRICK O'HARA
         The Lanier Law Firm
 9       6810 FM 1960 West
         Houston, Texas 77069
10       Post Office Box 691448
         Houston, Texas 77269-1448
11       (713) 659-5200
         wml@lanierlawfirm.com
12
     For the Defendant Pfizer:
13       KENNETH J. FERGUSON
         CEDRIC E. EVANS
14       Clark, Thomas & Winters
         300 West 6th Street, 15th Floor
15       Austin, Texas 78701
         P.O. Box 1148
16       Austin, Texas 78767
         (512) 472-8800
17       cee@ctw.com
18   For the witness:
         NOEL F. STAHL
19       Miller & Martin
         1200 one Nashville Place
20       150 Fourth Avenue North
         Nashville, Tennessee 37219
21       (615) 744-8503
         nstahl@millermartin.com
22
     Also present:
23
         Jonathan Wilkerson, law clerk
24       Sheldon Singh, videographer
25            -oOo-
```

## Page 5

```
 1            TABLE OF CONTENTS
 2                                    Page
     EDWARD MACKEY, M.D.
 3
       Direct By Mr. Lanier          7
 4     Cross By Mr. Ferguson         44
       Re-Direct By Mr. Lanier       93
 5     Re-Cross By Mr. Ferguson     107
 6
 7              EXHIBITS
 8   Exhibit  Description              Page
 9   Exhibit 1  Curriculum vitae        8
10   Exhibit 2  Medical records         8
11   Exhibit 3  Pfizer records         15
12   Exhibit 4  Neurontin product label 18
13   Exhibit 5  Information            21
14   Exhibit 6  FDA Division of        35
                Neuropharmacological Drug
15              Products Combined
                Medical-Statistical Review
16              10/13/93
17   Exhibit 7  Affidavit of David Franklin, 38
                Ph.D.
18
19   REPORTER'S CERTIFICATE           112
20            -oOo-
21
22
23
24
25
```

Page 6

1  VIDEOGRAPHER: My name is
2  Sheldon Singh of Nationwide Video
3  Productions, Inc., located in Roseland, New
4  Jersey.
5     Today's date is Wednesday, May
6  23rd, 2007, and the time on the monitor is
7  8:40 a.m. This deposition is being held in
8  the office of Miller and Martin, located at
9  150 Fourth Avenue, North, Nashville,
10 Tennessee, 37219.
11    The caption of this case is
12 Neurontin Marketing, Sales Practices and
13 Products Liability Litigation, Ruth Smith
14 v. Pfizer, Inc., et al.
15    The case number is 05-11515, in
16 the United States District Court, District
17 of Massachusetts.
18    The name of the witness is
19 Dr. Edward S. Mackey.
20    At this time the attorneys will
21 identify themselves and the parties they
22 represent after which our court reporter,
23 Mr. Fred Jeske, of Vowell & Jennings, will
24 swear in the witness so we can proceed.
25    MR. LANIER: My name is Mark

Page 7

1  Lanier. I'm here with a number of folks
2  representing the Smith family. I've got
3  from my office Bob Leone, Andrew
4  Finkelstein from his office is here, along
5  with Keith.
6     We've got Dara Hegar. We've got
7  Patrick O'Hara, and we've got -- and we
8  have got Jonathan Wilkerson here from our
9  office.
10    MR. FERGUSON: Ken Ferguson,
11 Clark, Thomas and Winters, in Austin, Texas
12 for Pfizer, Parke-Davis and Warner-Lambert
13 along with Cedric Evans from the same firm.
14    MR. STAHL: I'm Noel Stahl. I'm
15 here with Dr. Ed Mackey.
16    EDWARD MACKEY, M.D.,
17 having been duly sworn, testified as follows:
18    DIRECT EXAMINATION
19 BY MR. LANIER:
20 Q.  Dr. Mackey, thank you for taking time
21 to be with us today. We appreciate it.
22    We have an opportunity to take
23 your deposition by videotape so that a jury's
24 able to listen and watch your testimony, and
25 you don't have to stop your practice in the

Page 8

1  middle of the day to come down to the
2  courthouse to testify. But we do recognize you
3  taking time today, and we appreciate it.
4     I have a copy of what's your
5  curriculum vitae, kind of a resume type thing.
6  I'm marking it as Exhibit 1.
7  (Exhibit 1 marked.)
8  Q.  Would you confirm for the jury that
9  that's who you are.
10 A.  Yes.
11 Q.  Thank you. And then we have brought --
12 you have brought today a copy of your medical
13 records on Mr. Smith. We're going to mark that
14 as Exhibit 2 and we'll attach that as well.
15 (Exhibit 2 marked.)
16 Q.  Is that a full and complete copy of
17 those records, sir, to the best of your
18 knowledge?
19 A.  I, I believe so.
20 Q.  Okay. I assume you didn't make the
21 copies yourself personally but you asked for a
22 copy to be made?
