# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | )<br>)<br>)<br>)<br>)<br>)<br>) |
| THIS DOCUMENT RELATES TO:<br><br>RUTH SMITH, Individually and as Widow for the use and benefit of herself and the next of kin of Richard Smith, deceased.<br><br>05-CV-11515 | ) CASE NO.<br>) 04-10981<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION OF

PAMELA KRANCER, APN

Taken on Behalf of the Plaintiffs

June 8, 2007

Page 2

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3     MARK LANIER
        DARA HEGAR
 4      PATRICK O'HARA
        Lanier Law Firm
 5      6810 F.M. 1960 West
        Houston, Texas 77069
 6      713.659.5200
        713.659.6416
 7      wml@lanierlawfirm.com
 8      ANDREW G. FINKELSTEIN
        Finkelstein & Partners
 9      436 Robinson Avenue
        Newburgh, New York 12550
10      800.634.1212
        afinkelstein@lawampm.com
11
12  For the Defendant:
13     KENNETH J. FERGUSON
        Clark, Thomas & Winters
14      P.O. Box 1148
        Austin, Texas 78767
15      512.472.8800
        512.474.1129
16      kjf@ctw.com
17
    Also Present: Jason Powers, Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2  WITNESS: PAMELA KRANCER
 3         INDEX OF EXAMINATIONS
 4                  Page/Line
 5  By Mr. Lanier ..................  6   2
 6  By Mr. Ferguson ................ 18   3
 7  By Mr. Lanier .................. 32  11
 8  By Mr. Ferguson ................ 36  12
 9          INDEX OF EXHIBITS
10                  Page/Line
11  No. 1 .......................... 10  18
12  No. 2 .......................... 19   3
```

Page 4

```
 1
 2        The deposition of PAMELA KRANCER,
 3  APN, taken on behalf of the Plaintiffs, on the 8th
 4  day of June, 2007, in the offices of Howell Allen
 5  Clinic, 2011 Murphy Avenue, Suite 401, Nashville,
 6  Tennessee, for all purposes under the Federal
 7  Rules of Civil Procedure.
 8        The formalities as to notice,
 9  caption, certificate, et cetera, are waived. All
10  objections, except as to the form of the
11  questions, are reserved to the hearing.
12        It is agreed that Elisabeth A.
13  Miller, being a Notary Public and Court Reporter
14  for the State of Tennessee, may swear the witness,
15  and that the reading and signing of the completed
16  deposition by the witness are waived.
17
18
19
20              * * *
```

Page 5

```
 1        PAMELA KRANCER, APN,
 2  was called as a witness, and after having been
 3  first duly sworn, testified as follows:
```

Page 10

1  object, because all of that is background that I'm
2  not allowed to put into a question.
3        MR. LANIER: Do you want to lodge an
4  objection and -- I'll stipulate that's not a
5  question.
6        MR. FERGUSON: I was going to wait
7  until you put out a question. I will object to
8  the narrative comments. Please proceed.
9        MR. LANIER: Thank you. I'll start
10 clean with a question.
11 BY MR. LANIER:
12 Q.   Ma'am, I have here what I'm going to mark
13 as Exhibit No. 1, and these are call notes that
14 have been provided to us by the Neurontin folks
15 that show us when they made calls on you to talk
16 to you about their drug.
17 A.   Okay.
18       (Marked Exhibit No. 1.)
19 BY MR. LANIER:
20 Q.   You will see they've got dates --
21 A.   Uh-huh.
22 Q.   -- they've got the name of the rep, Ashley
23 Pippin --
24 A.   Uh-huh.
25 Q.   -- typically; when they left you

Page 11

1  samples --
2  A.   Uh-huh.
3  Q.   -- some notes about what you've had to say
4  during the calls and things like that. Do you see
5  those in front of you?
6  A.   Yes, I do.
7  Q.   Is it typical for you to receive -- I
8  think the word is detailing, by drug reps in your
9  job as a nurse?
10 A.   Yes.
11 Q.   Okay. When the drug reps come to you, I
12 assume they're coming because they want to detail
13 you or tell you details about their drugs and
14 their products so that you know what you've got to
15 help with your patients; is that fair?
16 A.   That's fair.
17 Q.   And I assume that's something that you
18 and -- much like the doctors we've talked to so
19 far, rely on?
20 A.   Uh-huh.
21 Q.   And I don't mean to be rude, but uh-huh is
22 yes?
23 A.   Oh, I'm sorry, yes.
24 Q.   When Elisabeth types it, the uh-huhs and
25 huh-uhs sometimes read the same, so I want to make

Page 12

1  sure I've got it.
