# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN MARKETING, SALES )
PRACTICES AND PRODUCTS LIABILITY )
LITIGATION )
)
)
)
)
)
) CASE NO.
) 04-10981
THIS DOCUMENT RELATES TO: )
)
RUTH SMITH, Individually and as )
Widow for the use and benefit of )
herself and the next of kin of )
Richard Smith, deceased. )
)
05-CV-11515 )
)

VIDEOTAPED DEPOSITION OF

CHRIS L. WOOD, DDS

Taken on Behalf of the Defendant

June 7, 2007

## Page 2

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3       MARK LANIER
         DARA HEGAR
 4       PATRICK O'HARA
         Lanier Law Firm
 5       6810 F.M. 1960 West
         Houston, Texas 77069
 6       713.659.5200
         713.659.6416
 7       wml@lanierlawfirm.com
 8       ANDREW G. FINKELSTEIN
         Finkelstein & Partners
 9       436 Robinson Avenue
         Newburgh, New York 12550
10       800.634.1212
         afinkelstein@lawampm.com
11
12   For the Defendant:
13       KENNETH J. FERGUSON
         Clark, Thomas & Winters
14       P.O. Box 1148
         Austin, Texas 78767
15       512.472.8800
         512.474.1129
16       kjf@ctw.com
17
     Also Present: Sheldon Singh, Videographer
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              INDEX
 2   WITNESS: CHRIS L. WOOD
 3           INDEX OF EXAMINATIONS
 4                    Page/Line
 5   By Mr. Ferguson ................  6   10
 6   By Mr. Lanier ..................  30   2
 7   By Mr. Ferguson ................  46   3
 8   By Mr. Lanier ..................  48  11
 9   By Mr. Ferguson ................  49  16
10   By Mr. Lanier ..................  50  10
11           INDEX OF EXHIBITS
12                    Page/Line
13   No. 1 ..........................  7  17
14   No. 2 ..........................  8   2
```

## Page 4

```
 1
 2            The videotaped deposition of CHRIS L.
 3   WOOD, DDS, taken on behalf of the Defendant, on
 4   the 7th day of June, 2007, in the offices of Chris
 5   L. Wood, DDS, 1502 17th Avenue South, Nashville,
 6   Tennessee, for all purposes under the Federal
 7   Rules of Civil Procedure.
 8            The formalities as to notice,
 9   caption, certificate, et cetera, are waived. All
10   objections, except as to the form of the
11   questions, are reserved to the hearing.
12            It is agreed that Elisabeth A.
13   Miller, being a Notary Public and Court Reporter
14   for the State of Tennessee, may swear the witness,
15   and that the reading and signing of the completed
16   deposition by the witness are waived.
17
18
19
20              * * *
```

## Page 5

```
 1            PROCEEDINGS
 2            THE VIDEOGRAPHER: Here begins
 3   Volume 1, Videotape No. 1 in the video deposition
 4   of Dr. Chris L. Wood in the matter in regarding
 5   Neurontin marketing, sales practices and products
 6   liability litigation in the United States District
 7   Court for the District of Massachusetts, MDL
 8   Docket No. 1629, master file No. 04-10981.
 9            Today's date is Thursday, June 7,
10   2007. Time on the video monitor is 10:17. The
11   videographer today is Sheldon Singh of Vowell &
12   Jennings, located at 214 Second Avenue North,
13   Nashville, Tennessee.
14            This video deposition is taking place
15   at 1502 17th Avenue South, Nashville, Tennessee.
16            Counsel, please identify yourselves
17   and state for the record whom you represent.
18            MR. LANIER: Yeah, my name is Mark
19   Lanier. I represent Ruth Smith and the Smith
20   family. I'm here with Dara Hegar from my office,
21   Patrick O'Hara from my office, and Andrew
22   Finkelstein with Andrew's office.
23            MR. FERGUSON: Ken Ferguson. I
24   represent Pfizer, Warner-Lambert, and Parke-Davis;
25   and I'm here by myself.
```

Page 6

1  THE VIDEOGRAPHER: The court reporter
2  today is Elisabeth Miller of Vowell & Jennings.
3  Would the reporter please swear in
4  the witness.
