# EXHIBIT 11

November 10, 2008

Angela Seaton, Esq.
Shook, Hardy & Bacon, L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108-2613

RE:    Smith v. Pfizer

Dear Ms. Seaton:

Please accept the following as my expert report on specific causation in Smith v. Pfizer et al.

## SUMMARY OF OPINIONS

- Neurontin did not cause Richard Smith's suicide.

- Mr. Smith had significant risk factors for suicide that pre-dated his use of Neurontin. These risk factors were not exacerbated in any way by his use of Neurontin.

- Mr. Smith's suicide was a result of his untreated depression, which was caused in large part by his severe, chronic pain.

- The medical records in this case reflect that when Mr. Smith experienced severe pain for any length of time, he became depressed.

- In 2003, Mr. Smith was diagnosed with depression and treated with an antidepressant (Lexapro) for depression and anxiety.

- After that, Mr. Smith received no treatment for his depression (medication or psychotherapy), despite the fact that at least two of his health care providers recommended in 2003 and 2004 (before he ever took Neurontin) that he been seen by a psychiatrist.

- When Mr. Smith was told in the Spring of 2004 that there was no long-term solution for his pain, he chose to end his life.

## QUALIFICATIONS OF ROBERT P. GRANACHER, JR., M.D., M.B.A.

The reader is referred to my Curriculum Vitae attached as an appendix. I received a bachelor of arts degree in chemistry in 1969 from the University of Louisville and a doctor of medicine degree from the University of Kentucky in 1972. I then served as resident and chief resident in psychiatric medicine at the University of Kentucky College of Medicine. Following that, I served as clinical and research fellow in psychopharmacology at the Harvard Medical School and the Massachusetts General Hospital in Boston. While a resident at the University of

1

Kentucky, I was a junior assistant resident in neurology for two months. While a fellow at Harvard, I was a senior assistant resident in neurology on the Harvard Neurology Unit at Boston City Hospital for nine months. I also served, while in Boston, as a research fellow at the McLean Hospital, clinical fellow in psychiatry at the Massachusetts Eye and Ear Infirmary, and research fellow at Boston State Hospital. In 2004, I received a master of business administration degree from the University of Tennessee.

I am board-certified in general psychiatry, geriatric psychiatry, forensic psychiatry, and behavioral neurology and neuropsychiatry. I am also board-certified in sleep medicine and board-certified in clinical psychopharmacology. All board certifications are current and competency testing based.

## CURRENT MEDICAL PRACTICE

I practice general psychiatry, geriatric psychiatry, forensic psychiatry, sleep medicine, and neuropsychiatry in Lexington, Kentucky. I am a staff member of the St. Joseph Hospital, directly across the street from my medical practice. At that hospital, I am chiefly involved in providing psychiatric consultation to internal medicine doctors and surgeons for patients treated in the Intensive Care Unit, Cardiothoracic Surgery Unit, Coronary Care Unit, and the general medical and surgical floors of the hospital. Thus, my psychiatric consultation is provided primarily to very ill medical and surgical patients and most suicidal patients. In the office setting, I treat thirty to forty patients weekly with various psychiatric, neuropsychiatric, and sleep disorder problems, and among the many pharmaceuticals used, I prescribe Neurontin. A large percentage of my practice deals with chronic pain and depression, similar to what was experienced by Richard Smith.

In addition to treating patients, I teach fourth and fifth year psychiatric residents as clinical professor of psychiatry at the University of Kentucky College of Medicine. I also have a forensic neuropsychiatry consultation business, which is national in scope. I evaluate cases in Canada, United States, and the Caribbean Islands. My current testimony is approximately 52% for the defense and 48% for the plaintiff where testimony is called for by trial or deposition. The reader is referred to the Federal Rule 26 Disclosure attached as an appendix to this report. The content of the forensic psychiatric consultation covers all general areas in forensic psychiatry, but the majority of the cases are involved in the analysis of traumatic brain injury, complex brain neurotoxic syndromes, perinatal birth injury, pharmaceutical product liability, personal injury, Workers' Compensation, and civil rights. I examine three to four new Workers' Compensation cases weekly. The majority are chronic pain cases and more than 50% of these are cervical and lumbar pain claimants or crush injuries. I routinely evaluate complex regional pain syndromes, type I and II (formally called reflex sympathetic dystrophy).These subject areas comprise more than 90% of the consultations performed by me. There are other areas where I occasionally consult and those are outlined in the website posted by me at: drgranacher.com.

I serve on a number of not-for-profit boards as a director of corporations and other entities. For

instance, I serve as a founding board member of St. Joseph Health System. This system operates in central and eastern Kentucky and manages seven general medical-surgical hospitals and one community health center. The current budget is approximately seven hundred fifty million dollars yearly. As a member of that board, I chair the important subcommittee for Quality and Process Improvement and physician credentialing for all eight institutions. We statistically review quality and safety every two months. I am the final signatory for credentialing roughly a thousand physicians in this system, including all medical specialties.

I practice sleep disorder medicine on a daily basis. I developed the St. Joseph Sleep Disorder Center in 1983 with Katherine Hanson. I was medical director of that center from 1984 to 1996. I currently confine my sleep disorder medicine practice to outpatient only. In addition to serving on the Board of Directors of St. Joseph Health System, I also serve on the Board of Governors of the Kentucky Traumatic Brain Injury Trust Fund, the Dean's Council at the University of Kentucky College of Medicine, the Interprofessional Education Committee at the University of Kentucky College of Medicine, and I am a director of CBA Pharma, Inc., which is an ongoing oncology research company currently developing a pharmaceutical product to reverse cancer cell resistance to chemotherapy. A new drug application is before the FDA at this moment. Lastly, I serve on the Board of Directors of the Kentucky Psychiatric Medical Association, the professional body for psychiatrists in Kentucky. I have been awarded the Distinguished Life Fellow Award by the American Psychiatric Association in 2005. The reader is referred to my Curriculum Vitae for further information.

For 23 years, I was the psychiatrist on call to the St. Joseph Hospital emergency department. I evaluated all suicidal patients when on-call to this 466 bed hospital.

## GERIATRIC SUICIDE, CHRONIC PAIN, AND HOPELESSNESS

Suicidality is a medical term of art that has come into psychiatric usage within the last ten years. The FDA, June 12, 2008, defined suicidality as "suicidal ideation and behavior" (see record 2, page 21). Self-destructive behavior and nonfatal suicide attempts, have been previously conceptualized as parasuicide. Experts have pointed out that the distinction between parasuicide and completed suicide is important: parasuicidal patients usually recognize that the means are nonlethal, and these patients have different characteristics than patients who display lethal suicidal behavior.[1]

In contrast to parasuicide, wherein many attempts at suicide are not always part of a psychiatric illness complex, epidemiological surveys have demonstrated that the vast majority of completed suicides are found in patients with diagnosable psychiatric conditions. The classic study by Robins, et al.[2] demonstrated that 94% of individuals who completed suicide were psychiatrically ill. The majority of these persons had affective illness (depression or bipolar illness) or alcoholism. The studies by Black and Winokur[3] found a similar result thirty years later based upon a review of studies of completed suicides. Ninety-percent of those in this study, who completed suicide, were psychiatrically ill at the time of death.

3

One of the critical factors noted to be present in patients committing suicide, particularly geriatric patients toward the end of life, is hopelessness. Hopelessness seems to co-vary very strongly with suicidal attempts in all persons, but particularly in the elderly.[4-8]  There is a synergy between hopelessness and risk factors.

