# EXHIBIT 12

# PROFESSIONAL PSYCHIATRIC ASSOCIATES
ONE WASHINGTON STREET, SUITE 304
WELLESLEY HILLS, MASSACHUSETTS 02481-1706
TEL (781) 239-0071
FAX (781) 235-6390

Douglas G. Jacobs, M.D.
E-mail: drj@djacobsmd.com

November 10, 2008

Ms. Lori McGroder
Shook, Hardy & Bacon
2555 Grand Boulevard
Kansas City, MO  64108

Re:  *Smith v. Pfizer*

Dear Ms. McGroder,

At your request, I have reviewed the following information in the above named case (see attachment A).

In addition, these are the materials reviewed subsequent to my report of Dec 20, 2007:

FDA Alert: Suicidality and Epileptic Drugs – 01/31/08

Supplemental Expert Report of Robert D Gibbons, PhD – 07/11/08 and 11/05/08

Daubert Hearing, Days 1, 2 & 3 – July 2008

FDA Advisory Committee – 07/10/08

Relevant Literature

## SUMMARY OF OPINIONS

1.) There is no reliable scientific evidence that Neurontin causes or contributes to suicidal thinking and behavior. The FDA Alert and the Advisory Committee proceeding do not change my opinions that Neurontin is safe and effective as labeled and that Neurontin does not increase the risk of suicidal thinking and behavior. In fact, the FDA's meta-analysis as it relates to Neurontin data demonstrates that there is no statistically significant increased risk of suicidality for Neurontin. Consequently, there was no basis on which Pfizer should have added a warning related to suicide with Neurontin. It is my opinion that the labeling for Neurontin is adequate to advise doctors of the risks associated with its use.

2.) Richard Smith had multiple Risk Factors for suicide that pre-dated his use of Neurontin and that substantially contributed to and resulted in his suicide. Neurontin did not cause or contribute to Mr. Smith's suicide.

3.) Richard Smith's Risk Factors for suicide included:

   1. Age: Mr. Smith was a 79-Year-Old white male. Males of this age and older have the highest rate of suicide,

   2. Richard Smith had experienced 2 episodes of suicidal ideation (that are documented) prior to the ingestion of Neurontin.

   3. Richard Smith had a history of being treated for depression with an anti-depressant in 2003. Mr. Smith did not seek or receive treatment for his depression in 2004.

   4. Richard Smith had multiple orthopedic surgeries since 1991, requiring multiple joint replacements, including back surgery.

   5. As a consequence of the surgeries and underlying osteoarthritis; Richard Smith developed chronic pain and immobility

   6. By March 1, 2004, Mr. Smith's chronic pain and functional impairments resulted in suicidal ideation. By March 9, 2004, before he ever ingested Neurontin, Mr. Smith's family was concerned about his mental state and his physician suggested psychiatric consultation. Mr. Smith was never seen or treated by a psychiatrist at any time before his suicide.

2

7. Approximately 6 weeks prior to his suicide, Richard Smith was told he was no longer a candidate for surgery and that he would have to learn to manage his pain. During the months of April and May of 2004 Richard Smith was not responding to physical therapy and his pain continued. Mr. Smith became hopeless and felt useless as a result of his chronic and debilitating pain and the lack of options for treatment and pain relief.

It was the combination of these risk factors and not Neurontin that fully explain the suicide of Richard Smith.

## QUALIFICATIONS

I am an Associate Clinical Professor of Psychiatry at Harvard Medical School. I maintain an active clinical psychiatric practice in Wellesley, Massachusetts, suburbs of Boston. I have edited three books and numerous papers on suicide. I am the editor of the textbook, the <u>Harvard Medical School Guide to Suicide Assessment and Intervention</u>, which was published in 1999. I have organized and have led academic seminars, locally for Harvard faculty and nationally for other mental health professionals, on the subject of suicide and related psychiatric subjects (*e.g.*, depression). I currently teach Harvard medical students, who are pursuing careers in nonpsychiatric disciplines. In addition, I established a unique non-profit organization, Screening for Mental Health, Inc. (SMH), which is devoted to screening for, and providing education about, a variety of mental health disorders, including depression. The programs of SMH are offered to a variety of healthcare clinicians, mental health professionals, and primary care clinicians.

I received my undergraduate degree from Trinity College in Hartford, Connecticut, in 1967. I received my medical degree from the University Of Pennsylvania School Of Medicine in 1971. Next, I completed a three-year residency (1972-75) in adult psychiatry at the Massachusetts Mental Health Center, a Harvard Medical School teaching program. I was board certified by the American Board of Psychiatry and Neurology in 1977.

As part of my clinical practice, I am on the staff of several psychiatric hospitals in the greater Boston area, including McLean Hospital in Belmont, Massachusetts. I have been a member of the Harvard Medical School faculty since 1975. I am a member of several professional organizations, including the American Psychiatric Association and the American Association of Suicidology.

I have more than 30 years experience evaluating, treating and consulting on suicidal patients. Between 1975 and 1983, I served as Director of Psychiatric Emergency Services at The Cambridge Hospital, where I was responsible for evaluating and supervising 3,000 psychiatric emergencies per year. In this patient group, there was approximately one suicide attempt per day. In my hospital experience and private practice since 1975, I have developed expertise in examining, understanding, and treating a diverse range of suicidal patients.

I am the founder of the Harvard Medical School Suicide Symposium (1981), and directed that symposium for seven years. This symposium remains Harvard Medical School's Department of Continuing Education only postgraduate symposium specifically on the subject of suicide. In 2005, I was the keynote speaker on the subject of Adolescent Suicide.

I am the founder of National Depression Screening Day (NDSD) and its sister mental health screening programs, which are endorsed by the American Psychiatric Association. National Depression Screening Day is held each October during Mental Illness Awareness Week, which was established by the U.S. Congress. Since 1991, numerous hospitals, health centers, libraries, schools, primary care offices, and other practitioners have provided free depression screenings across the country on the designated day. As one of the programs of the non-profit Screening for Mental Health organization, this screening program is funded by federal and state government agencies, corporations, foundations, as well as by registration fees from our participating healthcare facilities and organizations. When I initiated the program fifteen years ago, it was the first time that the concept of large-scale mental health screening had been attempted. The program has been recognized by mental health professionals, the media, mental health advocacy groups and the federal government for its success in reaching people with depression and other disorders who can benefit from treatment, but who had not sought it in the past.

4

In terms of the primary care program, relevant professional organizations that serve as sponsors to this program are: the American Chronic Pain Association, the American College of Physicians, and the American Medical Association.

I was appointed by the American Psychiatric Association as Chairperson of the Workgroup to develop practice guidelines for the assessment and treatment of the patient with suicidal behaviors. The guidelines were published in 2003 and 2004.

