# EXHIBIT 15

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3

 4    IN RE:                              )
      NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
 5    AND PRODUCTS LIABILITY LITIGATION    ) Pages 1 - 103

 6

 7

 8
                             MOTION HEARING
 9
                  BEFORE THE HONORABLE PATTI B. SARIS
10                     UNITED STATES DISTRICT JUDGE

11

12

13

14                                 United States District Court
                                   1 Courthouse Way, Courtroom 19
15                                 Boston, Massachusetts
                                   October 20, 2008, 2:05 p.m.
16

17

18

19

20

21

22
                             LEE A. MARZILLI
23                        OFFICIAL COURT REPORTER
                        United States District Court
24                       1 Courthouse Way, Room 3205
                             Boston, MA  02210
25                             (617)345-6787
```

Page 2

```
 1  APPEARANCES:
 2
    FOR THE PLAINTIFFS:
 3
        ANDREW G. FINKELSTEIN, ESQ. and KEITH L. ALTMAN, ESQ.,
 4  Finkelstein & Partners, LLP, 436 Robinson Avenue, Newburgh,
    New York, 12550.
 5
        KENNETH B. FROMSON, ESQ., Finkelstein & Partners, LLP,
 6  785 Broadway, 3rd Floor, Kingston, New York, 12401.
 7      MARSHALL P. RICHER, ESQ., Finkelstein & Partners, LLP,
    80 Wolf Road, Suite 503, Albany, New York, 12205.
 8
        THOMAS M. GREENE, ESQ., Greene & Hoffman, P.C.,
 9  125 Summer Street, Suite 1410, Boston, Massachusetts, 02110.
10
11  FOR THE DEFENDANTS:
12      DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
    160 Federal Street, 23rd Floor, Boston, Massachusetts,
13  02110-1701.
14      JAMES P. ROUHANDEH, ESQ., ESQ., Davis, Polk & Wardwell,
    450 Lexington Avenue, New York, New York, 10017.
15
        DOUGLAS B. MADDOCK, JR., ESQ. and SCOTT W. SAYLER,
16  ESQ., Shook, Hardy & Bacon, LLP, 2555 Grand Boulevard,
    Kansas City, Missouri, 64108-2613.
17
```

Page 3

```
 1              PROCEEDINGS
 2       THE CLERK: In Re: Neurontin Marketing, Sales
 3  Practices and Product Liability Litigation, Civil
 4  Action 04-10981, will now be heard before this Court. Will
 5  counsel please identify themselves for the record.
 6       MR. FROMSON: Good afternoon, Judge. For the
 7  plaintiffs, Kenneth Fromson from the law firm of
 8  Finkelstein --
 9       THE COURT: Did you all fill in that form that we
10  usually have? Robert, did you distribute that?
11       MR. FROMSON: I did give a card to the reporter.
12       THE COURT: Anyway, so go ahead. What's your name
13  again?
14       MR. FROMSON: Last name is Fromson, first name is
15  Kenneth, for the plaintiff.
16       MR. FINKELSTEIN: Andrew Finkelstein, Finkelstein
17  & Partners, on behalf of the plaintiffs.
18       MR. RICHER: Marshall Richer, R-i-c-h-e-r,
19  Finkelstein & Partners, for the the plaintiffs.
20       MR. ALTMAN: Keith Altman, A-l-t-m-a-n, for the
21  plaintiffs.
22       MR. ROUHANDEH: Good afternoon, your Honor. Jim
23  Rouhandeh, Davis Polk, for the defendants.
24       MR. MADDOCK: Good afternoon, your Honor. Doug
25  Maddock, Shook, Hardy & Bacon, for the defendants.
```

Page 4

