UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                        :     MDL Docket No. 1629
In re:  NEURONTIN MARKETING,        :
         SALES PRACTICES AND        :     Master File No. 04-10981
         PRODUCTS LIABILITY LITIGATION  :
                                          :     Judge Patti B. Saris
-------------------------------------------------------------x
                                        :     Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:        :
                                        :
PRODUCTS LIABILITY ACTIONS      :
                                        :
-------------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' EMERGENCY MOTION FOR PROTECTIVE
ORDER WITH RESPECT TO DR. GIBBONS'S CO-AUTHORS**

Products Liability Plaintiffs submit this memorandum in opposition to Defendants Pfizer

Inc., and Warner-Lambert Company LLC's motion for a protective order that would unfairly

prevent Plaintiffs from questioning under oath any of the three co-authors who contributed to the

litigation-driven pharmacoepidemiologic article by Defendants' expert, Robert D. Gibbons,

Ph.D., entitled "The Relationship Between Antiepileptics and Suicide Attempts" (the "Article"),

and Dr. Gibbons's admittedly litigation-driven pharmacoepidemiologic study on gabapentin (the

"Study").  Plaintiffs respectfully request that this Court deny Defendants' motion in its entirety

because:  (1) the co-authors have information concerning the factual underpinnings of the Study,

which, Defendants have admitted, is relevant to the crucial issues of this litigation; (2) Plaintiffs

seek to elicit testimony pertaining solely to the Study and Article in question; (3) Defendants

have not asserted any claims of privilege as to the Study or Article; (4) each of the co-authors has

first hand knowledge and information as to his participation and methodology employed in the

Study and Article, and thus such testimony would not be cumulative; and (5) the prejudice to

Plaintiffs in not being allowed to discovery of testimony and information on such a crucial issue

far outweighs any perceived burden to the authors as Plaintiffs are willing to accommodate the

three co-authors' schedules. In the alternative, Plaintiffs request that a three-hour time limit per

deposition be allotted to Plaintiffs to question under oath each of the three co-authors.

## PRELIMINARY STATEMENT AND FACTUAL BACKGROUND

On May 22, 2008, Dr. Gibbons received two sets of data — purchased by Pfizer

Defendants — that formed the basis of his Study and related Article, both of which are

admittedly relied upon by Dr. Gibbons in his expert report. The Study pertains to gabapentin and

suicidality. The related Article pertains to bipolar patients, antiepileptics, and suicidality.

Initially, Plaintiffs received untimely disclosure of Dr. Gibbons's supplemental expert report in

which he bases his opinions on the Study and related Article. On November 14, 2008, Plaintiffs

opposed Defendants' motion for leave to file Dr. Gibbons's supplemental report on the grounds

that it was beyond the FDA Alert on Anticonvulsants, and Plaintiffs sought from Defendants

"production related to all data Dr. Gibbons reviewed and relied upon in reaching his opinions, as

well as all underlying data to which Dr. Gibbons had access but may have ignored." *See* Pls.'

Mem. in Supp., ECF Doc. # 1490.

This Court had previously limited Dr. Gibbons's opinions to the FDA Alert on

Anticonvulsants about which the Court is very well familiar. Thereafter, on December 2, 2008,

the Court recognized the impropriety of Defendants' disclosure of Dr. Gibbons's supplemental

expert report related to his Study and Article and described the disclosure as "untimely and

beyond the scope of this Court's order." *See* Electronic ORDER dated 12/02/2008.

Nevertheless, the Court provided Defendants with a means for introducing the Study and Article

at trial, and the Court also ordered that Plaintiffs be granted discovery. *Id.*

It is undisputed that the opinions expressed by Dr. Gibbons "relate" to his Study and Article. *See* Defs.' Mem. in Supp., ECF Doc. # 1619 at p. 3. Defendants do not deny that the Study and Article "is the subject of his supplemental disclosures" (i.e., his report). *Id.* It is undisputed that the Article by Dr. Gibbons and his co-authors encompasses the data about which Dr. Gibbons provided his new untimely opinions. Defendants admit that "[a] copy of the unpublished manuscript was submitted as Exhibit A to [Defendants'] reply memorandum" to Plaintiffs' previous application for preclusion. *Id.* at p. 4. Defendants also admit that "Dr. Gibbons references the manuscript in his supplemental report, and he relies on its findings." *Id.* at p. 4 (emphasis added). Just after Dr. Gibbons completed the Study, he and his co-authors submitted the related manuscript for publication. *See* Defs.' Reply Mem., ECF Doc. # 1518 at p. 3. Defendants claim that this evidence reflects the "gold standard" for assessing a causal relationship and that it is "powerful evidence that is critical to the outcome of the pending motions." *Id.* at p. 2.

