EXHIBIT D

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

IN RE NEURONTIN MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION
            V.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   04-10981
                  D. Mass.

TO:   Kwan Hur
      5000 S. Fifth Avenue
      Hines, Illinois 60141

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Gary D. McCallister & Associates 120 North LaSalle Street, Suite 2800, Chicago, Illinoi 60602 | DATE AND TIME  2/06/09   9:00 am |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

All documents concerning the submitted scientific paper, "The Relationship Between Antiepileptics and Suicide Attempts," by Robert D. Gibbons, Kwan Hur, C. Hendricks Brown, and J. John Mann, dated September 2008. See attached.

| PLACE   Gary D. McCallister & Associates 120 North LaSalle Street, Suite 2800, Chicago, Illinois 60602 | DATE AND TIME  2/06/09   9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  _(signature)_  Attorney for Products Liability Plaintiffs | DATE  12/29/08 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Andrew G. Finkelstein, Esq., 1279 Route 300, P.O. Box 1111, Newburgh, NY 12551
800-634-1212 ext 9540

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                          DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## DEFINITIONS

1.      "Respondent", "You", and/or "Your" shall mean  , and/or its predecessor(s), agent(s), servant(s), and/or employee(s).

2.      "Document" or "Documents", wherever used throughout these requests, shall mean any written or graphic matter of any kind whatsoever, however produced or reproduced, any electronically or magnetically recorded matter of any kind or character, and any other matter constituting the recording of data or information upon any tangible thing by any means, including but not limited to, the original and any non-identical copy of any of the following (regardless of however or by whomever prepared, reproduced, maintained or  stored):  books, records, reports, articles, abstracts, posters, studies, memoranda, notes, letters, correspondence, e-mail, instant messages, chats, chat postings, bulletin boards, electronic bulletin boards, posters, blogs, websites, voicemail, studies, trials, clinical data, reports, analysis, evaluations, assessments, speeches, telegrams, diaries, calendar entries, diary, journal, logs, schedules, maps, graphs, charts, contracts, releases, appraisals, valuations, estimates, opinions, studies, analyses, summaries, magazines, booklets, pamphlets, circulars, brochures, bulletins, instructions, minutes, photographs, purchase orders, bills, checks, drafts, certificates, tabulations, questionnaires, films, or tapes, surveys, messages, correspondence, letters, records (of meetings, conferences and telephone or other conversations or communications), tables, drawings, sketches, tax reports, working papers, financial statements, computer data (including information or programs stored in a computer or storage media, whether or not ever printed out or displayed) as well as any other tangible thing on which information is recorded in any writing, sound, electronic or magnetic impulse, or in any other manner, and including preliminary versions, drafts, revisions or amendments to or of any of the foregoing and any supporting, underlying or preparatory materials.

## INSTRUCTIONS

1.      In responding to these requests, the witness is required to produce all documents known or reasonably available to you, regardless of whether such documents are in your possession, custody, or control or in the possession, custody, or control of your agents, consignees, representatives or investigators, or by your attorneys or their agents, employees, representatives, or investigators.

2.      If any of the documents or information requested cannot be produced in full, you are required to specify, to the extent possible, the reasons for your inability to produce the remainder, and the approximate date when you expect to produce such documents, if at all.

3.      If any request is deemed to call for the production of privileged or otherwise protected information or materials, you must provide the following information in a written response, designating and identifying those documents or information withheld from production on grounds of privilege:

    a.      The reason for withholding the document or information;

    b.      A statement of the legal basis for the claim of privilege, work product or other ground for non-disclosure;

c.    A brief description of the document, including:

d.    The date of the document;

e.    The number of pages, attachments, and appendices;

f.    The name(s) of its author(s) or preparer(s) and identification by employment and title of each such person;

g.    The name of each person who was sent, shown, or copied on the document, or has had access to or custody of the document, together with an identification of each such person;

h.    The present custodian; and

i.    The subject matter of the document, and in the case of any document relating or referring to a meeting or conversation, identification of such meeting or conversation, in sufficient detail to enable the Court to determine the propriety of any claim of privilege.

4.    Failure to properly identify any withheld documents may result in the waiver of any right to assert a privilege later.

5.    These requests impose a continuing obligation upon you. If after producing documents or information responsive to this demand additional information or documents become available to you, you are required to produce such additional documents or information.

6.    With respect to each document requested which has been lost, destroyed, or otherwise disposed of since its preparation or receipt, you shall provide the following information separately as to each such document:

a.    A general description of the subject matter, author, recipient(s), date;

b.    The identity of each person who has received a copy or had an opportunity to receive a copy thereof;

c.    The last custodian of the document or copies thereof; and

d.    The full particulars or circumstances whereby the document was disposed of, destroyed, or otherwise lost.

7.    All documents produced in response to these requests shall be either:

a.    Organized and labeled to correspond with the number of the specific request to which the documents are responsive, or

b.    Produced in the order and in the manner that they are kept in the usual course of business.

8.    All documents requested shall include all documents and information that relate in whole or in part to the relevant time period, or to events or circumstances during

such relevant time period, even though dated, prepared or generated or received prior to relevant time period.

9.    All documents that exist in computer-based and other digital or electronic format are to be produced in such format and in their native form or other searchable form, not in an electronic form that is merely a picture of a document such as a TIFF file, a TIF file, or a PDF file. All documents that exist only in paper form are to be produced as image files with corresponding searchable text.

## DOCUMENTS SUBPOENAED

All documents concerning submitted scientific paper, "The Relationship Between Antiepileptics and Suicide Attempts," by Robert D. Gibbons, Kwan Hur, C. Hendricks Brown, and J. John Mann, dated September 2008. A copy of the paper is annexed hereto as Exhibit A.

# EXHIBIT A

Word Count: 3421
Tables: 2
Figures: 1

## The Relationship Between Antiepileptics and Suicide Attempts

Robert D. Gibbons[1]
Kwan Hur[1,2]
C. Hendricks Brown[1,3]
J. John Mann[4]

[1]Center for Health Statistics, University of Illinois at Chicago
Rooms 455-457 (MC 912), 1601 W. Taylor, Chicago, IL 60612, USA

[2]Cooporate Studies Program Coordinating Center,
Hines VA Hospital, Hines, IL 60141

[3]Prevention Science and Methodology Group,
Department of Epidemiology and Biostatistics, College of Public Health MDC-56
University of South Florida, 13201 Bruce B Downs Blvd Tampa, FL 33612

[4]Department of Neuroscience, New York State Psychiatric Institute
Department of Psychiatry, Columbia University College of Physicians & Surgeons
1051 Riverside Drive, New York, NY 10032, USA

September 2008

**Corresponding Author**:
Robert D. Gibbons, Ph.D.
Director, Center for Health Statistics
University of Illinois at Chicago
1601 W. Taylor
Chicago, IL 60614
Phone: (312) 413-7755
Fax:   (312) 996-2113
Email: rdgib@uic.edu

**Acknowledgements:** This work was supported by NIMH grants MH062185 (JJM) and
R56 MH078580 (RDG and CHB), and MH40859 (CHB) and AHRQ grant
1U18HS016973.  Dr. Gibbons has served as an expert witness for the U.S. Department
of Justice, and Wyeth and Pfizer Pharmaceuticals, the latter involving gabapentin, one of
the drugs considered in this paper. Dr. Mann has received research support from
GlaxoSmithKline and has served as an adviser to Eli Lilly and Lundbeck
Pharmaceuticals. Dr. Brown directs a suicide prevention program at the University of
South Florida that is funded by JDS Pharmaceuticals. Dr. Hur reports no competing
interests. Dr. Gibbons had full access to all of the data in the study and takes

responsibility for the integrity of the data and the accuracy of the data analysis. The data were obtained from PHARMetrics with assistance of a grant-in-aid from Pfizer. Pfizer was not involved in any of the research and did not review the results or the manuscript prior to submission for publication.

# ABSTRACT

**Context:** On January 31, 2008, FDA issued an alert regarding increased risk of suicidal thoughts and behavior with antiepileptic drugs (AED) (1). On July 10, 2008, an FDA scientific advisory committee voted yes that there was a significant positive association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality. **Objective:** To determine if AEDs increase risk of suicide attempt in patients with bipolar disorder. **Design:** A pharmacoepidemiologic study in which suicide attempt rates were compared before and after treatment and to a no medication control group. Analyses were restricted to AED and lithium monotherapy. **Setting:** We used the PharMetrics medical claims database to study the relationship between the 11 AEDs identified in the FDA alert and lithium to suicide attempts. **Main Outcome Measure:** Suicide attempts. **Patients:** A cohort of 47,918 patients with bipolar disorder with a minimum of a one-year window of information before and after the index date of their illness. **Results:** Overall, there was no significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000). In subjects treated with an AED, the rate of suicide attempts was significantly higher prior to treatment (72/1000) than after treatment (13/1000). In patients receiving no concomitant treatment with an antidepressant or antipsychotic, AEDs were significantly protective relative to no pharmacologic treatment (3/1000 versus 15/1000). **Conclusions:** Despite FDA reports regarding increased risk of suicidality associated with AED treatment, the current study reveals that as a class, AEDs do not increase risk of suicide attempts in patients with bipolar disorder relative to patients not treated with an AED or lithium. AEDs reduce suicide attempt rates both

relative to patients not receiving any psychotropic medication and relative to their own

pre-treatment levels.

## INTRODUCTION

Anticonvulsant medications are life saving in the treatment of seizure disorders and are also extensively used for other indications such as mood disorders and trigeminal neuralgia. In March of 2005, The Food and Drug Administration in the United States (FDA) sent letters to sponsors of 11 antiepileptic drugs (AEDs) requesting the submission of suicidality data from placebo-controlled randomized clinical trials (RCTs). The data consisted of suicide-related adverse event reports and a search for suicide-related terms in electronic data bases related to the studies. The 11 AEDs included gabapentin, divalproex, felbamate, lamotrigine, levetiracetam, oxcarbazepine, pregabalin, tiagabine, topiramate, zonisamide, and carbamazepine. FDA conducted a meta-analysis of 199 placebo-controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs (2). They found that 0.43% of the patients in drug treatment groups reported suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who reported suicidal behavior or ideation than in the placebo treatment groups. Based on these findings, on January 31, 2008, FDA issued an alert to health care providers warning of increased risk of suicidal thoughts and behavior with AEDs (1). On July 10, 2008 FDA convened a meeting of two of their scientific advisory committees to determine the type and extent of the warning that FDA would promulgate regarding AEDs and suicidality. The committee voted that yes there was a significant association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality.

There have been two previous pharmacoepidemiologic studies of the relationship between antiepileptic drugs and suicide in bipolar patients where the suicide rate is clearly elevated to begin with and where a treatment effect may be easier to detect (3,4). One study (3) compared suicide completion and attempt rates between lithium, gabapentin, divalproex, and carbamazepine in a cohort of 12,662 bipolar patients from an Oregon Medicaid medical claims database. There were 11 suicides and 79 attempts. Relative to lithium, divalproex had higher suicide attempt rates and gabapentin had higher rates of suicide completion.   The authors concluded that lithium may have protective effects with regard to suicide attempts among Medicaid patients with bipolar disorder, however it remains unclear whether or not lithium protects these patients against suicide completion.  They also note that the difference between lithium and gabapentin in suicide rates could be due to confounding by indication, where "completed suicide among gabapentin users may well be related to prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk of suicide.  In addition, the study did not control for previous suicide attempts or previous treatment with lithium.  It may be the case that more severely ill patients who did not respond to lithium were then prescribed gabapentin, and it is this lack of treatment response that is related to increased suicide incidence.  Of course, the study was based on only 11 suicides, and these results have not been confirmed by replication in other studies.

The second study (4) involved 20,638 bipolar disorder patients from two large integrated health plans from California and Washington.  Suicide attempt rates were 31.3/1000

person years for divalproex versus 10.8/1000 for lithium, a significant difference following adjustment for age, sex, comorbid medical and psychiatric conditions and concomitant use of other psychotropic drugs.  Completed suicide rates were also higher for divalproex versus lithium (1.7/1000 versus 0.7/1000).   Again, there was no adjustment for previous suicide attempts or comparison to patients that were not treated with either lithium or an AED.

