# EXHIBIT 2 Part 2

On Page 9, Dr. Greenland states in a discussion of adverse event reports, that "case-report databases at best provide a sentinel alert for adverse events associated with a drug…" This is indeed true, despite the misuse and misinterpretation of such data in the Blume report.  When appropriate analyses of postmarketing data are conducted it is clear that no signal of suicidality emerged at any time prior to 2005.  It is not disputed in this case, that after 2003 the effects of publicity and other factors biased reporting such that it totally negated the value of this database for any signaling.   My opinions and analysis on this issue are provided above.

Dr. Greenland criticizes Pfizer's assessment of adverse event reports by noting that the elimination of cases based on a clinical assessment "is a violation of standard protocol in randomized clinical trials, which proscribe exclusions following randomization (Greenland et al, 2008)" (page 9)  In a clinical trial, patients are randomization into treatment or comparator (placebo) arms and the frequency of events can be compared between the arms.  In spontaneous reports there are only events; no randomization and no comparator arm(s).  Therefore, reports are evaluated differently and for a different purpose.  It is standard practice in pharmacovigilance to evaluate each report individually to see if there are reports in which there is no plausible alternative for the event, except for the drug.  Guidance for Industry Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), and Center for Biologics Evaluation and Research (CBER) March 2005. http://www.fda.gov/cder/guidance/6359OCC.htm;  Strom, 4th ed., Chap. 36, p. 557.

On Page 10, Dr. Greenland states: "Elimination of cases in this fashion leads to underestimation of suicide rates in postmarketing surveillance and uncontrolled comparisons, which greatly increases the likelihood of false-negative results (failure to find a genuine excess)."  This is misleading as the rates of suicide or of any other condition cannot be determined from spontaneous reports.  As spontaneous reports are voluntary, only an unknown proportion of all events are reported to the FDA or the manufacturer.  The denominator is also unknown and can only be roughly estimated from national sales or prescription data.

On Page 11,  Dr. Greenland suggests that the validity of the postmarketing data can be assessed by taking the ratio of attempted to completed suicides, and gives a ratio of 2.1 and compares it to the 6.0 from the clinical trials (Parsons report) and 7.2 from an observation study (Collins & McFarland Paper).  A low ratio of suicides to suicide attempts is expected in spontaneous reporting data, as seriousness of the outcome is one of the criteria for reporting.  Suicide attempts that do not meet the criteria for a serious adverse event (21 C.F.R. § 314.80) may not be reported to the FDA as individual reports. My independent academic research has shown that starting in 1998, immediately following the initiation of AERS, the number reports released in the FIO-AERS database was only half of the number of reports as received by CDER.

B. Cheryl Blume's report

Based on her CV, report, and deposition it is clear that Dr. Blume has little or no training in epidemiology and is not an epidemiologist or a pharmacoepidemiologist. Specific examples are listed below. Her CV is devoid of any mention of expertise, training, or publications in epidemiology or pharmacoepidemiology. She is listed as a member, but not a fellow, of the International Society of Pharmacoepidemiology (ISPE) as of October 2007. The only requirement for general membership is payment of the $220 dues. I searched the abstracts, poster sessions, and listings of podium presentations and could find no evidence of her participated in any way at any of ISPE's annual meetings over the last five years. Similarly, she has not been listed as an author or co-author in any manuscript published in the official journal of the society, Pharmacoepidemiology & Drug Safety.

In discussing the clinical trial data, Dr. Blume states that the clinical development "....include studies designed to assess the clinical safety and efficacy of a drug in the patient population for whom the drug *will be prescribed*." This is incorrect. The studies must be conducting in patients for whom the drug *will be indicated*, that is the intended population as it is written in the drug label and for which the drug will be approved. The indicated disease or condition is chosen by the drug sponsor/manufacturer and not the FDA. Once a drug is on the market it can be prescribed by physicians differently from how it is labeled. This "off-label prescribing" is quite common, particularly for children and in the field of psychiatry. Radley, D., et al. Off-label Prescribing Among Office-Based Physicians. *Arch Int Med.* 2006; 166:1021-26; Barbui, C., et al. Off-label and non-classical prescriptions of antipsychotic agents in ordinary in-patient practice. *Acta Psychiatr Scand* 2004; 109:275-78; Chen, H., et al. An epidemiological investigation of off-label anticonvulsant drug use in the Georgia Medicaid Population. *Pharmacoepidemiology & Drug Safety* 2005; 14:629-38. In a study of off –label prescribing among Georgia Medicaid recipients, Chen et al found that more than 70% of patients receiving anti-convulsants were prescribed the drugs for off-label uses. The rates of off-label prescribing were highest among the newer anti-convulsants and being younger than 18 years, was a significant predictor of off-label use. Hua, et al., An epidemiological investigation of off-label anticonvulsantdrug use in the Georgia Medicaid population. *Pharmacoepidemiology and Drug Safety* 2005; 14: 629-638.

