# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                     :      MDL Docket No. 1629

In re:  NEURONTIN MARKETING,    :
          SALES PRACTICES AND     :      Master File No. 04-10981
          PRODUCTS LIABILITY LITIGATION  :

                                       :      Judge Patti B. Saris
-------------------------------------------------------------x
                                     :      Magistrate Judge Leo T. Sorokin

*Bulger v. Pfizer Inc., et al.*, 07-CV-11426-PBS  :

*Smith v. Pfizer Inc., et al.*, 05-CV-11515-PBS  :
                                     :
-------------------------------------------------------------x

## PRODUCTS LIABILITY PLAINTIFFS' MOTION TO
## <u>EXCLUDE THE TESTIMONY OF SHEILA WEISS SMITH, Ph.D.</u>

Product Liability Plaintiffs hereby move pursuant to the standards of expert evidence enunciated in *Daubert* and its progeny and Rule 702 of the Federal Rules of Evidence, for an Order excluding the testimony of Pfizer Defendants' expert witness Sheila Weiss Smith, Ph.D.

This Motion is supported by the Memorandum in Support, and the Declaration of Kenneth B. Fromson, Esq., and attached Exhibits, submitted herewith.

Dated:  January 23, 2009

Respectfully submitted,

**Members of Products Liability
Plaintiffs' Steering Committee**

By:     /s/ **Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551

By:     /s/ **Jack W. London**
Jack W. London, Esquire
Law Offices of Jack W. London
  & Associates
3701 Bee Cave Road, Suite 200
Austin-Westlake, TX  78746

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on January 23, 2009.

Dated:  January 23, 2009

/s/ **Andrew G. Finkelstein**
Andrew G. Finkelstein

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                           :      MDL Docket No. 1629
In re:   NEURONTIN MARKETING,       :
          SALES PRACTICES AND        :      Master File No. 04-10981
          PRODUCTS LIABILITY LITIGATION   :
                                            :      Judge Patti B. Saris
-------------------------------------------------------------x
                                            :      Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:        :
                                            :
*Bulger v. Pfizer Inc., et al.*, 07-CV-11426-PBS   :
                                            :
*Smith v. Pfizer Inc., et al.*, 05-CV-11515-PBS   :
                                            :
-------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF PRODUCTS LIABILITY PLAINTIFFS'
MOTION TO EXCLUDE THE TESTIMONY OF SHEILA WEISS SMITH, Ph.D.**

This Memorandum is submitted in support of Products Liability Plaintiffs' Motion pursuant to the standards of expert evidence enunciated in *Daubert* and its progeny and Rule 702 of the Federal Rules of Evidence, for an Order excluding the testimony of Pfizer Defendants' expert witness Sheila Weiss Smith, Ph.D.

## I. INTRODUCTION

Defendants designated Dr. Weiss Smith to testify concerning whether the post-marketing safety data for Neurontin revealed a safety signal. Dr. Weiss Smith's initial expert report was submitted in December 2007,[1] and she was deposed in January 2008. In November 2008, under the guise of case-specific testimony, she submitted a supplemental report that expanded upon her initial report and added opinions on "Pfizer's conduct in the development, testing and labeling of

---

[1] Declaration of Kenneth B. Fromson, Esq., Exhibit A.

Neurontin which were not part of my general causation opinions in my first report."[2] Subsequently, Dr. Weiss Smith was deposed on December 22, 2008, prompting the instant motion.

Dr. Weiss Smith freely admitted during her deposition that she is not qualified to render expert opinions regarding the clinical interpretation of safety information, labeling, FDA regulatory practices, suicidology, terms to search for safety signals relevant to suicidology, or the adequacy of Defendants' NDA procedures, all of which are central to her opinions. Dr. Weiss Smith's opinions also should be excluded because she made fundamental mathematical errors that call her analyses into question, then destroyed the underlying background work, making it impossible for Plaintiffs or this Court to verify her work.

Dr. Weiss Smith's opinions also should be excluded because she admittedly made false citing references and incomplete quotations to professional literature, thereby spinning a false perception as to the safety of Neurontin. She specifically uses those tactics to express opinions on the role of nonserious reports in the FDA database, and the evidentiary value given by the FDA to challenge-rechallenge events, both issues of some importance in the litigation.

In sum, Dr. Weiss Smith is not qualified to render many of the opinions she has rendered. Her opinions do not comply with the requirement of Rule 702 that she disclose the underlying basis of her opinions or that her work be verifiable and reproducible. Her methodology is both unreliable and misleading.

## II. **THE LEGAL STANDARD**

The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

---

[2] Fromson Decl., Ex. B at 1.

