# EXHIBIT 10

# GOODELL, DeVRIES, LEECH & DANN, LLP

ATTORNEYS AT LAW
ONE SOUTH STREET, 20TH FLOOR
BALTIMORE, MARYLAND 21202

TELEPHONE  (410) 783-4000

FACSIMILE  (410) 783-4040

MICHAEL J. WASICKO
MJW@GDLDLAW.COM
WRITER'S DIRECT NUMBER
410-783-4036

February 2, 2009

Keith Altman, Esq.
Finkelstein & Partners
1279 Route 300
P.O. Box 1111
Newburgh, NY 12551

Re:    Neurontin Products Liability Litigation, Discovery: Dr. Sheila Weiss Smith Smith

Dear Keith:

I appreciate your time and effort to help to resolve the discovery dispute regarding Dr. Sheila Weiss Smith. With this letter, I would like to summarize my understanding of our agreements to date on this issue.

First, you are seeking production of the source data for the figures presented in Dr. Weiss Smith' expert report and supplemental report. In Plaintiffs' Motion to Compel at page 6, regarding "the raw and processed data," you assert that Dr. Weiss Smith did not save any of her work. As we discussed on the telephone today, Dr. Weiss Smith misunderstood your use of the term "raw data." Dr. Weiss Smith testified that when she ran her analyses of FDA AERS data using the QScan program, she would download a "delimited file," which she would not keep on her computer. *See* Weiss Smith deposition, December 22, 2008, at 322:6 -24 (testifying that because these were "raw" files she would not keep these files). What did not come across clearly in the deposition is that Dr. Weiss Smith prepared Excel spreadsheets to be used to create the graphs that appear in her reports, but these Excel spreadsheets were not deleted from her computer. As we discussed today, we will provide you with CD of a) the original Excel spreadsheets and graphs from her first and supplemental reports, b) individual case listings of completed suicide and suicide attempts for Neurontin, all other drugs, and the subset of AEDs examined by FDA in its recent analysis. The data contained in these disks will provide you with

Keith Altman, Esq.
February 2, 2009
Page 2

the data considered by Dr. Weiss Smith in forming her opinions in this matter. We believe that by producing these data we have fully met the requirements of Rule 26 of the Federal Rules of Evidence, which requires "the data or oterh information considered by the witness…"

Second, you have some specific questions regarding the QScan program that Dr. Weiss Smith used to analyze the FDA AERS data – a program licensed to Dr. Weiss Smith by a company called DrugLogic. Your opinion that Dr. Weiss Smith does not know the details of your specific questions is not accurate. Dr. Weiss Smith does have a working knowledge of certain aspects of QScan, and she has in the past, in the ordinary course of her profession, undertaken efforts to verify the accuracy of the data obtained from QScan. You state at page 3 of Plaintiffs' Motion to Compel that Dr. Weiss Smith "did not do anything to verify the adequacy of DrugLogic's cleaning, etc., of the data prior to utilizing same." However, at her deposition on January 9, 2008, Dr. Weiss Smith specifically testified that although she did not do anything "for this litigation," she has in the course of her research outside of the context of litigation done work to verify the accuracy of the data provided to her from DrugLogic. Weiss Smith deposition, January 9, 2008, at 134:9 – 135:11.

Regarding your specific questions about QScan, you sent, via an email dated January 29, 2009, a non-exhaustive list of 6 general questions that you feel you need answered in order to adequately cross-examine Dr. Weiss Smith. During our telephone conversation today, I told you that Dr. Weiss Smith has a sufficient working knowledge of QScan to provide answers to all 6 of these general questions. We agreed that I would provide you with Dr. Weiss Smith's informal (i.e., not testimonial) answers to these questions in an attempt to avoid having to contact DrugLogic directly. The questions and Dr. Weiss Smith' informal answers are as follows:

1) How was the SRS data integrated into AERS? Dr. Weiss Smith will say that QScan maps the data in the SRS database to the data in the AERS database by mapping the COSTART terms used in the SRS database to the MedDRA terms used in the AERS database.

2) COSTART to MedDRA migration? As above, Dr. Weiss Smith will say that QScan maps the data in the SRS database to the data in the AERS database by mapping the COSTART terms used in the SRS database to the MedDRA terms used in the AERS database.

3) How dates are used with respect to reports with multiple versions? Dr. Weiss Smith did not know the answer to this at her deposition, but subsequently checked with DrugLogic to determine that the convention used by QScan for a report with multiple versions is the date of the most recent version.

4) How the "other" category for serious is used? Assuming that you are referring to the "Other Serious (Important Medical Events)" category of seriousness, Dr. Weiss Smith

Keith Altman, Esq.
February 2, 2009
Page 3

will say that cases that are designated by this outcome are considered "serious" under the FDA regulatory definition (21 C.F.R. § 314.80) so they are included in queries in QScan for serious cases.

5) How the data reflects 15 day reports that have no seriousness criteria checked? Dr. Weiss Smith will say that QScan has the capability to search by report type, which includes expedited, direct or periodic. Any search performed for expedited cases (as Dr. Weiss Smith did in her first report) would capture cases that may have excluded seriousness criteria.

6) How the software computes counts with respect to terms higher than preferred terms? Dr. Weiss Smith will say that for each query, each level of the MedDRA hierarchy (from System Organ Class to Preferred Terms) is generated. You will recall that in her supplemental report, Dr. Weiss Smith, while she disagreed with your use of the Higher Level Term "suicide and self-injurious behavior," did look at the PRR for this term using her same protocol and found that the PRR was at or below 1 through 2004. Weiss Smith Supplemental Report at p. 23.

It is our position that production of these data provides you with the information Plaintiffs seek in their Motion to Compel and satisfies our requirements for production of expert materials under the Federal Rules. Per your call this afternoon, I understand that Plaintiffs have agreed to a 10-day extension for Defendants to file an Opposition to Plaintiffs' Motion to Compel, which moves the deadline to February 16, 2009. We would like to resolve this discovery dispute, thereby avoiding further burdening the court with this discovery issue, which I'm confident we can resolve. We appreciate your efforts in that direction.

Very truly yours,

Michael J. Wasicko

MJW/

cc:    Lori McGroder, Shook, Hardy & Bacon (via email)
       Richard M. Barnes

4813-9169-8435