UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
: MDL Docket No. 1629
In re:  NEURONTIN MARKETING, :
SALES PRACTICES AND : Master File No. 04-10981
PRODUCTS LIABILITY LITIGATION :
: Judge Patti B. Saris
------------------------------------------------------------x
: Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS :
:
------------------------------------------------------------x

## DECLARATION OF RONALD W. MARIS, Ph.D., IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SPECIFIC CAUSATION TESTIMONY OF DR. MARIS

I, Ronald W. Maris, declare and state as follows:

1. I am one of Plaintiff's experts in the above-captioned matter, and I make this declaration in opposition to Defendants' motion to exclude my specific causation testimony.

2. I have reviewed the following motions made by the defense in the Bulger litigation. They include these specific documents:

    A. Defendants' Motion to Exclude the Specific Causation Testimony of Dr. Maris and Dr. Kruszewski, including Motion, Memorandum in Support, Corrected Memorandum in Support, and Sayler Declaration in Support.

    B. Defendants' Motion for Summary Judgment, including Motion, Memorandum in Support, Local Rule 56.1 Statement of Material Facts, Sayler Declaration in Support, and McGroder Declaration in Support

3. I submit no new opinions in this Declaration, but rather seek to make clear those portions of my testimony and opinions that Defendants seek to mischaracterize or otherwise apparently do not understand.

4. Defense counsel states that I have been a Plaintiff's witness for 50 years (Defs.' Mem., p. 5, fn. 2); however, my *curriculum vitae* that was supplied to defense counsel clearly indicates my first forensic case was in 1977. Thus, the correct number of years is 32 and the correct ratio of my Plaintiff v. Defense testimony is 54% versus 46% in just over 200 cases. Defense counsel claims that "*30,000 patients die by suicide in the United States*

*each year* (Defs.' Mem., pp. 1-2)," but the truth is that about 80 % of those deaths are not by patients at all. Defendants' motion not only misstates the facts but it makes a systematic misrepresentation of my Neurontin causation suicide theory, and my deposition testimony.

5. In regard to Defendants' assertions that I "cannot rule out" Alternative Causes of Susan Bulger's Suicide (Defs.' Mem., p. 6, ¶ 2), I respond with the following:

   A. With the differential diagnosis model (See **DSM-IV-TR**, 2000), one needs to consider all the reasonable alternative causes or suicide risk factors. I certainly did consider all relevant alternative suicide risk factors. (See fourth expert opinion in my report of July 18, 2008, p. 25 *et seq.*). However, the Defense either misunderstands or misrepresents my suicide theory and how Neurontin causes suicide.

   B. Contrary to Defendants' assertions, I have no problem with using the word "cause," in reference to this case, as long as it is acknowledged by Defendants that suicide is multicausal (Defs.' Mem., p. 6, ¶ 2). "Cause" often gets misinterpreted to mean there is one and only one cause (a "sufficient condition"). I utilize the phrase "*substantial proximate factor in*" to make it clear that there can be, and usually are, other factors causing suicide in addition to Neurontin. In fact, I utilize the word "cause" in my 7/18/08 expert report. For example, on page 24: "*Neurontin caused Susan Bulger to become hopeless.*" To provide clarification in my expert report I note on p. 26, ¶ 4, lines 3-4, that a "*contributing factor is not a sufficient or the only cause* (sic) *in most cases of suicide.*" On page 27, I clearly state that "*gabapentin was a substantial or major contributing factor [cause] of Bulger's suicide.*"

   C. Moreover, the differential diagnosis decision tree procedure is intended for assessing and diagnosing mental disorders, and **not** for suicide assessment. Suicide is not a mental disorder and appears nowhere in the **DSM**, except as a criterion for two mental disorders (viz., Major Depressive Disorder on Axis I and Borderline Personality Disorder on Axis II). Thus, differential diagnosis is not intended as a procedure for assessing suicide, and it is incorrect for the Defense to claim that it is (see Maris deposition @ 1253). Furthermore, even the **DSM** allows for "co-morbid" diagnoses, such as Major Depression and Alcohol Dependence on Axis I.

