UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
                                 :

In re:  NEURONTIN MARKETING,      :
        SALES PRACTICES AND          :
        PRODUCTS LIABILITY LITIGATION   :
                                 :

---------------------------------------------------------------x
                                 :

THIS DOCUMENT RELATES TO:     :
                                 :

*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS   :
                                 :

---------------------------------------------------------------x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

## DECLARATION OF STEFAN P. KRUSZEWSKI, MD
## IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
## SPECIFIC CAUSATION TESTIMONY OF DR. KRUSZEWSKI

I, Stefan P. Kruszewski, MD, declare and state as follows:

1.  I am one of plaintiff's experts in the above-captioned matter, and I make this declaration in opposition to defendants' motion to exclude my specific causation testimony.

2.  I have reviewed the following motions made by the defense in the Bulger litigation. They include these specific documents:

      1.  Corrected Memorandum in Support of Pfizer Inc. and Warner-Lambert Company LLC's Motion to Exclude the Specific Causation Testimony of Doctors William Maris and Stefan Kruszewski

      2.  Defendants' Motion for Summary Judgment, including Motion, Memorandum in Support, Local Rule 56.1 Statement of Material Facts, Sayler Declaration in Support, and McGroder Declaration in Support

3.  Defendants allege that my testimony should be excluded for these primary reasons:

      a.  Dr. Kruszewski unreasonably ignores established risk factors for suicide and fails to consider alternative causes for Mrs. Bulger's suicide.
      b.  Dr. Kruszewski's inquiry lacks scientific objectivity.
      c.  Dr. Kruszewski blames Neurontin by resort to logical fallacy or 'rules in' Neurontin on the basis of 'pure speculation'.

4. Defendants have made substantial errors in the following general manners:

1. They misrepresent or inaccurately identify my findings and conclusions from my expert report;
2. They misrepresent my findings as elaborated by me in my lengthy depositions;
3. They cherry-pick pieces of information that are out of context from my statements or do not uphold either the meaning or intent of my findings;
4. They inaccurately report specific pieces of information both from medical-psychosocial evidence related to Mrs. Bulger (for example, it is certainly not a 'settled' issue that Mrs. Bulger suffered from bipolar disorder, as defense claims; see comments later in this declaration) and from general nature of counter-arguments (for example: while previous suicide attempts are a significant risk factor for subsequent suicide, the *nature of the population* who have attempted suicide changes the risk: for example, schizophrenic men are at much higher risk than non-schizophrenic men or non-schizophrenic women....and, separately, the risk for a successful suicide attempt is greatest in the two-year period following the last attempt.) I specifically chose these examples because both of them would significantly *decrease* Mrs. Bulger's risk of suicide due to 'previous' attempts'. In other words, Mrs. Bulger would have been at higher risk for suicide in the period from 1998-2000 than in 2004 and would have been at higher risk if she suffered from schizophrenia. These observations are discussed in a landmark paper published in *BMJ* in late 2008 by Tidemalm, Langstrom, Lichtenstein and Runeson, "Risk of suicide after suicide attempt according to coexisting psychiatric disorder: Swedish cohort study with long term follow-up." [BMJ 2008;337:a2205 doi:10.1136/bmj.a2205] which study is being introduced at this juncture because it was not available when I wrote my expert report.

5. Defendants were inaccurate, incorrect in their statements and/or misrepresented my previously articulated findings and conclusions in the following instances:

Example 1:
On page 1 of the memorandum in support of the motion under the heading "Preliminary Statement" defendants state: "Professor Kruszewski's specific causation opinion suffers from similar flaws; he: (1) ignores scientifically reliable and generally accepted risk factors for suicide, thus failing to consider numerous alternative causes of Mrs. Bulger's suicide."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 369: 22-25-370:21.

"...The considerations that I used as other risk factors or other explanations or contributing factors for Mrs. Bulger's suicide included her history of -- I'm taking this exactly from page 12. BY MS. McGRODER: Q. Okay. We'll -- okay. Go ahead. We will just try to keep it quick. A. Yes. Her purported history of emotional trauma as a

youngster, her absent or negative parenting -- we discussed that yesterday -- from her schizophrenic mother and absent father, her placement in foster care, the placement of her son in foster care when he was in 5th and 6th grade because of her substance use, her substance use, her rheumatoid arthritis, which she had for a very long time, other medical problems which we've described, most of which have relationships to her diagnosis of RA, her history of chronic pain, history of marital problems, history of financial problems, her history of depression, anxiety and posttraumatic stress."

2. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading Conclusions on page 12:

"I examined the issues that increased Mrs. Bulger's risk of suicide: her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports, including previous specific adverse reports from the use of Neurontin and the re-prescription and continuing use of Neurontin in a patient with a psychiatric history *and* I examined the factors that protected her from suicide: a high school GED, her femaleness, treatment for substance abuse, recovery from substance abuse, raising her children, especially her five year old daughter (Exhibits B, GGG), positive response to certain antidepressants (Exhibits G3, LL), intermittently successful treatment for psychiatric symptoms (Exhibit UU), a supportive sister, and a forward future outlook prior to the immediate decision to commit suicide (Exhibit W). After careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals (particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

Example 2:
On page 1 of the memorandum in support of the motion under the heading "Preliminary Statement" defendants state: "Professor Kruszewski...unreasonably rules out other potential alternative causes."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 369: 22-25-370:1-21.

"...The considerations that I used as other risk factors or other explanations or contributing factors for Mrs. Bulger's suicide included her history of -- I'm taking this exactly from page 12. BY MS. McGRODER: Q. Okay. We'll -- okay. Go ahead. We will

just try to keep it quick. A. Yes. Her purported history of emotional trauma as a youngster, her absent or negative parenting -- we discussed that yesterday -- from her schizophrenic mother and absent father, her placement in foster care, the placement of her son in foster care when he was in 5th and 6th grade because of her substance use, her substance use, her rheumatoid arthritis, which she had for a very long time, other medical problems which we've described, most of which have relationships to her diagnosis of RA, her history of chronic pain, history of marital problems, history of financial problems, her history of depression, anxiety and posttraumatic stress."

2. From Expert report of Dr. Stefan Kruszewski on August 7, 2008 under the heading Conclusions on page 12:

"I examined the issues that increased Mrs. Bulger's risk of suicide: her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports, including previous specific adverse reports from the use of Neurontin and the re-prescription and continuing use of Neurontin in a patient with a psychiatric history *and* I examined the factors that protected her from suicide: a high school GED, her femaleness, treatment for substance abuse, recovery from substance abuse, raising her children, especially her five year old daughter (Exhibits B, GGG), positive response to certain antidepressants (Exhibits G3, LL), intermittently successful treatment for psychiatric symptoms (Exhibit UU), a supportive sister, and a forward future outlook prior to the immediate decision to commit suicide (Exhibit W). After careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals (particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

Example 3:
On page 1 of the memorandum in support of the motion under the heading "Preliminary Statement" defendants state: Professor Kruszewski "rules in" "Neurontin as a cause of Mrs. Bugler's suicide on the basis of pure speculation---all in contravention of the established methodology for determining specific causation."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading Addendum B on page 29:

"Applying the guidelines from the Naranjo et al. publication to assess the cause of an adverse drug reaction (with the assumption that an adverse reaction to a drug may differ from an adverse behavioral response to a medication), I obtained a score of 7, as noted. That score places the adverse event (AE) of suicide from Neurontin for Mrs. Bulger in the mid-range of a 'probable' causative association."

