UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                                    :    MDL Docket No. 1629
In re:   NEURONTIN MARKETING,                       :
         SALES PRACTICES AND                        :    Master File No. 04-10981
         PRODUCTS LIABILITY LITIGATION              :
                                                    :    Judge Patti B. Saris
-------------------------------------------------------------x
                                                    :    Magistrate Judge Leo T. Sorokin
                                                    :
THIS DOCUMENT RELATES TO:                           :
                                                    :
*Smith v. Pfizer Inc.*, 1:05-11515-PBS             :
                                                    :
-------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFF'S EXPERTS, DR. MARIS AND PROF. TRIMBLE**

Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
*Attorneys for Plaintiff Ruth Smith*
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551

## PRELIMINARY STATEMENT

Plaintiff's designated specific causation experts, Ronald W. Maris, Ph.D., and Michael Trimble, M.D., are experienced, highly qualified expert witnesses with specialized training in their areas of expertise.  Plaintiff's experts have applied their methodologies in a reliable way to the facts of this case.  As will be more fully explained, each expert has taken into account all available scientific evidence which, when taken together, is a compelling basis for the expert's proffered opinion. Each element of the scientific evidence that Plaintiffs' experts rely upon is generally accepted, reliable, scientific evidence.  Moreover, each of Plaintiff's experts reviewed and weighed the evidence in this case with the same rigorous manner that each uses in his professional life.  Ultimately, the *weight of the evidence* as analyzed by Plaintiff's experts leads to their opinions on specific causation in this case that the ingestion of Neurontin was a substantial factor in proximately causing the death by suicide of the decedent, Richard Smith.

## FACTUAL BACKGROUND

On May 13, 2004, Richard Smith committed suicide by a gunshot wound to the head. Finkelstein Decl., Ex. 1 at 6:9-21; 18:9-14.  A pill bottle of Neurontin was on a dresser in the bedroom which was the scene of the suicide.  Finkelstein Decl., Ex. 1 at 44:23-48:4.  The evidence shows that Richard Smith reported adverse mood and behavioral side effects after having ingested Neurontin.  For example, Dr. Christopher Wood, the family dentist and friend who had known Mr. Smith for some twenty years testified that when he saw Mr. Smith on May 10, 2004, four days before his death, Smith told him that Neurontin was making him feel weird. Finkelstein Decl., Ex. 2 at 23:14-20.  In like fashion, Mr. Smith's son in law, also a doctor of pharmacology, testified that on the Sunday five days prior to his death, Mr. Smith asked him about certain side effects he was experiencing, and asked if his son-in-law thought they could be

attributed to the Neurontin he was taking.  He told his son-in-law that he was feeling "loopy" and not himself.  Finkelstein Decl., Ex. 3 at 19:18-21:10, 22:17-21.

Richard Smith had many protective factors against suicide.  He was a deeply religious man who had been a minister for the Church of Christ for over 40 years.  Finkelstein Decl., Ex. 4 at 35:15-40:23.  His death was inexplicable to the family members because he was a godly man and he knew suicide was wrong.  Finkelstein Decl., Ex. 3 at 58:4-59:14.  Likewise, another son-in-law, Buford Hoskins, testified that he was "just confused" by his father-in-law's suicide, because it was just not like him to do something like that:  "He was a very spiritual-minded man.  He was the spiritual leader of our family.  He would not have done anything to hurt himself or his family or his grandchildren….(It was) (j)ust not his character."  Finkelstein Decl., Ex. 5 at 42:10-43:3.  Mr. Smith had a supportive family.  Finkelstein Decl. Ex. 6 at 68:15-23.

Notwithstanding Mr. Smith's prior surgeries to his hip, back and knees, his orthopedic surgeon, Dr. Stewart Stowers, testified that he considered all of those surgeries to be a success, that Mr. Smith "had full range of motion, would walk...without any assistive devices and …lived a pretty normal life." He stated that the two knee replacements and the hip replacement had relieved Mr. Smith from his chronic pain.  Finkelstein Decl., Ex. 7 at 55:3-21.

With respect to whether Mr. Smith had exhibited depression, his physician, Dr. Cato, saw him on 6/27/03 and found that he was "doing well" in regard to his depression, and that he was no longer depressed.  Finkelstein Decl., Ex. 8 at 61:15-62:2, 75:9-14.  Dr. Cato did not think that Mr. Smith was depressed or suicidal during office visits on 1/20/2004, 2/23/04, prior to when he began ingesting Neurontin in March 2004.  Finkelstein Decl., Ex. 8 at 73:11-74:5.  Similarly, Dr. Berlacich treated Mr. Smith, prior to his ingestion of Neurontin, and stated that although had chronic pain, he had never thought that he was suicidal.  Finkelstein Decl., Ex. 9 at 41:9-42:9.

While it is true that Dr. McCombs felt that Mr. Smith was not a candidate for surgical intervention, on March 9, 2004, Dr. Mackey discussed various surgical options with the plaintiff, and then referred him to a neurosurgeon, Dr. Howell.  Finkelstein Decl., Ex. 10 at 58:23-59:6.  In addition, Mr. Smith had an appointment scheduled with a Dr. Chang on the day of his death to discuss alternative measures.  Mr. Smith's daughter Cindy described him as "hopeful" about this upcoming consultation.  Finkelstein Decl., Ex. 6 at 111:3-113:7.

**LEGAL STANDARD**

The standards for admissibility of expert testimony are set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, the Federal Rules of Evidence, together with the <u>Reference Manual for Scientific Evidence, Second</u>.  In applying the standards of admissibility to opinions involving psychiatry, a "soft" science, the courts have <u>broad discretion</u> to determine if the opinions are based upon sufficient facts and data and were derived from reliable principles and methods.  *See* Products Liability Plaintiffs' Memorandum submitted in opposition to Defendants' *Daubert* motion on general causation, ECF Doc. # 1191, pp. 5-9. The same standards employed by the Court in its determination of general causation should also be applied in regard to specific causation.  Plaintiff incorporates by reference the legal standards detailed in Products Liability Plaintiffs' earlier Memorandum as if fully set forth herein.

