# EXHIBIT 1

Biggs, Gary Wayne (Smith)  2/8/2008  11:35:00 AM

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN MARKETING, SALES )CASE NO.
PRACTICES AND PRODUCTS LIABILITY )04-10981
LITIGATION                       )
                                 )
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
RUTH SMITH, Individually and as  )05-CV-11515
Widow for the use and benefit of )
herself and the next of kin of   )
Richard Smith, deceased.         )
_____)

VIDEOTAPED DEPOSITION OF:

GARY WAYNE BIGGS, SR.

Taken on behalf of the Defendant

February 8, 2008

---

**Page 3**

```
              INDEX
WITNESS: GARY WAYNE BIGGS, SR.
       INDEX OF EXAMINATIONS

              Page/Line

Examination by Mr. Evans      06  04
Examination by Mr. Soh        59  11
Examination by Mr. Evans      73  05
Certificate                   75  01
Errata Sheet                  76  01


        INDEX OF EXHIBITS

No. 1                         15  17
No. 2                         17  06
No. 3                         29  07
No. 4                         46  17
No. 5                         46  17
No. 6                         51  08
No. 7                         64  05
```

---

**Page 2**

APPEARANCES:

For the Plaintiff:

KENNETH S. SOH, ESQUIRE
Lanier Law Firm
6810 F.M. 1960 West
Houston, Texas 77069
(713) 659-5200
713) 659-2204
kss@lanierlawfirm.com

For the Defendant:
CEDRIC E. EVANS
Clark, Thomas & Winters
P.O. Box 1148
300 West 6th Street, 15th Floor
Austin, Texas 78701
(512) 472-8800
(512) 474-1129
cce@ctw.com

Also Present: Amanda Martin, Videographer

---

**Page 4**

The videotaped deposition of GARY WAYNE BIGGS, SR., taken on behalf of the Defendant, on the 8th day of February, 2008, in the offices of Medical Forensics, 850 R.S. Gass Boulevard, Nashville, Tennessee, 37216, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Deborah J. Harris, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are reserved.

* * *

---

Biggs, Gary Wayne (Smith) 2/8/2008 11:35:00 AM

Page 5

1   PROCEEDINGS
2   THE VIDEOGRAPHER: Here begins
3   Volume 1, Videotape No. 1, in the
4   deposition of Gary Biggs, in the manner of
5   Neurontin Marketing and Sales Practices
6   versus Pfizer Incorporated, in the United
7   States District Court for the District of
8   Massachusetts.
9   The Case No. is 04-10981. Today's date is
10  the 8th of February, 2008. The time on the
11  video monitor is 9:07. The video operator
12  today is Amanda Martin of Vowell & Jennings,
13  Nashville, Tennessee. This video deposition is
14  taking place at 850 RS Gass Boulevard,
15  Nashville, Tennessee.
16  Counsel, please identify yourselves and
17  state whom you represent.
18  MR. EVANS: Cedric Evans representing
19  Pfizer.
20  MR. SOH: Kenneth Soh for the
21  Plaintiffs.
22  THE VIDEOGRAPHER: The court reporter
23  today is Deborah Harris of Vowell &
24  Jennings. Would the reporter please swear
25  in the witness.

Page 6

1   GARY WAYNE BIGGS, SR.,
2   was called as a witness, and after having been
3   first duly sworn, testified as follows:
4   EXAMINATION
5   BY MR. EVANS:
6   Q   Mr. Biggs, can you state your name
7   for the record, please?
8   A   Gary Wayne Biggs.
9   Q   Okay. Well, my name is Cedric Evans.
10  You and I have met previously. And we are here
11  today to take your deposition in a case
12  involving a claim by the family of a gentleman
13  named Richard Smith related to his May 13, 2004
14  suicide.
15  And it's our understanding that you have
16  had a role in the investigation of Mr. Smith's
17  suicide, so we are interested in talking with
18  you about your activities as it relates to
19  investigating Mr. Smith's suicide.
20  Do you understand that?
21  A   Yes, sir.
22  Q   Okay. Have you ever given a
23  deposition before?
24  A   Yes.
25  Q   Approximately how many times?

Page 7

1   A   Once.
2   Q   Once. Okay. And how long ago was
3   that?
4   A   Back in '88.
5   Q   And what were the circumstances of
6   that deposition?
7   A   It was personal.
8   Q   So this is the first deposition that
9   you've given related to your activities as a
10  forensic investigator?
11  A   Yes, sir.
12  Q   Just --
13  A   Oh, I take that back. I did give
14  another deposition on a accidental death suit
15  back in '98.
16  Q   Was that in your capacity as a
17  forensic investigator?
18  A   Yes, sir.
19  Q   And where were you working at the
20  time?
21  A   Forensic Medical.
22  Q   The same company that you work for
23  now?
24  A   (Nods head.)
25  Q   Yes?

Page 8

1   A   Yes.
2   Q   All right. Let me just remind you of
3   some of the ground rules to the deposition that
4   make it go a bit more smoothly.
5   As you can see, the court reporter is
6   taking down everything that's said in the
7   room -- my questions, your answers, any
8   questions or comments by Mr. Soh.
9   It is important, therefore, that, because
10  she's trying to take down everything that's
11  said, that you always make sure you answer
12  questions audibly, you know, either a yes or
13  no, or a narrative response if that's what the
14  question calls for, and avoid just shaking your
15  head up and down or side to side. It's okay to
16  do that if you're going to also answer audibly.
17  Also, sometimes in normal conversation you
18  anticipate where a question is going and we
19  start to answer before someone actually
20  finishes the question.
21  While that's great in normal conversation,
22  it's not so great in a deposition setting. So
23  if you could just make sure that you let the
24  question get out before you start answering and
25  then, you know, we'll also let you get a

Biggs, Gary Wayne (Smith) 2/8/2008 11:35:00 AM

**17**

1  MR. EVANS: Wait a minute. Let's do
2  this. You're actually looking now -- let
3  me go ahead and let me do this right here.
4  Let me mark a copy of these notes as
5  deposition Exhibit No. 2.
6  (EXHIBIT NO. 2 WAS MARKED FOR
7  IDENTIFICATION.)
8  BY MR. EVANS:
9  Q  Okay. Can you -- let's do this then.
10  Can you walk us through kind of what we're
11  looking at when we look at the notes from the
12  top going down?
13  A  Sure. At the very top -- I guess it
14  would be the corner.
15  Q  The top right corner?
16  A  Yeah, there you go.
17  Q  Okay.
18  A  It says 8628510, dash 8510. That's
19  dispatch's number. And they could page me at
20  5:53 that morning. Over here it says 04-1575.
21  I assigned it a case number.
22  Q  Okay. So you assign the case number?
23  Yes?
24  A  Yes.
25  Q  Okay.

**18**

1  A  Sorry.
2  Q  That's all right.
3  A  Of course the decedent's name, his
4  age.
5  Q  Okay.
6  A  I didn't write his race and sex. I
7  normally write that down. I didn't write that
8  down.
9  Q  Tell me something. Just the --
10  the -- the name and the age -- and is that the
11  date of birth, that 1/4?
12  A  Yes.
13  Q  Was it 1/4/20 --
14  A  25.
15  Q  25. Is that information that you got
16  before you arrived at the scene or is that
17  information you got at the scene?
18  A  Since ya'll have copies, you can't
19  see the difference in color. When I took the
20  initial call, it was in red. And then I had a
21  black pen. So that's when I got out to the
22  scene I had a different pen.
23  Q  Okay.
24  A  So you can see my initial notes.
25  Q  Well, let's just for the record, so

**19**

1  it's clear that in terms of the things that are
2  in red, it's the dispatch phone number and
3  time. You also have --
4  A  Location.
5  Q  -- the 1443 Janie Avenue also in red?
6  A  And the officer at the scene.
7  Q  Okay. And that is --
8  A  Well, no. It's off of Murray and
9  McGavock Pike.
10  Q  Okay. So those are the cross streets
11  for the address?
12  A  Yes, sir.
13  Q  Okay. And everything else -- so
14  those are notes that you made when you got the
15  call. Everything else that is in black are
16  notes that you would have made at the scene?
17  A  At the scene.
18  Q  Okay.
19  A  Or when I got back.
20  Q  Or when you got back. Are you able
21  to distinguish between the notes that you made
22  at the scene and the notes you made when you
23  got back?
24  A  Pretty much I can tell by my writing
25  most of my notes were done at the scene. The

**20**

1  case number, since it's in blue, it was
2  probably when I got back.
3  Q  Okay. You can keep working.
4  A  All right. So we've got the
5  decedent's name, Richard H. Smith. He was at
6  1443 Janie Avenue in Inglewood, 37216 Zip code.
7  The Complaint No. 04-240830, that's the Metro
8  Police complaint number. And if you look about
9  midway down the page on the left-hand side.
10  Q  Right.
11  A  It says, 0545 --
12  Q  Yes.
13  A  -- MPD. That's what time they got
14  the call.
15  Q  And is that information -- who do you
16  get that information from?
17  A  Either dispatch or the detective on
18  the scene.
19  Q  Okay.
20  A  And back to the top of the page on
21  the left-hand side, you see 738, 1098 below it?
22  That's the code for leaving the scene. So
23  that's the time I left that scene, 738.
24  Q  Okay.
25  A  Below that says 640, 1097. That's

Biggs, Gary Wayne (Smith) 2/8/2008 11:35:00 AM

Page 41

1  Q  How do you know that?
2  A  Even though I didn't sign it, I know
3  it because the computer generates my name as
4  Gary Biggs. I go in there and manually change
5  it to Gary W. Biggs, Sr.
6     MR. SOH: You are OCD.
7  A  I never lie. At least I try not to.
8     (COURT REPORTER ASKS EVERYONE TO
9     SPEAK UP.)
10    (DISCUSSION WAS HAD OFF THE RECORD.)
11 BY MR. EVANS:
12 Q  Okay. Let's talk now about the scene
13 investigation report which is also part of your
14 file, correct?
15 A  Yes, sir.
16 Q  Okay. Tell me how the scene -- this
17 is a document that's created by you?
18 A  Yes, sir.
19 Q  Okay. Tell me when in the process of
20 your investigation this document would have
21 been created.
22 A  When I get back to the office.
23 Q  So it would have been created that
24 morning?
25 A  More than likely. I would have to

Page 42

1  check the computer. But I believe it was.
2  Q  And is this -- in the terms of the
3  scene description, is this like the narrative
4  summary, where it's created based upon your
5  notes and also based upon your memory of the
6  scene?
7  A  Yes, sir. And this is usually an
8  internal document that is not released out to
9  the family. So it can't -- it won't -- like I
10 said, that day I was here for a while. So I
11 would have done that that day. But there are
12 occasions that we do them like that night when
13 we return or later.
14 Q  Now, can you tell me this, because
15 this -- this scene description appears to have
16 more information than the narrative summary.
17 Is there a reason for that?
18 A  The narrative summary you don't put
19 all the information in there. This is more for
20 the doctors to read, to give them more of the
21 story.
22    You don't want to -- I personally do not
23 want the family to remember certain aspects of
24 the scene, so I'm not going to put that in
25 there, because it needs to be more generalized,

Page 43

1  as opposed to this needs to be more in depth,
2  when you talk about the report of the County
3  Medical Examiner.
4  Q  So is the thought that the report of
5  the County Medical Examiner was going to end up
6  with the family?
7  A  If they request it.
8  Q  So you're more -- a little bit more
9  selective about the information that you put in
10 there?
11 A  Yes, sir.
12 Q  All right. I want to --
13 A  Thus, it's totally different from
14 a --
15 Q  I wanted to ask you a few questions
16 about some of the information that is contained
17 in the scene investigation report.
18    You mentioned that you -- you also took
19 photographs of the scene, correct?
20 A  Yes, sir.
21 Q  Okay. Do you look at the -- tell me
22 this: When you're completing the scene
23 description, in that part of the scene
24 investigation report, do you also review your
25 photographs to assist you with that?

Page 44

1  A  Several times, yes, sir.
2  Q  Okay.
3  A  But not all the time. But a lot of
4  times.
5  Q  Okay. Do you have a recollection of
6  whether or not you would have reviewed the
7  photographs for this?
8  A  I don't know.
9  Q  I know that's a while ago.
10 A  We download the photographs into the
11 computer system, so I have them right there, so
12 I can look at them a lot.
13 Q  Now you have -- you've got a copy of
14 you -- of the photographs that you took in
15 front of you?
16 A  Yes, sir.
17 Q  All right. Now what I'm interested
18 in is in the scene description, coming down
19 kind of toward the -- toward the end of that
20 last paragraph, it says, what appeared to be --
21 do you see that part?
22 A  Yes, sir.
23 Q  Okay. What appeared to be several
24 prescriptions on the dresser were noted. Wait
25 a minute. I'm sorry. Let me read it.

Biggs, Gary Wayne (Smith)  2/8/2008  11:35:00 AM

**Page 45**

1    What appeared to be several prescriptions
2    on a dresser were noted. The victim appeared
3    to have been prescribed Hydrocodone,
4    cyclobenzaprine, and Neurontin.
5        Do you see that?
6    A   Yes, sir.
7    Q   Okay. In terms of this information,
8    would this have been based upon your
9    observations of the bedroom?
10   A   Well, yes. But we also collect the
11   medication at the scene.
12   Q   Okay. All right. And if, for
13   example -- and I assume that if -- we're going
14   to look at the photographs in a second. But I
15   assume if you saw -- you know, you could see a
16   pill bottle that, you know, contained
17   medication and a pill bottle that did not
18   contain medication?
19   A   Yes, sir.
20   Q   If you had a pill bottle, even though
21   on the outside it said that it was, for
22   example, hydrocodone, if it didn't contain any
23   medication, would you note on your scene
24   description that there was hydrocodone at the
25   scene?

**Page 46**

1    A   I would still put that the pill
2    bottle was there.
3    Q   Okay.
4    A   But I would more than likely note
5    that it was empty.
6    Q   Okay. All right. Now, looking at
7    the photographs -- and I've got a version of
8    photographs that actually has the number -- the
9    numbers that were assigned that was part of the
10   file. And I have the 04-1575-01. Yours may --
11   A   That's fine.
12   Q   -- they may be a little clearer than
13   mine. And I want to look first at
14   photographs 6 and 14. And I'm going to mark as
15   deposition Exhibit No. 4 photograph 6, and
16   deposition Exhibit No. 5 photograph 14.
17       (EXHIBIT NOS. 4 AND 5 WERE MARKED FOR
18       IDENTIFICATION.)
19   BY MR. EVANS:
20   Q   Now, looking at these two
21   photographs, there are a number of -- well,
22   fair to say there are a number of medication
23   bottles on the dresser?
24   A   Uh-huh.
25   Q   Yes?

**Page 47**

1    A   Yes, sir.
2    Q   All right.
3    A   Sorry.
4    Q   Are you able to tell me from looking
5    at these photographs which pill bottle the
6    Neurontin was contained in?
7    A   The one that says courtesy refills,
8    Eckerd on top, the big one.
9    Q   Okay. The big one that's --
10   A   Right there.
11   Q   -- kind of in the center of -- next
12   to the cell phone?
13   A   It was between the cell phone and the
14   watch.
15   Q   So to the right of the cell phone.
16   All right.
17       And how is it that you know that that's
18   the bottle that contained Neurontin?
19   A   Because you can see it on the pill
20   bottle.
21       MR. SOH: You can see it on the what?
22   A   You can see it on the pill bottle. I
23   see Neurontin all the time and plus I was
24   prescribed it in the past.
25   BY MR. EVANS:

**Page 48**

1    Q   Okay. All right. So it's your
2    belief that bottle contains the Neurontin, the
3    big pill bottle?
4    A   Yes, sir.
5    Q   Okay. Are you -- are you -- is that
6    something that you're certain of?
7    A   I'm pretty sure of that because it
8    looks like you can see the writing right there
9    on the capsule, Gabapentin, Neurontin.
10       MR. SOH: Can I see your copy?
11       MR. EVANS: His is a little clearer.
12       THE WITNESS: And here's another one
13   that you can see. Do you see what I'm
14   talking about?
15       MR. SOH: No.
16       THE WITNESS: Trust me on these
17   pills.
18       MR. SOH: Okay. That's all right.
19   That's all right.
20       THE WITNESS: All right.
21   BY MR. EVANS:
22   Q   And can you tell me -- you said
23   something about the collection of medications
24   at the scene.
25       Are you able to tell me one way or the