# EXHIBIT 6

Smith-Charlton, Cindy (Smith) rough transcript 10/3/2007 9:14:00 AM

**Page 1**

1  CASE:
2
3  DEPOSITION OF:
4  DATE:         , 2003
5
6         IMPORTANT NOTICE
7  PLEASE READ BEFORE USING REALTIME ROUGH DRAFT
8         AGREEMENT OF PARTIES
9     WORKING WITH REALTIME ROUGH DRAFTS
10
11     We, the party working with the realtime
12  and rough draft transcripts, understand that if we
13  choose to use the realtime rough draft screen or
14  printout, we are doing so with the understanding
15  that the rough draft is an uncertified copy.
16     We further agree not to share, give, copy,
17  scan, fax, or in any way distribute this realtime
18  rough draft in any form (written or computerized)
19  to any party. However, our own experts,
20  co-counsel, and staff may have limited internal
21  use of same, with the understanding that we agree
22  to destroy our realtime rough draft and/or any
23  computerized form, if any, and replace it with the
24  final transcript upon its completion.
25

**Page 2**

1         REPORTER'S NOTE
2
3     Since this deposition has been realtimed
4  and is in rough draft form, please be aware that
5  there may be discrepancies regarding page and line
6  number when comparing the realtime screen, the
7  rough draft, rough draft disk, and the final
8  transcript.
9     Also please be aware that the realtime
10  screen and the uncertified rough draft transcript
11  may contain untranslated steno, reporter's notes,
12  FLAG or SPELL strokes, or nonsensical English word
13  combinations. All such entries will be corrected
14  on the final, certified transcript.

**Page 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
IN RE: NEURONTIN MARKETING, SALES )
PRACTICES AND PRODUCTS LIABILITY )
LITIGATION                       )
                                 )
_____  )
                                 )
                                 )
                        ) CASE NO.
                        ) 04-10981
THIS DOCUMENT RELATES TO:        )
                                 )
RUTH SMITH, Individually and as  )
Widow for the use and benefit of )
herself and the next of kin of   )
Richard Smith, deceased.         )
                                 )
05-CV-11515                      )
                                 )
   VIDEOTAPED DEPOSITION OF
   CINDY SMITH-CHARLTON
   Taken on Behalf of the Defendant
   October 3, 2007

**Page 4**

1  APPEARANCES:
2  For the Plaintiff:
3     MAURA C. KOLB
      KENNETH S. SOH
4     Lanier Law Firm
      6810 F.M. 1960 West
5     Houston, Texas  77069
      713.659.5200
6     713.659.6416
      wml@lanierlawfirm.com
7     kss@lanierlawfirm.com
      mck@lanierlawfirm.com
8
9  For the Defendant:
10    KENNETH J. FERGUSON
      Clark, Thomas & Winters
11    P.O. Box 1148
      Austin, Texas 78767
12    512.472.8800
      512.474.1129
13    kjf@ctw.com
14    ANGELA SEATON
      Shook, Hardy & Bacon
15    2555 Grand Boulevard
      Kansas City, Missouri  64108-2613
16    816.474.6550
      aseaton@shb.com
17
18  Also Present: Andrew Langsdon, Videographer
19
20
21
22
23
24
25

Page 65

1  than just pain that you reported to Dr. Mackey on
2  that day ^FLAG?
3  A.   We wanted his pain to go away.
4       MR. FERGUSON:  We need to just change
5  tapes real quick.
6       THE VIDEOGRAPHER:  We are going off
7  the record. Time on the monitor is 10:44.
8       (Brief recess observed.)
9       THE VIDEOGRAPHER:  Back on the
10 record, here marks the beginning of Tape No. 2 in
11 the deposition of Cindy Smith-Charlton, Volume 1.
12 The time is 10:48.
13 BY MR. FERGUSON:
14 Q.   Back on the record. Ready to go?
15 A.   Yes.
16 Q.   Okay. We had talked a bit about the two
17 knee replacements and the hip replacement your
18 father had had. I just want to hit on a few
19 things in his past. And you may or may not know
20 anything about these, and I won't dwell on them.
21      But were you aware that your father had
22 had some prostate issues in the past?
23 A.   Yes.
24 Q.   And that he had had prostate surgery at
25 some point? Do you understand that?

Page 66

1  A.   Yes.
2  Q.   And do you understand that he -- he had
3  had some off and on continuing issues following
4  the process state surgery?
5  A.   I don't know.
6  Q.   To your knowledge and to your observation,
7  at any point in his life, did the -- the hip or
8  knee replacements interfere with his -- his
9  ability to participate in activities or ability to
10 do things?
11 A.   He wasn't comfortable standing for long
12 periods of time.
13 Q.   But other than that, generally, obviously
14 except for right after the surgeries, he was able
15 to -- able to do what he needed to do?
16 A.   Yes.
17 Q.   Were you aware of him having some problems
18 with his left shoulder at any time? And I'm
19 talking about -- this is probably in the eight
20 years or so prior to his death.
21 A.   Yes.
22 Q.   Okay. And what kind of problems were you
23 aware of that he had with his shoulder?
24 A.   I was aware of arthritis.
25 Q.   Do you know if the physicians had

Page 67

1  discussed the possibility of -- of performing
2  surgery on his shoulder?
3  A.   I don't know.
4  Q.   But you were aware of it because of
5  conversations with your father or your mother
6  fair?
7  A.   Yes.
8  Q.   In terms of the issues that led up to his
9  having the knee replacements and the hip
10 replacement, did you or your sisters help -- well,
11 let me ask you, did any of you to your knowledge
12 go to his doctors appointments leading up to the
13 knee and hip replacements?
14 A.   To the best of my knowledge, no.
15 Q.   And I guess what I'm trying to figure out
16 is, from your perspective, what was different
17 about March of -- of '04? You said you and your
18 sisters were trying to be supportive of your
19 father. And you were going along to visits with
20 him in March '04, but you didn't back in prior
21 years when he was having these -- these issues
22 that led that joint write placements.
23      What was different in '04?
24      MS. KOLB:  Objection, form.
25      MR. FERGUSON:  Sure.

Page 68

1       THE WITNESS:  Could you repeat the
2  question, Ken, please?
3  BY MR. FERGUSON:
4  Q.   Sure, sure. Why was it that y'all were
5  going to appointments with him in 2004 and didn't
6  go to appointments with him in the past when he
7  had had issues that were significant enough to
8  actually have replacements of both knees and hip?
9       MS. KOLB:  Objection, form.
10      THE WITNESS:  Well, first of all, I
11 don't recall specifically if we went to other
12 doctor appointments, so I wouldn't know if there
13 was anything specifically different about his back
14 versus his knees.
15 BY MR. FERGUSON:
16 Q.   Okay. You said first of all. Was there a
17 second of all or --
18 A.   Well, we're a supportive family.
19 Q.   From your observation, in March of 2004,
20 was his -- his back problem and his leg problems
21 affecting his ability to -- to live his everyday
22 life more than the prior problems had been with
23 his joints?
24 A.   Could you clarify live his everyday life?
25 I'm not sure what you mean there.

**Page 109**

1 discussed as a possibility; is that correct ^FLAG?
2 A. Yes, Dr. Mackey brought that up.
3 Q. Do -- do you know from sources within your
4 family or doctors or anybody what ultimately
5 happened? Did Dr. Mackey ultimately say he could
6 or could not help your father with further
7 surgery?
8 A. My recollection is that Dr. Mackey said it
9 might help; it might not help. It might make
10 things worse.
11 Q. And do you understand that -- that your
12 father went, again, to see Dr. McCombs after
13 having seen Dr. Mackey?
14 A. If that's what the record says. I have no
15 recollection.
16 Q. And that's what the records say, but I'm
17 trying to get what -- what you know about it not
18 only from your personal knowledge but from your
19 family -- your close family that was discussing
20 these matters?
21 A. I understand.
22 Q. Okay. And is it fair to say that this was
23 a very important issue within your family during
24 this time period in March of 2004, trying to -- to
25 help your father get the best help he could get?

**Page 110**

1 A. Yes.
2 Q. Dr. McCombs' note of March 31 of 2004,
3 indicates that Dr. Mackey did not feel that the
4 patient needed additional surgery, and goes on to
5 say in Dr. McCombs' opinion he is to the a
6 candidate for any type of operative intervention.
7 My question is, during this period late
8 March of 2004, did you become aware that the
9 surgeons your father was looking to for help
10 basically told him they probably couldn't help him
11 from a surgical standpoint?
12 A. I'm not sure of the time frame, but I
13 believe that that did occur.
14 Q. So you, obviously your father, your
15 mother, your family were seeking help for -- for
16 your father, whether that was surgery or -- or
17 other options? And at some point around this time
18 frame -- you don't know the exact date -- the
19 surgeons indicated they couldn't help him
20 surgically?
21 A. Again, I'm not sure of the time frame. I
22 do believe that surgical options or -- it was
23 concluded that surgery was not going to be an
24 option.
25 Q. How did your father in your observation

**Page 111**

1 react to that news that surgery was not going to
2 be an option for him?
3 A. I think he remained hopeful for for
4 alternative measures.
5 Q. And do you know what alternative measures
6 were being recommended?
7 A. I'm not sure what you mean by recommended
8 or who recommended.
9 Q. Sure. Okay.
10 A. We were researching therapy options and
11 things of that nature.
12 Q. Okay. That's fair. Let me ask you this,
13 do you know what other options, either Dr. McCombs
14 or Dr. Mackey had recommended for him?
15 A. No.
16 Q. What sort of research were you and your
17 family doing in order to find him some help? What
18 were you looking into?
19 A. Talking to family and friends that had
20 experienced similar back issues.
21 Q. And what kind of information were you
22 getting from -- from that that you thought might
23 help your father, if any?
24 A. I had not found any information.
25 Q. Had your sisters or your mother or your

**Page 112**

1 brothers in law found any information from others
2 that they thought might be helpful in finding some
3 help for your father?
4 A. My sister Gayle had located a doctor who
5 we thought might be helpful. I'm not sure what he
6 was going to do, but it sounded very positive.
7 Q. And who was that doctor?
8 A. I don't remember his name. It was
9 something like Dr. Ching or Chang or -- I don't
10 remember.
11 Q. Okay. And where was that doctor located
12 (brothers-in-law)?
13 A. I don't remember.
14 Q. Do you know whether or not that doctor was
15 associated with Vanderbilt, if you know one way or
16 the other?
17 A. If I were going to guess, I would think
18 that was correct. I wasn't involved in those
19 direct communications.
20 Q. And do you know what kind of doctor that
21 was?
22 A. No.
23 Q. And you don't know what kind of potential,
24 possible treatment was proposed by this doctor or
25 was being considered?

Smith-Charlton, Cindy (Smith) rough transcript 10/3/2007 9:14:00 AM

**Page 113**

1  A.  No.
2  Q.  And my understanding, am I correct --
3  well, do you know whether your father, period of
4  time, ever saw this doctor?
5  A.  He had an appointment scheduled the
6  morning he died. I do not believe he saw him
7  before that.
8  Q.  Okay.
9  Q.  So this was a doctor he was supposed to
10  see the day of his death, and he had never seen
11  him previously; is that your understanding?
12       MR. FERGUSON:  Do you guys want to
13  take a lunch break?
14       MR. SOH:  Sure.
15       THE WITNESS:  If you want to, we'll
16  do it.
17       THE VIDEOGRAPHER:  We are now going
18  off the record, the time on the video monitor now
19  is 10 -- or 12:10.
20       (Luncheon recess observed.)
21       THE VIDEOGRAPHER:  We are now going
22  back on the record. The time on the video monitor
23  is 1317.
24  BY MR. FERGUSON:
25  Q.  Ms. Charlton, are you ready to proceed?

**Page 114**

1  A.  Yes.
2  Q.  Okay. We talked earlier about any
3  discussion about having your father see a
4  psychiatrist, psychologist, counselor, or other
5  mental healthcare practitioner. Do you remember
6  that we had -- we talked about that?
7  A.  Yes.
8  Q.  Do you know whether your father ever saw
9  a -- a pastor, a minister, any religious leader to
10  discuss his problems of pain?
11  A.  No.
12  Q.  You're not aware that he did?
13  A.  I'm not aware that he did.
14  Q.  During the year, let's say year prior to
15  your father's death, what church did your father
16  attend?
17  A.  Jackson Park Church of Christ.
18  Q.  And I forget if that was the ones you
19  already told me -- one of the ones you already
20  told me about. I don't think so.
21  A.  I don't think I've mentioned it before.
22  Q.  Okay. Who was the pastor at that church?
23  A.  Jim Olive.
24  Q.  And was Jim Olive a friend of your dad's?
25  A.  He knew him. I don't believe they would

**Page 115**

1  socialize as friends particularly.
2  Q.  What kind of activities did your father
3  like to participate in? And let's take like the
4  last ten years of his life. What kinds of things,
5  other than his work at Nashville Office Machines
6  and his work at the church, what other
7  recreational things would he do?
8  A.  He enjoyed yard work and being with
9  family, and he enjoyed music.
10  Q.  How about, did he ever like to work on --
11  work on a car, work on cars at all?
12  A.  He did some.
13  Q.  You wouldn't put that as major as the
14  other ones you mentioned?
15  A.  That's correct.
16  Q.  During the several months prior to his
17  death, was he able to do yard work?
18  A.  Yes.
19  Q.  Did he have problems doing yard work?
20  A.  I don't remember.
21  Q.  So you just don't recall one way or the
22  other whether the pain that he's having -- he was
23  having during that time period affected his
24  ability to -- to do the yard work he enjoyed?
25  A.  He did yard work. He would not always

**Page 116**

1  ride a lawn mower.
2  Q.  Okay. I'm not quite sure what that means.
3  He wouldn't -- did he have a riding lawn mower?
4  A.  Yes.
5  Q.  How long had he had a riding lawn mower?
6  A.  Almost as long as I can remember. I can't
7  give you a -- a year.
8  Q.  So are you saying in the months preceding
9  his death, he wasn't able to ride the lawn mower
10  like he had in the past?
11  A.  My recollection is he would not ride the
12  lawn mower.
13  Q.  And when did he stop riding the lawn
14  mower?
15  A.  I don't know exactly.
16  Q.  Was it years before his death or within a
17  year before his death, if -- if you know?
18  A.  Within a year before his death.
19  Q.  And what kind of musical activities did he
20  like to participate in?
21  A.  He would play the guitar and play the
22  banjo and sing.
23  Q.  Does that mean -- just at church, or did
24  he do that around the house?
25  A.  He did it around the house.

**Page 125**

1  why did you want him to write that down? What is
2  it you were -- you were trying to figure out?
3      MS. KOLB: Objection, form.
4      THE WITNESS: Could you repeat the
5  question, Ken?
6  BY MR. FERGUSON:
7  Q.  Sure.
8  A.  Or clarify?
9  Q.  Sure.
10     You asked Dr. Wood to write down his
11 recollection of his -- the visit with your father
12 several days previously?
13 A.  Yes.
14 Q.  And I'm just trying to understand what the
15 purpose of that was.
16 A.  We were trying to understand any reason
17 that might have caused my father's death. As I
18 said, we were clueless. We had no idea why what
19 happened happened. And we were attempting to
20 gather information that might give us some clues,
21 and that included history.
22 Q.  Did you have any discussion with Dr. Wood
23 at the funeral home on that day you believe to be
24 Saturday regarding the drug Neurontin?
25 A.  No.

**Page 126**

1  Q.  And -- and let me ask you a few questions
2  about your comment that the family had no idea
3  what your father had done what he had done. Is
4  that an accurate -- accurate repetition of your
5  statement? Your family just didn't know what --
6  why --
7  A.  That is correct. We had no idea.
8  Q.  Y'all didn't know that your father had
9  been in severe pain for a -- for months, didn't
10 you at least?
11     MS. KOLB: Objection, form.
12     THE WITNESS: We knew he had been in
13 pain.
14 BY MR. FERGUSON:
15 Q.  Okay. Because there was an objection --
16 I'm not sure what the basis was -- but let me ask
17 you this, were you aware that your father had been
18 in pain for a period of months prior to his death?
19 A.  Yes.
20     MS. KOLB: Objection, form.
21 BY MR. FERGUSON:
22 Q.  Okay. Did you understand that to be
23 severe pain?
24     MS. KOLB: Objection, form.
25     THE WITNESS: I did not understand it

**Page 127**

1  to be any more severe pain than what he had
2  experienced previously in his life.
3  BY MR. FERGUSON:
4  Q.  At -- at that time when you indicated your
5  family was clueless -- and that's your term. I'm
6  not trying to be disrespectful at all. You
7  understand that?
8  A.  I understand. No, that was my term.
9  Q.  When you indicated your family was
10 clueless about the reason for this, were you aware
11 of the statement in Dr. McCombs' records from
12 about a year previously indicating that your
13 father had stated that he wanted to die because of
14 pain and depression?
15 A.  No.
16 Q.  When you did find out about that
17 statement, did that help at all in explaining the
18 reason for your father's actions?
19     MS. KOLB: Objection, form.
20     THE WITNESS: Could you clarify,
21 please?
22 BY MR. FERGUSON:
23 Q.  Sure. You said your family was looking
24 for -- for the explanation why your father did
25 what he did. Am I correct about that?

**Page 128**

1  A.  Yes.
2  Q.  And when you did subsequently find that
3  out back in early May 2003, he had said to
4  someone, apparently according to the medical
5  records, that he wishes he could die because of
6  pain and depression. Did that help you personally
7  try to explain why he had acted in the way he had?
8  A.  No.
9  Q.  Okay. Why not?
10 A.  Because my father was not depressed.
11     (Marked Exhibit No. 1.)
12 BY MR. FERGUSON:
13 Q.  Let me show you a document we discussed
14 earlier, which is a record -- page from a record
15 of Neurosurgical Associates, which is Dr. McCombs'
16 office. And it has some gray -- what looks like
17 gray highlighting here. I apologize for that.
18     But there's a notation here 5-2-03 that
19 has the comment we just discussed.
20 A.  Uh-huh. Yes.
21 Q.  And below that there is some writing that
22 I understand from your mother to be your father's
23 writing.
24 A.  Okay.
25 Q.  Would you take a look at that?