EXHIBIT 8

Cato, James (Smith) 6/29/2007 1:14:00 PM

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN MARKETING, SALES )
PRACTICES AND PRODUCTS LIABILITY )
LITIGATION                        )
                                  )
_____)
                                  )
                                  )
                         ) CASE NO.
                         ) 04-10981
THIS DOCUMENT RELATES TO:         )
                                  )
RUTH SMITH, Individually and as   )
Widow for the use and benefit of  )
herself and the next of kin of    )
Richard Smith, deceased.          )
                                  )
05-CV-11515                       )
                                  )

VIDEOTAPED DEPOSITION OF
JAMES R. CATO, M.D.
Taken on Behalf of the Defendant
June 29, 2007

---

**Page 2**

1   APPEARANCES:
2   For the Plaintiff:
3       KENNETH S. SOH
        Lanier Law Firm
4       6810 F.M. 1960 West
        Houston, Texas 77069
5       713.659.5200
        713.659.6416
6       wml@lanierlawfirm.com
        kss@lanierlawfirm.com
7
8   For the Defendant:
9       CEDRIC E. EVANS
        Clark, Thomas & Winters
10      P.O. Box 1148
        Austin, Texas 78767
11      512.472.8800
        512.474.1129
12      kjf@ctw.com
        cee@ctw.com
13
14  Also Present: Sheldon Singh, Videographer
                  Wes Henry, Videographer

---

**Page 3**

1                    I N D E X
2   WITNESS: JAMES R. CATO
3           INDEX OF EXAMINATIONS
4                                      Page/Line
5   By Mr. Evans ........................  5   10
6   By Mr. Soh ..........................  70   9
7   By Mr. Evans ........................ 84   23
8           INDEX OF EXHIBITS
9                                      Page/Line
10  No. 1 ...............................  21  10
11  No. 2 Late Filed ....................  85  17

---

**Page 4**

2       The videotaped deposition of JAMES R.
3   CATO, M.D., taken on behalf of the Defendant, on
4   the 29th day of June, 2007, in the offices of
5   Heritage Medical Associates, 2325 Crestmoor Road,
6   Nashville, Tennessee, for all purposes under the
7   Federal Rules of Civil Procedure.
8       The formalities as to notice,
9   caption, certificate, et cetera, are waived. All
10  objections, except as to the form of the
11  questions, are reserved to the hearing.
12      It is agreed that Elisabeth A.
13  Miller, being a Notary Public and Court Reporter
14  for the State of Tennessee, may swear the witness,
15  and that the reading and signing of the completed
16  deposition by the witness are waived.

20              * * *

**61**

1  Q. Okay. And you --
2  A. And we don't note it on our office note.
3  We had this special sheet that we -- it's kind of
4  a flow sheet that we noted medicines.
5  Q. All right. So as we sit here right now,
6  you do not believe you prescribed Neurontin for
7  Mr. Smith?
8  A. And we also have another sheet where we
9  put down all prescriptions that we write, and I
10 find no evidence that we wrote any prescriptions
11 for that.
12 Q. So you do not believe that you prescribed
13 Neurontin?
14 A. No, I do not.
15 Q. All right. He came to see you again on
16 June the 27th of 2003?
17 A. Correct.
18 Q. And, again, you note anxiety/depression?
19 A. Yeah, and I -- but I also said he was
20 doing --
21 Q. Right.
22 A. -- doing well. Overall improved.
23 Q. Now, were you -- were you referring to the
24 overall improved in terms of his -- his ongoing
25 pain or with respect to the anxiety/depression?

**62**

1  A. You know, I didn't note that, but I think
2  it's probably more related to the depression.
3  Q. Okay. And you noted that he was off
4  Lexapro at that time?
5  A. Yeah, because I had given him samples, and
6  he ran out.
7  Q. But you still noted that you thought he
8  was suffering from a postlaminectomy syndrome?
9  A. Yes. But I also noted that he had
10 improved.
11 Q. All right. He came to -- to see you on --
12 switching to your computer?
13 A. Switching to the computer.
14 Q. Okay. All right. January 20th of 2004?
15 A. Correct.
16 Q. And he was there for an evaluation, a
17 follow-up evaluation. Was he continuing to
18 complain of pain in his back?
19 A. Yes.
20 Q. He was also complaining of pain in his
21 ankles?
22 A. Correct, from his back to his ankles.
23 Q. From his back to his ankles? Okay. And
24 also he was complaining of some -- some -- it
25 says, "Having problems with pricking, and back

**63**

1  knees and ankles hurt." What is that -- pricking,
2  what does that mean?
3  A. I presume -- I presume that's a form of
4  pain like pins sticking you. I don't remember
5  specifically. That's probably how he described
6  it.
7  Q. Oh, and let me just ask you this, other
8  than what be -- what would be noted in your chart
9  in terms of Mr. Smith being on Neurontin, do you
10 have any other information about any other times
11 that Mr. Smith would have been taking Neurontin?
12 A. No.
13 Q. Okay. All right. What did you do to --
14 to treat him for the -- the problems that he
15 complained about when you saw him on January 20,
16 2004?
17 A. I said -- I -- the diagnosis was
18 postlaminectomy lumbar, which is the ICD9 code,
19 which is just the disease code. Every disease has
20 a code, but that was my impression. Still having
21 some leg problems, maybe arthritic. Prescribed
22 Bextra, which is a COX-2 inhibitor, which has also
23 been taken off the market.
24 Q. All right. Looking at your February 23rd,
25 2004, note, it looks like here the chief

**64**

1  complaints were hypertension, chest tightness.
2  A. Right.
3  Q. Left shoulder pain.
4  A. Right.
5  Q. He noted, it looks like, in your -- in
6  your history of present illness that, quote, it
7  hurts to move?
8  A. Right.
9  Q. Was it your understanding that it -- did
10 that -- did that relate to his shoulder pain?
11 A. Correct.
12 Q. Okay. And you also note that he was still
13 having a lot of pain in his back and legs?
14 A. Right.
15 Q. And he was actually getting a second
16 opinion. He saw a Dr. Shell and a Dr. Mackey for
17 a second opinion?
18 A. Correct.
19 Q. Do you know what the -- what the nature of
20 the second opinion was?
21 A. Well, I think it was related to the fact
22 that he was still having a lot of problems. He
23 noted he had a myelogram but had not -- didn't
24 have the results of that yet.
25 Q. Okay. And as I asked you -- I think I

**Page 73**

1  Q.  In that visit with you, he did not mention
2  any acute pain or any acute problems that he had
3  at that time, correct?
4  A.  Correct.
5  Q.  All right. You did not diagnose him as
6  depressed, did you?
7  A.  No.
8  Q.  Okay. And did you have any thought that
9  he was suicidal two months before he passed away?
10 A.  No.
11 Q.  All right. Let's go back to the previous
12 visit, which was in February 23rd of 2004. Do you
13 want to look at it on paper, or do you want to
14 look at it on the computer?
15 A.  I don't care.
16 Q.  Okay. Thank you.
17     Again, was there any suggestion to you
18 that he was depressed in February 20 -- February
19 of 2004?
20 A.  Did not note it.
21 Q.  Is there any suggestion that he was
22 suicidal in February of 2004?
23 A.  No.
24 Q.  All right. Let's go back to the prior
25 visit. I have it down as January 20th, 2004,

**Page 74**

1  again, approximately four months before he passed
2  away. All right.
3      Is there any suggestion that he was
4  depressed in this visit?
5  A.  No.
6  Q.  Is there any suggestion he was suicidal in
7  this visit?
8  A.  No.
9  Q.  If he was suicidal, you -- at any point in
10 time that you saw him, you would have taken
11 medical measures to -- for his -- for the
12 patient's safety, correct?
13 A.  Yes.
14 Q.  All right. Let's go back to -- I want to
15 show you the visit he had before then, which I
16 have down as June 27th, 2003, okay?
17 A.  Yep.
18 Q.  You said you took him -- I guess and --
19 and then I want -- the other one I want to talk to
20 you about very briefly is -- in conjunction with
21 that visit is the visit he had immediately before
22 that which was May 15th of 2003, correct?
23 A.  Right.
24 Q.  May 15th, 2003, you wrote -- you diagnosed
25 Mr. Smith as being depressed, and you prescribed

**Page 75**

1  Lexapro and desipramine?
2  A.  Desipramine.
3  Q.  Desipramine for him, correct?
4  A.  Correct.
5  Q.  And then you noted that about six weeks
6  later he was no longer -- he was off Lexapro, and
7  he was doing better?
8  A.  Correct.
9  Q.  At that point in time, do you believe that
10 he was depressed -- in June of 2003, do you
11 believe that Mr. Smith was depressed?
12 A.  I thought he was better at that point.
13 Q.  Okay. No longer depressed?
14 A.  Correct.
15 Q.  All right. Let me just note here, if you
16 want to look at the May record --
17 A.  Okay.
18 Q.  -- of 2003, it says he's -- it looks like
19 he's 204 pounds.
20 A.  Correct.
21 Q.  That's about your recollection of him, of
22 his weight?
23 A.  He was probably -- he probably weighed
24 more than that over the years.
25 Q.  And then he lost weight?

**Page 76**

1  A.  Right.
2  Q.  In 2003?
3  A.  Correct.
4  Q.  Part of your suggestion of -- probably
5  part of your suggestion of helping ease his
6  musculoskeletal pain?
7  A.  And probably the fact that he had been
8  sick with the surgery.
9  Q.  Okay. The lawyer for Pfizer
10 Warner-Lambert went through a lot of sort of
11 conditions or things over a 15-year period where
12 he had some pain with you. Okay. I just want to
13 touch upon those very briefly. You don't even
14 need your notes.
15 A.  Okay.
16 Q.  But I just want it clear. Okay.
17     He had prostate pain in 1989?
18 A.  Correct.
19 Q.  That eventually cleared up?
20 A.  Correct.
21 Q.  No longer had the pain?
22 A.  Correct.
23 Q.  He had jaw pain in 1990?
24 A.  Right.
25 Q.  That cleared up, no longer had the pain?