# EXHIBIT 10

Mackey, Edward MD (Smith prescriber) 5/23/2007 8:40:00 AM

---

**Page 1**

In re: NEURONTIN        MDL Docket No. 1629

MARKETING, SALES      Master File No.

PRACTICES and PRODUCTS        04-10981

LIABILITY LITIGATION     Judge Patti B. Saris

Magistrate Judge

Leo T. Sorokin

RUTH SMITH,

Plaintiff,    C. A. No. 05-11515

V.

PFIZER, INC., et al.,

Defendants.

Videotaped Deposition of:

EDWARD MACKEY, M.D.

Wednesday, May 23, 2007

---

**Page 2**

STIPULATIONS

It is stipulated and agreed, by and between the parties through their respective counsel, that the videotaped deposition of:

EDWARD MACKEY, M.D., may be taken before Fred W. Jeske, court reporter and Tennessee Notary Public, at the offices of Miller & Martin, 1200 US Bank Tower, 150 Fourth Avenue, North, Nashville, Tennessee, on Wednesday, May 23, 2007, commencing at approximately 8:40 a.m.

It is further stipulated and agreed that the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

---

**Page 3**

It is further stipulated and agreed that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

---

**Page 4**

APPEARANCES:
For the Plaintiff:
ANDREW G. FINKELSTEIN
KEITH ALTMAN
Finkelstein & Partners
436 Robinson Avenue
Newburgh, New York 12550
(800) 634-1212
afinkelstein@lawampm.com
-and-
W. MARK LANIER
ROBERT LEONE
DARA HEGAR
PATRICK O'HARA
The Lanier Law Firm
6810 FM 1960 West
Houston, Texas 77069
Post Office Box 691448
Houston, Texas 77269-1448
(713) 659-5200
wml@lanierlawfirm.com

For the Defendant Pfizer:
KENNETH J. FERGUSON
CEDRIC E. EVANS
Clark, Thomas & Winters
300 West 6th Street, 15th Floor
Austin, Texas 78701
P.O. Box 1148
Austin, Texas 78767
(512) 472-8800
cee@ctw.com
For the witness:
NOEL F. STAHL
Miller & Martin
1200 one Nashville Place
150 Fourth Avenue North
Nashville, Tennessee 37219
(615) 744-8503
nstahl@millermartin.com

Also present:

Jonathan Wilkerson, law clerk
Sheldon Singh, videographer
-oOo-

Mackey, Edward MD (Smith prescriber) 5/23/2007 8:40:00 AM

**Page 57**

1  an idea it was, you know, regardless of his --
2  talked about the non-union at 4-5, but he
3  really did not have any significant stenosis
4  based on the myelogram CT. And so part of what
5  we might have been dealing with was just nerve
6  damage. And that will not get better with more
7  surgery.
8        And at that point I wanted to
9  get him to see one of the neurosurgeons I work
10  with to see what his thoughts were.
11  Q.   And when you discussed surgery with
12  them, you discussed a number of different
13  options; correct?
14  A.   I did.
15  Q.   Okay. Including a lumbar, lumbar
16  laminectomy and fusion, which had already been
17  performed. This would be a redo; correct?
18  A.   It would be. And this time I would
19  recommend that we use pedicle screws and either
20  a zone graft or bone -- BMP to do something
21  different than had been done the first time.
22  Q.   Did you communicate to the family that
23  day that you did or did not think that surgery
24  was, was a good option for him at that time,
25  given the entire circumstances?

**Page 58**

1  A.   I was ambivalent about it. You have to
2  respect the patient's pain. That's why they
3  come to see you. That that's why all the --
4  all my patients come to see me, is because they
5  hurt. And so he, he was, he was hurting,
6  hurting a lot, and surgery, though, would have,
7  based on the studies, had probably a fairly low
8  yield. You know, you're not looking at marked
9  stenosis or severe disc herniations, as such.
10  So -- and also his age. So it wasn't clear
11  whether all his pain was just neur --
12  neuropathy, nerve damage, or a component of
13  that, plus non-union.
14        But again we come back to the
15  studies that have shown that, that
16  non-instrumented fusion gets a -- probably a
17  40 -- or a very low success rate in terms of
18  fusion but a fairly high success rate in terms
19  of clinical outcome.
20        So, again, just because he had a
21  non-union did not make it a slam dunk that he
22  would do well with an operation.
23  Q.   You wanted him to see a neurosurgeon in
24  your office; correct?
25  A.   He is not in my office.

**Page 59**

1  Q.   Okay.
2  A.   He is a colleague of mine that we
3  collaborate a lot on, particularly on more
4  complex patients.
5  Q.   Is that Dr. Howell?
6  A.   Yes.
7  Q.   And do you know if Mr. Smith ever saw
8  Dr. Howell?
9  A.   I know an appointment was made, and I
10  received a letter on March 31st, 2004, where he
11  did not show up for that appointment.
12  Q.   So an appointment was made and, for
13  whatever reason, Mr. Smith did not go to that
14  appointment; correct?
15  A.   That's correct.
16  Q.   So, to your knowledge, he never saw Dr.
17  Howell, at least as far as you know.
18  A.   As far as I know, no.
19        But I will also add, this is a
20  form letter they send out if -- you know, if I
21  missed an appointment with them, I would get
22  this letter.
23  Q.   The discussions we just talked about
24  with regard to surgery, did that all take place
25  in the examining room, --

**Page 60**

1  A.   Yeah.
2  Q.   -- if you recall?
3        In your note of March 9th you
4  note that Mr. Smith's daughter raised a concern
5  about whether or not there are some other
6  issues going on. And I think I quoted that.
7        Can you tell us what
8  conversation took place in that regard,
9  regarding other issues going on?
10  A.   That particular conversation did not
11  occur in the room.
12  Q.   Okay.
13  A.   My recollection of that was that she
14  pulled me aside as they had left or were
15  leaving, and brought that up. And, as I
16  recall, I think we made an appointment for him
17  to see Dr. West, but I'm not positive about
18  that.
19  Q.   And Dr. West is what kind of doctor?
20  A.   Psychiatrist.
21  Q.   Can you recall specifically in any more
22  detail what, what the daughter told you?
23  A.   No.
24  Q.   Okay.
25  A.   Just that she was worried about

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

Page 93

1  A.  No. Not that I'm aware of. Not that I
2  recall.
3  Q.  Okay.
4      MR. FERGUSON: I think that's
5  all I have for now, Doctor. Thank you very
6  much.
7      THE WITNESS: All right.
8      MR. LANIER: You know, he did
9  better on time than I thought he was going
10 to. I got to give it to you.
11     MR. FERGUSON: Appreciate it.
12     REDIRECT EXAMINATION
13 BY MR. LANIER:
14 Q.  I want to go back through some
15 questions that were just asked of you and make
16 sure I understand some of the answers, okay?
17     You were first asked, is it true
18 that you decide how to treat patients and
19 nobody tells you how to do it. Do you remember
20 those questions?
21 A.  Yes, I do remember that question.
22 Q.  Let me understand how you do this,
23 please. You certainly are the doctor, and you
24 make your recommendations, is that fair to
25 say?

Page 94

1  A.  Yes.
2  Q.  When you treat patients, though, don't
3  you do it in conjunction with the patient?
4  A.  Yes.
5  Q.  And so you sit down with the patients
6  and you tell them the risks that you know
7  about, on drugs, for example?
8  A.  Yes.
9  Q.  And you tell them the possible
10 benefits, is that fair to say?
11 A.  Yes.
12 Q.  And then the patients can make an
13 informed choice with the help of you, their
14 physician, on what course of treatment, is that
15 fair?
16 A.  Yes.
17 Q.  Now, before you can even have this
18 conversation with your patients, is it
19 important that drug companies inform you about
20 their drugs and what they know are problems
21 with them?
22 A.  I think that's a fair expectation.
23 Q.  Okay. Next area: Mr. Smith had seen
24 other doctors in your clinic. You talked about
25 reading through his chart and seeing the hip

Page 95

1  replacement and the knee work, talked about
2  the, the laminectomy and fusion done by another
3  doctor. Remember?
4  A.  Yes.
5  Q.  Sir, in all of the review for that
6  eight-year history of serious medical treatment
7  and pain, was there ever any indication during
8  all eight years when his hip's hurtin' him, he
9  gets a hip replacement, he's recovered from a
10 hip replacement; his right knee, he gets the
11 work, he's recovering; his left knee, he gets
12 the work; the low back, he gets the
13 laminectomy, he gets the fusion, he starts
14 recovering. Is there any indication in all
15 eight years of all of that medical treatment
16 that he ever one time contemplated suicide or,
17 or tried to commit suicide?
18 A.  I -- the records I really had available
19 to me were Dr. Shell's and mine, even though he
20 had seen Stewart Stowers and Gene Regen,
21 they're in my office but different location.
22 So that chart is not part of my chart. That
23 being said, I was not aware of any issue, what
24 you're describing, at all.
25 Q.  I mean these were painful

Page 96

1  procedures, and obviously they're done because
2  pain already exists, is that fair to say?
3  A.  Yes.
4  Q.  I would assume you operate on people
5  every week. Probably several days a week,
6  don't you?
7  A.  Yes.
8  Q.  And most everybody you operate on,
9  you're operating on them because they're
10 hurting; right?
11 A.  It's almost universally about pain.
12 Q.  Well, do most of those people kill
13 themselves over the pain?
14 A.  No.
15 Q.  Next area: You have a note in there,
16 worried about dementia, and when you talked
17 about that note you said forgetfulness. You
18 weren't sure if you used the word dementia or
19 if the daughter did. What is it you were
20 communicating when you made that note in the
21 file?
22 A.  The -- that she had some concerns that
23 he was forgetful or --
24 Q.  Old-timer's disease?
25 A.  For lack of a better term. And, you