EXHIBIT 12

### Page 309

```
 1        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 2
 3   _____
                                   )
 4   In re: NEURONTIN MARKETING,   )
        SALES PRACTICES, AND PRODUCTS)
 5      LIABILITY LITIGATION,      )
                                   )
     _____)
 6
 7              VOLUME II
 8
 9      CONTINUED VIDEOTAPED DEPOSITION OF
10         RONALD Wm. MARIS, Ph.D.
11            (Taken by Defendant)
12          Columbia, South Carolina
13         Tuesday, September 30, 2008
...
24          Reported in Stenotype by
          V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription
```

### Page 310

```
           APPEARANCES
 1   ON BEHALF OF THE PLAINTIFFS:
 2      RON ROSENKRANZ, Esquire
 3      Finkelstein & Partners
        1279 Route 300
 4      Newburgh, New York 12551
        (845) 563-9442
 5      rrosenkranz@lawampm.com
 6         and
 7
        KENNTH S. SOH, Esquire
 8      The Lanier Law Firm
        6810 FM 1960 West
 9      Houston, Texas 77069
        (713) 659-5200
10      kss@lanierlawfirm.com
11
     ON BEHALF OF THE DEFENDANT PFIZER:
12
        LORI CONNORS McGRODER, Esquire
13      JENNIFER M. STEVENSON, Esquire
        ANGELA M. SEATON, Esquire
14      LORI SCHULTZ, Esquire
        (Appearing Via Telephone)
15      Shook, Hardy & Bacon, L.L.P.
        2555 Grand Boulvard
16      Kansas City, Missouri 64108
        (816) 474-6550
17      lmcgroder@shb.com
        jstevenson@shb.com
18      aseaton@shb.com
        lschultz@shb.com
19
     Also Present:
20
        JAMES DOWNIE, CLVS, Videographer
21
```

### Page 311

```
        CONTINUED VIDEOTAPED DEPOSITION OF R
Wm. MARIS, Ph.D., a witness called on behalf of the
Defendant, before V. Dario Stanziola, CSR, RPR,
CRR, held at the Columbia Marriott, 1200 Hampton
Street, Columbia, South Carolina, on Tuesday,
September 30, 2008, commencing at 9:12 a.m.
```

### Page 312

```
           INDEX OF EXAMINATIONS

By Ms. McGroder           PAGE   314

           INDEX OF EXHIBITS

NUMBER      EXHIBIT                      MARKED
Exhibit 20: Handwritten document with       314
attachments entitled Notes dated 9/26/08
                                            322
Exhibit 21: A document entitled Rates Of
Depression Reported As An Adverse Event
In Neurontin Placebo-Controlled
Neuropathy And Epilepsy Clinical Trials
                                            322
Exhibit 22: A document entitled
Neurontin Gabapentin Capsules; Neurontin
Gabapentin Tablets; Neurontin Gabapentin
Oral Solution
                                            3392
Exhibit 23: A document entitled an FDA
Center for Drug Evaluation and Research
Document entitled Review and Evaluation
of Clinical Data
                                            342
Exhibit 24: A document entitled Rates Of
Depression Reported As An Adverse Event
In Neurontin Placebo-Controlled
Neuropathy And Epilepsy Clinical Trials
                                            354
Exhibit 25: A letter dated 5/29/92 to
Paul D. Leber from Janeth L. Turner
                                            356
Exhibit 26: A document entitled Appendix
C.11. Summary of Adverse Events By Body
System
                                            370
Exhibit 27: A document entitled Summary
Of All Adverse Events In <1 Percent Of
Patients With Partial Seizures Treated
With Gabapentin Or Placebo During
Controlled Clinical Studies, By Body
System And Double-Blind Treatment Group
```

Maris, Ron (F&P Expert) 10/1/2008 9:54:00 AM

### Page 648

```
 1        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 2
 3    _____
                                    )
 4    In re: NEURONTIN MARKETING,   )
       SALES PRACTICES, AND PRODUCTS)
 5     LIABILITY LITIGATION,        )
                                    )
      _____)
 6
 7              VOLUME III
 8
 9    CONTINUED VIDEOTAPED DEPOSITION OF
10         RONALD Wm. MARIS, Ph.D.
11           (Taken by Defendant)
12          Columbia, South Carolina
13         Wednesday, October 1, 2008
...
24         Reported in Stenotype by
        V. Dario Stanziola, CSR, RPR, CRR
25  Transcript produced by computer-aided transcription
```

### Page 649

```
                APPEARANCES
      ON BEHALF OF THE PLAINTIFFS:
          RON ROSENKRANZ, Esquire
          Finkelstein & Partners
          1279 Route 300
          Newburgh, New York 12551
          (845) 563-9442
          rrosenkranz@lawampm.com

              and

          KENNETH S. SOH, Esquire
          The Lanier Law Firm
          6810 FM 1960 West
          Houston, Texas 77069
          (713) 659-5200
          kss@lanierlawfirm.com

      ON BEHALF OF THE DEFENDANT PFIZER:

          LORI CONNORS McGRODER, Esquire
          JENNIFER M. STEVENSON, Esquire
          ANGELA M. SEATON, Esquire
          LORI SCHULTZ, Esquire
          IAN LOSASSO, Esquire
          (Appearing Via Telephone)
          Shook, Hardy & Bacon, L.L.P.
          2555 Grand Boulevard
          Kansas City, Missouri 64108
          (816) 474-6550
          lmcgroder@shb.com
          jstevenson@shb.com
          aseaton@shb.com
          lschultz@shb.com
          ilosasso@shb.com

      Also Present:

          JAMES DOWNIE, CLVS, Videographer
```

### Page 650

```
 1    CONTINUED VIDEOTAPED DEPOSITION OF R
 2    Wm. MARIS, Ph.D., a witness called on behalf of the
 3    Defendant, before V. Dario Stanziola, CSR, RPR,
 4    CRR, held at the Columbia Marriott, 1200 Hampton
 5    Street, Columbia, South Carolina, on Wednesday,
 6    October 1, 2008, commencing at 9:54 a.m.
```

### Page 651

```
                INDEX OF EXAMINATIONS

      By Ms. McGroder              PAGE   652

                INDEX OF EXHIBITS

      NUMBER        EXHIBIT              MARKED
      Exhibit 39: A photocopy of a Medline   672
      Plus article

      Exhibit 41: A fax cover sheet to John S.   757
      Allen, subject Richard Smith dated
      9/23/08 with attachment

      Exhibit 42: Photocopy of Mr. Smith's    764
      suicide note
      Exhibit 43: Photocopy of a journal       770
      article entitled Suicide As Psychache: A
      Clinical Approach to Self-Destructive
      Behavior by Edwin Shneidman, Ph.D.
```

Maris, Ron (F&P Expert-Bulger) 10/20/2008 9:01:00 AM

### Page 825

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
In re: NEURONTIN MARKETING, )
SALES PRACTICES, AND PRODUCTS )
LIABILITY LITIGATION,    )
_____ )

VOLUME IV

CONTINUED VIDEOTAPED DEPOSITION OF
RONALD Wm. MARIS, Ph.D.
(Taken by Defendant)
Columbia, South Carolina
Monday, October 20, 2008

Reported in Stenotype by
V. Dario Stanziola, CSR, RPR, CRR
Transcript produced by computer-aided transcription

### Page 826

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
    RON ROSENKRANZ, Esquire
    Finkelstein & Partners
    1279 Route 300
    Newburgh, New York 12551
    (845) 563-9442
    rrosenkranz@lawampm.com

ON BEHALF OF THE DEFENDANT PFIZER:
    ANGELA M. SEATON, Esquire
    IAN LOSASSO, Esquire
    LORI SCHULTZ, Esquire
    (Appearing Via Telephone)
    Shook, Hardy & Bacon, L.L.P.
    2555 Grand Boulevard
    Kansas City, Missouri 64108
    (816) 474-6550
    aseaton@shb.com
    ilosasso@shb.com
    lschultz@shb.com

Also Present:
    JAMES DOWNIE, CLVS, Videographer

CONTINUED VIDEOTAPED DEPOSITION OF R
Wm. MARIS, Ph.D., a witness called on behalf of the
Defendant, before V. Dario Stanziola, CSR, RPR,
CRR, held at the Columbia Marriott, 1200 Hampton
Street, Columbia, South Carolina, on Monday,
October 20, 2008, commencing at 9:01 a.m.

### Page 827

INDEX OF EXAMINATIONS

By Ms. Seaton              PAGE   832

INDEX OF EXHIBITS

| NUMBER | EXHIBIT | MARKED |
|---|---|---|
| Exhibit 44: | Plaintiff's Expert Disclosure On Specific Causation | 832 |
| Exhibit 45: | Document entitled Appendix A, New Evidence For Bulger v. Pfizer Received After July 18, 2008, Ronald Wm. Maris, Ph.D. October 8, 2008 | 833 |
| Exhibit 46: | Report of Ronald Wm. Maris, Ph.D. | 834 |
| Exhibit 47: | First Amended Notice of Videotaped Deposition Duces Tecum of Professor Ronald W. Maris, Ph.D. | 837 |
| Exhibit 48: | Handwritten notes | 840 |
| Exhibit 49: | Manilla folder containing billing record of Ronald Wm. Maris, Ph.D. | 841 |
| Exhibit 50: | Ronald W. Maris, Ph.D. Curriculum Vitae September 2008 | 843 |
| Exhibit 51: | Psychological Autopsy and Death Investigation, File Name Susan Bulger | 853 |
| Exhibit 52: | Photocopy of videotaped deposition of Ronald J. Bulger, Sr. | 890 |
| Exhibit 53: | Office visit note for Susan Bulger dated 1/6/00 | 903 |
| Exhibit 54: | Progress notes for Susan Bulger dated 12/20/02 | 909 |

### Page 828

| NUMBER | EXHIBIT | MARKED |
|---|---|---|
| Exhibit 55: | Document entitled Commonwealth of Massachusetts Department of Social Services Child Abuse/Neglect Report | 951 |
| Exhibit 56: | Document entitled Commonwealth of Massachusetts Department of Social Services FamilyNet dictation report | 952 |
| Exhibit 57: | Photocopy of a PowerPoint presentation entitled Suicide and SSRIs Ronald Wm. Maris, Ph.D. AAFS Annual Conference 11 a.m. - 12 p.m. Tuesday February 20, 2007 San Antonio, Texas | 953 |
| Exhibit 58: | Document entitled Beverly Hospital D/B/A BayRidge Hospital Intake Evaluation | 988 |
| Exhibit 59: | AtlantiCare Progress Notes dated 5/25/93 | 990 |
| Exhibit 60: | AtlantiCare Medical Center Report of Consultation dated 5/17/93 | 993 |
| Exhibit 61: | A document entitled Past Psychiatric History | 999 |
| Exhibit 62: | AtlantiCare Medical Center medical record | 1001 |
| Exhibit 63: | A document entitled Patient Messages Susan E. Bulger | 1006 |
| Exhibit 64: | A medical record | 1015 |
| Exhibit 65: | A photocopy of videotaped deposition of Yoshiharu Akabane, M.D. | 1016 |
| Exhibit 66: | A medical record Salem Hospital dated 8/17/88 | 1017 |
| Exhibit 67: | AtlantiCare Medical Center report of consultation dated 6/5/90 | 1018 |
| Exhibit 68: | Brigham and Women's Hospital nursing history questionnaire | 1019 |

Maris, Ron (F&P Expert-Bulger) 10/22/2008 9:07:00 AM

### 1105

```
 1      UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3
 4
 5
 6   IN RE: NEURONTIN MARKETING,
 7   SALES PRACTICES AND PRODUCTS
 8   LIABILITY LITIGATION
 9
10
11              VOLUME V
12
13
14   CONTINUED VIDEOTAPED DEPOSITION OF
15       RONALD WILLIAM MARIS, Ph.D.
16          (Taken by Defendant)
17         Columbia, South Carolina
18       Wednesday, October 22, 2008
```

### 1106

```
 1            APPEARANCES:
 2   FOR THE PLAINTIFFS:
 3      RON ROSENKRANZ, Esquire
 4      Finkelstein & Partners
 5      1279 Route 300
 6      Newburgh, NY  12551
 7      (845)563-9442
 8      rrosenkranz@lawampm.com
 9   FOR THE DEFENDANT PFIZER:
10      ANGELA M. SEATON
11      IAN LOSASSO
12      LORI SCHULTZ (via telephone)
13      Shook Hardy & Bacon, LLP
14      2555 Grand Boulevard
15      Kansas City, MI  64108
16      (816)474-6550
17      aseaton@shb.com
18      lschulta@shb.com
19      ilosasso@shb.com
20   ALSO PRESENT:
21      JAMES DOWNIE, CLVS, VIDEOGRAPHER
```

### 1107

```
             EXHIBIT INDEX

EXHIBIT 89 - BULGER NOTES            1111
EXHIBIT 90 - SMITH NOTES             1111
EXHIBIT 91 - HANDWRITTEN             1126
   AFFIDAVIT, 00376-118PFC-00012
EXHIBIT 92 - COMMONWEALTH OF         1129
   MASSACHUSETTS, TRIAL COURT/PROBATE
   AND FAMILY COURT DEPARTMENT
   MOTION PAPER, 00376-118PFC-00029
EXHIBIT 93 - HANDWRITTEN             1131
   AFFIDAVIT, 000376-118PFC-00010
EXHIBIT 94 - TWO-PAGE REPORT OF      1136
   TPR MC GRAVINI, 000376-47ECD-00002
   AND 000376-47ECD-00003
EXHIBIT 95 - MEDICAL RECORD OF DR.   1191
   GOLDMAN, 000376-25AMD-00020
EXHIBIT 96 - COMMONWEALTH OF         1202
   MASSACHUSETTS DEPARTMENT OF SOCIAL
   SERVICES, ASSESSMENT WORKSHEET
   00376-57MDS-00056 and
   000376-57MDS-00057
EXHIBIT 97 - ENCOUNTER NOTE BY DR.   1214
   GOLDMAN, 000376-25AMD-0020
EXHIBIT 98 - MEDICAL RECORD OF DR.   1217
   O'FLYNN, 000376-25AMD-00015
EXHIBIT 99 - ENCOUNTER NOTE BY DR.   1219
   GOLDMAN, 000376-25AMD-00019
EXHIBIT 100 - ENCOUNTER NOTE BY      1221
   DR. GOLDMAN, 000376-25-AMD-00018
EXHIBIT 101 - ENCOUNTER NOTE OF      1223
   DR. GOLDMAN, 00376-25AMD-00017

(Exhibit index continued:)
```

### 1108

```
EXHIBIT 102 - COMMONWEALTH OF        1268
   MASSACHUSETTS DEPARTMENT OF SOCIAL
   SERVICES ASSESSMENT WORKSHEET
   000376-57MDS-00056 AND
   000376-57-MDS-00057
EXHIBIT 103 - CAB HEALTH &           1269
   RECOVERY SERVICES, INC., PROGRESS
   NOTES, INDIVIDUAL SESSION
   000376-70MDG-00267


           WITNESS INDEX:
RONALD MARIS, Ph.D.
   Examination by Ms. Seaton        1270
```

### 549

1    The article doesn't state that gabapentin
2    works within 30 minutes and has a clinical effect to
3    reduce seizures within 30 minutes. It doesn't say
4    that, does it?
5        A.   It doesn't say -- it says it can be used
6    as needed, which would -- which would mean that you
7    already had a need for it and that you could take
8    it like an aspirin for a headache. That's what it
9    seems to suggest.
10       Q.   But would you agree with me this article
11   does not state that gabapentin has a clinical effect
12   to reduce seizures within 30 minutes; would you agree
13   with that?
14       A.   It doesn't explicitly say that.
15       Q.   How many consecutive days of Neurontin
16   administration does it take to get a steady state?
17       A.   That's beyond my expertise. I've given
18   you all the references I have.
19       Q.   Okay.
20       A.   If it gets a steady state in two to three
21   hours and you keep taking it, I would say one day.
22       Q.   Okay. But you don't know?
23       A.   I don't know.
24       Q.   Do you know how many hours following
25   administration of a single dose of gabapentin there

### 550

1    is no appreciable drug left in the system?
2        A.   According to Petroff, it doesn't really
3    say. We know what the half life is. You know,
4    that would not be -- that would be a rough
5    approximation of how much.
6        Q.   Okay.
7        A.   So I previously testified to that. It's
8    also in the package insert.
9        Q.   The half life is in the package insert?
10       A.   The half life is mentioned. It says half
11   life is five to seven hours.
12       So as you know, the half life is not
13   doubled. You know, it's not like -- if it's a half
14   life of seven, it's not 14. But it sounds to me
15   like it would be within 24 hours based on the half
16   life if you didn't take anymore.
17       Q.   Okay. Prior to a suicide, within what
18   period of time must a person take Neurontin for it to
19   be a significant factor in the suicide?
20       A.   I don't think there's an exact time. I
21   don't think anybody knows, again.
22       Q.   Do you know Mr. Smith's GABA level at the
23   time of his death?
24       A.   No.
25       Q.   Do you know Ms. Bulger's GABA level at the

### 551

1    time of her death?
2        A.   No.
3        And may I say this? The medical examiner
4    doesn't typically check for Neurontin. They check
5    for other panels. So that even if you had a
6    toxicology report, there would not be any medical
7    examiner evidence.
8        Q.   Okay. I -- I was actually not asking you
9    about a gabapentin level. I was asking you about a
10   brain GABA level.
11       A.   That's even more complicated because
12   you'd have to take a central spinal tap, which
13   nobody does, almost nobody.
14       Q.   So you don't know the brain GABA level at
15   the time of death of either Ms. Bulger or Mr. Smith,
16   correct?
17       A.   True.
18       Q.   And you don't know the serotonin level in
19   the cerebrospinal fluid of either Mr. Smith or Ms.
20   Bulger at the time of their deaths, correct?
21       A.   That's correct.
22       Q.   I really need to break that up. I'm sorry.
23   I have to ask it in two questions.
24       You don't know the serotonin level of Mr.
25   Smith at the time of his death, correct?

### 552

1        A.   Correct.
2        Q.   And you don't know the serotonin level of
3    Ms. Bulger at the time of her death, correct?
4        A.   Correct.
5        Q.   The same would be true for dopamine and
6    norepinephrine levels, correct?
7        A.   Correct.
8        Q.   The same would be true for glutamine
9    levels, correct?
10       A.   And for acetylcholine and histamine and
11   every other neurotransmitter they weren't checked
12   for.
13       Q.   And so the answer is correct?
14       A.   Correct.
15       Q.   I think you said that one of the things
16   that you base your opinion on about Mr. Smith's
17   ingestion is that Ruth Smith testified that he took
18   his medications as prescribed by the doctor, correct?
19       A.   Correct.
20       Q.   Were you aware that Dr. Mackey instructed
21   Mr. Smith that if his medication was not working, he
22   should discontinue it?
23       A.   No.
24       Q.   Is there any evidence in this record that
25   Mr. Smith believed that Neurontin was not helping

Maris, Ron (F&P Expert) 10/1/2008 9:54:00 AM

**Page 692**

1  you say you're trying to create an image of a person
2  on the edge of a suicidal precipice, let's say that
3  person who's on the edge of a suicidal precipice is
4  not taking Neurontin.
5      What -- what are -- what are those factors
6  that are going to put push that person over the edge?
7      A.  There are a number of factors. Sometimes
8  just the set that you listed in your hypothetical
9  are sufficient themselves to push him over the
10 edge. So I'm not denying that all the risk
11 factors, that both the hypothetical and Richard
12 Smith had, could be enough.
13     Q.  It's just that in Mr. Smith's case he was
14 on Neurontin, so that was the tipping factor?
15     A.  Well, it wasn't just that. It was a
16 dramatic demonstrated, in my mind, trigger which
17 has a causal mechanism, which affects depression,
18 which is a major correlate of suicide outcome and
19 in a person who had lived with these risk factors
20 for many years. You have to ask yourself, why now?
21 Why now? Why not -- why not earlier when he had a
22 laminectomy and it didn't work? So --
23     Q.  And so the -- and so the "why now" question
24 is the reason why you would attribute the suicide to
25 Neurontin?

**Page 693**

1      A.  That's certainly one of the major
2  factors. You know the law, post hoc ergo propter
3  hoc. It was just after he took the Neurontin and a
4  significant amount of that, before he had all these
5  risk factors that you described before his
6  laminectomy in '03, and he didn't kill himself.
7      Q.  Now, I want to ask you, you said twice.
8  You said once he had a large amount of Neurontin
9  before he killed himself, and now you just said he
10 had a significant amount of Neurontin before he just
11 killed himself.
12     You're not suggesting he took a lot of
13 Neurontin on the day before he killed himself?
14     A.  Not at all.
15     Q.  You're talking about normal usage?
16     A.  I'm talking about the normal usage that I
17 described. My best estimate of how much Neurontin
18 he had is in my report, 67 days, some of those days
19 BID, near the end TID, leftover samples, wife saw
20 him take it, maybe missed a couple of times.
21     So I don't know exactly, but he had a
22 significant opportunity to have a new factor, which
23 I think is suicidogenic, which could easily, could
24 easily make him unable to cope, could easily make
25 him write a suicide note like that.

**Page 694**

1      Q.  Is your testimony that Neurontin made
2  Mr. Smith write his suicide note?
3      A.  That's a little much of a stretch, but I
4  think certainly it causes impulse control
5  deregulation.
6      Q.  Is your testimony that Neurontin caused his
7  suicide and his suicide was impulsive?
8      A.  I think it was partly impulsive, because
9  I think that in the literature that I looked up --
10 for example, I had Brown, et al., in my -- in my --
11 in my Assessment and Prediction of Suicide book, I
12 asked them to address this question: What happens
13 in animals and in human beings if you have
14 serotonergic dysfunction? Do they become more
15 impulsive? Do they become more aggressive? Do
16 they become more suicidal? And the answer was an
17 unequivocal yes. So that any drug that disrupts
18 the serotonergic system contributes to impulsivity.
19     Q.  Doctor, first, we talked yesterday for a
20 long time about Mr. Smith's Neurontin ingestion and
21 what you wrote in your report about it and whether
22 there was evidence that the family ever observed
23 Mr. Smith actually take his drugs. And you answered
24 questions for a long time yesterday about that.
25     The answer you just gave is not meant to

**Page 695**

1  replace or change the answers you gave yesterday, is
2  it?
3      A.  No, I think it -- I think I said the same
4  thing I said yesterday.
5      Q.  Okay. But -- but what I want -- yesterday
6  you said that -- well, I'm not going to debate with
7  you what you said.
8      All I want to know is, is the answer that
9  you just gave right now, that is not meant to replace
10 the answers you gave yesterday when we went over the
11 -- at length your opinion about Mr. Smith's ingestion
12 of Neurontin?
13     MR. ROSENKRANZ:  Objection to form.
14     A.  Correct.
15     Q.  Okay.
16     A.  I stand by what I said yesterday, and
17 it's all in my report.
18     Q.  Okay. And if you turn to page 22 of your
19 report, this is your -- these are your 15 factors
20 that you mentioned in your answer just a bit ago?
21     A.  Yes.
22     Q.  And number 13 is anger, aggression,
23 impulsivity and irritability, correct?
24     A.  Right.
25     Q.  And you write no?

696

1  A. That's wrong. That -- that was from the
2  psych autopsy. I didn't -- I'm -- I'd be
3  interested to go back and look at the psych autopsy
4  and see if I didn't correct Michelle Faye, because
5  she wrote that, and I went on her evidence. But
6  that's absolutely wrong. It should have another
7  risk factor based on that. That's wrong.
8  Q. So that's wrong. Today, your testimony
9  today, you want to change that answer?
10  A. It's wrong.
11  Q. What else is wrong in your report,
12  Dr. Maris?
13  MR. SOH: Objection. Argumentative.
14  A. How would I know? Let me look at the
15  autopsy and make sure I didn't question it in the
16  autopsy.
17  Q. So you wrote this --
18  A. One thing at a time. You're rushing me.
19  Q. Can I ask you while you're looking?
20  A. I'd rather you wouldn't. I'd like to
21  concentrate.
22  THE VIDEOGRAPHER: Five minutes.
23  A. Okay. I see what the problem is here.
24  And page 32, question 7513 of the autopsy, the
25  questions related to impulsivity were not related

697

1  to Neurontin. They were: Does the decedent
2  typically have a temper and be angry? The answer
3  is no. Is the person aggressive, typically? No.
4  Does the person meet the criteria for a
5  DSM-IV impulse control disorder, intermittent
6  explosive disorder, cleptomania, pyromania,
7  pathological gambling, trichotillomania or not
8  otherwise specified? No.
9  So the answer based on that evidence had
10  to be no. But since this issue was raised, and it
11  was raised specifically in Trimble's deposition, I
12  went out and got some more literature from my study
13  of serotonergic dysfunction. And based on that,
14  and I can give you a copy of the article, it's yes.
15  Q. Well, so let me get this straight.
16  You wrote your report in December of 2007,
17  right?
18  A. Right.
19  Q. And on the front of your psychological --
20  psychological autopsy, you -- you reviewed that in
21  June of 2007, right? You reviewed the psychological
22  autopsy --
23  A. Yes.
24  Q. -- in June of 2007, right?
25  A. Yes, yes, yes, yes.

698

1  Q. Then you wrote your report in December of
2  2007 relying on that psychological -- psychological
3  autopsy, right?
4  A. Right.
5  Q. Then yesterday you told me you went back
6  over that psychological autopsy and you made changes
7  in it and you corrected all the things that were
8  wrong in the psychological autopsy, correct?
9  A. I didn't say that. I said I corrected
10  many of the things that I found were wrong. This
11  is one I missed.
12  Q. Okay. So now you -- do you want to correct
13  some more things in the psychological autopsy?
14  A. I just did.
15  Q. Is there anything else that you want to
16  change in your psychological autopsy as we sit here,
17  because I need to know what your opinions are. Two
18  things, Dr. Maris, I need to know every change you
19  want to make to your psychological autopsy today and
20  -- so let's get it out.
21  A. Well, this is it. And this is -- this is
22  a big one. This is something that I did after I
23  read Trimble, which was very recent. Here's the
24  article I'm referring to.
25  Q. That article doesn't even relate to

699

1  Neurontin?
2  A. Sure does.
3  Q. What's the name of the article?
4  A. Impulsivity, Aggression, and Associated
5  Affects. Some literature suggests a serotonergic
6  trait. This trait includes --
7  Q. Well, who's the author of that article,
8  Dr. Maris?
9  A. Gerald Brown, Frederick Goodwin, and
10  Markku Linnoila at NIH.
11  Q. Does the word Neurontin appear in the
12  article by Brown and Goodwin?
13  A. No.
14  Q. Right.
15  And -- and so after you --
16  A. You going to tell me what's relevant to
17  -- to my testimony?
18  Q. Are you asking me a question?
19  A. Yes.
20  Q. Would you like to take my deposition?
21  A. No, but I'm saying I think this is
22  relevant.
23  Q. Well, all I'm telling -- all I'm asking
24  you, Dr. Maris, is does the word Neurontin appear in
25  the article that you just cited from Brown and

Page 861

1  information I need to form and defend an opinion.
2  Often when I look at the records, many of these
3  questions in my psych autopsy have never been
4  asked.
5  And, for example, the risk factors, do I
6  have sufficient information on each case about the
7  suicide risk factors in order to form an opinion?
8  So all of these sections in here are designed to
9  gather information which may or may not have been
10 asked before in order to help me as a scientist to
11 look objectively at the factors that I think are
12 related usually to a suicide outcome, in some cases
13 through the causes of the suicide outcome.
14     Q. But fair to say that this psychological
15 autopsy was compiled and put together by plaintiffs'
16 lawyers?
17     In other words, it was plaintiffs who
18 decided what information to include in the
19 psychological autopsy, you didn't do that?
20     A. That's not true.
21     Q. Okay. Tell me why that's not true.
22     A. We went over this last time. Andy
23 Vickery originally had his name on this. All Andy
24 Vickery in Houston did was to provide me with money
25 for me to do a hundred percent of the work with one

Page 862

1  exception, which I pointed out in the Smith case,
2  which was the section 17, the Puzzling Paradox. He
3  wanted to gather information on that and see how
4  many cases that that was actually his theory.
5     But everything else, all 23 of the items
6  are things that I wrote all by myself. All he did
7  was provide the money, I provided the time and the
8  expertise and experience.
9     Q. No, and I understand that. That's actually
10 not the point that I'm trying to get at. The point
11 I'm trying to get at is that you as an independent
12 expert and no one of your staff actually gathered the
13 information that is contained in the psychological
14 autopsy. Instead, plaintiffs' counsel is the one who
15 went through and prepared the responses to these
16 questions, correct?
17     A. Sure. And I -- like I do with all my
18 books, I went through and looked at it and when I
19 thought that it -- I read the record, of course,
20 just like Michelle Faye does. And when I thought
21 that she had missed something, I corrected it. So
22 I -- I don't know what the word would be vetted it.
23 I -- I stated after I made corrections that this
24 was consistent with my own reading of the record.
25 So in a sense, we both did it.

Page 863

1     Q. Okay. Did it ever occur to you to interview
2  Ron Bulger?
3     A. Yes, it did. And I have been -- in my
4  past experience is that it's very problematic to
5  interview witnesses.
6     Q. Why?
7     A. Because the defense always demands it,
8  they get to be there when the interview takes
9  place. And if you do, they're circumspect, they
10 don't trust you. So I have found that often, even
11 though sometimes I do, it's so problematic, it's
12 almost like an end run that I go and talk to one of
13 the witnesses without the other side being there.
14 And I often get into trouble if I try to do that.
15 So, for the most part, I rely on the depositions
16 and the file.
17     Q. Okay. I'd like to ask you some questions
18 about some notes that you made on this psychological
19 autopsy. If you would, turn to page ten. And
20 actually, the question begins on page nine, it's
21 question number 36. When you get there, let me know.
22     A. Okay.
23     Q. Okay. It says, DCD, and I assume that
24 stands for decedent. Decedent had two sisters, one
25 brother and multiple half siblings. Decedent had

Page 864

1  very little contact with family and was not close to
2  her parents, siblings or extended family. Husband
3  has no additional information concerning decedent's
4  family. Decedent spent time in foster care.
5     You highlighted decedent spent time in
6  foster care, correct?
7     A. I did.
8     Q. Why is that important to you? Or why was
9  that important to you?
10     A. Well, one of the theories about suicide
11 is what we sometimes call early trauma or
12 multi-problem family of origin. And so I saw this
13 as evidence that she -- that her father was gone,
14 her mother was schizophrenic and she was unable --
15 her family was unable to raise her. So she was put
16 in a surrogate home, in a foster care home. In
17 fact, that's where Ron Bulger met her, in a foster
18 care home. So evidence of multi-problem family and
19 early trauma.
20     Q. Okay. And I would assume then that that's
21 also why you've highlighted the fact that Susan
22 Bulger's mother was diagnosed with schizophrenia,
23 that she had an abusive family relationship growing
24 up with her mom. And then I see your handwritten
25 note where you say, mother beat her with tennis

### Page 865

1  racquet. Is that -- am I reading that correctly?
2     A.  That's what Ron Bulger said. Her sister
3  denied that.
4     Q.  Okay.
5     A.  Landry said that's not true. But Ron
6  Bulger said it was true.
7     Q.  Okay.
8     A.  And there are examples of where I've
9  tried to refine a psych autopsy. I didn't take it
10 lock, stock and barrel. I went through things and
11 highlighted them and made additions and added
12 additional notes. So I didn't just have Michelle
13 Faye do it.
14    Q.  Let's go back to your report in this case.
15 If you would, turn to page 28.
16    A.  Yes.
17    Q.  About midway down, it says is this the
18 best, quote, Neurontin causing suicide case, end
19 quote, that I have ever investigated? Obviously not.
20 For example, in some of my other Neurontin suicide
21 cases the decedent had fewer non-Neurontin suicide
22 risk factors and a more prominent role in causing
23 suicide was played by Neurontin. Nevertheless, I
24 still opine that Neurontin was a substantial
25 contributing factor in Susan Bulger's suicide.

### Page 866

1  Did I read that correctly?
2     A.  Yes, you did.
3     Q.  Tell me, what other Neurontin cases have
4  you investigated? What other Neurontin cases have you
5  investigated?
6     A.  Well, we've already discussed this,
7  Smith, Shearer and Crone.
8     Q.  Can you rank those for me in terms of which
9  one's the best one and which one's the worst one?
10    MR. ROSENKRANZ: Objection.
11    A.  Well, Shearer is in process and I've been
12 told not to continue working on that, so I've never
13 written a report for that. I am not as well
14 prepared. And Crone was years ago. I'm going to
15 have to go out to San Francisco, there's going to
16 be a deposition soon in November, I believe. But
17 of the two that I'm familiar with, I think Smith
18 was the best and probably Bulger was the weakest.
19    Q.  Okay. Do you consider yourself an advocate
20 for plaintiffs?
21    A.  No, of course not.
22    Q.  Okay. Why then do you use the term best?
23 What do you mean when you say the best
24 case?
25    A.  Only that I read both of them and if I

### Page 867

1  did exactly what you asked me to do, how -- in
2  other words, I can say yes, I believe Neurontin was
3  a substantial factor in -- a substantial proximate
4  factor in let's say Susan Bulger's suicide. And I
5  do. Do I think it's as clear that Neurontin caused
6  her suicide; you know, quote, caused substantial
7  proximate factor? No, because I think Richard
8  Smith, he was a Christian minister, he had -- he
9  had lots of protective factors, he didn't have a
10 history of psychological -- so in that I sense,
11 even though I think both of them were acceptably
12 caused by Neurontin, I thought my opinion was
13 stronger. And so by best, I mean my opinion in
14 Smith is a little stronger than it is in Susan's,
15 the confidence that I have in my opinion.
16    Q.  I understand.
17 Tell me -- tell me all the things that make
18 the Susan Bulger case a bad case?
19    MR. ROSENKRANZ: Objection.
20    A.  A weak case.
21    Q.  A weak case. Fair.
22    A.  Well, obviously the fact that she has a
23 long history of psychiatric disorder, substance
24 abuse, family trauma, you know, childhood
25 socialization problems, the fact that she had many

### Page 868

1  suicide attempts which, you know, wasn't the case
2  in Smith. In other words, she had a lot -- to make
3  it short, she had a lot more suicide risk factors
4  than Richard Smith did.
5     Q.  Okay.
6     A.  And all of those, of course, as you know,
7  are potential alternative explanations for why she
8  killed herself.
9     Q.  Right.
10 Is -- no matter what risk factors somebody
11 has, if they took Neurontin prior to their death and
12 then committed suicide, would you opine that it was
13 the Neurontin that caused the suicide?
14    A.  Probably not. I mean, that's -- the
15 problem with that is that's a hypothetical and a
16 generic statement and we're talking about specific
17 cases. And, of course, in specific cases there are
18 always facts that are relevant that are absent in
19 that question. But the short answer is no, I
20 wouldn't say just because they had risk factors and
21 took Neurontin that the Neurontin did it. I mean,
22 there are sometimes when the risk factors are so
23 dramatic that they overpower the -- you know, and
24 most people who take Neurontin never become
25 suicidal.

Maris, Ron (F&P Expert-Bulger) 10/22/2008 9:07:00 AM

1253

1   Q.   Did you rule out the fact that Susan
2   Bulger had stopped receiving counseling as the
3   cause of her suicide?
4   A.   First of all, I don't have the same
5   model that you are assuming, which is a
6   differential diagnosis model, where you rule out
7   the alternatives.
8        My theory, as you know, is that I
9   rule them in, and I talk about them actually
10  contributing to making her part of a vulnerable
11  minority of patients --
12  Q.   Well, Dr. Maris --
13       THE WITNESS: I'm not finished.
14       MS. SEATON: Okay.
15  A.   And that by ruling them in, then the
16  Neurontin becomes an additional substantive
17  proximate risk factor, not the only factor.
18       So I'm not ruling these things out.
19  I never tried to rule them out.
20       I'm saying that there was a
21  combination of effects and risk factors that
22  made her suicidal, and which Neurontin was one
23  of them.
24  Q.   You have testified in this
25  litigation, in addition to publicly stating,

1254

1   that any plausible argument that a drug causes a
2   suicide, needs to make every effort to rule out,
3   or at least account for alternative
4   explanations, correct?
5   A.   Certainly account for them.
6   Q.   Did you account for the fact that
7   Susan Bulger stopped receiving counseling as the
8   potential cause of her suicide?
9   A.   I knew about it. I didn't make it a
10  major feature, but I list it -- not only did I
11  account for these things, I listed them in my
12  report, and said: All of these things were
13  contributory as risk factors.
14       And I went through depression,
15  substance abuse, chronic pain, etcetera,
16  etcetera.
17  Q.   Show me in your expert report, where
18  you considered her lack of mental health
19  treatment as a risk factor.
20  A.   I didn't consider that explicitedly
21  and didn't think it was significant, so I didn't
22  put it in.
23       Incidentally, mental health treatment
24  is often just drug treatment --
25       THE WITNESS: I'm still finishing my

1255

1   question, give me a minute to think.
2   Q.   What question are you answering?
3   A.   Did I consider treatment?
4        And the question is: She was getting
5   mental health treatment. She was getting
6   Effexor and Clonopin.
7        And almost all psychiatrists, all
8   they do these days is give you medicine.
9        So she was getting mental treatment.
10  She wasn't getting counseling.
11  Q.   Is it your testimony that Susan
12  Bulger would not have benefited from some
13  counseling in the year prior to her death?
14  A.   I don't know. I doubt it, because
15  she failed at many, many counseling attempts.
16       And I think she had been through
17  there, done that.
18       It probably wouldn't have made much
19  difference.
20  Q.   Let's talk about that -- agree or
21  disagree -- that for a substance abuser, failed
22  and discontinued attempts at detox and rehab is
23  a risk factor for suicide?
24  A.   It certainly could be; although, they
25  tend to be chronic, regardless of whether you

1256

1   complete detox or not, they tend to relapse.
2   Q.   Would you agree that she failed to
3   complete her detox on several occasions?
4   A.   Yes.
5   Q.   Were you aware that in January, 1995,
6   she attempted to detox at Beverly Hospital, but
7   checked out the next day without having gone
8   through detox at all?
9   A.   Yes.
10  Q.   Were you --
11       MR. ROSENKRANZ: What was the year
12  there?
13       MS. SEATON: Ninety-five.
14  Q.   Were you aware that Ron Bulger
15  interfered with his wife's attempts to detoxify?
16  A.   I have seen some of that in the
17  records, yes.
18  Q.   Were you aware that after her near
19  death suicide overdoes attempt in 1993, Ron
20  Bulger was barred from the unit as a result of
21  inappropriate behavior after having left two
22  verbally-abuse, threatening phone messages on
23  the nurse's voice mail?
24  A.   Yes.
25       MR. ROSENKRANZ: Objection to form.