UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
:
In re:  NEURONTIN MARKETING,                     :   MDL Docket No. 1629
       SALES PRACTICES AND                       :
       PRODUCTS LIABILITY LITIGATION      :   Master File No. 04-10981
:
:   Judge Patti B. Saris
------------------------------------------------------------x
:   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                        :
:
*Smith v. Pfizer Inc.*, 1:05-cv-11515-PBS        :
:
------------------------------------------------------------x

## DECLARATION OF RONALD W. MARIS, Ph.D., IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE SPECIFIC CAUSATION TESTIMONY OF DR. MARIS

I, Ronald W. Maris, declare and state as follows:

1. I am one of plaintiff's experts in the above-captioned matter, and I make this declaration in opposition to Defendants' motion to exclude my specific causation testimony.

2. I have reviewed the following motions made by the defense in the Smith litigation. They include these specific documents:

   A. Defendants' Motion to Exclude the Specific Causation Testimony of Dr. Maris and Prof. Trimble, including Motion, Memorandum in Support, and Sayler Declaration in Support.

   B. Defendants' Motion for Summary Judgment, including Motion, Memorandum in Support, Local Rule 56.1 Statement of Material Facts, and Sayler Declaration in Support.

3. I submit no new opinions in this declaration, but rather seek to make clear those portions of my testimony and opinions that Defendants seek to mischaracterize or otherwise apparently do not understand.

4. Defense counsel states that I have been a Plaintiff's witness for 50 years (Defs.' Mem., p. 5, fn. 6); however, my *curriculum vitae*, which was supplied to defense counsel clearly indicates my first forensic case was in 1977. Thus, the correct number of years is 32 and the correct ratio of my Plaintiff v. Defense testimony is 54% versus 46% in just over 200 cases. Defense counsel claims that "*30,000 patients die by suicide in the United States*

*each year* (Defs.' Mem., p. 2, ¶ 5)," but the truth is that about 80 % of those deaths are not by patients at all. Defendants motion not only misstates the facts but it makes a systematic misrepresentation of my Neurontin causation suicide theory, and my deposition testimony.

5. In regard to Defendants' assertions that I "cannot rule out" Alternative Causes of Richard Smith's Suicide (p. 5, ¶ 3), I respond with the following:

A.   With the differential diagnosis model (See **DSM-IV-TR**, 2000), one needs to consider all the reasonable alternative causes or suicide risk factors. I certainly did consider all relevant alternative suicide risk factors (See fourth expert opinion, in my report of December 3, 2007, p. 21 *et seq*.,). However, the Defense either misunderstands or misrepresents my suicide theory and how Neurontin causes suicide.

B.   I have no problem with using the word "cause," in reference to this case, as long as it is acknowledged by Defendants that suicide is multicausal (Defs.' Mem., p. 6, ¶ 1). "Cause" often gets misinterpreted to mean there is one and only one cause (a "sufficient condition"). I utilize the phrase "*substantial proximate factor in*" to make it clear that there can be, and usually are, other factors causing suicide in addition to Neurontin. In fact I utilize the word "cause" in my 12/3/07 expert report. For example, on pages 21-22: "*I maintain that if Richard Smith had not taken Neurontin, it is more likely than not that he would have not suicided...Thus, gabapentin was a substantial or major proximate cause of Smith'suicide.*" Again (p. 24, ¶7): "*I believe that gabapentin pushed Richard Smith over the edge. He changed dramatically after taking Neurontin.*"

C.   Moreover, the differential diagnosis decision tree procedure is intended for assessing and diagnosing <u>mental disorders</u>, and **not** for suicide assessment. Suicide is not a mental disorder and appears nowhere in the **DSM**, except as a criterion for two mental disorders (viz., Major Depressive Disorder on Axis I and Borderline Personality Disorder on Axis II). Thus, differential diagnosis is not intended as a procedure for assessing suicide, and it is incorrect for the Defense to claim that it is (see Maris deposition @ 1253). Furthermore, even the **DSM** allows for "co-morbid" diagnoses, such as Major Depression and Alcohol Dependence on Axis I.

D.   It is my opinion that Neurontin can and does **cause** suicide, in concert with other suicide risk factors (like those risk factors clearly listed on p. 22 of my 12/3/07 expert report; viz., depression and affective disorder, substance abuse, suicide ideation, a history of prior suicide attempts, age, gender, race, use of lethal methods to attempt, social isolation, hopelessness, and so on). Neurontin clearly has side-effects or serious adverse events (SAEs) that are suicidogenic; i.e., that can **cause** suicide (see my 12/3/07 expert report @ p. 20 *et seq*.). For example, the **PDR** says that depression is "frequently" associated with Neurontin treatment. Furthermore, Dr. McCormick in her review of the Neurontin NDA (1992, pp. 87 & 98) says that <u>both</u> depression and anxiety are "frequent" side-effects of Neurontin. It is my opinion, and the opinion of other suicidologists (see Joiner, 2006) that depression and anxiety (see Fawcett, 2006) cause or substantially contribute to suicide outcomes.

E.  The Defense has totally mischaracterized my theory of suicide as I have ruled in and ruled out certain suicide risk factors. For example, I **both** "rule. in" and "rule. out" (ECF Doc #1633-26 at 24) non-Neurontin suicide risk factors. This methodology is fundamentally sound, due to the multifactorial nature of suicide. It would be naïve, even ridiculous, to claim that Richard Smith's depression, chronic pain, and hopelessness did not contribute to his suicide at all (i.e., to totally "rule them out").

F.  My theory of suicide, based on over 30 years of education, training and experience, is that <u>other</u> suicide risk factors tend to make some individuals part of a vulnerable minority of patients (or sub-set of Neurontin users) who are susceptible to the suicidologenic side-effects of Neurontin. Further, I opine that most individuals have long suicidal "careers," over many years (cf., Joiner, 2006, **Why People die by Suicide**, Harvard Press), involving many suicide risk factors. (see also, Maris, **Pathways to Suicide,** 1981, Johns Hopkins Press).

6. Defendants assert that I did not identify "Hallmarks" of Neurontin-Induced Suicides (Defs.' Mem., p. 6, ¶ 3 ff.). Suicide is a multifactorial phenomenon, and is very unlike a signature disease such as mesothelioma which may only be attributed to exposure to asbestos. Therefore, multi-factor individual criteria, and how the decedent's condition worsened formed the basis for my opinions in this case and in the <u>Bulger</u> case. In Richard Smith's case, he coped or lived with many suicide risk factors for a long time (at least since 1993 (when Dr. Stowers replaced Richard's left knee), (see Maris 12/3/07 expert report Medical Treatment Timeline, p. 7 *et seq.*) without completing suicide (Maris 12/3/07 expert report @ 23 *et seq.*). As noted below, in regard to Mr. Smith, the criteria that was established based upon the documents and information reviewed included the following:

   - The patient had recently ingested Neurontin and became suddenly suicidal.
   - The patient exhibited suicidogenic behavioral changes after and proximate to Neurontin ingestion.
   - The patient's depression became worse after Neurontin ingestion.
   - The patient had "ego-dystonic" reactions to Neurontin.
   - The patient's post-Neurontin ingestion suicide attempt was violent and lethal.
   - The patient had *de novo* hopelessness following Neurontin ingestion.
   - Neurontin "tips the scale" or disrupts the patient's fragile coping equilibrium and the result is a fatal suicide attempt.

7. Defendants incorrectly allege that I relied solely on "the Logical Fallacy of *Post Hoc Ergo Propter Hoc"* (Defs.' Mem., p. 7, ¶ 3 *et seq.*) in the formation of my expert opinions in this case. Obviously Defendants are not correct; as noted in my expert report and above, I have considered and reviewed all the available evidence in this case, have ruled in and ruled out several risk factors for suicide and have not just relied on *post hoc ergo propter hoc* in forming my opinions. Clearly, Neurontin could not cause Mr. Smith's suicide, if it occurred <u>before</u> he took Neurontin. I have appropriately pointed out dramatic changes in Richard Smith's suicidality and traits/states associated sequentially

and proximately with his Neurontin-ingestion, consistent with the Bradford-Hill temporality criterion for causation. For example:

A. Richard Smith had become suddenly suicidal after ingesting Neurontin (Maris 12/3/07 expert report, p. 20, ¶ 3): *"I (Dr. Maris) asked Ruth Smith (Richard's wife) if Richard ever became 'suddenly suicidal' (*i.e., was there de novo suicide ideation; See $\psi$A @ Q. 103)." Ruth answered: *"Yes, approximately 3 weeks prior to his suicide* (May 13, 2004 was the day of Richard's suicide; so, about late April…Neurontin was taken about 30 days before on 3/9/04 and 3/24/04) *Richard asked me if she thought: 'Honey, would God forgive me, if I just did away with myself'?"* (Ruth Smith Deposition @ 145; cf., $\psi$A @ Q.75-3).

B. In the same vein (Maris 12/3/07 report, p. 20, ¶ 4): *"Dr. Mackey admitted (his deposition @ 95) that in Richard's 8-year medical history with accompanying chronic pain, he never ever contemplated suicide even one time."*

C. Mr. Smith's Neurontin-induced suicidal death was violent ($\psi$A, Q 104). Although Richard Smith may have had some suicide ideation before taking Neurontin (see May 2, 2003 comment to his daughter about *"wishing to die"*), he never made any suicide attempts until after ingesting Neurontin (script first from Dr. Mackey on 3/9/04 and later from Dr. McCombs on 3/24/04). However, about two months after starting Neurontin, Richard Smith graphically committed a violent, bloody suicide by shooting himself in his right temple (see color scene photos by investigator Biggs and the Medical Examiner; no autopsy was done). Firearm shots to the brain are highly lethal and violent (Maris et al., 2000: 298 *et seq.*).

D. When I view a suicide outcome in a person like Richard Smith, who is only moderately suicidal and has many suicide protective factors (most long-time Christian pastors with loving, supportive families have the very lowest suicide rates (see Table 25.2 in Maris et al., 1992: p. 533, in which clergymen have the lowest suicide rates of any occupation; see also, Maris 12/3/07 expert report @ p. 23)), this often suggests a *"trigger,"* such as Neurontin ingestion and the resulting suicidogenic side-effects. As noted in my 12/3/07 expert report (p. 23, ¶ 4): *"…absent a Neurontin reaction, Richard Smith was one of the people least likely to kill himself."*[1]

E. From the two cases, Bulger and Smith, that I have reviewed, Neurontin-induced suicides tend to have a fragile coping equilibrium. Because of their other non-Neurontin suicide risk factors overtime (a *"suicidal career"* or Joiner's (2006) *"acquired ability to inflict lethal self-injury"*), side-effects of a drug like Neurontin (see Maris 12/3/07 expert

---

[1] Defense comments in a footnote (Defs.' Mem., p. 8, fn. 8) that Dr. Maris's testimony is different outside litigation. For example, in a Washington Post interview on September 13, 2000 @ C 01 Weingarten and von Dreble quote Dr. Maris as saying *"probably about 70 percent of all suicides are escape, escape from an intolerable life situation."* However, what Defense fails to mention is that Neurontin can *"trigger"* or enable an escape. Through Neurontin's side-effects of affectual deadening or emotional blunting, ego-dystonia, somnolence, worsened depression, and anxiety, Neurontin can *facilitate* a suicidal escape that would otherwise be highly unlikely.

report @ p. 20 ff) can make a noticeable difference in suicidality or *"tip the scale"* in the direction of a fatal suicide attempt. For example:

> i. Neurontin has frequent side-effects of depression and anxiety, is more likely than placebo to cause somnolence, abnormal thoughts, hostility, emotional lability or fluctuating mood swings, ataxia, etc. (see Maris 12/3/07 expert report @ p. 16, Table 1 and p. 18 ¶ 4). In my experience such side-effects can and have triggered fatal suicide attempts.
>
> ii. A person who dies as a result of a Neurontin-induced suicide may experience ego-dystonia (see Maris 12/3/07 report @ p. 17). After the patient takes Neurontin, they can undergo profound character or personality changes. For example, Richard Smith said to his son-in-law, Wes Carnahan: *"I'm on Neurontin and it makes me feel loopy"* (ψA @ Q 49, p. 16; Maris 12/3/07 report @ p. 17, ¶ 3). Again, Ruth Smith said in her deposition (@ p. 187): *"We just felt it was not him. It was the medicine that made him...this was just not his character at all."* Finally, Ruth (deposition @ p. 26) said: *"just in the last few weeks of his life...he became so absorbed in himself. He was not outward anymore. Completely different personality."* On 5/9/04 at church (Richard died on 5/13/04) Richard told Mike Bumbalo that *"He* (Richard) *was not himself"* (Maris 12/3/07 report @ p. 17, ¶ 4).
>
> iii. Neurontin ingestion worsened Mr. Smith's depressive disorder (see Maris 12/3/07 report @ p. 17). In suicidology is well-known that depression is the number one single cause of suicide. Even though it is unclear how severely depressed Richard Smith was before starting Neurontin (see Dr. Berklacich, 2/29/03 and Dr. Cato, 5/2/03), it is clear at the very least that Mr. Smith's depression got much worse after taking Neurontin. This is reasonable, since Neurontin depletes serotonin and norepinephrine (see Maris 12/3/07 report, p. 13 ff.) and, thus, worsens or induces depression (Maris 12/3/07 expert report @ p. 18, ¶ 3). Depression is a *"frequent"* side-effect or taking Neurontin (**PDR**). It was my opinion (Maris 12/3/07 report @ p. 19, ¶ 2) that Richard Smith had all 9 **DSM-IV** criteria for a Major Depressive Disorder after taking Neurontin on 3/9/04. Finally, Dr. Wood reported on 5/10/04 (Richard died on 5/13/04) that Richard told Chris Wood *"Neurontin makes me feel weird and is not helping."* Richard Smith further told Wood that he felt *"hopeless"* and that *"he was almost useless"* (Maris 12/3/07 report @ p. 10, ¶ 4).

8. Defense claims *"Dr. Maris uses unreliable methods,"* most notably my psychological autopsy and my suicide theory or model (Defs.' Mem. @ p. 9). My psychological autopsy was systematically developed for non-litigation purposes (see Maris et al., 1992, *Assessment and Prediction of Suicide*, Chapter 8 and pp. 667-669) over many years and it is in fact objective, unbiased, and reliable. In the area of suicidology, the psychological autopsy is a standardized and recognized method for retrospectively gathering data after a suicide (see Berman et al., 2006. *Suicide and Life-threatening Behavior*, 36-5: 511-518).

In regard to the psychological autopsy and methodology that I employed in this case see the following:

A.   I first developed his psychological autopsy in the late 1960s, when I was a Deputy Medical Examiner in Baltimore, Maryland. I later (1969 and 1981) refined the psychological autopsy (ψA )as a non-litigation survey research schedule. Finally, in the last 30 years I have adapted my ψA to forensic investigation, especially of the role of psychiatric medications in suicide.

B.   It is in fact way beyond the standard in forensic investigation of suicides to do any original, systematic data-gathering on a decedent. Most experts in litigation rely solely on official records (medical, toxicological, medical examiner, police, etc) and depositions. I, on the other hand, gathers original data to help formulate and defend my expert opinions.

C.   The vast majority of the questions on the my ψA is factual and can be derived from the Smith case file. The most knowledgeable person about the Smith files (for the Plaintiff) was a paralegal, Ms. Michelle Faye, at the Finkelstein firm. Thus, it was eminently prudent and reasonable for me to ask her to do a first draft of the Smith ψA.

D.   Contrary to Defense's claim (see Defs.' Mem. @ p. 11, ¶ 4), the persons gathering the information for the ψA does not themselves have to be a qualified suicidologist. I am the qualified suicidologist, who uses the information.

E.   Defense makes the blatantly false claim (Defs.' Mem. @ p. 12) that I "made corrections" after Ms. Faye prepared the Smith ψA and during his deposition testimony. Defense is well aware that I reviewed the original ψA very carefully, compared it with the objective case records, and then, indeed, wrote extensive verbatim revisions in the margins of the original ψA (see Maris deposition @ p. 862: *"When I thought that she* [Michelle Faye] *missed something, I corrected it"* and @ p. 865: *"So, I didn't just have Michelle Faye do it* (i.e., do the ψA)."

F.   Contrary to Defendants' assertions, there were emphatically **not** a *"multitude (sic) of mistakes"* in my expert report or my Psychological Autopsy (see Defs.' Mem. @ p. 12, ¶ 2). The one (not a *"multitude"*) issue the Defendants' Memorandum cites (see pages 568-570 of my deposition testimony and Defs.'Mem. @ p. 14, ¶¶ 1-2) concerns whether or not Richard Smith had been diagnosed or treated for depression before March 9, 2004 (when his Neurontin was started. I admit (it was no *"mistake"*) in my 12/3/07 expert report (see p. 17, ¶ 6 ff) that on 5/2/03 Richard Smith apparently told his daughter, who in turn told Becky Hughes (Dr. Cato's secretary), who then told Dr. Cato (he himself denied it at first, then later on said *"maybe"* (sic) he did say it) that he *"wished he could die because of pain and depression."* I used the term *"apparently"* because this incident was colored by innuendo and hearsay.

However, the entire Smith family (Ruth Deposition @ pp. 74 & 153, Cindy Deposition @ p. 126, Gayle Deposition @ p. 29, and Sherri Deposition @ p. 44) testified (see Maris

12/3/07 report @ p. 18, ¶ 1) that Richard Smith <u>never in his life</u> saw a psychiatrist, nor ever received a **DSM** diagnosis of *"depression."* Richard Smith was only seen by family practice doctors (not by specialists in the diagnosis of depression).

Presumably, based on this 5/2/03 hearsay, Dr. Cato (5/15/03) started giving Richard Lexapro (which he stopped on 6/22/03) and some Desipramine to help him sleep (and earlier some Elavil for sleep). The <u>only</u> other reference to depression came in Dr. Berklacich's *"New Patient Questionnaire"* (2/27-28/03), in which *"depression"* is simply mentioned.

Based on the medical records, it is unclear if Richard Smith was depressed, and when he was depressed, whether he was treated for insomnia or depression, what type of **DSM** depressive disorder he may have had (there are no **DSM** diagnostic codes in the medical records), how severe the depression might have been, etc. Thus, I did not make a *"mistake"* about Richard Smith's pre-Neurontin depression. The truth is that the facts and the medical records were vague and inconclusive.

The <u>only</u> other "mistake" (sic) Defendants' Memorandum mentions is the number of suicide risk factors that Richard Smith had (Defs.' Mem. @ p. 12, ¶ 2). On page 22 of my 12/3/07 expert report I opine that Richard had 7 of 15 suicide risk factors. After a long discussion with defense counsel, Ms. McGroder (see Maris deposition @ pp. 694-699), I conceded that if Neurontin made Richard Smith <u>impulsive</u>, then probably he had 8 of 15 suicide risk factors (viz., plus risk factor # 13). That is not really a *"mistake,"* since it was Neurontin-induced and risk factor # 13 also includes anger and aggression, which were not traits of Richard Smith. Finally, 7 or 8 out of 15 risk factors is not a significant difference in suicide risk.

My response of *"How would I know?"* to Defense counsel's argumentative question *"What else is wrong with your report?"* (Defs.' Mem. @ p. 14, ¶ 2), was meant to imply that my report was not accurate. Furthermore, *"How would I know?"* (Maris deposition @ p. 696) referred to a question about which a source was relevant to the issue (viz., the ψA or an article by Brown et al. on aggression serotonin, and impulsivity), not to my entire report.

G.  Of course, I <u>could</u> have interviewed relevant parties and personally filled out all of the ψA. However, there was little likelihood on most questions of significantly different data resulting, if I had done so. It would have been cost prohibitive for my personally conducting the interviews whereas the benefit would have been marginal. In providing an expert opinion in this case, I arrived at my opinions with the same rigors that I utilize in my professional life. In no way did I *"set aside his own professional scruples"* in the performance of the Smith ψA. I believe it is also very problematic to cavalierly go around interviewing witnesses without the Defense being present.

H.  There is no <u>one</u> proper was to do a ψA. I followed my professional scruples in <u>demanding</u> that a ψA be done for Smith. Whether the initial ψA was drafted by others, or

a combination of both, how many informants one should have, etc., is discretionary and not likely to substantially influence the results.

I.   There are at least three separate citations to my suicide model in the peer-reviewed scientific literature (see Defs.' Mem. @ p. 14, ¶ 2). The model appeared first in my book *Assessment and Prediction of Suicide* (Guilford Press, 1992: p. 668 ff). Second, the model was published in my *Comprehensive Textbook of Suicidology* (Guilford, 2000: p. 58 ff). Third and lastly, the model appeared in the British medical journal, *The Lancet* (2002, volume 360: 319-326).

All three of these publications were peer-reviewed and had nothing to do with the Neurontin litigation. Thus, obviously, the my suicide model was **not** prepared *"expressly for the purpose of testifying."* The Smith suicide model is identical to the three published sources described above.

9.   Furthermore, the Defense motion to exclude my testimony about general causation (see Defs.' Mem. @ p. 14, ¶ 1) is totally unfounded. As to my qualifications, while I acknowledged in my deposition testimony that I was not a physician/psychopharmacologist, and that I lacked the specific training of Drs. Trimble and Kruszewski, this was not an admission that I am incompetent to address general causation or to assess Neurontin's effects on suicide. In fact, I have been a consultant to the FDA committee on antidepressant medications and suicide and my research and opinions helped lead to the **PDR** black box warnings now required for all antidepressants.

10.   Defense counsel mischaracterizes my testimony relating to the half-life of Neurontin in terms of its elimination from the body. (Maris deposition @ p. 550, line 9 *et seq.*). Although I acknowledge that Neurontin's half-life is five to seven hours in terms of its elimination from an individual's "system", this testimony does not equate to a marker for the time it takes for Neurontin to no longer have an effect on the brain's neurotransmitters (e.g., serotonin) and contribute to suicidality. The package insert for Neurontin and discussion of its half-life does not pertain to effects on neurotransmitters; rather, the package insert pertains to blood/plasma: "Gabapentin is eliminated from the systemic circulation by renal excretion as unchanged drug. Gabapentin is not appreciably metabolized in humans. Gabapentin elimination half-life is 5 to 7 hours and is unaltered by dose or folowing multiple dosing." (See Neurontin package insert). I also made clear this issue in my 12/3/07 expert report (pp. 12-13) when I stated "Gabapentin's half-life is 5 to 7 hours, with a peak plasma level at 2 to 3 hours post dose" (emphasis added).

11.   In conclusion, Defendants' contentions (1) that I am a solely a "Plaintiff" witness; (2) that I must and cannot rule out all alternative causes of Mr. Smith's suicide; (3) that I did not identify a "hallmark" of a Neurontin suicide; (4) that I solely relied on *Post Hoc Ergo Propter Hoc"*; and (5) that I utilized unreliable methodologies in providing expert opinions concerning Mr. Smith's suicide, are patently untrue and have no basis in fact.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February __19__, in __2009__.

*Ronald Wm. Maris, PH.D.* (signature)

_____
Ronald Wm. Maris, Ph.D.

Distinguished Professor Emeritus, Departments of Psychiatry & Family Medicine, University of South Carolina School of Medicine (Columbia).

February 18, 2009

*Megan C. Martin* (signature) 2/19/09

Megan C. Martin
Notary Public for South Carolina
My commission expires on February 22, 2015