UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
                                                               :    MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                                   :
        SALES PRACTICES AND                                    :    Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION                          :
                                                               :    Judge Patti B. Saris
---------------------------------------------------------------x
                                                               :    Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                                      :
                                                               :
*Bulger v. Pfizer Inc.*, 1:07-11426-PBS                        :
                                                               :
---------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ronald J. Bulger, Sr., respectfully submits this memorandum in opposition to the motion for summary judgment by Defendants Pfizer Inc. and Warner-Lambert Company LLC.

**PRELIMINARY STATEMENT**

The Amended Complaint in this action pleads six claims for relief: (1) Negligence; (2) Breach of Warranty (express and implied); (3) Strict Liability; (4) Fraud; (5) Violation of Massachusetts Consumer Protection Act; and (6) Survival Action. Defendants have moved for summary judgment on the grounds that without the specific causation testimony of Plaintiff's experts, Plaintiff has no admissible evidence on the issue of specific causation and cannot establish the essential element of causation, and that Plaintiff's express warranty, strict liability, fraud and consumer protection claims fail as a matter of law. Defendants have not moved for summary judgment on Plaintiff's implied warranty or survival claims. As discussed below, Plaintiff has sufficient evidence to continue to pursue and go to trial on his claims of negligence, breach of implied warranty, fraud and survival, which may not be dismissed as a matter of law.

## FACTUAL BACKGROUND

As set forth in Defendants' Local Rule 56.1 Statement of Material Facts, and reiterated in Defendants' memorandum, the allegedly undisputed material facts in connection with Defendants' motion for summary judgment are limited to Defendants' argument that Plaintiff's fraud claim fails as a matter of law.  *See* Defs.' Mem., pp. 7-9.

"II.  Factual Background" of Defendants' memorandum alleges a litany of "facts" concerning Mrs. Bulger's personal history, not including the ingestion of Neurontin, which Defendants claim caused Mrs. Bulger to commit suicide.  None of such facts are relevant and material to resolving Defendants' motion for summary judgment, and need not be addressed in this Plaintiff's memorandum submitted in opposition to Defendants' motion for summary judgment.

## SUMMARY JUDGMENT STANDARD OF REVIEW

This Court has recently reiterated its standard of review on a motion for summary judgment, which will not be repeated in full herein.  *See McKenna v. First Horizon Home Loan Corp.,* 537 F. Supp. 2d 284, 287 (D. Mass. 2008); *Carter v. Symmes*, 2008 U.S. Dist. LEXIS 7680 at *5-6 (D. Mass. 2008).  Plaintiff, however, wishes to emphasize, and respectfully refers the Court to its following statements concerning the summary judgment standard of review:

> . . ."To succeed [on a motion for summary judgment], the moving party must show that there is an <u>absence of evidence</u> [emphasis added] to support the nonmoving party's position."  *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).
>
> . . .The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." [*Barbour v. Dynamics Research Corp.*, 73 F.3d 32, 36 (1st Cir. 1995).]

*McKenna,* 537 F. Supp. 2d at 287; *Carter*, 2008 U.S. Dist. LEXIS 7680 at *5-6.

## I. PLAINTIFF HAS SUFFICIENT ADMISSIBLE EVIDENCE ON THE ISSUE OF SPECIFIC CAUSATION AND CAN SATISFY HIS BURDEN OF PROVING PROXIMATE CAUSE

This Court should deny Defendants' motion for summary judgment on the issue of specific-causation because Plaintiff has demonstrated, via admissible expert testimony, that Susan Bulger's ingestion of Neurontin was a proximate cause of her injuries and death. As set forth in detail in Plaintiffs' Memorandum in opposition to Defendants' motion to exclude the specific-causation testimony of Doctors Kruszewski and Maris, Plaintiff's experts on specific causation opinions are relevant, reliable and pass Rule 702 and *Daubert's* requirements. Although not exhaustive of the arguments and expert opinions discussed in said Memorandum and exhibits submitted therewith, incorporated by reference as if fully set forth herein is the crux of Plaintiff's experts' opinions on specific causation: Doctors Maris and Kruszewski have opined that Susan Bulger ingested Neurontin and that she experienced side effects consistent with Neurontin use, including mood and behavioral disturbances and worsened depression. Both Doctors Maris and Kruszewski have opined that Susan Bulger's ingestion of Neurontin was a proximate cause of her suicide.

They each base their opinion upon their clinical experience and education, their review of the depositions of physicians, family, incident reports, medical records, as well as literature on pharmaceuticals related to adverse and suicidogenic side effects, as well expert reports disclosed in this case. Further, each expert bases his opinion on the biological plausibility of Neurontin to contribute to suicide, as well as the FDA's meta-analysis that demonstrated an increased risk of suicidality with use of antinconvulsants.

Dr. Maris further bases his opinion, in part, on the results of a "psychological autopsy" he conducted in an attempt to reconstruct her psychological life, thoughts, feelings and relevant

environmental factors preceding her death. Dr. Maris also analyzed suicide risk factors and protective factors his research has identified as statistically significant. Dr. Maris sought to "rule in" and "rule out" alternative causes, and he opined that Susan Bulger had 12 of 15 known risk factors for suicide and 4 were probably induced or made worse by Neurontin. Dr. Maris opined that Susan Bulger possessed personal and social characteristics known to be protective from suicide.

Dr. Kruszewski applied a differential diagnosis in which he examined the risk factors and protective factors in relation to Susan Bulger's suicide. He utilized as guideposts the factors set forth by Sir Bradford Hill in evaluating causation, and also utilized the Naranjo Adverse Drug Reaction Probability Scale which assesses the cause of an adverse drug reaction as a guidepost in his specific causation analyses.

Plaintiff has sufficient admissible evidence on the issue of specific causation to satisfy his burden of proving proximate cause. Consequently, Defendants' motion should be denied.

## II. PLAINTIFF IS ENTITLED TO CONTINUE TO PURSUE HIS CLAIMS FOR NEGLIGENCE AND BREACH OF IMPLIED WARRANTY

Defendants have moved for summary judgment on Plaintiff's claim for breach of express warranty. *See* Defs.' Mem., pp. 4-5. Plaintiff does not oppose this part of Defendants' motion. Defendants, however, have not moved for summary judgment on Plaintiff's claims for breach of implied warranty.

Defendants also have moved for summary judgment on Plaintiff's strict liability claim on the grounds that in Massachusetts, "there is no strict liability in tort apart from the liability for breach of warranty under the Uniform Commercial Code," quoting *Swartz v. General Motors Corp.*, 378 N.E.2d 61, 62 (Mass. 1978). *See* Defs.' Mem., pp. 5-6. Plaintiff also does not oppose this part of Defendants' motion.

However, this does not dispose of Plaintiff's negligence claim or breach of implied warranty claim. "Amendments to the Massachusetts version of the Uniform Commercial Code [have] made it clear that the Legislature transformed warranty liability into a remedy intended to be as fully comprehensive as the strict liability theory of recovery that has been adopted by many other jurisdictions." *Kelley v. Eli Lilly & Co.*, 517 F. Supp. 2d 99, 109 (D.D.C. 2007) (citations omitted). "Under Massachusetts law, a theory of liability based upon implied warranty is 'congruent in nearly all respects with the principles expressed in § 402a of the Restatement (Second) of Torts (1965).'" *Id.* at 110 (citations omitted).

The District Court in *Kelley* went on to state:

Furthermore, the Supreme Judicial Court of Massachusetts recognized that prescription drug cases must be evaluated under the principles of negligence. [Citations omitted.] This rule has been followed by both the Supreme Judicial Court and federal courts applying Massachusetts law. [Citations omitted.] Thus, in accordance with Massachusetts law and the precedents set forth within the First Circuit, this Court consolidates the plaintiff's breach of implied warranty claim with her claims of negligence ...." [*Id.*]

Thus, here, Mr. Bulger is entitled to pursue his claim of negligence, and his claim for breach of implied warranty, which under Massachusetts law is congruent with the theory of strict liability expressed in § 402a of the Restatement (Second) of Torts (1965).

### III. WHETHER BECAUSE OF DEFENDANTS' SUPPRESSION OF DEPRESSION/-SUICIDALITY INFORMATION, OR BECAUSE OF DEFENDANTS' AFFIRMATIVE MISREPRESENTATIONS, PLAINTIFF HAS RAISED TRIABLE ISSUES OF FACT REGARDING DEFENDANTS' FRAUD

It has been well established for over a century that under Massachusetts law: "Fraud may lie in suppression or concealment." *Graves v. Morgan*, 182 Mass. 161, 164, 65 N.E. 50, 51 (1902); *see also Van Houten v. Morse*, 162 Mass. 414, 417, 38 N.E. 705, 706 (1894) ("if she willfully concealed and suppressed such facts, and thereby led the defendant to believe that the matters to which such statements related were different from what they actually were, she would

be guilty of a fraudulent concealment"); *Lee v. Whitney*, 149 Mass. 447, 448, 21 N.E. 948, 949 (1889) ("fraudulent suppression of the truth").

This Court addressed certification of a class action involving Neurontin where it has been alleged that Defendants suppressed or misrepresented the results of negative or unfavorable studies concerning off-label uses, *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 93 (D. Mass. 2007); suppressed the publication of negative research concerning Neurontin, *id.* at 94; suppressed or misrepresented studies that demonstrated Neurontin was not effective for the off-label uses, *id.* at 95; suppressed a number of clinical studies that showed Neurontin to be ineffective or were inconclusive for pain indications, *id.* at 96; suppressed the results of the largest clinical trial related to Neurontin and painful diabetic neuropathy, *id.*; suppressed the results of internal testing concluding that overall, the analgesic effect of gabapentin and hydrocodone treatment was similar to hydrocodone treatment alone, *id.* at 97; and suppressed the results of other internal testing that did not find Neurontin to be effective in patients with postoperative pain following dental surgery. *Id.* This Court found that: "Plaintiffs have met their burden of demonstrating that the "key messages" of efficacy and clinical evidentiary support disseminated by plaintiffs, coupled with the suppression or misrepresentation of unfavorable data, are materially uniform per indication." *Id.* at 109.[1]

Judge Richard G. Stearns has also recognized that: "'Fraud is a generic germ used to describe anything calculated to deceive, whether by single act or combination, or by suppression

---

[1] *See also* Order and Memorandum Opinion by the Honorable Mark J. Bernstein, J., dated June 29, 2007, in *Clark v. Pfizer Inc.*, Phila. Ct. Comm. Pleas, June Term, 2004, No. 1819, granting plaintiffs' motion for class certification of Pennsylvania Neurontin class action, Finkelstein Decl., Ex. 1; and Judge Bernstein's Opinion in the same case, denying Pfizer defendants' motion for summary judgment, and noting that under Pennsylvania law, a defendant may be liable for misrepresentation to foreseeable plaintiffs even without any direct relation between the parties). Finkelstein Decl., Ex. 2, at p. 14. (By Order and Opinion dated February 9, 2009, Judge Bernstein recently granted in part Pfizer defendants' motion for summary judgment, and granted defendants' motion for class decertification on other grounds. Finkelstein Decl., Ex. 3.)

of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.'" *In re Lupron Mktg. & Sales Practices Litig.*, 2004 U.S. Dist. LEXIS 18512 at *11 (D. Mass. 2004) (discussing Pennsylvania law); see also *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 181 (D. Mass.) (discussing several state consumer protection act statutes concerning suppression or omission of any material fact in connection with the sale or advertisement of any merchandise).

In 1992, the U.S. Food & Drug Administration (FDA) evaluated Neurontin's use for Defendants' sought after epilepsy indication, and FDA advised Defendants that patients ingesting Neurontin may suffer worsening depression that may "require intervention or lead to suicide, as it has resulted in some suicide attempts." ECF Doc. # 1200-6, at p. 10. Finkelstein Decl., Ex. 4, at 0084477. Despite this knowledge, Defendants <u>suppressed</u>, concealed and failed to disclose information regarding depression/suicidality to Plaintiff's decedent, Susan Bulger, and her prescribing physicians. Additionally, genuine issues of material fact exist as to whether Defendants' off-label promotion scheme for which they pled guilty, or Defendants' sales details to Susan Bulger's prescribers, influenced, induced and caused Susan Bulger's physicans to prescribe, and Susan Bulger to ingest Neurontin for off-label uses.

Defendants' actions resulted in preventing Susan Bulger and her prescribing physician(s) from being able to fully assess the risk-benefit analysis for the underlying <u>off-label</u> condition for which Neurontin was prescribed to Susan Bulger, and from being able to fully monitor changes in Susan Bulger's mood and behavior caused by Neurontin. Consequently, Susan Bulger ingested Neurontin, and Neurontin was a substantial factor in her suicide. Because Plaintiff has raised genuine issues of material fact related to each element of Plaintiff's common law fraud claim, Defendants' motion should be denied.

Since at least 1992, Defendants knew that Neurontin was associated with depression/suicidality, yet Defendants suppressed this negative information while promoting Neurontin's safety and efficacy for off-label uses. In doing so, Defendants failed to provide adequate <u>written</u> depression/suicidality information in Defendants' Neurontin package insert (the "Label"), a "Dear Doctor" Letter,[2] or any other written communication to Susan Bulger or her prescribing physicians.[3] Additionally, Defendants' acts of suppression are reflected by the absence of any <u>verbal</u> information about despression/suicidality communicated by sales representatives to Susan Bulger's prescribers.

As summarized below, Defendants knew about Neurontin's association with depression/suicidality but suppressed information important to Susan Bulger and her prescribers, to wit:

1. Since 1992, Defendants knew of FDA's concern about Neurontin's association with depression and suicidality, albeit in the context of Neurontin's on-label indication for Epilepsy.[4] FDA prepared a Combined Medical-Statistical Review of Neurontin and stated "[D]epression, while it may [not be] an infrequent occurrence in the epileptic population,

---

[2] Even a single report of an adverse event during the postmarketing phase of a drug can trigger the need for a "Dear Doctor" Letter. For example, in October 2008, the Genentech drug company, which manufactures Raptiva®, issued a "Dear Doctor Letter" because of one reported case of progressive multifocal leukoencephalopathy (PML), a rare central nervous system disease, that was reported with use of Raptiva®. Finkelstein Decl., Ex. 5.

[3] Defendants suppressed depression/suicidality information in the product Label; thus, even in the absence of an actual visit and verbal detail from a sales representative, each physician who prescribed Neurontin did so based upon a Label in the physician's possession that did not include depression/suicidality information. Further, the Label's "Information for Patient" section did not communicate to Susan Bulger Neurontin's association with depression/suicidality.

[4] In 1992, Defendants' own ranking members of their Regulatory Department, including Dr. Richard Spivey, then Senior Director of Regulatory Affairs, and Janeth Turner, then Director of Regulatory Affairs, knew of the FDA's concern over Neurontin's association with suicidality as set forth in FDA's Combined Medical-Statistical Review (the "FDA Clinical Review") Finkelstein Decl., Ex. 6. On December 7, 1992, Ms. Turner provided the FDA 1992 Clinical Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development. Finkelstein Decl., Ex. 7, at p. 375:17-22, pp. 379-381. Ms. Turner was also a member of the Drug Development Team and New Product Committee whose stated purpose was to explore new uses for Neurontin beyond the epileptic population. Finkelstein Decl., Ex. 7, at p. 382:7-14. Despite Ms. Turner's knowledge as to the potential risks of depression/suicidality with Neurontin, she did not advise members of the Drug Development Team.

may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts." ECF Doc. # 1200-6, at p. 10; Finkelstein Decl., Ex. 4, at 0084477.

2. In 1995, Defendants retained consultant—and now Plaintiffs' expert in this case—Michael Trimble, M.D., who provided Defendants a paper entitled, *Psychosis with Gabapentin*. Dr. Trimble advised that "anticonvulsant drugs influence the mental state, and this can be broken down into adverse and beneficial effects . . . . The main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression." *See* ECF Doc. # 1200-109, at p. 6.

3. Defendants knew Neurontin's mechanism of action contributes to depression and suicidality, because Neurontin reduces the release of excitatory neurotransmitters (e.g., serotonin) in the brain.[5] Finkelstein Decl., Ex. 8, at pp. 11-14; Finkelstein Decl., Ex. 9, at p. 3; ECF Doc. # 1200-6, at p. 9, ¶ 39.

4. Defendants' own controlled clinical trial data demonstrated an association with suicidality, as confirmed by FDA over a decade later. In 2008, an FDA Alert indicated a doubling of the risk for suicidal behavior associated with the use of antiepileptic drugs, including Neurontin. The FDA analyzed 11 drugs, including Neurontin, and specifically stated that the results were generally consistent across all drugs reviewed.

5. Incidences of positive dechallenge/rechallenge psychiatric events have been documented in Defendants' own clinical trials for Neurontin.[6] Since 1990, positive dechallenge/rechallenge reactions of depression were observed by Defendants' own investigators who rendered causal association assessments that the depression was probably related to Neurontin.[7]

---

[5] *See* ECF Doc. # 1200-103, at 0075642. ("Neurontin treatment may shift the relative balance of neurotransmitters from excitatory to inhibitory); ECF Doc. # 1200-104, at 0010853 ("In addition to reducing neurotransmitter release, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro"); *see* ECF Doc. # 1200-105, at 0005343 ("Inhibition of Neurotransmitter Release"); *see* ECF Doc. # 1200-106, at 115776 (1993 Product Monograph states "Neurontin slightly reduces the release of monoamine neurotransmitters in vitro"). *See* ECF Doc. # 1200-107, at pp. 13, 294-298, 300 (Deposition of Defendants' witness Leslie Tive, Medical Director, Team Leader for Neurontin (7/19/06)): "Q. Do you have any degrees? A. I do. Q. And what are your degrees? A. I have a Ph.D. in biopsychology with a specialization in neuropharmacology. Q. Okay. Would you agree that there are drugs sold by Pfizer that are utilized by patients to affect neurotransmitters in the brain? A. Yes. . . . Q. And as a neuropharmacologist, you understand what dopamine is, right? A. Yes. Q. You understand what serotonin is, right? A. Yes, I do. . . . Q. And when you reference serotonin, what is serotonin? A. It's another neurotransmitter. Q. Miss Tive, do you have an understanding as to whether an increased amount of serotonin or a decreased amount of serotonin in the brain can be associated with depression? A. An increase or decrease of serotonin in the brain can be associated with depression. . . . . Q. Let's talk about clinical depression. All right. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine? A. You're saying monoamines in general? Q. Correct. A. A reduction in monoamines has been associated with depression."

[6] "If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge. A positive rechallenge refers to the reoccurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug. ECF Doc. # 1200-6, at p. 12, ¶ 53.

[7] Defendants' causal association assessment ranged from Definite, Probable, Possible, or of Unknown Relationship. ECF Doc. # 1200-6, at p. 13 n.37. Defendants utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin

6. Since 1990, Defendants' own clinical trials reflected that Acute Severe Depression and Suicidal Ideation were expected adverse events associated with Neurontin. See ECF Doc. # 1200-98. Clinical trials demonstrated associated psychiatric adverse drug experiences observed by Defendants' own investigators. ECF Doc. # 1200-99, at pp. 13-15.[8]

7. Defendants' own Epilepsy clinical trials performed as part of their New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. In the total exposed population of said New Drug Application, seventy-eight (78) patients reported depression as an adverse event (e.g., 5.3% of the population of patients). Finkelstein Decl., Ex. 4, at 0084447. There were seven (7) reports of depression as serious adverse events, and nine (9) patients who withdrew from studies because of depression. Finkelstein Decl., Ex. 4, at 0084462.

8. Defendants' own Epilepsy clinical trials, performed as part of their New Drug Application for Neurontin, reflected at least seven (7) cases of "Depression" adverse events that Defendants' own medical investigator considered possibly or probably related to Neurontin; there was observed at least two (2) cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator. Finkelstein Decl., Ex. 4, at 0084467-0084468.

9. Defendants' own clinical trials reflected that approximately twice as many Neurontin patients (compared to placebo patients) withdrew as a result of clinically-related psychobiologic events. ECF Doc. # 1200-6, at p. 9, ¶ 39.

10. Defendants possessed post-marketing adverse event reports through 2002, prior to any potential notoriety bias that Defendants relate to the publicity of this litigation, demonstrating an association of psychiatric adverse events, including depression and suicidality, with Neurontin use. A 'safety signal' clearly existed, particularly with off label uses. ECF Doc. # 1200-6, at pp. 175-182, ¶¶ 263-282; pp. 192-195, ¶¶ 313-323.

Here, Susan Bulger's prescribers, Doctors Dino Crognale and Richard Goldman, testified about the material information suppressed by Defendants in terms of its role in their prescribing

---

(Protocol 945-15), and not a Bradford-Hill assessment. The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear. *Id.* Additionally, Defendants' own investigator rendered a causal association assessment during a clinical trial pertaining to diabetic peripheral neuropathy that a suicide attempt and intentional overdose were "definitely related" to Neurontin. ECF Doc. # 1200-100, at p. 59. Also, Health Canada, the Canadian Regulatory authority equivalent to FDA, has stated the following to Pfizer regarding dechallenge/rechallenge findings related specifically to Neurontin and post-marketing psychiatric adverse events: "One suicide attempt was found to have positive dechallenge/rechallenge, indicating that this event was related to gabapentin. ECF Doc. #`1200-48.

[8] During Defendants' own clinical trials prior to FDA approval for Neurontin's epilepsy indication, "Depression and Suicidal Ideation" was the ninth (9th) most common adverse reaction resulting in discontinuation of Neurontin. Finkelstein Decl., Ex. 4, at 0084444.

practices. First, both physicians utilized the Neurontin Label. Dr. Crognale explained that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug. Finkelstein Decl., Ex. 10, at 16:17-17:13. Dr. Goldman testified he utilized both the PDR and an online formulary reference called EPOCRATES Rx. Finkelstein Decl., Ex. 11, at 17:15-18:10. Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label. Finkelstein Decl., Ex. 10 at 37:3-37:18.

Second, both Dr. Crognale and Dr. Goldman, in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Ms. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (seorotonin), Finkelstein Decl., Ex. 10, at 195:12-196:6; Finkelstein Decl., Ex. 11, at 178:12-178:19; Finkelstein Decl., Ex. 11, at 197:2-197:17; (b) suicide attempts during clinical trials, Finkelstein Decl., Ex. 10, at 191:11-191:17; Finkelstein Decl., Ex. 11, at 182:8-184:5; (c) depression adverse events during clinical trials, Finkelstein Decl., Ex. 10, at 197:4-198:2; Finkelstein Decl., Ex. 11, at 183:13-184:5; and (d) that patients taking Neurontin may suffer mood and behavioral disturbances. Finkelstein Decl., Ex. 10, at 200:5-200:14.

In the absence of a specific affirmative misrepresentation by Defendants, Plaintiff raises issues of material facts in dispute as to whether Plaintiff's physicians relied upon Defendants' <u>suppression</u> of depression and suicidality information. Because the concept of suppression involves the omission of an affirmative representation, it is axiomatic that Plaintiffs cannot point to one. Indeed, neither Ms. Bulger nor her prescribers had the benefit of depression/suicidality information on which to rely, because Defendants suppressed or concealed such information in the first place. Susan Bulger, and in particular, her prescribing physicians, would have heeded a

11

warning related to depression/suicidality had Defendants provided one.  *See Section 402A of the Restatement (Second) of Torts*.  In relevant part, comment j provides:  "Where warning is given, the seller may reasonably assume that it will be read and heeded . . . ."  *See Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992) ("To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning [footnote omitted] or subjective evidence of how the treating physician would have responded.").

Whether the Court considers Susan Bulger's direct contact with Defendants' Label (via its "Information for Patient" section), her prescriber's direct contact with Defendants' Label, or her prescriber's direct contact with Defendants' sales representatives, Defendants suppressed the above referenced information regarding Neurontin and depression/suicidality. Such information was material to Susan Bulger's prescribers.

Defendants also actively promoted Neurontin to Susan Bulger's physicians via direct sales representative detailing to the doctors' offices.  Although Defendants acknowledge it was inappropriate to detail physicians other than Neurologists and Epileptologists, Finkelstein Decl., Ex. 12, at 45:8-45:25; *see* Finkelstein Decl., Ex. 13, at 009942, Defendants detailed Ms. Bulger's prescriber, Dr. Dino Crognale, who was a general family medicine doctor, Finkelstein Decl., Ex. 10, at 169:3-170:23, and Dr. Richard Goldman, an internist.  Finkelstein Decl., Ex. 11, at 13:1-13:5.  Doctors Crognale and Goldman were detailed and had direct contact with Defendants' sales representatives who never disclosed depression/suicidality as a risk with Neurontin. Finkelstein Decl., Ex. 14, at 19:13-20:15, 21:4-21:7; Finkelstein Decl., Ex. 15.  Doctors Crognale and Goldman subsequently prescribed Neurontin to Susan Bulger for off-label uses.  For example, Dr. Crognale provided Neurontin to Ms. Bulger for her for chronic pain related to

rheumatoid arthritis, as well as for anxiety and depression – all off-label, unapproved uses. Finkelstein Decl., Ex. 10, at 66:23–67:22, 130:22–131:6, 157:1–158:3, 165:11-165: 14; *but see* 165:17–165:20.

The evidence of Defendants' guilt related to their admitted fraud and off-label promotion scheme, about which this Court is fully aware,[9] coupled with the above-documented promotional visits by sales representatives, and testimony from Ms. Bulger's prescribing doctors, demonstrates a genuine issue of material fact as to whether her prescribers were influenced by Defendants' <u>affirmative fraudulent promotion</u> of Neurontin as safe and effective for treatment of pain, depression or anxiety – all off-label uses. *See In Re: Pharmaceutical Ind. Avg. Wholesale Price Litigation*, 252 F.R.D. 83, 99 (D. Mass. 2008) (quoting *Group Health Plan, Inc., v. Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn. 2001) ("where the plaintiffs' damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers, the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products.")).

In *Knipe v. Smithkline Beecham,* 583 F. Supp. 2d. 602 (E.D. Pa. 2008), the federal court addressed a strikingly similar situation as the Court confronts here. In *Knipe*, the makers of the drug Paxil defended claims that their drug was associated with suicidality and that they allegedly misrepresented the safety/efficacy of Paxil. The defendant drug company sought to dismiss the plaintiff's fraud claim because the plaintiff could not put forward a specific affirmative fraudulent representation by the drug company to the plaintiff's prescriber. Notwithstanding the lack of a specific affirmative misrepresentation to the prescribing physican, the *Knipe* Court

---

[9] *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 114 (D. Mass. 2007) (this Court extensively detailed Defendants' "End-Run on the FDA" and illegal "Off-Label Promotion": "This case is troublesome because defendants allegedly used a national marketing scheme to promote a fraud. If true, they should not get off scot-free if there is a practical statistical way to address the difficult causation issues.").

13

denied the drug company's motion to dismiss Plaintiff's fraud claims where the plaintiff's prescribing physician had been influenced by the medical community and his partners, and his prescribing practices were generally guided by information from many other sources, including medical journals, the PDR, and lectures. *Id.* at 621-22.

> Any of these sources—not simply the brochures and GSK sales representative meetings referenced by Defendant—could have resulted in him relying upon, in some attenuated fashion, the substance of GSK's alleged misrepresentation regarding Paxil. Nothing in the record supports Defendant's unsubstantiated suggestion that Dr. Durham relied solely on his own medical intuition about the safety and efficacy of the drug. Any challenges by Defendant to Dr. Durham's lack of specificity regarding the sources of his information about Paxil are ultimately questions for the jury. [*Id.,* at 623.][10]

The *Knipe* Court concluded that taken as a whole, such evidence created a genuine issue of material fact as to whether the plaintiff's prescriber was influenced, albeit indirectly, by the defendant drug company's fraud. *Id.; see also Michael v. Shiley, Inc.,* 46 F.3d 1316 (3d Cir. 1995) (finding sufficient evidence to raise a genuine issue of fact on fraud claim where, despite no direct evidence that prescribers were targeted by Defendant, the prescribers had read standard journals to remain current in their field). Applying *Knipe* to the case at bar, Plaintiff has raised a triable issue of fact as to Defendants' fraudulent conduct.

Although Dr. Crognale did not recall all specific facts regarding sales detailing about Neurontin at his office by Defendants' sales representative, Finkelstein Decl., Ex. 10, at 170:12-170:23, or whether he was a target of off-label promotion by Defendants, "these statements far

---

[10] This Court, in *In Re Neurontin Mkg. & Sales Practices Litig.*, 244 F.R.D. 89, 113 (2007), albeit in denying class certification of an "overbroad class", commented on the viability that fraud could be proven circumstantially and without proof of a specific affirmative misrepresentation to a given prescriber: "If Dr. Rosenthal has an accurate methodology for calculating that, say, 85% of all Neurontin prescriptions for migraines resulted from a fraudulent marketing campaign, it seems reasonable for a TPP to allege that 85% of its reimbursements for that indication were a result of the fraud." *Id.* This Court stated further that although "plaintiffs have pointed to cases in which courts have certified consumer classes without requiring proof of individual causation and injury, they have not identified a single case where a court certified an overbroad class with members who were not injured under such a theory." *Id.* Here, Plaintiff's decedent, Susan Bulger, is not a member of an "overbroad class"; the *Knipe* case is squarely on all points with the case at bar; and Plaintiff has put forth marketing expert Charles King III, Ph.D.'s testimony in support of Plaintiff's fraud claim.

14

from equate to a showing that [Dr. Crognale] did not rely on any of [Defendants'] alleged misrepresentations about [Neurontin] from *any other* sources." *Id.* at 622. Indeed, Dr. Crognale expressly indicated that his bases for prescribing Neurontin included (a) his communication with the medical community; (b) discussions with colleagues at symposiums; (c) consideration of medical journals, Finkelstein Decl., Ex. 10, at 180:14-186:5, and Dr. Crognale read and utilized the Physicians Desk Reference, Finkelstein Decl., Ex. 10, at 16:17-17:21. Any of these sources could have resulted in Dr. Crognale relying upon Defendants' illegal off-label marketing scheme related to Neurontin. *Id.* at 623. Similarly, Dr. Goldman acknowledged direct contact with Defendants' sales representatives, but could not recall specific discussions. Finkelstein Decl., Ex. 11, at 48:10-50:23. Dr. Goldman acknowledged his attendance at conferences, Finkelstein Decl., Ex. 11, at 15:20-16:4; his consideration of journals; discussions with colleagues; and his review of drug labels via the PDR or online EPOCRATES. Finkelstein Decl., Ex. 11, at 16:8-19:3, 35:7-36:5, 41:16-41:20.

Moreover, Plaintiff's marketing expert, Charles King III, Ph.D., also explains how Defendants' extensive marketing of Neurontin for off-label uses influenced healthcare providers like Doctors Crognale and Goldman even in the absence of a specific affirmative misrepresentation:

> 80. Most doctors likely would never had heard of Neurontin but for the off-labeling marketing efforts of Warner-Lambert and allegedly Pfizer. The inability to prove that Warner-Lambert or Pfizer contacted a doctor directly does not mean that that doctor was not influenced by Warner-Lambert and Pfizer marketing efforts. Pfizer's off-label marketing of Neurontin directly influenced all, or substantially all, doctors prescribing Neurontin in one of two ways. First, **a doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did.** Second, all, or substantively all, doctors were indirectly affected by Pfizer's **suppression of negative or adverse information about Neurontin that would have affected their prescribing habits**. [Emphasis added.]

15

Finkelstein Decl., Ex. 16, at p. 44.

In conclusion, reading the record in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that reflect Defendants' fraudulent conduct related to Plaintiff's decedent and her medical prescribers. Consequently, Defendants' motion for summary judgment on Plaintiff's fraud claim should be denied.

## CONCLUSION

As discussed above, Plaintiff expects this Court will deny Defendants' motion to exclude the testimony of Plaintiff's specific causation experts, Dr. Maris and Dr. Kruszewski, and Plaintiff therefore has sufficient evidence on the issue of specific causation and can satisfy his burden of proving proximate cause. Further, in view of the above, it is respectfully requested that this Court deny that part of Defendants' motion for summary judgment on Plaintiff's fraud claim.

Dated:  February 23, 2009                    Respectfully submitted,

                                             Finkelstein & Partners, LLP
                                             *Attorneys for Plaintiff Ronald J. Bulger, Sr.*


                                        By:   **/s/ Andrew G. Finkelstein**
                                             Andrew G. Finkelstein, Esquire
                                             Finkelstein & Partners, LLP
                                             1279 Route 300, P.O. Box 1111
                                             Newburgh, NY  12551


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 23, 2009.

                                              **/s/ Andrew G. Finkelstein**
                                             Andrew G. Finkelstein, Esquire