EXHIBIT 1

**IN THE COURT OF COMMON PLEAS**
**OF PHILADELPHIA COUNTY**

**CIVIL TRIAL DIVISION**

| | | |
|---|---|---|
| **GREGORY CLARK AND LINDA MEASHEY** | : | **June TERM, 2004** |
| **OF HERSELF AND ALL OTHERS** | : | |
| **SIMILARLY SITUATED** | : | |
| | : | |
| | : | |
| **VS.** | : | |
| | : | |
| **PFIZER INC., and WARNER-LAMBERT** | : | **NO. 1819** |
| **COMPANY,LLC** | | |

**ORDER**

AND NOW, this 29th day of June , 2007, it is hereby ORDERED and

DECREED that Plaintiffs' Motion for Class Certification is granted. This certified class is

defined as:

> "All persons who purchased Neurontin, or its generic equivalent, gabapentin, in the
> Commonwealth of Pennsylvania primarily for personal, family or household purposes
> from 1995 to the present, other than for treatment of partial seizures associated with
> epilepsy (as adjunctive therapy), or for management of post-herpetic neuralgia (pain
> associated with herpes zoster skin rash outbreaks."

Plaintiff's counsels are appointed as counsel for the Class. The parties shall submit

proposals for a notification procedure and proposed forms of notice for class members within

thirty days from the date of this Order.  Discovery for trial shall commence.  A new Case

Management Order is issued herewith.

BY THE COURT

MARK I. BERNSTEIN, J.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| GREGORY CLARK AND LINDA MEASHEY | : | June TERM, 2004 |
| OF HERSELF AND ALL OTHERS | : | |
| SIMILARLY SITUATED | : | |
| | : | |
| | : | |
| VS. | : | |
| | : | |
| PFIZER INC., and WARNER-LAMBERT | : | NO. 1819 |
| COMPANY,LLC | | |

CASE MANAGEMENT ORDER
CLASS ACTION TRACK

AND NOW, this **29th** day of **June**, 2007, it is Ordered that the following case

management time standards shall be applicable to this case:

1.  All discovery shall be completed not later than December 31, 2007.

2.  Plaintiff shall identify and submit to all other parties curriculum vitae and expert reports of all expert witnesses intended to testify not later than December 31, 2007.

3.  Plaintiff shall file a Motion for Class Certification not later than December 31, 2007.

4.  Defendant and any additional defendants shall identify and submit to all other parties curriculum vitae and expert reports of all expert witnesses intended to testify not later than January 30, 2008.

5.  Defendant and any additional defendant shall file an Answer to the Motion for Class Certification not later than January 30, 2008.

6.      All dispositive motions, including Frye and Summary Judgment motions, shall be filed not later than January 30, 2008.

7.      A pre-trial conference may be scheduled any time after February 28, 2008. Fifteen days prior to any such conference, all counsel shall serve all opposing counsel and file a pre-trial memorandum containing the following:

   (a)   Plaintiff's memorandum shall include a concise summary of the nature of the claim together with a clear definition of the class sought for certification.

   (b)   Defendant or additional defendant's memorandum shall include a concise summary of the reasons class certification should be denied.

   (c)   A list of all witnesses who may be called to testify by name and address. Counsel should expect witnesses not listed to be precluded from testifying.

   (d)   A list of all exhibits the party intends to offer into evidence. All exhibits shall be pre-numbered and exchanged among counsel prior to the conference. Counsel should expect any exhibit not listed to be precluded.

8.      It is expected that the case will be ready for a ~~Certification Hearing~~ *Trial* at any time after April 1, 2008.


                        BY THE COURT:


                        MARK I. BERNSTEIN, J.
                        TEAM LEADER

IN THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY

CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| GREGORY CLARK AND LINDA MEASHEY | : | June TERM, 2004 |
| OF HERSELF AND ALL OTHERS | : | |
| SIMILARLY SITUATED | : | |
| | : | |
| | : | |
| VS. | : | |
| | : | |
| PFIZER INC., and WARNER-LAMBERT | : | NO. 1819 |
| COMPANY,LLC | | |

## MEMORANDUM OPINION

Plaintiffs, individually and on behalf of all similarly situated purchasers of the drug

Neurontin or its generic equivalent, gabapentin whose prescriptions were written for off-label

uses not approved by the F.D.A., bring this class action lawsuit seeking a refund. The claimed

loss does not exceed $75,000 per class member. Plaintiffs bring claims for Misrepresentation

(Count I); Negligence (Count II); Negligence per se (Count III) and Breach of Express Warranty

(Count IV). The sole issue presently before this court is whether the prerequisites for

certification have been satisfied.

The purpose of class action lawsuits is "to provide a means by which the claims of many

individuals could be resolved at one time, thereby eliminating the possibility of repetitious

litigation and providing small claimants with a method to seek compensation for claims that

1

would otherwise be too small to litigate". DiLucido v. Terminix Intern, Inc., 450 Pa. Super. 393,

397, 676 A.2d 1237, 1239 (Pa. Super. 1996). For a suit to proceed as a class action, Rule 1702 of

the Pennsylvania Rules of Civil Procedure requires that five criteria be met:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
> (4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709;
> (5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Rule 1708 of the Pennsylvania Rules of Civil Procedure requires:

> In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]

a) Where monetary recovery alone is sought, the court shall consider

(1) whether common questions of law or fact predominate over any question affecting only individual members;
(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;
(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of
(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;
(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;
(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;
(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;
(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;
(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

(b) Where equitable or declaratory relief alone is sought, the court shall consider

(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

2

(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b).

The burden of demonstrating each of the elements in Rule 1702 is initially on the moving party. This burden "is not heavy and is thus consistent with the policy that decisions in favor of maintaining a class action should be liberally made." Cambanis v. Nationwide Ins. Co., 348 Pa. Super. 41, 45, 501 A.2d 635, 637 (Pa. Super. 1985).  The moving party needs only present evidence sufficient to make out a prima facie case "from which the court can conclude that the five class certification requirements are met." Debbs v. Chrysler Corp., 2002 Pa. Super. 326, 810 A.2d 137,153-154 (2002)(quoting Janicik v. Prudential Ins. Co., 305 Pa. Super. 120, 451 A.2d 451, 455 (Pa. Super. 1982)) .

In other contexts, the prima facie burden has been construed to mean "some evidence," "a colorable claim," "substantial evidence," or evidence that creates a rebuttable presumption that requires the opponent to rebut demonstrated elements. In the criminal law context, "the prima facie standard requires evidence of the existence of each and every element." Commonwealth v. Martin, 727 A.2d 1136, 1142 (Pa. Super. 1999), alloc. denied, 560 Pa. 722, 745 A.2d 1220 (1999).  However, "The weight and credibility of the evidence are not factors at this stage." Commonwealth v. Marti, 779 A.2d 1177, 1180 (Pa. Super. 2001).

In the family law context, the term "prima facie right to custody' means only that the party has a colorable claim to custody of the child." McDonel v. Sohn, 762 A.2d 1101, 1107 (Pa. Super. 2000).  Similarly, in the context of employment law, the Commonwealth Court has opined that a prima facie case can be established by "substantial evidence" requiring the

3

opposing party to affirmatively rebut that evidence. See, e.g., <u>Williamsburg Community School District v. Com.</u>, <u>Pennsylvania Human Rights Comm.</u>, 512 A.2d 1339 (Pa. Commw. 1986).

Courts have consistently interpreted the phrase "substantial evidence" to mean "more than a mere scintilla," but rather evidence "which a reasonable mind might accept as adequate to support a conclusion." <u>SSEN, Inc., v. Borough Council of Eddystone</u>, 810 A.2d 200, 207 (Pa. Commw. 2002). In <u>Grakelow v. Nash</u>, 98 Pa. Super. 316 (Pa. Super. 1929), a tax case, the Superior Court said: "To ordain that a certain act or acts shall be prima facie evidence of a fact means merely that from proof of the act or acts, a rebuttable presumption of the fact shall be made;…it attributes a specified value to certain evidence but does not make it conclusive proof of the fact in question."

Class certification is a mixed question of fact and law. <u>Debbs v. Chrysler Corp.</u>, 2002 Pa. Super. 326, 810 A.2d, 154 (Pa. Super. 2002). The court must consider all the relevant testimony, depositions and other evidence pursuant to Rule 1707 (c). In determining whether the prerequisites of Rule 1702 have been met, the court is only to decide who shall be the parties to the action and nothing more. The merits of the action and the plaintiffs' right to recover are excluded from consideration. (1977 Explanatory Comment to Pa. R. Civ. P. 1707.) In making a certification decision, "courts in class certification proceedings regularly and properly employ reasonable inferences, presumptions, and judicial notice." <u>Janicik</u>, 451 A.2d at 454, 455. Where evidence conflicts, doubt should be resolved in favor of class certification. Accordingly, this court must refrain from ruling on plaintiff's ultimate right to achieve any recovery, the credibility of the witnesses and the substantive merits of defenses raised.

"The burden of proof to establish the five prerequisites to class certification lies with the class proponent; however, since the hearing on class certification is akin to a preliminary

4

hearing, it is not a heavy burden." Professional Flooring Co. v. Bushar Corp., 61 Pa. D&C 4th 147, 153, 2003 WL 21802073 (Pa. Com. Pl. Montgo. Cty. Apr. 14, 2003), citing Debbs v. Chrysler Corp., 810 A.2d 137, 153-54 (Pa. Super. 2002); Janicik v. Prudential Inc. Co. of America, 451 A.2d 451, 455 (Pa. Super. 1982). See also Baldassari v. Suburban Cable TV Co., 808 A.2d 184, 189 (Pa. Super. 2002); Cambanis v. Nationwide Insurance Co., 501 A.2d 635 (Pa. Super. 1985). The prima facie burden of proof standard at the class certification stage is met by a qualitative "substantial evidence" test.  The burden of persuasion and the risk of non-persuasion however, rest with the plaintiff.

Our Superior Court has instructed that it is a strong and oft-repeated policy of this Commonwealth that, decisions applying the rules for class certification should be made liberally and in favor of maintaining a class action. Weismer by Weismer v. Beech-Nut Nutrition Corp., 615 A.2d 428, 431 (Pa. Super. 1992).  See also Janicik, 451 A.2d at 454, citing and quoting Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968) ("in a doubtful case . . . any error should be committed in favor of allowing the class action").

Likewise, the Commonwealth Court has held that "in doubtful cases any error should be committed in favor of allowing class certification." Foust v. Septa, 756 A.2d 112, 118 (Pa. Commw. 2000).  This philosophy is further supported by the consideration that "[t]he court may alter, modify, or revoke the certification if later developments in the litigation reveal that some prerequisite to certification is not satisfied." Janicik, 451 A.2d at 454

Within this context, the court will examine the requisite factors for class certification.

I. Numerosity

Defendants developed the drug Neurontin. In 1993 Neurontin was approved by the FDA for use as a treatment for epilepsy. In 2002 the FDA approved Neurontin for postherptic neuralgia. Neither law nor professional standards of care prohibits off-label prescription by doctors. However, federal law prohibits a drug manufacturer from promoting off-label uses of an approved medication. At the certification hearing plaintiff produced evidence which, if believed, demonstrates that beginning in 1995, knowing that effectiveness had not been scientifically demonstrated, defendants' deliberately and unlawfully promoted Neurontin to physicians for "off-label use." Defendants did this promotion by "educating" the medical profession to the effectiveness for non-FDA approved use. Defendants "educational" promotions included soliciting anecdotal articles for insertion in medical journals, paying opinion leader physicians, and sponsoring continuing medical education conferences which were actually paid promotional events.

Defendant Warner-Lambert entered into a criminal plea agreement in the Federal District Court of Massachusets in the case of United States of American v. Wavner-Lambert Company, LLC, (U.S. D.C. MA) on charges of violations of Title 21 United States Code Sections 331(a), 331(d), 352(f)(1) and 355(a). As part of that plea agreement the defendant agreed to a fine of Two Hundred and Forty Million Dollars to be paid within 14 days of sentencing. As part of that plea defendant also agreed to cease all attempts to promote the drug for off-label use.

The information to which defendant pled guilty describes defendants activities. It states in pertinent part:

6

## WARNER-LAMBERT'S STRATEGY FOR NEUTRONTIN

"11.   Warner-Lambert conducted evaluations of the market potential for certain of the Unapproved Uses for Neurontin, including but not limited to:  post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

12.   In or about the fall of 1995, Warner-Lambert's southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including conference calls on pain and a pain consultant meeting.

13.   Certain of WARNER-LAMBERT'S annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies, and tactics for increasing sales of the Unapproved Uses of the drug.  The marketing plans budgeted for and funded these tactics.

14.   From early 1995, on repeated occasions, WARNER-LAMBERT determined not to seek FDA approval for certain Unapproved Uses.

15.   In or about April and May of 1995, WARNER-LAMBERT performed a Marketing Assessment of proposed psychiatric indications for Neurontin.  In that Marketing Assessment, WARNER-LAMBERT forecast potential revenue from Neurontin for bipolar and anxiety treatment under two scenarios: with and without FDA approval.  WARNER-LAMBERT's Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the company would not seek approval to promote and sell the drug for those Unapproved Uses.

16.   In or about July of 1995 WARNER-LAMBERT'S assessment of Neurontin's market potential for neuropathic pain was distributed to its Neurontin Development Team and to a Warner-Lambert Vice President for Marketing.  That assessment stated that "there is no intention to fully develop the indication at this point."  Full development would have required submission of an NDA to FDA for approval.

17.   One of the principal factors WARNER-LAMBERT considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that WARNER-LAMBERT had been developing. The company expected this new drug would be approved by FDA not only for epilepsy but also for a variety of uses beyond Neurontin's Approved Use.

18.   Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in WARNER-LAMBERT's original NDA approval for Neurontin. If WARNER-LAMBERT sought and obtained approval for any of the

7

Unapproved Uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those Unapproved Uses. WARNER-LAMBERT was concerned that under those circumstances the generic equivalent would undermine sales of the new drug that was under development.

WARNER-LAMBERT'S PROMOTION OF NEURONTIN FOR UNAPPROVED USES

19.     From in or about June of 1995 through in or about August 20, 1996, by certain of the conduct described in greater detail below, WARNER-LAMBERT promoted the sale and use of Neurontin for certain conditions other than the Approved Use in Massachusetts and elsewhere.

20.     In October 1995, a member of WARNER-LAMBERT'S Epilepsy Disease Team circulated a memorandum to a group including other senior members of WARNER-LAMBERT's Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 WARNER-LAMBERT sales representatives for whom data was available in a two month period, was for off-label use of Neurontin. Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

21.     On or about July 10, 1996, a WARNER-LAMBERT sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

22.     Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could do lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

OFF-LABEL PROMOTION THROUGH MEDICAL LIAISONS

23.     WARNER-LAMBERT employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasion, a WARNER-LAMBERT medical liaison promoted Neurontin for Unapproved Uses:

>           (a)     In or about June of 1996, a WARNER-LAMBERT sales representative requested that a WARNER-LAMBERT medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

>           (b)     The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the

8

sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)     Among the topics of the presentation was the use of Neurontin for Unapproved Uses.

(d)     During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of Unapproved Uses.

(e)     After the presentation, a WARNER-LAMBERT Medical Director praised the event as "another great example of use of the medical liaisons" and an Area Business Manager called it an "outstanding utilization of…one of the medical affairs liaisons."

24.     In or about May 1996, a WARNER-LAMBERT Medical Director based in the Northeast CBU sent a voicemail message to the Medical Liaisons in the Northeast CBU in which he stated:

What we'd like you to do is, any time you're called out just make sure that your main focus out of what you're doing is on Neurontin…When we get out there, we want to kick some ass, we want to sell Neurontin on pain. All right?  And monotherapy and everything that we can talk about, that's what we want to do.

One or more Medical Liaisons in the Northeast CBU interpreted this statement to mean that he or she should promote Neurontin for Unapproved Uses and thereafter, in or about May and June 1996, promoted Neurontin for Neuropathic pain, an unapproved use.

## OFF-LABEL PROMOTION THROUGH CONSULTANTS' MEETING AND ADVISORY BOARDS

25.     WARNER-LAMBERT organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida on April 19-21, 1996.  Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to Unapproved Uses of Neurontin.

26.     WARNER-LAMBERT invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this event, WARNER-LAMBERT paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.  Doctors who acted as faculty were paid between $1,500 and $2,000.

27.     Among the presentations made to the physicians in attendance was one relating to Unapproved Uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In

9

the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was  promoted for use in the treatment of pain.

28.     Another presentation made at the Jupiter Beach Conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol, and pain.

29.     On or about May 8, 1996, following the Jupiter Beach conference, WARNER-LAMBERT circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations. WARNER-LAMBERT told its employees that: "[t]he meeting was a great success and the participants were delivered a hard hitting message about Neurontin." WARNER-LAMBERT distributed to these employees a form entitled "Jupiter Beach Trending Worksheet" which was intended to be used to gauge the effect of the meeting on the prescribing by doctors who attended the Jupiter Beach meeting.

30.     From August 1-5, 1996 WARNER-LAMBERT organized an "advisory board meeting," in Atlanta, Georgia in conjunction with the 1996 Summer Olympics. WARNER-LAMBERT expressly instructed several of the physician speakers to address some of the Unapproved Uses.

31.     During that meeting, WARNER-LAMBERT hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid al the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies. The company had already had numerous opportunities to consult with the doctors, and, in fact, many of them had spoken on WARNER-LAMBERTS's behalf at prior meetings.

32     Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

## OFF-LABEL PROMOTION THROUGH TELECONFERENCES

33.     In or about January, 1996, a WARNER-LAMBERT Vice President of the Southeast Customer Business Unit sent a memorandum to WARNER-LAMBERT sales representatives listing certain goals, including: "Utilize the Medical Liaison Group to target the Neurontin, Pain & Psychiatric market. Objective to conduct twice weekly Pain Teleconferences moderated by key Neuro Consultants. Goals 250 Physicians Participants quarterly."

34.     On or about March 1, 1996, WARNER-LAMBERT sponsored such a teleconference moderated by a WARNER-LAMBERT employee with a pain specialist as a speaker on Neurontin. The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

10

35.     On or about March 28m 1996, a WARNER-LAMBERT Medical Director in the Northcentral Customer Business Unit sent a memorandum to WARNER-LAMBERT Medical Liaisons in that unit instructing them to hold a series of teleconferences with doctors to provide clinical updates on Neurontin, including monotherapy epilepsy data and non-epilepsy use data entitled "Neurontin, A Clinical Update."

36.     In or about May, 1996, a WARNER-LAMBERT Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference."

Evidence was introduced at the Certification hearing that a May 18, 1995 Parke-Davis marketing report affirmatively outlined a "publication strategy" to promote Neurontin for psychiatric uses. Defendants also developed data bases of influential prescribers of Neurontin for off-label uses and affirmatively promoted their views. Defendants provided financial incentives for these influential physicians to prescribe Neurontin off-label. This publication strategy consisted of publicizing positive anecdotal and case study results of off-label uses, financially supporting articles in medical literature which affirmed Neurontin's "emerging uses", and paying for "continuing medical education programs" dinners and teleconferences featuring only presentations by physicians selected because they believed Neurontin was effective in off label uses. The evidence further demonstrated that defendant Warner-Lambert affirmatively recommended that its medical liaisons sales force focus their marketing efforts on selling Neurontin for pain management generally and explained how to answer physicians objections. One internal memo read:

> "One important point first, there have been cases of pharmacists questioning Rxs for NEUTROTIN if the patient does not have epilepsy. To avoid any problems, just tell the physician to write on the Rx pad, *For pain management,* when he/she is Rxing NEURONTIN."

11

At least 200,000 prescriptions were written in Pennsylvania. Defendants sold between $53,000,000.00 and $64,000,000.00 dollars of the drug per quarter in Pennsylvania. At the certification hearing Plaintiffs presented expert testimony that Parke-Davis' off-label marketing efforts resulted in a significant increase in the prescription of Neurontin for off-label uses even though no scientifically reliable studies have ever demonstrated effectiveness for off-label use.

To be eligible for certification, Appellant must demonstrate that the class is "so numerous that joinder of all members is impracticable." Pa.R.C.P. 1702(1). A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should plaintiffs sue individually." *Temple University v. Pa. Dept. of Public Welfare,* 30 Pa.Cmwlth. 595, 374 A.2d 991, 996 (1977) (123 members sufficient); [FN4] *ABC Sewer Cleaning Co. v. Bell of Pa.,* 293 Pa.Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin, Inc. v. Bell Tel. Co. of Pa.,* 291 Pa.Super. 40, 435 A.2d 208 (1981) (204 plaintiffs sufficiently numerous). Appellant need not plead or prove the actual number of class members, so long as he is able to "define the class with some precision" and provide "sufficient indicia to the court that more members exist than it would be practicable to join." *Janicik,* 451 A.2d at 456. Since the evidence demonstrated that the improper promotion of Neurontin for off-label use significantly increased the prescribing behavior of the medical community in the United States generally and in Pennsylvania specifically and that hundreds of thousands of prescriptions were written during the relevant time period, numerosity has been established.

II. Commonality

12

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa. R. Civ. P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct on the part of the class opponent." Janicik, supra. 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." Weismer by Weismer v. Beechnut Nutrition Corp., 419 Pa. Super. 403, 615 A.2d 428 (Pa. Super. 1992). However, where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. Janicik, supra. 457.

"While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." D'Amelio v. Blue Cross of Lehigh Valley, 347 Pa. Super. 338, 487 A.2d 995, 997 (Pa. Super. 1985). In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. "Once a common source of liability has been clearly identified, varying amounts of damages among the plaintiffs will not preclude class certification." See Weismer by Weismer v. Beech-Nut Nutrition Corp., 419 Pa. Super. 403, 409, 615 A.2d 428, 431 (Pa.Super.). Where there exists intervening and possibly superseding causes of damage however, liability cannot be determined on a class-wide basis. Cook v. Highland Water and Sewer Authority, 108 Pa. Cmwlth. 222, 231, 530 A.2d 499, 504 (Pa. Cmwlth.1987).

Related to this requirement for certification is whether trial on a class basis is a fair and efficient method of adjudication under the criteria set forth in Rule 1708. In addition to the existence of common questions of law and fact, plaintiffs must also establish that the common

13

issues predominate.  Accordingly the analysis of predominance under Rule 1708 (a) (1) is

closely related to that of commonality under Rule 1702(2).  <u>Janick</u>, supra.   451 A.2d at 461.

Plaintiff proposes to certify a class for trial as follows:

> "All persons who purchased Neurontin, or its generic equivalent, gabapentin, in the
> Commonwealth of Pennsylvania primarily for personal, family or household purposes
> from 1995 to the present, other than for treatment of partial seizures associated with
> epilepsy (as adjunctive therapy), or for management of post-herpetic neuralgia (pain
> associated with herpes zoster skin rash outbreaks)."

Dr. Mark Levine, a professor of pharmaceutical science at the University of British

Columbia by his report attested to the generally accepted scientific standards for demonstrating

efficacy and efficiency of a new drug. He conducted a literature review of Neurontin. He

concluded to a reasonable degree of scientific certainty that Neurontin has not been demonstrated

to be effective for off-label non-FDA approved uses.  He states: "…it is not scientifically sound

to say that sufficient evidence of a drug's effectiveness exists unless there has been at least one

well-structured RCT to support that conclusion.  The other types of evidence are simply

insufficiently robust to constitute strong evidence of efficacy/effectiveness in the absence of

proper RCTs."

Defense experts concede that there has never been a randomized controlled study (RCT)

which demonstrated effectiveness for off-label uses.  They support writing off-label prescriptions

on the basis of uncontrolled case reviews and case reports.  The testimony of Dr. B. Franklin

Diamond the Chief of the Division of Neurology and Director was presented by the defense. Dr.

Diamond testified that it is proper for Physicians to prescribe medications off-label.  His

conclusions supporting off-label use was based entirely upon his own clinical judgment,

14

experience and reliance upon case studies published in the medical literature.[1] He admits that other small controlled studies on the relevant issues were inconclusive. He testified that physician prescription decisions are based upon "less well-controlled trial, the opinions of their colleagues, the opinions of experts in the field and, most importantly, reactions of their patients." He conceded, however, that case studies are not considered valid scientific proof of effectiveness.[2] He explained that such anecdotal reports in literature cannot demonstrate effectiveness because "there's no control"[3] and therefore are incapable of properly analyzing the reason for relief of symptoms.

The defendant's business plan said "Medical education drives this market." As demonstrated prima facie at the certification hearing, their multifaceted marketing approach promoting off-label use included a $40 Million advertising and promotional budget two-thirds of which was allocated for "professional education." Physicians who frequently prescribed anticonvulsant agents were targeted. Another targeted group were physicians influential among colleagues. "Local Champions" were identified for "peer to peer" influence programs. Medical "thought leaders" "Key influences" and "movers and shakers" were identified. These influential physicians were given honoraria, research and grants.

Plaintiff offered into evidence a review of the defendants' promotion of Gabapentin which had been published in the Annals of Internal Medicine[4]. This article reviewed public documents revealed by the defendant's criminal prosecution. The conclusion of those authors was:

---

[1] It is these case studies which plaintiff claims were unlawfully supported and improperly promoted by defendant.
[2] N.T. 11/21/06 pg. 78, 79.
[3] N.T. pg. 80.
[4] Exhibit 213.

15

"The promotion of gabapentin was a comprehensive and multifaceted process. Advisory boards, consultants meetings, and accredited continuing medical education events organized by third-party vendors were used to deliver promotional messages. These tactics were augmented by the recruitment of local champions and engagement of thought leaders, who could be used to communicate favorable messages about gabapentin to their physician colleagues. Research and scholarships were also used for marketing by encouraging "key customers" to participate in research, using a large study to advance promotional themes and build market share, paying medical communications companies to develop and publish articles about gabapentin for the medical literature, and planning to suppress unfavorably study results."

The authors concluded: "…the techniques used to promote gabapentin illustrate how commercial interests can intrude into the practice of medicine in both visible and hidden ways." Whether these conclusions are warranted by the defendants own internal documents and whether plaintiffs' claims can be proven at trial remain to be seen. However if plaintiffs can demonstrate at trial a comprehensive marketing scheme to unlawfully promote the off-label use of an FDA approved medication amounting to fraud on the medical community a classwide claim has been proven.

Upon cross-examination Dr. Diamond admitted that he had exaggerated the truth in his report. In his report Dr. Diamond said that the effectiveness of neurontin has been demonstrated in clinical trials in patients suffering from Reflex Sympathetic Dystrophy. He conceded in Court, however, that this suggestion that effectiveness in treating Reflex Sympathetic Dystrophy had been "demonstrated in clinical trials" was inaccurate.[5]

As to causation plaintiffs presented the report of Dr. Meredith Rosenthal an Assistant Professor of Health, Economics and Policy at the Harvard School of Public Health. She states:

---

[5] N.T. 11/21/06, pgs. 98-99. Dr. Diamond's report also contains a remarkable indictment of our entire governmental regulatory scheme for prescription drugs. He says: "If a physician were limited to using drugs that had completed clinical trials for specific indications, there would be relatively few patients treated for anything successfully."

16

"In summary, I find that the unlawful conduct alleged in the Complaint would likely have resulted in impact to the Class.  Specifically, a large body of economic theory and empirical evidence suggests that pharmaceutical company marketing activities increase prescribing…Moreover, if Defendant's off-label promotion of Neurontin is proven to be illegal, it is feasible to quantify the causal effect of specific promotional strategies on off-label prescribing".  Dr Rosenthal concluded that there was "marked increases in prescribing for migraine, pain and psychiatric uses….immediately after Parke-Davis documents show the launch of off-label marketing campaigns specific to each of those categories of indications."[6]

The fact that the substance of the alleged improper marketing activity consisted of the pretense of scientific education rather than catchy jingles does not change the common sense observation that targeted promotional activity works.  Even the defense experts agreed that physicians obtain their prescribing information in precisely the ways defendants targeted; pharmaceutical representatives, other physicians' recommendations, medical literature, case reviews, medical conferences and the medical community's shared information and understanding.[7]

The claims of plaintiff class, if ultimately proven at trial, amount to an unlawful manipulation of medical literature, medical opinion, and a fraud upon the entire medical community of the country.

---

[6] Indeed, ever since Coca Cola decided to create brand identification through advertising, it has been known that marketing campaigns and advertising work.  $200,000,000,000.00 is spent annually upon marketing and advertising in America.

[7] Defense experts Jefferson and Greist acknowledge in their reports that their opinions as to the effectiveness of Neurontin in psychiatric treatment are based exclusively on case reviews and case reports.

17

Since plaintiffs claim reimbursement for the costs of off-label prescriptions, it is clear that common questions predominate. Individual issues do not prohibit certification. The plaintiffs have proven the requirement of commonality.

III. Typicality.

The claimants must also meet the requirement of typicality. The third step in the certification test requires the plaintiff to show that the class action parties' claims and defenses are typical of the entire class. The purpose behind this requirement is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members, to ensure that pursuit of their interests will advance those of the proposed class members. DiLucido v. Terminix Intern, Inc., 450 Pa. Super. 393, 404, 676 A.2d 1237, 1242 (Pa. Super. 1996).

The named Plaintiffs herein purchased Neurontin prescribed for off-label use. Plaintiff Meashey was prescribed Neurontin for the treatment of the psychiatric condition of Bi-Polar disease and Mr. Clark was prescribed Neurontin for Knee pain. In the only significant aspect, namely Neurontin having been prescribed off-label for non FDA approved useage, the named plaintiffs are congruently typical of every other member of the class. The Court finds that the claims presented satisfy the typicality requirement of Rule 1702 (3).


IV. Adequacy of Representation

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa. R. Civ. P. 1702 (4). In determining whether the representative parties will fairly and adequately represent the interests of the class, the court shall consider the following:

18

"(1) whether the attorney for the representative parties will adequately represent the interests of the class,

(2) Whether the representative parties have a conflict of interest in the maintenance of the class action, and

(3) Whether the representative parties have or can acquire financial resources to assure that the interests of the class will not be harmed."
Rule 1709.

"Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." Janicik, 305 Pa. Super. at 136, 451 A.2d at 458. "Courts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." Janicik, 305 Pa. Super. at 136, 451 A.2d at 458.

The Court is familiar with the legal work of local plaintiffs' counsel, and knows that the firm represents its clients at the highest levels of professional competence and professionalism. The Adequacy of Representation requirement of Rule 1702 (4) has been met. Defendants do not challenge the sincereity, adequacy, honesty or character of the personal representatives. The criteria of adequacy of representation has been met.

V. Fair and Efficient Method of Adjudication

The final criteria under Pa. R. Civ. P. 1702 is a determination of whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708. Since the court has determined that a Class satisfies the other requirements of Pa. R. Civ. P. 1702 and plaintiffs do not request equitable relief, it is not necessary to consider subdivision (b) of Rule 1708.

1. Predominance of Common Questions of Law and Fact

19

The most important requirement in determining whether a class should be certified under Rules 1702 (5) and 1708 (a) (1) is whether common questions of law and fact predominate over any question affecting only individual members. In addition to demonstrating the existence of common questions of law and fact, plaintiffs must also establish that common issues predominate. The analysis of predominance under Rule 1708 (a) (1) is closely related to that of commonality under Rule 1702(2). Janick, supra. 451 A.2d at 461. The court adopts and incorporates its analysis of commonality and concludes that the requirement of predominance has been satisfied

　　2. The Existence of Serious Management Difficulties

　　　　Under Pa. R. Civ. P. 1708 (2), a court must also consider the size of the class and the difficulties likely to be encountered in the management of the action as a class action. While a court must consider the potential difficulties in managing the class action, any such difficulties generally are not accorded much weight. Problems of administration alone ordinarily should not justify the denial of an otherwise appropriate class action for to do so would contradict the policies underlying this device. Yaffe v. Powers, 454 F.2d 1362 (1st Cir. 1972). Rather, the court should rely on the ingenuity and aid of counsel and upon its plenary authority to control the action to solve whatever management problems the litigation may bring. Id (citing Buchanan v. Brentwood Federal Sav. and Loan Ass'n, 457 Pa. 135, 320 A.2d 117, 131 (Pa. 1974)).

　　The court is confident that any individualized issues of payment of damages that may eventually exist should plaintiff prevail on their overriding common issues of liability can be justly resolved by any one or combination of a number of common class action management tools. Whatever management problems remain, this court is confident that the ingenuity and aid

of counsel can justly resolve in accord with this certification decision. <u>Janicik</u>, 305 Pa. Super. at
142, 451 A.2d 462.

    3. Potential for Inconsistent Adjudications

        Pennsylvania Rule 1708 (a) (3) also requires a court to evaluate whether the
prosecution of separate actions by individual members of the class would create a risk of
inconsistent or varying adjudications with respect to individual members of the class.   In
considering the separate effect of actions, the precedential effect of a decision is to be considered
as well as the parties' circumstances and respective ability to pursue separate actions. <u>Janicik</u>,
305 Pa. Super. at 143, 415 A.2d at 462.

    A substantial risk of inconsistent adjudications exists if individual actions are pursued in
these cases.  As a certified class, one case can determine liability and a vast multiplicity of
litigation is rendered unnecessary.  By this class action and the potential for inconsistent
adjudications is avoided.

    4.  Extent and Nature of any Preexisting Litigation and the Appropriateness of this
       Forum

        Under Pa. R. Civ. P. 1708 (a) (4) and (a) (5), a court should consider the extent
and nature of any litigation already commenced by or against members of the class involving any
of the same issues.  Although preexisting litigation exists the court is aware of no conflicting
litigation concerning the Pennsylvania plaintiffs in this Pennsylvania certified class.  This court
finds that this forum is appropriate to litigate the claims presented. The Court of Common Pleas
of Philadelphia County Complex Litigation Center has achieved a well earned national
reputation for excellence in the expeditious and just case management and trial of complex mass
tort and class action matters.  This Court has handled all class action matters in Philadelphia

21

County for almost two years, trying three to verdict. This is an appropriate forum for this class action concerning only Pennsylvania residents.

     5.    The Separate Claims of the Individual Plaintiffs are Insufficient in Amount to Support Separate Claims or their Likely Recovery.

     Rule 1708 also requires the court to consider the amount of damages sought by the individual plaintiffs in determining the fairness and efficiency of a class action. Thus, a court must analyze whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate amounts. Pa. R. Civ. P. 1708 (a) (6). Alternatively, the rules ask the court to analyze whether it is likely that the amounts which may be recovered by individual class members will be so small in relation to the expense and effort of the administering the action as not to justify a class a action. Pa. R. Civ. P. 1708 (a) (7). This criteria is rarely used to disqualify an otherwise valid class action claim.[8] (Trial court erred in refusing to certify a class on the grounds that the class members' average claim was too small in comparison to the expenses incurred.)

     In this action which involves individual prescription costs. This criteria has been met.

     6.    Appropriateness of Equitable or Declaratory Relief

     Since plaintiffs do not seek equitable relief it is not necessary to consider the criteria set forth in Pa. R. Civ. P. 1708 (b).

     Having weighed the Rule 1702 requirements, this court finds that a class action is a fair and efficient method for adjudicating plaintiffs' claims and an appropriate Order is issued herewith.

---

[8]See Kelly v. County of Allegheny, 519 Pa. 213, 215, 546 A.2d 608, 609 (Pa.1988 ).

22

CONCLUSIONS OF LAW

1. The class is sufficiently numerous that joinder of all its members would be impracticable.

2. There are questions of law and fact common to the Class.

3. The claims of Plaintiff are typical of the class claims.

4. Plaintiffs will fairly and adequately assert and protect the interests of the Class.

5. Allowing Class claims provides a fair and efficient method for adjudication of the criteria set forth in Pa. R. Civ. P. 1708.

CONCLUSION

For these reasons, Plaintiffs' Motion for Class Certification is granted. Plaintiffs' counsels are appointed as counsel for the Class. The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within thirty days from the date of this Order. Discovery for trial shall commence. A new Case Management Order shall be issued.

A contemporaneous order consistent with this Opinion is filed.

BY THE COURT

6/29/06
DATE

MARK I. BERNSTEIN, J.

23