# EXHIBIT 7

## Page 345

```
 1
 2           UNITED STATES DISTRICT COURT
 3            DISTRICT OF MASSACHUSETTS
 4   ---------------------------X
 5   In re: NEURONTIN MARKETING    MDL Docket No. 1629
 6   SALES PRACTICES, AND PRODUCTS  Master File No.
 7   LIABILITY LITIGATION          04-10981
 8   ---------------------------X
 9
10           VIDEOTAPED DEPOSITION OF JANETH TURNER
11                  New York, New York
12                   October 12, 2007
13
14
15
16
17
18
19
20   Reported by:
       Bonnie Pruszynski, RMR
21
22
23
24
25
```

## Page 346

```
 1
 2   STATE OF NEW YORK
 3   COUNTY OF NEW YORK
 4   ---------------------------x
 5   IN RE NEURONTIN PRODUCT
 6   LIABILITY LITIGATION    Index Number 765000
 7   ---------------------------x
 8
 9
10
11          VIDEOTAPED DEPOSITION OF JANETH TURNER
12                  New York, New York
13                   October 12, 2007
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 347

```
 1
 2
 3
 4                    October 12, 2007
 5                       9:10 a.m.
 6
 7
 8          VIDEOTAPED DEPOSITION OF JANETH
 9   TURNER, held at DAVIS, POLK & WARDWELL, LLP,
10   450 Lexington Avenue, New York, New York,
11   before Bonnie Pruszynski, a Notary Public of
12   the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 348

```
 1
 2   A P P E A R A N C E S:
 3   FINKELSTEIN & PARTNERS
       Attorneys for Product Liability Plaintiffs
 4        785 Broadway, Third Floor
          Kingston, New York 12401
 5   BY:   ANDREW G. FINKELSTEIN, ESQ.
 6
 7   ROBINS, KAPLAN, MILLER & CIRESI
       Attorneys for Plaintiffs
 8        2800 LaSalle Plaza
          800 LaSalle Avenue
 9        Minneapolis, MN
       BY:   ANNAMARIE DALEY, ESQ.
10
11   GREENE & HOFFMAN
       Attorneys for Plaintiffs
12        125 Summer Street, Suite 1410
          Boston, MA 02110
13        ILYAS RONA, ESQ.
14
15   GOODELL, DeVRIES, LEECH & DANN, LLP
       Attorneys for Defendant Pfizer
16        One South Street, 20th Floor
          Baltimore, Maryland 21202
17   BY:   RICHARD M. BARNES, ESQ.
18   SHOOK, HARDY & BACON, LLP
       Attorneys for Defendant Pfizer
19        2555 Grand Boulevard
          Kansas City, Missouri 64108
20   BY:   VINCENT GUNTER, ESQ.
21
       ALSO PRESENT:  Keith Altman, Finkelstein &
22          Partners
23          Christine Mylod, Pfizer paralegal
24
25
```

**373**

1        Janeth Turner
2    Advisory Committee briefing document.
3    Q    Let me hand over to you what is
4    marked as Turner 35. If you could keep 31 in
5    front of you also, please.
6    A    Okay. 34 and all that are over here.
7    Okay. Okay.
8        (Turner Exhibit Number 35 marked for
9        identification as of this date.)
10   A    I'm sorry, that was a long contact.
11   Yes, I have read it.
12   Q    I draw your attention to cover page,
13   where it says purpose of contact.
14   A    Yes.
15   Q    Actually, before we do, the date is
16   December 9, 1992?
17   A    December 9.
18   Q    Is that your signature on the top?
19   A    Yes, it is.
20   Q    Where it says initiated by PD. Does
21   that mean you made the phone call?
22   A    Yes.
23   Q    And where it says made it, a phone
24   call?
25   A    Yes.

**374**

1        Janeth Turner
2    Q    Who was the phone call made to?
3    A    I -- it says Russel Katz, but I am
4    sure I called Nancy Chamberlain. When you are
5    doing something like this, you are having a
6    telephone, more like a conference call with the
7    agency. Nancy Chamberlain and Dr. Katz would be
8    in one room at FDA, and we would be in another
9    room at Parke Davis, and I would call Nancy
10   Chamberlain, and we would initiate the
11   conversation.
12   Q    And the purpose of contact says
13   request for clarification of FDA briefing
14   document.
15   A    Request for clarification from FDA
16   briefing document.
17   Q    And the briefing document that
18   references, is that what is contained in Turner
19   31?
20   A    Yes. It would have been. This was
21   dated December 7, this is dated December 9.
22   Q    And present for Parke Davis, was
23   yourself, Jan Turner.
24   A    Um-hum.
25   Q    Richard Spivey.

**375**

1        Janeth Turner
2    A    My boss.
3    Q    Mark Pierce.
4    A    He had taken over as the medical
5    monitor for gabapentin.
6    Q    And Mickey Fletcher.
7    A    Mark Pierce is a physician, an M.D.
8    And Mickey Fletcher, he was the -- what did we
9    call them. He reported -- the project manager.
10       He reported to the drug development
11   vice president for the Neurontin Development Team.
12   Q    Who was that, the vice president, do
13   you know?
14   A    At that -- at this time it was Ron
15   Martin.
16   Q    And present from the FDA was Russ
17   Katz and Nancy Chamberlain?
18   A    Yes.
19   Q    And it was a conference call?
20   A    Yes.
21   Q    The request for clarification from
22   the FDA briefing document.
23   A    Um-hum.
24   Q    And then we will talk about the
25   information contained in a moment.

**376**

1        Janeth Turner
2    I just want to ask very simply, did
3    the members that were present on the phone from
4    Parke Davis have the briefing document for
5    purposes of this discussion?
6    A    Yes. They must have. I'm assuming
7    they did, because we had already started preparing
8    some responses to a couple of things that they had
9    talked about in there.
10   Q    And do you know how long this
11   conversation lasted?
12   A    No, I don't.
13   Q    And was the conversation related to
14   the safety and efficacy of the patients with
15   epilepsy?
16   A    Okay. The first would have been
17   safety, because this is where they are going to
18   talk about carcinogenicity. So, yes, that one is
19   safety.
20   Q    I just -- I appreciate you going
21   through it. I'm not going to stop you. I just
22   want, just so you answer my question, safety and
23   efficacy as relates to the epilepsy population.
24       So, if it's not, I would appreciate
25   you pointing it out; if it is --

### Page 377

1  Janeth Turner
2   MR. BARNES: Make sure, I didn't
3  understand your question. So what is your
4  question?
5   Q  My question very simply is the
6  conversation that is contained and described in
7  Turner 35 related to the safety and efficacy of
8  the epilepsy population?
9   A  Okay. For the first paragraph, it's
10  related to safety for all human beings.
11   Q  Okay.
12   A  This -- these are, this was a study
13  done in mice, I think, is the one that they are
14  talking about. And these are standard studies
15  that are done for any drug that is given
16  long-term. So this applies to everybody.
17   Q  And it relates to cancer; right?
18   A  Yes.
19   MR. BARNES: In animals.
20   Q  In animals.
21   A  In animals. And how it, I mean, FDA
22  is always trying to predict whether it applies to
23  humans or not, and it's an unresolved issue.
24  Okay.
25   Gabapentin patient population

### Page 378

1  Janeth Turner
2  increase in seizures, the increase in seizures,
3  which was assigned FDA request number 125, would
4  be dealing with efficacy, which, of course, would
5  be patients with epilepsy, okay.
6   Literature references for sudden
7  death in epilepsy, that would deal with the
8  epilepsy population, of course.
9   And B-18 appendix, one page,
10  distribution of patients by number of days with
11  missed doses of study drug.
12   Whoa. I would have to assume that
13  this dealt with patients with epilepsy, because
14  you were most concerned about missed doses of drug
15  during the double blind phase; therefore, if it
16  was a double blind study, presumably this was
17  epilepsy. This has nothing to do with safety or
18  efficacy. This was to do with patient compliance.
19   Q  Again, just related to the epilepsy
20  population or something different?
21   A  Yes. This would be the epilepsy
22  population, because 877210.P was an study in
23  epilepsy.
24   Seizure frequency data, where only a
25  seizure flurry was reporter; that would be

### Page 379

1  Janeth Turner
2  efficacy in epilepsy. So, that answers your
3  question.
4   Q  If Parke Davis raised issues for
5  clarification at this phone conference, would you
6  have put in this Record of Contact.
7   A  I put everything Parke Davis raised
8  in this Record of Contact, and everything FDA
9  raised would be in this Record of Contact, and
10  copies of it were sent it to everyone in
11  attendance at Parke Davis.
12   And if I missed anything, they sure
13  would have let me know. I don't recall anyone
14  ever calling me and saying you missed something.
15  I was pretty thorough.
16   Q  And the page three distribution?
17   A  Oh, my, yes. It went to lots of
18  people.
19   Q  What I want to ask is PC just means
20  what, stands for what?
21   A  Well --
22   Q  On the right it says action and then
23  PC.
24   A  It's like a copy, maybe it's a
25  personal copy. I don't know what it stood for.

### Page 380

1  Janeth Turner
2  It meant they all got copies. And action were the
3  guys that were - they had to do the responses at
4  this point in time. We had to get them back right
5  away.
6   Poor Linda LaMoreaux. She did them
7  already.
8   Q  So, you have are several people
9  listed there and then you have CBIAA, RAAA, CI-1.
10  Those aren't people. What is that?
11   A  CBI was the, it was an official
12  document area, and it was located downstairs.
13  What did CBI stand for? I don't remember what it
14  stands for.
15   Q  Okay.
16   A  So, we kept a file there.
17   And we also kept a file, a regulatory
18  file in -- right there on our floor, where you
19  could go in very quickly and easily and see
20  things. We could check those out. You could
21  never touch anything in CBI.
22   Q  Do you know when you distributed what
23  is set forth as Turner 35, this record of contact,
24  did you also distribute what is set forth in
25  Turner 31, the briefing document?

**381**

1              Janeth Turner
2      A     I don't have on here who I sent the
3   briefing document to.
4      Q     On Turner 31? You don't have that.
5      A     That's this thing, with my Record of
6   FDA Contact.
7            I don't know why it doesn't list who
8   I sent it to. I can't explain that. I don't
9   know.
10     Q     That's what I am asking.
11     A     Maybe the mail copy got here before
12  this copy, I don't recall. But I was just sending
13  it to CBI and our regulatory files.
14     Q     My question is very simple.
15     A     Okay.
16     Q     This, what is set forth in 35,
17  describes a distribution list of several people
18  and I want to just ask you was that distribution
19  list limited to the FDA Record of Contact or did
20  it also include, the subject of the briefing
21  document, include the actual briefing document?
22     A     I don't know.
23     Q     Okay.
24     A     I know that Mark Pierce must have had
25  a copy, Linda LaMoreaux must have had a copy,

**382**

1              Janeth Turner
2   because they were part of doing our responses to
3   it. But, as I said, in response to your simple
4   question, it's not on this Record of FDA Contact;
5   therefore, I don't have a record of who got it.
6   Okay?
7      Q     The Neurontin Drug Development Team
8   that you were a member of --
9      A     Yes.
10     Q     -- that development team dealt with
11  evaluating new indications; correct?
12     A     Post approval.
13     Q     Post approval?
14     A     Of the initial indication, yes.
15     Q     And while you were a member of that
16  development team, were you more than a scribe?
17  Did you participate and vocalize any opinions?
18           MR. BARNES: Objection.
19     A     I don't understand that at all.
20           Was I more than a scribe? You mean
21  did I sit there and write things down?
22     Q     Right.
23     A     That was the job of the project
24  manager. I did not take minutes at those
25  meetings.

**383**

1              Janeth Turner
2      Q     Well, did you actively participate in
3   any of those meetings?
4      A     I'm sure I did. I represented U.S.
5   Regulatory Affairs.
6      Q     And it was your job, as representing
7   U.S. Regulatory Affairs at this meeting, to
8   communicate what? Why were you at the meeting?
9      A     I was at the meeting because when we
10  did new indications, they would eventually be
11  filed with the FDA and I was there to make certain
12  that when we did our studies, that we did them
13  according to what FDA would warrant and we could
14  submit the data to the FDA.
15     Q     Was your part, was part of your role
16  as the Regulatory Affairs member of the new drug
17  committee?
18     A     Drug development team.
19     Q     I'm sorry. Drug development team, to
20  communicate prior experiences with the FDA as it
21  relates to Neurontin?
22     A     I don't understand that question.
23     Q     Were you intended to sit in this team
24  with the knowledge of having gone through the NDA
25  application for the originally approved

**384**

1              Janeth Turner
2   indication?
3      A     I think a large majority of the
4   people on this team were on the team when we filed
5   the NDA, so, we all went through it together.
6      Q     And your role, did it include
7   communicating to the team interactions with the
8   FDA during the original approval process?
9      A     It would depend on what the
10  interaction was about. If you were a member of
11  the team, and the interaction had to do with your
12  area of responsibility, yes. I don't think I
13  routinely sent every FDA contact that I made with
14  the agency to every member of the drug development
15  team. That would be -- you can look at every one
16  of the contacts, people I sent a copy to on here,
17  and we could verify that, indeed, there were times
18  that I didn't send it to everybody. I decided who
19  would get it, but I think I always sent it to the
20  drug development team chair.
21           Again, you would have to look at it.
22  I don't recall.
23           And he could send it to the team if
24  he wished. I don't recall that happening, but --
25  do you want me to look at a couple, and see if I