# EXHIBIT 10

Page 1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF MASSACHUSETTS |
| 3 | MDL Docket No. 1629 |
| 4 | Master File No. 04-10981 |
| 5 | ************************************** |
| 6 | IN RE: NEURONTIN MARKETING, SALES |
| 7 | PRACTICES AND PRODUCTS |
| 8 | LIABILITY LITIGATION |
| 9 | ************************************** |
| 10 | THIS DOCUMENT RELATES TO: |
| 11 | RONALD J. BULGER, SR., as Administrator |
| 12 | of the Estate of Susan Bulger, Deceased |
| 13 | ************************************** |
| 14 | CONTAINS CONFIDENTIAL INFORMATION |
| 15 | VIDEOTAPED DEPOSITION OF |
| 16 | DINO A. CROGNALE, MD |
| 17 | |
| 18 | Held At: |
| | Hare & Chaffin |
| 19 | 160 Federal Street |
| | Boston, Massachusetts 02110 |
| 20 | |
| | March 25th, 2008 |
| 21 | 10:24 AM |
| 22 | |
| | Reported By: Maureen O'Connor Pollard, RPR, CLR |
| 23 | |
| 24 | Videographer: Shawn Budd |

Page 2

1   APPEARANCES:
2   FOR THE PLAINTIFF:
3     BY: ANDREW G. FINKELSTEIN, ESQ.
4     FINKELSTEIN & PARTNERS
5     436 Robinson Avenue
6     Newburgh, New York 12550
7     800-634-1212
8     fink33@mac.com
9
10  FOR THE DEFENDANTS:
11    BY: DAVID B. CHAFFIN, ESQ.
12    HARE & CHAFFIN
13    160 Federal Street
14    Boston, Massachusetts 02110
15    617-330-5000
16    dchaffin@hare-chaffin.com
17
18  FOR THE DEPONENT:
19    BY: JAMES A. BELLO, ESQ.
20    MORRISON MAHONEY LLP
21    250 Summer Street
22    Boston, Massachusetts 02210-1181
23    617-737-8803
24    jbello@morrisonmahoney.com

Page 3

1               INDEX
2   EXAMINATION                           PAGE
3   DINO A. CROGNALE, MD
4    BY MR. CHAFFIN                        6
5    BY MR. FINKELSTEIN                    174
6    BY MR. CHAFFIN                        222
7
8              EXHIBITS
9   NO.      DESCRIPTION                  PAGE
10  Ex. 1    Document Bates stamped BULG
11           00034 through 00110.............   4
12  Ex. 2    Documents Bates stamped
13           000376-28SPR-00003 through
14           00376-28SPR-00123...............   4
15  Ex. 3    Document dated 10/29/07 with
16           attachments.....................   4
17  Ex. 4    Document dated 10/29/07 with
18           attachments.....................   4
19  Ex. 5    Eight page document titled
20           Patient Chart: Vitals Problems
21           and Medications.................   4
22  Ex. 6    Four page printout from US
23           Food and Drug Administration....   208
24  Ex. 7    6/22/06 letter..................   222

Page 4

1              P R O C E E D I N G S
2
3           (Whereupon, Crognale Exhibit Numbers 1
4   through 5 were marked for
5   identification.)
6
7           (Attorney Finkelstein present via
8   speakerphone.)
9           THE VIDEOGRAPHER: Okay. We are on
10  the record.
11          This is the video operator speaking,
12  Shawn Budd. Today's date is March 25th, 2008,
13  and the time is 10:24.
14          We are here at the offices of Hare &
15  Chaffin located in Boston, Massachusetts to take
16  the videotaped deposition of Dr. Dino Crognale
17  in the matter of In Re: Neurontin Marketing,
18  Sales Practices and Products Liability
19  Litigation.
20          Would counsel please introduce
21  themselves?
22          MR. CHAFFIN: Thank you.
23          MR. FINKELSTEIN: Andrew Finkelstein,
24  Finkelstein & Partners, on behalf of the

**13**

1  medical education?
2     A. Yes.
3     Q. Have you ever taken any courses
4  related to suicide in connection with your CME
5  requirements or in any other context?
6     A. Not specific courses. I have been to
7  conferences where that's been a part of the
8  course.
9     Q. Any courses or conferences concerning
10 anti-convulsants?
11    A. Again, not specific courses, but parts
12 of courses.
13    Q. Parts of courses?
14    A. Yes.
15    Q. When was that?
16    A. You know, I can't speak for sure
17 what -- I don't remember a specific lecture at a
18 specific conference that I can say.
19    Q. Do you have any specific memory of any
20 lectures at the suicide -- at the conference
21 that covered suicide, among other issues?
22    A. No.
23    Q. How about conferences or courses on
24 neuropathic pain?

**14**

1     A. No.
2     Q. Courses or conferences on chronic
3  pain?
4     A. Yes.
5     Q. Do you have a recollection, when did
6  that occur, or can you describe it, please?
7     A. I can -- it was at a Prime Ed
8  conference here in Boston, I don't know which
9  year, it was not this past one but one within
10 the recent past, and it was lecture on low back
11 pain, management of low back pain.
12    Q. Lower back pain?
13    A. Yes.
14    Q. Any discussion of any drug therapy?
15    A. Yeah, there was.
16    Q. Any discussion of Neurontin?
17    A. I can't remember the specifics of what
18 drugs.
19    Q. No recollection of any discussion of
20 any particular drug?
21    A. The only thing I can remember is
22 talking about over the counter medications like
23 Ibuprofen.
24    Q. About what? I'm sorry.

**15**

1     A. Ibuprofen.
2     Q. Ibuprofen.
3        Have you ever been to any courses,
4  seminars involving Neurontin, or at which
5  Neurontin was discussed?
6        (Off the record discussion.)
7        MR. CHAFFIN: We lost you for a few.
8        MR. FINKELSTEIN: It's okay. You can
9  go on. I heard most of it.
10    A. Can you restate that question?
11       BY MR. CHAFFIN:
12    Q. Sure.
13       Did you ever attend any
14 courses/seminars at which Neurontin was
15 discussed that you can recall?
16    A. I can't recall any specifically where
17 Neurontin was the focus. It may have been
18 mentioned in passing.
19    Q. Okay. Are you a member of any medical
20 societies or associations?
21    A. No, I'm not.
22    Q. Do you subscribe, or does your office
23 subscribe to the New England Journal of
24 Medicine?

**16**

1     A. Not currently.
2     Q. The Journal of the American Medical
3  Association?
4     A. No.
5     Q. Any other journals?
6     A. The Journal of -- I'm sorry, not
7  journal. The American Family Physician.
8     Q. Is that true throughout this decade?
9     A. Yes.
10    Q. Does your office subscribe to any
11 psychiatry or neurology journals?
12    A. No.
13    Q. What textbooks, if any, do you
14 typically rely on?
15    A. Primarily Harrison's Internal
16 Medicine.
17    Q. Do you subscribe to the PDR?
18    A. Yes.
19    Q. Personally, or the office?
20    A. The office.
21    Q. And do you review it when it comes out
22 for drugs you prescribe?
23    A. I review, I review drugs as they come
24 up.

**Page 17**

1  Q. And what do you mean by "as they come
2  up"?
3  A. So if there are drugs that have a new
4  indication or a new warning, then I'll review
5  those at that time. But I don't certainly read
6  the PDR from cover to cover.
7  Q. Each year?
8  A. Each year.
9  Q. It's a big book.
10     Do you refer to it before you
11 prescribe a new drug that you haven't prescribed
12 before?
13  A. Yes.
14  Q. Do you refer to it annually for drugs
15 you prescribe on a regularly basis?
16  A. No.
17  Q. No.
18     Do you consult with other physicians
19 concerning drugs, about their risks and
20 benefits?
21  A. Yes.
22  Q. And who are they? What physicians?
23  A. Primarily my colleagues at the
24 practice. And occasionally if it's a specialty

**Page 18**

1  medication then I'll consult, again usually not
2  in a formal consultation, but verbal
3  consultation with one of my partners.
4  Q. What do you mean by that, "a specialty
5  drug"?
6  A. So if I wanted to use one of the newer
7  antibiotics, let's say, I would talk to one of
8  my infectious disease colleagues before
9  prescribing that.
10  Q. Someone out of your practice?
11  A. Someone out of my practice, yeah.
12  Q. How about, have you obtained
13 information about drugs you prescribe regularly
14 during any sorts of meetings or via handouts
15 that you can recall?
16  A. Can you maybe rephrase that?
17  Q. Yes.
18     Do you have any specific recollection
19 of receiving information about drugs you
20 prescribe on a regular basis at meetings, other
21 than the ones you've already described?
22  A. Yes.
23  Q. Any memory of anything like that
24 concerning Neurontin?

**Page 19**

1  A. No.
2  Q. After you completed your residency,
3  where did you go to work?
4  A. I initially worked at Beverly
5  Hospital's Family Practice Residency Program.
6  Q. And what years was that?
7  A. That would have been 2000 to 2002.
8  Q. And then what employment did you have
9  after that?
10  A. After that I started with Danvers
11 Family Doctors.
12  Q. In 2002?
13  A. I was trying to think of this this
14 morning. I think they started the practice in
15 October of 2002, but it could have been 2003. I
16 couldn't really say.
17  Q. Is that the only employment you've had
18 since you started at Danvers Family Doctors?
19  A. Yes.
20  Q. Did you ever serve in the military?
21  A. No.
22  Q. Have you published any peer review
23 literature -- peer reviewed literature?
24  A. No.

**Page 20**

1  Q. Ever been on an editorial board of any
2  medical journal?
3  A. No.
4  Q. Now, would you describe your practice
5  in general terms, please, with particular
6  attention to the period from 2002 or 3 when you
7  joined Danvers Family Practice to the present,
8  please?
9  A. Okay. In the beginning of our
10 practice I primarily worked in the office seeing
11 patients, and then with some hospital work when
12 patients of ours were admitted.
13     Since the beginning of 2007, I have
14 worked in a different capacity again with
15 respect to going to Kenya, starting to
16 transition my practice.
17     Our practice also covers for an acute
18 rehabilitation hospital, and so I've taken over
19 the work as the hospitalist on that floor.
20  Q. And what hospital is that, the acute
21 rehab hospital?
22  A. It's New England Rehabilitation
23 Hospital at Danvers.
24  Q. When did you take on that duty?

### 37

1  Q. Do you use informed consent forms?
2  A. Not generally for all prescribing.
3  Q. When you -- do you have a regular
4  practice with your patients when you're
5  prescribing them a new prescription drug with
6  side effects of discussing with them all of the
7  potential side effects that are listed in the
8  PDR, for example?
9      MR. BELLO: Objection.
10     You may answer.
11 A. I -- my practice is to pick a handful
12 of the most common side effects that are listed
13 in the PDR, or ones that are specifically
14 relevant to them.
15     BY MR. CHAFFIN:
16 Q. Okay. And you discuss those with the
17 patient?
18 A. Yes.
19 Q. But not all the side effects or risks
20 that are listed?
21 A. No.
22 Q. And why is that, that you deal with
23 just a handful?
24 A. Primarily because what we know about

### 38

1  patient's comprehension is they're only likely
2  to remember three or four things that you tell
3  them in an encounter.
4  Q. Do you have a -- is it your general
5  practice that when you prescribe a drug you
6  analyze the available information concerning the
7  drug and do a cost/benefit analysis to determine
8  whether the potential benefit outweighs the
9  risks?
10 A. Yes.
11     MR. FINKELSTEIN: Objection to form.
12     David, you said a cost/benefit. I
13 think you meant to say a risk/benefit?
14     MR. CHAFFIN: Thank you, Andrew.
15     BY MR. CHAFFIN:
16 Q. Let me rephrase the question.
17     Do you do a risk/benefit analysis,
18 Doctor? Is that your general practice?
19 A. Yes.
20 Q. Yes.
21     Now, the information that you consider
22 when you're doing that risk/benefit analysis
23 include the information in the PDR?
24 A. Yes.

### 39

1  Q. Dear Doctor letters?
2  A. I'm sorry, what's a Dear Doctor
3  letter?
4  Q. A letter from a drug company
5  concerning updated information on a drug? Are
6  you familiar with those?
7  A. Can you clarify what that --
8      MR. BELLO: Can you just repeat the
9  question?
10     BY MR. CHAFFIN:
11 Q. Sure.
12     Do you consider Dear Doctor letters,
13 i.e. doctors -- letters from drug companies
14 concerning updated information on a drug?
15 A. Only those that are talking about a
16 new specific piece of information like a new
17 warning or a new side effect or something.
18 Q. And do you consider information you've
19 received from colleagues about their experiences
20 with drugs?
21 A. Yes.
22 Q. Do you consider published literature?
23 A. Yes.
24 Q. Do you consider what you've learned at

### 40

1  seminars or conferences?
2  A. Yes.
3  Q. And your own experiences with the
4  drugs, you consider that as well, right?
5  A. Yes.
6  Q. Anything else that you take into
7  account when you do the risk/benefit analysis?
8      MR. CHAFFIN: I thank you, again,
9  Mr. Finkelstein for the correction.
10 A. The patient's record, the patient's
11 own history.
12     BY MR. CHAFFIN:
13 Q. Is it fair to say that you only will
14 prescribe a drug for a patient when you've
15 satisfied yourself that the potential benefits
16 of the drug outweigh the potential risks?
17 A. Yes.
18     MR. BELLO: Note my objection.
19     BY MR. CHAFFIN:
20 Q. And if that balance changes, i.e. it's
21 appearing that the risks are becoming greater
22 than the potential benefits or the benefits, you
23 just take the patient off the drug?
24     MR. BELLO: Objection as well.

**Page 65**

1  A. Yes.
2  Q. Did you look at Dr. Mengel's records
3  of his treatment of Mrs. Bulger in preparation
4  for the deposition today, the pages in this 1 to
5  76?
6  A. Yes.
7  Q. You did. Okay.
8     And you notice that Dr. Mengel's
9  entries are --
10    MR. CHAFFIN: Give me one second,
11 Andrew, please. I'm just trying to find the
12 start point --
13    MR. FINKELSTEIN: No problem.
14    MR. CHAFFIN: -- for Dr. Crognale.
15    MR. BELLO: Are you looking for a
16 date?
17    MR. CHAFFIN: I'm looking for a page
18 actually.
19    BY MR. CHAFFIN:
20 Q. Doctor, if you turn to Page 58. Let's
21 look at 57 to 58 in this record.
22    MR. BELLO: I don't have a copy of
23 what he has.
24    MR. CHAFFIN: I'll give you one.

**Page 66**

1     MR. BELLO: Do you have one?
2     MR. CHAFFIN: I do. Sure. Here you
3  go (handing).
4     MR. BELLO: Thanks.
5     BY MR. CHAFFIN:
6  Q. And you know what numbers I'm looking
7  at, the upper right-hand side, Doctor?
8  A. Yes, I do, yes.
9  Q. Okay. If you look at 57 and 58,
10 you'll notice on the bottom of 58 Dr. Mengel is
11 shown as the cosignatory on the prescription?
12 A. I see that.
13 Q. All right. And on 57 you signed a
14 visit note.
15    Would that appear that you began
16 treating --
17 A. It would appear that way, yes.
18 Q. And what would be the date when you
19 began treating her, based on this record?
20 A. Based on this record, it looks like
21 9/8/2000.
22 Q. 9/8/2000?
23 A. Yes.
24 Q. Based on this record, for what were

**Page 67**

1  you treating her?
2  A. Based on this record, it was
3  rheumatoid arthritis and chronic pain.
4  Q. And what was the source of the chronic
5  pain?
6  A. Her rheumatoid arthritis.
7  Q. For how long did you treat her, if you
8  know?
9  A. From this point to 2003 when she left
10 our practice.
11 Q. Did you treat her for the rheumatoid
12 arthritis and the chronic pain for that entire
13 three-year period?
14 A. Yes.
15 Q. It never resolved?
16 A. No.
17 Q. Any other conditions, if you can
18 recall offhand without looking at the record,
19 for which you treated her?
20 A. Depression.
21 Q. I'm sorry? Depression?
22 A. Depression, anxiety.
23 Q. Anxiety.
24    And can you tell me, what was your

**Page 68**

1  general practice in how you prepared these visit
2  notes?
3  A. How they were prepared?
4  Q. Yes.
5  A. I'm sorry.
6  Q. How these came to be generated. Did
7  you dictate them? Did you sit at a computer?
8  A. Oh, yes, yes. So during the patient
9  visit I would take notes, and from those notes I
10 would dictate, and then they're transcribed
11 within our office.
12 Q. You had office personnel who would
13 transcribe from the dictation?
14 A. Correct.
15 Q. And would you -- did you have a
16 regular practice with respect to how long after
17 a visit you would dictate the notes?
18 A. As soon as could be. Yeah, not at --
19 it was usually within the day or two.
20 Q. Okay. And what type of information
21 did you take down when you were making notes and
22 then dictating those notes, general practice?
23 A. My general practice is to find out
24 from the patient how they feel that they're

**Page 157**

1  Q. And then "2. Will fill out prior
2  authorization for Neurontin 300 milligram 3 tab
3  PO BID, which is helping her significantly
4  regarding both her affective disorder and her
5  pain syndrome."
6     You wrote that?
7  A. Yes.
8  Q. And what was the basis for your
9  writing that the Neurontin was helping her
10 significantly regarding both her affective
11 disorder and her pain syndrome?
12 A. It's not stated specifically here, but
13 from the reading of the note, the fact that she
14 had come off the medication and was doing worse
15 is an indicator that perhaps it was helping.
16 Based on notes that we've already gone through,
17 it looked like she was having positive affects
18 on things that would be considered either
19 affective symptoms or pain symptoms.
20 Q. Okay. When you used the phrase
21 "affective disorder" in paragraph two here on
22 this Page 6, what were you referring to
23 specifically?
24 A. That refers to her anxiety and

**Page 158**

1  depression.
2  Q. Her --
3  A. Anxiety and depression.
4  Q. So it was your view at this point in
5  time that the Neurontin was affecting both her
6  anxiety -- was affecting her anxiety, depression
7  and pain, helping her?
8  A. Yes.
9  Q. Page 5. On the bottom there, are
10 these some office notes concerning attempts to
11 get approval for Neurontin?
12 A. Correct.
13 Q. And then on the top of five is renewal
14 of Klonopin?
15 A. Correct.
16 Q. Right?
17    And that's one milligram?
18 A. Correct.
19 Q. Had she gone up on the Klonopin?
20 A. Yes, she had.
21 Q. Next page, OxyContin refill on the
22 bottom, on June 16th, is that what that is?
23 A. Correct.
24 Q. And then in the middle is Klonopin

**Page 159**

1  refill?
2  A. Correct.
3  Q. Again at one milligram? She's gone
4  up?
5  A. Right.
6  Q. And then at the top there's an
7  OxyContin refill?
8  A. Correct.
9  Q. Is that at the higher dosage that you
10 had approved previously?
11 A. Yes. This is from that other note,
12 yes.
13 Q. Right.
14    And then this is the Lexapro that you
15 had prescribed for her not all that long before
16 this, right?
17 A. Which was, it looks like, also
18 increased.
19 Q. Okay. Let's go to, please, Page 3 on
20 the bottom, this is another Klonopin refill,
21 correct?
22 A. Correct.
23 Q. And then Pages 2 to 3, your notes on
24 8/11 --

**Page 160**

1  A. Right.
2  Q. -- 03.
3     Taking a look at your records, this is
4  your last appointment with Mrs. Bulger?
5  A. It appears to be.
6  Q. And then after that you refill some
7  medications, but no other appointments?
8  A. That's right.
9  Q. And specifically if we look at Pages 1
10 and 2, you refilled -- you gave her Valium on
11 August 28 of '03, is that right?
12 A. Yes.
13 Q. And there was a switch from Klonopin
14 to Diazepam?
15 A. Correct.
16 Q. And there's a note on Zantac on
17 August 14th?
18 A. Right.
19 Q. And in the middle of Page 2 -- or the
20 top of 2 there's a Zantac prescription?
21 A. Correct.
22 Q. And in the middle of 2 there's
23 pre-authorizations for Neurontin and Prilosec?
24 A. Correct.

**165**

1  A. Yeah, I mean it's a complicated
2  answer.
3      BY MR. CHAFFIN:
4  Q. What are the risks of untreated
5  depression?
6  A. Further depression. It's not simple.
7  It's not a simple answer.
8  Q. How about untreated anxiety?
9  A. Again, it's speculative to say what
10 the outcome would be.
11 Q. And for Mrs. Bulger's chronic pain,
12 the medications you gave her were OxyContin and
13 Neurontin?
14 A. Correct.
15 Q. Any others?
16 A. Not that I can see from the record.
17 Q. Can you tell from your record, was
18 part of your purpose in prescribing Neurontin to
19 address her depression?
20 A. No.
21 Q. No.
22     As between OxyContin and Neurontin,
23 which one has more side effects?
24     MR. FINKELSTEIN: Objection.

**166**

1      If you're qualified to answer.
2      MR. BELLO: I was going to object. If
3  you can answer the question.
4  A. I don't think I'm qualified to answer.
5      BY MR. CHAFFIN:
6  Q. Does OxyContin have the potential for
7  liver damage, do you know?
8  A. Not that I'm aware of.
9  Q. It's highly addictive, though?
10 A. Yes, it is.
11 Q. Had you prescribed Neurontin for other
12 patients before you started giving Mrs. Bulger
13 Neurontin for her chronic pain?
14     MR. FINKELSTEIN: Objection.
15 A. I can't say. I can't say for sure.
16     BY MR. CHAFFIN:
17 Q. Not sure?
18 A. Not sure.
19 Q. But you've done it since?
20 A. Yes.
21 Q. Any other memory of why you decided to
22 put Mrs. Bulger on Neurontin?
23 A. No.
24 Q. Did you receive -- do you recall

**167**

1  receiving any information directly from any
2  representative of Warner-Lambert, Parke-Davis or
3  Pfizer about Neurontin?
4  A. Yes.
5  Q. Could you describe what the
6  information was and how you got it?
7  A. The only recollection I have of any
8  information from a drug representative directly
9  is in a conversation with a drug rep who
10 mentioned that the side effect of sedation
11 improves with increasing doses.
12 Q. I'm sorry, that what?
13 A. That the side effect of sedation that
14 comes with Neurontin improves with increasing
15 doses.
16 Q. So, in other words, the more you take
17 the less you're sedated?
18 A. Yes.
19 Q. The less you're sedated or the more
20 you're sedated?
21 A. The less you're sedated.
22 Q. I'm sorry?
23 A. The less you're sedated.
24 Q. When was that?

**168**

1  A. I couldn't pinpoint that specifically.
2  Q. Where?
3  A. It would have been in my office.
4  Q. What was the rep's name, do you know?
5  A. No, I have no idea. Sorry.
6  Q. Man or woman?
7  A. It was a man.
8  Q. I'm sorry, did I ask you this; when
9  did this take place?
10 A. I don't know.
11 Q. Pfizer rep or a Parke-Davis rep?
12 A. I have no idea. I had no idea who
13 made this medicine until this.
14 Q. And what caused you to be inquiring
15 about this?
16 A. I wasn't inquiring.
17     MR. FINKELSTEIN: Objection.
18     MR. BELLO: Objection.
19     Go ahead. You can answer.
20     MR. FINKELSTEIN: I still don't know
21 that he was inquiring. That's the basis of my
22 objection.
23 A. Yes.
24     MR. CHAFFIN: Since you're unanimous

**169**

1  on it, I'll fix it, including the witness.
2       BY MR. CHAFFIN:
3       Q.  Can you describe the exchange with me,
4  if you would, please?
5       A.  The exchange would have been in
6  context of the representative telling us about
7  the medication, and in discussion of side
8  effects making an emphasis that this was one
9  side effect that improved counter-intuitively
10 with dose.
11      Q.  Can you remember, I mean the rep -- to
12 whom was the rep talking at the time?
13      A.  It would have been to me and some
14 number of people from my office.  I can't tell
15 you exactly.
16      Q.  You don't know who else was there?
17      A.  I cannot tell you that for sure.
18      Q.  Any discussion about any other side
19 effects or uses or anything of that nature?
20      A.  I'm sure there were, but the only
21 recollection I have of the entire conversation
22 is that statement.
23      Q.  Is that the more you took, the less
24 sleepy it was going to make you?

**170**

1       A.  That's right.
2       Q.  Do you remember for what indication --
3  do you remember what indication was being
4  discussed at the time?
5       A.  No, I do not.
6       Q.  Again, I'm sorry --
7       A.  That's okay.
8       Q.  -- a year, two years, several years
9  ago?
10      A.  I can say it was within the last five
11 years, but I can't be sure any more than that.
12      Q.  Okay.  Is that the only contact you
13 can recall with any representative of
14 Parke-Davis, Warner-Lambert or Pfizer concerning
15 Neurontin?
16      A.  That's my only specific recollection.
17      Q.  Okay.  And you're sure it was
18 Neurontin and not Lyrica?
19      A.  No, I'm sure it was Neurontin.
20      Q.  Okay.  How long did this meeting with
21 this representative take?
22      A.  They probably would have been in the
23 office for 20 minutes to a half hour total.
24      Q.  Have you had any recent discussions

**171**

1  with anyone else in your office about this
2  meeting with the representative?
3       A.  No.
4       Q.  No?
5       A.  No.
6       Q.  Okay.  Now, your dosing decision with
7  respect to Mrs. Bulger and Neurontin, was that
8  based on what this Pfizer sales rep told you?
9       A.  No.
10      Q.  Do you make prescribing decisions
11 based on what drug company sales representatives
12 tell you?
13      A.  No.
14      Q.  Why?
15      A.  Because I don't think they have the
16 medical knowledge to make that -- decisions made
17 medically are not simply about pharmacokinetics,
18 they're about patients, and so I don't think
19 that I can be directed by somebody that only
20 knows the pharmacology of the medication.
21      Q.  Did you ever meet any medical liaisons
22 from Warner-Lambert?
23      A.  Can you tell me what that means?
24      Q.  Okay.

**172**

1       A.  Medical liaison?
2       Q.  You've answered my question.
3           Do you know what a medical liaison is?
4       A.  No, I'm not sure I do.
5       Q.  Okay.  Good.
6           Other than sales representatives or
7  detailers --
8       A.  No.
9       Q.  -- for Pfizer?
10      A.  For Neurontin, no.
11      Q.  Okay.
12          MR. CHAFFIN:  You need to change,
13 right?
14          THE VIDEOGRAPHER:  Yes.
15          MR. CHAFFIN:  Okay.  Let's take a
16 couple minute break if that's okay.
17      A.  That's fine.
18          THE VIDEOGRAPHER:  This is the end of
19 tape number two.  The time is five minutes after
20 two.  We are off the record.
21          (Whereupon, a recess was taken.)
22          THE VIDEOGRAPHER:  Okay.  We are back
23 on the record.  This is tape number three.  The
24 time is 2:13.

**177**

1  Q. Did the Pfizer rep who came to visit
2  you tell you that they were under investigation
3  related to their sales practices of Neurontin?
4  A. No.
5     MR. CHAFFIN: Objection.
6     BY MR. FINKELSTEIN:
7  Q. I want to see -- I appreciate you said
8  you don't have a specific memory of that visit
9  by the Pfizer sales rep.
10 A. Right.
11 Q. I just want to try and hone it down a
12 little bit if we can.
13 A. Sure.
14 Q. Do you know what time of year it was?
15 I don't want you to guess if you don't know.
16 A. I just don't know. Sorry.
17 Q. Fine.
18    Prior to that visit, had you ever
19 prescribed Neurontin?
20 A. I can't say for sure.
21 Q. But you're certain that it was a man
22 who made the visit?
23 A. Yes.
24 Q. And if I have records from the

**178**

1  individual who paid that visit, would you
2  challenge the date?
3     MR. CHAFFIN: Objection.
4     MR. BELLO: Object as well.
5     Go ahead. You can answer.
6  A. Yes, yes.
7     BY MR. FINKELSTEIN:
8  Q. You would challenge the date?
9     MR. CHAFFIN: Objection.
10 A. Yes.
11    BY MR. FINKELSTEIN:
12 Q. Okay.
13 A. Can I explain why?
14 Q. Sure.
15 A. I would say that drug reps come in and
16 out of our office on a routine basis, and so I
17 could not -- if you gave me two dates within two
18 years, I couldn't pick one for sure, so that's
19 why I would contest it.
20 Q. But if the drug rep writes down "today
21 I met with Dr. Crognale --"
22 A. Yes, Crognale.
23 Q. "-- and we discussed Neurontin," would
24 you challenge that?

**179**

1     MR. CHAFFIN: Objection.
2  A. No.
3     BY MR. FINKELSTEIN:
4  Q. And how often do the drug reps come in
5  and out of your office?
6  A. Roughly once a week.
7  Q. And from Pfizer, how many times do
8  they come in and out of your office?
9  A. No idea. I really don't pay attention
10 to who makes what drug.
11 Q. Do you know if the Pfizer drug rep
12 left any samples of Neurontin?
13 A. I don't.
14 Q. Do you have a protocol within your
15 office regarding samples?
16 A. Yes.
17 Q. What is that?
18 A. We accept samples, they're logged into
19 a book, and then if samples are given they are
20 logged into the chart as well.
21 Q. And based on your reading of the
22 Bulger chart, was she provided any samples?
23 A. No.
24 Q. Are you the only one -- or is the

**180**

1  physician the only one who gives samples to
2  patients?
3  A. Physician or nurse practitioner, yes.
4  Q. And the nurse practitioner always logs
5  it into the chart?
6  A. Yes.
7  Q. I'd like to know if you knew this. Do
8  you know what a medical review officer for the
9  FDA is?
10 A. No.
11 Q. Do you know how the FDA approves
12 drugs?
13 A. No.
14 Q. When you decided to prescribe
15 Neurontin for the very first time, what was the
16 foundation with which you prescribed it?
17 A. It would have been, just speaking from
18 my general practice, not from a specific
19 instance, it would have been primarily after
20 discussion with colleagues, review of some early
21 literature, and basis that again the risk versus
22 benefit was more towards the evidence of
23 benefit.
24 Q. The colleagues --

**181**

1  A. Yes.
2  Q. -- now I'm asking specifically related
3  to Neurontin --
4  A. Yes.
5  Q. -- were there colleagues that you
6  spoke to specifically that felt Neurontin was
7  appropriate for the treatment of pain?
8  A. Specific colleagues, no.
9  Q. In general amongst --
10  A. It would have been either in the
11  setting of symposium -- I'm sure that there were
12  conversations with specific colleagues that I
13  can't recollect, but that I would have said, you
14  know, "what's your experience with this? I
15  heard this, what's your experience?" That's how
16  I practice.
17  Q. Based on anecdotal reports?
18  A. In conjunction with more, you know,
19  maybe not randomized control trials because
20  there isn't always that, but there are some
21  studies with small results that may be
22  applicable.
23  Q. And do you recall any of the studies
24  that you've relied upon to prescribe Neurontin

**182**

1  for pain?
2  A. No, not specifically.
3  Q. Are you aware of any that exist,
4  randomized control trials?
5  A. No, I am not.
6  Q. So if no randomized control trials
7  existed for Neurontin in treatment for pain, was
8  the basis of your prescribing of Neurontin based
9  on your communication with the medical
10  community?
11      MR. CHAFFIN: Objection.
12      MR. BELLO: Objection.
13      You may answer.
14  A. In part. Again, there are
15  non-randomized control studies that, yes, are
16  not the gold standard, but do have some impact
17  on how we prescribe.
18      BY MR. FINKELSTEIN:
19  Q. And do you know of any non-randomized
20  control trials that provided you a foundation to
21  prescribe Neurontin?
22  A. I can't quote them off the top of my
23  head. I know that they are in existence.
24  Q. Do you know any of the authors of any

**183**

1  of them that you relied upon?
2  A. No.
3  Q. Do you know any of the articles that
4  they were published in -- I'm sorry, the
5  journals that they were published in?
6  A. Not the journals, no.
7  Q. Do you have a record of any of those?
8  Do you maintain them anywhere?
9  A. No, I don't. I don't have a specific
10  file, no, I do not.
11  Q. If I asked -- I just want to know if
12  you're capable of doing this, I'm not asking you
13  to do it.
14  A. Sure.
15  Q. If I asked you could you go back to
16  your office and find the articles that laid the
17  foundation for you to prescribe Neurontin, would
18  you be able to do that?
19  A. No, I could not.
20  Q. And why is that?
21  A. Why is that?
22  Q. Yeah. Do you throw the journals away?
23  Do you not maintain them?
24  A. Generally once I have looked over an

**184**

1  article I generally discard it, unless it's
2  highly relevant to my practice.
3  Q. And the physicians that you discussed,
4  whether it be at symposiums or outside the
5  symposiums, regarding the efficacy of Neurontin
6  and its treatment of pain, can you name any of
7  them?
8  A. No, I cannot.
9  Q. Would you say it's your opinion was
10  formed on the basic general medical community's
11  opinion of Neurontin and its treatment of pain?
12      MR. CHAFFIN: Objection.
13      MR. BELLO: Objection.
14      You may answer.
15  A. I would say yes, with supplementation
16  from small report data.
17      BY MR. FINKELSTEIN:
18  Q. Do you know if any of the report data
19  that you relied upon, the non-gold standard
20  trials, do you know if Pfizer, Parke-Davis or
21  Warner-Lambert sponsored any of them?
22  A. I cannot say that for sure.
23  Q. Is that information that's important
24  for you to know, who sponsors a trial when you

**185**

1 read it?
2    MR. CHAFFIN: Objection.
3    A. It is important.
4    BY MR. FINKELSTEIN:
5    Q. Why is it important?
6    A. Because it helps you to decide whether
7 or not there is some bias to the data.
8    Q. The journal articles that you read
9 related to Neurontin and treatment of pain, do
10 you have any recollection as to whether or not
11 Pfizer sponsored any of it?
12    A. I do not know.
13    MR. CHAFFIN: Objection.
14    BY MR. FINKELSTEIN:
15    Q. If they did sponsor any of it, would
16 you have taken note of it?
17    MR. CHAFFIN: Objection.
18    MR. BELLO: Objection.
19    A. Yes.
20    BY MR. FINKELSTEIN:
21    Q. How many doctors are in your practice?
22    A. Four.
23    Q. And how many doctors were in your
24 practice in 2000?

**186**

1    A. That's a good question. There were
2 many, because we were at that time a residency
3 practice, and so I can't tell you exactly how
4 many faculty we had and how many residents at
5 the time.
6    Q. When did you graduate medical school?
7    A. Graduate medical school?
8    Q. Mm-hmm.
9    A. In 1997.
10    Q. When did you complete your residency?
11    A. 2000.
12    Q. And after you completed your
13 residency, where was your first place of
14 employment?
15    A. As a faculty member at Beverly
16 Hospital Family Practice Residency.
17    Q. And did there come a time that that
18 transitioned to the private practice?
19    A. That's correct.
20    Q. And when was that?
21    A. That's -- I'm unsure if it was 2002 or
22 2003.
23    Q. While it was Beverly medical
24 facility -- what's the name of it?

**187**

1    A. Family Practice Residency Program.
2    Q. Beverly Family Practice Residency
3 Program?
4    A. Yes.
5    Q. While it was the Beverly Family
6 Practice Residency Program, was there any
7 prohibition on receiving sales calls from
8 pharmaceutical reps?
9    A. Yes. We did not receive, during the
10 period of being a residency we did not receive
11 in-office any pharmaceutical reps.
12    Q. Did you receive any outside of the
13 office?
14    A. There were allowed at the hospital.
15    Q. And did you personally receive any
16 information from pharmaceutical reps?
17    A. I'm sure over the years I did, but I
18 can't -- not a specific instance I can
19 recollect.
20    Q. Do you know if you received any
21 information from any pharmaceutical rep related
22 to Neurontin?
23    A. Other than the incident that I already
24 related, no.

**188**

1    Q. At any time did any pharmaceutical rep
2 offer to take you out to dinner?
3    MR. CHAFFIN: Objection.
4    A. Any pharmaceutical rep?
5    BY MR. FINKELSTEIN:
6    Q. Any pharmaceutical rep.
7    A. Yes.
8    Q. And did you ever go?
9    A. Not at that type of an invitation, no.
10    Q. Did any pharmaceutical company ever
11 compensate you for attending a symposium?
12    A. Define compensation.
13    Q. Provide something of monetary value to
14 you.
15    A. Yes, yes. Primarily it would be a
16 dinner at the symposium, but nothing beyond
17 that.
18    Q. Okay. And which pharmaceutical
19 company?
20    A. I have no idea. I really have no
21 idea.
22    Q. Fair enough.
23    Do you know what symposiums?
24    A. No. Periodically there are dinners at

**189**

1  various restaurants in our area, and up until a
2  few years ago we would periodically attend.
3     Q.  And at those dinners, what would
4  transpire?
5     A.  Generally there would be a speaker who
6  presented data about something.  It was usually
7  problem-based rather than drug-based, and of
8  course, you know, they were sponsored by the
9  representative and, of course, would mention the
10 drug, but usually pretty fairly with other
11 medications.
12    Q.  Were there any symposiums, or what
13 you're describing these dinners with the
14 speaker, any of them related to the treatment of
15 pain?
16    A.  No.
17    Q.  Any of them related to psychiatric
18 treatment?
19    A.  No.
20    Q.  Was Neurontin discussed at any of
21 them?
22    A.  Not that I recollect.
23    Q.  Do you know who Cynthia McCormick is?
24    A.  No, I do not.

**190**

1     Q.  Do you know what a medical officer at
2  the FDA does?
3        MR. CHAFFIN:  Objection.
4     A.  No, I do not.
5        BY MR. FINKELSTEIN:
6     Q.  Do you know what a clinical medical
7  review pre-approval is at the FDA?
8     A.  No.
9     Q.  Did you know that prior to approval
10 Parke-Davis, who was the sponsor of Neurontin,
11 submitted clinical trials to the FDA seeking
12 approval?
13    A.  I didn't know that, but I generally
14 assume most drug companies have to do that.
15    Q.  Did you know that a medical officer
16 from the FDA reviewed the totality of the Pfizer
17 submitted data prior to approval?
18       MR. CHAFFIN:  Objection.
19    A.  I did not know that.
20       BY MR. FINKELSTEIN:
21    Q.  Did you know that the medical officer
22 who reviewed the Parke-Davis submitted data
23 wrote that "less common but more serious events
24 may limit the widespread usefulness of

**191**

1  Neurontin," and that she said "third, is that
2  depression, while it may not be an infrequent
3  occurrence in the epileptic population, may
4  become worse and require intervention or lead to
5  suicide as it has led -- as it has resulted in
6  some suicidal attempts"?  Did you know that?
7        MR. CHAFFIN:  Objection.
8        MR. BELLO:  Objection.
9     A.  I did not know that.
10       BY MR. FINKELSTEIN:
11    Q.  Would you have liked to have known
12 that there were suicidal attempts in the
13 clinical trials of Neurontin?
14       MR. CHAFFIN:  Objection.
15       MR. BELLO:  Objection as well.
16       You may answer.
17    A.  That would have been helpful.
18       BY MR. FINKELSTEIN:
19    Q.  Do you know whether or not Neurontin
20 is associated with increasing depression?
21    A.  I'm not aware of that.
22    Q.  Do you know what monoamines are?
23    A.  Monoamines?  Yes.
24    Q.  What are monoamines?

**192**

1     A.  Monoamines -- well, I don't actually.
2  I guess I know in general that they're a
3  biochemical substance.  I couldn't draw the
4  structure for you.
5     Q.  Do you know what neurotransmitters
6  are?
7     A.  I do.
8     Q.  Do you know what Norepinephrine is?
9     A.  Yes.
10    Q.  Do you know what serotonin is?
11    A.  Yes.
12    Q.  Are they monoamines?
13       MR. CHAFFIN:  Objection.
14    A.  I don't think so.  I can't tell you
15 for sure.
16       BY MR. FINKELSTEIN:
17    Q.  Okay.  I'm not looking to quiz you.
18    A.  I don't believe they are.
19    Q.  What do you believe serotonin is?
20       MR. BELLO:  Sounds like a quiz.
21    A.  What do I believe serotonin is?
22       BY MR. FINKELSTEIN:
23    Q.  Yes.
24    A.  It's a biochemical neuro and other

**193**

1  hormone -- hormonal transmitter.
2      Q.  Do you believe reduced serotonin is
3  associated with depression?
4          MR. CHAFFIN:  Objection.
5      A.  I think that there is evidence to that
6  effect, yes.
7          BY MR. FINKELSTEIN:
8      Q.  And do you believe that increasing
9  serotonin improves depression?
10         MR. CHAFFIN:  Objection.
11     A.  I do.
12         BY MR. FINKELSTEIN:
13     Q.  Is that the basic tenets of SSRI
14  medications?
15     A.  Yes, it is.
16     Q.  And rather than me say it, can you
17  tell me when you prescribe an SS -- first, what
18  is an SSRI?
19     A.  A selective serotonin re-uptake
20  inhibitor.
21     Q.  And that class of drugs is considered
22  what?
23         MR. CHAFFIN:  Objection.
24     A.  Primarily anti-depressant or

**194**

1  anti-anxiety.
2          BY MR. FINKELSTEIN:
3      Q.  And a selective serotonin re-uptake
4  inhibitor, when you prescribe that, is it your
5  goal to alter the brain chemistry in some way?
6          MR. CHAFFIN:  Objection.
7      A.  It is.
8          BY MR. FINKELSTEIN:
9      Q.  And that alteration of the brain
10  chemistry is to do what?
11     A.  Is to improve function.
12     Q.  Well, improve function.  But what
13  specifically is the alteration you're hoping to
14  achieve?
15     A.  The alteration we're trying to achieve
16  is the increase of serotonin at the neurofibers.
17     Q.  And by increasing serotonin in what
18  you describe as the neurofibers, what's the
19  affect you hope to obtain?
20         MR. CHAFFIN:  Objection.
21     A.  The affect is a decrease in symptoms,
22  whether anxiety or depression.
23         BY MR. FINKELSTEIN:
24     Q.  And do you know whether depleting

**195**

1  serotonin has affect on mood and behavior?
2          MR. CHAFFIN:  Objection.
3          MR. BELLO:  Objection as well.
4      A.  I don't.
5          BY MR. FINKELSTEIN:
6      Q.  Do you know whether somebody who has
7  low serotonin is at greater risk of suicidality?
8          MR. BELLO:  Objection.
9          MR. CHAFFIN:  Objection.
10     A.  I do not know that.
11         BY MR. FINKELSTEIN:
12     Q.  When you prescribe a medication, do
13  you want to know what the affect that medication
14  has on the neurochemistry?
15     A.  I do.
16     Q.  And if Neurontin is known to deplete
17  serotonin, is that something you would want to
18  know?
19         MR. CHAFFIN:  Objection.
20         MR. BELLO:  Objection.
21     A.  Yes.
22         BY MR. FINKELSTEIN:
23     Q.  And why would you want to know that?
24         MR. CHAFFIN:  Objection.

**196**

1      A.  Because although I may not be able to
2  tell you exactly what the molecule is, the
3  biochemistry does make a difference in how it
4  will affect people, and so I would want to know
5  that, and interactions with other medications as
6  well.
7          BY MR. FINKELSTEIN:
8      Q.  Well, what's your expectation if a
9  pharmacological agent depletes serotonin, what
10  effect would that have?
11         MR. CHAFFIN:  Objection.
12         MR. BELLO:  Objection.
13     A.  I can't predict that.
14         BY MR. FINKELSTEIN:
15     Q.  Can you predict what a pharmacological
16  agent if it increases serotonin --
17         MR. CHAFFIN:  Objection.
18         BY MR. FINKELSTEIN:
19     Q.  -- what's your expectation?
20     A.  My expectation based on studies on
21  SSRIs is that will improve depression and
22  anxiety.
23     Q.  What does treatment emergent affect
24  mean?

**197**

1  MR. CHAFFIN: Objection.
2  A. I don't know.
3  BY MR. FINKELSTEIN:
4  Q. Did you know that 5.3 percent of the
5  population in the original clinical trials of
6  Neurontin reported depression as an adverse
7  event?
8  MR. CHAFFIN: Objection.
9  A. No, I did not know that.
10  BY MR. FINKELSTEIN:
11  Q. Did you know that of the 5.3 percent,
12  equated to 78 people, that 19 of them had no
13  prior history of depression?
14  MR. CHAFFIN: Objection.
15  A. I did not know that.
16  BY MR. FINKELSTEIN:
17  Q. And did you know that 22 of the
18  patients required pharmacological treatment for
19  their depression during the clinical trials?
20  MR. CHAFFIN: Objection.
21  A. No.
22  BY MR. FINKELSTEIN:
23  Q. Is that information you would have
24  liked to have known?

**198**

1  MR. CHAFFIN: Objection.
2  A. Yes.
3  BY MR. FINKELSTEIN:
4  Q. What is when you give somebody a drug
5  and they have an effect, a side effect, and then
6  you take the drug away and the side effect goes
7  away, what is that called?
8  MR. CHAFFIN: Objection.
9  BY MR. FINKELSTEIN:
10  Q. Do you know?
11  A. An anecdotal trial. I don't know.
12  I'd be speculating.
13  Q. Well, have you ever heard the term
14  de-challenge?
15  A. No, I have not.
16  Q. Okay. Have you ever heard the term
17  challenge?
18  A. Yes.
19  Q. What's a challenge?
20  A. Challenge is when you give a patient a
21  medication and you see what effect it has.
22  Q. And when you take the medication away,
23  the term is de-challenge, you see what the --
24  A. That makes sense.

**199**

1  MR. CHAFFIN: Objection.
2  MR. BELLO: Objection.
3  BY MR. FINKELSTEIN:
4  Q. Would you -- I think earlier you
5  testified that, your personal experience, that
6  when you take a drug away from somebody you see
7  what the result is, right?
8  A. Yes.
9  Q. And you take that into consideration
10  in future prescribing habits?
11  A. For that patient, yes. I can't say
12  that it widely affects the rest of my practice,
13  because each patient is individual.
14  Q. What does idiosyncratic mean?
15  A. It means it's unexpected.
16  Q. And have you ever seen idiosyncratic
17  affects from medications?
18  MR. CHAFFIN: Objection.
19  A. I'm sure I have. I can't think of a
20  specific instance currently.
21  BY MR. FINKELSTEIN:
22  Q. What is a Med Watch report?
23  MR. CHAFFIN: Objection.
24  A. No idea.

**200**

1  BY MR. FINKELSTEIN:
2  Q. Have you ever filed a Med Watch
3  report?
4  A. No.
5  Q. If the drug company that manufactures
6  Neurontin was warning physicians in the United
7  Kingdom that Neurontin can be the subject of
8  mood and behavioral disturbances, would you have
9  wanted to know that?
10  MR. CHAFFIN: Objection.
11  A. Yes.
12  BY MR. FINKELSTEIN:
13  Q. Did you know that?
14  A. No.
15  MR. CHAFFIN: Objection.
16  BY MR. FINKELSTEIN:
17  Q. Do you know today whether or not
18  Neurontin is associated with mood and behavioral
19  disturbances?
20  MR. CHAFFIN: Objection.
21  A. Yes.
22  BY MR. FINKELSTEIN:
23  Q. And what's your knowledge?
24  A. My knowledge is that it can cause mood