EXHIBIT 14

-

MICHELE MEAGER

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re:  NEURONTIN          MDL Docket

MARKETING, SALES PRACTICES    No. 1629

AND PRODUCTS LIABILITY       Master File

LITIGATION          No. 04-10981

Judge Patti Saris

Magistrate Judge

Leo T.Sorokin

- - - - - - - - - - - - - - - -

Confidential telephonic deposition of

MICHELE MEAGER, taken by and before Fred W.

Jeske, a certified shorthand reporter and notary

public of the State of Tennessee, held at the

Conference Room C of the Courtyard by Marriott,

170 Fourth Avenue North, Nashville, Tennessee.

---

3

1    MICHELE MEAGER
2         INDEX
3
     WITNESS                    PAGE
4
     MICHELE MEAGER
5
         Direct by Mr. Cohen        5
6        Cross by Ms. Seaton        57
         Redirect by Mr. Cohen       59
7
8    Reporter's certificate        61
9
10          -oOo-
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

2

1         MICHELE MEAGER
2    APPEARANCES:
3
4    Attorneys for Personal Injury Plaintiffs:
5       FINKELSTEIN & PARTNERS
        80 Wolf Road
6       Suite 503
        Albany, New York 12205
7       BY:  STEVE COHEN, ESQ. via telephone
8
     Attorneys for Defendant Pfizer:
9
        SHOOK, HARDY & BACON, LLP
10      2555 Grand Boulevard
        Kansas City, Missouri  64108-2613
11      BY:  ANGELA M. SEATON, ESQ.
            IAN C. LOSASSO, ESQ.
12
13
14          -oOo-
15
16
17
18
19
20
21
22
23
24
25

---

4

1         MICHELE MEAGER
2         The telephonic deposition of MICHELE
3    MEAGER, taken on Friday, March 21, 2008, at 170
4    4th Avenue North, Nashville, Tennessee, for all
5    purposes under the Federal Rules of Civil
6    Procedure.
7         The formalities as to notice, caption,
8    certificate, et cetera, are waived.  All
9    objections, except as to the form of the
10   questions, are reserved to the hearing.
11        It is agreed that Fred W. Jeske, being
12   a Notary Public and Court Reporter for the State
13   of Tennessee, may swear the witness, and that
14   the reading and signing of the completed
15   deposition by the witness are waived.
16
17
18
19
20
21
22
23
24
25

17

```
1            MICHELE MEAGER
2   Neurontin in 2004.
3       Q.    Okay.  Do you remember as you sit here
4   today what indications Neurontin was approved
5   for in early 2004?
6       A.    Epilepsy.
7       Q.    That it?
8       A.    Correct.
9       Q.    Are you aware or were you aware or
10  were you -- let's do it this way.  Were you
11  aware in 2004 that using it or detailing it for
12  other treatments that were not approved is
13  considered an off-label use?
14      A.    Yes.
15      Q.    Okay.  Were there other teams of sales
16  reps in your area, or was this solely your
17  territory in early 2004?
18      A.    I was the part-time territory rep, and
19  I don't remember if the full-time reps had
20  Neurontin.  I don't remember.
21      Q.    Who was the full-time rep?
22      A.    I don't remember their names.
23      Q.    Okay.  Were there any other part-time
24  reps?
25      A.    No.
```

18

```
1            MICHELE MEAGER
2       Q.    All right.  So it was one full-time
3   rep and you covering that geographic area?
4       A.    Well, back then it was probably nine
5   Pfizer representatives and myself, but everybody
6   had different drugs.
7       Q.    Okay.  So you were the only one that
8   was detailing Neurontin.
9       A.    I think so.
10      Q.    Okay.  Now what types of specialties
11  of doctors would Neurontin be detailed to in
12  early 2004?
13      A.    Prime --
14            MS. SEATON:  Objection.  Objection.
15            You can answer.
16      A.    Primary care or internal medicine.
17            Any doctor that would see an
18  epileptic patient.
19  BY MR. COHEN:
20      Q.    Okay.  And again it was for epilepsy
21  only?
22      A.    Correct.
23      Q.    All right.  Do you know if Neurontin
24  was detailed to other specialists as well?
25      A.    I don't know.  I know what I detailed
```

19

```
1            MICHELE MEAGER
2   Neurontin for.
3       Q.    All right.  Who made that decision as
4   to what type of doctor you would be detailing
5   Neurontin to?
6       A.    I worked for the part-time division
7   that only called on internal medicine and
8   primary care physicians.
9       Q.    Okay.  All right.  Did you ever
10  discuss off-label use of Neurontin with any
11  doctor you ever serviced?
12      A.    No.
13      Q.    Were you ever asked about Neurontin's
14  association with adverse psychiatric experiences
15  by any doctor you detailed?
16      A.    No.
17            MS. SEATON:  Hold on just a second.
18            I just heard a beep.  Did
19  somebody join?
20            MR. COHEN:  That's just some other
21  line ringing in here, I think.
22            MS. SEATON:  Oh, okay.
23            MR. COHEN:  Okay.  All right.
24  BY MR. COHEN:
25      Q.    Did you ever advise any doctor about
```

20

```
1            MICHELE MEAGER
2   these adverse events?
3       A.    No.
4            MS. SEATON:  Objection.
5            Wait.  Give a little bit of
6   pause just so I can say "objection to
7   form," and then you can go ahead and
8   answer.
9            THE WITNESS:  Okay.
10            Can you repeat the question?
11            MR. COHEN:  Yes.
12  BY MR. COHEN:
13      Q.    Did you ever advise any doctor about
14  adverse psychiatric events or experiences?
15      A.    No.
16      Q.    Okay.  All right.  Were you ever
17  informed about lawsuits relating to Neurontin
18  and suicides?
19      A.    No.
20      Q.    Were you ever provided with documents
21  by your company that allowed for a scripted or
22  standard response to inquiries from
23  doctors regarding Neurontin and suicide?
24      A.    No.  Never.
25      Q.    All right.  Did you ever work for
```

---

**21**

```
1            MICHELE MEAGER
2   Warner-Lambert?
3   A.     No.
4   Q.     Okay.  Now, do you recall detailing a
5   Dr. Richard Goldman in Wellesey, Massachusetts
6   in 2004?
7   A.     Yes.
8   Q.     All right.  Do you, as you sit there
9   today, have any idea when the first time you
10  detailed him was?
11  A.     No.
12  Q.     Do you have any documents in front of
13  you that might refresh your recollection?
14  A.     I know I detailed him in 2004.
15  Q.     All right.  I have some call sheets,
16  or one call sheet, and then another page talking
17  about some, some product that was left.  Do you
18  have those there at all?
19  A.     Yes.  My, my -- can I ask him?  Is it
20  just if I detailed them in 2004?
21  Q.     Well, I have a page here that talks
22  about four visits from January of '04 through
23  April of '04, and then dates that product was
24  left.  That's what I'm looking -- that was
25  provided by your attorneys, I believe.
```

**22**

```
1            MICHELE MEAGER
2   A.     Yes, I have this.
3          MS. SEATON:  Just a second.
4          Steve, I just heard someone.
5          Did someone join?
6          MR. COHEN:  No.  I think it may
7          be -- what happens is when someone tries
8          to call here on this number, it may beep
9          and ring over into another line, so don't
10         worry about it.
11         MS. SEATON:  Okay.
12  A.     Yes, I have that sheet in front of me.
13  BY MR. COHEN:
14  Q.     Okay.  As you look at that sheet, do
15  you see that your first visit to Dr. Richard
16  Goldman was January 8th, 2004?
17  A.     Yes.
18  Q.     All right.  Do you have any documents
19  anywhere that show if you were there before
20  that?
21  A.     No.
22  Q.     All right.  And can you tell what drug
23  or drugs you were detailing or would have
24  detailed to him from that sheet?
25  A.     No.
```

**23**

```
1            MICHELE MEAGER
2   Q.     Okay.  Would it have been only
3   Neurontin?
4   A.     I don't remember.
5   Q.     All right.  Do you know what else you
6   might have been detailing to him at that time --
7          MS. SEATON:  Objection.
8   BY MR. COHEN:
9   Q.     -- if anything?  Were there any other
10  drugs you might have detailed to Dr. Goldman on
11  January 8th, 2004?
12  A.     Zoloft and Aricept.
13  Q.     Okay.  Now, on the second page there
14  is an indication that some product was, was left
15  with him; is that correct?
16  A.     Yes.
17         MS. SEATON:  Objection.
18         I just want to be clear,
19         Steve.  We only have -- she's looking at a
20         one-page sheet in front of her.
21         MR. COHEN:  It may just be that it
22         printed out on two sheets here.
23         MS. SEATON:  Oh, okay.
24         THE WITNESS:  It's this part.
25
```

**24**

```
1            MICHELE MEAGER
2   BY MR. COHEN:
3   Q.     On the bottom maybe of that one sheet,
4   does it indicate that Neurontin was left with
5   him on January 8th of 2004?
6          MS. SEATON:  You can answer.
7   A.     No.  It says I detailed with starters.
8   It does not say what medication was left.
9   BY MR. COHEN:
10  Q.     Okay.  My, my sheet says call date
11  1/8/2004.  There is a call I.D. number, and then
12  it says:  Formulation Neurontin, 300 milligrams
13  times three, quantity 18.  Do you have that
14  data?
15  A.     No.
16  Q.     Okay.  If I indicate -- if I told you
17  that the materials provided by your counsel
18  pursuant, pursuant to our request indicate that
19  on January 8th Neurontin, 300 milligrams times
20  three quantity 18 was detailed or left with
21  Dr. Goldman, would you have any reason to
22  disagree with that?
23  A.     No.
24  Q.     Would you have been the one that would
25  have left the drugs with him?
```

---