UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
:                    MDL Docket No. 1629
In re:  NEURONTIN MARKETING,            :
    SALES PRACTICES AND                 :    Master File No. 04-10981
    PRODUCTS LIABILITY LITIGATION       :
                                        :    Judge Patti B. Saris
---------------------------------------------------------------x
                                        :    Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:               :
                                        :
*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS   :
                                        :
---------------------------------------------------------------x

**PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS AND
PLAINTIFFS' FURTHER STATEMENT OF MATERIAL FACTS**

**I.   PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.   Mrs. Bulger's primary care physician, Dr. Crognale's testified that his decision to prescribe Neurontin was based on his own experience with the drug and his medical training.

Response:
   Disputed.  Plaintiff submits that paragraph 1 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Crognale testified that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company  labels, before prescribing a drug. Crognale Dep. 16:17-17:13 (Finkelstein Decl., Ex. 10).  Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label. Crognale Dep. 37:3-18 (Finkelstein Decl., Ex. 10).  Dr. Crognale, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (seorotonin) Crognale Dep. 195:12- 196:6 (Finkelstein Decl., Ex. 10); (b) suicide attempts during clinical trials Crognale Dep. 191:11-17 (Finkelstein Decl., Ex. 10); (c) depression adverse events during clinical trials Crognale Dep. 197:4-198:2 (Finkelstein Decl., Ex. 10); and (d) that patients taking Neurontin may suffer mood and behavioral disturbances. Crognale Dep. 200:5-200:14 (Finkelstein Decl., Ex. 10).

2.   Dr. Crognale testified that he recalled receiving a visit from one of defendant sales representatives sometime within the last five years regarding Neurontin in which the side

effects of sedation and dosing were discussed. Dr. Crognale could not recall to what indication this conversation related.

Response:
      Disputed.  Plaintiff submits that paragraph 2 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Crognale testified that he recalled receiving information directly from a representative at either Warner-Lambert, Parke-Davis or Pfizer about Neurontin. Crognale Dep. 166: 24-167:4 (Finkelstein Decl., Ex. 10).  Dr. Crognale testified that his only recollection of information from a drug representative directly was a conversation in which the side effects of sedation and dosing were discussed.  Dr. Crognale could not recall to what indication this conversation related.  However, Dr. Crognale testified that he was sure that there were other discussions. Crognale Dep. 169:18-169:20 (Finkelstein Decl., Ex. 10).  Dr. Crognale testified that the "the exchange would have been in context of the representative telling us about the medication, and in discussion of side effects making an emphasis that this was one side effect that improved counter-intuitively with dose."  Crognale Dep. 169:5-10 (Finkelstein Decl., Ex. 10).

      3.     Dr. Crognale's decision to prescribe Neurontin to Mrs. Bulger "did not have anything to do with anything any representative of Pfizer, Warner- Lambert or Parke-Davis told [him]."

Response:
      Disputed.  Plaintiff submits that paragraph 3 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  As to his reliance on, or influence by a representative, Dr. Crognale's prescribing decisions take into consideration medical knowledge, and "decisions made medically are not simply about pharmacokinetics, they're about patients, and so I don't think that I can be directed by somebody that only knows the pharmacology of the medication." Crognale Dep. 172:15-20 (Finkelstein Decl., Ex. 10).  Dr. Crognale did not state that he did not consider what a sales representative advised regarding pharmacokinectics in arriving at his determination to prescribe a medication.  Crognale Dep. 171:10-20 (Finkelstein Decl., Ex. 10). Dr. Crognale testified generally that he had received and accepted from pharmaceutical representatives offers to go to dinner, that he was compensated for attending dinner symposiums sponsored by a representative where there would be discussion of  "problem-based" or "drug-based" data.  Crognale Dep. 188:1-189:11 (Finkelstein Decl., Ex. 10).

      4.     Dr. Crognale could not recall any studies he relied on in prescribing Neurontin for pain.

Response:
      Disputed.  Plaintiff submits that paragraph 4 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Crognale stated that there were non-randomized control trials that provided him with a basis to prescribe Neurontin.  Crognale Dep. 182:18-23 (Finkelstein Decl., Ex. 10).  Dr. Crognale read journal articles that laid the foundation for his

Neurontin prescriptions, but he would be unable to go back and find these articles because generally discards them. Crognale Dep. 183:7-184:2 (Finkelstein Decl., Ex. 10).

5.      Dr. Crognale does not make his prescribing decision based on what a pharmaceutical company sales representative tells him.

Response:
Disputed.  Plaintiff submits that paragraph 5 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  As to his reliance on, or influence by a representative, Dr. Crognale's prescribing decisions take into consideration medical knowledge, and "decisions made medically are  not simply about pharmacokinetics, they're about patients, and so I don't think that I can be directed by somebody that only knows the pharmacology of the medication." Crognale Dep. 172:15-20 (Finkelstein Decl., Ex. 10).

Dr. Crognale did not state that he did not consider what a sales representative advised regarding pharmacokinetics in arriving at his determination to prescribe a medication. Crognale Dep. 171:10-20 (Finkelstein Decl., Ex. 10.)  Dr. Crognale testified generally that he had received and accepted from pharmaceutical representatives offers to go to dinner, that he was compensated for attending dinner symposiums  sponsored by a representative where there would be discussion of  "problem-based" or "drug-based" data.  Crognale  Dep. 188:1-189:11 (Finkelstein Decl., Ex. 10).

6.      Dr. Goldman testified that he does not recall ever having a conversation with a Pfizer or Parke-Davis sales representative about Neurontin.

Response:
Undisputed; however, Dr. Goldman did not recall having "specifically any conversations specific to Neurontin" with defendants sales representatives.  Goldman Dep. 48:10-14 (Finkelstein Decl., Ex. 11).

7.      Dr. Goldman prescribed Neurontin based on his colleagues' experience and the benefits and risks to particular patients.

Response:
Disputed.  Plaintiff submits that paragraph 7 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Goldman testified he utilized, inter alia, both the PDR and an online formulary reference called EPOCRATES for information in regard to prescribing. Goldman Dep. 17:15-18:10 (Finkelstein Decl., Ex. 11).  Dr. Goldman, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (seorotonin) Goldman Dep. 178:12-19, 197:2-17 (Finkelstein Decl., Ex. 11); (b) suicide attempts during clinical trials Goldman Dep. 182:8-184:5 (Finkelstein Decl., Ex. 11); (c) depression adverse events during clinical trials.  Goldman Dep. 183:13-184:5 (Finkelstein Decl., Ex. 11).

3

8. Dr. Goldman does not recall reading any medical articles related to Neurontin or attending conference where Neurontin was discussed.

Response:

Disputed. Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Goldman stated that although journals and medical articles relating to Neurontin did not initially lead to him prescribing it for pain, subsequently he did read such articles. Goldman Dep. 203:14-204:3 (Finkelstein Decl., Ex. 11). Goldman was not able to specifically identify such articles. Goldman Dep. 204:22-205:1 (Finkelstein Decl., Ex. 11).

## II. PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. Dr. Crognale provided Neurontin to Ms. Bulger for her for chronic pain related to rheumatoid arthritis, as well as for anxiety and depression – all off-label, unapproved uses (Finkelstein Decl., Ex. 10, at 66:23–67:22, 130:22–131:6, 157:1–158:3, 165:11-165: 14; *but see* 165:17–165:20).

2. Prior to Ms. Bulger's death, Defendants actively promoted Neurontin to Susan Bulger's physicians via direct sales representative detailing to the doctors' offices. Although Defendants acknowledge it was inappropriate to detail physicians other than Neurologists and Epileptologists (Finkelstein Decl., Ex. 12, at 45:8-45:25; *see* Finkelstein Decl., Ex. 13, at 009942).

3. Prior to Ms. Bulger's death, Defendants detailed Ms. Bulger's prescriber, Dr. Dino Crognale, who was a general family medicine doctor (Finkelstein Decl., Ex. 10, at 169:3-170:23).

4. Dr. Crognale did not recall all specific facts regarding sales detailing about Neurontin at his office by Defendants' sales representative (Finkelstein Decl., Ex. 10, at 170:12-170:23).

5. Defendants detailed Ms. Bulger's prescriber, Dr. Richard Goldman, an internist (Finkelstein Decl., Ex. 11, at 13:1-13:5).

6. Dr. Goldman acknowledged direct contact with Defendants' sales representatives, but could not recall specific discussions (Finkelstein Decl., Ex. 11, at 48:10-50:23).

7. Dr. Goldman acknowledged his attendance at conferences, Finkelstein Decl., Ex. 11, at 15:20-16:4; his consideration of journals; discussions with colleagues; and his review of drug labels via the PDR or online EPOCRATES (Finkelstein Decl., Ex. 11, at 16:8-19:3, 35:7-36:5, 41:16-41:20).

8. Dr. Crognale explained that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug (Finkelstein Decl., Ex. 10, at 16:17-17:13).

9. Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label (Finkelstein Decl., Ex. 10 at 37:3-37:18).

10. Dr. Goldman testified he utilized both the PDR and an online formulary reference called EPOCRATES Rx (Finkelstein Decl., Ex. 11, at 17:15-18:10).

11. Dr. Crognale expressly indicated that his bases for prescribing Neurontin included (a) his communication with the medical community; (b) discussions with colleagues at symposiums; (c) consideration of medical journals (Finkelstein Decl., Ex. 10, at 180:14-186:5).

5

12. Both Dr. Crognale and Dr. Goldman, in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Ms. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (seorotonin) (Finkelstein Decl., Ex. 10, at 195:12-196:6; Finkelstein Decl., Ex. 11, at 178:12-178:19; Finkelstein Decl., Ex. 11, at 197:2-197:17); (b) suicide attempts during clinical trials (Finkelstein Decl., Ex. 10, at 191:11-191:17; Finkelstein Decl., Ex. 11, at 182:8-184:5); (c) depression adverse events during clinical trials, Finkelstein Decl., Ex. 10, at 197:4-198:2 (Finkelstein Decl., Ex. 11, at 183:13-184:5); and (d) that patients taking Neurontin may suffer mood and behavioral disturbances (Finkelstein Decl., Ex. 10, at 200:5-200:14).

13. Doctors Crognale and Goldman were detailed and had direct contact with Defendants' sales representatives who never disclosed depression/suicidality as a risk with Neurontin (Finkelstein Decl., Ex. 14, at 19:13-20:15, 21:4-21:7).

14. Defendants did not disclose to Ms. Bulger's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality.

15. Defendants did not disclose to Ms. Bulger's prescribing medical providers that Neurontin usage increased the risk of depression and/or suicidality.

16. Defendants did not disclose to Ms. Bulger's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts.

Dated:  February 23, 2009                                    Respectfully submitted,

                                                      Finkelstein & Partners, LLP
                                                      *Attorneys for Plaintiff Ronald J. Bulger, Sr.*


By:    **/s/ Andrew G. Finkelstein**
       Andrew G. Finkelstein, Esquire
       Finkelstein & Partners, LLP
       1279 Route 300, P.O. Box 1111
       Newburgh, NY  12551


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 23, 2009.

       **/s/ Andrew G. Finkelstein**
       Andrew G. Finkelstein, Esquire