UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
:   MDL Docket No. 1629
In re: NEURONTIN MARKETING, :
 SALES PRACTICES AND :   Master File No. 04-10981
 PRODUCTS LIABILITY LITIGATION :
:   Judge Patti B. Saris
------------------------------------------------------------x
:   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Smith v. Pfizer Inc.*, 1:05-11515-PBS :
:
------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ruth Smith respectfully submits this memorandum in opposition to the motion for summary judgment by Defendants Pfizer Inc. and Warner-Lambert Company LLC.

**PRELIMINARY STATEMENT**

The Amended Complaint in this action pleads six counts: (1) Negligence; (2) Breach of Warranty (express and implied); (3) Strict Liability; (4) Fraud; (5) Consumer Protection under the Tennessee Consumer Protection Act ("TCPA"); and (6) Punitive Damages.

Defendants have moved for summary judgment on the grounds that Plaintiff cannot establish the essential element of causation, and that Plaintiff's warranty, fraud and TCPA claims fail as a matter of law. Defendants have not specifically moved for summary judgment on Plaintiff's negligence, strict liability and punitive damages claims. Plaintiff does not oppose those parts of Defendants' motion for summary judgment on Plaintiff's express warranty and TCPA claims. As discussed below, Plaintiff has sufficient evidence to establish the essential element of causation, and to continue to pursue and go to trial on her claims of negligence,

breach of implied warranty, strict liability, fraud and punitive damages claims, which may not be dismissed as a matter of law.

## FACTUAL BACKGROUND

As set forth in Defendants' Local Rule 56.1 Statement of Material Facts, and reiterated in Defendants' memorandum, the allegedly undisputed material facts in connection with Defendants' motion for summary judgment are limited to Defendants' arguments that Plaintiff cannot establish the essential element of causation, and that Plaintiff's fraud claim fails as a matter of law. *See* Defs.' Mem., pp. 3-11, 14-17.

"II. Factual Background" of Defendants' memorandum alleges a litany of "facts" concerning Mr. Smith's personal history, <u>not</u> including the ingestion of Neurontin, which Defendants claim caused Mr. Smith to commit suicide. None of such facts are relevant and material to resolving Defendants' motion for summary judgment, and need not be addressed in this Plaintiff's memorandum in opposition to Defendants' motion for summary judgment.

## SUMMARY JUDGMENT STANDARD OF REVIEW

This Court has recently reiterated its standard of review on a motion for summary judgment, which will not be repeated in full herein. *See McKenna v. First Horizon Home Loan Corp.,* 537 F. Supp. 2d 284, 287 (D. Mass. 2008); *Carter v. Symmes*, 2008 U.S. Dist. LEXIS 7680 at *5-6 (D. Mass. 2008). Plaintiff, however, wishes to emphasize, and respectfully refers the Court to its following statements concerning the summary judgment standard of review:

> . . ."To succeed [on a motion for summary judgment], the moving party must show that there is an <u>absence of evidence</u> [emphasis added] to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

> . . .The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." [*Barbour v. Dynamics Research Corp.*, 73 F.3d 32, 36 (1st Cir. 1995).]

*McKenna,* 537 F. Supp. 2d at 287; *Carter*, 2008 U.S. Dist. LEXIS 7680 at *5-6.

## I.   PLAINTIFF CAN ESTABLISH THE ESSENTIAL ELEMENT OF CAUSATION

### A.   There Is Sufficient Evidence That Mr. Smith Ingested Neurontin Temporally Related to His Suicide.

Defendants argue that Plaintiff has adduced no evidence that Mr. Smith ingested Neurontin at any time temporally related to his suicide. At the outset, Defendants assert that based on Neurontin's half-life, Plaintiff's expert, Dr. Maris, testified that there would be no appreciable Neurontin left in an individual's "system" within 24 hours after taking the drug. However, as discussed in Dr. Maris's Declaration, submitted in opposition to Defendants' motion to exclude the specific causation testimony of Dr. Maris and Prof. Trimble in the *Smith* case, Defendants mischaracterizes Dr. Maris's testimony relating to the half-life of Neurontin in terms of its elimination from the body:

> Although I acknowledge that Neurontin's half-life is five to seven hours in terms of its elimination from an individual's "system", **this testimony does not equate to a marker for the time it takes for Neurontin to no longer have an effect on the brain's neurotransmitters (e.g., serotonin) and contribute to suicidality**. The package insert for Neurontin and discussion of its half-life does not pertain to effects on neurotransmitters; rather, the package insert pertains to blood/plasma ...

Maris Declaration, ¶ 10, ECF Doc. # 1673 (emphasis added).

Defendants have cited no authority that in a products liability wrongful death drug case, plaintiff must prove that the drug was in the decedent's "system" at the time of death in order to prove proximate cause. Further, that no toxicology tests were conducted after Mr. Smith's violent suicide by gunshot that could demonstrate the presence of Neurontin in Mr. Smith's system would certainly not be unexpected. Moreover, Plaintiff's evidence indicates that Neurontin has continuing psychiatric suicidogenic effects, due to its effects on the brain's

3

neurotransmitters, even if the drug has been eliminated from the decedent's system (e.g., blood or plasma).

Defendants further contend that Plaintiff has nothing but speculative testimony that Mr. Smith was taking Neurontin as prescribed during the time temporally related to his suicide. However, even without eyewitness testimony regarding each time Mr. Smith ingested Neurontin, Plaintiff has substantial non-speculative evidence indicating that Mr. Smith was regularly taking his Neurontin during the period of time temporally related to his suicide. *See* Plaintiff's Responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and Plaintiffs' Further Statement of Material Facts, Further Statement, ¶¶ 1-14, re Usage and Pill Bottle.

### B. There Is Sufficient Evidence That Inadequate Warnings Proximately Caused Mr. Smith's Suicide.

Defendants argue that under Tennessee's learned intermediary doctrine, Plaintiff has no admissible evidence that either of Mr. Smith's prescribers, Dr. Mackey and Nurse Krancer, relied on the Neurontin package insert in prescribing Neurontin for Mr. Smith, and that neither Dr. Mackey nor Nurse Krancer testified that different or additional warnings would have changed their decision to prescribe Neurontin to Mr. Smith in 2004.

However, as Defendants admit in their Local Rule 56.1 Statement, "5.  Dr. Mackey testfied that he 'probably' read the Neurontin package insert 'a long time' before he prescribed Neurontin for Mr. Smith," and that "23.  Nurse Krancer testified that she 'doesn't usually read the entire package insert.'"  Defs.' Statement, ¶¶ 5, 23 (emphasis added).  More importantly, Dr. Mackey testified that he was not aware of various important information concerning problems with Neurontin, depression and suicide, and that had he been told of these problems with Neurontin, he "probably" would have changed the way he treated Mr. Smith, and would have given Mr. Smith specific warnings and told him to be observant about side effects; and Nurse

4

Krancer testified that had Defendants told her that Neurontin was associated with increases in depression and suicide, she would have educated the patients on these potential side effects. *See* Plaintiff's Responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and Plaintiffs' Further Statement of Material Facts, Further Statement, ¶¶ 15-23, re Learned Intermediary.

Both *Collins v. Danek Med., Inc.*, 1999 U.S. Dist. LEXIS 4489 (W.D. Tenn. Mar. 24, 1999), and *King v. Danek Med., Inc.*, 37 S.W.3d 429 (Tenn. Ct. App. 2000), cited by Defendants, are easily distinguishable as each physician in those cases testified that he was well aware of the risks of pedicle fixation surgery, including the risk of loose screws with pedicle fixation, *Collins*, 1999 U.S. Dist. LEXIS at *21, and that they were fully aware of the risks involved in using the hardware in this type of surgery, and were well-experienced in the use of internal fixation devices utilizing pedicle screws. *King*, 37 S.W.3d at 452, 453.  In contrast, there is no evidence that either Dr. Mackey or Nurse Krancer was aware of the problems with Neurontin, depression and suicide at the time they prescribed Neurontin to Mr. Smith.

## C. Plaintiff Has Sufficient Admissible Evidence on the Issue of Specific Causation and Can Satisfy Her Burden of Proving Proximate Cause.

Plaintiff has demonstrated, via admissible expert testimony, that Richard Smith's ingestion of Neurontin was a proximate cause of his injuries and death. As set forth in detail in Plaintiffs' Memorandum in opposition to Defendants' motion to exclude the specific-causation testimony of Dr. Maris and Prof. Trimble, Plaintiff's experts on specific causation have opinions that are relevant, reliable and pass Rule 702 and *Daubert's* requirements.  Although not exhaustive of the arguments and expert opinions discussed in the Memorandum and exhibits submitted therewith, incorporated by reference as if fully set forth herein is the crux of Plaintiff's experts' opinions on specific causation:  Dr. Maris and Prof. Trimble have opined that Mr. Smith

ingested Neurontin and that he experienced side effects consistent with Neurontin use, including mood and behavioral disturbances and worsened depression. Both Dr. Maris and Prof. Trimble have opined that Mr. Smith's ingestion of Neurontin was a proximate cause of his suicide.

Both experts base their opinions upon their clinical experience and education, their review of the depositions of physicians, family, incident reports, medical records, as well as literature on pharmaceuticals related to adverse and suicidogenic side effects, as well expert reports disclosed in this case. Further, each expert bases his opinion on the biological plausibility of Neurontin to contribute to suicide, as well as the FDA's meta-analysis that demonstrated an increased risk of suicidality with use of antinconvulsants. Both experts employed a differential diagnosis wherein each analyzed suicide risk factors and protective factors and he sought to "rule in" and "rule out" alternative causes.

In this regard, Dr. Maris analyzed suicide risk factors and protective factors his research has identified as statistically significant. Dr. Maris opined that Mr. Smith had only 7 of 15 known risk factors for suicide and 3 of those were induced by Neurontin. Dr. Maris further based his opinion, in part, on the results of a "psychological autopsy" he conducted in an attempt to reconstruct Mr. Smith's psychological life, thoughts, feelings and relevant environmental factors preceding his death. Plaintiff therefore has sufficient admissible evidence on the issue of specific causation to satisfy her burden of proving proximate cause.

## II. THERE IS SUFFICIENT EVIDENCE TO SUPPORT PLAINTIFF'S BREACH OF IMPLIED WARRANTY CLAIM

Defendants contend that in order to bring a claim for implied warranty of fitness under Tennessee law, Plaintiff must prove, *inter alia*, actual reliance by the buyer on the seller's skill and judgment, and that Plaintiff has no evidence that Mr. Smith relied on Defendants to select or furnish suitable goods for him. Defs.' Mem., pp. 12-13.

However, there is evidence that Mr. Smith, while he was taking Neurontin, had searched the Internet for information concerning Neurontin, and found information that Neurontin was extremely powerful, with numerous side effects. Finkelstein Decl., Ex. 1. Accordingly, there is evidence that Mr. Smith relied on information disseminated by Defendants concerning the safety and effectiveness of Neurontin for treating his pain, and continued to take Neurontin to treat his pain based upon his reliance upon such information.

Defendants further contend that Plaintiff failed to provide notice of Defendants' alleged breach of implied warranty within a reasonable time after he discovered or should have discovered any breach, citing *Friedman v. Georgia Showcase Co.*, 27 Tenn. App. 574, 579-80, 183 S.W.2d 9, 11-12 (Tenn. Ct. App. 1944). *Friedman* was a sales contract case where the plaintiff did not provide notice to the defendant of his intent to claim a breach by the defendant until at least two years after the alleged breach, when the pleadings were filed in the case. In contrast, here Mr. Smith committed suicide on May 13, 2004, and this wrongful death lawsuit providing Defendants notice of Plaintiff's breach of implied warranty claim was commenced by Plaintiff Ruth Smith on May 5, 2005, less than a year after her husband's death, and plainly within a reasonable time after Mrs. Smith discovered any breach.

### III. WHETHER BECAUSE OF DEFENDANTS' SUPPRESSION OF DEPRESSION/-SUICIDALITY INFORMATION, OR BECAUSE OF DEFENDANTS' AFFIRMATIVE MISREPRESENTATIONS, PLAINTIFF HAS RAISED TRIABLE ISSUES OF FACT REGARDING DEFENDANTS' FRAUD

It is well established under Tennessee law that concealment or suppression of the truth can constitute fraud:

> In 12 Ruling Case Law, p. 306, it is said: "As a general rule to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts. There must be a concealment, and the silence must amount to fraud. Concealment in this sense may consist in withholding information asked for, or in making use of some

7

device to mislead, thus involving act and intention. The term generally infers also that the person is in some way called upon to make a disclosure. It may be said, therefore, that, in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them."

\* \* \*

In the same book from which we quoted above, and on the next page, it is said: "But, while one cannot properly withhold the truth from those who have reason to expect information from him, those who do not look to him for information and expect no disclosure from him, cannot properly complain of his silence or successfully contend that he has suppressed the truth. Hence, in order that suppression of the truth may constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him. In other words, the facts concealed must be such as, in fair dealing, the one party has a right to expect to be disclosed, and such as the other party is bound to disclose. If, then, there is a legal obligation to speak, a failure to speak amounts to a suppression of the fact which should have been disclosed; and such failure is a fraud, but where there is no obligation to speak, silence cannot be termed suppression, and is not a fraud."

*Patten v. Standard Oil Co. of Louisiana*, 165 Tenn. 438, 443-44, 55 S.W.2d 759, 761 (1933); *see also Gurley v. Hickory Withe Partners, L.P.*, 2003 Tenn. App. LEXIS 674 at \*11-13 (2003) (fraud by concealment or suppression of the truth may be actionable when it constitutes a trick or contrivance or when there is a duty to disclose); *Rotello v. Clayton Homes of Delaware, Inc.*, 2006 U.S. Dist. LEXIS 68950 at \*5-6 (E.D. Tenn. 2006) (suppression can be the foundation for tort claims under Tennessee law where suppression is an element of a claim for fraud); *Anderson v. Warren*, 2001 Tenn. App. LEXIS 958 at \*9 (Tenn. Ct. App. 2003) ("As a general rule, a party may be held liable for damages caused by his failure to disclose material facts to the same extent that a party may be liable for damages caused by fraudulent or negligent misrepresentation"); *cf. B & R Constr. Co. v. Tennessee Investment Props., Inc.*, 1990 Tenn. App. LEXIS 852 at \*5-7

(1990) (record failed to establish any legal or equitable duty of disclosure, or any device to mislead, trick or contrivance).

This Court addressed certification of a class action involving Neurontin where it has been alleged that Defendants suppressed or misrepresented the results of negative or unfavorable studies concerning off-label uses, *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 93 (D. Mass. 2007); suppressed the publication of negative research concerning Neurontin, *id.* at 94; suppressed or misrepresented studies that demonstrated Neurontin was not effective for the off-label uses, *id.* at 95; suppressed a number of clinical studies that showed Neurontin to be ineffective or were inconclusive for pain indications, *id.* at 96; suppressed the results of the largest clinical trial related to Neurontin and painful diabetic neuropathy, *id.*; suppressed the results of internal testing concluding that overall, the analgesic effect of gabapentin and hydrocodone treatment was similar to hydrocodone treatment alone, *id.* at 97; and suppressed the results of other internal testing that did not find Neurontin to be effective in patients with postoperative pain following dental surgery. *Id.* This Court found that: "Plaintiffs have met their burden of demonstrating that the "key messages" of efficacy and clinical evidentiary support disseminated by plaintiffs, coupled with the suppression or misrepresentation of unfavorable data, are materially uniform per indication." *Id.* at 109.[1]

Judge Richard G. Stearns has also recognized that: "'Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression

---

[1] *See also* Order and Memorandum Opinion by the Honorable Mark J. Bernstein, J., dated June 29, 2007, in *Clark v. Pfizer Inc.*, Phila. Ct. Comm. Pleas, June Term, 2004, No. 1819, granting plaintiffs' motion for class certification of Pennsylvania Neurontin class action, Finkelstein Decl., Ex. 2; and Judge Bernstein's Opinion in the same case, denying Pfizer defendants' motion for summary judgment, and noting that under Pennsylvania law, a defendant may be liable for misrepresentation to foreseeable plaintiffs even without any direct relation between the parties). Finkelstein Decl., Ex. 3, at p. 14. (By Order and Opinion dated February 9, 2009, Judge Bernstein recently granted in part Pfizer defendants' motion for summary judgment, and granted defendants' motion for class decertification on other grounds.  Finkelstein Decl., Ex. 4.)

of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.'" *In re Lupron Mktg. & Sales Practices Litig.*, 2004 U.S. Dist. LEXIS 18512 at *11 (D. Mass. 2004) (discussing Pennsylvania law); see also *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 181 (D. Mass.) (discussing several state consumer protection act statutes concerning suppression or omission of any material fact in connection with the sale or advertisement of any merchandise).

In 1992, the U.S. Food & Drug Administration (FDA) evaluated Neurontin's use for Defendants' sought after epilepsy indication, and FDA advised Defendants that patients ingesting Neurontin may suffer worsening depression that may "require intervention or lead to suicide, as it has resulted in some suicide attempts." ECF Doc. # 1200-6, at p. 10. Finkelstein Decl., Ex. 5, at 0084477. Despite this knowledge, Defendants <u>suppressed</u>, concealed and failed to disclose information regarding depression/suicidality to Plaintiff's decedent, Richard Smith, and his prescribing physicians. Additionally, genuine issues of material fact exist as to whether Defendants' off-label promotion scheme for which they pled guilty, or Defendants' sales details to Mr. Smith's prescribers, influenced, induced and caused Mr. Smith's physicans to prescribe, and Mr. Smith to ingest Neurontin for off-label uses.

Defendants' actions resulted in preventing Mr. Smith and his prescribing medical providers from being able to fully assess the risk-benefit analysis for the underlying <u>off-label</u> condition for which Neurontin was prescribed to Mr. Smith, and from being able to fully monitor changes in Mr. Smith's mood and behavior caused by Neurontin. Consequently, Mr. Smith ingested Neurontin, and Neurontin was a substantial factor in his suicide. Because Plaintiff has raised genuine issues of material fact related to each element of Plaintiff's common law fraud claim, Defendants' motion should be denied.

Since at least 1992, Defendants knew that Neurontin was associated with depression/suicidality, yet Defendants suppressed this negative information while promoting Neurontin's safety and efficacy for off-label uses. In doing so, Defendants failed to provide adequate <u>written</u> depression/suicidality information in Defendants' Neurontin package insert (the "Label"), a "Dear Doctor" Letter,[2] or any other written communication to Richard Smith or his prescribing medical providers.[3] Additionally, Defendants' acts of suppression are reflected by the absence of any <u>verbal</u> information about despression/suicidality communicated by sales representatives to Richard Smith's prescribers.

As summarized below, Defendants knew about Neurontin's association with depression/suicidality but suppressed information important to Richard Smith and his medical prescribers:

1. Since 1992, Defendants knew of FDA's concern about Neurontin's association with depression and suicidality, albeit in the context of Neurontin's on-label indication for Epilepsy.[4] FDA prepared a Combined Medical-Statistical Review of Neurontin and stated "[D]epression, while it may [not be] an infrequent occurrence in the epileptic population,

---

[2] Even a single report of an adverse event during the postmarketing phase of a drug can trigger the need for a "Dear Doctor" Letter. For example, in October 2008, the Genentech drug company, which manufactures Raptiva®, issued a "Dear Doctor Letter" because of one reported case of progressive multifocal leukoencephalopathy (PML), a rare central nervous system disease, that was reported with use of Raptiva®. Finkelstein Decl., Ex. 6.

[3] Defendants suppressed depression/suicidality information in the product Label; thus, even in the absence of an actual visit and verbal detail from a sales representative, each physician who prescribed Neurontin did so based upon a Label in the physician's possession that did not include depression/suicidality information. Further, the Label's "Information for Patient" section did not communicate to Susan Bulger Neurontin's association with depression/suicidality.

[4] In 1992, Defendants' own ranking members of their Regulatory Department, including Dr. Richard Spivey, then Senior Director of Regulatory Affairs, and Janeth Turner, then Director of Regulatory Affairs, knew of the FDA's concern over Neurontin's association with suicidality as set forth in FDA's Combined Medical-Statistical Review (the "FDA Clinical Review") Finkelstein Decl., Ex. 7. On December 7, 1992, Ms. Turner provided the FDA 1992 Clinical Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development. Finkelstein Decl., Ex. 8, at p. 375:17-22, pp. 379-381. Ms. Turner was also a member of the Drug Development Team and New Product Committee whose stated purpose was to explore new uses for Neurontin beyond the epileptic population. Finkelstein Decl., Ex. 8, at p. 382:7-14. Despite Ms. Turner's knowledge as to the potential risks of depression/suicidality with Neurontin, she did not advise members of the Drug Development Team.

may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts." ECF Doc. # 1200-6, at p. 10; Finkelstein Decl., Ex. 5, at 0084477.

2. In 1995, Defendants retained consultant—and now Plaintiffs' expert in this case—Michael Trimble, M.D., who provided Defendants a paper entitled, *Psychosis with Gabapentin*. Dr. Trimble advised that "anticonvulsant drugs influence the mental state, and this can be broken down into adverse and beneficial effects . . . . The main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression." *See* ECF Doc. # 1200-109, at p. 6.

3. Defendants knew Neurontin's mechanism of action contributes to depression and suicidality, because Neurontin reduces the release of excitatory neurotransmitters (e.g., serotonin) in the brain.[5] Finkelstein Decl., Ex. 9, at pp. 11-14**;** Finkelstein Decl., Ex. 10, at p. 3; ECF Doc. # 1200-6, at p. 9, ¶ 39.

4. Defendants' own controlled clinical trial data demonstrated an association with suicidality, as confirmed by FDA over a decade later. In 2008, an FDA Alert indicated a doubling of the risk for suicidal behavior associated with the use of antiepileptic drugs, including Neurontin. The FDA analyzed 11 drugs, including Neurontin, and specifically stated that the results were generally consistent across all drugs reviewed.

5.  Incidences of positive dechallenge/rechallenge psychiatric events have been documented in Defendants' own clinical trials for Neurontin.[6] Since 1990, positive dechallenge/rechallenge reactions of depression were observed by Defendants' own investigators who rendered causal association assessments that the depression was probably related to Neurontin.[7]

---

[5] *See* ECF Doc. # 1200-103, at 0075642. ("Neurontin treatment may shift the relative balance of neurotransmitters from excitatory to inhibitory); ECF Doc. # 1200-104, at 0010853 ("In addition to reducing neurotransmitter release, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro"); *see* ECF Doc. # 1200-105, at 0005343 ("Inhibition of Neurotransmitter Release"); *see* ECF Doc. # 1200-106, at 115776 (1993 Product Monograph states "Neurontin slightly reduces the release of monoamine neurotransmitters in vitro"). *See* ECF Doc. # 1200-107, at pp. 13, 294-298, 300 (Deposition of Defendants' witness Leslie Tive, Medical Director, Team Leader for Neurontin (7/19/06)): "Q. Do you have any degrees? A. I do. Q. And what are your degrees? A. I have a Ph.D. in biopsychology with a specialization in neuropharmacology. Q. Okay. Would you agree that there are drugs sold by Pfizer that are utilized by patients to affect neurotransmitters in the brain? A. Yes. . . . Q. And as a neuropharmacologist, you understand what dopamine is, right? A. Yes. Q. You understand what serotonin is, right? A. Yes, I do. . . . Q. And when you reference serotonin, what is serotonin? A. It's another neurotransmitter. Q. Miss Tive, do you have an understanding as to whether an increased amount of serotonin or a decreased amount of serotonin in the brain can be associated with depression? A. An increase or decrease of serotonin in the brain can be associated with depression. . . . . Q. Let's talk about clinical depression. All right. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine? A. You're saying monoamines in general? Q. Correct. A. A reduction in monoamines has been associated with depression."

[6] "If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge. A positive rechallenge refers to the reoccurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug. ECF Doc. # 1200-6, at p. 12, ¶ 53.

[7] Defendants' causal association assessment ranged from Definite, Probable, Possible, or of Unknown Relationship. ECF Doc. # 1200-6, at p. 13 n.37. Defendants utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin

6. Since 1990, Defendants' own clinical trials reflected that Acute Severe Depression and Suicidal Ideation were expected adverse events associated with Neurontin. See ECF Doc. # 1200-98. Clinical trials demonstrated associated psychiatric adverse drug experiences observed by Defendants' own investigators. ECF Doc. # 1200-99, at pp. 13-15.[8]

7. Defendants' own Epilepsy clinical trials performed as part of their New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. In the total exposed population of said New Drug Application, seventy-eight (78) patients reported depression as an adverse event (e.g., 5.3% of the population of patients). Finkelstein Decl., Ex. 5, at 0084447. There were seven (7) reports of depression as serious adverse events, and nine (9) patients who withdrew from studies because of depression. Finkelstein Decl., Ex. 5, at 0084462.

8. Defendants' own Epilepsy clinical trials, performed as part of their New Drug Application for Neurontin, reflected at least seven (7) cases of "Depression" adverse events that Defendants' own medical investigator considered possibly or probably related to Neurontin; there was observed at least two (2) cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator. Finkelstein Decl., Ex. 5, at 0084467-0084468.

9. Defendants' own clinical trials reflected that approximately twice as many Neurontin patients (compared to placebo patients) withdrew as a result of clinically-related psychobiologic events. ECF Doc. # 1200-6, at p. 9, ¶ 39.

10. Defendants possessed post-marketing adverse event reports through 2002, prior to any potential notoriety bias that Defendants relate to the publicity of this litigation, demonstrating an association of psychiatric adverse events, including depression and suicidality, with Neurontin use. A 'safety signal' clearly existed, particularly with off label uses. ECF Doc. # 1200-6, at pp. 175-182, ¶¶ 263-282; pp. 192-195, ¶¶ 313-323.

Here, Richard Smith's prescribing medical providers, Doctors Paul McCombs and Edward Mackey, testified about the material information suppressed by Defendants in terms of its role in

---

(Protocol 945-15), and not a Bradford-Hill assessment. The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear. *Id.* Additionally, Defendants' own investigator rendered a causal association assessment during a clinical trial pertaining to diabetic peripheral neuropathy that a suicide attempt and intentional overdose were "definitely related" to Neurontin. ECF Doc. # 1200-100, at p. 59. Also, Health Canada, the Canadian Regulatory authority equivalent to FDA, has stated the following to Pfizer regarding dechallenge/rechallenge findings related specifically to Neurontin and post-marketing psychiatric adverse events: "One suicide attempt was found to have positive dechallenge/rechallenge, indicating that this event was related to gabapentin. ECF Doc. #`1200-48.

[8] During Defendants' own clinical trials prior to FDA approval for Neurontin's epilepsy indication, "Depression and Suicidal Ideation" was the ninth (9th) most common adverse reaction resulting in discontinuation of Neurontin. Finkelstein Decl., Ex. 5, at 0084444.

their prescribing practices. Both Doctors McCombs and Mackey, in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Mr. Smith, wanted to know about suicide attempts during clinical trials; depression adverse events during clinical trials, and whether depression and suicidality were side effects. Finkelstein Decl., Ex. 11, at 12:3-12:19, 12:20-14:23, 28:10-29:19; Finkelstein Decl. Ex. 12, at 34:14-36:25. Dr. Mackey's practice with Mr. Smith was to discuss the side effects relevant to Neurontin. Finkelstein Decl., Ex. 12, at 64:13-64:25. Dr. Mackey acknowledged that had he been informed of depression/suicidality information by Defendants, it would have certainly changed the way he treated Mr. Smith; he would have warned Mr. Smith. Finkelstein Decl., Ex. 12, at 42:17-43:9, 98:14-99:10.

Consequently, even in the absence of a specific affirmative misrepresentation by Defendants, Plaintiff raises issues of material facts in dispute as to whether Plaintiff's prescribing medical providers relied upon Defendants' suppression of depression and suicidality information. Because the concept of suppression involves the omission of an affirmative representation, it is axiomatic that Plaintiffs cannot point to one. Indeed, neither Mr. Smith nor his medical providers had the benefit of depression/suicidality information on which to rely, because Defendants suppressed or concealed such information in the first place. Richard Smith, and in particular, his prescribing medical providers, would have heeded a warning related to depression/suicidality had Defendants provided one. *See Section 402A of the Restatement (Second) of Torts*. In relevant part, comment j provides: "Where warning is given, the seller may reasonably assume that it will be read and heeded . . . ." *See Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992) ("To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have

14

responded to an adequate warning [footnote omitted] or subjective evidence of how the treating physician would have responded.").

Defendants also actively promoted Neurontin to Richard Smith's prescribing medical providers via direct sales representative detailing to the doctors' offices. Finkelstein Decl., Ex. 13. There is nothing in the entire factual record to reflect that any of Defendants' sales representatives informed Mr. Smith's prescribing medical providers of Neurontin's association with depression/suicidality. What is known is that the providers were detailed, and Mr. Smith was prescribed Neurontin for pain – an off-label, unapproved use. Finkelstein Decl., Ex. 12, at 28:14-28:19. In fact, although Defendants acknowledge it was inappropriate to detail physicians other than Neurologists and Epileptologists, Finkelstein Decl., Ex. 14, at 45:8-45:25; *see* Finkelstein Decl., Ex. 15, at 009942, Defendants detailed Mr. Smith's providers: a neurosurgeon, an orthopedist, and a nurse. In doing so, Defendants, who breached their own internal standards, fraudulently represented to Mr. Smith's prescribing physicians that Neurontin was safe and/or efficacious for indications never approved for use by the FDA (e.g., pain and neuropathic pain).

For example, prior to Mr. Smith's death, Defendants' sales representative actively promoted Neurontin to Mr. Smith's orthopaedist, Edward Mackey, M.D., and the doctors in his medical practice on approximately 69 occasions with respect to Neurontin. Finkelstein Decl., Ex. 16. Dr. Mackey testified that Defendants detailed him about "neuropathic pain", which is an off-label, unapproved use by the FDA. Finkelstein Decl., Ex. 12, at 76:23-77:16.

Defendants' sales representative actively promoted Neurontin to Mr. Smith's healthcare provider, Pamela Krancer, an Advanced Practice Nurse, on approximately 27 occasions with respect to Neurontin. In fact, Defendants' sales representative (Ashley Pippin) planned to "probe" into where Nurse Krancer was dispensing Neurontin and "get help through her with other surgeons." Finkelstein Decl., Ex. 17. Defendants' sales representatives clearly acted on this "probe" plan as

evidenced by the more than 300 occasions in which Defendants detailed the medical practice and distributed Neurontin samples[9] where both Mr. Smith sought treatment and Nurse Krancer worked. Finkelstein Decl., Ex. 18. Defendants' sales representative also detailed Mr. Smith's prescriber, Paul McCombs, III, M.D., a neurosurgeon, on approximately three occasions with respect to Neurontin. Finkelstein Decl., Ex. 19.

Whether the Court considers Richard Smith's direct contact with Defendants' Label (via its "Information for Patient" section), his prescribing medical providers' direct contact with Defendants' Label, or his prescribers' direct contact with Defendants' sales representatives, Defendants <u>suppressed</u> the above referenced information regarding Neurontin and depression/suicidality. Such information was material to Richard Smith's Neurontin prescribers.

The evidence of Defendants' guilt related to their admitted fraud and off-label promotion scheme, about which this Court is fully aware,[10] coupled with the above documented promotional visits by sales representatives, and testimony from Mr. Smith's prescribing medical providers, demonstrates a genuine issue of material fact as to whether his prescribers were influenced by Defendants' <u>affirmative fraudulent promotion</u> of Neurontin as safe and effective for treatment of pain, depression or anxiety – all off-label uses. *See In Re: Pharmaceutical Ind. Avg. Wholesale Price Litigation*, 252 F.R.D. 83, 99 (D. Mass. 2008) (quoting *Group Health Plan, Inc., v. Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn. 2001) ("where the plaintiffs' damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number

---

[9] Noteworthy, each distribution of a Neurontin sample to the medical practice also included the Neurontin Label which Defendants admit provided inadequate directions for unapproved uses. This admission is reflected in their 2004 guilty plea for distributing a misbranded drug. *See* ECF Doc. # 1200-3.

[10] *See In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 114 (D. Mass. 2007) (this Court extensively detailed Defendants' "End-Run on the FDA" and illegal "Off-Label Promotion": "This case is troublesome because defendants allegedly used a national marketing scheme to promote a fraud. If true, they should not get off scot-free if there is a practical statistical way to address the difficult causation issues.").

of consumers, the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products.")).

In *Knipe v. Smithkline Beecham,* 583 F. Supp. 2d. 602 (E.D. Pa. 2008), the federal court addressed a strikingly similar situation as the Court confronts here. In *Knipe*, the makers of the drug Paxil defended claims that their drug was associated with suicidality and that they allegedly misrepresented the safety/efficacy of Paxil. The defendant drug company sought to dismiss the plaintiff's fraud claim because the plaintiff could not put forward a specific affirmative fraudulent representation by the drug company to the plaintiff's prescriber. Notwithstanding the lack of a specific affirmative misrepresentation to the prescribing physician, the *Knipe* Court denied the drug company's motion to dismiss Plaintiff's fraud claims where the plaintiff's prescribing physician had been influenced by the medical community and his partners, and his prescribing practices were generally guided by information from many other sources, including medical journals, the PDR, and lectures. *Id.* at 621-22.

> Any of these sources—not simply the brochures and GSK sales representative meetings referenced by Defendant—could have resulted in him relying upon, in some attenuated fashion, the substance of GSK's alleged misrepresentation regarding Paxil. Nothing in the record supports Defendant's unsubstantiated suggestion that Dr. Durham relied solely on his own medical intuition about the safety and efficacy of the drug. Any challenges by Defendant to Dr. Durham's lack of specificity regarding the sources of his information about Paxil are ultimately questions for the jury. [*Id.,* at 623.][11]

---

[11] This Court, in *In Re Neurontin Mkg. & Sales Practices Litig.*, 244 F.R.D. 89, 113 (2007), albeit in denying class certification of an "overbroad class", commented on the viability that fraud could be proven circumstantially and without proof of a specific affirmative misrepresentation to a given prescriber: "If Dr. Rosenthal has an accurate methodology for calculating that, say, 85% of all Neurontin prescriptions for migraines resulted from a fraudulent marketing campaign, it seems reasonable for a TPP to allege that 85% of its reimbursements for that indication were a result of the fraud." *Id.* This Court stated further that although "plaintiffs have pointed to cases in which courts have certified consumer classes without requiring proof of individual causation and injury, they have not identified a single case where a court certified an overbroad class with members who were not injured under such a theory." *Id.* Here, Plaintiff's decedent, Susan Bulger, is not a member of an "overbroad class"; the *Knipe* case is squarely on all points with the case at bar; and Plaintiff has put forth marketing expert Charles King III, Ph.D.'s testimony in support of Plaintiff's fraud claim.

17

The *Knipe* Court concluded that taken as a whole, such evidence created a genuine issue of material fact as to whether the plaintiff's prescriber was influenced, albeit indirectly, by the defendant drug company's fraud. *Id.; see also Michael v. Shiley, Inc.,* 46 F.3d 1316 (3d Cir. 1995) (finding sufficient evidence to raise a genuine issue of fact on fraud claim where, despite no direct evidence that prescribers were targeted by Defendant, the prescribers had read standard journals to remain current in their field).

Here, Dr. Mackey acknowledged that his understanding of Neurontin's off-label use to treat Dr. Smith's pain was in part based upon his interactions with other doctors in his practice. Finkelstein Decl., Ex. 12, at 27:6-27:13. He testified that he subscribed to journals and that he consulted physicians outside of his practice as well as with his partners, Doctors Clendenin and Nichols—neither were neurologists or epileptologists—but both had been detailed extensively by Defendants about Neurontin for off-label uses. Finkelstein Decl., Ex. 16; Finkelstein Decl., Ex. 12, at 28:20-31:25, 74:1-74:23. Dr. Mackey acknowledged that he utilized the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels that would include Neurontin, for his risk/benefit analysis before prescribing a drug. Finkelstein Decl., Ex. 12, at 73:12-73:25. Dr. Mackey also provided testimony that he had been detailed by Defendants' sales representative regarding Neurontin who discussed Neurontin usage and who provided samples for distribution. Finkelstein Decl., Ex. 12, at 75:7-78:4. Applying *Knipe* to the case at bar, Plaintiff has raised a triable issue of fact as to Defendants' fraudulent conduct and whether Mr. Smith's prescribing medical providers were influenced, directly or indirectly, by Defendants.

Moreover, Plaintiff's marketing expert, Charles King III, Ph.D., also explains how Defendants' extensive marketing of Neurontin for off-label uses influenced healthcare providers

18

like Doctors Crognale and Goldman even in the absence of a specific affirmative mispresentation:

> Most doctors likely would never had heard of Neurontin but for the off-labeling marketing efforts of Warner-Lambert and allegedly Pfizer.  The inability to prove that Warner-Lambert or Pfizer contacted a doctor directly does not mean that that doctor was not influenced by Warner-Lambert and Pfizer marketing efforts. Pfizer's off-label marketing of Neurontin directly influenced all, or substantially all, doctors prescribing Neurontin in one of two ways.  First, **a doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did.**  Second, all, or substantively all, doctors were indirectly affected by Pfizer's **suppression of negative or adverse information about Neurontin that would have affected their prescribing habits**.  [Emphasis added.]

Finkelstein Decl., Ex. 20, at p. 44.

In conclusion, reading the record in the light most favorable to Plaintiff, there are genuine issues of material fact in dispute that reflect Defendants' fraudulent conduct related to Plaintiff"s decedent and his medical prescribers.  Consequently, Defendants' motion for summary judgment on Plaintiff's fraud claim should be denied.

## CONCLUSION

As discussed above, Plaintiff expects this Court will deny Defendants' motion to exclude the testimony of Plaintiff's specific causation experts, Dr. Maris and Prof. Trimble, because Plaintiff has sufficient evidence on the issue of specific causation and can satisfy his burden of proving proximate cause. Further, in view of the above, it is respectfully requested that this Court deny those parts of Defendants' motion for summary judgment on Plaintiff's breach of implied warranty and fraud claims.

Dated:  February 23, 2009                                         Respectfully submitted,

                                                                                    Finkelstein & Partners, LLP
                                                                                    Attorneys for Plaintiff Ruth Smith


                                                                 By:      /s/ Andrew G. Finkelstein
                                                                                    Andrew G. Finkelstein, Esquire
                                                                                    Finkelstein & Partners, LLP
                                                                                    1279 Route 300, P.O. Box 1111
                                                                                    Newburgh, NY  12551

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on February 23, 2009.

                                                                                     /s/ Andrew G. Finkelstein
                                                                                    Andrew G. Finkelstein, Esquire