EXHIBIT 12

**1**

In re: NEURONTIN        MDL Docket No. 1629

MARKETING, SALES       Master File No.

PRACTICES and PRODUCTS        04-10981

LIABILITY LITIGATION    Judge Patti B. Saris

            Magistrate Judge

            Leo T. Sorokin

RUTH SMITH,

   Plaintiff,     C. A. No.  05-11515

V.

PFIZER, INC., et al.,

   Defendants.

   Videotaped Deposition of:

   EDWARD MACKEY, M.D.

   Wednesday, May 23, 2007

**2**

1
2    STIPULATIONS
3       It is stipulated and agreed, by
4  and between the parties through their
5  respective counsel, that the videotaped
6  deposition of:
7       EDWARD MACKEY, M.D., may be
8  taken before Fred W. Jeske, court reporter and
9  Tennessee Notary Public, at the offices of
10 Miller & Martin, 1200 US Bank Tower, 150 Fourth
11 Avenue, North, Nashville, Tennessee, on
12 Wednesday, May 23, 2007, commencing at
13 approximately 8:40 a.m.
14      It is further stipulated and
15 agreed that the signature to and reading of the
16 deposition by the witness is waived, the
17 deposition to have the same force and effect as
18 if full compliance had been had with all laws
19 and rules of Court relating to the taking of
20 depositions.
21
22
23
24
25

**3**

1
2       It is further stipulated and
3  agreed that it shall not be necessary for any
4  objections to be made by counsel to any
5  questions, except as to form or leading
6  questions, and that counsel for the parties may
7  make objections and assign grounds at the time
8  of the trial, or at the time said deposition is
9  offered in evidence, or prior thereto.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1   APPEARANCES:
2   For the Plaintiff:
       ANDREW G. FINKELSTEIN
3      KEITH ALTMAN
       Finkelstein & Partners
4      436 Robinson Avenue
       Newburgh, New York  12550
5      (800) 634-1212
       afinkelstein@lawampm.com
6   -and-
       W. MARK LANIER
7      ROBERT LEONE
       DARA HEGAR
8      PATRICK O'HARA
       The Lanier Law Firm
9      6810 FM 1960 West
       Houston, Texas  77069
10     Post Office Box 691448
       Houston, Texas  77269-1448
11     (713) 659-5200
       wml@lanierlawfirm.com
12
    For the Defendant Pfizer:
13     KENNETH J. FERGUSON
       CEDRIC E. EVANS
14     Clark, Thomas & Winters
       300 West 6th Street, 15th Floor
15     Austin, Texas  78701
       P.O. Box 1148
16     Austin, Texas  78767
       (512) 472-8800
17     cee@ctw.com
18  For the witness:
       NOEL F. STAHL
19     Miller & Martin
       1200 one Nashville Place
20     150 Fourth Avenue North
       Nashville, Tennessee 37219
21     (615) 744-8503
       nstahl@millermartin.com
22
    Also present:
23
       Jonathan Wilkerson, law clerk
24     Sheldon Singh, videographer
25         -oOo-

### Page 25

1  Q.  (By Mr. Lanier) If you'll go back to
2  this information, the Exhibit 5 that was filed
3  with the government, on page 8, talks about
4  other ways that Warner-Lambert, Pfizer was
5  promoting through medical liaisons off-label
6  uses. Do you see that?
7  A.  Yes.
8  Q.  It says Warner-Lambert employed medical
9  liaisons who were presented to doctors or
10 physicians as employees of the company's
11 medical and scientific affairs department.
12 Then they specifically cite one occasion where
13 one of the Warner-Lambert liaisons promoted
14 Neurontin for unapproved uses, subparagraph A
15 shows it's in June of '96. Do you see that?
16 A.  Yes.
17 Q.  And was a presentation made at Longwood
18 Gardens in Kenneth Square, Pennsylvania, to a
19 group of doctors who were members of a local
20 medical society. Do you see that?
21 A.  Yes.
22 Q.  The sales representative and the
23 medical liaison selected the topic for the
24 presentation to the local medical society.
25 After deciding in consultation with the sales

### Page 26

1  rep that Neurontin would be the topic, the
2  medical liaison prepared the presentation. Do
3  you see that?
4      And then subpart C, among the
5  topics of the presentation was the use of
6  Neurontin for unapproved uses. Do you see
7  that, sir?
8  A.  I do.
9  Q.  During the presentation, in the
10 presence of the sales rep, the medical liaison
11 promoted the use of Neurontin in the treatment
12 of a number of unapproved uses. Do you see
13 that as well?
14 A.  I do.
15 Q.  Another example of this, sir, is given
16 on page 10. If you would flip there, please.
17 A.  Um-hum.
18 Q.  Paragraph 27, it's talking about
19 another conference where the physicians in
20 attendance, among the presentations made to the
21 physicians in attendance was one relating to
22 unapproved uses entitled Reduction of Pain
23 Symptoms During Treatment with Gabapentin. Do
24 you understand gabapentin is the technical name
25 for Neurontin?

### Page 27

1  A.  I do.
2  Q.  It says during this presentation
3  Neurontin was promoted for use in the treatment
4  of pain. Do you see that as well?
5  A.  I do.
6  Q.  Now, sir, during your medical career,
7  either through interactions with the doctors in
8  your clinic or through going to any of these
9  presentations or through reading what other
10 people are saying, had you been under the
11 impression that Neurontin was effective for
12 pain relief in a person like Mr. Smith?
13 A.  Yes.
14 Q.  When you make determinations like this,
15 I asked you this earlier but the question was
16 objected to, so I got to reask it in another
17 form.
18     Do you go out there and do your
19 own independent medical research on drugs
20 before you prescribe them?
21 A.  No.
22 Q.  Do you rely upon the drug companies to
23 be honest and forthright with you?
24     MR. FERGUSON: Object to form.
25 A.  Yes.

### Page 28

1  Q.  (By Mr. Lanier) Do you rely on the
2  drug companies to tell you both the, the good
3  and the bad and the ugly about their drugs, be
4  honest about it?
5  A.  Yes.
6  Q.  Don't doctors like you, who are busy
7  treating people, have to rely upon drug
8  companies to tell you the truth? I mean would
9  you have time to go out and, and do major
10 medical research on every drug you prescribe?
11 A.  No.
12     MR. FERGUSON: Object to form.
13     Excuse me, Doctor. Sorry.
14 Q.  (By Mr. Lanier) When you prescribed
15 Neurontin to Mr. Smith, did you do it for
16 pain --
17 A.  Yes.
18 Q.  -- relief?
19 A.  Yes.
20 Q.  Now, how important is it to you --
21 well, let me take a step back. I didn't ask
22 you this. Where did you learn it might work
23 for pain relief? Was it from the doctors in
24 your clinic? Was it from -- do you know?
25 A.  Ah, not exactly. I certainly spent

**29**

1  some time trying to find out where I first
2  heard about it, and then subsequently different
3  sources going forward, and -- but I can't tell
4  you exactly who.
5   Q.    I would assume, we've got a chance to
6  look at -- the Pfizer folks were putting a lot
7  of samples in your office of this drug?
8   A.    Yes.
9   Q.    And they were making calls not just on
10  Dr. Clendenin but, oh, there is another doc,
11  Dr. Nichols. Do you know a Dr. Nichols?
12  A.    Dr. Nichols and Dr. Clendenin are both
13  pain, what we call physical medicine rehab.
14  They deal with a lot of chronic pain issues.
15  Q.    Okay.
16  A.    So -- and they're partners, and
17  partners within our group.
18  Q.    Okay. Now they're not shingles
19  doctors, though, are they?
20  A.    No, they are not.
21  Q.    They are not epileptic doctors, are
22  they?
23  A.    No.
24  Q.    So when the Pfizer people were making
25  sales calls on them for Neurontin and giving

**30**

1  them Neurontin, by definition they're not doing
2  it for the label reasons, they're not doing it
3  for shingles or, or epilepsy, are they?
4         MR. FERGUSON: Object to form.
5   A.    Certainly neither Clendenin nor Nichols
6  treat seizures.
7   Q.    Okay.
8   A.    They may have had an occasion to treat
9  postherpetic neuralgia.
10  Q.    Okay.
11  A.    But clearly not the dominant reason
12  they prescribed it.
13  Q.    (By Mr. Lanier) Right. And I assume
14  you would interact with these folks enough to
15  know if, if they're being told that Neurontin's
16  effective for pain and the samples are being
17  given, would that be one of the places where
18  you would have gotten some of your knowledge
19  about possibly using it?
20        MR. FERGUSON: Object to form.
21  A.    Yeah, the rule -- the sort of the setup
22  in our office, the PM&R guys handle
23  non-operative back and pain. I'm a spine
24  surgeon, and I do a lot of the operative, but
25  clearly I have patients who have pain issues,

**31**

1  either operative or non-operative, that I rely
2  on them to some extent to guide me.
3   Q.    Okay. I guess what I'm driving at is,
4  I don't show that the Pfizer people directly
5  went to you and said, Here, use Neurontin for
6  pain. I see that they went to your partners
7  that are the pain specialists in the clinic,
8  and, and I'm trying to figure out if, if that
9  would have had an influence on your
10  prescription writing when you're writing
11  something for pain before you do a surgery to
12  see if conservative treatment would work.
13        MR. FERGUSON: Object to form.
14  Q.    (By Mr. Lanier) Would it have any
15  bearing on you?
16  A.    I definitely interact with Clendenin
17  and Nichols on a regular basis.
18  Q.    Great.
19  A.    And the issues of pain management come
20  up regularly, my asking them for input advice,
21  not just on this but other issues than that.
22  Q.    Fair enough.
23        Now, Doctor, had you ever -- all
24  right. Let me, let me back up and explain why
25  I'm asking these questions. And this is

**32**

1  probably objectionable, so get ready -- get on
2  the edge of your seat.
3         MR. FERGUSON: Thanks for the
4  tip.
5         MR. LANIER: All right. I'm
6  just warning you.
7         MR. STAHL: Do you want someone
8  to rule on it too?
9         MR. LANIER: No. I'm telling
10  you, we can, we can do the whole thing.
11  No, this is, this is just what I call
12  sign-posting. I'm just telling you where
13  I'm going. I can't play this to the jury,
14  so they're going to object and make sure I
15  don't play it to the jury, and I'll
16  stipulate right now this is probably
17  something I can't play to the jury.
18        Here it is:
19  Q.    (By Mr. Lanier) One of the pleadings
20  that Pfizer has filed in this case indicates
21  that Pfizer's saying that this isn't their
22  fault, that you are what's called a learned
23  intermediary, and by that they mean you knew
24  everything there was to know about this drug
25  and you decided to prescribe it, so don't blame

**Page 33**

1  them, blame you.
2  　　　　Obviously we don't blame you.
3  We don't see that you have done anything wrong
4  at all.
5  　　　　But because they say that you're
6  the learned intermediary, I got to ask you some
7  questions about did you know all this kind of
8  stuff and see if you knew what they think you
9  knew.
10 　　　　Do you want to object to that?
11 　　　　MR. FERGUSON:  Yeah, can I go
12 ahead and object?
13 　　　　And also say it's not true what
14 he said.
15 　　　　MR. LANIER:  Oh, so you're
16 waiving -- you will not assert a learned
17 intermediary defense?  Then I can skip
18 these.
19 　　　　MR. FERGUSON:  There is no -- no
20 one's blaming you, Doctor.
21 　　　　MR. LANIER:  Are you asserting a
22 learned intermediary defense?
23 　　　　MR. FERGUSON:  We're asserting
24 the defenses we've asserted.
25 A.  Press on.

**Page 34**

1  Q.  (By Mr. Lanier)  Doctor, did anyone
2  ever tell you or did you know that taking
3  Neurontin reduces the serotonin in the brain?
4  　　　　MR. FERGUSON:  Object to form.
5  A.  No.
6  Q.  (By Mr. Lanier)  Would you have liked
7  to have known such a fact --
8  　　　　MR. FERGUSON:  Object to form.
9  Q.  (By Mr. Lanier) -- before you started
10 prescribing it for pain?
11 　　　　MR. FERGUSON:  Object to form.
12 A.  I don't know how it would have impacted
13 me one way or the other.
14 Q.  (By Mr. Lanier)  All right.  Would
15 you -- did -- did you know before you
16 prescribed it that the FDA, before they
17 approved the drug for the very limited purposes
18 they approved it for, that the FDA specifically
19 said to ultimately Pfizer that a serious event
20 might limit the drug's widespread usefulness,
21 several of them actually, the third being
22 depression, specifically.  While it may not be
23 an infrequent occurrence in the epileptic
24 population, depression may become worse and
25 require intervention or lead to suicide as it's

**Page 35**

1  resulted in some suicidal attempts.
2  　　　　Did you know about that concern
3  on this drug before you prescribed it?
4  A.  No.
5  　　　　MR. FERGUSON:  Object to form.
6  And could you identify what document you
7  were reading from, please?
8  　　　　MR. LANIER:  Yeah.  This is a
9  1993 document that was -- we had to get
10 through the Freedom of Information Act
11 because it was not widely available.
12 　　　　I'll mark it as Exhibit 6.
13 (Exhibit 6 marked.)
14 Q.  (By Mr. Lanier)  This is an FDA
15 document.
16 　　　　I'm assuming you have never seen
17 this document before.
18 A.  No.
19 Q.  All right.  On page 117 it talks about
20 problems with suicide.  It talks about -- let
21 me show you the --
22 A.  I'm looking at it.
23 　　　　MR. FERGUSON:  It's the third
24 paragraph?
25 　　　　MR. LANIER:  Yes, third

**Page 36**

1  paragraph has got the suicide, and then the
2  bottom paragraph has got the reference to
3  clinically important depression.
4  Q.  No one ever told you about that, did
5  they?
6  　　　　MR. FERGUSON:  Object to form.
7  A.  No.
8  Q.  (By Mr. Lanier)  Am I correct, no one
9  ever told you about that?
10 A.  No.
11 Q.  No, as in no, they did not tell you?
12 A.  No, they did not tell me.
13 Q.  All right.  Is that the kind of thing
14 that would be important to know before you
15 start prescribing a drug?
16 　　　　MR. FERGUSON:  Object to form.
17 A.  Yes.
18 Q.  (By Mr. Lanier)  All right.  Because if
19 you're going -- if you have got a drug that,
20 that may cause suicide, clinically significant
21 depression, you probably had other optional
22 drugs you could have given Mr. Smith that, that
23 don't seem to have that side effect; true?
24 　　　　MR. FERGUSON:  Object to form.
25 A.  Potentially, yes.

**37**

1  Q.   (By Mr. Lanier) And, and at least if
2  you're going to prescribe a drug that might
3  have those side effects, if you know about them
4  ahead of time, you would be able to warn the
5  patient, --
6  A.   Yes.
7  Q.   -- wouldn't you?
8  A.   Yes.
9  Q.   Now, did anybody at either Pfizer or
10 Warner-Lambert or any of your partners or
11 anybody out there tell you about some of the
12 testing that was done on this drug by the
13 company where the testing itself showed pretty
14 clearly that this drug leads to suicide?
15       MR. FERGUSON:  Object to form.
16 Q.   (By Mr. Lanier) Do you know about any
17 of those tests?
18       MR. FERGUSON:  Same objection.
19 A.   I'm not aware of any of those tests.
20 Q.   (By Mr. Lanier) Did you know anything
21 about -- have you ever heard of a doctor whose
22 name is Dr. David Franklin?
23 A.   No.
24 Q.   Dr. Franklin -- I'm going to give you
25 an exhibit we'll mark as Exhibit 7.  And it's

**38**

1  an affidavit of Dr. Franklin.
2        MR. LANIER:  Noel, here's a copy
3  for you.  I don't mean to exclude you from
4  this.
5        MR. STAHL:  That's fine.
6        MR. LANIER:  I apologize.
7        MR. FERGUSON:  He'll read it
8  tonight.
9        MR. LANIER:  He'll spend a lot
10 of time pouring over this affidavit.
11 (Exhibit 7 marked.)
12 Q.   This is an affidavit for a fella.  You
13 can get an idea of who he is just by looking at
14 the beginning.
15       He is a Ph.D., did a two-year
16 research fellowship with Harvard Med School and
17 Dana-Farber.  And if you will look on page 2,
18 he was hired, in paragraph 6, by Warner-
19 Lambert's Parke-Davis division to work as a
20 medical liaison.  And he didn't do it long.  He
21 did it for just a little over four months, when
22 he quit, effective immediately.  Didn't even
23 give two weeks' notice.  Do you see that?
24 A.   Yes.
25 Q.   All right.  This gentleman -- if you'll

**39**

1  turn to page 4, you will see paragraph 15.  I
2  was trained and instructed to tell physicians
3  that Parke-Davis had statistically significant
4  data that indicated Neurontin was highly
5  effective in the treatment of a variety of
6  syndromes.  Then he includes a bunch, ALS,
7  bipolar disorder, painful diabetic neuropathy,
8  peripheral neuropathy.
9        Neuropathy, is that nerve pain?
10 A.   Yes.
11 Q.   Is -- that may be one of the problems
12 that was possibly, a possible diagnosis for
13 Mr. Smith?
14 A.   Yes.
15 Q.   And then there are some others listed
16 there.  He actually says, I made those
17 representations, and he lists doctors that he
18 made them to.  And says, I witnessed as part of
19 my on-the-job training some others represent
20 that it was safe and effective for those
21 unapproved indications.
22       Then look at paragraph 16.
23 Parke-Davis had no significant data from
24 clinical trials to support those
25 representations.  Do you see that?

**40**

1  A.   Yes.
2  Q.   Paragraph 17.  I was trained and
3  instructed to misrepresent the amount of
4  clinical evidence available to support the use
5  of Neurontin.  You see that?
6  A.   I do.
7  Q.   Little bit further down in that
8  paragraph, I was instructed to lead doctors to
9  believe that Dr. Bruce Ehrenberg's 160 patients
10 were enrolled in a well controlled clinical
11 trial and were achieving a 90 percent response
12 rate.  This was untrue.  Do you see that as
13 well?
14       MR. FERGUSON:  Object to form.
15 A.   Yes, I see it.
16 Q.   (By Mr. Lanier) On page 7, paragraph
17 21, it's got a transcript from a phone message
18 left by a Phil Magistro the ultimately Pfizer
19 medical director of affairs for the northeast
20 business unit.  Do you see the single-spaced
21 statement, the transcript?
22       MR. FERGUSON:  Object to form.
23 Q.   (By Mr. Lanier) There in paragraph 21,
24 the single space, do you see that?
25 A.   Yes.

**41**

1  Q.   It says, Medical liaisons, this is
2  Phil. I'm calling in regard to the, you know,
3  there's a Neurontin push that's supposed to be
4  on. What we'd like you to do is, any time
5  you're called out, just make sure you're --
6  that your main focus out of what you're doing
7  is on Neurontin. I'm not saying don't do
8  Accupril calls, but the idea is you're supposed
9  to be pushing on Neurontin. I think some
10 people have lost that message, and I think a
11 lot may be somewhat ineffectual in that regard.
12 So what we need to do is focus on Neurontin.
13 When we get out there, we want to kick some A
14 on Neurontin. We want to sell Neurontin on
15 pain, all right? And mono therapy, and
16 everything that we can talk about, that's what
17 we want to do, because I'm embarrassed. I
18 don't know if you guys are embarrassed, but I'm
19 embarrassed about where we are with Neurontin.
20 We got to take it into our own hands and really
21 kick some A on it. All right? Let's do it up.
22 Talk to you soon. Bye. See that?
23 A.   Yes.
24 Q.   Paragraph 22, I was trained and
25 instructed to use a number of misleading

**42**

1  abstracts and case reports in promoting
2  Parke-Davis's prescription drugs, including
3  Neurontin, for a variety of medically
4  unacceptable uses. Do you see that as well?
5  A.   Yes.
6  Q.   Sir, as a doctor, is it important to
7  you that drug companies put patient safety
8  first?
9  A.   Yes.
10 Q.   Is it important to you that drug
11 companies follow FDA instructions and rules and
12 guidelines --
13      MR. FERGUSON:  Object to form.
14 Q.   -- about what they're telling you and
15 what they're not?
16 A.   Yes.
17 Q.   (By Mr. Lanier) Now if you had been
18 told either in the labeling information or
19 through sales reps or, Dr. Mackey, through your
20 partners, if you had been told that Neurontin
21 was a drug with some of the problems we've
22 talked about so far today, would it have
23 changed the way you treated Mr. Smith?
24      MR. FERGUSON:  Object to form.
25 A.   Possibly. Probably.

**43**

1  Q.   (By Mr. Lanier) Probably. And by
2  probably, would it have meant you would have
3  either tried another drug first, or would you
4  have at least put out some warnings and some
5  safeties and precautions and told them what to
6  be observant about?
7      MR. FERGUSON:  Object to form.
8  A.   Certainly I would have done the
9  latter.
10 Q.   Okay.
11 A.   And I don't know about the former.
12 Q.   (By Mr. Lanier) All right. Now if
13 someone's at risk of -- I don't know that you
14 see often someone that you consider a suicide
15 risk in your practice, but if you see someone
16 that presents that you think is a serious
17 candidate for suicide, I would assume you would
18 do something about that. There is some
19 protocol.
20 A.   Yes.
21 Q.   Okay. Mr. Smith, when he presented to
22 you, I've read through your chart, there's
23 nothing about him that made you think he was a
24 suicide risk when he presented, was there?
25 A.   No.

**44**

1  Q.   All right. How did you find out about
2  his death?
3  A.   His wife called our office and spoke
4  with our telephone answering operator and then
5  spoke with my nurse.
6  Q.   Okay. Did you by any chance file a
7  MedWatch report with the FDA after this, do you
8  know?
9  A.   I don't know. I don't think I've
10 ever -- I don't know to do that or --
11 Q.   Yeah. I didn't think so, but I didn't
12 see one, and I just wasn't sure.
13      MR. LANIER:  I'm going to, I've
14 used 45 of my minutes. I'm going to save
15 my other 45. I'm going to pass the witness
16 and see if he can really do it in 44.
17      MR. FERGUSON:  Doctor, are you
18 doing okay? Do you need a break or
19 anything?
20      THE WITNESS:  I'm okay.
21      CROSS-EXAMINATION
22 BY MR. FERGUSON:
23 Q.   Dr. Mackey, we met briefly before the
24 deposition. My name is Ken Ferguson. I
25 represent Pfizer in this matter. Do you

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

**Page 61**

1  dementia, or forgetfulness, and I may have
2  taken her words and put it into the term
3  dementia. But, you know, she certainly --
4  they're a very involved family, very, you know,
5  interested in the well-being of their, their
6  father. And she pulled me aside and asked me
7  that question, so I, as I recall, made an
8  appointment, but I don't think he ever went to
9  that appointment.
10 Q.    Do you know why he never went to that
11 appointment?
12 A.    No.
13 Q.    You did write a prescription for
14 Neurontin on that day; is that correct?
15 A.    Um, you know, as I said earlier, I
16 don't -- I could not find that. I'll have to
17 take, you know, whatever you can produce. But
18 I, I -- I am -- if, if you say I did, I'm sure
19 I did. I did use it for that type of problem.
20 Q.    You have no recollection of having done
21 it, but if the records would reflect that,
22 then --
23 A.    I would not argue.
24 Q.    Okay. When you say that you used
25 Neurontin for that kind of problem, what are

**Page 62**

1  you referring to?
2  A.    Nerve pain.
3  Q.    So this was not the first patient you
4  prescribed Neurontin for?
5  A.    No.
6  Q.    Any estimate about how many patients
7  you had prescribed Neurontin for before, for
8  this kind of nerve problem?
9  A.    I don't -- I couldn't tell you.
10 Q.    It's something that you did fairly
11 regularly?
12 A.    Yes.
13 Q.    Do you know when you started
14 prescribing Neurontin?
15 A.    Back in my fellowship. I did my
16 fellowship out at San Francisco, and I know we
17 started using it for neuropathic pain during
18 that time.
19 Q.    And what time period was that?
20 A.    I believe it was '94 to '95. My CV
21 will have it down to the exact, but I'm pretty
22 sure that's the year.
23 Q.    Once you got into your practice and
24 were prescribing Neurontin, did you see
25 benefits from it for your patients?

**Page 63**

1  A.    Yes.
2  Q.    If you prescribed a medication that
3  none of your patients benefited from, would you
4  continue to prescribe it?
5  A.    No.
6  Q.    And do you monitor your patients after
7  you prescribe a particular medication for them
8  to see if they get some benefit?
9  A.    I do.
10 Q.    When you prescribe medication
11 generally, is it true that some patients may
12 benefit and some patients may not benefit from
13 the use of that medication?
14 A.    That is true.
15 Q.    And was that true of Neurontin as well?
16 A.    Yes.
17 Q.    And with respect to Mr. Smith, before
18 you prescribed Neurontin, you're aware that he
19 took some other pain medications without
20 relief?
21 A.    That is correct.
22 Q.    What discussion, if any, took place, or
23 do you recall any discussion between you and
24 either Mr. Smith or his family members on that
25 day regarding the use of Neurontin?

**Page 64**

1  A.    Um, in terms of dosing, side effects?
2  Q.    Yes, sir.
3  A.    Um, I don't recall.
4  Q.    Do you have a normal practice in that
5  regard, if you're prescribing a new medication
6  for a patient, as to what discussion if any --
7  A.    Yeah.
8  Q.    -- takes place?
9        What's your normal practice?
10 A.    Well, --
11       MR. LANIER:  Now or then?
12       MR. FERGUSON:  Yeah, sure.
13 Q.    (By Mr. Ferguson) What was your normal
14 practice back in March of 2004?
15 A.    2004? If it's new medicine, I tell
16 them why I'm prescribing it, and what the
17 potential side effects are, and what to watch
18 for. And if it doesn't help, stop, stop taking
19 it. Call us with any problems.
20 Q.    And is there any reason to believe that
21 you didn't follow that practice when you
22 prescribed, assuming you prescribed, Neurontin
23 for Mr. Smith back in March 9th of 2004?
24 A.    No, there is no reason to believe I
25 didn't go through that.

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)    Page 61 - 64

                                                                73
1  depression to your understanding?
2  A.  Yes.
3  Q.  Is it true that, that many beneficial
4  medications carry significant or very serious
5  risks?
6  A.  Yes.
7  Q.  Even penicillin; correct?
8  A.  Yes.
9  Q.  Virtually all prescription medications
10 carry some risk; correct?
11 A.  Yes.
12 Q.  When you are prescribing a medication,
13 you have to determine in your professional
14 opinion whether the benefits of that medication
15 outweigh the risks for that particular patient;
16 correct?
17 A.  Based on the available information I
18 have to me, I try to do what's best for my
19 patient in any given circumstance.
20 Q.  And let's talk about what sources of
21 information you have about risks and benefits
22 of medications.  First of all, you have the
23 product labeling which we -- was discussed
24 earlier; correct?  The PDR.
25 A.  Yes.

                                                                74
1  Q.  How about medical literature, do you
2  ever read medical literature with regard to
3  risks and benefits of medications?
4  A.  I don't get literature sent to me on
5  that.  It's what's provided to me by detail
6  people, and that's -- and again, as I mentioned
7  earlier, you know, resources you have within
8  your own group as partners.
9  Q.  Sure.
10 A.  But, no, I don't read literature
11 regarding pain management.
12 Q.  Do you read literature, period?
13 A.  Yeah.
14 Q.  Do you subscribe to journals?
15 A.  Yeah.  Yes.
16 Q.  You have discussions with other
17 colleagues in your group, correct, --
18 A.  Yes.
19 Q.  -- about medications in general?
20 A.  Yes.
21 Q.  And other colleagues outside your
22 group; correct?
23 A.  Absolutely.
24 Q.  And you rely on your own experience
25 significantly, don't you?

                                                                75
1  A.  I do.
2  Q.  If you determine that the risks of a
3  medication outweigh the benefits for a
4  particular patient you'd stop prescribing it
5  for that patient; correct?
6  A.  That's correct.
7  Q.  With regard to Mr. Lanier talked about
8  sales people or detail people, you know who
9  those are?
10 A.  Yes.
11 Q.  To your knowledge, you don't recall any
12 detail person or sales representative from
13 Pfizer during the 2002-2003 time period coming
14 to talk to you about Neurontin?
15 A.  I'm pretty sure I've spoken to some
16 people in my office regarding it.  I know I had
17 samples in my office during the time.  So I
18 don't know why there's no signature there other
19 than Dr. Anderson shares the same pod with me
20 and there is the chance that he just wound up
21 signing for it instead of me.  So --
22 Q.  Signing for the samples?
23 A.  Yes.
24 Q.  Because a physician has to sign for
25 samples; correct?

                                                                76
1  A.  That is correct.
2  Q.  You don't have any present recollection
3  of any conversations with Pfizer, detailers or
4  sales reps during the 2002, 2003, 2004 time
5  frame?
6  A.  Well, Pfizer or any set -- can I answer
7  with any sales rep?
8  Q.  Sure.
9  A.  I don't know who's aligned with who.
10      I do recall talking with
11 somebody, I don't know who it was, during that
12 time frame regarding Neurontin.
13 Q.  Okay.
14 A.  I mean it's natural that they would
15 come talk to me as a spine surgeon more so
16 probably than talking to Clendenin or Nichols,
17 but I mean less so compared to them but
18 certainly more than Allen Anderson, who would
19 not treat that at all.
20      So I feel, though I couldn't --
21 probably greater than 50 percent certainty, you
22 know, not 90 percent.
23 Q.  So you think more likely than not some
24 Pfizer --
25 A.  Yes.

**77**

1  Q.   -- sales representative came and talked
2  to you about, about Neurontin?
3  A.   Or whomever. Somebody with Neurontin.
4  Q.   Okay.
5  A.   Again Pfizer, Parke-Davis, Warner-
6  Lambert.
7  Q.   Sure. More likely than not you had
8  such a discussion. Do you recall anything
9  about what discussion was had in that
10 meeting?
11 A.   Just again what I would use it for, and
12 that is neuropathic pain. And I recall a
13 discussion about a study coming out that shows
14 on-label use of it at some point, but I
15 can't -- and that was -- that may have been
16 after or during this time, I don't recall.
17 Q.   Okay. You're a little vague on that?
18 A.   Um, you know, it's asking something
19 that's -- you know, I got so many other things
20 going through.
21 Q.   I understand.
22 A.   To remember three or four, five years
23 ago. And I -- it could be longer than that.
24 Q.   Okay.
25 A.   But I -- I guess what I want to tell

**78**

1  you that I recall for sure, --
2  Q.   Um-hum.
3  A.   -- that I had samples in my closet for
4  distribution to patients.
5  Q.   Okay. And did you distribute those
6  samples?
7  A.   I did.
8  Q.   And those samples are always
9  accompanied by their product labeling, aren't
10 they?
11 A.   I believe so. I think each box comes
12 with one.
13 Q.   We talked about the fact that Lortab or
14 narcotic pain relievers have potential for
15 addictive behavior. To your knowledge, does
16 Neurontin have potential for addictive
17 behavior?
18 A.   I'm not aware of it.
19 Q.   Do some medications have the potential
20 to damage the liver, because they're
21 metabolized through the liver?
22 A.   Yes.
23 Q.   Do you know if Neurontin fits that
24 category or not?
25 A.   I believe it goes through the kidney.

**79**

1  Q.   And you noted that you had had success
2  with Neurontin with other patients prior to
3  Mr. Smith?
4  A.   Yes.
5  Q.   And you have had success with Neurontin
6  since prescribing for Mr. Smith.
7  A.   Yes.
8  Q.   Was the fact that you had had success
9  in treating other patients with Neurontin a
10 factor in making the decision to prescribe for
11 Mr. Smith?
12 A.   Among others, yes.
13 Q.   Other than the discussions that you
14 think may have taken place, probably took place
15 with sales representatives, did you receive any
16 other information from any source of Pfizer,
17 Warner-Lambert, Parke-Davis regarding the use
18 of Neurontin, that you recall?
19 A.   Not that I recall.
20 Q.   And I think Mr. Lanier asked you this,
21 but I can't recall exactly what your answer
22 was. With regard to the PDR information, the
23 labeling information regarding Neurontin, had
24 you reviewed that at some point prior to
25 prescribing for Mr. Smith?

**80**

1  A.   A long time ago, probably.
2  Q.   There was a lot of discussion on the
3  prior examination regarding off-label use
4  versus on-label use. Do you understand that
5  distinction?
6  A.   Quite well.
7  Q.   And really off-label use can, can
8  include indications that aren't labeled;
9  correct?
10 A.   Right.
11 Q.   Off-label use can also include for --
12 in dosages not labeled; correct?
13 A.   I didn't realize that as well, but yes,
14 that makes sense.
15 Q.   Okay. Is it uncommon or common for
16 doctors to prescribe medications for unlabeled
17 indications?
18 A.   I, I imagine it's relatively common. I
19 don't know to what extent it is.
20 Q.   Okay. Is Neurontin the only medication
21 you have ever prescribed off-label?
22 A.   I don't know.
23 Q.   Do you know whether or not the FDA
24 recognizes and even approves the prescription
25 of drugs off-label?

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

### 97

1  know, obviously she didn't want to talk about
2  it in front of her dad, so... and again, as I
3  recall, she pulled me aside to ask me that
4  question. So I said, Okay, we can send you to
5  somebody who you can talk to about that and see
6  if it's a valid, you know, issue or not.
7  Q.  Fair enough. Thank you.
8      Next subject: You stated you
9  started prescribing Neurontin in your
10 fellowship years, '94-95 in San Francisco.
11 A.  Yes.
12 Q.  When you prescribe a drug like that, do
13 you do what's called risk-benefit analysis?
14 A.  Probably not formally, like you're
15 talking about, but clearly any treatment that I
16 undertake, you, you -- what you do before
17 you is weigh --
18 Q.  You at least do it in your brain.
19 A.  Yes.
20 Q.  You try to figure out, okay, what are
21 the risks of this drug, if I choose to use it
22 in this patient, and what are the potential
23 benefits; right?
24 A.  Yes.
25 Q.  Again, before you ever prescribe a drug

### 98

1  like this, then, it's very important the drug
2  companies be honest and forthright and tell you
3  what the potential risks are, would you agree?
4  A.  Yes.
5  Q.  And that's true whether it's in 1994,
6  1995, 2003, 2004, or heaven's, 2007 or
7  2008; true?
8  A.  Yes.
9  Q.  You also were asked what typically you
10 would discuss with patients when you were
11 prescribing a drug. Do you remember those
12 questions?
13 A.  Yes.
14 Q.  You said typically you would tell them
15 why you were prescribing it, what the potential
16 side effects were, what to watch out
17 for; right?
18 A.  Yes.
19 Q.  But, sir, would it be fair to say when
20 it comes to Neurontin, you're only able to them
21 what you know?
22 A.  Sure. Yes.
23 Q.  You weren't an insider who had secret
24 inside information from the drug company, were
25 you?

### 99

1  A.  No.
2  Q.  Okay. If you had known that it was a
3  drug that the scientists were concerned might
4  lead to suicide with some people, would you
5  have warned them about it?
6      MR. FERGUSON: Object to form.
7  A.  I think that's a significant enough
8  complication, concern, that at least in -- if
9  it got to that point, with this particular
10 patient, you would talk to them.
11 Q.  (By Mr. Lanier) Sure. Now, next
12 subject: You now prescribed Neurontin you said
13 very infrequently, second or third line when
14 you do it; fair?
15 A.  Yes.
16 Q.  And when you do that, sir, do you take
17 time to give folks warnings, that they want to
18 look out for depression or altered mental
19 status?
20 A.  Yes.
21 Q.  Next issue: You were asked about the
22 fact that there are risks to narcotics, Lortab
23 and hydrocodone, you mentioned addiction,
24 depression and confusion; remember?
25 A.  Yes.

### 100

1  Q.  Do you know about those risks?
2  A.  Yes.
3  Q.  I mean you came up -- you told us about
4  that, so obviously that's stuff you know
5  about; right?
6  A.  Yes.
7  Q.  And I assume you tell patients about.
8  A.  Yes.
9  Q.  And then y'all make an intelligent
10 decision of whether they want to be on that
11 drug or not; true?
12 A.  Yes.
13 Q.  And then not only are they able to make
14 an intelligent decision with you, but they know
15 what to look out for, there may a problem?
16 A.  Yes.
17 Q.  Next: There was a reference to the
18 fact that Pfizer might have some studies that
19 showed depression is greater on placebo than on
20 the drug. I would assume you're not here to
21 testify about any of those studies because you
22 hadn't seen them; right?
23 A.  No.
24 Q.  You do know enough from your training
25 to know that you never want to cherry pick