EXHIBIT 12

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

---

**Page 1**

In re: NEURONTIN     MDL Docket No. 1629

MARKETING, SALES      Master File No.

PRACTICES and PRODUCTS      04-10981

LIABILITY LITIGATION     Judge Patti B. Saris

Magistrate Judge

Leo T. Sorokin

RUTH SMITH,

Plaintiff,     C. A. No.  05-11515

V.

PFIZER, INC., et al.,

Defendants.

Videotaped Deposition of:

EDWARD MACKEY, M.D.

Wednesday, May 23, 2007

---

**Page 3**

2      It is further stipulated and
3  agreed that it shall not be necessary for any
4  objections to be made by counsel to any
5  questions, except as to form or leading
6  questions, and that counsel for the parties may
7  make objections and assign grounds at the time
8  of the trial, or at the time said deposition is
9  offered in evidence, or prior thereto.

---

**Page 2**

2      STIPULATIONS
3      It is stipulated and agreed, by
4  and between the parties through their
5  respective counsel, that the videotaped
6  deposition of:
7      EDWARD MACKEY, M.D., may be
8  taken before Fred W. Jeske, court reporter and
9  Tennessee Notary Public, at the offices of
10  Miller & Martin, 1200 US Bank Tower, 150 Fourth
11  Avenue, North, Nashville, Tennessee, on
12  Wednesday, May 23, 2007, commencing at
13  approximately 8:40 a.m.
14      It is further stipulated and
15  agreed that the signature to and reading of the
16  deposition by the witness is waived, the
17  deposition to have the same force and effect as
18  if full compliance had been had with all laws
19  and rules of Court relating to the taking of
20  depositions.

---

**Page 4**

APPEARANCES:
For the Plaintiff:
   ANDREW G. FINKELSTEIN
   KEITH ALTMAN
   Finkelstein & Partners
   436 Robinson Avenue
   Newburgh, New York  12550
   (800) 634-1212
   afinkelstein@lawampm.com
-and-
   W. MARK LANIER
   ROBERT LEONE
   DARA HEGAR
   PATRICK O'HARA
   The Lanier Law Firm
   6810 FM 1960 West
   Houston, Texas  77069
   Post Office Box 691448
   Houston, Texas  77269-1448
   (713) 659-5200
   wml@lanierlawfirm.com

For the Defendant Pfizer:
   KENNETH J. FERGUSON
   CEDRIC E. EVANS
   Clark, Thomas & Winters
   300 West 6th Street, 15th Floor
   Austin, Texas  78701
   P.O. Box 1148
   Austin, Texas  78767
   cee@ctw.com
For the witness:
   NOEL F. STAHL
   Miller & Martin
   1200 one Nashville Place
   150 Fourth Avenue North
   Nashville, Tennessee 37219
   (615) 744-8503
   nstahl@millermartin.com

Also present:

   Jonathan Wilkerson, law clerk
   Sheldon Singh, videographer
        -oOo-

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

25

1   Q.    (By Mr. Lanier)  If you'll go back to
2   this information, the Exhibit 5 that was filed
3   with the government, on page 8, talks about
4   other ways that Warner-Lambert, Pfizer was
5   promoting through medical liaisons off-label
6   uses.  Do you see that?
7   A.    Yes.
8   Q.    It says Warner-Lambert employed medical
9   liaisons who were presented to doctors or
10  physicians as employees of the company's
11  medical and scientific affairs department.
12  Then they specifically cite one occasion where
13  one of the Warner-Lambert liaisons promoted
14  Neurontin for unapproved uses, subparagraph A
15  shows it's in June of '96.  Do you see that?
16  A.    Yes.
17  Q.    And was a presentation made at Longwood
18  Gardens in Kenneth Square, Pennsylvania, to a
19  group of doctors who were members of a local
20  medical society.  Do you see that?
21  A.    Yes.
22  Q.    The sales representative and the
23  medical liaison selected the topic for the
24  presentation to the local medical society.
25  After deciding in consultation with the sales

26

1   rep that Neurontin would be the topic, the
2   medical liaison prepared the presentation.  Do
3   you see that?
4         And then subpart C, among the
5   topics of the presentation was the use of
6   Neurontin for unapproved uses.  Do you see
7   that, sir?
8   A.    I do.
9   Q.    During the presentation, in the
10  presence of the sales rep, the medical liaison
11  promoted the use of Neurontin in the treatment
12  of a number of unapproved uses.  Do you see
13  that as well?
14  A.    I do.
15  Q.    Another example of this, sir, is given
16  on page 10.  If you would flip there, please.
17  A.    Um-hum.
18  Q.    Paragraph 27, it's talking about
19  another conference where the physicians in
20  attendance, among the presentations made to the
21  physicians in attendance was one relating to
22  unapproved uses entitled Reduction of Pain
23  Symptoms During Treatment with Gabapentin.  Do
24  you understand gabapentin is the technical name
25  for Neurontin?

27

1   A.    I do.
2   Q.    It says during this presentation
3   Neurontin was promoted for use in the treatment
4   of pain.  Do you see that as well?
5   A.    I do.
6   Q.    Now, sir, during your medical career,
7   either through interactions with the doctors in
8   your clinic or through going to any of these
9   presentations or through reading what other
10  people are saying, had you been under the
11  impression that Neurontin was effective for
12  pain relief in a person like Mr. Smith?
13  A.    Yes.
14  Q.    When you make determinations like this,
15  I asked you this earlier but the question was
16  objected to, so I got to reask it in another
17  form.
18        Do you go out there and do your
19  own independent medical research on drugs
20  before you prescribe them?
21  A.    No.
22  Q.    Do you rely upon the drug companies to
23  be honest and forthright with you?
24        MR. FERGUSON:  Object to form.
25  A.    Yes.

28

1   Q.    (By Mr. Lanier)  Do you rely on the
2   drug companies to tell you both the, the good
3   and the bad and the ugly about their drugs, be
4   honest about it?
5   A.    Yes.
6   Q.    Don't doctors like you, who are busy
7   treating people, have to rely upon drug
8   companies to tell you the truth?  I mean would
9   you have time to go out and, and do major
10  medical research on every drug you prescribe?
11  A.    No.
12        MR. FERGUSON:  Object to form.
13        Excuse me, Doctor.  Sorry.
14  Q.    (By Mr. Lanier)  When you prescribed
15  Neurontin to Mr. Smith, did you do it for
16  pain --
17  A.    Yes.
18  Q.    -- relief?
19  A.    Yes.
20  Q.    Now, how important is it to you --
21  well, let me take a step back.  I didn't ask
22  you this.  Where did you learn it might work
23  for pain relief?  Was it from the doctors in
24  your clinic?  Was it from -- do you know?
25  A.    Ah, not exactly.  I certainly spent

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

29

1    some time trying to find out where I first
2    heard about it, and then subsequently different
3    sources going forward, and -- but I can't tell
4    you exactly who.
5        Q.    I would assume, we've got a chance to
6    look at -- the Pfizer folks were putting a lot
7    of samples in your office of this drug?
8        A.    Yes.
9        Q.    And they were making calls not just on
10   Dr. Clendenin but, oh, there is another doc,
11   Dr. Nichols.  Do you know a Dr. Nichols?
12       A.    Dr. Nichols and Dr. Clendenin are both
13   pain, what we call physical medicine rehab.
14   They deal with a lot of chronic pain issues.
15       Q.    Okay.
16       A.    So -- and they're partners, and
17   partners within our group.
18       Q.    Okay.  Now they're not shingles
19   doctors, though, are they?
20       A.    No, they are not.
21       Q.    They are not epileptic doctors, are
22   they?
23       A.    No.
24       Q.    So when the Pfizer people were making
25   sales calls on them for Neurontin and giving

30

1    them Neurontin, by definition they're not doing
2    it for the label reasons, they're not doing it
3    for shingles or, or epilepsy, are they?
4            MR. FERGUSON:  Object to form.
5        A.    Certainly neither Clendenin nor Nichols
6    treat seizures.
7        Q.    Okay.
8        A.    They may have had an occasion to treat
9    postherpetic neuralgia.
10       Q.    Okay.
11       A.    But clearly not the dominant reason
12   they prescribed it.
13       Q.    (By Mr. Lanier)  Right.  And I assume
14   you would interact with these folks enough to
15   know if, if they're being told that Neurontin's
16   effective for pain and the samples are being
17   given, would that be one of the places where
18   you would have gotten some of your knowledge
19   about possibly using it?
20           MR. FERGUSON:  Object to form.
21       A.    Yeah, the rule -- the sort of the setup
22   in our office, the PM&R guys handle
23   non-operative back and pain.  I'm a spine
24   surgeon, and I do a lot of the operative, but
25   clearly I have patients who have pain issues,

31

1    either operative or non-operative, that I rely
2    on them to some extent to guide me.
3        Q.    Okay.  I guess what I'm driving at is,
4    I don't show that the Pfizer people directly
5    went to you and said, Here, use Neurontin for
6    pain.  I see that they went to your partners
7    that are the pain specialists in the clinic,
8    and, and I'm trying to figure out if, if that
9    would have had an influence on your
10   prescription writing when you're writing
11   something for pain before you do a surgery to
12   see if conservative treatment would work.
13           MR. FERGUSON:  Object to form.
14       Q.    (By Mr. Lanier)  Would it have any
15   bearing on you?
16       A.    I definitely interact with Clendenin
17   and Nichols on a regular basis.
18       Q.    Great.
19       A.    And the issues of pain management come
20   up regularly, my asking them for input advice,
21   not just on this but other issues than that.
22       Q.    Fair enough.
23           Now, Doctor, had you ever -- all
24   right.  Let me, let me back up and explain why
25   I'm asking these questions.  And this is

32

1    probably objectionable, so get ready -- get on
2    the edge of your seat.
3            MR. FERGUSON:  Thanks for the
4    tip.
5            MR. LANIER:  All right.  I'm
6    just warning you.
7            MR. STAHL:  Do you want someone
8    to rule on it too?
9            MR. LANIER:  No.  I'm telling
10   you, we can, we can do the whole thing.
11   No, this is, this is just what I call
12   sign-posting.  I'm just telling you where
13   I'm going.  I can't play this to the jury,
14   so they're going to object and make sure I
15   don't play it to the jury, and I'll
16   stipulate right now this is probably
17   something I can't play to the jury.
18           Here it is:
19       Q.    (By Mr. Lanier)  One of the pleadings
20   that Pfizer has filed in this case indicates
21   that Pfizer's saying that this isn't their
22   fault, that you are what's called a learned
23   intermediary, and by that they mean you knew
24   everything there was to know about this drug
25   and you decided to prescribe it, so don't blame

33

1   them, blame you.
2          Obviously we don't blame you.
3   We don't see that you have done anything wrong
4   at all.
5          But because they say that you're
6   the learned intermediary, I got to ask you some
7   questions about did you know all this kind of
8   stuff and see if you knew what they think you
9   knew.
10         Do you want to object to that?
11         MR. FERGUSON:  Yeah, can I go
12   ahead and object?
13         And also say it's not true what
14   he said.
15         MR. LANIER:  Oh, so you're
16   waiving -- you will not assert a learned
17   intermediary defense?  Then I can skip
18   these.
19         MR. FERGUSON:  There is no -- no
20   one's blaming you, Doctor.
21         MR. LANIER:  Are you asserting a
22   learned intermediary defense?
23         MR. FERGUSON:  We're asserting
24   the defenses we've asserted.
25   A.   Press on.

34

1   Q.   (By Mr. Lanier)  Doctor, did anyone
2   ever tell you or did you know that taking
3   Neurontin reduces the serotonin in the brain?
4          MR. FERGUSON:  Object to form.
5   A.   No.
6   Q.   (By Mr. Lanier)  Would you have liked
7   to have known such a fact --
8          MR. FERGUSON:  Object to form.
9   Q.   (By Mr. Lanier)  -- before you started
10   prescribing it for pain?
11         MR. FERGUSON:  Object to form.
12   A.   I don't know how it would have impacted
13   me one way or the other.
14   Q.   (By Mr. Lanier)  All right.  Would
15   you -- did -- did you know before you
16   prescribed it that the FDA, before they
17   approved the drug for the very limited purposes
18   they approved it for, that the FDA specifically
19   said to ultimately Pfizer that a serious event
20   might limit the drug's widespread usefulness,
21   several of them actually, the third being
22   depression, specifically.  While it may not be
23   an infrequent occurrence in the epileptic
24   population, depression may become worse and
25   require intervention or lead to suicide as it's

35

1   resulted in some suicidal attempts.
2          Did you know about that concern
3   on this drug before you prescribed it?
4   A.   No.
5          MR. FERGUSON:  Object to form.
6   And could you identify what document you
7   were reading from, please?
8          MR. LANIER:  Yeah.  This is a
9   1993 document that was -- we had to get
10   through the Freedom of Information Act
11   because it was not widely available.
12         I'll mark it as Exhibit 6.
13   (Exhibit 6 marked.)
14   Q.   (By Mr. Lanier)  This is an FDA
15   document.
16         I'm assuming you have never seen
17   this document before.
18   A.   No.
19   Q.   All right.  On page 117 it talks about
20   problems with suicide.  It talks about -- let
21   me show you the --
22   A.   I'm looking at it.
23         MR. FERGUSON:  It's the third
24   paragraph?
25         MR. LANIER:  Yes, third

36

1   paragraph has got the suicide, and then the
2   bottom paragraph has got the reference to
3   clinically important depression.
4   Q.   No one ever told you about that, did
5   they?
6          MR. FERGUSON:  Object to form.
7   A.   No.
8   Q.   (By Mr. Lanier)  Am I correct, no one
9   ever told you about that?
10   A.   No.
11   Q.   No, as in no, they did not tell you?
12   A.   No, they did not tell me.
13   Q.   All right.  Is that the kind of thing
14   that would be important to know before you
15   start prescribing a drug?
16         MR. FERGUSON:  Object to form.
17   A.   Yes.
18   Q.   (By Mr. Lanier)  All right.  Because if
19   you're going -- if you have got a drug that,
20   that may cause suicide, clinically significant
21   depression, you probably had other optional
22   drugs you could have given Mr. Smith that, that
23   don't seem to have that side effect; true?
24         MR. FERGUSON:  Object to form.
25   A.   Potentially, yes.

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

41

1   Q.   It says, Medical liaisons, this is
2   Phil. I'm calling in regard to the, you know,
3   there's a Neurontin push that's supposed to be
4   on. What we'd like you to do is, any time
5   you're called out, just make sure you're --
6   that your main focus out of what you're doing
7   is on Neurontin. I'm not saying don't do
8   Accupril calls, but the idea is you're supposed
9   to be pushing on Neurontin. I think some
10  people have lost that message, and I think a
11  lot may be somewhat ineffectual in that regard.
12  So what we need to do is focus on Neurontin.
13  When we get out there, we want to kick some A
14  on Neurontin. We want to sell Neurontin on
15  pain, all right? And mono therapy, and
16  everything that we can talk about, that's what
17  we want to do, because I'm embarrassed. I
18  don't know if you guys are embarrassed, but I'm
19  embarrassed about where we are with Neurontin.
20  We got to take it into our own hands and really
21  kick some A on it. All right? Let's do it up.
22  Talk to you soon. Bye. See that?
23  A.   Yes.
24  Q.   Paragraph 22, I was trained and
25  instructed to use a number of misleading

42

1   abstracts and case reports in promoting
2   Parke-Davis's prescription drugs, including
3   Neurontin, for a variety of medically
4   unacceptable uses. Do you see that as well?
5   A.   Yes.
6   Q.   Sir, as a doctor, is it important to
7   you that drug companies put patient safety
8   first?
9   A.   Yes.
10  Q.   Is it important to you that drug
11  companies follow FDA instructions and rules and
12  guidelines --
13       MR. FERGUSON: Object to form.
14  Q.   -- about what they're telling you and
15  what they're not?
16  A.   Yes.
17  Q.   (By Mr. Lanier) Now if you had been
18  told either in the labeling information or
19  through sales reps or, Dr. Mackey, through your
20  partners, if you had been told that Neurontin
21  was a drug with some of the problems we've
22  talked about so far today, would it have
23  changed the way you treated Mr. Smith?
24       MR. FERGUSON: Object to form.
25  A.   Possibly. Probably.

43

1   Q.   (By Mr. Lanier) Probably. And by
2   probably, would it have meant you would have
3   either tried another drug first, or would you
4   have at least put out some warnings and some
5   safeties and precautions and told them what to
6   be observant about?
7        MR. FERGUSON: Object to form.
8   A.   Certainly I would have done the
9   latter.
10  Q.   Okay.
11  A.   And I don't know about the former.
12  Q.   (By Mr. Lanier) All right. Now if
13  someone's at risk of -- I don't know that you
14  see often someone that you consider a suicide
15  risk in your practice, but if you see someone
16  that presents that you think is a serious
17  candidate for suicide, I would assume you would
18  do something about that. There is some
19  protocol.
20  A.   Yes.
21  Q.   Okay. Mr. Smith, when he presented to
22  you, I've read through your chart, there's
23  nothing about him that made you think he was a
24  suicide risk when he presented, was there?
25  A.   No.

44

1   Q.   All right. How did you find out about
2   his death?
3   A.   His wife called our office and spoke
4   with our telephone answering operator and then
5   spoke with my nurse.
6   Q.   Okay. Did you by any chance file a
7   MedWatch report with the FDA after this, do you
8   know?
9   A.   I don't know. I don't think I've
10  ever -- I don't know to do that or --
11  Q.   Yeah. I didn't think so, but I didn't
12  see one, and I just wasn't sure.
13       MR. LANIER: I'm going to, I've
14  used 45 of my minutes. I'm going to save
15  my other 45. I'm going to pass the witness
16  and see if he can really do it in 44.
17       MR. FERGUSON: Doctor, are you
18  doing okay? Do you need a break or
19  anything?
20       THE WITNESS: I'm okay.
21       CROSS-EXAMINATION
22  BY MR. FERGUSON:
23  Q.   Dr. Mackey, we met briefly before the
24  deposition. My name is Ken Ferguson. I
25  represent Pfizer in this matter. Do you

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

61

1    dementia, or forgetfulness, and I may have
2    taken her words and put it into the term
3    dementia.  But, you know, she certainly --
4    they're a very involved family, very, you know,
5    interested in the well-being of their, their
6    father.  And she pulled me aside and asked me
7    that question, so I, as I recall, made an
8    appointment, but I don't think he ever went to
9    that appointment.
10   Q.    Do you know why he never went to that
11   appointment?
12   A.    No.
13   Q.    You did write a prescription for
14   Neurontin on that day; is that correct?
15   A.    Um, you know, as I said earlier, I
16   don't -- I could not find that.  I'll have to
17   take, you know, whatever you can produce.  But
18   I, I -- I am -- if, if you say I did, I'm sure
19   I did.  I did use it for that type of problem.
20   Q.    You have no recollection of having done
21   it, but if the records would reflect that,
22   then --
23   A.    I would not argue.
24   Q.    Okay.  When you say that you used
25   Neurontin for that kind of problem, what are

62

1    you referring to?
2    A.    Nerve pain.
3    Q.    So this was not the first patient you
4    prescribed Neurontin for?
5    A.    No.
6    Q.    Any estimate about how many patients
7    you had prescribed Neurontin for before, for
8    this kind of nerve problem?
9    A.    I don't -- I couldn't tell you.
10   Q.    It's something that you did fairly
11   regularly?
12   A.    Yes.
13   Q.    Do you know when you started
14   prescribing Neurontin?
15   A.    Back in my fellowship.  I did my
16   fellowship out at San Francisco, and I know we
17   started using it for neuropathic pain during
18   that time.
19   Q.    And what time period was that?
20   A.    I believe it was '94 to '95.  My CV
21   will have it down to the exact, but I'm pretty
22   sure that's the year.
23   Q.    Once you got into your practice and
24   were prescribing Neurontin, did you see
25   benefits from it for your patients?

63

1    A.    Yes.
2    Q.    If you prescribed a medication that
3    none of your patients benefited from, would you
4    continue to prescribe it?
5    A.    No.
6    Q.    And do you monitor your patients after
7    you prescribe a particular medication for them
8    to see if they get some benefit?
9    A.    I do.
10   Q.    When you prescribe medication
11   generally, is it true that some patients may
12   benefit and some patients may not benefit from
13   the use of that medication?
14   A.    That is true.
15   Q.    And was that true of Neurontin as well?
16   A.    Yes.
17   Q.    And with respect to Mr. Smith, before
18   you prescribed Neurontin, you're aware that he
19   took some other pain medications without
20   relief?
21   A.    That is correct.
22   Q.    What discussion, if any, took place, or
23   do you recall any discussion between you and
24   either Mr. Smith or his family members on that
25   day regarding the use of Neurontin?

64

1    A.    Um, in terms of dosing, side effects?
2    Q.    Yes, sir.
3    A.    Um, I don't recall.
4    Q.    Do you have a normal practice in that
5    regard, if you're prescribing a new medication
6    for a patient, as to what discussion if any --
7    A.    Yeah.
8    Q.    -- takes place?
9          What's your normal practice?
10   A.    Well, --
11         MR. LANIER:  Now or then?
12         MR. FERGUSON:  Yeah, sure.
13   Q.    (By Mr. Ferguson)  What was your normal
14   practice back in March of 2004?
15   A.    2004?  If it's new medicine, I tell
16   them why I'm prescribing it, and what the
17   potential side effects are, and what to watch
18   for.  And if it doesn't help, stop, stop taking
19   it.  Call us with any problems.
20   Q.    And is there any reason to believe that
21   you didn't follow that practice when you
22   prescribed, assuming you prescribed, Neurontin
23   for Mr. Smith back in March 9th of 2004?
24   A.    No, there is no reason to believe I
25   didn't go through that.

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

73

1   depression to your understanding?
2   A.   Yes.
3   Q.   Is it true that, that many beneficial
4   medications carry significant or very serious
5   risks?
6   A.   Yes.
7   Q.   Even penicillin; correct?
8   A.   Yes.
9   Q.   Virtually all prescription medications
10  carry some risk; correct?
11  A.   Yes.
12  Q.   When you are prescribing a medication,
13  you have to determine in your professional
14  opinion whether the benefits of that medication
15  outweigh the risks for that particular patient;
16  correct?
17  A.   Based on the available information I
18  have to me, I try to do what's best for my
19  patient in any given circumstance.
20  Q.   And let's talk about what sources of
21  information you have about risks and benefits
22  of medications.  First of all, you have the
23  product labeling which we -- was discussed
24  earlier; correct?  The PDR.
25  A.   Yes.

74

1   Q.   How about medical literature, do you
2   ever read medical literature with regard to
3   risks and benefits of medications?
4   A.   I don't get literature sent to me on
5   that.  It's what's provided to me by detail
6   people, and that's -- and again, as I mentioned
7   earlier, you know, resources you have within
8   your own group as partners.
9   Q.   Sure.
10  A.   But, no, I don't read literature
11  regarding pain management.
12  Q.   Do you read literature, period?
13  A.   Yeah.
14  Q.   Do you subscribe to journals?
15  A.   Yeah.  Yes.
16  Q.   You have discussions with other
17  colleagues in your group, correct, --
18  A.   Yes.
19  Q.   -- about medications in general?
20  A.   Yes.
21  Q.   And other colleagues outside your
22  group; correct?
23  A.   Absolutely.
24  Q.   And you rely on your own experience
25  significantly, don't you?

75

1   A.   I do.
2   Q.   If you determine that the risks of a
3   medication outweigh the benefits for a
4   particular patient you'd stop prescribing it
5   for that patient; correct?
6   A.   That's correct.
7   Q.   With regard to Mr. Lanier talked about
8   sales people or detail people, you know who
9   those are?
10  A.   Yes.
11  Q.   To your knowledge, you don't recall any
12  detail person or sales representative from
13  Pfizer during the 2002-2003 time period coming
14  to talk to you about Neurontin?
15  A.   I'm pretty sure I've spoken to some
16  people in my office regarding it.  I know I had
17  samples in my office during the time.  So I
18  don't know why there's no signature there other
19  than Dr. Anderson shares the same pod with me
20  and there is the chance that he just wound up
21  signing for it instead of me.  So --
22  Q.   Signing for the samples?
23  A.   Yes.
24  Q.   Because a physician has to sign for
25  samples; correct?

76

1   A.   That is correct.
2   Q.   You don't have any present recollection
3   of any conversations with Pfizer, detailers or
4   sales reps during the 2002, 2003, 2004 time
5   frame?
6   A.   Well, Pfizer or any set -- can I answer
7   with any sales rep?
8   Q.   Sure.
9   A.   I don't know who's aligned with who.
10          I do recall talking with
11  somebody, I don't know who it was, during that
12  time frame regarding Neurontin.
13  Q.   Okay.
14  A.   I mean it's natural that they would
15  come talk to me as a spine surgeon more so
16  probably than talking to Clendenin or Nichols,
17  but I mean less as compared to them but
18  certainly more than Allen Anderson, who would
19  not treat that at all.
20          So I feel, though I couldn't --
21  probably greater than 50 percent certainty, you
22  know, not 90 percent.
23  Q.   So you think more likely than not some
24  Pfizer --
25  A.   Yes.

77

1    Q.    -- sales representative came and talked
2    to you about, about Neurontin?
3    A.    Or whomever.  Somebody with Neurontin.
4    Q.    Okay.
5    A.    Again Pfizer, Parke-Davis, Warner-
6    Lambert.
7    Q.    Sure.  More likely than not you had
8    such a discussion.  Do you recall anything
9    about what discussion was had in that
10   meeting?
11   A.    Just again what I would use it for, and
12   that is neuropathic pain.  And I recall a
13   discussion about a study coming out that shows
14   on-label use of it at some point, but I
15   can't -- and that was -- that may have been
16   after or during this time, I don't recall.
17   Q.    Okay.  You're a little vague on that?
18   A.    Um, you know, it's asking something
19   that's -- you know, I got so many other things
20   going through.
21   Q.    I understand.
22   A.    To remember three or four, five years
23   ago.  And I -- it could be longer than that.
24   Q.    Okay.
25   A.    But I -- I guess what I want to tell

79

1    Q.    And you noted that you had had success
2    with Neurontin with other patients prior to
3    Mr. Smith?
4    A.    Yes.
5    Q.    And you have had success with Neurontin
6    since prescribing for Mr. Smith.
7    A.    Yes.
8    Q.    Was the fact that you had had success
9    in treating other patients with Neurontin a
10   factor in making the decision to prescribe for
11   Mr. Smith?
12   A.    Among others, yes.
13   Q.    Other than the discussions that you
14   think may have taken place, probably took place
15   with sales representatives, did you receive any
16   other information from any source of Pfizer,
17   Warner-Lambert, Parke-Davis regarding the use
18   of Neurontin, that you recall?
19   A.    Not that I recall.
20   Q.    And I think Mr. Lanier asked you this,
21   but I can't recall exactly what your answer
22   was.  With regard to the PDR information, the
23   labeling information regarding Neurontin, had
24   you reviewed that at some point prior to
25   prescribing for Mr. Smith?

78

1    you that I recall for sure, --
2    Q.    Um-hum.
3    A.    -- that I had samples in my closet for
4    distribution to patients.
5    Q.    Okay.  And did you distribute those
6    samples?
7    A.    I did.
8    Q.    And those samples are always
9    accompanied by their product labeling, aren't
10   they?
11   A.    I believe so.  I think each box comes
12   with one.
13   Q.    We talked about the fact that Lortab or
14   narcotic pain relievers have potential for
15   addictive behavior.  To your knowledge, does
16   Neurontin have potential for addictive
17   behavior?
18   A.    I'm not aware of it.
19   Q.    Do some medications have the potential
20   to damage the liver, because they're
21   metabolized through the liver?
22   A.    Yes.
23   Q.    Do you know if Neurontin fits that
24   category or not?
25   A.    I believe it goes through the kidney.

80

1    A.    A long time ago, probably.
2    Q.    There was a lot of discussion on the
3    prior examination regarding off-label use
4    versus on-label use.  Do you understand that
5    distinction?
6    A.    Quite well.
7    Q.    And really off-label use can, can
8    include indications that aren't labeled;
9    correct?
10   A.    Right.
11   Q.    Off-label use can also include for --
12   in dosages not labeled; correct?
13   A.    I didn't realize that as well, but yes,
14   that makes sense.
15   Q.    Okay.  Is it uncommon or common for
16   doctors to prescribe medications for unlabeled
17   indications?
18   A.    I, I imagine it's relatively common.  I
19   don't know to what extent it is.
20   Q.    Okay.  Is Neurontin the only medication
21   you have ever prescribed off-label?
22   A.    I don't know.
23   Q.    Do you know whether or not the FDA
24   recognizes and even approves the prescription
25   of drugs off-label?

Mackey, Edward MD (Smith prescriber)  5/23/2007  8:40:00 AM

97

1  know, obviously she didn't want to talk about
2  it in front of her dad, so... and again, as I
3  recall, she pulled me aside to ask me that
4  question.  So I said, Okay, we can send you to
5  somebody who you can talk to about that and see
6  if it's a valid, you know, issue or not.
7  Q.  Fair enough.  Thank you.
8      Next subject:  You stated you
9  started prescribing Neurontin in your
10  fellowship years, '94-95 in San Francisco.
11  A.  Yes.
12  Q.  When you prescribe a drug like that, do
13  you do what's called risk-benefit analysis?
14  A.  Probably not formally, like you're
15  talking about, but clearly any treatment that I
16  undertake, you, you -- what you do before
17  you is weigh --
18  Q.  You at least do it in your brain.
19  A.  Yes.
20  Q.  You try to figure out, okay, what are
21  the risks of this drug, if I choose to use it
22  in this patient, and what are the potential
23  benefits; right?
24  A.  Yes.
25  Q.  Again, before you ever prescribe a drug

99

1  A.  No.
2  Q.  Okay.  If you had known that it was a
3  drug that the scientists were concerned might
4  lead to suicide in some people, would you
5  have warned them about it?
6      MR. FERGUSON:  Object to form.
7  A.  I think that's a significant enough
8  complication, concern, that at least in -- if
9  it got to that point, with this particular
10  patient, you would talk to them.
11  Q.  (By Mr. Lanier)  Sure.  Now, next
12  subject:  You now prescribed Neurontin you said
13  very infrequently, second or third line when
14  you do it; fair?
15  A.  Yes.
16  Q.  And when you do that, sir, do you take
17  time to give folks warnings, that they want to
18  look out for depression or altered mental
19  status?
20  A.  Yes.
21  Q.  Next issue:  You were asked about the
22  fact that there are risks to narcotics, Lortab
23  and hydrocodone, you mentioned addiction,
24  depression and confusion; remember?
25  A.  Yes.

98

1  like this, then, it's very important the drug
2  companies be honest and forthright and tell you
3  what the potential risks are, would you agree?
4  A.  Yes.
5  Q.  And that's true whether it's in 1994,
6  1995, 2003, 2004, or heaven's, 2007 or
7  2008; true?
8  A.  Yes.
9  Q.  You also were asked what typically you
10  would discuss with patients when you were
11  prescribing a drug.  Do you remember those
12  questions?
13  A.  Yes.
14  Q.  You said typically you would tell them
15  why you were prescribing it, what the potential
16  side effects were, what to watch out
17  for; right?
18  A.  Yes.
19  Q.  But, sir, would it be fair to say when
20  it comes to Neurontin, you're only able to them
21  what you know?
22  A.  Sure.  Yes.
23  Q.  You weren't an insider who had secret
24  inside information from the drug company, were
25  you?

100

1  Q.  Do you know about those risks?
2  A.  Yes.
3  Q.  I mean you came up -- you told us about
4  that, so obviously that's stuff you know
5  about; right?
6  A.  Yes.
7  Q.  And I assume you tell patients about.
8  A.  Yes.
9  Q.  And then y'all make an intelligent
10  decision of whether they want to be on that
11  drug or not; true?
12  A.  Yes.
13  Q.  And then not only are they able to make
14  an intelligent decision with you, but they know
15  what to look out for, there may a problem?
16  A.  Yes.
17  Q.  Next:  There was a reference to the
18  fact that Pfizer might have some studies that
19  showed depression is greater on placebo than on
20  the drug.  I would assume you're not here to
21  testify about any of those studies because you
22  hadn't seen them; right?
23  A.  No.
24  Q.  You do know enough from your training
25  to know that you never want to cherry pick