EXHIBIT 14

Castro, Lucy (Pfizer)  7/10/2007  9:08:00 AM

**Page 1**

```
 1              LUCY CASTRO
 2       UNITED STATES DISTRICT COURT
 3     FOR THE DISTRICT OF MASSACHUSETTS
 4   ----------------------------x
 5   IN RE NEURONTIN MARKETING AND
     SALES PRACTICES LITIGATION
 6
     MDL Docket No. 1629
 7   Master File No., 04-10981
     Judge Patti B. Saris
 8   Magistrate Leo T. Sorokin
     ----------------------------x
 9
10
11     SUPREME COURT OF THE STATE OF NEW YORK
12            COUNTY OF NEW YORK
13
     -----------------------x
14
     IN RE:  NEW YORK NEURONTIN
15   PRODUCTS LIABILITY LITIGATION
16   Case Management
     Index No. 765,000/2006
17   Hon. Marcy S. Friedman
     -----------------------x
18
19
20
                 July 10, 2007
21               9:08 a.m.
22
23
24
25
```

**Page 2**

```
 1              LUCY CASTRO
 2
 3        Deposition of LUCY CASTRO MANRIQUE,
 4   taken by Class Plaintiffs, at the offices of
 5   Davis, Polk & Wardwell, 450 Lexington Avenue,
 6   New York, New York, before Brandon Rainoff, a
 7   Federal Certified Realtime Reporter and Notary
 8   Public of the State of New York.
 9
```

**Page 3**

```
 1              LUCY CASTRO
 2   A P P E A R A N C E S:
 3
 4   FINKELSTEIN & PARTNERS
 5   Attorneys for Product Liability Plaintiffs
 6       785 Broadway, 3rd Floor
 7       Kingston, NY 12401
 8       (800) 634-1212
 9   BY:  KENNETH B. FROMSON, ESQ.
10        KEITH ALTMAN
11
12   ROBINS KAPLAN MILLER & CIRESI
13   Attorneys for Assurance Plaintiffs
14       2800 LaSalle Plaza
15       800 La Salle Avenue
16       Minneapolis, MN 55402
17   BY:  ANNAMARIE DALEY, ESQ.
18
19   COHEN & MALAD, LLP
20   Attorneys for Class Plaintiffs
21       136 N. Delaware Street, Suite 300
22       Post Office Box 627
23       Indianapolis, Indiana 46206-0627
24   BY:  IRWIN B. LEVIN, ESQ.
25        ERIC S. PAVLACK, ESQ.
```

**Page 4**

```
 1              LUCY CASTRO
 2   A P P E A R A N C E S (Continued):
 3
 4   SHOOK, HARDY & BACON, LLP
 5   Attorneys for Pfizer
 6       2555 Grand Blvd.
 7       Kansas City, Missouri 64108-2613
 8   BY:  VINCENT E. GUNTER, ESQ.
 9        TREY ALFORD, ESQ.
10
11   JONES DAY
12   Attorneys for Wyeth
13       222 East 41st Street
14       New York, NY 10017-6702
15       (212) 326-7894
16   BY:  JOSEPH A. STRAZZERI, ESQ.
17        BART GREEN
```

**Page 45**

```
 1              LUCY CASTRO
 2   whatsoever from Pfizer to the field force or to
 3   the public in any manner, way, shape or form
 4   that said Neurontin is not FDA approved for
 5   general neuropathic pain?
 6        A.   I am aware of training internally but
 7   nothing to the public.
 8        Q.   Thank you.  So if in fact the sales of
 9   Neurontin going back to the Warner Lambert-Parke
10   Davis days were increased because of illegal
11   marketing practices, to your knowledge since you
12   have been at Pfizer, there has been nothing done
13   to specifically address those and affirmatively
14   dispel the notion other than as far as you
15   understand it staying within the label as you
16   promote it today, is that fair?
17             MR. GUNTER:  Objection as to the form
18   of that question.
19             MR. LEVIN:  You can answer.
20        A.   Like I stated previously, we did not
21   do a communication externally but we did do
22   training.  We also -- the field force was only
23   allowed to detail to very specific physicians
24   that would be neurologists and epileptologists,
25   and all internal training was on label, again.
```

**Page 46**

```
 1              LUCY CASTRO
 2        Q.   What were the regulations that Warner
 3   Lambert had with regard to detailing?
 4             MR. GUNTER:  Objection, that's
 5   getting -- calls for speculation.  She never
 6   worked for Warner Lambert.
 7        A.   I am not aware of what their practices
 8   were.
 9        Q.   You mentioned the acronym WLF.  What
10   is that?
11        A.   Washington Legal Foundation.
12        Q.   You just mentioned that your field
13   force was only allowed to detail to certain type
14   of physicians, do you recall that?
15        A.   Yes.
16        Q.   What type of physicians?
17        A.   Neurologists, epileptologists.
18        Q.   To your knowledge, then, Pfizer never
19   marketed Neurontin to primary care physicians,
20   is that correct?
21        A.   We did, once we got the PHN
22   indication.
23        Q.   Once you marketed for PHN, you never
24   mentioned general neuropathic pain in any way,
25   correct?
```

**Page 47**

```
 1              LUCY CASTRO
 2        A.   In terms of promoting for general
 3   neuropathic pain?
 4        Q.   Yes.
 5        A.   No.
 6        Q.   Okay.  So I won't see anything that
 7   would be directed to the public that mentions
 8   anything about general neuropathic pain?
 9             MR. GUNTER:  Objection.
10        A.   There are pieces that have disease
11   state information that start with providing
12   context in terms of disease state so that PHN
13   can be understood.  In general my understanding
14   from materials I haven't seen is that
15   neuropathic pain in general is under recognized,
16   under diagnosed, and certainly the lay public
17   doesn't understand it well even to this day.  So
18   our materials gave very brief context and
19   immediately went into PHN.
20        Q.   So it would be your understanding then
21   that the primary focus of the terms that you are
22   aware of would have been PHN and other
23   neuropathic pain for context would just be a
24   minor part of the --
25        A.   Very minor, yes.
```

**Page 48**

```
 1              LUCY CASTRO
 2        Q.   That would be important to you as a
 3   regulator, as somebody involved in the
 4   regulatory department, right?
 5        A.   Absolutely.
 6        Q.   Why would that be important?
 7        A.   Like I said, we wanted to make sure we
 8   are on label, and in fact that type of approach
 9   was precleared with the FDA's DDMAC division.
10        Q.   But let's leave the FDA out of it for
11   a minute.  I just want to know from your
12   standpoint as somebody from regulatory, that
13   would be important to you, the PHN would be the
14   focus of the piece as opposed to pain?
15        A.   Absolutely.
16        Q.   As a person involved in regulatory, if
17   somebody were to come to you and say here is a
18   piece and it was primarily about pain and only a
19   little bit about PHN, what would you tell them?
20        A.   That we couldn't approve that.
21        Q.   Why?
22        A.   Because the focus has to be on label
23   PHN.
24        Q.   Why does the focus have to be on PHN?
25        A.   Because that's the indication
```