EXHIBIT 24

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN MARKETING, SALES ) CASE NO.

PRACTICES AND PRODUCTS LIABILITY ) 04-10981

LITIGATION                    )

                              )

                              )

THIS DOCUMENT RELATES TO:     )

                              )

RUTH SMITH, Individually and as  ) 05-CV-11515

Widow for the use and benefit of  )

herself and the next of kin of    )

Richard Smith, deceased.          )

_____)

VIDEOTAPED DEPOSITION OF:

GARY WAYNE BIGGS, SR.

Taken on behalf of the Defendant

February 8, 2008

_____

## Page 2

APPEARANCES:

For the Plaintiff:

KENNETH S. SOH, ESQUIRE
Lanier Law Firm
6810 F.M. 1960 West
Houston, Texas 77069
(713) 659-5200
713) 659-2204
kss@lanierlawfirm.com

For the Defendant:
CEDRIC E. EVANS
Clark, Thomas & Winters
P.O. Box 1148
300 West 6th Street, 15th Floor
Austin, Texas 78701
(512) 472-8800
(512) 474-1129
cce@ctw.com

Also Present: Amanda Martin, Videographer

## Page 3

I N D E X

WITNESS: GARY WAYNE BIGGS, SR.

INDEX OF EXAMINATIONS

Page/Line

Examination by Mr. Evans         06  04
Examination by Mr. Soh           59  11
Examination by Mr. Evans         73  05
Certificate                      75  01
Errata Sheet                     76  01

INDEX OF EXHIBITS

No. 1                            15  17
No. 2                            17  06
No. 3                            29  07
No. 4                            46  17
No. 5                            46  17
No. 6                            51  08
No. 7                            64  05

## Page 4

The videotaped deposition of GARY WAYNE BIGGS, SR., taken on behalf of the Defendant, on the 8th day of February, 2008, in the offices of Medical Forensics, 850 R.S. Gass Boulevard, Nashville, Tennessee, 37216, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agreed that Deborah J. Harris, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are reserved.

* * *

                                                                41
1   Q   How do you know that?
2   A   Even though I didn't sign it, I know
3   it because the computer generates my name as
4   Gary Biggs. I go in there and manually change
5   it to Gary W. Biggs, Sr.
6       MR. SOH: You are OCD.
7   A   I never lie. At least I try not to.
8       (COURT REPORTER ASKS EVERYONE TO
9   SPEAK UP.)
10      (DISCUSSION WAS HAD OFF THE RECORD.)
11  BY MR. EVANS:
12  Q   Okay. Let's talk now about the scene
13  investigation report which is also part of your
14  file, correct?
15  A   Yes, sir.
16  Q   Okay. Tell me how the scene -- this
17  is a document that's created by you?
18  A   Yes, sir.
19  Q   Okay. Tell me when in the process of
20  your investigation this document would have
21  been created.
22  A   When I get back to the office.
23  Q   So it would have been created that
24  morning?
25  A   More than likely. I would have to

                                                                42
1   check the computer. But I believe it was.
2   Q   And is this -- in the terms of the
3   scene description, is this like the narrative
4   summary, where it's created based upon your
5   notes and also based upon your memory of the
6   scene?
7   A   Yes, sir. And this is usually an
8   internal document that is not released out to
9   the family. So it can't -- it won't -- like I
10  said, that day I was here for a while. So I
11  would have done that that day. But there are
12  occasions that we do them like that night when
13  we return or later.
14  Q   Now, can you tell me this, because
15  this -- this scene description appears to have
16  more information than the narrative summary.
17  Is there a reason for that?
18  A   The narrative summary you don't put
19  all the information in there. This is more for
20  the doctors to read, to give them more of the
21  story.
22      You don't want to -- I personally do not
23  want the family to remember certain aspects of
24  the scene, so I'm not going to put that in
25  there, because it needs to be more generalized,

                                                                43
1   as opposed to this needs to be more in depth,
2   when you talk about the report of the County
3   Medical Examiner.
4   Q   So is the thought that the report of
5   the County Medical Examiner was going to end up
6   with the family?
7   A   If they request it.
8   Q   So you're more -- a little bit more
9   selective about the information that you put in
10  there?
11  A   Yes, sir.
12  Q   All right. I want to --
13  A   Thus, it's totally different from
14  a --
15  Q   I wanted to ask you a few questions
16  about some of the information that is contained
17  in the scene investigation report.
18      You mentioned that you -- you also took
19  photographs of the scene, correct?
20  A   Yes, sir.
21  Q   Okay. Do you look at the -- tell me
22  this: When you're completing the scene
23  description, in that part of the scene
24  investigation report, do you also review your
25  photographs to assist you with that?

                                                                44
1   A   Several times, yes, sir.
2   Q   Okay.
3   A   But not all the time. But a lot of
4   times.
5   Q   Okay. Do you have a recollection of
6   whether or not you would have reviewed the
7   photographs for this?
8   A   I don't know.
9   Q   I know that's a while ago.
10  A   We download the photographs into the
11  computer system, so I have them right there, so
12  I can look at them a lot.
13  Q   Now you have -- you've got a copy of
14  you -- of the photographs that you took in
15  front of you?
16  A   Yes, sir.
17  Q   All right. Now what I'm interested
18  in is in the scene description, coming down
19  kind of toward the -- toward the end of that
20  last paragraph, it says, what appeared to be --
21  do you see that part?
22  A   Yes, sir.
23  Q   Okay. What appeared to be several
24  prescriptions on the dresser were noted. Wait
25  a minute. I'm sorry. Let me read it.

45
1   What appeared to be several prescriptions
2   on a dresser were noted.  The victim appeared
3   to have been prescribed Hydrocodone,
4   cyclobenzaprine, and Neurontin.
5       Do you see that?
6    A   Yes, sir.
7    Q   Okay.  In terms of this information,
8   would this have been based upon your
9   observations of the bedroom?
10   A   Well, yes.  But we also collect the
11  medication at the scene.
12   Q   Okay.  All right.  And if, for
13  example -- and I assume that if -- we're going
14  to look at the photographs in a second.  But I
15  assume if you saw -- you know, you could see a
16  pill bottle that, you know, contained
17  medication and a pill bottle that did not
18  contain medication?
19   A   Yes, sir.
20   Q   If you had a pill bottle, even though
21  on the outside it said that it was, for
22  example, hydrocodone, if it didn't contain any
23  medication, would you note on your scene
24  description that there was hydrocodone at the
25  scene?

46
1    A   I would still put that the pill
2   bottle was there.
3    Q   Okay.
4    A   But I would more than likely note
5   that it was empty.
6    Q   Okay.  All right.  Now, looking at
7   the photographs -- and I've got a version of
8   photographs that actually has the number -- the
9   numbers that were assigned that was part of the
10  file.  And I have the 04-1575-01.  Yours may --
11   A   That's fine.
12   Q   -- they may be a little clearer than
13  mine.  And I want to look first at
14  photographs 6 and 14.  And I'm going to mark as
15  deposition Exhibit No. 4 photograph 6, and
16  deposition Exhibit No. 5 photograph 14.
17      (EXHIBIT NOS. 4 AND 5 WERE MARKED FOR
18      IDENTIFICATION.)
19  BY MR. EVANS:
20   Q   Now, looking at these two
21  photographs, there are a number of -- well,
22  fair to say there are a number of medication
23  bottles on the dresser?
24   A   Uh-huh.
25   Q   Yes?

47
1    A   Yes, sir.
2    Q   All right.
3    A   Sorry.
4    Q   Are you able to tell me from looking
5   at these photographs which pill bottle the
6   Neurontin was contained in?
7    A   The one that says courtesy refills,
8   Eckerd on top, the big one.
9    Q   Okay.  The big one that's --
10   A   Right there.
11   Q   -- kind of in the center of -- next
12  to the cell phone?
13   A   It was between the cell phone and the
14  watch.
15   Q   So to the right of the cell phone.
16  All right.
17      And how is it that you know that that's
18  the bottle that contained Neurontin?
19   A   Because you can see it on the pill
20  bottle.
21      MR. SOH:  You can see it on the what?
22   A   You can see it on the pill bottle.  I
23  see Neurontin all the time and plus I was
24  prescribed it in the past.
25  BY MR. EVANS:

48
1    Q   Okay.  All right.  So it's your
2   belief that bottle contains the Neurontin, the
3   big pill bottle?
4    A   Yes, sir.
5    Q   Okay.  Are you -- are you -- is that
6   something that you're certain of?
7    A   I'm pretty sure of that because it
8   looks like you can see the writing right there
9   on the capsule, Gabapentin, Neurontin.
10      MR. SOH:  Can I see your copy?
11      MR. EVANS:  His is a little clearer.
12      THE WITNESS:  And here's another one
13  that you can see.  Do you see what I'm
14  talking about?
15      MR. SOH:  No.
16      THE WITNESS:  Trust me on these
17  pills.
18      MR. SOH:  Okay.  That's all right.
19  That's all right.
20      THE WITNESS:  All right.
21  BY MR. EVANS:
22   Q   And can you tell me -- you said
23  something about the collection of medications
24  at the scene.
25      Are you able to tell me one way or the

49

1   other whether or not there was a collection
2   made of the medications, the cyclobenzaprine,
3   the Hydrocodone, and Neurontin at the Smith
4   home?
5       A   Did I collect them?
6       Q   Yes.
7       A   Yes.
8       Q   You did?  Okay.
9       A   As best I remember.
10      Q   Okay.  And why -- do you have a
11  specific recollection of collecting the pill
12  bottles?
13      A   As best I remember, I collected them.
14      Q   Okay.  All right.  And then what
15  happens to the pill bottles once they're
16  collected?
17      A   You transport them back here.  We
18  usually use two forms, a medication log, which
19  basically logs the medication that was there.
20  And we have a medication list, which we put the
21  type of drug, when it was prescribed, how many
22  were left, who prescribed it, such like that.
23      Q   Okay.
24      A   So I probably didn't do that.  And
25  the reason is because I couldn't find it,

50

1   because I noted it in my -- and I didn't think
2   since they looked in therapeutic range that it
3   was related to the death.
4       Q   Okay.  All right.  And you said that
5   you -- you said you didn't do it because you
6   noted it where?
7       A   In my senior investigation form.
8       Q   Okay.  And then what was the second
9   thing you said about there appeared to be
10  therapeutic range?
11      A   Yeah.  There was pills in there.  If
12  he had overdosed, he more than likely would
13  have took them all and not used what he did.
14      Q   Okay.  Because your concern with the
15  medication at that time would have been whether
16  or not they were medications that were used to
17  facilitate the suicide?
18      A   Yes.  And, plus, you don't leave the
19  narcotics on the scene.
20      Q   Okay.  You also, in addition to that
21  note, you note that there is a -- that there
22  was a suicide note.
23      You note that in your scene report,
24  correct?
25      A   Oh, yes, sir.

51

1       MR. EVANS:  I'm going to mark as
2   Exhibit No. 6 photograph 5.  It's the same
3   one.
4       THE WITNESS:  Here.  You can see it
5   better.
6       MR. SOH:  That's all right.  I have
7   seen it.
8       (EXHIBIT NO. 6 WAS MARKED FOR
9   IDENTIFICATION.)
10  BY MR. EVANS:
11      Q   Does what I have marked as deposition
12  Exhibit No. 5, which is scene photograph number
13  005, does that appear to be the suicide note
14  that you reference in your report?
15      A   Yes, sir.
16  BY MR. EVANS:
17      Q   And you note here in this, also after
18  kind of you -- you -- you recite what the note
19  says.  You said the victim reportedly had a
20  history of hip and knee replacement surgery.
21      The victim was reportedly in chronic pain
22  and the victim reportedly discussed thoughts of
23  suicide in March of 2004.
24      Are you able to tell me specifically where
25  that information came from?

52

1       A   More than likely -- well, definitely,
2   the officers and detectives on the scene.  Then
3   when I talked to the wife, I would have either
4   confirmed or denied it real quick.  Like I
5   said, she was really distraught.  So I might
6   have just rushed real --
7       Q   Okay.  Okay.  The last -- is there
8   something else I wanted to talk to you about?
9   Oh, yeah.  The statement of opposition to
10  autopsy.
11      A   Is there one in the file?
12      Q   There is one in the file.  Give me --
13  here it is.  It's page 18 of deposition Exhibit
14  No. 1.  And if you can't find it, I've got a
15  copy of it.  And, actually --
16      A   To save time, we'll look at this one.
17      Q   Who created this document; do you
18  know?
19      A   It's a blank document except for the
20  wording and that's from us.  And I believe
21  David Crowder had them put the opposition for
22  autopsy.
23      Q   Okay.  All right.
24      A   Because he signed it at the bottom.
25  And that's --

**61**

1   MR. EVANS: Object to the form.
2   A   We knew about it, like the Vioxx or
3   whatever, we could like of look forward to that
4   when that came out.
5   BY MR. SOH:
6   Q   Okay. Oh, okay. You mentioned
7   Vioxx. Let's give you an example.
8   So you're saying that if someone died of a
9   heart attack while taking Vioxx, you would
10  investigate whether or not Vioxx might have
11  caused that heart attack?
12  A   If we found Vioxx, we would bring it
13  back in and document it.
14  Q   Okay. But you didn't do that in this
15  case with the Smith Family and the Neurontin?
16  A   We did bring -- I did document the
17  drug.
18  Q   That he was on Neurontin. But you
19  didn't go and document any kind of scientific
20  literature or anything like that to maybe show
21  a link between Neurontin and suicide?
22  A   No, sir.
23  Q   Okay. Let me ask you. I got a
24  little confused about your answers, and I just
25  want to maybe try and make it clearer, okay?

**62**

1   Do you believe that you or the Medical
2   Examiner's Office actually took possession of
3   the prescription medication at Richard Smith's
4   home on the day of his suicide?
5   A   The best I would remember, yes.
6   Q   Okay. But there is no documentation
7   in your file or anywhere else in the Medical
8   Examiner's Office that says there are three --
9   we took three bottles of Neurontin and there
10  were 18 pills left in there?
11  A   No. I'm just going on standard
12  protocol.
13  Q   Okay.
14  A   But there are occasions when we have
15  left them on the scene.
16  Q   Okay. But -- so you're saying that
17  standard protocol in the Medical Examiner's
18  Office would be that you would take possession
19  of all prescription medication at the scene?
20  A   Yes, sir.
21  Q   But there's no paper trail or any
22  other documents in your possession that showed
23  that you actually took possession or how many
24  pills were left in those prescription bottles?
25  A   No, sir.

**63**

1   Q   All right. Do you have any personal
2   knowledge of taking possession of the
3   prescription medication that day?
4   A   The best I remember I took it.
5   Q   Okay. But there's no documentation
6   and there's no --
7   A   Four years ago.
8   Q   What would happen to that medication?
9   Would it be released back to the family or
10  would it be disposed of?
11  A   We dispose of it here.
12  Q   Okay. But best of your recollection,
13  you took it but there's no other documentation;
14  fair statement?
15  A   Fair statement.
16  MR. SOH: All right. I just wanted
17  to clear that up. You -- let me show you
18  the police report real quick. I'm going
19  to mark -- what's next? -- Exhibit 5 --
20  MR. EVANS: No. 7, I think.
21  MR. SOH: Mark the police report as
22  Exhibit 7 to your deposition. This is
23  Detective Satterfield's supplemental
24  report from the -- I'm sorry -- I'm just
25  noting that the --

**64**

1   MR. EVANS: Are you just marking --
2   are you marking the whole thing or just
3   his report? Because now you put that --
4   yeah, okay.
5   (EXHIBIT NO. 7 WAS MARKED FOR
6   IDENTIFICATION.)
7   BY MR. SOH:
8   Q   All right. I'm going to be marking
9   Detective Satterfield's supplemental report
10  from the Metropolitan Nashville Police
11  Department on the Smith suicide. I want to
12  mark that exhibit.
13  I just want -- I'm highlighting a couple
14  sentences in there, okay. And just read that
15  highlighted section.
16  A   Ms. Smith states that about one year
17  ago the victim had hip and knee replacement
18  surgery and has been in constant pain since
19  that time. On 3/1/04 the victim mentioned to
20  his daughter Cindy Smith that he might take his
21  own life.
22  Q   That's virtually identical to your
23  narrative summary, isn't it?
24  A   Do you mean in the report?
25  Q   In the narrative summary from your