# Exhibit 38

```
                                                                    547
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2                       MDL Docket No. 1629
                         Master File No. 04-10981
 3
       *****************************************
 4     In Re:  NEURONTIN MARKETING, SALES
       PRACTICES, AND PRODUCTS LIABILITY
 5     LITIGATION

 6     *****************************************

 7     THIS DOCUMENT RELATES TO:

 8     *****************************************
       HARDEN MANUFACTURING CORPORATION;
 9     LOUISIANA HEALTH SERVICE INDEMNITY
       COMPANY, dba BLUECROSS/BLUESHIELD OF
10     LOUISIANA; INTERNATIONAL UNION OF
       OPERATING ENGINEERS, LOCAL NO. 68
11     WELFARE FUND; ASEA/AFSCME LOCAL 52
       HEALTH BENEFITS TRUST; GERALD SMITH;
12     and LORRAINE KOPA, on behalf of
       themselves and all others similarly
13     situated, v. PFIZER INC. and
       WARNER-LAMBERT COMPANY.
14
       *****************************************
15
       THE GUARDIAN LIFE INSURANCE COMPANY
16     OF AMERICA v. PFIZER INC. and

17     AETNA, INC. v. PFIZER, INC.
       *****************************************
18
            SUPREME COURT OF THE STATE OF NEW YORK
19                    COUNTY OF NEW YORK
       *****************************************
20
       In Re:  NEURONTIN PRODUCT LIABILITY
21     LITIGATION

22     ***************************************** Index No.

23     THIS DOCUMENT APPLIES TO:              765000/06
                ALL CASES
24     *****************************************
```

572

1  was involved, and I just wanted you to explain
2  that more to me.
3      A.  No, I'm sorry, I just think it's a
4  language issue.
5          So these documents are all documents
6  that during the course of writing my report I
7  felt it was appropriate to cite them, and so
8  these are all cited.  If there are other legal
9  documents cited in the report that are not
10 included here, that would be an oversight.  But
11 I believe that these are the sum total of legal
12 documents that I cite in my report, and so it
13 was entirely based on the documents that I felt
14 were relevant.
15     Q.  Is it the sum total of all the
16 documents that you considered and relied upon
17 for purposes of your 2008 report?
18     A.  In terms of legal documents, yes, I
19 believe so.  Yes.
20     Q.  Did you consider or rely upon any
21 deposition testimony in connection with your
22 2008 report?
23     A.  I did not.  I believe in the
24 earlier -- that some of those Bates numbered

573

1  documents, you'll actually have to forgive me
2  while I look, I believe there were some -- there
3  was some deposition testimony from Franklin that
4  I had cited earlier, but I may be wrong about
5  that.  I'm looking for -- I would have to check.
6          But I don't believe there was
7  anything -- there was nothing specific in this
8  analysis that relied on deposition testimony.  I
9  don't see the deposition testimony cited in my
10 class certification report, but I recall that
11 there was something that was relevant, but I
12 would have to go and figure out exactly what
13 that was I was thinking of.
14     Q.  Let me ask it like this.
15         With the possible exception of any
16 deposition testimony, excerpts or otherwise that
17 might be imbedded in the Bates numbered
18 documents, is there any other deposition
19 testimony that you considered or relied upon in
20 connection with your 2008 report?
21     A.  No, there isn't.
22     Q.  Have you read any depositions of any
23 company witnesses?
24     A.  I have not, no.

574

Q.  Have you read any depositions of any
physicians who have prescribed Neurontin?
    A.  No, except to the extent that they
have been cited in Dr. Bell's report and
Dr. Keeley's report.
    Q.  Do you mean that you went back and
looked at deposition transcripts because they
were cited in a report you read, or you have a
familiarity with them based on what you've read
in other reports?
    A.  I have a familiarity with them based
on what they -- what I've seen in other reports.
I believe that's true for some of the company
depositions as well.  I believe there was a
Marino deposition.
        Again, these were depositions that
came up in other reports, but I have not
specifically sought them out, read them and
relied upon them.
    Q.  You haven't read transcripts of any
company witness reports or doctor -- I'm sorry,
company witness depositions or doctor
depositions?
    A.  Not to my recollection, no.

575

Q.  Did you consider your Neurontin
declaration in the Pennsylvania Clark case in
connection with your work on your 2008 MDL
declaration?
    A.  Well, it was -- certainly that work
was -- as you know, the work is closely related,
and the analysis that I undertook in that matter
influenced in some ways the way I approached
this matter, you know, having worked with the
data, understood the patterns that I obtained in
that analysis, certainly influenced it.  But I
wouldn't say that I relied upon it.  It's hard
to say that they're not intertwined, however.
    Q.  It's something that you considered,
though, in connection with the work you did for
the MDL report?
    A.  I would say that that would be a fair
statement, I considered it, yes.
    Q.  Any particular reason why it's not
listed among the documents that are listed on
Attachment B?
    A.  Well, again, I don't mean to split
hairs, but I didn't really rely on that
analysis.  Some of the things that I learned in

804
1  NDTI data, and IAMS IPS data as your primary
2  data sources, is that correct?
3      A.  That's correct.
4      Q.  You mentioned some census data, I
5  think, earlier as well that you rely on?
6      A.  That's correct.
7      Q.  That's publicly available data?
8      A.  That's correct.
9      Q.  Is there any other data that you rely
10 on for purposes of your analysis?
11     A.  Maybe I could just review it to be
12 sure.
13     Q.  Sure, please do.
14     A.  I believe that those are certainly the
15 major ones.
16         (Witness reviewing document.)
17     A.  I believe that would be everything.
18         BY MR. MISHKIN:
19     Q.  How did you choose those specific data
20 sources?
21     A.  Well, those IMS and Verispan are the
22 two major sources for pharmaceutical sales and
23 promotion data, so there, to my knowledge, there
24 are no other sources of promotional spending

805
1  data.
2          Woulters Kluwer, I believe, owns one
3  of them now, so if I may include that. So those
4  are the possible sources.
5          And I believe that, as we discussed
6  earlier, that some of the data we had obtained
7  for earlier reports either in this matter or in
8  the Pennsylvania matter, and so the data were
9  already available, and we augmented them where
10 we needed to with additional data.
11     Q.  Did you ever consider using any other
12 data sets that you ultimately didn't use.
13     A.  I don't believe so. I think in some
14 of these cases Verispan and IMS Health have
15 identical data series available, or virtually
16 identical, so we may have price shopped between
17 the two of them. But I don't believe other
18 sources of data other than those were
19 considered.
20     Q.  The promotional data you mentioned
21 that you used for your analysis is detailing in
22 journal advertisement spending for Neurontin, is
23 that correct?
24     A.  That's correct.

806
1      Q.  And the source for Neurontin
2  promotional data in your model is IMS IPS data?
3      A.  Correct.
4      Q.  The IMS IPS data sources confine to
5  detailing in journal advertising, correct?
6      A.  They also have samples and direct to
7  consumer advertising, neither of which are
8  available for the whole period. So I believe we
9  do have the sample data, I think it was extra to
10 buy the direct to consumer advertising data, and
11 there, I'm fairly certain, there wasn't any for
12 Neurontin.
13     Q.  So IMS IPS contains data on, as you
14 understand it, detailing, journal advertising,
15 samples, and direct to consumer advertising?
16     A.  That's correct. I believe that's
17 everything there.
18         As I reported the sampling data, I
19 believe they only go back to 1998, and I
20 reported the correlation between the samples and
21 details as is well-known. Most samples are
22 distributed through detailing, so they tend to
23 be highly correlated.
24     Q.  There's no other type of promotional

807
1  data that I haven't mentioned that's included in
2  IMS IPS, to your knowledge?
3      A.  I don't believe so. If you're
4  thinking of something specific you might need to
5  just ask me, but I don't believe so.
6      Q.  No, I'm not trying to trick you.
7          My understanding, and I just want you
8  to confirm it, is that there's no other type of
9  promotional data contained in the IMS IPS data
10 source other than detailing and journal
11 advertising and perhaps sample data and direct
12 to consumer advertising?
13     A.  That's correct. And direct to
14 consumer advertising, I believe, are additional,
15 they buy them from another source, TMS Media.
16     Q.  Okay. And the direct to consumer
17 advertising component wasn't relevant to this
18 case?
19     A.  That was my understanding, that's
20 right.
21     Q.  You didn't use any direct to consumer
22 advertising data in connection with your work on
23 this case?
24     A.  No. And I believe that I actually

808

1  asked about it, asked IMS about it, and there
2  wasn't any.
3      Q.  Okay.  And then the sample data which
4  you're saying is in IMS IPS that you report, you
5  didn't ultimately use that in your analysis
6  here, is that correct?
7      A.  That's correct, because it's
8  incomplete.
9      Q.  Okay.  And your measure of promotion,
10 your input of promotion into your model is not
11 based on something other than IMS IPS data, is
12 that correct?
13     A.  That's correct.
14     Q.  So, for example, the measure of
15 promotion that you use as an input into your
16 model, it's not based on documents or data
17 received from Defendants, for example?
18     A.  No, it's not.
19     Q.  How does IPS quantify the amount spent
20 on detailing?
21     A.  IPS, my understanding of how it works
22 is that physician practices report on detail
23 visits and the subject of those visits, and then
24 IMS essentially imputes detailing cost based on

809

1  detailing time and time per minute in essence.
2  That's my understanding.  It's an imputation.
3      Q.  Do they use a concept of a cost per
4  call?
5      A.  That's the sort of thing that I was
6  describing.
7      Q.  Okay.  I think you previously
8  testified to this; do you recall that you've
9  testified that the IPS data that you've used as
10 an input into your model includes visits by
11 sales representatives to doctors where they
12 simply left a sample of Neurontin but didn't
13 have any actual discussion with the doctor?
14     A.  That's my understanding, that those
15 kinds of visits count as well, yes.
16     Q.  So part of what you're treating as
17 alleged improper promotion here is pure sampling
18 by sales representatives to particular
19 specialities where there was no actual
20 discussion between the sales representative and
21 a physician?
22     A.  Well, it may be that there was no
23 actual discussion.  But I believe the way the
24 but for scenarios are constructed, those visits

810

1  would be appropriately counted.
2      Q.  And what are you basing that on?
3      A.  Well, so, for example, a visit to a
4  psychiatrist to do nothing but leave a sample I
5  would believe would be subject to the
6  allegations.
7      Q.  And what is the basis of that belief?
8      A.  Again, my reading of the complaint.
9      Q.  Did you have any discussions with
10 counsel about that belief?
11     A.  I don't believe we talked about that
12 specific issue, no.
13     Q.  Okay.  Do you know the extent to which
14 your promotional spending input includes
15 spending on what we'll call pure sampling visits
16 of the type that you just mentioned where there
17 was no discussion between the sales
18 representative and the doctor?
19     A.  I do not, no.
20     Q.  Have you investigated, taken any steps
21 to investigate that issue?
22     A.  No, I have not.
23     Q.  Let's talk about journal
24 advertisements.  You said that your promotions

811

1  variable also contains money spent on journal
2  advertisements?
3      A.  Correct.
4      Q.  And that data also comes from IPS?
5      A.  Correct.
6      Q.  It doesn't come from any other source?
7      A.  No, it does not.
8      Q.  How does IPS quantify the amount of
9  money spent on journal advertisements?
10     A.  Similar method, they can observe ads
11 in journals, and they apply the standard journal
12 rate pricing to those advertisements to
13 construct the cost of the advertisements.
14     Q.  And how does IPS allocate journal
15 advertisement expenditures to particular
16 specialties?
17     A.  According to readership.
18     Q.  How does that work?
19     A.  So if a neurology journal, for
20 example, the readership is 80 percent
21 neurologists, then 80 percent of that
22 advertising spend would go into the neurologist
23 category.
24     Q.  Okay.  And to the extent there are

```
                                                                    895
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2                        MDL Docket No. 1629
                          Master File No. 04-10981
 3
       ***********************************
 4     In Re:  NEURONTIN MARKETING, SALES
       PRACTICES, AND PRODUCTS LIABILITY
 5     LITIGATION

 6     ***********************************

 7     THIS DOCUMENT RELATES TO:

 8     ***********************************
       HARDEN MANUFACTURING CORPORATION;
 9     LOUISIANA HEALTH SERVICE INDEMNITY
       COMPANY, dba BLUECROSS/BLUESHIELD OF
10     LOUISIANA; INTERNATIONAL UNION OF
       OPERATING ENGINEERS, LOCAL NO. 68
11     WELFARE FUND; ASEA/AFSCME LOCAL 52
       HEALTH BENEFITS TRUST; GERALD SMITH;
12     and LORRAINE KOPA, on behalf of
       themselves and all others similarly
13     situated, v. PFIZER INC. and
       WARNER-LAMBERT COMPANY.
14
       ***********************************
15
       THE GUARDIAN LIFE INSURANCE COMPANY
16     OF AMERICA v. PFIZER INC. and

17     AETNA, INC. v. PFIZER, INC.
       ***********************************
18
            SUPREME COURT OF THE STATE OF NEW YORK
19                   COUNTY OF NEW YORK
       ***********************************
20
       In Re:  NEURONTIN PRODUCT LIABILITY
21     LITIGATION

22     *********************************** Index No.

23     THIS DOCUMENT APPLIES TO:            765000/06

24            ALL CASES
```

912

1  was being retained by counsel here today, and
2  the Zyprexa states case/cases involve individual
3  law firms for each of those cases.
4      Q.   The national version of the Zyprexa
5  case, though, who were you retained by?
6      A.   Hagens Berman Sobol Shapiro.
7      Q.   All right. Any others where the
8  counsel was different?
9      A.   I don't believe so. We discussed
10 yesterday the Neurontin Canada matter, those are
11 different lawyers.
12     Q.   Right.
13          Okay. Any others that come to mind?
14     A.   No.
15     Q.   Looking at all these cases, in which
16 ones have you offered opinions or are you
17 intending to offer opinions regarding the
18 magnitude of impact that some sort of promotion
19 had on pharmaceutical sales?
20     A.   The Zyprexa matters involve such
21 calculation, as well as the Neurontin matters,
22 as you know.
23     Q.   Any others?
24     A.   I don't believe so. I don't believe

913

1  so, no.
2      Q.   Okay. I'm sorry, did you want to
3  amend that?
4      A.   I'm -- I believe the Vioxx litigation
5  has a component related to the impact of
6  promotion.
7      Q.   What work have you done on that, and
8  what is the component?
9      A.   The work that I've done on that has
10 been very preliminary, so not -- I haven't done
11 any analysis on that matter yet, simply proposed
12 a methodology. And I believe, I'm not certain,
13 the matter that you may be familiar with, the
14 general background in the Vioxx matter which
15 relates to information about the product, I'm
16 not certain that that analysis won't involve
17 examining the impact of promotion. The report
18 that I filed was quite a while ago, so I don't
19 remember the exact details of the proposed
20 analysis.
21     Q.   Does the proposed analysis contemplate
22 a regression analysis?
23     A.   That's the part that I can't
24 absolutely remember.

914

    Q.   Okay. You can put that aside for now.
    A.   Okay.
    Q.   Let's talk about the assumptions that
you've made regarding alleged improper promotion
in your 2008 report. I think the easiest thing
to do is to turn to Attachment I.4, which is the
very last page of the report.
         Are you with me there on I.4?
    A.   I am.
    Q.   This attachment sets forth the
categories of promotion that you've assumed to
be improper for purposes of your analysis,
correct?
    A.   That's correct.
    Q.   These assumptions were provided to you
by counsel?
    A.   Yes, they were.
    Q.   According to the assumptions counsel
provided to you, detailing and journal
advertising are assumed to be proper or improper
based on the specialty of the physician who
received the detailing or the journal
advertising?
    A.   That's correct.

915

    Q.   Other than the physician's specialty
and the date of the promotion, there's no other
criteria applied to determine whether a
particular promotion is proper or improper in
your analysis, is that correct?
    A.   That's correct.
    Q.   Let's talk about journal advertising
first.
         As I understand it, you were told to
assume that some of Defendants' journal
advertising for Neurontin was off-label, is that
correct?
    A.   I was told to assume that some of
Defendants' journal advertising could be proven
to have supported the campaign for off-label
use. So when you say advertising being
off-label, I want to be sure that we understand
each other, that the advertisements did not
necessarily mention pain, for example,
neuropathic pain per se, but instead were
general ads aimed at delivering a message to
physicians who were not using Neurontin for
epilepsy.
    Q.   So you've been told to assume that if

**Page 916**

1  there's an advertisement purely related to an
2  on-label use, it's still possible that any
3  impact that such an advertisement had could give
4  rise to liability?
5      A.  Well, again I think my understanding,
6  and this is described in my declaration, is that
7  there were two kinds of advertisements that
8  Defendants used in support of Neurontin sales.
9          One was an indication specific ad
10 talking about epilepsy.
11         The other was a general ad simply
12 describing either the safety or efficacy of
13 Neurontin without discussing indications, and
14 that the second type of ad, as Defendants' own
15 documents cite, and those documents I cite in my
16 report, was aimed at primary care physicians and
17 others to try to support these other efforts
18 that were ongoing to generate interest in using
19 Neurontin for off-label uses.
20    Q.  Let's talk about those categories one
21 at a time.
22         With respect to journal advertisements
23 that do refer to a particular on-label
24 indication, your understanding is that those are

**Page 917**

1  not alleged to be improper in any way?
2      A.  Well, I don't think that that's
3  necessarily a fair way to summarize.  I think
4  that the matter is such that to the extent that
5  the journal advertisements were placed so they
6  would be seen by those physicians who do not
7  treat epilepsy, that the allegations suggest
8  that those advertisements were intended again to
9  support this broader campaign for general uses
10 of Neurontin.
11         So whether or not specifically the ad
12 mentioned epilepsy, I don't believe that was the
13 criteria by which the lawyers decided what was
14 going to be considered illegal versus
15 legitimate.
16    Q.  What were the criteria applied to a
17 journal advertisement that is talking about an
18 on-label indication?  What criteria do you
19 understand counsel are applying to determine
20 whether such an advertisement is improper or
21 not?
22    A.  I think for the purposes of this
23 analysis, again the assumptions I was asked to
24 make were with regard to the extent of targeting

**Page 918**

1  of journal advertising to specialties other than
2  neurology, and a given time period over which,
3  my understanding is, that counsel has evidence
4  the Defendant used its journal advertising to
5  support this off-label campaign.
6          So I don't believe a parsing of
7  individual advertisements was -- clearly a
8  parsing of such individual advertisements
9  doesn't enter into this definition of off-label
10 journal advertising.
11    Q.  Okay.  To make sure that I understand
12 then, the theory that you've been asked to
13 accept and to assume is true for part of your
14 analysis is that it's possible that a journal
15 advertisement that on its face is completely
16 within the label, doesn't say anything about any
17 off-label uses, still potentially could give
18 rise to liability in this matter depending on
19 what Defendants had intended with respect to
20 that journal advertisement?
21         MR. NOTARGIACOMO:  Object to the
22 question.
23    A.  Again, I think I want to answer that
24 as directly as possible, but I haven't made a

**Page 919**

1  judgment one way or another about that nuance
2  legal issue that you've just put before me.  I
3  have been -- I found on my own in discovery
4  materials support for the notion that Defendants
5  used their journal advertisements to promote the
6  use of Neurontin for uses other than those that
7  were on its approved label.  I'm aware that
8  there were these general advertisements and
9  specific advertisements and the data suggest
10 considerable targeting of these specialties
11 other than neurology.
12         Whether the lawyers will prove that
13 advertisements that were -- did not, let's say,
14 violate FDA promotional regulations were -- can
15 be proven to have been used in this way that
16 under this matter will be considered
17 illegitimate, I don't know the exact legal
18 strategy they're using.
19 BY MR. MISHKIN:
20    Q.  Your estimates include some number of
21 prescriptions that you've determined were caused
22 by journal advertisements, is that correct?
23    A.  That's correct.
24    Q.  And among those journal advertisements

924

1  strategy documents.
2  Q. Let's talk a little bit more about
3  those.
4      Can you be as specific as possible and
5  explain what those marketing documents said with
6  respect to the journal advertisements?
7  A. I believe that there's a document that
8  I cite in my report that talks about, again
9  about a general advertising campaign that was
10 aimed at primary care physicians.
11     Shall I look?
12 Q. Yes. Can you point me to the document
13 you're talking about?
14 A. Sure.
15     Footnote 33 on Page 13.
16 Q. And for the record, you're referring
17 to a document that was entitled "Neurontin 2000
18 Situation Analysis" with the Bates number
19 Pfizer_MDana_0000776 through 806, is that right?
20 A. Correct.
21 Q. Are there any other documents that you
22 have in mind that you believe support the
23 assumption you've made?
24 A. This is the one I had in mind.

925

1  Q. Did you review any other documents
2  that supported this assumption?
3  A. I don't know any to cite here, so I
4  can't say for certain that I didn't see other
5  documents, but I only cited the one here.
6  Q. As you sit here now, you're not aware
7  of any other documents that would support this
8  assumption?
9  A. As I sit here I'm not, no.
10 Q. Okay. Let's talk about the
11 methodology used to classify certain journal
12 advertising expenditures as improper or proper.
13     I think as we discussed yesterday IMS
14 IPS allocates journal advertising to different
15 specialties based on the journal's readership,
16 is that right?
17 A. That's correct.
18 Q. And if we look again at Attachment
19 I.4, counsel asked you to make some assumptions
20 based on that methodology that IPS IMS uses, is
21 that right?
22 A. Based on the data that are produced by
23 that methodology, yes.
24 Q. Right.

926

So using the IMS IPS methodology,
counsel told you to assume that, for example,
all journal advertising expenditures allocated
by IMS to the physician groups, psychiatrists
and, quote unquote, other physicians were
improper, is that correct?
A. That's correct.
Q. And counsel also asked you to assume
that all journal advertising expenditures
allocated by IMS to the physician group called
PHN prior to the third quarter of 2002 were
improper?
A. That's correct.
Q. Now, by assuming that some amount of
improper -- by assuming that there was some
amount of improper journal expenditures, you're
making a different assumption from the one that
you made in the Pennsylvania case, is that
right?
A. I believe that's true, yes.
Q. Why did you make a different
assumption here?
A. Again, this was an assumption I was
asked to make by counsel, and the lawyers in

927

these cases, as you know, are different and
have -- my understanding is they, under the
different laws in which they're operating and
the matters they're trying, they are pursuing
different legal avenues.
Q. Did you have any discussions with
anyone about the fact that you were applying
different assumptions in the two cases with
regard to journal advertisement?
A. I don't recall any discussions to that
point, no.
Q. When did counsel tell you that they
wanted you to treat some portion of journal
advertising as improper and subject to the
allegations?
A. As I believe my best recollection was
yesterday, at least perhaps I'll be consistent
with yesterday, I think we started discussing
the but for assumptions in June, perhaps as late
as July, but the assumptions with regard to
journal advertising were discussed at the same
time as the assumptions with regard to
detailing.
Q. Did there ever come a point where the

940

1  Q. And this one refers to Neurontin
2  scored tablets, and then above that it says "an
3  effective dosage is conveniently within reach
4  for patients with postherpetic neuralgia," do
5  you see that?
6  A. I see that, yes.
7  Q. Same question about this
8  advertisement; as you sit here, are you aware of
9  any way in which the content of this journal
10 advertisement is improper?
11     MR. NOTARGIACOMO: Same objection.
12 A. Again, I am not specifically aware.
13 The only thing that I notice is that this
14 advertisement cites the JAMA study, or two JAMA
15 studies, I believe -- one JAMA study and one
16 pain study that I believe are mentioned in the
17 complaint, but I would have to refer directly to
18 the complaint to be sure that those are the same
19 studies.
20     BY MR. MISHKIN:
21 Q. Do you have some reason to believe
22 that the reference to those articles here is
23 improper?
24     MR. NOTARGIACOMO: Objection.

941

1  A. Again, I'm not qualified to make a
2  legal opinion on that, but I believe that some
3  of the data described in this advertisement are
4  specifically -- I'm sorry, are we looking -- I'm
5  looking at the first page.
6  Q. Maybe that explains the confusion.
7  A. I'm sorry.
8  Q. That's all right. Let's do the one on
9  the last page.
10 A. The page before appears to report some
11 of the data that I believe are mentioned with
12 regard to bias studies. I apologize. The back
13 page. Again I have -- I don't know necessarily
14 that the content is improper, I have no reason
15 to believe that.
16 Q. Have you had any discussions with
17 counsel about either this particular journal
18 advertisement or ones like it, for example
19 journal advertisements that cite studies?
20 A. I don't believe that we have discussed
21 journal advertisements that cite studies. We
22 have discussed the notion of Defendants' use of
23 those studies in its marketing more generally by
24 way of detailing, for example.

942

Q. Have Plaintiffs told you that part of
their theory of liability in the case involves
references in journal advertisements to studies
in some cases?
A. Not specifically. My understanding is
that the allegations suggest that Defendant used
a multifactorial approach and leveraged
research, peer influence, all of these things
together. So my understanding is that the
allegations are all intertwined with one
another.
Q. I'm asking you, though, a very
specific question about journal advertisements
and whether you've had any discussions or
otherwise have any knowledge of what Plaintiffs
are alleging with respect to journal
advertisements that reference studies.
A. Not with that specific -- specifically
the connection between advertising and those
published studies, no.
Q. Do you know whether physician
specialties other than the group you've called
PHN specialties and neurologists subscribe to
the New England Journal of Medicine?

943

A. I don't know, other than -- let me
just be clear on the question.
     So PHN specialties and other
physicians, other being the residual, are likely
to subscribe to the New England Journal of
Medicine.
Q. So let's talk about that other group,
for example.
A. Okay.
Q. To be clear, with respect to the,
quote unquote, other physician group, you've
assumed that any journal advertisement,
expenditures directed at that, quote unquote,
other physician group were improper throughout
the entire time period of the analysis?
A. That's correct.
Q. And you've just told me that you think
it's quite likely that the physicians in that
other physician group do subscribe to the
New England Journal of Medicine?
A. Certainly there are some of them in
there.
Q. Okay. And for that reason your
analysis is treating some portion of what was

13 (Pages 940 to 943)

944

1  spent on the journal advertisements in the
2  New England Journal of Medicine as improper
3  expenditures subject to liability?
4       A.   That's correct.
5       Q.   Okay.  You can put that aside.
6            Let's look again at Attachment I.4.
7  So let's talk now about detailing.
8            According to the assumptions counsel
9  provided you, all detailing to psychiatrists and
10 the physician group called other was improper
11 from the launch of Neurontin until the end of
12 the period that you look at?
13      A.   That's correct.
14      Q.   And also according to the assumptions
15 counsel provided you, all detailing to the group
16 called PHN physicians was improper from the
17 launch of Neurontin until the second quarter of
18 2002?
19      A.   That's correct.
20      Q.   And also according to the assumptions
21 counsel provided you, detailing to neurologists
22 was off-label after the third quarter of 1995 in
23 the same proportion that neurologists wrote
24 off-label prescriptions of Neurontin?

945

1       A.   That's correct.
2       Q.   Did you ever run any models or ever
3  run your analysis using any different
4  assumptions regarding detailing from the ones
5  that we just talked about, putting aside the one
6  that you've already mentioned with the similar
7  but different treatment of the neurologist
8  alleged off-label portion?
9       A.   I don't believe so.  Aside from what
10 we've talked about, different start dates and
11 that issue of specifically how to model the
12 neurologist detailing, no.
13      Q.   What documents did you review that
14 informed you about what Pfizer and
15 Warner-Lambert sales representatives were
16 actually saying to physicians about Neurontin?
17      A.   There are many documents, many of them
18 have been cited in the complaint.  As you know,
19 there are some e-mail correspondence that shows
20 up; a specific physician who got in touch with,
21 I believe it was Warner-Lambert at the time
22 after being detailed improperly.  There are a
23 number -- any number of documents that I cite
24 across my declarations as well as that are cited

946

in the complaint.
     Q.   Let's try to categorize them, if we
could.
          Tell me more about the first document
that you referenced.
     A.   I'd have to look for the specific
cite, but there is an e-mail correspondence, a
physician who e-mailed Warner-Lambert, I
believe, again my recollection that it was
Warner-Lambert, regarding an improper detail
related to an off-label use for Neurontin.
     Q.   Do you know what the date of that
communication was?
     A.   No.  I would have to go back and look
in the documents.
     Q.   Was it during the Warner-Lambert time
period?
     A.   That is my recollection, that it
predates the Pfizer period.  Whether it's
Parke-Davis or Warner-Lambert, I can't entirely
recall.
     Q.   Okay.  Is it possible by looking at
your report that you could figure out which
document this is?

947

     A.   It's possible.
     Q.   Spend however much time you need to do
that.
     A.   It may be more likely that it's
actually in my earlier report.
          (Witness reviewing documents.)
          BY MR. MISHKIN:
     Q.   You know, let's go off the record a
moment so that we can dial someone in.  Why
don't you keep looking.
     A.   Sure.  That's fine.
          THE VIDEOGRAPHER:  The time is 9:30.
We're off the record.
          (Off the record discussion.)
          THE VIDEOGRAPHER:  We're back on the
record.  The time is 9:32.
     A.   So I'm not entirely sure that it's
this cite.  If you see footnote -- sorry, I am
in Exhibit 1, which is my report in support of
Plaintiffs' motion for class certification.
     Q.   Right.  You know, just give me a
minute because I've got to pull my document.
Now I know how you feel.
          MR. NOTARGIACOMO:  Take all the time

14 (Pages 944 to 947)

### Page 996

strategy that I undertook instead, as you know, was to identify based on instructions from counsel the off-label -- the allegedly illegal promotion by time and specialty, and to look for the effects by indication.

The comparator methodology was to be a potential substitute for the methodology I used here, and I did not undertake such an analysis.

Q. Just so I understand, it was meant to be a substitute, or as originally conceived it was meant to be a substitute for what?

A. As originally conceived it was one alternative way of identifying the incremental effect of the allegedly unlawful promotion, was to take a drug that was exactly the same as Neurontin and look for any difference in the trend in off-label use.

But in fact, it's, having considered the matter more closely, it's unclear how one would choose such a comparator given Neurontin's use for so many different indications, it was not clear how one would go about selecting such a comparator. So I did not undertake any specific analysis to follow that line of logic,

### Page 997

instead rejected it early on.

Q. Okay.

A. Yes.

Q. Early on you determined that the potential avenue of finding a comparator drug to Neurontin would not be feasible?

A. That's correct.

Q. Do you remember when you reached that conclusion?

A. I think prior to starting the Pennsylvania analysis.

MR. NOTARGIACOMO: When you have a chance to take a break.

MR. MISHKIN: Let's go off the record.

THE VIDEOGRAPHER: The time is 10:42. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: Back on the record. The time is 10:51.

BY MR. MISHKIN:

Q. Professor Rosenthal, have you done any investigation of Defendants' other promotional conduct or alleged other promotional conduct besides detailing and journal advertising that

### Page 998

you didn't do in connection with your Pennsylvania report?

A. I'm not entirely sure how the last clause pertains, so let me say I examined the extent to which the sample data that I had for a limited period of time that we discussed yesterday was correlated with the detailing data, I may have done that for Pennsylvania.

In the report you see I report a correlation coefficient for those two series, and again examine discovery materials. I think they are largely the same as what I did in Pennsylvania, although I believe that I did additional document review in the MDL matter.

Again, as we discussed, we made some attempt to construct a series out of the meetings data, and so that was additional analysis of those allegedly improper promotional events.

Q. When did you do that analysis of the meetings data?

A. Again, when I say "analysis" I mean we went systematically through discovery documents and asked counsel to provide us with all the

### Page 999

meetings and events-related documents that they had, and attempted to construct a time series, and failed in that attempt. That would have been done in May, June of 2008.

Q. Okay. Any other analysis of other promotional activities not relating to detailing or journal advertising that happened after that June, May-June, 2008 time period?

A. Nothing that I can recall specifically, no.

Q. Okay. And then that correlation investigation that you referred to with respect to sampling, just so that I'm clear, that was an investigation of the extent to which the sample data and the detailing data were correlated when looking at IMS IPS?

A. That's correct.

Q. Okay. You didn't do any other type of correlation analysis like that with respect to other types of commercial conduct, isn't that right?

A. I didn't have data series to do that, so no.

Q. And anything else come to mind in

1000

1  terms of research or investigation of
2  promotional activities, again that you wouldn't
3  have done in Clark or that you would not yet
4  have done as of the time of your Clark
5  deposition, if you remember when that was in
6  July, 2008?
7      A.  I -- nothing that I can think of, no.
8      Q.  Okay.  Let's turn now to time trends.
9          What is a time trend?
10     A.  A time trend is a construct that is
11 introduced in a statistical model.  The broader
12 concept of a time trend is anything that has a
13 pattern over time.
14         A time trend specifically when we're
15 talking about econometric models is a construct
16 that is introduced to the model to capture some
17 agglomeration of variables believed to have such
18 a pattern over time.
19     Q.  And why do econometricians sometimes
20 put time trends in models?
21     A.  Econometricians put time trends in
22 models when they believe there is an independent
23 factor that is moving both the dependent and
24 certain independent variables over time, so

1001

1  something independent of the included right-hand
2  side variables that has this effect of moving
3  all of these things over time.  And so a time
4  trend is put in in essence to control for the
5  effects of this unmeasured factor.
6      Q.  To be clear, the models that you've
7  put forward in your 2008 report don't include a
8  time trend, is that right?
9      A.  That's correct.
10     Q.  None of them do?
11     A.  That's correct.
12     Q.  Originally when you were thinking
13 about the analysis, when you set out to do it,
14 you had planned to include a time trend in your
15 models, is that right?
16     A.  That's right.
17     Q.  Did you ever run a version of any of
18 your models included in your 2008 report that
19 did include a time trend?
20     A.  I don't believe that these models were
21 ever run with a time trend, but I am not 100
22 percent certain that's true.  I know that I
23 used time trends in early versions of the
24 Pennsylvania models, and I am not certain that

1002

the time trends -- it is possible that versions
of these models were run with time trends.
    Q.  Okay.  Can you explain to me why
there's some uncertainty about whether the
models that you put forward in your 2008 report
were run with time trends or not?
    A.  I think it's just been six months
since these analyses were done, and I have a
little trouble separating in my mind
recollections from the Pennsylvania analysis and
this one given their similarity and the length
of time that has passed.  So I think, I think
it's most likely that versions of these models
were run with time trends, but I'm simply not
sure.
    Q.  Do any results still exist of the
models that you've included in your 2008 report
where time trends were included?
    A.  No, they do not.
    Q.  You referred to results of preliminary
versions of your model in the Pennsylvania
matter where time trends were included.  Did
your review of those results inform your
judgment as to whether time trends should be

1003

included in the models that you've put forward
in your 2008 report?
    A.  Certainly, yes.
    Q.  And do those results still exist?
    A.  No, they do not.
    Q.  And that's because they were not
retained?
    A.  That's correct.
    Q.  Okay.  Tell me why you didn't put the
time trends in the models.
    A.  Okay.  So as I noted, a time trend is
intended to pick up other unmeasured factors,
that is factors that the analyst does not have
data to capture but believe have an independent
effect on both the independent and dependent
variables, and thereby would lead to spurious
correlation between those variables.
        A time trend, because it is intended
to capture something unmeasured, is inherently
based on some untestable assumption as to
existence and functional form, so many
economists feel comfortable making certain
assumptions about the functional form of a time
trend to put in a model, either linear, that

28 (Pages 1000 to 1003)