# Exhibit 39

```
                                    VOLUME:      I
                                    PAGES:    1-248
                                    EXHIBITS:  1-11

                    PHILADELPHIA COUNTY
                   COURT OF COMMON PLEAS
                   C.A. JUNE TERM 2004
                         NO. 1819


                                        )
   GREGORY CLARK AND LINDA              )
   MEASHEY, individually and on         )
   behalf of others similarly           )
   situated,                            )
         Plaintiffs,                    )
                                        )
   vs.                                  )
                                        )
   PFIZER, INC., and                    )
   WARNER-LAMBERT COMPANY, LLC,         )
         Defendants.                    )
```

     VIDEOTAPED DEPOSITION OF MEREDITH B. ROSENTHAL, Ph.D., a witness called on behalf of the Defendants, pursuant to the provisions of the Philadelphia Rules of Civil Procedure, before Jill Shepherd, Registered Professional Reporter, CSR, CLR and Notary Public, in and for the Commonwealth of Massachusetts, at the offices of Hare & Chaffin, 160 Federal Street, Boston, Massachusetts, on Wednesday, July 9, 2008, commencing at 8:50 a.m.

```
                                                          114
 1    effect on off-label prescribing independent
 2    from any promotion -- pardon -- independent
 3    from any detailing?
 4  A. They could. As you know, the allegations in
 5    this matter pertain also to those scientific
 6    publications, to funding for targeted
 7    research that was aimed at promoting
 8    Neurontin for off-label uses, suppression of
 9    negative results that can influence the way
10    those results that are published affect
11    prescribing.
12         So I would say, that may be true, but
13    it's not clear that that's a variable that
14    one would want to control for, per se, in
15    the sense of taking it out of the effects
16    that we're looking to characterize here.
17  Q. Were you told to assume that any
18    publications regarding Neurontin would be
19    subject to the allegations?
20  A. Well, I don't think I was told specifically
21    to assume that they were all associated with
22    the allegations. They are certainly in the
23    complaint and I have assumed that the
24    allegations, as presented in the complaint,
25    are true. So, in that sense, yes, but not

                                                          115
 1    specifically told to incorporate that into
 2    my analysis.
 3  Q. To the extent that there are publications
 4    that had an impact on prescribing that's
 5    independent from the detailing, your model
 6    wouldn't account for that?
 7  A. Again, yes, that's true, but it's not clear
 8    to me that one would want to control for
 9    that.
10  Q. Okay. Did you or anyone working for you do
11    a literature search for articles on
12    Neurontin?
13  A. I don't believe so, no.
14  Q. Did you or anyone working for you, for
15    example, do a Pub Med search on Neurontin
16    articles?
17  A. That would be what I would consider to be a
18    literature search, no.
19  Q. Did anyone look for any articles on -- that
20    would pertain to potential substitutes for
21    Neurontin?
22  A. Well, those would be the competitors that I
23    discussed with regard to promotion. And,
24    again, we began to look at the diagnoses and
25    to consider what it would take to identify

                                                          116
 1    all the competitors to Neurontin. And so in
 2    that sense, those are therapeutic
 3    substitutes.
 4  Q. But, ultimately, you decided not to research
 5    into that?
 6  A. Decided that it was both infeasible and
 7    unlikely to be useful.
 8  Q. Okay. Does your model include any
 9    explanatory variables that would take
10    account of the effects on prescriptions of
11    meetings or CMEs or other types of events
12    pertaining to Neurontin?
13  A. Not directly. Again, to the extent that
14    those are correlated with detailing, the
15    model will pick them up. So, as we know,
16    from the marketing literature, that
17    marketing strategies are often deliberately
18    coordinated, and so those meetings and
19    events, which, of course, are subject to
20    significant allegations, we weren't able to
21    capture them for this model. And so by
22    leaving them out, we're probably being
23    conservative, although, I would expect that
24    the meetings and events would be highly
25    correlated with detailing.

                                                          117
 1  Q. But you didn't do any research that would
 2    allow you to say whether or not they were
 3    correlated with detailing; is that right?
 4  A. That's correct. In the document reviews
 5    that I conducted, I tried to find data from
 6    the discovery materials that would allow me
 7    to create a time series for these challenged
 8    events -- the Jupiter Beach meeting, other
 9    meetings that are mentioned in the
10    complaint -- but the data are too incomplete
11    to get that full-time series.
12  Q. So, as a result, you didn't make a time
13    series of events corresponding to Neurontin;
14    is that correct?
15  A. I did not.
16  Q. Did you contact any medical societies
17    regarding, for example, any CME events
18    during the class period?
19  A. I did not.
20  Q. Did you have any contact with the medical
21    education staff at any -- in any of those
22    societies?
23  A. No, I did not.
24  Q. Does your model include any explanatory
25    variables that would account for the effect
```

Page 122

1  explanatory variables that would account for
2  the effect of approvals of drugs other than
3  Neurontin on Neurontin prescriptions?
4  A. The generic entry variable, of course,
5  accounts for the launch of those generics,
6  so in that sense, approvals, but if you mean
7  other brand-named drugs, no.
8  Q. Did you look into -- did you do any research
9  into approvals of other drugs for conditions
10 for which Neurontin is prescribed?
11 A. Well, again, as I mentioned, in terms of
12 competitor promotion, the same general set
13 of considerations: I looked at the set of
14 drugs that treat the major conditions for
15 which Neurontin is prescribed, and there are
16 hundreds of them. So I did not try to map
17 out those launches during the period to put
18 in the equation. I knew that it would be
19 impossible to do so.
20 Q. I understand that, of course, you didn't do
21 that for hundreds, but did you do that for
22 any other drug?
23 A. I did not include those, no.
24 Q. Now, your model attempts to estimate the
25 impact specifically of detailing on

Page 123

1  Neurontin and Gabapentin prescriptions; is
2  that right?
3  A. I use detailing to capture the effect of the
4  alleged off-label promotion. So what I
5  measure is detailing. But as we discussed
6  earlier, I believe it's likely to pick up
7  the related allegations with regard to
8  meetings and events and other spending
9  that's correlated with detailing.
10 Q. Well, you haven't done any specific analysis
11 of the impact on prescriptions of any other
12 types of alleged improper promotion besides
13 detailing; is that correct?
14 A. That's correct.
15 Q. So you're not expressing any opinion as to
16 the effect that, you know, alleged improper
17 promotion, other than detailing, may have
18 had on off-label Neurontin and Gabapentin
19 prescriptions?
20 A. Well, again, I guess I believe that the
21 inclusion of the detailing measure here,
22 which is the best available measure I have,
23 captures the overall effect of the
24 allegations. I believe that my report
25 essentially says that. It doesn't say that

Page 124

I haven't estimated other effects. So I
know it to be true that some of these
variables are correlated.
   For example, the samples, I don't have
sampling data for the whole period so I
can't include it my model. But I can see,
over the period I do have it, as I reported
in the document, that there's a .75
correlation between the two series, and,
therefore, the detailing variable picks up
some of the effect of free samples.
Q. Have you analyzed the pattern over time of
defendants' promotional activities other
than detailing?
A. In sampling, as I just discussed --
Q. Right. I'm sorry.
A. -- and advertising, journal advertising,
which is not subject to the allegations.
Q. Other than those that you just mentioned,
have you done any analysis of defendants'
promotional activities?
A. Again, I only have piecemeal data that are
to be found in the discovery materials,
including those materials that I cited in my
2005 report, but I don't have a complete

Page 125

trend data to analyze those, no.
Q. So you haven't, for example, in any
systematic way analyzed how much defendants
were spending on other types of detailing at
different points -- I'm sorry. Let me
rephrase that.
   You haven't analyzed in any systemic
way the amounts of money the defendants were
spending on other types of promotional
activities besides detailing?
A. Not in the same systematic way we were just
discussing, no.
Q. So as you sit here, you don't have a sense
of when those expenditures, other than on
detailing, would have been increasing or
decreasing; is that correct?
A. Other than by inference from the
allegations? For example, that these
activities were increasing from April 1995
forward, the specific discovery documents
related to the off-label campaign, so other
than that, I don't have a full-time series
by which I could plot that relationship.
Q. And you don't know how the patterns compare,
for example?

Page 126

1 A. That's correct.
2 Q. What about in terms of relative magnitude,
3    do you know how defendants' expenditures on
4    detailing in journal ads compare to
5    defendants' expenditures on other types of
6    promotion?
7 A. Not in any precise way, no.
8 Q. So I take it you haven't done any analysis
9    to determine the extent to which your model
10    might or might not be picking up the effects
11    of promotional activities other than
12    detailing?
13 A. No. Although, if you look at my estimates,
14    as we describe, they suggest that more than
15    90 percent of off-label prescriptions were
16    caused by the promotion that I contract
17    there. So I think that it's likely that
18    I've captured a substantial portion of the
19    effect.
20 Q. But the extent to which you've done that,
21    that's just not something you've analyzed?
22 A. I just don't have the data to do that.
23 Q. You said it's possible that your model is
24    picking up the effects of other types of
25    alleged improper promotion.

Page 127

1    Is it possible that your model is also
2    picking up the effects of promotional
3    activities that are not alleged to be
4    improper?
5 A. I'm not sure to which you are referring.
6    Can you give me an example?
7 Q. Well, I mean, I think I'd like to first ask
8    the question generally. I mean but can you
9    think of any -- there are types of
10    promotional activities, as you understand
11    it, that are not subject to the allegations?
12    Is that your understanding?
13 A. Like the journal advertising, for example?
14 Q. Okay. Are there -- and so I mean, as you
15    sit here -- let me rephrase that.
16    What analysis have you done to assure
17    yourself that your detailing measure is not
18    picking up the effects of something
19    permissible -- is not picking up the effects
20    of some type of permissible promotion?
21 A. Well, I used all the data that I had that
22    were complete for this time series. So that
23    I've done -- is included in those variables
24    to the best of my ability given feasibility
25    constraints. So one could always say that

Page 128

there's something that's not included in a
model. But there's nothing that I know of
that I am worried about that's not included
in the model.
Q. Did you ever make a list either based on
   your own research or with input from counsel
   of types of promotional activity that would
   not be subject to the allegations here?
A. That would not be subject -- no.
Q. Okay. Let's talk about constant terms.
   What is a constant term?
A. A constant term picks up a baseline level.
   We have all these other explanatory
   variables, and the constant terms says, What
   would the level of the dependent variable be
   if all those other terms were zero?
Q. And is a constant term also known as an
   intercept term?
A. That's right. So it's a sort of level
   setting variable.
Q. And the model that you put forward in your
   2008 declaration does not include a constant
   term; is that correct?
A. That's correct.
Q. You had originally planned to include a

Page 129

constant term in your model; is that
correct?
A. I certainly considered doing that. And, in
   fact, considered using the constant. The
   constant, when added to my model, is not
   statistically significant. Moreover, it's
   not altogether clear that it makes sense in
   the context where we have the baseline for
   Neurontin is essentially its launch, where
   all those other variables would be zero. So
   the question you have to ask yourself is:
   Would there be any prescriptions of
   Neurontin if Parke Davis had never promoted
   it? So not only was it statistically
   insignificant, but it also doesn't have a
   very good economic interpretation here.
Q. So you've assumed that the level of
   prescriptions would have been zero in the
   absence of promotion?
A. That's essentially what the no constant --
   the no constant model says.
Q. Yeah. You said that you had originally
   thought about using a constant term.
   Am I correct that on the various
   occasions where you've written down your