# Exhibit 41

```
                                                                    1
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                     MDL DOCKET NO. 1629

 5                   MASTER FILE NO. 04-10981

 6

 7   IN RE:  NEURONTIN MARKETING, SALES         )

 8   PRACTICES, AND PRODUCTS LIABILITY          )

 9   LITIGATION                                 )

10   ---------------------------------------

11   THIS DOCUMENT RELATES TO:                  )

12   ALL ACTIONS                                )

13

14

15           Videotaped Deposition of RAYMOND S.

16   HARTMAN, taken before GREG S. WEILAND, CSR, RMR,

17   CRR, Notary Public, pursuant to the Federal Rules of

18   Civil Procedure for the United States District Court

19   pertaining to the taking of depositions, at

20   Suite 3800, One South Dearborn Street, in the City

21   of Chicago, Cook County, Illinois, commencing at

22   9:19 o'clock a.m., on the 13th day of December,

23   2006.

24
```

**Page 18**

millions of claims and looking at the electronic rollouts of claims that have been paid by PBMs and paid by third-party payors, paid by the government, so I've certainly seen the kind of information and look at the financials of wholesalers, PBMs, third-party payors. I've done it as a client, as being retained by them, but I've looked at how that process works and familiar with it.

Q. Fair enough. The work that you've done I guess could probably be described as after-the-fact analysis of prescription reimbursement as opposed to actual participation in the process?

A. Well, I've not paid claims or been part of the paying of claims or worked for a third-party payor or for a PBM, so that's correct.

Q. Okay. And you've never worked directly or indirectly for the FDA; is that right?

A. That's correct.

Q. Have you ever taken Neurontin?

A. I have.

Q. For what condition?

A. For a chronic pain condition. It was prescribed.

Q. When did you take the drug?

**Page 19**

A. There was a period of time starting a number of years ago.

Q. How long was the period of time?

A. It continues.

Q. So you're taking Neurontin currently?

A. While I'm sitting here I'm on Neurontin.

Q. So how long in the aggregate have you been taking Neurontin?

A. Several years.

Q. I assume that since you've continued to take it for several years that it's been effective for you?

A. Well, I'm taking it with a mix. I've had a chronic pain problem for 20 years, and I've been -- tried different medications to help with it, and I've gone on and off medications, and so there's a mix of medication that's being tried now, and the mix is effective. I'm not sure which is the effective part of it, but ...

Q. Okay. But Neurontin is part of that mix?

A. That's correct.

Q. If you didn't think it was effective, would you have told your doctor that you didn't want to keep taking the drug?

**Page 20**

A. Well, my doctor and I have discussed -- I've gone off, I've gone on, and with different other medications, and it's a continual balancing act.

Q. You're aware, I assume, from your work in this case that your prescription for Neurontin is off-label?

A. I am.

Q. One last question on it.

Do you pay for your Neurontin prescription yourself, or is it paid for by an insurance plan of some kind?

A. It's paid for by a third-party payor and a copay by myself obviously.

Q. So you're a member of the individual consumer subclass in this case; is that correct?

A. I guess I am.

Q. And so if there were a recovery in this case, you would be entitled to receive some amount of damages?

A. I guess that's true.

Q. Have you given any thought to what the amount of damages would be that you would recover if plaintiffs were successful in this case personally?

**Page 21**

A. My guess would be, as with most of these class action matters in which I receive mailings, I would receive -- I would receive nothing since I wouldn't pay attention to the mailings. But if it --

Q. Did you testify that in some cases maybe you did send -- maybe you didn't.

A. I think in some cases I did and in some -- but that was when I was a younger man and I thought there was some benefit to doing so.

Q. Do you now think there isn't a benefit of doing so?

A. No, I've thought that the opportunity cost of taking the time to do it is more than the recovery for me individually.

So it's -- so, you know, the copays, you know, they would amount to in the hundreds of dollars I would assume over time.

Q. What's the -- well, withdrawn.

Do you have any understanding for the reasons that your doctor prescribed you Neurontin as part of the mix of medications that you've been taking?

MR. MATTHEWS: Objection.

```
                                                            244
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2                     MDL Docket No. 1629
                       Master File No. 04-10981
 3
     ****************************************
 4   In Re:  NEURONTIN MARKETING, SALES
     PRACTICES, AND PRODUCTS LIABILITY
 5   LITIGATION,

 6   ****************************************

 7   THIS DOCUMENT RELATES TO:

 8   ****************************************
     HARDEN MANUFACTURING CORPORATION;
 9   LOUISIANA HEALTH SERVICE INDEMNITY
     COMPANY, dba BLUECROSS/BLUESHIELD OF
10   LOUISIANA; INTERNATIONAL UNION OF
     OPERATING ENGINEERS, LOCAL NO. 68
11   WELFARE FUND; ASEA/AFSCME LOCAL 52
     HEALTH BENEFITS TRUST; GERALD SMITH;
12   and LORRAINE KOPA, on behalf of
     themselves and all others similarly
13   situated, v. PFIZER INC. and
     WARNER-LAMBERT COMPANY.
14
     ****************************************
15
     THE GUARDIAN LIFE INSURANCE COMPANY
16   OF AMERICA v. PFIZER INC. and

17   AETNA, INC. v. PFIZER, INC.
     ****************************************
18
         SUPREME COURT OF THE STATE OF NEW YORK
19                 COUNTY OF NEW YORK
     ****************************************
20
     In Re:  NEURONTIN PRODUCT LIABILITY
21   LITIGATION

22   **************************************** Index No.

23   THIS DOCUMENT APPLIES TO:           765000/06

24         ALL CASES
```

**345**

counsel instructed you that recoverable damages in this case consist of the entire amount that class members paid for any prescriptions caused by alleged improper promotion?
A. That's correct.
Q. So, in essence, you're calculating what would amount to a full refund of the price of the quantities that were calculated by Professor Rosenthal, is that correct?
A. That's correct.
Q. Am I correct that you don't consider any issues of efficacy or effectiveness of Neurontin in reaching your damages estimates?
A. Well, the basis for the theory, as I understand it, is the FDA definition of efficacy, and that if there is a prescription for a use for which the FDA has not found efficacy, then what I've been instructed to do is calculate the damages as the full refund.
Q. So to the extent that some of the Neurontin prescriptions calculated by Professor Rosenthal were effective or efficacious for particular class members, I take it that you don't seek to carve those out in any way from

**346**

the damages estimates that you put forward, is that right?
MR. NOTARGIACOMO: Objection.
A. I have not sought to try and calculate some measure of efficacy for those indications that the FDA has found that they're not efficacious.
BY MR. MISHKIN:
Q. So, for example, you're not seeking to -- or your method doesn't in any way try to reduce damages to something less than a full refund to reflect any potential benefits that class members may have received from Neurontin?
A. Well, the directions that I've been given are as a matter of law, it's a full refund.
Now, if there were -- if there conceivably could be some benefits, I've been told that's not part of the theory, unless the FDA has found that it's efficacious.
Likewise, if there have been serious negative impacts of, say, prescribing of Neurontin for bipolar where someone commits suicide or something where there's a serious

**347**

negative effect, I've not been asked to calculate that either.
I haven't been asked to calculate positive or negative effects of Neurontin, except for I've been asked to take the FDA findings for efficacy as the basis, and anything that's not efficacious according to the FDA or negatively or positively has an effect, I don't -- I haven't been asked to quantify that.
Q. Okay. So to stick with my example, if there were benefits, that's not something that you've at all been asked to look at?
A. I haven't been asked to look at any additional effects that Neurontin may have had, positive or negative.
Q. Okay. Dr. Hartman, are you still taking Neurontin?
A. I am.
Q. Are you taking it today?
A. I am.
Q. Are you continuing to take it for your chronic pain condition?
A. It has been prescribed to me with a mix of drugs that I've been taking for a while

**348**

for a chronic pain condition, that's correct.
Q. And have you taken Neurontin continuously since your deposition in the Pennsylvania Clark case in June, 2008?
A. I have.
Q. Let's take a look at the tables in your report starting with Table B.1.
Table B.1 is called "Brand Neurontin Retail Price Calculation," is that right?
A. That's correct.
Q. On this table you come up with an average price of non-Medicaid Neurontin prescriptions by quarter?
A. That's correct. And I'm -- as we talk through the tables it might be useful to have B.10 at the ready, because I haven't memorized all the elements in each of these tables.
But yes, that's right.
Q. Fair enough.
And for the record, B.10 is where you have your calculation notes that explain more specifically what each column is calculating?
A. That's correct.
Q. So absolutely, as I ask these