# Exhibit 42

```
                                                                   1
    1         UNITED STATES DISTRICT COURT

    2           DISTRICT OF MASSACHUSETTS

    3                  ---oOo---

    4

    5  In re: NEURONTIN MARKETING, SALES
       PRACTICES AND PRODUCTS LIABILITY
    6  LITIGATION
       _____/
    7
       THIS DOCUMENT RELATES TO:
    8                                          MDL Docket
       HARDEN MANUFACTURING CORPORATION;       No. 1629
    9  LOUISIANA HEALTH SERVICE INDEMNITY
       COMPANY, dba BLUECROSS/BLUESHIELD OF    Master File
   10  LOUISIANA; INTERNATIONAL UNION OF       No. 04-10981
       OPERATING ENGINEERS, LOCAL NO. 68
   11  WELFARE FUND; ASEA/AFSCME LOCAL 2
       HEALTH BENEFITS TRUST; GERALD SMITH;
   12  and LORRAINE KOPA, on behalf of
       themselves and all others similarly
   13  situated, v. PFIZER INC. and
       WARNER-LAMBERT COMPANY.
   14  _____/

   15  THE GUARDIAN LIFE INSURANCE COMPANY OF
       AMERICA v. PFIZER INC. and
   16
       AETNA, INC. v. PFIZER INC.
   17
       _____/
   18

   19

   20
          VIDEOTAPED DEPOSITION OF NICHOLAS P. JEWELL, Ph.D.
   21
                 THURSDAY, JANUARY 8, 2009
   22

   23

   24  Job No.: 185820

   25  Pages 1 - 246
```

VERITEXT CORPORATE SERVICES (800) 567-8658

**Page 18**

1  Q. And about how much time did you spend?
2  A. About two hours.
3  Q. And when did you spend those two hours?
4  A. Yesterday.
5  Q. Did you do that by yourself or was there
6  anyone with you?
7  A. (To Mr. Himmelstein) I was going to call
8  you Dr. Himmelstein.
9  Q. You can call him Dr. Himmelstein.
10 A. Barry was there and Ilyas Rona and Palko
11 Goldman were on the phone in the conference at the
12 same time.
13 Q. And any other preparation other than the
14 two hours, approximately, that you spent yesterday
15 that you just described?
16 A. Not in preparation for the deposition, no.
17 Q. Other than the calls you mentioned with
18 Dr. Abramson and Dr. Perry, the drafting of your
19 report, your looking at Dr. Gibbons' report and the
20 preparation you spent yesterday, have you done
21 anything else related to this case?
22 A. No, I have not.
23 Q. Are you working on any further report in
24 connection with this litigation?
25 A. Not at the current time.

**Page 19**

1  Q. Do you have plans to do so?
2  A. I don't have any immediate plans, no.
3  Q. Do you have any non-immediate plans?
4  A. I don't understand that question.
5  Q. Do you have any plans at all to prepare a
6  further report?
7  A. Not at the current time, no.
8  Q. Do you consider yourself an expert in
9  statistics?
10 A. Yes, I do.
11 Q. And do you consider yourself an expert in
12 biostatistics?
13 A. Yes, I do.
14 Q. Do you consider yourself an expert in pain
15 management?
16 A. No, I do not.
17 Q. Do you consider yourself an expert in
18 neurology?
19 A. No, I do not.
20 Q. Do you consider yourself an expert in
21 biochemistry?
22 A. No, I do not.
23 Q. Do you consider yourself an expert in
24 epidemiology?
25 A. I am an expert in areas of epidemiology.

**Page 20**

1  Q. Which areas?
2  A. Mostly methodological applications of
3  design and analysis of epidemiologic studies.
4  Q. Can you be more specific in terms of the
5  methodological applications of analysis where your
6  expertise is?
7  A. My main expertise is in the design and
8  analysis of observational studies, both in the area
9  of infectious disease transmission and in the area of
10 chronic disease epidemiology.
11 Q. And just so the record is clear, what is
12 epidemiology?
13 A. Epidemiology is a body of study that
14 investigates the distribution of diseases across
15 populations with a view to describing and
16 understanding the variation and incidence of disease
17 across populations, usually human, but not
18 necessarily human.
19 Q. What is an observational study? I believe
20 you used that term.
21 A. An observational study does not involve the
22 use of randomization and assignment of exposure of
23 treatment.
24 Q. Okay. So do you consider yourself an
25 expert with respect to epidemiology as it relates to

**Page 21**

1  randomized clinical trials?
2  A. Well, randomized clinical trials goes
3  beyond epidemiology, of course, into clinical
4  medicine as well. I consider myself an expert in the
5  statistics of randomized clinical trials.
6  Q. Do you consider yourself an expert in
7  clinical medicine?
8  A. No, I do not.
9  Q. Do you consider yourself an expert in
10 biology?
11 A. No, I do not.
12 Q. Do you consider yourself an expert in drug
13 approval process?
14 A. No, I do not.
15 Q. Do you consider yourself an expert in the
16 effect of drugs on human beings?
17 A. No, I do not.
18 Q. Do you consider yourself an expert in
19 pharmacology?
20 A. No, I do not.
21 Q. Do you consider yourself an expert in new
22 drug development?
23 A. No, I do not.
24 Q. Do you consider yourself an expert in
25 statistical estimation methods preferred by the Food

```
 1  and Drug Administration?
 2       MR. HIMMELSTEIN: Objection. Vague and
 3  ambiguous.
 4       THE WITNESS: Well, I don't know what
 5  statistical methods are preferred by the Food and
 6  Drug Administration in detail, so it's hard for me to
 7  describe myself as an expert.
 8       BY MR. POTISCHMAN:
 9    Q. Let me ask a better question.
10       Do you know what statistical methods, if
11  any, the Food and Drug Administration prefers for
12  clinical trials?
13       MR. HIMMELSTEIN: Objection. Vague and
14  ambiguous.
15       THE WITNESS: I can't speak for the Food
16  and Drug Administration. I don't know. You'd have
17  to ask them what they prefer. I certainly am an
18  expert on methods that I think they might like, but I
19  should not speak for them.
20       BY MR. POTISCHMAN:
21    Q. I'm not asking you to speak for them. I am
22  just trying to figure out whether you are familiar
23  with statistical methods that the FDA prefers, if
24  any, to be included in clinical trials.
25       MR. HIMMELSTEIN: Objection. Asked and
```

Page 23

```
 1  answered.
 2       BY MR. POTISCHMAN:
 3    Q. You can answer it.
 4    A. I am not familiar with what the Food and
 5  Drug Administration requires for new drug approvals.
 6    Q. Do you have any expertise in connection
 7  with drug prescribing?
 8    A. No, I do not.
 9    Q. Do you consider yourself an expert in any
10  -- withdrawn.
11       Do you consider yourself an expert in
12  diabetic peripheral neuropathy?
13    A. No, I do not.
14    Q. Do you consider yourself an expert in
15  postherpetic neuralgia?
16    A. No, I do not.
17    Q. Do you consider yourself an expert in
18  neuropathic pain generally?
19    A. No, I do not.
20    Q. Other than your work on this report have
21  you had any other experience with the drug
22  gabapentin?
23    A. No, not to my knowledge.
24    Q. You've never studied the drug?
25    A. No, I have not.
```

Page 24

```
 1    Q. You've never taken the drug?
 2    A. Not to my -- to the best of my knowledge.
 3    Q. Do you have any understanding of the
 4  mechanism of action of the drug?
 5    A. No, I do not.
 6    Q. In any of your graduate work have you ever
 7  studied or taken any courses related to pain
 8  management?
 9    A. No, I have not.
10    Q. Can you briefly describe for me your
11  publications experience related to medications.
12    A. Well, my publications, I probably have a
13  handful of papers that relate to the effect of drugs
14  or interventions, other kinds of medical
15  interventions.
16    Q. And are those concentrated in any drug or
17  class of drugs or disease states?
18    A. No, they are not.
19    Q. Have you published any papers related to
20  any anti-convulsant or any anti-seizure medications?
21    A. I don't believe so, no.
22    Q. To the best of your recollection, have you
23  published any pieces that relate to diabetic
24  peripheral neuropathy or any other neuropathic pain
25  state?
```

Page 25

```
 1    A. No, I have not.
 2    Q. Have you had a particular focus of your
 3  research in, say, the last 10 years?
 4    A. Not really a particular focus. Before that
 5  I was focused on HIV, but not specifically as much in
 6  the last 10 years.
 7    Q. Have you ever consulted before with
 8  pharmaceutical companies on clinical trials?
 9    A. Yes, I have.
10    Q. And when is the last time you did that?
11    A. With a pharmaceutical company?
12    Q. Yes.
13    A. Well, that's a hard one. I can't be sure
14  that I've consulted with a pharmaceutical company --
15  well, probably sometime in the last five years. Not
16  a lot. Sometime in the last -- certainly in the last
17  five to 10 years, and certainly some in the 10 to 25
18  years before that.
19    Q. What type of consulting work have you done
20  in that regard?
21    A. Over my entire career?
22    Q. Yes.
23    A. Over my entire career it's ranged from
24  helping pharmaceutical companies prepare materials
25  for new drug applications, analyzing clinical trial
```

VERITEXT CORPORATE SERVICES (800) 567-8658

```
                                                          42
 1   occurrence of adverse effects.
 2       Q. Your report lists in the bibliography
 3   section three documents. I am looking on the 15th
 4   page.
 5           Do you have that in front of you?
 6       A. Yes.
 7       Q. To the best of your recollection, did you
 8   review any other documents, other than these three,
 9   before submitting your report?
10       A. No, not in -- that had any material
11   content. I did have another pain paper there that I
12   didn't really pay any attention to by Cerpell, I
13   think was the first author's name, but I did not use
14   it in any way and I don't believe I even read it very
15   carefully.
16       Q. Was that something that you had -- that
17   piece something that you had found during your
18   research or was it given to you by plaintiffs'
19   counsel or something else?
20       A. It was given to me by plaintiffs' counsel.
21       Q. Do you have an understanding about why they
22   gave it to you?
23       A. No, I do not.
24       Q. And after your report was submitted, I
25   believe you indicated that you've seen and looked at
```

```
                                                          43
 1   to some extent Dr. Gibbons' report, correct?
 2       A. That is correct.
 3       Q. Have you received any other documents since
 4   you submitted your report?
 5       A. Not that I'm aware. I think I may have
 6   received a couple of other documents by -- from the
 7   other side of the case, the defendants, but I haven't
 8   looked at them. I may have received two or three pdf
 9   files and I only looked at the one by Gibbons. I
10   haven't even opened the other two.
11       Q. At some point you received a subpoena,
12   correct?
13       A. Actually, I didn't receive it but the
14   attorneys at Greene & Hoffman received it.
15       Q. Did you ever get it?
16       A. I think I was ultimately sent it --
17   forwarded it, yes.
18       Q. Do you have any understanding of who the
19   plaintiffs are in this case?
20       A. No, I have very little understanding of the
21   plaintiffs.
22       Q. Do you know whether you are working on
23   behalf of the plaintiffs or the defendants?
24       A. I believe I'm working on behalf of the
25   plaintiffs.
```

```
                                                          44
 1           MR. HIMMELSTEIN: I certainly hope so.
 2           BY MR. POTISCHMAN:
 3       Q. But you don't know who any of them are?
 4       A. No, I do not.
 5       Q. Does the report, Jewell Exhibit 2, does
 6   that embody a complete statement of your opinions
 7   regarding gabapentin?
 8       A. As of the time it was written, yes, and
 9   it's only been impacted -- changed to the extent I've
10   thought about Dr. Gibbons' report, but that hasn't
11   really changed my opinions, so yes.
12       Q. Your report, and I am looking at paragraph
13   7, page 3, says -- and I'm just quoting:
14           "I have been asked to provide an
15       analysis of data underlying the paper by
16       Backonja, et al., on the effects of
17       gabapentin on pain severity in a sample of
18       patients randomized to treatment with
19       either gabapentin or placebo."
20           Do you see that?
21       A. I do see that sentence.
22       Q. And did I read that correctly?
23       A. Yes, you did.
24       Q. And does that accurately summarize what you
25   were asked to do?
```

```
                                                          45
 1       A. Without providing detail as to what kind of
 2   analysis, yes.
 3       Q. And that is what you did, correct?
 4       A. That's what I did, yes.
 5       Q. Are you familiar with the term a
 6   "literature review"?
 7       A. Yes, I am.
 8       Q. What is a literature review?
 9       A. Well, to me that would be let's say on a
10   specific statistical technique being able to survey
11   the literature on articles and work done referencing
12   or using or describing or developing that technique.
13       Q. Was this project a literature review?
14       A. No, it was not.
15       Q. And your focus and conclusions relate to
16   this one study, Jewell Exhibit 1, correct?
17       A. That is correct.
18       Q. You didn't review and you don't have any
19   opinions about other studies about gabapentin?
20       A. No, I do not.
21       Q. Have you ever heard the term "meta
22   analysis"?
23       A. Yes, I have.
24       Q. And can you describe what a meta analysis
25   is.
```

12 (Pages 42 to 45)

**Page 46**

1  A. To me a meta analysis refers to a
2  statistical combination -- or a statistical analysis
3  based on combining results from multiple
4  investigations.
5  Q. And did you perform a meta analysis here?
6  A. No, I did not.
7  Q. Do you have an opinion, sir, on whether
8  gabapentin can be an effective treatment for people
9  suffering from DPN?
10  A. Only with regards to this particular trial
11  population.
12  Q. And then my question is broader. Do you
13  have an opinion on the state of science generally on
14  whether gabapentin can be an effective treatment for
15  patients suffering from DPN?
16     MR. HIMMELSTEIN: Objection. The witness
17  is not retained to provide such an opinion. It is
18  beyond the scope of his designation.
19     But I will allow him to answer.
20     MR. POTISCHMAN: That is a speaking
21  objection which is noted on the record.
22  Q. You can answer the question now.
23  A. My opinion about the efficacy of gabapentin
24  is limited to the analysis of the results in the
25  Backonja paper.

**Page 47**

1  Q. That is what I am trying to understand, is
2  does your review of the Backonja or Backonja -- we'll
3  settle on one before it's over -- does your review of
4  the Backonja paper allow you to draw a conclusion
5  about whether gabapentin can be an effective
6  treatment for patients suffering from DPN?
7  A. Yes, within the limit of that one piece of
8  information. I understand that there may be other
9  pieces of information that I am not familiar with
10  that would reflect on that question. But I do have
11  an opinion based on that one clinical trial.
12  Q. Okay. And what is that opinion?
13  A. That there is not strong evidence of any
14  efficacy of the drug in reducing pain in any
15  significant manner.
16  Q. And so when you say that there is not
17  strong evidence of any efficacy, does that mean that
18  there is some evidence of efficacy?
19  A. I think we'd have to talk about specifics
20  rather than parsing it in English, that question. I
21  don't want you to -- when I say I don't believe there
22  is any evidence from this trial or any strong
23  evidence from this trial that there is an efficacious
24  reduction in pain through use of gabapentin as
25  compared to placebo.

**Page 48**

1  Q. Do you know one way or the other whether
2  any other studies have been done about gabapentin and
3  its ability to treat DPN?
4  A. I'm not particularly aware. As I indicated
5  earlier, plaintiffs' counsel did send me another
6  paper by Cerpell, et al., but I can't honestly say
7  that I know that was about gabapentin because I
8  didn't really study it. But I assume there are other
9  studies.
10  Q. Okay. And the conclusions in your report,
11  Exhibit 2, are focused on the one study that you did
12  review in detail?
13  A. That is correct.
14     MR. POTISCHMAN: Why don't we take a short
15  break.
16     THE VIDEOGRAPHER: We are now going off the
17  record. The time is approximately 10:01 a.m.
18     (Whereupon, a recess was taken from
19     10:01 a.m. until 10:12 a.m.)
20     THE VIDEOGRAPHER: We are now going back on
21  the record. The time is approximately 10:12 a.m.
22     BY MR. POTISCHMAN:
23  Q. I believe you used the term "unblinding"
24  earlier today.
25     Are you familiar with the term?

**Page 49**

1  A. Yes, I am.
2  Q. What is unblinding?
3  A. Unblinding refers to the situation where
4  either -- any individual involved in a clinical trial
5  is aware of the treatment assigned to a specific
6  individual.
7  Q. And why is that potentially a problem, to
8  your knowledge?
9  A. It's potentially a problem with regard to
10  anyone being unblinded to the extent that it may
11  either consciously or unconsciously influence their
12  conduct in reporting the results of a trial or the
13  data for trial.
14  Q. To your knowledge, are there steps that an
15  investigator can take to try to reduce the risk of
16  unblinding?
17  A. Yes, there are.
18  Q. What kind of steps can an investigator take
19  in planning a trial?
20  A. They can take the step of blinding all
21  participants to the assigned treatment assignment.
22  Q. And in a general sense for the jury, how do
23  you blind someone?
24  A. Well, it depends on the --
25  Q. The participant. I'm sorry.

```
                                                          62
 1   word. But it was a pain severity rating on an
 2   11-point Likert -- L-i-k-e-r-t -- scale, and that was
 3   their primary efficacy outcome. And there were
 4   secondary efficacy outcomes on various measures of
 5   sleep interference, to the extent I understand those.
 6        When you go to the efficacy results which
 7   are described on the next page, 1834, you see they
 8   immediately turn to their primary efficacy end point
 9   in terms of mean pain score, mean sleep interference
10   and various variants of those measurements.
11        Q. And do you know what "sleep interference"
12   refers to?
13        A. Not in -- at the level of a clinical
14   understanding, no.
15        Q. You understand the words, but not the
16   clinical meaning of that term?
17        A. That is correct.
18        Q. Do you also see on the efficacy discussion
19   that goes from 1834 to 1835, that it also refers to
20   the CGIC scale and it refers to impact on
21   anger/hostility, vigor/activity, fatigue/inertia and
22   total mood disturbance.
23        Do you see that?
24        A. I don't see it at the moment. Can you
25   point me to --
```

```
                                                          63
 1        Q. Sure. It's the last sentence on 1834,
 2   carrying over to 1835.
 3        A. The CGIC scale? CGIC, is that what you are
 4   referring to?
 5        Q. Yes.
 6        A. I see those words, yes.
 7        Q. Okay. Do you see the discussion of
 8   anger/hostility, mood disturbance that appears on the
 9   top of page 1835?
10        A. I do see that, yes.
11        Q. And just going to the front page of the
12   study, I'm looking at 1831 where they summarize the
13   results.
14        Do you have that page in front of you?
15        A. Yes, I do.
16        Q. And do you see the sentence in the -- about
17   five lines down under "Results" which talks about
18   "All secondary outcome measures..."?
19        A. Yes, I do.
20        Q. And you see there is a reference to
21   "...statistically significant differences favoring
22   gabapentin treatment were observed in measures of
23   quality of life"?
24        A. That is correct.
25        Q. Do you have an understanding of what
```

```
                                                          64
 1   "quality of life" refers to there?
 2        A. No, not specifically. It refers to a
 3   36-point questionnaire. So other than that, I don't
 4   know.
 5        Q. Have you ever, to the best of your
 6   recollection, dealt with quality-of-life scoring in
 7   analyzing whether a medicine is beneficial to
 8   patients?
 9        A. Yes, I have.
10        Q. Have you ever done that in connection with
11   a pain medication?
12        A. Not that I'm aware of.
13        Q. The work that you did in your report, am I
14   correct that it focused on the primary end point
15   being the daily pain scores or weekly pain scores?
16        A. It focused entirely on the measurement of
17   pain in primary, and not on the secondary outcomes.
18        Q. Okay. So it didn't focus on any of the
19   secondary outcomes we've discussed?
20        A. That is correct.
21        Q. Do you have any opinion about the study's
22   results as it relates to secondary outcomes?
23        A. Not at this point, no.
24        Q. On page 1833, you see in sort of the middle
25   of the page there is a bold paragraph heading titled
```

```
                                                          65
 1   "Analyses"?
 2        A. I see that section.
 3        Q. And the first line says:
 4            "All testing was two-sided."
 5        Do you see that?
 6        A. I do.
 7        Q. Do you have an understanding of what the
 8   term "two-sided" means?
 9        A. Yes, I do.
10        Q. And can you tell me what that means?
11        A. It means that they were allowing for the
12   possibility that the active treatment may actually
13   perform worse than placebo, in addition to possibly
14   performing better than placebo. So they allowed for
15   both variants from the hypothesis that there is
16   absolutely no difference.
17        Q. So it's possible to test a drug only in a
18   one-sided way where you are only looking for
19   efficacy?
20        A. It is possible to look at the data with a
21   view to focusing solely on one -- departures in one
22   direction, that is correct.
23        Q. Do you know one way or the other whether
24   that type of one-sided data analysis was commonly
25   done in the mid to late 1990s?
```

## Page 78

1  negative 1.9 and negative 1.6, does that have any
2  meaning to you as a statistician?
3      A. Yes, it does.
4      Q. And what does it mean?
5      A. Well, it means that -- if you look at a
6  confidence interval, the estimate that you want of
7  this unknown quantity, in this case, the mean
8  difference in population pain scores between the two
9  groups, gabapentin and placebo, the point estimate is
10 minus 1.2 and the confidence interval will always
11 contain the point estimate. It doesn't have to be
12 exactly in the middle. In this case it is I think
13 exactly in the middle because of the procedures used.
14     And then as you move out towards the edge
15 of the confidence interval you would expect that
16 those values are less and less plausible as a
17 possible estimate of the difference in means. And as
18 you go outside the confidence interval you think they
19 really are beginning to be quite implausible.
20     So that we don't believe, for example, that
21 minus 3 difference in the mean difference in means is
22 plausible based on this evidence. It is not
23 impossible, but it's highly implausible.
24     Minus 1.9, which is at the edge of the
25 confidence interval, is pretty implausible, but right

## Page 79

1  at the point where we are beginning to think, well,
2  it's just starting to enter the area of plausibility.
3      And as you move into the middle of the
4  confidence interval, based on this data, that seems
5  to be increasing the level of plausibility of this as
6  an estimate of the true difference in the means.
7      Q. I don't want to repeat the entire exercise
8  for the mean sleep interference score, but is it --
9  can you at least tell me what you understand Table 2
10 to conclude on gabapentin versus placebo about mean
11 sleep interference.
12     A. It is very similar to the row above. The
13 scales of course are different, but it reports a
14 difference in means at the end point in favor of
15 gabapentin with a significant p-value of less than
16 .001.
17     Q. But again the mean sleep interference score
18 data is not something that your report addressed,
19 correct?
20     A. That is correct.
21     Q. Can you describe for me, to the extent you
22 understand it, the conclusion that can be drawn from
23 the next row, the total SF-MPQ.
24     A. Well, I don't even understand what SF-MPQ
25 is without going back, but from just looking at the

## Page 80

1  numbers, there is a similar column of information
2  about these scales of both gabapentin and the placebo
3  and the difference in one direction or the other and
4  of p-value and a confidence interval for each of
5  those outcomes.
6      Q. And again, the p-value is less than .001,
7  correct?
8      A. That is correct.
9      Q. Is your answer the same with respect to the
10 next row, the SF-MPQ VAS?
11     A. It's similar, yes. A very different scale.
12 A scale I don't claim to understand.
13     Q. But the results are indicating a
14 statistically significant difference between the
15 gabapentin group and the placebo group on that scale,
16 correct?
17     A. That is correct.
18     Q. And is the answer the same with respect to
19 the next row, SF-MPQ PPI?
20     A. That is correct.
21     Q. The next row says "Short Form 36 QOL
22 Questionnaire Bodily Pain."
23     Do you see that?
24     A. I do see that, yes.
25     Q. The p-value has changed here. It is now

## Page 81

1  .01, but I have the same question. To your
2  knowledge, does this show a statistically significant
3  difference between the gabapentin group and the
4  placebo group on that score?
5      A. If you use a five percent level of --
6  tolerance level or threshold level, yes.
7      Q. Which is what they were using?
8      A. Which is what they were using, correct.
9      Q. The same question with respect to the
10 mental health row, does this show a statistically
11 significant difference between the gabapentin group
12 and the placebo group?
13     A. It does, yes.
14     I should point out as we are going down
15 these rows one by one that, to my understanding,
16 these rows can only be read one at a time because the
17 results on each of these outcome measures are
18 presumably highly correlated with an individual's,
19 which would mean that the estimates that ultimately
20 lead to the estimates of the means or difference in
21 the means being highly similar correlated across rows
22 and the p-values therefore being similar from a
23 correlation point of view and not representing
24 separate independent pieces of information.
25     Statisticians are well aware of that and

**146**

1  Q. And so to be clear, before when I had asked
2  you a question about whether even under your analysis
3  there were statistically significant differences
4  during the first few weeks of the study, if you could
5  take a look at paragraph 20 on page 12, which refers
6  to the figure in the middle, 2(B) on page 13, I
7  believe you'll see on page 12 it says that in figure
8  2(B):
9      "The means are only statistically
10     significant in weeks two and three, and
11     never thereafter."
12     Do you see that?
13  A. In figure 2(B)? Yes.
14  Q. I'm looking at the text in the middle of
15  the page.
16  A. That's correct.
17  Q. Okay. So according to your reanalysis
18  here, there was a statistically significant drop in
19  pain scores in the gabapentin group in the first two
20  to three weeks of the study, correct?
21  A. If you look at those results separately
22  within specific weeks, yes. I think it was just
23  weeks two and three, and not week one, if I recall.
24  That's what I meant by the means are only
25  statistically significant in weeks two and three.

**147**

1  Q. And if you take a look at weeks I think
2  it's one, four and five, am I right in seeing these
3  as showing that the confidence intervals do not
4  overlap between the placebo group and the treatment
5  group?
6  A. That is correct on paragraph -- in figure
7  2(B).
8  Q. Thank you.
9     Even when confidence intervals don't
10  overlap, as in those situations, it's possible that
11  the results are not statistically significant?
12  A. It's possible. They don't always match up
13  exactly. You can see the confidence intervals almost
14  touch there, so that's not a big surprise to me. The
15  p-value is probably around .06 or .055 or something.
16  Q. But in weeks two and three, this early
17  onset, there is a statistically significant
18  difference in pain relief in the gabapentin group
19  compared to placebo; correct?
20  A. That is correct.
21     MR. POTISCHMAN: All right. Let's take a
22  break.
23     THE VIDEOGRAPHER: We are now going off the
24  record. The time is approximately 12:35 p.m.
25  //

**148**

1     (Whereupon, a recess was taken from
2     12:35 p.m. until 1:20 p.m.)
3     THE VIDEOGRAPHER: We are now going back on
4  the record. The time is approximately 1:20 p.m.
5     BY MR. POTISCHMAN:
6  Q. Professor Jewell, do you still have your
7  report, Jewell Exhibit 2, in front of you?
8  A. Yes, I do.
9  Q. Can you take a look at paragraph 15 of that
10  report which begins on page 8.
11  A. Yes. I have it in front of me.
12  Q. It refers to steps you took with respect to
13  central nervous system side effects.
14     Do you see that?
15  A. I see that, yes.
16  Q. Who identified the side effects that you
17  used in your analysis?
18  A. It was a gentleman called Palko Goldman who
19  provided me ultimately with the list of CNS side
20  effects and sent to me the appendix C.36 that is
21  referred to in my report.
22  Q. And is Mr. Goldman -- who is Mr. Goldman?
23  A. He is a non-attorney I think that works
24  with Greene & Hoffman.
25  Q. Do you know whether he has a medical

**149**

1  background?
2  A. I don't know anything about his background,
3  no.
4  Q. Did you personally do anything with respect
5  to determining the list of CNS side effects to use in
6  your report?
7  A. I chose the synomyms that were used. The
8  list that is provided in appendix C.36 has side
9  effects I think like somnolence. And I myself chose
10  to attribute synonyms like sleepiness to the -- as
11  another version of the same side effect. And I think
12  I probably checked that with Mr. Goldman at some
13  point that the list of synonyms that I had used...
14     And other than that I did look at the
15  Backonja paper to see -- obviously, we knew from the
16  start the two side effects that they focused on that
17  we discussed this morning I think were dizziness and
18  somnolence, and he refers -- they refer to those in
19  the end as CNS side effects. There were other side
20  effects in the data set beyond the CNS ones.
21  Q. Okay. So Mr. Goldman sent you an initial
22  list from Greene & Hoffman of CNS side effects that
23  he had identified?
24  A. They are identified in this appendix of the
25  945-210 research report which I think came from

38 (Pages 146 to 149)