# Exhibit 44

```
                                                                    1
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2                              MDL Docket No. 1629
                                Master File No. 04-10981
 3
       ****************************************
 4     In Re:  NEURONTIN MARKETING, SALES
       PRACTICES, AND PRODUCTS LIABILITY
 5     LITIGATION,

 6     ****************************************

 7     THIS DOCUMENT RELATES TO:

 8     ****************************************
       HARDEN MANUFACTURING CORPORATION;
 9     LOUISIANA HEALTH SERVICE INDEMNITY
       COMPANY, dba BLUECROSS/BLUESHIELD OF
10     LOUISIANA; INTERNATIONAL UNION OF
       OPERATING ENGINEERS, LOCAL NO. 68
11     WELFARE FUND; ASEA/AFSCME LOCAL 52
       HEALTH BENEFITS TRUST; GERALD SMITH;
12     and LORRAINE KOPA, on behalf of
       themselves and all others similarly
13     situated, v. PFIZER INC. and
       WARNER-LAMBERT COMPANY.
14
       ****************************************
15
       THE GUARDIAN LIFE INSURANCE COMPANY
16     OF AMERICA v. PFIZER INC. and

17     AETNA, INC. v. PFIZER, INC.
       ****************************************
18
            SUPREME COURT OF THE STATE OF NEW YORK
19                   COUNTY OF NEW YORK
       ****************************************
20
       In Re:  NEURONTIN PRODUCT LIABILITY
21     LITIGATION

22     **************************************** Index No.

23     THIS DOCUMENT APPLIES TO:            765000/06

24           ALL CASES
```

**Page 226**

actually.
Q. Is that consistent across patients?
A. It depends on the procedure code. A new hour eval is 250. This may not make a lot of sense, a half hour is 135, two half hours 270, one full hour 200.
Q. Could you go over those rates again from lowest to highest describing what the rates are for?
A. Certainly. A full 50 minutes, not initial eval, follow-up is 200 an hour. A new eval is 250 per hour. A half hour follow-up is 135 for 30 minutes, or 270 for an hour.
Q. Okay.
A. I've not raised my rates in ten years.
Q. Really?
A. Really.
Q. What have you been retained to do in this case?
A. Well, to carefully look at the science behind Neurontin, particularly the efficacy clinical trials, to review the marketing material, to make a judgment on the soundness of the science or research as it pertains to

**Page 227**

gabapentin and its efficacy in bipolar disorder and solely bipolar disorder, and then ask do the results of the science and clinical trial data support the marketing, as well as sort of more peripherally, I suppose, discuss what is bipolar disorder, discuss what is evidence-based medicine, discuss the treatments of bipolar disorder. And finally, in the supplemental record to review early clinical and early safety data as it pertains to potential adverse effects on mood, and comment on the relevance there as it pertains to the marketing of Neurontin.
Q. Is there any work that you were asked to do in connection with this matter that you have not yet done?
A. No.
Q. Have you completed any work in this matter that Plaintiffs have elected not to disclose as part of your reports?
A. No.
Q. Can you describe how you first became aware of this case?
A. Yes. I had received a phone call from one of Plaintiffs' attorneys.

**Page 228**

Q. Who was that?
A. Attorney Rona.
Q. Do you know how Mr. Rona was referred to you?
    MR. RONA: Objection.
A. I don't know exactly. I seem to recall that the firm Greene & Hoffman had spoken to a colleague of mine who writes The Carlat Psychiatry Report, and it's my understanding that he provided Plaintiffs' counsel with my name and contact info.
    BY MS. HARRIS:
Q. And what was the subject matter of your first discussion, which I believe you said was in late February or early March, 2008?
A. It was a general outline of what this case was about, and what -- do I have an opinion, do I have any feelings or interest.
Q. Did you have an opinion at that point after receiving a general overview of what the case was about?
A. Yes. I had always been of the mind that Neurontin was not effective as a mood stabilizer and, you know, I was aware of the

**Page 229**

Level 1 evidence on Neurontin, and I was concerned, that's sort of a heavy word but conveys the sentiment, that Neurontin was used inappropriately in patients with bipolar disorder.
Q. Have you ever written on that topic?
A. No.
Q. Do you know how Mr. Rona would know that you might have that opinion on this issue?
A. We had a conversation to that effect.
Q. So it was based on that first conversation?
A. Yes.
Q. Was there anyone else on the call besides you and Mr. Rona?
A. I think initially it was Mr. Rona and myself.
Q. You say "initially." Was there some other time that there were more people on the call?
A. We had a face to face meeting sometime in March with representatives from Mr. Rona's firm.
Q. Who besides Mr. Rona attended?

314

1  poles, they're closer to easier to treat.
2      Q.  Is there a cure for bipolar disorder?
3      A.  Bipolar disorder is a cyclic recurrent
4  disorder that, like diabetes or hypertension, is
5  a disorder of chronic management.  We don't
6  really think about these disorders as curable.
7      Q.  So what are the goals, then, of
8  treating a patient with bipolar disorder?
9      A.  The goal of treatment is to ensure
10 that the mood becomes euthymic, normal mood, and
11 stays that way.
12     Q.  Are there patients who don't get
13 adequate relief or enter into the euthymic state
14 from the currently available FDA-approved
15 medications for bipolar disorder?
16     A.  That can happen.  But as I said
17 before, fortunately that's quite rare.
18     Q.  What does it mean for a patient to be
19 refractory?
20     A.  Refractory.  There's a spectrum, if
21 you will, from treatment responsive to treatment
22 refractory, and we talk about the intermediate
23 areas as treatment resistant.
24         Treatment refractory describes those

315

1  patients, again thankfully the minority, who are
2  very difficult, if not impossible, to treat.
3      Q.  Do you use different medication
4  strategies for patients along different points
5  of that spectrum you've just described?
6      A.  Interesting question, because many of
7  the treatments will work for different -- for
8  the same stages of severity, so you have a large
9  number of applications.  And that's interesting,
10 because sometimes you have somebody who's just a
11 little hypomanic who needs a big gun, so to
12 speak, and other times you have somebody who is
13 more severe who responds to a more gentle
14 treatment.
15     Q.  I see.
16         Do patients sometimes go into
17 remission?
18     A.  Yes.  I mean when you use good Level 1
19 data and you use treatments that work that are
20 supported by the literature and you do this
21 enough, you get to a point where patients will
22 not only go into remission but will stay, and we
23 call that a full and sustained remission.
24     Q.  Has the number of patients who achieve

316

remission increased over time as there have been
more medications available to treat bipolar
disorder?
    A.  I think with the advent of new high
level of evidence, Level 1 evidence treatments,
I think we've been much more successful in
getting our patients into remission and keeping
them in remission, yes.
    Q.  You say "much more successful."  Was
that not always the case over time?
    A.  Well, I can't give you percentages of
what number of patients remitted at different
points in time, but I could tell you that the
ability to treat these patients with novel
treatments has really become much more complete.
    Q.  Because of the development of new
medicines?
    A.  In large part, yes.
    Q.  If we're talking back, say, in 1994,
is there a significant difference between the
available FDA-approved medicines from 1994 to
today?
    A.  Yes.  The cornerstone of treating
bipolar disorder, the mood stabilizers.  And the

317

classic mood stabilizers are lithium which has
been around for a long time which is actually a
great, great mood stabilizer, quite possibly the
best, even though it's been around forever.
Another drug called Depakote, valproic acid,
also extremely good.  And the other classic
anti-convulsant mood stabilizer was
Carbamazepine, or Tegretol I guess is the brand
name, and that, too, has a very good activity
profile.  And in general we did really well with
those three agents.
        Nowadays what's improved with the use
of the anti-psychotics, the second generation
anti-psychotics, or atypicals as they're also
known, is the ability to more rapidly treat
patients who are acutely manic or in acute mixed
states.
        The trouble with the atypicals as
newer treatments is some of them have very
deleterious impact on tolerability, things like
weight gain, induction quite possibly of
diabetes and other metabolic matters.
        So really the goal of treatment still
is to more rapidly get these patients better and

342

A. Before we get to the tolerability, could we just take a break, men's room break?
MS. HARRIS: Sure. Absolutely.
THE VIDEOGRAPHER: The time is 5:15. We're off the record.
(Whereupon, a recess was taken.)
THE VIDEOGRAPHER: Back on the record. The time is 5:24.
BY MS. HARRIS:
Q. Dr. Barkin, you've indicated a few times that you're not sure as you sit here today whether there's Level 1 evidence on various indications for which you use some of these medications in bipolar patients.
Do you search for Level 1 evidence before you prescribe these medicines?
A. If it's a new treatment I do, yes.
Q. Do you search to make sure that the science has not changed or the evidence, Level 1 evidence has not changed with respect to any of the medications that you prescribe?
A. Not with medications that I commonly use. When a new medication is made available, I do review the literature surrounding that, yes.

343

Q. I gather that you prescribe a lot of these medications fairly frequently?
A. Yes.
Q. But you're still not aware of whether there are Level 1 evidence supporting some of the indications you've discussed?
A. Well, I thought I was clear that all of these medications that we've discussed have Level 1 evidence to support their use in various phases of bipolar disorder.
Q. So it's your position that for all of the indications that you use these medications, there's Level 1 evidence supporting it?
A. No. I said that there's Level 1 evidence to support the use of these medications in bipolar disorder. I think it would be, I don't know, minutia to say this one has it for this mood state for this amount of time versus that. But they all have Level 1 data to support efficacy in bipolar disorder.
Q. Why does the FDA give approval for specific indications -- or let me back up for a second.
Why does the FDA give approval in

344

bipolar patients for particular phases if it's true that if it works for one phase it probably will work for other phases?
MR. RONA: Objection. I think that mischaracterizes his testimony.
A. The FDA in general responds to the drug company's desire to seek additional indications. I think that that's a marketing stance.
So before you could say that your medication is FDA-approved for this specific phase of bipolar disorder in this case, one has to demonstrate that in the form of two double-blind, randomized trials of FDA.
Where I'm going here is that there's Level 1 evidence to support the efficacy in a phase of bipolar disorder supporting the use of these medications in bipolar disorder. I think it becomes a level of detail of what states of bipolar disorder one of these treatments has an FDA indication in as opposed to a clinical Gestalt, if you will, that a drug works in bipolar disorder.
BY MS. HARRIS:

345

Q. I see.
A. In other words, let me try to clarify. You wouldn't say "well, you know, today I learned that this drug now has an additional indication, so let me take you off this and put you on --" it just doesn't go like that. There's more of a continuity when treating patients.
Q. Okay. Bipolar disorder is a specific mood disorder, is that correct?
A. What do you mean by "specific"?
Q. Is one type of mood disorder?
A. Yes.
Q. What are other types of mood disorders?
A. Well, you know, we typically think of on one hand bipolar disorder and on the other hand unipolar disorder.
Unipolar is a depressive disorder that does not have mania or hypomania or mixed elements.
Q. Are there other mood disorders?
A. There's something called dysthymic disorder, which is typically a long-term low

### Page 346

grade depression, and that encompasses the Axis 1 or major mood disorders. There are other medical induced, you could have an affective disorder, a mood disorder from different medical causes, hypothyroidism. Certainly you can have a mood disorder from the use of substances, or substance withdrawal, other medical causes like Parkinson's disease and the like.

Q. I think you've already testified that patients can respond differently to the same medicine; that's correct, right?

A. Yes.

Q. What that means then is that even an FDA-approved medication may not work in every patient for which it is indicated?

A. Yes.

Q. So the medicine can be demonstrated effective in a Level 1 study but still not work for a particular patient?

MR. RONA: Objection.

A. Yes. The Level 1 study, Level 1 protocols define groups of people that respond or not to a given treatment.

BY MS. HARRIS:

### Page 347

Q. So if someone is outside of the group used in the Level 1 study, the Level 1 study doesn't necessarily tell you anything about how effective that treatment would be outside of that population?

A. Well, we routinely make inferences. I mean Level 1 studies describe a group, right, but when we're treating people not everybody is part of that group. Sometimes they are, sometimes they're not. So the Level 1 data gives a nice roadmap for people who may respond. But as you point out, not everybody is going to respond.

Q. Level 1 studies are probabilistic studies, correct?

A. What do you mean by "probabilistic"?

Q. Well, they tell you the probability that a particular drug will be effective in a particular population?

MR. RONA: Objection.

A. Well, sort of. It's more like they describe what percent of people respond, what percent of people get to a certain end point, primary outcome. So I suppose in that sense

### Page 348

it's probabilistic.

BY MS. HARRIS:

Q. Because they don't definitively tell you that a drug will be effective in any particular patient, correct?

MR. RONA: Objection.

A. They tell you that a drug will be effective within a group of patients.

BY MS. HARRIS:

Q. A probability that the drug will be effective within a group of patients; isn't that what a P value is?

A. Yes.

Q. Now we're going to get to your favorite topic.

Can you describe evidence-based medicine?

A. I don't know why you say it's my favorite topic, but it is an interesting topic.

Evidence-based medicine is something that describes how physicians and other prescribers and other health care practitioners arrive at decisions on how to evaluate and how to treat patients.

### Page 349

Q. I think at Page 6 of your report which we've marked as Barkin Exhibit Number 4, I believe, you state at the second paragraph that evidence-based medicine demonstrates what treatments work, correct?

A. Yes. The idea of evidence-based medicine is to describe with as much lack of bias, as much lack of confounding factors that which works best for a given patient.

Q. Do all doctors practice evidence-based medicine?

A. Absolutely.

Q. Is that a requirement of the ethics code for doctors, to practice evidence-based medicine?

MR. RONA: Objection.

A. I don't know if it's an ethical issue. I think it's a practical issue. Evidence-based medicine derives from reading the medical literature. I certainly hope that all physicians are reading the medical literature.

BY MS. HARRIS:

Q. You write that there are three levels of evidence, correct?

```
                                                                   389
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2                             MDL Docket No. 1629
                               Master File No. 04-10981
 3
     ************************************
 4   In Re:  NEURONTIN MARKETING, SALES
     PRACTICES, AND PRODUCTS LIABILITY
 5   LITIGATION,

 6   ************************************

 7   THIS DOCUMENT RELATES TO:

 8   ************************************
     HARDEN MANUFACTURING CORPORATION;
 9   LOUISIANA HEALTH SERVICE INDEMNITY
     COMPANY, dba BLUECROSS/BLUESHIELD OF
10   LOUISIANA; INTERNATIONAL UNION OF
     OPERATING ENGINEERS, LOCAL NO. 68
11   WELFARE FUND; ASEA/AFSCME LOCAL 52
     HEALTH BENEFITS TRUST; GERALD SMITH;
12   and LORRAINE KOPA, on behalf of
     themselves and all others similarly
13   situated, v. PFIZER INC. and
     WARNER-LAMBERT COMPANY.
14
     ************************************
15
     THE GUARDIAN LIFE INSURANCE COMPANY
16   OF AMERICA v. PFIZER INC. and

17   AETNA, INC. v. PFIZER, INC.
     ************************************
18
          SUPREME COURT OF THE STATE OF NEW YORK
19                 COUNTY OF NEW YORK
     ************************************
20
     In Re:  NEURONTIN PRODUCT LIABILITY
21   LITIGATION

22   ************************************  Index No.

23   THIS DOCUMENT APPLIES TO:              765000/06

24            ALL CASES
```

**Page 454**

the majority of cases where one is guided by evidence, Level 1 evidence, one has to weight that appropriately.

To directly answer your question, could a Level 1 trial miss efficacy, be a so-called false/negative, it's possible, yes.

BY MS. HARRIS:

Q. So how many trials do you think are necessary?

MR. RONA: Objection.

A. It depends upon the design. But in general, if there's a replication trial of the first trial that also is negative, to me and to people I know that would be very supportive of lack of efficacy.

BY MS. HARRIS:

Q. Within the population being studied?

A. Yes.

MR. RONA: Objection.

A. Within the population being studied, and within the limitations of the inclusion and exclusion criteria.

BY MS. HARRIS:

Q. Okay. Just so we're on the same page,

**Page 455**

which Level 1 studies support your opinion on the efficacy of Neurontin?

MR. RONA: Objection.

A. The trial of Pande, the trial of Frye, the trial of Guille, the trial of Vieta.

BY MS. HARRIS:

Q. Those four?

A. Yes.

Q. Okay. Do you know how many patients when you combine all those studies were actually treated with gabapentin?

A. I'd have to go back to the articles and add them up.

Q. Did you know that it was fewer than 100 patients?

MR. RONA: Objection.

A. The trial started out with a larger sample size, and over time unfortunately the sample size went down.

BY MS. HARRIS:

Q. But when you combine the sample size for the four studies you just listed for the patients that were actually treated with gabapentin, it's less than 100 patients?

**Page 456**

MR. RONA: Objection.

A. Again I'd have to add them up from the trials, but for the sake of argument we can talk about that.

BY MS. HARRIS:

Q. And you're comfortable rendering an expert opinion that Neurontin is not effective for the treatment of bipolar disorder based on results in less than 100 patients?

MR. RONA: Objection.

A. I feel confident based upon four different clinical trials of Level 1 evidence that gabapentin is ineffective in bipolar disorder compared to placebo.

BY MS. HARRIS:

Q. Studies on less than 100 patients is sufficiently powered in your view?

MR. RONA: Objection.

A. The fact that this is four separate clinical trials, to me in my opinion strongly and consistently demonstrates lack of efficacy.

BY MS. HARRIS:

Q. On Page 7 of your report, the middle paragraph, or the second paragraph on that page

**Page 457**

you state "utilizing treatment which lack evidence of therapeutic benefit places the patient at great risk."

Did I read that correctly?

A. Yes. In general, if you have choices of different treatments for a general clinical population, not a research population, unless you have really good reasons, using treatments that lack Level 1 evidence subjects clinical patients to lack of efficacy compared to other treatments which may have Level 1 evidence, yes.

Q. Do you believe that you're placing your two patients that are on Neurontin at great risk?

MR. RONA: Objection.

A. The two patients that I had mentioned to you are on numerous other mood stabilizers, so no, they're not subject to risk.

BY MS. HARRIS:

Q. So even though you're utilizing with them a drug that you believe lacks any evidence of therapeutic benefit, you don't believe you're putting them at great risk given the combination of their other medications?

462

Q. So this study examined gabapentin's efficacy only as an adjunctive treatment to lithium, valproate, or a combination of the two drugs in patients who were suffering from the more severe form of bipolar disorder, is that correct?

A. If what you mean by "more severe" is that they hadn't yet showed response to lithium, valproate or a combination, yes.

Q. What I meant by "more severe" is Bipolar I versus Bipolar II.

A. Yes.

Q. So this study does not discuss gabapentin's efficacy as a monotherapy, correct?

A. Correct.

Q. And it does not discuss gabapentin's efficacy for Bipolar II patients?

MR. RONA: Objection.

A. Correct.

BY MS. HARRIS:

Q. And it does not discuss gabapentin's efficacy with respect to non-refractory patients, correct?

A. Yes.

463

MR. RONA: Objection.

BY MS. HARRIS:

Q. And all of that is as a result of the inclusion and exclusion criteria for this particular study, correct?

MR. RONA: Objection.

A. Yes.

BY MS. HARRIS:

Q. So as we discussed earlier, this study has limited generalizability?

MR. RONA: Objection.

(Witness reviewing document.)

A. To the extent there are some exclusion criteria, this study is generalizable to patients with Bipolar I who are resistant or refractory, really refractory to lithium, Depakote, or the combination of the two.

BY MS. HARRIS:

Q. But it is generally not generalizable to patients outside of that criteria?

A. If what you mean by "outside of that criteria" is non-responders to lithium, valproate or the combination of the two, that would be correct. The inclusion criteria of the

464

study was patients who were not better on lithium, valproate or a combination and who were Bipolar I.

Q. Right. So it's not generalizable to Bipolar II?

MR. RONA: Objection.

A. Well, I don't know if it's generalizable to II, it may be. It may carry over to II. But the explicit outcome here would pertain to Bipolar I's.

BY MS. HARRIS:

Q. Okay.

MR. RONA: Do you want to take a break now?

MS. HARRIS: Sure.

MR. RONA: Are you done with Pande?

MS. HARRIS: I am.

MR. RONA: Okay.

MS. HARRIS: Do you want to take a bathroom break?

MR. RONA: Yes.

MS. HARRIS: Okay. Sure.

MR. RONA: Good.

MS. HARRIS: Five minutes?

465

MR. RONA: Sure.

THE VIDEOGRAPHER: This is the end of tape number one, deposition -- volume two of the deposition of Dr. Jeffrey Barkin. The time is 10:23. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: Here begins tape two, volume two in the deposition of Dr. Jeffrey Barkin. We're back on the record. The time is 10:38.

(Whereupon, Barkin Exhibit Number 13 was marked for identification.)

BY MS. HARRIS:

Q. Dr. Barkin, the court reporter has just handed you -- actually before we go into the exhibit that we've just handed you, during the break did you discuss with Plaintiffs' counsel your testimony this morning?

A. No.

Q. No discussion at all about any of the testimony or any of the exhibits you were shown this morning?

A. We talked about persistence of Level 1 data, and that's it. I mean nothing that is

466

1  material or that would change anything here
2  today.
3      Q.   The court reporter has handed you an
4  exhibit marked Exhibit 13, it's an article
5  describing a study done by Dr. Frye and others,
6  am I correct?
7          (Witness reviewing document.)
8      A.   Yes.
9          BY MS. HARRIS:
10     Q.   Is this the Frye study that you
11 testified you relied on in connection with your
12 expert opinion?
13     A.   It is.
14     Q.   And this is a study of gabapentin and
15 Lamotrigine as monotherapy in refractory
16 patients, is that correct?
17     A.   Yes, it is.
18     Q.   As we previously discussed, refractory
19 means that the patients are not responding to
20 their existing treatments, is that correct?
21     A.   Yes.
22     Q.   Do you mention in your expert report
23 that this study only evaluated gabapentin in
24 refractory patients?

467

1      A.   I have to look back at my report.
2      Q.   Please do so.
3      A.   I may have, I may not have.
4          (Witness reviewing document.)
5      A.   I did not explicitly state refractory.
6          BY MS. HARRIS:
7      Q.   This study doesn't reach any
8  conclusions about the efficacy of gabapentin in
9  non-refractory patients, correct?
10         MR. RONA:  Objection.
11     A.   That's correct.
12         BY MS. HARRIS:
13     Q.   Are you aware that Frye discusses the
14 limitations of his study in the article?
15     A.   Yes.
16     Q.   You didn't reference the limitations
17 of this study in your expert report either, did
18 you?
19     A.   No, I did not describe every paragraph
20 of the study.  It's contained in the study.
21     Q.   So in contrast, you did discuss
22 extensively what you viewed as the limitations
23 of the Vieta study, which is the only positive
24 study that you looked at, is that correct?

468

1          MR. RONA:  Objection.
2      A.   I don't know that I would necessarily
3  characterize the Vieta study as particularly
4  positive in light of the group of patients
5  involved.
6          BY MS. HARRIS:
7      Q.   My question is, though, you did not
8  discuss the limitation of the Frye study which
9  is negative, but you did discuss the limitations
10 of the Vieta study which is positive.  Why the
11 difference in approach?
12         MR. RONA:  Objection.
13         I don't think it's been established
14 that the Vieta study is positive.
15     A.   I was really looking at the efficacy
16 outcomes primarily with Frye, and not getting
17 into the caveats that he discusses in his
18 report.
19         BY MS. HARRIS:
20     Q.   Well, let's talk about those caveats.
21         Could you turn to Page 612, please?
22     A.   Yes.
23     Q.   At the top of Page 612, Dr. Frye and
24 the authors write, quote, "other limitations and

469

caveats relate to the type of patients studied
and the generalizability of the findings.  As
presented in Table 1, the study population was
highly refractory and had a high degree of
exposure to conventional agents and were either
intolerant or refractory.  A very high
percentage (92 percent) of this bipolar sample
was rapid cycling, which is substantially
greater than the general population estimates of
this course specifier (DSM-IV.).  Both
refractory UP and BP patients were included in
this preliminary study.  The degree of efficacy
in a more homogeneous and typical population of
patients who were less severely ill remains to
be explored.  Also, the direct application of
these preliminary monotherapy results to
community treatment guidelines is limited, given
that a combination treatment is the norm and
monotherapy regimes are rarely used in clinical
practice."
        Would you agree with me that Frye and
the other authors of this article are pointing
out that there are limitations to the
generalizability of their conclusions?

21 (Pages 466 to 469)

470

1  A. Yes.
2  Q. You didn't think it was important to
3  note those limitations in your expert report?
4     MR. RONA: Objection.
5  A. In my report I didn't relate every
6  point, every strength or limitation of every
7  piece, that's correct.
8     BY MS. HARRIS:
9  Q. Yet you nonetheless generalize from
10 this report that Neurontin is ineffective in
11 treating all bipolar patients, correct?
12    MR. RONA: Objection.
13    Which report are you talking about?
14    MS. HARRIS: His expert report.
15 A. Yes. The conclusion of my report in
16 looking at all of the Level 1 trials is that
17 gabapentin is not effective in bipolar disorder.
18    BY MS. HARRIS:
19 Q. Do you disregard the limitations that
20 Dr. Frye and the other articles of this study
21 say are an important consideration in evaluating
22 their conclusions?
23 A. All trials, all studies have
24 limitations. But what I was honing in on was

471

1  the efficacy or lack thereof from all of the
2  known, all of the known Level 1 trials of
3  gabapentin, placebo.
4  Q. Pande also looks only at refractory
5  patients, correct?
6  A. Yes. That was a criteria for entry.
7  Q. So both Pande and Frye only look at
8  refractory patients, correct?
9  A. Yes.
10 Q. Farther down on Page 612 the authors
11 note, quote, "the role of both of these agents
12 in a combination treatment or as adjuncts, as
13 they would likely be used in practice settings,
14 remains to be clarified."
15 A. I'm sorry, where are you reading from?
16 Q. Three-quarters of the way down the
17 first column on Page 612.
18 A. "Early open studies"?
19    MR. RONA: Is it right after footnote
20 58?
21    MS. HARRIS: Exactly.
22    MR. RONA: Do you see footnote 58?
23 A. Let me just get there.
24    BY MS. HARRIS:

472

1  Q. Last sentence of the second paragraph.
2  A. Yes.
3  Q. "The role of both of these agents in a
4  combination treatment or as adjuncts, as they
5  would likely be used in practice settings,
6  remains to be clarified."
7     Would you agree that the authors of
8  this study have not definitively concluded that
9  Neurontin or gabapentin is ineffective in
10 treating all bipolar patients?
11    MR. RONA: Objection.
12 A. The authors also note in the sentence
13 before that that "a second placebo-controlled
14 study of gabapentin add-on to suboptimally
15 mood-stabilized bipolar manic patients found no
16 benefit of gabapentin over placebo." And as you
17 point out, that's the Pande study as referenced
18 58 in the Frye report.
19    BY MS. HARRIS:
20 Q. Yes. So even considering the Pande
21 study and the results that fail to show any
22 efficacy for gabapentin in treating bipolar
23 patients in the population studied, the authors
24 of the Frye study still believe that more work

473

1  needs to be done before concluding that
2  gabapentin is ineffective, don't you agree?
3     MR. RONA: Objection.
4  A. He feels that the use of these agents
5  as mono or adjunctive therapies remains to be
6  clarified in practice settings, which is a
7  fairly reasonable statement.
8     But this is again now two Level 1
9  trials. And the important thing about Frye is
10 Lamotrigine, the LTG, did separate from placebo
11 and did separate from gabapentin. But in the
12 Frye report, consistent with the Pande report,
13 again gabapentin as an adjunct in this as in
14 Frye didn't separate from placebo and is
15 negative in efficacy.
16    BY MS. HARRIS:
17 Q. But at least as of this study, even
18 considering Pande, Frye believes there's more
19 work to be done before reaching definitive
20 conclusions about gabapentin and bipolar
21 disorder, correct?
22    MR. RONA: Objection.
23 A. That's what he suggests.
24    BY MS. HARRIS:

482

1  patients, do you?
2       MR. RONA: Objection.
3   A.  I did not in my report.
4       BY MS. HARRIS:
5   Q.  And you don't list any Level 1 studies
6  supporting the extrapolation of the conclusions
7  with respect to refractory patients to
8  non-refractory patients in your relied upon
9  materials, isn't that correct?
10      MR. RONA: Objection.
11  A.  Yes.
12      BY MS. HARRIS:
13  Q.  Let's look at an abstract from the
14 Guille study which you also indicated you relied
15 on, I believe, is that correct?
16  A.  Yes.
17      (Whereupon, Barkin Exhibit Number 14
18      was marked for identification.)
19      (Witness reviewing document.)
20      MR. RONA: Has this been marked?
21      COURT REPORTER: 14.
22      MR. RONA: 14. I'm just going to
23 object to the use of this exhibit insofar as it
24 doesn't have a Bates number on it, and it

483

1  doesn't seem like this was something that was
2  produced in discovery by Pfizer. To the extent
3  that it should have, I object to it being used
4  now.
5       MR. ROCHE: Is it publicly available?
6  Or I should say isn't it publicly available?
7       MS. HARRIS: Well, maybe we can
8  resolve this objection by going back to
9  Dr. Barkin's expert report.
10      BY MS. HARRIS:
11  Q.  Dr. Barkin, could you turn to your
12 first expert report, please? Could I turn your
13 attention to Page 24 of that report, please?
14 Under "Publications," number 14, is listed as
15 "Guille C.," quote, "Gabapentin versus placebo
16 as adjunctive treatment for acute mania and
17 mixed states in bipolar disorders," end quote.
18 "American Psychiatric Association, Annual
19 Meeting 1999."
20      Did I read that correctly?
21  A.  Yes.
22  Q.  Is Barkin Exhibit 14 the same document
23 that I just identified as part of your reviewed
24 publications?

484

A.  Yes.
    MR. RONA: I still keep my objection.
I don't know whose handwriting this is. I don't
dispute that this is publicly available, it may
be, but I don't know if it would be publicly
available with the checkmark and the handwriting
at the bottom of the page.
    I'll allow questioning, but I just --
for the record, there's an objection to each
question about this document until we can
ascertain that this is what he's seen.
    BY MS. HARRIS:
Q.  Dr. Barkin, I believe you just
testified that this is the same document that
you relied upon and reviewed in connection with
your expert report, correct?
A.  Yes.
Q.  Okay. Dr. Guille's study was also a
study of adjunctive gabapentin in refractory
patients, is that correct?
A.  Yes.
Q.  Similar to Pande and Frye in the sense
that they were all looking at refractory
patients, correct?

485

A.  Yes.
Q.  In your expert report on Page 9, in
your discussion of the Guille study, you quote
Dr. Guille as follows, quote, "this study did
not find adjunctive gabapentin to be efficacious
treatment for refractory mania," and then
eclipses are inserted, correct?
A.  Yes.
Q.  If I turn your attention to Barkin
Exhibit 14.
A.  Okay.
Q.  On the back page at the top on the
left column, am I correct that the full sentence
reads, quote, "this study did not find
adjunctive gabapentin to be efficacious
treatment for refractory mania, but cannot
address efficacy for non-refractory bipolar
disorder," period, end quote.
    MR. RONA: Just for the record, it
actually reads no space NR -- or "N capital N
capital R refractory bipolar disorder."
    MS. HARRIS: So noted.
    BY MS. HARRIS:
Q.  Did I read that correctly, Dr. Barkin?

25 (Pages 482 to 485)

486

1 A. Yes.
2 Q. Why did you leave out the end of that
3 sentence in your expert report?
4 A. Because I was trying to get to
5 Guille's ultimate conclusion that gabapentin is
6 a mood stabilizing agent may be unwarranted.
7 Q. You did not think it was important to
8 note in your discussion of Guille that she
9 explicitly notes that she is not making any
10 conclusions as to efficacy in non-refractory
11 patients?
12     MR. RONA: Objection.
13 A. I did not consider that. I just view
14 this as yet another double-blind protocol.
15     BY MS. HARRIS:
16 Q. So three of the four studies that you
17 relied upon in support of your expert opinion
18 that gabapentin is ineffective in all bipolar
19 patients only look at refractory patients,
20 correct?
21     MR. RONA: Objection.
22 A. Yes, they look at refractory patients.
23 However, these studies are the only Level 1
24 evidence available to us. So obviously we have

487

1 to do some extrapolation, we can't be so rigid
2 as to say we have no data. This is Level 1
3 data.
4     BY MS. HARRIS:
5 Q. Yet you don't cite any Level 1 studies
6 or any Level 1 data supporting the extrapolation
7 to all patients, correct?
8     MR. RONA: Objection.
9 A. Correct.
10     MR. RONA: You mean all bipolar
11 patients?
12     MS. HARRIS: What did I say?
13     MR. RONA: "All patients."
14     MS. HARRIS: I meant all bipolar
15 patients.
16     MR. RONA: Same objection.
17     BY MS. HARRIS:
18 Q. Do you know the size of the Guille
19 study?
20 A. I believe it was eighteen, nine in
21 each group.
22 Q. So only nine patients received
23 gabapentin in Dr. Guille's study, is that
24 correct?

488

A. That was their design of their Level 1
protocol, yes.
Q. Let's go back to the notes, Barkin
Exhibit 7.
     On Page 10 of Barkin Exhibit Number 7,
there's a note that says in the middle of the
page, quote, "why include Guille," end quote.
     What does this statement refer to?
A. That it's Level 1 protocol, that it
should be included, and we did.
Q. Was there a question of including
Guille?
A. Not that I recall. We looked for all
Level 1, all double-blind data available. And
it may be, I mean again you're asking me to look
at notes from last June, it may be that there
was another question, but I don't recall what
that would have been.
Q. Do you recall any discussion with
Plaintiffs' counsel or Dr. Goldman about whether
or not to include Guille in your expert report?
A. I don't recall having a conversation
last June, though it's certainly possible.
Q. You can put that aside.

489

Do you know what statistics were used
in connection with the Guille study?
     MR. RONA: Objection.
A. I don't know what statistical tests
they used, though the primary outcome variables
were changed in YMRS and Hamilton's depression.
     BY MS. HARRIS:
Q. Do you know if the study used
parametric statistics?
A. I don't have, excuse me, I don't have
the statistical tests available from the poster.
Q. You previously testified that the
small sample size doesn't bother you because
they used perimetric statistics but, in fact,
you don't know that Dr. Guille used parametric
statistics, isn't that correct?
A. We don't know what statistical tests
that they employed.
Q. You can put that aside.
     Are you aware of any Level 1 evidence
that looked at efficacy of gabapentin in
non-refractory patients?
     MR. RONA: Objection.
A. In reviewing the Level 1 protocols,

26 (Pages 486 to 489)