UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------x
: MDL Docket No. 1629
In re:  NEURONTIN MARKETING, :
       SALES PRACTICES AND : Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION :
: Judge Patti B. Saris
----------------------------------------------------------------x
: Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Bulger v. Pfizer Inc., et al.*, 07-CV-11426-PBS :
:
*Smith v. Pfizer Inc., et al.*, 05-CV-11515-PBS :
:
----------------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' REPLY MEMORANDUM
TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
<u>TO EXCLUDE THE TESTIMONY OF SHEILA WEISS SMITH, Ph.D.</u>**

This memorandum is submitted in reply to Defendants' opposition, and in further support of Products Liability Plaintiffs' motion to exclude the testimony of Defendants' expert Sheila Weiss Smith, Ph.D. Dr. Weiss Smith renders opinions in areas in which she admits she is unqualified, and there are numerous mistakes in her reports which demonstrate unreliability, a flawed methodology and carelessness. Plaintiffs therefore request an evidentiary hearing.

**A.    Defendants' Misdirection to Confuse the Court.**

Defendants' Opposition, ECF Doc. # 1657, is the zenith, or perhaps the nadir, of the destructive power of litigation over the meaning of ordinary words. Defendants boldly declare that their motives are mistaken; that they ". . . will not call Dr. Weiss-Smith to offer opinions regarding (a) *clinical* interpretation of safety information, . . . or (g) adequacy of defendants' *pharmacovigilance practices*." *Id*. at 2.

However, Defendants' left hand is quicker than the eye.  After supposedly staking out such high ground, Defendants then go on to declare that Dr. Weiss-Smith will be called to testify about "pharmacovigilance/drug safety."  *Id.*  They also offer her opinions on "pharmacovigilance data that form the bases for Neurontin labeling."  *Id.* At 5.  They even state that her opinions do not require expertise in certain fields but, rather, in pharmacovigilance.  *Id.* At 7.  They then draw the false distinction that she is named as an expert just on "pharmacovigilance drug safety."  *Id.*

All of this posturing disregards Dr. Weiss Smith's admission that she is not an expert in pharmacovigilance, ECF Doc. # 1626 at 6, and shows Defendants' willingness to play word games to confuse the Court and, ultimately, the juries.  This is the very thing that Fed. R. Evid. 403 and 702, and *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993), seek to prevent.

Defendants' denial that Dr. Weiss Smith will not testify about *clinical interpretations* is similarly undermined by a slight of hand by which they assert that she will testify about her view that the *clinical* data does not show an elevated risk of suicidality, that the *clinical trials* show no association between Neurontin and suicidality, and about opinions formed based upon statistical evidence she drew from the Neurontin *clinical* trial data.  ECF Doc. # 1657 at 2, 3.  Defendants even assert that Dr. Weiss Smith has the expertise to evaluate whether other clinical experts' review of the data is "consistent with her own epidemiological opinions."  *Id.* at 10.  This belies the fact that she not only conceded her lack of expertise, she also admitted she has never read the clinical data about which Defendants plan to offer her views to the jury.  ECF Doc. # 1626 at 10.

A thistle by another name still is not a rose, or, to draw from the Third Circuit's view of such word gaming, "The district court was not without basis for believing that heat-degraded PCBs are functionally dioxins by another name."  *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 456 (3d Cir. 1997).  Defendants' bait-and-switch faint praise for Dr. Weiss Smith's lack of

pharmacovigilance and clinical expertise is nevertheless a dioxin by any other name — they want her to testify about pharmacovigilance and the qualitative presence or absence of clinical data in patients who took Neurontin.  Even if Defendants themselves visualize such distinctions without differences, that hardly makes Dr. Weiss Smith's opinions reliable.  If she isn't qualified, she isn't qualified, and she candidly admits that she is not qualified.  Defendants thus ask the Court to ignore not only Fed. R. Evid. 702 but also Rule 403.  Evidence that is so confusing that it outweighs any potential help to the jury is inadmissible.  *See Lehman v Leichliter*, 2004 U.S. Dist. LEXIS 30679 at *6 (W.D. La. 2004).

**B.    Dr. Weiss Smith's Testimony Would Not Be Helpful to a Jury.**

Here, Dr. Weiss Smith's purported testimony that a safety signal did not result from "data mining" is not helpful to the jury and should be precluded.  Defendants' own employee, Dr. Manfred Hauben, a pharmacoepidemiologist, succinctly described the accepted limitations on data mining when addressing Defendants' concern over suicidality:

> We can data mine on gabapentin but I don't think that negative data mining findings would make a strong counterargument to a signal that may have arisen from clinical observations.  [Declaration of Kenneth B. Fromson, Esq., Ex. A.]

Dr. Weiss Smith herself agreed:

> Q    But the absence of a signal in data mining does not mean everything is a okay; is that correct?
>
> A    That can be the case.  Not everything will signal in data mining, it's only proportional reporting.  [Fromson Decl., Ex. B, at 154.]

That Dr. Weiss Smith did not observe a safety signal from data mining in the material she did read is not helpful to the jury because, in the words of Dr. Hauben and English philosopher William Cowper, "An absence of proof is not proof of absence."  Dr. Weiss Smith nevertheless opines that her failure to observe a signal in her *statistical* data mining investigations means that

3

that there was no signal in the *clinical* trials or case reports. That is precisely what the standard of pharmacoepidemiolgy says may not be concluded. The risk of confusion and absence of helpfulness compel that her opinions be excluded.

**C.     Dr. Weiss Smith's Lack of Experience Will Confuse the Jury.**

The FDA has never required a *statistical* association of increased risk of suicidology to compel a change in labeling to address the risk; it has, and does, require a *clinical* association of a signal.[1] Whether by design or by default, Defendants would use Dr. Weiss Smith's confusion concerning the provisions in the Code of Federal Regulations regarding labeling and changes to confuse the correct method to analyze data for evidence of a signal.

Plaintiffs do not criticize Dr. Weiss Smith because she is not a suicidologist; but because she lacks the experience to determine what events should be reviewed to search for a data mining signal in the first place. In her deposition, she admitted she did not check to see whether suicidal ideation reports included patient presentations that were "serious," but just summarily concluded that suicidal ideation is inherently "non-serious." Fromson Decl., Ex. B, at 247-250.

On the contrary, a review of the FDA database between 1997 and 2008 shows that of 884 reports where suicidal ideation was the only adverse event on the report, 779 were marked as "serious." Between 1988 and March 2008, of 2,666 reports of suicide attempt, about 153 were marked as "non-serious." By excluding the seemingly-innocuous reports of ideation and preparatory acts, Dr. Weiss Smith excluded all these serious clinical reports.

It is for this reason that analyzing and having the ability to analyze the clinical significance of Adverse Event Reports is necessary to determine whether they disclose evidence of a safety

---

[1] The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved. 21 C.F.R. 201.57(e) (4/1/06).

4

signal.  By relying on vague and changing definitions such as "serious," excluding "preparatory," "ideation" and the like, and not actually analyzing the underlying clinical record which a reporter has submitted with an AER, statisticians miss what clinicians do not:  virtually all completed suicides and attempted suicides were preceded by ideations and preparatory acts.

It is noteworthy that while asserting that Dr. Weiss Smith's methods are widely accepted, Defendants have failed to describe any of them.  The most that Defendants have said about her methodology is that she "considered the evidence commonly considered by epidemiologists," ECF Doc. # 1657 at 10, and "analyzed Neurontin post-marketing data to respond to Dr. Blume." *Id*. at 12.  What, exactly, did she do and why is it supposedly a reliable method for doing it?

The most complete explanation of her work is that Dr. Weiss Smith focused her analysis on only two terms, "completed suicide" and "suicide attempt," to maximize her chances of only studying those events, thereby excluding numerous adverse events consistent with suicidality (e.g., depression).  In doing so she automatically condemned her study to miss years of clinically significant events because the terms "completed suicide" and "suicidal ideation" were not in the FDA's COSTART Dictionary and have appeared in the MedDRA dictionary used by the FDA only since November 1997, some six years after Defendants began to methodically and criminally market Neurontin off-label to the vulnerable population.  How reliable is a method of study that excludes most of the subjects?

### D.     Defendants Would Lead This Court to Believe That Mistakes Do Not Demonstrate Flawed Methodology.

Defendants try to convince the Court that mistakes are just fodder for cross examination. They imply that Plaintiffs have only found a few mistakes but omit that when Plaintiffs' motion

---

Fromson Decl., Ex. C.  As recently as February 19, 2009, the FDA issued an advisory for the drug Raptiva based on only three reports of an adverse event, progressive multifocal leukoencephalopathy.  Fromson Decl., Ex. D.

was submitted, Dr. Weiss Smith had not produced the underlying data in compliance with Defendants' Rule 26 requirements. But even with the limited information available, Plaintiffs noted several meaningful errors. Dr. Weiss Smith's mistakes consistently demonstrate a fundamental misunderstanding of the methodologies, a willingness to mislead through selective citations, and a lack of attention to detail. The burden shifted to Defendants to prove why Dr. Weiss Smith's opinions are reliable despite her miscalculations and mistakes. At this point the only support for her work is her and Defendants' *ipse dixit*. Therefore, mistakes do count and for more than simple weight of the evidence.

### E.     Excluding an Unqualified Dr. Weiss Smith Is Not a Basis to Exclude a Qualified Dr. Blume.

In another attempt at misdirection, Defendants claim that if Dr. Weiss Smith is excluded, then so should be Dr. Blume. Defendants ask the Court to ignore that for almost 30 years and to this day, Dr. Blume's career focused on evaluating complex pharmaceutical information for manufacturers and making FDA-related decisions and recommendations based on her assessments. This includes the interpretation of clinical information from clinical trials as well and post-marketing safety information. Dr. Blume's opinion that a clinical signal for suicidality existed before the drug was placed on the market is completely consistent with her professional non-litigation experience and activities. That Dr. Weiss Smith lacks the requisite experience to confirm or refute Dr. Blume's opinions concerning clinical signals is no criticism of Dr. Blume.

Plaintiffs do not criticize Dr. Weiss Smith because she relied upon information prepared by Defendants, but because she conducted no independent research using Defendants' own files on the hypothesis of Neurontin and suicidality. Dr. Blume's support work was done at her direction and included the exact research that Dr. Weiss Smith never conducted. Dr. Blume read virtually

every research report on human studies as well as summaries prepared by Defendants. Dr. Weiss Smith only relied upon summaries. This is tantamount to Dr. Blume having read the proverbial book while Dr. Weiss Smith merely read the cover. This Court must not allow Dr. Weiss Smith to judge the book by its cover.

## Conclusion

Plaintiffs submit that the testimony of Dr. Weiss Smith should be excluded because she lacks adequate expertise in areas in which she offers opinions and utilizes flawed methodology; and Defendants have failed to demonstrate that her methodology is reliable. Furthermore, Plaintiffs request an evidentiary hearing to examine Dr. Weiss Smith before this Court.

Dated: March 5, 2009                                   Respectfully submitted,

*Members of Products Liability
Plaintiffs' Steering Committee*

By:     **/s/ Andrew G. Finkelstein**
        Andrew G. Finkelstein, Esquire
        Finkelstein & Partners, LLP
        1279 Route 300, P.O. Box 1111
        Newburgh, NY  12551

By:     **/s/ Jack W. London**
        Jack W. London, Esquire
        Law Offices of Jack W. London
          & Associates
        3701 Bee Cave Road, Suite 200
        Austin-Westlake, TX  78746

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 5, 2009.

        **/s/ Andrew G. Finkelstein**
        Andrew G. Finkelstein, Esquire