EXHIBIT B

Weiss-Smith, Sheila (Defense Expert-Bulger) 12/22/2008 9:17:00 AM

### Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   In re: NEURONTIN MARKETING,
 5   SALES PRACTICES AND PRODUCTS
 6   LIABILITY LITIGATION
 7   _____/
 8   THIS DOCUMENT RELATES TO:   MDL Docket No. 16
 9   Bulger v. Pfizer, et al.   Master File No. 04-10981
10   07-11426-PBS
11
12   Smith v. Pfizer, et al.
13   05-CV-11515-PBS
14   Crone v. California State Court
15   _____/
16
17        The videotaped deposition of SHEILA WEISS
18   SMITH, PH.D. was held on Monday, December 22, 200
19   commencing at 9:17 A.M., at the Law Offices of Goodel
20   DeVries, Leech & Dann, LLP, 20th Floor Commerce Pl
21   One South Street, Baltimore, Maryland 21202,
22   before Ronda J. Thomas, a Notary Public.
23
24   Job No.: 183061
25   REPORTED BY: Ronda J. Thomas, RPR, CLR
```

### Page 2

```
 1   APPEARANCES:
 2
 3      ON BEHALF OF THE PLAINTIFFS, PRODUCTS LI
 4      STEERING COMMITTE AND CRONE:
 5        KEITH ALTMAN, ESQUIRE
 6        Finkelstein & Partners
 7        436 Robinson Avenue
 8        Newburgh, New York 12550
 9        Telephone: 845.562.0203
10        Facsimile: 845.562.3492
11        Email: Kaltman@lawampmmt.com
12
13      ON BEHALF OF PFIZER AND MDL:
14        RICHARD M. BARNES, ESQUIRE
15        MICHAEL J. WASICKO, ESQUIRE
16        Goodell, DeVries, Leech & Dann, LLP
17        One South Street, 20th Floor
18        Baltimore, Maryland 21202
19        Telephone: 410.783.4000
20        Facsimile: 410.783.4040
21        Email: Rmb@gdldlaw.com, mjw@gdldlaw.com
22
23
24
25   (APPEARANCES continued on next page.)
```

### Page 3

```
 1   (APPEARANCES continued.)
 2
 3      ON BEHALF OF RAYMOND JENNINGS, M.D.:
 4        ELANA GOLD, ESQUIRE (via teleconference)
 5        Law Offices of Steven D. Hillyard, APC
 6        345 California Street, Suite 1770
 7        San Francisco, California 94104
 8        Telephone: 415.334.6880
 9        Facsimile: 415.334.6967
10        Email: Egold@hdmlaw.com
11
12   ALSO PRESENT: Robert Kowalchik, Videographer
```

### Page 4

```
              INDEX
        Deposition of SHEILA WEISS SMITH, Ph.D.
              December 22, 2008

 EXAMINATION BY:                           PAGE
 Mr. Altman                                  6
 Mr. Barnes                                329
 Mr. Altman                                331

 EXHIBIT NUMBER:                         MARKED
 18   Supplemental Report                    5
 19   Materials considered                   5
 20   Current CV                              5
 21   Materials relied on by Dr. Weiss Smith  5
 22   Gabapentin Related Clinical Study Cases 155
 23   Statement by Janet Woodcock, M.D.      195
 24   3 page document Pfizer_MHauben_0000123-125
 25   Cumulative Percentage Reports of
      Suicidal and Self-Injurious Behavior   228
 26   FDA letter                             265
 27   Chart - Percentage of Serious Reports  280
 28   Invoices                               328
 29-32 CD's (retained)                       332
```

**153**

1  some data mining and for the data mining you don't see
2  a signal, does that mean that the person, the clinical
3  reviewer, was wrong when they thought there was a
4  signal there?
5      MR. BARNES: Objection. If you know.
6   A   Data mining is a signal of disproportional
7  reporting. There's a lot of reasons why things may
8  signal that are true may signal and things that are
9  false may signal and vice versa. I don't understand --
10  Q   So I think what -- I let her finish. Did
11  you finish your answer?
12  A   I don't understand how you're putting these
13  two things together, data mining and --
14  Q   I received a -- I'm in pharmacovigilance
15  for a pharmaceutical company and I've received a numb
16  of case reports that I believe constitutes a signal,
17  okay, I decide that I need to do some followup along
18  those lines.
19      One of the thing I choose to do is some
20  data mining. When I do the data mining I don't find
21  any signal in the data mining. Does that mean there's
22  no signal that -- from my clinical judgment?
23      MR. BARNES: You're a doctor? The person
24  doing the data mining, the person that's doing the
25  pharmacovigilance --

**154**

1       MR. ALTMAN: I'm in pharmacovigilance, it
2  doesn't matter.
3   Q   The person working in the pharmaceutical
4  company in the pharmacovigilance department has
5  concluded based on case reports that there is a signal.
6  If you then go do some data mining and you don't see
7  any signal in the data mining, does that mean the
8  person was wrong?
9   A   I don't know.
10  Q   Okay. So the absence?
11  A   From what you've given me, I don't know. I
12  don't know -- it's going to depend on the circumstance
13  whether what they think is a signal ends up being a
14  true association or not or causal or not. That's a
15  long way off from what you're asking.
16  Q   But the absence of a signal in data mining
17  does not mean everything is a okay; is that correct?
18  A   That can be the case. Not everything will
19  signal in data mining, it's only proportional
20  reporting.
21  Q   That's all I'm trying to get at.
22      Dr. Weiss Smith, I'm going to hand you a
23  document, I'm not going to mark it as an exhibit -- it
24  was marked. We can mark it if you want. I only have
25  one copy?

**155**

1       MR. BARNES: Let's try to mark it.
2       MR. ALTMAN: I only have one copy.
3       MR. BARNES: I can do that quickly.
4       MR. ALTMAN: Okay.
5       MR. BARNES: Two seconds I'll get this
6  copied.
7       MR. ALTMAN: I don't need a copy. If you
8  want to just mark that one.
9       MR. BARNES: Let's mark this one as the
10  next exhibit in the deposition.
11      (Whereupon, a document was marked as
12  Deposition Exhibit Number 22.)
13      (Witness reading.)
14  Q   I just want you to take a look at that
15  quickly.
16      MR. BARNES: The date on it, let me say
17  what it is for the record. It's a printout, Serious
18  Adverse Events, Gabapentin Related Clinical Studies
19  cases 1/1/1980 to 31/12/2003.
20  Q   Which is the European date?
21      MR. BARNES: Yes.
22  Q   It appears to be run on 5th of February,
23  2004, correct? If you look all the way on the
24  right-hand -- all the way on the right-hand side?
25      MR. BARNES: Yeah.

**156**

1   Q   It's also marked as Pfizer, underscore,
2  THO, underscore, 00007 -- I'm sorry, 793.
3       MR. BARNES: Thank you. That's good
4  enough.
5   Q   I'd like you to go to page four of the
6  document. First of all, does this appear to be a
7  listing of serious adverse event reports from the
8  Gabapentin related clinical studies cases?
9   A   That's the title.
10  Q   Okay. On page four, the second item down,
11  do you see that one? It's a got number of
12  001-0945-9600035. Did I read that correctly?
13  A   Which number down?
14  Q   The second report. I'm sorry it's --
15      MR. BARNES: Is it the one --
16  Q   I'm sorry, it's the third page of the
17  document.
18  A   The second report down? Say the number
19  again.
20  Q   Under the event term, it says psychosis,
21  are we talking about same page now?
22      MR. BARNES: 0010945960035. Is that the
23  one?
24  Q   Yes, do you see that one there? It should
25  be the second one on the page. Did I read that report

**245**

1   is suicidal ideation marked serious, with one of the
2   serious criteria, then are you saying those people are
3   wrong?
4        A    Again, if it met the FDA definition of
5   serious, based on the legal definition of serious,
6   that's amazing. I mean, I'm just surprised.
7             It would be, you know, require death,
8   hospitalization, initial prolonged, congenital anomaly,
9   life threatening. So I mean, these are the issues.
10  Maybe there is a case, but I'm not going to hypothesize
11  that.
12       Q    Do you know if there are a lot of cases?
13       A    A lot of cases in FDA --
14       Q    In the FDA database where suicidal ideation
15  is the only term marked as serious?
16       A    I'm not aware of the number of cases or if
17  there are any. That's hypothetical.
18       Q    And you didn't look at Gabapentin to see if
19  there were any cases of suicide ideation as the only
20  event marked serious, correct?
21       A    I looked at suicide ideation with
22  Gabapentin. I didn't look for ones that just had that
23  one term in them. I did find quite a few that had many
24  terms, like 20 to 40 terms of which it was one of many
25  terms.

**246**

1        Q    Okay. But you cannot tell, just by looking
2   at the terms selected, as to which one of the events
3   caused the event -- which one of the terms caused the
4   overall event to be considered serious, correct?
5             MR. BARNES: Objection. If you know, you
6   can answer.
7        A    In my report I go through a couple of cases
8   where I found that there were some events which really
9   by definition would be serious because they're life
10  threatening like QT prolongation. Do I know the intent
11  of the reporter? No. But it makes a lot of sense that
12  that would be the reason of someone having a heart
13  attack, a QT prolongation would meet the serious all
14  the time.
15            But suicide ideation would not by itself
16  meet the definition of a serious event.
17       Q    If somebody put a gun up to their head and
18  said I think I want to blow my brains out, is that a
19  suicide attempt?
20            MR. BARNES: Objection. If you know.
21       A    I'm not a clinical doctor. I believe it
22  probably could be. Depending on the circumstances.
23       Q    It could also be just suicide ideation,
24  correct?
25       A    I think it goes beyond ideation, even for a

**247**

1   lay person.
2        Q    Well, is it an attempt?
3        A    Again, I don't know. There's a fine
4   degradation between these and I don't want to sit there
5   and make a clinical judgment.
6        Q    So somebody, a clinician, could consider
7   that suicide ideation, correct?
8        A    I don't want to make a clinical judgment.
9        Q    I'm not asking you. I'm saying a
10  clinician, who is there?
11       A    That's a clinical judgment.
12       Q    And they could call it a suicidal ideation,
13  correct?
14            MR. BARNES: Objection. You may answer.
15       A    That is a clinical judgment.
16       Q    Okay. But you're making a judgment here
17  that suicidal ideation is never serious and there
18  you're willing to make that statement that it's never
19  serious, but you're not willing to make a statement
20  that it could be serious. I don't understand why it
21  isn't a two way street?
22            MR. BARNES: Objection. Two different
23  questions. You may answer again.
24       A    In one case I'm talking about a report has
25  a term. The term is not how seriousness or

**248**

1   non-seriousness is defined. It is defined by CFR that
2   it is defined by the outcome; what happened to the
3   patient. Not by what the event was. So there are some
4   events that are, by their nature, serious.
5   Particularly those events like suicide that result in
6   death.
7        Q    Isn't there also a category for where they
8   reported things, while it doesn't meet one of those
9   explicit definitions, they think it could lead to one
10  of those outcomes?
11            MR. BARNES: Objection. Calls for
12  speculation.
13       A    What are you --
14       Q    Do you know if there's a box on the
15  MedWatch form for other?
16       A    There is a box for other.
17       Q    And that that box is to be used when in the
18  opinion of the reporter the event, while not meeting
19  one of the other conditions, death, et cetera, could
20  lead to one of those conditions, correct?
21       A    Box other does not have that clear a
22  definition of how it's used. I find that it's used
23  pretty broadly for just about anything.
24       Q    Have you read the instructions to the
25  MedWatch form?

**249**

1  A   Yes.
2  Q   MedWatch form specifically says that when
3  the reviewer thinks that it could lead to one of those
4  things, they can mark the other box, correct?
5  A   Yes, other serious events.
6  Q   So to make the statement that suicidal
7  ideation is nonserious is not necessarily a true
8  statement, is it?
9       MR. BARNES:  Objection.  Asked and
10 answered.  You can answer it again.
11 A   By itself the term suicidal ideation does
12 not mean that the patient had an event that met the FDA
13 definition of serious.  Conversely, if someone commits
14 suicide, that does, by itself, just that term,
15 automatically meet the definition of serious.  That's
16 what I'm telling you.
17 Q   Okay.  That's fine.
18     Would you look at how many reports of
19 intentional self-injury were in the database?
20 A   Did I look at --
21 Q   For all drugs?
22 A   I did not analyze those because I don't
23 believe that those are going to tell me anything when I
24 do a data mining exercise.
25 Q   So it's your suggestion that intentional

**250**

1  self-injury has nothing whatsoever to do with
2  suicidality?
3       MR. BARNES:  Objection.  You may answer.
4  A   I'm not making a clinical definition.  I'm
5  not making clinical judgment.  I'm data mining on two
6  event terms that are used in the epidemiologic
7  literature that are by definition serious.
8  Q   Who picked those terms to use?
9  A   I based it on the work done by Bentson
10 McFarland who did an epidemiological study suicide an
11 suicide attempt.
12 Q   Did anybody tell you not to use suicidal
13 ideation?
14 A   No one told me what to do.  I set my own
15 protocol.
16 Q   So if somebody with clinical experience
17 felt that suicidal ideation should be looked at, as
18 someone who is not a clinician and not a suicide
19 expert, would you have the experience to dispute that?
20     MR. BARNES:  For data mining purposes?
21 Q   For data mining purposes.
22 A   For data mining purposes I would talk to
23 them and say that I want to make sure that the events
24 that I look at are considered by themselves serious and
25 if you're going to start putting together constellation

**251**

1  of terms, like this HLT, then there's just -- you've
2  got to include all the terms.
3       So there's other -- there's other preferred
4  terms under other system organ classes, under other
5  HLTs that are for example in the data capture rate that
6  are suicide related.  But they are not all -- depends,
7  they're not all by definition serious.  And again you
8  need to make sure that a priori they're established,
9  which a protocol is.  It has to make sense.  This
10 doesn't make sense to me.
11 Q   But if a clinician thought so, they could
12 have good reason, correct?
13     MR. BARNES:  Objection.
14 A   In data mining and spontaneous report, I
15 would have to say that might not -- I wouldn't
16 necessarily agree.  No.
17 Q   Okay.  You may object -- aside from
18 disagreeing with whether it's HLT or not, whether you
19 should use the HLT or not, does the data in between the
20 black bars of Exhibit 25 suggest that there is a ratio
21 greater than two, a chi-squared greater than 4 and you
22 don't know the number of reports but assume for the
23 sake of argument that anything that is 1 percent of the
24 entire background of all events has to be greater than
25 4 reports?

**252**

1  A   Why does it have to be greater than four
2  reports?
3  Q   How many reports are there -- how many
4  reports are there in the AERS database?
5       MR. BARNES:  These are cumulative, correct?
6       MR. ALTMAN:  Yeah.
7  Q   At the point in time we're talking about,
8  how many reports are there in the AERS database?
9  A   Currently over 3 million.
10 Q   What's 1 percent of 3 million?  In '99,
11 just between '97 and '99 would you say there's at least
12 a million reports?
13     MR. BARNES:  If you know.
14 A   Probably about that because it's really
15 grown over time.
16 Q   What's 1 percent of a million, about
17 10,000?
18 A   Okay.
19 Q   That's a lot more than four, right?
20 A   That's for the -- for all the drugs, right.
21 Q   For all the drugs.  So you don't have any
22 real worry that 1 percent of the background is more
23 than four reports here, right?
24 A   I mean, it would be an assumption.  But a
25 reasonable assumption potentially.