# EXHIBIT 11

# (CORRECTED)

Page 1

```
1    IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
2
3    IN RE: NEURONTIN MARKETING, SALES )
     PRACTICES AND PRODUCTS LIABILITY   )
4    LITIGATION                         )
                                        )
5    _____    )
                                        )
6                                       )
                        ) CASE NO.
7                       ) 04-10981
     THIS DOCUMENT RELATES TO:         )
8                       )
     RUTH SMITH, Individually and as   )
9    Widow for the use and benefit of  )
     herself and the next of kin of    )
10   Richard Smith, deceased.          )
                                       )
11   05-CV-11515                       )
                                       )
12
13
14       VIDEOTAPED DEPOSITION OF
15       PAUL R. McCOMBS, III, M.D.
16       Taken on Behalf of the Plaintiffs
17       June 8, 2007
```

Page 2

```
1    APPEARANCES:
2    For the Plaintiff:
3       MARK LANIER
        DARA HEGAR
4       PATRICK O'HARA
        Lanier Law Firm
5       6810 F.M. 1960 West
        Houston, Texas 77069
6       713.659.5200
        713.659.6416
7       wml@lanierlawfirm.com
8       ANDREW G. FINKELSTEIN
        Finkelstein & Partners
9       436 Robinson Avenue
        Newburgh, New York 12550
10      800.634.1212
        afinkelstein@lawampm.com
11
12   For the Defendant:
13      KENNETH J. FERGUSON
        Clark, Thomas & Winters
14      P.O. Box 1148
        Austin, Texas 78767
15      512.472.8800
        512.474.1129
16      kjf@ctw.com
17
        Also Present: Jason Powers, Videographer
```

Page 3

```
                    I N D E X
    WITNESS: PAUL RAY McCOMBS
              INDEX OF EXAMINATIONS
                    Page/Line
    By Mr. Lanier .......................  6   5
    By Mr. Ferguson ..................... 15  11
    By Mr. Lanier ....................... 28   9
    By Mr. Ferguson ..................... 30   4
    By Mr. Lanier ....................... 35   7
              INDEX OF EXHIBITS
                    Page/Line
    No. 1 ............................... 29  24
    No. 2 ............................... 29  25
    No. 3 ............................... 34  12
```

Page 4

         The videotaped deposition of PAUL R. McCOMBS, III, M.D., taken on behalf of the Plaintiffs, on the 8th day of June, 2007, in the offices of Howell Allen Clinic, 2011 Murphy Avenue, Suite 401, Nashville, Tennessee, for all purposes under the Federal Rules of Civil Procedure.

         The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

         It is agreed that Elisabeth A. Miller, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are waived.

                    * * *

**9**

1  treatment or help?
2  A.   Yes.
3  Q.   Would you tell the jury a little bit of
4  what you tried to do to help him?
5  A.   After being seen on 3 March '03, I
6  recommended a course of conservative treatment,
7  including oral medication, anti-inflammatory by
8  the name of Vioxx, as well as epidural steroid
9  injection, which is injecting steroids in the
10 lower portion of his back. He returned to see me
11 and did not have any improvement after
12 conservative treatment.
13      We subsequently ended up doing surgery on
14 this gentleman, removing the pressure off the
15 nerves in the back of his spine from the L3
16 vertebra down to the level of the tailbone or
17 sacrum. He tolerated the procedure without
18 difficulty and did not have any complications.
19      He was seen in follow up. He did
20 reasonably well for a period of time and developed
21 some recurrent pain in the time after that I saw
22 him.
23      He -- I saw him last after his surgery
24 in -- let's see, in April 1st of 2003. I last saw
25 him in follow up with that surgery on 13

**10**

1  October '03, and at that time, was doing well.
2  Released him from my care.
3       And the next time I saw him was in March
4  of '04, and at that time, he was having recurrent
5  pain in his back and into his legs.
6  Q.   All right. So if I understand this right,
7  you did a surgery on his low back that seemed
8  to -- to help him?
9  A.   Yes.
10 Q.   You released him in October of '03 after
11 following up from that surgery?
12 A.   Yes.
13 Q.   And he seemed to be doing fine until he
14 came back to you in March of '04?
15 A.   Yes.
16 Q.   And it looked like he was having more
17 problems?
18 A.   Yes.
19 Q.   When he came back to you in March of '04,
20 did you -- what -- what did you do?
21 A.   Well, I conducted an examination on him,
22 and I reviewed his studies that were done. He had
23 some narrowing of the spinal canal above the level
24 of his previous surgery site. We -- he had seen,
25 by that time, Dr. Howell and Dr. Mackey. Both

**11**

1  are -- Dr. Mackey is an orthopedic spine surgeon.
2  Dr. Howell is a neurosurgeon in this group.
3       The -- it was recommended that he be
4  treated conservatively. That was carried out.
5       The last time I saw him physically was on
6  31 March 2004.
7  Q.   Okay. Doctor, I've had a chance to look
8  through your records; I think all the parties
9  have. We show a period of time where y'all were
10 giving the drug Neurontin to Mr. Smith. I'd like
11 to talk to you for a bit -- minute about
12 Neurontin.
13      First of all, that is the drug you've
14 prescribed, I'm assuming?
15 A.   Yes. It is a drug that had been started
16 by another physician that we continued.
17 Q.   Okay. And is it important that drug
18 companies tell you everything they know about
19 their drugs and possible side effects that they
20 suspect might be caused by their drugs?
21 A.   I don't know what the standard of care in
22 the community is in that regard. I do know that I
23 like my detail reps to come talk to me about what
24 the indications for uses are and potential side
25 effects. In terms of telling me all that they

**12**

1  know, I don't know what -- what's appropriate
2  there.
3  Q.   Okay. Let me ask it to you this way, did
4  you know that Neurontin was a drug that the FDA at
5  least had considered might lead to suicides?
6  A.   No.
7       MR. FERGUSON:  Object to form.
8  BY MR. LANIER:
9  Q.   Did you know that Neurontin was a drug
10 where there was concern within the -- the -- the
11 drug company and the FDA about whether it
12 increased depression?
13      MR. FERGUSON:  Object to form.
14      THE WITNESS:  No.
15 BY MR. LANIER:
16 Q.   Is that the kind of information you'd like
17 to know?
18 A.   If it is considered a significant risk,
19 then, yes, I do.
20 Q.   Okay. If you -- when -- when Richard
21 Smith presented to you, at any time that he came
22 in, did he -- did he ever present, either himself
23 or through phone calls with his daughters, as
24 someone who was depressed and -- and down?
25 A.   Yes, sir.

**13**

1  Q.   Is that something that's rare with people
2  who have a lot of back pain that need your help,
3  or is that --
4  A.   Chronic -- chronic pain syndromes are
5  frequently associated with depression and treated
6  with medication for depression.
7  Q.   Okay.  Is that the kind of fellow you
8  would ever want to give a drug to that -- if you
9  had a choice in the matter -- that -- if that drug
10  was going to be one that increased depression or
11  caused a loss of impulse control or suicide or
12  things like that?
13  A.   It's something that would have to be
14  weighed.  If the patient's depression was caused
15  by significant pain and the Neurontin helped the
16  pain, that would maybe help the depression, but it
17  could do -- it could go either way.
18  Q.   All right.  Is that why it's important for
19  you as a doctor to know if suicide or depression
20  is a -- considered a prominent side effect of the
21  drug?
22  A.   Yes.
23  Q.   If you had been told by the detail reps
24  who were -- were -- in talking to you about the
25  drug Neurontin, that this drug was one that is

**14**

1  associated with a loss of impulse control,
2  associated with a loss of cognitive awareness of
3  things, or -- or increase in depression, would it
4  have changed your prescription habits as far as
5  Mr. Smith?
6       MR. FERGUSON:  Object to form.
7       THE WITNESS:  Perhaps.
8  BY MR. LANIER:
9  Q.   And by perhaps, would you have considered
10  trying other drugs first?
11  A.   I would go over his medication list and
12  try to pick the best possible choice to alleviate
13  his pain.  If I had known it was associated with
14  depression, knowing him, I would be very careful
15  with it --
16  Q.   Yeah.  If --
17  A.   -- if I decided to use it.
18  Q.   So if you decided to use it, would you at
19  least have given him some significant warnings and
20  his family and made sure everybody was tuned in to
21  the fact that if his depression seemed to be
22  getting worse, that he needs to contact someone?
23  A.   I would.
24  Q.   Okay.
25       MR. LANIER:  I'll pass the witness.

**15**

1       How much time did I use, please?
2       THE WITNESS:  You were right at --
3       THE VIDEOGRAPHER:  10 minutes -- 10
4  minutes 30.
5       MR. LANIER:  Oh, baby, I've got more
6  time.  You better not leave me an opening.
7       THE WITNESS:  It's about me.
8       MR. LANIER:  Thank you, Doctor.
9       THE WITNESS:  You're welcome.
10       E X A M I N A T I O N
11  BY MR. FERGUSON:
12  Q.   Dr. McCombs, let me ask you a little bit
13  about your -- your treatment of -- of Mr. Smith.
14  First of all, Mr. Lanier asked you about whether
15  there had been some contacts with the family
16  regarding any -- any concerns that might give rise
17  to a concern that perhaps Mr. Smith was depressed
18  or was down, correct?
19  A.   Yes, sir.
20  Q.   Okay.  And, in particular, let me show you
21  a record -- I'm sure you have it in front of you,
22  but just to save time, I'll hand it to you --
23  dated 5-2-03.
24  A.   I have it right in front of me.
25  Q.   Okay.  Yes, sir.

**16**

1       Let me ask you, first of all, you have
2  your chart in front of you?
3  A.   Yes, sir.
4  Q.   Can we make sure that one way or the
5  other, a copy of the chart is attached to the
6  deposition?
7       MR. LANIER:  Whatever the doctor
8  says.  We don't have any problem.  No HIPAA
9  concerns or anything like that.  We'll waive.
10       THE WITNESS:  Okay.
11       MR. FERGUSON:  Okay.  And can we
12  stipulate that these -- that his chart is -- are
13  business records of his --
14       MR. LANIER:  Absolutely.
15       MR. FERGUSON:  --
16  neurosurgical procedures?
17       MR. LANIER:  It saves us five minutes
18  of questions of it.
19       MR. FERGUSON:  There you go.  Thank
20  you.
21  BY MR. FERGUSON:
22  Q.   Okay.  On this page, Doctor, the -- the
23  notation on 5-2-03 is in handwriting.  Whose
24  handwriting is that in?
25  A.   That would be Becky Hughes.

**25**

1  A.   Yes.
2  Q.   And you also say, he will be treated
3  conservatively?
4  A.   Yes, sir.
5  Q.   And is that with medications and -- and
6  physical therapy?
7  A.   Yes.
8  Q.   And -- and was that how he had been
9  treated, say, over the last year or so?
10 A.   He had been treated conservatively.
11 Q.   And -- and, obviously, from his viewpoint
12 anyway, he wasn't happy with the results from that
13 conservative treatment?
14 A.   That's correct.
15 Q.   There's a -- there's a notation that I
16 have in handwriting that's below the 31 March
17 that's 5-5-04?
18 A.   Yes, sir.
19 Q.   And -- and, again, is that from one of
20 your staff?
21 A.   Yes, sir.
22 Q.   Okay.  And there, it's noted that -- that
23 he -- he apparently called, said he was having a
24 sticking feeling in buttocks and legs, correct?
25 A.   Yes, sir.

**26**

1  Q.   And he was taking Advil, Neurontin, Lortab
2  with no relief?
3  A.   Yes, sir.
4  Q.   And what's Lortab again?
5  A.   Hydrocodone.  It is a Schedule 3 narcotic.
6  Q.   Again, a pretty heavy-duty pain --
7  A.   It is.
8  Q.   Said he was having PT at present, but that
9  hasn't helped so far, correct?
10 A.   Yes.
11 Q.   So you've told him in March, really can't
12 do anything for you surgically, right?
13 A.   That's true.
14 Q.   We need to treat you with medications and
15 physical therapy, right?
16 A.   Yes, sir.
17 Q.   He reports on -- on May 5 to your staff
18 that he's not getting relief from that
19 conservative therapy?
20 A.   Yes, sir.
21 Q.   Okay.
22 A.   This is Gloria Frawley; that's whose
23 handwriting this is, who's a secretary of mine.
24      MR. FERGUSON:  I've gone ten minutes?
25      THE VIDEOGRAPHER:  You have gone ten.

**27**

1       MR. FERGUSON:  Okay.
2  BY MR. FERGUSON:
3  Q.   Doctor, Mr. Lanier asked you some
4  questions about whether you would like to have
5  known if, in fact, Neurontin was a -- was
6  associated with depression or suicide.  Do you
7  recall those questions?
8  A.   Yes, sir.
9  Q.   Okay.  If, in fact, there is no scientific
10 evidence of any association between Neurontin and
11 suicide, would you want the FDA and the company to
12 tell you that there was?
13 A.   Yeah, if there's no evidence of it, that
14 would be just hearsay.
15 Q.   Okay.  What you want to know -- and I
16 think you used the term -- you want to know
17 prominent side effects, correct?
18 A.   Yes.
19 Q.   Because it's possible that people can have
20 any one of a number of reactions to -- while
21 they're on a particular drug, correct?
22 A.   Yes.
23 Q.   And you don't want to know necessarily
24 about every reaction anybody has ever had while
25 they're taking a drug; you want to know whether

**28**

1  there's evidence that -- that -- for -- in this
2  case, that suicide and depression are
3  scientifically associated with Neurontin?
4  A.   That's correct.
5  Q.   Okay.
6       MR. FERGUSON:  I'll pass the witness
7  for now.
8            E X A M I N A T I O N
9  BY MR. LANIER:
10 Q.   So if the FDA has told Pfizer that less
11 common but more serious events may limit the
12 drug's widespread usefulness, and the third one
13 that they listed was depression, while it may not
14 be an infrequent occurrence in the epileptic
15 population, may become worse and require
16 intervention or lead to suicide, as this drug has
17 resulted in some suicidal attempts, is that
18 significant enough for you to want to know about
19 it?
20      MR. FERGUSON:  Object to form.
21      THE WITNESS:  Can I see this, please?
22      MR. LANIER:  And for the jury and
23 court's sake, I'm looking at the FDA documents for
24 the Neurontin new drug approval memorandum that --
25 dated from July of 1994.

**29**

1 THE WITNESS: This document is
2 written by who to who?
3 BY MR. LANIER:
4 Q. It's written by the FDA to the drug
5 manufacturer.
6 MR. FERGUSON: I believe the date
7 was '92, though, Mr. Lanier.
8 MR. LANIER: '92 instead of '94?
9 It's even worse than I thought. Okay.
10 MR. FERGUSON: Object to the sidebar
11 comment. Go ahead.
12 BY MR. LANIER:
13 Q. It's signed off by Russell Katz, M.D. with
14 the division of neuropharmacological drug
15 products. It's a supervisory overview of safety
16 and efficacy data for Neurontin as a drug
17 submitted by Parke-Davis, now Pfizer.
18 A. I think this is a -- would be of
19 significance, yes, sir.
20 MR. LANIER: Thank you very much.
21 And for the record, Your Honor, we have Page 117
22 out of what we're marking as Exhibit 2 to this
23 deposition.
24 (Marked Exhibit No. 1.)
25 (Marked Exhibit No. 2.)

**30**

1 MR. LANIER: And I'll pass the
2 witness.
3 E X A M I N A T I O N
4 BY MR. FERGUSON:
5 Q. Let me talk to you about that specific
6 document you just saw. This is from 1992,
7 correct?
8 A. I don't know.
9 Q. Take a look --
10 MR. LANIER: I'll stipulate it is.
11 BY MR. FERGUSON:
12 Q. -- at the entire document.
13 MR. FERGUSON: Thank you, sir.
14 BY MR. FERGUSON:
15 Q. And this document was actually written by
16 a clinical reviewer before Neurontin was approved?
17 A. Okay.
18 Q. Do you understand that? If I tell you
19 that's correct, you don't have any reason to --
20 A. Okay.
21 Q. -- dispute that?
22 A. Okay.
23 Q. Okay. Are you aware that that same
24 clinical reviewer did later reviews; ten years
25 later did a review of Neurontin and didn't even

**31**

1 mention the possibility of suicide --
2 A. I'm unaware of that too.
3 Q. -- or depression?
4 A. I'm unaware of that.
5 Q. Again, that would have some significance
6 to you as well in the light of what Mr. Lanier
7 asked you?
8 MR. LANIER: He already said it once.
9 Why is he going to say it again? You didn't
10 rewrite this. You're misleading the doctor. He
11 gave us supplemental information about some other
12 problems, but he didn't ever --
13 MR. FERGUSON: Mark --
14 MR. LANIER: -- detract from this.
15 MR. FERGUSON: -- are we going to
16 argue this?
17 MR. LANIER: No, but don't mislead
18 him.
19 MR. FERGUSON: You are taking my
20 time.
21 MR. LANIER: Okay. I apologize.
22 Deduct a minute from me. Go ahead.
23 BY MR. FERGUSON:
24 Q. Doctor, assume with me that this is done
25 before the FDA approved Neurontin for any reason.

**32**

1 Okay?
2 A. Yes, sir.
3 Q. If that is true and Neurontin was, in
4 fact, approved by the FDA, do you know if it
5 contained a warning about suicide or depression?
6 A. I don't know. I'd have to pull up the --
7 the PDR and look and see if it has information
8 about that in there.
9 Q. Okay. Assume with me that it doesn't have
10 a warning or a precaution about depression.
11 Apparently, in light of this FDA document that
12 Mr. Lanier just showed you, the FDA later made the
13 determination that it wasn't appropriate to warn
14 about suicide or depression, correct?
15 MR. LANIER: No, objection calls for
16 speculation and stuff outside this witness'
17 expertise. You're not calling him as an FDA
18 expert.
19 THE WITNESS: I don't --
20 MR. FERGUSON: You asked him about
21 the FDA document.
22 MR. LANIER: No, I just asked him if
23 he's --
24 THE WITNESS: I'll answer the
25 question.