UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------x
In re:  NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION
------------------------------------------------x
THIS DOCUMENT RELATES TO:

*Bulger v. Pfizer Inc., et al., 1:07-cv-11426-PBS*


------------------------------------------------x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**DEFENDANTS PFIZER INC. AND WARNER-LAMBERT COMPANY LLC'S
REPLY TO PLAINTIFFS' RESPONSE TO LOCAL RULE 56.1 STATEMENT OF
MATERIAL FACTS AND RESPONSE TO PLAINTIFF'S FURTHER
<u>STATEMENT OF MATERIAL FACTS</u>**

Defendants Pfizer Inc. and Warner-Lambert Company LLC ("defendants") submit the following reply to Plaintiffs' Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, and response to Plaintiff's Further Statement of Material Facts.

**I.    REPLY TO PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL
       RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Set forth below is each material fact included in defendants' Local Rule 56.1 Statement of Undisputed Material Facts, along with plaintiff's response to each, followed by defendants' reply:

3361997v1

1.      Mrs. Bulger's primary care physician, Dr. Crognale, testified that his decision to prescribe Neurontin was based on his own experience with the drug and his medical training. Crognale Dep. 173:10-13 (Sayler Decl., Ex. 1.)[1]

Plaintiffs' Response to No. 1: Disputed. Plaintiff submits that paragraph 1 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Crognale testified that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug. Crognale Dep. 16:17-17:13 (Finkelstein Decl., Ex. 10). Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label. Crognale Dep. 37:3-18 (Finkelstein Decl., Ex. 10).  Dr. Crognale, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin) Crognale Dep. 195:12-196:6 (Finkelstein Decl., Ex. 10); (b) suicide attempts during clinical trials Crognale Dep. 191:11-17 (Finkelstein Decl., Ex. 10); (c) depression adverse events during clinical trials Crognale Dep. 197:4-198:2 (Finkelstein Decl., Ex. 10); and (d) that patients taking Neurontin may suffer mood and behavioral disturbances. Crognale Dep. 200:5-200:14 (Finkelstein Decl., Ex. 10).

**Defendants' Reply to Fact No. 1:**   Plaintiff's response ignores the sworn testimony of Dr. Crognale:

> Q.   Independent of the medical records, <u>do you have any recollection of why you prescribed Neurontin for Mrs. Bulger</u>?
> A.   No, I do not.
> Q.   <u>Was it based on your</u>, in an effort to refresh your recollection, your <u>experience with the drug and your medical training</u>?
> A.   <u>Yes.</u>

Crognale Dep. 173:6-13 (Sayler Decl., Ex. 1.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Dr. Crognale testified that he refers to the PDR before he prescribes a drug that he has <u>not prescribed before.</u> He never testified that he relies on the PDR in general in prescribing medications, nor that he even reviewed the PDR before prescribing Neurontin to Mrs. Bulger, let alone that he relied on the PDR for this purpose.  In fact, Dr. Crognale testified that he does not refer to the PDR annually for drugs he prescribes on a regular basis.  Crognale Dep. 16:17-17:17.

---

[1] "Sayler Decl." refers to exhibits attached to the Declaration of Scott W. Sayler, Esq. in Support of Motion for Summary Judgment, filed January 23, 2009 (Dkt. # 1640.)

- 2 -

(McGroder Decl., Ex. 1.)[2]  Further, what Dr. Crognale may or may not tell patients and what he "wanted to know" is immaterial to this fact, which deals with the bases for Dr. Crognale's decision to prescribe Neurontin.

2.     Dr. Crognale testified that he recalled receiving a visit from one of defendants' sales representatives sometime within the last five years regarding Neurontin in which the side effects of sedation and dosing were discussed.  Dr. Crognale could not recall to what indication this conversation related.  Crognale Dep. 166:24-171:9 (Sayler Decl., Ex. 1.)

<u>Plaintiffs' Response to No. 2:</u>  Disputed.  Plaintiff submits that paragraph 2 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Crognale testified that he recalled receiving information directly from a representative at either Warner-Lambert, Parke-Davis or Pfizer about Neurontin.  Crognale Dep. 166:24-167:4 (Finkelstein Decl., Ex. 10).  Dr. Crognale testified that his only recollection of information from a drug representative directly was a conversation in which the side effects of sedation and dosing were discussed.  Dr. Crognale could not recall to what indication this conversation related.  However, Dr. Crognale testified that he was sure that there were other discussions.  Crognale Dep. 169:18-169:20 (Finkelstein Decl., Ex. 10).  Dr. Crognale testified that the "the exchange would have been in context of the representative telling us about the medication, and in discussion of side effects making an emphasis that this was one side effect that improved counter-intuitively with dose."  Crognale Dep. 169:5-10  (Finkelstein Decl., Ex. 10).

**Defendants' Reply to Fact No. 2:**  Plaintiff's response ignores the sworn testimony of Dr. Crognale:

> Q.   <u>Did you receive – do you recall receiving any information directly from any representation of Warner-Lambert, Parke-Davis or Pfizer about Neurontin?</u>
> A.   Yes.
> Q.   Could you describe what the information was and how you got it?
> A.   <u>The only recollection I have of any information from a drug representative directly is in a conversation with a drug rep who mentioned that the side effect of sedation improves with increasing doses.</u>

---

[2] "McGroder Decl." refers to exhibits attached to the Declaration of Lori M. McGroder, Esq. in Support of Defendants' Reply in Support of Motion for Summary Judgment, filed March 12, 2009.

- 3 -

3361997v1

| | | |
|---|---|---|
| Q. | | So in other words, the more you take the less you're sedated? |
| A. | | Yes. |
| Q. | | The less you're sedated or the more you're sedated |
| A. | | The less you're sedated. |
| Q. | | I'm sorry? |
| A. | | The less you're sedated. |
| Q. | | When was that? |
| A. | | I couldn't pinpoint that specifically. |

\*\*\*

Q. <u>Do you remember for what indication – do you remember what indication was being discussed at the time?</u>
A. <u>No, I do not</u>.
Q. Again, I'm sorry—
A. That's okay.
Q -- a year, two years, several years ago?
A. <u>I can say it was within the last five years, but I can't be sure any more than that.</u>
Q. Okay. Is that the only contact you can recall with any representative of Parke-Davis, Warner-Lambert or Pfizer concerning Neurontin?
A. That's my only specific recollection.

Crognale Dep. 166:24-168:1, 170:2-16 (Sayler Decl., Ex. 1.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment. The additional facts plaintiff cites provide no evidence that defendants' sales representative misrepresented a material fact on which Dr. Crognale relied in prescribing Neurontin to Mrs. Bulger, and therefore, are immaterial to plaintiff's fraud claim. In fact, Dr. Crognale testified that neither his dosing decision with regard to Mrs. Bulger, nor his decision to prescribe the drug was based on this conversation with the sales representative. Crognale Dep. 171:6-13 (Sayler Decl., Ex. 1.)

3.  Dr. Crognale's decision to prescribe Neurontin to Mrs. Bulger "did not have anything to do with anything any representative of Pfizer, Warner- Lambert or Parke-Davis told [him]." Crognale Dep. 173:6-17 (Sayler Decl., Ex. 1.)

<u>Plaintiffs' Response to No. 3:</u> Disputed. Plaintiff submits that paragraph 3 of Defendants' Statement of Facts is incorrect or otherwise incomplete. As to his reliance on, or influence by a representative, Dr. Crognale's prescribing decisions take into consideration medical knowledge, and "decisions made medically are not simply about

pharmacokinetics, they're about patients, and so I don't think that I can be directed by somebody that only knows the pharmacology of the medication." Crognale Dep. 172:15-20 (Finkelstein Dec1., Ex. 10). Dr. Crognale did not state that he did not consider what a sales representative advised regarding pharmacokinetics in arriving at his determination to prescribe a medication. Crognale Dep. 171:10-20 (Finkelstein Dec1., Ex. 10). Dr. Crognale testified generally that he had received and accepted from pharmaceutical representatives offers to go to dinner, that he was compensated for attending dinner symposiums sponsored by a representative where there would be discussion of "problem-based" or "drug-based" data. Crognale Dep. 188:1-189:11 (Finkelstein Dec1., Ex. 10).

**Defendants' Reply to Fact No. 3:**   Plaintiff's response ignores the sworn testimony of Dr. Crognale:

> Q. Independent of the medical records, <u>do you have any recollection of why you prescribed Neurontin for Mrs. Bulger</u>?
> A. No, I do not.
> Q. Was it based on your, in an effort to refresh your recollection, your experience with the drug and your medical training?
> A. Yes.
> Q. <u>Did it have anything to do with anything any representative of Pfizer, Warner-Lambert or Parke-Davis told you?</u>
> A. <u>No.</u>

Crognale Dep. 173:6-17 (Sayler Decl., Ex. 1.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment. That Dr. Crognale testified "generally" that he attended dinner symposiums is immaterial to plaintiff's fraud claim, as plaintiff has neither established that the symposiums were sponsored by defendants, nor that Dr. Crognale was exposed to any alleged misrepresentation at one of the symposiums that caused him to prescribe Neurontin to Mrs. Bulger.

4.   Dr. Crognale could not recall any studies he relied on in prescribing Neurontin for pain. Crognale Dep. 181:23-182:2 (Sayler Decl., Ex. 1.)

<u>Plaintiffs' Response to No. 4:</u>  Disputed. Plaintiff submits that paragraph 4 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Crognale stated that there were non-randomized control trials that provided him with a basis to prescribe Neurontin. Crognale Dep. 182:18-23 (Finkelstein Decl., Ex. 10). Dr. Crognale read journal articles that laid the foundation for his Neurontin prescriptions, but he would be unable to go back and find these articles because he generally discards them. Crognale Dep. 183:7-184:2 (Finkelstein Decl., Ex. 10).

**Defendants' Reply to Fact No. 4:**   Plaintiff's response ignores the sworn testimony of Dr. Crognale:

> Q. And do you recall any of the studies that you've relied upon to prescribe Neurontin for pain?
> A. No, not specifically.

Crognale Dep. 181:21-182:2 (Sayler Decl., Ex. 1.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiff has not and cannot identify any specific studies on which Dr. Crognale based his decision to prescribe Neurontin for pain and consequently lacks evidence that Dr. Crognale was even exposed to a misrepresentation made by defendants.

5. Dr. Crognale does not make his prescribing decision based on what a pharmaceutical company sales representative tells him.  Crognale Dep. 171:10-20 (Sayler Decl., Ex. 1.)

Plaintiffs' Response to No. 5: Disputed.  Plaintiff submits that paragraph 5 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  As to his reliance on, or influence by a representative, Dr. Crognale's prescribing decisions take into consideration medical knowledge, and "decisions made medically are not simply about pharmacokinetics, they're about patients, and so I don't think that I can be directed by somebody that only knows the pharmacology of the medication." Crognale Dep. 172:15-20 (Finkelstein Decl., Ex. 10).

Dr. Crognale did not state that he did not consider what a sales representative advised regarding pharmacokinetics in arriving at his determination to prescribe a medication. Crognale Dep. 171: 10-20 (Finkelstein Decl., Ex. 10.) Dr. Crognale testified generally that he had received and accepted from pharmaceutical representatives offers to go to dinner, that he was compensated for attending dinner symposiums sponsored by a representative where there would be discussion of "problem-based" or "drug-based" data. Crognale Dep. 188:1-189:11 (Finkelstein Decl., Ex. 10).

**Defendants' Reply to Fact No. 5:**   Plaintiff's response ignores the sworn testimony of Dr. Crognale:

> Q. Do you make prescribing decisions based on what drug company representatives tell you?
> A. No.

3361997v1

>Crognale Dep. 171:10-13 (Sayler Decl., Ex. 1.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment. That Dr. Crognale testified "generally" that he attended dinner symposiums is immaterial to plaintiff's fraud claim, as plaintiff has neither established that the symposiums were sponsored by defendants, nor that Dr. Crognale was exposed to any alleged misrepresentation at one of the symposiums that caused him to prescribe Neurontin to Mrs. Bulger.

6. Dr. Goldman testified that he does not recall ever having a conversation with a Pfizer or Parke-Davis sales representative about Neurontin. Goldman Dep. 48:10-14 (Sayler Decl., Ex. 4.)

Plaintiffs' Response to No. 6: Undisputed; however, Dr. Goldman did not recall having "specifically any conversations specific to Neurontin" with defendants sales representatives. Goldman Dep. 48:10-14 (Finkelstein Decl., Ex. 11).

**Defendants' Reply to Fact No. 6:** N/A

7. Dr. Goldman prescribed Neurontin based on his colleagues' experience and the benefits and risks to particular patients. Goldman Dep. 50:3-7, 204:11-21 (Sayler Decl., Ex. 4.)

Plaintiffs' Response to No. 7: Disputed. Plaintiff submits that paragraph 7 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Goldman testified he utilized, inter alia, both the PDR and an online formulary reference called EPOCRATES for information in regard to prescribing. Goldman Dep. 17:15-18:10 (Finkelstein Decl., Ex. 11). Dr. Goldman, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin) Goldman Dep. 178:12-19,197:2-17 (Finkelstein Decl., Ex. 11); (b) suicide attempts during clinical trials Goldman Dep. 182:8-184:5 (Finkelstein Decl., Ex. 11); (c) depression adverse events during clinical trials. Goldman Dep. 183:13-184:5 (Finkelstein Decl., Ex. 11).

**Defendants' Reply to Fact No. 7:** Plaintiff's response ignores the sworn testimony of Dr. Goldman:

>Q. In prescribing Neurontin for pain, Doctor, do you take into account that it has certain advantages over other pain medications?

- 7 -

3361997v1

> A.  <u>Whenever I prescribe a drug a make a decision based on benefits and risks to particular patients</u>, and usually would prescribe a drug because I felt it hopefully would provide some benefit to that patient.
>
> \*\*\*
>
> Q.  Fair to say you have no recollection other than that you recall some vague comment by a neurologist or a specialist?
>
> A.  I know <u>that's how I started using it [Neurontin], I remember, you know, in general that on a patient that I may have sent to a neurologist for a pain condition, either initiated it or told me, you know, we've been using it.</u> Because again, when I prescribed it I usually explain to patients that's how I started using it, <u>that's why I use it.</u>

Goldman Dep. 49:24-50:7, 204:11-21 (Sayler Decl., Ex. 4.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment, and misstates Dr. Goldman's testimony.  Dr. Goldman testified that he does not review the PDR regularly and that "honestly, I don't use it all that much," because "it's just not as easy to use." He testified that he uses a program called Epocrates, which he described as "a quick reference for doctors."  Goldman Dep. 17:15-18:10 (McGroder Decl., Ex. 2.)  Dr. Goldman also testified that he could not recall whether he had ever reviewed the labeling for Neurontin, or whether he reviewed the labeling when he prescribed Neurontin to Mrs. Bulger. Goldman Dep. 43:17-44:4 (McGroder Decl., Ex. 2.)  Further, what Dr. Goldman "wanted to know" is immaterial to this fact, which deals with the bases for Dr. Goldman's decision to prescribe Neurontin.

8.  Dr. Goldman does not recall reading any medical articles related to Neurontin or attending conference where Neurontin was discussed.  Goldman Dep. 15:20-16:4, 203:14-204:2, 204:22-205:1 (Sayler Decl., Ex. 4.)

<u>Plaintiffs' Response to No. 8:</u> Disputed.  Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Goldman stated that although journals and medical articles relating to Neurontin did not initially lead to him prescribing it for pain, subsequently he did read such articles.  Goldman Dep. 203:14-204:3 (Finkelstein Decl., Ex. 11).  Goldman was not able to specifically identify such articles.  Goldman Dep. 204:22-205: 1 (Finkelstein Dec1., Ex. 11).

**Defendants' Reply to Fact No. 8:** Plaintiff's response ignores the sworn testimony of Dr. Goldman:

> Q. Have you ever attended any seminars, dinners, conferences, or anything of that nature concerning Neurontin?
> A. I don't remember specifically that I went to a particular dinner or conference specifically about Neurontin. I cannot say for certain that it was not mentioned in some conference, but nothing specific to my recollection.
>
> \*\*
>
> Q. Do you ever read anything about Neurontin in journals or summaries that led you to prescribe Neurontin for pain?
> A. I don't recall specifically reading something that caused me to prescribe it. My recollection is that I—you know, the reason I prescribed it for pain was that a neurologist or some specialist told me or explained to me or suggested it for a particular patient for a pain condition. It was not something that I remember reading initially. I can't say that after that I didn't read articles or things talking about using it, but I don't think—that was not the reason I used it initially.
>
> \*\*
>
> Q. Do you recall any literature articles, medical journal articles related to Neurontin at all that you've read?
> A. Nothing specific, no, sorry.
>
> Goldman Dep. 15:20-16:4, 203:14-204:2, 204:22-205:1 (Sayler Decl., Ex. 4.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment, and misstates Dr. Goldman's testimony. As noted above, Dr. Goldman testified that he could not recall specifically reading any journal articles that caused him to prescribe Neurontin for pain, but that that "I can't say that after that I didn't read articles or things talking about using it, but I don't think—that was not the reason I used it initially." He never testified that he in fact read articles regarding Neurontin.

## II. DEFENDANTS' RESPONSE TO PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Set forth below is each fact on which plaintiff relies in opposition to defendants' Motion for Summary Judgment, along with defendants' response to each:

1. Dr. Crognale provided Neurontin to Ms. Bulger for her for chronic pain related to rheumatoid arthritis, as well as for anxiety and depression - all off-label, unapproved uses (Finkelstein Decl., Ex. 10, at 66:23-67:22,130:22-131:6, 157:1-158:3, 165:11-165: 14; *but see* 165:17-165:20).

   **Defendants' Response to Fact No. 1:** Disputed and immaterial. Dr. Crognale testified that he <u>prescribed</u> Neurontin to Mrs. Bulger "because of her chronic pain." Crognale Dep. at 130:22-131:6 (Sayler Decl., Ex. 1.) ("Q. Other than having any specific recollection of the conversation and having looked at the records today, do you know why you put her on it?  A.  I would say I put her on it because of her chronic pain." He testified that he <u>treated</u> Mrs. Bulger for rheumatoid arthritis, chronic pain, depression and anxiety.  Crognale Dep. 66:24-67:22 (Sayler Decl., Ex. 1.)  He also testified that, although Mrs. Bulger was "having positive affects on things that would be considered either affective symptoms or pain symptoms," while on Neurontin, *id.* at 156:7-158:8 (McGroder Decl., Ex. 1), he could not tell from his records whether part of the purpose in prescribing Neurontin was to address Mrs. Bulger's depression.  Crognale Dep. 165:17-20 (Sayler Decl., Ex. 1.).  Moreover, whether Mrs. Bulger was prescribed Neurontin for on or off-label uses is immaterial to whether defendants committed fraud by misrepresenting material facts on which Mrs. Bulger's prescribers relied and which caused them to prescribe Neurontin to her.

2. Prior to Ms. Bulger's death, Defendants actively promoted Neurontin to Susan Bulger's physicians via direct sales representative detailing to the doctors' offices. Although Defendants acknowledge it was inappropriate to detail physicians other than Neurologists and Epileptologists (Finkelstein Decl., Ex. 12, at 45:8-45:25; *see* Finkelstein Decl., Ex. 13, at 009942).

   **Defendants' Response to Fact No. 2:** Disputed, unsupported and immaterial.  First, plaintiff has failed to cite any support for the proposition that defendants "actively promoted Neurontin to Susan Bulger's physicians," as required by

- 10 -

3361997v1

Fed. R. Civ. P. 56(e) and Local Rule 56.1.  Second, plaintiff's claimed acknowledgement by defendants that it was inappropriate to detail physicians other than Neurologists and Epileptologists grossly misstates the record.  Plaintiff cites the testimony of Lucy Castro, who testified that, prior to the post herpetic neuralgia (PHN) approval, Pfizer only allowed the sales field force to detail very specific physicians—neurologists and epileptologists—and that this policy was put in place to specifically address and affirmatively dispel the notion that Pfizer was promoting off-label.  She never testified that it was "inappropriate" to detail any physicians other than neurologists and epileptologists.  Moreover, she testified that, after the PHN approval (in 2002), Pfizer began marketing the drug to primary care physicians.  Castro Dep. 45:8-46:22 (McGroder Decl., Ex. 3.)  Exhibit 13, also cited by plaintiff, likewise provides no support for the proposition that "defendants acknowledge it was inappropriate to detail physicians other than Neurologists and Epileptologists."  Rather the document describes the policy for detailing only "Neurologists and institution based epilepsy centers" as "a prudent[] measure that can be taken to ensure that Pfizer avoids even the appearance of engaging in inappropriate sales and marketing activity for Neurontin."  (Finkelstein Decl., Ex. 13, at 009942.)

   3. Prior to Ms. Bulger's death, Defendants detailed Ms. Bulger's prescriber, Dr. Dino Crognale, who was a general family medicine doctor (Finkelstein Decl., Ex. 10, at 169:3- 170:23).

   **Defendants' Response to Fact No. 3:**  Disputed and immaterial.  In the cited excerpt, Dr. Crognale testified the only visit from a sales representative that he could recall occurred "within the last five years."  He did not testify that the visit occurred prior to Mrs. Bulger's death.  Crognale Dep. 169:3-170:23 (Sayler Decl., Ex. 1.)

   4. Dr. Crognale did not recall all specific facts regarding sales detailing about Neurontin at his office by Defendants' sales representative (Finkelstein Decl., Ex. 10, at 170:12-170:23).

   **Defendants' Response to Fact No. 4:**  Undisputed.

   5. Defendants detailed Ms. Bulger's prescriber, Dr. Richard Goldman, an internist (Finkelstein Decl., Ex. 11, at 13:1-13:5).

   **Defendants' Response to Fact No. 5:**  Disputed, but immaterial and unsupported.  Plaintiff has failed to support the assertion that Dr. Goldman was detailed by defendants with record support as required by Fed. R. Civ. P. 56(e) and Local Rule

56.1.  Dr. Goldman in fact testified that he does not recall ever having a conversation or any meetings with a Pfizer or Parke-Davis sales representative about Neurontin.  He speculated, however, that he was "sure [he] saw Pfizer representatives because [he] see[s] representatives and Pfizer has a lot of representatives, and statistically I'm sure one of them came into my office and gave me literature or samples on some drug that Pfizer makes."  Goldman Dep. 48:10-49:5 (Sayler Decl., Ex. 4.)  Moreover, Dr. Goldman's speculation regarding "some drug that Pfizer makes" is immaterial to plaintiff's claim that defendants committed fraud by misrepresenting material facts on which Mrs. Bulger's prescribers relied and which caused them to prescribe Neurontin to her.

   6.  Dr. Goldman acknowledged direct contact with Defendants' sales representatives, but could not recall specific discussions (Finkelstein Decl., Ex. 11, at 48: 10-50:23).

   **Defendants' Response to Fact No. 6:**  Disputed and immaterial.  Dr. Goldman testified that he does not recall ever having a conversation or any meetings with a Pfizer or Parke-Davis sales representative about Neurontin.  He speculated, however, that he was "sure [he] saw Pfizer representatives because [he] see[s] representatives and Pfizer has a lot of representatives, and statistically I'm sure one of them came into my office and gave me literature or samples on some drug that Pfizer makes."  Goldman Dep. 48:10-49:5 (Sayler Decl., Ex. 4.)  Moreover, Dr. Goldman's speculation regarding "some drug that Pfizer makes" is immaterial to plaintiff's claim that defendants committed fraud by misrepresenting material facts on which Mrs. Bulger's prescribers relied and which caused them to prescribe Neurontin to her.

   7.  Dr. Goldman acknowledged his attendance at conferences, Finkelstein Decl., Ex. 11, at 15:20-16:4; his consideration of journals; discussions with colleagues; and his review of drug labels via the PDR or online EPOCRATES (Finkelstein Decl., Ex. 11, at 16:8-19:3,35:7- 36:5,41:16-41:20).

   **Defendants' Response to  Fact No. 7:**  Disputed and immaterial.  First, Dr. Goldman in fact testified that he did not specifically remember attending any courses, seminars, dinners or conferences about Neurontin.  *See* Defendants' Fact No. 8 (citing Goldman Dep. 15:17-16:4 (Sayler Decl., Ex. 4.))  Similarly, Dr. Goldman testified that he had not to his recollection had any conversations concerning Neurontin with other physicians.  Goldman Dep. 18:11-19:3 (McGroder Decl., Ex. 2.)  Moreover, although Dr. Goldman testified that he reviews a journal called Journal Watch, he never testified that he relied on that Journal in prescribing Neurontin.  Goldman Dep. 16:8-17:6 (Sayler Decl., Ex. 4.)  In fact, when asked, "do you recall any literature articles, medical journal articles related to Neurontin at all that you've read," Dr. Goldman responded, "nothing

- 12 -

specific, no, sorry." Goldman Dep. 204:22-205:1 (Sayler Decl., Ex. 4.)  Whether Dr. Goldman attended conferences, read journal articles, or had discussions with colleagues about subjects other than Neurontin is immaterial to plaintiff's fraud claim.

    Regarding the PDR, Dr. Goldman testified that he does not review the PDR regularly and that "honestly, I don't use it all that much," because "it's just not as easy to use." He testified that he uses a program called Epocrates, which he described as "a quick reference for doctors." Goldman Dep. 17:15-18:10 (McGroder Decl., Ex. 2.) Dr. Goldman also testified that he could not recall whether he had ever reviewed the labeling for Neurontin, or whether he reviewed the labeling when he prescribed Neurontin to Mrs. Bulger. Goldman Dep. 43:17-44:4 (McGroder Decl., Ex. 2.)

  8. Dr. Crognale explained that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug (Finkelstein Decl., Ex. 10, at 16:17-17:13).

  **Defendants' Response to Fact No. 8:**  Disputed. Dr. Crognale testified that he refers to the PDR before he prescribes a drug that he has not prescribed before. He never testified that he relies on the PDR in general in prescribing medications, or that he even reviewed the PDR before prescribing Neurontin to Mrs. Bulger, let alone that he relied on the PDR for this purpose. In fact, he testified that he does not refer to the PDR annually for drugs he prescribes on a regular basis. Crognale Dep. 16:17-17:17 (McGroder Decl., Ex. 1.)

  9. Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label (Finkelstein Decl., Ex. 10 at 37:3-37:18).

  **Defendants' Response to Fact No. 9:**  Disputed, incomplete and misleading. Dr. Crognale testified that, when prescribing a new prescription drug with side effects for his patients, his "practice is to pick a handful of the most common side effects listed in the PDR, or ones that are specifically relevant to them." He does not discuss all the side effects or risks that are listed with his patients. Crognale Dep. 37:3-21 (McGroder Decl., Ex. 1.)

  10. Dr. Goldman testified he utilized both the PDR and an online formulary reference called EPOCRATES Rx (Finkelstein Decl., Ex. 11, at 17:15-18:10).

  **Defendants' Response to Fact No. 10:**  Disputed. Dr. Goldman testified that he does not review the PDR regularly and that "honestly, I don't use it all that much," because "it's just not as easy to use." He testified that he uses a program called

3361997v1

Epocrates on his PDA, which he described as "a quick reference for doctors."  Goldman Dep. 17:15-18:10 (McGroder Decl., Ex. 2.)  Dr. Goldman also testified that he could not recall whether he had ever reviewed the labeling for Neurontin, or whether he reviewed the labeling when he prescribed Neurontin to Mrs. Bulger.  Goldman Dep. 43:17-44:4 (McGroder Decl., Ex. 2.)

11.   Dr. Crognale expressly indicated that his bases for prescribing Neurontin included (a) his communication with the medical community; (b) discussions with colleagues at symposiums; (c) consideration of medical journals (Finkelstein Decl., Ex. 10, at 180:14-186:5).

**Defendants' Response to Fact No. 11:**  Disputed.  Although Dr. Crognale testified that his general practice is to prescribe drugs for the first time primarily after discussions with colleagues, review of some early literature and a risk versus benefit determination, he could not recall any specific colleagues to whom he spoke who told him that Neurontin was appropriate for the treatment of pain. Crognale Dep. 180:14-181:8 (Sayler Decl., Ex. 1.)  Moreover, while he testified that it is his practice to ask colleagues in the setting of a symposium about their experience with a particular drug, Crognale Dep. 181:14-181:16 (Sayler Decl., Ex. 1), he could not recollect any symposiums where Neurontin or the treatment of pain was discussed.  Crognale Dep. 189:12-22 (McGroder Decl., Ex. 1.)  Finally, Dr. Crognale could not specifically recall any studies he relied on to prescribe Neurontin for pain.  He likewise could not provide the titles or  authors of (or journal in which) any articles that provided him a foundation for prescribing Neurontin were published.  Crognale Dep. 181:17-183:6 (Sayler Decl., Ex. 1.)

12.   Both Dr. Crogna1e and Dr. Goldman, in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Ms. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin) (Finkelstein Decl., Ex. 10, at 195:12-196:6; Finkelstein Decl., Ex. 11, at 178:12-178:19; Finkelstein Decl., Ex. 11, at 197:2-197:17); (b) suicide attempts during clinical trials (Finkelstein Decl., Ex. 10, at 191:11- 191:17; Finkelstein Decl., Ex. 11, at 182:8-184:5); (c) depression adverse events during clinical trials, Finkelstein Decl., Ex. 10, at 197:4-198:2 (Finkelstein Decl., Ex. 11, at 183:13-184:5); and (d) that patients

3361997v1

taking Neurontin may suffer mood and behavioral disturbances (Finkelstein Decl., Ex. 10, at 200:5-200:14).

**Defendants' Response to Fact No. 12:** Disputed, incomplete and immaterial. First, Dr. Crognale testified that he would also want to know: (1) that FDA reviewer Cynthia McCormick never concluded that the Neurontin clinical data affirmatively established or supported the conclusion Neurontin increases the risk of, or causes, depression or suicidal behavior; (2) that the FDA's scientific judgment in December 1993 was that there was no reasonable evidence of an association with Neurontin and suicidal behavior or any psychiatric adverse event; and (3) that in connection with the approval of Neurontin for a second indication, FDA similarly drew no conclusions with respect to an association between Neurontin and suicidal behavior. Crognale Dep. 223:19-224:21 (McGroder Decl., Ex. 1.)

Dr. Goldman repeatedly testified that he "like[s] to have as much information as possible in general" when prescribing medications for his patients, assuming that the information is relevant. For instance, a drug's capacity to increase depression is relevant depending on whether or not it is a significant or a rare occurrence. Goldman Dep. 178:12-19, 180:23-184:5 (McGroder Decl., Ex. 2.) Regarding whether Neurontin reduces serotonin, Dr. Goldman testified that this is just "one piece of information that I'd want to know in terms of using a particular drug," and that "mechanism versus clinical sometimes are different." Goldman Dep. 197:2-17 (McGroder Decl., Ex. 2.) In addition, Dr. Goldman testified that he would want to know what the Neurontin trial data in the FDA Alert actually showed with respect to suicidality to determine the risk of suicide or suicide attempt. Goldman Dep. 221:13-222:13 (McGroder Decl., Ex. 2.)

Moreover, what Dr. Crognale and Dr. Goldman would have "wanted to know" is immaterial to plaintiff's fraud claim unless that information would have changed the physicians' decision to prescribe Neurontin to Mrs. Bulger, thereby preventing Mrs. Bulger's injury. Plaintiff has no affirmative evidence on this critical issue. Dr. Crognale specifically testified that he was "not sure" whether he would have prescribed Neurontin to Mrs. Bulger if he had the information he has today, including the FDA Alert. Crognale Dep. 212:4-12 (McGroder Decl., Ex. 1.) Plaintiff has no testimony that Dr. Goldman would have changed his prescribing decision and did not even ask the question. Further, Dr. Goldman was not even sure that he would have warned Mrs. Bulger had he been aware that Neurontin had the capacity to increase the risk of suicide, testifying that he could "not say what [he] would have done." Goldman Dep. at 191:7-17 (McGroder Decl., Ex. 2.)

13. Doctors Crognale and Goldman were detailed and had direct contact with Defendants' sales representatives who never disclosed depression/suicidality as a risk with Neurontin (Finkelstein Decl., Ex. 14, at 19:13-20:15, 21:4-21:7).

**Defendants' Response to Fact No. 13:**  Disputed and incomplete. Plaintiff omits that Michele Meager, a sales representative who called on Dr. Goldman testified that she was never even asked about Neurontin's alleged association with adverse psychiatric experiences by any doctor she detailed.  She accordingly never advised any doctor about adverse psychiatric events or experiences.  Meager Dep. 19:13-20:15 (McGroder Decl., Ex. 4.)  Nor did she ever receive any inquiries from physicians regarding potential suicide risks with Neurontin.  Meager Dep. 49:14-50:1 (McGroder Decl., Ex. 4.)  Ms. Meager also testified that she did not discuss off-label use of Neurontin with any doctor she ever serviced, including Dr. Goldman.   Meager Dep. 19:9-12, 58:17-19 (McGroder Decl., Ex. 4.)

Further, the cited deposition excerpts only provide support that Ms. Meager detailed Dr. Goldman, not both Dr. Goldman and Dr. Crognale.  Ms. Meager testified that she had never even heard of Dino Crognale.  Meager Dep. 58:20-22 (McGroder Decl., Ex. 4.)

14.  Defendants did not disclose to Ms. Bulger's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality.

**Defendants' Response to Fact No. 14:**  Disputed and unsupported. First, plaintiff has failed to cite to any support for this proposition, let alone set out specific facts showing a genuine issue for trial, as required by Fed. R. Civ. P. 56(e) and Local Rule 56.1.  As such, he has not set forth any "fact" that would preclude summary judgment.  In addition, plaintiff is incorrect to the extent he suggests that defendants provided no information regarding depression and suicide in the Neurontin label.  Both depression and suicidal behavior were listed as adverse events that occurred in the Neurontin clinical trials at the time in which the physicians prescribed Neurontin to Mrs. Bulger.  *See* Neurontin Label at 24, 27-28 (May 2002) (McGroder Decl., Ex. 5.)

15.  Defendants did not disclose to Ms. Bulger's prescribing medical providers that Neurontin usage increased the risk of depression and/or suicidality.

**Defendants' Response to Fact No. 15:**  Disputed and unsupported. First, plaintiff has failed to cite to any support for this proposition, let alone set out specific facts showing a genuine issue for trial, as required by Fed. R. Civ. P. 56(e) and Local Rule 56.1.  As such, he has not set forth any "fact" that would preclude summary judgment.  In addition, plaintiff is incorrect to the extent he suggests that defendants provided no information regarding depression and suicide in the Neurontin label.  Both depression and suicidal behavior were listed as adverse events that occurred in the Neurontin clinical trials at the time in which the physicians prescribed Neurontin to Mrs. Bulger.  *See* Neurontin Label at 24, 27-28 (May 2002) (McGroder Decl., Ex. 5.)

16.     Defendants did not disclose to Ms. Bulger's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts.

**Defendants' Response to Fact No. 16:**     Disputed and unsupported. First, plaintiff has failed to cite to any support for this proposition, let alone set out specific facts showing a genuine issue for trial, as required by Fed. R. Civ. P. 56(e) and Local Rule 56.1.  As such, he has not set forth any "fact" that would preclude summary judgment.  In addition, plaintiff is incorrect to the extent he suggests that defendants provided no information regarding depression and suicide in the Neurontin label.  Both depression and suicidal behavior, including the adverse events that occurred in the epilepsy clinical trials (which were discussed in FDA's 1992 Review) subsequently appeared in the FDA-approved labeling.  *See* Neurontin Label at 24, 27-28 (May 2002) (McGroder Decl., Ex. 5.)

Dated: March 12, 2009                       Respectfully submitted,

                                        DAVIS POLK & WARDWELL

                                        By:   /s/ James P. Rouhandeh
                                                      James P. Rouhandeh

                                        450 Lexington Avenue
                                        New York, NY 10017
                                        Tel:  (212) 450-4000

                                                -and-

                                        SHOOK, HARDY & BACON L.L.P.

                                        By:   /s/ Scott W. Sayler
                                                      Scott W. Sayler

                                        2555 Grand Blvd.
                                        Kansas City, MO 64108-2613
                                        Tel:  (816) 474-6550

                                                -and-

                                        WHITE & WILLIAMS LLP

                                        By:   /s/ David B. Chaffin
                                                      David B. Chaffin

                                        100 Summer Street, 27th Floor
                                        Boston, MA 02110
                                        Tel:  (617) 748-5200

                                        *Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 12, 2009.

/s/ David B. Chaffin
David B. Chaffin
