# Exhibit 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3                  MDL Docket No. 1629
 4                  Master File No. 04-10981
 5     ***********************************
 6     IN RE:  NEURONTIN MARKETING, SALES
 7             PRACTICES AND PRODUCTS
 8             LIABILITY LITIGATION
 9     ***********************************
10     THIS DOCUMENT RELATES TO:
11     RONALD J. BULGER, SR., as Administrator
12     of the Estate of Susan Bulger, Deceased
13     ***********************************
14            CONTAINS CONFIDENTIAL INFORMATION
15                VIDEOTAPED DEPOSITION OF
16                  DINO A. CROGNALE, MD
17
18                       Held At:
                       Hare & Chaffin
19                   160 Federal Street
                 Boston, Massachusetts 02110
20
                      March 25th, 2008
21                       10:24 AM
22
       Reported By:  Maureen O'Connor Pollard, RPR, CLR
23
24     Videographer:  Shawn Budd
```

Page 14

1   A.  No.
2   Q.  Courses or conferences on chronic
3   pain?
4   A.  Yes.
5   Q.  Do you have a recollection, when did
6   that occur, or can you describe it, please?
7   A.  I can -- it was at a Prime Ed
8   conference here in Boston, I don't know which
9   year, it was not this past one but one within
10  the recent past, and it was lecture on low back
11  pain, management of low back pain.
12  Q.  Lower back pain?
13  A.  Yes.
14  Q.  Any discussion of any drug therapy?
15  A.  Yeah, there was.
16  Q.  Any discussion of Neurontin?
17  A.  I can't remember the specifics of what
18  drugs.
19  Q.  No recollection of any discussion of
20  any particular drug?
21  A.  The only thing I can remember is
22  talking about over the counter medications like
23  Ibuprofen.
24  Q.  About what?  I'm sorry.

Page 15

1   A.  Ibuprofen.
2   Q.  Ibuprofen.
3       Have you ever been to any courses,
4   seminars involving Neurontin, or at which
5   Neurontin was discussed?
6       (Off the record discussion.)
7       MR. CHAFFIN:  We lost you for a few.
8       MR. FINKELSTEIN:  It's okay.  You can
9   go on.  I heard most of it.
10  A.  Can you restate that question?
11      BY MR. CHAFFIN:
12  Q.  Sure.
13      Did you ever attend any
14  courses/seminars at which Neurontin was
15  discussed that you can recall?
16  A.  I can't recall any specifically where
17  Neurontin was the focus.  It may have been
18  mentioned in passing.
19  Q.  Okay.  Are you a member of any medical
20  societies or associations?
21  A.  No, I'm not.
22  Q.  Do you subscribe, or does your office
23  subscribe to the New England Journal of
24  Medicine?

Page 16

1   A.  Not currently.
2   Q.  The Journal of the American Medical
3   Association?
4   A.  No.
5   Q.  Any other journals?
6   A.  The Journal of -- I'm sorry, not
7   journal.  The American Family Physician.
8   Q.  Is that true throughout this decade?
9   A.  Yes.
10  Q.  Does your office subscribe to any
11  psychiatry or neurology journals?
12  A.  No.
13  Q.  What textbooks, if any, do you
14  typically rely on?
15  A.  Primarily Harrison's Internal
16  Medicine.
17  Q.  Do you subscribe to the PDR?
18  A.  Yes.
19  Q.  Personally, or the office?
20  A.  The office.
21  Q.  And do you review it when it comes out
22  for drugs you prescribe?
23  A.  I review, I review drugs as they come
24  up.

Page 17

1   Q.  And what do you mean by "as they come
2   up"?
3   A.  So if there are drugs that have a new
4   indication or a new warning, then I'll review
5   those at that time.  But I don't certainly read
6   the PDR from cover to cover.
7   Q.  Each year?
8   A.  Each year.
9   Q.  It's a big book.
10      Do you refer to it before you
11  prescribe a new drug that you haven't prescribed
12  before?
13  A.  Yes.
14  Q.  Do you refer to it annually for drugs
15  you prescribe on a regularly basis?
16  A.  No.
17  Q.  No.
18      Do you consult with other physicians
19  concerning drugs, about their risks and
20  benefits?
21  A.  Yes.
22  Q.  And who are they?  What physicians?
23  A.  Primarily my colleagues at the
24  practice.  And occasionally if it's a specialty

Page 34

1  Oxycodone plus acetaminophen.
2    Q.  Got it.
3        These pain medications and some of the
4  others you mentioned before, the SSRIs and the
5  anti-seizure medications, some of them list
6  serious potential risks on the label, right?
7    A.  Mm-hmm.
8        MR. BELLO: You just have to say yes.
9    A.  Yes.
10       BY MR. CHAFFIN:
11   Q.  Have you had an overall positive
12  experience prescribing these medications?
13       MR. BELLO: Objection.
14       MR. FINKELSTEIN: Note my objection.
15       MR. BELLO: My objection as well.
16       You may answer.
17   A.  Can you clarify that?
18       BY MR. CHAFFIN:
19   Q.  Sure.
20       Well, you've prescribed these
21  medications, and continue to do so, right?
22   A.  Correct.
23   Q.  Fair to say that that's been -- you've
24  found them beneficial for your patients?

Page 35

1        MR. BELLO: Objection.
2        MR. FINKELSTEIN: Note my objection.
3        MR. BELLO: You may answer.
4    A.  Can you clarify it further? Sorry.
5        BY MR. CHAFFIN:
6    Q.  Well, let me ask, maybe this is
7  easier, why do you prescribe these anti-seizure
8  medicines, pain medicines, etcetera, for your
9  patients?
10   A.  To improve their quality of life.
11   Q.  And do they?
12       MR. BELLO: Objection.
13       You may answer.
14   A.  Sometimes.
15       BY MR. CHAFFIN:
16   Q.  Sometimes. Sometimes not?
17   A.  Sometimes not.
18   Q.  And more often than not, do they not
19  improve their condition?
20       MR. BELLO: Objection.
21       You may answer.
22   A.  Can you clarify what you mean by
23  "condition"?
24       BY MR. CHAFFIN:

Page 36

1    Q.  It's a tough question.
2        MR. BELLO: Double negatives.
3    A.  Double negatives.
4        BY MR. CHAFFIN:
5    Q.  Two negatives, that's right.
6        Well, in the situations where -- the
7  not sometimes where they don't improve the
8  condition, what do you do?
9    A.  We -- I would sit down with the
10  patient and we would try to figure out what part
11  of the medication was, or the prescription was
12  not helping them, what it was that was not
13  helping, and then we would either withdraw,
14  change or add medication.
15   Q.  And when you prescribe one of these
16  narcotics, pain relievers or the anti-seizure
17  medications, do you try to stay apprised, on top
18  of your patient's condition when they're first
19  going on them?
20   A.  Yes.
21   Q.  And do you advise your patients that
22  they need to keep you informed of their
23  condition and their reaction to the drugs?
24   A.  Yes.

Page 37

1    Q.  Do you use informed consent forms?
2    A.  Not generally for all prescribing.
3    Q.  When you -- do you have a regular
4  practice with your patients when you're
5  prescribing them a new prescription drug with
6  side effects of discussing with them all of the
7  potential side effects that are listed in the
8  PDR, for example?
9        MR. BELLO: Objection.
10       You may answer.
11   A.  I -- my practice is to pick a handful
12  of the most common side effects that are listed
13  in the PDR, or ones that are specifically
14  relevant to them.
15       BY MR. CHAFFIN:
16   Q.  Okay. And you discuss those with the
17  patient?
18   A.  Yes.
19   Q.  But not all the side effects or risks
20  that are listed?
21   A.  No.
22   Q.  And why is that, that you deal with
23  just a handful?
24   A.  Primarily because what we know about

Page 66

1    MR. BELLO: Do you have one?
2    MR. CHAFFIN: I do. Sure. Here you
3 go (handing).
4    MR. BELLO: Thanks.
5    BY MR. CHAFFIN:
6    Q. And you know what numbers I'm looking
7 at, the upper right-hand side, Doctor?
8    A. Yes, I do, yes.
9    Q. Okay. If you look at 57 and 58,
10 you'll notice on the bottom of 58 Dr. Mengel is
11 shown as the cosignatory on the prescription?
12    A. I see that.
13    Q. All right. And on 57 you signed a
14 visit note.
15       Would that appear that you began
16 treating --
17    A. It would appear that way, yes.
18    Q. And what would be the date when you
19 began treating her, based on this record?
20    A. Based on this record, it looks like
21 9/8/2000.
22    Q. 9/8/2000?
23    A. Yes.
24    Q. Based on this record, for what were

Page 67

1 you treating her?
2    A. Based on this record, it was
3 rheumatoid arthritis and chronic pain.
4    Q. And what was the source of the chronic
5 pain?
6    A. Her rheumatoid arthritis.
7    Q. For how long did you treat her, if you
8 know?
9    A. From this point to 2003 when she left
10 our practice.
11    Q. Did you treat her for the rheumatoid
12 arthritis and the chronic pain for that entire
13 three-year period?
14    A. Yes.
15    Q. It never resolved?
16    A. No.
17    Q. Any other conditions, if you can
18 recall offhand without looking at the record,
19 for which you treated her?
20    A. Depression.
21    Q. I'm sorry? Depression?
22    A. Depression, anxiety.
23    Q. Anxiety.
24       And can you tell me, what was your

Page 68

1 general practice in how you prepared these visit
2 notes?
3    A. How they were prepared?
4    Q. Yes.
5    A. I'm sorry.
6    Q. How these came to be generated. Did
7 you dictate them? Did you sit at a computer?
8    A. Oh, yes, yes. So during the patient
9 visit I would take notes, and from those notes I
10 would dictate, and then they're transcribed
11 within our office.
12    Q. You had office personnel who would
13 transcribe from the dictation?
14    A. Correct.
15    Q. And would you -- did you have a
16 regular practice with respect to how long after
17 a visit you would dictate the notes?
18    A. As soon as could be. Yeah, not at --
19 it was usually within the day or two.
20    Q. Okay. And what type of information
21 did you take down when you were making notes and
22 then dictating those notes, general practice?
23    A. My general practice is to find out
24 from the patient how they feel that they're

Page 69

1 doing, find out objective measures of how they
2 are doing, find out about any side effects they
3 may be having from treatment, any benefits they
4 are getting from treatment, discuss what the
5 other possibilities are if they're not getting
6 the benefits that they're hoping for.
7    Q. Now, you reviewed these records in
8 preparation for the deposition today, right?
9    A. Yes.
10    Q. This record that we're looking at on
11 Page 56 of Exhibit 1 is from September of 2000?
12    A. Correct.
13    Q. And Mrs. Bulger was on OxyContin at
14 the time?
15    A. Correct.
16    Q. And was this -- can you quantify
17 whether this is a heavy dosage of OxyContin or
18 low dosage?
19    MR. FINKELSTEIN: Objection to form.
20    A. No, I can't, because each individual
21 responds differently.
22    BY MR. CHAFFIN:
23    Q. And for what was she on the OxyContin,
24 what condition?

18 (Pages 66 to 69)

Page 154

1  prescription, correct.
2      Q.  If she refilled both times?
3      A.  Yes.
4      Q.  Pages 7 to 8.
5      A.  Yes.
6      Q.  This is 4/22/03, visit with
7  Mrs. Bulger, is it?
8      A.  Yes.
9      Q.  And this is a follow-up on her chronic
10  anxiety and depression, is that right?
11      A.  Yes, it is.
12      Q.  And she's on Prozac at this point in
13  time?
14      A.  Correct.
15      Q.  80 milligrams a day?
16      A.  Yes.
17      Q.  Okay.  At the end of that first
18  paragraph she said "she would like to try
19  something else.  Has tried multiple other meds,
20  including BuSpar, Zoloft, Paxil without good
21  relief.  She has never been on Celexa, Lexapro
22  or Wellbutrin," right?
23      A.  Yes.
24      Q.  On the second page of this on the

Page 155

1  "depression and anxiety," you mention or you
2  write that it was poorly controlled on the high
3  dose of Prozac, and that you were going to
4  change her to Lexapro?
5      A.  Correct.
6      Q.  Did that occur?
7      A.  Yes.
8      Q.  And then in paragraph two, "given the
9  fact that she has not done well in terms of her
10  overall mood and spontaneous crying, will write
11  a note of prior authorization for Lexapro.
12  Patient is currently displaying no SI or HI.
13  Follow-up in one month."
14          What's the SI or HI?
15      A.  SI is suicidal ideation.  HI is
16  homicidal ideation.
17      Q.  And she's on Neurontin at this point
18  in time, correct?
19      A.  Correct.
20      Q.  And up above on Page 7, there's the
21  authorization for the Lexapro, correct?
22      A.  Yes.
23      Q.  Okay.  Let's go to Page 6, please.
24  This is your appointment with Mrs. Bulger on

Page 156

1  May 19th of '03?
2      A.  Correct.
3      Q.  And she came in on that date to follow
4  up on her chronic pain secondary to the
5  rheumatoid arthritis?
6      A.  Correct.
7      Q.  And you write "she is in need of
8  refills."
9          Would that be something she told you?
10      A.  Yes.
11      Q.  Okay.  Then you write "specifically
12  she's quite agitated about the fact that Mass
13  Health does not cover her Neurontin, as she has
14  now been out of this for a couple of days."
15          She indicated to you that she wanted
16  the Neurontin?
17      A.  That's what it would seem from this
18  note.
19      Q.  Down at the bottom under "P" for plan,
20  number one is "increase OxyContin to
21  40 milligrams PO BID," right?
22      A.  Yes.
23      Q.  So she's going up on the OxyContin?
24      A.  Right.

Page 157

1      Q.  And then "2.  Will fill out prior
2  authorization for Neurontin 300 milligram 3 tab
3  PO BID, which is helping her significantly
4  regarding both her affective disorder and her
5  pain syndrome."
6          You wrote that?
7      A.  Yes.
8      Q.  And what was the basis for your
9  writing that the Neurontin was helping her
10  significantly regarding both her affective
11  disorder and her pain syndrome?
12      A.  It's not stated specifically here, but
13  from the reading of the note, the fact that she
14  had come off the medication and was doing worse
15  is an indicator that perhaps it was helping.
16  Based on notes that we've already gone through,
17  it looked like she was having positive affects
18  on things that would be considered either
19  affective symptoms or pain symptoms.
20      Q.  Okay.  When you used the phrase
21  "affective disorder" in paragraph two here on
22  this Page 6, what were you referring to
23  specifically?
24      A.  That refers to her anxiety and

Page 158

1  depression.
2  Q. Her --
3  A. Anxiety and depression.
4  Q. So it was your view at this point in
5  time that the Neurontin was affecting both her
6  anxiety -- was affecting her anxiety, depression
7  and pain, helping her?
8  A. Yes.
9  Q. Page 5. On the bottom there, are
10 these some office notes concerning attempts to
11 get approval for Neurontin?
12 A. Correct.
13 Q. And then on the top of five is renewal
14 of Klonopin?
15 A. Correct.
16 Q. Right?
17    And that's one milligram?
18 A. Correct.
19 Q. Had she gone up on the Klonopin?
20 A. Yes, she had.
21 Q. Next page, OxyContin refill on the
22 bottom, on June 16th, is that what that is?
23 A. Correct.
24 Q. And then in the middle is Klonopin

Page 159

1  refill?
2  A. Correct.
3  Q. Again at one milligram? She's gone
4  up?
5  A. Right.
6  Q. And then at the top there's an
7  OxyContin refill?
8  A. Correct.
9  Q. Is that at the higher dosage that you
10 had approved previously?
11 A. Yes. This is from that other note,
12 yes.
13 Q. Right.
14    And then this is the Lexapro that you
15 had prescribed for her not all that long before
16 this, right?
17 A. Which was, it looks like, also
18 increased.
19 Q. Okay. Let's go to, please, Page 3 on
20 the bottom, this is another Klonopin refill,
21 correct?
22 A. Correct.
23 Q. And then Pages 2 to 3, your notes on
24 8/11 --

Page 160

1  A. Right.
2  Q. -- 03.
3     Taking a look at your records, this is
4  your last appointment with Mrs. Bulger?
5  A. It appears to be.
6  Q. And then after that you refill some
7  medications, but no other appointments?
8  A. That's right.
9  Q. And specifically if we look at Pages 1
10 and 2, you refilled -- you gave her Valium on
11 August 28 of '03, is that right?
12 A. Yes.
13 Q. And there was a switch from Klonopin
14 to Diazepam?
15 A. Correct.
16 Q. And there's a note on Zantac on
17 August 14th?
18 A. Right.
19 Q. And in the middle of Page 2 -- or the
20 top of 2 there's a Zantac prescription?
21 A. Correct.
22 Q. And in the middle of 2 there's
23 pre-authorizations for Neurontin and Prilosec?
24 A. Correct.

Page 161

1  Q. Okay. Let's look at your note on your
2  last meeting with Mrs. Bulger, if we could,
3  please, Pages 2 to 3.
4     "S," you write "Susan comes in today
5  in follow-up of her routine meds and issues,
6  including: 1. Depression. 2. Joint pain
7  secondary to RA and multiple surgical revisions.
8  And 3. New issue of reflux."
9     Right?
10 A. Correct.
11 Q. Okay. So she's still suffering from
12 depression and chronic pain?
13 A. Yes.
14 Q. And she's got a new issue; reflux?
15 A. Right.
16 Q. A gastrointestinal problem?
17 A. Right.
18 Q. Then you write "regarding her
19 depression, she feels like Lexapro 20 milligram
20 in combination with Neurontin 300 milligram
21 QHS --" that's?
22 A. At bedtime.
23 Q. At bedtime.
24    "-- seems to be improving her mood

41 (Pages 158 to 161)

**Page 186**

1  A. That's a good question. There were
2  many, because we were at that time a residency
3  practice, and so I can't tell you exactly how
4  many faculty we had and how many residents at
5  the time.
6  Q. When did you graduate medical school?
7  A. Graduate medical school?
8  Q. Mm-hmm.
9  A. In 1997.
10  Q. When did you complete your residency?
11  A. 2000.
12  Q. And after you completed your
13  residency, where was your first place of
14  employment?
15  A. As a faculty member at Beverly
16  Hospital Family Practice Residency.
17  Q. And did there come a time that that
18  transitioned to the private practice?
19  A. That's correct.
20  Q. And when was that?
21  A. That's -- I'm unsure if it was 2002 or
22  2003.
23  Q. While it was Beverly medical
24  facility -- what's the name of it?

**Page 187**

1  A. Family Practice Residency Program.
2  Q. Beverly Family Practice Residency
3  Program?
4  A. Yes.
5  Q. While it was the Beverly Family
6  Practice Residency Program, was there any
7  prohibition on receiving sales calls from
8  pharmaceutical reps?
9  A. Yes. We did not receive, during the
10  period of being a residency we did not receive
11  in-office any pharmaceutical reps.
12  Q. Did you receive any outside of the
13  office?
14  A. There were allowed at the hospital.
15  Q. And did you personally receive any
16  information from pharmaceutical reps?
17  A. I'm sure over the years I did, but I
18  can't -- not a specific instance I can
19  recollect.
20  Q. Do you know if you received any
21  information from any pharmaceutical rep related
22  to Neurontin?
23  A. Other than the incident that I already
24  related, no.

**Page 188**

1  Q. At any time did any pharmaceutical rep
2  offer to take you out to dinner?
3     MR. CHAFFIN: Objection.
4  A. Any pharmaceutical rep?
5     BY MR. FINKELSTEIN:
6  Q. Any pharmaceutical rep.
7  A. Yes.
8  Q. And did you ever go?
9  A. Not at that type of an invitation, no.
10  Q. Did any pharmaceutical company ever
11  compensate you for attending a symposium?
12  A. Define compensation.
13  Q. Provide something of monetary value to
14  you.
15  A. Yes, yes. Primarily it would be a
16  dinner at the symposium, but nothing beyond
17  that.
18  Q. Okay. And which pharmaceutical
19  company?
20  A. I have no idea. I really have no
21  idea.
22  Q. Fair enough.
23     Do you know what symposiums?
24  A. No. Periodically there are dinners at

**Page 189**

1  various restaurants in our area, and up until a
2  few years ago we would periodically attend.
3  Q. And at those dinners, what would
4  transpire?
5  A. Generally there would be a speaker who
6  presented data about something. It was usually
7  problem-based rather than drug-based, and of
8  course, you know, they were sponsored by the
9  representative and, of course, would mention the
10  drug, but usually pretty fairly with other
11  medications.
12  Q. Were there any symposiums, or what
13  you're describing these dinners with the
14  speaker, any of them related to the treatment of
15  pain?
16  A. No.
17  Q. Any of them related to psychiatric
18  treatment?
19  A. No.
20  Q. Was Neurontin discussed at any of
21  them?
22  A. Not that I recollect.
23  Q. Do you know who Cynthia McCormick is?
24  A. No, I do not.

Page 210

1  else?
2     A.  I am not.
3     Q.  Have you -- do you have any other
4  degrees other than in family medicine?
5     A.  No, I do not.
6     Q.  Have you ever taken any courses in
7  neuropsychopharmacology?
8     A.  Not beyond medical school training.
9     Q.  Have you ever taken any courses in
10 behavioral neurology?
11    A.  Again, only in the context of medical
12 school.
13    Q.  Are you a member of the American
14 Psychiatric Association?
15    A.  I am not.
16    Q.  Are you a member of the American
17 Neurological Association?
18    A.  I am not.
19    Q.  Have you ever taken any post-medical
20 schools in neuroanatomy?
21    A.  No.
22    Q.  Have you ever dissected a brain?
23    A.  In medical school.
24    Q.  You actually dissected the brain?

Page 211

1     A.  Yes.
2     Q.  Are you a member of the Collegium
3  International for Neuropsycho Collegium?
4     A.  No.
5         MR. CHAFFIN:  I bet their meetings are
6  fun.
7         BY MR. FINKELSTEIN:
8     Q.  You don't hold yourself out as a
9  pharmacologist?
10    A.  I do not.
11    Q.  And have you authored any peer
12 reviewed articles?
13    A.  No, I have not.
14    Q.  Have you authored any textbooks,
15 medical textbooks?
16    A.  No, I have not.
17    Q.  Have you had a chance to read the FDA
18 Information For Health Care Professionals
19 Suicidality and Anti-Epileptic Drugs marked as
20 Exhibit 6?
21    A.  Yes, I have.
22    Q.  And prior to today, had you ever seen
23 that?
24    A.  No, I had not.

Page 212

1     Q.  Prior to today, were you aware of the
2  information that's contained therein?
3     A.  I was not.
4     Q.  Now that you've had an opportunity to
5  read the Information For Health Care
6  Professional Suicidality and Anti-Epileptic
7  Drugs, when you prescribe an anti-epileptic drug
8  for any condition, will you warn your patient of
9  suicidality?
10        MR. BELLO:  Objection.
11        MR. CHAFFIN:  Objection.
12    A.  I'm not sure.
13        BY MR. FINKELSTEIN:
14    Q.  If a patient has depression and
15 anxiety and you add impulsivity to it, does that
16 increase the risk of suicide?
17        MR. CHAFFIN:  Objection.
18        MR. BELLO:  Objection.
19    A.  I don't have enough knowledge base to
20 make that determination.
21        BY MR. FINKELSTEIN:
22    Q.  Are you a suicidologist?
23    A.  No, I am not.
24    Q.  If a behavioral neurologist examined

Page 213

1  your records, and a psychopharmacologist
2  examined your records and drew conclusions
3  related to the effect of the pharmacological
4  agents that were prescribed, that it had a
5  deleterious affect on Miss Bulger's mood, would
6  you disagree?
7         MR. CHAFFIN:  Objection.
8         MR. BELLO:  Objection.
9     A.  Again it's not a simple answer, and I
10 don't think I could make that judgment.
11        BY MR. FINKELSTEIN:
12    Q.  Okay.  Related to Exhibit 6, when the
13 document says "patients who were treated for
14 epilepsy, psychiatric disorders and other
15 conditions were all at increased risk for
16 suicidality compared to placebo," what does that
17 mean to you as a physician?
18        MR. CHAFFIN:  Objection.
19    A.  It means that in the trials, those who
20 were given medication were increased in risk
21 throughout the three groups that they looked at
22 compared to placebo, which is a non-medication.
23        BY MR. FINKELSTEIN:
24    Q.  Do you agree that symptoms such as

Page 222

1   BY MR. FINKELSTEIN:
2   Q. When I say couldn't cope, couldn't
3   cope such that she was a suicidal candidate,
4   that were at risk of that?
5   A. No, I don't believe so.
6   Q. Okay.
7   MR. FINKELSTEIN: All right. That's
8   all I have.
9   MR. CHAFFIN: Can we take a break for
10  about two minutes, I want to copy a document,
11  please?
12  THE VIDEOGRAPHER: It's ten minutes
13  after three. We are off the record.
14  (Whereupon, a recess was taken.)
15  (Whereupon, Crognale Exhibit Number 7
16  was marked for identification.)
17  THE VIDEOGRAPHER: We are back on the
18  record. The time is 3:20.
19  REDIRECT EXAMINATION
20  BY MR. CHAFFIN:
21  Q. Doctor, Mr. Finkelstein --
22  MR. CHAFFIN: Is it Finkelstein or
23  Finkelstein?
24  MR. FINKELSTEIN: Finkelstein.

Page 223

1   BY MR. CHAFFIN:
2   Q. -- Finkelstein asked you some
3   questions about a Cynthia McCormick.
4   Do you recall that?
5   A. Yes, I do.
6   Q. And you'd never heard of her?
7   A. I still don't know who she is.
8   Q. You don't know one way or another,
9   sir, what the FDA's internal workings were with
10  respect to approval of Neurontin for either
11  indication?
12  A. No, I do not.
13  Q. But I think at some point in response
14  to one of Mr. Finkelstein's questions you
15  indicated that if Ms. McCormick at FDA had
16  indicated a certain thing, you would have wanted
17  to know that?
18  A. Yes.
19  Q. Would you have -- would you want to
20  know, Doctor, before you decided one way or
21  another whether to take Dr. McCormick's views
22  into account in prescribing Neurontin what her
23  full opinions were on that subject?
24  A. Yeah.

Page 224

1   Q. Would you want to know, for example,
2   forgive me, that in connection with her review
3   of the new drug application for Neurontin she
4   never concluded that the clinical trial data
5   affirmatively established or supported the
6   conclusion Neurontin increases the risk of, or
7   causes, depression or suicidal behavior?
8   A. Yes.
9   Q. Would you have wanted to know that the
10  FDA's scientific judgment in December, 1993 was
11  that there was no reasonable evidence of an
12  association with Neurontin and suicidal behavior
13  or any psychiatric adverse event?
14  A. Yes.
15  Q. Would you have wanted to know that
16  subsequently in connection with the approval of
17  Neurontin for a second indication that the FDA
18  similarly drew no conclusion with respect to an
19  association between Neurontin and suicidal
20  behavior?
21  A. Yes.
22  Q. Mr. Finkelstein asked you some
23  questions about the FDA alert.
24  A. Yes.

Page 225

1   Q. And asked you if you would now start
2   warning patients on AEDs or anti-epileptic drugs
3   about a risk of suicide, and I think you said
4   you weren't sure.
5   A. Yes. That's correct.
6   Q. And is the cause of your uncertainty
7   what you read in the FDA alert?
8   A. My cause for uncertainty is that, you
9   know, looking over one document in ten minutes
10  does not make a decision. And again, I think
11  that, you know, I think it's something that I
12  need more information on. I just can't take
13  somebody's else's summary at face value. So --
14  Q. Did you understand that the FDA alert
15  was based on pooled data for an entire class of
16  drugs?
17  A. I did.
18  Q. Would you want to look at the data on
19  a drug by drug basis?
20  A. I think that would be helpful.
21  Q. And did I just show you some data on a
22  drug by drug basis?
23  A. Well, you showed me data about one
24  drug.