# Exhibit 3

1

1          LUCY CASTRO

2        UNITED STATES DISTRICT COURT

3      FOR THE DISTRICT OF MASSACHUSETTS

4   ------------------------------x

5   IN RE NEURONTIN MARKETING AND
    SALES PRACTICES LITIGATION
6
    MDL Docket No. 1629
7   Master File No., 04-10981
    Judge Patti B. Saris
8   Magistrate Leo T. Sorokin
    ------------------------------x

9

10

11      SUPREME COURT OF THE STATE OF NEW YORK

12          COUNTY OF NEW YORK

13
    ------------------------x
14
    IN RE:  NEW YORK NEURONTIN
15  PRODUCTS LIABILITY LITIGATION

16  Case Management
    Index No. 765,000/2006
17  Hon. Marcy S. Friedman
    ------------------------x
18

19

20

21                          July 10, 2007
                            9:08 a.m.
22

23

24

25



42

LUCY CASTRO

1  answered.
2      MR. LEVIN: Okay. No reason to
3  quibble.
4      MR. GUNTER: But she is free to give
5  that same answer.
6  A.    Like I said, maybe they thought it was
7  already approved because it was effective for
8  that, but we were appropriately marketing the
9  product and telling them what the indications
10  were at the time.
11      Q.    Ma'am, you told me a minute ago that
12  if the message that was getting out was wrong,
13  that you thought that Pfizer ought to have to do
14  something about it, do you recall that
15  testimony?
16      A.    That is incorrect. The statement is
17  if the message was interpreted incorrectly.
18      Q.    Fine.
19      A.    But we were not providing a message
20  that we were indicated for any type of
21  neuropathic pain indication. We were on label
22  in terms of adjunctive epilepsy and all
23  materials were in line with that indication.
24      Q.    Ma'am, my question is is that if 40

43

LUCY CASTRO

1  percent of the doctors in America say that we
2  thought based on the information that we got
3  that Neurontin was indicated for general
4  neuropathic pain, are you telling me that as a
5  person in the regulatory department of Pfizer,
6  that's okay with you?
7      MR. GUNTER: Objection. Again, it's
8  been asked and answered.
9      MR. LEVIN: It's a different question.
10      MR. GUNTER: Very vague, incomplete
11  hypothetical.
12      MR. LEVIN: Fine.
13      Q.    You can answer.
14      A.    If we provided the appropriate
15  materials that didn't have anything to do with
16  neuropathic pain, then I'm fine with that.
17      Q.    So if you provided materials that had
18  nothing to do with general neuropathic pain, you
19  would be okay with it? Okay.
20      Well, doesn't that incentivize your
21  company to come as close to the line as
22  possible?
23      MR. GUNTER: Objection, argumentative.
24      A.    No, it doesn't.

44

LUCY CASTRO

1      Q.    If 40 percent of the physicians
2  surveyed -- sound like a match game now -- if 40
3  percent of the physicians surveyed said that
4  they thought that Neurontin was indicated for
5  neuropathic pain based on the information that
6  they got, okay, what do you think you could do
7  to dispel this misimpression?
8      MR. GUNTER: Objection, it is an
9  incomplete hypothetical.
10      MR. LEVIN: You can answer.
11      A.    Like I said, we did a lot of
12  corrective action. We --
13      Q.    Tell --
14      A.    Go ahead.
15      Q.    I wasn't going to cut you off, I
16  thought you were done. Go ahead.
17      A.    Yes. We insured that all our
18  materials were on label. We insured that for
19  Neurontin there was no WLF. We insured
20  everything we could within what all the
21  practices our field and all our personnel
22  actually that dealt with Neurontin, that it was
23  all on label.
24      Q.    Are you aware of any communication

45

LUCY CASTRO

1  whatsoever from Pfizer to the field force or to
2  the public in any manner, way, shape or form
3  that said Neurontin is not FDA approved for
4  general neuropathic pain?
5      A.    I am aware of training internally but
6  nothing to the public.
7      Q.    Thank you. So if in fact the sales of
8  Neurontin going back to the Warner Lambert-Parke
9  Davis days were increased because of illegal
10  marketing practices, to your knowledge since you
11  have been at Pfizer, there has been nothing done
12  to specifically address those and affirmatively
13  dispel the notion other than as far as you
14  understand it staying within the label as you
15  promote it today, is that fair?
16      MR. GUNTER: Objection as to the form
17  of that question.
18      MR. LEVIN: You can answer.
19      A.    Like I stated previously, we did not
20  do a communication externally but we did do
21  training. We also -- the field force was only
22  allowed to detail to very specific physicians
23  that would be neurologists and epileptologists,
24  and all internal training was on label, again.

12 (Pages 42 to 45)

46

LUCY CASTRO

1
2   Q.   What were the regulations that Warner
3   Lambert had with regard to detailing?
4        MR. GUNTER: Objection, that's *
5   getting -- calls for speculation. She never
6   worked for Warner Lambert.
7        A.   I am not aware of what their practices
8   were.
9        Q.   You mentioned the acronym WLF.  What
10  is that?
11       A.   Washington Legal Foundation.
12       Q.   You just mentioned that your field
13  force was only allowed to detail to certain type
14  of physicians, do you recall that?
15       A.   Yes.
16       Q.   What type of physicians?
17       A.   Neurologists, epileptologists.
18       Q.   To your knowledge, then, Pfizer never
19  marketed Neurontin to primary care physicians,
20  is that correct?
21       A.   We did, once we got the PHN
22  indication.
23       Q.   Once you marketed for PHN, you never
24  mentioned general neuropathic pain in any way,
25  correct?

47

LUCY CASTRO

1
2        A.   In terms of promoting for general
3   neuropathic pain?
4        Q.   Yes.
5        A.   No.
6        Q.   Okay.  So I won't see anything that
7   would be directed to the public that mentions
8   anything about general neuropathic pain?
9        MR. GUNTER: Objection.
10       A.   There are pieces that have disease
11  state information that start with providing
12  context in terms of disease state so that PHN
13  can be understood.  In general my understanding
14  from materials I haven't seen is that
15  neuropathic pain in general is under recognized,
16  under diagnosed, and certainly the lay public
17  doesn't understand it well even to this day.  So
18  our materials gave very brief context and
19  immediately went into PHN.
20       Q.   So it would be your understanding then
21  that the primary focus of the terms that you are
22  aware of would have been PHN and other
23  neuropathic pain for context would just be a
24  minor part of the --
25       A.   Very minor, yes.

48

LUCY CASTRO

1
2        Q.   That would be important to you as a
3   regulator, as somebody involved in the
4   regulatory department, right?
5        A.   Absolutely.
6        Q.   Why would that be important?
7        A.   Like I said, we wanted to make sure we
8   are on label, and in fact that type of approach
9   was precleared with the FDA's DDMAC division.
10       Q.   But let's leave the FDA out of it for
11  a minute.  I just want to know from your
12  standpoint as somebody from regulatory, that
13  would be important to you, the PHN would be the
14  focus of the piece as opposed to pain?
15       A.   Absolutely.
16       Q.   As a person involved in regulatory, if
17  somebody were to come to you and say here is a
18  piece and it was primarily about pain and only a
19  little bit about PHN, what would you tell them?
20       A.   That we couldn't approve that.
21       Q.   Why?
22       A.   Because the focus has to be on label
23  PHN.
24       Q.   Why does the focus have to be on PHN?
25       A.   Because that's the indication

49

LUCY CASTRO

1
2   Neurontin was -- got from the FDA, so that's
3   what we have to -- we stay on label, we have to
4   focus on PHN.
5        Q.   I just want to make sure I understand.
6   If there was a promotional piece that was
7   primarily about pain and just a little bit
8   about -- just sort of mentioned PHN, what would
9   be wrong with that?
10       A.   So if you are asking about a disease
11  state piece, that is a different type of piece
12  as opposed to a branded piece that would have
13  Neurontin on it?
14       Q.   Yes.  Okay.  Let's talk about branded
15  pieces.  Okay.  Strike that.  We'll move on.
16       Would you agree with me there is some
17  tension between marketing and regulatory?
18       A.   I would like to think that we work
19  together, but, yes, I guess that is a good way
20  of characterizing it.
21       Q.   And could you describe that tension?
22       A.   Well, I think that their goals are
23  different.
24       Q.   Could you explain that?
25       A.   I want to make sure that we provide

13 (Pages 46 to 49)