# Exhibit 4

Confidential

MICHELE MEAGER

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br>Master File No. 04-10981<br><br>Judge Patti Saris<br><br>Magistrate Judge Leo T. Sorokin |

- - - - - - - - - - - - - - - -

CONFIDENTIAL

Condensed Copy

Confidential telephone deposition of MICHELE MEAGER, taken by and before Fred W. Jeske, a certified shorthand reporter and notary public of the State of Tennessee, held at the Conference Room C of the Courtyard by Marriott, 170 Fourth Avenue North, Nashville, Tennessee.

Doerner & Goldberg New York * A Veritext Company
1350 Broadway * New York, NY 10018 * 212-564-8808

Confidential

|  | 18 |
|---|---|
| 1 | MICHELE MEAGER |
| 2 | Q. All right. So it was one full-time |
| 3 | rep and you covering that geographic area? |
| 4 | A. Well, back then it was probably nine |
| 5 | Pfizer representatives and myself, but everybody |
| 6 | had different drugs. |
| 7 | Q. Okay. So you were the only one that |
| 8 | was detailing Neurontin. |
| 9 | A. I think so. |
| 10 | Q. Okay. Now what types of specialties |
| 11 | of doctors would Neurontin be detailed to in |
| 12 | early 2004? |
| 13 | A. Prime -- |
| 14 | MS. SEATON: Objection. Objection. |
| 15 | You can answer. |
| 16 | A. Primary care or internal medicine. |
| 17 | Any doctor that would see an |
| 18 | epileptic patient. |
| 19 | BY MR. COHEN: |
| 20 | Q. Okay. And again it was for epilepsy |
| 21 | only? |
| 22 | A. Correct. |
| 23 | Q. All right. Do you know if Neurontin |
| 24 | was detailed to other specialists as well? |
| 25 | A. I don't know. I know what I detailed |

|  | 19 |
|---|---|
| 1 | MICHELE MEAGER |
| 2 | Neurontin for. |
| 3 | Q. All right. Who made that decision as |
| 4 | to what type of doctor you would be detailing |
| 5 | Neurontin to? |
| 6 | A. I worked for the part-time division |
| 7 | that only called on internal medicine and |
| 8 | primary care physicians. |
| 9 | Q. Okay. All right. Did you ever |
| 10 | discuss off-label use of Neurontin with any |
| 11 | doctor you ever serviced? |
| 12 | A. No. |
| 13 | Q. Were you ever asked about Neurontin's |
| 14 | association with adverse psychiatric experiences |
| 15 | by any doctor you detailed? |
| 16 | A. No. |
| 17 | MS. SEATON: Hold on just a second. |
| 18 | I just heard a beep. Did |
| 19 | somebody join? |
| 20 | MR. COHEN: That's just some other |
| 21 | line ringing in here, I think. |
| 22 | MS. SEATON: Oh, okay. |
| 23 | MR. COHEN: Okay. All right. |
| 24 | BY MR. COHEN: |
| 25 | Q. Did you ever advise any doctor about |

|  | 20 |
|---|---|
| 1 | MICHELE MEAGER |
| 2 | these adverse events? |
| 3 | A. No. |
| 4 | MS. SEATON: Objection. |
| 5 | Wait. Give a little bit of |
| 6 | pause just so I can say "objection to |
| 7 | form," and then you can go ahead and |
| 8 | answer. |
| 9 | THE WITNESS: Okay. |
| 10 | Can you repeat the question? |
| 11 | MR. COHEN: Yes. |
| 12 | BY MR. COHEN: |
| 13 | Q. Did you ever advise any doctor about |
| 14 | adverse psychiatric events or experiences? |
| 15 | A. No. |
| 16 | Q. Okay. All right. Were you ever |
| 17 | informed about lawsuits relating to Neurontin |
| 18 | and suicides? |
| 19 | A. No. |
| 20 | Q. Were you ever provided with documents |
| 21 | by your company that allowed for a scripted or |
| 22 | standard response to inquiries from |
| 23 | doctors regarding Neurontin and suicide? |
| 24 | A. No. Never. |
| 25 | Q. All right. Did you ever work for |

|  | 21 |
|---|---|
| 1 | MICHELE MEAGER |
| 2 | Warner-Lambert? |
| 3 | A. No. |
| 4 | Q. Okay. Now, do you recall detailing a |
| 5 | Dr. Richard Goldman in Wellesey, Massachusetts |
| 6 | in 2004? |
| 7 | A. Yes. |
| 8 | Q. All right. Do you, as you sit there |
| 9 | today, have any idea when the first time you |
| 10 | detailed him was? |
| 11 | A. No. |
| 12 | Q. Do you have any documents in front of |
| 13 | you that might refresh your recollection? |
| 14 | A. I know I detailed him in 2004. |
| 15 | Q. All right. I have some call sheets, |
| 16 | or one call sheet, and then another page talking |
| 17 | about some, some product that was left. Do you |
| 18 | have those there at all? |
| 19 | A. Yes. My, my -- can I ask him? Is it |
| 20 | just if I detailed them in 2004? |
| 21 | Q. Well, I have a page here that talks |
| 22 | about four visits from January of '04 through |
| 23 | April of '04, and then dates that product was |
| 24 | left. That's what I'm looking -- that was |
| 25 | provided by your attorneys, I believe. |

6 (Pages 18 to 21)

Confidential

### Page 46

MICHELE MEAGER

1
2  April, when you met with him, did you ever
3  discuss off-label use with him, of Neurontin?
4  A.     No.
5  Q.     Do you know if anyone else from Pfizer
6  ever discussed off-label use with him?
7  A.     No.
8  Q.     Do you know if your boss had any
9  contact with him, with Dr. Goldman?
10 A.     His only contact was through me.
11 Q.     Okay. Who had access to the Sherlock
12 data, your Sherlock data, at Pfizer?
13 A.     I did.
14 Q.     Nobody else?
15 A.     It would get sent straight to
16 headquarters.
17 Q.     All right. And it was sent over the
18 Internet, or how would that work?
19 A.     Ah, I don't know.
20 Q.     Okay. Was that daily, monthly,
21 weekly? How often would you send the data?
22 A.     You would send it every evening. You
23 would log in.
24 Q.     Okay. Do you know if your boss or
25 anyone else at Pfizer ever used that Sherlock

### Page 47

MICHELE MEAGER

1
2  data and contacted doctors who you were
3  detailing maybe to do quality control or get
4  feedback or anything?
5  A.     No.
6  Q.     No? Okay.
7         All right. Do you know how much
8  money Pfizer made on Neurontin in 2004?
9  A.     No.
10 Q.     How about in 2003?
11 A.     No.
12 Q.     How about 2002?
13 A.     Nope.
14 Q.     Well, is it your understanding that in
15 2004 the only FDA-approved uses for Neurontin
16 was epilepsy?
17 A.     Correct.
18 Q.     Okay. What if a doctor attempted to
19 initiate an off-label discussion with you, what
20 would you do?
21 A.     We would tell him the indication for
22 the medication, and then do a medical inquiry
23 for the doctor, and then we would step away.
24 Q.     All right. Now, would you note
25 anywhere on your call sheet that that was done

### Page 48

MICHELE MEAGER

1
2  if you were visiting with a doctor and he asked
3  you a specific question?
4  A.     It would be done through the computer.
5  There was a button that you would hit for a
6  medical inquiry, and that would get sent right
7  to our physicians who worked with Pfizer, and
8  then they would contact Dr. Goldman, and we
9  would not --
10 Q.     All right.
11 A.     They would go around us and contact
12 him directly.
13 Q.     All right. So would that ever get
14 noted anywhere on the call sheet or the day that
15 you visited, that there was such an inquiry
16 made?
17 A.     No.
18 Q.     Okay. All right. Were you aware that
19 Warner-Lambert pled guilty to some felonies
20 related to off-label marketing of Neurontin?
21 A.     Yes.
22 Q.     Who made you aware of that?
23 A.     The newspaper.
24 Q.     And what did you learn? What do you
25 recall?

### Page 49

MICHELE MEAGER

1
2  A.     I recall that Pfizer settled a
3  lawsuit. And that's all I recall.
4  Q.     All right. Were you told to do
5  anything different in terms of the marketing
6  which you had been doing after this guilty plea?
7         MS. SEATON: Objection.
8  A.     We did not do anything different.
9  BY MR. COHEN:
10 Q.     Okay. Did you know of any sales reps
11 who did engage in off-label marketing of
12 Neurontin?
13 A.     No.
14 Q.     Did there come a time when you learned
15 that taking Neurontin posed a suicide risk?
16 A.     No. This is the first I've heard of
17 it.
18 Q.     Today is the first you've heard?
19        MS. SEATON: Objection.
20            Go ahead.
21 A.     Yes. Today's the first I've heard.
22 BY MR. COHEN:
23 Q.     Okay. Did you ever get inquiries from
24 any physicians regarding potential suicide risks
25 associated with Neurontin?

13 (Pages 46 to 49)

```
                                                    50
 1            MICHELE MEAGER
 2    A.    No.
 3    Q.    What's a backgrounder?
 4    A.    A backgrounder would be when you
 5    have -- when you're learning about a product, it
 6    would be the disease state and treatment for
 7    that product. It was a sales tool.
 8    Q.    Okay. Did you ever get any
 9    backgrounders regarding the suicide risks
10    associated with Neurontin?
11    A.    No.
12    Q.    Did you ever learn about Neurontin's
13    impact on serotonin levels in the brain?
14          MS. SEATON: Objection.
15          You can answer.
16    A.    I don't recall.
17    BY MR. COHEN:
18    Q.    Okay. Did anyone tell you not to
19    discuss with doctors Neurontin's impact on
20    serotonin levels in the brain?
21    A.    No.
22    Q.    Did you ever learn about Neurontin's
23    impact on norepinephrine in the human brain?
24          MS. SEATON: Objection.
25          Go ahead.
```

```
                                                    51
 1            MICHELE MEAGER
 2    A.    No.
 3    BY MR. COHEN:
 4    Q.    Did you ever learn what effect
 5    Neurontin had on monoamine, if I'm saying it
 6    right, neurotransmitters in the human brain?
 7    It's N-O-M-O-A-Mas in Mary I-N-E.
 8          MS. SEATON: Objection.
 9    A.    No.
10    BY MR. COHEN:
11    Q.    Did any of the physicians you detailed
12    Neurontin to ever report to you that a patient
13    on Neurontin had an adverse event?
14    A.    No.
15    Q.    Was there some other way for them to
16    transmit that data to Pfizer, or would it have
17    gone through you?
18          MS. SEATON: Objection.
19    A.    Through me.
20    BY MR. COHEN:
21    Q.    Okay. Did you learn about any
22    Neurontin adverse events from anyone else?
23    A.    No.
24    Q.    Did you ever suggest to any of the
25    physicians that you detailed that they take a
```

```
                                                    52
 1            MICHELE MEAGER
 2    history for depression or suicide prior to
 3    prescribing Neurontin to their patients?
 4    A.    No.
 5    Q.    Were you aware of the FDA concern
 6    raised in the original FDA review related to
 7    Neurontin's association with suicide?
 8          MS. SEATON: Objection.
 9    A.    No.
10    BY MR. COHEN:
11    Q.    Did you ever become aware that any of
12    the physicians you were detailing were
13    prescribing Neurontin off-label?
14    A.    No.
15    Q.    Did you ever become aware that at some
16    point that over 90 percent of the prescriptions
17    written were for off-label use of Neurontin?
18          MS. SEATON: Objection.
19    A.    No.
20    BY MR. COHEN:
21    Q.    What information have you kept about
22    your detailing contacts with Dr. Goldman before
23    August of 2004, anything at all?
24    A.    No. Nothing.
25    Q.    Okay. After Pfizer acquired the
```

```
                                                    53
 1            MICHELE MEAGER
 2    Neurontin product line but before the approval
 3    for postherpetic neuralgia, also known as
 4    shingles, can you identify for me all the types
 5    of doctors by specialty you would distribute
 6    Neurontin samples to, other than the primary
 7    care doctors; anybody else?
 8          MS. SEATON: Objection.
 9          You can answer, if you
10       understand.
11    A.    Nobody else.
12    BY MR. COHEN:
13    Q.    Okay. Do you know what IMS data is?
14    A.    No.
15    Q.    Okay. Was it normal practice to keep
16    dropping off prescriptions for doctors who were
17    already writing Neurontin?
18          MS. SEATON: Objection.
19          Go ahead.
20    A.    We didn't drop off prescriptions.
21    BY MR. COHEN:
22    Q.    I'm sorry. I'll ask it a correct way.
23    Was it normal custom and practice for you to
24    leave samples of Neurontin with doctors who were
25    already actively prescribing Neurontin?
```

**Page 58**

MICHELE MEAGER

2  A.    No.
3  Q.    Have you ever had any contact or
4  communication with Mr. Ford?
5  A.    No.
6  Q.    Did you ever have a substantive
7  discussion with Dr. Goldman about Neurontin?
8  A.    Repeat?
9  Q.    Yeah. Did you ever have any kind of
10 substantive discussion about Neurontin with
11 Dr. Goldman?
12 A.    About epilepsy.
13 Q.    Okay. Outside of a discussion about
14 epilepsy, did you ever have any discussions with
15 Dr. Goldman?
16 A.    No.
17 Q.    Okay. Did you ever promote off-label
18 to Dr. Goldman?
19 A.    No.
20 Q.    Did you ever -- are you familiar with
21 Dr. Dino Crognale?
22 A.    No.
23 Q.    Did you ever -- strike that.
24       Did you ever detail Neurontin
25 off-label to any doctor?

**Page 59**

MICHELE MEAGER

2  A.    No.
3  Q.    Were you ever encouraged by Pfizer to
4  detail Neurontin off-label?
5  A.    No.
6  Q.    Were you ever motivated, were you ever
7  motivated to detail off-label Neurontin to
8  increase your bonus?
9  A.    No.
10      MS. SEATON: Okay. I have no
11 further questions for this witness.
12      REDIRECT EXAMINATION
13 BY MR. COHEN:
14 Q.    You just mentioned a Dr. Dino
15 Crognale. The records I have indicate that he
16 was in Danvers, Massachusetts. Would that have
17 been your area?
18 A.    No.
19 Q.    No?
20       Do you know whose area it was?
21 A.    No.
22 Q.    Okay. Did Dr. Goldman ever tell you
23 that he was prescribing Neurontin for pain and
24 not for epilepsy to any patient?
25 A.    No.

**Page 60**

MICHELE MEAGER

2       MR. COHEN: Okay. I have nothing
3  else.
4       MS. SEATON: All right. We can go
5  off the record.
6       Actually, while we're still on
7  the record, you have an opportunity to
8  read through the transcript and look and
9  make sure that he typed down everything
10 exactly correctly, or you can waive
11 signature. And it's totally your call.
12 If you would like to look at it and check
13 it and sign it, that's fine. Or if you
14 would like to waive signature, that's fine
15 too.
16      THE WITNESS: I'll waive signature.
17      MS. SEATON: Okay. All right.
18 We're off the record.
19 (Deposition concluded at 1:52 p.m.)

**Page 61**

MICHELE MEAGER
REPORTER'S CERTIFICATE

3       I, Fred W. Jeske, Court Reporter and
4  State of Tennessee at-large Notary Public, do
5  hereby certify that I recorded to the best of my
6  skill and ability by machine shorthand all the
7  proceedings in the foregoing transcript, and
8  that said transcript is a true, accurate, and
9  complete transcript to the best of my ability.
10      I further certify that I am not an
11 attorney or counsel of any of the parties, nor a
12 relative or employee of any attorney or counsel
13 connected with the action, nor financially
14 interested in the action.
15      SIGNED this 28th day of March, 2008.

Fred W. Jeske, Court Reporter
State of Tennessee
At-large Notary Public

My Commission Expires: November 14, 2009

16 (Pages 58 to 61)