# Exhibit 6

```
                                                              Page 1
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3                 MDL Docket No. 1629

 4                 Master File No. 04-10981

 5   *********************************

 6   IN RE:  NEURONTIN MARKETING, SALES

 7           PRACTICES AND PRODUCTS

 8           LIABILITY LITIGATION

 9   *********************************

10   THIS DOCUMENT RELATES TO:
     Bulger v. Pfizer, Inc., Et Al
11   Case No. 07-11426-PBS
             and
12   Smith, Et Al v Pfizer, Et Al
     Case No. 05-CV-11515-PBS
13
     *********************************
14

15      VIDEOTAPED DEPOSITION OF CHARLES KING, III

16
                      Held At:
17            Greylock McKinnon Associates
                 One Memorial Drive
18             Cambridge, Massachusetts

19

20              October 28th, 2008
                    9:05 A.M.
21

22   Reported By:  Maureen O'Connor Pollard, RPR, CLR

23
     Videographer:  William Slater
24
```


**Page 82**

1  succinctly, and were representative of what I
2  had discovered in reading various documents.
3     Q.  All right. Let's talk about the
4  heading under "Legal Documents." Well, let me
5  take a step back first.
6           Are there other documents that you are
7  relying upon for purposes of your opinion that
8  you chose not to include in this list of
9  documents relied upon?
10    A.  You know, there are other documents
11 available that support my opinions, but these
12 are the ones that, you know, I specifically
13 chose to rely upon for the opinions in the
14 report.
15    Q.  Okay. Did you specifically choose to
16 rely upon any deposition testimony other than
17 the deposition testimony listed here under
18 "Legal Documents"?
19    A.  Well, the answer should be no.
20    Q.  Okay. And if you look at -- well, you
21 said "the answer should be no." Do you have any
22 reason to think the answer is something other
23 than no?
24    A.  No, I don't.

**Page 83**

1     Q.  All right. And let's look at --
2     A.  Other than clerical error.
3     Q.  Okay. Are there other legal documents
4  outside of the -- outside of deposition
5  transcripts that you specifically relied upon
6  for purposes of your opinion in this case that
7  are not reflected in this list?
8     A.  No.
9     Q.  And then there's another heading here
10 "Bates Documents." Are there any Bates
11 documents that you specifically relied upon for
12 purposes of your opinions expressed in this
13 report that are not listed here on attachment B
14 under the heading "Bates Documents"?
15    A.  No.
16    Q.  Have you reviewed the Bulger or Smith
17 amended complaints?
18    A.  No.
19    Q.  Do you plan to review them?
20    A.  I wasn't asked to.
21    Q.  Do you have any plans to review them
22 in the future?
23    A.  No.
24    Q.  Have you reviewed the complaints in

**Page 84**

1  any of the personal injury cases?
2     A.  No.
3     Q.  Are you familiar with the facts in any
4  of the individual personal injury cases?
5     A.  No.
6     Q.  So I take it you're not offering any
7  opinions that are specific to any of the
8  particular personal injury cases, is that right?
9     A.  That's correct, except that the
10 opinions that I offer here apply to all doctors,
11 so they would apply to the individual doctors in
12 the personal injury cases. But I'm not offering
13 an opinion to a -- concerning a specific
14 personal injury case.
15    Q.  Have you ever spoken to any of the
16 Plaintiffs in the personal injury cases?
17    A.  No.
18    Q.  Have you read any of the deposition
19 transcripts in the personal injury cases?
20    A.  No.
21    Q.  Do you plan to read any of those?
22    A.  Not unless I'm asked to.
23    Q.  Do you know who the treating
24 physicians were in any of the personal injury

**Page 85**

1  cases?
2     A.  No.
3     Q.  Do you know who Ron Bulger is?
4     A.  No.
5     Q.  Do you know in what state Mr. Bulger
6  resides?
7     A.  No.
8     Q.  Do you know for what condition Susan
9  Bulger was prescribed Neurontin?
10    A.  No.
11    Q.  Do you know the names of Mrs. Bulger's
12 prescribing doctors?
13    A.  No.
14    Q.  Do you know who a Dr. Goldman is in
15 the context of this case?
16    A.  No.
17    Q.  Have you reviewed any testimony by
18 Dr. Goldman?
19    A.  No.
20    Q.  Do you know anything about what
21 Dr. Goldman has testified regarding why he
22 prescribes Neurontin?
23    A.  No.
24    Q.  And maybe just to cut through this, I

Page 86

1 take it if I asked you those types of similar
2 questions regarding other personal injury cases
3 your answers would be the same?
4   A.   Yes.
5       MR. MISHKIN: Let's mark the next
6 exhibit.
7       You know what? Looks like we're
8 coming to the end of the videotape, why don't we
9 go off the record.
10  A.   Okay.
11      THE VIDEOGRAPHER: This is the end of
12 tape number one in the deposition of Charles
13 King, III. The time is 10:24. We're off the
14 record.
15      (Whereupon, a recess was taken.)
16      THE VIDEOGRAPHER: This is the
17 beginning of tape number two in the deposition
18 of Charles King, III. Back on the record. The
19 time is 10:36.
20      BY MR. MISHKIN:
21  Q.   Dr. King, what did you do to prepare
22 for your deposition today?
23  A.   What did I do. Well, I sat down with
24 my report and read it a few times, and I looked

Page 87

1 at the backup materials and the footnotes
2 supporting the report, I looked at some of the
3 additional reports that have been filed in the
4 case, and I conferred with counsel.
5   Q.  What counsel did you confer with?
6   A.  Ron Rosenkranz.
7   Q.  Any other counsel?
8   A.  I spoke to Ken Fromson also.
9   Q.  How many times did you have these
10 contacts with counsel in preparation for your
11 deposition?
12  A.  Let's see. I talked to, once or twice
13 to Ken Fromson, once or twice to Ron Rosenkranz,
14 and then yesterday Ron, Keith and I sat down for
15 a few hours to prepare for the deposition.
16  Q.  Can you estimate how much time in
17 total you spent with your attorneys preparing?
18  A.  Yes. I would say half an hour, 45
19 minutes in terms of phone calls, and then
20 yesterday Keith Altman arrived about ten, I
21 think Attorney Rosenkranz arrived around eleven,
22 11:30, and we finished around --
23      MR. ROSENKRANZ: Having gotten lost.
24  A.  -- and we finished about three.

Page 88

1       BY MR. MISHKIN:
2   Q.  Did you --
3       MR. ROSENKRANZ: For the record, by
4 the way, Mr. Altman is also counsel. He is now
5 an admitted lawyer in California.
6       MR. MUEHLBERGER: Congratulations.
7       MR. ALTMAN: Thank you.
8       BY MR. MISHKIN:
9   Q.  Did you search for any materials in
10 preparation for the deposition?
11  A.  I did look at material that I
12 reviewed, I looked to see if there were other
13 documents that I'd reviewed that supported some
14 of the points. So yes, I did some additional.
15  Q.  You understand that there was a
16 request or a subpoena by the Defendants for some
17 materials in connection with your report?
18  A.  Yes.
19  Q.  Did you review that subpoena?
20  A.  I did.
21  Q.  What --
22  A.  Oh, sorry, subpoena. No, I didn't get
23 a -- I don't know anything about the subpoena.
24 I know something about the notice of deposition

Page 89

1 that had a document request in it.
2   Q.  That's what I'm referring to.
3       Did you review the document requests
4 that were contained in that notice of
5 deposition?
6   A.  Yes.
7   Q.  And what work did you or others do to
8 collect documents that were responsive to the
9 requests contained in that deposition notice?
10  A.  I went and tried to find them for you.
11 So we talked about how best to convey the
12 database of documents that I reviewed and relied
13 upon, we collected information on billing that
14 you'd requested, I put together the package of
15 e-mails that you have. If you have the list I
16 could go through it.
17  Q.  We may do that, but let me first just
18 ask you about some specific categories.
19  A.  Sure.
20  Q.  You mentioned billing records, and we
21 received from you one piece of paper which we've
22 marked as Exhibit 2. Is that what you were able
23 to find in terms of billing records?
24  A.  That's how we responded to your

Page 122

1  their promotional efforts in promoting off-label
2  sales. I looked at their strategic plans, and
3  when you do that you discover that the main
4  source of growth for Neurontin is not in its
5  approved indication for epilepsy or pediatric
6  epilepsy or post-herpetic neuralgia, it all
7  comes from the off-label uses, and that's where
8  they concentrated their marketing efforts. And
9  it's a very comprehensive scheme of things that
10 was done to promote the off-label uses, and
11 we've touched on some of the aspects of that.
12 So I looked at the company documents to see what
13 the company was doing and how they were thinking
14 about it.
15      And also I looked at their own
16 analyses of the market in terms of how
17 successful they were in meeting their corporate
18 objectives.
19      I also reviewed the academic
20 literature to see what's known about promotion
21 of pharmaceuticals and how it would relate to
22 this case.
23      You know, I drew upon my own
24 experience, too.

Page 123

1       And then I did some additional
2  analyses of data that you provided to see if I
3  could corroborate the findings that I had from
4  the documents, from the academic studies, and
5  see if that's what I observed in this case.
6       And then finally, as we've discussed,
7  when subsequent expert reports came out, I read
8  the expert reports and analyzed them to see if
9  they were consistent with the analyses that I'd
10 done based on company documents, based on
11 independent market and economic analyses, and
12 based on my review of the academic literature,
13 and they were highly corroborative.
14    Q.  So let me just try to recap and make
15 sure I'm not missing anything.
16      You reviewed documents produced by
17 Defendants, you reviewed the literature,
18 academic literature on pharmaceutical promotion,
19 and you reviewed expert reports filed by other
20 Plaintiffs' experts?
21    A.  Well, subsequently to writing the
22 report. And I also did analyze the data,
23 available data to see what was happening in the
24 market.

Page 124

1    Q.  Did you do anything else?
2    A.  I think that's most of it. I can't
3  think of anything at the moment. If I thought
4  about it.
5    Q.  Okay. Just to be clear, when you -- I
6  think you've already said this, but when you
7  refer to Plaintiffs' other expert reports, you
8  mentioned that those were received after you
9  submitted this report, right?
10   A.  Correct.
11   Q.  So they didn't form the basis for the
12 opinions as you've expressed them in the report?
13   A.  No, they don't, but they corroborate
14 my findings and opinions.
15   Q.  And the data analysis, is there any
16 data work that you've done that is not reflected
17 in the charts that appear in your report?
18   A.  Not that support the basis of my
19 opinion, no. It's all here in the report.
20   Q.  Okay. And this may be implicit in one
21 of your last answers, but I take it you haven't
22 sought to quantify in any specific way the
23 impact of any particular types of alleged
24 improper promotion on off-label sales of

Page 125

1  Neurontin?
2    A.  I have not. And I would also add it's
3  not clear to me, or I wasn't able to on the
4  basis of the information and data that I had, I
5  didn't see a way that I could actually do that
6  with what had been provided.
7    Q.  So this is a kind of analysis that you
8  personally haven't done?
9    A.  No, I haven't done any such analysis.
10   Q.  And you haven't sought to determine
11 whether any particular Neurontin prescriptions
12 for any particular patients were the result of
13 alleged improper promotions, is that right?
14   A.  In an individual case?
15   Q.  Right.
16   A.  No.
17   Q.  Okay. So you're not offering an
18 opinion that any particular Plaintiff's
19 Neurontin prescriptions resulted from any
20 alleged improper conduct?
21       MR. ROSENKRANZ: Objection. Asked and
22 answered.
23       You can answer.
24   A.  I guess there I would say, you know,