UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
In re:  NEURONTIN MARKETING, SALES
   PRACTICES AND PRODUCTS
   LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:

  *Smith v. Pfizer Inc., et al.,* 1:05-cv-11515-PBS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**DEFENDANTS PFIZER INC. AND WARNER-LAMBERT COMPANY LLC'S
REPLY TO PLAINTIFFS' RESPONSE TO LOCAL RULE 56.1 STATEMENT OF
MATERIAL FACTS AND RESPONSE TO PLAINTIFF'S FURTHER
<u>STATEMENT OF MATERIAL FACTS</u>**

   Defendants Pfizer Inc. and Warner-Lambert Company LLC ("defendants") submit the following reply to Plaintiffs' Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, and response to Plaintiff's Further Statement of Material Facts.

**I. REPLY TO PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL
  RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

   Set forth below is each material fact included in defendants' Local Rule 56.1 Statement of Undisputed Material Facts, along with plaintiff's response to each, followed by defendants' reply:

   1. Mr. Smith was first prescribed Neurontin on May 5, 2003.  (Sayler Decl., Ex. 13.)[1]

   <u>Plaintiffs' Response to No. 1:</u>  Admit.

---

[1] "Sayler Decl." refers to exhibits attached to the Declaration of Scott W. Sayler, Esq. in Support of Motion for Summary Judgment filed on January 23, 2009 (Dkt. # 1644.)

**Defendants' Reply to Fact No. 1:**   N/A

2.    There is no evidence that Mr. Smith took Neurontin when it was prescribed in 2003.  Ruth Smith Dep. 112:13-117:15 (Sayler Decl., Ex. 4); Maris Dep. 536:11-537:20 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 2:        Admit.

**Defendants' Reply to Fact No. 2:**   N/A

3.    A second physician suggested Neurontin on January 5, 2004, but Mr. Smith did not take Neurontin at that time.  Maris Dep. 536:11-537:20 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 3:        Admit.

**Defendants' Reply to Fact No. 3:**   N/A

4.    On March 9, 2004 visit, Dr. Mackey prescribed Neurontin 300 mg, twice a day for Mr. Smith.  Maris Dep. 536:11-17 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 4:        Admit.

**Defendants' Reply to Fact No. 4:**   N/A

5.    Dr. Mackey testified that he "probably" read the Neurontin package insert "a long time" before he prescribed Neurontin for Mr. Smith, but that he typically did not re-review prescription drug labeling on any kind of regular basis.  Mackey Dep. 79:20-80:1, 81:9-19 (Sayler Decl., Ex. 7.)

Plaintiffs' Response to No. 5:        Disputed. Plaintiff submits that paragraph 5 of Defendants Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he probably would have changed the way he treated Richard Smith. Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12). Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects. Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).

**Defendants' Reply to Fact No. 5:**   Plaintiff's response ignores the sworn testimony of Dr. Mackey:

> Q.   And I think Mr. Lanier asked you this, but I can't recall exactly what your answer was.   <u>With regard to the PDR information, the labeling information regarding Neurontin, had you reviewed that at some point prior to prescribing for Mr. Smith</u>?
>
> A.   <u>A long time ago, probably.</u>
>
> \*\*\*
>
> Q.   During the period of time that you—you said you may have reviewed the Neurontin label sometime prior to having prescribed for Mr. Smith.   <u>Do you re-review labeling on an annual basis or on any kind of a regular basis or not, on medications that you prescribe regularly</u>?
>
> A.   <u>Ah, not typically.</u>

Mackey Dep. 79:20-80:1, 81:9-19 (Sayler Decl., Ex. 7.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Whether Dr. Mackey would have changed his treatment of Mr. Smith is immaterial to plaintiff's claims as the dispositive question in a failure to warn case is whether the prescribing decision would have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

6.   Mr. Smith filled his one and only thirty-day prescription for Neurontin on March 9, 2003, nearly two months before his death.  Plaintiff' Response to Defendants' First Set of Interrogatories at No. 14, p. 22 (Sayler Decl., Ex. 8.)

Plaintiffs' Response to No. 6: Disputed.  Plaintiff submits that paragraph 6 of Defendants Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey had samples of Neurontin in his closet for distribution to patients and he did distribute those samples to patients. Mackey Dep. 78:3-7 (Finkelstein Decl., Ex. 12). Mr. Smith's daughter Cindy saw samples of Neurontin on the file cabinet in her father's office in his house, prior to his death. Smith-Charlton Dep. 80:18-25-81:1-8 (Finkelstein Decl., Ex. 21). There was several boxes of samples. The boxes were four or five inches tall and about two inches square. The word Neurontin was printed on the boxes.  Smith-Charlton Dep. 81:16-25, 82:1-18 (Finkelstein Decl., Ex. 21).

**Defendants' Reply to Fact No. 6:**   Plaintiff's response ignores plaintiff's sworn Interrogatory answers:

3347748v1

Interrogatory No. 14:  [F]or each prescription, please also state the name of the prescribing health care professional, the name of the prescription, the prescription dosage, each date that the prescription was prescribed, where the prescription was filled, the reason for the prescription and whether it was effective at treating the condition for which it was prescribed.

Response to Interrogatory No. 14:
Neurontin; Dr. Mackey – 300 mg/2xs day – 3/9/04

Plaintiff's Response to Defendants' First Set of Interrogatories at No. 14, pp. 19, 22 (Sayler Decl., Ex. 8.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  The fact that Mr. Smith received samples is not evidence that he in fact ingested them.

7.     Mrs. Smith herself picked up Mr. Smith's Neurontin prescription from Eckerd's on March 9, 2004.  Ruth Smith Dep. 114:2-19, 139:9-141:19 (Sayler Decl., Ex. 4.)

Plaintiffs' Response to No. 7:          Admit.

**Defendants' Reply to Fact No. 7:**   N/A

8.     Had Mr. Smith taken the Neurontin prescribed and filled on March 9, 2004 according to doctor's instructions, the prescription bottle would have been empty by April 8, 2004.  Granacher Rpt. at 6 (Sayler Decl., Ex. 11); Jacobs Rpt. at 13 (Sayler Decl., Ex. 12.)

Plaintiffs' Response to No. 8: Disputed.  Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete. The Pfizer representatives were putting a lot of samples of Neurontin in Dr. Mackey's office. Mackey Dep. 29:2-8 (Finkelstein Decl., Ex. 12). Dr. Mackey had samples of Neurontin in his closet for distribution to patients and he did distribute those samples to patients. Mackey Dep. 78:3-7 (Finkelstein Decl., Ex. 12). Mr. Smith's daughter Cindy saw samples of Neurontin on the file cabinet in her father's office in his house, prior to his death. Smith-Charlton Dep. 80:18-25, 81:1-8 (Finkelstein Decl., Ex. 21). There were several boxes of samples. The boxes were four or five inches tall and about two inches square. The word "Neurontin" was printed on the boxes. Smith-Charlton Dep. 81:16-25, 82:1-18 (Finkelstein Decl., Ex. 21). Mr. Smith made five different statements about Neurontin affecting his mental state. Trimble Dep. 126:1-127:8 (Finkelstein Decl., Ex.

23). Concerning Mr. Smith's ingestion of Neurontin, Dr. Trimble testified that: a family member reported that Mr. Smith reliably took the medication he was prescribed; Mr. Smith stated Neurontin made him feel "loopy", and Mr. Smith told Mr. Woods that he was taking Neurontin and that it made him feel "weird"; Mr. Smith told physicians that Neurontin was not helping him; and there was a Neurontin pill bottle on the dresser at the time of his suicide, and he had samples of Neurontin. Trimble Dep. 546:19-549:22 (Finkelstein Decl., Ex. 23). The evidence that Dr. Trimble considered that Mr. Smith was in fact ingesting Neurontin was Ruth Smith's testimony that in Mr. Smith's own words, he underwent a mental state change, after he was ingesting Gabapentin. Trimble Dep. 267:3-268:1 (Finkelstein Decl., Ex. 23). There is indirect evidence that Mr. Smith was ingesting 300 milligrams three times a day. Trimble Dep. 269:22-271:20 (Finkelstein Decl., Ex. 23).

**Defendants' Reply to Fact No. 8:**   Plaintiff's response does not controvert Statement of Fact No. 8 and therefore does not give rise to a genuine issue of material fact that would preclude summary judgment.   Statement of Fact No. 8 deals with Mr. Smith's Neurontin prescription, not whether Mr. Smith was given samples.  In addition, the fact that Mr. Smith received samples is not evidence that he in fact ingested them.

9.    Plaintiff testified that she cannot recall observing Mr. Smith take his Neurontin every time he was supposed to according to prescription.  Ruth Smith Dep. 143:12-16 (Sayler Decl., Ex. 4.)

Plaintiffs' Response to No. 9:        Admit.

**Defendants' Reply to Fact No. 9:**   N/A

10.    Plaintiff testified that Mr. Smith took his prescriptions as prescribed because "that was just the way he did things."  Ruth Smith Dep. 143:2-16 (Sayler Decl., Ex. 4.)

Plaintiffs' Response to No. 10:       Admit.

**Defendants' Reply to Fact No. 10:**  N/A

11.    A Neurontin bottle, which plaintiff's expert Dr. Maris described as "full," was found on the dresser of Mr. Smith's bedroom following his death.  Maris Dep. 527:18-528:15 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 11:          Disputed. Plaintiff submits that paragraph 11 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Gary Wayne

Biggs, the medical/death investigator from Medical Forensics who investigated the death, collected the bottle of Neurontin. He probably did not make a note of how many pills were left in the bottle. Biggs Dep. 49:14-25 (Finkelstein Decl., Ex. 24). He could not find any written notation in his notes of how many pills were left in the bottle. Biggs Dep. 49:14-25-50:1-7 (Finkelstein Decl., Ex. 26). Medical Forensics disposes of medications collected from the scene. Biggs Dep. 63:8-11 (Finkelstein Decl., Ex. 24).

**Defendants' Reply to Fact No. 11:** Plaintiff's response ignores the sworn testimony of Dr. Maris:

> Q.    Okay.  And so part of your opinion is don't get hung up on dose response.  What does that mean?
>
> A.    That means that we really can't say exactly how much Neurontin that Richard Smith took.  I know there was 67 days.  I don't know for a fact that he took it every day.  <u>I know that in Bigg's investigation there's a big bottle sitting on his dresser which looks like it's full of Neurontin.</u>

Maris Dep. 527:18-528:1 (Sayler Decl., Ex. 3.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  That Investigator Biggs did not make any notation about how many pills were left in the bottle does not controvert Dr. Maris' testimony that the bottle appeared "full."

12.    Dr. Maris testified that Mr. Smith "skipped a few doses" of Neurontin.

Maris Dep. 540:5-18 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 12:    Disputed. Plaintiff submits that paragraph 12 of Defendants' Statement of Facts is incorrect or otherwise incomplete. According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

**Defendants' Reply to Fact No. 12:** Plaintiff's response ignores the sworn testimony of Dr. Maris:

> Q.    If you turn to your report at page 14, you say that Mr. Smith may have skipped a few doses or days, but then you go on to say and did ingest a minimum of 42,000 milligrams before he died on May 13, 2004.  You don't know for a fact, right that he consume 42—
>
> A.    Why would you say I know that?
>
> Q.    Pardon me?
>
> A.    Why would you say I know what?

3347748v1

> Q.    My question to you is you don't know that, do you?
> A.    <u>I said right here he may have skipped a few doses.</u>

Maris Dep. 540:5-18 (Sayler Decl., Ex. 3.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiff testified that she "knows" Mr. Smith took his Neurontin because "that was just the way he did things," even though she could not recall Mr. Smith taking his Neurontin every time as prescribed by his doctor.  Ruth Smith Dep. 143:2-16 (Sayler Decl., Ex. 4.)  In other words, plaintiff believes that Mr. Smith took his Neurontin, but does not have personal knowledge he did so.

13.    Dr. Maris testified that, based on Neurontin's half-life of five to seven hours, there would be no appreciable Neurontin left in an individual's system within twenty-four hours after taking the medication.  Maris Dep. 549:24-550:16 (Sayler Decl., Ex. 3.)

<u>Plaintiffs' Response to No. 13:</u>        Disputed. Plaintiff submits that paragraph 13 of Defendants Statement of Facts is incorrect or otherwise incomplete and mischaracterizes Dr. Maris's testimony. Defendants mischaracterizes Dr. Maris's testimony relating to the half-life of Neurontin in terms of its elimination from the body:

> Although I acknowledge that Neurontin's half-life is five to seven hours in terms of its elimination from an individual's "system", **this testimony does <u>not</u> equate to a marker for the time it takes for Neurontin to no longer have an effect on the brain's neurotransmitters (e.g., serotonin) and contribute to suicidality**.  The package insert for Neurontin and discussion of its half-life does <u>not</u> pertain to effects on neurotransmitters; rather, the package insert pertains to blood/plasma ... [See Maris Declaration, ¶10, ECF Doc. #1673 (emphasis added)].

"[T]here is no direct relationship between dose by mouth and the amount of drug in the brain." Trimble Dep. 247:20-248:9 (Finkelstein Decl., Ex. 23). It probably takes 24 to 48 hours (2 days) of consecutive gabapentin administration to get to a "steady state." Trimble Dep. 249-250:2 (Finkelstein Decl., Ex. 23). The half-life of gabapentin is extended in elderly individuals.  Trimble Dep. 250:4-16 (Finkelstein Decl., Ex. 23). Regarding the length of time it would take for Neurontin to clear an individual's "system" after the last dose, Prof. Trimble submits that where the individual took multiple doses, like Mr. Smith, the "body becomes saturated with the product. And if you stop taking the drug, you will still get the product emerging from fatty tissue" so the delay, when you've been taking the drug chronically, is very different." Trimble Dep.

- 7 -

258:11-23 (Finkelstein Decl., Ex. 23). If you have been taking gabapentin for two months, it would take several days at least after your last dose before there is no appreciable gabapentin in your system. Trimble Dep. 258:24-259:6 (Finkelstein Decl., Ex. 23). A separate question is at what point the drug would have no clinical effect following the last ingestion – "if you have a drug which acts on the brain and influences brain neurochemistry, you may well have an effect which by far outlasts the effect of the amount of the blood, of what's in the blood. So once you have got the blood into the brain, you're talking again about a different system to just looking at what comes out when you stop the drug from the bloodstream." Trimble Dep. 259:13-260:1 (Finkelstein Decl., Ex. 23). Since Mr. Smith was taking 900 milligrams of Neurontin a day, an increased GABA level that would have caused a reduction in serotonin that would cause an impulsive suicide "may well have occurred in the first of 12 hours" and "you see biochemical changes very soon, so one dose may have sent the chain rolling, if you like. Or the ball rolling." Trimble Dep. 276:12-24 (Finkelstein Decl., Ex. 23). Mr. Smith "clearly committed suicide after several weeks on this medication. And it may well be that the effects were magnified when the dose was increased, which is often the case. That it's the change of dose which leads to an alteration of the amount of change within the central nervous system." Trimble Dep. 277:18-278:3 (Finkelstein Decl., Ex. 23).

**Defendants' Reply to Fact No. 13:** Plaintiff's response ignores the sworn testimony of Dr. Maris:

Q.    Do you know how many hours following administration of a single dose of gabapentin there is no appreciable drug left in the system?

A.    According to Petroff, it doesn't really say. We know what the half life is. You know, that would not be—that would be a rough approximation of how much.

Q.    Okay.

A.    So I previously testified to that. It's also in the package insert.

Q.    The half life is in the package insert?

A.    The half life is mentioned. It says half life is five to seven hours. So as you know, the half life is not doubled. You know, it's not like—if it's a half life of seven, it's not 14. But it sounds to me like it would be within 24 hours based on the half life if you didn't take anymore.

Maris Dep. 549:24-550:16 (Sayler Decl., Ex. 3.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment and is based on an improper, after-the-fact attempt to change Dr. Maris' testimony and is therefore subject to a separate motion to strike. Moreover, Dr. Trimble's testimony that there would be no Neurontin left in one's system within "several days" is vague and does not give rise to a genuine issue of material fact given Dr. Maris' testimony that no one observed Mr. Smith ingest Neurontin on any of the four days leading up to his death, Maris Dep. 529:14-530:14 (Sayler Decl., Ex. 3.) and Dr. Trimble's testimony that he does not know when Mr. Smith

- 8 -

last ingested Neurontin prior to his death.  Trimble Dep. 263:9-10 (Sayler Decl., Ex. 2.).
Moreover, Trimble admits he does not know Mr. Smith's GABA or serotonin level at the
time of his suicide, rendering his reliance on purported changes in GABA and serotonin
levels speculative as to Mr. Smith.  Trimble Dep. 268:14-270:4 (McGroder Decl., Ex. 1.)[2]

14.    Dr. Maris testified that no one observed Mr. Smith ingest Neurontin on
any of the four days leading up to his suicide, nor on any other particular day.  Maris
Dep. 529:14-530:14 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 14:    Disputed. Plaintiff submits that paragraph 14
of Defendants' Statement of Facts is incorrect or otherwise incomplete.  According to
Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it.
She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

**Defendants' Reply to Fact No. 14:**  Plaintiff's response  ignores  the  sworn
testimony of Dr. Maris:

Q.    And when you say you can't—there's no way to know how much
Neurontin he took, it's true, isn't it, that no family member
personally observed him taking Neurontin on the day of his
suicide; is that correct?

A.    On the day of his suicide?

Q.    Yes.

A.    I think that is true.

Q.    What about the day before, what about the 11th of May 2004, did
any family member personally observe Mr. Smith take Neurontin
on that day?

A.    I don't think there's any evidence one way or the other.

Q.    And what about the day before that on 5/10/2004, is there any
evidence that any family member personally observed Mr. Smith
take Neurontin on that day?

A.    I don't think there's any evidence on any specific day.  So if you
go to day four, I'm going to say also the same thing.

Maris Dep. 529:14-530:9 (Sayler Decl., Ex. 3.)

Further responding, plaintiff's response does not give rise to a genuine issue of
material fact that would preclude summary judgment.  Plaintiff testified that she "knows"
Mr. Smith took his Neurontin because "that was just the way he did things" even though
she could not recall Mr. Smith taking his Neurontin every time as prescribed by his
doctor.  Ruth Smith Dep. 143:2-16 (Sayler Decl., Ex. 4.)  In other words, plaintiff

---

[2] "McGroder Decl." refers to exhibits attached to the Declaration of Lori M. McGroder, Esq. in Support of
Defendants' Reply in Support of Motion for Summary Judgment, filed March 12, 2009.

believes that Mr. Smith took his Neurontin, but does not have personal knowledge he did so.

      15.    Dr. Trimble testified that he does not know when Mr. Smith last took

Neurontin prior to his death.  Trimble Dep. 263:9-10 (Sayler Decl., Ex. 2.)

     <u>Plaintiffs' Response to No. 15:</u>    Disputed. Plaintiff submits that paragraph 15 of Defendants' Statement of Facts is incorrect or otherwise incomplete. According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

     **<u>Defendants' Reply to Fact No. 15:</u>** Plaintiff's response ignores the sworn deposition testimony of Dr. Trimble:

     Q.    And when did he [Mr. Smith] take his last dose?
     A.    That I do not know.

     Trimble Dep. 263:9-10 (Sayler Decl., Ex. 2.)

     Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiff testified that she "knows" Mr. Smith took his Neurontin as prescribed because "that was just the way he did things" even though she could not recall Mr. Smith taking his Neurontin every time as prescribed by his doctor.  Ruth Smith Dep. 143:2-16 (Sayler Decl., Ex. 4.)  In other words, she believes that Mr. Smith took his Neurontin as prescribed, but does not have personal knowledge he did so.

       16.    Dr. Maris testified that he did not know how many Neurontin pills

Mr. Smith may have ingested at any time.  Maris Dep. 539:12-20 (Sayler Decl., Ex. 3.)

     <u>Plaintiffs' Response to No. 16:</u>    Disputed. Plaintiff submits that paragraph 16 of Defendants' Statement of Facts is incorrect or otherwise incomplete. According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

     **<u>Defendants' Reply to Fact No. 16:</u>** Plaintiff's response ignores the sworn testimony of Dr. Maris:

     Q.    You don't know the actual number of pills Mr. Smith took, correct?
     A.    No.  All I know is that he theoretically had 67 days from March 9th until his death.  Whether he took them every day, how much he took every day, could have been variable.

     Maris Dep. 539:15-20 (Sayler Decl., Ex. 3.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiff testified that she "knows" Mr. Smith took his Neurontin as prescribed because "that was just the way he did things" even though she could not recall Mr. Smith taking his Neurontin every time as prescribed by his doctor.  Ruth Smith Dep. 143:2-16 (Sayler Decl., Ex. 4.)  In other words, plaintiff believes that Mr. Smith took his Neurontin as prescribed, but does not have personal knowledge he did so.

17.     There is no biochemical evidence of Neurontin in Mr. Smith's body at the time of his death because Mr. Smith's blood was not tested for the presence of Neurontin.

Trimble Dep. 268:19-269:13 (Sayler Decl., Ex. 2.)

Plaintiffs' Response to No. 17:     Disputed. Plaintiff submits that paragraph 16 of Defendants' Statement of Facts is incorrect or otherwise incomplete. It is not known if there was biochemical evidence of Neurontin in Mr. Smith's at the time of his death. Admit that Mr. Smith's blood was not tested.  A separate question is at what point the drug would have no clinical effect following the last ingestion – "if you have a drug which acts on the brain and influences brain neurochemistry, you may well have an effect which by far outlasts the effect of the amount of the blood, of what's in the blood. So once you have got the blood into the brain, you're talking again about a different system to just looking at what comes out when you stop the drug from the bloodstream." Trimble Dep. 259:13-260:1 (Finkelstein Decl., Ex. 23).

**Defendants' Reply to Fact No. 17:**  Plaintiff's   response   ignores   the   sworn testimony of Dr. Trimble:

Q.     Well, he didn't have an autopsy; did he?
A.     Okay, I'm sorry.  Blood was not taken to look to see what—well, they didn't measure—actually it was taken, blood was taken, but they didn't measure Gabapentin.
Q.     Other than a post-mortem blood screen—well, let me articulate it differently.  Setting aside a post-mortem blood screen that doesn't identify Gabapentin—well, withdrawn.
       It's true that you have no evidence as you sit here today that Mr. Smith had Gabapentin in his body at the time of his suicide?
A.     There is no evidence that Mr. Smith had Gabapentin inside his body in terms of biochemical evidence, that is correct.

Trimble Dep. 268:19-269:13 (Sayler Decl., Ex. 2.)

Further responding, plaintiff's response does not give to a genuine issue of material fact that would preclude summary judgment.  Dr. Trimble admits he does not know Mr. Smith's GABA or serotonin level at the time of his suicide, rendering his

- 11 -

reliance on "brain neurochemistry" speculative as to Mr. Smith.  Trimble Dep. 268:14-270:4 (McGroder Decl., Ex. 1.)

18.    Dr. Maris testified that he did not know how many samples Mr. Smith

might have ingested.  Maris Dep. 539:12-14 (Sayler Decl., Ex. 3.)

Plaintiffs' Response to No. 18:          Disputed. Plaintiff submits that paragraph 18 of Defendants' Statement of Facts is incorrect or otherwise incomplete. According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

**Defendants' Reply to Fact No. 18:**  Plaintiff's response  ignores  the  sworn testimony of Dr. Maris:

Q.    You don't know the number of samples Mr. Smith took, correct?
A.    I don't know.
Q.    You don't know the actual number of pills Mr. Smith took, correct?
A.    No.  All I know is that he theoretically had 67 days from March 9th until his death.  Whether he took them every day, how much he took every day, could have been variable.

Maris Dep. 539:12-20 (Sayler Decl., Ex. 3.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Plaintiff testified that she "knows" Mr. Smith took his Neurontin as prescribed because "that was just the way he did things" even though she could not recall Mr. Smith taking his Neurontin every time as prescribed by his doctor.  Ruth Smith Dep. 143:2-16 (Sayler Decl., Ex. 4.)  In other words, plaintiff believes that Mr. Smith took his Neurontin as prescribed, but does not have personal knowledge he did so.

19.    Dr. Mackey could state with more than 50, but less than 90 percent

certainty that he had a conversation with a sales representative at some point in time

about Neurontin. He testified that this conversation was about a study in an on-label use

and that the discussion could have taken place before or after the period he treated

Mr. Smith.  Mackey Dep. 76:2-23 (Sayler Decl., Ex. 7.)

Plaintiffs' Response to No. 19:          Disputed. Plaintiff submits that paragraph 19 of Defendants' Statement of Facts is incorrect or otherwise incomplete. A sales representative from Pfizer, Parke-Davis, Warner Lambert came an talked to Dr. Mackey about Neurontin. They discussed what Dr. Mackey would prescribe Neurontin for, that is,

neuropathic pain, which is an off-label use of the drug.   Mackey Dep. 76:10-77:12 (Finkelstein Decl., Ex. 12).   In addition, the sales representatives who came to Dr. Mackey's practice targeted the particular physicians who dealt with chronic pain, that is, the physical medical rehabilitation physicians or pain specialists in the practice. Mackey Dep. 29:6-31:21 (Finkelstein Decl., Ex. 12).

**Defendants' Reply to Fact No. 19:** Plaintiff's response   ignores   the   sworn testimony of Dr. Mackey:

Q.   You don't have any present recollection of any conversations with Pfizer, detailers or sales reps during the 2002, 2003, 2004 time frame?

A.   Well, Pfizer or any set—can I answer with any sales rep?

Q.   Sure.

A.   I don't know who's aligned with who.   I do recall talking with somebody, I don't know who it way, during that time frame regarding Neurontin.

Q.   Okay.

A.   I mean it's natural that they would come talk to me as a spine surgeon more so probably than talking to Clendenin or Nichols, but I mean less so compared to them but certainly more than Allen Anderson, who would not treat them at all.
So I feel, though I couldn't--probably greater than 50 percent certainty , you know, not 90 percent.

Q.   So you think more likely than not some Pfizer—

A.   Yes.

Q.   --sales representative came and talked to you about, about Neurontin?

A.   Or whomever.   Somebody with Neurontin.

Q.   Okay

A.   Again Pfizer, Parke-Davis, Warner-Lambert.

Q.   Sure.   More likely than not you had such a discussion.   Do you recall anything about what discussion was had in that meeting?

A.   Just again what I would use it for, and that is neuropathic pain. And I recall a discussion about a study coming out that shows on-label use of it at some point, but I can't—and that was—that may have been after or during this time, I don't recall.

Q.   Okay.   You're a little vague on that?

A.   Um, you know, it's asking something that's you know, I got so many other things going through.

Q.   I understand.

A.   To remember three or four, five years ago.   And I—it could be longer than that.

Mackey Dep. 76:2-77:23 (Sayler Decl., Ex. 7.)

- 13 -

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  First, plaintiff does not controvert that Dr. Mackey could not recall whether the conversation with the sales representative took place before or after he treated Mr. Smith, or that Dr. Mackey was only 50-90% sure the conversation even occurred.  Second, Dr. Mackey testified that the meeting with the sales representative was about what he would use Neurontin for, "that that is neuropathic pain," of which postherpetic neuralgia is a type. Dr. Mackey did not state that an "off-label" use of the drug was discussed.  He additionally stated that he recalled a discussion of a study regarding "on-label use" of Neurontin.  Moreover, plaintiff's suggestion that defendants targeted particular doctors in Dr. Mackey's practice is not supported by the referenced excerpt, which states only that two doctors, Dr. Clendenin and Dr. Nichols, were detailed by defendants' sales representatives.  That doctors other than Mr. Smith's prescriber, Dr. Mackey, were detailed is immaterial to plaintiff's claims.

20.     Dr. Mackey testified that he does not read literature of any kind regarding pain management.  Mackey Dep. 74:10-11 (Sayler Decl., Ex. 7.)

Plaintiffs' Response to No. 20:     Disputed. Plaintiff submits that paragraph 20 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey relies on the drug companies to be honest and forthright with him. Mackey Dep. 27:22-3, 25 (Finkelstein Decl., Ex. 12). He relies on the drug companies to tell him both the good and the bad about their drugs. Mackey Dep. 28:1-5 (Finkelstein Decl., Ex. 12). Pfizer representatives were making calls on Dr. Nichols and Dr. Clendenin, the doctors who are the pain specialists in Dr. Mackey's group.  Mackey Dep. 29:9-25, 30:1-12 (Finkelstein Decl., Ex. 12). They prescribed Neurontin primarily for pain. Mackey Dep. 30:5-12 (Finkelstein Decl., Ex. 12). Dr. Mackey relies on Dr. Nichols and Dr. Clendenin to guide him when he has patients who have pain issues. Mackey Dep. 30:25-31:1-2 (Finkelstein Decl., Ex. 12). He asks them for input advice on pain management issues. Mackey Dep. 31:16-20 (Finkelstein Decl., Ex. 12).

**Defendants' Reply to Fact No. 20:** Plaintiff's response ignores Dr. Mackey's sworn testimony:

Q.     How about medical literature, do you ever read medical literature with regard to risks and benefits of medications?
A.     I don't get literature sent to me on that.  It's what's provided to me by detail people, and that's—and again, as I mentioned earlier, you know, resources you have within your own group as partners.
Q.     Sure.
A.     But, no, I don't read literature regarding pain management.

Mackey Dep. 74:1-11 (Sayler Decl., Ex. 7.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  That defendants detailed other doctors in Dr. Mackey's practice is immaterial to plaintiff's claims.  Moreover, plaintiff

- 14 -

omits Dr. Mackey's testimony that Dr. Nichols and Dr. Clendenin "may have had an occasion to treat postherpetic neuralgia." Mackey Dep. 29:24-30:9 (McGroder Decl., Ex. 2.)

21.     When Dr. Mackey was asked whether he would have prescribed Neurontin to Mr. Smith based on the information he has today, Dr. Mackey testified that he would prescribe Lyrica if Mr. Smith walked into his office today. Mackey Dep. 92:16-93:2 (Sayler Decl., Ex. 7.)

Plaintiffs' Response to No. 21:     Disputed. Plaintiff submits that paragraph 21 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he "probably" would have changed the way he treated Richard Smith. Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12). Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects. Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).

**Defendants' Reply to Fact No. 21:** Plaintiff's response ignores the sworn testimony of Dr. Mackey:

| | |
|---|---|
| Q. | And my understanding from your testimony, Mr. Lanier is, based on what you know today, you don't know one way or the other whether you would still prescribe for Mr. Smith, is that accurate? |
| A. | If Mr. Smith came into my office today, I would not prescribe him Neurontin as –he would have gotten Lyrica. |
| Q. | Okay.  Lyrica wasn't available in 2004, was it? |
| A. | No. Not that I'm aware of.  Not that I recall. |

Mackey Dep. 92:16-93:2 (Sayler Decl., Ex. 7.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Whether Dr. Mackey would have changed his treatment of Mr. Smith is immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

22.     Dr. Mackey testified that he continues to prescribe Neurontin to this day in spite of the information regarding suicidal events in the product labeling.  Mackey Dep. 83:24-84:13 (Sayler Decl., Ex. 7.)

<u>Plaintiffs' Response to No. 22:</u>          Disputed. Plaintiff submits that paragraph 22 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he "probably" would have changed the way he treated Richard Smith. Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12). Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects. Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).

**<u>Defendants' Reply to Fact No. 22:</u>** Plaintiff's response ignores the sworn deposition testimony of Dr. Mackey:

> Q. <u>We were talking a little bit earlier about the fact that you are aware now that back in the 2003-2004 time frame there was some information about suicidal conduct, suicidal gesture in the, the Neurontin labeling</u>; correct?
> A. It's in the PDR, 2004.
> Q. Right. When did you become aware of that?
> A. Preparing for this deposition.
> Q. <u>And the fact of that was in there, that's not keeping you from prescribing Neurontin to anybody, is it</u>?
> A. <u>I wouldn't say to anybody, but it has not—I will still prescribe it</u>.

Mackey Dep. 83:24-84:13 (Sayler Decl., Ex. 7.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment. Whether Dr. Mackey would have changed his treatment of Mr. Smith is immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would have changed. *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

23.       Nurse Krancer testified that she "doesn't usually read the entire package insert" and instead relies on books and "blurbs in journals about new medications."

Krancer Dep. 29:2-10 (Sayler Dec., Ex. 9.)

<u>Plaintiffs' Response to No. 23:</u>          Disputed. Plaintiff submits that paragraph 23 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in depression and suicide, she would have educated the patients on these potential side effects. Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

**<u>Defendants' Reply to Fact No. 23:</u>** Plaintiff's response ignores the sworn testimony of Nurse Pamela Krancer:

3347748v1

> Q.    I understand.  The PDR or the package insert, is that something you read before you prescribe medications for patients?
> A.    <u>I usually don't read the entire package insert.  But we have books that are available to us, and there's always blurbs in our journals about new medication, and, you know, we try to at least read all that so we can at least educate people as much as we can on side effects.</u>

Krancer Dep. 29:2-10 (Sayler Decl., Ex. 9.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Whether Nurse Krancer would "probably" have provided additional education to her patients is immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

24.    Nurse Krancer was asked whether "if it had been brought to her attention that this drug [Neurontin] is associated with increases in depression and suicide," she "would have taken into account that information when prescribing this drug." In response she stated that she "probably would have thought abut [the prescription ] a little bit harder."  Krancer Dep. 15:2-15 (Sayler Decl., Ex. 9.)

<u>Plaintiffs' Response to No. 24:</u>          Disputed. Plaintiff submits that paragraph 24 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects. Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

**<u>Defendants' Reply to Fact No. 24:</u>** Plaintiff's response ignores the sworn testimony of Nurse Pamela Krancer:

> Q.    Okay.  If you had known about the side effects that I've discussed, if it had been brought to your attention that this drug is associated with increases in depression and suicide, would you have taken into account that information before you prescribed this drug?
> A.    I guess being—not being a psychiatrist or even a psychiatric nurse, I have to be honest in the fact that I—I always consider any drug that I give to somebody that I feel is truly depressed, but I don't—you know, I probably would have thought about it a little bit harder.

Krancer Dep. 15:2-15 (Sayler Decl., Ex. 9.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Whether Nurse Krancer would "probably" have provided additional education to her patients is immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

25.     Nurse Krancer testified that she does not recall any discussion with sales representatives regarding Neurontin for pain management and that any discussions regarding pain involved herpetic pain—one of Neurontin's approved indications.

Krancer Dep. 32:15-33:9 (Sayler Decl., Ex. 9.)

<u>Plaintiffs' Response to No. 25:</u>        Disputed.  Plaintiff submits that paragraph 25 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects. Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

**<u>Defendants' Reply to Fact No. 25:</u>** Plaintiff's response ignores the sworn testimony of Nurse Pamela Krancer:

> Q.     When you have been visited by the sales folks from the Neurontin drug, have they detailed you on using it for pain relief like you were doing for Mr. Smith?
> A.     I can't remember—I don't remember that, and I have to be honest.
> Q.     That's okay.  In some of the notes that they put on here—
> A.     Because I—
> Q.     Go ahead.
> A.     I don't remember when it was for herpetic pain, and—I mean, there's been a lot of transition with the medication, and I don't remember the chronological changes with the drug.
> Q.     Okay.
> A.     That's just being honest.  So when the drug changed, it's what we were using it for.  I'm not sure I can tell you exactly the date when all that happened.

Krancer Dep. 32:15-33:9 (Sayler Decl., Ex. 9.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Whether Nurse Krancer would "probably" have provided additional education to her patients is immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would

- 18 -

have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

26.     Nurse Krancer testified that she does not prescribe drugs based on what a sales representative tells her, but instead educates herself about the medication. Krancer Dep. 12:8-16 (Sayler Decl., Ex. 9.)

Plaintiffs' Response to No. 26:     Disputed. Plaintiff submits that paragraph 26 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects. Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

**Defendants' Reply to Fact No. 26:** Plaintiff's response ignores the sworn testimony of Nurse Pamela Krancer:

Q.     Sure.
A.     I don't prescribe a drug strictly on what a rep tells me.
Q.     Okay.
A.     I feel that no matter what a rep tells me, that before I prescribe the drug, hopefully, that I'm educated on it, before I—before I prescribe it.

Krancer Dep. 12:8-16 (Sayler Decl., Ex. 9.)

Further responding, plaintiff's response does not give rise to a genuine issue of material fact that would preclude summary judgment.  Whether Nurse Krancer would "probably" have provided additional education to her patients is immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).

- 19 -

## II. DEFENDANTS' RESPONSE TO PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Set forth below is each fact on which plaintiff relies in opposition to defendants'

Motion for Summary Judgment, along with defendants' response to each:

<u>USAGE</u>

1.      Richard Smith obtained 60 pills of Neurontin on March 9, 2004

(Finkelstein Dep., Ex. 28.)

**Defendants' Response to Fact No. 1**:  Admitted.  Defendants add that the 60 pills were obtained by prescription from Dr. Mackey and were a 30-day supply of Neurontin.  (Defendants' Statement of Fact No. 4.)

2.      Richard Smith obtained samples from Dr. Mackey's office.  Ruth Smith

Dep. 147:6-12 (Finkelstein Decl., Ex. 22.)

**Defendants' Response to Fact No. 2**: Disputed.  Mrs. Smith testified that <u>Dr. McCombs</u> gave Mr. Smith samples of Neurontin.  Ruth Smith Dep. 147:6-12 (McGroder Decl., Ex. 3.)  Dr. Mackey testified that he had samples for distribution in his closet, Mackey Dep. 77:25-78:7 (Sayler Decl., Ex. 7), but he did not testify that he gave samples to Mr. Smith.

3.      Dr. Mackey's office received samples of Neurontin for distribution to

patients.  Mackey Dep. 77:1-78:1-4 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 3**:  Admitted, but immaterial.  That Dr. Mackey's office received samples is not evidence that Dr. Mackey gave samples to Mr. Smith.

4.      Richard Smith had not used all of his samples when he died.  Smith-

Charlton Dep. 13:18-15:18 (Finkelstein Decl., Ex. 21.)

**Defendants' Response to Fact No. 4**:  Admitted in part.  First, the referenced deposition excerpt does not support plaintiff's fact.  Second, defendants admit that unopened samples were produced by plaintiffs, but dispute Fact No. 4 to the extent it suggests that Mr. Smith used some but not all of the samples he was provided.  Cindy Smith-Charlton testified that her mother had boxes of Neurontin samples containing "unopened blister packs" in her possession after Mr. Smith's death.  Smith-Charlton Dep. 11:19-13:15 (McGroder Decl., Ex. 4.)

5.      Richard Smith's daughter (Cindy Smith-Charlton) saw Neurontin samples

in his [sic] father's possession before he committed suicide.  Smith-Charlton Dep. 13:18-

15:18 (Finkelstein Decl., Ex. 21.)

**Defendants' Response to Fact No. 5**:  Disputed.  First, the referenced deposition
excerpt does not support plaintiff's fact.  Second, Cindy Smith-Charlton did not testify
that she saw samples in her father's possession.  Rather she testified that, after her
father's death, plaintiff had boxes of Neurontin samples containing "unopened blister
packs" in her possession.  Smith-Charlton Dep. 11:19-13:15 (McGroder Decl., Ex. 4.)

6.      Richard Smith informed his physical therapist he was taking Neurontin on

April 14, 2004 (Finkelstein Decl., Ex. 31.)

**Defendants' Response to Fact No. 6**:  Disputed.  First, the Declaration of Mr.
Finkelstein contains Exhibits 1-30; there is no Exhibit 31.  Plaintiff appears to have
intended to reference Exhibit 30, which is a physical therapy record of Mr. Smith.  That
plaintiff listed Neurontin as a "current medication" on April 14, 2004, nearly a month
before his death on May 13, 2004, is not evidence that Mr. Smith was actually taking
Neurontin as prescribed on April 14, 2004, nor that Mr. Smith took Neurontin every day
as prescribed from April 14, 2004 to May 13, 2004, or at any time temporally related to
his death.

7.      Richard Smith informed his dentist that he was taking Neurontin and that

it make [sic] him feel weird on May 10, three days before he committed suicide.

(Finkelstein Decl., Ex. 1.)

**Defendants' Response to Fact No. 7**:  Disputed.  First, the referenced exhibit is a
letter written by Dr. Wood, Mr. Smith's dentist, following Mr. Smith's death at the
request of Cindy Smith-Charlton, one of Mr. Smith's daughters.  Wood Dep. 9:15-10:4
(Sayler Decl., Ex. 10.)  The letter purports to summarize Dr. Wood's "remembrance" of a
conversation he had with Mr. Smith on May 10, 2004.  *Id.*  As such, the letter is pure
hearsay and, hence, inadmissible.  *See* Fed. R. Evid. 801.  Second, nowhere does the
letter state that Mr. Smith "was taking Neurontin" on May 10, 2004.  *See* Finkelstein
Decl., Ex. 1.

8.      Richard Smith informed his son-in-law (Wes Carnahan) on May 8 that he

was taking Neurontin, 5 days before he committed suicide.  Carnahan Dep. 18:21-19:21

(Finkelstein Decl., Ex. 26.)

3347748v1

**Defendants' Response to Fact No. 8**:  Disputed.  The referenced exhibit is an excerpt of the deposition testimony of Wes Carnahan, in which Mr. Carnahan purports to recount (during his deposition in October 2007) Mr. Smith's side of a conversation that occurred on May 8, 2004.  Carnahan Dep. 18:21-21:20 (McGroder Decl., Ex. 5.)  Mr. Carnahan's after-the-fact summary of what Mr. Smith may have said is pure hearsay and, hence, inadmissible.  *See* Fed. R. Evid. 801(b).

9.     Wes Carnahan is a pharmacist at the VA Hospital in Nashville, TN.

Carnahan Dep. 9:20-10:7 (Finkelstein Decl., Ex. 26.)

**Defendants' Response to Fact No. 9**:  Admitted, but immaterial.

10.    Richard Smith told his son-in-law (Wes Carnahan) that he was taking

Neurontin, that it made him feel loopy and he didn't feel like himself.  Carnahan Dep.

21:6-10 (Finkelstein Decl., Ex. 26.)

**Defendants' Response to Fact No. 10**:  Disputed.  The referenced exhibit is an excerpt of the deposition testimony of Wes Carnahan, in which Mr. Carnahan purports to recount (during his deposition in October 2007) Mr. Smith's side of a conversation that occurred on May 8, 2004.  Carnahan Dep. at 18:21-21:20 (McGroder Decl., Ex. 5.)  Mr. Carnahan's after-the-fact summary of what Mr. Smith may have said is pure hearsay and, hence, inadmissible.  *See* Fed. R. Evid. 801(b).

## PILL BOTTLE

11.    The medical examiner's office took photographs of Richard Smith's

bedroom as part of its investigation.  Biggs Dep. 43:18-20 (Finkelstein Decl., Ex. 24.)

**Defendants' Response to Fact No. 11**:  Admitted, but immaterial.

12.    Clearly visible in one photograph is a pill bottle with a lid that has

"Eckerd" and "Courtesy Refills" on the lid of the bottle.  Biggs Dep. 47:4-8 (Finkelstein

Decl., Ex. 24.)

**Defendants' Response to Fact No. 12**:  Admitted, but immaterial.

13.    The label on the pill bottle is not visible.  (Finkelstein Dec., Ex. 30.)

**Defendants' Response to Fact No. 13**:  Disputed.  First, the referenced Exhibit, "Ex. 30" is a physical therapy record.  Plaintiff appears to have intended to reference Exhibit 29, which is one of many photos of the suicide scene.  Plaintiff's fact contradicts Investigator Biggs testimony that he knew the bottle contained Neurontin because "you can see it on the pill bottle."  Biggs Dep. 47:4-24 (McGroder Decl., Ex. 6.)

14.     Gary Biggs, investigator for the Medical Examiner, believes the pill bottle with a lid that says "Eckerd" and "Courtesy Refills" is Neurontin because "it looks like you can see the writing right there on the capsule."  Mr. Biggs sees Neurontin "all the time" and has been prescribed Neurontin in the past.  Biggs Dep. 47:17-48:9 (Finkelstein Decl., Ex. 24.)

**Defendants' Response to Fact No. 14**:  Disputed.  Investigator Biggs testified he knew the bottle contained Neurontin because "you can see it on the pill bottle."  Biggs Dep. 47:4-24 (McGroder Decl., Ex. 6.)  Moreover, disputed to the extent plaintiff is suggesting that the fact that the pre-printed the lid says "Courtesy Refills" indicates that Mr. Smith in fact refilled his Neurontin prescription anytime after he was prescribed it on March 9, 2004.  Plaintiff admitted in sworn interrogatories to one and only one prescription of Neurontin (the March 9, 2004 prescription).  Plaintiff's Responses to Defendants' Interrogatories at No. 14, p. 22 (Sayler Decl., Ex. 8.)

**LEARNED INTERMEDIARY**

15.     Dr. Mackey prescribed Neurontin for Richard Smith.  Ruth Smith Dep. 130:23-25 (Finkelstein Decl., Ex. 22.)

**Defendants' Response to Fact No. 15**:  Admitted.

16.     Dr. Mackey was not aware of the FDA's concern that (i) Neurontin's widespread usefulness might be limited because of serious adverse events including depression and (ii) that depression may become worse in the epileptic population and require intervention or lead to suicide.  Mackey Dep. 34:14-35:5 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 16**:  Admitted but incomplete.  Dr. Mackey also did not know that in later reviews, FDA reviewer Cynthia McCormick failed to note any additional concerns about Neurontin and suicide, and that there were more instances

of depression among placebo patients in Neurontin neuropathic pain studies than patients taking Neurontin.  Mackey Dep. 84:18-87:18 (Sayler Decl., Ex. 7.)

17.    This information would be important to Dr. Mackey before he prescribed a

drug.  Mackey Dep. 36:13-17 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 17**:  Admitted but incomplete and immaterial. Dr. Mackey testified that he would want to know "any relevant information," including that in later FDA reviews.  Cynthia McCormick, the FDA reviewer who noted the initial concerns, failed to note any additional concerns about Neurontin and suicide or depression, and that there were more instances of depression among placebo patients in Neurontin neuropathic pain studies than patients taking Neurontin.  Mackey Dep. 84:18-87:18 (Sayler Decl., Ex. 7.)  Moreover, Dr. Mackey did not testify that, had he known this information, he would have changed his prescribing decision, making this fact immaterial to plaintiff's claims.

18.    Dr. Mackey had other alternatives to Neurontin that he could have

prescribed to Richard Smith that did not have the side effect of clinically significant

depression or suicide.  Mackey Dep. 36:18-25 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 18**:  Disputed.  Defendants dispute plaintiff's characterization of Neurontin as having the side effect of "clinically significant depression or suicide."   The cited deposition excerpt is phrased in the form of a hypothetical drug that "may cause suicide, clinically significant depression," and does not support the conclusion that Neurontin causes depression or suicide.  Moreover, Dr. Mackey testified only that there were "potentially" other drugs that he could have prescribed in response to a question about whether he "probably" had other options for Mr. Smith.  Mackey Dep. 36:18-25 (McGroder Decl., Ex. 2.)  Dr. Mackey also testified that narcotic pain medications, such as Lortab and hydrocodone, carry significant risks of "addiction, depression, and confusion."  Mackey Dep. 72:10-73:2 (McGroder Decl., Ex. 2.)

19.    Dr. Mackey was not aware of any testing performed by Pfizer or Warner-

Lambert that showed Neurontin leads to suicide.  Mackey Dep. 37:9-19 (Finkelstein

Decl., Ex. 12.)

**Defendants' Response to Fact No. 19**:  Admitted but immaterial.

20.    Dr. Mackey was not aware of the information contained in the affidavit of

Dr. Franklin who was a former medical liaison for Warner-Lambert/Parke-Davis who

stated that (i) he witnessed false representations that Neurontin was safe and effective for

unapproved indications; (ii) he was trained and instructed to misrepresent the amount of

clinical evidence available to support the use of Neurontin; (iii) the was trained and

instructed to use a number of misleading abstracts and case reports to promote Neurontin

for medically unaccepted uses.  Mackey Dep. 37:20-42:5 (Finkelstein Dep., Ex. 12.)

**Defendants' Response to Fact No. 20:**  Admitted but immaterial.  Dr. Franklin's affidavit concerned activity that occurred in 1996, eight years before Mr. Smith was prescribed Neurontin by Dr. Mackey in 2004.  Mackey Dep. 88:5-89:8 (Sayler Decl., Ex. 7.)  Moreover, plaintiff lacks any evidence that the information contained in Dr. Franklin's affidavit in any way influenced Dr. Mackey's prescription of Neurontin to Mr. Smith.

21.     Dr. Mackey testified that had he been told that Neurontin was a drug that

had the aforementioned problems, he "probably" would have changed the way he treated

Richard Smith.  Mackey Dep. 42:17-25  (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 21:**  Disputed, vague and immaterial.  Dr. Mackey testified that if he had been told that "Neurontin was a drug with some of the problems we have talked about today," he "possibly, probably" would have changed the way he treated Mr. Smith.  Mackey Dep. 42:17-43:25 (McGroder Decl., Ex. 2.)  It is unclear what "problems" Dr. Mackey was being asked about, as this question was directly proceeded by questions about off-label marketing.  Mackey Dep. 39:24-42:9 (McGroder Decl., Ex. 2.)  Moreover, the facts cited by plaintiff are immaterial as the "dispositive question" in a failure to warn case is whether the prescribing decision would have changed.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).  Dr. Mackey specifically testified that he "didn't know" if he would still have prescribed Neurontin had he known about the "problems" associated with it.  Mackey Dep. 42:17-43:11 (McGroder Decl., Ex. 2.)

22.     Had Dr. Mackey known of these problems associated with Neurontin, he

would have given Richard Smith specific warnings and told him to be observant about

side effects.  Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 22:**  Admitted, but vague and immaterial. First, it is unclear what "problems" Dr. Mackey was being asked about, as this question was directly proceeded by questions about off-label marketing.  Mackey Dep. 39:24-42:9 (McGroder Decl., Ex. 2.)  Second, although Dr. Mackey agreed that he would have "put

out some warnings and some safeties and precautions and told them what to be observant about," this does not raise a triable issue of material fact.  The dispositive question in a failure to warn case is whether different warnings would have changed the prescribing decision.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).  Dr. Mackey specifically testified that he "didn't know" if he would still have prescribed Neurontin had he known about the "problems" associated with it.  Mackey Dep. 42:17-43:11 (McGroder Decl., Ex. 2.)

23.     Had Warner-Lambert told Pam Krancer that Neurontin was associated

with increases in depression and suicide, she would have educated the patients on these

potential side effects.  Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25.)

**Defendants' Response to Fact No. 23:**     Admitted, but incomplete and immaterial.  Nurse Krancer additionally testified that if the scientific evidence did not show Neurontin increases depression and suicide, then she might do things differently than what she told Mr. Finkelstein (to whom she indicated that she would have educated her patients on potential side effects).  Krancer Dep. 28:7-29:1 (Sayler Decl., Ex. 9.)  In addition, the dispositive question in a failure to warn case is whether different warnings would have changed the prescribing decision.  *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 986, 997 (C.D. Cal. 2001), *aff'd* 358 F.3d 659 (9th Cir. 2004).  Plaintiff did not ask Nurse Krancer this dispositive question.

### DEFENDANTS ADMITTED FAILURE TO WARN

24.     On June 7, 2004, Defendant Warner Lambert LLC entered a plea of guilty

related to a charge of distribution of a misbranded drug; specifically, Defendant admitted

to having introduced the sale of Neurontin in "interstate commerce for unapproved uses

without adequate directs being provided to physicians and consumers for such uses."

(Finkelstein Decl., Ex. 29.)

**Defendants' Response to Fact No. 24:**  Disputed, incomplete and immaterial.  First, plaintiff references "Exhibit 29" in support of this fact, but Exhibit 29 appears to be a photo of Mr. Smith's dresser taken at the suicide scene.  Plaintiff appears to have intended to reference Exhibit 28, which is the transcript from the criminal plea hearing.  Defendants deny that the plea on June 7, 2004 is an admission that they failed to warn Mr. Smith's medical providers.  The plea was limited to conduct that occurred in 1995 and 1996, not in 2004 when Mr. Smith was prescribed Neurontin.  *See* Finkelstein Decl., Ex. 28 at 18-31 (summarizing factual basis of plea).

- 26 -

<u>**D**EFENDANTS' **S**UPPRESSION AND **F**RAUDULENT **P**ROMOTION OF **N**EURONTIN</u>

25.     Dr. Mackey testified that Defendants detailed him about "neuropathic pain," which is an off-label, unapproved use by the FDA.  Mackey Dep. 76:23-77:16 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 25:**  Disputed and immaterial.  Dr. Mackey testified that he was 50-90% sure he recalled meeting with a sales representative and that his best recollection was that the meeting was about what he would use Neurontin for, "that is neuropathic pain," of which postherpetic neuralgia is a type.  Dr. Mackey did not state that an "off-label" use of the drug was discussed.  He additionally stated that he recalled a discussion of a study regarding "on-label use" of Neurontin.  Mackey Dep. 76:2-77:24 (Sayler Decl., Ex. 7.)  In addition, Dr. Mackey could not recall whether this conversation took place before or after he treated Mr. Smith, Mackey Dep. 77:17-23 (Sayler Decl., Ex. 7.) making it immaterial.  Moreover, defendants' sales representative, Ashley Pippen Moreland, testified that she did not call on "pain specialists" until after the postherpetic neuralgia (PHN) indication.  Pippen Moreland 104:18-105:6 (McGroder Decl., Ex. 7.)

26.     Prior to Mr. Smith's death, Defendants' sales representative actively promoted Neurontin to Mr. Smith's healthcare provider, Pamela Krancer, an Advanced Practice Nurse, on approximately 27 occasions with respect to Neurontin.  (Finkelstein Decl., Ex. 17.)

**Defendants' Response to Fact No. 26:**  Disputed and immaterial.  Plaintiff attaches one page of call notes as Exhibit 17 that shows four visits to Nurse Krancer.  None of the notes state that defendants are "actively promot[ing]" Neurontin as opposed to simply detailing Nurse Krancer on the medication.  In fact, the word "Neurontin" does not even appear on Exhibit 17.  Moreover, that Nurse Krancer was visited by defendants' sales representative is not evidence that defendants made any misrepresentations regarding Neurontin.  Defendants' sales representative, Ashley Pippen Moreland, also testified that she never discussed off-label use of Neurontin with Nurse Krancer.  Pippen Moreland Dep. 100:4-101:7 (McGroder Decl., Ex. 7.)
.

27.     Prior to Mr. Smith's death, Defendants' sales representative actively promoted Neurontin to Mr. Smith's orthopaedist, Edward Mackey, M.D., and the doctors

in his medical practice on approximately 69 occasions with respect to Neurontin.

(Finkelstein Decl., Ex. 13.)

**Defendants' Response to Fact No. 27:**   Disputed and immaterial.   The referenced evidence does not support that defendants even detailed Dr. Mackey, a fact plaintiff's counsel has admitted.   Mackey Dep. 31:3-12 (McGroder Decl., Ex. 2.) (Plaintiff's counsel: "I don't show that the Pfizer people directly went to you and said, Here, use Neurontin for pain.   I see that they went to your partners that are the pain specialists in the clinic . . . .").   Moreover, Dr. Clendenin and Dr. Nichols, physicians in Dr. Mackey's practice, are not mentioned in the numerous pages plaintiff attached as Exhibit 13.   In addition, Exhibit 13 also includes call notes for among many other doctors, Dr. Clinton, who defendants' sales representative Ashley Pippen Moreland testified was not affiliated with Dr. Mackey's medical practice.   Pippen Moreland Dep. 86:15-87:22, 115:3-24 (McGroder Decl., Ex. 7.)

Further, that sales representatives visited physicians in Dr. Mackey's medical practice is not evidence the doctors were "actively promoted."   Plaintiff has also failed to identify any alleged misrepresentation made to any of these doctors and Dr. Mackey testified that he did not know what was discussed in these meetings.   Mackey Dep. 115:4-116:25 (McGroder Decl., Ex. 2.)   In addition, sales representative Ashley Pippen Moreland testified that she never discussed off-label use of Neurontin with any physicians.   Pippen Moreland Dep. 101:17-102:7, 136:18-24 (McGroder Decl., Ex. 7.) Because plaintiff has no evidence that any misrepresentation was made to any of Dr. Mackey's colleagues, the fact that the doctors were detailed by defendants fails to raise a genuine issue of fact that would preclude summary judgment.

28.     Prior to Mr. Smith's death, Defendants' sales representative detailed Mr. Smith's prescriber, Paul McCombs, III, M.D., a neurosurgeon, on approximately three occasions with respect to Neurontin.  (Finkelstein Decl., Ex. 19.)

**Defendants' Response to Fact No. 28:**  Disputed and immaterial.  Defendants do not dispute that Dr. Paul McCombs' name appears on Exhibit 19 on three occasions. However, the word "Neurontin" does not appear anywhere on Exhibit 19.  In addition, Dr. McCombs was not asked and did not offer any testimony in this case that he was even detailed by defendants' sales representatives.   Moreover, plaintiff did not fill the prescription he received from Dr. McCombs in 2003 (Defendants' Statement of Fact No. 2) and Nurse Krancer, not Dr. McCombs, prescribed Neurontin to Mr. Smith in 2004. Krancer Dep. 14:20-15:1 (Sayler Decl., Ex. 9.).  Thus, any alleged detailing of Dr. McCombs fails to raise a genuine issue of material fact on plaintiff's fraud claims.

29.     Dr. Mackey acknowledged during his deposition that his understanding of Neurontin's off-label use to treat Dr. [sic] Smith's pain was in part based upon his

- 28 -

interactions with other doctors in his practice.  Mackey Dep. 27:6-13 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 29:**  Disputed.  Dr. Mackey agreed that he "had been under the impression that Neurontin was effective for pain relief in a person like Mr. Smith," during his medical career, "either through interactions with doctors in [his] clinic or through going to any of these presentations or through reading what other people are saying."  Mackey Dep. 27:6-13 (McGroder Decl., Ex. 2.)  He never testified that he discussed his use of Neurontin for Mr. Smith with any of the doctors in his practice.  In addition, Dr. Mackey testified that he was not sure from exactly whom he learned that Neurontin "might work for pain relief."  Mackey Dep. 28:20-29:4 (McGroder Decl., Ex. 2.)

30.    Dr. Mackey acknowledged during his deposition that he utilized the Physician's Deck Reference (PDR), a commercially published compilation of drug company labels that would include Neurontin, for his risk/benefit analysis before prescribing a drug.  Mackey Dep. 73:12-25 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 30:**  Disputed.  The cited deposition excerpt does not support plaintiff's assertion that Dr. Mackey in fact <u>utilized</u> the PDR when prescribing Neurontin or any other drug.  Rather, in the excerpt Dr. Mackey agreed that one of the sources of information he had "available" to him about the "risks and benefits of medications" is the PDR.  Moreover, Dr. Mackey was not even sure he read the Neurontin label any time before he prescribed Neurontin to Mr. Smith, testifying only that he "probably" read the Neurontin package insert "a long time" before he prescribed Neurontin to Mr. Smith.  Mackey Dep. 79:20-80:1 (Sayler Decl., Ex. 7.)  Dr. Mackey never testified that he utilized the PDR or the Neurontin label in prescribing the medication to Mr. Smith.  Dr. Mackey additionally testified that he typically does not re-review prescription drug labeling on any kind of regular basis.  Mackey Dep. 81:9-19 (Sayler Decl., Ex. 7.).

31.    Dr. Mackey provided testimony that he had been detailed by defendants' sales representative regarding Neurontin who discussed Neurontin usage and who provided samples for distribution.  Mackey Dep. 75:7-78:4 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 31:**  Admitted but incomplete and immaterial.  Dr. Mackey also testified that he recalled "a discussion about a study coming out that shows on-label use of [Neurontin]"  Mackey Dep. 77:7-16 (Sayler Decl., Ex. 7.)  In

addition, the simple fact that Dr. Mackey was detailed on Neurontin does not raise a genuine issue of material fact precluding summary on plaintiff's fraud claims.

32.     Both Doctors McCombs and Mackey, during their depositions, and in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Mr. Smith, wanted to know about suicide attempts during clinical trials; depression adverse events during clinical trials, and whether depression and suicidality were side effects.  McCombs Dep. 12:3-19, 12:20-14:23, 28:10-29:19 (Finkelstein Decl., Ex. 27); Mackey Dep. 34:14-36:14 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 32:**  Disputed, incomplete and immaterial. First, Mr. Smith did not even fill the Neurontin prescribed by Dr. McCombs in 2003 (Defendants' Statement of Fact No. 2).  Nurse Krancer, not Dr. McCombs, prescribed Neurontin to Mr. Smith in 2004, Krancer Dep. 14:20-15:1 (Sayler Decl., Ex. 9), making any allegations regarding Dr. McCombs immaterial to plaintiff's claims.  Second, Dr. McCombs testified he would want to know about a concern with suicide and increased depression and Neurontin "if it is considered a significant risk."  McCombs Dep. at 12:3-19 (McGroder Decl., Ex. 8.)  Third, the cited excerpt for Dr. Mackey only includes questions about an FDA Clinical Review of Neurontin from 1992, and references a passage that states: "While [depression] may not be an infrequent occurrence in the epileptic population, depression may become worse and require intervention or lead to suicide as it's resulting in some suicide attempts."  Dr. Mackey later testified that he would also have liked to have known that in later reviews, FDA Clinical Reviewer Cynthia McCormick failed to note any additional concerns about Neurontin and suicide, and that there were more instances of depression among placebo patients in Neurontin neuropathic pain studies than patients taking Neurontin.  Mackey Dep. 84:18-87:18 (Sayler Decl., Ex. 7.).

33.     Dr. Mackey acknowledged during his deposition that had he been informed of depression/suicidality information by Defendants, it would have certainly changed the way he treated Mr. Smith; he would have warned Mr. Smith.  Mackey Dep., 42:17-43:9, 98:14-99:10 (Finkelstein Decl., Ex. 12.)

**Defendants' Response to Fact No. 33:**  Disputed and vague.  Dr. Mackey testified that if he had been told that "Neurontin was a drug with some of the problems we have talked about today," he "possibly, probably" would have changed the way he treated Mr. Smith.  Mackey Dep. 42:17-43:25 (McGroder Decl., Ex. 2.)  It is unclear what "problems" Dr. Mackey was being asked about, as this question was directly

proceeded by questions about off-label marketing, not questions about depression and suicide.  Mackey Dep. 39:24-42:9 (McGroder Decl., Ex. 2.)

34.    Defendants did not disclose to Mr. Smith's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality.

**Defendants' Response to Fact No. 34:**  Disputed.  First, plaintiff has failed to cite to any support for this proposition, let alone set out specific facts showing a genuine issue for trial, as required by Fed. R. Civ. P. 56(e) and Local Rule 56.1.  As such, she has not set forth any "fact" that would preclude summary judgment.  In addition, plaintiff is incorrect to the extent she suggests that defendants provided no information regarding depression and suicide in the Neurontin label.  Both depression and suicidal behavior were listed as adverse events that occurred in the Neurontin clinical trials at the time in which the physicians prescribed Neurontin to Mr. Smith.  *See* Neurontin label at 24, 27-28 (May 2002) (McGroder Decl., Ex. 9.)  Dr Mackey testified that there was information in the Neurontin label in 2004 regarding suicidal behavior and suicidal gesture, but that he still prescribes Neurontin in spite of this information.  Mackey Dep. 81:20-82:8, 83:24-84:13 (Sayler Decl., Ex. 7.)

35.    Defendants did not disclose to Mr. Smith's prescribing medical providers that Neurontin usage increase the risk of depression and/or suicidality.

**Defendants' Response to Fact No. 35:**  Disputed.  First, plaintiff has failed to cite to any support for this proposition, let alone set out specific facts showing a genuine issue for trial, as required by Fed. R. Civ. P. 56(e) and Local Rule 56.1.  As such, she has not set forth any "fact" that would preclude summary judgment.  In addition, plaintiff is incorrect to the extent she suggests that defendants provided no information regarding depression and suicide in the Neurontin label.  Both depression and suicidal behavior were listed as adverse events that occurred in the Neurontin clinical trials at the time in which the physicians prescribed Neurontin to Mr. Smith.  *See* Neurontin label at 24, 27-28 (May 2002) (McGroder Decl., Ex. 9.)  Dr Mackey testified that there was information in the Neurontin label in 2004 regarding suicidal behavior and suicidal gesture, but that he still prescribes Neurontin in spite of this information.  Mackey Dep. 81:20-82:8, 83:24-84:13 (Sayler Decl., Ex. 7.)

36.    Defendants did not disclose to Mr. Smith's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts.

**Defendants' Response to Fact No. 36:**  Disputed.  First, plaintiff has failed to cite to any support for this proposition, let alone set out specific facts showing a genuine issue for trial, as required by Fed. R. Civ. P. 56(e) and Local Rule 56.1.  As such, she has

- 31 -

not set forth any "fact" that would preclude summary judgment.  In addition, plaintiff is incorrect to the extent she suggests that defendants provided no information regarding depression and suicide in the Neurontin label.   Both depression and suicidal behavior, including the adverse events that occurred in the epilepsy clinical trials (which were discussed in FDA's 1992 Review) subsequently appeared in the FDA-approved labeling. *See* Neurontin label at 24, 27-28 (May 2002) (McGroder Decl., Ex. 9.)   Dr Mackey testified that there was information in the Neurontin label in 2004 regarding suicidal behavior and suicidal gesture, but that he still prescribes Neurontin in spite of this information.  Mackey Dep. 81:20-82:8, 83:24-84:13 (Sayler Decl., Ex. 7.)

3347748v1

Dated: March 12, 2009                    Respectfully submitted,


DAVIS POLK & WARDWELL

By:      /s/ James P. Rouhandeh
           James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel:  (212) 450-4000


-and-

SHOOK, HARDY & BACON L.L.P.

By:      /s/ Scott W. Sayler
           Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550


-and-

WHITE & WILLIAMS

By:      /s/ David B. Chaffin
           David B. Chaffin

100 Summer Street, 27th Floor
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

- 33 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 12, 2009.

/s/ David B. Chaffin

3347748v1