# Exhibit 2

```
         IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS


In re:  NEURONTIN            MDL Docket No. 1629
MARKETING, SALES             Master File No.
PRACTICES and PRODUCTS                04-10981
LIABILITY LITIGATION         Judge Patti B. Saris
                             Magistrate Judge
                             Leo T. Sorokin

RUTH SMITH,

     Plaintiff,         C. A. No.   05-11515
V.

PFIZER, INC., et al.,

     Defendants.


        Videotaped Deposition of:

        EDWARD MACKEY, M.D.

        Wednesday, May 23, 2007
```

Page 26

1 rep that Neurontin would be the topic, the
2 medical liaison prepared the presentation. Do
3 you see that?
4          And then subpart C, among the
5 topics of the presentation was the use of
6 Neurontin for unapproved uses. Do you see
7 that, sir?
8 A.    I do.
9 Q.    During the presentation, in the
10 presence of the sales rep, the medical liaison
11 promoted the use of Neurontin in the treatment
12 of a number of unapproved uses. Do you see
13 that as well?
14 A.    I do.
15 Q.    Another example of this, sir, is given
16 on page 10. If you would flip there, please.
17 A.    Um-hum.
18 Q.    Paragraph 27, it's talking about
19 another conference where the physicians in
20 attendance, among the presentations made to the
21 physicians in attendance was one relating to
22 unapproved uses entitled Reduction of Pain
23 Symptoms During Treatment with Gabapentin. Do
24 you understand gabapentin is the technical name
25 for Neurontin?

Page 27

1 A.    I do.
2 Q.    It says during this presentation
3 Neurontin was promoted for use in the treatment
4 of pain. Do you see that as well?
5 A.    I do.
6 Q.    Now, sir, during your medical career,
7 either through interactions with the doctors in
8 your clinic or through going to any of these
9 presentations or through reading what other
10 people are saying, had you been under the
11 impression that Neurontin was effective for
12 pain relief in a person like Mr. Smith?
13 A.    Yes.
14 Q.    When you make determinations like this,
15 I asked you this earlier but the question was
16 objected to, so I got to reask it in another
17 form.
18          Do you go out there and do your
19 own independent medical research on drugs
20 before you prescribe them?
21 A.    No.
22 Q.    Do you rely upon the drug companies to
23 be honest and forthright with you?
24          MR. FERGUSON: Object to form.
25 A.    Yes.

Page 28

1 Q.    (By Mr. Lanier) Do you rely on the
2 drug companies to tell you both the, the good
3 and the bad and the ugly about their drugs, be
4 honest about it?
5 A.    Yes.
6 Q.    Don't doctors like you, who are busy
7 treating people, have to rely upon drug
8 companies to tell you the truth? I mean would
9 you have time to go out and, and do major
10 medical research on every drug you prescribe?
11 A.    No.
12          MR. FERGUSON: Object to form.
13          Excuse me, Doctor. Sorry.
14 Q.    (By Mr. Lanier) When you prescribed
15 Neurontin to Mr. Smith, did you do it for
16 pain --
17 A.    Yes.
18 Q.    -- relief?
19 A.    Yes.
20 Q.    Now, how important is it to you --
21 well, let me take a step back. I didn't ask
22 you this. Where did you learn it might work
23 for pain relief? Was it from the doctors in
24 your clinic? Was it from -- do you know?
25 A.    Ah, not exactly. I certainly spent

Page 29

1 some time trying to find out where I first
2 heard about it, and then subsequently different
3 sources going forward, and -- but I can't tell
4 you exactly who.
5 Q.    I would assume, we've got a chance to
6 look at -- the Pfizer folks were putting a lot
7 of samples in your office of this drug?
8 A.    Yes.
9 Q.    And they were making calls not just on
10 Dr. Clendenin but, oh, there is another doc,
11 Dr. Nichols. Do you know a Dr. Nichols?
12 A.    Dr. Nichols and Dr. Clendenin are both
13 pain, what we call physical medicine rehab.
14 They deal with a lot of chronic pain issues.
15 Q.    Okay.
16 A.    So -- and they're partners, and
17 partners within our group.
18 Q.    Okay. Now they're not shingles
19 doctors, though, are they?
20 A.    No, they are not.
21 Q.    They are not epileptic doctors, are
22 they?
23 A.    No.
24 Q.    So when the Pfizer people were making
25 sales calls on them for Neurontin and giving


Page 30

1  them Neurontin, by definition they're not doing
2  it for the label reasons, they're not doing it
3  for shingles or, or epilepsy, are they?
4          MR. FERGUSON: Object to form.
5  A.   Certainly neither Clendenin nor Nichols
6  treat seizures.
7  Q.   Okay.
8  A.   They may have had an occasion to treat
9  postherpetic neuralgia.
10 Q.   Okay.
11 A.   But clearly not the dominant reason
12 they prescribed it.
13 Q.   (By Mr. Lanier) Right. And I assume
14 you would interact with these folks enough to
15 know if, if they're being told that Neurontin's
16 effective for pain and the samples are being
17 given, would that be one of the places where
18 you would have gotten some of your knowledge
19 about possibly using it?
20         MR. FERGUSON: Object to form.
21 A.   Yeah, the rule -- the sort of the setup
22 in our office, the PM&R guys handle
23 non-operative back and pain. I'm a spine
24 surgeon, and I do a lot of the operative, but
25 clearly I have patients who have pain issues,

Page 31

1  either operative or non-operative, that I rely
2  on them to some extent to guide me.
3  Q.   Okay. I guess what I'm driving at is,
4  I don't show that the Pfizer people directly
5  went to you and said, Here, use Neurontin for
6  pain. I see that they went to your partners
7  that are the pain specialists in the clinic,
8  and, and I'm trying to figure out if, if that
9  would have had an influence on your
10 prescription writing when you're writing
11 something for pain before you do a surgery to
12 see if conservative treatment would work.
13         MR. FERGUSON: Object to form.
14 Q.   (By Mr. Lanier) Would it have any
15 bearing on you?
16 A.   I definitely interact with Clendenin
17 and Nichols on a regular basis.
18 Q.   Great.
19 A.   And the issues of pain management come
20 up regularly, my asking them for input advice,
21 not just on this but other issues than that.
22 Q.   Fair enough.
23         Now, Doctor, had you ever -- all
24 right. Let me, let me back up and explain why
25 I'm asking these questions. And this is

Page 32

1  probably objectionable, so get ready -- get on
2  the edge of your seat.
3          MR. FERGUSON: Thanks for the
4  tip.
5          MR. LANIER: All right. I'm
6  just warning you.
7          MR. STAHL: Do you want someone
8  to rule on it too?
9          MR. LANIER: No. I'm telling
10 you, we can, we can do the whole thing.
11 No, this is, this is just what I call
12 sign-posting. I'm just telling you where
13 I'm going. I can't play this to the jury,
14 so they're going to object and make sure I
15 don't play it to the jury, and I'll
16 stipulate right now this is probably
17 something I can't play to the jury.
18         Here it is:
19 Q.   (By Mr. Lanier) One of the pleadings
20 that Pfizer has filed in this case indicates
21 that Pfizer's saying that this isn't their
22 fault, that you are what's called a learned
23 intermediary, and by that they mean you knew
24 everything there was to know about this drug
25 and you decided to prescribe it, so don't blame

Page 33

1  them, blame you.
2          Obviously we don't blame you.
3  We don't see that you have done anything wrong
4  at all.
5          But because they say that you're
6  the learned intermediary, I got to ask you some
7  questions about did you know all this kind of
8  stuff and see if you knew what they think you
9  knew.
10         Do you want to object to that?
11         MR. FERGUSON: Yeah, can I go
12 ahead and object?
13         And also say it's not true what
14 he said.
15         MR. LANIER: Oh, so you're
16 waiving -- you will not assert a learned
17 intermediary defense? Then I can skip
18 these.
19         MR. FERGUSON: There is no -- no
20 one's blaming you, Doctor.
21         MR. LANIER: Are you asserting a
22 learned intermediary defense?
23         MR. FERGUSON: We're asserting
24 the defenses we've asserted.
25 A.   Press on.

Page 34

1  Q.   (By Mr. Lanier) Doctor, did anyone
2  ever tell you or did you know that taking
3  Neurontin reduces the serotonin in the brain?
4         MR. FERGUSON: Object to form.
5  A.   No.
6  Q.   (By Mr. Lanier) Would you have liked
7  to have known such a fact --
8         MR. FERGUSON: Object to form.
9  Q.   (By Mr. Lanier) -- before you started
10 prescribing it for pain?
11        MR. FERGUSON: Object to form.
12 A.   I don't know how it would have impacted
13 me one way or the other.
14 Q.   (By Mr. Lanier) All right. Would
15 you -- did -- did you know before you
16 prescribed it that the FDA, before they
17 approved the drug for the very limited purposes
18 they approved it for, that the FDA specifically
19 said to ultimately Pfizer that a serious event
20 might limit the drug's widespread usefulness,
21 several of them actually, the third being
22 depression, specifically. While it may not be
23 an infrequent occurrence in the epileptic
24 population, depression may become worse and
25 require intervention or lead to suicide as it's

Page 35

1  resulted in some suicidal attempts.
2         Did you know about that concern
3  on this drug before you prescribed it?
4  A.   No.
5         MR. FERGUSON: Object to form.
6     And could you identify what document you
7     were reading from, please?
8         MR. LANIER: Yeah. This is a
9     1993 document that was -- we had to get
10    through the Freedom of Information Act
11    because it was not widely available.
12        I'll mark it as Exhibit 6.
13 (Exhibit 6 marked.)
14 Q.   (By Mr. Lanier) This is an FDA
15 document.
16        I'm assuming you have never seen
17 this document before.
18 A.   No.
19 Q.   All right. On page 117 it talks about
20 problems with suicide. It talks about -- let
21 me show you the --
22 A.   I'm looking at it.
23        MR. FERGUSON: It's the third
24    paragraph?
25        MR. LANIER: Yes, third

Page 36

1     paragraph has got the suicide, and then the
2     bottom paragraph has got the reference to
3     clinically important depression.
4  Q.   No one ever told you about that, did
5  they?
6         MR. FERGUSON: Object to form.
7  A.   No.
8  Q.   (By Mr. Lanier) Am I correct, no one
9  ever told you about that?
10 A.   No.
11 Q.   No, as in no, they did not tell you?
12 A.   No, they did not tell me.
13 Q.   All right. Is that the kind of thing
14 that would be important to know before you
15 start prescribing a drug?
16        MR. FERGUSON: Object to form.
17 A.   Yes.
18 Q.   (By Mr. Lanier) All right. Because if
19 you're going -- if you have got a drug that,
20 that may cause suicide, clinically significant
21 depression, you probably had other optional
22 drugs you could have given Mr. Smith that, that
23 don't seem to have that side effect; true?
24        MR. FERGUSON: Object to form.
25 A.   Potentially, yes.

Page 37

1  Q.   (By Mr. Lanier) And, and at least if
2  you're going to prescribe a drug that might
3  have those side effects, if you know about them
4  ahead of time, you would be able to warn the
5  patient, --
6  A.   Yes.
7  Q.   -- wouldn't you?
8  A.   Yes.
9  Q.   Now, did anybody at either Pfizer or
10 Warner-Lambert or any of your partners or
11 anybody out there tell you about some of the
12 testing that was done on this drug by the
13 company where the testing itself showed pretty
14 clearly that this drug leads to suicide?
15        MR. FERGUSON: Object to form.
16 Q.   (By Mr. Lanier) Do you know about any
17 of those tests?
18        MR. FERGUSON: Same objection.
19 A.   I'm not aware of any of those tests.
20 Q.   (By Mr. Lanier) Did you know anything
21 about -- have you ever heard of a doctor whose
22 name is Dr. David Franklin?
23 A.   No.
24 Q.   Dr. Franklin -- I'm going to give you
25 an exhibit we'll mark as Exhibit 7. And it's

### Page 38

1  an affidavit of Dr. Franklin.
2       MR. LANIER: Noel, here's a copy
3  for you. I don't mean to exclude you from
4  this.
5       MR. STAHL: That's fine.
6       MR. LANIER: I apologize.
7       MR. FERGUSON: He'll read it
8  tonight.
9       MR. LANIER: He'll spend a lot
10  of time pouring over this affidavit.
11  (Exhibit 7 marked.)
12  Q.   This is an affidavit for a fella. You
13  can get an idea of who he is just by looking at
14  the beginning.
15       He is a Ph.D., did a two-year
16  research fellowship with Harvard Med School and
17  Dana-Farber. And if you will look on page 2,
18  he was hired, in paragraph 6, by Warner-
19  Lambert's Parke-Davis division to work as a
20  medical liaison. And he didn't do it long. He
21  did it for just a little over four months, when
22  he quit, effective immediately. Didn't even
23  give two weeks' notice. Do you see that?
24  A.   Yes.
25  Q.   All right. This gentleman -- if you'll

### Page 39

1  turn to page 4, you will see paragraph 15. I
2  was trained and instructed to tell physicians
3  that Parke-Davis had statistically significant
4  data that indicated Neurontin was highly
5  effective in the treatment of a variety of
6  syndromes. Then he includes a bunch, ALS,
7  bipolar disorder, painful diabetic neuropathy,
8  peripheral neuropathy.
9       Neuropathy, is that nerve pain?
10  A.   Yes.
11  Q.   Is -- that may be one of the problems
12  that was possibly, a possible diagnosis for
13  Mr. Smith?
14  A.   Yes.
15  Q.   And then there are some others listed
16  there. He actually says, I made those
17  representations, and he lists doctors that he
18  made them to. And says, I witnessed as part of
19  my on-the-job training some others represent
20  that it was safe and effective for those
21  unapproved indications.
22       Then look at paragraph 16.
23  Parke-Davis had no significant data from
24  clinical trials to support those
25  representations. Do you see that?

### Page 40

1  A.   Yes.
2  Q.   Paragraph 17. I was trained and
3  instructed to misrepresent the amount of
4  clinical evidence available to support the use
5  of Neurontin. You see that?
6  A.   I do.
7  Q.   Little bit further down in that
8  paragraph, I was instructed to lead doctors to
9  believe that Dr. Bruce Ehrenberg's 160 patients
10  were enrolled in a well controlled clinical
11  trial and were achieving a 90 percent response
12  rate. This was untrue. Do you see that as
13  well?
14       MR. FERGUSON: Object to form.
15  A.   Yes, I see it.
16  Q.   (By Mr. Lanier) On page 7, paragraph
17  21, it's got a transcript from a phone message
18  left by a Phil Magistro the ultimately Pfizer
19  medical director of affairs for the northeast
20  business unit. Do you see the single-spaced
21  statement, the transcript?
22       MR. FERGUSON: Object to form.
23  Q.   (By Mr. Lanier) There in paragraph 21,
24  the single space, do you see that?
25  A.   Yes.

### Page 41

1  Q.   It says, Medical liaisons, this is
2  Phil. I'm calling in regard to the, you know,
3  there's a Neurontin push that's supposed to be
4  on. What we'd like you to do is, any time
5  you're called out, just make sure you're --
6  that your main focus out of what you're doing
7  is on Neurontin. I'm not saying don't do
8  Accupril calls, but the idea is you're supposed
9  to be pushing on Neurontin. I think some
10  people have lost that message, and I think a
11  lot may be somewhat ineffectual in that regard.
12  So what we need to do is focus on Neurontin.
13  When we get out there, we want to kick some A
14  on Neurontin. We want to sell Neurontin on
15  pain, all right? And mono therapy, and
16  everything that we can talk about, that's what
17  we want to do, because I'm embarrassed. I
18  don't know if you guys are embarrassed, but I'm
19  embarrassed about where we are with Neurontin.
20  We got to take it into our own hands and really
21  kick some A on it. All right? Let's do it up.
22  Talk to you soon. Bye. See that?
23  A.   Yes.
24  Q.   Paragraph 22, I was trained and
25  instructed to use a number of misleading

Page 42

1  abstracts and case reports in promoting
2  Parke-Davis's prescription drugs, including
3  Neurontin, for a variety of medically
4  unacceptable uses. Do you see that as well?
5  A.  Yes.
6  Q.  Sir, as a doctor, is it important to
7  you that drug companies put patient safety
8  first?
9  A.  Yes.
10  Q.  Is it important to you that drug
11  companies follow FDA instructions and rules and
12  guidelines --
13          MR. FERGUSON: Object to form.
14  Q.  -- about what they're telling you and
15  what they're not?
16  A.  Yes.
17  Q.  (By Mr. Lanier) Now if you had been
18  told either in the labeling information or
19  through sales reps or, Dr. Mackey, through your
20  partners, if you had been told that Neurontin
21  was a drug with some of the problems we've
22  talked about so far today, would it have
23  changed the way you treated Mr. Smith?
24          MR. FERGUSON: Object to form.
25  A.  Possibly. Probably.

Page 43

1  Q.  (By Mr. Lanier) Probably. And by
2  probably, would it have meant you would have
3  either tried another drug first, or would you
4  have at least put out some warnings and some
5  safeties and precautions and told them what to
6  be observant about?
7          MR. FERGUSON: Object to form.
8  A.  Certainly I would have done the
9  latter.
10  Q.  Okay.
11  A.  And I don't know about the former.
12  Q.  (By Mr. Lanier) All right. Now if
13  someone's at risk of -- I don't know that you
14  see often someone that you consider a suicide
15  risk in your practice, but if you see someone
16  that presents that you think is a serious
17  candidate for suicide, I would assume you would
18  do something about that. There is some
19  protocol.
20  A.  Yes.
21  Q.  Okay. Mr. Smith, when he presented to
22  you, I've read through your chart, there's
23  nothing about him that made you think he was a
24  suicide risk when he presented, was there?
25  A.  No.

Page 44

1  Q.  All right. How did you find out about
2  his death?
3  A.  His wife called our office and spoke
4  with our telephone answering operator and then
5  spoke with my nurse.
6  Q.  Okay. Did you by any chance file a
7  MedWatch report with the FDA after this, do you
8  know?
9  A.  I don't know. I don't think I've
10  ever -- I don't know to do that or --
11  Q.  Yeah. I didn't think so, but I didn't
12  see one, and I just wasn't sure.
13          MR. LANIER: I'm going to, I've
14  used 45 of my minutes. I'm going to save
15  my other 45. I'm going to pass the witness
16  and see if he can really do it in 44.
17          MR. FERGUSON: Doctor, are you
18  doing okay? Do you need a break or
19  anything?
20          THE WITNESS: I'm okay.
21          CROSS-EXAMINATION
22  BY MR. FERGUSON:
23  Q.  Dr. Mackey, we met briefly before the
24  deposition. My name is Ken Ferguson. I
25  represent Pfizer in this matter. Do you

Page 45

1  understand that?
2  A.  Yes.
3  Q.  Doctor, you graduated from Dartmouth
4  undergrad; correct?
5  A.  Yes.
6  Q.  And you went to Vanderbilt University
7  Medical School right here?
8  A.  Yes.
9  Q.  You're board certified in orthopedic
10  surgery?
11  A.  I am.
12  Q.  You're board certified in spine surgery
13  also; correct?
14  A.  Yes.
15  Q.  Generally, do you make your own
16  decisions about how you treat your patients?
17  A.  Yes.
18  Q.  Nobody's going to tell you how to treat
19  your patients, are they?
20  A.  No.
21  Q.  I want to follow up a bit on some of
22  the care and treatment you actually performed
23  on Mr. Smith, if I could, okay?
24          Mr. Lanier spoke about that
25  briefly. Let me ask you some questions.

Page 70

1  Lortab. The, the extent of that, other pain
2  management options, I'm not, I'm not aware
3  of.
4  Q.  Do you have any knowledge one way or
5  the other, and I didn't see it in your notes,
6  as to whether or not the Neurontin was giving
7  my Smith any relief during the period that you
8  were seeing him?
9  A.  I don't know one way or the other.
10 Q.  Let's talk for a minute about pain
11 medications, Doctor. As an orthopedic surgeon,
12 do you regularly have to prescribe pain
13 medications?
14 A.  Yes.
15 Q.  Do you prescribe different medications
16 for acute pain versus chronic pain,
17 postsurgical pain, do you provide that?
18 A.  Yes.
19 Q.  What are -- let's take the overall for
20 pain. What are the, kind of the most common
21 medications you prescribe for pain? And let's
22 talk about the 2004 time period.
23 A.  Okay. Postsurgical pain?
24 Q.  Sure, we'll go with postsurgical.
25 A.  Usually will prescribe a pain medicine

Page 71

1  such as hydrocodone, Lortab, and a muscle
2  relaxer such as Flexeril, Soma.
3  Q.  How about for chronic pain, chronic
4  long-term pain that may be joint pain? What
5  kind of medications during that time frame
6  would you were you commonly prescribing?
7  A.  If Vioxx and Bextra were still on the
8  market, I'd use those. Celebrex, Naprosyn.
9  When you get much past that, I try to send that
10 out. I don't do chronic, long-term pain
11 management.
12 Q.  And of course Neurontin was one of the
13 medications you would prescribe during the 2004
14 time period as well?
15 A.  Yes.
16 Q.  And for some period, you can't recall
17 how long before that, you had prescribed
18 Neurontin?
19 A.  I think you'd probably date back to my
20 fellowship.
21 Q.  Are you currently prescribing Neurontin
22 for any patients?
23 A.  Very infrequently.
24 Q.  But you do still prescribe for some
25 patients?

Page 72

1  A.  It's a second or third line drug.
2  Q.  If you try other medications and they
3  don't work, then you may try someone on a
4  course of Neurontin?
5  A.  I will.
6  Q.  So clearly for some patients, at this
7  time even, you think that the benefits of
8  Neurontin for them outweighs the risks?
9  A.  Yes.
10 Q.  With regard to the medications, pain
11 medications you prescribed, do you prescribe
12 any narcotic pain medications?
13 A.  Yes.
14 Q.  What are some of the names of those?
15 A.  Lortab, hydrocodone.
16 Q.  Do those medications carry significant
17 risks?
18 A.  Yes.
19 Q.  Such as?
20 A.  Addiction, depression, confusion.
21 Q.  So even, even Lortab, a narcotic pain
22 reliever, first of all has an addictive
23 potential; correct?
24 A.  Yes.
25 Q.  But it also has the risk of causing

Page 73

1  depression to your understanding?
2  A.  Yes.
3  Q.  Is it true that, that many beneficial
4  medications carry significant or very serious
5  risks?
6  A.  Yes.
7  Q.  Even penicillin; correct?
8  A.  Yes.
9  Q.  Virtually all prescription medications
10 carry some risk; correct?
11 A.  Yes.
12 Q.  When you are prescribing a medication,
13 you have to determine in your professional
14 opinion whether the benefits of that medication
15 outweigh the risks for that particular patient;
16 correct?
17 A.  Based on the available information I
18 have to me, I try to do what's best for my
19 patient in any given circumstance.
20 Q.  And let's talk about what sources of
21 information you have about risks and benefits
22 of medications. First of all, you have the
23 product labeling which we -- was discussed
24 earlier; correct? The PDR.
25 A.  Yes.

Page 114

```
1   Still believes that Neurontin is the gold
2   standard.
3           Again, that's a comment from
4   Dr. Clendenin, not a comment from the sales
5   representatives; correct?
6   A.   Yes.
7   Q.   And again I won't take up your time by
8   going through each and every one of these, but
9   I'll represent that the, the information in
10  these indicate that the doctors are giving
11  sales rep information, not vice versa.
12          And whether there was
13  information going --
14          MR. LANIER: Objection; form.
15          MR. FERGUSON: You through
16  laughing?
17          MR. LANIER: I don't know.
18          MR. FERGUSON: Okay.
19          MR. LANIER: If I chew on it
20  more, I may start laughing again. But I'm
21  objecting to the form.
22          MR. FERGUSON: Let me know when
23  you're done. That's fair enough.
24          MR. LANIER: He was laughing
25  too. Get on Noel's case.
```

Page 115

```
1           THE WITNESS: Hey.
2           MR. STAHL: Have I said
3   anything?
4   Q.   (By Mr. Ferguson) Is there any
5   information in any of these, Doctor, that you
6   have seen and we have talked about that
7   indicates that the sales representative was
8   telling the doctor about any particular uses
9   for Neurontin?
10          MR. LANIER: He hadn't read them
11  all.
12          MR. FERGUSON: Okay.
13  Well, let's read them all then.
14          MR. LANIER: Yeah.
15          MR. FERGUSON: Page 1, page 2.
16          MR. LANIER: I'd start with page
17  15. That'll cut to the chase and he'll get
18  out of here sooner.
19          THE WITNESS: I appreciate that.
20          MR. FERGUSON: Okay. I'll do
21  page 15.
22          MR. LANIER: Yeah.
23  Q.   (By Mr. Ferguson) Page 15. There are
24  four notations in there; correct?
25  A.   Yes.
```

Page 116

```
1   Q.   The first one says, As usual,
2   Dr. Nichols was in a hurry, said he was using
3   more Neurontin; correct?
4   A.   Yes.
5   Q.   The next one, Dr. Nichols stated that
6   he uses lots of Neurontin in his patient
7   population.
8   A.   Yes.
9   Q.   Next one, seems to love Neurontin but
10  doesn't even use the 100s.
11  A.   Yes.
12  Q.   Next one, Dr. Nichols seems to like
13  Neurontin, although he is hard to read.
14  A.   Yes.
15  Q.   Okay. This page that we just read and
16  the other ones I discussed with you, and I am
17  not going to take you through each and every
18  one, but you don't know what communications
19  occurred in these other than whatever
20  information you get from these pages; correct?
21  A.   That's correct.
22  Q.   What the sales rep was or was not
23  talking to the doctor about you don't know;
24  correct?
25  A.   I do not know.
```

Page 117

```
1   Q.   Okay. And actually looking at the
2   notations we've looked at, your colleagues who
3   work with pain really seem to like Neurontin?
4   A.   Yes.
5   Q.   Okay. And it seems to work for their
6   patients?
7   A.   Based on what she wrote down, yes.
8   Q.   Correct. And that's all we're dealing
9   with right now?
10  A.   Correct.
11  Q.   So based upon what she wrote down, your
12  colleagues in your office who work with pain
13  patients believe that Neurontin assists those
14  patients with their pain.
15  A.   Based on what we have in this record,
16  yes.
17          MR. FERGUSON: Thank you,
18  Doctor.
19          REDIRECT EXAMINATION
20  BY MR. LANIER
21  Q.   When it says on the note Neurontin
22  safety discussion, a discussion kind of means a
23  back and forth, doesn't it?
24  A.   Yes, it does.
25  Q.   All right. Next subject: You were
```