UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------ x
In re: NEURONTIN MARKETING,
SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION
------------------------------------------------ x
THIS DOCUMENT RELATES TO:

  *Bulger v. Pfizer Inc., et al.*
  Case No. 07-11426-PBS


------------------------------------------------ x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

# DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF PFIZER INC. AND WARNER-LAMBERT COMPANY LLC'S MOTION TO EXCLUDE THE SPECIFIC CAUSATION TESTIMONY OF DOCTORS MARIS AND KRUSZEWSKI

Defendants, Pfizer Inc. and Warner-Lambert Company LLC ("defendants"), respectfully submit this reply memorandum in support of their motion to exclude the specific causation testimony of Doctors Maris and Kruszewski.

## PRELIMINARY STATEMENT

Under *Daubert* and Rule 702, the Court must scrutinize the reliability of plaintiff's experts' methods, as well as the reliability of their application of those methods to the facts of this case.[1] Plaintiff concedes that his experts did not conduct a methodologically proper differential diagnosis (as Dr. Maris has repeatedly admitted), in that they have not ruled out

---

[1] Plaintiff's contention that the field of behavioral science is "soft science" not subject to *Daubert* and that his expert's testimony should be admitted merely because he believes they are qualified is misplaced. Setting aside that psychiatry is a *medical* science, and qualified psychiatrists with expertise in suicide do not agree with plaintiff's unsupported characterization of it as "soft," *Daubert* is a threshold requirement for all expert testimony for reliability and admissibility. Whether an expert is qualified is a separate inquiry. *See generally Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir. 1996) (*Daubert* is aimed at abuse: "That abuse is the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side of a lawsuit.").

alternative risk factors as causes of Mrs. Bulger's suicide. Their opinions, therefore, rest exclusively on temporality (*post hoc ergo propter hoc*) and subjective belief. This "methodology" for specific causation is insufficient under *Daubert* and Rule 702, and warrants exclusion of their specific causation opinions.

## ARGUMENT

### I. PLAINTIFF'S EXPERTS EITHER ADMIT THAT THEY DID NOT CONDUCT A DIFFERENTIAL DIAGNOSIS, OR MISAPPLIED THE METHOD BY FAILING TO RULE OUT ALTERNATIVE CAUSES

#### A. Dr. Maris Admitted He Has Not Conducted A Differential Diagnosis.

As an initial matter, Dr. Maris testified that he does not ascribe to, and did not use, differential diagnosis as a methodology in this case. McGroder Decl., Ex. 1 at 1253:4-23 ("First of all, I don't have the same model that you are assuming, which is the differential diagnosis model, where you rule out alternatives. My theory is, as you know, is that I rule them in, and I talk about them actually contributing to make her part of a vulnerable minority of patients. . . . So I am not ruling these things out. I never tried to rule them out."). Notwithstanding this unequivocal testimony, plaintiff and Dr. Maris attempt to rewrite the record in a belatedly submitted declaration; and now insist—in spite of his numerous admissions to the contrary[2]— that Dr. Maris conducted a differential diagnosis ruling out Mrs. Bulger's alternative suicide risk factors. It is clear, based on Dr. Maris' testimony under oath, that he made no effort to rule out alternative causes, but instead, "embraced them" as part of his method. This approach unmistakably is *not* differential diagnosis.

---

[2] Defendants have concurrently filed a motion to strike plaintiff's experts' untimely and improper declarations attempting to fix flaws in the methodologies.

> **B.      Plaintiff's Experts Did Not Properly "Rule In" Or Adequately Investigate The Number One Risk Factor for Suicide, Mrs. Bulger's Multiple Prior Suicide Attempts.**

Even assuming that plaintiff's experts attempted to conduct a differential diagnosis, they did it wrong. This methodology requires plaintiff's experts to "rule in" all potential causes or risk factors for Mrs. Bulger's suicide. Def. Br. at 4–5, 15–16. In assessing a causal relationship, an expert must not exclude relevant evidence, and should obtain information "to minimize the likelihood of a false conclusion." *Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1086 (D. Kan. 2002). Critical to an expert's inquiry in a suicide case should be the decedent's prior history of suicidal behavior and thinking. *See id.* at 1085. Dr. Kruszewski unreliably failed to "rule in" all alternative potential causes of Mrs. Bulger's suicide—most significantly, prior suicide attempts—and neither expert investigated the circumstances surrounding her history of suicidal behavior.

First, Dr. Kruszewski failed to "rule in" the number one risk factor for suicide, Mrs. Bulger's numerous prior suicide attempts. *See* Def. Br. at 16–17. Although Dr. Kruszewski now claims to have "considered" Mrs. Bulger's prior suicide attempts, Pl. Opp. Br. at 16–17, it is undisputed that: (1) he did not even identify prior suicide attempts (or suicidal thoughts) in his expert report on his list of Mrs. Bulger's suicide risk factors, *compare* Def. Br. at 16–17 *with* Pl. Opp. Br. at 17, and (2) he testified under oath at his deposition that the list of risk factors in his report was a complete list of all the risk factors he considered. McGroder Decl., Ex. 2 at 62:1–11. Plaintiff makes much of the fact that Dr. Kruszewski devoted three brief sentences about "conflicted evidence" in the "various commentary" section of his report. Pl. Opp. Br. at

16.[3]  That commentary is not, however, the section of Dr. Kruszewski's report where he purports to conduct his differential diagnosis by identifying and analyzing Mrs. Bulger's risk factors for suicide.

Plaintiff's attempt to "backfill" the flaws in Dr. Kruszewski's opinion (by claiming that he, in fact, put prior suicide attempts on the list) does nothing to "fix" the additional flaws in his purported differential diagnosis.[4]  It is undisputed that neither expert did anything to investigate Mrs. Bulger's prior attempts for distinguishing characteristics from what they claim is her "Neurontin-induced suicide."  Plaintiff has not refuted that, as the closest approximations of her ultimate suicide, Mrs. Bulger's prior attempts have much to offer plaintiff's experts by way of explaining her suicide, if they had only investigated them. Def. Br. at 17.  Plaintiffs' experts' opinions in *Mille*, 196 F. Supp. 2d at 1087, *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1166–67 (S.D. Fla. 1996), and *Cloud v. Pfizer*, 198 F. Supp. 2d 118, 1136 (D. Ariz. 2001), were excluded as unreliable and inadmissible due, in part, to the experts' *failure to fully probe* alternative causes of the decedent's violence or suicide.  Setting aside plaintiff's experts' new declarations attempting to patch and repair their original reports, plaintiff cannot undo the fact that Drs. Maris and Kruszewski admit they did nothing to investigate or compare the events precipitating Mrs. Bulger's prior suicide attempts and her intent at those times with her ultimate suicide, to probe

---

[3] That Dr. Kruszewski failed to even consider prior suicide attempts—let alone rule them out—as an alternative explanation for Mrs. Bulger's suicide, and that plaintiff goes to extreme lengths to try to read this into Dr. Kruszewski's analysis, highlights the seriousness of this flaw in his methodology.  No qualified psychiatrist in the real world would forget or ignore a prior history of suicide attempts in conducting a suicide assessment and differential diagnosis.

[4] For example, while Dr. Kruszewski mentions Mrs. Bulger's GED among her protective factors, he does not list suicide attempt among her risk factors.  Pl. Opp. Br. at 17. And, of all the voluminous records about Mrs. Bulger's several suicide attempts that Dr. Kruszewski selects to evaluate, Dr. Kruszewski chooses a single passage from the deposition of Linda Landry and a single intake questionnaire, but none of the actual medical records regarding her prior suicide attempts. *Id.* at 16.  This exclusion is not particularly surprising given that the cited records purport to support his hypothesis, but convey the least information about Mrs. Bulger's prior attempts.

for similarities or differences. Def. Br. at 9 n.5 (Dr. Maris); *Id.* at 16–17 (Dr. Kruszewski). Despite this admitted failure to even investigate her prior suicide behavior, Dr. Maris unscientifically discounts Mrs. Bulger's past suicide attempts as "cries for help." Pl. Opp. at 5. As in *Miller*, plaintiff's experts' failure to investigate Mrs. Bulger's prior suicide attempts (assuming they were considered at all) renders their purported differential diagnosis unreliable.

>   C.  **Plaintiff's Experts Are Required To, But Did Not, Rule Out Mrs. Bulger's Numerous Risk Factors That Fully Explain Her Suicide.**

Not only did plaintiff's experts fail to "rule in" or fully consider Mrs. Bulger's prior suicide attempts, but they also failed to properly "rule out" numerous alternative causes of Mrs. Bugler's suicide—a premise plaintiff does not dispute. Pl. Opp. Br. at 8–11, 18. This failure, in and of itself, renders their methodology and opinions unreliable. Contrary to plaintiff's assertions, and ignoring overwhelming precedent, Pl. Opp. Br. at 8–10, the differential diagnosis method follows generally accepted and scientifically reliable standards, among which is the requirement that an expert rule out alternative potential causes. *See Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 786 (D.N.J. 1996). Indeed, the *Daubert* decision was based, in part, on the expert's failure to "explain how . . . he was able to eliminate all other potential causes of [the] birth defects." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).[5]

---

[5] Plaintiff's argument that his experts need not rule out alternative causes is based on cases interpreting the substantial factor test and principles of comparative negligence that predate *Daubert* and address plaintiff's substantive law burden on causation, not admissibility under *Daubert*. Pl. Opp. Br. at 8. *Daubert* is an initial threshold inquiry to determine whether an expert's methodology is reliable and admissible. Def. Br. at 4–5. Whether a plaintiff has proven that the suspected cause was a substantial factor in his injury is a separate, *subsequent* inquiry. *See generally, Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655 (D. Mass. 1997) (applying *Daubert* to exclude unreliable expert and then applying the substantial factor test to grant defendant's motion for summary judgment). None of the authority cited by plaintiff suggests that plaintiff's substantive law burden of proof should lower—let alone abrogate—plaintiff's burden to demonstrate admissibility of his experts' opinions under *Daubert* and Rule 702. *Accord In Re Paoli R.R. Yard PCB Litig.*, 35 F. 3d 717 ,760 n.31 (3d Cir. 1994).

And plaintiff's argument is belied by the very case law he cites. For instance, plaintiff cites *Baker v. Dalkon Shield*, 156 F.3d 248, 253 (1st Cir. 1998), Pl. Opp. Br. at 10 n.11, but the expert in *Baker* worked by "narrowing the more likely causes until the most likely culprit [was] isolated." *Id.* Plaintiff, conversely, insists that his experts have not (and need not) rule out alternative causes, nor do his experts testify that Neurontin was the most likely cause of Mrs. Bulger's suicide. In addition, unlike the expert in *Baker*, Drs. Maris and Kruszewski have not attributed the decedent's injury to its most common cause generally, *id.* at 252; instead, they have picked Neurontin over numerous more common (and recognized) causes of suicide without any scientific basis. Nor have Drs. Maris and Kruszewski identified anything unique about Mrs. Bulger's suicide that caused them to attribute it to Neurontin as opposed to other factors, which was present in *Baker*.[6] This case, and many others,[7] demonstrate that plaintiff's experts' failure to rule out obvious and likely alternative causes renders their methodology and opinions unreliable and inadmissible.

---

[6] The expert in *Baker* testified that "Baker's specific medical injuries from PID [pelvic inflammatory disease] were consistent with damages caused by Chlamydia," and did not have the physical appearance of "the acute kind [of PID] caused by gonorrhea." *Baker*, 156 F.3d at 252.

[7] Plaintiff overstates *Paoli*, 35 F.3d at 760, which, while it does state that an expert need not always rule out all alternative causes with certainty, went on to affirm the exclusion of several experts, finding that in cases where the defendants point to some likely alternative cause, an expert should be excluded who does not engage in standard diagnostic techniques ruling out alternative causes and who cannot offer a reasonable explanation for still believing the defendants' actions were a substantial factor in comparison. *Id.*

Other cases cited by plaintiff are distinguishable. *See Annello v. Shaw Indus., Inc.*, No. 95-30234-FHF, 2000 U.S. Dist. LEXIS 6835, *13 (D. Mass. Mar. 31, 2000) and *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 989 (10th Cir. 2003). In the former, unlike Drs. Maris and Kruszewski, the expert discredited other potential causes. Drs. Maris and Kruszewski, in contrast, admit that they cannot discredit a multitude of other possible causal factors in Mrs. Bulger's suicide. Pl. Opp. Br. at 11, 18. In the latter, the expert simply had not explicitly ruled out depression and testified that the plaintiff's symptoms were "classic" of acute mountain sickness and high altitude cerebral edema, *Goebel*, 346 F.3d at 998, a distinction that lends further support to the requirement that plaintiff's experts identify some hallmark of an allegedly Neurontin-induced suicide that differentiates it from other risk factors. *See infra* Part III. Neither expert can identify any such generally accepted "classic" symptom or appearance of a "Neurontin-induced" suicide.

Nor is this case any different simply because it involves suicide or because suicide has multiple risk factors, as plaintiff tries to argue, relying on *Giles v. Wyeth*, 500 F. Supp. 2d 1048 (S.D. Ill. 2007).[8]  Plaintiff's reliance on *Giles* only bolsters defendants' argument that Dr. Maris has applied his method unreliably in this case.  At his deposition in this case, Dr. Maris was asked to explain how he ruled out Mrs. Bulger's use of Effexor as the "scale-tipper" for her suicide, when he opined in *Giles* that Effexor was the "scale-tipper" and "just-noticeable difference maker" for the suicide in that case. McGroder Decl., Ex. 1 at 913:16–918:16.  Not seeming to understand that he was being asked about his methodology, Dr. Maris disavowed his opinion in *Giles*—testifying that the *Giles* jury rejected it as "wrong" when they entered a defense verdict—and was completely unable to reconcile the two conflicting opinions, *id.*—yet another example of how his methodology is unreliable and litigation-driven.[9]

Furthermore, *Giles* is an outlier.  The differential diagnosis method is always used in cases where the injury has multiple potential causes—otherwise it would not be needed—and many injuries besides suicide involve the interplay of multiple risk factors.[10]  Other courts have

---

[8] Plaintiff also cites *dicta* from *Smith v. Pfizer*, No. CIV.A. 98-4156-CM, 2001 U.S. Dist. LEXIS 12983, at 1–2 (D. Kan. Aug. 14, 2001), and fails to point out that in this case, the court excluded plaintiff's experts' general causation opinion as unreliable, and found plaintiff's expert had ruled out alcoholism as a cause before granting summary judgment for defendants.

[9] Among other things, plaintiff's opposition ignores defendants' challenge to the litigation-driven nature of Drs. Maris and Kruszewski's inquiries, namely, the marshaling of facts to pre-ordained conclusions, which defendants have demonstrated by the errors in the psychological autopsy and Dr. Maris' report, Def. Br. at 11–12, his use of verbatim legal metaphors across every prescription drug case in which he has ever testified, *id.* at 5 n.2, and by Dr. Kruszewski's *ad hoc* dismissal of pertinent facts and deposition chicanery. *Id.* at 17–19. Dr. Kruszewski even went so far as to admit in another Neurontin case, that the only way he would *not* opine that Neurontin was a substantial factor was if there were *no* evidence the decedent was prescribed or took Neurontin. McGroder Decl., Ex. 2 at 108:18–110:23.  Plaintiff's experts should be excluded as unreliable on this basis alone. Def. Br. at 5 n.2 (citing *Cloud*, 198 F. Supp. 2d at 1135  and *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502–03 (9th Cir. 1994)).

[10] For example, *Nat'l Bank of Commerce v. Dow*, 965 F. Supp. 1490, 1513–14 (E.D. Ark. 1996), which plaintiff has yet to address, dealt with colon cancer and the court explicitly explained that one problem with the reliability of the expert's method was that colon cancer has multiple risk factors, some of which the expert could not rule out with

excluded experts' opinions as unreliable where the expert did not rule out alternative causes of the decedent's suicide, such as self-destructive behavior and psychological problems. *Haggerty*, 950 F. Supp. at 1166–67 (excluding expert's specific causation opinion that drug caused violence as unreliable); *Cloud*, 198 F. Supp. 2d at 1135-37 (excluding expert's specific causation opinion that drug caused suicide as unreliable); *Miller v. Pfizer*, 196 F. Supp. 2d at 1085-86 (same); *Blanchard v. Eli Lilly*, 207 F. Supp. 2d 308, 320 (D. Vt. 2002) (same).[11]

## II.     THE SOLE BASIS FOR PLAINTIFF'S EXPERTS' OPINION IS TEMPORALITY

Failing to apply the differential diagnosis methodology properly, or otherwise failing to rule out alternative causes of Mrs. Bulger's suicide, plaintiff's experts' "method" boils down to nothing more than temporality, *i.e.*, because Mrs. Bulger committed suicide, and because Mrs. Bulger took Neurontin, Neurontin must have caused the suicide. This reliance on temporality has been rejected by this Court (and others) because it suffers from the logical fallacy of *post hoc ergo propter hoc* and is yet another basis for excluding plaintiff's experts' testimony. *Whiting v. Boston*, 891 F. Supp. 12, 23 n.52 (D. Mass. 1995); Def. Br. at 7–8 (*citing, e.g., McClain v. Metabolife*, 401 F.3d 1233, 1243 (11th Cir. 2005)).

Although plaintiff claims on the one hand that his experts did not rely on pure temporality, *see, e.g.*, Pl. Opp. Br. at 4 n.3, 13, 18–20, on the other hand, plaintiff argues—

---

certainty. Def. Br. at 6–7. The fact that colon cancer has multiple risk factors did not excuse the expert from the requirement that he rule out alternative possible causes. *Id*.

[11] *See also Latiolais v. Merck Co.*, No. CV 06-02208 MRP (JTLx), 2007 WL 5861354, *4 n.2 (C.D. Cal. Feb. 6, 2007) ("To that end, Dr. Golomb also did not perform any differential analysis in order to rule out potential alternative causes of Decedent's suicide, such as Decedent's preexisting mental health or job stress or the fact that Decedent was taking sleeping medication near the time of his suicide . . .").

contrary to established precedent—that it is permissible to do so.[12]  Despite plaintiff's waffling, there is no getting around the fact that *post hoc ergo propter hoc* is plaintiff's experts' only support. Def. Br. at 8.  Plaintiff's experts' sole basis for opining that Neurontin, as compared to all of Mrs. Bulger's alternative risk factors (that fully explain her suicide), was the proximate, substantial causal factor is that this time, unlike her other three or four prior attempts, she was on Neurontin.  For example, Dr. Maris opines that, notwithstanding Mrs. Bulger's pre-existing risk factors (which he did not fully investigate), she did not kill herself earlier, but merely *tried* to kill herself multiple times.  So he asks, "why now?" *see id.* at 8–9, and his answer is Neurontin.[13]  Dr. Kruszewski merely opines that because her prior suicide attempts did not kill her, but this one did, he knows it was Neurontin.  Both Dr. Maris' "coping" theory (*i.e.*, that Mrs. Bulger was "coping" until she took Neurontin, so Neurontin must have caused her suicide) and Dr. Kruszewski's attempt to distinguish Mrs. Bulger's prior attempts as "non-lethal" (*i.e.*, that her prior suicide attempts are different because she did not die—although he agrees that this is merely by chance), are variations of the same fallacy. *Id.* at 11, 18–20.

Plaintiff's experts also opine that because Mrs. Bulger's pre-existing risk factors became worse after she began taking Neurontin—simultaneously ignoring that those same factors had been worse at times when she was *not* taking Neurontin—it must be because of Neurontin.

---

[12] Plaintiff suggests that permitting an expert to rely on temporality is the "modern trend," *see* Pl. Opp. Br. at 12 n.14 (citing *Zuchowicz v. U.S.*, 140 F.3d 381, 389 (2d Cir. 1998)), but plaintiff leaves out that this portion of the opinion is discussing whether plaintiff had met the substantive law burden of proof on causation *after* the court had conducted its separate *Daubert*/reliability inquiry, *see id.* at 386–88, and that the experts at issue provided *direct evidence* of a causal relationship, not just temporality alone. *Id.* at 391.

[13] Notably, outside of litigation, Dr. Maris applies a different methodology, asking instead: "what was the decedent trying to escape?" Plaintiff ignores that the only reason for Dr. Maris to change his inquiry in this litigation and ask "why now?" is because asking what the decedent was trying to escape would point to other risk factors for suicide, and not the agent advantageous to the plaintiff's claim, Neurontin. *Compare* Def. Br. at 8 n.4 *with* Pl. Opp. Br. at 11–13.

Again, plaintiff's experts resort to temporality as the lone basis for this opinion. Pl. Opp. Br. at 2, 13.  Setting aside the absence of any factual or scientific support for the proposition that Neurontin made her condition worse,[14] the flaw in their opinion is also that it is solely based on temporality.  Plaintiff's experts made no effort to rule out other causes for her alleged symptoms (*e.g.*, feeling "devoid of life and anhedonic"), such as abuse of street drugs, methadone overuse, longstanding depression, and psychosocial stressors (*e.g.*, marital discord, severe financial strain, and health problems), to name a few.[15]  In addition, the experts have cherry-picked evidence in an attempt to demonstrate a temporal relationship between Mrs. Bulger's alleged ingestion of Neurontin and her alleged worsening symptoms.  For instance, Dr. Maris credits Ron Bulger Sr.'s contradictory testimony that his wife both exhibited "dramatic" behavior changes, Def. Br., Sayler Decl. Ex. 10 at 26, and increased suicidal ideation before she committed suicide, *id.* at 22–25 (used to prove that Neurontin worsened symptoms), *and* that "there was nothing unusual in Susan's behavior the two weeks prior to her suicide." *Id.* at 31–33 (used to rule out other triggers besides Neurontin).  Plaintiff's experts' "method," rests entirely on temporality, and should be rejected under established precedent disavowing the *post hoc ergo propter hoc* fallacy

---

[14] In making this and other arguments, plaintiff devotes much of his opposition to general causation.  Plaintiff's experts' general causation opinions are subject to a separate challenge pending before this Court.  Plaintiff's experts must also apply a reliable scientific method to the facts of this case for their *specific causation* opinions to be admissible, independent of any ruling on the issue of general causation.

[15] The psychological autopsy, for example, looks only at the decedent's behavior *after* taking Neurontin. Def. Br., Sayler Decl. Ex. 11 at 16 ("Here the interviewer should discover and record any neurological, behavioral, physical, or attitudinal changes that occurred <u>after</u> the ingestion of NEURONTIN") (original emphasis).  Plaintiff's experts point to Mrs. Bulger's medical records after taking Neurontin, when they could have just as easily and arbitrarily pointed to her records before, except that these records demonstrate that Mrs. Bulger's problems were just as severe before. *See, e.g.*, Def. Br. at 2–3.  The source for the crucial piece of evidence plaintiff's experts rely on, that Mrs. Bulger was "devoid of life and anhedonic," Pl. Opp. Br. at 2, is Ron Bulger Sr.'s statement to Dr. Crognale that this period of depression had been going on for two to three months, which means that it actually began well before Mrs. Bulger started Neurontin. McGroder Decl., Ex. 1 at 1053:19–1055:8, 1056:20–1058:8.

as an unreliable basis for an expert's methodology. *See Whiting*, 891 F. Supp. at 23 n.52; Def. Br. at 7–8 (*citing, e.g., McClain v. Metabolife*, 401 F.3d 1233, 1243 (11th Cir. 2005)).[16]

### III. PLAINTIFF'S EXPERTS HAVE NO RELIABLE BASIS TO DIFFERENTIATE A SUICIDE CAUSED BY NEURONTIN FROM A SUICIDE CAUSED BY PRE-EXISTING RISK FACTORS

Ultimately, plaintiff's experts' failure to rule out alternative causes of the decedent's suicide, leaves them with no reliable basis—other than subjective belief and speculation—for differentiating Neurontin from Mrs. Bulger's extensive list of pre-existing risk factors for suicide. Plaintiff's experts acknowledge that suicide occurs in the general population, and in rates higher than the general population for individuals like Mrs. Bulger, with co-morbid psychiatric illness, chronic pain, and substance abuse,[17] and they opine that not every patient who commits suicide while on Neurontin does so because of Neurontin. In this context, plaintiff's experts must either rule out alternative risk factors *or* point to symptoms that one would not expect to find in any other suicide case that would allow them to distinguish Neurontin (on the basis of something other than speculation) from the well-known risk factors that fully explain Mrs. Bulger's suicide. Def. Br. at 6–7. *See Nat'l Bank of Commerce v. Dow*, 965 F. Supp. at 1513–14, *Baker*, 156 F.3d at 253; *Goebel*, 346 F.3d at 989. Plaintiff's experts admit that they have done neither.[18] Moreover, plaintiff's response to this argument is limited to

---

[16] In all of the cases cited by plaintiff, *Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 154 (3d Cir. 1999), *Westberry v. Gislavad Guummi AB*, 178 F.3d 257, 265 (4th Cir. 1999), *Zuchowicz v. U.S.*, 140 F.3d 381, 385–90 (2d Cir. 1998), and *Tobin v. Smithkline Beecham Pharms.*, 164 F. Supp. 2d 1278 (D. Wyo. 2001), the expert at issue (1) relied on other bases, *in addition to temporality*, in applying his methodology, and (2) the *onset* of the plaintiff's injuries began with exposure. Drs. Maris and Kruszewski, on the other hand, admit the decedent's risk factors were pre-existing and offer the fallacy alone for their differentiation of Neurontin from those risk factors.

[17] The lifetime rate of suicide is 1 in 10,000 in the general population; the rate is higher in populations with conditions for which Neurontin is prescribed; suicide is difficult to predict, and is often the result of unknown causes. *See* Def. Br. at 1 (background on suicide).

[18] Dr. Maris readily admits he cannot identify anything unique to Mrs. Bulger's suicide, Pl. Opp. Br. at 11 n.12, while Dr. Kruszewski purports to identify as a "hallmark" that the decision to commit suicide "was abrupt, acute,

one conclusory footnote relying on the self-serving declaration of Dr. Maris that a "hallmark" is not necessary; this is the epitome of *ipse dixit*. Pl. Opp. Br. at 11 n.12.

Stripped of semantics, plaintiff's experts' opinions about the role of Neurontin in Mrs. Bulger's suicide amount to subjective belief and inadmissible speculation that would not help a jury. *See Whiting*, 891 F. Supp. at 25; *Haggerty,* 950 F. Supp. at 1167. Plaintiff instead asks this Court to admit his experts' testimony based solely on the assumption that because Mrs. Bulger took Neurontin, her suicide was caused by Neurontin.[19] Yet, plaintiff's experts have failed to follow any generally accepted reliable methodology for determining specific causation, and Dr. Maris asserts that he should be excused from doing so. Nor have the experts otherwise explained why Mrs. Bulger's suicide was caused by Neurontin, rather than her numerous pre-existing suicide risk factors. Plaintiff's instead ask the Court to take his experts word for it because they are "qualified." The Court need not and should not admit these opinions on the *ipse dixit* of the experts. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

---

was—did not happen over a protracted period of time." *Id.* at 19. Plaintiff here, however, does not contend, nor could he, that Mrs. Bulger's suicide was of that type. *Id.* Indeed, plaintiff's own expert Dr. Roh contends that Mrs. Bulger agonized her decision for 20 minutes while continuing to press her weight into the rope around her neck as she kneeled, McGroder Decl., Ex. 4 at 2, and plaintiff himself stated to the police: "Last time was the same. She never said a word. She took a bottle of pills." McGroder Decl., Ex. 1 at 1212:17–19.

[19] Plaintiff's "vulnerable minority" theory only underscores his experts' failure to rule out alternative causes of Mrs. Bulger's suicide and differentiate her suicide as "Neurontin induced" from all other recognized explanations. *See* Pl. Opp. Br. at 5, 11, 14, 19. Dr. Kruszewski, Pl. Opp. Br. at 19, and, more recently, Dr. Maris, *id.* at 5, hypothesize that Mrs. Bulger was a member of a "vulnerable minority" of individuals susceptible to Neurontin *because of her pre-existing risk factors*. Dr. Kruszewski, however, cannot prospectively identify which individuals belong to the "vulnerable minority," and the markers he retrospectively examines to determine whether a person's suicide was caused by Neurontin are the same regardless of whether Neurontin was involved. Def. Br. at 19. In other words, Dr. Kruszewski's "vulnerable minority" is anyone already at risk of suicide, and, just as with his application of differential diagnosis, he provides no way to identify why Mrs. Bulger was "vulnerable" other than all the risk factors that made her independently susceptible or "vulnerable" to suicide regardless of Neurontin. Thus, according to this theory, the only explanation for identifying Mrs. Bulger as "vulnerable" is because she was allegedly taking Neurontin. This reasoning is, at best, no better than *post hoc ergo propter hoc*, and, at worst, circular and completely speculative. *See Rotman v. Nat'l R.R. Passenger Corp.*, 669 N.E.2d 1090, 1091 (Mass. App. Ct. 1996) (affirming expert's exclusion: "there was no way to identify the patients in whom trauma exacerbated optic neurosis . . . .").

## IV. PLAINTIFF'S EXPERTS' UNRELIABLE METHODOLOGY EXTENDS BEYOND THEIR IMPROPER USE OF DIFFERENTIAL DIAGNOSIS

Plaintiff's opposition attempts to resurrect his experts by claiming that Drs. Maris and Kruszewski used methods other than differential diagnosis that are acceptable, such as the psychological autopsy and Naranjo scale.[20] Plaintiff's argument that these methods are generally reliable misses the mark. Defendants do not contend that the psychological autopsy, for example, is never reliable, but instead, that Dr. Maris has unreliably applied this method to the facts of this case. *See* Def. Br. at 10.

### A. Dr. Maris Uses His Suicide Chart Unreliably.

As an initial matter, and contrary to plaintiff's opposition, *e.g.* Pl. Opp. Br. at 3; *Id.* at 4 n.1, defendants have challenged Dr. Maris' qualifications to opine on general causation largely on the basis of his own repeated admissions that he is "not competent" to offer an opinion on Neurontin's mechanism of action and relies entirely on plaintiff's other experts' for his general causation opinion. Def. Br. at 14. Dr. Maris' repeated statements under oath that he is not qualified is alone a sufficient basis to disqualify him from offering general causation opinions in this case.

Moreover, plaintiff essentially concedes the unreliability of Dr. Maris' self-described "general causation model" (his suicide chart) by defending it in half a footnote. Pl. Opp. Br. at 6 n.6. Further, plaintiff does not dispute that the chart was not timely disclosed and has never been "generally accepted" as it is offered in this case. Contrary to plaintiff's blanket assertion, *id.*, Dr. Maris' suicide chart does not appear in any peer-reviewed publication *in its present form*; the

---

[20] Plaintiff also suggests (in a footnote) that Dr. Kruszewski applied the Bradford Hill criteria and Naranjo scale as part of his specific causation methodology. Pl. Opp. Br. at 14−15; *Id.* at 20 n.24. As Dr. Kruszewski himself, admits, however, neither is a reliable method for determining specific causation. Def. Br. at 15−16 n.13. This is entirely consistent with defense expert's use of the Bradford Hill criteria in his *general* causation report. *See* McGroder Decl., Ex. 3.

published version of the model does not show or even suggest that medication is a suicide "trigger," but instead shows medication as a protective factor. Dr. Maris' litigation-driven version of the chart presented in this case is an unscientific and litigation-driven attempt to retrofit the model to his causation opinion for purposes of testifying for plaintiffs in Neurontin litigation. Def. Br. at 14–15.

### B.   Dr. Maris Applies the Psychological Autopsy Method Unreliably.

Plaintiff puts up a straw man arguing that the psychological autopsy method is generally reliable. Pl. Opp. Br. at 5. It is Dr. Maris' unreliable application of the psychological autopsy methods to the facts of this case that renders his opinion inadmissible.[21] Indeed, Dr. Maris failed to follow his own methodological standards for use of a psychological autopsy outside the courtroom, infecting his analysis here with mistakes and biases. Def. Br. at 11–13. For example, despite previously insisting that the psychological autopsy be conducted by a qualified suicidologist or other appropriate healthcare official, and centered on face-to-face interviews of two to three people with knowledge, Dr. Maris merely relied on a paid employee of plaintiff's law firm to perform the "psychological autopsy," in this case, disregarding all of the steps that help ensure reliability, such as interviews of family members. *Id.* Plaintiff's only response to this argument is that it is permissible to use plaintiff's counsel as a source of information. Pl. Opp. Br. at 7. But defendants' challenge is much more nuanced than plaintiff's response. As

---

[21] Plaintiff's cited cases provide further support for defendants' argument that regardless of the reliability of the psychological autopsy generally, the court properly excludes experts who unreliably apply that method to the facts of the case. *See Cloud*, 198 F. Supp. 2d at 1135; *Blanchard*, 207 F. Supp. 2d at 320; *Miller v. Pfizer*, 196 F. Supp. 2d at 1068 (notably plaintiff cites the earlier *Miller v. Pfizer*, No. 99-2326, 199 U.S. Dist. LEXIS 18345 (D. Kan. Nov. 10, 1999)) (all three cases excluding the plaintiffs' proffered experts who used psychological autopsies as unreliable and inadmissible on the issue of specific causation, and granting summary judgment in favor of the defendants on the issue of causation). *Herrin v. Treon*, 459 F. Supp. 2d 525, 530 (N.D. Tex. 2006) and *Yanco v. U.S.*, 45 Fed. Cl. 782, 794–95 (Fed. Cl. 2000) are inapposite. Neither court even discussed the reliability of the psychological autopsy method.

defendants' motion makes clear with numerous record citations, the law firm employee did much more than serve as a source of information; she actually *conducted* the psychological autopsy—twice because the first attempt was so shoddy. Def. Br. at 11–13.[22] Plaintiff's conclusory claim (based solely on Dr. Maris' affidavit) that Dr. Maris followed his own "professional standards" is thus belied by the actual evidence in this case—unless the only "professional" standards Dr. Maris has are for professional testimony in litigation using methods he concedes he would not use in his field. As such, Dr. Maris' testimony on the basis of the "psychological autopsy" is unreliable and inadmissible.

*Giles* and *Routhier*, cited by plaintiff, support defendants' argument that Dr. Maris applied the psychological autopsy method unreliably in this case. In *Routhier v Keenan*, No. 04-1359, 2008 Mass. Super. LEXIS 372, at *17 (Mass. Super. Nov. 4, 2008) and *Giles*, 500 F. Supp. 2d at 1063, there is no evidence that the psychological autopsy in question was conducted by a legal assistant of a plaintiffs' law firm. To the contrary, the *Routhier* court seemed to believe that Dr. Maris himself conducted the psychological autopsy. *Routhier*, 2008 Mass. Super LEXIS 372, at *14. *Giles* is likewise distinguishable because Dr. Maris insisted on using people he knew with training and suicidology backgrounds to conduct the autopsy, Def. Br. at 11, and he interviewed family members. *Giles*, 500 F. Supp. 2d at 1062.

---

[22] Although plaintiff claims by reference to Dr. Maris' after-the-fact declaration that Dr. Maris reviewed the psychological autopsy carefully and made numerous revisions to ensure that the information contained therein was "accurate and complete," Pl. Opp. Br. at 7, it is undisputed that the psychological autopsy still contained errors at the time of Dr. Maris' deposition—errors for which Dr. Maris blamed the law firm employee. Def. Br. at 11–12.

## V. CONCLUSION

The specific causation expert opinions of Drs. Maris and Kruszewski are based on unreliable and improperly applied methodology. Accordingly, they should be excluded pursuant to Rule 702 and *Daubert*.

Dated: March 12, 2009　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　　　　　DAVIS POLK & WARDWELL

　　　　　　　　　　　　　　　　　　　　By:　　/s/ James P. Rouhandeh
　　　　　　　　　　　　　　　　　　　　　　　　James P. Rouhandeh

　　　　　　　　　　　　　　　　　　　　450 Lexington Avenue
　　　　　　　　　　　　　　　　　　　　New York, NY 10017
　　　　　　　　　　　　　　　　　　　　Tel: (212) 450-4000

　　　　　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　　SHOOK, HARDY & BACON L.L.P.

　　　　　　　　　　　　　　　　　　　　By:　　/s/ Lori C. McGroder
　　　　　　　　　　　　　　　　　　　　　　　　Lori C. McGroder

　　　　　　　　　　　　　　　　　　　　2555 Grand Blvd.
　　　　　　　　　　　　　　　　　　　　Kansas City, MO 64108-2613
　　　　　　　　　　　　　　　　　　　　Tel: (816) 474-6550

　　　　　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　　HARE & CHAFFIN

　　　　　　　　　　　　　　　　　　　　By:　　/s/ David B. Chaffin
　　　　　　　　　　　　　　　　　　　　　　　　David B. Chaffin

　　　　　　　　　　　　　　　　　　　　160 Federal Street
　　　　　　　　　　　　　　　　　　　　Boston, MA 02110
　　　　　　　　　　　　　　　　　　　　Tel: (617) 330-5000

　　　　　　　　　　　　　　　　　　　　*Attorneys for Defendants Pfizer Inc. and*
　　　　　　　　　　　　　　　　　　　　*Warner-Lambert Company LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 12, 2009.

/s/ David B. Chaffin
David B. Chaffin