# EXHIBIT 1

1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3    _____
                                    )
 4    In re: NEURONTIN MARKETING,   )
      SALES PRACTICES, AND PRODUCTS )
 5    LIABILITY LITIGATION,         )
                                    )
 6    _____)

 7

 8       VIDEOTAPED DEPOSITION OF RONALD Wm. MARIS, Ph.D.

 9                     (Taken by Defendant)

10                   Columbia, South Carolina

11                  Monday, September 29, 2008

12

13

14

15

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
           V. Dario Stanziola, CSR, RPR, CRR
25    Transcript produced by computer-aided transcription
```

*Condensed* (watermark)

302

1 unclear on that.
2     A.  I think we're opening a can of worms here
3 with ten minutes to go.
4     Q.  We'll do our best.
5     A.  Okay. First of all, the general model
6 has never been offered into evidence of suicide.
7 That's -- that's the graph or the figure that I
8 attached.
9     Q.  And this is the graph that you have
10 published in your 2002 Lancet article, right?
11    A.  Right. But it's never been introduced
12 into this trial.
13    Q.  And so -- okay.
14    A.  That's new.
15    Q.  And this is -- and this is a -- this is a
16 theory for how Neurontin caused suicide in Mr. Smith?
17    A.  It's a general model, and then I modify
18 it with highlighting and with facts from the case
19 to make it specific to Smith.
20    Q.  Okay. You know what, that's going to be a
21 problem for the record, because our exhibit doesn't
22 have your highlighting on it. So I'm going to give
23 you a highlighter, and I would like for you to
24 highlight the exhibit copy for the model and then
25 we'll continue. Because I do want to know everything

303

1 else that's new general causation testimony in this
2 report.
3     A.  You've got five minutes.
4         MR. ROSENKRANZ:  In light of the fact
5     that it's five to 5:00 --
6         THE WITNESS:  My wife's going to kill me.
7         MR. ROSENKRANZ:  -- why don't you let him
8     highlight now and start tomorrow.
9         MS. McGRODER:  We can get it done in five
10    minutes.
11    A.  I don't know if we can or not.
12        THE VIDEOGRAPHER:  We've got two minutes
13    in the tape.
14        MS. McGRODER:  We've got two minutes.
15    A.  You're going to say my general theory was
16 hastily drawn.
17        MR. ROSENKRANZ:  This is known as dead
18    air in the radio business.
19    Q.  Okay.
20    A.  It's not done yet.
21        This is red. This was in red. This was
22 in red. And this was in red.
23    Q.  Okay. Thank you.
24        Now, moving on -- we'll go into that more
25 tomorrow.

304

1         Moving on, what else in Exhibit 19 is a new
2 opinion about how Neurontin causes suicide? I'm
3 talking general causation.
4     A.  Well, obviously from the diagram, I've
5 added -- I've added in addition to the biology
6 genetics neurochemistry, which I think Trimble
7 talked about and which Kruszewski talked about,
8 I've added psychological factors. I've added
9 sociology and culture. I've added psychiatry and
10 diagnostic considerations. I just don't think we
11 can do this in five minutes.
12    Q.  Okay. Let's cut.
13        MS. McGRODER:  Wait a minute. I'm going
14    to -- just off the record.
15        (A DISCUSSION WAS HELD OFF THE RECORD.)
16        THE VIDEOGRAPHER:  Let me -- this is the
17    end of Tape No. 6 in the deposition of Ronald
18    Maris. The time is 4:56 p.m.
19        (TIME NOTED: 4:56 p.m.)
20        (SIGNATURE RESERVED.)

305

WITNESS' CERTIFICATE

    I, RONALD Wm. MARIS, Ph.D., do hereby
certify that I have read and understand the
foregoing transcript and believe it to be true,
accurate, and complete transcript of my testimony,
subject to the attached list of changes, if any.


             Ronald Wm. Maris, Ph.D.


This deposition was signed in my presence by
_____, on the _____ day of
_____, 2008.


             NOTARY PUBLIC
My commission expires:

1        UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2

3   _____
                                    )
4   In re: NEURONTIN MARKETING,     )
    SALES PRACTICES, AND PRODUCTS   )
5   LIABILITY LITIGATION,           )
    _____)
6

7                  VOLUME II

8

9       CONTINUED VIDEOTAPED DEPOSITION OF

10           RONALD Wm. MARIS, Ph.D.

11             (Taken by Defendant)

12           Columbia, South Carolina

13         Tuesday, September 30, 2008

14

15

16

17

18

19

20

21

22

23

24            Reported in Stenotype by
         V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription

Page 554

1  as instructed?
2      A.  I think that's possible.  I think it's
3  unlikely.
4      Q.  But you agree it's possible?
5      A.  It's certainly possible.
6      Q.  Would you agree it's a reasonable
7  inference?
8      A.  I don't think so.  I think it's a
9  stretch.
10     Q.  You agree that Mr. Smith had depression
11 before he ever took Neurontin, correct?
12     A.  A mild depression.
13     Q.  Well, you know that in May of 2003 he was
14 diagnosed with depression and anxiety, correct?
15     A.  He was diagnosed -- he was -- he took
16 Elavil in May of 2001 from Dr. Cato.  He also in
17 May 2nd of 2003 was given -- it was noted that he
18 was depressed and anxious.
19         By May 15th, 2003 he was diagnosed with
20 anxiety and depression by Dr. Cato, and he -- it
21 was noted in the record that he was taking Lexapro
22 and Desipramine, 25 milligrams, HS.
23     Q.  Now, where is that in your report?
24         I don't see that.
25     A.  I've got handwriting.

Page 555

1      Q.  All right.  Then may I borrow that?
2      A.  I'll probably never get it back.
3      Q.  Now, that's something you went -- you
4  didn't include information about Mr. Smith's
5  diagnosed anxiety and depression in May of 2003 in
6  your original report, correct?
7      A.  I kept working from December to now, so
8  it is correct.
9      Q.  And what did you look at to conclude that,
10 in fact, Mr. Smith was diagnosed with anxiety and
11 depression in May of 2003?
12     A.  The medical records.
13     Q.  Of whom?
14     A.  Probably Cato, yes.
15     Q.  Okay.  Did you make these notes on your
16 report in pencil here after you read the deposition
17 of Dr. Trimble?
18     A.  Possibly.  I don't know exactly when I
19 made them.  I know that they were including the --
20 I think it was the Exhibit 5 addendum of evidence,
21 after I read all of that, which included Dr.
22 Trimble.  But I don't know if it was specifically
23 after Trimble.
24         I have no idea when I made those.  I
25 mean, they were made between December and probably

Page 556

1  fairly recently.
2      Q.  Well, when's the first time you learned
3  that Mr. Smith was diagnosed with anxiety and
4  depression in May of 2003?
5      A.  I think it was always in the medical
6  records.
7      Q.  Yeah, but I'm asking you when's the first
8  time you read those medical records and learned that?
9      A.  I -- I'm not sure.  If what your
10 suggesting is that I read Dr. Trimble's deposition
11 and that jogged my memory to go look it up, that's
12 quite possible.  The fact is I got it right.
13     Q.  Is it significant to your opinion that Mr.
14 Smith was diagnosed with depression and anxiety in
15 May of 2003 and was prescribed an antidepressant for
16 major depressive disorder and generalized anxiety
17 disorder at that time?
18     A.  It's a compound --
19         MR. SOH:  Objection, form, foundation.
20     A.  Yeah, compound question.  And the problem
21 is --
22     Q.  Are you asserting an objection, Dr. Maris?
23     A.  No, I'm saying that I can't answer your
24 question as stated.
25     Q.  Okay.  Let me restate it.

Page 557

1         Is it significant to your opinion that Mr.
2  Smith was diagnosed in May of 2003 with depression
3  and anxiety for which he was prescribed Lexapro,
4  which is indicated for the use of major depressive
5  disorder and generalized anxiety disorder?
6      A.  I can say yes, but I can't say a simple
7  yes because Lexapro is also for other things than
8  major depression.
9      Q.  Okay.  Do you think he was prescribed
10 Lexapro for depression?
11     A.  Yes.  But we don't know if it was major
12 depression, which is a technical category within
13 the DSM, which I've never seen him given that
14 diagnosis.
15     Q.  Did you go back and try to determine
16 whether Mr. Smith had a major depressive disorder in
17 May of 2003?
18     A.  I think it's in my report.
19     Q.  Where is it in your report?
20         Okay.  I have your report.
21     A.  I'm not sure.  It says 2003.  I think I
22 said it -- by the time that we reached 2004,
23 there's an explicit section in my report on the
24 question that you're asking me, which is the
25 depression level of Richard Smith.  And it starts

Page 570

1  Q. Did you just X out on the document of the
2  psychological autopsy, which is Exhibit 30, the
3  portion of the sentence that says however, decedent
4  was never diagnosed nor treated for depression?
5      You X'd out never diagnosed nor, and you
6  wrote in diagnosed --
7  A. And.
8  Q. -- and.
9      Okay. So now is that corrected?
10 A. Yes.
11 Q. Thank you.
12     If you could turn to page 18 of your
13 report. On the very top --
14 A. Yes.
15 Q. -- you say Richard never saw any
16 psychiatrist nor received any DSM diagnosis for
17 depression or mood disorder.
18     Is that also incorrect?
19 A. That's probably incorrect. The problem
20 is I -- what I mean by DSM diagnosis is something
21 like 296.23, which is a code in the DSM which means
22 major depression, first episode, serious without
23 psychosis.
24     He did give a word depression so that to
25 that extent, it's not right. But I never saw any

Page 571

1  DSM diagnostic code which is required for insurance
2  purposes.
3  Q. Okay. So if -- if Dr. Cato had actually
4  listed a DSM diagnostic code alongside his reference
5  to depression and anxiety, then this statement in
6  your report would be wrong?
7  A. That's correct.
8  Q. Okay. Going back to your psychological
9  autopsy on page 26, okay? Now, let me just remind
10 you we're talking about your major depressive
11 disorder diagnosis on page 19 of your report, and you
12 say you rely on psychological autopsy question 1
13 related to Dr. Hampf's new patient questionnaire,
14 right?
15 A. Yes.
16 Q. What is the date of Dr. Hampf's new patient
17 questionnaire where the decedent notes he is
18 depressed because of lack of pain -- because of pain
19 and lack of sleep?
20 A. The one I have in my treatment history
21 was from Dr. Berklacich, Berklacich, however you
22 pronounce his name.
23 Q. You know, I still to this day don't know.
24     MS. SEATON: It's Berklacich.
25 Q. Berklacich.

Page 572

1  A. Berklacich. It's 2/27, 28, '03. And it
2  diagnosed -- under the new patient questionnaire it
3  mentioned depression, pain, and again another
4  reference to sleep disorder.
5  Q. And so that's 2/27 of 2003, correct?
6  A. Right.
7      This reference to new patient
8  questionnaires confused me because it probably
9  wasn't Dr. Hampf because he also did one.
10 Q. Okay.
11 A. But the one I have is a reference to
12 2/27, 28 of '03.
13 Q. Okay. And so I just want to understand
14 this. For depressed mood most of the day nearly
15 every day, your diagnosis on page 19 of your report,
16 you're referring to a 2003 record of depression
17 because of pain and lack of sleep?
18 A. And plus the other references that I've
19 already given you to Cato.
20 Q. Okay. And -- and you understand the 2003
21 record is pre-Neurontin, correct?
22 A. Correct.
23 Q. Okay.
24 A. Incidentally, when he started taking
25 Neurontin, they wanted him to get tested for a

Page 573

1  psychiatric disorder.
2  Q. Right.
3      Why do you think that is?
4  A. I don't know why. You can ask Dr.
5  Mackey. Apparently, he showed signs -- you know,
6  when you have somebody who's elderly, you often
7  suspect -- that is to say, Rule 65, you often
8  suspect that there may be dementia involved because
9  it's so common, and usually it's Alzheimer's type.
10     But I don't know why. You'd have to ask
11 him. Maybe he looked confused. Maybe he was
12 forgetting things.
13 Q. We'll come back to that.
14     Okay. Also in your report on page 19 you
15 say after taking Neurontin, Smith had all nine
16 criteria required for a DSM diagnosis of major
17 depressive disorder.
18     And then you cite to some DSM-IV codes,
19 right?
20 A. Yes.
21 Q. And one of the codes is 296.33, correct?
22 A. Right.
23 Q. And you know what that code is for, right?
24 A. Of course, that's why I wrote it.
25 Q. Yeah.

Page 594

1  we just talked about, right?
2  A. Right.
3  Q. And I just do want you to note at the
4  bottom of the first paragraph the record states -- it
5  says pain does disrupt his sleep, right?
6  A. Right.
7  Q. As you reviewed Mr. Smith -- Mr. Smith's
8  medical records, you agree that his pain often
9  disrupted his sleep, right?
10     I mean, is that sort of a consistent trait
11  when he had pain?
12  A. I think so.
13  Q. Okay. If you'll turn to page 50. At the
14  top it says February 28, 2003, the office received a
15  call from the patient's wife.
16     Are you with me?
17  A. My pages are out of number now. It goes
18  48, 32.
19  Q. Oh, I'm sorry. Keep going toward the back.
20  It's when you get to the office notes and the
21  handwritten --
22  A. Okay. I got it.
23  Q. There you go. Sorry.
24     The office received a call from Mrs. Smith,
25  the patient's wife, because -- and they want to pick

Page 595

1  up the MRI film because they don't feel that Mr.
2  Smith can wait until April 16th for his surgery.
3     Do you see that?
4  A. Right.
5  Q. And they want to take -- they want to make
6  an appointment with Dr. McCombs, right?
7  A. Right.
8  Q. To be seen.
9     Is Dr. McCombs a surgeon; do you know?
10  A. Yes, yes.
11  Q. And then the very next -- well, it's not
12  the very next day. On March 3, the patient's wife
13  apparently called again, right, per patient's wife?
14  A. Yes.
15  Q. They changed their mind now, and they say
16  yeah, we want to keep the surgery scheduled on
17  April 16th with Dr. Berklacich?
18  A. Right.
19  Q. Right?
20  A. Right.
21  Q. The very next day on March 4, the office of
22  Dr. Hampf receives a call from Mr. Smith, right, from
23  the patient?
24     Do you see that?
25  A. Right.

Page 596

1  Q. And it says he's requesting surgery
2  scheduled for 4/16/03 to be canceled?
3  A. Right.
4  Q. And the patient stated, quote, I've talked
5  with my family and they want me to try conservative
6  treatment first. I'm going to try physical therapy
7  and a block and see if I get better, end quote.
8  A. Right.
9  Q. And then the note says that the office --
10  the person -- well, I don't know if this is the
11  physician. The nurse's note, the nurse says: I
12  explained to him that was fine, but I want him to
13  understand if he should decide to reschedule, it will
14  be at a later date.
15     The patient says he understands, right?
16  A. Um-hum. Yes.
17  Q. If you turn the page, it's the very next
18  day, March 5, 2003.
19     Do you see that?
20  A. Yes.
21  Q. And the -- Mrs. Smith calls back, and she
22  requests that her husband be put back on the surgery
23  schedule, right?
24  A. Right.
25  Q. And what she says is, quote, I don't know

Page 597

1  what's wrong with Richard. He's in so much pain, I
2  think he is out of his mind. He saw Dr. McCombs on
3  Monday, and we didn't even talk about surgery. He
4  suggested nerve blocks and physical therapy, but I
5  know that is not a cure and Richard is not going to
6  get better until he has surgery.
7     Is that reflected anywhere in your
8  treatment record?
9  A. I just added it.
10  Q. Oh, you just added it?
11  A. Yeah.
12  Q. Is that -- is that significant at all to
13  your opinions in this case about his condition in the
14  spring of 2003?
15  A. Sure. And he gets a laminectomy on
16  April 1st, and then after that he feels a lot
17  better.
18  Q. Well, not quite after that, but we'll get
19  there.
20     MR. ROSENKRANZ: Objection.
21  A. By 4/21/03 he says doing well and is
22  pleased four weeks after his laminectomy.
23  Q. Okay. We'll get there. I'm going to ask
24  you some questions about that, okay?
25  A. Okay.

Page 648

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3    _____
                                            )
 4    In re: NEURONTIN MARKETING,           )
      SALES PRACTICES, AND PRODUCTS         )
 5    LIABILITY LITIGATION,                 )
      _____)
 6

 7                        VOLUME III

 8

 9         CONTINUED VIDEOTAPED DEPOSITION OF

10               RONALD Wm. MARIS, Ph.D.

11                 (Taken by Defendant)

12               Columbia, South Carolina

13              Wednesday, October 1, 2008

14

15

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
            V. Dario Stanziola, CSR, RPR, CRR
25    Transcript produced by computer-aided transcription
```

Page 669

1  the medical records he reports sleep disorder.
2      Q. And Dr. Mackey actually testified that
3  insomnia is typical of people with chronic pain,
4  right? Do you remember that testimony?
5      A. Yes.
6      Q. And Ruth Smith testified that Richard
7  Smith's problems sleeping came on in connection with
8  the increasing pain he had, right? Do you remember
9  that testimony?
10     A. And to the point that they started
11 sleeping in separate bedrooms because he was up --
12 he was so restless at night that she couldn't sleep
13 with him.
14     Q. Okay. Do you know when it was that they
15 started sleeping in separate bedrooms?
16     A. I don't remember, but I could go back and
17 look at the record.
18     Q. Okay. You would agree that Mr. Smith's
19 pain at -- at this time, on March 9th, was extremely
20 severe, correct?
21     A. Gosh, I wish I had that pain scale, but
22 it certainly was -- I don't know if I'd say
23 extremely severe, because that sounds like a nine
24 or ten instead of a seven or eight, and I don't
25 know if I have the evidence for that.

Page 670

1      Q. How about severe?
2      A. It was severe.
3      Q. Okay. And on the pain scale that you
4  looked at and perhaps made a note of, a seven was
5  excruciating pain, right?
6      A. Right, seven, eight is excruciating.
7      Q. Do you know whether Dr. Mackey raised the
8  possibility of surgery at this visit?
9      A. He said consider surgery and get a psych
10 evaluation for dementia, both.
11     Q. Okay. And so let's talk about the surgery
12 first. The note says that we discussed the
13 possibility of surgery. We are going to go ahead and
14 make him an appointment to see Dr. Everette Howell.
15     And you're -- you're aware that Dr. Howell
16 is a surgeon, right?
17     A. Yes.
18     Q. Okay. So at this point would you agree
19 that Mr. Smith had an expectation that surgery was a
20 possibility?
21     A. Yes.
22     Q. His daughter -- the note says that his
23 daughter, quote, raised the concern about whether or
24 not there are some other issues going on. And on the
25 basis of her concerns, Dr. Mackey recommended a

Page 671

1  psychiatric evaluation, right?
2      A. Right. She had actually called March 1st
3  and mentioned suicide ideation, which she
4  interpreted as suicide ideation. She called
5  Mackey's office for this March 9th visit, and that
6  was probably part of his phone records that the
7  daughter was concerned about him. And -- and any
8  time you mention suicide, they tend to get you to a
9  psychiatrist.
10     Q. And we talked about that yesterday, right?
11     A. Yes.
12     Q. And so Dr. Mackey's note -- or Dr. Mackey
13 in his deposition said that he made an appointment
14 for Mr. Smith to see a Dr. West.
15     Do you remember that testimony?
16     A. Yes, I do.
17     Q. And that Mr. Smith did not keep that
18 appointment or -- or go -- go to see Dr. West?
19     A. That's correct.
20     Q. Okay. Do you think that Mr. Smith had
21 reluctance to visit a psychiatrist at this time
22 because of the factors we talked about yesterday,
23 being an elderly white male, having pride, and maybe
24 being somewhat reluctant to get psychiatric care?
25     A. You know, it's hard to know. I think

Page 672

1  we're probably only speculating, because all we
2  know for a fact is that he was resistant to
3  psychiatric treatment. We have -- I have no way of
4  getting in his mind. I mean, I can speculate that
5  people don't want to be thought of as having
6  dementia or being unable to control their suicidal
7  impulses or whatever that he may have been
8  thinking. But I have no direct evidence what was
9  in his mind, just the fact that he didn't keep the
10 appointment.
11     Q. Okay. That's fair.
12     Do you believe that the recommendation to
13 see a psychiatrist at this point was based on both
14 suicidal ideation and concern about possible
15 dementia?
16     A. Yes.
17     Q. And what are some of the symptoms of
18 dementia, if you know?
19     A. Well, of course, I know. The most common
20 type of dementia is Alzheimer's type. And the
21 prominent characteristic of Alzheimer's type
22 dementia is memory impairment.
23         (Exhibit 39: A photocopy of a Medline
24     Plus article marked for identification, as of
25     this date.)

7 (Pages 669 to 672)

Page 825

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3        _____
                                           )
 4        In re: NEURONTIN MARKETING,      )
          SALES PRACTICES, AND PRODUCTS    )
 5        LIABILITY LITIGATION,            )
          _____)
 6

 7                          VOLUME IV

 8

 9            CONTINUED VIDEOTAPED DEPOSITION OF

10                  RONALD Wm. MARIS, Ph.D.

11                    (Taken by Defendant)

12                   Columbia, South Carolina

13                  Monday, October 20, 2008

14

15

16

17

18

19

20

21

22

23

24              Reported in Stenotype by
             V. Dario Stanziola, CSR, RPR, CRR
25      Transcript produced by computer-aided transcription
```

Page 910

1  900 milligrams BID.
2      Q.  What's BID?
3      A.  That means twice a day. So it sounds
4  like she is getting 1,800.
5      Q.  Okay. Now keep going.
6      A.  And HS. So it sounds like she's getting
7  a lot more than 1,200 a day.
8      Q.  Okay. In fact, what's nine times three, 27?
9      A.  Yep.
10     Q.  So she's getting -- she's being prescribed
11 2,700 milligrams of Neurontin in December of 2002,
12 right?
13     A.  Let me see here. Sounds like it. I
14 mean, I think that's ambiguous. But one way of
15 reading it is she was getting that much.
16     Q.  What's ambiguous about it?
17     A.  It's not really ambiguous. Just seems
18 like a lot.
19     Q.  Okay. So she's -- in December of 2002
20 she's being prescribed 2,700 milligrams a day. And
21 you'd agree with me that that is a much higher dose
22 than she was taking at the time of her death, right?
23     A.  Right.
24     Q.  Okay. In order to opine that Susan
25 Bulger's suicide was caused by Neurontin, she had to

Page 911

1  be taking Neurontin at the time of her death, right?
2      A.  Well, no, that's not true. We know she
3  took it for some time. And I said there's two
4  effects of Neurontin, one is the -- for example, I
5  opine she may be on Effexor and Lexapro because the
6  Neurontin is making her depressed.
7      Q.  You know what, let's talk about. Let's talk
8  about Effexor.
9      A.  Well, let me try to answer your first
10 question before you change the question. You asked
11 me a question, I haven't answered it yet. Could you
12 repeat the question?
13     Q.  I'm not going to repeat the question.
14        MR. ROSENKRANZ: Can you read it back,
15   please.
16        MS. SEATON: You could read it back.
17        (THE QUESTION WAS READ BACK.)
18     A.  And my answer was yes and no. I think
19 there were two effects; one was the long-term
20 effect of taking Neurontin and one was the acute
21 effect of taking Neurontin. So you can have a kind
22 of -- you can have a long-term effect and a
23 short-term effect.
24     Q.  Okay. But you're not going to tell a jury
25 that somebody could not be taking Neurontin and you'd

Page 912

1  still opine that Neurontin caused the suicide?
2        MR. ROSENKRANZ: Objection to the form of
3   the question.
4      A.  No, of course not.
5      Q.  Okay. So in order to opine that she -- that
6  Neurontin caused her suicide, she had to be taking
7  Neurontin at the time, right?
8      A.  Not at the time. She had to have been
9  taking it for some time. Plus I think at the time
10 as well.
11     Q.  Okay. Well, let's delve into that.
12        How long could she have discontinued
13 Neurontin use prior to the suicide and it would still
14 in your opinion be related to the Neurontin use?
15     A.  Gosh, I don't know how to answer that.
16 I'm assuming that she was pretty much on Neurontin
17 right up from the time she started taking it in
18 June 24th of 2002 pretty much right up until she
19 died. Now, you're saying let's assume she wasn't.
20 So that's -- that assumes facts contrary to my
21 reading of the record.
22     Q.  That wasn't -- I wasn't asking you to
23 assume that though. I'm trying to understand if
24 you're -- if you're going to tell a jury that she
25 didn't have to be taking Neurontin at the time of her

Page 913

1  death, when could she have stopped taking Neurontin
2  and you would still opine that her death was caused
3  by Neurontin?
4      A.  Well --
5      Q.  Do you understand my question?
6      A.  I'm not sure because I said before I
7  think she had to be taking it chronically and
8  acutely.
9      Q.  Okay. So then we agree. We agree that in
10 order for you to opine that Neurontin caused her
11 suicide, she had to be taking it at the time of her
12 death?
13     A.  And before her death.
14     Q.  Okay. Okay. I think we agree.
15     A.  Yeah.
16     Q.  Do you remember the Giles case?
17     A.  I do. That was an Effexor case in
18 southern Illinois of a mine worker.
19     Q.  Do you recall drafting an expert report in
20 which you stated that absent Effexor Jeff had
21 stoically managed years of injuries, work disruptions
22 and physical pain without attempting or even thinking
23 about suicide?
24     A.  Yes.
25     Q.  Do you recall opining in the Giles case

Page 918

1  Q. Like what?
2  A. Well, I don't remember the Giles case in
3  enough detail. But if I could look at it and go
4  over the side effects that are common with Effexor.
5  Q. Well, it's -- I mean, it's interesting
6  because it's -- basically it sounds just like the
7  Bulger case. In your report in Giles, you're talking
8  about I'm not arguing that Effexor was the one and
9  only cause. Clearly depressive disorder, physical
10 injuries, family history of depression, chronic pain,
11 unemployment were all suicidogenic too. However,
12 Jeff lived with these stressors for many years. It
13 was after starting Effexor. Effexor was the scale
14 tipper, just the noticeable difference maker pushing
15 him over the edge. To me that sounds just like the
16 Susan Bulger case.
17 A. No, you're not even --
18     MR. ROSENKRANZ: Objection to form.
19 A. You're not --
20     MR. ROSENKRANZ: You're not testifying,
21   counselor.
22 A. You're not even addressing the issue that
23 I'm raising, which is in that case what are the
24 purported adverse effects of taking Effexor in the
25 Giles case.

Page 919

1  Q. Well, I assume that in the Giles case you
2  said that the Effexor made Jeff Giles' depression
3  worse?
4  A. I don't know. We'd have to go back and
5  look. There's specific side effects for each drug.
6  Q. Okay. If in fact in the Giles case you
7  testified that the Effexor made the depression worse,
8  and in this case you're saying the Neurontin made
9  Susan Bulger's depression worse, how do you know it
10 wasn't the Effexor that made her depression worse?
11 A. I don't know for a hundred percent, I
12 agree. And I -- but I do think she's on Effexor
13 partly because she's taking Neurontin. The
14 Neurontin caused the Effexor.
15 Q. Okay. Now, I want to go back. You said
16 something about you -- part of your methodology in
17 excluding the Effexor was the fact that the Effexor
18 was transitory, right?
19 A. Well, it certainly wasn't being taken at
20 the same amount -- I don't know the treatment
21 history. When I see it for the first time here, I
22 have to go back and look at the other times that it
23 could have been prescribed. I know she was on
24 Prozac, I know she was on Paxil. But I don't see
25 any reference to the Effexor until 11/6/03.

Page 920

1  Q. Right.
2     And you acknowledge that at the time of her
3  death she was taking Effexor, according to Ron
4  Bulger, right?
5  A. Right. And, of course, it wasn't found
6  in her blood toxicology either.
7  Q. Well, neither was Neurontin, right?
8  A. They didn't test for Neurontin.
9  Q. Right.
10    And they didn't test for Effexor?
11 A. I don't know. That's a good question.
12 Q. You would agree with me that Ron Bulger
13 told the police that Susan was taking Effexor at the
14 time, right?
15 A. I believe that's true, yes.
16 Q. Okay. And so do you have any reason to
17 dispute that Susan Bulger was prescribed and took
18 Effexor continuously or as prescribed from -- from
19 November 2003 until her suicide?
20 A. I just don't know the answer to that.
21 Q. Okay. But you have no reason to dispute
22 that, right?
23 A. Well, the time she stopped taking her
24 medicines without telling anybody. So it's
25 possible.

Page 921

1  Q. Okay. We've been going for about another
2  hour. If you'd like --
3  A. We have?
4  Q. Yes. I know.
5     Do you mind if we --
6     MR. ROSENKRANZ: It's a little under an
7   hour.
8     MS. SEATON: Okay. Well, can we take five
9   minutes?
10 A. Sure.
11 Q. Great.
12    THE VIDEOGRAPHER: End of tape number two
13   in the deposition of Dr. Ronald Maris, Volume
14   I. The time is 10:52 a.m. We're now off the
15   record.
16    (A BRIEF RECESS WAS TAKEN.)
17    THE VIDEOGRAPHER: This is the beginning
18   of tape number three in the deposition of Dr.
19   Ronald Maris, Volume I. The time is
20   10:59 a.m. We're back on the record.
21 Q. Dr. Maris, I want to go back to this issue
22 and this opinion in your report where your say on
23 page 19, second, meaning your second opinion, Susan
24 Bulger had clearly been ingesting Neurontin from at
25 least 10/20/99 until her death on August 4th, 2004.

Page 1050

1  evidence for the proposition that Neurontin worsened
2  her depression. And I think we've already talked
3  about kind of what her depression looked like before
4  Neurontin. You're relying on a July 4th, 2002 record
5  that for the proposition that Neurontin made her
6  worse, right?
7       MR. ROSENKRANZ: Objection. Objection.
8       You're taking what the doctor just said out of
9       context.
10      MS. SEATON: Well, actually, I'm going to
11      object and I'm going to move to strike what
12      the doctor just said because there was no
13      question pending and it was non-responsive to
14      any question that was on the table.
15      MR. ROSENKRANZ: Well, it was responsive
16      to your question just now that you're using
17      Dr. -- the note from Crognale in 2002 as the
18      basis and support. And the doctor said that
19      that is not so because you didn't look at the
20      year before.
21      MS. SEATON: Okay.
22   Q. Well, Doctor, let's go to your report, page
23  22. You indicate that Neurontin treatment worsened
24  Susan Bulger's depressive disorder. In your report
25  what evidence do you cite for that proposition?

Page 1051

1    A. Partly the fact that she had not had
2  significant depression for the whole calendar year
3  before then.
4    Q. Where does it say that in your report?
5    A. It says that on my time line.
6    Q. Where?
7    A. You have --
8    Q. What I'm saying where in your section on
9  worsened depression does it say that the year
10 preceding her Neurontin prescription the fact that
11 she wasn't depressed is some kind of evidence?
12   A. It doesn't. But now that you've gone
13 through your whole list of all the times she was
14 depressed, I want to point out to the jury that you
15 stopped a calendar year before she got her
16 Neurontin script when she did not have significant
17 depression. So by definition, any depression would
18 be worse because she didn't have very much.
19   Q. Okay.
20      MS. SEATON: Object and move to strike.
21   Q. What other evidence do you rely on for the
22 proposition that her Neurontin treatment worsened her
23 depressive disorder?
24   A. Well, there was evidence that -- first of
25 all, that Neurontin can do this. That is to say,

Page 1052

1  there was evidence not on that particular date that
2  we just talked about, but other times that it made
3  her moody, and I cite the exhibit.
4    Q. Okay. Right now we're talking about her
5  worsening depression now.
6       What evidence --
7    A. I'm going through page 23 at the top and
8  you're objecting to evidence that I cited with
9  particular citations.
10   Q. Okay.
11   A. I'm saying that, first of all, if
12 Neurontin made her depression worse, is there any
13 indication at any time, not just this time in June
14 and July, that she had a reaction to Neurontin,
15 which would be something that could have happened
16 before this first Crognale prescription when she
17 took it before. And in indeed, she became moody,
18 she was totally out of it. And she -- Bulger
19 stated at -- I recite this psychological autopsy,
20 Susan became more depressed, quieter and slept more
21 frequently after taking Neurontin.
22   Q. Okay. What date are we talking about at
23 this point?
24   A. Well, you can look up the citations. I
25 didn't put a date in here.

Page 1053

1    Q. Okay. You're relying on what Ron Bulger
2  said during his deposition?
3    A. I'm relying on the exhibits. I'm relying
4  on Crognale. Many of these comments were in
5  Crognale's treatment history where he talked about
6  how Neurontin affected her. My point is they were
7  not just at the time you say well, what else
8  besides the 7/2/02 note are you citing and I'm
9  saying that there was an earlier note on
10 October 30th of 2000 that Neurontin made her
11 completely out of it.
12   Q. And I think we talked about that
13 October 2000 note and we talked about the fact that,
14 number one, it was not a contemporaneous report of
15 Neurontin making her out of it. Number two, being
16 out of it does not translate to depression or suicide
17 or suicidal intent, right?
18   A. That's true.
19   Q. Okay. And then the other record you cite in
20 your report is this July 2nd, 2002 record, which the
21 record itself says Sue comes in today initially
22 accompanied by her husband Ron and daughter. Ron at
23 the outset of the interview states that he's very
24 concerned about his wife and her depression which has
25 been going on for two to three months, right?

Page 1058

1  depressed she's also had all of her teeth removed,
2  right?
3     A.  Where do we see that? I see it.
4     Q.  The next paragraph.
5         Fair to say that bankruptcy and having all
6  your teeth pulled are fairly significant events that
7  might lead to depression?
8     A.  And probably fairly similar.
9     Q.  Okay. The other record that you cite in
10 your report for this proposition that Neurontin
11 treatment worsened Susan Bulger's depressive disorder
12 is a December 2nd, 2002, record. And I'm on page 23
13 of your report.
14    A.  Hold on a second.
15        Yes. What's the question?
16    Q.  All right. That's one of the things that --
17 one of the pieces of evidence that you're relying on
18 for this proposition that Neurontin worsened her
19 depression is this 12/2/02 record?
20    A.  Right.
21    Q.  Indicating that the Neurontin -- she's not
22 taking Neurontin because it was making her moody,
23 right?
24    A.  Right.
25    Q.  Now, she was actually prescribed Neurontin

Page 1059

1  from May 14, '02 to 10/17/02, right?
2     A.  I believe so, yes.
3     Q.  Okay. I'm going to hand you what I'm going
4  to mark as Deposition Exhibit No. 86?
5         (Exhibit 86: Progress Notes of Susan
6         Bulger dated 5/14/02 marked for
7         identification, as of this date.)
8     Q.  Up at the top it's indicating that she's
9  taking Neurontin a hundred milligrams one at bedtime,
10 then increased to two at bedtime, right?
11    A.  Right.
12    Q.  And during this time frame she never
13 indicated she was experiencing any ill effects from
14 Neurontin, right?
15    A.  That's true. It's a very low dose too.
16 Of course, but we've got to get this 7/2 record and
17 find out for sure what her dose was.
18    Q.  Okay.
19    A.  Because I had something different.
20    Q.  Would you agree with me that being moody
21 was not at all unusual for Susan Bulger?
22        In fact -- in fact, we looked at a 1993
23 record in which Susan Bulger wrote I used to be very
24 outgoing, I'm usually very moody most days, right?
25    A.  Right. But here's she specifically,

Page 1060

1  specifically attributing it to Neurontin.
2     Q.  Okay.
3     A.  And in another place, Neurontin made me
4  completely out of it. So she's making specific
5  attributions.
6     Q.  But they're not contemporaneous, right?
7     A.  They're not. They're just an evidence
8  that in the past that she gave us some indication
9  that Neurontin may have an effect on her that's
10 adverse.
11    Q.  One thing I noticed is that your chronology
12 doesn't include places where her depression is
13 improved while she's taking Neurontin.
14        And I wonder, did you consider those
15 records in forming your opinions?
16    A.  I did. I did.
17    Q.  Okay. Why didn't you include them in your
18 report?
19    A.  I don't know why I didn't include them in
20 my report. They're, you know, like I don't think
21 of Neurontin primarily -- the direct effects of
22 Neurontin are not designed to improve your mood.
23 That's a side effect. And so, you know, I was
24 looking for adverse side effects, not -- not
25 intended main effects. Although I did notice them

Page 1061

1  as I read them.
2     Q.  Okay. And so you were aware then that in
3  August of 2003 she told Dr. Crognale that she felt
4  like the Lexapro in combination with Neurontin
5  300 milligrams at bedtime seemed to be improving her
6  mood stability?
7     A.  What date is this?
8     Q.  8/11/03. She indicated that she was
9  feeling less depressed and anxious and felt more even
10 and that Neurontin was helping her to sleep better.
11    A.  Can I see the record?
12    Q.  Absolutely.
13    A.  Because this is not it, right?
14    Q.  No.
15        (Exhibit 87: Progress Notes of Susan
16        Bulger dated 8/14/03 marked for
17        identification, as of this date.)
18    Q.  I'm going to hand you what we're going to
19 mark as Deposition Exhibit No. 87.
20        And at the bottom it's dated 8/11/03,
21 quote, regarding her depression she feels like
22 Lexapro 20 milligrams in combination with Neurontin
23 300 milligrams, QHS at bedtime, seems to be improving
24 her mood stability. She feels less depressed and
25 anxious. Feels more even. Is having no significant

Page 1105

1         UNITED STATES DISTRICT COURT
2           DISTRICT OF MASSACHUSETTS
3
4
5
6  IN RE:  NEURONTIN MARKETING,
7  SALES PRACTICES AND PRODUCTS
8  LIABILITY LITIGATION
9
10
11                VOLUME V
12
13
14       CONTINUED VIDEOTAPED DEPOSITION OF
15          RONALD WILLIAM MARIS, Ph.D.
16             (Taken by Defendant)
17           Columbia, South Carolina
18          Wednesday, October 22, 2008
19
20
21
22
23
24
25

Page 1110

1  now, color copies of your billing records for
2  the Bulger case and the -- or, actually, are
3  these your billing records?
4      A.  Yes.  They are notes -- notes and
5  billing records.
6      Q.  For both the Smith and the Bulger
7  case?
8      A.  Right.
9          MS. SEATON:  All right.  I'm going to
10 mark as Exhibit No. 89, this Bulger -- these
11 Bulger notes.
12         What I would like to do, if it's
13 okay, is put a page on the front, because I
14 don't want the -- I don't want the exhibit
15 number to --
16         COURT REPORTER:  Obliterate.
17         MS. SEATON:  Thank you.
18         I'm going to mark as Exhibit 89 your
19 Bulger notes.
20         And I'm going to mark as Exhibit 90,
21 your Smith notes.
22         (EXHIBIT 89 MARKED.)
23         (EXHIBIT 90 MARKED.)
24     Q.  Yesterday we had a free day.  And so
25 I spent some time on the Internet.  And I

Page 1111

1  Googled you.
2          And I found you under
3  suicideexpert.com.
4          I was wondering, how long have you
5  had that domain name?
6      A.  The honest answer is:  I don't
7  remember exactly, but it's been several years,
8  probably five years.
9      Q.  Whose idea was it to register the
10 domain name:  Suicideexpert.com?
11     A.  It was my idea.
12     Q.  Do you pay a fee every year to have
13 that domain name of www.suicideexpert.com?
14     A.  No more than anybody else does for a
15 dot com listing.
16         It's like -- a small amount of money,
17 it's $100 or so, a year.
18     Q.  Okay.
19     A.  And just to answer your question, it
20 has all my information, my CV, my references,
21 previous cases.
22         So it's just like an information
23 site.
24         MS. SEATON:  I'm going to object and
25 move to strike as non-responsive, as there was

Page 1112

1  no question pending.
2      Q.  One of the things that we talked
3  about yesterday -- or I'm sorry -- on Monday,
4  was past suicides attempts and ideation.
5          And I think that you acknowledged
6  that a history of past suicide attempts is one
7  of the most significant risk factors of suicide;
8  yes?
9      A.  With the qualification that it's not
10 for men.
11         And people make relatively few
12 attempts.
13         And it's a complicated relationship,
14 because, for example, in Bulger's case, she had
15 low lethality attempts, and then a lethal/fatal
16 attempt.
17         So it's not simply -- you don't just
18 count the number of attempts.
19         Many people say it's one of the most
20 important risk factors.
21     Q.  Let's talk a little bit more about
22 that.
23         Low lethality attempts, we also
24 talked on Monday about the fact -- well, let's
25 go at it this way:

Page 1113

1          Would you agree with me that from the
2  standpoint of a suicide risk assessment, the
3  strength of a patient's intent to die, and his
4  or her subjective belief about the lethality of
5  the method, are more relevant than the objective
6  lethality of the chosen method?
7          MR. ROSENKRANZ:  Objection to form.
8      A.  More important for what?
9      Q.  From the standpoint of suicide risk
10 assessment.
11         So in deciding whether or not someone
12 is at an increased risk for suicide, it's more
13 important to look at the patient's intent with
14 regard to a suicide attempt, as opposed to the
15 actual lethality or lack of lethality of the
16 method chosen.
17     A.  No.  I don't think that's true.
18         I think that the notion of lethality
19 is the medical certainty or probability that if
20 you do a certain method, it will lead to death,
21 regardless of your intent.
22     Q.  So you disagree with the American
23 Psychiatric Guidelines that the patient's intent
24 is actually more important than the method that
25 he or she chooses with the suicide attempt -- in

Page 1210

1   COURT REPORTER: Okay. I'm going to
2  read the question back --
3   THE WITNESS: You didn't have to
4  coach me, I said the same thing -- before he
5  said anything.
6   COURT REPORTER: Okay. You want the
7  question back?
8   MS. SEATON: Please.
9   COURT REPORTER: Here is my question:
10  Ron Bulger did not tell the police
11  that Susan Bulger was thinking about ending her
12  life, did he?
13   MR. ROSENKRANZ: Objection to form;
14  he never testified to that either.
15  Q.  Now you may answer.
16  A.  Right. I mean, the statement that he
17  gave to the trooper, which was the night she
18  died, says -- in addition to what I said: For
19  about six months, she has been really depressed.
20   MS. SEATON: I object, and I move to
21  strike as non-responsive.
22  Q.  You are not answering my question.
23   And my question is not difficult:
24   Did Ron Bulger tell the police
25  that -- Ron Bulger did not tell the police she

Page 1211

1  was talking about ending her life, did he?
2   MR. ROSENKRANZ: Object to form.
3   You are basing that on being
4  inconsistent with his testimony.
5   That was the basis of your question.
6   He never testified that she was
7  thinking of ending her life.
8   MS. SEATON: Gentlemen, this is not a
9  difficult question.
10  Q.  Ron Bulger did not tell the police
11  that Susan Bulger was thinking about ending her
12  life, did he?
13   MR. ROSENKRANZ: The basis of that
14  question is that that is inconsistent with his
15  testimony.
16   And his testimony in his deposition
17  is --
18   MS. SEATON: And now you're
19  testifying.
20   MR. ROSENKRANZ: -- is that she was
21  hopeless, not that she was thinking of ending
22  her life.
23   MS. SEATON: Counsel --
24   MR. ROSENKRANZ: So there's no
25  inconsistency.

Page 1212

1   MS. SEATON: Inappropriate.
2   MR. ROSENKRANZ: Objection to form.
3   MS. SEATON: Inappropriate. You're
4  testifying. I have not asked a difficult
5  question here.
6  Q.  True or false -- that Ron Bulger did
7  not tell the police that Susan Bulger was
8  thinking about ending her life, did he?
9  A.  He did not say that. He said that
10  she tried suicide, so he mentioned suicide at
11  least three times here in the context of what is
12  happening.
13   MS. SEATON: I object, and I move to
14  strike everything except for "no."
15  Q.  In fact, Ron Bulger did tell the
16  police that:
17   Last time, it was the same. She
18  never said a word. She took a bottle of pills,
19  correct?
20  A.  Yeah.
21   That's the last thing he says to the
22  trooper.
23   MR. ROSENKRANZ: Object to form.
24   MS. SEATON: Okay.
25  Q.  Did you consider the fact that Ron

Page 1213

1  Bulger's deposition testimony is also completely
2  contrary to Susan Bulger's reports to her
3  treating physicians during that period of time?
4   MR. ROSENKRANZ: Objection to form.
5   MS. SEATON: Okay.
6  A.  Yeah.
7   MR. ROSENKRANZ: To what are you
8  specifying?
9  Q.  The question is simple: Did you
10  consider the fact that Ron Bulger's testimony is
11  inconsistent with what Susan Bulger was telling
12  her doctors about her mental state?
13   MR. ROSENKRANZ: Objection to form.
14   To what are you specifically
15  referring -- again, I ask.
16  A.  I think she did tell him that -- I
17  think that he put her on Effexor because she
18  told him that.
19  Q.  You know what? Let's go back, and
20  let's actually look at the medical records and
21  see what Susan Bulger was telling her doctors
22  immediately prior to her death.
23   (EXHIBIT 97 MARKED.)
24  Q.  I'm handing you what I'm going to
25  mark as Exhibit No. 97.

28 (Pages 1210 to 1213)

Page 1250

1  took the Neurontin, right?
2       MR. ROSENKRANZ: Objection; asked and
3  answered.
4    A.   I have been asked that a number of
5  times, and I said the only evidence is that she
6  asked for it immediately --
7    Q.   Okay.
8    A.   -- before her suicide.
9    Q.   Did you -- are there any other
10 additional risk factors, other than the suicide
11 attempts that you -- strike that --
12      Let me start over:
13      I want to talk, Doctor, about this
14 methodology by which you reached an opinion that
15 Neurontin played some role in Susan Bulger's
16 suicide.
17      And, specifically, I want to know
18 what risk factors you considered, and how you
19 ruled out various risk factors.
20      Do you know whether lack of mental
21 health treatment is a risk factor for suicide?
22   A.   It certainly can be, yes.
23   Q.   Receiving counsel or seeking a
24 therapist can be a protective factor, correct?
25   A.   If you have a good counselor.

Page 1251

1    Q.   You did not identify lack of mental
2  health treatment as a risk factor for
3  Mrs. Bulger, correct?
4    A.   I did not.
5    Q.   And, in fact, you identified
6  treatment for depression as a protective factor
7  in this case, correct?
8    A.   Actually, if you ever to get to my
9  new theory, I defined it as both, which is to
10 say: People who get treatment usually have some
11 remission of symptoms, not always.
12      For example, 60 to 70 percent of
13 people taking an anti-depressant never have an
14 anti-depressant effect.
15      But -- so it helps them, but if there
16 are adverse events or adverse effects then,
17 obviously, it can also hurt them.
18   Q.   Are you aware that Susan Bulger had
19 been seeing a counselor and receiving some group
20 therapy between 2000 and 2003?
21   A.   Yes.
22   Q.   And that was part of her -- one of
23 the requirements that, in order to get her
24 methadone, she had to attend the therapy
25 sessions; is that right?

Page 1252

1    A.   I believe that's correct.
2    Q.   Are you aware Mrs. Bulger stopped
3  going to that counselor and group therapy 11
4  months prior to her death, because she found
5  Dr. Goldman, who would prescribe methadone to
6  her without requiring her to receive any
7  therapy?
8    A.   I believe that she did certainly find
9  Goldman.
10      I don't know if he made that
11 stipulation; I'll take your word for it.
12   Q.   Are you aware -- did you consider the
13 fact that Susan Bulger received no counseling or
14 therapy for the 11 months prior to her suicide?
15   A.   Right. I'm aware of that.
16   Q.   In your expert opinion, would Susan
17 Bulger have benefited from psychiatric treatment
18 in 2004?
19   A.   She could have; although, she had had
20 treatment many times before.
21      I think you pointed out to me, she
22 had never finished a detox program.
23      She was often non-compliant, and so
24 I'm not sure how much help she would have
25 gotten.

Page 1253

1    Q.   Did you rule out the fact that Susan
2  Bulger had stopped receiving counseling as the
3  cause of her suicide?
4    A.   First of all, I don't have the same
5  model that you are assuming, which is a
6  differential diagnosis model, where you rule out
7  the alternatives.
8       My theory, as you know, is that I
9  rule them in, and I talk about them actually
10 contributing to making her part of a vulnerable
11 minority of patients --
12   Q.   Well, Dr. Maris --
13      THE WITNESS: I'm not finished.
14      MS. SEATON: Okay.
15   A.   And that by ruling them in, then the
16 Neurontin becomes an additional substantive
17 proximate risk factor, not the only factor.
18      So I'm not ruling these things out.
19 I never tried to rule them out.
20      I'm saying that there was a
21 combination of effects and risk factors that
22 made her suicidal, and which Neurontin was one
23 of them.
24   Q.   You have testified in this
25 litigation, in addition to publicly stating,

38 (Pages 1250 to 1253)