# EXHIBIT 2

1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3      In re:  NEURONTIN         : MDL DOCKET NO. 1629
        MARKETING, SALES          :
 4      PRACTICES AND PRODUCTS     :
        LIABILITY LITIGATION       :
 5      ------------------------   : MASTER FILE NO.
        THIS DOCUMENT RELATES TO:  : 04-10981
 6                                 :
        Bulger,v. Pfizer, Inc.,    :
 7      et al.                     :
        Case No. 05-CV-11515-PBS   :
 8

 9     VIDEOTAPE DEPOSITION OF STEFAN P. KRUSZEWSKI, M.D.

10              VOLUME I (Page 1 - 344)

11              Taken in the Harrisburg Hilton,

12  located at 1 North Second Street, Harrisburg,

13  Pennsylvania, on Wednesday, October 15, 2008,

14  commencing at 9:07 a.m., before  Sally A. Slifer,

15  Registered Merit Reporter, Certified Realtime

16  Reporter, and Robert Cowalchik, Videographer.

17
    APPEARANCES:
18
                    FINKELSTEIN & PARTNERS, L.L.P.
19                  BY:  KENNETH FROMSON, ESQ.
                    785 Broadway, 3rd Floor
20                  Kingston, NY  12401
                     -- For the Plaintiff
21

22

23

24

25
```

**62**

1  Q.      I am handing you now what is marked now as
2  Exhibit 2 to your deposition.  Can you please tell us
3  for the record what that is?
4  A.      That is a 37 page copy of my expert report
5  prepared in the Susan Bulger versus Pfizer litigation.
6  Q.      What is the date that that was prepared?
7  A.      August 7, 2008.
8  Q.      Does that contain all the opinions you intend
9  to give in the Bulger case?
10        MR. FROMSON:  Objection as to form.
11 A.      Yes, I believe so.
12 Q.      I am looking at the copy of the report that
13 you brought here with you today, and it has some
14 highlighting that looks like it was done on the
15 computer, correct?
16 A.      (Witness nods head.)
17 Q.      If you will just take a look at that, can you
18 tell me why there is highlighting related to your
19 report and the discussion of academic teaching
20 assignments on page two, published articles on page
21 two, and then the entire top half of page three; why
22 is that highlighted.
23 A.      You mean why is it not highlighted here?
24 Q.      Why have you highlighted it in your report?
25 I assume that's highlighting you prepared?

**63**

1  A.      It's actually not.  I can't tell you exactly
2  how this happens, but sometimes in the reports that I
3  prepare, when items are copy and pasted, and I don't
4  understand this in terms of formatting, but it is copy
5  and pasted in its entirety, and that's the way it
6  shows up on a final copy.
7  Q.      So the portions in that report relating to
8  your -- let's see, is it under the heading of relevant
9  educational and clinical background information?
10 A.      Yes.
11 Q.      The highlighting under that section in your
12 copy of the report is as a result of that information
13 being cut and paste from somewhere else and put into
14 this report in Bulger, correct?
15 A.      It probably was, yes.
16 Q.      Do you know where that is cut and pasted
17 from, is that from other litigation reports?
18 A.      It probably would be from another litigation
19 report, yes.
20 Q.      Is there anything else highlighted in your
21 copy of the report?
22 A.      I don't believe so.  No.
23 Q.      I think you testified earlier, correct me if
24 I am wrong, that based on your review of the
25 depositions in the case and the medical records of

**64**

1  Susan Bulger, that information was -- I don't know if
2  you used the word coalesced -- or culminated I think
3  you said, it culminated in the exhibits that are
4  referenced in your report, is that correct?
5        MR. FROMSON:  Objection to form.
6  A.      Yes, I took pieces of information that I
7  thought were helpful to explain my conclusions or to
8  support them from any and all exhibits, including in
9  part from the response to your interrogatories, I
10 believe I used that as well.
11 Q.      Would it be fair to say that the exhibits on
12 page 13 of your report through page -- well, to the
13 top of page 27, those are the portions of the record
14 in the Bulger matter that were important to your
15 opinions in the case?
16        MR. FROMSON:  Objection as to form.
17 A.      Yes.
18 Q.      Also on page four of your report, there's a
19 section entitled review of documents?
20 A.      I'm sorry.
21 Q.      Page four of your report.
22 A.      Okay.
23 Q.      It goes through page seven of your report, to
24 the top of page seven.
25 A.      Yes.

**65**

1  Q.      Are these all of the materials that you
2  reviewed to formulate your opinions as expressed in
3  your report dated August 7th, 2008?
4  A.      If you include the reviewed documents as well
5  as the additional information, yes.
6  Q.      Is there anything you have reviewed that you
7  rely on for purposes of your opinion in the Bulger
8  matter since the time you drafted this report that is
9  not referenced under review of documents and
10 additional information on pages four to seven of your
11 report?
12 A.      Possibly.
13 Q.      And can you tell us what that is?
14 A.      It's actually already here.  I was
15 thinking -- I stopped for a moment on page 35 with
16 Bettina Schmitz's article on the effects of
17 anti-epileptic drugs on mood and behavior from 2006.
18 I just re-read that and I wasn't sure it was on my --
19 Q.      That's reference number 70 in your addendum?
20 A.      It is.
21 Q.      Is the Bettina Schmitz article contained in
22 your original reference list from your general
23 causation report?
24 A.      I don't believe it is, but we can check.
25 Q.      Did you include the Bettina Schmitz article

17 (Pages 62 to 65)

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                      COUNTY OF LAKE

3                        --oOo--

4    NICOLETTE CRONE, et al.,          )
                                       )
5                      Plaintiffs,     )
                                       )
6            vs.                       )   No. CV 400432
                                       )
7                                      )
     PFIZER INC., et al.,              )
8                                      )
                     Defendants.       )
9    _____ )

10

11                      VOLUME I

12    VIDEOTAPED DEPOSITION OF STEFAN KRUSZEWSKI, M.D.

13   DATE:        November 17, 2006

14   TIME:        8:58 a.m.

15   LOCATION:    Shook, Hardy & Bacon
                  333 Bush Street, Suite 600
16                San Francisco, CA

17

18

19

20

21   REPORTED BY:  Kenneth T. Brill
                    Registered Professional Reporter
22                  Certified Shorthand Reporter No. 12797

23

24

25   Job No. 179354

## Page 2

```
 1              INDEX
 2          INDEX OF EXAMINATIONS
 3    Examination by Ms. McGroder...............5
 4
 5
 6       EXHIBITS MARKED FOR IDENTIFICATION
 7    No.        Description        Page
 8    1    Dr. Kruszewski's notes on yellow
           loose leaf pad made during dep    15
 9
10    2    Report of Stefan Kruszewski, M.D.   27
11    3    County of Lake Coroner's Report
           for Rick Arthur Crone, dated
           4/14/2002              34
12
13    4    Correspondence from Jack E. Miller
           to Christine Nabor, Ph.D., dated
           April 15, 1999           51
14
15    5    Correspondence from Scott Sherman
           addressed to "To Whom It May
           Concern" dated May 16, 2005, Bates
16         Range SLS000001 through 000018   112
17    6    Mendocino County Mental Health
           Services Progress Notes for Ben
18         Crone, Bates range Ben - MCMH 0003
           through 0012           160
19
20    7    Redbud Community Hospital
           Prescription Refills records for
           Rick Crone             266
21
22    8    Handwritten notes made on scrap
           of paper during deposition    404
23
24
25
```

## Page 3

```
 1    APPEARANCES:
 2
      FINKELSTEIN & PARTNERS
 3    BY: KEITH L. ALTMAN, ESQUIRE
      1279 Route 300
 4    Newberg, NY 12551
      (845) 563-0204
 5    kaltman@lawampmnt.com
             and
 6    EDGAR LAW FIRM
      BY: JEREMY R. FIETZ, ESQUIRE
 7    408 College Avenue
      Santa Rosa, CA 95401
 8    (707) 545-3200
      jeremy@classattorneys.com
 9    Representing the Plaintiffs
10
11
      SHOOK, HARDY & BACON LLP
12    BY: LORI CONNORS MCGRODER, ESQUIRE
      JENNIFER M. STEVENSON, ESQUIRE
13    2555 Grand Boulevard
      Kansas City, MO 64108-2613
14    (816) 474-6550
      lmcgroder@shb.com
15    Representing the Pfizer Defendants
16
17
      LAW OFFICES OF STEVEN D. HILLYARD, APC
18    BY: KENDRA BERMAN, ESQUIRE
      345 California Street, Suite 1770
19    San Francisco, CA 94105
      (415) 334-6880
20    KBerman@HDMLaw.com
      Representing the Defendant Dr. Jennings
21
22          --oOo--
23
24    ALSO PRESENT: Benjamin Gerald, Videographer
25
```

## Page 4

```
 1          THE VIDEOGRAPHER:  Good morning.  My name   08:58:08
 2    is Benjamin Gerald of Veritext Deposition Services.   08:58:09
 3    The date today is November 17th, 2008, and the     08:58:14
 4    time is approximately 8:58 a.m.  This deposition is  08:58:17
 5    being held in the office of Shook, Hardy & Bacon,   08:58:20
 6    located at 333 Bush Street, San Francisco,        08:58:25
 7    California.                08:58:28
 8          The caption of this case is Nicolette      08:58:29
 9    Crone, et al., versus Pfizer Incorporated, et al.,    08:58:32
10    held in the Superior Court of the State of        08:58:38
11    California, County of Lake.  The name of the witness  08:58:40
12    is Stefan Kruszewski, M.D.            08:58:43
13          At this time, the attorneys will identify   08:58:47
14    themselves and the parties they represent, after    08:58:48
15    which our court reporter, Ken Brill, of Veritext    08:58:51
16    Deposition Services, will swear in the witness and   08:58:53
17    we can proceed.              08:58:55
18          MR. ALTMAN:  Keith Altman, Finkelstein &    08:58:56
19    Partners, Newberg, New York, for the plaintiffs.    08:58:57
20          MR. FIETZ:  Jeremy Fietz, Edgar Law Firm,   08:58:58
21    Santa Rosa, California, for the plaintiffs.       08:59:01
22          MS. McGRODER:  Lori McGroder, Shook, Hardy  08:59:03
23    & Bacon, representing Pfizer Defendants.        08:59:06
24          MS. BERMAN:  Kendra Berman, from the law    08:59:08
25    offices of Steven Hillyard, representing        08:59:10
```

## Page 5

```
 1    Dr. Jennings.               08:59:10
 2          MS. STEVENSON:  Jennifer Stevenson, Shook,  08:59:12
 3    Hardy & Bacon, representing the Pfizer Defendants.   08:59:13
 4          STEFAN KRUSZEWSKI, M.D., after      08:59:14
 5    having been first duly sworn, was       08:59:14
 6    examined and testified as follows:       08:59:14
 7          ---                08:59:14
 8          EXAMINATION          08:59:14
 9          ---                08:59:22
10          THE VIDEOGRAPHER:  Thank you.  Please    08:59:23
11    proceed.                  08:59:25
12          --oOo--             08:59:25
13    BY MS. McGRODER:                08:59:25
14      Q.  All right.  Dr. Kruszewski, you wrote a     08:59:25
15    report in the Crone case dated December 9th, 2007;   08:59:27
16    is that correct?              08:59:31
17      A.  That is correct.            08:59:32
18      Q.  And that report contains the opinions that  08:59:33
19    you are going to offer in the Crone matter; is that  08:59:37
20    correct?                  08:59:39
21      A.  It is correct.             08:59:39
22      Q.  Does it contain all of the opinions you    08:59:40
23    intend to offer in the Crone case?         08:59:44
24      A.  Yes, I believe so.           08:59:45
25      Q.  When is the last time you reviewed that    08:59:46
```

VERITEXT CORPORATE SERVICES (800) 567-8658

**6**

```
1    report?                           08:59:48
2    A.  Last night.                   08:59:49
3         MR. ALTMAN:  Can you go off the record for  08:59:50
4    one second?  I think there is some confusion over  08:59:53
5    the date of the report.           08:59:55
6         THE VIDEOGRAPHER:  The -- the time is  08:59:57
7    8:59 a.m., and we are off the record.  08:59:58
8         ---              09:00:00
9         (Discussion held off the record.)  09:00:00
10        ---              09:00:22
11        THE VIDEOGRAPHER:  The time is  09:00:28
12   9:00 o'clock, and we are back on the record.  09:00:29
13   BY MS. McGRODER:                  09:00:32
14        Q.  And you also identified, Dr. Kruszewski,  09:00:33
15   certain materials that you reviewed in conjunction  09:00:35
16   with the formulation of your opinions in the Crone  09:00:38
17   case in that report; correct?     09:00:40
18        A.  That is correct.         09:00:42
19        Q.  And are those all of the materials that  09:00:43
20   you've rev-- -- reviewed in the Crone matter?  09:00:45
21        A.  No.                      09:00:47
22        Q.  So subsequent to December 9, 2007, you  09:00:48
23   reviewed additional materials?    09:00:50
24        A.  I did.                   09:00:52
25        Q.  What did you review?     09:00:53
```

**7**

```
1    A.  I was furnished with more documents,  09:00:54
2    including the Long Valley health records of  09:00:57
3    Mr. Crone, probably in the last month.  09:01:02
4    I also reviewed Dr. Maris's report, and  09:01:07
5    the psychological autopsy, which I believe was put  09:01:11
6    together by the Finkelstein firm in preparation for  09:01:15
7    Dr. Maris's subsequent report.    09:01:19
8         Q.  Well, the psychological autopsy you're  09:01:24
9    referring to is the one that Mr. Maris uses as a  09:01:26
10   matter of course in testimony and litigation;  09:01:30
11   correct?                          09:01:32
12        A.  Yes.                     09:01:33
13        Q.  And is your understanding that that  09:01:33
14   psychological autopsy was prepared by a member of  09:01:35
15   the Finkelstein law firm?         09:01:37
16        MR. ALTMAN:  Objection.  Calls for  09:01:39
17   speculation.                      09:01:40
18        THE WITNESS:  It has been my understanding  09:01:42
19   that this -- in this case, and in the case we  09:01:43
20   previously discussed and for which I was deposed,  09:01:45
21   was that the Finkelstein firm had extracted some of  09:01:48
22   the information from the records in putting together  09:01:52
23   the psychological autopsy, not Dr. Maris's report,  09:01:54
24   which was Dr. Maris's own work.   09:02:00
25   BY MS. McGRODER:                  09:02:03
```

**8**

```
1         Q.  And is your understanding about who  09:02:03
2    prepared the psychological autopsy in the Crone case  09:02:04
3    based on the testimony of Dr. Maris in the Bulger  09:02:07
4    matter, where he testified that a member of the  09:02:11
5    Finkelstein law firm filled out the psychological  09:02:14
6    autopsy form for that case?       09:02:17
7         MR. ALTMAN:  Objection.  Lacks -- lack of  09:02:19
8    foundation, assumes a fact not in evidence.  09:02:20
9         THE WITNESS:  In part.  It was also told  09:02:23
10   to me by Mr. Fromson in our prior deposition in  09:02:25
11   Harrisburg.                       09:02:29
12   BY MS. McGRODER:                  09:02:29
13        Q.  For the Bulger case?     09:02:31
14        A.  For the Bulger case.      09:02:33
15        Q.  Okay.  All right.  Yes, we've spent a  09:02:34
16   little bit of time together over the past several  09:02:36
17   months; haven't we?               09:02:40
18        A.  We have.                 09:02:41
19        Q.  All right.  And, you know, I -- there will  09:02:41
20   be times when I will be asking you some of the  09:02:42
21   similar or same types of questions, in particular  09:02:45
22   about risk factors associated with suicide that  09:02:45
23   you've previously answered in the Bulger case.  And  09:02:47
24   I just want you to understand that, you know, we may  09:02:50
25   have to go over some of those again because you're  09:02:51
```

**9**

```
1    testifying in a different matter; correct?  09:02:54
2         A.  Correct.                 09:02:56
3         Q.  And you understand that?  09:02:57
4         A.  I do.                    09:02:58
5         Q.  Okay.  You've testified that in virtually  09:02:58
6    every suicide there is a precipitating event.  Is  09:03:03
7    that your opinion?                09:03:07
8         A.  It is.                   09:03:08
9         Q.  And is that your opinion in the Crone  09:03:09
10   case?                             09:03:11
11        A.  Yes.                     09:03:11
12        Q.  And what was the precipitating event in  09:03:12
13   the Crone matter?                 09:03:14
14        MR. ALTMAN:  Objection.  Vague.  09:03:16
15        THE WITNESS:  In my opinion, the  09:03:17
16   precipitating event was the increase of Neurontin  09:03:18
17   from 900 milligrams a day to 1800 milligrams a day  09:03:24
18   that was done on or about March 21st, or  09:03:29
19   March 22nd of 2002, several weeks before Mr. Crone  09:03:34
20   committed suicide on April 13th, 2002.  09:03:42
21   BY MS. McGRODER:                  09:03:45
22        Q.  Is your testimony that had Mr. Crone's  09:03:45
23   dosage of Neurontin not increased from 900 to 1800  09:03:48
24   milligrams, he would not have committed suicide?  09:03:52
25        MR. ALTMAN:  Object.  Misstates his  09:03:56
```

3 (Pages 6 to 9)

VERITEXT CORPORATE SERVICES (800) 567-8658

106

1   other neurologic symptoms, would you agree that   11:08:21
2   walking in front of a moving car on a freeway during  11:08:24
3   that time period for Mr. Crone would be more likely  11:08:27
4   suicidal ideation, or more likely psychosis?   11:08:31
5       MR. ALTMAN: Objection, vague, compound,  11:08:35
6   calls for speculation.   11:08:37
7       THE WITNESS: I absolutely accept it as  11:08:38
8   being suicidal.   11:08:40
9   BY MS. McGRODER:   11:08:50
10     Q.  You did not take into account at the time  11:08:51
11   that you formed your opinions in this case these  11:08:55
12   other instances of suicide ideation that Rick Crone  11:08:57
13   experienced; did you?   11:09:02
14     A.  I did not have those specifics available  11:09:03
15   to me, so I did not take them into account.  11:09:06
16     Q.  Fair to say that you have not taken any  11:09:11
17   steps to determine what might have precipitated  11:09:13
18   Mr. Crone's thoughts about driving off the road in  11:09:16
19   an attempt to harm himself?   11:09:19
20       MR. ALTMAN: Objection, foundation.  11:09:21
21       THE WITNESS: It is fair to say that.  11:09:22
22   BY MS. McGRODER:   11:09:24
23     Q.  Is it fair to say also that you have taken  11:09:24
24   no steps to determine what precipitated Mr. Crone's  11:09:26
25   long walks along the freeway in which -- in which he  11:09:30

107

1   considered throwing himself in front of a moving  11:09:35
2   car?   11:09:38
3       MR. ALTMAN: Objection, foundation.  11:09:38
4       THE WITNESS: It is fair to say that as  11:09:39
5   well.   11:09:41
6   BY MS. McGRODER:   11:09:41
7     Q.  Are you aware that Mrs. Crone created a  11:09:46
8   diary in the Peterson lawsuit?   11:09:48
9     A.  I was --   11:09:51
10       MR. ALTMAN: Objection, foundation.  11:09:53
11       THE WITNESS: I was not aware of that.  11:09:54
12   BY MS. McGRODER:   11:09:55
13     Q.  You've never seen a copy of that diary?  11:09:55
14     A.  I have not.   11:09:58
15     Q.  Would Mrs. Crone's summary of the  11:10:00
16   events -- strike that.   11:10:04
17       Would Mrs. Crone's summary of symptoms she  11:10:07
18   believed that Mr. Crone experienced as a result of  11:10:11
19   the fall off the deck contained in that diary, would  11:10:14
20   those be important to your opinions in this case?  11:10:19
21       MR. ALTMAN: Objection, foundation,  11:10:21
22   speculation, incomplete hypothetical.  11:10:22
23       THE WITNESS: Any and all information  11:10:24
24   about his emotional life and the issues and problems  11:10:26
25   that he had before his suicide would be relevant and  11:10:32

108

1   important.   11:10:36
2   BY MS. McGRODER:   11:10:36
3     Q.  So you would have liked to have seen  11:10:36
4   Mrs. Crone's diary in the lawsuit against the  11:10:39
5   Petersons; correct?   11:10:42
6       MR. ALTMAN: Objection, foundation.  11:10:44
7       THE WITNESS: The same answer, which is  11:10:45
8   yes.   11:10:47
9   BY MS. McGRODER:   11:10:47
10     Q.  And that would have been important for you  11:10:47
11   to look at prior to the time you formulated your  11:10:48
12   opinions about the cause of suicide in this case;  11:10:51
13   correct?   11:10:53
14     A.  Not necessarily. I'm not aware that it  11:10:57
15   would change my opinion, but it would be helpful,  11:10:59
16   obviously, for me to see any additional information  11:11:02
17   that would be available.   11:11:05
18     Q.  Well, what would it take to change  11:11:06
19   your posi-- excuse me, what would it take to  11:11:08
20   change your opinion in this case that it was  11:11:10
21   Neurontin that was a substantial factor in causing  11:11:12
22   Mr. Crone's suicide?   11:11:16
23       MR. ALTMAN: Objection. Vague, compound,  11:11:17
24   incomplete hypothetical.   11:11:19
25       THE WITNESS: What would it take to change  11:11:21

109

1   my opinion?   11:11:22
2   BY MS. McGRODER:   11:11:23
3     Q.  Yes. I mean facts. Factual -- factual  11:11:24
4   circumstances. Any?   11:11:27
5     A.  Yes.   11:11:28
6     Q.  What factual circumstances would have to  11:11:29
7   exist in this case in order for you to opine that it  11:11:30
8   wasn't the Neurontin that caused Mr. Crone's  11:11:33
9   suicide?   11:11:35
10       MR. ALTMAN: Objection. Vague.  11:11:36
11       THE WITNESS: I would -- I just want to  11:11:40
12   think about this for a minute. I would reconsider  11:11:44
13   my opinion if gabapentin in the toxicology reports  11:11:49
14   was not found at the level of 49 micrograms per mL.  11:11:55
15   And if the laboratory performing that result stated  11:12:03
16   that that was an error.   11:12:07
17   BY MS. McGRODER:   11:12:11
18     Q.  So --   11:12:12
19     A.  I would --   11:12:13
20     Q.  I'm sorry, you weren't finished?  11:12:14
21     A.  I'm not --   11:12:16
22     Q.  Okay.   11:12:19
23     A.  -- finished, yeah.   11:12:19
24       My opinion might be reconsidered -- let me  11:12:21
25   restate the second issue. Another issue for me in  11:12:26

28 (Pages 106 to 109)

## 110

1  this case was that Dr. Jennings had testified in    11:12:29
2  part that he probably wrote three prescriptions for   11:12:35
3  Mr. Crone prior -- in the March 20th visit in his    11:12:40
4  office. And the question there was, did he write a   11:12:46
5  prescription for Neurontin or not?    11:12:50
6      We have the records from, I think, Moran's   11:12:54
7  Pharmacy, M-O-R-A-N, apostrophe S, that in fact the   11:12:57
8  prescription for Neurontin was written and -- and    11:13:03
9  filled.    11:13:07
10     So we have a -- a issue here of -- that    11:13:13
11 would make me reconsider things if we knew that    11:13:19
12 Dr. Jennings had not refilled that prescription, and   11:13:23
13 there -- if we knew for a fact that there was no    11:13:26
14 Neurontin available or in the household, which would   11:13:29
15 have to be then in concert with a negative    11:13:33
16 toxicological report.    11:13:36
17     It would also alter my opinion,    11:13:38
18 potentially, if this case were ruled by the coroner   11:13:41
19 a homicide as opposed to a suicide.    11:13:57
20 BY MS. McGRODER:    11:14:01
21   Q.  Anything else?    11:14:01
22   A.  Not that I can think of as I sit here    11:14:04
23 right now.    11:14:06
24     MS. McGRODER:  Okay. Let's take a short    11:14:07
25 break to change the tape.    11:14:08

## 111

1      THE VIDEOGRAPHER:  The marks the end of    11:14:10
2  tape number one in the deposition of Stefan    11:14:12
3  Kruszewski, M.D.    11:14:15
4      The time is 11:14 a.m. and we are off the    11:14:18
5  record.    11:14:21
6      (Recess taken.)    11:14:27
7      THE VIDEOGRAPHER:  The time -- this marks    11:25:18
8  beginning of disk number two in the deposition of    11:25:20
9  Stefan Kruszewski, M.D.  The time is 11:25 a.m.  We    11:25:24
10 are back on the record.    11:25:27
11 BY MS. McGRODER:    11:25:30
12   Q.  You are aware, Dr. Kruszewski, that Mr. --   11:25:30
13   A.  I'm just smiling at his voice,    11:25:34
14 because it's like --    11:25:36
15   Q.  Melodic?    11:25:37
16   A.  -- I expected jazz, you know, to come back   11:25:38
17 on.    11:25:40
18   Q.  You are aware that Mr. Crone also saw a   11:25:41
19 therapist named Scott Sherman; correct?    11:25:43
20     MR. ALTMAN:  Objection.    11:25:46
21     THE WITNESS:  I'm -- I'm sorry.    11:25:46
22     MR. ALTMAN:  Foundation.    11:25:46
23 BY MS. McGRODER:    11:25:47
24   Q.  You're aware that Mr. Crone saw a    11:25:48
25 therapist named Scott Sherman?    11:25:50

## 112

1   A.  Yes.    11:25:53
2   Q.  Have you reviewed Scott Sherman's records?   11:25:53
3   A.  I have not in about a year and a half    11:25:56
4  unfortunately, so...    11:25:58
5   Q.  I -- what we're marking as Exhibit 5 and    11:25:59
6  I'm handing to you, you can refer to them as you    11:26:05
7  need to. Okay?    11:26:05
8   A.  Okay.    11:26:06
9      ---    11:26:06
10     (Whereupon the document was marked,    11:26:06
11 for identification purposes, as Exhibit    11:26:06
12 Number 5.)    11:26:06
13     ---.    11:26:07
14 BY MS. McGRODER:    11:26:08
15   Q.  In the summer of 1999, Mr. Sherman's    11:26:15
16 records reflect that Mr. Crone was in a state of    11:26:20
17 profound depression and had a strong sense of    11:26:25
18 uselessness.    11:26:28
19     Do you recall those records?    11:26:29
20   A.  I don't.    11:26:30
21     MR. ALTMAN:  Objection. Foundation.    11:26:31
22     THE WITNESS:  I don't.    11:26:32
23 BY MS. McGRODER:    11:26:32
24   Q.  If -- if you would like to, go ahead and   11:26:33
25 look at the record dated July 16, 1999. It says    11:26:35

## 113

1  worked more on issue of lack of energy, profound    11:26:49
2  depression and strong sense of uselessness, also    11:26:53
3  problems with not finding right medications and of    11:26:57
4  having to use medications to deal with pain, did    11:27:00
5  some work on pain reduction.    11:27:03
6      Do you see that?    11:27:04
7   A.  Yes.    11:27:05
8   Q.  Did I read that correctly?    11:27:05
9   A.  Except it says "strong seems of    11:27:07
10 uselessness." There's lots of typos in --    11:27:10
11   Q.  Right.    11:27:14
12   A.  -- Mr. Sherman's notes.    11:27:14
13   Q.  We're pretty sure that means sense.    11:27:15
14   A.  Yes. We --    11:27:17
15   Q.  Okay.    11:27:18
16   A.  -- are.    11:27:19
17   Q.  You don't refer to this record in your    11:27:19
18 report; do you?    11:27:20
19   A.  I do not.    11:27:22
20   Q.  Do you refer at all in your report to any   11:27:24
21 of the records of Scott Sherman?    11:27:27
22   A.  I don't believe that I do.    11:27:29
23   Q.  Were the records of one of Rick Crone's    11:27:33
24 therapists not important to you in your    11:27:36
25 determination of the cause of his suicide?    11:27:40

29 (Pages 110 to 113)