UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------x
In re:  NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION
------------------------------------------------x
THIS DOCUMENT RELATES TO:

*Smith v. Pfizer Inc., et al.*, 1:05-cv-11515-PBS

------------------------------------------------x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

# DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF PFIZER INC. AND WARNER-LAMBERT COMPANY LLC'S MOTION TO EXCLUDE THE SPECIFIC CAUSATION TESTIMONY OF DOCTOR MARIS AND PROFESSOR TRIMBLE

Defendants, Pfizer Inc. and Warner-Lambert Company LLC ("defendants"), respectfully submit this reply memorandum in support of their motion to exclude the specific causation testimony of Doctor Maris and Professor Trimble.

## PRELIMINARY STATEMENT

Under *Daubert* and Rule 702, the Court must scrutinize the reliability of plaintiff's experts' methods, as well as the reliability of their application of those methods to the facts of this case.[1] Plaintiff concedes that her experts did not conduct a methodologically proper differential diagnosis (as Dr. Maris has repeatedly admitted), in that they have not ruled out

---

[1] Plaintiff's contention that the field of behavioral science is "soft science," not subject to *Daubert*, and that her expert's testimony should be admitted merely because she believes they are qualified is misplaced. Setting aside that psychiatry is a *medical* science, and qualified psychiatrists with expertise in suicide do not agree with plaintiff's unsupported characterization of it as "soft," *Daubert* is a threshold requirement for all expert testimony for reliability and admissibility. Whether an expert is qualified is a separate inquiry. *See generally Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir. 1996) (*Daubert* is aimed at abuse: "That abuse is the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side of a lawsuit.").

alternative risk factors as causes of Mr. Smith's suicide, and that, therefore, their opinions rest exclusively on temporality (*post hoc ergo propter hoc*) and subjective belief. This "methodology" for specific causation is insufficient under *Daubert* and Rule 702, and warrants exclusion of their specific causation opinions.

## ARGUMENT

**I. PLAINTIFF'S EXPERTS EITHER ADMIT THAT THEY DID NOT CONDUCT A DIFFERENTIAL DIAGNOSIS, OR MISAPPLIED THE METHOD BY FAILING TO RULE OUT ALTERNATIVE CAUSES**

   **A.   Dr. Maris Admitted He Has Not Conducted A Differential Diagnosis.**

As an initial matter, Dr. Maris testified that he does not ascribe to, and did not use, differential diagnosis as a methodology in this case. McGroder Decl., Ex. 1 at 1253:4-23 ("First of all, I don't have the same model that you are assuming, which is the differential diagnosis model, where you rule out alternatives. My theory is, as you know, is that I rule them in, and I talk about them actually contributing to make [him] part of a vulnerable minority of patients. . . . So I am not ruling these things out. I never tried to rule them out."). Notwithstanding this unequivocal testimony, plaintiff and Dr. Maris attempt to rewrite the record in a belatedly submitted declaration, and now insist—in spite of his numerous admissions to the contrary[2]—that Dr. Maris conducted a differential diagnosis ruling out Mr. Smith's alternative suicide risk factors. It is clear, based on Dr. Maris' testimony under oath, that he made no effort to rule out alternative causes, but instead, "embraced them" as part of his method. This approach unmistakably is not differential diagnosis.

   **B.   Professor Trimble Failed to Even "Rule In" Numerous Suicide Risk Factors or Adequately Investigate Facts Bearing On Mr. Smith's Suicide Risk.**

---

[2] Defendants have concurrently filed a motion to strike plaintiff's experts' untimely and improper declarations attempting to fix flaws in the methodologies.

Unlike Dr. Maris, Professor Trimble claims to have conducted a differential diagnosis. He did not, however, conduct it properly. This methodology requires plaintiff's experts to "rule in" all potential causes or risk factors for Mr. Smith's suicide. Def. Br. at 4–5; *Id.* at 15–16. In assessing a causal relationship, an expert must not exclude relevant evidence, and should obtain information "to minimize the likelihood of a false conclusion." *Miller v. Pfizer*, 196 F. Supp. 2d 1062, 1086 (D. Kan. 2002). First, Professor Trimble did not "rule in" or even consider all of Mr. Smith's suicide risk factors. Second, Professor Trimble failed to review and understand all the available evidence regarding Mr. Smith's suicide risk factors, infecting his analysis with mistakes and rendering his methodology even less reliable.

As an initial matter, Professor Trimble did not identify in his report numerous scientifically reliable and generally accepted suicide risk factors as risk factors for Mr. Smith—contrary to the standard for conducting a reliable differential diagnosis. Def. Br. at 16. Instead, and without any scientific basis, Professor Trimble picked what he called his "top four risk factors for suicide," a fact that plaintiff apparently misunderstands as demonstrating reliability of Professor Trimble's opinions. Pl. Opp. at 19. But, in focusing on his own "top four risk factors," such as, *inter alia*, "living alone," Professor Trimble either overlooked or discarded risk factors that he later admitted are not only more commonly associated with suicide on the basis of epidemiological data—including suicidal ideation; hopelessness; chronic pain; depression; functional limitations; difficulty coping; recent stressful life event; being an elderly white male; and access to firearms—but are also more relevant to the facts of the *Smith* case. *See* Def. Br. at 16 (risk factors not ruled in); McGroder Decl., Ex. 3 at 530:12–531:12.[3] The fact that

---

[3] Plaintiffs asserts that Professor Trimble "considered" other risk factors besides those in his report, Pl. Opp. at 16–19. While it is true that Professor Trimble produced notes in his deposition that recorded him going through the risk factors properly identified by defense experts, Drs. Jacobs and Rothschild, that process occurred "coming over

Professor Trimble selected four factors without any scientific (or factual) basis—disregarding a host of other more relevant risk factors—is not surprising given his inexpertise on suicide in the United States.[4] Def. Br. at 18–20.  Nonetheless, Professor Trimble's selection of his "top four" factors to the exclusion of more common suicide and generally accepted risk factors demonstrates that he did not conduct a reliable differential diagnosis, as he clearly did not "rule in" all potential causes, let alone those that are most pertinent to Mr. Smith.

Not only did Professor Trimble disregard numerous relevant suicide risk factors for Mr. Smith, but he ignored pertinent facts. Def. Br. at 16.  For instance, Professor Trimble dismissed as irrelevant the fact that Mr. Smith was no longer a candidate for additional surgery; that Mr. Smith's daughter had cancer; and that Mr. Smith never received a psychiatric evaluation as his doctors recommended. *Id.*  Even worse, Professor Trimble was unaware of key facts bearing on Mr. Smith's suicide risk until he was informed of them by defense counsel during his deposition.  For instance, Professor Trimble denied that Mr. Smith had any pre-existing psychiatric history or depression, testifying that Mr. Smith was only depressed "in the lay sense." Def. Br. at 17-18; Pl. Opp. Br. at 15, 16 n.16, 17.  During his deposition, however, he became aware for the first time

---

on the airplane; [t]he weekend [before his deposition]," and *after* he formed his expert opinions and wrote his report. McGroder Decl., Ex. 3 at 202:2–204:18 (Q. . . .Did you do this analysis before you authored your report in this case, or are you just doing this now, just right now at this deposition?  A. I'm doing this analysis specifically to answer your questions for this deposition.").  When Professor Trimble was asked to clarify the role of those notes in his deposition, he stated that his differential diagnosis is as set forth in his report and nothing else. *Id.* at 527:21–528:18.

[4] Defendants note that plaintiff's response focuses on Professor Trimble's qualifications generally, Pl. Opp. Br. at 13–14, by arguing for instance that he serves on peer review committees in the United States, whereas defendants more narrowly challenge his qualifications and knowledge regarding *suicidology* in the United States.  For example, despite the fact that Mr. Smith was diagnosed and treated in the United States, Professor Trimble discredits the APA Guidelines on Suicide Assessment: "these are not set out in tablets of stone," McGroder Decl., Ex. 3 at 216:12–13, and states that he does not use the APA Guidelines in his practice. *Id.* at 153:11–13.  Professor Trimble also does not use, and expresses disdain for, standard American diagnostic tools in psychiatry.  He testified that the DSM IV is a "cookbook," which he "prefers not" to use. *Id.* at 156:22–14 ("In the United Kingdom they do not rely on an American diagnostic manual.").  Importantly, Professor Trimble's rejection of accepted methodology for suicide assessment in the United States is reflected in his failure to apply accepted methodology for his work on this case.

that Mr. Smith had been diagnosed with depression before he ever took Neurontin, and was prescribed an anti-depressant (Lexapro). Def. Br. at 17. After requesting a break to look up Lexapro—because he thought it was an analgesic—he admitted that, indeed, Mr. Smith had been treated for depression. *Id.* Professor Trimble also opined that physical therapy relieved Mr. Smith's pain, allowing him to discount or eliminate pain as a risk factor for his suicide. *Id.* At his deposition, it became clear that Professor Trimble did not know that Mr. Smith's pain relief from physical therapy was temporary and short lived, apparently having misread or misunderstood the relevant medical records. *Id.* Whether due to his failure to fully investigate Mr. Smith's prior suicide risk factors, or his lack of expertise in suicidology in the United States, Professor Trimble's methods in this case fall far short of a reliable differential diagnosis and require exclusion of his testimony. *See, e.g.*, *Cloud v. Pfizer,* 198 F. Supp. 2d 1118, 1135-37 (D. Ariz. 2001) (excluding expert's specific causation opinion as unreliable where there was evidence the expert came to a firm conclusion before a full review of the records, making his opinion susceptible to error); *Miller*, 196 F. Supp. 2d at 1082 (excluding expert's specific causation opinion as unreliable where the expert had dismissed evidence that, if considered, would have tended to falsify his hypothesis).

Plaintiff's opposition focuses on Professor Trimble's deposition testimony where he attempted to rehabilitate his obviously flawed differential diagnosis. But plaintiff has ignored that Professor Trimble substantially modified his original opinions during his deposition based on facts he was just then learning for the first time, as demonstrated *above*. (This was prevalent in the depositions of all of plaintiffs' expert witnesses, some of whom, like Dr. Maris, felt free to simply revise their Rule 26 reports during the deposition to correct their mistakes and misunderstanding of the factual record.) This approach can hardly be considered a scientifically

reliable methodology, since the newly learned risk factors were considered and ruled out in the same breath, and only after Professor Trimble's conclusions were already reached. *See* Def. Br. at 17. Professor Trimble's *ad hoc* attempt to simultaneously consider and rule out key risk factors during his deposition (heavily relied upon by plaintiff in her arguments, *e.g.*, Pl. Opp. Br. at 18) shows only that he held pre-ordained conclusions, another independent basis for his exclusion. *See Cloud*, 198 F. Supp. 2d at 1135; *Claar v. Burlington N.R.R.*, 29 F.3d 499, 502–05 (9th Cir. 1994).

### C. Plaintiff's Experts Are Required to, But Did Not, Rule Out Numerous Risk Factors for Suicide that Fully Explain Mr. Smith's Suicide.

To the extent Professor Trimble considered any relevant alternative causes of Mr. Smith's suicide, he failed to rule them out. Dr. Maris' methodology suffers from the same flaw—a fact plaintiff admits. Pl. Opp. Br. at 8–10. For instance, Professor Trimble admits that he could not rule out a number of Mr. Smith's pre-existing suicide risk factors, including his despair, hopelessness, and unrelenting chronic pain.[5] Def. Br. at 18. He additionally testified that depression is a "possible additional factor" that he is "ambivalent about" and apparently did not ultimately rule out. *Id.* Dr. Maris goes so far as to opine that Mr. Smith probably would *not* have killed himself but for his chronic pain. Def. Br. at 6 ("Q. If Richard Smith had not been suffering from excruciating chronic pain, would he still have committed suicide? A. Probably not."). Plaintiff's experts' admitted failure to rule out known suicide risk factors that fully explain Mr. Smith's suicide—and, in particular, their failure to rule out chronic pain, which Mr. Smith

---

[5] Contrary to the well-established literature and empirical data—which plaintiff's expert Dr. Maris acknowledged, McGroder Decl., Ex. 1 at 302:16-304:10—Professor Trimble was not aware that chronic pain is a risk factor for suicide and, when asked about it, repeatedly chorused: "I have said again and again that, in and of itself, chronic pain does not predict suicide." *E.g.*, McGroder Decl., Ex. 3 at 455:5–10.

himself clearly stated in his suicide note was the reason for his decision to commit suicide—renders their opinions unreliable.

Nor does plaintiff's suggestion that her experts need not rule out alternative causes fix the obvious defects in her experts' methodologies. Contrary to plaintiff's assertions, and ignoring overwhelming precedent, Pl. Opp. Br. at 8–10, the differential diagnosis method follows generally accepted and scientifically reliable standards, among which is the requirement that an expert rule out alternative potential causes. *See Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 786 (D.N.J. 1996). Indeed, the *Daubert* decision was based, in part, on the expert's failure to "explain how . . . he was able to eliminate all other potential causes of [the] birth defects." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).[6]

And, plaintiff's argument is belied by the very case law she cites. For instance, plaintiff cites *Baker v. Dalkon Shield*, 156 F.3d 248, 253 (1st Cir. 1998), Pl. Opp. Br. at 10 n.11, but the expert in *Baker* worked by "narrowing the more likely causes until the most likely culprit [was] isolated." *Id.* Plaintiff, conversely, insists that her experts have not (and need not) rule out alternative causes, nor do her experts testify that Neurontin was the most likely cause of Mr.

---

[6] Plaintiff's argument that her experts need not rule out alternative causes is based on cases interpreting the substantial factor test and principles of comparative negligence that predate *Daubert* and address plaintiffs' substantive law burden on causation, not admissibility under *Daubert*. Pl. Opp. Br. at 8. *Daubert* is an initial threshold inquiry to determine whether an expert's methodology is reliable and admissible. Def. Br. at 4–5. Whether a plaintiff has proven that the suspected cause was a substantial factor in his injury is a separate, *subsequent* inquiry. *See generally, Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655 (D. Mass. 1997) (applying *Daubert* to exclude unreliable expert and then applying the substantial factor test to grant defendant's motion for summary judgment). None of the authority cited by plaintiff suggests that plaintiff's substantive law burden on causation should lower—let alone abrogate—plaintiff's burden to demonstrate admissibility of her expert's opinions under *Daubert* and Rule 702. *Accord In Re Paoli R.R. Yard PCB Litig.*, 35 F. 3d 717 ,760 n.31 (3d Cir. 1994). Plaintiff's citation to *Lancaster v. Montesi* is particularly unavailing because that case held that the decedent's volitional decision to commit suicide acts as superseding cause, breaking the chain of liability, unless the decedent suffered an insane frenzy. 390 S.W.2d 217, 221–22 (Tenn. 1965). Of course, none of plaintiff's experts suggested that Mr. Smith suffered from an insane frenzy at the time of his death. *See, e.g.*, Pl. Opp. Br. at 15 (". . . there was evidence . . . which demonstrates that following his ingestion of gabapentin his mental state was altered, but not psychotic" or a "recognizable psychiatric disorder as would be classified by DSM IV"). Thus, if plaintiff's substantive law burden were applied, it would only further support her experts' exclusion.

Smith's suicide. In addition, unlike the expert in *Baker*, Dr. Maris and Professor Trimble have not attributed the decedent's injury to its most common cause generally, *id.* at 252; instead, they have picked Neurontin over numerous more common and recognized causes of suicide without any scientific basis. Nor have Dr. Maris and Professor Trimble identified anything unique about Mr. Smith's suicide that caused them to attribute it to Neurontin, as opposed to other factors, which was present in *Baker*.[7] This case, and many others,[8] demonstrates that plaintiff's experts' failure to rule out obvious and likely alternative causes renders their methodology and opinions unreliable and inadmissible.

Nor is this case any different simply because it involves suicide or because suicide has multiple risk factors, as plaintiff tries to argue, relying on *Giles v. Wyeth*, 500 F. Supp. 2d 1048 (S.D. Ill. 2007).[9] Plaintiff's reliance on *Giles* only bolsters defendants' argument that Dr. Maris has applied his method unreliably in this case. At his deposition in the *Bulger* case, Dr. Maris

---

[7] The expert in *Baker* testified that "Baker's specific medical injuries from PID [pelvic inflammatory disease] were consistent with damages caused by Chlamydia," and did not have the physical appearance of "the acute kind [of PID] caused by gonorrhea." *Baker*, 156 F.3d at 252.

[8] Plaintiff overstates *Paoli*, 35 F.3d at 760, which, while it does state that an expert need not always rule out all alternative causes with certainty, went on to affirm the exclusion of several experts. It found that in cases where the defendants point to some likely alternative cause, an expert should be excluded who does not engage in standard diagnostic techniques ruling out alternative causes and who cannot offer a reasonable explanation for still believing the defendants' actions were a substantial factor in comparison. *Id.*

Other cases cited by plaintiffs are distinguishable. *See Annello v. Shaw Indus., Inc.*, No. 95-30234-FHF, 2000 U.S. Dist. LEXIS 6835, *13 (D. Mass. Mar. 31, 2000) and *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 989 (10th Cir. 2003). In the former, unlike Dr. Maris and Professor Trimble, the expert discredited other potential causes. Dr. Maris and Professor Trimble, in contrast, admit that they cannot discredit a multitude of other possible causal factors in Mr. Smith's suicide. Pl. Opp. Br. at 5; Def. Br. at 6 (Maris), 18 (Trimble). In the later case, the expert simply had not explicitly ruled out depression and testified that the plaintiff's symptoms were "classic" of acute mountain sickness and high altitude cerebral edema, *Goebel*, 346 F.3d at 998, a distinction that lends further support to the requirement that plaintiff's experts identify some hallmark of an alleged Neurontin-induced suicide that differentiates it from other risk factors. Neither expert can identify any such generally accepted "classic" symptoms or appearances of a "Neurontin-induced" suicide.

[9] Plaintiff also cites *dicta* from *Smith v. Pfizer*, No. CIV.A. 98-4156-CM, 2001 U.S. Dist. LEXIS 12983, at 1–2 (D. Kan. Aug. 14, 2001), and fails to point out that in this case, the court excluded plaintiff's experts' general causation opinion as unreliable, found plaintiff's expert had ruled out alcoholism as a cause, and granted summary judgment in favor of the defendants.

was asked to explain how he ruled out Mrs. Bulger's use of Effexor as the "scale-tipper" for her suicide (she had been taking Effexor and numerous prescription and street drugs at the time of her suicide), when he opined in *Giles* that Effexor was the "scale-tipper" and "just-noticeable difference maker" for the suicide in that case. McGroder Decl., Ex. 1 at 913:16–918:16.  Not seeming to understand that he was being asked about his methodology, Dr. Maris disavowed his opinion in *Giles*—testifying that the *Giles* jury rejected it as "wrong" when they entered a defense verdict—yet another example of how his methodology is unreliable and litigation-driven.[10] *Id.*

Furthermore, *Giles* is an outlier.  The differential diagnosis method is always used in cases where the injury has multiple potential causes—otherwise it would not be needed—and many injuries besides suicide involve the interplay of multiple risk factors.[11]  Other courts have excluded experts' opinions as unreliable where the expert failed to rule out alternative causes of the decedent's suicide, such as a plaintiff's self-destructive behavior and psychological problems. *Haggerty v. Upjohn*, 950 F. Supp. 1160, 1166–67 (S.D. Fla. 1996) (excluding expert's specific causation opinion that drug caused violence as unreliable); *Cloud*, 198 F. Supp. 2d at 1135-37 (excluding expert's specific causation opinion that drug caused suicide as unreliable);

---

[10] Plaintiff's opposition likewise ignores defendants' challenge to the litigation-driven nature of plaintiff's experts' inquiry, namely, the marshaling of facts to pre-ordained conclusions, which defendants demonstrated by the errors in Dr. Maris' psychological autopsy and report, Def. Br. at 11–12, his use of verbatim legal metaphors across every prescription drug case in which he has ever testified, *id.* at 5 n.2, and Professor Trimble's *ad hoc* dismissal of evidence and risk factors as he considered them for the first time. Plaintiff's experts should be excluded as unreliable on this basis alone. Def. Br. at 5 n.2 (citing *Cloud*, 198 F. Supp. 2d at 1135 and *Claar,* 29 F.3d at 502–03).

[11] For example, *Nat'l Bank of Commerce v. Dow*, 965 F. Supp. 1490, 1513–14 (E.D. Ark. 1996), which plaintiff has yet to address, dealt with colon cancer and the court explicitly explained that one problem with the reliability of the expert's method was that colon cancer has multiple risk factors, some of which the expert could not rule out with certainty. Def. Br. at 6–7.  The fact that colon cancer has multiple risk factors did not excuse the expert from the requirement that he rule out alternative possible causes. *Id*.

*Miller*, 196 F. Supp. 2d at 1085-86 (same); *Blanchard v. Eli Lilly*, 207 F. Supp. 2d 308, 320 (D. Vt. 2002) (same).[12]

## II. THE SOLE BASIS FOR PLAINTIFF'S EXPERTS' OPINION IS TEMPORALITY

Failing to apply the differential diagnosis methodology properly, or otherwise failing to rule out alternative causes of Mr. Smith's suicide, plaintiff's experts' "method" boils down to nothing more than temporality, *i.e.*, because Mr. Smith committed suicide, and because Mr. Smith took Neurontin, Neurontin must have caused his suicide. This reliance on temporality has been rejected by this Court (and others) because it suffers from the logical fallacy of *post hoc ergo propter hoc* and is yet another basis for excluding plaintiff's experts' testimony. *Whiting v. Boston*, 891 F. Supp. 12, 23 n.52 (D. Mass. 1995); Def. Br. at 7–8 (*citing, e.g., McClain v. Metabolife*, 401 F.3d 1233, 1243 (11th Cir. 2005)).

Although plaintiff claims, on the one hand, that her experts did not rely on pure temporality, *see, e.g.*, Pl. Opp. Br. at 11–13 (Dr. Maris); *Id.* at 20 (Professor Trimble), on the other hand, plaintiff argues—contrary to established precedent—that it is permissible to do so.[13] Despite plaintiff's waffling, there is no getting around the fact that *post hoc ergo propter hoc* is plaintiff's experts only support. Def. Br. at 8. Plaintiff's experts' sole basis for opining that Neurontin, as compared to all of Mr. Smith's alternative risk factors (that fully explain his

---

[12] *See also Latiolais v. Merck Co.*, No. CV 06-02208 MRP (JTLx), 2007 WL 5861354, *4 n.2 (C.D. Cal. Feb. 6, 2007) ("To that end, Dr. Golomb also did not perform any differential analysis in order to rule out potential alternative causes of Decedent's suicide, such as Decedent's preexisting mental health or job stress or the fact that Decedent was taking sleeping medication near the time of his suicide . . .").

[13] Plaintiff suggests that permitting an expert to rely on temporality is the "modern trend," *see* Pl. Opp. Br. at 12 n.14 (citing *Zuchowicz v. U.S.*, 140 F.3d 381, 389 (2d Cir. 1998)), but plaintiff leaves out that this portion of the opinion is discussing whether plaintiff had met the substantive law burden of proof on causation *after* the court had conducted its separate *Daubert*/reliability inquiry, *see id.* at 386–88, and that the experts at issue provided *direct evidence* of a causal relationship, not just temporality alone. *Id.* at 391.

suicide), was the proximate, substantial causal factor is that this time, unlike the other times he talked about committing suicide, he was on Neurontin.  For example, Dr. Maris opines that, notwithstanding Mr. Smith's pre-existing risk factors (which he did not fully investigate), he did not kill himself earlier, but merely *thought and talked* about it multiple times.  So he asks, "why now?" *see id.* at 8–9, and his answer is Neurontin.[14]  Dr. Maris' "coping" theory (*i.e.*, that Mr. Smith was "coping" until he took Neurontin, so Neurontin must have caused his suicide) is another variation of the same fallacy. *Id.* at 8.

Likewise, plaintiff's experts also opine that because Mr. Smith experienced "dramatic changes," Pl. Opp. Br. at 4 (Dr. Maris), and exhibited an "altered mental state," *id.* at 17, 20 (Professor Trimble) after he began taking Neurontin—simultaneously ignoring that those symptoms had been worse when he was *not* taking Neurontin[15]—it must be because of Neurontin.  Again plaintiff's experts resort to temporality as the lone basis for their opinion. *See* Pl. Opp. Br. at 12.  Setting aside the absence of any factual or scientific evidence for the proposition that Neurontin made his condition worse, the flaw in their opinion is also that it is solely based on temporality.  Plaintiff's experts made no effort to rule out other causes for his alleged symptoms (*e.g.*, feeling "loopy"), such as depression, chronic pain and resulting

---

[14] Notably, outside of litigation, Dr. Maris applies a different methodology, asking instead: "what was the decedent trying to escape?" Plaintiff ignores that the only reason for Dr. Maris to change his inquiry in this litigation and ask "why now?" is because asking what the decedent was trying to escape would point to other fully explanatory and obvious risk factors—especially in this case where Mr. Smith himself states he is trying to get away from the pain. Def. Br. at 3 (quoting Mr. Smith's suicide note: "<u>Pain has taken over my mind and body!</u> I need back surgery, left and right rotator cuffs, right bicep torn, back surgery to correct pain in legs. . . .") (original emphasis). *Compare* Def. Br. at 8 n.8 *with* Pl. Opp. Br. at 11–13.

[15] In making this and other arguments, plaintiff devotes much of his opposition to general causation.  Plaintiff's experts' general causation opinions are subject to a separate challenge pending before this Court.  Plaintiff's experts must also apply a reliable scientific method to the facts of this case for their *specific causation* opinions to be admissible, independent of any ruling on the issue of general causation.

sleeplessness, pain medications, and dementia, to name a few.[16] In addition, the experts cherry-picked evidence attempting to demonstrate a temporal relationship between Mr. Smith's alleged ingestion of Neurontin and his alleged altered mental state. For instance, Professor Trimble ignores the fact that (1) Mr. Smith stated he wished he could die because of pain and lack of sleep, Def. Br. at 2–3, (2) plaintiff herself stated, "I don't know what's wrong with Richard. He's in so much pain, I think he is out of his mind," McGroder Decl., Ex. 1 at 596:17-597:2, and (3) Mr. Smith was referred for psychological evaluation "to make sure there is not a dementia type issue playing into this as well," *id.* at 670:22–671:2—all well before he was prescribed Neurontin.[17] Plaintiff's experts' "method," rests entirely on temporality, and should accordingly be rejected under established precedent disavowing the *post hoc ergo propter hoc* fallacy as an unreliable basis for an expert's methodology. *See Whiting*, 891 F. Supp. at 23 n.52; Def. Br. at 7–8 (*citing, e.g., McClain v. Metabolife*, 401 F.3d 1233, 1243 (11th Cir. 2005)).[18]

---

[16] The psychological autopsy, for example, looks only at the decedent's behavior *after* taking Neurontin. Def. Br., Sayler Decl. Ex. 16 at 19 ("Here the interviewer should discover and record any neurological, behavioral, physical, or attitudinal changes that occurred after the ingestion of NEURONTIN") (original emphasis). Plaintiff's experts point to Mr. Smith's medical records after taking Neurontin, when they could have just as easily and arbitrarily pointed to records before he began taking Neurontin, except that they show that Mr. Smith's mental state began deteriorating much earlier.

[17] Likewise, Dr. Maris admitted that for the purposes of the psychological autopsy and his report, he relied on a questionnaire where Mr. Smith indicated that he was depressed because of pain and lack of sleep, which was taken well before Mr. Smith took Neurontin, McGroder Decl., Ex. 1 at 571:8-572:22. He also admitted that he did not include in his report that Mr. Smith was depressed and anxious in May 2003; was prescribed Elavil; was diagnosed with anxiety and depression later in May 2003; and was prescribed Lexapro and desipramine 25 milligrams. *Id.* at 554:13-555:8. Dr. Maris has since written those facts into his report in handwriting (*Id.* at 554:23-25), as he read Professor Trimble's deposition and looked those facts back up in Mr. Smith's medical records. *Id.* at 556:2-12.

[18] In all of the cases cited by plaintiff, *Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 154 (3d Cir. 1999), *Westberry v. Gislavad Guummi AB*, 178 F.3d 257, 265 (4th Cir. 1999), *Zuchowicz v. U.S.*, 140 F.3d 381, 385–90 (2d Cir. 1998), and *Tobin v. Smithkline Beecham Pharms.*, 164 F. Supp. 2d 1278 (D. Wyo. 2001), the expert at issue (1) relied on other bases, in addition to temporality, in applying his methodology and (2) the *onset* of the plaintiff's injuries began with exposure. Dr. Maris and Professor Trimble, on the other hand, admit the decedent's risk factors were pre-existing and offer the fallacy alone for their differentiation of Neurontin from those risk factors.

### III. PLAINTIFF'S EXPERTS HAVE NO RELIABLE BASIS TO DIFFERENTIATE A SUICIDE CAUSED BY NEURONTIN FROM A SUICIDE CAUSED BY PRE-EXISTING RISK FACTORS

Ultimately, plaintiff's experts' failure to rule out alternative causes of the decedent's suicide leaves them with no reliable basis—other than subjective belief and speculation—for differentiating Neurontin from Mr. Smith's extensive list of pre-existing risk factors for suicide. Plaintiff's experts acknowledge that suicide occurs in the general population, and in rates higher than the general population for individuals like Mr. Smith with co-morbid depression, chronic pain, and a history of suicidal ideation,[19] and they opine that not every patient who commits suicide while on Neurontin does so because of Neurontin.[20]  In this context, plaintiff's experts must either rule out alternative risk factors *or* point to symptoms that one would not expect to find in any other suicide case that would allow them to distinguish Neurontin (on the basis of something other than speculation) from the well-known risk factors that fully explain Mr. Smith's suicide. Def. Br. at 6–7; *See Nat'l Bank of Commerce v. Dow*, 965 F. Supp. at 1513–14, *Baker*, 156 F.3d at 253; *Goebel*, 346 F.3d at 989.  Plaintiff's experts admit that they have done neither.[21]  Moreover, plaintiff's response to defendants' argument is limited to one conclusory footnote relying on the self-serving declaration of Dr. Maris that a "hallmark" is not necessary; this is the epitome of *ipse dixit*. Pl. Opp. Br. at 10 n.11.

---

[19] The lifetime rate of suicide is 1 in 10,000 in the general population; that rate is higher in the population with conditions for which Neurontin is prescribed; suicide is difficult to predict, and is often the result of unknown causes. See Def. Br. at 1 (background on suicide).

[21] In this litigation, Dr. Maris readily admits he cannot identify a hallmark, Pl. Opp. Br. at 10 n.11, while Professor Trimble purports to identify as a hallmark that Neurontin-induced suicides are evidenced by "changes of brain chemistry" that lead to impulsive suicidal acts. *Id.* at 19–20; McGroder Decl., Ex. 2 at 6.  However, Professor Trimble has not shown that Mr. Smith's brain chemistry was altered by Neurontin—admitting he does not know what Mr. Smith's active serotonin or GABA levels were at the time of his suicide, McGroder Decl., Ex. 3 at 268:14–270:4—and was unaware of evidence that undermines his impulsivity theory, like the fact that Mr. Smith planned his suicide, including laying out a plastic sheet on the bed before committing suicide. *Id.* at 504:16-25.

Stripped of semantics, plaintiff's experts' opinions about the role of Neurontin in Mr. Smith's suicide amount to subjective belief and inadmissible speculation that would not help a jury. *See Whiting*, 891 F. Supp. at 25; *Haggerty,* 950 F. Supp. at 1167. Plaintiff asks this Court to admit her experts' testimony based solely on the assumption that because Mr. Smith took Neurontin, his suicide was caused by Neurontin. Yet, plaintiff's experts have failed to follow any generally accepted reliable methodology for determining specific causation, and Dr. Maris asserts that he should be excused from doing so. Nor have the experts otherwise explained why Mr. Smith's suicide was caused by Neurontin rather than his numerous pre-existing suicide risk factors. Plaintiff instead asks the Court to take her experts word for it because they are "qualified." The Court need not and should not admit these opinions on the *ipse dixit* of the experts. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## IV. EVEN APART FROM DR. MARIS' FAILURE TO CONDUCT A PROPER DIFFERENTIAL DIAGNOSIS, HE APPLIED HIS METHODS UNRELIABLY

Plaintiff's opposition attempts to resurrect Dr. Maris' testimony by claiming that he used methods other than differential diagnosis that are generally acceptable, such as the psychological autopsy methodology. Plaintiff's contention that these methods are generally reliable misses the mark. Defendants do not contend that the psychological autopsy is never reliable, but instead, that Dr. Maris has unreliably applied this method to the facts of this case. *See* Def. Br. at 9–10.

### A. Dr. Maris Uses His Suicide Chart Unreliably.

As an initial matter, and contrary to plaintiff's opposition, *e.g.* Pl. Opp. Br. at 3, defendants have challenged Dr. Maris' qualification to opine on general causation, largely on the basis of his own repeated admissions that he is "not competent" to offer an opinion on Neurontin's mechanism of action and relies entirely on plaintiff's other experts for his general

causation opinion. Def. Br. at 13. Dr. Maris' repeated statements under oath that he is not qualified are alone a sufficient basis to disqualify him from offering general causation opinions in this case.

Moreover, plaintiff essentially concedes the unreliability of Dr. Maris' self-described "general causation model" (his suicide chart) by defending it in half a footnote. Pl. Opp. Br. at 6 n.6. Further, plaintiff does not dispute that the chart was not timely disclosed, and has never been "generally accepted" as it is offered in this case. Contrary to plaintiff's blanket assertion, *id.*, Dr. Maris' suicide chart does *not* appear in any peer-reviewed publication *in its present form*; the published version of the model does not show or even suggest that medication is a suicide "trigger," but instead shows medication as a protective factor. Dr. Maris' version of the chart presented in this case is an unscientific and litigation-driven attempt to retrofit the model to his causation opinion for purposes of testifying for plaintiffs in Neurontin litigation. Def. Br. at 14.

### B. Dr. Maris Applies the Psychological Autopsy Method Unreliably.

Plaintiff puts up a straw man arguing that the psychological autopsy method is generally reliable. Pl. Opp. Br. at 6. It is Dr. Maris' unreliable application of the psychological autopsy methods to the facts of this case that render his opinion inadmissible.[22] Indeed, Dr. Maris failed to follow his own methodological standards for use of a psychological autopsy outside the courtroom, infecting his analysis here with mistakes and biases. Def. Br. at 9–13. For example,

---

[22] Plaintiff's cited cases provide further support for defendants' argument that regardless of the reliability of the psychological autopsy generally, the court properly excludes experts who unreliably apply that method to the facts of the case. *See Cloud*, 198 F. Supp. 2d at 1135; *Blanchard*, 207 F. Supp. 2d at 320; *Miller*, 196 F. Supp. 2d at 1068 (notably plaintiff cites the earlier *Miller v. Pfizer*, No. 99-2326, 199 U.S. Dist. LEXIS 18345 (D. Kan. Nov. 10, 1999)) (all three cases excluding the plaintiffs' proffered experts who used psychological autopsies as unreliable and inadmissible on the issue of specific causation, and granting summary judgment in favor of the defendants on the issue of causation). *Herrin v. Treon*, 459 F. Supp. 2d 525, 530 (N.D. Tex. 2006) and *Yanco v. U.S.*, 45 Fed. Cl. 782, 794–95 (Fed. Cl. 2000) are inapposite. Neither court even discussed the reliability of the psychological autopsy method.

despite previously insisting that the psychological autopsy be conducted by a qualified suicidologist or other appropriate healthcare official, and centered on face-to-face interviews of two to three people with knowledge, Dr. Maris merely relied on a paid employee of plaintiff's law firm to conduct the "psychological autopsy" in this case, disregarding all of the steps that help ensure reliability, such as interviews of family members. *Id.* at 11. Plaintiff's only response to this argument is that it is permissible to use plaintiff's counsel as a source of information.[23] Pl. Opp. Br. at 7. But defendants' challenge is much more nuanced than plaintiff's response. As defendants' motion makes clear with numerous record citations, the law firm employee did much more than serve as a source of information; she actually *conducted* the psychological autopsy.[24] Def. Br. at 11–13. Plaintiff's conclusory claim (based solely on Dr. Maris' affidavit) that Dr. Maris followed his own "professional standards" is thus belied by the actual evidence in this case—unless the only "professional" standards Dr. Maris has are for professional testimony in litigation using methods he concedes he would not use in his field. As such, Dr. Maris' testimony on the basis of the "psychological autopsy" is unreliable and inadmissible.

*Giles* and *Routhier*, cited by plaintiff, support defendants' argument that Dr. Maris applied the psychological autopsy method unreliably in this case. In *Routhier v Keenan*, No. 04-1359, 2008 Mass. Super. LEXIS 372, at *17 (Mass. Super. Nov. 4, 2008) and *Giles*, 500 F. Supp. 2d at 1063, there is no evidence that the psychological autopsy in question was conducted by a legal assistant of a plaintiffs' law firm. To the contrary, the *Routhier* court seemed to believe that Dr. Maris himself conducted the psychological autopsy. *Routhier*, 2008 Mass. Super LEXIS 372, at *14. *Giles* is likewise distinguishable because Dr. Maris insisted on using people he

---

[24] Although plaintiff claims by reference to Dr. Maris' after-the-fact declaration that Dr. Maris reviewed the psychological autopsy carefully and made revisions to ensure that the information was "accurate and complete," Pl. Opp. Br. at 7, it is undisputed that the psychological autopsy, and, consequentially, Dr. Maris' report, still contained errors at the time of his deposition. Def. Br. at 11–12.

knew with training and suicidology backgrounds to conduct the autopsy, Def. Br. at 11, and he interviewed the family members. *Giles*, 500 F. Supp. 2d at 1062.

## CONCLUSION

For all of the foregoing reasons, defendants respectfully request that this Court grant their motion to exclude the testimony of Dr. Maris and Professor Trimble.

Dated: March 12, 2009

Respectfully submitted,

DAVIS POLK & WARDWELL

By: /s/ James P. Rouhandeh
     James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000

-and-

SHOOK, HARDY & BACON L.L.P.

By: /s/ Lori C. McGroder
     Lori C. McGroder

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
     David B. Chaffin

100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

## **CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 12, 2009.

                                                 /s/ David B. Chaffin
                                               David B. Chaffin