UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------x
                                                                :  MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                                    :
        SALES PRACTICES AND                                     :  Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION                           :
                                                                :  Judge Patti B. Saris
----------------------------------------------------------------x
                                                                :  Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                                       :
                                                                :
*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS                      :
                                                                :
----------------------------------------------------------------x

**PLAINTIFF'S SUR-REPLY MEMORANDUM
IN FURTHER OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFF'S EXPERTS, DR. MARIS AND DR. KRUSZEWSKI**

**PRELIMINARY STATEMENT**

Plaintiff's designated specific causation experts, Ronald W. Maris, Ph.D., and Stefan Kruszewski, M.D., are experienced, highly qualified expert witnesses with specialized training in their areas of expertise. Dr. Maris's "psychological autopsy" has been generally accepted as a scientific methodology for determining the cause of suicide in numerous courts including the state courts of Massachusetts. *Routhier v. Keenan,* 2008 Mass. Super. LEXIS 372, at *17, 18 (Mass. Super. Ct. Nov. 12, 2008).[1] Dr. Kruszewski provides expert opinions based on the facts of this case by utilizing generally accepted scientific methodology and his 28 years of clinical practice in which he has treated several thousand patients with a wide variety of psychiatric and neuropsychiatric conditions to whom he prescribed numerous drugs for psychiatric and neuropsychiatric indications.

---

[1] *See Giles v. Wyeth Inc,* 500 F. Supp. 2d 1048, 1063 (S.D. Ill. 2007) (citing *Blanchard v. Eli Lilly & Co.,* 207 F. Supp. 2d 308, 313 & n.2 (D. Vt. 2002) (citing *Miller v. Pfizer, Inc.,* No. 99-2326, 1999 U.S. Dist. LEXIS 18345 (D. Kan. Nov. 10, 1999)); *Cloud v. Pfizer Inc.,* 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001); *see also Herrin v. Treon,* 459 F. Supp. 2d 525, 545 (N.D. Tex. 2006); *Yanco v. United States,* 45 Fed. Cl. 782, 787 (Fed. Cl. 2000)).

Each expert properly reviewed all relevant materials, and weighed all available scientific evidence in the same rigorous manner that he uses in his professional life, to enable him to render an expert opinion that the ingestion of Neurontin was a substantial factor in proximately causing the death by suicide of the decedent, Susan Bulger.

This is not a case involving a medical condition such as mesothelioma, for which the **only** known cause is asbestos fibers and for which various immuno-histochemical staining and analysis may conclusively determine that it is mesothelioma versus adenocarcinoma.  Defendants fail to appreciate the fact that suicide is a **multi-factorial** phenomenon involving a synergistic increase of risk with the addition of each suicidal risk factor.  Increasing any of these risk factors due to ingestion of Neurontin can be a substantial factor, the *sine qua non* of bringing about suicidality in any individual.  Contrary to Defendants' assertion, and as numerous other courts have found, Dr. Maris's methodology in which he considers potential causes and risk factors in relation to the suicide, utilizes a psychological autopsy in which he "rules in" and "rules out" certain risk factors or "predictors," Maris Rep., pp. 19-33, ECF Doc. # 1636-18, and also considers certain protective factors concerning suicide, has been accepted as admissible and under *Daubert* standards.

Similarly, contrary to Defendants' assertions otherwise, Dr. Kruszewski utilized a differential diagnosis in which he examined and considered the risk factors and protective factors in relation to Mrs. Bulger's suicide and "ruled in" and "ruled out" certain potential causes.  Kruszewski Rep., pp. 8-26, ECF Doc. # 1636-20.  Furthermore, notwithstanding Defendants' assertions, Dr. Kruszewski did consider the appropriate and scientifically reliable and generally acceptable risk factors in his differential diagnosis, including Mrs. Bulger's purported prior suicide attempts.[2]

---

[2] *See also* ECF Doc. # 1668-16 at 369:22-370:20.

As noted in Plaintiff's opposition papers, the failure to rule out all concurrent causes does not render an expert opinion inadmissible; rather, it goes to the weight of the expert's testimony. Plaintiff's experts' opinions are established by a preponderance of the reliable scientific evidence.

## ARGUMENT

I. **DR. MARIS CONSIDERED ALL POTENTIAL RISK FACTORS AND, DUE TO THE MULTI-FACTORIAL NATURE OF SUICIDE, RULED IN CONTRIBUTORY RISK FACTORS**

Defendants mischaracterize Dr. Maris's methodology in which he carefully considers and accounts for all alternative explanations in regard to potential risk factors for suicide, and rules in what he determines to be significant contributing factors. Defendants engage in word-parsing of the phrases "rule-in" or "rule-out", but the fact remains that Dr. Maris considered and accounted for alternative explanations; consequently, Dr. Maris's methodology is consistent with a differential diagnosis:

> Q.    You have testified in this litigation, in addition to publicly stating, that any plausible argument that a drug causes a suicide, needs to make every effort to rule out, or at least account for alternative explanations, correct?
>
> A.    Certainly account for them.
>
> Q.    Did you account for the fact that Susan Bulger stopped receiving counseling as the potential cause of her suicide?
>
> A.    I knew about it. I didn't make it a major feature, but I list it -- not only did I account for these things, I listed them in my report, and said: All of these things were contributory as risk factors. And I went through depression, substance abuse, chronic pain, etcetera, etcetera.
>
> Q.    Show me in your expert report, where you considered her lack of mental health treatment as a risk factor.
>
> A.    I didn't consider that explicitly and didn't think it was significant, so I didn't put it in. Incidentally, mental health treatment is often just drug treatment –
>
> THE WITNESS:    I'm still finishing my question, give me a minute to think.
>
> Q.    What question are you answering?

> A. Did I consider treatment? And the question is: She was getting mental health treatment. She was getting Effexor and Clonopin. And almost all psychiatrists, all they do these days is give you medicine. So she was getting mental treatment. She wasn't getting counseling.
>
> Q. Is it your testimony that Susan Bulger would not have benefited from some counseling in the year prior to her death?
>
> A. I don't know. I doubt it, because she failed at many, many counseling attempts. And I think she had been through there, done that. It probably wouldn't have made much difference.

Finkelstein Sur-Reply Decl., Ex. 1 at 1253:23-1255:19.

As noted in Plaintiff's moving papers, Dr. Maris's methodology included the use of a "psychological autopsy" he conducted in an attempt to reconstruct Susan Bulger's psychological life, thoughts, feelings and relevant environmental factors preceding her death. He also analyzed suicide risk factors and protective factors that his research has identified as statistically significant. Maris Rep. at 27-29, ECF Doc. # 1636-18. He sought to "rule in" and "rule out" alternative causes, and he opined that Susan Bulger had 12 of 15 known risk factors for suicide and 4 of those were induced by Neurontin. *Id.* at 28. He also opined that Susan Bulger possessed personal and social characteristics known to be protective from suicide. *Id.* at 28-29.

In direct contradiction with Defendants' assertions, Dr. Maris considered Susan Bulger's prior suicide attempts as a risk factor in his opinion and discussed Susan's non-fatal suicide attempts in various sections of his expert report. Dr. Maris reviewed Susan Bulger's medical records, the depositions of physicians, family and friends and considered all such material regarding her prior suicide attempts. *Id.*

## II.   DR. KRUSZEWSKI CONSIDERED SUSAN BULGER'S RISK FACTORS FOR SUICIDE AND PERFORMED A DIFFERENTIAL DIAGNOSIS

Contrary to Defendants assertions, Dr. Kruszewski did consider the appropriate and scientifically reliable and generally acceptable risk factors in his differential diagnosis, including Mrs. Bulger's purported prior suicide attempts:[3]

> As I described above, there is various commentary about the vicissitudes of the life of Mrs. Bulger that can be found throughout her medical records. **From numerous reports of problems that increased her risk and predisposed her to suicide** (Exhibits Z, Aa,), even from individuals who testified to the problems in Mrs. Bulger's relationship to her husband (Exhibits N, P, V, W), with her substance use (Exhibits O, G2) or psychiatrically (Exhibit O), there was also evidence that demonstrated she was 'protected' from suicide because she enjoyed her life (Exhibits H, R), was able to make her own decisions (Exhibit C), loved her children (Exhibit R, X) and was at times supported by her husband. (Exhibit B). **Conflicted evidence also exists about her suicide history**. (Exhibits O) For example, the reports from CAB (Center for Addictive Behaviors) noted on their intake sheets that she both answered yes and no to the same question **re previous suicide attempts** (Exhibits JJJ, KKK). Her sister, Linda Landry, testified that none of Mrs. Bulger's previous "attempts" were in fact actual suicide attempts at all, but rather either accidents or cries for attention and help.

Kruszewski Rep. at 9-10 (emphasis added), ECF Doc. # 1636-20).

Dr. Kruszewski considered Mrs. Bulger's suicide attempts as a risk factor and treated them as such in his analysis and differential diagnosis. ECF Doc #1668-16 at 423:11-424:4; 332:17-333:9; 456:8-12; 476:23-25; 480:24-25-481:1-4; 503:14-18; ECF Doc. # 1636-20 at 9, 10. He obtained his information concerning Susan Bulger's suicide attempts from her medical records, and depositions of family and friends. ECF Doc. # 1668-16 at 332:6-333:9.

Furthermore, although Defendants questioned Dr. Kruszewski's use of the Naranjo Adverse Drug Reaction Probability Scale which assesses the cause of an adverse drug reaction as a guidepost in his specific causation analyses, the Appellate Division of the Superior Court of New Jersey, in *McCarrell v. Hoffman-La Roche Inc., et al.,* Docket No. A-3280-07T1, in a March 12, 2009

---

[3] *See also* ECF Doc #1668-16 at 369:22-370:20.

decision, basically explored the fact that pharmaceutical companies widely utilize the Naranjo scale as an objective causality assessment tool. Finkelstein Sur-Reply Decl., Ex. 2 at 33, 35, 72-75. The Court found that the Naranjo scale, in combination with other analyses, was an accepted scientific methodology. *Id.* at 75.

### III. DEFENDANTS' PREMISE THAT PLAINTIFFS' EXPERTS ARE REQUIRED TO RULE OUT ALL OTHER RISK FACTORS IS FLAWED DUE TO THEIR MISUNDERSTANDING OF THE MULTI-FACTORIAL NATURE OF SUICIDE

*Giles v. Wyeth Inc,* 500 F. Supp. 2d 1048, 1063 (S.D. Ill. 2007), is not an "outlier" case as suggested by Defendants. In *Tobin v. Smithkline Beecham Pharms.,* Civil No. 00-CV-0025-Bea (D. Wyo. May 8, 2001), the court found that the case specific testimony of Dr. Maltsburger, who employed a psychological autopsy, was admissible. Finkelstein Sur-Reply Decl., Ex. 3 at 31. *Tobin* involved a decedent who shot his wife, daughter and granddaughter before he committed suicide as a direct result of his ingestion of the SSRI drug Paxil. The court found that a psychological autopsy in that case was not disputed as a methodology when even defendant's own expert characterized a psychological autopsy as: "accepted in the fields of psychiatry and suicidology and is 'the most scientifically rigorous' means to determine factors which contributed to a person completed suicide." *Id.* at 18. It appears that in that case, the judge and experts for both parties appreciated the multifactorial nature of suicide, and that there is more than one factor which contributes to a person's completed suicide. The court in *Tobin,* characterized defendant's attack on plaintiffs' experts as a "criticism of the results that they reach rather than the methodology they employ. . . not the proper scope or purpose of a *Daubert* motion." *Id.* at 32.

Here, as in *Tobin*, Dr. Maris utilized a psychological autopsy to determine the factors which contributed to Susan Bulger's completed suicide. Dr. Maris utilized the "most scientifically rigorous means" to evaluate and determine Neurontin's causal relationship to Mrs. Bulger 's suicide in this

6

case, and *Tobin* flies in the face of Defendants' assertions that here Dr. Maris must "rule out" all other factors that contributed to causing Susan Bulger's suicide.  The decision in *Baker v. Dalkon Shield Claimants Trust* allows for dual causation, which may be the exception in certain cases but would be the rule in suicide cases due to their multifactorial nature.  156 F.3d 248, 253 (1st Cir. 1998).  Furthermore, *Goebel v. Denver & Rio Grande W. R.R. Co.,* stands for the proposition that an expert need not rule out all other potential causes as the appellate court affirmed the district court's decision not to exclude an expert who had performed a differential diagnosis, and ruled out some alternative explanations but not depression.  346 F.3d 987, 998-99 (10th Cir. 2003).

Moreover, in support of the proposition that an expert must rule out all other causes of an injury or point to a "signature of the disease," Defendants again misleadingly cite to *National Bank of Commerce v. Dow,* 965 F. Supp. 1490 (E.D. Ark. 1996), which quotes from an article that in turn cites *In re Joint E. & S. Dist. Asbestos Litig.,* 827 F. Supp. 1014 (S.D.N.Y. 1993), for the proposition that, "An expert witness who claims that a plaintiff's colon cancer was caused by asbestos exposure must undertake a thorough 'differential diagnosis,' performed by a qualified expert, to rule out other potential causes."  965 F. Supp. at 1513.  *See* Defs.' Reply Mem. at 7-8 n.10.  Defendants even go so far as to note disapprovingly that Plaintiff has yet to address the *National Bank* case.  *Id.*  Plaintiff accepts that challenge here.

It is the Defendants who fail to note that the *Asbestos* case relied upon by *National Bank* was **reversed** by the Second Circuit, 52 F.3d 1124 (2d Cir. 1995), which stated:

> The district court first observed that not only were plaintiff's experts unable to narrow down the universe of possible confounding factors for colon cancer, but they acknowledged that asbestos exposure is not considered to be a risk factor.  Indeed, as the district court noted, the rate for colon cancer in Nassau County — the New York county in which Maiorana resided — was 25.7 per 100,000 persons between 1970 and 1975, compared to 18.1 per 100,000 persons nationally during the same time period.  This fact, the district court wrote, "raises a serious question about the various carcinogenic substances to which Maiorana and all the other residents of Nassau

7

> County have been exposed over the years and which constitute confounding factors in assessing the proximate cause of Maiorana's cancer."

*Id.* at 1130 (citations omitted).

The Second Circuit noted that "[i]n rejecting plaintiff's experts' differential diagnosis, the district court gave little weight to Maiorana's relatively young age of death," *id.* at 1137, and that the District Court had emphasized that asbestos fibers was not present in the colon tissue of the decedent.  *Id.*  The appellate court found that "Maiorana's own medical records and personal history were adequate to serve as a clinical basis for a conclusion that asbestos exposure constituted a significant causal factor in Maiorana's colon cancer." *Id.* at 1136.  The Second Circuit also held that the District Court's decision was at odds with their previous stance and stated:  "[Plaintiff's] experts concluded that asbestos exposure was 'a significant factor' and 'a proximate cause, and a substantial factor' in causing the colon cancer.  Granting plaintiff all favorable inferences, these statements are the equivalent of stating that asbestos exposure more probably than not caused the colon cancer" *Id.* at 1136.  Further, the asbestos litigation is quite distinguishable from the case at bar, because it dealt with claims of injury due to asbestos exposure and situations in which one may obtain hard scientific evidence — pathology and immuno-histochemical staining and analysis — to determine whether the cancer was asbestos related, not the case in this litigation which deals with suicide.

Contrary to Defendants assertions, not every disease or injury has a "hallmark" or a "signature" like the asbestos caused mesothelioma.  As Second Circuit emphasized in the *Asbestos* case, not even every asbestos caused injury — like colon cancer — has a "hallmark" — i.e., asbestos fibers were not found in the pathology.  This is not a case involving mesothelioma, for which the only known cause is asbestos fibers and for which various immuno-histochemical staining and analysis may conclusively determine that it is mesothelioma versus adenocarcinoma.  In the asbestos

8

litigation, literally thousands of cases have been filed, the cases have latency issues which are not present in this pharmaceutical action, and the litigation has a history which spans decades.

Thus far, Plaintiffs' experts have extensively reviewed and provided expert reports for two cases in the MDL — one would surmise that an expert would have to review more than one or two cases in order to ascertain if indeed a "hallmark" of a Neurontin induced suicide has been established. In this case, Dr. Maris has identified some of the "suicidogenic Neurontin-induced or worsened serious adverse events in Susan Bulger as: 1) Ego-dystonia; 2) worsened depression; 3) *De novo* hopelessness; 4) behavioral changes; 5) *De novo* suicidality." Maris Rep. at 21-28, ECF Doc. # 1636-18.

Dr. Kruszewski made note in his expert report regarding a hallmark of a Neurontin suicide versus any other suicide, that the qualitative effects were the same – that in the Neurontin cases he has reviewed, the decision to commit was "abrupt, acute, was – did not happen over a protracted period of time." ECF Doc. # 1668-16 at 209:12-23.

**IV.  PLAINTIFFS' EXPERTS HAD GOOD GROUNDS FOR THEIR OPINIONS THAT NEURONTIN WAS A SUBSTANTIAL FACTOR IN SUSAN BULGER'S SUICIDE AND DID NOT RELY UPON TEMPORALITY ALONE**

**A.   Dr. Maris had good grounds for forming his opinions, and his consideration of a temporal connection, in combination with numerous other factors, was appropriate and reliable.**

In *Tobin v. Smithkline Beecham Pharms.*, the District Court found that where an expert's general causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research, his specific causation testimony based on medical records was "sufficient to support the jury's verdict." 164 F. Supp. 2d 1278, 1283, 1284 (D. Wyo. 2001). Applying *Tobin* to the present case, Dr. Maris's testimony passes muster.

9

Dr. Maris considered Susan Bulger's personal, marital and family history and reviewed the deposition of family and others. Maris Rep. at 7-11, ECF Doc. # 1636-18. He reviewed the circumstances concerning her completed suicide, the suicide scene and the records and deposition testimony of Massachusetts authorities. *Id.* at 8. Dr. Maris explored the medical and psychiatric records and history of pain, depression and anti-anxiety medications of Susan Bulger in great detail. *Id.* at 7, 8, 11-17. The medical records of Dr. Crognale provided evidence that after taking Neurontin, Mrs. Bulger experienced being "devoid of life and anhedonic" and having "Major depression with severe dysthmia and panic attacks," and that she was "completely out of it". *Id.* at 11, 13, 14, 22, 23. Dr. Maris reviewed and considered the transcripts of Susan Bulger's treating physicians who were deposed in this case. *Id.* at 14-17. Contrary to Defendants' assertions, Dr. Maris also considered in detail Mrs. Bulger's prior three or four incidents of self-destructive behavior which occurred prior to her ingestion of Neurontin and compared the characteristics of those incidents to her completed suicide after the ingestion of Neurontin in arriving at his determination. Finkelstein Sur-Reply Decl., Ex. 1 at 976:20-981:23, 983:3-1003:25; Maris Rep. at 11, 25, 26, 27, 28, 33, ECF Doc. # 1636-18.

Dr. Maris considered the psychopharmacologic properties of Neurontin, Susan Bulger's ingestion of Neurontin, and the serious adverse events that Susan Bulger experienced due to her ingestion of Neurontin. Maris Rep. at 17-25, ECF Doc. # 1636-18. Dr. Maris considered in detail the risk factors present in Susan Bulger's life and ruled out three of 15 statistically significant potential risk factors for suicide. *Id.* at 25-28. Dr. Maris concluded that, "apart from taking gabapentin, Susan Bulger was only moderately suicidal, a condition that she had been able to cope with prior to ingesting Neurontin on 10/20/99 and thereafter." *Id.* at 25. Dr. Maris also considered personal and social characteristics of Susan Bulger's life that are known to be protective of suicide.

10

*Id.* at 28, 29. He examined and evaluated Susan Bulger's history of physical pain. *Id.* at 29-31. Further, Dr. Maris examined in great detail and considered the intricacies of Susan Bulger's marital history and relationship with Ron Bulger, which he found to have both negative and positive aspects. *Id.* at 31, 32. Clearly, Dr. Maris had "good grounds" and did not rely solely upon a temporal connection, but considered a host of other factors including ruling in and ruling out (or considering and accounting for) suicide risk factors, which formed a solid and reliable foundation for his opinion that gabapentin was a substantial or major contributing factor (cause) of Mrs. Bulger's suicide.

Dr. Maris employed reliable and accepted scientific methodology, including a psychological autopsy, in arriving at his opinions — of course whether Susan Bulger was ingesting Neurontin at the time of her suicide and whether Susan was experiencing changes in her behavior and emotional state from her ingestion of Neurontin are critical factors to be considered. As demonstrated above, Dr. Maris clearly did not solely rely on temporality.

> **B.     Dr. Kruszewski had good grounds for forming his opinions, and his consideration of a temporal connection, in combination with numerous other factors, was appropriate and reliable.**

Dr. Kruszewski reviewed and/or relied on numerous documents and materials in arriving at his opinions on specific causation, including medical records, deposition transcripts, medical literature and expert reports in this litigation.[4] Dr. Kruszewski utilized several reliable and accepted scientific methodologies in reaching his opinions: 1) differential analysis in which he examined the risk factors and protective factors in relation to Susan Bulger's suicide; 2) Sir Bradford Hill's "Guideposts" to ascertain that Neurontin was a significant contributory factor in Mrs. Bulger's

---

[4] A detailed listing of the materials reviewed are set forth in Dr. Kruszewski's report and include the following: death certificate of Susan Bulger; pleadings and discovery responses; toxicology report; police report; fire department report; pharmacy records; the records and depositions of Susan Bulger's treating physicians and hospital records; social services records; the depositions of family and friends; the expert reports and depositions of Dr. Trimble, Dr. Blume and his own expert report on general causation; the January 31, 2008 FDA Alert; Antiepileptic Drugs Increase Risk of Suicide, But No Boxed Warning Needed, Panel Says July 18, 2008, *Pharmaceutical Law & Industry Report,* Vol. 6, Number 20.

suicidal behavior and completed suicide, Kruszewski Rep. at 10-11, ECF Doc. # 1636-20; 3) the Naranjo Adverse Drug Reaction Probability Scale which assesses the cause of an adverse drug reaction as a guidepost in his specific causation analyses. ECF Doc. # 1636-20 at 30, Addendum B.

Dr. Kruszewski considered numerous factors in determining that Neurontin was a substantial factor in Mrs. Bulger's suicidal behavior and completed suicide in addition to temporality: her risks for and protective features against suicide, that she was one of the "susceptible minority or individuals" due to premorbid adverse effects from Neurontin and "the documented ability of Neurontin to precipitate suicidal thinking and suicidal behaviors in certain individuals." *See* ECF Doc. # 1636-20 at 13 "Conclusions". Moreover, he stated in regard to a hallmark of a Neurontin suicide versus any other suicide, that the qualitative effects were the same - that in the Neurontin cases he has reviewed, the decision to commit was "abrupt, acute, was – did not happen over a protracted period of time." ECF Doc #1688-16 at 209:12-23.

Dr. Kruszewski examined and analyzed a multitude of issues in the life of Susan Bulger in arriving at his conclusions regarding her suicide. Dr. Kruszewski considered her medical and psychiatric history. Kruszewski Rep. at 7, 8, 9,11, 12, ECF Doc #1636-20. He also considered her history of chronic pain, substance abuse, and prior suicide attempts. *Id.* at 8 Dr. Kruszewski examined and evaluated Mrs. Bulger's educational and work history and her marital and family relationships. *Id.* at 8. Dr. Kruszewski considered the circumstance of her suicide. *Id.* at 7. Dr. Kruszewski also analyzed and considered the medication that Susan Bulger ingested during her lifetime. *Id.* at 9, 10.

Dr. Kruszewski considered and weighed all of the relevant and material risk factors and protective factors in his differential analysis and did not solely resort to a temporal consideration in

arriving at his conclusion.[5] Dr. Kruszewski made it clear that he performed an extensive analysis in arriving at his determination:

> Q.   But would you agree that its often difficult to determine what that precipitating event might have been, since the person is now dead?
>
> A.   Yes.  Obviously, it can only be done with the retrospective analysis and weighting of the risk factors very much, and the protective factors very much, like I described in my general report and was described in the weighting of suicide risk factors in the treatment guidelines for the APA.  So when I considered all of the risk factors that we talked about, from previous psychiatric history and marital dysfunction and polysubstance abuse and psychiatric issues and previous self injuries and/or suicide attempts, et cetera, and then considered all of the protective factors, that this is a woman who had come back to her husband after some apparent and alleged abuse and marital conflict, that she had a small girl at home, that she was not apparently abusing psychotropic drugs any longer, and that there had been some stability and she had a plan to move on in her life, that when I looked at all of those factors and in the addition of all her medicines, including Neurontin, that gave rise to my decision in weighting all of those risk factors that Neurontin was the precipitating cause that pushed her over the edge.

ECF Doc #1668-16 at 561;24-563:6.

Dr. Kruszewski's specific causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research and the medical records and other pertinent relevant materials and information which was considered in his differential diagnosis and which formed a solid and reliable foundation for his opinion that Neurontin was a substantial contributing factor (cause) of Mrs. Bulger's suicide.[6]

---

[5] *See also* ECF Doc #1668-16 at 617:21-618:18 (on Neurontin for long period, GABA levels increased and increased risk for suicide); 562:11-563:6 (considered risk factors, previous suicide attempts and protective factors, marital conflict; apparently no longer abusing drugs; some stability a plan to move on in her life; all her medicines weighing factors and Neurontin precipitating cause); 401:12-402:2; 672:2-675:16 (why Dr. Kruszewski ruled out certain risk factors as precipitating factors for her suicide).

[6] Dr. Kruszewski also considered the Sir Bradford Hill's Guideposts and that there was a strength of association; "indirect evidence including adverse event report and the evidence reviewed by the US FDA which demonstrates evidence that supports the causative relationship between Neurontin and susceptible individuals."  ECF Doc. # 1636-20 at 10.

## V. DR. MARIS'S APPLICATION OF THE PSYCHOLOGICAL AUTOPSY IS RELIABLE

Defendants assert that Dr. Maris's psychological autopsy in this case is tainted because he did not personally gather the initial information for psychological autopsy instrument; the initial information was gathered by Plaintiff's counsel's legal assistant. Defs.' Reply Mem., ECF Doc. # 1711 at 14. However, the fact that an expert "relied on information supplied by plaintiff's counsel in reaching his conclusion" does not mandate the exclusion of that expert's testimony. *Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1432 (5th Cir 1989). Dr. Maris made clear during his deposition testimony that the paralegal who gathered the information for the psychological autopsy instrument "simply abstracted the data. She didn't edit it in any way." Finkelstein Sur-Reply Decl., Ex. 1 at 425:16:19. In other words, Dr. Maris created the psychological autopsy instrument for this case, which called for the initial culling of specific information from medical records and deposition testimony. As noted in Plaintiff's earlier memorandum in opposition, Dr. Maris reviewed and considered a myriad of evidence/materials in this case to arrive at his opinions, including depositions, medical records, literature and expert reports.[7] Dr. Maris reviewed the initial psychological autopsy instrument carefully and compared it with the medical records and other voluminous materials. He made revisions where appropriate to ensure its accuracy, completeness and scientific objectivity. Finkelstein Sur-Reply Decl., Ex. 1 at 425:16:19; ECF Doc. # 1669 at ¶ 8E.

The court in *Routhier, supra,* stated that Dr. Maris's methodology "addresses many of the inherent complexities of suicidology and incorporates a broad spectrum of scientific learning on the subject." 2008 Mass. Super. LEXIS 372, at *13. In *Routhier,* Dr. Maris developed a psychological autopsy, as he did in this case by reviewing of various materials (including the depositions of the plaintiffs family and friends, medical records, autopsy reports, police report) and analyzing fifteen

---

[7] A more detailed listing of the materials reviewed by Dr. Maris is included in his Expert Report, ECF Doc. # 1636-18 at pages 2-3.

suicide risk factor and protective factors. *Id.* at *17, *18. It is clear that in both cases, Dr. Maris followed his professional standards in demanding that a psychological autopsy be performed and in ensuring that the information contained therein was accurate and complete. Any inaccuracies in Dr. Maris's expert disclosure may be explored by the Defendants on cross-examination at trial.

Moreover, in regard to Dr. Maris's testimony relating to general causation, Plaintiffs have not disclosed Dr. Maris as their general causation expert, but Dr. Maris may opine on general causation based upon the previous expert disclosures of Plaintiff's general causation experts and information provided by the FDA related to anticonvulsants and suicidality. Simply stated, it is axiomatic that Dr. Maris may provide testimony that his opinions on case-specific causation are consistent with and corroborated by the general causation opinions of Plaintiffs' experts and by the FDA.

## CONCLUSION

For all of the reasons stated above and in the earlier Plaintiffs' Memorandum in Opposition, ECF Doc. # 1667, Plaintiffs respectfully request that this Court deny Defendants motion to exclude the testimony of Dr. Maris and Dr. Kruszewski.

Dated:  March 23, 2009                                  Respectfully submitted,

                                                       Finkelstein & Partners, LLP
                                                       *Attorneys for Plaintiff Ruth Smith*

                                              By:      **/s/ Andrew G. Finkelstein**
                                                       Andrew G. Finkelstein, Esquire
                                                       Finkelstein & Partners, LLP
                                                       1279 Route 300, P.O. Box 1111
                                                       Newburgh, NY  12551

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 23, 2009.

                                                       **/s/ Andrew G. Finkelstein**
                                                       Andrew G. Finkelstein, Esquire