# EXHIBIT 1

309

```
 1           UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2
 3   _____
                                    )
 4   In re: NEURONTIN MARKETING,    )
     SALES PRACTICES, AND PRODUCTS  )
 5   LIABILITY LITIGATION,          )
     _____)
 6
 7              VOLUME II
 8
 9       CONTINUED VIDEOTAPED DEPOSITION OF
10            RONALD Wm. MARIS, Ph.D.
11              (Taken by Defendant)
12              Columbia, South Carolina
13              Tuesday, September 30, 2008
14
15
16
17
18
19
20
21
22
23
24          Reported in Stenotype by
         V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription
```

311

```
 1       CONTINUED VIDEOTAPED DEPOSITION OF R
 2   Wm. MARIS, Ph.D., a witness called on behalf of the
 3   Defendant, before V. Dario Stanziola, CSR, RPR,
 4   CRR, held at the Columbia Marriott, 1200 Hampton
 5   Street, Columbia, South Carolina, on Tuesday,
 6   September 30, 2008, commencing at 9:12 a.m.
```

310

```
 1              APPEARANCES
 2   ON BEHALF OF THE PLAINTIFFS:
 3       RON ROSENKRANZ, Esquire
         Finkelstein & Partners
 4       1279 Route 300
         Newburgh, New York 12551
 5       (845) 563-9442
         rrosenkranz@lawampm.com
 6
     and
 7
         KENNTH S. SOH, Esquire
 8       The Lanier Law Firm
         6810 FM 1960 West
 9       Houston, Texas 77069
         (713) 659-5200
10       kss@lanierlawfirm.com
11
     ON BEHALF OF THE DEFENDANT PFIZER:
12
         LORI CONNORS McGRODER, Esquire
13       JENNIFER M. STEVENSON, Esquire
         ANGELA M. SEATON, Esquire
14       LORI SCHULTZ, Esquire
         (Appearing Via Telephone)
15       Shook, Hardy & Bacon, L.L.P.
         2555 Grand Boulvard
16       Kansas City, Missouri 64108
         (816) 474-6550
17       lmcgroder@shb.com
         jstevenson@shb.com
18       aseaton@shb.com
         lschultz@shb.com
19
     Also Present:
20
         JAMES DOWNIE, CLVS, Videographer
21
22
23
24
25
```

312

```
 1              INDEX OF EXAMINATIONS
 2
 3   By Ms. McGroder              PAGE   314
 4              INDEX OF EXHIBITS
 5   NUMBER        EXHIBIT             MARKED
 6   Exhibit 20: Handwritten document with   314
     attachments entitled Notes dated 9/26/08
 7                                           322
     Exhibit 21: A document entitled Rates Of
 8   Depression Reported As An Adverse Event
     In Neurontin Placebo-Controlled
 9   Neuropathy And Epilepsy Clinical Trials
                                             322
10   Exhibit 22: A document entitled
     Neurontin Gabapentin Capsules; Neurontin
11   Gabapentin Tablets; Neurontin Gabapentin
     Oral Solution
12                                          3392
     Exhibit 23: A document entitled an FDA
13   Center for Drug Evaluation and Research
     Document entitled Review and Evaluation
14   of Clinical Data
                                             342
15   Exhibit 24: A document entitled Rates Of
     Depression Reported As An Adverse Event
16   In Neurontin Placebo-Controlled
     Neuropathy And Epilepsy Clinical Trials
17                                           354
     Exhibit 25: A letter dated 5/29/92 to
18   Paul D. Leber from Janeth L. Turner
                                             356
19   Exhibit 26: A document entitled Appendix
     C.11. Summary of Adverse Events By Body
20   System
                                             370
21   Exhibit 27: A document entitled Summary
     Of All Adverse Events In <1 Percent Of
22   Patients With Partial Seizures Treated
     With Gabapentin Or Placebo During
23   Controlled Clinical Studies, By Body
     System And Double-Blind Treatment Group
24
25
```

Maris, Ron (F&P Expert-Smith)  9/30/2008  9:12:00 AM

### 425

1  I -- when I got them, in some cases I sent them
2  back because I felt like they were incomplete.
3      But the short answer is I did not do them
4  myself.  I sent the form to Fromson, and he had one
5  of his case managers, who was most familiar with
6  all the evidence, to look at the evidence and fill
7  them out for me.
8    Q.  And Ken Fromson obviously is a plaintiff's
9  lawyer who represents individuals bringing lawsuits
10  against Pfizer involving Neurontin, correct?
11    A.  That's some of the stuff he does, yes.
12    Q.  And Michelle Faye, does she work for Ken
13  Fromson?
14    A.  She works for Finkelstein, and she's a
15  case manager for the Neurontin cases.
16    Q.  So case manager doesn't imply that Ms. Faye
17  has any sort of medical background, correct?
18    A.  No, she simply abstracted the data.  She
19  didn't edit it in any way.
20    Q.  So she's an employee of the law firm
21  representing plaintiffs?
22    A.  She is.
23    Q.  And who was interviewed -- well, the same
24  question then for the Bulger report?
25    A.  She did the same thing in the Bulger

### 426

1  report.
2    Q.  Okay.
3    A.  In other words, I wanted the information.
4  And you'll notice when you go through my autopsy,
5  that there are -- there are questions where I
6  disagree with her conclusions and I actually
7  corrected them.  For example, here's a place here
8  where she said no -- yes, and I said no.
9      So, in other words, I didn't just take it
10  lock, stock, and barrel.  I actually proofread
11  everything based on my knowledge of the case.
12    Q.  So the -- the efforts that you've made to
13  go back through and correct things that Michelle Faye
14  did when she conducted the psychological autopsy,
15  those are handwritten notes you made in that Smith
16  psychological autopsy report?
17    A.  Yes.
18    Q.  When did you do that?
19    A.  As soon as I got -- I got it on 5/26/07,
20  and I did it when I read it on June 13th, '07.
21    Q.  And you were pointing, I think, at page 42
22  where you showed me where you crossed out a yes on
23  question 108?
24    A.  Right.
25    Q.  And you made it a no?

### 427

1    A.  Right.
2    Q.  Okay.  I don't have that version.
3    A.  Well, I'm sure you'll get a copy of this.
4  You're welcome to have it.
5      MR. ROSENKRANZ:  We'll make a copy of it
6  now.
7      THE WITNESS: Yeah, it's not a big deal.
8      MS. McGRODER:  No, I'm just going -- I'm
9  just going to make an objection on the record
10  that he's actually changed the information --
11  the substantive information in the
12  psychological autopsy over a year ago, and
13  that wasn't provided to us.  So now I've
14  relied on the version that was provided to us,
15  which is substantially different because he's
16  changed the answers.  That's a problem.
17      MR. ROSENKRANZ:  Well, I don't believe
18  that that was provided to us either.  So we
19  couldn't have possibly provided it to you.
20    A.  That's true.  I changed it, but I didn't
21  send it back to them.  And you want me to get it
22  right, don't you?
23    Q.  Well, what I want is to understand your
24  opinions, and there's a deadline by which your
25  opinions are to be provided to us in this litigation.

### 428

1    A.  You can take that up to them.
2      MR. SOH:  Those questions are directed to
3  --
4    Q.  Can I mark this as an exhibit, please?
5    A.  As long as you give it back to me because
6  I've got to look at it.
7      (Exhibit 30: A document entitled
8      Psychological Autopsy and Death Investigation,
9      File Name Richard H. Smith marked for
10      identification, as of this date.)
11    Q.  Did you do the same analysis in Bulger to
12  go through and --
13    A.  I did it particularly in Bulger.  I
14  thought Bulger had a lot more errors in it.
15    Q.  Oh, okay.
16    A.  In fact, I insisted that Bulger be
17  redone, I thought it was so much incomplete.
18    Q.  Did you give Ms. Faye any sort of training
19  in how to conduct a psychological autopsy?
20    A.  No.  I mean, there are instructions and I
21  -- basically they say -- they're basically factual
22  questions.
23    Q.  So the instructions are contained within
24  the document itself?
25    A.  Yeah.  And I also told her if you have

**825**

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2
 3   _____
                                 )
 4   In re: NEURONTIN MARKETING, )
     SALES PRACTICES, AND PRODUCTS)
 5   LIABILITY LITIGATION,       )
     _____)
 6
 7                  VOLUME IV
 8
 9       CONTINUED VIDEOTAPED DEPOSITION OF
10            RONALD Wm. MARIS, Ph.D.
11              (Taken by Defendant)
12              Columbia, South Carolina
13              Monday, October 20, 2008
14
15
16
17
18
19
20
21
22
23
24         Reported in Stenotype by
           V. Dario Stanziola, CSR, RPR, CRR
25   Transcript produced by computer-aided transcription
```

**826**

```
 1              APPEARANCES
 2   ON BEHALF OF THE PLAINTIFFS:
 3       RON ROSENKRANZ, Esquire
         Finkelstein & Partners
 4       1279 Route 300
         Newburgh, New York 12551
 5       (845) 563-9442
         rrosenkranz@lawampm.com
 6
 7   ON BEHALF OF THE DEFENDANT PFIZER:
 8       ANGELA M. SEATON, Esquire
         IAN LOSASSO, Esquire
 9       LORI SCHULTZ, Esquire
         (Appearing Via Telephone)
10       Shook, Hardy & Bacon, L.L.P.
         2555 Grand Boulevard
11       Kansas City, Missouri 64108
         (816) 474-6550
12       aseaton@shb.com
         ilosasso@shb.com
13       lschultz@shb.com
14   Also Present:
15       JAMES DOWNIE, CLVS, Videographer
16
17
18
19
20          CONTINUED VIDEOTAPED DEPOSITION OF R
21   Wm. MARIS, Ph.D., a witness called on behalf of the
22   Defendant, before V. Dario Stanziola, CSR, RPR,
23   CRR, held at the Columbia Marriott, 1200 Hampton
24   Street, Columbia, South Carolina, on Monday,
25   October 20, 2008, commencing at 9:01 a.m.
```

**827**

```
 1           INDEX OF EXAMINATIONS
 2
 3
     By Ms. Seaton              PAGE   832
 4
             INDEX OF EXHIBITS
 5
     NUMBER      EXHIBIT                MARKED
 6   Exhibit 44: Plaintiff's Expert        832
     Disclosure On Specific Causation
 7
     Exhibit 45: Document entitled Appendix   833
 8   A, New Evidence For Bulger v. Pfizer
     Received After July 18, 2008, Ronald Wm.
 9   Maris, Ph.D. October 8, 2008
10   Exhibit 46: Report of Ronald Wm. Maris,  834
     Ph.D.
11
     Exhibit 47: First Amended Notice of      837
12   Videotaped Deposition Duces Tecum of
     Professor Ronald W. Maris, Ph.D.
13
     Exhibit 48: Handwritten notes            840
14
     Exhibit 49: Manilla folder containing    841
15   billing record of Ronald Wm. Maris,
     Ph.D.
16
     Exhibit 50: Ronald W. Maris, Ph.D.       843
17   Curriculum Vitae September 2008
18   Exhibit 51: Psychological Autopsy and    853
     Death Investigation, File Name Susan
19   Bulger
20   Exhibit 52: Photocopy of videotaped      890
     deposition of Ronald J. Bulger, Sr.
21
     Exhibit 53: Office visit note for Susan  903
22   Bulger dated 1/6/00
23   Exhibit 54: Progress notes for Susan     909
     Bulger dated 12/20/02
24
25
```

**828**

```
 1   Exhibit 55: Document entitled            951
     Commonwealth of Massachusetts Department
 2   of Social Services Child Abuse/Neglect
     Report
 3
     Exhibit 56: Document entitled            952
 4   Commonwealth of Massachusetts Department
     of Social Services FamilyNet dictation
 5   report
 6   Exhibit 57: Photocopy of a PowerPoint    953
     presentation entitled Suicide and SSRIs
 7   Ronald Wm. Maris, Ph.D. AAFS Annual
     Conference 11 a.m. - 12 p.m. Tuesday
 8   February 20, 2007 San Antonio, Texas
 9   Exhibit 58: Document entitled Beverly    988
     Hospital D/B/A BayRidge Hospital Intake
10   Evaluation
11   Exhibit 59: AtlantiCare Progress Notes   990
     dated 5/25/93
12
     Exhibit 60: AtlantiCare Medical Center   993
13   Report of Consultation dated 5/17/93
14   Exhibit 61: A document entitled Past     999
     Psychiatric History
15
     Exhibit 62: AtlantiCare Medical Center   1001
16   medical record
17   Exhibit 63: A document entitled Patient  1006
     Messages Susan E. Bulger
18
19   Exhibit 64: A medical record            1015
20   Exhibit 65: A photocopy of videotaped   1016
     deposition of Yoshiharu Akabane, M.D.
21   Exhibit 66: A medical record Salem      1017
     Hospital dated 8/17/88
22
     Exhibit 67: AtlantiCare Medical Center  1018
23   report of consultation dated 6/5/90
24   Exhibit 68: Brigham and Women's Hospital 1019
     nursing history questionnaire
25
```

973

1  your opinion that Susan Bulger's prior attempts were
2  low lethality attempts as opposed to high lethality?
3      A.  Sure.  Well, there's actually a reference
4  in one of my books to somebody named Card, like the
5  playing card, and he has a list of all the
6  different methods people can use to attempt
7  suicide.  In that list hanging is one of the most
8  fatal.  Of course, guns are the very most fatal.
9  But overdoses and cutting are among the least
10 fatal, the least likely to kill you.  And so many
11 people think that they're attention getting or
12 cries for help.  Some sort of a tension reduction.
13 But they're not as serious attempts in the sense
14 that they're not likely to result in a death.
15     Q.  Is it your opinion that Susan Bulger never
16 really intended to kill herself until she actually
17 did?
18     A.  I am not clear about that.  I think that
19 all I'm saying is that the methods -- if your
20 serious and you use a low lethality method, that
21 would indicate to me less desire to die usually.
22     Q.  Well, to be fair, I mean, Susan Bulger
23 didn't -- she didn't hang herself from a noose
24 suspended from the ceiling.  In other words, she
25 didn't -- she didn't take a chair and jump off the

974

1  chair and hang herself, right?
2      A.  That's true.  And nobody does.
3      Q.  Nobody does?
4      A.  Almost nobody.  You'd be surprised.  In
5  fact, I think the medical examiner consultant said
6  that it's more like an execution, like a hangman's
7  execution where you actually free-fall and break
8  the neck.  Almost nobody does that.  Everybody
9  kneels.
10     Q.  Okay.
11     A.  Let's say 95 percent.
12     Q.  You disagree or agree with Dr. Roh's
13 testimony that at any time while Susan Bulger was
14 leaning she could have changed her mind and/or Ron
15 could have come downstairs?
16     A.  I disagree with that.
17     Q.  You disagree with that?
18     A.  Yeah.  Because I think you rapidly lose
19 conscious -- just think about it for a minute.
20 Once you cut off these arteries, it only takes a
21 few minutes before you're unconscious or before you
22 lose control.  So that -- in fact, one of the
23 things that happens when you hang yourself is that
24 the body purges itself, you defecate, you have --
25 your bladder stops working properly.  So you --

975

1  what happens when you hang yourself is you very
2  quickly lose voluntarily control of your muscles.
3  And I think it's very unlikely -- I think it's more
4  likely that she would have tried to hang herself,
5  would have passed out pretty quickly, wouldn't have
6  died immediately, but would have passed out
7  quickly.
8      Q.  But you would agree with me that that is
9  absolutely pure speculation on your part?
10     A.  No.  That's based on thousands of suicide
11 cases that I've investigated, studied or read
12 about.
13     Q.  But it has nothing to do with Susan
14 Bulger's case.  You have no idea whether she passed
15 out quickly or not, correct?
16     A.  That's not true.
17     Q.  How do you know?
18     A.  Because everybody who does that passes
19 out relatively quickly.  They don't sit there and
20 think about it.
21     Q.  Okay. So are you testifying that it is not
22 possible that Susan Bulger sat there and contemplated
23 and leaned forward and leaned back and leaned forwar
24 and leaned back?
25         MR. ROSENKRANZ:  Objection to the form of

976

1  the question.
2      A.  I think it's highly unlikely.
3          MR. ROSENKRANZ:  Argumentative.
4          I'm sorry, what was your answer?
5          THE WITNESS:  Highly unlikely.
6      Q.  Would you agree with me that in terms of a
7  suicide attempt, a person's intent is really the most
8  important factor, not whether they actually succeed
9  or not?
10     A.  Well, by definition, you go look it up in
11 Webster's or any medical dictionary, the difference
12 between suicide and non-suicide is that you intend
13 to kill yourself.  Now, can people intend to kill
14 themselves but not use a fatal method?  Sure.  That
15 happens occasionally.
16     Q.  Okay. Do you concede that Susan Bulger
17 intended to kill herself before she ever took
18 Neurontin?
19     A.  I don't know.
20     Q.  Okay.
21     A.  I really don't know.  I think probably
22 what she did was tension reduction.  Again, this is
23 based on everything I know about her.  Ways of
24 drawing attention to her problems, ways of -- you
25 know, when you cut yourself you escape from your

Maris, Ron (F&P Expert-Bulger)  10/20/2008  9:01:00 AM

**977**

1  ordinary daily responsibilities because you get to
2  play the sick role for a while, often you get
3  hospitalized. So I have no evidence that she
4  seriously intended to die in those early attempts.
5  In fact, the first attempt might have even been an
6  accident.
7      Q.  Okay. Well, let's talk about her various
8  suicide attempts.
9      The first time Susan Bulger attempted
10  suicide was when she was 14. And would you agree
11  that she wasn't taking Neurontin when she was 14?
12      A.  She wasn't taking Neurontin, as I
13  understand it, in any of her early attempts except
14  the last one.
15      Q.  But my question was --
16      A.  I know, yes.
17      Q.  Okay. I'm going to hand you what we're
18  going to mark -- I'm actually not going to mark this
19  because it is not the correct record.
20      Okay. Were you aware that Susan Bulger
21  told healthcare providers when questioned about past
22  suicidal behavior that she had cut her wrists when
23  she was 14 years old?
24      A.  I'd have to look and see how old she is.
25  The first one I have is --

**978**

1      MR. ROSENKRANZ: Objection, I don't --
2  when she was 14?
3      MS. SEATON: Are you objecting to my
4  question or his answer?
5      MR. ROSENKRANZ: I'm objecting. I don't
6  -- I object as to the accuracy of that
7  statement.
8      MS. SEATON: Okay.
9      MR. ROSENKRANZ: And to the form of that
10  question.
11      Q.  Are you aware --
12      A.  The first recorded incident I have is
13  6/5/90. Would she have been 14 then?
14      Q.  I don't know. I'm not good with math.
15  And, I mean, honestly, what's important, you would
16  acknowledge that she was not taking Neurontin at the
17  time that she -- the first time she attempted
18  suicide?
19      A.  That's -- in fact, none of these early
20  attempts was she taking Neurontin. So yes, I would
21  agree.
22      Q.  Okay. Do you anything else anything else
23  about her first suicide attempt where she allegedly
24  or se claimed that she tried to kill herself by
25  cutting her wrists?

**979**

1      A.  I know that if we look at the AtlantiCare
2  medical records we'll find something about it.
3      Q.  Okay.
4      A.  That's what I wrote down. For the one
5  I'm talking about. And you may be talking about the
6  '98 ER slice the wrists --
7      Q.  Oh, no, we're not there yet.
8      A.  Okay. So I'm talking about 6/5/90. Let
9  me just see when she was born. Date of birth, '64.
10  She wasn't 14. I have no record of something at
11  14.
12      Q.  Okay. So the first suicide attempt that
13  you have in your notes is a 1990 suicide attempt
14  where she attempted to cut her wrists, right?
15      A.  I think she attempted to cut. I know she
16  did in 1998.
17      Q.  Okay. Can you kill yourself by cutting your
18  wrists?
19      A.  Sure.
20      Q.  Okay.
21      A.  Not likely though.
22      Q.  Well, and I'm interested to know, what
23  makes you conclude that when someone cuts their
24  wrists that they're not serious about -- their intent
25  isn't to kill themselves?

**980**

1      A.  I'm not so much talking about intent.
2  I'm talking about the logical empirical
3  consequences of cutting a wrist. I mean, everybody
4  knows, you cut a wrist, you -- typically you don't
5  get a serious wound, you get something that bleeds
6  and stops. So, you know, like cutting your wrist,
7  empirically, based on all the science that I've
8  ever read, is that those people tend to survive
9  their attempts. They're not the same as shooting
10  yourself or hanging yourself.
11      Q.  Do you have any opinion about what the
12  cause of this wrist cutting attempt was, this first
13  attempt?
14      A.  I didn't even know it existed until I
15  went back and looked at some of the records. If
16  you could show me the record, I can tell you. I
17  never knew about it before.
18      Q.  Okay. But the answer to my question is you
19  don't have any opinion about what caused that
20  attempt?
21      A.  I have no information.
22      Q.  Okay.
23      A.  Other than she did it.
24      Q.  Okay. Were you aware that Mrs. Bulger
25  advised her healthcare providers that sometime prior

Maris, Ron (F&P Expert-Bulger)  10/20/2008  9:01:00 AM

981

1  to 1998 she had driven her car off a cliff?
2    A.  Sure.  That's the early incident we were
3  talking about.
4    Q.  No -- well, we talked about the first
5  incidence, which was a wrist cutting.  The second
6  incident being a driving a car off a cliff, right?
7    A.  I don't know if it was in that order.
8  But I certainly knew about driving a car off a
9  cliff when she was an adolescent.
10    Q.  And you noted in your report that Linda
11  Landry, excuse me, testified that this was an
12  accident, right?
13    A.  She did.  But other people said it was a
14  suicide attempt.
15    Q.  Right.  And you, yourself, noted that we
16  have to temper Linda's statements, right?
17    A.  Right.
18    Q.  Okay. Were you aware that James Gibbons
19  testified that she drove her car off a cliff in
20  Nahant called 40 steps and that she was trying to
21  kill herself?
22    A.  Right.  There was conflicting evidence
23  from the -- from the sister and from James Gibbons.
24    Q.  Okay.  Do you know what the cliff height is
25  in Nahant?

982

1    A.  Do I know what the cliff height is?  No,
2  I don't.
3    Q.  Well, I mean, all jokes aside, this is an
4  important issue.  You know, if you drive off the
5  Grand Canyon, can you kill yourself?
6    A.  Yeah, I mean, I'd be interested to know
7  that.  But nothing I ever read even mentioned that.
8  You'd have to actually be a police officer and go
9  out there and measure it.  I don't think anybody
10  did.
11    Q.  Did you do anything to follow up? Did you
12  Google it?
13    A.  I read what I had.  Did I go look at the
14  cliff?  No.
15    Q.  Did you Google it?
16    A.  Did I what.
17    Q.  Did you Google it?
18    A.  Is it on the Google?
19    Q.  I don't know.  Did you ask plaintiffs'
20  counsel?
21       MR. ROSENKRANZ:  Well, I'm going to
22    object if you're asking me if I Googled.  And
23    I'm going to object to the statements --
24       MS. SEATON:  Object to form.
25       MR. ROSENKRANZ: -- because there were

983

1  variables involved with driving off a cliff.
2       MS. SEATON:  Ron, object to form is fine.
3    Q.  Do you know if Susan considered this a
4  serious suicide attempt?
5    A.  I have no idea.  I know that she did it.
6  But I have no idea.  It could have been an
7  accident, it could have been that she was
8  intoxicated, it could have been a suicide attempt,
9  it could have been a bunch of things.
10    Q.  Well, is that an -- is that important to
11  know?
12    A.  Yeah, but we can't know.
13    Q.  Okay.
14    A.  Sure it's important to know.
15    Q.  Do you have any opinion about what caused
16  this suicide attempt?
17    A.  Which one?
18    Q.  The driving off the cliff in Nahant.
19    A.  No, I don't remember that.
20    Q.  Okay.
21       MR. ROSENKRANZ:  And I'm objecting to
22    form of the question.
23       MS. SEATON:  To form, okay.
24    Q.  You would agree that Neurontin had nothing
25  to do with her driving off the cliff in Nahant,

984

1  right?
2    A.  Right.
3    Q.  Okay. Were you aware that Susan Bulger was
4  admitted to the ER at AtlantiCare medical center on
5  June 5th, 1990 after she overdosed on pills and cut
6  her wrists?
7    A.  Didn't I volunteer that?  That was the
8  first one I mentioned.
9    Q.  Okay. I'm going to ask again.
10      Were you aware that Susan Bulger was
11  admitted to the ER at AtlantiCare medical center on
12  June 5th, 1990 after she overdosed on pills and cut
13  her wrists?
14    A.  Yes, I was.
15    Q.  Okay. She wasn't taking Neurontin at that
16  time, right?
17    A.  No.
18    Q.  Did you reach any conclusion about serious
19  this suicide attempt was?
20    A.  No, other than the fact that overdoses
21  and cut wrists are typically not serious.
22    Q.  Do you have an opinion about what caused
23  that suicide attempt?
24    A.  Not without seeing the records.  And all
25  I did was find the -- the only information I found

**985**

1  was the date that she overdosed and cut her wrists
2  and that she went to AtlantiCare medical center. I
3  haven't actually seen the medical document.
4      Q.  Okay. You would agree with me that this
5  attempt at overdose and cutting her wrists had
6  nothing to do with Neurontin in 1990, right?
7      A.  That's true.
8      Q.  Okay. The fact that she slit her wrists and
9  overdosed indicate a seriousness of purpose to you?
10     In other words, not -- she didn't just slit
11 her wrists, she didn't just overdose, she did both.
12 Does that indicate a seriousness of purpose to you?
13     A.  It could. I mean, it's twice -- two
14 attempts, it increases the probability you could
15 die by at least two.
16     Q.  Okay.
17     A.  But they're both non-lethal methods.
18     Q.  But she could have died?
19     A.  Well, we don't know how much. I think
20 it's almost impossible she could have died from
21 wrist cutting. But the overdose would depend on
22 what she took and how much she took and stuff I
23 don't know.
24     Q.  Okay. Are you aware that Susan Bulger
25 attempted suicide by drug overdose in 1993?

**986**

1      A.  May 1993 to be exact, yes.
2      Q.  Okay. Do you have an opinion about what the
3  cause of that attempt was?
4      A.  I don't know. I know she was found
5  unresponsive at home, that she was presumably in a
6  coma for three or four days.
7      Q.  Okay. That wasn't my question.
8         Do you have --
9      A.  That's all I know.
10     Q.  Okay. So you don't have an opinion about
11 what the cause was?
12     A.  No.
13     Q.  Okay. You would agree with me that it had
14 nothing to do with Neurontin, though, right?
15     A.  Right.
16     Q.  Okay. What makes you opine that this 1993
17 overdose was a low lethality attempt?
18     A.  Well, obviously it was an overdose.
19 That's my main -- my main indication. The other
20 thing is that I'm -- excuse me, I'm pretty sure
21 that Ron said it was a serious attempt. But I
22 don't know for sure if he's a fateful reporter.
23 We've already talked about that.
24     Q.  Hey, you know, now that you mention that,
25 how do you decide when you believe Ron Bulger and

**987**

1  when you don't believe Ron Bulger?
2      A.  When we talk about the facts and the
3  facts are corroborated by other independent
4  observers would be one way.
5      Q.  Okay.
6      A.  In other words, what's the medical
7  records say? And I didn't get to see that.
8         But my short answer is it's still an
9  overdose, but apparently it was an overdose where
10 she could have died from it.
11     Q.  Well, but -- okay. But I want to go back to
12 you said Ron Bulger you think said that it was a
13 serious attempt but that you don't necessarily
14 believe him, right?
15     A.  I don't -- a lot of things where he
16 doesn't remember the facts quite as correctly. I'm
17 not saying he's lying. I'm saying that sometimes
18 he mis -- for example, he said she never went to a
19 psychiatrist and I found several times that she
20 did. So he may not remember the facts -- also, in
21 this time frame, he's trying to get custody of his
22 son, there's a lot of argument with the department
23 of social services, he's trying to make her look
24 like she's near death's door. I think he could
25 have been exaggerating what happened to her.

**988**

1      Q.  So fair to say then when Ron Bulger has a
2  motive to lie, we need to consider that he might be
3  lying?
4      A.  We need to consider it, yes.
5      Q.  Okay. All right. But back to Ron actually
6  you say indicated it was a serious attempt. And
7  maybe I just didn't listen well enough and I'm going
8  to listen better this time. What makes you opine
9  that this overdose in '93 was low lethality?
10     A.  The fact the fact it was an overdose and
11 not --
12        MR. ROSENKRANZ:  Objection, asked an
13     answered.
14     A.  -- not a method which is designed to kill
15 you rapidly and irreversibly.
16        If we're discussing medical records, I'd
17 like to see them too.
18     Q.  I want to show them to you, but I want to
19 -- I'm having trouble reading them and I want to make
20 sure that I've got the right records so we don't muck
21 up our deposition record.
22        (Exhibit 58: Document entitled Beverly
23     Hospital D/B/A BayRidge Hospital Intake
24     Evaluation marked for identification, as of
25     this date.)

989

1   Okay. I'm going to hand you what we're
2   going to mark as Deposition Exhibit No. 58.
3   And I will represent to you that this is a
4   record from Beverly Hospital, BayRidge
5   Hospital?
6   A.  Which incident is this, what date?
7   Q.  The date on it up in the top right corner
8   is April 23rd, 1998.
9       So this is prior to Susan Bulger ever
10  taking Neurontin, right?
11  A.  Right.
12  Q.  Okay. And under identifying data and chief
13  complaint, it indicates this 33-year old female with
14  a past history of depression and poly substance
15  dependence, including, and then the author's written
16  in, many psychiatric hospitalizations, is now
17  evaluated for depression and a desire for support.
18  Do you see where I'm reading?
19  A.  Yeah. And it says 0 BayRidge psychiatric
20  hospitalization. So in other words, they have no
21  record of her ever being hospitalized. Somebody
22  told them that.
23  Q.  Okay.
24      MS. SEATON: Let's go off the record for
25  a second.

990

1       THE VIDEOGRAPHER: The time 1:28 p.m.
2       (A DISCUSSION WAS HELD OFF THE RECORD
3       THE VIDEOGRAPHER: The time is 1:35 p.m.
4   We're back on the record.
5   Q.  Dr. Maris, before we went off the record we
6   were talking about Susan Bulger's suicide attempt in
7   1993 in which she tried to kill herself by drug
8   overdose, right?
9   A.  Right.
10  Q.  Okay. I am going to hand you what we're
11  going to mark as Deposition Exhibit 59.
12      This is a AtlantiCare progress note and you
13  could see up in the right-hand corner it's dated
14  May 25th, 1993.
15      (Exhibit 59: AtlantiCare Progress Notes
16      dated 5/25/93 marked for identification, as of
17      this date.)
18  A.  Right.
19  Q.  Okay. And were you aware that Susan Bulger
20  was actually found by her husband at home, Ron
21  Bulger?
22  A.  Yes.
23  Q.  And are you aware that when the EMT's went
24  to the home, they found her in respiratory arrest and
25  that she quickly went into cardiac arrest?

991

1   A.  I believe that's true, yes.
2   Q.  Okay. You're aware that the EMT's had to
3   initiate CPR for two minutes and she had no pulse?
4   A.  Is this on the page here?
5   Q.  I don't know if it is or isn't.
6   A.  It's not on my page.
7   Q.  I don't know if it is or isn't. I wanted
8   to give you some medical record to look at. Because
9   --
10  A.  Well, I'm not looking at what you're
11  talking about is the problem.
12  Q.  Okay. Well, let's just -- then just listen
13  to my questions. And if you need to look at
14  something, then we'll -- then you need to look at
15  something.
16  A.  But you're quoting something from a
17  document that I can't look at, so that's the
18  problem.
19  Q.  Well, were you aware -- forget the medical
20  record. Were you aware or were you not aware that
21  Susan Bulger went into a coma secondary to
22  respiratory arrest?
23      MR. ROSENKRANZ: Objection.
24  A.  I was aware that she went into a coma.
25  Q.  Okay.

992

1   A.  But I don't see where it says that.
2   Q.  Okay. But you're aware that she did go into
3   a coma?
4   A.  That's what I -- that's what Ron said.
5   But I have not seen the record, it's one of the
6   reasons I wanted to get the record so we could see
7   what the record said.
8   Q.  Aware that she didn't awake from the coma
9   for three days?
10  A.  Again, I'm not aware of that. If you've
11  got something you're quoting from, I'd love to see
12  it.
13  Q.  Well, let's look at the -- let's look at
14  the record that you've got in front of you.
15  A.  Okay. Let's do that.
16  Q.  Okay. Twenty-eight year old --
17      MS. SEATON: This isn't it. We're going
18  to have to go back off the record. I
19  apologize.
20      THE VIDEOGRAPHER: The time is 1:38 p.m.
21      (A DISCUSSION WAS HELD OFF THE RECORD
22      THE VIDEOGRAPHER: The time is 1:39 p.m.
23  We're back on the record.
24  Q.  I apologize, Dr. Maris, Susan Bulger's
25  medical records are so voluminous and so full of

Maris, Ron (F&P Expert-Bulger)  10/20/2008  9:01:00 AM

993

1  mental health issues, sometimes I get confused. I
2  think I found the right record. And I'm going to
3  hand you what we're going to mark as Defense Exhibit
4  No. 60.
5          (Exhibit 60: AtlantiCare Medical Center
6          Report of Consultation dated 5/17/93 marked
7          for identification, as of this date.)
8          MR. ROSENKRANZ: This better be the right
9          one. I'm tired of getting up.
10     Q.  All right. See up in the corner it says
11 date of consultation May 17th, 1993, right?
12     A.  Right.
13     Q.  Okay. Chief complaint, coma, secondary to
14 respiratory arrest, secondary to drug overdose,
15 right?
16     A.  Right.
17     Q.  History of present illness, second
18 paragraph, the patient was found yesterday
19 unresponsive by her husband. When the EMT's went to
20 the home, they found her in respiratory arrest and
21 then she quickly went into cardiac arrest. CPR was
22 initiated and a pulse returned within two minutes.
23 Blood pressure was recorded as 110 over 70 with a
24 pulse of 114. Apparently the EKG monitor showed
25 sinus tachycardia. Patient was given the usual

994

1  Narcan and Thiamine and she gradually began awaken
2  in the ambulance. She was semi-responsive.
3          Reading on, she was comatose with dilated
4  pupils and no response to painful stimulant.
5          Under past medical history says the patient
6  has a history of depression and she also has some
7  surgeries for her arthritis. Apparently her
8  physician became aware of the fact that she was
9  abusing the narcotics and was cutting her off from
10 those.
11         Do you see where I'm reading?
12     A.  Sure do.
13     Q.  Okay. And we've got some more information
14 about this attempt. Under social history it says the
15 patient has a history of substance abuse, alcohol and
16 cocaine.
17     A.  So this well could have been an
18 accidental overdose.
19     Q.  Okay. That wasn't my -- that wasn't my --
20 there's no question pending.
21         You see under social history it says, the
22 patient has a history of substance abuse, alcohol and
23 cocaine?
24     A.  Yes.
25     Q.  Okay. If Ron Bulger had not found Susan

995

1  Bulger and called 911, she would have died, wouldn't
2  she have?
3      A.  It seems quite likely, yes.
4      Q.  And if the resuscitation and the ambulance
5  wouldn't have worked, she would have died; is that
6  correct?
7      A.  Again, very likely.
8      Q.  Okay. If she hadn't come out of the coma
9  she would have died or she would have been left in a
10 vegetative state, right?
11     A.  Yes.
12     Q.  Okay. Do you have any opinion about what
13 the cause of that suicide attempt was?
14     A.  I don't think it was a suicide attempt.
15 I think it was probably an accidental overdose of
16 heroine or some other substance.
17     Q.  Okay. Tell me everything that you base your
18 opinion that this was an accident on?
19     A.  Well, for example, the record which is
20 Exhibit 60 nowhere says this was a suicide attempt,
21 nowhere. It says it was a drug overdose. It goes
22 on to say that she has a history of abusing
23 narcotics, then it says under social history she
24 has a history of substance abuse, alcohol and
25 cocaine. It seems to me that this has never been

996

1  identified as a suicide attempt. It's only
2  mentioned as possibly as an accidental overdose.
3      Q.  Well, I mean, in fairness, at the time that
4  this record was written, they weren't able to speak
5  to Susan Bulger, right? I mean, under family
6  history, unobtainable at this time. I assume, and
7  don't you, that that means that she -- they weren't
8  able to talk to her?
9      A.  Sure. But there's plenty of other
10 history on this page, none of it says suicide
11 attempt.
12     Q.  Okay.
13     A.  It says that she had an overdose.
14     Q.  And I think that you've told me before that
15 Ron certainly considered this a suicide attempt?
16     A.  I think he thinks it was. But I think
17 here's a woman who has a history of serious opioid
18 abuse and drug abuse, these kind of people often
19 have accidental overdoses. And I think that's more
20 likely than a suicide attempt, at least as likely.
21     Q.  Are you aware that Susan Bulger cut her
22 wrists again in 1998 and was again admitted to
23 AtlantiCare emergency department?
24     A.  Right.
25     Q.  Did you review the Gallant testimony about

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                Page 993 - 996

Maris, Ron (F&P Expert-Bulger)  10/20/2008  9:01:00 AM

### 997

1  having to drive Susan Bulger to the hospital after
2  this attempt?
3  　A.　No.
4  　Q.　Can you tell --
5  　A.　Are you talking about her neighbors?
6  　Q.　Uh-huh.
7  　A.　Yeah, I did see that.
8  　Q.　Do you have an opinion about what caused
9  that suicide attempt?
10 　A.　I don't remember what caused that suicide
11 attempt.
12 　Q.　You would agree, though, that in 1998 it
13 would have had nothing to do with Neurontin, right?
14 　A.　Again, I've said none of these have had
15 anything to do with Neurontin, all of them before
16 she took them.
17 　Q.　Okay. I want to go back to this 1993
18 overdose attempt, and I want to ask you, assume with
19 me that this was a suicide attempt.  Just assume with
20 me.
21 　A.　Okay.
22 　Q.　And assume she was successful, which you
23 agreed that she was darned near successful, she very
24 easily could have died, right?
25 　A.　Right.

### 998

1  　Q.　Okay. Let's assume that she did die and
2  let's assume that it was a suicide attempt.  Could we
3  have done a psychological autopsy?
4  　A.　I don't understand the question.  I mean,
5  how could I talk to her, she's dead?
6  　Q.　Well, we can't talk to her this time around
7  either, she's dead.  But you've done a psychological
8  autopsy and you've given an opinion about cause.  I'm
9  asking -- stop.  I'm sorry.
10 　　　I'm asking why couldn't we do the same
11 thing in 1993 if, indeed, she had successfully
12 committed suicide at that time?
13 　A.　We could.
14 　Q.　Okay. Let's do that.
15 　　　Let's do a psychological autopsy and let's
16 figure out what the cause would have been in 1993 if
17 she would have successfully killed herself.
18 　A.　Accidental overdose.
19 　Q.　You have opined that the overdose was an
20 accident, right?  That it wasn't a --
21 　A.　I'm think.  I don't know for a fact that
22 it was or was not.
23 　Q.　Okay.
24 　A.　I think it could have been an overdose,
25 it could have been a suicide attempt.  I think

### 999

1  based on the records you've been showing me, the
2  fact that she was a substance abuser, it's just as
3  likely that it was an accidental overdose.
4  　Q.　Well, would it be important to know what
5  Susan Bulger considered it, if she considered it an
6  accidental overdose or if she considered it suicide?
7  　A.　Well, you tell me what she thought it
8  was.
9  　Q.　Okay. I'm going to hand you what we're
10 going to mark as Deposition Exhibit No. 61.  And this
11 is difficult to read, the handwriting's difficult to
12 read.  But under past psychiatric history it says
13 suicidal behavior.  And Susan Bulger reports none
14 currently; has overdosed; has driven off a cliff,
15 attempted to it's either cut or slit her wrists.
16 　　　(Exhibit 61: A document entitled Past
17 　　　Psychiatric History marked for identification,
18 　　　as of this date.)
19 　Q.　Do you see where I'm reading?
20 　A.　Yes.
21 　Q.　So Susan Bulger herself identified the
22 overdose, the driving off the cliff and the wrist
23 cutting as suicide attempts, right?
24 　A.　No, she just -- she described it as
25 suicidal behavior.

### 1000

1  　Q.　Okay.
2  　A.　Coming to depositions three days in a row
3  is suicidal behavior.  But it's not a suicide
4  attempt.
5  　Q.　So you're saying that Susan -- Susan Bulger
6  distinguished in her own head between suicidal
7  behavior and suicidal attempt?
8  　A.　I think she may well have.  I mean, she
9  knows she's a chronic drug abuser, she knows her
10 behavior is self-destructive.  Furthermore, you
11 don't know if she's talking about that overdose.
12 There could have been other overdoses.
13 　Q.　Okay. All right.  Let's go back to assuming
14 that she had -- she had succeeded in killing herself
15 in 1993.  At that point in 1993 she's got a lot of
16 risk factors going on, right?
17 　A.　Sure she does.
18 　Q.　And would those risk factors work together
19 to -- would you be able to look at those risk factors
20 and explain the reasons for Susan Bulger's suicide?
21 　A.　I can make an opinion, sure.
22 　Q.　Okay. And it would -- what would it be?
23 　A.　I don't know because I haven't done it.
24 And I don't do these things flippantly.
25 　Q.　Okay.

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)　　　Page 997 - 1000

**1001**

1  A. It would take a lot of time. I started
2  working on this case in 2004 -- actually, 2008.
3  But I started working -- it takes a long time to do
4  it, you don't do it just right now sitting in a
5  deposition.
6  Q. Okay. Do you know what precipitated the
7  1998 wrist cutting incident?
8  A. I don't remember exactly. I remember
9  that was a time there was a lot of custody
10  considerations and family was involved and that was
11  when she and Ron were fighting about custody of
12  Ron, Junior. But I don't have that record. If you
13  have it --
14  Q. Okay. And I'm going to -- we're trying to
15  get it for you.
16      (Exhibit 62: AtlantiCare Medical Center
17       medical record marked for identification, as
18       of this date.)
19  Q. I'm going to hand you what we're going to
20  mark as Deposition Exhibit No. 62. And this is a
21  medical record of Susan Bulger's from AtlantiCare
22  medical center. Up in the right corner it's dated
23  February 24th, 1998, and under notes -- I'm right
24  here, Dr. Maris -- states --
25  A. This is really hard to read.

**1002**

1  Q. I agree that it is. I read it to say
2  ambulating with help to room three, states
3  self-inflicted lac, laceration, with razor --
4  A. You skipped a bunch of words.
5  Q. Well, to -- to left arm or to lower arm
6  with razor after fighting with husband. Do you see
7  where I'm reading?
8  A. Right. I do.
9  Q. Okay. So would you agree with me that her
10  attempt in 1998 was precipitated by a fight with her
11  husband Ron?
12      MR. ROSENKRANZ: I'm sorry, did you read
13       self-inflicted laceration.
14      MS. SEATON: Uh-huh.
15      MR. ROSENKRANZ: Okay.
16  A. That's what it says, yes.
17  Q. Did you exclude -- strike that.
18      What about when she drove her car off the
19  cliff in Nahant, were you aware it was precipitated
20  by an argument with a guy?
21  A. I vaguely remember that to be the case,
22  yes.
23  Q. And what about the overdose when she ended
24  up on life support, were you aware that there was
25  evidence that it was triggered by a fear of being cut

**1003**

1  off from her medications?
2  A. I didn't remember that.
3  Q. Okay. Go back to Deposition Exhibit -- the
4  typewritten one. I don't know what number -- it was
5  -- it's 88.
6  A. 88? Can't be 88.
7  Q. No, no, no, I'm sorry, the Bates number.
8  That's it, yeah.
9      Past medical history, apparently her
10  physician became aware of the fact she was abusing
11  narcotics and was cutting off -- cutting her off from
12  this. Do you see where I'm reading?
13  A. Right.
14  Q. Okay. So fair to say that whoever wrote
15  this report attributed the attempt to -- or at least
16  in part the fact that she was being cut off from
17  narcotics?
18  A. Or that she was abusing narcotics.
19  Q. Okay.
20  A. Doesn't say what time they cut her off.
21  Q. All right. We've already talked about the
22  fact that you and I agree that in order to render an
23  opinion on specific causation, you have to rule out
24  and/or account for alternative explanations, right?
25  A. The best of your ability, yes.

**1004**

1  Q. Okay. Let's talk first about chronic pain
2  and physical illness.
3      You note that she had this risk factor,
4  right?
5  A. Right.
6  Q. Would you agree or disagree that Susan
7  Bulger had longstanding chronic pain?
8  A. She did have.
9  Q. Aware that Susan Bulger told her physicians
10  that she was always depressed because this disease,
11  meaning the rheumatoid arthritis, has taken the life
12  right out of her?
13  A. I don't remember exactly the context when
14  she said that, and she probably wasn't always
15  depressed because depression waxes and wanes. But
16  she felt in her own mind she was depressed more
17  often than not, I guess.
18  Q. Okay. Were you aware that she also told
19  healthcare providers that she's pretty down and that
20  she's, quote, never without pain?
21  A. Yes.
22  Q. Okay. And you're aware that Mrs. Bulger
23  had undergone 14 surgeries due to her pain?
24  A. Right.
25  Q. Do you know whether Susan Bulger was

### Page 1105

```
 1      UNITED STATES DISTRICT COURT
 2         DISTRICT OF MASSACHUSETTS
 3
 4
 5
 6   IN RE:  NEURONTIN MARKETING,
 7   SALES PRACTICES AND PRODUCTS
 8   LIABILITY LITIGATION
 9
10
11            VOLUME V
12
13
14      CONTINUED VIDEOTAPED DEPOSITION OF
15        RONALD WILLIAM MARIS, Ph.D.
16           (Taken by Defendant)
17          Columbia, South Carolina
18         Wednesday, October 22, 2008
```

### Page 1106

```
 1              APPEARANCES:
 2   FOR THE PLAINTIFFS:
 3       RON ROSENKRANZ, Esquire
 4       Finkelstein & Partners
 5       1279 Route 300
 6       Newburgh, NY   12551
 7       (845)563-9442
 8       rrosenkranz@lawampm.com
 9   FOR THE DEFENDANT PFIZER:
10       ANGELA M. SEATON
11       IAN LOSASSO
12       LORI SCHULTZ (via telephone)
13       Shook Hardy & Bacon, LLP
14       2555 Grand Boulevard
15       Kansas City, MI   64108
16       (816)474-6550
17       aseaton@shb.com
18       lschulta@shb.com
19       ilosasso@shb.com
20   ALSO PRESENT:
21       JAMES DOWNIE, CLVS, VIDEOGRAPHER
```

### Page 1107

```
            EXHIBIT INDEX

EXHIBIT 89 - BULGER NOTES              1111
EXHIBIT 90 - SMITH NOTES               1111
EXHIBIT 91 - HANDWRITTEN               1126
    AFFIDAVIT, 00376-118PFC-00012
EXHIBIT 92 - COMMONWEALTH OF           1129
    MASSACHUSETTS, TRIAL COURT/PROBATE
    AND FAMILY COURT DEPARTMENT
    MOTION PAPER, 00376-118PFC-00029
EXHIBIT 93 - HANDWRITTEN               1131
    AFFIDAVIT, 000376-118PFC-00010
EXHIBIT 94 - TWO-PAGE REPORT OF        1136
    TPR MC GRAVINI, 000376-47ECD-00002
    AND 000376-47ECD-00003
EXHIBIT 95 - MEDICAL RECORD OF DR.     1191
    GOLDMAN, 000376-25AMD-00020
EXHIBIT 96 - COMMONWEALTH OF           1202
    MASSACHUSETTS DEPARTMENT OF SOCIAL
    SERVICES, ASSESSMENT WORKSHEET
    00376-57MDS-00056 and
    000376-57MDS-00057
EXHIBIT 97 - ENCOUNTER NOTE BY DR.     1214
    GOLDMAN, 000376-25AMD-0020
EXHIBIT 98 - MEDICAL RECORD OF DR.     1217
    O'FLYNN, 000376-25AMD-00015
EXHIBIT 99 - ENCOUNTER NOTE BY DR.     1219
    GOLDMAN, 000376-25AMD-00019
EXHIBIT 100 - ENCOUNTER NOTE BY        1221
    DR. GOLDMAN, 000376-25-AMD-00018
EXHIBIT 101 - ENCOUNTER NOTE OF        1223
    DR. GOLDMAN, 00376-25AMD-00017

(Exhibit index continued:)
```

### Page 1108

```
EXHIBIT 102 - COMMONWEALTH OF          1268
    MASSACHUSETTS DEPARTMENT OF SOCIAL
    SERVICES ASSESSMENT WORKSHEET
    000376-57MDS-00056 AND
    000376-57-MDS-00057
EXHIBIT 103 - CAB HEALTH &             1269
    RECOVERY SERVICES, INC., PROGRESS
    NOTES, INDIVIDUAL SESSION
    000376-70MDG-00267


            WITNESS INDEX:
RONALD MARIS, Ph.D.
    Examination by Ms. Seaton           1270
```

Maris, Ron (F&P Expert-Bulger)  10/22/2008  9:07:00 AM

**1249**

1   it take?
2   A.   Well, you know, someplace between
3   five and 30 minutes, I think, would be the
4   range.
5       Again, it depends on what we are
6   talking about.
7       We are getting a little bit outside
8   my expertise.  I'm not a neuropharmacologist,
9   and I don't claim to be.
10      But I'm saying, from Petroff and
11  other articles I have read on this, that they
12  talk about peak plasma level in two or three
13  hours and noticeable differences in 30 to 60
14  minutes.
15      Petroff, which, to me, makes it more
16  likely it would be around 6:30ish before she
17  would have had her suicide attempt.
18  Q.   We have no idea when she decided to
19  kill herself, right?
20      MR. ROSENKRANZ:  Objection; asked and
21  answered.
22  A.   We don't know when she decided.  And
23  I'm not even sure we know for sure how long she
24  was dead when she was found at seven.
25  Q.   And we have no evidence that she even

**1250**

1   took the Neurontin, right?
2       MR. ROSENKRANZ:  Objection; asked and
3   answered.
4   A.   I have been asked that a number of
5   times, and I said the only evidence is that she
6   asked for it immediately --
7   Q.   Okay.
8   A.   -- before her suicide.
9   Q.   Did you -- are there any other
10  additional risk factors, other than the suicide
11  attempts that you -- strike that --
12      Let me start over:
13      I want to talk, Doctor, about this
14  methodology by which you reached an opinion that
15  Neurontin played some role in Susan Bulger's
16  suicide.
17      And, specifically, I want to know
18  what risk factors you considered, and how you
19  ruled out various risk factors.
20      Do you know whether lack of mental
21  health treatment is a risk factor for suicide?
22  A.   It certainly can be, yes.
23  Q.   Receiving counsel or seeking a
24  therapist can be a protective factor, correct?
25  A.   If you have a good counselor.

**1251**

1   Q.   You did not identify lack of mental
2   health treatment as a risk factor for
3   Mrs. Bulger, correct?
4   A.   I did not.
5   Q.   And, in fact, you identified
6   treatment for depression as a protective factor
7   in this case, correct?
8   A.   Actually, if you ever to get to my
9   new theory, I defined it as both, which is to
10  say:  People who get treatment usually have some
11  remission of symptoms, not always.
12      For example, 60 to 70 percent of
13  people taking an anti-depressant never have an
14  anti-depressant effect.
15      But -- so it helps them, but if there
16  are adverse events or adverse effects then,
17  obviously, it can also hurt them.
18  Q.   Are you aware that Susan Bulger had
19  been seeing a counselor and receiving some group
20  therapy between 2000 and 2003?
21  A.   Yes.
22  Q.   And that was part of her -- one of
23  the requirements that, in order to get her
24  methadone, she had to attend the therapy
25  sessions; is that right?

**1252**

1   A.   I believe that's correct.
2   Q.   Are you aware Mrs. Bulger stopped
3   going to that counselor and group therapy 11
4   months prior to her death, because she found
5   Dr. Goldman, who would prescribe methadone to
6   her without requiring her to receive any
7   therapy?
8   A.   I believe that she did certainly find
9   Goldman.
10      I don't know if he made that
11  stipulation; I'll take your word for it.
12  Q.   Are you aware -- did you consider the
13  fact that Susan Bulger received no counseling or
14  therapy for the 11 months prior to her suicide?
15  A.   Right.  I'm aware of that.
16  Q.   In your expert opinion, would Susan
17  Bulger have benefited from psychiatric treatment
18  in 2004?
19  A.   She could have; although, she had had
20  treatment many times before.
21      I think you pointed out to me, she
22  had never finished a detox program.
23      She was often non-compliant, and so
24  I'm not sure how much help she would have
25  gotten.

Maris, Ron (F&P Expert-Bulger)  10/22/2008  9:07:00 AM

**1253**

1  Q.  Did you rule out the fact that Susan
2  Bulger had stopped receiving counseling as the
3  cause of her suicide?
4  A.  First of all, I don't have the same
5  model that you are assuming, which is a
6  differential diagnosis model, where you rule out
7  the alternatives.
8      My theory, as you know, is that I
9  rule them in, and I talk about them actually
10 contributing to making her part of a vulnerable
11 minority of patients --
12 Q.  Well, Dr. Maris --
13     THE WITNESS:  I'm not finished.
14     MS. SEATON:  Okay.
15 A.  And that by ruling them in, then the
16 Neurontin becomes an additional substantive
17 proximate risk factor, not the only factor.
18     So I'm not ruling these things out.
19 I never tried to rule them out.
20     I'm saying that there was a
21 combination of effects and risk factors that
22 made her suicidal, and which Neurontin was one
23 of them.
24 Q.  You have testified in this
25 litigation, in addition to publicly stating,

**1254**

1  that any plausible argument that a drug causes a
2  suicide, needs to make every effort to rule out,
3  or at least account for alternative
4  explanations, correct?
5  A.  Certainly account for them.
6  Q.  Did you account for the fact that
7  Susan Bulger stopped receiving counseling as the
8  potential cause of her suicide?
9  A.  I knew about it.  I didn't make it a
10 major feature, but I list it -- not only did I
11 account for these things, I listed them in my
12 report, and said:  All of these things were
13 contributory as risk factors.
14     And I went through depression,
15 substance abuse, chronic pain, etcetera,
16 etcetera.
17 Q.  Show me in your expert report, where
18 you considered her lack of mental health
19 treatment as a risk factor.
20 A.  I didn't consider that explicitedly
21 and didn't think it was significant, so I didn't
22 put it in.
23     Incidentally, mental health treatment
24 is often just drug treatment --
25     THE WITNESS:  I'm still finishing my

**1255**

1  question, give me a minute to think.
2  Q.  What question are you answering?
3  A.  Did I consider treatment?
4      And the question is:  She was getting
5  mental health treatment.  She was getting
6  Effexor and Clonopin.
7      And almost all psychiatrists, all
8  they do these days is give you medicine.
9      So she was getting mental treatment.
10 She wasn't getting counseling.
11 Q.  Is it your testimony that Susan
12 Bulger would not have benefited from some
13 counseling in the year prior to her death?
14 A.  I don't know.  I doubt it, because
15 she failed at many, many counseling attempts.
16     And I think she had been through
17 there, done that.
18     It probably wouldn't have made much
19 difference.
20 Q.  Let's talk about that -- agree or
21 disagree -- that for a substance abuser, failed
22 and discontinued attempts at detox and rehab is
23 a risk factor for suicide?
24 A.  It certainly could be; although, they
25 tend to be chronic, regardless of whether you

**1256**

1  complete detox or not, they tend to relapse.
2  Q.  Would you agree that she failed to
3  complete her detox on several occasions?
4  A.  Yes.
5  Q.  Were you aware that in January, 1995,
6  she attempted to detox at Beverly Hospital, but
7  checked out the next day without having gone
8  through detox at all?
9  A.  Yes.
10 Q.  Were you --
11     MR. ROSENKRANZ:  What was the year
12 there?
13     MS. SEATON:  Ninety-five.
14 Q.  Were you aware that Ron Bulger
15 interfered with his wife's attempts to detoxify?
16 A.  I have seen some of that in the
17 records, yes.
18 Q.  Were you aware that after her near
19 death suicide overdoes attempt in 1993, Ron
20 Bulger was barred from the unit as a result of
21 inappropriate behavior after having left two
22 verbally-abuse, threatening phone messages on
23 the nurse's voice mail?
24 A.  Yes.
25     MR. ROSENKRANZ:  Objection to form.