EXHIBIT 2

FILED
DISTRICT OF WYOMING
CHEYENNE

MAY - 3  AM 10: 56

CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

|  |  |  |
|---|---|---|
| THE ESTATES OF DEBORAH MARIE TOBIN, and ALYSSA ANN TOBIN, Deceased by TIMOTHY JOHN TOBIN, Personal Representative; and THE ESTATES OF DONALD JACK SCHELL, and RITA CHARLOTTE SCHELL, Deceased, by NEVA KAY HARDY, Personal Representative, | ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| vs. | ) ) | Civil No. 00-CV-0025-Bea |
| SMITHKLINE BEECHAM PHARMACEUTICALS, | ) ) ) ) |  |
| Defendant. | ) |  |

**ORDER DENYING DEFENDANT SMITHKLINE BEECHAM CORPORATION'S MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF PLAINTIFFS' EXPERTS**

The above-entitled matter having come on regularly for hearing before the Court on Defendant SmithKline Beecham Corporation's Motion to Exclude or Limit the Testimony of Plaintiffs' Experts, the plaintiff appearing by and through their counsel Andy Vickery and James E. Fitzgerald, and the defendant appearing by and through its counsel Vernon I. Zvoleff, Tamar P. Halpern, Thomas G. Gorman, and Misha E. Westby; and the Court having heard the arguments of counsel in support of and in opposition to said motion, having fully and carefully reviewed and



considered the motion and briefs filed therewith and all matters pertinent thereto, and being fully advised in the premises FINDS:

Currently before the Court is SmithKline Beecham Corporation's Motion to Exclude or Limit the Testimony of Plaintiffs' Experts. This *Daubert* styled motion is an attempt by the defendant to limit or exclude the proposed testimony of Dr. David Healy and Dr. John T. Maltsburger, two witnesses the plaintiffs intend to call to offer expert testimony in this matter. The plaintiffs oppose the defendant's motion and suggest that Dr. Healy and Dr. Maltsburger should be allowed to offer testimony pursuant to Rule 702 of the Federal Rules of Evidence.

## Background

This action originally comes before the Court on the plaintiffs' claims for product liability, pursuant to section 402A of the second Restatement of Torts, negligent failure to warn, negligent misrepresentation, and negligent failure to test and investigate. This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1332. The plaintiffs allege decedent Donald Schell shot and killed his wife, decedent Rita Schell, his daughter, decedent Deborah Marie Schell Tobin, and his granddaughter, decedent Alyssa Ann Tobin, before killing himself, as a direct result of his ingestion of Paxil, a pharmaceutical drug manufactured and distributed by the defendant.

2

The plaintiffs rely on Dr. Healy's proposed expert testimony to demonstrate that Paxil caused this murder suicide by inducing either: (1) extreme anguish, akathisia, or agitation; (2) psychotic decompensation; or (3) emotional blunting. (*See* Rule 26 Expert Report of Dr. Healy, dated January 11, 2001, and March 15, 2001). Dr. Healy generally suggests that all SSRIs can "produce a state of affairs which make an individual who may not have been likely to commit suicide before taking the pill, more likely to do so while on a course of treatment." (*See* Rule 26 Expert Report of Dr. Healy, dated January 11, 2001, page 1). Dr. Healy specifically suggests that "Paxil (paroxetine) is an SSRI that in my experience can produce these problems. There are a number of studies in the literature supporting this position. There is also an extensive literature on SSRIs in respect to these possibilities." *Id.* Thus, Dr. Healy's testimony would primarily be offered as to "general causation" in this litigation, demonstrating that Paxil can induce suicidal ideation. *See In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1224 (D.Colo. 1998) (generally defining general and specific causation).

Dr. Healy's expert witness qualifications are as follows. Dr. Healy has the United Kingdom equivalent of a medical degree and the United Kingdom equivalent of Ph.D. in pharmacology. (*See* Deposition of Dr. Healy, *Tobin v. SmithKline*, March 25, 2001, pages 13-15; Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 27). Dr. Healy is a practicing psychiatrist and an academic neuro-pharmacologist. (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 27). Dr.

3

Healy has authored or coauthored over one hundred peer-reviewed journal articles, has authored or coauthored twenty-two book chapters, has written over twelve books, and serves on the editorial board of one journal. Many of Dr. Healy's peer-reviewed publications relate to antidepressants, serotonin receptors, depression, and other topics relevant to the general subject matters at issue in this litigation. (Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 27; Curriculum Vitae, Dr. David Healy).

The plaintiffs rely upon Dr. John T. Matlsburger's testimony primarily in support of their specific causation argument, that Donald Schell's ingestion of Paxil in this case led to the unfortunate results involved in this litigation. Dr. Maltsburger proposes to testify that:

> [i]t is generally understood by most psychiatrists that a certain number of patients, perhaps five percent, will develop restlessness and anxiety when prescribed selective serotonin uptake inhibitor drugs (SSRIs) of which Paxil is an example. . . . Furthermore, a certain number of depressed patients are known to 'switch' in to hypomanic states when treated with antidepressant drugs. When a patient has a hypomanic history (Mr. Schell appears to have had none) or already exhibits akathisic symptoms (Mr. Shell did), SSRI compounds should not be prescribed because they have the potential to make the anxiety much worse, indeed, to make it unbearable. There are credible reports of patients becoming suicidal and homicidal when thrown into intolerable states of anguish by prescription of these drugs. . . . Further, we know that depressed patients given SSRI drugs are more likely to harm themselves than are those who are given tricyclic antidepressants. . . . Already anxious, his mind speeding, and sleepless, when given an SSRI in 1998, he quickly became violent and killed his family and himself. . . . In this case I can identify only one factor which triggered the murders and subsequent suicide—Paxil. . . . Though we lack details of what exactly Mr. Schell's mental state was on that fatal night, it is clear to me that it was Paxil that drove him out of control. ( *See* Rule 26 Expert Report of Dr. Healy, dated January 11, 2001, pages 5-6).

4

Dr. Maltsburger obtained a medical degree from Harvard in 1959. He is a highly educated psychiatrist and suicidologist and currently is an Associate Clinical Professor of Psychiatry at Harvard Medical School. (*See* Curriculum Vitae, Dr. David Healy). Dr. Maltsburger has held numerous prestigious academic, hospital, and other professional appointments. Dr. Maltsburger currently serves in an editorial or consulting capacity on the editorial boards of three journals and has been a reviewer for eight others. He has published twenty one original peer-reviewed articles, nineteen chapters, six books, monographs, or test books, and has conducted twelve case reports. (*See* Curriculum Vitae, Dr. David Healy).

## Arguments

The defendant, SmithKline Beecham Corporation, argues that the Court should either exclude or severely limit the testimony of Dr. David Healy and Dr. John T. Maltsburger for three primary reasons. First, defendant argues that Dr. Healy and Dr. Maltsburger are not properly qualified to offer expert testimony under Rule 702 of the Federal Rules of Evidence. The defendant argues that Dr. Healy is not qualified to offer opinions concerning epidemiology or the adequacy of the warnings provided by the defendant since such matters are beyond his area of expertise. (*See* Defendant's Motion to Exclude or Limit Testimony, page 8). The defendant additionally argues that Dr. Maltsburger is not qualified to give opinions concerning pharmacology, neuropharmacology,

psychopharmacology, epidemiology, or FDA warnings since his area of expertise is psychiatry. (*See* Defendant's Motion to Exclude or Limit Testimony, page 10).

Second, defendant argues that the proposed opinion testimony of Dr. Healy and Dr. Maltsburger is not reliable. The defendant suggests the plaintiffs' proposed expert testimony is not reliable since research involving SSRIs other than Paxil cannot be used to establish the effects of Paxil. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 13-21). Additionally, the defendant asserts there are no controlled epidemiological studies establishing an association between Paxil and suicide or homicide. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 22-30). The defendant also contends that randomized controlled epidemiological studies tend to demonstrate that Paxil does not cause suicidality. (*See* Defendant's Motion to Exclude or Limit Testimony, page 32). Finally, the defendant suggest the plaintiffs' proposed expert testimony is unreliable since the plaintiffs are unable to demonstrate specific causation utilizing differential diagnosis, a patient specific process of elimination that a medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 41-47).

Third, the defendant argues the methodology employed by Dr. Healy and Dr. Maltsburger is unreliable. The defendant asserts that the methodologies utilized by Dr. Healy and Dr. Maltsburger have not been published and that they are driven by litigation. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 47-49). The defendant further suggests that said opinions are

6

subject to an unknown rate of error, and are not generally accepted.  (*See* Defendant's Motion to Exclude or Limit Testimony, pages 49-53).

The plaintiffs first argue the defendant did not appropriately frame its motion in light of Rule 702 of the Federal Rules of Evidence as amended in December of 2000.  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 3).  The plaintiffs suggest the methodology of Dr. Healy and Dr. Maltsburger is beyond repute and that said testimony is based on the best scientific evidence available.[1]  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 3-11).  Further, the plaintiff argues the Donovan study, entitled *Deliberate Self-Harm and Antidepressant Drugs Investigation*, which appeared in the British Journal of Psychiatry in December of 2000, provides significant support for the causation opinions and methodology employed by Dr. Healy and Dr. Maltsburger. (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 6).  The plaintiffs contend the study demonstrates the incidents of self-harm for people taking SSRIs is five and a half times higher than incidents of self-harm for individuals on the tricyclic antidepressants.  The study specifically suggests that persons taking the SSRI paroxetine have a relative risk of deliberate self-harm four times higher than a person taking the tricyclic antidepressant

---

[1]The plaintiffs suggest that the defendant has purposely declined to undertake appropriate placebo controlled randomized test regarding SSRIs and suicidal or homicidal behavior.  The Court takes no position regarding these allegations, nor do such accusations have any bearing on the Court's decision regarding the instant motion.

7

amitripyline which was used as the comparator in this study.  Stuart Donovan *et al.*, *Deliberate Self-Ham and Antidepressant Drugs Investigation of a Possible Link,* 177  BRITISH JOURNAL OF PSYCHIATRY, 551, 554 (2000).  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 6-7).  The plaintiffs argue the defendant's attacks on Dr. Healy and Dr. Maltsburger are primarily attacks on the conclusions they draw, rather than their methodological approachs.  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 19).  The plaintiffs additionally provide the Court with affidavits in support of Dr. Healy's testimony from other, similar, cases in which Dr. Healy has been asked to testify regarding similar matters.  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 20-23).  Finally, the plaintiffs set forth multiple reasons they believe Dr. Healy and Dr. Maltsburger's testimony and methodology to be sufficiently reliable.  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 29-50).

## Analysis

**Legal Standard—**

In the seminal case of *Daubert v. Merrell Cow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the United States Supreme Court made it clear that the trial court must screen proffered expertise to ensure that the testimony admitted "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  The Supreme Court made it clear that the trial court not only has the power, but the

obligation to act as a "gatekeeper." *Id.* Therefore, under *Daubert*, when faced with a proffer of expert scientific testimony, the Court must determine at the outset, pursuant to Rule 104(a) of the Federal Rules of Evidence, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert*, 509 U.S. at 592; *Summers v. Missouri Pacific Railroad System*, 132 F.3d 599, 603 (10th Cir. 1997). Essentially, the Court must ensure that the proffered evidence is not only relevant, but reliable. *Daubert*, 509 U.S. at 589. "In particular, 'scientific knowledge' tests reliability, whereas the second element, helpfulness to the trier of fact, evaluates relevancy. Reliability is verified by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance is determined by ascertaining whether [that] reasoning or methodology properly can be applied to the facts in issue." *Summers*, 132 F.3d 599 at 603 (citing *Daubert*, 509 U.S. at 592-93).

Under the first prong of the *Daubert* test the adjective "scientific" implies a grounding in the methods and procedures of science and the word "knowledge" connotes more than subjective belief or unsupported speculation. *Daubert*, 509 U.S. at 590. The trial court's obligation under Rule 702 of the Federal Rules of Evidence and *Daubert* is to determine evidentiary reliability, or the trustworthiness of the proposed testimony. *Daubert*, 509 U.S. at 590 n. 9. "In a case involving scientific evidence, evidentiary reliability will be based on scientific validity." *Daubert*, 509 U.S. at 590 n. 9. "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation–i.e., 'good

9

grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Daubert, 509 U.S. at 590; *accord Summers v. Missouri Pacific Railroad System*, 132 F.3d 599, 603 (10th Cir.1997).

> [T]here are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes. *Daubert*, 509 U.S. at 596-97.

In *Daubert*, the Court announced a set of flexible standards to be used by trial courts when evaluating the reliability of proposed testimony. These standards include: (1) whether the theory has been empirically studied or tested and the nature of the methodology used; (2) the degree of peer review and publication; (3) the rate of known error; and (4) the rate or degree of acceptance within the scientific community. *Daubert*, 509 U.S. at 590-95. In considering these factors, the "focus, of course, must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

In the case of *Kuhmo Tire Co. v. Carmishael*, 526 U.S. 137 (1999), the Supreme Court clarified that the *Daubert* factors were not exclusive and that they may or may not be pertinent in any

specific case. *Kuhmo*, 526 U.S. at 150.  The factors may or may not be relevant depending on the "nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Id.* However, the Supreme Court made it clear that in all cases the trial court must exercise its gatekeeping obligation so that the expert, whether relying on "professional studies or personal experience," will, when testifying, employ "the same level of intellectual rigor" that the expert would use outside the courtroom when working in the relevant discipline. *Kuhmo*, 526 U.S. at 152.

The second prong under *Daubert* concerns relevancy, or "fit." *Daubert*, 509 U.S. at 591. " 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other unrelated purposes." *Id.*  "[T]he scientific knowledge must be connected to the question at issue." *In re Breast implant Litigation*, 11 F.Supp.2d 1217, 1223 (D.Colo. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994)).  Scientific expert testimony introduces special dangers to the fact-finding process because it "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (internal quotation marks and citation omitted). Therefore, federal judges must exclude proffered scientific evidence under Rule 702 of the Federal Rules of Evidence unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury. *In re Breast implant Litigation*, 11 F.Supp.2d 1217, 1223 (D.Colo. 1998) (other citations omitted).

Further, the Federal Rules of Evidence were amended in December of 2000 in order to

more accurately reflect the above noted rulings from the United States Supreme Court.  The

Committee Notes to the amended rules make it clear that these changes were a reaction to both

*Daubert* and *Kuhmo*.  Committee Notes 2000, FED.R.EVID. 702.  Rule 702 states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to
> understand the evidence or determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may testify thereto in the
> form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and methods, and (3) the
> witness has applied the principles and methods reliably to the facts of the case.
> FED.R.EVID. 702.

This Court finds that the plaintiffs have carried the burden in demonstrating the basis,

reliability, and fit of the proposed expert testimony of Dr. Healy and Dr. Maltsburger.  FED.R.EVID.

702.  Said experts will be allowed to testify at trial in a manner consistent with their Rule 26

designations filed on January 11, 2001, as supplemented on March 15, 2001.

**1)  Qualifications of the Plaintiffs' Experts—**

Initially, this Court finds that the plaintiffs' experts are properly qualified to testify in a

manner consistent with their respective proffered testimony.  The defendant generally argues that Dr.

Healy is not qualified to offer testimony regarding whether Paxil can cause homicidal and suicidal

action by inducing akathisia or emotional indifference.  The defendant make this contention based

upon the fact that Dr. Healy is neither an epidemiologist or a biostatician.  This Court finds that Dr.

Healy is qualified to offer expert testimony despite the fact that he is not an epidemiologist or a

biostatician.  Further, contrary to the defendant's contentions, this Court finds that Dr. Healy does

not dismiss "concepts such as randomized control trials, statistical significance, confidence intervals, relative risk and p-values" in place of his own concepts and theories.  The defendant's argument to the contrary is not well grounded and is distorted by their view of the facts in this case.  Dr. Healy has developed a theory regarding the effect SSRIs may have upon a small but definable group of depressed individuals.  Said opinion is based upon his extensive experience studying serotonin and its functions in the brain, the pharmacology of SSRIs, and his review of the facts in this case. Further, as stated above, Dr. Healy has published over one hundred articles, book chapters, or books, many of which are germane, at least generally, to subject at issue in this litigation.  (*See* Curriculum Vitae, Dr. David Healy).  Such extensive publications, as well as his advanced degrees in medicine and pharmacology, are good indications of his qualifications to testify regarding general causation in this matter.  Committee Notes 2000, FED.R.EVID.702 (Noting that "experience alone—or in conjunction with other knowledge, skill, training or education—may provide a sufficient foundation for expert testimony.").  Even the Supreme Court of the United States notes in the case of *Kuhmo Tire Co. v. Carmishael*, 526 U.S. 137 (1999), that some Rule 702 testimony will be given by witnesses "whose expertise is based purely on experience." *Kuhmo*, 526 U.S. at 151-52.

Additionally, this Court finds that although Dr. Healy does not hold a degree in epidemiology, and although he does not rely on the same studies the defendant experts rely upon, such does not render Dr. Healy unqualified to testify in this litigation.  The mere fact that Dr. Healy proposes to offer testimony contrary to the opinions of the defendant's experts does not suggest that

13

he dismisses good science.   Committee Notes 2000, FED.R.EVID.702.   While his particular methodology concerning Paxil has not been published, Dr. Healy's opinions regarding other SSRIs have been.   David Healy, *Antidepressant Induced Suicidality*, 6 PRIMARY CARE PSYCHIATRY 23 (2000); David Healy, *The Fluoxetine and Suicide Controversy A Review of the Evidence*, 1 (3) CNS DRUGS 223 (1994). As is discussed in greater detail *infra*, Dr. Healy's opinions, while contrary to the defendant's view of this litigation, are sufficiently grounded in reliable methodology.   Simply stated, Dr. Healy's education, experience, training, and extensive research regarding SSRIs, serotonin, and depression, qualify him to offer expert testimony with regard to general causation in this litigation.

Dr. Healy also intends to opine at trial that "the absence of warnings about the possibility of akathisia, emotional blunting and suicidality of Paxil contributed materially to Donald Schell's death and that of his family." (*See* Rule 26 Expert Report of Dr. Healy, dated April 15, 2001, page 2).   The defendant suggests that Dr. Healy is not qualified to offer an expert opinion regarding the adequacy of prescription drug warnings or the FDA's regulations, policies, and practices governing such warnings.   The defendant cites in support of its position an unreported decision from the Eastern District of Pennsylvania, and an unreported decision from the Fourth Circuit Court of Appeals.   In the case of *In Re Diet Drugs Products Liability Litigation* the district court found that a medical ethics expert was not sufficiently qualified to provide testimony regarding pharmaceutical industry standards for warnings regarding possible adverse effects.   *In Re Diet Drugs Products*

14

*Liability Litigation*, No. MDL1203 , 2001 U.S.Dist.LEXIS 1174, at *10 (E.D.Pa. Feb. 1, 2001). The court in that case found that the proposed expert did not have "sufficient expertise in medical specialties that would qualify him as a witness." *Id.* Such is not the case in this litigation where Dr. Healy's equivalent of a Ph.D in pharmacology, his medical degree, and his extensive research and numerous publications demonstrate his sufficient expertise just as Dr. Maltsburger's medical degree, clinical experience, and publications demonstrate his. In *Wehling* the trial court found, and the court of appeals affirmed, that a pharmacist with no experience regarding FDA warnings other than reading prescription labels and warnings is not qualified to offer testimony regarding the adequacy of a particular drug warning.[2] *Wehling v. Sandoz Pharmaceuticals*, No. 97-2212, 1998 WL546097, at **4 (4th Cir. Aug. 20, 1998). Once again, the facts in *Wehling* are easily distinguishable from the facts in this case. First, the court in *Wehling* noted that the proposed witness had no knowledge of how the prescription in question worked in the brain or how it could interact with other medications. *Id.* Such a situation is remote from this case since Dr. Healy and Dr. Maltsburger have extensive training and experience regarding such issues since he is both a medical doctor and a pharmacologist. Second, unlike the witness in *Wehling* Dr. Healy's opinion is not based primarily upon "subsequent remedial measures" or a brief review of scientific literature after he was retained as an expert. *Id.* Instead, the opinions of Dr. Healy are well documented and, as is discussed *infra*, sufficiently based

---

[2]The Court notes that the defendant cites to the *Wheling* case in contravention of Local Rule 36 of the Local Rules for the United States Court of Appeals for the Fourth Circuit.

in reliable methodology.   Simply stated, the defendant's reliance upon the above cases is unpersuasive and inappropriate.

Further, the Court finds that the opinions of Dr. Healy and Dr. Maltsburger regarding the adequacy of the warnings provided do not require any specialized knowledge of FDA procedures or warnings.  Therefore, this Court does not finds that Dr. Healy is not required to have <u>any</u> specialized knowledge regarding Food and Drug Administration policies or procedures regarding warnings included with pharmaceuticals.  Dr. Healy's opinion does not, directly, call into question the legal adequacy of the FDA warning provided with Paxil.  Dr. Healy only states that, in his opinion, the absence of a warning on Paxil contributed materially to Donald Schell's death and the death of his family.  Said opinion is based on his qualifications and his review of the facts in this case and does not require any specialized knowledge regarding FDA policies and procedures.

Additionally, this Court finds that a psychiatrist such as Dr. Healy, with extensive knowledge of SSRIs, depression, and brain chemistry, specifically with regard to serotonin and serotonin reuptake inhibitors, is entitled to offer an opinion concerning the adequacy of the warning at issue in this case.  Indeed, the defendant's own FDA expert, Dr. Mann, states that it is his background as a psychiatrist and a pharmacologist which qualifies him to offer opinions regarding the adequacy of FDA warnings.  (*See* Deposition of Dr. Mann, *Tobin v. SmithKline*, April 12, 2001, page 10-15).  This Court agrees with Dr. Mann that scientists and physicians, like Dr. Healy, are in the best position to "evaluate the kind of information the clinician needs in order to manage the patient safely

16

with medications" since they both study and prescribe medications. (*See* Deposition of Dr. Mann, *Tobin v. SmithKline*, April 12, 2001, page 15). However, since Dr. Healy does not have any specific expertise with regard to FDA warnings and FDA regulations, Dr. Healy shall not offer an opinion regarding the legal adequacy of the Paxil warnings, and shall only be allowed to testify regarding the adequacy of the warning in this case in light of his background as a practicing psychiatrist and academic pharmacologist.

This Court also finds that Dr. Maltsburger is qualified to offer expert testimony in this matter. As stated above, Dr. Maltsburger is a well educated psychiatrist with an impressive amount of academic and clinical experience. (*See* Curriculum Vitae, Dr. Maltsburger). Dr. Maltsburger intends to opine that Paxil was the specific cause of Donald Schell's actions on February 12 or 13, 1998. Dr. Maltsburger intends to offer said testimony regarding a "psychological autopsy" he performed on Donald Schell. A psychological autopsy is a process by which the last days and hours of an individual's life are psychologically analyzed and reconstructed by interviewing persons who interacted with the decedent shortly before his or her death. (*See* Deposition of Dr. Maltsburger, *Tobin v. SmithKline*, March 28, 2001, pages 134-36). The defendant suggests that since Dr. Maltsburger has no training as a pharmacologist or an epidemiologist he should not be allowed to testify regarding "causation between a drug [Paxil] and an adverse effect or on drug safety." (*See* Defendant's Motion to Exclude or Limit Testimony, page 10). The defendant suggests that Dr. Maltsburger is primarily a psychoanalyst who relies on talk therapy rather than treatment involving

17

drugs. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 49-53). The defendant

further suggest that Dr. Maltsburger is not qualified to testify regarding the adequacy of the warnings

in this case since he has no direct knowledge of the FDA regulations regarding warnings and has no

direct expertise regarding warnings.

The Court finds the defendant's arguments regarding Dr. Maltsburger's qualifications

unpersuasive. First, the Court notes Dr. Maltsburger's extensive education, training, and experience

regarding psychiatry. As noted above, under these circumstances, experience alone can be a

sufficient basis for testimony under Rule 702 of the Federal Rules of Evidence. Committee Notes

2000, FED.R.EVID. 702; *Kuhmo Tire Co. v. Carmishael*, 526 U.S. 137, 151-52 (1999). Second, this

Court finds the methodology employed in Dr. Maltsburger's psychological autopsy of Donald Schell

is not seriously disputed. The defendant's expert, Dr. Mann, testified that a psychological autopsy

is accepted in the fields of psychiatry and suicidology and is the "most scientifically rigorous" means

to determine factors which contributed to a persons completed suicide. (*See* Deposition of Dr. Mann,

*Tobin v. SmithKline*, April 12, 2001, page 59-60). Third, this Court does not find that an individual

needs to be an expert regarding FDA warning regulations in order to offer an opinion regarding their

adequacy to a prescribing physician. The defendant's own "FDA warnings expert" candidly admits,

despite his extensive experience in working with the FDA on matters related to drug warnings, that

the adequacy of drug warnings is not a proper area of expertise. (*See* Deposition of Dr. Mann, *Tobin

v. SmithKline*, April 12, 2001, page 9-10). As stated above with regard to Dr. Healy, since Dr.

18

Malstburger is not testifying with regard to SmithKline's adherence to FDA regulations, but is only

testifying with regard to his opinion regarding the adequacy of the warnings provided with Paxil, he

is not required to have any "FDA qualifications" in order to testify.  Fourth, this Court does not find

that Dr. Maltsburger is precluded from offering testimony regarding treatment with medications,

such as Paxil, since his area of expertise is psychoanalysis.  Dr. Maltsburger clearly states in his

deposition that such treatment is part of his practice, but not the major part of his practice.  (*See*

Deposition of Dr. Maltsburger, *Tobin v. SmithKline*, March 28, 2001, page 30).  Dr. Maltsburger's

education, training and experience which qualifies him to provide Rule 702 testimony in this

litigation.  Fifth, for the same reasons stated above, since Dr. Maltsburger is both a scientist and a

physician, he is qualified to offer testimony regarding the adequacy of the warnings at issue in this

case based on his experience and background as a psychiatrist.  (*See* Deposition of Dr. Mann, *Tobin*

*v. SmithKline*, April 12, 2001, page 15).

   **2) Reliability of the Plaintiffs' Experts with regard to General Causation—**

   The defendant next attacks the reliability of the plaintiffs' expert testimony regarding

general causation.  The defendant suggests the plaintiffs' experts should not be permitted to testify

regarding Paxil causing or inducing suicidal or homicidal tendencies for four reasons.  First, the

defendant suggests the plaintiffs' experts cannot properly extrapolate research concerning other

SSRIs and suicidality to Paxil and the plaintiffs general causation argument.  (*See* Defendant's

Motion to Exclude or Limit Testimony, pages 13-22).  Second, the defendant suggests the plaintiffs'

19

experts testimony is unreliable since there are no controlled epidemiological studies establishing an association between Paxil and suicide or murder-suicide. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 22-32). Third, the defendant suggest the plaintiffs' experts testimony is unreliable since there are randomized controlled epidemiological studies demonstrating that Paxil does not cause suicidality. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 32-34). Fourth, the defendant argues the plaintiffs' experts testimony is unreliable since they are based on case reports. (*See* Defendant's Motion to Exclude or Limit Testimony, pages 34-41).

The Supreme Court of the United States has noted that:

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data, but nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion testimony which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great of an analytical gap between the data and the opinion proffered. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

However, this Court finds that such is not the case in this litigation. Dr. Healy's reliance on studies done concerning other SSRIs, including Prozac and Zoloft, as well as the studies done concerning Paxil itself, form an appropriate and reliable nexus for his expert opinion testimony. After carefully considering each of the factors listed in *Daubert* regarding the reliability of the proffered expert testimony, this Court finds that the plaintiffs have met their burden in demonstrating the reliability of the proposed expert testimony of Dr. Healy and Dr. Maltsburger.

**Analysis of the *Daubert* Factors—**

20

(1) The plaintiffs have demonstrated the scientific theories of plaintiffs' experts have been studied and tested to an extent sufficient to demonstrate the reliability of the methodology they employed in formulating their opinions. The defendant primarily objects to Dr. Healy and Dr. Maltsburger's proposed expert testimony in this matter since said experts are unable to offer a randomized, placebo controlled, epidemiological study conclusively establishing a causal relationship between the ingestion of Paxil and suicidal or homicidal tendencies.

"Epidemiology is the medical science devoted to determining the cause of disease in human beings. Empidemeologists employ cohort studies, case-controlled studies, and ecological studies to determine whether individuals exposed to an agent have a greater risk of developing the disease in question." BAILEY ET AL. *Reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 340-52 (2000). Epidemiological studies provide the primary generally accepted methodology for demonstrating "a causal relation between a chemical compound and a set of symptoms or disease." *Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F.Supp.2d 1347, 1356 (N.D. Ga. 2001) (other citations and internal quotations omitted). "A valid epidemiological study requires that study subjects, cases and controls are chosen by an unbiased sampling method from a definable population." *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1224 (D. Colo. 1998). However, in this litigation, the appropriateness and usefulness of a carefully controlled epidemiological study is more difficult to access since this case involves a murder suicide. Unlike other scientific studies, the individual actions and personal decisions of Donald Schell cannot be entirely removed from any

causation argument or analysis.  Unfortunately for the trier of fact, this litigation does not involve

a relatively simple, more definable cause and effect relationship such as was argued in the Benedictin

cases.  *See Wilson v. Merrell Dow Pharmaceuticals Inc.*, 893 F.2d 1149, 1153-54 (10th Cir. 1990);

*DeLuca v. Merrel Dow Pharmaceuticals Inc.*, 911 F.2d 941, 945-48 (3d Cir. 1990); *Lynch v.*

*Merrell-National Laboratories Divisions of Richardson-Merrell, Inc.*, 646 F.Supp 856 863-65 (D.

Mass. 1986).  Rather, the Court, and the jury, will be required to assess a wide variety of factors

when deciding what effect, if any, Donald Schell's ingestion of Paxil played in the tragic events of

February 12th or 13th of 1998.  The matter is further complicated by the fact that during the hearing

on this motion, the defendant candidly admitted that no comprehensive epidemiological study,

utilizing all of the controls it believes to be necessary, has ever been conducted by the defendant or

anyone else.  (*See also* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude

or Limit Testimony, pages 5-10).

However, this Court finds and holds that Dr. Healy and Dr. Maltsburger's reliance upon the

Donovan study, as well as their own analysis and experience, provide a sufficiently reliable

methodology to base their opinions concerning the relationship between Paxil and suicidality upon.

While said study does not rely upon a placebo control, it represents at least one clear study

demonstrating that significantly more deliberate self-harm occurred following the prescription of an

SSRI than that of a tricyclic antidepressant.  Specifically, the Donovan studied demonstrated that the

relative risk of deliberate self-harm following a prescription for paroxetine was four times greater

than the comparator tricyclic amitriptyline.   Stuart Donovan *et al.*, *Deliberate Self-Harm and Antidepressant Drugs Investigation of a Possible Link,* 177 BRITISH JOURNAL OF PSYCHIATRY, 551, 554 (2000).   While the defendant disagrees with and criticizes the results reached and the methodology employed by Dr. Donovan and his associates, such concerns are more appropriately addressed through vigorous cross examination and the presentation of contrary evidence than in the instant *Daubert* motion.  *Daubert*, 509 U.S. at 596.

Finally, the plaintiffs have adequately demonstrated that studies and research done concerning SSRIs other than Paxil can be extrapolated in support of the plaintiffs' general theory of causation.   The Court recognizes are there are significant differences in the chemical structures, chemical properties, and ability to inhibit the reuptake of serotonin of the various SSRIs.   However, the Court finds persuasive Dr. Healy's statement that:

> "SSRIs are widely referred to in the scientific community as SSRIs precisely because they share this physiological property and the functional effects of this property [the inhibition of the reuptake of serotonin] in common.  These drugs in fact share a wide range of functional effects in common.  The list of side-effects for all of the drugs in the class overlaps heavily. . . . The general designation of these drugs as SSRIs . . . refers to a common understanding that broadly speaking the drugs are similar - [sic] there may be differences but there is broad overlap." (*See* Declaration of Dr. Healy in Response to Defendant's Motion to Exclude or Limit Testimony, page 3).

Additionally, the defendant's pharmacology expert, Dr. Alan Frazer, has also written about the similarities amongst the SSRIs, despite the fact that he intends to testify regarding their differences at trial in this matter.   "Another group of newer drugs shares the common

23

pharmacological action of selectively blocking the reuptake of 5-hydroxytryptamine (5-HT; serotonin) *in vivo*: because of this, they have been named selective serotonin reuptake inhibitors (SSRIs)." Alan Frazer, *Pharmacology of Antidepressants*, Vol 17. No. 2 Supp 1 JOURNAL OF CLINICAL PSYCHOLOGY 2S, 2S (1997).  The Court notes that SSRIs are discussed as a general class in a majority of the articles and studies, including those not written by Dr. Healy, which are cited by the parties.  Stuart Donovan et al., *Deliberate Self-Harm and Antidepressant Drugs Investigation of a Possible Link,* 177 BRITISH JOURNAL OF PSYCHIATRY, 551, 554 (2000); D. Dunner, R. Kumar, *Paroxetine: a Review of Clinical Experience*, 31 PHARMACOPSYCIATRIST 89, 89 (1998); Alan Frazer, *Pharmacology of Antidepressants*, Vol 17. No. 2 Supp 1 JOURNAL OF CLINICAL PSYCHOLOGY 2S, 2S-7S (1997); S. Kasper, *The Place of Milinacipran in the Treatment of Depression*, Vol 12 HUMAN PSYCHOPHARMACOLOGY S135, S135-S141 (1997); Roger M. Lane, *SSRI-Induced Extrapyramidal Side-effects and Akathisia: Implications for Treatment*, 12 JOURNAL OF PSYCHOPHARMACOLOGY 192, 192-93, 199, 208 (1998);  Andrew C. Leon, Martin B. Keller et al., *Prospective Studies of Fluoxetine Treatment and Suicidal Behavior in Affectively Ill Subjects*, 156 AMERICAN JOURNAL OF PSYCHIATRY 195, 195 (1999); JJ Lopez-Ibor Jr., *Reduced Suicidality with Paroxetine*, 8 Suppl 1 EUR PSYCHIATRY 17S, 17S (1993); J. John Mann, Shitij Kapur, *The Emergence of Suicidal Ideation and Behavior During Antidepressant Pharmacotherapy*, 48 ARCH GEN PSYCHIATRY 1027, 1029 (1991); S.A. Montgomery, D.L. Dunner, G.C. Dunbar, *Reduction of Suicidal Thoughts with Paroxetine in Comparison with Reference Antidepressants and Placebo*, 5 EUROPEAN

24

NEUROPSYCHOPHARMACOLOGY 5, 5 (1995); Robbert J. Verkes, C. Vand der Mast et al., *Reduction by Paroxetine of Suicidal Behavior in Patients With Repeated Suicide Attempts But Not Major Depression*, 155 AMERICAN JOURNAL OF PSYCHIATRY 543, 543 (1998). Based on the fact that SSRIs are often treated as a class by the scientific and medical communities and literature, this Court finds that Dr. Healy is entitled to offer testimony regarding other SSRIs and extrapolate general conclusions regarding Paxil therefrom using the Bradford Hill factors. (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 29-45). The Bradford Hill factors, also known as the Koch Postulates, are a list of factors developed in the 1800's to analyze the question of whether exposure to a specific condition or item caused a particular health outcome. (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 29). These factors "should be considered when an epidemiologist determines whether the association between and agent and a disease is causal." BAILEY ET AL., *Reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 121, 160-161 (1994).

> The factors that guide epidemiologist in making judgments about causation are 1. temporal relationship; 2. strength of the association; 3. dose–response relationship; 4. replication of the findings; 5. biological plausibility (coherence with existing knowledge); 6. consideration of alternate explanations; 7. cessation of exposure; 8. specificity of the association; and 9. consistency with other knowledge." BAILEY ET AL. *Reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 375 (2000).

"There is no formula or algorithm that can be used to access whether a causal inference is appropriate based on these guidelines. One or more factors may be absent even when a true causal

relationship exists.  Similarly, the existence of some factors does not ensure a causal relationship exists." BAILEY ET AL. *Reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 375  (2000).  The Court finds the use of the factors listed above, and employed by Dr. Healy, to be a reliable method of attempting to demonstrate and establish a causal connection between Paxil and suicidal ideation to the jury. BAILEY ET AL. *Reference Guide on Epidemiology,* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 375-381 (2000).

Further, this Court does not find persuasive or controlling the case law cited by the defendant which suggests the inappropriateness of comparing or extrapolating data from one drug or chemical to another for two reasons.  *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999); *Schudel v. Gneral Electric Corp.*, 120 F.3d 991, 997 (9th Cir. 1997); *Glassetter v. Novartis Pharm. Corp.*, 107 F.Supp.2d 1015, 1034 (E.D.Mo. 2000); *Nelson v. American Home Prod. Corp.*, 92 F.Supp.2d 954, 969 (W.D. Mo. 2000); *Brumbaugh v. Sandoz Phar. Corp.*, 77 F.Supp.2d 1153, 1157 (D.Mt. 1999); *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F.Supp33, 38 n.11 (D. N.H. 1995).  First, the cases cited by the defendant involve situations in which the party comparing the distinct chemical compounds or drugs failed to provide evidence or scientific literature, other than anecdotal case reports, supporting their similarities.  *Mitchell*, 165 F.3d at 782 (noting that the literature did not support comparison); *Schudel*, 120 F.3d at 997 (noting studies were dissimilar); *Glassetter*, 107 F.Supp.2d at 1034 (noting the compared chemicals did not share similar physiological effects; *Nelson*, 92 F.Supp.2d at 969 (holding that ill prepared case reports could not establish similarity or

26

causation); *Brumbaugh*, 77 F.Supp.2d at 1157 (holding unsupported suspicion could not establish similarities); *Grimes*, at 38 n.11(noting expert did not claim compared chemicals has similar structures). Such is not the situation in this litigation in which there is sufficient scientific literature supporting the similarities between the various SSRIs, namely that they all block or inhibit the reuptake of serotonin in the brain. These drugs have been classified together and are collectively referred to as the SSRIs because of their similar ability to block serotonin reuptake. Alan Frazer, *Pharmacology of Antidepressants*, Vol 17. No. 2 Supp 1 JOURNAL OF CLINICAL PSYCHOLOGY 2S, 2S (1997). Second, the plaintiff in this case has demonstrated the similarities between the various SSRIs are sufficient to allow Dr. Healy to extrapolate information from studies done concerning other SSRIs to Paxil, since Dr. Healy's opinions all relate to the inhibition of the reuptake of serotonin and its effects upon the brain chemistry. These factors distinguish this case from the cases cited by the defendant in which parties were improperly comparing chemicals in an attempt to demonstrate direct causation.

(2) This Court further finds that Dr. Healy's methodology concerning SSRIs and akathisia induced suicide has sufficiently been subjected to peer review and publication. Dr. Healy has published several articles which have been subjected to peer review concerning the possible correlation between suicidality and SSRIs. David Healy, *Emergence of Antidepressant Induced Suicidality*, Vol. 6 PRIMARY CARE PSYCHIATRY 23 (2000); David Healy et al., *Suicide in the Course of Treatment of Depression*, 13(1) JOURNAL OF PSYCHOPHARMACOLOGY 94 (1999); David Healy,

27

*The Fluoxetine and Suicide Controversy A Review of the Evidence*, 1 (3) CNS DRUGS 223 (1994).
Additionally, a review of Dr. Healy's curriculum vitae demonstrates that he has published numerous
other articles and book chapters which are generally germane to the opinions he intends to offer in
this litigation. (*See* Curriculum Vitae, Dr. David Healy). Finally, the Court notes that Dr. Healy has
published at least one comprehensive book which, again, discusses in detail some the opinions he
intends to offer in the case at bar.   *See* DAVID HEALY, THE ANTIDEPRESSANT ERA (Harvard
University Press 1999) (1997).

 Additionally, as previously discussed above, there has been several other articles written
concerning SSRI induced suicidality in general, and at least one peer review study which specifically
addressed Paxil and an increase in suicidality.  This Court notes that while not all of the studies
discussed above entirely meet the standards for "reliable" research the defendant would prefer, such
studies have been published and subjected to peer review.  Further, the Court is aware that there is
not universal acceptance for the proposition that SSRIs can induce suicidality, and that there have
been significant and important studies done which suggest that Paxil is effective in reducing suicidal
tendencies and thoughts.  D. Dunner, R. Kumar, *Paroxetine: A Review of Clinical Experience*, 31
PHARMACOPSYCIATRIST 89, 89 (1998); JJ Lopez-Ibor Jr., *Reduced Suicidality with Paroxetine*, 8
Suppl 1 EUR PSYCHIATRY 17S, 17S (1993); S.A. Montgomery, D.L. Dunner, G.C. Dunbar,
*Reduction of Suicidal Thoughts with Paroxetine in Comparison with Reference Antidepressants and
Placebo*, 5 EUROPEAN NEUROPSYCHOPHARMACOLOGY 5, 5 (1995); Robbert J. Verkes, C. Vand der

28

Mast et al., *Reduction by Paroxetine of Suicidal Behavior in Patients With Repeated Suicide Attempts But Not Major Depression*, 155 AMERICAN JOURNAL OF PSYCHIATRY 543, 543 (1998). However, "*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998). The focus for this Court, "of course, must be solely on the principles and methodology, not on the conclusions they generate." *Daubert* 509 U.S. at 595. This Court finds that the opinions the plaintiffs' experts intend to offer at trial have been sufficiently subjected to peer review and publication and are, thus, reliable. The defendant's strong arguments in opposition to the opinions to be offered by Dr. Healy and Dr. Maltsburger are most appropriately left to "[v]igorous cross-examination, [the] presentation of contrary evidence, and careful instruction of the burden of proof." *Daubert*, U.S. at 595.

    (3) The Court finds that, to the extent possible in this litigation, the contested theories have an acceptable known rate of error. First, while this Court finds that it is difficult to access the rate of known error when dealing with human psychology and the events in question in this litigation, the plaintiffs have sufficiently demonstrated that the studies they rely upon, including the Donovan study, have a known and acceptable rate of error since each study discusses the rate of error present therein as well as the limitations of the conclusions drawn therefrom. *See e.g.* Stuart Donovan *et al.*, *Deliberate Self-Ham and Antidepressant Drugs Investigation of a Possible Link*, 177 BRITISH JOURNAL OF PSYCHIATRY, 551, 554 (2000). This Court does not find credible the defendant's

contention that Dr. Healy "rejects methods for assessing rates of error."    (*See* Defendant's Motion

to Exclude or Limit Testimony, page 52).   Rather, Dr. Healy is keenly aware, as is this Court, that:

> "[n]otions of confidence interval, relative risk and P values are entirely relative to
> specific study frameworks.  Both SmithKline and I would agree . . . they should only
> be linked to an appropriate study framework.  In the absence of an appropriate study
> designed to address the issues, there is unfortunately no place for them in this case.
> (*See* Declaration of Dr. Healy in Response to Defendant's Motion to Exclude or
> Limit Testimony, page 16).

(4) Finally, this Court finds that, given the extensive publication on the subject, that Dr.

Healy and Dr. Maltsburger's testimony has attained sufficient general acceptance in the pertinent

scientific community.   The acceptance of Dr. Healy's proposed testimony has been further

demonstrated by the plaintiffs' inclusion of the declarations of Dr. Jonathon Cole and Dr. Roger

Greenberg.  While there is little doubt that there are competing principles concerning the role, if any,

of SSRIs, including Paxil, in inducing or increasing suicidal thoughts and tendencies, this Court

finds Dr. Healy and Dr. Maltsburger's will testify with the same level of intellectual rigor they would

employ outside the courtroom in their respective disciplines.  *Kuhmo*, 526 U.S. at 152.   As stated

above, however, "*Daubert* neither requires nor empowers trial courts to determine which of several

competing scientific theories has the best provenance." *Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85

(1st Cir. 1998).   The focus for this Court, "of course, must be solely on the principles and

methodology, not on the conclusions they generate." *Daubert* 509 U.S. at 595.  This Court finds that

the opinions the plaintiffs' experts intend to offer at trial have received sufficient general acceptance

that they are reliable enough to be presented to the jury.  By finding that Dr. Healy and Dr. Maltsburger's testimony has attained sufficient general acceptance this Court is in no way suggesting that the testimony of any or all of the defendant's expert testimony is unreliable.  Rule 702 of the Federal Rules of Evidence is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise.  Committee Notes 2000, FED.R.EVID. (citing *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 160 (3d. Cir. 1999)).

**Reliability of the Plaintiffs' Experts - Specific Causation**

The defendant briefly argues the plaintiffs' experts are unable to testify regarding specific causation with the requisite degree of reliability required by Rule 702 of the Federal Rules of Evidence and *Daubert*.  The defendant briefly argues that "differential diagnosis" cannot establish that Paxil caused Donald Schell's actions.  (*See* Defendant's Motion to Exclude or Limit Testimony, pages 13-21).  The plaintiffs argue that while Dr. Healy relies, to some extent, on differential diagnosis in reaching his opinions regarding general and specific causation, he also relies upon the Bradford Hill Factors/Koch Postulate, discussed *supra*, in reaching his opinion.  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, pages 5-10).  The plaintiffs additionally contend that the Dr. Maltsburger also utilizes other processes, including a psychological autopsy in support of his opinions concerning specific causation in this matter.  (*See* Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude or Limit Testimony, page 46).  After carefully reviewing the designations of the plaintiffs' experts and the arguments

from counsel, this Court is convinced that the proposed testimony of both Dr. Healy and Dr. Maltsburger is sufficiently reliable to be presented to the jury in this matter. Essentially, this Court finds the defendant's attack on Dr. Healy and Dr. Maltsbuger's proposed testimony to be a criticism of the results they reach rather than the methodology they employ. Such is not the proper scope or purpose of a *Daubert* motion.

Specifically, this Court finds that the proposed testimony of Dr. Healy and Dr. Maltsburger regarding specific causastion meets the requirements set forth in *Daubert* and Rule 702 of the Federal Rules of Evidence. The testimony of both doctors is scientific knowledge that will assist the trier of fact in understanding or determining a fact in issue. *Daubert*, 509 U.S. at 592; *Summers v. Missouri Pacific Railroad System*, 132 F.3d 599, 603 (10th Cir. 1997). The testimony of Dr. Healy and that of Dr. Maltsburger is based on the sound and accepted principles of psychology and psychiatry. Such methodology is reliable and may be presented to the jury.

### 3) Relevance of the Proposed Testimony

The final requirement of the trial court's gatekeeping function under *Daubert* is to ensure that the proposed expert testimony is relevant to the pending litigation. *Daubert*, 509 U.S. at 591. "Relevance is determined by ascertaining 'whether [the] reasoning or methodology properly can be applied to the facts in issue.' " *Summers v. Missouri Pacific Railroad System*, 132 F.3d 599, 603 (10th Cir. 1997) (citing *Daubert*, 509 U.S. at 593)). Although not directly attacked by the defendant, this Court finds that the proposed testimony of Dr. Healy and Dr. Maltsburger is closely tied to the

32

facts in dispute and, thus, will assist the trier in fact.  Dr. Healy's proposed testimony satisfies the "fit" requirement since it is offered in order to suggest general causation, that the ingestion of Paxil could, generally, induce suicidal ideation or homicidal tendencies in a certain definable group of patients.  Further, Dr. Healy's testimony fits the facts in this case since he will testify regarding the adequacy of the warning provided with Paxil, a difficult question which will be left to the jury to resolve.  Second, Dr. Maltsburger's proposed testimony also satisfies the "fit" requirement since it is offered in an attempt to demonstrate specific causation.  His testimony will detail the last days and hours of Donald Schell's life and explain how Paxil may have led to the tragic deaths of his wife, daughter, granddaughter, and himself.  His testimony regarding the adequacy of the warning is further relevant since it, again, relates to a disputed fact which must be decided by the jury.

**Conclusion**

The plaintiffs have demonstrated the reliability and the relevance of the proposed testimony of Dr. Healy and Dr. Maltsburger, therefore, the defendant's motion shall be denied.

NOW, THEREFORE, IT IS ORDERED that SmithKline Beecham Corporation's Motion to Exclude or Limit the Testimony of Plaintiffs' Experts be, and the same hereby is, DENIED.

Dated this 8th day of May, 2001.

William C. Beaman, United States Magistrate Judge

34