UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
:  MDL Docket No. 1629
In re: NEURONTIN MARKETING, :
      SALES PRACTICES AND : Master File No. 04-10981
      PRODUCTS LIABILITY LITIGATION :
:  Judge Patti B. Saris
---------------------------------------------------------------x
:  Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Smith v. Pfizer Inc.*, 1:05-11515-PBS :
:
---------------------------------------------------------------x

**PLAINTIFF'S SUR-REPLY MEMORANDUM
IN FURTHER OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE PLAINTIFF'S EXPERTS, DR. MARIS AND PROF. TRIMBLE**

**PRELIMINARY STATEMENT**

Plaintiff's designated specific causation experts, Ronald W. Maris, Ph.D., and Professor Michael Trimble, M.D., are experienced, highly qualified expert witnesses with specialized training in their areas of expertise. Dr. Maris's "psychological autopsy" has been generally accepted as a scientific methodology for determining the cause of suicide in numerous courts including the state courts of Massachusetts. *Routhier v. Keenan,* 2008 Mass. Super. LEXIS 372, at *17, 18 (Mass. Super. Ct. Nov. 12, 2008).[1] Prof. Trimble is particularly well suited to provide opinions in this case based upon his qualifications as an expert psychiatrist/behavioral neurologist and neuropsychopharmacologist, which are impeccable. *See* Prof. Trimble's' CV, ECF Doc. # 1197-6. Moreover, Prof. Trimble's expert opinions are based on the facts of this case by utilizing generally

---

[1] *See Giles v. Wyeth Inc,* 500 F. Supp. 2d 1048, 1063 (S.D. Ill. 2007) (citing *Blanchard v. Eli Lilly & Co.,* 207 F. Supp. 2d 308, 313 & n.2 (D. Vt. 2002) (citing *Miller v. Pfizer, Inc.,* No. 99-2326, 1999 U.S. Dist. LEXIS 18345 (D. Kan. Nov. 10, 1999)); *Cloud v. Pfizer Inc.,* 198 F. Supp. 2d 1118, 1135 (D. Ariz. 2001); *see also Herrin v. Treon,* 459 F. Supp. 2d 525, 545 (N.D. Tex. 2006); *Yanco v. United States,* 45 Fed. Cl. 782, 787 (Fed. Cl. 2000)).

accepted scientific methodology and his clinical experience of dealing with people who have a high risk of suicide for over 35 years, and his knowledge, training, education, and skill.  ECF Doc. # 1671 at 14-15, ECF Doc. # 1672-12 at 29:2-7.  Each expert properly reviewed all relevant materials, and weighed all available scientific evidence in the same rigorous manner that he uses in his professional life, to enable him to render an expert opinion that the ingestion of Neurontin was a substantial factor in proximately causing the death by suicide of the decedent, Richard Smith.

This is not a case involving a medical condition such as mesothelioma, for which the **only** known cause is asbestos fibers and for which various immuno-histochemical staining and analysis may conclusively determine that it is mesothelioma versus adenocarcinoma.  Defendants fail to appreciate the fact that suicide is a **multi-factorial** phenomenon involving a synergistic increase of risk with the addition of each suicidal risk factor.  Increasing any of these risk factors due to ingestion of Neurontin can be a substantial factor, the *sine qua non* of bringing about suicidality in any individual.  Contrary to Defendants' assertion, and as numerous other courts have found, Dr. Maris's methodology in which he considers potential causes and risk factors in relation to the suicide, utilizes a psychological autopsy in which he "rules in" and "rules out" certain risk factors or "predictors", Maris Rep., pp. 13-24, ECF Doc. # 1633-26, and also considers certain protective factors concerning suicide, has been accepted as admissible under *Daubert* standards.

Similarly, contrary to Defendants' assertions otherwise, Prof. Trimble utilized a differential diagnosis in which he examined the risk factors and protective factors in relation to Mr. Smith's suicide and "ruled in" and "ruled out" certain potential causes.  Trimble Rep., pp. 12-14, ECF Doc. # 1633-29.  Prof. Trimble considered both Mr. Smith's psychiatric[2] and physical/orthopaedic[3] history.

---

[2] Prof. Trimble stated that Mr. Smith did not have a psychiatric history prior to the events discussed in his report, and based this opinion on, *inter alia,* the following:  comments in his medical records on 04.08.94 and 05.10.01 of "no depression or anxiety"; a 20.09.01 letter from Dr. Cato that Smith "does not appear anxious or depressed"; that on 06.05.01 he was taking amitriptyline (not taking 12 months before death), most likely for pain and to sleep but there was

Prof. Trimble's employment of a differential analysis in forming his specific causation opinions is reliable and comports with *Daubert* standards for the admission of expert evidence.[4]

Defendants have essentially made the same arguments in their reply that they make in their moving paper; however, Plaintiff feels compelled to respond with a sur-reply due to the fact that Defendants have cavalierly mischaracterized the deposition testimony and methodologies utilized by Dr. Maris and Prof. Trimble.

As noted in Plaintiff's opposition papers, the failure to rule out all concurrent causes does not render an expert opinion inadmissible; rather, it goes to the weight of the expert's testimony. Plaintiff's experts' opinions are established by a preponderance of the reliable scientific evidence.

## ARGUMENT

### I. DR. MARIS CONSIDERED AND ACCOUNTED FOR ALL POTENTIAL RISK FACTORS

Although Defendants cite to Dr. Maris's testimony in the *Bulger* case and not the *Smith* case, Defendants mischaracterize Dr. Maris's methodology in which he carefully considers and accounts for all of the alternative explanations in regard to potential risk factors, and rules in what he determines to be significant contributing factors. Defendants engage in word-parsing of the phrases

---

no evidence that the drug was prescribed for depression; and that Smith was not taking any other CNS psychotropic drugs until he was prescribed gabapentin on 03.09.04. Prof. Trimble also noted that Mr. Smith was ingesting hydrocodone for 12 months prior to his death and about the time of his death. *Id.* at 6-7.

[3] Prof. Trimble also reviewed and considered Mr. Smith's past medical history including his orthopaedic difficulties, early tonsillectomy and appendectomy; 1991 transurethral prostatectomy and groin pain; hernia repair; bladder neck contracture; two knee replacements and hip replacement; increasing back pain and mobility difficulties and back surgery; further April 2003 lumbar laminectomy; and basal cell carcinoma removal and cataract surgery. *Id.* at 6.

[4] Prof. Trimble reviewed and considered Mr. Smith's family history, determining that it was stable and there was no evidence of dysfunctionality or history of psychiatric disorders; Mr. Smith's youth, education and work history, ascertaining that he was high school educated, in the armed forces and a popular minister for more than 60 years at the Church of Christ; that his wife and children had no known psychiatric disorders; and that he was a non-smoker and had no history or alcohol misuse or drug dependence. Trimble Rep. at 4-5, ECF Doc. # 1633-29.

"rule-in" or "rule-out", but the fact remains that Dr. Maris considered and accounted for alternative explanations; consequently, Dr. Maris's methodology is consistent with a differential diagnosis:

> Q. You have testified in this litigation, in addition to publicly stating, that any plausible argument that a drug causes a suicide, needs to make every effort to rule out, or at least account for alternative explanations, correct?
>
> A. Certainly account for them.
>
> Q. Did you account for the fact that Susan Bulger stopped receiving counseling as the potential cause of her suicide?
>
> A. I knew about it. I didn't make it a major feature, but I list it -- not only did I account for these things, I listed them in my report, and said: All of these things were contributory as risk factors. And I went through depression, substance abuse, chronic pain, etcetera, etcetera.
>
> Q. Show me in your expert report, where you considered her lack of mental health treatment as a risk factor.
>
> A. I didn't consider that explicitly and didn't think it was significant, so I didn't put it in. Incidentally, mental health treatment is often just drug treatment –
>
> THE WITNESS: I'm still finishing my question, give me a minute to think.
>
> Q. What question are you answering?
>
> A. Did I consider treatment? And the question is: She was getting mental health treatment. She was getting Effexor and Clonopin. And almost all psychiatrists, all they do these days is give you medicine. So she was getting mental treatment. She wasn't getting counseling.
>
> Q. Is it your testimony that Susan Bulger would not have benefited from some counseling in the year prior to her death?
>
> A. I don't know. I doubt it, because she failed at many, many counseling attempts. And I think she had been through there, done that. It probably wouldn't have made much difference.

Finkelstein Sur-Reply Decl., Ex. 1 at 1253:23-1255:19.

As noted in Plaintiff's moving papers Dr. Maris's methodology included the use of a "psychological autopsy" he conducted in an attempt to reconstruct Mr. Smith's psychological life, thoughts, feelings and relevant environmental factors preceding his death. He also analyzed suicide

risk factors and protective factors that his research has identified as statistically significant.  Maris Rep. at 22, 23, ECF Doc. # 1633-26.  He sought to "rule in" and "rule out" alternative causes, and he opined that Mr. Smith had only 7 of 15 known risk factors for suicide and 3 of those were induced by Neurontin.  *Id.* at 22.  He also opined that Mr. Smith possessed personal and social characteristics known to be protective from suicide.  *Id.* at 23.

## II.     PROF. TRIMBLE  CONSIDERED RICHARD SMITH'S RISK FACTORS FOR SUICIDE AND PERFORMED A DIFFERENTIAL DIAGNOSIS

Defense counsel is being disingenuous at best in mischaracterizing the testimony of Prof. Trimble in stating that he did not consider and any other factors other than the four major factors in his differential diagnosis.  Prof. Trimble made clear that although he considered the four predictors of suicide in his differential diagnosis as noted on page 11 of his report, ECF Doc #1633-29 page 12, in relation to Richard Smith's suicide, his differential diagnosis was actually on pages 12 and 13 of his report, ECF Doc #1633-29 pages 13 & 14, where other known risk factors were considered and ruled out in his determination including dementia, chronic pain and physical state, that he had no depressive disorder, and that there was evidence that gabapentin altered Mr. Smith's mental state:

> Q      Well, we are talking about page 11.  On page 11 of your report, if you recall yesterday you told me that this is how you did your differential diagnosis, and these are the highest risk factors for suicide.
>
> A      Well, the differential diagnosis is on page 12. And we went through that yesterday.
>
> Q      Okay, so –
>
> A      And at the top is dementia.
>
> Q      Okay. So you considered dementia as  part of your differential diagnosis?
>
> A      I did.
>
> Q      You just don't consider dementia as one of the top four highest risk factors --
> So you considered dementia in terms of your differential diagnosis?

> A    Correct.
>
> Q    But you did not consider dementia one of the top 4 highest risk factor for suicide as represented on page 11 of your report?
>
> A    Correct.
>
> Q    Okay, I'm with you now.
>
> A    That's correct.

Finkelstein Sur-Reply Decl., Ex. 1 at 529:2-25.

Defendants' assertions that Prof. Trimble only considered the four major predictors of suicide in his differential diagnosis, and not chronic pain or psychiatric history, are dishonest mischaracterizations of his methodology.  No matter how many times defense counsel questioned him, as demonstrated again and again in Prof. Trimble's report and his testimony, Prof. Trimble affirmed that he considered all of the appropriate risk factors present in this case in performing a differential diagnosis:

> Q    I just don't remember if you answered my question, I apologize.  And so, at the time that you wrote this report, at some point prior to October of 2007, did you look at and consider and rule out any risk factors other than these top four?
>
> A    If you turn to my differential diagnosis on the next page, I rule out a number of other risk -- medical and psychiatric risk   factors.
>
> Q    And tell me, give me the list of exactly what you ruled out.
>
> A    Okay, I rule out –
>
> Q    Are we talking on page 12?
>
> A    I rule out prior psychiatric disorder, previous history of suicide, alcohol and drug abuse, dementia, ah, head injury -- well, cerebral vascular disease, because it was said he had some hypertension. And then depression. I have already stated that I don't  think there's enough evidence to consider that Mr. Smith suffered a depressive illness, as would be classified by DSM4 criteria.

Finkelstein Sur-Reply Decl., Ex. 2 at 212:7-213:4.

6

As noted in Plaintiff's opposition papers, Prof. Trimble indeed did testify that he considered Richard's Smith's despair, hopelessness and chronic pain, his daughter's bout with cancer, etc.  Pl. Opp., ECF Doc. # 1671 at 19, 20.  Ultimately, Prof. Trimble included these factors in his analysis and differential diagnosis in finding that there was not adequate evidence that Richard Smith was suffering from a depressive illness or DSM IV diagnostic category depression prior to his ingestion of Neurontin, and he concluded that based upon his 35 years of training, skill, education and experience, it is more likely than not that Neurontin was a substantial factor in Mr. Smith committing suicide.  Trimble Rep. at 13, ECF Doc. # 1633-29.

### III. DEFENDANTS' PREMISE THAT PLAINTIFFS' EXPERTS ARE REQUIRED TO RULE OUT ALL OTHER RISK FACTORS IS FLAWED DUE TO THEIR MISUNDERSTANDING OF THE MULTI-FACTORIAL NATURE OF SUICIDE

*Giles v. Wyeth Inc,* 500 F. Supp. 2d 1048, 1063 (S.D. Ill. 2007), is not an  "outlier" case as suggested by Defendants.  In *Tobin v. Smithkline Beecham Pharms.,* Civil No. 00-CV-0025-Bea (D. Wyo. May 8, 2001), the court found that the case specific testimony of Dr. Maltsburger, who employed a psychological autopsy, was admissible.  Finkelstein Sur-Reply Decl., Ex. 3 at 31.  *Tobin* involved a decedent who shot his wife, daughter and granddaughter before he committed suicide as a direct result of his ingestion of the SSRI drug Paxil.  The court found that a psychological autopsy in that case was not disputed as a methodology when even defendant's own expert characterized a psychological autopsy as: "accepted in the fields of psychiatry and suicidology and is 'the most scientifically rigorous' means to determine factors which contributed to a person completed suicide." *Id.* at 18.  It appears that in that case, the judge and experts for both parties appreciated the multifactorial nature of suicide, and that there is more than one factor which contributes to a person's completed suicide.  The court in *Tobin,* characterized defendant's attack on plaintiffs'

7

experts as a "criticism of the results that they reach rather than the methodology they employ. . . not the proper scope or purpose of a *Daubert* motion." *Id.* at 32.

Here, as in *Tobin*, Dr. Maris utilized a psychological autopsy to determine the factors which contributed to Richard Smith's completed suicide. Dr. Maris utilized the "most scientifically rigorous means" to evaluate and determine Neurontin's causal relationship to Mr. Smith's suicide in this case, and *Tobin* flies in the face of Defendants' assertions that in this case Dr. Maris must "rule out" all other factors that contributed to causing Mr. Smith's suicide. The decision in *Baker v. Dalkon Shield Claimants Trust,* allows for dual causation, which may be the exception in certain cases but would be the rule in suicide cases due to their multifactorial nature. 156 F.3d 248, 253 (1st Cir. 1998). Moreover, *Goebel v. Denver & Rio Grande W. RR. Co.,* stands for the proposition that an expert need not rule out all other potential causes as the appellate court affirmed the district court's decision not to exclude an expert who had performed a differential diagnosis, and ruled out some alternative explanations but not depression. 346 F.3d 987, 998-999. (10th Cir. 2003).

Moreover, in support of the proposition that an expert must rule out all other causes of an injury or point to a "signature of the disease," Defendants again misleadingly cite to *National Bank of Commerce v. Dow,* 965 F. Supp. 1490 (E.D. Ark. 1996), which quotes from an article that in turn cites *In re Joint E. & S. Dist. Asbestos Litig.,* 827 F. Supp. 1014 (S.D.N.Y. 1993), for the proposition that, "An expert witness who claims that a plaintiff's colon cancer was caused by asbestos exposure must undertake a thorough 'differential diagnosis,' performed by a qualified expert, to rule out other potential causes." 965 F. Supp. at 1513. *See* Defs.' Reply Mem. at 9 n.11. Defendants even go so far as to note disapprovingly that Plaintiff has yet to address the *National Bank* case. *Id.* Plaintiff accepts that challenge here.

It is the Defendants who fail to note that the *Asbestos* case relied upon by *National Bank* was **reversed** by the Second Circuit, 52 F.3d 1124 (2d Cir. 1995), which stated:

> The district court first observed that not only were plaintiff's experts unable to narrow down the universe of possible confounding factors for colon cancer, but they acknowledged that asbestos exposure is not considered to be a risk factor. Indeed, as the district court noted, the rate for colon cancer in Nassau County — the New York county in which Maiorana resided — was 25.7 per 100,000 persons between 1970 and 1975, compared to 18.1 per 100,000 persons nationally during the same time period. This fact, the district court wrote, "raises a serious question about the various carcinogenic substances to which Maiorana and all the other residents of Nassau County have been exposed over the years and which constitute confounding factors in assessing the proximate cause of Maiorana's cancer."

*Id.* at 1130 (citations omitted).

The Second Circuit noted that "[i]n rejecting plaintiff's experts' differential diagnosis, the district court gave little weight to Maiorana's relatively young age of death," *id.* at 1137, and that the District Court had emphasized that asbestos fibers was not present in the colon tissue of the decedent. *Id.* The appellate court found that "Maiorana's own medical records and personal history were adequate to serve as a clinical basis for a conclusion that asbestos exposure constituted a significant causal factor in Maiorana's colon cancer." *Id.* at 1136. The Second Circuit also held that the District Court's decision was at odds with their previous stance and stated: "[Plaintiff's] experts concluded that asbestos exposure was 'a significant factor' and 'a proximate cause, and a substantial factor' in causing the colon cancer. Granting plaintiff all favorable inferences, these statements are the equivalent of stating that asbestos exposure more probably than not caused the colon cancer" *Id.* at 1136. Further, the asbestos litigation is quite distinguishable from the case at bar, because it dealt with claims of injury due to asbestos exposure and situations in which one may obtain hard scientific evidence — pathology and immuno-histochemical staining and analysis — to determine whether the cancer was asbestos related, not the case in this litigation which deals with suicide.

9

Contrary to Defendants assertions, not every disease or injury has a "hallmark" or a "signature" like the asbestos caused mesothelioma.  As Second Circuit emphasized in the *Asbestos* case, not even every asbestos caused injury — like colon cancer — has a "hallmark" — i.e., asbestos fibers were not found in the pathology.  This is not a case involving mesothelioma, for which the only known cause is asbestos fibers and for which various immuno-histochemical staining and analysis may conclusively determine that it is mesothelioma versus adenocarcinoma.  In the asbestos litigation, literally thousands of cases have been filed, the cases have latency issues which are not present in this pharmaceutical action, and the litigation has a history which spans decades.

Thus far, Plaintiffs' experts have extensively reviewed and provided expert reports for two cases in the MDL — one would surmise that an expert would have to review more than one or two cases in order to ascertain if indeed a "hallmark" of a Neurontin induced suicide has been established.  Thus far, Dr. Maris has identified some of the "suicidogenic Neurontin-induced or worsened SAEs in Richard Smith as: 1) Ego-dystonia; 2) worsened depression; 3) *De novo* hopelessness; 4) behavioral changes; 5) *De novo* suicidality; 6) Overpowering religious protections. Maris Rep. at 15-21. ECF Doc. # 1633-26.

Likewise, Prof. Trimble made note in his expert report that "the absence of a recognizable psychiatric disorder, the spontaneous and impulsive nature of his suicidal act require explanation: "As outlined in my concurrent report, Gabapentin is associated with changes of brain chemistry which, I find with a reasonable degree of scientific and medical probability, leads to impulsive suicidal acts.  It is therefore my opinion that it is more likely than not Gabapentin was a substantial factor in Mr. Smith committing suicide."  Trimble Rep. at 10, ECF Doc. # 1633-29.

## IV. PLAINTIFFS' EXPERTS HAD GOOD GROUNDS FOR THEIR OPINIONS THAT NEURONTIN WAS A SUBSTANTIAL FACTOR IN MR. SMITH'S SUICIDE AND DID NOT RELY UPON TEMPORALITY ALONE

### A. Dr. Maris had good grounds for forming his opinions and his consideration of a temporal connection in combination with numerous other factors was appropriate and reliable.

In *Tobin v. Smithkline Beecham Pharms.*, the District Court found that where an expert's general causation testimony was not based on a temporal association alone but on numerous other factors including his education, training, experience and extensive research, his specific causation testimony based on medical records was "sufficient to support the jury's verdict." 164 F. Supp. 2d 1278, 1283, 1284 (D. Wyo. 2001). Applying *Tobin* to the present case, Dr. Maris's testimony passes muster.

Dr. Maris points to the fact that his conclusions do not rely on temporal considerations alone, but that "dramatic changes in Richard Smith's suicidality and traits/states associated sequentially and proximately with his Neurontin–ingestion, consistent with the Bradford-Hill temporality criterion for causation". ECF Doc. # 1673 at ¶¶ 7, 7A-E.[5] Dr. Maris reviewed Richard Smith's extensive medical records and considered Mr. Smith's medical and psychiatric history in the preparation of his psychological autopsy and report. Maris Rep. at 1-27, ECF 1633-26. Dr. Maris noted that out of 15 potential risk factors that Richard Smith had 7, and he believed that three of those risk factors were induced by Neurontin. *Id.* at 22.. Dr. Maris opined that after taking Neurontin, "Richard Smith had all 9 criteria required for a DSM diagnosis of 'Major Depressive Disorder." *Id.* at 19. A Major

---

[5] Dr. Maris reviewed and considered the medical records of Mr. Smith's physicians, including Dr. Mackey, who testified to Mr. Smith's becoming suicidal after ingesting Neurontin and that in "Richard's 8-year medical history with accompanying chronic pain, he never ever contemplated suicide even one time." Maris Rep. at 22, ECF Doc. # 1633-26. He considered the testimony of Mr. Smith's wife who testified that Mr. Smith suddenly became suicidal three weeks prior to his suicide, during which time he was ingesting Neurontin, stating, "Honey, would God forgive me if I just did away with myself". Maris Rep. at 22, ECF Doc. # 1633-26, ECF Doc # 1673 at ¶ 7A. Mr. Smith's own words reported three days prior to his death demonstrates the adverse effects caused by his ingestion of Neurontin: "Neurontin makes me feel weird and is not helping," and that he felt "hopeless" and that he was "almost useless". ECF Doc. # 1673 at 7Eiii.

11

Depressive Disorder required that the patient has to meet at least 5 of the 9 criteria for at least two weeks and it must be a change from normal functioning." *Id.* at 18. Dr. Maris considered Richard Smith's mental state both prior and subsequent to his ingestion of Neurontin. *Id.* at 21. He also considered that Mr. Smith was only moderately suicidal, had no prior suicide attempts, had profound character or personality changes after Neurontin ingestion, and had many protective factors, a supportive family, and the fact that he was a clergyman, a member of an occupation which has the lowest suicide rates, "which often suggests a "trigger" such as Neurontin ingestion and the resulting suicidogenic side-effects." *Id.* at 22-24. Dr. Maris considered all of Richard Smith's other possible suicide risk factors in detail. *Id.* at 22. Dr. Maris also considered Richard Smith's personal characteristics (known to be protective from suicide) and Mr. Smith's chronic pain. *Id.* at 23. Dr. Maris employed reliable and accepted scientific methodology, including a psychological autopsy, in arriving at his opinions — of course whether Richard Smith was ingesting Neurontin at the time of his suicide and whether Smith was experiencing changes in his behavior and emotional state from his ingestion of Neurontin are critical factors to be considered. As demonstrated above, Dr. Maris clearly did not solely rely on temporality.

      **B.**      **Prof. Trimble had good grounds for forming his opinions and his consideration of a temporal connection in combination with numerous other factors was appropriate and reliable.**

Prof. Trimble carefully reviewed considered Richard Smith's psychiatric and medical history through an extensive review of his medical records. Trimble Rep. at 2, ECF Doc. # 1633-29. Prof. Trimble also considered Mr. Smith's family history, his history of medical problems, including his orthopaedic conditions, surgeries and chronic pain. *Id.* at 5-7. Prof. Trimble also reviewed and considered Richard Smith's complaints of pain, his wife's statements regarding his pain, and his treating physicians' notes regarding his surgery and pain. *Id.* at 7,8.

12

Prof. Trimble also reviewed and considered Richard Smith's medication history including gabapentin and his mental state prior to his completed suicide. *Id.* at 6, 9,11. Prof. Trimble performed a differential diagnosis in which he considered both Mr. Smith's risk factors and protective factors. *Id.* at 11, 12, 13. Prof. Trimble further considered that as an elderly individual, Mr. Smith's "brain would be more susceptible to the drugs and the drug levels than a younger person," ECF Doc #1672-12 at 88:11-25; and that Mr. Smith had been ingesting Neurontin for several weeks prior to his suicide and there was an increase in the dose which "may well be that the effects were magnified when the dose was increased," and increasing the dose "was instrumental in altering this man's cerebral chemistry, leading to the ultimate suicidal act." ECF Doc #1672-12 at 277:18-280:6.

Clearly, Prof. Trimble did not resort solely to temporality in arriving at his opinion. Further, Prof. Trimble had good grounds, in opining that Neurontin (gabapentin) was a substantial factor in Mr. Smith committing suicide, including that Neurontin alters the brain chemistry and that the objective medical evidence and statements from Mr. Smith himself and his family and friends demonstrated that his mental state was altered after ingesting gabapentin.

## V. DR. MARIS'S APPLICATION OF THE PSYCHOLOGICAL AUTOPSY IS RELIABLE.

Defendants assert that Dr. Maris's psychological autopsy in this case is tainted because he did not personally gather the initial information for the psychological autopsy instrument; the initial information was gathered by Plaintiff's counsel's legal assistant. Defs.' Mem., ECF Doc. # 1713 at 15-16. However, the fact that an expert "relied on information supplied by plaintiff's counsel in reaching his conclusion" does not mandate the exclusion of that expert's testimony. *Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1432 (5th Cir 1989). Dr. Maris made clear during his deposition testimony that the paralegal who gathered the information for the psychological autopsy instrument

13

and "simply abstracted the data. She didn't edit it in any way." Finkelstein Sur-Reply Decl, Ex. 1 at 425:16:19. In other words, Dr. Maris created the psychological autopsy instrument for this case, which called for the initial culling of specific information from medical records and deposition testimony. As noted in Plaintiff's memorandum in opposition, Dr. Maris reviewed and considered a myriad of evidence/materials in this case to arrive at his opinions, including depositions, medical records, literature and expert reports.[6] In this case, Dr. Maris reviewed the initial psychological autopsy instrument carefully and compared it with the medical records and other voluminous materials. He made revisions where appropriate to ensure the instruments accuracy, completeness and scientific objectivity. Finkelstein Sur-Reply Decl, Ex. 1 at 425:16:19; ECF Doc # 1673 at ¶ 8E.

The court in *Routhier, supra,* stated that Dr. Maris's methodology "addresses many of the inherent complexities of suicidology and incorporates a broad spectrum of scientific learning on the subject." 2008 Mass. Super. LEXIS 372, at *13. In *Routhier,* Dr. Maris developed a psychological autopsy, as he did in this case by reviewing of various materials (including the depositions of the plaintiffs family and friends, medical records, autopsy reports, police report) and analyzing fifteen suicide risk factor and protective factors. *Id.* at *17, *18. It is clear that in both cases, Dr. Maris followed his professional standards in demanding that a psychological autopsy be performed and in ensuring that the information contained therein was accurate and complete. Any inaccuracies in Dr. Maris's expert disclosure may be explored by the Defendants on cross-examination at trial.

Moreover, in regard to Dr. Maris's testimony relating to general causation, Plaintiffs have not disclosed Dr. Maris as their general causation expert, yet Dr. Maris may opine on general causation based upon the previous expert disclosures of Plaintiff's general causation experts and information provided by the FDA related to anticonvulsants and suicidality. Simply stated, it is axiomatic that

---

[6] A more detailed listing of the materials reviewed by Dr. Maris is included in his Expert Report ECF Doc. # 1633-26 at pages 2-3.

14

Dr. Maris may provide testimony that his opinions on case-specific causation are consistent with and corroborated by the general causation opinions of Plaintiffs' experts and by the FDA.

## CONCLUSION

For all of the reasons stated above and in the earlier Plaintiff's Memorandum in Opposition, ECF Doc. # 1671, Plaintiff respectfully requests that this Court deny Defendants' motion to exclude the testimony of Dr. Maris and Prof. Trimble.

Dated: March 23, 2009                                     Respectfully submitted,

                                                          Finkelstein & Partners, LLP
                                                          *Attorneys for Plaintiff Ruth Smith*

                                                    By:   **/s/ Andrew G. Finkelstein**
                                                          Andrew G. Finkelstein, Esquire
                                                          Finkelstein & Partners, LLP
                                                          1279 Route 300, P.O. Box 1111
                                                          Newburgh, NY  12551

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 23, 2009.

                                                          **/s/ Andrew G. Finkelstein**
                                                          Andrew G. Finkelstein, Esquire