# EXHIBIT 2

```
                                                                    1
         IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
   IN RE:                    Videotape
   NEURONTIN MARKETING, SALES  :  Deposition of:
   PRACTICES AND PRODUCTS      :
   LIABILITY LITIGATION        :  MICHAEL TRIMBLE
                               :
   ----------------------------
   THIS DOCUMENT RELATES TO:
   Smith, et al. v Pfizer, et al.
   Case No. 05-cv-11515-PBS
        TRANSCRIPT of testimony as taken by and
   before PATRICIA A. SANDS, a Shorthand Reporter
   and Notary Public of the States of New York and
   New Jersey, at the offices of Lanier Law Firm,
   126 East 56th Street, New York, New York, on
   Tuesday, September 2, 2008, commencing at 9:15
   in the forenoon.
          REPORTING SERVICES ARRANGED THROUGH:
          VERITEXT/NEW JERSEY REPORTING COMPANY
             25B Vreeland Road, Suite 301
             Florham Park, New Jersey 07932
       Phone: (973) 410-4040    Fax: (973) 410-1313
```

```
                                                                    2
 1     A P P E A R A N C E S:
 2
 3     FINKELSTEIN & PARTNERS
       436 Robinson Avenue
 4     Newburgh, New York 12550
       BY:  ANDREW G. FINKELSTEIN, ESQ.
 5     For the Plaintiff
       800 634-1212
 6
 7     THE LANIER LAW FIRM
       Tower 56
 8     126 East 56th Street, 6th Floor
       New York, New York 10022
 9     BY:  KENNETH SOH, ESQ.
       For the Plaintiff
10     212 421-2800
11
       SHOOK, HARDY & BACON, LLP
12     2555 Grand Boulevard
       Kansas City, Missouri 64108-2613
13     BY:  LORI CONNORS McGRODER, ESQ.
       For the Defendant
14     816 474-6550
15
16     ALSO PRESENT:
17      Adam DiCola, Videographer
18
19
20
21
22
23
24
25
```

```
                                                                    3
 1                    I N D E X
 2
 3
 4     WITNESS                       DIRECT
 5     PROFESSOR MICHAEL TRIMBLE
 6
 7       Ms. McGroder                  6
 8
 9                    E X H I B I T S
10
11     NUMBER      DESCRIPTION              PAGE
12     TRIMBLE
13
14     Exhibit 1    Declaration              37
15     Exhibit 2    Aid memoir               37
16     Exhibit 3    Fromson letter           40
17     Exhibit 4    Table 15 & pg 37 of report  89
18     Exhibit 5    Table 7.20               95
19     Exhibit 6    Graphic                  97
20     Exhibit 7    Article                 112
21     Exhibit 8    Literature              113
22     Exhibit 9    Notes                   117
23
24
25
```

```
                                                                    4
 1          E X H I B I T S, continued.
 2
 3     NUMBER      DESCRIPTION              PAGE
 4     TRIMBLE
 5
 6     Exhibit 10   Expert reports          128
 7     Exhibit 11   Gabapentin papers       129
 8     Exhibit 12   Questionaire            130
 9     Exhibit 13   Re GABA receptors       132
10     Exhibit 14   PubMed article          134
11     Exhibit 15   Questionaire            140
12     Exhibit 16   APA Guidelines          214
13     Exhibit 17   Cato's medical records  286
14     Exhibit 18   McComb's records        311
15
16
17
18
19
20
21
22
23
24
25
```

**89**

1  I mean, there is a whole host of data that will
2  tell you that elderly people are much more
3  susceptible to the effects of drugs.
4      Q   To the effects of drugs that cross
5  into the blood brain barrier?
6      A   Drugs that cross the blood brain
7  barrier, that's correct.
8      Q   I just want to make sure I understand
9  your opinions in this Smith case.
10         MS. McGRODER:  You know what, let's
11     go ahead and mark this as Exhibit 4 to the
12     deposition.
13         (Exhibit 4 marked for
14     identification.)
15         MS. McGRODER:  We are marking as
16     Exhibit 4, two pages that were among the
17     materials that you brought with you here
18     today.  The first page is Table 15 and the
19     second page is a single page 37 of your
20     original general causation report.
21  BY MS. McGRODER:
22      Q   Is that accurate?
23      A   That's correct.
24      Q   Do you know what study this Table 15
25  or what document this Table 15 comes from?

**90**

1         MR. FINKELSTEIN:  It says it right on
2     there.  Research report, that's what it --
3     RR 720.
4         MS. McGRODER:  Right.  I'm asking
5     Dr. Trimble.
6         MR. FINKELSTEIN:  Sorry.
7      A   Oh, well, if you to go my original
8  deposition, Mr. Hooper questioned me about
9  this, and you will find the precise
10 documentation there.
11     Q   Okay.  Is that a single study, or is
12 that an analysis of multiple studies,
13 randomized controlled studies for Gabapentin,
14 do you know?
15     A   The one you're looking at?
16        (Reporter clarification.)
17     A   That's correct.  If you read the
18 heading, it is placebo controlled studies
19 looking at the effect of dose on side effect.
20     Q   Do you know whether this research
21 report relates to studies in epilepsy or
22 studies in pain?
23     A   My understanding is the majority of
24 those trials are in epilepsy, but they do
25 include some pain.

**91**

1      Q   Do you happen to know the date of
2  this document?
3      A   This is all to do with the generic
4  case, and I haven't come here to answer the
5  generic case.  You have all of the --
6          MR. FINKELSTEIN:  She just wants to
7     know do you know the date of that.
8      A   No.
9          MR. FINKELSTEIN:  That's all, just
10     answer her question.
11     Q   Well, Professor Trimble, you brought
12 this with you here today; right?
13     A   Uhm --
14     Q   Let's just -- let's just be clear on
15 the record, this is something you brought with
16 you here today that you said had significance
17 to your Smith opinion.  So does it or doesn't
18 it?
19     A   And I want to make something clear.
20 I have pointed out that that was here
21 already, although I did select it out from some
22 other materials, because I wanted just to
23 remember some things.  And in case you asked me
24 about causality, I wanted to point out that
25 there is a causal dose effect relationship

**92**

1  between taking Gabapentin and the emergence of
2  a psychiatric disorder, depression.
3          And that is very relevant to the issue of
4  causality, generally.
5          Now, how does that relate to the Smith
6  case?  We're dealing here with a single case,
7  so if we have an established generic case, then
8  that obviously has bearing on the Smith case,
9  as an individual within the overall context of
10 the effects of Gabapentin.
11     Q   Did Mr. Smith have depression?
12         MR. FINKELSTEIN:  When?
13 BY MS. McGRODER:
14     Q   Ever?
15     A   My belief is it's possible, but I do
16 not know.  I do not know.
17     Q   At any time after March 9, 2004 was
18 Mr. Smith diagnosed with depression?
19     A   Well, I don't wish to be obscure
20 about this.  The reports are quite varied, and
21 some people, I read yesterday, in these --
22     Do we have some music?
23         MS. McGRODER:  Let's go off the
24     record.
25         THE VIDEO OPERATOR:  We are going off

**93**

1  the record, the time is 11:04 a.m.
2  (Off the record.)
3  THE VIDEO OPERATOR: Please standby.
4  We are back on the record, the time
5  is 11:13 a.m.
6  BY MS. McGRODER:
7  Q  Professor Trimble, before we were
8  interrupted and took a break, we were
9  discussing your opinion about dose response
10  relationship as part of your general causation
11  opinion; correct?
12  A  Correct.
13  Q  Other than the fact that that is
14  information that you use to come to the
15  conclusion that Neurontin is capable of causing
16  suicide, in your opinion, does that information
17  have particular relevance to the Smith matter?
18  A  No.
19  Q  Are you aware, Dr. Trimble, that
20  depression was reported as higher on placebo
21  than Gabapentin in the combined data from all
22  randomized controlled studies on Gabapentin?
23  A  This has to do with the generic case,
24  and I'm not prepared to go back over those
25  data, because I haven't reviewed them recently.

**94**

1  Q  So you're not aware that depression
2  was reported higher on patients in placebo than
3  on patients in Gabapentin, when you combined
4  all of the data on all the randomized
5  controlled trials for Gabapentin?
6  MR. FINKELSTEIN: Objection.
7  THE WITNESS: As I sit here, where
8  are those data?
9  BY MS. McGRODER:
10  Q  Have you ever looked at those data?
11  A  In the past, I have looked at the
12  data which has been sent to me, but it's not at
13  the forefront of my mind. And it's not
14  relevant to the Smith case.
15  Q  So would it be fair to say that your
16  opinion about dose response relationship, apart
17  from its use to derive a general causation
18  opinion, has no relevance to the Smith case?
19  A  Correct.
20  MS. McGRODER: I'm marking -- are you
21  ready? I'm marking a review and
22  evaluation of clinical data by Sharon
23  Hertz of the FDA, dated May 24, 2002 as
24  Exhibit 5 to your deposition.
25  (Exhibit 5 marked for

**95**

1  identification.)
2  BY MS. McGRODER:
3  Q  Can you please take a look at that.
4  A  (Reviewing document.)
5  Q  If you see, Professor Trimble, about
6  a quarter of the way down on Table 7.20, there
7  is an entry for depression.
8  Do you see that?
9  A  I do.
10  Q  And if you look at the, "All
11  Neuropathy" Gabapentin data, the number for
12  depression is 1.3; correct?
13  A  That is correct.
14  Q  And if you go two columns over for
15  all neuropathy data, the placebo number is 2.2;
16  correct?
17  A  Ah --
18  Q  For depression?
19  A  That is correct.
20  Q  And so you see that depression is
21  reported as higher in patients on placebo in
22  the neuropathy data than on Gabapentin;
23  correct?
24  A  That is correct.
25  Q  Okay. And in the fourth column over,

**96**

1  you see the epilepsy Gabapentin number for
2  depression.
3  Do you see that, it's 1.8?
4  A  That is correct.
5  Q  That's reported in the package
6  insert; correct?
7  A  That is correct.
8  Q  And for placebo that number is 1.1;
9  correct?
10  A  That is correct.
11  Q  And that difference between 1.8 and
12  1.1 is not statistically significant; is that
13  correct?
14  MR. FINKELSTEIN: Objection.
15  THE WITNESS: I have no idea.
16  BY MS. McGRODER:
17  Q  If you -- you've never, you've never,
18  you've never looked to see whether the
19  difference reported on depression between
20  Gabapentin and placebo in epilepsy patients has
21  statistical significance?
22  MR. FINKELSTEIN: Objection.
23  THE WITNESS: No.
24  BY MS. McGRODER:
25  Q  Did you ask Dr. Hesdorffer if the

```
                                                            342
IN THE UNITED STATES DISTRICT COURT
  FOR THE DISTRICT OF MASSACHUSETTS                 I N D E X
           Continued
IN RE:             Videotape              WITNESS              DIRECT
NEURONTIN MARKETING, SALES  :  Deposition of:   PROFESSOR MICHAEL TRIMBLE
PRACTICES AND PRODUCTS      :
LIABILITY LITIGATION        :  MICHAEL TRIMBLE    Ms. McGroder          344
                            :
----------------------------                        E X H I B I T S
THIS DOCUMENT RELATES TO:
Smith, et al. v Pfizer, et al.            NUMBER    DESCRIPTION         PAGE
Case No. 05-cv-11515-PBS                  TRIMBLE

    TRANSCRIPT of testimony as taken by and
before PATRICIA A. SANDS, a Shorthand Reporter  EXHIBIT 19   Shell report         352
and Notary Public of the States of New York and EXHIBIT 20   Neurogurgical records  399
New Jersey, at the offices of Lanier Law Firm,  EXHIBIT 21   UMC notes            404
126 East 56th Street, New York, New York, on    EXHIBIT 22   Juurlink article     455
Wednesday, September 3, 2008, commencing at     EXHIBIT 23   Police report        482
9:16 in the forenoon.                           EXHIBIT 24   Medical examiner's report 489
    REPORTING SERVICES ARRANGED THROUGH:        EXHIBIT 25   Suicide note         497
    VERITEXT/NEW JERSEY REPORTING COMPANY       EXHIBIT 26   Photo                508
      25B Vreeland Road, Suite 301              EXHIBIT 27   Wood letter          539
      Florham Park, New Jersey 07932
 Phone: (973) 410-4040    Fax: (973) 410-1313
```

```
                                            341                                              343
 1   A P P E A R A N C E S:                      1    P R O F.  M I C H A E L  T R I M B L E,
 2                                               2    Institute of Neurology
 3   FINKELSTEIN & PARTNERS                           Queen Square
     436 Robinson Avenue                         3    London  WCIN3CB,
 4   Newburgh, New York 12550                         having been previously sworn, was
     BY:  ANDREW G. FINKELSTEIN, ESQ.            4    examined and testified as follows:
 5   For the Plaintiff                           5
     800 634-1212                                6        THE VIDEO OPERATOR:  Please standby.
 6                                               7        We are on the record.  My name is
 7   THE LANIER LAW FIRM                         8    Adam DiCola of Veritext Corporate
     Tower 56                                    9    Services.  The date today is September 3,
 8   126 East 56th Street, 6th Floor            10    2008, and the time is approximately
     New York, New York 10022                   11    9:16 a.m.  This deposition is being held
 9   BY:  KENNETH SOH, ESQ.                     12    in the office of Lanier Law Firm, located
     For the Plaintiff                          13    at 126 East 56th Street, New York, New
10   212 421-2800                               14    York.
11                                              15        The caption of this case is Smith, et
     SHOOK, HARDY & BACON, LLP                  16    al., versus Pfizer, et al., in the United
12   2555 Grand Boulevard                       17    States District Court, District of
     Kansas City, Missouri 64108-2613           18    Massachusetts, Case Number
13   BY:  LORI CONNORS McGRODER, ESQ.           19    05-CV-11515-PBS.
     For the Defendant                          20        The name of the witness is Professor
14   816 474-6550                               21    Michael Trimble.
15                                              22        At this time the attorneys will
16                                              23    identify themselves and the parties they
17   ALSO PRESENT:                              24    represent, after which our court reporter,
18    Adam DiCola, Videographer                 25    Patricia Sands, will swear in the witness
```

**528**

1  through it, if you like.
2      Q   Well, I'm just trying to understand
3  why the lists are different, because I really
4  need to know what you did for purposes of your
5  differential diagnosis in this case.
6      A   Well, I think --
7      Q   So should I, should I understand that
8  your differential diagnosis is as set forth in
9  your report?
10     A   Correct.
11     Q   And nothing else?
12     A   Correct.
13     Q   So the list you created on page 12
14  does not contain any opinions that you have in
15  the Smith case in terms of what should or
16  shouldn't go on the differential diagnosis
17  list?
18     A   Correct.
19     Q   And is there a reason why you put
20  dementia on this list on page 12, but you did
21  not put dementia on your list in your report at
22  page 11?
23     A   Dementia is clearly in my report.
24     Q   Not on page 11.
25     A   Well, maybe you should turn to

**529**

1  page 12.
2      Q   Well, we are talking about page 11.
3  On page 11 of your report, if you recall
4  yesterday you told me that this is how you did
5  your differential diagnosis, and these are the
6  4 highest risk factors for suicide.
7      A   Well, the differential diagnosis is
8  on page 12.  And we went through that
9  yesterday.
10     Q   Okay, so --
11     A   And at the top is dementia.
12     Q   Okay.  So you considered dementia as
13  part of your differential diagnosis?
14     A   I did.
15     Q   You just don't consider dementia as
16  one of the top four highest risk factors --
17  So you considered dementia in terms of
18  your differential diagnosis?
19     A   Correct.
20     Q   But you did not consider dementia one
21  of the top 4 highest risk factor for suicide as
22  represented on page 11 of your report?
23     A   Correct.
24     Q   Okay, I'm with you now.
25     A   That's correct.

**530**

1      Q   Looking at the risk factors that you
2  put in your report on page 11.
3      A   Yes.
4      Q   I want to ask you, Professor Trimble,
5  is living alone a higher risk factor for
6  suicide than saying I wish I could die because
7  of pain?
8          MR. FINKELSTEIN:  Objection.
9          THE WITNESS:  I have no idea if
10     anybody has done a comparative study.
11  BY MS. McGRODER:
12     Q   Okay.  Let me ask it this way:  Is
13  living alone a higher risk factor for suicide
14  than suicidal ideation?
15     A   I do not know if anybody has done a
16  study to look at the different frequencies of
17  those two.
18     Q   In the suicide literature, is suicide
19  ideation a risk factor for suicide?
20     A   It is.
21     Q   And is it addressed more often than
22  living alone?
23     A   Addressed by whom?
24     Q   In the literature, is it addressed
25  more often as a high risk factor for suicide

**531**

1  than it is living alone?
2      A   It would be, yes.
3      Q   Is living alone a higher risk factor
4  for suicide than hopelessness?
5      A   I do not know.
6      Q   Is living alone a higher risk factor
7  for suicide than severe chronic pain?
8      A   I do not know.
9      Q   Is living alone a higher risk factor
10  for suicide than a prior diagnosis of
11  depression with suicidal ideation?
12     A   I do not know.
13     Q   Do you think it would be?
14     A   I prefer not to guess.
15     Q   Well, does the literature discuss
16  depression as the highest risk factor for
17  suicide?
18     A   It is depression, with -- I think you
19  said depression with suicidal ideation.
20     Q   Yes.
21     A   So I would accept that as probably
22  greater on the list than living alone.
23     Q   There is no evidence in this case, is
24  there, Professor Trimble, that Mr. Smith had a
25  history of aggressive behavior?