# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------------------x
:       MDL Docket No. 1629
In re:   NEURONTIN MARKETING,            :
       SALES PRACTICES AND            :       Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION  :
:       Judge Patti B. Saris
----------------------------------------------------------------x
:       Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                :
:
*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS   :
:
----------------------------------------------------------------x

**[PROPOSED]**
**AMENDED PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL**
**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND**
**PLAINTIFF'S FURTHER STATEMENT OF MATERIAL FACTS**

**I.      PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Mrs. Bulger's primary care physician, Dr. Crognale's testified that his decision to prescribe Neurontin was based on his own experience with the drug and his medical training.

Response:

      Disputed.  Plaintiff submits that paragraph 1 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Crognale testified that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug. Crognale Dep. 16:17-17:13 (Finkelstein Decl., Ex. 10).  Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label. Crognale Dep. 37:3-18 (Finkelstein Decl., Ex. 10).  Dr. Crognale, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin) Crognale Dep. 195:12- 196:6 (Finkelstein Decl., Ex. 10); (b) suicide attempts during clinical trials Crognale Dep. 191:11-17 (Finkelstein Decl., Ex. 10); (c) depression adverse events during clinical trials Crognale Dep. 197:4-198:2 (Finkelstein Decl., Ex. 10); and (d) that patients taking Neurontin may suffer mood and behavioral disturbances. Crognale Dep. 200:5-200:14 (Finkelstein Decl., Ex. 10).

      2.      Dr. Crognale testified that he recalled receiving a visit from one of defendant sales representatives sometime within the last five years regarding Neurontin in which the side effects of sedation and dosing were discussed. Dr. Crognale could not recall to what indication this conversation related.

Response:
      Disputed. Plaintiff submits that paragraph 2 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Crognale testified that he recalled receiving information directly from a representative at either Warner-Lambert, Parke-Davis or Pfizer about Neurontin. Crognale Dep. 166: 24-167:4 (Finkelstein Decl., Ex. 10). Dr. Crognale testified that his only recollection of information from a drug representative directly was a conversation in which the side effects of sedation and dosing were discussed. Dr. Crognale could not recall to what indication this conversation related. However, Dr. Crognale testified that he was sure that there were other discussions. Crognale Dep. 169:18-169:20 (Finkelstein Decl., Ex. 10). Dr. Crognale testified that the "the exchange would have been in context of the representative telling us about the medication, and in discussion of side effects making an emphasis that this was one side effect that improved counter-intuitively with dose." Crognale Dep. 169:5-10 (Finkelstein Decl., Ex. 10).

      3.      Dr. Crognale's decision to prescribe Neurontin to Mrs. Bulger "did not have anything to do with anything any representative of Pfizer, Warner- Lambert or Parke-Davis told [him]."

Response:
      Disputed. Plaintiff submits that paragraph 3 of Defendants' Statement of Facts is incorrect or otherwise incomplete. As to his reliance on, or influence by a representative, Dr. Crognale's prescribing decisions take into consideration medical knowledge, and "decisions made medically are not simply about pharmacokinetics, they're about patients, and so I don't think that I can be directed by somebody that only knows the pharmacology of the medication." Crognale Dep. 172:15-20 (Finkelstein Decl., Ex. 10). Dr. Crognale did not state that he did not consider what a sales representative advised regarding pharmacokinetics in arriving at his determination to prescribe a medication. Crognale Dep. 171:10-20 (Finkelstein Decl., Ex. 10). Dr. Crognale testified generally that he had received and accepted from pharmaceutical representatives offers to go to dinner, that he was compensated for attending dinner symposiums sponsored by a representative where there would be discussion of "problem-based" or "drug-based" data. Crognale Dep. 188:1-189:11 (Finkelstein Decl., Ex. 10).

      4.      Dr. Crognale could not recall any studies he relied on in prescribing Neurontin for pain.

Response:
      Disputed. Plaintiff submits that paragraph 4 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Crognale stated that there were non-randomized control trials that provided him with a basis to prescribe Neurontin. Crognale Dep. 182:18-23

2

(Finkelstein Decl., Ex. 10). Dr. Crognale read journal articles that laid the foundation for his Neurontin prescriptions, but he would be unable to go back and find these articles because generally discards them. Crognale Dep. 183:7-184:2 (Finkelstein Decl., Ex. 10).

     5.    Dr. Crognale does not make his prescribing decision based on what a pharmaceutical company sales representative tells him.

Response:
     Disputed. Plaintiff submits that paragraph 5 of Defendants' Statement of Facts is incorrect or otherwise incomplete. As to his reliance on, or influence by a representative, Dr. Crognale's prescribing decisions take into consideration medical knowledge, and "decisions made medically are not simply about pharmacokinetics, they're about patients, and so I don't think that I can be directed by somebody that only knows the pharmacology of the medication." Crognale Dep. 172:15-20 (Finkelstein Decl., Ex. 10).

     Dr. Crognale did not state that he did not consider what a sales representative advised regarding pharmacokinetics in arriving at his determination to prescribe a medication. Crognale Dep. 171:10-20 (Finkelstein Decl., Ex. 10.) Dr. Crognale testified generally that he had received and accepted from pharmaceutical representatives offers to go to dinner, that he was compensated for attending dinner symposiums sponsored by a representative where there would be discussion of "problem-based" or "drug-based" data. Crognale Dep. 188:1-189:11 (Finkelstein Decl., Ex. 10).

     6.    Dr. Goldman testified that he does not recall ever having a conversation with a Pfizer or Parke-Davis sales representative about Neurontin.

Response:
     Undisputed; however, Dr. Goldman did not recall having "specifically any conversations specific to Neurontin" with defendants sales representatives. Goldman Dep. 48:10-14 (Finkelstein Decl., Ex. 11).

     7.    Dr. Goldman prescribed Neurontin based on his colleagues' experience and the benefits and risks to particular patients.

Response:
     Disputed. Plaintiff submits that paragraph 7 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Goldman testified he utilized, inter alia, both the PDR and an online formulary reference called EPOCRATES for information in regard to prescribing. Goldman Dep. 17:15-18:10 (Finkelstein Decl., Ex. 11). Dr. Goldman, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin) Goldman Dep. 178:12-19, 197:2-17 (Finkelstein Decl., Ex. 11); (b) suicide attempts

3

during clinical trials Goldman Dep. 182:8-184:5 (Finkelstein Decl., Ex. 11); (c) depression adverse events during clinical trials.  Goldman Dep. 183:13-184:5 (Finkelstein Decl., Ex. 11).

      8.     Dr. Goldman does not recall reading any medical articles related to Neurontin or attending conference where Neurontin was discussed.

Response:

     Disputed.  Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Goldman stated that although journals and medical articles relating to Neurontin did not initially lead to him prescribing it for pain, subsequently he did read such articles. Goldman Dep. 203:14-204:3 (Finkelstein Decl., Ex. 11).  Goldman was not able to specifically identify such articles. Goldman Dep. 204:22-205:1 (Finkelstein Decl., Ex. 11).

4

## II.  PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1. Dr. Crognale provided Neurontin to Ms. Bulger for her for chronic pain related to rheumatoid arthritis, as well as for anxiety and depression – all off-label, unapproved uses (Finkelstein Decl., Ex. 10, at 66:23–67:22, 130:22–131:6, 157:1–158:3, 165:11-165: 14; *but see* 165:17–165:20).

2. Prior to Ms. Bulger's death, Defendants actively promoted Neurontin to Susan Bulger's physicians via direct sales representative detailing to the doctors' offices.  Although Defendants acknowledge it was inappropriate to detail physicians other than Neurologists and Epileptologists (Finkelstein Decl., Ex. 12, at 45:8-45:25; *see* Finkelstein Decl., Ex. 13, at 009942).

3. Prior to Ms. Bulger's death, Defendants detailed Ms. Bulger's prescriber, Dr. Dino Crognale, who was a general family medicine doctor (Finkelstein Decl., Ex. 10, at 169:3-170:23).

4. Dr. Crognale did not recall all specific facts regarding sales detailing about Neurontin at his office by Defendants' sales representative (Finkelstein Decl., Ex. 10, at 170:12-170:23).

5. Defendants detailed Ms. Bulger's prescriber, Dr. Richard Goldman, an internist (Finkelstein Decl., Ex. 11, at 13:1-13:5).

6. Dr. Goldman acknowledged direct contact with Defendants' sales representatives, but could not recall specific discussions (Finkelstein Decl., Ex. 11, at 48:10-50:23).

7. Dr. Goldman acknowledged his attendance at conferences, Finkelstein Decl., Ex. 11, at 15:20-16:4; his consideration of journals; discussions with colleagues; and his review of drug labels via the PDR or online EPOCRATES (Finkelstein Decl., Ex. 11, at 16:8-19:3, 35:7-36:5, 41:16-41:20).

8. Dr. Crognale explained that he relied upon the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug (Finkelstein Decl., Ex. 10, at 16:17-17:13).

9. Dr. Crognale's practice is to discuss the side effects relevant to his patients as set forth in a drug company's label (Finkelstein Decl., Ex. 10 at 37:3-37:18).

10. Dr. Goldman testified he utilized both the PDR and an online formulary reference called EPOCRATES Rx (Finkelstein Decl., Ex. 11, at 17:15-18:10).

11. Dr. Crognale expressly indicated that his bases for prescribing Neurontin included (a) his communication with the medical community; (b) discussions with colleagues at symposiums; (c) consideration of medical journals (Finkelstein Decl., Ex. 10, at 180:14-186:5).

5

12.     Both Dr. Crognale and Dr. Goldman, in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Ms. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin) (Finkelstein Decl., Ex. 10, at 195:12-196:6; Finkelstein Decl., Ex. 11, at 178:12-178:19; Finkelstein Decl., Ex. 11, at 197:2-197:17); (b) suicide attempts during clinical trials (Finkelstein Decl., Ex. 10, at 191:11-191:17; Finkelstein Decl., Ex. 11, at 182:8-184:5); (c) depression adverse events during clinical trials, Finkelstein Decl., Ex. 10, at 197:4-198:2 (Finkelstein Decl., Ex. 11, at 183:13-184:5); and (d) that patients taking Neurontin may suffer mood and behavioral disturbances (Finkelstein Decl., Ex. 10, at 200:5-200:14).

13.     Doctors Crognale and Goldman were detailed and had direct contact with Defendants' sales representatives who never disclosed depression/suicidality as a risk with Neurontin (Finkelstein Decl., Ex. 14, at 19:13-20:15, 21:4-21:7).

14.     Defendants did not disclose to Ms. Bulger's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality.

15.     Defendants did not disclose to Ms. Bulger's prescribing medical providers that Neurontin usage increased the risk of depression and/or suicidality.

16.     Defendants did not disclose to Ms. Bulger's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts.

Defendants' Fraudulent Suppression

17.     In 1992, the U.S. Food & Drug Administration (FDA) evaluated Neurontin's use for Defendants' sought after epilepsy indication, and FDA advised Defendants that patients ingesting Neurontin may suffer worsening depression that may "require intervention or lead to suicide, as it has resulted in some suicide attempts." Finkelstein Sur-Reply Decl., Ex. 2 at p. 10. Finkelstein Decl., Ex. 4, at 0084477.

18.     Since at least 1992, Defendants knew that Neurontin was associated with depression/suicidality, yet Defendants suppressed this negative information while promoting Neurontin's safety and efficacy for off-label uses. In doing so, Defendants failed to provide adequate written depression/suicidality information in Defendants' Neurontin package insert (the "Label"), such as a "Dear Doctor" Letter. Even a single report of an adverse event during the postmarketing phase of a drug can trigger the need for a "Dear Doctor" Letter. For example, in October 2008, the Genentech drug company, which manufactures Raptiva®, issued a "Dear Doctor Letter" because of one reported case of progressive multifocal leukoencephalopathy (PML), a rare central nervous system disease, that was reported with use of Raptiva®. Finkelstein Decl., Ex. 5.

19.     Since 1992, Defendants knew of FDA's concern about Neurontin's association with depression and suicidality, albeit in the context of  Neurontin's on-label indication for

Epilepsy.  In 1992, Defendants' own ranking members of their Regulatory Department, including Dr. Richard Spivey, then Senior Director of Regulatory Affairs, and Janeth Turner, then Director of Regulatory Affairs, knew of the FDA's concern over Neurontin's association with suicidality as set forth in FDA's Combined Medical-Statistical Review (the "FDA Clinical Review").  Finkelstein Decl., Ex. 6.

20. On December 7, 1992, Ms. Turner provided the FDA 1992 Clinical Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development.  Finkelstein Decl., Ex. 7, at p. 375:17-22, pp. 379-381.

21. Ms. Turner was also a member of the Drug Development Team and New Product Committee whose stated purpose was to explore new uses for Neurontin beyond the epileptic population.  Finkelstein Decl., Ex. 7, at p. 382:7-14.

22. FDA prepared a Combined Medical-Statistical Review of Neurontin and stated "[D]epression, while it may [not be] an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts."  Finkelstein Sur-Reply Decl., Ex. 2 at p. 10; Finkelstein Decl., Ex. 4, at 0084477.

23. In 1995, Defendants retained consultant—and now Plaintiffs' expert in this case—Michael Trimble, M.D., who provided Defendants a paper entitled, *Psychosis with Gabapentin*.  Dr. Trimble advised that "anticonvulsant drugs influence the mental state, and this can be broken down into adverse and beneficial effects . . . . The main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression."  *See* Finkelstein Sur-Reply Decl., Ex. 3 at p. 6.

24. Defendants knew Neurontin's mechanism of action contributes to depression and suicidality, because Neurontin reduces the release of excitatory neurotransmitters (e.g., serotonin) in the brain.  *See* Finkelstein Sur-Reply Decl., Ex. 4 at 0075642 ("Neurontin treatment may shift the relative balance of neurotransmitters from excitatory to inhibitory); Finkelstein Sur-Reply Decl., Ex. 5 at 0010853 ("In addition to reducing neurotransmitter release, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro"); Finkelstein Sur-Reply Decl., Ex. 6 at 0005343 ("Inhibition of Neurotransmitter Release"); Finkelstein Sur-Reply Decl., Ex. 7 at 115776 (1993 Product Monograph states "Neurontin slightly reduces the release of monoamine neurotransmitters in vitro"); Finkelstein Sur-Reply Decl., Ex. 8 at pp. 13, 294-298, 300 (Deposition of Defendants' witness Leslie Tive, Medical Director, Team Leader for Neurontin (7/19/06)): "Q. Do you have any degrees? A. I do. Q. And what are your degrees? A. I have a Ph.D. in biopsychology with a specialization in neuropharmacology. Q. Okay. Would you agree that there are drugs sold by Pfizer that are utilized by patients to affect neurotransmitters in the brain? A. Yes. . . . Q. And as a neuropharmacologist, you understand what dopamine is, right? A. Yes. Q. You understand what serotonin is, right? A. Yes, I do. . . .  Q. And when you reference serotonin, what is serotonin? A. It's another neurotransmitter. Q. Miss Tive, do you have an understanding as to whether an increased amount of serotonin or a decreased amount of serotonin in the brain can be associated with depression? A. An increase or decrease of serotonin in the brain can be associated with depression. . . . . Q. Let's talk about clinical depression. All

right. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine? A. You're saying monoamines in general? Q. Correct. A. A reduction in monoamines has been associated with depression."); Finkelstein Decl., Ex. 8, at pp. 11-14**;** Finkelstein Decl., Ex. 9, at p. 3; Finkelstein Sur-Reply Decl., Ex. 2 at p. 9, ¶ 39.

25. Incidences of positive dechallenge/rechallenge psychiatric events have been documented in Defendants' own clinical trials for Neurontin. "If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge. A positive rechallenge refers to the reoccurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug. Finkelstein Sur-Reply Decl., Ex. 2 at p. 12, ¶ 53.

26. Since 1990, positive dechallenge/rechallenge reactions of depression were observed by Defendants' own investigators who rendered causal association assessments that the depression was probably related to Neurontin. Defendants' causal association assessment ranged from Definite, Probable, Possible, or of Unknown Relationship. Finkelstein Sur-Reply Decl., Ex. 2 at p. 13 n.37. Defendants utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin (Protocol 945-15), and not a Bradford-Hill assessment. The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear. *Id.* Additionally, Defendants' own investigator rendered a causal association assessment during a clinical trial pertaining to diabetic peripheral neuropathy that a suicide attempt and intentional overdose were "definitely related" to Neurontin. Finkelstein Sur-Reply Decl., Ex. 9 at p. 59. Also, Health Canada, the Canadian Regulatory authority equivalent to FDA, has stated the following to Pfizer regarding dechallenge/rechallenge findings related specifically to Neurontin and post-marketing psychiatric adverse events: "One suicide attempt was found to have positive dechallenge/rechallenge, indicating that this event was related to gabapentin. Finkelstein Sur-Reply Decl., Ex. 10.

27. Since 1990, Defendants' own clinical trials reflected that Acute Severe Depression and Suicidal Ideation were expected adverse events associated with Neurontin. See Finkelstein Sur-Reply Decl., Ex. 11. Clinical trials demonstrated associated psychiatric adverse drug experiences observed by Defendants' own investigators. Finkelstein Sur-Reply Decl., Ex. 12, at pp. 13-15.

28. During Defendants' own clinical trials prior to FDA approval for Neurontin's epilepsy indication, "Depression and Suicidal Ideation" was the ninth (9th) most common adverse reaction resulting in discontinuation of Neurontin. Finkelstein Decl., Ex. 4, at 0084444.

29. Defendants' own Epilepsy clinical trials performed as part of their New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. In the total exposed population of said New Drug Application, seventy-eight (78) patients reported depression as an adverse event (e.g., 5.3% of the population of patients). Finkelstein Decl., Ex. 4, at 0084447. There were seven (7) reports of depression as serious adverse events, and nine (9) patients who withdrew from studies because of depression. Finkelstein Decl., Ex. 4, at 0084462.

30. Defendants' own Epilepsy clinical trials, performed as part of their New Drug Application for Neurontin, reflected at least seven (7) cases of "Depression" adverse events that Defendants' own medical investigator considered possibly or probably related to Neurontin; there was observed at least two (2) cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator. Finkelstein Decl., Ex. 4, at 0084467-0084468.

31. Defendants' own clinical trials reflected that approximately twice as many Neurontin patients (compared to placebo patients) withdrew as a result of clinically-related psychobiologic events. Finkelstein Sur-Reply Decl., Ex. 2, at p. 9, ¶ 39.

32. Defendants possessed post-marketing adverse event reports through 2002, prior to any potential notoriety bias that Defendants relate to the publicity of this litigation, demonstrating an association of psychiatric adverse events, including depression and suicidality, with Neurontin use. A 'safety signal' clearly existed, particularly with off label uses. Finkelstein Sur-Reply Decl., Ex. 2, at pp. 175-182, ¶¶ 263-282; pp. 192-195, ¶¶ 313-323.

Dated: March 23, 2009                     Respectfully submitted,

                                          Finkelstein & Partners, LLP
                                          *Attorneys for Plaintiff Ronald J. Bulger, Sr.*


                                    By:   **/s/ Andrew G. Finkelstein**
                                          Andrew G. Finkelstein, Esquire
                                          Finkelstein & Partners, LLP
                                          1279 Route 300, P.O. Box 1111
                                          Newburgh, NY  12551


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 23, 2009.

                                          **/s/ Andrew G. Finkelstein**
                                          Andrew G. Finkelstein, Esquire