UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
In re:  NEURONTIN MARKETING,
        SALES PRACTICES AND
        PRODUCTS LIABILITY LITIGATION
------------------------------------------------------------x
THIS DOCUMENT RELATES TO:

*Smith v. Pfizer Inc.*, 1:05-11515-PBS
------------------------------------------------------------x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**PLAINTIFF'S SUR-REPLY MEMORANDUM IN FURTHER
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Ruth Smith respectfully submits this sur-reply memorandum in further opposition to the motion for summary judgment by Defendants Pfizer and Warner-Lambert.

**PRELIMINARY STATEMENT**

Defendants baldly presume that Plaintiff's statement in her earlier Memorandum, that she was not opposing those parts of Defendants' motion for summary judgment on Plaintiff's express warranty and Tennessee Consumer Protection Act claims, constitutes an "admission that she cannot prove these claims" and "is also fatal to her fraud claim, which obviously demands a higher level of proof." Defs.' Reply Mem. at 2, ECF Doc. # 1708.

In fact, Plaintiff did not oppose Defendants' motion on her express warranty claim because there was insufficient evidence that Defendants had made an express warranty to Mr. Smith; and Plaintiff did not oppose Defendants' motion on her TCPA claim because Plaintiff could not distinguish the case authority cited in Defendants' moving Memorandum holding that wrongful death claims are not cognizable under the TCPA. *See Kirksey v. Overton Pub, Inc.*,

804 S.W.2d 68, 73 (Tenn. Ct. App. 1990).  In contrast, here, there is sufficient evidence that affirmatively suppressed, concealed and failed to disclose information regarding depression/suicidality to Plaintiff's decedent, Richard Smith, and his prescribing physicians; and Defendants cannot deny that, under Tennessee law, Plaintiff may properly state a wrongful death cause of action based upon fraud.

I.     PLAINTIFF CAN ESTABLISH THE ESSENTIAL ELEMENT OF CAUSATION

    A.     There Is Sufficient Evidence That Inadequate Warnings Proximately Caused Mr. Smith's Suicide.

        1.     Defendants have failed to demonstrate an absence of evidence that Mr. Smith's physicians relied on the Neurontin label in prescribing the medication to him.

Defendants reiterate their earlier argument that under Tennessee's learned intermediary doctrine, Plaintiff has no evidence that either of Mr. Smith's prescribers, Dr. Mackey or Nurse Krancer, relied on the Neurontin label in prescribing Neurontin for Mr. Smith.

But there is sufficient evidence that the medical providers relied on the Neurontin label in prescribing Neurontin to Mr. Smith:  "5.  Dr. Mackey testified that he 'probably' read the Neurontin package insert 'a long time' before he prescribed Neurontin for Mr. Smith"; and "23. Nurse Krancer testified that she 'doesn't usually read the entire package insert.'"  Defs.' Local Rule 56.1 Statement, ¶¶ 5, 23 (emphasis added), ECF Doc. # 1643.

Whether what Mr.; Smith's medical providers "probably" or "usually" did or did not do in this case is subject to interpretation and raise genuine disputed issues of material fact that may not be resolved on a motion for summary judgment.  Defendants have therefore failed to "show that there is an absence of evidence to support the nonmoving party's position, and that such evidence, "view[ed] in the light most favorable to the non-moving party, [and] drawing all reasonable inferences in that party's favor," warrant granting Defendants' motion for summary

2

judgment on the issue of proximate cause.  *See McKenna v. First Horizon Home Loan Corp.*, 537 F. Supp. 2d 284, 287 (D. Mass. 2008); *Carter v. Symmes*, 2008 U.S. Dist. LEXIS 7680 at *5-6 (D. Mass. 2008) (emphasis added).

> **2. Defendants have failed to demonstrate an absence of evidence that different warnings would have changed Mr. Smith's health care providers' decision to prescribe Neurontin to him.**

Defendants also again argue that <u>no</u> evidence that different or additional warnings would have changed Dr. Mackey's or Nurse Krancer's decision to prescribe Neurontin to Mr. Smith in 2004.  In particular, Defendants argue that, "Dr. Mackey testified that he 'didn't know' whether he would have still prescribed Neurontin to Mr. Smith in 2004, McGroder Decl., Ex. 2 at 42:17-43:11, but that if Mr. Smith walked into his office today, he would prescribe Lyrica—a medication that was not available in 2004.  Sayler Decl., Ex. 7 at 92:16-93:2 (Statement of Fact ¶ 21)."  Defs.' Reply Mem. at 5-6.  But Dr. Mackey also testified that he was not aware of various important information concerning problems with Neurontin, depression and suicide, and that had he been told of these problems with Neurontin, he "probably" would have changed the way he treated Mr. Smith, and would have given Mr. Smith specific warnings and told him to be observant about side effects.  *See* Plaintiff's Responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and Plaintiffs' Further Statement of Material Facts, Further Statement, ¶¶ 15-22, re Learned Intermediary, ECF Doc. # 1678.  And Nurse Krancer testified that had Defendants told her that Neurontin was associated with increases in depression and suicide, she would have educated the patients on these potential side effects.  *See id.*, Plaintiff's Further Statement, ¶ 23.  Neither counsel for Plaintiff nor Defendants asked Nurse Krancer whether she would have prescribed Neurontin to Mr. Smith had she been given additional warnings.

Defendants contend that the testimony of Mr. Smith's medical providers is "speculative". On the contrary, under similar circumstances in *Forst v. SmithKline Beecham Corp.*, 2009 U.S. Dist. LEXIS 19415 (E.D. Wis. Mar. 11, 2009), the court recently explained:

> GSK asserts that the plaintiffs fail to show that Dr. Todd would have refrained from prescribing Paxil if given a different warning, which the plaintiffs must do to sustain their claims. GSK points to Dr. Todd's testimony that his decision to prescribe Paxil to Mr. Forst was appropriate.  However, when all the evidence is viewed in the light most favorable to the plaintiffs, a reasonable jury could conclude that Dr. Todd would not have prescribed Paxil if warned about increased suicidality.  There is evidence in the record showing that Dr. Todd made changes to his prescribing habits after learning new information about the suicide risks of SSRI's like Paxil:
>
> * * *
>
> . . . Finally, GSK repeatedly notes that Dr. Todd testified that he would not have changed his decision to prescribe Paxil to Mr. Forst. ... However, when the cited testimony is reviewed, the statements are less conclusive than GSK asserts. Dr. Todd responds only that he "doubts" information about Paxil's increased risk of suicidality would have changed his behavior and that he "doesn't know" whether he would want to change his behavior after viewing information about Paxil's suicide risk. ... Thus, a genuine issue of fact exists regarding whether Dr. Todd would have prescribed Paxil if given warnings about risks of increased suicidality in patients."

*Id.* at *20-23.

Similarly, genuine issues of material fact exist regarding whether Dr. Mackey and Nurse Krancer would have prescribed Neurontin to Mr. Smith if given warnings about the risks of increased suicidality in patients taking Neurontin, and Defendants have failed to demonstrate that there is no evidence that different warnings would have changed Mr. Smith's medical providers' decisions to prescribe Neurontin to Mr. Smith.

> **3.    Defendants have failed to demonstrate an absence of evidence that Mr. Smith ingested Neurontin at a time temporally related to his suicide.**

What constitutes "temporally related" clearly varies from patient to patient. It is therefore understandable that neither Dr. Maris nor Prof. Trimble provided a specific time period when Neurontin could continue to affect the brain chemistry of patients. Defendants note that when Mrs. Smith produced Neurontin samples in her possession, none of the samples had been opened, no pills had been pushed through the blister packs and no pills were missing. But this does not prove that there were not whole blister packs of Neurontin from which Mr. Smith had ingested the Neurontin and then discarded the empty blister packs. Defendants' repeated suggestion that Plaintiff must offer testimony of an eyewitness who saw Mr. Smith actually popping Neurontin into his mouth during the three days prior to his suicide is also unsupported by any authority. Although Defendants question the testimony of Mrs. Smith and the letter written by Dr. Wood, both witnesses will be subject to cross-examination by Defendants at trial in Tennessee. Finally, that Defendants cite no legal authority in reiterating these arguments demonstrates that these are all genuine issues of material fact for the jury at trial, which may not be resolved on a motion for summary judgment.

> **C.    Plaintiff Has Sufficient Admissible Evidence on the Issue of Specific Causation and Can Satisfy Her Burden of Proving Proximate Cause.**

Plaintiff respectfully refers the Court to the arguments set forth in Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment, ECF Doc. # 1677 at 5-6, Plaintiff's Memorandum in Opposition to Defendants' Motion to Exclude Plaintiff's Experts, Dr. Maris and Prof. Trimble, ECF Doc. # 1671, and Plaintiff's Sur-Reply Memorandum in Further Opposition to Defendants' Motion to Exclude Plaintiff's Experts, filed herewith.

## II. THERE IS SUFFICIENT EVIDENCE TO SUPPORT PLAINTIFF'S BREACH OF IMPLIED WARRANTY CLAIM

As discussed in Plaintiff's earlier Memorandum, there is evidence that Mr. Smith, while he was taking Neurontin, had searched the Internet for information concerning Neurontin, and found information that Neurontin was extremely powerful, with numerous side effects. Finkelstein Decl., Ex. 1, ECF Doc. # 1679-2.  This is evidence that Mr. Smith relied on information disseminated by Defendants concerning the safety and effectiveness of Neurontin for treating his pain, and continued to take Neurontin to treat his pain based upon his reliance upon such information.  Defendants counter by arguing that, "It is more likely that Mr. Smith may have stumbled across a lawyer advertisement sponsored by plaintiff's counsel's firm." Defs.' Reply Mem. at 11, ECF Doc. # 1708.  Clearly, whether it is "more likely" or not that Mr. Smith "may have" relied on information disseminated by Defendants or by some third party is a genuine issue of material fact that may not be resolved on a motion for summary judgment.

With regard to Defendants' reiteration of their argument that Plaintiff Ruth Smith failed to provide notice to Defendants prior to filing her suit, and that the notice provided by Plaintiff in commencing this action less than a year after her husband's death is not "reasonable," again, whether Plaintiff's notice was "reasonable" is a genuine issue of material fact that should not be resolved on a summary judgment motion.  *See* Pl.'s Mem. Opp., ECF Doc. # 1677 at 7.

## III. WHETHER BECAUSE OF DEFENDANTS' SUPPRESSION OF DEPRESSION/-SUICIDALITY INFORMATION, OR BECAUSE OF DEFENDANTS' AFFIRMATIVE MISREPRESENTATIONS, PLAINTIFF HAS RAISED TRIABLE ISSUES OF FACT REGARDING DEFENDANTS' FRAUD

### A. Plaintiff Is Not Alleging a Securities-Based Fraud on the Market Argument to Support Her Theory of Reliance.

Defendants misconstrue Plaintiff's theory of reliance in arguing that Plaintiff's theory is allegedly based upon a federal, securities-based, fraud-on-the-market theory, and that this theory is flawed and should be rejected.  Defs.' Reply Mem. at 14-16.

Plaintiff did not base her reliance on a securities-based fraud on the market theory.  That is Defendants' characterization of Plaintiff's theory.  Plaintiff did, however, base her theory of reliance in  part on the opinion of her marketing expert, Charles King III, Ph.D., who explained in his expert report how Defendants' extensive marketing of Neurontin for off-label uses influenced healthcare providers, such as Mr. Smith's medical prescribers, and how suppression of negative or adverse information about Neurontin would have affected their prescribing habits, even in the absence of a specific affirmative misrepresentation.  *See* Pl.'s Mem. Opp. at 18-19.

Defendants attempt to dismiss Dr. King's opinion on the grounds that he is not offering any specific opinion as to whether any of Mr. Smith's Neurontin prescriptions were caused by any misrepresentation.  *See* Defs.' Reply Mem. at 16 n.10.  However, the effect of Defendants' suppression is such that, as Dr. King opined:

> First, **a doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did.**  Second, all, or substantively all, doctors were indirectly affected by Pfizer's **suppression of negative or adverse information about Neurontin that would have affected their prescribing habits**.  [Emphasis added.]

Pl.'s Mem. Opp. at 19.  Thus, Plaintiff need not offer an expert opinion specifically as to whether Mr. Smith's prescriptions were caused by any misrepresentation.

### B.     There Is Sufficient Evidence on the Element of Causation.

Defendants again, as earlier in their Reply Memorandum, argue that Plaintiff lacks evidence that Mr. Smith's prescribers relied on information that was disclosed or that the allegedly omitted information would have affected the prescribing decision; and that Plaintiff

lacks evidence that had Defendants disclosed the allegedly omitted information, Mr. Smith's medical providers' prescribing decisions would have changed. Plaintiff respectfully refers the Court to the discussion of these issues at I.A.1. and I.A.2., *supra*.

Furthermore, the court in *Forst v. SmithKline Beecham Corp.*, 2009 U.S. Dist. LEXIS 19415, rejected defendant's similar argument:

> Though GSK made no direct representations to the plaintiffs, the plaintiffs based their decisions regarding Paxil on the information and advice of Dr. Todd. (G. Forst Dep., at 268:13-15). This information, in turn, was based upon GSK representations. Therefore, a genuine issue of material fact exists regarding whether Dr. Todd and the plaintiffs relied upon GSK's alleged misrepresentations.

*Id.* at *29.

Similarly, here, there is no question that Mr. Smith based his decision regarding Neurontin at least in part on the information and advice of his medical providers. To the extent that Defendants not merely omitted, but suppressed important information concerning Neurontin and suicidality that should have been provided to Mr. Smith's medical providers, and that Mr. Smith relied on the advice of his medical providers in taking the Neurontin, the information suppressed by Defendants so as not to be accessible to Mr. Smith's medical providers may also be deemed to have been suppressed as to Mr. Smith.

Defendants also argue that "plaintiff relies on a laundry list of information she claims Mr. Smith's prescribers "wanted to know" in prescribing the medication. *See* Pl. Opp. at 14."[1]

---

[1] Defendants assert that, "Moreover, in contravention of Local Rule 56.1, plaintiff does not include any of this information in her separate Statement where she purports to set forth the undisputed facts on which she relies." Defs.' Reply Mem. at. 16 n.11, ECF Doc. # 1708. However, in her Memorandum in Opposition at 10-13, ECF Doc. # 1677, Plaintiff did specifically refer to supporting documentation immediately following each of these allegations. Thus, Defendants are merely faulting Plaintiff for not having performed the simple word processing task of copying and pasting each of these allegations with references to supporting documentation, from Plaintiff's Memorandum in Opposition, to Plaintiff's Local Rule 56.1 Statement. Defendants do not and cannot argue that they had no opportunity to address Plaintiff's further allegations and are prejudiced by this alleged contravention of Local Rule 56.1. In any event, Defendants admit that this issue has been fully briefed in the general causation *Daubert* briefing. Defs.' Reply Mem. at 16, n.11.

Defendants cite *Nix v. SmithKline Beecham Corp.*, 2007 U.S. Dist. LEXIS 65860 (D. Ariz. Sept. 5, 2007), where plaintiff's prescribing physician testified that he "would have liked to have known more" about deaths associated with the drug Serevant, and the court held that "merely raising the possibility that [the prescriber] might have acted differently is not enough to satisfy Plaintiffs' burden of proof on causation." Id. at *9. The court in *Nix*, however, also refused to credit the prescriber's testimony that generally the lack of accurate information about potential side effects makes it difficult to perform a risk-benefit analysis. *Id.*

At his deposition, Dr. Mackey provided testimony that similarly indicates that the lack of accurate information about Neurontin and suicidality made it more difficult for him to perform a risk-benefit analysis:

> Q. When you are prescribing a medication, you have to determine in your professional opinion whether the benefits of that medication outweigh the risks for that particular patient; correct?
>
> A. Based on the information I have to me, I try to do what's best for my patient in any given circumstance.
>
> * * *
>
> Q. If you determine that the risks of a medication outweigh the benefits for a particular patient you'd stop prescribing it for that patient; correct?

---

Plaintiff is filing, as an exhibit to the Sur-Reply Declaration of Andrew G. Finkelstein, Esq., a [Proposed] Amended Plaintiff's Responses to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts and Plaintiffs' Further Statement of Material Facts, adding these further allegations with appropriate references to documentation supporting each allegation, as previously set forth in Plaintiff's earlier Memorandum, and with such documentation also filed as exhibits to the Finkelstein Sur-Reply Declaration, pursuant to Local Rule 56.1. Plaintiff respectfully requests that the Court accept the proposed Amended 56.1 Statement, if the Court deems it necessary. *See Schubert v. Nissan Motor Corp.*, 148 F.3d 25, 28 (1st Cir. 1998) (where in response to defendant's motion, plaintiffs argued without citation to the record, district court was not satisfied and issued order requiring plaintiffs to comply with Local Rule 56.1, and explicitly address causation and show what admissible evidence will be offered to support plaintiff's theory of causation); *Richards v. City of Lowell*, 472 F. Supp. 2d at 56 ("The Rule does not dictate a particular format that an opposing party must follow in order to demonstrate which asserted facts are in dispute"); *Crabowski v. Bank of Boston*, 997 F. Supp. 1111 (D. Mass. 1997) (where only one of many plaintiffs filed a Local Rule 56.1 Statement formally disputing the facts submitted by defendant in its motion for summary judgment, and other plaintiffs relied on their own statements of fact made in support of their own summary judgment motions to dispute defendant's statement, this Court held that under the circumstances the Court would decline to deem defendant's facts to be admitted pursuant to Local Rule 56.1).

>A. That's correct.

* * *

>Q. When you prescribe a drug like that, do you do what's called risk-benefit analysis?
>
>A. Probably not formally, like you're talking about, but clearly any treatment that I undertake, you, you – what you do before you is weigh –
>
>Q. You at least do it in your brain.
>
>A. Yes.
>
>Q. You try to figure out, okay, what are the risks of this drug, if I choose to use it in this patient, and what are the potential benefits; right?
>
>A. Yes.
>
>Q. Again, before you ever prescribe a drug like this, then, it's very important the drug companies be honest and forthright and tell you what the potential risks are, would you agree?
>
>A. Yes.

*See* Mackey Dep., Exhibit 12 (Corrected), at 73, 75, 97-98, ECF Doc. # 1700-2.

In discussing the causal connection issue and the learned intermediary doctrine in *Forst v. SmithKline Beecham Corp*, the court held that "a jury could weigh Dr. Todd's statements that he was unable to do a proper risk/benefit analysis at the time he prescribed Paxil to Mr. Forst in concluding that his decision to prescribe would have changed." 2009 U.S. Dist. LEXIS 19415 at *21. As previously discussed by Plaintiff:

>Defendants' actions resulted in preventing Mr. Smith and his prescribing medical providers from being able to fully assess the risk-benefit analysis for the underlying <u>off-label</u> condition for which Neurontin was prescribed to Mr. Smith, and from being able to fully monitor changes in Mr. Smith's mood and behavior caused by Neurontin. Consequently, Mr. Smith ingested Neurontin, and Neurontin was a substantial factor in his suicide.

Pl.'s Mem. Opp. at 10, ECF Doc. # 1677; *see also id.* at 13-14.  Similarly, as the court held in *Forst*, the jury here should be permitted to weigh Dr. Mackey's testimony concerning the need to disclose all relevant information concerning the risks of Neurontin and suicidality in determining whether Dr. Mackey's decision to prescribe Neurontin to Mr. Smith would have changed.

### B. Defendants Have Cited No Tennessee Legal Authority That the Heeding Presumption Is Not Relevant to the Issue of Fraudulent Omission and Suppression.

Defendants argue that Plaintiff cites no Tennessee authority applying the heeding presumption in the context of a strict liability failure to warn claim, and that Plaintiff should not be permitted to rely on such a presumption in the context of her fraud claim.  Defs.' Reply Mem. at 19.  It is noteworthy, however, that neither have Defendants cited any Tennessee authority rejecting application of the heeding presumption in either a strict liability failure to warn claim or in a fraud claim.

### C. Plaintiff's Fraud Theory Relies Not Merely on a Failure to Disclose, But Also on Fraud by Concealment or Suppression, Which Is Actionable.

Defendants quote from *Patten v. Standard Oil Co. of Louisiana*, 165 Tenn. 438, 55 S.W.2d 759 (1933), where the Court held:

> In 12 Ruling Case Law, p. 306, it is said: "As a general rule to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts.  There must be a concealment, and the silence must amount to fraud.  Concealment in this sense may consist in withholding information asked for, or in making use of some device to mislead, thus involving act and intention.  The term generally infers also that the person is in some way called upon to make a disclosure.  It may be said, therefore, that, in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them."

155 Tenn. at 443-44, 55 S.W.2d at 761.  Defendants argue both that there is no evidence that Defendants made use of some device, trick or contrivance in order to conceal or suppress

11

information concerning Neurontin and suicidality, and that plaintiff cannot establish that Defendants had a duty to disclose such important information.

It is axiomatic that manufacturers of ethical drugs, such as Defendants here, have a duty to disclose, and not suppress, information concerning the safety and risks of using their drugs. This is the basis for all drug and pharmaceutical failure to warn claims. No fiduciary or special relationship need be demonstrated in order for the Court to find that Defendants owed prescribing physicians and their patients a duty to disclose information concerning Defendants' ethical drug Neurontin and suicidality.

Moreover, this Court is well acquainted with the various devices, tricks and contrivances used by Defendants in promoting Neurontin for off-label use and downplaying and suppressing the risks of Neurontin use and suicidality. *See, e.g.*, Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss Products Liability Plaintiffs' Fraud Claims Based Upon Allegedly Improper Marketing, at 3-6, ECF Doc. # 1258.[2]

---

[2] In fact, as this Court is probably aware, recently "[a] widely known Massachusetts anesthesiologist whose research has influenced how doctors treat surgery patients for pain has been accused of fabricating results in at least 21 published studies and, in some cases, even inventing patients." *See* "Doctor accused of faking studies," The Boston Globe, Mar. 11, 2009, reprint attached as Exhibit 13 to the Finkelstein Sur-Reply Declaration, submitted herewith. "In some instances, the studies in question involved data about drugs made by pharmaceutical giant Pfizer Inc., including Celebrex, Lyrica, and Neurontin. The company gave Reuben five research grants between 2002 and 2007, and he was a member of Pfizer's speakers bureau, in which physicians give talks about Pfizer drugs to colleagues." *Id.* "More in question, [Dr. James Rathmell, chief of the Massachusetts General Hospital pain clinic] said, is Reuben's idea of adding Lyrica and Neurontin to the mix. 'He's done the few studies in that area,' Rathmell said." *Id. See also* "A Medical Madoff: Anesthesiologist Faked Data in 21 Studies," Scientific American, Mar. 10, 2009, reprint, Finkelstein Sur-Reply Decl., Ex. 14 ("He [Reuben] claimed that using drugs in combination with the Pfizer anticonvulsant Neurontin (gabapentin), and later Lyrica (pregabalin), prior to and during surgery could be effective in decreasing postoperative pain and reduce the use of addictive painkillers"; "Although Pfizer funded Reuben's research between 2002 and 2007, Baystate [Medical Center, where Reuben has worked as a staff anesthesiologist and the director of acute pain management] has no records of those payments and says that the research funds could have been paid directly to Reuben. Such an arrangement would be 'highly unusual,' [Steven Shafer, editor in chief of the journal Anesthesia & Analgesia, which published 10 of Reuben's fraudulent papers] said."). While Pfizer has responded that the company was "not involved in the conduct of any of these independent studies or in the interpretation of publication of the study results," *see* Boston Globe article, and "insists the grants were properly disbursed to Baystate in accordance with Pfizer policy," *see* Scientific American article, Pfizer obviously was aware that Reuben's studies were being conducted in connection with Pfizer's drugs Neurontin and Lyrica, and was well aware that because of the sums of money being paid directly to Dr. Reuben and not through Baystate, he would have a significant incentive to author studies favoring Pfizer's drugs without fear of any interference from Baystate.

## CONCLUSION

In view of the above, it is respectfully requested that this Court deny Defendants' motion for summary judgment, other than those parts of Defendants' motion for summary judgment on Plaintiff's express warranty and Tennessee Consumer Protection Act claims, which Plaintiff does not oppose.

Dated: March 23, 2009 

Respectfully submitted,

Finkelstein & Partners, LLP
Attorneys for Plaintiff Ruth Smith

By:     **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 23, 2009.

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire