EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-----------------------------------------------------------------x
                                                                 :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                                     :
        SALES PRACTICES AND                                      :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION                            :
                                                                 :   Judge Patti B. Saris
-----------------------------------------------------------------x
                                                                 :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                                        :
                                                                 :
Smith v. Pfizer Inc., 1:05-11515-PBS                             :
                                                                 :
-----------------------------------------------------------------x
```

**[PROPOSED]**
**AMENDED PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL**
**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND**
**PLAINTIFFS' FURTHER STATEMENT OF MATERIAL FACTS**

**I.      PLAINTIFF'S RESPONSES TO DEFENDANTS' LOCAL**
         **RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

   1.    Mr. Smith was first prescribed Neurontin on May 5, 2003.

Response:
         Admit.


   2.    There is no evidence that Mr. Smith took Neurontin when it was prescribed in 2003.

Response:
         Admit.


   3.    A second physician suggested Neurontin on January 5, 2004, but Mr. Smith did not take Neurontin at that time.

Response:
         Admit.

   4. On March 9, 2004 visit, Dr. Mackey prescribed Neurontin 300 mg, twice a day for Mr. Smith.

Response:
  Admit.


   5. Dr. Mackey testified that he "probably" read the Neurontin package insert "a long time" before he prescribed Neurontin for Mr. Smith, but that he typically did not re-review prescription drug labeling on any kind of regular basis.

Response:
  Disputed. Plaintiff submits that paragraph 5 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he "probably" would have changed the way he treated Richard Smith. Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12). Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects. Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).


   6. Mr. Smith filled his one and only thirty-day prescription for Neurontin on March 9, 2003, nearly two months before his death.

Response:
  Disputed. Plaintiff submits that paragraph 6 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey had samples of Neurontin in his closet for distribution to patients and he did distribute those samples to patients. Mackey Dep. 78:3-7 (Finkelstein Decl., Ex. 12). Mr. Smith's daughter Cindy saw samples of Neurontin on the file cabinet in her father's office in his house, prior to his death. Smith-Charlton Dep. 80:18-25-81:1-8 (Finkelstein Decl., Ex. 21). There was several boxes of samples. The boxes were four or five inches tall and about two inches square. The word "Neurontin" was printed on the boxes. Smith-Charlton Dep. 81:16-25-82:1-18 (Finkelstein Decl., Ex. 21).

   7. Mrs. Smith herself picked up Mr. Smith's Neurontin prescription from Eckerd's on March 9, 2004.

Response:
  Admit


   8. Had Mr. Smith taken the Neurontin prescribed and filled on March 9, 2004 according to doctor's instructions, the prescription bottle would have been empty by April 8, 2004.

Response:
    Disputed. Plaintiff submits that paragraph 8 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  The Pfizer representatives were putting a lot of samples of Neurontin in Dr. Mackey's office. Mackey Dep. 29:2-8 (Finkelstein Decl., Ex. 12).  Dr. Mackey had samples of Neurontin in his closet for distribution to patients and he did distribute those samples to patients. Mackey Dep. 78:3-7 (Finkelstein Decl., Ex. 12).  Mr. Smith's daughter Cindy saw samples of Neurontin on the file cabinet in her father's office in his house, prior to his death. Smith-Charlton Dep. 80:18-25-81:1-8 (Finkelstein Decl., Ex. 21).  There were several boxes of samples.  The boxes were four or five inches tall and about two inches square.  The word "Neurontin" was printed on the boxes.  Smith-Charlton Dep. 81:16-25-82:1-18 (Finkelstein Decl., Ex. 21).  Mr. Smith made five different statements about Neurontin affecting his mental state.  Trimble Dep. 126:1-127:8 (Finkelstein Decl., Ex. 23).  Concerning Mr. Smith's ingestion of Neurontin, Dr. Trimble testified that: a family member reported that Mr. Smith reliably took the medication he was prescribed; Mr. Smith stated Neurontin made him feel "loopy", and Mr. Smith told Mr. Woods that he was taking Neurontin and that it made him feel "weird"; Mr. Smith told physicians that Neurontin was not helping him; and there was a Neurontin pill bottle on the dresser at the time of his suicide, and he had samples of Neurontin.  Trimble Dep. 546:19-549:22 (Finkelstein Decl., Ex. 23).  The evidence that Dr. Trimble considered that Mr. Smith was in fact ingesting Neurontin was Ruth Smith's testimony that in Mr. Smith's own words, he underwent a mental state change, after he was ingesting Gabapentin.  Trimble Dep. 267:3-268:1 (Finkelstein Decl., Ex. 23).  There is indirect evidence that Mr. Smith was ingesting 300 milligrams three times a day.  Trimble Dep. 269:22-271:20 (Finkelstein Decl., Ex. 23).

9.    Plaintiff testified that she cannot recall observing Mr. Smith take his Neurontin every time he was supposed to according to prescription.

Response:
    Admit.

10.    Plaintiff testified that Mr. Smith took his prescriptions as prescribed because "that was just the way he did things."

Response:
    Admit.

11.    A Neurontin bottle, which plaintiff's expert Dr. Maris described as "full," was found on the dresser of Mr. Smith's bedroom following his death.

Response:
    Disputed. Plaintiff submits that paragraph 11 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Gary Wayne Biggs, the medical/death investigator from Medical Forensics who investigated the death, collected the bottle of Neurontin.  He probably did not make a note of how many pills were left in the bottle. Biggs Dep. 49:14-25 (Finkelstein

Decl., Ex. 24). He could not find any written notation in his notes of how many pills were left in the bottle. Biggs Dep. 49:14-25 -50:1-7 (Finkelstein Decl., Ex. 26). Medical Forensics disposes of medications collected from the scene. Biggs Dep. 63:8-11 (Finkelstein Decl., Ex. 24).

      12.    Dr. Maris testified that Mr. Smith "skipped a few doses" of Neurontin.

Response:

Disputed. Plaintiff submits that paragraph 12 of Defendants' Statement of Facts is incorrect or otherwise incomplete. According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

      13.    Dr. Maris testified that, based on Neurontin's half-life of five to seven hours, there would be no appreciable Neurontin left in an individual's system within twenty-four hours after taking the medication.

Response:

Disputed. Plaintiff submits that paragraph 13 of Defendants' Statement of Facts is incorrect or otherwise incomplete and mischaracterizes Dr. Maris's testimony. Defendants mischaracterizes Dr. Maris's testimony relating to the half-life of Neurontin in terms of its elimination from the body:

> Although I acknowledge that Neurontin's half-life is five to seven hours in terms of its elimination from an individual's "system", **this testimony does not equate to a marker for the time it takes for Neurontin to no longer have an effect on the brain's neurotransmitters (e.g., serotonin) and contribute to suicidality**. The package insert for Neurontin and discussion of its half-life does not pertain to effects on neurotransmitters; rather, the package insert pertains to blood/plasma ... [*See* Maris Declaration, ¶ 10, ECF Doc. # 1673 (emphasis added].

"[T]here is no direct relationship between dose by mouth and the amount of drug in the brain." Trimble Dep. 247:20-248:9 (Finkelstein Decl., Ex. 23). It probably takes 24 to 48 hours (2 days) of consecutive gabapentin administration to get to a "steady state." Trimble Dep. 249:-250:2 (Finkelstein Decl., Ex. 23). The half-life of gabapentin is extended in elderly individuals. Trimble Dep. 250:4-16 (Finkelstein Decl., Ex. 23). Regarding the length of time it would take for Neurontin to clear an individual's "system" after the last dose, Prof. Trimble submits that where the individual took multiple doses, like Mr. Smith, the "body becomes saturated with the product. And if you stop taking the drug, you will still get the product emerging from fatty tissue…so the delay, when you've been taking the drug chronically, is very different." Trimble Dep. 258:11-23 (Finkelstein Decl., Ex. 23). If you have been taking gabapentin for two months, it would take several days at least after your last dose before there is no appreciable gabapentin in your system. Trimble Dep. 258:24-259:6 (Finkelstein Decl., Ex. 23). A separate question is at what point the drug would have no clinical effect following the last ingestion - "if you have a drug which acts on the brain and influences brain neurochemistry, you may well have an effect

which by far outlasts the effect of the amount of the blood, of what's in the blood.  So once you have got the blood into the brain, you're talking again about a different system to just looking at what comes out when you stop the drug from the bloodstream."  Trimble Dep. 259:13-260:1 (Finkelstein Decl., Ex. 23).  Since Mr. Smith was taking 900 milligrams of Neurontin a day, an increased GABA level that would have caused a reduction in serotonin that would cause an impulsive suicide "may well have occurred in the first of 12 hours" and "you see biochemical changes very soon, so one dose may have sent the chain rolling, if you like.  Or the ball rolling."  Trimble Dep. 276:12-24 (Finkelstein Decl., Ex. 23).  Mr. Smith "clearly committed suicide after several weeks on this medication.  And it may well be that the effects were magnified when the dose was increased, which is often the case.  That it's the change of dose which leads to an alteration of the amount of change within the central nervous system."  Trimble Dep. 277:18-2783 (Finkelstein Decl., Ex. 23).

      14.     Dr. Maris testified that no one observed Mr. Smith ingest Neurontin on any of the four days leading up to his suicide, nor on any other particular day.

Response:
     Disputed. Plaintiff submits that paragraph 14 of Defendants' Statement of Facts is incorrect or otherwise incomplete. . According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case.  Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

      15.     Dr. Trimble testified that he does not know when Mr. Smith last took Neurontin prior to his death.

Response:
     Disputed.  Plaintiff submits that paragraph 15 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case.  Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

      16.     Dr. Maris testified that he did not know how many Neurontin pills Mr. Smith may have ingested at any time.

Response:
     Disputed.  Plaintiff submits that paragraph 16 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it.  She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

      17.     There is no biochemical evidence of Neurontin in Mr. Smith's body at the time of his death because Mr. Smith's blood was not tested for the presence of Neurontin.

5

Response:

Disputed. Plaintiff submits that paragraph 16 of Defendants' Statement of Facts is incorrect or otherwise incomplete. It is not known if there was biochemical evidence of Neurontin in Mr. Smith's at the time of his death. Admit that Mr. Smith's blood was not tested. A separate question is at what point the drug would have no clinical effect following the last ingestion - "if you have a drug which acts on the brain and influences brain neurochemistry, you may well have an effect which by far outlasts the effect of the amount of the blood, of what's in the blood. So once you have got the blood into the brain, you're talking again about a different system to just looking at what comes out when you stop the drug from the bloodstream." Trimble Dep. 259:13-260:1 (Finkelstein Decl., Ex. 23).

18. Dr. Maris testified that he did not know how many samples Mr. Smith might have ingested.

Response:

Disputed. Plaintiff submits that paragraph 18 of Defendants' Statement of Facts is incorrect or otherwise incomplete. According to Mrs. Smith, Mr. Smith took his medication in the way that the doctor had prescribed it. She knows this to be the case. Ruth Smith Dep. 143:2-7 (Finkelstein Decl., Ex. 22).

19. Dr. Mackey could state with more than 50, but less than 90 percent certainty that he had a conversation with a sales representative at some point in time about Neurontin. He testified that this conversation was about a study in an on-label use and that the discussion could have taken place before or after the period he treated Mr. Smith.

Response:

Disputed. Plaintiff submits that paragraph 19 of Defendants' Statement of Facts is incorrect or otherwise incomplete. A sales representative from Pfizer, Parke-Davis, Warner Lambert came an talked to Dr. Mackey about Neurontin. They discussed what Dr. Mackey would prescribe Neurontin for, that is, neuropathic pain, which is an off-label use of the drug. Mackey Dep. 76:10-77:12 (Finkelstein Decl., Ex. 12). In addition, the sales representatives who came to Dr. Mackey's practice targeted the particular physicians who dealt with chronic pain, that is, the physical medical rehabilitation physicians or pain specialists in the practice. Mackey Dep. 29:6-31:21 (Finkelstein Decl., Ex. 12).

20. Dr. Mackey testified that he does not read literature of any kind regarding pain management.

Response:

Disputed. Plaintiff submits that paragraph 20 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Dr. Mackey relies on the drug companies to be honest and forthright with him. Mackey Dep. 27:22-3, 25 (Finkelstein Decl., Ex. 12). He relies on the drug companies to tell him both the good and the bad about their drugs. Mackey Dep. 28:1-5

(Finkelstein Decl., Ex. 12).  Pfizer representatives were making calls on Dr. Nichols and Dr. Clendenin, the doctors who are the pain specialists in Dr. Mackey's group.  Mackey Dep. 29:9-25, 30:1-12 (Finkelstein Decl., Ex. 12).  They prescribed Neurontin primarily for pain. Mackey Dep. 30:5-12 (Finkelstein Decl., Ex. 12).  Dr. Mackey relies on Dr. Nichols and Dr. Clendenin to guide him when he has patients who have pain issues. Mackey Dep. 30:25-31:1-2 (Finkelstein Decl., Ex. 12).  He asks them for input advice on pain management issues. Mackey Dep. 31:16-20 (Finkelstein Decl., Ex. 12).

21.     When asked Dr. Mackey was asked whether he would have prescribed Neurontin to Mr. Smith based on the information he has today, Dr. Mackey testified that he would prescribe Lyrica if Mr. Smith walked into his office today.

Response:
    Disputed.  Plaintiff submits that paragraph 21 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he "probably" would have changed the way he treated Richard Smith.  Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12).  Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects. Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).

22.     Dr. Mackey testified that he continues to prescribe Neurontin to this day in spite of the information regarding suicidal events in the product labeling.

Response:
    Disputed. Plaintiff submits that paragraph 22 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he "probably" would have changed the way he treated Richard Smith.  Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12).  Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects.  Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).

23.     Nurse Krancer testified that she "doesn't usually read the entire package insert" and instead relies on books and "blurbs in journals about new medications."

Response:
    Disputed. Plaintiff submits that paragraph 23 of Defendants' Statement of Facts is incorrect or otherwise incomplete. Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects.  Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

7

24.     Nurse Krancer was asked whether "if it had been brought to her attention that this drug [Neurontin] is associated with increases in depression and suicide," she "would have taken into account that information when prescribing this drug." In response she stated that she "probably would have thought abut [the prescription ] a little harder."

Response:
    Disputed.  Plaintiff submits that paragraph 24 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects.  Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

25.     Nurse Krancer testified that she does not recall any discussion with sales representatives regarding Neurontin for pain management and that any discussions regarding pain involved herpetic pain – one of Neurontin's approved indications.

Response:
    Disputed.  Plaintiff submits that paragraph 25 of Defendants' Statement of Facts is incorrect or otherwise incomplete. H ad Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects.  Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

26.     Nurse Krancer testified that she does not prescribe drugs based on what a sales representative tells her, but instead educates herself about the medication. Krancer Dep. 12:10-16 (Finkelstein Decl., Ex. 25).

Response:
    Disputed.  Plaintiff submits that paragraph 26 of Defendants' Statement of Facts is incorrect or otherwise incomplete.  Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects.  Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

8

## II. PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Usage

1. Richard Smith obtained 60 pills of Neurontin on March 9, 2004 (Finkelstein Decl., Ex. 28).

2. Richard Smith obtained samples from Dr. Mackey's office. Ruth Smith Dep. 147:6-12 (Finkelstein Decl., Ex. 22).

3. Dr. Mackey's office received samples of Neurontin for distribution to patients. Mackey Dep. 77:1-78:1-4 (Finkelstein Decl., Ex. 12).

4. Richard Smith had not used all of his samples when he died. Smith-Charlton Dep. 13:18-15:18 (Finkelstein Decl., Ex. 21).

5. Richard Smith's daughter (Cindy Smith-Charlton) saw Neurontin samples in his father's possession before he committed suicide. Smith-Charlton Dep. 13:18-15:18 (Finkelstein Decl., Ex. 21.)

6. Richard Smith informed his physical therapist that he was taking Neurontin on April 14, 2004 (Finkelstein Decl., Ex. 31.)

7. Richard Smith informed his dentist that he was taking Neurontin and that it make him feel weird on May 10, three days before he committed suicide (Finkelstein Decl., Ex. 1).

8. Richard Smith informed his son-in-law (Wes Carnahan) on May 8 that he was taking Neurontin, 5 days before he committed suicide. Carnahan Dep. 18:21-19:21 (Finkelstein Decl., Ex. 26).

9. Wes Carnahan is a pharmacist at the VA Hospital in Nashville, TN. Carnahan Dep. 9:20-10:7 (Finkelstein Decl., Ex. 26).

10. Richard Smith told his son-in-law (Wes Carnahan) that he was taking Neurontin, that it made him feel loopy and he didn't feel like himself. Carnahan Dep. 21:6-10 (Finkelstein Decl., Ex. 26).

Pill Bottle

11. The medical examiner's office took photographs of Richard Smith's bedroom as part of its investigation. Biggs Dep. 43: 18-20 (Finkelstein Decl., Ex. 24).

12. Clearly visible in one photograph is a pill bottle with a lid that has "Eckerd" and "Courtesy Refills" on the lid of the bottle. Biggs Dep. 47:4-8 (Finkelstein Decl., Ex. 24).

9

13.   The label on the pill bottle is not visible. (Finkelstein Decl., Ex. 30).

14.   Gary Biggs, investigator for the Medical Examiner, believes the pill bottle with a lid that says "Eckerd" and "Courtesy Refills" is Neurontin because "it looks like you can see the writing right there on the capsule." Mr. Biggs sees Neurontin "all the time" and has been prescribed Neurontin in the past. Biggs Dep. 47:17-48:9 (Finkelstein Decl., Ex. 24).

Learned Intermediary

15.   Dr. Mackey prescribed Neurontin for Richard Smith. Ruth Smith Dep. 130: 23-25 (Finkelstein Decl., Ex. 22).

16.   Dr. Mackey was not aware of the FDA's concern that (i) Neurontin's widespread usefulness might be limited because of serious adverse events including depression and (ii) that depression may become worse in the epileptic population and require intervention or lead to suicide. Mackey Dep. 34:14-35:4 (Finkelstein Decl., Ex. 12).

17.   This information would be important to Dr. Mackey before he prescribed a drug. Mackey Dep. 36:13-17 (Finkelstein Decl., Ex. 12).

18.   Dr. Mackey had other alternatives to Neurontin that he could have prescribed to Richard Smith that did not have the side effect of clinically significant depression or suicide. Mackey Dep. 36:18-25 (Finkelstein Decl., Ex. 12).

19.   Dr. Mackey was not aware of any testing performed by Pfizer or Warner-Lambert that showed Neurontin leads to suicide. Mackey Dep. 37:9-19 (Finkelstein Decl., Ex. 12).

20.   Dr. Mackey was not aware of the information contained in the affidavit of Dr. Franklin who was a former medical liaison for Warner-Lambert/Parke-Davis who stated that (i) he witnessed false representations that Neurontin was safe and effective for unapproved indications; (ii) he was trained and instructed to misrepresent the amount of clinical evidence available to support the use of Neurontin; (iii) he was trained and instructed to use a number of misleading abstracts and case reports to promote Neurontin for medically unacceptable uses. Mackey Dep. 37:20-42:5 (Finkelstein Decl., Ex. 12).

21.   Dr. Mackey testified that had he been told that Neurontin was a drug that had the aforementioned problems, he "probably" would have changed the way he treated Richard Smith. Mackey Dep. 42:17-25 (Finkelstein Decl., Ex. 12).
.
22.   Had Dr. Mackey known of these problems associated with Neurontin, he would have given Richard Smith specific warnings and told him to be observant about side effects. Mackey Dep. 43:1-9 (Finkelstein Decl., Ex. 12).

23.   Had Warner-Lambert/Pfizer told Pam Krancer that Neurontin was associated with increases in Depression and suicide, she would have educated the patients on these potential side effects. Krancer Dep. 15:2-16:15 (Finkelstein Decl., Ex. 25).

10

Defendants Admitted Failure to Warn

24. On June 7, 2004, Defendant Warner Lambert, LLC entered a plea of guilty related to a charge of distribution of a misbranded drug; specifically, Defendant admitted to having introduced the sale of Neurontin in "interstate commerce for unapproved uses without adequate directions being provided to physicians and consumers for such uses." (Finkelstein Decl., Ex. 29.)

Defendants' Suppression and Fraudulent Promotion of Neurontin

25. Dr. Mackey testified that Defendants detailed him about "neuropathic pain", which is an off-label, unapproved use by the FDA. Mackey Dep. 76:23-77:16 (Finkelstein Decl., Ex. 12).

26 Prior to Mr. Smith's death, Defendants' sales representative actively promoted Neurontin to Mr. Smith's healthcare provider, Pamela Krancer, an Advanced Practice Nurse, on approximately 27 occasions with respect to Neurontin (Finkelstein Decl., Ex. 17).

27. Prior to Mr. Smith's death, Defendants' sales representative actively promoted Neurontin to Mr. Smith's orthopaedist, Edward Mackey, M.D., and the doctors in his medical practice on approximately 69 occasions with respect to Neurontin (Finkelstein Decl., Ex. 13).

28. Prior to Mr. Smith's death, Defendants' sales representative detailed Mr. Smith's prescriber, Paul McCombs, III, M.D., a neurosurgeon, on approximately three occasions with respect to Neurontin (Finkelstein Decl., Ex. 19).

29. Dr. Mackey acknowledged during his deposition that his understanding of Neurontin's off-label use to treat Dr. Smith's pain was in part based upon his interactions with other doctors in his practice. Mackey Dep. 27:6-13 (Finkelstein Decl., Ex. 12).

30. Dr. Mackey acknowledged during his deposition that he utilized the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels that would include Neurontin, for his risk/benefit analysis before prescribing a drug. Mackey Dep. 73:12-25 (Finkelstein Decl., Ex. 12).

31. Dr. Mackey provided testimony that he had been detailed by Defendants' sales representative regarding Neurontin who discussed Neurontin usage and who provided samples for distribution. Mackey Dep. 75:7-78:4 (Finkelstein Decl., Ex. 12).

32. Both Doctors McCombs and Mackey, during their depositions, and in discussing their prescribing practices and risk/benefit analyses for prescribing a drug to Mr. Smith, wanted to know about suicide attempts during clinical trials; depression adverse events during clinical trials, and whether depression and suicidality were side effects. McCombs Dep. 12:3-19, 12:20-14:23, 28:10-29:19 (Finkelstein Decl., Ex. 27); Mackey Dep. 34:14-36:14 (Finkelstein Decl., Ex. 12).

11

33. Dr. Mackey acknowledged during his deposition that had he been informed of depression/suicidality information by Defendants, it would have certainly changed the way he treated Mr. Smith; he would have warned Mr. Smith. Mackey Dep. 42:17-43:9, 98:14-99:10 (Finkelstein Decl., Ex. 12).

34. Defendants did not disclose to Mr. Smith's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality.

35. Defendants did not disclose to Mr. Smith's prescribing medical providers that Neurontin usage increased the risk of depression and/or suicidality.

36. Defendants did not disclose to Mr. Smith's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts.

Defendants' Fraudulent Suppression

37. In 1992, the U.S. Food & Drug Administration (FDA) evaluated Neurontin's use for Defendants' sought after epilepsy indication, and FDA advised Defendants that patients ingesting Neurontin may suffer worsening depression that may "require intervention or lead to suicide, as it has resulted in some suicide attempts." Finkelstein Sur-Reply Decl., Ex. 2, at p. 10. Finkelstein Decl., Ex. 5, at 0084477.

38. Since at least 1992, Defendants knew that Neurontin was associated with depression/suicidality, yet Defendants suppressed this negative information while promoting Neurontin's safety and efficacy for off-label uses. In doing so, Defendants failed to provide adequate <u>written</u> depression/suicidality information in Defendants' Neurontin package insert (the "Label"), such as a "Dear Doctor" Letter. Even a single report of an adverse event during the postmarketing phase of a drug can trigger the need for a "Dear Doctor" Letter. For example, in October 2008, the Genentech drug company, which manufactures Raptiva®, issued a "Dear Doctor Letter" because of one reported case of progressive multifocal leukoencephalopathy (PML), a rare central nervous system disease, that was reported with use of Raptiva®. Finkelstein Decl., Ex. 6.

39. Since 1992, Defendants knew of FDA's concern about Neurontin's association with depression and suicidality, albeit in the context of Neurontin's on-label indication for Epilepsy. In 1992, Defendants' own ranking members of their Regulatory Department, including Dr. Richard Spivey, then Senior Director of Regulatory Affairs, and Janeth Turner, then Director of Regulatory Affairs, knew of the FDA's concern over Neurontin's association with suicidality as set forth in FDA's Combined Medical-Statistical Review (the "FDA Clinical Review"). Finkelstein Decl., Ex. 7.

40. On December 7, 1992, Ms. Turner provided the FDA 1992 Clinical Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development. Finkelstein Decl., Ex. 8, at p. 375:17-22, pp. 379-381.

12

41. Ms. Turner was also a member of the Drug Development Team and New Product Committee whose stated purpose was to explore new uses for Neurontin beyond the epileptic population. Finkelstein Decl., Ex. 8, at p. 382:7-14.

42. FDA prepared a Combined Medical-Statistical Review of Neurontin and stated "[D]epression, while it may [not be] an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts." Finkelstein Sur-Reply Decl., Ex. 2, at p. 10; Finkelstein Decl., Ex. 5, at 0084477.

43. In 1995, Defendants retained consultant—and now Plaintiffs' expert in this case—Michael Trimble, M.D., who provided Defendants a paper entitled, *Psychosis with Gabapentin*. Dr. Trimble advised that "anticonvulsant drugs influence the mental state, and this can be broken down into adverse and beneficial effects . . . . The main adverse effect of anticonvulsants is the link between anticonvulsant drugs and depression." *See* Finkelstein Sur-Reply Decl., Ex. 3, at p. 6.

44. Defendants knew Neurontin's mechanism of action contributes to depression and suicidality, because Neurontin reduces the release of excitatory neurotransmitters (e.g., serotonin) in the brain. *See* Finkelstein Sur-Reply Decl., Ex. 4, at 0075642 ("Neurontin treatment may shift the relative balance of neurotransmitters from excitatory to inhibitory); Finkelstein Sur-Reply Decl., Ex. 5, at 0010853 ("In addition to reducing neurotransmitter release, [Neurontin] . . . reduces calcium influx into synaptasomes in vitro"); Finkelstein Sur-Reply Decl., Ex. 6, at 0005343 ("Inhibition of Neurotransmitter Release"); Finkelstein Sur-Reply Decl., Ex. 7, at 115776 (1993 Product Monograph states "Neurontin slightly reduces the release of monoamine neurotransmitters in vitro"); Finkelstein Sur-Reply Decl., Ex. 8, at pp. 13, 294-298, 300 (Deposition of Defendants' witness Leslie Tive, Medical Director, Team Leader for Neurontin (7/19/06)): "Q. Do you have any degrees? A. I do. Q. And what are your degrees? A. I have a Ph.D. in biopsychology with a specialization in neuropharmacology. Q. Okay. Would you agree that there are drugs sold by Pfizer that are utilized by patients to affect neurotransmitters in the brain? A. Yes. . . . Q. And as a neuropharmacologist, you understand what dopamine is, right? A. Yes. Q. You understand what serotonin is, right? A. Yes, I do. . . . Q. And when you reference serotonin, what is serotonin? A. It's another neurotransmitter. Q. Miss Tive, do you have an understanding as to whether an increased amount of serotonin or a decreased amount of serotonin in the brain can be associated with depression? A. An increase or decrease of serotonin in the brain can be associated with depression. . . . . Q. Let's talk about clinical depression. All right. What happens when there's a reduction in the flow of monoamines such as dopamine, serotonin, and norepinephrine? A. You're saying monoamines in general? Q. Correct. A. A reduction in monoamines has been associated with depression."); Finkelstein Decl., Ex. 9, at pp. 11-14**;** Finkelstein Decl., Ex. 10, at p. 3; Finkelstein Sur-Reply Decl., Ex. 2, at p. 9, ¶ 39.

45. Incidences of positive dechallenge/rechallenge psychiatric events have been documented in Defendants' own clinical trials for Neurontin. "If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge. A positive rechallenge refers to the

13

reoccurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug. Finkelstein Sur-Reply Decl., Ex. 2, at p. 12, ¶ 53.

46. Since 1990, positive dechallenge/rechallenge reactions of depression were observed by Defendants' own investigators who rendered causal association assessments that the depression was probably related to Neurontin. Defendants' causal association assessment ranged from Definite, Probable, Possible, or of Unknown Relationship. Finkelstein Sur-Reply Decl., Ex. 2, at p. 13 n.37. Defendants utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin (Protocol 945-15), and not a Bradford-Hill assessment. The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear. *Id.* Additionally, Defendants' own investigator rendered a causal association assessment during a clinical trial pertaining to diabetic peripheral neuropathy that a suicide attempt and intentional overdose were "definitely related" to Neurontin. Finkelstein Sur-Reply Decl., Ex. 9, at p. 59. Also, Health Canada, the Canadian Regulatory authority equivalent to FDA, has stated the following to Pfizer regarding dechallenge/rechallenge findings related specifically to Neurontin and post-marketing psychiatric adverse events: "One suicide attempt was found to have positive dechallenge/rechallenge, indicating that this event was related to gabapentin. Finkelstein Sur-Reply Decl., Ex. 10.

47. Since 1990, Defendants' own clinical trials reflected that Acute Severe Depression and Suicidal Ideation were expected adverse events associated with Neurontin. See Finkelstein Sur-Reply Decl., Ex. 11. Clinical trials demonstrated associated psychiatric adverse drug experiences observed by Defendants' own investigators. Finkelstein Sur-Reply Decl., Ex. 12, at pp. 13-15.

48. During Defendants' own clinical trials prior to FDA approval for Neurontin's epilepsy indication, "Depression and Suicidal Ideation" was the ninth (9th) most common adverse reaction resulting in discontinuation of Neurontin. Finkelstein Decl., Ex. 5, at 0084444.

49. Defendants' own Epilepsy clinical trials performed as part of their New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. In the total exposed population of said New Drug Application, seventy-eight (78) patients reported depression as an adverse event (e.g., 5.3% of the population of patients). Finkelstein Decl., Ex. 5, at 0084447. There were seven (7) reports of depression as serious adverse events, and nine (9) patients who withdrew from studies because of depression. Finkelstein Decl., Ex. 5, at 0084462.

50. Defendants' own Epilepsy clinical trials, performed as part of their New Drug Application for Neurontin, reflected at least seven (7) cases of "Depression" adverse events that Defendants' own medical investigator considered possibly or probably related to Neurontin; there was observed at least two (2) cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Defendants' Investigator. Finkelstein Decl., Ex. 5, at 0084467-0084468.

51. Defendants' own clinical trials reflected that approximately twice as many Neurontin patients (compared to placebo patients) withdrew as a result of clinically-related psychobiologic events. Finkelstein Sur-Reply Decl., Ex. 2, at p. 9, ¶ 39.

52. Defendants possessed post-marketing adverse event reports through 2002, prior to any potential notoriety bias that Defendants relate to the publicity of this litigation, demonstrating an association of psychiatric adverse events, including depression and suicidality, with Neurontin use. A 'safety signal' clearly existed, particularly with off label uses. Finkelstein Sur-Reply Decl., Ex. 2, at pp. 175-182, ¶¶ 263-282; pp. 192-195, ¶¶ 313-323.

Dated: March 23, 2009

>Respectfully submitted,
>
>Finkelstein & Partners, LLP
>*Attorneys for Plaintiff Ruth Smith*
>
>By: **/s/ Andrew G. Finkelstein**
>Andrew G. Finkelstein, Esquire
>Finkelstein & Partners, LLP
>1279 Route 300, P.O. Box 1111
>Newburgh, NY  12551

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on March 23, 2009.

>**/s/ Andrew G. Finkelstein**
>Andrew G. Finkelstein, Esquire