EXHIBIT 2

# I. BACKGROUND

1. My name is Cheryl D. Blume, Ph.D. I am the President of Pharmaceutical Development Group, Inc. (hereinafter, "PDG") a consulting firm specializing in pharmaceutical development and registration activities, located in Tampa, Florida. As described in the Curriculum Vitae attached as Exhibit 1, my background includes holding several executive positions in pharmaceutical companies over a period of 20 years, including Vice President of Scientific Affairs for Mylan Laboratories, Inc., and Executive Vice President and Chief Operations Officer for Somerset Pharmaceuticals, Inc. I also was a member of the Board of Directors of Somerset.

2. I was responsible for overseeing preclinical and clinical (Phases I-IV) programs associated with pharmaceutical product development and the securing of premarketing approvals for over 100 new prescription pharmaceutical drugs from the U.S., Food and Drug Administration (FDA). These products included both new (brand name) and generic drug products. These responsibilities included the design, execution and interpretation of pivotal preclinical and clinical trials.

3. My duties included direction of all phases of interactions with the FDA relating to the prosecution of New Drug Applications (NDAs), Abbreviated New Drug Application (ANDAs) Supplements to New Drug Applications (sNDAs), drafting labeling and other aspects of the approval procedures. I have been centrally involved in supervising the collection and evaluation of post marketing adverse medical events, the design and implementation of studies to assess post-marketing signals, and the preparation and dissemination of updated product information to health providers and patients.

4. I have been asked by counsel to provide an opinion on whether Neurontin contributes to mood and behavior disturbances including self-injurious actions and suicide. I have also been asked to evaluate the actions taken by defendants (Warner Lambert Co., Parke-Davis and Pfizer; hereinafter "Pfizer Defendants") with respect to the regulatory and marketing efforts associated with Neurontin (gabapentin). The scientific opinions set forth in this report are true to a reasonable degree of scientific certainty based on the data and information provided to date.

5. I reserve the right to supplement this report if additional information is provided. I cannot possibly list all of the documentation that supports my opinions; however, I have based my opinions in part upon my education, personal experience, and review of documents disclosed during the pendency of this litigation, included but not limited to sources containing adverse events associated with Neurontin, Pfizer Defendants' internal Research Reports, Investigational and New Drug Applications, Annual Reports, adverse event surveillance databases (Pfizer's internal database, Spontaneous Reporting System (SRS), Adverse Event Reporting System (AERS), and the World Health Organization (WHO)), Periodic Safety Update Reports, FDA records, international regulatory efforts, expert reports prepared by Drs. Trimble, Kruszewski and Roth, medical literature, deposition transcripts and exhibits.

# II. INTRODUCTION

6. The documentary evidence in this case demonstrates that the Pfizer Defendants were aware of multiple pre-marketing clinical trial reports and post-marketing patient events of self-injurious behavior, including suicide, in association with Neurontin.

1

volunteers where there was a relationship between the events and increased exposures to gabapentin. Withdrawals from certain Pfizer Defendants' studies also reflected that approximately twice as many gabapentin patients (compared to placebo patients) withdrew as a result of clinically-related psychobiologic events. Moreover, Pfizer Defendants --- apparently cognizant of a safety signal of psychobiologic events --- commissioned only a perfunctory review of psychosis and behavioral disturbances in or about 1995. Finally, despite knowledge of Neurontin's increasing off-label use in populations with underlying depressive conditions, Pfizer Defendants failed to appropriately address or pursue language in the product labeling regarding Neurontin's mechanism of action to adequately inform healthcare professionals as to Neurontin's capacity to reduce the release of monoamine neurotransmitters in the brain (*e.g.*, serotonin, norepinephrine), an action that is implicated in the pathophysiology of clinical depression.

40. The time period October 1996 – May 2002 represents another stage in the development and marketing of Neurontin in which critical safety signals continued to escalate. Defendants also gained approval for the post herpetic neuralgia indication during this timeframe. However, the Pfizer Defendants failed to appropriately address or pursue updated language in the product labeling regarding Neurontin's mechanism of action to reduce the release of monoamine neurotransmitters in the brain (*e.g.*, serotonin, norepinephrine). These actions may contribute to psychobiologic adverse events, including suicidal behavior.

41. June 2002 through present day reflects, not only the continuing safety signals mentioned above, but also Pfizer Defendants' labeling change regarding suicide and suicide attempt and FDA's pending inquiry to Pfizer Defendants about Neurontin's capacity to contribute to suicidal behavior.

42. Pfizer Defendants failed to take appropriate action to recognize and respond to safety signals demonstrating an association between Neurontin use and psychobiologic adverse events, including depression and suicidal behavior. A more careful examination of these signals should have been undertaken and subsequently, changes to the product labeling should have been affected to reflect the rate and severity of these events. Moreover, Pfizer Defendants should have undertaken an educational campaign targeted to healthcare professionals and patients using neurontin, with particular attention to discouraging off label use.

43. As more fully set forth in this report, throughout the life of Neurontin's development and marketing, Pfizer Defendants possessed specific information indicating a lack of efficacy, particularly with certain off-label indications (*e.g.*, psychiatric/bipolar disorder). Pfizer Defendants failed to reasonably warn healthcare professionals of this lack of efficacy notwithstanding Pfizer Defendants' knowledge of Neurontin's widescale use for such indications.[24]

---

[24] *See* Bernstein, *Enhancing Drug Effectiveness and Efficacy through Personal Injury Litigation*, Journal of Law and Policy (2007) at p.133: "Since safety is a context-driven condition, bound up with effectiveness --- even a small risk is too much when the drug is absolutely ineffective --- and because no prescription drug is perfectly safe, this black-letter necessarily takes effectiveness into account. And whenever consumers have more than one treatment to choose from, effectiveness cannot be divorced from comparisons with the drug's alternatives. To put the point within traditional warning doctrine, a crucial element of an adequate warning is communication about the consequences of not heeding it. Warnings are messages about choice. The risk reduction category of warning says, 'When you use our product, consider the following concurrent precaution, for the following reason.'"

9

## IV(a) Psychobiological Adverse Events in Pre-Approval Stage

44. Neurontin's capacity to contribute to mood and behavioral disturbances, particularly depression and suicide-related behavior, was known to Pfizer Defendants prior to the product's approval by the FDA. Before Neurontin was approved by FDA in 1993, on December 14th and 15th, 1992, a meeting was held between Parke-Davis and the Peripheral and Central Nervous System Drugs Advisory Committee.[25] At that time, a total of 5 reports of overdose involving gabapentin were noted. Four cases involved patients in Neurontin clinical trials, who also ingested additional drugs. The other case involved the child of a study subject who ingested gabapentin only. None of these patients died.

45. In the total exposed population of the NDA there were 78 reports of depression (or 5.3% of the patients).[26] There were 7 reports of depression as a serious adverse event and 9 patients withdrew from studies because of depression, some of which had suicidal ideation (no number was provided for this). It was determined that of the 78 patients reporting depression, 19 had no prior history and 22 patients required treatment for their symptoms. In the transcript to the Advisory Committee Meeting it is indicated that *"gabapentin has a safety profile that is generally good, but ... there remain some concerns."*[27] FDA approval for gabapentin was received on December 30, 1993.

46. Regulatory documents from the FDA reflect Pfizer Defendants' knowledge about Neurontin's capacity to contribute to mood and behavioral disturbances, including depression and suicidal behavior. Prior to approval for use as adjunctive medication in refractory partial epilepsy, the FDA via the Division of Neuropharmacological Drug Products prepared a combined medical-statistical review.[28] As part of this clinical safety review, FDA reviewed portions of Pfizer Defendants' New Drug Application (NDA). The FDA concluded that **"[l]ess common but more serious events may limit the drug's widespread usefulness…. [D]epression, while it may [not be] an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts."**[29] FDA further stated the following:

> In its clinical database of 2048 patients, gabapentin has a risk profile that is uncertain, with five groups of important adverse events that have not yet been fully characterized, specifically, seizure exacerbation, carcinogenicity, **clinically important depression**, renal failure and teratogenicity. Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy. . . . In conclusion NDA 20-235 is approvable with appropriate and prominent labeling for use in a specific population.[30]

---

[25] Dept. of Health and Human Services, Public Health Services, FDA, Peripheral and Central Nervous System Drugs Advisory Committee Transcript (Vol. II, Dec. 15, 1992); *see also* Deposition of Lloyd Knapp, at Ex. 7 (July 18, 2006).
[26] Dept. of Health and Human Services, Public Health Services, FDA, Peripheral and Central Nervous System Drugs Advisory Committee Transcript (Vol. II, Dec. 15, 1992 at p.58); *see* NDA #20-235 Medical-Statistical Review, at 114.
[27] Dept. of Health and Human Services, Public Health Services, FDA, Peripheral and Central Nervous System Drugs Advisory Committee Transcript (Vol. II, Dec. 15, 1992 at p.59).
[28] NDA #20-235 Medical Statistical Review.
[29] NDA #20-235 Medical Statistical Review, at p.117.
[30] NDA #20-235 Medical Statistical Review, at pp. 117, 119.

## Dechallenge and Rechallenge Events

52. Psychobiological events involving dechallenge and rechallenge data associated with Neurontin use were not fully described in the ISS documents or disclosed in the Neurontin launch label.
53. If an adverse event that develops following the initiation of drug therapy subsequently resolves following the discontinuation of the drug, this is referred to as a positive dechallenge. A positive rechallenge refers to the re-occurrence of the adverse event (following a positive dechallenge) subsequent to re-initiation of the drug.
54. The FDA places great significance on dechallenge/rechallenge observations and these events are often included in product labeling to assist prescribers and patients with benefit/risk assessments. As such, the dechallenge/rechallenge psychobiological events described in conjunction with Neurontin use should have been incorporated into the labeling.[35] Such incorporation into the labeling would have been consistent with FDA guidelines. The following description of serious adverse events can be found in the *Guideline for the Format and Content of the Clinical and Statistical Sections of an Application* (*July 1988*), a document prepared by the Center for Drug Evaluation and Research (FDA) and intended to be used as a guide for the formatting of a New Drug Application (NDA): "***It may not, indeed often will not, be possible to decide whether a particular serious event is drug-induced, but such events should be noted for future review and consideration in the post-marketing period and perhaps identified in labeling as a possible adverse effect of uncertain relationship to the drug. Steps planned to evaluate adverse events further should be noted.***"
55. It is not necessary to have significant numbers of dechallenge/rechallenge events to appreciate drug toxicities. For example, in the March 2005 Guidance for Industry – Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, FDA notes the following: "*It is possible that even a single well-documented case report can be viewed as a signal, particularly if the report describes a positive rechallenge or if the event is extremely rare in the absence of drug*".
56. Publications contributed by FDA authors also note that dechallenge/rechallenge data are useful for causation considerations.[36]

---

[35] Temple et al., 1979; Strom 2000 Pharmacoepidemiology, 3rd Edition
[36] See Temple *et al.*, 1979; See also Strom, BL, 2000 Pharmacoepidemiology, Chapter 10 (Kennedy, DL, Goldman, SA & Lillie RB, *Spontaneous Reporting in the United States*)

12

57. Incidences of positive dechallenge/rechallenge events have been documented in clinical trials involving gabapentin. Dechallenge events include suicidal ideation, depression and hostility. In addition, a positive rechallenge event was documented in one patient (depression).

58. Original patient narratives relating to dechallenge events are outlined below. **In one particular instance there was a well-documented case of dechallenge/rechallenge.** A patient (Patient 1-1 from Study 945-015, RR #720-02837) receiving gabapentin became severely depressed and had suicidal ideations while on the drug. **When gabapentin was tapered and subsequently discontinued, the patient recovered from both the depressive and suicidal events. Upon readministration of gabapentin (rechallenge) the patient again became depressed.** "The investigator considered the event <u>probably</u> <u>related</u> to gabapentin therapy, and the patient was withdrawn from the study."[37] This event should have been highlighted in a separate section of the Pfizer Defendants' ISS and discussed in detail with the additional patients who expressed suicidal ideations or attempted to take their own life. Examples of positive dechallenge/rechallenge events related to psychobiologic function and associated with Neurontin are provided below (a-g). All of these events occurred prior to the December 1993 approval of Neurontin.

a. Research Report #RR-X-4300-00003   June 9, 1986
   Positive dechallenge: **reactive depression (1)**

> Psychological symptoms of "depression/depressed feeling" were reported in 3/57 patients of unknown origin: 2 under baseline SAEDs and 1 patient under 600 mg gabapentin (possibly reactive depression) lasting 1.5 months during the dosage reduction period (following completion of the treatment phase up to 1200 mg) which completely disappeared in the one month follow-up phase after washout of gabapentin.

---

[37] RR 720-02837 (emphasis added) at p. 94-95. Pfizer Defendants' causal association assessment ranged from Definite, Probable, Possible, or of Unknown Relationship. *See* RR 720-02837 at p.67. Additionally, Pfizer Defendants also appear to have utilized Causality Assessments based on Karch, F.E. and Lasagna, L., JAMA 234, 1236-1241 (1975) as it pertained to such open-label studies of the safety and efficacy of gabapentin (Protocol 945-15). *See* Pfizer_LLaMoreaux_0018652 at 0018671. The criteria for assessment of causality (using Karch and Lasagna's approach) included Definite, Probable, Possible, Remote, and Unclear. Under these circumstances, the adverse event of depression regarding Patient 1 should have been coded more conservatively as Definitely Related. Definite is defined as "[a] reaction that follows a reasonable temporal sequence from administration of the drug <u>or</u> in which the drug level has been established in body fluids or tissues. Improvement or disappearance on stopping or reducing the dosage (dechallenge), [and] Reappearance of the reaction on repeated exposure (rechallenge)." Pfizer_LLaMoreaux_0018652 at 0018671.