# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
    :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,     :
        SALES PRACTICES AND      :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  Judge Patti B. Saris
    :
THIS DOCUMENT RELATES TO:       :   Magistrate Judge Leo T.
    :   Sorokin
*Bulger v. Pfizer Inc., et al.*, 1:07-cv-11426-PBS  :
*Smith v. Pfizer Inc., et al.*, 1:05-cv-11515-PBS  :
    :
    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE
THE UNTIMELY SUPPLEMENTAL DECLARATIONS
OF STEFAN P. KRUSZEWSKI AND RONALD W. MARIS.**

Plaintiffs do not dispute that their experts' declarations are out of time and in contravention of Rule 26 and this Court's orders. Instead, plaintiffs suggest that the declarations are "rebuttal declarations," necessary to correct inaccuracies in defendants' motions to exclude. This suggestion is not only inaccurate, but begs the question—*i.e.*, if defendants mischaracterized testimony, why have plaintiffs not merely directed the Court to the deposition testimony that was allegedly mischaracterized, rather than submit all new declarations? The reason is simple: plaintiffs' experts' declarations are much more than an attempt to explain inaccuracies. They are a blatant attempt to backfill and rewrite the record after the fact. Plaintiffs' attempt to shore up their experts' flawed methodology via untimely declarations is improper and should not be allowed.

**I.**    **Plaintiffs' Experts' Declarations Are Not Proper "Rebuttal" Testimony.**

Plaintiffs claim that their expert declarations are proper "rebuttal," but cite no authority whatsoever suggesting that expert declarations—which contradict prior reports and sworn

testimony—offered in response to a motion to exclude (and on which a summary judgment motion is based) are proper rebuttal. "The principal objective of rebuttal is to permit a litigant to counter new, unforeseen facts brought out in the other side's case." *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir. 1999). Plaintiffs do not contend that new or unforeseen facts were brought out in defendants' motions to exclude plaintiffs' experts. Nor could they. Defendants' motions were based on the reports and deposition testimony of plaintiffs' own experts and how the reports and testimony related to the experts' methodologies. Thus, to the extent plaintiffs' experts attempt to rebut anything, they are either rebutting their own reports and testimony or defendants' legal argument. Neither of these constitutes "new, unforeseen facts" and neither is appropriate rebuttal.

Moreover, the law is clear that plaintiffs cannot "rebut" a summary judgment motion by relying on an expert declaration that differs from an earlier Rule 26(a) report. *Brumley v. Pfizer Inc.*, 200 F.R.D. 596 (S.D. Tex. 2001), is analogous. In *Brumley*, the plaintiffs' expert executed an affidavit containing a previously, undisclosed opinion in response to the defendants' motion for summary judgment. *Id.* at 598. Noting that "[a] subsequent expert affidavit submitted to rebut a summary judgment motion may be excluded if it differs from an earlier Rule 26 report," which the Rule requires to be "detailed and complete" in order to "avoid the disclosure of sketchy and vague expert information," the court concluded that the affidavit was materially different from the expert's Rule 26 report and struck the affidavit as untimely. *Id.* at 603-04. As in *Brumley*, plaintiffs have ignored Rule 26 by submitting untimely expert declarations containing new and different opinions, *see* II. *infra*, bearing on the experts' methodology in response to defendants' motions to exclude.[1] Accordingly, the declarations should be stricken.

---

[1] Plaintiffs admittedly ignore Rule 26, but suggest that they should be excused from doing so because the Court previously permitted a report from Dr. Gibbons, a rebuttal witness. Plaintiffs' tactics in response to defendants'

**II.     The Declarations Are An Improper, After-the-Fact Attempt to Correct Deficiencies in the Experts' Prior Reports and Deposition Testimony.**

Plaintiffs suggest that defendants have been "intellectually dishonest" in filing their motion to strike, when plaintiffs are the ones playing fast and loose with the facts.  A review of plaintiffs' experts' reports and deposition testimony alongside the experts' new declarations demonstrates that plaintiffs have improperly attempted to fix the flaws in their experts' methodologies to avoid summary judgment.  Defendants offered two examples of this blatant back-filling in their motion.  Plaintiffs' attempt to explain away the 180-degree change in their experts' opinions is unavailing.

First, defendants demonstrated that when Dr. Maris was specifically asked about his methodology in the *Bulger* case and whether he ruled out risk factors pertinent to Mrs. Bulger, he specifically disavowed use of the differential diagnosis method, which requires an expert to rule out possible alternative causes.  Mot. to Strike at 4 ("First of all, I don't have the same model that you are assuming, which is the differential diagnosis model, where you rule out alternatives.").  Defendants further demonstrated that this testimony was contrary to Dr. Maris' declaration where he claimed that the defendants' mischaracterized his "theory of suicide" because "he both rule[d] in and ruled out non-Neurontin suicide risk factors."  *Id.*

Ignoring Dr. Maris' explicit testimony about his methodology, plaintiff cites to an earlier portion of Dr. Maris' deposition where he was asked whether he "rule[d] out <u>and/or</u> account[ed] for alternative explanations for Mrs. Bulger's suicide," to which Dr. Maris responded, "I think I

---

motions are not comparable to the Court's allowance of Dr. Gibbons.  First, defendants properly followed Rule 26 and sought leave, which plaintiffs have never once attempted to do.  Moreover, plaintiffs easily could have complied with Rule 26 by updating the experts' reliance lists or supplementing their reports.  Instead, plaintiffs attempted to change the record after the close of expert discovery and the *Daubert* motions were fully submitted.  In violation of Rule 26 and the Court's scheduling orders, plaintiffs have continued on the course they began with the *Daubert* briefing on general causation, refusing to stand by the record and attempting to "repair" it with new and different opinions contained in untimely and improper declarations.

- 4 -

did. . . . I certainly considered them all under risk factors." Pl. Opp. at 4 (emphasis added). This excerpt neither demonstrates that Dr. Maris "ruled out" Mrs. Bulger's risk factors (as opposed to considering them), nor that Dr. Maris conducted a differential diagnosis. It thus does <u>not</u> show, as plaintiffs suggest, that Dr. Maris' declaration is consistent with his prior deposition testimony. If anything, it highlights the contradictions between the two, as plaintiffs still have not and cannot show that Dr. Maris ruled out the possible alternative explanations of Mrs. Bulger's suicide in order to arrive at Neurontin as the most likely cause.[2]

Second, defendants established that Dr. Kruszewski did not in fact include Mrs. Bulger's prior suicide attempts <u>on his list of suicide risk factors</u> in his report, Def. Mot. at 4-5, a fact Dr. Kruszewski has repeatedly admitted:

> Q.    Doctor, show me in your report where you listed prior suicide attempts as a risk factor that increased Mrs. Bulger's risk for suicide.
>
> A.    I don't believe that I did.

Ex. A at 422:11-17.[3]  Defendants additionally demonstrated that—contrary to his deposition testimony—Dr. Kruszewski now claims to have "considered these [suicide] attempts in [his] estimation of <u>the risk factors for suicide</u>." Def. Mot. at 5.

---

[2] Defendants also noted that Dr. Maris produced new general and specific causation opinions for the first time at his deposition. Def. Mot. at 3. In response, plaintiffs address only Dr. Maris' general causation suicide model, conceding that they do not intend to rely on this model, and simultaneously ignore Dr. Maris' new specific causation opinions and the perpetual handwritten revisions he made to his report throughout his deposition. In addition, plaintiffs argue that although Dr. Maris was not disclosed as a general causation expert, "he may testify" on the issue of general causation. This issue was raised not in defendants' motion to strike, but in defendants' motion to exclude. Moreover, plaintiffs cite no legal authority in support of their contention that it is "axiomatic" that an expert may testify on general causation when, contrary to this Court's orders, he was not timely disclosed as an expert on this issue.

[3] *See also* Exhibit A at 418:2-419:11:

> Q. Doctor, what I see is missing from this list of issues that increased her risk of suicide is any mention of prior suicide attempts, correct?
> A. I believe I did not include that here.
> Q. And you did not include suicidal ideation, correct?
> A. I did not include that here.

5183219v.1

In response, plaintiffs again cite to the same paragraph in Dr. Kruszewski's report to which they have referred before. Notably, it is <u>not</u> the paragraph discussing Mrs. Bulger's risk factors, but rather discusses "various commentary about the vicissitudes of the life of Mrs. Bulger" and only states that "conflicted evidence also exists about [Mrs. Bulger's] suicide history." This paragraph is not evidence that Dr. Kruszewski included Mrs. Bulger's prior suicide attempts as a risk factor in his differential diagnosis. Indeed, Dr. Kruszewski admitted that prior suicide attempts did not make it on his list of risk factors because he was not even sure that Mrs. Bulger's attempts (which include driving her car off a cliff and overdosing to the point of cardiac arrest, rendering herself comatose for four days) were actually suicide attempts:

> Q.     But you didn't list prior suicide attempts as an issue that increased Mrs. Bulger's risk for suicide, correct?
>
> A.     That is correct, because I was not convinced from the information that I had available and some of the information that I just cited that, in fact, those attempts at hurting herself and driving her car off the cliff represented suicide attempts.

Exhibit A at 424:8-19. Thus, despite plaintiffs' suggestion otherwise, Dr. Kruszewski clearly and repeatedly expressed his opinion that he did not include Mrs. Bulger's prior suicide attempts on his list of risk factors for his differential diagnosis in both his original report and his

---

Q. And you did not include suicide intent?
A. Suicide intent?
Q. Correct.
A. I did not include that in that paragraph.
Q. And you did not include suicidal planning, correct?
A. That's correct, I did not include suicidal planning in that paragraph
Q. And just so we're clear, that paragraph that you're referring to is the paragraph that identifies the issues that increased Mrs. Bulger's risk of suicide, correct?
A. That's correct, or it provides protective factors against her suicide in the latter part of the paragraph.

5183219v.1

deposition—a fact which plaintiffs try to rewrite using Dr. Kruszewski's new declaration in response to defendants' motion to exclude.[4]

Moreover, not only has Dr. Kruszewski purported to include "prior suicide attempts" on his list of risk factors for Mrs. Bulger in his new declaration, but he relies on a new legal theory to justify his discounting of Mrs. Bulger's suicide history based on a never before disclosed journal article. Plaintiffs argue only that their delay in producing this article is "substantially justified," citing *Watson v. Electrolux Outdoor Prof. Prods., Inc.*, No. 04-11782-DPW, 2006 U.S. Dist. LEXIS 54386 (D. Mass. Aug 4, 2006), in which the expert produced a new opinion eight days after obtaining new information and prior to the expert's deposition in that case. *Id.* at * 21. Not only is this case distinguishable on the facts[5]—the article at issue here was published on November 18, 2008 and plaintiffs waited until February 23, 2008 (more than three months), after Dr. Kruszewski's deposition and defendants' motion to exclude, to disclose it—but plaintiffs ignore that Dr. Kruszewski attempts to use the article to form new opinions that contradict his prior report. For example, while Dr. Kruszewski previously testified that he did not even list suicide attempt on his risk factors because of the conflicted evidence, he now

---

[4] Plaintiffs also claim that defendants "place their credibility at issue in this case," by stating that Dr. Kruszewski testified that it was just "a matter of chance" that Mrs. Bulger was not successful in her prior suicide attempts. Pl. Opp. at 3. As an initial matter, Dr. Kruszewski's testimony on cross-examination that whether Mrs. Bulger's prior suicide attempt was successful was "a matter of chance" is not evidence that Dr. Kruszewski considered the prior suicide attempts in his differential diagnosis. Further, this issue was not raised in defendants' motion to strike; it was raised in defendants' motion to exclude. Plaintiffs' attempt to backdoor a response to defendants' motion to exclude through their opposition to defendants' motion to strike is improper. Moreover, defendants' assertion regarding Dr. Kruszewski's testimony is confirmed by the record: "Q. Well, the one [suicide attempt] in 1993, she came about as close to dying as is humanly possible, correct? A. Yes. Q. And it was only a matter of chance that Ron Bulger happened to find her and call the EMTs, correct? A. I'll accept that." Ex. A at 510:11-18. The excerpt cited by plaintiffs does not even address Mrs. Bulger's prior suicide attempts and is completely inapposite.

[5] *Diomed, Inc. v. Angiodynamics Inc.*, 450 F. Supp. 2d 130 (D. Mass. 2006), is equally distinguishable and in fact supports exclusion. In *Diomed*, the court found that the expert's failure to include the new theory in his initial report "may have resulted from a misunderstanding with respect to discovery requests made by Diomed." *Id.* at 137. The court then concluded that defendants had not shown adequate prejudice because they were alerted of the new theory regarding damages at the expert's deposition and "the issue of damages [was] not pertinent to the pending motions for summary judgment." *Id.* In contrast, here plaintiffs' experts have proffered new, contradictory opinions offered for the first time in an attempt to avoid defendants' dispositive motions.

5183219v.1

claims, confusingly, that Mrs. Bulger's risk of suicide was <u>decreased</u> because of her prior

attempts.  Kruszewski Decl. at 2, ¶ 4 (Doc. 1670).  This is a wholly new and different opinion.

Plaintiffs suggest that Dr. Kruszewski's reliance on new literature, coupled with both

experts' changed opinions (such as Dr. Kruszewski's belated attempt to include suicide attempt

as a risk factor for Mrs. Bulger, and Dr. Maris' suggestion that his methodology includes "ruling

out" risk factors) is "harmless."  This suggestion is disingenuous, given that defendants filed

their motions to exclude based on the record as it existed at that time and could not have

anticipated wholesale revisions to plaintiffs' experts' opinion attempting to fix their unreliable

methodologies.  Defendants appropriately considered the record "closed" at the time they filed

their motions to exclude.  Indeed, in a nearly identical situation, the court in *Baker v. Indian*

*Prairie Cmty. Unit*, No. 96 C 3927, 1999 WL 988799 (N.D. Ill. Oct. 27, 1999), concluded before

striking the experts' untimely declarations:

> Defendants were entitled to assume that [plaintiff's experts'] reports were
> complete. Defendants are now unfairly prejudiced by the [plaintiffs'] reliance on
> new and untimely expert opinions in response to summary judgment. . . . One of
> the primary goals of the federal civil discovery rules and Rule 26(a) is to
> 'eliminate surprise.'  The Court will not allow the [plaintiffs] to ambush
> Defendants with new expert opinions after the expert opinion disclosure deadline
> and after they filed for summary judgment.

*Id.* *3.  The Court should likewise strike plaintiffs' prejudicial, after-the-fact expert declarations.[6]

---

[6] Defendants also noted that the Drs. Maris' and Kruszewski's declarations were an attempt to do an end-run around
the applicable page limitation, as plaintiffs attempted to address defendants' arguments not in their opposition brief
(which is subject to a page limitation), but rather in line-by-line fashion in the experts' declarations.  In response,
plaintiffs admit that the declarations rebut the motions to exclude, *see* Pl. Opp. at 9, but claim that defendants'
replies were too long, citing Discovery Order No. 2, which provides a briefing schedule and guidelines for discovery
motions, not dispositive motions, such as motions to exclude.  Thus, contrary to plaintiffs' contention, defendants'
replies were not subject to a seven-page limitation.  Moreover, plaintiffs' suggestion that their experts' declarations
were too long because of the length of defendants' <u>replies</u> is nonsensical.  The declarations were submitted in
response to <u>defendants' motions to exclude</u>.  It was defendants that were forced to reply to an overly voluminous
submission (including 48 pages of expert declarations in addition to the opposition briefs), not plaintiffs.

Dated: March 27, 2009                    Respectfully submitted,


                                         DAVIS POLK & WARDWELL

                                         By:      /s/  James P. Rouhandeh
                                                  James P. Rouhandeh

                                         450 Lexington Avenue
                                         New York, NY 10017
                                         Tel:  (212) 450-4000

                                                  -and-

                                         SHOOK, HARDY & BACON L.L.P.

                                         By:      /s/ Scott W. Sayler
                                                  Scott W. Sayler

                                         2555 Grand Blvd.
                                         Kansas City, MO 64108-2613
                                         Tel:  (816) 474-6550

                                                  -and-

                                         WHITE & WILLIAMS

                                         By:      /s/ David B. Chaffin
                                                  David B. Chaffin

                                         100 Summer Street, 27th Floor
                                         Boston, MA 02110
                                         Tel:  (617) 748-5200

                                         *Attorneys for Defendants Pfizer Inc. and
                                         Warner-Lambert Company LLC*

- 9 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 27, 2009.


/s/ David B. Chaffin
David B. Chaffin

5183219v.1

# Exhibit A

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
2
   RONALD J. BULGER, SR.,   :  NO.
3  as Administrator of      :  07-CA-11426-PBS
   the Estate of            :
4  SUSAN BULGER,            :
   Deceased,                :
5               Plaintiff   :
         vs.                :
6  PFIZER, INC., et al.,    :
                Defendants  :
7                           :

8          VIDEOTAPE DEPOSITION OF

9        STEFAN P. KRUSZEWSKI, M.D.

10        VOLUME II, (Page 345-699)

11

12           Taken in the Harrisburg

13  Hilton, located at 1 North Second Street,

14  Harrisburg, Pennsylvania, on Thursday,

15  October 16, 2008, commencing at

16  8:42 a.m., before Linda Beyerle, Court

17  Reporter.

18
   APPEARANCES:
19
        FINKELSTEIN & PARTNERS, L.L.P.
20      BY:   KENNETH FROMSON, ESQ.
        785 Broadway, 3rd Floor
21      Kingston, NY   12401
         -- For the Plaintiff
22
                   *  *  *
23

24

25

418

1   A.   Correct.
2   Q.   Doctor, what I see is missing from
3   this list of issues that increased her risk
4   of suicide is any mention of prior suicide
5   attempts, correct?
6   A.   I believe I did not include that here.
7   Q.   And you did not include suicidal
8   ideation, correct?
9   A.   I did not include that here.
10  Q.   And you did not include suicide
11  intent?
12  A.   Suicide intent?
13  Q.   Correct.
14  A.   I did not include that in that
15  paragraph.
16  Q.   And you did not include suicidal
17  planning, correct?
18  A.   That's correct, I did not include
19  suicidal planning in that paragraph.
20  Q.   And just so we're clear, that
21  paragraph that you're referring to is the
22  paragraph that identifies the issues that
23  increased Mrs. Bulger's risk of suicide,
24  correct?
25  A.   That's correct, or it provides

419

1   protective factors against her suicide in
2   the latter part of the paragraph.
3   Q.   So the paragraph says, "I examined the
4   issues that increased Mrs. Bulger's risk of
5   suicide," and then you list those risks,
6   correct?
7   A.   Correct.
8   Q.   And then you also list the factors
9   that you think protected her from suicide,
10  correct?
11  A.   That's correct.
12  Q.   Doctor, why wouldn't you list
13  Mrs. Bulger's prior suicide attempts as
14  risk -- as issues that increased her risk
15  for suicide?
16  A.   I addressed that yesterday and I'll be
17  happy to repeat my response.
18      I am aware and did consider that
19  there is evidence in her medical records
20  that Mrs. Bulger made attempts to hurt
21  herself. There is an episode when she is a
22  young woman where she drives off a cliff.
23  There are episodes that are documented in
24  her records as early as Salem Hospital in
25  1988, and subsequently, that she attempted

420

1   to overdose on one, two or three occasions,
2   and may have also hurt herself by slicing
3   her wrists, I believe.
4       There is also conflicting
5   evidence in the deposition transcripts about
6   whether any of those represented, in fact,
7   suicide attempts or something other, some
8   attempt at calling attention to herself or
9   an attempt to ask for help or something else
10  entirely.
11      The conflicted evidence about
12  that was highlighted for me, and I believe I
13  put this in my report, in the CAB initial
14  evaluations that were done -- that's the
15  Center for Addictive Behaviors, I believe,
16  in Massachusetts -- where at one time she
17  says that the -- or the person who fills out
18  the form says that she has not had any
19  previous attempts and another form says that
20  she has. So even the same institution has
21  conflicted evidence.
22      And I believe that I quoted her
23  sister, Linda Landry, who has stated in her
24  deposition that she was not suicidal
25  previously.

421

1       The evidence that I just cited
2   about the reports were the -- sorry -- the
3   forms signed by Dr. Medwid on May 31st,
4   2002, where they were signed differently,
5   and the information -- I can't find it at
6   the moment, but there's information, I
7   believe, from Linda Landry, which I again
8   suggested yesterday that says that she was
9   not specifically trying to kill herself.
10      But, nonetheless, again, I
11  didn't list that, I absolutely could have,
12  because I considered that in my overall
13  assessment.
14  Q.   Well, first of all, a prior suicide
15  attempt is one of the number one risk
16  factors for suicide, correct?
17  A.   Correct.
18  Q.   So if you had concluded that she had
19  attempted suicide previously, that would
20  surely be included as one of the issues that
21  increased her risk of suicide in your
22  conclusion, correct?
23  A.   As I said, I did mention it in my
24  report, but there was conflicting evidence
25  as to whether or not she was actually trying

20 (Pages 418 to 421)

422

1  to hurt herself -- trying to kill herself.
2  Q.   But, Doctor, you agree that you did
3  not list prior suicide attempts as an issue
4  that increased Mrs. Bulger's risk of
5  suicide, correct?
6      MR. FROMSON: Objection.
7  Asked and answered.
8      THE WITNESS: In that
9  paragraph, I did not.
10 BY MS. SCHULTZ:
11 Q.   Doctor, show me in your report where
12 you listed prior suicide attempts as a risk
13 factor that increased Mrs. Bulger's risk for
14 suicide.
15     MR. FROMSON: Objection.
16     THE WITNESS: I don't believe
17 that I did. What I'm saying verbally is
18 that I accept and did and gave evidence
19 in the exhibits that she had previous
20 attempts at hurting herself and comments
21 on that, but I thought the evidence was
22 so conflicted that I just didn't put it
23 in my conclusionary assessment.
24 BY MS. SCHULTZ:
25 Q.   Is it your conclusion that she had

423

1  previous attempts at harming herself or your
2  conclusion that she had previous suicide
3  attempts?
4      MR. FROMSON: Objection as to
5  form.
6      THE WITNESS: She clearly had
7  attempts at harming herself.
8  BY MS. SCHULTZ:
9  Q.   Do you conclude that she had previous
10 suicide attempts?
11 A.   My answer to that is the same. I have
12 accepted the fact that there is enough
13 evidence that she had prior suicide
14 attempts, including running her car off the
15 cliff.
16     However, the evidentiary basis
17 for that in the report is conflicted, and
18 it's the reason I did not put it in that
19 concluding statement, but --
20 Q.   So because you think the evidence as
21 to whether there were prior suicide attempts
22 is conflicted, you chose not to consider
23 that as a factor that increased
24 Mrs. Bulger's risk for suicide, correct?
25     MR. FROMSON: Objection as to

424

1  form. Misstates his testimony.
2      THE WITNESS: That's not
3  exactly accurate.
4      As I said, I considered it. I
5  did not write it in that summary. I
6  certainly could have.
7  BY MS. SCHULTZ:
8  Q.   But you didn't list prior suicide
9  attempts as an issue that increased
10 Mrs. Bulger's risk for suicide, correct?
11     MR. FROMSON: Objection.
12 Asked and answered.
13     THE WITNESS: That is
14 correct, because I was not convinced from
15 the information that I had available and
16 some of the information that I just cited
17 that, in fact, those attempts at hurting
18 herself and driving her car off the cliff
19 represented suicide attempts.
20 BY MS. SCHULTZ:
21 Q.   If, in fact, Mrs. Bulger had attempted
22 suicide, and you concluded that there were,
23 in fact, prior suicide attempts, that would
24 be something that you would have included as
25 a risk factor for suicide -- her suicide,

425

1  correct?
2      THE WITNESS: May I ask you
3  to read that back to me?
4      MS. SCHULTZ: I'll restate
5  the question.
6  BY MS. SCHULTZ:
7  Q.   If you had, in fact, concluded that
8  Mrs. Bulger did, in fact, have prior suicide
9  attempts, then that would have been
10 something that you would have considered to
11 be a high risk for suicide, correct?
12     MR. FROMSON: Objection as to
13 form.
14     THE WITNESS: Yes.
15 BY MS. SCHULTZ:
16 Q.   Doctor, you also state that were it
17 not for the prescription of Neurontin,
18 Mrs. Bulger's mental status would not have
19 deteriorated to the point that suicide
20 became an option for her.
21     Do you recall stating that in
22 your report?
23 A.   I do.
24 Q.   Is it your opinion that Susan Bulger's
25 mental status had not previously ever

21 (Pages 422 to 425)

510

1  accept the fact that she has overdosed, and
2  that she has slit her wrists, and that she
3  has driven her car off a cliff. I don't
4  need to say it again.
5  BY MS. SCHULTZ:
6  Q.  Well, Doctor, you testified earlier
7  that the difference between her prior
8  suicide attempts and the one in 2004 was the
9  fact that she died in 2004, correct?
10  A.  Yes.
11  Q.  Well, the one in 1993, she came about
12  as close to dying as is humanly possible,
13  correct?
14  A.  Yes.
15  Q.  And it was only a matter of chance
16  that Ron Bulger happened to find her and
17  call the EMTs, correct?
18  A.  I'll accept that.
19  Q.  So there's really no difference
20  between her suicide attempt in 1993 where
21  she came so, so close to dying and her
22  attempt in 2004 that was successful; do you
23  agree?
24      MR. FROMSON:  Objection as to
25  the form of the question.

511

1      THE WITNESS:  Absolutely not.
2  It's all the difference in the world, and
3  it's the difference between life and
4  death.  In 2004, she had a successfully
5  completed suicide and had ingested
6  Neurontin before that action in an
7  abrupt, impulsive, unplanned decision to
8  kill herself.
9  BY MS. SCHULTZ:
10  Q.  And how is that different from 1993?
11  A.  She was not taking Neurontin at that
12  time.  She did not successfully complete
13  suicide.
14  Q.  So the fact that Ron Bulger found her
15  in time in 1993, but didn't find her in time
16  in 2004 forms the basis for your opinion?
17      MR. FROMSON:  Objection.
18  Misstates testimony.
19      THE WITNESS:  I don't believe
20  that's an accurate reflection of my
21  opinion.
22  BY MS. SCHULTZ:
23  Q.  Well, had Ron Bulger gone downstairs
24  and found Susan Bulger in respiratory arrest
25  or cardiac arrest and called the EMTs and

512

1  they saved her, there'd be no difference,
2  correct?
3      MR. FROMSON:  Objection as to
4  the form of the question.
5      THE WITNESS:  There would be
6  still an enormous difference.
7  BY MS. SCHULTZ:
8  Q.  What's the enormous difference?
9  A.  It would be wonderful if she had been
10  found in time and resuscitated.  However, in
11  the retrospective analysis that I did, when
12  people hurt themselves, and in this case,
13  when she was taking Neurontin, that analysis
14  reflected that she was taking Neurontin, and
15  precipitously hurt herself following that.
16  That is not the situation that occurred in
17  1993 or any other time when she hurt herself
18  or did whatever she did to overdose.
19      And again, we don't know the
20  intent of her overdose in this specific
21  event, because it could have been an
22  unintentional overdose, because she was
23  abusing cocaine, alcohol, and opioids.
24  Q.  So you still say it could have been
25  unintentional, even though Susan Bulger,

513

1  herself, says she previously attempted
2  suicide by overdose?  Is that right?
3      MR. FROMSON:  Objection as to
4  form.
5      THE WITNESS:  We do not have
6  a statement from Susan Bulger that, I
7  intentionally tried to kill myself in
8  1993 or 1998.
9  BY MS. SCHULTZ:
10  Q.  Do we have that in 2004?  Do we have a
11  statement from Susan Bulger that says, I
12  intentionally tried to kill myself on
13  August 4, 2004?
14  A.  We do not.
15  Q.  And we don't know if she thought that
16  Ron Bulger may come find her, as she was
17  leaning against her rope, correct?
18  A.  That's correct.
19  Q.  So what is the difference between her
20  attempt in 1993 where she was seconds away
21  from death and her attempt in 2004 where
22  Ron Bulger didn't find her in time?
23      MR. FROMSON:  Objection as to
24  form.  Asked and answered.
25      THE WITNESS:  The situation

43 (Pages 510 to 513)