IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                        )
NEURONTIN SALES, MARKETING and ) CA No. 04-10981-PBS
PRODUCTS LIABILITY LITIGATION  ) Pages 1 - 92



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 31, 2009, 2:10 p.m.





LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3

          ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
4    and KEITH L. ALTMAN, ES1., Finkelstein & Partners, LLP,
     1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.

5

6

     FOR THE DEFENDANTS:

7

          DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
8    100 Summer Street, Suite 2707, Boston, Massachusetts, 12110.

9         JAMES P. ROUHANDEH, ESQ., Davis, Polk & Wardwell,
     450 Lexington Avenue, New York, New York, 10017.

10

          SCOTT W. SAYLER, ESQ., Shook, Hardy & Bacon, LLP,
11   2555 Grand Boulevard, Kansas City, Missouri, 64108-2613.

12        MARK S. CHEFFO, ESQ. and MARA C. CUSKER GONZALEZ, ESQ.,
     Skadden, Arps, Slate, Meagher & Flom, LLP,
13   Four Times Square, New York, New York, 10036.

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE CLERK:  In re:  Neurontin Marketing, Sales

3    Practices and Products Liability Litigation, Civil Action

4    No. 04-10981, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6            MR. FROMSON:  Good afternoon, Judge.  Kenneth

7    Fromson from Finkelstein & Partners for the plaintiffs.

8            MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein

9    & Partners, for the plaintiffs.  Good afternoon.

10            MR. ALTMAN:  Keith Altman, Finkelstein & Partners,

11    for the plaintiffs.  Good afternoon.

12            MR. ROUHANDEH:  Good afternoon, your Honor.  Jim

13    Rouhandeh of Davis, Polk & Wardwell.  You know Mr. Sayler.

14    I wanted to introduce a new face.  This is Mark Cheffo from

15    Skadden Arps.  He's new to this case, but --

16            THE COURT:  Boston, New York?

17            MR. CHEFFO:  New York, your Honor.

18            THE COURT:  New York, all right.

19            MR. ROUHANDEH:  And he's going to be arguing the

20    motions because he's done a lot of work for Pfizer on

21    similar type issues.  We put in a pro hac application.  I

22    don't believe your Honor has ruled on it, but --

23            THE COURT:  Yes, of course.

24            MR. SAYLER:  Good afternoon, your Honor.  Scott

25    Sayler, Shook, Hardy & Bacon.

 1          MR. CHAFFIN:  Good afternoon, your Honor.  David

 2    Chaffin for the defendants.

 3          MS. GONZALEZ:  Good afternoon.  Mara Cusker

 4    Gonzalez, also from Skadden, for the defendants.

 5          THE COURT:  So we essentially have two motions,

 6    two separate cases.  I didn't know if you wanted, if you

 7    talked about this, to do one case first and complete oral

 8    argument on it, and then do the second case, or whether your

 9    intent was to argue both cases simultaneously.

10          MR. CHEFFO:  Well, your Honor, for my part, I

11    think there's a fair amount of overlap between the cases,

12    and I think we can address them at the same time.  I do

13    think -- for example, Dr. Maris testifies in both issues of

14    causation -- the arguments are very similar.

15          THE COURT:  Have you talked about a schedule?  How

16    long do you think you would need?

17          MR. CHEFFO:  With respect to the argument?  Yes.

18          MR. CHEFFO:  Probably twenty, twenty-five minutes,

19    your Honor.

20          THE COURT:  All right.  And for you?

21          MR. FROMSON:  I'm sorry, Judge, we have not

22    discussed it.  I agree basically that there is a lot of

23    overlap, and twenty, twenty-five minutes should be adequate.

24          THE COURT:  Before you get going, though, I just

25    want to understand one thing because there's been a lot of

1    back-and-forth in the briefs.  What are the outstanding

2    claims in the Smith and Bulger cases?  In other words, you

3    admitted that certain things weren't going to fly, like, for

4    example, the Tennessee consumer law.

5               MR. FROMSON:  Yes, Judge.  Basically, in response

6    to your question, the complaint as it stands in the Smith

7    case alleges negligence, breach of warranty, both express

8    and implied --

9               THE COURT:  I just want to know what's left.

10              MR. FROMSON:  Well, you're correct that there was

11   no opposition as to the Tennessee Consumer Protection.

12              THE COURT:  I know, but I had trouble because I

13   was back and forth with motions and oppositions and replies

14   and surreplies, not just with respect to two separate cases

15   but also the expert issue.  So I just want to make sure I

16   understand.  So there's an outstanding negligence claim in

17   Smith?

18              MR. FROMSON:  That is correct.  What's basically

19   not there anymore is the express warranty --

20              THE COURT:  I want to know what is there.

21              MR. FROMSON:  Fine.  Negligence, breach of implied

22   warranty, strict liability, fraud, and the claim for

23   punitive damages.

24              THE COURT:  All right.  And let me just say, under

25   Tennessee law, is that deemed a separate claim, or is that

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1  just a damage theory?

2          MR. FROMSON:  That's a very good question.  I

3  don't know.

4          THE COURT:  Well, I'm going to for this moment

5  assume that that is a separate damage theory.

6          MR. FROMSON:  We framed it as such.

7          THE COURT:  And the negligence is what encompasses

8  the duty to warn?

9          MR. FROMSON:  Yes, your Honor.

10         THE COURT:  And does that come up in any other way

11 under Tennessee law?  It's not strict liability, is it?

12         MR. FROMSON:  Well, we do claim strict liability.

13         THE COURT:  I know that, but is that a

14 duty-to-warn claim?

15         MR. FROMSON:  Well, the failure to adequately warn

16 is strictly liable whether -- yes, your Honor.

17         THE COURT:  I just want to understand.

18         MR. FROMSON:  Yes.

19         THE COURT:  The theory of the strict liability is

20 a duty to warn?

21         MR. FROMSON:  Yes.

22         THE COURT:  I just want to understand.  All right,

23 so Bulger would be?  What's left?

24         MR. FROMSON:  In the Bulger case, your Honor, we

25 still claim strict liability.

1          THE COURT:  Now, this is Massachusetts law?

2          MR. FROMSON:  Yes.

3          THE COURT:  But I thought there was no strict

4     liability.

5          MR. FROMSON:  Well, the negligence and the implied

6     warranty --

7          THE COURT:  No, I want to know what's left.

8          MR. FROMSON:  Fine, your Honor.  Negligence,

9     implied warranty, fraud, and the survival action.

10         THE COURT:  Well, what's a survival --

11         MR. FROMSON:  Which is the related issue of

12    damages again, your Honor.

13         THE COURT:  That's the wrongful death piece.

14         MR. FROMSON:  Yes.

15         THE COURT:  But that sounds in either warranty or

16    negligence, right?

17         MR. FROMSON:  Yes, your Honor.

18         THE COURT:  So really what's left is, in Smith

19    under Tennessee law is negligence, breach of implied

20    warranty, strict liability, and fraud; and in Bulger under

21    Mass. law is negligence, implied warranty, and fraud?

22         MR. FROMSON:  Yes, Judge.

23         THE COURT:  Okay, I just want to make sure I

24    understand what's left.  As I understand it, and before you

25    go, what are the actual misrepresentations that you're

1    claiming?  I'll let you do this.  I just want to --

2              MR. CHEFFO:  Fine, your Honor.

3              THE COURT:  I just --

4              MR. FROMSON:  You're asking me what the fraudulent

5    misrepresentations are?

6              THE COURT:  Yes.

7              MR. FROMSON:  Start with suppression.

8              THE COURT:  And that's what, suppression of what?

9              MR. FROMSON:  Suppression of all of the safety

10   signals that you have become accustomed with over the course

11   of this litigation, your Honor.

12             THE COURT:  But that's not good enough for me.  I

13   want to understand it.  Depression, is it the depressive

14   side effects of the drug Neurontin?

15             MR. FROMSON:  That is one, your Honor.

16             THE COURT:  That's the only one I know.

17             MR. FROMSON:  Fine, your Honor.

18             THE COURT:  So if there's another one, have you

19   pled it?

20             MR. FROMSON:  Yes, your Honor.  We set forth in

21   our opposition papers in detail at Document 1674, Page 8 and

22   Page 9 and Page 10 in the Bulger case, with great

23   specificity the various specific facts that the defendants

24   did not inform both physicians and consumers with respect to

25   Neurontin.  These were all suppressed.  I can read verbatim

1   from my opposition papers, but essentially I'm referring you

2   specifically to the pages and the footnotes with respect to

3   the actual issues that were suppressed.

4           THE COURT:  All right.  And what are the

5   affirmative -- and is that the same suppression in Bulger?

6           MR. FROMSON:  Yes, your Honor.

7           THE COURT:  Bulger and Smith?

8           MR. FROMSON:  That was Bulger, your Honor.

9           THE COURT:  And what about Smith?

10          MR. FROMSON:  Smith would be the same issues,

11  would be the same specific detailed suppressed information

12  that was set forth in the opposition papers.

13          THE COURT:  Okay.  And the affirmative

14  misrepresentations, are you still doing an affirmative

15  misrepresentation case?

16          MR. FROMSON:  We are still trying to pursue that

17  claim by way of the amended complaints earlier, for which we

18  haven't received a decision, but we are certainly not going

19  to concede that point absent a decision from you.

20          THE COURT:  Well, let me ask you this then because

21  I just want to understand this:  So the thrust of the

22  briefing for these have been suppression cases, is that

23  right?  That's essentially what the focus is today is a

24  suppression case?

25          MR. FROMSON:  That is the thrust of the briefing,

1    your Honor.  I would agree with that.  However, we do want

2    to try and pursue the claim that the widespread off-label

3    marketing scheme by this company essentially led to

4    distributed information and went to these physicians.

5    Whether they admit it --

6              THE COURT:  But that's what you would call the

7    fraudulent off-label marketing campaign, the boondoggle

8    conferences, the basic marketing approach of the company,

9    right, as opposed to --

10             MR. FROMSON:  That is correct.

11             THE COURT:  -- a suppression of information?

12             MR. FROMSON:  That is correct.  Suppression is

13   part of fraud, but you could delineate the difference

14   between suppression and a specific affirmative statement to

15   a doctor, and so I recognize that.  There are two --

16             THE COURT:  So at least for purposes of Bulger and

17   Smith, you're alleging that the salesmen walked into the --

18   well, tell me what is the contact that you said was the

19   exact misrepresentation for both of them.

20             MR. FROMSON:  Well, there's a direct contact

21   either by a sales representative verbally speaking with a

22   physician.  There is also direct contact by the company

23   through the package insert itself, a written document to the

24   physician.  In both of those situations, the absence of the

25   sales representative properly informing of the risk is

1    suppression, and the failure of the package insert to

2    provide adequate safety information is also suppression.

3    Also, the failure of the company to submit "Dear Doctor" or

4    "Dear Health Care Professional" letters to physicians is

5    also an act of suppression.

6              THE COURT:  Is the package insert the same as the

7    label?

8              MR. FROMSON:  Essentially, your Honor, yes.  A

9    package insert includes both information for the physician

10   and actually a separate "Information for Patient" section.

11   So when you hear things such as the theory that, "Well, the

12   package insert is for the doctor," well, that is not

13   entirely true.  It's not false; it's just not entirely true

14   because labels also include a separate section for the

15   patient.

16             THE COURT:  So the new Supreme Court case, I just

17   want to -- this is what nobody has briefed very much other

18   than I know the preemption argument was a -- the new Supreme

19   Court case talks about viable theories of liability arising

20   from the label, something that we haven't all focused much

21   on, but I've read the case.  So assuming for a minute, as

22   I've suggested at prior hearings, that I'm not just going to

23   allow a general marketing campaign without some evidence of

24   direct contact, you would push back and say:  Yeah, we've

25   got -- maybe, you know, we'll fight you on that, Judge, but,

308ed1bc-2ab1-41d2-868f-e7b4a62df620

Page 12

1    in any event, we've got direct contact with either the sales

2    rep speaking to someone in the doctor's office, or, B, the

3    package inserts, or, C, the possibility of sending out a

4    "Dear Doctor" letter?

5              MR. FROMSON:  Correct.  And if I just simply may

6    add, when I reference the package insert, you must also keep

7    in mind the samples that go from the sales representative to

8    the doctor, that's another item.  It's a package, it's a box

9    that includes the sample with the package insert in it.

10   Again, it's another avenue by which the doctor gets the

11   package insert.

12             THE COURT:  So both the prescription and the

13   sample you would argue sort of disclose this information?

14             MR. FROMSON:  Yes.

15             THE COURT:  All right.  And that would be true

16   with both cases?

17             MR. FROMSON:  That's true.  And keep in mind that

18   across this country physicians rely upon the nationally

19   published Physician's Desk Reference, which is actually the

20   identical label that --

21             THE COURT:  At some point the depressive side

22   effect does show up in the Physician's Desk Reference?

23             MR. FROMSON:  It depends how you're referencing

24   depressive side effects.  There is reference of adverse

25   events reported within the package insert label, but

1  defendants would not agree that that equates to causation or

2  even association.

3            THE COURT:  I understand.  When did that come into

4  the PDR?

5            MR. FROMSON:  There was a change between -- well,

6  I don't know when the word "depression" actually came into

7  the PDR.

8            THE COURT:  Do you know?

9            MR. SAYLER:  Yes, your Honor.  It was in the

10 initial labeling that was approved in the end of 1993.

11           MR. FROMSON:  There was a change between the term

12 "suicide" and "suicide attempt" that was done more --

13           THE COURT:  So the Physician's Desk Reference

14 since 1993 -- I'm not sure it's even in this record -- had

15 some reference to adverse side effects of suicide?

16           MR. FROMSON:  No.  It had an adverse event report

17 reference of depression.

18           THE COURT:  An adverse event report on depression.

19           MR. FROMSON:  The term "completed suicide" was

20 never in the package insert until after approximately 2005.

21           THE COURT:  So in 2005 it became an adverse event

22 report with respect to a completed suicide?

23           MR. FROMSON:  Correct.

24           THE COURT:  Okay, all right.  Thank you, that's

25 very helpful.  All right, now you're up at bat.

1           MR. CHEFFO:  Thank you, your Honor.  We are all on

2     the same page with respect to the claims, Smith and Bulger.

3     I think counsel appropriately addressed those.  The Bulger

4     case is Massachusetts, and Smith is a District of Tennessee

5     case.  There are actually five motions on today, but there

6     is substantial amount of overlap.  There's a summary

7     judgment motion with respect to each of the claims and the

8     legal issues that your Honor has been asking questions

9     about.  There's also a motion to strike late-filed 45

10    single-spaced pages of additional expert affidavits, and

11    then there's motions to exclude the specific medical

12    causation testimony in both of the cases.  There are

13    actually three experts, and one of them, Dr. Maris,

14    testified as to specific medical causation in both Smith and

15    Bulger.

16          But with the Court's indulgence, I think where I'd

17    like to start is with respect to the proximate or the legal

18    causation, and the reason why is because with respect to

19    proximate or legal causation, not the specific medical

20    causation issue that I'll deal with with respect to the

21    experts, but it's a claim and it's an element of each and

22    every one of the Smith claims.  We've also asserted the

23    proximate/legal causation with respect to the fraud claim in

24    the Bulger case.

25          Now, to defeat -- the crux of the plaintiffs'

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1   claims here, the allegations, is that if additional warnings

2   had been provided, Mr. Smith and Mrs. Bulger would not have

3   committed suicide.  So in connection with these two cases,

4   having a full and fair opportunity to develop a record, the

5   plaintiffs must proffer admissible evidence that the

6   prescribing physicians would not have written these

7   prescriptions if they had received the additional warnings

8   that the plaintiffs suggest that they should have received.

9           Now, with respect to Smith, there were three --

10          THE COURT:  I'm sorry, can I back up.  Are we

11  talking now about the fraud claim or the duty-to-warn claim?

12          MR. CHEFFO:  Well, your Honor, we're talking about

13  all of them, and I can differentiate.  Proximate cause/

14  legal causation is an element certainly of fraud, the

15  negligence, the strict liability, the warranty claim.  So

16  it's an element of each and every one of the claims in

17  Smith; and it's an element of the claims in the Bulger case,

18  but we've asserted at this juncture only as to the fraud

19  claim in the Bulger case.  However, there are additional

20  reasons, which I'll get to in a minute, but I certainly can

21  address them now, with respect to the fraud claims.  So, for

22  example --

23          THE COURT:  So wait.  You're going too fast and

24  talking too fast.  So proximate causation with respect to

25  the claim that the Neurontin -- you say that plaintiffs must

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    prove that the doctors would not have prescribed Neurontin

2    if they had known about the depressive side effects?

3            MR. CHEFFO:  At least, if not so far as they must

4    prove for summary judgment there was proffered admissible

5    evidence that the doctors would not have prescribed.

6            THE COURT:  And you're pressing that only with

7    respect to the fraud claim in Bulger and with respect to

8    both the fraud and duty to warn in Smith?

9            MR. CHEFFO:  All of the claims in Smith and the

10   fraud claim.  And the reason, your Honor, and I can get into

11   more detail, but there's a heeding presumption which has

12   been discussed in a First Circuit case, and, frankly, we

13   decided to be surgical and tactical in light of that

14   decision.  We're not conceding the issue, but in light of

15   that First Circuit decision, we thought the appropriate step

16   on summary judgment here was to be targeted and focused with

17   the proximate causation analysis.  In Tennessee, the heeding

18   presumption has not been adopted.  Therefore, we believe the

19   proximate causation argument that I'd like to talk about

20   will apply to all of the claims.  With respect to --

21           THE COURT:  Can I back you up on that?

22           MR. CHEFFO:  Sure, please.

23           THE COURT:  We actually did in the last two days

24   our own legal search on that Tennessee issue.  We have found

25   no case in Tennessee addressing it.

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1          MR. CHEFFO:  Yes, your Honor, and that's what we

2     have found also.  It is based on, as the Court is likely

3     aware, it's based on the Restatement Comment J.  And, you

4     know, our position certainly is to the extent that it would

5     have to be affirmatively adopted.  So the plaintiffs have

6     not identified any information or any case law to support

7     that comment.

8          THE COURT:  There's just nothing one way or

9     another on the heeding presumption.

10          MR. CHEFFO:  I think that's fair, your Honor.

11          THE COURT:  Okay, I just wanted to make sure.

12     You're Skadden Arps.  You know, I'm assuming that if you

13     found it, you would feel duty-bound to disclose it.  And so

14     I think that is correct that there is no case addressing

15     this issue in Tennessee.

16          MR. CHEFFO:  I think that's absolutely my

17     understanding, your Honor, that there is no case addressing

18     it.

19          THE COURT:  You're preserving the issue that --

20     the argument that the Tennessee Supreme Court would not

21     likely adopt it.  That's basically your position?

22          MR. CHEFFO:  That's correct, your Honor, and

23     certainly, you know, the Restatement has been around for a

24     long time in many other states, including Massachusetts.

25          THE COURT:  Would it matter to you that Tennessee

1  has adopted that Restatement section; they just haven't

2  addressed Comment J?

3         MR. CHEFFO:  Well, I think that would be in our

4  favor.  I mean, I think that to the extent that --

5         THE COURT:  That's good, so you're jumping

6  right --

7         MR. CHEFFO:  I think to the extent that --

8         THE COURT:  In any event, so I think we found a

9  few cases where they followed the Restatement (Second), so

10  that tends to be their practice.  And I guess your argument

11  would be, yeah, but they haven't yet addressed Comment J.

12  They just haven't discussed it one way or another.

13         MR. CHEFFO:  That's correct, and, you know, I'm

14  trying to be kind of mindful and a little surgical with the

15  case law, but I would, you know, to the extent that I was

16  able to have a little bit of liberty, I would argue that the

17  Restatement has been around for a long time, and lots of

18  smart judges and lots of smart appellate courts have had an

19  opportunity to evaluate and adopt it, if they were so

20  inclined.  And to the extent that certain sections were and

21  others were not, I can't speak for the highest court, but

22  what I can say is, I think that's pretty good evidence that

23  there's no effort and there's no determination --

24         THE COURT:  A deafening silence.

25         MR. CHEFFO:  Exactly, your Honor.

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1          THE COURT:  So let's move on from that.

2          MR. CHEFFO:  Fair enough, your Honor.  So that's

3    why we've parsed out some of the claims.  But the bottom

4    line is, you know, and I had the pleasure of reading the

5    October 20 hearing transcript, and basically, you know, your

6    Honor asked the same questions:  "I need some specific

7    information.  Perhaps if you were to take some depositions,

8    we'd have a record."  We're at that point right now.

9          THE COURT:  We are.

10          MR. CHEFFO:  We have a record.  You know, it's not

11   going to change.  The doctors have been deposed.  Very

12   skilled lawyers on the other side, they've had a chance to

13   ask all the questions that they want to ask.  And what's

14   happened is, in the Smith case, there are three prescribers,

15   and each one of them was deposed.  None of those physicians

16   testified that they would not have prescribed Neurontin if

17   they had received additional warnings.  That fact in and of

18   itself, your Honor, I think is both indisputed and it's

19   absolutely dispositive with respect to proximate causation.

20   Cases such as Nix, Motus, Vanderwerf and just basic common

21   law principles of proximate causation compel that result,

22   your Honor.

23          And with respect to the Bulger case, and again I'm

24   jumping around a bit, but Bulger fraud, proximate cause

25   still is an element.  You still have to prove reliance, but

1   right now I'm talking about proximate cause.  The same is

2   true.  The physicians, there was Dr. Crognale and

3   Dr. Goldman.  Both were deposed, and neither doctor

4   testified that he would not have written the prescription

5   for Neurontin if additional warnings or additional

6   information had been provided.  We think, again, with

7   respect to those claims, based on that testimony, your Honor

8   essentially could stop and say there is no at this point

9   admissible evidence of proximate causation.

10          Now --

11          THE COURT:  So it may well be that this heeding

12   presumption, which I had never heard of until two days ago,

13   is the thing that might, in your view, distinguish a

14   duty-to-warn case that's viable as opposed to a fraud case

15   that's viable.

16          MR. CHEFFO:  Well, I think that it would certainly

17   have an impact, your Honor.  I think it would be

18   disingenuous if I said that it wouldn't, but --

19          THE COURT:  Because that tips the burden

20   essentially.

21          MR. CHEFFO:  Well, you know, we could go back and

22   forth.  In fact, there's a Restatement (Third) and there's

23   some, you know, analysis from some of the scholars that

24   said, well, now the court has an opportunity to look at it.

25   And I think the issue here -- and the First Circuit case is

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1  a case before the Restatement (Third), so even in

2  Massachusetts.  And I think the heeding presumption, many

3  people have challenged whether it should be applied from a

4  policy perspective, but to the extent that it --

5          THE COURT:  It may make an difference in this

6  case.

7          MR. CHEFFO:  It could provide a certain element.

8  It would also depend on how it's applied and not only if

9  it's applied.  So, in other words, various courts in various

10 states have applied the heeding presumptions in different

11 ways.  But to answer your Honor's question directly, I think

12 to the extent that there was proof that Tennessee adopted

13 it, I think it would be something that the Court would

14 certainly want to look at, but I don't think there is.

15         Now, the plaintiffs are not home-free, if you

16 will, even with a proximate cause argument, or if the Court

17 were not to adopt that, and even with the heeding

18 presumption, particularly with respect to the fraud claim.

19 Now, your Honor is certainly well aware of the --

20         THE COURT:  But can we make sure that -- like,

21 assume for a minute I find that there is a heeding

22 presumption in both states -- I don't know that I will --

23 but fraud is different, right?  You have to show reasonable

24 reliance.

25         MR. CHEFFO:  Absolutely.

1          THE COURT:  So, now, let me just get to that for a

2    minute.  I hadn't thought much about the labels or the

3    inserts, mostly because I actually didn't know how that

4    Supreme Court case would come out.  Maybe you all assumed it

5    would come out differently because no one really briefed

6    this very much other than on the preemption issue.  That's

7    very good language for plaintiffs in the case.

8          So let's assume for a minute that there was an

9    intentional suppression of information that was arising,

10   let's say, between 1995 and 2000, in that time period, about

11   the depressive side effects of Neurontin.  Let's assume

12   there was intentional suppression and it should have been in

13   the insert.  So what do I then do with reasonable reliance

14   and causation?

15         MR. CHEFFO:  I think that's an easy one, with all

16   due respect, your Honor, because I think that --

17         THE COURT:  I haven't said anything about it.

18         MR. CHEFFO:  Oh, well, I mean, to the extent that

19   you were going to basically turn to the issue of whether

20   there was suppression or not, I think just taking a step

21   back, I think there's really no dispute -- you've asked

22   counsel, they've said it in their brief -- there's no

23   dispute that there is no misrepresentation of fact, okay.

24   The plaintiffs have --

25         THE COURT:  No affirmative.  Right, that's not

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1   what these summary judgments are about.

2          MR. CHEFFO:  That's correct.  So in the next

3   surrogate, if you will, plaintiffs come back and say, well,

4   we don't have a misrepresentation of fact; what we have

5   maybe is this kind of amorphous suppression/omission theory,

6   okay, as a surrogate for that part.  But what they don't

7   have, what they don't have is reliance.  And now would be

8   the time certainly, your Honor, after summary judgment,

9   because we're not talking about doctors in the world,

10  doctors in the United States; we're talking about the

11  physicians in Smith and Bulger.

12          All five of the physicians were deposed.  They

13  certainly could have asked, "Had you seen additional

14  information, had you known this, had you done this, you

15  know, is it fair to say, Doctor, you would not have

16  prescribed this?"  Those types of questions or perhaps other

17  circumstantial.  There is no evidence.  None of the doctors

18  said, knowing additional information, hearing additional

19  information or anything else would have changed.  So the

20  element of both proximate cause and reliance -- in other

21  words, "Did you rely on the fact that this information

22  wasn't there?" -- there's none of that in these records.  So

23  as a result, both based on proximate causation grounds and

24  just straight vanilla common law fraud principles, they

25  cannot survive the motion for summary judgment.

1          Now, just a few words.  I think your Honor

2     correctly characterized this.  You know, having no reliance,

3     they again looked for a few surrogates.  They wanted to look

4     for the fraud-on-the-market theory.  Essentially, it's out

5     there, so people must have relied.  I think your Honor

6     suggested quite properly, more articulate than I had, you

7     said that this has big problems at the October 20 hearing.

8     And your Honor has dealt with cases, including the Van- --

9          THE COURT:  But you kept quoting my millisecond

10    quote over and again, but that was in the context of this

11    sort of broad marketing campaign, not in terms of the

12    details to the doctors' offices.

13         MR. CHEFFO:  Well, and fair enough, and I do

14    appreciate that, your Honor.  My point really is just to say

15    that both in cases your Honor has held -- and, you know,

16    this is really not in dispute.  The Circuit Courts, in the

17    context of anything but even federal securities cases, not

18    even securities cases dealing with common law fraud, the

19    courts have not, and your Honor has not, used the market

20    share theory as a surrogate for reliance.  So that's one

21    area that the plaintiffs relied on.

22         And I think the other is, they basically say,

23    "Well, we don't have testimony from the doctors.  We could

24    have had it but -- and we're going to try and rely on fraud

25    on the market, but our next surrogate theory is, we're going

1    to look to Dr. King."  He was a general causation marketing

2    expert.  "And Dr. King is going to testify essentially how

3    the omission would have affected the doctors."

4         So the doctors have testified that there's no

5    evidence that they have been affected, but they want to use

6    Dr. King.  And we think, again, for a common law fraud,

7    that's an improper attempt to use a surrogate.

8         Now, unless your Honor has more specific questions

9    on that, I'd like to turn briefly to the motion to strike.

10        The plaintiffs' Rule 26 expert reports were due on

11   August 7 of 2008.  Your Honor certainly is aware that

12   Rule 26 requires a complete statement of all the opinions

13   that the experts will express.  Here's what happened:  The

14   plaintiffs did in fact comply, and they provided expert

15   reports, and depositions were scheduled.  And I'm talking

16   about the three expert -- there's actually two additional

17   experts who provided supplemental reports, Dr. Kruszewski

18   and Dr. Maris, and Dr. Maris provided these two additional

19   reports in both Smith and Bulger.

20        THE COURT:  Excuse me, are you talking about

21   Dr. Blume?  Motion to strike whose report?

22        MR. CHEFFO:  These are -- what happened, your

23   Honor, is, these are reports that were only provided after

24   Pfizer moved for summary judgment and to exclude based on

25   702 in Daubert.  So there was the initial reports, and then

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1   those folks were deposed.  Then Pfizer said, "Okay, the

2   record is closed.  We've now followed the process that your

3   Honor set in place.  We're going to move to exclude based on

4   their testimony.  We're going to move for summary judgment."

5          It's only without seeking leave of the Court,

6   without notice to Pfizer, they attached in their opposition

7   papers, or actually through a declaration of counsel,

8   45 single-spaced pages of additional, additional expert

9   reports.  You know, we think for a host of reasons -- one,

10  it's improper -- I'm sorry, were you going to ask me a

11  question, your Honor?

12         THE COURT:  I mean, to the extent it's brand-new

13  stuff, maybe, but I thought as I started to read some of

14  those that it was just responding to points you made in the

15  brief.  In other words, it wasn't a brand-new theory.

16         MR. CHEFFO:  With that, I don't disagree.  So if

17  your Honor was going to ask me, you know, "If I was to deny

18  your motion to strike, do you lose?" my answer would be --

19  and I don't mean to play judge and counsel -- my answer

20  would be, no, we don't because they don't change the

21  substantive underlying issue.

22         The point really here, though, is, you know, these

23  are not the only cases before your Honor.  And Dr. Maris

24  showed up at his initial deposition with a new expert

25  report.  And during the testimony he was futzing and adding

1    and writing, and Pfizer could have been within its rights to

2    move to strike at that point.  So these are not picayune

3    procedural-type motions.  We didn't do that.  But the point

4    is, you know, if we're going to have some order and process

5    as we go forward with this and the other cases, we just

6    think Rule 26, Rule 37 without notice, it's not the proper

7    forum to essentially kind of lob over the transom 45 new

8    pages of testimony that we then have to address in reply

9    briefs and your Honor has to read at the last minute.  So do

10   they materially change anything I've told you as to why we

11   think the motion should be granted?  No.

12            THE COURT:  So let's go on to the next one.

13            MR. CHEFFO:  Yes, your Honor, and this is the

14   final kind of set of motions.  These are motions to exclude

15   in Bulger.  Again, it's Maris and Kruszewski, and in Smith

16   it's Maris and Trimble.  And I promise I won't continue to

17   read your Honor's case law, but there is, if you'll just

18   indulge me for one minute, there's two or three sentences

19   from your decision in the Perrier case where I think it's

20   completely instructive.  You said, "The court's gatekeeper

21   role is especially sensitive in cases where the plaintiff

22   claims that exposure to a toxic substance causes injury

23   because a jury may blindly accept an expert's opinion that

24   conforms with their underlying fears of toxic substances

25   without carefully understanding or examining the basis of

1   that opinion."

2           Now, I understand that there may be some subtle

3   differences between certain of the toxins, but the general

4   point here is --

5           THE COURT:  The claim in that case was that

6   drinking Perrier caused leukemia.

7           MR. CHEFFO:  That's correct, and you determined

8   that general causation testimony was inappropriate.  The

9   point here is, I think the theme of this is having folks in

10  white coats who are M.D./Ph.D. come in and testify about

11  things that the average person doesn't understand, complex

12  medical issues, is particularly dangerous; and that's the

13  point I think that we believe should govern your Honor's

14  analysis of the motions to exclude.

15          THE COURT:  But, you know, interesting, going

16  back, I remember the doctor very well.  He was a practicing

17  cancer doctor in Florida, but he hadn't done any research.

18  So it was different from somebody like Trimble who spent his

19  life in this area, or the guy who is the suicidologist that

20  everyone cites.  It was a different kind of expert.

21          MR. CHEFFO:  Well, your Honor, you know, I'm not

22  going to kind of move over into the --

23          THE COURT:  I'm just saying, Satera, there were no

24  epidemiological studies.  The guy was a practicing doctor

25  who cared passionately, but he hadn't done the work in this

1    area.

2             MR. CHEFFO:  Well, I would submit, with all due

3    respect, that particularly on specific causation -- and I'd

4    like to just talk briefly about some of the examples -- I

5    think the experts, the specific causation expert here is

6    akin to someone who hasn't done anything in the area.  In

7    other words --

8             THE COURT:  Which one are you referring to now?

9             MR. CHEFFO:  I'm referring to Dr. Saris.

10            THE COURT:  That's my brother.

11            (Laughter.)

12            MR. CHEFFO:  I can probably turn around and just

13   leave right now.

14            THE COURT:  My father always wanted it, but it

15   just didn't go that way.

16            MR. CHEFFO:  Talk about wanting to change, you

17   know, correct the record onto fly.

18            Dr. Maris, Dr. Kruszewski, and Dr. Trimble.  Now,

19   basically plaintiffs bear the burden here of establishing

20   that these three experts have employed the proper scientific

21   methodology in deriving their opinions that Neurontin caused

22   Mrs. Bulger and Mr. Smith's suicide.  This is a footnote.

23   We still have the general causation issues.  I'm not going

24   to discuss that, but your Honor only needs to reach the

25   specific causation issues to the extent that you were not

1    inclined to agree with our general causation position.

2          Now, each of these opinions is result-oriented,

3    litigation-motivated, and methodologically unsound.  Let's

4    just talk a little bit who these folks are, the decedents.

5    Dr. Maris in his report said that both were moderately

6    suicidal before Neurontin, okay.  Now, we know -- and this

7    is just really the highlights, if you will -- Mrs. Bulger

8    had a long history of mental health disease, chronic and

9    disabling pain.  She in fact had over a dozen surgeries for

10   rheumatoid arthritis, severe marital problems, domestic

11   discord.  And perhaps the most important factor from a

12   suicide perspective, she had multiple, four prior suicide

13   attempts.  And everything I just mentioned, your Honor, that

14   was all before she took her first dose of Neurontin.

15         Now, Mr. Smith, Mr. Smith was a 79-year-old man.

16   He had severe untreated depression related to his very

17   chronic and severe joint and spine pain.  Again, that

18   preceded Neurontin.  He had expressed to family members the

19   desire to die because of the pain on several occasions.

20   Recently, while he was on Neurontin but before his suicide,

21   he was told by doctors that essentially his condition was

22   inoperable, they could not provide any medical relief in

23   terms of operations for his chronic pain.  And we know from

24   his suicide note, he said, amongst other things, that "Pain

25   has taken over my mind and body."

1          So that's essentially just a very quick, broad

2    backdrop, your Honor.  But yet all of these experts have

3    opined, and notwithstanding Dr. Maris' determination that

4    they were suicidal before Neurontin, that despite these

5    numerous generally accepted risk factors, it's Neurontin.

6          Well, we have asked over and over again, well, how

7    do you differentiate?  How can you say it's Neurontin?  What

8    do you do to rule in and rule out?  Well, the reason why

9    they've had such problem, we know Dr. Maris testified that

10   he does not even use a differential diagnosis.  As your

11   Honor may be aware, the differential diagnosis is the

12   generally accepted methodology when performed appropriately

13   for health care professionals to rule in and rule out and

14   come to specific causation analyses.

15          Just as a few points here, your Honor --

16          THE COURT:  So just help me a little bit on the

17   differential diagnosis.

18          MR. CHEFFO:  Sure.

19          THE COURT:  Does your experts discuss this?

20          MR. CHEFFO:  Scott, do our experts --

21          MR. SAYLER:  Absolutely, they apply the

22   differential diagnosis.

23          THE COURT:  Yes, but do they accept physical -- I

24   understand there's a difference of opinion, as I would well

25   expect, about whether Neurontin was the tipping point that

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1   tipped them over or whether or not these other factors

2   caused the suicide.  And, of course, many factors cause a

3   suicide, but I was looking for, is there an established and

4   widely accepted methodology in the suicide area as opposed

5   to, let's say, cancer?

6            MR. CHEFFO:  I would sure the answer is "yes," your

7   Honor.  I think that the differential -- in fact,

8   Drs. Trimble and Kruszewski testify that they purport to

9   apply a differential diagnosis.

10           THE COURT:  Right, they say they do, and you just

11   said that they didn't, and so that's why I stopped you right

12   there.

13           MR. CHEFFO:  And perhaps I misspoke.  There is a

14   differentiation, if you will, between the doctors.

15   Dr. Maris did not.  Now, this is from Page 1,253 of the

16   record.  He basically says, "Did you rule out the fact that

17   Susan Bulger had stopped receiving counseling as the cause

18   of her suicide?  Answer:  First of all, I don't have the

19   same model that you are assuming, which is a differential

20   diagnosis model where you rule out the alternatives.  My

21   theory, as you know, is that you rule them in.  And I talk

22   about them actually contributing to making her part of a

23   vulnerable minority of patients, and that by ruling them in,

24   then the Neurontin becomes an additional substantive

25   proximate risk factor, not the only factor.  So I'm not

1    ruling these things out.  I never tried to rule them out."

2            So my point to your Honor with respect to

3    Dr. Maris, you know, which one of these is different than

4    the other, Dr. Maris is different only to the extent that he

5    comes out in his deposition testimony and says, "I never

6    tried to perform a differential diagnosis."  The other two

7    folks say, "We tried, but --"  You know, this is not an

8    issue, your Honor, where we're coming and challenging

9    conclusions or kind of picking minor details.  The other two

10   folks, as I will try and explain in very short order, have

11   engaged in such a methodologically flawed effort at

12   differential diagnosis that it essentially is inadmissible.

13           So turning back, if I might, to Dr. Maris, and I'm

14   going to try and --

15           THE COURT:  I'm going to say this -- and it's

16   partly my fault -- we had talked about twenty to twenty-five

17   minutes.

18           MR. CHEFFO:  Yes, and I'm probably well over

19   already.

20           THE COURT:  Well over, so how much --

21           MR. CHEFFO:  I can wrap up in five minutes, your

22   Honor.

23           THE COURT:  Fine.

24           MR. CHEFFO:  Let me just hit the highlights for

25   your Honor.  Dr. Maris, he relies basically almost

1  exclusively on temporal proximity.  All of the experts do.

2  What they fail to do and what they can't do is, they say,

3  "There are certain things about Neurontin, we think

4  Neurontin caused X, Y, and Z."  But when asked over and over

5  again, they can't differentiate.  There's no prospective

6  criteria by which you, the jury, Pfizer could determine why

7  Neurontin.  They haven't ruled in or ruled out the alternate

8  causes.

9          They also say there's a vulnerable minority of

10  folks who are susceptible.  Again, when asked, "Well, how do

11  you know who's in the vulnerable minority?" they have no

12  answer to that.  So you have this incredible difference.

13  You have 79-year-old Mr. Smith who is a preacher with a

14  stable family life with 39-year-old Mrs. Bulger who has a

15  very severe psychiatric history and drug abuse.  They're in

16  the minority.

17          THE COURT:  By the way, did each of you get to

18  choose one of these?  Was that the genesis of these two

19  examples?

20          MR. CHEFFO:  Yes.  The Smith case --

21          THE COURT:  You chose Bulger, and you chose Smith?

22          MR. FROMSON:  Yes, your Honor.

23          THE COURT:  How did I guess?

24          (Laughter.)

25          MR. CHEFFO:  So that the question here, you know,

1    if I had to point out some of the highlights, there's

2    absolutely no methodology, not a flawed methodology, but

3    there's no methodology for figuring out how you

4    differentiate between Neurontin and all of the other things.

5              Dr. Maris testified in the Giles case that a

6    46-year-old man taking Effexor took three pills; he

7    committed suicide as a result of those three pills, okay.

8    And that was against Wyeth.  Yet in this case Mrs. Bulger

9    was taking Effexor.  When asked, "Well, how do you

10   differentiate between Giles?" he says, "Well, I must have

11   been wrong.  I lost that case."

12             And it's the same thing with respect to

13   Dr. Kruszewski, said, "Well, who would be in this vulnerable

14   minority?  How do you differentiate?"  Dr. Kruszewski in the

15   Crone case, which is another Neurontin case, was deposed.

16   He said, "Well, I would say it's Neurontin except for two

17   things:  if there was proof that the person didn't take

18   Neurontin, or they died as a result of something other than

19   suicide."

20             So these are just a few examples, your Honor, but

21   they're absolutely in the record, and they're to the point.

22   This is the ipse dixit of the experts.  They don't tell you

23   how they come to their conclusions.  They don't tell you the

24   guideposts.  You know, how would Pfizer begin to

25   cross-examine these people at trial?  How would the jury

1   understand who's in, how they've differentiated, because

2   they don't even think that they need to do it?

3            THE COURT:  Isn't psychiatry what they call soft

4   science, as opposed to the things we're currently struggling

5   through, I'm sure you're glad to know, in Daubert, where

6   there's like peer-reviewed scientific literature on tests

7   and that sort of thing?  Psychiatry, and I've done hundreds

8   of cases, psychiatry is just not so precise.

9            MR. CHEFFO:  Well, and I understand the Court's,

10  you know, struggle with the issues.  And I hope your Honor

11  doesn't hear me saying that this has to be a math equation

12  because, you know, I don't see that there's this position.

13  I also fully recognize where your Honor would be and where

14  all the cases talk about challenging the conclusion.  But

15  this is so different.  This is not an element where we're

16  quibbling around the margins.  This is an element that there

17  simply is no methodology.  You can search the record, and

18  you will not be able to find who's vulnerable, why did you

19  pick Neurontin?  In fact, Dr. Kruszewski says, well, he

20  didn't even consider the suicides as a potential risk

21  factor.  Why?  Because they were nonlethal.  Well, isn't

22  that the definition of an attempted suicide in the Bulger

23  case?

24            So these are essentially litigation-driven.  This

25  is not how they would practice as psychiatrists in the real

1    world, your Honor, to their patients.  This is not how they

2    would publish.

3            Just one or two final examples.  Dr. Maris came to

4    the deposition.  He had prepared the night before a suicide

5    report, okay.  And in his report he listed medication -- he

6    had two kind of things that could lead to suicide and things

7    that were preventative.  And he came with this report, and

8    he medication on the side of things that could lead to

9    suicide.  And he said, "Yeah, I have published this report

10   before."  But when he published it before, your Honor,

11   medication was on the other side.  It said things that were

12   preventative.

13           THE COURT:  Well, maybe it was preventative in the

14   other case.

15           MR. CHEFFO:  No.  These are things that he's

16   published in the literature.

17           THE COURT:  No, I'm saying maybe there's some

18   medication that we know is preventative.  Like lithium in

19   bipolar, you know, isn't that the gold standard that beats

20   out Neurontin?  So that would be something that would be

21   protective, right?

22           MR. CHEFFO:  But I think, your Honor, he was

23   talking about from a general causation -- he was talking

24   medication as a general matter.  He gave certain factors on

25   both sides.  My point is that it was -- and they've since

1    backed off and they've withdrawn, my understanding, that

2    suicide report when challenged on it.

3            So, again, I could certainly speak for a little

4    while longer, but I want to be respectful of the Court's

5    time.

6            THE COURT:  Yes, I think maybe you need to sit

7    down, and then I'm going to give the plaintiffs a chance,

8    and then maybe we would take a break before rebuttal.

9            MR. CHEFFO:  Sorry I went over, your Honor.

10            THE COURT:  Thank you.

11            MR. FROMSON:  Your Honor, I would like to also

12    mention that it's our understanding there's yet an

13    additional motion on for today.  In accordance with the

14    discovery schedule for dispositive motions on the

15    case-specific cases, we brought a motion to exclude the

16    testimony of defendants' expert, Sheila Weiss Smith.

17            THE COURT:  All right, but that goes to something

18    else, right?  That's not about these cases.

19            MR. FROMSON:  Because she was disclosed in the

20    context of the Bulger and Smith captions, we were obligated

21    to make a motion under the case-specific --

22            THE COURT:  But I'm not prepared on that.

23            MR. FROMSON:  I appreciate that, Judge.  I just

24    wanted to make sure you were aware.  Obviously, I'm sure you

25    are.

1           THE COURT:  I think I saw that come in late,

2    right?

3           MR. FROMSON:  That motion came in on the day it

4    was due for case-specific.

5           THE COURT:  I'm not saying you were late.  I'm

6    saying that wasn't part of the motions -- it's not relevant

7    to motions for summary judgment, right?

8           MR. FROMSON:  No, no, not for the issues that are

9    here today.  It's a separate motion to exclude her

10   testimony.

11          THE COURT:  One thing I will tell you I'm not

12   going to do, because I did read them.  I'm not going to --

13   "She can't say this in this line of her report."  I'm not

14   going to go through a hundred objections to a hundred

15   opinions.  It strikes me that there are lots of things she

16   can say, given her credentials, and there may be some things

17   she can't say.  But it would take me months to go through

18   every little line item that you want to zero out, and I'm

19   not likely to do that.

20          MR. FROMSON:  And I think the purpose of our oral

21   argument would be to target that for you.

22          THE COURT:  Maybe.  If you go to trial, do a

23   motion in limine.  I mean, it strikes me that some of it --

24   you're not even contesting she can give a bunch of those

25   opinions.  It's just some of them you don't think she can

1    give.

2              MR. FROMSON:  I understand, your Honor.

3              THE COURT:  And I'm not saying you're not right on

4    some of them, but when you're not looking at a knock-dead

5    punch -- in other words, she can't testify at all -- I don't

6    want to take the time today.

7              MR. FROMSON:  I understand.  Thank you.  All

8    right, let me get to the motions that are --

9              THE COURT:  Let's get to the heart of this.

10             MR. FROMSON:  And it's a big one.

11             Obviously, with respect to the defendants' motion

12   for summary judgment, in both Smith and Bulger, there are

13   many overlapping issues, and I appreciate the opportunity to

14   speak about both of them in one presentation.  I'll skip

15   over the standard of review, and obviously the motion papers

16   should be reviewed in the light most favorable to the

17   nonmoving party, which is plaintiffs.  And the plaintiffs

18   have raised triable questions of fact for the jury.  Those

19   include the negligence and breach of implied warranty claims

20   as well as the fraud claims.

21             The breach of the defendants' duty is clear.  They

22   fail in their pharmacovigilance obligations, which if you

23   have recently read Wyeth V. Levine was a big part of that

24   decision.  Their obligations include the requirement of

25   being vigilant as to post-marketing adverse events, clinical

1    trial adverse events, and pharmacology issues so that they

2    can properly and vigilantly inform physicians and consumers

3    about the risks of their drug.  That doesn't appear to be an

4    issue here today.  Rather, the defendants in their oral

5    argument are focusing on proximate cause.

6              THE COURT:  They pretty much concede they have a

7    duty to warn.  They're not conceding fraud, but they're

8    certainly conceding a duty to warn.

9              MR. FROMSON:  Yes, your Honor.  Now, what they are

10   arguing here today is that there has to be proximate cause

11   between the drug company, the doctor, and the plaintiff.

12   What I mean by that is, they stood before you and said:

13   Unless plaintiff can prove that a physician would not have

14   prescribed the drug, then there is this learned intermediary

15   defense that breaks the chain of causation.  That's not

16   true.  What we can show is:  Defendants breached their duty

17   of care in pharmacovigilance, that that breach of duty led

18   to an inadequate warning, and the inadequate warning was a

19   substantial factor, maybe not the substantial factor, but it

20   was a substantial factor in causing this plaintiff to commit

21   suicide.

22              We went and we deposed numerous physicians and

23   nurses, and on many of the occasions the testimony did in

24   fact reveal that these physicians would have changed or

25   altered their prescribing habits, or they would have changed

308ed1bc-2ab1-41d2-868f-e7b4a62df620

Page 42

1    or altered their monitoring habits.  There is no case law

2    that defense has cited today or in their papers that says I

3    must prove a doctor would not have prescribed the drug.

4    Even the FDA is not requiring that in their new enhanced

5    warning and medication guide for Neurontin.  All they are

6    asking is that physicians monitor their patients more

7    closely, inform family members, and be more vigilant about

8    their dosages.

9              Similarly here, that is what the plaintiffs are

10   arguing.  We are not claiming that this drug should come off

11   the market.  We are simply claiming that physicians and

12   consumers, particularly in this case, the Smith and Bulger

13   families should have been properly informed so that they

14   could have given informed consent to take this drug.

15             THE COURT:  So you're trying to essentially --

16   this is interesting -- bypass the doctor.  You're saying

17   that it should have been in the insert to the consumer.

18             MR. FROMSON:  We're doing both.  We're bypassing

19   the doctor by defeating the defendants' learned intermediary

20   defense.  We're making the second, this separate argument

21   that the patient was not appropriately warned or informed

22   via the patient information section in the label or via a

23   medication guide.  However, I want to focus now upon the

24   testimony of various physicians in the two cases.  Oh, I'm

25   sorry.

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1         THE COURT:  Is there any court -- maybe I missed

2    it -- it's not something I focused on in your briefs -- is

3    there any court that has essentially bypassed the doctor in

4    these situations and found a duty to warn the customer?

5         MR. FROMSON:  Well, the issue of reliance

6    traditionally goes to the consumer.  And so if the consumer

7    is relying upon the package insert, then, yes, we've met --

8    that is --

9         THE COURT:  But let's be very careful here because

10   I understand there's a ton of literature to totally support

11   your point of view, let's say, on a tricycle for a child or

12   a chain saw or something like that.  But I'm talking about,

13   in the medical world, are there cases that would support

14   your theory that there is a duty to warn the consumer --

15        MR. FROMSON:  Well, by virtue --

16        THE COURT:  -- in these package inserts?

17        MR. FROMSON:  By virtue of the fact that the

18   physician would not be a learned intermediary, all right,

19   you then get to look to the consumer --

20        THE COURT:  I'm talking about not an

21   over-the-counter drug.  I'm talking about a prescribed

22   medication.

23        MR. FROMSON:  I cannot cite a case off the top of

24   my head, your Honor, because, frankly, it's not necessary

25   for me to have a case that says you have to inform the

1  patient when that's what the regulatory requirements are of

2  a package insert in the first place.  You need to inform the

3  patient and you need to inform the physician, so I wouldn't

4  have a case that says that.  The regulatory requirements

5  require the package insert to have certain sections.

6         THE COURT:  Right, but most of the cases on the

7  heeding presumption have focused on the doctor.

8         MR. FROMSON:  Yes, your Honor.

9         THE COURT:  You have to assume that the objective

10  and reasonable doctor would have followed the warnings in

11  their medical and prescribing practices, and it shifts the

12  burden to the defendant to show, well, in this circumstance,

13  he wouldn't have.  So you're taking me -- and maybe it's

14  correct.  I don't know.  I mean, is it presumed that a

15  consumer will read and heed warnings in a prescription

16  medication that the doctor bypasses; I mean, in other words,

17  if the doctor says "Take it"?

18         MR. FROMSON:  I think in fairness, your Honor,

19  it's a burden of proof for a plaintiff to be able to

20  demonstrate that there is prima facie evidence that a

21  patient read a label or gained information from his or her

22  physician, and we are willing to accept that.  It's not a

23  challenge.  In this case, there is prima facie proof that

24  Mr. Smith gained information by virtue of his having the

25  package --

1      THE COURT:  I'm actually asking a really simple

2  question, which is, are there cases that discuss a

3  differential duty to the consumer versus the physician?

4  It's something I didn't think of when I walked in here

5  because I have been so focused on the doctor.

6      MR. FROMSON:  It's really a common sense argument

7  from my perspective and reliance on the regulatory

8  requirements of the FDA.

9      THE COURT:  None of this is common sense.  I never

10  even heard of the heeding presumption, all right, so --

11      MR. FROMSON:  Now, if I may go on, with respect to

12  the physicians, let's look to the physicians' testimony,

13  okay, because the physicians' testimony does demonstrate

14  that they wanted to know about this information that was

15  significant and relevant regarding safety, and they would

16  have definitely changed either their prescribing practice or

17  they would have monitored the patient differently.  For

18  example, if you can see on your screen, if it's on --

19      THE COURT:  Actually it's not, so hold on.  Good.

20  Do you have a copy of these for me?

21      MR. FROMSON:  As traditionally is the case, I work

22  on these on the fly as I'm watching and listening to

23  defendants, so I will have a copy by tomorrow submitted to

24  the courthouse.

25      THE COURT:  You were preparing this as they were

308ed1bc-2ab1-41d2-868f-e7b4a62df620

Page 46

1    talking?

2              MR. FROMSON:  I do that often because you never

3    know when something happens that I need to respond to, and

4    so --

5              THE COURT:  Actually, Mr. Alba can print them.

6              MR. FROMSON:  That's fine.

7              THE COURT:  And maybe make one for you as well?

8              MR. CHEFFO:  Thank you, your Honor.

9              THE COURT:  Do you have these?

10             MR. FROMSON:  I can e-mail, or I can use a thumb

11   drive.

12             THE COURT:  Well, try it, see if you can get them.

13   But, anyway, you can keep going.

14             MR. FROMSON:  Okay.  So if you look at Paul

15   McCombs, medical doctor and prescribing to Mr. Smith --

16             (Discussion off the record.)

17             MR. FROMSON:  The question at issue which is

18   highlighted, "Let me ask it to you this way:  Did you know

19   that Neurontin was a drug that the FDA at least had

20   considered might lead to suicides?"  Now, that's a

21   reference, your Honor, to the FDA's 1993 review of the

22   epilepsy indication.  The answer from the prescriber was

23   "No."

24             "Did you know that Neurontin was a drug where

25   there was a concern --" that was language from the FDA --

1    "within the drug company and the FDA about whether it

2    increased depression?"  The answer was "No."

3            "Isn't that the kind of information you'd like to

4    know?  Answer:  If it is considered a significant risk,

5    then, yes, I do."

6            May I change the screen?

7            THE COURT:  Sure, and you'll just shoot us this by

8    e-mail.

9            MR. FROMSON:  Yes.  Again on the same topic, that

10   being the signal, a red flag, from as long ago as 1993, "So

11   if the FDA has told Pfizer that less common but more serious

12   events may limit the drug's widespread usefulness, and the

13   third concern was with respect to depression, while it may

14   not be an infrequent occurrence in the epileptic population,

15   may become worse and require intervention or lead to

16   suicide," basically asking, "would this be significant

17   enough for you to want to know about it?"

18           Now, the context of all these questions was

19   because they wanted to know about their prescribing

20   practices.  The answer was, "Yes, this would be of

21   significance."

22           Now, the same physician was asked, "Is this the

23   kind of fellow," referring to Mr. Smith, "that you would

24   ever want to give a drug if you had a choice in the matter,

25   if that drug was going to be one that increased depression

1    or caused a loss of impulse control or suicide or things

2    like that?  Answer:  It's something that would have to be

3    weighted.  If the patient's depression was caused by

4    significant pain and the Neurontin helped the pain, that

5    would maybe help the depression, but it could go either

6    way."  And the question was, "Is that why it's important for

7    you as a doctor to know if suicide or depression is

8    considered a prominent side effect of the drug?"  The answer

9    was "Yes."

10            The same physician was asked, "If you had been

11    told by the detail reps," and this goes to the suppression

12    argument, "in talking to you about the drug Neurontin, if

13    they would have discussed with you that increases

14    depression, would it have changed your prescription habits

15    as far as Mr. Smith?  Answer:  Perhaps.  Question:  And by

16    'perhaps,' would you have considered trying other drugs

17    first?"  And in highlighted I put, "If I had known it was

18    associated with depression, knowing me, I would be very

19    careful with it.  Answer:  Yeah, if I decided to use it."

20            So it's not exactly accurate for the defense

21    attorneys to come into this court today and say we have no

22    evidence that physicians would have changed their

23    prescribing practices or would have monitored differently

24    Mr. Smith.

25            Now, the probative question to Dr. McCombs was,

Page 49

1    "So if you decided to use it, would you at least have given

2    him some significant warnings and his family, and made sure

3    everybody was tuned in to the fact that his depression

4    seemed to be getting worse, that he needed to contact

5    someone?  Answer:  I would."

6                Now, keep in mind, your Honor, this deposition was

7    taken before the FDA's enhanced warning, and so this was a

8    precursor to what the FDA has found to be the requirement

9    for Pfizer now.  As of December, 2008, Pfizer has to include

10   a medication guide and enhance their warning with respect to

11   Neurontin so as to explain to physicians that they need to

12   change their monitoring and their prescribing practices to

13   be more vigilant about suicidality.

14                This wasn't the only physician who was deposed in

15   the Smith case.  Edward Mackey, who was an orthopedist, your

16   Honor, testified similarly.  The question was, "No one told

17   you about that?"  And that's basically the general topic of

18   suicidality.  "No."

19                "Is that the kind of thing that would have been

20   important to know before you start prescribing a drug?

21   Answer:  Yes.  Question:  Because if you're going -- if you

22   have got a drug that may cause suicide, clinically

23   significant depression, you probably had other optional

24   drugs you could have given Mr. Smith that don't seem to have

25   that side effect, true?"  The answer was "Potentially, yes."

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1            Along the same lines, your Honor -- and I could go

2    on, but I think the point has been made -- lastly,

3    Dr. Mackey says, "I would have done the latter," in response

4    to basically explaining that he would have "put out warnings

5    and some safeties and precautions and told them what to be

6    observant about," that meaning the patients.

7            The threshold for Dr. Mackey in terms of whether

8    something would have been important enough to him in this

9    slide is that "I think that's a significant enough

10   complication/concern that at least if it got to that point,

11   with this particular patient, we would talk to him."  And

12   that's in response to scientists who are concerned that

13   Neurontin may lead to suicide with some people, not

14   everyone.

15           With respect to the affirmative representations,

16   your Honor, this is all about suppression, but before I move

17   on to the Bulger case, there's been a statement here today

18   that there are no affirmative representations of fraud that

19   could be proven and we're trying to rely on some

20   fraud-on-the-market claim.  Well, it's not entirely true.

21   There's a lot of circumstantial evidence in the Smith claim

22   that there were fraudulent misrepresentations made, and this

23   is the circumstantial evidence I would ask you to consider.

24           THE COURT:  This is Dr. King?

25           MR. FROMSON:  This is not Dr. King.  This is

1    actually, if you consider the factual circumstances of what

2    happened in the Smith case, I think you will find that

3    there's at least an issue of fact for a jury to decide

4    whether there were in fact direct statements of fraud.

5            You should know that Pfizer's in-office plan and

6    protocol is not to detail Neurontin to anyone but

7    neurologists and epileptologists.  Now, that makes sense

8    because the drug was only approved for epilepsy and

9    postherpetic neuralgia.  We find it quite spurious that they

10   detail orthopedists.  Dr. Mackey was an orthopedist.

11           We also found it striking that these detailers for

12   Pfizer, Ashley Pippin in her notes, which are a part of this

13   record, her sales notes stated that she planned to probe

14   into Nurse Krancer at Dr. Mackey's practice to get help

15   through her with other surgeons.  I simply don't know why

16   they would be detailing Neurontin to surgeons; surgeons for

17   neuropathic pain possibly, which they admit and which is an

18   off-label use.  So you have circumstantial evidence of

19   detailers to this practice, to physicians who don't

20   traditionally treat epileptic patients, and the number of

21   occasions to Dr. Mackey was 69.  On 69 occasions the

22   detailer went to that practice.

23           And with respect to Dr. McCombs, if I recall, we

24   had cited almost over 200 -- over 300 visits between

25   Ms. Pippin to Dr. Mackey's practice.  That is striking

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1  information, and that might not be a specific affirmative

2  representation, but Ashley Pippin won awards for being the

3  top salesperson that year, and that also is set forth in her

4  deposition testimony.

5        THE COURT:  As I've been talking about now for

6  twelve years -- I think, Mr. Rouhandeh, you were here from

7  the beginning -- off-label marketing is illegal, but it is

8  not necessarily fraudulent.  So I agree that that supports

9  your claim that there was illegal off-label marketing.  They

10 pled guilty to that.  It's just I need more for a fraud.

11       MR. FROMSON:  Okay, Judge, now I'll move back to

12 the Bulger case and the proximate cause issue, or, as I call

13 it, the learned intermediary defense, which they have not

14 met their burden.  I've outlined Mr. Smith's physician quite

15 specifically.  If you look to the next slide, Dino Crognale

16 was a prescriber for Susan Bulger.  Dr. Crognale

17 acknowledged his reliance on the Physician's Desk Reference

18 as a way to learn about this drug.  He was asked, "Do you

19 subscribe to the PDR?"  That's the Physician's Desk

20 Reference.  "Answer:  Yes.  Question:  And do you review it

21 when it comes out for drugs you prescribe?  Answer:  I

22 review, I review drugs as they come up.  Question:  What do

23 you mean as they come up?  Answer:  So if there are drugs

24 that have a new indication or a new warning, then I will

25 review those at that time each year."

1           Here, any reliance on the Physician's Desk

2    Reference from the day it was approved for epilepsy to the

3    point of either of these plaintiffs' deaths in 2004, there

4    was no heightened warning or reasonable warning that

5    adequately informed patients or these consumers about the

6    depression and suicidality that they knew about and yet

7    chose not to do anything about.

8           THE COURT:  Who writes the Physician's Desk

9    Reference?

10          MR. FROMSON:  My understanding is that

11   the Physician's Desk --

12          THE COURT:  Is there anything in the record on who

13   writes it?

14          MR. FROMSON:  I don't believe it would be in

15   dispute that the Physician's Desk Reference is a publicly

16   available published book, which basically takes identical

17   labels from all the companies in the country and publishes

18   their labels which are given to the PDR, okay, so that these

19   Physician's Desk References can be made available to

20   physicians.

21          THE COURT:  But is there more?  I think there is

22   more.  Don't they cite peer-reviewed studies?  I mean, it

23   goes beyond that.

24          MR. FROMSON:  The answer is -- Mr. Altman, if you

25   want to add to that issue.

1    MR. ALTMAN:  Your Honor, the companies pay the
2    company that publishes the PDR to print their label out.
3    They can choose to not include it or include it if they --
4              THE COURT:  So Pfizer would pay to print their
5    labels?
6              MR. ALTMAN:  That's right.
7              THE COURT:  Is there more?
8              MR. ALTMAN:  No.  It's nothing but the labels.
9    That's all that's in here.  There's some product
10   identification information like pictures of pills and things
11   like that, but other than that, it is nothing more than the
12   product insert.
13             THE COURT:  So if I looked at a Physician's Desk
14   Reference and they explained how they compiled it, they
15   would just simply say, "We copied the label"?
16             MR. ALTMAN:  Well, it's not that they copied it.
17   I mean, literally Pfizer affirmatively has to send it.  Not
18   every company does it.  There are like generic
19   manufacturers, many of them choose not to include package
20   inserts.  They just simply list all their drugs, and that's
21   it.
22             THE COURT:  And there's no independent evaluation?
23             MR. ALTMAN:  No.
24             MR. FROMSON:  Dr. Crognale was further influenced
25   by the fact that defendants did not inform him that

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    Neurontin decreases serotonin.  This goes to the biological

2    plausibility, the mechanism of action of Neurontin.  It

3    decreases serotonin in the brain, and it's generally

4    accepted that when you decrease serotonin in the brain,

5    you're going to have adverse mood and behavioral effects.

6    So he was asked, "And if Neurontin is known to deplete

7    serotonin, is that something you would want to know?

8    Answer:  Yes.  Question:  And why would you want to know

9    that?  Answer:  Because although I may not be able to tell

10   you exactly what the molecule is, the biochemistry does make

11   a difference in how it will affect people, and so I would

12   want to know that, and interaction with other medications as

13   well."

14           He was also asked specific questions about the

15   clinical trials of Neurontin from the point it was at its

16   approval stage moving forward.  So, for example,

17   Mr. Finkelstein at the deposition of Dr. Crognale

18   specifically set forth examples, such as the fact that

19   5.3 percent of the population in the original clinical

20   trials for Neurontin reported depression as an adverse

21   event.  This physician did not know that.  "Did you know

22   that the 5.3 percent equated to 78 people, that 19 of them

23   had no prior history of depression?"  He did not know that.

24   "And did you know that 22 of the patients required

25   treatment, drug treatment for their depression during the

1   very clinical trials that Pfizer was doing?"  The answer was

2   "No."

3              "And is that information you would have liked to

4   have known?"  The answer was "Yes."

5              Dr. Goldman was another prescriber of Susan

6   Bulger, and, again, he too was never informed by the company

7   that Neurontin decreased serotonin, and that was something

8   he would have wanted the know as a prescribing physician.

9              Now, we're parsing words when they say, "Well, you

10   should not have asked the doctor, would he have liked to

11   have known it?"

12             THE COURT:  Why didn't you just ask, "Would you

13   have done something differently?"

14             MR. FINKELSTEIN:  We did, we did.

15             THE COURT:  You did for one of them but not for

16   all of them.

17             MR. FROMSON:  I basically cannot explain every

18   form of every question, but the context was clearly for

19   prescribing purposes, which is basically what was asked

20   here:  "Would you have liked to have known that as a

21   prescribing physician?"  And the answer was, "I like to have

22   any information that I can about drugs and how they will

23   work."

24             THE COURT:  One of the doctors said, "Yes, I would

25   have still prescribed it, but I would have monitored it

1    better."  But I don't have that for everyone, right?

2              MR. FROMSON:  Correct.  Dr. Goldman also was

3    asked, "If a drug is known to have the potential to increase

4    depression, is that the type of information you would like

5    to know?  Answer:  I can't say specifically what kind of

6    information I'd want to know, but, as I said, I would want

7    to know relevant significant information about any drug that

8    I prescribe for a patient.  Question:  Is a drug's capacity

9    to increase depression relevant information to you as a

10   physician?  Answer:  It's relevant, again, depending on

11   whether or not it's significant or if it's a rare

12   occurrence."

13             Now, when we talk of the defendants' fraud on

14   physicians and consumers, there is case law directly on

15   point involving a drug for which a plaintiff claimed

16   suicidality, Paxil.  It's a serotonin reuptake inhibitor.

17   The mechanism of action of that drug causes an imbalance of

18   the serotonin levels of people's brains.  The injury in the

19   case was suicide, and the Federal District Court of

20   Pennsylvania addressed it only last year.  Similar to the

21   present case, the defendants in that case argued there was

22   no specific affirmative fraud to the prescribers, just as we

23   are confronted with here.  However, the court still denied

24   their motion.  The Federal District Court recognized that

25   the prescriber in that case, based upon the deposition

1   testimony, was influenced by the medical community,

2   partners; and prescribing practices were guided by numerous

3   sources, such as the Physician's Desk Reference, medical

4   literature, going to continuing medical education classes

5   and so on.

6            We are confronted with the very same issue here,

7   and in our motion papers we set forth quite specifically

8   that the physicians in these cases also dealt with their

9   partners.  They were influenced by their partners.  They

10  went to dinners.  They relied on the package insert, but

11  they couldn't specifically finger Pfizer as saying something

12  fraudulent to them.  We would ask the Court to doubt the

13  reasoning in the Knipe V. SmithKline Beecham case.

14           THE COURT:  I'm going to say the same thing to

15  you.  We're now about a half an hour, okay, so how much

16  longer do you think you have?

17           MR. FROMSON:  I think I have -- well, I haven't

18  done the motion in limine yet, your Honor, to exclude

19  experts Maris, Trimble, and Kruszewski, and I'd like ample

20  time to do that.

21           THE COURT:  Which is?

22           MR. FROMSON:  Fifteen minutes?

23           (Discussion off the record.)

24           THE COURT:  We'll take a fifteen-minute break now,

25  come back, I'll assume ten or fifteen minutes.  Does anyone

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    have a flight they have to catch?  All right, no.  That

2    they'd like to catch?  You're all on a shuttle, right?

3              MR. CHEFFO:  Yes.

4              THE CLERK:  Court is in recess.

5              (A recess was taken, 2:20 p.m.)

6              (Resumed, 3:50 p.m.)

7              THE COURT:  You're refreshed and ready to go?

8              MR. FROMSON:  I wish I could say the same for my

9    voice, but I appreciate --

10              THE COURT:  You have laryngitis?

11              MR. FROMSON:  It comes and goes.  The last time it

12    was my back, now it's my throat, but we'll move on.

13              The defendants' motion to exclude the plaintiffs'

14    experts should be denied, your Honor.  The experts in this

15    case, Dr. Trimble, Dr. Maris, and Dr. Kruszewski, are

16    qualified, have professionalized knowledge, and they applied

17    the same rigor here as they do in their professional

18    practice.  These are not just, as you would say, a

19    passionate doctor from Florida who's providing testimony in

20    the Perrier case.  These are three highly qualified,

21    educated and experienced experts who have dedicated their

22    professional lives to clinical practice, not litigation and

23    the --

24              THE COURT:  We don't have that much time, so I got

25    it.

1          MR. FROMSON:  You got it.  The crux of the issue

2     here is whether the plaintiffs' experts used generally

3     accepted reliable methods pursuant to Daubert standards, and

4     here they did.  This is the crux of what they did.

5     Dr. Maris performed and utilized a psychological autopsy in

6     which he analyzed statistically significant suicide risk

7     factors and protective factors.  He considered and accounted

8     for them, or he ruled in and ruled out them.

9          THE COURT:  All right, so stop there.  So the

10    challenges to that methodology, is that peer-reviewed?

11         MR. FROMSON:  That is generally accepted, not only

12    in peer-review literature, and in fact he has a published

13    textbook on the issue, but he has also been qualified in

14    several courts of various jurisdictions, as has been the use

15    of his psychological autopsy.  And I will cite them for you,

16    okay, and I'll move on to that now.

17         Dr. Kruszewski and Dr. Trimble utilized a

18    differential diagnosis.  Dr. Kruszewski also used as a

19    guidepost the Bradford Hill Guidelines, which you know about

20    from the general causation arguments; and he used an Naranjo

21    Adverse Drug Reaction Probability Scale, also which is

22    generally accepted and has been recognized in the court

23    system.

24         Dr. Trimble, your Honor, also utilized a

25    differential diagnosis and emphasized the drug's mechanism

1    of action, given his experience as a neuro-

2    psychopharmacologist with a specialty in neuropsychiatric

3    disorders.

4           With respect to the use of a psychological

5    autopsy, I would respectfully refer your attention to the

6    Massachusetts state court case of Routhier V. Keenan of

7    2008, as well as the Southern District of Illinois of 2007,

8    Giles V. Wyeth, a case in which Dr. Maris was qualified to

9    give testimony.

10          THE COURT:  But wait, wait.  These were all

11   psychological autopsy cases that said that that methodology

12   is generally accepted?

13          MR. FROMSON:  In each of these cases -- well, in

14   Routhier specifically, and I will show you the specific

15   reference because it is a Massachusetts case, but the answer

16   is, yes, in each of these cases, a psychological autopsy was

17   deemed validated.  Specifically, the Massachusetts State

18   Court in 2008 recognized that Dr. Maris is a well-recognized

19   expert in the field of suicidology.  If you look to the text

20   in the middle, you see the judge explains his extensive

21   review of thousands of suicide case studies, and that he has

22   conducted extensive epidemiological research on suicide and

23   its causes.  He is a distinguished professor emeritus, an

24   adjunct professor --

25          THE COURT:  No one challenged his qualifications,

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    no one.  The issue is whether the methodology is generally

2    accepted.  So he's the king of suicide, so no one is

3    challenging qualifications.  The issue is, is the

4    methodology accepted?  Is there language there that accepts

5    the methodology?

6            MR. FROMSON:  Yes, your Honor.  The next line,

7    which I've highlighted the important information, it states,

8    "A psychological autopsy is a generally accepted methodology

9    for determining the cause of suicide."  I don't think it can

10   be stated any more clearly, and it cites various state court

11   and Federal Court actions.  The rest of the highlight

12   information is succinct.  What he does in his autopsies is,

13   he analyzes fifteen suicide risk factors and ten protective

14   factors that his research have identified as significant.

15   This is important because this is where we do word parsing

16   over whether he accounts for or rules in and rules out

17   issues, and I wanted to bring to the Court's attention

18   specific testimony at his deposition where he was

19   specifically asked whether he rules in and rules out issues.

20   And at exhibit to the Maris deposition Exhibit A to

21   electronically filed Document 727, he is asked,

22   "Question:  All right, well, the exact quote reads, 'Any

23   plausible argument that an antidepressant causes a suicide

24   or other act of violence needs to make every effort to rule

25   out or at least account for alternative explanations,'

1    right?"  He answers "Sure."

2           Now the application to this case.  He's asked,

3    "And that would also be true in the context of antiepileptic

4    drugs, right? Answer:  Yes.  Question:  Okay, did you rule

5    out and/or account for alternate explanations for Susan

6    Bulger's suicide?  Answer:  I think I did.  Question:  Okay.

7    Answer:  I certainly considered them all under risk

8    factors."

9           So it's disingenuous to say that he did not do a

10   rule in/rule out.

11          THE COURT:  It would be fair to say, though, that

12   given the two polar extreme cases, Mrs. Bulger who tried

13   four times to commit suicide and Reverend or Minister Smith

14   who had never done it before, essentially Maris seems to

15   take the position that as long as the person took Neurontin

16   and somehow expressed or exhibited depressive side effects

17   and then committed suicide, that would be enough for his

18   opinion.

19          MR. FROMSON:  I would --

20          THE COURT:  In other words, you have people -- I

21   mean, you could make the argument, well, if somebody has

22   four prior suicides, she's exactly the kind of woman you

23   don't want to give this drug to.  You could also argue,

24   well, it must have made a difference because he's a minister

25   and had so many protective factors.  But it really boils

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1   down to, if you look at both cases together, if the person

2   took Neurontin in significant enough doses, and expressed

3   some side effects so you had some sense that it was creating

4   a depression in that person, or acted that way, then that

5   would be enough evidence for him, together with the

6   scientific evidence of the depressive side effects, to say

7   that's a contributing cause.

8           MR. FROMSON:  Your Honor, I believe Dr. Maris, in

9   accordance with his report, would say that you would have to

10  specifically evaluate the fifteen suicide risk factors and

11  the protective factors together, and in doing so, you may

12  find that one individual may have had a moderate --

13          THE COURT:  Well, has he ever said in any of the

14  suicide cases -- what, there were over 200 in Federal Court,

15  right?

16          MR. FROMSON:  There are many, your Honor, yes.

17          THE COURT:  I think at one point, some 40.  I

18  don't remember how many have been weeded out, but has he

19  ever said that this Neurontin -- where it had been ingested

20  and there was a suicide soon after the ingestion, has he

21  ever ruled that it wasn't Neurontin?

22          MR. FROMSON:  Judge, I can only comment on the two

23  specific cases that are before you, and I simply can't

24  comment on other cases in other litigations or other studies

25  where he has ruled in or ruled out opinions.  He has a

1   textbook where he specifically sets forth with sufficient

2   diagnostic criteria how he comes to his conclusion.  And

3   it's the methodology that is important here, and his

4   methodology is generally accepted.  He uses risk factors and

5   protective factors.  He comes up with a spectrum of risks

6   and whether a drug is causally related, or at least plays a

7   substantial factor.  That substantial factor can be

8   different from one person to the next.

9          THE COURT:  And that might just be a jury issue,

10  but I'm simply saying, where we've got two polar extremes --

11         MR. FROMSON:  I understand, and, as I say, I think

12  it's a jury question.  And in this case, obviously, what he

13  did was exactly that which was found reasonable and

14  generally accepted in the Massachusetts case.  He put forth

15  and employed a psychological autopsy which satisfied

16  Daubert.  He went through extensive medical records,

17  depositions of family, friends, physicians, police

18  investigations, and he used statistically significant risk

19  factors and protective factors to reach his conclusions in

20  both cases.

21         This is a list of those --

22         THE COURT:  Don't read them.

23         MR. FROMSON:  I'm sorry?

24         THE COURT:  Don't read them.  We don't have time.

25         MR. FROMSON:  Fine.  This is simply the

1   mathematical equation that was utilized.  Again, it goes to

2   methodology.  You will read it later, I hope, and you will

3   see how he opines differently for Smith and Bulger.

4   Whereas, Mr. Smith had seven to fifteen known risk factors,

5   Ms. Bulger had twelve to fifteen, so he recognizes that

6   there are different risk factors in the way a drug can

7   affect someone.

8         Differential diagnosis is what Dr. Kruszewski and

9   Dr. Trimble utilized.  It is a standard scientific/medical

10  technique, and it has been generally accepted in various

11  courts of jurisdiction in this country, including the First

12  Circuit.

13        THE COURT:  Has it been accepted in the

14  psychiatric area, which seems so much more difficult than

15  Dalkon Shield, for example?

16        MR. FROMSON:  Your Honor, I would say that if you

17  look at what Dr. Maris, Dr. Trimble, and Dr. Kruszewski have

18  done collectively, it is essentially a differential

19  diagnosis.  In each one of their particular --

20        THE COURT:  No, I'm saying, has a Federal Court

21  approved it in a psychological setting?

22        MR. FROMSON:  Yes.  Yes, I can get you a cite, but

23  I think that the psychological autopsy is in fact what the

24  court looks at to be a differential diagnosis because it

25  rules in and rules out, just as is evaluation and accounting

1    for risk factors and protective factors comes to a

2    conclusion.

3              THE COURT:  But suicide is different.

4              MR. FROMSON:  Yes.  It's multi-factorial.

5              THE COURT:  Because everyone agrees:  No one kills

6    them because they took Neurontin.  They killed themselves

7    because they have a bad back or they have an abusive

8    husband, or whatever it is.  And the question is whether

9    Neurontin is the thing that gets them depressed enough at

10   that moment to give into the other factors.  I mean, that's

11   typically, what is it, the tipping --

12             MR. FROMSON:  You may refer to them as the

13   trigger.

14             THE COURT:  Or the trigger.  So it's not like the

15   Dalkon Shield, is that the reason you can't have babies?

16   It's different.

17             MR. FROMSON:  I agree.  I understand what you're

18   saying, Judge, and I don't think we're on different pages.

19   However, this is an issue of whether it's a substantial

20   factor, not the substantial factor.

21             The issue here is whether he has to rule out or

22   any of our experts have to rule out all causes, and we

23   simply don't.  What is traditional hornbook law is that

24   proximate cause only requires Neurontin to be a substantial

25   factor, not the only factor.  And we set forth three cases,

1    all of which are in our brief.  Smith V. Pfizer was a

2    suicide case in which the defendant's claim failed, meaning

3    the expert did not have to account for all other potential

4    causes.  The issue went to the weight, not its

5    admissibility.  Giles V. Wyeth, which we've already heard

6    about, recognized that a combination of factors generally

7    cause one to commit suicide.  That's what you're saying,

8    your Honor, and in that case the psychological autopsy was

9    approved.

10          Dr. Kruszewski used the differential diagnosis and

11   the Bradford Gill Guideposts, but I wanted to bring to your

12   arrange the Naranjo Probability Scale.  That is basically a

13   differential diagnosis.  It is a review allocating a point

14   system to various issues that would pertain to a patient's

15   psychiatric history, medical history, social stressors, and

16   use of other drugs.  This Naranjo Probability Scale has not

17   been made for litigation purposes.  It's been used for

18   years, and in fact as recently as March of 2009 the

19   Appellate Court in New Jersey recognized that the Naranjo

20   Probability Scale was an accepted and scientifically

21   validated method of evaluating causation.  So Dr. Kruszewski

22   not only does a differential diagnosis, but he employs the

23   generally accepted Naranjo Probability Scale.

24          The defendants themselves question our reliance on

25   temporality.  It's important to know that the defendants,

1    Warner-Lambert, Pfizer, in their clinical trials use a

2    causality assessment in their own open-label clinical trials

3    that in fact emphasize temporality and an analysis of other

4    risk and protective factors.  And so even here, under

5    "Plausible," if it's focused and you can read it, they find

6    you can have a possible causal relationship so long as

7    there's a plausible temporal sequence, and that the adverse

8    event might have been produced by the patient's clinical

9    state, basic illness, or concomitant illness, or other modes

10   of therapy administered to the patient.

11           So that's an example where you can put in someone

12   like Mr. Smith or Mrs. Bulger and say, well, this is a

13   person who took the drug but had many other factors.  And

14   yet even the defendants would recognize in their own

15   causality assessments that in the usual course of business,

16   with scientific rigor, that you could still have possible

17   causation.

18           Without being repetitive, Dr. Trimble did the same

19   thing, a differential diagnosis; and this goes to the

20   method, not the conclusion.  The conclusion is what the

21   defendants disagree about, but the methods were generally

22   accepted and reliable.

23           With respect to the motion to strike, Judge, all

24   the affidavits that were in the motion to strike, the extra

25   declarations of Kruszewski and Maris, our position is, there

Page 70

1   are no new opinions, and that we can provide case law

2   through a surreply, if you will allow it, that can indicate

3   that --

4              THE COURT:  No.  I don't want any more paper.

5              MR. FROMSON:  Good enough.

6              THE COURT:  So what do I do with it?  I mean,

7   we're far enough away from it.  I don't have a serious

8   problem if you think that an expert thinks someone

9   misconstrued his report, but --

10             MR. FROMSON:  That's what it is.

11             THE COURT:  I know, but then do they get another

12  deposition of the expert?

13             MR. FROMSON:  There's nothing new.  Basically he

14  said --

15             THE COURT:  Well, there must have been something

16  new or you wouldn't have filed it.

17             MR. FROMSON:  Well, in a separate section, that's

18  exactly --

19             THE COURT:  No, no, no.  I mean, I'm likely to

20  allow -- it's not going to rise and fall on it, but if there

21  is a request for an additional hour or two of a deposition

22  on them, I think that's fair game.  But at this point, I'm

23  going to allow about a ten-minute reply, ten-minute

24  surreply, and take it under advisement.

25             MR. CHEFFO:  Yes, your Honor, and I hope to be

1    even quicker than that.  I think Mr. Sayler just wanted to

2    make one note.

3              MR. SAYLER:  Just to clarify a response to a

4    question you had about the original labeling and the

5    original PDR, you asked if depression was reported as an

6    adverse event in the originally approved labeling which was

7    contained in the original PDR then, and I told you that it

8    was.  That is correct, depression was reported as an adverse

9    event in that initial labeling, but in addition to that,

10   suicidal events and suicide gestures were also itemized and

11   listed as adverse events in the initial FDA-approved

12   labeling for Neurontin.  In other words, from day one, the

13   Neurontin labeling has reflected suicidality and depression

14   as reported adverse events.  That's a very different thing

15   than causality, but in the adverse events section,

16   suicidality and depression have been in the labeling from

17   day one.

18             THE COURT:  So do you agree that the Physician's

19   Desk Reference is something that Pfizer drafts?

20             MR. SAYLER:  I believe the Physician's Desk

21   Reference was accurately characterized, in that this is a

22   reference -- it's probably four inches thick -- which

23   contains FDA-approved labeling for various pharmaceutical

24   products that Pfizer, in the instance of Neurontin, since

25   it's been a Pfizer product --

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1           THE COURT:  Let me just press you on this because

2     it's now -- you say that Pfizer did warn that there was

3     suicidality and depression as a side effect to Neurontin in

4     its label?

5           MR. SAYLER:  Yes, from day one, depression and

6     suicidal --

7           THE COURT:  So just out of curiosity, why hasn't

8     anyone raised this in a motion for summary judgment?  I

9     mean, if people have been warned, why isn't that enough to

10    meet -- no one's raised this.

11          MR. SAYLER:  Actually, I believe we have, your

12    Honor, in our general absence of a duty to warn motion for

13    summary judgment.

14          THE COURT:  But you did warn.  Why am I debating

15    this?  Let me just say, is it in there?

16          MR. SAYLER:  Yes, absolutely.

17          THE COURT:  You say it's not in there?

18          MR. FROMSON:  Your Honor, it's not in there in the

19    way he's characterizing.  The completed suicide has actually

20    been reported to the FDA as an unlabeled event.  So from a

21    regulatory perspective, the company has reported suicides as

22    an unlabeled event, meaning --

23          MR. FINKELSTEIN:  The distinction is simple.  One

24    is, we observed these events during the course of clinical

25    trials, but we're making no mention as to causation.

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    Another section says "This causes."  So they're saying both

2    sides.  They're saying we advised, we observed this event,

3    but we're making no mention that it's caused from the drug.

4    So they're now trying to bootstrap on to say, well, that

5    really is a warning --

6            THE COURT:  I'm not going to start a whole new

7    briefing thing.  It's either in there or not.  But I had

8    thought the whole debate was that you didn't need to warn

9    because, A, the science generally doesn't support it as

10   general causation, and, B, there were all these, you know,

11   there was nothing to report, it's not true.  Dr. Taylor, not

12   true, he lives and dies with this banner, not true, lives

13   this drug.  So I'm a little surprised to hear you say you

14   warned about it.

15           MR. SAYLER:  Well, and to be more precise, your

16   Honor, the adverse events section of the labeling identifies

17   adverse events that were simply observed during the clinical

18   trials.

19           THE COURT:  So they're right in saying that's

20   different than sort of a warning that it can or might or

21   possibly will cause depression.

22           MR. SAYLER:  It absolutely is our position that

23   the labeling is adequate because it accurately reports

24   adverse events observed during clinical trials.  Yet at the

25   same time there is no well-controlled clinical trial data

1    that establishes general causation, and this gets back to

2    the Daubert general causation issue.  So, yes, there's

3    absolute consistency between the two positions, that the

4    labeling is adequate and that there is no reliable

5    scientific evidence that Neurontin causes depression or

6    suicidality.

7              THE COURT:  To the extent that, and this is what

8    the Supreme Court case talks a lot about, to the extent that

9    you observed something in the clinical trials, but you

10   didn't feel that it was caused by it, but over the course of

11   the next decade, say, you had developed data that showed

12   that there was an association or nexus or causality, that

13   you would have a duty to warn at that point.

14             MR. SAYLER:  In the situation with regard to

15   Neurontin, however, although those adverse events were

16   observed during the clinical trials, we know from, among

17   other things, the analysis that went into the FDA review

18   over the last year that the well-controlled Neurontin

19   clinical trial data fails to establish that Neurontin

20   increases the risk of suicide-related events, and, you

21   know --

22             THE COURT:  I understand that's your science

23   position of Daubert, but I'm simply saying, if there were

24   clear -- let's just move aside from this case -- data that

25   developed over the course of the next decade that it caused

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    suicidality or depression, you would agree there would be a

2    duty to warn?

3              MR. SAYLER:  The federal regulations govern that,

4    and, yes.

5              MR. CHEFFO:  Now, your Honor, with the Court's

6    permission, I'm just going to try and tick off in a

7    rebuttal, not spend a lot of time on some of the points.

8    First is, perhaps counsel may have just misunderstood.  I

9    tried to choose my words very carefully early with respect

10   to the proximate causation, and I think it's exhibited by

11   the quotes and your Honor's insight in looking at them what

12   I say, and I think I said there's no cases for this.  I

13   think the Nix, the Motus, and the Vanderwerf cases, all on

14   the proximate causation, do speak to the fact that just, you

15   know, maybe I would have done something different, maybe I

16   would have given warnings, maybe I would have done X, Y, and

17   Z.  That's not enough for proximate causation because once

18   you have to start asking yourself, well, would they have

19   done something different, would they have given warnings,

20   would the patient, would the family, all those "would have"

21   questions, well, that gets into the point of speculation.

22   And once you have speculation, you can't have proximate

23   causation.  So from a proximate causation perspective, you

24   need admissible testimony that the doctor would not have

25   prescribed the medicine absent -- if he had --

1        THE COURT:  Well, why aren't they right, "or would

2   have monitored"?

3        MR. CHEFFO:  Because, again, that's a speculative

4   inquiry, your Honor, you know, whether -- because even if

5   you assume that there would have been monitoring, that

6   doesn't necessarily get you to a proximate causation

7   analysis.

8        THE COURT:  Right, but to the family member,

9   saying, "Look, we're giving you this for your back pain, but

10  I've got to tell you, it's going to cause depression in a

11  lot of people," so say to the family, "You watch for it, and

12  I want you to come in every week, and I want to talk to you

13  about it."  I don't know, but, I mean, he might have still

14  prescribed it and still monitored it.  Now, you would then

15  say, "well, maybe yes, maybe no.  Who's to say that would

16  have stopped the suicide?"

17       MR. CHEFFO:  Well, exactly.

18       THE COURT:  I mean, that's where the heeding

19  presumption comes in, sort of.

20       MR. CHEFFO:  Well, it comes in, yes.  I think

21  that's right.  I mean, here we know from the proximate

22  causation perspective, you know, these are people who were

23  seeing physicians, you know.  And we know, for example, that

24  Mrs. Bulger was taking prednisone and some other medicines

25  and had a warning of depression.  So this "what if/what

1    would have happened" question gets you into the realm of

2    speculation.  That's the type of testimony they would have

3    needed to come forward in meeting our summary judgment

4    motion.

5              THE COURT:  If I went your way, doesn't that

6    defeat every single case?  Because most doctors are going to

7    say, "Yeah, I would have wanted to know this, and I would

8    have monitored better and warned the people."  And so then

9    if you say that's not enough, you have to actually literally

10   say, "I would not have prescribed it," that that really

11   essentially defeats, my guess is, 99 percent of the cases.

12   Maybe it does, but you're taking a pretty strong position:

13   The doctor literally has to say, "I would not have

14   prescribed this drug."  That's your position.

15             MR. CHEFFO:  Well, it is my position.  Whether it

16   would defeat the cases or not, I don't know, but I certainly

17   know, as I said, in at least -- and there's others -- but in

18   the Nix case, in the Vanderwerf case, and the Motus case,

19   that's exactly what happened.  You know, they --

20             THE COURT:  Right, you have some case studies who

21   said that, and some judges have said something else, and

22   there's a split on that as to what's enough here.

23             MR. CHEFFO:  Well, I think the weight is clearly

24   on our side, but I also think, just from a perception of

25   proximate causation speculation, it's not just, you know,

1    kind of counting heads with respect to the cases.  It's the

2    analysis in those cases I think carries the day, and

3    certainly we believe should carry it for your Honor's

4    analysis.

5             Now, I just wanted to spend a minute or two with

6    respect to the methodology issue.  I took up a little too

7    much time probably on the proximate causation argument, so I

8    just want to speak for a minute or two.  It's not a question

9    of conclusions.  They have no methodology for

10   differentiating between Neurontin and non-Neurontin

11   suicides.  This is from Dr. Kruszewski:  "Correct me if I'm

12   wrong, Dr. Kruszewski.  I think you told me that a suicide

13   retrospectively, when you were analyzing whether a suicide

14   was caused by Neurontin, it will look the same as any other

15   suicide.  The only difference will be that the person took

16   Neurontin.  Is that right?"  There's an objection.  "If

17   that's not right, then I need to know it.  Answer:  No.

18   That's very accurate."

19             "So today in a patient population, you cannot

20   identify who are the individuals who might be susceptible to

21   the adverse effects of Neurontin, true?  Answer:  True."

22             It's exactly the question your Honor tried to get

23   counsel to respond to is, tell me where are the objective

24   criteria, where has this been published, where is the

25   research?  Where is it other than in the doctor's head to

1  say, well, these fifteen characteristics?  And essentially,

2  your Honor, trust me, trust me, I'll figure it out, I'll

3  tell you which ones --

4        THE COURT:  Why wouldn't just a simplistic model

5  work here?  Somebody has all sorts of life problems, a very

6  sad life as these two people here, all sorts of problems.

7  They take Neurontin, and an hour and a half later they're

8  dead, or whatever it is, two hours later she hangs herself,

9  somebody who's got a life history of depression, has said to

10 people it makes her feel --

11       MR. CHEFFO:  I think one of them might have said

12 "loopy."

13       THE COURT:  So it has had an effect on her.  She's

14 articulated, I think both had at some point, and they seemed

15 different to people around them, and then she's dead.  No

16 one kills themselves because of Neurontin; they have life

17 problems; but the question is, does this make them so

18 vulnerable because of depression that they'd do something

19 they might otherwise not have?  I mean, why --

20       MR. CHEFFO:  I understand, your Honor, but, you

21 know, let's just take the facts of the cases before us.  For

22 example, Bulger -- and, you know, I'm not conceding the

23 temporal proximity issue, but just the fact of Mrs. Bulger,

24 she was taking Neurontin for two years, and in fact at some

25 points was taking it at higher doses, was titrated up, down,

1   two years where all this happened; and then essentially

2   Dr. Maris says, well, it was the last four pills that she

3   took an hour and a half --

4          THE COURT:  That was a lot.  That's lot of

5   Neurontin.  Wasn't it like 1,800 milligrams' worth?

6          MR. CHEFFO:  Well, she was taking less of a dosage

7   than she had taken successfully --

8          THE COURT:  Right, 1,200, maybe 300, four pills?

9          MR. CHEFFO:  And the point, your Honor, is that,

10  you know, well, at this point having raised the issue from

11  Pfizer's perspective, you know, the question of, okay, tell

12  me, if you're saying it's these four pills, then explain for

13  the Court, explain for the jury, how were they taking more

14  than that for two years?  Why now?  How could it not be

15  Effexor?  What about the fact that, you know, she was told

16  that her methadone dose was going to go down?  What about

17  the fact that she was cut off from her sister?  You know,

18  each of these, and the experts all say, are very significant

19  traumatic factors, but yet they're essentially pulling out

20  one without any methodology.

21          THE COURT:  Okay, I do understand the argument.

22  Thank you.

23          Do you want anything?

24          MR. FROMSON:  Yes, very briefly.  This is not

25  speculation.  When the widow of Mr. Smith, Ruth Smith, heard

1    from her husband within a week before his death that he was

2    considering killing himself, she had nowhere to turn to ever

3    know that Neurontin was playing a substantial factor.  It

4    wasn't in the label.  Her doctors didn't know.  And she

5    testified, had she known, she would have done something

6    about it.  That's not speculation.  That's evidence for a

7    jury to decide in terms of its weight.

8            When Mr. Smith went to his dentist and complained

9    about being on Neurontin and that it was making him have

10   some adverse effects, the dentist went to the PDR, and there

11   was nothing in the PDR to adequately inform him that there

12   was something that was playing a substantial --

13           THE COURT:  I meant to ask you about that dentist

14   actually.  Is he available to testify?

15           MR. FINKELSTEIN:  He gave testimony, your Honor.

16           THE COURT:  A deposition?

17           MR. FINKELSTEIN:  He gave deposition testimony.

18           THE COURT:  It's not just a little letter?

19           MR. FINKELSTEIN:  Two days before the death he

20   visited his dentist.  The dentist wrote a letter after, I

21   think two or three days after the death because it struck

22   him --

23           THE COURT:  But is there testimony about it?

24           MR. FINKELSTEIN:  There's absolute testimony.

25           THE COURT:  Under oath?

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1        MR. FINKELSTEIN:  Under oath.

2        MR. FROMSON:  And, your Honor, on the issue, you

3   had asked me during a break whether there's any case law

4   about an obligation to warn patient as opposed to

5   physicians.  I'm informed -- I haven't checked the cite --

6   that there's a case Perez V. Wyeth out of the New Jersey

7   State Court, which is supposedly a Norplant case that

8   essentially involved direct consumer advertising, which

9   meant direct contact by the company to the consumers led to

10  an obligation to warn them.

11       THE COURT:  Is that an over-the-counter drug?

12       MR. FROMSON:  Norplant is not.  It's a birth

13  control --

14       MR. CHEFFO:  I don't mean to interrupt, but the

15  Perez case is a case that's, I think, over a decade old.

16  It's a direct-to-consumer advertising case.  It's not been

17  adopted in any jurisdiction that I know of ever, I don't

18  think even in New Jersey, so it's an absolutely different --

19       THE COURT:  Every time you hear an ad on TV, it's

20  longer on what could happen to you as opposed to what it's

21  for?

22       MR. CHEFFO:  Well, as your Honor has indicated, I

23  think almost every state that I know of has adopted and

24  continues to apply the learned intermediary doctrine, your

25  Honor.

1        THE COURT:  It's an issue I hadn't thought about.

2   I mean, as I think about it as a parent, you read it for a

3   child, but I don't think I'd read it for my spouse.  I mean,

4   it might be fact-specific for it.  I mean, the child

5   couldn't read the insert and see what the effects are,

6   right, for a drug?  So you'd know what to watch for in a

7   child.  I think that needs to be fact-specific for the

8   situation for each family:  Would she have read, would she

9   have read that warning for her husband?  I mean, I don't

10  know, do you all read the inserts for your spouse's drugs?

11       MR. FROMSON:  Mr. Smith had the right to be

12  informed.  He had the patient --

13       THE COURT:  He's dead, so it's hard to figure out

14  if he read it.  It's just complicated.

15       MR. CHEFFO:  It's just that it's also a

16  direct-to-consumer advertising case where it's not --

17  there's no evidence in this case of that, your Honor.

18       THE COURT:  You know, it might be so for a child

19  and maybe not for a spouse.  Or maybe the spouse said

20  something so we know what the spouse did or didn't do.  We

21  don't know whether he read it or not or would have read it.

22  I don't know.  I don't know.  It's a new issue for me.  I'm

23  not sure it's been flushed out, but thank you.

24       Is there anything else I need to do at this point?

25  I don't think so.

1      MR. ROUHANDEH:  No, your Honor.

2      THE COURT:  Now, let me just ask you one question.

3  I owe you guys a lot of stuff.  It's all on the front

4  burner.  It's all chugging through.  If I permit the cases

5  to go to trial, as I understand it, one goes to Tennessee,

6  and one stays here.  Is that how this works?

7      MR. FINKELSTEIN:  Correct.

8      MR. ROUHANDEH:  That's correct.

9      THE COURT:  And we would all treat them like

10 bellwether trials.

11     MR. FROMSON:  How are you defining that?

12     THE COURT:  In other words, as I understand it --

13 just remind me -- that you each chose the best case from

14 your point of view.  So that the way this works, I think

15 best practice in multidistrict litigation would be to have

16 two trials, one that you chose, one that you chose, see how

17 the verdict comes out, and try and settle the rest.  As I

18 understand it, that's the theory behind why we chose two

19 cases, right?

20     MR. ROUHANDEH:  Well, as a practical matter, every

21 time you have a verdict, I think --

22     THE COURT:  That's how this would go, and I would

23 set up a trial here in Boston on Bulger, if it got that far,

24 and we'd send the other one back to Tennessee.  And was

25 there a judge in particular who had it?

1           MR. FROMSON:  Yes, your Honor.

2           THE COURT:  Who was it?

3           MR. FROMSON:  I don't recall the judge's name, but

4   I do believe that there was a judge assigned there for

5   discovery before it got shipped out here.  I don't know if

6   that judge is the trial judge, but --

7           MR. ROUHANDEH:  Yes, whoever had it when it was

8   filed in that court and it was transferred here, so there is

9   a judge it will go back to.

10          THE COURT:  And then at that point, I suppose when

11  I decide what to do, I would call you all in here to figure

12  out, A, what to do on those two cases, and, B, what to do

13  with -- I think there were well over 200 of these kinds of

14  cases, right?  Not to mention the New York cases which I'm

15  not in charge of, but --

16          MR. FINKELSTEIN:  Just to refresh your memory, we

17  also have, I believe, nine other cases that we've already

18  done a substantial amount of discovery on that we could

19  start working on and following up on as well while these two

20  are going.  In other words, we selected ten, but there were

21  two that were added.  We did preliminary discovery.  We did

22  depositions of all of the doctors, all of the prescribers,

23  all of the plaintiffs, so they're ready to go.  And then

24  from that pot, we selected --

25          THE COURT:  Well, help me out on this.  Let's

1   assume for a minute I get through and I ship off Tennessee

2   and I do Bulger myself and I've got these other ten.  We're

3   having a little trouble, of course, as you probably did,

4   which is I'm trying to learn Tennessee law.  So I assume the

5   other ten involve other states' jurisdiction?

6               MR. ROUHANDEH:  Correct.

7               THE COURT:  Is it the practice, though, does

8   everyone agree that I start triaging them?  Or do I send

9   them back to these various courts on the summary judgment?

10  I think I do them, right?

11              MR. ROUHANDEH:  That's correct, your Honor.

12              MR. FINKELSTEIN:  It's our opinion, you accomplish

13  what the MDL is set up for, and then you disburse them back

14  to their court of original jurisdiction.  I don't believe

15  that it's jurisdictionally --

16              THE COURT:  I'm just trying to think about it now

17  because I've actually now hit this point, which is, I for

18  sure am responsible for the summary judgment on any

19  crosscutting issues; but as I've received them back before

20  as the transferor court, issues of specific causation might

21  well go back to the home turf.

22              MR. FINKELSTEIN:  Right, right, and we agree --

23              THE COURT:  As opposed to Daubert or what's the

24  law of --

25              MR. FINKELSTEIN:  On Frye on general causation.

1          THE COURT:  Or even some of these -- I think that

2     was --

3          MR. FINKELSTEIN:  Well, it's our position, your

4     Honor, that the Smith, for example, on the Tennessee could

5     have gone back already.

6          THE COURT:  Some of the motions to strike, I mean,

7     some of the general would be --

8          MR. ROUHANDEH:  There are other common issues that

9     it was sent here for, those cases were sent here for, and

10    the whole idea was at some point, these are the two test

11    cases, see what happens in these test cases and see if that

12    breaks any sort of logjam.

13         THE COURT:  But just take, for example, something

14    that nobody's argued because maybe you left it to the briefs

15    or whatever, did he ingest the pills within the four days

16    beforehand, so specific to an individual case that I might

17    leave that to some other court to decide whether it was

18    summary judgment material; in other words, so specific

19    factually.

20         MR. ROUHANDEH:  Well, there are some specific

21    facts that would go back, but there's obviously a lot more

22    discovery to be done that would be done typically in the

23    MDL.

24         THE COURT:  Absolutely, right, the plane crash

25    cases where the crosscutting issue was what caused the plane

308ed1bc-2ab1-41d2-868f-e7b4a62df620

1    crash; but whether or not the person, I don't know, was

2    happily married and it was a true loss of consortium would

3    go back to the state court.

4         MR. ROUHANDEH:  Well, I think there's a lot of

5    those issues to be discussed, and I think what your Honor's

6    first inclination was, see what you can do with these cases.

7    It's obviously our position that all of the cases should go

8    away on Daubert or summary judgment.  Even if not, we think

9    two cases --

10         THE COURT:  I think the best thing is to pull

11   everyone one.

12         MR. ROUHANDEH:  At some later point and discuss

13   the issue.

14         MR. FINKELSTEIN:  Your Honor, if I may, we've been

15   coming here for five years.  With all due respect, we have

16   clients who have been calling regularly, "When does my case

17   get to move forward?"

18         THE COURT:  So do you want me to set a briefing

19   schedule right now on the other ten cases?

20         MR. FINKELSTEIN:  No.  What we request of this

21   Court is, after we receive your decision with respect to the

22   general causation, Daubert and Frye --

23         THE COURT:  You want immediate trial?

24         MR. FINKELSTEIN:  -- we want immediate trials of

25   the two, and then remand the others to their courts of

1    original jurisdiction because all that is left is

2    case-specific issues, and we want to get moving on discovery

3    on those.

4            THE COURT:  I will seriously think about it.  So

5    let me ask you this:  Do you want to set up a trial right

6    now on Bulger?  That's the one thing I have some control

7    over.  And then if it goes away, then it goes away.

8            MR. FINKELSTEIN:  Absolutely.

9            MR. ROUHANDEH:  I think what I would say, your

10   Honor, which is what you led off with, which is, see where

11   these case are going and come back in and set a schedule.

12           THE COURT:  I mean, in a way, I'd at least like to

13   have your schedules cleared so I don't have six months from

14   then.  I mean, would you be available --

15           MR. FINKELSTEIN:  Your Honor, we'll be available

16   anytime except for October.

17           MR. ROUHANDEH:  Why don't the parties confer on

18   this issue.  You're raising a lot of issues that actually we

19   haven't talked about.

20           THE COURT:  Well, you do it to me.

21           (Laughter.)

22           THE COURT:  It's a two-way street here.

23           MR. ROUHANDEH:  There's lots of motions.  But we

24   would like the opportunity to have the discussion with our

25   client and discuss -- you're raising significant issues --

Page 90

1   and discuss it with the plaintiffs.  Maybe we'll come with

2   an agreement; maybe we won't.

3              MR. FINKELSTEIN:  Judge, I will say this:  We have

4   forty trial attorneys.  You set the date, we'll be ready to

5   go.

6              THE COURT:  I'm unfortunately on emergency duty

7   in August, and I'm not here to destroy anyone's marriage, so

8   how long would a trial look like, two or three weeks?

9              MR. FINKELSTEIN:  Two or three weeks.

10             MR. ROUHANDEH:  Maybe longer.  I'm not sure.

11             THE COURT:  Maybe a month?

12             MR. ROUHANDEH:  Yes, a month.

13             MR. FINKELSTEIN:  The only thing that I have to

14  temperate it with is our experts' availability, as you

15  can --

16             THE COURT:  No, I understand, and the summers are

17  difficult.  So maybe, when will we be able to do it?  Let's

18  say the second week in July or something, and then if we

19  finish in time so everyone could take the end of August, the

20  dog days off, and then I would have to send it -- if Smith

21  went, I couldn't schedule it for the Tennessee court, but I

22  could schedule for -- is Bulger the only Massachusetts case?

23             MR. FINKELSTEIN:  Shearer.

24             MR. ROUHANDEH:  There are three other

25  Massachusetts cases.

1        THE COURT:  I would just want to do one and see

2   where it went.  It's your pick so it's not a bad situation

3   for you.  When do we have available?  Like, the week of

4   July 20-ish?

5        MR. ROUHANDEH:  I just thought it may be difficult

6   to get it in before mid-August.  That would be my concern.

7   And there's still a lot to be done between now and then,

8   but --

9        THE COURT:  We're talking about the last week in

10  July.

11       MR. ROUHANDEH:  Your Honor, there are expert

12  issues.  Respectfully, if we could confer with our clients

13  and discuss it with the plaintiffs before we --

14       THE COURT:  Throw out that date.  What's the date?

15       THE CLERK:  The 27th?  That's the last week in

16  July.

17       THE COURT:  July 27, assuming it's three weeks.

18  Then you can have the end of August.  Try it.  I'm not

19  holding you.  Just let me know within a week.  There are

20  lots of lawyers here.  It's impossible to get people in the

21  room, so just to sort of see where your experts are, see

22  what's doable, maybe videotape some of the experts so I

23  don't have to rely on every single doctor's schedule,

24  trials, depositions and that sort of thing.  I mean, I could

25  also potentially do it in June.

Page 92

1          MR. ROUHANDEH:  Well, why don't we discuss it, and

2     we'll discuss it with our client and get back to your Honor.

3          THE COURT:  One of my concerns about September,

4     which is not your problem but mine, is that I have a whole

5     new turnover of law clerks.  I start all over again.  And so

6     it's easier for me with people who have worked on it.  June

7     is just cutting it a little tight for me in terms of getting

8     all of the opinions I need to out.  They'll probably come

9     out in spurts.

10          MR. FINKELSTEIN:  We can do it in June, your Honor.

11          MR. ROUHANDEH:  I would have to confer and talk.

12          THE COURT:  Confer because it might be easier for

13     your schedules.  In other words, I could do the month of

14     June, and then we'd all have the summer off.  But the thing

15     I can't do is, the week of July 4 is difficult just because

16     it's impossible to get a jury, and the following week I'm on

17     the Court Budget Committee, so those are the two weeks in

18     there.  I'm on emergency duty all of August, so I'm stuck

19     here, but it doesn't necessarily mean you're stuck here.  So

20     let me know.  That's at least -- one thought is July 27 to

21     mid-August, and everyone can go where they're going to go

22     with their families at the end.  Okay?

23          MR. FINKELSTEIN:  Thank you, your Honor.

24          MR. ROUHANDEH:  Thank you, your Honor.

25          (Adjourned, 4:35 p.m.)

308ed1bc-2ab1-41d2-868f-e7b4a62df620

Page 93

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court

8   Reporter, do hereby certify that the foregoing transcript,

9   Pages 1 through 92 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 04-10981-PBS, In Re:  Neurontin Sales, Marketing

12  and Products Liability Litigation, and thereafter by me

13  reduced to typewriting and is a true and accurate record of

14  the proceedings.

15          In witness whereof I have hereunto set my hand

16  this 10th day of April, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
                                    _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25