UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | |
| THIS DOCUMENT RELATES TO: ALL MARKETING AND SALES PRACTICES ACTIONS | MDL Docket No. 1629<br>Master File No. 04-10981<br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


I. RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS .............. 1

A. Consumer Plaintiffs .............. 1

1. Gary L. Varnam (Bipolar).............. 1

2. Jan Frank Wityk (Bipolar and Dosages Above 1800 mg Per Day) .............. 2

3. Gerald Smith (Headache and Neuropathic Pain) .............. 5

4. Lorraine Kopa (Neuropathic Pain).............. 6

5. Carolyn Hollaway (Nociceptive Pain) .............. 7

6. Jeanne Ramsey (Dosages Above 1800 mg Per Day).............. 8

B. Third-Party Payor Class Plaintiffs .............. 9

1. BCBSLA .............. 9

2. ASEA .............. 10

3. Harden.............. 11

II. LEGAL STANDARD.............. 11

III. THERE IS OVERWHELMING EVIDENCE THAT NEURONTIN IS INEFFECTIVE FOR THE OFF-LABEL INDICATIONS AT ISSUE.............. 12

A. Neurontin Has Been Proven Ineffective for Bipolar and Other Mood Disorders .............. 13

B. Neurontin Has Been Proven Ineffective for Both Neuropathic and Nociceptive Pain .............. 16

C. Neurontin Has Been Proven Ineffective for Migraine and Headache .............. 19

D. Neurontin Provides No Additional Benefit at Dosages Over 1800 mg Per Day .............. 20

IV. THE EVIDENCE OF CAUSATION IS OVERWHELMING.............. 22

A. There Is Overwhelming Evidence that Defendants' Misrepresentations and Non-Disclosures Concerning Neurontin's Efficacy Caused Doctors to Prescribe Neurontin for the Off-Label Conditions at Issue .............. 23

B. Professor Rosenthal's Report Is Additional Evidence of Causation .............. 28

1. Prof. Rosenthal's Model Assesses the Impact of Defendants' Fraudulent Off-Label Marketing Campaign .............. 29

2. The Assumptions Made By Prof. Rosenthal Are Reasonable and Supported by the Record.............. 32

**TABLE OF CONTENTS**
**(continued)**

**Page**


3. The Factors Incorporated Into Prof. Rosenthal's Analysis Are Valid and Appropriate.......... 34

V. DEFENDANTS' MISREPRESENTATIONS AND NON-DISCLOSURES WERE DONE WITH THE REQUISITE SCIENTER.......... 36

A. Defendants Misrepresented Neurontin's Effectiveness for Nociceptive Pain.......... 36

B. Defendants Acted With the Requisite Scienter.......... 37

VI. THE TPP PLAINTIFFS HAVE STANDING TO RECOVER FOR THEIR INJURIES.......... 39

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ... 24

*Banks v. Office of the Senate Sergeant-At-Arms*,
241 F.R.D. 370 (D.D.C. 2007) ... 25

*Bonilla v. Volvo Car Corp.*,
150 F.3d 62 (1st Cir. 1998) ... 37

*City of New York v. Smokes-Spirits.Com, Inc.*,
541 F.3d 425 (2d Cir. 2008) ... 23

*Davis v. Southern Bell Tel. & Tel. Co.*,
158 F.R.D. 173 (S.D. Fla. 1994) ... 38

*Dellinger v. Pfizer, Inc.*,
2006 WL 2057654 (W.D.N.C. July 19, 2006) ... 27, 28

*Desiano v. Warner-Lambert Co.*,
326 F.3d 339 (2d Cir. 2003) ... 40

*Econo-Car International, Inc. v. Agency Rent-A-Car, Inc.*,
589 F. Supp. 1368 (D. Mass. 1984) ... 22

*Hayes v. Douglas Dynamics, Inc.*,
8 F.3d 88 (1st Cir. 1993) ... 11

*Holmes v. Secs. Investor Prot. Corp.*,
503 U.S. 258 (1992) ... 39

*Ierardi v. Lorillard, Inc.*,
1991 U.S. Dist. LEXIS 11887 (E.D. Pa. Aug. 23, 1991) ... 25

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
484 F. Supp. 2d 973 (D. Minn. 2007) ... 40

*In re JDS Uniphase Corp. Securs. Litig.*,
2007 WL 219857 (N.D.Cal. Jan. 29, 2007) ... 25

*In re Neurontin Marketing and Sale Practices Litig.*,
244 F.R.D. 89 (D. Mass. 2007) ... 25, 28, 29, 34

*In re Neurontin Marketing, Sales Practices, and Prods. Liab. Litig.*,
433 F. Supp. 2d 172 (D. Mass. 2006) ... 29, 38

*In re Pharmaceutical Ind. Average Wholesale Price Litig.*,
460 F. Supp. 2d 277 (D. Mass. 2006) ... 11

*In re Rezulin Prods. Liab. Litig.*,
171 F. Supp. 2d 299 (S.D.N.Y. 2001) ... 40

*In re Zyprexa Prods. Liab Litig.*,
253 F.R.D. 69 (E.D.N.Y. 2008) ... 23, 27

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*,
196 F.3d 818 .......... 40

*McClure Enters. v. General Ins. Co. of Am.*,
2009 U.S. Dist. LEXIS 4131 (D. Ariz. Jan. 8, 2009) .......... 22

*McDonough v. City of Quincy*,
452 F.3d 8 (1st Cir. 2006) .......... 23

*Meade v. Cedarapids, Inc.*,
164 F.3d 1218 (9th Cir. 1999) .......... 38

*Nickerson v. G.D. Searle & Co.*,
900 F.2d 412 (1st Cir. Mass. 1990) .......... 22

*PNH Corp. v. Hullquist Corp.*,
843 F.2d 586 (1st Cir. 1988) .......... 24

*Rainey v. American Forest and Paper Association*,
26 F. Supp. 2d 82 (D.D.C. 1998) .......... 25

*Salvas v. Wal-Mart Stores, Inc.*,
452 Mass. 337, 893 N.E.2d 1187 (Mass. 2008) .......... 34

*Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
249 F.3d 1068 (D.C. Cir. 2001) .......... 40

*Solo v. Bed Bath & Beyond, Inc.*,
2007 WL 1237825 (D.N.J. Apr. 26, 2007) .......... 23

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
360 F.3d 220 (1st Cir. 2004) .......... 24

*U.S. v. Funt*,
896 F.2d 1288 (11th Cir. 1990) .......... 38

*United States v. Parke-Davis*,
2003 WL 22048255 (D. Mass. Aug. 22, 2003) .......... 24

*Williams v. Mohawk Indus.*,
465 F.3d 1277 (11th Cir. 2006) .......... 23

**OTHER AUTHORITIES**

27A Farrell, Kennell, *et al.*,
Fed. Proc., L.Ed § 62:599 (Sept. 2008) .......... 25

E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market,"
*American Economic Review*, Vol. 85, No. 2 (May 1995) .......... 30

F. Gonul, F. Carter, E. Petrova and K. Srinivasan, "Promotion of Prescription Drugs and Its Impact on Physician Choice Behavior,"
*Journal of Marketing*, 65:3 (2001) .......... 30

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

J. Rizzo, "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, 42:1 (1999) .......... 30

*Merriam-Webster On-line Edition, available at http://www.merriam-webster.com/dictionary/down%5B4%5D (last accessed on March 17, 2009)* .......... 5

Restatement (Second) of Torts, § 434 .......... 22

Restatement (Third) of Agency, § 5.03 .......... 38

**TREATISES**

Andrew C. Harvey, *The Econometric Analysis of Time Series* (MIT Press, 1990) .......... 35

C. King, III, "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Boston MA: *Harvard Business School Working Paper No. 01-014* (2000) .......... 30

# I. RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS

## A. Consumer Plaintiffs

The Consumer Plaintiffs' prescribing physicians are a small but representative "random sample" of the targets of Defendants' fraudulent off-label marketing efforts. Contrary to Defendants' argument, the evidence that they were exposed to and strongly influenced by Defendants' fraudulent off-label marketing is overwhelming.

### 1. Gary L. Varnam (Bipolar)

Gary Varnam suffers from bipolar disorder and received numerous prescriptions for Neurontin over a period of more than three years. Mr. Varnam has testified that Neurontin was "completely ineffective in treating my bipolar disorder" and "gave me no benefit." *See* Class Plaintiffs' Statement of Disputed and Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("SOF") ¶ 193.

Mr. Varnam was first prescribed Neurontin by Dr. John Arness in February 2001. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 7). Dr. Arness's testimony that he never discussed Neurontin with a sales representative and that he learned about Neurontin's use for bipolar based on his own clinical experience are belied by the evidence in this case. In September 1999—two years before Dr. Arness prescribed Neurontin to Mr. Varnam—Dr. Arness discussed Neurontin's psychiatric uses with Laurie Winslow, a Parke-Davis sales representative and area business manager. *See* SOF ¶ 195. Within days, Dr. Arness received a Medical Information Request letter from Parke-Davis concerning "treatment of bipolar depression and mood disorder." *See* SOF ¶¶ 195, 196. The letter contained a false, misleading, inaccurate and omissive summary of the available evidence on the use of Neurontin for bipolar and other mood disorders. Specifically, the letter omits any reference to the FDA's finding of depression associated with Neurontin use, Parke-Davis's own internally completed Pande study, which showed a placebo

was *superior* to gabapentin to treat bipolar, or the negative results of the Frye and Guille studies. *See* SOF ¶¶ 98-99. In place of the unfavorable Level 1 evidence (*see* n.8, *infra*) that was known to the company, the letter discusses favorable unscientific and anecdotal evidence, including the misleading and deceptive Dimond article, which was written by Parke-Davis employees, made unsubstantiated claims, and omitted reference to the FDA's findings of depression associated with Neurontin use. This was the most widely distributed letter on bipolar, distributed to more than 5,500 physicians, mostly psychiatrists, in the United States. *See* SOF ¶¶ 198. Following his receipt of this letter, Dr. Arness's prescriptions of Neurontin skyrocketed.[1] *See* Class Plaintiffs' Appendix of Charts in Opposition to Defendants' Motion for Summary Judgment, Chart 1;[2] *see also* SOF ¶ 199.

In the two years prior to receiving the letter, Dr. Arness's Neurontin prescriptions averaged only $289 per month. In the two years after he received the "Dear Doctor" letter, Dr. Arness's Neurontin prescriptions soared to an average of $3,486 per month, a 1100% increase. Mr. Varnam's initial Neurontin prescription occurred at the peak of this massive surge in prescriptions that began almost immediately after Dr. Arness received the inaccurate and misleading "Dear Doctor" letter. In total, Dr. Arness wrote more than $83,600 in Neurontin prescriptions after having been detailed on Neurontin. *See* SOF ¶ 200. Mr. Varnam was subsequently treated by Dr. Beverly Grimm, who took him off the drug. *See* SOF ¶ 201.

**2. <u>Jan Frank Wityk (Bipolar and Dosages Above 1800 mg Per Day)</u>**

Jan Wityk also suffers from bipolar disorder, and her psychiatric symptoms included bouts of suicidal thoughts. *See* SOF ¶ 202. Ms. Wityk took Neurontin for several years, but she "never got better." *Id.*

---

[1] Dr. Arness's own testimony that he has achieved "good results" prescribing Neurontin to a limited number of bipolar patients is contradicted by his own prescriptions, which began declining steeply in the months that follow Varnam's first prescription. (*See* Chart 1; *see also* SOF ¶ 199).

[2] For ease of reference, Plaintiffs have compiled the many charts referred to herein in a separate appendix, numbered sequentially.

In December 1997, Ms. Wityk was examined by Dr. Nagaveni Ragothaman, who suggested various drugs as potential treatment, including Zoloft and Ativan. Neurontin was not one of the drugs discussed, and, at that time, Dr. Ragothaman had never prescribed Neurontin. *See* SOF ¶ 203.

Dr. Ragothaman incorrectly testified that she was never detailed on Neurontin's use for bipolar, when in fact she was detailed—at least *three times*—in 1999. *See* SOF ¶ 204. On February 4, 1999, Dr. Ragothaman discussed Neurontin's use in "Bi-Polar" with Parke-Davis sales representative Steve Alberti. *Id.* On February 11, 1999, as a result of this conversation, a copy of the very same fraudulent "Dear Doctor" letter that Dr. Arness received was mailed to Dr. Ragothaman. *Less than one week later,* Dr. Ragothaman decided to recommend Neurontin to Ms. Wityk, despite never having prescribed the drug before. *See* SOF ¶¶ 204-05. The "Dear Doctor" letter made no reference to the FDA's finding of clinically significant depression, with or without suicidal ideation, associated with Neurontin use, a finding that would have likely forced Dr. Ragothaman to reconsider her recommendation of Neurontin to Ms. Wityk given her prior suicidal thoughts. *See* SOF ¶¶ 98, 202, 204. The letter also omitted the negative data from the Pande clinical trial (945-209), which had been known to the company for a year. *See* SOF ¶¶ 14, 98, 204. One month later, on March 17, 1999, Dr. Ragothaman wrote her very first Neurontin prescription—to none other than Ms. Wityk. *See* SOF ¶ 205.

Dr. Ragothaman discussed the use of Neurontin for "Mood Disorder" with Steve Alberti again in June 1999. In September 1999, Dr. Ragothaman had yet another discussion of Neurontin's use for bipolar with another Parke-Davis sales representative, Roger Williams, who noted in his call notes that the doctor "desires data on the clinical efficacy of Neurontin for Bi-Polar Disorder." *See* SOF ¶ 206. Once again, Dr. Ragothaman received the same, un-updated, fraudulent "Dear Doctor" letter that she had received earlier, whose growing list of glaring omissions now included the

negative data from the Frye and Guille studies. *See* SOF ¶ 206.

The impact of this detailing effort was striking and immediate. Dr. Ragothaman went from a non-prescriber of Neurontin to a steady prescriber. *See* Chart 2; *see also* SOF ¶ 208.

Although she had never written a single Neurontin prescription prior to being detailed by Parke-Davis, after being detailed and receiving the misleading "Dear Doctor" letters, Dr. Ragothaman went on to write a total of $41,302 in Neurontin prescriptions. This included Ms. Wityk's prescriptions to treat bipolar disorder, the *very first* Neurontin prescription written by Dr. Ragothaman. *See* SOF ¶ 209.

Ms. Wityk was subsequently treated by Dr. Jerrold Gray, who continued to prescribe her Neurontin and increased her daily dosage. Although Dr. Gray cannot recall being detailed by Parke-Davis and Pfizer sales representatives, and denied being influenced by them, his testimony is contradicted by Ms. Wityk, who testified as follows:

> At the time I began starting to see Dr. Gray, he was gung-hoe [sic] on Neurontin, telling me that one of the drugs that I was currently on was old school, that the *drug reps were pleased with the off-label success of Neurontin for people with bipolar disorder like myself*. And that I should give it some consideration and thought to changing medications as the *drug representatives had seen amazing results*.

*See* SOF ¶ 210.

Ms. Wityk testified that she informed Dr. Gray that Neurontin was not providing a meaningful benefit, and that Dr. Gray's response, *based on conversations with Parke-Davis sales representatives*, was to increase her daily dose of Neurontin. *See* SOF ¶ 211 ("I know that during one of my very first visits with Dr. Gray, he did relay to me that he had discussed the fact that I was not getting better on the Neurontin with the drug, specifically with the drug representative who told him that they just needed to continue to titrate me to a higher dose until I was receiving benefit. That I just wasn't on a high enough dose yet.") Clearly, there is an issue of fact as to whether Dr. Gray was

detailed and whether this detailing influenced his prescription writing practices.

In September 2001, Dr. Gray agreed to discontinue prescribing Neurontin for Ms. Wityk. *See* SOF ¶ 211. It is Ms. Wityk's testimony that "Neurontin was ineffective for the entire time that [she] was on it." *Id.*

### 3. Gerald Smith (Headache and Neuropathic Pain)

Gerald Smith suffered from severe headaches and neuropathic pain. He took Neurontin over a period of nearly two years, and in that time period his headaches never got better. *See* SOF ¶ 455.

Mr. Smith's neurologist, Kylene Huler, was detailed hundreds of times by various Parke-Davis and Pfizer sales representatives from 1996 through 2004. *See* SOF ¶ 456. This frequent detailing biased Dr. Huler towards Pfizer and its products, including Neurontin, as revealed by the contemporaneous observations of Pfizer sales representative Vernon Clayton, who in more than one year detailed Dr. Huler approximately 27 times:

> Dr. Huler…is down[3] with all of the Pfizer [products]…She is the Pfizer Queen (Zoloft, Neurontin) and she said as much…Dr. Huler really likes the fact that we know she is high on the list of Pfizer (zoloft, Neurontin) products… Feed her ego although she is a nicelady [sic] and not an megalomaniac, she likes being the #1 queen. *See* SOF ¶ 457.

Given her cozy relationship with Pfizer, Dr. Huler's testimony that she was not influenced by her biweekly meetings with its salespeople is inherently suspect. In fact, her testimony that "Defendants' sales representatives never discussed Neurontin's off-label uses with [her]" is flatly contradicted by the Defendants' own detail records, which show that she discussed off-label uses like "migraine" with sales representatives. *See* SOF ¶ 456.

Dr. Huler's claim that "she began prescribing Neurontin to Smith based on her clinical experience" is both circular and flawed. Obviously, she lacked any clinical experience with

[3] Down appears to be used in its slang meaning: "cool; understanding or supportive of something or someone." *Merriam-Webster On-line Edition, available at* *http://www.merriam-webster.com/dictionary/down%5B4%5D* *(last accessed on March 17, 2009).*

Neurontin prior to her first prescription. Furthermore, her claim that she learned about off-label prescription as early 1994 is belied by her prescribing records, which show a lack of Neurontin prescriptions until July 1998, by which time she had already been detailed more than 30 times by 3 different sales reps. *See* SOF ¶ 457. Clearly there is a fact issue as to the influence of Defendants' off-label marketing efforts on Dr. Huler's prescribing activity, and her own self-serving, subjective impression is not dispositive.

**4. <u>Lorraine Kopa (Neuropathic Pain)</u>**

Lorraine Kopa suffered chronic neck and back pain as a result of a car accident. She took Neurontin for approximately six months but did not benefit from the drug. *See* SOF ¶ 458.

Ms. Kopa's prescribing physician was Dr. Vithalbahai Dhaduk. Dr. Dhaduk's testimony that he never attended an event where off-label uses of Neurontin were discussed is not true. Indeed, Dr. Dhaduk himself had been "trained" by the Defendants as a speaker and spoke regularly about Neurontin, and earned significant fees for doing so. *See* SOF ¶ 459.

Defendants also paid Dr. Dhaduk to attend their conferences and consultant meetings. *See* SOF ¶ 462. Dr. Dhaduk attended a Parke-Davis "Pain Weekend" seminar.[4] *See* SOF ¶ 460. At all times, Dr. Dhaduk's airfare, hotel and meals were paid for by Defendants. *See* SOF ¶ 462. Finally, Dr. Dhaduk has received hundreds of visits from Defendants' sales representatives and medical liaisons. *See* SOF ¶ 463.

This steady stream of financial perquisites between Dr. Dhaduk and the Defendants created an apparent *quid pro quo* relationship. According to Pfizer's sales call database, a Pfizer sales representative asked Dr. Dhaduk to agree to increase the share of his prescriptions for Rebif, a Pfizer

[4] In addition to pain, Dr. Dhaduk's involvement with the Defendants directly related to other off-label uses, including the use of Neurontin at doses above 1800 mg per day, and epilepsy monotherapy. Dr. Dhaduk was an investigator in the STEPS study, a "seeding" trial designed to induce physicians to prescribe Neurontin at higher than approved doses through the use of kickbacks. Dr. Dhaduk had also agreed to serve as a speaker on monotherapy, even though monotherapy was never an approved use of Neurontin. *See* SOF ¶ 461.

drug used to treat multiple sclerosis, to 25%, and Dr. Dhaduk "said don't worry about it, I'll get the business." *See* SOF ¶ 464.

### 5. Carolyn Hollaway (Nociceptive Pain)

Defendants continue to claim that Carolyn Hollaway suffered from neuropathic rather than nociceptive pain, based entirely on the after-the-fact testimony of Ms. Hollaway's treating physician, Dr. Greg Rogers, rather than her contemporaneous medical records, which are devoid of any reference to neuropathic, neurogenic or nerve-related pain. On the contrary, Ms. Holloway's medical records make it clear that Ms. Holloway: (a) suffered chronic back pain resulting from a traumatic motor vehicle accident, (b) that she suffered from inflammation which prompted a prescription for Bextra, a COX-2 inhibitor used to treat nociceptive pain, and (c) that she experienced "specific point tenderness in the lower back" *See* SOF ¶ 465. Each of these is consistent with a diagnosis and treatment for nociceptive pain. Even worse, Defendants' exclusive reliance on Dr. Rogers' testimony is especially faulty because, as Dr. Rogers concedes, he has "trouble distinguishing between [neuropathic pain and nociceptive pain]." *See* SOF ¶ 466.[5]

Pfizer also relies on Dr. Rogers' own subjective impressions to determine whether his Neurontin prescriptions were influenced by Pfizer. Dr. Rogers is as oblivious to the effect that marketing has on his prescribing patterns as Drs. Huler and Dhaduk. Dr. Rogers's prescribing data—produced by Pfizer in this litigation—shows *no* Neurontin prescriptions until November 2002, the

---

[5] Dr. Rogers' testimony clearly reveals that he has *reversed* the definitions of neuropathic and nociceptive pain:

> Q Let me switch gears with you for a second. Have you ever heard of nociceptive pain?
> A Yes. Nociceptive.
> Q How would you define that?
> A That's pain that's not really generated by a specific location such as an arm, a leg, a knee, an ankle. But the nerve that connects the brain to that location is being affected and is generating the pain that the brain perceives. And it's not really -- it may seem like it's knee pain, but it's really something involving the nerve between the knee and the brain. So if something in the brain stem goes wrong, you won't perceive it properly. If something -- if there's a herniated disc in the lumbar spine, it can affect it and cause the sensation of knee pain without the knee actually being injured. So that -- that would be sort of my description of it.

*See* SOF ¶ 466.

*same month* that he was *first* detailed by a Pfizer sales representative. *See* Chart 3; *see also* SOF ¶ 467.

According to Pfizer's records, Dr. Rogers was detailed three times between November 2002 and March 2004, and each detail was followed by a significant increase in Dr. Rogers's Neurontin prescriptions. Clearly, there is a triable issue as to the impact of Defendants' off-label marketing efforts on Dr. Rogers' prescribing activity. *Id.*

**6. <u>Jeanne Ramsey (Dosages Above 1800 mg Per Day)</u>**

Defendants apparently do not understand the nature of Plaintiffs' claims for doses above 1800 mg per day. *See* SOF ¶ 694. How Dr. Haynsworth became aware of Neurontin generally, or why he prescribed it to Ms. Ramsey, is immaterial. The issue is why he chose to prescribe Neurontin at *doses above 1800 mg per day*, in the face of unequivocal scientific evidence that such excessive doses were wasteful and provided no additional benefit.

Ms. Ramsey first saw Dr. Waldo for her reflex sympathetic dystrophy (RSD), a form of neuropathic pain, in March 2000. On March 13, 2000, Dr. Waldo prescribed her Neurontin at a dose of 900 mg per day. *See* SOF ¶ 695. Ms. Ramsey's insurance required her to pay half the prescription cost. *See* SOF ¶ 694. Ms. Ramsey's co-pay for this prescription was $46.44. *See* SOF ¶ 696. Two weeks later, on March 31, 2000, Ms. Ramsey saw Dr. Haynsworth, who had earlier that month been detailed for the first time on Neurontin. Within one month of this detail, Dr. Haynsworth raised her Neurontin prescription to 2400 mg per day, and then 3200 mg per day. *See* SOF ¶ 697. Her co-pay for this prescription nearly tripled, to $124.60. *See* SOF ¶ 698. On July 25, 2000, Ms. Ramsey again saw Dr. Waldo who reduced her Neurontin prescription back under 1800 mg per day. *See* SOF ¶ 699.

Ms. Ramsey saw Dr. Haynsworth again on September 12, 2000. Dr. Haynsworth, who had been detailed on Neurontin again in July and August, once again raised her dose of Neurontin above

1800 mg per day, to 2400 mg per day. *See* SOF ¶ 700. Once again, Ms. Ramsey's co-pays went back to $124.60. *See* SOF ¶ 701. By December 2000, Dr. Waldo again lowered Ms. Ramsey's Neurontin dosage to below 1800 mg per day. *See* SOF ¶ 702. Ramsey spent a total of $898.40 on Dr. Haynsworth's four Neurontin prescriptions in 2000, while she only spent $157.58 for the four prescriptions written by Dr. Waldo during that same time period. *See* SOF ¶ 703.

The fact that Dr. Waldo consistently kept Ms. Ramsey's prescriptions within the FDA-approved range, and Dr. Haynsworth consistently exceeded it should not be surprising, given the fact that Dr. Haynsworth was detailed heavily during the time that he was treating Ms. Ramsey. *See* SOF ¶ 704. During that time, the cost of an average Neurontin prescription written by Dr. Haynsworth surged from well below $200 (roughly the cost of a 30-day supply at 1800 mg per day) to more than $200. *See* SOF ¶ 705. In many months, Dr. Haynsworth's average prescription greatly exceeded 1800 mg per day. *See* Chart 4; *see also* SOF ¶ 705.

This surge in prescriptions stands in stark contrast to Dr. Waldo, whose prescriptions remained relatively constant throughout this same period. *See* Chart 5; *see also* SOF ¶ 706.

## B. Third-Party Payor Class Plaintiffs[6]

### 1. BCBSLA

BCBSLA maintains an open formulary, meaning that it pays for all FDA approved drugs regardless of the formulary status of the drug. BCBSLA did not hire its first staff pharmacist until 1999, when it also formed its own P&T committee. However, from February 1999 through February 2002, the P & T committee at BCBSLA made no decisions on drugs, but was merely a token committee, existing to comply with Blue Cross regulations. The generic version of Neurontin is gabapentin which became available in certain strengths in 2004. Like all drugs that go generic, Neurontin went from a preferred brand tier on BCBSLA's formulary to a generic tier, or non-

[6] The coordinated TPP plaintiffs (Kaiser, Aetna, and Guardian), will respond separately to Defendants' factual assertions concerning them.

formulary drug.

By September 2007, BCBSLA still did not use step therapy, but was considering implementing step therapy for drugs with available generics to control costs. BCBSLA did not implement Medicare Part D until January 2006, two years after the proposed class period in this case. Pfizer's reference to plans implemented to comply with the Federal requirements of the Medicare Part D program are immaterial here. Furthermore, Lyrica was not approved by the FDA for any indication until December 2004, and was not covered by Medicare Part D in 2006. Moreover, the BCBSLA coverage plan referenced by Pfizer does not require gabapentin to be used off-label because Lyrica is indicated for pain associated with post-herpetic neuralgia, an indication it shares with gabapentin. This plan does not require gabapentin to be taken for diabetic peripheral neuropathy. Off-label uses of drugs are generally not covered by Medicare part D. BCBSLA does not know the indication for which a drug is prescribed. *See* SOF ¶¶ 711-53, 767-75.

**2. ASEA**

Defendants distort the deposition testimony of ASEA's Chairman, Fred Brown, to argue that ASEA has "no factual basis for claiming that the fraudulent scheme alleged in the complaint caused ASEA to pay for any off-label Neurontin prescriptions." Def. Mem. at 15. As Mr. Brown repeatedly made clear during this portion of his deposition, while ASEA itself has no independent knowledge concerning the marketing of Neurontin for off-label uses or the effect of that marketing on prescribers, it is relying on its attorneys to discover and present this information. *See* Class Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, ¶ 101. The issue on this motion is whether there is evidence that Defendants' pervasive misinformation campaign caused physicians to prescribe Neurontin for the off-label uses at issue, not whether ASEA, a typical victim of Defendants' fraudulent marketing scheme, has personal knowledge of the matter.

**3. Harden**

Similarly, with respect to Harden, Defendants distort the relevant deposition testimony. Defendants argue that Harden, a small self-insured manufacturer, has no knowledge that Defendants' alleged misconduct caused Harden to pay for off label prescriptions (Def. Mem. at 16), and that Harden failed to survey each of the doctors who prescribed Neurontin to its employees to determine their reasons for doing so. *Id*. Walter Matthews, Vice President and CFO of Harden testified repeatedly that although Harden has no independent knowledge related to the marketing of Neurontin or the effect of that marketing on prescribing by physicians, Harden is relying on its attorneys to discover and present such information. *See* Class Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, ¶ 104..

## II. LEGAL STANDARD

Defendants present a skewed articulation of the summary judgment standard. "'To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position.'" *In re Pharmaceutical Ind. Average Wholesale Price Litig.*, 460 F. Supp. 2d 277, 284 (D. Mass. 2006) (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990)). In making this determination, "[t]he Court must 'view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" *Id.* (quoting *Barbour v. Dynamics Research Corp*., 63 F.3d 32, 36 (1st Cir. 1995). Moreover, an expert opinion, "which may be more inferential than that of fact witnesses," can defeat summary judgment so long as it "include[s] the factual basis and the process of reasoning which makes the conclusion viable…" *Hayes v. Douglas Dynamics, Inc*., 8 F.3d 88, 92 (1st Cir. 1993).

As set forth in the foregoing Response to Defendants' Statement of Undisputed Facts, the accompanying separate statement, and the argument below, there is overwhelming evidence that: (1) Neurontin is ineffective for the off-label uses at issue; (2) Defendants engaged in a pervasive

campaign to persuade physicians to prescribe Neurontin for those uses by intentionally distorting, misrepresenting, and concealing the best available scientific evidence of Neurontin's efficacy for those uses; and (3) Defendants' unlawful and misleading off-label marketing campaign achieved its stated goal of causing physicians to write billions of dollars of Neurontin prescriptions for these uses.

## III. THERE IS OVERWHELMING EVIDENCE THAT NEURONTIN IS INEFFECTIVE FOR THE OFF-LABEL INDICATIONS AT ISSUE

There is ample evidence that Neurontin is ineffective for the off-label indications at issue in this case. For each indication, the clinical trial evidence alone is sufficient to create a triable issue of fact.[7] In addition, Plaintiffs present expert opinions, from prominent physicians and researchers, that Neurontin is ineffective for the treatment of the indications at issue in this case, and that the medical literature has been thoroughly distorted by Defendants' selective reporting and/or suppression of the results of clinical trial. To arrive at these opinions, Plaintiffs' experts, when necessary, conducted statistical and/or meta-analyses of the relevant double-blind, randomized placebo-controlled trials (DBRCT).[8] Defendants have not challenged the methodology or admissibility of these opinions, or the expertise of Plaintiffs' experts.

For several indications, the FDA's comments, reviews, and rejections provide even more

---

[7] *See* Reporter's Transcript, Sept. 27, 2006 at 13:21-16:10 (THE COURT: "They're going to put on the fact that there are studies out there that actually show it wasn't effective. . . . Again, they can meet their burden by putting in these studies, as far as I'm concerned.").

[8] When determining a drug's effectiveness, the highest level of evidence, indeed the level of evidence upon which the FDA relies, comes from the double-blind randomized controlled trial. This "Gold Standard" is appropriately called "Level 1 Evidence." Lesser levels of evidence, including case reports and consensus guidelines, are fraught with potential confounders and biases, and are therefore incapable of testing a hypothesis. *See* SOF ¶ 24. The essence of this litigation is that Defendants misrepresented and/or suppressed the results of DBRCT such that the *available* evidence in the medical literature, compared to the *actual* evidence Defendants possessed, was biased in favor of gabapentin, "render[ing] information about Neurontin's effectiveness [for the indications at issue], as disseminated in the published literature (as stand-alone reports of trials or as included in systematic reviews), untrustworthy and invalid." *See* Ex. 117, Reporting and other biases in studies of Neurontin for migraine, psychiatric/bipolar disorders, nociceptive pain and neuropathic pain ("Dickersin Report") at 52. Because of this, Plaintiffs' experts – in contradistinction to Defendants' experts and other third parties who have attempted to evaluate Neurontin – are the *only* experts who have analyzed Neurontin's efficacy for these conditions based upon the *actual* evidence. Indeed, prior to trial, Plaintiffs will move to exclude the testimony of every one of Defendants' indication-specific experts, due to their failure to adhere to the most basic tenets of modern, evidence-based medicine.

evidence that Neurontin is ineffective. Finally, for several of the indications, Defendants' own admissions provide still further evidence that Neurontin is ineffective.

### A. <u>Neurontin Has Been Proven Ineffective for Bipolar and Other Mood Disorders</u>

Four DBRCT have been conducted studying Neurontin in bipolar disorder.[9] Not one of these studies indicates that Neurontin is any more effective than placebo in treating any aspect of bipolar disorder. The *first* trial studying Neurontin in bipolar disorder, Defendants' own protocol 945-209, not only demonstrated that Neurontin is no more effective than placebo at treating either the depressive or manic symptoms of bipolar disorder, but also indicated that *placebo* is a more effective anti-manic agent than Neurontin. The *second* trial, the lead investigator of which was Dr. Mark Frye, then of the National Institute of Mental Health, demonstrated that Neurontin was no more effective than placebo as a treatment for bipolar disorder. The *third* trial, authored by investigators associated with Harvard Medical School, demonstrated that Neurontin was no more effective than placebo at treating mania. The *fourth* trial, Defendants' own protocol 945-421-291, demonstrated that Neurontin was no more effective than placebo at improving bipolar symptom severity.[10] *See* SOF ¶¶ 13-18. This evidence alone creates a triable issue of fact as to whether Neurontin is effective for bipolar and other mood disorders.

Plaintiffs' expert reports provide additional evidence that Neurontin is ineffective for bipolar and other mood disorders. In his expert report, Dr. Jeffrey Barkin, a board-certified psychiatrist and Director of the Maine's Medicaid Drug Utilization Review Board, states: "[I]n reviewing all of the double-blind, placebo-controlled trials (Level 1 Evidence), no efficacy of gabapentin is

---

[9] Bipolar Disorder is a type of mood disorder. It is a cyclic mood disorder characterized by recurrent mood states including mania, depression and mixed mania and depression. *See* Ex. 021, Barkin Report, at 3-4.

[10] Defendants continue to misrepresent the results of the Vieta study (protocol 945-421-291). The primary results from this protocol indicated that Neurontin was not effective. The Vieta article misleadingly presented positive results from a "cherry-picked" subpopulation falsely claiming that they were the results from the primary population analyzed. As Plaintiffs' experts have described, this is a blatant, dishonest, and unethical misrepresentation of the trial's negative results. *See* SOF ¶¶ 163-70.

demonstrated. I conclude that the clinical trial database of Level 1 Evidence consistently shows lack of efficacy of gabapentin for the treatment of bipolar disorder. Therefore, the use of gabapentin for the treatment of bipolar disorder, as monotherapy or adjuvant therapy, is unsupported by the scientific evidence." Dr. Barkin further concludes: "[T]he scientific evidence clearly shows that gabapentin is ineffective as a treatment for bipolar disorder. Based on this scientific evidence, Neurontin should never have been recommended as a treatment for bipolar disorder." *See* SOF ¶¶ 25-6.

Dr. John Abramson, an expert and best-selling author on the impact of pharmaceutical company marketing on physician prescription writing, reaches the same conclusion: "In sum, four randomized controlled clinical trials testing the efficacy of Neurontin for bipolar disorders have been done. Of the two identified as sponsored by the manufacturer, one showed that Neurontin is significantly worse than placebo [Protocol 945-209, Pande et al.], and one showed no benefit [Protocol 945-421-291, Vieta et al.]. The study done by NIMH showed no benefit [Frye et al.]. Another presented in 1999 [Guille et al.] also showed no benefit." *See* SOF ¶ 27.

Defendants' own admissions provide even further evidence that Neurontin is ineffective for bipolar and other mood disorders. Prior to marketing Neurontin to psychiatrists, Parke-Davis admitted that there was a "lack of scientific rationale" to support Neurontin's use as a treatment for bipolar and other mood disorders. Parke-Davis admitted that there was "no preclinical data [to] support the efficacy of gabapentin in acute mania." After learning of the results of his own study, 945-209, as well as the results from the Frye and Guille studies, Dr. Atul Pande (who was Defendants' Senior Director of Central Nervous System Worldwide Clinical Research) admitted that Neurontin has a "weak, if any, anti-manic effect" and that there is "negligible evidence" supporting its use in bipolar disorder. Dr. Pande further admitted: "There is pretty good consensus among

experts in the area that gabapentin is not a good anti-manic treatment." Dr. Pande has admitted that Parke-Davis had "absolutely no evidence whatsoever that Gabapentin was likely to be antidepressant, and therefore felt it ethically unjustified to include depressed patients [in a mood trial]." Pfizer admits that psychiatric opinion leaders refer to gabapentin as "the drug that does not work." *See* SOF ¶¶ 19-23. Defendants' own admissions create a triable issue of fact as to whether Neurontin is effective for bipolar and other mood disorders.

The FDA's combined medical-statistical review ("FDA Review") of Neurontin, conducted as part of Defendants' 1992 New Drug Application (NDA), provides still further evidence that Neurontin is ineffective as a treatment for bipolar and other mood disorders. The FDA Review found that 5.3% of the total Neurontin-exposed population reported "depression as a serious adverse event." This included many patients with no previous history of depression. The FDA Review further concluded that Neurontin caused serious events, including "clinically important depression," that limited "the drug's widespread usefulness."[11]

In summary, the negative results from each of the four DBRCT studying Neurontin for bipolar disorder provide evidence sufficient to create a triable issue of fact as to whether Neurontin is effective for bipolar and other mood disorders. The clinical trial evidence is reinforced by the reports of Plaintiffs' experts, Defendants' own admissions, and the findings of the FDA. Plaintiffs will indeed be able to prove that Neurontin is wholly ineffective for the treatment of bipolar and other mood disorders.

---

[11] Specifically, the FDA found Neurontin could exacerbate depression, which could "require intervention or lead to suicide, as it has resulted in some suicidal attempts." The reports of depression included a case of challenge-dechallenge-rechallenge. In his report, Plaintiff's eminently qualified expert in drug safety and clinical trials, Dr. Curt Furberg, concludes that "[c]ases of challenge-dechallenge-rechallenge may be "considered evidence of causation." Both Dr. Barkin and Dr. Furberg agree that the 1992 FDA Review contained a "very strong safety signal that gabapentin increases the risk of depression with or without suicidal ideation." Dr. Furberg finds it both "misleading and unethical for a Sponsor to claim that the drug has a therapeutic benefit while denying the existence of evidence that the drug may lead to a worsening of outcomes in the same therapeutic area." Moreover, Dr. Barkin writes that the FDA's finding of clinically significant depression, with or without suicidal ideation, "indicates a lack of beneficial, and possible negative, effect on mood" that "would have been material to the physician making an informed decision to prescribe gabapentin for a mood disorder." *See* SOF ¶¶ 1-10.

**B. Neurontin Has Been Proven Ineffective for Both Neuropathic and Nociceptive Pain**

Defendants do not contest that Plaintiffs have adduced evidence sufficient to create a triable issue of fact as to whether Neurontin is effective for nociceptive pain.[12] Several DBRCT have been conducted studying Neurontin in neuropathic pain. The consistently negative results of these DBRCT establish that Neurontin is ineffective for the treatment of neuropathic pain.

The *first* trial, conducted by Dr. Kenneth Gorson, demonstrated that Neurontin was no more effective than placebo at treating painful diabetic peripheral neuropathy (PDPN), a common neuropathic pain condition. The *second* trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-210, was irrevocably corrupted by a poor trial design that led to the unblinding of enrolled patients, a fact which was known to Defendants. Using Defendants' unpublished data, Plaintiffs' expert biostatistician, Dr. Nicholas Jewell, corrected this corruption in his report. He concludes that protocol 945-210 "provides no basis of any clinical efficacy of gabapentin over placebo in reducing pain." About 945-210, Dr. Abramson writes: "for the remaining patients, still blinded to treatment allocation, Neurontin failed to provide significant relief from the pain of diabetic neuropathy." The *third* trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-224, the results of which were never published, showed "no beneficial effect on primary or secondary outcomes of any dose of gabapentin." A *fourth* trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-306, failed to achieve statistical significance as to the primary endpoint, indicating that Neurontin was no more effective than placebo for the treatment of neuropathic pain. A *fifth* trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-271, the results of which Defendants suppressed for over seven years, demonstrated that Neurontin was no better than placebo at reducing mean pain scores, the primary

[12] Defendants have studied Neurontin, as a treatment for nociceptive pain, in several clinical trials. Each of these trials has found that Neurontin is no more effective than placebo as a treatment for nociceptive pain. None of the results from these trials have been published. *See* SOF ¶ 229.

endpoint.[13] *See* SOF ¶¶ 212-21, 223-26. The overwhelming clinical trial evidence alone creates a triable issue of fact as to whether Neurontin is effective for neuropathic pain.

Plaintiffs' expert reports provide additional evidence that Neurontin is ineffective for the treatment of neuropathic pain. Dr. Thomas L. Perry undertook a "thorough and scientifically valid analysis of all relevant double blind randomized clinical trials (DBRCT)." Dr. Perry's analysis included the results from Defendants' suppressed clinical trials that were not available to other reviewers. Dr. Perry concluded that "Neurontin is not an effective drug for the treatment of Neuropathic pain" and that Neurontin has "at best a clinically insignificant average effect on pain scores" that is "essentially clinically meaningless." According to Defendants, the best evidence of Neurontin's efficacy comes from protocol 945-210. The expert report of Dr. Jewell demonstrates that this purported best evidence is in fact evidence that Neurontin is ineffective for neuropathic pain. Dr. Perry cautions that "[t]here is no reason to think that the other large DBRCT [involving Neurontin] were exempt from the [unblinding] effect observed by Dr. Jewell" in Defendants' protocol 945-210. Therefore, even Dr. Perry's analysis "significantly exaggerates the apparent analgesic effects of" Neurontin. *See* SOF ¶¶ 238-40. Plaintiffs' expert reports provide more than sufficient evidence to create a triable issue of fact as to whether Neurontin is effective for neuropathic pain.

Defendants' own pain experts provide even further evidence that Neurontin is ineffective for neuropathic pain. In 2001, Pfizer held a consultants' meeting to discuss the evidence that supported Neurontin's efficacy for Neuropathic pain and whether or not to seek FDA approval for a

[13] More recent clinical trials have also demonstrated that Neurontin is no more effective than placebo as a treatment for neuropathic pain. In 2005, a trial involving neuropathic pain patients published in the *New England Journal of Medicine,* authored by Dr. Ian Gilron *et al*., reported that "gabapentin did not produce significantly better results than placebo with regard to the primary outcome of this trial [reduction in pain scores]." The April 2009 issue of the journal *Pain* contains a trial, authored by Dr. Robert Dworkin *et al*., which demonstrated that "gabapentin did not provide significantly greater pain relief than placebo" in the group of neuropathic pain patients studied. *See* SOF ¶¶ 236-7.

neuropathic pain indication. In attendance were numerous Pfizer employees, Pfizer's paid "pain experts" Mitchell Max, Robert Dworkin and Gary Bennett, and Paul Leber, the former head of the Division of Neuropharmacologic Drug Products at the FDA. After all the evidence was presented, Defendants' experts concluded that "the evidence is not convincing to support a broad neuropathic pain claim." The presentation included data from several clinical trials that had been concealed from physicians and would remain so for years, including the negative results from protocol 945-224, the fact that the claimed statistical significance from protocol 945-306 was "predominantly the result of the PHN patients," as well as the "negative" results from 945-271 (the POPP study).[14] Dr. Max's reaction to the presentation was "you're done." *See* SOF ¶¶ 230-32.

The FDA's refusal to even *file* Pfizer's proposed neuropathic pain indication for Neurontin, and Pfizer's subsequent avoidance of an independent review of its neuropathic pain data, provide still further evidence that Neurontin is ineffective for neuropathic pain. In 2001, Pfizer filed a supplemental new drug application (sNDA) seeking approval to market Neurontin as a treatment for neuropathic pain. At the time it filed the sNDA, Pfizer knew that the FDA would not approve a broad neuropathic pain indication, especially in areas where there were no studies, or where the company had one purportedly positive study. The FDA informed Pfizer that the application would be "refused to file," as it was obvious that the application would not be approved. The FDA did, however, offer to have the application reviewed by an Advisory Committee of outside pain experts. Based on the Defendants' expert consultants' meeting described above, Pfizer's marketing team leader concluded that it would be in Pfizer's "best interest" to "avoid an Advisory Committee

[14] A similar negative opinion of Neurontin was shared by the investigators for the POPP study, who informed Pfizer that "Neurontin may be a drug for overall 'well-being' and not NeP [neuropathic pain]." In 2002, Defendants consulted with two pain experts concerning the differentiation of new compounds for treating pain. Once again, Pfizer was informed that the "success of gabapentin is not due to its efficacy, it is less efficacious than Tricyclic antidepressants." *See* SOF ¶¶ 234-5. The admissions of Defendants' own retained pain experts and clinical investigators provide evidence sufficient to create a triable issue of fact as to whether Neurontin is effective for neuropathic pain.

review" of the neuropathic pain data. Accordingly, Pfizer restricted its neuropathic pain sNDA to only one narrow indication, postherpetic neuralgia. *See* SOF ¶¶ 227-8. The FDA's refusal to file Pfizer's sNDA for neuropathic pain, and Pfizer's subsequent avoidance of an independent review of their neuropathic pain data, provide further evidence that Neurontin is ineffective for that broad off-label use.

In sum, a veritable mountain of evidence establishes that Neurontin is ineffective for the treatment of neuropathic pain.

### C. Neurontin Has Been Proven Ineffective for Migraine and Headache

Defendants have conducted the three major DBRCT studying Neurontin for the treatment of migraine. The results from these trials consistently demonstrate that Neurontin is no more effective than placebo as a treatment for migraine.

In 1990, the *first* trial studying Neurontin's use in migraine, Defendants' own protocol 879-200, found no statistically significant difference in the primary efficacy measure between placebo and Neurontin. In 1998, the *second* trial studying Neurontin's use in migraine, Defendants' own protocol 945-220, also showed no significant difference between Neurontin and placebo in the primary outcome studied. Finally, in 1999, the *third* trial studying Neurontin's use in migraine, Defendants' own protocol 945-217, again failed to demonstrate any statistically significant difference between Neurontin and placebo. *See* SOF ¶¶ 468-71.

The report of Plaintiffs' expert, Dr. Douglas McCrory, a health services researcher experienced in the evaluation of clinical trials, provides additional evidence that Neurontin is ineffective for the treatment of migraine. Dr. McCrory undertook a review of the results of all of the DBRCT studying gabapentin for migraine, and performed a meta-analysis of the data. Based on this work, Dr. McCrory concludes that: "the total evidence does not meet the generally established criteria for efficacy;" the results from the clinical trials "fail[] to show a statistically significant effect

of gabapentin compared with placebo for migraine prophylaxis;" "[i]n comparison with other widely used migraine preventive drugs, the estimated effect size of gabapentin not only fails to reach statistical significance, but also has a much lower magnitude of effect;" and that "Neurontin is ineffective for migraine prevention." *See* SOF ¶¶ 472-474, 476-7. The report of Plaintiffs' expert, Dr. McCrory, provides evidence sufficient to create a triable issue of fact as to whether Neurontin is ineffective for migraine and headache.

In sum, the consistent negative results from multiple DBRCT, bolstered by Dr. McCrory's report and analysis of the migraine trials, establishes that Neurontin is ineffective for the treatment of migraine.

### D. Neurontin Provides No Additional Benefit at Dosages Over 1800 mg Per Day

Defendants have conducted the three fixed-dose DBRCT capable of assessing Neurontin's efficacy at dosages over 1800 mg/day. The consistently negative results from these DBRCT establish that Neurontin is no more effective at dosages above 1800 mg/day. The *first* trial, Defendants' own protocol 945-082, not only failed to provide evidence of enhanced efficacy at dosages above 1800mg/day, but also failed to demonstrate any dose-response relationship (*i.e.*, improvement in efficacy with escalating dose) for the drug. The *second* trial, Defendants' own protocol 945-224, not only demonstrated that Neurontin was not effective in treating neuropathic pain at doses both above and below 1800 mg/day, but also failed to demonstrate a dose-response effect of Neurontin. The *third* trial, Defendants' own protocol 945-295, specifically designed to garner data on the dose-response of Neurontin, once again demonstrated that there was no increased efficacy at doses above 1800 mg/day, while also failing to demonstrate a dose-response effect of Neurontin. *See* SOF ¶¶ 565, 569-70. This consistently negative clinical trial evidence is more than sufficient to create a triable issue of fact as to whether Neurontin is any more effective at dosages above 1800mg/day.

The report of Plaintiffs' expert, Dr. Brian Alldredge, a Professor of Clinical Pharmacy at the University of California at San Francisco School of Pharmacy and Health Sciences Clinical Professor of Neurology at the UCSF School of Medicine, provides additional evidence that Neurontin is no more effective at dosages above 1800 mg/day. Dr. Alldredge reviewed all of the Defendants' trials studying Neurontin at doses above 1800 mg/day, and concludes that "the highest quality evidence [evidence from DBRCT] failed to establish a dose-related effect (*i.e.*, continued improvement in efficacy) at dosages above 1800 mg/day." Dr. Alldredge also found that "[t]here is insufficient evidence to demonstrate enhanced efficacy of gabapentin (Neurontin) at doses above 1800 mg/day." Finally, Dr. Alldredge's expert opinion is that "Neurontin is not more effective at doses greater than 1800 mg per day," and that the studies of high-dose Neurontin "demonstrate that dosing Neurontin above 1800 mg per day is ineffective as a strategy to improve therapeutic response." *See* SOF ¶¶ 582, 586.

The FDA's rejection, on two separate occasions, of Defendants' efforts to increase the recommended dose of Neurontin above 1800 mg/day provide further evidence that Neurontin is no more effective at dosages above 1800 mg/day. First, in 1996, Defendants submitted a supplemental New Drug Application (sNDA) to the FDA seeking "an increase in the effective dose range to include up to 3600 mg/day" with a "maximum recommended dose of 4800 mg/day." The FDA rejected the request, finding that the data submitted failed to provide evidence that higher doses were more effective than 1800 mg/day. Second, in 2002, the FDA rejected Defendants' proposed dosing instructions for postherpetic neuralgia that included an increase in the daily dose to 3600 mg and the statement that there was "greater efficacy with increasing dose." The FDA required that the label read that "[a]dditional benefit of using doses greater than 1800 mg/day was not demonstrated." *See* SOF ¶¶ 575-8. The FDA's two-time rejection of Defendants' proposals to increase the daily dose of

Neurontin provides additional evidence that there is no enhanced efficacy of Neurontin at dosages above 1800 mg/day.

Defendants' own admissions provide further evidence that Neurontin offers no greater efficacy at doses above 1800 mg/day. In 1995, at a Neurontin Core Marketing Team Meeting, Defendants discussed how the results of protocol 945-082 would be "considered negative by regulatory authorities due to lack of statistical significance between" the dose groups. In 1997, at a Neurontin Core Marketing Team Meeting, Defendants admitted that protocol 945-082 had "failed to establish a significant difference between the doses" and that protocol 945-088 had also failed to demonstrate evidence of a dose–response. *See* SOF ¶¶ 587-8. Defendants' own admissions provide evidence sufficient to create a triable issue of fact as to whether there is enhanced efficacy of Neurontin at dosages above 1800 mg/day.

In sum, the consistent negative results from multiple DBRCT, the opinion of Plaintiffs' expert, Dr. Alldredge, the FDA's two-time rejection of Defendants' proposals to increase the daily dose of Neurontin, as well as Defendants' own admissions, prove that Neurontin is no more effective at dosages above 1800 mg/day.

## IV. <u>THE EVIDENCE OF CAUSATION IS OVERWHELMING</u>

Generally speaking, questions of causation, in-fact and proximate, are reserved for the jury. Restatement (Second) of Torts, § 434; *Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 416 (1st Cir. Mass. 1990). This is true in RICO cases as well. *Econo-Car International, Inc. v. Agency Rent-A-Car, Inc.*, 589 F. Supp. 1368, 1372 (D. Mass. 1984); *McClure Enters. v. General Ins. Co. of Am.*, 2009 U.S. Dist. LEXIS 4131, *43-44 (D. Ariz. Jan. 8, 2009).

Under RICO, "proximate cause is not ... the same thing as a sole cause," and a showing that the unlawful conduct "was a substantial factor in the sequence of responsible causation" is sufficient.

*Williams v. Mohawk Indus.*, 465 F.3d 1277, 1288 n.5 (11th Cir. 2006) (internal quotation omitted).[15] In this case, the direct, circumstantial, and expert opinion evidence that Defendants' fraudulent off-label marketing caused Neurontin prescriptions to skyrocket for those conditions is overwhelming, and deserves to be heard by a jury.

### A. There Is Overwhelming Evidence that Defendants' Misrepresentations and Non-Disclosures Concerning Neurontin's Efficacy Caused Doctors to Prescribe Neurontin for the Off-Label Conditions at Issue

Defendants argue that summary judgment is required because the Consumer Plaintiffs' prescribing physicians testified that they prescribed Neurontin for the Consumer Plaintiffs based on their own independent medical judgment and were not exposed to and/or influenced by Defendants' pervasive misinformation campaign. As set forth in detail in Part I-A, *supra*, there is overwhelming evidence that the Consumer Plaintiffs' prescribing physicians were exposed to and influenced by Defendants' fraudulent off-label marketing, even if they remain subjectively unaware of the influence. *See In re Zyprexa Prods. Liab Litig.*, 253 F.R.D. 69, 174 (E.D.N.Y. 2008) (summarizing expert testimony that "[d]octors themselves are often unaware of the extent of commercial influence on information they believe to be objective and subsequently find it is biased and misleading.").

The Court should not accept as conclusive the physicians' stated reasons for prescribing Neurontin, and should permit the trier of fact to determine this question of fact in light of all the evidence bearing on the question, including the physicians' documented exposure to Defendants' fraudulent off-label marketing efforts and the dramatic impact on their prescribing activity. "Determinations of motive and intent… are questions better suited for the jury." *McDonough v. City of Quincy*, 452 F.3d 8, 19 (1st Cir. 2006) (internal quotation omitted).[16]

[15] *Accord City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 442 (2d Cir. 2008) ("defendants remain liable where their actions were a substantial factor that caused the loss"). *See also Solo v. Bed Bath & Beyond, Inc.*, 2007 WL 1237825, at *4 (D.N.J. Apr. 26, 2007) (New Jersey Consumer Fraud Act "does not require that the misrepresentation have been the sole cause of Plaintiff's damages, but merely that it be a cause").

[16] Summary judgment is inappropriate where the non-moving party has provided circumstantial evidence calling

At a minimum, the evidence that the Consumer Plaintiffs' physicians were exposed to Defendants' fraudulent off-label marketing messages and shortly thereafter began prescribing Neurontin (Drs. Ragothaman and Rogers), sharply increased their Neurontin prescriptions (Dr. Arness), expressly told their patient that they were prescribing Neurontin because of Defendants' off-label detailing (Dr. Gray), or were themselves deeply enmeshed in Defendants' promotional efforts (Drs. Huler and Dhaduk) raises triable issues of fact precluding summary judgment. *See United States v. Parke-Davis*, 2003 WL 22048255, *5 (D. Mass. Aug. 22, 2003) (denying motion for summary judgment on causation grounds, where "Relator has produced circumstantial evidence (*e.g.*, the rates of off-label prescriptions before and after physician conferences hosted by Parke-Davis) and direct evidence (the 'Verbatim' market-research reports recording doctors' state of mind after marketing meetings.").

Defendants similarly argue that the TPP Class Plaintiffs have failed to present evidence that their insureds' physicians were exposed to and influenced by Defendants' fraudulent off-label marketing,[17] relying exclusively on the testimony of their corporate designees, who lacked such specific knowledge.[18]

---

into question a party's stated motive. *See, e.g., PNH Corp. v. Hullquist Corp.*, 843 F.2d 586, 593 (1st Cir. 1988) (reversing summary judgment where sufficient circumstantial evidence called into question employees' explanation of events). *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970) ("defendants' declarations of their states of mind were not sufficient to allow summary judgment where certain circumstantial facts existed that might have tended to impeach the defendants' testimony").

[17] Defendants also complain that "none of the TPP plaintiffs has adduced evidence of the uses for which its insureds were prescribed Neurontin . . . ." Def. Mem. at 20. This information is not available on a prescription-by-prescription basis, as Defendants are well aware. *See* SOF ¶¶ 731, 767-775. Accordingly, as the Court has already held, it is sufficient "if that problem can be resolved statistically," and Plaintiffs have done so, as has been briefed extensively in connection with the pending motion for class certification. *See In re Neurontin Marketing and Sale Practices Litig.*, 244 F.R.D. 89, 114-15 (D. Mass. 2007); Memorandum of Law In Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1018) at 12-13 & n.13, 39-40; Revised Declaration of Rena Conti in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1142) ¶ 61 & Table 4; Reply Memorandum of Law In Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1184) at 3-5; Rebuttal Declaration of Rena Conti, Ph.D. In Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1186).

[18] The TPP Class Plaintiffs, whose only involvement in the transactions at issue was to pay for their insureds' prescriptions, need not possess such specific knowledge, which in fraud cases, as courts have repeatedly recognized, tends to reside in the hands of defendants. *See, e.g., U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 229 (1st Cir. 2004). To defeat summary judgment, such evidence need not have been presented at deposition

A comparison of BCBSLA's and ASEA's own Neurontin prescription records, Defendants' call-detail databases produced in discovery (Merlin, Sherlock, and CMMS), and the comprehensive Neurontin prescription records also produced by Defendants in discovery (Wolters Kluwer) reveals the same pattern among BCBSLA's and ASEA's insureds' physicians demonstrated above with respect to the Consumer Plaintiffs' prescribing physicians — exposure to Defendants' fraudulent off-label marketing in the form of details, CMEs, and/or "Dear Dr." letters, followed by increases in their Neurontin prescribing activity. *See* SOF ¶¶ 779, *et seq*.[19]

When it last addressed the causation issue, the Court found "dramatic statistics that even a lay judge can understand without an econometric model" showing the off-label prescription rates before and after Defendants began their psychiatric, pain, and migraine promotional campaigns" constituted compelling evidence of causation. *See In re Neurontin Marketing and Sale Practices Litig*., 244 F.R.D. 89, 111 (D. Mass. 2007) (rejecting Defendants' alternative explanation for "such a large bump up in off-label sales immediately following a promotional campaign").[20] To further illustrate the

---

by Plaintiffs' Rule 30(b)(6) representatives. *See, e.g.*, 27A Farrell, Kennell, *et al*., Fed. Proc., L.Ed § 62:599 (Sept. 2008) ("[S]ummary judgment is improper if, as to the issue on which summary judgment is sought, there is any evidence in the record *from any source* from which a reasonable inference may be drawn in favor of the nonmoving party.") (emphasis added). Defendants' cited cases only reinforce this unremarkable point. In *Rainey v. American Forest and Paper Association*, 26 F. Supp. 2d 82, 94-95 (D.D.C. 1998), a Fair Labor Standards Act case, the defendant opposed summary judgment by submitting an affidavit from a former employee that contradicted the deposition testimony of its corporate designees. The TPP Plaintiffs have offered no such contradictory evidence. The cited portion of Defendants' other authority, *Ierardi v. Lorillard, Inc.*, 1991 U.S. Dist. LEXIS 11887, at*3 (E.D. Pa. Aug. 23, 1991) states only that a defendant must produce a witness in response to a Rule 30(b)(6) notice in addition to providing interrogatory responses.

[19] The deposition of ASEA's representative was taken on October 20, 2005 (Defs. Ex. 36), the deposition of Harden's representative was taken on December 14, 2005 (Defs. Ex. 37), and the deposition of BCBSLA's representative was taken on January 19, 2006 (Defs. Ex. 35). Defendants did not produce their complete call-detail records databases in usable form until February 2007, and did not produce the Wolters Kluwer prescription data until March 2007. Rona Decl., ¶ 3. Accordingly, Defendants' implicit argument that the TPP Class Plaintiffs' corporate designees were required to come to their depositions prepared to testify about the results of a comparison of these voluminous databases is patently frivolous. *See In re JDS Uniphase Corp. Securs. Litig*., 2007 WL 219857, at *1 (N.D.Cal. Jan. 29, 2007) (an organization "need not make extreme efforts to obtain all information possibly relevant to the requests"). Instead, "[o]bviously a rule of reason applies." *Banks v. Office of the Senate Sergeant-At-Arms*, 241 F.R.D. 370, 373 (D.D.C. 2007) (internal citation and quotation omitted).

[20] The Court reasoned further that "it stands to reason that Pfizer believes its promotional campaign has an impact because it spends so much time and money on marketing and evaluating its effect," noting that "Pfizer spends approximately $100 million annually to obtain data [just from IMS] for use in its own marketing analyses. *Id*.

progressive and cumulative impact of Defendants' various off-label marketing initiatives, Plaintiffs submitted the declaration of Dr. Rena Conti, Ph.D., who charted Neurontin off-label prescription rates over time, using the same, industry-standard datasets obtained by Defendants to measure the success of their promotional efforts.[21] *See* Declaration of Ilyas Rona in Opposition to Defendants' Motion for Summary Judgment, Ex. 138 (Revised Declaration of Rena Conti, Ph.D in Support of Plaintiffs' Renewed Motion for Class Certification ("Conti Decl.") (Dkt. No. 1142)).[22] When the major events in Defendants' indication-specific marketing campaigns are superimposed on Dr. Conti's charts,[23] the relationship is readily apparent.

In the four quarters prior to the commencement of Defendants' bipolar campaign, there were only 3,141 Neurontin prescriptions for bipolar. In the four quarters that followed, there were 62,295 prescriptions, an increase of over 2,000%. *See* Chart 6 (based on Conti Decl. Fig. 7); Conti Decl. ¶ 27. Sales ramped up steadily from the beginning to the end of the promotional effort. *See* Chart 6.

In the four quarters prior to the commencement of Defendants' pain campaign, there were only 5,658 Neurontin prescriptions for neuropathic pain. In the four quarters that followed, there were 90,302 prescriptions, an increase of 1,600%. *See* Chart 7 (based on Conti Decl. Fig. 8); Conti Decl. ¶ 28. As to nociceptive pain, there were *no* recorded prescriptions in the four quarters prior to the onset of Defendants' marketing effort, but 21,110 prescriptions in the four quarters thereafter. *See* Chart 8 (based on Conti Decl. Fig. 9); Conti Decl. ¶ 29. In both cases, sales ramped up steadily throughout the promotional effort. *See* Charts 7, 8.

The same pattern holds true for migraine, where prescriptions rose from 1,904 in the four quarters before the fraudulent marketing campaign commenced to 21,989 in the four quarters that

---

[21] The Charts themselves are admissible evidence. *See* Fed. R. Evid. 1006 ("The contents of voluminous writings . . . which cannot be conveniently examined in court may be presented in the form of a chart, summary, or calculation.").
[22] Unless the context indicates otherwise, all further references to "Ex." refer to exhibits to the Rona Declaration.
[23] Evidence concerning the marketing events identified on Charts 6-10 is set forth in Plaintiffs' SOF.

followed, with sales increasing steadily throughout the promotional effort. *See* Chart 9 (based on Conti Fig. 10); Conti Decl. ¶ 30. The dramatic rise in non-epilepsy prescriptions over 1800 mg/day likewise tracks Defendants' promotional efforts. *See* Chart 10 (based on Conti Decl. Fig. 24); Conti Decl. ¶ 49.

In addition to the foregoing *direct* evidence that the Consumer Plaintiffs' and TPP Class Plaintiffs' insureds' physicians — and Neurontin prescribers in general — were exposed to and impacted by Defendants' fraudulent off-label marketing, in a detailed, 123-page declaration, Plaintiffs' expert Dr. John Abramson describes the sources of information typically relied upon by physicians in making prescribing decisions, and how those sources were systematically and effectively manipulated by Defendants. Based on his exhaustive review of Defendants' multi-faceted misleading off-label marketing efforts, Dr. Abramson concludes that:

> The result of [those] tactics was the delivery of inaccurate, incomplete, and overly positive information about the efficacy of Neurontin, for the indications that are the subject of this case, to potential prescribers (as well as payers, policy makers and the public). These activities . . . affected the traditionally independent and trusted sources of information upon which physicians rely in making informed prescribing decisions.

Ex. 023, Expert Report of John Abramson, M.D., at 4. *See also*, *Zyprexa*, 253 F.R.D. at 174 (summarizing and crediting Dr. Abramson's testimony as to off-label marketing campaign for *Zyprexa*).

In litigation concerning Neurontin itself, *Dellinger v. Pfizer, Inc.*, 2006 WL 2057654 (W.D.N.C. July 19, 2006), Defendants sought summary judgment based on similar testimony of the plaintiff's prescribing physician that "he was initially inclined to prescribe Neurontin for an 'off-label' use based on the experiences of other physicians and various medical articles," none of which he could specifically recall; that "he had observed positive results with previous patients;" and that his "confirmed practice was to *not* speak with representatives of the drug companies." *Id.* at *7.

Notwithstanding this testimony – which, unlike in this case, was uncontroverted – the Court found that summary judgment could not be granted on this ground, explaining that:

> viewing the evidence in the light most favorable to Plaintiff, Dr. Miller could have been influenced by the professional opinion of one or more of his colleagues, who had been influenced by Defendants' alleged unfair and deceptive trade practices. Notably, Dr. Miller admits that sources are fairly limited concerning drug studies and findings. In fact, Dr. Miller also concedes that his colleagues would have likely learned about the "off-label" usage of drugs through some study or report. Therefore, based on the extensive misrepresentations made regarding scientific information of the "off-label" usage of Neurontin, there is a genuine issue as to whether the Defendants' conduct indirectly caused Dr. Miller to prescribe Neurontin for an "off-label" use.

*Id*. at *7 (citations omitted).

Summary judgment is even more inappropriate here. Plaintiffs have presented evidence that: (1) the Consumer Plaintiffs' and TPP Class Plaintiffs' insureds' prescribing physicians *were* exposed to Defendants' misleading marketing messages, and this exposure either initiated or dramatically increased their Neurontin prescribing activity; or (2) the physicians were themselves involved in disseminating those messages; and (3) Defendants thoroughly contaminated the sources of information on which physicians typically rely in making prescribing decisions. The quantum of evidence presented by Plaintiffs easily dwarfs the evidence found sufficient to withstand summary judgment in *Franklin* and *Dellinger*.

**B. <u>Professor Rosenthal's Report Is Additional Evidence of Causation</u>**

While the *direct* evidence of causation presented by Plaintiffs is more than sufficient to withstand summary judgment on this issue, Plaintiffs also offer the expert opinion of Professor Meredith Rosenthal, whose report quantifies the impact of Defendants' fraudulent off-label marketing campaign on Neurontin prescribing activity for the conditions at issue. *See* Ex. 079, Declaration of Prof. Meredith B. Rosenthal (Dkt. No. 1457, Ex. F, "Rosenthal Decl."). The Court previously found that "Professor Rosenthal's proposed methodology is a plausible way of

determining aggregate class-wide liability . . . ." 244 F.R.D. at 111. Defendants' criticisms of Prof. Rosenthal's report are without merit.[24]

**1. Prof. Rosenthal's Model Assesses the Impact of Defendants' Fraudulent Off-Label Marketing Campaign**

Defendants argue that they "are entitled to summary judgment because false statements made at educational or professional seminars or in published journal articles do not factor into Professor Rosenthal's analysis." Def. Mem. at 21. As the Court has already held, "Plaintiffs have met their burden of demonstrating that the 'key messages' of efficacy and clinical evidentiary support disseminated by plaintiffs [sic], coupled with the suppression or misrepresentation of unfavorable data, are materially uniform per indication." 244 F.R.D. at 109. The particular *mode* by which those messages were disseminated — whether via physician detailing, reprints of misleading journal articles, "Dear Doctor" letters, or at CME events — is immaterial. For example, the Court has specifically allowed Plaintiffs' claims that Defendants' sales representatives engaged in misleading off-label promotion to move forward. *See In re Neurontin Marketing, Sales Practices, and Prods. Liab. Litig*., 433 F. Supp. 2d 172, 184-85 (D. Mass. 2006).

As Prof. Rosenthal forthrightly explains in her report, Defendants either did not keep — or did not produce in discovery — sufficient records of their off-label promotional expenditures to permit them to be analyzed directly. Rosenthal Decl., ¶¶ 46, 53. However, "[t]he IMS Health promotional spending data reported by specialty . . . capture detailing to physicians who do not typically treat the conditions for which Neurontin is approved," epilepsy and post-herpetic neuralgia (PHN). *Id.*

The principle factors Prof. Rosenthal's model uses to measure impact on off-label

[24] As a condition of agreeing not to oppose Plaintiffs' request for a two week extension to file the instant opposition, Defendants insisted that Plaintiffs agree to refrain from filing any expert rebuttal reports, citing the Court's November 4, 2008 Revised Scheduling Order (Dkt. No. 1488), which states, parenthetically, "no expert rebuttals." This agreement also effectively precludes Plaintiffs from correcting a mathematical error in Professor Rosenthal's calculations that does not impact her methodology.

prescriptions, spending on detailing and journal advertising, are highly correlated with the publication strategy and peer-selling to physicians. That is to say that over time, spending on detailing and spending on publication and peer-selling rise and fall together. Use of spending on detailing and journal advertisements in Prof. Rosenthal's model captures the effect of the peer-selling activities and publication strategy.[25]

The link between spending on detailing and other promotional activities is supported by well accepted economic literature in the field,[26] as well as the facts of this case. Defendants used sales representatives to hand out journal reprints that were central to the "publication strategy." *See* SOF ¶¶ 105, 114, 373, 382. Defendants also used sales representatives to invite physicians to peer-to-peer marketing events. *See* SOF ¶¶ 380, 790, 793, 798, 799, 805, 807, 808, 810, 812, 816, 817.

Defendants complain that neither Professor Rosenthal nor Plaintiffs "have conducted any analysis or otherwise offered any evidence" to support their common-sense hypothesis that promotional expenditures are correlated with Defendants' off-label promotional efforts. Def. Mem. at 21 n.11. Plaintiffs accept the challenge.

Chart 11 depicts, on the left axis, the number of detail visits to psychiatrists per month for which Defendants' call detail records contain legible call notes containing one or more keywords

---

[25] Prof. Rosenthal has testified on this issue in deposition. "I use detailing to capture the effect of the alleged off-label promotions. So what I measure is detailing. But as we discussed earlier, I believe it's likely to pick up the related allegations with regard to meetings and events and other spending that's correlated with detailing." Moreover, "by leaving them [meetings, CME's or other types of events] out, we're probably being conservative, although, I would expect that the meetings and events would be highly correlated with detailing." Ex. 681, Deposition of Meredith B. Rosenthal , July 9 2008 ("Rosenthal PA Depo.") at 123:3-9. The same is true for the publication strategy. When asked about including the effects of publications, Prof. Rosenthal responded "Publications don't directly enter into the model. To the extent that they were used, for example, in detailing, that would get picked up in the detailing estimates." *Id.* at 113:20-23.

[26] *See August 2005 Declaration of Meredith Rosenthal* (Dkt. No. 202, Exh. B), § V. *See also*, E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*, Vol. 85, No. 2, at 100-105 (May 1995); J. Rizzo, "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, 42:1, at 89-116 (1999); C. King, III, "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Boston MA: *Harvard Business School Working Paper No. 01-014* (2000); and F. Gonul, F. Carter, E. Petrova and K. Srinivasan, "Promotion of Prescription Drugs and Its Impact on Physician Choice Behavior," *Journal of Marketing*, 65:3, at 79-90 (2001).

indicating that the detailer (a) invited the psychiatrist to a CME, dinner meeting, or advisory board where false and misleading claims of efficacy were made concerning psychiatric uses for Neurontin; (b) provided the psychiatrist with false and misleading journal articles which claimed efficacy for those psychiatric uses; or (c) providing samples to psychiatrists to induce Neurontin prescriptions for psychiatric conditions for which it was ineffective. On the right axis, the chart depicts the amount Defendants spent per month detailing psychiatrists on Neurontin as reported by IMS, the key variable used by Dr. Rosenthal in her analysis of the effect of Defendants' off-label promotional efforts on that physician group. As shown on the chart, the two variables have an extremely high correlation coefficient of 0.81, providing objective evidence that the variable employed by Professor Rosenthal is indeed highly correlated with the activities complained of.

Similarly, Chart 12 depicts, on the left axis, the number of misleading "Dear Doctor" letters per month sent by Defendants to psychiatrists who also appear in Defendants' call detail databases. The right axis depicts the number of Neurontin detail visits to psychiatrists per month as reported by IMS, another key variable employed by Professor Rosenthal as a surrogate for amounts spent by Defendants on off-label promotion. As shown on the chart, the two variables have an even higher correlation coefficient of 0.83. Chart 13 depicts the relationship between the cost of Neurontin details on psychiatrists and the number of misleading "Dear Doctor" letters sent to psychiatrists who also appear in Defendants' call detail databases, with an equally impressive correlation coefficient of 0.77, firmly establishing a strong statistical relationship between Defendants' Neurontin detailing and misleading off-label promotion.

Finally, Chart 14 shows, on a monthly basis, as many as 900 "Dear Doctor" letters purportedly "requested" by psychiatrists on the *same day* they were detailed, and within 7 days of a detail, demonstrating that Defendants' sales representatives were in fact pushing Neurontin for off-

label uses. By comparison, the number of letters that went out to psychiatrists *more* than 7 days after a detail is negligible, further establishing the strong, positive relationship between expenditures on detailing and off-label promotion.

### 2. The Assumptions Made By Prof. Rosenthal Are Reasonable and Supported by the Record

Defendants complain that Professor Rosenthal's analysis relies on the assumption that all detailing to non-neurologists, prior to the FDA-approval of Neurontin for post-herpetic neuralgia (PHN) in mid-2002, was both off-label and fraudulent, and that these assumptions are at odds with the deposition testimony of the Consumer Plaintiffs' prescribing physicians, who "testified that statements made by defendants' sales representatives during detailing visits were strictly limited to Neurontin's labeled uses." Def. Mem. at 23. That testimony was false, as set forth in Part I-A, *supra*, and Professor Rosenthal's assumptions are fully supported by the record.

As to the assumption that that all such promotions were off-label, Prof. Rosenthal made the simple and straightforward assumption that "Parke-Davis, absent the illegal activities [*i.e.*, off-label promotion], would not have undertaken promotional activities, including both detailing and journal advertising, to psychiatrists or any other specialties that did not treat epilepsy or PHN." Rosenthal Decl., ¶ 46. Defendants proffer no explanation as to why, for example, they would detail psychiatrists on Neurontin, when psychiatrists have no conceivable "on-label" use for the medication. In fact, Defendants' internal data shows that there were no appreciable details on psychiatrists prior to the commencement of the fraud, and only a *de minimis* number of psychiatrists prescribed Neurontin during that time period. By late 1998, however, psychiatrists had become the most frequently detailed specialty,[27] surpassing even neurologists, but this surge in detailing did not

[27] Rosenthal Decl., ¶ 27. As Dr. Rosenthal also notes, "[s]pending on detailing to psychiatrists was particularly high during the period between June 1998 and November 2000, after which it ended abruptly. This clearly demarcated period of detailing to psychiatrists is consistent with documents produced by the Defendants surrounding an alleged campaign to encourage the use of Neurontin for bipolar and other mood disorders." *Id.*, ¶ 28 (citations omitted).

result in any growth in psychiatrists' on-label prescriptions of Neurontin. *See* Conti Decl., Fig. 19 (revised). In late 2000, an internal memo to Pfizer's sales force reveals that Pfizer *itself* believed that the only legitimate detailing of Neurontin — based on its "recently acquired understanding" of the illegality of the "off-label" promotion — was to neurologists (*see* SOF ¶ 140), the only physician group likely to prescribe Neurontin for epilepsy.[28] The ban on detailing was communicated more emphatically in a Pfizer 2004 memo, which contained the following directive: "No calls on Psychs!!!!" *See* SOF ¶ 146.

As to the assumption that all promotion for off-label indications was fraudulent, Class Plaintiffs have proffered seven different expert reports that demonstrate that there was no legitimate scientific basis to encourage the prescription of Neurontin for the off-label indications at issue, supporting the assumption that all detailing to physicians not treating FDA-approved indications for Neurontin furthered the misconception of Neurontin's efficacy. Dr. Dickersin, Plaintiffs' publication bias expert, concludes that "[t]he documents I reviewed represent a remarkable assemblage of evidence of reporting biases that amount to outright deception of the biomedical community, and suppression of the scientific truth concerning the effectiveness of Neurontin for migraine, bipolar disorders, and pain." Dickersin Report at 4. As a result, even if Pfizer's sales representatives detailed doctors with information that accurately matched the publicly available scientific literature, it would have been false and misleading.

Professor Rosenthal has observed that "virtually all of the growth in Neurontin prescribing beginning in 1996 was attributable to off-label use." Rosenthal Decl., ¶ 16. This growth occurred during a time period where Defendants spent between $500,000 and in excess of $2,000,000 *per month* on physician detailing. Rosenthal Decl., ¶ 25. There are only two possible explanations for this: either (a) Defendants spent all of this money on detailing Neurontin as a treatment for epilepsy

[28] Indeed, Dr. Conti confirms that the overwhelming majority of on-label prescriptions for Neurontin were written by Neurologists. *See* Conti Decl., Figs. 19-22 (revised).

to a wide array of specialties, none of whom (except neurologists) treat epilepsy, and continued to spend it month after month and year after year despite the continued lack of growth in prescriptions for epilepsy by these physician specialty groups, while off-label prescriptions written by these same groups skyrocketed by sheer coincidence; or (b) Defendants spent the money on off-label detailing, which resulted in huge growth in prescription-writing for the off-label indications they detailed. Prof. Rosenthal's assumptions are fully justified. *See Neurontin*, 244 F.R.D. at 111 ("It stands to reason that Pfizer believes its promotional campaign has an impact because it spends so much time and money on marketing and evaluating its effect.").

### 3. The Factors Incorporated Into Prof. Rosenthal's Analysis Are Valid and Appropriate

Finally, Defendants complain that Prof. Rosenthal's model does not control for other factors that may influence physician-prescribing decisions. This argument is unavailing, as such criticisms go to the weight of the evidence, not its admissibility.[29] Defendants' argument also runs directly contrary to the opinion of its own econometrics expert, Prof. Fiona Scott Morton, who criticized Prof. Rosenthal's then-current model as too complicated, and pointed to a paper by another of Defendants' experts, Dr. Pradeep Chintagunta, as an example of a "simpler model" that had an "advantage over Dr. Rosenthal's proposal."[30] The advantage? Dr. Chintagunta used a single variable in his model, "*expenditures on detailing*." *Id.* ¶ 82. (emphasis added). Defendants advocated Prof. Rosenthal's current approach — until she adopted it.

Prof. Rosenthal selected promotional expenditures as the key explanatory variable in her model because promotional expenditures are the most important determinant affecting the number of

[29] *See Salvas v. Wal-Mart Stores, Inc.*, 452 Mass. 337, 359-60, 893 N.E.2d 1187 (Mass. 2008) (failure to take account of additional factors affected expert report's probativeness, rather than admissibility) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (holding, in a case involving statistical regression analysis, that failure to include variables will affect the analysis' probativeness, not its admissibility, unless regression analysis is so incomplete as to be inadmissible as irrelevant)).

[30] Declaration of Professor Fiona Scott Morton dated: December 21, 2006 ("Morton Report," attached as Exh. 20 to the Declaration of Matthew B. Rowland (Dkt. No. 586)) ¶¶ 81-82.

prescriptions of a particular drug. This is especially true when looking at changes over time, as Prof. Rosenthal's model does.[31] Prof. Rosenthal presents a series of compelling charts which illustrate the strong correlation between Neurontin promotion and prescriptions. Chart 15 illustrates Neurontin's promotional stock (the value of promotional spending to a particular physician specialty discounted to take account of the rate at which the effect of that promotion decreases over time) and use of Neurontin by psychiatrists.[32] Even without sophisticated statistical analysis, this chart suggests a very strong and positive relationship between promotion to psychiatrists and their prescription of Neurontin. Prof. Rosenthal presents a series of equally compelling charts for each of the other physician specialty groups and indications at issue in this case. *See* Rosenthal Decl., Attachments E1-E8.

Defendants' criticism that Prof. Rosenthal's model does not control for all other factors that may influence prescribing is true of any economic model, which cannot possibly account for every factor that may affect the variable of interest. The real question is not whether the model accounts for all of the possible factors, but whether, given the variable of interest (in this case, the number of Neurontin prescriptions) the model accounts for the variables that are most important and, most critically, that it includes those factors that are known to have an effect on the variable of interest.[33]

[31] Prof. Rosenthal was also questioned about this in her deposition in the Pennsylvania case: "So I believe that you are suggesting that the other drug features, let's say side effects for example, are going to be important determinants of sales. This is true, but when we're looking at sales over time, as I am in this regression, we want to think about factors that vary over time, and promotion is the one that is most important." Ex. 681, Rosenthal PA Depo. at 50-51.

[32] Defendants' detailing to psychiatrists for off-label uses was pervasive. Dr. John Abramson writes that "[i]n September 1997, there were zero or close to zero 'details' (i.e. visits by drug reps) to psychiatrists. By February 1999…there were about 7,300 calls [per month] from drug reps to psychiatrists to discuss Neurontin use." Ex. 023, at 115. Citing Pfizer's 2002 operating plan, Dr. Abramson points out how detailing reflected the "pattern of CME," as "only 20% of samples and 25% of details were provided to neurologists (the one specialty most likely to be prescribing Neurontin as adjunctive therapy for seizure disorder). Psychiatrists received the most samples and details (55 and 43% of total, respectively), followed by PCPs [Primary Care Physicians] and 'others.'" *Id*. at 10.

[33] *See* Andrew C. Harvey, *The Econometric Analysis of Time Series*, at 5 (MIT Press, 1990) ("From the statistical point of view, the key feature of a simple model is that it contains a small number of parameters.…In explaining household expenditure on food we are well aware of influences other than income and household size. Occupation, education, social class, and age are all relevant factors, but in formulating [the model], it is hypothesized that income and household size are the dominating influences. Very little explanatory power is lost by relegating the other factors to the disturbance term, but a good deal is gained by focusing the analysis on the variables which really

## V. DEFENDANTS' MISREPRESENTATIONS AND NON-DISCLOSURES WERE DONE WITH THE REQUISITE SCIENTER

### A. Defendants Misrepresented Neurontin's Effectiveness for Nociceptive Pain

Defendants argue that they are 'entitled to summary judgment on all claims relating to nociceptive or non-neuropathic pain because plaintiffs have failed to adduce evidence that defendants made any statements whatsoever relating to Neurontin's effectiveness for this use." Def. Mem. at 31-32. Not so.

On June 3, 1999, at the Parke-Davis sponsored 2nd International Conference on Mechanisms and Treatment of Neuropathic Pain in Washington, DC., a presentation was given that misleadingly suggested Neurontin's utility in "acute inflammatory pain," *i.e.*, nociceptive pain. SOF ¶ 383. In early 2001, Pfizer, under the aegis of the American Academy of Pain Medicine (AAPM) held a series of 12 meetings entitled "New Directions in the Understanding & Treatment of Chronic Pain" in various cities around the country. During these meetings, approximately 1,200 physicians in attendance were exposed to a misleading presentation entitled "Practical Approaches to Treating Chronic Low Back Pain," discussing Neurontin's use in treating nociceptive pain.[34] SOF ¶¶ 398-99, 401. Six months into this litigation, one of Pfizer's paid speakers, the now infamous Dr. Scott Reuben, promoted Neurontin's use for nociceptive pain at the National Pain Forum.[35] Defendants

---

matter.").

[34] Neurontin was listed as an analgesic option for nociceptive low back pain, without disclosure of the multiple negative studies demonstrating Neurontin's inefficacy for nociceptive pain. On January 12, 2002, at a physician advisory board held at the Four Seasons Resort in Palm Beach, Florida, Pfizer employees gave multiple presentations. At all of these presentations, the Pfizer employees misleading stated that low back pain was a condition "associated with neuropathic pain" in contrast to nociceptive pain. This statement misleadingly suggested that Neurontin's falsely claimed efficacy for neuropathic pain was applicable to nociceptive low back pain. No disclosure was made of the multiple negative nociceptive pain clinical trials.

[35] On October 1-3, 2004, Dr. Reuben gave a presentation at the National Pain Forum on Neurontin and nociceptive pain. The slides used by Dr. Reuben contained false and misleading statements, including the misleading suggesting that Neurontin might be " a 'Broad-Spectrum' Analgesic," and a presentation of the results of a single trial of Neurontin in nociceptive pain, which omitted any reference to the Defendants' multiple negative clinical trials. Pfizer gave Reuben five research grants between 2002 and 2007, and he was a member of Pfizer's speakers bureau, for which he gave talks about Pfizer drugs to colleagues such as the one listed above. Subsequently, Dr. Reuben was discovered to have faked entire clinical trials for various drug companies. According to the Boston Globe "…

misrepresented the efficacy of Neurontin for nociceptive pain just as they did for the other indications in this case.

**B. Defendants Acted With the Requisite Scienter**

Defendants falsely claim that the Court has held they "were under no legal obligation when disclosing positive information, anecdotal or otherwise, to disclose all potentially relevant information" (Def. Mem. at 32), citing the Report & Recommendation (Dkt. No. 269) at 50, and the portion of *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1998) it quotes. That section of the Report, entitled "Failure to Disclose the Absence of Supporting Scientific Evidence," holds only that "Plaintiffs cannot maintain their claims on a theory that Defendants failed to disclose that *no scientific studies had been done*." Report at 50 (emphasis added). Indeed, the Court quoted *Bonilla* as standing for the proposition that "half-truths, omissions, and non-disclosures are equally actionable," as follows:

> "[T]he locus classicus of fraud is a seller's affirmative false statement or a half truth, i.e., a statement that is literally true but is made misleading by a significant omission. At common law, fraud doctrine did not impose any broader, general duty to disclose, but it is settled that the mail and wire fraud statutes go somewhat beyond the common law. Thus, a leading commentary on federal jury instructions says that even where there is no falsehood or half
>
> truth:
>
> [T]he failure to disclose information may also constitute a fraudulent representation. . .if the defendant was under a legal, professional, or contractual duty to make such a disclosure." . . .
>
> Whether or not Defendants had an affirmative duty to disclose, they made fraudulent or misleading statements in that Defendants hired the doctors to relate their positive anecdotal experiences despite knowing that scientific studies (the results of some of which Defendants had withheld) significantly contradicted and undermined the doctors' statements.

Report & Recommendation at 48-49 (quoting *Bonilla*, 150 F.3d at 69-70). Accordingly, in ruling on the motion to dismiss, the Court held that "Plaintiffs have stated a claim with respect to *any theory*

---

the studies in question involved data about drugs made by pharmaceutical giant Pfizer Inc., including Celebrex, Lyrica, and Neurontin." *See* SOF ¶ 345.

based on Defendant's misrepresentation of the results of scientific studies or *omission of existing negative studies*." *In re Neurontin*, 433 F. Supp. 2d at 184172, 184 (D. Mass. 2007) (emphasis added, citation omitted).

Although not entirely clear, Defendants appear to argue that because the negative studies they suppressed do not establish Neurontin's ineffectiveness for the off-label uses at issue, they cannot possibly have intended to deceive anyone by withholding them.[36] This argument proceeds from a false premise. As set forth in Part III, *supra*, the suppressed studies present compelling, if not conclusive evidence that Neurontin is ineffective in treating bipolar and other mood disorders, neuropathic and nociceptive pain, migraine and headache, and at dosages in excess of 1800 mg/day. In any event, to impose liability for material omissions, the withheld information need not be conclusive, it need only be *material* — in the words of the Court, information that would have "significantly contradicted and undermined" the information presented. Report at 49. Plaintiffs' experts have described in excruciating detail how the "Level 1" evidence of inefficacy suppressed, misrepresented, and/or distorted by Defendants "significantly contradicted and undermined" the anecdotal and other purported evidence of efficacy broadcast to the entire medical community by Defendants.[37] No more is required. *Id*.

---

[36] To the extent Defendants are suggesting that they can escape liability by pointing to paid speakers from whom they withheld negative scientific information, a principal may not insulate itself from liability for misrepresentations and nondisclosures by using an innocent intermediary. *See* Restatement (Third) of Agency, § 5.03 (Reporter's Notes) ("a principal is subject to liability if the principal withholds facts from an agent, knowing that the agent will as a result make material misstatements to third parties"); *Meade v. Cedarapids, Inc*., 164 F.3d 1218, 1222 (9th Cir. 1999) ("A principal who deliberately withholds material facts from his agent in order that the agent may innocently misrepresent the facts is guilty of fraud if the agent does in fact make such a misrepresentation and it is relied on by the third party.") (internal quotations and citations omitted); *U.S. v. Funt*, 896 F.2d 1288, 1293-94 (11th Cir. 1990) ("ICE Miami cannot insulate itself from its fraudulent acts by use of an intermediary, even if the intermediary has no fraudulent intent."); *Davis v. Southern Bell Tel. & Tel. Co*., 158 F.R.D. 173, 178 (S.D. Fla. 1994) (denying summary judgment where defendant "intended its sales representatives to act as mere conduits for the delivery of" misleading information).

[37] Indeed, there is compelling evidence that Defendants' paid speakers themselves would have considered the omitted "Level 1" information *highly* material, as revealed in the transcript of a March 2000 meeting of Defendants' presenting physicians:

> [A]lmost everything I'm talking about (reports of successful off-label Neurontin usage) appears in

## VI. THE TPP PLAINTIFFS HAVE STANDING TO RECOVER FOR THEIR INJURIES

Defendants recycle their argument, thoroughly briefed[38] and rejected on their initial motion to dismiss, that the TPP Plaintiffs' injuries are too remote to permit recovery, because they are "'purely contingent on the harm suffered by' their insureds." Def. Mem. at 33, quoting *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992). The Court has already held that this argument is "without merit":

> Defendants' argument that the third party payors (TPPs) have failed to plead causation because any injury suffered by them is too remote is likewise without merit and does not warrant lengthy discussion. *See In re Pharmaceutical Industry Avg. Wholesale Price Litig.*, 307 F.Supp.2d 196, 207 (D.Mass.2004) ("The Defendants' arguments are not persuasive. In the private, end-payor context, the harm alleged by Defendants' alleged actions is visited directly upon the end-payor Plaintiffs, as they have paid directly for the named drugs . . .")[.]

Report at 20 (citation omitted).

The Court correctly distinguished between cases such as this one, in which "the harm alleged by Defendants' alleged actions is visited directly upon the end-payor Plaintiffs, as they have paid directly for the named drugs" (*id*.), and the principal cases relied upon by Defendants, in which the

---

> the form of letters to the editor or open case series. The amount of controlled trials, the evidence base for this, is not very good. And there is a sense of feeling awkward—Elizabeth [a Parke-Davis employee], this is something we should address—there's a sense of getting up there and talking about these things (off-label Neurontin usage) when, maybe, at best, there might be one or two controlled trials that support a given use.
>
> So, clinical use is running way ahead of what research is giving us. I mean, I can't remember, in psychiatry, anything like this, where there's such extensive use of drugs, without there necessarily being an indication or the data we would consider gold standard.
>
> So, one of the questions that I have for you to think about is, can we really say with any certainty that these drugs really work in the way that we're reporting? How confident are you, individually or as a group, that even without the clinical trials, that we can get up in front of clinicians and say, look, trust us that these things do work.

SOF ¶ 121.

[38] *See* Joint Memorandum of Law of the Class and Coordinated Plaintiffs in Opposition to Defendants' Motions to Dismiss (Dkt. No. 101) at 14-16; Joint Surreply Memorandum of Law of the Class and Coordinated Plaintiffs in Opposition to Defendants' Motions to Dismiss (Dkt. No. 144) at 7-8.

initial injury was a *physical* injury suffered by the insured.[39] Class Plaintiffs will not further burden the already-overburdened Court with duplicative briefing on this already-resolved issue. Accordingly, Class Plaintiffs join in and incorporate by reference Part IV-B of the contemporaneously-filed Coordinated TPP Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

[39] *See Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc*., 249 F.3d 1068, 1070 (D.C. Cir. 2001) ("[t]he funds seek to recover their payments for participants' smoking-related health care costs"); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 820 (plaintiffs "contend[ed] that the tobacco producers must compensate the insurers for the costs of smokers' health care"); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig*., 484 F,. Supp. 2d 973, 984 (D. Minn. 2007) ("In essence, the TPP Plaintiffs allege that Guidant committed a tort on their insureds, causing injury and resulting in the insureds seeking medical treatment, which in turn caused economic harm to the TPPs because they were contractually obligated to pay for the injureds' [sic] medical care."); *In re Rezulin Prods. Liab. Litig*., 171 F. Supp. 2d 299, 300-01 (S.D.N.Y. 2001) (TPPs sought to recover, *inter alia*, "the amounts they paid for diagnostic liver tests recommended by defendant Warner-Lambert for Rezulin users, and the amounts the providers expect to pay in the future for such tests," stating that "the crux of [the TPPs'] complaint is that Warner-Lambert marketed a defective product for use by their insureds"), *reversed*, *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003) ("this and other courts have long recognized the right of HBPs [Health Benefit Providers] to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices").

Dated: April 15, 2009

Respectfully Submitted,

By: */s/ Thomas Greene*
Thomas Greene
Greene & Hoffman
33 Broad Street, 5th Floor
Boston, MA 02109

By: */s/ Barry Himmelstein*
Barry Himmelstein
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

By: */s/ Thomas M. Sobol*
Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Boston, MA 02110

By: */s/ Don Barrett*
Don Barrett
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

By: */s/ Daniel Becnel*
Daniel Becnel, Jr.
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By: */s/ James Dugan*
James Dugan
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

***Members of the Class Plaintiffs' Steering Committee***