UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) MDL Docket No. 1629 ) Master File No. 04-10981 ) Judge Patti B. Saris |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) Mag. Judge Leo T. Sorokin ) ) ) |

**CLASS PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

809902.1

Pursuant to Local Rule 56.1, Class Plaintiffs submit the following response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1.  Copies of all documentation referenced herein and in the accompanying Class Plaintiffs Statement of Disputed and Undisputed Material Facts are being filed as accompanying declarations and/or exhibits thereto.

## CONSUMER PLAINTIFFS

### Gerald Smith

1.  Gerald Smith was first prescribed Neurontin in or about October 1999 for the treatment of headaches and neuropathic pain. October 9, 2006 Deposition of Gerald Smith ("Smith Dep.") (attached as Ex. 1 to the Mar. 2, 2009 Declaration of Rajesh S. James) at 51.[1]

*Not disputed for purposes of this motion.*

2.  Over the course of his treatment with Neurontin, Smith's symptoms improved to the point that he was able to discontinue the medication in August 2001.  Aug. 14, 2001 Letter from Dr. Kylene Huler to Dr. Thaddeus Poe (Ex. 2).

Disputed.  See SOF, ¶ 455.

3. Dr. Kylene Huler, Smith's prescribing doctor, first prescribed Neurontin off-label in 1994 when she was a student at the Indiana University School of Medicine and observed the chairman of the neurology department use Neurontin to treat migraines.  November 1, 2006 Deposition of Dr. Kylene Huler ("Huler Dep.") (Ex. 3) at 40, 43.

Disputed.  See SOF, ¶ 560.

4. Around that same time, Dr. Huler witnessed diabetics with peripheral neuropathy, a form of neuropathic pain, experience benefits when treated with Neurontin.  Huler Dep. At 38.

Disputed.  *See* SOF, ¶ 560.

5. Dr. Huler began prescribing Neurontin to Smith based on her positive prior clinical experiences with Neurontin.  Huler Dep. At 65

Disputed.  See SOF, ¶ 457.

6. Dr. Huler continued to prescribe Neurontin to Smith based on her clinical experience and on Smith's contemporaneous reports that Neurontin alleviated his migraine and neuropathic pain symptoms.  Huler Dep. at 66–68, 70.

Disputed.  See SOF, ¶¶ 557-59.

7. Defendants' sales representatives never discussed Neurontin's off-label uses with

See SOF, ¶ 558.

Dr. Huler.  Huler Dep.at 87, 89–90.

8.  Dr. Huler requested information on                Disputed.  See SOF, ¶¶ 557-59.
Neurontin's off-label uses from defendants' sales
representatives, but she made these requests well
after she began prescribing Neurontin to Smith
and did not base her decision to prescribe
Neurontin to him on any information she
received.  Huler Dep. at 88, 168–170, 191.

9.  Dr. Huler continues to prescribe                  Disputed.  See SOF, ¶¶ 557-59.
Neurontin for a number of off-label uses
including neuropathic pain, sciatica, migraines
and trigeminal neuralgia based on her extensive
clinical experience.  Huler Dep. at 37–40, 43, 51,
138.

10.  Dr. Huler believes that Neurontin               Disputed.  See SOF, ¶¶ 557-59.
"works, and it's very safe, and it does not
interact with other medications." Huler Dep. at
40; *see also id.* at 37–39, 43–44, 51–52.

**Lorraine Kopa**

11.  Lorraine Kopa was first prescribed              *Not disputed for purposes of this motion.*
Neurontin for the treatment of neuropathic pain
in or about November 2003, and continued to

use Neurontin to manage her pain symptoms
until April 2004.  January 10, 2006 Deposition
of Lorraine Kopa ("Kopa Dep.") (Ex. 4) at 122,
32.

12.  Dr. Vithal Dhaduk, Kopa's
prescribing doctor, prescribed Neurontin to Kopa
to manage her pain symptoms based on his
independent medical judgment, informed by his
positive clinical experiences using Neurontin to
treat other patients for off-label conditions.
November 12, 2006 Deposition of Vithal
Dhaduk ("Dhaduk Dep.") (Ex. 5) at 85–86.

Disputed.  See SOF, ¶¶ 458-64.
Moreover, Dr. Dhaduk's  medical
judgment, if any, was not independent and
was corrupted and influenced by the
suppression and/or misrepresentation of
negative clinical trial data.  See SOF, ¶¶
212-454.

13.  Dr. Dhaduk's positive clinical
experiences with Neurontin for off-label uses
date to the late 1990's.  Dhaduk Dep. at 30–31.

Disputed.  See SOF, ¶¶ 458-64.
Moreover, Dr. Dhaduk's  medical
judgment, if any, was not independent and
was corrupted and influenced by the
suppression and/or misrepresentation of
negative clinical trial data.  See SOF, ¶¶
212-454.

14.  When prescribing Neurontin for its
labeled indication as an adjunctive therapy for
partial seizures during the late 1990s, Dr.
Dhaduk observed certain patients experience

Disputed.  See SOF, ¶ 24.

improvement in coexisting or "comorbid" symptoms such as migraines and neuropathic pain.  Dhaduk Dep. at 33–34, 41–42, 47, 86.

15.  Based on his observations, Dr. Dhaduk began prescribing Neurontin for off-label uses such as neuropathic pain where patients had not responded to treatments approved by the FDA or FDA-approved treatments produced unwanted side-effects. Dhaduk Dep. at 41, 49.

Disputed.  See SOF, ¶ 24. Moreover, Dr. Dhaduk's medical judgment, if any, was not independent and was corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  See SOF, ¶¶ 212-454.

16.  Dr. Dhaduk prescribed Neurontin to Kopa after she had proven unresponsive to the narcotics that she had previously been prescribed to treat her neuropathic pain.  Dhaduk Dep. at 83–85, 211.

*Not disputed for purposes of this motion.*

17.  Dr. Dhaduk was visited by sales representatives regarding Neurontin, but these representatives never discussed Neurontin's off-label uses with him.  Dhaduk Dep. at 111–15, 180–81.

Disputed.  See SOF, ¶¶ 459-64.

18.  Any Neurontin-related events that Dr. Dhaduk attended were limited to its

Disputed.  See SOF, ¶ 460-62.

approved on-label uses.  Dhaduk Dep. at 124–26,
142–43, 285.

19.  Dr. Dhaduk continues to prescribe          Disputed. See SOF, ¶ 24.
Neurontin for off-label uses based upon his
positive clinical experiences with the drug.
Dhaduk Dep. at 39, 49.

**<u>Carolyn Hollaway</u>**

20.  Carolyn Hollaway was prescribed          Disputed.  See SOF, ¶¶ 465-46.
Neurontin in late 2003 for "neurogenic" or
"nerve-generated" pain.  Feb. 2, 2008 Deposition
of Dr. Gregory Rogers ("Rogers Dep.") (Ex. 6)
at 60–63, 127.

21.  The clinical experience of Dr.          Disputed. See SOF, ¶ 24.  Moreover, Dr.
Gregory Rogers, Hollaway's prescribing doctor,   Roger's prescription decisions were
plays a "tremendously important" role in each of   corrupted and influenced by the
his prescription decisions.  Rogers Dep. at 27–   suppression and/or misrepresentation of
28.                                              negative clinical trial data.  See SOF, ¶¶
                                                 212-454.

22.  Dr. Rogers' past positive experience    Disputed. See SOF, ¶ 24. Moreover, Dr.
with Neurontin informs decisions of when to use   Roger's decisions of when to use
Neurontin with new patients.  Rogers Dep. at   Neurontin were corrupted and influenced
35–36.                                           by the suppression and/or
                                                 misrepresentation of negative clinical trial

data.  See SOF, ¶¶ 212-454.

23.  Dr. Rogers' positive clinical experience with Neurontin dates to the mid-1990s.  Rogers Dep. at 42–44.

Disputed. See SOF, ¶ 467.

24.  One of Dr. Roger's early experiences with Neurontin came in 1994 or 1995 when he noticed that an epileptic patient whom he was treating with Neurontin—*i.e.*, a patient taking the drug for a labeled indication—reported improvement with comorbid neuropathic pain symptoms.  Rogers Dep. at 42–44.

Disputed. See SOF, ¶ 24.

25.  Dr. Rogers initially prescribed Neurontin to Hollaway because he believed, based on his positive clinical experiences with Neurontin, that it would help her neuropathic pain symptoms.  Rogers Dep. at 60–61.

Disputed. See ¶¶ 24, 465-66.  Moreover, Dr. Roger's decisions of when to use Neurontin were corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  See SOF, ¶¶ 212-454.

26.  Dr. Rogers continued to prescribe Neurontin to Hollaway based on her contemporaneous expressions of satisfaction with the drug: Hollaway requested a Neurontin

Disputed.  See ¶ 465.

refill when her prescription ran out and never indicated to Dr. Rogers that she believed that Neurontin was ineffective.  Rogers Dep. at 62–63, 83, 86, 119–20; Progress Report (Ex. 7) at HOLLOWAY0018.

27.   No Pfizer or Parke-Davis sales representative ever promoted Neurontin to Dr. Rogers for an off-label use.  Rogers Dep. at 94–96.

Disputed.  See SOF, ¶ 467.

28.   Dr. Rogers had already been prescribing Neurontin for off-label uses before he was ever visited by a sales representative regarding Neurontin.  Rogers Dep. at 97.

Disputed.  See SOF, ¶ 467.

29.   At the one promotional event at which Dr. Rogers could recall Neurontin being discussed, the presentation was limited to on-label uses, with the only off-label discussion occurring after the conclusion of the talk, when Dr. Rogers himself inquired about other uses for Neurontin.  Rogers Dep. at 100–02.  This event also occurred after Dr. Rogers had begun prescribing Neurontin for off-label uses.  Rogers Dep. at 97, 106.

*Not disputed for purposes of this motion*.

**Gary Varnam**

30.  Gary Varnam was prescribed Neurontin between February 2001 and June 2004 for bipolar disorder.  February 7, 2008 Deposition of Gary Varnam ("Varnam Dep.") (Ex. 8) at 23–24.

*Not disputed for purposes of this motion.*

31.  Dr. John Arness, Varnum's first prescribing physician, began prescribing Neurontin for bipolar disorder because other anticonvulsants are widely accepted treatment for bipolar disorder.  February 13, 2008 of Dr. John Arness ("Arness Dep.") (Ex. 9) at 24.

Disputed.  See SOF, ¶¶ 195-200.

32.  Dr. Arness has prescribed Neurontin with good results as adjunctive therapy for ten to twenty patients with mild bipolar symptoms. Arness Dep. at 23–26, 64.

Disputed.  See SOF, ¶ 24.

33.  Dr. Arness's experiences with Neurontin, together with Neurontin's favorable side effect profile and ease of administration, informed his decision to prescribe it to other bipolar patients.  Arness Dep. at 25–26, 31–32, 59–60.

Disputed.  See SOF, ¶ 24. Moreover, Dr. Arness's decisions were not fully informed and were corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  See SOF, ¶¶ 1-192.

34. Dr. Arness began to prescribe Neurontin to Varnam because of his own past experiences and that of his colleagues; because Varnam wished to discontinue Tegretol, a drug that required him to undergo frequent blood tests; and because Neurontin had few side effects and did not require blood testing. Arness Dep. at 24, 25, 31.

Disputed. See SOF, ¶ 24. Moreover, Dr. Arness's decisions were not fully informed and were corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data. See SOF, ¶¶ 1-192.

35. Varnam previously had been prescribed lithium, which he refused to continue taking due to side effects. Varnam Dep. at 81, 185–86.

*Not disputed for purposes of this motion.*

36. Varnam also refused to take Depakote, another FDA-approved bipolar treatment at the time, due to concerns about side effects. Varnum Dep. at 187–88; Arness Dep.at 59.

*Not disputed for purposes of this motion.*

37. Prior to being prescribed Neurontin, Varnam has also taken Tegretol, which he refused to continue taking due to the requirement of regular blood monitoring. Varnum Dep. at 30–32.

*Not disputed for purposes of this motion.*

38.   Varnum specifically asked Dr.          *Not disputed for purposes of this motion.*

Arness about the existence of any "new"

treatments and, while still on Tegretol, was given

Neurontin.  Varnum Dep. (Ex. 8) at 32; Feb. 14,

2001 Progress Note (Ex. 10) at

KBH_VARNAM_00193.

39.   Dr. Arness continued to prescribe          Disputed.  See SOF, ¶¶ 24, 193.

Neurontin to Varnum based on Varnum's

contemporaneous reports that the medication

was effective in managing his bipolar symptoms.

Arness Dep. at 38–42, 57, 60, 69.

40.   No sales representatives of the          Disputed.  See SOF, ¶¶ 195-99.

defendants discussed Neurontin with Dr. Arness.

Arness Dep. at 65.

41.   Dr. Arness did not attend any          *Not disputed for purposes of this motion.*

conferences or other events at which Neurontin

was discussed.  Arness Dep. at 67–68.

42.   Varnam's second treating physician,          Disputed.  See SOF, ¶ 201.

Dr. Beverley Grimm, began prescribing

Neurontin for off-label uses during her residency

in the mid-1990s.  Declaration of Dr. Beverley

Grimm, dated Mar. 11, 2008 ("Grimm Decl.")

(Ex. 11) at ¶ 3.

43.   Dr. Grimm began prescribing Neurontin for bipolar disorder because other anticonvulsants were already being used to treat bipolar disorder.  Grimm Decl. at ¶ 3.

Disputed.  See SOF, ¶ 201.

44.   In Dr. Grimm's clinical experience, Neurontin has been a safe and effective adjunctive treatment for bipolar disorder and comorbid conditions such as chronic pain or anxiety disorder.  Grimm Decl. at ¶ 4.

Disputed.  See SOF, ¶ 24.

45.   Dr. Grimm continued to prescribe Neurontin to Varnam because the drug appeared to be effective in managing his bipolar symptoms.  Grimm Decl. ¶ 6.

Disputed.  See SOF, ¶ 193.

46.   Varnam took Neurontin for approximately three-and-one-half years always at the same, low dose: 300mg/day.  Arness Dep. at 26, 62; Grimm Decl. ¶ 5.

*Not disputed for purposes of this motion.*

47.   Varnam never asked Dr. Grimm to change his prescription of Neurontin.  Grimm Decl. ¶¶ 5–6.

Disputed.  See SOF, ¶ 193.

48.   No sales representative or medical liaison from any pharmaceutical company spoke to Dr. Grimm about Neurontin's off-label uses.

*Not disputed for purposes of this motion.*

Grimm Decl. ¶ 8.

    49.  Dr. Grimm never attended any         *Not disputed for purposes of this motion.*

events or conferences concerning Neurontin's

off-label uses.  Grimm Decl. ¶ 8.

**Jan Frank Wityk**

    50.  Jan Frank Wityk was prescribed         *Not disputed for purposes of this motion.*

Neurontin as an adjunctive therapy for bipolar

disorder over a period of years.  Feb. 5, 2008

Deposition of Jan Frank Wityk ("Wityk Dep.")

(Ex. 12) at 116–17, 119.

    51.  Wityk was prescribed Neurontin         *Not disputed for purposes of this motion.*

only after trying a number of other medications

that either produced intolerable side effects or

failed to control her symptoms.  Wityk Dep. at

116–17, 119.

    52.  The clinical experience of Dr.         Disputed.  See SOF, ¶¶ 24, 203-09.

Nagaveni Ragothaman, Wityk's first prescribing     Moreover, Dr. Ragothaman's first

physician, was a factor in her first decision to     decision to prescribe Neurontin was not

prescribe Neurontin to Wityk, as was Wityk's     fully informed and was corrupted and

desire to take Neurontin because she did not     influenced by the suppression and/or

want to take other alternatives with more serious     misrepresentation of negative clinical trial

side effects.  April 4, 2008 Deposition of Dr.     data.  See SOF, ¶¶ 1-192.

Nagaveni Ragothaman ("Ragothaman Dep.")

(Ex. 13) at 52–55.

53.  It was Wityk herself who first raised
with Dr. Ragothaman the possibility of Wityk's
taking Neurontin to treat her bipolar disorder.
Ragothaman Dep.at 132–22.

Disputed.  See SOF, ¶ 204.

54.  Wityk also refused to take other
medications that could cause serious side effects
or would require blood tests.  Ragothaman
Dep.at 53–55

*Not disputed for purposes of this motion.*

55.  Dr. Ragothaman continued Wityk's
Neurontin prescriptions because she responded
well and did not experience side effects.
Ragothaman Dep. at 64–65, 70, 73, 74, 77–78.

Disputed.  See SOF, ¶ 202.

56.  Dr. Ragothaman did not recall ever
having been detailed on Neurontin or attending
continuing medical education events at which
Neurontin's off-label uses were discussed.
Ragothaman Dep. at 88–89, 93, 100.

Disputed.  See SOF, ¶¶ 204-09.

57.  Dr. Ragothaman continues to prescribe Neurontin to bipolar patients, like Wityk, who suffer comorbid anxiety symptoms and report that Neurontin is benefiting them. Ragothaman Dep. at 31, 87–88.

*Not disputed for purposes of this motion.*

58.  Dr. Gerald Gray, Wityk's second prescribing physician, prescribed Neurontin to Wityk based on his own medical judgment that Neurontin was an appropriate treatment for her. Feb. 6, 2008 Deposition of Dr. Jerrold Gray ("Gray Dep.") (Ex. 14) at 57; 109.

Disputed.  See SOF, ¶ 210.  Moreover, Dr. Gray's medical judgment was not fully informed and was corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  See SOF, ¶¶ 1-192.

59.  Dr. Gray based his prescription decisions in large part on Wityk's own expressions of her satisfaction with Neurontin. Gray Dep. at 53–55, 74.

Disputed.  See SOF, ¶ 202.

60.  Dr. Gray had considered substituting a different mood stabilizer for Neurontin, but ultimately decided to keep Wityk on Neurontin because that was her clear, expressed wish.  Gray Dep. at 134, 165.

Disputed.  See SOF, ¶ 202.

61.  Wityk told Dr. Gray that Neurontin provided her "significant benefits."  Gray Dep. at 73–74; Feb. 1, 2000 Progress Note (Ex. 15) at

Disputed.  See SOF, ¶ 202.

Wityk047.

62.  Wityk also told Dr. Gray that Neurontin had "helped make her highs and lows less extreme."  Gray Dep. at 54–55; Jan. 19, 2000Progress Note (Ex. 16) at Wityk049.

Disputed.  See SOF, ¶ 202.

63.  In February 2000, Dr. Gray had to "reassure" Wityk that he would not discontinue her Neurontin.  Gray Dep. at 78–79; Feb. 1, 2000 Progress Note at Wityk047.

Disputed.  See SOF, ¶ 202.

64.  Dr. Gray never received any information relating to Neurontin from a sales representative and he would not, in any event, have based a prescription on such information. Gray Dep. at 109–10, 116–18, 146–47.

Disputed.  See SOF, ¶ 210.  Moreover, whatever information upon which Dr. Gray based his Neurontin's prescriptions was not fully informed and was corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  See SOF, ¶¶ 1-192.

65.  Wityk "wouldn't have gone without" Neurontin in the more than two years that she stayed on the medication, Wityk Dep. at 125–26, 176.

Disputed.  See SOF, ¶ 202.

66.  Wityk discontinued Neurontin because of financial considerations.  Wityk Dep.

Disputed.  See SOF, ¶ 202.

at 179–80.

67. Wityk "likely would have continued on Neurontin" if she had been able to obtain free samples. Wityk Dep. at 181.

Disputed. See SOF, ¶ 202.

**<u>Jeanne Ramsey</u>**

68. Jeanne Ramsey was prescribed Neurontin for reflex sympathetic dystrophy ("RSD"), a form of neuropathic pain, in March 2000, and continued to take Neurontin until December 2003. February 8, 2008 Deposition of Jeanne Ramsey ("Ramsey Dep.") (Ex. 17) at 31–32.

Disputed. See SOF, ¶ 702.

69. Dr. Rick T. Waldo, Ramsey's primary care physician, prescribed Neurontin to Ramsey because he believed it was an appropriate treatment based on his independent medical judgment. Feb. 1, 2008 Deposition of Dr. Rick T. Waldo ("Waldo Dep.") (Ex. 18) at 43–44.

Disputed. Dr. Waldo's medical judgment, if any, was not independent and was corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data. ¶¶ 212-454, 563-693.

70. Dr. Waldo initially began prescribing Neurontin for neuropathic pain based on information he obtained from clinical literature and from neurologists whom he

*Not disputed for purposes of this motion.*

consulted.  Waldo Dep. at 29.

| | |
|---|---|
| 71.   Dr. Waldo has prescribed Neurontin to hundreds of patients, and his clinical experiences with the medication inform his decisions to prescribe Neurontin to patients suffering from neuropathic pain.  Waldo Dep. at 26–27. | Disputed.  See SOF, ¶ 24.  Moreover, Dr. Waldo's decisions were not fully informed and were corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  ¶¶ 212-454, 563-693. |
| 72.   Dr. Waldo continued to prescribe Neurontin to Ramsey because he believed it was effective in treating her neuropathic pain.  Waldo Dep. 44–45, 56. | Disputed.  See SOF, ¶ 702. |
| 73.   Dr. Waldo never discussed Neurontin's off-label uses with defendant's sales representatives.  Waldo Dep. at 87–89. | *Not disputed for purposes of this motion.* |
| 74.   Dr. Robert Haynsworth, Jr., a pain specialist to whom Ramsey was referred, initially prescribed Neurontin to Ramsey based on his independent medical judgment, informed by his review of the scientific literature and his clinical experience.  Feb. 1, 2008 Deposition of Dr. Robert F. Haynsworth, Jr. ("Haynsworth Dep.") (Ex. 19) at 44–45. | Disputed.  See SOF, ¶ 24.  Moreover, Dr. Haynsworth's medical judgment, if any, was not independent and was corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  ¶¶ 212-454, 563-693. |

75.  Dr. Haynsworth began prescribing Neurontin in the mid-1990s, and his early experiences with Neurontin included attending conferences at which studies in rat models of allodynia (a pain response often associated with neuropathic pain conditions) were discussed. Haynsworth Dep. at 28–29.

*Not disputed for purposes of this motion.*

76.  Dr. Haynsworth continued to prescribe Neurontin to Ramsey based on her response to the drug.  Haynsworth Dep. at 47–51, 61–62.

Disputed.  See SOF, ¶ 702.

77.  Ramsey reported that her pain decreased by 80% after her Neurontin dosage was increased, and that her pain returned after her Neurontin dosage was reduced.  Haynsworth Dep. at 47–51, 54, 128.

Disputed.  See SOF, ¶ 702.

78.  Dr. Haynsworth does not see pharmaceutical sales representatives, nor does he accept payment from pharmaceutical companies to attend conferences or consultants' meetings. Haynsworth Dep. at 15, 80, 127.

Disputed.  See SOF, ¶ 704.

**THIRD PARTY PAYOR CLASS**

**PLAINTIFFS**

**Lousianna Health Service Indemnity d/b/a**

**Blue Cross Blue Shield of Lousianna**

**("BCBSLA")**

| | |
|---|---|
| 96.   BCBSLA is a Louisiana insurer that has roughly 525,000 covered lives under its pharmacy benefit. Jan. 19 and 20, 2006 Deposition of Milam W. Ford ("Ford Dep.") (Ex. 35) at 221. | Disputed.  To the extent that the number of covered lives with a pharmacy benefit changed over the relevant period. Transcript of deposition testimony of Milan Ford as 30(b)(6) witness for BCBS, conducted January 19, 2008 ("Ford Tr.") at p. 222:13-19. |
| 97.   BCBSLA has a P&T Committee, comprised of physicians and pharmacists, which periodically reviews the formulary status of branded drugs based on an assessment of their safety, efficacy, and cost.  Ford Dep. at 77–78, 165, 275–79. | Disputed.  In 1999, BCBSLA formed its P & T committee.  Prior to 2000, BCBSLA adopted the Medco formulary, which was entirely controlled by Medco and Medco's P & T committee.  Medco's P & T committee reviewed new drugs coming out on the market, new drug indications, and classification switches of drug for inclusion on Medco's formulary.  After 2000, BCBSLA's P & T committee still relies heavily on the PBM and only |

reviews new drugs or classes of drugs. BCBSLA basically still used Medco's existing formulary, and BCBSLA's P & T committee would review new drugs to determine at which tier a drug would be placed, e.g. whether it would be a preferred brand or a nonpreferred brand. The determination of BCBSLA's P &T committee of which tier to place a new drug was primarily driven by the price and rebates of the drug.  BCBSLA's P & T committee did not review Neurontin because it was already included on the Medco formulary.  BCBSLA's formulary was always an open formulary with Medco. BCBSLA switched to ESI from Medco in 2004. BCBSLA maintains an open formulary, meaning that they pay for all FDA approved drugs regardless of the formulary status of the drug.  Deposition of James Gengelbach at pp. 36:23-37:1, 83:19-84:8, 237; Deposition of Susan Hoomanian at pp. 14-16, 28:25-29:6,

|  | 35:11-17, 41:3-9, 51:18-22, 65:25-66:1, 148:20-149:10-17; Deposition of Dr. James Gengelbach at pp. 35:25-36:22, 38:7-39:12, 44:24-46:16, 80:14-22; Deposition of J. Richard Williams at pp. 36:23-37:11; Deposition of Milam Ford at pp. 129-30, 149-150, 445; Deposition of Imelda Coleman at pp. 25:23-27:3, 29:11-33:9; 35:1-37:4, 76:23-25, 77:3-7; Deposition of Sabrina Heltz at pp. 46:7-48:24. |
|---|---|
| 98.   Since 2007, three years after commencing this lawsuit, BCBSLA has required seniors enrolled in its Medicare Part D prescription drug plan to take gabapentin or another generic anticonvulsant before BCBSLA will reimburse them Lyrica, a drug approved by the FDA for the treatment of painful DPN. Declaration of Martin James Whalen, dated March 2, 2009 (Ex. 51). | Disputed.  BCBSLA considered implementing a closed formulary when implementing Medicare Part D in January 2006.  However, a closed formulary created too many complications operationally and was not competitive in the Louisiana marketplace, so BCBSLA switched to an open formulary for Medicare Part D.  Deposition of Sabrina Heltz at pp. 39:10-11, 43:10-45:15, 75:4-23. |

**ASEA/AFSCME Local 52 Health Benefits**

**Trust ("ASEA")**

| | |
|---|---|
| 99.   ASEA is a health benefits trust formed in November 2000 that began providing health benefits to certain Alaskan government employees and their dependants in July 2001. October 19-20, 2005 Deposition of Fred Brown ("Brown Dep.") (Ex. 36) at 30, 109. | *Not disputed for purposes of this motion.* |
| 100.  ASEA does not know the uses for which it reimbursed Neurontin.  Brown Dep. at 327. | *Not disputed for purposes of this motion* |
| 101.  ASEA does not have any factual basis for claiming that the fraudulent scheme alleged in the complaint caused ASEA to pay for any off-label Neurontin prescriptions.  Brown Dep. at 403–04; *see also id.* at 398, 405. | Disputed.  As Mr. Brown repeatedly made clear during this portion of his deposition, while ASEA itself has no independent knowledge concerning the marketing of Neurontin for off-label uses or the effect of that marketing on prescribers, it is relying on its attorneys to discover and present this information.  See, e.g., Brown Dep. at 386:4-389:2  ("Q.  Do you know if anyone from the Trust has any personal knowledge about the facts alleged in the |

Complaint besides the facts in paragraph 7 [pertaining to the Trust]? . . . A.  I'm not aware of any. . . . Q.  You're not aware of any such facts that the trustees have personal knowledge of?  A. Correct." . . . MS. PACHARZINA:  And I just want to make it clear for the record, that when you're talking about knowledge other than his attorneys' knowledge.   MR. MURRAY:  Yes."); 399:24-400:13  ("Q. How would the Trust go about determining that the fraudulent scheme caused the Trust to pay for Neurontin prescriptions for conditions for which the drug was not effective? . . . [T]he Trust does not do that.  It's going to rely on its attorneys to develop that information and its theories.").

**Harden Manufacturing Corporation ("Harden")**

102.  Harden is a self-insured, Alabama-based furniture manufacturer with roughly 600 employees.  Dec. 15, 2005 Deposition of Walter

*Not disputed for purposes of this motion.*

E. Matthews ("Matthews Dep.") (Ex. 37) at 66,

113–14.

103.  Over the relevant time period, only
twenty of Harden's insureds were prescribed
Neurontin.  Matthews Dep. at 236.

*Not disputed for purposes of this motion.*

104.  Harden has no evidence that these
prescriptions were for a relevant off-label use.
Matthews Dep. at 214–15.

Disputed.  Walter Matthews, Vice
President and CFO of Harden testified
repeatedly that although Harden has no
independent knowledge related to the
marketing of Neurontin or the effect of
that marketing on prescribing by
physicians, Harden is relying on its
attorneys to discover and present such
information.  See, e.g., Matthews Depo at
218:2 – 17 ("Q. Did Harden ever
determine what portion of the prescription
drug claims it was paying for approved
uses and what portion were for off label
uses?  A. We have not.  We're relying on
counsel to come to that determination. . .
.Q.  Did Harden have the ability to
determine which of the prescription drug

claims that it paid for were for approved

uses and which were for off-label uses?

A: We did not but we will rely on counsel

to determine that and their experts.").

105.   Harden has not approached the          *Not disputed for purposes of this motion.*

prescribing doctors to these twenty insureds to

determine whether any of these prescriptions was

caused by defendants' alleged misconduct rather

than by the exercise of the prescribing

physician's independent medical judgment.

Matthews Dep. at 237–38, 242.

**<u>GENERAL</u>**

106.   A meta-analysis of available           Disputed.  See SOF, ¶ 238.

double-blind randomized controlled trials

regarding Neurontin's effectiveness for

neuropathic pain demonstrates that Neurontin is

efficacious in treating neuropathic pain:  It

showed statistically significant effects of

treatment with Neurontin over placebo in three

different efficacy measures.  January 22-23,

2009 Deposition of Dr. Thomas L. Perry ("Perry

Dep.") (Ex. 43) at 219–221; 229–230; 232–233;

282—283; 318–319; August 11, 2008 Report of

Dr. Thomas L. Perry ("Perry Report") (Dkt #

1457 Ex. L) at 33–34; December 15, 20098

Report of Dr. Robert D. Gibbons ("Gibbons

Report") (Ex. 46) at 8.

| | |
|---|---|
| 107.  It would be "reasonable" for doctors, in light of the available evidence, to prescribe Neurontin as a treatment for neuropathic pain.  Perry Dep. at 314; December 12, 2008 Report of Dr. Shawn J. Bird (Ex. 47) at 15–16; December 15, 2008 Report of Dr. Gary J. Brenner ("Brenner Report") (Ex. 48) at 5–6. | Disputed.  See SOF, ¶ 238. |
| 108.  The data underlying Backonja, et al., *Gabapentin for the Symptomatic Treatment of Painful Neuropathy in Patients with Diabetes Mellitus*, 280:21 JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 1831-36 (1998) demonstrate that patients receiving gabapentin experienced statistically significant reductions in pain scored in the second and third weeks of the study.  January 8, 2009 Deposition of Dr. Nicholas P. Jewell ("Jewell Dep.") at 146, 147. | Disputed.  See SOF, ¶¶ 368-69. |

109.  In a real-world setting, some number of patients would enjoy a "meaningful response" from Neurontin for the off-label treatment of neuropathic pain.  Perry Dep. (Ex. 43) at 280.

Disputed.  See SOF, ¶ 238.

110.  Dr. Douglas C. McCrory, one of plaintiffs' retained medical witnesses, has prescribed Neurontin off-label for treatment of various forms of neuropathic pain, including painful diabetic neuropathy, and, as of the date of his deposition at the end of January 2009, continued to do so for at least some patients. January 29-30 Deposition of Dr. Douglas C. McCrory ("McCrory Dep.") (Ex. 40) at 115–16.

*Not disputed for purposes of this motion.*

111.  Plaintiffs' retained economist, Dr. Raymond Hartman, has taken Neurontin off-label for a chronic pain condition starting several years before his first deposition in this case December 2006, at which time he explained that Neurontin—along with the other medications he was taking—was an effective treatment for his chronic pain, and Dr. Hartman has continued to take Neurontin off-label for his chronic pain

Disputed.  See SOF, ¶ 24.

condition at least through the date of his most
recent deposition in January 2009.  December
13, 2006 Deposition of Raymond S. Hartman
(Ex. 41) at 18–20 ; January 27, 2009 Deposition
of Raymond S. Hartman (Ex. 41) at 347–348.

|  |  |
|---|---|
| 112.  Spira, et al., *Gabapentin in the Prophylaxis of Chronic Daily Headache: A Randomized, Placebo-Controlled Study*, 61 NEUROLOGY 1753-59 (2003) reports a statistically significant benefit of Neurontin in treating chronic daily headache.  McCrory Dep. at 143. | Disputed.  See SOF, ¶ 534. |
| 113.  The limited available data on Neurontin's efficacy for treatment of migraine prophylaxis shows a trend favoring gabapentin's efficacy over placebo.  McCrory Dep. at 173–74; Gibbons Report (Ex. 46) at 15. | Disputed.  See SOF, ¶¶ 472-77. |
| 114.  It would be reasonable for a prescribing physician to prescribe Neurontin to patients for the treatment of migraine prophylaxis or chronic daily headache. December 12, 2008 Report of Dr. Alan M. Rapaport ("Rapaport Report") (Ex. 49) at 7. | Disputed. See SOF, ¶¶ 472-77. |

115.  In 2000, the U.S. Headache Consortium published guidelines in which they informed the public that a 1987 study concerning gabapentin's use in migraine prophylaxis failed to reach its primary endpoint.  McCrory Dep. at 195–96.

Disputed. See SOF, ¶¶ 479-93.

116.  The study Vieta, et al., *A Double-Blind, Randomized, Placebo-Controlled, Prophylaxis Study of Adjunctive Gabapentin for Bipolar Disorder*, 67 J. CLIN. PSYCHIATRY 473-77 (2006) shows that Neurontin "is likely to provide some benefits on the long-term outcome of the disorder, confirming what some clinicians and open-label studies have suggested before." January 21-22, 2009 Deposition of Dr. Jeffrey S. Barkin ("Barkin Dep.") (Ex. 44) at 454-455; Vieta, et al 67 J. CLIN. PSYCHIATRY at 473-77.

Disputed. See SOF, ¶¶ 18, 163-70.

117.   The remaining three studies reviewed by Dr. Barkin, the Pande, Frye, and Guille studies, addressed only the use of Neurontin in treating *refractory* bipolar patients, a "minority" of bipolar patients who are "very difficult to treat."  Barkin Dep. at 314–15.  None of these studies examined or reached any conclusions regarding Neurontin's efficacy in non-refractory patients.  Barkin Dep. at 462, 467, 484.  One cannot generalize the findings of the Pande, Frye, or Guille studies to the broader population of non-refractory bipolar patients.  Barkin Dep. at 463, 469–70, 485.

Disputed.  See SOF, ¶ 26.

118.   "[S]ome patients do derive incremental benefit" from gabapentin prescriptions for epilepsy and neuropathic pain at doses "up to 3600 mg/day."  January 31, 2009 Deposition of Brian Alldredge ("Alldredge Dep.") (Ex. 45) at 170, 175–176; December 12, 2008 Report of Dr. Michael J. McLean (Ex. 50) at 3.

Disputed.  See SOF, ¶¶ 563-70, 586.

119.   "[T]here may be individuals who need doses [of gabapentin] up to 3600 mg/day"

Disputed.  See SOF, ¶¶ 563-70, 586.

to experience efficacy.  Alldredge Dep. at 175–176.

120.  Clinicians should increase doses of anti-epileptic drugs in patients based on individual patient response.  Alldredge Dep. at 163.

Disputed.  See SOF, ¶¶ 563-70, 586.

121.  Dr. Brian Alldredge, one of plaintiffs' own retained medical witnesses, prescribes gabapentin to his own patients at dosages as high as 3600 mg/day.  Alldredge Dep. at 130–131.

See SOF, ¶ 586, (Declaration of Dr. Brian Alldredge, ¶ 3).

122.  A wide range of factors, including a physician's own clinical experience, can and do influence individual physicians' prescription decisions.  Perry Dep. at 153–160 (Ex. 43); McCrory Dep. at 103, 111 (Ex. 40); Barkin Dep. (Ex. 44) at 162–67; Alldredge Dep. (Ex. 45) at 126; Brenner Report (Ex. 48) at 6.

Disputed.  A physician's own clinical experience is fraught with bias. See SOF, ¶ 24.  Moreover, all prescription decisions with respect to Neurontin were not fully informed and were corrupted and influenced by the suppression and/or misrepresentation of negative clinical trial data.  See SOF, ¶¶ 1-192, ¶¶ 212-454, ¶¶ 563-693, ¶¶ 468-556.

Dated: April 15, 2009

Respectfully Submitted,

By:   */s/ Thomas Greene*
Thomas Greene
Greene & Hoffman
33 Broad Street, 5th Floor
Boston, MA 02109

By:   */s/ Barry Himmelstein*
Barry Himmelstein
Lieff Cabraser Heimann &
Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

By:   */s/ Thomas M. Sobol*
Thomas M. Sobol
Hagens Berman Sobol Shapiro
One Main Street, 4th Floor
Cambridge, MA  02142
Boston, MA 02110

By:   */s/ Don Barrett*
Don Barrett
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

By:   */s/ Daniel Becnel*
Daniel Becnel, Jr.
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By:   */s/ James Dugan*
James Dugan
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

***Members of the Class Plaintiffs'
Steering Committee***