UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL MARKETING AND SALES PRACTICES ACTIONS | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**DECLARATION OF BRIAN K. ALLDREDGE, PHARM.D. IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, BRIAN K. ALLDREDGE, declare and state:

1. I submitted an expert report in this case on August 8, 2008 and I was deposed in this case on January 31, 2009.

2. I am a clinician with multiple years of experience prescribing drugs, including Neurontin, for the treatment of epilepsy. For the purpose of developing an expert opinion in this case, I also reviewed published documents and research reports regarding a dose-response relationship for Neurontin in epilepsy and neuropathic pain. Selected statements made by me during my deposition (at pages 168, 170, and 175-76) were based on my clinical experience and I believe that these statements could lead one to misinterpret my expert opinion regarding the dose-response relationship for Neurontin.

3. In the course of my epilepsy clinical practice, I have observed several patients who seemed to respond to Neurontin at doses up to 3600 mg per day. In addition, I have spoken with clinicians who seemed to observe benefits from Neurontin at doses up to 4800 mg per day. However, these individual observations are inconsistent with the highest quality evidence that I reviewed for this case. In the randomized, fixed-dose, parallel group studies of Neurontin that I reviewed, no significant additional benefit (in seizure reduction or neuropathic pain control) was observed at doses above 1800 mg per day.

4. Observations made during the course of clinical care are fraught with confounders - that is, factors that can confound the assessment of a "causal" relationship between an intervention and an effect. That is the reason that the FDA approves drugs based on high-quality clinical trials research, as opposed to clinical observations made by prescribers in the course of patient care. Examples of confounders that could either give the appearance of a drug-related effect, or could obscure a drug-related benefit in epilepsy care include non-drug related clinical factors, such as adherence to seizure medication, sleep patterns, and life stress — all of which may influence the frequency of seizures — and the phenomenon of variability in seizure frequency within an individual patient over time. In statistics, this phenomenon is referred to as "regression toward the mean" and it is relevant to clinical trials of antiepileptic drugs. An

observation that supports the occurrence of such "endogenous fluctuations" in seizure frequency is the placebo response rate in antiepileptic drug trials. It has been observed that 9% to 16% of patients treated with an inert placebo in randomized clinical trials of epilepsy drugs experience a 50% or greater reduction in seizures — an outcome measure used commonly to define treatment efficacy. *See* J.G. Burneo, V.M. Montori and E. Faught, Magnitude of the placebo effect in randomized trials of antiepileptic agents. Epilepsy. Behav. 3 (2002), pp. 532-534.

5.  My expert report (Table 1; pages 31-33) identifies four randomized, fixed-dose, parallel group studies that were adequately designed to demonstrate differences between a therapeutic benefit of Neurontin at doses above 1800 mg per day to a therapeutic benefit of Neurontin at doses of 1800 mg/day or less (945-82, 945-88, 945-224, 945-295). All four studies failed to detect a statistically significant difference between these dosage ranges. Furthermore, in reviewing the results of all randomized, fixed-dose, parallel-group studies of Neurontin for epilepsy and neuropathic pain cited in my report (i.e., studies with a design adequate to evaluate a dose-response relationship of Neurontin) it is evident that Neurontin was never shown in these studies to have a significant additional therapeutic effect at any dosage above the lowest dose that was demonstrated to be efficacious.

6.  My expert opinion is that Neurontin is not more effective at doses greater than 1800 mg per day when compared to doses of 1800 mg per day and less.

7.  My expert report shows that multiple studies of appropriate design were conducted to evaluate a dose-response relationship for Neurontin at doses above 1800 mg per day in epilepsy and neuropathic pain. In all such studies, the null hypothesis (i.e., that there is no difference in efficacy between Neurontin doses higher than 1800 mg per day when compared to doses of 1800 mg per day or below) is not refuted. In plain language, these studies demonstrate that dosing Neurontin above 1800 mg per day is ineffective as a strategy to improve therapeutic response.

8.  I would like to clarify my opinion regarding the dose-response relationship of Neurontin at doses above 1800 mg per day in the treatment of bipolar disorder and migraine

headache. Assuming that Neurontin is demonstrated to be ineffective for the treatment of bipolar disorder, the drug would not have a dose-related effect across the range of dosages studied. This same concept holds true for the use of Neurontin in migraine headache prevention. Thus, assuming that Neurontin is demonstrated to be ineffective for the prophylaxis of migraine headache, the drug would not have a dose-related effect across the range of dosages studied.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 13, 2009 at San Francisco, California.

_____
Brian K. Alldredge, Pharm.D.