UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
----------------------------------------------------------------x
                                           :      MDL Docket No. 1629
In re:   NEURONTIN MARKETING,              :
         SALES PRACTICES AND               :      Master File No. 04-10981
         PRODUCTS LIABILITY LITIGATION     :
                                           :      Judge Patti B. Saris
----------------------------------------------------------------x
                                           :      Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                  :

ALL PRODUCT LIABILITY CASES                :
                                           :
----------------------------------------------------------------x
```

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION
TO COMPEL THE DEPOSITION OF DR. KWAN HUR**

Products Liability Plaintiffs, by the undersigned counsel, respectfully move, pursuant to

Rule 37 of the Federal Rules of Civil Procedure, by Emergency Motion for an Order compelling

Pfizer Defendants to produce Dr. Kwan Hur for deposition.

## I.  PRELIMINARY STATEMENT

Plaintiffs previously sought the deposition of Dr. Kwan Hur; however, Defendants

opposed Plaintiffs' request for the deposition and sought a protective order from this Court.

Thereafter, on January 29, 2009, Magistrate Judge Sorokin issued an electronic order "granting

[1618] Motion for Protective Order . . . However, plaintiffs may seek leave after Gibbons'

Deposition to take the other three authors' deposition, if warranted and necessary." Now, in light

of further discovery, despite the fact that Defendants did not disclose Dr. Hur as an expert, the

record is clear that Dr. Hur provided crucial expert work product.  Therefore, Plaintiffs seek an

order from this Court which allows Plaintiffs to proceed with the deposition of Dr. Hur.

Plaintiffs are moving hereto by Emergency Motion because this Court has set for trial the Track

One case, *Bulger v Pfizer et al*, on July 27, 2009, with scheduling dates of May 22, 2009 to identify witnesses, together with deposition portions to be used at trial.[1]  Consequently, time is of the essence.

Since the Court's issuance of the protective order preventing Plaintiffs from deposing Dr. Hur,  Plaintiffs have deposed Defendants' expert, Dr. Gibbons.  During his February 3, 4, and March 5, 2009 depositions, Defendants' expert Dr. Gibbons testified in detail about Dr. Hur's substantive, expert involvement:  Dr. Hur performed the underlying computer SAS programs which served as the basis for Dr. Gibbons' November 2008 pharmacoepidemiology expert report in this litigation and a related paper ('the Article') which he relied on in that report. Excerpts of the Deposition Transcript of Dr. Gibbons are annexed hereto as Exhibit A at 44:12-16, 205:8-207:7, 210:10-18, 297:7-298:6, 440:7- 440:13.

Dr. Hur provided crucial expert work product including (a) programming the underlying database for Dr. Gibbons' analysis, (b) extracting the data which formed the very basis for Dr. Gibbons' analysis, and (c) reviewing the results of Dr. Gibbons' reports. Exhibit A at 210:10-18. Dr. Gibbons depended on the underlying work performed by Dr. Hur.

## II. FACTUAL BACKGROUND

On May 22, 2008, Dr. Gibbons received two sets of data --- purchased by Pfizer Defendants ---  that formed the basis of his Study and related Article, both of which are admittedly relied upon by Dr. Gibbons in his expert report.   The Study pertains to gabapentin and suicidality.  The related Article pertains to bipolar patients, antiepileptics, and suicidality. Again, both papers --- the Study and the Article --- are so intertwined as part of Dr. Gibbons' opinions in this case that they are indistinguishable for discovery purposes.  Initially, Plaintiffs

---

[1] Plaintiffs expect to disclose an expert reply/rebuttal to Defendants' experts Dr. Gibbons and Dr. Hur's ever-changing pharmacoepidemiology reports after discovery of documents and depositions of these individuals are complete.

received disclosure of Dr. Gibbons' untimely supplemental expert report in which Dr. Gibbons bases his opinions on the Study and related Article.[2]   Dr. Gibbons' report contains nine entirely new opinion paragraphs and two data tables.   It also incorporates the unpublished Article that Dr. Gibbons has submitted for publication which contains a comparable study on bipolar patients; the Article lists Dr. Hur and others as co-authors.   The supplemental expert report further contains opinions relating to the relationship between anti-epileptic drugs and suicide attempts by bipolar patients.   The tables in both the expert report and the Article purport to set out suicide/suicide attempt rates, before and after treatment with Gabapentin, and to set out event rate ratios, all from data extracted and coded from patient claim records.

Plaintiffs served Dr. Hur with a subpoena for a deposition in January/February 2009. However, Defendants filed an emergency Motion for a Protective Order (ECF Doc # 1618), claiming that Dr. Hur knew nothing about Dr. Gibbons' work in this case.   To persuade Judge Sorokin to grant their motion, Defendants filed therewith a declaration signed by Dr. Hur in which he stated under oath, "I have no knowledge concerning the details of plaintiffs' allegations or any expert issues in this litigation" (ECF Doc # 1623 page 2).   In that declaration, Dr. Hur also stated under oath that "I do not possess any knowledge concerning Dr. Gibbons' supplemental expert report submitted in this litigation."   (ECF Doc # 1623 page 4).

Dr. Gibbons also signed a Declaration under oath in which he said "I do not believe that

---

[2] On November 14, 2008, Plaintiffs sought to preclude Dr. Gibbons' opinions as being beyond the FDA Alert on Anticonvulsants.   At that time, Plaintiffs sought from Pfizer Defendants "production related to all data Dr. Gibbons reviewed and relied upon in reaching his opinions, as well as all underlying data to which Dr. Gibbons had access but may have ignored." (See ECF # 1490, Plaintiffs' Mem. in Support).   The Court had previously limited Dr. Gibbons' opinions to the FDA Alert on Anticonvulsants about which the Court is very well familiar.   Thereafter, on November 25, 2008, this Court recognized the impropriety of Pfizer Defendants' disclosure of Dr. Gibbons' supplemental expert report and that it related to his Study and Article when the Court described the disclosure as "untimely and beyond the scope of this Court's order." (Electronic Order, November 25, 2008).   Nevertheless, the Court provided Pfizer Defendants with a means towards introducing the Study and Article at trial, and the Court also ordered that Plaintiffs be granted discovery on Dr. Gibbons' new report without setting a scheduling order for its completion.   *Id.*

Drs. Hur, Brown, and Mann possess any knowledge or have formed any opinions concerning the specific expert issues that have been raised in this litigation, or the content of my expert reports." (ECF Doc #1624, page 4).[3]  On January 29, 2009, Magistrate Judge Sorokin issued an electronic order "granting [1618] Motion for Protective Order . . . However, plaintiffs may seek leave after Gibbons' Deposition to take the other three authors' deposition, if warranted and necessary."

Plaintiffs diligently pursued requested discovery of all records, tests, data, databases, analyses, and work done on the two studies.  Plaintiffs deposed Dr. Gibbons and inquired as to the discovery of such materials, as well as to the collaboration between Dr. Gibbons and Dr. Hur.

Over the course of Dr. Gibbons' deposition it was discovered that, contrary to his and Dr. Hur's sworn declarations to Magistrate Sorokin,  Dr. Hur performed more than 80 hours of work just on Dr. Gibbons' expert report alone, as well as an unknown amount of work and hours on the unpublished Article.  Pfizer counsel and Dr. Gibbons paid Dr. Hur well over $8,000 solely for his work on the expert report.  Exhibit A at 743:1-23, 825:12-20, 964:5-965:10.  The 80 hours Dr. Hur did perform became the statistical core of Dr. Gibbons' opinions.

Dr. Hur wrote and executed the programs for the pharmacoepidemiology studies for Dr. Gibbons' November 2008 gabapentin expert report and also for the Article on which Dr. Gibbons relies upon in his expert report. Exhibit A at 210:10-18, 440:7-13.  This included creating the programming logic for the execution of the data searches. Exhibit A at 532:15-535:11.

Further, Dr. Gibbons testified that he did *not* check Dr. Hur's work. Exhibit A at 757:6-

---

[3]Dr. Gibbons also stated in his declaration in support of Defendants' request for a Protective Order that  "I have provided to counsel for defendants all materials requested by plaintiffs on which I relied in conducting the pharmacoepidemiology study of whether there is an association between Neurontin and suicide attempt.  I have also produced all materials requested by plaintiffs in their letter of November 12, 2008, on which my co-authors and I relied in preparing the manuscript."  (Document 1624 at 2-3).  That statement was false: Dr. Gibbons testified that he had never seen the Plaintiffs' November 12 discovery request letter and, as will be seen,  had not produced most of the items requested until after his deposition began weeks later.  Exhibit A at 707:24-710:9  and 692:12-700:19

758:21, 785:7-786:4, 793:14-794:14, 811:12- 812:1. As a consequence, Dr. Gibbons completely missed a programming logic error made by Dr. Hur. Exhibit A at 761:6-762:1, 796:5-796:8.  It resulted in misallocating some 10,000 patients who had major depressive disorders.  Dr. Gibbons could not answer questions about the error and testified that Dr. Hur would have to answer them. Exhibit A at 532:15-535:11, 888:21-889:8.  When asked about it, Dr. Gibbons testified that since it was in Dr. Hur's programming, only Dr. Hur could provide reliable answers about it. *Id.*

When this all came to light,  Plaintiffs' counsel asked defense counsel to withdraw their opposition to Plaintiffs' conducting a deposition of Dr. Hur.   Defense counsel refused, insisting they had already succeeded on their motion for a protective order.   Time is of the essence:  when the Court gave limited approval to the defense to add Dr. Gibbons as an expert, the scheduling order dates applicable to experts had passed and there is no schedule for completion of discovery of Dr. Gibbons' work and Dr. Gibbons is quick to slide through this crack.  After what was thought to be the completion of Dr. Gibbons' deposition, he filed an entirely new expert report on March 19, 2009, replacing his report and tables of November 5, 2008.

### III.  ARGUMENT

**Plaintiffs Are Entitled to Depose Dr. Hur Because He Collaborated With Defendants' Expert, Dr. Gibbons On The Methodological Strategy And The Analysis Employed To Reach Dr. Gibbons' Expert Opinions In This Case.**

Pursuant to Fed. R. Civ. P. 26(b)(1), Plaintiffs are entitled to "discovery regarding any nonprivileged matter that is relevant to an party's claim or defense."  Moore's Federal Rules Pamphlet 2009).  Courts have generally followed the premise that "the broad mandates of Fed. R. Civ. P. 26 demand that the scope of discovery be liberally construed so as to provide both parties with information essential to proper litigation on all the facts."  *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc*., 103 F.R.D. 635 (D. Mass. 1984) (citing to *Mitsui & Co.*

*(U.S.A.), Inc. v. Puerto Rico Water Resources Auth.,* 79 F.R.D. 72 (D.P.R. 1978). The issue presented in this case is very similar to *Herman v. Marine Midland Bank,* 207 F.R.D. 26, (W.D.N.Y. 2002) in which an expert witnesses was assisted in the report by a person who co-authored a scholarly paper on the subject in litigation. The court adopted the language of *Derrickson v. Circuit City Stores, Inc.,* 1999 WL 1456538, 1999 U.S. Dist. Lexis 21100 (D.Md. March 19, 1999):

> Defendant cannot properly cross-examine [the expert] without first understanding how his assistant manipulated the data. This is not a case where the testifying expert relied on a single, discrete written report by a non-testifying expert. If that were so, Plaintiffs would simply need to produce the non-testifying expert's report. To the contrary, [the expert]'s opinions in this matter are the result of a seamless collaboration with his assistant. Under these circumstances, Defendant is entitled to know what [the expert]'s assistant did.

*Herman* and *Derrickson* are not fringe decisions. In *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609, (7th Cir. [Indiana] 2002), the court wrote:

> An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify. United States v. Bramlet, 820 F.2d 851, 855-56 (7th Cir.1987); United States v. Lawson, 653 F.2d 299, 301-02 (7th Cir.1981). The opposing party can depose them in order to make sure they performed their tasks competently; and the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was standard practice in his field."

It is clear that Dr. Gibbons was unable to answer critical questions concerning the computer SAS programs that Dr. Hur wrote and executed for Dr. Gibbons' Study and related article. Dr. Gibbons testified that Dr. Hur was better able to testify than he about the SAS program and that he was unable to reconcile the error in Dr. Hur's programs which inevitably affected the results of Dr. Gibbons' analyses. Exhibit A, 751:1-24, 757:2-760:21, 757:6-15, 759:17-760:21. It is clear that the assertions in Dr. Gibbons' expert report are predicated upon the work of Dr. Hur. Dr. Gibbons' expert report is a salient part of Defendants' defense to this

action.  Plaintiffs' will be severely prejudiced in their prosecution of this action if they are not permitted to discovery of the complete analysis including the deposition of Dr. Hur who participated in designing the methodology employed, the designing and coding of the programs utilized, execution of the programs, reviewing or verification of results, and actual writing of the Article.  Judge Sorokin clearly anticipated that Dr. Gibbons' deposition alone would not suffice in providing adequate discovery concerning the expert report when he ordered that  "plaintiffs may seek leave after Gibbons' Deposition to take the other three authors' deposition, if warranted and necessary."  Plaintiffs submit that given that much of what made up the basis of Dr. Gibbons' work for Pfizer was done by and known only to Dr. Hur, and can be explained (if at all) only by him, the deposition of  Dr. Hur is clearly necessary and warranted in this case.

## IV.  CONCLUSION

Plaintiffs respectfully request the Court resolve this issue immediately. As stated above, Dr. Gibbons has served a new report, dated March 19, 2009,  after completion of his deposition on March 5, 2009.  Since that event the Court has set for trial the Track One case, *Bulger v Pfizer et al*, on July 27, 2009, with scheduling dates of May 22, 2009 to identify witnesses, together with deposition portions to be used at trial.

Accordingly, Plaintiffs move the Court  to compel Dr. Hur to submit to a deposition as set forth above and he produce all computer files, directories, documents, records, correspondence, materials, studies, charts, tables, graphs, analyses, bills, checks, and items of every description which  pertain in any way to the pharmacoepidemiology studies and articles submitted herein and the related studies on which they relied, including the Pharmetrics database and all related matters.

Dated:  April 17, 2009

Respectfully submitted,

***Members of Products Liability
Plaintiffs' Steering Committee***

By:      **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY  12550


By:      **/s/ Jack W. London**
Jack W. London, Esquire
Law Offices of Jack W. London
   & Associates
106 E. 6th Street, Suite 700
Austin, TX  78701


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on April 17, 2009.

**/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein