EXHIBIT A

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
2
    IN RE: NEURONTIN          )
3   MARKETING SALES PRACTICES )
    & PRODUCTS LIABILITY      )
4   LITIGATION                ) MDL DOCKET
                              ) No. 1629
5   BULGER VS. PFIZER, et al. ) No. 1629
    07-11426-PBS              )
6                             ) MASTER FILE
    SMITH VS. PFIZER, et al.  ) No. 04-10981
7   05-CV-11515-PBS           )
8
         SUPERIOR COURT OF THE STATE OF CALIFORNI
9                   CITY OF LAKE
10  NICOLETTE CRONE,  et. al,  )
                              )
11       Plaintiffs,          )
                              )
12       versus               ) CV 400432
                              )
13  PFIZER, INC., et al.,     )
                              )
14       Defendants.          )
15  Job No.: 183059
                VOLUME I
16       The videotaped deposition of ROBERT D.
17  GIBBONS, Ph.D.., called by the Plaintiffs, for
18  examination, pursuant to Notice, and pursuant to
19  the Rules of Civil Procedure for the United States
20  District Courts, taken before Sandra L. Rocca, CSR,
21  CRR and Notary Public in and for the County of
22  DuPage, and State of Illinois, at 506 West
23  Harrison, Chicago, Illinois, on the 3rd day of
24  February, 2009, at the hour of 9:09 a.m..
```

**2**

```
1   APPEARANCES:
2
    MR. JACK LONDON
3   3701 Bee Cave, Suite 200
    Austin, TX  78746
4   (512) 478-5858
    jlondon@texas.net
5
            -and-
6
    FINKELSTEIN & PARTNERS
7   By:  MR. KEITH L. ALTMAN
    463 Robinson Avenue
8   Newburgh, NY  12550
    (516) 456-5885/Fax: (951) 303-1222
9   kaltman@lawampmmt.com
10           -and-
11  THE LANIER LAW FIRM
    By: MR. KENNETH S. SOH
12  6810 FM 1960 West
    Houston, TX  77069
13  (713) 659-5200/Fax: (713) 659-2204
    Kss@lanierlawfirm.com
14
         appeared on behalf of
15       the Plaintiffs;
16
    SHOOK, HARDY & BACON, L.L.P.
17  By: MS. LORI CONNORS McGRODER
    2555 Grand Blvd.
18  Kansas City, MO  64108-2613
    (816) 474-6550/Fax: (816) 421-5547
19  lmcgroder@shb.com
20       appeared on behalf of the
         Defendants;
21
    (continued)
22
23
24
```

**3**

```
1   APPEARANCES: (Continued)
2
3   LAW OFFICES OF STEVEN D. HILLYARD, P.C.
    By: MR. GERHARD WINKLER
4   345 California Street, Suite 1770
    San Francisco, CA  94104
5   (415) 334-6880
6        appeared on behalf of Defendant
         Dr. Jennings.
7
8
    Also Present:
9
         James Pierdzioch, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
1        VIDEOGRAPHER:  My name is James
2   Pierdzioch of Veritext.  The date today is
3   February 3rd, 2009 and the time is 9:09 a.m.  This
4   deposition is being held at the Holiday Inn located
5   at 506 West Harrison Street in Chicago, Illinois.
6   The captions for this case are In Re:  Neurontin
7   Marketing Sales Properties and Products Liability
8   Litigation in the United States District Court,
9   District of Massachusetts and Nicolette Crone,
10  et al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13       The name of the witness is Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identifies themselves for the record.
16       MR. LONDON:  I'm Jack London.  I
17  represent the multi-district litigation Plaintiffs,
18  product liability steering committee Plaintiffs.
19       MR. ALTMAN:  Keith Altman.  I'm here
20  representing Nicolette Crone and the Crone
21  Plaintiffs and I'll be asking questions on behalf
22  of Crone.
23       MR. SOH:  Ken Soh for the Plaintiffs.
24       MR. WINKLER:  Gerhard Winkler on behalf
```

41

1  of a study was -- I mean, I'm not sure that, if you
2  will, the light bulb went off after listening to
3  Dr. Bloom. I may have, you know, thought about
4  doing this kind of thing earlier on. I'm not sure
5  -- I don't remember the exact sequence of events.
6  BY MR. LONDON:
7     Q. Let me ask it a different way. Did you
8  not buy the PHARMetrics database in question until
9  after speaking with Pfizer counsel about it?
10     MS. McGRODER: Object to form.
11     THE WITNESS: Yes, that's correct.
12  BY MR. LONDON:
13     Q. And it was primarily Miss McGroder that
14  you recall being the counsel with whom you spoke?
15     A. Yes.
16     Q. And that leads to the next question and
17  that is, even though you paid for the database by
18  writing a check I assume for $15,000, were you
19  reimbursed for that payment?
20     A. Yes, I was.
21     Q. And let me just ask, who reimbursed you?
22     A. I sent an invoice to Miss McGroder.
23     Q. Okay. I'm not trying to pick, but here's
24  the reason I am not clear on it. I can envision

42

1  sending an invoice for services or expenses to
2  Miss McGroder and receiving a check from their law
3  firm, but I can also envision sending that same
4  invoice and receiving a check via their law firm
5  but written on a Pfizer account. Do you understand
6  the question?
7     A. Yes.
8     Q. Do you recall which it was?
9     A. All of the payments that I've received
10  have been through their law firm.
11     Q. On a law firm checking account?
12     A. That's my understanding, yes.
13     Q. May I ask this question, when did you
14  physically receive the database on the disk from I
15  assume from PHARMetrics?
16     A. I don't recall.
17     Q. And I ask that because of the date. I
18  mean the date says May 21. Is that something that
19  you can just send them over the signed request and
20  it comes in the mail within a few days or is it
21  months?
22     A. I don't think it was months certainly,
23  but it wasn't -- I don't think I got it the next
24  day, but I don't recall the exact sequence of when

43

1  we actually received it.
2     Q. I don't want to push too hard on this,
3  but I would like to know the date you received it.
4  And I appreciate you don't have that information
5  here in front of you, but among your bills and
6  communications with Miss McGroder, is there a
7  record somewhere that you can look at this
8  afternoon after the recess and come up with the
9  date that would be within a few days of the date
10  you received the PHARMetrics database?
11     A. I can't think of any way to triangulate
12  on that date.
13     Q. I like that phrase. Are you sure you
14  weren't in the military?
15     A. I'm very sure.
16     Q. Are you a pilot?
17     A. No.
18     Q. Sailor?
19     A. No.
20     Q. Just triangulate's in that universe of
21  your vocabulary?
22     A. Yeah.
23     Q. What did you do upon receiving the
24  PHARMetrics database insofar as working with that

44

1  database is concerned?
2     A. I met with Dr. Hur and there were I
3  believe SAS transport files.
4     Q. What does that mean? I'm sorry.
5     A. It's the way that you transmit a SAS
6  file. It's sort of a protected and condensed mode
7  that allows it to be locked and unlocked and
8  extract the SAS files which contain the data. And
9  I asked him to, you know, begin going over it and
10  verifying that what was there was what we had asked
11  for.
12     Q. Is that something that you would have the
13  particular skill set to have done without Dr. Hur
14  yourself?
15     A. I could have done it, but he's much
16  better at it than I am.
17     Q. And I accept that. I'm just curious
18  whether if you looked up one day and you found only
19  yourself and a big computer and a desert island and
20  a PHARMetrics database and a SAS file, you could
21  have done the work that involved the SAS transport
22  files and the database and begin to do the work?
23     MS. McGRODER: Object to form.
24     THE WITNESS: I have done SAS work in the

205

1     MS. McGRODER:  Same objection.  Go ahead
2  and answer it, Dr. Gibbons.
3     THE WITNESS:  Dr. Hur provided the
4  numbers that are in Table 1 based on analyzing the
5  PHARMetrics data in the way that I had instructed
6  him to.
7  BY MR. LONDON:
8     Q.  What did Dr. Hur do in Table 2?
9     A.  Table 2 provides output that was a part
10  of the analyses that Dr. Hur performed.  This came
11  out of SAS outputs.
12     Q.  Are the numbers in Table 2, are those
13  simply SAS outputs?
14     A.  They are abstracted from the SAS outputs,
15  but all of these numbers can be found in the SAS
16  output files.
17     Q.  When you go back to Table 1, you said as
18  I understood it, that Dr. Hur provided the numbers
19  in Table 1 pursuant to the instructions you gave
20  him and then I lost your answer.  The methodology
21  or the categories of information, what was it you
22  instructed Dr. Hur to look for to get these
23  numbers?
24     A.  To look at the number of attempts before

206

1  initiation of treatment, to look at the number of
2  person years to compute the rates per person year
3  for each one of the drug groups in terms of suicide
4  attempts, to do this using monotherapy conditions,
5  to then look at a pooled analysis of all 11 of the
6  AEDs or any of the 11 AEDs to restrict that
7  analysis then to those people who took one of the
8  11 AEDs only without any other concomitant
9  medication, to look at lithium monotherapy and to
10  look at the two no medication conditions, no
11  medication with respect to the 11 AEDs and/or
12  lithium and no medication with respect to any
13  central nervous system medication.
14     Q.  Do I understand you to mean that while he
15  extracted the numbers, it was you who came up with
16  the definitions for the categories that are the
17  caption of each of the columns?
18     A.  That's correct.
19     Q.  You came up with the definition that
20  would be used by Dr. Hur to come up with the number
21  at risk?
22     A.  That's correct.
23     Q.  And the same as numbers before, person
24  years and so on, each of those column captions?

207

1     A.  That's correct.
2     Q.  And he would take the instructions you
3  gave him and do whatever SAS computing was require
4  for him to extract that information?
5     MS.. McGRODER:  Object to form.
6     THE WITNESS:  He would perform those
7  analyses.
8  BY MR. LONDON:
9     Q.  Did you on your own perform any of the
10  analyses yourself either as a check on Dr. Hur or
11  as a two people working in parallel to see if he
12  replicated the results?
13     A.  Both of those seem to me to be the same
14  thing, yes.
15     Q.  All right.  And you did?
16     A.  Yes.
17     Q.  And did you do all of those or just
18  selective ones?
19     A.  I did everything in Table 1.
20     Q.  To replicate what Dr. Hur had already
21  done in Table 1?
22     A.  To replicate that the summary statistics
23  that led to the statistical analyses were done
24  correctly.

208

1     Q.  Okay.  Can I ask you the same question
2  about Table 2?  Did he extract the data from the
3  SAS information based on the definitions or the
4  parameters that you gave him that are the captions
5  for each of those columns, the post drug versus no
6  drug, the pre-drug versus no drug and the post drug
7  versus pre-drug?
8     A.  That's correct.
9     Q.  In other words, you would define what
10  those parameters were, he would use those defined
11  parameters to do the SAS calculations?
12     A.  I'm not sure I understand what you mean
13  parameters.
14     Q.  Well, I assume post drug versus no drug,
15  no drug means no drug, but post drug means that you
16  would give him the date that he was to work with
17  and look for whatever drug administration's or
18  prescriptions occurred after that date and he would
19  follow that instruction to get the data in the
20  first column?
21     A.  No, that's not correct.
22     Q.  That's all right.  Just please describe
23  for me what happened.
24     A.  Well, what's not correct about that is I

209

1  didn't give him a date.  The date of drug
2  initiation of drug therapy will vary for each
3  subject who actually took one of these drugs and
4  took only one of these drugs.  And so the
5  instruction I gave him was to do a statistical
6  comparison between the period following the
7  initiation of say, for example, in the first row
8  gabapentin monotherapy, monotherapy with respect to
9  the other 10 AEDs and lithium and compare that to
10  those people who didn't take any of the 11 AEDs or
11  lithium.
12     Q.  Okay.  And he would take those directions
13  and extract the data from the SAS computer and
14  produce the numbers that are in Table 2?
15     A.  He wasn't extracting the data.  He would
16  just -- he would develop and run the SAS code to
17  perform that analysis.
18     Q.  I want to go back and start asking the
19  same questions about Dr. Brown if I may.  Who is
20  Dr. Brown?
21     A.  Hendricks Brown, he's a professor of
22  biostatistics at the University of South Florida
23  and also a visiting member of our Center For Health
24  Statistics.

210

1     Q.  Does he have a faculty position at your
2  institute?
3     A.  No.  We have a grant which we're
4  co-principal investigators on and the grant is
5  administered through the University of Illinois and
6  the primary subcontract is to the University of
7  South Florida under the direction of Dr. Brown.
8     Q.  Is he a medical doctor?
9     A.  No.
10     Q.  What was his role in the project of the
11  paper?
12     A.  He helped in both the original design of
13  the methodological strategy for the analysis of the
14  data from the original VA study, helped in thinking
15  about the -- adopting that strategy to the
16  PHARMetrics data that as we've discussed had a
17  somewhat different form than the VA study, helped
18  in reviewing the results and writing up the paper.
19     Q.  Did he compose some of the text of the
20  paper as opposed to the tables?
21     A.  As I recall, I wrote the first draft of
22  the paper and then distributed it to all of my
23  coauthors who either verbally or, you know, with
24  edits sent back their comments and rewrites to the

211

1  text.
2     Q.  Did Dr. Brown write any of the paragraphs
3  or the pages -- I appreciate that he edited and
4  suggested, but in reading any of the paper, is
5  there something that we could identify with a pen
6  or a magic marker or page number and say Dr. Brown
7  wrote this?
8     A.  I don't remember offhand who, you know,
9  would be responsible for each particular sentence,
10  but I know that Hendricks did quite a bit of
11  writing and overview.
12     Q.  And what?
13     A.  Overview.
14     Q.  Overview?
15     A.  Of the paper.  I mean, he contributed
16  significantly to the work.
17     Q.  Did his contributions have to do with the
18  statistical subjects or did they have anything to
19  do with pharmacy or did they have anything to do
20  with medicine?
21     A.  No.
22     MS. McGRODER:  Object to form.
23     THE WITNESS:  His contributions are
24  methodological contributions.  And again, you know,

212

1  he was responsible in large part as one of the
2  original contributors to the general idea of how to
3  do this kind of work from the VA paper which, of
4  course, predated all of this.
5  BY MR. LONDON:
6     Q.  Okay.  Could he have written this paper
7  without you?
8     A.  I think he probably could have.
9     Q.  And then I want to ask the same question
10  about -- is it Dr. Mann, what was Dr. Mann's
11  contribution?
12     A.  John Mann is a psychiatrist at Columbia
13  University who is head of the department of
14  neuroscience at Columbia University and one of the
15  leading experts in the field of suicide in the
16  world and he is our resident or non-resident
17  clinical expert.
18     Q.  What did he contribute to the paper?
19     A.  He helped with the review of the relevant
20  literature and the discussion of the results and
21  how they fit in with the rest of the literature.  I
22  think he also suggested a couple of the comparisons
23  that ultimately ended up in the paper.
24     Q.  Can you recall what those were of the

297

1    Q.  Is it more than 100 hours?

2    A.  It's probably more than 100 hours.

3    Q.  Is it less than 500?

4    A.  I don't really know.

5    Q.  So somewhere between 100 and 1,000?

6    A.  That's a guess.

7    Q.  I'm just trying to get a ballpark idea

8  since we don't have the bills, so we don't

9  understand what the issues are.  We're going to

10  discuss it in more detail later, but the SAS

11  programs that were created to do both analyses

12  associated with the cohorts, did you write those

13  SAS programs?

14    A.  They were written primarily by Dr. Hur.

15    Q.  Did you have any part in writing those

16  SAS programs?

17    A.  I worked with him from time to time on

18  constructing the logic of the code.

19    Q.  Did you ever do the editing of the

20  program yourself or did you just have discussions

21  with him and he did the editing?

22    A.  We might work together in front of the

23  same computer and going through that and making

24  sure that the logic of the programs were doing what

298

1  was intended and then he would do the editing of

2  the programs.

3    Q.  Did you ever work on the programs

4  independently of Dr. Hur?

5    A.  No, I did not.  Not on the SAS programs

6  if that's what you're referring to.

7    Q.  That's what I was referring to, the SAS

8  programs.  You said that Dr. Hur extracted the data

9  out of the SAS data sets and gave them to you for

10  you to perform some independent analyses, is that

11  correct?

12    A.  Yes, it is.

13    Q.  And I think you said he provided it to

14  you as an ASCII format?

15    A.  Correct.

16    Q.  Which is A-S-C-I-I, by the way, all

17  capitals.  Didn't know if you knew it.

18    What tool did you use to analyze that

19  data?

20    A.  Fortran.

21    Q.  Did those -- do you have those fortran

22  programs?

23    A.  I do.

24    Q.  Did you turn those over to your counsel

299

1  as part of the materials asked for in this case?

2    A.  No, I didn't.  I only used those to

3  verify the analyses that were done in the SAS

4  programs which were what we relied upon.

5    Q.  Were you able to do all of the analyses

6  including the Poisson modeling and everything like

7  that within the fortran programs?

8    A.  No, I did everything up until the

9  preparation of the summary statistics that would go

10  into the Poisson regression.  I could do that.

11  I've written those kinds of programs before, but I

12  figured relying on SAS to do those appropriately

13  was okay.

14    Q.  A lot more than three lines of code in

15  SAS?

16    A.  Even in APL.

17    Q.  Did those fortran analyses produce any

18  output -- I want to say output.  I mean did you

19  output the information to a data file or did it

20  just literally come up on the screen?

21    A.  Both.

22    Q.  Do you have the output data files that

23  you created?

24    A.  I do.

300

1    MR. ALTMAN:  Lori, as part of the stuff

2  that we'll ask for, we'll ask for those working

3  files.

4    Q.  In your conduct of running your

5  independent verification analyses, did you ever

6  find a time that you had a difference between what

7  you saw and what Dr. Hur saw?

8    MS. McGRODER:  Wait.  Object just because

9  I don't know, are we talking about the gabapentin

10  cohort or the bipolar cohort?

11    MR. ALTMAN:  All of it.

12    MS. McGRODER:  Does your question relate

13  to both?

14  BY MR. ALTMAN:

15    Q.  Relates to both.  Wait, time out, strike

16  it.  You got me confused.

17    But with respect to either cohort, yeah,

18  with respect to either cohort, did you ever find a

19  difference in your analysis from what Dr. Hur had

20  which caused you to call Dr. Hur and say hey,

21  something's not right, either I got something wrong

22  or you got something wrong?

23    A.  Yes.

24    Q.  Do you remember any of those

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

352

1      IN THE UNITED STATES DISTRICT COURT
2         DISTRICT OF MASSACHUSETTS
3   IN RE; NEURONTIN            )
4   MARKETING SALES PRACTICES        )
5   & PRODUCT LIABILITY         )
6   LITIGATION,             )
7                  ) MDL DOCKET
8   BULGER vs. PFIZER, et al.,    ) No. 1629
9                  ) MASTER FILE
10  SMITH vs. PFIZER, et al.,    ) No. 04-10981
11  05-CV-11515-PBS         )
12    SUPERIOR COURT OF THE STATE OF CALIFORNIA
13            CITY OF LAKE
14  NICOLETTE CRONE, et al.,      )
15        Plaintiffs,    )
16        vs.        ) CV 400432
17  PFIZER, INC., et al.,      )
18        Defendants.   )
19      2/4/09  Job No.: 183060
20        9:16 a.m.
21      The videotaped deposition of ROBERT D.
22  GIBBONS, Ph.D., resumed pursuant to adjournment at
23  Suite 533, 506 West Harrison Street, Chicago,
24  Illinois.

353

1   PRESENT:
2   LAW OFFICES OF JACK LONDON,
3      (3701 Bee Cave, Suite 200,
4      Austin, Texas 78746,
5      512-478-5858), by:
6   MR. JACK LONDON,
7      jlondon@texas.net,
8      -and-
9   FINKELSTEIN & PARTNERS, LLP,
10     (463 Robinson Avenue,
11     Newburgh, New York 12550,
12     800-634-1212), by:
13  MR. KEITH L. ALTMAN,
14     kaltman@lawampmmt.com,
15     -and-
16  THE LANIER LAW FIRM,
17     (6810 FM 1960 West,
18     Houston, Texas 77069,
19     713-659-5200), by:
20  MR. KENNETH S. SOH,
21     kss@lanierlawfirm.com,
22       appeared on behalf of the Plaintiffs;
23
24

354

1   PRESENT:  (Continued)
2   SHOOK, HARDY & BACON, L.L.P.,
3      (2555 Grand Boulevard,
4      Kansas City, Missouri 6108-2613,
5      816-474-6550), by:
6   MS. LORI CONNORS McGRODER,
7      lmcgroder@shb.com,
8       appeared on behalf of the Defendants;
9
10  LAW OFFICES OF STEVEN D. HILLYARD, PC,
11     (345 California Street, Suite 1770,
12     San Francisco, California 94104,
13     415-334-6880), by:
14  MR. GERHARD O. WINKLER,
15       appeared telephonically on behalf of
16       Defendant Raymond D. Jennings, M.D.
17
18  VIDEOTAPED BY:
19  MR. JAMES PIERDZIOCH, Veritext Chicago
20       Reporting Company.
21
22
23  REPORTED BY:  ANDREA L. CARTER,
24       Illinois CSR No. 84-3722.

355

1      THE VIDEOGRAPHER:  My name is James Pierdzioch
2   of Veritext.  The date today is February 4th, 2009,
3   and the time is 9:16 a.m.  This deposition is being
4   held at the Holiday Inn located at 506 West Harrison
5   Street in Chicago, Illinois.
6          The captions for this case are Neurontin
7   Marketing Sales Practices and Products Liability
8   Litigation in the United States District Court,
9   District of Massachusetts, and Nicolette Crone, et
10  al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13        This is the day two deposition of Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identify themselves for the record.
16  MR. ALTMAN:  Keith Altman on behalf of
17  Nicolette Crone and the Crone plaintiffs.
18  MR. LONDON:  Jack London on behalf of the MDL
19  product liability plaintiffs.  Also here but out of
20  the room for a moment is Ken Soh also with the
21  plaintiffs' product liability MDL group.
22  MS. McGRODER:  Lori McGroder on behalf of
23  Pfizer.
24  MR. WINKLER:  Gary Winkler on behalf of

440

1    MS. McGRODER:  As he sits here right at this
2  moment?
3    MR. ALTMAN:  As he sits here right now.
4  BY THE WITNESS:
5    A.  I have nothing planned at this moment.
6  BY MR. ALTMAN:
7    Q.  By the way, I just want to -- you said
8  Dr. Hur helped you with the programs for both the
9  bipolar study and the gabapentin study, correct?
10    A.  That's correct.
11    Q.  Did you pay Dr. Hur for his help -- for
12  his assistance with you on the gabapentin study?
13    A.  For the gabapentin study, yes, I did.
14    Q.  Okay.  How much did you pay Dr. Hur for
15  that?
16    A.  I don't remember how much.
17    Q.  Do you have records for that?
18    A.  I might.
19    Q.  Okay.  We request that -- did you pay him
20  personally, or did you pay him out of your
21  corporation?
22    A.  Out of my corporation.
23    MR. ALTMAN:  Okay.  We request that we get
24  information associated with how much Dr. Hur had

441

1  been paid for his work in the gabapentin study.
2    MS. McGRODER:  Your request is noted.
3  BY MR. ALTMAN:
4    Q.  How does it work with -- for the bipolar
5  study and the grants and everything like that, is
6  there an actual -- does the grant go to the
7  university, and you just kind of just do work and
8  the grant funds part of your work, or is there an
9  actual transfer of funds from some -- you know, bank
10  account -- does the grant send you some money, you
11  put it in a bank account, and then as you expend
12  work under the grant, you just withdraw funds out of
13  that and give it to the university?
14    How does that work?
15    A.  The grant is to the university, and the
16  university pays my salary, and there are, you know,
17  objectives and pays the salary of Dr. Hur and my
18  co-investigators, but the money goes directly to the
19  university.
20    Q.  Do you have to account for how much time
21  you spend working on, you know, something that falls
22  under the umbrella of a particular grant?
23    A.  There's no like time sheet kind of thing
24  or anything like that.  There's a proposal and the

442

1  proposal, you know, lists various percent efforts
2  for members of the grant, and they are usually gross
3  underestimates, and, you know, we do the work.  And,
4  you know, the National Institute of Health is either
5  happy based on our productivity or not happy.
6  Generally for our work, they are pretty happy.
7    Q.  Now, if you wanted to use an outside
8  individual to assist in a grant, would you -- would
9  they wind up getting some money from your university
10  going to that other person's university?
11    A.  An example of that would be we have a
12  subcontract with the University of South Florida to
13  pay for time and travel and support for Dr. Brown on
14  our suicide grant, both on the current suicide grant
15  and the original R-56 grant.
16    Q.  Okay.  I'd like you to pull out your
17  original declaration which is I believe Exhibit 8.
18  I believe it's Exhibit 8.
19    At the bottom of page 3 -- we are not
20  going to look at page 1 and 2 -- would you please
21  read in the first sentence of the paragraph at the
22  bottom?
23    A.  "Our best estimate of the ratio of the
24  probability of suicidality for patients treated with

443

1  gabapentin to those treated with placebo is a ratio
2  of 1.033 indicating no increased risk of suicidality
3  with gabapentin at a confidence level" --
4    MS. McGRODER:  Just for the court reporter,
5  slow down.
6  BY THE WITNESS:
7    A.  Oh, I'm sorry.  -- "in excess of 99.9
8  percent."
9  BY MR. ALTMAN:
10    Q.  Now, you didn't qualify when you said
11  "our best estimate."  That is just taking the
12  submission to the FDA by Pfizer at face value?
13    I mean, you didn't actually look to see
14  whether that -- whether they should have included
15  all those studies, whether that was the right way to
16  do it, whether you have should included -- gone to
17  patient years or any of that when you said that,
18  correct?
19    MS. McGRODER:  Object to form.
20  BY THE WITNESS:
21    A.  That was my estimate based on the data
22  that were submitted to the FDA by Pfizer.
23  BY MR. ALTMAN:
24    Q.  Is that the best estimate that you could

532

1 implemented, and we went through them to such a
2 degree so that we were able to find confidence that
3 that, in fact, was the case.
4        I then supplemented that by redoing these
5 in Fortran, and as I have said, I will share those
6 with counsel and the associated ASCII files which
7 they read.
8        So having said that, you know, I can -- I
9 can give it my best shot, but I can't tell you that
10 you will ask me a question and I will go -- it might
11 take a long time to try and figure it out, and I
12 might not be able to answer it for you.
13       MR. ALTMAN:  Objection, non-responsive.
14 BY MR. ALTMAN:
15       Q.   My question to you was:  Would Dr. Hur be
16 in a better position to discuss these SAS programs
17 than you would?
18       MS. McGRODER:  Well, objection to form and
19 foundation, and he already answered that question,
20 asked and answered.
21       MR. ALTMAN:  He did not.
22 BY MR. ALTMAN:
23       Q.   Would you please answer that question.
24       MS. McGRODER:  He can't know whether Dr. Hur is

533

1 it in a better position until you ask him the
2 questions, and he gives you the answers.  I mean,
3 how can he know that --
4        MR. ALTMAN:  Would you answer -- Lori, you are
5 coaching the witness now.  You are not allowed to do
6 that --
7        MS. McGRODER:  No, he answered your question.
8        MR. ALTMAN:  No, he did not.  I asked him would
9 Dr. Hur be in a better position to discuss the SAS
10 programs.
11       MS. McGRODER:  Well, my objection is --
12       MR. ALTMAN:  He told me --
13       MS. McGRODER:  -- there is no foundation for
14 him to answer that question until you ask the
15 questions.
16       MR. ALTMAN:  That's fine.
17 BY MR. ALTMAN:
18       Q.   Would Dr. Hur be in a better position to
19 discuss these SAS programs than you?
20       A.   You know, it depends on what part of the
21 programs that you are describing.  As I have
22 testified, Dr. Hur had the primary role of writing
23 those programs.  Authors are always, you know,
24 closest to their code, but everything that's in the

534

1 code is based on -- on direction that Dr. Hur
2 received from me.
3        So I should be, you know, in reasonably
4 good stead to -- stead -- I am not sure that's even
5 a word.  I should be able to -- to review them with
6 you, if you would like.
7        Q.   Still not answering my question.  Would
8 Dr. Hur be in a better position to discuss these
9 programs?
10       MS. McGRODER:  Object to form and foundation,
11 asked and answered.  He cannot answer that question.
12 He can't know until you ask --
13 BY MR. ALTMAN:
14       Q.   Did you rely on Dr. Hur to write these
15 programs as opposed to yourself?
16       A.   Dr. Hur wrote the programs, that's
17 correct.
18       Q.   Would it have been as easy for you to
19 write these programs as Dr. Hur?
20       A.   He has more expertise in using SAS than I
21 do.
22       Q.   Do you routinely rely upon Dr. Hur to
23 write your SAS programs in projects that you work on
24 together?

535

1       A.   Yes, I do.
2       Q.   Is there a time where you would write the
3 program as opposed to Dr. Hur?
4       A.   Well, which program are you talking
5 about?
6       Q.   Is there -- can you think of instances
7 where you and Dr. Hur have collaborated on papers
8 where you wrote the SAS programs instead of Dr. Hur
9 writing the SAS programs?
10      A.   If you are just talking upon SAS
11 programs, then I would rely upon Dr. Hur to do that.
12      MR. ALTMAN:  Okay.  Let's mark as the next two
13 exhibits -- well, let's mark as -- this exhibit
14 first whatever the next number is 29.
15          (WHEREUPON, a certain document was
16          marked Gibbons Deposition Exhibit
17          No. 29, for identification, as of
18          2/4/09.)
19 BY MR. ALTMAN:
20      Q.   Now, Dr. Gibbons, if you would please
21 pull -- it's probably Exhibit No. 5 which was the
22 listing of the contents of the CD.  It's the next
23 one right there.
24          You see that there are several files at

692

1      MS. McGRODER:  Okay.  The deposition is over.
2  We are out.  You want more time.  We are not going
3  to do this.  We are not going to pull this game.  We
4  are not doing this.
5      MR. LONDON:  You are the one pulling the game.
6      MR. ALTMAN:  I'm asking him whether -- it says
7  I have produced all materials requested by
8  plaintiffs in their letter of November 12, 2008.
9      MS. McGRODER:  Do not answer any more
10  questions.  We are finished for today.
11  BY MR. ALTMAN:
12      Q.   Are you abiding by her --
13      MR. ALTMAN:  Let's call the judge.
14      MS. McGRODER:  Call the judge.
15      MR. ALTMAN:  You are going to be here -- you
16  are going to miss your flight.
17      MS. McGRODER:  You said you are not done
18  anyway.  We are going to come back.
19      MR. ALTMAN:  Are you going to stipulate that we
20  come back?
21      MS. McGRODER:  Not right now.
22      MR. ALTMAN:  Then let's call the judge.
23      MS. McGRODER:  Go ahead.
24      Let me explain my --

693

1      MR. ALTMAN:  No, I don't want to hear your
2  position.  We are calling --
3      MS. McGRODER:  Well, I'm going to explain my
4  position for the record.
5      MR. ALTMAN:  We are calling the judge.  You
6  have already terminated --
7      MS. McGRODER:  For the record --
8      MR. ALTMAN:  I'm sorry.  You terminated the
9  deposition.
10      MS. McGRODER:  For the record --
11      MR. ALTMAN:  Lori, did you -- Lori, did you
12  terminate the deposition?
13      MS. McGRODER:  -- his declaration says: "I
14  have also produced all materials requested by
15  plaintiffs in their letter of November 12, 2008 on
16  which my co-authors and I relied in preparing the
17  manuscript."
18      The bulk of materials with one exception
19  today are not items on which Dr. Gibbons and his
20  co-authors relied in preparing the manuscript.  So
21  for you to insinuate that Mr. Gibbons has been
22  misleading or has been untruthful is improper and
23  inappropriate, and I won't allow it.
24      MR. ALTMAN:  It is not a true statement.

694

1      MS. McGRODER:  It is -- your -- you are -- you
2  are assuming and insinuating, and it's misleading
3  and improper, and I won't allow it.
4      MR. LONDON:  Well, we know we don't have the
5  sensitivity analyses.  We know we don't have --
6      MS. McGRODER:  The sensitivity analyses were
7  not used in preparing the manuscript.  They were
8  done after the fact.
9      MR. ALTMAN:  Are you kidding?  Lori, are you
10  serious?  He says he used -- he prepared it in
11  preparing a defense for peer-reviewed publication.
12  You can't seriously stand there and say that the
13  sensitivity analysis have nothing to do with his
14  manuscript.
15      MS. McGRODER:  Well, look, did we say we are
16  going to give you the sensitivity analysis?  Yes, we
17  did --
18      MR. ALTMAN:  No, but you have not --
19      MS. McGRODER:  -- he did not -- he did not --
20  he did not prepare the sensitivity analysis and
21  relied on them in preparing his manuscript.  His
22  manuscript was submitted on September -- in
23  September of 2008.  Those sensitivity analyses were
24  not done before the manuscript was prepared.  So a

695

1  fortiori his statement is not untrue.
2      MR. LONDON:  A fortiori.
3      MS. McGRODER:  His statement is not untrue.
4      MR. LONDON:  No, his statement --
5      MR. ALTMAN:  Lori, I am sure the judge will
6  truly appreciate --
7      MS. McGRODER:  You know what, I think this
8  is -- this is a legal argument, and I will not allow
9  him to answer questions where you are telling him
10  that he is lying.  It's not --
11      MR. ALTMAN:  I didn't suggest that he was
12  lying.  What I suggest is it's not a true statement.
13  That does not mean he lied.  I never suggested that
14  he lied.
15      MS. McGRODER:  There is no difference.
16      MR. ALTMAN:  There is a difference.
17      MS. McGRODER:  No, there's not.
18      MR. ALTMAN:  Yes, there is a difference.  There
19  are statements that could be made that are not
20  truthful --
21      MS. McGRODER:  Keith, you can ask him a
22  legitimate question --
23      MR. ALTMAN:  Lori --
24      MS. McGRODER:  -- in this deposition, and we

696

1  will conclude it for today.  He is not answering
2  that question.  That question is improper, and I
3  won't allow him to answer it.  If you want to ask a
4  legitimate question, we can continue.
5      MR. LONDON:  Well, you are not the judge of a
6  legitimate question.  You don't get to call that
7  shot.  The rules for that, Lori --
8      MS. McGRODER:  You can -- you can criticize my
9  characterization, but he is not answering that
10  question.
11  BY MR. ALTMAN:
12    Q.  Fine.  Dr. Gibbons, would you please go
13  in Exhibit 2 to point 3.
14        Would you please read that for the
15  record.
16      MS. McGRODER:  Objection, asked and answered.
17  We did this yesterday.
18      MR. ALTMAN:  Good, we are going to do it again.
19  BY THE WITNESS:
20    A.  "Plaintiffs demand all documents
21  associated" --
22    Q.  I'm sorry?
23    A.  -- "with retention of Dr. Gibbons by the
24  defendants."

697

1    Q.  I'm sorry.  On the second page.  We are
2  talking about the study now, the bipolar study.
3    A.  "Plaintiffs demand all documents and
4  underlying data that pertain to the aforementioned
5  study, Gibbons, et al. (2008)."
6    Q.  Was there anything in that sentence that
7  says the word relied upon?
8      MS. McGRODER:  I object to this question.  He's
9  never even seen -- he has never even seen this
10  letter --
11      MR. ALTMAN:  Lori --
12      MS. McGRODER:  -- this is legal --
13      MR. ALTMAN:  Lori, stop coaching the witness.
14      MS. McGRODER:  And it's not about --
15      MR. ALTMAN:  Lori, you are coaching the
16  witness.  I have asked him a simple question.
17  BY MR. ALTMAN:
18    Q.  Does the word relied upon exist anywhere
19  in point 3?
20      MR. ALTMAN:  The man can read --
21      MS. McGRODER:  And I --
22      MR. ALTMAN:  -- he is a biostatistician.
23      MS. McGRODER:  And I object to you --
24      MR. ALTMAN:  That's nice.

698

1      MS. McGRODER:  -- asking him questions about
2  legal communications --
3      MR. ALTMAN:  Lori --
4      MS. McGRODER:  -- between you and me.
5      MR. ALTMAN:  -- that's fine.  He put in his
6  declaration that he complied --
7      MS. McGRODER:  I didn't say he couldn't answer
8  the question.  Stop your argument and let him answer
9  it.  I'm putting my objection on the record.
10      MR. ALTMAN:  That's fine.  Your objection is
11  noted.
12      MS. McGRODER:  If you can answer the
13  question --
14      MR. ALTMAN:  Now stop.
15      MS. McGRODER:  -- I can make the objection, and
16  he can answer that question.
17  BY MR. ALTMAN:
18    Q.  Dr. Gibbons, does the word relied upon
19  exist anywhere in there?
20      THE COURT REPORTER:  Wait one second.
21      MR. LONDON:  Are you worn out?
22      THE COURT REPORTER:  Okay.  Go ahead.
23  BY THE WITNESS:
24    A.  The word relied upon does not exist in

699

1  sentence -- in bullet No. 3 on page 2 of Exhibit 2.
2        However, in answering your question, I
3  believe I did a very reasonable job of giving you
4  materials.  I know I have not given the raw data
5  files and all of the SAS files, and I understand
6  that there may be a SAS file or two that maybe
7  didn't make it into it, and I apologize for that.
8        It wasn't my intention to do that.  I
9  didn't try to trip you up in any way.  If you had
10  asked for it prior to this, I would have, you know,
11  made sure that it was there.  You could have said to
12  opposing counsel, you know, we are trying to
13  recreate the cmed dataset, and I can't find it in
14  here.  Could Dr. Gibbons go back and see if that's
15  being created in another file, and I certainly would
16  have done that, and I would have given it to you.
17        I relied upon the -- and I know that word
18  isn't in here, but I'm just trying to be as honest
19  with you as I can -- the SAS output to build the
20  paper.  The paper was submitted.  The reference to
21  that paper is the paper that was submitted for
22  publication.  It's a part of my academic work.  I
23  have been doing further sensitivity analyses, and I
24  will use those -- those antiepileptic data hopefully

700

1   for the next ten years as an example of how to do
2   the pharmacoepidemiologic work, and I hope that I
3   will continue to evolve and revise the methodology
4   to a point where we can use it in a wide variety of
5   applications.
6        And I really -- I mean, I feel like I did
7   a yeoman's job of giving you all of the data in the
8   files. I could have made it far more obscure, and
9   I -- you know, this is a complicated project. It's
10  big dataset, and the SAS files are pretty
11  complicated, but, you know, I tried hard not to --
12  to make it difficult for you.
13       And the Fortran code and associated work
14  was done for my own edification to make sure that
15  the SAS files which formed the basis of the results
16  that went into the paper and went into my expert
17  report were simply done for my own reassurance that
18  what was done by myself and my colleague was -- was
19  accurate.
20  BY MR. ALTMAN:
21       Q.   Dr. Gibbons, I'm not suggesting that you
22  intentionally withheld anything.
23       MS. McGRODER:  No, you are suggesting that he
24  lied.

701

1        MR. ALTMAN:  No, I didn't suggest that he lied.
2   I am pointing -- I'm pointing out a simple fact that
3   a motion was filed, and we are going to talk more
4   about this in a minute.
5   BY MR. ALTMAN:
6        Q.   We wanted to take the deposition of your
7   co-authors.
8        Are you aware of that?
9        A.   Yes, I am.
10       Q.   When they got their subpoenas -- you are
11  aware that they were subpoenaed to testify, correct?
12       A.   I am.
13       Q.   Did they call you?
14       A.   I got a terrified call by Dr. Hur who
15  hates confrontation of any kind, not knowing what
16  this was about, and he was very frightened about it.
17  I later learned that Dr. Mann and Dr. Brown were
18  also contacted.
19       And, frankly, I don't think they cared
20  one way or the other, but, you know, I am very
21  protective of Dr. Hur, and I don't want to put him
22  in a position that would make him uncomfortable.
23       Q.   Did you refer Dr. Hur to Shook Hardy?
24       A.   I don't believe so. I believe they had

702

1   contact directly.
2        MR. LONDON:  What's the basis of that?
3   BY MR. ALTMAN:
4        Q.   How do you know that -- that's a good
5   question.
6        What is the basis of that belief?
7        A.   Because Kwan told me that he had talked
8   with Lori, and you know, I don't -- I don't recall
9   saying, Kwan, you need to call Lori or giving him
10  her number or anything like that. I think she was
11  in contact with him directly when she knew that the
12  subpoena had been served.
13       Q.   Okay.  You understand that an -- do you
14  understand that an objection was filed by Pfizer to
15  the depositions being taken of Dr. Hur, Mann, and
16  Brown?
17       A.   I do.
18       Q.   Okay.  And you are aware that your
19  affidavit you wrote here was used in support of
20  their objection to those depositions, correct?
21       MS. McGRODER:  If you know.
22  BY THE WITNESS:
23       A.   That I don't know.
24

703

1   BY MR. ALTMAN:
2        Q.   Do you know why you wrote this
3   declaration?
4        A.   Yes, this was used to indicate that the
5   buck stops with me and that I take responsibility
6   for this work and this is my work and I directed
7   this work and am the primary author of this paper
8   and there's no information that can or will be
9   obtained from my co-authors that I cannot provide.
10       Q.   But you don't know -- I think I asked you
11  this.  You don't know whether Dr. Hur has any work
12  files that he worked on that you don't have,
13  correct?
14       MS. McGRODER:  Objection, argumentative and
15  asked and answered.
16  BY THE WITNESS:
17       A.   Everything that Dr. Hur worked on with
18  the possible exception of the SAS file that was not
19  included here assuming there was such a file was
20  provided to you.
21  BY MR. ALTMAN:
22       Q.   You are aware that in SAS you can create
23  a project, correct?
24       A.   That's correct.

704

1  Q. And that project can contain all the
2  various outputs that are generated, correct?
3  A. That's correct.
4  Q. Was that SAS project provided to us?
5  A. My understanding of what was required was
6  the underlying data and programs that were used to
7  produce the results that were described in my paper,
8  and that's exactly what I provided to you.
9  Q. I will direct you back to the request
10  point 3 on the second page.
11  MS. McGRODER: This is exactly what we gave
12  him.
13  BY MR. ALTMAN:
14  Q. That says "all documents and underlying
15  data."
16  HTML documents are created as part of the
17  SAS run, correct?
18  A. They are not necessarily saved as a part
19  of that run. You have to rerun it, and what I gave
20  you was the -- was the SAS code and the underlying
21  SAS data files that all you had to do was stick in
22  SAS and run, and you would get the exact same output
23  that we got. If you had contacted, Lori, and -- I'm
24  sorry?

705

1  MR. LONDON: Dr. Hur.
2  BY THE WITNESS:
3  A. If you had contacted Lori, and she had
4  asked me you know what, you know, they don't have
5  SAS, and they don't want to go out and pay the money
6  to buy SAS, can you give me the outputs, I would
7  have gladly given you the outputs. I wasn't holding
8  them back for any particular reason.
9  BY MR. ALTMAN:
10  Q. I'm not suggesting that you were, but the
11  fact is those outputs may exist. He may have saved
12  them when he ran them and saved the project which
13  you can do which will save your HTML outputs,
14  correct? You can do that.
15  MS. McGRODER: Are you asking him whether he
16  knows that is a fact or not?
17  BY MR. ALTMAN:
18  Q. Yeah, I'm asking him do you know?
19  A. I do know that it's not a fact because
20  every time that, you know, we have gone back to a
21  particular analysis, he pulls up the SAS code and
22  reruns it, and I will go back to the same thing ten
23  minutes later, and he will rerun it again. So he
24  doesn't keep those.

706

1  Q. You don't know that for sure?
2  MS. McGRODER: Well, objection, argumentative.
3  BY THE WITNESS:
4  A. You know, I've just -- I've just
5  testified to that effect.
6  BY MR. ALTMAN:
7  Q. Okay. That's fine.
8  When did you begin doing the sensitivity
9  analyses?
10  A. I started on several of those after the
11  paper had been submitted.
12  Q. So that was after September 2008?
13  A. Yes, I don't remember the exact date of
14  my lecture at Harvard, but, you know, I was invited
15  to give the -- once a year the departments of
16  statistics and biostatistics at Harvard have an
17  invited lecture. They don't like each other very
18  much, and so they only get together once a year, and
19  I was the -- the invited lecturer for this year, and
20  they asked me to talk about some of my work and the
21  statistical issues underlying pharmacoepidemiology
22  and drug safety.
23  And, you know, I presented the work on --
24  you know, starting from the early work on

707

1  antidepressant and suicide in children and then
2  adults and the analysis of spontaneous reports and
3  ecological data and meta-analysis issues related to
4  randomized clinical trials, and then I also included
5  some of the more recent work on antiepileptic drugs
6  that, you know, were -- were reported in this -- in
7  this draft paper that's been submitted.
8  And, you know, I got some wonderful
9  comments back from some of the great statisticians
10  that, you know, have been my heroes for a long, long
11  time, and, you know, really good comments, and I
12  have been thinking more and more about those, and
13  those sensitivity analysis at least in part are
14  motivated by those conversations.
15  Q. Do you have any idea when you went to
16  Harvard?
17  A. I think it was sometime in October.
18  MR. LONDON: Did you say October?
19  THE WITNESS: October, yeah.
20  BY MR. ALTMAN:
21  Q. And you -- when you came back, you
22  started doing some of those things?
23  A. That's correct.
24  Q. So as of the letter of November 12th, you

708

1   had some of these sensitivity analysis, correct?
2       A.   Probably -- you know, I don't know the
3   exact dates. I don't know if a letter of November
4   12 or when they were actually finished, but, you
5   know, this is -- this is in an area that's, you
6   know, close to the center of my current research,
7   and it's not motivated by this -- by this
8   litigation.
9           It's motivated by trying to develop
10  better tools for drug surveillance and safety, and I
11  will continue to think about it after this case is
12  over, and in some ways I'm thankful to this case
13  because it has given me some practical experience
14  with this and an opportunity to look at other kinds
15  of datasets.
16      Q.   Had you ever seen Exhibit 2 before? And
17  when I say "before," before this deposition started
18  yesterday.
19      A.   I can't answer that yes or no. It
20  doesn't ring a bell. You know, I may have seen it,
21  but it doesn't ring a bell.
22      Q.   Do you see at the bottom in your
23  declaration on page 2: "I have also produced all
24  materials requested by plaintiffs in their letter of

709

1   November 12, 2008."
2           If you hadn't seen the letter, how could
3   you make that statement?
4       A.   Well, I just said --
5       MS. McGRODER: Objection.
6   BY THE WITNESS:
7       A.   I just said that I don't know that -- I
8   don't remember did I see this letter or not. You
9   know, I know what was asked of me by counsel to
10  produce for you, and I tried to do that in the best
11  faith possible. And these issues -- I may have had
12  the letter, and we went over it point by point or
13  maybe Lori read the letter to me over the telephone
14  and said, you know, these are the things that they
15  are looking for. Can you provide these. And I
16  said, yeah, the easiest way for me to provide it is
17  why don't I just give them the entire PharMetrics
18  database as I received it and give them all the
19  programs that I used to analyze it and, you know,
20  what could be better.
21          And she said, yeah, that should work, and
22  I remember her telling me, you know, I'm -- I'm very
23  big on -- I don't know if you call it -- what the
24  right term is discovery, whatever. You know,

710

1   whatever it is you did, just give it to them.
2       Q.   Did you -- then I think -- did you review
3   this letter in writing -- when you wrote your
4   declaration here on January 22, 2009 just about 12
5   days ago?
6       A.   I have already told you I don't remember
7   writing -- reading this letter, you know, in
8   particular or -- and I also told you that I, you
9   know, edited this. I didn't write the whole thing.
10      Q.   You understand that the judge, in fact,
11  granted the defendants' motion to quash the
12  depositions of your three co-authors, correct? Are
13  you aware of that?
14      MS. McGRODER: Objection, asked and answered.
15  And you know what, I'm not going to allow him to
16  ask -- to ask --
17      MR. ALTMAN: I'm asking did he know.
18      MS. McGRODER: But you just asked him that, and
19  he said, yes, he did know.
20      MR. ALTMAN: Did he know that the judge granted
21  the motion?
22      MS. McGRODER: I don't know about that, but
23  this is all legal argument, Keith.
24      MR. ALTMAN: No, it's not legal argument, Lori.

711

1       MS. McGRODER: If you want to -- you know what
2   discovery you want. You've asked him all the
3   questions about the discovery. Asking him about the
4   Court's ruling on a motion is irrelevant. It's
5   improper.
6       MR. ALTMAN: Lori, thank you.
7   BY MR. ALTMAN:
8       Q.   Were you aware that the judge granted the
9   motion quashing the depositions?
10      A.   Yes, I was told that.
11      Q.   Okay. And were you aware that that was
12  done in part based upon your declaration?
13      A.   I hope so.
14      MR. ALTMAN: Let's mark the next exhibit.
15          (WHEREUPON, a certain document was
16          marked Gibbons Deposition Exhibit
17          No. 36, for identification, as of
18          2/4/09.)
19  BY MR. ALTMAN:
20      Q.   Dr. Gibbons, I have handed you what's
21  been marked as Exhibit 36. At the top it's titled
22  "Computer Retrieval of Information on Scientific
23  Projects," CRISP.
24          Have you ever heard of this system

735

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          DISTRICT OF MASSACHUSETTS
 3   IN RE; NEURONTIN            )
 4   MARKETING SALES PRACTICES      )
 5   & PRODUCT LIABILITY          )
 6   LITIGATION,             )
 7                    ) MDL DOCKET
 8   BULGER vs. PFIZER, et al.,     ) No. 1629
 9                    ) MASTER FILE
10   SMITH vs. PFIZER, et al.,     ) No. 04-10981
11   05-CV-11515-PBS           )
12      SUPERIOR COURT OF THE STATE OF CALIFORNIA
13              CITY OF LAKE
14   NICOLETTE CRONE, et al.,      )
15        Plaintiffs,    )
16        vs.          ) CV 400432
17   PFIZER, INC., et al.,       )
18        Defendants.   )
19      3/5/09   Job No.: 191803
20          9:09 a.m.
21        The videotaped deposition of ROBERT D.
22   GIBBONS, Ph.D., Volume III resumed pursuant to
23   adjournment at Suite 2800, 333 West Wacker Drive,
24   Chicago, Illinois.
```

737

```
 1   PRESENT:  (Continued)
 2        SHOOK, HARDY & BACON, L.L.P.,
 3        (2555 Grand Boulevard,
 4        Kansas City, Missouri 6108-2613,
 5        816-474-6550), by:
 6        MS. LORI CONNORS McGRODER,
 7        lmcgroder@shb.com,
 8          appeared on behalf of the Defendants;
 9
10        LAW OFFICES OF STEVEN D. HILLYARD, PC,
11        (345 California Street, Suite 1770,
12        San Francisco, California 94104,
13        415-334-6880), by:
14        MS. ELANA GOLD,
15          appeared telephonically on behalf of
16          Defendant Raymond D. Jennings, M.D.
17
18   VIDEOTAPED BY:
19        MR. NICK PAGE, Veritext Chicago
20          Reporting Company.
21
22
23   REPORTED BY:  ANDREA L. CARTER,
24          Illinois CSR No. 84-3722.
```

736

```
 1   PRESENT:
 2        LAW OFFICES OF JACK LONDON,
 3        (3701 Bee Cave, Suite 200,
 4        Austin, Texas 78746,
 5        512-478-5858), by:
 6        MR. JACK LONDON,
 7        jlondon@texas.net,
 8          -and-
 9        FINKELSTEIN & PARTNERS, LLP,
10        (463 Robinson Avenue,
11        Newburgh, New York 12550,
12        800-634-1212), by:
13        MR. KEITH L. ALTMAN,
14        kaltman@lawampmmt.com,
15          -and-
16        THE LANIER LAW FIRM,
17        (6810 FM 1960 West,
18        Houston, Texas 77069,
19        713-659-5200), by:
20        MR. KENNETH S. SOH,
21        kss@lanierlawfirm.com,
22          appeared on behalf of the Plaintiffs;
23
24
```

738

```
 1        THE VIDEOGRAPHER:  My name is Nick Page in
 2   association with Veritext National Court
 3   Reporting Services.  The date today is March 5,
 4   2009, and the time is 9:09 a.m.
 5        This deposition is being held in the
 6   offices of Mandell Menkes, LLC, located at 333
 7   West Wacker Drive, Chicago, Illinois.  The
 8   caption of the case is In Re:  Neurontin
 9   Marketing and Sales Practices and Product
10   Liability Litigation, Bulger versus Pfizer, et
11   al, Smith versus Pfizer, et al., O5-CV-11515-PBS,
12   MDL Docket No. 1629, Master File No. 04-10981,
13   and in the Superior Court of the State of
14   California, City of Lake, Nicolette Crone, et
15   al., plaintiffs versus Pfizer Incorporated, et
16   al, defendants, No. CV 400432.
17        The name of the witness is Robert
18   Gibbons.  This is Volume III.  At this time will
19   the attorneys please identify themselves and the
20   parties they represent.
21        MR. ALTMAN:  Keith Altman, Finkelstein &
22   Partners.  I'll be asking questions on behalf of
23   the Crone plaintiffs.
24        MR. LONDON:  Jack London, I represent Bulger
```

743

1    Q.   And is all of that 10,100 for work in
2    this?
3    A.   It's -- probably the majority of it is
4    for work in this.  There may have been some other
5    things.  Again, you know, I asked him how much
6    time he spent, and this was not the only project
7    that he worked on last year, but I think it is
8    safe to assume that the majority of that work was
9    related to this project.
10    Q.   What is his hourly rate that he bills
11    you at?
12    A.   It is $100 an hour.
13    Q.   Okay.  And did you pay him by check or
14    by cash?
15    A.   Check.
16    Q.   Okay.  And he never provided you any
17    invoices for the work that he did?
18    A.   No.
19    Q.   So I think with what you are saying --
20    do you have an estimate of what percentage of the
21    10,000 was for work on this case?
22    A.   My best guess would be, you know, 80
23    percent or more.
24    Q.   So with what you are saying, he

744

1    probably told you then if the rate is $100 an
2    hour, about 40 hours, and you doubled that to
3    about 80 -- about -- about 80 hours?
4    A.   He usually undercuts himself.  You
5    know, to the extent, I don't know if it was
6    doubled or whatever, you know.  That was the
7    amount that I paid him last year.
8    Q.   So is it reasonable to assume that he
9    did 40 to 50 -- he told you 40 to 50 hours worth
10    of work?
11    A.   I think it would probably be, you
12    know -- a lot of times he will just tell me I
13    don't know exactly, and I will try and get a
14    sense of it, and -- and then write him a check
15    accordingly.  So I can't say that he told me 40
16    or 50 hours.
17    You know, I would just assume that,
18    you know, that a minimum of $8,000 of the money
19    that I paid him was related to his direct work on
20    the -- on either reviewing data or the gabapentin
21    cohort.  He spent a huge amount of time
22    working on the bipolar cohort in preparation for
23    the manuscript which I didn't pay him
24    additionally in any amount because that was

745

1    covered by the grants.
2    Q.   Why did you pay him for the work on
3    the gabapentin analysis?
4    A.   Because that was specifically for this
5    court case, and it would be inappropriate to pay
6    him out of federal grants for something that was
7    done as a -- as a consultant.  So I wanted to
8    make sure that any work that he did that was
9    related to a consulting project, which is
10    perfectly fine with the university, was paid for
11    separately.
12    Q.   So he knew that you were working on
13    this court case when he did that work for you,
14    correct?
15    A.   He knew that this was related to a
16    consulting project and, you know, he doesn't -- I
17    am not sure that he knew anything about this
18    court case, but he knew that this was a
19    consulting project just like he knew that, you
20    know, other projects that we have done have been
21    consulting projects and, you know, I will just
22    indicate to him this is a project for the
23    university.  This is a consulting project but
24    wouldn't necessarily go into the details of that.

746

1    Q.   Did he know that you were serving as
2    an expert witness in a litigation related to
3    Neurontin?
4    A.   I don't know.  I know he knows it now,
5    but I don't know at that time if he knew it.  In
6    fact, I don't think he did.
7    Q.   Okay.  Let's mark the next exhibit.
8    (WHEREUPON, a certain document
9    was marked Gibbons Deposition
10    Exhibit No. 41, for
11    identification, as of 3/5/09.)
12    BY MR. ALTMAN:
13    Q.   I am also going to hand to you,
14    Dr. Gibbons -- sorry -- what's been previously
15    marked as Exhibit 30.  I'm sorry.  It's the wrong
16    one.
17    What's been previously marked as
18    Exhibit 29.
19    (WHEREUPON, the document was
20    tendered to the witness.)
21    MS. McGRODER:  Can we go off the record for
22    one second?
23    MR. ALTMAN:  Sure.
24

755

1    Q.   And if group3 was equal to 311, that
2  would be true, right?
3    A.   That would be --
4    MS. McGRODER:  Object to form.  Go ahead.
5  BY THE WITNESS:
6    A.   That statement would be -- would be
7  satisfied.  That would be true, yes.
8  BY MR. ALTMAN:
9    Q.   Okay.  And so then we would execute
10  the code that's in there, correct?
11    A.   Yes.
12    Q.   Okay.  And the first line is ind
13  equals PSYCD, correct?
14    A.   That's correct.
15    Q.   So what you are doing is you're
16  setting everything equal to PSYCD within that
17  range of numbers 290 to 316, correct?
18    A.   Yes.
19    Q.   And the next line what it's actually
20  doing is changing some of them back to something
21  else, correct?
22    A.   That's correct.
23    Q.   And there are several different codes
24  that are being set to BIPLD which is bipolar

756

1  disorder, correct?
2    A.   Correct.
3    Q.   None of those -- none of those codes
4  there are 311, correct, on that line?
5    A.   That's correct.
6    Q.   Okay.  And the next line you see else
7  if group4 and some other numbers.  Then set it
8  equal to MDD which is major depressive disorder,
9  correct?
10    A.   That's correct.
11    Q.   And none of those are 311, correct?
12    A.   That's correct.
13    Q.   Okay.  And then it says else if it's
14  between a couple of numbers, 2950 and 2959, and
15  then set it equal to SCHIZ which I imagine is
16  schizophrenia, correct?
17    A.   That's correct.
18    Q.   Okay.  So at this point anything that
19  was 311 would have been set to PSYCD, correct?
20    A.   That's correct.
21    Q.   Okay.  And then we end, and then we go
22  to the next line that says else if group3 in 311,
23  then ind equals MDD, correct?
24    Did I read that line correct?

757

1    A.   That's correct.
2    Q.   Now, if group3 had been 311, then it's
3  between 290 and 316, and that would evaluate to
4  true, correct?
5    A.   That's correct.
6    Q.   Then when it gets to the else if
7  group3 equals 311, it's never going to evaluate
8  that code, is it, if it's 311?
9    MS. McGRODER:  Object to form.
10  BY THE WITNESS:
11    A.   I'm not sure whether that's correct.
12  I would have to go back and look at the syntax
13  for how SAS evaluates these things and run some
14  diagnostics to know whether that was true and
15  meet with Dr. Hur to go over that.
16  BY MR. ALTMAN:
17    Q.   Well, Dr. Gibbons you have accepted
18  responsibility for that.
19    Is that true?
20    A.   That's correct.
21    Q.   Okay.  This is basic if then elses.
22  That's basic programming logic, correct?
23    A.   That's correct, but we will have to
24  see how this is actually done.  Let me take a

758

1  look at this.
2    Q.   Well, I represent to you, Dr. Gibbons,
3  that that code never gets executed because since
4  the first part of that is true, between 290 and
5  316, then if it's 311, that else if never gets
6  run.
7    MS. McGRODER:  Well, object to form and
8  foundation --
9  BY THE WITNESS:
10    A.   Again, I'm not sure that --
11    MS. McGRODER:  Wait, let me object.  Assumes
12  facts not in evidence, improper hypothetical.  Go
13  ahead.
14  BY THE WITNESS:
15    A.   With the information that I have in
16  front of me, I cannot answer that question for
17  you.
18  BY MR. ALTMAN:
19    Q.   You can't look at this program code
20  there and tell that?
21    A.   I have answered that question.
22    Q.   Were any -- were any of the
23  diagnostic -- well, go back to Exhibit 41 for a
24  second, and I'd like you to go to 311, which is

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

759

1   probably on about the fourth page.
2        Could you read how many people -- how
3   many records there are with 311 as a diagnostic
4   code?
5        MS. McGRODER: Objection to foundation for
6   use of this document.
7   BY THE WITNESS:
8        A.   I have what you have listed here as
9   24,297.
10  BY MR. ALTMAN:
11       Q.   Okay.  And you could verify that once
12  again any time you wanted to, correct?
13       A.   Yes.
14       MS. McGRODER:  Well, object to form and
15  foundation.
16  BY MR. ALTMAN:
17       Q.   Dr. Gibbons, if you represented to --
18  that you accepted responsibility for the programs
19  and the data and you represented to the court
20  that you had all the knowledge necessary to
21  discuss anything about the programs and the data
22  and that we didn't need to talk to Dr. Hur or
23  anybody else, how is it that you can sit here and
24  say you can't tell whether the program is correct

760

1   or not?
2        MS. McGRODER:  Object to form.
3   BY THE WITNESS:
4        A.   I would need to go back to the
5   program, go back to the SAS manual, and determine
6   whether or not the else here -- this else if is
7   for the original if or for the entire clause.
8   BY MR. ALTMAN:
9        Q.   Was 311 -- if the code was 311, was
10  that set to MDD in this program?
11       A.   Again, I would have to go back to
12  this.  This is not how I would do this in
13  FORTRAN, and so I would have to go back and
14  verify that this was done appropriately, but this
15  syntax would be specific to SAS.
16       So I would have to verify that.  As I
17  have told you before, I'm not an expert in SAS.
18  This would not even -- this if then else
19  statement would not even execute in FORTRAN which
20  is the code that I use to verify this.  So I
21  would have to go back and verify that.
22       Q.   If that's true, then the number of
23  patients that you have assigned to the MDD group
24  and the other psychiatric indications group would

761

1   be different, wouldn't they?
2        MS. McGRODER:  Object to foundation.
3   BY THE WITNESS:
4        A.   If what's true?
5   BY MR. ALTMAN:
6        Q.   If you did not -- if it turns out that
7   for code 311 those people were not set to MDD
8   because this line didn't execute and were left as
9   other psychiatric disorder, then Table 1 in your
10  expert report would have an incorrect number of
11  patients for the MDD group and for the
12  psychiatric disorder group, correct?
13       MS. McGRODER:  Object to form and
14  foundation, assumes facts not in evidence.
15  BY THE WITNESS:
16       A.   If I'm understanding your question
17  correctly, if there was an error in the code that
18  confused major depressive disorder patients with
19  general psychiatric or other psychiatric disorder
20  patients, then that particular part of the
21  analysis of the gabapentin with respect to the
22  psychiatric indication or the MDD indication
23  would change if that error -- assuming such an
24  error has been committed, then those number would

762

1   change, of course.
2   BY MR. ALTMAN:
3        Q.   But in Table 1 in your expert report,
4   you also calculate percentages for concomitant
5   conditions.  So it would be a little more than
6   just simply changing the gab -- the MDD line and
7   the psychiatric disorder line since you
8   calculated how many percentages -- you know, what
9   percentage of the people had various different
10  conditions, correct?
11       MS. McGRODER:  Object to form and
12  foundation, assumes facts not in evidence,
13  improper hypothetical.
14  BY THE WITNESS:
15       A.   Again, if -- if what you are asking is
16  if there's an error here with respect to what is
17  designated as MDD versus what is designated as
18  other psychiatric disorders, then any entry
19  within Table 1 that referred to MDD or
20  psychiatric disorders would be incorrect to the
21  extent that this, you know, was actually an error
22  that was made.
23       It certainly wouldn't change the
24  conclusions of the study since, you know, the

783

1  out would be -- this is a listing of what's on
2  the disk.
3  BY MR. ALTMAN:
4       Q.   Does this look to be the files that
5  are on the disk that you provided to counsel?
6       A.   From my memory, yes.
7       Q.   Okay.  When did you do the FORTRAN
8  analysis -- strike that.
9            When did you do the -- get the extract
10  from Dr. Hur so that you could perform your
11  FORTRAN analysis?
12       A.   I don't remember the date.
13       Q.   Approximately?
14  MS. McGRODER:  Object to form.
15  BY THE WITNESS:
16       A.   I don't remember.
17  BY MR. ALTMAN:
18       Q.   Was it before New Years or after New
19  Years?
20       A.   I don't remember.
21       Q.   Did you do it before you submitted the
22  manuscript -- strike that.
23            One of the FORTRAN analysis you did
24  was based upon the bipolar data, correct?

784

1       A.   That's correct.
2       Q.   And the bipolar data is the basis of
3  the manuscript, correct?
4       A.   That's correct.
5       Q.   Did you do that verification with
6  FORTRAN before you submitted the manuscript or
7  after the manuscript?
8       A.   I don't recall.  If I -- I mean, I
9  would just -- I would be guessing.
10       Q.   That's a six-month span.  You don't
11  have any date by which you could say you know you
12  definitely did it before that date?
13  MS. McGRODER:  Object to form,
14  argumentative.  He has answered that question
15  four times now.
16  BY THE WITNESS:
17       A.   I mean, I'm looking at the number --
18  the data on the text files which would have been
19  the data file that, you know, I had received from
20  Dr. Hur, and those dates are 1/25/2009 and
21  1/28/2009, and if those were the generation dates
22  of those files, then my FORTRAN code would have
23  been done after the receipt of those.
24            I just don't know sitting here right

785

1  now with you how I could verify that that, in
2  fact, was the generation date and not maybe, you
3  know, I had saved it to another media kind of
4  date.  So that's -- you know, so that's why -- I
5  don't -- I don't remember off the top of my head.
6  BY MR. ALTMAN:
7       Q.   The dates of your FORTRAN programs are
8  dated on February the 6th of 2009, correct?
9       A.   Well, they are dated that here, but
10  again, you know, in creating these -- in creating
11  the files to provide to you, I may have resaved
12  them in a way that gave it the date of when I,
13  you know, gave them to you.
14            All I am saying is -- and I'm not
15  trying to be difficult.  All I'm saying is is I
16  can't verify sitting here right now that the date
17  that I created my FORTRAN files was February 6,
18  2009, and that the date that Dr. Hur created the
19  text files was 1/25/2009 and 1/28/2009.  Are
20  these correct?  Maybe they are.  I don't know.  I
21  just can't answer that, you know, with certainty
22  sitting here right now.
23       Q.   Well, 2/6/2009 was after your
24  deposition in February, correct?

786

1       A.   You will have to remind me the date of
2  the deposition.
3       Q.   I believe it was the 3rd and the 4th
4  of February.
5       A.   Okay.  So I had done these analyses
6  prior to the deposition because I reported to you
7  at the deposition that I had done these analyses.
8  So it looks like the date -- these time stamps
9  reflect the time that I provided this disk to you
10  and not when I actually did the work, and I
11  cannot remember specifically when I went back and
12  did that work.
13       Q.   And you can't even give me a general
14  idea at all?
15  MS. McGRODER:  Well, object to form, asked
16  and answered.
17  BY THE WITNESS:
18       A.   Yeah, no.
19  BY MR. ALTMAN:
20       Q.   Was -- did you have the FORTRAN data
21  files prior to the 25th of January 2009?
22       A.   I've told you in two or three
23  different ways I just don't remember the date or
24  even close to the date when I did that work.  I

791

1    A.   There is.

2    Q.   You didn't happen to bring a copy of

3    that with you, did you?

4    A.   I sent it to counsel.

5    Q.   Were there any substantive changes

6    other than misspellings of words?

7    A.   There were some misspellings.  There

8    were some examples like accrued instead of two

9    words a crude.  That's what I remember offhand.

10       I mean, there weren't any major

11   changes that I think would substantively change

12   things, but I would have to go back over it.

13   Q.   Okay.  You have been handed Exhibits

14   45 and 46, correct?

15       Exhibit 45 is a couple of things that

16   that -- actually three things that went along

17   with your bipolar FORTRAN analysis, and I would

18   just like to make sure I have it right.

19       The first five or six pages or is it

20   nine pages is a FORTRAN program.  Does that

21   appear to be the FORTRAN program that you wrote

22   to process the bipolar data?

23   A.   You are referring to Exhibit 45?

24   Q.   45, yes, pages 1 through 9.

792

1    A.   Yes, it does.

2    Q.   Okay.  The next page after that is

3    just a single page.  It's an output file.

4        Does that appear to be the output file

5    that went along with the bipolar data at least in

6    form?  I understand without looking at the disk,

7    but is there anything that you see there that

8    says, God, that can't possibly be what I gave

9    you?

10   A.   This looks like the format of the file

11   that this program would have generated.

12   Q.   Okay.

13   MS. McGRODER:  Well, can I just ask you,

14   Keith, like with respect to the other exhibits,

15   is this something that you printed off the disk?

16   MR. ALTMAN:  Yes.

17   MS. McGRODER:  Okay.

18   MR. ALTMAN:  Yes.

19   BY MR. ALTMAN:

20   Q.   And then we have three pages because

21   obviously there would be thousands of pages if we

22   were to print them out.  This is just the first

23   three pages of the BP data file.

24       Does that look to generally be in the

793

1    format that the BP data file on the disk was?

2    A.   Yes, it does.

3    Q.   Okay.  Looking at the BP data file as

4    here -- as it is here, is that the same format as

5    the PharMetrics -- the original PharMetrics data

6    was?

7    A.   No, this is the abstracted data that

8    Dr. Hur provided for me to do this analysis.

9    Q.   And it appears that with respect to

10   the bipolar data here, he had already done the

11   classification of these records by the particular

12   drug involved; is that correct?

13   A.   That's correct.

14   Q.   Okay.  So this is not the original --

15   this is some number of steps away from the

16   PharMetrics database, correct?

17   A.   It's at least one step away from the

18   PharMetrics database because the -- the drug

19   names are provided here in these categorizations

20   that he would have had to have made from the

21   original files.

22   Q.   So if there was a mistake in Dr. Hur's

23   programs prior to the point that he made this

24   extraction, you wouldn't have any way to know

794

1    that, correct?

2    MS. McGRODER:  Object to form, foundation,

3    improper hypothetical.

4    BY MR. ALTMAN:

5    Q.   Simply based upon this data?

6    A.   Simply based upon this dataset.  You

7    know, if there were errors that he had made, you

8    know, I would have had a way of knowing it by

9    sitting side by side with him going over his SAS

10   programs if there was an error that had slipped

11   through that predated the generation of these

12   codes that are in this file, then I would not on

13   the basis of this file alone have a way of

14   knowing that.

15   Q.   And then I would like you to go to

16   Exhibit 46, and is Exhibit 46 essentially the

17   same information for the gabapentin cohort which

18   is your FORTRAN program and output file and then

19   a few pages out of the data file?

20   A.   Yes.

21   Q.   And the same point with the data file

22   over here.  If there was a problem with the

23   processing of the data prior to this point, this

24   data file does not allow you to check to see

795

1    whether there was an error just simply based upon
2    this data file, correct?
3        MS. McGRODER:  Object to form, foundation,
4    improper hypothetical.
5    BY THE WITNESS:
6        A.  If your question is did -- would I be
7    able to go back to the codes that generated say
8    the diagnosis of schizophrenia on the basis of
9    this dataset alone, the GABA.txt file, the answer
10   is no.
11   BY MR. ALTMAN:
12       Q.  Okay.  Now, one little problem that I
13   found in looking at your FORTRAN dataset is no
14   where in this dataset is the actual patient ID
15   from the PharMetrics data, is it?
16       MS. McGRODER:  Object to form.
17   BY THE WITNESS:
18       A.  I have used the sequential number of
19   the patient ID.
20   BY MR. ALTMAN:
21       Q.  Was that sequential number generated
22   by -- strike that.
23           If you would sort the patient IDs
24   alphanumerically and then assign a sequential

796

1    number to each one of those patient IDs, would
2    that match up with your patient IDs that's here?
3        A.  From what I am looking at right here,
4    I don't have any way of knowing that.
5        Q.  Do you know how Dr. Hur generated
6    those patient ID numbers?
7        A.  Not at this moment sitting here
8    looking at this.
9        Q.  Okay.  Let's go back to exhibit -- the
10   one that had the bipolar ICD codes.  I don't know
11   if that was 40.
12       MS. McGRODER:  42.
13   BY MR. ALTMAN:
14       Q.  42.  Okay.  Now, because the patient
15   ID was deleted -- deleted is not the right
16   term -- but it was changed to a sequential number
17   as opposed to the patient ID, it made it a little
18   bit difficult to match up the -- your FORTRAN
19   data that you used with the PharMetrics data, but
20   I will represent to you that that is how the
21   patient IDs were generated.  That it is
22   sequential and alphanumerical order, and we are
23   going to look at one particular patient, and to
24   satisfy yourself that that is, in fact, true that

797

1    I could match up the PharMetrics with your
2    FORTRAN data, I would like you to take a look
3    at -- go to the next page.
4           That is for a particular patient in
5    your FORTRAN dataset.  That is a particular
6    patient ID number 107869, and obviously we are
7    not going to sit and look at the disk right now.
8    I will represent to you that if you take your --
9    and this is out of the gabapentin set.  I will
10   represent to you if you go to the gabapentin set
11   and take a look at this patient, this is the
12   records that will go along with that.
13          Does the format appear to match the
14   format of your dataset?
15       MS. McGRODER:  Object to form and
16   foundation.
17   BY THE WITNESS:
18       A.  So you are representing that this is
19   based on the GABA dot -- this is -- this is a
20   particular record from the GABA dot text?
21   BY MR. ALTMAN:
22       Q.  A particular patient.
23       A.  A particular patient.
24       Q.  Yes.  Does that -- does the format of

798

1    this particular patient appear to be the same as
2    the GABA dot text file that you have in front of
3    you --
4        MS. McGRODER:  Object to form.
5    BY MR. ALTMAN:
6        Q.  -- after it had been loaded in -- I
7    mean, you obviously assigned field names to each
8    one of these records.
9           Does this appear to match with what
10   you had done?
11       A.  It would be in the same format as the
12   GABA dot text file.
13       Q.  And if you wanted to verify that this
14   was, in fact, the data for that particular
15   patient, that wouldn't be particularly difficult
16   for you to do, correct?
17       A.  No.
18       Q.  Okay.
19       MS. McGRODER:  Well, if he has the disk, and
20   he does it or --
21       MR. ALTMAN:  He has got the FORTRAN data.
22   I'm saying if he wanted to sit and take this
23   data -- I mean, he can't do it right here right
24   this second.  Although, he could --

811

1  that's a -- that's a question mark about those
2  data.
3        It's the nature of dealing with
4  medical claims data that there are going to be
5  uncertainties associated with them.  There are
6  going to be some inconsistencies.  One of the
7  advantages of having such large numbers is that
8  you -- most of those kinds of anomalies tend to
9  wash out.  They don't have an undue influence on
10  the overall results of the analysis.  So that's
11  one of the reasons we do sensitivity analysis.
12        Q.   What validity checks did you actually
13  run off of the PharMetrics data?
14        A.   Sitting here right now, I can't
15  remember.
16        Q.   Did you do the validity checks of the
17  data?
18        A.   I worked with Dr. Hur.  We went
19  through and screened the data, made sure that we
20  were getting consistent results.  I don't
21  remember all of those analyses.  Those were done
22  some time ago.
23        Q.   Was any records kept of those
24  analyses?

812

1        A.   Not to my knowledge.
2        Q.   Would Dr. Hur be in a better position
3  to talk about what kind of validity checks were
4  run upon the data?
5        A.   I don't think so.
6        Q.   Did Dr. Hur run any of these validity
7  checks on his own not sitting with you?
8        A.   I don't recall at this moment whether
9  everything was done together, whether or not we
10  sent out a list of things to -- to evaluate or
11  not.
12        Q.   If you had sent out a list, how would
13  you have done it by e-mail?
14        A.   No, no, just sitting and talking
15  together.  I promise you that, as you look
16  through these datasets, you will find anomalies.
17  I can go back, and I will find additional
18  anomalies.  There -- you know, these are -- we
19  are talking about millions and millions of
20  records.
21        Q.   Dr. Gibbons, I am going to hand you.
22
23
24

813

1        (WHEREUPON, a certain document
2        was marked Gibbons Deposition
3        Exhibit No. 47, for
4        identification, as of 3/5/09.)
5  BY MR. ALTMAN:
6        Q.   Dr. Gibbons, I am going to hand you
7  what's been marked as Exhibit 47 which is -- a
8  few weeks ago Lori McGroder sent us an e-mail
9  with an updated version of your November 5th,
10  2008 expert report at which you made two
11  corrections based upon our last deposition.
12        Does this appear to be that?  I think
13  one of them was you changed the other psychiatric
14  and antipsychotic number from to 81.6 to 16.2,
15  and you changed in Table 2 the all number from
16  1.22 to 1.23; is that correct?
17        A.   That's my memory, yes.
18        Q.   Okay.  Does this appear to be the
19  revised report?
20        A.   Yes, it does.
21        Q.   Okay.  Let's put that aside for a
22  second.
23        MS. McGRODER:  Oh, you did mark that?
24        MR. ALTMAN:  Yes.  It's 47.

814

1        MS. McGRODER:  Thank you.
2        MR. ALTMAN:  Mark the next exhibit.
3        (WHEREUPON, a certain document
4        was marked Gibbons Deposition
5        Exhibit No. 48, for
6        identification, as of 3/5/09.)
7  BY MR. ALTMAN:
8        Q.   Dr. Gibbons, the first two pages of
9  what I provided to you as Exhibit 48 --
10  Dr. Gibbons?
11        A.   Yes.
12        Q.   Do you have the --
13        A.   Oh, I am sorry.
14        Q.   That's okay.  The first page of
15  Exhibit 48 was provided on the FORTRAN disk was
16  listed as PGMS3 dot SAS which appeared to take
17  the bipolar -- take the bipolar data -- I'm
18  sorry -- take the gabapentin cohort data and kind
19  of generate the results for the last column of
20  Table 2 in your expert report that I just handed
21  to you; is that correct?
22        And what I have given you as the next
23  page is the output if you run that program.
24        A.   Okay.  I mean, I -- I have no reason

823

1 change your confidence interval, couldn't it?
2     MS. McGRODER:  Object to form, foundation,
3 improper hypothetical, calls for speculation, and
4 assumes facts not in evidence.
5 BY THE WITNESS:
6     A.  Again, if -- if, in fact, 29683 is not
7 an index of bipolar disorder and I called it an
8 index of bipolar disorder, then the data for that
9 subject would have been included in the data for
10 bipolar disorder, and to some extent, probably
11 proportional to the number of cases of 29683, it
12 would change the estimates associated with the
13 subanalysis that was done for bipolar disorder.
14 BY MR. ALTMAN:
15     Q.  And even -- and even changing one
16 patient potentially worse -- potentially could
17 change that confidence interval so that it is
18 over one and not .9953, correct?
19     MS. McGRODER:  Object to form, foundation,
20 improper hypothetical.
21 BY THE WITNESS:
22     A.  It could go either way.  It could make
23 it so that it's, you know, less.  It could make
24 it that it's more.  It's hard for me to imagine

824

1 in a sample of that size one patient's data
2 making much of a difference, but, again, as I
3 said before, it's proportional to the number of
4 those.
5 BY MR. ALTMAN:
6     Q.  But you don't know how many patients
7 there were with this problem, correct?
8     A.  I don't know that it is a problem, and
9 I don't know how many patients there were with a
10 code of 29683.  For me to determine if it was a
11 problem, I would have to go back to the folks at
12 PharMetrics and say why did you put that 29683 in
13 my nice database.
14     Q.  And once, again, you didn't look to
15 see how many invalid -- how many -- the number --
16 not necessarily how many of each, but the number
17 of different codes in the diagnosis data that
18 don't match up to an ICD code as provided by
19 PharMetrics, correct?
20     MS. McGRODER:  Well, object to form and
21 foundation and asked and answered four times.
22 BY MR. ALTMAN:
23     Q.  Do you have any intention of going
24 back and checking this issue out now that I have

825

1 brought it to your attention?
2     A.  Yes, I'd like to.
3     Q.  Okay.  Over the last several weeks, I
4 have been receiving a number of sensitivity
5 analyses from you which I assume -- well, from
6 Ms. McGroder which I'm assuming that you provided
7 to her; is that correct?
8     A.  I don't -- I don't brush my teeth in
9 the morning without sending you a file.
10     MS. McGRODER:  Pretty white.
11 BY MR. ALTMAN:
12     Q.  Did you work with Dr. Hur on any of
13 these sensitivity analyses?
14     A.  I did.
15     Q.  Did you work with Dr. Hur on both the
16 bipolar and the gabapentin sensitivity analyses?
17     A.  Yes.
18     Q.  Will you be paying Dr. Hur for his
19 work on the gabapentin sensitivity analyses?
20     A.  I plan to.
21     Q.  At your last deposition we discussed
22 bipolar sensitivity analyses, but we did not
23 discuss any gabapentin sensitivity analyses.
24     At the time of your last deposition,

826

1 had you done sensitivity analyses of the
2 gabapentin collection?
3     MS. McGRODER:  Well, object to form just to
4 the extent it misstates the record.
5     MR. ALTMAN:  Well, if I have misstated the
6 record, then please correct me.
7 BY THE WITNESS:
8     A.  I think --
9     MS. McGRODER:  Well, he would have to get
10 out the deposition and review it in total.  So I
11 objected just to the extent that it does.  You
12 can still ask the question, and he can still
13 answer it.
14     MR. ALTMAN:  No, that's fine.  Then let's
15 ask it a different way.
16 BY MR. ALTMAN:
17     Q.  You do recall that we discussed
18 sensitivity analyses you ran for the bipolar
19 cohort, correct?
20     A.  Yes.
21     Q.  Do you recall if we discussed any
22 sensitivity analyses you ran for the gabapentin
23 cohort?
24     A.  I think I in my deposition referred to

887

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   And the confidence intervals as shown

4    as .3278 which would round to .33, correct?

5    A.   That's correct.

6    Q.   And the upper would be 1.1990,

7    correct?

8    A.   Correct.

9    Q.   That would round to 1.20, correct?

10   A.   Correct.

11   Q.   So according to this analysis of just

12   the gabapentin data, this does not show

13   that gaba -- these are not statistically

14   significant results for gabapentin, correct?

15   A.   That's true, and that's reiterated

16   under the P values where the probability value

17   testing whether or not the regression weight is

18   one or the odds ratio -- the -- the regression

19   weight is -- the logarithm of the odds ratio is

20   equal to -- is equal to zero is .1581.  So that's

21   not statistically significant.

22        So we can't conclude that, you know,

23   gabapentin in this analysis -- the presence of

24   gabapentin is significantly decreasing the risk

888

1    of suicide attempts.  The purpose of the analysis

2    is to show if we were to -- you know, obviously

3    we are reducing the sample size by quite a bit by

4    just looking at gabapentin as opposed to looking

5    at all of the AEDs, and what we are seeing is, I

6    believe, that the risk ratio -- the estimated

7    odds ratio for the overall AED was .59, and

8    that's looking at all of the AEDs simultaneously,

9    and that was statistically significant.  And this

10   effect is quite similar to it, but it's not

11   statistically significant because of the lower

12   sample size.

13   MR. ALTMAN:  Let me take a break for a

14   minute.  Can we go off the record?

15   THE VIDEOGRAPHER:  Off the record at 1:26.

16        (WHEREUPON, a recess was had at

17        1:26 p.m. until 1:29 p.m.)

18   THE VIDEOGRAPHER:  We are back on the record

19   at 1:29.

20   BY MR. ALTMAN:

21   Q.   Dr. Gibbons, I forgot to ask you one

22   thing.

23        Before the lunch break, we were

24   talking about trying to locate the SAS programs

889

1    that extracted the data.  Did you have any luck?

2    A.   I put in a request to get them.  I'm

3    not sure that, you know, we will be able to get

4    them, but I'm waiting for a return phone call.  I

5    put my phone on -- on mute.  So as soon as I hear

6    back, I am expecting a call one way or the other.

7    Q.   Who did you call to ask them?

8    A.   Dr. Hur.

9    Q.   Okay.  Do you think he might not have

10   them at all or --

11   A.   Today he is at the VA, and the VA with

12   recent issues related to data security doesn't

13   necessarily allow you to plug an external data

14   storage device into their network.  So he would

15   have to be able to do it elsewhere.  So he is

16   investigating (No. 1) does he even have it around

17   with him, and (No. 2) can he plug it into a

18   computer where he can have access to send it to

19   me.  So if he doesn't have it, you know, or isn't

20   able to do that, surely, I'll be able to get it

21   tonight and forward it on.

22   Q.   Is all the work that was done with

23   these data analyses on an external drive or a

24   discrete external drive?

890

1    MS. McGRODER:  Object to form.  "These

2    analyses" you mean, the sensitivity analysis?

3    BY MR. ALTMAN:

4    Q.   All the work that's been done in this

5    case by Dr. Hur, does he keep that on a separate

6    external drive?

7    A.   Not to my knowledge.

8    Q.   Does he keep -- he keeps it on his

9    laptop, on the hard drive on the laptop?

10   A.   Some of it is at the computer at the

11   university.  Some of it is on an external drive

12   that he keeps, you know, those sort of things.

13   Some of it obviously is on my computer or on my

14   external drives.

15   Q.   So there may be some data on his

16   drives or his computer that is not on your

17   computer?

18   A.   There shouldn't be at this point.  I

19   don't think I have on my computer the SAS program

20   that you are looking for that generated the

21   monthly data file that I used in my analysis, and

22   I also want to double-check.  There may be -- I

23   may have taken that file and then modified that

24   file for the purpose of putting it into the

963

1    MR. ALTMAN:  I know, but if he make marks
2  off of --
3    MS. McGRODER:  Are you going to be able to
4  see it?
5    MR. LONDON:  No, I would rather -- I would
6  rather just --
7    MR. ALTMAN:  Okay.  That's fine.
8  BY MR. LONDON:
9    Q.  Maybe I have a different way to do
10  this.  If it goes to Mr. Hopper or Ms. McGroder,
11  is it this case, and if it goes to --
12    A.  I'm not positive.  I don't think
13  that -- I don't think that works.
14    Q.  All right.  That's fine.
15    A.  And I'm assuming when you say this
16  case, the work that I did right from the
17  beginning on the Daubert is part of this case?
18    Q.  That's correct, yes.
19    A.  So just an X through the ones that are
20  related to the other case or a star up here?
21    Q.  That would be fine.  Star means other
22  case, asterisk.
23    A.  (Indicating).
24    Q.  All right.  Now --

964

1    MR. ALTMAN:  One second, Jack.  Let me just
2  look at the exhibit for one second.
3    MR. LONDON:  Sure.
4  BY MR. LONDON:
5    Q.  This morning Mr. Altman asked you
6  about I believe it was the sum of approximately
7  $10,100 that you had paid to Dr. Hur, and you
8  estimated that, as I recall, at least $8,000 of
9  those dollars related to the work on the
10  gabapentin case.
11    Is that your memory of what you said?
12    A.  Yes.
13    Q.  80 percent at least.
14    A.  None of those amounts showed up in any
15  of the bills that I saw in Exhibit 25 -- 25 as
16  such?
17    A.  That's correct.
18    Q.  Were those amounts inside those bills?
19    A.  Yes.
20    Q.  Okay.  How could we look at the bills,
21  if we could, and tell on what dates and in what
22  amounts Dr. Hur did work on the gabapentin case?
23    A.  All I did was sort of when I, you
24  know, would pay him, I was paying him at 1/5th

965

1  the rate that I did.  So I would just take -- I
2  would just add into my own hourly rate 1/5th of
3  that amount what I did -- you know, what I paid
4  to Kwan to get essentially reimbursed for that,
5  but I didn't break it out as a separate line
6  item.
7    Q.  Do you believe that -- he was being
8  paid $100 an hour, and you were being paid $500
9  an hour?
10    A.  Correct.
11    Q.  Do you believe that all of his
12  inclusions in his bills were in five-hour
13  increments?
14    A.  Roughly.  I mean, you know, I don't --
15  I mean, I don't know if it worked out exactly
16  like that.
17    Q.  Well, I'm just looking for example --
18    A.  There won't be an example.  I mean,
19  there's nothing that says exactly.  I mean, I
20  just --
21    Q.  If you look at the bill for September
22  2 just as an example, it's a bill for 40 hours at
23  $500 an hour, $20,000.
24    If that were $20,100, we could

966

1  conclude that $100 of those dollars went to
2  Dr. Hur's time?
3    A.  Correct.
4    Q.  But without such an indication or a
5  breakout, is there just no way to know?
6    A.  No way to know.
7    Q.  Did Dr. Hur do anything more than just
8  tell you, oh, this many hours from time to time,
9  and then you would double that and include that
10  in the bill to Ms. McGroder?
11    A.  Well, I wouldn't double it in a bill
12  to Ms. McGroder.  He would -- I would write him
13  checks from time to time based on his level of
14  effort, and if I felt that he had put in more
15  effort than he was telling me, then I would write
16  the check accordingly, and as I would bill
17  Ms. McGroder, I would, you know, add in -- I
18  would increase my rate by an hour or two hours or
19  five hours or whatever it was to accommodate the
20  expenses.
21    Q.  Okay.  Okay.  Now, I want to start
22  with these bills and kind of work backwards, if
23  we can.
24    The last bill we have appears to be