# Exhibit A

```
 1        IN THE UNITED STATES DISTRICT COURT    DISTRICT OF MASSACHUSETT
 2   IN RE: NEURONTIN                )
 3   MARKETING SALES PRACTICES  ) & PRODUCTS LIABILITY    )
 4   LITIGATION                 )                    ) MDL DOCKET
 5   BULGER VS. PFIZER, et al.  ) No. 1629 07-11426-PBS              )
 6                              ) MASTER FILE SMITH VS. PFIZER, et al.  ) No. 04-1
 7   05-CV-11515-PBS            )
 8        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 9                    CITY OF LAKE
10   NICOLETTE CRONE,  et. al,  )                    )
11         Plaintiffs,          )                    )
12         versus               ) CV 400432                    )
13   PFIZER, INC., et al.,      )                    )
14         Defendants.          )
15   Job No.: 183059                    VOLUME I
16         The videotaped deposition of ROBERT D.
17   GIBBONS, Ph.D.., called by the Plaintiffs for
18   examination, pursuant to Notice, and pursuant to
19   the Rules of Civil Procedure for the United States
20   District Courts, taken before Sandra L. Rocca, CSR,
21   CRR and Notary Public in and for the County of
22   DuPage, and State of Illinois, at 506 West
23   Harrison, Chicago, Illinois, on the 3rd day of
24   February, 2009, at the hour of 9:09 a.m..
```

                                                  1

```
 1   APPEARANCES:
 2         MR. JACK LONDON
 3         3701 Bee Cave, Suite 200          Austin, TX  78746
 4         (512) 478-5858         jlondon@texas.net
 5             -and-
 6         FINKELSTEIN & PARTNERS
 7         By:  MR. KEITH L. ALTMAN        463 Robinson Avenue
 8         Newburgh, NY  12550       (516) 456-5885/Fax: (951) 303-1222
 9         kaltman@lawampmmt.com
10             -and-
11         THE LANIER LAW FIRM          By: MR. KENNETH S. SOH
12         6810 FM 1960 West         Houston, TX  77069
13         (713) 659-5200/Fax: (713) 659-2204       Kss@lanierlawfirm.com
14               appeared on behalf of
15               the Plaintiffs;
16         SHOOK, HARDY & BACON, L.L.P.
17         By: MS. LORI CONNORS McGRODER        2555 Grand Blvd.
18         Kansas City, MO  64108-2613      (816) 474-6550/Fax: (816) 421-5547
19         lmcgroder@shb.com
20               appeared on behalf of the          Defendants;
21   (continued)
22
23
24
```

                                                  2

```
 1   APPEARANCES: (Continued)
 2
 3         LAW OFFICES OF STEVEN D. HILLYARD, P.C.         By: MR. GER
 4         345 California Street, Suite 1770          San Francisco, CA
 5         (415) 334-6880
 6               appeared on behalf of Defendant          Dr. Jen
 7
 8         Also Present:
 9               James Pierdzioch, Videographer
```

                                                  3

```
 1              VIDEOGRAPHER:  My name is James
 2   Pierdzioch of Veritext.  The date today is
 3   February 3rd, 2009 and the time is 9:09 a.m.  This
 4   deposition is being held at the Holiday Inn located
 5   at 506 West Harrison Street in Chicago, Illinois.
 6   The captions for this case are In Re:  Neurontin
 7   Marketing Sales Properties and Products Liability
 8   Litigation in the United States District Court,
 9   District of Massachusetts and Nicolette Crone,
10   et al. versus Pfizer Incorporated, et al. in the
11   Superior Court of the State of California for the
12   County of Lake.
13              The name of the witness is Robert
14   Gibbons, Ph.D.  At this time the attorneys will
15   please identifies themselves for the record.
16              MR. LONDON:  I'm Jack London.  I
17   represent the multi-district litigation Plaintiffs,
18   product liability steering committee Plaintiffs.
19              MR. ALTMAN:  Keith Altman.  I'm here
20   representing Nicolette Crone and the Crone
21   Plaintiffs and I'll be asking questions on behalf
22   of Crone.
23              MR. SOH:  Ken Soh for the Plaintiffs.
24              MR. WINKLER:  Gerhard Winkler on behalf
```

                                                  4

1      MS. McGRODER: Same objection. Go ahead
2 and answer it, Dr. Gibbons.
3      THE WITNESS: Dr. Hur provided the
4 numbers that are in Table 1 based on analyzing the
5 PHARMetrics data in the way that I had instructed
6 him to.
7 BY MR. LONDON:
8   Q.   What did Dr. Hur do in Table 2?
9   A.   Table 2 provides output that was a part
10 of the analyses that Dr. Hur performed. This came
11 out of SAS outputs.
12   Q.   Are the numbers in Table 2, are those
13 simply SAS outputs?
14   A.   They are abstracted from the SAS outputs,
15 but all of these numbers can be found in the SAS
16 output files.
17   Q.   When you go back to Table 1, you said as
18 I understood it, that Dr. Hur provided the numbers
19 in Table 1 pursuant to the instructions you gave
20 him and then I lost your answer. The methodology
21 or the categories of information, what was it you
22 instructed Dr. Hur to look for to get these
23 numbers?
24   A.   To look at the number of attempts before

1 initiation of treatment, to look at the number of
2 person years to compute the rates per person year
3 for each one of the drug groups in terms of suicide
4 attempts, to do this using monotherapy conditions,
5 to then look at a pooled analysis of all 11 of the
6 AEDs or any of the 11 AEDs to restrict that
7 analysis then to those people who took one of the
8 11 AEDs only without any other concomitant
9 medication, to look at lithium monotherapy and to
10 look at the two no medication conditions, no
11 medication with respect to the 11 AEDs and/or
12 lithium and no medication with respect to any
13 central nervous system medication.
14   Q.   Do I understand you to mean that while he
15 extracted the numbers, it was you who came up with
16 the definitions for the categories that are the
17 caption of each of the columns?
18   A.   That's correct.
19   Q.   You came up with the definition that
20 would be used by Dr. Hur to come up with the number
21 at risk?
22   A.   That's correct.
23   Q.   And the same as numbers before, person
24 years and so on, each of those column captions?

1   A.   That's correct.
2   Q.   And he would take the instructions you
3 gave him and do whatever SAS computing was required
4 for him to extract that information?
5      MS.. McGRODER: Object to form.
6      THE WITNESS: He would perform those
7 analyses.
8 BY MR. LONDON:
9   Q.   Did you on your own perform any of the
10 analyses yourself either as a check on Dr. Hur or
11 as a two people working in parallel to see if he
12 replicated the results?
13   A.   Both of those seem to me to be the same
14 thing, yes.
15   Q.   All right. And you did?
16   A.   Yes.
17   Q.   And did you do all of those or just
18 selective ones?
19   A.   I did everything in Table 1.
20   Q.   To replicate what Dr. Hur had already
21 done in Table 1?
22   A.   To replicate that the summary statistics
23 that led to the statistical analyses were done
24 correctly.

1   Q.   Okay. Can I ask you the same question
2 about Table 2? Did he extract the data from the
3 SAS information based on the definitions or the
4 parameters that you gave him that are the captions
5 for each of those columns, the post drug versus no
6 drug, the pre-drug versus no drug and the post drug
7 versus pre-drug?
8   A.   That's correct.
9   Q.   In other words, you would define what
10 those parameters were, he would use those defined
11 parameters to do the SAS calculations?
12   A.   I'm not sure I understand what you mean
13 parameters.
14   Q.   Well, I assume post drug versus no drug,
15 no drug means no drug, but post drug means that you
16 would give him the date that he was to work with
17 and look for whatever drug administration's or
18 prescriptions occurred after that date and he would
19 follow that instruction to get the data in the
20 first column?
21   A.   No, that's not correct.
22   Q.   That's all right. Just please describe
23 for me what happened.
24   A.   Well, what's not correct about that is I

## Page 209

1  didn't give him a date. The date of drug
2  initiation of drug therapy will vary for each
3  subject who actually took one of these drugs and
4  took only one of these drugs. And so the
5  instruction I gave him was to do a statistical
6  comparison between the period following the
7  initiation of say, for example, in the first row
8  gabapentin monotherapy, monotherapy with respect to
9  the other 10 AEDs and lithium and compare that to
10 those people who didn't take any of the 11 AEDs or
11 lithium.
12     Q.  Okay. And he would take those directions
13 and extract the data from the SAS computer and
14 produce the numbers that are in Table 2?
15     A.  He wasn't extracting the data. He would
16 just -- he would develop and run the SAS code to
17 perform that analysis.
18     Q.  I want to go back and start asking the
19 same questions about Dr. Brown if I may. Who is
20 Dr. Brown?
21     A.  Hendricks Brown, he's a professor of
22 biostatistics at the University of South Florida
23 and also a visiting member of our Center For Health
24 Statistics.

## Page 210

1     Q.  Does he have a faculty position at your
2  institute?
3     A.  No. We have a grant which we're
4  co-principal investigators on and the grant is
5  administered through the University of Illinois and
6  the primary subcontract is to the University of
7  South Florida under the direction of Dr. Brown.
8     Q.  Is he a medical doctor?
9     A.  No.
10    Q.  What was his role in the project of the
11 paper?
12    A.  He helped in both the original design of
13 the methodological strategy for the analysis of the
14 data from the original VA study, helped in thinking
15 about the -- adopting that strategy to the
16 PHARMetrics data that as we've discussed had a
17 somewhat different form than the VA study, helped
18 in reviewing the results and writing up the paper.
19    Q.  Did he compose some of the text of the
20 paper as opposed to the tables?
21    A.  As I recall, I wrote the first draft of
22 the paper and then distributed it to all of my
23 coauthors who either verbally or, you know, with
24 edits sent back their comments and rewrites to the

## Page 211

1  text.
2     Q.  Did Dr. Brown write any of the paragraphs
3  or the pages -- I appreciate that he edited and
4  suggested, but in reading any of the paper, is
5  there something that we could identify with a pen
6  or a magic marker or page number and say Dr. Brown
7  wrote this?
8     A.  I don't remember offhand who, you know,
9  would be responsible for each particular sentence,
10 but I know that Hendricks did quite a bit of
11 writing and overview.
12    Q.  And what?
13    A.  Overview.
14    Q.  Overview?
15    A.  Of the paper. I mean, he contributed
16 significantly to the work.
17    Q.  Did his contributions have to do with the
18 statistical subjects or did they have anything to
19 do with pharmacy or did they have anything to do
20 with medicine?
21    A.  No.
22         MS. McGRODER:  Object to form.
23         THE WITNESS:  His contributions are
24 methodological contributions. And again, you know,

## Page 212

1  he was responsible in large part as one of the
2  original contributors to the general idea of how to
3  do this kind of work from the VA paper which, of
4  course, predated all of this.
5  BY MR. LONDON:
6     Q.  Okay. Could he have written this paper
7  without you?
8     A.  I think he probably could have.
9     Q.  And then I want to ask the same question
10 about -- is it Dr. Mann, what was Dr. Mann's
11 contribution?
12    A.  John Mann is a psychiatrist at Columbia
13 University who is head of the department of
14 neuroscience at Columbia University and one of the
15 leading experts in the field of suicide in the
16 world and he is our resident or non-resident
17 clinical expert.
18    Q.  What did he contribute to the paper?
19    A.  He helped with the review of the relevant
20 literature and the discussion of the results and
21 how they fit in with the rest of the literature. I
22 think he also suggested a couple of the comparisons
23 that ultimately ended up in the paper.
24    Q.  Can you recall what those were of the

2/4/2009 Gibbons, Robert V2

1   BY THE WITNESS:
2       A.   You know, I relied on the expertise of my
3   co-author Dr. Mann to review the drugs that were --
4   we defined as concomitant therapy, and in previous
5   work I have relied upon others like Rob Valuck who
6   is a pharmacist and pharmacoepidemiologist to make
7   sure that the list of drugs that we are using in our
8   analyses are the appropriate ones.
9   BY MR. ALTMAN:
10      Q.   Did you talk with Dr. Mann specific to
11  either the bipolar or the gabapentin study as to
12  what drugs you should purchase?
13      MS. McGRODER:  Object to form.
14  BY THE WITNESS:
15      A.   The --
16      MS. McGRODER:  What drug data you should
17  purchase?
18      MR. ALTMAN:  The drug data -- you know, what
19  drug data.  That's what we are talking --
20      MS. McGRODER:  It just sounded bad.
21  BY THE WITNESS:
22      A.   I spoke with him as we were developing
23  these lists for -- in connection with the bipolar
24  study.  I have had no discussion with Dr. Mann about

528

2/4/2009 Gibbons, Robert V2

1   the gabapentin study.
2   BY MR. ALTMAN:
3       Q.   But since you used the same -- since you
4   have used the same set of criteria for the
5   gabapentin study, then in effect he's influenced
6   both, correct?
7       MS. McGRODER:  Object to form.  Well, calls
8   for -- no, go ahead.
9   BY THE WITNESS:
10      A.   Much of the discussions of the lists of
11  drugs evolved out of our work with the Veterans
12  Administration database.  So while I think I may
13  have, you know, run these lists by John Mann, and,
14  you know, I don't, you know, specifically remember,
15  you know, the drugs have been reviewed by him at one
16  phase or another.
17  BY MR. ALTMAN:
18      Q.   We are going to spend a little time in
19  the SAS programs in a bit, but in the gabapentin
20  study, you classified the use of the drug by
21  indication, correct?
22      MS. McGRODER:  Object to form.
23  BY MR. ALTMAN:
24      Q.   In your gabapentin analysis in your

529

2/4/2009 Gibbons, Robert V2

1   expert report, you break up by indication,
2   correct -- your analysis by indication?
3       A.   If I'm understanding your -- your
4   question correctly, I show the -- the effects of
5   drug or break downs of drug further stratified by
6   different indications like bipolar disorder,
7   epilepsy, pain, so forth.
8       Q.   And you used an inquiry based on various
9   different ICD codes to bucket these -- to bin these
10  up into different buckets, correct?
11      MS. McGRODER:  Object to form.  ICD 9 codes?
12  BY THE WITNESS:
13      A.   If your question is about using ICD 9
14  codes to, you know, derive the diagnostic
15  information, the answer is yes.
16  BY MR. ALTMAN:
17      Q.   Who was the person who decided what codes
18  went with what bucket?
19      A.   I believe those grew out of our -- some
20  of the prior work for the VA sample, and I think
21  also Dr. Mann reviewed those codes.  I think I might
22  have also -- I think we probably developed a
23  preliminary list, and then ran that by John Mann.
24      Q.   And you only used a list like that in the

530

2/4/2009 Gibbons, Robert V2

1   gabapentin study, correct -- strike that.  We will
2   come back to it a different -- when we look at the
3   programs.  Why don't we -- why don't we mark the
4   programs for right now.
5            Now, before I throw the SAS -- SAS
6   programs at you, do you believe that you are
7   qualified to sit and explain the exquisite, intimate
8   details of these SAS programs, or would Dr. Hur be
9   in a better position to do that?
10      MS. McGRODER:  Object to form.
11  BY THE WITNESS:
12      A.   You know, I -- I can make my way through
13  them.  I have replicated the results of those SAS
14  programs independently.  So I can testify to their
15  validity.  If you pull a line out of a -- you know,
16  the middle of one of them and ask me to explain
17  exactly what's going on, I can give it my best shot.
18           I don't pretend to be a world-class
19  expert in SAS, and these are fairly complicated
20  files.  I have gone through them completely to the
21  point at the time that I went through them, I
22  understood exactly what was going on.  That was one
23  of the things that Dr. Hur and I did together to
24  make sure that the logic of what I had asked for was

531

2/4/2009 Gibbons, Robert V2

1   implemented, and we went through them to such a
2   degree so that we were able to find confidence that
3   that, in fact, was the case.
4            I then supplemented that by redoing these
5   in Fortran, and as I have said, I will share those
6   with counsel and the associated ASCII files which
7   they read.
8            So having said that, you know, I can -- I
9   can give it my best shot, but I can't tell you that
10  you will ask me a question and I will go -- it might
11  take a long time to try and figure it out, and I
12  might not be able to answer it for you.
13       MR. ALTMAN:  Objection, non-responsive.
14  BY MR. ALTMAN:
15       Q.   My question to you was:  Would Dr. Hur be
16  in a better position to discuss these SAS programs
17  than you would?
18       MS. McGRODER:  Well, objection to form and
19  foundation, and he already answered that question,
20  asked and answered.
21       MR. ALTMAN:  He did not.
22  BY MR. ALTMAN:
23       Q.   Would you please answer that question.
24       MS. McGRODER:  He can't know whether Dr. Hur is

1   code is based on -- on direction that Dr. Hur
2   received from me.
3            So I should be, you know, in reasonably
4   good stead to -- stead -- I am not sure that's even
5   a word.  I should be able to -- to review them with
6   you, if you would like.
7       Q.   Still not answering my question.  Would
8   Dr. Hur be in a better position to discuss these
9   programs?
10       MS. McGRODER:  Object to form and foundation,
11  asked and answered.  He cannot answer that question.
12  He can't know until you ask --
13  BY MR. ALTMAN:
14       Q.   Did you rely on Dr. Hur to write these
15  programs as opposed to yourself?
16       A.   Dr. Hur wrote the programs, that's
17  correct.
18       Q.   Would it have been as easy for you to
19  write these programs as Dr. Hur?
20       A.   He has more expertise in using SAS than I
21  do.
22       Q.   Do you routinely rely upon Dr. Hur to
23  write your SAS programs in projects that you work on
24  together?

2/4/2009 Gibbons, Robert V2

1   it in a better position until you ask him the
2   questions, and he gives you the answers.  I mean,
3   how can he know that --
4       MR. ALTMAN:  Would you answer -- Lori, you are
5   coaching the witness now.  You are not allowed to do
6   that --
7       MS. McGRODER:  No, he answered your question.
8       MR. ALTMAN:  No, he did not.  I asked him would
9   Dr. Hur be in a better position to discuss the SAS
10  programs.
11       MS. McGRODER:  Well, my objection is --
12       MR. ALTMAN:  He told me --
13       MS. McGRODER:  -- there is no foundation for
14  him to answer that question until you ask the
15  questions.
16       MR. ALTMAN:  That's fine.
17  BY MR. ALTMAN:
18       Q.   Would Dr. Hur be in a better position to
19  discuss these SAS programs than you?
20       A.   You know, it depends on what part of the
21  programs that you are describing.  As I have
22  testified, Dr. Hur had the primary role of writing
23  those programs.  Authors are always, you know,
24  closest to their code, but everything that's in the

2/4/2009 Gibbons, Robert V2

1       A.   Yes, I do.
2       Q.   Is there a time where you would write the
3   program as opposed to Dr. Hur?
4       A.   Well, which program are you talking
5   about?
6       Q.   Is there -- can you think of instances
7   where you and Dr. Hur have collaborated on papers
8   where you wrote the SAS programs instead of Dr. Hur
9   writing the SAS programs?
10       A.   If you are just talking upon SAS
11  programs, then I would rely upon Dr. Hur to do that.
12       MR. ALTMAN:  Okay.  Let's mark as the next two
13  exhibits -- well, let's mark as -- this exhibit
14  first whatever the next number is 29.
15            (WHEREUPON, a certain document was
16            marked Gibbons Deposition Exhibit
17            No. 29, for identification, as of
18            2/4/09.)
19  BY MR. ALTMAN:
20       Q.   Now, Dr. Gibbons, if you would please
21  pull -- it's probably Exhibit No. 5 which was the
22  listing of the contents of the CD.  It's the next
23  one right there.
24            You see that there are several files at

1   A.   Sitting here right now, I would have to
2   say, you know, they -- they would be pretty similar
3   kinds of analysis. Again, it's defining a cohort
4   based on an index episode of something, and in this
5   case it would be epilepsy, and we probably would
6   look for a plus or minus one-year window.
7        So, yeah, I think we could do something
8   for epilepsy in and of itself that would be similar
9   to this.
10  Q.   And the same thing for neuropathic,
11  correct?
12  A.   You could do -- you could do it for any
13  particular indication. I think that by doing the
14  gabapentin analysis cohort where we were able to
15  condition on indication in the ways that you are
16  describing now and specifically look at gabapentin,
17  the drug in question in this particular case, it
18  allowed us to sort of have the best of both worlds.
19       In one cohort we condition on a
20  particular illness. In the other we condition on a
21  particular and most relevant treatment to this case
22  and explore the effects of different indications.
23  So I felt that for the purpose of my looking as an
24  academic at antiepileptics in a high-risk

724

1   population, the bipolar cohort was pretty useful,
2   and for the purpose of this case, the gabapentin
3   cohort was essential, and that was about as much I
4   could tolerate of doing applied work.
5   Q.   Were you aware that the vast majority of
6   the cases against Pfizer involved individuals who
7   were not taking Neurontin for an on-label
8   indication?
9        MS. McGRODER: Object to form and foundation.
10  BY THE WITNESS:
11  A.   I don't -- I'm not aware of what the vast
12  majority of cases are about for -- for Pfizer. I'm
13  aware of the Daubert hearing that I participated in
14  and the -- and about this particular case, but
15  that's the -- kind of the only two that I kind of --
16  that I -- that I really know about in specific. I
17  know there's the MDL which contains a lot of
18  different cases, but I don't know the specifics of
19  those cases.
20  MR. ALTMAN: I am going to mark the next three
21  exhibits. How much time do I have?
22  THE VIDEOGRAPHER: Seven minutes.
23  MR. ALTMAN: Seven minutes, what to do in seven
24  minutes.

725

1   MS. McGRODER: Mark three exhibits.
2        (WHEREUPON, certain documents were
3        marked Gibbons Deposition Exhibit
4        Nos. 37-39, for identification, as
5        of 2/4/09.)
6   BY MR. ALTMAN:
7   Q.   Before we get to this, by the way, do you
8   think that you can actually separate your efforts on
9   the gabapentin study from your efforts on the
10  bipolar study as if they are completely separate and
11  distinct and don't have cross-over?
12  MS. McGRODER: I will object to form.
13  BY THE WITNESS:
14  A.   I guess it depends on what you mean about
15  that. I mean, with respect to what?
16  BY MR. ALTMAN:
17  Q.   The things you learned about the bipolar
18  cohort, ideas, ways of working with the data that
19  you then used in the gabapentin study.
20  A.   I think that the general analytic
21  strategies that were laid out in advance and that
22  were developed as a part of our work with the VA and
23  then adapted to this slightly different design for
24  the PharMetrics data were laid out in advance both

726

1   for the gabapentin and for the bipolar. They
2   haven't really changed a great deal.
3        Certainly, our knowledge of working with
4   PharMetrics' data benefited from being able to look
5   at both databases and -- but otherwise I think they
6   are, you know, fairly independent. I don't cite the
7   gabapentin dataset or, you know, the results of
8   those analyses in -- in my -- in the paper on the
9   bipolar cohort, nor do I see any particular reason
10  to do so.
11  Q.   Okay. I have handed you Exhibits 37, 38,
12  and 39. These are the three declarations from your
13  co-authors.
14       Have you ever seen these documents
15  before?
16  A.   No.
17  Q.   Okay. I want to ask you a question about
18  Dr. Hur's declaration, and if you go to page 4,
19  point 14, it says: "I do not have any information
20  or possess any knowledge concerning either the
21  manuscript or any of the records supporting the
22  manuscript that is not equally (if not more)
23  available to and within Dr. Gibbons' knowledge"; is
24  that correct?

727

2/4/2009 Gibbons, Robert V2

1  A.  Yes.
2  MS. McGRODER:  Objection.  I object on grounds
3  of foundation to any questions for these documents
4  that he has never seen.  You can still answer.
5  BY MR. ALTMAN:
6  Q.  Do you know whether that is a true
7  statement other than what Dr. Hur has written here?
8  MS. McGRODER:  Object on form and foundation.
9  BY THE WITNESS:
10 A.  I don't understand your question.
11 BY MR. ALTMAN:
12 Q.  Do you have any independent basis for
13 knowing the truth of point 14 other than what
14 Dr. Hur wrote here?
15 MS. McGRODER:  Object to form and foundation.
16 BY THE WITNESS:
17 A.  I mean, I have worked with Dr. Hur, and I
18 know that all of the analyses that were conducted
19 in -- relating to either the gabapentin cohort or
20 the bipolar cohort were all done under my direction.
21        He didn't initiate these analyses.  He
22 didn't design those analyses.  He helped in the
23 writing of the SAS code to implement the analyses
24 that I envisioned and oversaw, and to make sure that

1  MR. ALTMAN:  That's fine.
2  THE VIDEOGRAPHER:  Okay.  This concludes day 2.
3  The time is 5:59 p.m.  We are off the record.
4        (WHEREUPON, the deposition was
5         concluded at 5:59 p.m.)

2/4/2009 Gibbons, Robert V2

2/4/2009 Gibbons, Robert V2

1  they were accurate, I went through the painstaking
2  task of writing the Fortran programs to reproduce
3  the results.  So I don't think that he has anything
4  to add above and beyond what I have told you and
5  what questions I can answer for you.
6  MS. McGRODER:  How much time is left?
7  BY MR. ALTMAN:
8  Q.  Point 15 it says:  "I do not possess any
9  knowledge concerning Dr. Gibbons' supplemental
10 expert report submitted in this litigation."
11        Did I read that correctly?
12 MS. McGRODER:  Objection to form and
13 foundation.
14 BY THE WITNESS:
15 A.  It looks like you read it correctly.
16 BY MR. ALTMAN:
17 Q.  Okay.  He did, though, in fact, work on
18 the gabapentin analysis, correct?
19 A.  He helped me with the gabapentin
20 analysis, but he never saw any of my expert reports
21 or supplemental reports and was not involved in
22 writing those reports or reviewing those reports and
23 never had any knowledge of those reports.
24 MS. McGRODER:  Okay.  The deposition is over.

1        IN THE UNITED STATES DISTRICT COURT
2            DISTRICT OF MASSACHUSETTS
3  IN RE; NEURONTIN et al.,        )
4                                   ) MDL DOCKET
5  BULGER vs. PFIZER, et al.,      ) No. 1629
6                                   ) MASTER FILE
7  SMITH vs. PFIZER, et al.,       ) No. 04-10981
8  05-CV-11515-PBS                 )
9        I hereby certify that I have read the
10 foregoing transcript of my deposition given at the
11 time and place aforesaid, consisting of Pages 352 to
12 730, inclusive, and I do again subscribe and make
13 oath that the same is a true, correct and complete
14 transcript of my deposition so given as aforesaid,
15 and includes changes, if any, so made by me.
16
17
18                    ROBERT D. GIBBONS, Ph.D.
19
20
21 SUBSCRIBED AND SWORN TO before me
22 this      day of              , A.D. 200 .
23
24    Notary Public

```
1   probably on about the fourth page.
2           Could you read how many people -- how
3   many records there are with 311 as a diagnostic
4   code?
5       MS. McGRODER: Objection to foundation for
6   use of this document.
7   BY THE WITNESS:
8       A.   I have what you have listed here as
9   24,297.
10  BY MR. ALTMAN:
11      Q.   Okay. And you could verify that once
12  again any time you wanted to, correct?
13      A.   Yes.
14      MS. McGRODER: Well, object to form and
15  foundation.
16  BY MR. ALTMAN:
17      Q.   Dr. Gibbons, if you represented to --
18  that you accepted responsibility for the programs
19  and the data and you represented to the court
20  that you had all the knowledge necessary to
21  discuss anything about the programs and the data
22  and that we didn't need to talk to Dr. Hur or
23  anybody else, how is it that you can sit here and
24  say you can't tell whether the program is correct
```

```
1   or not?
2       MS. McGRODER: Object to form.
3   BY THE WITNESS:
4       A.   I would need to go back to the
5   program, go back to the SAS manual, and determine
6   whether or not the else here -- this else if is
7   for the original if or for the entire clause.
8   BY MR. ALTMAN:
9       Q.   Was 311 -- if the code was 311, was
10  that set to MDD in this program?
11      A.   Again, I would have to go back to
12  this. This is not how I would do this in
13  FORTRAN, and so I would have to go back and
14  verify that this was done appropriately, but this
15  syntax would be specific to SAS.
16          So I would have to verify that. As I
17  have told you before, I'm not an expert in SAS.
18  This would not even -- this if then else
19  statement would not even execute in FORTRAN which
20  is the code that I use to verify this. So I
21  would have to go back and verify that.
22      Q.   If that's true, then the number of
23  patients that you have assigned to the MDD group
24  and the other psychiatric indications group would
```

```
1   be different, wouldn't they?
2       MS. McGRODER: Object to foundation.
3   BY THE WITNESS:
4       A.   If what's true?
5   BY MR. ALTMAN:
6       Q.   If you did not -- if it turns out that
7   for code 311 those people were not set to MDD
8   because this line didn't execute and were left as
9   other psychiatric disorder, then Table 1 in your
10  expert report would have an incorrect number of
11  patients for the MDD group and for the
12  psychiatric disorder group, correct?
13      MS. McGRODER: Object to form and
14  foundation, assumes facts not in evidence.
15  BY THE WITNESS:
16      A.   If I'm understanding your question
17  correctly, if there was an error in the code that
18  confused major depressive disorder patients with
19  general psychiatric or other psychiatric disorder
20  patients, then that particular part of the
21  analysis of the gabapentin with respect to the
22  psychiatric indication or the MDD indication
23  would change if that error -- assuming such an
24  error has been committed, then those number would
```

```
1   change, of course.
2   BY MR. ALTMAN:
3       Q.   But in Table 1 in your expert report,
4   you also calculate percentages for concomitant
5   conditions. So it would be a little more than
6   just simply changing the gab -- the MDD line and
7   the psychiatric disorder line since you
8   calculated how many percentages -- you know, what
9   percentage of the people had various different
10  conditions, correct?
11      MS. McGRODER: Object to form and
12  foundation, assumes facts not in evidence,
13  improper hypothetical.
14  BY THE WITNESS:
15      A.   Again, if -- if what you are asking is
16  if there's an error here with respect to what is
17  designated as MDD versus what is designated as
18  other psychiatric disorders, then any entry
19  within Table 1 that referred to MDD or
20  psychiatric disorders would be incorrect to the
21  extent that this, you know, was actually an error
22  that was made.
23          It certainly wouldn't change the
24  conclusions of the study since, you know, the
```

## Page 763

1  conclusions of the study are clear for all people
2  considered, all people who received gabapentin
3  monotherapy, and basic conclusion from Table 1 is
4  that we see the protective effects or effects
5  that are in the direction of being protective for
6  the psychiatric disorders which include both MDD
7  and other psychiatric disorders.
8      And for the pain disorders, there
9  doesn't appear to be any -- any difference before
10 or after initiation of drugs.  So even if this
11 were true, it wouldn't change any of my
12 conclusions relative to the study.
13     I mean, obviously we want this to be
14 as accurate as possible and mistakes are made.  I
15 don't know if you are correct in assuming that
16 this is a mistake.  If it is, it certainly can be
17 corrected, but I can assure you that it's not
18 going to change the -- the conclusions of the
19 study if, in fact, what you have identified is
20 the error that you assume it to be.
21     MR. LONDON:  I object to everything after
22 the word incorrect as being non-responsive.  I
23 think you answered two questions, and only one
24 was asked.

## Page 764

1  BY MR. ALTMAN:
2      Q.  How -- how do you know what effect
3  this would have on Table 2 if it's, in fact,
4  true?
5      MS. McGRODER:  Well, object to form and
6  foundation, improper hypothetical, and assumes
7  facts not in evidence.
8  BY THE WITNESS:
9      A.  Everything you have said so far is
10 about Table 1.  Now you are talking about Table
11 2.  So could you give me a copy of my expert
12 report where Table 1 and Table 2 are?
13     MR. ALTMAN:  Sure.  Could you find that?
14     MR. LONDON:  I am going to give it from the
15 original exhibits.
16     MR. ALTMAN:  Yes, please do.
17 BY MR. ALTMAN:
18     Q.  I'm going to hand you, Dr. Gibbons,
19 what's been -- what was previously marked as
20 Exhibit 21.
21         (WHEREUPON, the document was
22          tendered to the witness.)
23 BY THE WITNESS:
24     A.  Thank you.

## Page 765

1  BY MR. ALTMAN:
2      Q.  Now, Table 1 is a -- calculates
3  various different percentages for various
4  different consequences of concomitant
5  indications, correct?
6      And I think we said if the number of
7  MDD and psychiatric disorder patients were
8  different than that report, then all of those
9  that rely upon any comparison with MDD or the
10 psychiatric conditions would be altered, correct?
11     MS. McGRODER:  Object to form and
12 foundation, improper hypothetical, assumes facts
13 not in evidence.
14 BY THE WITNESS:
15     A.  If I understand your question --
16 excuse me -- correctly, if there was an
17 interchange between what was designated as MDD
18 and what was designated as other psychiatric
19 disorders as broken out in this table, then there
20 would be changes in the summary statistics that
21 are presented in Table 1 for those two
22 categories, and those two categories alone --
23 BY MR. ALTMAN:
24     Q.  Well --

## Page 766

1      MS. McGRODER:  Wait.  Were you finished with
2  your answer?
3      MR. ALTMAN:  I'm sorry.
4  BY THE WITNESS:
5      A.  And then with respect to Table 2 --
6  BY MR. ALTMAN:
7      Q.  Well, I asked you about Table 1.  So
8  let's just focus on Table 2.
9      A.  You asked me about Table 2.  If you go
10 back to the record, you asked me about Table 2.
11 That's why I asked --
12     Q.  No, I only asked you about Table 1.
13 Now, Table 1 --
14     MS. McGRODER:  Before that.
15     MR. ALTMAN:  But I will get back to Table 2.
16 We are talking about Table 1.  When I handed him
17 the exhibit, I asked him a question about Table
18 1.  I would like to finish with Table 1.
19 BY MR. ALTMAN:
20     Q.  If you take your schizophrenia line,
21 though, and you go across, there's a column with
22 psychiatric disorder, correct?
23     A.  As I said, any -- if -- if your
24 hypothetical is correct, assuming that, that

```
 1    that's a -- that's a question mark about those
 2    data.
 3            It's the nature of dealing with
 4    medical claims data that there are going to be
 5    uncertainties associated with them.  There are
 6    going to be some inconsistencies.  One of the
 7    advantages of having such large numbers is that
 8    you -- most of those kinds of anomalies tend to
 9    wash out.  They don't have an undue influence on
10    the overall results of the analysis.  So that's
11    one of the reasons we do sensitivity analysis.
12        Q.   What validity checks did you actually
13    run off of the PharMetrics data?
14        A.   Sitting here right now, I can't
15    remember.
16        Q.   Did you do the validity checks of the
17    data?
18        A.   I worked with Dr. Hur.  We went
19    through and screened the data, made sure that we
20    were getting consistent results.  I don't
21    remember all of those analyses.  Those were done
22    some time ago.
23        Q.   Was any records kept of those
24    analyses?
```

811

```
 1        A.   Not to my knowledge.
 2        Q.   Would Dr. Hur be in a better position
 3    to talk about what kind of validity checks were
 4    run upon the data?
 5        A.   I don't think so.
 6        Q.   Did Dr. Hur run any of these validity
 7    checks on his own not sitting with you?
 8        A.   I don't recall at this moment whether
 9    everything was done together, whether or not we
10    sent out a list of things to -- to evaluate or
11    not.
12        Q.   If you had sent out a list, how would
13    you have done it by e-mail?
14        A.   No, no, just sitting and talking
15    together.  I promise you that, as you look
16    through these datasets, you will find anomalies.
17    I can go back, and I will find additional
18    anomalies.  There -- you know, these are -- we
19    are talking about millions and millions of
20    records.
21        Q.   Dr. Gibbons, I am going to hand you.
22
23
24
```

812

```
 1                 (WHEREUPON, a certain document
 2                 was marked Gibbons Deposition
 3                 Exhibit No. 47, for
 4                 identification, as of 3/5/09.)
 5    BY MR. ALTMAN:
 6        Q.   Dr. Gibbons, I am going to hand you
 7    what's been marked as Exhibit 47 which is -- a
 8    few weeks ago Lori McGroder sent us an e-mail
 9    with an updated version of your November 5th,
10    2008 expert report at which you made two
11    corrections based upon our last deposition.
12            Does this appear to be that?  I think
13    one of them was you changed the other psychiatric
14    and antipsychotic number from to 81.6 to 16.2,
15    and you changed in Table 2 the all number from
16    1.22 to 1.23; is that correct?
17        A.   That's my memory, yes.
18        Q.   Okay.  Does this appear to be the
19    revised report?
20        A.   Yes, it does.
21        Q.   Okay.  Let's put that aside for a
22    second.
23        MS. McGRODER:  Oh, you did mark that?
24        MR. ALTMAN:  Yes.  It's 47.
```

813

```
 1        MS. McGRODER:  Thank you.
 2        MR. ALTMAN:  Mark the next exhibit.
 3                 (WHEREUPON, a certain document
 4                 was marked Gibbons Deposition
 5                 Exhibit No. 48, for
 6                 identification, as of 3/5/09.)
 7    BY MR. ALTMAN:
 8        Q.   Dr. Gibbons, the first two pages of
 9    what I provided to you as Exhibit 48 --
10    Dr. Gibbons?
11        A.   Yes.
12        Q.   Do you have the --
13        A.   Oh, I am sorry.
14        Q.   That's okay.  The first page of
15    Exhibit 48 was provided on the FORTRAN disk was
16    listed as PGMS3 dot SAS which appeared to take
17    the bipolar -- take the bipolar data -- I'm
18    sorry -- take the gabapentin cohort data and kind
19    of generate the results for the last column of
20    Table 2 in your expert report that I just handed
21    to you; is that correct?
22            And what I have given you as the next
23    page is the output if you run that program.
24        A.   Okay.  I mean, I -- I have no reason
```

814

3/5/2009 Gibbons, Robert V3

1   Q.   Is that correct?
2   A.   Yes.
3   Q.   And the confidence intervals as shown
4   as .3278 which would round to .33, correct?
5   A.   That's correct.
6   Q.   And the upper would be 1.1990,
7   correct?
8   A.   Correct.
9   Q.   That would round to 1.20, correct?
10  A.   Correct.
11  Q.   So according to this analysis of just
12  the gabapentin data, this does not show
13  that gaba -- these are not statistically
14  significant results for gabapentin, correct?
15  A.   That's true, and that's reiterated
16  under the P values where the probability value
17  testing whether or not the regression weight is
18  one or the odds ratio -- the -- the regression
19  weight is -- the logarithm of the odds ratio is
20  equal to -- is equal to zero is .1581.  So that's
21  not statistically significant.
22       So we can't conclude that, you know,
23  gabapentin in this analysis -- the presence of
24  gabapentin is significantly decreasing the risk

3/5/2009 Gibbons, Robert V3

1   of suicide attempts.  The purpose of the analysis
2   is to show if we were to -- you know, obviously
3   we are reducing the sample size by quite a bit by
4   just looking at gabapentin as opposed to looking
5   at all of the AEDs, and what we are seeing is, I
6   believe, that the risk ratio -- the estimated
7   odds ratio for the overall AED was .59, and
8   that's looking at all of the AEDs simultaneously,
9   and that was statistically significant.  And this
10  effect is quite similar to it, but it's not
11  statistically significant because of the lower
12  sample size.
13       MR. ALTMAN:  Let me take a break for a
14  minute.  Can we go off the record?
15       THE VIDEOGRAPHER:  Off the record at 1:26.
16            (WHEREUPON, a recess was had at
17             1:26 p.m. until 1:29 p.m.)
18       THE VIDEOGRAPHER:  We are back on the record
19  at 1:29.
20  BY MR. ALTMAN:
21  Q.   Dr. Gibbons, I forgot to ask you one
22  thing.
23       Before the lunch break, we were
24  talking about trying to locate the SAS programs

3/5/2009 Gibbons, Robert V3

1   that extracted the data.  Did you have any luck?
2   A.   I put in a request to get them.  I'm
3   not sure that, you know, we will be able to get
4   them, but I'm waiting for a return phone call.  I
5   put my phone on -- on mute.  So as soon as I hear
6   back, I am expecting a call one way or the other.
7   Q.   Who did you call to ask them?
8   A.   Dr. Hur.
9   Q.   Okay.  Do you think he might not have
10  them at all or --
11  A.   Today he is at the VA, and the VA with
12  recent issues related to data security doesn't
13  necessarily allow you to plug an external data
14  storage device into their network.  So he would
15  have to be able to do it elsewhere.  So he is
16  investigating (No. 1) does he even have it around
17  with him, and (No. 2) can he plug it into a
18  computer where he can have access to send it to
19  me.  So if he doesn't have it, you know, or isn't
20  able to do that, surely, I'll be able to get it
21  tonight and forward it on.
22  Q.   Is all the work that was done with
23  these data analyses on an external drive or a
24  discrete external drive?

3/5/2009 Gibbons, Robert V3

1        MS. McGRODER:  Object to form.  "These
2   analyses" you mean, the sensitivity analysis?
3   BY MR. ALTMAN:
4   Q.   All the work that's been done in this
5   case by Dr. Hur, does he keep that on a separate
6   external drive?
7   A.   Not to my knowledge.
8   Q.   Does he keep -- he keeps it on his
9   laptop, on the hard drive on the laptop?
10  A.   Some of it is at the computer at the
11  university.  Some of it is on an external drive
12  that he keeps, you know, those sort of things.
13  Some of it obviously is on my computer or on my
14  external drives.
15  Q.   So there may be some data on his
16  drives or his computer that is not on your
17  computer?
18  A.   There shouldn't be at this point.  I
19  don't think I have on my computer the SAS program
20  that you are looking for that generated the
21  monthly data file that I used in my analysis, and
22  I also want to double-check.  There may be -- I
23  may have taken that file and then modified that
24  file for the purpose of putting it into the