UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
----------------------------------------x
                                        :  MDL Docket No. 1629
In re:  NEURONTIN MARKETING, SALES      :
        PRACTICES AND PRODUCTS          :  Master File No. 04-10981
        LIABILITY LITIGATION            :
----------------------------------------x  Judge Patti B. Saris
                                        :
THIS DOCUMENT RELATES TO:               :  Magistrate Judge Leo T.
                                        :  Sorokin
PRODUCTS LIABILITY ACTIONS              :
                                        :
                                        :
                                        :
----------------------------------------x
```

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO COMPEL DISCOVERY OF KEITH ALTMAN AND DR. CHERYL BLUME**

Defendants, Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer"), respectfully submit this memorandum in support of their motion to compel discovery of Keith Altman and Dr. Cheryl Blume.

**PRELIMINARY STATEMENT**

For her 207-page expert report in this action, Dr. Cheryl Blume relied upon data collected and tables created by Mr. Keith Altman, who purported to search the AERS database and "filter" the data that form the basis of her opinions on Neurontin post-market adverse events. Dr. Blume does not know and cannot verify Mr. Altman's methodology. And, though she attempts to bolster his (and her) work by claiming that it was accepted by the FDA, she refuses to disclose details about the circumstances where she used his methodology. Since Pfizer filed its motion to exclude Dr. Blume, Mr. Altman has generated more data that she also cannot verify and submitted his own Declaration attesting to the reliability of his methods and Dr. Blume's opinions. Plaintiffs have refused to make Mr. Altman available for deposition and have also rejected Pfizer's continued requests for discovery on the work experience that forms the basis of Dr. Blume's opinions. Accordingly, Pfizer brings this motion so that it may have an opportunity to fully explore through discovery the bases for Dr. Blume's opinions in this case.

Plaintiffs' refusal to consent to Pfizer's requests is especially remarkable given the fact that Plaintiffs recently filed an emergency motion seeking to depose Dr. Kwan Hur, an independent biostatistician who, along with two others, co-authored an unpublished manuscript, of which defense expert Dr. Robert Gibbons is the lead author and which Dr. Gibbons referenced in and provided with his expert report.  Dr. Hur also provided certain computer programming assistance in connection with data on which Dr. Gibbons relied in his expert report.  Plaintiffs sought Dr. Hur's deposition even though Dr. Gibbons testified that any work done by Dr. Hur was done under Dr. Gibbons' supervision, was thoroughly reviewed by Dr. Gibbons, and Dr. Gibbons was able to respond to substantive questions about the data he relied upon.  On April 24, 2009, Magistrate Judge Sorokin ordered that Plaintiffs may depose Dr. Hur, for up to two hours, regarding the methodology he employed in connection with the unpublished manuscript and/or the expert report of Dr. Gibbons.  (*See* 4/24/09 Electronic Order.)

In contrast to Dr. Gibbons, who supervised and verified any data provided by Dr. Hur that Dr. Gibbons relied upon, Dr. Blume was unable to answer any questions about Mr. Altman's work.  Dr. Blume testified both to her ignorance of Mr. Altman's methods and her failure to validate his work.  Nonetheless, Plaintiffs have refused to make Mr. Altman available for deposition or produce all of his underlying work and communications with Dr. Blume regarding Neurontin, which indisputably were for purposes of their long history of collaboration on Neurontin litigation.  For the reasons discussed below, Plaintiffs should be ordered to make Mr. Altman available for deposition, to make Dr. Blume available for a supplemental deposition, and to produce the requested documents from Mr. Altman and Dr. Blume.

## ARGUMENT

### Pfizer Is Entitled To Full And Complete Discovery Of All Material Considered By Dr. Blume For Her Opinions In This Litigation

Federal Rule of Civil Procedure 26(b)(1) extends discovery to "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Further, it has "long [been] recognized that the Federal Rules of Civil Procedure are to be construed liberally in favor

of discovery." *S.E.C. v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000). More specifically, Rule 26(a)(2)(B) requires disclosure of any documents "considered by [an expert] witness in forming the opinion," as well as any "data or other information" considered by an expert witness. *Stephens v. Trust For Pub. Land*, 475 F. Supp. 2d 1299, 1306 (N.D. Ga. 2007). In determining the scope of Rule 26(a)(2)(B), "the term 'consider' should be construed broadly, and encompasses all 'documents and information disclosed to a testifying expert in connection with his testimony . . . , whether or not the expert relies on the documents and information in preparing his report.'" *Id.*; *see also, e.g.*, *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375-76 (Fed. Cir. 2001).

In this case, Pfizer has been denied a full and fair opportunity to depose one of Plaintiffs' key expert witnesses, Dr. Blume, because it has not been allowed an opportunity to adequately examine, through the tools of discovery, the data and methodology that undergird her opinions. Dr. Blume's opinions rely, in large part, on data analysis of spontaneously reported adverse events provided by Keith Altman, one of the attorneys for Plaintiffs.[1] For instance, Dr. Blume's report includes a chart entitled "PRR Over Time Suicidal and Self-Injurious Behaviour (HLT)" that purports to calculate a proportional reporting ratio ("PRR") between Neurontin and six other drugs according to a textbook methodology (Strom's *Pharmacoepidemiology*). (*See* Sayler Decl. [#1160-31], Ex. 24, Pt. 2, at 25 (p. 194 of report).) Dr. Blume concludes from the data in this chart that "[n]o later than mid 2001, Pfizer had a safety signal of a possible association between Neurontin and suicidal events" (*Id.*) This is just one example. Much of the data analysis contained within Dr. Blume's report was prepared by Mr. Altman. (*See* Blume Tr., attached hereto as Ex. A, at 50:9-54:5.) Without such analysis, she would have been able to support few, if any, of the opinions she expresses in this litigation.

---

[1] Mr. Altman previously served as an "adverse event analyst" at Finkelstein & Partners, Plaintiff's counsel. His duties at Finkelstein included providing Plaintiffs' experts with the statistical information on which they based their reports. On December 10, 2008, Mr. Altman applied for – and was granted – status as counsel of record in this action. [# 1498]

Although heavily reliant upon Mr. Altman's work, Dr. Blume was unable to meaningfully respond to questions about the methodology he employed. For example, Dr. Blume admitted that Mr. Altman did not follow a true PRR methodology (*See* Blume Tr. at 129:6-18, 138:21-139:2, 174:21-175:6), but was unable to explain Mr. Altman's methodology. She was unable to identify which adverse event reports were encompassed by the search terms Mr. Altman used (*id.* at 140:19-143:3, 148:8-149:16; 158:9-21), or provide any of the raw numbers for the suicide events "represented" in the chart. (*Id.* at 169:15-170:6.)

Likewise, Dr. Blume admitted that she does not know and cannot speak to Mr. Altman's methods, including whether he made any attempt to control for bias and confounding factors:

> THE WITNESS: *I can't specifically address what he does*. I know that we reviewed various bias-related issues when we – when we first started generating these for the FDA, but – and I'm assuming he used the same approach in this one, but I am not specifically familiar with what he did for this. *You'd have to ask him*.
>
> BY MR. BARNES:
>
> Q:    Same question as to confounding factors.
>
> A:    Again, you'd have to check with him.

(*Id.* at 480:13-22 (emphases added).) She also did not know how Mr. Altman "filters" a database:

> I know that several procedures and controls are put into place to allow him to do that. *What the specific natures are, specific natures of those controls, I just don't know.*

(*Id.* 71:10-13 (emphasis added).) She admitted that she did not validate any of Mr. Altman's tables:

> Q:    Okay. And did you – again, you didn't validate this work, did you?
>
> A:    No.
>
> Q:    Is it fair to say – just so we don't have to ask this every time you identify Mr. Altman as the source of the – of the tables, is it fair to say that – that *you've not independently validated or tested any of the tables that Mr. Altman provided to you, correct*?
>
> A:    *That is correct.*

(*Id.* 97:18-98:2 (emphasis added); *see also id.* 69:8-10 ("I am not capable of independently validating his extraction of data from – from these databases."); *id.* 73:8-15 (admitting that she did not validate how Mr. Altman extracted "serious" cases from the database).)

Although admitting that she did not and could not verify Mr. Altman's data or explain his methodology, Dr. Blume nonetheless characterized it as "reliable" based solely on her past working relationships with Mr. Altman. Dr. Blume asserted that she has used Mr. Altman many times before for FDA submissions and she believes the FDA would approve his methodology here. But when asked to share a specific example of when FDA "approved" his methodology as part of an NDA approval, she claimed that every one of these collaborations is shielded by confidentiality agreements that she cannot violate. (*Id.* 20:16-23:14; 57:17-24; 391:11-16.) Likewise, throughout his Declaration, Mr. Altman repeatedly held out the "confidential" work that neither he nor Dr. Blume will produce as the basis for his purported expertise here and the reliability of his analysis. (Altman Decl. [# 1197-144], attached hereto as Ex. B, ¶¶ 10, 17, 32.) Dr. Blume did the same in her Declaration. (Blume Decl. [# 1197-120], attached hereto as Ex. C, ¶ 5.)

Plaintiffs cannot shield Dr. Blume's opinions and methodology from scrutiny by cloaking them in mystery. As Plaintiffs acknowledged in their motion to compel the deposition of Dr. Hur, numerous courts have held that, where an expert witness is substantially assisted in creating a report, and the methodology and analysis underlying the expert report are "exclusively within the assistant's cognizance," a party is entitled to depose the person who aided the expert. (*See* Pls.' Mem. in Support of Mot. to Compel [#1764] at 5-7.) For example, in *Derrickson v. Circuit City Stores, Inc.*, No. DKC 95-3296, 1999 U.S. Dist. LEXIS 21100 (D. Md. Mar. 19, 1999), *aff'd sub nom. Johnson v. Circuit City Stores, Inc.*, 203 F.3d 821 (4th Cir. 2000), the court addressed the fundamental unfairness inherent when a party is denied discovery of an assistant's work and information about the assistant's methodology and results are "exclusively within the assistant's cognizance." *Id.* at *19. Indeed, as the *Derrickson* court noted, a party "cannot properly cross-

...

...

examine [an expert] without first understanding how his assistant manipulated the data." *Id.* at *18.

Likewise, the Seventh Circuit has explained that where an expert witness has relied on others in formulating his expert opinion, discovery should be permitted "to make sure they performed their tasks competently" and to ask "whether [the expert] supervised them carefully." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). Discovery of a collaborator is all the more necessary when the person rendering assistance to the testifying expert is more than a mere numbers-cruncher, but provides substantive assistance about which the designated expert cannot herself testify. *See id.*; *see also Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D.N.Y. 2002) (holding that defendant was entitled to depose an expert's associate where the expert's report "was the result of substantial collaborative work by he and [his associate]"); *Long Term Capital Holdings v. United States*, No. 01-CV-1290, 2003 WL 21269586, at *3 (D. Conn. May 6, 2003) (holding that party was entitled to depose persons who worked "on the collection and analysis of the data underlying the Testifying Experts' reports"). Here, the need for discovery is all the more compelling given that Mr. Altman has actually testified in this matter by declaration – *twice*. In November 2007, Mr. Altman filed an affidavit in support of Plaintiffs' causation expert, Dr. Michael Trimble. [# 966]  In April 2008, he filed a declaration in support of both his own adverse event data analysis – which he supplied to Dr. Cheryl Blume – and Dr. Blume's expert report and opinions. [# 1197-144]

Rule 26 contemplates full and complete discovery into the bases of Dr. Blume's opinions. Plaintiffs cannot avoid appropriate discovery by asserting claims of either confidentiality or privilege as to any matters considered by Dr. Blume. *See Norfin, Inc. v. IBM*, 74 F.R.D. 529, 531-32 (D. Colo. 1977) (holding that plaintiff could not shield from discovery expert's prior relevant experience with claims of confidentiality); *Herman*, 207 F.R.D. at 29-30 (collecting

cases and explaining that as to materials considered by a testifying expert, Rule 26's disclosure requirement trumps any claim of privilege).[2]

Accordingly, Plaintiffs should be required to produce Mr. Altman for deposition. Prior to making him available, Plaintiffs should produce all documents relevant to the work he performed that was relied upon by Dr. Blume, including all letters, e-mails, notes, calendars, and any other documents reflecting communications between Mr. Altman and Dr. Blume related to the Neurontin litigation; all of Mr. Altman's underlying data, protocols, programs and outputs for analyses regarding Neurontin adverse events, including, but not limited to, analyses of the AERS database and Pfizer's ARISg database; all documents related to Dr. Blume's prior FDA experience with Mr. Altman, which is the basis for her assumption of reliability of his methods and data; all billing records of Dr. Blume and any billing records of Mr. Altman; and all of Dr. Blume's e-mails, written correspondence or other documented communications related to Neurontin.[3]

Plaintiffs should then be ordered to produce Dr. Blume for deposition. Not only should Pfizer be given an opportunity to depose Dr. Blume on any issues discovered during Mr. Altman's deposition, Dr. Blume should be ordered to testify about her prior collaborations with Mr. Altman that led her to assume the reliability of his methods and data analysis, upon which she relies for her opinions in this case. If Dr. Blume is not willing, for reasons of confidentiality or otherwise, to testify fully about the bases of her opinions, Plaintiffs should withdraw her as an expert.

---

[2] Notably, while Dr. Blume testified that the work she and Mr. Altman have done together for other companies' FDA submissions is "confidential," she also testified that a number of the subject products were approved by FDA and are currently marketed. Thus, the protective order entered in this case would more than ensure the continued "confidentiality" of whatever materials demonstrate that FDA "accepted" her and Mr. Altman's methods, as Dr. Blume suggests in her testimony.

[3] By letter dated April 14, 2009, Pfizer requested that Plaintiffs produce the above listed documents. (*See* 4/14/09 letter, attached hereto as Ex. D.)

## CONCLUSION

For all the foregoing reasons, Pfizer asks that this motion be granted and that Plaintiffs be ordered to (1) produce all documents related to Dr. Blume's opinions, including documents related to Mr. Altman's work and communications with Dr. Blume, (2) make Mr. Altman available for deposition, (3) make Dr. Blume available for a supplemental deposition following the deposition of Mr. Altman, and (4) direct Dr. Blume to respond to questions about her prior collaborations with Mr. Altman.

Dated: April 29, 2009                    Respectfully submitted,

                                        SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP

                                      By:     /s/Mark S. Cheffo
                                                   Mark S. Cheffo

                                        Four Times Square
                                        New York, NY 10036
                                        Tel:  (212) 735-3000

                                                   -and-

                                        SHOOK, HARDY & BACON L.L.P.

                                        By:     /s/Scott W. Sayler
                                                   Scott W. Sayler

                                        2555 Grand Blvd.
                                        Kansas City, MO 64108-2613
                                        Tel:  (816) 474-6550

                                                   -and-

WHITE AND WILLIAMS LLP

By:  /s/David B. Chaffin
         David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on April 29, 2009.

                                        /s/David B. Chaffin  
                                        David B. Chaffin