# Exhibit A

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3  In re:   NEURONTIN MARKETING, SALES  MDL DOCKET NO:  1629
             PRACTICES, AND PRODUCTS
 4           LIABILITY LITIGATION        Master File No. 04-10981

 5  _____/

 6  THIS DOCUMENT RELATES TO:

 7          ALL PRODUCTS LIABILITY
            ACTIONS
 8  _____/

 9

10      VIDEOTAPED
        DEPOSITION OF:    CHERYL D. BLUME, Ph.D.

11      DATE:             November 12, 2007

12      TIME:             9:25 a.m. to 6:07 p.m.

13      PLACE:            13902 North Dale Mabry Highway
                          Suite 122
14                        Tampa, Florida

15      PURSUANT TO:      Notice by counsel for
                          Defendants for purposes
16                        of discovery, use at
                          trial or such other
17                        purposes as are permitted
                          under the Federal Rules
18                        of Civil Procedure

19      BEFORE:           VALERIE A. HANCE, RPR
                          Notary Public, State of
20                        Florida at Large

21                        Volume 1
                          Pages 1 to 370
22

23

24

25
```

Page 18

1    A.  Both U.S. and international.
2    Q.  Are the -- involves the products that are --
3  are they generic or are they ethical pharmaceuticals,
4  branded pharmaceuticals?
5    A.  They are both.
6    Q.  Do you direct his activities when he works
7  with you on your -- your pharmacovigilance work for
8  private clients outside of litigation?
9    A.  Yes.
10    Q.  And so he -- you basically ask him to run the
11  queries of the database and you will run the queries?
12    A.  Yes.
13    Q.  Does he ever design the queries himself?
14    A.  I did -- I request the type of information
15  that I need extracted.  He -- he designs the assignments
16  that he conducts in order to assess the database,
17  electronically access the database and check the
18  database.
19    Q.  So I understand, you will say, "Mr. Altman, I
20  would like for you to query the database to extract this
21  information, run these analyses," and he would use his
22  system to pull the information out and return the
23  information to you for your professional evaluation?  Is
24  that fair?
25    A.  Yes.  And his -- and his analyses procedures

Page 19

1  are included with the information that is provided to
2  both the client and to the Food and Drug Administration.
3    Q.  Let me know, how does that work?  When he
4  provides you with the analyses and procedures, what
5  are -- what documentation does he provide you with in
6  response to your request for information?
7    MR. FROMSON:  Just note my objection as to
8  form.
9    THE WITNESS:  Well, it takes -- it takes --
10  takes different approaches depending on the type of
11  search and depending on the client.  Generally he
12  is involved with the design, the information that
13  is needed in the goals for -- for the IND or for
14  the NDA.  And so he is aware of what we are -- what
15  we are working on.
16    And I will ask him specific queries, either at
17  a meet -- either at a face-to-face meeting or
18  telephonically or electronically, and he will run
19  that information.  There is generally telephonic
20  contact back and forth as that information is
21  generated.  And the information is provided to us
22  electronically or he brings us to us when we meet.
23  BY MR. BARNES:
24    Q.  Your prior answer talked about that he would
25  provide you with design and documentation back to you in

Page 20

1  terms of the request.
2    Does he provide you with the protocol for a
3  search or how does he set up the search or does he --
4  you just let him run the search as he sees fit?
5    A.  Well, we've done it several times, and he
6  provides to me an overview of how he has -- how he plans
7  on conducting the search.  That protocol and the -- and
8  his execution of that protocol has been previously found
9  acceptable by the Food and Drug Administration.
10  Generally, that same general type of search is conducted
11  for all of our searches.
12    Q.  And when -- when was it found acceptable by
13  the Food and Drug Administration?
14    A.  I think our first NDA with that was approved
15  in 2004.
16    Q.  And what -- what protocol did he run that was
17  found acceptable by the Food and Drug Administration?
18  Describe it, the protocol and what the output was.
19    MR. FROMSON:  Just note my objection as to
20  form.
21    THE WITNESS:  Within the confines of our
22  confidentiality agreement with that client, the
23  search was designed to compare a variety of
24  adverse-related events over a family of drug
25  products.  And we were interested in specific

Page 21

1  events within a drug product and across the family
2  of drugs.  And we were also interested in the
3  standard pharmacovigilance tools of accessing the
4  top 25 events at each reporting period, any changes
5  in the top 25 events, any events that represent a
6  signal from one reporting period to the next, any
7  new events that have popped up on the database from
8  the previous period.
9  BY MR. BARNES:
10    Q.  And do you have a -- was that information
11  submitted to the Food and Drug Administration?
12    A.  Yes.
13    Q.  And was this NDA approved?
14    A.  Yes.
15    Q.  Is it, work that Mr. Altman did, publicly
16  available from the Food and Drug Administration?
17    A.  I don't know if that is specifically noted in
18  the summary basis of approval.  I don't know.
19    Q.  The infor- -- you provide information to the
20  government that was prepared by Mr. Altman, correct?
21    A.  Yes.
22    Q.  Is there any -- any -- any known reason -- any
23  basis for confidentiality that you can identify with
24  regard to the information that your company submitted to
25  the Food and Drug Administration that was presented by

6 (Pages 18 to 21)

Page 22

1  Mr. -- prepared by Mr. Altman in connection with that
2  NDA?
3      A.  The only thing that is publicly available from
4  a new drug application is the information that the FDA
5  provides relating to that new drug application.  And I
6  don't know if the FDA's release of the clinical data
7  section includes an overview of the postmarketing
8  pharmacovigilance.  I don't know.
9      Q.  And what's the name of that drug?
10     A.  I just can't share this with you.
11     Q.  Well, just so I understand, you did work on
12  behalf of a pharmaceutical company in regard to a new
13  drug application, correct?
14     A.  Yes.
15     Q.  And that your -- your client submitted that
16  information to the Food and Drug Administration in
17  connection with seeking FDA approval for a drug?
18     A.  Yes.
19     Q.  And now is it your testimony that the drug was
20  subsequently approved by the Food and Drug
21  Administration?
22     A.  Yes.
23     Q.  And you're claiming that the work that you
24  submitted to the United States Government is somehow
25  confidential in connection with that approval of -- of a

Page 23

1  drug for marketing to the United States?
2      A.  Yes.
3      Q.  I'm asking you -- so you're just refusing to
4  provide me with the name of the drug?
5      A.  All the work that I provide goes to the client
6  and is embedded within their new drug application.
7      Q.  What's confidential with the name of the drug?
8          MR. FROMSON:  Just note my objection as to
9  form.
10         THE WITNESS:  I am not permitted to talk about
11  the clients nor their drug products.
12  BY MR. BARNES:
13     Q.  By whom?
14     A.  By the client.
15     Q.  Are you relying on any of your experience
16  working with these pharmaceutical clients in forming
17  your opinions in this case?
18         MR. FROMSON:  Note my objection as to form.
19         THE WITNESS:  My opinions in this case are --
20  are predicated upon my 25 years in the
21  pharmaceutical industry as well as the work that I
22  have continued over the last six years.
23  BY MR. BARNES:
24     Q.  Are you relying on any of the work you've done
25  with the Food and Drug Administration in connection with

Page 24

1  pharmaceutical clients in expressing any of your
2  opinions in this case, including the methods that
3  Mr. Altman employed on your behalf in making these
4  submissions?
5      A.  No.  Not specifically, no.
6      Q.  Not specifically.  How about generally?
7      A.  He does the same general types of searches in
8  both litigation and as well as in the product
9  development assignments.
10     Q.  It's not my question.
11         MR. BARNES:  Would you read back that last
12  question, please.
13         (The reporter read the portion requested.)
14         THE WITNESS:  It is the same methods that he
15  uses for both our litigation work as well as
16  pharmaceutical development work.  So I'm relying on
17  the experience I have gained with him in the
18  litigation for my work in this case.
19  BY MR. BARNES:
20     Q.  Please list every drug pharmaceutical client
21  that Mr. Altman has assisted you with --
22         (Brief interruption.)
23         MR. FROMSON:  Did you finish the question?
24         MR. BARNES:  I did not.  Thank you.
25         MR. FROMSON:  Okay.

Page 25

1  BY MR. BARNES:
2      Q.  Please list for me each pharmaceutical client
3  with whom you have provided services and have engaged
4  the services of Mr. Altman of Finkelstein &
5  Associates --
6          MR. FROMSON:  Object --
7  BY MR. BARNES:
8      Q.  -- for me.
9          MR. FROMSON:  Okay.  Now, just note my
10  objection again to the extent that she's already
11  indicated that confidentiality agreements from
12  those pharmaceutical companies --
13         MR. BARNES:  Make your record.
14         MR. FROMSON:  I thank you.
15  -- prevent her from answering that question.
16         THE WITNESS:  Yes, I can't answer it.
17  BY MR. BARNES:
18     Q.  Would you please -- you're refusing to answer
19  the question?
20     A.  Well, I'm refusing because I am not permitted
21  to answer the question.
22     Q.  Would you please provide me with
23  confidentiality agreements with these companies with the
24  names redacted?
25         MR. FROMSON:  Just note my -- my same

Page 46

1    have 6 -- I have 6 being the -- I pulled this out
2    separately.  Put it right on top.  Thanks.
3        Now, I'm going to -- I'm just going to -- now,
4    I'm going to just -- just lay a foundation with --
5    with counsel so we understand what this is.
6        This was at our request.  Your firm, from
7    Mr. Altman, provided Exhibit No. 7.  Mr. Altman,
8    will you describe what -- what is -- Exhibit No. 7
9    contains, for the record, please.
10       MR. FROMSON:  Notwithstanding that Mr. Altman
11   has not been sworn under oath, I certainly don't --
12       MR. BARNES:  I'll -- I'll --
13       MR. FROMSON:  I don't have an objection to him
14   making a representation for our firm and for our --
15   for our discussion purposes.
16       MR. BARNES:  And he did -- he made that
17   repre- -- he can make -- he's making this
18   representation under your direction and permission,
19   correct?
20       MR. FROMSON:  As part of what we'd consider --
21   we would consider to be a meet-and-confer process,
22   absolutely.
23       MR. BARNES:  Thank you very much.
24       MR. FROMSON:  Go ahead.
25       MR. BARNES:  Okay.

Page 47

1        MR. ALTMAN:  I prepared a disk at the request
2    of defense counsel which contained all of the
3    material that I had sent to Dr. Blume and all of
4    the material I had actually created, all of my
5    working copies of all of the material I had worked
6    with, as well as the raw data, I believe, that had
7    been provided to me by either the -- by the
8    defendants, by Pfizer, in this case.
9        MR. BARNES:  Okay.
10       MR. ALTMAN:  And I just might add, that disk
11   will contain a lot of information that was not
12   actually provided to Dr. Blume, so she does not
13   have everything that is on that disk.
14   BY MR. BARNES:
15   Q.  Okay.  Dr. -- Dr. Blume, describe for me, if
16   you would --
17       MR. BARNES:  I'll accept your representation,
18   and thank you.  That was not part of that
19   discussion between counsel and -- for the
20   plaintiffs and the defense counsel.
21   BY MR. BARNES:
22   Q.  When Mr. Altman -- describe how in this case
23   you've interacted with Mr. Altman in terms of the
24   performing any analyses and -- on the various databases
25   and data sets that you've referenced in -- in your -- in

Page 48

1    your prior answer.
2        MR. FROMSON:  Just -- just note my objection
3    to the form of the question to the extent that
4    you're asking her anything that pertains to the
5    subject matter of draft reports that were
6    ultimately provided.
7        MR. BARNES:  I do not want draft report
8    information.  I don't know if she'd even know that.
9    But if you do, that -- not the draft report.
10   BY MR. BARNES:
11   Q.  What I want to know, when you communicated
12   with Mr. Altman, what analyses -- or how did you
13   interact with him in terms of creating the analyses for
14   your consideration in this case?  Broadly.
15   A.  Uh-huh.  (Indicates affirmatively.)
16       I asked Mr. Altman to conduct the same sort of
17   analyses that we conduct in our standard
18   pharmacovigilance work for -- for pharmaceutical
19   companies.  And what that means is accessing the
20   different types of events at different periods of time.
21       In this particular instance, the report is
22   divided into four time periods.  And in each time
23   period, we looked at all available databases, which
24   included the U.S. pharmacovigilance database referred to
25   as either "SRS" or "SRS/AERS."  We accessed the World

Page 49

1    Health Organization database.  We looked at Health
2    Canada at least during one period in which it was
3    available.  I believe in this report we also looked at
4    DAWN, the Drug Abuse Network Test, the Test Network, and
5    the internal Pfizer pharmacovigilance database or
6    adverse event database.
7        And during that period of time -- during those
8    periods of time, we conducted the same sort of queries
9    that we conduct as part of our NDA preparation efforts
10   and as part of our post-NDA pharmacovigilance
11   assignments for clients.
12       And that includes -- in this particular case,
13   we were interested in psychobiological, neuropsychiatric
14   terms, and we were also look -- interested in looking at
15   the contribution of those terms relative to the entire
16   database over time.
17   Q.  Okay.  Now, specifically, can you set forth in
18   specifics what inquiries you had Mr. Altman run in
19   connection with your review of the various databases?
20   And I'm not so much interested in report, but the -- you
21   know, the -- but the types of inquiries you asked him to
22   run.  And are all of them included in your report?
23   A.  Yes, I can address that.
24   Q.  Thank you.
25   A.  And the assignments varied, of course, by

Page 50

1    necessity during different time periods.
2        I believe the first time period that we will
3    be interested in is in the period 1994 to 1996. And
4    I'll get to that in just a second.
5        Now, the adverse events that are noted in this
6    report that appear in either quarterly or annual reports
7    or in PSURs, we are able to access those and address
8    those in our office.
9        Where I turn to Mr. Altman's expertise are in
10   the -- are in the large databases that are relied upon
11   in doing -- conducting pharmacovigilance work. So that
12   would include the Pfizer's -- Pfizer's internal
13   database. And, for example, he would have been involved
14   in the work that we did in -- the first time period of
15   relevance is '94 to '96.
16       Q.  Would you please tell me the charts which he
17   pulled for you, please.
18       A.  He filtered the data that would have been
19   involved in -- on page 69 of my report, page 70, 71, 72,
20   which are the filter of the top 25 adverse events during
21   that relevant time period in the database across all
22   body systems. And that would proceed to 72, 73, 74.
23       Beginning on page 75, which is paragraph 117,
24   we turn then to the various available databases,
25   independent available databases. During this timeframe

Page 51

1    with the U.S. Government, it would have been the SRS --
2        Q.  Who did --
3        A.  -- system.
4        Q.  Who -- who pulled the data on -- and did the
5    analysis for paragraph 117 on page 75?
6        A.  Mr. Altman.
7        Q.  Mr. Altman did?
8        A.  Yes. This is from the FDA's database. It's
9    maintained by -- I think it's maintained by NTIS.
10       Q.  So just so I understand, the tables on 69, 70,
11   71, 72, 73, 74, and page 75 were prepared by Mr. Altman,
12   correct?
13       A.  He provided me with the numbers of events.
14   The tables were actually prepared here.
15       Q.  What did you do -- let's just take page 75.
16   What -- describe what you personally did to prepare
17   Table -- the table on page 75.
18       A.  Okay. This is in 1994, which would have been
19   the first marketed year of Neurontin in the
20   United States, so Pfizer would be submitting quarterly
21   reports during that timeframe. So we pulled the terms
22   that we were interested in having filtered by Mr. --
23   Mr. Altman from the FDA's database. We gave him the
24   terms that we were interested in. He gave me the number
25   of reports.

Page 52

1        I also asked him to give me the total number
2    of events in the database so we could do the standard
3    calculation of the percent of total.
4        Q.  So on page 75, you look at abnormal dreams,
5    that -- that percentage, the numerator is -- let's say
6    on 1996 Q2, the numerator would be one, and then the
7    denominator would be all events in the database
8    pertaining to having been reported to Neurontin?
9        A.  That would be yes.
10       Q.  Okay.
11       A.  Oh, yeah. And it would only be the Pfizer
12   database, of course, because it was a sole source
13   product at that time.
14       Q.  Okay. Continue after '75 as to what -- what
15   Mr. Altman prepared versus to what -- as to what you
16   prepared.
17       A.  Okay. So the --
18       Q.  Who accessed Health Canada on page 76?
19       A.  Well, that's World Health Organization.
20       Q.  I'm sorry.
21       A.  That's not Health Canada.
22       Q.  I made a mistake. I apologize.
23       A.  We generally access the WHO database. Now,
24   whether we did it in this case or Mr. Altman accessed
25   it, I don't specifically recall.

Page 53

1        Q.  You don't know who prepared this. Who
2    provided the terms?
3        A.  We provided the terms.
4        Q.  You directed the terms and he went -- he or
5    you -- on this, on page 76 -- went into the database to
6    extract it?
7        A.  Yes, it's a little different with the World
8    Health Organization. When you receive the database from
9    them, they send you the entire database, so it's a
10   matter of going through and extracting from a whole --
11   you don't -- you don't have the opportunity to do it by
12   body systems. They send you everything.
13       Q.  Do you have -- okay.
14       Do you have the database that was provided to
15   you from World Health Organization in your possession;
16   that was used to create this table on page 76?
17       A.  Yes, and I have put that on this disk as well.
18       Q.  And that would be referring to Exhibit No. 3?
19       A.  Yes.
20       Q.  Thank you very much.
21       All right. Why don't you continue to review
22   the report just as to what you -- so -- what you
23   prepared.
24       Right now, we have Mr. Altman preparing 69,
25   70, 71, 72, 73, 74, 75, and 76, correct?

14 (Pages 50 to 53)

Page 54

1    MR. FROMSON: Just note my objection as to the
2    form in terms of the use of the word "prepare."
3    MR. BARNES: "Filtered" was her room -- word.
4    "Filtered." I'll --
5    THE WITNESS: Yes. And just to clarify, I
6    would have to check if we -- if we did the World
7    Health Organization or if he did it.
8    BY MR. BARNES:
9    Q. You'll check on that for me?
10   A. Yes, I will.
11   Q. Okay. Now, when you -- Mr. Fromson noted an
12   objection. What do you mean by Mr. -- by using the
13   phrase Mr. Altman filtered the information for you, what
14   does that mean?
15   A. Well, my understanding of the FDA and some of
16   these other databases is they are huge databases. The
17   word "filter" is simply my way of asking him to apply
18   the rules and the conditions that he has established in
19   evaluating the database and calculating the number of
20   specific events at -- at this designated time periods.
21   Q. What are the rules that Mr. Altman established
22   in querying the databases to get the number of events?
23   A. Well, we out -- we outline these. When we
24   submit, for example, to the Food and Drug
25   Administration, we give a complete list of what he does.

Page 55

1    But my understanding is that care is taken to
2    take into consideration when there is an initial report
3    versus a follow-up report so it is not counted twice.
4    We filter -- I believe he filters the database so that
5    we are getting all of the information. We take the last
6    reports so that it includes all the cumulative
7    information. He checks for duplicates. He is able to
8    filter them for us by suspect status, nonsuspect status.
9    If we ask, he can filter it by various demographics.
10   For example, if the patient were on other meds, were not
11   on other meds.
12   If we're given information generally, whatever
13   fields -- it is my understanding, whatever fields are in
14   the intake form, he would be able to filter by those
15   forms -- fields. Excuse me.
16   Q. Are you -- is it your testimony that that's
17   what he did in this case?
18   A. Well, what I asked for -- and there are
19   certain -- there are certain precautions that he
20   undertakes for all tables. For example, he is very
21   careful that we don't double count. He is very careful
22   that we put the event when the event was -- when the
23   event occurred, not necessarily when reported.
24   Q. How do you know he was careful? What did you
25   do to -- did you do anything to audit his work in this

Page 56

1    case to verify that he was exercising care?
2    A. We have used his -- the method that he has
3    developed has been provided to the FDA. FDA has queried
4    him independently on the way in which he analyzes these
5    data. FDA has -- has approved our applications using
6    these data. I understand that Mr. Altman communicates
7    with the FDA on projects other than mine, as well, on
8    these database assignments, so --
9    Q. My question is, what did you do in this
10   particular case to verify that Mr. Altman exercised care
11   in preparing these tables and filtered it in an accurate
12   and reliable way --
13   A. Well, I under --
14   Q. -- in this case?
15   A. Yes. I understood he used the same system
16   that has been previously found to be acceptable. I
17   cannot tell you over the last four years of whether I
18   did any other independent checking or not. I just don't
19   recall.
20   Q. In this case, did you do any independent
21   checking of Mr. Altman?
22   A. That's what I'm saying. In the last four
23   years, I just don't recall if I did or not.
24   Q. Well, when were you retained in this matter?
25   A. 2003. 2003, I think.

Page 57

1    Q. 2003.
2    And who called you?
3    A. Wow. I think I was contacted by
4    Andrew Finkelstein.
5    Q. Okay. So is there any documentation that you
6    have reviewed to verify that the material provided to
7    you and the analysis provided to you by Mr. Altman was
8    done in -- in a scientifically-rigorous and reliable
9    manner?
10   MR. FROMSON: Just note my objection as to
11   form.
12   THE WITNESS: I -- over the years, I don't
13   recall if I did any of that on this case. I accept
14   his work because it has been accepted and -- and
15   validated to FDA satisfaction.
16   BY MR. BARNES:
17   Q. Would you de- -- would you please describe to
18   me the -- the cases that Mr. Altman worked --
19   Mr. Altman's work has been validated by the Food and
20   Drug Administration.
21   A. Well, I -- I can tell you that NDAs have been
22   approved using his database work, but I -- it's the same
23   answer I gave you earlier. I can't identify those
24   clients.
25   Q. Has any of Mr. Altman's work been published in

15 (Pages 54 to 57)

Page 58

1  a peer-reviewed medical or scientific journal concerning
2  FDA databases?
3      A.  I believe so.  I know he's published at
4  meetings.
5      Q.  Well, published --
6      A.  At peer-reviewed meetings.
7      Q.  Peer-reviewed journals is the question.
8      A.  I think so.  You would have to question him,
9  but I do recall that there was a journal article.  Yes,
10 I think so.
11     Q.  And what was the name of the article?
12     A.  I don't recall.  It was some year or so ago.
13 You'll have to question him.  I don't know.
14     Q.  Can you tell me how -- what -- if you've read
15 it?
16     A.  I did at the time, yes.
17     Q.  And you cannot identify it for the record
18 today?
19     A.  No.
20     Q.  So is your testimony that Keith Altman has
21 been published in the peer-reviewed medical literature
22 regarding postmarket surveillance?
23     A.  I think so.  Yes, I think so.
24     Q.  Is that important to you?
25     A.  Well, it would -- I guess.  What's important

Page 59

1  to me is if FDA accepts his work.
2      Q.  Okay.  And I want --
3      A.  And FDA has accepted his work.  So that's
4  what's important to a regulatory person.
5      Q.  And I'm going to take your word for it.
6      A.  Well, I know, but -- and if I can tell you
7  more, I will.  But I will -- I'm under oath and I will
8  tell you that the database work that he has done for us
9  has been a component of the pharmacovigilance assignment
10 of approved NDAs.
11     Q.  Well, do you understand that Mr. Altman is
12 employed by Mr. Finkelstein and Mr. Fromson's law firm?
13     A.  Yes, of course.
14     Q.  Do you understand that he has a financial
15 interest in the outcome of this litigation?
16         MR. FROMSON:  Just note my objection as to
17 form.
18         THE WITNESS:  Oh, I have no idea how he's
19 compensated.  I have no idea.
20 BY MR. BARNES:
21     Q.  Okay.  When -- have -- do you think it's --
22 that the -- that his work preparing data for you and
23 tables for you could be subject to bias, given his
24 firm's financial interest in the litigation?
25         MR. FROMSON:  Objection as to form.

Page 60

1          THE WITNESS:  Oh, I would have no idea how to
2  answer that.  He has no -- he's only paid hourly
3  for the work that he does for the pharmaceutical
4  companies, and that work has withheld inspection
5  and approval by FDA.
6  BY MR. BARNES:
7      Q.  No, that's not my question.  My question --
8      A.  But I can't answer the question you've posed.
9      Q.  Well, I'm going to ask the question again,
10 okay.
11         MR. BARNES:  Would you read back the question
12 that I asked?
13         (The reporter read the portion requested.)
14         THE WITNESS:  And I will answer the same way.
15 I have no idea how he's compensated.  I don't -- I
16 don't -- I don't think so.
17 BY MR. BARNES:
18     Q.  Well, usually --
19     A.  But I don't know.
20     Q.  Well, usually in -- do you have an
21 understanding generally in pharmaceutical litigation how
22 plaintiff's law firms are compensated, in a general way?
23     A.  Yeah, I think so.
24     Q.  Can you tell me?
25     A.  My understanding -- and, again, this is

Page 61

1  completely without anyone ever telling me this.  But my
2  general understanding is that plaintiff law firms
3  develop the cases and hire the experts and review the
4  data.  And if the plaintiff cases are successful, then
5  there is some -- some percentage given to the attorneys
6  from the earnings of the -- of the plaintiffs, the
7  victims.
8      Q.  So you would agree that the -- the plaintiff's
9  lawyers have -- and their employees -- have a financial
10 interest in the outcome of the -- of the Neurontin
11 litigation?
12         MR. FROMSON:  Just note my objection.
13 BY MR. BARNES:
14     Q.  Do you agree with that?
15         MR. FROMSON:  Same objection, form.
16         THE WITNESS:  Yes, I guess it -- on a 30,000
17 feet, I would agree to that.  How -- how this type
18 of work is -- how the expenses for his time and
19 this --
20 BY MR. BARNES:
21     Q.  That's not my question.
22     A.  -- I have no idea.
23     Q.  Because you do a lot of pharmaceutical
24 litigation work, don't you, for plaintiff's firms,
25 right?

16 (Pages 58 to 61)

Page 66

1    Q.  You may answer.
2         THE WITNESS:  Do I answer?
3  BY MR. BARNES:
4    Q.  Yes.
5    A.  Mr. Altman is hired to do this because he has
6  a specialty in filtering, or whatever more sophisticated
7  term that should be applied to it, these databases.  He
8  is used for this in our -- in our work and in other
9  people's work.
10         He was asked by the FDA years ago to validate
11  his efforts, and FDA confirmed his method.  I would not
12  be able to completely validate what he does.  But once
13  the FDA statisticians and epidemiologists approved NDA's
14  using his method, I have accepted his method.
15    Q.  How do you know that --
16    A.  And --
17    Q.  I'm sorry.
18    A.  And as you will know through my discussions of
19  the data, my opinions are certainly not predicated upon
20  these individual databases any more than they are on
21  other events in this database.  So while the information
22  is important and while it agrees with other opinions, it
23  is not the ultimate opinion, but I accept his work based
24  on persons far more knowledgeable and skilled in this
25  area than I.

Page 67

1    Q.  Did FDA review his work in this case?
2    A.  No.
3    Q.  In the Neurontin case?
4    A.  No.
5         MR. FROMSON:  Just note my objection as to
6    form.
7         THE WITNESS:  He -- they -- they reviewed and
8    validated his approach of the FDA databases and
9    other databases.
10  BY MR. BARNES:
11    Q.  Which you won't produce to me yet at this
12  point for me to examine you on?
13    A.  Well, I'm certainly willing to ask if I may do
14  that, but you would certainly not ask me to violate my
15  confidentiality or contracts.
16    Q.  Not today.  I'm not going to ask you to do
17  that today.  I've asked -- we'll take it up with the
18  court if we have to.
19         But have you --
20    A.  No, I have not validated his work.
21    Q.  Okay.  And so you don't know the rate of error
22  in his work in the report, do you?
23         MR. FROMSON:  Objection as to form.
24         THE WITNESS:  If -- if there is any errors.  I
25    don't know if there is any errors.

Page 68

1  BY MR. BARNES:
2    Q.  One way --
3    A.  The error -- the error rate was acceptable
4  when he did a far more difficult assignment.
5    He -- the -- the NDA work that he does for us
6  is far more difficult than this work.  And the rate of
7  errors were -- if any, were certainly acceptable.
8    Q.  That's not my question.
9    A.  I know, but I'm trying to answer your
10  question.
11    Q.  I understand you are, but listen to my
12  question, okay, and we'll just keep moving on.
13         My question is in connection with the work he
14  has done on pages -- in your report -- 60 -- you've
15  identified Pages 69, 70, 71, 72, 73, 74, 75.  We don't
16  know about 76.
17         For example, you have not gone back and -- and
18  established the error -- any -- the rate of error in the
19  filtering he did for you prior to this deposition,
20  correct?
21         MR. FROMSON:  Objection to the extent that it
22    hasn't already been asked and answered.
23         THE WITNESS:  Correct, I have not done that.
24    He may well have underestimated the reports.  No,
25    I'm kidding.  He -- I have not checked anything.

Page 69

1  I'm not capable of validating his work.
2  BY MR. BARNES:
3    Q.  So it is your testimony that you have never
4  specifically done anything to validate his data in 2007
5  on his work in Neurontin?
6         MR. FROMSON:  Same objection, to the extent
7    that it hasn't already been asked and answered.
8         THE WITNESS:  Yes, I have not -- I am not
9    capable of independently validating his extraction
10    of data from -- from these databases.
11  BY MR. BARNES:
12    Q.  At any time in this litigation, correct?
13         MR. FROMSON:  Same objection to the extent
14    that it has not already been asked and answered.
15         THE WITNESS:  Yes.
16  BY MR. BARNES:
17    Q.  Okay.  Now, let's -- let's finish going
18  through your report and identify other tables that
19  Mr. Altman --
20    A.  Okay.
21    Q.  -- filtered for you.
22    A.  Okay.  And, again, I don't -- I don't mean
23  to -- to limit what he does as filtering.  That's simply
24  my shorthand way of referring to it.
25         The Pfizer database --

Page 70

1    Q.  Well, they --
2        MR. BARNES:  Would you read that back, that
3    last answer.  I apologize.  Read back her last
4    answer.  And identify the pages, but read back that
5    last answer.
6        (The requested portion was read by the
7    reporter.)
8    BY MR. BARNES:
9    Q.  Well, would you give me the long-handed way of
10   referring to filtering as to describing in detail what
11   Mr. Altman's work entails for you when he runs these
12   tables and analysis for you, because I don't want to --
13   you've said "shorthand." I don't want the short.  I
14   want the complete answer.
15       MR. FROMSON:  Just note -- are you finished?
16       MR. BARNES:  Yeah.
17       MR. FROMSON:  Just note my objection as to
18   form to the extent that it has not already been
19   asked and answered.  On the record, you will see
20   that she -- you asked about rules, conditions, and
21   evaluating queries, so that my objection is to the
22   extent it's already been asked and answered.  Go
23   ahead.
24       THE WITNESS:  Okay.  My understanding, when --
25   again, you certainly have to ask him these

Page 71

1    questions.
2        My understanding, when Mr. Altman approaches a
3    database, is that he establishes the database so
4    that we are fulfilling requirements for ensuring
5    that we have access -- that we have secured all the
6    numbers that are available, that there has not been
7    double counting, and that we have structured the
8    database in such a way that allows us to get an
9    accurate number of the events at each time period.
10       I know that several procedures and controls
11   are put into place to allow him to do that.  What
12   the specific natures are, specific natures of those
13   controls, I just don't know.
14   BY MR. BARNES:
15   Q.  That's fair.  Thank you.
16       MR. BARNES:  All right.  Let's take a very
17   short break, about five minutes pushing.
18       MR. FROMSON:  Okay.
19       THE VIDEOGRAPHER:  Off the record at 10:42.
20       (Recess taken.)
21       THE VIDEOGRAPHER:  On the record 10:51.
22   BY MR. BARNES:
23   Q.  Okay.  I think, Dr. Blume, we were at page 76
24   and you were talking about -- we were addressing the
25   work that Mr. Altman had done on your -- with you on

Page 72

1    your report.  And let's continue after page 75 and 76.
2    You're not sure about 76.  You'll tell me.  Let's
3    continue.
4        When -- what's -- what other pages did he
5    provide you the work product for?
6    A.  Well, if I didn't already say it, when I was
7    talking about the internal database, these are captioned
8    as serious events.  So another thing that we do when
9    we're looking at databases is, in addition to canvassing
10   the entire database, we also look at variety of subsets.
11   And one of those subsets are those events that have been
12   declared serious.  And FDA defines a serious, a
13   criteria for an event to be serious.
14   Q.  And who did that canvassing of the database to
15   identify serious adverse events?  Is that something you
16   did personally?
17   A.  If you -- if you look at an FDA MedWatch form,
18   it defines the criteria which makes it serious, so it's
19   a computer filtering of it.  If a patient is
20   hospitalized, there is certain things that you check to
21   make it serious or nonserious.
22   Q.  I asked a poor question and I apologize.  But
23   my question is in terms of your analysis when you
24   generated reports on serious adverse events.
25       Did -- who did the query to generate the

Page 73

1    listings of the serious adverse events; something you
2    did or someone did at your request?
3    A.  Okay.  Serious is -- there is -- there is no
4    degree of choice in that.
5    Q.  It's a designation.  I understand that.
6    A.  Yes.  And we use the same designation for the
7    term "serious" that FDA does.
8    Q.  Who extracted the serious cases for your
9    report?
10   A.  Mr. Altman.
11   Q.  Okay.  He did that for you?
12   A.  Yes.
13   Q.  And, again, you -- you've not validated
14   that -- that query?
15   A.  No.
16   Q.  You agree?  I asked you a double negative.
17   A.  Well, I agree that Mr. Altman uses the
18   specific terms that we require for serious, which are
19   the FDA terms for serious, but I did not hire a separate
20   computer base -- computer database expert to validate
21   his work for Neurontin.
22   Q.  And you didn't do it personally?
23   A.  Well, if I could have done it personally, I
24   wouldn't have hired Mr. Altman.  I hire him for his
25   expertise.

19 (Pages 70 to 73)

Page 74

1    Q.  Are you paying Mr. Altman in the Neurontin
2  litigation or -- or not?  Who -- who --
3    A.  Oh, no, I don't think so.  No, no, not in
4  Neurontin, but in general.
5    Q.  Well, in this case?
6    A.  In this case.
7    Q.  He's working for the law firm, right?
8    A.  Yeah, I don't know how all the different law
9  firms orchestrate together.  I have no idea.  But I did
10  not pay him.
11    Q.  And you're -- so -- and you understand he's an
12  employee of the Finkelstein law firm, correct?
13    A.  Yes, I answered that earlier.  Yes.
14    Q.  And you understand that Mr. Finkelstein's law
15  firm, Mr. Fromson's law firm are liaison counsel in the
16  product liability litigations?  He said that at the
17  start of the deposition, right?
18    A.  Yes.
19    Q.  So -- so -- and it's your understanding that
20  Mr. Altman's work in this case, is as part of the
21  Finkelstein law firm, correct, and not part of the --
22  your organization, correct?
23    A.  Yes.
24    Q.  Okay.  Let's go back to highlighting the parts
25  that Mr. Altman did for you.

Page 75

1    A.  Page?
2    Q.  I'm sorry.  Why don't you go -- we were at the
3  World Health Organization on page 76.  Let's start from
4  there.
5    A.  Yes.  And, again, I don't know if we tabulated
6  these numbers or if we sent -- or if we sent the
7  database and Mr. Altman gave us the numbers.  I don't
8  know.
9    Q.  Okay.
10    A.  I think we ordered the World Health.  We
11  generally order the World Health Organization database.
12    Q.  And so you'll let me know?
13    A.  I will.
14    Q.  Okay.  Thank you.
15    A.  Continue?
16    Q.  Yeah, please.  I'm on page 78.  That's the
17  next table.
18    A.  We did this table.  This is coming from
19  research reports.  This is just a summary of suicidal
20  events from Pfizer's research reports.
21    Q.  Okay.  You did that yourself?
22    A.  Yes.
23    Q.  Okay.  What's the next table?
24    A.  The next table is similar to what we have just
25  discussed.  This is a tabular summary of dechallenge

Page 76

1  events from various Pfizer studies.
2    Q.  And what page is that on?
3    A.  88.  Begins on 88.
4    Q.  I have it on page 87.
5    A.  87?
6    Q.  On my version of your report, it's 87.
7    A.  Yeah.  Yes, this is -- well, page 7 is an
8  overview of everything that's going to follow.
9    Q.  Who prepared your table on page 87?
10    A.  We did, PDG.
11    Q.  Okay.  And how about page 88?
12    A.  PDG did 88, 89.  89.
13      And we are now in the next time era, which is
14  '96 to 2002.
15    Q.  Let me ask you this at this juncture.  We'll
16  continue with Mr. Altman vs. PGD (sic) -- and PGD is
17  Cheryl Blume?
18    A.  Well --
19    Q.  And people working your under direction?
20    A.  PDG is -- is everyone at PDG, yes.
21    Q.  Who works for you?
22    A.  Yes.
23    Q.  So you're directing PGD work?
24    A.  Yes.
25    Q.  Okay.  So just -- I'm just making sure I

Page 77

1  understand.
2      So when you say "PGD," it's either you or
3  someone working under your supervision at this
4  organization?
5    A.  At PDG, yes.
6    Q.  Okay.  Got it.
7      Okay.  Just a preparatory question.  You said
8  that your report was organized into time periods.  Who
9  made the decision as to which -- how the time periods
10  would be stratified?
11    A.  Oh, when we -- when the Finkelstein firm first
12  talked to me about this case and outlined what -- what
13  they had -- would like to see me consider completing, it
14  was decided that we would look at this time period,
15  which was -- which was, you know, fairly long, '94 to
16  present, and in a -- what would be the best way from a
17  regulatory or pharmacovigilance perspective to evaluate
18  the Pfizer actions, data available to Pfizer from other
19  places, et cetera.  And I had suggested that the way
20  it's done in industry is that we look at a product prior
21  to approval and then after approval at -- at various
22  points in time.
23      And when I had a chance to review initial --
24  initiate my review of the Neurontin story, in my mind,
25  it fell into four -- four categories, the critical

20 (Pages 74 to 77)

Page 94

1   "Pfizer," Pfizer -- you understand that to be Pfizer,
2   Inc., a corporation, right?
3       A.   I guess, yes.
4       Q.   And if Pfizer -- so -- so you're willing to
5   say "Pfizer," just lump the defendants together under
6   the rubric Pfizer even if it's inaccurate or misleading
7   or unfair?
8       MR. FROMSON:   Just note my objection as to
9   form.
10      THE WITNESS:   That's just simply the way it's
11      been referred.   I've just referred it as to the
12      last one.   If you want, I can go back and at
13      various time points specifically note which one it
14      is, but my understanding of the -- of the concern
15      has gone from the beginning until now.
16  BY MR. BARNES:
17      Q.   Well, where you understand it's Pfizer, Inc.,
18  that has prepared the table or have -- has provided
19  analysis or not used the -- I'd appreciate if you'd use
20  the word "Pfizer, Inc.," so I can ask you questions that
21  way.   And if it's a prior -- if it's Parke-Davis or
22  Warner-Lambert that is responsible for the preparation
23  of the event, to the extent you -- you can say that, I
24  would appreciate it.   It would make our -- it would make
25  the deposition go quicker, because I'm going to ask you

Page 95

1   these questions:   "What is the basis on Pfizer, Inc.,
2   dated?"
3       "Oh, I just lumped them all together."
4       So to the extent you're capable of actually
5   differentiating between corporations and parties in this
6   litigation as to who did what, that would be
7   appreciated.
8       MR. FROMSON:   Just note my objection as to the
9   form of the last question.
10      THE WITNESS:   Right.   Well, I can make it even
11      easier than that.   I have all of the annual reports
12      and the PSURs and IND annual reports in the room,
13      so when you ask the question, I will get up and
14      actually get the annual report --
15  BY MR. BARNES:
16      Q.   Well --
17      A.   -- so I answer it specifically.
18      Q.   When -- when did Pfizer -- do you understand
19  when Pfizer, Inc., acquired an interest and
20  Warner-Lambert acquired the company?
21      MR. FROMSON:   Just note my objection as to the
22      form of the question, in terms of it having a legal
23      conclusion when you use the term "acquire
24      interest."
25      THE WITNESS:   I think it's 2000.

Page 96

1   BY MR. BARNES:
2       Q.   Okay.   So -- okay.
3       In 1996, who had the -- the approval by the
4   Food and Drug Administration to market Neurontin in the
5   United States?
6       A.   Oh, I don't -- I don't know if one was
7   marketing.   I don't know the difference between the
8   Parke-Davis and Warner-Lambert issue.   I don't know.
9       Q.   Just say Warner-Lambert, who --
10      A.   Okay.   Warner-Lambert.   I don't know.   I have
11  no idea.   But I have the report, so if you want a --
12      Q.   No, I -- do you --
13      A.   If you want a correct answer, I will get up
14  and get the reports.
15      Q.   Why don't we do this.
16      You don't know who filed the data in fourth
17  quarter of 1996, do you?   You don't know what company
18  filed it, do you?
19      A.   I -- I think it's Parke-Davis, but I'm not
20  sure.   But I have the reports, so why don't I get up --
21      Q.   You know it's not Pfizer, correct?
22      A.   Well, I think -- I think Pfizer is 2000.   But
23  I have the reports, so I don't know why you're
24  questioning me this way when I can get up and get them.
25      Q.   Just when you say "Pfizer," you should be

Page 97

1   intentional as to what you're saying about Pfizer.   And
2   if another company filed it, then I'd appreciate if
3   you'd -- you direct your --
4       A.   Well --
5       Q.   -- your -- your -- your answers to that.
6       A.   I will --
7       Q.   We'll proceed.   I'll correct you every time if
8   I have to.   Okay?
9       A.   Okay.
10      Q.   So this is an Altman analysis on 1996, 1997,
11  correct?
12      A.   Page?
13      Q.   Page 128.
14      MR. FROMSON:   Hold on.   Just note my objection
15      to the form of the question as "Altman analysis."
16      THE WITNESS:   Yes.
17  BY MR. BARNES:
18      Q.   Okay.   And did you -- again, you didn't
19  validate this work, did you?
20      A.   No.
21      Q.   Is it fair to say -- just so we don't have to
22  ask this every time you identify Mr. Altman as the
23  source of the -- of the tables, is it fair to say
24  that -- that you've not independently validated or
25  tested any of the tables that Mr. Altman provided to

25 (Pages 94 to 97)

Page 98

1  you, correct?
2     A.  That is correct.
3     Q.  Okay.  When's the next one?  What's the next
4  table?  I have one on 130.  And this is the World Health
5  Organization.
6     A.  Yes, I see on it -- just getting back to your
7  previous criticism, I see on the front page that I have
8  specifically noted that "Pfizer defendants" will refer
9  to Warner-Lambert, Parke-Davis, and Pfizer.  And I think
10 the tables do -- are coded as "Pfizer defendants."
11       So if it makes it easier, I will say "Pfizer
12 defendants" instead of "Pfizer."
13    Q.  Well, now -- but I -- but I think -- do -- do
14 you think it's misleading to have -- to say the word
15 "Pfizer defendants" to -- which includes Pfizer in -- in
16 a report or a regulatory activity or a marketing
17 practice that predated their -- their ownership of the
18 company?  That's -- that's --
19       MR. FROMSON:  Just note my objection as to
20 form.
21       THE WITNESS:  I think that I referred to all
22 three clients and I -- no, I don't think it makes a
23 bit of difference as to what my conclusions are.
24 No.
25 BY MR. BARNES:

Page 99

1     Q.  So accuracy as to -- as to which entity
2  actually submitted the report is not important to you as
3  a scientist or regulatory affairs professional?
4     A.  Well, of course -- of course.
5       MR. FROMSON:  Just note my objection as to the
6  form of the question.  Misstates her testimony.
7       THE WITNESS:  Yes, of course it's important,
8  but I specifically said here I was accessing and
9  reviewing data from all three.  And I was very
10 careful to say "Pfizer defendants."
11      But I don't see "Pfizer" in here.  I say
12 "Pfizer defendants."
13 BY MR. BARNES:
14    Q.  Well, what if you would -- are definitions
15 important to you as a scientist and regulatory affairs
16 professional?
17    A.  Of course they are.
18    Q.  And if your definition is somehow misleading
19 or biased or inaccurate, wouldn't you think it would be
20 important to correct it on the record here today if you
21 have a chance?
22    A.  If I'm referred --
23       MR. FROMSON:  Note my objection as to form.
24       THE WITNESS:  I'm referring to it as "Pfizer
25 defendants."  "Pfizer defendants" include all

Page 100

1     three.
2  BY MR. BARNES:
3     Q.  Okay.  All right.  Then let's go to page 132.
4       Who prepared that?
5     A.  PDG.
6     Q.  And next one, please.  Next table.
7     A.  PDG for pages 132, 133, and 134.
8     Q.  Okay.
9     A.  And 135.
10    Q.  How about 137?  These are the Poison Control
11 Center reports.
12    A.  Yes.  And there was a journal article that
13 accessed all of this information.  And I believe this
14 table derives directly from the AGEM (sic), American
15 Journal of Emergency Medicine Report.
16    Q.  And who prepared this table?
17    A.  PDG.
18    Q.  Okay.  How about the DAWN table on page 143?
19    A.  I believe PDG did that.
20    Q.  How about the tables on 145 and 147 -- 6?
21    A.  Okay.  The -- this was done by PDG and these
22 refer back -- this is similar to what we have already
23 discussed.  These refer back to research reports that
24 were generated during this time period.
25    Q.  How about 165?

Page 101

1     A.  Okay.  We've now moved into the fourth
2  category, June 2002 to present.
3     Q.  This is PSUR, so I assume PDG did it, on 166?
4     A.  163, I think was skipped.  That was PDG.
5     Q.  Uh-huh.  (Indicates affirmatively.)
6       Thank you.
7     A.  165 would be PDG.  166.  And then we're back
8  to the AERS database on page 167.
9     Q.  And -- okay.  167, 168 would be work that
10 Mr. Altman provided to you, correct?
11    A.  Correct.
12    Q.  These are SR -- these are AERS database --
13    A.  Yes.
14    Q.  -- tables, correct?
15    A.  Correct.
16    Q.  And then World Health Organization would be
17 PGD?
18    A.  Would be PDG.
19    Q.  PDG.
20       Okay.  And then the next table I have is
21 two -- really, maybe you can explain to me what they
22 are.  Going to page 193, 194, and 195.
23    A.  One, these tables relate to a dany (sic) -- a
24 data mining effort recognized by the agency, recommended
25 by the agency, called PRRs or percent comparison across

26 (Pages 98 to 101)

Page 126

1    Q.  Do you agree with the definition set forth in
2  Dr. Strom's textbook, fourth edition of
3  Pharmacoepidemiology, at 171?
4    A.  If -- if you want to compare across drugs. He
5  also mentions -- or whoever wrote this -- you can
6  compare across disease events. You can use it in a
7  variety of ways. I didn't use it that way, all the
8  ways. I just used it to compare two drugs. You can use
9  a PRR to compare hepatitis versus suicide. You can
10  compare hepatitis with one drug and hepatitis with
11  another.
12    Q.  My question is, do you agree with that -- with
13  Dr. Strom's definition of PRR that is in his group in
14  his textbook at page 171, fourth edition of
15  Pharmacoepidemiology?
16        MR. FROMSON:  Just note my objection as to
17    form of the question and to the extent that
18    she's asked -- it's been asked and answered.
19        THE WITNESS:  Yes, actually, this is the WHO's
20    definition. They wrote this chapter. But, yes, I
21    agree that -- I agree with how you calculate it and
22    that you can use those ratios in a variety of ways
23    to compare across drugs or within a database to
24    compare across events.
25  BY MR. BARNES:

Page 127

1    Q.  Okay. May I have the book back, please. Give
2  you some space.
3        Now, is -- did -- did what Mr. Altman did
4  conform with the method set forth by Dr. Strom in
5  Dr. Strom's textbook at page 171?
6        MR. FROMSON:  Just note my objection as to
7    form, foundation.
8  BY MR. BARNES:
9    Q.  Is that what Mr. Altman did at page 194?
10    A.  Well, I think we also referenced --
11        MR. FROMSON:  Same objection.
12        THE WITNESS:  -- this textbook of it, yes.
13  BY MR. BARNES:
14    Q.  I'm ask -- but if that was -- if that was --
15  fourth edition of Strom on Pharmacoepidemiology, is that
16  what Mr. Altman did?
17    A.  I think we referenced this edition.
18    Q.  I'll come to this --
19    A.  Yes.
20    Q.  -- in a minute.
21    A.  Well, I'm just trying to be specific --
22    Q.  Well, I -- I will --
23    A.  -- when there is issues.
24    Q.  I'll do -- I'm going to come to the third
25  edition in a second.

Page 128

1    A.  Okay.
2    Q.  So let's do the fourth edition. And then if
3  it's important to do the third edition, I'm not -- I'll
4  be happy to do that.
5    A.  Well, I just want to be specific when there is
6  issues.
7    Q.  Okay. Well, my question -- my question is,
8  did -- is what Mr. Altman did what Dr. Strom describes
9  in the fourth edition of Pharmacoepidemiology by
10  Brian Strom at page 171?
11        MR. FROMSON:  Just note my objection.
12        THE WITNESS:  Yes, one of the permutations
13    that is suggested in there is what we did.
14  BY MR. BARNES:
15    Q.  Is -- is -- is what Dr. Strom says is the
16  correct way to do proportional reporting ratio reflected
17  on page 194?
18        MR. FROMSON:  Objection as to form of the
19    question.
20        THE WITNESS:  I don't know how else to say
21    this. In 194, we did the ratios for each drug. By
22    visually looking at the lines in the table, one can
23    do a PRR of one drug for this event versus another
24    drug. I gave you an example of the 12 percent
25    versus the four percent.

Page 129

1  BY MR. BARNES:
2    Q.  PRR was not actually calculated, correct?
3    A.  Well, you can calculate a million PRRs. It's
4  every point against every other point. This is a visual
5  overview of all of the individual percent reports.
6    Q.  Did your report show the individual PRR values
7  over time on page 9 -- 194?
8    A.  Well, it certainly does for Neurontin earlier
9  in the report. I --
10    Q.  On page 194, ma'am?
11    A.  No, this is just a visual overview.
12    Q.  So it's an eyeball, right? You're eyeball --
13  eyeballing it?
14    A.  Well, because, remember, all pharmacovigilance
15  is a signal detection and we're just trying to show the
16  difference. I mean, clearly, Neurontin distinguishes
17  itself in suicide and self-injurious behaviors from the
18  other drugs in -- in this category.
19    Q.  This is your report?
20    A.  So that is meant to be -- that is the purpose
21  of signal detection. If you read FDA's review of the --
22  of the use of PRRs, it is to detect a signal.
23    Q.  Well, we'll get to the FDA's review in a
24  second. Let's -- let's -- I'm asking you a question.
25        Does your report demonstrate the different

1  values of PRR over time?  Did you -- were they
2  calculated?
3          MR. FROMSON:  Just note my objection to the
4  form of the question to the extent it's been asked
5  and answered.
6          THE WITNESS:  There -- there is no table in
7  the report that compares one point with all the
8  other points.  There is not a table that has these
9  hundreds of points in here, no.
10         We did the -- a schematic to show that there
11  is the signal, there is a grouping.  That's all the
12  purpose of this report was.
13  BY MR. BARNES:
14     Q.  Did -- did you do any independent calculations
15  concerning the -- concerning the differences ? the --
16  between the various drugs as are depicted on page 194 in
17  your report, the PRR table class?
18     A.  Are you asking if I validated his arithmetic?
19     Q.  No, did -- based upon -- you said you can
20  eyeball it and make some comparisons and you said
21  clearly there is a signal seen on page 194 because
22  Neurontin is different, correct?
23     A.  I said that when you looked at these kind of
24  data, there is a signal.  Not all of the products are
25  behaving the same.  That's all you get out of a PRR

1  signal is there might be a difference.
2     Q.  Did you conduct any statistical analysis of
3  the data that is depicted on page 194 to determine if
4  there were, in fact, true differences between the plots
5  of the various drugs?
6     A.  No, I --
7          MR. FROMSON:  Just note my -- hold on.  Just
8  note my objection as to the form of the question to
9  the extent she did already -- it has been asked and
10  she did partially answer.
11         THE WITNESS:  I thought I had, but I haven't
12  done anything more than put this table.
13  BY MR. BARNES:
14     Q.  Did you calculate 95 percent competence
15  intervals for the values on the graph on page 194 to
16  determine if the values for Neurontin, for example, are,
17  in fact, different from the values of the other drugs
18  plotted on that graph?
19     A.  No.  And I've never seen 95 percent confidence
20  intervals calculated across a PRR, especially for
21  products that are used for different indications.
22     Q.  How do you know the values are different --
23     A.  I --
24     Q.  -- statistically?
25     A.  I don't.  And that isn't what signal detection

1  and that isn't what PRR is for.  And never have I said
2  that is the purpose of PRRs.
3     Q.  So, statistically, you do not know if the
4  values of the PRR are different for Neurontin than from
5  any other medicine depicted on page 194 of your report,
6  correct?
7     A.  Correct, I have not done any statistical
8  analysis to confirm that.
9     Q.  Now, I'm going to just organize my material
10  here for a second.  Okay?  We'll keep these references
11  here, because we may come back to this.
12         Did you ask Mr. Altman to conduct any
13  statistical analysis between the drugs to see if the
14  values depicted on page 194 of the report are, in fact,
15  statistically different from Neurontin?
16     A.  Well, no, I -- we have a statistician that we
17  use, but I -- I have never done statistical analyses on
18  PRR ratios.  Generally the rule of thumb is, if it's two
19  or more, it's different.
20         And I know for Neurontin that it's at 12 and
21  the next highest one is at six.  So even for the next
22  highest one, the rule of thumb is if it differs by two
23  or more, it's worthy of study.
24         So, no, the answer to your question is it does
25  satisfy the two or more rule, but no --

1     Q.  Where is that published?
2     A.  Well, FDA general -- I know it's in the
3  FDA's -- the last meeting that they did that a signal,
4  if something changes by two or more, either across time
5  or between products, that is a signal and it is
6  deservant (sic) of further study.
7     Q.  Would you please find in the FDA guidance
8  where that is set forth, please.
9     A.  Yeah, I don't know if it's in the guidance or
10  it's the last speech that they just gave on
11  pharmacovigilance issues.
12     Q.  What speech was that?
13     A.  They did a webcast last month.
14     Q.  Was there a text to that?
15     A.  I think -- we listened to it.  I think there
16  is a transcript, but I will check on the break.
17     Q.  Thank you.
18     A.  But perhaps they have the two or more in here.
19     Q.  Is that webcast cited in your report?
20     A.  I don't know.  I don't know.  About the two or
21  more?  I don't --
22     Q.  We'll do the webcast separately.  I don't
23  think it is, but why don't you check the guidance.
24     A.  Okay.  Of the two or more?
25     Q.  Yeah, show me where in the guidance documents

Page 138

1     A. Sure, it's all -- it's one of the tools we
2 have, but you can't say that that reflects what's going
3 on with the product, because FDA cautions that the new
4 number now is -- that they believe it used to be
5 10 percent. They now say one to 10 percent.
6     Q. So the answer to my question is that you did
7 not do statistical analyses to demonstrate that the
8 values for Neurontin on the chart on page 190 -- 194 of
9 your report are statistically different from the other
10 values for the other medicines, correct?
11     MR. FROMSON: Just note my objection to the
12 form of the question to the extent that it has
13 already been asked and answered.
14     THE WITNESS: Yeah, I think I've answered it
15 four times. But, no, I did not do statistical
16 analyses.
17 BY MR. BARNES:
18     Q. Okay. Now, looking at the chart on page 194,
19 the graph, I'd like you to explain to me some things.
20 Okay.
21     So the PRR at the very top of the page, the
22 PRR that's listed -- that is listed here is really an
23 ability to compare to do an eyeball between one line and
24 another line on the graph, correct; and then make an
25 estimation of the difference in terms of a proportional

Page 139

1 difference?
2     A. Yes, you could do that.
3     Q. I mean, what -- I'm trying to understand what
4 you said before, just to orient myself to where you
5 were.
6     So in what sense is this graph a PRR again,
7 just to make sure I understand it?
8     MR. FROMSON: Same --
9 BY MR. BARNES:
10     Q. On page 194.
11     MR. FROMSON: Note my objection to the form of
12 the question to the extent it has already been
13 asked and answered. Go ahead and answer it again
14 over my objection.
15     THE WITNESS: Yeah, I don't -- okay.
16 The Y axis is the percent within a product.
17 So we have a 10 points or 15 points, whatever we
18 have for each product at different time points. If
19 I wanted to compare across time one product with
20 another, I could compare the same point in time
21 with one product and another group of products.
22 PRRs can be conducted a variety of ways including
23 across product comparisons.
24 BY MR. BARNES:
25     Q. So you're saying the information -- okay --

Page 140

1 the information. And I -- this doesn't look like a PRR
2 to me based upon what I read in Dr. Strom's test --
3 textbook.
4     You're saying a comparison, a proportional
5 comparison could be derived from -- by comparing the
6 various data points on the chart and doing a
7 proportional analysis between drugs, correct?
8     A. Incorrect.
9     MR. FROMSON: Just note my objection to the
10 form.
11 BY MR. BARNES:
12     Q. Is that -- is that what you could do with it?
13 Is that what -- is that how you do it?
14     MR. FROMSON: Note my objection to the form of
15 the question.
16 BY MR. BARNES:
17     Q. Is that how you use this chart?
18     A. I could, yes.
19     Q. Well, tell me what inferences you -- well,
20 strike that. Let me ask you this way.
21     What is the word -- well, explain to me what
22 the -- what preferred terms map to the system organ
23 class psychiatric disorders that was used in this
24 analysis?
25     MR. FROMSON: Note my objection as to the form

Page 141

1 of the question.
2     THE WITNESS: Can you repeat that?
3 BY MR. BARNES:
4     Q. Yeah. Explain to me how -- you have a
5 higher-level term for a classification, correct?
6     A. Well, I don't. FDA does.
7     Q. Well, in this report, the table Mr. Altman
8 provided to you says "PRR Over Time, Suicidal and
9 Self-Injurious Behavior HLT," correct?
10     A. Right, this is the high-level -- this is the
11 grouping of high-level terms coded suicidal and
12 self-injurious behavior. He took that number and
13 divided it by the total number of reports at that
14 timeframe.
15     Q. Okay. This is a -- this is their -- as I
16 understand MedDRA, there is something called a -- a
17 system organ class, correct?
18     A. Well, that's one category. This is one down
19 from that.
20     Q. Okay. Well, then the -- so what is the --
21 what is the system organ class for the higher-level
22 terms used on page 194?
23     A. What is the system organ class?
24     Q. Uh-huh. (Indicates affirmatively.)
25     A. I don't -- I mean, I'd have to look at the

36 (Pages 138 to 141)

Page 142

1    map. I don't know what high-level term it fits into.
2    Probably psycho -- psychiatric or psychobiological or
3    CNS. I don't know.
4        Q.  You just don't know?
5        A.  No. We have a whole map system here I can
6    pull out for you and show it to you.
7        Q.  Okay. Do you know the terms that were --
8    that -- for suicide -- the preferred terms that map to
9    the term "suicidal and self-injurious behavior" for the
10   NEC classification not elsewhere identified or
11   classified?
12       MR. FROMSON:  Can you just -- objection as to
13       the form, use of the term "NEC."
14   BY MR. BARNES:
15       Q.  NEC. Do you know what NEC, not other --
16   elsewhere classified, means?
17       A.  No.
18       Q.  What does that mean?
19       A.  Wait a minute. Are you asking what preferred
20   terms get funneled into high-level terms?
21       Q.  Eventually.
22       A.  No, I don't -- I don't know specifically. We
23   have a chart here that we refer to. I do not know
24   specifically.
25       Q.  Do you -- do you know how Mr. Altman performed

Page 143

1    the analysis in terms of identifying the preferred terms
2    that map to the high-level term "suicidal" that is
3    depicted on page 194? What are the preferred terms for
4    the analysis?
5        A.  Well, my understanding, he used the high-level
6    term grouping that includes all of the suicidal and
7    self-injurious behaviors that are collated into -- or
8    reduced into the high-level term.
9        Q.  My -- okay. My question is, what preferred
10   terms map to suicidal as appears on -- now, we're using
11   the analysis on page 194?
12       A.  I don't -- I -- I -- let me see if we --
13       MR. FROMSON:  Was there a question posed?
14       MR. BARNES:  Uh-huh. (Indicates
15       affirmatively.)
16       Question mark.
17       MR. FROMSON:  All right. Now I -- now I
18       recognize it as a question. Thank you.
19       THE WITNESS:  No, I don't -- I did not list in
20       here the specific terms that are included in the
21       HLT grouping, but it was the same grouping across
22       all the -- all of the drugs. And at the break, I
23       can give you the list of --
24   BY MR. BARNES:
25       Q.  Well, what --

Page 144

1        A.  -- specific terms that went into this.
2        Q.  I want to know if you know which ones
3    Mr. Altman included in -- what preferred terms he
4    included in the --
5        A.  He --
6        Q.  -- in the analysis for suicidal?
7        A.  He would have -- it wasn't a choice. It would
8    have been the preferred terms that are collected into
9    the high-level term group.
10       Q.  And do you know how he performed that
11   function?
12       A.  No. You will have to ask him. Specifically,
13   I do not know how he did that, but I will tell you the
14   terms at the break that fall -- that are collected into
15   the high-level term.
16       Q.  As to how he did it, you wouldn't know?
17       A.  Well, he would have -- he would -- he would
18   not have exercised any editing of that. He would have
19   taken whatever terms were in the high-level term.
20       Q.  How do you know that?
21       A.  Because that's what we do. We don't edit
22   terms.
23       Q.  That's what you do. Do you know what
24   Mr. Altman did in this case?
25       A.  Well, when I say that's what we do, he does

Page 145

1    this work for us and we did -- we developed a program
2    that FDA has approved so that we don't have double
3    booking of terms -- or double counting of terms.
4        Q.  Okay. Well, let me ask you this.
5        Do you know how he avoids double counting of
6    terms?
7        A.  I -- I don't understand. Electronically, I
8    don't understand what he does. No, I don't understand
9    it.
10       Q.  Okay. That's fine. Let's talk about
11   self-injurious behaviors.
12       What preferred terms map to self-injurious
13   behaviors for purposes of the graph on page 194 of
14   the --
15       A.  Oh, it's going to be the same answer, I will
16   have to give you the specific list. I can't tell you
17   now what terms are in there.
18       Q.  And do you know how Mr. Altman performed the
19   analysis to actually group the appropriate preferred
20   terms into self-injurious behaviors? Do you -- do you
21   know how that happened, if that happened?
22       A.  Well --
23       Q.  Or how it happened?
24       A.  I don't know specifically -- I don't know
25   which terms are collected within HLT. No, I do not know

37 (Pages 142 to 145)

Page 146

1  that.
2  Q.  Do you know how Mr. Altman treated overdose
3  cases?
4      MR. FROMSON:  Note my objection as to form.
5      THE WITNESS:  I know we discussed earlier in
6  the report that in some cases we included all
7  overdose and in some we ruled out ones that were --
8  we only did intentional overdoses.  And the tables
9  so note that in the earlier part of the report.
10 BY MR. BARNES:
11 Q.  On the PRR Over Time, Suicidal -- I'm sorry.
12 For the PRR Over Time graph on page 194, do
13 you know how Mr. Altman treated overdose cases?
14 A.  I do not know if he included the prescriber --
15 misprescribing of the extra -- of the higher doses.  I
16 don't know that.
17 Q.  Do you know how he treated intentional
18 overdose cases?
19 A.  Well, the intentional would have been included
20 in here.
21 Q.  How do you know that?
22 A.  Because we discussed it and included it in the
23 earlier tables.
24 Q.  Do you know for a fact that intentional
25 overdose cases were included in as -- in either the

Page 147

1  suicidal or self-injurious behavior event?
2  A.  No, I do not have a list of what terms went
3  into this.
4  Q.  Are all intentional overdoses -- constitute
5  suicidal behavior, in your view?
6  A.  No, that's why we have it as two separate
7  categories earlier in the report.
8  Q.  So my question is here, do you know if he
9  differentiated between -- how he -- if he differentiated
10 between intentional overdose cases that did exhibit
11 self-injurious behavior and intentional overdose cases
12 that were not self-injurious behavior?
13     MR. FROMSON:  Just note my objection as to
14 form.
15     THE WITNESS:  No, I don't know how he did it.
16 BY MR. BARNES:
17 Q.  Now -- so if there was some degree of editing
18 discretion that Mr. Altman used in deciding which cases
19 were included in the analysis on page 194 and which
20 cases were not used in the analysis on 194, correct?
21     MR. FROMSON:  Just note my objection as to
22 form.
23     THE WITNESS:  No, that is not my
24 understanding.  We do not edit within it.  We
25 select a category and do it across all drug

Page 148

1  products.
2      I do not know what he did in this table
3  though.  I will have to go back and check.  I do
4  not have the terms memorized that went into this.
5  I can tell you it was the same terms across all
6  products.
7  BY MR. BARNES:
8  Q.  When you -- when you submitted this report,
9  did you know how Mr. Altman treated overdose cases in
10 terms of including and excluding them from this table?
11     MR. FROMSON:  Objection to form to the extent
12 that it has already been asked and answered.  Over
13 my objection, you can answer.
14     THE WITNESS:  My understanding is intentional
15 overdoses are included.
16 BY MR. BARNES:
17 Q.  And you would agree that not all intentional
18 overdoses constitute self-injurious or suicidal
19 behavior, correct?
20     MR. FROMSON:  Objection to the extent that it
21 has not already been asked and answered.
22     THE WITNESS:  I think because Pfizer included
23 intentional overdoses when they did their list, we
24 put intentional overdoses in the same list.  I -- I
25 believe that's the reasoning behind that.  When

Page 149

1  they listed the list, the intentional overdoses
2  were separated out from physician error.
3  BY MR. BARNES:
4  Q.  Do you know that for a fact or are you just
5  supposing that's what Mr. Altman did?
6  A.  I think -- I think -- well, I don't know for a
7  fact what Mr. Altman did, but that was what we did
8  earlier in the report when we isolated out intentional
9  overdoses.
10 Q.  Now, was any preferred terms excluded from the
11 analysis that would normally map to the high-level term
12 suicidal or self-injurious behavior when Mr. Altman did
13 his report -- his work?
14 A.  Well, it's the same answer I've given you.  I
15 don't know the terms that went into this.  I will have
16 to get those to you at the break.
17 Q.  Well, how are you going to find out what
18 Mr. Altman did?
19 A.  I'm going -- I'm going to look at the data
20 that we have -- we have the data sets -- and see what
21 goes into it.
22 Q.  Where is it in your report?
23 A.  I gave you a disk that has the data sets on
24 here.
25 Q.  Exhibit 7?

38 (Pages 146 to 149)

Page 150

```
1    A.   3.
2    Q.   Exhibit 3.  Okay.
3         Now, can you tell me how many completed
4  suicides are reflected in your report -- in the graph on
5  page 194 for Neurontin?  What's the N?
6    A.   For Neurontin?
7    Q.   Yes.  How many?
8    A.   Okay.  Well, you have to -- I'm going to have
9  to go across two.  I'm going to have to go across two
10 tables here.  And we started in 1999.
11   Q.   And please go to your -- go to your -- if you
12 would, tell me what pages you're looking at.
13   A.   For the period ending Quarter 4 for --
14   Q.   What page, please?
15   A.   -- completed suicide -- 117 -- there were
16 three.  And that's for 1999.
17        Okay.  Three in '99, on page 116.  Eight in
18 2004.
19   Q.   What page are you on?
20   A.   116.
21   Q.   So three on 1999 and what's -- and then eight
22 on what?
23   A.   Eight in 2004.
24   Q.   Eight in 2004.
25   A.   20 --
```

Page 151

```
1    Q.   On page 116, you get eight in 2004?
2    A.   Yes, completed suicides.  See the way it
3  works.  Eight.
4    Q.   That's -- that's eight in 2000.  Not 2004.
5    A.   The close of Quarter 4.
6    Q.   2000.  Got it.
7    A.   See, the table says, "Reports are cumulative."
8    Q.   I understand that.  Thank you.
9    A.   Uh-huh.  (Indicates affirmatively.)
10        And then at the close of 2001, there is 22.
11   Q.   Uh-huh.  (Indicates affirmatively.)
12   A.   And 27 at the close of 2002.
13   Q.   Okay.  And your chart ends in June 30, '03, so
14 let's fill out to -- through June 30, '03.
15   A.   Where do you see '03?  Oh, the next section.
16   Q.   Yeah -- yeah, because your report ends
17 June 30, '03, so let's just take it up to -- that's the
18 one that's in your report.  That's the one we're going
19 to work with.  And that's the one that's subject to the
20 litigation report, so let's just deal with that.  Then
21 we'll go on.
22        MR. FROMSON:  Note my objection to the
23 commentary.
24        THE WITNESS:  Okay.  At the close of Quarter 4
25 of 2003, there is 75.
```

Page 152

```
1  BY MR. BARNES:
2    Q.   Your graph goes through June 30 of -- of '03,
3  and so give me the number for what the --
4    A.   I don't have the date -- I have it only broken
5  out at the end of the years.
6    Q.   Why does it end June 30, '03, your graph on
7  page 194?  Do you know why Mr. Altman did it that way?
8    A.   Because I believe that the information became
9  public relating to your client's settlement and guilty
10 plea.  And if you notice, the counts go from 75 in
11 Quarter 4 to 485.  So I think that it started to go up
12 and that's why we cut it off.
13        As I said to you earlier, when there is a
14 public event --
15   Q.   Bias?
16   A.   -- the events start to go up.  So, I mean,
17 they were reported, they're in the database, but because
18 it was public, the guilty plea in the illegal acts to
19 market the product, we would have stopped it at that
20 point.
21   Q.   Make sure I understand.  You -- is it true
22 that you -- just so I understand your testimony on --
23 you -- the plot on page 194 ends on June 30, 2003,
24 because after that date there was a guilty plea entered
25 by Warner-Lambert with regard to some promotional
```

Page 153

```
1  activities?
2    A.   No, I think it's 2004, but that may be the
3  last point we have before it goes up.  I just don't
4  know.
5    Q.   You don't know the --
6    A.   I'd have to see the actual data because I
7  see my -- that is my -- we know at the end of 2003 that
8  we were at 75.  This one only goes to 6/30.
9    Q.   Well, my -- let me ask you the clean question.
10 If you know, you don't know, that's fine.
11        Do you know why Mr. Altman stopped the report
12 on June 30, 2003?
13        MR. FROMSON:  Just note my objection to form
14 to the extent it's already been asked and answered.
15        THE WITNESS:  No, I don't know.  We have more
16 data than this.  I don't know why the table stops.
17 BY MR. BARNES:
18   Q.   Okay.  And do you know to the June 30th, 2003,
19 how many reports of suicide were in the FDA AERS
20 database that was used in this report?
21   A.   Through?
22   Q.   June 30, '03.
23   A.   June 30, '03.
24        No, I have -- all I have here is 75.  And that
25 is for the entire June -- entire 2003.  But the
```

39 (Pages 150 to 153)

Page 158

1    Q.  Well, let me ask you this.  Are you aware
2  that -- is suicide -- does suicide map to suicidal or
3  self-injurious behaviors or both?
4    A.  Well, I think completed suicide is a separate
5  term.  Complete -- yeah, completed suicide is a separate
6  term.  And -- and I have the map out there.  I will have
7  to refer to that before I can answer that specific
8  question.
9    Q.  Make sure I understand.  Does -- do -- does
10  the data on page 194 include completed suicides for all
11  of these drugs that are listed on page 194?
12    A.  Yeah, I will have to check.  I -- I -- I'll
13  have to check and see what -- what is subsumed, folded
14  into HLT as it relates to completed suicide.
15    Q.  So as you sit here right now, do you -- you
16  don't -- you cannot confirm that completed suicides are
17  even part of the analysis on page 194?
18    A.  I don't know if it mapped into that.  I don't.
19  I'll check for you.  It says that it's suicidal and
20  self-injurious.  Whether completed suicides, I just have
21  to check.
22    MR. BARNES:  Why don't we -- Ken, why don't we
23  take a lunch break so she can check out the mapping
24  stuff, because we have to just understand how it's
25  done.  So I thought she would have that done, so --

Page 159

1    MR. FROMSON:  We can take a break for lunch
2  and -- let's take a break now.  That's fine.
3    MS. McGRODER:  How -- how long?
4    MR. FROMSON:  30 minutes.
5    MR. BARNES:  30 minutes.
6    THE VIDEOGRAPHER:  Off the record at
7  12:53 p.m.
8    (Lunch recess taken.)
9    THE VIDEOGRAPHER:  On the record 1:28 p.m.
10  BY MR. BARNES:
11    Q.  Thank you.  Good afternoon, Dr. Blume.
12    A.  Good afternoon.
13    Q.  Did you -- were you able to find some of the
14  mapping terms I asked you for?
15    A.  I did.
16    Q.  Okay.  Can you release them to me now.
17    A.  (Handing.)
18    Q.  These same copies of the same thing?
19    A.  They are.
20    Q.  Okay.  What I'll do is I'll mark this as the
21  next exhibit and then you can tell me what it is.  Okay?
22    A.  Okay.
23    MR. BARNES:  If you would.
24    (Deposition Exhibit No. 10 marked for
25  identification.)

Page 160

1    MR. BARNES:  Thank you.
2  BY MR. BARNES:
3    Q.  I'm going to hand the witness what's been
4  marked as Blume Exhibit 10.  Can you identify Blume
5  Exhibit 10 for the record.  Please?
6    A.  Yes, these -- this is the map of the terms
7  that goes into the single HLT category entitled
8  "Suicidal and Self-Injurious Behaviors."  And these --
9  this is a spreadsheet that has the preferred term, the
10  noted high-level term, high-level group term, and the
11  SOC class.
12    Q.  Okay.  I have a -- you keep the exhibit and we
13  keep -- is that an extra copy for me?  Thank you.
14    A.  Okay.
15    Q.  Let me just look at it with counsel here.
16    Okay.  Let's -- let's work through Exhibit 10,
17  if we might, okay?  And keep page 194 handy and we'll
18  make our -- make our way through the -- the exhibit,
19  okay?
20    Now, can you explain what -- how this works on
21  Exhibit 10, working your way from left to right across
22  the vertical access?  And go from the top line across.
23    A.  Yes.  And these are -- these -- one, two,
24  three, four, five, six, seven, eight.
25    These eight terms, eight preferred terms are

Page 161

1  all subsumed within the high-level term.  And it is one
2  high-level term group, suicidal and self-injurious
3  behaviors.  I think it might have been mentioned earlier
4  these were two HLT terms.  They're not.  They're one.
5    Q.  Oh, okay.  So can I just follow up on that
6  then.
7    The suicidal and self-injurious behavior term
8  is the MedDRA HL -- HLT term?
9    A.  Yes.
10    Q.  High-level term?
11    A.  Yes.
12    Q.  And who created this suicidal and
13  self-injurious behavior HLT term; did you or did someone
14  else?
15    A.  No, the MedDRA.
16    Q.  This MedDRA dictionary?
17    A.  Right, MedDRA did this.
18    Q.  Okay.  And so -- so completed suicide maps to
19  the higher-level term suicidal and self-injurious
20  behavior as one category?
21    A.  All of these terms.  All of these preferred
22  terms map to the same HLT category.  And it just so
23  happens it has the same name as the -- the HL --
24  high-level group term category.
25    Q.  So working your way across then, there are

41 (Pages 158 to 161)

Page 166

BY MR. BARNES:
1
2  Q.  What basis do you say this is not the accepted
3  definition of proportional reporting ratio?
4  A.  I'm not saying it isn't. I'm just saying I
5  don't -- I don't use it for all drugs across all
6  categories.
7  Q.  And what -- and why don't you use the -- the
8  proportional reporting ratio set forth in the textbook
9  by Dr. Strom on page 171, Exhibit --
10  A.  Well, I don't know I'm disagreeing.
11  Q.  -- Exhibit 11?
12  A.  I simply don't know his statement is for all
13  drugs in the database. For all I know, it's all drugs
14  in the database dealing with antiepileptic drugs or
15  database dealing with statins, so we may be saying the
16  same thing.
17      What I'm saying is, generally when I do a
18  comparison, I do it a compare -- comparison is generally
19  with drugs of one of the three categories that I
20  mentioned earlier today.
21  Q.  And as to -- and my earlier question was where
22  was that method published. And you mentioned
23  Dr. Strom's book and you mentioned the FDA guidance
24  document.
25      And my question is, the method you described

Page 167

1  earlier is not described in either Dr. Strom's textbook,
2  the best I can tell, or in the FDA guidance document
3  that you referenced.
4  A.  What -- what method?
5  Q.  -- isn't that correct?
6  A.  I'm sorry.
7  Q.  Well, you just -- you referenced a method that
8  you employed in the -- on page 194 of your report. And
9  I said, "Where is that published?" And you testified it
10  was in Dr. Strom's textbook as well as the FDA guidance
11  document. We pulled those guidance -- those two
12  documents out.
13      So my question is, isn't it that the PRR graph
14  that's on page 194, the report is -- is not, in fact, a
15  proportion of all reactions to the drug that represent a
16  particular medical condition of interest compared to the
17  same proportion for all drugs in the database, is it?
18      MR. FROMSON:  Just note my objection as to
19  form, asked and answered.
20      THE WITNESS:  I have no idea what the term
21  "database" is referring to. My only comment was it
22  would not -- it -- I do not use it for all drugs.
23  BY MR. BARNES:
24  Q.  Okay. And let me make -- make -- I want to
25  just make sure I understand.

Page 168

1      My question that led to Dr. Strom's book and
2  the FDA guidance document is I asked you where is the
3  method published on page 194 in your report published in
4  the medical or scientific literature.
5      Do you have a reference you can give me that I
6  can look at to verify the method that you're using has
7  been published in a -- somewhere in the scientific or
8  medical literature?
9      MR. FROMSON:  Same -- just note my objection
10  to the extent it's been asked and answered. Also
11  misstates her testimony.
12      THE WITNESS:  Yeah, I thought what you had
13  asked me, to show me where PRR is ever mentioned by
14  the FDA or by Brian Strom, so I brought in
15  Brian Strom's textbook and I brought in the FDA
16  guidance.
17  BY MR. BARNES:
18  Q.  Let's go back to the first principles.
19      Can you cite me a -- any reference in the
20  medical literature, published medical literature,
21  where -- where the method that you described that led to
22  the creation of a plot on page 194 of the report is
23  published in the medical literature or scientific
24  literature?
25      MR. FROMSON:  Same ob- -- just note my

Page 169

1  objection to the extent it was asked and answered.
2      THE WITNESS:  Well, the same mec- -- the same
3  analysis was used by FDA, as I mentioned earlier
4  with Baycol, where they compared fatalities with
5  Baycol specifically with fatalities with other
6  statins. And that is publicly available in the FDA
7  database.
8  BY MR. BARNES:
9  Q.  Well, let me do it this way, okay. I'm not
10  sure we're connecting.
11      Look at the -- the -- the bottom of page 1 --
12  the second paragraph on page 171, okay?
13      There is -- there is a formula there, correct?
14  A.  Yes.
15  Q.  Okay. Do you see "PRR is a/(a+b) divided by
16  c/(c+d)"?
17  A.  Right.
18  Q.  In the -- in the PRR analysis you contend was
19  performed on page 194, what is the "a" for Neurontin on
20  2000 -- June 30, 2003?
21  A.  Well, I -- I don't have that. I -- my
22  report -- like, as we discussed earlier, it's for the
23  entire year. But the "a" in this --
24  Q.  Your report --
25  A.  The "a" --

43 (Pages 166 to 169)

Page 170

1    Q.   Your report on -- on -- I'm directing you to
2 the data point on your graph on June 30, 2003.
3         What -- what is the "a" for Neurontin in the
4 PRR formula in Dr. Strom's book?
5         MR. FROMSON:  Note my objection as to form.
6         THE WITNESS:  I -- I can't answer that.
7 BY MR. BARNES:
8    Q.   And -- and why not?
9    A.   Because the -- the raw data aren't here.  The
10 ratio is 10 percent.  But the "a" would be the number of
11 events for Neurontin divided by the total number of
12 events in the Neurontin database.
13   Q.   Do you see --
14   A.   For that point, it's 10 percent.
15   Q.   Do you have the -- okay.  I'm asking you for
16 the -- for the number that -- that represents the "a" in
17 that -- in that formula.  And you say you can give me
18 a -- you give me percentage.  I want to know the raw
19 data by which that proportion can be created.
20   A.   Well --
21        MR. FROMSON:  Just note my objection as to the
22   extent it's been asked and answered.
23        THE WITNESS:  Okay.  I'll --
24        MR. FROMSON:  I think she said it's not there.
25        THE WITNESS:  Yeah, I don't have it.  I can

Page 171

1 give you the number for that entire year using
2 these terms.  But for the specific date you picked,
3 it's in the middle of the year and my -- my report
4 is done by end of -- end of the calendar years.
5 BY MR. BARNES:
6    Q.   Well -- well, I -- I'm going to the last data
7 point on your -- on your -- which is cumulative, so I
8 want to -- I'm going to the last data point on your
9 plot.  So let me go to "b."
10        Wouldn't you also need to know what the "b" is
11 from Dr. Strom's formula, which is the number of all
12 other reactions for the -- in the Neurontin database,
13 correct?
14   A.   Yes, I would need to know that, and we did
15 know that.
16   Q.   Do you know that today?
17   A.   Well, the database is in the -- in the file.
18 But, no, specifically sitting here, I don't know how
19 many thousands and thousands of adverse events you had
20 reported with Neurontin at June 30th, 2003.
21   Q.   Is there anywhere in your report where the
22 calculation a/(a+b) is set forth, which is the numerator
23 of the PRR ratio reported in Dr. Strom's book?
24   A.   Only at the end of the quarter.
25   Q.   Is where?

Page 172

1    A.   At the end of the year.
2         Well, for example, on page 168, the sui--
3 the percentage of suicide events on page 168, for
4 completed suicide there is a percentage at the end of
5 Quarter -- end of 2002, 2003.
6         MR. BARNES:  Read my last question back.  I'd
7    like an answer to that question.
8         (The reporter read the portion requested.)
9         THE WITNESS:  No, it is not in this report.
10 BY MR. BARNES:
11   Q.   Okay.  Thank you.
12        Now, with regard to the -- the formula in Dr.
13 Strom's book for PRR, you also need to know the "c"
14 value, which is the value for all other drugs in the
15 database, for the reaction of interest, correct?
16   A.   Correct.
17   Q.   What is the "c" element of the PRR formula
18 that's December -- June 30th, 2003, for the Neurontin
19 plot?  Do you know what the "c" value is?
20   A.   For what?  For these other drugs?
21   Q.   For -- for -- for -- first of all, for the --
22 for Neur-- you're comparing Neurontin against
23 Neurontin, correct?
24        MR. FROMSON:  Objection as to form.  I don't
25    think she's comparing Neurontin to Neurontin.

Page 173

1         THE WITNESS:  No, I'm not comparing Neurontin
2    to Neurontin.
3 BY MR. BARNES:
4    Q.   What's the percentage basis?  You have it --
5    A.   The percentage is --
6    Q.   Okay.  Well, let me know what the "c" then, in
7 terms of --
8    A.   "c" is the other drug you're going to do.
9    Q.   Or other drugs?
10   A.   Or however you want to do it, right, but it's
11 not Neurontin.
12   Q.   Okay.  So what is the -- what is the number
13 for "c" in your report for the other drugs?
14   A.   It would be the number for whatever drug we
15 were going to compare it with on this table.
16   Q.   Drug or drugs, one or all?
17   A.   No, we did these by individual drugs.  We did
18 not lump them together.
19   Q.   Okay.  For each -- so for each -- each
20 medicine on 194, do you know the value for "c"?
21   A.   No, they don't have -- I do not have them
22 listed here.  It's listed only by percent, but the
23 numbers will be in your database.
24   Q.   But it's not in your -- I can't find it in the
25 report, correct?

44 (Pages 170 to 173)

Page 174

1    A.   No, I only used the percentages.
2    Q.   So, finally, you'd also need to know what the
3  "d" value is for the other drugs in the database for all
4  other reactions, correct?
5    A.   Well, that'd be the total number of events in
6  their database, of course, yes.
7    Q.   And you -- is there anywhere in your report
8  that that is set forth, the value for "d" in the
9  proportional reporting ratio?
10   A.   No, just as evidenced by the percentage.
11   Q.   Percentage of what?
12   A.   All I've done is the percentage of the
13  suicidal events over their -- that's all I have.
14   Q.   So is it true to say that -- that nowhere in
15  your report was a proportional reporting ratio
16  calculated, correct?
17       MR. FROMSON:  Objection as to form.
18       THE WITNESS:  No, the table simply has a
19   diagram of all the individual percent reports.
20  BY MR. BARNES:
21   Q.   So you would agree with my statement that a
22  proportional reporting ratio was not prepared in your
23  report?
24       MR. FROMSON:  Objection.  Asked and answered.
25       THE WITNESS:  Ken --

Page 175

1  BY MR. BARNES:
2    Q.   On page 194 or anywhere in your report,
3  correct?
4        MR. FROMSON:  Objection.  Asked and answered.
5        THE WITNESS:  Exactly.  As I've answered it
6   before, they are not in the report.
7        MR. BARNES:  All right.  Okay.  I'm going to
8   mark as the next exhibit composite exhibit, which
9   we can discuss.  For you guys.  Mark as the next
10   exhibit, please.
11       (Deposition Exhibit No. 12 marked for
12   identification.)
13  BY MR. BARNES:
14   Q.   All right.  Dr. Blume, would you identify
15  Exhibit No. 12 for the record, please.
16       MR. FROMSON:  Just note my objection as to
17   form.  Do you want to know if she can or will she?
18       MR. BARNES:  Can you.
19       MR. FROMSON:  Okay.
20       THE WITNESS:  I have no idea what this is.
21  BY MR. BARNES:
22   Q.   For the record, we printed out on -- from a
23  Blume Exhibit No. 3 the graphs that were generated on
24  May 6th, 2003, as reflected on Blume Exhibit No. 3.
25       Were you involved in the generation of these

Page 176

1  graphs on -- on March 6th, 2006?
2        MR. FROMSON:  Just note my objection as to the
3   form of the question.  March of '06 --
4        MR. BARNES:  Okay.  I'm reading --
5        MR. FROMSON:  -- or March of '03?
6        MR. BARNES:  -- three different documents, so
7   let me try it again.
8        MR. FROMSON:  Thanks.
9        MR. BARNES:  Thanks.
10  BY MR. BARNES:
11   Q.   And this is -- what is this, Exhibit No. 12?
12       Exhibit No. 12 -- well, you've never seen
13  these before, Exhibit No. 12?  Take a moment and look at
14  them.
15   A.   Okay.  These are system -- okay.  This starts
16  with system organ class of all psychiatric through the
17  period 2004.
18   Q.   Right.  And -- and this was generated on
19  March 6th, 2006.  Do you see that the bottom left-hand
20  corner of the page?
21   A.   Yes.
22   Q.   Now, these -- these plots were pulled from
23  Exhibit 3 to your deposition, the Blume exhibit -- I'm
24  sorry.  Wait.  The exhibit -- wait a minute.
25       Pulled from Exhibit 7, I believe.  Correct?

Page 177

1  Okay.  Let me go back to the beginning.  I have too many
2  disks around here.
3        MR. FROMSON:  Rich, do you mean that on the
4   data that was on the disk you pulled the plots and
5   then you -- then you made this graph, or was the
6   graph on there already?
7        MR. BARNES:  The graph -- the graph was
8   already on it.
9        MR. FROMSON:  Okay.
10       THE WITNESS:  This is from Mr. Altman.
11       MR. BARNES:  Yeah, let me go back.  Let me go
12   back.
13  BY MR. BARNES:
14   Q.   On Exhibit -- Exhibit No. 7 is a CD that was
15  provided to Shook, Hardy & Bacon by Mr. Altman on
16  October 28th, 2007, pursuant to a discovery request
17  between firms.  And this was made available to us here
18  today as Exhibit No. 7.
19       MR. FROMSON:  Right.
20       MR. BARNES:  Okay.
21       MR. FROMSON:  So that's the October disk that
22   we provided to Shook, Hardy & Bacon.
23       MR. BARNES:  Correct.
24       MR. FROMSON:  Got you.  And do you have a --
25   do you -- would you happen to have the name of the

45 (Pages 174 to 177)

Page 371

```
 1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 2

 3   In re:  NEURONTIN MARKETING, SALES MDL DOCKET NO:  1629
             PRACTICES, AND PRODUCTS
 4           LIABILITY LITIGATION      Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7           ALL PRODUCTS LIABILITY
             ACTIONS
 8   _____/

 9
             VIDEOTAPED
10           DEPOSITION OF:     CHERYL D. BLUME, Ph.D.

11   DATE:                      November 13, 2007

12   TIME:                      9:06 a.m. to 6:08 p.m.

13   PLACE:                     13902 North Dale Mabry Highway
                                Suite 122
14                              Tampa, Florida

15   PURSUANT TO:               Notice by counsel for
                                Defendants for purposes
16                              of discovery, use at
                                trial or such other
17                              purposes as are permitted
                                under the Federal Rules
18                              of Civil Procedure

19   BEFORE:                    VALERIE A. HANCE, RPR
                                Notary Public, State of
20                              Florida at Large

21                              Volume 2
                                Pages 371 to 722
22

23

24

25
```

Page 388

1  application review process goes.
2      Q.  I don't want you to do that.  I don't want
3  you -- no.  Let me take back that -- I don't want you to
4  explain the new drug application.  I understand how
5  new app- -- new drug application works.
6      My question is, as I understand it, his
7  analysis was included in an NDA, correct?
8      A.  Yes.
9      Q.  And subsequent to that, the NDA was approved
10 by the Food and Drug Administration, correct?
11     A.  Yes.
12     Q.  Was there any specific discussion involving
13 Mr. Altman's work on postmarket surveillance with the
14 Food and Drug Administration in the -- in the context of
15 their -- your -- their review?
16     A.  Yes.
17     Q.  Okay.  And what did they say to you about
18 Mr. Altman's analysis?
19     A.  They called with a couple of questions about
20 how the charts were prepared.
21     Q.  Did they say anything about approving the
22 method that he used?
23     A.  The charts that he demonstrated were an
24 integral part of our ISS, which is the integrated
25 summary of safety.  That integrated summary of safety

Page 389

1  was approved with those charts inside it.
2      Q.  Okay.
3      A.  FDA -- I have no experience where FDA ever
4  writes to you with your approval letter and say they are
5  approving individual sections of your NDA.  The NDA is
6  approved or it's not approved.  You only know if
7  something is wrong if FDA tells you in either a
8  nonapprovable letter or even an approvable letter that
9  certain sections are deficient and need to either be
10 corrected or replaced.
11     Q.  So other than the fact that the data was --
12 when Mr. Altman was submitted an NDA and reviewed by the
13 Food and Drug Administration with some questions about
14 the graphs, and that the NDA was subsequently approved,
15 you have no specific information as to now FDA
16 interpreted or evaluated Mr. Altman's analysis, correct?
17     MR. FROMSON:  Objection to form.
18     THE WITNESS:  I -- I believe -- and you'll
19 have to ask him this.  I believe there were also
20 communications between Mr. Altman and the FDA on
21 this.  And I also had no communications with FDA on
22 that NDA on the clinical trials, but yet those
23 clinical trials provided the bases of the approval
24 of that NDA for efficacy.
25 BY MR. BARNES:

Page 390

1      MR. BARNES:  Move to strike as nonresponsive.
2  Would you read back the last question, please.
3      (The reporter read the portion requested.)
4  BY MR. BARNES:
5      Q.  Now, please answer that question.
6      MR. FROMSON:  And I have an objection.
7      THE WITNESS:  I don't know how to answer it
8  any differently, but I'll try again.
9      In my years with dealing with the FDA, I have
10 never received an approval letter or an
11 approval letter -- approvable letter that
12 specifically recited everything that they agreed
13 with in the -- in those letters.
14 BY MR. BARNES:
15     Q.  Or disagreed with?
16     A.  No, when they disagree with something, you do
17 have that.  They tell you what needs to be corrected or
18 replaced.  But I have never had a recitation that they
19 agree with this study, that study, or not that study.
20     In that NDA, those data were submitted, they
21 were discussed between the FDA and me, questions were
22 posed by the FDA.  No complaints, no further reviews, no
23 further requests for information were ever requested.
24 Those charts remained the way they were and the NDA was
25 approved.

Page 391

1      Q.  Okay.  And so you're drawing -- you would draw
2  an inference that F -- from that scenario, that FDA did
3  not object to Mr. Altman's analysis and accepted it in
4  the context --
5      A.  Absolutely.
6      Q.  -- of the Food and Drug Administration?  Okay.
7      A.  They also -- in that NDA, I submitted clinical
8  trial data that they didn't specifically write that they
9  approved of that clinical trial data, but yet that data
10 forms the basis of the efficacy conclusions.
11     Q.  So -- and -- and just -- just to complete the
12 loop, you will not tell me the name of the drug,
13 correct?
14     A.  No, but I did give you the name of my
15 corporate counsel yesterday and I did inform him that
16 you may well be calling him.
17     Q.  I don't recall his name.
18     A.  I gave it to you.  Dr. Jay Wolfson.
19     Q.  Dr. Jay Wolfson?
20     A.  Yes.  (813) --
21     Q.  Well -- okay.  (813) --
22     A.  240 --
23     Q.  Uh-huh.  (Indicates affirmatively.)
24     A.  -- 1363.
25     Q.  Well -- 1 -- 1363?

6 (Pages 388 to 391)

Page 480

1     MR. BARNES:  Okay.  You have to change the
2  tape?  We -- it's a good time to stop.  Thank you.
3     THE VIDEOGRAPHER:  Off the record 11:27.
4     (Recess taken.)
5     THE VIDEOGRAPHER:  On the record 11:37.
6  BY MR. BARNES:
7     Q.  Looking at your report, going back to
8  page 194, are you aware of any methods that were used by
9  Mr. Altman to control for bias in the calculations and
10  analysis that he did that's -- that is reflected in the
11  plot on page 194 of your report?
12     MR. FROMSON:  Just objection as to form.
13     THE WITNESS:  I can't specifically address
14     what he does.  I know that we reviewed various
15     bias-related issues when we -- when we first
16     started generating these for the FDA, but -- and
17     I'm assuming he used the same approach in this one,
18     but I am not specifically familiar with what he did
19     for this.  You'd have to ask him.
20  BY MR. BARNES:
21     Q.  Same question as to confounding factors.
22     A.  Again, you'd have to check with him.
23     Q.  Okay.  Do you -- as a general matter, do you
24  accept that Neurontin is generally well tolerated by
25  patients overall as an anti- -- as an antiepileptic

Page 481

1  medication?
2     A.  I can't answer it.  I was only asked to look
3  at psychological and suicide-related events.  I have
4  not looked at overall system -- any system organ classes
5  other than that.
6     Q.  Okay.  So no opinion?
7     A.  No opinion.
8     Q.  Okay.  Why don't we look at your opinions with
9  regard to psychobiologic adverse events then and clean
10  up the exhibits.  I think we're done with Exhibit 12 and
11  Exhibit 18.  Exhibit 18 is multiple -- I believe it's
12  multiple pages.
13     MR. FROMSON:  I thought 18 was one single
14     page.
15     THE WITNESS:  Yeah, there is no staple.
16     MR. FROMSON:  Exhibit 12 is one with multiple
17     charts.
18     MR. BARNES:  That's fine.  You're correct.
19     Thank you.
20     THE WITNESS:  Put all these back?
21     MR. BARNES:  Put it back in order, yes.
22  BY MR. BARNES:
23     Q.  Now, your -- your report refers to
24  psychobiological adverse events at several places,
25  correct?

Page 482

1     A.  Yes.
2     Q.  Would you please define for me the case
3  definition of a psychobiologic adverse event?
4     A.  I'm -- I'm -- I don't understand what is a
5  case definition.
6     Q.  Do you know what a case definition is in
7  epidemiologic studies?
8     A.  Yes.  And I know what a trial definition is
9  for the psychobiological, but I know that it also varies
10  across studies.
11     Q.  Well, what is the -- what do you mean when you
12  say "psychobiologic adverse event"?  Is that -- I'm
13  asking you, is that a case definition or where is it
14  derived from?
15     A.  I derived the psychobiological events -- it's
16  quoted in the various sections to what I'm referring,
17  but I use the line listings that were either in system
18  organ class or the ones in the research report -- annual
19  report -- or PSUR reports from the Pfizer database.
20     Q.  Is there a DSM criteria for psychobiologic
21  adverse events?
22     A.  Well, there are several DSM criterias for
23  psychobiological events.
24     Q.  Is there one specifically for that term?
25     A.  I don't know.  I don't know.

Page 483

1     Q.  Is "psychobiological adverse events" a term
2  used -- is that in any recognized dictionary or adverse
3  event coding?
4     A.  I don't know.  I used the term in my adverse
5  events for our depression NDA, and I pulled the events
6  from the Pfizer research reports in their annual
7  reports.
8     Q.  So you're using "psychobiological adverse
9  events" because it -- it's a term that is used in some
10  of the Pfizer reports?  Basically, is that what you're
11  doing?
12     A.  Yes.  And I've used the term before in dealing
13  with the Food and Drug Administration.  And I defined
14  them.  I don't -- I don't just use a category.  In each
15  case -- at each place where we use it, I give the line
16  listing of it --
17     Q.  Now --
18     A.  -- of the individual events.
19     Q.  Okay.  And in the individual -- in the line
20  listings you've described yesterday in the reports, is
21  it fair to say that your discussions of psychobiological
22  adverse events are essentially just crude case -- serial
23  case reports or a crude -- crude count of the events
24  that are -- you classify as psychobiological adverse
25  events?

29 (Pages 480 to 483)