UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------- x
In re: NEURONTIN MARKETING,
SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION
---------------------------------------------------------- x

THIS DOCUMENT RELATES TO:

ALL PRODUCTS LIABILITY CASES

---------------------------------------------------------- x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**(Leave to File Granted on May 7, 2009)**

### RESPONSE TO PRODUCT LIABILITY PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DOCTORS TRIMBLE, KRUSZEWSKI AND BLUME ON THE ISSUE OF GENERAL CAUSATION

Plaintiffs' Supplemental Authority is not only in direct contravention of this Court's Order that no additional briefing or authority be filed, but mischaracterizes the FDA Advisory Committee's (the "Committee") and Dr. Katz's conclusions about Neurontin in no less than five ways.[1]

First, plaintiffs selectively quote Dr. Katz to suggest FDA concluded that Neurontin causes suicide. But neither Dr. Katz nor FDA has made a causality finding as to Neurontin. Rather, when specifically asked whether he could conclude that any individual drug has an increased risk of suicidality, Dr. Katz responded that he could not:

> Roy Twyman (Advisory Committee Member): Let's assume that the effect is generalizable to the class of AEDs, but if you look at the compounds individually could one draw the conclusion individually that compounds have a risk. Or do

---

[1] Defendants are mindful of the Court's admonition regarding additional filings—which plaintiffs completely ignored—and thus have filed a motion for leave seeking the Court's permission to file this reply.

5292603v.1

> you need the entire data set of all the AEDs put together in order to draw the conclusion that AEDs have a signal?
>
> Russell Katz: I would say we need the entire data set in this case.

Hearing Transcript at 63, attached as Ex. A. Even in the excerpt quoted by plaintiffs, Dr. Katz states, "if it's statistically significantly different from placebo we say *the drug* caused it." *Id.* at 99 (emphasis added). FDA's own analysis of the drug at issue here—Neurontin—demonstrates that there is no statistically significant association between Neurontin and suicidal thinking or behavior. FDA Statistical Analysis and Review at 24, Figure 2 (May 23, 2008), attached as Ex. B.

Second, plaintiffs misrepresent the actions of the Committee, stating that it "voted 20-0 (with 1 abstention) in favor of FDA's overall finding of an increase in suicidality for the 11 drugs analyzed." Plaintiffs' Supplemental Authority at 2. Plaintiffs omit that the Committee chair, Larry Goldstein, reiterated again and again that the question before the Committee was whether there was "a signal" and that a signal is <u>not</u> the same as causation.[2] That the Committee agreed that FDA's analysis shows "a signal"—i.e., a hypothesis requiring further study—is quite distinct from a determination of causation.[3]

Third, plaintiffs misleadingly state that "the Advisory Committee then voted 18-3 in favor of the position that the FDA's causation analysis was applicable to each of the 11 drugs at

---

[2] Ex. A at 93 ("So the first question is does the committee agree with the agency's overall finding of an increase in suicidality for the 11 AEDs analyzed? And the real crux of the question is do we think there's a signal here? Is there a signal."); *Id* at 95 ("I think that the first question is, is there a signal in this group?" How one interprets it is it causality is a related but not the same question."); *Id* at 96 "Now whether one concludes that this is causal or not, I think is open to debate but the bottom line is that this is the data we got; these are the results. So we believe the signal?").

[3] Indeed, Dr. Katz noted that there was no clear mechanistic understanding of the signal: "First of all, not every drug that we analyzed was seen to have a signal. And two and perhaps more interestingly, there is no obvious reason why there should be a similar signal for this event for drugs with such, at least presumed disparate pharmacologic activities." Ex. A. at 5.

issue." Plaintiffs' Supplemental Authority at 2. The vote on question number two was whether the Committee could *exclude* any drugs analyzed—including those for which there was no statistically significant association—from FDA's finding of an increased risk. At no point did the Committee conclude that each or any of the eleven drugs could cause anything. Several Committee members made the precise point prior to the vote on question number two that this was a policy-based class-wide risk assessment, not a drug-specific causation assessment:

> Sean Hennessy: Yes, I'd like to make the point that when you say the results apply, we're really talking about an assumption so there are a couple of different things you can assume either in the absence of data you can assume that any particular drug that hasn't been shown to be dangerous is not.
>
> Or on the other side you could assume that all of the drugs are the same unless proven different. For a safety concern the conservative thing to do is to assume that all drugs in a particular class, and whether that be pharmacologic class or therapeutic class, share the same risk unless proven otherwise.
>
> That's a reasonable assumption to make in a safety context. <u>But I think we should be clear that we are making an assumption and that we are not able to use scientific reasoning to make the inference that each one of those individual agents is—has an increased risk.</u>
>
> So we make an assumption from a public policy perspective of what we will do from the label. <u>But the data aren't—I would say the data aren't there for the individual drugs.</u>
>
> \*\*\*
>
> Daniel Pine: So two things. One thing, just to second what Dr. Hennessy said. From a safety perspective I think that we have to look for the presence of data to suggest that we should do something unusual with one or another medicine.
>
> Do we single it out as particularly good or particularly not good? And <u>in the absence of statistical evidence, from a safety standpoint I think it behooves us to not single something out unless the evidence is there.</u>"

Ex. A at 102 (emphasis added). Thus, contrary to plaintiffs' suggestion to this Court, the Committee made no causality assessment whatsoever because "the data aren't there" to support a causality finding for the individual drugs.

3

Fourth, plaintiffs' Supplemental Authority fails to mention the Committee's vote on question three. After determining that it could not exclude the possibility that a potential risk existed for any of the drugs in the meta-analysis, the Committee went one step further. The Committee concluded that FDA's finding of an increased risk should apply to all medications indicated for epilepsy, even those drugs <u>not</u> part of FDA's analysis. In other words, the Committee extended FDA's finding to drugs for which no data and no statistically significant association exists. This decision is no more a conclusion that the unstudied drugs cause suicidal thinking or behavior than was the Committee's vote on question number two. Rather, it too demonstrates that the Committee's focus was a public policy risk assessment, not a drug-specific causation analysis. Ex. A at 106 ("Obviously we don't know about the effects of drugs that aren't studied. <u>The question is, from a public policy perspective, what do we do about that?</u>") (testimony of Dr. Sean Hennessy).

Fifth, also noticeably absent from plaintiff's brief is the Committee's vote on question four. The Committee voted 14-4 against the addition of a black box to the labeling of AEDs discussing FDA' analysis. If—as plaintiffs suggest—the Committee believed that each of the drugs studied could cause suicide, the Committee undoubtedly would have voted to include a black box warning. Yet, it did not.

Pfizer's position going into the Advisory Committee hearing—supported by FDA's own analysis—was that the Neurontin data do not demonstrate a statistically significant increased risk of suicidal behavior or thinking. Hence, the Neurontin-specific data do not support the conclusion that Neurontin can cause suicide. Neither FDA nor any Advisory Committee member disagreed with that conclusion.

4

Dated: May 8, 2009

Respectfully submitted,

DAVIS POLK & WARDWELL

By: /s/James P. Rouhandeh
James P. Rouhandeh

450 Lexington Avenue
New York, NY 10017
Tel: (212) 450-4000

-and-

SHOOK, HARDY & BACON L.L.P.

By: /s/Scott W. Sayler
Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

HARE & CHAFFIN

By: /s/David B. Chaffin
David B. Chaffin

160 Federal Street
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order #3.

/s/David B. Chaffin

5292603v.1