UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x
                                              :      MDL Docket No. 1629
In re:   NEURONTIN MARKETING,                 :
         SALES PRACTICES AND                  :      Master File No. 04-10981
         PRODUCTS LIABILITY LITIGATION        :
                                              :      Judge Patti B. Saris
-------------------------------------------------------------x
                                              :      Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                     :
                                              :
ALL PRODUCT LIABILITY CASES                   :
                                              :
-------------------------------------------------------------x

## PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY OF KEITH ALTMAN, ESQ., AND DR. CHERYL BLUME

Products Liability Plaintiffs ("Plaintiffs") hereby oppose Defendants' motion to compel discovery of Plaintiffs' counsel, Keith Altman, Esq., and Dr. Cheryl Blume, which is (a) contrary to all of the previous Orders of this Court in relation to discovery, (b) untimely because Defendants' *Daubert* motion has been denied by this Court, and (c) contrary to prior stipulations between the parties.  Defendants' motion is nothing more than:  1) Defendants' new defense counsel, Skadden, Arps, Slate, Meagher & Flom LLP's, untimely attempt to correct the prior strategic errors and miscalculations of Defendants' other five (at least) longstanding defense counsel in this litigation and to obtain a second bite of the apple on their *Daubert* motions which have already been denied; 2) an attempt to reopen the discovery process on general causation in order to indefinitely delay the July 27, 2009 trial date; and 3) to harass Plaintiffs in retaliation for seeking this Court's assistance in obtaining discovery related to Dr. Gibbons's untimely expert report:  Plaintiffs were granted the deposition of Dr. Hur who, as a biostatistician, provided substantive, subjective expert assistance to Defendants' expert, Dr. Gibbons.

Unlike Defendants' untimely exchange of Dr. Gibbons's expert disclosure, Dr. Blume's disclosure in 2007 was timely, and discovery related to her expert disclosure has long been over. Unlike Dr. Hur, who performed substantive, subjective expert activities for Defendants, Mr. Altman's activities were objective, secretarial pulling of data for purposes of Federal Rule of Evidence 1006. Plaintiffs request oral argument before Judge Saris on Defendants' motion because this issue was originally raised, in part, with Judge Saris during the cross-examination of Dr. Cheryl Blume on June 20, 2008, the second day of the *Daubert* hearing for this litigation.

## PRELIMINARY STATEMENT

This Court established a schedule for expert discovery on general causation which specifically delineated dates by which expert reports were to be served, expert depositions were to be conducted, *Daubert* motions were to be briefed and oral argument on the motions to be heard. The Court took great pains to schedule the *Daubert* hearings for June 19 and 20, 2008, so that Judge Marcy Friedman, who is assigned to the New York Coordinated Litigation, *In re Neurontin Products Liability Litigation,* would be in attendance. Last week, this Court denied Defendants' motion to exclude the testimony of Plaintiffs' experts in a well reasoned 96-page decision. The fact that Defendants have hired a sixth (at least) new law firm as an additional defense counsel should not give them the right to reopen the expert discovery process more than ten months after the *Daubert* hearing before this Court in an attempt to correct what defense counsel must perceive to be errors or miscalculations of their other longstanding counsel. To allow this new defense counsel to reopen discovery would run amuck of the judicial system and only serve to delay this litigation indefinitely.

In November 2007, Plaintiffs' counsel and Keith Altman conferred with Defendants' counsel related to all data provided by Mr. Altman to Dr. Blume at her request. Prior to Dr.

Blume's deposition, Plaintiffs provided to defense counsel data disk (hard drive) compilations reflecting materials provided to Dr. Blume.  Mr. Altman was made available to discuss his data compilations, and Mr. Altman in fact conferred with defense counsel Richard Barnes and Michael Wasicko in Tampa, Florida, in 2007 regarding any questions they posed about the data.[1] The data disks were marked for identification as Exhibits 2 and 7 at Dr. Blume's deposition on November 12, 2007.  Even shortly after Dr. Blume's deposition, Plaintiffs' counsel offered to produce Mr. Altman for a deposition.  However, by correspondence dated January 11, 2008, defense counsel Lori McGroder outright rejected the offer to depose Mr. Altman labeling him a "non-testifying witness who works for your law firm. . . ."  Finkelstein Decl., Ex. B.

Further, the parties have made certain stipulations and agreements related to the discovery of expert opinions:  drafts of expert reports are not discoverable, and drafts of expert reports is a subject about which the parties shall not inquire at depositions.  Finkelstein Decl. Ex. C.  Consequently, the compiling and pulling of data by Mr. Altman from the adverse event reporting system (AERS) database so that the information could be utilized by Dr. Blume in the drafting of her expert report is a subject of inquiry precluded by the parties' letter agreement dated November 7, 2007.

This is a Court of law – and Defendants are not allowed to a "do-over".  Defendants' motion is nothing more than harassment and a veiled attempt to re-open the expert discovery process and delay the litigation in order to circumvent this Court's order that the *Bulger* trial be scheduled to begin July 27, 2009.

---

[1] On or about February 19, 2008, Plaintiffs provided to Defendants a Rule 26 Supplemental Disclosure Statement in which Plaintiffs specifically disclosed pursuant to Rule 26(a)(1)(B) the data disk (hard drive) reflecting the compilation of materials provided to Dr. Blume.  Declaration of Andrew G. Finkelstein, Ex. A.

## BACKGROUND

With the exception of Defendants' expert, Dr. Gibbons, the schedule for expert discovery on general causation in this litigation was completed when the parties appeared before this Court for the *Daubert* hearings, more than ten months ago on June 19 and 20, 2008.[2]  Plaintiffs' expert Cheryl Blume, Ph.D., provided timely expert disclosure in 2007; she was deposed in 2007 and again in 2008; and she provided testimony at the *Daubert* hearing in 2008.  Defendants have no right or basis for an additional deposition.  Moreover, despite the fact that Dr. Blume testified unequivocally that certain collaborations regarding other drug companies' products are subject to confidentiality requirements and thus could not be discussed at her deposition, Defendants had a full and fair opportunity, prior to the deadlines established for the expert discovery schedule established by this Court, to make a motion to compel Dr. Blume to divulge such information. Now, after the deadlines for expert discovery on general causation has elapsed, and ten months after the *Daubert* hearing, Defendants' new defense counsel want to reopen the entire process – there is no excuse or justification for Defendants' outrageous request.  Hundreds of Plaintiffs are waiting for their day in court in this litigation, the neglect of Defendants' other defense counsel should not be rewarded, to do so would necessarily unjustly punish these innocent Plaintiffs.

---

[2]  The only reason that expert disclosure of Defendants' rebuttal expert Dr. Gibbons is still proceeding in this litigation at this late date is that on November 14, 2008, Plaintiffs sought to preclude Dr. Gibbons's opinions as being beyond the FDA Alert on Anticonvulsants.  At that time, Plaintiffs sought from Pfizer Defendants "production related to all data Dr. Gibbons reviewed and relied upon in reaching his opinions, as well as all underlying data to which Dr. Gibbons had access but may have ignored."  (See ECF Doc. # 1490, Plaintiffs' Mem. in Supp.).  The Court had previously limited Dr. Gibbons's opinions to the FDA Alert on Anticonvulsants about which the Court is very well familiar.  Thereafter, on November 25, 2008, this Court recognized the impropriety of Pfizer Defendants' disclosure of Dr. Gibbons's supplemental expert report and that it related to his Study and Article when the Court described the disclosure as "**untimely and beyond the scope of this Court's order**" (emphasis added) (Electronic Order, November 25, 2008).  Nevertheless, the Court provided Pfizer Defendants with a means towards introducing the Study and Article at trial, and the Court also ordered that Plaintiffs be granted discovery on Dr. Gibbons's new report without setting a scheduling order for its completion.  *Id.*

Moreover, it is very clear that Keith Altman, an employee of Finkelstein & Partners, LLP, who became an attorney with Plaintiffs' counsel subsequent to the deadlines for expert disclosure, pulled and compiled data from the voluminous FDA adverse event database and the Pfizer database at Dr. Blume's request, and his actions were objective and ministerial. Unlike Dr. Hur, who provided Defendants' expert Gibbons, Ph.D., with subjective substantive expert assistance, Plaintiffs' counsel, Keith Altman's involvement was objective and "secretarial". Indeed, Judge Saris clearly recognized Mr. Altman's role in this regard.

For example, on the second day of the hearing before this Court, on June 20, 2008, during Defendants' cross examination of Plaintiffs' regulatory expert, Dr. Cheryl Blume, the issue arose concerning the fact Keith Altman had pulled data from the FDA adverse event database pursuant to Federal Rules of Evidence Rule 1006 regarding summaries of voluminous materials. It is clear that Judge Saris understood that Mr. Altman was performing an objective function at the explicit direction of Dr. Blume:

> MR. BARNES:  A couple of points.  I'll just proffer what my concern is.  Dr. Blume is using a method, as she has described it up here, where Mr. Altman has been – this method, this approach has been specifically excluded in a prior case as being unreliable on issues of –
>
> JUDGE SARIS:  No offense to him.  Isn't it like asking my secretary, "Take everything from the reports that says suicide or self-injury, and, like, type it in"?  I mean, no offense to him, but, I mean, isn't that what we're talking about?
>
> MR. BARNES:  Not at all.  Not at all.  Not at all. And let me tell you -- let me just–
>
> MR. FINKELSTEIN:  We submitted this, your Honor.
>
> JUDGE SARIS:  Well, let me ask you.  Is that your understanding of what it is?
>
> THE WITNESS:  The FDA adverse event database is a huge database that requires filtering across its various hierarchy terms.  My understanding is that Mr. Altman has developed a method, has a method to filter those, and that's what he

does.  There is no subjective interpretation.  We use the terms as FDA defines them.

MR. BARNES:  Your Honor, I'll make a proffer here. Even under the method -- and I'll show you in the pharmacovigilance document -- all this -- assume this is in fact what they are purporting it to be.  All it is evidence of a signal.  It is explicitly prohibited to be considered on issues of causation by the very document they cite, the pharmacovigilance document in 2005, and I can show it to you.

JUDGE SARIS:  Maybe.  I just wanted to understand your point about Altman.

MR. BARNES:  The point about Mr. Altman is that –

JUDGE SARIS:  I got the whole thing now, okay.

MR. BARNES:  I will give you a cite on this point that I think is important.  It's In Re:  Meridia Products Liability Litigation, 328 F. Supp. 791, and the Court held after a similar hearing, "Even readers with only a casual understanding of statistics can recognize that this evidence does not speak to the issue of causation, and therefore cannot create a genuine issue of causation --"

JUDGE SARIS:  Excuse me.  That's a legal argument. We'll get to that.  I just want factually I understand the dispute, so why don't we just move on.

MR. BARNES:  Okay.

Finkelstein, Decl., Ex. D at 155:16-157:9.

Plaintiffs submit that, other than the remaining Court ordered expert disclosure of Defendants' Dr. Gibbon concerning matters other than the FDA Alert, the deadlines for expert disclosure on general causation have elapsed and any of Defendants' unjustified efforts to "redo" their discovery of Plaintiffs' expert Cheryl Blume rightly should be foreclosed.  Plaintiffs request oral argument before Judge Saris because the issues broached in Defendants' motion are critically important to this litigation as Keith Altman has become an attorney with Plaintiffs' counsel subsequent to the *Daubert* hearing, and, as noted above, at the hearing Judge Saris began consideration of the issue that by solely pulling data Altman had performed a ministerial task.

**ARGUMENT**

**I.     MR. ALTMAN'S ACTIONS SERVED A MINISTERIAL FUNCTION IN PULLING DATA FROM THE ADVERSE EVENT DATABASE FOR PURPOSES OF FED RULES OF EVIDENCE RULE 1006 SUMMARIES, AND THE PARTIES HAVE ALREADY AGREED THERE IS NO DISPUTE OVER EITHER PARTY'S PULLING OF DATA.**

Keith Altman, then an employee of Finkelstein & Partners, LLP, and now a counsel for Plaintiffs, prepared charts and summaries at the direction of Plaintiffs' expert, Cheryl Blume, Ph.D. These charts were the results of Mr. Altman pulling and compiling voluminous data and prepared in accordance with FRE 1006. Defendants conferred with Plaintiffs' counsel and Mr. Altman regarding the data, Dr. Blume testified to the objective nature of the data, and the parties agreed there is no dispute over the pulling of the data from the underlying adverse event database.

**a.   Mr. Altman's Activities Were Secretarial in That He Pulled and Compiled Data Summaries Consistent With FRE Rule 1006.**

Pursuant to Rule 1006 of the Federal Rules of Civil Procedure:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court. Fed. R. Civ. P. 1006 (Moore's Federal Rules Pamphlet 2009).

In *In re Meridia Prods. Liab. Litig.,* Keith Altman, similar to the situation here, pulled data from an FDA AER database and utilized basic math in preparation of summaries from a voluminous database and did not in any way analyze the data. 328 F. Supp. 791 (N.D. Ohio 2004). The Court found that Altman was not an expert and did not provide any substantive expert analysis:

> Mr. Altman does not present statistical evidence which requires an expert. Within the Sixth Circuit, "there is no requirement that statistical evidence be supported by

expert testimony."  *McCabe v. Champion Intern. Corp.,* 916 F.2d 713(6th Cir. 1990) citing *EEOC* v. *Pet, Inc.,* 543 F. Supp. 911, 914 (M.D. Ala. 1982), *aff'd* 719 F.2d 383 (11th Cir. 1983)).  There is consensus among courts that "parties should not be deprived of the opportunity to present the results of fairly simply statistical tests simply because they cannot obtain the services of a trained statistician."  *Green v. Kinney Shoe Corp.,* 715 F. Supp. 1122, 1124 (D.D.C. 1989).  If a witness performs "simple arithmetic" and avoids analyzing the data, the witness does not need to qualify as an expert.  Stratton v. Dep't for the Aging, 132 F.3d 869, 877 (2d Cir. 1997).  Here, the data at issue involves the mere compilation of numbers and does not involve analysis of the data.  [*Id.* at 808.]

Mr. Altman's charts are summaries of voluminous materials prepared in accordance with FRE 1006 and are based upon publicly available data from the FDA as well as the Defendant. To prepare these charts, Mr. Altman did nothing more that count the number of adverse events for certain drugs or indications over time.  At each point in time, he then counted the number of reports for each adverse event term that was actually reported.  From these two numbers, he divided to get the percentage of each adverse term at each point in time for each drug.

In this litigation, Dr. Blume requested that Keith Altman pull the same type of data that she did in her standard pharmacovigilance work that she performs for pharmaceutical companies in "accessing the different types of events at different periods of time."  Finkelstein Decl., Ex. E at 48:11-49:11  Blume transcript.  In pulling the data, Keith Altman used the same procedures, including checking that double counts did not occur, that were utilized by Dr. Blume in other submissions on behalf of her pharmaceutical clients to the FDA.  Finkelstein Decl., Ex. E, at 54:21-55:23.  Dr. Blume testified in detail how she provided assignments to Keith Altman and his procedure in the pulling of the data from the database:

> A.    And that includes -- in this particular case, we were interested in psychobiological, neuropsychiatric terms, and we were also look -- interested in looking at the contribution of those terms relative to the entire database over time.

> Q.    Okay.  Now, specifically, can you set forth in specifics what inquiries you had Mr. Altman run in connection with your review of the various databases?

And I'm not so much interested in report, but the – you  know, the -- but the types of inquiries you asked him to run.  And are all of them included in your report?

A.      Yes, I can address that.

Q.      Thank you.

A.      And the assignments varied, of course, by necessity during different time periods.  I believe the first time period that we will be interested in is in the period 1994 to 1996.  And  I'll get to that in just a second. Now, the adverse events that are noted in this report that appear in either quarterly or annual reports or in PSURs, we are able to access those and address those in our office.  Where I turn to Mr. Altman's expertise are in the -- are in the large databases that are relied upon in doing – conducting pharmacovigilance work.  So that would include the Pfizer's -- Pfizer's internal database.   And, for example, he would have been involved in the work that we did in -- the first time period of relevance is '94 to '96.  [Finkelstein Decl., Ex. E, at 49:12-50:15.]

*  *  *

Q.      What did you do -- let's just take page 75.  What -- describe what you personally did to prepare Table -- the table on page 75.

A.      Okay.  This is in 1994, which would have been the first marketed year of Neurontin in the United States, so Pfizer would be submitting quarterly reports during that timeframe.  So we pulled the terms that we were interested in having filtered by Mr. -- Mr. Altman from the FDA's database.  We gave him the terms that we were interested in.  He gave me the number of reports. I also asked him to give me the total number of events in the database so we could do the standard calculation of the percent of total.

Q.      So on page 75, you look at abnormal dreams, that -- that percentage, the numerator is -- let's say on 1996 Q2, the numerator would be one, and then the denominator would be all events in the database  pertaining to having been reported to Neurontin?

A.      That would be yes.

Q.      Okay.

A.      Oh, yeah.  And it would only be the Pfizer database, of course, because it was a sole source product at that time.  [Finkelstein Decl., Ex. E at 51:15 – 52:13.]

While Dr. Blume may not have known the mechanical details of how the counts were

done, she was fully aware that counts were being done and the work done by Mr. Altman could

be readily verified.  Dr. Cheryl Blume stated in her expert declaration more than one year ago

that she relied upon Mr. Altman's objective pulling of the data.  Dr. Blume also clarified that at

no point in time did Mr. Altman exercise any subjective judgment in performing the above tasks

which were undertaken at her behest:

> 11.    Based on my past experience with Mr. Altman, I rely upon his **data compilations in the routine course of my business** , both in litigation projects and drug development projects.  To date, no one has demonstrated any substantive errors in any analysis he has performed at my request. I am confident that he has accurately **prepared data summaries and tables** which I requested.

> 12.    Mr. Altman's technical skill in working with the data exceeds my own; I personally could not replicate the work he performed.  Nevertheless, I know that since **all of the data compilations he has performed are objective in nature**, they can be replicated by anyone who uses the same data he used.

> 13.    In this case I asked Mr. Altman to prepare computational analyses of adverse event data. Mr. Altman was instructed to perform the work I delegated to him in an objective manner and to **not exercise subjective judgment** as to the interpretation of the data.  He and I had several conversations concerning **possible data summaries.**  I decided which analyses were the most appropriate for my evaluation of Neurontin.  [ECF Doc. # 1197, Ex. 102 at ¶¶ 11-13.]

Moreover, Dr. Blume designs the queries for the database based upon information that she

requires in her analysis and Keith Altman pulls the data from the database:

> Q.    Do you direct his activities when he works with you on your -- your pharmacovigilance work for private clients outside of litigation?

> A.    Yes.

> Q.    And so he -- you basically ask him to run the queries of the database and you will run the queries?

> A.    Yes.

> Q.    Does he ever design the queries himself?

> A.    I did -- I request the type of information that I need extracted.  He -- he designs the assignments that he conducts in order to assess the database, electronically access the database and check the database.  [Finkelstein Decl., Ex. E at 18:6-18.]

Mr. Altman, as well as Defendants and the FDA, used the standard adverse event dictionary known as MedDRA which is a hierarchical classification system consisting of multiple levels.  As to the adverse event terms, Mr. Altman generated the counts for *all* terms at each level of the MedDRA dictionary.  Once all of the counts and percentages were completed, Dr. Blume specified to Mr. Altman which specific charts she wanted to view.  If Mr. Altman counted an event as "suicidal ideation" it was only because Defendants or the FDA identified the event as such.  Dr. Blume testified that Altman was not provided with any "choice" and did not utilize any subjective determination in classifying an adverse event – that FDA designations were utilized:

> Q.      Okay.  I think, Dr. Blume, we were at page 76 and you were talking about -- we were addressing the work that Mr. Altman had done on your -- with you on page 72 your report.  And let's continue after page 75 and 76. You're not sure about 76.  You'll tell me.  Let's continue.  When -- what's -- what other pages did he provide you the work product for?

> A.      Well, if I didn't already say it, when I was talking about the internal database, these are captioned as serious events.  So another thing that we do when we're looking at databases is, in addition to canvassing the entire database, we also look at variety of subsets.  And one of those subsets are those events that have been declared serious.  And FDA defines a serious, a criteria for an event to be serious.

> Q.      And who did that canvassing of the database to identify serious adverse events?  Is that something you did personally?

> A.      If you -- if you look at an FDA MedWatch for it defines the criteria which makes it serious, so it's a computer filtering of it.  If a patient is hospitalized, there is certain things that you check to make it serious or nonserious.

> Q.      I asked a poor question and I apologize.  But my question is in terms of your analysis when you generated reports on serious adverse events.  Did -- who did the query to generate the listings of the serious adverse events; something you did or someone did at your request?

> A.      Okay.  Serious is -- there is -- there is no degree of choice in that.

> Q.      It's a designation.  I understand that.

A.      Yes.  And we use the same designation for the term "serious" that FDA does.

Q.      Who extracted the serious cases for your report?

A.      Mr. Altman.  [Finkelstein Decl., Ex. E at 71:23-73:10.]

Dr. Blume reiterated the fact that Altman objectively pulled the data for the suicide analysis and did not have any choice concerning the terms utilized:

Q.      I want to know if you know which ones Mr. Altman included in -- what preferred terms he included in the –

A.      He –

Q.      -- in the analysis for suicidal?

A.      He would have -- it wasn't a choice.  It would have been the preferred terms that are collected into   the high-level term group.

Q.      And do you know how he performed that function?

A.      No.  You will have to ask him.  Specifically, I do not know how he did that, but I will tell you the terms at the break that fall -- that are collected into the high-level term.

Q.      As to how he did it, you wouldn't know?

A.      Well, he would have -- he would -- he would not have exercised any editing of that.  He would have taken whatever terms were in the high-level term.

Q.      How do you know that?

A.      Because that's what we do.  We don't edit terms.

Q.      That's what you do.  Do you know what Mr. Altman did in this case?

A.      Well, when I say that's what we do, he does this work for us and we did -- we developed a program  that FDA has approved so that we don't have double booking of terms -- or double counting of terms.  [Finkelstein Decl., Ex. E at 144:2-145:3.]

Dr. Blume stated that Altman was not instructed to perform and type of  biostatistical analyses in his pulling of the data from the database.  Finkelstein Decl., Ex. E at 230:11-17.

Dr. Blume testified that Altman's pulling of data from the database was validated by the

FDA:

> Q.      And so I just want to ask you, knowing that they -- we -- you've testified
> that they have a financial interest in the outcome of this litigation. And,
> specifically, the evidence that you are putting forth that it's matter of opinions,
> don't you think it's appropriate for you to actually validate the analyses that Mr.
> Altman is giving to you to make sure they're accurate and -- as a matter of
> scientific discipline and rigor?
>
> MR. FROMSON:  Objection as to form to the extent it has already been asked
> and answered.
>
> BY MR. BARNES:
> Q.   You may answer.
>
> THE WITNESS:  Do I answer?
>
> BY MR. BARNES:
> Q.      Yes.
>
> A.      Mr. Altman is hired to do this because he has a specialty in filtering, or
> whatever more sophisticated term that should be applied to it, these databases. He
> is used for this in our -- in our work and in other people's work. He was asked by
> the FDA years ago to validate is efforts, and FDA confirmed his method. I would
> not be able to completely validate what he does. But once the FDA statisticians
> and epidemiologists approved NDA's using his method, I have accepted his
> method.
>
> Q.      How do you know that –
>
> A.      And –
>
> Q.      I'm sorry.
>
> A.      And as you will know through my discussions of  the data, my opinions
> are certainly not predicated upon these individual databases any more than they
> are on other events in this database.  So while the information is important and
> while it agrees with other opinions, it is not the ultimate opinion, but I accept his
> work based on persons far more knowledgeable and skilled in this area than I.
> [Finkelstein Decl., Ex. E at 65:14-66:25.]

Dr. Blume made it perfectly clear that she directed the PRR tables, across comparisons of

different epileptic drugs,  which were contained in her report.  Finkelstein Decl., Ex. E at 101:19-

114:25, 115:9-116:23, 285:19-291:4.   Dr. Blume also clarified that there was no statistical

analysis involved in the preparation of the tables:

> Q.      Yeah.  And isn't it true that all of your reports -- all of your tables in your report are counts taken from various reports submitted by Pfizer to the Food and Drug Administration, or regulatory authorities, or from databases?
>
> A.      Yes, these are set up exactly as you would set them up if you were doing an ISS report or an annual report summary, yes.
>
> Q.      Crude counts of cases, correct?  Just so I know what you're –
>
> A.      It's just a tabular listing of what we're provided in the Pfizer reports or whatever I'm listing.
>
> Q.      Without any statistical analyses applied by you or Mr. Altman, correct?
>
> A.      Yes, or just –
>
> MR. FROMSON:  Objection to form.
>
> THE WITNESS:  Yeah, are you saying a reference to statistical analysis?
>
> BY MR. BARNES:
> Q.      No, I'm making sure I didn't.  I don't see any statistical analysis that you've done in this case.
>
> A.      Oh, no, I never –
>
> MR. FROMSON:  Objection to form.
>
> THE WITNESS:  Yeah, and I didn't intend for you to and I –
>
> BY MR. BARNES:
> Q.      That's fine.
>
> A.      -- I didn't conduct statistical analysis.  [Finkelstein Decl., Ex. E at 485:7-486:9.]

There truly is no comparison between the subjective and substantive work that Dr. Hur

performed in referenced to litigation and the objective pulling of data from a database into

summaries which Keith Altman was assigned by Dr. Blume.  Dr. Hur's work would not qualify

as a summary of voluminous materials under FRE 1006.  Dr. Hur is a Ph.D. biostatistician, a scientist in his own right, who worked with Dr. Gibbons to implement the appropriate sophisticated statistical model to perform calculations on the data.  The distinction between Mr. Altman and Dr. Hur is not that the experts, Dr. Blume and Dr. Gibbons, relied upon the work of others.  It is because while there is no dispute about how to count the number of objects (which is what Keith Altman actually did), Dr. Hur made critical substantive decisions concerning which of numerous statistical models would be used to analyze data.  Moreover, for each model, there were subjective substantive decisions which were made by Dr. Hur concerning the many options in each of the statistical models which could be employed.

> **b.  Contrary to Defendants' Assertions, the Parties Exchanged Discovery of the Federal Rules of Evidence 1006 Summaries, the Parties Exchanged; Keith Altman Provided the Raw Adverse Event Files and Working Files That He Prepared; and the Parties Agreed That the Pulling of Data From the AERS Databases Would Not Be the Subject of Dispute in This Litigation.**

On October 28, 2007, Keith Altman provided Defendants' counsel with a DVD containing the raw adverse event files and the working files that he used to provide information that Dr. Blume requested that he pulled from the databases.  Finkelstein Decl., Ex. F.  Not only was this DVD provided to Defendants prior to Dr. Blume's deposition on November 12, 2007, it was also marked as an exhibit at that deposition.  Moreover, Plaintiffs' February 19, 2008 Rules 26 supplemental disclosure specifically referenced the data discs (see items 14 and 15) that related to the compilation of materials provided by Keith Altman to Cheryl Blume.  Finkelstein Decl., Ex. A.  It is clear that in accordance with Rule 1006 of the Federal Rules of Evidence,, the documents underlying the summaries were made available to Defendants and Defendants did not pose objections to the summaries.  Defendants were in possession of these materials and did not

seek the Court's intervention prior to the deadline for conclusion of expert disclosure on general

causation or the *Daubert* hearing.

Moreover, on January 7, 2008, prior to the time that Altman became employed as an

attorney with Plaintiffs' law firm and almost 6 months prior to the *Daubert* hearing, Plaintiffs'

counsel, Kenneth Fromson, wrote to defense counsel and delineated Plaintiffs' efforts to resolve

any dispute concerning Altman's pulling of data from the databases and preparation of summary

materials for Dr. Blume:

> Notwithstanding any right you may or may not have to further inquiry of Dr.
> Blume or to the pursuit of the information you seek, your pursuit of the
> "approved" methodology utilized by Mr. Altman can more easily and
> appropriately be recovered via other discovery devices, as opposed to Dr. Blume.
> Indeed, prior to Dr. Blume's deposition, Plaintiffs' counsel made Mr. Altman
> available for a formal deposition; Mr. Altman was made available for an informal
> meet-and-confer; Mr. Altman made himself available before Dr. Blume's
> deposition, and he actually did meet and confer with defense counsel at Dr.
> Blume's office about his data and the methodology employed.  [Finkelstein Decl.,
> Ex. G.]

Defense counsel Lori McGroder responded in a January 11, 2008 letter to Mr. Fromson

that she **rejected Plaintiffs' offer of producing Altman for deposition (Altman was not an**

**attorney at the time), and correctly acknowledged and identified Altman as "a non-**

**testifying witness."**  Finkelstein Decl., Ex. B.  Subsequently, in exchange for Plaintiffs'

withdrawing of the motion to compel discovery related to Defendants' expert, Dr. Weiss Smith,

the parties agreed through an exchange of e-mail that, *inter alia,* stated the "pulling" of data from

the raw adverse event database (AERS) would not be questioned in this litigation by either side:

> We can agree to a stipulation that neither side will question how the data are
> pulled from the raw AERS data.  We will agree that both Plaintiffs and
> Defendants are equally capable of running programs that will ***pull*** data from
> AERS into a form for subsequent ***queries and analyses***.  The points of contention
> start then with the various experts' use of specific protocols to ***analyze the data***
> (e.g. serious versus all, HGLT versus PT, etc.).  The stipulation is that if all

experts ran the analyses using the same protocols, the results should be similar."
(emphasis added).  [Finkelstein Decl., Ex. H.]

It is undisputed that Defendants already deposed Plaintiffs' expert, Cheryl Blume, Ph.D.,

regarding her queries and analyses of the data pulled by Mr. Altman.  However, by filing this

motion and requesting a deposition of Keith Altman in regard to his pulling of data from

databases into a form (summaries), Defendants have essentially violated the February 2009

agreement between the parties.  As noted in *United States v. Collins,* in regard to Federal Rules

of Evidence 1006 summaries:  "we have in the past encouraged trial courts to conduct hearings

out of the jury's presence 'in order to determine that everything contained in the summary is

supported  by the proof,' *United States v. Bartone*, 400 F.2d 459, 461 (6th Cir. 1968), cert.

denied, 393 U.S. 1027, 89 S. Ct. 631, 21 L. Ed. 2d 571 (1969), such proceedings are not

invariably required, especially when, as in this case, the summaries are straightforward and their

basis in the evidence clear."  596 F.2d 166 (6th Cir. 1979).

Plaintiffs submit that if there is any need for Keith Altman's testimony to authenticate the

summaries, there will be a similar need for the authentication of Defendants' pulling of the data

from the databases and the same may be accomplished outside the purview of the jury at trial.

Further, on November 7, 2007, the parties executed a letter agreement that drafts of

expert reports would not be discoverable in this litigation and drafts of expert reports would be a

subject of inquiry not allowed at depositions.  Finkelstein Decl., Ex. C.  In demanding in their

instant motion that this Court compel certain documents from Keith Altman and Dr. Blume that

Defendants are in essence violating the November 7, 2007 stipulation.

Plaintiffs have honored the stipulations and agreements between the parties in this

litigation.  If Defendants are allowed to go back, redo their discovery of Plaintiffs' general

causation experts at this late date, without any justification for sitting on their hands and not

seeking the intervention of this Court to obtain same – this would open up the expert discovery process anew.  Plaintiffs would seek to re-depose all of Defendants' experts concerning draft expert reports, and anyone who pulled raw data from a database for use in an expert report for defendants experts would be fair game.  Any e-mails or correspondence, if any, between Dr. Blume and Keith Altman is a subject necessarily within the purview of the "draft report" stipulation as such correspondence relates to what assignments she required in order to prepare any draft reports which ultimately culminated in her final expert report.   If this agreement between the parties is not honored, Plaintiffs would also be entitled to all correspondence and e-mails between defense counsel in any way related to the provision of a report from each of their experts.  Certainly, depositions would follow and this litigation would be extended *ad infinitim*.

## II.   DEFENDANTS' MOTION TO DEPOSE DR. BLUME SHOULD BE DENIED BECAUSE GENERAL CAUSATION DISCOVERY ENDED OVER A YEAR AGO, PLAINTIFFS TIMELY PROVIDED EXPERT DISCLOSURE OF DR. BLUME, SHE WAS DEPOSED TWICE DURING THE GENERAL CAUSATION PHASE OF DISCOVERY, AND SHE WAS CROSS-EXAMINED AT THE *DAUBERT* HEARING; DEFENDANTS HAVE FAILED TO MAKE A TIMELY MOTION FOR FURTHER DISCOVERY.

The First Circuit has stated "the bedrock proposition that federal courts possess wide-ranging power to sanction parties who repeatedly balk at complying with court-imposed deadlines," and that "disclosures are to be made 'at the times and in the sequence directed by the [district] court.'"  *Santiago- Diaz v. Laboratoria Clinco Y De Referencia Del Este and Sara Lopen, M.D.,* 456 F.3d 272, 275 (1st Cir. 2006).  In *Alper v. United States,* defendants moved to quash a subpoena issued by plaintiff served upon defendants' medical expert for documents and his presence at trial, after the close of the court implemented discovery schedule.  During the established discovery period, plaintiff was provided with a copy of the report of the expert in question but decided not to depose him.  190 F.R.D. 281(D. Mass. 2000).  The Court quashed the

subpoena in regard to document and noted that '"to allow a party to continue with formal discovery -- that is, discovery which invokes the authority of the Court -- whether in the guise of Rule 45 or any of the other discovery methods recognized by Rule 26(a)(5), after the discovery deadline unnecessarily lengthens discovery process, and diverts the parties' attention, from the post-discovery aspects of preparing a case for Trial."'  *Id.* at 284 (citing to *Marvin Lumber & Cedar Co. v,. PPG Indus., Inc.,* 177 F.R.D. 443, 445).  The court concluded that, "Plaintiff's last minute effort to obtain documents, if allowed, could raise significant evidentiary issues, about which the court will have had no prior notice. Judicial resources would surely be wasted."  *Id.*

It is clear in this case where this Court has already determined and denied Defendants' motion to exclude Plaintiffs' experts that the issue of expert discovery should be laid to rest. Defendants have essentially waived their rights to further expert discovery and any further such discovery would inevitably open up the process again, overburden both the resources of Plaintiffs and the judicial system.  Defendants have had a fair opportunity during the process and the hiring of a new law firm does not provided any justification whatsoever for obtaining additional discovery which Defendants had ample time and opportunity to discovery during the discovery schedule established by this Court.

> **a. Plaintiffs Offered to Resolve This Dispute Concerning Dr. Blume and Her Confidentiality Agreements With Other Pharmaceutical Entities During the Discovery Time Period Allotted by This Court for Expert Disclosure by providing a Declaration.**

In a January 7, 2008 letter to defense counsel Lori McGroder, Plaintiffs' counsel, Kenneth Fromson attempted to resolve a dispute between the parties regarding confidentiality agreements with certain of Dr. Blume's pharmaceutical company clients which precluded her from providing testimony in regard to other instances in which the FDA has approved submissions based, in part, upon Keith Altman's pulling data from a database and creating

summaries.  Finkelstein Decl., Ex. G.  Mr. Fromson advised that Dr. Blume's past requests to disclose such information from the entities involved had been met with denials, but in an attempt to resolve the dispute that Dr. Blume consulted with her counsel, Jay Wolfson, Esq., and her counsel had agreed to provide a Declaration in support of Dr. Blume's position.  *Id.*

Defendants rejected Plaintiffs' offer to resolve the confidentiality issue in regard to Dr. Blume and continued to "sit on their hands", until now – more than 10 months after oral argument, and after this Court has reached it decision to deny Defendants' motion to exclude Plaintiffs' experts.  This conduct should not be countenanced by this Court.  It makes a mockery of the Court's orders, will waste and overburden Plaintiffs, this Court, and the swift administration of justice.  There is no justification for Defendants' inaction – hiring a new counsel, when supposedly the crème of the crème in national law firms represented them during the expert discovery process, is not an excuse.

## CONCLUSION

Plaintiffs therefore respectfully request that this Court deny Defendants' motion to compel discovery of Keith Altman, Esq., and Dr. Cheryl Blume, in its entirety, and that the Court grant oral argument of this motion before Judge Saris.

Dated:  May 13, 2009

Respectfully submitted,

***Members of Products Liability***
***Plaintiffs' Steering Committee***

By:     **/s/ Andrew G. Finkelstein**
Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551

By:     **/s/ Jack W. London**
    Jack W. London, Esquire
    Law Offices of Jack W. London
     & Associates
    106 E. 6th Street, Suite 700
    Austin, TX  78701


## CERTIFICATE OF SERVICE

  I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on May 13, 2009.


    **/s/ Andrew G. Finkelstein**
    Andrew G. Finkelstein, Esquire