EXHIBIT E

**1**

```
 1      UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 2
 3   In re:  NEURONTIN MARKETING, SALES MDL DOCKET NO:
           PRACTICES, AND PRODUCTS
 4         LIABILITY LITIGATION    Master File No. 04-10981
 5   _____/
 6   THIS DOCUMENT RELATES TO:
 7        ALL PRODUCTS LIABILITY
          ACTIONS
 8   _____/
 9
          VIDEOTAPED
10   DEPOSITION OF:    CHERYL D. BLUME, Ph.D.
11   DATE:             November 12, 2007
12   TIME:             9:25 a.m. to 6:07 p.m.
13   PLACE:            13902 North Dale Mabry Highway
                       Suite 122
14                     Tampa, Florida
15   PURSUANT TO:      Notice by counsel for
                       Defendants for purposes
16                     of discovery, use at
                       trial or such other
17                     purposes as are permitted
                       under the Federal Rules
18                     of Civil Procedure
19   BEFORE:           VALERIE A. HANCE, RPR
                       Notary Public, State of
20                     Florida at Large
21                     Volume 1
                       Pages 1 to 370
22
23
24
25
```

**2**

```
 1   APPEARANCES:
 2       KENNETH B. FROMSON, ESQUIRE
         Finkelstein & Partners
 3       785 Broadway
         3rd Floor
 4       Kingston, New York  12401
         (800) 634-1212 Ext. 2755
 5          Attorney for Plaintiffs
 6       RICHARD M. BARNES, ESQUIRE
         MICHAEL J. WASICKO, ESQUIRE
 7       Goodell, DeVries, Leech & Dann, LLP
         One South Street
 8       20th Floor
         Baltimore, Maryland  21202
 9       (410) 783-4000
10       -and-
11       VINCENT E. GUNTER, ESQUIRE
         LORI C. McGRODER, ESQUIRE (via telephone)
12       Shook, Hardy & Bacon, LLP
         2555 Grand Boulevard
13       Kansas City, Missouri  64108-2613
         (816) 474-6550
14          Attorneys for Defendant, Pfizer, Inc.
15       ANNAMARIE A. DALEY, ESQUIRE (via telephone)
         Robins, Kaplan, Miller & Ciresi L.L.P.
16       2800 LaSalle Plaza
         800 LaSalle Avenue
17       Minneapolis, Minnesota 55402
         (612) 349-8500
18          Attorney for Plaintiff, Assurant
19       ELANA GOLD, ESQUIRE (via telephone)
         Law Office of Steven Hillyard
20       345 California Street
         Suite 1770
21       San Francisco, California  94104
         (415) 334-6880
22          Attorney for Raymond Jennings, M.D.
23   ALSO PRESENT:
         KEITH ALTMAN, Finkelstein & Partners
24       DAVID LEGGETT, Videographer
25
```

**3**

```
 1                INDEX
                                               PAGE
 2   DIRECT EXAMINATION BY MR. BARNES.............   6
 3   CERTIFICATE OF OATH.................. 369
 4   REPORTER'S CERTIFICATE............... 370
 5
 6              EXHIBITS
                                          ID    MARK
 7    1   First Amended Notice of .............   9      9
          Videotaped Deposition Duces Tecum of
 8        Cheryl D. Blume, Ph.D.
 9    2   Hard Drive (Retained by counsel)........  13     13
10    2A  Directory of Contents on Hard Drive.....  14
11    3   Disk of Neurontin/gabapentin ...........  14     14
          Bibliography
12
      3A  Directory of Documents Found on Disk....  15     14
13
14    4   Exhibit Number Skipped..................  35
15    5   Notebook................................  36     36
16    6   Correspondence and Communications ......  36     36
          Removed from Notebook (Exhibit 4)
17
      7   Disk In Re:  Neurontin Keith Altman ....  45     45
18        ADE Files (10/28/07)
19    8   Yellow Legal Paper for Requested .......  117    117
          Formula
20
      9   Guidance for Industry, Good ............  118    118
21        Pharmacovigilance Practices and
          Pharmacoepidemiologic Assessment,
22        March 19th, 2005, Clinical Medical
23    10  Map of Terms for Suicidal and ..........  160    159
          Self-Injurious Behaviors
24
      11  Pharmacopeidemiology, Fourth Edition, ..  164    164
25        by Brian Strom (Page 171)
```

**4**

```
 1            EXHIBITS (Continued)
                                          ID    MARK
 2    12  Composite, Graphs (7)................... 178    175
 3    13  Photograph............................. 196    196
 4    14  Photograph............................. 197    197
 5    15  PDG Financials......................... 249    249
 6    16  Collins-McFarland Research Report - .... 346    346
          Divalproex, lithium and suicide among
 7        Medicaid patients with bipolar
          disorder
 8
 9
10
...
25
```

45

1    MR. BARNES: Well, if you would like to spend
2  any more time authenticating this document, I'd be
3  delighted to have you spend all of lunch time
4  confirming it, but we'll go on the -- we're going
5  to go on the basis that this is the CD that you
6  provided to defense counsel last week.
7    MR. FROMSON: That makes sense.
8    MR. BARNES: Thank you. Let's mark this as
9  Exhibit No. 7, I believe. Correct? Thank you,
10 Dr. Blume. 6.
11   MR. FROMSON: Well, we did --
12   THE REPORTER: 7.
13   MR. FROMSON: By the way, the disk was labeled
14 that was provided to her in October 28th of '07.
15 That's my understanding as to when it was provided.
16   MR. BARNES: That -- I'll take your
17 representation. Thank you.
18   MR. FROMSON: Thanks.
19   (Deposition Exhibit No. 7 marked for
20 identification.)
21   MR. FROMSON: 7. All right. What's
22 Exhibit 6?
23   THE WITNESS: This is 6.
24   MR. FROMSON: 6 were the e-mails.
25   MR. BARNES: I have the -- I have the -- I

46

1  have 6 -- I have 6 being the -- I pulled this out
2  separately. Put it right on top. Thanks.
3    Now, I'm going to -- I'm just going to -- now,
4  I'm going to just -- just lay a foundation with --
5  with counsel so we understand what this is.
6    This was at our request. Your firm, from
7  Mr. Altman, provided Exhibit No. 7. Mr. Altman,
8  will you describe what -- what is -- Exhibit No. 7
9  contains, for the record, please.
10   MR. FROMSON: Notwithstanding that Mr. Altman
11 has not been sworn under oath, I certainly don't --
12   MR. BARNES: I'll -- I'll --
13   MR. FROMSON: I don't have an objection to him
14 making a representation for our firm and for our --
15 for our discussion purposes.
16   MR. BARNES: And he did -- he made that
17 repre- -- he can make -- he's making this
18 representation under your direction and permission,
19 correct?
20   MR. FROMSON: As part of what we'd consider --
21 we would consider to be a meet-and-confer process,
22 absolutely.
23   MR. BARNES: Thank you very much.
24   MR. FROMSON: Go ahead.
25   MR. BARNES: Okay.

47

1    MR. ALTMAN: I prepared a disk at the request
2  of defense counsel which contained all of the
3  material that I had sent to Dr. Blume and all of
4  the material I had actually created, all of my
5  working copies of all of the material I had worked
6  with, as well as the raw data, I believe, that had
7  been provided to me by either the -- by the
8  defendants, by Pfizer, in this case.
9    MR. BARNES: Okay.
10   MR. ALTMAN: And I just might add, that disk
11 will contain a lot of information that was not
12 actually provided to Dr. Blume, so she does not
13 have everything that is on that disk.
14 BY MR. BARNES:
15   Q.  Okay. Dr. -- Dr. Blume, describe for me, if
16 you would --
17   MR. BARNES: I'll accept your representation,
18 and thank you. That was not part of that
19 discussion between counsel and -- for the
20 plaintiffs and the defense counsel.
21 BY MR. BARNES:
22   Q.  When Mr. Altman -- describe how in this case
23 you've interacted with Mr. Altman in terms of the
24 performing any analyses and -- on the various databases
25 and data sets that you've referenced in -- in your -- in

48

1  your prior answer.
2    MR. FROMSON: Just -- just note my objection
3  to the form of the question to the extent that
4  you're asking her anything that pertains to the
5  subject matter of draft reports that were
6  ultimately provided.
7    MR. BARNES: I do not want draft report
8  information. I don't know if she'd even know that.
9  But if you do, that -- not the draft report.
10 BY MR. BARNES:
11   Q.  What I want to know, when you communicated
12 with Mr. Altman, what analyses -- or how did you
13 interact with him in terms of creating the analyses for
14 your consideration in this case? Broadly.
15   A.  Uh-huh. (Indicates affirmatively.)
16     I asked Mr. Altman to conduct the same sort of
17 analyses that we conduct in our standard
18 pharmacovigilance work for -- for pharmaceutical
19 companies. And what that means is accessing the
20 different types of events at different periods of time.
21     In this particular instance, the report is
22 divided into four time periods. And in each time
23 period, we looked at all available databases, which
24 included the U.S. pharmacovigilance database referred to
25 as either "SRS" or "SRS/AERS." We accessed the World

**53**

1  Q. You don't know who prepared this. Who
2  provided the terms?
3  A. We provided the terms.
4  Q. You directed the terms and he went -- he or
5  you -- on this, on page 76 -- went into the database to
6  extract it?
7  A. Yes, it's a little different with the World
8  Health Organization. When you receive the database from
9  them, they send you the entire database, so it's a
10 matter of going through and extracting from a whole --
11 you don't -- you don't have the opportunity to do it by
12 body systems. They send you everything.
13 Q. Do you have -- okay.
14    Do you have the database that was provided to
15 you from World Health Organization in your possession;
16 that was used to create this table on page 76?
17 A. Yes, and I have put that on this disk as well.
18 Q. And that would be referring to Exhibit No. 3?
19 A. Yes.
20 Q. Thank you very much.
21    All right. Why don't you continue to review
22 the report just as to what you -- so -- what you
23 prepared.
24    Right now, we have Mr. Altman preparing 69,
25 70, 71, 72, 73, 74, 75, and 76, correct?

**54**

1  MR. FROMSON: Just note my objection as to the
2  form in terms of the use of the word "prepare."
3  MR. BARNES: "Filtered" was her room -- word.
4  "Filtered." I'll --
5  THE WITNESS: Yes. And just to clarify, I
6  would have to check if we -- if we did the World
7  Health Organization or if he did it.
8  BY MR. BARNES:
9  Q. You'll check on that for me?
10 A. Yes, I will.
11 Q. Okay. Now, when you -- Mr. Fromson noted an
12 objection. What do you mean by Mr. -- by using the
13 phrase Mr. Altman filtered the information for you, what
14 does that mean?
15 A. Well, my understanding of the FDA and some of
16 these other databases is they are huge databases. The
17 word "filter" is simply my way of asking him to apply
18 the rules and the conditions that he has established in
19 evaluating the database and calculating the number of
20 specific events at -- at this designated time periods.
21 Q. What are the rules that Mr. Altman established
22 in querying the databases to get the number of events?
23 A. Well, we out -- we outline these. When we
24 submit, for example, to the Food and Drug
25 Administration, we give a complete list of what he does.

**55**

1  But my understanding is that care is taken to
2  take into consideration when there is an initial report
3  versus a follow-up report so it is not counted twice.
4  We filter -- I believe he filters the database so that
5  we are getting all of the information. We take the last
6  reports so that it includes all the cumulative
7  information. He checks for duplicates. He is able to
8  filter them for us by suspect status, nonsuspect status.
9  If we ask, he can filter it by various demographics.
10 For example, if the patient were on other meds, were not
11 on other meds.
12    If we're given information generally, whatever
13 fields -- it is my understanding, whatever fields are in
14 the intake form, he would be able to filter by those
15 forms -- fields. Excuse me.
16 Q. Are you -- is it your testimony that that's
17 what he did in this case?
18 A. Well, what I asked for -- and there are
19 certain -- there are certain precautions that he
20 undertakes for all tables. For example, he is very
21 careful that we don't double count. He is very careful
22 that we put the event when the event was -- when the
23 event occurred, not necessarily when reported.
24 Q. How do you know he was careful? What did you
25 do to -- did you do anything to audit his work in this

**56**

1  case to verify that he was exercising care?
2  A. We have used his -- the method that he has
3  developed has been provided to the FDA. FDA has queried
4  him independently on the way in which he analyzes these
5  data. FDA has -- has approved our applications using
6  these data. I understand that Mr. Altman communicates
7  with the FDA on projects other than mine, as well, on
8  these database assignments, so --
9  Q. My question is, what did you do in this
10 particular case to verify that Mr. Altman exercised care
11 in preparing these tables and filtered it in an accurate
12 and reliable way --
13 A. Well, I under --
14 Q. -- in this case?
15 A. Yes. I understood he used the same system
16 that has been previously found to be acceptable. I
17 cannot tell you over the last four years of whether I
18 did any other independent checking or not. I just don't
19 recall.
20 Q. In this case, did you do any independent
21 checking of Mr. Altman?
22 A. That's what I'm saying. In the last four
23 years, I just don't recall if I did or not.
24 Q. Well, when were you retained in this matter?
25 A. 2003. 2003, I think.

49

1  Health Organization database.  We looked at Health
2  Canada at least during one period in which it was
3  available.  I believe in this report we also looked at
4  DAWN, the Drug Abuse Network Test, the Test Network, and
5  the internal Pfizer pharmacovigilance database or
6  adverse event database.
7       And during that period of time -- during those
8  periods of time, we conducted the same sort of queries
9  that we conduct as part of our NDA preparation efforts
10 and as part of our post-NDA pharmacovigilance
11 assignments for clients.
12      And that includes -- in this particular case,
13 we were interested in psychobiological, neuropsychiatric
14 terms, and we were also look -- interested in looking at
15 the contribution of those terms relative to the entire
16 database over time.
17      Q.  Okay.  Now, specifically, can you set forth in
18 specifics what inquiries you had Mr. Altman run in
19 connection with your review of the various databases?
20 And I'm not so much interested in report, but the -- you
21 know, the -- but the types of inquiries you asked him to
22 run.  And are all of them included in your report?
23      A.  Yes, I can address that.
24      Q.  Thank you.
25      A.  And the assignments varied, of course, by

50

1  necessity during different time periods.
2       I believe the first time period that we will
3  be interested in is in the period 1994 to 1996.  And
4  I'll get to that in just a second.
5       Now, the adverse events that are noted in this
6  report that appear in either quarterly or annual reports
7  or in PSURs, we are able to access those and address
8  those in our office.
9       Where I turn to Mr. Altman's expertise are in
10 the -- are in the large databases that are relied upon
11 in doing -- conducting pharmacovigilance work.  So that
12 would include the Pfizer's -- Pfizer's internal
13 database.  And, for example, he would have been involved
14 in the work that we did in -- the first time period of
15 relevance is '94 to '96.
16      Q.  Would you please tell me the charts which he
17 pulled for you, please.
18      A.  He filtered the data that would have been
19 involved in -- on page 69 of my report, page 70, 71, 72,
20 which are the filter of the top 25 adverse events during
21 that relevant time period in the database across all
22 body systems.  And that would proceed to 72, 73, 74.
23      Beginning on page 75, which is paragraph 117,
24 we turn then to the various available databases,
25 independent available databases.  During this timeframe

51

1  with the U.S. Government, it would have been the SRS --
2       Q.  Who did --
3       A.  -- system.
4       Q.  Who -- who pulled the data on -- and did the
5  analysis for paragraph 117 on page 75?
6       A.  Mr. Altman.
7       Q.  Mr. Altman did?
8       A.  Yes.  This is from the FDA's database.  It's
9  maintained by -- I think it's maintained by NTIS.
10      Q.  So just so I understand, the tables on 69, 70,
11 71, 72, 73, 74, and page 75 were prepared by Mr. Altman,
12 correct?
13      A.  He provided me with the numbers of events.
14 The tables were actually prepared here.
15      Q.  What did you do -- let's just take page 75.
16 What -- describe what you personally did to prepare
17 Table -- the table on page 75.
18      A.  Okay.  This is in 1994, which would have been
19 the first marketed year of Neurontin in the
20 United States, so Pfizer would be submitting quarterly
21 reports during that timeframe.  So we pulled the terms
22 that we were interested in having filtered by Mr. --
23 Mr. Altman from the FDA's database.  We gave him the
24 terms that we were interested in.  He gave me the number
25 of reports.

52

1       I also asked him to give me the total number
2  of events in the database so we could do the standard
3  calculation of the percent of total.
4       Q.  So on page 75, you look at abnormal dreams,
5  that -- that percentage, the numerator is -- let's say
6  on 1996 Q2, the numerator would be one, and then the
7  denominator would be all events in the database
8  pertaining to having been reported to Neurontin?
9       A.  That would be yes.
10      Q.  Okay.
11      A.  Oh, yeah.  And it would only be the Pfizer
12 database, of course, because it was a sole source
13 product at that time.
14      Q.  Okay.  Continue after '75 as to what -- what
15 Mr. Altman prepared versus to what -- as to what you
16 prepared.
17      A.  Okay.  So the --
18      Q.  Who accessed Health Canada on page 76?
19      A.  Well, that's World Health Organization.
20      Q.  I'm sorry.
21      A.  That's not Health Canada.
22      Q.  I made a mistake.  I apologize.
23      A.  We generally access the WHO database.  Now,
24 whether we did it in this case or Mr. Altman accessed
25 it, I don't specifically recall.

**49**

1  Health Organization database.  We looked at Health
2  Canada at least during one period in which it was
3  available.  I believe in this report we also looked at
4  DAWN, the Drug Abuse Network Test, the Test Network, and
5  the internal Pfizer pharmacovigilance database or
6  adverse event database.
7       And during that period of time -- during those
8  periods of time, we conducted the same sort of queries
9  that we conduct as part of our NDA preparation efforts
10  and as part of our post-NDA pharmacovigilance
11  assignments for clients.
12       And that includes -- in this particular case,
13  we were interested in psychobiological, neuropsychiatric
14  terms, and we were also look -- interested in looking at
15  the contribution of those terms relative to the entire
16  database over time.
17       Q.  Okay.  Now, specifically, can you set forth in
18  specifics what inquiries you had Mr. Altman run in
19  connection with your review of the various databases?
20  And I'm not so much interested in report, but the -- you
21  know, the -- but the types of inquiries you asked him to
22  run.  And are all of them included in your report?
23       A.  Yes, I can address that.
24       Q.  Thank you.
25       A.  And the assignments varied, of course, by

**50**

1  necessity during different time periods.
2       I believe the first time period that we will
3  be interested in is in the period 1994 to 1996.  And
4  I'll get to that in just a second.
5       Now, the adverse events that are noted in this
6  report that appear in either quarterly or annual reports
7  or in PSURs, we are able to access those and address
8  those in our office.
9       Where I turn to Mr. Altman's expertise are in
10  the -- are in the large databases that are relied upon
11  in doing -- conducting pharmacovigilance work.  So that
12  would include the Pfizer's -- Pfizer's internal
13  database.  And, for example, he would have been involved
14  in the work that we did in -- the first time period of
15  relevance is '94 to '96.
16       Q.  Would you please tell me the charts which he
17  pulled for you, please.
18       A.  He filtered the data that would have been
19  involved in -- on page 69 of my report, page 70, 71, 72,
20  which are the filter of the top 25 adverse events during
21  that relevant time period in the database across all
22  body systems.  And that would proceed to 72, 73, 74.
23       Beginning on page 75, which is paragraph 117,
24  we turn then to the various available databases,
25  independent available databases.  During this timeframe

**51**

1  with the U.S. Government, it would have been the SRS --
2       Q.  Who did --
3       A.  -- system.
4       Q.  Who -- who pulled the data on -- and did the
5  analysis for paragraph 117 on page 75?
6       A.  Mr. Altman.
7       Q.  Mr. Altman did?
8       A.  Yes.  This is from the FDA's database.  It's
9  maintained by -- I think it's maintained by NTIS.
10       Q.  So just so I understand, the tables on 69, 70,
11  71, 72, 73, 74, and page 75 were prepared by Mr. Altman,
12  correct?
13       A.  He provided me with the numbers of events.
14  The tables were actually prepared here.
15       Q.  What did you do -- let's just take page 75.
16  What -- describe what you personally did to prepare
17  Table -- the table on page 75.
18       A.  Okay.  This is in 1994, which would have been
19  the first marketed year of Neurontin in the
20  United States, so Pfizer would be submitting quarterly
21  reports during that timeframe.  So we pulled the terms
22  that we were interested in having filtered by Mr. --
23  Mr. Altman from the FDA's database.  We gave him the
24  terms that we were interested in.  He gave me the number
25  of reports.

**52**

1       I also asked him to give me the total number
2  of events in the database so we could do the standard
3  calculation of the percent of total.
4       Q.  So on page 75, you look at abnormal dreams,
5  that -- that percentage, the numerator is -- let's say
6  on 1996 Q2, the numerator would be one, and then the
7  denominator would be all events in the database
8  pertaining to having been reported to Neurontin?
9       A.  That would be yes.
10       Q.  Okay.
11       A.  Oh, yeah.  And it would only be the Pfizer
12  database, of course, because it was a sole source
13  product at that time.
14       Q.  Okay.  Continue after '75 as to what -- what
15  Mr. Altman prepared versus to what -- as to what you
16  prepared.
17       A.  Okay.  So the --
18       Q.  Who accessed Health Canada on page 76?
19       A.  Well, that's World Health Organization.
20       Q.  I'm sorry.
21       A.  That's not Health Canada.
22       Q.  I made a mistake.  I apologize.
23       A.  We generally access the WHO database.  Now,
24  whether we did it in this case or Mr. Altman accessed
25  it, I don't specifically recall.

**17**

1  Q.  On what basis do you -- you can't identify
2  your pharmaceutical clients?
3      MR. FROMSON:  Just note my objection to the
4  extent that it may be privileged information or
5  subject to confidentiality agreements that she has
6  with both pharmaceutical companies.
7      THE WITNESS:  That is correct.  And I have
8  questioned them in the past regarding these types
9  of issues and they have forbidden me to identify
10 them.
11 BY MR. BARNES:
12 Q.  How many clients has Mr. Altman worked with
13 you on product development matters?
14 A.  Probably four or five.
15 Q.  And when did that begin?
16 A.  In 2004.
17 Q.  Describe the nature of the work that
18 Mr. Altman does for you for your pharmaceutical clients.
19 A.  He has evaluated U.S. as well as international
20 databases, both publicly available as end company-based
21 databases, relating to adverse events for utilization in
22 either IND or NDA submissions or in the establishment of
23 pharmacovigilance assignments following an NDA approval.
24 Q.  Are these U.S.-based companies that you're
25 working with?

**18**

1  A.  Both U.S. and international.
2  Q.  Are the -- involves the products that are --
3  are they generic or are they ethical pharmaceuticals,
4  branded pharmaceuticals?
5  A.  They are both.
6  Q.  Do you direct his activities when he works
7  with you on your -- your pharmacovigilance work for
8  private clients outside of litigation?
9  A.  Yes.
10 Q.  And so he -- you basically ask him to run the
11 queries of the database and you will run the queries?
12 A.  Yes.
13 Q.  Does he ever design the queries himself?
14 A.  I did -- I request the type of information
15 that I need extracted.  He -- he designs the assignments
16 that he conducts in order to assess the database,
17 electronically access the database and check the
18 database.
19 Q.  So I understand, you will say, "Mr. Altman, I
20 would like for you to query the database to extract this
21 information, run these analyses," and he would use his
22 system to pull the information out and return the
23 information to you for your professional evaluation?  Is
24 that fair?
25 A.  Yes.  And his -- and his analyses procedures

**19**

1  are included with the information that is provided to
2  both the client and to the Food and Drug Administration.
3  Q.  Let me know, how does that work?  When he
4  provides you with the analyses and procedures, what
5  are -- what documentation does he provide you with in
6  response to your request for information?
7      MR. FROMSON:  Just note my objection as to
8  form.
9      THE WITNESS:  Well, it takes -- it takes --
10 takes different approaches depending on the type of
11 search and depending on the client.  Generally he
12 is involved with the design, the information that
13 is needed in the goals for -- for the IND or for
14 the NDA.  And so he is aware of what we are -- what
15 we are working on.
16     And I will ask him specific queries, either at
17 a meet -- either at a face-to-face meeting or
18 telephonically or electronically, and he will run
19 that information.  There is generally telephonic
20 contact back and forth as that information is
21 generated.  And the information is provided to us
22 electronically or he brings us to us when we meet.
23 BY MR. BARNES:
24 Q.  Your prior answer talked about that he would
25 provide you with design and documentation back to you in

**20**

1  terms of the request.
2      Does he provide you with the protocol for a
3  search or how does he set up the search or does he --
4  you just let him run the search as he sees fit?
5  A.  Well, we've done it several times, and he
6  provides to me an overview of how he has -- how he plans
7  on conducting the search.  That protocol and the -- and
8  his execution of that protocol has been previously found
9  acceptable by the Food and Drug Administration.
10 Generally, that same general type of search is conducted
11 for all of our searches.
12 Q.  And when -- when was it found acceptable by
13 the Food and Drug Administration?
14 A.  I think our first NDA with that was approved
15 in 2004.
16 Q.  And what -- what protocol did he run that was
17 found acceptable by the Food and Drug Administration?
18 Describe it, the protocol and what the output was.
19     MR. FROMSON:  Just note my objection as to
20 form.
21     THE WITNESS:  Within the confines of our
22 confidentiality agreement with that client, the
23 search was designed to compare a variety of
24 adverse-related events over a family of drug
25 products.  And we were interested in specific

**69**

1    I'm not capable of validating his work.
2    BY MR. BARNES:
3    Q.  So it is your testimony that you have never
4    specifically done anything to validate his data in 2007
5    on his work in Neurontin?
6        MR. FROMSON:  Same objection, to the extent
7    that it hasn't already been asked and answered.
8        THE WITNESS:  Yes, I have not -- I am not
9    capable of independently validating his extraction
10   of data from -- from these databases.
11   BY MR. BARNES:
12   Q.  At any time in this litigation, correct?
13       MR. FROMSON:  Same objection to the extent
14   that it has not already been asked and answered.
15       THE WITNESS:  Yes.
16   BY MR. BARNES:
17   Q.  Okay.  Now, let's -- let's finish going
18   through your report and identify other tables that
19   Mr. Altman --
20   A.  Okay.
21   Q.  -- filtered for you.
22   A.  Okay.  And, again, I don't -- I don't mean
23   to -- to limit what he does as filtering.  That's simply
24   my shorthand way of referring to it.
25       The Pfizer database --

**70**

1    Q.  Well, they --
2        MR. BARNES:  Would you read that back, that
3    last answer.  I apologize.  Read back her last
4    answer.  And identify the pages, but read back that
5    last answer.
6        (The requested portion was read by the
7    reporter.)
8    BY MR. BARNES:
9    Q.  Well, would you give me the long-handed way of
10   referring to filtering as to describing in detail what
11   Mr. Altman's work entails for you when he runs these
12   tables and analysis for you, because I don't want to --
13   you've said "shorthand."  I don't want the short.  I
14   want the complete answer.
15       MR. FROMSON:  Just note -- are you finished?
16       MR. BARNES:  Yeah.
17       MR. FROMSON:  Just note my objection as to
18   form to the extent that it has not already been
19   asked and answered.  On the record, you will see
20   that she -- you asked about rules, conditions, and
21   evaluating queries, so that my objection is to the
22   extent it's already been asked and answered.  Go
23   ahead.
24       THE WITNESS:  Okay.  My understanding, when --
25   again, you certainly have to ask him these

**71**

1    questions.
2        My understanding, when Mr. Altman approaches a
3    database, is that he establishes the database so
4    that we are fulfilling requirements for ensuring
5    that we have access -- that we have secured all the
6    numbers that are available, that there has not been
7    double counting, and that we have structured the
8    database in such a way that allows us to get an
9    accurate number of the events at each time period.
10       I know that several procedures and controls
11   are put into place to allow him to do that.  What
12   the specific natures are, specific natures of those
13   controls, I just don't know.
14   BY MR. BARNES:
15   Q.  That's fair.  Thank you.
16       MR. BARNES:  All right.  Let's take a very
17   short break, about five minutes pushing.
18       MR. FROMSON:  Okay.
19       THE VIDEOGRAPHER:  Off the record at 10:42.
20       (Recess taken.)
21       THE VIDEOGRAPHER:  On the record 10:51.
22   BY MR. BARNES:
23   Q.  Okay.  I think, Dr. Blume, we were at page 76
24   and you were talking about -- we were addressing the
25   work that Mr. Altman had done on your -- with you on

**72**

1    your report.  And let's continue after page 75 and 76.
2    You're not sure about 76.  You'll tell me.  Let's
3    continue.
4        When -- what's -- what other pages did he
5    provide you the work product for?
6    A.  Well, if I didn't already say it, when I was
7    talking about the internal database, these are captioned
8    as serious events.  So another thing that we do when
9    we're looking at databases is, in addition to canvassing
10   the entire database, we also look at variety of subsets.
11   And one of those subsets are those events that have been
12   declared serious.  And FDA defines a serious, a
13   criteria for an event to be serious.
14   Q.  And who did that canvassing of the database to
15   identify serious adverse events?  Is that something you
16   did personally?
17   A.  If you -- if you look at an FDA MedWatch form,
18   it defines the criteria which makes it serious, so it's
19   a computer filtering of it.  If a patient is
20   hospitalized, there is certain things that you check to
21   make it serious or nonserious.
22   Q.  I asked a poor question and I apologize.  But
23   my question is in terms of your analysis when you
24   generated reports on serious adverse events.
25       Did -- who did the query to generate the

**73**

1 listings of the serious adverse events; something you
2 did or someone did at your request?
3   A.   Okay.  Serious is -- there is -- there is no
4 degree of choice in that.
5   Q.   It's a designation.  I understand that.
6   A.   Yes.  And we use the same designation for the
7 term "serious" that FDA does.
8   Q.   Who extracted the serious cases for your
9 report?
10   A.   Mr. Altman.
11   Q.   Okay.  He did that for you?
12   A.   Yes.
13   Q.   And, again, you -- you've not validated
14 that -- that query?
15   A.   No.
16   Q.   You agree?  I asked you a double negative.
17   A.   Well, I agree that Mr. Altman uses the
18 specific terms that we require for serious, which are
19 the FDA terms for serious, but I did not hire a separate
20 computer base -- computer database expert to validate
21 his work for Neurontin.
22   Q.   And you didn't do it personally?
23   A.   Well, if I could have done it personally, I
24 wouldn't have hired Mr. Altman.  I hire him for his
25 expertise.

**74**

1   Q.   Are you paying Mr. Altman in the Neurontin
2 litigation or -- or not?  Who -- who --
3   A.   Oh, no, I don't think so.  No, no, not in
4 Neurontin, but in general.
5   Q.   Well, in this case?
6   A.   In this case.
7   Q.   He's working for the law firm, right?
8   A.   Yeah, I don't know how all the different law
9 firms orchestrate together.  I have no idea.  But I did
10 not pay him.
11   Q.   And you're -- so -- and you understand he's an
12 employee of the Finkelstein law firm, correct?
13   A.   Yes, I answered that earlier.  Yes.
14   Q.   And you understand that Mr. Finkelstein's law
15 firm, Mr. Fromson's law firm are liaison counsel in the
16 product liability litigations?  He said that at the
17 start of the deposition, right?
18   A.   Yes.
19   Q.   So -- so -- and it's your understanding that
20 Mr. Altman's work in this case, is as part of the
21 Finkelstein law firm, correct, and not part of the --
22 your organization, correct?
23   A.   Yes.
24   Q.   Okay.  Let's go back to highlighting the parts
25 that Mr. Altman did for you.

**75**

1   A.   Page?
2   Q.   I'm sorry.  Why don't you go -- we were at the
3 World Health Organization on page 76.  Let's start from
4 there.
5   A.   Yes.  And, again, I don't know if we tabulated
6 these numbers or if we sent -- or if we sent the
7 database and Mr. Altman gave us the numbers.  I don't
8 know.
9   Q.   Okay.
10   A.   I think we ordered the World Health.  We
11 generally order the World Health Organization database.
12   Q.   And so you'll let me know?
13   A.   I will.
14   Q.   Okay.  Thank you.
15   A.   Continue?
16   Q.   Yeah, please.  I'm on page 78.  That's the
17 next table.
18   A.   We did this table.  This is coming from
19 research reports.  This is just a summary of suicidal
20 events from Pfizer's research reports.
21   Q.   Okay.  You did that yourself?
22   A.   Yes.
23   Q.   Okay.  What's the next table?
24   A.   The next table is similar to what we have just
25 discussed.  This is a tabular summary of dechallenge

**76**

1 events from various Pfizer studies.
2   Q.   And what page is that on?
3   A.   88.  Begins on 88.
4   Q.   I have it on page 87.
5   A.   87?
6   Q.   On my version of your report, it's 87.
7   A.   Yeah.  Yes, this is -- well, page 7 is an
8 overview of everything that's going to follow.
9   Q.   Who prepared your table on page 87?
10   A.   We did, PDG.
11   Q.   Okay.  And how about page 88?
12   A.   PDG did 88, 89.  89.
13        And we are now in the next time era, which is
14 '96 to 2002.
15   Q.   Let me ask you this at this juncture.  We'll
16 continue with Mr. Altman vs. PGD (sic) -- and PGD is
17 Cheryl Blume?
18   A.   Well --
19   Q.   And people working your under direction?
20   A.   PDG is -- is everyone at PDG, yes.
21   Q.   Who works for you?
22   A.   Yes.
23   Q.   So you're directing PGD work?
24   A.   Yes.
25   Q.   Okay.  So just -- I'm just making sure I

### Page 141

1  of the question.
2  　　THE WITNESS:  Can you repeat that?
3  BY MR. BARNES:
4  　Q.  Yeah.  Explain to me how -- you have a
5  higher-level term for a classification, correct?
6  　A.  Well, I don't.  FDA does.
7  　Q.  Well, in this report, the table Mr. Altman
8  provided to you says "PRR Over Time, Suicidal and
9  Self-Injurious Behavior HLT," correct?
10 　A.  Right, this is the high-level -- this is the
11 grouping of high-level terms coded suicidal and
12 self-injurious behavior.  He took that number and
13 divided it by the total number of reports at that
14 timeframe.
15 　Q.  Okay.  This is a -- this is their -- as I
16 understand MedDRA, there is something called a -- a
17 system organ class, correct?
18 　A.  Well, that's one category.  This is one down
19 from that.
20 　Q.  Okay.  Well, then the -- so what is the --
21 what is the system organ class for the higher-level
22 terms used on page 194?
23 　A.  What is the system organ class?
24 　Q.  Uh-huh.  (Indicates affirmatively.)
25 　A.  I don't -- I mean, I'd have to look at the

### Page 142

1  map.  I don't know what high-level term it fits into.
2  Probably psycho -- psychiatric or psychobiological or
3  CNS.  I don't know.
4  　Q.  You just don't know?
5  　A.  No.  We have a whole map system here I can
6  pull out for you and show it to you.
7  　Q.  Okay.  Do you know the terms that were --
8  that -- for suicide -- the preferred terms that map to
9  the term "suicidal and self-injurious behavior" for the
10 NEC classification not elsewhere identified or
11 classified?
12 　　MR. FROMSON:  Can you just -- objection as to
13 　the form, use of the term "NEC."
14 BY MR. BARNES:
15 　Q.  NEC.  Do you know what NEC, not other --
16 elsewhere classified, means?
17 　A.  No.
18 　Q.  What does that mean?
19 　A.  Wait a minute.  Are you asking what preferred
20 terms get funneled into high-level terms?
21 　Q.  Eventually.
22 　A.  No, I don't -- I don't know specifically.  We
23 have a chart here that we refer to.  I do not know
24 specifically.
25 　Q.  Do you -- do you know how Mr. Altman performed

### Page 143

1  the analysis in terms of identifying the preferred terms
2  that map to the high-level term "suicidal" that is
3  depicted on page 194?  What are the preferred terms for
4  the analysis?
5  　A.  Well, my understanding, he used the high-level
6  term grouping that includes all of the suicidal and
7  self-injurious behaviors that are collated into -- or
8  reduced into the high-level term.
9  　Q.  My -- okay.  My question is, what preferred
10 terms map to suicidal as appears on -- now, we're using
11 the analysis on page 194?
12 　A.  I don't -- I -- I -- let me see if we --
13 　　MR. FROMSON:  Was there a question posed?
14 　　MR. BARNES:  Uh-huh.  (Indicates
15 affirmatively.)
16 　　Question mark.
17 　　MR. FROMSON:  All right.  Now I -- now I
18 recognize it as a question.  Thank you.
19 　　THE WITNESS:  No, I don't -- I did not list in
20 here the specific terms that are included in the
21 HLT grouping, but it was the same grouping across
22 all the -- all of the drugs.  And at the break, I
23 can give you the list of --
24 BY MR. BARNES:
25 　Q.  Well, what --

### Page 144

1  　A.  -- specific terms that went into this.
2  　Q.  I want to know if you know which ones
3  Mr. Altman included in -- what preferred terms he
4  included in the --
5  　A.  He --
6  　Q.  -- in the analysis for suicidal?
7  　A.  He would have -- it wasn't a choice.  It would
8  have been the preferred terms that are collected into
9  the high-level term group.
10 　Q.  And do you know how he performed that
11 function?
12 　A.  No.  You will have to ask him.  Specifically,
13 I do not know how he did that, but I will tell you the
14 terms at the break that fall -- that are collected into
15 the high-level term.
16 　Q.  As to how he did it, you wouldn't know?
17 　A.  Well, he would have -- he would -- he would
18 not have exercised any editing of that.  He would have
19 taken whatever terms were in the high-level term.
20 　Q.  How do you know that?
21 　A.  Because that's what we do.  We don't edit
22 terms.
23 　Q.  That's what you do.  Do you know what
24 Mr. Altman did in this case?
25 　A.  Well, when I say that's what we do, he does

---

**145**

1  this work for us and we did -- we developed a program
2  that FDA has approved so that we don't have double
3  booking of terms -- or double counting of terms.
4      Q.  Okay.  Well, let me ask you this.
5          Do you know how he avoids double counting of
6  terms?
7      A.  I -- I don't understand.  Electronically, I
8  don't understand what he does.  No, I don't understand
9  it.
10     Q.  Okay.  That's fine.  Let's talk about
11 self-injurious behaviors.
12         What preferred terms map to self-injurious
13 behaviors for purposes of the graph on page 194 of
14 the --
15     A.  Oh, it's going to be the same answer, I will
16 have to give you the specific list.  I can't tell you
17 now what terms are in there.
18     Q.  And do you know how Mr. Altman performed the
19 analysis to actually group the appropriate preferred
20 terms into self-injurious behaviors?  Do you -- do you
21 know how that happened, if that happened?
22     A.  Well --
23     Q.  Or how it happened?
24     A.  I don't know specifically -- I don't know
25 which terms are collected within HLT.  No, I do not know

**146**

1  that.
2      Q.  Do you know how Mr. Altman treated overdose
3  cases?
4          MR. FROMSON:  Note my objection as to form.
5          THE WITNESS:  I know we discussed earlier in
6      the report that in some cases we included all
7      overdose and in some we ruled out ones that were --
8      we only did intentional overdoses.  And the tables
9      so note that in the earlier part of the report.
10 BY MR. BARNES:
11     Q.  On the PRR Over Time, Suicidal -- I'm sorry.
12         For the PRR Over Time graph on page 194, do
13 you know how Mr. Altman treated overdose cases?
14     A.  I do not know if he included the prescriber --
15 misprescribing of the extra -- of the higher doses.  I
16 don't know that.
17     Q.  Do you know how he treated intentional
18 overdose cases?
19     A.  Well, the intentional would have been included
20 in here.
21     Q.  How do you know that?
22     A.  Because we discussed it and included it in the
23 earlier tables.
24     Q.  Do you know for a fact that intentional
25 overdose cases were included in as -- in either the

**147**

1  suicidal or self-injurious behavior event?
2      A.  No, I do not have a list of what terms went
3  into this.
4      Q.  Are all intentional overdoses -- constitute
5  suicidal behavior, in your view?
6      A.  No, that's why we have it as two separate
7  categories earlier in the report.
8      Q.  So my question is here, do you know if he
9  differentiated between -- how he -- if he differentiated
10 between intentional overdose cases that did exhibit
11 self-injurious behavior and intentional overdose cases
12 that were not self-injurious behavior?
13         MR. FROMSON:  Just note my objection as to
14     form.
15         THE WITNESS:  No, I don't know how he did it.
16 BY MR. BARNES:
17     Q.  Now -- so if there was some degree of editing
18 discretion that Mr. Altman used in deciding which cases
19 were included in the analysis on page 194 and which
20 cases were not used in the analysis on 194, correct?
21         MR. FROMSON:  Just note my objection as to
22     form.
23         THE WITNESS:  No, that is not my
24     understanding.  We do not edit within it.  We
25     select a category and do it across all drug

**148**

1      products.
2          I do not know what he did in this table
3      though.  I will have to go back and check.  I do
4      not have the terms memorized that went into this.
5      I can tell you it was the same terms across all
6      products.
7  BY MR. BARNES:
8      Q.  When you -- when you submitted this report,
9  did you know how Mr. Altman treated overdose cases in
10 terms of including and excluding them from this table?
11         MR. FROMSON:  Objection to form to the extent
12     that it has already been asked and answered.  Over
13     my objection, you can answer.
14         THE WITNESS:  My understanding is intentional
15     overdoses are included.
16 BY MR. BARNES:
17     Q.  And you would agree that not all intentional
18 overdoses constitute self-injurious or suicidal
19 behavior, correct?
20         MR. FROMSON:  Objection to the extent that it
21     has not already been asked and answered.
22         THE WITNESS:  I think because Pfizer included
23     intentional overdoses when they did their list, we
24     put intentional overdoses in the same list.  I -- I
25     believe that's the reasoning behind that.  When

Blume, Cheryl (F&P Expert)  11/12/2007  9:25:00 AM

**229**

1  A.  In the -- I mean, we don't hire
2  biostatistician to interpret literature article, but we
3  do hire a biostatistician to help us design the power of
4  a clinical study or to help us evaluate animal data with
5  regard to statistical issues, yes.
6  Q.  And how about human data, do you -- do you
7  personally run the biostatistical analyses of human data
8  or do others do that in your practice?
9  A.  Well, I thought I said clinical studies before
10 I said animal.  No, we use an outside biostatistician
11 for clinical issues.
12 Q.  In your report that was provided in this case,
13 which is contained within Exhibit 5, were there any
14 biostatistical analyses conducted to -- with regard to
15 the relationship between Neurontin and suicidal
16 behavior?
17 A.  No, I did not.  We do not do any statist- --
18 no.  We do not do statistics on the pharmacovigilance
19 data, no.
20    There were statistics done in your client's
21 research reports in the studies that reported
22 psychobiological events or suicide-related events, but
23 we did not run any additional statistics on pharm --
24 pharmacovigilance work, no.
25 Q.  Did you run any biostatistics on randomized

**230**

1  clinical trials; any analyses on that data?
2  A.  No, but we report -- we reported the
3  differences.  We reported the -- the data that your
4  client reported for those trials.
5  Q.  But you, Dr. Blume, and Dr. -- or the PDG
6  Group did not do biostatistical analyses of the clinical
7  trial data as referenced in your report of --
8  A.  Oh, no, I assumed the -- no, I just accepted
9  the Pfizer numbers.
10 Q.  Fine.
11    And do you know if Mr. Altman did any
12 biostatistical analyses in connection with addressing
13 the question of Neurontin and its association with
14 suicide or suicidal behavior?
15    MR. FROMSON:  Just note my objection as to
16 form.
17    THE WITNESS:  Well, yeah, I'm not aware of it.
18 BY MR. BARNES:
19 Q.  Okay.  Going on to neurobiology, do you hold
20 yourself out as a neurobiologist?
21 A.  No, I'm a pharmacologist.  My -- my -- my
22 specialty was -- our department in training was -- was
23 neurobiology and endocrine biology.  No, I don't hold
24 myself out to be a neurobiologist.
25    I have several patents in neurobiology and

**231**

1  much of my work has been done with neurobiological end
2  points, especially with the selegiline and
3  desmethylselegiline.  But notwithstanding those patents
4  and that background, I would not consider myself a basic
5  neuropharmacologist.
6  Q.  Okay.  And as to treatment of depression -- I
7  know we've talked about -- about psychiatry.  Do you
8  hold yourself as an expert in the treatment of
9  depression?
10 A.  Well, not to be repetitive, but I'm not a
11 physician, not a prescriber, not a psychiatrist, so, no,
12 I don't hold myself out to be a depression expert.  I
13 mean, I've worked on NDAs with depression and -- and --
14 and --
15 Q.  But you're not -- you don't treat it nor do
16 you diagnose it, correct?
17 A.  No, I'm not a physician.
18 Q.  Okay.  Now, when is the last time you
19 published article in the peer-reviewed medical
20 literature?
21 A.  Not since I left -- not since Mylan, not since
22 we finished the Mylan work.
23 Q.  Can you tell me the date of your last
24 peer-reviewed publication?
25 A.  Literature publication, not the patent

**232**

1  literature?
2  Q.  Peer-reviewed medical.
3  A.  I think it was 10, 15 years ago.  I don't have
4  my CV in here.
5  Q.  Let me find your CV.  The CV you gave us
6  had -- your report had more than that.
7     Now, let me hand you the same one.  I'm going
8  to hand you this.  We won't mark it because I believe
9  it's already in Exhibit 5, but that may help you answer
10 the question.
11 A.  1990.
12 Q.  So just so I understand, the last article
13 published in the peer-reviewed medical literature by
14 Cheryl Blume was in April of 1990; is that correct?
15 A.  Yes.
16 Q.  And you are listed as the fifth author on a
17 medical article entitled "Absorption and Disposition of
18 Low-Dose Combination Formulation of Hydrochlorothiazide
19 and Triamterene;" is that correct?
20 A.  No, it's Triamterene.
21 Q.  Triamterene.  Thank you.
22    That was published in "Biopharmacology Drug
23 Dispositions"?
24 A.  "Biopharmaceutics and Drug Disposition."
25 Q.  Okay.  Why haven't you published since 1990?

**Page 65**

1  defense has not -- has not retained you in this case,
2  correct?
3      A.  What defense?
4      Q.  The defendants have not retained you in this
5  case, correct?
6      A.  No, I am not working for Pfizer in this case.
7      Q.  Your work -- have you ever worked for Pfizer
8  in litigation?
9      A.  I don't think so.
10     Q.  I don't think so.  Okay.
11         How about Mr. Fromson?  You -- he has retained
12 you, correct; his firm?  The Finkelstein firm, right?
13     A.  Yes.
14     Q.  And so I just want to ask you, knowing that
15 they -- we -- you've testified that they have a
16 financial interest in the outcome of this litigation.
17 And, specifically, the evidence that you are putting
18 forth that it's matter of opinions, don't you think it's
19 appropriate for you to actually validate the analyses
20 that Mr. Altman is giving to you to make sure they're
21 accurate and -- as a matter of scientific discipline and
22 rigor?
23         MR. FROMSON:  Objection as to form to the
24     extent it has already been asked and answered.
25 BY MR. BARNES:

**Page 66**

1      Q.  You may answer.
2          THE WITNESS:  Do I answer?
3  BY MR. BARNES:
4      Q.  Yes.
5      A.  Mr. Altman is hired to do this because he has
6  a specialty in filtering, or whatever more sophisticated
7  term that should be applied to it, these databases.  He
8  is used for this in our -- in our work and in other
9  people's work.
10         He was asked by the FDA years ago to validate
11 his efforts, and FDA confirmed his method.  I would not
12 be able to completely validate what he does.  But once
13 the FDA statisticians and epidemiologists approved NDA's
14 using his method, I have accepted his method.
15     Q.  How do you know that --
16     A.  And --
17     Q.  I'm sorry.
18     A.  And as you will know through my discussions of
19 the data, my opinions are certainly not predicated upon
20 these individual databases any more than they are on
21 other events in this database.  So while the information
22 is important and while it agrees with other opinions, it
23 is not the ultimate opinion, but I accept his work based
24 on persons far more knowledgeable and skilled in this
25 area than I.

**Page 67**

1      Q.  Did FDA review his work in this case?
2      A.  No.
3      Q.  In the Neurontin case?
4      A.  No.
5          MR. FROMSON:  Just note my objection as to
6      form.
7          THE WITNESS:  He -- they -- they reviewed and
8      validated his approach of the FDA databases and
9      other databases.
10 BY MR. BARNES:
11     Q.  Which you won't produce to me yet at this
12 point for me to examine you on?
13     A.  Well, I'm certainly willing to ask if I may do
14 that, but you would certainly not ask me to violate my
15 confidentiality or contracts.
16     Q.  Not today.  I'm not going to ask you to do
17 that today.  I've asked -- we'll take it up with the
18 court if we have to.
19         But have you --
20     A.  No, I have not validated his work.
21     Q.  Okay.  And so you don't know the rate of error
22 in his work in the report, do you?
23         MR. FROMSON:  Objection as to form.
24         THE WITNESS:  If -- if there is any errors.  I
25     don't know if there is any errors.

**Page 68**

1  BY MR. BARNES:
2      Q.  One way --
3      A.  The error -- the error rate was acceptable
4  when he did a far more difficult assignment.
5          He -- the -- the NDA work that he does for us
6  is far more difficult than this work.  And the rate of
7  errors were -- if any, were certainly acceptable.
8      Q.  That's not my question.
9      A.  I know, but I'm trying to answer your
10 question.
11     Q.  I understand you are, but listen to my
12 question, okay, and we'll just keep moving on.
13         My question is in connection with the work he
14 has done on pages -- in your report -- 60 -- you've
15 identified Pages 69, 70, 71, 72, 73, 74, 75.  We don't
16 know about 76.
17         For example, you have not gone back and -- and
18 established the error -- any -- the rate of error in the
19 filtering he did for you prior to this deposition,
20 correct?
21         MR. FROMSON:  Objection to the extent that it
22     hasn't already been asked and answered.
23         THE WITNESS:  Correct, I have not done that.
24 He may well have underestimated the reports.  No,
25 I'm kidding.  He -- I have not checked anything.

### Page 101

1  A. Okay. We've now moved into the fourth
2  category, June 2002 to present.
3  Q. This is PSUR, so I assume PDG did it, on 166?
4  A. 163, I think was skipped. That was PDG.
5  Q. Uh-huh. (Indicates affirmatively.)
6     Thank you.
7  A. 165 would be PDG. 166. And then we're back
8  to the AERS database on page 167.
9  Q. And -- okay. 167, 168 would be work that
10 Mr. Altman provided to you, correct?
11 A. Correct.
12 Q. These are SR -- these are AERS database --
13 A. Yes.
14 Q. -- tables, correct?
15 A. Correct.
16 Q. And then World Health Organization would be
17 PGD?
18 A. Would be PDG.
19 Q. PDG.
20    Okay. And then the next table I have is
21 two -- really, maybe you can explain to me what they
22 are. Going to page 193, 194, and 195.
23 A. One, these tables relate to a dany (sic) -- a
24 data mining effort recognized by the agency, recommended
25 by the agency, called PRRs or percent comparison across

### Page 102

1  products as percent reports. Both of these tables were
2  done by Mr. Altman.
3  Q. Who directed that these tables be prepared?
4  A. The table in 194 is a table across comparisons
5  of different antiepileptic drugs. It's a standard way
6  that we have tried to pictorially present the data that
7  we looked at earlier in comparison to other sister
8  drugs. I asked that that be done.
9  Q. And so you directed this analysis?
10 A. Yeah, this is a routine analysis for us in our
11 work when we're -- when we have drugs that are part of a
12 class.
13    And I had -- page 195 is a comparison from
14 another trial -- another project that I guess Mr. Altman
15 is working on. But it illustrated the same sort of
16 separation within a class.
17 Q. So Mr. Altman prepared this chart on page 195,
18 correct?
19 A. Yeah, well, he did 194 and 195.
20 Q. Did both of them?
21 A. Right.
22 Q. Okay. Did you do any independent work to
23 validate the graph on page 194 or on page 195?
24 A. No.
25 Q. And so you don't know if there is a rate of

### Page 103

1  error for the data depicted on page 194 which is
2  entitled "PRR Over Time, Suicidal and Self-Injurious
3  Behavior HLT," correct?
4  A. I don't know if there is any rate of error and
5  I --
6  Q. One way or the other?
7  A. I don't have a -- no, I did not validate it.
8  Q. Did you -- did you -- you said something about
9  this is how -- at page 194, 195 -- this is how you
10 routinely do these analyses for other -- other clients?
11 A. No, for pharmacovigilance work.
12    What this does is, we're interested in this
13 case in Neurontin, so Neurontin will be on the chart,
14 but as pharmacovigilance assignments, you're always
15 interested if a particular adverse event is simply
16 part of the -- is part of what is observed with that
17 class of drugs or whether there is something unique
18 with --
19    (Phone ringing.)
20    THE WITNESS: Somebody is calling in.
21    -- whether there is something unique with your
22 drug.
23    So what one does, what we are -- what is
24 suggested, what we are taught to do is to do these
25 PRR ratios. Because if there is something unique

### Page 104

1  about a drug, it will look different in a PRR time,
2  time-derived data, than will the other drugs in the
3  class.
4  BY MR. BARNES:
5  Q. Who chose the drugs on page 194 for
6  comparison?
7  A. Oh, I -- I don't know if we did these. I -- I
8  think I mentioned in my report Gabitril. I know we talk
9  about carbamazepine. I don't -- I don't know if we did
10 that collectively or if I sent the list one. I don't
11 know.
12 Q. So it's possible that Mr. Altman chose the
13 comparator drugs --
14 A. Well --
15    MR. FROMSON: Just note my objection.
16 BY MR. BARNES:
17 Q. -- on this graph?
18 A. I --
19    MR. FROMSON: I'm sorry. Just note my
20 objection as to form.
21    THE WITNESS: I don't recall how we did this.
22 We had to do it in a -- we had to pick drugs that
23 would have data across the relevant time period, so
24 we couldn't use an -- an AED that were approved in
25 2003 or 2004, because it wouldn't have the data.

**105**

1  So I -- I don't -- whether we collectively did
2  this or not, I just don't recall.
3  BY MR. BARNES:
4  Q.  So it's possible that Mr. Altman chose the
5  comparator drugs, correct, without your supervision?
6  MR. FROMSON:  Note my objection as to form.
7  THE WITNESS:  I recall the discussion of
8  including Gabitril in there.  I know that I
9  remember that.  Now, I just don't recall.
10 BY MR. BARNES:
11 Q.  You say "class of drugs."  What do you mean by
12 a class of drugs?
13 A.  Well, when you look at pharmacovigilance data,
14 you're interested, of course, in the -- in the drug in
15 question for that particular NDA, but you're also
16 interested in other drugs that are chemically similar to
17 that drug, whether it's used for the same indication or
18 not, so you do that comparison.  You compare the adverse
19 event of interest with other drugs that are approved for
20 the same indication, and you also approve drugs that
21 have the same mechanism of action.  So there is
22 different ways that you canvas pharmacovigilance data.
23 In this particular table or this particular
24 graph, what we have here are the PRRs for the
25 suicide-related events, the high-level term

**106**

1  suicide-related events, against a selection of drugs
2  that are -- are used for epileptic patients.
3  Q.  Is it your testimony that Topamax and
4  Neurontin are chemically similar medicines?
5  MR. FROMSON:  Just note my objection as to
6  form.
7  THE WITNESS:  I would have to check
8  chemically.  They both have adjunctive indications.
9  BY MR. BARNES:
10 Q.  Are they -- do they have the same mech- --
11 does Topamax and Neurontin have the same mechanism of
12 action or similar mechanism of action?
13 A.  I don't -- I would have to look.
14 This was picked because they're used in the
15 same subpopulation.  We would have a different table if
16 we were looking at drugs.  We may have drugs in this
17 table for same chemical that had nothing do with
18 epilepsy.
19 Q.  So is it -- is it your understanding that the
20 drug -- the comparator drugs on page 194 were selected
21 because they had similar indi- -- indications?  Is that
22 the basis for choosing them as a comparator?
23 A.  Well, if you look on the previous page, we
24 tried to break out why they were in here.  We picked
25 using the PRRs for suicide self-injurious behavior.  At

**107**

1  the top of the list for those are Baclofen, Gabitril,
2  and Neurontin.  Neurontin and Gabitril are both GABA
3  analogs, so those were added in there.
4  Q.  Okay.  What was the -- my question is -- is --
5  you've addressed that you had Gabitril in because it's a
6  GABA analog.
7  And my question is, what is the basis for the
8  other drugs being included on this table?  What is the
9  scientific or regulatory basis for that?
10 A.  Well, in data mining -- I mean, in data -- you
11 can look at the data however you so choose in data
12 mining.  One of the ways of looking at it is to compare
13 it to other drugs.  You may compare it to one drug or
14 you may compare it to ten.
15 In this particular -- in this particular
16 instance, in the conclusions of these -- in the
17 conclusions of this section, we were -- now that we had
18 1998 all the way to 2000, we had -- I'm sorry.  Yeah --
19 we had enough period of time that we could look at
20 different drugs.
21 Q.  My -- my question is -- please listen to my
22 question, okay?
23 My question is, on what basis did you choose
24 to include the comparator drugs on page 194?  If they're
25 all the same, that's fine.  If there are different bases

**108**

1  for different drugs, that's fine.  So I want you to go
2  through each one of these and tell me the reason why
3  they were chosen as a comparator drug for Neurontin in
4  the PRR Over Time table listed on page 194 of your
5  report.
6  MR. FROMSON:  All right.  Just note my
7  objection to the extent it may have already been
8  asked and answered.  But she also indicated look
9  back to page 193.
10 MR. BARNES:  And it doesn't provide
11 information to my question, Counsel.
12 MR. FROMSON:  Well, I disagree.
13 Paragraph 319.
14 BY MR. BARNES:
15 Q.  Go ahead.
16 A.  From what I can recall, when we did this --
17 this table, we were interested in trying to express
18 somehow PRR ratios over time in drugs that may be
19 considered used for the same population or have a
20 mechanism of action that might be similar to it.  It was
21 meant to be illustrative of the Neurontin pattern versus
22 other drugs and to show that the Neurontin data are not
23 the same as all the other drugs in the category.
24 That is a -- that is a signal in
25 pharmacovigilance work when your drug looks different

### Page 109

1  than other drugs used in the same population. This is a
2  very, very overview type of -- this would be a signal to
3  a company to look further.
4       Clearly, Neurontin doesn't look like the rest
5  of the pack down there. We picked drugs that would have
6  data during this timeframe. We know that adverse events
7  are the most heavily reported early in a products
8  marketing or after a major event, so we tried to pick
9  drugs that would have it across this time period.
10  Q.  Okay. So just so I understand your -- your
11  answer, the comparator drugs were chosen on the basis
12  that they were used in similar patient populations
13  during the relevant time period as you selected,
14  correct?
15  A.  Or have similar pharmacologic activities.
16  Q.  Or have similar pharmacologic activities.
17  A.  Right.
18  Q.  Those are two bases --
19  A.  Uh-huh. (Indicates affirmatively.)
20  Q.  -- for choosing these drugs?
21  A.  And had adequate data to be reasonable to
22  put -- had reasonable enough data during these years.
23  Q.  Okay. Which medicines were placed on this
24  chart because they were used -- they were used, in your
25  opinion or in Mr. Altman's opinion, in similar patient

### Page 110

1  populations?
2       MR. FROMSON: Obviously, just note my
3       objection to the form of the question.
4  BY MR. BARNES:
5  Q.  And if you chose them, that's fine. Tell me
6  which ones he picked or which ones you picked. Or if
7  you don't know, you don't know.
8       MR. FROMSON: Same objection as to form.
9       THE WITNESS: We were interested in looking at
10      products in the AERS database that are associated
11      with reports of suicide. There aren't that many
12      drugs that have high -- or have significant numbers
13      of suicide events, so how to look at that. Can we
14      see any classing by pharmacologic class, any
15      grouping by endpoint?
16          So what we did is we took the AERS database
17      and filtered it for suicide-related events. My
18      understanding is that --
19  BY MR. BARNES:
20  Q.  Move to strike that portion of the answer.
21  Now, answer my question with regard to the basis --
22      MR. FROMSON: Hold on. Hold on.
23      THE WITNESS: No, I did answer your question.
24      MR. FROMSON: Let's -- let's agree to let the
25      witness finish her answer.

### Page 111

1       MR. BARNES: All right. Well, she -- go
2       ahead.
3       MR. FROMSON: All right. If you could -- if
4       Madam Court Reporter can simply read the last --
5       last clause of her answer, I would appreciate it.
6       (The requested portion was read by the
7  reporter.)
8  BY MR. BARNES:
9  Q.  Now, which --
10      MR. FROMSON: Hold on. Now, have you finished
11      your answer, Dr. Blume?
12      THE WITNESS: Well, no, I'm going to explain.
13  So --
14      MR. BARNES: Fine. Thank you.
15      THE WITNESS: Thank you. Continue?
16      MR. FROMSON: Yes, you can continue your
17      answer, please. Please.
18      THE WITNESS: We were interested in those
19      products that were marketed during the timeframe of
20      interest, which again is our timeframe of interest
21      on the X axis, and which had suicide-related
22      events.
23  BY MR. BARNES:
24  Q.  Right.
25  A.  And in order to be fair, we didn't take new --

### Page 112

1  brand new ones or ones who had just been suddenly
2  withdrawn off the market. So we took ones that would be
3  in the normal course of business.
4       When we picked -- I'm interested in three
5  different categories of drugs, as I've outlined earlier.
6  Neurontin and Gabitril are both GABA analogs and both of
7  them have had significant problems with off-label use.
8  So both of those were in there. And the reason they're
9  in there is because Neurontin has been used in so many
10  off-label populations, we picked a product that has a
11  similar action, mechanism of action, that has also been
12  inappropriately used in so many subpopulations. And the
13  best one for that is Gabitril because they sent a dear
14  doctor letter about that. So that's why Neurontin and
15  Gabitril are in there. Okay?
16      The Pfizer defendants in some of their
17  pharmacology studies noted in some of the animal studies
18  a correlation between the activities of Neurontin and
19  that of Baclofen. So because they included it in a
20  study, we put it in the chart. Okay?
21      Then -- see if I can get the next one in here.
22      Then we put in here other drugs. Now, the
23  other drugs are products that are used for
24  epileptications (sic) although these drugs may have a
25  monotherapy as well as an adjunctive.

### Page 113

1  Q. Can you tell me which ones are used -- you
2  chose on the basis of their use in epileptic population
3  either in monotherapy or as -- or as an adjunctive?
4  A. I think Tegretol has both. And it's sort of
5  the oldest of all, so it has the -- it's one of the
6  oldest. Dilantin and Tegretol are both among the oldest
7  and I know -- I'm pretty sure that Tegretol has both
8  monotherapy and adjunctive. I'm -- I can't remember if
9  Pheny- -- Dilantin does or not. I don't know. But it
10 has a long period of history.
11 Q. So Dilantin and Tegretol were chosen on the
12 basis of their indications for epilepsy, correct?
13 A. Right.
14 Q. Any others?
15 A. Gabitril is epilepsy, but it's also used off
16 label, so that's in there. Baclofen's in there because
17 your client put it in their studies as pharmacologically
18 similar. And I can't remember right now why we put
19 Topamax in. I can't remember the reason for that one.
20 Q. Can you tell me in anywhere I can find in any
21 published medical or scientific literature the method
22 that you've employed to -- or Mr. -- you or Mr. Altman
23 employed in creating the PRR Over Time chart on
24 page 194?
25    MR. FROMSON: Just note my objection as to

### Page 114

1  form.
2     THE WITNESS: Well, PRRs have been used for
3  years. They're referenced in Brian Strom's
4  textbook, the standard -- gold standard textbook of
5  "Pharmacoepidemiology." It's in the FDA's guidance
6  on how to conduct pharmacolo- --
7  pharmacoepidemiology, pharmacovigilance.
8     We routinely use them with our clients when we
9  conduct their postmarketing safety surveillance.
10    And we use them with NDA databases when we're
11    trying to have a basis for comparing incidences of
12    events across time.
13 BY MR. BARNES:
14 Q. Do you have Brian Strom's textbook in your
15 office?
16 A. I have, yes, the last two editions in my
17 office.
18 Q. Okay. But on the break -- we have to take a
19 break because the tape has to change. I want you to
20 come back with the part in Brian Strom's textbook which
21 publishes the method that you just described on page 194
22 in your report, as well as the Food and Drug
23 Administration guidance document you just referenced
24 that -- that publishes the method that you've just
25 described for the graph on page 194.

### Page 115

1  MR. BARNES: And I think we need to stop
2  because we're out of tape.
3  MR. FROMSON: I'll take your request under
4  advisement.
5  THE VIDEOGRAPHER: Off the record 11:41.
6  (Recess taken.)
7  THE VIDEOGRAPHER: On the record 11:51.
8  BY MR. BARNES:
9  Q. Dr. Blume, we took a break. And I asked you
10 to pull some references in light of your last answer,
11 but would you please describe the formula or the -- that
12 was used by Mr. Altman to create the chart on page 194.
13 What was -- how was it created?
14    MR. FROMSON: Just note my objection as to
15    form.
16    THE WITNESS: Okay. Consistent with the
17    definitions of a PRR that are in the materials that
18    I provided to you, a PRR is very straightforward
19    calculation where the endpoint, the adverse event
20    endpoint of interest, or the constellation of
21    preferred terms that describe that endpoint are
22    collected and they are divided by the overall
23    collection of adverse events.
24    So if I had ten events of headache in a
25    database of a hundred, it would be 10/100.

### Page 116

1  BY MR. BARNES:
2  Q. So just so I understand it, I think -- I was
3  asking -- so with regard to 194, make sure I understand
4  it, let's just take Tegretol. Explain how the data
5  point for 3/31/1998 was created for Tegretol.
6  A. Okay. For the period ending -- for -- for the
7  database period ending 3/31/98, the Tegretol -- the
8  Tegretol database would have been filtered using -- and
9  controlled using his standard methodology. And he would
10 have accessed the suicide and self-injurious terms in
11 the high-level term group.
12    The FDA database has divided the series of
13 term groupings. In this case, suicidal and
14 self-injurious is a high-level term grouping.
15    He would have taken those terms -- and the
16 same terms, the same grouping would be used across all
17 products. He would take those terms and divide it by
18 the total number of carbamazepine.
19    Are we doing carbamazepine?
20 Q. I said "Tegretol."
21 A. Tegretol. Yeah, Tegretol. We do the total
22 number of Tegretol events during that same time period
23 and you would get a percentage.
24 Q. Okay. Would you please -- I'm going to hand
25 you a piece of paper. Would you please write down the

### Page 285

1  MR. FROMSON: Just one moment. Let me just
2  read back your question. Can you go up for me?
3  All right. Objection as to form to the extent
4  that it -- to -- to -- only to the extent that the
5  answer -- that a responsive answer would infringe
6  upon the agreement not to inquire of the witness
7  about drafting of her reports. She can answer.
8  MR. BARNES: I want to know her methods.
9  BY MR. BARNES:
10  Q. What did you do --
11  MR. FROMSON: That's a different question.
12  BY MR. BARNES:
13  Q. -- by step -- step by step, what did you do?
14  What were your methods, and step by step what did you do
15  to answer the question?
16  MR. FROMSON: Well, then that's a compound
17  question. I have no objection to the method.
18  BY MR. BARNES:
19  Q. Methods first. Tell me the methods you
20  employed to answer the question asked of you that
21  Neurontin contributes to mood or behavioral disturbances
22  including self-injurious actions and suicide?
23  A. Several assignments were undertaken to address
24  this issue. An independent review of both the
25  nonclinical and clinical literature was undertaken. And

### Page 286

1  the articles that were obtained by us in that review
2  were provided on your disk. Those articles were
3  obtained by PDG and were not provided to us by anyone
4  else.
5  We also accessed available regulatory
6  information relating to the product -- and that
7  information is also on the disk -- from the
8  United States and from those Western European countries
9  that will also provide that information.
10  After reviewing that information, we then
11  accessed various databases, most of which or all of them
12  are referenced in the report; the World Health
13  Organization database, Health Canada for the years that
14  it was available during the relevant time period, and
15  the others that are listed.
16  Following that, we -- or not following that,
17  but in concert with that, we were also reviewing the
18  information that was provided to us according to the
19  time periods that we've already discussed today.
20  First area of interest were the time -- were
21  the events leading up to the initial approval. And we
22  would look at the research reports that were generated
23  by your client during that timeframe, their internal
24  database, if it were available during that timeframe,
25  the nature of the FDA submissions, FDA regulatory

### Page 287

1  actions, FDA regulatory reviews, advisory committee
2  reviews. And pretty much exactly as I've laid it out in
3  the report is the -- are the materials that we reviewed.
4  And we took the first period to the time of
5  the -- of the first approval. Because the first
6  approval was for a limited indication and other studies
7  were ongoing at that timeframe, we amplified the first
8  section of the report to include other available
9  studies. So you will see comments in here relating to
10  monotherapy, relating to other disease states that
11  were -- were ongoing at the time. Okay?
12  Once the first -- once the product was
13  launched, we go into the second period, the 1994 to
14  1996. Becomes a little more complicated at that point,
15  because then we are dealing with -- we are dealing with
16  postmarketing adverse event databases as well as
17  internal databases, so you will see in the next section
18  where we begin to look at the SRS, the AERS system,
19  et cetera.
20  We also then are looking at the required
21  reports that the -- that your client had to provide to
22  FDA or to the European authorities. In all cases, be it
23  research reports or the tabular summaries or narrative
24  summaries given in the quarterly or annual reports, we
25  were looking at the actual research reports compared

### Page 288

1  with the information that was summarized by the clients.
2  So we were actually able to look at the adverse events
3  and compare designation of those events and the reports
4  that were provided to the authorities.
5  Once the product is approved, we can start
6  mining the database, if you will. And in each section,
7  we asked -- at this point, Mr. Altman was involved with
8  this and we were asking him to do the same sort of
9  assignments that we routinely do for pharmacovigilance;
10  that is, break the data up into quarters, access the top
11  25 events, look for events that change by a factor of
12  two or more.
13  For -- because we were interested in
14  self-injury events or potential self-injury events, we
15  were focusing on the system organ class that we
16  discussed earlier today and those psychobiological
17  events. But because your client had in their database
18  concerned with aggression, aggressivity, hostility, we
19  became aware of the interest in depersonalization. We
20  added those to our lists as well.
21  At each point in time --
22  (Counsel conferring off the record.)
23  THE WITNESS: At -- at --
24  MR. FROMSON: Go ahead. Finish your answer,
25  Doctor.

### Page 289

1  THE WITNESS: At each point in time, we were
2  updating for you any new nonclinical literature or
3  medical literature that may have occurred during
4  the relevant time period. Okay?
5     After approval, we were also accessing
6  regulatory events where their efforts to obtain
7  additional approvals, were their letters with
8  DD Mac, were there other letters sent to the FDA
9  from the FDA, any meetings or communications
10 between the Pfizer defendants and the FDA. So
11 pretty much creating little quarterly and annual
12 reports using all available databases.
13    If you look at the next section, which is the
14 longest section, where we go from '96 to 2002, we
15 repeated all the same assignments that I've already
16 outlined for you, but this time we stepped back and
17 did the same sort of assignments we did in the
18 first quarter, the first quarter of the report,
19 which is to look at the basis of the data that
20 formed the basis of the second approval, which is
21 the subset of the postherpetic neuralgia.
22    So in addition to looking at all the
23 postmarketing information, the literature, the
24 non -- the animal literature, the human literature,
25 pharmacokinetic literature, quarterly reports,

### Page 290

1  annual reports, PSURs, and all the postmarketing
2  databases, we were also accessing information
3  relating to, first, the general neuropathic pain
4  proposed indication and in the subset actually
5  approved for postherpetic neuralgia. And that, by
6  far, is the longest period of time.
7     And then the last quarter, there hasn't been
8  any additional approvals of the last one-fourth of
9  the report, so what we did is we took it from the
10 time of the postherpetic and went forward in time
11 and again compared the various postmarketing
12 databases and any new data that were in your
13 client's research reports or in their reports, and
14 paid particular attention to the reanalysis of the
15 controlled clinical trial phases one through four
16 dating the postmarketing data that the Pfizer
17 defendants submitted in response to the various FDA
18 requests.
19    And as we do with -- with all of our work, we
20 look at other -- look at those areas of insert
21 where we think that additional information should
22 have been provided. And we look to see if there
23 were examples of where other companies may have
24 provided information that would have been helpful
25 to the prescriber, either for the approved

### Page 291

1  indication or perhaps directed towards the
2  off-label indications. And that's finalizes the
3  report. We waited until the end, the last section,
4  to do that.
5  BY MR. BARNES:
6     Q. Okay. Move to strike portions of your answer
7  as unresponsive, and I'll ask you this question.
8     MR. FROMSON: I mean, are you -- are you -- do
9  you want to let her finish, because I think her
10 answer was responsive.
11    MR. BARNES: But -- I thought you were done.
12    MR. FROMSON: Are you done, Dr. Blume, or no?
13    THE WITNESS: Yeah, I was done.
14    MR. FROMSON: Okay. Thank you. I apologize.
15    MR. BARNES: Move to strike her answer as
16 nonresponsive, and -- and I'll ask this question.
17 BY MR. BARNES:
18    Q. To the extent that's the methodology you
19 employed for assessing the question of whether Neurontin
20 causes suicide, can you cite one scientific reference in
21 a peer-reviewed journal which uses that method to
22 establish that a medicine causes suicide or any adverse
23 event?
24    MR. FROMSON: Let me object to the form of
25 that question to the extent it's even

### Page 292

1  comprehensible.
2  BY MR. BARNES:
3     Q. Do you understand my question? Where --
4  where -- where -- what -- that you describe the method
5  by which you assess the question that Neurontin causes
6  suicide, correct? That was my question.
7     A. And you want me to --
8     Q. Well, and I'm --
9     A. -- give you examples of where that method is
10 used to -- to change labeling.
11    Q. No, the question had to deal with causation.
12 My question was not about labeling. It's causation.
13    Now, where -- where in the worldwide medical
14 and scientific literature is that method published --
15    MR. FROMSON: Just note my objection.
16 BY MR. BARNES:
17    Q. -- as we've just described?
18    MR. FROMSON: Note my objection to the form of
19 your question.
20    THE WITNESS: Well, insofar as I was looking
21 at this from a regulatory perspective, if you pick
22 up the books that I gave you and the references I
23 gave you earlier, both Brian Strom and the FDA will
24 talk about various situations in which one can
25 examine causality with -- with adverse events.

### Page 483

1  Q. Is "psychobiological adverse events" a term
2  used -- is that in any recognized dictionary or adverse
3  event coding?
4  A. I don't know. I used the term in my adverse
5  events for our depression NDA, and I pulled the events
6  from the Pfizer research reports in their annual
7  reports.
8  Q. So you're using "psychobiological adverse
9  events" because it -- it's a term that is used in some
10  of the Pfizer reports? Basically, is that what you're
11  doing?
12  A. Yes. And I've used the term before in dealing
13  with the Food and Drug Administration. And I defined
14  them. I don't -- I don't just use a category. In each
15  case -- at each place where we use it, I give the line
16  listing of it --
17  Q. Now --
18  A. -- of the individual events.
19  Q. Okay. And in the individual -- in the line
20  listings you've described yesterday in the reports, is
21  it fair to say that your discussions of psychobiological
22  adverse events are essentially just crude case -- serial
23  case reports or a crude -- crude count of the events
24  that are -- you classify as psychobiological adverse
25  events?

### Page 484

1      MR. FROMSON: Objection to form.
2  BY MR. BARNES:
3  Q. Just --
4  A. Yes, they are -- if you said "accrued," they
5  are accrued from the listings that were either --
6  Q. Not accrued. Crude, c-r-u-d-e.
7  I don't see any comparisons or any statistical
8  analyses. What I see in all of your tables in your
9  report, save the report on page 194 where there is a
10  graph from Mr. Altman, I don't -- I'm only seeing case
11  counts and not statistical analyses in all these tables,
12  correct?
13      MR. FROMSON: Objection to form.
14  BY MR. BARNES:
15  Q. I use --
16  A. Can you give me an example of what you're
17  referring too?
18  Q. Okay. Well, let's just look at page 34.
19  That -- that is -- that is simply a -- the table there
20  is simply a crude count of adverse events, but that you
21  call psychobiological adverse events, correct?
22  A. Well, I took these from your publication, from
23  the STEPS trial, and they're -- this trial was designed
24  to look at different doses of Neurontin, so it's broken
25  out exactly as it is in the paper.

### Page 485

1  Q. I'm not saying what -- I understand you got it
2  from the paper. What I'm saying is, it's a -- it's just
3  a count of adverse events. It's not a statistical
4  analysis, correct? What you've depicted on page 34.
5  A. No, it's a count taken directly from the
6  report.
7  Q. Yeah. And isn't it true that all of your
8  reports -- all of your tables in your report are counts
9  taken from various reports submitted by Pfizer to the
10  Food and Drug Administration, or regulatory authorities,
11  or from databases?
12  A. Yes, these are set up exactly as you would set
13  them up if you were doing an ISS report or an annual
14  report summary, yes.
15  Q. Crude counts of cases, correct? Just so I
16  know what you're --
17  A. It's just a tabular listing of what we're
18  provided in the Pfizer reports or whatever I'm listing.
19  Q. Without any statistical analyses applied by
20  you or Mr. Altman, correct?
21  A. Yes, or just --
22      MR. FROMSON: Objection to form.
23      THE WITNESS: Yeah, are you saying a reference
24      to statistical analysis?
25  BY MR. BARNES:

### Page 486

1  Q. No, I'm making sure I didn't. I don't see any
2  statistical analysis that you've done in this case.
3  A. Oh, no, I never --
4      MR. FROMSON: Objection to form.
5      THE WITNESS: Yeah, and I didn't intend for
6      you to and I --
7  BY MR. BARNES:
8  Q. That's fine.
9  A. -- I didn't conduct statistical analysis.
10  Q. And that's fine.
11  Now, is there any definition of
12  psychobiological events in the peer-reviewed literature?
13  A. Are you asking if there is a line listing of
14  them in the --
15  Q. No, a definition that you -- that I can refer
16  to in the -- in the peer-reviewed medical literature.
17  A. Oh, I don't know.
18  Q. Okay. Can you cite me any medical or
19  scientific literature that uses the term
20  "psychobiological event" in the context of analyzing the
21  risk of suicide?
22  A. I have -- I haven't addressed the articles
23  that I provided to you -- that we discussed yesterday --
24  that relate to the suicidal events to see if they use
25  that term, but --