# EXHIBIT 20

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

______________________________

IN RE: NEURONTIN MARKETING )
SALES PRACTICES, AND )
PRODUCTS LIABILITY ) MDL Docket
LITIGATION ) No. 1629
____________________________ ) Master File No.
THIS DOCUMENT RELATES TO: ) 04-10981
) Judge Patti B.
ALL MARKETING AND SALES ) Saris
PRACTICES ACTIONS ) Mag. Judge Leo
______________________________) T. Sorokin

VIDEOTAPED DEPOSITION of RENA M. CONTI, Ph.D., called as a witness by and on behalf of Pfizer, Inc., pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before P. Jodi Ohnemus, Notary Public, Certified Shorthand Reporter, Certified Realtime Reporter, and Registered Merit Reporter, within and for the Commonwealth of Massachusetts, at the offices of Hare & Chaffin, 160 Federal Street, Boston, Massachusetts, on Tuesday, 12 February, 2008, commencing at 9:09 a.m.

testimony at some length, correct?

A. Exactly. Exactly.

Q. Okay. I could read you the next sentence, but actually, I think you say essentially the same thing again on Page 7. So we might want to -- you're welcome to take a look at this carry-over sentence or just flip straight ahead to Page 7 to the very first sentence on that page.

You write that, "The focus of these analyses is to provide information to the Court on the number of prescriptions and the number of physicians prescribing Neurontin for various nonFDA-approved uses and doses over the proposed class periods."

Did I read that one correctly?

A. Yes, you did.

Q. Okay. And by "these analyses" in that sentence, I assume you mean the analyses in Section 3 of your report; is that right?

A. Yes, in the body of the document.

Q. Okay.

A. Correct.

Q. And by "nonFDA approved uses" here, you -- you're referring to what could also be described as off-label uses or off-label indications; is that

right?

A. That's correct.

Q. The terminology's basically the same, as best you know?

A. Yes.

Q. Okay. The next sentence reads, "However, the data, as described above, cannot be used to directly address this question, since no available dataset will allow us to directly link the number of physicians in the US to indications for use of Neurontin over the proposed class periods."

Am I right that what you're saying here is that there is essentially no data available that can tell us, for example, the number of psychiatrists who prescribe Neurontin for bipolar?

A. Yes.

Q. Okay.

A. And specifically that the Wolters Kluwer data that was provided to us by the Plaintiffs cannot -- cannot directly link physicians to indications.

Q. And that would be true of the IMS Xponent data, too; is that correct?

A. That is true, yes.

Q. Okay. Okay. And we'll circle back to the

of any efforts having been made by Greylock McKinnon to acquire Wolters Kluwer data for the period after December 2004?

A. I did not make any efforts to acquire data after December 19 -- 2004.

Q. Do you know if data's available from Wolters Kluwer after that date?

A. I do not.

Q. And why didn't you make efforts to get data from that time period after December of 2004?

A. Honestly, in my opinion, the Wolters Kluwer data that was provided to us by the -- by the Defendants was not a very high quality, in particular if you wanted to analyze data by specialty. The data that was provided to us by the Defendants only had records by specialty by less than 30 percent -- by 29 percent of -- of the records had any recorded specialty information.

So based on that information, it wouldn't have been my first choice for getting data to describe point-in-time estimates of physicians in aggregate or by physician specialty prescribing Neurontin.

Q. When you say that the Wolters Kluwer data is not a very high quality, do you mean something

A. That's correct.
Q. Do you know whether that data is available for purchase from IMS?
A. I do not know.
Q. And I take it you didn't ask for data before 1996 for IMS Xponent?
A. No, I did not.
Q. Did you have any discussions or communications with anybody about whether or not to try to get more IMS Xponent data for your work in this matter?
A. No, I did not.
Q. Okay. Like the Wolters Kluwer data, the IMS Xponent data doesn't reflect every prescription filled around the country, correct?
A. Right, there is no dataset that's going to contain every prescription filled in the United States.
Q. And IMS Xponent's no exception to that.
A. That's right.
Q. And that these data are also -- so -- well, withdrawn -- that these data are effectively a sample as well.
A. Right. But --
Q. Based on a sample, I should say.