# EXHIBIT 24

1

```
                    UNITED STATES DISTRICT COURT

                     DISTRICT OF MASSACHUSETTS

                            ---oOo---


In re:  NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION
_____/

THIS DOCUMENT RELATES TO:
                                           MDL Docket
HARDEN MANUFACTURING CORPORATION;          No. 1629
LOUISIANA HEALTH SERVICE INDEMNITY
COMPANY, dba BLUECROSS/BLUESHIELD OF       Master File
LOUISIANA; INTERNATIONAL UNION OF          No. 04-10981
OPERATING ENGINEERS, LOCAL NO. 68
WELFARE FUND; ASEA/AFSCME LOCAL 52
HEALTH BENEFITS TRUST; GERALD SMITH;
and LORRAINE KOPA, on behalf of
themselves and all others similarly
situated, v. PFIZER INC. and
WARNER-LAMBERT COMPANY.
_____/

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and

AETNA, INC. v. PFIZER INC.

_____/



      VIDEOTAPED DEPOSITION OF MICHAEL C. KEELEY, Ph.D.

              WEDNESDAY, FEBRUARY 11, 2009



Pages 1 - 222
```

77

1   that, you know, those particular events were both
2   off-label and fraudulent, someone could look at that
3   evidence and make a judgment if it was strong or not,
4   I suppose.  Although, as I say, that doesn't fall
5   into Professor Rosenthal's model.  So maybe, given                11:05:18AM
6   what she's actually done, it wouldn't matter whether
7   one could do that or not.
8        Q.  Certainly you or no one on your staff
9   undertook such an analysis to determine whether or
10  not it was even possible to do that; is that correct?            11:05:34AM
11           MR. POLUBINSKI:  Objection.
12           THE WITNESS:  Well, we certainly haven't
13  tried to do that.  I don't see any reason why it
14  wouldn't be possible, but it's true we haven't tried
15  to do that.                                                      11:05:48AM
16           BY MR. NOTARGIACOMO:
17       Q.  You also mentioned in your answer to the
18  last question that there were more data available
19  that Meredith Rosenthal could have used.
20           What data are you referring to?                         11:05:58AM
21       A.  I think there's -- with regard to
22  detailing, there may be more data that would indicate
23  whether detailing was physician initiated as opposed
24  to being initiated by the detailer.
25           For example, if a detailer goes into a                  11:06:20AM

78

1   particular doctor's office and that doctor asks
2   questions or asks for samples of a particular drug
3   even though the sales representative hasn't even
4   mentioned that drug, I think there are data on that
5   from IMS that Professor Rosenthal could have                 11:06:40AM
6   obtained. I am not sure how detailed those data are
7   or what period they are available for.
8       Q.  Do you know which IMS product includes that
9   data?
10      A.  I'm not sure.                                        11:06:55AM
11      Q.  Have you ever worked with that data before?
12      A.  No, I haven't.
13      Q.  How do you know that that data exists?
14      A.  Someone on my staff had mentioned that
15  those data are available.                                    11:07:05AM
16      Q.  Do you have any idea how that data is
17  collected?
18      A.  I'm not really sure. I assume it is from
19  the same survey method that is used to obtain the
20  data that Professor Rosenthal actually uses.                 11:07:23AM
21      Q.  And how do you propose -- assuming this
22  data exists, how do you propose that Meredith
23  Rosenthal could have used it in her analysis?
24          MR. POLUBINSKI:  Objection.
25          THE WITNESS:  Well, I haven't, you know,             11:07:37AM

79

1  really worked through all that, but it does seem like
2  one possibility might be that physician-initiated
3  requests for information about, say, a particular
4  drug or requests for samples of a particular drug,
5  even if it might be outside their normal area of                    11:08:00AM
6  prescribing, it would be hard to argue that that was
7  improper detailing, either off-label, or certainly
8  fraudulent if a detailer is just responding to a
9  request from a physician.
10         BY MR. NOTARGIACOMO:                                        11:08:24AM
11     Q.  Is there any other data, other than the
12  data set that we just discussed, that you believe is
13  available to make the determination as to whether
14  promotions were proper or improper?
15     A.  I am not aware of data that are available,                  11:08:39AM
16  but it does seem like another approach would be to
17  conduct a survey of physicians themselves to ask them
18  whether they were detailed or not and -- or whether
19  the -- if they were detailed, whether they received
20  any off-label detailing.  And if they received any                 11:09:00AM
21  off-label detailing, whether that influenced them at
22  all.
23         As I understand, all the physicians in the
24  case, including physicians representing plaintiffs,
25  have testified that they weren't influenced by                     11:09:14AM

86

1       For example, I think the Pfizer or
2  Warner-Lambert representatives were detailing Celexa
3  to psychiatrists.  And if a psychiatrist would have
4  asked them for -- at least during certain periods of
5  time, if they would have asked them for, say, a                11:22:04AM
6  sample of Neurontin because maybe they were using
7  other AEDs to treat various psychological ailments,
8  that would be recorded as a Neurontin detailing, even
9  though the sales representative didn't initiate any
10 -- initiate the act of providing any information              11:22:29AM
11 about Neurontin for off-label uses.  Or a
12 psychiatrist might just ask questions about, you
13 know, off-label results, clinical studies or the
14 like, you know.
15      So there are certainly reasons why you              11:22:50AM
16 would see in the data off-label promotion to, say,
17 psychiatrists.
18      Also, you see in some early documents that
19 Pfizer had -- I guess it was probably Warner-Lambert
20 at that time.  They'd gathered survey data themselves  11:23:11AM
21 about writing prescriptions.  And I saw some that
22 showed that at an early point in time psychiatrists
23 were writing a substantial number of epilepsy
24 prescriptions.  So that would be another reason, at
25 least in the Warner-Lambert era, they might have been  11:23:33AM

87

1  detailing psychiatrists.
2          Then finally, I think one has to more
3  generally take into account the idea that the major
4  costs of at least most prescription drugs are the
5  cost of the research involved to invent the drug and      11:23:54AM
6  get the drug through testing and FDA approval.
7          So you have all these very high up-front
8  costs which loom large relative to the manufacturing
9  costs.  So the incremental margins of additional
10 sales tend to be very high.  So even a relatively low     11:24:11AM
11 effect on sales can be profitable, which means it can
12 be profitable to engage in detailing even when you
13 expect relatively few additional incremental sales..
14          BY MR. NOTARGIACOMO:
15     Q..  One of the factors you just mentioned in         11:24:37AM
16 support of on-label detailing to psychiatrists is
17 where -- a scenario where a doctor may have asked for
18 samples or asked questions about Neurontin for
19 various reasons such as they were using another AED
20 for some psychiatric purpose..                            11:25:00AM
21          Do you have any evidence or have you seen
22 any evidence in the record or the data that you've
23 looked at that that has occurred?
24          MR. POLUBINSKI:  Objection.
25          THE WITNESS:  Well, I think there is             11:25:15AM