# EXHIBIT 29

# Part I

*In Re Neurontin Marketing and Sales Practices Litigation*

Before Judge Patti B. Saris

In the United States District Court
District of Massachusetts

MDL Docket No. 1629
Master File No. 04-10981

# Expert Report of Michael C. Keeley, Ph.D.

December 15, 2008

I.      Qualifications ..........................................................................................................................1
II.     Assignment and Materials Considered ...................................................................................2
III.    Overview of Plaintiffs' Allegations and the Declarations of Plaintiffs' Retained
        Economists ...............................................................................................................................3
IV.     Summary of Opinions ..............................................................................................................6
        A.  Professor Rosenthal Makes Unwarranted and Unsupported Assumptions
            Regarding the Level of Improper Detailing and Journal Advertising for
            Neurontin ....................................................................................................................6

        B.  Professor Rosenthal Fails to Account for Numerous Factors that Drive
            Prescriptions and Incorrectly Attributes the Effects of Omitted Factors to
            Promotion....................................................................................................................8

        C.  Professor Rosenthal's Choice of Explanatory Factors Is Results-Driven and
            As Such Violates Acceptable Econometric Practice ..................................................9

        D.  A Single Revised Regression Model, Consistent with what Professor
            Rosenthal Originally Proposed, Fails to Demonstrate a Statistically
            Significant Relationship between Promotional Spending and Off-Label
            Prescriptions..............................................................................................................10

        E.  Professor Rosenthal's Previously Articulated Reasons for Excluding Time
            Trends Are Not Defensible ........................................................................................12

        F.  Professor Rosenthal's Analysis Suffers from Several Additional Flaws.................12

        G.  Dr. Hartman's Purported Damage Estimates Do Not Reflect Damages .................14

V.      Professor Rosenthal Makes Unwarranted and Unsupported Assumptions
        Regarding the Level of Improper Detailing and Journal Advertising for Neurontin ........15
        A.  Professor Rosenthal Fails to Provide Support for Her Assumed Levels of
            Improper Promotion and Ignores Contradictory Evidence......................................16

        B.  Professor Rosenthal Makes Contradictory Assumptions Regarding Which
            Promotions Are Improper ..........................................................................................21

        C.  Professor Rosenthal Justifies Her Unsupported Assumptions with Circular
            Reasoning...................................................................................................................23

        D.  Professor Rosenthal Fails to Provide Any Empirical Evidence that
            Defendants' Allegedly Improper "Publication" and "Peer Selling" Strategies
            Affected Off-Label Prescribing of Neurontin...........................................................24

VI.     Professor Rosenthal Fails to Account for Numerous Factors that Drive
        Prescriptions and Incorrectly Attributes the Effects of These Omitted Factors to
        Promotion................................................................................................................................26
        A.  When Modeling the Determinants of Prescriptions, Professor Rosenthal
            Ignores Numerous Factors Including Physicians' Experience with Neurontin........26

        B.  Professor Rosenthal's Failure to Account for Important Determinants of
            Neurontin Prescriptions Biases Upward Her Estimates of the Effects of
            Promotion...................................................................................................................32

VII.   Professor Rosenthal's Model Specifications Are Results-Driven and As Such
       Violate Acceptable Econometric Practice ...................................................................... 35
VIII.  Application of a Single Revised Model, Consistent with what Professor Rosenthal
       Originally Proposed, Fails to Demonstrate a Statistically Significant Relationship
       between Promotional Spending and Off-label Prescriptions ............................................. 39
IX.    Professor Rosenthal's Previously Articulated Reasons for Excluding Time Trends
       Are Not Defensible ........................................................................................................ 42
       A.   Time trends should be included in the regression model precisely because
            they are correlated with promotions ..................................................................... 43

       B.   AR models do not substitute for time trends and will not solve omitted
            variables bias ...................................................................................................... 44

X.     Professor Rosenthal's Analysis Suffers from Several Additional Flaws .......................... 45
       A.   Professor Rosenthal Incorrectly Deflates Promotional Expenditures ..................... 45

       B.   Professor Rosenthal Claims that Allegedly Improper Promotion Caused
            More Prescriptions than Actually Were Written .................................................... 46

       C.   Professor Rosenthal Fails to Estimate Empirically the Effects, If Any, of
            Allegedly Improper Promotion as Opposed to the Effects of All Promotion ........... 47

       D.   Professor Rosenthal Assumes that Improper Promotions Began Earlier than
            Plaintiffs Allege .................................................................................................. 48

       E.   Professor Rosenthal's "Competitor" Variables Fail to Measure the
            Competitive Environment Faced by Neurontin ..................................................... 50

       F.   Professor Rosenthal Inappropriately Includes a Separate Variable for
            Promotion Occurring between August 2002 and October 2004 ............................... 52

       G.   Professor Rosenthal Excludes Prescriptions Written for Generic Gabapentin ......... 54

       H.   Professor Rosenthal Provides No Basis for Her Assumed AR Structures and
            Standard Tests Reject Her Them .......................................................................... 54

       I.   Professor Rosenthal Does Not Adequately Account for Neurontin's Price in
            Her Regression Models ........................................................................................ 55

       J.   Professor Rosenthal Inadequately Accounts for Endogeneity .................................. 56

XI.    Dr. Hartman's Purported Damage Estimates Do Not Reflect Damages ........................... 56
XII.   Conclusions .................................................................................................................. 59

## I.     Qualifications

1.     My name is Michael C. Keeley.  I am a Senior Vice President of Cornerstone Research, an economic and financial consulting firm.  I specialize in economic, financial, and statistical analysis.  I earned an S.B. degree in mathematics from the Massachusetts Institute of Technology, and the University of Chicago awarded me M.A. and Ph.D. degrees in economics.

2.     I have provided economic consulting services for more than 20 years.  In particular, I have served as an expert or consultant in a number of cases in the pharmaceutical industry.  I previously submitted declarations in this matter addressing issues pertaining to class certification.  I have also served as an expert addressing whether Plaintiffs' retained economists, Professor Meredith Rosenthal and Dr. Raymond Hartman, had provided reliable empirical evidence of causation and damages in the related Pennsylvania litigation: *Gregory Clark and Linda Meashey v. Pfizer Inc., and Warner-Lambert Company, LLC*.  Moreover, I served as an expert or consultant in a number of other cases in the pharmaceutical industry dealing with a variety of issues including the potential effects of allegedly misleading marketing information on consumers, the wholesale pricing of drugs, the effects of the entry of generic manufacturers on the market, alleged monopolization in the distribution of drugs, and the role of pharmacy benefit managers.  Moreover, I have served as an expert or consultant in a number of other cases in the health-care industry, addressing issues such as hospital pricing and competition, the markets for medical devices, and the provision of physician services to hospitals.

3.     In addition to consulting on issues relating to litigation, I have consulted on non-litigation business, economic, and public policy issues.

4.    My research has been published widely in economics and finance journals. Based on

citations of my research, I was selected for inclusion in *Who's Who in Economics*. I was also

awarded the Garn prize for my research and I have served as a referee (i.e., reviewer) for many

of the major economics and finance journals. Details of my qualifications are provided in my

curriculum vitae in Appendix A. A list of cases in which I have provided testimony since 2002

is provided in Appendix B. Cornerstone Research is being compensated at my customary

billing rate of $585 per hour for the work I have done on this case. Cornerstone Research's

compensation is not dependent on the outcome of this litigation.


## II.    Assignment and Materials Considered

5.    I have been asked to review and assess the August 11, 2008 declarations and analyses of

Professor Meredith Rosenthal ("Rosenthal Declaration") and Dr. Raymond Hartman

("Hartman Declaration"). As part of my analysis, I have also reviewed the prior declarations

and analyses of Professor Rosenthal and Dr. Hartman in this case and the related Pennsylvania

case.[1]

6.    In reaching my opinions, I reviewed legal pleadings, documents, data, Professor

Rosenthal's calculations, academic articles, depositions, declarations, and other relevant

materials from this case and the related Pennsylvania case. Appendix C lists the materials that

I have considered. I may revise my opinions in light of any additional materials including data,

documents, expert reports, and deposition or other testimony that may subsequently become

---

[1] I have reviewed the declaration filed on August 8, 2005 by Professor Rosenthal in the class certification proceedings for this case ("Rosenthal Class Certification Declaration"), the February 21, 2007 reply declaration filed by Professor Rosenthal in the class certification proceedings ("Rosenthal Class Certification Reply Declaration"), and Professor Rosenthal's deposition testimony given in October 2006 and March 2007. I have also reviewed Professor Rosenthal's declarations, deposition testimony, and Frye motion hearing testimony in the related Pennsylvania case and Dr. Hartman's deposition testimony in this case and in the related Pennsylvania case.

available.  In addition, I plan to continue my work and plan to prepare demonstrative exhibits to be used at trial.

### III.  Overview of Plaintiffs' Allegations and the Declarations of Plaintiffs' Retained Economists

7.     Plaintiffs allege that Pfizer and the Parke-Davis division of Warner-Lambert improperly promoted Neurontin for off-label uses.  Plaintiffs have alleged the improper promotion strategy had two broad components:  a "publication strategy" in which Defendants allegedly caused misleading articles to be published, and a "peer selling strategy" in which Defendants allegedly paid physicians to promote Neurontin for off-label uses in the guise of independent professional seminars.[2]  I understand that the Court has ruled that separate consumer and third party payer subclasses are required for each indication.[3]  As a result, Plaintiffs have proposed the following five subclasses for both consumers and third party payers: (1) bipolar and other mood disorders, (2) migraine, (3) neuropathic pain, (4) nociceptive pain, and (5) doses greater than 1800 mg per day.  As discussed below, Plaintiffs appear to have subsequently acknowledged that the consumer subclasses cannot be certified as originally proposed.[4]

8.     Plaintiffs' retained economist, Professor Rosenthal, has run a number of econometric analyses in which she purports to estimate the effect of *all* detailing and journal advertising expenditures on off-label Neurontin prescriptions separately by indication and physician

---

[2]  Judge Patti B. Saris, Memorandum and Order, *In Re Neurontin Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL Docket No. 1629, Civil Action No. 04-10981, August 29, 2007, pp. 4-6.

[3]  Judge Patti B. Saris, Memorandum and Order, *In Re Neurontin Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL Docket No. 1629, Civil Action No. 04-10981, August 29, 2007, p. 14.

[4]  See Class Plaintiffs' Response to Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Second Motion for Class Certification, MDL Docket No. 1629, Master File No. 04-10981, October 1, 2008, pp 5-6, and Exhibit A.

specialty.  Specifically, Professor Rosenthal estimates separate regression models for each of

the indication-specialty pairings listed below ("indication-specialty regressions"):

1.  Bipolar prescriptions written by psychiatrists

2.  Migraine prescriptions written by neurologists

3.  Neuropathic pain prescriptions written by neurologists

4.  Neuropathic pain prescriptions written by "PHN specialties"[5]

5.  Neuropathic pain prescriptions written by other specialties[6]

6.  Nociceptive pain prescriptions written by neurologists

7.  Nociceptive pain prescriptions written by "PHN specialties"

8.  Nociceptive pain prescriptions written by other specialties

9.     Professor Rosenthal then uses her regression results to forecast the number of off-label

prescriptions that would have occurred absent the challenged conduct based on the following

assumed levels of improper spending provided to her by Plaintiffs' counsel.

- Neurologists:      From third quarter 1995 forward, detailing is assumed to be improper in proportion to the portion of neurologist uses that are off-label.  Prior to third quarter 1995, all detailing is assumed to be proper.  All journal advertising is assumed to be proper.

- PHN specialties:  All detailing and journal advertising are assumed to be improper through second quarter 2002.  All detailing and journal advertising are assumed to be proper thereafter.

- Psychiatrists:      All detailing and journal advertising is assumed to be improper.

- Other specialties:  All detailing and journal advertising is assumed to be improper.

---

[5] Note that there is no such thing as a PHN specialist.  Rather Professor Rosenthal defines PHN specialists as physicians that write prescriptions for post-herpetic neuralgia ("PHN").  She includes family practice, general practice, geriatrics, internal medicine, and osteopathic medicine as "PHN specialties."  See Rosenthal Declaration, ¶26, footnote 34.

[6] Professor Rosenthal classifies allergy, cardiology, dermatology, emergency medicine, endocrinology, gastroenterology, hematology, nephrology, obstetrics/gynecology, oncology, oncology/neoplastic, ophthalmology, otolaryngology, pediatrics, podiatry, pulmonary diseases, rheumatology, urology, general surgery, orthopedic surgery, and all other surgery as "other specialties."  See Rosenthal Declaration, Attachment I.1.

10.    Professor Rosenthal runs an additional regression model that estimates the effect of all detailing and journal advertising expenditures on the share of prescriptions that are written for daily doses above 1800 mg ("high-dose regression").  Professor Rosenthal uses the results from this model to forecast the number of high-dose prescriptions, among prescriptions not already attributed to allegedly improper promotion, that were written because of allegedly improper promotion.  When estimating the number of high-dose prescriptions caused by allegedly improper promotion, she assumes that all detailing was improper except for detailing to neurologists prior to the third quarter of 1995 and detailing to pediatricians beginning in the fourth quarter of 2000 (when Neurontin received pediatric approval from the FDA).

11.    According to the calculations put forward by Professor Rosenthal, a substantial portion of migraine prescriptions, neuropathic and nociceptive pain prescriptions written by neurologists, and prescriptions written for doses above 1800 mg per day were not caused by the allegedly improper promotion.  In light of these results, Plaintiffs appear to have conceded that consumer classes that include these indications and specialties cannot be certified.[7]  If so, Plaintiffs have now proposed that the consumer subclasses be limited to the following: (1) bipolar and other mood disorders, (2) neuropathic pain limited to PHN and other specialties, and (3) nociceptive pain limited to PHN and other specialties.

12.    Plaintiffs' other retained economist, Dr. Hartman, uses Professor Rosenthal's estimates of the number of prescriptions supposedly caused by the allegedly improper promotion as inputs into his purported damage calculations.

---

[7] See Class Plaintiffs' Response to Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Second Motion for Class Certification, MDL Docket No. 1629, Master File No. 04-10981, October 1, 2008, pp 5-6, and Exhibit A.

13. For consumers, he estimates the proportion of prescriptions that fall into four different payment categories: Uninsured, Copay, Coinsurance, and Medicaid. He then uses estimates of the average out-of-pocket costs for consumers in each of these categories to estimate consumers' expenditures on Neurontin. Dr. Hartman considers these expenditures to be damages by assuming that the treatment provided was completely ineffective for all of the prescriptions Professor Rosenthal claims were caused by allegedly improper promotions. Neither Professor Rosenthal nor Dr. Hartman demonstrates that the allegedly improper promotion affected each consumer's consumption of Neurontin or costs of treatment, or whether each consumer was harmed. Nor could they, given the methods they employ.

14. For third party payers, Dr. Hartman multiplies his estimate of the number of prescriptions caused by allegedly improper promotions and paid for by third party payers by his estimate of the average amount third party payers reimbursed for each Neurontin prescription they covered. Dr. Hartman considers these expenditures to be damages. Dr. Hartman employs a slightly different alternative methodology—discussed below—for Kaiser, one of the Coordinated Plaintiffs.

## IV.  Summary of Opinions

### A.  Professor Rosenthal Makes Unwarranted and Unsupported Assumptions Regarding the Level of Improper Detailing and Journal Advertising for Neurontin

15. Professor Rosenthal's results depend critically on unsupported assumptions rather than analysis regarding the nature and extent of allegedly improper detailing and journal advertising. At the instruction of counsel, she has assumed that entire categories of detailing and journal advertising were improper based solely on the specialty of the physicians in

question. For example, she assumes that 100 percent of detailing to so-called "PHN specialties" prior to mid-2002 (including detailing to all general practitioners, family doctors, and internists), as well as detailing to numerous other specialties throughout the entire class period, was improper.[8] Professor Rosenthal has not identified any support for these sweeping assumptions, even though her results are entirely dependent on them.[9]

16.    Professor Rosenthal tries to justify her assumption that most detailing and journal advertising expenditures were improper based on the hypothesis that "Parke-Davis would have promoted Neurontin only to those specialties which would likely prescribe the drug for its on-label approved uses."[10] However, Professor Rosenthal's own data demonstrate that many of the specialties she assumes do not write on-label Neurontin prescriptions in fact write significant numbers of such prescriptions. For example, her data reflect that before approval of Neurontin for post-herpetic neuralgia ("PHN") in mid-2002, approximately 734,000 Neurontin prescriptions written by "PHN specialties" were for epilepsy, yet Professor Rosenthal assumes there was no legitimate reason for defendants to have detailed those specialties prior to PHN approval in mid-2002.

17.    Moreover, Professor Rosenthal has offered no analysis to measure the effects of the challenged "publication" and "peer-selling" strategies that are the focus of Plaintiffs' complaint and has thus failed to establish a causal link between the challenged conduct and Neurontin prescriptions. Although she says that she at least partially captured the effects of publication and peer-selling strategies because she claims they are highly correlated with expenditures on detailing and journal advertisements, she offers no evidence in support of such a claim. In

---

[8] Rosenthal Declaration, Attachment I.4.

[9] She has also directly contradicted her approach in the related Pennsylvania matter where she assumed that all journal advertising was proper.

[10] Rosenthal Declaration, ¶46.

addition, and as discussed in more detail below, Professor Rosenthal ignores the fact that her

detailing and journal advertising expenditures variable will capture the effects of other

variables excluded from her model, such as physicians' favorable experiences with Neurontin,

that are correlated with detailing and journal advertising.

### B. Professor Rosenthal Fails to Account for Numerous Factors that Drive Prescriptions and Incorrectly Attributes the Effects of Omitted Factors to Promotion

18.  Promotion is but one of many factors that drive prescriptions.  Indeed, Professor

Rosenthal has conceded that factors such as the results of clinical trials, approvals in other

countries, approvals of other anti-epileptic drugs ("AEDs") for the off-label indications at issue

in this case, and physicians' experiences with Neurontin affect Neurontin's sales.[11]  She fails to

include any of these factors in her model, however.

19.  Of particular importance are physicians' and patients' positive experiences with

Neurontin and the diffusion of information about these experiences over time.[12]

Professor Rosenthal fails to include any variable in her models to account for the diffusion of

information about these positive experiences over time despite stating that she would do so.

This exclusion causes her to attribute incorrectly the effects of physicians' experiences with

Neurontin to promotional expenditures.[13]  Professor Rosenthal stated in her deposition that she

---

[11] Rosenthal Deposition, October 25, 2006, pp. 324, 327-329. See also p. 257.

[12] The increased prescribing of Neurontin over time is consistent with physicians and patients having positive experiences with Neurontin.  If physicians and patients had not experienced positive outcomes with Neurontin, physicians would not have continued to prescribe it and patients would not have continued to use it.  Moreover, word would have spread that Neurontin did not lead to positive outcomes, reducing the number of prescriptions other physicians would have written.  Instead, the available evidence suggests that positive experiences with Neurontin for off-label uses have played a large role in driving prescription growth.

[13] Because she measures promotion as a stock (i.e., the sum of previous promotional expenditures less depreciation), by construction it increases over time just as physicians' and patients' experiences with Neurontin increase over time.  Thus, her promotions variable captures the effects of physicians' experiences causing Professor Rosenthal to wrongly attribute the effects of physicians' experiences to promotion.

would include variables known as "time trends" to reflect or proxy for experience, but she has not done so. Her failure to do so renders her results meaningless and unreliable.

### C.     Professor Rosenthal's Choice of Explanatory Factors Is Results-Driven and As Such Violates Acceptable Econometric Practice

20.    Professor Rosenthal runs a separate regression model for each of the eight indication-specialty pairings. Each regression attempts to estimate the relationship between prescriptions for a particular indication and specialty and a set of explanatory factors. Despite proposing to use a single set of explanatory factors across all eight models, Professor Rosenthal alters the set of included explanatory factors from model to model without explanation or justification. Her results change dramatically depending on which of her explanatory factors she includes in each model.

21.    Professor Rosenthal's decisions as to the explanatory factors included in each of her indication-specialty models are ad hoc and have no basis in economic theory or statistics; rather, they appear to be driven purely by results (i.e., she apparently chooses which particular set of explanatory factors to include in each model based on whether that set produces statistically significant positive effects of promotion). Choosing a regression model based on desired results violates standard econometric practice and produces results that have no scientific meaning or statistical validity.

**D.** **A Single Revised Regression Model, Consistent with what Professor Rosenthal Originally Proposed, Fails to Demonstrate a Statistically Significant Relationship between Promotional Spending and Off-Label Prescriptions**

22.    Professor Rosenthal's results are highly sensitive to small changes that address some of the key flaws in her model.[14]  A single revised regression model with the same explanatory factors applied to all eight indication-specialty pairings no longer demonstrates a statistically significant relationship between promotional expenditures and prescriptions for any of the eight indication-specialty pairings.  The revised model does not and is not intended to fix all of the problems with Professor Rosenthal's analysis, but it is more consistent with published academic research (including her own) and with the model she proposed in her Class Certification Declaration.  In particular, the revised model includes a constant term and time trends, both of which Professor Rosenthal repeatedly said she would include in her model but apparently ultimately omitted when their inclusion resulted in statistically insignificant results.[15]  With regard to time trends, Professor Rosenthal has previously acknowledged that they partially account for the role of physician experience in determining prescribing decisions, which otherwise her model does not address at all.  Instead, her model without time trends

---

[14] This sensitivity violates a general principle of applied economics, namely that results should be invariant to small changes in empirical methods.  Results that lack this quality are considered weak and unconvincing.  For example, the Federal Judicial Center's Reference Guide on Scientific Evidence observes that "The issue of *robustness*— whether regression results are sensitive to slight modifications in assumptions…—is of vital importance." *Reference Guide on Scientific Evidence*, 2nd Edition, Federal Judicial Center, 2000, p. 195.

[15] Rosenthal MDL Class Certification Declaration, August 8, 2005, ¶33.  Professor Rosenthal explicitly identifies time trends as a factor that affects prescriptions: "Such factors will include, but not be limited to, the time since market entry (which measures market awareness); variables quantifying the time since FDA approval of Neurontin for alternative therapeutic indications (e.g., a variable that counts the number of months since the FDA approval of Neurontin for post-herpetic neuralgia May 2002); ..." See also Rosenthal MDL Deposition, pp. 336-337: "For example, by using time trends, linear quadratic time trends to capture other secular trends in what's happening in the market by including variables on other drugs.  So certainly those factors would be considered and incorporated either explicitly or captured in the time trend, the secular trend." See also Rosenthal MDL Deposition, p. 454: "You want to correctly specify the time relationships, in particular in this model . . . with regard to whether it's a linear trend or a quadratic trend, these specification issues are important for getting good estimates as well." See also Rosenthal Pennsylvania Class Certification Declaration, August 31, 2005, ¶14, and Rosenthal Pennsylvania Damage Declaration, March 31, 2008, Attachment F, ¶1.

wrongly attributes effects of physician experience to promotion, which is correlated with physician experience.  Professor Rosenthal removed time trends from her model, and I add them back in because it is undisputed that physician experience is a critically important determinant of prescriptions.[16]

23.    As Professor Fiona Scott Morton and I explained in our respective class certification declarations, given the large amount of measurement error in Professor Rosenthal's data on off-label prescriptions, the small number of observations, and other econometric problems, it is not surprising that the revised models generated statistically insignificant results of the effect of detailing and journal advertising on prescriptions.[17]  Basic econometric practice dictates that the researcher decide on a model she believes is theoretically sound and then investigate whether the estimates from that model support or reject a particular hypothesis.  Here the results from Professor Rosenthal's model as she originally specified it do not support her hypothesis that detailing expenditures are the primary driver of Neurontin prescriptions. Instead of accepting that result, Professor Rosenthal changed her model, not based on any theoretical justification, but based on results—i.e., not based on an argument that physician experience somehow does not matter to prescribing decisions, but because a model that attempted to address physician experience did not result in statistically significant estimates of the effects or promotions on prescriptions.  This is a classic example of an improper results-driven analysis and is inconsistent with standard econometric practice.

---

[16] The regression model Professor Rosenthal uses to estimate the effect of promotions on the share of prescriptions that are high-dose suffers from many of the same flaws as her indication-specialty regression models.  For example, her high-dose regression fails to include a constant term and time trends.  Once a constant term and time trends are included in her high-dose regression model, it no longer finds a statistically significant relationship between promotional expenditures and high-dose prescribing.

[17] Declaration of Michael C. Keeley In Opposition to Class Certification, December, 2006 ("Keeley Class Certification Declaration"), ¶¶18-19, 55-57.  Declaration of Fiona Scott Morton, December 21, 2006, ¶¶6, 68-77.

### E.    Professor Rosenthal's Previously Articulated Reasons for Excluding Time Trends Are Not Defensible

24.    In the related Pennsylvania case, Professor Rosenthal tried to justify excluding time

trends by stating that (1) time trends are too highly correlated with her promotional

expenditures stock variable to allow her to separately estimate the effects of both promotional

expenditures and time trends and (2) she has accounted for time by employing an

autoregressive ("AR") regression model that makes time trends unnecessary.  Neither of these

reasons can be used to defend her exclusion of time trends from her regression models.  The

first reason only reinforces the likelihood that her promotions variables is capturing the effects

of other variables that trend up over time such as physician experience.  The second reason is

completely contradictory to accepted econometric teaching.

### F.    Professor Rosenthal's Analysis Suffers from Several Additional Flaws

25.    Professor Rosenthal's analysis suffers from several additional problems outside of her

failure to objectively choose which variables to include in her regression models.

26.    First, in attempting to account for the effects of inflation on detailing and journal

advertising expenditures over time, Professor Rosenthal has "deflated" promotional

expenditures incorrectly for her indication-specialty regressions (given her exclusion of a

constant term). Correcting this mistake causes her estimated effects of promotion to change

and, for two of her indication-specialty pairings (neuropathic pain prescriptions written by

PHN and other specialties), her estimated effects of promotion are no longer statistically

significant.

27.    Second, for five out of eight of her indication-specialty pairings, Professor Rosenthal's

regression results lead her to conclude that the number of prescriptions caused by allegedly

improper detailing and journal advertising is greater than the actual number of prescriptions

purchased during the relevant time period.[18] As a result, in several cases Dr. Hartman

computes purported damages on a larger number of prescriptions than were actually purchased.

For example, in the case of nociceptive pain prescriptions written by PHN specialties,

Professor Rosenthal's estimate of prescriptions caused by allegedly improper promotions is 11

percent higher than the actual number of prescriptions sold.  Allegedly improper promotion

could not have caused the purchase of more prescriptions than were actually purchased.

28.    Third, despite stating in her Class Certification Declaration that she would analyze

empirically the effects of allegedly improper promotion, while controlling for proper

promotion and other factors, in fact her regression models do not even attempt to estimate the

effects of allegedly improper promotion.  Instead, her regression models only estimate the

effect of *all* detailing and journal advertising expenditures, regardless of whether they were

improper.  To calculate the supposed effects of allegedly improper promotion she must assume

that the promotion was improper and that allegedly improper promotion caused off-label

prescriptions rather than proper promotion or other factors such as positive physician

experience with Neurontin.  Thus, she has provided no empirical evidence of causation.

29.    Fourth, putting aside the fact that she failed to estimate the effects, if any, of allegedly

improper promotion on prescriptions in her indication-specialty regressions, she inadequately

corrects for two common statistical problems: an autoregressive error structure and

endogeneity.

---

[18] In Attachment G of her declaration, Professor Rosenthal calculates that "fraudulent" prescriptions are 99 to 100
percent of all prescriptions for a particular indication and specialty.  Her measure of "all prescriptions" is not based
on actual data, however, and is instead based on the number of prescriptions forecast by her regressions models
when actual values of the explanatory variables are plugged into those models.

30.   Fifth, Professor Rosenthal also includes poorly measured and thus meaningless competitor price and promotion variables, includes a badly structured Neurontin price variable, and relies on an indefensible segregation of promotional expenditures into "baseline" and "spike" promotions.

31.   Lastly, Professor Rosenthal assumes that improper promotion started earlier than Plaintiffs have alleged.  She assumes improper promotion began upon Neurontin's introduction in the first quarter of 1994 even though Plaintiffs have alleged that improper promotion began at least a year later (depending on the subclass, between March 1995 and November 1995). This causes her to overstate damages even within the framework of her own models.

### G.    Dr. Hartman's Purported Damage Estimates Do Not Reflect Damages

32.   Dr. Hartman's so-called damage estimates do not reflect damages.  First, he relies on Professor Rosenthal's unreliable estimates of the number of off-label prescriptions caused by allegedly improper promotions.  Second, even if Professor Rosenthal's estimates were reliable, Dr. Hartman fails to account for the cost and efficacy of whatever alternative drug a patient would have taken absent the allegedly improper promotion and how those compare to the cost and efficacy of Neurontin.[19]  Dr. Hartman also assumes without support and contrary to the

---

[19] For one of the Coordinated Third Party Payer Plaintiffs, Kaiser, Dr. Hartman estimates damages under an alternative damages theory that supposedly accounts for the cost of alternative therapies. (Hartman Declaration, footnotes 14 and 16.)  He does not provide a basis for his choice of alternative therapies saying only that Counsel provided a list of alternative drugs for each indication.  Nor does he provide any basis for the allocation of Neurontin prescriptions to particular alternative therapies.  I understand that subsequent to Dr. Hartman's Declaration, Kaiser has provided the same list of purported alternative drugs in response to Defendants' interrogatories. (See, Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals Fifth Supplemental Response and Objections to Defendants' Second Set of Interrogatories, *In Re Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981, November 10, 2008.)  However, neither Kaiser's responses nor the Affidavits of Mirta Millares supplied by Kaiser provide any details on how these drugs were identified or why they might be preferable to Neurontin in particular cases, let alone why they would be preferable for all patients under all circumstances.

record that patients received no value from their use of Neurontin (i.e., he assumes that Neurontin was entirely ineffective for all patients for all off-label uses).

33.     The assumption that Neurontin has no efficacy, and that damages are therefore equivalent to out-of-pocket costs, is contrary to medical evidence, the actions of Dr. Hartman, and statements made by Professor Rosenthal. Medical experts who have filed reports in this case describe the effectiveness of Neurontin for off-label uses. In addition, Dr. Hartman himself has used Neurontin for many years to treat pain—an off-label use—and was still doing so as of at least the time of his deposition in the Pennsylvania matter in June 2008. That he has chosen to continue using (and paying for) Neurontin for an off-label condition despite being fully aware of the allegations in this case indicates that he receives a benefit from taking Neurontin, in which case damages for Dr. Hartman and similar patients cannot be out-of-pocket costs. Furthermore, Professor Rosenthal has acknowledged that off-label prescribing is a routine part of clinical practice and that lack of FDA approval does not indicate anything about the true effectiveness of Neurontin.

## V.     Professor Rosenthal Makes Unwarranted and Unsupported Assumptions Regarding the Level of Improper Detailing and Journal Advertising for Neurontin

34.     Professor Rosenthal arrives at the pivotal input to her analysis—the level of detailing and journal advertising spending that is improper—by making unverified and self-serving assumptions that are contradicted by the record. For psychiatrists and other specialties she assumes, at the direction of Counsel, that all detailing and journal advertising expenditures were improper.[20] For PHN specialties, she assumes that all detailing and journal advertising expenditures were improper prior to August 2002. For neurologists, she assumes beginning in

---

[20] Rosenthal Declaration, ¶¶46-47.

July 1995 that detailing expenditures were improper in proportion to the share of neurologists'

uses that were off-label.

### A.   Professor Rosenthal Fails to Provide Support for Her Assumed Levels of Improper Promotion and Ignores Contradictory Evidence

35.   Professor Rosenthal has conducted no analysis of allegedly improper promotion and

offers no evidence in support of her assumptions regarding the level of improper promotion.

Professor Rosenthal stated in her class certification declaration that she planned to divide

promotional expenditures into on-label and off-label categories based on a review of

Defendants' internal documents.  She cited as examples of the documents she would rely upon

"product profit and loss statements and detailed promotional expense statements .... strategic

documents that describe marketing efforts for the specific off-label campaigns including

migraine, bipolar disorder and other psychiatric uses, and chronic pain… [and] numerous

agreements … that track spending on off-label promotion in the form of speaking engagements

and consultancies."[21]  She also testified that in the face of any doubt as to whether a particular

category of promotion was proper or improper, she would make the conservative assumption

that it was entirely proper.[22]

36.   Professor Rosenthal has now adopted precisely the opposite approach.  Instead of

undertaking a specific and conservative analysis and categorization of proper and improper

promotions based on the record, and despite the fact that she claims to have now completed an

---

[21] Rosenthal Class Certification Declaration, ¶41a.

[22] "Q: Here  again you would agree that it's important in conducting your analysis that you be able to distinguish between whether a particular factor falls within the MT [on-label] category on the one hand and the OT or ODT [off-label] category on the other  hand, correct?  A: I believe that's correct.  In the limit one would have to include a category – an expenditure in the legitimate side to be conservative if one couldn't tell [whether it promoted on- or off-label use]." (Rosenthal Deposition, 10/24/06, p. 304.)

"extensive review" of documents,[23] Professor Rosenthal has simply assumed that all detailing and journal advertising was improper for most specialties and time periods without pointing to any support in the record.[24]  Professor Rosenthal has in fact disregarded the record entirely by stating that it only provides her with an "incomplete picture" of the challenged conduct.[25]

37.    Moreover, Professor Rosenthal's assumptions regarding detailing and journal advertisements make no sense and are contradicted by her own data.  First, Professor Rosenthal tries to justify her assumption that most detailing and journal advertising expenditures were improper based on the hypothesis that "Parke-Davis would have promoted Neurontin only to those specialties which would likely prescribe the drug for its on-label approved uses"[26] Professor Rosenthal's own data, however, demonstrate that many of the specialties she assumes do not write on-label Neurontin prescriptions in fact write significant numbers of such prescriptions.  Indeed, before approval of Neurontin for PHN in mid-2002, her data reflect that approximately 734,000 Neurontin prescriptions written by "PHN specialties" were for epilepsy, yet Professor Rosenthal assumes there was no legitimate reason for defendants to have detailed those specialties prior to PHN approval and that all such promotions were both off-label and fraudulent.

38.    Second, with regard to journal advertising, Professor Rosenthal relies on data that allocate journal advertising expenditures to different specialties based on the share of the

---

[23] Rosenthal Declaration, ¶46.

[24] This assumption is particularly problematic in light of Professor Rosenthal's decision to use a log-log model.  A log-log model implies that off-label prescriptions must be zero when any explanatory variable is zero regardless of the estimated coefficient of that variable.  For this reason, log-log models are not generally employed when explanatory variables can take on zero values.  Thus, in this way too Professor Rosenthal departs from accepted econometric practice. Because of this issue, Professor Rosenthal assumes $1 of promotion in her "but-for" world—instead of $0 of promotion as she states she assumes—in order to avoid taking the log of zero (which is equal to minus infinity).

[25] Rosenthal Declaration, ¶46.

[26] Rosenthal Declaration, ¶46.

journal's subscribers belonging to each specialty. As a result, when she designates journal advertisements as improper for some specialties and proper for others, she is assuming that the same journal advertisement can be both proper and improper depending on who is viewing it. For example, for a Neurontin advertisement for PHN placed in a 2004 issue of the New England Journal of Medicine—a journal not geared towards any particular specialty— Professor Rosenthal assumes that the advertisement is proper for neurologists and "PHN" specialties but improper for psychiatrists and other specialties.[27] But this cannot be the case— the content of an advertisement does not change due to the reader's specialty. Professor Rosenthal apparently has made no attempt to review actual journal advertisements to determine if their content was improper or if journal advertisements even varied in content across different publications.

39.    While I have not reviewed the entire record, the evidence I have seen directly contradicts Professor Rosenthal's assumption that detailing and journal advertising were improper for most specialties. For example, as a factual matter, none of the physicians who have been deposed in this case and the related Pennsylvania action has testified that they received off-label detailing. Several testified that the sales representatives with whom they met that promoted Neurontin never promoted Neurontin for off-label uses, while others testified that they had never even met with sales representatives who promoted Neurontin for any purpose.[28] For example, Dr. Vithal Dhaduk, who treated Lorraine Kopa, a named plaintiff in this case, testified that he did

---

[27] Pfizer_AMishra_0007311-0007470 at 0007319-0007320.

[28] Deposition of Dr. John Arness, 2/13/08, pp. 65-66; Deposition of Dr. Douglas Barrett, 12/7/04, pp. 60-61, 72-73; Deposition of Dr. Richard J. Brown, pp. 60-61, 76-77; Deposition of Dr. Vithal Dhaduk, 11/12/06 ("Dhaduk Deposition"), pp. 111-15, 180-81, 193-94; Deposition of Dr. Amy Fitzsimmons, 9/22/08, p. 24; Deposition of Jerrold Gray, 2/6/08, pp 109-113, 115-118; Deposition of Dr. Robert Haynsworth, 2/1/08, pp. 15, 75-76; Deposition of Dr. Kylene Huler, 11/1/06, p. 87; Deposition of Dr. E. Michael Okin, 8/30/05, pp. 50-52; Deposition of Dr. Thaddeus Poe, 11/1/06, pp. 44-48; Deposition of Dr. Gwen Robinson, 12/8/04, pp. 60-63; Deposition of Dr. Gregory Rogers, 2/2/08, pp. 94-96; and Deposition of Dr. Rick T. Waldo, pp. 75-78, 88-89, 100-101.

not recall discussing off-label use of any medication with any sales representative.[29]  He also

testified that in treating patients with both epilepsy and migraines, he observed that Neurontin

was effective at treating migraines.[30]  This experience along with the safety of the medication

informed Dr. Dhaduk's decision to continue to prescribe Neurontin for migraines and pain.[31]

Similarly, Dr. Kylene Huler testified that no sales representative ever discussed the off-label

use of Neurontin and that her observation of positive results in patients with pain indications

encouraged her to continue to prescribe Neurontin for these uses.[32]  Finally, Dr. Rick Waldo

testified that he never talked to Neurontin representatives about off-label uses of Neurontin,

and that the observation of Neurontin's safety and efficacy in his patients was part of the

decision to continue to prescribe it for bipolar and pain indications.[33]  Physicians deposed in

the related Pennsylvania matter have offered similar testimony.[34]  This evidence contradicts

Professor Rosenthal's assumption that virtually all detailing of Neurontin was improper.[35]

40.    Moreover, Warner-Lambert and Pfizer sales and marketing managers testified that off-

label promotion was a violation of company policy and that sales representatives were trained

---

[29] Deposition of Dr. Vithal Dhaduk, 11/12/06 ("Dhaduk Deposition"), pp. 111-112.

[30] Dhaduk Deposition, pp. 33-34.

[31] Dhaduk Deposition, pp. 34, 86.

[32] Deposition of Kylene Huler, M.D., 11/1/06, pp. 40, 87.

[33] Deposition of Dr. Rick Waldo, 2/1/08, pp. 88, 27.

[34] Dr. Michael Okin testified that he received no information on Neurontin related to the off-label conditions for which he prescribed it, and that other factors led him to prescribe Neurontin for off-label uses.  In fact, he testified that he first prescribed Neurontin for reflex sympathetic dystrophy, an off-label condition, because a patient specifically requested the medication based on her own research. See Deposition of Dr. E. Michael Okin, 8/30/05, pp. 34-35, 39-40, 45-46, 62-63.  Similarly, Dr. Richard Brown testified that he did not meet with Warner Lambert sales representatives before prescribing Neurontin for bipolar indications, and that his prescriptions were guided by his independent medical judgment, experience with his own patients (some of whom benefited from Neurontin), and conversations with colleagues.  See Deposition of Dr. Richard Brown, 8/18/05, pp.60-65, 76-77.

[35] It also contradicts her assumption that detailing is the only means whereby physicians receive information about Neurontin.

to promote solely for on-label uses.[36] In addition, sales managers regularly accompanied sales representatives on detail visits and monitored compliance with this policy.[37] Furthermore, the sales and marketing managers testified that they had never witnessed or heard of any off-label marketing occurring for Neurontin, let alone any false or misleading statements about Neurontin's efficacy for any use.[38] Here again, the evidence fails to support Professor Rosenthal's assumption regarding the amount of improper promotion of Neurontin by sales representatives.

41.    Professor Rosenthal does not and cannot point to the documents she includes in her documents considered list to support her assumptions that all detailing and journal advertising was improper for most specialties. I have reviewed these documents and have found no support for her sweeping assumption that most detailing and journal advertising was improper. Nor can Professor Rosenthal point to the Warner Lambert guilty plea to support her assumption regarding the level of improper promotion. The plea relates to specific instances of conduct in 1995 and 1996, with no references to conduct after 1996. The plea does not provide any basis for assuming that all detailing and journal advertising to certain specialties throughout the entire class period was off-label[39] nor does it provide any evidence that

---

[36] Deposition of Margaret Yoder, June 20-21, 2007 ("Yoder Deposition"), pp. 88, 91-92, 347-348; Deposition of Allison Fannon, June 19-20, 2007 ("Fannon Deposition"), pp. 23-25, 91-92, 501-02, 582-83; Deposition of John Marino, July 2-3, 2007 ("Marino Deposition"), pp. 31-34, 630; Deposition of Mark Brown, October 2, 2007 ("Brown Deposition"), pp. 88-92; Deposition of Timothy George, June 20-21, 2007 ("George Deposition"), pp. 92-93, 175-77; Deposition of Leonard Bruce Fleischmann, June 13-14, 2007 ("Fleischmann Deposition"), pp. 145-147, 175, 182, 184-85, 426; and Deposition of Christopher Dowd, September 13-14, 2007 ("Dowd Deposition"), pp. 148-149, 468-69; Deposition of Suzanne Doft, June 12-13, 2007 ("Doft Deposition"), pp. 67, 637; Deposition of Tamela Martin, October 4-5, 2007 ("Martin Deposition"), pp. 26-27; Deposition of Avanish Mishra, June 14-15, 2007 ("Mishra Deposition"), pp. 136-137.

[37] Marino Deposition, p. 429; Brown Deposition, pp. 88-92.

[38] Doft Deposition, pp. 556, 663-664; Fannon Deposition, pp. 501-502; Deposition of Christine Grogan, June 26, 2007, p. 485; Brown Deposition, p. 90-91; George Deposition, pp. 93, 177.

[39] Indeed, one document cited in the guilty plea, and by Professor Rosenthal herself, directly contradicts her assumption. In her class certification declaration, Professor Rosenthal cites a survey conducted by the pharmaceutical marketing research firm Scott-Levin in July and August 1995 in support of her claim that off-label

allegedly off-label detailing by Warner Lambert, even in 1995 and 1996, was false or misleading.

**B.    Professor Rosenthal Makes Contradictory Assumptions Regarding Which Promotions Are Improper**

42.    Instead of providing support for her assumed levels of improper promotion, Professor Rosenthal applies a rule-based approach for categorizing promotion as either proper or improper.  She does not apply these rules consistently, however.  For example, in the case of neurologists, Professor Rosenthal assumes that detailing and journal advertising expenditures are proper in proportion to the portion of neurologists' uses that are on-label.  For specialties other than neurology, however, she assumes instead that all detailing and journal advertising were improper, despite the fact that these other specialties also wrote on-label prescriptions. While there is no basis in the record to assume that improper promotion occurred in proportion to off-label prescribing, if the assumed level of improper promotion for PHN specialties prior to third quarter 2002[40] is based on such a rule (and is thus made consistent with what Professor Rosenthal assumes for neurologists) the number of allegedly fraudulent prescriptions decreases substantially.  For example, with just this change to make Professor Rosenthal's assumptions consistent but otherwise leaving her analysis unchanged, she would conclude that less than half of neuropathic pain prescriptions written by "PHN specialties" were caused by allegedly

---

promotion took place in detailing visits.  (Rosenthal Class Certification Declaration, ¶8, footnote 24.)  Whether or not the survey in the memorandum she cites is accurate or actually reflects any improper promotion or is representative of physicians detailed even in 1995, the document suggests only that ten of fifty physicians in that particular survey reported discussions of off-label content in meetings with Parke Davis sales representatives. (Memorandum to J. Knoop/E. Guerrero from J. Rizzo, October 20, 1995, V091893, Interrogatory Response Exhibit 132.)  This falls well short of Professor Rosenthal's assumption regarding the level of improper promotion occurring in detail visits.  I have also reviewed the other documents cited by Professor Rosenthal in her declaration and none of those documents support her assumptions regarding the level of improper promotion.

[40] Professor Rosenthal assumes all promotions to PHN specialties after PHN approval in third quarter 2002 are proper.

improper promotion, rather than 100 percent as she currently reports.  Implementing the same change for nociceptive pain prescriptions written by PHN specialties and neuropathic and nociceptive pain prescriptions written by other specialties also causes the percent of prescriptions allegedly caused by improper promotion to fall substantially.

43.    Additional inconsistencies in Professor Rosenthal's assumptions also lead to overstated results.  First, Professor Rosenthal's assumptions for neurologists after PHN approval in third quarter 2002 are inconsistent with her assumptions for PHN specialties.  Professor Rosenthal's "PHN specialties" are designated as such because they account for a large portion of PHN prescriptions.  Because these specialties write PHN prescriptions she assumes that all detailing to these specialties after PHN approval was proper.  However, neurologists account for more PHN prescriptions than three of the five specialties Professor Rosenthal designates as PHN specialties.  As a result, promotion to neurologists after PHN approval should also be assumed to be proper according to Professor Rosenthal's logic.  Second, Professor Rosenthal's assumptions for the neuropathic and nociceptive pain subclasses are inconsistent with the assumptions she makes for her high-dose subclass and with the assumptions she made in the related Pennsylvania case.  For both the high-dose subclass and for the Pennsylvania case, she assumed that promotion to pediatricians was proper beginning in October 2000 when Neurontin received pediatric approval.  In contrast, she assumes all promotion to pediatricians was improper for her nociceptive and neuropathic pain subclasses.

44.    Professor Rosenthal's estimates of the number of prescriptions caused by allegedly improper promotion depend critically on her assumed level of improper promotion.  As the above example demonstrates, changes to her assumptions regarding the amount of improper promotion have a direct impact on her estimates of prescriptions caused by allegedly improper

promotion. Her estimates are driven by the level of improper promotion that she assumes, rather than by any actual empirical analysis. Without support for Professor Rosenthal's assumed levels of improper promotion, her conclusions have no basis and are unreliable.

## C. Professor Rosenthal Justifies Her Unsupported Assumptions with Circular Reasoning

45.    Professor Rosenthal's rule-based approach to categorizing promotion as either proper or improper is based on circular reasoning. By her logic, because off-label prescribing occurred, promotion for Neurontin must have been improper, and thus she is able to find that improper promotion caused off-label prescribing. Indeed, for neurologists, she assumes that promotion was improper in direct proportion to the share of prescriptions written by neurologists that are off-label. As a result, Professor Rosenthal assumes what she sets out to prove because, with this logic, the mere demonstration of off-label prescribing is all that is required to prove that off-label promotion occurred.[41]   However, prescribing drugs for off-label uses is a common medical practice and is in no way indicative of improper promotion. Neurontin's substantial off-label use cannot simply be presumed to have been caused by improper promotion.

46.    Not only does Professor Rosenthal's logic ignore all the other factors that could drive off-label prescribing, it specifically assumes that on-label promotion cannot drive off-label prescriptions. Professor Rosenthal makes this assumption despite previously acknowledging that on-label promotion can and usually does affect the amount of off-label prescribing that

---

[41] In the related Pennsylvania matter Professor Rosenthal pointed to the growth on off-label prescriptions as support for her hypothesis that most promotion was off label. Her circular reasoning ignores the fact that many factors other than alleged off-label promotion could account for the growth in off-label prescriptions. (Rosenthal Pennsylvania Damage Declaration, March 31, 2008, ¶39.)

occurs for a drug.[42]  For example, her assumptions ignore the fact that on-label promotion

would have increased physicians' knowledge of Neurontin as an AED with a benign side-effect

profile and thus encouraged physicians to try Neurontin for off-label uses for which other

AEDs with less benign side-effect profiles were already being used.[43]  Medical experts and the

named plaintiffs' prescribing physicians agree that Neurontin's benign side-effect profile and

lack of drug-drug interactions have driven Neurontin's use for off-label conditions.[44]  On-label

promotion that informed physicians of Neurontin's beneficial characteristics therefore likely

would have increased off-label use.  Moreover, on-label promotion for indications like

neuropathic pain from PHN could increase off-label prescriptions for other types of

neuropathic pain.

      **D.**      **Professor Rosenthal Fails to Provide Any Empirical Evidence that Defendants' Allegedly Improper "Publication" and "Peer Selling" Strategies Affected Off-Label Prescribing of Neurontin**

47.    Professor Rosenthal fails to measure any alleged effects of the "publication strategy" (in

which Defendants allegedly caused misleading articles to be published) and the "peer selling

strategy" (in which Defendants allegedly paid physicians to promote Neurontin for off-label

uses in the guise of independent professional seminars) that have been the focus of Plaintiffs'

allegations.  Her model contains no variables capturing marketing events, such as continuing

---

[42]  Rosenthal Class Certification Declaration, Attachment PA-A, ¶34d: "The model allows for the fact that there may be and usually is some spillover from legal promotional activities and spending ($X_{jt}$ and $M_t$) on physician prescription behavior for off-label applications."

[43]  For example, Dr. E. Michael Okin, the prescribing physician for named plaintiff Gregory Clark in the Pennsylvania matter testified that "...many years ago they used to use Dilantin for [peripheral neuropathy], as an off-label use for the same thing, and the Neurontin had less complications than the Dilantin as far as hypertrophy of the gums and things like that.  So that's probably why I started using Neurontin." (Deposition of Dr. E. Michael Okin, 8/30/05, p. 28-29.)

[44]  Expert report of Dr. Shawn J. Bird, 11/29/06, pp. 3-4; Expert Report of Dr. Samuel Potolicchio, 12/8/06, pp. 2-3; Expert Report of Alan M. Rapoport, M.D.,12/1/06, pp. 3-4; and Expert Report of Andrew E. Slaby, M.D., PH.D., M.P.H., p. 13; Deposition of Kylene Huler, M.D., 11/1/06, p. 40; Deposition of Vithal Dhaduk, M.D., 11/12/06, pp. 33-34.

medical education ("CME") seminars, or new publications when estimating the number of prescriptions caused by promotions. These events and publications are ignored even though they have been the primary focus of Plaintiffs' allegations.[45] Instead, Professor Rosenthal limits her analysis to the effects of detailing and journal advertising. As such, Professor Rosenthal has failed to establish a causal link between the principal alleged improper promotion and Neurontin prescriptions.

48.   Professor Rosenthal says that she at least partially measured the effects of expenditures on Defendants' "publication" and "peer selling" strategies because she claims such expenditures are highly correlated with expenditures on detailing and journal advertisements.[46] She offers no evidence in support of such a claim, however—this is simply another unsupported assumption. In fact, her model results imply that promotion other than detailing and journal advertising had no effect on prescriptions.[47]

49.   Moreover, Professor Rosenthal ignores the possibility that her promotions variable will capture the effects of other variables excluded from her model that are correlated with her promotions variable such as positive physician and patient experiences with Neurontin and on-label promotion. She thus turns a blind eye to the bias caused by omitting important explanatory factors from her model. This point is discussed below in more detail.

---

[45] Judge Patti B. Saris, Memorandum and Order, *In Re Neurontin Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL Docket No. 1629, Civil Action No. 04-10981, August 29, 2007, pp. 4-6.

[46] Deposition of Meredith Rosenthal in Clark et al v. Pfizer, Inc. and Warner Lambert ("Rosenthal Pennsylvania Deposition"), July 9, 2008, pp. 116, 123-4.

[47] Unless expenditures on publication and peer-selling strategies are perfectly correlated with detailing and journal advertising expenditures, Professor Rosenthal's results imply that such expenditures have no effect on prescriptions at all for the five indication-specialty pairings for which she claimed that essentially all off-label prescriptions were caused by improper detailing and journal advertising. Otherwise, detailing and journal advertising expenditures could not explain all prescriptions as Professor Rosenthal has found for these five indication-specialty pairings. As such, she should conclude that either her models are wrong or that the challenged "peer selling" and "publication" strategies focused on by Plaintiffs had no effect on Neurontin prescriptions for these indications.

**VI.     Professor Rosenthal Fails to Account for Numerous Factors that Drive Prescriptions and Incorrectly Attributes the Effects of These Omitted Factors to Promotion**

50.     Apart from her flawed and unsubstantiated assumptions regarding the extent of alleged improper promotion, Professor Rosenthal's analysis is not scientifically valid or reliable for the independent reason that she fails to account for numerous factors other than promotion that drive prescriptions.  Despite conceding that factors such as the results of clinical trials, approvals in other countries, the approval of other AEDs for the off-label indications at issue in this case, and physicians' and patients' positive experiences with Neurontin all affect Neurontin's sales,[48] Professor Rosenthal fails to include any of these factors in her regression models.  Instead she assumes that promotional expenditures are the primary driver of prescriptions and that these other factors have no effect.  This assumption is in direct contradiction to the findings of prior academic research and the testimony of all of the physicians who have been deposed in this case and the related Pennsylvania matter.

**A.     When Modeling the Determinants of Prescriptions, Professor Rosenthal Ignores Numerous Factors Including Physicians' Experience with Neurontin**

51.     An extensive economics and marketing literature examines the diffusion of information as a trigger for the adoption of new products over time.[49]  Diffusion models suggest that the S-shaped adoption curve typical of products that successfully enter the market—the same curve we see for Neurontin sales—is driven by the spread of information through different channels

---

[48] Rosenthal Deposition, October 25, 2006, pp. 320-336.

[49] For reviews of the academic literature, see Geroski, Paul A., "Models of Technology Diffusion," *Research Policy*, (29), 2000, pp. 603-625; Mahajan, Vijay, Eitan Muller, and Frank M. Bass,  "New Product Diffusion Models in Marketing: A Review and Directions for Research," *Journal of Marketing*, 54 (1), January 1990; and Bass, Frank M., "A New Product Growth Model for Consumer Durables," *Management Science*, 15 (1), January, 1969, pp. 215-227; See also, Griliches, Zvi, "Hybrid Corn: An Exploration of the Economics of Technological Change," *Econometrica*, 25(4), October 1957, pp. 501-522.

such as mass media and word-of-mouth communication.[50]  Studies of new drug adoption

establish that published research and physicians' experience prescribing a drug and observing

its efficacy and side effects are key influences on physicians' prescribing decisions.[51]  As I

discuss below in more detail, the testimony of all of the physicians deposed in this case and the

related Pennsylvania action indicates that such factors drove their decisions to prescribe

Neurontin, not allegedly improper detailing and journal advertising for Neurontin.

52.    Professor Rosenthal ignores these widely accepted conclusions and instead attempts to

explain the growth of Neurontin sales over time almost solely as a function of detailing and

journal advertising expenditures.[52]  A simple comparison of sales and detailing expenditures

over time reveals that her attempt is misguided.  In the chart below I have plotted the data upon

which Professor Rosenthal relies on prescriptions and detailing and journal advertising

expenditures.[53]

---

[50] Mahajan, Vijay, Eitan Muller, and Frank M. Bass, "New Product Diffusion Models in Marketing: A Review and Directions for Research," Journal of Marketing, 54 (1), January 1990, p.2.

[51] See, for example, Berndt, Ernst R., "The U.S. Pharmaceutical Industry: Why Major Growth In Times Of Cost Containment?" *Health Affairs*, Volume 20(2), 2001, pp. 100-114; Berndt, Ernst R. , "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price," *The Journal of Economic Perspectives*, Fall 2002, pp. 45-66; Berndt, Ernst R., Robert Pindyck, and Pierre Azoulay, "Consumption and Diffusion in Pharmaceutical Markets: Antiulcer Drugs," *Journal of Industrial Economics,* LI(2), June 2003, pp. 243-270; Azoulay, Pierre, "Do Pharmaceutical Sales Respond to Scientific Evidence?," *Journal of Economics & Management Strategy*, Volume 11(4), Winter 2002, pp. 551-594; Coscelli, Andrea, and Matthew Shum, "An Empirical Model of Learning and Patient Spillovers in New Drug Entry," *Journal of Econometrics,* 122(2), 2004, pp. 213–246; Ching, Andrew, and Masakazu Ishihara, "The Effects of Detailing on Prescribing Decisions under Quality Uncertainty," *Draft Paper*, August 2006.

[52] Indeed, in two of Professor Rosenthal's models, detailing expenditure is the only factor that varies over time before the entry of generic competitors in October 2004.

[53] I analyze the actual data on detailing and journal advertising expenditures rather than the promotional stock variable as constructed by Professor Rosenthal.  However, similar results would have been obtained had I used her promotional stock variable.  I also include prescriptions of generic gabapentin which Professor Rosenthal did not include.



Neurontin / Gabapentin Prescriptions and Promotional Expenditures
Source:  Verispan VONA data; IMS Health IPS Data
(all numbers in millions)

53.   If, as Professor Rosenthal claims, promotion is the primary driver of prescriptions, an
increase in promotion should cause an increase in sales and a decrease in promotion should
cause a decrease in sales.  However, the chart shows that Neurontin prescriptions failed to
increase significantly following a dramatic increase in detailing in mid-2002.  Furthermore,
sales of Neurontin and its generic equivalent (gabapentin) continued to grow during the period
after generic entry when detailing expenditures fell to zero.  This implies that sources of
information other than detailing, such as direct experience, contributed to market adoption of
Neurontin and gabapentin.  Instead of being driven primarily by promotions, sales of Neurontin
instead follow the pattern one would expect as more physicians and consumers learn by
experience of its benefits for off-label uses.

54.   Exhibits 1A-1I chart Professor Rosenthal's promotional stock variable and Neurontin and generic gabapentin prescriptions for each indication-specialty pairing and for the high-dose share of Neurontin and gabapentin prescriptions.[54]  Professor Rosenthal included similar charts for her indication-specialty pairings in Attachment E of her declaration although she did not plot the data after 2004 and thus failed to show that prescribing of Neurontin and generic gabapentin continued despite the fact that promotion of Neurontin ceased and the promotional stock declined.  Professor Rosenthal also adjusted the axes in her charts so that promotions and prescriptions appear to occur on the same scale.  My charts maintain a constant relative scale of prescriptions to promotional stock across the eight indication-specialty pairings.  I have also broken out Professor Rosenthal's "baseline" promotions from her "spike" promotions (promotions occurring between August 2002 and October 2004) when she included separate variables for "spike" promotions in her regression models.[55]

55.   These charts frequently display a lack of close correlation between prescriptions and promotions—far less correlation than one would expect if promotion caused essentially 100 percent of prescriptions as Professor Rosenthal concludes for five of the eight indication-specialty pairings.  For example, bipolar prescriptions written by psychiatrists continued to increase for two years after promotions ended and promotional stock began to decline in 2001 (See Exhibit 1A).  The promotional stock for PHN specialties increased for several years (at

---

[54] In these charts, I use the same depreciation rates for promotion for each indication-specialty pairing as estimated by Professor Rosenthal in her regression models.  These depreciation rates are only correct if Professor Rosenthal's regression models are correctly specified, which they are not.  Academic research and revised models discussed later in this report show that promotion depreciates at much higher rates than Professor Rosenthal estimates.  In fact, Natalie Mizik and Robert Jacobson directly measured the impact of previous detailing expenditures on prescriptions and found that the impact of detailing largely disappeared within a year.  (Between 84 percent and 100 percent of the impact of detailing occurred within one year across the three drugs under study.)  See Mizik, Natalie and Robert Jacobson, "Are Physicians 'Easy Marks'? Quantifying the Effects of Detailing and Sampling on New Prescriptions," *Management Science*, Vol. 50, No. 12, 2004, pp. 1704-1715.

[55] Professor Rosenthal includes a separate "spike" promotions variable in the four regression models she estimates for PHN specialties and other specialties.