# EXHIBIT 29
# Part II

least through 1997) without any corresponding increase in prescriptions for neuropathic and nociceptive pain (see Exhibits 1E and 1F).[56]

56. The lack of a close correlation between prescriptions and promotions suggests that other factors affect Neurontin prescribing. Among these other factors, physicians' and their patients' own experiences with Neurontin are likely to be particularly important. This is because patients and physicians learn from their experiences using Neurontin—i.e., Neurontin is what economists call an "experience good"[57]—and such experiences, if positive, will influence patients to continue using Neurontin and physicians to continue prescribing it. If patients and physicians instead have negative experiences with Neurontin—i.e., Neurontin is ineffective or has bad side effects—physicians would not continue prescribing it and Neurontin's sales would decline over time. Indeed, it is not a viable long-term strategy to fraudulently promote a product that is ineffective because consumers (i.e., physicians and patients) will soon learn the product is ineffective and stop using it.[58]

57. Physicians who have been deposed in this case and the related Pennsylvania action note the importance of their own experience when making prescribing decisions. For example, Dr. Vithal Dhaduk testified that he began prescribing Neurontin for migraines when he noticed that

[56] Professor Rosenthal states that her figures "illustrate the common sense notion of a causal relationship between promotion and sales that the regression results express in more formal and precise terms." (Rosenthal Declaration, ¶41.) She thus suggests that the correlation observed between overall promotional stock, which includes "spike" promotions is suggestive of a causal relationship even though in three of four cases her own regression results found no effect of "spike" promotion. It is unclear why Professor Rosenthal failed to include separate measures of "baseline" and "spike" promotion in her charts after concluding "spike" promotion had no effect on prescriptions based on her regression results. These results directly contradict her supposedly "common sense notion."

[57] See Tirole, J. *The Theory of Industrial Organization*, MIT Press, 1988, p. 95; Nelson, P., "Advertising as Information," *Journal of Political Economy*, 82, August, 1974, pp. 729-754. Professor Ernst Berndt observes that "clearly, prescription drugs are predominantly experience goods." (Berndt, Ernst., "The U.S. Pharmaceutical Industry: Why Major Growth in Times of Cost Containment?," *Health Affairs*, 20(2), March, 2001, p. 111.) Professor Rosenthal also acknowledged in her deposition testimony that prescription drugs have the characteristics of experience goods. (Rosenthal Deposition, p. 257.)

[58] Professor Rosenthal has not cited any studies (and I am not aware of any) that have analyzed the impact of allegedly *fraudulent* promotion on prescriptions. As such, any comparison of her results to those from the academic literature is meaningless if her assumptions regarding the amount of allegedly improper promotion are correct.

patients taking Neurontin for epilepsy also experienced fewer headaches.[59] Dr. Michael Okin, the prescribing physician for a named plaintiff in the related Pennsylvania case, also agreed that his past experience with a medication influences his prescribing of that medication and that this has been true for Neurontin specifically.[60] Indeed, Dr. Okin testified that his past experience with Neurontin is the primary factor that influences his decisions to prescribe Neurontin.[61] Moreover, Defendants' medical experts agree that experience drives prescribing decisions.[62] Professor Rosenthal herself acknowledged that physicians' prescribing of Neurontin is likely to be influenced by their experiences using Neurontin.[63] Physicians deposed in this case and the related Pennsylvania matter also explain that these positive outcomes are not likely to be placebo effects because in many cases they had prescribed a number of other drugs before prescribing Neurontin and these other drugs did not improve

---

[59] Deposition of Dr. Vithal Dhaduk, 11/12/06, p. 33.

[60] Deposition of Dr. E. Michael Okin, 8/30/05, p. 20: "If you find the drug works in a similar situation, you would try it again." See also, pp. 29, 37-38, 44, 66-67. See also Deposition of Dr. Richard J. Brown, 8/18/05, p. 63: "Q. And did you consider your past observations about how the drug [Neurontin] had worked with other patients as part of the mix of things you considered in deciding whether to prescribe it? A. Yes." See also p. 10. See also Deposition of Dr. Gregory Rogers, 2/2/08, pp. 35-36; Deposition of Dr. Jerrold Gray, 2/6/08, pp. 102-104; Deposition of Dr. Rick T. Waldo, 2/1/08, pp. 27, 29-31; Deposition of Dr. John Arness, 2/13/08, p. 64; Deposition of Dr. Vithal Dhaduk, 11/12/06, pp. 48-49, 85-86, 195; Deposition of Dr. Kylene Huler, 11/1/06, pp. 40, 43-44, 65, 138; Deposition of Dr. Thaddeus Poe, 11/1/06, pp. 10-11, 22-23; and Deposition of Dr. Douglas Barrett, 12/7/04, pp. 52-53.

[61] Deposition of Dr. E. Michael Okin, 8/30/05, pp. 20, 38-39, 67. See also Deposition of Dr. Kylene Huler, 11/1/06, p. 40; Deposition of Dr. Rick T. Waldo, 2/1/08, p. 27; Deposition of Dr. Vithal Dhaduk, 11/12/06, pp. 48-49; Deposition of Dr. Thaddeus Poe, 11/1/06, pp. 22-23; Deposition of Dr. Gregory Rogers, 2/2/08, pp. 35-36.

[62] See Expert Report of Dr. Shawn Bird, 11/29/06, p. 6: "I, and many of my colleagues, use gabapentin as the first drug in neuropathic pain for two reasons. First, it clearly is as effective in my experience, if not more so, than any other drug available for this use. Second, it is the best tolerated drug for this use, with the least bothersome side-effects and no requirement for blood monitoring."; Expert Report of Alan M. Rapoport, 12/1/06, p. 3: "When gabapentin (Neurontin) became available, I tried it in many patients as it had fewer adverse events than the only approved antiepileptic divalproex sodium and less chance of a serious problem if a patient becomes pregnant compared with divalproex. I noticed that [Neurontin] helped close to half of the patients I put on it, and the rare patient who had to stop it did so because of drowsiness or weight gain, but never a more serious problem."; Expert Report of Andrew E. Slaby, M.D., PH.D., M.P.H, pp. 12-13: "Physicians also discover by their own personal experience and by colleagues sharing experience of both approved and off label uses of medications….I, myself, have used Gabapentin for the management of bipolar illness alone, as well as adjunctively, as well as for withdrawal phenomena and anxiety states. I have also used it for explosive personality disorder…. It clearly has brought many patients relief from painful psychological symptoms that other approved drugs failed to relieve or failed to completely relieve."

[63] Rosenthal Deposition, p. 257.

their patients' symptoms.[64] In addition, some physicians testified that patients who stopped taking Neurontin often experienced a return of their symptoms. For example, Dr. Robert Haynsworth testified that the benefits of Neurontin that his patient experienced were not due to the placebo effect because "when she stopped it, she got worse," which would not be seen with a placebo effect.[65]

58. Thus, the strong growth rates witnessed for Neurontin as well as the high demand for Neurontin and gabapentin still seen today suggest that physicians and patients have had positive experiences using Neurontin and that Neurontin is effective and meets patients' needs. This suggestion is borne out by the testimony of Defendants' experts and the physicians deposed in this case and the related Pennsylvania matter. Professor Rosenthal has completely failed to include any variable that measures or proxies for physician experience in her regression models despite stating that she would do so in her Class Certification Declaration.

### B. Professor Rosenthal's Failure to Account for Important Determinants of Neurontin Prescriptions Biases Upward Her Estimates of the Effects of Promotion

59. The omission of important explanatory factors from a regression model frequently leads to what economists refer to as "omitted variables bias."[66] Professor Rosenthal herself points out the consequence of omitted variables in her class certification reply declaration. She acknowledges that omission of relevant explanatory variables may yield biased, inaccurate

---

[64] Deposition of Dr. Thomas Graham, 10/3/08, pp. 72-73. See also Deposition of Dr. Gregory Rogers, 2/2/08, p. 35, and Deposition of Dr. Vithal Dhaduk, 11/12/06, pp. 234-235.

[65] Deposition of Dr. Robert F. Haynsworth, 1/1/08, p. 128. See also Deposition of Dr. Brian Ahlstrom, 9/30/08, pp. 23-24; and Deposition of Dr. Amy Fitzsimmons, 9/22/08, pp. 44-45.

[66] See, for example, *Reference Guide on Scientific Evidence*, 2nd Edition, Federal Judicial Center, 2000, pp. 188: "Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable. In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis. This may lead to inferences made from regression analyses that do not assist the trier of fact."

results.[67] More specifically, if the causal factors omitted from her model are correlated with promotional expenditures and prescriptions, her model will yield biased results that conflate the true effect of promotion with effects properly attributed to omitted variables. The very nature of Professor Rosenthal's promotional stock variable, which by construction increases over time, will lead it to be correlated with diffusion of information about physicians' positive experiences with Neurontin, which also increases over time. Because her regression models fail to include a separate measure of physicians' experience with Neurontin, her models incorrectly attribute the effects of physicians' experiences to promotional expenditures, thereby substantially upwardly biasing her estimates of the effect of promotion on prescriptions.

60. There are variables available that Professor Rosenthal could have included in her regression models to attempt to proxy for physicians' experience. Indeed, variables known as "time trends" are frequently used in the literature and in Professor Rosenthal's own academic work for this purpose.[68] Time trends measure time since market entry and thus reflect or act as a proxy for increases in market awareness caused by the natural diffusion of information as physicians learn about Neurontin from, among other things, their own and others' experiences. In her Class Certification Declaration, Professor Rosenthal explicitly acknowledged that she

---

[67] Rosenthal Pennsylvania Surrebuttal Declaration, ¶12: "...[O]mitted variables ... introduce bias (that is, distort the estimate of the effect) when they are correlated with the variable of interest." (internal citation omitted).

[68] See Donohue, Julie, Ernst Berndt, Meredith. Rosenthal, Arnold Epstein, and Richard Frank, "Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression," Medical Care, 2004; and Rosenthal, Meredith., Ernst Berndt, Julie Donohue, Arnold Epstein, and Richard. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," Ch. 1 in Alan M. Garber, ed., Frontiers in Health Policy Research, Vol. 6, Cambridge, MA: MIT Press for the National Bureau of Economic Research, June 2003. Academic research has also attempted to control for experience by including past sales as an explanatory factor. Berndt, Pindyck, and Azoulay find that the level of past sales has a positive impact on the rate at which a drug diffuses in the marketplace, after controlling for promotional effort. See Berndt, Ernst R., Robert Pindyck, and Pierre Azoulay, "Consumption and Diffusion in Pharmaceutical Markets: Antiulcer Drugs," *Journal of Industrial Economics,* LI(2), June 2003, pp. 243-270. Mizik and Jacobson find that past sales have a positive impact on current sales after controlling for past and current promotional efforts. See Mizik, Natalie and Robert Jacobson, (2004) "Are Physicians 'Easy Marks'? Quantifying the Effects of Detailing and Sampling on New Prescriptions," *Management Science*, Vol. 50, No. 12, pp. 1704-1715..

should include a time trend in her model.[69] Moreover, when Professor Rosenthal was questioned in her deposition about a number of additional factors that affect prescriptions but that she would be unable to measure and therefore include in her model, she noted that she would include time trends in her model as a proxy for those omitted variables and thus account for their effects:

> [T]here are elements of the model intended to capture some of these other factors. For example, by using time trends, linear quadratic time trends to capture other secular trends in what's happening in the market by including variables on other drugs. So certainly those factors would be considered and incorporated either explicitly or captured in the time trend, the secular trend.[70]

61. Professor Rosenthal has also noted that "[i]n the economic literature on promotion of pharmaceuticals, the age of a drug or time since entry is nearly always included."[71] Moreover, Professor Rosenthal's published academic research points out that time trends are important to include in regression models when the analysis depends (just as it does in this case) on variation over time in promotional spending. For example, in a study of the effect of direct-to-consumer advertising and detailing on the likelihood that a patient diagnosed with depression would receive medication, Professor Rosenthal observed:

> Given that our analytical strategy relied on temporal variation in promotional spending and treatment patterns, we included linear and quadratic monthly time trends in the analyses to adjust for secular trends in the treatment of depression.[72]

[69] Rosenthal Class Certification Declaration, ¶33. She stated she would include "time since market entry (which measures market awareness)…."

[70] Rosenthal Deposition, 10/25/06, p. 337. See also Rosenthal Deposition, 10/25/06, p. 454: "You want to correctly specify the time relationships, in particular in this model . . . with regard to whether it's a linear trend or a quadratic trend, these specification issues are important for getting good estimates as well."

[71] Rosenthal Class Certification Reply Declaration, ¶21.

[72] Donohue, J., E. Berndt, M. Rosenthal, A. Epstein, and R. Frank, "Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression," Medical Care, 2004, p. 1178.

62. Professor Rosenthal also included linear and quadratic time trends in a study of the effects of detailing and direct-to-consumer advertising on pharmaceutical sales and again explicitly acknowledged the importance of these variables as a means of accounting for trends in the marketplace.[73]

63. In sum, Professor Rosenthal has failed to account for numerous factors in her regression models that affect physicians' prescribing decisions including physicians' past experience with Neurontin. She has also failed to include time trends in her models even though time trends could reflect or proxy for some of the factors she omits from her models. She fails to include time trends despite including them in the model she proposed in her Class Certification Declaration and stating in her deposition that she would include them to proxy for physician experience and other variables she fails to include in her models. She also fails to include time trends despite repeatedly noting in her academic work the importance of including time trends in similar models. Her omission results in upwardly biased estimates of the effects of promotions on prescriptions.

## VII. Professor Rosenthal's Model Specifications Are Results-Driven and As Such Violate Acceptable Econometric Practice

64. Despite outlining in her current Declaration a model specification that includes a constant term, a single promotions variable, a Neurontin price variable, and competitor price and promotion variables, Professor Rosenthal only implements such a model for two of the eight indication-specialty pairings she analyzes. Her remaining models differ from the model she outlines by 1) omitting a constant term, 2) omitting competitor price and promotion variables,

[73] See Rosenthal, M., E. Berndt, J. Donohue, A. Epstein, and R. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," Ch. 1 in Alan M. Garber, ed., Frontiers in Health Policy Research, Vol. 6, Cambridge, MA: MIT Press for the National Bureau of Economic Research, June 2003, p. 16.

and/or 3) including a variable that measures "spike" promotions. There is no basis in economic theory for these deviations from the model outlined in her Declaration. For example, there is no reason to expect *a priori* that competitor prices and promotions will have an effect on, say, neurologists prescribing for nociceptive pain, but will not have an effect on other specialties' prescribing for the same indication. Yet Professor Rosenthal's analysis includes competitor price and promotion in her regression models for nociceptive pain prescriptions written by neurologists and PHN specialties and excludes them in her regression model for nociceptive pain prescriptions written by other specialties.

65. Professor Rosenthal's treatment of the constant term violates accepted econometric principles, is inconsistent with accepted econometric practice, and also violates the guidelines she previously articulated as to the circumstances under which the omission of a constant term is justified. In her deposition for the related Pennsylvania case, Professor Rosenthal testified that both economic theory and statistical significance justified her exclusion of a constant term from her regression model. Her theoretical justification for excluding the constant term was that a constant term allows the model to forecast a baseline level of prescriptions to occur when promotional expenditures are zero but there is no reason to expect any prescriptions to occur without promotions.[74] Her statistical justification was that she tested the constant term in her

[74] Rosenthal Pennsylvania Deposition, p. 129, Rosenthal Frye Motion Hearing Testimony, 8/18/08, p. 117. Without a constant term, the model as outlined in Professor Rosenthal's Declaration (Attachment F, ¶1) assumes that the baseline level of prescriptions is zero and therefore predicts that zero prescriptions would occur if promotions and other variables in the model were zero. The same is true for the log-log model that Professor Rosenthal actually estimates, except that in her log-log model, a constant would allow for a baseline level of log prescriptions to occur when the log value of other explanatory variables (promotions and prices) are all equal to zero. However, note that in a log-log model such as that used by Professor Rosenthal, if any explanatory variable (including promotional expenditures) is zero prior to being logged, prescriptions must be zero regardless of whether there is a constant term. The log of zero is minus infinity. For this reason, log-log models are not typically used when an explanatory variable takes on a zero value.

model and excluded it because it was not statistically significant.[75] She agreed, however, that she most likely would have included a constant term in her model if it had been statistically significant.[76]

66. Professor Rosenthal cannot use either economic theory or statistical significance to support her inclusion or exclusion of constant terms in this case. First, while I strongly disagree with her premise that there is no reason to expect any sales of Neurontin to occur without detailing expenditures, if Professor Rosenthal truly believes this to be the case, then she should not estimate any models with a constant term or include a constant term in the model she outlines in her Declaration.[77] Second, the constant term is not statistically significant in either of the two regression models in which she includes it. In addition, when added to the six models from which she excludes a constant term, the constant term is statistically significant for four of those models. Thus her decisions in this case as to when to include a constant term in her regression models directly contradict her prior testimony from the Pennsylvania matter regarding when it is appropriate to include a constant term.[78]

67. Professor Rosenthal's regression results are very sensitive to the inclusion or exclusion of a constant term, competitor variables, and/or "spike" promotions; the estimated effects and statistical significance of promotion often change dramatically as her set of explanatory variables changes. For example, the *inclusion* of her competitor variables in her model for migraine prescriptions causes the estimated effect of promotion to become negative. However,

[75] Rosenthal Pennsylvania Deposition, pp. 129-130, Rosenthal Frye Motion Hearing Testimony, 8/18/08, p. 117. However, in a more correctly specified model that includes time trend variables and the constant term is statistically significant.

[76] Rosenthal Pennsylvania Deposition, p. 139.

[77] Rosenthal Declaration, Attachment F, ¶1.

[78] I do not agree with Professor Rosenthal's view that it is an appropriate statistical procedure to base the decision of whether or not to include a constant term in a regression model on its statistical significance.

for neuropathic and nociceptive pain indications written by PHN specialties, the *exclusion* of her competitor variables in these models causes the estimated effect of promotion to become negative. For PHN specialties, when Professor Rosenthal's baseline / spike specification of promotional stock is replaced with a single promotional stock specification, the number of prescriptions purportedly caused by promotion falls dramatically. Similarly, for five of the six regression models in which Professor Rosenthal excluded a constant term, the addition of a constant term results in either statistically insignificant or negative effects of promotional expenditures.

68. When trying to justify her choice of model in the related Pennsylvania case, Professor Rosenthal stated in her deposition that because she knew promotions must have a positive effect on prescriptions, she rejected models that did not find such an effect.[79] She appears to follow the same approach in this case, i.e., her choice of the variables included in her regression models appears to be based on whether their inclusion or exclusion yields positive and statistically significant effects of promotional expenditures on prescriptions.[80] Such a results-driven choice of explanatory variables is not acceptable econometric practice and her estimates of the effect and statistical significance of promotions on the number of Neurontin prescriptions have no scientific meaning or validity.[81]

---

[79] Rosenthal Pennsylvania Deposition, pp. 171-172. See also Rosenthal Frye Motion Hearing Testimony, 8/18/08, p.p. 99-100.

[80] Moreover, she apparently chooses an autoregressive error structure based on the results it yields rather than on accepted statistical tests to determine the appropriate error structure. (See ¶97.)

[81] While Professor Rosenthal rejects models that do not find a positive and statistically significant effect of her baseline promotions variable, she does not reject models when the estimated effects of other variables do not comport with economic theory. For example, economic theory predicts that as the relative price of competitor products increases, Neurontin sales should increase as consumers move towards what is now a relatively cheaper product. Professor Rosenthal includes competitor prices in six of her models and in three of them she estimates a negative, albeit statistically insignificant, effect of competitor prices on Neurontin prescriptions. She does not reject these models. Similarly, for one of her models (neuropathic pain prescriptions written by neurologists), generic entry (as measured by Professor Rosenthal's Neurontin price variable) is estimated to have a positive and insignificant effect on Neurontin prescriptions when we would expect a negative effect given the dramatic decrease

69. Moreover, there is no consensus in the academic literature that promotions have a large effect on prescribing. Indeed, in a 2004 article by Natalie Mizik and Robert Jacobson, the effects of detailing are found to be modest and the authors conclude that previous research has overstated the effects of promotion by failing to adequately control for factors such as physician experience.[82] They also find that promotion depreciates much more quickly than Professor Rosenthal claims.[83] The authors note several reasons why detailing may not greatly influence physicians including physicians' "skeptical and negative attitudes" toward sales reps and their greater reliance on their own experiences with a drug.

## VIII. Application of a Single Revised Model, Consistent with what Professor Rosenthal Originally Proposed, Fails to Demonstrate a Statistically Significant Relationship between Promotional Spending and Off-label Prescriptions

70. Two flaws in Professor Rosenthal's regression models that are of particular significance are her omission of a constant term and her omission of time trends; both omissions make her models inconsistent with standard econometric practices and, indeed, her own proposed model and prior academic research.[84] Correcting these flaws substantially diminishes the estimated

---

in Neurontin prescriptions that occurred with generic entry. This result did not cause Professor Rosenthal to reject the model. Professor Rosenthal also accepts all four models in which she includes "spike" promotions even though three of four models demonstrate that "spike" promotions had no effect on prescriptions. She offers no explanation for why a finding of insignificant effects of promotion justifies rejecting some models, but not others.

[82] Mizik, Natalie and Robert Jacobson, (2004) "Are Physicians 'Easy Marks'? Quantifying the Effects of Detailing and Sampling on New Prescriptions," *Management Science*, Vol. 50, No. 12, pp. 1704-1715.

[83] Mizik and Jacobson study three drugs and conclude that 84 percent, 96 percent, and 100 percent, respectively, of the impact of detailing visits occurs within twelve months. By comparison, at *most* 11 percent of the impact of detailing occurs within twelve months in seven of the eight models that Dr, Rosenthal estimates, and in four of her models, she reports the wholly implausible result that detailing effects *never* depreciate – the persistence of detailing is infinite. Note that Professor Rosenthal does not directly estimate the effect of depreciation as do Mizik and Jacobson but rather infers the level of depreciation.

[84] Rosenthal Class Certification Declaration, ¶33; Rosenthal Deposition, pp. 336-337; Donohue, J., E. Berndt, M. Rosenthal, A. Epstein, and R. Frank, "Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression," *Medical Care*, 2004; Rosenthal, M., E. Berndt, J. Donohue, A. Epstein, and R. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," Ch. 1 in Alan M. Garber, ed., *Frontiers in Health Policy Research*, Vol. 6, Cambridge, MA: MIT Press for the National Bureau of Economic Research, June 2003.

effect of promotional expenditures on prescriptions. In fact, simply adding a constant term and linear and quadratic time trends to Professor Rosenthal's indication-specialty regression models and high dose regression model results in her models ceasing to show any positive, statistically significant effect of promotion on prescriptions.

71. In contrast to Professor Rosenthal's decision to use different model specifications across the eight different indication-specialty pairings and the high-dose share model, I have estimated regression models using a consistent set of explanatory factors similar to that set of explanatory factors originally proposed by Professor Rosenthal. These factors include a constant term, time trends, Professor Rosenthal's price ratio variable, and a single promotional variable measuring detailing and journal advertising expenditures. The model excludes Professor Rosenthal's competitor variables because, as discussed in more detail below, these variables do not measure in any meaningful way the prices and promotions of drugs that compete with Neurontin.[85] While the revised models do not correct all of the flaws present in Professor Rosenthal's models, a comparison of the results of these models with the results of the models reported by Professor Rosenthal demonstrates the sensitivity of Professor Rosenthal's regression results to changes in the set of explanatory factors used (see Exhibits 2A – 2H).

72. As revised, none of the models demonstrates a statistically significant effect of detailing and journal advertising expenditures on prescriptions.[86] The estimated coefficients on promotional expenditures—i.e., the estimated impact of promotions on prescribing—are positive but statistically indistinguishable from zero in seven of the eight models and negative

---

[85] I have chosen the appropriate autoregressive error structure for each indication-specialty pairing based on the Breusch-Godfrey LM test.

[86] Including Professor Rosenthal's competitor price and promotion variables in the models does not significantly change the estimated effects of promotion.

but statistically indistinguishable from zero in the eighth model. In all eight models, the time trends are jointly statistically significant and are important determinants of prescriptions.[87] The dramatically different results of the revised regression models demonstrate that Professor Rosenthal's results are highly sensitive to changes and suggest that her decision to depart from the model she originally proposed was driven by results rather than theory.[88]

73. Professor Rosenthal's high-dose regression model suffers from the same flaws as her indication-specialty regression models, including the omission of a constant term and time trends. A comparison of the results of a revised high-dose regression model with the results of the model estimated by Professor Rosenthal is shown in Exhibit 2I. Similar to Professor Rosenthal's indication-specialty models, when her high-dose model is revised to include a constant term and time trends, the model identifies no statistically significant effect of promotion on the share of prescriptions that are high dose.[89]

74. As already noted, Professor Rosenthal claims that a model that does not find positive and statistically significant effects of promotion should be rejected. This is simply not correct. First, as explained in the previous section, there is no consensus in the academic literature that promotion has a large effect on prescribing. Second, the lack of statistical significance is not at

[87] A formal statistical test (an F test) demonstrates that linear and quadratic time trends are jointly significant; the probability that the time trend coefficients are jointly zero is less than one in 10,000.

[88] A formal statistical test (an F test) strongly rejects Professor Rosenthal's assumption that the constant term and time trend coefficients all have a true value of zero. Given the estimated values for the constant and time trend coefficients in the revised model, the probability that the true values are jointly zero is less than one in 10,000 (i.e., the p-value for the F test is less than 0.0001). It is important to note that if a constant term and time trends did not help to explain the observed number of prescriptions, their inclusion would not change the estimated effects of other variables in her model, including promotions. My corrections thus act as a test of Professor Rosenthal's model. In other words, the model is not forced to find any relationship between these variables and prescriptions. The fact that the revised regression model yields such dramatically different estimates of the effect of promotions demonstrates that Professor Rosenthal has inappropriately excluded variables from her regression model, and that her results crucially depend on those inappropriate exclusions.

[89] Exhibit 2I displays the results when the same set of explanatory variables used in the revised indication-specialty regressions is used for the high-dose share model. The effect of promotional expenditures is not statistically significant if the only change to Professor Rosenthal's high-dose share model is the inclusion of time trends and a constant term.

all surprising given the small number of observations—at most 45—available for analysis, the large amount of measurement error in Professor Rosenthal's dependent variable,[90] and the lack of cross-sectional variation in her data. One cannot conclude from a model that does not find statistically significant effects of promotion that promotion had no effect. Instead such a model only indicates that the effect of promotion falls within a wide range of possible values including zero. As a result, the true effect of promotion, if any, cannot be determined because the data and model structure that Professor Rosenthal used do not allow one to precisely estimate it.

## IX. Professor Rosenthal's Previously Articulated Reasons for Excluding Time Trends Are Not Defensible

75. Despite her previous insistence that she would include time trends to remove any biases introduced by omitting from her regression model other factors that drive Neurontin's sales, Professor Rosenthal has now excluded time trends from her regression models. In prior testimony for the related Pennsylvania case, she has put forward two defenses for the exclusion of time trends:

- Because time trends are correlated with promotional expenditures, she cannot separate the effects of both variables and thus she must exclude time trends from her model.[91]

---

[90] Professor Rosenthal relies on NDTI data to estimate the share of prescriptions that are high dose as well as the number of prescriptions for each indication-specialty pairing. NDTI data are based on a fairly small sample of physicians and its projected numbers can have margins of error of 60 percent or higher. (National Disease and Therapeutic Index, Drug Volume 1, 1Q 2006.) The lack of precision of the NDTI data is reflected in the large swings in prescriptions for each indication and specialty and in the share of prescriptions that are high dose, as displayed in Exhibit 1A-1I.

[91] Rosenthal Pennsylvania Deposition, pp. 162, 171-172, 179; Rosenthal Frye Motion Hearing Testimony, 8/18/08, pp. 96, 99-100.

- Her autoregressive (AR) model accounts for time in a different way and thus time trends are unnecessary.[92]

Neither of these defenses justifies her exclusion of time trends.

### A. Time trends should be included in the regression model precisely because they are correlated with promotions

76. Professor Rosenthal claims that the correlation between time trends, which trend up over time, and her promotional stock variable, which also trends up over time, makes it infeasible to include both time trends and promotional stock in her regression models and still obtain valid estimates of the effects of promotion.[93] The exact opposite is true. By omitting time trends she attributes to promotion the effects of *every* factor that trends up over time. Thus, she does not measure the effects of promotion at all. Instead, through her promotional stock variable, she has captured the aggregate effect of (1) promotions, (2) physicians' past experience with Neurontin, (3) other increases in the information available to physicians about Neurontin's efficacy and side effects from sources such as scientific publications or news about approvals in other countries, and (4) any other factor affecting Neurontin prescriptions that trends up over time (e.g., news about the effectiveness of other AEDs for off-label indications). Her estimates reveal absolutely nothing about the effects of promotion alone on Neurontin's sales.[94]

---

[92] Rosenthal Pennsylvania Deposition, p. 164; Rosenthal Frye Motion Hearing Testimony, 8/18/08, p.116.

[93] Rosenthal Pennsylvania Deposition, pp. 162, 171-172, 179; Rosenthal Frye Motion Hearing Testimony, 8/18/08, p. 96.

[94] Professor Rosenthal notes that unlike other researchers who study multiple drugs, she is only studying one drug and therefore cannot use variation in promotional levels across drugs to identify and estimate the effects of promotion. This data limitation cannot be used as an excuse to lump together the effects of other time varying factors and attribute all those effects to promotion. Moreover, Professor Rosenthal exaggerates the supposed "collinearity" problem. If time trends and promotional stock were perfectly collinear, the model could not be estimated. If they were almost perfectly collinear, neither the effect of promotions nor the effect of time trends would be statistically significant. Instead, time trends are jointly significant while promotions are not. This suggests that simple time trends explain prescriptions better than promotions do. This result is consistent with the role of experience and other factors in prescription writing and is not a justification for Professor Rosenthal to reject models with time trends.

77. Moreover, the data contradict Professor Rosenthal's justification for the exclusion of time trends from her model. She argues that time trends and promotional expenditures are so highly correlated that their effects cannot be distinguished. In fact, the revised models *are* able to distinguish between the effects of time trends and the effects of promotional expenditures. These models find that time trends are jointly statistically significant and her promotion variable is not. This means, contrary to Professor Rosenthal's claim, that promotion is not the only variable driving prescriptions and that other variables that trend up over time do have a statistically significant effect on off-label prescriptions. That is, holding promotion constant, other variables that trend over time affect off-label prescriptions. The fact that the promotions variable is statistically insignificant when time trends are included in the regression models indicates that Professor Rosenthal's regression models inappropriately attribute to promotional expenditures the effects of other factors and that time trends are better able to explain prescriptions than the promotions variable—i.e., other factors are more important than promotions in explaining prescriptions. Professor Rosenthal has no justification for attributing all the effects of these other factors to promotion.

### B. AR models do not substitute for time trends and will not solve omitted variables bias

78. Professor Rosenthal has claimed that she does not need to use time trends because she has implemented an autoregressive ("AR") model, i.e., a model that accounts for autoregressive correlation in the error term.[95] This claim is simply wrong and contrary to accepted econometric teaching. AR models do not and cannot prevent variables included in

[95] The use of an AR model is appropriate when error terms are correlated over time so that the value of the error term for one observation provides information about what the value of the error term will be in subsequent time periods. When this happens the standard errors from a simple regression model are not correct. A correctly specified AR model will provide correct standard errors and thus provide an accurate measure of the statistical significance of the estimates.

the model from incorrectly capturing the effects of the omitted variables with which they are correlated.[96] Indeed, in her deposition for the related Pennsylvania case Professor Rosenthal conceded that (1) AR models cannot be used to solve omitted variables bias, (2) AR models are not a substitute for time trends and (3) she knows of no researcher that has substituted an AR model for time trends.[97]

## X. Professor Rosenthal's Analysis Suffers from Several Additional Flaws

79. Professor Rosenthal's analysis suffers from several flaws outside of her failure to objectively choose which variables to include in her regression models. Below, I outline some of the most important additional flaws.

### A. Professor Rosenthal Incorrectly Deflates Promotional Expenditures

80. Professor Rosenthal has attempted to account for the effects of inflation on detailing and journal advertising expenditures over time. However, because of a computational error in her computer program, she has "deflated" promotional expenditures incorrectly for her indication-specialty regressions.[98] When this error is corrected, her estimated effects of promotion change

[96] Not only do AR models not solve omitted variables bias, the presence of autoregressive errors is often an indication of omitted variable bias as is discussed in the documentation to the regression package used by Professor Rosenthal. See EViews 6 User Guide, Volume 2, p. 68: "Before you [estimate an AR model], you may first wish to examine your model for other signs of misspecification. Serial correlation in the errors may be evidence of serious problems with your specification. In particular, you should be on guard for an excessively restrictive specification that you arrived at by experimenting with ordinary least squares. Sometimes, adding improperly excluded variables to your regression will eliminate the serial correlation."

[97] Rosenthal Pennsylvania Deposition, pp. 184-185.

[98] Professor Rosenthal attempts to deflate promotional expenditures to 1984-86 dollars. To do so, she uses the consumer price index published by the Bureau of Labor Statistics, which sets 1984-86 equal to 100. To deflate expenditures for a particular year to 1984-86 dollars, she must divide the expenditures by the CPI index value for the relevant year and then multiply by 100. For her indication-specialty regressions, however, Professor Rosenthal fails to multiply by 100. (See Professor Rosenthal's computer program titled "delta_phn_ips_forecast_rev.prg".) As a result her promotional expenditures are scaled incorrectly. Because she estimates log models without constant terms, Professor Rosenthal's error directly affects her coefficient estimates. This highlights another problem with her exclusion of constant terms. The scale used to measure promotional expenditures should have no effect on the

and for two of her indication-specialty pairings—neuropathic pain prescription written by PHN and other specialties—the effects are no longer statistically significant. Allegedly fraudulent neuropathic pain prescriptions written by PHN specialties and other specialties account, respectively, for $880 million and $454 million of Dr. Hartman's damages, all of which should be excluded if promotional expenditures do not have a significant effect on prescriptions.[99]

### B. Professor Rosenthal Claims that Allegedly Improper Promotion Caused More Prescriptions than Actually Were Written

81. A clear indication that Professor Rosenthal's results are overstated is that her analysis predicts that more prescriptions were caused by allegedly improper promotion than actually occurred. The table below lists the number of "fraudulent prescriptions" Professor Rosenthal claims were caused by allegedly improper promotions for five indication-specialty pairings based on her regression analysis. The table also includes the actual number of prescriptions purchased for these five indication-specialty pairings.

| Indication | Actual Prescriptions | Professor Rosenthal's Estimates of "Fraudulent Prescriptions" | "Fraudulent Prescriptions" as a Percent of Actual Prescriptions |
|---|---|---|---|
| Bipolar/Mood Disorders | 10,266,293 | 10,449,467 | 102% |
| Neuropathic Pain | | | |
| Other Specialties | 5,255,139 | 5,395,538 | 103% |
| PHN Specialties | 10,037,247 | 10,436,997 | 104% |
| Nociceptive Pain | | | |
| Other Specialties | 1,773,210 | 1,917,503 | 108% |
| PHN Specialties | 4,192,194 | 4,659,167 | 111% |

Note: Actual prescriptions are calcuated from Professor Rosenthal's own data (Verispan VONA) for the relevant time period. Professor Rosenthal's estimates of "Fraudulent Prescriptions" are from Attachment H of her Declaration. Neither actual prescriptions nor Professor Rosenthal's estimates of "Fraudulent Prescriptions" include mail order prescriptions or prescriptions purchased by other government entities.

estimated effects of promotion and does not have an effect in models with constant terms. Without constant terms, however, the estimated effects of promotion depend on the scale used to measure promotions.

[99] Hartman Declaration, Table 1.

82. As the table shows, Professor Rosenthal claims that the allegedly improper promotion "caused" more "fraudulent prescriptions" than the actual number of prescriptions purchased for these five indication-specialty pairings during their respective class periods. Professor Rosenthal then scales these numbers up to include mail-order and other government purchases and passes her inflated estimates to Dr. Hartman, who computes purported damages based on Professor Rosenthal's numbers. Her estimates are anywhere from 2 percent to 11 percent higher than the actual number of prescriptions purchased and in total she estimates that 1.4 million more prescriptions were caused by the allegedly improper promotion that the actual number of prescriptions purchased (before she inflates her estimates further for mail order and other government purchases). The fact that her models predict more fraudulent prescriptions to have occurred than the actual number of prescriptions that occurred further demonstrates the unreliability of her models. Improper promotion could not have caused more prescriptions to have been purchased than the actual number of prescriptions purchased.

### C. Professor Rosenthal Fails to Estimate Empirically the Effects, If Any, of Allegedly Improper Promotion as Opposed to the Effects of All Promotion

83. Despite stating in her Class Certification Declaration that she would analyze empirically the effects of allegedly improper promotion, while controlling for proper promotion and other factors, in fact her regression models do not even attempt to estimate the effects of allegedly improper promotion. Instead, her regression models estimate the effect of *all* detailing and journal advertising expenditures, regardless of whether they were improper or proper.

84. In her Class Certification Declaration Professor Rosenthal outlined a very different model that would include variables for both allegedly improper and proper promotion. By doing so, she would let the data determine whether there was a statistically significant causal relationship

between allegedly improper promotion and off-label prescribing, holding constant the effects of other market factors that drive off-label prescribing. Instead, she has combined all promotion into a single variable and estimated the effect of promotion overall, instead of allegedly improper promotion alone. If there is any effect of promotion, she takes that as evidence that there is also an effect of the allegedly improper promotion, but her models provide no direct evidence that any improper promotion took place or that allegedly improper promotion affects off-label prescriptions. By failing to estimate the effects of allegedly *improper* promotion on off-label prescribing, Professor Rosenthal has provided no empirical evidence of causation.[100]

### D. Professor Rosenthal Assumes that Improper Promotions Began Earlier than Plaintiffs Allege

85. Professor Rosenthal assumes that the allegedly improper promotion occurred much earlier than Plaintiffs are currently alleging, which in turn is much earlier that Plaintiffs' originally alleged. In fact, for every subclass except the migraine subclass Professor Rosenthal assumes that improper promotion began in the first quarter of 1994 when Neurontin entered the market. Plaintiffs alleged that improper promotion began at least a year later. The table below summarizes Plaintiffs' original and current allegations regarding the onset of allegedly

[100] Rosenthal Class Certification Declaration, ¶¶33-36. Plaintiffs' counsel has suggested that Defendants' expert, Professor Fiona Scott Morton, in her class certification declaration criticized Professor Rosenthal's model as too complicated and pointed to a model estimated by Dr. Pradeep Chintagunta as having an advantage over the model proposed by Professor Rosenthal because it only estimated a single promotional variable. (Class Plaintiffs' Response to Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Second Motion for Class Certification, *In re Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, 10/2/08, p. 7-8.) Plaintiffs have misrepresented Professor Scott Morton's criticism. She opined that Professor Rosenthal's proposed model, which included separate variables for proper and improper promotion, would likely be infeasible to estimate. She did not opine that a simpler model with a single promotional variable that combined proper and improper promotion would be more appropriate. (Declaration of Fiona Scott Morton, 12/21/06, ¶70)

improper promotion for each subclass, along with Professor Rosenthal's assumed start dates of allegedly improper promotion.[101]

| Subclass | Plaintiffs' Original Start Date of Allegedly Improper Promotions | Plaintiffs' Current Start Date of Allegedly Improper Promotions | Professor Rosenthal's Start Date of Allegedly Improper Promotions |
|---|---|---|---|
| Bipolar/Mood Disorders | May 1997 | November 1995 | March 1994 |
| Migraine/Headache | April 1996 | September 1995 | July 1995 |
| Neuropathic Pain | 1997 | July 1995 | January 1994 |
| Nociceptive Pain | 2000 | September 1995 | January 1994 |
| Doses> 1800 mg/day | 1995 | March 1995 | January 1994 |

86. Although Professor Rosenthal limits her estimates of "fraudulent" prescriptions to the Plaintiffs' alleged class periods (e.g., July 1995 – December 2004 for neuropathic pain), by assuming that improper promotion began earlier than the class period, she inflates her estimates of "fraudulent" prescriptions occurring during the class period. This is because she measures promotion as a cumulative stock so promotions that occurred prior to the class period still have an effect on prescriptions that occurred during the class period. As a result, according to Professor Rosenthal's analysis, some of her supposedly "fraudulent" prescriptions were caused by promotion that is not even alleged to be improper because it occurred prior to the class period.

[101] Plaintiffs' original alleged start dates of allegedly improper promotion are from Class Plaintiffs' Post-Argument Submission in Support of Class Certification, In Re Neurontin Marketing, Sales Practices and Products Liability Litigation, MDL Docket No. 1629, Master File No. 04-10981, filed May 25, 2007; Plaintiffs' current alleged start dates of fraudulent promotion are from Plaintiffs' Renewed Motion for Class Certification, In Re Neurontin Marketing, Sales Practices, and Products Liability Litigation, MDL Docket No. 1629, Master File No. 04-10982, filed December 18, 2007; Professor Rosenthal's assumed start dates of allegedly improper promotion are from the Declaration of Meredith Rosenthal, Attachment I.4 and Rosenthal production file "1994-2001.xls"

### E. Professor Rosenthal's "Competitor" Variables Fail to Measure the Competitive Environment Faced by Neurontin

87. For six of her eight indication-specialty regression models, Professor Rosenthal includes "competitor" price and promotion variables for drugs she claims are the largest competitors to Neurontin. These variables purport to measure prices and detailing and journal advertising expenditures for the five drugs with the highest usage levels for each of the indication subclasses.[102] Professor Rosenthal offers no economic or pharmacological analysis to support her conjecture that these drugs are the relevant set of competitors for Neurontin. Moreover, these drugs are inconsistent with the drugs Dr. Hartman claims are the relevant set of competitors in his alternative damages analysis performed for Kaiser, one of the Coordinated Plaintiffs. There are several additional flaws with Professor Rosenthal's "competitor" price and promotion variables.

88. First, when choosing the five drugs with the highest usage levels, Professor Rosenthal relies on usage data for 2002 through first quarter 2007. Thus, the basis of her choice of "competitor" drugs for each subclass fails to factor in how the drugs with the largest number of uses for a particular indication have changed over time and in particular which drugs had the largest number of uses early in the class period. As an example of why this is problematic, consider the nociceptive and neuropathic pain indications, where three of the five drugs she has chosen as so-called competitors were not introduced until well after 1994 (Celebrex and Vioxx were introduced in 1999 and Bextra was introduced in 2001). Moreover, two of the drugs (Vioxx and Bextra) were no longer on the market as of 2004 and 2005, respectively,[103] and a

[102] For the bipolar subclass, Professor Rosenthal includes nine drugs when measuring her competitor variables.

[103] See http://health.law360.com/print_article/73164 and http://health.law360.com/print_article/73358.

black box warning was added to Celebrex in 2005.[104] Thus, Professor Rosenthal's "competitor" price and promotion variables fail to include information on the drugs that have the largest number of uses for a particular indication at the beginning of the class period. As this example shows, they also fail to account for relevant news that is likely to affect the competitive pressure the drugs she has chosen place on Neurontin sales.

89. Second, Professor Rosenthal's "competitor" promotions variable also fails to measure the significant direct-to-consumer advertising that occurred for many of her "competitor" drugs. Vioxx and Celebrex (for nociceptive and neuropathic pain) and Paxil and Zoloft (for bipolar) all have significant direct-to-consumer advertising expenditures. Professor Rosenthal has ignored such expenditures.[105]

90. Third, Professor Rosenthal's "competitor" price variable does not accurately reflect the cost of treatment for Professor Rosenthal's so-called competitors. Her price measure is based on the price per pill and ignores the fact that different drugs require a different number of pills to be taken per day. For example, if a patient needs to take four pills a day for a drug that costs $0.50 per pill, the daily cost is $2.00. This drug would be more expensive than a drug that costs $1.00 per pill but requires only one pill per day. Professor Rosenthal's measure—which would average the $0.50 and $1.00 price per pill—ignores the fact that the daily cost of treatment for the first drug is greater than the daily cost of treatment for the second drug. It also fails to accurately reflect how the introduction of new strengths affects the cost of treatment for a particular drug (as opposed to the cost per pill) and how the introduction of a new drug (e.g., Vioxx in 1999) affects the average cost of treatment across all the competitors (as opposed to the average cost per pill). The price per pill provides little information on the

[104] http://www.fda.gov/cder/foi/appletter/2005/020998s018,019ltr.pdf

[105] Neurontin was not advertised directly to consumers.

daily cost of treatment for her competitor drugs relative to each other and relative to Neurontin and, as a result, her "competitor" price index is a meaningless measure of prices.

91. Lastly, Professor Rosenthal also fails to correct for endogeneity of competitor prices and promotions and assumes without basis that competitor promotions depreciate at the same rate as Neurontin promotions.

92. Because Professor Rosenthal's competitor variables are meaningless, I do not include them in the revised regression models. As already noted, however, the estimated effects of promotion remain statistically insignificant when competitor variables are added to the revised models.

### F. Professor Rosenthal Inappropriately Includes a Separate Variable for Promotion Occurring between August 2002 and October 2004

93. Professor Rosenthal has put forward four regression models that attempt to estimate the effect of promotions to PHN and other specialties on neuropathic and nociceptive pain prescriptions. Because PHN and other specialties were more heavily promoted between August 2002 and October 2004, Professor Rosenthal includes a separate variable ("spike" promotion) in her regression models for these specialties that measures promotion occurring during this period. In three of four cases promotion occurring during the "spike" period had no statistically significant effect on prescriptions.[106]

[106] "Spike" promotion was significant only for nociceptive pain prescriptions written by other specialties. The implication of Professor Rosenthal's results is that a small portion of all the detailing and journal advertising expenditures caused 100 percent of the neuropathic and nociceptive pain prescriptions written by PHN specialties and 100 percent of the neuropathic pain prescriptions written by other specialties. For example, for PHN specialties, Professor Rosenthal concludes that only 23 percent percent of detailing and journal advertising expenditures during the damages period caused 100 percent of neuropathic and nociceptive pain prescriptions. Thus, according to Professor Rosenthal's results, 77 percent of detailing and journal advertising expenditures during the damages period had no effect on neuropathic and nociceptive pain prescriptions written by PHN specialties. The same is true for neuropathic pain prescriptions written by other specialties. Professor Rosenthal does not attempt to explain why, according to her analysis, large portions of the promotion for Neurontin had no effect, while other much more limited portions supposedly had large effects.

94. Separating promotion effects into spike and baseline periods allows Professor Rosenthal to remove from her baseline promotions variable an increase in promotion that does not correspond to an increase in prescriptions. In other words, Professor Rosenthal removes the portion of promotions that does not appear to be correlated with prescriptions and thereby ensures a stronger correlation between prescriptions and her "baseline" promotions variable. As a result, rather than using her model to test empirically whether detailing and journal advertising expenditures affect prescriptions, she has chosen her model to arrive at this conclusion. This is not a valid scientific methodology for estimating the effect of promotion on prescriptions.

95. Professor Rosenthal's treatment of detailing and journal advertising expenditures is inconsistent with her prior research and other academic research on the effects of pharmaceutical promotional expenditures. Neither she nor other academic researchers she cites has split promotional expenditures into two variables that separately measure the sales impact of low levels and high levels of promotional expenditures on prescriptions.[107] Because there is no justification for including a separate "spike" promotion variable, I do not include one in the revised regression models.[108] Moreover, simply combining Professor Rosenthal's

[107] In her damages report in this case, Professor Rosenthal cites five published articles that study promotion of prescription drugs. Of these, just two conduct a regression analysis of the sales impact of promotion. Neither study proposes separate variables for different levels of promotion. See Berndt, Ernst R., Linda T. Bui, David H. Reiley and Glen L. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," American Economic Review, Vol. 85, No. 2, May 1995, pp. 100-105, and Rosenthal, Meredith B., Ernst R. Berndt, Julie M. Donohue, Arnold M. Epstein and Richard G. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," Ch. 1 in Alan M. Garber, ed., Frontiers in Health Policy Research, Vol. 6, Cambridge, MA: MIT Press for the National Bureau of Economic Research, June 2003, pp. 1-26. Professor Rosenthal cites a third paper that studied the effect of promotional expenditure on the duration of treatment with antidepressant medication. The model assigned drugs to different quartiles based on detailing expenditure levels and found that the impact of detailing expenditure on treatment duration was statistically equivalent to zero in all four quartiles. See Donohue, Berndt, Rosenthal, Epstein, and Frank, "Effects of Pharmaceutical Promotion on Adherence to the Treatment Guidelines for Depression," Medical Care 42(12), December 2004, pp. 1176-1185.

[108] In any event, the inclusion of separate variables for baseline and "spike" promotion in the revised regression models for PHN and other specialties does not result in positive and statistically significant estimates of the effects of promotion.

"baseline" and "spike" promotions into a single variable while making no other changes to her models, results in substantially lower estimates of "fraudulent" prescriptions.

### G. Professor Rosenthal Excludes Prescriptions Written for Generic Gabapentin

96. Professor Rosenthal excludes off-label prescriptions written for generic gabapentin. The entry of generic gabapentin led to a sharp drop in Neurontin prescriptions and detailing and journal advertising expenditures on Neurontin. All things equal, this would lead to spurious correlation between Neurontin prescriptions and detailing and journal advertising promotion expenditures. Both declined due to generic entry, not because there is a causal relationship between promotion and Neurontin sales.

### H. Professor Rosenthal Provides No Basis for Her Assumed AR Structures and Standard Tests Reject Her Them

97. Depending on the indication-specialty regression model, Professor Rosenthal includes up to five autoregressive (AR) terms supposedly to correct for serial correlation.[109] In the files included in Professor Rosenthal's production, no basis for her choice of AR structure is included and she includes no discussion of why she chose different AR structures in her Declaration. I have tested the AR specification assumed by Professor Rosenthal for each indication-specialty regression model. I find that for seven of her eight regression models, her AR specification is incorrect.[110] Correcting her mistakes leads to smaller estimated promotion

---

[109] Serial correlation refers to correlation over time in the residual or error terms of a regression model, where the residual term is the component of the dependent variable (in this case, prescriptions) that is not explained by the independent variables in the model (in this case, promotional stock, price, and other variables). The theory of regression analysis assumes that error terms are independent; thus in a time series setting, consecutive error terms must be serially *uncorrelated.* If a regression model violates the assumption of serially uncorrelated errors, the resulting coefficient estimates are *inefficient* (not optimal), and conclusions as to statistical significance are invalid. Given the fairly small sample used in Professor Rosenthal's analysis (46 observations), these problems can be severe, hence appropriate correction of serial correlation is an important issue.

[110] The Breusch-Godfrey LM test (with a significance level of 5%) was used to choose the appropriate number of AR terms. This is a standard, generally accepted test for determining the appropriate AR structure. The

effects in four of her eight models, and in three of her eight models, the same correction reveals that the promotion effects reported as statistically significant are in fact statistically insignificant.[111]

### I. Professor Rosenthal Does Not Adequately Account for Neurontin's Price in Her Regression Models

98. Professor Rosenthal's price variable is the ratio of Neurontin's price to the price of generic gabapentin. She sets this variable equal to one prior to generic entry even though no price exists for generic gabapentin during this period. As a result, Professor Rosenthal's price variable stays at a constant value prior to generic entry and then increases dramatically after generic entry. Because she measures her price variable in this manner, Professor Rosenthal is really only estimating the effect of generic entry on Neurontin prescriptions with her "price" variable. She has not accounted for the effect of Neurontin's price on Neurontin prescriptions in her regression model. Moreover, because she does not account for Neurontin's price, her competitor price variable does not accurately measure the effect of competitor prices on Neurontin prescriptions. This is because relative prices matter, and without Neurontin's price in the model, the model cannot determine how competitor prices are moving relative to Neurontin's price.

---

documentation for the econometrics software used by Professor Rosenthal describes this test and points out that it is preferable to the better-known Durbin Watson statistic "in most applications." (See *EViews 6 User Guide II*, chapter 26, pp. 64-67. In particular, the Durbin–Watson statistic is not valid if the model includes a lagged dependent variable *or any variable that depends on lagged values of the dependent variable*. See The New Palgrave Dictionary of Economics, Second Edition, 2008. The latter condition implies that the Durbin-Watson statistic is not valid when based on the model that Professor Rosenthal estimates, since the autoregressive (AR) terms included in her model depend on lagged values of the dependent variable.) Professor Rosenthal apparently does not apply the Breusch-Godfrey LM test because she chooses AR structures that are inconsistent with it. In fact, Professor Rosenthal provides no indication at all of the methodology she used to choose the AR structure of her regression models.

[111] The estimated number of "fraudulent" prescriptions decreased for neuropathic pain and nociceptive pain prescriptions written by neurologists and by other specialties. Baseline promotion is no longer statistically significant for neuropathic pain prescriptions written by PHN specialties and other specialties and nociceptive pain prescriptions written by PHN specialties.

### J. Professor Rosenthal Inadequately Accounts for Endogeneity

99. Professor Rosenthal recognizes but fails to correct properly for a widely recognized source of inaccuracy: endogeneity—the possibility that the direction of causation flows both ways between promotions and prescriptions. For example, a firm may make decisions about promotional spending based on its sales levels. In such a situation, sales and promotional spending will be correlated even if promotional spending has no effect on sales.[112] The result is that the regression model will overstate the impact of promotions on prescriptions. Although Professor Rosenthal agrees that endogeneity is likely a problem in her model,[113] her implementation of the statistical technique meant to correct for this inaccuracy is deeply flawed. Specifically, by using lagged values of her promotional stock variable as instruments, she replaces her original endogenous promotions variable with a virtually identical variable; promotional stock and lagged promotional stock are 99% correlated. She therefore fails to remove the endogenous component of her promotions variable and her estimates continue to suffer from the bias caused by endogeneity.[114]

## XI. Dr. Hartman's Purported Damage Estimates Do Not Reflect Damages

100. Dr. Hartman purports to calculate aggregate damages using Professor Rosenthal's estimates of the number of prescriptions supposedly caused by allegedly improper promotion. Because Dr. Hartman's damage estimates rely critically on Professor Rosenthal's unreliable

---

[112] Professor Rosenthal acknowledged precisely this source of endogeneity in her deposition testimony. "[C]ertainly there is an argument that promotional spending responds to the level of sales." Rosenthal Deposition, 10/25/06, p. 451. See also Rosenthal Deposition, 10/25/06, pp. 455, 458.

[113] Rosenthal Deposition, 10/25/06, pp. 448-449, 451, 455, 458.

[114] This conclusion follows directly from the definition of an instrument, which must be correlated with the endogenous regressor but uncorrelated with the error term. See Cameron and Trivedi, Microeconometrics, Cambridge University Press, 2005, p. 97. If the instrument and endogenous regressor are highly or perfectly correlated, the instrument is not valid.

estimates of the number of prescriptions supposedly caused by allegedly improper promotion, his damage estimates are similarly unreliable. For example, for five of the eight indication-specialty pairings, Professor Rosenthal has estimated that allegedly improper promotion caused more prescriptions than the actual number of prescriptions filled. Dr. Hartman is thus assessing damages on more prescriptions than the actual number that occurred. This error alone inflates damages (before prejudgment interest) by $116 million.

101. Even if Professor Rosenthal had reliably estimated the number of Neurontin prescriptions caused by allegedly improper promotions, Dr. Hartman fails to put forward a method of determining aggregate economic damages. Dr. Hartman's analysis largely assumes damages are equal to third party payers' and patients' expenditures on Neurontin. However, economic damages, if any, suffered by patients and third party payers depend on the cost and efficacy of whatever alternative treatment would have been provided absent the allegedly improper promotions.[115] Dr. Hartman fails to account for the costs and efficacy of whatever alternative treatment would have been provided absent the challenged promotion.[116]

102. With respect to the cost of alternative treatments, many Neurontin third party payers and patients would have paid the same for an alternate drug as they paid for Neurontin. For

[115] Differences in side effects also matter. For example, if Neurontin had the same efficacy as an alternative treatment but fewer side effects, a patient paying more for Neurontin is not damaged if avoiding the side effects is worth the higher cost.

[116] For one of the Coordinated Third Party Payer Plaintiffs, Kaiser, Dr. Hartman estimates damages under an alternative damages theory that supposedly accounts for the cost of alternative therapies. (Hartman Declaration, footnotes 14 and 16.) The drugs used by Dr. Hartman as alternative therapies are not the same set of drugs assumed to be competitors by Professor Rosenthal. Dr. Hartman does not provide a basis for his choice of alternative therapies saying only that Counsel provided a list of alternative drugs for each indication. Nor does he provide any basis for the allocation of Neurontin prescriptions to particular alternative therapies. I understand that subsequent to Dr. Hartman's Declaration, Kaiser has provided the same list of purported alternative drugs in response to Defendants' interrogatories. (See, Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals Fifth Supplemental Response and Objections to Defendants' Second Set of Interrogatories, *In Re Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981, November 10, 2008.) However, neither Kaiser's responses nor the Affidavits of Mirta Millares supplied by Kaiser provide any details on how these drugs were identified or why they might be preferable to Neurontin in particular cases, let alone why they would be preferable for all patients under all circumstances.

example, many Neurontin patients who made copayments for Neurontin (who account for $378 million in damages according to Dr. Hartman) would have paid the same copayment for an alternative prescription drug. This is true for patients with a flat copayment structure,[117] and for tiered copayment structures, the payment would have been the same for an alternative drug on the same tier. Similarly, Medicaid recipients often pay the same flat copay regardless of which drug is used. For Neurontin patients who are uninsured or pay coinsurance (who account for $437.8 million and $74.9 million of Dr. Hartman's damages, respectively), the costs of an alternative drug to Neurontin could have been higher, lower, or the same as Neurontin.[118] Similarly, for third party payers, the cost of an alternative drug to Neurontin could have been higher, lower, or the same as Neurontin depending on how the alternative drug compared to Neurontin in terms of total price and the share covered by the third party payer.

103. Even if no alternative treatment would have been used by patients, damages must account for the benefits patients received from Neurontin and how that compared to its cost. Instead, Dr. Hartman *assumes* without support and contrary to the record that Neurontin provided no benefit to patients and that expenditures on Neurontin thus constitute damages. The assumption that Neurontin has no efficacy (and that damages are therefore equivalent to out-of-pocket costs) is contrary to medical evidence, the actions of Dr. Hartman, and statements made by Professor Rosenthal. As already noted, medical experts who have filed reports in this matter have explained the efficacy of Neurontin for off-label uses based on their clinical experience and published literature.[119] The physicians deposed in this matter and the related

---

[117] Professor Rosenthal in her class certification declaration claimed that "[d]uring much of the Class Period, most insurance plans did not differentiate copayments by drug." (Rosenthal Class Certification Declaration, footnote 59.)

[118] Uninsured patients pay 100 percent of their prescription costs and patients with coinsurance pay less than 100 percent of their prescription costs.

[119] Expert Report of Dr. Shawn J. Bird, 11/29/06, p. 4-5; Expert Report of Alan M. Rapoport, M.D., 12/1/06, p. 2; Expert Report of Dr. Samuel Potolicchio, p. 3.