UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629 <br><br> Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: <br><br> ALL SALES & MARKETING ACTIONS | Judge Patti B. Saris <br> Mag. Judge Leo T. Sorokin |

**CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER
DENYING RENEWED MOTION FOR CLASS CERTIFICATION AS TO CONSUMER
AND THIRD PARTY PAYOR BIPOLAR AND MOOD DISORDER SUBCLASSES**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   THE MAY 2009 CLASS CERTIFICATION ORDER, AND PRIOR
      PROCEEDINGS ............................................................................................... 3

III.  COMMON ISSUES PREDOMINATE WITH RESPECT TO THE
      CONSUMER AND TPP BIPOLAR SUBCLASSES ......................................... 6

      A.    The Consumer Bipolar Subclass Representatives Would Not Have
            Been Prescribed Neurontin, But for Defendants' Fraudulent Off-
            Label Detailing ..................................................................................... 6

            1.    Jan Wityk ................................................................................... 7

            2.    Gary Varnam ............................................................................ 11

      B.    The Third Party Payors' Damages Can Be Reliably Measured in
            the Aggregate ...................................................................................... 14

      C.    Recent Cases Do Not Undermine a Finding of Predominance ............... 19

      D.    The Order Improperly Rejects Applied Healthcare Economics ............. 26

IV.   THE ORDER FAILS TO ADDRESS PLAINTIFFS' UNJUST
      ENRICHMENT CLAIM ................................................................................. 29

## I.   __INTRODUCTION__

In its May 13, 2008 Memorandum and Order denying Plaintiffs' Renewed Motion for Class Certification (the "Order," Dkt. No. 1780), the Court found that the Consumer and TPP Subclasses satisfy the numerosity, commonality, and typicality requirements of Rule 23(a)(1)-(3), but fail to satisfy the predominance requirement (and, as to the TPP Class, the superiority requirement) of Rule 23(b)(3).[1]  Plaintiffs move for reconsideration as to the Consumer and TPP bipolar and mood disorder subclasses *only*.

In addressing the predominance issue, the Court made a number of findings that significantly differentiate the bipolar and mood disorder subclasses from the other indication-specific subclasses, including that "no plausible, nonfraudulent reason existed for defendants to detail psychiatrists."  Order at 43.  Notwithstanding this finding, the Court declined to certify the Consumer bipolar Subclass, because the Consumer plaintiffs' psychiatrists testified that they were not detailed on Neurontin by Defendants, and that they prescribed Neurontin for reasons independent of Defendants' fraud.  When the additional evidence submitted by Plaintiffs in opposition to summary judgment is taken into consideration, it is apparent these factual findings are clearly erroneous.  The Consumer plaintiffs' psychiatrists were *repeatedly* detailed on Neurontin's use for bipolar, immediately following which they were mailed misleading "Dear Doctor" letters that promoted Neurontin's use for bipolar, when Defendants knew that it was no more effective than a placebo, and the psychiatrists either *began* prescribing Neurontin, or sharply *increased* their Neurontin prescriptions, immediately following these contacts.

The Order appears to deny class certification on the basis that class plaintiffs relied only on "use of a single causation expert."  Order at 45.  This is incorrect.  The record

---

[1] The Court previously found that the adequacy requirement of Rule 23(a)(4) had been satisfied. See In re Neurontin Marketing and Sales Practices Litig., 244 F.R.D. 89, 108 (D. Mass. 2007).

contains causation evidence (i) from multiple medical experts, (ii) a healthcare economist using techniques endorsed in the field, (iii) statistical evidence collated by another economist, (iv) before-and-after-the-fraud fact evidence of bipolar use (which this Court has previously described as "powerful evidence") and (v) documentary admissions from the Defendants' own files, which collectively show that "all (or nearly all) doctors who chose to prescribe Neurontin off-label [for bipolar and other mood disorders] were affected by defendants' fraud." Order at 24. The Order articulates reasons for rejecting the expert opinion of Meredith Rosenthal, Ph.D. which appear to reject out-of-hand a whole field of applied healthcare economics, or which have no application to the specific indication of bipolar and other mood disorders.

Because the evidentiary record in this case establishes that defendants were aware that Neurontin "was no better than a placebo in treating bipolar/mood disorder" and "was connected with an [undisclosed] increased risk of depression and suicide" (Order at 42-43), the bipolar and mood disorder Subclass does not present the kind of pros-versus-cons weighing that consumers or prescribing physicians faced in Vioxx (weighing proven efficacy against potential cardiovascular effects), McLaughlin (consumers choosing to smoke light cigarettes in spite of health risks) or Silzone (questioning whether heart valve selected merely because it was given FDA approval, or due to marketing). While a trend of recent cases might require this Court to "look closely" at how Professor Rosenthal reached her conclusions, the assumptions used by Professor Rosenthal are well grounded in the specific facts of the bipolar and mood disorder Subclass, and satisfy the standards enunciated in recent case law.

Finally, the Court finds that common issues do not predominate with respect to the TPP bipolar and mood disorder class because of formulary placement issues. Formulary

818383.7

placement issues are completely irrelevant to Plaintiffs' claims, as Defendants readily

acknowledge in their most recent filing.

## II.   THE MAY 2009 CLASS CERTIFICATION ORDER, AND PRIOR PROCEEDINGS

In addressing the predominance issue, the Court made a number of findings that

significantly differentiate the bipolar and mood disorder subclasses from the other indication-

specific subclasses:

- "The bipolar and mood disorder Subclass is an[] indication for which Professor Rosenthal's model shows the type [of] causal nexus between defendants' off-label marketing efforts and the increase in Neurontin prescriptions that could support a conclusion that a fraud had been perpetrated on the entire prescription market.  According to Professor Rosenthal's report, 99.4 percent of Neurontin prescriptions written by psychiatrists for bipolar disorder were the direct or indirect result of defendants' unlawful marketing. In other words, absent defendants' fraudulent off-label promotion, only 0.6 percent of the Neurontin prescriptions given to patients with bipolar/mood disorders would have been written.  [¶]  Because essentially all of the Neurontin prescriptions for these indications were, according to Professor Rosenthal's model, the result of fraudulent promotion, plaintiffs' claims for the indications would not require an individual inquiry into why a particular prescription was written."  Order at 37.

- "Professor Rosenthal . . . assumes that all detailing to specialists other than neurologists was both off-label and fraudulent.  To be certain, this assumption has validity, especially as it might apply to the bipolar/mood disorder Subclass.  Evidence produced by plaintiffs indicates that defendants, at least by 1995, were aware that Neurontin (1) was no better than a placebo in treating bipolar/mood disorder and (2) was connected with an increased risk of depression and suicide. . . . It is a short leap from that evidence to a reasonable conclusion that no plausible, nonfraudulent reason existed for defendants to detail psychiatrists.  Moreover, it is reasonable to infer that information about depression and suicidal side effects was material to a psychiatrist's decision-making about which drug to prescribe."  Order at 42-43.

Notwithstanding these findings, the Court concluded that common issues do not

predominate with respect to the Consumer bipolar Subclass, because:  (1) under Vioxx, "[w]here

plaintiffs (or plaintiffs' doctors) react differently to a misrepresentation, a presumption of

reliance cannot be utilized to satisfy the predominance requirement under the NJCFA;" and (2) "the record in this case demonstrates why [Prof. Rosenthal's] use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed," specifically, (a) "the absence of evidence of detailing of the doctors at issue in this case," and (b) "the deposition testimony of the doctors for the bipolar/mood disorder class representatives shows that their decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud." Order at 40-41.

With respect to the TPP bipolar Subclass, the Court concluded that common issues do not predominate because: (1) Plaintiffs seek to use a single expert to prove causation, which the Court viewed as prohibited by Vioxx; and (2) "though Professor Rosenthal's report provides reliable proof that a certain percentage of off-label prescriptions for Neurontin reimbursed by the TPPs was caused by defendants' promotion for certain indications, differences among TPPs would still necessitate individualized inquiries into whether defendants' alleged fraudulent marketing caused each TPP any economic damages," because "in order to establish the requisite causation for the TPPs, plaintiffs would have to present individualized evidence about what information a P & T Committee was exposed to regarding Neurontin and how the absence of fraudulent information would have altered Neurontin's placement within its formulary and how that alternative classification of Neurontin would have saved the TPP money." Order at 45-49. Finally, the Court concluded that "given the complexity of each TPP's method of reimbursement, the class action mechanism is not superior to other methods of affording relief to other TPPs." Order at 50.

At a brief April 16, 2008 hearing on Plaintiffs' Renewed Motion for Class Certification, the Court indicated it may wait until summary judgment to rule on class

- 4 -

certification, so that it could consider the causation issue on a more fully-developed evidentiary record.[2]  See Reporter's Transcript at 37:25-40:19.  Since that time, Plaintiffs have assembled additional evidence that the Consumer Plaintiffs' prescribing physicians' were, in fact, repeatedly subject to Defendants' fraudulent off-label detailing, which had an *immediate and dramatic* impact on their prescribing of Neurontin.  Plaintiffs presented that evidence, along with expert medical opinion evidence and other *non-expert* evidence of causation, in Class Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1754), the accompanying 314-page statement of facts ("SOF," Dkt. No. 1760) and supporting declarations and exhibits (Dkt. Nos. 1755, 1759, 1761).[3]

Unfortunately, the Order and Plaintiffs' opposition to Defendants' motion for summary judgment sailed past one another, like ships in the night.  Plaintiffs intended that the Court would consider the full evidentiary record on summary judgment, along with the class certification materials, when ruling on certification.  Instead, the Order limits plaintiffs'

---

[2] On October 20, 2008, the Court directed the parties to attempt to agree on a date for oral argument on Plaintiffs' Renewed Motion for Class Certification.  Plaintiffs suggested a hearing in February 2009, while Defendants suggested that "if the Court continues to believe that it needs additional development of the record before deciding the motion as to either the Consumer or TPP purported class, defendants believe the only fair and appropriate means of accomplishing this would be for the parties to brief summary judgment."  See Class Plaintiffs' Submission Regarding a Date for Further Oral Argument on Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1479); Defendants' Proposal Concerning Further Proceedings on Plaintiffs' Second Motion for Class Certification (Dkt. No. 1780), at 3.  As no hearing had been scheduled, and the summary judgment briefing was nearly complete, Plaintiffs had assumed the Court would take their summary judgment opposition into consideration in deciding class certification—especially with respect to the issue of causation—and would afford the parties an opportunity to argue the merits of the motion.  As the April 16, 2008 hearing was unavoidably truncated due to another engagement of the Court (see Reporter's Transcript at 5:16-19, 38:25), Plaintiffs respectfully request that the Court hold a hearing on this motion for reconsideration.

[3] As defense counsel noted at the April 2008 hearing, it was too soon to expect the parties to have fully developed the evidence to be presented at trial.  See Reporter's Transcript at 34:7-14. To ensure a full record for any appeals, Plaintiffs incorporate by reference the entirety of their summary judgment opposition (Dkt. Nos. 1754 through 1762) in support of this motion for reconsideration.

causation evidence to the Rosenthal Report.  As a result, the Order is premised upon factual findings contradicted by the summary judgment record, and rejects a critical assumption to Rosenthal's econometric model that, in fact, is fully supported by the medical opinion and documentary evidence before the Court.

## III.   COMMON ISSUES PREDOMINATE WITH RESPECT TO THE CONSUMER AND TPP BIPOLAR SUBCLASSES

### A.   The Consumer Bipolar Subclass Representatives Would Not Have Been Prescribed Neurontin, But for Defendants' Fraudulent Off-Label Detailing

The Court found the *results* of Prof. Rosenthal's model sufficient to support certification of a bipolar Subclass (see Order at 37),[4] but concluded that "the record in this case demonstrates why the use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed," relying entirely on the deposition testimony of the Consumer Plaintiffs' prescribing physicians that:  (1) "only one of them, Dr. Gregory A. Rogers [prescribing physician for nociceptive and neuropathic pain Subclass representative Holloway], was ever detailed by defendants about Neurontin," and "Dr. Rogers testified that all of the Neurontin detailing at his office was with respect to on-label uses for the drug;" and (2) "their decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud."  Order at 40-41.  The record presented to the Court in Plaintiffs' summary judgment opposition forcefully contradicts each of these findings, and fully supports, rather than undermines, Dr. Rosenthal's assumption that physician detailing was a major driver of Neurontin bipolar prescriptions, and highly correlated with Defendants' other misleading promotional efforts.

---

[4] The Court also finds the results of Prof. Rosenthal's model sufficient to support certification of a neuropathic and nociceptive pain Subclass, limited to prescriptions written by non-neurologists.  Order at 36-37.  However, as noted above, Plaintiffs only seek reconsideration with respect to the bipolar subclasses.

1.    **Jan Wityk**

The Court found that there is "no evidence that Dr. Gray, the primary care physician for bipolar/mood disorder class representative Wityk, was ever detailed by defendants about Neurontin," and credits his testimony "that the main reason he prescribed Neurontin for Wityk was that Wityk's prior physician had prescribed Neurontin and Wityk was unwilling to change medication." Order at 41. In fact, there is compelling evidence that both Dr. Gray and Ms. Wityk's prior physician, Dr. Navgeni Ragothaman, were repeatedly detailed by Defendants on Neurontin, were strongly influenced by that detailing, and would not have prescribed or continued prescribing Neurontin for Ms. Wityk but for Defendants' fraudulent off-label detailing.

In December 1997, Ms. Wityk was examined by Dr. Ragothaman, who suggested various drugs as potential treatment for her bipolar disorder, including Zoloft and Ativan. Neurontin was not one of the drugs discussed, and, at that time, Dr. Ragothaman had *never written a single Neurontin prescription*. See SOF ¶ 203.

Dr. Ragothaman incorrectly testified that she was never detailed on Neurontin's use for bipolar, when in fact she was detailed—at least *three times*—in 1999. See SOF ¶ 204. On February 4, 1999, Dr. Ragothaman discussed Neurontin's use in "Bi-Polar" with Parke-Davis sales representative Steve Alberti. Id. As a result of this conversation, on February 11, 1999, Dr. Ragothaman was mailed a Medical Information Request letter from Parke-Davis concerning "treatment of bipolar depression and mood disorder." See SOF ¶¶ 195, 196. The letter contained a false, misleading, inaccurate and omissive summary of the available evidence on the use of Neurontin for bipolar and other mood disorders. Specifically, the letter omitted any reference to the FDA's finding of depression associated with Neurontin use, or Parke-Davis's own internally completed Pande study, which showed that a placebo was *superior* to Neurontin

- 7 -

to treat bipolar.  See Order at 42-43.  In place of the unfavorable clinical trial evidence then known to the company, the letter made affirmative false and misleading claims of Neuron tin's efficacy for bipolar disorder.  This was the most widely distributed letter on bipolar, mailed to more than 5,500 physicians, mostly psychiatrists, in the United States.  See SOF ¶¶ 198.

Less than one week after receipt of this letter, Dr. Ragothaman recommended Neurontin to Ms. Wityk, despite never having prescribed the drug before.  See SOF ¶¶ 204-05.  One month later, on March 17, 1999, Dr. Ragothaman wrote her very first Neurontin prescription—to Ms. Wityk.  See SOF ¶ 205.

Dr. Ragothaman discussed the use of Neurontin for "Mood Disorder" with Mr. Alberti again in June 1999.  In September 1999, Dr. Ragothaman had yet another discussion of Neurontin's use for bipolar with another Parke-Davis sales representative, Roger Williams, who noted in his call notes that she "desires data on the clinical efficacy of Neurontin for Bi-Polar Disorder."  See SOF ¶ 206.  Dr. Ragothaman received the same, un-updated, fraudulent "Dear Doctor" letter that she had received earlier, whose growing list of glaring omissions now included the negative data from the Frye and Guille studies.  See SOF ¶ 206.

The impact of this detailing effort was striking and immediate.  Although she had never written a single Neurontin prescription prior to being detailed by Parke-Davis, after being detailed and receiving the misleading "Dear Doctor" letters, Dr. Ragothaman went from a non-prescriber of Neurontin to a steady prescriber, writing a total of $41,302 in Neurontin prescriptions:

818383.7



See SOF ¶ 208.  See United States v. Parke-Davis, 2003 WL 22048255, *5 (D. Mass. Aug. 22, 2003) (denying motion for summary judgment on causation grounds, where "Relator has produced circumstantial evidence (e.g., the rates of off-label prescriptions before and after physician conferences hosted by Parke-Davis) and direct evidence (the 'Verbatim' market-research reports recording doctors' state of mind after marketing meetings.").

        Ms. Wityk was subsequently treated by Dr. Jerrold Gray, who continued to prescribe her Neurontin and increased her daily dosage.  Although Dr. Gray did not recall being detailed by Parke-Davis and Pfizer sales representatives, and denied being influenced by them, his testimony is contradicted by Ms. Wityk, who testified that:

> At the time I began starting to see Dr. Gray, he was gung-hoe [sic] on Neurontin, telling me that one of the drugs that I was currently on was old school, that the

818383.7

*drug reps were pleased with the off-label success of Neurontin for people with bipolar disorder like myself.* And that I should give it some consideration and thought to changing medications as the *drug representatives had seen amazing results.*

<u>See</u> SOF ¶ 210.[5]

It is Ms. Wityk's testimony that "Neurontin was ineffective for the entire time that [she] was on it." <u>Id</u>. Dr. Gray's testimony that Ms. Wityk "was unwilling to change medication" (<u>see</u> Order at 41) is also contradicted by Ms. Wityk, who testified that she informed Dr. Gray that Neurontin was *not* providing a meaningful benefit, and that Dr. Gray's response, *based on conversations with Parke-Davis sales representatives*, was to increase her daily dose of Neurontin. <u>See</u> SOF ¶ 211 ("I know that during one of my very first visits with Dr. Gray, he did relay to me that he had discussed the fact that I was not getting better on the Neurontin with the drug, specifically with the drug representative who told him that they just needed to continue to titrate me to a higher dose until I was receiving benefit. That I just wasn't on a high enough dose yet."). Finally, in September 2001, Dr. Gray agreed to discontinue prescribing Neurontin for Ms. Wityk. <u>See</u> SOF ¶ 211. There can be little doubt that Drs. Ragothaman and Gray were detailed on Neurontin for bipolar, and that this detailing influenced their prescribing practices.

---

[5] Dr. Gray's statements to his patient concerning his reasons for prescribing Neurontin are admissible on multiple grounds, including Fed. R. Evid. 803(4), Statements for purposes of medical diagnosis or treatment. <u>See</u> <u>U.S. v. Peneaux</u>, 432 F.3d 882, 893 (8th Cir. 2005) (statement must be of a "type reasonably relied on by a physician in treatment or diagnosis and that the declarant's motive in making the statement was consistent with promoting treatment."); Nor is the rule limited to exchanges between doctors and patients. <u>See</u> Fed. R. Evid. 803, advisory committee's note to Paragraph (4). In addition, the statements of the Parke-Davis sales representative are not hearsay, as they are admissions by a party opponent (<u>see</u> Fed. R. Evid. 801(d)(2)(D)), and the statement by Dr. Gray to Ms. Wityk is not hearsay because it is not being offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Instead, the statement is offered to show that Dr. Gray was detailed, and to show his state of mind – specifically, why he chose to prescribe Neurontin to Ms. Wityk for an off-label use.

2.    **Gary Varnam**

The Court credits deposition "testimony from Dr. Arness, the only psychiatrist who treated bipolar/mood disorder class representative Varnam . . . , that he was never detailed by defendants about Neurontin and never requested information from defendants about Neurontin," and "that he prescribed Neurontin because of information he had learned about Neurontin from fellow doctors, because of his personal experience in successfully using the drug with other patients, because anticonvulsants like Neurontin were 'widely known and widely accepted as a treatment for bipolar disorder,'[6] and because Neurontin had a relatively benign set of side effects."  Order at 40-42.  Dr. Arness's testimony is belied by the evidence developed by Plaintiffs and presented in their summary judgment opposition.

Mr. Varnam was first prescribed Neurontin by Dr. Arness in February 2001.  Two years earlier, in September 1999, Dr. Arness discussed Neurontin's psychiatric use with Laurie Winslow, a Parke-Davis sales representative and area business manager.  *See* SOF ¶ 195.  Within days, Parke-Davis mailed Dr. Arness the same deceptive and misleading Medical Information Request letter sent to Dr. Ragothaman.  See SOF ¶¶ 195, 196.  Following his receipt of this letter, Dr. Arness's prescriptions of Neurontin skyrocketed:

[6] Contrary to Dr. Arness's testimony, there was a "lack of scientific rationale" to believe that Neurontin would be effective in treating bipolar disorder, "since Neurontin has a different mechanism of action than the mood-stabilizing anti-epileptics."  Dkt. No. 1761, Ex. 16.

818383.7



See SOF ¶ 199.

        In the two years prior to receiving the letter, Dr. Arness's Neurontin prescriptions averaged only $289 per month.  In the two years after receiving the letter, Dr. Arness's Neurontin prescriptions soared to an average of $3,486 per month, an 1100% increase.  Mr. Varnam's initial Neurontin prescription occurred at the peak of this massive surge in prescriptions that began almost immediately after Dr. Arness received the inaccurate and misleading "Dear Doctor" letter, and continued to increase as Dr. Arness was detailed 16 times over 15 months.  In total, Dr. Arness wrote more than $83,600 in Neurontin prescriptions after having been detailed on Neurontin.  See SOF ¶ 200.  Mr. Varnam was subsequently treated by Dr. Beverly Grimm, who took him off the drug.  See SOF ¶ 201.

In sum, the evidence is overwhelming that the Consumer bipolar Subclass representatives' physicians were, in fact, repeatedly detailed by Defendants on Neurontin,[7] were strongly influenced by that detailing, and would not have prescribed or continued prescribing Neurontin for the Consumer bipolar Subclass representatives but for Defendants' fraudulent off-label detailing.  The exposure and prescribing activity of this "random sample" of physicians is fully consistent with Dr. Rosenthal's model, and *validates* it, rather than calling it into question.[8]

---

[7] The Order complains that "many doctors were not detailed" (Order at 43), but the correlation between spending on detailing and other promotional activities is not only supported by well accepted economic literature in the field,  it is confirmed by the facts of this case.  Defendants used sales representatives to hand out journal reprints that were central to the "publication strategy."  See SOF ¶¶ 105, 114, 373, 382.  Defendants also used sales representatives to invite physicians to peer-to-peer marketing events.  See SOF ¶¶ 380, 790, 793, 798, 799, 805, 807, 808, 810, 812, 816, 817.  As set forth at pages 30-32 of Plaintiffs' summary judgment opposition, there is an extremely high correlation coefficient between the amount Defendants spent on detailing psychiatrists, the number of invitations to CME events, and the number of misleading journal reprints handed out during a detail.  Similarly, the number of misleading "Dear Doctor" letters on bipolar sent per month by Defendants to psychiatrists has an extremely high correlation coefficient with both the number of details per month and the amount spent on detailing, and virtually all such letters were sent to physicians within 7 days of a detail.

[8] The Court similarly finds that "[t]he evidence regarding Neurontin prescriptions written by non-neurologists for Subclass representatives suffering from neuropathic and nociceptive pain also fails to comport with Professor Rosenthal's assumptions."  Order at 42 n.9.  Specifically, the Court notes that Mr. "Smith's Neurontin prescriptions were written by Dr. Kylene Huyler, a neurologist to whom Smith was referred."  Id.  As set forth in Plaintiffs' summary judgment opposition, Dr. Huler was detailed hundreds of times by various Parke-Davis and Pfizer sales representatives from 1996 through 2004.  See SOF ¶ 456.  This frequent detailing biased Dr. Huler towards Pfizer and its products, including Neurontin, as revealed by the contemporaneous observations of Pfizer sales representative Vernon Clayton, who in a little over a year detailed Dr. Huler approximately 27 times:

> Dr. Huler…is down  with all of the Pfizer [products]…She is the Pfizer Queen (Zoloft, Neurontin) and she said as much…Dr. Huler really likes the fact that we know she is high on the list of Pfizer (zoloft, Neurontin) products… Feed her ego although she is a nicelady [sic] and not an megalomaniac, she likes being the #1 queen.

See SOF ¶ 457.  Dr. Huler's testimony that "Defendants' sales representatives never discussed Neurontin's off-label uses with [her]" is flatly contradicted by Defendants' own detail records, which show that she discussed off-label uses like "migraine" with sales representatives.  See SOF ¶ 456.

The Court also finds that "Dr. Rogers, family doctor for nociceptive pain Subclass representative Hollaway, . . . began prescribing Neurontin to treat neuropathic pain before he was ever detailed by defendants regarding Neurontin," and credits Dr. Rogers' testimony "that the

The Court should not accept as conclusive the physicians' stated reasons for prescribing Neurontin, and should permit the trier of fact to determine this question of fact in light of all the evidence bearing on the question, including the physicians' documented exposure to Defendants' fraudulent off-label detailing and the dramatic impact on their prescribing activity, even if they remain subjectively unaware of the influence.  See In re Zyprexa Prods. Liab Litig., 253 F.R.D. 69, 174 (E.D.N.Y. 2008) (summarizing expert testimony that "[d]octors themselves are often unaware of the extent of commercial influence on information they believe to be objective and subsequently find it is biased and misleading.").[9]

**B.      The Third Party Payors' Damages Can Be Reliably Measured in the Aggregate**

The Order finds Plaintiffs' purported reliance on "a single causation expert" to prove causation insufficient.  Order at 45.  This is inaccurate.  Although the April 2008 hearing focused primarily on the sufficiency of Prof. Rosenthal's expert report, the Court also found that the Plaintiffs—and especially, the TPPs—had presented compelling *non-expert* evidence that they were damaged by Defendants' fraud, which, in the Court's words, "even a lay judge can understand without an econometric model."  Neurontin, 244 F.R.D. at 111.  Indeed, the Court

primary reason he prescribed Neurontin to treat neuropathic pain in patients was his own experience witnessing the drug's efficacy."  Order at 42 n.9 (citations omitted).  The hard evidence is to the contrary, notwithstanding Dr. Rogers' recollection.  Dr. Rogers' prescribing data shows *no* Neurontin prescriptions until November 2002, the *same month* he was first detailed by a Pfizer sales representative.  See SOF ¶ 467.  According to Pfizer's records, Dr. Rogers was detailed three times between November 2002 and March 2004, and each detail was followed by a significant increase in Dr. Rogers' Neurontin prescriptions.  Id.  While Plaintiffs are not moving for reconsideration as to the proposed pain subclasses, clearly, this evidence further supports, rather than undermines, Dr. Rosenthal's methodology.
[9] See McDonough v. City of Quincy, 452 F.3d 8, 19 (1st Cir. 2006) ("Determinations of motive and intent… are questions better suited for the jury.") (internal quotation omitted); PNH Corp. v. Hullquist Corp., 843 F.2d 586, 593 (1st Cir. 1988) (reversing summary judgment where sufficient circumstantial evidence called into question employees' explanation of events); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970) ("defendants' declarations of their states of mind were not sufficient to allow summary judgment where certain circumstantial facts existed that might have tended to impeach the defendants' testimony").

quarreled at length with defense counsel on this very point:

> THE COURT:  I agree with you that it's exponentially more difficult Consumer by Consumer, but when you deal with these big plans where you know -- in other words, Neurontin was marketed as the tenth largest-selling drug in the country or something.  I don't know if it still is, but it was at some point.  You market it based on statistics.  I mean, the spikes based on the off-label are off the chart.
>
>  . . . It's hard for me to believe that on a third-party payor basis, you can't prove at least causation, that there was an injury.  . . . [O]n a statistical basis, you market on a statistical basis, they buy it, they have so many covered lives; but I think the plaintiffs will be able to prove, if there's a fraud, a big "if," that there's been injury caused by a fraud.
>
> MR. ROUHANDEH:  Well, your Honor, those spikes, those aren't statistical proof.  As a legal matter, as –
>
> THE COURT:  It's pretty darn powerful.
>
> MR. ROUHANDEH:  Well, anybody can make up a chart and say, before something happened, here's what the situation was, and after, and then sort of assume causation.  But as a legal matter –
>
> THE COURT:  Excuse me, excuse me.  What if you have no sales, then a fraud, and then a thousand percent spike, that's no proof?
>
> MR. ROUHANDEH:  Well, that's not legal proof, and it's not economic proof either.  It wouldn't be accepted by -- it shouldn't be accepted.
>
> THE COURT:  *It's proof.*  You would say it's not enough. *You know, it's called circumstantial evidence.*  I mean, you may say it's not enough, and maybe it needs Dr. Rosenthal to gild it and to rule out other things, like, you know, that some other drug didn't go off the market; thereby, you know, there isn't some other factor causing the fraud.  *It's proof.*  You would say it's not enough, so that's a good position for you to take, but *it is something*.

Apr. 16, 2008 Transcript at 27:5-28:20 (emphasis added).

In keeping with the foregoing, the Court concluded that "Professor Rosenthal's report provides reliable proof that a certain percentage [of] off-label prescriptions for Neurontin reimbursed by the TPPs was caused by defendants' promotion for certain indications," but finds

- 15 -

this insufficient, because "in order to establish the requisite causation for the TPPs, plaintiffs would have to present individualized evidence about what information a P & T Committee was exposed to regarding Neurontin and how the absence of fraudulent information would have altered Neurontin's placement within its formulary and how that alternative classification of Neurontin would have saved the TPP money." Order at 45-49. The Court appears to have adopted wholesale Defendants' argument that TPPs differ in the treatment of Neurontin on their formularies. For purposes of this motion, Plaintiffs need not dispute this proposition, because *formulary placement is entirely irrelevant to the Class TPPs' claims*. Defendants admitted as much in their recently-filed Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Dkt. No. 1785): "Three of the named TPPs – BCBSLA, ASEA, and Harden [i.e., the TPP class representatives] – do not even argue that Defendants made misrepresentations directly to them or that they based their formulary decisions on any such misrepresentations. Instead, their claims are based entirely on the purported effect of marketing statements on 'physicians.'" Id. at 3.[10]

As Defendants point out, Class Plaintiffs do not rely on a *different* causation theory for the TPP Class. Unlike the Coordinated Plaintiffs, Class Plaintiffs have *never* alleged or argued that Defendants misled the TPP Class Representatives or (absent class members) into giving Neurontin preferential treatment on their formularies, or of causing them to pay for the drug when they otherwise would not have. The Order knocks down a "straw man." Neurontin is an FDA-approved anti-convulsant medication. When prescribed by a licensed physician, virtually every TPP in the country reimburses for it, and always has, *never even knowing* the condition for which it was prescribed. See Expert Report of Kimberly P. McDonough (Dkt. No.

---

[10] Plaintiffs will respond to Defendants' reply brief on summary judgment in their surreply, due June 18, 2009. See May 19, 2009 Electronic Order granting Emergency Motion for Extension of Time.

1457, Exh. H ("McDonough Report").  Whether they paid more or less for the drug due to relative placement on their formularies is irrelevant to Plaintiffs' damages theory, which seeks to recoup the cost of the prescriptions in their entirety, *whatever they were* (less the copayments made by the Consumer Subclass), which amounts are accurately recorded by IMS, the pharmacy benefit managers, and/or the TPPs themselves.  See In re Zyprexa Prod. Liab. Litig., 253 F.R.D. 69, 189 (E.D.N.Y. 2008) ("reasonably accurate estimates can be made of the total out-of-pocket payments made by the class for Zyprexa over the class period. . . . [I]n the 'data rich' pharmaceutical field, expenditure information by year, source of payment (e.g., third-party payors, government payors, insurance copay or cash consumers), . . . are available.").  As the Court itself repeatedly notes, this is not a price inflation case.  While that classification apparently requires Plaintiffs to carry a heavier burden in some respects, its countervailing virtue is that it *relieves* Plaintiffs of the burden of showing that Defendants' fraud affected the *amount* they paid for Neurontin, and not merely the *fact* of payment.  With respect to Neurontin's overall price, and the net price paid by each member of the TPP Class, Plaintiffs have always been content to "play it where it lies."[11]

    While the Order adopts Dr. Bell's declaration chapter and verse, it neglects to consider the counter-declaration submitted by Plaintiffs' expert, Kimberly P. McDonough,[12]

---

[11] Indeed, there was a considerable squabble over just this point in connection with a discovery matter.  Defendants insisted that Plaintiffs provide them with a list of "cheaper and more optimal drugs" than Neurontin (a single ill-considered phrase in Plaintiffs' 100+ page complaint), despite Plaintiffs' written and repeated assurance that "Class Plaintiffs have elected not to pursue a damages model based on the availability of alternative treatments that were cheaper and more effective."  See Class Plaintiffs' Opposition to Defendants' Emergency Motion for Sanctions for Failure to Obey Court Order Requiring Plaintiffs to Respond to Interrogatories (Dkt. No. 1423) and related filings (Dkt. Nos. 1418-20, 1424-25, Sept. 15, 2008 Electronic Order, 1442, 1444, Oct. 3, 2008 Electronic Order).
[12] Dr. McDonough is a Pharm.D. and president of a consulting firm employing 32 persons devoted entirely to the assessment of pharmacy benefit programs, drug pricing, and drug

discussed in Class Plaintiffs' Response to Defendants' Supplemental Memorandum of Law in

Opposition to Plaintiffs' Second Motion for Class Certification (Dkt. No. 1453) at 16 n.33.[13]  Dr.

McDonough addresses each of the drug utilization techniques identified as the source of

variation by Dr. Bell, including formulary treatment, P&T committee review, electronic claim

edits, prior authorization, and drug utilization review.  Dr. McDonough explains why these

techniques are ill-suited for use by TPPs in attempting to control Neurontin prescriptions, that all

TPPs and pharmacy benefit managers face the same considerations and limitations as related to

Neurontin, and that as a result, Neurontin has enjoyed *virtually complete formulary acceptance*

*with very few restrictions*.  Dr. McDonough explains that "TPPs rarely adopt coverage

limitations for drug categories such as oncologics, anti-convulsants, and ant-retroviral therapy

that are used to treat serious diseases . . . . Because Neurontin is indicated for the treatment of

epilepsy, a disease that is very serious and sometimes difficult to treat, it has been widely

accepted in a preferred position on most TPP formularies . . . .In my experience working with

TPPs and their P&T Committees, these organizations are very hesitant to create any barriers that

would prevent access to effective products for patients suffering from seizures."  Id. at 15-16.

Surveys and discussions conducted by and for Defendants support Dr. McDonough's

conclusions and are summarized in her report.  Id. at 16-17.

       The Court finds it significant that "[a]ccording to Dr. Bell, by 2000,

'approximately 30 percent of covered lives were under plans that excluded coverage for off-label

prescriptions.'"  Order at 47-48 (quoting Dkt. No. 1175, Ex. 35 ("Bell Report") ¶ 57).  As far as

---

utilization, and the sole compliance auditor of the Medicare Part D, Part C, and other government
programs.  Id. at 1-2.
[13] Plaintiffs appreciate that a footnote is not the most prominent place for significant argument,
but deemed the point a lesser one in light of their damages theory, which eschews any
"formulary fraud" claims.  Plaintiffs were forced to make such compromises in presentation in
order to address Defendants' many arguments within the page limits.

Plaintiffs can tell, neither this quotation nor this purported information appears anywhere in Dr. Bell's report.[14]  What Dr. Bell *does* acknowledge is that TPPs and the PBMs that administer their pharmacy benefits generally have no idea whether a particular Neurontin prescription was written to treat an approved indication (epilepsy or post-herpetic neuralgia) or for an-off-label use—although Dr. Bell hypothesizes ways in which TPPs *could* obtain this information.  See Bell Report ¶ 55.  As Dr. McDonough explains:

> TPPs and PBMs are unable to use the pharmacy point-of-service claim processing system to limit coverage of Neurontin to FDA-approved indications.  Physicians and other prescribers are not required to include the patient's diagnosis on the prescription, and pharmacists do not have access to this information when they submit drug claims to the TPP or PBM.  [¶]  TPPs and PBMs are typically unwilling to require a prior authorization for Neurontin.  Doing so would create significant disruption to providers and patients when Neurontin is prescribed and use for the treatment of epilepsy and other FDA-approved conditions. . . . [¶]  All TPPs and PBMs are subject to the limitations and constraints described above.

McDonough Report, at 5.

    In any event, as set forth above, formulary placement is irrelevant to the TPP Subclass's claims.  Accordingly, the Court's conclusion that "given the complexity of each TPP's method of reimbursement, the class action mechanism is not superior to other methods of affording relief to other TPPs" (Order at 50) is unwarranted.

## C.    Recent Cases Do Not Undermine a Finding of Predominance

    The Court cites International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc., 192 N.J. 372 (2007) ("Vioxx") as "foreclos[ing] the instant plaintiffs' motion to certify indication-specific Consumer subclasses under the New Jersey Consumer

---

[14] The Court also finds it significant that "Dr. Bell asserts that many TPPs recommend or require and continue to require the use of Neurontin to treat off-label conditions."  Order at 48.  Dr. Bell does *not* say that any TPP *required* the use of Neurontin, nor do any of the 16 examples he gives of formulary or other actions.  See Bell Report ¶ 59.

Fraud Act," because (analogizing to the TPPs in Vioxx who "'made individualized decisions concerning the benefits that would be available to its members for whom Vioxx was prescribed'") "[w]here plaintiffs (or plaintiffs' doctors) react differently to a misrepresentation, a presumption of reliance cannot be used to satisfy the predominance requirement under the NJCFA."  Order at 24-25 (quoting Vioxx, 192 N.J. at 391).  The fundamental difference between this case and Vioxx is that in Vioxx, there was no question that the drug was effective in treating the pain conditions for which it had been approved by the FDA.  See International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc., 384 N.J. Super. 275, 281, 894 A.2d 1136, 1139 (N.J. Super. A.D. 2006) ("Vioxx was approved by the Federal Food & Drug Administration (FDA) for 'the relief of signs and symptoms of osteoarthritis [degenerative joint disease], management of acute pain in adults, and treatment of primary dysmenorrhea [difficult and painful menstruation]'").  In Vioxx, the gravamen of the complaint was "that defendant engaged in extensive efforts to conceal or otherwise minimize information coming to its attention . . . that its product was not as safe as available alternatives."  192 N.J. at 377.  There was no allegation that the product was ineffective.

This seemingly simple difference has profound implications.[15]  Before a physician—any physician—would even consider prescribing a medication for a particular patient, the physician must have some reason to believe it will be effective in treating the condition at issue.  Physicians do not prescribe drugs at random, and will simply not associate a drug with a condition if they are told the drug is ineffective in treating it.  Once a drug clears this primary hurdle, other factors may come into play (e.g., safety, side effects).  However, unless the hurdle is cleared, such factors are irrelevant.

---

[15] Plaintiffs apologize for not doing a better job distinguishing this line of cases in the prior briefing.

Vioxx cleared this hurdle, as it had been demonstrated effective in reducing pain, and was FDA-approved for that use.  Accordingly, a physician deciding whether to prescribe Vioxx would have to *balance* its unquestioned efficacy against its known cardiovascular risks, and reach the decision most appropriate for that particular patient.  Pfizer's current television commercial for Celebrex, a drug in the same COX-2 inhibitor class as Vioxx,[16] emphasizes the point:

> For many with arthritis pain, not treating, is not an option.  All prescription NSAID pain relievers, like Celebrex, ibuprofen and naproxen, *help treat arthritis pain and have some of the same warnings*.  But since individual results may vary, having options is important. . . . Based on the available data, the FDA stated that *for certain patients Celebrex's benefits outweight the risks*.  If you are worried about stomach upset, you should know, in clinical studies, a lower percentage of patients taking Celebrex reported stomach discomfort vs. prescription ibuprofen and naproxen. . . .  But when it comes to relieving your arthritis pain, **you and your doctor need to balance the benefits with the risks**. . . . Ask your doctor if you could benefit from Celebrex.  **Understand the risks, feel the benefits.™**

(Emphasis added.)[17]

This individualized "balancing act" ultimately undid the Consumer class in the Vioxx litigation, much as this Court extrapolated from <u>Vioxx</u>:

> The decision of whether to prescribe a medication is made upon a host of individualized factors, including other *risk factors* the plaintiffs possessed and whether other drugs were *effective* in relieving the plaintiffs pain.  Doctors react to medical warnings differently depending on the patient's condition and medical history.  An individualized determination would be required for each plaintiff to determine if the concealment of the CV risk information had a causal relationship on the decision made as to whether or not the patient used Vioxx.

---

[16] <u>See</u> <u>In re Bextra and Celebrex</u>, 524 F. Supp. 2d 1166, 1169 (N.D. Cal. 2007) (Merck "developed Vioxx, and Pfizer (or, more precisely, its predecessors) developed Celebrex and Bextra, NSAIDs known as COX-2 inhibitors, with the expectation that they would have fewer gastrointestineal side effects than traditional NSAIDs").

[17] The foregoing was transcribed from a recorded television commercial.

Kleinman v. Merck & Co., Inc., No. ATL-L-3954-04, et al., 2009 WL 699939, *8 (N.J. Super.
Mar. 17, 2009) (emphasis added).

   Unlike in Vioxx, in the present case—at least with respect to bipolar and other
mood disorders—there was no such balancing to be done.  In Parke-Davis' official Neurontin
Marketing Assessment, issued in May 1995, and representing the collective judgment of senior
management, the company acknowledged that there was a "lack of scientific rationale" to believe
that Neurontin would be effective in treating bipolar disorder, "since Neurontin has a different
mechanism of action than the mood-stabilizing anti-epileptics." CITE at WL 20564.  That same
month, the company filed a patent application stating—under oath—that using Neurontin to treat
bipolar disorder was "a novel use for gabapentin which would not be obvious to a practitioner of
ordinary skill."  SOF ¶ 40.  The Marketing Assessment noted that at the time, Neurontin was
capturing "0%" of the bipolar market, and projected that Neurontin's market share would remain
at "0%" until 1997, when the company hoped that "a positive exploratory trial" would be
published.  SOF ¶ 47.[18]

   Contrary to Defendants' rationale-less hopes, the scientific record establishes
quite clearly that Neurontin is an ineffective treatment for bipolar and other mood disorders.
Defendants studied Neurontin's use for bipolar in numerous placebo-controlled trials.  In every

---

[18] Indeed, Plaintiffs proffer this as the qualified, expert opinion of the world's largest
pharmaceutical company.  No outside expert could provide a more well-informed or
authoritative estimate of Neurontin's "but for" sales for bipolar than Defendants themselves.
Defendants' estimate of their "but for" bipolar market share at 0%, and Prof. Rosenthal's
estimate that 99% of bipolar sales were the result of Defendants' fraudulent off-label marketing
efforts, are but mirror images of one another.  Certainly, Vioxx did not involve the unique
situation presented here, where the results of Plaintiffs' expert analysis are fully consistent with
the Defendants' own contemporaneous and best judgment, unvarnished for litigation.  At a
minimum, Defendants' estimate of Neurontin's bipolar market share at a consistent 0%, year
after year, in the absence of an off-label marketing effort, provides independent evidentiary
support for Dr. Rosenthal's model.

one of those trials, Neurontin either fared no better than placebo, or worse.[19]  These findings

were consistent, beginning with the FDA's comprehensive review of Neurontin in the early

1990's, which found that Neurontin use was associated with *worsening* depression or even

suicide, rather than an improvement in mood.

   Because of the lack of either a "scientific rationale" or evidence of efficacy, there

was simply no association in the minds of physicians between Neurontin and bipolar disorder—

and a corresponding "0%" market share—prior to Defendants' fraudulent marketing blitz.  The

Court has found that Dr. Rosenthal's assumption that "all detailing to specialists other than

neurologists was both off-label and fraudulent . . . has validity, especially as it might apply to the

bipolar/mood disorder Subclass," because "no plausible, nonfraudulent reason existed for

defendants to detail psychiatrists."  Order at 42-43.  In the case of bipolar, there was no need for

physicians to balance the risks and benefits for each individual patient, because there were no

benefits to be had.  An inescapable corollary of the Court's conclusion that "no plausible, non-

fraudulent reason existed for defendant to detail psychiatrists" on Neurontin is that psychiatrists

had no plausible reason to *prescribe* Neurontin for bipolar, *except* as a result of Defendants'

fraudulent promotion.  While Vioxx may arguably have been worth *less* than the priced charged,

due to suppression of its negatives, Neurontin was utterly *worthless* for the treatment of bipolar

disorder—a fact concealed by Defendants—creating an "ascertainable loss" (i.e., the purchase

price) with every sale.

   As with <u>Vioxx</u>, in <u>McLaughlin v. American Tobacco Co</u>., 522 F.3d 215 (2d Cir.

2008), a "light" cigarettes Consumer fraud case, the predominance requirement was held

---

[19] Although not an issue on this motion in light of the Court's finding that "no plausible,
nonfraudulent reason existed for defendants to detail psychiatrists" (Order at 43), Plaintiffs
incorporate by reference Part III-A of Plaintiffs' summary judgment opposition (Dkt. No. 1754)
and supporting documents, which presents the results of each of these studies, and the FDA's
review.

unsatisfied because some class members could have "purchased lights for some reason other than the belief that Lights were a healthier alternative – for example, if a Lights smoker was unaware of that representation, preferred the taste of Lights, or chose Lights as an expression of personal style." Id. at 223. While there may be many reasons someone might smoke "light" cigarettes, it would not even occur to a responsible physician to prescribe Neurontin to treat bipolar absent evidence that it is effective to treat the condition. As the California Supreme Court explained last week in overturning the decertification of a tobacco class:

> "[R]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct. A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct."
>
> While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. " 'It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. . . . It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.' Moreover, *a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'*, and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.'"

In re Tobacco II Cases, ___ Cal. Rptr. 3d ___, 2009 WL 1362556, *16 (Cal. 2009) (citations omitted, emphasis added). This Court reached a similar decision just this week in the companion products liability cases, finding that "plaintiffs allege the elements necessary to establish a claim of fraudulent concealment, namely that defendants intentionally *withheld material information*

about the side effects of Neurontin from both consumers and their prescribing physicians, with the intent

to deceive." Memorandum and Order (Dkt. No. 1790), at 33 (emphasis added). This is the very same information that Class Plaintiffs claim was fraudulently concealed to hide the early evidence of Neurontin's inefficacy to treat mood disorders.

Applying these common law principles in this case, Plaintiffs are entitled to a presumption of reliance because no reasonable physician would prescribe Neurontin to treat bipolar, knowing that it had been proven no more effective in treating bipolar than a placebo, and may even cause depression or suicide.

Similarly, in In re St. Jude Medical Inc. Silzone Heart Valve Prods. Litig., 522 F.3d 836 (8th Cir. 2008), the device at issue was an FDA-approved synthetic heart valve. While individual trials would have been required to determine whether the device was selected merely because it was FDA-approved, or because of "[a] representation from St. Jude about the efficacy of the heart valve" in reducing the risk of infection (id. at 838-39), in either case, physicians were aware that the device was indeed a heart valve, and had been proven safe and effective to the satisfaction of the FDA. In this case, there was no plausible reason to prescribe Neurontin for bipolar, other than Defendants' deception. While Defendants have the right to call individual physicians to testify that they prescribed Neurontin to treat bipolar based on something other than Defendants' fraud, as Drs. Ragothaman and Arness testified, Plaintiffs have rebutted that showing. See Part III-A, supra. If, despite this evidence, Defendants can defeat class certification merely by postulating individual contrary proofs, unlike in Silzone,[20] it is difficult to

---

[20] The Court found this conclusion warranted in Silzone because of "evidence that many of the named class representatives and their doctors had never been exposed to any misrepresentations about the device." Order at 28. In this case, by contrast, Plaintiffs present compelling, if not

imagine how *any* Consumer fraud class could *ever* be certified.

Finally, as the Court acknowledges, <u>In re TJX Cos. Retail Security Breach Litig.</u>, 246 F.R.D. 389 (D. Mass. 2007) involved common law fraud claims, which, unlike RICO or the NJCFA, require proof of actual reliance.  <u>See</u> Order at 18, 29 n.6.  The Court finds it particularly relevant that "[e]ven if reliance could, in some situations, be demonstrated for the class as a whole via circumstantial evidence, doing so would not be appropriate" in <u>TJX</u>, because the record raised "significant questions about whether there was in fact class-wide reliance," as many of the class representatives had themselves provided plausible alternative reasons for their behavior unrelated to defendants' fraud.  In this case, by contrast, just as "no plausible, non-fraudulent reason existed for defendant to detail psychiatrists" on Neurontin (Order at 43), psychiatrists had no plausible reason to prescribe Neurontin for bipolar, *except* as a result of Defendants' fraudulent promotion.

> **D.** **The Order Improperly Rejects Applied Healthcare Economics**

After accepting that all marketing of Neurontin for bipolar and other mood disorders was essentially fraudulent, the Order notes that:

> However, many doctors were not detailed, and even if they were,
> the plaintiffs would have to demonstrate doctor-by-doctor that
> defendants' fraudulent misrepresentations or omissions during the
> off-label promotion caused the doctor to prescribe the medication.
> The model, while persuasive in the aggregate, cannot provide a
> shortcut for the indication-specific Consumer subclasses.

Order at 43.  In this passage, the Court appears to be saying that econometric modeling cannot be used to provide aggregate evidence of the impact of marketing (for either consumers or third party payors) because the impact of the marketing must be determined doctor-by-doctor.  But this interpretation really just means that the Order rejects the use of econometrics to show

conclusive evidence that each of the Consumer bipolar Subclass representatives' prescribing physicians was both exposed to and influenced by Defendants' fraudulent off-label marketing.

causation, notwithstanding other portions of the Order that expressly accept the reliability of econometric regressions, and acknowledge the role of healthcare and econometrics in explaining pharmaceutical sales and other activities.  Indeed, the Order contains another statement that contradicts both these notions, and attacks the fundamental basis of *all* applied econometrics: "Plaintiffs' theory is nothing if not novel; they ask the Court to permit a statistical analysis to function as common proof of causation for millions of disparate and varied human interactions that resulted in off-label prescriptions for Neurontin."  Order at 33.

In fact, Plaintiffs' theory is nothing if not mainstream empirical economics. Myriad examples exist in the economic literature that ascertain the effect of a single economic variable in a complex system.  The whole premise of econometrics is that underlying economic processes can be understood only by aggregating a large number of individual observations and discerning through multiple regressions on a set of key variables the interrelationship among inputs and outcomes.  At a minimum, given the importance placed by the Order on a critique of the Rosenthal Report, and this seeming confusion on how routine econometrics addresses "causation for millions of disparate and varied human interactions," the Court should reconsider the ruling and hear the parties on the issue of whether this Court should accept, as many others have, econometrics as a basis to explain complex economic facts, such as the relationship between pharmaceutical marketing and drug sales.

The fact that some physicians who wrote bipolar prescriptions were not themselves detailed (allegedly fraudulently) does not prove that all of the off-label detailing captured in the model was not fraudulent.  Rather, it points to the fact that the alleged scheme to promote the use of Neurontin for bipolar does not rely on a direct connection between the defendant and each and every doctor whose prescribing patterns were affected.

Since physician practice patterns diffuse through peer-to-peer contact and cross-coverage, it is incorrect to argue that for a physician to be influenced by promotion, a physician must be directly exposed to the promotional materials.  In fact, the literature presents something like a contagion model to more accurately describe the influence of marketing on medical practice.[21]  Moreover, plaintiffs allege that the defendants availed themselves of the full panoply of marketing modes to promote Neurontin for psychiatric uses, including CME, funding case series and other small "research" studies, favorably selecting results for publication, and medical liaisons.  While defendants have failed to produce data to allow Professor Rosenthal to quantify these efforts systematically,[22] she has opined that the pharmaceutical economics and marketing literature supports the contention that these fraudulent activities were undertaken in concert with detailing and journal advertising.  Therefore, some of the effect captured by her statistical analysis is attributable to these other marketing mechanisms.  For all of these reasons, the fact that not all physicians who wrote Neurontin prescriptions for bipolar or other mood disorders were detailed points to the understanding that the alleged fraud was perpetrated by manipulating

---

[21] J.S. Coleman, E. Katz, and H. Menzel, Medical Innovation: A Diffusion Study, Indianapolis: Bobbs-Merrill, 1996; and E.M. Rogers, Diffusion of Innovation, New York: Free Press, 1962 (the fifth and most recent edition was published in 2003).  See also E.R. Berndt, R.S. Pindyck and P. Azoulay, "Consumption Externalities and Diffusion in Pharmaceutical Markets: Antiulcer Drugs," The Journal of Industrial Economics, June 2003.

[22] Where, as here, plaintiffs are unable to prove damages with precision because of the defendant, a relaxed standard of proof applies.  See Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946); J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566-67 (1981) ("it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted"); Wallace Motor Sales, Inc. v. American Motor Sales Corp., 780 F.2d 1049, 1062 (1st Cir. 1985) ("a defendant whose wrongful conduct created the difficulty of ascertaining the precise damages suffered by the plaintiff is not entitled to complain that the damages cannot be measured with the same exactness and precision that would otherwise be possible.") (citing Bigelow); In re Watman, 331 B.R. 502, 510 (D. Mass. 2005) (Saris, J.) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.") (internal quotation omitted).

virtually all sources of decision support available to physicians as it pertains to off-label uses of approved drugs:  CME, opinion leaders, detail men and women, and peer-reviewed journals. And since there was virtually no other source of information to advocate its use for bipolar, it is not surprising that the absence of defendants' marketing campaign would have led to virtually *no* Neurontin sales for bipolar.

In summary, Plaintiffs' theory of the fraud does not require a direct "nexus between the doctor and the sales team," nor is this the economic model on which Professor Rosenthal's analysis rests.  Thus, for example, even if physicians accurately report that their off-label prescribing was the result of hearing about Neurontin from a colleague, or a discussion that occurred in psychiatric Grand Rounds, this does not imply that the causal chain does not lead back to the alleged fraud.

## IV.     THE ORDER FAILS TO ADDRESS PLAINTIFFS' UNJUST ENRICHMENT CLAIM

As this Court has recognized, unjust enrichment is an equitable remedy, and "[i]t is a basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law." In re Neurontin Mktg., Sales Practices and Products Liability Litig., 433 F. Supp.2d 172, 186 (D. Mass. 2006) (citing Mass. v. Mylan Labs., 357 F. Supp.2d 314, 324 (D. Mass. 2005)).  As a result of the Order, bipolar consumers no longer have adequate legal remedies.

A recent case from a federal court in New Jersey underscores the fact that Class Plaintiffs are able, and therefore should have been afforded the opportunity, to meet the requirements of Rule 23 with respect to their unjust enrichment claims.  In In re Mercedes-Benz Tele Aid Contract Litig., --- F.R.D. ---,  2009 WL 1101241, *29  (D.N.J. Apr. 24, 2009), the court certified a class of consumers who purchased or leased a Mercedes with emergency

response systems using obsolete analog cellular technology and brought an unjust enrichment claim against Mercedes.[23]   The court found that class plaintiffs had proven the first element of an unjust enrichment claim because they conferred a benefit on Mercedes.  Id.  The court in Mercedes-Benz thus found that only question for trial would be whether it would be inequitable to allow Mercedes to retain the subscription fees and/or digital upgrade payments remitted by Plaintiffs. This question was satisfied by a showing that: (1) Mercedes knew or should have known after August 8, 2002 that analog service would become unavailable, (2) the company's statements regarding the continued viability of the analog system were misleading in light of that knowledge, and (3) whether Plaintiffs had any legally-cognizable expectation that emergency response system would be available throughout the life of their vehicles.  The court found that since the first two issues dealt only with Mercedes's behavior and the third was a question of contractual interpretation that is common to all members of the putative class, Rule 23(b)(3)'s predominance requirement was satisfied with respect to the unjust enrichment claim.  Id.

Class Plaintiffs' claims of unjust enrichment against Pfizer are similarly amenable to class, rather than individual, proof.  First, it cannot be disputed that class plaintiffs have all conferred a benefit upon Pfizer.  Second, the issues of whether Pfizer knew or should have known that Neurontin was ineffective for bipolar disorder, and whether the company's statements regarding the purported efficacy were misleading in light of that knowledge, are common to all plaintiffs and can be tried in a single trial.  The third and final requirement hinges

---

[23] .  The gravemen of the plaintiffs' claims was that Mercedes knew from 2002 – 2006 that the analog systems being installed in its vehicles would cease to function by regulatory fiat of the FCC (so much so that Mercedes lobbied against the regulatory change) and yet withheld that critical information from consumers who purchased the system and agreed to pay the annual service charges during those years.  As a result, consumers either spent money on subscription fees that became worthless, or they were forced to incur additional fees to upgrade to a digital system that should have been avoided had consumers been told of the impending FCC regulations at the time of vehicle purchase.

on whether Class Plaintiffs had any legally-cognizable expectation that Neurontin would effectively treat symptoms of mood disorders rather than leaving the symptoms untreated and possibly causing them to get worse.  While this issue focuses on the expectations of the Consumer, it can scarcely be doubted that all persons prescribed Neurontin for bipolar expected that there was at least a reasonable chance the drug would be effective in treating their condition. Accordingly, Class Plaintiffs respectfully request that the Court reconsider its decision and, at a minimum, certify a class of bipolar consumers under the theory of unjust enrichment.

Respectfully submitted,

Dated:  May 28, 2009                          GREENE & HOFFMAN

By:   /s/ Thomas M. Greene
       Thomas M. Greene, Esq.

33 Broad Street, 5th Floor,
Boston, MA  02109

LIEFF, CABRASER, HEIMANN
 & BERNSTEIN, LLP

By:   /s/ Barry R. Himmelstein
       Barry R. Himmelstein, Esq.

275 Battery Street, 30th Floor
San Francisco, CA  94111-3339

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Thomas M. Sobol*
        Thomas M. Sobol, Esq.

One Main Street, 4th Floor
Cambridge, MA  02142

BARRETT LAW OFFICE

By:   */s/ Don Barrett*
        Don Barrett, Esq.

404 Court Square North
P.O. Box 987
Lexington, MS  39095

LAW OFFICES OF DANIEL BECNEL, JR.

By:   */s/ Daniel E. Becnel, Jr.*
        Daniel E. Becnel, Jr., Esq.

106 W. Seventh Street
P.O. Drawer H
Reserve, LA  70084

DUGAN & BROWNE

By:   */s/ James R. Dugan*
        James R. Dugan, Esq.

650 Poydras Street, Suite 2150
New Orleans, LA  70130

*Members of the Class Plaintiffs' Steering Committee*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 28, 2009.

*/s/  Barry Himmelstein*

818383.7