# Exhibit A
# Part I

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3   In re:   NEURONTIN MARKETING, SALES  MDL DOCKET NO:  1629
              PRACTICES, AND PRODUCTS
 4            LIABILITY LITIGATION        Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7           ALL PRODUCTS LIABILITY
             ACTIONS
 8   _____/

 9
             VIDEOTAPED
10           DEPOSITION OF:      CHERYL D. BLUME, Ph.D.

11      DATE:                    November 12, 2007

12      TIME:                    9:25 a.m. to 6:07 p.m.

13      PLACE:                   13902 North Dale Mabry Highway
                                 Suite 122
14                               Tampa, Florida

15      PURSUANT TO:             Notice by counsel for
                                 Defendants for purposes
16                               of discovery, use at
                                 trial or such other
17                               purposes as are permitted
                                 under the Federal Rules
18                               of Civil Procedure

19      BEFORE:                  VALERIE A. HANCE, RPR
                                 Notary Public, State of
20                               Florida at Large

21                               Volume 1
                                 Pages 1 to 370
22

23

24

25
```

Page 2

```
 1  APPEARANCES:
 2     KENNETH B. FROMSON, ESQUIRE
        Finkelstein & Partners
 3      785 Broadway
        3rd Floor
 4      Kingston, New York  12401
        (800) 634-1212 Ext. 2755
 5         Attorney for Plaintiffs
 6     RICHARD M. BARNES, ESQUIRE
        MICHAEL J. WASICKO, ESQUIRE
 7      Goodell, DeVries, Leech & Dann, LLP
        One South Street
 8      20th Floor
        Baltimore, Maryland  21202
 9      (410) 783-4000
10     -and-
11     VINCENT E. GUNTER, ESQUIRE
        LORI C. McGRODER, ESQUIRE (via telephone)
12      Shook, Hardy & Bacon, LLP
        2555 Grand Boulevard
13      Kansas City, Missouri  64108-2613
        (816) 474-6550
14         Attorneys for Defendant, Pfizer, Inc.
15     ANNAMARIE A. DALEY, ESQUIRE (via telephone)
        Robins, Kaplan, Miller & Ciresi L.L.P.
16      2800 LaSalle Plaza
        800 LaSalle Avenue
17      Minneapolis, Minnesota 55402
        (612) 349-8500
18         Attorney for Plaintiff, Assurant
19     ELANA GOLD, ESQUIRE (via telephone)
        Law Office of Steven Hillyard
20      345 California Street
        Suite 1770
21      San Francisco, California  94104
        (415) 334-6880
22         Attorney for Raymond Jennings, M.D.
23  ALSO PRESENT:
        KEITH ALTMAN, Finkelstein & Partners
24      DAVID LEGGETT, Videographer
25
```

Page 3

```
 1                INDEX
                             PAGE
 2  DIRECT EXAMINATION BY MR. BARNES..............  6
 3  CERTIFICATE OF OATH.................... 369
 4  REPORTER'S CERTIFICATE................. 370
 5
 6              EXHIBITS
                             ID     MARK
 7   1   First Amended Notice of .........   9      9
         Videotaped Deposition Duces Tecum of
 8       Cheryl D. Blume, Ph.D.
 9   2   Hard Drive (Retained by counsel)....  13    13
10   2A  Directory of Contents on Hard Drive.....  14
11   3   Disk of Neurontin/gabapentin ........  14    14
         Bibliography
12
     3A  Directory of Documents Found on Disk....  15   14
13
14   4   Exhibit Number Skipped................. 35
15   5   Notebook.............................  36    36
16   6   Correspondence and Communications ...... 36   36
         Removed from Notebook (Exhibit 4)
17   7   Disk In Re: Neurontin Keith Altman ....  45   45
         ADE Files (10/28/07)
18
     8   Yellow Legal Paper for Requested ....... 117  117
19       Formula
20   9   Guidance for Industry, Good ...........  118  118
         Pharmacovigilance Practices and
21       Pharmacoepidemiologic Assessment,
         March 19th, 2005, Clinical Medical
22
     10  Map of Terms for Suicidal and .......... 160  159
23       Self-Injurious Behaviors
24   11  Pharmacopeidemiology, Fourth Edition, ..  164  164
         by Brian Strom (Page 171)
25
```

Page 4

```
 1          EXHIBITS (Continued)
                              ID    MARK
 2  12  Composite, Graphs (7)............... 178   175
 3  13  Photograph........................... 196   196
 4  14  Photograph........................... 197   197
 5  15  PDG Financials....................... 249   249
 6  16  Collins-McFarland Research Report - .... 346   346
        Divalproex, lithium and suicide among
 7      Medicaid patients with bipolar
        disorder
 8
```

Page 5

 1          THE VIDEOGRAPHER:  This is the videotaped
 2  deposition of Cheryl Blume, Ph.D., being held in
 3  the offices of Pharmaceutical Development Group
 4  located at 13902 North Dale Mabry Highway in Tampa,
 5  Florida, on November 12th, 2007.  The time is
 6  9:25 a.m.
 7          My name is David Leggett.  I'm the videotape
 8  specialist.  And the court reporter is
 9  Valerie Hance.  Will counsel introduce themselves.
10          MR. BARNES:  Richard Barnes on behalf of
11  Pfizer.
12          MR. GUNTER:  Vince Gunter on behalf of Pfizer,
13  defendants.
14          MR. WASICKO:  Michael Wasicko on behalf of
15  Pfizer.
16          MR. FROMSON:  Kenneth Fromson on behalf of the
17  product liability plaintiffs in the MDL, liaison
18  counsel in the New York coordinated litigation, and
19  counsel for plaintiffs in the action of Nicolette
20  Crone vs. Pfizer, Lake County, California.
21          MR. ALTMAN:  Keith Altman, nonattorney with
22  Finkelstein & Partners.
23          MR. BARNES:  Counsel on the phone, please
24  identify themselves.
25          MS. DALEY:  Annamarie Daley, counsel for

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 6

1  Assurant plaintiffs.
2      MS. GOLD: Elana Gold, counsel for
3  Raymond Jennings, M.D.
4      THE VIDEOGRAPHER: And the court reporter,
5  please swear in the witness.
6          CHERYL D. BLUME, Ph.D.,
7  the witness herein, being first duly sworn on oath, was
8  examined and deposed as follows:
9      THE WITNESS: I do.
10         DIRECT EXAMINATION
11 BY MR. BARNES:
12  Q.  Could you please state your name and address
13 for the record, please.
14  A.  Cheryl D. Blume, B-l-u-m-e. Our office
15 address is 13902 North Dale Mabry Highway, Tampa 33618.
16 My home address is 2902 Whittington Place, Tampa,
17 Florida 33618.
18     MR. BARNES: Before we get started, I think
19 Mr. Fromson and I have some things to put on the
20 record, so I'll begin.
21     Plaintiffs have designated Cheryl Blume as an
22 expert in the Neurontin MDL proceedings. Pursuant
23 to the MDL Court's orders, defense counsel are here
24 to depose Dr. Blume on her analyses and opinions
25 that relate to the issue of general causation.

Page 7

1  That is whether plaintiffs can prove what
2  scientifically-reliable evidence that Neurontin
3  causes suicidal behavior, as well as the issue of
4  preemption, the two subjects on which the
5  defendants are expected to file motions for summary
6  judgment at this -- at this stage of the
7  proceedings.
8      Pursuant to discussions with plaintiff's
9  counsel regarding the scope and nature of
10 Dr. Blume's analyses and opinions, defendants have
11 withdrawn their motion to depose Dr. Blume beyond
12 the currently-scheduled two days, subject to
13 plaintiff's counsel's agreement that at -- if at
14 the end of the two days, defendants reassert this
15 motion, plaintiff's will not object on the ground
16 that this motion is untimely.
17     This case is being noted in the MDL and
18 New York consolidated proceedings.
19     Counsel.
20     MR. FROMSON: Just note my objection to the --
21 to the preface by defense counsel. Plaintiffs are
22 producing Dr. Blume in accordance with their
23 responses and objections to defendant's notice to
24 produce which was served on or about November 8th
25 or 9th of 2007. It's our understanding that

Page 8

1  Dr. Blume is providing opinions in accordance with
2  her disclosure, for which defendants have been
3  provided a copy. It's our understanding that she
4  is providing opinions that are consistent with the
5  discovery schedule in the actions including the
6  MDL, the New York coordinated litigation, as well
7  as the Lake County case of Crone vs. Pfizer.
8      And to the extent that defense counsel
9  refuses, fails, omits, or otherwise does not
10 inquire about subject matters in the
11 previously-served expert disclosure with
12 Cheryl Blume, we will not be voluntarily producing
13 her for deposition. We will produce her only with
14 court order. And it will be our position that such
15 actions by defendants would be a waiver of your
16 rights to depose her in the future as to the
17 subject matter that was included in her
18 previously-served expert disclosure.
19     MR. BARNES: Okay. With that, I'll just
20 respond that, with respect to this Crone case, that
21 Dr. Blume has not yet been designated as an expert
22 in the Crone case. And if Dr. Blume is, in fact,
23 designated as an expert in the Crone case by the
24 plaintiff's counsel prior to the expert dead --
25 deadline, defendants reserve their right to depose

Page 9

1  Dr. Blume on any and all issues, noncase specific
2  or case specific, in the matter of the Crone case.
3      With that, I think we can proceed with the
4  substance. What I'd like to do is -- I think I've
5  handed you a deposition notice. I'd like to mark
6  that as Defense Exhibit No. 1.
7      Do you have -- you have a copy of it I gave
8  you this morning.
9      (Deposition Exhibit No. 1 marked for
10 identification.)
11     MR. BARNES: Okay. Thank you very much.
12 BY MR. BARNES:
13  Q.  Dr. Blume, have you -- I'm going to hand you
14 what has been marked as Defense Exhibit No. 1. This is
15 the First Amended Depo -- First Amended Notice of
16 Videotaped Deposition Duces Tecum of Cheryl D. Blume,
17 Ph.D. Have you seen this before?
18  A.  The one that I was provided as the notice of
19 deposition does not include "First Amended."
20  Q.  Okay. Well, we've marked the First Amended.
21     Now, did the original notice have a
22 duces tecum or a document request at the end of it?
23     MR. FROMSON: Counsel, do you have a copy for
24 me of the First Amended?
25     MR. BARNES: I believe we do. I have an extra

Page 10

1  copy. Don't have it handy. We'll give you the --
2      MR. FROMSON: If I can just briefly take a
3  look at the one you'd provided to the witness then.
4      MR. BARNES: That would be fine.
5      MR. FROMSON: I'll give it right back.
6      Do you know if the only reason for the
7  amendment is the change in location?
8      MR. BARNES: Perhaps that's it.
9      MR. FROMSON: Okay.
10     MR. BARNES: Is that right?
11     MR. GUNTER: Yeah.
12     MR. BARNES: Pretty sure that's it.
13     MR. FROMSON: Okay. Thank you.
14     MR. BARNES: Yeah.
15 BY MR. BARNES:
16  Q. This is the one you'll work off. I think
17 we -- we've agreed that that's the one you have with
18 just change of address. We had originally noted for
19 another address and we -- as an accommodation to you, we
20 noted it for here. Okay?
21     Now, did you produce materials pursuant to the
22 deposition notice where we've asked you to produce
23 documents that you --
24  A. I did.
25  Q. Okay. We'll work through some of the

Page 11

1 logistical aspects of this and, counsel, we can make
2 sure we understand.
3      What I would like for you to do is provide me
4 with the hard drive of information that counsel provided
5 you in connection with this case. Do you have that
6 handy?
7   A. I do.
8   Q. Could you please --
9      MR. FROMSON: It's behind you.
10 BY MR. BARNES:
11  Q. -- grab that, please.
12  A. Yes.
13     MR. BARNES: All right. Mark this as
14 Exhibit 2 and we'll make -- Counsel, during the
15 course of the deposition, we'll find a way to
16 make -- transfer the information on this hard drive
17 to defendant's possession in a way that we can have
18 access to what you have provided Dr. Blume.
19     Mark this as Exhibit No. 2.
20     MR. FROMSON: I'll take your request under
21 advisement. We'll discuss it off the record.
22     MR. BARNES: Well, then, are you refusing to
23 make a copy of the information you provided to
24 Dr. Blume?
25     MR. FROMSON: No, not at all. Actually, I'm

Page 12

1 giving you this for your possession.
2      MR. BARNES: Okay.
3      MR. FROMSON: You can do with it what you
4 want. It's for you at no cost. And that --
5      MR. BARNES: Okay.
6      MR. FROMSON: -- was what was agreed upon by
7 defense -- by plaintiff's counsel in conversations
8 I've had with Lori McGroder. You can have that.
9      MR. BARNES: This is our copy of it?
10     MR. FROMSON: You can have that.
11     Now, whether you want -- now, as far as
12 authentication issues, if you've going to give it
13 to the reporter at the end of the day -- I don't
14 know what you want to do, but --
15     MR. BARNES: Well, here's what we'll do.
16     MR. FROMSON: -- you can have it.
17     MR. BARNES: What I would like to do is, we'll
18 take -- counsel will take possession of
19 Exhibit No. 2 at the end -- at the end of the
20 deposition. We'll just hold it in our possession,
21 with your agreement.
22     MR. FROMSON: I -- it's not that I have a
23 dispute as to you taking possession of it. It
24 becomes an issue of authentication later, because I
25 will not know what you have done with it, if

Page 13

1 anything. That's something -- that's why I says it
2 could all be taken under advisement as to what you
3 want --
4      MR. BARNES: I understand.
5      MR. FROMSON: -- do with it.
6      MR. BARNES: Let's mark this as Exhibit 2.
7 We'll talk off the record.
8      MR. FROMSON: It would probably be cured by
9 simply --
10     THE REPORTER: Excuse me.
11     MR. FROMSON: I'm sorry.
12     (Deposition Exhibit No. 2 marked for
13 identification.)
14     MR. GUNTER: Is this the index that goes to
15 this hard drive?
16     MR. FROMSON: No, it's --
17     MR. GUNTER: Do you have an index for the hard
18 drive? And that will clear up anything.
19     MR. ALTMAN: No. One could be brought in.
20     MR. GUNTER: If we had an index for the hard
21 drive, I think we'd be in good shape.
22     MR. ALTMAN: It would be thousands of pages
23 and not practical.
24     MR. GUNTER: Not pages, but just documents.
25     MR. ALTMAN: No, no, the index would be

Page 14

1  thousands of pages. There are probably almost a
2  million documents, not pages.
3      MR. GUNTER: Okay. So the best thing to do
4  then, if we have to extract any documents on that,
5  we could -- you could confirm that this was on
6  the --
7      MR. BARNES: Original.
8      MR. GUNTER: -- hard drive that you gave, the
9  original?
10     MR. ALTMAN: One simple way to do it is that,
11 maybe on a break, we can run a directory of what's
12 on that hard drive, mark that itself as an exhibit
13 which would authenticate what was on the hard
14 drive. Then you can take it with you. Then we
15 have the copy --
16     MR. BARNES: And that will be Exhibit -- we'll
17 make that as Exhibit 2A to the deposition.
18     MR. ALTMAN: And that would probably solve
19 that.
20     MR. BARNES: Okay. That's excellent. Thank
21 you.
22     And then I'd like to mark this as Exhibit 3
23 and 3A, if I might, Madame Court Reporter.
24     Excuse me, Dr. Blume.
25     (Deposition Exhibit Nos. 3 and 3A marked for

Page 15

1  identification.)
2  BY MR. BARNES:
3     Q. Can you identify what's been marked as
4  Exhibit 3 and Exhibit 3A to the deposition?
5     A. Yes. Exhibit 3 is a disk that I asked to be
6  prepared that includes the following information. It
7  includes our complete bibliography relating to Neurontin
8  and gabapentin of scientific literature articles. It
9  also includes information that I have cited in my report
10 that I obtained independently. And it includes the --
11 as I -- yes, it includes the databases that were
12 provided to us relating to the various postmarketing
13 pharmacovigilance data.
14    Q. Who provided information to you on the
15 pharmacovigilance data?
16    A. Mr. Altman.
17    Q. Who is Mr. Altman?
18    A. Keith Altman is an employee of Finkelstein who
19 works with PDG on various projects relating to
20 postmarketing pharmacovigilance.
21    Q. On how many products does Mr. Altman work with
22 your company on pharmacovigilance products?
23    A. Oh, over the last three or four years,
24 probably 20.
25    Q. And can you describe the -- the ref- -- the

Page 16

1  work you've done with Mr. Altman over the -- in the 20
2  projects that you've identified?
3     A. They may be divided into two categories. One
4  relates to the product development work we do for
5  pharmaceutical clients with respect to their preparation
6  of submissions for the U.S. Food and Drug
7  Administration, and the other relates to work that we
8  have done with him on litigation-related matters.
9     Q. Okay. Is Mr. Altman an employee of your firm?
10    A. No, as I noted, he's an employee of
11 Finkelstein.
12    Q. How is he -- when he works on project
13 development work for your clients with regard to FDA
14 submissions, on what basis is he compensated?
15    A. He -- he provides a bill -- he provides an
16 invoice for his hours to us, and that invoice is then
17 included with the expenses that I provide to the client.
18    Q. What clients have you worked with Mr. Altman
19 on product development work?
20       MR. FROMSON: Just note my objection as to
21 form.
22       THE WITNESS: Yes. And I can tell you the
23 types of clients they are, but I'm not permitted to
24 identify our pharmaceutical clients.
25 BY MR. BARNES:

Page 17

1     Q. On what basis do you -- you can't identify
2  your pharmaceutical clients?
3        MR. FROMSON: Just note my objection to the
4  extent that it may be privileged information or
5  subject to confidentiality agreements that she has
6  with both pharmaceutical companies.
7        THE WITNESS: That is correct. And I have
8  questioned them in the past regarding these types
9  of issues and they have forbidden me to identify
10 them.
11 BY MR. BARNES:
12    Q. How many clients has Mr. Altman worked with
13 you on product development matters?
14    A. Probably four or five.
15    Q. And when did that begin?
16    A. In 2004.
17    Q. Describe the nature of the work that
18 Mr. Altman does for you for your pharmaceutical clients.
19    A. He has evaluated U.S. as well as international
20 databases, both publicly available as end company-based
21 databases, relating to adverse events for utilization in
22 either IND or NDA submissions or in the establishment of
23 pharmacovigilance assignments following an NDA approval.
24    Q. Are these U.S.-based companies that you're
25 working with?

Page 18

1    A.  Both U.S. and international.
2    Q.  Are the -- involves the products that are --
3  are they generic or are they ethical pharmaceuticals,
4  branded pharmaceuticals?
5    A.  They are both.
6    Q.  Do you direct his activities when he works
7  with you on your -- your pharmacovigilance work for
8  private clients outside of litigation?
9    A.  Yes.
10   Q.  And so he -- you basically ask him to run the
11 queries of the database and you will run the queries?
12   A.  Yes.
13   Q.  Does he ever design the queries himself?
14   A.  I did -- I request the type of information
15 that I need extracted.  He -- he designs the assignments
16 that he conducts in order to assess the database,
17 electronically access the database and check the
18 database.
19   Q.  So I understand, you will say, "Mr. Altman, I
20 would like for you to query the database to extract this
21 information, run these analyses," and he would use his
22 system to pull the information out and return the
23 information to you for your professional evaluation?  Is
24 that fair?
25   A.  Yes.  And his -- and his analyses procedures

Page 19

1  are included with the information that is provided to
2  both the client and to the Food and Drug Administration.
3    Q.  Let me know, how does that work?  When he
4  provides you with the analyses and procedures, what
5  are -- what documentation does he provide you with in
6  response to your request for information?
7       MR. FROMSON:  Just note my objection as to
8    form.
9       THE WITNESS:  Well, it takes -- it takes --
10   takes different approaches depending on the type of
11   search and depending on the client.  Generally he
12   is involved with the design, the information that
13   is needed in the goals for -- for the IND or for
14   the NDA.  And so he is aware of what we are -- what
15   we are working on.
16      And I will ask him specific queries, either at
17   a meet -- either at a face-to-face meeting or
18   telephonically or electronically, and he will run
19   that information.  There is generally telephonic
20   contact back and forth as that information is
21   generated.  And the information is provided to us
22   electronically or he brings us to us when we meet.
23 BY MR. BARNES:
24   Q.  Your prior answer talked about that he would
25 provide you with design and documentation back to you in

Page 20

1  terms of the request.
2    Does he provide you with the protocol for a
3  search or how does he set up the search or does he --
4  you just let him run the search as he sees fit?
5    A.  Well, we've done it several times, and he
6  provides to me an overview of how he has -- how he plans
7  on conducting the search.  That protocol and the -- and
8  his execution of that protocol has been previously found
9  acceptable by the Food and Drug Administration.
10 Generally, that same general type of search is conducted
11 for all of our searches.
12   Q.  And when -- when was it found acceptable by
13 the Food and Drug Administration?
14   A.  I think our first NDA with that was approved
15 in 2004.
16   Q.  And what -- what protocol did he run that was
17 found acceptable by the Food and Drug Administration?
18 Describe it, the protocol and what the output was.
19      MR. FROMSON:  Just note my objection as to
20   form.
21      THE WITNESS:  Within the confines of our
22   confidentiality agreement with that client, the
23   search was designed to compare a variety of
24   adverse-related events over a family of drug
25   products.  And we were interested in specific

Page 21

1    events within a drug product and across the family
2    of drugs.  And we were also interested in the
3    standard pharmacovigilance tools of accessing the
4    top 25 events at each reporting period, any changes
5    in the top 25 events, any events that represent a
6    signal from one reporting period to the next, any
7    new events that have popped up on the database from
8    the previous period.
9  BY MR. BARNES:
10   Q.  And do you have a -- was that information
11 submitted to the Food and Drug Administration?
12   A.  Yes.
13   Q.  And was this NDA approved?
14   A.  Yes.
15   Q.  Is it, work that Mr. Altman did, publicly
16 available from the Food and Drug Administration?
17   A.  I don't know if that is specifically noted in
18 the summary basis of approval.  I don't know.
19   Q.  The infor- -- you provide information to the
20 government that was prepared by Mr. Altman, correct?
21   A.  Yes.
22   Q.  Is there any -- any -- any known reason -- any
23 basis for confidentiality that you can identify with
24 regard to the information that your company submitted to
25 the Food and Drug Administration that was presented by

Page 22

1  Mr. -- prepared by Mr. Altman in connection with that
2  NDA?
3     A.  The only thing that is publicly available from
4  a new drug application is the information that the FDA
5  provides relating to that new drug application.  And I
6  don't know if the FDA's release of the clinical data
7  section includes an overview of the postmarketing
8  pharmacovigilance.  I don't know.
9     Q.  And what's the name of that drug?
10    A.  I just can't share this with you.
11    Q.  Well, just so I understand, you did work on
12 behalf of a pharmaceutical company in regard to a new
13 drug application, correct?
14    A.  Yes.
15    Q.  And that your -- your client submitted that
16 information to the Food and Drug Administration in
17 connection with seeking FDA approval for a drug?
18    A.  Yes.
19    Q.  And now is it your testimony that the drug was
20 subsequently approved by the Food and Drug
21 Administration?
22    A.  Yes.
23    Q.  And you're claiming that the work that you
24 submitted to the United States Government is somehow
25 confidential in connection with that approval of -- of a

Page 23

1  drug for marketing to the United States?
2     A.  Yes.
3     Q.  I'm asking you -- so you're just refusing to
4  provide me with the name of the drug?
5     A.  All the work that I provide goes to the client
6  and is embedded within their new drug application.
7     Q.  What's confidential with the name of the drug?
8        MR. FROMSON:  Just note my objection as to
9     form.
10       THE WITNESS:  I am not permitted to talk about
11    the clients nor their drug products.
12 BY MR. BARNES:
13    Q.  By whom?
14    A.  By the client.
15    Q.  Are you relying on any of your experience
16 working with these pharmaceutical clients in forming
17 your opinions in this case?
18       MR. FROMSON:  Note my objection as to form.
19       THE WITNESS:  My opinions in this case are --
20    are predicated upon my 25 years in the
21    pharmaceutical industry as well as the work that I
22    have continued over the last six years.
23 BY MR. BARNES:
24    Q.  Are you relying on any of the work you've done
25 with the Food and Drug Administration in connection with

Page 24

1  pharmaceutical clients in expressing any of your
2  opinions in this case, including the methods that
3  Mr. Altman employed on your behalf in making these
4  submissions?
5     A.  No.  Not specifically, no.
6     Q.  Not specifically.  How about generally?
7     A.  He does the same general types of searches in
8  both litigation and as well as in the product
9  development assignments.
10    Q.  It's not my question.
11       MR. BARNES:  Would you read back that last
12    question, please.
13       (The reporter read the portion requested.)
14       THE WITNESS:  It is the same methods that he
15    uses for both our litigation work as well as
16    pharmaceutical development work.  So I'm relying on
17    the experience I have gained with him in the
18    litigation for my work in this case.
19 BY MR. BARNES:
20    Q.  Please list every drug pharmaceutical client
21 that Mr. Altman has assisted you with --
22       (Brief interruption.)
23       MR. FROMSON:  Did you finish the question?
24       MR. BARNES:  I did not.  Thank you.
25       MR. FROMSON:  Okay.

Page 25

1  BY MR. BARNES:
2     Q.  Please list for me each pharmaceutical client
3  with whom you have provided services and have engaged
4  the services of Mr. Altman of Finkelstein &
5  Associates --
6        MR. FROMSON:  Object --
7  BY MR. BARNES:
8     Q.  -- for me.
9        MR. FROMSON:  Okay.  Now, just note my
10    objection again to the extent that she's already
11    indicated that confidentiality agreements from
12    those pharmaceutical companies --
13       MR. BARNES:  Make your record.
14       MR. FROMSON:  I thank you.
15       -- prevent her from answering that question.
16       THE WITNESS:  Yes, I can't answer it.
17 BY MR. BARNES:
18    Q.  Would you please -- you're refusing to answer
19 the question?
20    A.  Well, I'm refusing because I am not permitted
21 to answer the question.
22    Q.  Would you please provide me with
23 confidentiality agreements with these companies with the
24 names redacted?
25       MR. FROMSON:  Just note my -- my same

Page 26

1  objection. Over my objection, she can answer the
2  question to the best she can.
3     THE WITNESS: I will check with our corporate
4  counsel. And depending on his response, I will
5  address that request.
6  BY MR. BARNES:
7     Q. What's confidential about the names of the
8  drugs that you have worked on for pharmaceutical
9  clients --
10    MR. FROMSON: Just note my objection.
11 BY MR. BARNES:
12    Q. -- that have been approved by the Food and
13 Drug Administration. Not in process, but that are now
14 approved. What's confidential about that?
15    MR. FROMSON: Note my objection to the form of
16 the question. She's not an attorney, so she can't
17 define for you what's confidential. She's
18 instructed -- she's indicating to you that her
19 confidentiality agreements prevent her from
20 disclosing it and her counsel is indicating she
21 can't do that.
22    MR. BARNES: I just want to know her
23 understanding.
24    THE WITNESS: Yes.
25    MR. FROMSON: Over my objection, you can

Page 27

1  answer.
2     THE WITNESS: Yes, we -- we sign
3  confidentiality agreements and contracts with these
4  clients. Those are reviewed by my corporate
5  counsel.
6     We've been asked this in earlier time. I've
7  requested permission to give their names. Both our
8  corporate counsel and the clients have refused.
9     MR. BARNES: So to the extent that you are
10 relying upon your work with these clients in
11 expressing any of your opinions here today, I will
12 object to that and ask that if that goes forward, I
13 want that information produced.
14    MR. FROMSON: I'll take your objection under
15 advisement.
16    MR. BARNES: Thank you.
17 BY MR. BARNES:
18    Q. Can you generally describe the terms of the
19 confidentiality agreement?
20    MR. FROMSON: Just note my objection as to
21 form. Over my objection, go ahead if you know..
22    And -- and, further, you don't even know if
23 the terms of the agreement are also confidential,
24 so you're asking her to deal with that issue.
25    MR. BARNES: Speaking objections now, Counsel.

Page 28

1  BY MR. BARNES:
2     Q. I'm not try -- if it's -- I want to know the
3  terms of the confidentiality agreements.
4     A. Really, I don't know if I'm permitted to talk
5  about this. I will check with our corporate counsel and
6  answer it later, depending on his response.
7     Q. How many times years -- do you know the term
8  of the confidentiality for -- is it -- is it forever or
9  is there a period of years and it's limited to years?
10    MR. FROMSON: Note my same objection.
11    THE WITNESS: Corporate counsel reviews these
12 contracts. From what I can recall, the ones that I
13 can recall, I believe are seven years after the NDA
14 is approved.
15 BY MR. BARNES:
16    Q. And that applies to all companies?
17    A. No, just the ones that I recall.
18    Q. Okay.
19    THE REPORTER: Excuse me. That are --
20    THE WITNESS: Just the ones that I recall.
21 BY MR. BARNES:
22    Q. Now, are there any clients for whom you do
23 pharmaceutical work in which Mr. Altman has worked with
24 you that do not have confidentiality agreements?
25    A. I don't think so. Not that I can recall, no.

Page 29

1     Q. What's Mr. Altman's background? Do you know
2  his educational background?
3     A. Yes. His undergraduate work, I believe, is
4  with SUNY in some sort of an mathematical engineering
5  degree. And I know that he has almost completed law
6  school.
7     Q. Oh, he's a lawyer, wants to be a lawyer?
8     A. I don't think he's completed yet, but I think
9  he's almost completed.
10    Q. And he's not a -- is he a medical doctor?
11    A. Not that I know of, no.
12    Q. Is he a biostatistician?
13    A. No.
14    Q. Is he an epidemiologist?
15    A. Not by training, no.
16    Q. Is he an epidemiologist professionally?
17    A. No.
18    Q. Now, he's worked with you on pharmaceutical
19 litigation, correct?
20    A. Yes.
21    Q. And describe how -- what clients he has worked
22 with you on -- identify the clients he's worked with you
23 on pharmaceutical litigation?
24    MR. FROMSON: Same objection as before, in
25 terms of confidentiality.

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 30

1    THE WITNESS: I don't know if I can answer
2    that question. I can answer that he was identified
3    in the courtroom one time at a Phen-Fen trial. So
4    I can identify that one. But other than that, I
5    don't know if I'm permitted to answer that.
6  BY MR. BARNES:
7    Q. Let's do it this way. You've -- you've
8  identified Mr. Altman as someone with whom you have
9  worked on pharmaceutical litigation in the past?
10   A. Yes.
11   Q. Okay. And he's obviously -- do you know, if
12 in doing so, was he engaged with Finkelstein &
13 Associates or is it something that he was freelancing
14 on --
15   MR. FROMSON: Just note --
16 BY MR. BARNES:
17   Q. -- when he did these -- when he did his work
18 with you?
19   MR. FROMSON: Just note my objection as to
20   form in terms of time, as well as whether it was
21   one or the other or both.
22   MR. BARNES: Well, let's -- let's -- let's
23   just break it down.
24   MR. FROMSON: Okay.
25 BY MR. BARNES:

Page 31

1    Q. And you've worked with Mr. --
2  Mr. Finkelstein's firm in the past, correct?
3    A. Yes.
4    Q. On how many cases, different litigations, have
5  you been engaged by the Finkelstein law firm in
6  pharmaceutical litigation?
7    A. Have I been engaged by the Finkelstein law
8  firm?
9    Q. For -- yes, we'll do engaged first.
10   A. One other.
11   Q. What --
12   A. One other case besides this.
13   Q. What's that?
14   A. I have no idea if I'm permitted to answer
15 that.
16   Q. Are you -- are you refusing to answer the
17 prior cases you've handled with the Finkelstein law
18 firm?
19   A. I also have an agreement and confidentiality
20 agreement with them --
21   Q. Will you produce that confidentiality
22 agreement?
23   A. -- in our contract, yes.
24       If they permit me to do that, I will ask them
25 at the break.

Page 32

1    Q. So you are -- you are refusing to identify the
2  litigations that you are involved with with the
3  Finkelstein law firm in this deposition; is that
4  correct?
5    MR. FROMSON: Just note my objection as to
6    form, to the extent that you're not only harassing
7    her. She said she would consult with counsel.
8    MR. BARNES: Well, we have -- we have -- we --
9    we have a limited period of time. It's been not
10   the most convenient spot to do a deposition. We're
11   trying to accommodate you. Are you instructing her
12   not to identify the cases which she's --
13   MR. FROMSON: Did I make an objection?
14   MR. BARNES: No, you -- I just --
15   MR. FROMSON: I did not make an objection.
16 BY MR. BARNES:
17   Q. So are you refusing to answer that question?
18   A. I simply don't know if I'm permitted to answer
19 that question. If I am permitted, I will answer it.
20   Q. Who would you have to speak with to find out
21 if you're permitted to answer the question about the
22 Finkelstein associate relationship?
23   A. Well, I would -- I would think that I could
24 ask Mr. Fromson that question.
25   Q. I would -- I would -- is Mr. Fromson in this

Page 33

1  room?
2    A. Yes.
3    Q. And is he seated right to your left?
4    A. Yes.
5    MR. BARNES: Okay. Mr. Fromson, are you --
6    would you permit her to identify the litigations
7    with your law firm that she is currently working on
8    or has worked on in the past?
9    MR. FROMSON: I think it's entirely
10   appropriate that at a break I simply speak with the
11   witness to identify the case that she believes
12   she's referencing, and then I can confer with you
13   after.
14 BY MR. BARNES:
15   Q. Do you recall providing a list of litigation
16 cases you've testified in in the past?
17   A. Yes.
18   Q. Okay. Let's go through it that way.
19       Name the pharmaceutical products with whom you
20 have -- you provided consulting services in the past ten
21 years.
22   MR. FROMSON: Just note my objection to form.
23   Can you -- I just want to have that question
24   read back for one second.
25       So you want to know about consulting services

Page 34

1  as opposed to testimony, Rick?
2        MR. BARNES: Right now, consulting services.
3        THE WITNESS: Oh, that, I do not --
4  BY MR. BARNES:
5     Q. Litigation consulting services.
6     A. Okay. You have the list in your notebook.
7     Q. This is testimony. I'm one step back. I want
8  to know the name of the -- names of the -- of the
9  litigations and products with whom -- for whom you have
10 provided litigation consulting services in the past ten
11 years.
12       MR. FROMSON: Note my objection as to form, to
13 the extent that it involves confidentiality
14 agreements that have already been involved with
15 previous testimony and in referencing it to
16 pharmaceutical companies in that respect.
17       MR. BARNES: Well --
18       THE WITNESS: PDG hasn't been existence ten
19 years.
20 BY MR. BARNES:
21    Q. You personally. You personally, Cheryl Blume.
22    A. Well, I only worked for two companies, so
23 they've --
24    Q. I don't care --
25    A. Those were Mylan Laboratories and Somerset

Page 35

1  Pharmaceuticals. I was 30(b)(6) witness for them, so
2  that --
3     Q. Exclude that.
4     A. -- that takes care of that.
5     Q. Exclude that.
6     A. The list that you have is the list which I was
7  instructed to prepare of those for which I've produced
8  affidavits, reports, and have provided deposition or
9  testimony transcript. I do not have a list of any
10 others.
11    Q. What I want you to do --
12       MR. BARNES: I'm going to mark Mr. Fink- --
13 Mr. Fromson has been kind enough to provide me with
14 a notebook, and we'll mark this as Exhibit No. 3.
15 And for the record --
16       MR. GUNTER: It would be 4.
17       MR. BARNES: Oh, 4. I'm sorry.
18 Exhibit No. 4.
19       And what I'm going to do is, I'm going to take
20 out -- Mr. -- Mr. Fromson's provided me with some
21 correspondence and communications back and forth
22 between you and his organization, so I will -- I'll
23 mark that as Exhibit 5.
24       But let me -- let me hand you this. I want
25 you to hand it to the court reporter, please.

Page 36

1  We'll mark it as Exhibit 5. Okay?
2        (Deposition Exhibit No. 5 marked for
3  identification.)
4  BY MR. BARNES:
5     Q. Okay. I'm going to hand you another group of
6  documents. This is -- I think counsel has represented
7  these are the communications between our firm -- I
8  mean -- I'm sorry -- his firm and you in connection with
9  this litigation, save for draft report communications.
10       MR. BARNES: Can you identify this for the
11 record, Mr. Fromson? I think that will be the
12 safest way to proceed.
13       MR. FROMSON: Thanks.
14       MR. BARNES: I'll take your representation.
15       MR. FROMSON: All right. The documents
16 include a document dated November 9th, 2007, which
17 is communications to Cheryl Blume that include the
18 deposition duces tecum served on our office as well
19 as e-mails and, lastly, her consulting and expert
20 witness retainer agreement with the Finkelstein law
21 firm.
22       MR. BARNES: We'll mark this as Exhibit No. 5.
23       (Deposition Exhibit No. 6 marked for
24 identification.)
25       MR. BARNES: Thank you. That's 6? This is 6.

Page 37

1  Behind.
2  BY MR. BARNES:
3     Q. Now, going back to Mr. Altman, if I might.
4  I'd like for you to look at your testimonies in this
5  exhibit. Do you have that handy?
6     A. No.
7     Q. You do not?
8     A. You have my testimony list.
9     Q. Okay.
10       MR. FROMSON: Can't you copy this?
11       MR. ALTMAN: Ken, do you want a copy?
12       MR. FROMSON: Yeah.
13 BY MR. BARNES:
14    Q. I'll hand you Exhibit No. 5. Can you
15 identify -- it's a tab called "Testimonies," right?
16 Take a moment, if you would, and identify the cases with
17 which you have worked with either the -- Mr. Altman
18 and/or the Finkelstein law firm.
19    A. I mean, I think I've -- I don't think I can do
20 this until I check with these case and see if it's all
21 right if I'm permitted to announce that we worked with
22 Mr. Altman in these cases. The fact that they're listed
23 here does not in any way connote that he was or wasn't
24 involved with these cases.
25    Q. All right. Do you -- can you look at this

10 (Pages 34 to 37)

Page 38

1  list and identify it, yes or no? Then we'll talk about
2  whether you'll tell me about it. We'll go off the
3  record and you can consult with Mr. Fromson and he can
4  give you his opinion. Then we'll take it up later with
5  the court, if necessary.
6      A.  Well, Mr. Fromson can talk with me about the
7  case I did with Finkelstein. I worked with Mr. Altman
8  on other cases that do not involve Finkelstein.
9      Q.  I want both.
10     A.  Well, I understand what you want.
11     Q.  Okay. Well, just -- just --
12     A.  I understand.
13     Q.  I understand. We'll -- we'll maybe have to
14 suspend the deposition or come back and do this later.
15 So just -- we'll make a record and you'll do what you
16 have to do, then we'll do what we have to do.
17     A.  That's fine.
18     Q.  Okay. So you take -- take -- take a moment
19 and look at that, consult with Mr. Fromson, and then
20 come back and answer the questions as you see fit.
21 Thank you.
22         MR. BARNES:  We'll go off the record.
23         THE VIDEOGRAPHER:  Off the record at 9:58.
24     (Off the record.)
25         THE VIDEOGRAPHER:  On the record 10:07.

Page 39

1  BY MR. BARNES:
2      Q.  Okay. Did you have a chance to review the
3  testimonies in Exhibit No. 5, on the break?
4      A.  Yes.
5      Q.  Okay. What we'll do, Mr. Finkelstein's law
6  firm first.
7          MR. GUNTER:  Exhibit 4.
8          MR. BARNES:  No, it is Exhibit --
9          THE WITNESS:  No, 5.
10         MR. BARNES:  -- 5.
11         MR. GUNTER:  Oh.
12 BY MR. BARNES:
13     Q.  Okay. And can you tell me which litigations
14 did you work with the Finkelstein law firm on?
15     A.  There is only one other litigation with the
16 Finkelstein law firm, and it is not listed on here and
17 it is listed on a case relating to Phenergan.
18     Q.  Did you work with the Finkelstein law firm on
19 the diet drug litigation?
20     A.  I worked with Mr. Altman on diet drug
21 litigation.
22     Q.  And did you compensate Mr. Altman for his time
23 and his work on the diet drug litigation?
24     A.  I can't recall. I think the attorneys did. I
25 don't think --

Page 40

1      Q.  What --
2      A.  -- that I did.
3      Q.  What -- what -- and what attorneys engaged his
4  services in the diet drug litigation?
5      A.  Oh.
6          MR. FROMSON:  Just note my objection as to
7      form.
8          THE WITNESS:  Yeah, I don't recall.
9  BY MR. BARNES:
10     Q.  You were working on behalf of plaintiff's
11 counsel in the diet drug litigation?
12     A.  Yes.
13     Q.  And you're working with the -- with the
14 Finkelstein firm on Phenergan, correct?
15     A.  Yes.
16     Q.  Okay. What other litigations have you worked
17 with Mr. Altman on?
18         MR. FROMSON:  Just note my objection as to
19     form.
20         THE WITNESS:  In reviewing the list, I recall
21     that Mr. Altman was publicly mentioned in the
22     Accutane litigation as well.
23 BY MR. BARNES:
24     Q.  Any other matters you've worked with
25 Mr. Altman on?

Page 41

1      A.  The only other ones that I am recalling that
2  were publicly announced are the criminal cases that I've
3  participated in with the State of Florida.
4      Q.  On how many matters have you worked with
5  Mr. Altman that are not, in your view, publicly
6  announced; number of matters?
7      A.  The number of different cases? Maybe four or
8  five.
9      Q.  Did they involve drug product liability cases?
10     A.  Yes.
11     Q.  Were they -- was the engagement on behalf of
12 plaintiffs in drug product liability litigation?
13     A.  I know that some of them were plaintiffs.
14 I've -- I've done some defense work, but I -- I don't
15 recall him participating with me in those.
16     Q.  In defense cases?
17     A.  Right.
18     Q.  What services did Mr. Altman provide in
19 connection with the four or five product liability
20 matters that you are not -- you believe you are not at
21 liberty to disclose?
22         MR. FROMSON:  Just note my objection.
23         THE WITNESS:  Well, as I indicated earlier, I
24     would check with them and --
25 BY MR. BARNES:

Page 42

1  Q. No, I just have --
2  A. -- find out if I'm able to.
3  Q. I'm not asking anything but the nature of his
4  work with you. Not anything more than that.
5  A. It's the same general types of assignments;
6  accessing pharmacovigilance or internal databases and
7  searching for adverse events, the occurrence of new
8  adverse events, changes in the severity or frequency of
9  previously identified adverse events; signal detection,
10  in an effort for data mining; evaluation of the most
11  frequently occurring events over time; evaluation of
12  events in various patient subgroups. Those are the
13  general assignments.
14  Q. And were those assignments similar to the
15  assignments you gave to Mr. Altman in this
16  litigation and --
17  A. Yes.
18  Q. -- on the -- on the Neurontin litigation?
19  A. Yes.
20  Q. Okay. And, again, you are not willing to
21  disclose those -- those matters?
22      MR. FROMSON: Just note my objection to the
23      extent it's been asked and answered.
24  BY MR. BARNES:
25  Q. At this point.

Page 43

1  A. I don't know if I'm permitted to do it, but I
2  will check.
3  Q. That's fine. You'll tell Mr. Fromson and
4  Mr. Fromson will --
5  A. Yes.
6  Q. -- tell me.
7  A. Yes.
8  Q. Thank you.
9      Now, I want to go to Exhibit No. 3 and 3A if
10  we might. Okay? You've identified these for the
11  records. I think -- well, let's have you identify
12  Exhibits 3 and 3A for the record, please, again. If I
13  did it -- if I did it before, I apologize.
14  A. Exhibit 3 is a disk that I had our office
15  prepare that included information that was not on --
16  that we -- was not on the hard drive that was provided
17  to you and that we collected independently.
18      And that would include our -- a complete
19  review of our reference manager database system; any
20  FDA-related documents that I independently retrieved;
21  the access databases that Mr. Altman employed in
22  evaluating the various databases I have provided in my
23  report, including the U.S. FDA database, the World
24  Health Organization database, pharmacovigilance database
25  relating to gabapentin. And I think that's it.

Page 44

1  Q. Okay. Thank you.
2      Now, I believe you -- your firm, pursuant to
3  our request, provided another disk of information,
4  correct, last week. I'll hand it to Mr. Fromson and
5  Mr. Altman. You would -- and I'll ask Mr. Fromson to
6  authenticate that for the record, please.
7      MR. FROMSON: We're just going to go look on
8      the disk and see what's on there is what we gave to
9      you --
10      MR. BARNES: Yes.
11      MR. FROMSON: -- to authenticate that. Simple
12      as that.
13      MR. BARNES: Yeah.
14      MR. FROMSON: Give me a second.
15      I'm assuming the new release of "Ratatouille"
16      is not on the DVD.
17      MR. BARNES: Actually, I watched that Saturday
18      night with my daughters.
19      MR. ALTMAN: It appears to be what --
20      MR. FROMSON: Okay. Do you know --
21      notwithstanding the cursory review that did -- it
22      appears to be an authentic copy or, if not, the
23      actual copy that was provided to you approximately
24      a week or so ago.
25      MR. ALTMAN: Two weeks ago.

Page 45

1      MR. BARNES: Well, if you would like to spend
2      any more time authenticating this document, I'd be
3      delighted to have you spend all of lunch time
4      confirming it, but we'll go on the -- we're going
5      to go on the basis that this is the CD that you
6      provided to defense counsel last week.
7      MR. FROMSON: That makes sense.
8      MR. BARNES: Thank you. Let's mark this as
9      Exhibit No. 7, I believe. Correct? Thank you,
10      Dr. Blume. 6.
11      MR. FROMSON: Well, we did --
12      THE REPORTER: 7.
13      MR. FROMSON: By the way, the disk was labeled
14      that was provided to her in October 28th of '07.
15      That's my understanding as to when it was provided.
16      MR. BARNES: That -- I'll take your
17      representation. Thank you.
18      MR. FROMSON: Thanks.
19      (Deposition Exhibit No. 7 marked for
20  identification.)
21      MR. FROMSON: 7. All right. What's
22      Exhibit 6?
23      THE WITNESS: This is 6.
24      MR. FROMSON: 6 were the e-mails.
25      MR. BARNES: I have the -- I have the -- I

12 (Pages 42 to 45)

Page 46

1  have 6 -- I have 6 being the -- I pulled this out
2  separately. Put it right on top. Thanks.
3       Now, I'm going to -- I'm just going to -- now,
4  I'm going to just -- just lay a foundation with --
5  with counsel so we understand what this is.
6       This was at our request. Your firm, from
7  Mr. Altman, provided Exhibit No. 7. Mr. Altman,
8  will you describe what -- what is -- Exhibit No. 7
9  contains, for the record, please.
10      MR. FROMSON: Notwithstanding that Mr. Altman
11 has not been sworn under oath, I certainly don't --
12      MR. BARNES: I'll -- I'll --
13      MR. FROMSON: I don't have an objection to him
14 making a representation for our firm and for our --
15 for our discussion purposes.
16      MR. BARNES: And he did -- he made that
17 repre- -- he can make -- he's making this
18 representation under your direction and permission,
19 correct?
20      MR. FROMSON: As part of what we'd consider --
21 we would consider to be a meet-and-confer process,
22 absolutely.
23      MR. BARNES: Thank you very much.
24      MR. FROMSON: Go ahead.
25      MR. BARNES: Okay.

Page 47

1       MR. ALTMAN: I prepared a disk at the request
2  of defense counsel which contained all of the
3  material that I had sent to Dr. Blume and all of
4  the material I had actually created, all of my
5  working copies of all of the material I had worked
6  with, as well as the raw data, I believe, that had
7  been provided to me by either the -- by the
8  defendants, by Pfizer, in this case.
9       MR. BARNES: Okay.
10      MR. ALTMAN: And I just might add, that disk
11 will contain a lot of information that was not
12 actually provided to Dr. Blume, so she does not
13 have everything that is on that disk.
14 BY MR. BARNES:
15   Q.  Okay. Dr. -- Dr. Blume, describe for me, if
16 you would --
17      MR. BARNES: I'll accept your representation,
18 and thank you. That was not part of that
19 discussion between counsel and -- for the
20 plaintiffs and the defense counsel.
21 BY MR. BARNES:
22   Q.  When Mr. Altman -- describe how in this case
23 you've interacted with Mr. Altman in terms of the
24 performing any analyses and -- on the various databases
25 and data sets that you've referenced in -- in your -- in

Page 48

1  your prior answer.
2       MR. FROMSON: Just -- just note my objection
3  to the form of the question to the extent that
4  you're asking her anything that pertains to the
5  subject matter of draft reports that were
6  ultimately provided.
7       MR. BARNES: I do not want draft report
8  information. I don't know if she'd even know that.
9  But if you do, that -- not the draft report.
10 BY MR. BARNES:
11   Q.  What I want to know, when you communicated
12 with Mr. Altman, what analyses -- or how did you
13 interact with him in terms of creating the analyses for
14 your consideration in this case? Broadly.
15   A.  Uh-huh. (Indicates affirmatively.)
16      I asked Mr. Altman to conduct the same sort of
17 analyses that we conduct in our standard
18 pharmacovigilance work for -- for pharmaceutical
19 companies. And what that means is accessing the
20 different types of events at different periods of time.
21      In this particular instance, the report is
22 divided into four time periods. And in each time
23 period, we looked at all available databases, which
24 included the U.S. pharmacovigilance database referred to
25 as either "SRS" or "SRS/AERS." We accessed the World

Page 49

1  Health Organization database. We looked at Health
2  Canada at least during one period in which it was
3  available. I believe in this report we also looked at
4  DAWN, the Drug Abuse Network Test, the Test Network, and
5  the internal Pfizer pharmacovigilance database or
6  adverse event database.
7       And during that period of time -- during those
8  periods of time, we conducted the same sort of queries
9  that we conduct as part of our NDA preparation efforts
10 and as part of our post-NDA pharmacovigilance
11 assignments for clients.
12      And that includes -- in this particular case,
13 we were interested in psychobiological, neuropsychiatric
14 terms, and we were also look -- interested in looking at
15 the contribution of those terms relative to the entire
16 database over time.
17   Q.  Okay. Now, specifically, can you set forth in
18 specifics what inquiries you had Mr. Altman run in
19 connection with your review of the various databases?
20 And I'm not so much interested in report, but the -- you
21 know, the -- but the types of inquiries you asked him to
22 run. And are all of them included in your report?
23   A.  Yes, I can address that.
24   Q.  Thank you.
25   A.  And the assignments varied, of course, by

Page 50

1  necessity during different time periods.
2  I believe the first time period that we will
3  be interested in is in the period 1994 to 1996. And
4  I'll get to that in just a second.
5  Now, the adverse events that are noted in this
6  report that appear in either quarterly or annual reports
7  or in PSURs, we are able to access those and address
8  those in our office.
9  Where I turn to Mr. Altman's expertise are in
10  the -- are in the large databases that are relied upon
11  in doing -- conducting pharmacovigilance work. So that
12  would include the Pfizer's -- Pfizer's internal
13  database. And, for example, he would have been involved
14  in the work that we did in -- the first time period of
15  relevance is '94 to '96.
16  Q. Would you please tell me the charts which he
17  pulled for you, please.
18  A. He filtered the data that would have been
19  involved in -- on page 69 of my report, page 70, 71, 72,
20  which are the filter of the top 25 adverse events during
21  that relevant time period in the database across all
22  body systems. And that would proceed to 72, 73, 74.
23  Beginning on page 75, which is paragraph 117,
24  we turn then to the various available databases,
25  independent available databases. During this timeframe

Page 51

1  with the U.S. Government, it would have been the SRS --
2  Q. Who did --
3  A. -- system.
4  Q. Who -- who pulled the data on -- and did the
5  analysis for paragraph 117 on page 75?
6  A. Mr. Altman.
7  Q. Mr. Altman did?
8  A. Yes. This is from the FDA's database. It's
9  maintained by -- I think it's maintained by NTIS.
10  Q. So just so I understand, the tables on 69, 70,
11  71, 72, 73, 74, and page 75 were prepared by Mr. Altman,
12  correct?
13  A. He provided me with the numbers of events.
14  The tables were actually prepared here.
15  Q. What did you do -- let's just take page 75.
16  What -- describe what you personally did to prepare
17  Table -- the table on page 75.
18  A. Okay. This is in 1994, which would have been
19  the first marketed year of Neurontin in the
20  United States, so Pfizer would be submitting quarterly
21  reports during that timeframe. So we pulled the terms
22  that we were interested in having filtered by Mr. --
23  Mr. Altman from the FDA's database. We gave him the
24  terms that we were interested in. He gave me the number
25  of reports.

Page 52

1  I also asked him to give me the total number
2  of events in the database so we could do the standard
3  calculation of the percent of total.
4  Q. So on page 75, you look at abnormal dreams,
5  that -- that percentage, the numerator is -- let's say
6  on 1996 Q2, the numerator would be one, and then the
7  denominator would be all events in the database
8  pertaining to having been reported to Neurontin?
9  A. That would be yes.
10  Q. Okay.
11  A. Oh, yeah. And it would only be the Pfizer
12  database, of course, because it was a sole source
13  product at that time.
14  Q. Okay. Continue after '75 as to what -- what
15  Mr. Altman prepared versus to what -- as to what you
16  prepared.
17  A. Okay. So the --
18  Q. Who accessed Health Canada on page 76?
19  A. Well, that's World Health Organization.
20  Q. I'm sorry.
21  A. That's not Health Canada.
22  Q. I made a mistake. I apologize.
23  A. We generally access the WHO database. Now,
24  whether we did it in this case or Mr. Altman accessed
25  it, I don't specifically recall.

Page 53

1  Q. You don't know who prepared this. Who
2  provided the terms?
3  A. We provided the terms.
4  Q. You directed the terms and he went -- he or
5  you -- on this, on page 76 -- went into the database to
6  extract it?
7  A. Yes, it's a little different with the World
8  Health Organization. When you receive the database from
9  them, they send you the entire database, so it's a
10  matter of going through and extracting from a whole --
11  you don't -- you don't have the opportunity to do it by
12  body systems. They send you everything.
13  Q. Do you have -- okay.
14  Do you have the database that was provided to
15  you from World Health Organization in your possession;
16  that was used to create this table on page 76?
17  A. Yes, and I have put that on this disk as well.
18  Q. And that would be referring to Exhibit No. 3?
19  A. Yes.
20  Q. Thank you very much.
21  All right. Why don't you continue to review
22  the report just as to what you -- so -- what you
23  prepared.
24  Right now, we have Mr. Altman preparing 69,
25  70, 71, 72, 73, 74, 75, and 76, correct?

Page 54

1    MR. FROMSON: Just note my objection as to the
2    form in terms of the use of the word "prepare."
3    MR. BARNES: "Filtered" was her room -- word.
4    "Filtered." I'll --
5    THE WITNESS: Yes. And just to clarify, I
6    would have to check if we -- if we did the World
7    Health Organization or if he did it.
8    BY MR. BARNES:
9    Q.  You'll check on that for me?
10   A.  Yes, I will.
11   Q.  Okay. Now, when you -- Mr. Fromson noted an
12   objection. What do you mean by Mr. -- by using the
13   phrase Mr. Altman filtered the information for you, what
14   does that mean?
15   A.  Well, my understanding of the FDA and some of
16   these other databases is they are huge databases. The
17   word "filter" is simply my way of asking him to apply
18   the rules and the conditions that he has established in
19   evaluating the database and calculating the number of
20   specific events at -- at this designated time periods.
21   Q.  What are the rules that Mr. Altman established
22   in querying the databases to get the number of events?
23   A.  Well, we out -- we outline these. When we
24   submit, for example, to the Food and Drug
25   Administration, we give a complete list of what he does.

Page 55

1    But my understanding is that care is taken to
2    take into consideration when there is an initial report
3    versus a follow-up report so it is not counted twice.
4    We filter -- I believe he filters the database so that
5    we are getting all of the information. We take the last
6    reports so that it includes all the cumulative
7    information. He checks for duplicates. He is able to
8    filter them for us by suspect status, nonsuspect status.
9    If we ask, he can filter it by various demographics.
10   For example, if the patient were on other meds, were not
11   on other meds.
12   If we're given information generally, whatever
13   fields -- it is my understanding, whatever fields are in
14   the intake form, he would be able to filter by those
15   forms -- fields. Excuse me.
16   Q.  Are you -- is it your testimony that that's
17   what he did in this case?
18   A.  Well, what I asked for -- and there are
19   certain -- there are certain precautions that he
20   undertakes for all tables. For example, he is very
21   careful that we don't double count. He is very careful
22   that we put the event when the event was -- when the
23   event occurred, not necessarily when reported.
24   Q.  How do you know he was careful? What did you
25   do to -- did you do anything to audit his work in this

Page 56

1    case to verify that he was exercising care?
2    A.  We have used his -- the method that he has
3    developed has been provided to the FDA. FDA has queried
4    him independently on the way in which he analyzes these
5    data. FDA has -- has approved our applications using
6    these data. I understand that Mr. Altman communicates
7    with the FDA on projects other than mine, as well, on
8    these database assignments, so --
9    Q.  My question is, what did you do in this
10   particular case to verify that Mr. Altman exercised care
11   in preparing these tables and filtered it in an accurate
12   and reliable way --
13   A.  Well, I under --
14   Q.  -- in this case?
15   A.  Yes. I understood he used the same system
16   that has been previously found to be acceptable. I
17   cannot tell you over the last four years of whether I
18   did any other independent checking or not. I just don't
19   recall.
20   Q.  In this case, did you do any independent
21   checking of Mr. Altman?
22   A.  That's what I'm saying. In the last four
23   years, I just don't recall if I did or not.
24   Q.  Well, when were you retained in this matter?
25   A.  2003. 2003, I think.

Page 57

1    Q.  2003.
2    And who called you?
3    A.  Wow. I think I was contacted by
4    Andrew Finkelstein.
5    Q.  Okay. So is there any documentation that you
6    have reviewed to verify that the material provided to
7    you and the analysis provided to you by Mr. Altman was
8    done in -- in a scientifically-rigorous and reliable
9    manner?
10   MR. FROMSON: Just note my objection as to
11   form.
12   THE WITNESS: I -- over the years, I don't
13   recall if I did any of that on this case. I accept
14   his work because it has been accepted and -- and
15   validated to FDA satisfaction.
16   BY MR. BARNES:
17   Q.  Would you de- -- would you please describe to
18   me the -- the cases that Mr. Altman worked --
19   Mr. Altman's work has been validated by the Food and
20   Drug Administration.
21   A.  Well, I -- I can tell you that NDAs have been
22   approved using his database work, but I -- it's the same
23   answer I gave you earlier. I can't identify those
24   clients.
25   Q.  Has any of Mr. Altman's work been published in

15 (Pages 54 to 57)

Page 58

1  a peer-reviewed medical or scientific journal concerning
2  FDA databases?
3      A.  I believe so. I know he's published at
4  meetings.
5      Q.  Well, published --
6      A.  At peer-reviewed meetings.
7      Q.  Peer-reviewed journals is the question.
8      A.  I think so. You would have to question him,
9  but I do recall that there was a journal article. Yes,
10 I think so.
11     Q.  And what was the name of the article?
12     A.  I don't recall. It was some year or so ago.
13 You'll have to question him. I don't know.
14     Q.  Can you tell me how -- what -- if you've read
15 it?
16     A.  I did at the time, yes.
17     Q.  And you cannot identify it for the record
18 today?
19     A.  No.
20     Q.  So is your testimony that Keith Altman has
21 been published in the peer-reviewed medical literature
22 regarding postmarket surveillance?
23     A.  I think so. Yes, I think so.
24     Q.  Is that important to you?
25     A.  Well, it would -- I guess. What's important

Page 59

1  to me is if FDA accepts his work.
2      Q.  Okay. And I want --
3      A.  And FDA has accepted his work. So that's
4  what's important to a regulatory person.
5      Q.  And I'm going to take your word for it.
6      A.  Well, I know, but -- and if I can tell you
7  more, I will. But I will -- I'm under oath and I will
8  tell you that the database work that he has done for us
9  has been a component of the pharmacovigilance assignment
10 of approved NDAs.
11     Q.  Well, do you understand that Mr. Altman is
12 employed by Mr. Finkelstein and Mr. Fromson's law firm?
13     A.  Yes, of course.
14     Q.  Do you understand that he has a financial
15 interest in the outcome of this litigation?
16        MR. FROMSON:  Just note my objection as to
17    form.
18        THE WITNESS:  Oh, I have no idea how he's
19    compensated. I have no idea.
20 BY MR. BARNES:
21     Q.  Okay. When -- have -- do you think it's --
22 that the -- that his work preparing data for you and
23 tables for you could be subject to bias, given his
24 firm's financial interest in the litigation?
25        MR. FROMSON:  Objection as to form.

Page 60

1        THE WITNESS:  Oh, I would have no idea how to
2    answer that. He has no -- he's only paid hourly
3    for the work that he does for the pharmaceutical
4    companies, and that work has withheld inspection
5    and approval by FDA.
6  BY MR. BARNES:
7      Q.  No, that's not my question. My question --
8      A.  But I can't answer the question you've posed.
9      Q.  Well, I'm going to ask the question again,
10 okay.
11        MR. BARNES:  Would you read back the question
12    that I asked?
13        (The reporter read the portion requested.)
14        THE WITNESS:  And I will answer the same way.
15    I have no idea how he's compensated. I don't -- I
16    don't -- I don't think so.
17 BY MR. BARNES:
18     Q.  Well, usually --
19     A.  But I don't know.
20     Q.  Well, usually in -- do you have an
21 understanding generally in pharmaceutical litigation how
22 plaintiff's law firms are compensated, in a general way?
23     A.  Yeah, I think so.
24     Q.  Can you tell me?
25     A.  My understanding -- and, again, this is

Page 61

1  completely without anyone ever telling me this. But my
2  general understanding is that plaintiff law firms
3  develop the cases and hire the experts and review the
4  data. And if the plaintiff cases are successful, then
5  there is some -- some percentage given to the attorneys
6  from the earnings of the -- of the plaintiffs, the
7  victims.
8      Q.  So you would agree that the -- the plaintiff's
9  lawyers have -- and their employees -- have a financial
10 interest in the outcome of the -- of the Neurontin
11 litigation?
12        MR. FROMSON:  Just note my objection.
13 BY MR. BARNES:
14     Q.  Do you agree with that?
15        MR. FROMSON:  Same objection, form.
16        THE WITNESS:  Yes, I guess it -- on a 30,000
17    feet, I would agree to that. How -- how this type
18    of work is -- how the expenses for his time and
19    this --
20 BY MR. BARNES:
21     Q.  That's not my question.
22     A.  -- I have no idea.
23     Q.  Because you do a lot of pharmaceutical
24 litigation work, don't you, for plaintiff's firms,
25 right?

Page 62

1    MR. FROMSON: Objection as to form.
2    THE WITNESS: Well, as I've testified before,
3    it ranges anywhere from 17 to 28 or -- 20 percent
4    of our income.
5  BY MR. BARNES:
6    Q.  Well, in the past year, you are -- you've
7  engaged in testimony in several separate pharmaceutical
8  litigations; have you not?
9    A.  I have.
10   Q.  Can you list those for me?  Just the -- if you
11 recall, in the past year, how many separate drugs have
12 you testified in connection with a trial?
13   A.  Well, I've done Accutane trials and I've done
14 a few of the hormone replacement trials.  And I think
15 those are the only trials that I've been in this year.
16   Q.  And you're retained in the Mirapex litigation?
17   A.  Oh, I haven't done a deposition or --
18   Q.  Have you been retained in that litigation?
19   A.  Yes.
20   Q.  By plaintiff's firms?
21   A.  Yes.
22   Q.  And you are -- have you been -- have you been
23 retained in connection with the Vioxx litigation?
24   A.  I think so.  I'm not sure if that's still
25 ongoing, but I think so.

Page 63

1    Q.  Yeah.
2        And you've been retained in the diet drug
3  litigation?
4    A.  I've already testified to that.
5    Q.  That, you agree?
6    A.  Yes.
7    Q.  Okay.  And you've testified in the Baycol
8  litigation?
9    A.  Yes.
10   Q.  And all these are against pharmaceutical
11 companies, correct?
12   A.  Well, they're on behalf of the plaintiffs,
13 yes.
14   Q.  And you under- -- so you do understand that
15 plaintiff's firms such as Mr. Finkelstein's firm,
16 Mr. Fromson's firm have a financial stake in the outcome
17 of their claims against the defendants in the Neurontin
18 litigation, correct?  You know that, right?
19   A.  Well, I understand that they are -- my
20 understanding is that they are only able to recover
21 money if -- if they are successful.  I think it's a
22 little different with the defense attorneys.  They
23 recover it by the hour --
24   Q.  So you --
25   A.  -- yes.

Page 64

1    Q.  -- understand that they have a big motivation
2  in -- in actually securing a -- your testimony to obtain
3  financial compensation in connection with the personal
4  injury cases that -- that they're bringing, correct?
5    MR. FROMSON: Objection as to form.
6    THE WITNESS: Well, I never know how to -- I
7    would never know how to answer that question.  I
8    don't know what "big" means.  And I don't -- you
9    know --
10 BY MR. BARNES:
11   Q.  You don't think it's important if they --
12 if -- to them --
13   MR. FROMSON: Can you let her finish her
14   answer, please.
15   MR. BARNES: Yeah, I will.  I apologize.
16   THE WITNESS: Yeah, I guess I just don't
17   under- -- you know, I -- having worked with both
18   defense attorneys and plaintiff's attorneys, I
19   behave the same way with both of them.  And I think
20   both of your groups have a large incentive to do
21   well and to succeed.  I mean, certainly, defense
22   attorneys are rehired and maintained based on their
23   merits and their successes in the case.
24 BY MR. BARNES:
25   Q.  But my question pertains -- I've not -- the

Page 65

1  defense has not -- has not retained you in this case,
2  correct?
3    A.  What defense?
4    Q.  The defendants have not retained you in this
5  case, correct?
6    A.  No, I am not working for Pfizer in this case.
7    Q.  Your work -- have you ever worked for Pfizer
8  in litigation?
9    A.  I don't think so.
10   Q.  I don't think so.  Okay.
11       How about Mr. Fromson?  You -- he has retained
12 you, correct; his firm?  The Finkelstein firm, right?
13   A.  Yes.
14   Q.  And so I just want to ask you, knowing that
15 they -- we -- you've testified that they have a
16 financial interest in the outcome of this litigation.
17 And, specifically, the evidence that you are putting
18 forth that it's matter of opinions, don't you think it's
19 appropriate for you to actually validate the analyses
20 that Mr. Altman is giving to you to make sure they're
21 accurate and -- as a matter of scientific discipline and
22 rigor?
23   MR. FROMSON: Objection as to form to the
24   extent it has already been asked and answered.
25 BY MR. BARNES:

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 66

1  Q. You may answer.
2     THE WITNESS: Do I answer?
3  BY MR. BARNES:
4  Q. Yes.
5  A. Mr. Altman is hired to do this because he has
6  a specialty in filtering, or whatever more sophisticated
7  term that should be applied to it, these databases. He
8  is used for this in our -- in our work and in other
9  people's work.
10    He was asked by the FDA years ago to validate
11 his efforts, and FDA confirmed his method. I would not
12 be able to completely validate what he does. But once
13 the FDA statisticians and epidemiologists approved NDA's
14 using his method, I have accepted his method.
15 Q. How do you know that --
16 A. And --
17 Q. I'm sorry.
18 A. And as you will know through my discussions of
19 the data, my opinions are certainly not predicated upon
20 these individual databases any more than they are on
21 other events in this database. So while the information
22 is important and while it agrees with other opinions, it
23 is not the ultimate opinion, but I accept his work based
24 on persons far more knowledgeable and skilled in this
25 area than I.

Page 67

1  Q. Did FDA review his work in this case?
2  A. No.
3  Q. In the Neurontin case?
4  A. No.
5     MR. FROMSON: Just note my objection as to
6  form.
7     THE WITNESS: He -- they -- they reviewed and
8  validated his approach of the FDA databases and
9  other databases.
10 BY MR. BARNES:
11 Q. Which you won't produce to me yet at this
12 point for me to examine you on?
13 A. Well, I'm certainly willing to ask if I may do
14 that, but you would certainly not ask me to violate my
15 confidentiality or contracts.
16 Q. Not today. I'm not going to ask you to do
17 that today. I've asked -- we'll take it up with the
18 court if we have to.
19    But have you --
20 A. No, I have not validated his work.
21 Q. Okay. And so you don't know the rate of error
22 in his work in the report, do you?
23    MR. FROMSON: Objection as to form.
24    THE WITNESS: If -- if there is any errors. I
25 don't know if there is any errors.

Page 68

1  BY MR. BARNES:
2  Q. One way --
3  A. The error -- the error rate was acceptable
4  when he did a far more difficult assignment.
5     He -- the -- the NDA work that he does for us
6  is far more difficult than this work. And the rate of
7  errors were -- if any, were certainly acceptable.
8  Q. That's not my question.
9  A. I know, but I'm trying to answer your
10 question.
11 Q. I understand you are, but listen to my
12 question, okay, and we'll just keep moving on.
13    My question is in connection with the work he
14 has done on pages -- in your report -- 60 -- you've
15 identified Pages 69, 70, 71, 72, 73, 74, 75. We don't
16 know about 76.
17    For example, you have not gone back and -- and
18 established the error -- any -- the rate of error in the
19 filtering he did for you prior to this deposition,
20 correct?
21    MR. FROMSON: Objection to the extent that it
22 hasn't already been asked and answered.
23    THE WITNESS: Correct, I have not done that.
24 He may well have underestimated the reports. No,
25 I'm kidding. He -- I have not checked anything.

Page 69

1  I'm not capable of validating his work.
2  BY MR. BARNES:
3  Q. So it is your testimony that you have never
4  specifically done anything to validate his data in 2007
5  on his work in Neurontin?
6     MR. FROMSON: Same objection, to the extent
7  that it hasn't already been asked and answered.
8     THE WITNESS: Yes, I have not -- I am not
9  capable of independently validating his extraction
10 of data from -- from these databases.
11 BY MR. BARNES:
12 Q. At any time in this litigation, correct?
13    MR. FROMSON: Same objection to the extent
14 that it has not already been asked and answered.
15    THE WITNESS: Yes.
16 BY MR. BARNES:
17 Q. Okay. Now, let's -- let's finish going
18 through your report and identify other tables that
19 Mr. Altman --
20 A. Okay.
21 Q. -- filtered for you.
22 A. Okay. And, again, I don't -- I don't mean
23 to -- to limit what he does as filtering. That's simply
24 my shorthand way of referring to it.
25    The Pfizer database --