# Exhibit A

# Part II

Page 70

1    Q.  Well, they --
2        MR. BARNES:  Would you read that back, that
3    last answer.  I apologize.  Read back her last
4    answer.  And identify the pages, but read back that
5    last answer.
6        (The requested portion was read by the
7    reporter.)
8    BY MR. BARNES:
9    Q.  Well, would you give me the long-handed way of
10   referring to filtering as to describing in detail what
11   Mr. Altman's work entails for you when he runs these
12   tables and analysis for you, because I don't want to --
13   you've said "shorthand."  I don't want the short.  I
14   want the complete answer.
15       MR. FROMSON:  Just note -- are you finished?
16       MR. BARNES:  Yeah.
17       MR. FROMSON:  Just note my objection as to
18   form to the extent that it has not already been
19   asked and answered.  On the record, you will see
20   that she -- you asked about rules, conditions, and
21   evaluating queries, so that my objection is to the
22   extent it's already been asked and answered.  Go
23   ahead.
24       THE WITNESS:  Okay.  My understanding, when --
25   again, you certainly have to ask him these

Page 71

1    questions.
2        My understanding, when Mr. Altman approaches a
3    database, is that he establishes the database so
4    that we are fulfilling requirements for ensuring
5    that we have access -- that we have secured all the
6    numbers that are available, that there has not been
7    double counting, and that we have structured the
8    database in such a way that allows us to get an
9    accurate number of the events at each time period.
10       I know that several procedures and controls
11   are put into place to allow him to do that.  What
12   the specific natures are, specific natures of those
13   controls, I just don't know.
14   BY MR. BARNES:
15   Q.  That's fair.  Thank you.
16       MR. BARNES:  All right.  Let's take a very
17   short break, about five minutes pushing.
18       MR. FROMSON:  Okay.
19       THE VIDEOGRAPHER:  Off the record at 10:42.
20       (Recess taken.)
21       THE VIDEOGRAPHER:  On the record 10:51.
22   BY MR. BARNES:
23   Q.  Okay.  I think, Dr. Blume, we were at page 76
24   and you were talking about -- we were addressing the
25   work that Mr. Altman had done on your -- with you on

Page 72

1    your report.  And let's continue after page 75 and 76.
2    You're not sure about 76.  You'll tell me.  Let's
3    continue.
4        When -- what's -- what other pages did he
5    provide you the work product for?
6    A.  Well, if I didn't already say it, when I was
7    talking about the internal database, these are captioned
8    as serious events.  So another thing that we do when
9    we're looking at databases is, in addition to canvassing
10   the entire database, we also look at variety of subsets.
11   And one of those subsets are those events that have been
12   declared serious.  And FDA defines a serious, a
13   criteria for an event to be serious.
14   Q.  And who did that canvassing of the database to
15   identify serious adverse events?  Is that something you
16   did personally?
17   A.  If you -- if you look at an FDA MedWatch form,
18   it defines the criteria which makes it serious, so it's
19   a computer filtering of it.  If a patient is
20   hospitalized, there is certain things that you check to
21   make it serious or nonserious.
22   Q.  I asked a poor question and I apologize.  But
23   my question is in terms of your analysis when you
24   generated reports on serious adverse events.
25       Did -- who did the query to generate the

Page 73

1    listings of the serious adverse events; something you
2    did or someone did at your request?
3    A.  Okay.  Serious is -- there is -- there is no
4    degree of choice in that.
5    Q.  It's a designation.  I understand that.
6    A.  Yes.  And we use the same designation for the
7    term "serious" that FDA does.
8    Q.  Who extracted the serious cases for your
9    report?
10   A.  Mr. Altman.
11   Q.  Okay.  He did that for you?
12   A.  Yes.
13   Q.  And, again, you -- you've not validated
14   that -- that query?
15   A.  No.
16   Q.  You agree?  I asked you a double negative.
17   A.  Well, I agree that Mr. Altman uses the
18   specific terms that we require for serious, which are
19   the FDA terms for serious, but I did not hire a separate
20   computer base -- computer database expert to validate
21   his work for Neurontin.
22   Q.  And you didn't do it personally?
23   A.  Well, if I could have done it personally, I
24   wouldn't have hired Mr. Altman.  I hire him for his
25   expertise.

Page 74

1    Q.  Are you paying Mr. Altman in the Neurontin
2   litigation or -- or not?  Who -- who --
3    A.  Oh, no, I don't think so.  No, no, not in
4   Neurontin, but in general.
5    Q.  Well, in this case?
6    A.  In this case.
7    Q.  He's working for the law firm, right?
8    A.  Yeah, I don't know how all the different law
9   firms orchestrate together.  I have no idea.  But I did
10  not pay him.
11   Q.  And you're -- so -- and you understand he's an
12  employee of the Finkelstein law firm, correct?
13   A.  Yes, I answered that earlier.  Yes.
14   Q.  And you understand that Mr. Finkelstein's law
15  firm, Mr. Fromson's law firm are liaison counsel in the
16  product liability litigations?  He said that at the
17  start of the deposition, right?
18   A.  Yes.
19   Q.  So -- so -- and it's your understanding that
20  Mr. Altman's work in this case, is as part of the
21  Finkelstein law firm, correct, and not part of the --
22  your organization, correct?
23   A.  Yes.
24   Q.  Okay.  Let's go back to highlighting the parts
25  that Mr. Altman did for you.

Page 75

1    A.  Page?
2    Q.  I'm sorry.  Why don't you go -- we were at the
3   World Health Organization on page 76.  Let's start from
4   there.
5    A.  Yes.  And, again, I don't know if we tabulated
6   these numbers or if we sent -- or if we sent the
7   database and Mr. Altman gave us the numbers.  I don't
8   know.
9    Q.  Okay.
10   A.  I think we ordered the World Health.  We
11  generally order the World Health Organization database.
12   Q.  And so you'll let me know?
13   A.  I will.
14   Q.  Okay.  Thank you.
15   A.  Continue?
16   Q.  Yeah, please.  I'm on page 78.  That's the
17  next table.
18   A.  We did this table.  This is coming from
19  research reports.  This is just a summary of suicidal
20  events from Pfizer's research reports.
21   Q.  Okay.  You did that yourself?
22   A.  Yes.
23   Q.  Okay.  What's the next table?
24   A.  The next table is similar to what we have just
25  discussed.  This is a tabular summary of dechallenge

Page 76

1   events from various Pfizer studies.
2    Q.  And what page is that on?
3    A.  88.  Begins on 88.
4    Q.  I have it on page 87.
5    A.  87?
6    Q.  On my version of your report, it's 87.
7    A.  Yeah.  Yes, this is -- well, page 7 is an
8   overview of everything that's going to follow.
9    Q.  Who prepared your table on page 87?
10   A.  We did, PDG.
11   Q.  Okay.  And how about page 88?
12   A.  PDG did 88, 89.  89.
13       And we are now in the next time era, which is
14  '96 to 2002.
15   Q.  Let me ask you this at this juncture.  We'll
16  continue with Mr. Altman vs. PGD (sic) -- and PGD is
17  Cheryl Blume?
18   A.  Well --
19   Q.  And people working your under direction?
20   A.  PDG is -- is everyone at PDG, yes.
21   Q.  Who works for you?
22   A.  Yes.
23   Q.  So you're directing PGD work?
24   A.  Yes.
25   Q.  Okay.  So just -- I'm just making sure I

Page 77

1   understand.
2       So when you say "PGD," it's either you or
3   someone working under your supervision at this
4   organization?
5    A.  At PDG, yes.
6    Q.  Okay.  Got it.
7       Okay.  Just a preparatory question.  You said
8   that your report was organized into time periods.  Who
9   made the decision as to which -- how the time periods
10  would be stratified?
11   A.  Oh, when we -- when the Finkelstein firm first
12  talked to me about this case and outlined what -- what
13  they had -- would like to see me consider completing, it
14  was decided that we would look at this time period,
15  which was -- which was, you know, fairly long, '94 to
16  present, and in a -- what would be the best way from a
17  regulatory or pharmacovigilance perspective to evaluate
18  the Pfizer actions, data available to Pfizer from other
19  places, et cetera.  And I had suggested that the way
20  it's done in industry is that we look at a product prior
21  to approval and then after approval at -- at various
22  points in time.
23       And when I had a chance to review initial --
24  initiate my review of the Neurontin story, in my mind,
25  it fell into four -- four categories, the critical

20 (Pages 74 to 77)

Page 78

1 regulatory time points.
2     And I recall there was some discussion
3 about -- about those time points, and I think that I --
4 I made the decision of what would be the critical time
5 points and went from there.
6     Q.  What was the basis for the various time
7 periods that you -- that you decide on?  What drove
8 these particular time periods from a regulatory or
9 scientific basis?
10     A.  Well, the first one is obvious.  It's the
11 events leading to the initial approval in late 1993.  So
12 the first time period is -- discusses available data,
13 available events up until the time of the first
14 approval.
15     The next approval is some years later.  There
16 is only the two.  And the next one doesn't occur for --
17 for several years.  So rather than go from '93 to 2002,
18 which is a tremendously long period of time and there
19 were a lot of data in there, I picked a period in -- in
20 between.  And I picked the time period 19 -- from the
21 approval to 1996, because in 1996 information was
22 available from Dr. Franklin regarding the subpopulations
23 using the product.
24     And for a pharmacovigilance person,
25 subpopulations or patient subsets or nonlabel

Page 79

1 populations are critically important when doing
2 pharmacovigilance assignments.
3     So because those were defined, he was there,
4 as I understand, in 1996 and defined those areas.  So I
5 picked the second point in time from '94 through '96.
6     Q.  Let me make sure I understand.  From 1994 to
7 1996, you believed that Dr. Franklin was at --
8     A.  No.
9     Q.  -- Warner-Lambert?
10     A.  No, I think he was only there for a few
11 months, and I think it was in '96.  And I have it
12 outlined in my report.
13     But we had ended the last one in December of
14 '93 with the approval, so rather than go from December
15 of '93 to the next approval which wasn't until 2002, I
16 wanted a point in between.
17     Q.  Were there other approvals prior to 2002 or
18 for -- not?
19     A.  Well, I do it usually based on the
20 indications.  And one was -- the first one was for
21 adjunctive therapy and the other one was for the subset
22 of postherpetic neuralgia.  I think, as I've outlined in
23 here, there were some tablet and capsules and syrups and
24 those kind of things, but I'm looking at indications.
25     Q.  Okay.  That's your understanding?

Page 80

1     A.  Yeah.
2     Q.  Okay.  Well, so your basis for breaking it
3 from '94 to '96 was that after 1996, for a few months,
4 Dr. Franklin became employed at Warner-Lambert?
5     A.  Well --
6     MR. FROMSON:  Just note my objection as to
7 form.  Misstates testimony.
8     THE WITNESS:  Yeah, I don't really care so
9 much about his employment, but the fact that as a
10 result of his time there, he gave -- he was giving
11 a description of the different subpopulations,
12 off-label populations that were using Neurontin.
13 My interest is in who was getting the product.  And
14 at that point in time, the only approval was for
15 the narrow adjunctive therapy to epilepsy subset.
16     But in reading his material, I learned that
17 there were other populations receiving it.  And
18 that type of information is important for a
19 pharmacovigilance assessment and certainly for a
20 regulatory person, because your evaluation of -- of
21 the drug is always dependent upon the population
22 actually receiving the drug.
23 BY MR. BARNES:
24     Q.  There were -- there -- I'm sorry.  Are you
25 finished?  I didn't want to interrupt you.

Page 81

1     A.  Yes, I'm finished.
2     Q.  I didn't mean to cut you off.
3     What was the basis for going from 1996 to
4 2006?
5     A.  2002?
6     Q.  2002.  I'm sorry.  1996 to 2002.
7     A.  Because I wanted -- generally, I do cuts
8 according to major regulatory events.  And they received
9 the FDA approval for postherpetic neuralgia at that
10 point, so now we have another population coming into
11 play.
12     Q.  At what year -- you said you were retained
13 with the -- by the Finkelstein firm in 2003, correct?
14     A.  You actually have the chart in your -- oh, I
15 have the notebook.
16     Q.  No, when you were retained.
17     A.  I have the notebook.
18     Q.  Yeah.
19     A.  2003.
20     Q.  Okay.  Can I see that page?
21     A.  Uh-huh.  (Indicates affirmatively.)
22     Q.  I'm sorry.  Can you pass it back, please.
23 Thank you very much.
24     So you began your work in 2003 and then you
25 were employed in 2004, '05, '06, and '07.  And this is

21 (Pages 78 to 81)

Page 82

1  out of Exhibit 5. Thank you. Okay.
2      I hand that back to you. Okay.
3    A.  All right.
4    Q.  Now -- okay. Then -- and then you then
5  organized from 2002 to 2006, correct?
6    A.  Yes.
7    Q.  Okay. And what was the basis for that time
8  period?
9    A.  To take it to current. My reference list --
10  actually, I think I have it coded 2002 to 2000- -- I
11  mean, to present.
12    Q.  To present?
13    A.  Yeah.
14    Q.  Okay. 2007?
15    A.  Yeah. And all of the publications that we
16  have accessed or other data are included --
17    Q.  All right.
18    A.  -- on the disks that we have prepared for you.
19    Q.  All right. Thank you.
20      Can we then go back to page 70 -- I'm sorry.
21  I think you were on 80s looking at which -- we were
22  looking at some line listings there, correct?
23      The last one I have is 89, page 89. And this
24  was dechallenge events that you organized, correct, and
25  did the analysis for?

Page 83

1    A.  Yes. Okay.
2      Okay. So the conclusions for '94 and '96 and
3  beginning on page 94, we go into the '96 to 2002
4  timeframe.
5    Q.  Yes. Now, what analysis did you run versus
6  Mr. Altman?
7      MR. FROMSON: Just note my objection to the
8    form of the question.
9      THE WITNESS: The sections parallel the one we
10    just discussed.
11  BY MR. BARNES:
12    Q.  What was that?
13    A.  Page 97, our information taken from the PSURs,
14  which --
15    Q.  Who did that?
16    A.  PDG did that.
17      And the same for the tabular listings that you
18  see on pages 101 through 114.
19    Q.  These were PGD?
20    A.  PDG.
21    Q.  PDG.
22    A.  Uh-huh. (Indicates affirmatively.)
23    Q.  All right. Now, let me ask you just a
24  question. And I want to use the right language.
25      Going back to pages 97 to 98, the -- these are

Page 84

1  simply line listings of adverse events included in a
2  PSUR, correct?
3    A.  On this particular page, yes.
4    Q.  So there -- there are no statistical
5  calculations that you performed on the tables on 97 or
6  98, but just a crude listing of events, correct?
7    A.  Yes.
8    Q.  Okay. Continue. And then you're up to 101 to
9  114. And they were -- these were all tables that
10  prepared at PDG?
11    A.  The tables were prepared at PDG from the
12  annual reports either for the Pfizer NDAs or the Pfizer
13  INDs.
14    Q.  Again, these are simply crude reports as
15  opposed to statistical analyses, correct?
16      MR. FROMSON: Just note my objection as to
17    form.
18      THE WITNESS: Yes, these are very similar to
19    the tables that are prepared as part of the normal
20    business of a pharmaceutical company for a given
21    NDA over time.
22  BY MR. BARNES:
23    Q.  But my question is, these are -- these are
24  just reports and not calculations? These are just event
25  reports, correct?

Page 85

1    A.  That is correct.
2    Q.  Who at PGD prepared these tables?
3    A.  I have -- I would have to check the records of
4  who -- who typed them. I don't know. We -- I don't
5  know.
6    Q.  How many people work at PGD?
7    A.  I think there is, today, 12 or 13.
8    Q.  When -- at the time this report was prepared,
9  how many people worked at PGD?
10    A.  I think it's about the same number.
11    Q.  Okay. And can you describe what you -- what
12  you asked them to do in preparing these reports?
13    A.  Well --
14      MR. FROMSON: Just note my objection as to
15    form to the extent that the inquiry deals with the
16    subject matter of draft expert reports.
17      MR. BARNES: I under- -- thank you.
18      MR. FROMSON: To the extent that you can
19    answer.
20      THE WITNESS: Do I answer? Do I answer?
21      MR. FROMSON: To the extent you can answer
22    without that issue.
23  BY MR. BARNES:
24    Q.  I'm asking you as to what -- what -- how they
25  accomplished putting these on the -- on the report.

Page 86

1   What was -- what was the assignment?
2       A.  Okay.  We were interested in all -- at all the
3   relevant time periods of examining the IND or NDA
4   quarterly or annual reports that were given to us or the
5   PSURs that were available in the database.  So those
6   were accessed and we were interested in psychobiological
7   and suicide-related terms.
8       And there are line listings in each of those
9   reports, or on most of those reports.  Those line
10  listings are in there and they were simply extracted
11  from those tables and made into a neat, tidy table that
12  covered the NDA for whatever the -- individual NDAs or
13  INDs for whatever this section covered, whatever
14  relevant time period.
15      Q.  Who actually made the determination that a
16  event was a psychobiological adverse event?
17      A.  We used the same terms throughout the report
18  and we took the terms from the terms that were in the
19  NDA reviews or in Pfizer's reviews.
20      Q.  Okay.  We'll come back to that.  Continue.
21  Page -- you were up to page 114.
22      Then how about the AERS database discussion on
23  page 116, 117, 118, who prepared those?
24      A.  Beginning on 116, Mr. Altman.
25      Q.  And did -- not to short-circuit the questions,

Page 87

1   is it true that you did not -- that he prepared it based
2   upon his customary methods of which you are familiar
3   from your nonpharmaceuti- -- from your nonlitigation
4   work and that you did not validate independently his
5   work on pages 116, 117, and 118?
6       MR. FROMSON:  Just note my objection as to
7   form.
8       THE WITNESS:  That is correct.
9   BY MR. BARNES:
10      Q.  And you do not know the rate of error that
11  exists as to the work product on pages 116, 117, 118,
12  correct?
13      MR. FROMSON:  Objection as to form.
14      THE WITNESS:  If indeed there is a rate of
15  error, I -- I have no idea.
16      My interest is always looking at his work over
17  time.  I really am not interested in a specific
18  number.  I'm looking at signals and for changes
19  over time, so I'm looking at his work and changes
20  over time, not so much a specific number.
21  BY MR. BARNES:
22      Q.  If Mr. Altman's work is wrong and inaccurate,
23  would that affect your opinions in this case?
24      MR. FROMSON:  Objection as to form.
25      THE WITNESS:  Well, as I said earlier, I have

Page 88

1   tried very hard to give an overview of all
2   available databases.  And while we're always
3   interested in the FDA's database and Pfizer's
4   internal database, it is not critical to -- I would
5   have the same opinion whether those databases were
6   in my report or not.
7       I also have no idea of the error in the Pfizer
8   database, so I simply assumed that the data they
9   gave me simply used the data that Pfizer gave me,
10  because I'm interested in their data changes over
11  time.  But I -- I have no idea what the internal
12  error rate in the Pfizer database over time.
13  BY MR. BARNES:
14      Q.  That's not my question.
15      A.  But I use the Pfizer database as well as I use
16  the FDA database.
17      Q.  Well, we're -- we're not to the Pfizer
18  database yet.
19      A.  Well, we discussed it in the past and --
20      Q.  Well, but my question is as to Mr. Altman's
21  work product.
22      If Mr. Altman's analyses and work product were
23  some way inaccurate as to the tables based on the Pfizer
24  database or the SRS database and report, would that
25  be -- you would -- your report be the same with or

Page 89

1   without the database analysis for FDA and the Pfizer
2   internal database?  Is that your testimony?
3       MR. FROMSON:  Objection as to form.
4       THE WITNESS:  Well, I relied not only on the
5   Pfizer database, but when Pfizer redid the database
6   in 2004.
7       Yes, my -- I would have the same opinion.
8   BY MR. BARNES:
9       Q.  So just so I understand, so if Mr. Altman's
10  work with regard to the FDA database and the Pfizer
11  database is inaccurate, wrong, that would not change
12  your opinions?
13      MR. FROMSON:  Objection as to form.
14      THE WITNESS:  Well, you know, I --
15      MR. FROMSON:  And to the extent it's already
16  been asked and answered.
17      I'm sorry.  Go ahead.
18      THE WITNESS:  I mean, if Mr. Altman had missed
19  that there were 50 additional suicides in the
20  Pfizer database or 50 or a hundred additional
21  suicides in the FDA's database, I may modify my
22  opinion somewhat as far as wherever I gave a
23  specific number, but the general nature of my
24  opinion would not change.
25  BY MR. BARNES:

Page 90

1    Q. Is -- are -- is -- is -- are the analyses that
2  Mr. Altman prepared for you, as you've defined it in
3  this litigation, important to your opinion in this case?
4        MR. FROMSON: Just note my objection as to the
5        form. That's an ambiguous question.
6        THE WITNESS: Well, I think that everything I
7        have in here is important. I mean, the World
8        Health Organization database is important to me.
9        Yes, they're all important to me.
10  BY MR. BARNES:
11   Q. So if -- if Mr. -- is it your testimony that
12  if you extracted the SRS database analysis and the
13  analysis based on the internal Pfizer databases that
14  your opinion would be the same with regard to the signal
15  analysis?
16   A. Well, the Pfizer database was also repeated in
17  the 2004 NDA records. So, I mean, even if I lost the
18  Pfizer databases, I would still have their analyses of
19  those databases in the NDA submission.
20      Yeah, my opinion would still be the same,
21  because there -- there was an amazing similarity in
22  signals and conclusions across SRS and WHO and even the
23  Health Canada database.
24   Q. Just so I understand though, you -- so your --
25  the absence -- you do not need the SRS database analysis

Page 91

1  to form your opinions with regard to signals?
2   A. Well, it's almost an impossible question to
3  answer. We are required to assess the SRS database for
4  signals. I mean, FDA has criteria on how one data mines
5  the database. So, yes, it's important to me, but we
6  additionally mined the WHO database and we looked at the
7  mining efforts of your client in their internal database
8  and in the materials they redid in 2004. So my opinion
9  is not dependent on any one issue.
10      And if, as you read the conclusions, I go
11  across -- I conduct pharmacovigilance across databases,
12  not dependent on one database. Now, if one database
13  were remarkably different than the other one, we might
14  go back and check that again.
15   Q. Okay. Let's move on. One --
16   A. What page are you on?
17   Q. 120, I think, is my next table. Who prepared
18  that?
19   A. This is the internal database, and I believe
20  this was Mr. Altman on through 120 -- let's see -- 127.
21   Q. So from 120 to 127 are various tables of
22  reports of adverse events that Mr. Altman extracted from
23  the Pfizer internal database between 1996 and 2002,
24  correct?
25   A. Yes.

Page 92

1    Q. And, again, did you audit or in any way
2  validate the work product you received from Mr. Altman
3  on pages 120 to 127?
4   A. No.
5   Q. Okay. What's on 128? This is PSURs, annual
6  reports? Or is this the internal Pfizer adverse event
7  database?
8   A. No, this is not -- this isn't PSUR. These
9  are -- this is the internal database.
10   Q. So then, again, this is Mr. Altman's work,
11  correct, on 128?
12   A. Yes. And these are for -- well, in part.
13      Your client did a partial amplification of
14  their label in '96 to include some additional
15  postmarketing events. And the ones listed on the page
16  are the ones that Pfizer chose to put into the package
17  insert at that timeframe.
18   Q. You say the word "Pfizer" in 1997. Is it your
19  testimony that Pfizer, Inc., modified the label in 1997?
20   A. Well, I think they -- I'm using "Pfizer" to
21  refer to them all. I think Pfizer came in around 2000,
22  but when I say "Pfizer," I'm referring to Parke-Davis
23  and Warner-Lambert.
24   Q. Is it important to you to be accurate in the
25  way you -- you testify in terms of what corporation,

Page 93

1  what party conducted certain analyses?
2   A. I think in the report I talk about the
3  different -- who submitted the different reports, when
4  they were submitted, at different time points. But for
5  the purposes of discussion, I have been just using the
6  term "Pfizer."
7   Q. Well, for purposes of this deposition, when I
8  use the term "Pfizer" and I use the term
9  "Parke-Davis/Warner-Lambert," they're two different
10  corporations. Do you understand that?
11   A. I do, but I also looked in the database and
12  couldn't find anywhere when Pfizer did -- did assume
13  control that they corrected anything that Parke-Davis
14  did.
15   Q. That's not -- that's not the question.
16   A. So since that time, I have just referred to
17  everything as "Pfizer."
18   Q. Well, what -- so is it your view that you just
19  lump everybody together no matter who's actually
20  involved as a matter of fact?
21        MR. FROMSON: Just note my objection as to
22        form.
23        THE WITNESS: I don't -- I don't understand.
24  BY MR. BARNES:
25   Q. Well, when you say the word -- when you say

24 (Pages 90 to 93)

Page 94

1  "Pfizer," Pfizer -- you understand that to be Pfizer,
2  Inc., a corporation, right?
3      A.  I guess, yes.
4      Q.  And if Pfizer -- so -- so you're willing to
5  say "Pfizer," just lump the defendants together under
6  the rubric Pfizer even if it's inaccurate or misleading
7  or unfair?
8          MR. FROMSON:  Just note my objection as to
9      form.
10         THE WITNESS:  That's just simply the way it's
11     been referred.  I've just referred it as to the
12     last one.  If you want, I can go back and at
13     various time points specifically note which one it
14     is, but my understanding of the -- of the concern
15     has gone from the beginning until now.
16  BY MR. BARNES:
17     Q.  Well, where you understand it's Pfizer, Inc.,
18  that has prepared the table or have -- has provided
19  analysis or not used the -- I'd appreciate if you'd use
20  the word "Pfizer, Inc.," so I can ask you questions that
21  way.  And if it's a prior -- if it's Parke-Davis or
22  Warner-Lambert that is responsible for the preparation
23  of the event, to the extent you -- you can say that, I
24  would appreciate it.  It would make our -- it would make
25  the deposition go quicker, because I'm going to ask you

Page 95

1  these questions:  "What is the basis on Pfizer, Inc.,
2  dated?"
3          "Oh, I just lumped them all together."
4          So to the extent you're capable of actually
5  differentiating between corporations and parties in this
6  litigation as to who did what, that would be
7  appreciated.
8          MR. FROMSON:  Just note my objection as to the
9      form of the last question.
10         THE WITNESS:  Right.  Well, I can make it even
11     easier than that.  I have all of the annual reports
12     and the PSURs and IND annual reports in the room,
13     so when you ask the question, I will get up and
14     actually get the annual report --
15  BY MR. BARNES:
16     Q.  Well --
17     A.  -- so I answer it specifically.
18     Q.  When -- when did Pfizer -- do you understand
19  when Pfizer, Inc., acquired an interest and
20  Warner-Lambert acquired the company?
21         MR. FROMSON:  Just note my objection as to the
22     form of the question, in terms of it having a legal
23     conclusion when you use the term "acquire
24     interest."
25         THE WITNESS:  I think it's 2000.

Page 96

1  BY MR. BARNES:
2      Q.  Okay.  So -- okay.
3          In 1996, who had the -- the approval by the
4  Food and Drug Administration to market Neurontin in the
5  United States?
6      A.  Oh, I don't -- I don't know if one was
7  marketing.  I don't know the difference between the
8  Parke-Davis and Warner-Lambert issue.  I don't know.
9      Q.  Just say Warner-Lambert, who --
10     A.  Okay.  Warner-Lambert.  I don't know.  I have
11  no idea.  But I have the report, so if you want a --
12     Q.  No, I -- do you --
13     A.  If you want a correct answer, I will get up
14  and get the reports.
15     Q.  Why don't we do this.
16         You don't know who filed the data in fourth
17  quarter of 1996, do you?  You don't know what company
18  filed it, do you?
19     A.  I -- I think it's Parke-Davis, but I'm not
20  sure.  But I have the reports, so why don't I get up --
21     Q.  You know it's not Pfizer, correct?
22     A.  Well, I think -- I think Pfizer is 2000.  But
23  I have the reports, so I don't know why you're
24  questioning me this way when I can get up and get them.
25     Q.  Just when you say "Pfizer," you should be

Page 97

1  intentional as to what you're saying about Pfizer.  And
2  if another company filed it, then I'd appreciate if
3  you'd -- you direct your --
4      A.  Well --
5      Q.  -- your -- your -- your answers to that.
6      A.  I will --
7      Q.  We'll proceed.  I'll correct you every time if
8  I have to.  Okay?
9      A.  Okay.
10     Q.  So this is an Altman analysis on 1996, 1997,
11  correct?
12     A.  Page?
13     Q.  Page 128.
14         MR. FROMSON:  Hold on.  Just note my objection
15     to the form of the question as "Altman analysis."
16         THE WITNESS:  Yes.
17  BY MR. BARNES:
18     Q.  Okay.  And did you -- again, you didn't
19  validate this work, did you?
20     A.  No.
21     Q.  Is it fair to say -- just so we don't have to
22  ask this every time you identify Mr. Altman as the
23  source of the -- of the tables, is it fair to say
24  that -- that you've not independently validated or
25  tested any of the tables that Mr. Altman provided to

Page 98

1  you, correct?
2      A.  That is correct.
3      Q.  Okay.  When's the next one?  What's the next
4  table?  I have one on 130.  And this is the World Health
5  Organization.
6      A.  Yes, I see on it -- just getting back to your
7  previous criticism, I see on the front page that I have
8  specifically noted that "Pfizer defendants" will refer
9  to Warner-Lambert, Parke-Davis, and Pfizer.  And I think
10 the tables do -- are coded as "Pfizer defendants."
11      So if it makes it easier, I will say "Pfizer
12 defendants" instead of "Pfizer."
13      Q.  Well, now -- but I -- but I think -- do -- do
14 you think it's misleading to have -- to say the word
15 "Pfizer defendants" to -- which includes Pfizer in -- in
16 a report or a regulatory activity or a marketing
17 practice that predated their -- their ownership of the
18 company?  That's -- that's --
19      MR. FROMSON:  Just note my objection as to
20 form.
21      THE WITNESS:  I think that I referred to all
22 three clients and I -- no, I don't think it makes a
23 bit of difference as to what my conclusions are.
24 No.
25 BY MR. BARNES:

Page 99

1      Q.  So accuracy as to -- as to which entity
2  actually submitted the report is not important to you as
3  a scientist or regulatory affairs professional?
4      A.  Well, of course -- of course.
5      MR. FROMSON:  Just note my objection as to the
6  form of the question.  Misstates her testimony.
7      THE WITNESS:  Yes, of course that's important,
8  but I specifically said here I was accessing and
9  reviewing data from all three.  And I was very
10 careful to say "Pfizer defendants."
11      But I don't see "Pfizer" in here.  I say
12 "Pfizer defendants."
13 BY MR. BARNES:
14      Q.  Well, what if you would -- are definitions
15 important to you as a scientist and regulatory affairs
16 professional?
17      A.  Of course they are.
18      Q.  And if your definition is somehow misleading
19 or biased or inaccurate, wouldn't you think it would be
20 important to correct it on the record here today if you
21 have a chance?
22      A.  If I'm referred --
23      MR. FROMSON:  Note my objection as to form.
24      THE WITNESS:  I'm referring to it as "Pfizer
25 defendants."  "Pfizer defendants" include all

Page 100

1  three.
2  BY MR. BARNES:
3      Q.  Okay.  All right.  Then let's go to page 132.
4      Who prepared that?
5      A.  PDG.
6      Q.  And next one, please.  Next table.
7      A.  PDG for pages 132, 133, and 134.
8      Q.  Okay.
9      A.  And 135.
10      Q.  How about 137?  These are the Poison Control
11 Center reports.
12      A.  Yes.  And there was a journal article that
13 accessed all of this information.  And I believe this
14 table derives directly from the AGEM (sic), American
15 Journal of Emergency Medicine Report.
16      Q.  And who prepared this table?
17      A.  PDG.
18      Q.  Okay.  How about the DAWN table on page 143?
19      A.  I believe PDG did that.
20      Q.  How about the tables on 145 and 147 -- 6?
21      A.  Okay.  The -- this was done by PDG and these
22 refer back -- this is similar to what we have already
23 discussed.  These refer back to research reports that
24 were generated during this time period.
25      Q.  How about 165?

Page 101

1      A.  Okay.  We've now moved into the fourth
2  category, June 2002 to present.
3      Q.  This is PSUR, so I assume PDG did it, on 166?
4      A.  163, I think was skipped.  That was PDG.
5      Q.  Uh-huh.  (Indicates affirmatively.)
6  Thank you.
7      A.  165 would be PDG.  166.  And then we're back
8  to the AERS database on page 167.
9      Q.  And -- okay.  167, 168 would be work that
10 Mr. Altman provided to you, correct?
11      A.  Correct.
12      Q.  These are SR -- these are AERS database --
13      A.  Yes.
14      Q.  -- tables, correct?
15      A.  Correct.
16      Q.  And then World Health Organization would be
17 PGD?
18      A.  Would be PDG.
19      Q.  PDG.
20      Okay.  And then the next table I have is
21 two -- really, maybe you can explain to me what they
22 are.  Going to page 193, 194, and 195.
23      A.  One, these tables relate to a dany (sic) -- a
24 data mining effort recognized by the agency, recommended
25 by the agency, called PRRs or percent comparison across

26 (Pages 98 to 101)

Page 102

1  products as percent reports. Both of these tables were
2  done by Mr. Altman.
3      Q.  Who directed that these tables be prepared?
4      A.  The table in 194 is a table across comparisons
5  of different antiepileptic drugs. It's a standard way
6  that we have tried to pictorially present the data that
7  we looked at earlier in comparison to other sister
8  drugs. I asked that that be done.
9      Q.  And so you directed this analysis?
10     A.  Yeah, this is a routine analysis for us in our
11 work when we're -- when we have drugs that are part of a
12 class.
13         And I had -- page 195 is a comparison from
14 another trial -- another project that I guess Mr. Altman
15 is working on. But it illustrated the same sort of
16 separation within a class.
17     Q.  So Mr. Altman prepared this chart on page 195,
18 correct?
19     A.  Yeah, well, he did 194 and 195.
20     Q.  Did you do both of them?
21     A.  Right.
22     Q.  Okay. Did you do any independent work to
23 validate the graph on page 194 or on page 195?
24     A.  No.
25     Q.  And so you don't know if there is a rate of

Page 103

1  error for the data depicted on page 194 which is
2  entitled "PRR Over Time, Suicidal and Self-Injurious
3  Behavior HLT," correct?
4      A.  I don't know if there is any rate of error and
5  I --
6      Q.  One way or the other?
7      A.  I don't have a -- no, I did not validate it.
8      Q.  Did you -- did you -- you said something about
9  this is how -- at page 194, 195 -- this is how you
10 routinely do these analyses for other -- other clients?
11     A.  No, for pharmacovigilance work.
12         What this does is, we're interested in this
13 case in Neurontin, so Neurontin will be on the chart,
14 but as pharmacovigilance assignments, you're always
15 interested if a particular adverse event is simply
16 part of the -- is part of what is observed with that
17 class of drugs or whether there is something unique
18 with --
19         (Phone ringing.)
20         THE WITNESS: Somebody is calling in.
21         -- whether there is something unique with your
22 drug.
23         So what one does, what we are -- what is
24 suggested, what we are taught to do is to do these
25 PRR ratios. Because if there is something unique

Page 104

1      about a drug, it will look different in a PRR time,
2      time-derived data, than will the other drugs in the
3      class.
4  BY MR. BARNES:
5      Q.  Who chose the drugs on page 194 for
6  comparison?
7      A.  Oh, I -- I don't know if we did these. I -- I
8  think I mentioned in my report Gabitril. I know we talk
9  about carbamazepine. I don't -- I don't know if we did
10 that collectively or if I sent the list one. I don't
11 know.
12     Q.  So it's possible that Mr. Altman chose the
13 comparator drugs --
14     A.  Well --
15         MR. FROMSON: Just note my objection.
16 BY MR. BARNES:
17     Q.  -- on this graph?
18     A.  I --
19         MR. FROMSON: I'm sorry. Just note my
20 objection as to form.
21         THE WITNESS: I don't recall how we did this.
22 We had to do it in a -- we had to pick drugs that
23 would have data across the relevant time period, so
24 we couldn't use an -- an AED that were approved in
25 2003 or 2004, because it wouldn't have the data.

Page 105

1      So I -- I don't -- whether we collectively did
2  this or not, I just don't recall.
3  BY MR. BARNES:
4      Q.  So it's possible that Mr. Altman chose the
5  comparator drugs, correct, without your supervision?
6         MR. FROMSON: Note my objection as to form.
7         THE WITNESS: I recall the discussion of
8  including Gabitril in there. I know that I
9  remember that. Now, I just don't recall.
10 BY MR. BARNES:
11     Q.  You say "class of drugs." What do you mean by
12 a class of drugs?
13     A.  Well, when you look at pharmacovigilance data,
14 you're interested, of course, in the -- in the drug in
15 question for that particular NDA, but you're also
16 interested in other drugs that are chemically similar to
17 that drug, whether it's used for the same indication or
18 not, so you do that comparison. You compare the adverse
19 event of interest with other drugs that are approved for
20 the same indication, and you also approve drugs that
21 have the same mechanism of action. So there is
22 different ways that you canvas pharmacovigilance data.
23         In this particular table or this particular
24 graph, what we have here are the PRRs for the
25 suicide-related events, the high-level term

27 (Pages 102 to 105)

Page 371

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2

 3   In re:  NEURONTIN MARKETING, SALES  MDL DOCKET NO:  1629
             PRACTICES, AND PRODUCTS
 4           LIABILITY LITIGATION      Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7        ALL PRODUCTS LIABILITY
          ACTIONS
 8   _____/

 9
          VIDEOTAPED
10        DEPOSITION OF:     CHERYL D. BLUME, Ph.D.

11        DATE:              November 13, 2007

12        TIME:              9:06 a.m. to 6:08 p.m.

13        PLACE:             13902 North Dale Mabry Highway
                             Suite 122
14                           Tampa, Florida

15        PURSUANT TO:       Notice by counsel for
                             Defendants for purposes
16                           of discovery, use at
                             trial or such other
17                           purposes as are permitted
                             under the Federal Rules
18                           of Civil Procedure

19        BEFORE:            VALERIE A. HANCE, RPR
                             Notary Public, State of
20                           Florida at Large

21                           Volume 2
                             Pages 371 to 722
22

23

24

25
```

Page 372

```
 1  APPEARANCES:
 2     KENNETH B. FROMSON, ESQUIRE
        Finkelstein & Partners
 3      785 Broadway
        3rd Floor
 4      Kingston, New York  12401
        (800) 634-1212 Ext. 2755
 5        Attorney for Plaintiffs
 6     RICHARD M. BARNES, ESQUIRE
        MICHAEL J. WASICKO, ESQUIRE
 7      Goodell, DeVries, Leech & Dann, LLP
        One South Street
 8      20th Floor
        Baltimore, Maryland  21202
 9      (410) 783-4000
10     -and-
11     VINCENT E. GUNTER, ESQUIRE
        LORI C. McGRODER, ESQUIRE (via telephone)
12      Shook, Hardy & Bacon, LLP
        2555 Grand Boulevard
13      Kansas City, Missouri  64108-2613
        (816) 474-6550
14        Attorneys for Defendant, Pfizer, Inc.
15     ANNAMARIE A. DALEY, ESQUIRE (via telephone)
        Robins, Kaplan, Miller & Ciresi L.L.P.
16      2800 LaSalle Plaza
        800 LaSalle Avenue
17      Minneapolis, Minnesota 55402
        (612) 349-8500
18        Attorney for Plaintiff, Assurant
19     ELANA GOLD, ESQUIRE (via telephone)
        Law Office of Steven Hillyard
20      345 California Street
        Suite 1770
21      San Francisco, California  94104
        (415) 334-6880
22        Attorney for Raymond Jennings, M.D.
23  ALSO PRESENT:
       KEITH ALTMAN, Finkelstein & Partners
24     DAVID LEGGETT, Videographer
25
```

Page 373

```
 1              INDEX
                              PAGE
 2  DIRECT EXAMINATION BY MR. BARNES (CONTINUED) ......... 375
 3  WITNESS' SIGNATURE PAGE.............................. 720
 4  CERTIFICATE OF OATH................................. 721
 5  REPORTER'S CERTIFICATE.............................. 722
 6
 7              EXHIBITS
                        ID    MARK
 8  17  "Conclusiveness of rechallenge in ...... 441    440
         the interpretation of adverse drug
 9       reactions"
10  18  Chart "PRR Over Time Completed ......... 462    461
         Suicide (PT) Serious Reports
11
12  19  Integrated Summary of Safety ........... 513    512
         Information
13  20  First Safety Update Following the ...... 517    516
         Submission of the ISS (5/29/92)
14
15  21  Medical Review - Application Number .... 533    533
         21-397/21-423/21-424
16  22  Affidavit of Cynthia McCormick.......... 552    550
17  23  Citizen Petition....................... 602    602
18  24  Letter from Russell Katz, M.D., to ..... 615    615
         Andrew G. Finkelstein (April 12, 2005)
19
20  25  Neurology Today Article (June 2005)..... 653    653
21  26  Record of FDA Contact.................. 659    659
22  27  Approvable Letter Package (12/21/93).... 664    664
23  28  Package Insert for Neurontin ........... 670    669
         (Gabapentin Capsules)
24  29  Record of FDA Contact (12/29/93)........ 671    671
25
```

Page 374

```
 1              EXHIBITS
                        ID    MARK
 2  30  Record of FDA Contact (12/22/93)........ 672    672
 3  31  Letter from Robert Temple, M.D., to .... 692    692
         Janeth Turner with Approval Letter
 4       (12/30/93)
 5  32  e-mail from Courtney Calder to Manini .. 705    704
         Patel (11/22/05)
 6
 7  33  Joint Response Assessment Report on .... 710    708
         List of Outstanding Issues, Neurontin
         and Associated Tradenames (Gabapentin)
```

Page 375

```
 1       (Proceedings continued from Volume 1.)
 2       THE VIDEOGRAPHER:  It's November 13th, 2007.
 3  We're on the record at 9:06 a.m.
 4          CHERYL D. BLUME, Ph.D.,
 5  the witness herein, being previously duly sworn on oath,
 6  was examined and deposed as follows:
 7       DIRECT EXAMINATION (CONTINUED)
 8  BY MR. BARNES:
 9    Q.  Good morning, Dr. Blume.
10    A.  Good morning.
11    Q.  We're going to resume your deposition today.
12  Okay?  Again, this is -- my name is Rick Barnes, and I'm
13  going to ask you some questions today about your report.
14       Yesterday I asked you several questions and
15  you stated you would have to look and check and see if
16  you could find certain information.  Did you have a
17  chance to review your file for the information regarding
18  the medical literature that we discussed yesterday as
19  well as the FDA reference that you mentioned?
20       MR. FROMSON:  Objection as to form.
21       THE WITNESS:  I'm sorry.  You're going to have
22  to remind me.
23  BY MR. BARNES:
24    Q.  Well, let me -- let me be very direct then.
25       Well, do you remember when I was asking you
```

Page 388

1  application review process goes.
2      Q.  I don't want you to do that.  I don't want
3  you -- no.  Let me take back that -- I don't want you to
4  explain the new drug application.  I understand how
5  new app- -- new drug application works.
6          My question is, as I understand it, his
7  analysis was included in an NDA, correct?
8      A.  Yes.
9      Q.  And subsequent to that, the NDA was approved
10  by the Food and Drug Administration, correct?
11      A.  Yes.
12      Q.  Was there any specific discussion involving
13  Mr. Altman's work on postmarket surveillance with the
14  Food and Drug Administration in the -- in the context of
15  their -- your -- their review?
16      A.  Yes.
17      Q.  Okay.  And what did they say to you about
18  Mr. Altman's analysis?
19      A.  They called with a couple of questions about
20  how the charts were prepared.
21      Q.  Did they say anything about approving the
22  method that he used?
23      A.  The charts that he demonstrated were an
24  integral part of our ISS, which is the integrated
25  summary of safety.  That integrated summary of safety

Page 389

1  was approved with those charts inside it.
2      Q.  Okay.
3      A.  FDA -- I have no experience where FDA ever
4  writes to you with your approval letter and say they are
5  approving individual sections of your NDA.  The NDA is
6  approved or it's not approved.  You only know if
7  something is wrong if FDA tells you in either a
8  nonapprovable letter or even an approvable letter that
9  certain sections are deficient and need to either be
10  corrected or replaced.
11      Q.  So other than the fact that the data was --
12  when Mr. Altman was submitted an NDA and reviewed by the
13  Food and Drug Administration with some questions about
14  the graphs, and that the NDA was subsequently approved,
15  you have no specific information as to now FDA
16  interpreted or evaluated Mr. Altman's analysis, correct?
17      MR. FROMSON:  Objection to form.
18      THE WITNESS:  I -- I believe -- and you'll
19  have to ask him this.  I believe there were also
20  communications between Mr. Altman and the FDA on
21  this.  And I also had no communications with FDA on
22  that NDA on the clinical trials, but yet those
23  clinical trials provided the bases of the approval
24  of that NDA for efficacy.
25  BY MR. BARNES:

Page 390

1      MR. BARNES:  Move to strike as nonresponsive.
2  Would you read back the last question, please.
3      (The reporter read the portion requested.)
4  BY MR. BARNES:
5      Q.  Now, please answer that question.
6      MR. FROMSON:  And I have an objection.
7      THE WITNESS:  I don't know how to answer it
8  any differently, but I'll try again.
9          In my years with dealing with the FDA, I have
10  never received an approval letter or an
11  approval letter -- approvable letter that
12  specifically recited everything that they agreed
13  with in the -- in those letters.
14  BY MR. BARNES:
15      Q.  Or disagreed with?
16      A.  No, when they disagree with something, you do
17  have that.  They tell you what needs to be corrected or
18  replaced.  But I have never had a recitation that they
19  agree with this study, that study, or not that study.
20          In that NDA, those data were submitted, they
21  were discussed between the FDA and me, questions were
22  posed by the FDA.  No complaints, no further reviews, no
23  further requests for information were ever requested.
24  Those charts remained the way they were and the NDA was
25  approved.

Page 391

1      Q.  Okay.  And so you're drawing -- you would draw
2  an inference that F -- from that scenario, that FDA did
3  not object to Mr. Altman's analysis and accepted it in
4  the context --
5      A.  Absolutely.
6      Q.  -- of the Food and Drug Administration?  Okay.
7      A.  They also -- in that NDA, I submitted clinical
8  trial data that they didn't specifically write that they
9  approved of that clinical trial data, but yet that data
10  forms the basis of the efficacy conclusions.
11      Q.  So -- and -- and just -- just to complete the
12  loop, you will not tell me the name of the drug,
13  correct?
14      A.  No, but I did give you the name of my
15  corporate counsel yesterday and I did inform him that
16  you may well be calling him.
17      Q.  I don't recall his name.
18      A.  I gave it to you.  Dr. Jay Wolfson.
19      Q.  Dr. Jay Wolfson?
20      A.  Yes.  (813) --
21      Q.  Well -- okay.  (813) --
22      A.  240 --
23      Q.  Uh-huh.  (Indicates affirmatively.)
24      A.  -- 1363.
25      Q.  Well -- 1 -- 1363?

6 (Pages 388 to 391)

Page 596

1  patent is not something that's published in a
2  peer-reviewed medical or scientific literature, correct?
3     A.  No, I list them separately in my -- the CV I
4  gave you, publications and the patents.  The patents
5  that we've done over the last four or five years relate
6  directly to changes in -- changes for neurologic --
7  neuro psychobiologic endpoints.
8          MR. BARNES:  I just had a call from my family.
9  Take it one second.
10         MR. FROMSON:  Absolutely.
11         THE VIDEOGRAPHER:  Off the record 3:00.
12         (Off the record.)
13         THE VIDEOGRAPHER:  On the record 3:02.
14  BY MR. BARNES:
15     Q.  You would agree with me that the patents that
16  are in your resume are not part of the medical and
17  scientific peer-reviewed medical and scientific
18  literature, correct?
19     A.  No, they are not peer-reviewed literature.
20  I've only listed patents that have been issued, but I
21  haven't -- they are -- I wouldn't consider them part of
22  the literature.
23     Q.  Okay.  Now, are you board certified in
24  clinical pharmacology?
25     A.  No, I'm not a physician.

Page 597

1     Q.  Are you -- so your -- are only clinical -- are
2  only physicians clinical pharmacologists?
3     A.  That was my understanding, to be able to be
4  certified.
5     Q.  All right.  And are you on the editorial
6  boards of any of the following journals?  Are you on the
7  editorial board of the "Journal of Clinical
8  Psychopharmacology"?
9     A.  No.
10    Q.  Are you on the editorial board of the "Journal
11  of Clinical Pharmacology"?
12    A.  No.
13    Q.  Have you ever been published in the "Journal
14  of Clinical Pharmacology"?
15    A.  I believe so.
16        "Journal of Clinical Pharmacology and
17  Therapeutics."
18    Q.  Okay.  So as to the "Journal of Clinical
19  Pharmacology," you haven't published in that journal?
20    A.  No.  I don't know if that's a separate journal
21  today from "Clinical Pharmacology and Therapeutics," but
22  I've published in "Clinical Pharmacology and
23  Therapeutics."
24    Q.  On how many occasions?
25    A.  One.

Page 598

1     Q.  What about the "Journal of
2  Neuropsychopharmacology"?
3     A.  No, I'm not on the editorial board.
4     Q.  Have you ever published in the "Journal of
5  Neuropsychopharmacology"?
6     A.  No.
7     Q.  Have you published in the "Journal of
8  Pharmacology and Toxicology"?
9     A.  "Pharmacology and Toxicology"?
10    Q.  Yes.
11    A.  No.
12    Q.  And are you -- have you ever served on the
13  editorial board of the "Journal of Pharmacology and
14  Toxicology"?
15    A.  No.
16    Q.  Have you ever served on any editorial board of
17  any peer-reviewed medical journal?
18    A.  No.
19    Q.  Are you a member of the American Society for
20  Clinical Investigation?
21    A.  I don't see that one on either my list or on
22  PDG's list.
23    Q.  And I'm concerned with your list.  Okay?
24        Are you a member of the American Society for
25  Pharmacology and Experimental Therapeutics?

Page 599

1     A.  Experimental -- I don't have that on my
2  current list.  I was a member while I was in graduate
3  school, but I don't have it on my current list.
4     Q.  You're a member of the American College of
5  Clinical Pharmacology?
6     A.  No, that's not on my current list either.
7     Q.  Have you ever been a member of the American
8  College of Clinical Pharmacology?
9     A.  I -- I -- I don't recall.
10    Q.  Have you ever -- are you a member of the
11  American College of Neuropsychopharmacology?
12    A.  Oh, no, I'm not that.
13    Q.  Okay.
14    A.  You're not asking about the rest of these?
15    Q.  No, I'm done.  Thanks.
16        Now, you've been working with the Finkelstein
17  firm since 2003, correct?
18    A.  Yes.
19    Q.  Were you involved in -- or have you -- were
20  you involved in the preparation of the citizen's
21  petition?
22    A.  Yes.
23    Q.  What is the citizen's petition?  What is a
24  citizen's petition?
25    A.  A citizen's petition is a mechanism by which a

58 (Pages 596 to 599)

Page 600

1  non-NDA holder or a non-device holder or non-application
2  holder for a particular product may submit -- and this
3  may be an individual or a group or an association,
4  whatever -- may -- using a format that is dictated by
5  SEDAR may submit a petition for the FDA or the agency to
6  consider a change or a modification in either a marketed
7  product, requirements for a marketed product, to request
8  a presence, information on a pending application on a
9  wide variety of issues. It's pretty much what it sounds
10  like, a petition submitted by a citizen for the agency
11  to consider something.
12      Q. Describe your involvement in the preparation
13  of the citizen's petition filed by the Finkelstein law
14  firm.
15      MR. FROMSON: Just note my objection to form.
16      THE WITNESS: I don't think I have a copy of
17  it here, but it is in the shelf.
18      As I recall -- this is going back some time --
19  I talked with them about what a citizen's petition
20  is, how it is put together, FDA's requirements for
21  routing it, the necessary period for review,
22  methods of amending it. I recall reading the
23  petition before it was submitted, reading over it,
24  discussing data that are normally included in a
25  petition. Those types of general assignments.

Page 601

1  BY MR. BARNES:
2      Q. Did you draft any portion of the citizen's
3  petition?
4      A. Boy, this far, I don't -- I don't recall
5  drafting any specific section. I do recall reading it
6  over. I may have edited. I just don't have specific
7  recollection of it.
8      Q. Were you compensated for your work in
9  assisting in the preparation of the citizen's petition
10  filed by Mr. Finkelstein's law firm?
11      A. That was not a -- it would not have been a
12  specific bill for that. It would have been part of the
13  hours during relevant timeframe.
14      Q. Did you work with Mr. Altman on the petition?
15      A. Yes.
16      Q. Now, are you aware of the -- of the specific
17  relief that was requested by the Finkelstein law firm
18  with your assistance in the citizen's petition?
19      A. No, I do not recall the specific relief we
20  requested.
21      Q. Okay.
22      A. That I requested.
23      Q. You don't have a copy handy by chance?
24      A. I believe it is in the data files on the
25  shelf.

Page 602

1      (Counsel conferring off the record.)
2      MR. BARNES: Please hand that to the court
3  reporter for marking.
4      (Deposition Exhibit No. 23 marked for
5  identification.)
6  BY MR. BARNES:
7      Q. Do you have that in front of you?
8      A. I do.
9      Q. Can you tell me what the exhibit number is?
10      A. Yes.
11      Q. What's --
12      A. Exhibit 23.
13      Q. Okay. Exhibit 23.
14      And this was submitted by Keith Altman,
15  Director of Adverse Event Analyses, Finkelstein and
16  Partners in Newburgh, New York, correct?
17      A. Yes.
18      Q. And do you recognize this document?
19      A. Yes.
20      Q. Directing your attention to page 2, the
21  petition requests FDA to make certain changes in the
22  labeling, correct?
23      A. Just a second.
24      Yes.
25      Q. Okay. And this citizen's petition was filed

Page 603

1  on May 17th, 2004, about three and a half years ago,
2  correct?
3      A. Yes.
4      Q. Okay. And, specifically, it asks for a bolded
5  black box warning. Do you see that?
6      A. You're on page?
7      Q. Three.
8      A. Yes.
9      Q. So reading on page 3, "The petitioners" --
10  which is Finkelstein & Associates -- "request that the
11  FDA commissioner act immediately to require the labeling
12  additions noted below. This action is especially
13  critical because of Neurontin's -- Neurontin's wide use
14  for nonlabeled indications and for which proper medical
15  monitoring instructions have not yet been established by
16  FDA."
17      Then have a "Bolded Black Block Warning." Do
18  you see that?
19      A. Yes.
20      Q. Did I read that correctly?
21      A. I don't recall the word "yet." I don't see
22  the word "yet" in the last sent- -- last line. But
23  other than that, yes.
24      Q. Okay. And then there is a requested black
25  box. What's a black box warning?

59 (Pages 600 to 603)