EXHIBIT 5

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert (Defense Expert)**
2/3/2009

Gibbons, Robert (Defense Expert) 2/3/2009 9:09:00 AM

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2
    IN RE: NEURONTIN        )
3   MARKETING SALES PRACTICES )
    & PRODUCTS LIABILITY     )
4   LITIGATION               )
                             ) MDL DOCKET
5   BULGER VS. PFIZER, et al. ) No. 1629
    07-11426-PBS             )
6                            ) MASTER FILE
    SMITH VS. PFIZER, et al.  ) No. 04-10981
7   05-CV-11515-PBS          )
8
       SUPERIOR COURT OF THE STATE OF CALIFORI
9                 CITY OF LAKE
10  NICOLETTE CRONE,  et. al,  )
                             )
11      Plaintiffs,          )
                             )
12      versus               ) CV 400432
                             )
13  PFIZER, INC., et al.,    )
                             )
14      Defendants.          )
15  Job No.: 183059
                 VOLUME I
16       The videotaped deposition of ROBERT D.
17  GIBBONS, Ph.D., called by the Plaintiffs for
18  examination, pursuant to Notice, and pursuant to
19  the Rules of Civil Procedure for the United States
20  District Courts, taken before Sandra L. Rocca, CSR,
21  CRR and Notary Public in and for the County of
22  DuPage, and State of Illinois, at 506 West
23  Harrison, Chicago, Illinois, on the 3rd day of
24  February, 2009, at the hour of 9:09 a.m..
```

**2**

```
1
2
    APPEARANCES:
3
       MR. JACK LONDON
       3701 Bee Cave, Suite 200
       Austin, TX 78746
4      (512) 478-5858
       jlondon@texas.net
5
                 -and-
6
       FINKELSTEIN & PARTNERS
7      By:  MR. KEITH L. ALTMAN
       463 Robinson Avenue
8      Newburgh, NY 12550
       (516) 456-5885/Fax: (951) 303-1222
9      kaltman@lawampmmt.com
10               -and-
11     THE LANIER LAW FIRM
       By:  MR. KENNETH S. SOH
12     6810 FM 1960 West
       Houston, TX 77069
13     (713) 659-5200/Fax: (713) 659-2204
       Kss@lanierlawfirm.com
14
           appeared on behalf of
15         the Plaintiffs;
16
       SHOOK, HARDY & BACON, L.L.P.
17     By:  MS. LORI CONNORS McGRODER
       2555 Grand Blvd.
18     Kansas City, MO  64108-2613
       (816) 474-6550/Fax: (816) 421-5547
19     lmcgroder@shb.com
20         appeared on behalf of the
           Defendants;
21
       (continued)
22
23
24
```

**3**

```
1
    APPEARANCES: (Continued)
2
3   LAW OFFICES OF STEVEN D. HILLYARD, P.C.
    By:  MR. GERHARD WINKLER
4   345 California Street, Suite 1770
    San Francisco, CA  94104
5   (415) 334-6880
6       appeared on behalf of Defendant
        Dr. Jennings.
7
8
9   Also Present:
10      James Pierdzioch, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
1       VIDEOGRAPHER:  My name is James
2   Pierdzioch of Veritext.  The date today is
3   February 3rd, 2009 and the time is 9:09 a.m.  This
4   deposition is being held at the Holiday Inn located
5   at 506 West Harrison Street in Chicago, Illinois.
6   The captions for this case are In Re:  Neurontin
7   Marketing Sales Properties and Products Liability
8   Litigation in the United States District Court,
9   District of Massachusetts and Nicolette Crone,
10  et al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13       The name of the witness is Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identifies themselves for the record.
16       MR. LONDON:  I'm Jack London.  I
17  represent the multi-district litigation Plaintiffs,
18  product liability steering committee Plaintiffs.
19       MR. ALTMAN:  Keith Altman.  I'm here
20  representing Nicolette Crone and the Crone
21  Plaintiffs and I'll be asking questions on behalf
22  of Crone.
23       MR. SOH:  Ken Soh for the Plaintiffs.
24       MR. WINKLER:  Gerhard Winkler on behalf
```

Gibbons, Robert (Defense Expert) 2/3/2009 9:09:00 AM

257

1    BY MR. LONDON:
2        Q.  I said out of the July 11 report?
3        A.  No, that's actually not what you said.
4            MS. McGRODER:  That's okay.  Ask a
5    question.
6    BY MR. LONDON:
7        Q.  Time out.  Just let me get the question
8    on the table.  Did you tell Dr. Hur that the
9    quotations that we have read out of the scholarly
10   paper that are the same or very similar to the
11   quotations that are in the scholarly -- the July
12   11th report first appeared in the July 11th report?
13           MS. McGRODER:  Object, argumentative and
14   assumes facts not in evidence.
15           THE WITNESS:  I don't recall if I told
16   him that or not, but we didn't discuss the -- my
17   expert report so I don't assume that I mentioned
18   that.
19   BY MR. LONDON:
20       Q.  Did you mention it to Dr. Brown?
21           MS. McGRODER:  Same objections,
22   argumentative and assumes facts not in evidence.
23           THE WITNESS:  No.
24

258

1    BY MR. LONDON:
2        Q.  Did you mention it to Dr. Mann?
3            MS. McGRODER:  Same objections.
4            THE WITNESS:  I don't believe so.
5    BY MR. LONDON:
6        Q.  The report is -- I'm sorry.  The paper is
7    dated September 2008 and can you tell me when it
8    was that you first sent it to JAMA?
9            MS. McGRODER:  Objection, asked and
10   answered.
11           THE WITNESS:  I don't remember.
12   BY MR. LONDON:
13       Q.  Did you send it to Miss McGroder before
14   you sent it to JAMA?
15       A.  No.
16       Q.  When did you send it to Miss McGroder?
17       A.  After it had been submitted for
18   publication.
19       Q.  Can you give me a date on that?
20       A.  I don't remember.
21           MR. LONDON:  Okay.  Lori, I need to know
22   if you have Dr. Gibbons's bills here so we can look
23   at them and see whether or not those help us
24   triangulate some of these missing dates.  Do you

259

1    have his bills here?
2            MS. McGRODER:  I don't.  I don't have
3    them.
4            MR. LONDON:  I request them for that very
5    purpose.
6            MS. McGRODER:  Okay.
7            MR. LONDON:  I'd like to know the amounts
8    of the bills, but more specifically, I want to see
9    the bills or billing information to see if they'll
10   help us understand some of these dates that we've
11   been asking about.  Will you do that for me?
12           MS. McGRODER:  I'll do my best.
13           MR. ALTMAN:  Can they be faxed from your
14   office?  I assume they're in your office.
15           MS. McGRODER:  I don't know.
16   BY MR. LONDON:
17       Q.  Let's lift hands for a minute and just
18   pause, okay.
19       A.  Okay.
20       Q.  Let's lift hands and pause for a minute.
21           VIDEOGRAPHER:  The time is 4:29 p.m.
22   We're going off the record.
23           (Short recess.)
24           VIDEOGRAPHER:  The time is 4:32 p.m.

260

1    This is the beginning of tape Number 7.  We are
2    back on record.
3    BY MR. LONDON:
4        Q.  Dr. Gibbons, did you send any financial
5    disclosures to the JAMA or the Archives of General
6    Psychiatry in connection with submission of the
7    scholarly paper of September 2008?
8        A.  I submitted the paper with the
9    acknowledgments that are listed in the front.
10       Q.  To that extent, the financial disclosure
11   that I saw that is germane to my question is this
12   one on page 17.  Do you see where I'm referring to?
13       A.  Yes.
14       Q.  And does it say that the data were
15   obtained from PHARMetrics with the assistance of a
16   grant in aid from Pfizer?
17       A.  Yes, it does.
18       Q.  Did you consider the reimbursement of the
19   PHARMetrics expense you incurred by the Pfizer
20   defense firm to be a grant in aid?
21       A.  At the time that's how I referred to it.
22   I guess that was just sort of standard way of
23   referring to that.
24       Q.  Well, it's true, isn't it, that you

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
2/4/2009

352

```
1      IN THE UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3   IN RE; NEURONTIN         )
4   MARKETING SALES PRACTICES    )
5   & PRODUCT LIABILITY      )
6   LITIGATION,          )
7                        ) MDL DOCKET
8   BULGER vs. PFIZER, et al.,    ) No. 1629
9                        ) MASTER FILE
10  SMITH vs. PFIZER, et al.,     ) No. 04-10981
11  05-CV-11515-PBS          )
12      SUPERIOR COURT OF THE STATE OF CALIFORNIA
13          CITY OF LAKE
14  NICOLETTE CRONE, et al.,     )
15          Plaintiffs,      )
16          vs.          ) CV 400432
17  PFIZER, INC., et al.,        )
18          Defendants.      )
19  2/4/09  Job No.: 183060
20          9:16 a.m.
21          The videotaped deposition of ROBERT D.
22  GIBBONS, Ph.D., resumed pursuant to adjournment at
23  Suite 533, 506 West Harrison Street, Chicago,
24  Illinois.
```

353

```
1   PRESENT:
2       LAW OFFICES OF JACK LONDON,
3       (3701 Bee Cave, Suite 200,
4       Austin, Texas 78746,
5       512-478-5858), by:
6       MR. JACK LONDON,
7       jlondon@texas.net,
8           -and-
9       FINKELSTEIN & PARTNERS, LLP,
10      (463 Robinson Avenue,
11      Newburgh, New York 12550,
12      800-634-1212), by:
13      MR. KEITH L. ALTMAN,
14      keltman@lawampmmt.com,
15          -and-
16      THE LANIER LAW FIRM,
17      (6810 FM 1960 West,
18      Houston, Texas 77069,
19      713-659-5200), by:
20      MR. KENNETH S. SOH,
21      kss@lanierlawfirm.com,
22          appeared on behalf of the Plaintiffs;
23
24
```

354

```
1   PRESENT:  (Continued)
2       SHOOK, HARDY & BACON, L.L.P.,
3       (2555 Grand Boulevard,
4       Kansas City, Missouri 6108-2613,
5       816-474-6550), by:
6       MS. LORI CONNORS McGRODER,
7       lmcgroder@shb.com,
8           appeared on behalf of the Defendants;
9
10      LAW OFFICES OF STEVEN D. HILLYARD, PC,
11      (345 California Street, Suite 1770,
12      San Francisco, California 94104,
13      415-334-6880), by:
14      MR. GERHARD O. WINKLER,
15          appeared telephonically on behalf of
16          Defendant Raymond D. Jennings, M.D.
17
18  VIDEOTAPED BY:
19      MR. JAMES PIERDZIOCH, Veritext Chicago
20          Reporting Company.
21
22
23  REPORTED BY:  ANDREA L. CARTER,
24          Illinois CSR No. 84-3722.
```

355

```
1       THE VIDEOGRAPHER:  My name is James Pierdzioch
2   of Veritext.  The date today is February 4th, 2009,
3   and the time is 9:16 a.m.  This deposition is being
4   held at the Holiday Inn located at 506 West Harrison
5   Street in Chicago, Illinois.
6       The captions for this case are Neurontin
7   Marketing Sales Practices and Products Liability
8   Litigation in the United States District Court,
9   District of Massachusetts, and Nicolette Crone, et
10  al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13      This is the day two deposition of Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identify themselves for the record.
16      MR. ALTMAN:  Keith Altman on behalf of
17  Nicolette Crone and the Crone plaintiffs.
18      MR. LONDON:  Jack London on behalf of the MDL
19  product liability plaintiffs.  Also here but out of
20  the room for a moment is Ken Soh also with the
21  plaintiffs' product liability MDL group.
22      MS. McGRODER:  Lori McGroder on behalf of
23  Pfizer.
24      MR. WINKLER:  Gary Winkler on behalf of
```

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

360

1  submitted some items to counsel and some items
2  didn't exist, correct?
3      A.  I believe so.
4      Q.  Dr. Gibbons, the pile you see in front of
5  you represents the sum total of the materials unique
6  to you that plaintiffs have received in this case.
7      MS. McGRODER:  Well, I -- I object to that
8  representation.
9      MR. ALTMAN:  Well, are there --
10     MS. McGRODER:  He has no idea to know whether
11  that's correct.
12     MR. ALTMAN:  I'm representing to him that
13  that's what's been produced.
14  BY MR. ALTMAN:
15     Q.  Are there other materials that you gave
16  to counsel that are not in the pile that you see in
17  front of you?
18     MS. McGRODER:  Well, I object to that, Keith,
19  because there are documents that we have given --
20  that Dr. Gibbons has received that we have given you
21  separately.  If you are asking him --
22     MR. ALTMAN:  I'm talking about in terms of -- I
23  am not talking about documents that were produced to
24  Dr. Gibbons.  I'm talking about correspondence

361

1  between Shook Hardy and Dr. Gibbons, anything along
2  those lines.
3  BY MR. ALTMAN:
4      Q.  Any other materials that you created
5  relevant to this case that you gave to counsel in
6  response to that document request.  Are there any
7  other materials?
8          For example, I think you were asked if
9  there were correspondence between you and Shook
10  Hardy.
11         Do you remember that?
12     A.  Yes.
13     Q.  I think you said there was some?
14     A.  Yes.
15     Q.  Do you see that -- any of that
16  correspondence in the pile over here?
17     A.  The majority of the correspondence that I
18  recall was via telephone.
19     Q.  Okay.  Was there any written
20  correspondence between you and counsel?
21     A.  Not to my knowledge beyond what's here.
22     Q.  So you sent no e-mails back and forth at
23  any time?
24     A.  There were occasional e-mails.  I haven't

362

1  saved those.  They weren't of a substantive nature.
2  Any substantive nature conversations were held on
3  the telephone.
4      Q.  So it's your representation there is
5  nothing substantive ever discussed in an e-mail
6  between you or counsel or counsel and you?
7      A.  That's correct.
8      Q.  Do you have the -- when you -- how did
9  you send the draft -- the submitted version of your
10  paper to counsel?
11     A.  I sent that as an e-mail.
12     Q.  Okay.  Do you have that e-mail?
13     A.  I don't retain e-mails that I have sent.
14     Q.  So you don't think that -- okay.  All
15  right.  We will come back to that.
16         Dr. Gibbons, Exhibit 25 has just been
17  produced to us is your invoices associated with the
18  Neurontin case, and I believe the first invoice here
19  is dated November 1st of 2008; is that correct?
20     MS. McGRODER:  Are you going in reverse
21  chronological order or --
22     MR. ALTMAN:  Well, the first invoice that I see
23  is dated April 1st of 2008.
24     MS. McGRODER:  You said November.

363

1      MR. ALTMAN:  Did I say November?  I apologize,
2  I meant April.
3  BY THE WITNESS:
4      A.  These are all of my invoices.  These all
5  include invoices on the sales and marketing case of
6  which you guys -- of which this deposition is not
7  about.
8  BY MR. ALTMAN:
9      Q.  Understood.  I'd just like to sum up the
10  total of these numbers.
11         The first invoice is for $13,600,
12  correct?
13     A.  Correct.
14     Q.  The next invoice dated April 23, 2008 is
15  for $28,000, correct?
16     A.  That's correct.
17     Q.  By the way, before we get to that, the
18  first invoice was that work for work in this case?
19     MS. McGRODER:  You mean the -- you mean the --
20     MR. ALTMAN:  In the products liability case.
21  BY THE WITNESS:
22     A.  Yes.
23  BY MR. ALTMAN:
24     Q.  Okay.  The next invoice for $28,000 dated

Gibbons, Robert D PhD (Defense Expert)  2/4/2009 9:16:00 AM

440

1    MS. McGRODER: As he sits here right at this
2    moment?
3    MR. ALTMAN: As he sits here right now.
4    BY THE WITNESS:
5    A.   I have nothing planned at this moment.
6    BY MR. ALTMAN:
7    Q.   By the way, I just want to -- you said
8    Dr. Hur helped you with the programs for both the
9    bipolar study and the gabapentin study, correct?
10   A.   That's correct.
11   Q.   Did you pay Dr. Hur for his help -- for
12   his assistance with you on the gabapentin study?
13   A.   For the gabapentin study, yes, I did.
14   Q.   Okay. How much did you pay Dr. Hur for
15   that?
16   A.   I don't remember how much.
17   Q.   Do you have records for that?
18   A.   I might.
19   Q.   Okay. We request that -- did you pay him
20   personally, or did you pay him out of your
21   corporation?
22   A.   Out of my corporation.
23   MR. ALTMAN: Okay. We request that we get
24   information associated with how much Dr. Hur had

441

1    been paid for his work in the gabapentin study.
2    MS. McGRODER: Your request is noted.
3    BY MR. ALTMAN:
4    Q.   How does it work with -- for the bipolar
5    study and the grants and everything like that, is
6    there an actual -- does the grant go to the
7    university, and you just kind of just do work and
8    the grant funds part of your work, or is there an
9    actual transfer of funds from some -- you know, bank
10   account -- does the grant send you some money, you
11   put it in a bank account, and then as you expend
12   work under the grant, you just withdraw funds out of
13   that and give it to the university?
14        How does that work?
15   A.   The grant is to the university, and the
16   university pays my salary, and there are, you know,
17   objectives and pays the salary of Dr. Hur and my
18   co-investigators, but the money goes directly to the
19   university.
20   Q.   Do you have to account for how much time
21   you spend working on, you know, something that falls
22   under the umbrella of a particular grant?
23   A.   There's no like time sheet kind of thing
24   or anything like that. There's a proposal and the

442

1    proposal, you know, lists various percent efforts
2    for members of the grant, and they are usually gross
3    underestimates, and, you know, we do the work. And,
4    you know, the National Institute of Health is either
5    happy based on our productivity or not happy.
6    Generally for our work, they are pretty happy.
7    Q.   Now, if you wanted to use an outside
8    individual to assist in a grant, would you -- would
9    they wind up getting some money from your university
10   going to that other person's university?
11   A.   An example of that would be we have a
12   subcontract with the University of South Florida to
13   pay for time and travel and support for Dr. Brown on
14   our suicide grant, both on the current suicide grant
15   and the original R-56 grant.
16   Q.   Okay. I'd like you to pull out your
17   original declaration which is I believe Exhibit 8.
18   I believe it's Exhibit 8.
19        At the bottom of page 3 -- we are not
20   going to look at page 1 and 2 -- would you please
21   read in the first sentence of the paragraph at the
22   bottom?
23   A.   "Our best estimate of the ratio of the
24   probability of suicidality for patients treated with

443

1    gabapentin to those treated with placebo is a ratio
2    of 1.033 indicating no increased risk of suicidality
3    with gabapentin at a confidence level" --
4    MS. McGRODER: Just for the court reporter,
5    slow down.
6    BY THE WITNESS:
7    A.   Oh, I'm sorry. -- "in excess of 99.9
8    percent."
9    BY MR. ALTMAN:
10   Q.   Now, you didn't qualify when you said
11   "our best estimate." That is just taking the
12   submission to the FDA by Pfizer at face value?
13        I mean, you didn't actually look to see
14   whether that -- whether they should have included
15   all those studies, whether that was the right way to
16   do it, whether you have should included -- gone to
17   patient years or any of that when you said that,
18   correct?
19   MS. McGRODER: Object to form.
20   BY THE WITNESS:
21   A.   That was my estimate based on the data
22   that were submitted to the FDA by Pfizer.
23   BY MR. ALTMAN:
24   Q.   Is that the best estimate that you could

Gibbons, Robert D PhD (Defense Expert) 2/4/2009 9:16:00 AM

508

1   diagnosis and the first treatment of gabapentin,
2   there are 213 patient years for the 1229 people,
3   correct?
4       A.   That's correct.
5       Q.   And there are 1,016 patient years of
6   exposure to gabapentin, correct, after that?
7       MS. McGRODER:   Object to form.
8   BY THE WITNESS:
9       A.   There's 1,016 person years of
10  gabapentin -- person years following the initiation
11  of gabapentin monotherapy with respect to the other
12  ten AEDs and lithium through the end of the what
13  turns out to be I believe 359-day follow up.
14  BY MR. ALTMAN:
15      Q.   And we talked about yesterday where you
16  used 359 and 360.
17          Within the precision of these kinds of
18  studies, that's not going to change results,
19  correct?
20      A.   I would agree with that.
21      Q.   Okay. I'm a little confused.
22          Are you saying there's a thousand six --
23  there's 1,016 patient years leftover or there's
24  1,016 patient years of gabapentin exposure in

509

1   those -- we are only talking about these 1229
2   people, not any other people. So we don't have to
3   qualify everything.
4           The 1,016 person years, is that the
5   person years of exposure on gabapentin?
6       A.   That's the person years of exposure after
7   the first initiation of gabapentin. So it's not the
8   amount of exposure to gabapentin in terms of you,
9   know, number of pills prescribed or anything. It's
10  the number of person years following the initiation
11  of gabapentin monotherapy.
12          That person could have been on gabapentin
13  or could have been prescribed gabapentin for one day
14  or 30 days or continuously throughout that same
15  period, and in this analysis that would be treated
16  all equally.
17      Q.   Why would you treat that all equally?
18      A.   Because the -- and, again, we have done
19  sensitivity analyses that look at it in different
20  ways, but the primary analysis here was comparing
21  the risk of suicide attempt before and after the
22  initial exposure to a particular antiepileptic drug
23  knowing that there may be a very short period of
24  time after the initiation of treatment and some kind

510

1   of suicidal behavior.
2           So requiring, for example, 30 days of
3   exposure. If there was a suicide attempt prior to
4   30 days, that wouldn't be counted. So we wanted to
5   cast the widest net and indicate any exposure to the
6   drug followed up by a suicide attempt irrespective
7   of the length of that exposure.
8           Sensitivity analyses we have also looked
9   at the density of the exposure, whether or not you
10  have been on gabapentin, you know, from month to
11  month, and how does that relate to the likelihood of
12  a suicide attempt using the number of pills data,
13  but for this analysis, it's before and after the
14  initial exposure.
15      Q.   You say you did that sensitivity
16  analysis?
17      A.   Yes.
18      Q.   Where is it?
19      A.   I, you know, have it around someplace.
20      MR. ALTMAN:   Okay. I asked that that be
21  produced.
22      MR. LONDON:   To be -- to be clear -- I'm
23  sorry -- the sensitivity analysis is not in the
24  manuscript?

511

1       THE WITNESS:   No, it's not at this point.
2   I've -- I mean, I have continued to -- for academic
3   purposes and for the purpose of preparing -- you
4   know, anticipating requested revisions to this
5   manuscript for publication, that there will be a
6   series of other issues raised, and some of those
7   issues have been raised to questions when I
8   presented this.
9           I had some really good questions when I
10  presented this at Harvard, and so I have been
11  interested in pursuing this, not so much in the
12  context of this litigation, but in the context of
13  this paper and in the context of proposing these --
14  this methodology for other applications.
15      MR. LONDON:   I apologize for the interjection
16  and clarification. Thank you. Thank you, Lori, for
17  letting me do that.
18  BY MR. ALTMAN:
19      Q.   So on this line over here, you have 13
20  attempts before -- you have 13 attempts before -- in
21  the period between the date of bipolar diagnosis and
22  the initiation of therapy, and then 13 attempts
23  after that, correct?
24      A.   That's correct.

528

1   BY THE WITNESS:
2       A.   You know, I relied on the expertise of my
3   co-author Dr. Mann to review the drugs that were --
4   we defined as concomitant therapy, and in previous
5   work I have relied upon others like Rob Valuck who
6   is a pharmacist and pharmacoepidemiologist to make
7   sure that the list of drugs that we are using in our
8   analyses are the appropriate ones.
9   BY MR. ALTMAN:
10      Q.   Did you talk with Dr. Mann specific to
11  either the bipolar or the gabapentin study as to
12  what drugs you should purchase?
13      MS. McGRODER:   Object to form.
14  BY THE WITNESS:
15      A.   The --
16      MS. McGRODER:   What drug data you should
17  purchase?
18      MR. ALTMAN:   The drug data -- you know, what
19  drug data.   That's what we are talking --
20      MS. McGRODER:   It just sounded bad.
21  BY THE WITNESS:
22      A.   I spoke with him as we were developing
23  these lists for -- in connection with the bipolar
24  study.   I have had no discussion with Dr. Mann about

529

1   the gabapentin study.
2   BY MR. ALTMAN:
3       Q.   But since you used the same -- since you
4   have used the same set of criteria for the
5   gabapentin study, then in effect he's influenced
6   both, correct?
7       MS. McGRODER:   Object to form.   Well, calls
8   for -- no, go ahead.
9   BY THE WITNESS:
10      A.   Much of the discussions of the lists of
11  drugs evolved out of our work with the Veterans
12  Administration database.   So while I think I may
13  have, you know, run these lists by John Mann, and,
14  you know, I don't, you know, specifically remember,
15  you know, the drugs have been reviewed by him at one
16  phase or another.
17  BY MR. ALTMAN:
18      Q.   We are going to spend a little time in
19  the SAS programs in a bit, but in the gabapentin
20  study, you classified the use of the drug by
21  indication, correct?
22      MS. McGRODER:   Object to form.
23  BY MR. ALTMAN:
24      Q.   In your gabapentin analysis in your

530

1   expert report, you break up by indication,
2   correct -- your analysis by indication?
3       A.   If I'm understanding your -- your
4   question correctly, I show the -- the effects of
5   drug or break downs of drug further stratified by
6   different indications like bipolar disorder,
7   epilepsy, pain, so forth.
8       Q.   And you used an inquiry based on various
9   different ICD codes to bucket these -- to bin these
10  up into different buckets, correct?
11      MS. McGRODER:   Object to form.   ICD 9 codes?
12  BY THE WITNESS:
13      A.   If your question is about using ICD 9
14  codes to, you know, derive the diagnostic
15  information, the answer is yes.
16  BY MR. ALTMAN:
17      Q.   Who was the person who decided what codes
18  went with what bucket?
19      A.   I believe those grew out of our -- some
20  of the prior work for the VA sample, and I think
21  also Dr. Mann reviewed those codes.   I think I might
22  have also -- I think we probably developed a
23  preliminary list, and then ran that by John Mann.
24      Q.   And you only used a list like that in the

531

1   gabapentin study, correct -- strike that.   We will
2   come back to it a different -- when we look at the
3   programs.   Why don't we -- why don't we mark the
4   programs for right now.
5           Now, before I throw the SAS -- SAS
6   programs at you, do you believe that you are
7   qualified to sit and explain the exquisite, intimate
8   details of these SAS programs, or would Dr. Hur be
9   in a better position to do that?
10      MS. McGRODER:   Object to form.
11  BY THE WITNESS:
12      A.   You know, I -- I can make my way through
13  them.   I have replicated the results of those SAS
14  programs independently.   So I can testify to their
15  validity.   If you pull a line out of a -- you know,
16  the middle of one of them and ask me to explain
17  exactly what's going on, I can give it my best shot.
18          I don't pretend to be a world-class
19  expert in SAS, and these are fairly complicated
20  files.   I have gone through them completely to the
21  point at the time that I went through them, I
22  understood exactly what was going on.   That was one
23  of the things that Dr. Hur and I did together to
24  make sure that the logic of what I had asked for was

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

532

1  implemented, and we went through them to such a
2  degree so that we were able to find confidence that
3  that, in fact, was the case.
4       I then supplemented that by redoing these
5  in Fortran, and as I have said, I will share those
6  with counsel and the associated ASCII files which
7  they read.
8       So having said that, you know, I can -- I
9  can give it my best shot, but I can't tell you that
10 you will ask me a question and I will go -- it might
11 take a long time to try and figure it out, and I
12 might not be able to answer it for you.
13      MR. ALTMAN: Objection, non-responsive.
14 BY MR. ALTMAN:
15      Q.  My question to you was: Would Dr. Hur be
16 in a better position to discuss these SAS programs
17 than you would?
18      MS. McGRODER: Well, objection to form and
19 foundation, and he already answered that question,
20 asked and answered.
21      MR. ALTMAN: He did not.
22 BY MR. ALTMAN:
23      Q.  Would you please answer that question.
24      MS. McGRODER: He can't know whether Dr. Hur is

533

1  it in a better position until you ask him the
2  questions, and he gives you the answers. I mean,
3  how can he know that --
4       MR. ALTMAN: Would you answer -- Lori, you are
5  coaching the witness now. You are not allowed to do
6  that --
7       MS. McGRODER: No, he answered your question.
8       MR. ALTMAN: No, he did not. I asked him would
9  Dr. Hur be in a better position to discuss the SAS
10 programs.
11      MS. McGRODER: Well, my objection is --
12      MR. ALTMAN: He told me --
13      MS. McGRODER: -- there is no foundation for
14 him to answer that question until you ask the
15 questions.
16      MR. ALTMAN: That's fine.
17 BY MR. ALTMAN:
18      Q.  Would Dr. Hur be in a better position to
19 discuss these SAS programs than you?
20      A.  You know, it depends on what part of the
21 programs that you are describing. As I have
22 testified, Dr. Hur had the primary role of writing
23 those programs. Authors are always, you know,
24 closest to their code, but everything that's in the

534

1  code is based on -- on direction that Dr. Hur
2  received from me.
3       So I should be, you know, in reasonably
4  good stead to -- stead -- I am not sure that's even
5  a word. I should be able to -- to review them with
6  you, if you would like.
7       Q.  Still not answering my question. Would
8  Dr. Hur be in a better position to discuss these
9  programs?
10      MS. McGRODER: Object to form and foundation,
11 asked and answered. He cannot answer that question.
12 He can't know until you ask --
13 BY MR. ALTMAN:
14      Q.  Did you rely on Dr. Hur to write these
15 programs as opposed to yourself?
16      A.  Dr. Hur wrote the programs, that's
17 correct.
18      Q.  Would it have been as easy for you to
19 write these programs as Dr. Hur?
20      A.  He has more expertise in using SAS than I
21 do.
22      Q.  Do you routinely rely upon Dr. Hur to
23 write your SAS programs in projects that you work on
24 together?

535

1       A.  Yes, I do.
2       Q.  Is there a time where you would write the
3  program as opposed to Dr. Hur?
4       A.  Well, which program are you talking
5  about?
6       Q.  Is there -- can you think of instances
7  where you and Dr. Hur have collaborated on papers
8  where you wrote the SAS programs instead of Dr. Hur
9  writing the SAS programs?
10      A.  If you are just talking upon SAS
11 programs, then I would rely upon Dr. Hur to do that.
12      MR. ALTMAN: Okay. Let's mark as the next two
13 exhibits -- well, let's mark as -- this exhibit
14 first whatever the next number is 29.
15      (WHEREUPON, a certain document was
16      marked Gibbons Deposition Exhibit
17      No. 29, for identification, as of
18      2/4/09.)
19 BY MR. ALTMAN:
20      Q.  Now, Dr. Gibbons, if you would please
21 pull -- it's probably Exhibit No. 5 which was the
22 listing of the contents of the CD. It's the next
23 one right there.
24      You see that there are several files at

544

1  see this, to -- to leave out any important pieces of
2  information, but if I did inadvertently, I can
3  certainly correct that.
4      Q.   And -- and you do realize that not having
5  that file would essentially keep these programs from
6  executing, correct?
7      A.   I'm assuming the programs will execute by
8  themselves, but if you are missing one of the
9  intermediate files, you know, it's going to -- it's
10 going to crash. So, you know, you would need that
11 file, and, again, it was not -- if I have excluded
12 something.
13     I do know that cmed was one of the
14 programs that gets created by one of the SAS
15 programs. If I've left that out, I apologize. It
16 wasn't my intention to do so.
17     Q.   And -- and I believe you didn't do it
18 intentionally, but, Dr. Gibbons, do you understand
19 that a lot of time and effort goes into reviewing
20 the information that you have provided?
21     MS. McGRODER:  Objection, you don't have to
22 answer that. What is this going to be a lecture on
23 why --
24     MR. ALTMAN:  No, it's not going to be -- it's

546

1  of a client that I represent in this deposition not
2  to answer that question. So you can move on.
3      BY MR. ALTMAN:
4      Q.   Are you going to abide by her
5  instruction?
6      A.   I like her more.
7      Q.   What I'm getting at, Dr. Gibbons, is that
8  on at least two or three times today we have
9  discovered that there is information concerning your
10 analyses with Neurontin that have not been provided.
11     MS. McGRODER:  Well, I object to that. I don't
12 even think that's accurate.
13     MR. ALTMAN:  Well, all the sensitivity -- were
14 the sensitivity analyses provided?
15     MS. McGRODER:  Keith, I didn't even know about
16 the sensitivity analysis until yesterday.
17     MR. ALTMAN:  Lori, I'm not -- no, Lori --
18     MS. McGRODER:  At the end of this deposition,
19 you can list all the things you want, and we'll try
20 to get them --
21     MR. ALTMAN:  Lori, I'm going to ask my
22 question. Stop coaching the witness.
23     MS. McGRODER:  No, I am not going to let him
24 answer --

545

1  not going to be a lecture, Lori.
2  BY MR. ALTMAN:
3      Q.   Do you understand that a lot of time and
4  effort is spent reviewing the information you
5  provided?
6      MS. McGRODER:  Objection, he has no idea how
7  much time you spend. You don't have to answer that.
8  There's no foundation --
9  BY MR. ALTMAN:
10     Q.   Are you going to answer --
11     MR. ALTMAN:  Are you instructing him --
12     MS. McGRODER:  No, I'm instructing him not to
13 answer.
14     MR. ALTMAN:  I don't know that you can.
15     MS. McGRODER:  I am.
16     MR. ALTMAN:  Okay. Well, you can't.
17 BY MR. ALTMAN:
18     Q.   Are you going to follow your lawyer's
19 advice?
20     MS. McGRODER:  Well, I'm not his lawyer --
21     MR. ALTMAN:  Okay. That's right. You are not
22 his lawyer.
23     MS. McGRODER:  -- and I am instructing him as a
24 witness that I am representing in this -- on behalf

547

1      MR. ALTMAN:  Lori -- Lori --
2      MS. McGRODER:  -- about your litigation
3  document production issues.
4      MR. ALTMAN:  -- Lori, that's enough now. Do we
5  need to call the Court?
6      MS. McGRODER:  Yeah, go ahead and call the
7  Court.
8      MR. ALTMAN:  That's fine.
9  BY MR. ALTMAN:
10     Q.   Dr. Gibbons, what I'm asking you is on at
11 least several times today you have identified
12 materials that have -- I'm not suggesting that was
13 done intentionally but was not identified to
14 counsel, was not identified to us.
15     And so what I am asking you is to take
16 some time and think is there any other materials on
17 anything having to do with Neurontin and these
18 calculations and these studies and your expert
19 reports that you may have forgotten in the past that
20 may be existing on a hard drive. And I'm asking if
21 you can't remember it, that when you go back today,
22 you make a diligent search through your materials to
23 see if there are other stuff.
24     MS. McGRODER:  I object to the form of that

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

692

1    MS. McGRODER: Okay. The deposition is over.
2    We are out. You want more time. We are not going
3    to do this. We are not going to pull this game. We
4    are not doing this.
5    MR. LONDON: You are the one pulling the game.
6    MR. ALTMAN: I'm asking him whether -- it says
7    I have produced all materials requested by
8    plaintiffs in their letter of November 12, 2008.
9    MS. McGRODER: Do not answer any more
10   questions. We are finished for today.
11   BY MR. ALTMAN:
12   Q.   Are you abiding by her --
13   MR. ALTMAN: Let's call the judge.
14   MS. McGRODER: Call the judge.
15   MR. ALTMAN: You are going to be here -- you
16   are going to miss your flight.
17   MS. McGRODER: You said you are not done
18   anyway. We are going to come back.
19   MR. ALTMAN: Are you going to stipulate that we
20   come back?
21   MS. McGRODER: Not right now.
22   MR. ALTMAN: Then let's call the judge.
23   MS. McGRODER: Go ahead.
24   Let me explain my --

693

1    MR. ALTMAN: No, I don't want to hear your
2    position. We are calling --
3    MS. McGRODER: Well, I'm going to explain my
4    position for the record.
5    MR. ALTMAN: We are calling the judge. You
6    have already terminated --
7    MS. McGRODER: For the record --
8    MR. ALTMAN: I'm sorry. You terminated the
9    deposition.
10   MS. McGRODER: For the record --
11   MR. ALTMAN: Lori, did you -- Lori, did you
12   terminate the deposition?
13   MS. McGRODER: -- his declaration says: "I
14   have also produced all materials requested by
15   plaintiffs in their letter of November 12, 2008 on
16   which my co-authors and I relied in preparing the
17   manuscript."
18   The bulk of materials with one exception
19   today are not items on which Dr. Gibbons and his
20   co-authors relied in preparing the manuscript. So
21   for you to insinuate that Mr. Gibbons has been
22   misleading or has been untruthful is improper and
23   inappropriate, and I won't allow it.
24   MR. ALTMAN: It is not a true statement.

694

1    MS. McGRODER: It is -- your -- you are -- you
2    are assuming and insinuating, and it's misleading
3    and improper, and I won't allow it.
4    MR. LONDON: Well, we know we don't have the
5    sensitivity analyses. We know we don't have --
6    MS. McGRODER: The sensitivity analyses were
7    not used in preparing the manuscript. They were
8    done after the fact.
9    MR. ALTMAN: Are you kidding? Lori, are you
10   serious? He says he used -- he prepared it in
11   preparing a defense for peer-reviewed publication.
12   You can't seriously stand there and say that the
13   sensitivity analysis have nothing to do with his
14   manuscript.
15   MS. McGRODER: Well, look, did we say we are
16   going to give you the sensitivity analysis? Yes, we
17   did --
18   MR. ALTMAN: No, but you have not --
19   MS. McGRODER: -- he did not -- he did not --
20   he did not prepare the sensitivity analysis and
21   relied on them in preparing his manuscript. His
22   manuscript was submitted on September -- in
23   September of 2008. Those sensitivity analyses were
24   not done before the manuscript was prepared. So a

695

1    fortiori his statement is not untrue.
2    MR. LONDON: A fortiori.
3    MS. McGRODER: His statement is not untrue.
4    MR. LONDON: No, his statement --
5    MR. ALTMAN: Lori, I am sure the judge will
6    truly appreciate --
7    MS. McGRODER: You know what, I think this
8    is -- this is a legal argument, and I will not allow
9    him to answer questions where you are telling him
10   that he is lying. It's not --
11   MR. ALTMAN: I didn't suggest that he was
12   lying. What I suggest is it's not a true statement.
13   That does not mean he lied. I never suggested that
14   he lied.
15   MS. McGRODER: There is no difference.
16   MR. ALTMAN: There is a difference.
17   MS. McGRODER: No, there's not.
18   MR. ALTMAN: Yes, there is a difference. There
19   are statements that could be made that are not
20   truthful --
21   MS. McGRODER: Keith, you can ask him a
22   legitimate question --
23   MR. ALTMAN: Lori --
24   MS. McGRODER: -- in this deposition, and we

Gibbons, Robert D PhD (Defense Expert) 2/4/2009 9:16:00 AM

688

1  is responsive to your requests, and I have not
2  disputed that one time.
3      So I think that is a waste of your
4  deposition time to be asking Dr. Gibbons to respond
5  to your legal argument about whether your document
6  production request has been satisfied.
7      MR. ALTMAN: That's fine.
8      Let's mark the next exhibit.
9      (WHEREUPON, a certain document was
10     marked Gibbons Deposition Exhibit
11     No. 35, for identification, as of
12     2/4/09.)
13 BY MR. ALTMAN:
14     Q.  Dr. Gibbons, you have just been handed
15 what I believe is Exhibit 35 which is titled
16 "Declaration of Dr. Robert D. Gibbons."
17     Did I read that correct?
18     A.  Yes.
19     Q.  Have you seen this document before?
20     A.  Right now I have seen so many documents I
21 can't remember what I have seen and what I haven't
22 seen. I believe so. I signed it.
23     Q.  And this is dated I believe the 21st day
24 of January; is that correct, right above your

689

1  signature?
2      A.  Yes.
3      Q.  Okay. Did you write this declaration or
4  was it written for you and given to you to sign?
5      MS. McGRODER: Object to form and foundation.
6  BY THE WITNESS:
7      A.  I know I have seen it, and I've gone over
8  it in some detail.
9  BY MR. ALTMAN:
10     Q.  Not my question. Did you write this
11 document?
12     A.  I wrote portions of it.
13     Q.  Okay. Did you then e-mail it to counsel?
14     A.  I believe so.
15     Q.  Do you have copies of those e-mails?
16     A.  No, I don't keep copies of my outgoing
17 e-mails.
18     Q.  Did counsel in this case ever suggest to
19 you that maybe you should send e-mails that are
20 correspondence between you and outgoing counsel and
21 that one day might be asked to produce those?
22     A.  No.
23     Q.  Counsel never suggested to you that you
24 save all of your e-mails between counsel and you,

690

1  either in or out?
2      A.  I don't recall having that conversation.
3  I mean, the majority of our communication has been
4  via the telephone.
5      Q.  But there have been e-mails sent back and
6  forth, correct?
7      A.  There have been, yes.
8      Q.  Okay. I'd like you to go to Item No. 6.
9  I'd like you to read Item No. 6 into the record.
10     A.  "I have provided to counsel for
11 defendants all materials requested by plaintiffs on
12 which I relied in conducting the
13 pharmacoepidemiologic study of whether there is an
14 association between Neurontin and suicide attempt.
15 I have also produced all materials requested by the
16 plaintiffs in their letter of November 12, 2008, on
17 which my co-authors and I relied in preparing the
18 Manuscript. It is my understanding that defense
19 counsel has provided all of these materials to the
20 attorneys for the plaintiffs."
21     Q.  In light of what we have discussed today,
22 that's not a true statement, correct?
23     MS. McGRODER: I object. That -- that is
24 misleading and improper cross-examination, and you

691

1  don't have to answer that question.
2      MR. LONDON: Yes, he does. I mean --
3      MS. McGRODER: No, no, he doesn't.
4      MR. ALTMAN: Yes, he does.
5      MR. LONDON: He issued an affidavit under
6  oath --
7      MS. McGRODER: Because he found out today that
8  there was a piece of data missing off of that disk
9  which he didn't know about --
10     MR. ALTMAN: Excuse me. A piece of data? The
11 Fortran analyses --
12     MS. McGRODER: Well. Let's do this on the
13 record. If you want to do this on the record, the
14 Fortran were not relied upon by Dr. Gibbons in
15 preparing his manuscript but --
16     MR. ALTMAN: Okay.
17     MS. McGRODER: Wait, wait. No, no, let me
18 finish, but there are not identified.
19     MR. ALTMAN: Don't you ever raise your voice at
20 me.
21     MR. LONDON: Stop it.
22     MS. McGRODER: But they are not -- but they are
23 not --
24     MR. ALTMAN: Lori.

Gibbons, Robert D PhD (Defense Expert) 2/4/2009 9:16:00 AM

692

1    MS. McGRODER: Okay. The deposition is over.
2    We are out. You want more time. We are not going
3    to do this. We are not going to pull this game. We
4    are not doing this.
5    MR. LONDON: You are the one pulling the game.
6    MR. ALTMAN: I'm asking him whether -- it says
7    I have produced all materials requested by
8    plaintiffs in their letter of November 12, 2008.
9    MS. McGRODER: Do not answer any more
10   questions. We are finished for today.
11   BY MR. ALTMAN:
12   Q.   Are you abiding by her --
13   MR. ALTMAN: Let's call the judge.
14   MS. McGRODER: Call the judge.
15   MR. ALTMAN: You are going to be here -- you
16   are going to miss your flight.
17   MS. McGRODER: You said you are not done
18   anyway. We are going to come back.
19   MR. ALTMAN: Are you going to stipulate that we
20   come back?
21   MS. McGRODER: Not right now.
22   MR. ALTMAN: Then let's call the judge.
23   MS. McGRODER: Go ahead.
24   Let me explain my --

693

1    MR. ALTMAN: No, I don't want to hear your
2    position. We are calling --
3    MS. McGRODER: Well, I'm going to explain my
4    position for the record.
5    MR. ALTMAN: We are calling the judge. You
6    have already terminated --
7    MS. McGRODER: For the record --
8    MR. ALTMAN: I'm sorry. You terminated the
9    deposition.
10   MS. McGRODER: For the record --
11   MR. ALTMAN: Lori, did you -- Lori, did you
12   terminate the deposition?
13   MS. McGRODER: -- his declaration says: "I
14   have also produced all materials requested by
15   plaintiffs in their letter of November 12, 2008 on
16   which my co-authors and I relied in preparing the
17   manuscript."
18   The bulk of materials with one exception
19   today are not items on which Dr. Gibbons and his
20   co-authors relied in preparing the manuscript. So
21   for you to insinuate that Mr. Gibbons has been
22   misleading or has been untruthful is improper and
23   inappropriate, and I won't allow it.
24   MR. ALTMAN: It is not a true statement.

694

1    MS. McGRODER: It is -- your -- you are -- you
2    are assuming and insinuating, and it's misleading
3    and improper, and I won't allow it.
4    MR. LONDON: Well, we know we don't have the
5    sensitivity analyses. We know we don't have --
6    MS. McGRODER: The sensitivity analyses were
7    not used in preparing the manuscript. They were
8    done after the fact.
9    MR. ALTMAN: Are you kidding? Lori, are you
10   serious? He says he used -- he prepared it in
11   preparing a defense for peer-reviewed publication.
12   You can't seriously stand there and say that the
13   sensitivity analysis have nothing to do with his
14   manuscript.
15   MS. McGRODER: Well, look, did we say we are
16   going to give you the sensitivity analysis? Yes, we
17   did --
18   MR. ALTMAN: No, but you have not --
19   MS. McGRODER: -- he did not -- he did not --
20   he did not prepare the sensitivity analysis and
21   relied on them in preparing his manuscript. His
22   manuscript was submitted on September -- in
23   September of 2008. Those sensitivity analyses were
24   not done before the manuscript was prepared. So a

695

1    fortiori his statement is not untrue.
2    MR. LONDON: A fortiori.
3    MS. McGRODER: His statement is not untrue.
4    MR. LONDON: No, his statement --
5    MR. ALTMAN: Lori, I am sure the judge will
6    truly appreciate --
7    MS. McGRODER: You know what, I think this
8    is -- this is a legal argument, and I will not allow
9    him to answer questions where you are telling him
10   that he is lying. It's not --
11   MR. ALTMAN: I didn't suggest that he was
12   lying. What I suggest is it's not a true statement.
13   That does not mean he lied. I never suggested that
14   he lied.
15   MS. McGRODER: There is no difference.
16   MR. ALTMAN: There is a difference.
17   MS. McGRODER: No, there's not.
18   MR. ALTMAN: Yes, there is a difference. There
19   are statements that could be made that are not
20   truthful --
21   MS. McGRODER: Keith, you can ask him a
22   legitimate question --
23   MR. ALTMAN: Lori --
24   MS. McGRODER: -- in this deposition, and we

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

696

1  will conclude it for today. He is not answering
2  that question. That question is improper, and I
3  won't allow him to answer it. If you want to ask a
4  legitimate question, we can continue.
5  MR. LONDON: Well, you are not the judge of a
6  legitimate question. You don't get to call that
7  shot. The rules for that, Lori —
8  MS. McGRODER: You can — you can criticize my
9  characterization, but he is not answering that
10  question.
11  BY MR. ALTMAN:
12  Q.  Fine, Dr. Gibbons, would you please go
13  in Exhibit 2 to point 3.
14  Would you please read that for the
15  record.
16  MS. McGRODER: Objection, asked and answered.
17  We did this yesterday.
18  MR. ALTMAN: Good, we are going to do it again.
19  BY THE WITNESS:
20  A.  "Plaintiffs demand all documents
21  associated" —
22  Q.  I'm sorry?
23  A.  "with retention of Dr. Gibbons by the
24  defendants."

698

1  MS. McGRODER: — asking him questions about
2  legal communications —
3  MR. ALTMAN: Lori —
4  MS. McGRODER: — between you and me.
5  MR. ALTMAN: — that's fine. He put in his
6  declaration that he complied —
7  MS. McGRODER: I didn't say he couldn't answer
8  the question. Stop your argument and let him answer
9  it. I'm putting my objection on the record.
10  MR. ALTMAN: That's fine. Your objection is
11  noted.
12  MS. McGRODER: If you can answer the
13  question —
14  MR. ALTMAN: Now stop.
15  MS. McGRODER: — I can make the objection, and
16  he can answer that question.
17  BY MR. ALTMAN:
18  Q.  Dr. Gibbons, does the word relied upon
19  exist anywhere in there?
20  THE COURT REPORTER: Wait one second.
21  MR. LONDON: Are you worn out?
22  THE COURT REPORTER: Okay. Go ahead.
23  BY THE WITNESS:
24  A.  The word relied upon does not exist in

697

1  Q.  I'm sorry. On the second page. We are
2  talking about the study now, the bipolar study.
3  A.  "Plaintiffs demand all documents and
4  underlying data that pertain to the aforementioned
5  study, Gibbons, et al. (2006)."
6  Q.  Was there anything in that sentence that
7  says the word relied upon?
8  MS. McGRODER: I object to this question. He's
9  never even seen — he has never even seen this
10  letter —
11  MR. ALTMAN: Lori —
12  MS. McGRODER: — this is legal —
13  MR. ALTMAN: Lori, stop coaching the witness.
14  MS. McGRODER: It's not about —
15  MR. ALTMAN: Lori, you are coaching the
16  witness. I have asked him a simple question.
17  BY MR. ALTMAN:
18  Q.  Does the word relied upon exist anywhere
19  in point 3?
20  MR. ALTMAN: The man can read —
21  MS. McGRODER: And I —
22  MR. ALTMAN: — he is a biostatistician.
23  MS. McGRODER: And I object to you —
24  MR. ALTMAN: That's nice.

699

1  sentence — in bullet No. 3 on page 2 of Exhibit 2.
2  However, in answering your question, I
3  believe I did a very reasonable job of giving you
4  materials. I know I have not given the raw data
5  files and all of the SAS files, and I understand
6  that there may be a SAS file or two that maybe
7  didn't make it into it, and I apologize for that.
8  It wasn't my intention to do that. I
9  didn't try to trip you up in any way. If you had
10  asked for it prior to this, I would have, you know,
11  made sure that it was there. You could have said to
12  opposing counsel, you know, we are trying to
13  recreate the cmed dataset, and I can't find it in
14  here. Could Dr. Gibbons go back and see if that's
15  being created in another file, and I certainly would
16  have done that, and I would have given it to you.
17  I relied upon the — and I know that word
18  isn't in here, but I'm just trying to be as honest
19  with you as I can — the SAS output to build the
20  paper. The paper was submitted. The reference to
21  that paper is the paper that was submitted for
22  publication. It's a part of my academic work. I
23  have been doing further sensitivity analyses, and I
24  will use those — those antiepileptic data hopefully

716

1    If we have a grant on suicide and we
2    write a paper that has suicide on it, whether the
3    grant is -- whether the paper is completely in line
4    with the specific aims of the grant or not, we
5    acknowledge support of that grant in our work.
6        And many times in our scientific work we
7    start out proposing to do one thing, and we end up
8    doing something different.  When I wrote this R56
9    grant, it was about antidepressants, but it was
10   really about the statistics of suicide, and the work
11   on antiepileptics is a derivative of that work, and
12   I didn't know anything about it when I wrote this
13   grant, but I think that it's completely in line with
14   the spirit of that grant and the objectives of that
15   grant.  So I acknowledge that grant in terms of it
16   funding my time to work on this.
17       Q.    Did you inform any of these granting --
18   organizations providing the grants that you were
19   going to use some of the work product for which
20   those grant funded in litigation?
21       MS. McGRODER:  Object to form, assumes facts
22   not in evidence, improper hypothetical.
23   BY MR. ALTMAN:
24       Q.    Okay.  Take a step back.

717

1        Did you include references and some of
2    the discussion of the findings from your -- your
3    relationship between antiepileptics and suicide
4    attempts paper in your expert report in this case?
5        A.    Yes.
6        Q.    Did you do that before it was even
7    accepted for publication?
8        A.    Probably.
9        Q.    It hasn't been accepted --
10       A.    I mean, it hasn't been accepted for
11   publication.  So, you know.
12       Q.    So you did that prior to it being
13   accepted for publication?
14       A.    Yes, I -- because it's the basis of work
15   that I have done and that work has been submitted
16   for publication.
17       Q.    And Pfizer -- and Pfizer bought you the
18   data back in -- back in May, correct?
19       MS. McGRODER:  Object to form.
20   BY THE WITNESS:
21       A.    The -- the data were purchased some time
22   back in May, yes.
23   BY MR. ALTMAN:
24       Q.    By the way, when you purchased the data

718

1    in May, did you know you were going to write a paper
2    on bipolar?
3        A.    No.
4        Q.    When you purchased the data in May, did
5    you know you were going to provide -- do an analysis
6    for the gabapentin cohort that would show up in your
7    expert report?
8        A.    Yes.
9        MS. McGRODER:  Well, object to form.
10   BY MR. ALTMAN:
11       Q.    Would you have included that in your
12   expert report if it showed that there was an
13   increased risk?
14       A.    I would have reported that and given that
15   to counsel, and they would have done whatever you
16   guys do when things don't work out the way you want.
17       Q.    When did you decide to write the paper on
18   bipolar disorder?
19       A.    I asked for the bipolar cohort largely in
20   trying to better understand the FDA Alert and -- and
21   thought about responding to it and thought this
22   would be a good opportunity to get those data.  Of
23   course, in the back of my mind, I felt that this
24   would be a good paper to write.

719

1        I mean, everything I do I think is a good
2    paper to write.  I think -- I think even the
3    gabapentin cohort would be a very interesting paper.
4    Although, given that it's so tightly aligned with
5    this court case, I doubt it will ever see the
6    publication light of day.
7        Q.    Why didn't you acquire data on other
8    indications besides bipolar?
9        A.    I thought that the -- strong tie-in
10   to the antidepressants and suicide in depressed
11   populations, and the group that would be in the
12   highest risk bipolar patients having extremely high
13   risk of suicide made it a perfect population to work
14   in.  I didn't know at the time when we requested it
15   whether or not there would be enough bipolar
16   patients in the PharMetrics data.
17       I was hopeful, and when I found out that
18   there were, you know, close to 50,000 bipolar
19   patients with a two-year window of continuous
20   enrollment, I was, you know, very pleased, and by
21   that time, I started to think, you know, this might
22   end up being a really good paper and communicated
23   with my -- my co-authors that this opportunity had
24   presented itself and would they be interested in

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
3/5/2009

735

1      IN THE UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3    IN RE; NEURONTIN          )
4    MARKETING SALES PRACTICES     )
5    & PRODUCT LIABILITY      )
6    LITIGATION,          )
7                    ) MDL DOCKET
8    BULGER vs. PFIZER, et al.,   ) No. 1629
9                    ) MASTER FILE
10   SMITH vs. PFIZER, et al.,   ) No. 04-10981
11   05-CV-11515-PBS      )
12       SUPERIOR COURT OF THE STATE OF CALIFORNIA
13           CITY OF LAKE
14   NICOLETTE CRONE, et al.,      )
15       Plaintiffs,    )
16       vs.      ) CV 400432
17   PFIZER, INC., et al.,      )
18       Defendants.    )
19   3/5/09   Job No.: 191803
20       9:09 a.m.
21       The videotaped deposition of ROBERT D.
22   GIBBONS, Ph.D., Volume III resumed pursuant to
23   adjournment at Suite 2800, 333 West Wacker Drive,
24   Chicago, Illinois.

736

1    PRESENT:
2        LAW OFFICES OF JACK LONDON,
3        (3701 Bee Cave, Suite 200,
4        Austin, Texas 78746,
5        512-478-5858), by:
6        MR. JACK LONDON,
7        jlondon@texas.net,
8        -and-
9    FINKELSTEIN & PARTNERS, LLP,
10       (463 Robinson Avenue,
11       Newburgh, New York 12550,
12       800-634-1212), by:
13       MR. KEITH L. ALTMAN,
14       kaltman@lawampmmt.com,
15       -and-
16   THE LANIER LAW FIRM,
17       (6810 FM 1960 West,
18       Houston, Texas 77069,
19       713-659-5200), by:
20       MR. KENNETH S. SOH,
21       kss@lanierlawfirm.com,
22       appeared on behalf of the Plaintiffs;
23
24

737

1    PRESENT:  (Continued)
2        SHOOK, HARDY & BACON, L.L.P.,
3        (2555 Grand Boulevard,
4        Kansas City, Missouri 6108-2613,
5        816-474-6550), by:
6        MS. LORI CONNORS McGRODER,
7        lmcgroder@shb.com,
8        appeared on behalf of the Defendants;
9
10       LAW OFFICES OF STEVEN D. HILLYARD, PC,
11       (345 California Street, Suite 1770,
12       San Francisco, California 94104,
13       415-334-6880), by:
14       MS. ELANA GOLD,
15       appeared telephonically on behalf of
16       Defendant Raymond D. Jennings, M.D.
17
18   VIDEOTAPED BY:
19       MR. NICK PAGE, Veritext Chicago
20       Reporting Company.
21
22
23   REPORTED BY:  ANDREA L. CARTER,
24       Illinois CSR No. 84-3722.

738

1        THE VIDEOGRAPHER:  My name is Nick Page in
2    association with Veritext National Court
3    Reporting Services.  The date today is March 5,
4    2009, and the time is 9:09 a.m.
5        This deposition is being held in the
6    offices of Mandell Menkes, LLC, located at 333
7    West Wacker Drive, Chicago, Illinois.  The
8    caption of the case is In Re:  Neurontin
9    Marketing and Sales Practices and Product
10   Liability Litigation, Bulger versus Pfizer, et
11   al, Smith versus Pfizer, et al., O5-CV-11515-PBS,
12   MDL Docket No. 1629, Master File No. 04-10981,
13   and in the Superior Court of the State of
14   California, City of Lake, Nicolette Crone, et
15   al., plaintiffs versus Pfizer Incorporated, et
16   al, defendants, No. CV 400432.
17       The name of the witness is Robert
18   Gibbons.  This is Volume III.  At this time will
19   the attorneys please identify themselves and the
20   parties they represent.
21       MR. ALTMAN:  Keith Altman, Finkelstein &
22   Partners.  I'll be asking questions on behalf of
23   the Crone plaintiffs.
24       MR. LONDON:  Jack London, I represent Bulger

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

855

1    at the greatest risk for suicide.  In fact, I
2    think the SuperMix analysis, the person-time
3    logistic regression analysis -- and I'm going to
4    be using those as synonyms -- shows that the
5    increased risk -- the people who made a suicide
6    attempt in the year prior to bipolar disorder
7    were 12 times more likely to make a suicide
8    attempt in the -- in the following year which is
9    kind of fascinating.
10          And so that final sensitivity analysis
11   is just looking at those 682 people and repeating
12   the same analysis on that very small but very
13   high risk sample of individuals to determine
14   whether or not the presence of an AED increased
15   or decreased the likelihood of a suicide, in this
16   case a repeat suicide attempt.
17          Q.   What did you use to generate the data
18   that you processed in SuperMix?
19          A.   Those data were created -- we created
20   a file that gave the monthly information for each
21   one of the -- you know, a monthly dataset that
22   allowed us to determine whether or not you had a
23   suicide attempt or drug prescription on each one
24   of the months.

857

1    look at it.  I just didn't know if you would be
2    able to see it.  There are nine files on the
3    disk.
4          There are -- there's an AED 1, 2, and
5    3 dot dat, an AED 1 inp dot dat, and an AED 1 dot
6    out for each one of these.  There are no SAS
7    programs.  And so what I would like to know is
8    how were these AED 1 dot dat files -- these three
9    data files created?
10          What created them?
11          A.   Those are created by a -- you know,
12   those were created by some SAS file that
13   apparently is not included in there.
14          Q.   Where would that SAS file be?
15          A.   I'm sure that we would have that
16   around some place.
17          Q.   Could you see if you can get that
18   e-mailed on a lunch break?
19          A.   I could try.
20          Q.   Because I don't want to have to come
21   back here again.
22          MS. McGRODER:  Let's go off the record for a
23   second.
24          MR. ALTMAN:  Let's go off the record.

856

1          Q.   Which of the programs did that?
2          A.   They weren't done in SuperMix.  Those
3    were done in SAS.
4          Q.   Which SAS program did that?
5          A.   I'm not sure.
6          Q.   Well, why don't you take a look at the
7    description of the sensitivity analyses you
8    provided there and tell me which one did that?
9          A.   Well, these are the programs that did
10   the analyses, and I believe there was a separate
11   description for these SuperMix analyses that
12   accompanied that.  I don't know if the dataset
13   included it, or can we see the transmittal for --
14          MS. McGRODER:  That may not be the
15   transmittal of the SuperMix analysis because I
16   think that was separate.
17   BY MR. ALTMAN:
18          Q.   Dr. -- Dr. Gibbons, I will represent
19   to you, and you can -- I mean, I can show you
20   that we have received a file called AED dot zip.
21          A.   Do you have the contents of that?
22          Q.   I'm going to show you that right now.
23          Anyway, I will represent to you,
24   Doctor -- I mean, you could certainly come and

858

1          THE VIDEOGRAPHER:  Off the record at 11:47.
2          (WHEREUPON, a recess was had at
3          11:47 a.m. until 11:53 a.m.)
4          THE VIDEOGRAPHER:  Back on record at 11:53.
5          MR. ALTMAN:  Just before we continue, I just
6    want to put something on the record.  I
7    appreciate that you are trying to get us all the
8    information.  I appreciate that there's a lot of
9    data, and it's very complex information, but
10   there clearly appear to be additional files that
11   we do not have that I request that be produced.
12          I do not know what impact that will
13   have on the rest of my examination and my desire
14   to have additional examination, but I just want
15   to point out that it is not the plaintiffs'
16   obligation to figure out what information should
17   be produced.  There is an affirmative obligation
18   on the part of an expert to provide the
19   information.  When information is omitted, we are
20   not the ones that have to figure -- we are not
21   the ones that have to figure it out, and that's
22   all I'm going to say about it.
23          MS. McGRODER:  Okay.  In response to that
24   I'm just going to say starting at -- on February

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

835

1  to you, and then finally the last set, which I
2  think has to do with -- with this, is then, as I
3  was going through the bipolar sensitivity
4  analyses, I noticed that the results that were
5  reported to you were in people and not in person
6  years, and I wanted to see how they looked in
7  person years as well.
8         And so that was sent to you. So those
9  are sort of the three waves as I recall them.
10     Q.  All right. I'm going to hand you
11  what's been marked as Exhibit 53 and 54 which are
12  printouts from the files you sent called bipolar
13  analysis one -- Bipolar Analysis and Bipolar
14  Analysis 2.
15         (WHEREUPON, a certain document
16            was marked Gibbons Deposition
17            Exhibit No. 53, 54, for
18            identification, as of 3/5/09.)
19     MS. McGRODER:  Thank you. So lithium
20  monotherapy is Exhibit 53?
21     MR. ALTMAN:  Well, they both -- they both
22  are. These were the two separate files. They
23  are labeled at the bottom. If you look at the
24  bottom, it will tell you if it was Bipolar

836

1  Analysis or Bipolar Analysis 2.
2     MS. McGRODER:  Oh, I see. I'm sorry.
3  Bipolar Analysis one is 53. Okay.
4     THE WITNESS:  And the one that's listed as
5  Bipolar Analysis 2 is 54.
6     MS. McGRODER:  Thank you. So I have two
7  Bipolar Analysis 2 is --
8     MR. ALTMAN:  Correct -- no. You have two
9  twos? Oh, did I give Jack two ones?
10     MS. McGRODER:  No, I have a one also. Is
11  this just an extra? This is not another exhibit,
12  right? I have this (indicating).
13     MR. ALTMAN:  Oh, I didn't give one to Jack.
14  I'm sorry.
15     MS. McGRODER:  Okay.
16     MR. ALTMAN:  There we go. Now we have got
17  it straightened out.
18     BY MR. ALTMAN:
19     Q.  Dr. Gibbons, you ran -- we are only
20  going to be talking about the bipolar sensitivity
21  analysis for a while. So you don't have to worry
22  about the gabapentin cohort.
23         It appears that you ran this
24  sensitivity analysis for a drug versus no drug --

837

1  post-drug versus no drug, correct?
2     A.  Correct.
3     MR. ALTMAN:  Can you hand me the paper,
4  Jack. It's about the middle of the stack.
5     BY MR. ALTMAN:
6     Q.  Dr. Gibbons, I am going to hand you
7  what has been marked as Exhibit 20 in your last
8  deposition which is the manuscript.
9         Before we get to talking about that,
10  have you received any news from any of the
11  journals concerning the manuscript?
12     A.  I did receive a letter from the
13  Archives of General Psychiatry regarding the
14  manuscript.
15     Q.  And what did they say?
16     A.  Revise and resubmit basically.
17     Q.  What did they ask you to revise?
18     A.  I --
19     MS. McGRODER:  Well, I object just to the
20  extent that those communications are
21  confidential.
22     MR. ALTMAN:  Lori, you cannot suggest that a
23  journal sending a request for Dr. Gibbons to
24  revise his report -- his manuscript is

838

1  confidential.
2     MS. McGRODER:  You just asked him what the
3  journal told him to revise, and that indeed is
4  confidential under the law that I sent you in my
5  letter of February approximately 10th.
6     MR. LONDON:  We will let the question
7  stand --
8     MR. ALTMAN:  Hold on.
9     BY MR. ALTMAN:
10     Q.  Dr. Gibbons, is Ms. McGroder
11  representing you in a legal capacity?
12     MS. McGRODER:  Well, object to form and
13  foundation. Of course I'm not representing him.
14  I'm representing Pfizer, and he is an expert --
15     MR. ALTMAN:  Lori --
16     MS. McGRODER:  -- witness testifying on
17  behalf of Pfizer.
18     MR. ALTMAN:  Lori, let him -- Lori, let him
19  answer the question.
20     MS. McGRODER:  It's a legal conclusion --
21     MR. ALTMAN:  Lori --
22     MS. McGRODER:  -- and, no, he doesn't have
23  to answer.
24

Gibbons, Robert D PhD (Defense Expert)   3/5/2009  9:09:00 AM

971

```
1      Q.   Well, the November 30th bill -- I'm
2   not quibbling with you -- doesn't say anything
3   about reports, does it?
4      A.   Please understand, you know, I'm a
5   university professor. I'm not too good at
6   providing really good descriptions of what I do
7   on these bills, and -- and in the past, not by
8   any of the lawyers sitting at this table, I have
9   been counseled in prior litigations in different
10   areas that having exquisitely detailed bills may
11   not be the best plan for litigation-related work.
12   So I haven't been very, very detailed in what I
13   have described in the work and haven't had too
14   many objections.
15      Q.   Well, did Ms. McGroder or someone call
16   you after the November bill and say does this
17   include your work on the final report?
18      A.   No, I've received no calls from
19   anybody regarding whether any -- any other
20   details about my bills.
21      Q.   All right. Did Ms. McGroder call you
22   after the October 18th bill and ask whether that
23   would be enough to cover you through the filing
24   of the final report?
```

972

```
1      MS. McGRODER: Object to form.
2   BY THE WITNESS:
3      A.   I never had a conversation with
4   Ms. McGroder regarding my -- the contents of my
5   bills or whether I would be billing on any -- any
6   area.
7   BY MR. LONDON:
8      Q.   These bills or any of the other bills
9   in that exhibit, is that what you are saying?
10      You have submitted them. They have
11   been paid. You have never discussed them with
12   Ms. McGroder?
13      A.   That's correct.
14      Q.   Okay. Moving forward, the next bill
15   that I find that appears to not have an asterisk
16   is dated September 2, 2008.
17      Do you see that?
18      MS. McGRODER: Did you already talk about
19   the October 5?
20      MR. LONDON: I thought I did.
21      MS. McGRODER: I might have just missed it.
22      MR. LONDON: Okay. We will talk about
23   October 5.
24      THE WITNESS: You are trying to help him
```

973

```
1   out?
2      MS. McGRODER: Sorry. As soon as I said it,
3   I thought.
4      MR. LONDON: She wants -- she want you to
5   come off looking good.
6   BY MR. LONDON:
7      Q.   What's the subject of your October 5
8   bill?
9      A.   Oh, no, not the October 5 bill.
10      Q.   I mean, you charged them $20,000 for
11   40 hours on October 5?
12      A.   How could you miss that, Mr. London?
13      Q.   It didn't seem like much money, and
14   then you charged them $16,000 13 days later.
15      Apart from that, what do I know about
16   those bills and what you did?
17      A.   This was in support of the work on the
18   analysis of the gabapentin cohort, thinking about
19   analyses, performing analyses, revising, redoing
20   analyses, a variety of different things.
21      Q.   But there's no way -- and you told me
22   earlier that you couldn't look at any of your
23   computer screens and reproduce these dates, and
24   now you are telling me there's no way we can look
```

974

```
1   at time records or e-mails or anything and
2   reproduce what was done on these dates. Is that
3   true?
4      MS. McGRODER: Well, object to form to the
5   extent it misstates his testimony.
6   BY THE WITNESS:
7      A.   I don't keep such records, and so, no,
8   I never had them. So there's no way to reproduce
9   them.
10   BY MR. LONDON:
11      Q.   And even though you don't keep such
12   records, you are also saying as far as you know
13   there are no such records whether kept by you or
14   anyone else?
15      MS. McGRODER: Object to form.
16   BY THE WITNESS:
17      A.   That's correct.
18   BY MR. LONDON:
19      Q.   The next bill -- unless Ms. McGroder
20   has others that I missed -- going further back in
21   time, further toward the front of the document is
22   dated September 2nd, 2008, 80901.
23      Do you see that?
24      A.   Which one? I'm sorry.
```

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert (Defense Expert)**
4/27/2009

Printed : 5/5/2009

Gibbons, Robert (Defense Expert) 4/27/2009 10:49:00 AM

---

1079

1  IN THE UNITED STATES DISTRICT COURT.
   DISTRICT OF MASSACHUSETTS
2
3  IN RE: NEURONTIN    )
   MARKETING SALES PRACTICES )
4  & PRODUCTS LIABILITY    )
   LITIGATION    )
5               ) MDL DOCKET
   BULGER vs. PFIZER, et al, ) No. 1629
6  07-11426-PBS    )
               )
7  SMITH vs. PFIZER, et al., ) MDL DOCKET
   05-CV-11515-PBS    ) No. 04-10981
8
9
10          VOLUME IV
11      The videotaped deposition of ROBERT D.
12  GIBBONS, Ph.D., called by the Plaintiffs for
13  examination, pursuant to stipulation, and pursuant
14  to the Rules of Civil Procedure for the United
15  States District Courts, taken before Sandra L.
16  Rocca, CSR, CRR and Notary Public in and for the
17  County of DuPage, and State of Illinois, at 6638
18  South Cicero Avenue, Chicago, Illinois, on the 27th
19  day of April, 2009, at the hour of 10:49 a.m.
20
21
22
23
24  Job No: 199412

---

1080

1  APPEARANCES:
2
3  FINKELSTEIN & PARTNERS
   By:  MR. KEITH L. ALTMAN
4  463 Robinson Avenue
   Newburgh, NY  12550
5  (516) 456-5885/Fax: (951) 303-1222
6  kaltman@lawampmmt.com
7       -and-
   MR. JACK LONDON
8  3701 Bee Cave, Suite 200
   Austin, TX  78746
9  (512) 478-5858
10 jlondon@texas.net
       appeared on behalf of the
11     Plaintiffs;
12 SHOOK, HARDY & BACON, L.L.P.
   By:  MS. LORI CONNORS McGRODER
13 2555 Grand Boulevard
   Kansas City, MO  64108-2613
14 (816) 474-6550/Fax: (816) 421-5547
   lmcgroder@shb.com
15
     -and-
16
   SKADDEN ARPS SLATE MEAGHER & FLOM LI
17 By: MR. STEVEN F. NAPOLITANO
   Four Times Square
18 New York, NY  10036-6522
   (212) 735-3000/Fax: (212) 735-2000
19 Snapolit@skadden.com
20     appeared on behalf of the
       Defendants.
21
   Also Present:
22
   Mr. James Pierdzioch, Videographer
23
24

---

1081

1       (Document marked as Defendants' Exhibit
2       Number 1 for identification.)
3       VIDEOGRAPHER:  My name is James
4  Pierdzioch of Veritext.  The date today is
5  April 27th, 2009 and the time is approximately
6  10:49 a.m.  This deposition is being held at the
7  Renaissance Inn in Chicago, Illinois.  The caption
8  of this case is Neurontin Marketing and Sales
9  Practices v Pfizer Incorporated.  The name of the
10 witness is Dr. Robert Gibbons.  At this time the
11 attorneys will please identify themselves for the
12 record.
13     MR. ALTMAN:  Keith Altman on behalf of
14 the Plaintiffs products liability steering
15 committee.
16     MR. LONDON:  Jack London, Plaintiffs
17 products liability steering committee.
18     MS. McGRODER:  Lore McGroder on behalf of
19 the Pfizer Defendants.
20     MR. NAPOLITANO:  Steven Napolitano on
21 behalf the Pfizer Defendants.
22     VIDEOGRAPHER:  The witness may now be
23 administered the oath by Sandi Rocca.
24     (Witness sworn.)

---

1082

1       MS. McGRODER:  Before we start, I'd like
2  to make a statement on the record.  As you know,
3  gentlemen, we are here to produce Dr. Gibbons for
4  Plaintiffs' fourth opportunity to depose him based
5  on an agreement between the parties and we are here
6  only pursuant to that agreement which is summarized
7  in what is marked as Defendants Exhibit Number 1 to
8  Dr. Gibbons' deposition, a correspondence dated
9  April 13, 2009, which states specifically,
10 "Dr. Gibbons is available for deposition" -- let me
11 back up.
12     Among other parts of the agreement, this
13 statement refers specifically to this deposition
14 day.  "Dr. Gibbons is available for deposition on
15 Thursday, April 23 or Monday April 27 subject to
16 our agreement of April 16 specifically limiting the
17 areas of inquiry to the new language in his
18 supplemental expert report dated March 19, 2009,
19 appearing in paragraphs 18 through 20 and Tables
20 2A, 2B, 2C, Tables 3, 3A, 3B and 3C.  As per our
21 conversations, although we will not set an
22 arbitrary time limit, our expectation is that this
23 will not be a full day deposition."
24     Continuing with the respect to the

---

1099

1  bipolar paper.
2      None of those in the revised manuscript,
3  you know, have changed in any way. And most of the
4  -- most of the responses to those reviewers with
5  respect to the questions that they raised had more
6  to do with some of the other sensitivity analyses
7  which are not a part of my expert report.
8      Q. That wasn't exactly what I was asking,
9  but there were some concerns that were raised about
10  various issues and my question to you was some of
11  the concerns that they had raised with respect to
12  your bipolar analysis, do those same concerns -- do
13  any of those concerns also apply to your gabapentin
14  analysis?
15      MS. McGRODER: Well, I object to form.
16      THE WITNESS: Not to my knowledge.
17  BY MR. ALTMAN:
18      Q. Have you resubmitted the bipolar paper
19  yet?
20      A. Yes.
21      Q. When did you resubmit it?
22      MS. McGRODER: Don't. That has nothing
23  to do with paragraphs 18 through --
24      MR. ALTMAN: Then instruct him.

1100

1      MS. McGRODER: No, I'm not going to do
2  that, Keith. We will stop the deposition now and
3  we'll call the Magistrate. Which do you want to
4  do? Do you want to proceed pursuant to the
5  agreement or do you want to stop the deposition
6  now?
7      MR. LONDON: Let me see if I can sort out
8  a middle ground problem.
9      MS. McGRODER: Then let's do that off the
10  record.
11      MR. LONDON: It seems to me --
12      MS. McGRODER: Let's go off the record.
13      MR. ALTMAN: No, we're doing this on the
14  record.
15      MR. LONDON: -- refers to the
16  epidemiology bipolar paper and to the extent that
17  the March 19th report incorporates the bipolar
18  paper, I think we need to learn what that means.
19      MS. McGRODER: Well, I don't disagree
20  that he relies on the manuscript as part of his
21  expert opinion in this case. But the agreement is
22  that your questions will be limited to changes he's
23  made in his supplemental expert report of March 19.
24  Those changes are made specifically in paragraphs

1101

1  18 through 20 and the tables that I already named
2  and are referenced in Defendants' Exhibit 1. So
3  that's what this deposition -- that's what we're
4  here for. We're here to produce him pursuant to
5  this agreement. And we can either do that or not,
6  but I'm not going to have this fight all day long.
7  Decide whether you want to comply with this or
8  don't.
9      MR. ALTMAN: Lori, I had made it very
10  clear to Angela that there would be the necessity
11  of asking some foundational questions, that you
12  could not that take such a narrow approach.
13      MS. McGRODER: That question was not
14  foundational. When did you make revisions to your
15  manuscript? That has nothing to do with paragraphs
16  18 through 20 and Tables 2 and 3 and their subparts
17  in his expert report.
18      MR. ALTMAN: Fine. I'll lay some
19  foundation.
20      Q. Dr. Gibbons, is the bipolar analysis --
21  the methodology that you used for the bipolar
22  analysis, does it have any relationship whatsoever
23  to the analyses you did that with respect to the
24  gabapentin cohorts?

1102

1      MS. McGRODER: Let's go off the record.
2  Let's call the Magistrate.
3      MR. ALTMAN: No, we're not going off the
4  record.
5      MS. McGRODER: Let's call the Magistrate.
6      MR. ALTMAN: Call the Magistrate on the
7  record. Go ahead.
8      MS. McGRODER: I will be calling the
9  Magistrate, but while I do that we are going off
10  the record.
11      MR. ALTMAN: No, let's do this on the
12  record.
13      MS. McGRODER: Can I make the phone call
14  without being on the record?
15      MR. ALTMAN: No, do it on the record.
16      MR. LONDON: Do we have a dial-in today?
17      MR. ALTMAN: We do not. Does that have
18  speaker phone?
19      MS. McGRODER: (On her cell phone) Can I
20  have David? Hi, David, it's Lori -- I'm good. The
21  Plaintiffs would not agree to go off the record so
22  even though this -- only this certain portion of
23  our conversation is on the record, the Plaintiffs
24  have violated the agreement summarizing Defendants'