UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------------------------------x
                                        :      MDL Docket No. 1629
In re:  NEURONTIN MARKETING,            :
        SALES PRACTICES AND             :      Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION   :
                                        :      Judge Patti B. Saris
-------------------------------------------------------------x
                                        :      Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:               :
                                        :
Bulger v. Pfizer Inc., 1:07-cv-11425-PBS :
                                        :
-------------------------------------------------------------x
```

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO STRIKE DEFENDANTS' EXPERT, ROBERT GIBBONS, PH.D. FOR PROVIDING FALSE TESTIMONY AND MAKING FALSE STATEMENTS IN HIS DECLARATIONS

Andrew G. Finkelstein, Esquire
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551
*Attorneys for Plaintiff Ronald J. Bulger, Sr.*

## I.  PRELIMINARY STATEMENT

Product Liability Plaintiffs move this Court by emergency motion for an order striking Defendants' expert witness, Robert Gibbons, Ph.D., for cause, and thereby excluding from evidence his expert testimony, reports, opinions, tables, statistics, and supporting data, and for other relief as detailed below.  Plaintiffs will demonstrate that Dr. Gibbons engaged in a course of persistent and prejudicial misconduct in this litigation, including proffering false testimony and making false statements in a sworn Declaration to this Court regarding his work and involvement in this litigation in detail below.

Further, if the instant motion does not resolve the issue of Dr. Gibbons exclusion as an expert, Plaintiffs intend to file a motion in limine at the appropriate juncture to exclude Dr. Gibbons as an expert, pursuant to the principles enunciated in F.R.E. 702 et. seq., and *Daubert v Merrill Dow Pharms.*, 509 U.S. 579 (1993), and its progeny.

## II.  SUMMARY OF FACTS RELEVANT TO THE MOTION

This motion is being made by emergency motion because trial in this case has been scheduled for July 27, 2009, and the issues herein are critical to preparing for trial.  Dr. Gibbons has knowingly given false testimony and made false statements in sworn declarations to this Court regarding his pharmacoepidemiology studies:

1.  Dr. Gibbons and defense counsel repeatedly represented to Plaintiffs' counsel and this Court that all discovery regarding Gibbons's pharmacoepidemiology studies and reports had been disclosed to Plaintiffs.

2.  Dr. Gibbons testified that he did not have or keep certain materials in his files, particularly communications.

3.  Dr. Gibbons knowingly made false statements in his declaration regarding the work that Dr. Hur performed at his request.

1

4.      Dr. Gibbons lied regarding the submission of his bipolar cohort article to the *Journal of the American Medical Association* and the *Archives of General Medicine.*

1.      <u>**Dr. Gibbons's claims that he had produced all discovery demanded by Plaintiffs in reference to the supplemental report were FALSE.**</u>

On November 12, 2008, Defendants filed a motion for leave to supplement the *Daubert* record and attached thereto a new November 5, 2008, Supplemental Expert Report by Dr. Gibbons.  ECF Doc. # 1489.  The report contained nine new non-FDA opinion paragraphs and two tables that purported to describe an epidemiology study of various categories of patients who were followed for a two year period, one year after first taking Neurontin and the year before, then the statistics regarding their attempted suicides were compared.  *Id.* at Ex. A.  Dr. Gibbons's new report relied on a study by 'Gibbons et al. (2008)' wherein an exclusively bipolar cohort of 47,918 patients with the same method and goal were examined.  *Id.*  That paper/study was not disclosed with Gibbons's November 5, 2008 Supplemental Report.

On that very day, Plaintiffs sent a letter to defense counsel objecting to the supplemental report and seeking all discoverable materials from Dr. Gibbons in regard to the supplemental report.  Declaration of Andrew G. Finkelstein, Esq., Ex. 1, marked as Exhibit 2 to Gibbons's deposition.  Plaintiffs objected to Gibbons's supplemental report as  untimely, since it was served on Plaintiffs a year beyond the deadline for general causation expert witness reports set by this Court's Discovery Order No. 26, ECF Doc. # 1337, and beyond both the date and the scope of the Court's April 30, 2008 electronic order limiting Gibbons to the FDA safety alert.

On November 26, 2008, Defendants sent a letter with enclosures to Plaintiffs in which it was represented that Defendants had disclosed everything responsive to Plaintiffs' November 12 letter.  Finkelstein Decl., Ex. 2.  On January 22, 2009, Defendants submitted to the Court a Declaration sworn by Dr. Gibbons in which he asserted:

2

> I have provided to counsel for defendants all materials requested by plaintiffs on which I relied in conducting the pharmacoepidemiologic study of whether there is an association between Neurontin and suicide attempt. I have also produced all materials requested by plaintiffs in their letter of November 12, 2008, on which my co-authors and I relied in preparing the manuscript. It is my understanding that defense counsel has provided all of these materials to the attorneys for the plaintiffs. [ECF Doc. # 1624 at p. 2, ¶ 6.]

Plaintiffs later learned that the above cited statement in the declaration was false. On February 3, 2009, Dr. Gibbons testified at his deposition that he had provided all his technical work regarding the new reports:

> Q.    And then the last is as I read this, essentially is all of the underpinning work relating to analyses, calculations, regarding adverse event data or databases conducted by you and in essence in this litigation. *Have you provided all that?*

> A.    *Yes,* I think I've done the best job of any one of these I've ever done in terms of giving you a complete record of the data.

> Q.    All right.

> A.    And analyses. [Finkelstein Decl., Ex. 3, at 22-23.]

Dr. Gibbons's statement was echoed by defense counsel Lori McGroder, who stated on the record that Defendants had produced everything:

> MS. McGRODER:

> Well, I object to that question. I mean you can direct that inquiry to me and Dr. Gibbons and I will talk about it and respond. As you know, the Plaintiffs' counsel sent a correspondence to us requesting specific items in conjunction with that article *and we produced everything that was on that list.* [Finkelstein Decl., Ex. 3, at 14.]

Dr. Gibbons testified to having produced everything that he had considered in connection with his supplemental expert report and that his Rule 26 list represented those materials. Finkelstein Decl., Ex. 3, at 286-287. Gibbons's testimony was completely false because there were hundreds of pages of undisclosed computer programs, data, and statistics in his possession

on which he relied and considered in his expert report and in his bipolar paper that had not been produced to Plaintiffs at the time of his deposition.

Dr. Gibbons's sworn declarations, answers under oath, and the statements of counsel concerning the demanded disclosure were completely false.  During the course of his deposition it was revealed that the epidemiology studies had been programmed by Dr. Hur in SAS format but that Gibbons checked the work in FORTRAN.  Finkelstein Decl., Ex. 3 at 544:4-16, 691:5-15.  Neither Gibbons's FORTRAN program and his statistical sensitivity analyses, nor certain of the SAS output files and missing CMED files, and other documents had been disclosed.  *Id* at 509:17-510:21, 699:4-7.  It was impossible for Plaintiffs' experts to duplicate or replicate Gibbons's work without these files.

It was also discovered that Dr. Gibbons had never seen the letter of November 12, 2008, in which Plaintiffs requested the discovery, although Gibbons's sworn declaration, ECF Doc. # 1624, was provided to Magistrate Judge Sorokin in support of Defendants' motion for a protective order for the deposition of his three co-authors, ECF Doc. # 1618, stated that he had complied with the discovery demands detailed in the letter:

> BY MR. LONDON:
>
> Q.    Dr. Gibbons, I'm giving you Exhibit 2, a letter dated November 12, 2008. Are you familiar with this letter?
>
> A.    It doesn't seem familiar.  [Finkelstein Decl., Ex. 3 at 23:12-15.]
>
> * * *
>
> Q.    Had you ever seen Exhibit 2 before? And when I say "before," before this deposition started yesterday.
>
> A.    I can't answer that yes or no. It doesn't ring a bell. You know, I may have seen  it, but it doesn't ring a bell.

Q.     Do you see at the bottom in your declaration on page 2: "I have also
       produced all materials requested by plaintiffs in their letter of November
       12, 2008."  If you hadn't seen the letter, how could you make that
       statement?

A.     Well, I just said --

MS. McGRODER: Objection.

BY THE WITNESS:

A.     I just said that I don't know that -- I don't remember did I see this letter or
       not.  [Finkelstein Decl., Ex. 3 at 708:16-709:8.]

In fact, during Dr. Gibbons's deposition, defense counsel Lori McGroder confirmed that

Gibbons had not seen Plaintiffs' November 12, 2008 letter:

Q.     I'm sorry. On the second page. We are talking about the study now, the
       bipolar study.

A.     "Plaintiffs demand all documents and underlying data that pertain to the
       aforementioned study, Gibbons, et al. (2008)."

Q.     Was there anything in that sentence that says the word relied upon?

MS. McGRODER: I object to this question. He's never even seen -- he has never
       even seen this letter.  [Finkelstein Decl., Ex. 3 at  697:1-10.]

Approximately one week after Dr. Gibbons's depositions on February 3-4, 2009, defense

counsel sent a letter to Plaintiffs agreeing to produce the undisclosed items and promising to

produce others, particularly the missing sensitivity analyses.  Finkelstein Decl., Ex. 4.  On

February 16, defense counsel sent an email to Plaintiffs' counsel attaching six previously

undisclosed files, tests, charts and statistics including three sensitivity analyses.  Finkelstein

Decl., Ex. 5.

In the meantime, Dr. Gibbons surreptitiously performed more work *after* his deposition,

including new sensitivity analyses, and a study on an undisclosed "Supermix" program .

Finkelstein Decl., Ex. 3, 851:24-859:14.  These and eight new statistical tables superseded the

two grossly flawed statistical tables of his November 5, 2008 supplemental report.  Gibbons, however, failed to produce the SAS program files necessary to read them.  Finkelstein Decl., Ex. 3 at 857:4-16.  Moreover, Gibbons did not disclose that these statistical analyses and tables constituted his new core opinions.  Those were set out in a new Supplemental Expert Report that was not disclosed until two weeks *after* his March 5, 2009 deposition.  Finkelstein Decl., Ex. 6. The new supplemental report contained two new core opinion paragraphs interpreting his new analyses and an oblique reference to the bipolar report.  *Id.*  These were disclosed after March 19, 2009, several weeks after Plaintiffs believed that discovery from him was complete.

Dr. Gibbons also knowingly withheld approximately 1,000 pages of documents that he had hoarded for almost a year, beginning in April 2008.  Finkelstein Decl., Ex. 7.  The late disclosures were the very items Plaintiffs had requested that Defendants produce and that Gibbons and defense counsel had misrepresented had complied with the production requests. However, it is the timing of late disclosures that made his false declarations so prejudicial.  By misrepresenting to this Court and Plaintiffs in his January Declaration that all of his underlying work had been produced in reply to Plaintiffs' discovery demand of November 12, Gibbons inevitably assured that his deposition on February 4-5, 2009, would be largely just a futile exercise.  By misrepresenting to Plaintiffs' counsel in mid-February 2009, after the February depositions, that everything finally had been disclosed, the subsequent attempt to complete Gibbons's deposition on March 5, 2009, failed as well; at that time Plaintiffs were completely deprived of the opportunity to ask Gibbons questions about his Supermix analysis or about the contents of his communications with PharMetrics and with the *Archives of General Psychiatry*.

The failure to disclose the one thousand pages of emails, letters, notes, spreadsheets and related items before those depositions was egregious enough, but to add insult to injury, defense

counsel held did not disclose the documents to Plaintiffs until one day before Gibbons's April 27, 2009 deposition.  Defense counsel then aborted that deposition when attorney Altman sought to ask Gibbons questions about what he had withheld.  Finkelstein Decl., Ex. 3 at pp. 1153:3-1158:24.

Finally, Dr. Gibbons refused to disclose a completely new pharmacoepidemiology report on the bipolar cohort until May 7, 2009.  That report was in his possession by at least March 15, 2009, the date he sent it to the *Archives of General Psychiatry* to replace the heavily criticized manuscript he had written in support of his November 5, 2008 Supplemental Expert Report.  Finkelstein Decl., Ex. 8.   The new manuscript report radically changes his previous study.  For example, it contains a "hazard function" analysis, complete with graphs.  It also contains a purported new sensitivity analysis of "1:1 propensity score matching."  Those are only two of the previously undisclosed studies that Gibbons brought out in his new May 7, 2009 disclosure.  *Id.*

It is not possible to properly prepare for trial or even to prepare to depose an expert witness who lies about the disclosure of concealed work he has done to reach his opinions.  Prior to Dr. Gibbons's April 2009 deposition, Defendants procured an agreement from Plaintiffs to limit the questioning of Gibbons.  Apart from the self-evident prejudice in not disclosing his data, programs, statistics, and spreadsheets, the practice of concealing the contents of his lengthy email and correspondence files until after soliciting and getting an agreement to limit questions in his April 2009 deposition was deceptive.  Gibbons and defense counsel knew in soliciting the agreement what Plaintiffs' counsel could not know – that the contents of the as-yet undisclosed documents were far different than Plaintiffs had been told by Gibbons under oath and confirmed on the record by defense counsel.  It is not possible to properly prepare for trial when opposing

expert conceals specific and essential contents of his file and the existence of his underlying work.

### a. False testimony proffered by Dr. Gibbons in regard to Plaintiffs' request for production of certain materials in his possession.

In the February deposition session, Dr. Gibbons testified that he did not keep emails and did not communicate with counsel on anything of substance in his files:

Q.      Okay.  Was there any written correspondence between you and counsel?

A.      Not to my knowledge beyond what's here.

Q.      So you sent no e-mails back and forth at any time?

A.      There were occasional e-mails. I haven't saved those.  They weren't of a substantive nature. Any substantive nature conversations were held on the telephone.

Q.      So it's your representation there is nothing substantive ever discussed in an e-mail between you or counsel or counsel and you?

A.      That's correct.  [Finkelstein Decl., Ex. 3 at 361:19-362:7.]

Dr. Gibbons repeated this testimony on during his testimony on March 5,2009:

Q.      But there's no way -- and you told me earlier that you couldn't look at any of  your computer screens and reproduce these dates, and now you are telling me there's no way we can look at time records or e-mails or anything and tell what was done on these dates.  Is that true?

MS. McGRODER:  Well, object to form to the extent it misstates his testimony.

BY THE WITNESS:

A.       I don't keep such records, and so, no, I never had them. So there's no way to reproduce them.  [Finkelstein Decl., Ex. 3 at 973:21-974:9.]

Plaintiffs later discovered that Dr. Gibbons's proffered testimony was absolutely false. As noted above, on April 23, 2009, defense counsel sent, belatedly, 1,000 pages of material to Plaintiffs one day before the concluding session of Gibbons's deposition.  Finkelstein Decl., Ex.

7.    Among the material which included emails received by Gibbons during the February deposition session was an emailed letter from the *Archives of General Psychiatry* rejecting his manuscript.  Finkelstein Decl., Ex. 9.  The materials also included lengthy notes sent by counsel to Gibbons via attachments to email on February 2, 2009, two days *before* Gibbons testified under oath that there were no such emails.  Finkelstein Decl., Ex. 10.  There was an email of April 2, 2008, attaching a proposal, a paper, and a detailed specification; these documents have not yet been disclosed to Plaintiffs.  Finkelstein Decl., Ex. 11.  There was an email string dated June 9-11, 2008, enclosing to Gibbons various charts and spreadsheets that purport to contain the number of patients in various Neurontin studies.  Finkelstein Decl., Ex. 12.  There were emails from May 2008, some three weeks *after* Judge Saris had ordered that he was limited to the FDA analysis discussing the use of a dataset to support Pfizer.  Finkelstein Decl., Ex. 13.  There also were emails in June, 2008, attaching records pertaining to one of Plaintiffs' experts and a Gabapentin random controlled trial summary Excel spreadsheet.  Finkelstein Decl., Ex. 14.

All of these materials should have been disclosed at the outset.  The materials were not privileged and were directly related to Dr. Gibbons's expert work that he performed for Defendants.  The materials which Gibbons withheld were critically important to Plaintiffs' understanding of how he derived the statistics in his analysis of the FDA Safety Alert of Neurontin and other anti-epileptic drugs, as noted in his expert reports and declarations.

The failure to be truthful in his proffered testimony and provide timely disclosure of these materials prevented Plaintiffs from completing discovery of Dr. Gibbons's opinions, and his data, tests, records, and studies by the end of his deposition of February 3-4, 2009.  It prevented Plaintiffs from completing discovery of Gibbons's opinions, bases, tests, data, records, and studies by the end of his depositions on March 5, 2009, and April 27, 2009.  Proffering such false

testimony to the opposing party, withholding disclosure and then slowly leak the very items requested, items that should have been voluntarily disclosed under Rule 26 is conduct which is appalling and should not be countenanced by this Court.  Such conduct caused Plaintiffs expense, stress, and prolonged discovery not only well past the discovery deadline but to such a degree that it has obstructed Plaintiffs' ability to prepare for trial.

### 3.  Dr. Gibbons's false declaration to the Court regarding Dr. Kwan Hur.

To persuade Magistrate Judge Sorokin to grant an emergency motion to quash the deposition of Dr. Kwan Hur, defense counsel filed a declaration by Dr. Hur in which he stated under oath, *"I have no knowledge concerning the details of plaintiffs' allegations or any expert issues in this litigation"* and *"I do not possess any knowledge concerning Dr. Gibbons' supplemental expert report submitted in this litigation."*  ECF Doc. # 1623, at p. 2, ¶ 10; p. 4, ¶ 10.  These statements were false.

Dr. Gibbons's declaration under oath to Magistrate Judge Sorokin on the same day stated, *"I do not believe that Drs. Hur, Brown, and Mann possess any knowledge* or have formed any opinions concerning the specific expert issues that have been raised in this litigation, *or the content of my expert reports*."  ECF Doc. # 1624 at 4, ¶ 12.

Those statements were also false.

Moreover, Dr. Gibbons also stated under oath, "... I have overseen all analyses that were conducted and replicated those analyses myself to insure their accuracy."  ECF Doc. # 1624 at p. 3, ¶ 9.

Dr. Gibbons's and Dr. Hur's declarations that Hur had nothing to do with Gibbons's expert reports were untrue.  At his deposition on February 3-4, 2009, Gibbons confessed that Hur

had programmed the PharMetrics database to extract the data that Gibbons wanted for his November 5 Supplemental Expert Report:

> Q. By the way, I just want to -- you said Dr. Hur helped you with the programs for both the bipolar study and the gabapentin study, correct?
> A. That's correct.
>
> Q. Did you pay Dr. Hur for his help – for his assistance with you on the gabapentin study?
>
> A. For the gabapentin study, yes, I did.  [Finkelstein Decl., Ex. 3, 440:7-13.]
>
> * * *
>
> Q. Would Dr. Hur be in a better position to discuss these SAS programs than you?
>
> A. You know, it depends on what part of the programs that you are describing.  As I have testified, Dr. Hur had the primary role of writing those programs.  [Finkelstein Decl., Ex. 3, 533:18-23.]

In his deposition on March 5, 2009, Dr. Gibbons confessed that Dr. Hur had done at least eighty (80) hours of work on the statistics and analysis just for the November 5, 2008 report. Gibbons paid Hur more than $10,000, of which more than 80% of Hur's work (at $100.00 per hour) was done solely for the November 5, 2008 expert report.

> Q This morning Mr. Altman asked you about I believe it was the sum of approximately $10,100 that you had paid to Dr. Hur, and you estimated that, as I recall, at least $8,000 of those dollars related to the work on the gabapentin case. Is that your memory of what you said?
>
> A. Yes.  [Finkelstein Decl., Ex. 3, 964:5-12.]

In Dr. Gibbons's letter which transmitted a revised manuscript to *The Archives*, he wrote that Dr. Hur had assisted him with the expert report.  Finkelstein Decl., Exs. 8, 15.  Gibbons's statement in the letter is in direct conflict with the statements he made in his declarations under oath that were submitted to Magistrate Judge Sorokin.

By signing Declarations which averred that Dr. Hur "knew nothing" or "has no knowledge," Dr. Gibbons affirmatively lied to this Court and Plaintiffs' counsel. Long before Gibbons signed his declarations that Hur knew nothing about the Supplemental Expert Report, Gibbons had already paid Hur over $8,000 for work on that report alone, apart from any work Hur may have done on the bipolar manuscript. Finkelstein Decl., Ex. 3, 964:5-965:6. As Gibbons admitted, he could not have done the work, or made some of his mistakes in the expert report, without Hur's programming. Finkelstein Decl., Ex. 3, 759:17-760:21;778:19-780:23.

These are not inconsequential falsehoods. Plaintiffs had noticed and arranged to take Dr. Hur's deposition in January, 2009. Defendants and Dr. Gibbons filed a successful emergency motion for a protective order in regard to the deposition based on the false declarations that Hur had not done any work on and had no knowledge regarding Gibbons's Supplemental Expert Report of November 5, 2008. ECF Doc. # 1618. But for deceiving Magistrate Judge Sorokin, Hur would have been deposed in January. Now that Defendants' deception has been exposed, Magistrate Judge Sorokin has ordered that Hur's deposition be taken, but it is now set for May 21, 2009, one day before the first compliance date on Judge Saris's trial schedule for this case. Thus, Defendants have caused a five-month delay, until 65 days before trial, before Plaintiffs can depose the man who did the work that generated Defendants' new core defense theory.

**4. Defendants' Expert Dr. Gibbons proffered false testimony regarding the manuscript and the *Archives of General Medicine.***

Dr. Gibbons's bipolar manuscript indicates that it was supported by National Institute of Medicine grants, particularly (as to Gibbons) grant number R56 MH078580. It states that "Dr. Gibbons *has served* as an expert witness for the U.S. Department of Justice, and Wyeth and Pfizer Pharmaceuticals, the latter involving gabapentin, one of the drugs considered in this

paper.....   The data were obtained from PharMetrics with assistance of a grant-in-aid from Pfizer."  ECF Doc. # 1492-2.

Dr. Gibbons's claim that the manuscript was supported by the NIM grants stretched the truth to a falsehood.  Despite Gibbons's declaration, he admitted under oath that Pfizer had indeed paid for his work on the manuscript.  Finkelstein Decl., Ex. 3, p. 976.

To be sure, Dr. Gibbons denied that he was paid for writing the paper.  However, the bills alone reflect that he was paid at least $44,000 by defense counsel for projects that were described as the bipolar cohort, i.e., the paper.  Finkelstein Decl., Ex. 16; Ex. 3, 980:5-983:8.

Dr. Gibbons was paid money by Defendants for working with the data, getting up to speed with data, reviewing the data, constructing a statistical database, computing summary statistics, and performing screening analyses for the bipolar cohort are far different than what he represented to JAMA and to the *Archives of General Psychiatry*, that is, that he was funded by a NIM grant and that Pfizer paid only for the purchase of a database.[1]

Dr. Gibbons proffered false testimony concerning the Journal's reception to his manuscript.  In the February deposition sessions, Gibbons testified to not having heard back from the scholarly journal about whether the article was accepted.  But the *Archives of General*

---

[1] One other aspect of Dr. Gibbons's cavalier disregard for the rules requires attention.  Gibbons did not disclose his excessive fees to JAMA or to the Archives.  Gibbons has been paid almost $400,000 by Pfizer defense counsel since April 2008.  He is an expert witness for them both in the products liability MDL and in the commercial cases in this MDL.  His services have the capacity to financially benefit Pfizer by the amount at stake in this litigation.

Gibbons's failure to disclose the amount of his fees from Pfizer directly violates 42 C.F.R. § 50.601 et seq.  Each person who conducts a health research scholarly study pursuant to a public health service grant must report all amounts received in excess of $10,000 from any conflicting interest, that is, any entity whose financial interests would reasonably appear to be affected by the research; 42 C.F.R. § 50.603(6), § 50.604(c)(I); § 50.604(c)(ii).

Dr. Gibbons took public grant money from the NIH for compensation for his first bipolar manuscript without disclosing to anyone that he had been paid by Pfizer for the expert report he submitted on for the testimony he gave at the Daubert hearing on the FDA safety alert on that identical subject, or for the programming and analyses he did for Pfizer's counsel.  When he resubmitted the manuscript to the Archives in March 2009, he admitted that he was presently a Pfizer expert.  He even admitted that Dr. Hur helped him as a Pfizer expert, directly contrary to what they had told Magistrate Judge Sorokin.  But Gibbons continued to misrepresent that his funding came from the NIM rather than Pfizer.  Pfizer and Pfizer's counsel had paid Gibbons over $400,000 for expert witness services for the very subject of his manuscript – the effect of anti-epileptic drugs on bipolar disorder.

*Psychiatry* emailed him during the deposition.   Finkelstein Decl., Ex. 9.   However, since Gibbons did not admit that he had heard from the *Archives* and failed to produce their letter, Plaintiffs did not further inquire about the Journal's response in February.

The subject came back up in March, however, and Dr. Gibbons then proceeded to lie about what the *Archives* told him:

> Before we get to talking about that,  have you received any news from any of the journals concerning the manuscript?
>
> A.      I did receive a letter from the Archives of General Psychiatry regarding the manuscript.
>
> Q.      And what did they say?
>
> A.      Revise and resubmit basically.  [Finkelstein Decl., Ex. 3, 837:12-16.]

In fact, the Journal's responded by advising Dr. Gibbons that the manuscript was rejected:

> The reviewers raise a number of concerns which are outlined at the bottom of this letter.  Given the nature of these concerns, I regret to inform you that the Archives of General Psychiatry must reject your manuscript."  [Finkelstein Decl., Ex. 9.]

Not only did Dr. Gibbons deny that he had received the letter while his first deposition was in progress, Defendants refused to produce the letter until after his March 5 deposition session.  It became the subject of a discovery dispute, resolved by defense counsel soliciting and obtaining an agreement, under false pretenses, to produce the letter if Plaintiffs would not question Gibbons about it.  Believing at that time what Gibbons had said under oath was true that the letter had said "revise and resubmit, basically," Plaintiffs' counsel agreed.  If Plaintiffs' counsel had known what defense counsel and Gibbons knew, that the letter said "must reject your manuscript," Plaintiffs counsel would not have agreed.[2]

---

[2] A subsequent manuscript was accepted by the Archives and produced to Plaintiffs on May 7, 2009.  Plaintiffs have not had the opportunity to question Dr. Gibbons concerning the new manuscript.

Plaintiffs also were misled because of yet another falsehood proffered by Dr. Gibbons, that he did not keep his email correspondence:

> Q.   Okay. Was there any written correspondence between you and counsel?
>
> A.   Not to my knowledge beyond what's here.
>
> Q.   So you sent no e-mails back and forth at any time?
>
> A.   There were occasional e-mails. I haven't saved those. They weren't of a substantive nature. Any substantive nature conversations were held on the telephone.
>
> Q.   So it's your representation there is nothing substantive ever discussed in an e-mail between you or counsel or counsel and you?
>
> A.   That's correct.
>
> Q.   Do you have the -- when you -- how did you send the draft -- the submitted version of your paper to counsel?
>
> A.   I sent that as an e-mail.
>
> Q.   Okay. Do you have that e-mail?
>
> A.   I don't retain e-mails that I have sent.  [Finkelstein Decl., Ex. 3, 361:19-362:13.]

Dr. Gibbons further reiterated what we know now was false testimony regarding the emails:

> Q.   Do you have any -- did you at any time have any emails with Dr. Hur concerning this paper?
>
> A.   I may have. I don't recall specifically.
>
> Q.   When you said you submitted drafts of the paper to the authors for their input, correct?
>
> A.   Correct.
>
> Q.   How did you submit the paper to them?
>
> A.   Sent it via email.
>
> Q.   And did you get responses from them?

A.      Yes.

Q.      Was that also via email?
A.      Yes.

Q.      Do you have any of those emails?

A.      Not that I'm aware of.

Q.      What did you do with the emails?

A.      Usually just simply discard them after I would take a look at the -- what
they had attached with their edits and then I would, you know, create the
next version of the paper.  [Finkelstein Decl., Ex. 3, 288:12-289:6; *see
also* Finkelstein Decl., Ex. 3, 973:15-974:9.]

Plaintiffs' counsel were not aware that Dr. Gibbons had lied about the rejection of his

manuscript until April 23, 2008, one day before deposing Gibbons on his new March 19 report.

Based upon Defendants' misrepresentations, Plaintiffs' counsel continued to work under the

false belief that Gibbons had been truthful about the bipolar manuscript and his emails and

records.  Defense counsel finally disclosed the Archives rejection letter – along with almost one

thousand pages of Gibbons's emails and other documents that he and they had withheld from

discovery, going a year back to April, 2008!

The 1,000 pages contained the rejection letter from the Archives, dated February 2,

2009.[3]  During the deposition of April 27, 2009, Plaintiffs attempted to ask Dr. Gibbons about

these revelations, but defense counsel shut down the deposition based upon a prior agreement

they had obtained under false pretenses, to limit questioning that would be posed to Gibbons:

Q.      Dr. Gibbons, is the bipolar analysis -- the methodology that you used for
the bipolar analysis, does it have any relationship whatsoever to the
analysis you did that with respect to the gabapentin cohorts?

---

[3] The materials also contain extensive emails between Dr. Gibbons and defense counsel McGroder in which lengthy
notes, excel spreadsheets of data used by Gibbons, and Pfizer and the FDA correspondence were attached.  The e-
mail sent by Gibbons on April 2, 2008 refers to but does not include an attached proposal and 'relevant paper,'
neither of which have yet been disclosed.  Finkelstein Decl., Ex.11.

MS. McGRODER:  Let's go off the record.  Let's call the Magistrate.

MR. ALTMAN:  We're not going off the record.
MS. McGRODER:  Let's call the Magistrate.

MR. ALTMAN:  Call the Magistrate on the record.  Go ahead.

MS. McGRODER:  I will be calling the Magistrate but while I do that we are
going off the record.  [Finkelstein Decl., Ex. 3, 1101:20-1102:10.]

In essence, defense counsel shut down the deposition and denied Plaintiffs' their right to

question Dr. Gibbons about anything surrounding his manuscript.

### III

### ARGUMENT

This court has the ability "to protect the administration of justice by levying sanctions in

response to abusive litigation practices."  *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,*

771 F.2d 5, 19-20 (1st Cir. 1985) (citing to *Penthouse Int'l, LTD. v. Playboy Enterprises, Inc.,*

663 F.2d 371, 386 (2d Cir. 1981).  Federal courts have the broad discretion to strike an expert

witness as a sanction for discovery misconduct under Rule 37 of the Federal Rules of Civil

Procedure and its "inherent authority".  *AT&T Wireless Servs. of Cal. LLC v. City of Carlsbad,*

2002 U.S. Dist. LEXIS 28286, *12 (S.D. Cal. 2002)**.**  The inherent power of this Court "can be

invoked even if procedural rules exist which sanction the same conduct."  *Chambers v. NASCO,*

*Inc.,* 501 U.S. 32, 49 (1991).  The proper sanction against an expert witness for proffering false

testimony about material matters is to strike the witness and his testimony.  *See Cardiac*

*Pacemakers, Inc. v. St. Jude Medical, Inc.*,  2002 U.S. Dist. LEXIS 14767 at *186 (S.D. Ind.

2002), affirmed in pertinent part on appeal, 381 F.3d 1371 (7th Cir. 2004).  Perjury by a witness,

particularly an expert witness, is not novel.  Two early common law cases are *Morrell v.*

*Kimball*, 1 Me. 322 (1821), and *Great Falls Mfg. Co. v. Mathes*, 5 N.H. 574 (1832).  As to

whether a party should escape sanctions because it was a witness who committed the perjury, rather than the party itself, the *Morrell* Court said in a rather common sense way:

> If the judgment rendered against the petitioner was obtained by perjury, he is not the less injured because it was not committed in consequence of the procurement, subornation, or even privity of the adverse party.  Though the latter may have been innocent of any charge ... it is more than questionable whether he can.... enjoy the fruits of perjury...  [1 Me. at 324.]

In *Cardiac,* the court was faced with the situation where an the Plaintiffs' expert had undermined the trial by proffering false testimony. 2002 U.S. Dist. LEXIS 14767 (S.D. Ind. 2002). The court chose to fashion a remedy whereby it issued findings under which it granted judgment to defendants and stated that if the findings were overturned on appeal that defendants would be entitled to a trial untainted by plaintiffs' expert, and other sanctions. *Id.* at 191-193. That is not this Court's choice here.   The expert in *Cardiac* was plaintiffs only liability expert in that case; here, Dr. Gibbons is Defendants' tangential defense expert on statistics.   Striking Gibbons for his misconduct still leaves Defendants with all their defenses.

In *ClearValue Inc. v. Pearl River Polymers, Inc.*, 560 F.3d 1291 (Fed. Cir. 2009), the Federal Circuit affirmed the trial court's finding of sanctionable conduct  where the trial court was confronted mid-trial by evidence that an expert witness, Stoll, and counsel had withheld test results regarding the subject of Stoll's expert testimony.   As noted in the Federal Circuits opinion, the pertinent communications had taken place in undisclosed emails between counsel and Stoll:

> Appellants concede that 'documents and information disclosed to a testifying expert in connection with his testimony are discoverable by the opposing party, whether or not the expert relies on the documents and information in preparing his report.'   *In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375 (Fed. Cir.2001). They state, however, that Stoll "forgot" about the Lark and Texas Oil tests and 'did not plan to take any action in light of them' because he found the test results "worthless."   Essentially, Appellants argue that Stoll could not have considered

18

the results because (1) the tests had no relevance to claim construction, and (2) Stoll forgot about the tests before giving his liability opinion.

The district court did not err in finding that ClearValue, Haase, and Waggett failed to make a disclosure required by Rule 26(a); they withheld test results reviewed by a testifying expert. *See In re Pioneer Hi-Bred*, 238 F.3d at 1370. Litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions-whether or not ultimately relied upon by the expert-are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.") (internal quotation marks omitted). Although Appellants offered a justification for the failure to disclose, namely, that the Lark and Texas Oil tests were conducted to address a customer issue, the district court evaluated the credibility of Haase, Stoll, and Waggett and found their explanations implausible. As we have stated, "this court gives great deference to the district court's decisions regarding credibility of witnesses." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed.Cir.2006) (internal quotation marks omitted). We find no error in the district court's fact finding that Haase, Stoll, and Waggett failed to offer a substantial justification for their conduct. Based on the emails exchanged between them, the lack of evidence regarding the alleged customer problem, Haase's conflicting testimony (he first claimed he did not share the information with any of his attorneys), and the potentially damaging nature of the material involved, there is more than ample support for the finding that the Appellants engaged in unjustified and sanctionable conduct. [560 F.3d at 1304, 1304.]

The misconduct of the expert witness in the *ClearValue* was discovered during testimony proffered at trial – the damage has already transpired. In the case at bar, Plaintiffs have provided this Court with information concerning the transgressions of Defendants' expert witness, Dr. Gibbons. This Court has the ability under it inherent powers to strike Gibbons as an expert witness for cause before he is able to spin further tales of statistical import to a jury that in all probability will be un-trained in the statistical arts. Here, Gibbons, as demonstrated above, has provided false deposition testimony, and has knowingly withheld material and information which are critical to the issues in this case. Gibbons's outrageous conduct has undermined his credibility and has prejudiced Plaintiffs. Plaintiffs respectfully request that this Court strike Gibbons's expert testimony because such conduct has undermined this litigation.

19

Dr. Gibbons and defense counsel failed to disclose the contents of his work in a timely fashion, and knowingly and affirmatively misrepresented to Plaintiffs that all applicable documents and information had been disclosed.  If Defendants are permitted to utilize Gibbons's expert reports and testimony in this litigation after he has obstructed the discovery and proffering of false testimony, it will be fundamentally unfair to Plaintiffs who have abided by the discovery process.  Gibbons has disregarded Judge Saris's order to limit his expert role to the FDA safety alert.  He has withheld documents from Plaintiffs and lied about doing so.  He has obstructed Plaintiffs' access to testimony from Dr. Hur and lied about doing so.  He has lied about the status of a manuscript he wrote for this lawsuit, lied to the publications about his funding, and been entirely dishonest with Plaintiffs concerning the journal's criticisms of his studies.

The only effective measure to correct his false testimony and to stop the pattern and practice he has undertaken is to remove him from the trial arena for which he has shown such disregard.  Plaintiffs respectfully move the Court to exclude Dr. Gibbons and to order that his studies be excluded. Plaintiffs move that the costs of all discovery related to Gibbons be assessed against Defendants.

## IV.  Request for Evidentiary Hearing

Plaintiffs also respectfully request that this Court conduct an evidentiary hearing, to direct Dr. Gibbons to personally appear and testify regarding the above, and to enter findings of fact regarding the false testimony, declarations, and deceptions that are the basis of this motion.

## V.  Conclusion

Plaintiffs respectfully request that this Court grant their motion and issue and order striking Defendants' expert witness, Robert Gibbons, Ph.D., for cause, and thereby excluding

from evidence his expert testimony, reports, opinions, tables, statistics, and supporting data, and

for and evidentiary hearing and for such and other relief as the Court finds just.

Dated:  May 29, 2009                                 Respectfully submitted,

                                        By:    **/s/ Andrew G. Finkelstein**
                                               Andrew G. Finkelstein, Esquire
                                               Finkelstein & Partners, LLP
                                               1279 Route 300, P.O. Box 1111
                                               Newburgh, NY  12551
                                               *Attorneys for Plaintiff Ronald J. Bulger, Sr.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on May 29, 2009.

Dated:  May 29, 2009

                                                **/s/ Andrew G. Finkelstein**
                                                Andrew G. Finkelstein, Esquire