EXHIBIT 3

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert (Defense Expert)**
2/3/2009

**1**

```
 1          IN THE UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2
      IN RE: NEURONTIN        )
 3    MARKETING SALES PRACTICES )
      & PRODUCTS LIABILITY     )
 4    LITIGATION               )
                               ) MDL DOCKET
 5    BULGER VS. PFIZER, et al. ) No. 1629
      07-11426-PBS             )
 6                             ) MASTER FILE
      SMITH VS. PFIZER, et al. ) No. 04-10981
 7    05-CV-11515-PBS          )
 8
          SUPERIOR COURT OF THE STATE OF CALIFORI
 9                  CITY OF LAKE
10    NICOLETTE CRONE, et. al,  )
                                )
11        Plaintiffs,           )
                                )
12        versus                ) CV 400432
                                )
13    PFIZER, INC., et al.,     )
                                )
14        Defendants.           )
15    Job No.: 183059
                VOLUME I
16        The videotaped deposition of ROBERT D.
17    GIBBONS, Ph.D.., called by the Plaintiffs, for
18    examination, pursuant to Notice, and pursuant to
19    the Rules of Civil Procedure for the United States
20    District Courts, taken before Sandra L. Rocca, CSR,
21    CRR and Notary Public in and for the County of
22    DuPage, and State of Illinois, at 506 West
23    Harrison, Chicago, Illinois, on the 3rd day of
24    February, 2009, at the hour of 9:09 a.m..
```

**2**

```
 1
 2    APPEARANCES:
 3    MR. JACK LONDON
      3701 Bee Cave, Suite 200
      Austin, TX  78746
 4    (512) 478-5858
      jlondon@texas.net
 5
           -and-
 6
      FINKELSTEIN & PARTNERS
 7    By:  MR. KEITH L. ALTMAN
      463 Robinson Avenue
 8    Newburgh, NY  12550
      (516) 456-5885/Fax: (951) 303-1222
 9    kaltman@lawampmmt.com
10         -and-
11    THE LANIER LAW FIRM
      By:  MR. KENNETH S. SOH
12    6810 FM 1960 West
      Houston, TX  77069
13    (713) 659-5200/Fax: (713) 659-2204
      Kss@lanierlawfirm.com
14
           appeared on behalf of
15         the Plaintiffs;
16
      SHOOK, HARDY & BACON, L.L.P.
17    By:  MS. LORI CONNORS McGRODER
      2555 Grand Blvd.
18    Kansas City, MO  64108-2613
      (816) 474-6550/Fax: (816) 421-5547
19    lmcgroder@shb.com
20         appeared on behalf of the
           Defendants;
21
      (continued)
22
23
24
```

**3**

```
 1
 2    APPEARANCES: (Continued)
 3    LAW OFFICES OF STEVEN D. HILLYARD, P.C.
      By: MR. GERHARD WINKLER
 4    345 California Street, Suite 1770
      San Francisco, CA  94104
 5    (415) 334-6880
 6         appeared on behalf of Defendant
           Dr. Jennings.
 7
 8
      Also Present:
 9
           James Pierdzioch, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1          VIDEOGRAPHER:  My name is James
 2    Pierdzioch of Veritext.  The date today is
 3    February 3rd, 2009 and the time is 9:09 a.m.  This
 4    deposition is being held at the Holiday Inn located
 5    at 506 West Harrison Street in Chicago, Illinois.
 6    The captions for this case are In Re:  Neurontin
 7    Marketing Sales Properties and Products Liability
 8    Litigation in the United States District Court,
 9    District of Massachusetts and Nicolette Crone,
10    et al. versus Pfizer Incorporated, et al. in the
11    Superior Court of the State of California for the
12    County of Lake.
13          The name of the witness is Robert
14    Gibbons, Ph.D.  At this time the attorneys will
15    please identifies themselves for the record.
16          MR. LONDON:  I'm Jack London.  I
17    represent the multi-district litigation Plaintiffs,
18    product liability steering committee Plaintiffs.
19          MR. ALTMAN:  Keith Altman.  I'm here
20    representing Nicolette Crone and the Crone
21    Plaintiffs and I'll be asking questions on behalf
22    of Crone.
23          MR. SOH:  Ken Soh for the Plaintiffs.
24          MR. WINKLER:  Gerhard Winkler on behalf
```

13

1    talking about?
2       A.  Yes, we will.
3       Q.  And have all of those studies, reports,
4    records, opinions, notes and calculations relating
5    to the September 8th article also been provided to
6    defense counsel?
7       A.  Yes, they have.
8       Q.  And that includes those between you and
9    your coauthors?
10          MS. McGRODER:  Well --
11          MR. LONDON:  That's the question.
12          MS. McGRODER:  Objection to that
13   question.
14   BY MR. LONDON:
15      Q.  That's the question.
16      A.  I provided all of the data upon which
17   that paper is based, all of the statistical
18   analysis, files, so that every -- every data point
19   and every analytic method and every result is
20   easily reproducible by you.
21      Q.  Have you -- well, were there any emails
22   or correspondence between you and the other
23   coauthors regarding that paper?
24      A.  There may have been, sure.

14

1       Q.  Have you produced those to defense
2    counsel?
3       A.  Not to my knowledge.  I'm not sure I even
4    have them.
5       Q.  Are those retrievable?
6       A.  In general, no, I don't keep a long list
7    of emails.
8       Q.  And what about other correspondence?
9       A.  No other correspondence.
10      Q.  Okay.  Well, I'm going to ask if you will
11   do a reasonable search to see whether you have
12   emails between yourself and your coauthors of the
13   September article?
14      A.  Happy to.
15      Q.  And if you do, would you produce copies
16   of those for us, please?
17          MS. McGRODER:  Well, I object to that
18   question.  I mean you can direct that inquiry to me
19   and Dr. Gibbons and I will talk about it and
20   respond.  As you know, the Plaintiffs' counsel sent
21   a correspondence to us requesting specific items in
22   conjunction with that article and we produced
23   everything that was on that list.
24

15

1    BY MR. LONDON:
2       Q.  We're going to get there.  But I'm only
3    asking about things that were not produced or we
4    don't have any correspondence or emails with
5    coauthors.  So I'm asking for you to make a
6    reasonable search for that and produce those.  Do
7    you understand my request?
8       A.  I do understand your request.
9       Q.  And if you don't comply with it, it will
10   be because of conversations with yourself and
11   defense counsel, is that my understanding?
12      A.  Correct.
13          MS. McGRODER:  You know, Jack, I just
14   have to interpose on that one.  There are -- there
15   are cases that address the confidentiality of
16   communications between coauthors on a manuscript
17   submitted for publication.  So to the extent we
18   didn't produce something to you, it would be
19   pursuant to those cases.
20   BY MR. LONDON:
21      Q.  And if there are such things, I'm going
22   to ask you to submit them under seal to the court
23   so the court can determine whether confidentiality
24   applies.  Do you understand that?

16

1           MS. McGRODER:  I object to that question.
2    You don't have to answer that.
3           MR. LONDON:  Yes, you do.  You can't tell
4    him not to answer questions.
5       Q.  Do you understand that I'm requesting you
6    to submit under seal anything that you or your
7    defense counsel contends to be confidential?  Do
8    you understand that?
9           MS. McGRODER:  I object to the question.
10   You're asking him to understand your legal
11   arguments and --
12          MR. LONDON:  I'm not making an argument.
13   I'm asking a question.
14          MS. McGRODER:  It's inappropriate.
15          MR. LONDON:  Do you understand the
16   question.
17          MS. McGRODER:  Objection.  You don't have
18   to answer it.
19   BY MR. LONDON:
20      Q.  You do have to answer it, Doctor.  Do you
21   understand that I'm asking you to submit under seal
22   to the court anything that you contend or that
23   Miss McGroder contends to be confidential because
24   of its relationship to a pending publication

21

1 it, the generic term for Neurontin is gabapentin,
2 is that your understanding?
3     A. Yes.
4     Q. If we refer to those interchangeably,
5 will that be all right with you?
6     A. Of course.
7     Q. Because I never know when to call it one
8 or the other frankly. Fair enough?
9     A. Fair enough.
10     Q. Is there a better time to use one term
11 more than the other?
12     A. I would not be an expert on that.
13     Q. You would not be an expert on that. We
14 share the same level of inexpertise on that matter?
15     A. Yes, sir.
16     Q. I asked you previously about notes,
17 slides, overheads, presentation materials. The
18 same question, to the extent that there are any,
19 have you provided those to defense counsel? I
20 apologize I abbreviated that for time's sake and I
21 didn't do it well.
22     Have you taught any classes, courses,
23 seminars or other nonlitigation presentations
24 regarding Neurontin, adverse events, suicidal

22

1 ideation or behavior related to Neurontin?
2     A. I'm asked to give lectures on my work on
3 the statistics of suicide and I'm just trying to
4 remember if ever used any of the antiepileptic data
5 that formed the basis of our paper. I certainly
6 haven't used any of the data directly related to
7 Neurontin that formed the basis of the analysis
8 that I'm sure we'll be discussing here today.
9     But with respect to the paper, I may have
10 presented, you know, a slide, maybe one of the
11 tables from the paper at one of the lectures that
12 I've given.
13     Q. Would the presentation that you made, if
14 you did to a class or group, have simply been using
15 the same documents, for example, tables that were
16 in the paper?
17     A. That's correct.
18     Q. The September '08 paper?
19     A. That's correct.
20     Q. Nothing different than that?
21     A. Not to my knowledge, no.
22     Q. And then the last is as I read this,
23 essentially is all of the underpinning work
24 relating to analyses, calculations, regarding

23

1 adverse event data or databases conducted by you
2 and in essence in this litigation. Have you
3 provided all that?
4     A. Yes, I think I've done the best job of
5 any one of these I've ever done in terms of giving
6 you a complete record of the data.
7     Q. All right.
8     A. And analyses.
9     (Document marked as Gibbons Exhibit
10     Number 2 for identification.)
11 BY MR. LONDON:
12     Q. Dr. Gibbons, I'm giving you Exhibit 2, a
13 letter dated November 12, 2008. Are you familiar
14 with this letter?
15     A. It doesn't seem familiar.
16     Q. All right. In short reference -- and
17 I'll give you a moment to read but in short
18 reference, this is a letter in which generally
19 Mr. Fromson requested of Miss McGroder items
20 regarding the pharmacoepidemiologic study. When I
21 say pharmacoepidemiologic study, I think of the
22 report that you wrote that was dated I believe
23 November 5th, 2008. It contains tables regarding
24 pharmacoepidemiologic analyses. Is that your

24

1 understanding --
2     A. Yes.
3     Q. -- of pharmacoepidemiologic study?
4     A. Yes.
5     Q. And then the other one has to do with
6 references to Gibbons, et al., 2008. Again, I
7 believe that to be the September 2008 paper
8 referred to inside the November study. Do you see
9 that over on the second page, sir?
10     MS. McGRODER: Object to form. I guess I
11 just don't know what you mean by inside the
12 November study.
13     THE WITNESS: This is a reference to the
14 paper on antiepileptic drugs that we spoke of
15 before. And I referred to this paper in my
16 supplemental report of November the 5th where I
17 describe the analyses that I did for the purpose of
18 that report on the gabapentin data.
19 BY MR. LONDON:
20     Q. Now, since we understand that the letter
21 concerns requests regarding the paper and the
22 November report, will you take a moment at your
23 convenience now and see whether the numbered items
24 in -- first on page 1, Items 1 through 9,

285

1  the practice of any of my colleagues doing this
2  kind of work.
3      Q.  Did you tell Dr. Hur you were going to
4  include references and data from this report in
5  your expert report?
6      A.  No, I did not..
7      Q.  Did you tell Dr. Brown?
8      A.  No.
9      Q.  Did you tell Dr. Mann?
10     A.  No, but I would have no reason to do so
11  and I wouldn't expect them to do so the same for
12  me..
13     Q.  Were you aware that Shook Hardy in this
14  case submitted the paper as part of the discovery
15  process in this case?
16     A.  I shared the paper with them after I had
17  submitted it for publication to ensure that there
18  would be no confusion of them having any role in
19  the writing and/or editing of that paper, just in
20  the same way as Pfizer was never provided a copy of
21  our paper in 2005 that was published in the
22  Archives of General Psychiatry despite the fact
23  that they had donated $30,000 to John Mann to
24  obtain part of the data that were used in that

286

1  paper.
2      Q.  Do you have any opinions in any case
3  involving -- in the Neurontin litigation specific
4  to a particular plaintiff?  Let me strike that.
5          All the opinions you expressed today and
6  your expert reports and everything, is any of that
7  specific to Mr. Crone?
8      A.  Only to the extent that there's a
9  question about the relationship between the drug
10  that he took and the behavior that he exhibited.
11     Q.  But that's not specific to Mr. Crone,
12  that's to anybody who took that drug and that
13  behavior, correct?
14     A.  Conditional on that age, but yes.
15     Q.  Same thing for, you know, the Smith case,
16  there's nothing that you said here that's specific
17  to the Smith case, correct?
18     A.  My opinions in this case are about the
19  general science and about the data and the
20  literature related to the statistics, methodology
21  and science underlying this putative relationship.
22     Q.  Did you -- are there any materials that
23  you reviewed for any purposes associated with this
24  litigation that are not listed on your materials

287

1  considered that you provided which I believe is our
2  Exhibit -- I believe it's Exhibit 10 and
3  Exhibit 19?
4      A.  I've reviewed --
5          MS. McGRODER:  Well, I'm sorry.  I object
6  just to the extent that I mean, for example, I
7  don't think the PHARMetrics data is listed there.
8  But --
9  BY MR. ALTMAN:
10     Q.  That's one thing, fine.  Is there
11  anything else that's not listed?
12     A.  Not to my knowledge.
13     Q.  Okay.  How did you communicate with --
14  strike that.
15         You said you had communications with
16  Dr. Hur concerning both the gabapentin study and
17  the bipolar study, correct?
18     A.  Correct.
19     Q.  How did those communications take place?
20     A.  Verbally.
21     Q.  Were there any emails?
22     A.  Not to my knowledge.
23     Q.  When he did a data run, how did he send
24  you the results of the data run?

288

1      A.  He is at the university every Wednesday
2  and so we would review everything typically on his
3  computer or he would print something out and, you
4  know, show it to me.
5      Q.  Did you save those printouts or papers or
6  anything that he shared with you?
7      A.  No.
8      Q.  Did you specifically discard them?
9      A.  No.  It's not my practice to save papers.
10         MS. McGRODER:  Object to form.
11  BY MR. ALTMAN:
12     Q.  Do you have any -- did you at any time
13  have any emails with Dr. Hur concerning this paper?
14     A.  I may have.  I don't recall specifically.
15     Q.  When you said you submitted drafts of the
16  paper to the authors for their input, correct?
17     A.  Correct.
18     Q.  How did you submit the paper to them?
19     A.  Sent it via email.
20     Q.  And did you get responses from them?
21     A.  Yes.
22     Q.  Was that also via email?
23     A.  Yes.
24     Q.  Do you have any of those emails?

289

1    A.  Not that I'm aware of.
2    Q.  What did you do with the emails?
3    A.  Usually just simply discard them after I
4 would take a look at the -- what they had attached
5 with their edits and then I would, you know, create
6 the next version of the paper.
7    Q.  Did you save any of the versions of the
8 papers as you modified them over time?
9    MS. McGRODER:  Well, I'm just going to
10 object to this whole line of questioning on the
11 basis that drafts of manuscripts submitted for
12 publication are confidential.  So you can ask..
13    MR. ALTMAN:  I'm just curious, what's the
14 basis of that?
15    MS. McGRODER:  Case law.
16    MR. ALTMAN:  What case law?
17    MS. McGRODER:  I can't cite it to you,
18 but I looked it up.
19    MR. ALTMAN:  I'm sorry.  I don't agree
20 with you.
21    MS. McGRODER:  You can disagree if you
22 want, but it is confidential.
23    MR. ALTMAN:  Are you instructing him not
24 to --

290

1    MS.. McGRODER:  No, I didn't tell him he
2 couldn't answer.  I'm just telling you I'm putting
3 my objection on the record on the basis that drafts
4 -- information about drafts of a manuscript or
5 production of drafts submitted for publication is
6 confidential.
7    MR. ALTMAN:  I'd like you to send me a
8 copy of the case law.  That would be very useful.
9    MS. McGRODER:  I'll do it.
10    MR. ALTMAN:  But there is also a
11 confidentiality agreement in this case I might add.
12    MS. McGRODER:  I don't think that impacts
13 my objection.
14    MR. ALTMAN:  That's fine.
15    Q.  Do you know if Dr. Hur sent -- had any
16 communications with Dr. Mann directly?
17    A.  Not to my knowledge.
18    Q.  Well, do you know they didn't or you just
19 don't know one way or the other?
20    A.  I just answered your question.
21    Q.  I'm confused.  Do you know one way or the
22 other whether Dr. Mann had any communications with
23 Dr. --
24    A.  I don't remember.

291

1    MS. McGRODER:  Wait.  Objection asked and
2 answered.
3    MR. ALTMAN:  No, I don't think it was, I
4 think we were unclear or I was unclear.  Let's take
5 it again.
6    Q.  Do you know one way or the other whether
7 Dr. Hur had any direct communications with
8 Dr. Brown?
9    MS. McGRODER:  Objection, asked and
10 answered.
11    THE WITNESS:  Now you're asking me about
12 Dr. Brown?
13 BY MR. ALTMAN:
14    Q.  I'm starting over.  Do you know one way
15 or the other whether they had communications?
16    A.  I don't -- I think that they had
17 communications when Dr. Brown was visiting with us
18 in Chicago and we talked about a great number of
19 things and there were times where the three of us
20 would be in my office talking about the manuscript
21 and the analyses and Kwan would be, you know,
22 reviewing some of the findings with us and we'd be
23 discussing them.
24    Q.  But do you know whether he ever had

292

1 communications with Dr. Brown that you were not a
2 party to?
3    A.  I don't -- with respect to this paper or
4 in general?
5    Q.  With respect to either one of these
6 analyses, this paper, Neurontin?
7    A.  Well, I know he had no communications
8 with Dr. Brown or Dr. Mann with respect to the
9 gabapentin analyses that were the subject of my
10 expert report.  With respect to this paper, I
11 believe the only communications that Dr. Hur had
12 were with Dr. Brown when Dr. Brown was visiting
13 with us in the summer.
14    Q.  What's your basis of saying there were no
15 communications for the gabapentin studies?
16    MS. McGRODER:  Well, object to form.
17 That's not what he said.  It misstates his
18 testimony.
19 BY MR. ALTMAN:
20    Q.  You said I know he had no communications
21 with Dr. Brown or Dr. Mann with respect to the
22 gabapentin analyses that were the subject of my
23 expert report.  What is your basis for making that
24 statement?

345

1     A.  These are just analyses that I've done in
2   the context of my own research.
3     Q.  Have you provided those to counsel?
4     A.  No, I haven't opined on them or used them
5   in any connection with this case.
6     Q.  Well, you did today when you said that
7   there was a decreasing function over time?
8         MS. McGRODER:  Objection.  Is that a
9   question or are you just arguing with him?
10        MR. ALTMAN:  I'm not arguing with him.
11        MS. McGRODER:  Ask him a question.
12        MR. ALTMAN:  I asked him a question.
13        MS. McGRODER:  And he answered it.
14        MR. ALTMAN:  I'd like the production of
15   the data that forms the basis of what he answered
16   in this deposition.
17        MS. McGRODER:  You can ask us for that
18   and we'll take it under advisement.  You don't have
19   to argue with him.
20        THE WITNESS:  I also haven't finished my
21   statement.
22   BY MR. ALTMAN:
23     Q.  I'm sorry.  Please do.
24     A.  I've also seen this with the VA data..

346

1   I've also for antidepressant medications.  I've
2   also seen this with the studies published by Simon
3   showing the risk of suicide attempts from the time
4   of initiation of treatment.  They all indicate that
5   the highest risk of suicide attempt is the month
6   prior to the initiation of treatment and then it
7   goes down in sort of an exponential way from the
8   time of the initiation of treatment.
9     Q.  On page 29 though the FDA did an
10   exploratory analysis of time to event analysis,
11   correct?
12     A.  Yes.
13     Q.  And their conclusion was that the higher
14   hazard was observed as early as one week from
15   initiating treatment until at least 24 weeks,
16   correct?
17     A.  They're talking about the drug versus
18   placebo difference and they indicate that it's hard
19   to tell because there wasn't a lot of data after 24
20   weeks.
21     Q.  But they do say that there's a risk as
22   early as one week and for at least 24 weeks,
23   correct?
24        MS. McGRODER:  Object to form.

347

1         THE WITNESS:  That's what they say.
2         MR. ALTMAN:  Okay.  Why don't we stop for
3   tonight.  We'll pick up in the morning.
4         MS. McGRODER:  You can ask it tomorrow.
5         MR.. LONDON:  Stand by one second.
6         MS. McGRODER:  It's not like we won't be
7   here.
8         MR. WINKLER:  9:00 a.m. tomorrow?
9         MS. McGRODER:  Yes, 9:00 a.m. tomorrow.
10        MR. LONDON:  We're off.
11        VIDEOGRAPHER:  This is the end of tape
12   Number 8.  The time is 6:23 p.m.  We are going off
13   the record.
14        (Whereupon, the deposition adjourned at
15        6:23 p.m.)
16
17
18
19
20
21
22
23
24

348

I N D E X
WITNESS                           PAGE
ROBERT D. GIBBONS, Ph.D.
EXAMINED BY
    Mr. London                    5
    Mr. Altman                    269
          EXHIBITS
NUMBER                    MARKED FOR ID
Gibbons Deposition Exhibit
No. 1    Notice                           7
No. 2    11/12/08 Fromson letter to
         McGroder                   23
No. 3    License Agreement          27
No. 4    disk                       54
No. 5    list of contents of disk   54
No. 6    3/25/08 McGroder letter to
         Gibbons                    65
No. 7    Curriculum vitae           76
No. 8    Gibbons declaration        102
No. 9    Gibbons expert report      102
No. 10   list of materials considered  102
No. 11   Supplemental Gibbons report   102
No. 12   FDA online alert           102
No. 13   PowerPoint "Suicidality and
         Antiepileptic Drugs"       102
No. 14   US Dept of Health & Human Svs.
         statistical review         102
No. 15   Pfizer response to NDA on
         Neurontin                  124
No. 16   Pfizer Assessment of Suicide and
         Related Behaviors in Patients
         Treated with the alpha-2 ligands,
         gabapentin and pregabalin  139
No. 17   6/22/06 Evertsz letter to Katz  135
No. 18   6/22/06 Powers letter to Katz   135
No. 19   additional materials considered  148
No. 20   2008 submitted paper       201
No. 21   Supplemental Gibbons report   221
No. 22   Notice (Crone)             269
No. 23   Gibbons declaration (Crone)   269

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
2/4/2009

Gibbons, Robert D PhD (Defense Expert) 2/4/2009 9:16:00 AM

352

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3   IN RE: NEURONTIN            )
 4   MARKETING SALES PRACTICES     )
 5   & PRODUCT LIABILITY          )
 6   LITIGATION,                  )
 7                    ) MDL DOCKET
 8   BULGER vs. PFIZER, et al.,    ) No. 1629
 9                    ) MASTER FILE
10   SMITH vs. PFIZER, et al.,     ) No. 04-10981
11   05-CV-11515-PBS              )
12      SUPERIOR COURT OF THE STATE OF CALIFORNIA
13               CITY OF LAKE
14   NICOLETTE CRONE, et al.,      )
15           Plaintiffs,          )
16           vs.                  ) CV 400432
17   PFIZER, INC., et al.,         )
18           Defendants.          )
19   2/4/09  Job No.: 183060
20        9:16 a.m.
21        The videotaped deposition of ROBERT D.
22   GIBBONS, Ph.D., resumed pursuant to adjournment at
23   Suite 533, 506 West Harrison Street, Chicago,
24   Illinois.
```

353

```
 1   PRESENT:
 2        LAW OFFICES OF JACK LONDON,
 3        (3701 Bee Cave, Suite 200,
 4        Austin, Texas 78746,
 5        512-478-5858), by:
 6        MR. JACK LONDON,
 7        jlondon@texas.net,
 8        -and-
 9        FINKELSTEIN & PARTNERS, LLP,
10        (463 Robinson Avenue,
11        Newburgh, New York 12550,
12        800-634-1212), by:
13        MR. KEITH L. ALTMAN,
14        kaltman@lawampmmt.com,
15        -and-
16        THE LANIER LAW FIRM,
17        (6810 FM 1960 West,
18        Houston, Texas 77069,
19        713-659-5200), by:
20        MR. KENNETH S. SOH,
21        kss@lanierlawfirm.com,
22        appeared on behalf of the Plaintiffs;
23
24
```

354

```
 1   PRESENT: (Continued)
 2        SHOOK, HARDY & BACON, L.L.P.,
 3        (2555 Grand Boulevard,
 4        Kansas City, Missouri 6108-2613,
 5        816-474-6550), by:
 6        MS. LORI CONNORS McGRODER,
 7        lmcgroder@shb.com,
 8        appeared on behalf of the Defendants;
 9
10        LAW OFFICES OF STEVEN D. HILLYARD, PC,
11        (345 California Street, Suite 1770,
12        San Francisco, California 94104,
13        415-334-6880), by:
14        MR. GERHARD O. WINKLER,
15        appeared telephonically on behalf of
16        Defendant Raymond D. Jennings, M.D.
17
18   VIDEOTAPED BY:
19        MR. JAMES PIERDZIOCH, Veritext Chicago
20        Reporting Company.
21
22
23   REPORTED BY:  ANDREA L. CARTER,
24        Illinois CSR No. 84-3722.
```

355

```
 1        THE VIDEOGRAPHER:  My name is James Pierdzioch
 2   of Veritext.  The date today is February 4th, 2009,
 3   and the time is 9:16 a.m.  This deposition is being
 4   held at the Holiday Inn located at 506 West Harrison
 5   Street in Chicago, Illinois.
 6        The captions for this case are Neurontin
 7   Marketing Sales Practices and Products Liability
 8   Litigation in the United States District Court,
 9   District of Massachusetts, and Nicolette Crone, et
10   al. versus Pfizer Incorporated, et al. in the
11   Superior Court of the State of California for the
12   County of Lake.
13        This is the day two deposition of Robert
14   Gibbons, Ph.D.  At this time the attorneys will
15   please identify themselves for the record.
16        MR. ALTMAN:  Keith Altman on behalf of
17   Nicolette Crone and the Crone plaintiffs.
18        MR. LONDON:  Jack London on behalf of the MDL
19   product liability plaintiffs.  Also here but out of
20   the room for a moment is Ken Soh also with the
21   plaintiffs' product liability MDL group.
22        MS. McGRODER:  Lori McGroder on behalf of
23   Pfizer.
24        MR. WINKLER:  Gary Winkler on behalf of
```

360

1  submitted some items to counsel and some items
2  didn't exist, correct?
3      A.   I believe so.
4      Q.   Dr. Gibbons, the pile you see in front of
5  you represents the sum total of the materials unique
6  to you that plaintiffs have received in this case.
7      MS. McGRODER:  Well, I -- I object to that
8  representation.
9      MR. ALTMAN:  Well, are there --
10     MS. McGRODER:  He has no idea to know whether
11 that's correct.
12     MR. ALTMAN:  I'm representing to him that
13 that's what's been produced.
14 BY MR. ALTMAN:
15     Q.   Are there other materials that you gave
16 to counsel that are not in the pile that you see in
17 front of you?
18     MS. McGRODER:  Well, I object to that, Keith,
19 because there are documents that we have given --
20 that Dr. Gibbons has received that we have given you
21 separately.  If you are asking him --
22     MR. ALTMAN:  I'm talking about in terms of -- I
23 am not talking about documents that were produced to
24 Dr. Gibbons.  I'm talking about correspondence

362

1  saved those.  They weren't of a substantive nature.
2  Any substantive nature conversations were held on
3  the telephone.
4      Q.   So it's your representation there is
5  nothing substantive ever discussed in an e-mail
6  between you or counsel or counsel and you?
7      A.   That's correct.
8      Q.   Do you have the -- when you -- how did
9  you send the draft -- the submitted version of your
10 paper to counsel?
11     A.   I sent that as an e-mail.
12     Q.   Okay.  Do you have that e-mail?
13     A.   I don't retain e-mails that I have sent.
14     Q.   So you don't think that -- okay.  All
15 right.  We will come back to that.
16     Dr. Gibbons, Exhibit 25 has just been
17 produced to us is your invoices associated with the
18 Neurontin case, and I believe the first invoice here
19 is dated November 1st of 2008; is that correct?
20     MS. McGRODER:  Are you going in reverse
21 chronological order or --
22     MR. ALTMAN:  Well, the first invoice that I see
23 is dated April 1st of 2008.
24     MS. McGRODER:  You said November.

361

1  between Shook Hardy and Dr. Gibbons, anything along
2  those lines.
3  BY MR. ALTMAN:
4      Q.   Any other materials that you created
5  relevant to this case that you gave to counsel in
6  response to that document request.  Are there any
7  other materials?
8      For example, I think you were asked if
9  there were correspondence between you and Shook
10 Hardy.
11     Do you remember that?
12     A.   Yes.
13     Q.   I think you said there was some?
14     A.   Yes.
15     Q.   Do you see that -- any of that
16 correspondence in the pile over here?
17     A.   The majority of the correspondence that I
18 recall was via telephone.
19     Q.   Okay.  Was there any written
20 correspondence between you and counsel?
21     A.   Not to my knowledge beyond what's here.
22     Q.   So you sent no e-mails back and forth at
23 any time?
24     A.   There were occasional e-mails.  I haven't

363

1      MR. ALTMAN:  Did I say November?  I apologize.
2  I meant April.
3  BY THE WITNESS:
4      A.   These are all of my invoices.  These all
5  include invoices on the sales and marketing case of
6  which you guys -- of which this deposition is not
7  about.
8  BY MR. ALTMAN:
9      Q.   Understood.  I'd just like to sum up the
10 total of these numbers.
11     The first invoice is for $13,500,
12 correct?
13     A.   Correct.
14     Q.   The next invoice dated April 23, 2008 is
15 for $26,000, correct?
16     A.   That's correct.
17     Q.   By the way, before we get to that, the
18 first invoice was that work for work in this case?
19     MS. McGRODER:  You mean the -- you mean the --
20     MR. ALTMAN:  In the products liability case.
21 BY THE WITNESS:
22     A.   Yes.
23 BY MR. ALTMAN:
24     Q.   Okay.  The next invoice for $26,000 dated

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

440

1  MS. McGRODER:  As he sits right at this
2  moment?
3  MR. ALTMAN:  As he sits here right now.
4  BY THE WITNESS:
5  A.  I have nothing planned at this moment.
6  BY MR. ALTMAN:
7  Q.  By the way, I just want to -- you said
8  Dr. Hur helped you with the programs for both the
9  bipolar study and the gabapentin study, correct?
10  A.  That's correct.
11  Q.  Did you pay Dr. Hur for his help -- for
12  his assistance with you on the gabapentin study?
13  A.  For the gabapentin study, yes, I did.
14  Q.  Okay.  How much did you pay Dr. Hur for
15  that?
16  A.  I don't remember how much.
17  Q.  Do you have records for that?
18  A.  I might.
19  Q.  Okay.  We request that -- did you pay him
20  personally, or did you pay him out of your
21  corporation?
22  A.  Out of my corporation.
23  MR. ALTMAN:  Okay.  We request that we get
24  information associated with how much Dr. Hur had

441

1  been paid for his work in the gabapentin study.
2  MS. McGRODER:  Your request is noted.
3  BY MR. ALTMAN:
4  Q.  How does it work with -- for the bipolar
5  study and the grants and everything like that, is
6  there an actual -- does the grant go to the
7  university, and you just kind of just do work and
8  the grant funds part of your work, or is there an
9  actual transfer of funds from some -- you know, bank
10  account -- does the grant send you some money, you
11  put it in a bank account, and then as you expend
12  work under the grant, you just withdraw funds out of
13  that and give it to the university?
14  How does that work?
15  A.  The grant is to the university, and the
16  university pays my salary, and there are, you know,
17  objectives and pays the salary of Dr. Hur and my
18  co-investigators, but the money goes directly to the
19  university.
20  Q.  Do you have to account for how much time
21  you spend working on, you know, something that falls
22  under the umbrella of a particular grant?
23  A.  There's no like time sheet kind of thing
24  or anything like that.  There's a proposal and the

442

1  proposal, you know, lists various percent efforts
2  for members of the grant, and they are usually gross
3  underestimates, and, you know, we do the work.  And,
4  you know, the National Institute of Health is either
5  happy based on our productivity or not happy.
6  Generally for our work, they are pretty happy.
7  Q.  Now, if you wanted to use an outside
8  individual to assist in a grant, would you -- would
9  they wind up getting some money from your university
10  going to that other person's university?
11  A.  An example of that would be we have a
12  subcontract with the University of South Florida to
13  pay for time and travel and support for Dr. Brown on
14  our suicide grant, both on the current suicide grant
15  and the original R-56 grant.
16  Q.  Okay.  I'd like you to pull out your
17  original declaration which is I believe Exhibit 8.
18  I believe it's Exhibit 8.
19  At the bottom of page 3 -- we are not
20  going to look at page 1 and 2 -- would you please
21  read in the first sentence of the paragraph at the
22  bottom?
23  A.  "Our best estimate of the ratio of the
24  probability of suicidality for patients treated with

443

1  gabapentin to those treated with placebo is a ratio
2  of 1.033 indicating no increased risk of suicidality
3  with gabapentin at a confidence level" --
4  MS. McGRODER:  Just for the court reporter,
5  slow down.
6  BY THE WITNESS:
7  A.  Oh, I'm sorry.  -- "in excess of 99.9
8  percent."
9  BY MR. ALTMAN:
10  Q.  Now, you didn't qualify when you said
11  "our best estimate."  That is just taking the
12  submission to the FDA by Pfizer at face value?
13  I mean, you didn't actually look to see
14  whether that -- whether they should have included
15  all those studies, whether that was the right way to
16  do it, whether you have should included -- gone to
17  patient years or any of that when you said that,
18  correct?
19  MS. McGRODER:  Object to form.
20  BY THE WITNESS:
21  A.  That was my estimate based on the data
22  that were submitted to the FDA by Pfizer.
23  BY MR. ALTMAN:
24  Q.  Is that the best estimate that you could

508

1  diagnosis and the first treatment of gabapentin,
2  there are 213 patient years for the 1229 people,
3  correct?
4      A.  That's correct.
5      Q.  And there are 1,016 patient years of
6  exposure to gabapentin, correct, after that?
7      MS. McGRODER:  Object to form.
8  BY THE WITNESS:
9      A.  There's 1,016 person years of
10 gabapentin -- person years following the initiation
11 of gabapentin monotherapy with respect to the other
12 ten AEDs and lithium through the end of the what
13 turns out to be I believe 359-day follow up.
14 BY MR. ALTMAN:
15     Q.  And we talked about yesterday where you
16 used 359 and 360.
17         Within the precision of these kinds of
18 studies, that's not going to change results,
19 correct?
20     A.  I would agree with that.
21     Q.  Okay.  I'm a little confused.
22         Are you saying there's a thousand six --
23 there's 1,016 patient years leftover or there's
24 1,016 patient years of gabapentin exposure in

509

1  these -- we are only talking about these 1229
2  people, not any other people.  So we don't have to
3  qualify everything.
4          The 1,016 person years, is that the
5  person years of exposure on gabapentin?
6      A.  That's the person years of exposure after
7  the first initiation of gabapentin.  So it's not the
8  amount of exposure to gabapentin in terms of, you
9  know, number of pills prescribed or anything.  It's
10 the number of person years following the initiation
11 of gabapentin monotherapy.
12         That person could have been on gabapentin
13 or could have been prescribed gabapentin for one day
14 or 30 days or continuously throughout that same
15 period, and in this analysis that would be treated
16 all equally.
17     Q.  Why would you treat that all equally?
18     A.  Because the -- and, again, we have done
19 sensitivity analyses that took at it in different
20 ways, but the primary analysis here was comparing
21 the risk of suicide attempt before and after the
22 initial exposure to a particular antiepileptic drug
23 knowing that there may be a very short period of
24 time after the initiation of treatment and some kind

510

1  of suicidal behavior.
2          So requiring, for example, 30 days of
3  exposure.  If there was a suicide attempt prior to
4  30 days, that wouldn't be counted.  So we wanted to
5  cast the widest net and indicate any exposure to the
6  drug followed up by a suicide attempt irrespective
7  of the length of that exposure.
8          Sensitivity analyses we have also looked
9  at the density of the exposure, whether or not you
10 have been on gabapentin, you know, from month to
11 month, and how does that relate to the likelihood of
12 a suicide attempt using the number of pills data,
13 but for this analysis, it's before and after the
14 initial exposure.
15     Q.  You say you did that sensitivity
16 analysis?
17     A.  Yes.
18     Q.  Where is it?
19     A.  I, you know, have it around someplace.
20     MR. ALTMAN:  Okay.  I asked that that be
21 produced.
22     MR. LONDON:  To be -- to be clear -- I'm
23 sorry -- the sensitivity analysis is not in the
24 manuscript?

511

1      THE WITNESS:  No, it's not at this point.
2  I've -- I mean, I have continued to -- for academic
3  purposes and for the purpose of preparing -- you
4  know, anticipating requested revisions to this
5  manuscript for publication, that there will be a
6  series of other issues raised, and some of those
7  issues have been raised to questions when I
8  presented this.
9          I had some really good questions when I
10 presented this at Harvard, and so I have been
11 interested in pursuing this, not so much in the
12 context of this litigation, but in the context of
13 this paper and in the context of proposing these --
14 this methodology for other applications.
15     MR. LONDON:  I apologize for the interjection
16 and clarification.  Thank you.  Thank you, Lori, for
17 letting me do that.
18 BY MR. ALTMAN:
19     Q.  So on this line over here, you have 13
20 attempts before -- you have 13 attempts before -- in
21 the period between the date of bipolar diagnosis and
22 the initiation of therapy, and then 13 attempts
23 after that, correct?
24     A.  That's correct.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

532

1    implemented, and we went through them to such a
2    degree so that we were able to find confidence that
3    that, in fact, was the case.
4        I then supplemented that by redoing these
5    in Fortran, and as I have said, I will share those
6    with counsel and the associated ASCII files which
7    they read.
8        So having said that, you know, I can -- I
9    can give it my best shot, but I can't tell you that
10    you will ask me a question and I will go -- it might
11    take a long time to try and figure it out, and I
12    might not be able to answer it for you.
13        MR. ALTMAN: Objection, non-responsive.
14    BY MR. ALTMAN:
15    Q.    My question to you was: Would Dr. Hur be
16    in a better position to discuss these SAS programs
17    than you would?
18        MS. McGRODER: Well, objection to form and
19    foundation, and he already answered that question,
20    asked and answered.
21        MR. ALTMAN: He did not.
22    BY MR. ALTMAN:
23    Q.    Would you please answer that question.
24        MS. McGRODER: He can't know whether Dr. Hur is

533

1    it in a better position until you ask him the
2    questions, and he gives you the answers. I mean,
3    how can he know that --
4        MR. ALTMAN: Would you answer -- Lori, you are
5    coaching the witness now. You are not allowed to do
6    that --
7        MS. McGRODER: No, he answered your question.
8        MR. ALTMAN: No, he did not. I asked him would
9    Dr. Hur be in a better position to discuss the SAS
10    programs.
11        MS. McGRODER: Well, my objection is --
12        MR. ALTMAN: He told me --
13        MS. McGRODER: -- there is no foundation for
14    him to answer that question until you ask the
15    questions.
16        MR. ALTMAN: That's fine.
17    BY MR. ALTMAN:
18    Q.    Would Dr. Hur be in a better position to
19    discuss these SAS programs than you?
20    A.    You know, it depends on what part of the
21    programs that you are describing. As I have
22    testified, Dr. Hur had the primary role of writing
23    those programs. Authors are always, you know,
24    closest to their code, but everything that's in the

534

1    code is based on -- on direction that Dr. Hur
2    received from me.
3        So I should be, you know, in reasonably
4    good stead to -- stead -- I am not sure that's even
5    a word. I should be able to -- to review them with
6    you, if you would like.
7    Q.    Still not answering my question. Would
8    Dr. Hur be in a better position to discuss these
9    programs?
10        MS. McGRODER: Object to form and foundation,
11    asked and answered. He cannot answer that question.
12    He can't know until you ask --
13    BY MR. ALTMAN:
14    Q.    Did you rely on Dr. Hur to write these
15    programs as opposed to yourself?
16    A.    Dr. Hur wrote the programs, that's
17    correct.
18    Q.    Would it have been as easy for you to
19    write these programs as Dr. Hur?
20    A.    He has more expertise in using SAS than I
21    do.
22    Q.    Do you routinely rely upon Dr. Hur to
23    write your SAS programs in projects that you work on
24    together?

535

1    A.    Yes, I do.
2    Q.    Is there a time where you would write the
3    program as opposed to Dr. Hur?
4    A.    Well, which program are you talking
5    about?
6    Q.    Is there -- can you think of instances
7    where you and Dr. Hur have collaborated on papers
8    where you wrote the SAS programs instead of Dr. Hur
9    writing the SAS programs?
10    A.    If you are just talking upon SAS
11    programs, then I would rely upon Dr. Hur to do that.
12        MR. ALTMAN: Okay. Let's mark as the next two
13    exhibits -- well, let's mark as -- this exhibit
14    first whatever the next number is 29.
15        (WHEREUPON, a certain document was
16        marked Gibbons Deposition Exhibit
17        No. 29, for identification, as of
18        2/4/09.)
19    BY MR. ALTMAN:
20    Q.    Now, Dr. Gibbons, if you would please
21    pull -- it's probably Exhibit No. 5 which was the
22    listing of the contents of the CD. It's the next
23    one right there.
24        You see that there are several files at

544

```
1    see this, to -- to leave out any important pieces of
2    information, but if I did inadvertently, I can
3    certainly correct that.
4        Q.   And -- and you do realize that not having
5    that file would essentially keep these programs from
6    executing, correct?
7        A.   I'm assuming the programs will execute by
8    themselves, but if you are missing one of the
9    intermediate files, you know, it's going to -- it's
10   going to crash. So, you know, you would need that
11   file, and, again, it was not -- if I have excluded
12   something.
13       I do know that cmed was one of the
14   programs that gets created by one of the SAS
15   programs. If I've left that out, I apologize. It
16   wasn't my intention to do so.
17       Q.   And -- and I believe you didn't do it
18   intentionally, but, Dr. Gibbons, do you understand
19   that a lot of time and effort goes into reviewing
20   the information that you have provided?
21       MS. McGRODER: Objection, you don't have to
22   answer that. What is this going to be a lecture on
23   why --
24       MR. ALTMAN: No, it's not going to be -- it's
```

545

```
1    not going to be a lecture, Lori.
2    BY MR. ALTMAN:
3        Q.   Do you understand that a lot of time and
4    effort is spent reviewing the information you
5    provided?
6        MS. McGRODER: Objection, he has no idea how
7    much time you spend. You don't have to answer that.
8    There's no foundation --
9    BY MR. ALTMAN:
10       Q.   Are you going to answer --
11       MR. ALTMAN: Are you instructing him --
12       MS. McGRODER: No, I'm instructing him not to
13   answer.
14       MR. ALTMAN: I don't know that you can.
15       MS. McGRODER: I am.
16       MR. ALTMAN: Okay. Well, you can't.
17   BY MR. ALTMAN:
18       Q.   Are you going to follow your lawyer's
19   advice?
20       MS. McGRODER: Well, I'm not his lawyer --
21       MR. ALTMAN: Okay. That's right. You are not
22   his lawyer.
23       MS. McGRODER: -- and I am instructing him as a
24   witness that I am representing in this -- on behalf
```

546

```
1    of a client that I represent in this deposition not
2    to answer that question. So you can move on.
3    BY MR. ALTMAN:
4        Q.   Are you going to abide by her
5    instruction?
6        A.   I like her more.
7        Q.   What I'm getting at, Dr. Gibbons, is that
8    on at least two or three times today we have
9    discovered that there is information concerning your
10   analyses with Neurontin that have not been provided.
11       MS. McGRODER: Well, I object to that. I don't
12   even think that's accurate.
13       MR. ALTMAN: Well, all the sensitivity -- were
14   the sensitivity analyses provided?
15       MS. McGRODER: Keith, I didn't even know about
16   the sensitivity analysis until yesterday.
17       MR. ALTMAN: Lori, I'm not -- no, Lori --
18       MS. McGRODER: At the end of this deposition,
19   you can list all the things you want, and we'll try
20   to get them --
21       MR. ALTMAN: Lori, I'm going to ask my
22   question. Stop coaching the witness.
23       MS. McGRODER: No, I am not going to let him
24   answer --
```

547

```
1        MR. ALTMAN: Lori -- Lori --
2        MS. McGRODER: -- about your litigation
3    document production issues.
4        MR. ALTMAN: -- Lori, that's enough now. Do we
5    need to call the Court?
6        MS. McGRODER: Yeah, go ahead and call the
7    Court.
8        MR. ALTMAN: That's fine.
9    BY MR. ALTMAN:
10       Q.   Dr. Gibbons, what I'm asking you is on at
11   least several times today you have identified
12   materials that have -- I'm not suggesting that was
13   done intentionally but was not identified to
14   counsel, was not identified to us.
15       And so what I am asking you is to take
16   some time and think is there any other materials on
17   anything having to do with Neurontin and these
18   calculations and these studies and your expert
19   reports that you may have forgotten in the past that
20   may be existing on a hard drive. And I'm asking if
21   you can't remember it, that when you go back today,
22   you make a diligent search through your materials to
23   see if there are other stuff.
24       MS. McGRODER: I object to the form of that
```

688

1　Is responsive to your requests, and I have not
2　disputed that one time.
3　　　So I think that is a waste of your
4　deposition time to be asking Dr. Gibbons to respond
5　to your legal argument about whether your document
6　production request has been satisfied.
7　　　MR. ALTMAN:  That's fine.
8　　　Let's mark the next exhibit.
9　　　　(WHEREUPON, a certain document was
10　　　　marked Gibbons Deposition Exhibit
11　　　　No. 35, for identification, as of
12　　　　2/4/09.)
13　BY MR. ALTMAN:
14　　Q.　Dr. Gibbons, you have just been handed
15　what I believe is Exhibit 35 which is titled
16　"Declaration of Dr. Robert D. Gibbons."
17　　　Did I read that correct?
18　　A.　Yes.
19　　Q.　Have you seen this document before?
20　　A.　Right now I have seen so many documents I
21　can't remember what I have seen and what I haven't
22　seen. I believe so. I signed it.
23　　Q.　And this is dated I believe the 21st day
24　of January; is that correct, right above your

689

1　signature?
2　　A.　Yes.
3　　Q.　Okay. Did you write this declaration or
4　was it written for you and given to you to sign?
5　　　MS. McGRODER:  Object to form and foundation.
6　BY THE WITNESS:
7　　A.　I know I have seen it, and I've gone over
8　it in some detail.
9　BY MR. ALTMAN:
10　　Q.　Not my question. Did you write this
11　document?
12　　A.　I wrote portions of it.
13　　Q.　Okay. Did you then e-mail it to counsel?
14　　A.　I believe so.
15　　Q.　Do you have copies of those e-mails?
16　　A.　No, I don't keep copies of my outgoing
17　e-mails.
18　　Q.　Did counsel in this case ever suggest to
19　you that maybe you should send e-mails that are
20　correspondence between you and outgoing counsel and
21　that one day might be asked to produce those?
22　　A.　No.
23　　Q.　Counsel never suggested to you that you
24　save all of your e-mails between counsel and you,

690

1　either in or out?
2　　A.　I don't recall having that conversation.
3　I mean, the majority of our communication has been
4　via the telephone.
5　　Q.　But there have been e-mails sent back and
6　forth, correct?
7　　A.　There have been, yes.
8　　Q.　Okay. I'd like you to go to item No. 6.
9　I'd like you to read item No. 6 into the record.
10　　A.　"I have provided to counsel for
11　defendants all materials requested by plaintiffs on
12　which I relied in conducting the
13　pharmacoepidemiologic study of whether there is an
14　association between Neurontin and suicide attempt.
15　I have also produced all materials requested by the
16　plaintiffs in their letter of November 12, 2008, on
17　which my co-authors and I relied in preparing the
18　Manuscript. It is my understanding that defense
19　counsel has provided all of these materials to the
20　attorneys for the plaintiffs."
21　　Q.　In light of what we have discussed today,
22　that's not a true statement, correct?
23　　　MS. McGRODER:  I object. That -- that is
24　misleading and improper cross-examination, and you

691

1　don't have to answer that question.
2　　　MR. LONDON:  Yes, he does. I mean --
3　　　MS. McGRODER:  No, no, he doesn't.
4　　　MR. ALTMAN:  Yes, he does.
5　　　MR. LONDON:  He issued an affidavit under
6　oath --
7　　　MS. McGRODER:  Because he found out today that
8　there was a piece of data missing off of that disk
9　which he didn't know about --
10　　　MR. ALTMAN:  Excuse me. A piece of data? The
11　Fortran analyses --
12　　　MS. McGRODER:  Wait. Let's do this on the
13　record. If you want to do this on the record, the
14　Fortran were not relied upon by Dr. Gibbons in
15　preparing his manuscript but --
16　　　MR. ALTMAN:  Okay.
17　　　MS. McGRODER:  Wait, wait. No, no, let me
18　finish, but there are not identified.
19　　　MR. ALTMAN:  Don't you ever raise your voice at
20　me.
21　　　MR. LONDON:  Stop it.
22　　　MS. McGRODER:  But they are not -- but they are
23　not --
24　　　MR. ALTMAN:  Lori.

696

1    will conclude it for today.  He is not answering
2    that question.  That question is improper, and I
3    won't allow him to answer it.  If you want to ask a
4    legitimate question, we can continue.
5        MR. LONDON:  Well, you are not the judge of a
6    legitimate question.  You don't get to call that
7    shot.  The rules for that, Lori --
8        MS. McGRODER:  You can -- you can criticize my
9    characterization, but he is not answering that
10   question.
11   BY MR. ALTMAN:
12       Q.  Fine.  Dr. Gibbons, would you please go
13   in Exhibit 2 to point 3.
14           Would you please read that for the
15   record.
16       MS. McGRODER:  Objection, asked and answered.
17   We did this yesterday.
18       MR. ALTMAN:  Good, we are going to do it again.
19   BY THE WITNESS:
20       A.  "Plaintiffs demand all documents
21   associated" --
22       Q.  I'm sorry?
23       A.  -- "with retention of Dr. Gibbons by the
24   defendants."

697

1        Q.  I'm sorry.  On the second page.  We are
2    talking about the study now, the bipolar study.
3        A.  "Plaintiffs demand all documents and
4    underlying data that pertain to the aforementioned
5    study, Gibbons, et al. (2008)."
6        Q.  Was there anything in that sentence that
7    says the word relied upon?
8        MS. McGRODER:  I object to this question.  He's
9    never even seen -- he has never even seen this
10   letter --
11       MR. ALTMAN:  Lori --
12       MS. McGRODER:  -- this is legal --
13       MR. ALTMAN:  Lori, stop coaching the witness.
14       MS. McGRODER:  It's not about --
15       MR. ALTMAN:  Lori, you are coaching the
16   witness.  I have asked him a simple question.
17   BY MR. ALTMAN:
18       Q.  Does the word relied upon exist anywhere
19   in point 3?
20       MR. ALTMAN:  The man can read --
21       MS. McGRODER:  And I --
22       MR. ALTMAN:  -- he is a biostatistician.
23       MS. McGRODER:  And I object to you --
24       MR. ALTMAN:  That's nice.

698

1        MS. McGRODER:  -- asking him questions about
2    legal communications --
3        MR. ALTMAN:  Lori --
4        MS. McGRODER:  -- between you and me.
5        MR. ALTMAN:  -- that's fine.  He put in his
6    declaration that he complied --
7        MS. McGRODER:  I didn't say he couldn't answer
8    the question.  Stop your argument and let him answer
9    it.  I'm putting my objection on the record.
10       MR. ALTMAN:  That's fine.  Your objection is
11   noted.
12       MS. McGRODER:  If you can answer the
13   question --
14       MR. ALTMAN:  Now stop.
15       MS. McGRODER:  -- I can make the objection, and
16   he can answer that question.
17   BY MR. ALTMAN:
18       Q.  Dr. Gibbons, does the word relied upon
19   exist anywhere in there?
20       THE COURT REPORTER:  Wait one second.
21       MR. LONDON:  Are you worn out?
22       THE COURT REPORTER:  Okay.  Go ahead.
23   BY THE WITNESS:
24       A.  The word relied upon does not exist in

699

1    sentence -- in bullet No. 3 on page 2 of Exhibit 2.
2            However, in answering your question, I
3    believe I did a very reasonable job of giving you
4    materials.  I know I have not given the raw data
5    files and all of the SAS files, and I understand
6    that there may be a SAS file or two that maybe
7    didn't make it into it, and I apologize for that.
8            It wasn't my intention to do that.  I
9    didn't try to trip you up in any way.  If you had
10   asked for it prior to this, I would have, you know,
11   made sure that it was there.  You could have said to
12   opposing counsel, you know, we are trying to
13   recreate the cmed dataset, and I can't find it in
14   here.  Could Dr. Gibbons go back and see if that's
15   being created in another file, and I certainly would
16   have done that, and I would have given it to you.
17           I relied upon the -- and I know that word
18   isn't in here, but I'm just trying to be as honest
19   with you as I can -- the SAS output to build the
20   paper.  The paper was submitted.  The reference to
21   that paper is the paper that was submitted for
22   publication.  It's a part of my academic work.  I
23   have been doing further sensitivity analyses, and I
24   will use those -- those antiepileptic data hopefully

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

708

1    had some of these sensitivity analysis, correct?
2        A.  Probably -- you know, I don't know the
3    exact dates.  I don't know if a letter of November
4    12 or when they were actually finished, but, you
5    know, this is -- this is in an area that's, you
6    know, close to the center of my current research,
7    and it's not motivated by this -- by this
8    litigation.
9            It's motivated by trying to develop
10   better tools for drug surveillance and safety, and I
11   will continue to think about it after this case is
12   over, and in some ways I'm thankful to this case
13   because it has given me some practical experience
14   with this and an opportunity to look at other kinds
15   of datasets.
16       Q.  Had you ever seen Exhibit 2 before?  And
17   when I say "before," before this deposition started
18   yesterday.
19       A.  I can't answer that yes or no.  It
20   doesn't ring a bell.  You know, I may have seen it,
21   but it doesn't ring a bell.
22       Q.  Do you see at the bottom in your
23   declaration on page 2: "I have also produced all
24   materials requested by plaintiffs in their letter of

709

1    November 12, 2008."
2            If you hadn't seen the letter, how could
3    you make that statement?
4        A.  Well, I just said --
5        MS. McGRODER:  Objection.
6    BY THE WITNESS:
7        A.  I just said that I don't know that -- I
8    don't remember did I see this letter or not.  You
9    know, I know what was asked of me by counsel to
10   produce for you, and I tried to do that in the best
11   faith possible.  And these issues -- I may have had
12   the letter, and we went over it point by point or
13   maybe Lori read the letter to me over the telephone
14   and said, you know, these are the things that they
15   are looking for.  Can you provide these.  And I
16   said, yeah, the easiest way for me to provide it is
17   why don't I just give them the entire PharMetrics
18   database as I received it and give them all the
19   programs that I used to analyze it and, you know,
20   what could be better.
21           And she said, yeah, that should work, and
22   I remember her telling me, you know, I'm -- I'm very
23   big on -- I don't know if you call it -- what the
24   right term is discovery, whatever.  You know,

710

1    whatever it is you did, just give it to them.
2        Q.  Did you -- then I think -- did you review
3    this letter in writing -- when you wrote your
4    declaration here on January 22, 2009 just about 12
5    days ago?
6        A.  I have already told you I don't remember
7    writing -- reading this letter, you know, in
8    particular or -- and I also told you that I, you
9    know, edited this.  I didn't write the whole thing.
10       Q.  You understand that the judge, in fact,
11   granted the defendants' motion to quash the
12   depositions of your three co-authors, correct?  Are
13   you aware of that?
14       MS. McGRODER:  Objection, asked and answered.
15   And you know what, I'm not going to allow him to
16   ask -- to ask --
17       MR. ALTMAN:  I'm asking did he know.
18       MS. McGRODER:  But you just asked him that, and
19   he said, yes, he did know.
20       MR. ALTMAN:  Did he know that the judge granted
21   the motion?
22       MS. McGRODER:  I don't know about that, but
23   this is all legal argument, Keith.
24       MR. ALTMAN:  No, it's not legal argument, Lori.

711

1        MS. McGRODER:  If you want to -- you know what
2    discovery you want.  You've asked him all the
3    questions about the discovery.  Asking him about the
4    Court's ruling on a motion is irrelevant.  It's
5    improper.
6        MR. ALTMAN:  Lori, thank you.
7    BY MR. ALTMAN:
8        Q.  Were you aware that the judge granted the
9    motion quashing the depositions?
10       A.  Yes, I was told that.
11       Q.  Okay.  And were you aware that that was
12   done in part based upon your declaration?
13       A.  I hope so.
14       MR. ALTMAN:  Let's mark the next exhibit.
15           (WHEREUPON, a certain document was
16           marked Gibbons Deposition Exhibit
17           No. 36, for identification, as of
18           2/4/09.)
19   BY MR. ALTMAN:
20       Q.  Dr. Gibbons, I have handed you what's
21   been marked as Exhibit 36.  At the top it's titled
22   "Computer Retrieval of Information on Scientific
23   Projects," CRISP.
24           Have you ever heard of this system

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

728

1    A.  Yes.
2    MS. McGRODER:  Objection.  I object on grounds
3  of foundation to any questions for these documents
4  that he has never seen.  You can still answer.
5  BY MR. ALTMAN:
6    Q.  Do you know whether that is a true
7  statement other than what Dr. Hur has written here?
8    MS. McGRODER:  Object on form and foundation.
9  BY THE WITNESS:
10   A.  I don't understand your question.
11  BY MR. ALTMAN:
12   Q.  Do you have any independent basis for
13  knowing the truth of point 14 other than what
14  Dr. Hur wrote here?
15   MS. McGRODER:  Object to form and foundation.
16  BY THE WITNESS:
17   A.  I mean, I have worked with Dr. Hur, and I
18  know that all of the analyses that were conducted
19  in -- relating to either the gabapentin cohort or
20  the bipolar cohort were all done under my direction.
21   He didn't initiate these analyses.  He
22  didn't design those analyses.  He helped in the
23  writing of the SAS code to implement the analyses
24  that I envisioned and oversaw, and to make sure that

729

1  they were accurate, I went through the painstaking
2  task of writing the Fortran programs to reproduce
3  the results.  So I don't think that he has anything
4  to add above and beyond what I have told you and
5  what questions I can answer for you.
6    MS. McGRODER:  How much time is left?
7  BY MR. ALTMAN:
8    Q.  Point 15 it says:  "I do not possess any
9  knowledge concerning Dr. Gibbons' supplemental
10  expert report submitted in this litigation."
11   Did I read that correctly?
12   MS. McGRODER:  Objection to form and
13  foundation.
14  BY THE WITNESS:
15   A.  It looks like you read it correctly.
16  BY MR. ALTMAN:
17   Q.  Okay.  He did, though, in fact, work on
18  the gabapentin analysis, correct?
19   A.  He helped me with the gabapentin
20  analysis, but he never saw any of my expert reports
21  or supplemental reports and was not involved in
22  writing those reports or reviewing those reports and
23  never had any knowledge of those reports.
24   MS. McGRODER:  Okay.  The deposition is over.

730

1    MR. ALTMAN:  That's fine.
2    THE VIDEOGRAPHER:  Okay.  This concludes day 2.
3  The time is 5:59 p.m.  We are off the record.
4    (WHEREUPON, the deposition was
5    concluded at 5:59 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

731

1    IN THE UNITED STATES DISTRICT COURT
2    DISTRICT OF MASSACHUSETTS
3  IN RE; NEURONTIN et al.,    )
4    ) MDL DOCKET
5  BULGER vs. PFIZER, et al.,    ) No. 1629
6    ) MASTER FILE
7  SMITH vs. PFIZER, et al.,    ) No. 04-10981
8  05-CV-11515-PBS    )
9    I hereby certify that I have read the
10  foregoing transcript of my deposition given at the
11  time and place aforesaid, consisting of Pages 352 to
12  730, inclusive, and I do again subscribe and make
13  oath that the same is a true, correct and complete
14  transcript of my deposition so given as aforesaid,
15  and includes changes, if any, so made by me.
16
17
18    ROBERT D. GIBBONS, Ph.D.
19
20
21  SUBSCRIBED AND SWORN TO before me
22  this    day of    , A.D. 200 .
23
24    Notary Public

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
3/5/2009

735

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           DISTRICT OF MASSACHUSETTS
 3   IN RE; NEURONTIN            )
 4   MARKETING SALES PRACTICES   )
 5   & PRODUCT LIABILITY         )
 6   LITIGATION,                 )
 7                      ) MDL DOCKET
 8   BULGER vs. PFIZER, et al.,  ) No. 1629
 9                      ) MASTER FILE
10   SMITH vs. PFIZER, et al.,   ) No. 04-10981
11   05-CV-11515-PBS             )
12   SUPERIOR COURT OF THE STATE OF CALIFORNIA
13              CITY OF LAKE
14   NICOLETTE CRONE, et al.,    )
15          Plaintiffs,    )
16        vs.              ) CV 400432
17   PFIZER, INC., et al.,       )
18        Defendants.    )
19        3/5/09  Job No.: 191803
20        9:09 a.m.
21        The videotaped deposition of ROBERT D.
22   GIBBONS, Ph.D., Volume III resumed pursuant to
23   adjournment at Suite 2800, 333 West Wacker Drive,
24   Chicago, Illinois.
```

736

```
 1   PRESENT:
 2        LAW OFFICES OF JACK LONDON,
 3        (3701 Bee Cave, Suite 200,
 4        Austin, Texas 78746,
 5        512-476-5858), by:
 6        MR. JACK LONDON,
 7        jlondon@texas.net,
 8        -and-
 9        FINKELSTEIN & PARTNERS, LLP,
10        (463 Robinson Avenue,
11        Newburgh, New York 12550,
12        800-634-1212), by:
13        MR. KEITH L. ALTMAN,
14        kaltman@lawampmmt.com,
15        -and-
16        THE LANIER LAW FIRM,
17        (6810 FM 1960 West,
18        Houston, Texas 77069,
19        713-659-5200), by:
20        MR. KENNETH S. SOH,
21        kss@lanierlawfirm.com,
22        appeared on behalf of the Plaintiffs;
23
24
```

737

```
 1   PRESENT: (Continued)
 2        SHOOK, HARDY & BACON, L.L.P.,
 3        (2555 Grand Boulevard,
 4        Kansas City, Missouri 6108-2613,
 5        816-474-6550), by:
 6        MS. LORI CONNORS McGRODER,
 7        lmcgroder@shb.com,
 8        appeared on behalf of the Defendants;
 9
10        LAW OFFICES OF STEVEN D. HILLYARD, PC,
11        (345 California Street, Suite 1770,
12        San Francisco, California 94104,
13        415-334-6880), by:
14        MS. ELANA GOLD,
15        appeared telephonically on behalf of
16        Defendant Raymond D. Jennings, M.D.
17
18   VIDEOTAPED BY:
19        MR. NICK PAGE, Veritext Chicago
20        Reporting Company.
21
22
23   REPORTED BY:  ANDREA L. CARTER,
24        Illinois CSR No. 84-3722.
```

738

```
 1        THE VIDEOGRAPHER:  My name is Nick Page in
 2   association with Veritext National Court
 3   Reporting Services.  The date today is March 5,
 4   2009, and the time is 9:09 a.m.
 5        This deposition is being held in the
 6   offices of Mandell Menkes, LLC, located at 333
 7   West Wacker Drive, Chicago, Illinois.  The
 8   caption of the case is In Re:  Neurontin
 9   Marketing and Sales Practices and Product
10   Liability Litigation, Bulger versus Pfizer, et
11   al, Smith versus Pfizer, et al., 05-CV-11515-PBS,
12   MDL Docket No. 1629, Master File No. 04-10981,
13   and in the Superior Court of the State of
14   California, City of Lake, Nicolette Crone, et
15   al., plaintiffs versus Pfizer Incorporated, et
16   al, defendants, No. CV 400432.
17        The name of the witness is Robert
18   Gibbons.  This is Volume III.  At this time will
19   the attorneys please identify themselves and the
20   parties they represent.
21        MR. ALTMAN:  Keith Altman, Finkelstein &
22   Partners.  I'll be asking questions on behalf of
23   the Crone plaintiffs.
24        MR. LONDON:  Jack London, I represent Bulger
```

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

759

1  probably on about the fourth page.
2        Could you read how many people -- how
3  many records there are with 311 as a diagnostic
4  code?
5        MS. McGRODER:  Objection to foundation for
6  use of this document.
7  BY THE WITNESS:
8        A.  I have what you have listed here as
9  24,297.
10  BY MR. ALTMAN:
11        Q.  Okay.  And you could verify that once
12  again any time you wanted to, correct?
13        A.  Yes.
14        MS. McGRODER:  Well, object to form and
15  foundation.
16  BY MR. ALTMAN:
17        Q.  Dr. Gibbons, if you represented to --
18  that you accepted responsibility for the programs
19  and the data and you represented to the court
20  that you had all the knowledge necessary to
21  discuss anything about the programs and the data
22  and that we didn't need to talk to Dr. Hur or
23  anybody else, how is it that you can sit here and
24  say you can't tell whether the program is correct

760

1  or not?
2        MS. McGRODER:  Object to form.
3  BY THE WITNESS:
4        A.  I would need to go back to the
5  program, go back to the SAS manual, and determine
6  whether or not the else here -- this else if is
7  for the original if or for the entire clause.
8  BY MR. ALTMAN:
9        Q.  Was 311 -- if the code was 311, was
10  that set to MDD in this program?
11        A.  Again, I would have to go back to
12  this.  This is not how I would do this in
13  FORTRAN, and so I would have to go back and
14  verify that this was done appropriately, but this
15  syntax would be specific to SAS.
16        So I would have to verify that.  As I
17  have told you before, I'm not an expert in SAS.
18  This would not even -- this if then else
19  statement would not even execute in FORTRAN which
20  is the code that I use to verify this.  So I
21  would have to go back and verify that.
22        Q.  If that's true, then the number of
23  patients that you have assigned to the MDD group
24  and the other psychiatric indications group would

761

1  be different, wouldn't they?
2        MS. McGRODER:  Object to foundation.
3  BY THE WITNESS:
4        A.  If what's true?
5  BY MR. ALTMAN:
6        Q.  If you did not -- if it turns out that
7  for code 311 those people were not set to MDD
8  because this line didn't execute and were left as
9  other psychiatric disorder, then Table 1 in your
10  expert report would have an incorrect number of
11  patients for the MDD group and for the
12  psychiatric disorder group, correct?
13        MS. McGRODER:  Object to form and
14  foundation, assumes facts not in evidence.
15  BY THE WITNESS:
16        A.  If I'm understanding your question
17  correctly, if there was an error in the code that
18  confused major depressive disorder patients with
19  general psychiatric or other psychiatric disorder
20  patients, then that particular part of the
21  analysis of the gabapentin with respect to the
22  psychiatric indication or the MDD indication
23  would change if that error -- assuming such an
24  error has been committed, then those number would

762

1  change, of course.
2  BY MR. ALTMAN:
3        Q.  But in Table 1 in your expert report,
4  you also calculate percentages for concomitant
5  conditions.  So it would be a little more than
6  just simply changing the gab -- the MDD line and
7  the psychiatric disorder line since you
8  calculated how many percentages -- you know, what
9  percentage of the people had various different
10  conditions, correct?
11        MS. McGRODER:  Object to form and
12  foundation, assumes facts not in evidence,
13  improper hypothetical.
14  BY THE WITNESS:
15        A.  Again, if -- if what you are asking is
16  if there's an error here with respect to what is
17  designated as MDD versus what is designated as
18  other psychiatric disorders, then any entry
19  within Table 1 that referred to MDD or
20  psychiatric disorders would be incorrect to the
21  extent that this, you know, was actually an error
22  that was made.
23        It certainly wouldn't change the
24  conclusions of the study since, you know, the

775

1     With the PharMetrics database, there
2   was a table of ICD -- ICD 9 codes and the
3   descriptions, correct?
4     A.   Correct.
5     Q.   Okay.  What I have printed out for
6   you, the first page of Exhibit 42 is the listing
7   of the ICD 9 codes from the PharMetrics data that
8   match your criteria in Exhibit 29.  You can
9   verify that for yourself.
10     It's only the first page of this, but
11   you can see that Exhibit 29 says that bipolar is
12   2960 asterisk, 2961 asterisk, 2964 asterisk, 2965
13   asterisk, 2966 asterisk, and 2968 asterisk.
14     Did I read that correctly?
15     A.   I think you left out 2967 asterisk.
16     Q.   You are correct.  I left out 2967
17   asterisk.
18     With that correction, did I read
19   correctly what's in your program?
20     A.   Yes, I believe so.
21     Q.   Okay.  Does this appear to be the
22   list -- does that appear to be what's on this
23   list here?
24     A.   Well, this is a list.  I'm not sure

776

1   where it came from, but these are codes that
2   follow those prefixes, four digit prefixes.
3     Q.   Do you see 29683 listed here?
4     MS. McGRODER:  Well, I object to foundation
5   for the use of this document.
6   BY THE WITNESS:
7     A.   I don't see it listed here, but, you
8   know, again, I'm not sure exactly what all these
9   documents are.
10   BY MR. ALTMAN:
11     Q.   When you ran your code on Exhibit 29,
12   you don't actually check to see -- strike that.
13     Did you check to see whether there
14   were -- strike that, again.
15     There was a table within the
16   PharMetrics database that for each patient gave
17   the diagnoses for that patient, correct, in the
18   gabapentin cohort?
19     A.   Say that again.
20     Q.   In the PharMetrics data as produced,
21   one of the tables had all the diagnosis for each
22   patient, correct?
23     A.   That's correct.
24     Q.   Did you check to see whether there

777

1   were invalid codes in that list -- in those
2   patient diagnoses?
3     A.   I don't recall one way or the other at
4   this point.
5     Q.   And the program exhibit -- in Exhibit
6   29 does not make sure that the codes are valid,
7   correct?
8     It just uses ICD 9 codes, correct?
9     A.   The basis of the diagnosis-specific
10   analyses are the ICD 9 codes, yes.
11     Q.   And so, for example, if there was a
12   record within the actual patient diagnoses codes
13   for 29683, which is an invalid ICD 9 code, you
14   would have -- you didn't check to see if there
15   were invalid ICD codes, correct?
16     MS. McGRODER:  Object to form and
17   foundation, improper hypothetical, and assumes
18   facts not in evidence.
19   BY THE WITNESS:
20     A.   At this stage sitting here right now,
21   I cannot remember whether or not a search was
22   made for invalid ICD codes -- ICD 9 codes.  I
23   just can't remember at this point.  We did these
24   analyses some time ago.

778

1   BY MR. ALTMAN:
2     Q.   Well, the program does not search
3   against the -- does not search against the valid
4   ICD codes.  It only searches against the codes
5   that actual exist for particular patients,
6   correct?
7     MS. McGRODER:  Object to form.
8   BY THE WITNESS:
9     A.   My answer to you is I don't -- there's
10   nothing in this -- in this particular program
11   that will go through and say, you know, validate
12   the ICD codes and see whether or not, you know,
13   there's one that happens to be in the database
14   that may be an invalid one.
15     What I don't remember at this point is
16   whether or not additional searches of those data
17   were made.
18   BY MR. ALTMAN:
19     Q.   Okay.  We are going to make a little
20   side step, and then we are going to come back to
21   this.  Excuse me for one second.
22     Dr. Gibbons, when we were here the
23   last time, we talked about -- and I think you
24   even mentioned this morning that you -- parallel

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

779

1    to Dr. Hur's processing of the PharMetrics data,
2    you also processed the data and verified
3    Dr. Hur's results at least up until the point
4    that you ran any of the regression analysis,
5    correct?
6        A.    That's correct.
7        Q.    Did you start from the original
8    PharMetrics files and do all that, go step all
9    the way through the process and follow along with
10   the programs and do all of the steps that Dr. Hur
11   did?
12       A.    I used an export file from the
13   original files that Dr. Hur provided to me, and I
14   believe I provided those to you with the FORTRAN
15   programs.
16       Q.    And was that just -- was that just
17   simply a text version of the PharMetrics data
18   files, or were they in some format different than
19   the original PharMetrics data files?
20       A.    I don't recall right now, but I think
21   there was some -- some of the preprocessing of
22   the data had already been done.
23       Q.    So if there was a mistake in Dr. Hur's
24   programs prior to the extraction that he gave

780

1    you, you would have just -- you would have just
2    compounded his mistake, shall we say, for lack of
3    a better term, correct?
4        MS. McGRODER:    Object to form, foundation,
5    improper hypothetical, assumes facts not in
6    evidence, and calls for speculation.
7    BY MR. ALTMAN:
8        Q.    You can answer.
9        A.    Can I see the FORTRAN codes and have a
10   look at this so that I can answer your question?
11       Q.    Sure.  We are going to get there in
12   just a minute.
13       A.    Okay.
14       Q.    But what I was asking it's a different
15   thing.
16       You said Dr. Hur did some of the
17   processing of the data, correct, before he made
18   the extract to give you; is that correct?
19       A.    I don't remember what exactly he did
20   at that point and, you know, how close the data
21   that I used from the extract was to the original
22   PharMetrics data.  That's why I asked to see the
23   FORTRAN code.
24       Q.    Okay.  And we are going to come to

781

1    that.
2        MR. ALTMAN:    Let's mark the next exhibit.
3        (WHEREUPON, a certain document
4        was marked Gibbons Deposition
5        Exhibit No. 43, for
6        identification, as of 3/5/09.)
7        MR. ALTMAN:    Let's mark this at the same
8    time too.
9        (WHEREUPON, a certain document
10       was marked Gibbons Deposition
11       Exhibit No. 44, for
12       identification, as of 3/5/09.)
13   BY MR. ALTMAN:
14       Q.    Dr. Gibbons, you have just been handed
15   what's been marked as Exhibit 43 and 44.  43 is a
16   CD, which obviously we cannot look at right now,
17   that was provided to us by counsel which
18   represents your FORTRAN programs and your
19   FORTRAN -- the data files that you used in a
20   couple of SAS programs.
21       Exhibit 44 is a listing of what was on
22   the disk along with the file names along with the
23   dates modified and sizes.
24       Do you see that?

782

1        A.    Yes.
2        Q.    Okay.  Does this look -- does the
3    contents, Exhibit 44 look to be what you placed
4    on that disk that you sent to counsel and
5    ultimately to us?
6        A.    I believe so.
7        Q.    Okay.
8        MS. McGRODER:    Well, just so I don't have
9    keep objecting to foundation.  Is this something
10   that was printed off the disk, or is this
11   something you prepared based on your review of
12   the disk?
13       MR. ALTMAN:    Is it just a directory of
14   what's on the disk.
15       MS. McGRODER:    Because -- so it appears on
16   the disk itself?
17       MR. ALTMAN:    No, this file does not
18   appear -- this is just a listing of what appears
19   on the disk.
20       MS. McGRODER:    Okay.  That you created?
21       MR. ALTMAN:    It's a listing of what's on the
22   disk.  I mean, if you want to object that it's a
23   listing of what's on the disk.  There's no file
24   on the disk that's a listing.  Anything I print

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

835

1　to you, and then finally the last set, which I
2　think has to do with -- with this, is then, as I
3　was going through the bipolar sensitivity
4　analyses, I noticed that the results that were
5　reported to you were in people and not in person
6　years, and I wanted to see how they looked in
7　person years as well.
8　　　And so that was sent to you.  So those
9　are sort of the three waves as I recall them.
10　　Q.  All right.  I'm going to hand you
11　what's been marked as Exhibit 53 and 54 which are
12　printouts from the files you sent called bipolar
13　analysis one -- Bipolar Analysis and Bipolar
14　Analysis 2.
15　　　(WHEREUPON, a certain document
16　　　was marked Gibbons Deposition
17　　　Exhibit No. 53, 54, for
18　　　identification, as of 3/5/09.)
19　　MS. McGRODER:  Thank you.  So lithium
20　monotherapy is Exhibit 53?
21　　MR. ALTMAN:  Well, they both -- they both
22　are.  These were the two separate files.  They
23　are labeled at the bottom.  If you look at the
24　bottom, it will tell you if it was Bipolar

836

1　Analysis or Bipolar Analysis 2.
2　　MS. McGRODER:  Oh, I see.  I'm sorry.
3　Bipolar Analysis one is 53.  Okay.
4　　THE WITNESS:  And the one that's listed as
5　Bipolar Analysis 2 is 54.
6　　MS. McGRODER:  Thank you.  So I have two
7　Bipolar Analysis 2 is --
8　　MR. ALTMAN:  Correct -- no.  You have two
9　twos?  Oh, did I give Jack two ones?
10　　MS. McGRODER:  No, I have a one also.  Is
11　this just an extra?  This is not another exhibit,
12　right?  I have this (indicating).
13　　MR. ALTMAN:  Oh, I didn't give one to Jack.
14　I'm sorry.
15　　MS. McGRODER:  Okay.
16　　MR. ALTMAN:  There we go.  Now we have got
17　it straightened out.
18　BY MR. ALTMAN:
19　　Q.  Dr. Gibbons, you ran -- we are only
20　going to be talking about the bipolar sensitivity
21　analysis for a while.  So you don't have to worry
22　about the gabapentin cohort.
23　　　It appears that you ran this
24　sensitivity analysis for a drug versus no drug --

837

1　post-drug versus no drug, correct?
2　　A.  Correct.
3　　MR. ALTMAN:  Can you hand me the paper,
4　Jack.  It's about the middle of the stack.
5　BY MR. ALTMAN:
6　　Q.  Dr. Gibbons, I am going to hand you
7　what has been marked as Exhibit 20 in your last
8　deposition which is the manuscript.
9　　　Before we get to talking about that,
10　have you received any news from any of the
11　journals concerning the manuscript?
12　　A.  I did receive a letter from the
13　Archives of General Psychiatry regarding the
14　manuscript.
15　　Q.  And what did they say?
16　　A.  Revise and resubmit basically.
17　　Q.  What did they ask you to revise?
18　　A.  I --
19　　MS. McGRODER:  Well, I object just to the
20　extent that those communications are
21　confidential.
22　　MR. ALTMAN:  Lori, you cannot suggest that a
23　journal sending a request for Dr. Gibbons to
24　revise his report -- his manuscript is

838

1　confidential.
2　　MS. McGRODER:  You just asked him what the
3　journal told him to revise, and that indeed is
4　confidential under the law that I sent you in my
5　letter of February approximately 10th.
6　　MR. LONDON:  We will let the question
7　stand --
8　　MR. ALTMAN:  Hold on.
9　BY MR. ALTMAN:
10　　Q.  Dr. Gibbons, is Ms. McGroder
11　representing you in a legal capacity?
12　　MS. McGRODER:  Well, object to form and
13　foundation.  Of course I'm not representing him.
14　I'm representing Pfizer, and he is an expert --
15　　MR. ALTMAN:  Lori --
16　　MS. McGRODER:  -- witness testifying on
17　behalf of Pfizer.
18　　MR. ALTMAN:  Lori, let him -- Lori, let him
19　answer the question.
20　　MS. McGRODER:  It's a legal conclusion --
21　　MR. ALTMAN:  Lori --
22　　MS. McGRODER:  -- and, no, he doesn't have
23　to answer.
24

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

851

1  defined prior to the suicide attempt.
2        You can't do that if you have multiple
3  suicide attempts, and you can't do the pre versus
4  post if you get rid of the multiple suicide
5  attempts. So the different sensitivity analyses
6  provide information about different pieces of the
7  analysis. The first three -- I think the first
8  three there's the new monotherapy which also adds
9  in looking at a single suicide attempt for each
10 individual, gets around the question about
11 multiple suicide attempts like on the same, you
12 know, consecutive days, and those sorts of
13 things.
14       The second one being duration of 30
15 days or more cumulatively over the first year,
16 and the third sensitivity analyses of throwing
17 out all suicide attempts that occurred on the
18 index date to get a sense of how big -- how do
19 things change when you -- when you exclude those
20 people. Those analyses really pertain largely to
21 the post-drug versus no drug.
22       MR. ALTMAN: Objection, non-responsive.
23 BY MR. ALTMAN:
24       Q.  My question to you is why didn't you

852

1  run sensitivity analyses for the pre versus post?
2        MS. McGRODER: Objection, asked and
3  answered.
4  BY THE WITNESS:
5        A.  And I answered your question that I
6  did. The SuperMix analyses that are included
7  have a component of that analysis which is
8  exactly predrug versus post-drug, and, secondly,
9  the sensitivity analyses that I ran specifically
10 on the post-drug versus no drug could not be run
11 on the post-drug versus predrug because they did
12 not permit multiple suicide attempts.
13 BY MR. ALTMAN:
14       Q.  Okay. When you say you answered my
15 question, nowhere in that answer before did you
16 mention the word SuperMix.
17       So I'm trying to understand here
18 your -- for lack of a better term mish-mashing
19 some of the sensitivity analyses that you did
20 using the SAS programs with the SuperMix
21 programs. So why don't we take a step back.
22       What did you do in the SuperMix
23 program?
24       MS. McGRODER: Object to form.

853

1  BY THE WITNESS:
2        A.  The SuperMix program was a person-time
3  logistic regression, and it was performed using
4  SuperMix. So in my first answer to your
5  question, I talked about the person-time logistic
6  regressions, and then in the second answer to
7  your question, I expended on that and referred to
8  it as the SuperMix analysis because SuperMix was
9  the computer program that I used to perform the
10 person-time logistic regression analyses.
11 BY MR. ALTMAN:
12       Q.  Now, I looked at your SuperMix
13 analyses. Nowhere did you actually determine --
14 well, strike that.
15       For any of the sensitivity analyses
16 that you ran, did you check to see whether the
17 person was actually on the drug on the date of
18 the suicide attempt?
19       A.  The person-time analyses broke down
20 the year following the index episode of bipolar
21 disorder into monthly intervals and determined
22 whether or not a prescription included that month
23 in terms of the number of pills that were
24 available, and then within that month, whether or

854

1  not the suicide attempt occurred before or after
2  the prescription date.
3        So we had was there a prescription of
4  say gabapentin during month one, was there a
5  suicide attempt during month one, and if there
6  was a suicide attempt in month one, did it occur
7  before the prescription date for gabapentin or
8  after the prescription date.
9        Q.  Where did you do that, which analysis?
10       A.  That's all -- the analysis of those
11 data are reported in the -- in the SuperMix
12 files.
13       Q.  Okay. I am looking at your SuperMix.
14 Which of the SuperMix files?
15       A.  Well, I believe there are three
16 SuperMix files. The first one is the overall
17 cohort. The second one, I believe, and I might
18 be mistaken, the second one with the third one is
19 looking at the definition of exposure to
20 gabapentin only, and then the third one is
21 looking at only those people -- I believe there
22 were 662 people who had made a suicide attempt
23 prior to the index episode.
24       So looking at those people that were

855

1   at the greatest risk for suicide. In fact, I
2   think the SuperMix analysis, the person-time
3   logistic regression analysis -- and I'm going to
4   be using those as synonyms -- shows that the
5   increased risk -- the people who made a suicide
6   attempt in the year prior to bipolar disorder
7   were 12 times more likely to make a suicide
8   attempt in the -- in the following year which is
9   kind of fascinating.
10          And so that final sensitivity analysis
11   is just looking at those 662 people and repeating
12   the same analysis on that very small but very
13   high risk sample of individuals to determine
14   whether or not the presence of an AED increased
15   or decreased the likelihood of a suicide, in this
16   case a repeat suicide attempt.
17      Q.   What did you use to generate the data
18   that you processed in SuperMix?
19      A.   Those data were created -- we created
20   a file that gave the monthly information for each
21   one of the -- you know, a monthly dataset that
22   allowed us to determine whether or not you had a
23   suicide attempt or drug prescription on each one
24   of the months.

856

1      Q.   Which of the programs did that?
2      A.   They weren't done in SuperMix. Those
3   were done in SAS.
4      Q.   Which SAS program did that?
5      A.   I'm not sure.
6      Q.   Well, why don't you take a look at the
7   description of the sensitivity analyses you
8   provided there and tell me which one did that?
9      A.   Well, these are the programs that did
10   the analyses, and I believe there was a separate
11   description for these SuperMix analyses that
12   accompanied that. I don't know if the dataset
13   included it, or can we see the transmittal for --
14      MS. McGRODER: That may not be the
15   transmittal of the SuperMix analysis because I
16   think that was separate.
17   BY MR. ALTMAN:
18      Q.   Dr. -- Dr. Gibbons, I will represent
19   to you, and you can -- I mean, I can show you
20   that we have received a file called AED dot zip.
21      A.   Do you have the contents of that?
22      Q.   I'm going to show you that right now.
23          Anyway, I will represent to you,
24   Doctor -- I mean, you could certainly come and

857

1   look at it. I just didn't know if you would be
2   able to see it. There are nine files on the
3   disk.
4          There are -- there's an AED 1, 2, and
5   3 dot dat, an AED 1 inp dot dat, and an AED 1 dot
6   out for each one of these. There are no SAS
7   programs. And so what I would like to know is
8   how were these AED 1 dot dat files -- these three
9   data files created?
10          What created them?
11      A.   Those are created by a -- you know,
12   those were created by some SAS file that
13   apparently is not included in there.
14      Q.   Where would that SAS file be?
15      A.   I'm sure that we would have that
16   around some place.
17      Q.   Could you see if you can get that
18   e-mailed on a lunch break?
19      A.   I could try.
20      Q.   Because I don't want to have to come
21   back here again.
22      MS. McGRODER: Let's go off the record for a
23   second.
24      MR. ALTMAN: Let's go off the record.

858

1      THE VIDEOGRAPHER: Off the record at 11:47.
2          (WHEREUPON, a recess was had at
3          11:47 a.m. until 11:53 a.m.)
4      THE VIDEOGRAPHER: Back on record at 11:53.
5      MR. ALTMAN: Just before we continue, I just
6   want to put something on the record. I
7   appreciate that you are trying to get us all the
8   information. I appreciate that there's a lot of
9   data, and it's very complex information, but
10   there clearly appear to be additional files that
11   we do not have that I request that be produced.
12          I do not know what impact that will
13   have on the rest of my examination and my desire
14   to have additional examination, but I just want
15   to point out that it is not the plaintiffs'
16   obligation to figure out what information should
17   be produced. There is an affirmative obligation
18   on the part of an expert to provide the
19   information. When information is omitted, we are
20   not the ones that have to figure -- we are not
21   the ones that have to figure it out, and that's
22   all I'm going to say about it.
23      MS. McGRODER: Okay. In response to that
24   I'm just going to say starting at -- on February

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

859

1  10th, if not before, I have sent you virtually
2  biweekly, if not triweekly, information and data
3  that Dr. Gibbons has provided, and which I
4  understand you know and the SuperMix analysis
5  that we are now talking about I sent to you I
6  believe on February 16th.
7        So while I appreciate that you don't
8  have some duty to figure out what's not there,
9  the fact of the matter is you know the data
10  better than I know the data.  I can't tell what's
11  not there.  So had you given me some notice that
12  this wasn't among the materials sent, I would
13  have given it to you earlier, and -- and what you
14  have said I totally accept and understand.
15        MR. ALTMAN:  That's fine.  Let's move on.
16        MR. LONDON:  We are moving on with the
17  standing request that we take a brief lunch
18  break, and you make a run during the lunch break
19  to see if that can be e-mailed in.  That's on the
20  table.
21        MS. McGRODER:  Absolutely, we will do our
22  best.
23        MR. LONDON:  Thank you.
24

861

1  BY THE WITNESS:
2      A.  Years since the year 2000.  So
3  numbered with I believe 2000 being year one and
4  2006 being year six.
5  BY MR. ALTMAN:
6      Q.  Okay.  There's another -- next field
7  is called SAP.
8          What is SAP?
9      A.  Suicide attempt in the prior year.  So
10  in the year before the index episode was there a
11  suicide attempt made.
12      Q.  Okay.  AED I assume means do they take
13  any one of the 11 AEDs?
14      A.  That's correct.
15      Q.  Okay.  LI means did they take lithium?
16      A.  Correct.
17      Q.  AD means antidepressant, correct?
18      THE COURT REPORTER:  I'm sorry?
19  BY MR. ALTMAN:
20      Q.  Antidepressant, correct?
21      A.  Correct.
22      Q.  AP means antipsychotic, correct?
23      A.  Correct.
24      Q.  AC is anticonvulsant, correct?

860

1  BY MR. ALTMAN:
2      Q.  Now, I'm looking at -- just looking at
3  one of the AED files.  Unfortunately, I don't
4  have these printed out, and I am not going to
5  mark these as exhibits right now, but there are
6  variable -- there are various variable names.
7  One of them is called ID which I imagine is the
8  patient ID, correct?
9      A.  Correct.
10      Q.  One of them is called month, which
11  is -- as I imagine, is the patient's month,
12  correct?
13      A.  Correct.
14      Q.  The month for that particular patient.
15          Another one is age, correct?
16      A.  I believe so.  I don't have it in
17  front of me.
18      Q.  Another one is sex which I'm just
19  going to ask you.  It says "sex."  That I imagine
20  that's the sex.  There's one here that says year.
21  I think that's pretty obvious, and year I guess
22  is the year of the analysis stripped out --
23      THE COURT REPORTER:  I'm sorry.  What was
24  the --

862

1      A.  That's an additional anti --
2  antiepileptic drug that was not a part of the 11
3  epileptic drugs highlighted in the FDA Alert.
4      Q.  And SA is suicide attempt in that
5  period?
6      A.  Correct, and this is -- these are
7  monthly records.  So this is a vertical file that
8  has I believe 12 records per case indicating each
9  one of the months.  The file for analysis
10  actually would -- would end on the month in which
11  there was a suicide attempt, or if there was no
12  suicide attempt, through month 12.
13      Q.  Now, I'm looking at -- as far as I can
14  tell, looking at this data -- oh, inter -- and
15  what is intercept?
16      A.  Intercept would just be a vector of
17  ones.  That would be the term that would be --
18  are you looking at the output file now?
19      Q.  No, there's another variable called
20  intercept which is one in every record.
21      MS. McGRODER:  Do you need to see it?
22  BY THE WITNESS:
23      A.  No.  As long as it's one in every
24  record, it's the intercept of the -- of the

963

1  MR. ALTMAN:  I know, but if he make marks
2  off of --
3  MS. McGRODER:  Are you going to be able to
4  see it?
5  MR. LONDON:  No, I would rather -- I would
6  rather just --
7  MR. ALTMAN:  Okay.  That's fine.
8  BY MR. LONDON:
9  Q.  Maybe I have a different way to do
10  this.  If it goes to Mr. Hopper or Ms. McGroder,
11  is it this case, and if it goes to --
12  A.  I'm not positive.  I don't think
13  that -- I don't think that works.
14  Q.  All right.  That's fine.
15  A.  And I'm assuming when you say this
16  case, the work that I did right from the
17  beginning on the Daubert is part of this case?
18  Q.  That's correct, yes.
19  A.  So just an X through the ones that are
20  related to the other case or a star up here?
21  Q.  That would be fine.  Star means other
22  case, asterisk.
23  A.  (Indicating).
24  Q.  All right.  Now --

964

1  MR. ALTMAN:  One second, Jack.  Let me just
2  look at the exhibit for one second.
3  MR. LONDON:  Sure.
4  BY MR. LONDON:
5  Q.  This morning Mr. Altman asked you
6  about I believe it was the sum of approximately
7  $10,100 that you had paid to Dr. Hur, and you
8  estimated that, as I recall, at least $8,000 of
9  those dollars related to the work on the
10  gabapentin case.
11  Is that your memory of what you said?
12  A.  Yes.
13  Q.  80 percent at least.
14  None of those amounts showed up in any
15  of the bills that I saw in Exhibit 25 -- 25 as
16  such?
17  A.  That's correct.
18  Q.  Were those amounts inside those bills?
19  A.  Yes.
20  Q.  Okay.  How could we look at the bills,
21  if we could, and tell on what dates and in what
22  amounts Dr. Hur did work on the gabapentin case?
23  A.  All I did was sort of when I, you
24  know, would pay him, I was paying him at 1/5th

965

1  the rate that I did.  So I would just take -- I
2  would just add into my own hourly rate 1/5th of
3  that amount what I did -- you know, what I paid
4  to Kwan to get essentially reimbursed for that,
5  but I didn't break it out as a separate line
6  item.
7  Q.  Do you believe that -- he was being
8  paid $100 an hour, and you were being paid $500
9  an hour?
10  A.  Correct.
11  Q.  Do you believe that all of his
12  inclusions in his bills were in five-hour
13  increments?
14  A.  Roughly.  I mean, you know, I don't --
15  I mean, I don't know if it worked out exactly
16  like that.
17  Q.  Well, I'm just looking for example --
18  A.  There won't be an example.  I mean,
19  there's nothing that says exactly.  I mean, I
20  just --
21  Q.  If you look at the bill for September
22  2 just as an example, it's a bill for 40 hours at
23  $500 an hour, $20,000.
24  If that were $20,100, we could

966

1  conclude that $100 of those dollars went to
2  Dr. Hur's time?
3  A.  Correct.
4  Q.  But without such an indication or a
5  breakout, is there just no way to know?
6  A.  No way to know.
7  Q.  Did Dr. Hur do anything more than just
8  tell you, oh, this many hours from time to time,
9  and then you would double that and include that
10  in the bill to Ms. McGroder?
11  A.  Well, I wouldn't double it in a bill
12  to Ms. McGroder.  He would -- I would write him
13  checks from time to time based on his level of
14  effort, and if I felt that he had put in more
15  effort than he was telling me, then I would write
16  the check accordingly, and as I would bill
17  Ms. McGroder, you know, add in -- I
18  would increase my rate by an hour or two hours or
19  five hours or whatever it was to accommodate the
20  expenses.
21  Q.  Okay.  Okay.  Now, I want to start
22  with these bills and kind of work backwards, if
23  we can.
24  The last bill we have appears to be

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

971

1    Q.   Well, the November 30th bill -- I'm
2  not quibbling with you -- doesn't say anything
3  about reports, does it?
4    A.   Please understand, you know, I'm a
5  university professor. I'm not too good at
6  providing really good descriptions of what I do
7  on these bills, and -- and in the past, not by
8  any of the lawyers sitting at this table, I have
9  been counseled in prior litigations in different
10  areas that having exquisitely detailed bills may
11  not be the best plan for litigation-related work.
12  So I haven't been very, very detailed in what I
13  have described in the work and haven't had too
14  many objections.
15    Q.   Well, did Ms. McGroder or someone call
16  you after the November bill and say does this
17  include your work on the final report?
18    A.   No, I've received no calls from
19  anybody regarding whether any -- any other
20  details about my bills.
21    Q.   All right. Did Ms. McGroder call you
22  after the October 18th bill and ask whether that
23  would be enough to cover you through the filing
24  of the final report?

972

1    MS. McGRODER: Object to form.
2  BY THE WITNESS:
3    A.   I never had a conversation with
4  Ms. McGroder regarding my -- the contents of my
5  bills or whether I would be billing on any -- any
6  area.
7  BY MR. LONDON:
8    Q.   These bills or any of the other bills
9  in that exhibit, is that what you are saying?
10    You have submitted them. They have
11  been paid. You have never discussed them with
12  Ms. McGroder?
13    A.   That's correct.
14    Q.   Okay. Moving forward, the next bill
15  that I find that appears to not have an asterisk
16  is dated September 2, 2008.
17    Do you see that?
18    MS. McGRODER: Did you already talk about
19  the October 5?
20    MR. LONDON: I thought I did.
21    MS. McGRODER: I might have just missed it.
22    MR. LONDON: Okay. We will talk about
23  October 5.
24    THE WITNESS: You are trying to help him

973

1  out?
2    MS. McGRODER: Sorry. As soon as I said it,
3  I thought.
4    MR. LONDON: She wants -- she want you to
5  come off looking bad.
6  BY MR. LONDON:
7    Q.   What's the subject of your October 5
8  bill?
9    A.   Oh, no, not the October 5 bill.
10    Q.   I mean, you charged them $20,000 for
11  40 hours on October 5?
12    A.   How could you miss that, Mr. London?
13    Q.   It didn't seem like much money, and
14  then you charged them $16,000 13 days later.
15    Apart from that, what do I know about
16  those bills and what you did?
17    A.   This was in support of the work on the
18  analysis of the gabapentin cohort, thinking about
19  analyses, performing analyses, reviewing, redoing
20  analyses, a variety of different things.
21    Q.   But there's no way -- and you told me
22  earlier that you couldn't look at any of your
23  computer screens and reproduce these dates, and
24  now you are telling me there's no way we can look

974

1  at time records or e-mails or anything and
2  reproduce what was done on these dates. Is that
3  true?
4    MS. McGRODER: Well, object to form to the
5  extent it misstates his testimony.
6  BY THE WITNESS:
7    A.   I don't keep such records, and so, no,
8  I never had them. So there's no way to reproduce
9  them.
10  BY MR. LONDON:
11    Q.   And even though you don't keep such
12  records, you are also saying as far as you know
13  there are no such records whether kept by you or
14  anyone else?
15    MS. McGRODER: Object to form.
16  BY THE WITNESS:
17    A.   That's correct.
18  BY MR. LONDON:
19    Q.   The next bill -- unless Ms. McGroder
20  has others that I missed -- going further back in
21  time, further toward the front of the document is
22  dated September 2nd, 2008, 80901.
23    Do you see that?
24    A.   Which one? I'm sorry.

975

1    Q.   It's Invoice 80901.  It's dated
2  September 2, 2008?
3    A.   That's the one we were just
4  discussing.
5    Q.   Well, that's the one I began to ask
6  you about before Ms. McGroder so helpfully
7  intervened.
8    A.   Oh, I'm sorry, yes.
9    Q.   Is that correct?
10   A.   Yeah.
11   Q.   Okay.  What did you do that is the
12  subject of the invoice September 2, 2008?
13   A.   It's, you know, more of the same work
14  on -- on the -- looking at and analyzing the
15  gabapentin data.
16   Q.   Was there any billing in this for the
17  bipolar cohort?
18   A.   No.
19   Q.   This was six days, as I recall, before
20  the bipolar paper was published in the sense of
21  being called final and submitted for publication,
22  not published by a publication, but published by
23  you in hopes of finding a publication, correct?
24   A.   Correct.

976

1    Q.   All right.  And is it your testimony
2  that this invoice 80901 September 2, 2008 has
3  nothing to do with the gabapentin -- pardon me --
4  the bipolar cohort?
5    MS. McGRODER:  Objection, asked and
6  answered.
7    BY THE WITNESS:
8    A.   Yes, I've also, you know, made it
9  clear that the -- there were screening efforts
10  that were done on the initial data and getting
11  familiar with working with the data, and that
12  included both cohorts, but the invoices do not
13  include any of the analytic work for the bipolar
14  cohort.
15   BY MR. LONDON:
16   Q.   Let's look at that.  Let's go forward
17  one more bill, bill 80801.
18   Do you have that in front of you?
19   A.   I do.
20   Q.   Is that the bill of August 6, 2008?
21   A.   That's correct.
22   Q.   All right.  In that bill it says:
23  "Create specifications for statistical data
24  bases," true?

977

1    A.   True.
2    Q.   And what are those?
3    A.   This was related to additional
4  materials that were sent to PharMetrics.
5    Q.   I'm sorry Keith was telling me what to
6  ask you next.  I didn't hear what you said.
7    MS. McGRODER:  Well, you can read the record
8  back.  I mean --
9    BY MR. LONDON:
10   Q.   What did you tell me, Doctor?
11   A.   I told you that these were -- this is
12  for communications of the specifics and going
13  back and forth with the folks at PharMetrics in
14  specifying the databases, and then the second
15  item which is labeled here as the bipolar cohort
16  but actually includes all of the data were for
17  some of the preliminary screening and getting up
18  to speed and working with the data --
19   Q.   Well, the bill says -- I'm sorry.  I
20  didn't mean to interrupt you.
21   A.   Yeah, I know what the bill says, and,
22  yes, these were for all of our initial work
23  getting up to speed with both the gabapentin and
24  for the bipolar cohort.

978

1    Q.   Well, did you bill for analyses for
2  the bipolar cohort?
3    MS. McGRODER:  Objection, asked and
4  answered.
5    BY THE WITNESS:
6    A.   No, I did not.
7    BY MR. LONDON:
8    Q.   So the bill does not reflect what you
9  did.  The bill says it's for something that it's
10  not actually for.
11   Is that your testimony?
12   MS. McGRODER:  Objection, argumentative.
13   BY THE WITNESS:
14   A.   The second item:  "Construct
15  statistical database, compute summary statistics,
16  and perform screening analyses for the bipolar
17  cohort," those were analyses of internal
18  consistency both for the bipolar cohort and for
19  the gabapentin.
20   The omission is for the gabapentin,
21  but none of the analyses that are reported in the
22  paper that was submitted originally to JAMA and
23  is now currently under review in -- in the
24  Archives of General Psychiatry were billed for to

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

979

1    Ms. McGroder.
2    BY MR. LONDON:
3        Q.   How can I have reliability in that?
4    How can I hear what you are saying, read what you
5    are writing, know what you are getting paid for,
6    and reconcile those?
7        MS. McGRODER:  Objection.  That's an
8    argumentative question --
9        MR. LONDON:  It's all right.
10       MS. McGRODER:  -- and it calls for
11   speculation and it's improper.  He doesn't know
12   how you can have reliability, how you feel about
13   reliability, Jack.  How would he know that?
14   BY MR. LONDON:
15       Q.   What can you tell the judge -- what
16   can you tell Judge Saris that says even though I
17   said in my deposition under oath I was not paid
18   for the analyses and even though my bills page
19   showed that I was paid for the bipolar analysis
20   that was the subject of the paper, you really
21   shouldn't believe the bill.  You ought to believe
22   what I say.
23          What can you tell Judge Saris so she
24   will have comfort in that?

980

1        MS. McGRODER:  Objection to form.  It's
2    argumentative, and it misstates the testimony he
3    just gave you.
4    BY THE WITNESS:
5        A.   Well, first of all, I don't think that
6    item number two on this bill says that I billed
7    for the analyses that went into the -- into the
8    paper.  What it does say is computing summary
9    statistics and screening analyses.
10          And screening analyses to me means
11   something very, very different than the analyses
12   that were the subject of the paper.  So
13   my response to Judge Saris would be simply we
14   were looking at all of the data that we received
15   from PharMetrics.  We were getting up to speed
16   with using those data.  We were doing internal
17   consistency checks.  We were exploring those
18   data.  There's a huge amount of data.  It took
19   some time to do so, and that's what that bill was
20   for.
21          And as I have testified in my previous
22   deposition last time, that there were screening
23   analyses, internal consistency checks, and so
24   forth that were performed on both the gabapentin

981

1    and the bipolar cohort, and the only thing that's
2    misleading in this invoice is that it says
3    bipolar cohort, and it should have said both
4    cohorts.
5    BY MR. LONDON:
6        Q.   Were you paid money by the defense
7    counsel for working with the bipolar cohort?
8        MS. McGRODER:  Objection, asked and
9    answered.
10   BY THE WITNESS:
11       A.   I have testified both on this
12   deposition and the previous deposition that I was
13   paid money for working with the data, getting up
14   to speed with the data, reviewing the data, but I
15   was not paid by counsel for the analyses that I
16   performed that in all of the work that was done
17   and all of the sensitivity analyses that were
18   done in support of the paper in question.
19   BY MR. LONDON:
20       Q.   Well, we know you weren't paid before
21   the paper was published for the sensitivity
22   analyses because there weren't any before the
23   paper was submitted to JAMA.
24       A.   That's correct.

982

1        Q.   Okay.  So I'm back to these bills --
2        MS. McGRODER:  His answer included both.
3    His answer included both sensitivity analyses and
4    primary analyses.  He just said that.  You are
5    just being argumentative.
6    BY MR. LONDON:
7        Q.   I am back to the bills, and the bills
8    are all that I have, and the bills show, as you
9    have just testified, that at least in part some
10   of the bill you sent to Ms. McGroder and some of
11   the money Ms. McGroder sent to you was for
12   working on the bipolar cohort, true?
13       A.   True.
14       MS. McGRODER:  Objection, asked and
15   answered.
16   BY MR. LONDON:
17       Q.   Okay.  Okay.
18       MS. McGRODER:  You need to clarify that.
19   BY THE WITNESS:
20       A.   I mean, I think that what's really --
21   the key is that those analyses and all of the
22   work that was done in production for that paper
23   were not billed for, and that's what I would tell
24   Judge Saris.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

983

1    What I stated before and I stated in
2    this deposition is that our initial startup with
3    all of the data that we received from PharMetrics
4    which did include the bipolar data were supported
5    by this work. It was a part of -- a part of the
6    acquisition of the data. Just like the purchase
7    of the data was reimbursed by -- by counsel and
8    that included the bipolar data as well.
9    BY MR. LONDON:
10    Q.   Well, but that's an expense as opposed
11    to payment for time, isn't it, the reimbursement
12    for the PharMetrics database?
13    A.   Well, it's an expense, but there's a
14    very -- at least I draw a very strong distinction
15    between, you know, having to be brought up to
16    speed on the analysis of a new and very large
17    stream of data which included both the bipolar
18    data and the gabapentin data from doing a series
19    of research-related analyses of the bipolar
20    cohort data for the purpose of publishing a
21    report.
22    We spent a huge amount of time on
23    that, much more time on that than on the
24    gabapentin analyses, and I have not billed for

984

1    that, and that's what I will tell you, and that's
2    what I told you before, and that's what I will be
3    happy to tell Judge Saris.
4    Q.   And I'm sure you will, but the problem
5    that I am coping with is that I can hear you, but
6    I don't have any documents from you that many
7    people in the ordinary course of business would
8    maintain such as time slips, computer records to
9    show when work was done, that sort of thing.
10    MS. McGRODER: Object. You are asking
11    for the time slips --
12    BY MR. LONDON:
13    Q.   And so I'm trying to find out from
14    you --
15    MS. McGRODER: -- and computer records that
16    you didn't give us.
17    BY MR. LONDON:
18    Q.   So I am trying to find out from you --
19    I'm trying to find out from you without
20    Ms. McGroder asking to testify whether there's
21    any objective data you have that I can look at
22    that can validate your answer?
23    MS. McGRODER: Well, objection, asked and
24    answered. It's argumentative. It assumes that

985

1    he needs to validate his answer, and that he is
2    somehow not telling the truth. So it's an
3    improper question.
4    MR. LONDON: That's what you are hearing.
5    I'm just hearing what the witness is telling me.
6    MS. McGRODER: Well, I'm telling you that's
7    an improper question, and if you ask it another
8    time --
9    BY MR. LONDON:
10    Q.   Please answer.
11    MS. McGRODER: -- we will finish.
12    BY MR. LONDON:
13    Q.   Please answer.
14    MS. McGRODER: Asked and answered.
15    BY THE WITNESS:
16    A.   As I have said before, I don't have
17    any of the records that you are looking for. All
18    I have is -- is my experience in doing this and
19    to tell you that this is not inconsistent with
20    the way that I work with -- with people in the
21    real world from day-to-day.
22    BY MR. LONDON:
23    Q.   The next exhibit -- pardon me -- the
24    next invoice I found going forward is the July

986

1    29th invoice.
2    Do you see that? That's the one that
3    I have next. That may not be the actual next
4    one.
5    A.   There look to be two of them. Yes, I
6    see that.
7    Q.   Are there two different ones, or are
8    they duplicate copies?
9    A.   Two with the same date.
10    Q.   Are these different items?
11    A.   Yes.
12    Q.   Let's look at the one that I have in
13    mind. It's 80710.
14    Do you see that?
15    A.   Yes.
16    Q.   And it is for the expense for the data
17    from the PharMetrics database $15,000?
18    A.   That's correct.
19    Q.   Is that the date on which you received
20    the PharMetrics database?
21    MS. McGRODER: Objection, asked and
22    answered.
23    BY THE WITNESS:
24    A.   I don't recall. You know, as we have

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

1027

1   Q.  Would this be the lecture that you
2   mentioned previously when you said it generated
3   the questions that led you to the idea of doing
4   sensitivity analyses on the bipolar cohort?
5   A.  The lecture and the couple of days
6   that I spent at Harvard talking to -- some of
7   the faculty there.
8   Q.  All right.  And who were the faculty,
9   if you remember?
10   A.  There are quite a few.
11   Q.  Okay.  And then can you identify the
12   three attachments to the paper -- to the cover of
13   the exhibit?
14   A.  The first one is -- looks to be the
15   first slide of the -- of the lecture, and the
16   second one is this slide that was a part of the
17   Daubert hearing work and that breaks out the
18   lamotrigine and topiramate effects from the other
19   antiepileptic drugs.
20   Q.  And -- and was that same slide also
21   part of the lecture?
22   A.  Yes, it was.
23   Q.  And then the third page, please?
24   A.  This is an empirical Bayes estimate of

1028

1   rate multipliers and confidence intervals from
2   the AERS data on completed suicide rates.
3   Q.  And was that also a slide from the
4   Daubert hearing?
5   A.  I don't remember.
6   Q.  Okay.  Fair enough.  Was it a slide at
7   the Harvard presentation?
8   A.  I believe it was in there.
9   Q.  It was my intention to include it as
10   such, and if I have made a mistake, I apologize
11   now but --
12   A.  No, I think it probably was.  I'm --
13   you should know I'm not sure that I actually got
14   to all of these slides in my lecture.
15   Q.  I wasn't there.
16   A.  Yeah, I am not sure, you know, I even
17   made it to the antiepileptic part of this -- this
18   whole lecture.
19   Q.  Were the slides reproduced and given
20   as handouts?
21   A.  No.
22   Q.  Okay.  Were you paid by anyone to
23   participate in this lecture?
24   A.  They paid my expenses to go to

1029

1   Harvard.
2   Q.  All right.
3   A.  I think they once said something about
4   giving me an honorarium, but I'm not ever sure I
5   got it.
6   Q.  And the slides that we identified
7   attached --
8   A.  They took me out to dinner though.  It
9   was a nice dinner.
10   Q.  Yeah, good places to eat in Cambridge
11   for a country lawyer.
12   A.  Yeah.
13   Q.  But the slides that were part of the
14   Daubert litigation that were also used at the
15   Harvard lecture, those were slides that were paid
16   for in one of yours bills that you sent to
17   Ms. McGroder for work in the Harvard -- in the
18   Daubert part of the case, true?
19   MS. McGRODER:  Object to form and
20   foundation.
21   BY THE WITNESS:
22   A.  They were -- those were -- I mean, my
23   time in working on that was paid for as a
24   consultant.

1030

1   BY MR. LONDON:
2   Q.  In the litigation?
3   A.  In the litigation.
4   MR. LONDON:  I think that's all I'm going to
5   ask.
6   MS. McGRODER:  Okay.  We are concluded then.
7   Thank you.
8   THE VIDEOGRAPHER:  We are off the record at
9   4:21.
10   (WHEREUPON, the deposition was
11   concluded at 4:21 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

---

1031

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3    IN RE; NEURONTIN          )
 4    MARKETING SALES PRACTICES    )
 5    & PRODUCT LIABILITY         )
 6    LITIGATION,              )
 7         I hereby certify that I have read the
 8    foregoing transcript of my deposition given at
 9    the time and place aforesaid, consisting of Pages
10    735 to 1030, inclusive, and I do again subscribe
11    and make oath that the same is a true, correct
12    and complete transcript of my deposition so given
13    as aforesaid, and includes changes, if any, so
14    made by me.
15
16         ROBERT D. GIBBONS, Ph.D.
17
18
19
20    SUBSCRIBED AND SWORN TO before me
21    this      day of        , A.D. 200 .
22
23         Notary Public
24
```

---

1032

```
 1    STATE OF ILLINOIS )
 2             ) SS:
 3    COUNTY OF COOK    )
 4
 5         I, ANDREA L. CARTER, a State of
 6    Illinois Licensed Certified Shorthand Reporter,
 7    License number 84-3722, do hereby certify:
 8         That previous to the commencement of
 9    the examination of the aforesaid witness, the
10    witness was duly sworn to testify the whole truth
11    concerning the matters herein;
12         That the foregoing deposition
13    transcript was reported stenographically by me,
14    was thereafter reduced to typewriting under my
15    personal direction and constitutes a true record
16    of the testimony given and the proceedings had;
17         That the said deposition was taken
18    before me at the time and place specified;
19         That I am not a relative or employee
20    or attorney or counsel, nor a relative or
21    employee of such attorney or counsel for any of
22    the parties hereto, nor interested directly or
23    indirectly in the outcome of this action.
24
```

---

1033

```
 1        IN WITNESS WHEREOF, I do hereunto set
 2    my hand and affix my seal of office at Chicago,
 3    Illinois, this 10th day of March, 2009.
 4
 5
 6         Certified Shorthand Reporter
 7         License No. 84-3722.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

1034

```
 1            I N D E X
 2
 3    WITNESS:              PAGE:
 4    ROBERT D. GIBBONS, Ph.D.
 5      EXAM by MR. ALTMAN................. 739
 6      EXAM by MR. LONDON................ 954
 7
 8            *****
 9            I N D E X
10    EXHIBIT NUMBER              MARKED
11    No. 40.......................................740
12    No. 41.......................................746
13    No. 42.......................................774
14    No. 43.......................................781
15    No. 44.......................................781
16    Nos. 45, 46.............................790
17    No. 47.......................................813
18    No. 48.......................................814
19    Nos. 49, 50.............................828
20    No. 51.......................................829
21    No. 52.......................................829
22    Nos. 53, 54.............................835
23    Nos. 55, 56.............................884
24
```

---

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert (Defense Expert)**
4/27/2009

Gibbons, Robert (Defense Expert) 4/27/2009 10:49:00 AM

1079

```
 1        IN THE UNITED STATES DISTRICT COURT.
             DISTRICT OF MASSACHUSETTS
 2
 3   IN RE: NEURONTIN        )
     MARKETING SALES PRACTICES )
 4   & PRODUCTS LIABILITY     )
     LITIGATION              )
 5                    ) MDL DOCKET
     BULGER vs. PFIZER, et al, ) No. 1629
 6   07-11426-PBS          )
                      )
 7   SMITH vs. PFIZER, et al., ) MDL DOCKET
     05-CV-11515-PBS        ) No. 04-10981
 8
 9
10            VOLUME IV
11        The videotaped deposition of ROBERT D.
12   GIBBONS, Ph.D., called by the Plaintiffs for
13   examination, pursuant to stipulation, and pursuant
14   to the Rules of Civil Procedure for the United
15   States District Courts, taken before Sandra L.
16   Rocca, CSR, CRR and Notary Public in and for the
17   County of DuPage, and State of Illinois, at 6638
18   South Cicero Avenue, Chicago, Illinois, on the 27th
19   day of April, 2009, at the hour of 10:49 a.m.
20
21
22
23
24   Job No: 199412
```

1080

```
 1   APPEARANCES:
 2
 3   FINKELSTEIN & PARTNERS
     By:  MR. KEITH L. ALTMAN
 4   463 Robinson Avenue
     Newburgh, NY  12550
 5   (516) 456-5885/Fax: (951) 303-1222
     kaltman@lawampmmlt.com
 6        -and-
 7   MR. JACK LONDON
     3701 Bee Cave, Suite 200
 8   Austin, TX  78746
     (512) 478-5858
 9   jlondon@texas.net
10        appeared on behalf of the
          Plaintiffs;
11
12   SHOOK, HARDY & BACON, L.L.P.
     By:  MS. LORI CONNORS McGRODER
13   2555 Grand Boulevard
     Kansas City, MO  64108-2613
14   (816) 474-6550/Fax: (816) 421-5547
     lmcgroder@shb.com
15        -and-
16
     SKADDEN ARPS SLATE MEAGHER & FLOM LI
17   By:  MR. STEVEN F. NAPOLITANO
     Four Times Square
18   New York, NY  10036-6522
     (212) 735-3000/Fax: (212) 735-2000
19   Snapolit@skadden.com
20        appeared on behalf of the
          Defendants.
21
22   Also Present:
23        Mr. James Pierdzioch, Videographer
24
```

1081

```
 1        (Document marked as Defendants' Exhibit
 2   Number 1 for identification.)
 3        VIDEOGRAPHER:  My name is James
 4   Pierdzioch of Veritext.  The date today is
 5   April 27th, 2009 and the time is approximately
 6   10:49 a.m.  This deposition is being held at the
 7   Renaissance Inn in Chicago, Illinois.  The caption
 8   of this case is Neurontin Marketing and Sales
 9   Practices v Pfizer Incorporated.  The name of the
10   witness is Dr. Robert Gibbons.  At this time the
11   attorneys will please identify themselves for the
12   record.
13        MR. ALTMAN:  Keith Altman on behalf of
14   the Plaintiffs products liability steering
15   committee.
16        MR. LONDON:  Jack London, Plaintiffs
17   products liability steering committee.
18        MS. McGRODER:  Lore McGroder on behalf of
19   the Pfizer Defendants.
20        MR. NAPOLITANO:  Steven Napolitano on
21   behalf the Pfizer Defendants.
22        VIDEOGRAPHER:  The witness may now be
23   administered the oath by Sandi Rocca.
24        (Witness sworn.)
```

1082

```
 1        MS. McGRODER:  Before we start, I'd like
 2   to make a statement on the record.  As you know,
 3   gentlemen, we are here to produce Dr. Gibbons for
 4   Plaintiffs' fourth opportunity to depose him based
 5   on an agreement between the parties and we are here
 6   only pursuant to that agreement which is summarized
 7   in what is marked as Defendants Exhibit Number 1 to
 8   Dr. Gibbons' deposition, a correspondence dated
 9   April 13, 2009, which states specifically,
10   "Dr. Gibbons is available for deposition" -- let me
11   back up.
12        Among other parts of the agreement, this
13   statement refers specifically to this deposition
14   day.  "Dr. Gibbons is available for deposition on
15   Thursday, April 23 or Monday April 27 subject to
16   our agreement of April 16 specifically limiting the
17   areas of inquiry to the new language in his
18   supplemental expert report dated March 19, 2009,
19   appearing in paragraphs 18 through 20 and Tables
20   2A, 2B, 2C, Tables 3, 3A, 3B and 3C.  As per our
21   conversations, although we will not set an
22   arbitrary time limit, our expectation is that this
23   will not be a full day deposition."
24        Continuing with the respect to the
```

1099

1  bipolar paper.
2      None of those in the revised manuscript,
3  you know, have changed in any way. And most of the
4  -- most of the responses to those reviewers with
5  respect to the questions that they raised have more
6  to do with some of the other sensitivity analyses
7  which are not a part of my expert report.
8      Q.  That wasn't exactly what I was asking,
9  but there were some concerns that were raised about
10  various issues and my question to you was some of
11  the concerns that they had raised with respect to
12  your bipolar analysis, do those same concerns -- do
13  any of those concerns also apply to your gabapentin
14  analysis?
15      MS. McGRODER:  Well, I object to form.
16      THE WITNESS:  Not to my knowledge.
17  BY MR. ALTMAN:
18      Q.  Have you resubmitted the bipolar paper
19  yet?
20      A.  Yes.
21      Q.  When did you resubmit it?
22      MS. McGRODER:  Don't. That has nothing
23  to do with paragraphs 18 through --
24      MR. ALTMAN:  Then instruct him.

1100

1      MS. McGRODER:  No, I'm not going to do
2  that, Keith. We will stop the deposition now and
3  we'll call the Magistrate. Which do you want to
4  do? Do you want to proceed pursuant to the
5  agreement or do you want to stop the deposition
6  now?
7      MR. LONDON:  Let me see if I can sort out
8  a middle ground problem.
9      MS. McGRODER:  Then let's do that off the
10  record.
11      MR. LONDON:  It seems to me --
12      MS. McGRODER:  Let's go off the record.
13      MR. ALTMAN:  No, we're doing this on the
14  record.
15      MR. LONDON:  -- refers to the
16  epidemiology bipolar paper and to the extent that
17  the March 19th report incorporates the bipolar
18  paper, I think we need to learn what that means.
19      MS. McGRODER:  Well, I don't disagree
20  that he relies on the manuscript as part of his
21  expert opinion in this case. But the agreement is
22  that your questions will be limited to changes he's
23  made in his supplemental expert report of March 19.
24  Those changes are made specifically in paragraphs

1101

1  18 through 20 and the tables that I already named
2  and are referenced in Defendants' Exhibit 1. So
3  that's what this deposition -- that's what we're
4  here for. We're here to produce him pursuant to
5  this agreement. And we can either do that or not,
6  but I'm not going to have this fight all day long.
7  Decide whether you want to comply with this or
8  don't.
9      MR. ALTMAN:  Lori, I had made it very
10  clear to Angela that there would be the necessity
11  of asking some foundational questions, that you
12  could not that take such a narrow approach.
13      MS. McGRODER:  That question was not
14  foundational. When did you make revisions to your
15  manuscript? That has nothing to do with paragraphs
16  18 through 20 and Tables 2 and 3 and their subparts
17  in his expert report.
18      MR. ALTMAN:  Fine. I'll lay some
19  foundation.
20      Q.  Dr. Gibbons, is the bipolar analysis --
21  the methodology that you used for the bipolar
22  analysis, does it have any relationship whatsoever
23  to the analyses you did that with respect to the
24  gabapentin cohorts?

1102

1      MS. McGRODER:  Let's go off the record.
2  Let's call the Magistrate.
3      MR. ALTMAN:  No, we're not going off the
4  record.
5      MS. McGRODER:  Let's call the Magistrate.
6      MR. ALTMAN:  Call the Magistrate on the
7  record. Go ahead.
8      MS. McGRODER:  I will be calling the
9  Magistrate, but while I do that we are going off
10  the record.
11      MR. ALTMAN:  No, let's do this on the
12  record.
13      MS. McGRODER:  Can I make the phone call
14  without being on the record?
15      MR. ALTMAN:  No, do it on the record.
16      MR. LONDON:  Do we have a dial-in today?
17      MR. ALTMAN:  We do not. Does that have
18  speaker phone?
19      MS. McGRODER:  (On her cell phone) Can I
20  have David? Hi, David, it's Lori -- I'm good. The
21  Plaintiffs would not agree to go off the record so
22  even though this -- only this certain portion of
23  our conversation is on the record, the Plaintiffs
24  have violated the agreement summarizing Defendants'

1151

1   that analysis in the bipolar cohort is that we had
2   an index diagnosis and so we know that the
3   likelihood of suicide attempts is highest actually
4   right before the index diagnosis or right before
5   people initiate treatment and then it goes down
6   after that.
7          The person/time analysis, one of the big
8   benefits of that is it allows you to model the
9   independent effects of time since the diagnosis of
10  the index disorder along with the effects of drugs
11  and how those effects change over time. We don't
12  really have that in the gabapentin cohort. We have
13  the start of medication and we can see in the
14  gabapentin cohort because there were very few
15  patients who, you know, made a suicide attempt on
16  the same day they started gabapentin, so suicide
17  attempt was not leading to treatment in the
18  gabapentin cohort. So there wasn't the same
19  motivation for including the -- this sort of time
20  effect, the exponential decay that we see in a
21  cohort in which the index thing is a diagnosis.
22          Q.  Well, I'm a little confused about
23  something. But you said that when you did the time
24  to event analysis for the bipolar, wasn't -- if I

1152

1   remember right, weren't you just figuring out how
2   much time was it before the first suicide attempt
3   and that was it and once it fired, it was done?
4          A.  Are you referring now to the
5   person/time --
6          Q.  Person/time analysis?
7          A.  -- analysis in the bipolar cohort?
8          Q.  Right.
9          A.  So in that analysis, the data were broken
10  up into monthly intervals, 12 months of time, up
11  until the point of the first suicide attempt. And
12  the drug status was determined separately on each
13  one of the months. So you know, people who never
14  made a suicide attempt had 12 months of
15  observation. People who made a suicide attempt say
16  at month six would have had six months of
17  observation in that analysis. So it's a time to
18  that event.
19          Q.  And somebody who had an attempt in month
20  six and may have been on the drug, went off the
21  drug, went back on the drug and had another
22  attempt, you wouldn't be -- all the data past the
23  first attempt was just not used in that particular
24  study, correct?

1153

1          A.  That's correct, in that particular
2   analysis.
3          Q.  If and when your bipolar paper is
4   accepted for publication, do you intend to modify
5   any of the analyses that you did in your expert
6   report?
7          A.  No.
8          Q.  If the paper is ultimately not published,
9   do you expect to amend your expert report to
10  reflect the fact that it has not been published?
11          MS. McGRODER:  Well, I object to form.
12  If you know. I think it's an improper hypothetical
13  that assumes facts not in evidence. I mean if you
14  have an intention, you can state it. If you don't
15  have one, that's fine.
16          THE WITNESS:  I would leave it the way it
17  is because it indicates that it's under review. If
18  the paper's not accepted in the Archives of General
19  Psychiatry, I'll resubmit it someplace else. It's
20  a pretty high profile issue. Paper's pretty -- I
21  mean, I wrote it, but I think it's a pretty good
22  paper. I think somebody's going to publish it. I
23  don't know. It's hard to predict what reviewers
24  will do. But if it's not published, you know, I

1154

1   indicate that it's under review because it will be
2   under review. It will either be published or under
3   review. I'll keep submitting it for the rest of my
4   life.
5          MR. ALTMAN:  Persistence. Let's go off
6   the record.
7          VIDEOGRAPHER:  The time is 2:15 p.m. We
8   are going off the record.
9          (Short recess.)
10          VIDEOGRAPHER:  The time is 2:27 p.m. We
11  are back on the record.
12          (Document marked as Gibbons Exhibit
13          Number 94 for identification.)
14          MR. ALTMAN:  I'm going to mark what is
15  Exhibit 94 is a copy of three checks to Dr. Hur. I
16  guess, Lori, you'll authenticate that those are the
17  three checks?
18          MS. McGRODER:  Those are the checks that
19  Dr. Gibbons wrote to Dr. Hur that comport with his
20  testimony given about those checks.
21          MR. ALTMAN:  I want to put a few things
22  on the record and I think we may be done.
23  According to the agreement entered into April 13th
24  that we discussed earlier between counsel, we have

1155

1    not been able to substantively ask questions about
2    the materials that were produced just last Friday,
3    Exhibits 66 to 90 and as such, while we agreed that
4    we would not file a motion to compel on those
5    materials does not mean we waive for all time our
6    ability to ask questions about those materials --
7    not about -- about the content of the materials
8    including the letter from the journal.
9         Furthermore, the letter discusses the
10   fact that Dr. Gibbons may supplement his expert
11   report. It is our position that Dr. Gibbons
12   included his bipolar study as part of his expert
13   report, his originally filed expert report and
14   therefore as such, any changes to that manuscript
15   need to be produced in accordance with Rule 26 and
16   we have an understanding that Dr. Gibbons has
17   revised his manuscript and submitted it.
18        We have not had an opportunity to see it
19   nor have we had an opportunity to ask questions
20   about it and we believe that we have the right to
21   do so and that Defendants have an obligation to
22   supplement Dr. Gibbons' expert report with the
23   current version of the manuscript and any
24   additional letters that come from the Archives of

1156

1    General Psychiatry. Therefore, we believe we have
2    the right to redepose Dr. Gibbons on those
3    materials at some point in the future and that is
4    pending the discussion between the parties. Is
5    there anything you need to put on, Jack?
6         MS. McGRODER: May I see the agreement?
7         MR. ALTMAN: Sure.
8         MS. McGRODER: First, my response to your
9    statement on the record is that we will follow
10   Rule 26 as we always have. And to the extent that
11   Dr. Gibbons is going to rely or consider a revised
12   manuscript as part of his opinions in this case we
13   will of course give it to you pursuant to the rule
14   because that's required.
15        And separately, on the issue of the
16   documents and materials that were produced to you,
17   as you know, they were produced as part of this
18   agreement of April 13, 2009 in exchange for not
19   filing a motion to compel and also as part of that
20   agreement that you would have a fourth deposition
21   opportunity with Dr. Gibbons limited to the new
22   paragraphs and new tables in his supplemental
23   expert report.
24        So that's the agreement and you can, you

1157

1    know, seek whatever motion you like with the court.
2    And are we concluded?
3         MR. ALTMAN: Before we're done, you say
4    fourth deposition?
5         MS. McGRODER: This is your fourth
6    deposition day with Dr. Gibbons.
7         MR. ALTMAN: It's not the fourth
8    deposition though.
9         MS. McGRODER: I meant fourth deposition
10   day.
11        MR. ALTMAN: You said fourth deposition.
12        MS. McGRODER: Duly noted.
13        MR. ALTMAN: Lori, is it your position
14   that Dr. Gibbons does not already have the
15   obligation to submit his revised manuscript as part
16   of Rule 26 considering that he included that
17   manuscript and findings from that manuscript in his
18   expert report?
19        MS. McGRODER: Well, I think what he
20   included in his expert report was the manuscript
21   that was authored last September and that has been
22   provided to you and there's nothing in his
23   supplemental expert report that suggests he's
24   considering and relying on the recently revised and

1158

1    resubmitted manuscript, but I will explore that
2    with Dr. Gibbons and happy to do so and happy to
3    follow the rule as always.
4         MR. ALTMAN: But could you show me where
5    in Rule 26 it says relied upon?
6         MS. McGRODER: Keith, the rest of my
7    sentence was and considered. So -- or considered.
8    You know what, we can have this discussion off the
9    record. We're going both to follow the rule. We
10   both know it.
11        MR. LONDON: I think the issue --
12        MR. ALTMAN: I would say that --
13        MR. LONDON: We're in recess. We won't
14   be able to determine that we're concluded until we
15   resolve this issue about the manuscript and perhaps
16   the other issue about interpretation of the
17   agreement.
18        MS. McGRODER: And it's Defendants'
19   position that the deposition is concluded and any
20   further deposition time will have to be either
21   agreed on ordered by the court.
22        MR. LONDON: We understand.
23        MS. McGRODER: Thank you.
24        VIDEOGRAPHER: The time is 2:33 p.m. We

Gibbons, Robert (Defense Expert)  4/27/2009  10:49:00 AM

---

1159

```
 1    are going off the record.
 2         (Whereupon, the deposition was concluded
 3         at 2:33 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

1161

```
 1         IN THE UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 2
   IN RE: NEURONTIN MARKETING    )
 3 SALES PRACTICES & PRODUCTS    )
   LIABILITY LITIGATION          )
 4                      )MDL DOCKET
   BULGER vs. PFIZER, et al.,    )No. 1629
 5 07-11426-PBS                  )
                        )MDL DOCKET
 6 SMITH vs. PFIZER, et al.,   )No. 04-10981
   05-CV-11515-PBS               )
 7
 8    I, ROBERT D. GIBBONS, Ph.D., being first
 9 duly sworn, on oath say that I am the deponent in
10 the aforesaid deposition taken on April 27, 2009;
11 that I have read the foregoing transcript of my
12 deposition, consisting of pages REPLACE through
13 REPLACE inclusive, and affix my signature to same.
14
        _____ as it now appears
15      _____ as it now appears with corrections
16
17           ROBERT D. GIBBONS, Ph.D.
18
19
   SUBSCRIBED and sworn to
20 before me this _____ day of
   _____, 2009.
21
22 _____
        Notary Public
23
24
```

---

1160

```
 1              I N D E X
   WITNESS                     PAGE
 2
   ROBERT D. GIBBONS, Ph.D.
 3
   EXAMINED BY
 4
     Mr. Altman           1084
 5
 6
 7          EXHIBITS
   NUMBER          MARKED FOR ID
 8
   Gibbons Deposition Exhibit
 9
   No. 66  Gibbons emails        1088
10
   Nos. 67 to 89
11     Gibbons discrete emails    1088
12 No. 90  Seaton email        1088
   No. 91  March 19 expert report   1088
13 No. 92  McGroder 2/23/09 email
           with 11/5/08 expert report  1088
14 No. 93  original expert report    1088
   No. 94  copies of checks to Dr. Hur  1154
15
16 Defendants'
17 No. 1  4/13/09 Seaton letter    1081
18
19
20
21
22
23
24
```

---

1162

```
 1 STATE OF ILLINOIS   )
                       ) SS:
 2 COUNTY OF DuPAGE    )
 3    I, Sandra L. Rocca, a State of Illinois
 4 licensed Certified Shorthand Reporter, License No.
 5 084-003435, do hereby certify that on the 27th day
 6 of April, 2009, at 10:49 a.m., 6638 South Cicero
 7 Avenue, Chicago, Illinois, the deponent ROBERT D.
 8 GIBBONS, Ph.D. personally appeared before me.
 9    I further certify that the said ROBERT D.
10 GIBBONS, Ph.D. was by me first duly sworn to
11 testify and that the foregoing is a true record of
12 the testimony given by the witness.
13    I further certify that the deposition
14 terminated at 2:33 p.m.
15    I further certify that the reading and
16 signing of the deposition was not waived, and the
17 deposition was submitted for signature.  Pursuant
18 to Rule 30(e) of the Rules of Civil Procedure, if
19 deponent does not appear or read and sign the
20 deposition within 30 days, or make other
21 arrangements for reading and signing, the
22 deposition may be used as fully as though signed,
23 and this certificate will then evidence such
24 failure to appear as the reason for signature not
```

---

1163

```
 1    being obtained.
 2         I further certify that I am not counsel
 3    for nor related to any of the parties herein, nor
 4    am I interested in the outcome hereof.
 5         In witness whereof, I have hereunto set
 6    my hand and seal of office this      day of
 7            , 2009.
 8
 9
10         Notary Public, DuPage County, Illinois
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```