# EXHIBIT 8

**Neurontin Pfizer Sales _Marketing Team**
**Vega Sr, Adrian (Pfizer)**
6/14/2007

**Printed : 5/6/2008**

Page 267

```
 1
 2         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 3
 4
 5   ----------------------------X
 6   IN RE: NEURONTIN MARKETING    MDL Docket No. 1629
 7   SALES PRACTICES, AND PRODUCTS  Master File No.
 8   LIABILITY LITIGATION          04-10981
 9   ----------------------------X
10
11      VIDEOTAPED DEPOSITION OF ADRIAN VEGA, SR.
12            New York, New York
13            June 14, 2007
14
15
              VOLUME II
16
17
18
19
20
21   Reported by:
        Amy A. Rivera, CSR, RPR
22
23
24
25
```

Page 268

```
 1
 2   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
 3
 4   ----------------------------x
 5   IN RE: NEURONTIN PRODUCTS
 6   LIABILITY LITIGATION    Index Number 765000/2006
 7   ----------------------------x
 8
 9
10
11      VIDEOTAPED DEPOSITION OF ADRIAN VEGA, SR.
12
13
14            New York, New York
              June 14, 2007
15
16
17
18
19
20
21
22
23
24
25
```

Page 269

```
 1
 2
 3
 4         Deposition of ADRIAN VEGA, SR., held
 5   at DAVIS, POLK & WARDWELL, LLP, 450 Lexington
 6   Avenue, New York, New York, before Amy A. Rivera,
 7   a Notary Public of the State of New York.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 270

```
 1
 2   A P P E A R A N C E S:
 3   FINKELSTEIN & PARTNERS
        Attorneys for Product Liability Plaintiffs
 4         785 Broadway, Third Floor
           Kingston, New York 12401
 5   BY:    KENNETH B. FROMSON, ESQ.
 6
 7   NEBLETT, BEARD & ARSENAULT
        Attorneys for Product Liability Plaintiffs
 8         2220 Bonaventure Court
           Alexandria, Louisiana  71309-1190
 9   BY:    JEAN PAUL P. OVERTON, ESQ.
10
11   TAYLOR, MARTINO & KUYKENDALL
        Attorneys for Plaintiffs
12         216 Palafox Place
           P.O. Box 12305
13         Pensacola, Florida  32502
     BY:    JOSEPH A. ZARZAUR, JR., ESQ. (via telephone)
14
15   ROBINS, KAPLAN, MILLER & CIRESI
        Attorneys for Plaintiffs
16         2800 LaSalle Plaza
           800 LaSalle Avenue
17         Minneapolis, MN
     BY:    W. SCOTT SIMMER, ESQ.
18
19   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
        Attorneys for Class Plaintiffs
20         Embarcadero Center West
           275 Battery Street, 30th Floor
21         San Francisco, California  94111-3339
     BY:    BARRY R. HIMMELSTEIN, ESQ.
22          DANIEL E. SELTZ, ESQ.
23
24
25
```

371

1        Vega - examination
2    that.
3         Who in Medical Information during the
4    time that you were handling Neurontin decided
5    which adverse events observed during clinical
6    trials should be included in standard response
7    documents?
8         MS. McGRODER: Object to form.
9    A.   I'm not quite sure I understand your
10   question.
11   Q.   Okay. What is it that you don't
12   understand, and I'll certainly try to articulate
13   it better?
14   A.   So, if you're talking about a standard
15   response document on a particular topic, and
16   you're talking about a unpublished clinical trial.
17   Q.   No.
18   A.   Okay. Then that's why I'm not
19   understanding your question.
20   Q.   Let's forget about published
21   literature; okay? Just put it out of your mind
22   for a moment?
23   A.   Okay.
24   Q.   Will you do that?
25   A.   Sure.

372

1        Vega - examination
2    Q.   Forget about post-marketing safety
3    surveillance data; okay?
4    A.   Okay.
5    Q.   Can you put that out of your mind for
6    a moment?
7    A.   Sure.
8    Q.   We can agree that clinical trial,
9    in-house clinical trial information maintained by
10   the company as part of its new drug application is
11   also information that could be included in
12   standard response documents; right?
13   A.   Could be included; yes.
14   Q.   And obviously it would only be
15   included if it met certain requirements by Medical
16   Information if they felt it was necessary to be
17   accurate and timely and efficient in terms of
18   providing the standard response document; right?
19        MS. McGRODER: Object to form.
20   A.   Whether or not a particular study, an
21   in-house study was evaluated -- was evaluated for
22   inclusion, is that what you're asking?
23   Q.   Yes. Who makes that decision in
24   Medical Information?
25   A.   The Medical Information manager in

373

1        Vega - examination
2    charge of the product and in cases in
3    collaboration with their manager.
4    Q.   So, in response to a query about
5    behavior by healthcare professional, what was the
6    process to determine which adverse events from
7    United States clinical trials prior to approval
8    would be referenced in a standard response
9    document, if at all?
10   A.   What kind of behaviors are you talking
11   about?
12   Q.   Well, let's consider the standard
13   response document for behavioral changes.
14   A.   That's a very broad term.
15        MS. McGRODER: You need to show it to
16   him.
17   Q.   Are you aware of whether there is a
18   specific standard response document for behavioral
19   changes that was in existence during the time
20   frame you were handling Neurontin?
21   A.   If you show me the document, it might
22   help refresh my memory.
23   Q.   And are you aware of whether there was
24   a standard response document during the time frame
25   that you were handling Neurontin that pertained to

374

1        Vega - examination
2    suicide?
3    A.   With regards to an incidence of as an
4    adverse event report? Or use of, I'm not sure --
5    Q.   I can accept that caveat, sure. Are
6    you aware of such response documents?
7         MS. McGRODER: Object to form.
8    A.   This is with regard to Neurontin?
9    Q.   Yes.
10   A.   If there was a question that was asked
11   with regards to the topic that we're discussing, I
12   would believe that there would be a standard
13   response document.
14   Q.   Have you reviewed prior to your
15   deposition today, but for purposes of refreshing
16   your recollection about your involvement in the
17   Medical Information Department, any standard
18   response documents that pertain to inquiries
19   involving suicide?
20   A.   I saw several documents.
21   Q.   And what documents did you see that
22   pertained to suicide and standard response
23   documents, if any?
24   A.   Standard response document?
25   Q.   Are you asking me or telling me?

### Page 383

 1    Vega - examination
 2    A.  You're asking me if I was aware of
 3  that?
 4    Q.  Correct.
 5      MS. McGRODER:  Object to form.
 6      MR. FROMSON:  I'll rephrase the
 7  question.
 8    Q.  Doctor, during the time frame that you
 9  were dealing with Neurontin, did you have any
10  understanding or awareness that the FDA in
11  approximately January of 1992 had prepared a
12  combined medical statistical review?
13    A.  I wasn't at Pfizer in 1992.  I
14  wouldn't be aware of any of that information.
15    Q.  All right.  Was such documentation
16  from the FDA available to the Medical Information
17  Department during the time frame that you were
18  handling Neurontin during the 2002-2004 era,
19  notwithstanding the fact that the information from
20  the FDA may have originally been prepared in 1992?
21    A.  Not that I know, no.  I'm not aware of
22  it.  I didn't enter the industry until 1996.
23    Q.  Right.  I'm not sure we're on the same
24  page.
25      My question was:  Was this information

### Page 384

 1    Vega - examination
 2  available to you?  Not were you aware of it, but
 3  was the information from the FDA such as a medical
 4  or statistical review regarding safety available
 5  to you in your position in the information -- in
 6  the Medical Information Department?
 7    A.  That would -- I would say no, that's
 8  beyond the scope of what our department does.
 9    Q.  Okay.
10    A.  The documents you're stating there are
11  regulatory safety documents.  They would probably
12  be handled by the folks in that department.  So, I
13  wouldn't really know or have knowledge of what
14  you're talking about right there.
15    Q.  Okay.  And before today's deposition,
16  now the question goes from 2004 all the way up to
17  today, okay, up to today, has anyone -- up to
18  today, are you aware that the FDA performed a
19  combined medical statistical review in
20  approximately January of 1992, and in which the
21  clinical reviewer was Cynthia McCormick, M.D.?
22    A.  Not until -- no.  What you just stated
23  is the first time I've ever heard it.
24    Q.  Okay.  That's what I needed to know.
25  All right.

### Page 385

 1    Vega - examination
 2      Now, if I can reference your attention
 3  to -- well, actually, let me withdraw that.
 4      If FDA had rendered comments regarding
 5  the safety of the drug, and it concerned over the
 6  prevalence of suicide adverse events, and this is,
 7  of course, a hypothetical, okay, would that be
 8  information that would be important to you in
 9  determining whether a standard response document
10  regarding suicide is accurate?
11      MS. McGRODER:  Object to form.
12  Improper hypothetical; calls for speculation.
13    A.  Can you just repeat your question one
14  more time, please?
15    Q.  If I said it slow enough and she was
16  able to type it down.  Let me -- I think I could.
17  Let me see what I asked.
18      Doctor, if FDA had rendered comments
19  regarding the safety of the drug and its concerns
20  over the prevalence of suicide adverse events and
21  this is, of course, a hypothetical, would that be
22  information that would be important to you in
23  determining whether a standard response document
24  regarding suicide is accurate?
25      MS. McGRODER:  Same objections.

### Page 386

 1    Vega - examination
 2    A.  If I understand your question, you're
 3  talking about a potential adverse event, suicide,
 4  and whether that information would make it into a
 5  standard response.  If it's in the package insert,
 6  it more than likely -- and the topic was with
 7  regards to suicide, it would be put in the
 8  standard letter, should be considered for addition
 9  in reference as the package insert.
10    Q.  Okay.  Now, if you didn't understand
11  my question, then I don't know if I have an answer
12  to my question.  So, let me rephrase it.
13    A.  Okay.
14    Q.  From a practical standpoint, if you
15  know that the FDA has rendered a comment or a
16  concern regarding the prevalence of suicide as an
17  adverse event in the pre-approval clinical
18  trials -- and this, of course is, a
19  hypothetical -- would that be information that
20  you'd want to know about in your position in the
21  U.S. Medical Information department?
22      MS. McGRODER:  Object to form.
23  Improper hypothetical.  Calls for speculation.
24    A.  Would I find that information useful
25  for me to know?

**387**

1          Vega - examination
2     Q.   Yes.
3     A.   We're talking specifically about
4  Neurontin?
5     Q.   Yes.
6     A.   And hypothetically, not to say that
7  that was during the time I was responsible for the
8  product?
9     Q.   During the time you were responsible
10 for the product?
11         MS. McGRODER:  Same objections.
12    A.   It's kind of hard for me to answer
13 your question because there seems to be some time
14 frames that are not kind of aligning to in my
15 mind, they're not aligning to the sequence that
16 you describe, but hypothetically speaking, there's
17 information -- again, I'm having a hard time
18 trying to answer your question because I'm trying
19 to understand it.
20         The information that you're describing
21 in that dialogue with FDA would be dialogue that
22 they would be having with the folks in regulatory
23 and safety and not with Medical Information.
24    Q.   Understood.
25         Would you want to know about it?

**388**

1          Vega - examination
2          MS. McGRODER:  Object to form;
3  improper hypothetical.
4     A.   Would I want to know about the
5  information?
6     Q.   Yes.
7     A.   I would want my medical information
8  manager to be up to date on what's going on with
9  the product?  Yes.
10    Q.   Okay.  Were you ever informed in any
11 way, shape, or form, that Neurontin had a risk
12 profile that was uncertain?
13         MS. McGRODER:  Object to form.
14 Assumes facts not in evidence.
15    A.   Can you just repeat that one more
16 time, please?
17    Q.   Sure.
18         Were you ever informed in any way,
19 shape, or form that Neurontin had a risk profile
20 that was uncertain?
21         MS. McGRODER:  Same objections.
22    A.   No.
23    Q.   Were you ever informed that adverse
24 events of clinically important depression observed
25 during clinical trials prior to approval formed

**389**

1          Vega - examination
2  the basis for the FDA to indicate that Gabapentin
3  had a risk profile that was uncertain?
4          MS. McGRODER:  Object to form;
5  improper hypothetical.
6     A.   I have no knowledge of what you're
7  asking me.
8     Q.   All right.  Would it be important for
9  you to know in your position at the time that the
10 United States Medical Information that the FDA
11 prior to approval had indicated that Neurontin had
12 a risk profile that was uncertain with groups of
13 important adverse events that had not yet been
14 fully characterized including clinically important
15 depression?
16         MS. McGRODER:  Object to form.
17 Improper hypothetical.
18    A.   The information -- it's beyond the
19 scope of what my understanding -- of what you're
20 asking me.
21    Q.   Would that have been information that
22 you would have wanted your medical information
23 managers to know?
24         MS. McGRODER:  Object to form;
25 improper hypothetical.

**390**

1          Vega - examination
2     A.   Prior to the product being approved?
3  So, this is a hypothetical that you're asking me?
4  Yes?  Because I wasn't responsible or had no
5  knowledge of Neurontin other than in my practices
6  as a clinical pharmacist.
7     Q.   Right.  But I'm not dating you back
8  prior to Pfizer.  It's during the time frame that
9  you were handling Neurontin, as well as the
10 Medical Information managers were handling
11 Neurontin?
12    A.   Okay.
13    Q.   Would that have been information you
14 would have wanted to know?
15         MS. McGRODER:  Object to form.
16 Improper and incomplete hypothetical.
17    A.   Again, the information you're
18 describing would probably be the responsibility of
19 the Safety Department.  Safety and Regulatory.
20    Q.   Would it have been information you in
21 your position in Medical Information had wanted --
22 would have been information in your position in
23 Medical Information that you would have wanted to
24 know?
25         MS. McGRODER:  Same objections.