**EXHIBIT A**

1

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3   In re: NEURONTIN              : MDL DOCKET NO. 1629
     MARKETING, SALES              :
 4   PRACTICES AND PRODUCTS        :
     LIABILITY LITIGATION          :
 5   ------------------------      : MASTER FILE NO.
     THIS DOCUMENT RELATES TO:     : 04-10981
 6                                 :
     Bulger,v. Pfizer, Inc.,       :
 7   et al.                        :
     Case No. 05-CV-11515-PBS      :
 8

 9    VIDEOTAPE DEPOSITION OF STEFAN P. KRUSZEWSKI, M.D.

10              VOLUME I (Page 1 - 344)

11              Taken in the Harrisburg Hilton,

12   located at 1 North Second Street, Harrisburg,

13   Pennsylvania, on Wednesday, October 15, 2008,

14   commencing at 9:07 a.m., before  Sally A. Slifer,

15   Registered Merit Reporter, Certified Realtime

16   Reporter, and Robert Cowalchik, Videographer.

17

     APPEARANCES:
18
                        FINKELSTEIN & PARTNERS, L.L.P.
19                      BY:  KENNETH FROMSON, ESQ.
                        785 Broadway, 3rd Floor
20                      Kingston, NY  12401
                          -- For the Plaintiff
21

22

23

24

25
```

## Page 2

1  APPEARANCES: (Continued)
2
      SHOOK, HARDY & BACON, L.L.P.
3     BY: LORI McGRODER, ESQ.
          LORI SCHULTZ, ESQ.
4         JENNIFER M. STEVENSON, ESQ.
      2555 Grand Boulevard
5     Kansas City, MO  64108
      -- For Defendants

## Page 3

         INDEX TO WITNESSES.

WITNESS                          PAGE

STEFAN P. KRUSZEWSKI

  By Ms. McGroder                 4


         INDEX TO EXHIBITS

                                 PAGE
EXHIBIT    DESCRIPTION          MARKED
1     Medical Examiner Report        47
2     Dr. Kruszewski's report        61
3     Agenda for the Sheraton Hotel
      Meeting April 29th, 2008      144
4     CV                            148
5     FDA Statistical Review Chart
      May 23, 2008, Odds Ratio      241

## Page 4

1            THE OPERATOR: We are on the record.
2   The time is 9:07 a.m. My name is Robert Cowalchik of
3   Veritext Corporate Services. The date today is
4   October 15th, 2008. This deposition is being held in
5   the Harrisburg Hilton, located at One North Second
6   Street, Harrisburg, Pennsylvania.
7            The caption of this case is, in re,
8   Neurontin Marketing Sales Practices and Products
9   Liability Litigation. This document relates as to
10  Bulger v. Pfizer, Inc., et al. Case Number
11  05-CV-11515-PBS in the United States District Court,
12  District of Massachusetts.
13           At this time the attorneys will
14  identify themselves and the parties they represent
15  after which our court reporter will swear in the
16  witness and we can proceed. The name of the witness
17  is Stefan P. Kruszewski.
18           MR. FROMSON: For the Bulger family,
19  my name is Kenneth Fromson.
20           MS. McGRODER: Lori McGroder on
21  behalf of Pfizer defendants.
22           MS. STEVENSON: Jennifer Stevenson
23  on behalf of Pfizer.
24           MS. SCHULTZ: Lori Schultz on behalf
25  of Pfizer.

## Page 5

1            STEFAN P. KRUSZEWSKI, having been
2   duly sworn, was examined and testified as follows:
3                        * * *
4                     EXAMINATION
5   BY MS. McGRODER:
6   Q.    Good morning, Dr. Kruszewski.
7   A.    Good morning.
8   Q.    Good to see you again. We last met in
9   February of this year, correct, for a deposition?
10  A.    That's correct.
11  Q.    And then I guess you could say we met in June
12  and July again of this year for the Daubert hearing,
13  correct?
14  A.    We did.
15  Q.    Then we were here, as you know, on September
16  8th for a deposition that was scheduled in the Bulger
17  matter for which you were unable to appear, correct?
18  A.    That's correct.
19  Q.    Since the time that we last met in July of
20  2008, have you published your opinion in any peer
21  review journal that Neurontin is capable of causing
22  suicide?
23  A.    I have not.
24  Q.    Have you ever submitted for publication your
25  opinion in this litigation in a peer review journal --

82

1  Q.   Okay. And you brought with you notebooks
2  containing deposition transcripts, correct?
3  A.   Yes.
4  Q.   Notebooks containing medical records of Mrs.
5  Bulger, correct?
6  A.   Correct.
7  Q.   Have you reviewed any medical records of Ron
8  Bulger?
9  A.   I have not.
10 Q.   And you brought with you the report and
11 psychological autopsies by Dr. Maris, correct?
12 A.   Correct.
13 Q.   You brought your billing statements, correct?
14 A.   Correct.
15 Q.   Is there anything else you brought with you
16 today that responds to the deposition notice in this
17 case?
18 A.   I believe that the deposition notice stated
19 that anything I might have utilized in preparation for
20 this case, which is a very wide request, but under the
21 aegis of general causality being important to explain
22 specific causality, I also brought my deposition
23 transcripts from the general causality depositions.
24 Q.   And those were your depositions -- that was
25 the deposition that was taken in December of '07?

83

1  A.   With you and Mr. Rubin.
2  Q.   Right.
3  A.   Yes.
4  Q.   Did you also bring your deposition transcript
5  from February of '08 in connection with the FDA alert?
6  A.   Yes, I did.
7  Q.   And you brought your general causation
8  report?
9  A.   Yes, I did. I don't have the transcript, I
10 am sure it exists, from the Daubert hearing, so I did
11 not bring that.
12 Q.   Did you actually review that transcript?
13 A.   I did not.
14 Q.   Have you met with any witness consultants or
15 jury consultants to prepare to give testimony in
16 Neurontin or any other litigation?
17      MR. FROMSON: Just note my objection
18 as to the form, only to the extent it's compound.
19 You've included Neurontin and any other litigation
20 which has been involved. You can answer.
21 A.   I don't think I've ever met with either a
22 witness consultant -- well, let me take the first one
23 first.
24      I don't believe I ever met with a
25 witness consultant. My preparation for depositions

84

1  has come from personal reading and from the attorneys
2  and the attorney groups that I am working with. In
3  terms of -- what was the other part?
4  Q.   Well, let me rephrase. Hopefully I haven't
5  complicated it more than it needs to be.
6       Have you ever met with a consultant
7  to give you tips in talking about being an expert
8  witness and talk with you about giving testimony and
9  how you present yourself, have you ever met with that
10 kind of witness consultant?
11 A.   I have not.
12 Q.   Never at any time?
13 A.   Never at any time.
14 Q.   Do you know who David Egilman is?
15 A.   I do.
16 Q.   Is David Egilman a witness consultant?
17 A.   I don't know. He's a -- works on
18 occupational health, is a professor at Brown.
19 Q.   Does he have a side business offering witness
20 consultation?
21 A.   He may well.
22 Q.   Have you ever met with David Egilman?
23 A.   I have, right before I testified in the
24 Daubert hearings.
25 Q.   And what did you and David Egilman talk about

85

1  before the Daubert hearings?
2  A.   We talked about expectations for testifying.
3  Q.   Really. What is that about?
4       MR. FROMSON: Let him finish his
5  answer.
6  Q.   Go ahead and finish.
7  A.   He said he had testified previously, and we
8  talked mostly about Bradford Hill criteria. I talked
9  to him about the Naranjo criteria, and that's all I
10 can recall right now.
11 Q.   Who -- did you contact David Egilman to talk
12 with him prior to the Daubert hearing?
13 A.   I did not. He was in Boston when I arrived.
14 Q.   And was there a meeting arranged for you to
15 meet with Mr. Egilman?
16 A.   He -- I don't know if there was a specific
17 meeting. He was there, my understanding, at the
18 request of Mr. Finkelstein. And as Dr. Trimble was
19 there and a number of other people from different
20 firms, and Cheryl Blume, we would talk.
21 Q.   You all met together, Dr. Trimble, Cheryl
22 Blume, you, Mr. Egilman and lawyers from various law
23 firms, is that correct?
24 A.   No, that's not correct.
25 Q.   Okay. Straighten me out.

22 (Pages 82 to 85)

**Page 86**

1  A.     Cheryl Blume was there. The only time I met
2  with her was on the ride over to -- the morning I was
3  supposed to testify in the evidentiary hearings,
4  that's the only time I ever actually met her. Dr.
5  Trimble was also there. I did not specifically meet
6  with him either.
7  Q.     Dr. Trimble was also where?
8  A.     In Boston at the same time, because he was
9  also testifying on the general causality.
10 Q.     What I am getting at, Dr. Kruszewski, is when
11 you met with Mr. Egilman, who else was present?
12 A.     We met in a restaurant in the hotel we stayed
13 at. And we met -- we took a walk outside.
14 Q.     My question was who else was there, who was
15 there when you met with Mr. Egilman?
16 A.     That was it.
17 Q.     You and Mr. Egilman?
18 A.     Yes.
19 Q.     And the Finkelstein law firm arranged for
20 that meeting, correct?
21 A.     You would have to ask them. I don't know if
22 they specifically arranged for it. He's somebody I
23 had never met, someone whose name I knew from the
24 Zyprexa litigation.
25 Q.     So how did you know you were going to have a

**Page 87**

1  meeting with them, who told you?
2  A.     I think Mr. Finkelstein told me, he was
3  there, and that --
4  Q.     And that he wanted -- did Mr. Finkelstein
5  tell you he wanted you to meet with Mr. Egilman?
6  A.     I don't remember him using those words.
7  Q.     How do you spell Mr. Egilman, by the way?
8  A.     E-G-I-L-M-A-N.
9  Q.     What words did he use?
10 A.     He said, you know, we got David Egilman here
11 who has a wonderful understanding of Bradford Hill
12 criteria and a wonderful understanding of matters
13 regarding testimony, and so you really might want to
14 compare notes with him.
15 Q.     How does Mr. Egilman have a wonderful
16 understanding of matters regarding testimony?
17 A.     He told me he had testified in previous
18 litigation.
19 Q.     Did he tell you he had a witness consulting
20 business?
21 A.     He did not.
22 Q.     Did you ask Mr. Finkelstein why Mr. Egilman
23 was present before and during the Daubert hearing?
24 A.     I don't believe that I did.
25 Q.     Is Mr. Egilman a consultant to the

**Page 88**

1  Finkelstein law firm?
2  A.     I don't know that.
3  Q.     Did you ask Mr. Egilman if he was consulting
4  with the Finkelstein law firm?
5  A.     I don't believe that I did.
6  Q.     Did you have any understanding about that one
7  way or the other?
8  A.     Well, my assumption was that they must know
9  each other since he was invited up to Boston.
10 Anything more official than that I am not privy to.
11 Q.     You didn't ask Mr. Egilman if he was being
12 paid by the Finkelstein law firm to meet with you?
13 A.     No. My assumption was that he was being
14 paid, but I did not ask the question.
15 Q.     And what did Mr. Egilman tell you about
16 expectations for testifying?
17 A.     He said, to the best of my recollection, to
18 be calm, answer the question, stay focussed, answer
19 only the question and don't provide more information
20 than is specifically needed to answer the question.
21        Then we went over, as I said, things
22 related and unrelated in our conversations to the
23 case.
24 Q.     To your knowledge is Mr. Egilman --
25 A.     Dr. Egilman.

**Page 89**

1  Q.     Is he a consultant to the Finkelstein law
2  firm on the Neurontin litigation?
3  A.     I -- he may well be, I don't know that.
4  Q.     Did Mr. Egilman tell you he had any opinions
5  about Neurontin?
6  A.     He did not tell me any opinions he had about
7  Neurontin.
8  Q.     How is Mr. Egilman qualified?
9  A.     To do what?
10 Q.     Well, I mean, I think you said you think he's
11 a doctor. Is he a doctor?
12 A.     My understanding is that he's a professor of
13 occupational health; occupational and community health
14 at Brown University. Otherwise I don't know his
15 qualifications. He told me that he's done a lot of
16 testimony in a lot of different cases.
17 Q.     And let's talk about that briefly. First,
18 you don't know if he's a doctor or not, correct?
19 A.     I believe that he is a doctor, yes.
20 Q.     You think he has a Ph.D.?
21 A.     I think he has an M.D.
22 Q.     You do. And where is he a professor of
23 occupational health, do you know?
24 A.     I believe that he works in Massachusetts but
25 his appointment is to Brown University.

```
                                                    90
 1  Q.    And he's testified in litigation against
 2  Lilly in the Zyprexa litigation, is that what --
 3        Let me rephrase. In what
 4  testimony -- to your knowledge, what is Mr. Egilman's
 5  vast experience testifying?
 6  A.    He said he's testified many times.
 7  Q.    In what cases?
 8  A.    I can't name them for you.
 9  Q.    I think you said he testified in the Zyprexa
10  litigation, right?
11  A.    I don't know that I said he testified in
12  Zyprexa. I said he was heavily involved in the
13  Zyprexa litigation because of something I may have
14  reported in previous depositions here.
15        When Dr. Egilman was provided
16  documents from Eli Lilly from Jim Gottstein,
17  G-O-T-T-S-T-E-I-N, from Anchorage, Alaska, and those
18  documents were given to Alex Berenson of the New York
19  Times.
20  Q.    So Mr. Egilman was not only criticized for
21  handing over confidential documents, but he was
22  sanctioned, is that correct?
23  A.    That is correct.
24  Q.    Did Mr. Egilman talk with you at all about
25  your review of confidential documents in the Neurontin

                                                    91
 1  litigation?
 2  A.    I'm sorry. Repeat that.
 3  Q.    Did he talk with you at all about your review
 4  of confidential documents in the Neurontin litigation?
 5  A.    We did not discuss any documents in the
 6  Neurontin litigation.
 7  Q.    Has Mr. Egilman been provided any Pfizer
 8  company documents in the Neurontin litigation?
 9  A.    I have no idea.
10  Q.    Has Mr. Egilman signed a protective order in
11  the Neurontin litigation, to your knowledge?
12  A.    I have no idea.
13        MS. McGRODER: It's time to change
14  the tape.
15        THE OPERATOR: Going off the record.
16  The time is 11:20 a.m. This is the end of tape
17  number two.
18        (Brief recess was had.)
19        THE OPERATOR: We are on the record.
20  The time is 11:29 a.m. This is the beginning of tape
21  number three.
22  Q.    Now we talked about the meeting you had with
23  Mr. Egilman prior to the Daubert hearing, correct?
24  How long did that meeting last?
25  A.    We took a walk for about 45 minutes. We had

                                                    92
 1  another meeting in the cafeteria at the hotel, that
 2  was about 45 minutes.
 3  Q.    Have you since again met with Mr. Egilman?
 4  A.    I have spoken to him I have not actually --
 5  yes, spoken to him.
 6  Q.    In what context did you speak with Mr.
 7  Egilman again since the time of the July Daubert
 8  hearing?
 9  A.    I have another enterprise I am involved in
10  called RiverView Productions, that's R-I-V-E-R,
11  capital V, I-E-W. And RiverView Productions is a
12  recently formed group to make major motion pictures.
13        And Dr. Egilman said he had a screen
14  play that he would like me to see. So we discussed
15  that.
16  Q.    So is RiverView Productions a corporation, is
17  it incorporated?
18  A.    It's incorporated in the state of Delaware.
19  Q.    And are you the president or CEO, what is
20  your title at RiverView Productions?
21  A.    Principal.
22  Q.    Any other principals in RiverView
23  Productions, other than yourself?
24  A.    That's it.
25  Q.    Have you yourself written screen plays?

                                                    93
 1  A.    Yes.
 2  Q.    How many?
 3  A.    Five that have been copyrighted by the
 4  Screenwriters Guild and by the US Library of Congress,
 5  four of them have been copyrighted by the US Library
 6  of Congress.
 7        Approximately nine in total.
 8  Q.    And do these all have a similar subject
 9  matter or do they vary?
10  A.    They vary.
11  Q.    So what are they about, in a nutshell?
12        MR. FROMSON: I don't know if you
13  can do it in a nutshell.
14  A.    Really.
15  Q.    Give me the subject matter of each one?
16  A.    Scope of Practice was the first one I wrote.
17  Q.    Scope of medical practice?
18  A.    No, it's called Scope of Practice.
19  Q.    What is it about?
20  A.    It's about a Harvard psychiatrist who was
21  fired from his job working for a corporation that
22  doesn't really exist, working with the Commonwealth of
23  Pennsylvania, because he's found fraud and then how he
24  perseveres, and it has a fictitious ending.
25  Q.    And is that based on your own
```

24 (Pages 90 to 93)