UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL SALES & MARKETING ACTIONS | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**ERRATA RE CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER DENYING RENEWED MOTION FOR CLASS CERTIFICATION AS TO CONSUMER AND THIRD PARTY PAYOR BIPOLAR AND MOOD DISORDER SUBCLASSES**

In their haste to meet the jurisdictional deadline for filing their motion for reconsideration (Dkt. No. 1796),[1] Plaintiffs confused Dr. Bell's expert report, entitled "Declaration of Gregory P. Bell, Ph.D.," with the "Declaration of Gregory K. Bell, Ph.D. in Opposition to Plaintiffs' Renewed Motion for Class Certification," cited in the Court's May 13, 2009 Memorandum and Order ("the "Order"). See Order at 46 (citing Decl. of Gregory Bell ("Bell Decl."), Ex. 35, Docket No. 1175).[2]  As a consequence, Plaintiffs were unable to locate a number of the Court's references to Dr. Bell's declaration, and responded, in part, with references to Dr. Bell's un-filed expert report, instead of his declaration.  Plaintiffs apologize for the confusion, and respectfully submit this *errata*, so that the Court may address Class Plaintiffs' motion for reconsideration on a clear record.

As stated in the Order, "[a]ccording to Dr. Bell, by 2000, 'approximately 30 percent of covered lives were under plans that excluded coverage for off-label prescriptions.'"

---

[1] See, e.g., Gutierrez v. Johnson & Johnson, 523 F.3d 187, 192 (3d Cir. 2008).
[2] On December 15, 2008, Defendants emailed Plaintiffs a document entitled "Declaration of Gregory K. Bell, Ph.D.," described as Dr. Bell's "expert report."  As this report was apparently never filed with the Court, it lacked a header showing the docket number.

Order at 47-48 (quoting Bell Decl. ¶ 57). This statistic is of little significance.[3] Dr. Bell does not dispute Dr. McDonough's fundamental point that "[b]ecause POS (point-of-service) pharmacy claim technology is standardized in the United States and its territories, all pharmacy claims are processed in a substantially similar manner;" that "the information available through the claim processing system to TPPs and PBMs is essentially identical nationwide;" and that "TPPs and PBMs are unable to use the pharmacy point-of-service claim processing system to limit coverage of Neurontin to FDA-approved indications." Expert Report of Kimberly P. McDonough (Dkt. No. 1457, Exh. H ("McDonough Report")) §§ 4, 5.3. Dr. Bell offers little more than rampant speculation as to how, despite the uniform and fundamental inability of TPPs and their PBMs to distinguish between an "on" and "off-label" Neurontin prescription, TPPs "*could*" or "*may*" have attempted to restrict the off-label prescribing of Neurontin.[4]

---

[3] See U.S. ex rel. Franklin v. Parke-Davis, 147 F. Supp. 2d 39, 45 (D. Mass. 2001) ("unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid"); In re Pharmaceutical Ind. Average Wholesale Price Litig., 321 F. Supp. 2d 187, 195 (D. Mass. 2004) ("Drugs purchased by Medicaid recipients account for roughly ten percent of all prescription drugs purchased in the United States.").

[4] See Bell Decl. ¶ 8 ("Virtually all TPPs had *access* to formularies; many *may* have addressed the prescribing of Neurontin for specific off-label uses. TPPs also had *access* to a variety of non-formulary controls on drug utilization and costs, such as drug utilization review ("DUR") and academic "detailing" by pharmacists and physicians."), ¶ 52 ("one would *expect* high utilization products, such as Neurontin, to be identified and questions to be raised regarding appropriate use"), ¶ 54 ("a formulary *could*, for example, require prior authorization before the drug is dispensed; require that the drug only be dispensed for a particular indication ("use limits"); require that the drug only be dispensed by certain medical specialties ("specialty limits"); require that the drug only be prescribed after other specific therapeutic alternatives have been tried and found to be unsatisfactory ("step therapy"); or it *could* limit the allowable dose, quantity per day, or the number of refills ("quantity limits"). Each of these types of restrictions *could* be used by a TPP to control prescribing behavior, including off-label prescribing for Neurontin"), ¶ 70 ("Insofar as TPPs were concerned about the extent of Neurontin prescribing for specific off-label uses, they *may* have used academic detailing to educate their physicians and thereby influence prescribing of Neurontin for those uses"), ¶ 71 ("To the extent that TPPs were concerned about Neurontin prescribing for specific off-label conditions, they *may* have used DUR to identify those physicians and those prescriptions which might appear to be for those conditions in an attempt to influence such use."), ¶ 72 ("A DM program *could*, for example, affect physician

The Court accepts at face value Dr. Bell's representation that "[t]hose TPPs and PBMs that agreed to reimburse for off-label Neurontin prescriptions chose to include Neurontin in their formularies with varying prior authorization, use, specialty, and quantity limitations." Order at 48 (citing Bell Decl. ¶ 59). In fact, the only "examples" of such restrictions Dr. Bell was able to find within the Class period—despite a wide-ranging search including even the smallest health plans—are (1) in 2004 (only months before the end of a 9-year class period), "some" Aetna plans required prior authorization for larger than a 30-day supply of Neurontin at the maximum FDA-approved dose of 1800 mg/day;[5] and (2) a 2003 "recommendation" (apparently never acted upon) that ASEA impose quantity limits.[6] There is nothing peculiar to Neurontin about such limits.[7] To the extent any TPP was successful in limiting the size of its insureds' Neurontin prescriptions, that is reflected in the aggregate payments for the drug by private insurers,[8] and each TPP will be eligible to claim only its fair share of any TPP Subclass damages award, based on its own expenditures for Neurontin relative to the total. Dr. Bell's remaining examples of restrictions on the use of Neurontin occur entirely outside the Class

---

prescribing decisions for a given condition by identifying preferred therapeutic approaches or advising against the use of specific medications."), ¶ 74 ("A TPP that wanted to discourage Neurontin's use for neuropathic pain, for example, *could* have established a therapeutic interchange program for neuropathic pain medications, excluding Neurontin from the approved list.") (emphasis added).

[5] See Bell. Decl. ¶ 59.1 (citing AETNA 01939-941 (Brodeur Depo. Exh. 18), at AETNA 001939).

[6] See Bell Decl. ¶ 59.2.

[7] See McDonough Report at 11 ("most organizations limit claim restrictions to refill timeliness (refill-too-soon), quantity restrictions (30-days' supply) or age restrictions for selected medications").

[8] See In re Zyprexa Prod. Liab. Litig., 253 F.R.D. 69, 189 (E.D.N.Y. 2008) ("reasonably accurate estimates can be made of the total out-of-pocket payments made by the class for Zyprexa over the class period. . . . [I]n the 'data rich' pharmaceutical field, expenditure information by year, source of payment (e.g., third-party payors, government payors, insurance copay or cash consumers), . . . are available.").

period (i.e., after the April 2004 settlement of Franklin).[9]

Although Dr. Bell came up virtually empty-handed in his search for TPP-imposed *limits* on Neurontin prescriptions, Defendants persist in their unfortunate habit of advancing unrepresentative anecdotes in preference to better but negative evidence.  As Dr. McDonough reports:

- A January 12, 198 Parke-Davis Managed Care Business Plan states: "*Availability on formulary is virtually 100%. Anti-convulsant products currently fall below the radar screen for formulary and utilization controls.*"

- An August 2001 [Pfizer] market research survey of pharmacy and medical directors from 25 HMOs revealed that *100% of these health plans included Neurontin on the formulary without restrictions or prior authorization requirements*.

- Pfizer's internal HMO Opportunity Reports dated 2nd quarter 2001, show that, nationwide, *only 1.8% of plans excluded Neurontin from formulary*.[10] Furthermore, when the product was included on formulary, *only 1.1% of plans placed any restrictions or controls on Neurontin*.

McDonough Report at 16-17 (citations omitted, emphasis added).

In addition, at page 22 of Plaintiffs' motion for reconsideration, a citation to

---

[9] See id. ¶ 59.1 ("Aetna placed a number of restrictions—quantity limits, step therapy, precertification, and prior authorization—on Neurontin use across several formularies at least as early as *2005*.), ¶ 59.7 (Humana "imposed quantity limits in *2006*"), ¶ 59.9 (Lovelace Health Plan of Albuquerque, New Mexico . . . imposed step therapy in its FEHBP HMO product in *2007*"), 59.10 ("Maricopa Health Plan of Phoenix, Arizona had Neurontin on prior authorization and imposed step therapy after TCAs for neuropathic pain at least as early as *2006*"), ¶ 59.12 ("Mercy Health Plans of Chesterfield, Missouri placed Neurontin on step therapy after first-line use of TCAs (after a history of seizures) at least as early as [*Summer*] *2004*.  They continued step therapy in *2006*.  In *2007*, Mercy imposed quantity limits for Neurontin oral solution of up to 3600 mg per day for 25 days."), n.108 (citing *Summer* 2004 document), ¶ 59.14 ("The St. John's PremierPlus HMO and PremierPlus Options PPO plans imposed quantity limits on Neurontin oral solution of 3600 mg/day for 25 days at least as early as *2006*."), ¶ 59.16 ("The University of Michigan formulary listed Neurontin as on tier three with quantity limits at least as early as *2008*").
[10] To the extent any TPP *excluded* Neurontin from coverage, there would be no corresponding sales, and that TPP would not even fall within the class definition.

Parke-Davis' May 1995 Marketing Assessment was inadvertently omitted.  The correct citation is to Class Plaintiffs' Statement of Disputed and Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1760) ¶ 44, and Exhibit 16 to the Declaration of Ilyas Rona in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761) at Pfizer_JMarino_0001278.

                                        Respectfully submitted,

Dated:  June 11, 2009                        GREENE & HOFFMAN

                                        By:  */s/ Thomas M. Greene*
                                              Thomas M. Greene, Esq.

                                        33 Broad Street, 5th Floor,
                                        Boston, MA  02109

                                        LIEFF, CABRASER, HEIMANN
                                          & BERNSTEIN, LLP

                                        By:  */s/ Barry R. Himmelstein*
                                              Barry R. Himmelstein, Esq.

                                        275 Battery Street, 30th Floor
                                        San Francisco, CA  94111-3339

819714.1

HAGENS BERMAN SOBOL SHAPIRO LLP

By*:  /s/ Thomas M. Sobol*
    Thomas M. Sobol, Esq.

One Main Street, 4th Floor
Cambridge, MA  02142

BARRETT LAW OFFICE

By:  */s/ Don Barrett*
    Don Barrett, Esq.

404 Court Square North
P.O. Box 987
Lexington, MS  39095

LAW OFFICES OF DANIEL BECNEL, JR.

By:  */s/ Daniel E. Becnel, Jr.*
    Daniel E. Becnel, Jr., Esq.

106 W. Seventh Street
P.O. Drawer H
Reserve, LA  70084

DUGAN & BROWNE

By:  */s/ James R. Dugan*
    James R. Dugan, Esq.

650 Poydras Street, Suite 2150
New Orleans, LA  70130

*Members of the Class Plaintiffs' Steering Committee*

### CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on June 11, 2009.

                                                       */s/  Barry Himmelstein*