23 A.  That is correct.
24 Q.  All right. Thank you. Please feel
25 free to refer to that as you need to throughout

Page 9

1  the deposition, and we'll try not to take too
2  much of your time today.
3     First a little bit about you.
4  What kind of doctor are you?
5  A.  I'm an orthopedic surgeon.
6  Q.  In everyday language what's an
7  orthopedic surgeon?
8  A.  It's a doctor specializing in the care
9  of bones and muscles of the body.
10 Q.  If I have got a problem with my back,
11 are you the kind of doctor I'd go see?
12 A.  Yes.
13 Q.  Okay. Did you have a chance to look at
14 and take care of some Richard Smith?
15 A.  Yes.
16 Q.  And that's the gentleman whose chart
17 you have in front of you; right?
18 A.  Yes.
19 Q.  What, if you could tell the jury, is
20 the time period when you gave your care for
21 Mr. Smith?
22 A.  I first saw Mr. Smith February 12th,
23 2004.
24 Q.  And so that we get the other bookend in
25 place, when was your last time to see

Page 46

1  First of all, you said
2  Dr. Shell -- and feel free to refer to your
3  chart on this, because I may ask some fairly
4  specific questions.
5  Dr. Shell, who is a member of
6  your practice group, referred Mr. Smith to you;
7  is that correct?
8  A.   That's correct.
9  Q.   To your knowledge, had Mr. Smith seen
10 some other doctors in your practice group in
11 the years before? If you know one way or the
12 other.
13 A.   According to Dr. Shell's note, he had
14 replacement in 1996. He had had his total knee
15 done on the right, same side, by Dr. Gene Regen
16 in 1998. Dr. Regen is now retired.
17 He had a left knee replacement
18 done by Stewart Stowers, who is still
19 practicing. He sees, he sees Dr. Stuart Smith,
20 another one of my partners, for follow-up on
21 his total joints.
22 Q.   So before Mr. Smith came to see you
23 about his back pain, he had had a left knee
24 replaced previously; is that correct?
25 A.   That's correct.

Page 47

1  Q.   He had a right knee replaced in the
2  past; correct?
3  A.   Correct.
4  Q.   He had a right hip replacement done in
5  the past; correct?
6  A.   Correct.
7  Q.   And then also before he had come to see
8  you about his back he had actually had a
9  laminectomy and fusion performed by, by
10 Dr. McCombs; correct?
11 A.   Correct.
12 Q.   And can you tell us, and we'll talk
13 about it a little bit more, what is a
14 laminectomy and fusion?
15 A.   A fusion -- well, start with
16 laminectomy, is a procedure where the bone and
17 ligaments that are preshing -- pressing on
18 nerves are removed.
19 Q.   And then a fusion involves using a
20 bone; is that correct?
21 A.   It is trying to get the motion segment
22 where the narrowing is to grow together, and if
23 you stop the motion there, in theory you
24 prevent the spurs from coming back.
25 Q.   And skipping back and talking about

Page 48

1  these joint replacements we talked about, these
2  are actually where you actually go in and saw
3  bone and replace the natural joint with
4  artificial joints; correct?
5  A.   Correct.
6  Q.   And I guess any way we look at surgery,
7  that's a major surgery; correct?
8  A.   Yes.
9  Q.   Did you review Dr. Smith's note before
10 you actually saw Mr. Smith to get a little
11 history?
12 A.   No.
13 Q.   Let's talk about your first visit.
14 What date was that again?
15 A.   2/12/04.
16 Q.   And what was your understanding about
17 why Mr. Smith was coming to see you? Why had
18 he appeared in your office on that day?
19 A.   He had gone to see Dr. Shell, that's
20 misspelled in this note, regarding his leg
21 pain, and Dr. Shell felt that his pain was more
22 related to his prior back surgery than it was
23 related to his joints.
24 Q.   And because you do backs in your
25 office, he sent him to see you; is that right?

Page 49

1  A.   That's correct.
2  Q.   In this note, I believe, does it note
3  that he had been treated with pain medications?
4  And I'm looking at the February 12th visit.
5  Specifically it says the pain has not improved
6  despite muscle --
7  A.   Yes.
8  Q.   -- relaxants and pain medications?
9  A.   Yes.
10 Q.   Do you know what pain medications he
11 had been taking before that?
12 A.   Um, Flexeril, hydrocodone, Bextra.
13 Q.   So a number of other medications. Are
14 those pretty strong medications?
15 A.   Flexeril is a muscle relaxer. Bextra
16 is a antiinflammatory, it's a COX-2, it's no
17 longer on the market, and hydrocodone eases
18 pain, narcotic.
19 Q.   But his pain had not improved despite
20 taking those pain medications and muscle
21 relaxants; correct?
22 A.   Correct.
23 Q.   And he noted to you that he was
24 developing increasing left leg pain; correct?
25 A.   Yes.

Page 50

1  Q. You note that his symptoms were
2  consistent with sciatica. Could you tell us
3  what sciatica is.
4  A. It's pain that runs down a distribution
5  of an irritated nerve, at the L5-S1.
6  Q. And you noted you gave him information
7  regarding the lumbar laminectomy and fusion
8  redo with pedicle screws.
9  A. Yes.
10 Q. So essentially you were discussing with
11 him the possibility of a further surgery to try
12 to deal with his problem; correct?
13 A. Yeah.
14 Q. And perhaps in slightly different
15 manner than it was dealt with before?
16 A. Correct.
17 Q. You recommended him for some physical
18 therapy?
19 A. I did.
20 Q. Do you know if he went through that
21 physical therapy? Do your notes reflect that?
22 A. I believe he did.
23 Q. Do you have any information in your
24 notes, even in your next office visit,
25 indicating whether or not that physical therapy

Page 51

1  had helped him in any way with regard to his
2  pain?
3  A. I do not think it helped him
4  significantly.
5  Q. So you're trying a number of different
6  techniques to try to deal with Mr. Smith's
7  pain; correct?
8  A. Yes.
9  Q. Physical therapy, pain medications, et
10 cetera; correct?
11 A. Yes.
12 Q. You have a note of February 25th, and
13 in that note it notes you spoke with Mr. Smith
14 today. Is that actually a phone conversation
15 or is this an in-person visit?
16 A. That would be a phone conversation.
17 Document type, it says "phone call" at the top.
18 Q. You noted that the myelogram and post
19 myelogram CT had shown incomplete bony fusion.
20 A. Yes.
21 Q. Could you tell us what that means.
22 A. Means that he didn't get full bony
23 growth between the L4 and L5 level.
24 Q. The bone's supposed to actually heal
25 together and fuse?

Page 52

1  A. Yeah. In essence the goal of this
2  surgery is to make the body believe it's
3  healing a broken bone. The body heals bones
4  with normal bone tissue, and once you do that,
5  you stop the motion, in theory decrease back
6  pain, decrease leg pain.
7  Q. You noted that you do believe that he
8  had a non-union at 4-5, which is what we were
9  talking about, but you noted it's hard to tell
10 whether or not this is the cause of his
11 symptoms; right?
12 A. Yes.
13 Q. What are the choices? What else could
14 be the cause of his symptoms if it's not that?
15 A. Well, he also mentioned in this note
16 that he is also getting a lot of knee pain.
17 Again, clearly he had some problems with his
18 knee.
19     It could be scar tissue, it
20 could be nerve damage from the surgery itself.
21     We know that even though the
22 goal of this type of surgery is the fusion,
23 results don't always correlate with either
24 getting or not getting a fusion. Just because
25 you get a non-union doesn't mean that fixing

Page 53

1  that non-union is going to make it better, nor
2  does it mean that if you have a solid fusion,
3  you still have the pain, that there is still a
4  problem. It's not as cut and dry as, as that.
5  Q. Okay. In addition to the back and
6  radicular pain -- and what, again, is radicular
7  pain?
8  A. Nerve irritation pain.
9  Q. In addition to the back and radicular
10 pain you noted on the 25th, that it sounded
11 like he was getting a lot of knee pain as well;
12 correct?
13 A. Correct.
14 Q. Unfortunately the gentleman had a lot
15 of, lot of pain problems going on when you saw
16 him; correct?
17 A. Yes. It was -- yes.
18 Q. So you next saw him on March 9th; is
19 that right?
20 A. Yes.
21 Q. And that was actually an in-office
22 visit?
23 A. Yes.
24 Q. Did -- do you recall whether or not
25 some members of Mr. Smith's family accompanied

Page 54

1 him on that day?
2 A. Yes.
3 Q. Do you recall which ones?
4 A. I know there's at least one daughter.
5 And I think his wife.
6 Q. And on, on that date, on Fe --
7 March 9th, did you actually examine Mr. Smith
8 or did you simply talk to him and his family
9 about the issues?
10 A. I didn't document that I examined him,
11 but we did spend a lot of time talking about
12 the issues.
13 Q. And what symptoms was he reporting on
14 that day?
15 A. Reports knee pain, which identified
16 separately from the bilateral leg pain, which
17 I'm calling more as radicular complaints.
18 Q. And you noted worsening bilateral leg
19 pain.
20 A. Yes.
21 Q. And bilateral means both legs;
22 correct?
23 A. Yes.
24 Q. And by worsening, you had now seen him
25 or spoken to him over a period of about a month

Page 55

1 or so --
2 A. Yes.
3 Q. -- yourself.
4     And over that period of time,
5 based on this history, it was worsening pain
6 for him; correct?
7 A. Yes.
8 Q. You noted that the pain had gotten to
9 the point that he was getting around in a
10 wheelchair.
11 A. Yes.
12 Q. Now, was it your understanding --
13 well, how long had that been going on, or do
14 you have any understanding about that?
15 A. I don't.
16 Q. Did you have an understanding that it
17 was more than just in your office that day that
18 he was in a wheelchair?
19 A. Yes. But I, I don't know to what
20 length of time.
21 Q. You also noted that he was not sleeping
22 well; correct?
23 A. Yes.
24 Q. And, and you didn't note that, but was
25 that due to the pain?

Page 56

1 A. Pain.
2 Q. And is that fairly typical of people
3 who have chronic pain, they can't sleep well
4 either?
5 A. Yes, sir.
6 Q. And does that tend to aggravate the
7 situation?
8 A. Yes.
9 Q. You said that the bone scan showed
10 photopenia in his lumbar spine, which is not
11 surprising. Could you tell us what that term
12 is.
13 A. Just decreased blood flow through that
14 area, consistent with the surgery.
15 Q. Okay. And when you say it wasn't
16 surprising, why was it not surprising?
17 A. Because he had previous surgery there.
18 Q. What did you discuss with Mr. Smith and
19 his family on March 9th with regard to the
20 possibility of surgery assisting him in his
21 problems?
22 A. Well, clearly he was, he was hurting
23 quite a bit. And he was 79, and surgery would
24 be a fairly significant undertaking at his age.
25 And I thought it was -- I'm not sure how good

Page 57

1 an idea it was, you know, regardless of his --
2 talked about the non-union at 4-5, but he
3 really did not have any significant stenosis
4 based on the myelogram CT. And so part of what
5 we might have been dealing with was just nerve
6 damage. And that will not get better with more
7 surgery.
8     And at that point I wanted to
9 get him to see one of the neurosurgeons I work
10 with to see what his thoughts were.
11 Q. And when you discussed surgery with
12 them, you discussed a number of different
13 options; correct?
14 A. I did.
15 Q. Okay. Including a lumbar, lumbar
16 laminectomy and fusion, which had already been
17 performed. This would be a redo; correct?
18 A. It would be. And this time I would
19 recommend that we use pedicle screws and either
20 a zone graft or bone -- BMP to do something
21 different than had been done the first time.
22 Q. Did you communicate to the family that
23 day that you did or did not think that surgery
24 was, was a good option for him at that time,
25 given the entire circumstances?

Page 58

1  A.   I was ambivalent about it. You have to
2  respect the patient's pain. That's why they
3  come to see you. That that's why all the --
4  all my patients come to see me, is because they
5  hurt. And so he, he was, he was hurting,
6  hurting a lot, and surgery, though, would have,
7  based on the studies, had probably a fairly low
8  yield. You know, you're not looking at marked
9  stenosis or severe disc herniations, as such.
10 So -- and also his age. So it wasn't clear
11 whether all his pain was just neur --
12 neuropathy, nerve damage, or a component of
13 that, plus non-union.
14       But again we come back to the
15 studies that have shown that, that
16 non-instrumented fusion gets a -- probably a
17 40 -- or a very low success rate in terms of
18 fusion but a fairly high success rate in terms
19 of clinical outcome.
20       So, again, just because he had a
21 non-union did not make it a slam dunk that he
22 would do well with an operation.
23 Q.   You wanted him to see a neurosurgeon in
24 your office; correct?
25 A.   He is not in my office.

Page 59

1  Q.   Okay.
2  A.   He is a colleague of mine that we
3  collaborate a lot on, particularly on more
4  complex patients.
5  Q.   Is that Dr. Howell?
6  A.   Yes.
7  Q.   And do you know if Mr. Smith ever saw
8  Dr. Howell?
9  A.   I know an appointment was made, and I
10 received a letter on March 31st, 2004, where he
11 did not show up for that appointment.
12 Q.   So an appointment was made and, for
13 whatever reason, Mr. Smith did not go to that
14 appointment; correct?
15 A.   That's correct.
16 Q.   So, to your knowledge, he never saw Dr.
17 Howell, at least as far as you know.
18 A.   As far as I know, no.
19       But I will also add, this is a
20 form letter they send out if -- you know, if I
21 missed an appointment with them, I would get
22 this letter.
23 Q.   The discussions we just talked about
24 with regard to surgery, did that all take place
25 in the examining room, --

Page 60

1  A.   Yeah.
2  Q.   -- if you recall?
3       In your note of March 9th you
4  note that Mr. Smith's daughter raised a concern
5  about whether or not there are some other
6  issues going on. And I think I quoted that.
7       Can you tell us what
8  conversation took place in that regard,
9  regarding other issues going on?
10 A.   That particular conversation did not
11 occur in the room.
12 Q.   Okay.
13 A.   My recollection of that was that she
14 pulled me aside as they had left or were
15 leaving, and brought that up. And, as I
16 recall, I think we made an appointment for him
17 to see Dr. West, but I'm not positive about
18 that.
19 Q.   And Dr. West is what kind of doctor?
20 A.   Psychiatrist.
21 Q.   Can you recall specifically in any more
22 detail what, what the daughter told you?
23 A.   No.
24 Q.   Okay.
25 A.   Just that she was worried about

Page 61

1  dementia, or forgetfulness, and I may have
2  taken her words and put it into the term
3  dementia. But, you know, she certainly --
4  they're a very involved family, very, you know,
5  interested in the well-being of their, their
6  father. And she pulled me aside and asked me
7  that question, so I, as I recall, made an
8  appointment, but I don't think he ever went to
9  that appointment.
10 Q.   Do you know why he never went to that
11 appointment?
12 A.   No.
13 Q.   You did write a prescription for
14 Neurontin on that day; is that correct?
15 A.   Um, you know, as I said earlier, I
16 don't -- I could not find that. I'll have to
17 take, you know, whatever you can produce. But
18 I, I -- I am -- if, if you say I did, I'm sure
19 I did. I did use it for that type of problem.
20 Q.   You have no recollection of having done
21 it, but if the records would reflect that,
22 then --
23 A.   I would not argue.
24 Q.   Okay. When you say that you used
25 Neurontin for that kind of problem, what are

Page 74

1  Q.  How about medical literature, do you
2  ever read medical literature with regard to
3  risks and benefits of medications?
4  A.  I don't get literature sent to me on
5  that. It's what's provided to me by detail
6  people, and that's -- and again, as I mentioned
7  earlier, you know, resources you have within
8  your own group as partners.
9  Q.  Sure.
10 A.  But, no, I don't read literature
11 regarding pain management.
12 Q.  Do you read literature, period?
13 A.  Yeah.
14 Q.  Do you subscribe to journals?
15 A.  Yeah. Yes.
16 Q.  You have discussions with other
17 colleagues in your group, correct, --
18 A.  Yes.
19 Q.  -- about medications in general?
20 A.  Yes.
21 Q.  And other colleagues outside your
22 group; correct?
23 A.  Absolutely.
24 Q.  And you rely on your own experience
25 significantly, don't you?

Page 75

1  A.  I do.
2  Q.  If you determine that the risks of a
3  medication outweigh the benefits for a
4  particular patient you'd stop prescribing it
5  for that patient; correct?
6  A.  That's correct.
7  Q.  With regard to Mr. Lanier talked about
8  sales people or detail people, you know who
9  those are?
10 A.  Yes.
11 Q.  To your knowledge, you don't recall any
12 detail person or sales representative from
13 Pfizer during the 2002-2003 time period coming
14 to talk to you about Neurontin?
15 A.  I'm pretty sure I've spoken to some
16 people in my office regarding it. I know I had
17 samples in my office during the time. So I
18 don't know why there's no signature there other
19 than Dr. Anderson shares the same pod with me
20 and there is the chance that he just wound up
21 signing for it instead of me. So --
22 Q.  Signing for the samples?
23 A.  Yes.
24 Q.  Because a physician has to sign for
25 samples; correct?

Page 76

1  A.  That is correct.
2  Q.  You don't have any present recollection
3  of any conversations with Pfizer, detailers or
4  sales reps during the 2002, 2003, 2004 time
5  frame?
6  A.  Well, Pfizer or any set -- can I answer
7  with any sales rep?
8  Q.  Sure.
9  A.  I don't know who's aligned with who.
10     I do recall talking with
11 somebody, I don't know who it was, during that
12 time frame regarding Neurontin.
13 Q.  Okay.
14 A.  I mean it's natural that they would
15 come talk to me as a spine surgeon more so
16 probably than talking to Clendenin or Nichols,
17 but I mean less so compared to them but
18 certainly more than Allen Anderson, who would
19 not treat that at all.
20     So I feel, though I couldn't --
21 probably greater than 50 percent certainty, you
22 know, not 90 percent.
23 Q.  So you think more likely than not some
24 Pfizer --
25 A.  Yes.

Page 77

1  Q.  -- sales representative came and talked
2  to you about, about Neurontin?
3  A.  Or whomever. Somebody with Neurontin.
4  Q.  Okay.
5  A.  Again Pfizer, Parke-Davis, Warner-
6  Lambert.
7  Q.  Sure. More likely than not you had
8  such a discussion. Do you recall anything
9  about what discussion was had in that
10 meeting?
11 A.  Just again what I would use it for, and
12 that is neuropathic pain. And I recall a
13 discussion about a study coming out that shows
14 on-label use of it at some point, but I
15 can't -- and that was -- that may have been
16 after or during this time, I don't recall.
17 Q.  Okay. You're a little vague on that?
18 A.  Um, you know, it's asking something
19 that's -- you know, I got so many other things
20 going through.
21 Q.  I understand.
22 A.  To remember three or four, five years
23 ago. And I -- it could be longer than that.
24 Q.  Okay.
25 A.  But I -- I guess what I want to tell

Page 78

1  you that I recall for sure, --
2  Q.  Um-hum.
3  A.  -- that I had samples in my closet for
4  distribution to patients.
5  Q.  Okay. And did you distribute those
6  samples?
7  A.  I did.
8  Q.  And those samples are always
9  accompanied by their product labeling, aren't
10 they?
11 A.  I believe so. I think each box comes
12 with one.
13 Q.  We talked about the fact that Lortab or
14 narcotic pain relievers have potential for
15 addictive behavior. To your knowledge, does
16 Neurontin have potential for addictive
17 behavior?
18 A.  I'm not aware of it.
19 Q.  Do some medications have the potential
20 to damage the liver, because they're
21 metabolized through the liver?
22 A.  Yes.
23 Q.  Do you know if Neurontin fits that
24 category or not?
25 A.  I believe it goes through the kidney.

Page 79

1  Q.  And you noted that you had had success
2  with Neurontin with other patients prior to
3  Mr. Smith?
4  A.  Yes.
5  Q.  And you have had success with Neurontin
6  since prescribing for Mr. Smith.
7  A.  Yes.
8  Q.  Was the fact that you had had success
9  in treating other patients with Neurontin a
10 factor in making the decision to prescribe for
11 Mr. Smith?
12 A.  Among others, yes.
13 Q.  Other than the discussions that you
14 think may have taken place, probably took place
15 with sales representatives, did you receive any
16 other information from any source of Pfizer,
17 Warner-Lambert, Parke-Davis regarding the use
18 of Neurontin, that you recall?
19 A.  Not that I recall.
20 Q.  And I think Mr. Lanier asked you this,
21 but I can't recall exactly what your answer
22 was. With regard to the PDR information, the
23 labeling information regarding Neurontin, had
24 you reviewed that at some point prior to
25 prescribing for Mr. Smith?

Page 80

1  A.  A long time ago, probably.
2  Q.  There was a lot of discussion on the
3  prior examination regarding off-label use
4  versus on-label use. Do you understand that
5  distinction?
6  A.  Quite well.
7  Q.  And really off-label use can, can
8  include indications that aren't labeled;
9  correct?
10 A.  Right.
11 Q.  Off-label use can also include for --
12 in dosages not labeled; correct?
13 A.  I didn't realize that as well, but yes,
14 that makes sense.
15 Q.  Okay. Is it uncommon or common for
16 doctors to prescribe medications for unlabeled
17 indications?
18 A.  I, I imagine it's relatively common. I
19 don't know to what extent it is.
20 Q.  Okay. Is Neurontin the only medication
21 you have ever prescribed off-label?
22 A.  I don't know.
23 Q.  Do you know whether or not the FDA
24 recognizes and even approves the prescription
25 of drugs off-label?

Page 81

1  A.  Um, again, I don't know.
2  Q.  Okay. Does the FDA try to --
3        MR. STAHL: Four minutes.
4        MR. FERGUSON: Thank you.
5  Q.  (By Mr. Ferguson) Does the FDA ever,
6  to your knowledge, try to tell doctors how to
7  practice medicine?
8  A.  No.
9  Q.  During the period of time that you --
10 you said you may have reviewed the Neurontin
11 label sometime prior to having prescribed for
12 Mr. Smith. Do you re-review labeling on an
13 annual basis or on any kind of a regular basis
14 or not, on medications that you prescribe
15 regularly?
16 A.  Ah, not typically.
17     I guess, you know, those type of
18 updates or changes I sort of rely on
19 information coming to me.
20 Q.  Do you know one way or the other
21 whether in the label in, say, 2003-2004 time
22 frame, there was any information in the label
23 regarding suicidal behavior or suicidal
24 gesture?
25 A.  Do I -- did I know that in 2004?

Page 82

1  Q.   Yes, sir.
2  A.   No, I did not.
3  Q.   As you sit here today, do you know
4  whether or not there was --
5  A.   Yeah.
6  Q.   -- such information in the label back
7  in 2003-2004?
8  A.   Yes. Among many other issues.
9  Q.   As -- and if I'm getting out your area
10 you just let me know. But as someone who
11 treats chronic pain patients, and I realize you
12 treat them for certain, in certain situations.
13 And you would have your colleagues in your
14 office treat other kinds of chronic pain. But
15 you do treat chronic pain patients; correct?
16 A.   Um, if they're -- if I can manage them
17 surgically, I will.
18 Q.   Um-hum.
19 A.   If I cannot, I sent them out to someone
20 who does that.
21 Q.   Do you know one way or the other
22 whether individuals who have long-term chronic
23 pain are more likely or less likely to commit
24 suicide than the normal population?
25 A.   You're right, I think you're outside my

Page 83

1  area of expertise.
2  Q.   Okay. Fair enough.
3           VIDEOGRAPHER: One minute
4  remaining.
5           MR. FERGUSON: Why don't we go
6  ahead and break real quick since we have
7  one minute left, and then I'll try to
8  finish up here quickly.
9           VIDEOGRAPHER: We're going off
10 the record. This marks the end of tape
11 number 1. The time on the monitor is
12 10:02. Tape number 1. Going off the
13 record.
14 (Recess from 10:02 to 10:17 a.m.)
15          VIDEOGRAPHER: Stand by.
16          We're coming back on the record.
17 This marks the beginning of tape number 2.
18 Time on the monitor is 10:17.
19          You may proceed, counselor.
20 Q.   (By Mr. Ferguson) Okay, Doctor, we
21 have taken a break. Are you ready to
22 proceed?
23 A.   I am.
24 Q.   We were talking a little bit earlier
25 about the fact that you are aware now that back

Page 84

1  in the 2003-2004 time frame there was some
2  information about suicidal conduct, suicidal
3  gesture in the, the Neurontin labeling;
4  correct?
5  A.   It's in the PDR, 2004.
6  Q.   Right. When did you become aware of
7  that?
8  A.   Preparing for this deposition.
9  Q.   And the fact of that was in there,
10 that's not keeping you from prescribing
11 Neurontin to anybody, is it?
12 A.   I wouldn't say to anybody, but it has
13 not -- I still will prescribe it.
14 Q.   Okay. Are you aware of any, any
15 labeling changes that took place with regard to
16 Neurontin in the 2004-2005 time frame?
17 A.   I'm not aware of any.
18 Q.   Mr. Lanier talked to you about
19 Exhibit 6, which is, he represented, as an FDA
20 document. Do you recall that discussion?
21 A.   Yes.
22 Q.   And he showed you I think one page of
23 this. This is about a hundred and -- I don't
24 know how many page document. Hundred and
25 something page document; correct?

Page 85

1  A.   Yes.
2  Q.   Okay. You haven't reviewed the whole
3  document?
4  A.   No.
5  Q.   Okay. And if as you -- 119 pages. If
6  as he represented to you this is an FDA
7  document, the FDA had whatever information was
8  in here when it approved the Neurontin
9  labeling; correct?
10 A.   I would assume so.
11 Q.   And I think he asked you if you would
12 like to have known the information that he
13 pointed out in there; correct? Do you recall
14 that?
15 A.   Yeah, any, any relevant information I
16 would like --
17 Q.   Sure.
18 A.   -- to have available.
19 Q.   And this referred, this document,
20 Exhibit 6, referred to a suicide attempt that
21 may have occurred, or suicide in connection
22 with someone who was on Neurontin; correct?
23          MR. LANIER: Page 117.
24 Q.   (By Mr. Ferguson) Page 117.
25 A.   Okay. I'm sorry, what was your

Page 86

1  question?
2  Q.   Sure. I was asking you if Mr. Lanier,
3  and I am looking for the specific portion that
4  he pointed out to you, having to do with
5  suicide; correct? He talked to you about
6  suicides in connection with Neurontin?
7  A.   Yes.
8  Q.   You do understand that the submission
9  of information to the FDA in connection with
10 the approval of a medication is very
11 voluminous?
12 A.   I would imagine.
13 Q.   Much more voluminous than this?
14 A.   I would imagine so.
15 Q.   Thousands or millions of pages.
16 A.   Yes.
17 Q.   Data, data on hundreds of thousands of
18 adverse events; correct?
19 A.   That's correct.
20 Q.   Okay. This document, Exhibit 6, is
21 signed as a clinical reviewer for the FDA by a
22 Cynthia G. McCormick; correct? That's on page
23 119.
24 A.   Okay.
25 Q.   Were you aware, I assume you weren't

Page 87

1  since you didn't read this, that in later
2  updates and reviews on Neurontin Dr. McCormick
3  did not note any concerns about depression and
4  suicide with regard to Neurontin.
5  A.   I am not aware one way or the other.
6  Q.   Is that something you would have liked
7  to have known in answering Mr. Lanier's
8  questions?
9  A.   All relevant information is helpful.
10 Q.   Sure. Okay. Are you aware that in
11 studies on the use of Neurontin for neuropathic
12 pain that depression was more common in
13 patients on placebo than on patients on
14 Neurontin?
15 A.   I am not aware of that.
16 Q.   Okay. Again that's interesting
17 information, assuming that's true; correct?
18 A.   That is correct.
19 Q.   Mr. Lanier talked to you about this
20 what he called an information. I forget what
21 number it was. But talked to you about several
22 items on this information, which is Exhibit 5;
23 correct? And read several paragraphs to you.
24 And I think all the paragraphs he referred to
25 you there involved the years '95 and 1996.

Page 88

1  Were you aware that this information related to
2  conduct having occurred back in the '95-96 time
3  frame?
4  A.   I'm sorry. One more time on that.
5  Q.   Sure. The information that Mr. Lanier
6  asked you some questions about, were you aware
7  that all the conduct referred to in this
8  information was back in the 1995-1996 time
9  frame?
10 A.   Um, no.
11 Q.   And that was some eight years or so
12 before you prescribed Neurontin for Mr. Smith;
13 correct?
14 A.   Yes.
15 Q.   And also was years before the
16 information that he read to you from these call
17 notes regarding sales representatives visiting
18 some of your partners; correct?
19 A.   That is correct.
20 Q.   Okay. He also read from an affidavit
21 of David Franklin. And read several
22 paragraphs. Do you recall that?
23 A.   I do.
24 Q.   Okay. And Mr. Franklin's reports had
25 to do again with conduct that occurred in 1996;

Page 89

1  correct?
2  A.   I'll take your word for that.
3  Q.   Okay. If Mr. Franklin says he worked
4  only till July 29th, 1996, when he terminated
5  his employment, you would agree that -- with my
6  representation, that it's only conduct in 1996
7  that he's referring to?
8  A.   Based on what you're telling me, yes.
9  Q.   Okay. Do you have any idea how many
10 people have taken Neurontin worldwide?
11 A.   No.
12 Q.   If I represented 12 million people, is
13 that -- do you have any reason to dispute that?
14 A.   No reason to dispute that.
15 Q.   If a medication is taken by 12 million
16 people, is it surprising that many different
17 adverse events would be reported having
18 occurred while those patients were taking
19 Neurontin?
20 A.   One more time.
21 Q.   Sure. Sure. If 12 million people are
22 taking the medication worldwide, then certain
23 events are going to occur while they're taking
24 the drug.
25 A.   Sure.

Page 90

1  Q.   Including potential suicides?
2  A.   Statistically I'm sure, yes.
3  Q.   Okay. And the population taking
4  Neurontin are people with pain?
5  A.   Yes.
6  Q.   To your knowledge, epilepsy; correct?
7  A.   Yes.
8  Q.   And do both of those conditions, if you
9  know, have increased possibility of suicide?
10 A.   I do not know.
11 Q.   Okay. If 12 million people took
12 Neurontin worldwide, would, would it give you
13 concern one way or the other if there were 35
14 suicides reported in connection with that?
15      MR. LANIER: What do you mean by
16 "report"?
17      MR. FERGUSON: Has adverse
18 events.
19      MR. LANIER: Are you talking
20 about like filing those MedWatch things?
21      MR. FERGUSON: I'm talking about
22 adverse events reported to the company.
23      Like to say anything else?
24      MR. LANIER: Well, he hadn't
25 even filed a MedWatch. These doctors don't

Page 91

1  do that. You can't even look at those.
2  But I'll -- I shouldn't be saying that.
3  I'm saving that for redirect. Go ahead.
4       MR. FERGUSON: Thank you.
5  Q.   (By Mr. Ferguson) Doctor, if 12
6  million people took it, would it surprise you
7  if there were 35 suicides reported in
8  connection with those 12 million?
9  A.   Probably not. But I would want to know
10 the details surrounding that.
11 Q.   Sure. Sure. Fair enough. If 12
12 million people take something and a certain
13 number of things are going to occur by, by
14 chance alone; correct?
15 A.   Right. And but you also have to weigh
16 the relative complications --
17 Q.   Sure.
18 A.   -- to the frequency.
19 Q.   And I take it you're not an expert in
20 epidemiology, fair enough?
21 A.   Fair enough.
22 Q.   Okay. And with regard to the
23 epidemiology of suicide, you're specifically
24 not an expert; correct?
25 A.   No.

Page 92

1  Q.   With regard to this gentleman named
2  David Franklin, who Mr. Lanier talked to you
3  about, you never met Mr. Franklin, did you, or
4  Dr. Franklin?
5  A.   No. Again, not that I'm aware of.
6  Q.   And he read, read you some what
7  purported to be a quote from a guy named Phil
8  Magistro, a phone conversation or something.
9  You don't know Mr. Phil Magistro, do you?
10 A.   No.
11 Q.   Given the information you have today
12 going, going into today, as we discussed,
13 you're still prescribing Neurontin for some
14 patients?
15 A.   Selectively, yes.
16 Q.   And my understanding from your
17 testimony, Mr. Lanier is, based on what you
18 know today, you don't know one way or the other
19 whether you would still prescribe for
20 Mr. Smith, is that accurate?
21 A.   If Mr. Smith came into my office today,
22 I would not prescribe him Neurontin as -- he
23 would have gotten Lyrica.
24 Q.   Okay. Lyrica wasn't available in 2004,
25 was it?

Page 93

1  A.   No. Not that I'm aware of. Not that I
2  recall.
3  Q.   Okay.
4       MR. FERGUSON: I think that's
5  all I have for now, Doctor. Thank you very
6  much.
7       THE WITNESS: All right.
8       MR. LANIER: You know, he did
9  better on time than I thought he was going
10 to. I got to give it to you.
11      MR. FERGUSON: Appreciate it.
12      REDIRECT EXAMINATION
13 BY MR. LANIER:
14 Q.   I want to go back through some
15 questions that were just asked of you and make
16 sure I understand some of the answers, okay?
17      You were first asked, is it true
18 that you decide how to treat patients and
19 nobody tells you how to do it. Do you remember
20 those questions?
21 A.   Yes, I do remember that question.
22 Q.   Let me understand how you do this,
23 please. You certainly are the doctor, and you
24 make your recommendations, is that fair to
25 say?