2  A.   Yes.
3  Q.   Is it important to you that the detailing
4  by the drug reps be honest and forthright?
5  A.   Yes.
6  Q.   Do you expect them to tell you the good
7  and the bad about their drugs?
8  A.   Yes. Can I interject here or --
9  Q.   Sure.
10 A.   I don't prescribe a drug strictly on what
11 a rep tells me.
12 Q.   Okay.
13 A.   I feel that no matter what a rep tells me,
14 that before I prescribe the drug, hopefully, that
15 I'm educated on it, before I -- before I prescribe
16 it.
17 Q.   Fair enough.
18 A.   Is that --
19 Q.   Yeah, that makes sense.
20 A.   Okay.
21 Q.   By the same token, you do listen to the
22 reps?
23 A.   Yes.
24 Q.   And you do take into account what they
25 tell you, I would assume?

Page 13

1  A.   Correct.
2  Q.   I mean, I look at these visits. It looks
3  to me like, clearly, you do have a regular pattern
4  of visiting, to some degree at least, with the
5  reps; is that fair?
6  A.   That's fair.
7  Q.   Okay. Now, did the reps ever tell you
8  that Neurontin was associated with reduction in --
9  well, let's start with serotonin. Did they ever
10 tell you that?
11 A.   Not that I remember.
12 Q.   Do you remember them ever telling you
13 Neurontin was associated with a reduction in
14 norepinephrine?
15 A.   Not that I remember.
16 Q.   Do you remember them ever telling you
17 that, long before they visited with you, in fact,
18 before they started selling the drug, the FDA had
19 written them up saying that an increase in
20 depression and an increase in suicides are some of
21 the concerns that need to be addressed with the
22 drug?
23       MR. FERGUSON: Excuse me, object to
24 form.
25       You may go.

Page 14

1 THE WITNESS: Not that I remember.
2 BY MR. LANIER:
3 Q. Okay. And that was in 1992 that the FDA
4 did that, I'll represent to you.
5 In 2002, the FDA approved the drug for
6 another usage, and in the process, said that
7 they're -- other than the problems that had
8 already been pointed out, 1992, there hadn't been
9 any other problems. But even in 2002, did they
10 tell you about these earlier problems?
11 MR. FERGUSON: Object to the
12 narrative. I'm sorry. Excuse me.
13 THE WITNESS: No, that's fine.
14 MR. FERGUSON: Okay.
15 THE WITNESS: Not that I remember.
16 BY MR. LANIER:
17 Q. Did you actually write prescriptions
18 yourself for Richard Smith?
19 A. Yes, I did.
20 Q. And you wrote prescriptions for Neurontin?
21 A. Yes. It had been previously prescribed by
22 Dr. McCombs. And when I saw Mr. Smith, it had
23 been prescribed for Mr. Smith in 2003 by
24 Dr. McCombs. And then when I saw him back in 2004
25 in March and he was having similar symptoms, I

Page 15

1 represcribed it for him.
2 Q. Okay. If you had known about the side
3 effects that I've discussed, if it had been
4 brought to your attention that this drug is
5 associated with increases in depression and
6 suicide, would you have taken into account that
7 information before you prescribed this drug?
8 MR. FERGUSON: Object to form.
9 THE WITNESS: I guess being -- not
10 being a psychiatrist or a psychologist or even a
11 psychiatric nurse, I have to be honest in the fact
12 that I -- I always consider any drug that I give
13 somebody that I feel is truly depressed, but I
14 don't -- you know, I probably would have thought
15 about it a little bit harder.
16 BY MR. LANIER:
17 Q. Might have at least thought about giving
18 some warnings or some information about, hey, if
19 you think this is causing you to be more depressed
20 or something, would you please contact someone,
21 some medical help?
22 MR. FERGUSON: Object to form.
23 BY MR. LANIER:
24 Q. Is that fair to say?
25 A. I probably would have added it to my

Page 16

1 education, yes, sir.
2 Q. And by education, is that what you tell
3 patients when you give them drugs?
4 A. I try to educate them on side effects of
5 medication before I give it to them, yes, sir.
6 Q. Why is that important, nurse?
7 A. I think it's -- it's part of good patient
8 care in the fact that I think that people have a
9 right to know what medications might do to them
10 and that -- you know, it's not only -- because
11 people don't understand, and I think that it's
12 important to not only know the side effects but to
13 know interactions with other medications that
14 might -- you know, that they might develop side
15 effects with.
16 Q. How well did you know Richard Smith
17 yourself?
18 A. I'm afraid not that well. I had seen him
19 a few times by myself. I saw him in the office, I
20 think, two or three times, and then Dr. McCombs
21 saw him after I saw him the last time. And -- but
22 well enough that I know him and his -- knew --
23 Q. Okay.
24 A. I've taken -- I took care of him, because
25 I -- he was on their service for the -- you know,

Page 17

1 his entire stay with Dr. McCombs.
2 Q. Do you have any independent memory of him
3 beyond your sheets?
4 A. I afraid I don't. I'm sorry.
5 Q. I know you see a lot of people.
6 A. I'm sorry, I don't.
7 Q. All right. So any information you would
8 have to give us is just what you read from your
9 records?
10 A. I'm sorry, that's all. I mean, we go
11 through a lot of patients in a year and I don't
12 think it's fair to say that I remember the
13 gentleman or his family.
14 Q. You --
15 A. That's not fair, but -- I mean, that's not
16 a nice thing to say, but I --
17 Q. That's the truth and that's all we can ask
18 for.
19 A. Uh-huh.
20 MR. LANIER: Ma'am, I appreciate your
21 time. Those are the questions I have. I'm going
22 to reserve my time for anything else.
23 Can you tell me how much I used?
24 THE VIDEOGRAPHER: Yeah, 11 minutes,
25 43 seconds.

Page 22

1  seen in the office at the request of his wife --
2  A.     Uh-huh.
3  Q.     -- is that right?
4         And can you tell -- and, again, I realize
5  it is a while back, but was that his wife called
6  and made the appointment, or he came in and said,
7  my wife asked me to come and see you?
8  A.     No, to me, that means that the patient's
9  wife called and asked for an appointment.
10 Q.     It says, he is again having bilateral leg
11 pain that radiates down his buttocks, perineal
12 area, interior part of his thigh, and down his
13 knee, correct?
14 A.     Yes, sir.
15 Q.     And is that what's called sciatica?
16 A.     Yes, sir.
17 Q.     And you noted he had seen Dr. Mackey and
18 Dr. Howell. Are they neurosurgeons, or are they
19 orthopedic surgeons?
20 A.     Dr. Mackey is an orthopedic surgeon here
21 in town, and Dr. Howell is another neurosurgeon
22 here in town.
23 Q.     And then you say, after they worked him
24 up, they would not see him because he would not
25 let them do the initial surgery -- do his initial

Page 23

1  surgery. Can you give me any more information
2  about what that means?
3  A.     Probably because a lot of -- the way it is
4  in this -- in -- in Nashville, I'm afraid, is that
5  if you have a doctor do your operation, that most
6  of the time -- this surgery was in 4-1-03, so this
7  was less than a year later. They will not see you
8  in their office for at least a year following your
9  operation. That is pretty common practice.
10 Q.     Is that because they want to leave the
11 follow-up to the physician who did surgery?
12 A.     Yes, sir.
13 Q.     Is that how y'all prefer it anyway?
14 A.     Yes, sir.
15 Q.     One sentence you say there, I have
16 discussed at length a treatment plan?
17 A.     Uh-huh.
18 Q.     That was a treatment plan that --
19 A.     What are his options as far as, you know,
20 medication regimes, epidural steroid injections,
21 and what we -- you know, what the plan needs to be
22 for his further treatment, because Dr. McCombs saw
23 him -- I felt it was necessary for him to come
24 back fairly soon, just because he was hurting so
25 badly that I scheduled him a follow-up appointment

Page 24

1  with Dr. McCombs within a week, because I felt he
2  needed to be seen by a physician of the group.
3  Q.     Tell me -- you mentioned the severity of
4  his pain. Can you describe that at all for us, as
5  far as what he was saying?
6  A.     I can't remember, no.
7  Q.     You note -- and in your discussion with
8  him, did you discuss surgery as an option in this
9  treatment plan, or was it a treatment plan
10 including conservative measures?
11 A.     I always tell them conservative measures.
12 And when I look at their scans, I also tell them
13 that I need -- I reserve the right that the
14 physicians will review the x-rays also in case
15 that they do not agree with what I have to say.
16 Q.     And, ultimately, a decision to go to
17 surgery or not, would you defer to Dr. McCombs?
18 A.     Oh, most definitely.
19 Q.     And then you go on to say you started
20 Neurontin?
21 A.     Uh-huh. And like I said, he had
22 previously been on Neurontin and had previously
23 had epidural steroid injections, which had helped
24 him.
25 Q.     So both of those types of conservative

Page 25

1  therapy were follow ups on what Dr. McCombs had
2  already recommended for him?
3  A.     Previously, yes, sir.
4  Q.     And then you indicated because of the
5  severity of his pain, you set an appointment with
6  Dr. McCombs for about a week after?
7  A.     Yes, sir. He saw Dr. McCombs on March 31
8  of '04, which was exactly a week after I saw him.
9  Q.     And were you present there at all?
10 A.     No, sir.
11 Q.     Do you review the chart afterwards to see
12 what Dr. McCombs said?
13 A.     Well, Dr. McCombs has to sign my notes.
14 And if you -- when you get a copy of the chart,
15 you'll see that under my note where I -- from my
16 office visit, Dr. -- that little scribble is
17 Dr. McCombs' initials.
18 Q.     So he is constantly reviewing your records
19 and your visits as well?
20 A.     Yes, sir. It's state law that they have
21 to do that.
22 Q.     Plus, it keeps them fully informed about
23 the patient?
24 A.     Yes, sir.
25 Q.     There's some handwriting. I have a

Page 26

1  note -- at the top, it's dated 21 April '03, and
2  there's a typewritten paragraph at the top and
3  then some handwritten?
4  A.    Yes, sir.
5  Q.    And the -- the typed portion appears to be
6  by Dr. McCombs?
7  A.    Uh-huh.
8  Q.    It says PRM. Is that what that means?
9  A.    Yes, sir.
10 Q.    And then the 1, 2, 3, 4 notations in
11 handwriting, can you tell -- do you know from your
12 observations back then whose handwriting that is?
13 A.    I can tell you the first three. On the
14 28th, the 30th, and the 1st are Gloria, that's his
15 secretary, Dr. McCombs' secretary. And the last
16 one, which has initials after it, that's Becky,
17 his other secretary.
18 Q.    And at the bottom of the one on 5-2-03,
19 there are actually three sets of initials. It
20 looks like Dr. McCombs' initials --
21 A.    That means Dr. McCombs -- they spoke to me
22 about it and Dr. McCombs, and then that's the
23 secretary's initials after that.
24 Q.    Okay. So by the initials, does that mean
25 that the secretary spoke to both Dr. McCombs and

Page 27

1  you about this?
2  A.    Yes, sir.
3  Q.    And what the note says is, spoke with
4  patient's daughter, states patient wishes he could
5  die because of pain and depression?
6  A.    Yes, sir.
7  Q.    Advised to take patient to ER for psych
8  evaluation?
9  A.    Yes, sir.
10 Q.    And that's dated May 2, '03?
11 A.    Yes, sir.
12 Q.    And what conversation took place between
13 you and the person who took the call? In other
14 words --
15 A.    I don't know the date or -- the date or if
16 this was done -- a lot of times -- I have to be
17 honest, on days we're in the operating room, a lot
18 of this is done by phone. You know, we'll check
19 in during the day and talk to the secretaries and
20 make sure there's no problems. And so, you know,
21 I'm sure that when we received this information,
22 that that was what -- you know, either I spoke to
23 Dr. McCombs or she spoke to both of us. And we
24 advised them to take him to the emergency room.
25       And I don't know if that happened or not,

Page 28

1  because it's not in my notes.
2  Q.    Sure. Mr. Lanier asked you about whether
3  you would do things differently if you had known
4  that Neurontin was associated with depression
5  and/or suicide. Do you recall those questions?
6  A.    Yes, sir.
7  Q.    Is it fair to say that you yourself have
8  not gone out to research the scientific literature
9  to see if, in fact, Neurontin has any association
10 with suicide or depression?
11 A.    No, sir, I have not. I've read -- you
12 know, I think that I'm fairly well read in what I
13 do. But, you know, to say that I can read
14 everything that's been put out with every new drug
15 that's put out on the market, that's not a fair
16 statement to make.
17 Q.    So as you sit here, again, you just don't
18 know one way or the other whether or not there's
19 scientific evidence associating Neurontin with
20 suicide or depression?
21 A.    No, sir.
22 Q.    And he asked you what you would do if
23 there were such a -- if the scientific evidence
24 said there was not such an association, you might
25 do things differently than what you told him?

Page 29

1  A.    Hindsight is always 20/20.
2  Q.    I understand. The PDR or the package
3  insert, is that something you read before you
4  prescribe medications for patients?
5  A.    I usually don't read the entire package
6  insert. But we have books that are available to
7  us, and there's always blurbs in our journals
8  about new medication, and, you know, we try to at
9  least read all that so we can at least educate
10 people as much as we can on side effects.
11 Q.    And is it fair to say that these notation,
12 the package inserts, the PDR references, have long
13 lists of adverse events that have occurred either
14 postmarketing or in clinical trials?
15 A.    Yes, sir.
16 Q.    And is that fair to say, that when you
17 prescribe a medication to a patient, you don't go
18 through every adverse event that's listed?
19 A.    No, sir, I don't.
20 Q.    You couldn't do that, could you?
21 A.    No, sir.
22 Q.    But you may go through what the FDA and
23 the company have determined is appropriate to --
24 to warn or give precautions about, correct?
25 A.    Yes, sir.

Page 30

1  Q.  Do you recall as you sit here whether --
2  when you prescribed, back in 2004, Neurontin for
3  Mr. Smith, whether there were any warnings or
4  precautions in the Neurontin label regarding
5  suicide or depression?
6  A.  I don't remember.
7  Q.  Okay. And that's fair. I just want to
8  make sure.
9  A.  Yeah.
10 Q.  Y'all -- you work in a neurosurgeon's
11 office, correct?
12 A.  Yes, sir.
13 Q.  And you worked at neurosurgeon's office
14 back in 2004, the time period we're talking about?
15 A.  Yes, sir.
16 Q.  Neurosurgeons, I guess, by definition, are
17 brain surgeons?
18 A.  Yes, sir.
19 Q.  And as people who work on the brain, is it
20 fair to say they -- that they sometimes need to
21 prescribe antiseizure medications?
22 A.  Yes.
23 Q.  Antiepileptic drugs, correct?
24 A.  Yes, sir.
25 Q.  Or sometimes referred to as AED's?

Page 31

1  A.  Yes, sir.
2  Q.  And, in fact, in your office back in the
3  2004 time period, did y'all use Neurontin as an
4  antiepileptic drug?
5  A.  Yes, sir, we did.
6  Q.  When I say you, I mean did y'all
7  prescribe, for your patients, Neurontin as an
8  antiepileptic drug?
9  A.  Yes, sir.
10 Q.  Mr. Lanier asked you whether the territory
11 or the pharmaceutical representatives talked about
12 the affect of Neurontin on norepinephrine or
13 serotonin. Is it fair to say that generally when
14 you talked to pharmaceutical representatives about
15 medications, you don't talk in detail about the
16 pharmacology of the drug?
17 A.  Usually not. And a lot of times, if it's
18 to present us with new literature, you know, they
19 bring articles. And I can't say with Neurontin
20 they did that, but a lot of times they bring us
21 new literature, new information on medication,
22 things like that. But for the most part, you
23 know, it's -- it's just to talk to them, make sure
24 we're not having any trouble with the medication.
25      And, you know, at the time, Neurontin was

Page 32

1  very expensive, and samples were very important to
2  our patients, because it was -- so, you know.
3  That's just it.
4  Q.  Fair enough.
5      MR. FERGUSON: Thank you very much
6  for your time Ms. Krancer. I'll pass the witness.
7      How much time?
8      THE VIDEOGRAPHER: 14, 51 is what you
9  have used.
10     EXAMINATION
11 BY MR. LANIER:
12 Q.  Do you yourself treat epileptics?
13 A.  We treat patients with brain tumors that
14 are on prophylactic medication for seizures.
15 Q.  When you have been visited by the sales
16 folks from the Neurontin drug, have they detailed
17 you on using it for pain relief like you were
18 doing for Mr. Smith?
19 A.  I can't remember -- I don't remember that,
20 and I have to be honest.
21 Q.  That's okay.
22     In some of the notes that they put on
23 here --
24 A.  Because I --
25 Q.  Go ahead.

Page 33

1  A.  I don't remember when it was for herpetic
2  pain, and -- I mean, there's been a lot of
3  transition with the medication, and I don't
4  remember the chronologic changes with the drug.
5  Q.  Okay.
6  A.  That's just being honest. So when the
7  drug changed, it's what we were using it for. I'm
8  not sure I can tell you exactly the date when all
9  that happened.
10 Q.  Mr. Smith was not epileptic, was he?
11 A.  No.
12 Q.  You weren't prescribing it for him for
13 epilepsy, were you?
14 A.  No.
15 Q.  You were prescribing it for him for pain
16 relief?
17 A.  Neuropathic pain relief.
18 Q.  Did you know that was an off-label
19 prescription?
20 A.  Yes.
21 Q.  I was assuming that a drug rep or someone
22 had told you that it was useful for pain relief or
23 could be used in that way. Is that something you
24 got on your own, or is that something that came
25 from a -- were you detailed to that?