5  CHRIS L. WOOD, DDS,
6  was called as a witness, and after having been
7  first duly sworn, testified as follows:
8  THE VIDEOGRAPHER: You may proceed.
9  E X A M I N A T I O N
10 BY MR. FERGUSON:
11 Q.   Would you state your name for the record,
12 please, sir?
13 A.   Christopher L. Wood, Lehmann Wood, DDS.
14 Q.   What is your profession?
15 A.   I'm a dentist. I'm a dentist.
16 Q.   And how -- how long have you been
17 practicing as a dentist?
18 A.   It is 29 years, almost 30.
19 Q.   How long have you been practicing in the
20 Nashville area?
21 A.   In Nashville? Same. Same. My father was
22 a dentist, so I came back to Nashville.
23 Q.   What is your office address, please?
24 A.   It's 1502 17th Avenue South, Nashville.
25 Q.   Dr. Wood, you're aware that we're here

Page 7

1  in -- in a matter relating to Ruth Smith and
2  Richard Smith?
3  A.   Right.
4  Q.   Do you understand that?
5  A.   Yes, sir.
6  Q.   First of all, before we get into that, you
7  have in front of you, really, I guess, two sets of
8  documents. One is a folder which contains your
9  notes on your treatment and care of Richard Smith;
10 is that correct?
11 A.   Correct.
12 Q.   What I'd like to do -- and we can mark it
13 afterwards. I'd like to mark that as Exhibit 1
14 and get a copy of that to attach to the
15 deposition. Would that be okay, Doctor?
16 A.   Sure, sure.
17       (Marked Exhibit No. 1.)
18 BY MR. FERGUSON:
19 Q.   You also have in front of you something
20 that may or may not be contained in what we've
21 identified as Exhibit 1. But you have a letter on
22 your letterhead that relates to Mr. Smith and a
23 visit on Monday, May 10 with him; is that correct?
24 A.   Correct, yes, sir. Yes, sir.
25       MR. FERGUSON: And why don't we mark

Page 8

1  that as Exhibit 2 to your deposition.
2       (Marked Exhibit No. 2.)
3  BY MR. FERGUSON:
4  Q.   Let me ask you first, Doctor, how long
5  have you known the Smith family?
6  A.   It dates back quite a few years. We've --
7  we -- my wife and I were in school with some of
8  his -- some of his kids, some of his girls, and
9  are -- are personal friends with them. And so
10 it -- it really can date back to college days,
11 quite a -- quite a while in the -- in the '70s,
12 actually.
13 Q.   So it goes beyond your career as a
14 dentist; before --
15 A.   Yes.
16 Q.   -- your career as a dentist --
17 A.   Yes.
18 Q.   -- right?
19 A.   Yes.
20 Q.   And then once you started practicing as a
21 dentist, did you see the members of the Smith
22 family?
23 A.   We did, yes. We did when I came -- came
24 into Nashville. I don't, you know, recall the
25 exact time of the daughters and all, but -- but

Page 9

1  the whole family we were privileged to see.
2  Q.   Do you know about how many years you would
3  have treated Richard Smith, give or take?
4  A.   It -- early '80s. From the early '80s up
5  until -- up until when we last saw him in 2004.
6  Q.   And -- and we don't -- we don't need to
7  talk about all the dental care that he -- he was
8  seen for during that period of time. But was
9  there anything unusual? I mean, was it generally
10 maintenance dentistry, et cetera? Any- --
11 anything significant?
12 A.   For the -- for the most part, nothing --
13 nothing really out of the ordinary. Nothing out
14 of the ordinary.
15 Q.   Okay. Let me ask you about the -- this
16 letter dated May 19, 2004, that you have in front
17 of you that we've identified as Exhibit 2. Do you
18 have that in front of you?
19 A.   Yes, sir. Yes, sir.
20 Q.   Let me ask you first how you came to write
21 this letter. Why did you write this letter?
22 A.   I wrote that because, at the funeral,
23 Cindy, his daughter, and I talked, and it -- it
24 came up. I don't recall exactly why, but it came
25 up, and she said just for sentimental --

### Page 10

1  sentimental reasons, she would like to have my
2  remembrance of him in the last -- the last time I
3  had seen him, which was fairly recent from when
4  that -- that occurrence.
5  Q.    Can you recall anything else about that
6  conversation, anything that she -- she wanted
7  specific information about?
8  A.    No, just -- just that we had talked. I
9  think -- I think the concern was, at that time,
10 Donna, the daughter that was struggling with
11 cancer, and -- and that was on everyone's mind,
12 along with Mr. Smith.
13 Q.    When you -- when you had this conversation
14 with Cindy, did you -- did she bring up at all
15 any -- any medications that he may have been on,
16 anything like that?
17 A.    No, sir. No, sir.
18 Q.    Skipping back -- not to go too much out of
19 order, but during your period of time that you
20 treated Mr. Smith since, I believe, the
21 early '80s, did you see the family socially during
22 that period of time, or did you have a
23 dentist-patient relationship or both or what?
24 A.    I saw him more in the office than I did
25 socially, but occasionally we would see each other

### Page 11

1  at -- at Lipscomb events and church. But it was,
2  for most part, here, more at my office.
3  Q.    And when you say Lipscomb events, that's
4  David Lipscomb college?
5  A.    Correct -- well, it's university now.
6      MR. LANIER: University now.
7      THE WITNESS: Yeah. They changed
8  that.
9      MR. FERGUSON: Sorry. I --
10     MR. LANIER: Fighting Bisons of DLU.
11     MR. FERGUSON: I remember in the old
12 days when it was David Lipscomb college.
13     THE WITNESS: Well, that's when I was
14 there, so yes.
15 BY MR. FERGUSON:
16 Q.    So -- so, obviously, Mr. Smith and the
17 Smith family were friends and patients, fair
18 enough?
19 A.    Correct.
20 Q.    Okay. Coming back to -- to the letter of
21 May 19, Doctor, can you -- can you summarize for
22 us what you're talking about in that first
23 paragraph? I got a little confused. There was
24 something about a call and a squirrel had shorted
25 out a transformer. Can -- can you tell me what --

### Page 12

1  what you're telling --
2  A.    Right.
3  Q.    -- us there, or what you're telling --
4  A.    The --
5  Q.    -- whoever would read the letter?
6  A.    The -- there is a transformer on a pole
7  out here in the alley which, occasionally, a
8  squirrel will short out, and when it does, it
9  shuts down everything here. Our -- we lose our
10 phones, because it's -- it's controlled, of
11 course, with power, and then I can't operate. And
12 that morning, unfortunately, when he was trying to
13 reach us, that occurred.
14     And the person named -- Ann is my daughter
15 at home, who happened to be at home. And so when
16 Mr. Smith couldn't reach us here because it would
17 just sound like it was ringing and no one was
18 answering, he -- he phoned home and got her, and
19 it -- so -- so that's what the -- what the deal
20 was.
21 Q.    Do you -- do you know -- did you come to
22 learn why he was trying to call you? Was he
23 trying to confirm the appointment, cancel the
24 appointment or tell about a problem or what?
25 A.    He was trying to -- to make an appointment

### Page 13

1  and was having a problem.
2  Q.    So he was calling specifically -- it
3  wasn't a previously scheduled appointment; it was
4  something that was scheduled that very day?
5  A.    Correct, correct. Yes, sir. Yes, sir.
6  Q.    And -- and why -- and maybe this is
7  covered later in the body of the letter, but why
8  was he -- what concern was he having that was
9  requiring him to call and try to set up an
10 appointment for that day?
11 A.    He was having trouble with -- with pain
12 from his gums. And his wife, Ruth, asked him to
13 have it checked, because she was concerned. And
14 now, in retrospect, her concern was possibly
15 cancer, and that sort of would be maybe heightened
16 with -- with their trying to deal with their other
17 daughter.
18 Q.    All right. And -- and I know that -- now
19 that you mention that, it is discussed later in
20 the letter, and we'll talk about it a little bit
21 more.
22     The -- the last sentence in that first
23 paragraph, Doctor, says, excuse or not, normally,
24 Mr. Smith would never -- would have never allowed
25 that to go without some flack, yet I thought it

Page 14

1 strange it was not mentioned, referring to the
2 fact that he hadn't been able to reach you.
3     Can -- can you tell us what you mean by
4 that sentence?
5 A.   Mr. Smith had a fun sense of humor, and he
6 always interacted with people. And if he thought
7 he could kind of pull one on you or one-up you,
8 then he -- he would, and it -- it would sometimes
9 put you a little off step. You would be without
10 words, and he seemed to enjoy that.
11     But when he came in that day, now reading
12 the -- the letter, he was -- that wasn't -- that
13 wasn't brought up, which -- which, you know, in
14 all the years, I thought that was an opportunity
15 that was allowed to go by.
16 Q.   So you considered that a bit unusual that
17 day?
18 A.   I do. I do.
19 Q.   Did -- did -- did you think it was unusual
20 at the time on that day, or was it something that,
21 after his death, you said, well, now, thinking
22 back on that, that was a little unusual that he
23 didn't joke about that?
24 A.   I don't remember really when it occurred,
25 but, obviously, when I wrote the letter, it was --

Page 15

1 I was thinking, trying to -- to go back over my
2 mind and all the things that happened, and that
3 just sort of jumped out.
4     But I don't think it was an issue that
5 really caught my attention. And, frankly, I
6 was -- I was more concerned about what was going
7 on and why he was there than -- than to -- to try
8 and come up with a reason for that.
9 Q.   The next paragraph, you apparently are
10 referring to -- to some other pain problems,
11 nondental pain problems he was -- he was having.
12 You noted that he was still troubled by back pain.
13     And did he specifically tell you that that
14 day?
15 A.   Yes. We talked about it later, toward the
16 end of the appointment.
17     Basically, the appointment ended without
18 ex- -- you know, a definitive treatment being
19 prescribed for him. It's one of those
20 idiosyncrasies that you could -- you couldn't say
21 what his problem was for sure, but -- but that
22 issue came up in just talking to him as a -- as a
23 friend.
24 Q.   And -- and you indicated that immediately
25 he told you that an end to pain seemed to be

Page 16

1 hopeless. Is that pretty much an exact quote, as
2 best you recall it?
3 A.   Yes, yes.
4 Q.   Was there any other discussion -- further
5 discussion about that idea that -- that the end to
6 pain seemed to be hopeless, or was that the drop
7 after he said that?
8 A.   I think it was. I came -- and as the
9 letter, perhaps, will reveal a little later, I
10 asked why he hadn't, you know, sought other
11 physicians to see if there was some answer to it
12 or something that could be done.
13 Q.   And that really -- you go to that in the
14 next sentence.
15 A.   Right.
16 Q.   You say, he mentioned trying to get second
17 opinions, but each orthopedic physician he saw
18 seemed to tune him out after hearing he already
19 had surgery. And then you had a -- in quotes, it
20 was like they were all protecting each other,
21 correct?
22 A.   That's what he said, yes.
23 Q.   Okay.
24 A.   I do remember him, you know --
25 Q.   Again, was there any further discussion

Page 17

1 about that -- and I know we're going back several
2 years. And -- but if you can recall any other
3 discussion about this issue that -- that, at least
4 according to this, he perceived that the
5 orthopedic physicians were tuning him out when
6 they found out he had had surgery?
7 A.   I think that's pretty much it, but -- but,
8 you know, the voice and the -- the body language
9 sort of -- well, it seemed to -- it seemed to
10 underline that. And I think that's why I said
11 that, because he was -- you could tell it was
12 bothering him. It was...
13 Q.   And then you indicated you suggested to
14 him that he consider clinics outside of Tennessee,
15 correct?
16 A.   Right, right.
17 Q.   But you noted he didn't respond to that?
18 A.   He didn't say anything. I don't know
19 whether he did or not.
20 Q.   And then you say, he simply said, I wish I
21 had never had the surgery in the first place, and
22 you have that in quotes?
23 A.   Right, right.
24 Q.   Again, any further discussion about that?
25 Did you ask him why or anything else, you talked

| Page 18 | Page 20 |
|---|---|
| 1  to him about him wishing he had never had the<br>2  surgery in the first place?<br>3  A.   I think that pretty well speaks for<br>4  itself. I don't know the legal term for that;<br>5  y'all do, but --<br>6  Q.   I know it, but I don't want to --<br>7  A.   Yeah, the --<br>8  Q.   -- recite it, because --<br>9  A.   The --<br>10 Q.   -- I don't want to --<br>11 A.   The Latin --<br>12 Q.   -- remember those days.<br>13 A.   Those Latin terms, yeah. It truly did<br>14 pretty well represent that, so...<br>15 Q.   And -- and the discussions we've been<br>16 talking about, including, I wish I never had the<br>17 surgery in the first place, was referring to the<br>18 back surgery that he had, correct?<br>19 A.   Yes, yes.<br>20 Q.   Were you aware that he had had a number of<br>21 orthopedic surgeries, including replacement of<br>22 several joints?<br>23 A.   Yes, yes. That's important to us, because<br>24 we have to premedicate patients that have had<br>25 that, so we try to stay up on -- on those things. | 1  talking to you about these -- these issues about<br>2  things he couldn't do?<br>3  A.   He was -- he was pretty depressed about<br>4  that. He was -- well, that -- without playing on<br>5  words, that really was it. He -- he -- his -- his<br>6  spark, his kind of smile that -- that you could<br>7  tell he was kidding with you a little bit was<br>8  pretty well gone at that point.<br>9  Q.   The next paragraph, it seems that you are<br>10 talking about actually the dental consultation<br>11 that day, right?<br>12 A.   Right, right.<br>13 Q.   And -- and you noted, as you said before,<br>14 that -- that his wife, Ruth, thought his gums were<br>15 infected when she looked, and he complained they<br>16 seemed to burn, correct?<br>17 A.   Right.<br>18 Q.   And you thought that he was concerned<br>19 about cancer or some other pathology, right?<br>20 A.   Correct.<br>21 Q.   Did he -- did he express that, that he was<br>22 concerned about cancer, or was that sort of your<br>23 assumption given the questions he was asking?<br>24 A.   He expressed it. I think it was more from<br>25 Ruth's concern than his about the cancer, |

| Page 19 | Page 21 |
|---|---|
| 1  Q.   And then he went on to -- to say the<br>2  things that he could not do. Why don't you go<br>3  ahead -- instead of me reading it, why don't you<br>4  tell us what he -- he indicated to you about what<br>5  he -- he could not do.<br>6  A.   Well, we sort of shared interest in -- in<br>7  working on cars and things like that, cutting the<br>8  grass, doing things around the house. And it<br>9  was -- that was just -- in addition to the pain,<br>10 that was something I could tell that -- that<br>11 bothered him. It -- it had to for someone to --<br>12 to bring that up, especially in a dental setting.<br>13 Q.   And you indicate -- again, I think this is<br>14 in quotes -- I cannot cut the grass, work on cars.<br>15 You know, I used to like you do all the time.<br>16 A.   Yeah.<br>17 Q.   So he was sharing --<br>18 A.   We were --<br>19 Q.   Talking about your shared interest in<br>20 working on cars?<br>21 A.   Right, right.<br>22 Q.   And -- and then, again in quotes, you have<br>23 that he said, now I am almost useless, correct?<br>24 A.   Yes, yes.<br>25 Q.   I mean, what was his demeanor when he was | 1  possible.<br>2  Q.   And -- and as I read the letter -- and<br>3  correct me if I'm wrong -- just to summarize it,<br>4  he -- you reassured him that his gums were --<br>5  appeared to be normal?<br>6  A.   Correct.<br>7  Q.   And he asked why they would be burning,<br>8  and you suggested potentially food allergy or<br>9  certain toothpaste, right?<br>10 A.   Yeah. There's sort of a scenario that you<br>11 go over with food allergies, drugs. Younger<br>12 people that are going through, you know, hormonal<br>13 changes and that sort of thing deal with that.<br>14 And there's some other neurological things that --<br>15 that occur that -- that can cause that.<br>16 Q.   And you recommended that maybe he change<br>17 toothpastes and see if it helps?<br>18 A.   That would be a good conservative thing,<br>19 yes, sir.<br>20 Q.   And then you have a sentence -- I just<br>21 want to make sure I understand what you're saying.<br>22 It says, recounted past occurrences, and he seemed<br>23 interested and would do that. When it says<br>24 recounted past occurrences, was that you<br>25 recounting past occurrences of someone who had had |