There is significant evidence that chronic pain, which is common in depressed older adults, may influence clinical features of depression and should be assessed as a possible suicidal risk factor.[9]

An interesting study in Finnish farmers noted an association between back pain and suicidal tendency. The study originally was designed to investigate the relationship between back pain and fatal myocardial infarction. However, an unexpected outcome of the study was that those subjects who reported back pain during the year before the study baseline had a significantly increased risk of committing suicide during the first ten years of followup when compared with subjects with no back pain symptoms.[10]

Robert Edward, Ph.D. at Johns Hopkins University studied 1,512 chronic pain patients. Almost a third of the subjects reported some form of recent suicidal ideation. Suicidal thoughts were strongly linked to depression and feelings of catastrophic illness by the patient.[11]  These findings are consistent with those of Gregory E. Ratcliffe, et al., who also concluded that chronic pain conditions are associated with both suicidal ideation and suicide attempt even in the absence of a recognized mental disorder.[19]

Chronic pain patients who self-reported severe and frequent initial insomnia with concomitant daytime dysfunction and high pain intensity are more likely to report passive suicidal ideation, independent from the effects of depression severity.[12]

Pain has been found to be a contributory factor in episodes of deliberate self-harm. A recent study noted that in 1,665 pain patients, pain was contributory in 4% of the total episodes of deliberate self-harm over a two-year period (1 in 25 pain patients). These patients were older and had higher suicide intent scores, but lower rates of previous psychiatric illness or alcohol or drug misuse than did the deliberate self-harm patients with medical problems but no pain.[13]

World Health Organization data obtained in primary care centers worldwide demonstrates that 22% of all primary care patients suffer from persistent debilitating pain and that these patients are four times more likely to have comorbid anxiety or a depressive disorder than pain-free primary care patients. Not unexpectedly, risk of depression is greater when the pain is more diffuse or has a greater effect on the quality of life.[14]  In elderly patients, a large Canadian study noted that the odds ratio of suicide in older persons with severe pain is 7.52.[15]

A British literature review has found eight risk factors associated to increased risk of death and suicidal risk in chronic pain patients. These factors for suicidality in chronic pain included: the type, intensity and duration of pain, sleep onset insomnia co-occurring with pain, helplessness and hopelessness about pain, the desire for escape from pain, pain catastrophizing and avoidance, and problem solving deficits.[8]

4

The elderly experience significant losses as life persists into advanced age. Loss of function is a particular adverse consequence for mental health function in the elderly. A recent book has described the complexity that surrounds issues of loss in the chronically ill population. Ranjan Roy chronicles chronic pain, loss, and suffering in persons with chronic illness.[16]

It is considered very important by geriatric psychiatrists to identify depressed individuals early so that reasonable treatment can be accomplished to reduce risks of suicidality and completed suicide. There is significant epidemiological evidence that the judicious application of antidepressants to the depressed elderly population has in fact reduced the rate of suicide in the older age group. A very large recent study of U.S. suicide rates by age group from 1970 to 2002, demonstrates a significantly reduced rate of suicide among those over age 65 beginning in 1990. This correlates with an increased usage of antidepressants in this age group. In fact, the annual suicide rate for 100,000 people over age 65 in 1990 was 20.5. By 2002, that rate had progressively dropped to a rate per 100,000 people of 15.6 (a 25% reduction).[17]

With regard to the lethality of suicide attempts among elderly persons, there is a strong positive association between the availability of lethal means and the successful completion of suicide. Gun ownership has been positively linked to increased rates of completed suicide and there is a direct linear trend between rates of gun ownership and rates of completed suicide.[18]

1.  Moscicki, E.K.: Epidemiology surveys as tools for studying suicidal behavior: a review. *Suicide and Life Threatening Behavior*, 19:131-146, 1989.
2.  Robins, E., et al: Some clinical considerations in the prevention of suicide based on a study of 134 successful suicides. *American Journal of Public Health*, 49:888-899, 1959.
3.  Black, D.W. and Winokur, G.: Suicide and psychiatric diagnosis, in *Suicide Over the Life Cycle: Risk Factors, Assessment, and Treatment of Suicidal Patients*. Blumenthal, S.J. and Kupfer, D.J. (Eds). Washington, D.C., American Psychiatric Press, 1990, pp 135-153.
4.  Hatai, G., et al: Hopelessness in patients presenting to their family physician. *Psychiatry in Hungary*. 23:34-41, 2008.
5.  Levi, Y., et al: Mental pain and its communication in medically serious suicide attempts and "impossible situation." *Journal of Affective Disorders*. 2008, April 22 [Epub ahead of print].
6.  Burgy, M.: Phenomenological investigation of despair and depression. *Psychopathology*. 41:147-156, 2008.
7.  Abbey, J.G., et al: Hopelessness at the end of life: The utility of the hopelessness scale with terminally ill cancer patients. *British Journal of Health Psychology*. 11(Pt 2):173-183, 2006.
8.  Tang, N.K. and Crane, C.: Suicidality and chronic pain: A review of the prevalence, risk factors, and psychological links. *Psychological Medicine*. 36:575-586, 2006.
9.  Meeks, T.W., et al: Chronic pain and depression among geriatric psychiatry inpatients. *International Journal of Geriatric Psychiatry*. 23:637-642, 2008.
10. Fishbain, D.A.: Current research on chronic pain and suicide. *American Journal of*

*Public Health*. 86:1320-1321, 1996.

11.    Arehart-Treichel, J.:    Some chronic pain patients at increased suicide risk. *Psychiatric News*. 41:25, 2006.

12.    Smith, M.T., et al: Suicidal ideation in outpatients with chronic musculoskeletal pain: An exploratory study of the role of sleep onset insomnia and pain intensity. *Clinical Journal of Pain*. 20:111-118, 2004.

13.    Theodoulou, M., et al:  Pain and deliberate self-harm:  An important association. *Journal of Psychosomatic Research*. 58:317-320.

14.    Lépine, J.P. and Briley, M.:  The epidemiology of pain and depression. *Human Psychopharmacology*. 19 (Suppl. 1):S3-S7.

15.    Juurlink, D.N., et al:  Medical illness and the risk of suicide in the elderly. *Archives of Internal Medicine*. 164:1179-1184, 2004.

16.    Roy, R.:  Chronic pain, loss and suffering:  *A Clinical Perspective*.  University of Toronto Press, Toronto, 2004.

17.    McKeown, R.E., et al:  U.S. suicide rates by age group, 1970-2002:  An examination of recent trends. *American Journal of Public Health*. 96:1744-1751, 2006.

18.    Miller, M. and Hemenway, D.:  Guns and suicide in the United States. *New England Journal of Medicine*. 359:989-991, 2008.

19.    Ratcliffe, G. Chronic Pain Conditions and Suicidal Ideation and Suicide Attempts: An Epidemiologic Perspective. *Clin J Pain* Vol. 23, No. 3 (2008)

## ANALYSIS OF MR. SMITH'S SUICIDE

### Neurontin Did Not Cause Mr. Smith's Suicide

In order to conclude that Neurontin caused Richard Smith's suicide, an expert must first conclude that he was actually taking the medication at the time of his suicide.  I believe that plaintiffs' experts have overstated the evidence of ingestion in this case.  If Richard Smith had taken his Neurontin as prescribed, he would have run out of medication several weeks prior to his suicide.  On the day of his suicide, however, there were at least 15 pills remaining in his prescription bottle.  That Richard Smith may not have been taking Neurontin at the time of his suicide is further supported by the fact that he believed the medication was not helping him – he reported this to several of his doctors.  Dr. Mackey testified that he told Mr. Smith to discontinue taking Neurontin if it was not helping him.  One possibility is that Richard Smith followed Dr. Mackey's advice and discontinued his use of Neurontin.

In addition to the above, before an expert can consider whether Neurontin caused a suicide in any particular case, the expert must conclude that Neurontin is capable of causing suicide in the first place.  Plaintiffs' experts assume that Neurontin can cause suicide, despite a glaring lack of evidence.

Gabapentin was synthesized the first time by a German pharmaceutical company, Goedecke, A.G.[1]

I have read and reviewed the expert reports regarding Neurontin's mechanism of action. I agree with and adopt the opinions set forth by Charles Taylor in his expert report and deposition. To summarize, Gabapentin has some structural similarity to the inhibitory neurotransmitter in the brain, gamma-aminobutyric acid (GABA). Recent research has demonstrated that gabapentin is a compound unrelated to the actions of GABA. The present scientific knowledge base of gabapentin contains data that is consistent with gabapentin interacting and binding to a voltage-gated calcium channel in either brain or spinal cord. This has been described as the $alpha_2$-delta subunit.[2]

The original hypothesis of gabapentin's pharmacology, coming from scientific literature in the 1970s and the 1980s has been supplanted by more recent data in the 1990s, as well as the current decade. The original hypothesis that gabapentin acted at GABA subunits or mimicked the actions of GABA by acting as an agonist at GABA subunits is proved to be incorrect.

The actions of gabapentin and pregabalin on animal models that support pain, anxiety, and seizures, demonstrate that the analgesic, anxiolytic, and anticonvulsant actions result from a normalization of increased excitability and signaling networks associated with these three disorders. The normalization has been shown to occur by reducing the excitatory neurotransmitter release of glutamate at synapses associated with pain, anxiety, and seizures. Gabapentin is renally cleared and the half-life in the elderly is 6.5-10.5 hours.[5]

The current scientific evidence is against the theory that gabapentin is a GABAergic drug.[6] Contemporary scientific evidence is not consistent with gabapentin functioning as an analogue of GABA or acting at GABA receptors in human neural tissue. The current commonly accepted theories of gabapentin action center on drug binding to the $alpha_2$-delta subunit. Thus, plaintiff's arguments that gabapentin somehow modifies the signaling in the brain by altering the effects of monoamine transmission, is not consistent with the demonstrated actions of gabapentin at $alpha_2$-delta protein subunits of the voltage gated calcium channel. The contemporary data on the neurochemical actions of gabapentin are inconsistent with induction of suicidality by its alleged actions on monoamine systems thought to play a role in mood. Dr. Trimble's report, submitted on behalf of the plaintiff Smith, contains opinions regarding causal links between purported neurochemical actions in the brain and risk of suicide while using Neurontin. In my opinion, Dr. Trimble's statements of neuropharmacology are outdated and not consistent with the contemporary knowledge that gabapentin (Neurontin) is not GABAergic.

Sir Austin Bradford Hill, an honorary fellow of the London School of Hygiene and Tropical Medicine, was dean of the school from 1955 to 1957, and professor of medical statistics from 1946 to 1961. This man was described as the greatest medical statistician of the 20th century. Through his investigations into the reasons for the increasing mortality attributed to lung cancer, he developed model case control and cohort studies and set out guidelines for determining whether an observed association could be interpreted as indicating cause and effect. The arguments that led to the conclusion that "smoking is a factor, and an important factor, in the production of carcinoma of the lung" was subsequently formalized in Bradford Hill's presidential address to the Section of Occupational Medicine of the Royal Society of Medicine and summarized under nine heads in later editions of his *Principles of Medical Statistics*.[1]

Equally important was Sir Bradford Hill's introduction of the randomized controlled trial. In 1946 he persuaded two MRC committees to adopt it: firstly, to test the value of a pertussis vaccine, and secondly, a few months later, to test the efficacy of streptomycin in the treatment of pulmonary tuberculosis.[7, 8]

These trials, and other trials subsequently following, developed the standard of care and established randomization as the method of choice for testing the efficacy of treatments. Its use spread throughout the English-speaking countries.

Applying Bradford Hill's criteria within medicine, has led to nine rules for establishing an argument of causation.[9]

These criteria include:[9]

1. Strength of the association.

   The association has to be strong enough to be judged clinically significant by the reader of the argument. This is a necessary, but not sufficient, criterion in establishing an argument of causation. The possibility of "confounding" by undetected causative agents is one reason for the need for a controlled population with which to compare the strength of the association in the condition under investigation.

2. Consistency of the evidence.

   If A causes B, then we can expect that evidence supporting this relationship will be found consistently. If even a single piece of inconsistent evidence exists, then the argument of causation is seriously undermined.

3. Specificity of the association.

   This criterion has limitations to its validity in many respects. Clearly, this criterion does not hold even for infectious diseases or toxin exposures, in which multiple pathogens may produce the same set of symptoms, or in which a single pathogen may produce a number of outcomes. *E. coli* may produce urinary tract infections as well as infections of the gastrointestinal system.

4. Temporal sequence.

   If A is causing B, then A should necessarily occur prior to B. The only way to be certain about the temporal sequence is to conduct prospective studies, in which the samples are studied prior to the onset of the putative causative agent and then followed over time after the insult. To do otherwise may introduce recall bias.

5. Biological gradient.

Establishing a biological gradient, or dose-response, is appropriate for outcome secondary to insults such as infectious diseases or exposure to toxins, but it may not be appropriate, or may be difficult to establish, in certain conditions such as depression or suicidality. Moreover, in central nervous system disorders, what is the appropriate measure of severity of the insult to the brain? Choosing a narrow focus of severity may lead to the problem of missing important correlations or identifying misleading ones, since the variable assessed may not fully correlate with the severity of the insult.

6. Biologic rationale.

There is a greater likelihood of a causative relationship being present if it makes biological sense and is plausible that A causes B. However, just because the argument does not make sense to us does not necessarily mean that it is not true.

7. Coherence.

This criterion stipulates that there is a greater likelihood that A causes B if this postulated causal relationship is consistent with what is already known about the disease or disorder.

8. Experimental evidence.

In science, experimental evidence, or replication of findings, is the most compelling evidence of causation. If it can be shown that experimentally inducing the causative agent consistently produces the outcome, at greater rates than in a non-exposed controlled sample, this is clear and compelling evidence of causation.

9. Alternative explanations.

Alternative explanations must be effectively ruled out.

While the above factors of Sir Bradford Hill's criteria can be elegantly applied to general causation to determine whether there is a possible "association" between an effect and a medication, they do not tell us whether any association is causal, and they fall significantly short – and were not intended -- for a specific causation analysis. The plaintiffs are arguing in this case that signal detection by the FDA proves that Neurontin causes suicidality and thus the suicide of Mr. Smith was caused by Neurontin. This analysis is flawed.

First, signal detection is part of pharmacovigilance, which is used to detect information from large drug studies in order to perform a risk/benefit evaluation. The World Health Organization

has defined a pharmacovigilance signal as: "reported information on a possible causal association between an adverse event and a drug, the relationship being unclear or incompletely documented previously."[10]  The detection of a signal in no way proves causation. There is no scientific evidence to date that one can take a signal in large population of human drug trials and retrospectively convert that to causation in a single patient.

Second, and importantly, the FDA Meta Analysis in fact does not show a signal for Neurontin; the analysis specifically demonstrates there is no evidence of a statistically increased risk of suicidality for Neurontin.

On July 11, 2008, the Food and Drug Administration, through the Peripheral and Central Nervous System Drugs Advisory Committee and the Psychopharmacologic Drugs Advisory Committee, gave new advisory warnings for 11 antiepileptic drugs (AEDs). These committees listened to presentations about the findings of a Meta Analysis of 199 placebo-controlled clinical trials of 11 AEDs. After discussion, they voted on specific questions.

One question that the committee had to decide was whether or not it agreed with the agency's overall finding of an increase in suicidality for the 11 AEDs that were analyzed. Suicidality by the FDA was defined as suicidal ideation and behavior.   No statements in the FDA recommendations drew any conclusions about completed suicide and/or statements that the AEDs were proximately linked to completed suicide. As to the first question, the advisory committee, with one abstention, voted yes that there was a signal for suicidality for all AEDs that is statistically reliable.  There was discussion by the Advisory Committee and FDA, however, that one could not conclude there was a signal without pooling of data from all the drugs.  In other words, no signal could be identified for any particular drug individually.

The committee therefore suggested that the "signal" should apply to all currently approved, chronically administered AEDs, even those that were not part of the analyses.  Finally, the committee members voted against a black box warning.

Dr. Trimble has testified, at numerous points in his deposition that, "The FDA has clearly formulated an opinion which I am not going to go against, which says that Neurontin or gabapentin causes suicide," (page 13). Nowhere is that stated either by the advisory committees to the FDA or by the FDA. In fact, the FDA's statistical review demonstrates that there is no statistically significant increased risk of suicidality for gabapentin using either an odds ratio or a risk difference calculation. Dr. Trimble is completely wrong in this assertion, nor can his claim be backed by any peer reviewed published literature. I contrast, Dr. Maris testified that the FDA findings are nothing more than a signal and do not suggest causality for any of the drugs included in the analysis either as a group or individually  (page 277-78).

In forming my opinions in this case, I also reviewed the supplemental report prepared by Dr. Robert Gibbons. In his supplemental report, Dr. Gibbons analyzes data from a medical records database related to Neurontin and suicide attempt.  To my knowledge, this is the first time anyone has conducted a pharmacoepidemiologic study to compare Neurontin to an unexposed

control group looking at the risk of suicide behavior in different treatment groups. Dr. Gibbons' analysis shows that Neurontin does not increase the risk of suicide attempt and, in fact, may be protective in some patient groups.

1.   Thorpe, A., et al: Case Histories: Alpha$_2$-delta ligands: Gabapentin and pregabalin. In: Triggle, D.J. and Taylor, J.B. (Eds). *Comprehensive Medicinal Chemistry*, volume 8, Oxford, England, Elsevier, 2006, pp 227-246.

2.   Dooley, D.J., et al: Calcium$^2$ channel alpha$_2$-delta ligands: Novel modulators of neurotransmission. *Trends in Pharmacological Sciences*, 28:75-82, 2007.

3.   Bian, F., et al: Calcium channel alpha$_2$-delta type 1 subunit is the major binding protein for pregabalin in neocortex, hippocampus, amygdala, and spinal cord: An ex vivo autoradiographic study and alpha$_2$-delta type 1 genetically modified mice. *Brain Research*, 1075:68-80, 2006.

4.   Fink, K., et al: Inhibition of neuronal calcium$^2$ influx by gabapentin and pregabalin in the human neocortex. *Neuropharmacology*, 42:229-236, 2002.

5.   Sommer, B.R., et al: Safety and efficacy of anticonvulsants in elderly patients with psychiatric disorders: oxcarbazepine, topiramate, and gabapentin. *Expert Opinion on Drug Safety*. 6:133-145, 2007.

6.   Doll, R.: People of consequence: Sir Austin Bradford Hill and the progress of medical science. *British Medical Journal*. 305:1521-1526, 1992.

7.   Medical Research Council Whooping-Cough Immunization Committee. The prevention of whooping-cough by vaccination. *British Medical Journal*. i:1463-1471, 1950.

8.   Medical Research Council Tuberculosis Chemotherapy Trials Committee. The treatment of pulmonary tuberculosis with isoniazid. *British Medical Journal*. ii:735-746, 1952.

9.   vanReekum, R., Streiner, D.L., and Conn, D.K.: Applying Bradford Hill's criteria for causation to neuropsychiatry: Challenges and opportunities. *Journal of Neuropsychiatry and Clinical Neuroscience*. 13:318-325, 2001.

10.  www.haiweb.org/medicineprices/2410/contributions/saadShakir.doc, site visited 9/8/08.

## MR. SMITH HAD NUMEROUS RISK FACTORS FOR SUICIDE

In the context of trying to retrospectively determine what caused Mr. Smith's suicide, an expert must consider and rule out alternative explanations for the suicide. Plaintiff's expert, Dr. Ronald Maris, himself acknowledges this principle, although neither he nor Dr. Trimble actually did this analysis.

In my opinion, within reasonable medical probability, the law of parsimony should prevail in this case. That is to say, the most reasonable and simplest alternative explanation for Mr. Smith's suicide is a chronic pain syndrome inducing depression. The depression remained inadequately treated or untreated. His plight and depression was not recognized by his family, or if recognized, appropriate action was not taken. When told that his physicians had nothing else to offer, a sense of hopelessness produced in Mr. Smith feelings of extreme uselessness and futility

11

that led him to plan his suicide and undertake to end his life May 13, 2004, by his own hand.

In terms of well-recognized suicide risk factors, the following are present in this case:

- **Chronic pain.** It is absolutely indisputable that Richard Smith suffered from severe, chronic pain and that during the last year of his life, this pain had significantly interfered with his ability to engage in the activities of daily living. This risk factor pre-dated any use of Neurontin.

- **Untreated depression.** Mr. Smith's chronic pain led to depression, which went untreated. This depression and lack of mental health treatment pre-dated any use of Neurontin.

- **Hopelessness.** Mr. Smith received some temporary relief to his severe back pain following his surgery in 2003. However, in 2004, the back pain returned with even greater intensity. In 2004, Mr. Smith was told by both his physicians that he was not a candidate for further operative treatment and that his pain would be managed conservatively. According to the testimony of Mrs. Smith, he was told he "would have to learn to manage his pain." This led to extreme feelings of hopelessness for Mr. Smith. These feelings of hopelessness were directly related to his physical condition and had nothing to do with Neurontin.

- **Suicidal ideation.** Mr. Smith had pre-existing suicidal ideation. He expressed suicidal ideation both prior to and after using Neurontin.

- **Age.** Mr. Smith was an elderly, white male. This demographic group has the highest rate of completed suicide.

- **Access to firearms.** Mr. Smith had access to guns in his home. This is an important risk factor for suicide.

### A.   Chronic Pain

Dr. Cato, Mr. Smith's internist began treating Mr. Smith in 1989 until his death in May of 2004. Pain issues appear in the records of Dr. Cato throughout his longitudinal examinations of Mr. Smith. They began with jaw pain and pelvic pain in 1990 and 1991 (Cato deposition, page 27). Mr. Smith had pain in his left knee until it was replaced with a prosthetic knee in November 1993 (Cato deposition, page 31). In October 1995, Mr. Smith presented to Dr. Cato with musculoskeletal chest pain (Cato deposition, page 32). He then developed pain in the right hip, which was evaluated in April 1996 and Mr. Smith underwent right hip replacement in May 1996 (Cato deposition, page 35). Following the hip replacement, Mr. Smith complained of pain in his arms in that they would ache at night. He then came to a right total knee replacement in August 1998 (Cato deposition, page 37). In January of 1999, Mr. Smith developed left shoulder pain (Cato deposition, page 39). In September 2000, left knee pain became a focus of examination (Cato deposition, page 40). During April of 2001, Mr. Smith had pain bilaterally under his

shoulder-blades (Cato deposition, page 42). In May 2001, Mr. Smith complained to Dr. Cato of neck pain, chest pain, vertigo, and problems sleeping. Dr. Cato prescribed the antidepressant amitriptyline 10 mg at bedtime (Cato deposition, page 43). In June 2001, Mr. Smith was complaining of chest muscle soreness, and in December 2001 right shoulder pain (Cato deposition, page 47). By January 2003, Mr. Smith was reporting migratory pain and pain in all of his joints associated with insomnia (Cato deposition, page 48). In February 2003, Mr. Smith complained to Dr. Cato of joint and back pain (Cato deposition, page 50). In January 2004, Mr. Smith complained of pain from his back to his ankles associated with "pricking" (Cato deposition, page 62). In February 2004, Mr. Smith had left shoulder pain, was complaining that it "hurts to move," and was suffering from chest tightness, increased blood pressure and physical symptoms that were attributed to his pain (Cato record and deposition, page 63).

On February 27, 2003, Mr. Smith consulted with Carl R. Hampf, M.D., a neurosurgeon. His chief complaint to Dr. Hampf was:  severe pain in hip area, down back of thighs, down calves, ankles and heels, sometimes the end of spine, tingling-hard to walk. Mr. Smith told Dr. Hampf that he had injured himself trying to repair a broken water pipe in his bathroom. The pain began eight weeks prior to the examination of February 27, 2003 according to Dr. Hampf's record (Hampf deposition, pages 10, 13, and 14). Dr. Hampf diagnosed lumbar stenosis and recommended surgical correction. The stenosis was confirmed by MRI (Hampf deposition, page 25). Dr. Hampf scheduled surgery for April 16, 2003 (Hampf deposition, page 28). However, Mr. Smith decided to cancel the surgery because he "couldn't wait" for the April 16 appointment because he was "in so much pain." (FMB-52).

Mr. Smith sought consultation with Paul McCombs, III, M.D. Dr. McCombs diagnosed spondylolisthesis at L4-5 and spinal canal stenosis L3-S1 (McCombs deposition, page 8). Mr. Smith underwent a decompressive laminectomy and fusion L3-S1 on April 3, 2003 (McCombs deposition, page 9).

Initially following surgery, Mr. Smith's pain seemed to improve. However, the improvement did not last and by May 2003, Richard Smith stated that he "wished he could die because of pain and depression." (PRD-408). There are many records that illustrate the increasingly debilitating nature of Mr. Smith's chronic pain during this time from (*i.e.*, in the year preceding his suicide). Some examples are as follows:

> **May 5, 2003.**  Richard Smith tells Dr. Cato that he is experiencing new symptoms of increased leg pain. (NEA-1)

> **June 27, 2003**. Dr. Cato diagnoses Mr. Smith with anxiety and depression related to his pain. (HMA-65, 66).

> **February 2004**. Mr. Smith first consults Dr. Mackey for a second opinion about his severe leg pain and tells Dr. Mackey that his pain is getting worse. (TOA-4). He complains of back pain, leg pain, knee pain, and radicular pain. Mr. Smith reports to his doctor that it "hurts to move." (YHMA-89, 90)

> **March 2004**. Mr. Smith has several visits with Drs. Mackey and McCombs, desperately trying to find some relief for his chronic pain. He complains that neither

13

his epidural steroid injections nor his medications are helping him. (Krancer deposition at 24).

**April-May 2004**. Mr. Smith tries physical therapy to help with his pain, however, he quits because he says it is not improving. At this point, he describes his pain as a 7 or 8 out of 10, which is categorized as "excruciating." (UMC-76). Three days before the suicide, he visits his dentist and says that an end to his pain is hopeless. He says he cannot cut grass or work on cars like he used to. (CLW-1). This is consistent with Ruth Smith's deposition, where she testifies that in the April to May 2004 time frame, Richard Smith spent most of the day "laying around" because of his severe pain (Ruth Smith deposition at 164).

## B.   Untreated depression

On Dr. Hampf's medical questionnaire, completed by Mr. Smith February 27, 2003, Mr. Smith answered that he was depressed "because of pain." This is one year prior to the first prescription for Neurontin March 9, 2004. On May 2, 2003, one of Mr. Smith's daughters, called Dr. McCombs' office and stated that her father, "wished he could die because of pain and depression." Dr. McCombs' office advised Mr. Smith's daughter to take her father to the emergency department (McCombs deposition, page 17). Apparently, this was not done.

On May 15, 2003, after the call to Dr. McCombs by Mr. Smith's daughter, Dr. Cato diagnosed anxiety and depression in Mr. Smith (HMA-142, 143). He noted that Mr. Smith's pain had not been relieved after a decompressive laminectomy April 1, 2003, and he prescribed two antidepressants: Lexapro and imipramine (Cato deposition, page 56). Dr. Cato reexamined Mr. Smith June 27, 2003, and again noted anxiety/depression. His clinical note indicated that overall Mr. Smith was improved but that he had discontinued Lexapro as he had run out of samples (Cato deposition, page 61).

Interestingly, Mrs. Smith testified that she did not know that her husband had been given antidepressants by Dr. Cato (Ruth Smith deposition, pages 153-154).

Mr. Smith was a minister. Not only that, he was an elderly minister who came from a different era. Psychiatry and the ministry often did not mix. He was obviously a psychologically resistant man. His wife is able only to speculate on his use of or lack of use of Neurontin due to his limited communication to her about his treatments (see Mrs. Smith's deposition). In particular, as I have found in the treatment of priests, ministers, and seminary professors over the years, it is difficult for them to admit weakness and difficult for them to admit that God does not answer their prayers every time when they ask for relief of depression without medication or medical assistance. I believe that probably happened in Mr. Smith by virtue of his statements in his suicide note.

## C.   Hopelessness

When Mr. Smith's daughter called Dr. McCombs May 2, 2003, the content of what she told Dr. McCombs' staff is certainly consistent with hopelessness. She told Dr. McCombs' office that

14

her father, "wishes he could die because of pain and depression." Clearly, that is a hopeless statement and that statement was made before the first prescription of Neurontin (McCombs deposition, page 17). Overall, my analysis of the medical records, and in particular based on the deposition of Mrs. Smith, leads me to the conclusion that Mr. Smith had limited ability to share his feelings with others and a reluctance, if not aversion, to seeking any kind of mental health treatment where he would have to share his feelings. There appears to have been a reluctance by Mr. Smith to share information about his medical treatment with Mrs. Smith. Despite that this couple was married for many years, Mrs. Smith testified that she never knew her husband took Neurontin until after his death (Smith deposition, page 115); she testified that the only medication she was aware of was his pain medication. In fact, she may not have been sure about that as she testified, "He was probably on pain medicine. That's the only thing I know of" (Smith deposition, pages 153-154). She also testified on those same pages that she did not know that Dr. Cato had prescribed two antidepressants.

This information is important because, in my opinion, Mr. Smith was clearly hopeless and depressed and his apparent stoic attitude, reluctance to seek psychiatric treatment, and apparent lack of communication with his wife did not offer Mr. Smith the opportunity for treatment of his depression, and likewise, did not offer the family an opportunity to be fully aware of his level of distress. Levi, et al.[1] have published that individuals with problems sharing feelings with others are at risk for near lethal suicide. This study was undertaken in survivors of suicidal attempts and one can reasonably conclude that persons who complete suicide probably thought in a similar fashion to the survivors.

In my opinion, Mr. Smith's suicide note was memorializing contemporaneously a significantly hopeless mind. The poignant statement, "Forgive me, I cannot go on like this!" is clearly that of a hopeless man. Moreover, in his suicide note, Mr. Smith states at the top of the page and double underlines this exclamation, "Pain has taken over my mind and body." These are clearly hopeless statements. He goes on in his suicide note to clarify his hopelessness, "I need back surgery, left and right rotator cuffs, right bicep torn, back surgery to correct pain in legs." Clearly he understood his medical needs and unrelenting pain. Mrs. Smith testifies (at page 262 of her deposition) that in the last few months of his life, "for the first time," doctors told him they could do nothing. It is reasonable to conclude that Mr. Smith felt both helpless and hopeless (and, in his own words, "useless") as his physicians told him nothing else could be done to structurally correct his pain. He had been treated with Neurontin and opiate pain relievers with little success. Recent research has demonstrated that helplessness and hopelessness are significantly correlated with suicidal ideation.[2]

A recent study has noted that the key factor to the mitigation of suicidal ideas seems to be the perception of social support.[3] Mr. Smith had lost his social support systems from his doctors, as well meaning as they might be. His physicians had lost the ability to provide him any further treatment for his obvious slipped spine and the squeezing of his lower spinal cord by spinal stenosis.

It is my opinion that Mr. Smith's hopelessness was not caused or made worse by Neurontin, but rather, it was brought on by being told by all his doctors that there was simply nothing they could

15

do to help relieve his chronic pain. In fact, from February 2004 until his suicide in May 2004, it is clear that Mr. Smith and his family were desperately trying to find Mr. Smith some relief from his pain. On March 9, Mrs. Smith, Mr. Smith, Cindy Smith and one of the sons in law, all go to see Dr. Mackey to try to address Mr. Smith's pain, mentation, and functional impairments. In March 2004, Dr. Mackey tells Mr. Smith that he does not think surgery would help him. On March 31, 2004, Dr. McCombs concurs with Dr. Mackey, telling Mr. Smith that he is not a candidate for any type of operative intervention and that he would treat him with conservative therapies. In April, another local orthopedic surgeon (Dr. Berklacich) refused to treat Mr. Smith. Finally, on May 5, just one week prior to his suicide, Mr. Smith calls Dr. McCombs office once again asking for some relief from his pain. According to Mr. Smith's own handwritten note, he was told that they had "nothing to offer him" outside of steroid injections, medication, and physical therapy – none of which were helping his pain.

When Mr. Smith learned that his physicians had nothing else to offer him to treat his pain, a sense of hopelessness pervaded him and operated synergistically with his untreated depression and chronic pain to cause his suicide. His own statements to family and others indicate that he was contemplating suicide for at least a year. His suicide note clearly tells us exactly why he took his life. In his own words, pain had "taken over his mind and body." It states nothing about Neurontin. This was also reflected in Ruth Smith's statements to the medical personnel on her 911 call the morning of Mr. Smith's suicide. During that call, Ruth Smith acknowledged that Mr. Smith had "been in so much pain" and been "so sick." In addition, she tells the 911 responder that their youngest daughter had been suffering with cancer and it was just "too much." During the 911 call, Mrs. Smith also acknowledged that he was depressed and had been expressing suicidal thoughts (she later denied that he had been depressed and suicidal in her deposition). Mr. Smith's daughter also told the police that these suicidal thoughts began in March 2004 *before* Mr. Smith ever took Neurontin. This is consistent with the statement in the medical records that in May 2003, Mr. Smith apparently wanted to die because of pain and depression.

In sum, there is a clear pattern whereby Mr. Smith's pain level continued to increase, the options for treating the pain continued to decrease, which resulted in increased depression and severe hopelessness in Mr. Smith.

1. Levi, Y., et al:  Mental pain and its communication in medically serious suicide attempts and "impossible situation." *Journal of Affective Disorders*. 2008, April 22 [Epub ahead of print].
2. Burgy, M.:  Phenomenological investigation of despair and depression. *Psychopathology*. 41:147-156, 2008.
3. Abbey, J.G., et al:  Hopelessness at the end of life: The utility of the hopelessness scale with terminally ill cancer patients. *British Journal of Health Psychology*. 11(Pt 2):173-183, 2006.

   **D.    Suicidal ideation and plans by Mr. Smith**

On May 2, 2003, Richard Smith's daughter called Paul McCombs, M.D. and she is quoted as saying, "wishes he could die because of pain." Dr. McCombs' office advised her to take her father to the emergency department for a psychiatric evaluation but there is no evidence that this was done. Dr. Maris' protestations aside, this is clear evidence of suicidal ideation prior to Mr. Smith's use of Neurontin.

On May 15, 2003, Dr. Cato, his family physician since 1989, noted that Mr. Smith's chief complaint was anxiety/depression. He diagnosed him with anxiety/depression and prescribed Lexapro and imipramine. These are both antidepressants, and Lexapro is specifically indicated for treatment of major depressive disorder and generalized anxiety disorder. When Mr. Smith returned to see Dr. Cato June 27, 2003, six weeks later, Dr. Cato noted he was improved but apparently Mr. Smith stopped using Lexapro as he had run out of samples. Dr. Cato did not prescribe any more. In my opinion, the Lexapro was discontinued too soon. It takes six weeks for antidepressants to ramp up the protein chemistry system that enables receptor changes to take place inducing permanent improvement in depressive symptoms. The discontinuance of Mr. Smith's Lexapro at six weeks after initiation, even with a positive response, likely led to relapse, as this is the usual effect of stopping antidepressant medication too soon.

Mrs. Smith notes in her deposition (pages 144-145) that about three weeks before his death, Mr. Smith asked her, "Will God forgive me if I just do away with myself?" At another time, which was not specified by Mrs. Smith, she noted that when they left church, Mr. Smith said, "There's something wrong with my mind and I don't think like I used to." She testified further that she did not know that Dr. Cato was treating her husband for depression. On page 262, Mrs. Smith testified that in the last few months of his life, "for the first time," his doctors told him that they could do nothing.

Mr. Smith's suicide note is very coherent and telling regarding the reasons for his suicide. In my more than 30 year forensic practice, I have reviewed suicide notes too many times to count. Mr. Smith's suicide note describes his agony toward the end of his life and links it directly to his degenerating physical state, and in particular, to pain. As he stated at the top of his note, "Pain has taken over my mind and body."

The question before us is what was Mr. Smith's state of mind in the last year of his life? Did he kill himself impulsively or did he progressively become more depressed and plan to take his life? Was Mr. Smith on notice to himself that physicians could no longer help him to relieve his pain making him hopeless?

My answer to these rhetorical questions is yes. There is nothing impulsive about being in chronic pain for more than two years, being diagnosed with depression in 2003, being treated with two antidepressants but not for a sufficient period of time to be effective, and being told by one's physicians that nothing more can be done to alleviate pain described by Mr. Smith as excruciating. Mr. Smith was clinically depressed. It can be argued by experts what kind of depression this was, but without question, whether diagnosed by physicians or recognized by his family, he had a mood disorder that occurred before he ever took Neurontin. If one consults the DSM-IV, there is more than one way to diagnose a depression. One can describe Mr. Smith as

having a major depression, recurrent, or one could describe Mr. Smith as having a mood disorder due to chronic pain. Either way, Mr. Smith was depressed and his untreated depression and chronic pain led to his suicide. It is well known that geriatric patients with depression are the least likely of all patient groups to be diagnosed properly and treated appropriately.[1] Moreover, families have a significant difficulty with the burden of dealing with the depression in elderly patients and often fail either to recognize it or get appropriate treatment for their loved one.[2] Therefore, whether at the family level or physician level, depression in the older adult is often ignored, not recognized, or improperly treated.[3]

1. Blazer, D.G.: Chapter 37. Treatment of seniors. In: Hales, R.E., Yudofsky, S.C. and Gabbard, G.O. (Eds). *The American Psychiatric Publishing Textbook of Psychiatry*, 5th edition, Washington, D.C., American Psychiatric Publishing Inc., 2008.
2. Billig, N.: Attitude and burden in families of depressed elderly patients: Strategies for Care. *Southern Medical Journal.* 84:225-228, 1991.
3. Lawhorne, L.: Depression in the older adult. *Primary Care.* 32:787-792, 2005.

## THE NEURONTIN LABEL WAS AND IS APPROPRIATE

As discussed, there is no reliable scientific data to support the conclusion that Neurontin causes suicide. The FDA meta-analysis does not provide that Neurontin causes suicide. In fact, the Neurontin-specific data show that there is no statistically significant increased risk of suicide with Neurontin. The work of Dr. Robert Gibbons confirms this conclusion. Therefore, there is no basis upon which Pfizer should have changed its warning with respect to a risk of suicidal thinking or behavior. In my opinion as a board-certified psychiatrist who has and continues to prescribe Neurontin, the label is adequate to apprise prescribing physicians of the risks and benefits of the drug.

## PLAINTIFFS' CASE-SPECIFIC EXPERT OPINIONS ARE FLAWED

Dr. Trimble has testified that Mr. Smith committed suicide as an "impulsive act." In contrast, plaintiffs' other expert, Dr. Ronald Maris states in his report that Mr. Smith's suicide was not impulsive.

Dr. Maris has stated on page 22 of his report that, "Richard was a low moderate suicide risk, absent gabapentin ingestion. Suicides tend to have most, if not all, of the suicide risk factors." Dr. Maris goes on to state on page 23 of his report, "Richard Smith did not kill himself because of his chronic physical pain." Interestingly, Dr. Maris states on page 24 of his report, "Most people 'work' at becoming a suicide. For example, they have to acquire the ability to inflict lethal self-injury."

Actually, Dr. Maris' protestations aside, this is exactly what happened to Mr. Smith; he did work at his suicide. He began talking about suicide as an option for his chronic and unrelenting pain beginning in May 2003, when his daughter quoted him as saying he wished he could die because

of pain and depression. As his pain level increased, so did his depression and hopelessness, culminating when he was told that he must simply learn to live with his pain because additional operative intervention was out of the question.

If I am interpreting Dr. Trimble's report, and more particularly his deposition, correctly, it seems to me that Dr. Trimble concludes that since Neurontin is an intervening variable, added at a time before Mr. Smith's death, this proves a causal link between Mr. Smith's use of Neurontin and his suicide. In my judgment, there are two important defects in Dr. Trimble's analysis. The first defect is he does not adequately consider alternative explanations for Mr. Smith's suicide. The second defect is there is no published data, among peer reviewed publications, that demonstrates a causal link between the use of Neurontin and the completion of suicide (nor does the FDA analysis provide such support). With regard to alternative explanations, Dr. Trimble's lack of knowledge of risk factors for suicide in white male elderly persons is demonstrably lacking. For example, Dr. Trimble is not aware that chronic pain is itself a risk factor for suicide. Moreover, his deposition repeatedly demonstrates that he lacks a working knowledge of contemporary psychiatric practice in the United States and he is particularly lacking in understanding of psychiatric nosology and diagnostic terminology of mood disorders and depression in the United States – e.g., Dr. Trimble had never heard of and did not know what "Lexapro" is. In my judgment, these defects, and the others I have noted above, have led to erroneous conclusions from Dr. Trimble regarding Mr. Smith's suicide.

With regard to Dr. Maris, one glaring flaw with his opinion and his methodology is the fact that he has misused his own suicide model that he published in his textbook titled "Comprehensive Textbook on Suicide." When he published the book, "medication" was listed as a protective factor for suicide. Now, for his theory and testimony in this case , he has moved "medication," and specifically Neurontin, into the risk factor category. His testimony is the same in this case as it is in the other cases in which he testifies: Neurontin was the "tipping factor." This opinion is contrary to the evidence, which shows that Mr. Smith's suicide was the result of increasingly severe pain with no options for treatment, which caused depression, and ultimately hopelessness.

Also, Dr. Maris holds himself out on the first page of his report as a special expert "in the role of psychiatric drugs and suicide outcome." He states this notwithstanding that his academic training is not consistent with his assertion. Dr. Maris has not completed an undergraduate degree in any area of the biological or physical sciences. His curriculum vitae, posted by him on the internet, reveals that he received a bachelor of arts degree in 1958 from the University of Illinois at Urbana in philosophy, English, and chemical engineering.

His master's degree was also received at the same University of Illinois campus in 1961 in philosophy, logic, and history of science. His Ph.D. from the University of Illinois was in social psychology with a minor in philosophy. Thus, Dr. Maris, while a noted suicidologist, is a suicidologist by way of philosophy and social psychology. He also spent one year of graduate scholarship in philosophy and religion at Harvard University but did not receive a degree. Thus, again with all due respect to Dr. Maris, his testimony by way of his report about pharmacology and neurochemistry is poorly supported by his competency-based academic credentials. Further review of his curriculum vitae indicates that he has taught at the University of South Carolina

Medical School, the University of Pittsburg School of Medicine, and the University of Calgary School of Medicine, as well as a year at the University of Vienna School of Medicine in Europe. However, none of these professorships resulted in a competency-based diploma and he has no documented board certifications in any medical specialty that sets him out as an expert in depression or psychopharmacology.

There is only one professional discipline in the world that is certified by training, experience, and certification examination, to manage suicidal persons.   That is the medical specialty of psychiatry.  Management of suicidal persons is a core part of the four-year psychiatric residency curriculum in all medical schools in the world, and particularly in the United States.   If a psychologist, internist, surgeon, obstetrician-gynecologist, or sociologist, is attempting to assist an acutely suicidal person and does not refer the individual to an emergency department or consult with a psychiatrist, the treatment is negligent, substandard, and not within the standard of care for managing suicidal persons.   Thus, while I respect Dr. Maris' broad contributions to suicidology (the study of suicide), I do not respect his claims as an expert in whether or not Neurontin causes chemical changes leading to suicide in the human brain.

In particular, Dr. Maris' statements in his report regarding neurochemistry, neuropharmacology, and the pharmacology of gabapentin are in error.  They are in error because his data is old and inconsistent with the modern knowledge about the pharmacology of Neurontin.   He is particularly influenced by his blind obedience to the opinions of Dr. Trimble.

There is no contemporary world medical evidence that Neurontin (gabapentin) causes suicide. To argue from a general causation standpoint that purported and putative neurochemical changes in the brain to the specific act of suicide by Mr. Smith falls shorts by both of these experts.   It cannot be concluded that Neurontin is causally related to suicide, nor can it be concluded that Neurontin caused or contributed to Mr. Smith's suicide.   The following references are for background information regarding suicide ideation and the case specific experts:

1. Levi, Y., et al:  Mental pain and its communication in medically serious suicide attempts:  an "impossible situation." *Journal of Affective Disorders.* 2008, April 22nd (Epub ahead of print).
2. Lester, D. and Walker, R.L.:  Hopelessness, helplessness, and haplessness as predictors of suicidal ideation. *Omega (Westport).* 55:321-324, 2007.
3. Chioqueta, A.P. and Stiles, T.C.:  The relationship between psychological buffers, hopelessness, and suicidal ideation:  Identification of protective factors. *Crisis.* 28:67-73, 2007.
4. Maris, R.:  Curriculum vitae, internet site visited September 12, 2008.
5. wilderdom.com/research/meta-analysis.html, internet site visited October 31, 2008.

I have reviewed the following records, which in part with my training, education, research, analysis, and experience, form the material basis for my conclusions noted further in this report

and I expressly reserve the right to review and rely on subsequent materials, literature, and reports submitted by other experts in this litigation.

1.  Briefing Document for the July10, 2008 Advisory Committee Meeting to Discuss Antiepileptic Drugs (AEDs) and Suicidality.  From Russell Katz, M.D.
2.  Expert report of Janet Arrowsmith-Lowe, M.D.
3.  Expert report of Robert Gibbons, Ph.D. and Supplements to Same
4.  Expert report of Douglas Jacobs, M.D.
5.  Expert report of Anthony Rothschild, M.D.
6.  Expert report of Alexander Ruggeri, M.D.
7.  Expert report of Gerald Sanacora, M.D., Ph.D.
8.  Expert report of Charles Taylor, Ph.D.
9.  Expert report of Sheila Weiss Smith, Ph.D.
10. Deposition of Ruth Smith 4/12/2007
11. Deposition of Ruth Smith 4/13/2007
12. Deposition of Edward Mackey, M.D. May,23, 2007
13. Deposition of Frank Berklacich M.D. June 7, 2007
14. Deposition of Chris L. Wood, DDS 6/7/2007
15. Deposition of Pamela Krancer, APN 6/8/2007
16. Deposition of Paul R. McCombs, III, M.D. 6/8/2007
17. Deposition of Steward Stowers, M.D. 6/28/2007
18. Deposition of James R. Cato, M.D. 6/29/2007
19. Deposition of Carl R. Hampf, M.D. 8/6/02007
20. Deposition of Drew Charlton 10/3/2007
21. Deposition of Cindy Smith-Charlton 10/3/2007
22. Deposition of Arnold Eugene Lawson 10/4/2007
23. Deposition of Gayle Lawson 10/4/2007
24. Deposition of Lewis Wesley Carnahan, II Pharm. D. 10/23/2007
25. Deposition of Buford Hoskins 10/24/2007
26. Deposition of Sherri Hoskins 10/24/2007
27. Deposition of Danny Satterfield 2/7/2008
28. Deposition of Gary Wayne Biggs, SR 2/8/2008
29. Deposition of Dr. Feng Li, M.D., J.D., Ph.D. 2/8/2008
30. Action Quick Corporation
31. Baptist Hospital
32. Nashville Police Department Records
33. Dr. Frank Berklacich
34. Cardiology Group of Middle TN
35. Centennial Medical Group
36. Center For Medicare and Medicaid Srcs
37. Colon + Rectal Surgery
38. Eckerd Pharmacy
39. Forensic Medical
40. Dr. Carl Hampf
41. Dr. William Harwell

21

42. Heart & Vascular Clinic
43. Heritage Medical Association
44. Loden Vision Center
45. Nashville Orthopedic Associates
46. National Health Laboratories Lab Report
47. Neurological Surgeons, P.C.
48. Neurosurgical Associates
49. Otolaryngology Associates of TN
50. Outpatient Diagnostic Center
51. Spaulding & Nesbitt Urology Clinic
52. Specialized Assays
53. St. Thomas Hospital
54. TN Orthopedic Alliance
55. University Medical Center
56. Vanderbilt Patient Accounting
57. Vanderbilt University Medical Center
58. Willowbrook Home Care Agencies
59. Dr. Christopher Woods
60. Expert report of Cheryl Blume, Ph.D.
61. Expert report of Dan W. Brock, Ph.D.
62. Expert report of Sander Greenland, Dr., P.H.
63. Expert report of Charles King, III
64. Expert report of Stefan Kruszewski, M.D.
65. Expert report of Bentson McFarland, M.D., Ph.D.
66. Expert report of Robert Roth, Ph.D.
67. Expert report of Michael Trimble, M.D.
68. Expert report of Ronald W. Maris
69. Eight CDS of the Smith Family
70. Maris' Psychological Autopsy & Death Investigation
71. Photos from the eight CDS
72. Depositions of Dr. Ronald Maris and Dr. Michael Trimble

In addition, the following sources were reviewed for background information in forming my specific causation conclusions:

1. Meeks, T.W., et al: Chronic pain and depression among geriatric psychiatry inpatients. *International Journal of Geriatric Psychiatry*. 23:637-642, 2008.
2. Fishbain, D.A.: Current research on chronic pain and suicide. *American Journal of Public Health*. 86:1320-1321, 1996.
3. Arehart-Treichel, J.: Some chronic pain patients at increased suicide risk. *Psychiatric News*. 41:25, 2006.
4. Magni, G., et al: Suicidality and chronic abdominal pain: An analysis of the Hispanic Health and Nutrition Examination Survey (HHANES). *Pain*. 76:137-144, 1998.

5.    Smith, M.T., et al: Suicidal ideation in outpatients with chronic musculoskeletal pain: An exploratory study of the role of sleep onset insomnia and pain intensity. *Clinical Journal of Pain.* 20:111-118, 2004.

6.    Ernst, C.L. and Goldberg, J.F.: Anti-suicide properties of psychotropic drugs: A critical review. *Harvard Review of Psychiatry.* 12:14-41, 2004.

7.    Theodoulou, M., et al: Pain and deliberate self-harm: An important association. *Journal of Psychosomatic Research.* 58:317-320.

8.    Lépine, J.P. and Briley, M.: The epidemiology of pain and depression. *Human Psychopharmacology.* 19 (Suppl. 1):S3-S7.

9.    Smith, M.T., et al: Suicidal ideation, plans, and attempts in chronic pain patients: Factors associated with increased risks. *Pain.* 111:201-208, 2004.

10.   Juurlink, D.N., et al: Medical illness and the risk of suicide in the elderly. *Archives of Internal Medicine.* 164:1179-1184, 2004.

11.   Born, C., et al: Newer prophylactic agents for bipolar disorder and their influence on suicidality. *Archives of Suicide Research.* 9:301-306, 2005.

12.   McFarlane, G.J., et al: Widespread body pain and mortality: Prospective population based study. *British Medical Journal.* 323:662-665, 2001.

13.   Tang, N.K. and Crane, C.: Suicidality and chronic pain: A review of the prevalence, risk factors, and psychological links. *Psychological Medicine.* 36:575-586, 2006.

14.   Kalinin, V.V.: Suicidality and antiepileptic drugs: Is there a link? *Drug Safety.* 30:123-142, 2007.

15.   Reith, D.M. and Edmonds, L.: Assessing the role of drugs and suicidal ideation and suicidality. *CNS Drugs.* 21:463-472, 2007.

16.   Segatore, M.: Understanding chronic pain after spinal cord injury. *Journal of Neuroscience Nursing.* 26:230-236, 1994.

17.   Roy, R.: Chronic pain, Loss, and suffering: *A Clinical Perspective.* University of Toronto Press, Toronto, 2004.

18.   McKeown, R.E., et al: U.S. suicide rates by age group, 1970-2002: An examination of recent trends. *American Journal of Public Health.* 96:1744-1751, 2006.

19.   Hatai, G., et al: Hopelessness in patients presenting to their family physician. *Psychiatry in Hungary.* 23:34-41, 2008.

20.   Levi, Y., et al: Mental pain and its communication in medically serious suicide attempts and "impossible situation." *Journal of Affective Disorders.* 2008, April 22 [Epub ahead of print].

21.   Rudd, M.D.: Suicide warning signs in clinical practice. *Current Psychiatry Reports.* 10:87-90, 2008.

22.   Pompili, M., et al: Depression, hopelessness, and suicide risks among patients suffering from epilepsy. *Annals Ist Super Sanita.* 43:425-429, 2007.

23.   Burgy, M.: Phenomenological investigation of despair in depression. *Psychopathology.* 41:147-156, 2008.

24.   Lester, D. and Walker, R.L.: Hopelessness, helplessness, and haplessness as predictors of suicidal ideation. *Omega (Westport).* 55:321-324, 2007.

25.   Chioqueta, A.P. and Stiles, T.C.: The relationship between psychological buffers,

hopelessness, and suicidal ideation: Identification of protective factors. *Crisis*. 28:67-73, 2007.

26. Grewal, P.K. and Porter, J.E.: Hope theory: A framework for understanding suicidal action. *Death Studies*. 31:131-154, 2007.

27. Hirsch, J.K. and Conner, K.R.: Dispositional and explanatory style optimism as potential moderators of the relationship between hopelessness and suicidal ideation. *Suicide and Life Threatening Behavior*. 36:661-669, 2006.

28. McMillan, D., et al: Can we predict suicide and non-fatal self-harm with the Beck Hopelessness Scale? A Meta Analysis. *Psychological Medicine*. 37:769-778, 2007.

29. Sokero, P., et al: Decline and suicidal ideation among patients with MDD is predicted by decline in depression and hopelessness. *Journal of Affective Disorders*. 95:95-102, 2006.

30. Pompili, M., et al: Hopelessness and suicide risks emerge in psychiatric nurses suffering from burnout and using specific defense mechanisms. *Archives of Psychiatric Nursing*. 20:135-143, 2006.

31. Abbey, J.G., et al: Hopelessness at the end of life: The utility of the hopelessness scale with terminally ill cancer patients. *British Journal of Health Psychology*. 11(Pt 2):173-183, 2006.

32. Tang, N.K. and Crane, C.: Suicidality and chronic pain: A review of the prevalence, risk factors, and psychological links. *Psychological Medicine*. 36:575-586, 2006.

33. MacLeod, A.K., et al: Hopelessness and positive and negative future thinking in parasuicide. *British Journal of Clinical Psychology*. 44(Pt 4):495-504, 2005.

34. Chapman, A.L., et al: Factors associated with suicide attempts in female inmates, acgemony of hopelessness. *Suicide and Life Threatening Behavior*. 35:iii-vii, 2005.

35. Miller, M. and Hemenway, D.: Guns and suicide in the United States. *New England Journal of Medicine*. 359:989-991, 2008.

36. Avorn, J.: Drug warnings that cause fits. Communicating risks in a data-poor environment. *New England Journal of Medicine*. 359:991-994, 2008.

37. Weiner, R.: Pain Management: A Practical Guide for Clinicians

38. Schiffer, R and S. Rao and B. Fogel: Neuropsychiatry

Respectfully submitted,

Robert P Granacher, MD, MBA

Robert P. Granacher, Jr., M.D., M.B.A.
Distinguished Life Fellow of The American Psychiatric Association

RPG/lfp

24