In terms of awards, I received the Massachusetts Psychiatric Society Outstanding Psychiatrist Award in 2004 for advancement of the profession.  In 2007, I received a commendation from the Massachusetts House of Representatives for my work on National Depression Screening Day.

I have been asked by clinicians, hospitals, and school systems to consult when there is a suicidal crisis or in the aftermath of a suicide.  The American Psychiatric Association regularly refers media representatives who request information about suicide and other mental health topics to me for comment and analysis.

In the area of legal matters involving psychiatric disorders, suicide, or murder, I have been qualified by a number of courts as an expert in the specialty of psychiatry, specifically in the field of suicide and the medical treatment of psychiatric disorders and symptoms.  I have testified in both civil and criminal court proceedings and have reviewed cases on behalf of both plaintiffs and defendants. I have also testified before Congress and the FDA on the subject of suicide, principles of causation, and the relationship to pharmaceuticals.

In terms of fees, I charge $500.00 per hour for record review, etc.

**BACKGROUND OF SUICIDE**

"Suicide represents a major national and international public health problem with over 30,000 suicide deaths in the United States and 1 million deaths worldwide each year and every year. The estimated cost to this nation in lost income alone is 11.8 billion dollars per year." (Reference 1)  Suicide is the 11th leading cause of death within the general population (Reference 2) and representing approximately 1.4% of all deaths on an annual basis. (Reference 3) Internationally, there are 1 million suicide deaths every year.  (Reference 3)

Suicide is a multi-factorial event with a variety of conditions and stressors contributing to increased risk. The majority of persons who commit suicide have known risk factors for suicide. (Reference 4) Recognized risk factors for adult suicide include having psychiatric and medical conditions which make every day life more difficult (e.g. affective illness, alcohol / substance use, functional impairment, chronic pain), previous history of suicidal ideation, and being an elderly male. (Reference 5) In general, the more risk factors an individual has, the higher their risk of suicide. Moreover, certain risk factors can act in a synergistic fashion that increases the risk beyond simply adding the factors. "For example, the combined risk associated with comorbid depression and physical illness may be greater than the sum of the risk associated with each in isolation." (Reference 6) Certain psychiatric illnesses are associated with an increased risk for suicide, such as depression which can have an increased risk of suicide ranging from 12 to 20 times the general population. (Reference 6) Pain syndromes have been identified as an independent risk factor having an increased risk for suicide varying from 2 to 3 times (Reference 7, 15 & 16). Persons with functional limitations due to physical illness are known to have an increased risk of suicide. (Reference 8)

Approximately 75% of persons that die by suicide have seen a physician within six months; while 60% have visited a physician within 30 days of their suicide. These findings suggest that suicidal individuals appreciate the issues troubling them and make an effort to see a clinician, but do not or cannot communicate their suicidal thoughts. (Reference 3)

## SUICIDE IN THE ELDERLY WHITE MALE

The following are excerpts taken from the Institute of Medicine's Report, Chapter 9, which is entitled, "Barriers to Effective Treatment and Intervention". "Older men have the highest rates of suicide in the United States; the overall rate of suicide among men over 65 is about 30 per 100,000 population...Older people are less likely to accept a diagnosis of a mental disorder and they are less receptive to treatment than are other adults...Older persons are less likely to use mental health services than are other adults, and older males are less likely than older females. Thus, the demographic group most likely to complete suicide – older men – is the least likely to use services...Clinicians, family members, and older adults report that suicidal ideation and

6

depression are part of the aging process. The vast majority of surveyed Primary Care Physicians think that because of losses in late life, depression is understandable...Untreated or inadequately treated depression in primary care plays a role in suicide of older people. The detection of suicidality in older persons is a major opportunity considering that older people frequently make contact with their Primary Care Physician before suicide. Some studies suggest that up to 70% of older people visit their clinician within 30 days of death...Yet suicidality is complex to recognize in older persons for two reasons: comorbidities and infrequency of contact with mental health specialists...Comorbid chronic illnesses are common in older people, they increase risk for depression and suicide and they make symptom presentation more complicated to disentangle." (Reference 1)

## FDA ALERT AND ANALYSES BY DR. GIBBONS

On January 31, 2008 the FDA issued an alert on suicidality and epileptic drugs; "In the FDAs analysis patients receiving anti-epileptic drugs had approximately twice the risk of suicidal behavior or ideation (0.43%) compared to patients receiving placebo (0.22%) ... the results were generally consistent among the 11 drugs."

The supplemental expert reports of Dr Gibbons specifically responds to this alert highlighting that for Neurontin there were no suicides, no suicide attempts and the relative risk was 1.57 with a confidence interval that demonstrated that the relative risk was not statistically significant. This relative risk is important given that Dr Maris in his report refers to the gold standard of 2.0 as being a relative risk that is significant. Furthermore, the FDA has not determined that there is a causal mechanism between the anti-epileptic drugs and its findings. I am relying upon the expert reports of Dr Gibbons, particularly the analyses that he conducted in his November 5, 2008 report that demonstrate that there is no scientific evidence indicating that Neurontin has an increased risk of suicidal ideation, suicide attempts or completed suicides. In particular, in Dr. Gibbons' pharmacoepidemiologic analysis, the findings indicate that not only is there no increased risk of suicide attempt with Neurontin, but Neurontin may be protective in some treatment groups.

7

## THE ISSUE OF CAUSATION

I have previously submitted a report regarding my opinions as to general causation. My opinions remain the same and include my opinion that there is no new evidence that indicates a causative relationship between Neurontin and suicide.

## THE SUICIDE OF RICHARD SMITH-A CASE OF CHRONIC PAIN AND HOPELESSNESS

Richard Smith was a 79 year old married male father of 5 with one daughter who was dying of cancer. As an overview, Richard Smith suffered from chronic pain beginning in the early 1990s. He had sleep difficulties subsequent to the pain. As the pain increased, it began to affect his mood as evidenced by a self report in February of 2003 where he said he was depressed "because of pain and depression." In addition, when pain returned subsequent to surgery in 2003, he reported to one of his daughters that he "wishes he could die." In addition, he had communicated suicidal ideation to Cindy Smith on March 1, 2004, as indicated in the police report. There was a history of treatment for depression prior to Richard Smith's Neurontin use as evidenced by the records and testimony of Dr. Cato.

## REVIEW OF MEDICAL RECORDS

A review of Richard Smith's medical records indicates that he began to suffer from joint pain as far back as 1989. In 1990, Mr. Smith went underwent prostate surgery and was noted to have left hip pain. He was told to do flexibility and strengthening exercises (at a later date he required left hip replacement). It was further noted that he had right heel pain, and that he was diagnosed to have degenerative disease of the right knee. By 1992 there was a progression of knee pain and a diagnosis of severe degenerative arthritis of both knees. At that time he was not interested in knee replacement. In 1993, he did consent to have has his first joint replacement (left knee replacement). The surgery was successful; Hydrocodone was prescribed, and was accompanied by physical therapy. It is significant that in 1993, physical therapy was noted to be helpful (this is relevant to the understanding of the case in that in 2004 when Richard Smith had physical therapy it was noted that there was no change in the level of pain (which was characterized as severe) as a result of the physical therapy). In 1995, it was noted that Richard Smith had

8

discomfort in his jaw, and now was diagnosed with arthritis in his right knee.  Furthermore, it was noted that he had right hip pain with severe arthritis with a recommendation that there would be eventual replacement.  In 1996, he was noted to have low back pain and further progression of right hip pain resulting in right total hip replacement.  In 1997, he continued to have right knee pain and replacement was recommended.

In 1998, records indicate that Mr. Smith was "looking forward to another grass cutting season" but that he was having increasing and severe pain in his right knee.  This resulted in a right total knee replacement. He returned to work, but only half time.  This is noteworthy given that Dr. Trimble stated in his report that Mr. Smith worked full time up until the time of his death.  Dr. Trimble did acknowledge in his deposition that this was an incorrect statement.  The issue about grass cutting is relevant given that in 2003 and 2004 Mr. Smith was no longer able to cut the grass.  It has been demonstrated that when physical illness results in functional limitations there is an increase in suicide risk. (Reference 8)  In 1999, records indicate that Mr. Smith required analgesics and that he was now complaining of rib and shoulder pain.  In 2000, Richard Smith was diagnosed with lumbar syndrome and was noted to be on pain medications regularly.  Also during this year he had left knee flare up.

In 2001, Mr. Smith had a rotator cuff tear and was noted to have pain under his shoulder.  In addition, he received the diagnosis of degenerative joint disease of the spine.  As of this date, Mr. Smith had had right hip and bilateral knee replacements.  He was noted also to have neck pain, chest pain, vertigo, poor sleep and the diagnosis of fibromyalgia was considered.  Fibromyalgia is a commonly encountered disorder characterized by "chronic widespread musculoskeletal pain, stiffness, paresthesia, disturbed sleep, and easy fatigability along with multiple painful tender points which are widely and symmetrically distributed."  It is also associated with impaired memory, concentration, and psychiatric conditions such as less severe forms of depression and anxiety.  Amitriptyline was prescribed to Mr. Smith, which is a standard recommendation for fibromyalgia, sleep disturbance and symptoms of depression.  It is interesting that at this time Neurontin was recommended to Mr. Smith, but he never filled the prescription.  A major textbook in medicine recommends the use of Neurontin to reduce the pain in fibromyalgia. (Reference 9)  It is known that "approximately 30% of patients with fibromyalgia fit a

psychiatric diagnosis, the most common being depression and anxiety…" (Reference 9)  Thus, as early as 2001, it was noted that Richard Smith was experiencing depressive like symptoms.

In 2002, Richard Smith reported left shoulder and left knee pain.  In 2003, subsequent to an accident, Richard Smith was reported to have low back pain.  He had neurologic symptoms including decreased reflexes, motor weakness, and numbness and tingling.  The differential diagnosis was a disc versus spinal stenosis.  X-rays revealed mark central canal stenosis.  He was now reporting that the pain was impairing his sleep.  There were frequent episodes of joint pain even in the replaced joints.  He reported in a self questionnaire that "he is depressed because of pain and lack of sleep."  Mr. Smith also endorsed that his standing and walking endurance were quite limited.  He rated his pain as an 8 on a 0 to 10 scale.  He stated that tingling, and pins and needles were present in both legs with some numbness as well.  At times he had difficulty walking secondary to subjective weakness.  In addition to standing and walking, his symptoms were aggravated with coughing, sneezing, prolonged sitting, even lying down or physical activity.  It was not improved with any type of positional movements.  There is also an entry in record (64 CMD-00152) where it refers to pain intensity being a five that is brought on by any walking or yard work.  This is relevant given that one of Mr. Smith's pleasures was cutting the grass.  Insomnia is reported and that he takes sleeping aids.  Pain has awakened him, and although he takes pain pills "they really did not help."  Records further indicate that pain was encroaching on his work and lifestyle and was requiring ESI (epidural steroid injection).  This was as of March of 2003.  There was much ambivalence about whether or not to proceed with surgery.  It is at that point that Ruth Smith reports the following "he is in so much pain he is out of his mind."

After much ambivalence and even cancelling the surgery, Richard Smith decided to have surgery by Dr. McCombs.  He chose to have the surgery because "he was in so much pain."  He had decompressive lumbar laminectomy.  It is significant that one month after the surgery he complained of low back pain and leg pain, and he was placed back on opioid analgesics.  It is noted in the medical records in May, 2003 that Richard Smith said "wishes he could die because of pain and depression-a psychiatric evaluation is recommended."  This is significant for a number of reasons.  First, this is a statement that meets the criteria for suicidal ideation

(Reference 10).  In 2003, Richard Smith was again given a prescription for Neurontin in the context of a return of symptoms following surgery, however, as in the past he did not fill it. The occurrence of suicidal ideation subsequent to the development of pain is significant in this case because Mr. Smith demonstrated the same (or worse) symptoms and suicidal ideation in 2004, (March 1), when pain again returns to Richard Smith and he is subsequently told that he is no longer a candidate for surgery. There is an important visit to Dr. Cato in May of 2003. At that time, Mr. Smith's chief complaint was anxiety and depression and post laminectomy syndrome "having a lot of pain." Dr. Cato prescribes Lexapro and Desipramine. Dr. Cato testified that he prescribed Lexapro for depression and anxiety. This record is extremely important to the facts of this case. Dr. Maris opines that Richard Smith was never prescribed psychotropic drugs to treat a psychiatric condition prior to Neurontin being taken in March of 2004. This is clearly wrong. Dr. Trimble states that Richard Smith was never diagnosed with depression or prescribed any antidepressants. Again, this statement is also wrong based upon the records and testimony of Dr. Cato. Records indicate that Mr. Smith took the Lexapro for about a month and stopped it because he had improved. It should be noted that Dr Trimble did not know that Lexapro was an antidepressant, despite having ample opportunity in this case to review the records of Richard Smith and research any medications that Richard Smith was prescribed in the context of a presentation of depression. In 2004, Mr. Smith's condition takes a turn for the worse. For the first time he is noted to have increased blood pressure which can develop in persons experiencing both pain and stress. He sees Dr. Shell in consultation because he has had persistent pain in the lower back and was developing radiating pain down the back of both legs that was worse with walking. He was diagnosed with spinal stenosis and sciatica. The myelogram showed incomplete bony fusion of his surgery. Having both back and knee pain, he was now noted to have degenerative changes in the wrist and shoulders. He is then referred to Dr. Mackey for a second opinion. Dr. Mackey initially recommends rehab, and upon return visit patient is noted to have a lot of "back and radicular pain." While there is an increase in his level of pain and multiple doctor visits, Richard Smith reports to his daughter, Cindy Smith, on March 1 that he has had suicidal ideation. This is referenced in a police report, although denied by Cindy Smith at her deposition. This is significant given that this would be Richard Smith's second episode of suicidal ideation prior to March 9, 2004, when he first filled a prescription for Neurontin. These facts directly contradict statements by Dr. Maris in his report where he

11

indicates that the patient had de novo suicidality in response to Neurontin, although Dr. Maris agreed during his deposition that Mr. Smith had suicidal ideation on March 1, 2004.

On March 9, 2004, records of Dr. Mackey indicate that Mr. Smith was reporting knee pain and worsening bilateral leg pain. The pain has increased to the point that he is getting around in a wheelchair. This is contested by Cindy Smith at her deposition as to the significance of the wheelchair. Dr. Mackey notes that Mr. Smith is not sleeping well. The possibility of surgery was discussed during this visit. "His daughter raised the concern though about whether or not there are some issues going on and we are going to go ahead and have him evaluated psychiatrically to make sure that there is not a dementia type issue playing into this as well." Neurontin is prescribed and filled by Mr. Smith for the first time on March 9, 2004. Significantly on March 24, 2004, Mr. Smith visits Neurosurgical Associates 'at the request of his wife." He reports bilateral leg pain that radiates down his buttocks-perineal area, and interior part of his thigh, down to his knee. There is reference to Mr. Smith attempting to see Dr. Mackey and Dr. Howell. This is consistent with the observation that Mr. Smith was doctor shopping. Doctor shopping is relevant in the understanding of the case of Mr. Smith given that it is consistent with a sign of desperation. Nurse Practitioner Krancer recommends ESI and "to start Neurontin 300 mgs by mouth 3 times a day." Apparently Nurse Krancer did not know that Mr. Smith was already on Neurontin. He will have follow up with Dr. McCombs who was his original surgeon. On March 29th, Mr. Smith is seen by Dr. Mackey who makes reference to the issue of doctor shopping given that the family wanted him to operate on Mr. Smith. When Dr. Mackey learned that Mr. Smith was still seeing Dr. McCombs he informed the family that he would be "happy to take care of him, but we need to prevent his doctor shopping of going from one doctor to another. I have recommended that they go back to see Dr. McCombs and complete the discussion about possible revision surgery though I am not sure this is necessarily what he needs to have done. An alternative I suggested would be to be referred to one of the tertiary spine centers such as the Mayo Clinic or the Cleveland Clinic." During this time frame, another neurosurgeon, Dr. Howell, also refuses to see Mr. Smith.

An important and critical visit in this case occurs on March 31, 2004. After being to a number of surgeons, including Dr. Mackey, Mr. Smith returns to see the original surgeon, Dr. McCombs.

After carefully evaluating a number of medical tests, Dr. McCombs determines that "he is not a candidate for any type of operative intervention. He will be treated conservatively." Ruth Smith testified at her deposition that Mr. Smith was told he would have to learn to manage his pain. Over the next five weeks Richard Smith gets no relief from his pain. He had contacted Dr. McCombs office on May 5, 2004, complaining of pricking-sticking feeling in buttocks and legs. He states that "he is taking Advil, Neurontin, Lortab with no relief. He is having physical therapy at present, but that hasn't helped so far." Richard Smith is recommended to have ESI. In a handwritten note Richard Smith indicates that he is discouraged that all that is being recommended for him is ESI. Physical therapy visits on April 14th-April 30th and on May 6, 2004, indicate that the physical therapy either only helped for a short time or that it resulted in no change in his severe pain. On May 10, 2004, Richard Smith had visited his dentist, Christopher Woods. Dr. Woods wrote a letter post suicide in which he makes reference to Mr. Smith's hopelessness, his attempts of getting second opinions, and his feelings of uselessness.

There is some question whether Mr. Smith took his Neurontin as prescribed. At the time of his death, there were pills left in the bottle, which would not be expected if he took them as prescribed. Although samples were given to Mr. Smith, there is no evidence he took any of the samples. Finally, Mr. Smith's physician, Dr. Mackey, told him to stop taking the medication if it was not working for him. (Deposition, p. 64) He reports on May 5 to Dr. McCombs office that Neurontin is not helping him, and again to the dentist on May 10. Based on the instructions from his doctor and the comments he made, it is reasonable to expect that Mr. Smith may have stopped taking Neurontin at some point prior to his suicide.

On May 13, 2004 Richard Smith committed suicide with a firearm. His suicide note stated the following; "Pain has taken over my mind and body. I need back surgery, left and right rotator cuffs, right bicep torn, back surgery to correct pain in the legs. Forgive me; I cannot go on like this. I cannot have my body, the temple of the Holy Spirit, cut on anymore. I have talked to God all night and he understands."

13

## A SUMMARY OF MEDICAL RECORDS FROM 1989-2002

It is important to note that Dr. Maris begins the chronology of medical treatment beginning in 2003 and had opined that Richard Smith was a relatively healthy elderly male as of this time. The records clearly indicate the opposite. By the end of 2002, Richard Smith had multiple orthopedic interventions resulting in multiple joint replacements. He had been prescribed analgesics for a considerable length of time. He was only able to work half time. Significantly, the diagnosis of fibromyalgia was considered, which is frequently associated with depression. He had reported pain in multiple joints and other areas of his body-groin, neck and chest. He had been diagnosed with severe osteoarthritis. Most significantly in 2001 there is a report of both poor sleep and fibromyalgia, both of which are consistent with depressive like symptoms and depression.

## UNDERSTANDING THE SUICIDE OF RICHARD SMITH

The medical records clearly document that Richard Smith suffered from bone, joint and spine abnormalities which resulted in both pain and replacement surgeries. Almost every joint in his body had been either operated on or replaced. As can happen with persons who experience pain over an extended period of time, Richard Smith developed depressive symptoms. These symptoms escalated to the point where he had two documented episodes of suicidal ideation prior to being prescribed Neurontin. He was diagnosed with depression and treated with an antidepressant; Lexapro. This maladaptive response is critical in understanding the suicide of Richard Smith. Living with chronic pain requires pain coping strategies. When pain coping strategies fail and pain related catastrophizing develops, it has been demonstrated that suicide risk increases. (Reference 11) In addition, coping skills are known to be a protective factor for suicide. (Reference 6) Thus Richard Smith would have developed a risk factor for suicide as well as lost a protective factor due to his poor coping ability. Furthermore this maladaptive response is one important factor that led directly to the suicide of Richard Smith. Although Richard Smith seems to improve in the fall of 2003, he decompensates again beginning in January 2004. He visits multiple doctors and has multiple tests. During this time period he has a

14

second episode of suicidal ideation on March 1, 2004. Ultimately he is told that he is not a candidate for surgery. Conservative treatment included ESI and physical therapy. He is discouraged about the recommendation of ESI and does not have a positive response to physical therapy. Richard Smith reports to Dr Woods that he was experiencing hopelessness regarding whether there would ever be an end to his pain. He was also feeling useless. These are symptoms that are recognized risk factors for suicide. (Reference 6)  His suicide note explains the critical role of pain and how it had infiltrated his mind and body. The suicide note is a classic example of pain catastrophizing where he states, "Forgive me, I cannot go on like this." There is a direct correlation between the impact of pain and a suicidal state. These well recognized risk factors for suicide fully explain Mr. Smith's suicide without regard to Neurontin.  In my opinion as a psychiatrist and suicidologist, to a reasonable degree of medical and scientific certainty, it was these multiple factors that led to Mr. Smith's suicide and not Neurontin.

### RESPONSE TO PLANTIFF EXPERTS DR MARIS AND DR TRIMBLE

Dr Trimble's central hypothesis is that this was an impulsive suicide and that Richard Smith had no risk factors for suicide. Dr Trimble wants to discount the role of pain and its independent relationship to suicide despite literature to the contrary. (Reference 7) Even Dr Maris' writings acknowledge the role of pain and its recognized relationship to suicide. Furthermore, Dr Trimble opines that Mr. Smith did not suffer from a psychiatric disorder. Dr Trimble is wrong on all three counts. First, there is no evidence to support that Richard Smith's suicide was "impulsive" or "out of the blue". In fact, there is ample evidence to the contrary.  Second, Richard Smith did have risk factors for suicide. There is peer reviewed literature that identifies pain syndromes as an independent risk factor for suicide. Importantly Dr Maris, the other plaintiff expert, acknowledges chronic pain as an independent risk factor for suicide.  Third, contrary to what Dr. Trimble states, Dr. Maris proffers the opinion that Richard Smith indeed suffered from a psychiatric disorder both before and after Richard Smith filled the prescription of Neurontin. Importantly, Dr Trimble acknowledges in his deposition that he was unaware of the police report in which Cindy Smith had reported that her father had made a suicidal statement on March 1. Dr Trimble acknowledges that he did not consider this fact when he wrote his report.

**IMPULSIVE SUICIDE**

Dr Trimble states that there was no evidence that Richard Smith planned his suicide. Again Dr Trimble is wrong. This statement is made despite evidence to the contrary. First, there are the previous suicidal statements made by Richard Smith in May 2003 and March 2004, as well as the suicidal statements made to Ruth Smith several weeks prior to the suicide. Secondly, there is the suicide note itself. In the note Richard Smith specifically states that he has "talked to God all night." Thinking about suicide all night is also not consistent with an impulsive suicide. There are several physical elements to the suicide that Dr Trimble acknowledges he is not aware of such that Mr. Smith had laid a plastic sheet out on the bed to prevent the soiling of the bed and that Mr. Smith had locked his bedroom door before killing himself. All of these actions and previous reports of suicidal thinking contradict the opinion of Dr. Trimble that Mr. Smith's suicide was impulsive.

On page 22 of his report Dr Maris makes reference to his previously identified 15 risk factors. It is interesting that item #13 which refers to anger/aggression/impulsivity and irritability is checked "no" by Dr Maris. This is important given that Dr Trimble opines that Richard Smith's suicide was impulsive.

**HOPELESSNESS**

In terms of causation, Dr Trimble acknowledges that hopelessness was one of the multiple factors that contributed to "the eventual suicidal act." Dr Trimble ruled out depression as a possible cause of Richard Smiths suicide. Although Dr Maris wants to make the claim that Neurontin caused hopelessness, there is no scientific evidence to support this alleged causative relationship. Hopelessness is not listed as a treatment emergent adverse event that has been reported in the Neurontin clinical trials, nor does it appear in the peer reviewed literature. In fact, peer reviewed published literature suggests that in some patients, Neurontin can help with mood stabilization and reduce the risk of suicide. ((Reference 14) Dr. Gibbons' pharmacoepidemiologic study further supports this finding. Dr Trimble views the hopelessness as part of the causal chain. It is my opinion that Mr. Smith had depression and suicidal ideation before he took Neurontin, and experienced increased hopelessness subsequent to the

16

recommendation on March 31 that he was not a candidate for surgery. There is no generally accepted scientific mechanism for, or findings reported in the peer reviewed literature, of hopelessness caused by Neurontin. The clear explanation for Mr. Smith's hopelessness is his chronic pain, being told that he is not a candidate for surgery, lack of responsiveness to physical and other "conservative" therapy, being told he will have to manage his pain, and not Neurontin. Dr Trimble does acknowledge the significance of hopelessness as referenced in Dr Wood's letter of May 19, 2004.

In terms of Maris' 15 risk factors, #7; hopelessness, Dr Maris alleges that there is evidence that it was Neurontin induced. This statement is not supported by principles of general causation, nor has a reasonable basis in terms of specific causation. Richard Smith had evidenced hopeless statements prior to March 9, 2004. For example, he stated in February 2003 that he was depressed because of pain and lack of sleep. In May 2003 he indicated that he wished he could die because of the pain. On March 1, 2004, he communicated a suicidal statement to his daughter. Moreover, there is doctor shopping which occurred at the beginning of 2004 which is consistent with someone who is desperately looking for a solution to a problem. It would be understandable that Mr. Smith would become increasingly hopeless when he was finally told that he was no longer a candidate for surgery. Hopelessness is defined as a negative expectation of the future. Certainly Richard Smith's expectation that the future would be one of increasing and constant pain understandably would result in hopelessness.

There is testimony that an appointment was made with a neurosurgeon, Dr Chang, scheduled for the day of Richard Smiths suicide. However, this appointment was then put off for another month and instead an appointment with a nurse practitioner was scheduled for that day. The plaintiffs want to see this appointment as a sign of hopefulness and forward thinking. Richard Smith, in his suicide note, makes reference to the multiple areas of his body that would have to be cut upon in an effort to relieve pain. Moreover, Richard Smith had become skeptical of physicians believing that they were all covering for one another. Therefore an appointment with another neurosurgeon would not in and of itself be a sign of hopefulness for Richard Smith.

17

## RESPONSE TO DR MARIS' REPORT

In response to Dr Maris' report, in terms of general causation, Dr Maris totally relies upon the expert reports of Dr Trimble and Dr Kruszewski. He repeatedly refers to Neurontin as suicidogenic yet is not able to provide any evidence based studies to support that claim. In his report he cites six factors that he opines were produced in Richard Smith by Neurontin.

### 1.) De Novo Suicidality

Dr Maris, in his report, claims that Richard Smith did not become suicidal until after ingesting Neurontin on March 9, 2004. This statement is incorrect. It is noteworthy that during Dr Maris' deposition he concedes that Richard Smith had suicidal ideation prior to the ingestion of Neurontin. (See page 584-85). In fact; Richard Smith had two episodes of suicidal ideation prior to the ingestion of Neurontin. In terms of Dr Maris' 15 risk factors in terms of item #3 he indicates that suicidal ideation only occurred after the ingestion of Neurontin. However, Dr Maris acknowledges that Mr. Smith was a moderate suicide risk before taking Neurontin. Had Dr Maris correctly included suicidal ideation as occurring before Neurontin this would have increased Mr. Smith's level of suicidality prior to taking Neurontin. It is known in the field that persons who have experienced suicidal ideation are more at risk for suicide than those persons who have not experienced suicidal ideation.

Dr Maris indicates that he was a consultant in the Columbia Re-Classification Project. The classification scheme designed by the Columbia team clearly indicates that Richard Smith's statement "wishes he could die" satisfies criteria for suicidal ideation. (Reference 10)

*Smith v. Pfizer*

### 2.) SAE's

On page 16 Dr Maris lists a table of relative risk of SAE's of Neurontin vs. Placebo that are found in the PDR. First of all it would be inaccurate to calculate the relative risks and discuss their significance without knowing what the confidence interval is. Furthermore, the specific "SAEs" that are listed are not known to be specific risk factors for suicide. None of these AEs appear in Dr Maris' 15 risk factors for suicide. Furthermore the AEs of hostility and emotional lability were found in the pediatric clinical trials, and are not included in the adult clinical trials.

### 3.) Ego-dystonia

In terms of ego-dystonia Dr Maris provides a definition from statements made in reference to SSRIs. Dr Maris acknowledges that Neurontin is not an SSRI. Furthermore, the description he refers to in his report about Mr. Smith do not satisfy criteria for ego-dystonia. Moreover, ego-dystonia is not listed as one of Dr Maris' 15 risk factors.

### 4.) De Novo Hopelessness

Dr Maris relies upon Richard Smith's suicide note or statements referenced in Dr Wood's letter as the basis for his opinion that Neurontin caused De Novo hopelessness. It appears that the only basis for this statement is a temporal association. There is no mechanism proffered by any expert in this case that Neurontin causes hopelessness. Hopelessness is a risk factor for suicide (Reference 6). The alternative and most plausible explanation for the hopelessness is outlined in my summary of the suicide of Richard Smith. He had been operated on multiple times and for many years experienced relief from his pain subsequent to the surgeries. In the last year of his life, pain increased and surgery was no longer an option. Despite doctor shopping he could not locate a physician who would operate on him.

19

Therefore, he was left with the specter of enduring pain without relief. In his handwritten notes on the medical records, he indicates that it had been recommended that he have ESI, which he indicated had not been helpful. Moreover, the physical therapy in the months of April and May did not change the level of pain. It is these factors that explain the state of hopelessness and not the ingestion of Neurontin.

**5.) Depression**

Dr Maris opines that Richard Smith developed Major Depressive Disorder after ingesting Neurontin. As with his statements about suicidal ideation, Dr Maris in his deposition concedes that Richard Smith had mild depression prior to the ingestion of Neurontin. Dr Trimble, as stated in his report and deposition, specifically ruled out depression as a diagnosis that Richard Smith suffered from and further, criticized any attempt to retrospectively diagnose MDD (such as that done by Dr. Maris). Clearly these experts are proffering contradictory opinions.

In terms of pharmacologic mechanisms, Dr Maris on page 18 of his report offers a pharmacologic hypothesis as to how Neurontin might be implicated in depression. However he relies upon Dr Kruszewski and does not cite any evidence based studies in support of his theory. Moreover his reference to the PDR and the "SAE" of depression has several problems. First of all, the relative risk of 1.6 does not meet the gold standard of 2.0. Moreover, as previously stated, it is not statistically accurate to only refer to the relative risk without determining the confidence interval to determine its statistical significance. In fact, Dr. Maris admits there is no difference between Neurontin and placebo with respect to depression in the randomized controlled studies and no evidence that Neurontin is statistically significantly associated with depression. Finally, Dr Maris seems to discount Dr Cato's prescription of Lexapro; the records of Dr Cato and his testimony indicate that Lexapro was prescribed for depression.

20

Finally, his chart on page 19; referring to the diagnostic criteria of depression is based primarily on statements made from either Dr Wood or the plaintiff. In reviewing the records, there is evidence that prior to taking Neurontin, Mr. Smith would have satisfied the following criteria: depressed mood, insomnia, fatigue, diminished ability to think and recurrent thoughts about suicide and death. These five criteria would have satisfied the criteria for a diagnosis of Major Depressive Disorder.

### 6.) Overcame Strong Religious Prohibitions

On page 20, Dr Maris has as category #6; overcame strong religious prohibitions. It is acknowledged that religion is a protective factor against suicide. However, Dr Maris opines that Neurontin caused Richard Smith to overcome religious prohibitions and commit suicide. The evidence in the case indicates that Richard Smith's statement to his wife, "God forgive me" and his suicide note are consistent with a person who is struggling with suicide. Because religion is a protective factor does not mean that persons who practice religion do not commit suicide. Religion was an important part of Richard Smiths life. In fact, given that religion was important to him, his references to God either in his statements to his wife Ruth or in his suicide note are indicative of an awareness on Richard Smiths part that suicide may not be acceptable to God. It was not as if suicide occurred "out of the blue" or impulsively.

Dr Maris' conclusion at the bottom of page 22 is also significant. He indicates that Mr. Smith was a low/moderate suicide risk before ingesting Neurontin. He states that when a moderate suicide risk actually leads to a completed suicide "I often expect and/or find there to be some precipitant or trigger". He opines that the trigger is a reaction to gabapentin. I disagree strongly with this opinion based upon a number of factors that I have previously cited and opine that the "trigger" (although there does not necessarily have to be a "trigger" as Dr. Maris suggests) is the development of hopelessness in a patient with a long term history of surgeries that relieved pain, but now pain could no longer be relieved by surgery.

Dr Maris' final points on pages 23 and 24 address his opinion that Richard Smith did not commit suicide because of chronic pain. Dr Maris makes reference to the fact that "Richard Smith had lived for many years (at least 10) since 'Dr Stowers' replaced his left knee in 1993, with skeletal pain but was never suicidal before he took Neurontin." As previously stated, this is not an accurate statement; Richard Smith had at least 2 episodes of suicidal ideation prior to March 9, 2004. Moreover, although Dr Maris is correct that Richard Smith had a long history of skeletal pain, prior to 2004 it had been always been relieved by surgery. It was only from January through May of 2004 that Richard Smith's pain no longer was amenable to surgery or other options for relief of his pain. Dr Maris then makes a reference to one of the treaters in the case Dr Mackey, "As Dr Mackey said; most people do not kill themselves over pain." Whether or not Dr Mackey said this is irrelevant to this case. It is well known that the presence of pain increases the risk of suicide by 2 to 3 times. Moreover, a quote from Dr Maris' own book does address the role of pain in its relationship to suicide, page 342 "It is a clinical maxim that medical illness is a risk factor for suicide... to the extent that suicide represents a confluence of factors that diminish a persons will to live, it seems indisputable that medical illness with pain, disfigurement, restricted function and/or fear of dependence would increase the risk of suicide." Mr. Smith had these factors identified in the literature.

Finally, Dr Maris states that "It was not Richard Smith's physical pain that was different after 3/9/04 but rather his psyche, his mood or his Neurontin induced attitude towards his pain. In short, Neurontin changed a pre-Neurontin positive attitude and destroyed Richard's will and ability to keep living." First of all, it is incorrect to say that Richard Smith had a positive attitude about his pain. Records clearly indicate that he was depressed because of the pain, that he wished he could die because of the pain, and that he had extreme difficulty coping with the pain on and off since May 2003. Second, there is no scientific basis for the statement that Neurontin induced a certain negative attitude. As I have stated, the attitude that Richard Smith developed from January to May 2004 was a culmination of living with pain for over 10 years (as Dr Maris has said) but that the unrelenting and debilitating pain could no longer be relieved by surgery. The doctor shopping, the failed attempts at physical therapy, his own statements on the medical record, reflect an attitude change that relief from pain was no longer in sight.

22

## RESPONSE TO DR MARIS' CHART

In his supplemental report, Dr Maris presents his explanation for a mechanism for the suicide of Richard Smith. This chart was originally published in Dr Maris' book in 1992 and then republished in the exact format in a Lancet article in 2002. This model is not accepted in the field of psychiatry as a method for determining suicide causation or a mechanism for a suicide. As the editor of the American Psychiatric Associations Practice Guidelines for the Assessment and Treatment of Suicidal Behaviors, we reviewed over 3,000 articles and included approximately 850 as references. Dr Maris' model was not mentioned nor referred to in the Guidelines. Moreover, it is noteworthy that in the published diagram under protective factors, Dr Maris lists treatment and medication. In his supplemental report, which is offered during the litigation process, medication is no longer a protective factor. Medication has been converted to not only a trigger factor but a but-for factor. The conversion of medication from a protective factor to a trigger factor is without scientific basis and appears to be motivated by Dr Maris' participation in this legal matter.

## DR MARIS' USE OF THE PSYCHOLOGICAL AUTOPSY FORM

The psychological autopsy method has a long history in the fields of psychiatry and suicidology dating back to the 1950s. I have developed a special expertise in the methodology of the psychological autopsy having employed it in a number of legal cases (Reference 12) and have testified before the House Armed Services Committee (Reference 13). The critical issue in a product liability case is determining the but-for (proximal causation) as opposed to temporal relationship. First, Dr Maris' psychological autopsy form was prepared with the specific support of a known plaintiff attorney involved in SSRI cases. Dr Maris has attempted to adapt that form to Neurontin/Gabapentin cases. Before I critique Dr Maris' application of his psychological autopsy to the Smith case it is important to emphasize that the first threshold in a product liability case has not been established. In terms of general causation there is no scientific evidence supporting a causative link between Neurontin/Gabapentin and suicide. The FDA alert does not state that there is a causative relationship between anti-epileptic drugs and suicide and

23

more specifically the FDA analysis does not indicate that Neurontin/Gabapentin is associated with an increased risk of suicidality or suicide.

Secondly and equally important is that Dr Maris indicates on the cover page of the psychological autopsy and death investigation form that "this instrument is intended for the retrospective investigation of **scientific evidence** relative to manner of death determination with a special focus on a causal relationship of Neurontin/Gabapentin to death outcome." During the course of discovery it was learned that Dr Maris did not complete the psychological autopsy form but rather a legal assistant in the plaintiff attorneys firm. There is no accepted methodology in the field of suicidology in which an employee of the law firm bringing the litigation conducts the psychological autopsy, which obviously introduces bias which cannot be corrected. Not only did Dr. Maris not conduct the psychological autopsy himself, neither he nor the plaintiffs' attorney's agent contacted any family or conducted any interviews at all. Furthermore, Dr. Maris failed to even carefully review the work of the legal assistant for accuracy or completeness. During the course of Dr Maris' deposition in this matter, he changed sections of his psychological autopsy form in the Smith case. It is unscientific for an expert to submit material claiming it is scientific evidence and then change it after the fact.

There are specific issues in the psychological autopsy form that are either incomplete or incorrectly filled out.

- Page 8, Question #19, "Describe in some detail what happened in the two weeks prior to the incident. Was there any trigger of the suicide the day of or just before the suicide?" The responses to this question address on the one hand important elements pertaining to Richard Smith's suicide - that is constant pain, getting no relief, feeling hopeless, feeling that the doctors have "nothing to offer but injections," that the "end to pain seemed hopeless." There is a reference to the 911 call. Importantly this reference of the 911 call leaves out a significant statement by Ruth Smith that her husband had been in such pain – probably because Dr. Maris had never reviewed the 911 call. Leaving out such critical information when this case is about pain appears to be a deliberate attempt to leave out

important information that supports an alternative explanation (that is the role of pain and hopelessness) for Richard Smith's suicide.

- Page 13, Question #40 is incorrectly filled out which states that decedent was not prescribed psychiatric drugs.  Both records and deposition testimony indicate that indeed Richard Smith was prescribed an antidepressant; Lexapro.

- Question #41 is filled out incorrectly.  Richard Smith did have a psychiatric diagnosis (depression) and did receive treatment.

- Question #49; did decedent have any reactions/allergies to the above medications?  The responses to these questions are not responsive to the question.  None of the responses; i.e. pulling at the ear and talking about God forgiving him, can in any way be considered a reaction or an example of an allergy to Neurontin – in fact no such allergic reaction to Neurontin has ever been described in the peer reviewed literature.

- Question #57 is significant in that it asks for any behavioral, physical or attitudinal changes after the ingestion of Neurontin.  Importantly, impulsiveness, depression and agitation are checked 'no'.

- Page 59 asks about de novo suicide ideation.  The response to this question is wrong for several reasons; first, there were two documented episodes of suicide ideation and second, Dr Maris in his deposition acknowledges that Richard Smith had suicide ideation prior to the ingestion of Neurontin and that is significant to his opinion.

- Question #60, egodystonia, Dr. Maris gives an answer of depersonalization.  Again the answers to the question are really not responsive, for example pulling at the ear is not an example of egodystonia.  Moreover Question #57; Depersonalization is checked 'no'.

- Question #75 which refers to the 15 predictors-there is a statement saying decedent was never diagnosed nor treated for depression.  As previously stated, this is wrong.

- Page 27, item #3 is wrong, given that the suicide ideation dates of May 2003 and March 2004 are not listed.  There is an attempt to negate these statements of May 2003.

*Smith v. Pfizer*

- Page 32, item #13 is checked 'no' which pertains to impulsivity. Again, this is in opposition to Dr Trimble's opinion.

- Section 12 about Major Depressive episodes, items 1-6 and 8 and 9 are checked 'no'. Records and deposition testimony indicate that these responses are incorrect and that Dr Maris concedes that Richard Smith had mild depression before ingestion Neurontin and had major depression after ingestion Neurontin. As stated in the body of my report, it is my opinion that Richard Smith did satisfy criteria for a Major Depressive Disorder prior to ingesting Neurontin.

- Page 42, Question #107, "Were the decedent's suicidal acts preceded by abnormal neurologic or psychiatric behaviors?" The examples given are akathisia, emotional blunting, sleep disturbances. The response to this question is previously referred to on a number of occasions-"the pulling at the ear, the rubbing at his head, nervousness." There is no scientific merit to claim that pulling at ones ear is synonymous with akathisia, emotional blunting or the other items mentioned.

The psychological autopsy form that was submitted by Dr Maris does not meet scientific standards, was filled out incorrectly (by someone from the plaintiff's law firm who is not a psychiatrist, psychologist or suicidologist) in a number of important areas that are delineated incorrectly and was obviously not reviewed by Dr Maris prior to submission, given that Dr Maris changed several responses during his deposition.

### SUMMARY

It is my opinion, to a reasonable degree of medical certainty that the suicide of Richard Smith was not caused by nor contributed to by Neurontin. Richard Smith was an elderly white male, in an age group with the highest risk of suicide. He committed suicide with a firearm, the most common method in male suicides. He had a 15 year history of progressive, degenerative and disabling spine, joint and bone disease. He required multiple orthopedic surgeries, resulting in multiple joint replacements. He began to experience pain early in the 1990s. This pain magnified over the years which ultimately resulted in an inability to cope with the pain. He

26

developed depressive symptomotology.  Ultimately he experienced not one but two episodes of suicidal ideation.  Both episodes of suicidal ideation were directly related to his inability to cope with pain, subsequent to surgeries.  Surgeries for Richard Smith had been a perceived panacea.  However, ultimately surgery was no longer available as an option.  When Richard Smith began to deteriorate in January 2004, he consulted multiple physicians.  Despite consulting numerous doctors, no one would operate on him.  Conservative treatment which would consist of epidural steroid injections was recommended.  Both the injections and the physical therapy could not relieve the severe pain.  Suicidal ideation developed on March 1, 2004.  After Richard Smith was told on March 31, 2004, that he was no longer a candidate for surgery, at least by Dr Mackey, it would be expected that hopelessness would develop.  Clearly his suicide note and communications to the dentist are indicative of a state of hopelessness that was brought on by pain catastrophizing.  It was this series of events in a man would was severely disabled by his chronic orthopedic illness and in severe pain that led to the suicide of Richard Smith.  Neurontin has not been demonstrated to have increased risk of suicidal thoughts, suicidal behavior or suicide.  Specifically, Neurontin did not worsen Richard Smith's depression, it did not produce hopelessness, and it did not cause his suicide.

I reserve the right to amend or supplement this report based upon additional material that becomes available.

Signed:

Douglas G. Jacobs, M.D.

*Smith v. Pfizer*

# References

1.  Goldsmith SK, Pellmar TC, Kleinman AM, Bunney WE (Eds). Reducing Suicide: A National Imperative (2002). Washington, DC: National Academies Press.

2.  Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Web-based Injury Statistics Query and Reporting System (WISQARS) [online] Available from URL: www.cdc.gov/ncipc/wisqars.

3.  Jacobs DG. A 52-Year-Old Suicidal Man. JAMA 2000; 283(20): 2693-2699.

4.  Harris EC, Barraclough B. Suicide as an Outcome for Mental Disorders. A Meta-Analysis. British Journal of Psychiatry 1997; 170: 205-228.

5.  Jacobs DG (Ed.) The Harvard Medical School Guide to Suicide Assessment and Intervention (1999). Jossey-Bass: New York, New York.

6.  American Psychiatric Association. APA Practice Guidelines for the Assessment and Treatment of Patients with Suicidal Behaviors. American Journal of Psychiatry 2004; 160 (11).

7.  Tang NK, Crane C. Suicidality in Chronic Pain: A Review of the Prevalence, Risk Factors and Psychological Links. Psychological Medicine 2006; 36(5): 575-586.

8.  Kaplan MS, McFarland BH, Huguet N, Newsom JT. Physical Illness, Functional Limitations and Suicide Risk: A Population-Based Study. American Journal of Orthopsychiatry 2007; 77(1): 56-60.

9.  Langford CA, Gilliland BC. Chapter 329. Fibromyalgia (Chapter). Fauci AS, Braunwald E, Kasper DL, Hauser SL, Longo DL, Jameson JL, Loscalzo J: Harrison's Principles of Internal Medicine, 17th Edition

10. Posner K, Oquendo MA, Gould M, Stanley B, Davies M. Columbia Classification Algorithm of Suicide Assessment (C-CASA): Classification of Suicidal Events in the FDA's Pediatric Suicidal Risk Analysis of Antidepressants. American Journal of Psychiatry 2007; 164: 1035-1043.

11. Edwards RR, Smith MT, Kudel I, Haythornthwaite J. Pain-related Catastrophizing as a Risk Factor for Suicidal Ideation in Chronic Pain. Pain 2006; 126: 272-279.

12. Jacobs D, Klein-Benheim M. The Psychological Autopsy: A Useful Tool for Determining Proximate Causation in Suicide Cases. The Bulletin of the American Academy of Psychiatry and the Law 1995; 23(2): 165-182.

13. Jacobs DG. Review of Navy Investigation of U.S.S. Iowa Explosion. Joint Hearings Before the Investigations Subcommittee and the Defense Policy Panel of the Committee on Armed Services House of Representatives. Washington, DC. December 21, 1989.

14. Kalinin VV. Suicidality and Antiepileptic Drugs. Is There a Link? Drug Safety 2007; 30(2): 123-142.

15. Juurlink D, Herrmann N, Szalai J, Kopp A, Redelmeier D. Medical Illness and the Risk of Suicide in the Eldery. Arch Intern Med 2004; 164: 1179-1184.

*Smith v. Pfizer*

16. Ratcliffe G, Enns M, Belik SL, Sareen J. Chronic Pain Conditions and Suicidal Ideation and Suicide Attempts: An Epidemiologic Perspective. Clin J Pain 2008; 24(3): 204-210.