```
 1       MR. SAYLER: Good afternoon. Scott Sayler, Shook,
 2  Hardy & Bacon, for the defendants.
 3       MR. CHAFFIN: Good afternoon, your Honor. David
 4  Chaffin for the defendants.
 5       THE COURT: All right, so we have two things on
 6  today, motions to dismiss and the motions for summary
 7  judgment in the products cases, right?
 8       MR. ROUHANDEH: That's correct, your Honor.
 9       THE COURT: There's a bunch of new information
10  that has come in on the sales and marketing side, but that
11  is, as far as I can tell, irrelevant, or at least not what's
12  at issue here today.
13       MR. ROUHANDEH: That's correct.
14       THE COURT: Not directly irrelevant but not -- at
15  the end of this, I'm going to ask you, actually, to what
16  extent you feel that there is some overlap. You all, have
17  you been coordinating with the other side, not the other
18  side but the sales and marketing?
19       MR. FINKELSTEIN: Sales and marketing?
20       THE COURT: Yes.
21       MR. FINKELSTEIN: Not particularly.
22       THE COURT: Because actually some of the issues
23  are starting to overlap, and so I -- Is anyone here from the
24  other -- do you coordinate with the other side, the sales
25  and marketing side as well, Mr. Greene?
```

Page 5

```
 1       MR. GREENE: I am the sales and marketing side.
 2       THE COURT: You are exclusively?
 3       MR. GREENE: Yes.
 4       THE COURT: Have you read the briefs in this case?
 5       MR. GREENE: I have been following them, yes.
 6       THE COURT: There is some overlap.
 7       MR. GREENE: There is.
 8       THE COURT: So, all right. So I'm glad you're
 9  here because I think we need to address certain things, and
10  I know that defense counsel is the exact same, right, both
11  sides?
12       MR. ROUHANDEH: Yes.
13       THE COURT: All right. So what are we doing
14  first?
15       MR. ROUHANDEH: The motion to dismiss, your Honor.
16       THE COURT: Okay.
17       MR. ROUHANDEH: The motion to dismiss is a simple
18  motion. It's very straightforward. Actually, this is one
19  instance where I think the parties kept within the page
20  limits of your Honor. We had moved to dismiss the claims,
21  the fraud claims in the product liability cases pursuant to
22  9(b) now a couple of years ago, and the Court agreed with us
23  in a ruling that was issued on February 23, 2007, which is
24  Docket No. 646. And the Court agreed that the fraud
25  allegations were, and I quote here, "These complaints are
```

Page 26

1  First, I would say that the totality of the evidence creates
2  a strong circumstantial case that in certain cases, that
3  fraud was communicated. Putting that to one side because
4  your Honor is emphasizing the other aspect of our argument,
5  it is our position that information, material information
6  was suppressed, was intentionally not communicated to
7  physicians, and that this constitutes fraud. And in that
8  regard, I would direct the Court respectfully to the case of
9  Michael V. Shiley, 46 F. 3rd 1316, and at Page 1333 of that
10 case, the Third Circuit Court of Appeals pointed out that
11 "The concealment of a material fact can amount to a culpable
12 misrepresentation, no less than does an intentional false
13 statement."
14      THE COURT: And what -- see, you've got to put me
15 into common law fraud. You haven't yet told me what that
16 misrepresentation is and what was specifically pleaded in
17 your complaint. What is the material fact that was omitted?
18      MR. RICHER: Oh, the complaint contains many, many
19 details. For instance --
20      THE COURT: What is it? I haven't read them
21 because I got frustrated.
22      MR. RICHER: Well, let me give you the easiest
23 example, your Honor.
24      THE COURT: Good.
25      MR. RICHER: And I'll --

Page 27

1      THE COURT: The easiest. If I were you, this is
2  your case because we're not repleading at this point. It's
3  been too long. What have you alleged with specificity that
4  was not disclosed? I completely agree with that statement
5  of law in that Third Circuit case, but you've got to plead
6  it with particularity.
7      MR. RICHER: For instance, in the complaint in
8  Shearer, this is the amended complaint 1208 beginning at
9  Paragraph 243 on Page 59, it is alleged that on
10 December 15, 1992 --
11     THE COURT: Wait a minute, let me get there. This
12 is where the rubber hits the road. 243?
13     MR. RICHER: Your Honor, go to Paragraph 241,
14 please, on Page 58.
15     THE COURT: I may have the wrong -- which tab are
16 we talking about? Tab 2, okay. Which paragraph?
17     MR. RICHER: 241, your Honor.
18     THE COURT: All right, what does it allege?
19     MR. RICHER: It alleges that "Parke-Davis and
20 Warner-Lambert had specific knowledge on or about
21 December 7, 1992, by the FDA's 1992 review, that Neurontin's
22 widespread usefulness was limited because of the occurrence
23 of depression and suicide attempts during clinical trials.
24 Parke-Davis and Warner-Lambert had knowledge of Neurontin's
25 capacity to contribute to mood and behavioral disturbances,

Page 28

1  including depression and suicidality."
2      THE COURT: All right, so, now, where does it say
3  that that was not disclosed to the physicians?
4      MR. RICHER: It is alleged in subsequent
5  paragraphs. For instance, if you go down to the next page,
6  this concern on the part of the FDA was communicated to
7  specific employees of the defendants, including
8  Dr. Spivey --
9      THE COURT: It may be that you don't have it now,
10 okay. What I want to know is, where does it say that this
11 is the specific misrepresentation that was suppressed or not
12 relied upon? You do say it in your brief, but where I got
13 frustrated was trying to find stuff in the complaint.
14     MR. RICHER: Paragraph 247 at Page 60, your Honor.
15     THE COURT: All right. Okay, you do. All right,
16 now, that's very specific. Is that in every single one of
17 the complaints?
18     MR. RICHER: Yes, it is, your Honor.
19     THE COURT: Mirror image kinds of paragraphs?
20     MR. RICHER: Yes, your Honor. They're not always
21 enumerated exactly the same because the length of the
22 complaints are somewhat different, but that allegation is in
23 all of the complaints we're dealing with today, and in fact
24 all of the amended complaints.
25     THE COURT: So do you have any similar paragraphs

Page 29

1  that specifically say that the prescribing physicians were
2  told that something was safe and effective for bipolar or
3  safe and effective for the sample?
4      MR. RICHER: In the cases we are talking about, we
5  do not have testimony of a doctor who says that "I was told
6  it was safe and effective for a specific off-label use."
7      THE COURT: So you essentially want me to draw the
8  inference that that must have happened? Is that essentially
9  what we're talking about?
10     MR. RICHER: That is correct. There is --
11     THE COURT: There is a fraud?
12     MR. RICHER: There is strong circumstantial
13 evidence, as described earlier today by your Honor, that
14 given the circumstances, and as your Honor pointed out in
15 your decision in Document 646, that the Court acknowledges
16 that there is strong evidence of the defendant's general
17 scheme to illegally off-label market the drug. And in the
18 individual circumstances we detail, particularly in these
19 five cases where there are extensive marketing efforts
20 directed at doctors who would not be expected to prescribe
21 Neurontin to their patients for an indicated use, that --
22     THE COURT: I agree so far with everything you've
23 said, but now I've given you as much time and opportunity as
24 you want to depose the doctors and the members of their
25 offices, whatever you wanted to do. Do you have any

**Page 42**

1  uses, the off-label populations, the uses other than
2  epilepsy, that the difference between placebo and treatment,
3  it was greater for epilepsy than for the other uses. It's
4  not true that there is some greater risk of suicide or
5  depression among people who are taking -- that's just not
6  correct.
7       THE COURT: I understand that's your position,
8  which may end up being true eventually, I've got so many
9  Neurontin balls in the air; but at least for 9(b), the issue
10 is, they pled it, and they've done it with specificity. And
11 now you've raised a good point, which is whether or not
12 relying, "would have liked to have known" is good enough for
13 relying, but --
14      MR. ROUHANDEH: Right, and that will be my last
15 point. I don't think they have pled that with
16 particularity. In fact, they've pled something quite
17 different from that, which is doctors would like to have
18 known the --
19      THE COURT: What about that you only have to
20 allege that generally?
21      MR. ROUHANDEH: Well, the doctor's deposition was
22 taken. It's not like the record is going to change any more
23 on that.
24      THE COURT: It just means a procedural thing: Do
25 I do it on summary judgment, or do I do it on motion to

**Page 43**

1  dismiss? But, anyway, I --
2       MR. ROUHANDEH: Well, the thing about that is,
3  millions of dollars are going to be spent doing other
4  discovery in the cases that won't affect that issue. That
5  issue, what the doctor had to say about that and whether it
6  affected, that's been done. They took the deposition, and
7  they pled the best they can. If it's not good enough, the
8  defendants would say that your Honor should dismiss.
9       THE COURT: They took depositions of the doctors
10 generally or just on this issue?
11      MR. ROUHANDEH: On every issue.
12      THE COURT: On every issue. Okay, well, let me
13 come back to you on the harder case for you because I think
14 I've got the lay of the land on the -- how many is it, five?
15 You've at least put Pfizer into the office.
16      I've got really big problems with the other seven
17 because, as I understand it, without having read all the
18 complaints, you're basically alleging a fraud on the market;
19 you know, if you throw a feather pillowcase out there, all
20 the feathers scatter, and they must have caught one of them.
21      MR. RICHER: I wouldn't use that phrase because
22 that phrase has a specific legal meaning; and as pointed out
23 in their opposition papers, that it wouldn't be appropriate
24 to use it in the context of individual wrongful death
25 lawsuits, which is what we have brought, not a class action.

**Page 44**

1  And so --
2       THE COURT: Well, how do I -- if nobody detailed
3  these doctors and you can't put it into one of these
4  conferences or a ghost-written article into their hands, how
5  do you survive a 9(b) motion?
6       MR. RICHER: Well, one, our suppression argument.
7       THE COURT: But you don't know that they -- the
8  suppression argument only works if you get someone in there
9  saying wonderful things about a drug, even truthful, and
10 then you don't disclose material other information. You
11 don't know that these doctors ever talked to anyone from
12 Pfizer or saw anything fraudulent from Pfizer.
13      MR. RICHER: It's our position that the defendants
14 would have an affirmative duty to communicate this to the
15 medical community generally.
16      THE COURT: I think I would be reversed in a
17 millisecond. I think that's a wrong statement of fraud law.
18 You've got to get these individual doctors to be relying on
19 it; and if you haven't got it, it could just be that -- you
20 know, I've seen other cases. Half my prisoners are on
21 Neurontin, and I see other cases where people are on
22 Neurontin. It's a well-sold drug. It could just be that
23 some doctors tried everything else for the migraine and they
24 tried this. I don't think I can draw the inference.
25      MR. RICHER: That may be, your Honor, but I

**Page 45**

1  believe there is sufficient information for the Court to
2  find, and the discovery has produced a great deal of
3  information about the efforts undertaken by the defendants
4  to reach out in an educational and we believe also a
5  marketing sense to doctors, not individually but through
6  forums, medical journal articles, and written literature.
7  And this information, all the doctors that we deposed, and
8  to a varying extent and to various varying journals or
9  sources, said, "This is information that I in general take
10 in. I read these journal articles. I go to these
11 conferences."
12      THE COURT: Well, do any of these doctors that you
13 deposed, these other seven, say, "I read positive articles
14 about Neurontin, and I would have read a negative"?
15      MR. RICHER: Well, we're talking now about the
16 suppression argument.
17      THE COURT: I'm absolutely talking about the
18 suppression argument. Did any of them read one of these
19 so-called ghost-written articles so that they were misled,
20 and then they could have been curatively reeducated if they
21 had read the other one?
22      MR. RICHER: I think the general testimony has
23 been that while they admitted that they read particular
24 journal articles and that some of them may have generally
25 said, "I do remember reading things about Neurontin," they