To date, Defendants have never produced all data Dr. Gibbons reviewed and relied upon in reaching his opinions, or all underlying data to which Dr. Gibbons had access but may have ignored. On November 12, 2008, Plaintiffs provided correspondence to Defendants seeking detailed discovery related to the Study, including the following:

(a) documents that reflect inclusion or exclusion criteria for the Study;

(b) the underlying data in the same form and fashion as was reviewed, considered and relied upon by Dr. Gibbons or someone on his behalf[1];

(c) documents reflecting searches and reviews, if any, performed by Dr. Gibbons or someone on his behalf, that culminated in his final opinion related to his Study;

(d) drafts that culminated in the final publication of the Study;

---

[1] Common sense dictates that by reference to "someone on his behalf", Defendants should have included documents or work-product from the co-authors who may have acted on Dr. Gibbons's behalf in contributing to the Study.

(e) documents reflecting searches and reviews, if any performed by Dr. Gibbons, or someone on his behalf.

Plaintiffs also requested discovery related to the unpublished, related Article written by Dr.

Gibbons and his co-authors:

> **Dr. Gibbons's reference to "Gibbons, et al. (2008)":**  At paragraph 19, Dr. Gibbons references a purported publication as "Gibbons, et al. (2008)", and states that he "examined a cohort of 47,918 patients . . ."  He applies the findings of his cohort to his opinion that gabapentin has "protective effects" in a bipolar population.  In this regard, Plaintiffs demand disclosure of the following:
>
> 1. Plaintiff demand disclosure of said publication;
> 2. Plaintiffs demand copies of all drafts or manuscripts that culminated in the final publication;
> 3. Plaintiffs demand all documents and underlying data that pertain to the aforementioned Study, Gibbons, et al. (2008);
> 4. Plaintiffs demand all of the underlying data and databases reflecting searches and reviews, if any, performed by Dr. Gibbons, or on his behalf, that culminated in Gibbons, et al. (2008).

(*See* Letter to defense counsel, attached as Exhibit A to Declaration of Kenneth B. Fromson, Esq.)  Thus, Plaintiffs have clearly sought the underlying work from Dr. Gibbons and his co-authors that culminated in their Study and related Article.

Unfortunately, Defendants have produced only a subset of the underlying data and documents, yet proclaim they have met with Plaintiffs' requests.  Defendants have produced only the following materials:  the raw data used for the analyses, the contract with PHARMetrics (provider of the data), and the SAS statistical programs used.  Defendants have not produced any internal underlying work product by Dr. Gibbons or the co-authors, correspondence between the authors, Study protocols, or even financial documentation related to the costs and funding of the Study and related unpublished Article.  Plaintiffs continue to seek these materials, and Plaintiffs intend to question Dr. Gibbons and his co-authors on these issues.

Importantly, at this juncture, without first deposing Dr. Gibbons and his co-authors, it can reasonably be stated that Plaintiffs simply do not know what else has not yet been provided.  Dr. Gibbons's deposition was scheduled for January 23, 2009, but Defendants requested an adjournment to February 3, 2009, and Plaintiffs consented to the adjournment as a courtesy.

Dr. Gibbons admitted that he embarked on his Study and Article for litigation purposes, in response to Plaintiffs' expert, Dr. Cheryl Blume, and her testimony at the *Daubert* hearing in July 2008.  (*See* Gibbons Supplemental Expert Report dated November 5, 2008, Fromson Decl., Ex. B, ¶ 11 at pp. 8-9.)  Defendants' counsel, Lori C. McGroder, Esq., also admitted the litigation-driven nature of Dr. Gibbons's Study and related Article when she stated that "Dr. Gibbons's analysis was only recently conducted in response to [Plaintiffs'] experts' allegations (and concessions) that a pharmacoepidemiologic study was feasible and could have been, but was not, conducted by [Defendants]."  (*See* McGroder Letter, Fromson Decl., Ex. C.)

To further dispel any question as to whether the Study and Article were litigation driven, Defendants purchased the data for Dr. Gibbons on or about May 20, 2008, months before the *Daubert* hearing.  Defendants purchased two sets of data:  (1) a cohort of 131,178 patients who had taken gabapentin; and (2) a collection of 47,918 patients who had been diagnosed with bipolar disorder.  Clearly, Defendants intended to use this data for the purposes of this litigation, but never disclosed the data under the mandatory disclosure requirements of Rule 26.

Defendants claim that Plaintiffs' experts can do their own analysis of the data as used by Dr. Gibbons.  *See* Defs.' Reply Mem., ECF Doc. # 1518 at p. 11.  Had Defendants produced the data in a timely manner, Plaintiffs' experts may well have been able to perform such an analysis prior to the *Daubert* hearing in 2008.  Instead, Defendants engaged in gamesmanship by withholding the PHARMetrics data until November 2008, nearly six months after receiving the

aforementioned data in May 2008.  Now, Plaintiffs intend to fully explore the timing of the writing of the Study and related Article with the co-authors.  Dr. Gibbons engaged in litigation-driven science for his Study and related Article, and while doing so, recruited or otherwise engaged the services of his co-authors to participate.  Furthermore, it is unclear as to what, if any, influence the co-authors had over the Study that is part of Dr. Gibbons's supplemental report and for which no direct reliance has been disclosed.  As discussed, *infra*, it is almost inconceivable that given the intertwined nature of the Study and Article that the co-authors had no influence over the Study.

Plaintiffs have sought the non-party depositions of Dr. Gibbons's co-authors of the Article via subpoena, and Plaintiffs provided timely notice to each witness in accordance with the Federal Rules of Civil Procedure.  Drs. Brown, Mann and Hur were each served personally with their deposition subpoenas.  (*See* Subpoenas, Fromson Decl., Ex. D.)  Plaintiffs intend to query the co-authors on the facts and circumstances underlying their contribution to the Study and related Article, including development and implementation of the work at issue, funding, how they became personally involved, and results.  Not only are the locations for the witnesses' depositions within the jurisdictional limits of each subpoena, but the locations were carefully chosen to be within a few miles of the witnesses' offices.  Dr. Brown's deposition has been scheduled for Tampa, Florida, because Dr. Brown resides in southern Florida or is otherwise employed at the University of South Florida.  Similarly, Dr. Mann's deposition has been scheduled for New York City because Dr. Mann resides in New York or is otherwise employed at Columbia University in New York.  Dr. Hur's deposition is scheduled for Chicago because Dr. Hur resides in Chicago or is otherwise employed at the University of Illinois at Chicago.

After personal service of their deposition notices, Plaintiffs' counsel communicated with each co-author prior to Defendants' motion, and <u>not a single witness voiced an objection to appearance at a deposition</u>.  Rather, each witness merely inquired about rescheduling to a more convenient date.  (*See* Declaration of Keith L. Altman, Esq., submitted herewith.)  Plaintiffs' counsel has no objection to rescheduling the dates or changing the locations to a more convenient place to accommodate the witnesses.

On January 22, 2008, Defendants filed the emergency motion to which this opposition is directed.  Attached to the emergency motion were three affidavits from the three subpoenaed co-authors who now object to being deposed.  Importantly, none of the authors retained counsel of their own for the purpose of objecting to the subpoenas.  Each of the affidavits, aside from introductory language unique to the individual, has virtually <u>identical</u> language.  The only reasonable inference is that each affidavit was prepared by the same individual — no doubt counsel for Defendants.  Common sense dictates that Defendants prepared the identical affidavits on behalf of these co-authors and have otherwise influenced or controlled the appearances of these co-authors with respect to these depositions.  Such actions smack of impropriety and may very well constitute an ethical violation under Rule 3.4(f)[2] of the Massachusetts Rules of Professional Conduct, and ABA Model Rules of Professional Conduct, particularly if Defendants' counsel even requested that the authors not agree to be deposed.

The three authors state in their affidavits that they informed Plaintiffs' counsel, Mr. Altman, that their deposition dates were not convenient, but nowhere do they indicate any

---

[2] A lawyer shall not:
(f) request a person other than a client to refrain from voluntarily giving relevant information to another party unless:
> (1) the person is a relative or an employee or other agent of a client; and
> (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

communication at that time of an objection to the depositions going forward.  The declaration of

Mr. Altman accompanying this motion confirms that at no time did any of the three authors

object to being deposed.  It would appear that the authors' objections arose only after they had

contact with counsel for Defendants.

## ARGUMENT

**A.      Plaintiffs Are Entitled to Depose the Three Co-Authors Who Provided
Contributions to the Study and Related Unpublished Article That Are
Relevant and Critical to Plaintiffs' Claims and Defendants' Defense.**

Fed. R. Civ. P. 45 governs the form, content, service, quashing or modifying and

responding to subpoenas issued to command non-parties to provide testimony and/or produce

documents or other materials in an action.  Moore's Federal Rules Pamphlet 2009.  Pursuant to

Fed. R. Civ. P. 26(b)(1), Plaintiffs are entitled to "discovery regarding any nonprivileged matter

that is relevant to an party's claim or defense."  Moore's Federal Rules Pamphlet 2009.  Courts

have generally followed the premise that "the broad mandates of Fed. R. Civ. P. 26 demand that

the scope of discovery be liberally construed so as to provide both parties with information

essential to proper litigation on all the facts."  *M. Berenson Co., Inc. v. Faneuil Hall

Marketplace, Inc*., 103 F.R.D. 635 (D. Mass. 1984) (citing to *Mitsui & Co. (U.S.A.), Inc. v.

Puerto Rico Water Resources Auth.,* 79 F.R.D. 72 (D.P.R. 1978).  Rule 26(a)(2)(B)(ii), regarding

expert opinions, provides that an expert is required to produce "the data or other information

considered by the witness in forming them."  Moore's Federal Rules Pamphlet 2009.

It is clear that the Court should allow Plaintiffs to depose the three witnesses who may

have personally contributed to Dr. Gibbons's litigation-driven Study; who definitely contributed

to Dr. Gibbons's related Article; and who support its publication to the United States public.  Just

as Defendants claim the information is "crucial" to their case, *see* Defs.' prior Motion, ECF Doc.

# 1492, Plaintiffs will be prejudiced if not provided discovery of Dr. Gibbons's Study and related Article.  Defendants claim that their litigation-driven Study is the "gold standard" for a study. *See* Defs.' Reply Mem., ECF Doc. # 1518 at p. 2.  Defendants have gratuitously proclaimed the following:

> The Study erases any doubt that may linger due to the FDA Alert. It is concrete proof rather than fanciful theory.  It is careful science based on extensive data, not speculation based on hand-picked, unreliable case reports. . . . The truth is that the Study is so compelling and so damaging to plaintiffs' case that they do not want the Court to consider it.

Defs.' Reply Mem., ECF Doc. # 1518 at p. 2.  Defendants and Dr. Gibbons maintain that the Study and related Article reach conclusions that gabapentin as well as other anti-epileptics do not cause suicide attempts, but in fact are protective of suicide attempts.

Defendants also shout that the "ultimate goal of discovery and the justice system is to ascertain the truth."  *See* Defs.' Reply Mem., ECF Doc. # 1518 at p. 3.  Of course, Plaintiffs agree with this common goal, and thus Plaintiffs should be entitled to test the truth and veracity of the information via Dr. Gibbons and his co-authors.  Plaintiffs must be provided with the opportunity to review the evidence to determine whether Dr. Gibbons and his co-authors used sound scientific methods in conducting their work, one of the requirements under *Daubert* for such evidence to be admissible at trial.

Unlike the plaintiffs in *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8 (D. Mass. 2008), cited by Defendants, where Pfizer had the opportunity to depose the three authors and subpoenaed documents directly from the New England Journal of Medicine, here, Plaintiffs are seeking testimony and documents from three co-authors of Gibbons and which emanate from a study performed at the behest of Defendants.  Moreover, *Cusimano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998), also cited by Defendants, where

Microsoft subpoenaed authors for notes and information concerning quotations from interviews with individuals named in a book, is also distinguishable. 162 F. 3d 708(1st Cir. 1998). There, the First Circuit found that, unlike the Plaintiffs in the instant case, Microsoft could have deposed the individuals named in the book and had "enough time, enough knowledge, and enough resources to depose those individuals (or some subset of them), or otherwise obtain discovery from them" during the discovery process. *Id.* at 717.

   To reach the parties' undisputed goal of the "truth", Plaintiffs seek to depose the three co-authors, and Plaintiffs are amenable to a three-hour limitation for Plaintiffs' counsel's questioning at each deposition. The goal of ascertaining the truth warrants allowing Plaintiffs the right to query the co-authors on the facts and circumstances underlying their work, including its development, implementation, funding, how they became personally involved, and the results.

   Defendants maintain the co-authors (a) do not know the "details of the expert issues in this case", (b) do not "wish not to be deposed", and (c) do not want to "produce their personal records". *See* Defs.' Mem., ECF Doc. # 1619 at p. 2. Unfortunately for Defendants, their way to achieve the truth is flawed. The discovery rules and the interests of justice entitle Plaintiffs to question merely three witnesses on what is Defendants' self-proclaimed crucial, gold-standard evidence, particularly since the witnesses have personally participated with Dr. Gibbons.

   Plaintiffs are not required to limit their discovery to one single witness — Dr. Gibbons — and be bound by his testimony as if it were gospel. The co-authors, Drs. Brown, Mann and Hur, have first hand knowledge as to their particular work or contribution to the studies in question. Plaintiffs are entitled to reasonably test the truthfulness and veracity of witnesses, particularly in light of the public health hazard relating to anticonvulsants and suicidality. For this reason, Plaintiffs agree with Defendants' allegations that the co-authors do not know the "details of the

expert issues in this case". Indeed, Dr. Gibbons is a retained Pfizer expert arguably biased as to his opinions. Yet, the three witnesses, all purportedly uninvolved with the litigation, are co-authors with their own personal unfettered contributions. In essence, Defendants are suggesting that Plaintiffs should have to rely upon Dr. Gibbons's hearsay testimony about his co-authors, as opposed the best evidence: the direct, personal knowledge and testimony from the co-authors themselves.

Defendants further claim that this is not expert discovery and only expert discovery was permitted under the Court's Order. *See* Defs.' Mem., ECF Doc. # 1619 at p. 4. Defendants' claim is misplaced. First, it is undisputed, as set forth above, that Dr. Gibbons relies upon the Study and the related Article for purposes of his opinions in this litigation. Second, it is well settled that Rule 26(a)(2)(B)(ii), regarding expert opinions, provides that an expert is required to produce "the data or other information considered by the witness in forming the opinions." (Emphasis added.) Consequently, Plaintiffs' pursuit of discovery of the Study and related Article through its co-authors is appropriate.

Defendants try to draw a fine distinction between what the Dr. Gibbons opined upon and what he reviewed or prepared. At its very core, Dr. Gibbons, by including the Study and related Article in his expert report, is assuming the use of sound methodology in their preparation. Further, it is illogical to suggest that the correspondence between the authors and underlying intermediate work product of such a paper is not relevant, particularly in the context of a litigation-driven paper. Plaintiffs are therefore entitled under Rule 26 to discovery of the Study and its related Article.

Defendants chose to put this evidence into the forefront of their defense, even before its results were published, let alone peer reviewed. If the co-authors received negative commentary

or substantive criticism (as part of the pre-publication peer-review process) about their work's development, implementation or results, then Plaintiffs should be entitled to examine the co-authors on such facts. Furthermore, if any of the co-authors express or have expressed concerns about the methodology of the work at issue, such concerns are probative of the scientific validity of Dr. Gibbons's opinions in this litigation based upon the Study and related Article.

Additionally, Dr. Gibbons chose, or was directed by Defendants who purchased the underlying data, to write his article with the three co-authors who are the subject of Plaintiffs' deposition notices. One can only infer that these authors contributed to the paper with some particular expertise that Dr. Gibbons did not possess himself. Indeed, if they did not contribute to the paper, then it begs the question as to why these individuals are listed as co-authors. If they did contribute, then Plaintiffs are entitled to know, based upon their own personal knowledge, the details of their contributions. Therefore, Plaintiffs submit that the testimony and evidence which the three authors will provide should not be cumulative.

Moreover, while Plaintiffs have been provided with raw data used for the Study and related Article, Plaintiffs have no information on how Dr. Gibbons and the co-authors developed the protocol for the work. Furthermore, Plaintiffs have no knowledge as to what deliberations took place between the authors as to methodology and possible limitations of their work. Plaintiffs also seek to know each author's understanding of the purposes of his work and in what way the authors may have been influenced by Dr. Gibbons acting in his litigation capacity, purportedly unknown to them. Plaintiffs submit that the deposition testimony of Drs. Brown, Mann and Hur, and the documents demanded, are relevant to issues at the heart of this litigation and thus Plaintiffs will be severely prejudiced if this discovery is not allowed to proceed.

**B.     Dr. Gibbons's Study and the Unpublished Article to Which the Co-Authors Contributed Are Inseparable for Discovery Purposes.**

Plaintiffs assert that there is little difference between Dr. Gibbons's Study concerning gabapentin analysis on suicidality, and the related Article on bipolar patients, anticonvulsants and suicidality.  Both are prominently referenced and relied upon by Dr. Gibbons in his expert report.  On May 20, 2008, Defendants purchased for Dr. Gibbons two sets of data from PHARMetrics.[3]  On May 22, 2008, PHARMetrics provided the requested data sets, and the instruction file accompanying data indicates that this data is being provided in accordance with the agreement between PHARMetrics and Pfizer.[4]  Both of the data sets were purchased by Pfizer for Dr. Gibbons's use.  Both sets of data, while for different cohorts, were in essentially the same format.  One of the sets, the gabapentin set, Dr. Gibbons used for his Study.  The other set, bipolar, was used for Dr. Gibbons's related Article.  Plaintiffs were also provided with Dr. Gibbons's computer programs for the analysis of the data which are very similar for both the Study and the Article.  The similarity in the data sets for both the Study and the Article — all of which was reviewed, considered and relied upon by Dr. Gibbons for his opinions in this case — calls into question what influences the co-authors had on Dr. Gibbons in terms of protocol and methodology for the work involved.

**C.     Defendants Are Not Entitled to a Protective Order Quashing Plaintiffs' Deposition Subpoenas Because the Study and Article Were Done at the Request of Defendants, and Defendants Do Not Have Standing to Quash a Subpoena Directed at a Non-Party Witness.**

Defendants acknowledge that Fed. R. Civ. P. 45 (c) (3)(B)(ii) provides protection to a party to quash a subpoena when the "expert's study [was] made <u>not</u> at the request of any party." *See* ECF Doc. # 1619, Defs.' Mem. at p. 8 (emphasis added).  However, "in the absence of a

---

[3] Fromson Decl., Ex. E.
[4] Fromson Decl., Ex. F.

claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness." *Langford v. Chrysler Motors Corp.,* 513 F.2d 1121 (2d Cir. 1975); *see also In re Stone & Webster, Inc. Securities Litig.,* 2006 U.S. Dist. LEXIS 71288 (D. Mass. 2006) (motion to quash denied given party's lack of standing, failure to demonstrate why documents were not relevant, no assertion of privilege and lack of objection from subpoenaed non-parties).

In *Weinman v. Cable*, 427 F.3d 49 (1st Cir. 2005), the First Circuit vacated the order quashing a subpoena issued by the District Court of Massachusetts and remanded the case back for the Court's further consideration of various issues that were not addressed in the record.  The appeal involved subpoenas that were directed to a non-party attorney, Cable, who made various representations concerning IPOs which were quoted in a publication, *IPO Journal*.  *Id.* at 50.  The issues that the District Court was to consider on remand included:  whether the appellants sought not opinion from the deponents but "factual underpinnings" of the Study on which he based his statements; did the evidence sought meet the "threshold of relevance"; would the testimony survive any claims of privilege; would the testimony be cumulative; and whether appellants' discovery poses an undue burden upon the deponent.  *Id.* at 52.  The First Circuit noted that although there might be a burden upon a non-party, such a burden might be overcome depending upon the unique circumstances at issue.  *Id.* at 53; *see also,* 9 *Moore's Federal Practice,* § 45.044[3][a] (3d ed. 2005) ("quashing a subpoena ad testificandum is very rare because until the witness is asked specific questions, usually there is nothing on which to base a motion to quash").

### 1.    Defendants requested the Study and related Article.

Here, the Study and related Article were in fact made <u>at the request</u> of Defendants.  As set forth above, both Dr. Gibbons and defense counsel, Lori McGroder, have admitted that the

Study and related Article were done for litigation purposes in response to Plaintiffs' expert, Dr. Cheryl Blume, and her testimony at this Court's *Daubert* hearing in July 2008.  (*See* Fromson Decl., Ex. B, ¶ 11 at pp. 8-9; Fromson Decl., Ex. C.)  Dr. Gibbons engaged in litigation-driven science, and while doing so, recruited or otherwise engaged the services of his co-authors to contribute to the Study and related Article.

This is not the first time Dr. Gibbons and his co-authors (Hur, Mann, and Brown) have conspired to prepare litigation-driven articles masquerading as "science" in opposition to FDA meta-analyses on suicidality with certain drugs (e.g., Selective Serotonin Reuptake Inhibitors like Pfizer's Zoloft®).  In fact, in 2004 and 2006, after an FDA Advisory Committee required stronger warnings on Pfizer's antidepressant blockbuster drug, Zoloft®, a drug also entrenched in litigation for its association with suicidality, all four individuals collaborated in much the same way they have done here, and they published an article concluding that SSRI drugs were actually protective of suicide attempts.  (*See* Article, Fromson Decl., Ex. G.)  Now, they are simply employing the same litigation-driven tactics with respect to Neurontin.

Another possibility is that all of the work had in fact been done by Dr. Gibbons, and he simply enlisted the co-authors to give an air of legitimacy to the Article.  If this were true, then the co-authors' claims in their declarations might be true, and Dr. Gibbons alone has all of the knowledge related to the Study and Article.  Such conduct, though, would represent bad faith and fraud on the scientific community; in fact, it would demonstrate that Defendants Pfizer and Warner-Lambert have resorted to their previous ghost writing, illegal activity that culminated in a guilty plea in 2004 and likely violates the Corporate Integrity Agreement signed as part of the guilty plea.

Realistically, the co-authors while technically "un-retained" by Defendants, can hardly be said to be unknowing participants in support of Defendants' litigation-driven Study and related Article.  Either they, like Dr. Gibbons, knew the Study and related Article were requested and funded by Defendants, or even worse, Dr. Gibbons never disclosed to his own co-authors that he embarked on the Study and related Article for litigation purposes.  In either case, Plaintiffs are fully entitled to explore the relationship between Defendants, Dr. Gibbons, and the co-authors as well as the knowledge of the co-authors concerning the litigation-driven motivations behind the work at issue.

Additionally, Plaintiffs seek to determine which came first:  Dr. Gibbons's litigation-driven Study, or the purportedly uninvolved co-authors' Article.  If the Article came first, then it follows that Dr. Gibbons used some of the work from the Article in developing his litigation-driven Study.  If the Study came first, then it is likely that Dr. Gibbons's paid litigation work influenced the protocols and methodology of the Article, which is purported to be an objective scientific work.  In either case, it is crucial for Plaintiffs to have the opportunity to examine the co-authors to unravel the true sequence of events.

> **2.     The declarations of the co-authors are identical because Defendants, who have no standing to quash the non-party subpoenas, wrote the declarations for the co-authors.**

The Declarations of co-authors Drs. Mann, Brown and Hur are essentially identical, having obviously been written by Defendants, who, as explained above do not represent the co-authors and therefore have no standing to quash the subpoenas.  If anything, collaboration between the co-authors and Defendants only adds further implications of impropriety related to the litigation-driven Study and the Article.  Initially all three co-authors did **not** object to being deposed.  For the first time, Plaintiffs became aware of the co-authors' objections when the

16

instant motion was filed.  Each of the co-authors purportedly authored a declaration.  *See* ECF Doc. ## 1621, 1622, 1623.  A review of the declarations from the co-authors demonstrates that with the exception of the initial qualifications, the rest of the declarations are virtually identical as illustrated in the chart submitted herewith, where differences between the declarations are set in **bold** print.  (*See* Declaration Comparison, Fromson Decl., Ex. H.)

The only reasonable inference is that the declarations came from the same source, and since none of the co-authors other than Dr. Mann ever indicated they had retained counsel, it is apparent that Defendants communicated with the co-authors in an attempt to suppress their testimony.  Such conduct is unethical in accordance with Rule 3.4(f) of the Massachusetts Rules of Professional Conduct, and the ABA Model Rules of Professional Conduct.  This conduct also calls into question the scientific reliability of the Study and Article that were reviewed, considered and relied upon by Dr. Gibbons in his expert report where litigation issues seem to play a bigger and bigger role for him.

### D. Plaintiffs' Deposition Subpoenas Are in Compliance With the Federal Rules of Civil Procedure, and Plaintiffs Are Willing to Schedule the Depositions at Reasonable Times, Convenient Locations, and With Time Limitations.

The subpoenas in question were served in a timely manner and pursuant to the procedure for obtaining testimony and documents from non-parties in Fed. R. Civ. P. 45, and Defendants have not objected to the procedure utilized.  Plaintiffs are not intending to seek opinion testimony from the co-authors that does not pertain to their involvement with the Study and related Article.  Plaintiffs intend to inquire into the co-authors' opinions concerning the conduct and results of the Study and Article, and their personal involvement.  For example, Plaintiffs intend to inquire on opinions concerning the selection of the cohort for the Study and related Article and whether the co-authors agree with the conclusions of the Study and related Article.

Additionally, as set forth above in the Preliminary Statement, the deposition subpoenas scheduled the witnesses to appear at locations in close proximity to their residences or places of employment, during reasonable business hours. Moreover, Plaintiffs are amenable and have indicated their willingness to reschedule the depositions to locations and dates convenient to the co-authors. Further, Plaintiffs acknowledge that the co-authors have busy daily schedules with obligations apart from this litigation, and Plaintiffs are amenable to a time limitation of three hours of testimony, per witness, in response to Plaintiffs' counsel's questions. There is simply no burden demonstrated by the co-authors or Defendants that outweighs the prejudice Plaintiffs will suffer if Plaintiffs are denied their right to depose merely three witnesses, who have participated and contributed to work that has been reviewed, considered, and relied upon by Dr. Gibbons in forming his opinions in this litigation.

## CONCLUSION

Plaintiffs respectfully request the Court deny in its entirety Defendants' application for a protective order that would unfairly prevent Plaintiffs from questioning under oath any of the three co-authors who contributed to Dr. Gibbons's Study and related Article; or in the alternative, Plaintiffs request that a three-hour time limit per deposition be allotted to Plaintiffs to question under oath each of the three co-authors.

Dated: January 28, 2009                    Respectfully submitted,

                                           *Members of Products Liability*
                                           *Plaintiffs' Steering Committee*


                           By:    /s/ **Andrew G. Finkelstein**
                                  Andrew G. Finkelstein, Esquire
                                  Finkelstein & Partners, LLP
                                  1279 Route 300, P.O. Box 1111
                                  Newburgh, NY  12551

By:    **/s/ Jack W. London**

Jack W. London, Esquire
Law Offices of Jack W. London
   & Associates
3701 Bee Cave Road, Suite 200
Austin-Westlake, TX  78746

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on January 28, 2009.

Dated: January 28, 2009

**/s/ Andrew G. Finkelstein**

Andrew G. Finkelstein, Esquire