Completed suicide and attempted suicide are major concerns for people with bipolar disorder (5-8).  In the absence of treatment, approximately 10 per thousand individuals with bipolar disorder complete suicide annually and about 40 per thousand attempt suicide (5).  These risks are approximately one hundred-fold higher (completed suicide) and ten-fold greater (suicide attempts) than those for the general population (5). That makes this a population of interest in detecting the effect on suicide risk of AEDs in comparison to a no-treatment group. Further, the FDA warning implicated all 11 AEDs as a whole, which is surprising given their often quite different modes of action. This paper examines the effect on risk of different types of AEDs on a full population of bipolar patients.   Therefore the purpose of this study is to both replicate and expand the previous findings of the Collins and McFarland and Goodwin studies.  First, we examined a much larger cohort of bipolar patients than the previous studies.  Second, we investigated a much larger set of AEDs, i.e., the 11 AEDs in the FDA analysis.  Third, with respect to the 11 AEDs and lithium, we considered monotherapy only, thereby reducing the confounding effect of treatment resistance from the analysis.  Fourth, we adjusted for concomitant therapy including antidepressants, anticonvulsants, and other

AEDs (beyond the 11 considered by FDA) in the analysis (or completely eliminated in a sensitivity analysis). Fifth, suicide attempt prior to the index episode was adjusted for in the analysis. Sixth, we examined differences in suicide attempt rates between individuals who did or did not received AED or lithium treatment and within individuals before and after initiation of treatment. Seventh, we examined the possibility of selection effects by comparing suicide attempt rates between patients not receiving treatment with one of the 11 AEDs or lithium to pretreatment levels in those patients who ultimately received treatment with an AED or lithium. Eighth, using a Poisson regression model we were able to include patients with multiple attempts before and after initiation of treatment in the analysis.

## METHODS

Data for this study came from the PharMetrics Patient Centric Database, the largest
national patient-centric database of longitudinal integrated health care claims data
commercially available from PHARMetrics®, Inc., under unrestricted license. These
national data are not statistically different from the 2000 U.S. Census distributions of age,
gender, and region. The universe of data are comprised of medical, specialty, facility,
and pharmacy paid claims from more than 85 managed care plans nationally,
representing more than 47 million covered lives.

Data were collected during fiscal years 2000 through 2006. All patients with an ICD 9
diagnosis of bipolar disorder (ICD-9 codes: 296.0x, 296.1x, and 296.4x-296.8x) who
were continuously enrolled in the same health care plan for at least one year before and
after the index diagnosis date were included in the sample. A total of 47,918 patients
met these criteria, and there were 1,226 patients with at least one suicide attempt. The
ICD 9 codes used to identify suicide attempts were E950-E959, where subcategories are
E950-E952 (self-inflicted poisoning), E953 (self-inflicted injury by hanging), E954
(drowning), E955 (self-inflicted injury by firearms), E956 (self-inflicted injury by
cutting), E957 (self-inflicted injury by jumping from high places), E958
(other/unspecified self-inflicted injury), and E959 (late effects of self- inflicted injury).

Analysis of these data was based on Poisson regression models using the number of
patient exposure days as an offset. The method of generalized estimating equations

(GEE) was used for the within-subject analyses which compared suicide attempt rates before and after initiation of therapy.  Traditional maximum likelihood Poisson regression analysis was used for between subject comparisons of no medication (i.e., 11 AEDs and lithium) to pre-treatment and post-treatment AED and lithium conditions respectively.  Comparing no AED/lithium treatment to the pre-treatment exposure period allows us to examine selection effects in which more severely ill patients at higher risk for suicide attempts may be preferentially selected for AED or lithium treatment.  To adjust for other potential confounders, all models included concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006) as covariates.   Results were expressed as event rate ratios (ERR) and associated confidence intervals (CI), which are the exponential of the estimated treatment effect (and confidence interval) in the Poisson regression model.  The ERR is a rate multiplier which reflects the increased rate associated with treatment versus no treatment.  An ERR of 2.0 reflects double the rate of suicide attempts in treated versus untreated patients (or pre versus post treatment exposure period in a within-subject analysis), whereas an ERR of 0.5 reflects one-half the rate of suicide attempts in treated patients relative to untreated patients (or post versus pre treatment exposure periods in a within-subject analysis).

## RESULTS

Table 1 presents number of patients at risk, number of suicide attempts, person years of exposure and rate of suicide attempts per 1000 person years of exposure before and after initiation of treatment during the one year observation period following the index date of the bipolar disorder diagnosis. These summary statistics are provided for each of the 11 AEDs, lithium, the combination of all AEDs and the no medication condition, which consists of subjects not treated with any of the 11 AEDs or lithium. Table 1 also presents results for treatment with one of the 11 AEDs only and no pharmacologic treatment (i.e., no antidepressant, or antipsychotic or second AED). Table 1 reveals that there were a total of 13,385 patients who received either one of the 11 AEDs or lithium and 25,432 patients that did not receive any of the 11 AEDs or lithium. Post treatment suicide attempt rates for AEDs (13/1000 person years) and lithium (18/1000 person years) were comparable to no treatment rates (13/1000 person years). Of the 25,432 patients who did not receive any of the 11 AEDs or lithium, 11,207 (44%) also did not receive any other AED, antidepressant or antipsychotic medication. The rate of suicide attempts in this group was 15/1000 person years, slightly higher than those who did not receive one of the 11 AEDs or lithium. Table 1 reveals that for five of the drugs there was an insufficient number of cases for a meaningful individual drug-level statistical analysis (felbamate, levetiracetam, pregabalin, tiagabine, and zonisamide). Figure 1 presents a graphical summary of suicide rates by treatment type, before and after treatment.

### Table 1
### Suicide Attempt Rate per 1,000 Person Years Before and After Treatment by AED, Lithium and No Treatment

| Drug Use | # at Risk | # Attempts Before tx | Person Years | Rate before Tx per 1,000 Person Years | # Attempts After tx | Person Years | Rate after Tx per 1,000 Person Years |
|---|---|---|---|---|---|---|---|
| Gabapentin | 1,229 | 13 | 213 | 61 | 13 | 1,016 | 13 |
| Divalproex | 4,581 | 40 | 412 | 97 | 38 | 4,169 | 9 |
| Felbamate | na | | | | | | |
| Lamotrigine | 4,412 | 24 | 613 | 39 | 50 | 3,799 | 13 |
| Levetiracetam | 42 | 0 | 6 | 0 | 0 | 36 | 0 |
| Oxcarbazepine | 1,463 | 30 | 164 | 183 | 20 | 1,299 | 15 |
| Pregabalin | 85 | 0 | 29 | 0 | 0 | 56 | 0 |
| Tiagabine | 80 | 0 | 16 | 0 | 0 | 64 | 0 |
| Topiramate | 1,063 | 11 | 184 | 60 | 24 | 879 | 27 |
| Zonisamide | 84 | 2 | 11 | 182 | 0 | 73 | 0 |
| Carbamazepine | 346 | 2 | 40 | 50 | 9 | 306 | 29 |
| Any of 11 AEDs | 13,385 | 122 | 1,688 | 72 | 154 | 11,697 | 13 |
| 11 AEDs only | 1,910 | 9 | 204 | 44 | 5 | 1,706 | 3 |
| Lithium | 2,518 | 23 | 233 | 99 | 40 | 2,285 | 18 |
| No AED or Li+ | 25,432 | 334 | 25,432 | 13 | | | |
| No Medication | 11,207 | 170 | 11,207 | 15 | | | |

Following treatment there was no overall significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000 person years), adjusted event rate ratio (ERR) = 0.88, (CI: 0.72-1.08), p<0.22 (see rates in final column of Table 1). Similar effects were seen for the individual AEDs, with the exception of topiramate (27/1000 person years ERR=1.87, (CI: 1.22-2.87), p<0.004) and carbamazepine (29/1000 person years, ERR=2.37, (CI:1.21-4.61), p<0.01) which had significantly greater post-treatment risk relative to no treatment (see Table 2). A small but significant post-treatment increase for lithium versus no treatment was also found (ERR=1.46, (CI: 1.04-2.03), p<0.03). Overall, AEDs

were associated with lower suicide attempt rates than lithium (13/1000 versus 18/1000, ERR=0.62, (CI: 0.44-0.89), p<0.008); however, pre-treatment suicide attempt rates were not significantly higher for patients treated with lithium (99/1000 person years) relative to AEDs (72/1000 person years; adjusted ERR is 0.80, (0.51-1.25), p = 0.325).   While not statistically significant, the increased rate of suicide attempts observed before treatment for lithium might account for the modestly higher post treatment rate for lithium relative to AEDs.

In our within-subject analyses comparing attempts before and after receiving treatment with an AED, the rate of suicide attempts was significantly greater prior to treatment (72/1000 person years) than after treatment (13/1000 person years), ERR=0.19, (CI: 0.11-0.26), p<.0001.  Similar protective effects of AEDs were seen for the individual drugs and lithium, although the effects of topiramate (60/1000 vs. 27/1000, ERR=0.52, (CI: 0.18-1.48), p<0.22) and carbamazepine (50/1000 vs. 29/1000, ERR=0.76, (CI: 0.10-6.01), p<0.80) were not statistically significant (see Table 2).   The pre-treatment rate of suicide attempts in patients who ultimately received AED treatment was significantly higher than the no treatment suicide attempt rate (ERR=4.88, (CI: 3.91-6.09), p<0.0001) suggesting that patients who receive AED treatment  are more severely impaired.  A similar result was found for lithium (see Table 2).

### Table 2
### Event Rate Ratios (Confidence Intervals) Comparing Suicide Rates Before and After Treatment with AED and Lithium and Against No Drug

| Drug | Post-Drug vs. No Drug | | Pre-Drug vs. No Drug | | Post-Drug vs: Pre-Drug | |
|---|---|---|---|---|---|---|
| | ERR (CI) | p | ERR (CI) | p | ERR (CI) | p |
| Gabapentin | 1.16 (0.66-2.05) | .60 | 6.11 (3.46-10.79) | .0001 | 0.15 (0.05-0.47) | .001 |
| Divalproex | 0.72 (0.51-1.02) | .06 | 7.27 (5.16-10.25) | .0001 | 0.10 (0.05-0.19) | .0001 |
| Lamotragine | 0.85 (0.62-1.16) | .31 | 2.49 (1.63-3.81) | .0001 | 0.33 (0.19-0.59) | .0001 |
| Oxcarbazepine | 0.98 (0.62-1.56) | .94 | 10.78 (7.31-15.86) | .0001 | 0.09 (0.04-0.24) | .0001 |
| Topiramate | 1.87 (1.22-2.87) | .004 | 3.96 (2.15-7.29) | .0001 | 0.52 (0.18-1.48) | .22 |
| Carbamazepine | 2.37 (1.21-4.61) | .01 | 3.21 (0.80-12.94) | .10 | 0.76 (0.10-6.01) | .80 |
| Lithium | 1.46 (1.04-2.03) | .03 | 7.19 (4.65-11.11) | .0001 | 0.23 (0.11-0.49) | .0001 |
| Any AED | 0.88 (0.72-1.08) | .22 | 4.88 (3.91-6.09) | .0001 | 0.19 (0.11-0.26) | .0001 |
| AED only | 0.19 (0.08-0.47) | .0003 | 2.85 (1.46-5.57) | .002 | 0.05 (0.02-0.18) | .0001 |

ERR – Event Rate Ratio – ERR=2.0 indicates a doubling of the rate, ERR=0.5 indicates a halving of the rate. These are adjusted for concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006).

Finally, we compared suicide attempt rates for patients treated with no drugs (i.e., no AED, antidepressant, or antipsychotic) versus monotherapy with one of the 11 AEDs only (i.e., no concomitant psychotropic medication). The rate of suicide attempts was 15/1000 person years for no treatment versus 3/1000 for patients treated with one of the 11 AEDs alone (ERR=0.19, (CI: 0.08-0.47), p<0.0003), see Figure 1. This finding indicates that among those patients who received no concomitant AED, antidepressant, or antipsychotic treatment, the 11 AEDs were significantly protective in terms of suicide

attempt rates relative to those patients with a diagnosis of bipolar disorder that received

no pharmacologic treatment.  This finding is further highlighted by the fact that the pre-

treatment suicide rate among those treated exclusively with one of the 11 AEDs, was

significantly higher relative to the "pre-treatment" rate in those not pharmacologically

treated (44/1000 versus 15/1000, ERR=2.85, (CI: 1.46-5.57), p<0.002).  Within

individuals treated exclusively with one of the 11 AEDs, significant protective effects of

treatment were also observed (44/1000 versus 3/1000, ERR=0.05, (CI: 0.02-0.18),

p<0.0001).   This finding indicates that following treatment with one of the 11 AEDs

alone, the covariate adjusted rate of suicide attempts was approximately one twentieth of

the suicide rate before treatment in those patients that were previously diagnosed as

having bipolar disorder.



Figure 1: Suicide Attempt Rates Before and After Treatment

Open squares = Pre Treatment

Filled Squares = Post Treatment

Line = No Medication Rate

## DISCUSSION

The current study in patients with bipolar disorder reveals that as a class, AEDs do not increase risk of suicide attempts relative to patients not treated with an AED or lithium. In fact, among those patients not receiving any concomitant treatment with another AED, lithium, antidepressants, or antipsychotics, the rate of post AED treatment suicide attempts was 3/1000 patient years versus 44/1000 patient years prior to treatment and versus 13/1000 patient years for those who were not pharmacologically treated. These results reveal that AED monotherapy with one of the 11 AEDs results in a statistically and clinically significant reduction in suicide attempt rates relative to both pre-treatment rates (i.e., within patients) and no treatment rates (i.e., between patients), in patients with bipolar disorder.

Our analysis also reveals that there is a selection effect in that the pre-treatment rate of suicide attempts are almost 5 times higher is patients who are ultimately treated with an AED and 7 times higher in patients who are ultimately treated with lithium relative to patients not receiving pharmacologic treatment with one of these drugs. If pretreatment suicide attempt rates reflect severity of illness, it is the more severely impaired patients who are more likely to receive treatment with an AED or lithium relative to those less impaired. Nevertheless, post treatment suicide rates are significantly reduced in those patients treated with an AED or lithium from their elevated pre-treatment levels to the level found at or below patients not receiving treatment (slightly higher for lithium). This finding suggests a protective effect of AED or lithium treatment on suicidality in contrast to FDA's report of an increase in suicidality associated with AED treatment.

Since prior suicide attempt greatly increases the risk of future suicide, that effect would favor higher post-treatment suicide attempt rates in the AED-treated group, an effect that was outweighed by the apparent therapeutic effect of this treatment.

Possible exceptions are topiramate and carbamazepine which did not show significant reduction in suicide attempt rates with treatment and had post treatment suicide attempt rates significantly higher than no treatment levels. Nevertheless, even for these two AEDs, there was no evidence that they increased suicide rates, just that they did not appear to significantly reduce the already elevated pre-treatment suicide attempt rate.

The question arises as to the source of the difference between the results reported here and the findings of the FDA meta-analysis of RCTs. There are several possibilities. First, FDA's analysis was based on adverse events reports of suicidal thoughts and behavior, whereas our analysis is based exclusively on suicide attempts. Suicidal thinking and suicide attempts that are of sufficient magnitude to make it into the medical claims record reflect quite different levels of suicidal intent and may have different relationships to AED treatment. Second, FDA's meta-analysis combined several indications including psychiatric, pain, and epilepsy, but that may not be important because their sub-analysis for psychiatric indications did not provide evidence of significantly increased risk with AED treatment (OR=1.51, CI=0.95-2.45). Third, the majority of the suicidality events in the FDA analyses were observed for only 2 of the 11 AEDs, lamotragine and topiramate. Sixty-one percent of all of the events were observed for these two drugs, despite the fact that these two drugs account for only 38%.

of the suicide-related adverse event reports. These two drugs were the only drugs that individually had statistically significant effects on suicidality (lamotragine OR=2.08, CI=1.03-4.40; topiramate, OR=2.53, CI=1.21-5.85) and in the risk difference (RD) analysis that included data from all studies (lamotragine RD=5.40 per 1000, CI=0.24-10.57; topiramate RD=3.05, CI=0.98-5.11). By contrast, the other 9 drugs showed no significant association with suicidality either individually or in combination (OR=1.127, CI=0.652-1.948, p=0.78). These results reveal that FDA's meta-analysis was driven by lamotragine and topiramate, and had these two drugs (that already have suicidality warnings in their labels) been excluded from the analysis, there would have been no remaining signal of an association between AEDs and suicidality. Fourth, the results of FDA's analysis could be affected by two different ascertainment biases. Patients treated with a drug will have more side effects than patients on placebo and therefore more opportunity to report their suicidal thoughts (9). Suicide attempts made by taking an overdose of study medication will result in contact with the health care system (e.g., an emergency room) and therefore have a greater likelihood of being detected than an overdose on placebo (10).

With respect to the previous report by Collins and McFarland (3), their study was restricted to lithium, divalproex, gabapentin, and carbamazapine. For these four drugs, they identified 79 suicide attempts in 7017 person years whereas we identified 100 attempts in 7776 person years, so the overall incidence rate for these four drugs was slightly higher in our study. In terms of suicide attempt rates, they found rates of 6, 19, 10, and 17 per 1000 person years for lithium, divalproex, gabapentin, and carbamazapine

respectively, whereas our post-treatment incidence rates were 18, 9, 13, and 29

respectively.   Rates reported by Goodwin and colleagues (4) were generally higher than

those found by Collins and McFarland (3) and somewhat closer to our study with the

exception of divalproex: 11, 31, and 22 per 1000 person years for lithium, divalproex,

and carbamazapine respectively.


The major differences between our study and the two previous studies are that (a) we

were able to adjust for pre-treatment suicide attempts, (b) we considered AEDs and

lithium monotherapy whereas they designated patients in terms of their first treatment, (c)

we included a no treatment comparator group, and (d) we had pre-treatment data which

permitted a within-subject analysis.


Finally, our estimates of the untreated suicide attempt rate of 13 per 1000 person years

for no treatment with any of the 11 AEDs or lithium and 15 per 1000 person years for no

treatment with any AED, antidepressant, or antipsychotic medication is considerably

below the rate of 40 per 1000 reported by Baldessarini and colleagues (5).  Note

however, that among those bipolar patients who go on to be treated with an AED, the rate

is 72 suicide attempts per 1000 patient years and for those who are ultimately treated with

lithium, the suicide attempt rate is 99 per 1000 patient years.  As such their reported rate

of 40 per 1000 may be a reasonable estimate of the overall rate of suicide attempts in

untreated bipolar patients averaging over the entire range of severity of illness.

There are several limitations of our study. First, our results are based on medical claims data and there is likely to be under-reporting of suicide attempts. Second, we do not have access to information on completed suicides in this population. Third, our analyses do not incorporate intensity of treatment. Fourth, patients were not randomized to treatment, and there may be other factors that play a significant role in the process by which specific treatments are selected for patients. Fifth, diagnoses were obtained from electronic data systems and not from structured psychiatric interviews.

In summary, the present analysis provides no evidence that AEDs increase risk of suicide attempts among patients with bipolar disorder. If anything, the effects of most AEDs and lithium are to reduce suicide attempt rates relative to pre-treatment levels in those patients who are ultimately prescribed these drugs. In patients treated with no other psychotropic medication, the group of 11 AEDs as a whole significantly reduced the suicide attempt rate below that of patients who received no pharmacological treatment, despite the fact that their pre-treatment suicide attempt rate was almost 3 times higher than those who did not receive treatment.

## REFERENCES

1. Information for Healthcare Professionals Suicidality and Antiepileptic Drugs. http://www.fda.gov/CDER/Drug/InfoSheets/HCP/antiepilepticsHCP.htm, January 31, 2008.

2. Statistical review and evaluation. http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4372b1-01-FDA.pdf, May 23, 2008.

3. Collins JC, & McFarland BH. Divalproex, lithium, and suicide among Medicaid patients with bipolar disorder. *Journal of Affective Disorders*. 2008;107:23-28.

4. Goodwin, FK, Fireman, B, Simon, GE, Hunkeler, EM, Lee, J, Revicki, D. Suicide risk in bipolar disorder during treatment with lithium and divalproex. *JAMA*. 2003; 290:1467–1473.

5. Baldessarini RJ, Pompili M, Tondo L. Suicide in bipolar disorder: risks and management. *CNS Spectr*. 2006;11:465–471.

6. Goodwin FK. 1999. Anticonvulsant therapy and suicide risk in affective disorders. *J. Clin. Psychiatry*. 1999;60 (Suppl 2):89–93.

7. Baldessarini, RJ, Tondo, L. Suicide risk and treatments for patients with bipolar disorder. *JAMA*. 2003;290:1517–1519.

8. Müller-Oerlinghausen, B, Berghöfer, A, Bauer, M. Bipolar disorder. *Lancet*. 2002;359:241–247.

9. Posner K, Oquendo MA, Gould M, Stanley B, Davies M: Columbia classification algorithm of suicide assessment (C-CASA): Classification of suicidal events in the FDA's pediatric suicidal risk analysis of antidepressants. *American Journal of Psychiatry*. 2007;164:1035-1043.

10. Gibbons R.D., Brown C.H., Hur K., Marcus S., Bhaumik D.K., Mann J.J. The relationship between antidepressants and suicide: Results of analysis of the Veterans Health Administration datasets. *American Journal of Psychiatry*, 2007;164:1044-1049:2007.

AO88 (Rev. 12/07) Subpoena in a Civil Case

### Issued by the

# UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

IN RE NEURONTIN MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

**SUBPOENA IN A CIVIL CASE**

V.

Case Number:[1] 04-10981 D. Mass

TO:   J. John Mann
Dept. of Neuroscience, NYS Psychiatric Institute
Dept. of Psychiatry, Columbia University College of Physicians & Surgeons
1051 Riverside Drive, New York, NY 10032

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>Jacoby & Meyers, 39 Broadway, Suite 1850<br>New York, New York 10006 | DATE AND TIME<br>2/4/2009 9:00 am |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
All documents concerning the submitted scientific paper, "The Relationship Between Antiepileptics and Suicide Attempts," by Robert D. Gibbons, Kwan Hur, C. Hendricks Brown, and J. John Mann, dated September 2008. See attached.

| PLACE<br>Jacoby & Meyers, 39 Broadway, Suite 1850<br>New York, New York 10006 | DATE AND TIME<br>2/4/2009 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   Attorney for Products Liability Plaintiffs | DATE   12/22/08 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
ANDREW G. FINKELSTEIN, ESQ., 1279 Route 300, Suite 1111, Newburgh, NY 12551
800-634-1212 ext 9540

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

**Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:**

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## DEFINITIONS

1.      "Respondent", "You", and/or "Your" shall mean  , and/or its predecessor(s), agent(s), servant(s), and/or employee(s).

2.      "Document" or "Documents", wherever used throughout these requests, shall mean any written or graphic matter of any kind whatsoever, however produced or reproduced, any electronically or magnetically recorded matter of any kind or character, and any other matter constituting the recording of data or information upon any tangible thing by any means, including but not limited to, the original and any non-identical copy of any of the following (regardless of however or by whomever prepared, reproduced, maintained or stored):  books, records, reports, articles, abstracts, posters, studies, memoranda, notes, letters, correspondence, e-mail, instant messages, chats, chat postings, bulletin boards, electronic bulletin boards, posters, blogs, websites, voicemail, studies, trials, clinical data, reports, analysis, evaluations, assessments, speeches, telegrams, diaries, calendar entries, diary, journal, logs, schedules, maps, graphs, charts, contracts, releases, appraisals, valuations, estimates, opinions, studies, analyses, summaries, magazines, booklets, pamphlets, circulars, brochures, bulletins, instructions, minutes, photographs, purchase orders, bills, checks, drafts, certificates, tabulations, questionnaires, films, or tapes, surveys, messages, correspondence, letters, records (of meetings, conferences and telephone or other conversations or communications), tables, drawings, sketches, tax reports, working papers, financial statements, computer data (including information or programs stored in a computer or storage media, whether or not ever printed out or displayed) as well as any other tangible thing on which information is recorded in any writing, sound, electronic or magnetic impulse, or in any other manner, and including preliminary versions, drafts, revisions or amendments to or of any of the foregoing and any supporting, underlying or preparatory materials.

## INSTRUCTIONS

1.      In responding to these requests, the witness is required to produce all documents known or reasonably available to you, regardless of whether such documents are in your possession, custody, or control or in the possession, custody, or control of your agents, consignees, representatives or investigators, or by your attorneys or their agents, employees, representatives, or investigators.

2.      If any of the documents or information requested cannot be produced in full, you are required to specify, to the extent possible, the reasons for your inability to produce the remainder, and the approximate date when you expect to produce such documents, if at all.

3.      If any request is deemed to call for the production of privileged or otherwise protected information or materials, you must provide the following information in a written response, designating and identifying those documents or information withheld from production on grounds of privilege:

a.      The reason for withholding the document or information;

b.      A statement of the legal basis for the claim of privilege, work product or other ground for non-disclosure;

c.    A brief description of the document, including:

d.    The date of the document;

e.    The number of pages, attachments, and appendices;

f.    The name(s) of its author(s) or preparer(s) and identification by employment and title of each such person;

g.    The name of each person who was sent, shown, or copied on the document, or has had access to or custody of the document, together with an identification of each such person;

h.    The present custodian; and

i.    The subject mater of the document, and in the case of any document relating or referring to a meeting or conversation, identification of such meeting or conversation, in sufficient detail to enable the Court to determine the propriety of any claim of privilege.

4.    Failure to properly identify any withheld documents may result in the waiver of any right to assert a privilege later.

5.    These requests impose a continuing obligation upon you.  If after producing documents or information responsive to this demand additional information or documents become available to you, you are required to produce such additional documents or information.

6.    With respect to each document requested which has been lost, destroyed, or otherwise disposed of since its preparation or receipt, you shall provide the following information separately as to each such document:

a.    A general description of the subject matter, author, recipient(s), date;

b.    The identity of each person who has received a copy or had an opportunity to receive a copy thereof;

c.    The last custodian of the document or copies thereof; and

d.    The full particulars or circumstances whereby the document was disposed of, destroyed, or otherwise lost.

7.    All documents produced in response to these requests shall be either:

a.    Organized and labeled to correspond with the number of the specific request to which the documents are responsive, or

b.    Produced in the order and in the manner that they are kept in the usual course of business.

8.    All documents requested shall include all documents and information that relate in whole or in part to the relevant time period, or to events or circumstances during

such relevant time period, even though dated, prepared or generated or received prior to relevant time period.

9.    All documents that exist in computer-based and other digital or electronic format are to be produced in such format and in their native form or other searchable form, not in an electronic form that is merely a picture of a document such as a TIFF file, a TIF file, or a PDF file.  All documents that exist only in paper form are to be produced as image files with corresponding searchable text.

## DOCUMENTS SUBPOENAED

All documents concerning submitted scientific paper, "The Relationship Between Antiepileptics and Suicide Attempts," by Robert D. Gibbons, Kwan Hur, C. Hendricks Brown, and J. John Mann, dated September 2008.  A copy of the paper is annexed hereto as Exhibit A.

# EXHIBIT  A

Word Count: 3421
Tables: 2
Figures: 1

## The Relationship Between Antiepileptics and Suicide Attempts

Robert D. Gibbons[1]
Kwan Hur[1,2]
C. Hendricks Brown[1,3]
J. John Mann[4]

[1]Center for Health Statistics, University of Illinois at Chicago
Rooms 455-457 (MC 912), 1601 W. Taylor, Chicago, IL 60612, USA

[2]Cooporate Studies Program Coordinating Center,
Hines VA Hospital, Hines, IL 60141

[3]Prevention Science and Methodology Group,
Department of Epidemiology and Biostatistics, College of Public Health MDC-56
University of South Florida, 13201 Bruce B Downs Blvd Tampa, FL 33612

[4]Department of Neuroscience, New York State Psychiatric Institute
Department of Psychiatry, Columbia University College of Physicians & Surgeons
1051 Riverside Drive, New York, NY 10032, USA

September 2008

**Corresponding Author:**
Robert D. Gibbons, Ph.D.
Director, Center for Health Statistics
University of Illinois at Chicago
1601 W. Taylor
Chicago, IL 60614
Phone: (312) 413-7755
Fax:    (312) 996-2113
Email: rdgib@uic.edu

**Acknowledgements:** This work was supported by NIMH grants MH062185 (JJM) and R56 MH078580 (RDG and CHB), and MH40859 (CHB) and AHRQ grant 1U18HS016973.  Dr. Gibbons has served as an expert witness for the U.S. Department of Justice, and Wyeth and Pfizer Pharmaceuticals, the latter involving gabapentin, one of the drugs considered in this paper. Dr. Mann has received research support from GlaxoSmithKline and has served as an adviser to Eli Lilly and Lundbeck Pharmaceuticals. Dr. Brown directs a suicide prevention program at the University of South Florida that is funded by JDS Pharmaceuticals. Dr. Hur reports no competing interests. Dr. Gibbons had full access to all of the data in the study and takes

responsibility for the integrity of the data and the accuracy of the data analysis. The data were obtained from PHARMetrics with assistance of a grant-in-aid from Pfizer. Pfizer was not involved in any of the research and did not review the results or the manuscript prior to submission for publication.

# ABSTRACT

**Context:** On January 31, 2008, FDA issued an alert regarding increased risk of suicidal thoughts and behavior with antiepileptic drugs (AED) (1).  On July 10, 2008, an FDA scientific advisory committee voted yes that there was a significant positive association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality.  **Objective:** To determine if AEDs increase risk of suicide attempt in patients with bipolar disorder.  **Design:**  A pharmacoepidemiologic study in which suicide attempt rates were compared before and after treatment and to a no medication control group.  Analyses were restricted to AED and lithium monotherapy.  **Setting:** We used the PharMetrics medical claims database to study the relationship between the 11 AEDs identified in the FDA alert and lithium to suicide attempts.  **Main Outcome Measure:** Suicide attempts.  **Patients:** A cohort of 47,918 patients with bipolar disorder with a minimum of a one-year window of information before and after the index date of their illness.  **Results:**  Overall, there was no significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000).  In subjects treated with an AED, the rate of suicide attempts was significantly higher prior to treatment (72/1000) than after treatment (13/1000).    In patients receiving no concomitant treatment with an antidepressant or antipsychotic, AEDs were significantly protective relative to no pharmacologic treatment (3/1000 versus 15/1000).  **Conclusions:**  Despite FDA reports regarding increased risk of suicidality associated with AED treatment, the current study reveals that as a class, AEDs do not increase risk of suicide attempts in patients with bipolar disorder relative to patients not treated with an AED or lithium.  AEDs reduce suicide attempt rates both

relative to patients not receiving any psychotropic medication and relative to their own

pre-treatment levels.

## INTRODUCTION

Anticonvulsant medications are life saving in the treatment of seizure disorders and are also extensively used for other indications such as mood disorders and trigeminal neuralgia. In March of 2005, The Food and Drug Administration in the United States (FDA) sent letters to sponsors of 11 antiepileptic drugs (AEDs) requesting the submission of suicidality data from placebo-controlled randomized clinical trials (RCTs). The data consisted of suicide-related adverse event reports and a search for suicide-related terms in electronic data bases related to the studies. The 11 AEDs included gabapentin, divalproex, felbamate, lamotrigine, levetiracetam, oxcarbazepine, pregabalin, tiagabine, topiramate, zonisamide, and carbamazepine. FDA conducted a meta-analysis of 199 placebo-controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs (2). They found that 0.43% of the patients in drug treatment groups reported suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who reported suicidal behavior or ideation than in the placebo treatment groups. Based on these findings, on January 31, 2008, FDA issued an alert to health care providers warning of increased risk of suicidal thoughts and behavior with AEDs (1). On July 10, 2008 FDA convened a meeting of two of their scientific advisory committees to determine the type and extent of the warning that FDA would promulgate regarding AEDs and suicidality. The committee voted that yes there was a significant association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality.

There have been two previous pharmacoepidemiologic studies of the relationship between antiepileptic drugs and suicide in bipolar patients where the suicide rate is clearly elevated to begin with and where a treatment effect may be easier to detect (3,4). One study (3) compared suicide completion and attempt rates between lithium, gabapentin, divalproex, and carbamazepine in a cohort of 12,662 bipolar patients from an Oregon Medicaid medical claims database.  There were 11 suicides and 79 attempts. Relative to lithium, divalproex had higher suicide attempt rates and gabapentin had higher rates of suicide completion.  The authors concluded that lithium may have protective effects with regard to suicide attempts among Medicaid patients with bipolar disorder, however it remains unclear whether or not lithium protects these patients against suicide completion.  They also note that the difference between lithium and gabapentin in suicide rates could be due to confounding by indication, where "completed suicide among gabapentin users may well be related to prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk of suicide.  In addition, the study did not control for previous suicide attempts or previous treatment with lithium.  It may be the case that more severely ill patients who did not respond to lithium were then prescribed gabapentin, and it is this lack of treatment response that is related to increased suicide incidence.  Of course, the study was based on only 11 suicides, and these results have not been confirmed by replication in other studies.

The second study (4) involved 20,638 bipolar disorder patients from two large integrated health plans from California and Washington.  Suicide attempt rates were 31.3/1000

person years for divalproex versus 10.8/1000 for lithium, a significant difference

following adjustment for age, sex, comorbid medical and psychiatric conditions and

concomitant use of other psychotropic drugs.  Completed suicide rates were also higher

for divalproex versus lithium (1.7/1000 versus 0.7/1000).   Again, there was no

adjustment for previous suicide attempts or comparison to patients that were not treated

with either lithium or an AED.


Completed suicide and attempted suicide are major concerns for people with bipolar

disorder (5-8).  In the absence of treatment, approximately 10 per thousand individuals

with bipolar disorder complete suicide annually and about 40 per thousand attempt

suicide (5).  These risks are approximately one hundred-fold higher (completed suicide)

and ten-fold greater (suicide attempts) than those for the general population (5). That

makes this a population of interest in detecting the effect on suicide risk of AEDs in

comparison to a no-treatment group. Further, the FDA warning implicated all 11 AEDs

as a whole, which is surprising given their often quite different modes of action. This

paper examines the effect on risk of different types of AEDs on a full population of

bipolar patients.   Therefore the purpose of this study is to both replicate and expand the

previous findings of the Collins and McFarland and Goodwin studies.  First, we

examined a much larger cohort of bipolar patients than the previous studies.  Second, we

investigated a much larger set of AEDs, i.e., the 11 AEDs in the FDA analysis.  Third,

with respect to the 11 AEDs and lithium, we considered monotherapy only, thereby

reducing the confounding effect of treatment resistance from the analysis.  Fourth, we

adjusted for concomitant therapy including antidepressants, anticonvulsants, and other

AEDs (beyond the 11 considered by FDA) in the analysis (or completely eliminated in a sensitivity analysis). Fifth, suicide attempt prior to the index episode was adjusted for in the analysis. Sixth, we examined differences in suicide attempt rates between individuals who did or did not received AED or lithium treatment and within individuals before and after initiation of treatment. Seventh, we examined the possibility of selection effects by comparing suicide attempt rates between patients not receiving treatment with one of the 11 AEDs or lithium to pretreatment levels in those patients who ultimately received treatment with an AED or lithium. Eighth, using a Poisson regression model we were able to include patients with multiple attempts before and after initiation of treatment in the analysis.

**METHODS**


Data for this study came from the PharMetrics Patient Centric Database, the largest

national patient-centric database of longitudinal integrated health care claims data

commercially available from PHARMetrics®, Inc., under unrestricted license. These

national data are not statistically different from the 2000 U.S. Census distributions of age,

gender, and region.  The universe of data are comprised of medical, specialty, facility,

and pharmacy paid claims from more than 85 managed care plans nationally,

representing more than 47 million covered lives.


Data were collected during fiscal years 2000 through 2006.  All patients with an ICD 9

diagnosis of bipolar disorder (ICD-9 codes: 296.0x, 296.1x, and 296.4x-296.8x) who

were continuously enrolled in the same health care plan for at least one year before and

after the index diagnosis date were included in the sample.   A total of 47,918 patients

met these criteria, and there were 1,226 patients with at least one suicide attempt.   The

ICD 9 codes used to identify suicide attempts were E950-E959, where subcategories are

E950-E952 (self-inflicted poisoning), E953 (self-inflicted injury by hanging), E954

(drowning), E955 (self-inflicted injury by firearms), E956 (self-inflicted injury by

cutting), E957 (self-inflicted injury by jumping from high places), E958

(other/unspecified self-inflicted injury), and E959 (late effects of self- inflicted injury).


Analysis of these data was based on Poisson regression models using the number of

patient exposure days as an offset.   The method of generalized estimating equations

(GEE) was used for the within-subject analyses which compared suicide attempt rates before and after initiation of therapy. Traditional maximum likelihood Poisson regression analysis was used for between subject comparisons of no medication (i.e., 11 AEDs and lithium) to pre-treatment and post-treatment AED and lithium conditions respectively. Comparing no AED/lithium treatment to the pre-treatment exposure period allows us to examine selection effects in which more severely ill patients at higher risk for suicide attempts may be preferentially selected for AED or lithium treatment. To adjust for other potential confounders, all models included concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006) as covariates. Results were expressed as event rate ratios (ERR) and associated confidence intervals (CI), which are the exponential of the estimated treatment effect (and confidence interval) in the Poisson regression model. The ERR is a rate multiplier which reflects the increased rate associated with treatment versus no treatment. An ERR of 2.0 reflects double the rate of suicide attempts in treated versus untreated patients (or pre versus post treatment exposure period in a within-subject analysis), whereas an ERR of 0.5 reflects one-half the rate of suicide attempts in treated patients relative to untreated patients (or post versus pre treatment exposure periods in a within-subject analysis).

## RESULTS

Table 1 presents number of patients at risk, number of suicide attempts, person years of exposure and rate of suicide attempts per 1000 person years of exposure before and after initiation of treatment during the one year observation period following the index date of the bipolar disorder diagnosis. These summary statistics are provided for each of the 11 AEDs, lithium, the combination of all AEDs and the no medication condition, which consists of subjects not treated with any of the 11 AEDs or lithium. Table 1 also presents results for treatment with one of the 11 AEDs only and no pharmacologic treatment (i.e., no antidepressant, or antipsychotic or second AED). Table 1 reveals that there were a total of 13,385 patients who received either one of the 11 AEDs or lithium and 25,432 patients that did not receive any of the 11 AEDs or lithium. Post treatment suicide attempt rates for AEDs (13/1000 person years) and lithium (18/1000 person years) were comparable to no treatment rates (13/1000 person years). Of the 25,432 patients who did not receive any of the 11 AEDs or lithium, 11,207 (44%) also did not receive any other AED, antidepressant or antipsychotic medication. The rate of suicide attempts in this group was 15/1000 person years, slightly higher than those who did not receive one of the 11 AEDs or lithium. Table 1 reveals that for five of the drugs there was an insufficient number of cases for a meaningful individual drug-level statistical analysis (felbamate, levetiracetam, pregabalin, tiagabine, and zonisamide). Figure 1 presents a graphical summary of suicide rates by treatment type, before and after treatment.

**Table 1**
**Suicide Attempt Rate per 1,000 Person Years Before and After Treatment by AED, Lithium and No Treatment**

| Drug Use | # at Risk | # Attempts Before tx | Person Years | Rate before Tx per 1,000 Person Years | # Attempts After tx | Person Years | Rate after Tx per 1,000 Person Years |
|---|---|---|---|---|---|---|---|
| Gabapentin | 1,229 | 13 | 213 | 61 | 13 | 1,016 | 13 |
| Divalproex | 4,581 | 40 | 412 | 97 | 38 | 4,169 | 9 |
| Felbamate | na | | | | | | |
| Lamotrigine | 4,412 | 24 | 613 | 39 | 50 | 3,799 | 13 |
| Levetiracetam | 42 | 0 | 6 | 0 | 0 | 36 | 0 |
| Oxcarbazepine | 1,463 | 30 | 164 | 183 | 20 | 1,299 | 15 |
| Pregabalin | 85 | 0 | 29 | 0 | 0 | 56 | 0 |
| Tiagabine | 80 | 0 | 16 | 0 | 0 | 64 | 0 |
| Topiramate | 1,063 | 11 | 184 | 60 | 24 | 879 | 27 |
| Zonisamide | 84 | 2 | 11 | 182 | 0 | 73 | 0 |
| Carbamazepine | 346 | 2 | 40 | 50 | 9 | 306 | 29 |
| Any of 11 AEDs | 13,385 | 122 | 1,688 | 72 | 154 | 11,697 | 13 |
| 11 AEDs only | 1,910 | 9 | 204 | 44 | 5 | 1,706 | 3 |
| Lithium | 2,518 | 23 | 233 | 99 | 40 | 2,285 | 18 |
| No AED or Li+ | 25,432 | 334 | 25,432 | 13 | | | |
| No Medication | 11,207 | 170 | 11,207 | 15 | | | |

Following treatment there was no overall significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000 person years), adjusted event rate ratio (ERR) = 0.88, (CI: 0.72-1.08), $p < 0.22$ (see rates in final column of Table 1). Similar effects were seen for the individual AEDs, with the exception of topiramate (27/1000 person years ERR=1.87, (CI: 1.22-2.87), $p < 0.004$) and carbamazepine (29/1000 person years, ERR=2.37, (CI:1.21-4.61), $p < 0.01$) which had significantly greater post-treatment risk relative to no treatment (see Table 2). A small but significant post-treatment increase for lithium versus no treatment was also found (ERR=1.46, (CI: 1.04-2.03), $p < 0.03$). Overall, AEDs

were associated with lower suicide attempt rates than lithium (13/1000 versus 18/1000,
ERR=0.62, (CI: 0.44-0.89), p<0.008); however, pre-treatment suicide attempt rates were
not significantly higher for patients treated with lithium (99/1000 person years) relative to
AEDs (72/1000 person years; adjusted ERR is 0.80, (0.51-1.25), p = 0.325).   While not
statistically significant, the increased rate of suicide attempts observed before treatment
for lithium might account for the modestly higher post treatment rate for lithium relative
to AEDs.

In our within-subject analyses comparing attempts before and after receiving treatment
with an AED, the rate of suicide attempts was significantly greater prior to treatment
(72/1000 person years) than after treatment (13/1000 person years), ERR=0.19, (CI: 0.11-
0.26), p<.0001.  Similar protective effects of AEDs were seen for the individual drugs
and lithium, although the effects of topiramate (60/1000 vs. 27/1000, ERR=0.52, (CI:
0.18-1.48), p<0.22) and carbamazepine (50/1000 vs. 29/1000, ERR=0.76, (CI: 0.10-
6.01), p<0.80) were not statistically significant (see Table 2).   The pre-treatment rate of
suicide attempts in patients who ultimately received AED treatment was significantly
higher than the no treatment suicide attempt rate (ERR=4.88, (CI: 3.91-6.09), p<0.0001)
suggesting that patients who receive AED treatment  are more severely impaired.  A
similar result was found for lithium (see Table 2).

**Table 2**
**Event Rate Ratios (Confidence Intervals) Comparing Suicide Rates Before and
After Treatment with AED and Lithium and Against No Drug**

| Drug | Post-Drug vs. No Drug | | Pre-Drug vs. No Drug | | Post-Drug vs. Pre-Drug | |
|---|---|---|---|---|---|---|
| | ERR (CI) | p | ERR (CI) | p | ERR (CI) | p |
| Gabapentin | 1.16 (0.66-2.05) | .60 | 6.11 (3.46-10.79) | .0001 | 0.15 (0.05-0.47) | .001 |
| Divalproex | 0.72 (0.51-1.02) | .06 | 7.27 (5.16-10.25) | .0001 | 0.10 (0.05-0.19) | .0001 |
| Lamotragine | 0.85 (0.62-1.16) | .31 | 2.49 (1.63-3.81) | .0001 | 0.33 (0.19-0.59) | .0001 |
| Oxcarbazepine | 0.98 (0.62-1.56) | .94 | 10.78 (7.31-15.86) | .0001 | 0.09 (0.04-0.24) | .0001 |
| Topiramate | 1.87 (1.22-2.87) | .004 | 3.96 (2.15-7.29) | .0001 | 0.52 (0.18-1.48) | .22 |
| Carbamazepine | 2.37 (1.21-4.61) | .01 | 3.21 (0.80-12.94) | .10 | 0.76 (0.10-6.01) | .80 |
| Lithium | 1.46 (1.04-2.03) | .03 | 7.19 (4.65-11.11) | .0001 | 0.23 (0.11-0.49) | .0001 |
| Any AED | 0.88 (0.72-1.08) | .22 | 4.88 (3.91-6.09) | .0001 | 0.19 (0.11-0.26) | .0001 |
| AED only | 0.19 (0.08-0.47) | .0003 | 2.85 (1.46-5.57) | .002 | 0.05 (0.02-0.18) | .0001 |

ERR – Event Rate Ratio – ERR=2.0 indicates a doubling of the rate, ERR=0.5 indicates a halving of the rate. These are adjusted for concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006).

Finally, we compared suicide attempt rates for patients treated with no drugs (i.e., no

AED, antidepressant, or antipsychotic) versus monotherapy with one of the 11 AEDs

only (i.e., no concomitant psychotropic medication). The rate of suicide attempts was

15/1000 person years for no treatment versus 3/1000 for patients treated with one of the

11 AEDs alone (ERR=0.19, (CI: 0.08-0.47), p<0.0003), see Figure 1. This finding

indicates that among those patients who received no concomitant AED, antidepressant,

or antipsychotic treatment, the 11 AEDs were significantly protective in terms of suicide

attempt rates relative to those patients with a diagnosis of bipolar disorder that received

no pharmacologic treatment.  This finding is further highlighted by the fact that the pre-

treatment suicide rate among those treated exclusively with one of the 11 AEDs, was

significantly higher relative to the "pre-treatment" rate in those not pharmacologically

treated (44/1000 versus 15/1000, ERR=2.85, (CI: 1.46-5.57), p<0.002).  Within

individuals treated exclusively with one of the 11 AEDs, significant protective effects of

treatment were also observed (44/1000 versus 3/1000, ERR=0.05, (CI: 0.02-0.18),

p<0.0001).  This finding indicates that following treatment with one of the 11 AEDs

alone, the covariate adjusted rate of suicide attempts was approximately one twentieth of

the suicide rate before treatment in those patients that were previously diagnosed as

having bipolar disorder.



Figure 1: Suicide Attempt Rates Before and After Treatment

Open squares = Pre Treatment
Filled Squares = Post Treatment
Line = No Medication Rate

## DISCUSSION

The current study in patients with bipolar disorder reveals that as a class, AEDs do not increase risk of suicide attempts relative to patients not treated with an AED or lithium. In fact, among those patients not receiving any concomitant treatment with another AED, lithium, antidepressants, or antipsychotics, the rate of post AED treatment suicide attempts was 3/1000 patient years versus 44/1000 patient years prior to treatment and versus 13/1000 patient years for those who were not pharmacologically treated. These results reveal that AED monotherapy with one of the 11 AEDs results in a statistically and clinically significant reduction in suicide attempt rates relative to both pre-treatment rates (i.e., within patients) and no treatment rates (i.e., between patients), in patients with bipolar disorder.

Our analysis also reveals that there is a selection effect in that the pre-treatment rate of suicide attempts are almost 5 times higher is patients who are ultimately treated with an AED and 7 times higher in patients who are ultimately treated with lithium relative to patients not receiving pharmacologic treatment with one of these drugs. If pretreatment suicide attempt rates reflect severity of illness, it is the more severely impaired patients who are more likely to receive treatment with an AED or lithium relative to those less impaired. Nevertheless, post treatment suicide rates are significantly reduced in those patients treated with an AED or lithium from their elevated pre-treatment levels to the level found at or below patients not receiving treatment (slightly higher for lithium). This finding suggests a protective effect of AED or lithium treatment on suicidality in contrast to FDA's report of an increase in suicidality associated with AED treatment.

Since prior suicide attempt greatly increases the risk of future suicide, that effect would favor higher post-treatment suicide attempt rates in the AED-treated group, an effect that was outweighed by the apparent therapeutic effect of this treatment.

Possible exceptions are topiramate and carbamazepine which did not show significant reduction in suicide attempt rates with treatment and had post treatment suicide attempt rates significantly higher than no treatment levels. Nevertheless, even for these two AEDs, there was no evidence that they increased suicide rates, just that they did not appear to significantly reduce the already elevated pre-treatment suicide attempt rate.

The question arises as to the source of the difference between the results reported here and the findings of the FDA meta-analysis of RCTs. There are several possibilities. First, FDA's analysis was based on adverse events reports of suicidal thoughts and behavior, whereas our analysis is based exclusively on suicide attempts. Suicidal thinking and suicide attempts that are of sufficient magnitude to make it into the medical claims record reflect quite different levels of suicidal intent and may have different relationships to AED treatment. Second, FDA's meta-analysis combined several indications including psychiatric, pain, and epilepsy, but that may not be important because their sub-analysis for psychiatric indications did not provide evidence of significantly increased risk with AED treatment (OR=1.51, CI=0.95-2.45). Third, the majority of the suicidality events in the FDA analyses were observed for only 2 of the 11 AEDs, lamotragine and topiramate. Sixty-one percent of all of the events were observed for these two drugs, despite the fact that these two drugs account for only 38%

of the suicide-related adverse event reports.  These two drugs were the only drugs that individually had statistically significant effects on suicidality (lamotragine OR=2.08, CI=1.03-4.40; topiramate, OR=2.53, CI=1.21-5.85) and in the risk difference (RD) analysis that included data from all studies (lamotragine RD=5.40 per 1000, CI=0.24-10.57; topiramate RD=3.05, CI=0.98-5.11).   By contrast, the other 9 drugs showed no significant association with suicidality either individually or in combination  (OR=1.127, CI=0.652-1.948, p=0.78).  These results reveal that FDA's meta-analysis was driven by lamotragine and topiramate, and had these two drugs (that already have suicidality warnings in their labels) been excluded from the analysis, there would have been no remaining signal of an association between AEDs and suicidality.  Fourth, the results of FDA's analysis could be affected by two different ascertainment biases.  Patients treated with a drug will have more side effects than patients on placebo and therefore more opportunity to report their suicidal thoughts (9).  Suicide attempts made by taking an overdose of study medication will result in contact with the health care system (e.g., an emergency room) and therefore have a greater likelihood of being detected than an overdose on placebo (10).

With respect to the previous report by Collins and McFarland (3), their study was restricted to lithium, divalproex, gabapentin, and carbamazepine.  For these four drugs, they identified 79 suicide attempts in 7017 person years whereas we identified 100 attempts in 7776 person years, so the overall incidence rate for these four drugs was slightly higher in our study.  In terms of suicide attempt rates, they found rates of 6, 19, 10, and 17 per 1000 person years for lithium, divalproex, gabapentin, and carbamazepine

respectively, whereas our post-treatment incidence rates were 18, 9, 13, and 29 respectively.    Rates reported by Goodwin and colleagues (4) were generally higher than those found by Collins and McFarland (3) and somewhat closer to our study with the exception of divalproex: 11, 31, and 22 per 1000 person years for lithium, divalproex, and carbamazapine respectively.

The major differences between our study and the two previous studies are that (a) we were able to adjust for pre-treatment suicide attempts, (b) we considered AEDs and lithium monotherapy whereas they designated patients in terms of their first treatment, (c) we included a no treatment comparator group, and (d) we had pre-treatment data which permitted a within-subject analysis.

Finally, our estimates of the untreated suicide attempt rate of 13 per 1000 person years for no treatment with any of the 11 AEDs or lithium and 15 per 1000 person years for no treatment with any AED, antidepressant, or antipsychotic medication is considerably below the rate of 40 per 1000 reported by Baldessarini and colleagues (5).    Note however, that among those bipolar patients who go on to be treated with an AED, the rate is 72 suicide attempts per 1000 patient years and for those who are ultimately treated with lithium, the suicide attempt rate is 99 per 1000 patient years.    As such their reported rate of 40 per 1000 may be a reasonable estimate of the overall rate of suicide attempts in untreated bipolar patients averaging over the entire range of severity of illness.

There are several limitations of our study. First, our results are based on medical claims data and there is likely to be under-reporting of suicide attempts. Second, we do not have access to information on completed suicides in this population. Third, our analyses do not incorporate intensity of treatment. Fourth, patients were not randomized to treatment, and there may be other factors that play a significant role in the process by which specific treatments are selected for patients. Fifth, diagnoses were obtained from electronic data systems and not from structured psychiatric interviews.

In summary, the present analysis provides no evidence that AEDs increase risk of suicide attempts among patients with bipolar disorder. If anything, the effects of most AEDs and lithium are to reduce suicide attempt rates relative to pre-treatment levels in those patients who are ultimately prescribed these drugs.  In patients treated with no other psychotropic medication, the group of 11 AEDs as a whole significantly reduced the suicide attempt rate below that of patients who received no pharmacological treatment, despite the fact that their pre-treatment suicide attempt rate was almost 3 times higher than those who did not receive treatment.

## REFERENCES

1. Information for Healthcare Professionals Suicidality and Antiepileptic Drugs. http://www.fda.gov/CDER/Drug/InfoSheets/HCP/antiepilepticsHCP.htm, January 31, 2008.

2. Statistical review and evaluation. http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4372b1-01-FDA.pdf, May 23, 2008.

3. Collins JC, & McFarland BH. Divalproex, lithium, and suicide among Medicaid patients with bipolar disorder. *Journal of Affective Disorders.* 2008;107:23-28.

4. Goodwin, FK, Fireman, B, Simon, GE, Hunkeler, EM, Lee, J, Revicki, D. Suicide risk in bipolar disorder during treatment with lithium and divalproex. *JAMA.* 2003; 290:1467–1473.

5. Baldessarini RJ, Pompili M, Tondo L. Suicide in bipolar disorder: risks and management. *CNS Spectr.* 2006;11:465–471.

6. Goodwin FK. 1999. Anticonvulsant therapy and suicide risk in affective disorders. *J. Clin. Psychiatry.* 1999;60 (Suppl 2):89–93.

7. Baldessarini, RJ, Tondo, L. Suicide risk and treatments for patients with bipolar disorder. *JAMA.* 2003;290:1517–1519.

8. Müller-Oerlinghausen, B, Berghöfer, A, Bauer, M. Bipolar disorder. *Lancet.* 2002;359:241–247.

9. Posner K, Oquendo MA, Gould M, Stanley B, Davies M: Columbia classification algorithm of suicide assessment (C-CASA): Classification of suicidal events in the FDA's pediatric suicidal risk analysis of antidepressants. *American Journal of Psychiatry.* 2007;164:1035-1043.

10. Gibbons R.D., Brown C.H., Hur K., Marcus S., Bhaumik D.K., Mann J.J.   The relationship between antidepressants and suicide: Results of analysis of the Veterans Health Administration datasets. *American Journal of Psychiatry,* 2007;164:1044-1049:2007.

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA

IN RE NEURONTIN MARKETING, SALES PRACTICES
AND PRODUCTS LIABILITY LITIGATION

**SUBPOENA IN A CIVIL CASE**

V.

Case Number:[1]  04-10981 D. Mass.

TO: C. Hendricks Brown
USF College of Public Health MDC-56
13201 Bruce B Downs Blvd
Tampa, FL 33612

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION  Pharmaceutical Development Group<br>13902 N. Dale Mabry Hwy, Suite 122, Tampa, FL 33618 | DATE AND TIME<br>1/29/2009  9:00 am |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

All documents concerning the submitted scientific paper, "The Relationship Between Antiepileptics and Suicide Attempts," by Robert D. Gibbons, Kwan Hur, C. Hendricks Brown, and J. John Mann, dated September 2008. See attached.

| PLACE     Pharmaceutical Development Group<br>13902 N. Dale Mabry Hwy, Suite 122, Tampa, FL 33618 | DATE AND TIME<br>1/29/2009  9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Attorney for Products Liability Plaintiffs | DATE<br>12/22/08 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
ANDREW G. FINKELSTEIN, ESQ., 1279 Route 300, Suite 1111, Newburgh, NY 12551
800-634-1212 ext 9540

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

(d) DUTIES IN RESPONDING TO A SUBPOENA.

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT.

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## DEFINITIONS

1.      "Respondent", "You", and/or "Your" shall mean  , and/or its predecessor(s), agent(s), servant(s), and/or employee(s).

2.      "Document" or "Documents", wherever used throughout these requests, shall mean any written or graphic matter of any kind whatsoever, however produced or reproduced, any electronically or magnetically recorded matter of any kind or character, and any other matter constituting the recording of data or information upon any tangible thing by any means, including but not limited to, the original and any non-identical copy of any of the following (regardless of however or by whomever prepared, reproduced, maintained or stored): books, records, reports, articles, abstracts, posters, studies, memoranda, notes, letters, correspondence, e-mail, instant messages, chats, chat postings, bulletin boards, electronic bulletin boards, posters, blogs, websites, voicemail, studies, trials, clinical data, reports, analysis, evaluations, assessments, speeches, telegrams, diaries, calendar entries, diary, journal, logs, schedules, maps, graphs, charts, contracts, releases, appraisals, valuations, estimates, opinions, studies, analyses, summaries, magazines, booklets, pamphlets, circulars, brochures, bulletins, instructions, minutes, photographs, purchase orders, bills, checks, drafts, certificates, tabulations, questionnaires, films, or tapes, surveys, messages, correspondence, letters, records (of meetings, conferences and telephone or other conversations or communications), tables, drawings, sketches, tax reports, working papers, financial statements, computer data (including information or programs stored in a computer or storage media, whether or not ever printed out or displayed) as well as any other tangible thing on which information is recorded in any writing, sound, electronic or magnetic impulse, or in any other manner, and including preliminary versions, drafts, revisions or amendments to or of any of the foregoing and any supporting, underlying or preparatory materials.

## INSTRUCTIONS

1.      In responding to these requests, the witness is required to produce all documents known or reasonably available to you, regardless of whether such documents are in your possession, custody, or control or in the possession, custody, or control of your agents, consignees, representatives or investigators, or by your attorneys or their agents, employees, representatives, or investigators.

2.      If any of the documents or information requested cannot be produced in full, you are required to specify, to the extent possible, the reasons for your inability to produce the remainder, and the approximate date when you expect to produce such documents, if at all.

3.      If any request is deemed to call for the production of privileged or otherwise protected information or materials, you must provide the following information in a written response, designating and identifying those documents or information withheld from production on grounds of privilege:

a.      The reason for withholding the document or information;

b.      A statement of the legal basis for the claim of privilege, work product or other ground for non-disclosure;

c.    A brief description of the document, including:

d.    The date of the document;

e.    The number of pages, attachments, and appendices;

f.    The name(s) of its author(s) or preparer(s) and identification by employment and title of each such person;

g.    The name of each person who was sent, shown, or copied on the document, or has had access to or custody of the document, together with an identification of each such person;

h.    The present custodian; and

i.    The subject mater of the document, and in the case of any document relating or referring to a meeting or conversation, identification of such meeting or conversation, in sufficient detail to enable the Court to determine the propriety of any claim of privilege.

4.    Failure to properly identify any withheld documents may result in the waiver of any right to assert a privilege later.

5.    These requests impose a continuing obligation upon you. If after producing documents or information responsive to this demand additional information or documents become available to you, you are required to produce such additional documents or information.

6.    With respect to each document requested which has been lost, destroyed, or otherwise disposed of since its preparation or receipt, you shall provide the following information separately as to each such document:

a.    A general description of the subject matter, author, recipient(s), date;

b.    The identity of each person who has received a copy or had an opportunity to receive a copy thereof;

c.    The last custodian of the document or copies thereof; and

d.    The full particulars or circumstances whereby the document was disposed of, destroyed, or otherwise lost.

7.    All documents produced in response to these requests shall be either:

a.    Organized and labeled to correspond with the number of the specific request to which the documents are responsive, or

b.    Produced in the order and in the manner that they are kept in the usual course of business.

8.    All documents requested shall include all documents and information that relate in whole or in part to the relevant time period, or to events or circumstances during

such relevant time period, even though dated, prepared or generated or received prior to relevant time period.

9.    All documents that exist in computer-based and other digital or electronic format are to be produced in such format and in their native form or other searchable form, not in an electronic form that is merely a picture of a document such as a TIFF file, a TIF file, or a PDF file. All documents that exist only in paper form are to be produced as image files with corresponding searchable text.

## DOCUMENTS SUBPOENAED

All documents concerning submitted scientific paper, "The Relationship Between Antiepileptics and Suicide Attempts," by Robert D. Gibbons, Kwan Hur, C. Hendricks Brown, and J. John Mann, dated September 2008.  A copy of the paper is annexed hereto as Exhibit A.

# EXHIBIT  A

Word Count: 3421
Tables: 2
Figures: 1

# The Relationship Between Antiepileptics and Suicide Attempts

Robert D. Gibbons[1]
Kwan Hur[1,2]
C. Hendricks Brown[1,3]
J. John Mann[4]

[1]Center for Health Statistics, University of Illinois at Chicago
Rooms 455-457 (MC 912), 1601 W. Taylor, Chicago, IL 60612, USA

[2]Cooporate Studies Program Coordinating Center,
Hines VA Hospital, Hines, IL 60141

[3]Prevention Science and Methodology Group,
Department of Epidemiology and Biostatistics, College of Public Health MDC-56
University of South Florida, 13201 Bruce B Downs Blvd Tampa, FL 33612

[4]Department of Neuroscience, New York State Psychiatric Institute
Department of Psychiatry, Columbia University College of Physicians & Surgeons
1051 Riverside Drive, New York, NY 10032, USA

September 2008

**Corresponding Author**:
Robert D. Gibbons, Ph.D.
Director, Center for Health Statistics
University of Illinois at Chicago
1601 W. Taylor
Chicago, IL 60614
Phone: (312) 413-7755
Fax:    (312) 996-2113
Email: rdgib@uic.edu

**Acknowledgements:** This work was supported by NIMH grants MH062185 (JJM) and R56 MH078580 (RDG and CHB), and MH40859 (CHB) and AHRQ grant 1U18HS016973. Dr. Gibbons has served as an expert witness for the U.S. Department of Justice, and Wyeth and Pfizer Pharmaceuticals, the latter involving gabapentin, one of the drugs considered in this paper. Dr. Mann has received research support from GlaxoSmithKline and has served as an adviser to Eli Lilly and Lundbeck Pharmaceuticals. Dr. Brown directs a suicide prevention program at the University of South Florida that is funded by JDS Pharmaceuticals. Dr. Hur reports no competing interests. Dr. Gibbons had full access to all of the data in the study and takes

responsibility for the integrity of the data and the accuracy of the data analysis. The data were obtained from PHARMetrics with assistance of a grant-in-aid from Pfizer. Pfizer was not involved in any of the research and did not review the results or the manuscript prior to submission for publication.

# ABSTRACT

**Context:** On January 31, 2008, FDA issued an alert regarding increased risk of suicidal thoughts and behavior with antiepileptic drugs (AED) (1). On July 10, 2008, an FDA scientific advisory committee voted yes that there was a significant positive association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality. **Objective:** To determine if AEDs increase risk of suicide attempt in patients with bipolar disorder. **Design:** A pharmacoepidemiologic study in which suicide attempt rates were compared before and after treatment and to a no medication control group. Analyses were restricted to AED and lithium monotherapy. **Setting:** We used the PharMetrics medical claims database to study the relationship between the 11 AEDs identified in the FDA alert and lithium to suicide attempts. **Main Outcome Measure:** Suicide attempts. **Patients:** A cohort of 47,918 patients with bipolar disorder with a minimum of a one-year window of information before and after the index date of their illness. **Results:** Overall, there was no significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000). In subjects treated with an AED, the rate of suicide attempts was significantly higher prior to treatment (72/1000) than after treatment (13/1000). In patients receiving no concomitant treatment with an antidepressant or antipsychotic, AEDs were significantly protective relative to no pharmacologic treatment (3/1000 versus 15/1000). **Conclusions:** Despite FDA reports regarding increased risk of suicidality associated with AED treatment, the current study reveals that as a class, AEDs do not increase risk of suicide attempts in patients with bipolar disorder relative to patients not treated with an AED or lithium. AEDs reduce suicide attempt rates both

relative to patients not receiving any psychotropic medication and relative to their own

pre-treatment levels.

## INTRODUCTION

Anticonvulsant medications are life saving in the treatment of seizure disorders and are also extensively used for other indications such as mood disorders and trigeminal neuralgia. In March of 2005, The Food and Drug Administration in the United States (FDA) sent letters to sponsors of 11 antiepileptic drugs (AEDs) requesting the submission of suicidality data from placebo-controlled randomized clinical trials (RCTs). The data consisted of suicide-related adverse event reports and a search for suicide-related terms in electronic data bases related to the studies. The 11 AEDs included gabapentin, divalproex, felbamate, lamotrigine, levetiracetam, oxcarbazepine, pregabalin, tiagabine, topiramate, zonisamide, and carbamazepine. FDA conducted a meta-analysis of 199 placebo-controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs (2). They found that 0.43% of the patients in drug treatment groups reported suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who reported suicidal behavior or ideation than in the placebo treatment groups. Based on these findings, on January 31, 2008, FDA issued an alert to health care providers warning of increased risk of suicidal thoughts and behavior with AEDs (1). On July 10, 2008 FDA convened a meeting of two of their scientific advisory committees to determine the type and extent of the warning that FDA would promulgate regarding AEDs and suicidality. The committee voted that yes there was a significant association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality.

There have been two previous pharmacoepidemiologic studies of the relationship between antiepileptic drugs and suicide in bipolar patients where the suicide rate is clearly elevated to begin with and where a treatment effect may be easier to detect (3,4). One study (3) compared suicide completion and attempt rates between lithium, gabapentin, divalproex, and carbamazepine in a cohort of 12,662 bipolar patients from an Oregon Medicaid medical claims database. There were 11 suicides and 79 attempts. Relative to lithium, divalproex had higher suicide attempt rates and gabapentin had higher rates of suicide completion. The authors concluded that lithium may have protective effects with regard to suicide attempts among Medicaid patients with bipolar disorder, however it remains unclear whether or not lithium protects these patients against suicide completion. They also note that the difference between lithium and gabapentin in suicide rates could be due to confounding by indication, where "completed suicide among gabapentin users may well be related to prescription of this medication for people with chronic pain (in addition to bipolar disorder) who could be at very high risk of suicide. In addition, the study did not control for previous suicide attempts or previous treatment with lithium. It may be the case that more severely ill patients who did not respond to lithium were then prescribed gabapentin, and it is this lack of treatment response that is related to increased suicide incidence. Of course, the study was based on only 11 suicides, and these results have not been confirmed by replication in other studies.

The second study (4) involved 20,638 bipolar disorder patients from two large integrated health plans from California and Washington. Suicide attempt rates were 31.3/1000

person years for divalproex versus 10.8/1000 for lithium, a significant difference

following adjustment for age, sex, comorbid medical and psychiatric conditions and

concomitant use of other psychotropic drugs. Completed suicide rates were also higher

for divalproex versus lithium (1.7/1000 versus 0.7/1000). Again, there was no

adjustment for previous suicide attempts or comparison to patients that were not treated

with either lithium or an AED.


Completed suicide and attempted suicide are major concerns for people with bipolar

disorder (5-8). In the absence of treatment, approximately 10 per thousand individuals

with bipolar disorder complete suicide annually and about 40 per thousand attempt

suicide (5). These risks are approximately one hundred-fold higher (completed suicide)

and ten-fold greater (suicide attempts) than those for the general population (5). That

makes this a population of interest in detecting the effect on suicide risk of AEDs in

comparison to a no-treatment group. Further, the FDA warning implicated all 11 AEDs

as a whole, which is surprising given their often quite different modes of action. This

paper examines the effect on risk of different types of AEDs on a full population of

bipolar patients. Therefore the purpose of this study is to both replicate and expand the

previous findings of the Collins and McFarland and Goodwin studies. First, we

examined a much larger cohort of bipolar patients than the previous studies. Second, we

investigated a much larger set of AEDs, i.e., the 11 AEDs in the FDA analysis. Third,

with respect to the 11 AEDs and lithium, we considered monotherapy only, thereby

reducing the confounding effect of treatment resistance from the analysis. Fourth, we

adjusted for concomitant therapy including antidepressants, anticonvulsants, and other

AEDs (beyond the 11 considered by FDA) in the analysis (or completely eliminated in a sensitivity analysis). Fifth, suicide attempt prior to the index episode was adjusted for in the analysis. Sixth, we examined differences in suicide attempt rates between individuals who did or did not received AED or lithium treatment and within individuals before and after initiation of treatment. Seventh, we examined the possibility of selection effects by comparing suicide attempt rates between patients not receiving treatment with one of the 11 AEDs or lithium to pretreatment levels in those patients who ultimately received treatment with an AED or lithium. Eighth, using a Poisson regression model we were able to include patients with multiple attempts before and after initiation of treatment in the analysis.

## METHODS

Data for this study came from the PharMetrics Patient Centric Database, the largest national patient-centric database of longitudinal integrated health care claims data commercially available from PHARMetrics®, Inc., under unrestricted license. These national data are not statistically different from the 2000 U.S. Census distributions of age, gender, and region. The universe of data are comprised of medical, specialty, facility, and pharmacy paid claims from more than 85 managed care plans nationally, representing more than 47 million covered lives.

Data were collected during fiscal years 2000 through 2006. All patients with an ICD 9 diagnosis of bipolar disorder (ICD-9 codes: 296.0x, 296.1x, and 296.4x-296.8x) who were continuously enrolled in the same health care plan for at least one year before and after the index diagnosis date were included in the sample. A total of 47,918 patients met these criteria, and there were 1,226 patients with at least one suicide attempt. The ICD 9 codes used to identify suicide attempts were E950-E959, where subcategories are E950-E952 (self-inflicted poisoning), E953 (self-inflicted injury by hanging), E954 (drowning), E955 (self-inflicted injury by firearms), E956 (self-inflicted injury by cutting), E957 (self-inflicted injury by jumping from high places), E958 (other/unspecified self-inflicted injury), and E959 (late effects of self- inflicted injury).

Analysis of these data was based on Poisson regression models using the number of patient exposure days as an offset. The method of generalized estimating equations

(GEE) was used for the within-subject analyses which compared suicide attempt rates before and after initiation of therapy. Traditional maximum likelihood Poisson regression analysis was used for between subject comparisons of no medication (i.e., 11 AEDs and lithium) to pre-treatment and post-treatment AED and lithium conditions respectively. Comparing no AED/lithium treatment to the pre-treatment exposure period allows us to examine selection effects in which more severely ill patients at higher risk for suicide attempts may be preferentially selected for AED or lithium treatment. To adjust for other potential confounders, all models included concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006) as covariates. Results were expressed as event rate ratios (ERR) and associated confidence intervals (CI), which are the exponential of the estimated treatment effect (and confidence interval) in the Poisson regression model. The ERR is a rate multiplier which reflects the increased rate associated with treatment versus no treatment. An ERR of 2.0 reflects double the rate of suicide attempts in treated versus untreated patients (or pre versus post treatment exposure period in a within-subject analysis), whereas an ERR of 0.5 reflects one-half the rate of suicide attempts in treated patients relative to untreated patients (or post versus pre treatment exposure periods in a within-subject analysis).

## RESULTS

Table 1 presents number of patients at risk, number of suicide attempts, person years of exposure and rate of suicide attempts per 1000 person years of exposure before and after initiation of treatment during the one year observation period following the index date of the bipolar disorder diagnosis. These summary statistics are provided for each of the 11 AEDs, lithium, the combination of all AEDs and the no medication condition, which consists of subjects not treated with any of the 11 AEDs or lithium. Table 1 also presents results for treatment with one of the 11 AEDs only and no pharmacologic treatment (i.e., no antidepressant, or antipsychotic or second AED). Table 1 reveals that there were a total of 13,385 patients who received either one of the 11 AEDs or lithium and 25,432 patients that did not receive any of the 11 AEDs or lithium. Post treatment suicide attempt rates for AEDs (13/1000 person years) and lithium (18/1000 person years) were comparable to no treatment rates (13/1000 person years). Of the 25,432 patients who did not receive any of the 11 AEDs or lithium, 11,207 (44%) also did not receive any other AED, antidepressant or antipsychotic medication. The rate of suicide attempts in this group was 15/1000 person years, slightly higher than those who did not receive one of the 11 AEDs or lithium. Table 1 reveals that for five of the drugs there was an insufficient number of cases for a meaningful individual drug-level statistical analysis (felbamate, levetiracetam, pregabalin, tiagabine, and zonisamide). Figure 1 presents a graphical summary of suicide rates by treatment type, before and after treatment.

## Table 1
### Suicide Attempt Rate per 1,000 Person Years Before and After Treatment by AED, Lithium and No Treatment

| Drug Use | # at Risk | # Attempts Before tx | Person Years | Rate before Tx per 1,000 Person Years | # Attempts After tx | Person Years | Rate after Tx per 1,000 Person Years |
|---|---|---|---|---|---|---|---|
| Gabapentin | 1,229 | 13 | 213 | 61 | 13 | 1,016 | 13 |
| Divalproex | 4,581 | 40 | 412 | 97 | 38 | 4,169 | 9 |
| Felbamate | na | | | | | | |
| Lamotrigine | 4,412 | 24 | 613 | 39 | 50 | 3,799 | 13 |
| Levetiracetam | 42 | 0 | 6 | 0 | 0 | 36 | 0 |
| Oxcarbazepine | 1,463 | 30 | 164 | 183 | 20 | 1,299 | 15 |
| Pregabalin | 85 | 0 | 29 | 0 | 0 | 56 | 0 |
| Tiagabine | 80 | 0 | 16 | 0 | 0 | 64 | 0 |
| Topiramate | 1,063 | 11 | 184 | 60 | 24 | 879 | 27 |
| Zonisamide | 84 | 2 | 11 | 182 | 0 | 73 | 0 |
| Carbamazepine | 346 | 2 | 40 | 50 | 9 | 306 | 29 |
| Any of 11 AEDs | 13,385 | 122 | 1,688 | 72 | 154 | 11,697 | 13 |
| 11 AEDs only | 1,910 | 9 | 204 | 44 | 5 | 1,706 | 3 |
| Lithium | 2,518 | 23 | 233 | 99 | 40 | 2,285 | 18 |
| No AED or Li+ | 25,432 | 334 | 25,432 | 13 | | | |
| No Medication | 11,207 | 170 | 11,207 | 15 | | | |

Following treatment there was no overall significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000 person years), adjusted event rate ratio (ERR) = 0.88, (CI: 0.72-1.08), p<0.22 (see rates in final column of Table 1). Similar effects were seen for the individual AEDs, with the exception of topiramate (27/1000 person years ERR=1.87, (CI: 1.22-2.87), p<0.004) and carbamazepine (29/1000 person years, ERR=2.37, (CI:1.21-4.61), p<0.01) which had significantly greater post-treatment risk relative to no treatment (see Table 2). A small but significant post-treatment increase for lithium versus no treatment was also found (ERR=1.46, (CI: 1.04-2.03), p<0.03). Overall, AEDs

were associated with lower suicide attempt rates than lithium (13/1000 versus 18/1000, ERR=0.62, (CI: 0.44-0.89), p<0.008); however, pre-treatment suicide attempt rates were not significantly higher for patients treated with lithium (99/1000 person years) relative to AEDs (72/1000 person years; adjusted ERR is 0.80, (0.51-1.25), p = 0.325).   While not statistically significant, the increased rate of suicide attempts observed before treatment for lithium might account for the modestly higher post treatment rate for lithium relative to AEDs.

In our within-subject analyses comparing attempts before and after receiving treatment with an AED, the rate of suicide attempts was significantly greater prior to treatment (72/1000 person years) than after treatment (13/1000 person years), ERR=0.19, (CI: 0.11-0.26), p<.0001.  Similar protective effects of AEDs were seen for the individual drugs and lithium, although the effects of topiramate (60/1000 vs. 27/1000, ERR=0.52, (CI: 0.18-1.48), p<0.22) and carbamazepine (50/1000 vs. 29/1000, ERR=0.76, (CI: 0.10-6.01), p<0.80) were not statistically significant (see Table 2).   The pre-treatment rate of suicide attempts in patients who ultimately received AED treatment was significantly higher than the no treatment suicide attempt rate (ERR=4.88, (CI: 3.91-6.09), p<0.0001) suggesting that patients who receive AED treatment  are more severely impaired.  A similar result was found for lithium (see Table 2).

**Table 2**
**Event Rate Ratios (Confidence Intervals) Comparing Suicide Rates Before and After Treatment with AED and Lithium and Against No Drug**

| Drug | Post-Drug vs. No Drug | | Pre-Drug vs. No Drug | | Post-Drug vs. Pre-Drug | |
|---|---|---|---|---|---|---|
| | ERR (CI) | p | ERR (CI) | p | ERR (CI) | p |
| Gabapentin | 1.16 (0.66-2.05) | .60 | 6.11 (3.46-10.79) | .0001 | 0.15 (0.05-0.47) | .001 |
| Divalproex | 0.72 (0.51-1.02) | .06 | 7.27 (5.16-10.25) | .0001 | 0.10 (0.05-0.19) | .0001 |
| Lamotragine | 0.85 (0.62-1.16) | .31 | 2.49 (1.63-3.81) | .0001 | 0.33 (0.19-0.59) | .0001 |
| Oxcarbazepine | 0.98 (0.62-1.56) | .94 | 10.78 (7.31-15.86) | .0001 | 0.09 (0.04-0.24) | .0001 |
| Topiramate | 1.87 (1.22-2.87) | .004 | 3.96 (2.15-7.29) | .0001 | 0.52 (0.18-1.48) | .22 |
| Carbamazepine | 2.37 (1.21-4.61) | .01 | 3.21 (0.80-12.94) | .10 | 0.76 (0.10-6.01) | .80 |
| Lithium | 1.46 (1.04-2.03) | .03 | 7.19 (4.65-11.11) | .0001 | 0.23 (0.11-0.49) | .0001 |
| Any AED | 0.88 (0.72-1.08) | .22 | 4.88 (3.91-6.09) | .0001 | 0.19 (0.11-0.26) | .0001 |
| AED only | 0.19 (0.08-0.47) | .0003 | 2.85 (1.46-5.57) | .002 | 0.05 (0.02-0.18) | .0001 |

ERR – Event Rate Ratio – ERR=2.0 indicates a doubling of the rate, ERR=0.5 indicates a halving of the rate. These are adjusted for concomitant other AEDs (other than the 11 identified by FDA), antidepressants, antipsychotics, previous suicide attempts (in the year prior to the index diagnosis), age, sex, and year (2000-2006).

Finally, we compared suicide attempt rates for patients treated with no drugs (i.e., no AED, antidepressant, or antipsychotic) versus monotherapy with one of the 11 AEDs only (i.e., no concomitant psychotropic medication). The rate of suicide attempts was 15/1000 person years for no treatment versus 3/1000 for patients treated with one of the 11 AEDs alone (ERR=0.19, (CI: 0.08-0.47), p<0.0003), see Figure 1. This finding indicates that among those patients who received no concomitant AED, antidepressant, or antipsychotic treatment, the 11 AEDs were significantly protective in terms of suicide

attempt rates relative to those patients with a diagnosis of bipolar disorder that received

no pharmacologic treatment. This finding is further highlighted by the fact that the pre-

treatment suicide rate among those treated exclusively with one of the 11 AEDs, was

significantly higher relative to the "pre-treatment" rate in those not pharmacologically

treated (44/1000 versus 15/1000, ERR=2.85, (CI: 1.46-5.57), p<0.002). Within

individuals treated exclusively with one of the 11 AEDs, significant protective effects of

treatment were also observed (44/1000 versus 3/1000, ERR=0.05, (CI: .0.02-0.18),

p<0.0001). This finding indicates that following treatment with one of the 11 AEDs

alone, the covariate adjusted rate of suicide attempts was approximately one twentieth of

the suicide rate before treatment in those patients that were previously diagnosed as

having bipolar disorder.



Figure 1: Suicide Attempt Rates Before and After Treatment

Open squares = Pre Treatment
Filled Squares = Post Treatment
Line = No Medication Rate

## DISCUSSION

The current study in patients with bipolar disorder reveals that as a class, AEDs do not increase risk of suicide attempts relative to patients not treated with an AED or lithium. In fact, among those patients not receiving any concomitant treatment with another AED, lithium, antidepressants, or antipsychotics, the rate of post AED treatment suicide attempts was 3/1000 patient years versus 44/1000 patient years prior to treatment and versus 13/1000 patient years for those who were not pharmacologically treated. These results reveal that AED monotherapy with one of the 11 AEDs results in a statistically and clinically significant reduction in suicide attempt rates relative to both pre-treatment rates (i.e., within patients) and no treatment rates (i.e., between patients), in patients with bipolar disorder.

Our analysis also reveals that there is a selection effect in that the pre-treatment rate of suicide attempts are almost 5 times higher is patients who are ultimately treated with an AED and 7 times higher in patients who are ultimately treated with lithium relative to patients not receiving pharmacologic treatment with one of these drugs. If pretreatment suicide attempt rates reflect severity of illness, it is the more severely impaired patients who are more likely to receive treatment with an AED or lithium relative to those less impaired. Nevertheless, post treatment suicide rates are significantly reduced in those patients treated with an AED or lithium from their elevated pre-treatment levels to the level found at or below patients not receiving treatment (slightly higher for lithium). This finding suggests a protective effect of AED or lithium treatment on suicidality in contrast to FDA's report of an increase in suicidality associated with AED treatment.

Since prior suicide attempt greatly increases the risk of future suicide, that effect would favor higher post-treatment suicide attempt rates in the AED-treated group, an effect that was outweighed by the apparent therapeutic effect of this treatment.

Possible exceptions are topiramate and carbamazepine which did not show significant reduction in suicide attempt rates with treatment and had post treatment suicide attempt rates significantly higher than no treatment levels. Nevertheless, even for these two AEDs, there was no evidence that they increased suicide rates, just that they did not appear to significantly reduce the already elevated pre-treatment suicide attempt rate.

The question arises as to the source of the difference between the results reported here and the findings of the FDA meta-analysis of RCTs. There are several possibilities. First, FDA's analysis was based on adverse events reports of suicidal thoughts and behavior, whereas our analysis is based exclusively on suicide attempts. Suicidal thinking and suicide attempts that are of sufficient magnitude to make it into the medical claims record reflect quite different levels of suicidal intent and may have different relationships to AED treatment. Second, FDA's meta-analysis combined several indications including psychiatric, pain, and epilepsy, but that may not be important because their sub-analysis for psychiatric indications did not provide evidence of significantly increased risk with AED treatment (OR=1.51, CI=0.95-2.45). Third, the majority of the suicidality events in the FDA analyses were observed for only 2 of the 11 AEDs, lamotragine and topiramate. Sixty-one percent of all of the events were observed for these two drugs, despite the fact that these two drugs account for only 38%

of the suicide-related adverse event reports. These two drugs were the only drugs that individually had statistically significant effects on suicidality (lamotragine OR=2.08, CI=1.03-4.40; topiramate, OR=2.53, CI=1.21-5.85) and in the risk difference (RD) analysis that included data from all studies (lamotragine RD=5.40 per 1000, CI=0.24-10.57; topiramate RD=3.05, CI=0.98-5.11). By contrast, the other 9 drugs showed no significant association with suicidality either individually or in combination (OR=1.127, CI=0.652-1.948, p=0.78). These results reveal that FDA's meta-analysis was driven by lamotragine and topiramate, and had these two drugs (that already have suicidality warnings in their labels) been excluded from the analysis, there would have been no remaining signal of an association between AEDs and suicidality. Fourth, the results of FDA's analysis could be affected by two different ascertainment biases. Patients treated with a drug will have more side effects than patients on placebo and therefore more opportunity to report their suicidal thoughts (9). Suicide attempts made by taking an overdose of study medication will result in contact with the health care system (e.g., an emergency room) and therefore have a greater likelihood of being detected than an overdose on placebo (10).

With respect to the previous report by Collins and McFarland (3), their study was restricted to lithium, divalproex, gabapentin, and carbamazepine. For these four drugs, they identified 79 suicide attempts in 7017 person years whereas we identified 100 attempts in 7776 person years, so the overall incidence rate for these four drugs was slightly higher in our study. In terms of suicide attempt rates, they found rates of 6, 19, 10, and 17 per 1000 person years for lithium, divalproex, gabapentin, and carbamazepine

respectively, whereas our post-treatment incidence rates were 18, 9, 13, and 29 respectively.   Rates reported by Goodwin and colleagues (4) were generally higher than those found by Collins and McFarland (3) and somewhat closer to our study with the exception of divalproex: 11, 31, and 22 per 1000 person years for lithium, divalproex, and carbamazapine respectively.

The major differences between our study and the two previous studies are that (a) we were able to adjust for pre-treatment suicide attempts, (b) we considered AEDs and lithium monotherapy whereas they designated patients in terms of their first treatment, (c) we included a no treatment comparator group, and (d) we had pre-treatment data which permitted a within-subject analysis.

Finally, our estimates of the untreated suicide attempt rate of 13 per 1000 person years for no treatment with any of the 11 AEDs or lithium and 15 per 1000 person years for no treatment with any AED, antidepressant, or antipsychotic medication is considerably below the rate of 40 per 1000 reported by Baldessarini and colleagues (5).  Note however, that among those bipolar patients who go on to be treated with an AED, the rate is 72 suicide attempts per 1000 patient years and for those who are ultimately treated with lithium, the suicide attempt rate is 99 per 1000 patient years.  As such their reported rate of 40 per 1000 may be a reasonable estimate of the overall rate of suicide attempts in untreated bipolar patients averaging over the entire range of severity of illness.

There are several limitations of our study. First, our results are based on medical claims data and there is likely to be under-reporting of suicide attempts. Second, we do not have access to information on completed suicides in this population. Third, our analyses do not incorporate intensity of treatment. Fourth, patients were not randomized to treatment, and there may be other factors that play a significant role in the process by which specific treatments are selected for patients. Fifth, diagnoses were obtained from electronic data systems and not from structured psychiatric interviews.

In summary, the present analysis provides no evidence that AEDs increase risk of suicide attempts among patients with bipolar disorder. If anything, the effects of most AEDs and lithium are to reduce suicide attempt rates relative to pre-treatment levels in those patients who are ultimately prescribed these drugs. In patients treated with no other psychotropic medication, the group of 11 AEDs as a whole significantly reduced the suicide attempt rate below that of patients who received no pharmacological treatment, despite the fact that their pre-treatment suicide attempt rate was almost 3 times higher than those who did not receive treatment.

# REFERENCES

1. Information for Healthcare Professionals Suicidality and Antiepileptic Drugs. http://www.fda.gov/CDER/Drug/InfoSheets/HCP/antiepilepticsHCP.htm, January 31, 2008.

2. Statistical review and evaluation. http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4372b1-01-FDA.pdf, May 23, 2008.

3. Collins JC, & McFarland BH. Divalproex, lithium, and suicide among Medicaid patients with bipolar disorder. *Journal of Affective Disorders.* 2008;107:23-28.

4. Goodwin, FK, Fireman, B, Simon, GE, Hunkeler, EM, Lee, J, Revicki, D. Suicide risk in bipolar disorder during treatment with lithium and divalproex. *JAMA.* 2003; 290:1467–1473.

5. Baldessarini RJ, Pompili M, Tondo L. Suicide in bipolar disorder: risks and management. *CNS Spectr.* 2006;11:465–471.

6. Goodwin FK. 1999. Anticonvulsant therapy and suicide risk in affective disorders. *J. Clin. Psychiatry.* 1999;60 (Suppl 2):89–93.

7. Baldessarini, RJ, Tondo, L. Suicide risk and treatments for patients with bipolar disorder. *JAMA.* 2003;290:1517–1519.

8. Müller-Oerlinghausen, B, Berghöfer, A, Bauer, M. Bipolar disorder. *Lancet.* 2002;359:241–247.

9. Posner K, Oquendo MA, Gould M, Stanley B, Davies M: Columbia classification algorithm of suicide assessment (C-CASA): Classification of suicidal events in the FDA's pediatric suicidal risk analysis of antidepressants. *American Journal of Psychiatry.* 2007;164:1035-1043.

10. Gibbons R.D., Brown C.H., Hur K., Marcus S., Bhaumik D.K., Mann J.J. The relationship between antidepressants and suicide: Results of analysis of the Veterans Health Administration datasets. *American Journal of Psychiatry,* 2007;164:1044-1049:2007.