Paragraph 31. On postmarketing reports, Dr. Blume states "The system also detects increases in the frequency or severity of previously identified events." This is incorrect. The rate of events (i.e. frequency) among those at risk (i.e. exposed) cannot be determined from such reports as the numerator (total events that occurred) and the denominator (persons at risk) are both unknown. Therefore, changes in the frequency of events cannot be calculated from reports.

Paragraph 46. Dr. Blume contends, at several points in her report, that Neurontin causes or exacerbates depression and anxiety is contradicted by the results of three well-controlled randomized clinical trials specifically studying Neurontin in patients with various psychiatric disorders. . In all three of these trials -- involving patients with panic

disorder, bipolar disorder, and social phobia -- researchers utilized  Hamilton Depression (or HAM-D) and Hamilton Anxiety (HAM-A) Scales to evaluate depression and anxiety, respectively.  Research Report 720-04174 (March 26, 1999) (bipolar controlled study); Research Report 720-03851 (April 9, 1999) (panic disorder study); Research Report 720-03850 (March 19, 1999) (social phobia study). Results from all three studies showed no worsening in either the HAM-D or HAM-A scores at any time during the study period, indicating no emergence or exacerbation of depression or anxiety.  There were no reports of suicide or attempted suicide by a patient on gabapentin in any of the three psychiatric clinical studies.  And although there were reports of suicidal ideation by patients on placebo in the psychiatric controlled studies, there were no such reports in any patients on gabapentin. It is my opinion that the data from the bipolar, social phobia, and panic disorder controlled studies supports the hypothesis that Neurontin does not cause or worsen depression or anxiety.

Paragraphs 52-56.  Dr. Blume provides some background information on the concepts of dechallenge and rechallenge and asserts that there were "Incidences of positive dechallenge/rechallenge events have been documented in clinical trials involving gabapentin" and specifically notes the events as suicidal ideation, depression and hostility.  In certain limited contexts, an event that goes away when a drug is withdrawn and then comes back again when the drug is reintroduced, can provide support of a causal association.  However, a temporally-related sequence of events is not always evidence of dechallenge – rechallenge – and as such does not prove causality.  The hazard of falsely presuming that cycling of symptoms is evidence of a positive rechallenge is well described by Girard (Girard, Conclusiveness of rechallenge in the interpretation of adverse drug reactions. *Br J Clin Pharmacol.* 23:73 - 79 (1987)).  *See, also* Vilhjalmsson, et al., Factors associated with suicide ideation in adults.  Soc. Psychiatry Psych. Epidemiol. 33:97 – 103 (1998).  Particular to depression, FDA scientists Drs. O'Connell, Wilkin, and Pitts write that "Reports that document positive rechallence do not prove a causal relationship for events such as depression that have a high background rate and a chronic remitting natural history." Vilhjalmsson, et al., Factors associated with suicide ideation in adults. *Soc. Psychiatry Psych. Epidemiol.* 33:97 – 103 (1998)  Given the use of gabapentin in populations that have a high rates of depression (e.g. epilepsy and chronic pain) as well as a disease which manifests with episodes of depression (i.e. bipolar disorder) resolution and the subsequent reoccurrence of depression or depressive symptoms that are temporally related to treatment do not provide evidence for causality.  Depression is a subjective measure (qualitative) – and not measured in a valid way in event reports.  Given high background and lack of specificity, cycling of depressive symptoms is not considered evidence of positive dechallenge/rechallenge.

Paragraph 59.  Dr. Blume states that "suicide related events associated with Neurontin were evidence in the clinical trial data."  This statement is at odds with the clinical trial data as summarized by Evertsz in which there were no suicides and only one suicide attempt in all of the randomized controlled trials. Response to FDA Suicidality Request (June 22, 2006),  Pfizer_MEvertsz_0079431

Paragraphs 60-92. In this section, and in other sections throughout her report, Dr. Blume present tables which list terms, which she calls "psychobiological adverse events," and numbers. Data in such tables are uninterruptible and of no scientific value. A critical limitation is the absence of any methodology for her independent review of the clinical studies and postmarketing event reports and their compilation into tables. In particular, she provides neither a definition of the term "psychobiological adverse events" nor any references to this concept in the medical literature. Its validity as a measure of suicide-related events is unproven. Thus, it is scientifically inappropriate to attempt to show a causal relationship between Neurontin and suicide or suicide attempt based on purported changes of these "psychobiological adverse events." She provides no information on her methods; how the events were abstracted and clinically adjudicated or how she dealt with multiple terms together in a single case. Given the subjective nature of these events, a standardized protocol is necessary to find cases, followed by a standardized and critical evaluate narratives by an experienced clinician (ideally blinded to exposure), as was the protocol followed in Pfizer in their evaluation of the clinical and postmarketing data (*REF the Evertsz report, Parsons.) Furthermore, her tables are filled with raw counts (the number of purported events) and as such are uninterruptible. Without calculating and statistically comparing rates or proportions, these tables are essentially meaningless and inferences cannot be drawn from them.

Paragraph 96. Dr. Blume gives the proportion of patients who withdrew from trials by their treatment (gabapentin and placebo) and states that among patients who withdrew from these studies, the proportion that withdrew due to "clinically related psychobiologic events" was greater among gabapentin-exposed than among placebo-exposed. In addition to the dubious validity of her methodology, she also provides no statistical analysis to support this statement. There is no context to determine if the proportions provided are statistically different or due to random error.

Paragraph 101. Dr. Blume states that surveillance data provides "signals of increased numbers of deaths, suicide attempts, overdose, etc.", during the period 1994-1996. She makes similar statements throughout her report, in which she incorrectly calls the accumulation of adverse event reports over time *trends*, and that such "trends" are *signals*. Statistically, three years of data are not adequate to establish trends over time. Additionally, as long as a drug is marketed (and for a period following withdrawal), the number of reports that mention the drug will continue to accumulate. As Neurontin was approved in December 1993, it is expected that adverse events would accumulate in the FDA database. An accumulation of event reports do not constitute a "signal."

Paragraph 119. In her review of the World Health Organization's adverse event database, Dr. Blume states "The *incidence* of reports of psychiatric disorders (psychiatric disorder-related reports / total reports) during 1994-1996 was 22% (87/395) in 1994; 18% (201/1116) in 1995; and 16% (82/514) in 1996." However, the proportions presented are *not incidence*, which is one of the first measures of disease frequency that is taught in introductory epidemiology courses. Incidence is calculated by dividing the number of new events by the total persons at risk (or person-time at risk). What she gives here are actually proportions based on case reports and as such cannot be interpreted as incidence rates.

Paragraph 167.  Her definition of nonserious events is unusual and contrary to the
regulatory definition.  In her report Dr. Blume writes "Pfizer Defendants' discussion of
overdose events emphasized the *non-serious cases* (*i.e.*, those where the event was
attributed to another drug or there was no report of a daily dose in excess of the label
recommendation). Based on 21 C.F.R. § 314,80, a serious adverse event is defined as
"Any adverse drug experience occurring at any dose that results in any of the following
outcomes: Death, a life-threatening adverse drug experience, inpatient hospitalization or
prolongation of existing hospitalization, a persistent or significant disability/incapacity,
or a congenital anomaly/birth defect. Important medical events that may not result in
death, be life-threatening, or require hospitalization may be considered a serious adverse
drug experience when, based upon appropriate medical judgment, they may jeopardize
the patient or subject and may require medical or surgical intervention to prevent one of
the outcomes listed in this definition." A non-serious adverse event is an event that does
not rise to the level of a serious event. Dr. Blume's definition is inconsistent with this
definition.

Paragraph 175 – Dr. Blume notes "…increases were also observed in the SRS/AERS
database for the numbers of aggression, anxiety, agitation, depersonalization and
depression events from 1996 to 2002." It is also important to put these into context
which takes into account the increases in gabapentin sales, increases in total adverse
event reports for gabapentin, and increases in adverse event reporting for all drugs during
this time period. Another change that is likely to cause a spurious increase in nonserious
(and perhaps nonspecific) adverse event terms was the change from SRS to AERS in late
1997. That transition was accompanied by a change in the medical dictionary for adverse
event terminology, from COSTART to MedDRA, and an increase in the number of terms
that could be recorded, from four (COSTART) to unlimited (MedDRA), per report.
Neal, *et al.*, MedDRA and pharmacovigilance - the way forward. DIA annual meeting.
June 27-July 1 1999.
Slide # 7, http://www.fda.gov/cder/present/dia-699/dia628/sld007.htm

Paragraph 234.  Dr. Blume criticizes the protocol used to identify possible suicide-related
events, which was established by the FDA scientists in conjunction with Dr. Posner,
Columbia University, as "arguably too narrow to appropriately reflect all psychobiologic
adverse events including suicidal events." Indeed that is exactly why the FDA would
insist that companies follow their established and tested protocol. Creating a clear and
valid case definition and a reproducible (reliable) protocol to guide an unbiased
identification of cases, and exclusion of non-cases, is a necessary step in any
epidemiological study. A case definition that is too broad such that it incorporates a
heterogeneous constellation of conditions (e.g. psychobiological events) would tend to
bias a study toward the null hypothesis, finding no association when one exists.    Strom,
4th Ed., Chapt. 8, p. 118.

Paragraph 244. Dr. Blume states that "Pfizer Defendants should have recognized the
growing numbers of …. completed suicides that continued to accumulate in their internal

database" and notes the increases in suicides from 2002-2004 period. Not only does she neglect to mention that were no (zero) completed suicides reported for the first five years of marketing, but these raw numbers are taken out of context. Using the FOI-AERS database, and prescription sales data from Verispan, I plotted the number of completed suicides reported and the number of adverse event reports which mentioned gabapentin by report year alongside the total prescriptions. During the same period, there were substantial increases in the total number of gabapentin adverse event reports each year and also substantial growth in total prescription sales. (See Figure 11). Again, the large increase in the number of suicide reports in 2004 and 2005 is likely the result of increased direct-to-FDA reporting related to litigation and publicity.



Figure 11. Trends in gabapentin prescription sales and adverse event reports over time.

Paragraph 245. Dr. Blume criticizes Pfizer's scientists for putting suicide reports into context by considering the background rate of suicide in the patient populations who are likely receiving gabapentin and the total adverse events reported by saying 'these rationalizations have been previously criticized by FDA as inadequate and not applicable for suicide-related events" and quoting an FDA alert to health professionals: Isotretinoin (marked as Accutane), FDA; November 2005 http://www.fda.gov/cder/drug/InfoSheets/HCP/IsotretinoinHCP.htm. Her criticisms are misplaced. First, I find nothing in the referenced FDA alert that addresses the issue at hand and second, the FDA clearly states in their Guidance to Industry on Good Pharmacovigilance Practices (REF March 2005, Section G. Page 10), that reports of an event should be considered in the context of exposures (specifically mentioning prescription sales) and the background rates of the event in the population "ideally, in a subpopulation with characteristics similar to that of the exposed population."

Paragraph 248. Dr. Blume notes "by the end of 2005, completed suicide comprised over 3% of the total database." Because of the stimulated reporting of reports of suicide with Neurontin (primarily because of events reported directly to FDA by a law firm), which is readily apparent in the first quarter of 2005. In her deposition, Dr. Blume conceded that such notoriety bias likely began two years before. Completed suicide reports have been increasing in AERS, regardless of medication. This needs to be taken within the context of the overall increase in all AERS reports (CDER 2005 Report to the Nation) and the real increase in suicides rates among young America's from 2003-2004. Lubell, *et al.* Suicide Trends Among Youths and Young Adults Aged 10--24 Years --- United States, 1990—2004. MMWR. September 7, 2007 / 56(35);905-908, at: http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5635a2.htm

Dr. Blume makes numerous misstatements about data mining and particularly, the Proportional Reporting Ratio (PRR) in her paragraphs 313-320, some of these are highlighted in below.

Paragraph 313. She states that PRRs can be used to "compare different adverse events within a product or differences in adverse events between two products." When properly conducted, a PRR is a calculation of whether a particular drug-event combination is reported more often together than expected. It does this by "generating a score by comparing the fraction of all reports for a particular event (e.g., liver failure) for a specific drug (i.e., the "observed reporting fraction") with the fraction of reports for the same particular event for all drugs (i.e.,"the expected reporting fraction"). FDA Guidance document – pharmacovigilance, page 8. This score is then statically evaluated in context of a predetermined threshold. Importantly, at her deposition, Dr. Blume denied using any statistical methods to "compare different adverse events."

Paragraph 314. In her discussion of data mining, and particularly the PRR, Dr. Blume purports "a signal is considered whenever the PRR exceeds one." A review of the literature of data mining studies shows a threshold of a PRR of two or greater is commonly used in conjunction with a Chi-squared $\geq 4$, and an $n \geq 3$. Hauben M, et al., Data mining in pharmacovigilance: the need for a balanced perspective. *Drug Safety* 2005; 28(10):835-842; Evans, et al. Use of proportional reporting ratios (PRRs) for signal generation from spontaneous adverse drug reaction reports. *Pharmacoepidemiol Drug Safety* 2001; 10:483-486; Kubota, et al. Comparison of data mining methodologies using Japanese spontaneous reports. *Pharmacoepidemiology & Drug Safety* 13(6):387-94, 2004; Almenoff, et al. Comparative performance of two quantitative safety signalling methods: implications for use in a pharmacovigilance department. *Drug Safety* 2006; 29(10):875-887.

Paragraph 320. Dr. Blume makes reference to a chart in her report, that it "reflecting the PRR for Suicidal and Self-Injurious Behavior." However, there are no PRR values in the referenced chart (page 194). Because PRR is a ratio of two proportions, the resulting value has no units. In her chart, the y-axis is labeled % reports. It appears that this is just the percentage of total reports (for each of the drugs) that had a coded event that fell

within the broader higher level term "SUICIDAL AND SELF-INJURIOUS BEHAVIOUR".

Paragraph 323. Dr. Blume references a chart that she created based on data from what appears to be a consultation report (dated Feb 6, 2007) from Drs. Gelperin and Green to Mary Parks, M.D., Director Division of Metabolism and Endocrinology Products. She neglects that the authors noted "in a passive surveillance database such as AERS and as stated in a previous consult dated July 16, 2002,66 it is difficult to discern the drug effect associated with reported cardiac events in a non-randomized controlled trial setting." It is misleading to state that this is what the FDA based their determination of a signal for Avandia. The bulk of the briefing document deals with randomized controlled clinical trials and meta-analyses of these trials. In his presentation slides at that same meeting, Dr. David Graham, the senior medical epidemiologist, presented the clinical trial data to the total exclusion of AERS reports. http://www.fda.gov/ohrms/dockets/ac/07/slides/2007-4308s1-00-index.htm. The plot that she referenced was in an internal FDA consultation, that was part of the briefing document provided to advisory committee members prior to the meeting. http://www.fda.gov/ohrms/dockets/ac/07/briefing/2007-4308b1-02-fda-backgrounder.pdf. I could find no evidence that these data were discussed or presented during the advisory committee meeting, nor considered by the members in their review. http://www.fda.gov/ohrms/dockets/ac/07/slides/2007-4308s1-00-index.htm) In fact, they discussed the limitations of "high quality and well conducted" observational studies in informing their decision because of biases. http://www.fda.gov/ohrms/dockets/ac/07/minutes/2007-4308m1-final.pdf  - page 5) Adverse event reporting rates, which are what Dr. Blume presents here, are even less informative as they are not research studies at all and are subject to all of the well known and described limitations of postmarketing surveillance. Strom, 4th Ed., Chapt. 9, p. 152 – 154. There is no support for her statement that FDA has approved her methodology of analyzing the AERS database. Furthermore, the use of single comparator drugs, as presented in Dr. Blume's report (page 194), is improper, and there is no valid analysis to assert that the percentages that she presents are statistically different.

**In summary**

The totality of the clinical trial, observational studies, and postmarketing data fails to establish an association between gabapentin and suicide or suicide attempt. There were no suicides in the randomized clinical trials. Data mining of the spontaneous reporting system did not identify a statistically significant alert or signal of disproportional reporting for the preferred terms "suicide" or "suicide attempt" until 2005. That same year, in the first quarter of 2005, there is clear evidence of stimulated reporting by the plaintiff's attorneys themselves. Neither FDA nor any other regulatory agency has found that Neurontin is associated with suicide or suicide attempt. No medical or scientific peer-reviewed literature has established that Neurontin is associated with or causes suicide or suicide attempt. With reasonable scientific certainty, there is no evidence to even suggest, let alone prove, a link between gabapentin and increased risk of suicide or suicide attempt.

31

DATE: December 20, 2007

_____
Sheila Weiss Smith, Ph.D.