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, made clear that the district courts must act as gatekeepers to ensure that expert testimony is both relevant and reliable. The Court identified the following non-exclusive factors a district court may consider in evaluating an expert's testimony: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the theory or technique's degree of acceptance in the scientific community. 509 U.S. 579, 593-94 (1993). The First Circuit has detailed three requirements that must be fulfilled, in order to succeed against a Rule 702 challenge: (1) the expert must be qualified; (2) the expert's scientific testimony must be reliable; and (3) the testimony in question must "assist the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995).

An important requirement of the gatekeeping role is that a court "must, of course, ensure that the witness is qualified to offer an expert opinion." *United States v. Monteiro*, 407 F. Supp. 2d 351, 357 (D. Mass. 2006) (citing to *Poulis-Minnot v. Smith,* 388 F.3d 354, 359, 373 (1st Cir. 2004); *see, e.g. Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (finding that trial court had properly excluded testimony of property appraisal since witness was neither a licensed appraiser nor real estate broker and lacked training and formal schooling in appraisal methods). "Unless the witness's opinions are informed by expertise, they are no more helpful than the opinions of a lay witness. Thus, such opinions cannot be admitted pursuant to Rule 702 and instead must comply with the requirements of Fed. R. Evid. 701 governing the admissibility of opinion testimony by lay witnesses." *United States v. Shay*, 57

F.3d 126, 133 (1st "Cir. 1995) (citing for this general proposition, *United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995). "Qualifications alone are insufficient to satisfy the rule's requirements if the expert's testimony is based on unreliable methodology or if it cannot reliably be applied to the facts in issue." *Grimes v. Hoffman-LaRoche, Inc.*, 907 F. Supp. 33, 35 (D.N.H. 1995). This Court has stated that,"[t]o be sufficiently qualified to testify as an expert, a witness needs to have 'knowledge, skill, experience, training, or education,' Fed. R. Evid. 702, 'in the specific subject for which his testimony is offered.'" *Sutera v. Perrier Group, Inc.*, 986 F. Supp. 655 (D. Mass. 1997) (citing to *Whiting v. Boston Edison Co.*, 891 F. Supp. 12 (D. Mass. 1995)).

A. **Dr. Weiss Smith Should Be Precluded From Providing Opinion Testimony in Subjects in Which She Freely Admits She Is Not an Expert.**

Dr. Weiss Smith was deposed by Plaintiffs on two separate occasions, first on January 9, 2008, in regard to her initial expert report, Fromson Decl., Ex. C, and subsequently on December 22, 2008, in regard to her supplemental expert report. Fromson Decl., Ex. D. At the December 22, 2008 deposition, Dr. Weiss Smith was questioned in detail regarding her qualifications as an expert in relation to many of the areas in which she provided opinions in the initial and supplemental expert reports. She freely admitted during the deposition that there are several areas in which she does not possess the requisite qualifications as an expert, as noted below:

1. **Without clinical expertise and with no prior experience making clinical assessments, Dr. Weiss Smith's opinions that rely upon or provide clinical assessments should be excluded.**

Dr. Weiss Smith freely admits to neither being a clinician,[3] nor possessing the requisite experience to perform clinical assessments.[4] However, in various areas of her reports she does indeed make clinical assessments. For example, opinion 6 on page 27 of her supplemental

---

[3] Fromson Decl., Ex. D at 30:08-30:09.
[4] Fromson Decl., Ex. C at 154:09-154:20.

4

expert report states that "Plaintiffs' interpretation of the post-marketing adverse event data is flawed…" This implies that Dr. Weiss Smith possesses the expertise to interpret the adverse events. As a threshold matter, due to her lack of training and education or prior practical experience in making clinical assessments, all such portions of her report based on a clinical assessment should be excluded.

> **2. Without expertise and only minimal exposure to drug manufacturer labeling requirements, Dr. Weiss Smith's opinions regarding the labeling should be excluded.**

Dr. Weiss Smith admits not being an expert in labeling,[5] and never having written any part of a label.[6] It is clear from her testimony that in regard to labeling she has served no more than some undefined type of "advisory" role on pharmacoepidemiologic issues.[7] She did not testify to any qualifications to evaluate the adequacy of a label[8] and has never corresponded with the FDA concerning labeling.[9] She admitted not being cognizant of the obligations of a drug manufacturer in regard to making changes to a drug's label or of the appropriate conditions under which a drug manufacturer is required by law to make such changes.[10] Yet, in her supplemental expert report on page 1, Dr. Weiss Smith states that she also "offer[s] opinions regarding Pfizer's conduct in the development, testing, and labeling of Neurontin…" Such opinions should be excluded due to her admitted lack of expertise.

> **3. Dr. Weiss Smith admitted to not having expertise in suicidology, yet based her opinions on the false premise that the adverse event term dictated whether an adverse report was a serious condition rather than whether the clinical condition described in the report was a serious condition.**

---

[5] Fromson Decl., Ex. D at 29:14-30:01.
[6] Fromson Decl., Ex. D at 30:10-30:15.
[7] Fromson Decl., Ex. D at 30:19:31:20.
[8] Fromson Decl., Ex. D at 32:06-32:13.
[9] Fromson Decl., Ex. D at 32:14-32:16.
[10] Fromson Decl., Ex. D at 178:16-189:06.

Dr. Weiss Smith admits that she is not qualified as an expert in suicidology,[11] as well as to not being a clinician. Nevertheless, in her supplemental report she renders opinions that suicidal ideation and gestures are not serious events.[12] However, whether a suicidal gesture or ideation is a serious event requires a clinical evaluation to determine whether an event is serious.[13] There is a regulatory definition of "*serious*" that is dependent on the patient outcome and is subject to the clinical judgment of the reporter.[14] Because Dr. Weiss Smith is not a suicidologist and has no experience making clinical judgments, she should not be permitted to testify to what are the appropriate terms to use when looking for signals of suicidality.

### 4. Dr. Weiss Smith admits that she is not an expert in pharmacovigilance, and any testimony beyond her expertise in pharmacoepidemiology should be excluded.

The FDA defines pharmacovigilance as "all scientific and data gathering activities relating to the detection, assessment, and understanding of adverse events."[15] Dr. Weiss Smith is not an expert on pharmacovigilance.[16] The closest she comes to this field is as an expert in pharmacoepidemiology and data mining. Pharmacoepidemiology is defined as "the study of the utilization and effects of drugs in large numbers of people."[17] Data mining is the "systematic examination of the reported adverse events by using statistical or mathematical methods."[18] Both pharmacoepidemiology and data mining are components of the much broader topic of pharmacovigilance. She admits that safety signals can arise in the absence of data mining, but that she is not qualified to form reliable opinions on those issues.[19] She also admits that she is

---

[11] Fromson Decl., Ex. D at 69:19-69:20.
[12] Fromson Decl., Ex. D at 240:05-242:06.
[13] Fromson Decl., Ex. D at 244:18-245:11.
[14] Fromson Decl., Ex. D at 248:07-249:16.
[15] Fromson Decl., Ex. E at 4.
[16] Fromson Decl., Ex. D at 98:06-99:10.
[17] www.pharmacoepi.org/about/index.cfm.
[18] Fromson Decl., Ex. E at 8.
[19] Fromson Decl., Ex. D at 105:08-105:18.

not qualified as an expert in the subject of good pharmacovigilance practices.[20]  She has never

designed pharmacovigilance procedures for a pharmaceutical company.[21]  Nevertheless, she

consistently expresses the opinion that no signal for suicidality existed before 2005 and that the

company behaved appropriately with respect to pharmacovigilance.[22]  Without the requisite

training or experience in pharmacovigilance practices, her testimony should be given no more

credence than that of lay testimony.  Such portions of Dr. Weiss Smith's report be excluded.

### B.  Dr. Weiss Smith Should Be Precluded From Testifying in Regard to Areas in Which It Is Clear That She Does Not Have the Required Expertise.

#### 1.  Dr. Weiss Smith has limited regulatory experience and any opinions requiring expertise in regulatory matters should be excluded.

Dr. Weiss Smith claims that she is a regulatory expert 'to some degree.'[23]  This claim of

expertise is based upon the slender reed of having a fellowship at the FDA in which she

'touched' upon regulatory issues.  However, she has never worked in regulatory affairs for a

pharmaceutical company.[24]  When questioned concerning the standards for making a change in a

label, she did not have any opinions on such standards and stated that she had to review the

regulations.[25]  She commented upon the applicability of various FDA regulations in her

supplement expert report,[26] yet in the report she failed to utilize the regulations that were in

effect at the time that the majority of Plaintiffs' claims arose.[27]  Dr. Weiss Smith's testimony

concerning such issues should be excluded because without requisite training or sufficient

experience she is no more qualified to interpret or apply FDA regulations or regulatory practice

than a lay person who reads the FDA website.

---

[20] Fromson Decl., Ex. D at 171:18-171:21.
[21] Fromson Decl., Ex. D at 99:04-99:10, 306:18-307:13.
[22] Fromson Decl., Ex. B at 20.
[23] Fromson Decl., Ex. D at 34:10-35:15.
[24] *Id.*
[25] Fromson Decl., Ex. D at 112:12-112:19, 178:22-179:06.
[26] Fromson Decl., Ex. B at 17.
[27] Fromson Decl., Ex. D at 177:15-178:05.

**2. Dr. Weiss Smith had never reviewed a New Drug Application (NDA) or participated in the actual drafting of a NDA, and thus her criticism of Plaintiffs' expert's format for presenting safety data in an NDA is supposition, unreliable and should be excluded.**

Dr. Weiss Smith has never reviewed a New Drug Application (NDA),[28] although she has reviewed summaries as part of her presence on FDA Advisory Committees.[29]   Furthermore, she has never written any part of an NDA, including an integrated summary of safety (ISS), and has never analyzed data for inclusion in an ISS.[30]   Even though she has absolutely no factual knowledge or expertise of how the FDA reviews NDAs,[31] she provides comments in her expert report regarding whether the FDA has approved or accepted Dr. Blume's format for presenting safety data.[32]   Such comments are not based on experience or training, and should be excluded.

**C. Dr. Weiss Smith Should Not Be Permitted to Testify Regarding Dr. Blume's Charts Because Her Opinions Are Based on Speculations and Cannot Be Confirmed Through Testing and Attempts to Replicate Her Results.**

The Neurontin litigation involves millions of pages of documents and an enormous volume of electronic data.   It would be impracticable to include the bulk data in the expert reports.   As such, experts from both parties have prepared summaries of the data for use in the expert reports in accordance with Fed. R. Evid. 1006.   As part of her expert report, Dr. Cheryl Blume utilized numerous charts and graphs.   In response, Dr. Weiss Smith did the same.

Dr. Weiss Smith was provided with all the underlying data that formed the basis of the charts relied upon by Plaintiffs' expert Dr. Blume.[33]   Dr. Weiss Smith was also given the raw data from Defendants' own internal adverse event database (ArisG).[34]   By her own admission,

---

[28] Fromson Decl., Ex. D at 173:15-174:03.
[29] Fromson Decl., Ex. D at 36:21-38:04.
[30] Fromson Decl., Ex. D at 56:14-57:05.
[31] Fromson Decl., Ex. D at 173:15-174:03.
[32] Fromson Decl., Ex. B at 16.
[33] Fromson Decl., Ex. C at 181:17-182:10.
[34] Fromson Decl., Ex. D at 43:07-43:10.

she did nothing more than take a cursory glance at both disks.[35]  She did not perform any calculations or computations to validate, understand the method of calculations, or to contradict or refute any of the charts relied upon by Dr. Blume.[36]  She admits that she is capable of looking at the ArisG database but that she did not have time, even though she had been given the database more than one year before her December 2008 deposition.[37]  Since she did not take any steps to confirm the data that formed the basis of Plaintiffs' charts and Dr. Blume's expert opinions, she should not be allowed to opine on the accuracy, reliability, or methodology of either Plaintiffs' charts or on any of Dr. Blume's opinions which relied upon the charts.

One chart prepared by Plaintiffs' expert compares suicidal and self-injurious behavior associated with different indication groups such as psychiatric conditions and epileptic conditions.[38]  The chart demonstrates that the percentage is highest for psychiatric conditions. Dr. Weiss Smith dismissed this as being due to confounding by indication without considering any other possible explanations.[39]  Confounding by indication occurs where it is asserted that the underlying condition is the cause of the adverse event and not the drug.  When presented with other possible explanations such as Neurontin having no efficacy for psychiatric conditions or Neurontin actually causing harm, she categorically dismissed them without even considering these possibilities.[40]  The failure to consider other potential causes is not sound scientific methodology and therefore, such opinions should be excluded.

### D. Dr. Weiss Smith Should Not Be Permitted To Testify Regarding Clinical Safety Signals Because She Admits Not Having Expertise in that Area and She Did Not Perform Any Independent Review of Any of the Clinical Information, and Thus Her Opinions in This Area Should Be Excluded.

---

[35] Fromson Decl., Ex. D at 44:25-45:05.
[36] Fromson Decl., Ex. D at 132:07-132:19.
[37] Fromson Decl., Ex. D at 65:08-65:14.
[38] Fromson Decl., Ex. F.
[39] Fromson Decl., Ex. D at 289:16-292:17.
[40] Id.

Dr. Weiss Smith maintains there was no signal for suicidality (i.e., a red flag). She admits this statement does not include a signal that could arise in the absence of data mining.[41] Furthermore, she admits that she is not qualified to review information such as a case series that may have arisen in the Neurontin clinical trials or in post-marketing pharmacovigilance.[42] A case series is a collection of discrete adverse event reports that may arise from clinical trials or post marketing surveillance. Moreover, she did not see any evidence that the company reviewed post-marketing safety data for specific off-label populations,[43] and she did not ask for any such information. She simply relied upon a summary prepared by Defendants for the FDA in response to the FDA suicide inquiry. Without any admitted expertise in this area, and without performing any independent testing or verification of the summaries, Dr. Weiss Smith's opinions should not be given any more credence than those of a lay witness.

E. **Dr. Weiss Smith Failed to Review Sufficient Material Information to Form the Basis of Her Opinions on Existence of Signals Earler Than Pfizer's Acquisition of Parke-Davis/Warner-Lambert.**

Dr. Weiss Smith never asked Defendants to provide her with any particular documents,[44] and was thus limited to the documents chosen and provided to her by Defendants. While it may not be necessary for an expert to review all of the materials produced in litigation, it is certainly necessary that the expert review sufficient documents and information which are relevant and material to the issue so that their opinions have a sound basis.

With respect to pharmacovigilance, Dr. Weiss Smith reviewed "the epidemiologic literature, reviewed the FDA analysis and I did some independent data mining of the FDA FOI

---

[41] Fromson Decl., Ex. D at 305:1-305:20.
[42] Fromson Decl., Ex. D at 192:21-194:01.
[43] Fromson Decl., Ex. D at 224:23-225:22.
[44] Fromson Decl., Ex. D at 13:14-13:17.

database. So all of my opinions are based on that work."[45] She does not express any opinions on what was done by Defendants between 1993 and 2000, the Parke-Davis/Warner-Lambert era, yet she maintains that there was no safety signal during that time.[46] Moreover, she does not have an opinion whether the company could have been specifically reviewing psychiatric adverse events.[47] She also has the opinion that the company conducted adequate pharmacovigilance, yet she did not see any documents that the company did any mining whatsoever with respect to Neurontin.[48] Therefore, since she did not see any materials to suggest the company employed data mining practices and she is not qualified to evaluate the pharmacovigilance practices of the company, there is no basis for her to form a reliable opinion on those subjects. The Court should exclude her opinions in this area.

Dr. Weiss Smith renders opinions that there was no safety signal in either the post-marketing safety data or the initial development of the drug.[49] However, she only reviewed "a few" clinical trial reports,[50] which renders her opinion on this issue unreliable. This is in stark contrast to Plaintiffs' expert, Dr. Cheryl Blume, who reviewed more than 200 research reports including virtually every clinical trial report for human studies and most of the animal toxicology reports.[51] Because so little of the information was reviewed, any opinions by Dr. Weiss Smith concerning clinical trials should be excluded.

**F. Dr. Weiss Smith Did Not Use Sound Methods In Preparing Her Report, and Even for the Areas in Which She Does Have Expertise, and the Report Should Be Excluded.**

One of the *Daubert* cornerstones is that the expert must use sound methodology

---

[45] Fromson Decl., Ex. D at 111:22-112:01.
[46] Fromson Decl., Ex. D at 108:09:108:25, WS Expert Report 20.
[47] Fromson Decl., Ex. D at 306:18-307:13.
[48] Fromson Decl., Ex. D at 209:08-210:04.
[49] Fromson Decl., Ex. B at 20, 25.
[50] Fromson Decl., Ex. D at 83:18-84:7.
[51] *See* Expert Report of Cheryl Blume, ECF Doc. # 1197-5.

representative of methodologies used outside of the litigation process. Dr. Weiss Smith failed to follow sound methods.

> **1. Dr. Weiss Smith, lacking the requisite expertise, restricted her analyses to suicide attempt and completed suicides and excluded terms included in the FDA Alert such as depression, anxiety, and aggression.**

Dr. Weiss Smith made the decision to limit all of her review to the terms "suicide" and "suicide attempt" discussed *supra*. She admits that the FDA included suicidal ideation in its meta-analysis[52], yet renders unfounded opinions that suicidal ideations should be excluded[53]. Furthermore, the FDA in its January 2008 Alert lists several other symptoms that may be related to suicidality[54]. When asked who selected the terms she used for her analysis, she stated that she selected the terms.[55] Given that she admits to not being an expert in suicidology and having no expertise in making clinical judgment, her unreasonable limitation of the terms to use demonstrates her unsound methodology.

As discussed *supra*, Dr. Weiss Smith concluded that suicidal ideation was always nonserious without ever testing that premise in the database.[56] The plain error of her summarily concluding that suicide gestures and ideation do not meet the FDA definition of a serious adverse event enables her to dismiss the evidence of a signal arising from those adverse event reports. It is not reliable methodology to disregard the facts to conclude that there is no evidence.

> **2. Dr. Weiss Smith made numerous mathematical mistakes.**

Many of Dr. Weiss Smith's opinions are based upon mathematical calculations. Her deposition testimony demonstrated that the calculations she performed and on which she based her opinions are consistently fraught with errors. To compound the problem, she did not or

---

[52] Fromson Decl., Ex. D at 242:15-242:22.
[53] Fromson Decl., Ex. B at 23-25.
[54] Fromson Decl., Ex. G.
[55] Fromson Decl., Ex. D at 249:17-251:17.
[56] Fromson Decl., Ex. D at 245:12-245:25.

would not provide to Plaintiffs the underlying background materials that she utilized in the preparation of her charts. Therefore, Plaintiffs are completely unable to verify the accuracy of much of her analysis. As such, it is only possible to provide a few examples, as noted below, in which Plaintiffs were able to detect such errors.

During Dr. Weiss Smith's first deposition, a question was raised concerning the chart on page 21 of her first expert report which indicated that the proportional reporting rate (PRR) for completed suicide in the period prior to 1997 was zero. The PRR is the ratio of the percentage of adverse event reports of a certain term compared to all events for the drug divided by the same for some background. As an example, if for drug X, there were 10 reports of completed suicide out of 100 total reports, the result is 10%. If the comparator group had 10,000 reports out of 1,000,000, the result is 1%. The PRR would be 10 (10%/1%).

The only mathematical interpretation for her chart is that there were no suicides for Neurontin, while there was at least one suicide in the background. Prior to 1997, there was no term in the FDA database for completed suicide.[57] When asked about this, she was not aware that there was no term for completed suicide during that time period.[58] She admitted that if there was no term for completed suicide, then the PRR would be undefined since there would have been no reports for either Neurontin or the background. Moreover, she admitted that zero is not the same as undefined.[59] The error in her chart represents a substantial mathematical error. As part of the supplemental report, she tried to buffer this flaw. She stated that the Qscan software that she used reports zero for the PRR in instances when the PRR is actually undefined.[60] When asked how a reader would know that the PRR is undefined and not really zero, she stated that if a

---

[57] Version 11 MedDRA llt.txt data file.
[58] Fromson Decl., Ex. C at 165:21-170:10.
[59] Id.
[60] Fromson Decl., Ex. B at 21.

reader wanted to know, he could ask the author.[61]  It is clearly unsound methodology to publish a chart which the author knows is not correct and would likely to be misinterpreted.

Another example of Dr. Weiss Smith's poor numerical validation came out in her recent deposition.  In the supplemental report on page 28, she made four mathematical mistakes within the *same paragraph*.  In the paragraph, she was attempting to point at flaws in Plaintiffs' analyses by demonstrating relative increases in prescriptions, adverse event reports, and suicide reports generally.  First, she stated that a 20-fold increase was a 200% increase.  In fact, it is a 1900% increase.[62]  She then made a similar mistake three more times in the same paragraph where she references increases of 360%, 615%, and 174%.  The respective increases should have been 260%, 515%, and 74%.  She was asked about one of these increases (174%) in her deposition and admitted that she was wrong but claimed that it was simply a typographical error.[63]  The claim of the typographical error does not comport with the report where she essentially makes the same mistake four times in the same paragraph.  Instead, such substantive errors demonstrate either erroneous methodology or carelessness and is further indicia that the expert reports of Dr. Weiss Smith are unreliable.

Many of the charts created by Dr. Weiss Smith rely upon percentages and ratios in which she could have made additional similar mathematical errors.  The fact that she admits to discarding some of the background materials made it impossible for Plaintiffs to replicate or test the calculations and brings all of the data presentations in her expert reports into question.  Because her calculations cannot be tested, all of her opinions relating to all calculations she performed must be excluded due to poor methodology and unreliability.

---

[61] Fromson Decl., Ex. D at 259:24-259:16.
[62] To calculate the increase, the old value is subtracted from the new value and the resultant is divided by the old value.  Here, 20-1 (20-fold increase) is 19 which divide by 1 is 19.  Since 1 is 100%, this is a 1900% increase.
[63] Fromson Decl., Ex. D at 297:10-298:10.

### 3. Dr. Weiss Smith did not save the background information that forms the basis of her report.

The U.S. Supreme Court found that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). The First Circuit explained that one of the critical factors on which it bases its determination that an expert's testimony is reliable is "the verifiability of the expert's theory or technique". *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 80-81 (1st Cir. 1998). Because Dr. Weiss Smith did not save her work, this Court will not be in a position to ascertain whether there is a gap between the data and the opinion proffered or to test the reliability of her opinions by verifying her technique. Plaintiffs are completely unable to replicate the report data and test the accuracy of her opinions.

Dr. Weiss Smith made various computations and aggregations of data but did not provide the data and analysis that would enable Plaintiffs to test and verify her work. More importantly, for the analyses done as part of her supplemental report, she discarded the source data that was used to prepare her reports.[64] (In contrast, Plaintiffs provided all of the underlying data and analyses to Defendants; none of the defense experts has submitted that any of Plaintiffs' charts are mathematically incorrect).

This has completely frustrated Plaintiffs' ability to verify Dr. Weiss Smith's work. Given that her analyses are rife with mathematical errors as described *supra*, this Court should preclude the admission into evidence of all of the charts included in Dr. Weiss Smith's expert reports.

---

[64] Fromson Decl., Ex. D at 321:11-322:24.

### 4. Numerous references in Dr. Weiss Smith's expert reports are wrong or misleading.

Even though Dr. Weiss Smith concedes that the purpose of references in expert reports is to properly attribute findings to the appropriate source,[65] she did not provide accurate references and misquoted the references. When questioned, she stated: "I believe and I went through everything to make sure I properly attributed the correct person to the statements that are in there and that I accurately reflected what was in the reference."[66] It is scientifically unsound to misquote references, a practice which can mislead readers to accept statements even though they are not accurate. Some of the most egregious examples are noted below.

On Page 20 of the supplemental report Dr. Weiss Smith indicates that in reference to changes in the FDA adverse event database, "These include … not entering (periodic) manufacturers nonserious adverse event reports into the database."[67] This statement would lead any reasonable reader to conclude that nonserious adverse event reports were not being entered into the FDA database. In fact, how nonserious reports are accounted for in PRR calculations is in dispute by the experts and makes the existence or lack thereof very important. These considerations can make large differences when evaluating safety signals.

Dr. Weiss-Smith also cites a presentation by Janet Woodcock of the FDA. Dr. Woodcock's presentation actually stated "[n]onserious reports are not usually entered into AERS". AERS is the FDA adverse event database. Dr. Weiss Smith took out the "not usually," thus changing the statement in a way that leads the reader to reasonably conclude these reports are never entered into the database. When confronted on this issue during the deposition,[68] She tried to cover her mistake by saying that she did not actually say that none of the reports were

---

[65] Fromson Decl., Ex. D at 27:09-27:22.
[66] *Id.*
[67] Fromson Decl., Ex. B at 20.
[68] Fromson Decl., Ex. D at 194:18-199:13.

entered into the database.  She also stated that she could have "been more explicit."[69]  This clearly demonstrates that she will alter statements from other sources to suit Pfizer's goals.

Another more egregious example occurred in her initial expert report and was discussed in her first deposition.[70]  Even though, by her own admission, Dr. Weiss Smith is unqualified to discuss clinical issues, she rendered opinions on the adequacy of clinical trial dechallenge/rechallenge reports.  On page 26 of her original report, Dr. Weiss Smith wrote:

> Particular to depression, FDA scientists Drs. O'Connell, Wilkin, and Pitts write that "Reports that document positive rechallenge do not prove a causal relationship for events such as depression that have a high background rate and a chronic remitting natural history."  Vilhjalmsson, et al.

As it turns out, this quotation is not from the article by Vilhjalmsson.[71]  It originated in an American Journal of Dermatology article published in February 2006, which was not listed anywhere in Dr. Weiss Smith's materials but with some research Plaintiffs were able to locate the reference.  Upon reviewing the reference, however, it was clear that Dr. Weiss Smith omitted a key part of the statement from the FDA scientists that states:

> Reports that document positive rechallenge do not prove a causal relationship for events such as depression that have a high background rate and a chronic remitting natural history.  *Nonetheless, positive rechallenges are very important evidence in overall causality assessment of isotretinoin and psychiatric adverse events.*[72]

The second sentence of the statement substantially qualifies the first sentence.  The role of dechallenge/rechallenge events is a substantive topic in this litigation.  Dr. Weiss Smith's excluding the second sentence falsely supports the defense contention that the FDA itself does not believe that dechallenge/rechallenge events are useful.  When asked about her exclusion of

---

[69] Fromson Decl., Ex. D at 198:19-199:13.
[70] Fromson Decl., Ex. C at 51:09-59:11.
[71] Fromson Decl., Ex. C at 42:10-47:09.
[72] Isotretinoin (Accutane) and serious psychiatric adverse events. O'Connel et al.  Journal of the American College of Dermatology. Feb. 2003, pt 1, 48:2, Fromson Decl., Ex. H.

the second sentence, she felt that since she didn't agree with the second sentence, it was acceptable to exclude the sentence.[73]

Dr. Weiss Smith is careless with citing references and willing to alter the source material to support her opinions. The expert reports of Dr. Weiss Smith are not reliable and not up to the standards of the medical and scientific community.

### 5. Dr. Weiss Smith rendered opinions without review of sufficient materials.

Many of Dr. Weiss Smith's opinions are conclusory and are not based upon a review of the materials, even those produced by Defendants. For example, she renders opinions that there was no signal for suicidality either from data mining or from a review of the clinical information. In fact, she did not review the clinical information for Neurontin and simply relied upon a summary report prepared by Pfizer in response to the FDA which looked only at a very narrow range of terms.[74]

Dr. Weiss Smith maintains that suicidal ideation is nonserious *per se*. Apart from lacking the requisite expertise to form a reliable opinion on the subject, discussed *supra*, she did not even investigate whether suicidal ideations were reported as serious adverse events.[75] She expressed the opinion that Dr. Blume was incorrect in looking at the MedDRA[76] terms "suicidal" and "self-injurious behavior" because it included terms like "self-injurious behavior". Since Dr. Weiss Smith admits she is not an expert in suicidology and is not a clinician, this opinion lacks any reasonable basis.

Additionally, Dr. Weiss Smith was questioned whether she was aware that Dr. Blume had

---

[73] Fromson Decl., Ex. C at 51:09-57:11.
[74] Fromson Decl., Ex. D at 263:25-264.19.
[75] Fromson Decl., Ex. D at 244:24-245:25.
[76] MedDRA (Medical Dictionary for Regulatory Activities) is the standard dictionary used to describe adverse events. MedDRA is hierarchical and the category "Suicidal and Self Injurious Behavior" contains the following terms: Completed Suicide, Suicide Attempt, Suicidal Ideation, Suicidal Behavior, Intentional Self Injury, Self Injurious Ideation, and Self Injurious Behavior.

formed the opinion that there were substantial signals prior to 1997. Dr. Weiss Smith was not familiar with what Dr. Blume wrote in her report for that time period even though she claimed to have read everything in the report. In fact, the first 94 out of 197 pages of Dr. Blume's report discusses the period before October 1996. This clearly demonstrates that Dr. Weiss Smith could not have read much of the Blume report and certainly not the first half of the report.[77]

### 6. Dr. Weiss Smith did not adequately proofread her report.

Aside from typographical errors that do not have substantive impact, Dr. Weiss Smith has made numerous errors in her expert reports that are significant and demonstrate she lacked scientific rigor in rendering her opinions to this Court. Dr. Weiss Smith admitted that she did not check her references or verify her work to the same degree that she would have if she were submitting a paper to a scientific journal.[78]

### CONCLUSION

While Dr. Weiss Smith may have some relevant qualifications as a pharmacoepidemiologist, her testimony should be limited and she should not be allowed to testify on any of the following areas because she either lacks the qualifications to render opinions or she has not reviewed adequate materials to form the basis of her opinion:

- Clinical Interpretation of Safety Information
- Labeling
- Regulatory
- Suicidology or the appropriate use of terms to search for signals relevant to suicide
- Adequacy of Defendants NDA submissions
- NDA review procedures of NDA
- Adequacy of periodic safety reports
- Adequacy of pharmacovigilance practices of the company
- Existence or lack thereof of any safety signal based upon data without the use of data mining

---

[77] Expert Report of Cheryl Blume, ECF Doc. # 1197-5.
[78] Fromson Decl., Ex. D at 23:15-24:03, Fromson Decl., Ex. D at 329:19-331:23.

- Appropriateness of Plaintiffs' presentation of safety data in expert reports as well as numerical accuracy of Plaintiff data

As to Dr. Weiss Smith's capacity regarding data mining issues, her admitted area of expertise, these opinions should be struck because she: (1) made serious mathematical errors; (2) discarded the data that formed the basis of her work; and (3) did not prepare her report with the same vigor she would if she had been preparing work for a journal or a non-litigation consultation. Plaintiffs therefore respectfully request that this Court issue an Order excluding the testimony of Defendants' expert Dr. Weiss Smith.

Dated: January 23, 2009

Respectfully submitted,

**Members of Products Liability Plaintiffs' Steering Committee**

By:    **/s/ Andrew G. Finkelstein**

Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY 12551

By:    **/s/ Jack W. London**

Jack W. London, Esquire
Law Offices of Jack W. London
   & Associates
3701 Bee Cave Road, Suite 200
Austin-Westlake, TX 78746

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on January 23, 2009.

**/s/ Andrew G. Finkelstein**

Andrew G. Finkelstein, Esquire