   D. It is my opinion that Neurontin can and does **cause** suicide, in concert with other suicide risk factors (like those risk factors clearly listed on p. 27 of my 7/18/08 expert report; viz., depression and affective disorder, substance abuse, suicide ideation, a history of prior suicide attempts, age, gender, race, use of lethal methods to attempt, social isolation, hopelessness, and so on). Neurontin clearly has side-effects or serious adverse events (SAEs) that are suicidogenic; i.e., that can **cause** suicide (see my 7/18/08 expert report @ p. 20, *et seq.*). For example, the **PDR** says that depression is "frequently" associated with Neurontin treatment (7/18/08 expert report, p. 23). Furthermore, Dr. McCormick, in her review of the Neurontin NDA (1992, pp. 87 & 98) says that both depression and anxiety are "frequent" side-effects of Neurontin. It is my opinion, and the

opinion of other suicidologists (see Joiner, 2006) that depression and anxiety (see Fawcett, 2006) cause or substantially contribute to suicide outcomes.

E. The Defense has totally mischaracterized my theory of suicide as I have ruled in and ruled out certain suicide risk factors. For example, I **both** "rule in" (see Maris deposition @ p. 1253, line 14 ff & p. 1258, lines 7 & 8) and "rule out" (Maris deposition @ p. 955) non-Neurontin suicide risk factors. This methodology is fundamentally sound, due to the multifactorial nature of suicide. It would be naïve, even ridiculous, to claim that Susan Bulger's depression, substance abuse did not contribute to her suicide at all (i.e., to totally "rule them out").

F. My theory of suicide, based on over 30 years of education, training and experience, is that other suicide risk factors tend to make some individuals part of a vulnerable minority of patients (or sub-set of Neurontin users) who are susceptible to the suicidologenic side-effects of Neurontin. Further, I opine that most individuals have long suicidal "careers," over many years (cf., Joiner, 2006, **Why People die by Suicide,** Harvard Press), involving many suicide risk factors (see also, Maris, **Pathways to Suicide,** 1981, Johns Hopkins Press).

6. Defendants assert that I did not identify "Hallmarks" of Neurontin-Induced Suicides (Defs.' Mem., p. 6, ¶ 3 ff.). Suicide is a multifactorial phenomenon, and is very unlike a signature disease such as mesothelioma which may only be attributed to exposure to asbestos. Therefore, multi-factor individual criteria, and how the decedent's condition worsened formed the basis for my opinions in this case and in the Smith case. In Susan Bulger's case, she coped or lived with many suicide risk factors for a long time (at least since 1998, (see Maris 7/18/08 expert report Medical Treatment Timeline, p. 12, *et seq.*) without completing suicide (Maris 7/18/08 expert report @ 25, *et seq.*). As noted below, in regard to Mrs. Bulger, the criteria that was established based upon the documents and information reviewed included the following:

- The patient had recently ingested Neurontin and became suddenly suicidal.
- The patient exhibited suicidogenic behavioral changes after and proximate to Neurontin ingestion.
- The patient's depression became worse after their Neurontin ingestion.
- The patient had "ego-dystonic" reactions to Neurontin.
- The patient's post-Neurontin ingestion suicide attempt was violent and lethal.
- The patient had *de novo* hopelessness following Neurontin ingestion.
- Neurontin "tips the scale" or disrupts the patient's fragile coping equilibrium and the result is a fatal suicide attempt (see Maris ψA @ section 17, p. 38 ff and my expert report, p. 20 *et seq.*).

7. Defendants incorrectly allege that I relied solely on "the Logical Fallacy of *Post Hoc Ergo Propter Hoc"* (Defs.' Mem., p. 7, ¶ 3 ff) in the formation of my expert opinions in this case. Obviously, Defendants are not correct; as noted in my expert report and above, I have considered and reviewed all the available evidence in this case, have

ruled in and ruled out several risk factors for suicide and have not just relied on *post hoc ergo propter hoc* in forming my opinions. Clearly, Neurontin could not cause Susan Bulger's suicide if it occurred before she took Neurontin. I have appropriately pointed out dramatic changes in Susan Bulger's suicidality and traits/states associated sequentially and proximately with her Neurontin-ingestion, consistent with the Bradford-Hill temporality criterion for causation. For example:

A.  Dr. Crognale gave Susan Bulger Neurontin on 6/24/02. One week (7/2/02) later he reported Susan Bulger was *"devoid of life and anhedonic."* A little over two weeks after Susan got Neurontin (7/16/02), Crognale reported that she had a *"Major Depression with severe dysthymia and panic attacks."* Dr. Crognale also wrote on 10/20/00 that Neurontin made Susan Bulger *"completely out of it"* (Maris deposition @ 1147). This pattern clearly suggests suicidogenic side-effects of Neurontin ingestion for Susan Bulger.

B.  Again, the very night (at about 6:30 pm on 8/4/04) of her suicide, Susan Bulger asked for 4 Neurontin capsules. Neurontin was not tested for in her post-mortem toxicology screen, but common sense would indicate that people usually take their medicine after having just asked for and being provided with it (see Maris deposition @ 929). Taking all four Neurontin capsules together is a fairly large dose (viz., 1,200 mg).

C.  I considered that Susan Bulger's pre-Neurontin ingestion self-destructive behaviors were, of course, not lethal or especially violent. It is not even clear that the incidents were suicide attempts (see Maris deposition @ p. 977 ff). For example, wrist-cutting is very low lethality and not likely to result in suicide. Driving her car off a "cliff" (it was just "40 steps" down") was not seen as a suicide attempt by Susan Bulger's own brother, James Gibbons (see Maris @ 981), but rather an impulsive reaction to a boyfriend problem. Her most lethal pre-Neurontin behavior, an overdose of Elavil on June 5, 1990, could easily have been an accidental overdose in a known substance abuser, not a suicide attempt (see Maris deposition @ 984). In fact, Exhibit 60 (Susan's ER records after the Elavil overdose) does **not** say it was a "suicide attempt." All of these three pre-Neurontin ingestion self-destructive behaviors were not especially violent, lethal, or even suicide attempts. All of these three behaviors were reversible (and, indeed, were reversed), whereas hanging is rapidly fatal (in a few minutes) and is normally not reversible. Hanging ranks just behind shooting in lethality (see Card, 1973). When there is a suicide outcome in a person like Susan Bulger, who is only moderately suicidal (most younger white females have low suicide rates, see Maris expert report @ 28), it often suggests a *"trigger,"* such as Neurontin ingestion and the resulting suicidogenic side-effects.

D.  From the two Bulger and Smith cases, that I have reviewed, Neurontin-induced suicides tend to have a fragile coping equilibrium. Because of their other non-Neurontin suicide risk factors overtime (a *"suicidal career"* (Joiner's (2006)) or *"acquired ability to inflict lethal self-injury"*), side-effects of a drug like Neurontin (see Maris 7/18/08 expert report @ p. 20 *et seq.*) can make a noticeable difference in suicidality or *"tip the scale"* in the direction of a fatal suicide attempt. For example:

i. Neurontin has frequent side-effects of depression and anxiety, is more likely than placebo to cause somnolence, abnormal thoughts, hostility, emotional lability or fluctuating mood swings, ataxia, etc. (see Maris 7/18/08 expert report @ 21, Table 1). In my experience, such side-effects can and have triggered fatal suicide attempts.

ii. A person who dies as a result of a Neurontin-induced suicide may experience ego-dystonia (see Maris report @ p. 22). After the patient takes Neurontin they can undergo profound character or personality changes. Dr. Crognale said (10/30/00) that Neurontin made Susan Bulger *"completely out of it."* Ron Bulger, Sr. Deposition (@ pp. 131 & 113-114) said *"when it (Neurontin) was increased, she was just not the same woman."* In another place, Ron Bulger, Sr. reported (@ pp. 121-123): *In the last two months of her life, it was just* (like) *night and day."*

iii. Neurontin ingestion worsened Susan Bulger's depressive disorder (see Maris 7/18/08 expert report @ p. 22). In suicidology, it is well-known that depression is the number one single cause of suicide.

8. Defense claims *"Dr. Maris uses unreliable methodologies,"* most notably my psychological autopsy and my suicide theory or model (Defs.' Mem. @ p. 9). My psychological autopsy was systematically developed for non-litigation purposes (see Maris et al., 1992, *Assessment and Prediction of Suicide*, Chapter 8 and pp. 667-669) over many years, and it is in fact objective, unbiased, and reliable. In the area of suicidology, the psychological autopsy is a standardized and recognized method for retrospectively gathering data after a suicide (see Berman et al., 2006, *Suicide and Life-threatening Behavior*, 36-5: 511-518). In regard to the psychological autopsy and methodology that I employed in this case, see the following:

A. I first developed my psychological autopsy in the late 1960s, when I was a Deputy Medical Examiner in Baltimore, Maryland. I later (1969 and 1981) refined the psychological autopsy ($\psi$A) as a non-litigation survey research schedule. Finally, in the last 30 years I have adapted my $\psi$A to forensic investigation, especially in the role of psychiatric medications in suicide.

B. It is in fact way beyond the standard in forensic investigation of suicides to do <u>any</u> original, systematic data-gathering on a decedent. Most experts in litigation rely solely on official records (medical, toxicological, medical examiner, police, etc.) and depositions. I, on the other hand, gather original data to help formulate and defend my expert opinions.

C. The vast majority of the questions on the my $\psi$A is factual and can be derived from the <u>Bulger</u> case file. The most knowledgeable person about the Bulger files (for the Plaintiff) was a paralegal, Ms. Michelle Faye, at the Finkelstein firm. Thus, it was eminently prudent and reasonable for me to ask her to do a first draft of the Bulger $\psi$A.

D.  Contrary to Defense's claim (see Defs.' Mem. @ p. 11, ¶ 3), the person gathering the information for the ψA does not themselves have to be a qualified suicidologist. I am the qualified suicidologist, who uses the information.

E.  Defense makes the blatantly false claim (Defs.' Mem. @ p. 12) that I did not revise the Bulger ψA after Michelle Faye prepared the first draft. Defense knows very well that I reviewed the original ψA over very carefully, compared it with the objective case records, and then, indeed, wrote extensive verbatim revisions in the margins of the original ψA (see Maris deposition @ 862: *"When I thought that she* [Michelle Faye] *missed something, I corrected it"* and @ 865: *"So, I didn't just have Michelle Faye do it* (i.e., do the ψA)."

F.  Of course, I <u>could</u> have interviewed relevant parties and personally filled out all of the ψA. However, there was little likelihood on most questions of significantly different data resulting, if I had done so. It would have been cost prohibitive for my personally conducting the interviews whereas the benefit would have been marginal. In providing an expert opinion in this case, I arrived at my opinions with the same rigors that I utilize in my professional life. In no way did I *"set aside his own professional scruples"* in the performance of the Bulger ψA. I believe it is also very problematic to cavalierly go around interviewing witnesses without the Defense being present.

G.  There is no <u>one</u> proper was to do a ψA. I followed my professional scruples in <u>demanding</u> that a ψA be done for Bulger. Whether the initial ψA was drafted by others, or a combination of both, how many informants one should have, etc., is discretionary and not likely to substantially influence the results.

H.  There are at least three separate citations to my suicide model in the peer-reviewed scientific literature (see Defs.' Mem. @ p. 14, ¶ 3). The model appeared first in my book *Assessment and Prediction of Suicide* (Guilford Press, 1992: p. 668 ff). Second, the model was published in my *Comprehensive Textbook of Suicidology* (Guilford, 2000: p. 58 ff). Third and lastly, the model appeared in the British medical journal, *The Lancet* (2002, volume 360: 319-326).

All three of these publications were peer-reviewed and had <u>nothing</u> to do with the Neurontin litigation. Thus, obviously, my suicide model was **not** prepared *"expressly for the purpose of testifying."* The Bulger suicide model is identical to the three published sources described above.

9.  Furthermore, the Defense motion to exclude my testimony about general causation (see Defs.' Mem. @ p. 14, ¶ 2) is totally unfounded. As to my qualifications, while I acknowledged in my deposition testimony that I was <u>not a physician/psychopharmacologist,</u> and that I lacked the specific training of Drs. Trimble and Kruszewski, this was not an admission that I am <u>in</u>competent to address general causation or to assess Neurontin's effects on suicide. In fact, I have been a consultant to the FDA committee on antidepressant medications and suicide and my research and opinions helped lead to the **PDR** black box warnings now required for all antidepressants.

10. In conclusion, Defendants' contentions (1) that I am a solely a"Plaintiff" witness; (2) that I must and cannot rule out all alternative causes of Mrs. Bulger's suicide; (3) that I did not identify a "hallmark" of a Neurontin suicide; (4) that I solely relied on *Post Hoc Ergo Propter Hoc"*; and (5) that I utilized unreliable methodologies in providing expert opinions concerning Mrs. Bulger's suicide, are patently untrue and have no basis in fact.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February ___19___, in ___2009___.

*[signature: Ronald Maris]*

Ronald Wm. Maris, Ph.D.

Distinguished Professor Emeritus, Departments of Psychiatry & Family Medicine, University of South Carolina School of Medicine (Columbia).

February 18, 2009

*[signature: Megan C. Martin 2/19/09]*

Megan C. Martin
Notary Public for South Carolina
My commission expires on February 22, 2015