2.  From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading Application of Sir Bradford Hill's 'Guideposts' to the Question of Causation on pages 9-10:

"Application of Sir Bradford Hill's 'Guideposts' to the Question of Causation (See Addendum A for delineation of 'guideposts'.) Was Neurontin a significant contributory factor in Mrs. Bulger's suicidal behavior and completed suicide?

1. Strength of Association: Research from a number of sources, including the expert reports of Drs. Trimble, Blume and me as well as the clinical work established through the analysis of 199 clinical trials by the US FDA and as reported in the UDA FDA 31 January 2008 Alert, conclude that there is a significant association between the risk of suicide and ingestion of Neurontin.

2. Consistency: As demonstrated in my expert report, there are multiple studies, both in animals and in humans, which demonstrate Neurontin's GABAergic and anti-glutaminergic ability, and its ability to produce side-effects, such as dysphoria, mood changes, suicidal thinking and completed suicides.

3. Specificity: Many factors increase the risk of suicide. Many factors protect individuals from committing suicide. Neurontin causes more side-effects than suicide and suicide is caused by more factors than this drug. However, Neurontin shares the specific GABAergic responses that other GABAergic drugs share in causing mood changes and suicidal behaviors.

4. Temporality: Neurontin ingestion precedes the induction of mood changes and suicidal thinking. Those changes can occur in as little as hours after ingestion.

5. Biological Gradient: Neurontin's effects can be dose-dependent. Higher doses can cause, among other problems and benefits, more somnolence, more restlessness, more delirium and more mood changes.

6. Biological Plausibility. Neurontin's neurobiochemical mechanism of action can increase GABAergic functionality that gives rise to significant mood changes.

7. Biological Coherence. What is known about Neurontin's mechanism of action and mechanism of production of adverse effects and suicide potential is entirely consistent with the scientific research that explains the causative relationship between GABAergic drugs, anti-glutaminergic drugs and mood changes/suicidal behaviors.

8. Experimental evidence. No RC trial has ever been conducted with suicide as an endpoint. However, the indirect evidence reviewed by the US FDA, demonstrates evidence that supports the causative relationship between Neurontin and susceptible individuals.

9. Analogy: Neurontin is similar to other drugs, like pregabalin, topiramate and tiagabine (Gabitril), and Vigabatrin. All of these drugs have similar mechanism of action and all of them have demonstrated increased risk for suicide."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pg. 329: 10-12:

> "Neurontin. And we know from evidence, including the evidence from the FDA, for example, that Neurontin can increase the risk of suicide."

4. From FDA warning titled: Suicidal Behavior and Ideation and Antiepileptic Drugs

> "FDA ALERT [1/31/2008, Updated 12/16/2008] - The FDA has completed its analysis of reports of suicidality (suicidal behavior or ideation [thoughts]) from placebo-controlled clinical trials of drugs used to treat epilepsy, psychiatric disorders, and other conditions. Based on the outcome of this review, FDA is requiring, under the authorities granted under the Food and Drug Administration Amendments Act (FDAAA) of 2007, that all manufacturers of drugs in this class include a Warning in their labeling and develop a Medication Guide to be provided to patients prescribed these drugs to inform them of the risks of suicidal thoughts or actions. The drugs affected by these safety labeling changes are commonly referred to as antiepileptic or anticonvulsant drugs (see the list below). FDA's pooled analyses of 199 clinical trials of eleven antiepileptic drugs used as mono- and adjunctive therapies showed that patients who were randomized to receive one of the antiepileptic drugs had almost twice the risk of suicidal behavior or ideation (0.43%) compared to patients randomized to receive placebo (0.24%). This increase in the risk of suicidal thoughts or behavior represents the occurrence of approximately one additional case of suicidal thinking or behavior for every 530 patients treated with an antiepileptic drug. The risk of suicidal thoughts or behavior was generally consistent among the eleven drugs analyzed and was observed in patients who were treated for epilepsy, psychiatric disorders, and other conditions. The relative risk for suicidal thoughts or behavior was higher in the clinical trials for epilepsy compared to trials for psychiatric or other conditions. However, the absolute risk differences were similar in the clinical trials for epilepsy and psychiatric indications. The increased risk was observed as early as one week after starting antiepileptic drug treatment and throughout the observed duration of treatment. The increased risk of suicidal thoughts or behavior was generally consistent among the eleven drugs with varying mechanisms of action and across a range of indications. This observation suggests that the risk applies to all antiepileptic drugs used for any indication. All patients who are currently taking or starting on any antiepileptic drug for any indication should be monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or behavior or depression."

Example 4:
On page 2 of the memorandum in support of the motion under the heading "Factual Background" defendants state: "Mrs. Bulger was described as suffering from: bipolar disorder II, ...."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I asserts in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 370:22-25:

   " I did not list, by the way, bipolar disorder only because there was too much conflicted evidence in the record about whether indeed she was or was not bipolar."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 372:7-25:

   "I would not add bipolar. It wasn't --for a couple of reasons. It's been mentioned in the literature. It's been denied -- it's mentioned in the medical records. It's opposed in the medical records. And for a person, particularly from my view and my specialty as an addictionologist, is that she had a long-term career of using cocaine and opiates. And the expectation for me is that someone who has that significantly in their background has by definition mood swings as a result. So a non-addictionologist would more likely make the diagnosis of bipolar. But, in fact, the APA DSM-4 TR criteria say that you can't make the diagnosis of bipolar disorder without considering and eliminating the background of substance abuse."

3. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading on page 21 from Exhibit MM 7-9 Deposition of Dr. Crognale:

   "A. She had depression. Q. Was she bipolar? A. I don't believe so."

4. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading on page 21 from Exhibit PP 18-21 – Exhibit QQ 4-8 Deposition of Dr. Crognale:

   "With regard to her prior psych history, she has in the past been told by psychiatrists and by Dr. Mengel that there was a possibility that she had some bipolar disorder. I do not believe she was bipolar."

Example 5:
On page 15 of the memorandum in support of the motion under Section II entitled, "The Specific Causation Testimony of Plaintiff's Expert, Dr. Kruszewski, Is Unreliable and Inadmissible" defendants state: "First, Dr. Kruszewski ignored numerous risk factors in his report."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, pg. 8 fifth paragraph continuing onto page 9 first paragraph:

   "As I described above, there is various commentary about the vicissitudes of the life of Mrs. Bulger that can be found throughout her medical records. From numerous reports of problems that increased her risk and predisposed her to suicide(Exhibits Z, Aa,), even

from individuals who testified to the problems in Mrs. Bulger's relationship to her husband (Exhibits N, P, V, W), with her substance use (Exhibits O, G2) or psychiatrically (Exhibit O), there was also evidence that demonstrated she was 'protected' from suicide because she enjoyed her life (Exhibits H, R), was able to make her own decisions (Exhibit C), loved her children (Exhibit R, X) and was at times supported by her husband. (Exhibit B). Conflicted evidence also exists about her suicide history (Exhibits O). For example, the reports from CAB (Center for Addictive Behaviors) noted on their intake sheets that she both answered yes and no to the same question re previous suicide attempts (Exhibits JJJ, KKK). Her sister, Linda Landry, testified that none of Mrs. Bulger's previous "attempts" were in fact actual suicide attempts at all, but rather either accidents or cries for attention and help"

2. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, pg. 12 third paragraph under "Conclusions":

"I examined the issues that increased Mrs. Bulger's risk of suicide: her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports, including previous specific adverse reports from the use of Neurontin and the re-prescription and continuing use of Neurontin in a patient with a psychiatric history and I examined the factors that protected her from suicide: a high school GED, her femaleness, treatment for substance abuse, recovery from substance abuse, raising her children, especially her five year old daughter (Exhibits B, GGG), positive response to certain antidepressants (Exhibits G3, LL), intermittently successful treatment for psychiatric symptoms (Exhibit UU), a supportive sister, and a forward future outlook prior to the immediate decision to commit suicide (Exhibit W)."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 370: 6-21:

"Yes. Her purported history of emotional trauma as a youngster, her absent or negative parenting -- we discussed that yesterday -- from her schizophrenic mother and absent father, her placement in foster care, the placement of her son in foster care when he was in 5th and 6th grade because of her substance use, her substance use, her rheumatoid arthritis, which she had for a very long time, other medical problems which we've described, most of which have relationships to her diagnosis of RA, her history of chronic pain, history of marital problems, history of financial problems, her history of depression, anxiety and posttraumatic stress."

Example 6:
On page 15 of the memorandum in support of the motion under Section II entitled, "The Specific Causation Testimony of Plaintiff's Expert, Dr. Kruszewski, Is Unreliable and Inadmissible" defendants state: "Second, Dr. Kruszewski's ad hoc consideration and ruling out of pertinent facts demonstrate an absence of scientific objectivity."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 608:20-609:5:

   "There are many things that I rule out and did not reflect in my report. Obviously, my report in a few pages, is a summation of my opinions and conclusions based upon reasonable assessments and evidence. I did not include in my – for example, even though the death of a dog is a risk factor for people to hurt themselves and a risk factor for depression I did not include that in my summary conclusions as a significant risk factor for suicide."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 609:18-23:

   "The same way that I concluded that any risk factor may or may not be important. I was aware of her previous history of counseling. I was aware of all of the factors I reported in here. I was aware of many more factors as well."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 674:11-15:

   "Because it and much of the other elements that increased her risk of suicide had been chronic issues that we unchanging and did not result in a completed suicide prior to the time she was on Neurontin."

4. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 690:11-691:8:

   "My basic assumption is that she had successfully lived and been treated for chronic pain for a long period of time. I did not have specific evidence at the time of her death that that pain was acutely and markedly worse.
   I did have evidence that, like anybody who was in chronic pain -- this is going to be a long answer -- that anybody who has chronic pain is at increased risk. And in the susceptible group of individuals who have chronic pain and other factors, that may already have decreased circulating levels of serotonin in their brain, that someone who's treated with Neurontin has an enhanced decrease or further inhibition of serotonin by virtue of the GABAergic effects of the drugs." "And at some point in the long and chronic history in this case, 2002 to 2004, that that use of Neurontin resulted chronically and precipitously in her decision to commit suicide."

5. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, pg. 12 end of third paragraph under "Conclusions":

"After careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals (particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

Example 7:
On page 15 of the memorandum in support of the motion under Section II entitled, "The Specific Causation Testimony of Plantiff's Expert, Dr. Kruszewski, Is Unreliable and Inadmissible" defendants state: "Third, he has no basis for ruling out other risk factors and isolating Neurontin except an alleged temporal connection."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, page 12 end of third paragraph under "Conclusions":

   "After careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals(particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 617:21-618:18:

   "What I'll reiterate is what I said previously, is that this report is a summation of all of the considerations, all of the information I've reviewed in multiple boxes of records, and it is a reflection of my overall thinking and assessment that form the basis of my conclusions. So that when I concluded that this patient had been on Neurontin for a long period of time, that that increased her GABA levels in her brain, that increased GABA levels in short or long periods of time can increase the likelihood of suicide, that, in a reflection of all of the risk factors and all of the protective factors that this woman demonstrated, that, in my opinion, based upon my conclusion as referenced by all the facts and all the information that I've had to examine, that that was the significant contributing factor, being on Gabapentin for a protracted period of time, and acutely on the day that she committed suicide."

3.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 562:11-563:6:

"So when I considered all of the risk factors that we talked about, from previous psychiatric history and marital dysfunction and polysubstance use and psychiatric issues and previous self injuries and/or suicide attempts, et cetera, and then considered all of the protective factors, that this is a woman who had come back to her husband after some apparent and alleged abuse and marital conflict, that she had a small girl at home, that she was not apparently abusing psychotropic drugs any longer, and that there had been some stability and she had a plan to move on in her life, that when I looked at all of those factors and in the addition of all of her medicines, including Neurontin, that gave rise to my decision in weighting all of those risk factors that Neurontin was the precipitating cause that pushed her over the edge."

4.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 401:12-402:2:

"As I have said before, although there is no specific study to my knowledge that is has ever been conducted that's randomized and placebo-controlled, a clinical trial to determine as an outcome measurement the side effects associated with Neurontin, including suicide, which would be, of course, an unethical and unavailable and un-approvable study by any IRB, Institutional Review Board, there are multiple studies that suggest and provide evidence that certain people are at increased risk for suicide and a certain population is -- suffers side effects associated with Neurontin."

**Example 8:**
On page 15 of the memorandum in support of the motion under footnote #13 defendants state: "Dr. Kruszewski admits that the Bradford Hill and Naranjo criteria he sets forth in his Report cannot provide the basis for a specific causation opinion. *Id.* at 356:15-357:13 (Naranjo), 379:1-20 (Bradford Hill)."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 356:20-22:

"I do not. I believe only that it can be helpful in the overall evaluation of adverse events."

2.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 358:2-9:

"I am not sure I can answer that. I'm not sure if it's been endorsed. It's been cited. And as much as a citation represents an endorsement, yes. But, again, even if it has or hasn't, I only use it as a guidepost, the same way I use Bradford Hill criteria."

3.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 358:11-15:

    "Q. When you say as a guidepost, do you just mean one factor that influences your decision about whether a drug can cause an event? A. That's correct."

4.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 361:15-21:

    "I said that I am applying it, and I think that it can be applicable as a guidepost because it describes specific reactions to an adverse event from a pharmaceutical agent, for example. And the extrapolation is not a difficult one to make."

5.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 365:4-8:

    "That's true. Since it was an adaptation, and clearly I stated it was going to be an adaptation, it was just a quantitative tool to support other information in the report."

6.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 380:2-11:

    "They're exactly as I put on page 9 and 10 of my report in response to my asking myself the question was Neurontin a significant contributory factor in Mrs. Bulger's suicidal behavior and completed suicide.
    So, again, using a guidepost of criteria – a guidepost of Bradford Hill suggestions and recommendations about causality, I applied them in this case. And then I – so, again, it was a guidepost--"

Example 9:
On page 15 of the memorandum in support of the motion under Footnote #13 defendants state: "Dr. Kruszewski could not cite peer-reviewed published literature supporting the use of those methods to determine whether a drug caused an individual to commit suicide. *Id.* at 358:18-359:17 (Naranjo), 376:13-20 (Bradford Hill)."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 358:2-9:

    "I am not sure I can answer that. I'm not sure if it's been endorsed. It's been cited. And as much as a citation represents an endorsement, yes. But, again, even if it has or hasn't, I only use it as a guidepost, the same way I use Bradford Hill criteria."

2.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 358:11-15:

"Q. When you say as a guidepost, do you just mean one factor that influences your decision about whether a drug can cause an event? A. That's correct."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 376:24-377:4:

"There may be peer-reviewed review articles about the utility of using Bradford Hill criteria as guideposts to determine causality, but in terms of the way you asked the question, I don't believe that exists."

Example 10:
On page 15 of the memorandum in support of the motion under footnote #13 defendants state: "In addition, psychiatrists in the field do not use the Naranjo criteria, *id.* at 368:25-369:7,"

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 368:25-369:7:

"Q. Are you aware of any Board certified psychiatrist who routinely or regularly applies the Naranjo scale in clinical practice to determine whether adverse events experienced in that patient population have any causal association with a prescription medication? A. I do not."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 367:9-14:

"Q. Have you ever in a clinical setting used the Naranjo scale to determine whether an adverse event experienced by any one of your patients was caused by a prescription medication? A. I used it twice that I can recall."

Example 11:
On page 15 of the memorandum in support of the motion under footnote #13 defendants state: "and he did not analyze every medication that Mrs. Bulger was taking at the time of her death, contrary to the method's standards. *Id.* at 373:11-374:1.

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Expert report of Dr. Stefan Kruszewski on August 7, 2008, pg. 9 end of second paragraph:

"At the time of her death, she had recent prescriptions for Neurontin, Methadone, Effexor ER (Exhibit G3), Klonopin and OxyContin (Exhibit Ag, CC, OO). There was evidence that she was regularly taking Effexor 187.50 mgs each day and Klonopin 1.0

mg three or four times per day before she died and strong evidence that she consumed Neurontin 1200.00 mgs immediately prior to her suicide (Exhibit D, BB, G4). Of those medicines, there is only evidence that she had a mixed response, including seriously adverse responses, to Neurontin (Exhibit B, LL, QQ, WW, XX, XXa, YY, CCC, III)"

2.  From Expert report of Dr. Stefan Kruszewski on August 7, 2008, page 10 first paragraph under heading of "Some of the Evidence from Susan Bulger's Medical Records and the Deposition Transcripts applicable to this litigation that were used to form the basis of my conclusions:"

"To form the basis of my expert opinion, I relied on all of the information forwarded to me as enumerated in the section under document review. From my personal review, including my careful examination of Mrs. Bulger's medical and pharmaceutical history, I am able to support the factual basis for the following statements."

Example 12:
On page 16 of the memorandum in support of the motion under Section II, Subsection A entitled, "Dr. Kruszewski Unreasonably Ignores Established Risk Factors for Suicide" defendants state: "As set forth above, a proper differential diagnosis requires that the expert initially consider all possible causes. Dr. Kruszewski failed to do so."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading Conclusions on page 12:

"I examined the issues that increased Mrs. Bulger's risk of suicide: her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports, including previous specific adverse reports from the use of Neurontin and the re-prescription and continuing use of Neurontin in a patient with a psychiatric history *and* I examined the factors that protected her from suicide: a high school GED, her femaleness, treatment for substance abuse, recovery from substance abuse, raising her children, especially her five year old daughter (Exhibits B, GGG), positive response to certain antidepressants (Exhibits G3, LL), intermittently successful treatment for psychiatric symptoms (Exhibit UU), a supportive sister, and a forward future outlook prior to the immediate decision to commit suicide (Exhibit W). After careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals (particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am

able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

2.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 423:20-424:4:

    "Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it..."

3.  From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 332:17-333:9:

    "Q. Do you believe that prior to December of '99 Mrs. Bulger had any suicide attempts, or is it your testimony she had no suicide attempts prior to December of '99? A. Here is what I did, which is totally consistent with what I just said. I believed she had -- all those represent suicide attempts. There is, however, conflicting evidence and would take time to conclude that. But when I looked at all the evidence in this report, we know that those were not completed suicides because she continued to live. We know that she took -- overdosed, we know she was treated psychiatrically starting in I believe '98 in Salem Hospital. We know she had a long history of psychiatric treatment, drug and alcohol treatment, and my opinion about those suicide attempts is in fact I treated them as suicide attempts"

4.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 456:8-12:

    "A. I said I was aware of her suicide history, provided evidence in the exhibits, and, as I have already said here, included that in my overall formulation of her premorbid history."

5.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 370: 6-21:

    "...Her purported history of emotional trauma as a youngster, her absent or negative parenting -- we discussed that yesterday -- from her schizophrenic mother and absent father, her placement in foster care, the placement of her son in foster care when he was in 5th and 6th grade because of her substance use, her substance use, her rheumatoid arthritis, which she had for a very long time, other medical problems which we've described, most of which have relationships to her diagnosis of RA, her history of chronic pain, history of marital problems, history of financial problems, her history of depression, anxiety and posttraumatic stress."

6.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 476:23-25:

"I did accept as a risk factor that she was trying to hurt herself and/or made suicide attempts."

Example 13:

On page 17 of the memorandum in support of the motion under Section II, Subsection A entitled, "Dr. Kruszewski Unreasonably Ignores Established Risk Factors for Suicide" defendants state: "Dr. Kruszewski does not even mention Mrs. Bulger's prior suicide attempts."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Expert Report of Dr. Stefan Kruszewski dated August 7, 2008, pages 8-9:

   "Conflicted evidence also exists about her suicide history. (Exhibits O) For example, the reports from CAB (Center for Addictive Behaviors) noted on their intake sheets that she both answered yes and no to the same question re previous suicide attempts (Exhibits JJJ, KKK). Her sister, Linda Landry, testified that none of Mrs. Bulger's previous "attempts" were in fact actual suicide attempts at all, but rather either accidents or cries for attention and help."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 476:23-25:

   "I did accept as a risk factor that she was trying to hurt herself and/or made suicide attempts."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 456-8-12:

   "A. I said I was aware of her suicide history, provided evidence in the exhibits, and, as I have already said here, included that in my overall formulation of her premorbid history."

4. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 423:20-424:4:

   "Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it…"

5. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 332:17-333:9:

"Q. Do you believe that prior to December of '99 Mrs. Bulger had any suicide attempts, or is it your testimony she had no suicide attempts prior to December of '99? A. Here is what I did, which is totally consistent with what I just said. I believed she had -- all those represent suicide attempts. There is, however, conflicting evidence and would take time to conclude that. But when I looked at all the evidence in this report, we know that those were not completed suicides because she continued to live. We know that she took -- overdosed, we know she was treated psychiatrically starting in I believe '98 in Salem Hospital. We know she had a long history of psychiatric treatment, drug and alcohol treatment, and my opinion about those suicide attempts is in fact I treated them as suicide attempts"

6.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 429:2-5: Question from Defense Counsel

    "Let's take a look at the only place in your report that you refer to suicide history. Okay? Can you look with me at page 8, the bottom of page 8?"

7.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 430:4-6: Question from Defense Counsel

    "And, Doctor, is it correct that this is the only place in your report that you reference her prior suicide history?"

8.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 432:18-24:

    "A. Where is the reference? The reference that you're citing is -- where did I reference that in my report? Q. In the one paragraph in which you mentioned her suicidal history on page 8 -- bottom of page 8 and top of page 9. You say....."

9.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 503:14-18:

    "Did you consider it in reaching your opinion in this case? A. As I have said, yes. Because I considered her overdoses, her wrist slicing, and her driving her car off a cliff."

Example 14:
On page 17 of the memorandum in support of the motion under Section II, Subsection A entitled, "Dr. Kruszewski Unreasonably Ignores Established Risk Factors for Suicide" defendants state: "His report's failure to even mention her prior suicide attempts indicate a failure to reliably rule out her prior suicide attempts."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Expert Report of Dr. Stefan Kruszewski dated August 7, 2008, pgs. 8-9:

"Conflicted evidence also exists about her suicide history. (Exhibits O) For example, the reports from CAB (Center for Addictive Behaviors) noted on their intake sheets that she both answered yes and no to the same question re previous suicide attempts (Exhibits JJJ, KKK). Her sister, Linda Landry, testified that none of Mrs. Bulger's previous "attempts" were in fact actual suicide attempts at all, but rather either accidents or cries for attention and help."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 429:2-5: Question from Defense Counsel

"Let's take a look at the only place in your report that you refer to suicide history. Okay? Can you look with me at page 8, the bottom of page 8?"

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 430:4-6: Question from Defense Counsel

"And, Doctor, is it correct that this is the only place in your report that you reference her prior suicide history?"

4. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 432:18-24:

"A. Where is the reference? The reference that you're citing is -- where did I reference that in my report? Q. In the one paragraph in which you mentioned her suicidal history on page 8 -- bottom of page 8 and top of page 9. You say....."

Example 15:
On page 17 of the memorandum in support of the motion under Section II, Subsection A entitled, "Dr. Kruszewski Unreasonably Ignores Established Risk Factors for Suicide" defendants state: "Dr. Kruszewski's omission" (of suicide attempts) "is significant, demonstrating the inadmissibility of his opinion,...."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Expert Report of Dr. Stefan Kruszewski dated August 7, 2008, pgs. 8-9:

"Conflicted evidence also exists about her suicide history. (Exhibits O) For example, the reports from CAB (Center for Addictive Behaviors) noted on their intake sheets that she both answered yes and no to the same question re previous suicide attempts (Exhibits JJJ, KKK). Her sister, Linda Landry, testified that none of Mrs. Bulger's previous "attempts" were in fact actual suicide attempts at all, but rather either accidents or cries for attention and help."

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 429:2-5:

Question from Defense Council "Let's take a look at the only place in your report that you refer to suicide history. Okay? Can you look with me at page 8, the bottom of page 8?"

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 430:4-6: Question from Defense Counsel

"And, Doctor, is it correct that this is the only place in your report that you reference her prior suicide history?"

4. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 432:18-24:

"A. Where is the reference? The reference that you're citing is -- where did I reference that in my report? Q. In the one paragraph in which you mentioned her suicidal history on page 8 -- bottom of page 8 and top of page 9. You say....."

5. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 476:23-25:

"I did accept as a risk factor that she was trying to hurt herself and/or made suicide attempts."

6. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 456:8-12:

"A. I said I was aware of her suicide history, provided evidence in the exhibits, and, as I have already said here, included that in my overall formulation of her premorbid history."

7. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 423:20-424:4

"Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it..."

8. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 332:17-333:9:

"Q. Do you believe that prior to December of '99 Mrs. Bulger had any suicide attempts, or is it your testimony she had no suicide attempts prior to December of '99? A. Here is what I did, which is totally consistent with what I just said. I believed she had -- all those represent suicide attempts. There is, however, conflicting evidence and would take time to conclude that. But when I looked at all the evidence in this report, we know that those

were not completed suicides because she continued to live. We know that she took --
overdosed, we know she was treated psychiatrically starting in I believe '98 in Salem
Hospital. We know she had a long history of psychiatric treatment, drug and alcohol
treatment, and my opinion about those suicide attempts is in fact I treated them as suicide
attempts"

Example 16:
On page 18 of the memorandum in support of the motion under Section II, Subsection B
entitled: "Dr. Kruszewski's Inquiry Lacked Scientific Objectivity" defendants state: "Whereas
his report makes no mention of Mrs. Bulger's prior suicide attempts"

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions
because I assert in my expert report and deposition testimony the following:

1.  From Expert Report of Dr. Stefan Kruszewski dated August 7, 2008, pages 8-9:

    "Conflicted evidence also exists about her suicide history. (Exhibits O) For example, the
    reports from CAB (Center for Addictive Behaviors) noted on their intake sheets that she
    both answered yes and no to the same question re previous suicide attempts (Exhibits JJJ,
    KKK). Her sister, Linda Landry, testified that none of Mrs. Bulger's previous "attempts"
    were in fact actual suicide attempts at all, but rather either accidents or cries for attention
    and help."

2.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 429:2-5:
    Question from Defense Counsel

    "Let's take a look at the only place in your report that you refer to suicide history. Okay?
    Can you look with me at page 8, the bottom of page 8?"

3.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 430:4-6:
    Question from Defense Counsel

    "And, Doctor, is it correct that this is the only place in your report that you reference her
    prior suicide history?"

4.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 432:18-
    25:

    "A. Where is the reference? The reference that you're citing is -- where did I reference
    that in my report? Q. In the one paragraph in which you mentioned her suicidal history on
    page 8 -- bottom of page 8 and top of page 9. You say....."

Example 17:
On page 18 of the memorandum in support of the motion under Section II, Subsection B
entitled: "Dr. Kruszewski's Inquiry Lacked Scientific Objectivity" defendants state: "Dr.

Kruszewski attempted to explain during his deposition (on an ad hoc basis) that he failed to identify these attempts because they were 'non-lethal'."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 332:17-333:9:

   "Q. Do you believe that prior to December of '99 Mrs. Bulger had any suicide attempts, or is it your testimony she had no suicide attempts prior to December of '99? A. Here is what I did, which is totally consistent with what I just said. I believed she had -- all those represent suicide attempts. There is, however, conflicting evidence and would take time to conclude that. But when I looked at all the evidence in this report, we know that those were not completed suicides because she continued to live. We know that she took -- overdosed, we know she was treated psychiatrically starting in I believe '98 in Salem Hospital. We know she had a long history of psychiatric treatment, drug and alcohol treatment, and my opinion about those suicide attempts is in fact I treated them as suicide attempts"

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 423:11-19.

   "My answer to that is the same. I have accepted the fact that there is enough evidence that she had prior suicide attempts, including running her car off the cliff. However, the evidentiary basis for that in the report is conflicted, and it's the reason I did not put it in that concluding statement ..."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 423:20-424:4:

   "Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it..."

Example 18:
On page 18 of the memorandum in support of the motion under Section II, Subsection B entitled: "Dr. Kruszewski's Inquiry Lacked Scientific Objectivity" defendants state: "does not excuse Dr. Kruszewski's ignorance of Mrs. Bulger's suicide attempts."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pg. 332:17-333:9:

    "Q. Do you believe that prior to December of '99 Mrs. Bulger had any suicide attempts, or is it your testimony she had no suicide attempts prior to December of '99? A. Here is what I did, which is totally consistent with what I just said. I believed she had -- all those represent suicide attempts. There is, however, conflicting evidence and would take time to conclude that. But when I looked at all the evidence in this report, we know that those were not completed suicides because she continued to live. We know that she took -- overdosed, we know she was treated psychiatrically starting in I believe '98 in Salem Hospital. We know she had a long history of psychiatric treatment, drug and alcohol treatment, and my opinion about those suicide attempts is in fact I treated them as suicide attempts"

2.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 423:1-19.

    "My answer to that is the same. I have accepted the fact that there is enough evidence that she had prior suicide attempts, including running her car off the cliff. However, the evidentiary basis for that in the report is conflicted, and it's the reason I did not put it in that concluding statement ..."

3.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 423:20-424:4

    "Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it..."

4.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 456:8-12:

    "A. I said I was aware of her suicide history, provided evidence in the exhibits, and, as I have already said here, included that in my overall formulation of her premorbid history."

5.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 480:24-25-481:1-4:

    "THE WITNESS: As I've already stated, I have included in my report that there is evidence of her suicide history. And I tried to accurately reflect that. And I've, certainly, discussed it here today and yesterday."

Example 19:
On page 18 of the memorandum in support of the motion under Section II, Subsection B entitled: "Dr. Kruszewski's Inquiry Lacked Scientific Objectivity" defendants state: "Dr.

Kruszewski's failure to consider Mrs. Bulger's multiple previous suicide attempts points to the kind of ...."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 332:17-333:9:

   "Q. Do you believe that prior to December of '99 Mrs. Bulger had any suicide attempts, or is it your testimony she had no suicide attempts prior to December of '99? A. Here is what I did, which is totally consistent with what I just said. I believed she had -- all those represent suicide attempts. There is, however, conflicting evidence and would take time to conclude that. But when I looked at all the evidence in this report, we know that those were not completed suicides because she continued to live. We know that she took -- overdosed, we know she was treated psychiatrically starting in I believe '98 in Salem Hospital. We know she had a long history of psychiatric treatment, drug and alcohol treatment, and my opinion about those suicide attempts is in fact I treated them as suicide attempts"

2. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 423:20-424-4:

   "Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it..."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 456:8-12:

   "A. I said I was aware of her suicide history, provided evidence in the exhibits, and, as I have already said here, included that in my overall formulation of her premorbid history."

4. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 476:23-25:

   "I did accept as a risk factor that she was trying to hurt herself and/or made suicide attempts."

Example 20:
On page 18 of the memorandum in support of the motion under Section II, Subsection B entitled: "Dr. Kruszewski's Inquiry Lacked Scientific Objectivity" defendants state: "In the end, Dr. Kruszewski ultimately admitted that it was just a matter of "chance" that Mrs. Bulger was not successful in her prior attempts."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my deposition testimony the following:

1.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 475:23-25-476:1-16:

    "Q. Well, isn't it often just a matter of chance as to whether someone successfully completes a suicide? A. There is some chance in it. We also believe -- when I say "we," I think I speak for suicidologists and Dr. Maris, in particular -- that people make a specific decision in their suicide careers when they, in fact, are going to end their life. Before that time, it may -- their decisions to hurt themselves, their decisions to make some attempt may be less than fully engaged, if you will. So I make the same distinction as the Physician Desk Reference does when it lists side affects associated with drugs and list suicidal thoughts, suicidal ideations, attempted suicides, and completed suicides. They're all somewhat different."

Example 21:
On page 18 of the memorandum in support of the motion under Section II, Subsection B entitled: "Dr. Kruszewski's Inquiry Lacked Scientific Objectivity" defendants state: "Dr. Kruszewski's treatment of other risk factors that he failed to identify or consider further confirms that his conclusions are pre-ordained and speculative."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 370: 6-21.

    "…Her purported history of emotional trauma as a youngster, her absent or negative parenting -- we discussed that yesterday -- from her schizophrenic mother and absent father, her placement in foster care, the placement of her son in foster care when he was in 5th and 6th grade because of her substance use, her substance use, her rheumatoid arthritis, which she had for a very long time, other medical problems which we've described, most of which have relationships to her diagnosis of RA, her history of chronic pain, history of marital problems, history of financial problems, her history of depression, anxiety and posttraumatic stress."

2.  From Expert report of Dr. Stefan Kruszewski on August 7, 2008, under the heading Conclusions on page 12:

    "I examined the issues that increased Mrs. Bulger's risk of suicide: her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports, including previous specific adverse reports from the use of Neurontin and the re-prescription and continuing use of Neurontin in a patient with

a psychiatric history *and* I examined the factors that protected her from suicide: a high school GED, her femaleness, treatment for substance abuse, recovery from substance abuse, raising her children, especially her five year old daughter (Exhibits B, GGG), positive response to certain antidepressants (Exhibits G3, LL), intermittently successful treatment for psychiatric symptoms (Exhibit UU), a supportive sister, and a forward future outlook prior to the immediate decision to commit suicide(Exhibit W). After careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals (particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

3. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pgs. 423:20-424:4:

"Q. So because you think the evidence as to whether there were prior suicide attempts is conflicted, you chose not to consider that as a factor that increased Mrs. Bulger's risk for suicide, correct? MR. FROMSON: Objection as to form. Misstates his testimony. THE WITNESS: That's not exactly accurate. As I said, I considered it..."

4. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 456:8-12:

"A. I said I was aware of her suicide history, provided evidence in the exhibits, and, as I have already said here, included that in my overall formulation of her premorbid history."

5. From Deposition Testimony of Dr. Stefan Kruszewski on October 16, 2008, pg. 476:23-25:

"I did accept as a risk factor that she was trying to hurt herself and/or made suicide attempts."

Example 22:
On page 19 of the memorandum in support of the motion under Section II, Subsection C entitled: "Dr. Kruszewski Blames Neurontin by Resort to Logical Fallacy" defendants state: " Dr. Kruszewski neither rules out potential causes of Mrs. Bulger's suicide,..."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 16 , 2008, pgs. 672:2-675:16:

"Q. Now, I want to run briefly through the risk factors that you list here in your report as issues that increased Mrs. Bulger's risk of suicide. Okay? A. Okay. Q. First you have emotional trauma as a youngster? A. Yes. Q. But you ruled out that as the precipitating factor for her suicide, correct? A. That's correct. Q. You list placement of son in foster care as a risk factor, correct? A. Yes. Q. But you ruled that out, correct? A. I ruled it in, but did not consider it a significant contributing factor for her suicide at the time that it occurred. Q. Okay. Depression -- let me go in your order. I'm sorry. Absent or negative parenting and foster care. You determined that those were not precipitating causes to her suicide, correct? A. Yes. Q. Substance abuse, you determined that was not the precipitating cause of her suicide, correct? A. That's correct. Q. With respect to the risk factors we've already discussed that you determined were not the precipitating factors to her suicide, are there any other reasons for that opinion that we've not already discussed today or yesterday in your deposition? THE WITNESS: Let me hear that question again. MR. FROMSON: Note my objection as to the form of the question. Overbroad. (The record was read as requested.) MS. SCHULTZ: Let me just ask it quickly this way instead. BY MS. SCHULTZ: Q. Have we already discussed the reasons why you would have ruled out emotional trauma as a youngster as the precipitating cause of her suicide? A. I discussed the emotional trauma that has been alleged in the records as a significant risk factor for depression and as a factor for increasing the risk of suicide. So that part I discussed. Q. And why did you rule out emotional trauma as a youngster as being a precipitating factor for her suicide? A. Because it and much of the other elements that increased her risk of suicide had been chronic issues that were unchanging and did not result in a completed suicide prior to the time she was on Neurontin. Q. And why did you rule out absent or negative parent? Same reason? A. Yes. Q. Foster care, same reason? A. Yes. Q. Placement of her son in foster care, same reason? A. Yes. Q. Substance abuse, same reason? A. Yes. Q. Rheumatoid arthritis, same reason? A. Yes. Q. Other medical problem, same reason? A. Yes. Q. Chronic pain, same reason? A. Yes. Q. Marital problems, same reason? A. Yes. Q. Financial problems, same reason? A. Yes. Q. Depression, same reason? A. Yes. Q. Anxiety, same reason? A. Yes. Q. Posttraumatic stress, same reason? A. Yes."

2. From Expert report of Dr. Stefan Kruszewski on August 7, 2008 under the heading Conclusions on page 12:

"I examined the issues that increased Mrs. Bulger's risk of suicide: her history of purported emotional trauma as a youngster, absent or negative parenting, foster care, placement of her son in foster care, substance abuse, rheumatoid arthritis, other medical problems, chronic pain, marital problems, financial problems; depression, anxiety and posttraumatic stress; mixed reports, including previous specific adverse reports from the use of Neurontin and the re-prescription and continuing use of Neurontin in a patient with a psychiatric history *and* I examined the factors that protected her from suicide: a high school GED, her femaleness, treatment for substance abuse, recovery from substance abuse, raising her children, especially her five year old daughter (Exhibits B, GGG), positive response to certain antidepressants (Exhibits G3, LL), intermittently successful treatment for psychiatric symptoms (Exhibit UU), a supportive sister, and a forward future outlook prior to the immediate decision to commit suicide (Exhibit W). After

careful review and consideration, I am able to conclude that Mrs. Bulger had many risks for suicide and many protective features against suicide, but that she was one of the susceptible minority of individuals (particularly, but not exclusively, because of her history of documented premorbid adverse effects from Neurontin and the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals) where Neurontin was a significant contributing factor in her suicide. I am able to conclude that Mrs. Bulger's ingestion of Neurontin was a substantial contributing factor to her suicidal behavior and completed suicide."

Example 23:
On page 19 of the memorandum in support of the motion under Section II, Subsection C entitled: "Dr. Kruszewski Blames Neurontin by Resort to Logical Fallacy" defendants state: "…nor can point to a hallmark of "Neurontin-induced" suicides."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1.  From Deposition Testimony of Dr. Stefan Kruszewski on October 16 , 2008, pgs. 691:16-692:4:

    "Neurontin associated with opioids can make pain worse. Neurontin associated with opioids can also increase the emotional outlook of an individual. It can also impair the emotional outlook of an individual. So the combination -- so just the use of Neurontin for any individual by virtue of its GABAergic effects can increase the risk of suicide and particularly for someone who had all of the risk factors as did Mrs. Bulger resulted and was a significant contributing factor to her suicide."

2.  From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 209:12-209:23:

    "Q. Is there any sort of hallmark of a Neurontin suicide in your opinion, does it look different from any other suicide you have seen? A. I am not sure the qualitative effects are different. The Neurontin cases that have come before me, I believe that the decision to commit suicide has been an abrupt one. And for the two cases that I know in the community that are not part of this litigation that appear to me to have been mediated by Neurontin I believe the same held true in that the decision to commit suicide was abrupt, acute, was -- did not happen over a protracted period of time."

3.  From Expert report of Dr. Stefan Kruszewski on August 7, 2008 under the heading Application of Sir Bradford Hill's 'Guideposts' to the Question of Causation on page 9:

    "Strength of Association: Research from a number of sources, including the expert reports of Drs. Trimble, Blume and me as well as the clinical work established through the analysis of 199 clinical trials by the US FDA and as reported in the UDA FDA 31

January 2008 Alert, conclude that there is a significant association between the risk of suicide and ingestion of Neurontin."

4. From Expert report of Dr. Stefan Kruszewski on August 7, 2008 under the heading Application of Sir Bradford Hill's 'Guideposts' to the Question of Causation on page 10:

"Experimental evidence. No RC trial has ever been conducted with suicide as an endpoint. However, the indirect evidence, including the accumulation of adverse event reports, and the evidence reviewed by the US FDA, demonstrates evidence that supports the causative relationship between Neurontin and susceptible individuals."

5. From Expert report of Dr. Stefan Kruszewski on August 7, 2008 under the heading Some of the Evidence from Susan Bulger's Medical Records and the Deposition Transcripts applicable to this litigation that were used to form the basis of my conclusions: on page 10:

"Neurontin has been associated with depression, suicidal thinking and completed suicides. (2006 Physician's Desk Reference, Kruszewski Expert report re biological plausibility of gabapentin to produce mood changes, including severe depression and suicide; US FDA reports on 11 anticonvulsants, including gabapentin, in 2008; Expert report of Dr. Michael Trimble)"

Example 24:
On page 20 of the memorandum in support of the motion under Section II, Subsection C entitled: "Dr. Kruszewski Blames Neurontin by Resort to Logical Fallacy" defendants state: "Regardless, Dr. Kruszewski admits that any opinion about when Mrs. Bulger decided to commit suicide- after she allegedly took four Neurontin or any time before – is pure speculation,…."

This statement is inaccurate and a misrepresentation of my expert analysis and conclusions because I assert in my expert report and deposition testimony the following:

1. From Deposition Testimony of Dr. Stefan Kruszewski on October 15, 2008, pgs. 285:23-268:8

"Q. If the answer is unknown, how can it be anything other than speculative to provide a conclusion, if the answer is unknown?  Is your testimony that where a – where there is no answer, you can provide one? A. The answer is as I just said. The answer specifically is unknown. I can provide an answer based upon all the information and clinical experience and education that I have already provided, that's based upon reasonable assessments and assumptions having relied on all of that information and database."

6. Defendants' contention that I failed to consider Mrs. Bulger's history of "suicide attempts" is not correct. With respect to this issue, the list below is a composite of possible attempts Mrs. Bulger made to hurt herself that I have recognized and considered.  For some of these, there is very little information, including whether or not these were indeed attempts to seriously hurt herself or kill herself. (That piece of information remains significant since many individuals

"cut" themselves without desiging to kill themselves and individuals have car accidents without
any desire to hurt or kill themselves). I considered these attempts in my estimation of the risk
factors for suicide, as delineated above.

- Possible attempt to hurt self: car driven off a cliff, when Mrs. Bulger was young,
- 1990 – attempted pill overdose and slit left wrist – approx. 26 years old.
- 1993 - overdose – approx. 29 years old.
- 1978?/1998 – slit wrists – approx. 14/34 years old.

Importantly, as I discussed early in this declaration, the fact that Mrs. Bulger did not
attempt to hurt herself in the period from 1998-2004 is significant, because her risk
would have been much lower in 2004 than it was in 1998-2000.

7.   In addition, I considered the possibility of bipolar disorder and found the defense claim that
Mrs. Bulger had a history of bipolar disorder to be questionable. Contrary to the defense
assertion in that regard, there was evidence that I previously reported that Mrs. Bulger did NOT
or may not have suffered from bipolar disorder, including the following exhibits to my
previously disclosed expert report:

> Exhibit MM
> Exhibit PP
> Exhibit III

8.   And again, contrary to defense assertion, there was evidence cited in my report or testimony
that shows that Mrs. Bulger may or may not have been buying cocaine 'on the street' six months
before her death. Importantly, as I testified to, the evidence is at best ambiguous and confusing
whether Mrs. Bulger may have been using cocaine in the year or six months prior to her suicide,
as follows:

**From Expert Report of Dr. Stefan Kruszewski dated August 7, 2008**

Exhibit C: Deposition of Rosenberg, Chaim, MD (Bulger) on 6/26/2008, page 22 lines
10-12.

> "She has been off Cocaine for the past month and is trying to get her house and
> life back in order."

Exhibit E: Deposition of Gravini, Matthew (Bulger) on 6/27/2008, page 46 lines 23-24
and page 47 lines 1-2

> "-- did you see any illegal drugs? Did you see anything that might have looked
> like cocaine or heroin or anything of that nature?
> A. No."

**From Deposition of Dr. Stefan Kruszewski on October 16, 2008**

Page 515 lines 22-25

"At the time of her death, I don't have any evidence that she was actively abusing opioids or cocaine or alcohol."

Page 539 lines 16-21

"There's evidence in the records that, if we accept the possibility that Ron Bulger was selling her prescriptions, that she had to medicate her pain by buying substances on the street, which would include opioids, cocaine, or alcohol."

Page 626 lines 14-21

"The University of Massachusetts Memorial Medical Center determined that she had benzodiazepines in her system at the time of her suicide by hanging. But limited toxicological results did not detect alcohol, nor did they test for cocaine, opioids, barbiturates, nonsteroidal analgesics, antidepressants, or Gabapentin."

Page 631 line 13 - page 632 lines 1-13

"I believe that any relapsive behavior on drugs and alcohol is an increased -- increases your risk factor for suicide. That relapsive behavior, as you've just testified to me, occurred six months before her death. I do not have any evidence that she was actively abusing cocaine on the day of her death or the day before her death. It was not tested for. And a history of using cocaine six months prior would no longer be a significant contributing factor because of the very, very short half-life of the cocaine metabolites."

Page 634 lines 1-16

"I'm saying that, like any person who abuses substances, including Susan Bulger, that the relapsive and recidivistic behaviors associated with substance abuse are chronic risk factors. The separate issue is the use of cocaine six months before her death. I do not believe that that was a risk factor. I do not believe that was a significant contributing factor to explain her decision to submit suicide. It is hypothetical because I have no evidence that she was abusing cocaine immediately before her death to help explain her cause of death."

Page 636 lines 3-16

"My response would be the same. It's still six months out in my overall assessment of risk factors, risk factor is always when someone relapses on substance abuse or alcohol. However, in my determination of what was etiologically related to her decision to commit suicide and my explanation and my conclusions, I did not believe that that was a significant contributing factor, because there was furthermore no evidence that she was using cocaine at the time of her suicide."

Page 637 line 25 - page 638 line 16

"Q. Were you aware of the fact that Susan Bulger was caught buying cocaine off of the street six months before her suicide? Yes or no?
MR. FROMSON: Objection. Asked and answered. Lack of foundation. Assumes facts not in the record. Go ahead and answer again.

THE WITNESS: As I said, I did not specifically remember that until you reintroduced it into this conversation. That does not mean that I did not consider it, because I actively considered, as reflected in my specific causality report, that she was using substances of choice, which included cocaine, opioids, and alcohol."

Page 644 lines 6-13

"Do you have another page that I didn't read just now? I have Page 22. I'm sorry. I did read that. That was, again, this does not specifically say when she relapsed and when she was back on the drugs. That could have been specifically that she had abused cocaine and what we've already described in the scenario six months before her death."

**Even the testimony of Linda Landry certainly does not confirm that Mrs. Bulger _bought_ cocaine six months before she committed suicide. And, some of Linda's testimony infers the opposite:**

### Deposition of Linda Landry Page 29 starting at line 2

Q. And this is the year before she died?
A. Yes.
Q. And what did you say to her, and what did she say to you?
A. I said, "Susan, what are you doing? You just got your life straightened out. You got – you had your baby girl. You have your son. You got everything going for you. I told you we were going to help, and you stayed clean for all this time," And she actually said that they weren't for me, that they were for Ronny, but I - - whether or not to believe that, I couldn't say
Q. And what drugs was she looking to buy?
A. Cocaine.
Q. And did she refer to it as cocaine?
A. Yup, Yes

### Deposition of Linda Landry Page 21 starting at line 17

Q. Okay, And you mentioned earlier that Susan expressed a desire to break away from Ron?
A. Yes
Q. And what did she say?
A. That -- because she was tired of doing the drugs and everything else like that, and she was afraid of losing -- you know, because she had just had her baby girl, and she was very, very happy.
There was quite a few times she tried to leave him, and that's what we were working on there. I told her she could come stay with me and everything else. And that was in like February.
And March is when I had gotten my cancer, and kept calling the house, and Ronny kept saying. "I'll give her the message" but she never returned my call, which I thought was strange.

I was in – when I woke up in the ICU, I called again. No answer. My son grad – I
had two more surgeries, because I needed her to babysit. No answer. And she was
dead five months later.
Q. So this was March of 2004?
A. '4, yes

9.   In conclusion, defendants contentions (1) that I failed to consider numerous alternative
causes of Mrs. Bulger's suicide; (2) that I unreasonably ruled out other potential alternative
causes; and (3) that I "ruled in" Neurontin as a cause of Mrs. Bulger's suicide on the basis of
pure speculation are patently untrue and have no basis in fact.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on February ____19th____, in ____2009____.

_____
Stefan P. Kruszewski, MD