I.     **THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT, DR. MARIS, IS RELIABLE AND ADMISSIBLE**

   A.     **Dr. Maris Has the Requisite Knowledge, Skill, Education, Training and Experience to Opine on the Specific Causes of Mr. Smith's Suicide.**

Although Dr. Maris is a Ph.D., and not an M.D., his qualifications as a suicidologist/suicide expert and an expert on the psychiatry of suicide are impeccable and not challenged by Defendants.  *See* Dr. Maris's expert report, ECF Doc. # 1633-26 at. 4-7.

3

**B.      Dr. Maris Utilized Sound and Reliable Principles and Methods Which He Applied to the Facts of This Case in Forming His Opinions.**

Dr. Maris provided expert opinions based on the specific facts of this case by utilizing generally accepted scientific methodology and his 45 years of education, training and experience in the area of suicidology.   In reaching his opinion on specific causation, he reviewed the depositions of physicians, family, incident reports, medical records, literature on pharmaceuticals related to adverse and suicidogenic side effects, as well expert reports disclosed in this litigation.[1]

Dr. Maris's methodology included the use of a "psychological autopsy" he conducted in an attempt to reconstruct Mr. Smith's psychological life, thoughts, feelings and relevant environmental factors preceding his death.   He also analyzed suicide risk factors and protective factors that his research has identified as statistically significant.   ECF Doc #1633-26, Maris Rep. 22, 23.   He sought to "rule in" and "rule out" alternative causes, and he opined that Mr. Smith had only 7 of 15 known risk factors for suicide and 3 of those were induced by Neurontin. *Id.* at 22.   He also opined that Mr. Smith possessed personal and social characteristics known to be protective from suicide. *Id.* at 23. As discussed below, his methodology is generally accepted.

The crux of Dr. Maris's opinions on specific causation are as follows:

1.        Richard Smith had been ingesting Neurontin from March 9, 2004, until his death on May 13, 2004. *Id.* at 14.[2]

---

[1] Dr. Maris has concurred with Plaintiff's general causation experts that the psychopharmacologic properties of gabapentin/Neurontin are suicidogenic.   ECF Doc #1633-26 Maris Report at 12.   His opinion is further based on numerous sources including, *inter alia*, the Physicians Desk Reference (PDR), expert reports on general causation in this litigation regarding Neurontin's GABAergic effects and Neurontin's mechanism of action to decrease the release of neurotransmitters (e.g., serotonin) in the brain; the depletion of monoamines "leads to significant increased risk of depression". *Id.* at 13.   Dr. Maris's opinion is also based in part on the FDA's meta-analysis that demonstrated an increased risk of suicidality with use of anticonvulsants. Dr. Maris points to his own research, the research of others in the field that is published in books and peer-reviewed journals and serious adverse events in Defendants' own clinical trials.

[2] Dr. Maris arrives at this opinion based upon review and consideration of the prescribing records of Mr. Smith's physicians; his pharmacy records; that he received Neurontin samples from at least four of his prescribing physicians, and that there were still outstanding prescriptions remaining for him to fill; and information received

2.      Richard Smith had several suicidogenic serious adverse events or side-effects resulting from taking Neurontin, including ego-dystonia, worsened depression, de novo hopelessness, behavioral changes, de novo suicidality and he overcame religious prohibitions.  *Id.* at 15-21.[3]

3.      Apart from taking Neurontin, Richard Smith was only moderately suicidal, a condition that he had been able to cope with prior to ingesting Neurontin on 3/9/04 and thereafter.  *Id.* at 21.

4.      Richard Smith  had several personal characteristics known to be protective from suicide.  *Id.* at 23.[4]

5.      Richard Smith did not kill himself because of chronic physical pain.  *Id.* at 23.[5]

6.      Dr. Maris opined with a reasonable degree of certainty, *id.* at 12, that "if Richard Smith had not taken Neurontin on March 9, 2004 and thereafter, that he would not have committed suicide."  *Id.* at 24.

Dr. Maris based his opinions on his research that:  there are "multiple suicidogenic forces or factors both in one's family of origin and in one's own lifetime;" that there is a "susceptible minority of vulnerable people' who may have serious adverse events after taking Neurontin"; that "Richard survived may years of chronic pain <u>without once attempting suicide</u>;" and that "gabapentin pushed Richard Smith over the edge.   He changed dramatically after taking

---

from and the deposition testimony of his family and records of his treating physicians which indicate that he was ingesting Neurontin during that time period.  *Id.* at 14, 15.

[3] Dr. Maris based this opinion on his extensive experience and training including as a consultant for the FDA committee for black box suicide warnings for anti-depressants, and on the review and consideration of numerous sources:  the medical records and the psychological autopsy of Mr. Smith, the PDR, the Pfizer package insert for Neurontin, and peer-reviewed published journal articles and sections in published books; the deposition testimony of family and friends including his wife Ruth Smith, daughter Cindy, his son in law Carnahan, Dr. Wood, and his treating physicians; and his suicide note  *Id.* at 2, 3.

[4] Mr. Smith was a long-time Church of Christ pastor, had a loving wife of 59 years and four adoring daughters, was confident and normally had a calm mood, had a strong ego and positive sense of self-work, and was musical and life-affirming.  *Id.*at 23.  Dr. Maris opined that "absent a Neurontin reaction, Mr. Smith was one of the people least likely to kill himself.  There are just not many alternative explanations for his suicide, other than Neurontin."  *Id.*

[5] This opinion was based upon a detailed history of Mr. Smith's pain, medical records and the deposition testimony of his physicians Drs. Berklacich and Mackey, the deposition testimony of his family, the timeline established by Dr. Maris, and citations to published books.  *Id.* at 23-24.  Dr. Maris concluded that, "[i]t was not Richard Smith's physical pain that was different after 3/9/04, but rather his **psyche** his mood or his Neurontin-induced <u>attitude</u> toward his pain.  In short, Neurontin changed that pre-Neurontin positive attitude and destroyed Richard's will and ability to keep living."  *Id.* at 24.

Neurontin.  Gabapentin was the trigger that destroyed Richard Smith's prior considerable ability to cope with life's problems and to fend off suicide."  *Id.* at 24.

> **1.    Dr. Maris employed, in part, a "psychological autopsy", which is accepted as a reliable methodology to ascertain specific causation in the context of a suicide.**

Dr. Maris based his specific causation opinion in this case, in part, upon a "psychological autopsy", which is a methodology to determine causation for suicides focusing on risk factors in order to rule them in and rule them out.[6]  Dr. Maris's psychological autopsy is more than sufficient in that it is "beyond the standard in forensic investigation of suicides to do <u>any</u> original, systematic data-gathering on the DCD," and most court experts rely solely on official records (medical, toxicological, medical examiner, police, etc) and depositions" whereas he "gathers original data to help formulate and defend his expert opinions."  Maris Decl., at ¶ 8B.

Numerous courts have held that a "psychological autopsy" is generally accepted as a scientific methodology for determining the cause of suicide.  *Routhier v. Keenan,* 2008 Mass. Super. LEXIS 372, at *17,18 (Super. 2008).[7]  In *Routhier,* plaintiffs claimed their decedent committed suicide due to the ingestion of Wellbutrin, and the Superior Court held that Dr. Maris's opinion was found to be reliable and admissible under *Daubert-Lanigan.*  2008 Mass. Super. LEXIS 372, at *17.  The Court accepted Dr. Maris's methodology and analysis where he employed the use of a psychological autopsy; a review of depositions of family and friends;

---

[6]  Dr. Maris's psychological autopsy was developed for non-litigation purposes and is a "standardized and recognized method for retrospectively gathering data after a suicide."  *See* Declaration of Dr. Maris, dated January 23, 2009, at ¶8.  Dr. Maris' suicide model has appeared in peer-reviewed scientific literature:  in Dr. Maris' books *Assessment and Prediction of Suicide,* Guilford Press 1992) and *Comprehensive Textbook of Suicidology* (Guilford, 2000), and *The Lancet* (2002, volume 360:319-326).  Maris Decl. at ¶ 8I.

[7]  *See Giles v. Wyeth Inc,* 500 F. Supp. 2d 1048, 1063 (S.D. Ill.  2007) (citing *Blanchard v. Eli Lilly & Co.,* 207 F. Supp. 2d 308, 313 & n.2 (D. Vt. 2002) (citing *Miller v. Pfizer, Inc.,* No. 99-2326, 1999 U.S. Dist. LEXIS 18345 (D. Kan. Nov. 10, 1999)); *Cloud v. Pfizer Inc.,* 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001); *see also Herrin v. Treon,* 459 F. Supp. 2d 525, 545 (N.D. Tex. 2006); *Yanco v. United States,* 45 Fed. Cl. 782, 787 (Fed. Cl. 2000)).

medical reports; review of the literature on the drug in question and its side effects; the analyses of 15 suicide risk factors and protective factors; and a review of the decedent's side effects consistent with the drug's use.  *Id.* at 17, 18.

> ### 2.   Dr. Maris's opinions and psychological autopsy are adequately supported by the facts and circumstances of this case.

Dr. Maris reviewed and considered a myriad of evidence/materials in this case to arrive at his opinions, including depositions, medical records, literature and expert reports.[8]  Defendants assert that Dr. Maris's psychological autopsy in this case is tainted because he did not personally gather the initial information for it; the initial information was gathered by Plaintiff's counsel's legal assistant.  Defs.' Mem., ECF Doc. # 1629 at 13.  However, the fact that an expert "relied on information supplied by plaintiff's counsel in reaching his conclusion" does not mandate the exclusion of that expert's testimony.  *Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1432 (5th Cir 1989).  Dr. Maris reviewed the initial psychological autopsy carefully and compared it with the medical records and other voluminous materials.  He made revisions where appropriate to ensure its accuracy, completeness and scientific objectivity.  Maris Decl. at ¶ 8E.  Dr. Maris followed his professional standards in demanding that a psychological autopsy be performed and in ensuring that the information contained therein was accurate and complete.  *Id.* at ¶¶ 8E, 8G.

Further, Defendants claim that Dr. Maris arbitrarily singled out Neurontin as a substantial cause thus rendering his opinion unreliable.  As noted *supra*, Dr. Maris reviewed and considered a myriad of sources for the psychological autopsy including the medical records, work history, depositions of family, friends, physicians etc., and "ruled in" and "ruled out" numerous potential causes based upon his education, skill, training and experience as a suicidologist.  "In situations in which a medical expert has relied upon a patient's self-reported history and that history is

---

[8] A more detailed listing of the materials reviewed by Dr. Maris is included in his Expert Report ECF Doc. # 1633-26 at pages 2-3.

found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination."  *Baker v. Soo Line R. Co.,* 208 F.3d 581, 586 (7th Cir. 2000); *Loudermill v. Dow Chem. Co.,*. 863 F.2d 566 (8th Cir. 1988); *Peteet v. Dow Chem. Co.*, 868 F.2d at 1431; *Brown v. Wal-mart Stores, Inc.,* 402 F. Supp. 2d 303 (D. Me. 2005).

Dr. Maris reviewed and considered, in combination with other numerous and various objective sources of information, the testimony of Mr. Smith's family, physicians and friends and reports of changes in his behavior after ingestion of Neurontin.  Such evidence is routinely relied upon, and generally accepted by in experts in the medical and scientific field and does not render expert testimony unreliable.  Defendants fail to appreciate the multi-dimensional factors in suicide and that Dr. Maris found Neurontin to be a substantial factor in Mr. Smith's suicide.

### 3.    Dr. Maris did not have to rule out every potential cause of Mr. Smith's suicide in order for his determination to be reliable

"The negligent act of defendant, to be the legal cause of plaintiff's injuries, need not be the sole cause.  It is sufficient if such act was a substantial factor in causing the harm." *Lancaster v. Montesi,* 216 Tenn. 50, 57 (1965).  "The defendant's conduct need not be the sole cause or even the last act prior to the injury." *Gardner  v. State of Tennessee,* 1989 Tenn. App. LEXIS 672 (Tenn. App. 1989).  In *Anello v. Shaw Indus., Inc.,* which concerned allegations that a new-carpet installed in a home was "off-gassing toxic chemicals" and causing injury to the homes' inhabitants, the court found that the testimony of one of plaintiff's experts was admissible even though the expert had "considered and discredited other potential environmental sources of causation and recognized that he could not rule out all other potential causes or conclude that the carpet definitively caused the plaintiffs' injuries."  2000 U.S. Dist. LEXIS 6835, *13 (D. Mass. 2000).  The court noted that the experts' causation testimony was based on "good grounds" and would be "helpful to the jury" and could be tested by the adversarial system.

*Anello* at 14); *see also In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 761 (3d Cir. 1994) ("so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion"); *Longoria v. State of Texas*, 2007 U.S. Dist. LEXIS 95853, at *11, 12, 13, 14 (E.D. Tex. 2007) (noting that in cases where expert testimony concerns the social sciences, "other indicia of reliability are considered . . . including professional experience, education, training, and observations," that "the test does not judge the conclusions themselves, but rather focuses on the principles and methodology," and that rejection of testimony under *Daubert* is "'the exception rather than the rule.'")

In *Baker v. Dalkon Shield Claimants Trust*, the First Circuit reversed the trial court's exclusion of defendants' expert's testimony and remanded the case for trial where a plausible theory of alternative causation was supported by a standard scientific technique, and the Court noted that "little in diagnosis is certain" . . . *Daubert* "merely requires that evidence makes a contested fact more likely than it would be without the evidence (not 'more likely than not')." 156 F.3d 248, 253 (1st Cir. 1998).[9]

In *Smith v. Pfizer Inc.,* the plaintiff brought suit claiming that Pfizer's drug, Zoloft, resulted in suicide.  2001 U.S. Dist. LEXIS 12983 at *1, 2 (D. Kan. 2001).  The District Court allowed the testimony of plaintiff's specific causation expert, finding that "[d]efendants' claim that [the expert] has failed to account for other potential causal factors goes to the weight and credibility of the opinion, not its admissibility."  *Id.* at*28.

---

[9] In *Goebel v. Denver & Rio Grand W. R.R. Co.*, plaintiff claimed he sustained injury while working and being exposed to high elevations and diesel fumes.  346 F.3d 987, 989 (10th Cir. 2003).  The case went to a jury, which reached a verdict for plaintiff on the issues of causation and damages, and defendant appealed on the grounds that the District Court abused its discretion in finding plaintiff's expert's testimony on causation admissible.  *Id.* at 989.  The expert did not opine that the injury was developed "solely from the altitude exposure; rather, he opined that other factors contributed to the onset . . ."  *Id.* at 996.  The Circuit Court found that the district court was correct in finding that the expert had "followed a standard and accepted methodology in arriving at the diagnoses . . . that his failure to exclude explicitly one alternative (depression) did not affect the admissibility of the testimony, although it was an issue the fact finder could consider when assigning weight."  *Id.* at 999.

Similarly, in *Giles v. Wyeth, Inc.*, plaintiff claimed that her husband's ingestion of the drug Effexor caused his suicide.  500 F. Supp. 2d 1048 (S.D. Ill. 2007).  Wyeth moved to exclude the testimony of Dr. Maris for failing to rule out every other risk factor.  *Id.* at 1062.  The Court found Dr. Maris's testimony that "suicide is a 'multifactorial' phenomenon for which it is impossible 'to "rule out" other factors entirely'" plausible, and stated that "[b]ecause a combination of factors generally cause one to commit suicide, it is not surprising that Maris would refuse to admit that depression, financial hardship, and other factors played no role" in the suicide in question in that case, and also found Dr. Maris's testimony "sufficiently reliable and relevant to present to a jury."  *Id.*

Here, Dr. Maris emphasizes that suicide is "multicausal".  *See* Maris Decl. at ¶ 5B.  He uses the phrase "*substantial proximate factor*" in evaluating a "cause" of suicide, because "there can be, and usually are, other factors causing suicide in addition to Neurontin."  *Id.*  Contrary to Defendants' assertions, Dr. Maris certainly did review and consider all relevant alternative suicide risk factors for Richard Smith.  Maris Decl. at ¶ 5A; Maris expert report, ECF Doc. # 1633-26 at 22-24.  Dr. Maris did "rule in" and "rule out" non-Neurontin suicide risk factors. Maris Decl. at ¶¶ 5C, 5E.  Further, based upon Dr. Maris's education, experience, training and experience, his theory of suicide is that "other suicide risk factors tend to make some individuals part of a vulnerable minority of patients (or sub-set of Neurontin users) who are susceptible to the suicidologenic side-effects of Neurontin. *Id.* at ¶ 5F.[10]  Consequently, Defendants' argument that Dr. Maris must specifically rule out  or rule in all other causes is misplaced.[11]

---

[10] Contrary to Defendants' assertions regarding "mistakes" in Dr. Maris' psychological autopsy, Dr. Maris did consider incidents regarding depression but found the medical records on these issues were vague and inconclusive and that Mr. Smith had never seen a psychiatrist nor received a DSM diagnosis of "depression".  Maris Rep., ECF Doc. # 1633-26, at 7, 8.

[11] Defendants improperly seek to require a "hallmark" requirement for specific-causation. Defs.' Mem. ECF # 1629 at p.8.  However, suicide is a multifactorial phenomenon, and is very unlike a signature disease such as

> **4.** **Dr. Maris had good grounds for forming his opinions, and his consideration of a temporal connection (post hoc ergo hoc) in combination with numerous other factors was appropriate and reliable.**

"[A]n expert need not present evidence that makes causation an absolute, indisputable certainty. Indeed, the expert simply must have good grounds for reaching an opinion, and cross-examination and the testimony of contrary experts, if admissible, are available to test the ultimate correctness of the expert's results; the methods for reaching the conclusion are what must be sound in order for an expert's testimony to be admissible." *Quickel v. Lorillard, Inc.*, 1999 U.S. Dist. LEXIS 23453, *11 (D.N.J. 1999). Courts are not in the "position to declare or even know with any degree of certainty whether otherwise admissible expert testimony is, in fact, correct." *Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d at 994; *see also Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 79, 85 (1st Cir. 1998)

"The temporal relationship will often be (only) one factor, and how much weight it provides for the overall determination of whether an expert has "good grounds" for his or her conclusion will differ depending on the strength of that relationship." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 154 (3d Cir. 1999). "Both a differential diagnosis and a temporal analysis, properly performed, would generally meet the requirements of *Daubert*." *Id.; see also Westbury v. Gislaved Gummi AB,* 178 F.3d 257 (4th Cir. 1999) (where expert relied on, *inter alia,* the "temporal proximity" of a claimant's exposure to talc and worsening health problems); *Zuchowicz v. United States,* 140 F.3d 381, 385, 390 (2d Cir. 1998).[12]

---

mesothelioma, which may only be attributed to exposure to asbestos, or how exposure to coal dust is understood to result in pneumoconiosis. Therefore, multi-factor individual criteria, and how the decedent's condition worsened with Neurontin, formed the basis for the opinions of Dr. Maris. Maris Decl. at ¶ 6.

[12] In *Zuchowicz*, the Second Circuit explained that the law regarding temporal connection has changed: At one time, courts were reluctant to say in such circumstances that the wrong could be deemed to be the cause. They emphasized the logical fallacy of *post hoc, ergo propter hoc*, and demanded some direct evidence connecting the defendant's wrongdoing to the harm. . . All that has changed, however. And, as is so frequently the case in tort law,

In *Tobin v. Smithkline Beecham Pharms.*, plaintiffs claimed that the murder of family members and the murderer's suicide were caused by his ingestion of Paxil.  164 F. Supp. 2d 1278 (D. Wyo. 2001).  The District Court found that where an expert's general causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research, his specific causation testimony based on medical records was "sufficient to support the jury's verdict."  *Id.* at 1283, 1284.

Here, Dr. Maris points to the fact that his conclusions do not rely on temporal considerations alone, but that "dramatic changes in Richard Smith's suicidality and traits/states associated sequentially and proximately with his Neurontin–ingestion, consistent with the Bradford-Hill temporality criterion for causation".  Maris Decl. at ¶¶ 7, 7A-E.[13]  He also considered that Mr. Smith was only moderately suicidal, had no prior suicide attempts, had profound character or personality changes after Neurontin ingestion, and had many protective factors, a supportive family, and the fact that he was a clergyman, a member of an occupation which has the lowest suicide rates, "which often suggests a "<u>trigger</u>" such as Neurontin ingestion and the resulting suicidogenic side-effects."  Maris Decl. at ¶¶ 7A-D.  Dr. Maris also considered Mr. Smith's depression before starting Neurontin and ascertained that his depression got much

---

Chief Judge Cardozo in New York and Chief Justice Traynor in California led the way.  In various opinions, they stated that: if (a) a negligent act was deemed wrongful *because* that act increased the chances that a particular type of accident would occur, and (b) a mishap of that very sort did happen, this was enough to support a finding by the trier of fact that the negligent behavior caused the harm.  Where such a strong causal link exists, it is up to the negligent party to bring in evidence denying *but for* cause and suggesting that in the actual case the wrongful conduct had not been a substantial factor.  140 F.3d 381, 390.

[13] Dr. Maris reviewed and considered the medical records of Mr. Smith's physicians, including Dr. Mackey who testified to Mr. Smith's becoming suicidal after ingesting Neurontin and that in "Richard's 8-year medical history with accompanying chronic pain, he <u>never ever</u> contemplated suicide even one time." Maris Rep., ECF Doc. # 1633-26 at 22.  He considered the testimony of Mr. Smith's wife who testified that Mr. Smith suddenly became suicidal three weeks prior to his suicide, during which time he was ingesting Neurontin, stating,"Honey, would God forgive me if I just did away with myself".  Maris Rep., ECF Doc. # 1633-26 at 22, Maris Decl. at ¶ 7A.  Mr. Smith's own words reported three days prior to his death demonstrates the adverse effects caused by his ingestion of Neurontin: "Neurontin makes me feel weird and is not helping," and that he felt "hopeless" and that he was "almost useless".  Maris Decl. at ¶ 7Eiii.

worse.  Maris Decl. at ¶ 7E(iii).

Dr. Maris noted that:  "Depression is a 'frequent' side effect of taking Neurontin (**PDR**)," and he opined that Mr. Smith had all '9 **DSM-IV**' criteria for a Major Depressive Disorder <u>after</u> taking Neurontin on 3/9/04.  *Id.*  Clearly, Dr. Maris had good grounds, and did not rely solely upon a temporal connection, but performed a differential diagnose in which he considered a host of other factors which  formed a solid and reliable foundation for his opinion that Neurontin was substantial or major contributing factor (cause) of Mr. Smith's suicide.  Maris Decl. at ¶¶ 5B, 5D, and 7; Maris Rep., ECF Doc. # 1633-26, at 18-29.

## II.   THE SPECIFIC CAUSATION TESTIMONY OF PLAINTIFF'S EXPERT, PROF. TRIMBLE, IS RELIABLE AND ADMISSIBLE

### A.   Prof. Trimble Has the Requisite Knowledge, Skill, Education, Training and Experience to Provide Opinions on the Cause of Mr. Smith's  Suicide.

Prof. Trimble's qualifications as a psychiatrist/behavioral neurologist and neuropsychopharmacologist expert are impeccable.  *See* Dr. Trimble's' CV, ECF Doc. #1197-6. Instead, Defendants challenge Prof. Trimble's qualifications to opine on specific causation in this case on the grounds that, *inter alia,* he does not treat patients in the U.S., and he is not a suicidologist or was not able to recite U.S. suicide data.  Defendants' argument simply borders on the absurd.  Prof. Trimble is one of a very small number of people in the world who have a medical degree and expertise in neurology, psychiatry, neuropsychopharmacology, neuroimaging and neuroanatomy.[14]   The confluence of his specialized clinical training and research experience enables Prof. Trimble to have unique insight from a neurological, psychiatric, neuroanatomy, neurochemistry and psychopharmacological perspective as to how Neurontin's psychoactive affects in human brain negatively alter mood and behavior.

Defendants argue that Prof. Trimble is not a suicidologist; however, he is a psychiatrist

---

[14] ECF Doc. # 1197, Ex. 54 at 1.

who has clinical experience in dealing with people who have a high risk of suicide for over 35 years.  Finkelstein Decl., Ex. 11 at 29:2-7; *Mitchell v. United States*, 141 F.3d 8, 15 (1st Cir. 1998) ("The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.").

Defendants are requesting that this Court place artificial international borders on scientific expertise, a limitation that is neither a reality based reflection of what is acceptable in the scientific community at large nor a *Daubert* consideration.  Prof. Trimble was a member of the Harvard Review of Psychiatry and the Journal of Forensic Psychiatry, is a member or fellow of various associations in the U.S. and internationally including:  Johns Hopkins Medical & Surgical Association, American Biological Psychiatry Association, Fellow, American Psychiatric Association, New York Academy of Sciences, American Neurological Association, American Association for the Advancement of Science, Collegium Internationale Neuro-Psychopharmacologium.  ECF Doc. # 1197, Ex. 3.  Moreover, Prof. Trimble was a resident at Johns Hopkins Hospital in Baltimore, and as Defendants admit (ECF Doc. # 1629 at 21), Prof. Trimble has treated and diagnosed patients in the U.S.  *Id.*  Prof. Trimble is in private practice and treats patients who are depressed and are bipolar.  Finkelstein Decl., Ex. 11 at 63:1-11.  Prof. Trimble is familiar with the American Diagnostic Manual and DSM4 diagnoses criteria and the European Classification of Diseases ICD 10.  Finkelstein Decl., Ex. 11 at 156:13-158:3.

> **B.**     **Prof. Trimble Utilized Sound and Reliable Principles and Methods Which He Applied to the Facts of This Case in Forming His Opinions.**

Prof. Trimble provides expert opinions based on the facts of this case by utilizing generally accepted scientific methodology and his clinical experience of dealing with people who have a high risk of suicide for over 35 years, and his knowledge, training, education, and skill. Finkelstein Decl., Ex. 11 at 29:2-7.  Prof. Trimble opines in his expert report in this case that

"gabapentin is associated with changes of brain chemistry which I find with a reasonable degree of scientific and medical probability, leads to impulsive suicidal acts.  It is therefore my opinion that it is more likely than not Gabapentin was a substantial factor in Mr. Smith committing suicide."  Trimble Rep., ECF Doc. # 1633-29 at 14.

In arriving at his expert opinion, Prof. Trimble points to the peer-reviewed literature regarding the impulsive aggressive behavior in patients receiving gabapentin,  Finkelstein Decl., Ex. 11 at 9:10-10:1, and his review and consideration of case materials including the extensive medical, hospital and pharmacy records of Mr. Smith, the pathology records, the employment records, the deposition testimony of his wife Ruth Smith, and a DVD in relation to the life of Mr. Smith and obituary notes, and his expert report on general causation.  Trimble Rep., ECF Doc. # 1633-29 at 3.  Moreover, Prof. Trimble also reviewed the literature, including books of two suicidologists and peer-reviewed articles on suicide during his preparation of his expert report. Finkelstein Decl., Ex. 11 at 104:2-107:23.

Prof. Trimble based his opinions, in part, upon consideration of the following:  Mr. Smith did not have numerous risk factors which are predictors of people who are at higher risk for suicide; there was no evidence of dementia or deterioration of his memory; whether he had a depressive illness associated with his chronic pain; there was evidence that he was depressed in 2003 and 2004 but it was more in the "lay sense rather than as a reflection of a DSM IV diagnostic category"; there was evidence from Mr. Smith's own comments, and from comments from his family which demonstrate that following his ingestion of gabapentin his mental state was altered but not "psychotic" or  a "recognizable psychiatric disorder as would be classified by DSM IV"; his suicide act was impulsive and out of character; clinicians who were monitoring him did not indicate that he had suicidal ideation or intention; and his strong religious beliefs and

affiliation was a protective factor.  Trimble Rep., ECF Doc. # 1633-29 at 12-14.

> **1.    Prof. Trimble employed reliable methodology to ascertain whether ingestion of Neurontin was a substantial factor in Mr. Smith's suicidal behavior and completed suicide.**

Prof. Trimble utilized a differential diagnosis in which he examined the risk factors and protective factors in relation to Mr. Smith's suicide and "ruled in" and "ruled out" certain potential causes.  Trimble Rep., ECF Doc. # 1633-29 at 12-14.  The First Circuit has found that a differential diagnosis is a "standard scientific medical technique, widely used in medicine, of identifying a medical 'cause' by narrowing the more likely causes until the most likely culprit is isolated.  *Baker v. Dalkon Shield Claimants' Trust,* 156 F.3d at 252; *see also In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 755; *Goebel v. Denver & Rio Grand W. R.R. Co.*, 346 F.3d at 998-99.  Prof. Trimble's employment of a differential analysis in forming his specific causation opinions comports with *Daubert* standards for the admission of expert evidence.[15]

To apply a differential diagnosis, Prof. Trimble utilized all of the documents and materials which were available in this case and which are routinely relied upon and general accepted by experts in performing his differential diagnosis.  Prof. Trimble therefore sufficiently complied with the *Daubert* standards, and his testimony should not be excluded.

Prof. Trimble considered both Mr. Smith's psychiatric[16] and physical/orthopaedic[17]

---

[15] Prof. Trimble reviewed and considered Mr. Smith's family history, determining that it was stable and there was no evidence of dysfunctionality or history of psychiatric disorders; Mr. Smith's youth, education and work history, ascertaining that he was high school educated, in the armed forces and a popular minister for more than 60 years at the Church of Christ; that his wife and children had no known psychiatric disorders; and that he was a non-smoker and had no history or alcohol misuse or drug dependence.  Trimble Rep., ECF Doc. # 1633-29 at 4-5.

[16] Prof. Trimble stated that Mr. Smith did not have a psychiatric history prior to the events discussed in his report, and based this opinion on, *inter alia*, the following:  comments in his medical records on 04.08.94 and 05.10.01 of "no depression or anxiety"; a 20.09.01 letter from Dr. Cato that Smith "does not appear anxious or depressed"; that on 06.05.01 he was taking amitriptyline (not taking 12 months before death), most likely for pain and to sleep but there was no evidence that the drug was prescribed for depression; and that Smith was not taking any other CNS psychotropic drugs until he was prescribed gabapentin on 03.09.04.  Prof. Trimble also noted that Mr. Smith was ingesting hydrocodone for 12 months prior to his death and about the time of his death.  *Id.*  at 6-7.

history.   Moreover, Prof. Trimble considered the material events leading up to Mr. Smith's suicide, including pain in his joints, his decompressive laminectomy and follow-up; his church activities; further symptoms and leg pain; notes to obtain a psychiatric evaluation to rule out any dementia.   Prof. Trimble considered that on 03/09/04 Mr. Smith began being prescribed Neurontin of 300 mg twice a day and increasing to three times a day, that further Neurontin was received through samples and that there was evidence that Mr. Smith himself considered that the Neurontin was affecting him mentally.   He considered that Mr. Smith had been on Neurontin some 65 days when he committed suicide.   *Id.* at 8-10.   Prof. Trimble also examined the details of Mr. Smith's mental state prior to his ingestion of Neurontin and noted that "Mr. Smith was depressed because of pain" but it was not "used in a psychiatric sense"; although in pain, Smith was "continuing to go to the church, he was coping adequately."   *Id.* at 9-11.

> **2.     Prof. Trimble did consider appropriate risk factors in his differential diagnosis and did not have to rule out every potential cause of Mr. Smith's suicide in order for his determination to be reliable.**

In performing his analyses, Prof. Trimble considered Mr. Smith's psychiatric and medical problems that are interlinked with suicide and initially ruled out the medical risk factors Finkelstein Decl., Ex. 11 at 57:12-58:4.   Prof. Trimble next considered the psychiatric factors and found that Mr. Smith did not have a classifiable psychiatric disorder.   Finkelstein Decl., Ex. 11 at 74:2-75:23.   It is simply not true that Prof. Trimble did not provide a basis for ruling out psychiatric history as a cause of the suicide.   Prof. Trimble explained that in his professional opinion, Dr. Berklacich was using the term "depressed" in a lay sense and not in a psychiatric

---

[17]Prof. Trimble also reviewed and considered Mr. Smith's past medical history including his orthopaedic difficulties, early tonsillectomy and appendectomy; 1991 transurethral prostatectomy and groin pain; hernia repair; bladder neck contracture; two knee replacements and hip replacement; increasing back pain and mobility difficulties and back surgery; further April 2003 lumbar laminectomy; and basal cell carcinoma removal and cataract surgery. *Id.* at 6.

sense.  Finkelstein Decl., Ex. 11 at 137:12-21.[18]  Prof. Trimble opined that the ability to cope is inconsistent with a depressive psychiatric illness.  Finkelstein Decl., Ex. 11 at 142:16-143:12.  Further, Dr. Trimble noted that Mr. Smith had back surgery on April 1, 2003, and was still experiencing resultant pain.  Finkelstein Decl., Ex. 11 at 316:17- 318:10.  Trimble testified that Dr. Cato, Mr. Smith's primary physician, in May 2003 prescribed an anti-depressant for him, but that just after two prescriptions, Cato notes indicate that regarding anxiety and depression that he was "doing well.  Overall improved."  Finkelstein Decl., Ex. 11 at 330:10-331:5.[19]

Contrary to Defendants' assertions, Prof. Trimble utilized his years of clinical experience to perform a thorough differential diagnosis and did indeed consider various factors in his analysis including: Mr. Smith's being able to cope with his symptoms, Finkelstein Decl., Ex. 11 at 138:2-139:5, 163:3-29, Trimble Rep., ECF Doc. # 1633-29 at 8, 11; his hopelessness, Finkelstein Decl., Ex. 11 at  207:1-8; his functional limitations which Prof. Trimble categorized as contributing to hishopelessness, Finkelstein Decl., Ex. 11 at 420:11-422:1-5, 437:13-20, 451:14-23, 516:11-520:2, 541:11-542:4); Mr. Smith's daughter's cancer which he did not deem to be a factor, Finkelstein Decl., Ex. 11 at 550:16-20; that he was still searching for another opinion for further surgery, Finkelstein Decl., Ex. 11 at 397:8-16; and in regard to his pain, that he was still "battling on" as he had been doing.  Finkelstein Decl., Ex. 11 at 537:5-20.[20]  Prof.

---

[18] Prof. Trimble's basis for this conclusion are that Mr. Smith scored right in the middle average of a 10 point rating scale that had to do with coping, and thus there was no suggestion that he was not managing to cope with his symptoms at that point in time, as well as the testimony of various family members that Mr. Smith was never depressed.  Finkelstein Decl., Ex. 11 at 138:15-139:23.

[19] Dr. Cato saw Mr. Smith on 6/27/03 and found that he was "doing well" in regard to his depression, and that he was no longer depressed.  Finkelstein Decl., Ex. 8 at 61:15-62:2., 75:9-14.  Dr. Cato did not think that Mr. Smith was depressed or suicidal during office visits on 1/20/2004, 2/23/04 , prior to when Mr. Smith began ingesting Neurontin  in 3/04.  Finkelstein Decl., Ex. 8 at 73:11-74:5.

[20] Defendants point to the fact that Mr. Smith was on Lexapro and depressed prior to his ingestion of Neurontin.  Defs.' Mem., ECF Doc. # 1629 at 19.  However, Dr. Trimble questions the extent of the depression.  Trimble Rep., ECF Doc. # 1633-29 at 13; in 1992.  The fact that Mr. Smith may have been depressed only further bolsters Dr. Trimble's opinion in that the FDA evaluated Neurontin's use for Defendants' sought after epilepsy indication, and

Trimble made clear that his expert report was a "clinical report dealing with psychiatric issue" and that he had considered multiple factors in his differential diagnosis that were not specifically laid out in his report including the effects of hydrocodone.  Finkelstein Decl., Ex. 11 at 520:22-521:5-12; 554:2-555:6, 555:24-556:9.  Prof. Trimble reviewed and considered peer-reviewed articles on the elderly and medical illness and suicide and chronic pain in performing his differential diagnosis.  Finkelstein Decl., Ex. 11 at 459:16-461:2, 514:9-517:3.  He considered in his analyses that Mr. Smith was advised to seek a psychiatric evaluation for dementia,  Trimble Rep,, ECF Doc # 1633-29 at 9, due to the concerns of his daughter, but "no physician who had seen him appears to have considered him to have had a major depressive disorder."  *Id.* at 11, 13.

Dr. Trimble has opined that Neurontin was a substantial factor in Mr. Smith's suicide. Defendants have chosen to ignore the fact that in this case Prof. Trimble ruled out several of the highest risk factors in regard to Mr. Smith, namely:  (1) living alone; (2) alcohol or drug dependence; (3) known severe psychiatric disorders such as a major depressive disorder or schizophrenia; and (4) those who have previous attempts to harm themselves, so called parasuicide.  Finkelstein Decl., Ex. 11 at 209:2-213:4.  Prof. Trimble analyzed and considered Mr. Smith's risk factors and protective factors and his chronic pain in arriving at his opinions in this case.  Finkelstein Decl., Ex. 11 at 206:5-208:21.

In arriving at his opinions, Prof. Trimble considered the generally accepted risk factors for suicide as applied to, *inter alia,* the objective evidence, including the medical records and psychiatric history of Mr. Smith in this case, and he performed a thorough differential analyses. He considered the changes of brain chemistry resulting from Neurontin ingestion and which lead to impulsive suicidal acts. His methodology and differential diagnosis should be deemed reliable.

---

FDA advised Defendants that patients ingesting Neurontin may suffer worsening depression that may "require intervention or lead to suicide, as it has resulted in some suicide attempts."  ECF Doc. # 1197, Ex. 5, Parts 1-10.

      **3.**     **Prof. Trimble had good grounds for forming his opinions and his consideration of a temporal connection (post hoc ergo hoc) in combination with numerous other factors was appropriate and reliable.**

Prof. Trimble considered and weighed all of the relevant and material risk factors and protective factors in his differential analysis and did not solely resort to a temporal consideration in arriving at his conclusion.   He made an extensive review of the medical, hospital and pharmacy records, the depositions of family, friends and physicians in rendering his opinion.  He considered that as an elderly individual Mr. Smith's "brain would be more susceptible to the drugs and the drug levels than a younger person," Finkelstein Decl., Ex. 11 at 88:11-25; and that Mr. Smith had been ingesting Neurontin for several weeks prior to his suicide and there was an increase in the dose which "may well be that the effects were magnified when the dose was increased," and increasing the dose "was instrumental in altering this man's cerebral chemistry, leading to the ultimate suicidal act."  Finkelstein Decl., Ex. 11 at 277:18-280:6.

Clearly, Prof. Trimble had good grounds, including that Neurontin alters the brain chemistry and that the objective medical evidence and statements from Mr. Smith himself and his family and friends demonstrated that his mental state was altered after ingesting gabapentin. As demonstrated by the discussion in section I.B.4., above, temporal considerations with a differential diagnosis, properly performed would be sufficient under *Daubert* standards.   His specific causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research and the medical records and other pertinent relevant materials and information which formed a solid and reliable foundation for his opinion that Neurontin was a substantial factor in Mr. Smith's suicide.

Dated:  February 23, 2009

Respectfully submitted,

Finkelstein & Partners, LLP
*Attorneys for Plaintiff Ruth Smith*

By:     **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 23, 2009.

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire