# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
:
In re: NEURONTIN MARKETING         :    MDL Docket No. 1629
SALES PRACTICES AND PRODUCTS
LIABILITY LITIGATION           :    Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THIS DOCUMENT RELATES TO:     :
:
:
TERESA DRINKWINE, Individually and as Trustee  :
for The Next of Kin of MICHAEL DRINKWINE,   :   Judge Patti B. Saris
Decedent,                      :
:
Plaintiff,        :   Magistrate Judge Leo T. Sorokin
:
-against-         :
:
PFIZER INC., PARKE-DAVIS, a division of Warner-  :
Lambert Company and Warner-Lambert Company   :
LLC, WARNER-LAMBERT COMPANY, WARNER-  :
LAMBERT COMPANY LLC, and TEVA       :
PHARMACEUTICALS USA, INC.,        :
:
Defendants.      :
x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
:
AND RELATED CASES (SEE EXHIBIT A)    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -:
x

## MEMORANDUM OF LAW
## IN SUPPORT OF TEVA PHARMACEUTICALS USA, INC.'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

Teva Pharmaceuticals USA, Inc. ("Teva") respectfully submits this Memorandum in support of Teva's Motion to Dismiss the Complaint in the above-captioned action as to it on the grounds of Fed. R. Civ. P. 12(b)(6).[1]  Plaintiff's claims against Teva – a generic drug manufacturer – are all based on a "failure to warn" theory, and as such are in clear conflict with federal law and FDA regulations that prohibit any departure in Teva's product labeling from the FDA-approved labeling for the branded drug.  Thus, under the doctrine of federal preemption pursuant to the Supremacy Clause of the United States Constitution, Plaintiff's claims are preempted.

The United States Supreme Court's recent decision in *Wyeth v. Levine*, No. 06-1249, 2009 WL 529172 (March 4, 2009), is not to the contrary.  There, the Court held that FDA approval of the labeling of a <u>branded</u> drug did not provide a preemption defense against state law claims alleging failure to provide adequate warnings.  While *Levine* concerned the general topic of preemption in the area of prescription drugs, the precise issue before the Supreme Court involved a <u>branded</u> pharmaceutical product – not a <u>generic</u> pharmaceutical product, as in the instant case.  This distinction makes a critical difference with respect to the rationale underpinning the Supreme Court's analysis and holding in *Levine*.

---

[1] Teva is named as a Defendant in other matters pending in the Neurontin Multidistrict litigation, Docket No. 1629 (*see* Ex. A).  Teva either previously responded to those complaints or agreed to a stipulation with plaintiffs that Teva need not file a responsive pleading until this Court considered Pfizer Defendants' preemption motion.  Because Pfizer Defendants withdrew their Motion for Summary Judgment on the grounds of federal preemption in the wake of *Wyeth v. Levine* (Pfizer Inc. and Warner-Lambert Company LLC's Notice of Withdrawal of Federal Preemption Ground in Motion for Summary Judgment, No. 1:04-cv-10981 (March 9, 2009)), it is now the appropriate time for Teva to raise its preemption arguments.  Thus, where Teva has not yet answered a complaint, as is the case with the above-captioned matter, Teva hereby files a 12(b)(6) motion.  Where Teva has already answered the complaint, Teva requests that this motion be treated as a motion under Fed. R. Civ. P. 12(c), for judgment on the pleadings, adopting and incorporating by reference this Motion to Dismiss, Memorandum in Support thereof, and accompanying exhibits in the above-captioned matter.

Federal law expressly requires that, at all times, each generic drug must bear the exact labeling that FDA approves for the corresponding branded or "reference listed" drug.  The regulatory provision that permits branded manufacturers to alter their labeling without prior FDA approval – the precise provision that, according to the Court in *Levine*, enabled Wyeth to alter its labeling so as to comply with both state and federal law – does <u>not</u> similarly authorize generic manufacturers to make changes to their labeling without prior FDA approval, if by making such changes, the language of the generic label would diverge from that of the relevant reference listed drug.  Thus, whereas the Supreme Court held that it was possible for a branded manufacturer to comply with both federal and state law by making unilateral changes to its drug labeling, the dissimilar regulatory framework makes it <u>impossible</u> for a generic manufacturer, such as Teva, to make such changes and to comply with both federal and state law.  Accordingly, *Levine* is not dispositive of Teva's preemption arguments and should not vitiate the recent trend of federal case law finding in favor of generic preemption.  Plaintiff's conflicting state law claims against Teva are preempted.  Teva, therefore, requests that its Motion to Dismiss be granted in all respects.

<u>**STATEMENT OF FACTS**</u>

**A.      Alleged Ingestion and Injuries**

This action seeks relief for injuries allegedly suffered by Plaintiff's decedent, Michael Drinkwine, as a result of the use of a prescription pharmaceutical product, Neurontin®, or its generic equivalent gabapentin, for an unapproved or so-called "off-label" use, the treatment of pain and nerve damage.  (*See* Compl. ¶¶ 1, 140-142).  Plaintiff brings this action Individually and as Trustee for the Next of Kin of Plaintiff's decedent, Michael Drinkwine, alleging that Michael Drinkwine committed suicide on April 25, 2006, due to the alleged consumption of Neurontin® and its generic equivalent, gabapentin.  (Compl. ¶ 145).  The instant action was filed

2

in the United States District Court, District of Minnesota, on or about April 24, 2009.  The action

was thereafter transferred to this MDL by CTO-61, dated May 27, 2009.  The defendants include

Pfizer, Inc., Warner-Lambert Company and its subsidiary, Parke Davis, the manufacturer of

Neurontin® (collectively "Pfizer" or the "Pfizer Defendants"), and Teva, a manufacturer of a

generic gabapentin product.

  While the Complaint, comprising some 270 paragraphs of allegations, purports to state

nine claims for relief, only the Sixth, Seventh, Eighth, and Ninth Causes of Action, set forth in

the last 24 paragraphs of substantive allegations, allege claims against Teva.  These four causes

of action against Teva purport to sound in negligence, breach of warranty, strict products liability

and wrongful death.  No matter how labeled, though, the alleged causes of action seek to do

nothing more than hold Teva liable for complying with federal regulations in securing the right

to manufacture and sell gabapentin for its United States Food and Drug Administration ("FDA")-

approved indications.  For instance, Plaintiff alleges that Teva breached its duty to exercise

reasonable care in the design and development of gabapentin by "adopting the statements,

studies, labeling and representations of the brand name manufacturer of Neurontin . . . ." (*See*

Compl. ¶¶ 248-249).  Similarly, Plaintiff alleges that Teva, "in reliance upon the representations

of the Pfizer defendants, expressly warranted . . . that gabapentin was safe and effective . . . ."

(Compl. ¶ 256).  Not only is the Complaint devoid of any factual allegations supporting

conclusory statements such as that Teva "adopted" the statements, studies, labeling or

representations of Pfizer, the manufacturer of Neurontin®, but as will be described further below,

a proponent of a generic drug product is not required to reproduce the safety and efficacy testing

required of the innovator (brand name manufacturer) of the drug, but instead, must only show

"bioequivalence" of its generic version of the drug with the branded product.  Further, Teva, as a

3

generic manufacturer, is *required* by force of the Food and Drug Act and FDA regulations to conform its labeling to that of the branded drug.  Plaintiff improperly alleges that Teva's mere compliance with federal law amounts to a breach of Teva's common law duty, but such claims are preempted.

### B.      Federal Regulation of Generic Drugs

The manufacture and sale of prescription drug products in the United States is a highly regulated industry, under the jurisdiction of FDA.  FDA draws its statutory authority as to the approval of such manufacture and sale of drugs primarily from its enabling statute, the Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq*., as amended by the Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman Amendments") (collectively, the "Food and Drug Act"), and has promulgated regulations implementing such statutes, which may be found in pertinent part at 21 C.F.R. Part 314.

Broadly speaking, under the United States' regulatory scheme, prescription drugs fall into two categories, branded drugs and generic drugs.  A branded drug is one that has not previously been established or generally recognized by persons with relevant scientific training as safe and effective for the purposes or medical indications for which its use is intended.  21 U.S.C. § 312(p).  The right to manufacture and market such a drug in the United States is secured through the filing of a New Drug Application ("NDA").  In order to obtain approval of an NDA, the applicant (innovator) must demonstrate the safety and efficacy of the drug for its intended indications to the satisfaction of FDA, typically through the conduct of extensive clinical trials in humans.  The research and development of such drugs and the conduct of the requisite clinical trials is often a costly process, which takes years to complete.  The large, research-driven pharmaceutical companies who bring such drugs to market are most often accorded patent

4

protection and a period of exclusivity in marketing their drugs, which are sold under proprietary

brand names and are often very expensive.

In the public policy interest of providing more affordable prescription drugs for

consumers and lowering medical costs, as well as fostering competition, Congress and FDA

enacted statutory provisions and regulations to encourage the manufacture and marketing of the

other category of drugs, known as generic drugs.  Specifically, the Hatch-Waxman Amendments

(codified at 21 U.S.C. § 355(j); 35 U.S.C. §§ 156, 271, 281) established the current procedure for

obtaining approval from FDA to market and sell a generic drug, allowing the generic maker to

submit an abbreviated NDA ("ANDA").  The ANDA applicant need only demonstrate that its

generic drug product will be bioequivalent to its branded counterpart (*i.e.*, its "reference-listed

drug") and that its proposed labeling, including warning language, is identical to that of the

branded drug. 21 U.S.C. § 355(j)(2)(A).[2]

The requirements that a generic manufacturer must meet under the ANDA process are set

forth in Section 505(j) of the Food and Drug Act, 21 U.S.C. § 355(j).  Specifically, the process

begins with a requirement that the information not be new or innovative, but wholly derivative of

information already provided by the innovator manufacturer.  *See* 21 U.S.C. § 321(aa) (ANDA

must "rel[y] on the approved application of another drug with the same active ingredient to

establish safety and efficacy").  The 1984 House Report on the Hatch-Waxman Act, 21 U.S.C.

---

[2] The elements that the generic drug manufacturer must establish are explained in H.R. Rep. No. 98-857 at 21-22. The ANDA must show that:

- the conditions of use on the proposed labeling for the generic drug are the same as those approved for the listed drug [§ 505(j)(2)(A)(i)], excepting only indications covered by a patent or subject to exclusivity protection under FDCA § 505(j)(5)(D). *See* 21 C.F.R. § 314.94(a)(8)(iv); *see also* 57 Fed. Reg. at 17,961.
- the active ingredient is the same as that of the listed drug [§ 505G(2)(A)(ii)].
- the route of administration, dosage form, and strength are the same as those of the listed drug [§ 505(j)(2)(A)(iii)].
- the generic drug is bioequivalent to (i.e., can be expected to have the same therapeutic effect as the listed drug) [§ 505(j)(2)(A)(iv)].

5

§ 355 (j), explains that "the focus of [§ 505(j)] is to provide [FDA] with sufficient information to assure that the generic drug is the same as the listed drug," thereby obviating any need for duplicate testing for safety or effectiveness of the generic drug.  H.R. Rep. No. 98-857, at 21 (Ex. B).  Thus:

> the manufacturer of a pioneer drug must conduct tests on humans that show the product to be safe and effective and submit the results in a new drug application (NDA). A manufacturer of a generic drug must conduct tests that show the generic drug is the same as the pioneer drug and that it will be properly manufactured and labeled.

*Id*. at 16.  As such, an ANDA applicant is not required or expected to conduct clinical trials to establish the safety and efficacy of its drug.  The Food and Drug Act and FDA's regulatory scheme contemplates that safety and efficacy will have been established by the pharmaceutical company who originally submitted the NDA for the drug.  In contrast, the generic manufacturer is obliged only to conduct so-called "bioequivalency" studies, to establish that its dosage formulation of the generic product has the same pharmacological action in the human body as does the relevant reference-listed drug.  In that case, that is, if the generic version of the drug is shown to be "bioequivalent" to its reference-listed drug, it is assumed to have the same safety and efficacy profile.  By avoiding time-consuming and costly clinical trials, generic drug manufacturers are able to bring generic drugs to market quickly and at less expense.

The flip side of this regulatory framework is that the labeling – that is, the prescribing information or package insert – of the generic drug may not deviate in any material respect from that of its reference-listed drug.  But for differences relating to the fact of the product being manufactured by a different company, chiefly physical description, inactive ingredients and, perhaps, listing fewer indications for use, the generic manufacturer's labeling -- including all statements as to Warnings, Precautions, Contraindications, Adverse Reactions -- must adhere

LIBNY/4828729.3

letter for letter to the corresponding provisions of the labeling of the relevant reference-listed drug.

On or about October 8, 2004, Teva received approval of an ANDA for gabapentin capsules, a generic version of the reference listed drug Neurontin®.  (Compl. ¶ 130).  In securing approval of its gabapentin capsule ANDA, Teva did not conduct safety and efficacy testing *per se*, but rather conducted tests through which it demonstrated to the satisfaction of FDA that its gabapentin product was bioequivalent to Neurontin®.  Further, Teva conformed its FDA-approved gabapentin labeling in all material respects, including Warnings and listed Adverse Reactions, to that of Neurontin®.  Not to have done so would have meant that its gabapentin product was misbranded, unapprovable and unsaleable in the United States, as noted in Plaintiff's Complaint at ¶¶ 114-115.

Teva's gabapentin was and is indicated for use in the treatment of epilepsy and postherpetic neuralgia.  As noted correctly in Plaintiff's Complaint, the use of gabapentin in the treatment of any other medical indication is an "off-label" use, which has not been approved by FDA.[3]  Specifically, Teva's full prescribing information/product label for gabapentin neither contained nor contains any reference to the treatment of pain and nerve damage, nor could it, if Teva was to be in compliance with federal law and FDA regulations.

---

[3] Notwithstanding the lack of FDA approval, physicians, in the exercise of their sound clinical judgment, may lawfully prescribe gabapentin for purposes other than those indicated in the product label. 21 C.F.R. § 312.2(d).

LIBNY/4828729.3

<u>**ARGUMENT**</u>

**I.   THE COMPLAINT FAILS TO STATE A CLAIM INSOFAR AS ANY ATTEMPT TO IMPOSE TORT LIABILITY UPON TEVA UNDER STATE COMMON LAW IS PREEMPTED BY THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION AND FEDERAL LAW**

In securing and preserving the right to sell gabapentin for the indications approved by FDA, Teva was subject to the dictates of the Food and Drug Act and to pervasive regulation by FDA, including regulation of the content of its product labeling.  Such statutory laws and regulations included an obligation to maintain the content of its labeling, including warnings, indications and directions for use, in the form prescribed to it by FDA.  Any finding by a jury applying state tort law that Teva should have provided warnings or other product information inconsistent with this obligation is impermissible under the doctrine of federal preemption pursuant to the Supremacy Clause of the United States Constitution.  The recent Supreme Court decision in *Wyeth v. Levine* is not adversely dispositive of Teva's preemption argument here as the Supreme Court only addressed the issue of preemption as it relates to branded manufacturers.  Generic manufacturers, like Teva, have an entirely different set of preemption arguments, which were not before the Supreme Court, and thus, not addressed by that Court.  As such, all of Plaintiff's state law claims should be dismissed.

**A.   Plaintiffs' State Law Claims Create an Impermissible Conflict with Federal Law**

The Supremacy Clause of the United States Constitution, article VI, clause 2, preempts any state law that conflicts with the exercise of federal power.  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S. Ct. 3014 (1982).  "Pre-emption may be either express or implied, and 'is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Matter of Cajun Elec. Power Co-op., Inc.*, 109 F.3d 248, 254 (5th Cir. 1997) (*citing Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

8

Without explicit pre-emptive language in the relevant statute, congressional intent to displace state law may be inferred because "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose." *Id.* (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  This so-called "conflict preemption," where "a state common-law claim directly conflict[s] with a federal regulation . . ., or if it [is] impossible to comply with any such regulation without incurring liability under state common law," *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65, 123 S. Ct. 518 (2002), is applicable to the instant case.  Specifically, Plaintiff's state law claims alleging that Teva simply "adopted" Pfizer's labeling or failed to provide adequate warnings in the marketing of its gabapentin product create an impermissible conflict because the addition of unapproved language is in direct contravention of federal law.[4]

### 1. Federal Law and Regulations Require Generic Manufacturers to Conform the Labeling of Their Drugs to That of the Counterpart Branded Drug Products

21 C.F.R. § 314.94 prescribes the procedures for filing and content of an ANDA, implementing Section 505(j) of the Food and Drug Act, 21 U.S.C. § 335(j)(2)(A)(v), which requires an ANDA applicant to submit to FDA:

---

[4] In January 2009, a federal court, in finding that state law claims against a medical device manufacturer were preempted by the Medical Device Amendments to the FDCA, began its analysis by acknowledging that "federal courts are frequently confronted with sympathetic plaintiffs who are, nevertheless, without remedy by operation of law. . . . [T]he doctrine of federal preemption []leaves some plaintiffs without judicial recourse to pursue claims for damages."  *In re Medtronic, Inc. Sprint Fidelis Leads Products Liability Litigation*, 2009 WL 35467, at *1 (D. Minn. Jan. 5, 2009).  Similarly, in the instant case, even if the Court were to find that Plaintiff was injured by Teva's product, her claims necessarily run afoul of the Supremacy Clause of the United States Constitution, and are barred.

LIBNY/4828729.3

> information to show that <u>the labeling proposed for the new drug is
> the same as the labeling approved for the listed drug</u> referred to in
> clause (i) except for changes required because . . . the new drug
> and the listed drug are produced or distributed by different
> manufacturers.

(emphasis added).  *See also* 21 C.F.R. § 314.94(a)(8)(i) (generic drug manufacturer must provide

a copy of currently approved labeling for the reference-listed drug); 21 C.F.R. § 314.94(a)(8)(iv)

(generic manufacturer must submit side-by-side comparison of its proposed labeling with the

approved labeling for the reference-listed drug, with all differences annotated and explained; no

differences permitted, except as enumerated therein); 21 C.F.R. § 314.127(a)(7) (FDA will

refuse to approve an ANDA if information submitted is "insufficient to show that the labeling

proposed for the drug is the same as the labeling approved for the listed drug").

FDA also controls the content of the generic label post-approval of the ANDA, with the

content of the approved label for the relevant reference-listed drug remaining the lodestar for the

generic label.  Indeed, at all times throughout the life of the product, the generic label must be

maintained in conformity with that of the relevant reference-listed drug, and any addition could

result in the withdrawal of approval of the ANDA.  *See* 21 C.F.R. § 314.150(b)(10).

### 2. The "Changes Being Effected" Regulation Does Not Provide an Exception to the Rule Mandating Conformation of Generic Drug Labeling to that of the Relevant Reference-Listed Drug

The so-called "Changes Being Effected" ("CBE") provision (21 C.F.R. §

314.70(c)(6)(iii)(A)) does not provide a mechanism for an ANDA holder to enhance warnings.

As demonstrated below, from the inception of generic drug regulation under the Hatch-Waxman

Amendments, FDA's uniform and unvarying position has been that under 21 C.F.R. § 314.70(c),

<u>no labeling changes can be made unilaterally by a generic manufacturer</u>.  In FDA's Final Rulemaking

on ANDA Regulations, published in 1992, FDA clearly rejected any notion that the CBE

regulation applies to generic drug manufacturers: "[a]fter approval of an ANDA, if an ANDA

10

holder believes that new safety information should be added, it should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised." *Abbreviated New Drug Application Regulations, Final Rule,* 57 Fed. Reg. 17950, 17961 comm. 40 (April 28, 1992) (Ex. C).[5]  FDA also expressly rejected public requests that ANDA applicants be allowed to unilaterally deviate from the labeling of the innovator drug to add contraindications, warnings, precautions, adverse reactions, and other safety related information:

> Two comments said the labeling provisions should be revised to permit ANDA applicants to deviate from the labeling for the reference listed drug to add contraindications, warnings, precautions, adverse reactions, and other safety-related information.
>
> *   *   *
>
> <u>FDA disagrees with the comments.  Except for labeling differences due to exclusivity or a patent and differences under section 505(j)(2)(v) of the [Food and Drug Act], the ANDA product's labeling must be the same as  the listed drug product's labeling because the listed drug product is the basis for ANDA approval.</u>

*Id.* (emphasis added).

This long-held position was made even more abundantly clear by the admonishment in the November 1999 FDA Guidance and the April 2004 Revision I to that Guidance that "[a]ll labeling changes for ANDA products must be consistent with § 505(j) of the Act," ("FDA Guidances") (Ex. D at 24), *i.e.*, must conform to the labeling of the relevant reference-listed drug.  Further,

---

[5]  FDA's interpretation of its own regulations is entitled to significant deference.  *See, e.g., Auer v. Robbins*, 519 U.S. 452, 461 (1997).  The Supreme Court's discussion of the level of deference due to FDA's pronouncements regarding preemption in the preamble of the 2006 Federal Register notice is simply inapposite to the instant case.  The preemption argument relevant to generic manufacturers does not rely or depend on the 2006 preamble, as did Wyeth's argument in *Levine* but rather on the interplay of the Hatch-Waxman Amendments and implementing regulations.  Congress's and FDA's position that generic manufacturers are disabled from making unilateral label changes has never changed.  From the time the Hatch-Waxman Amendments were enacted to permit the approval of generic drugs, generic manufacturers have been subject to a mandate to maintain their labeling in conformity to FDA-approved branded drug's labeling.  Accordingly, the analysis of the deference due FDA with regard to its interpretation of its own regulations that preclude
*(Footnote continued on following page)*

FDA, in a December 1996 letter, cautioned ANDA holders that they cannot adopt innovator labeling that has been unilaterally revised by the innovator through the mechanism of 21 C.F.R. § 314.70(c), unless and until such revised innovator drug labeling has been affirmatively approved by the agency.  The letter stated that "[t]he FDA must still review, possibly recommend changes and approve the [revised innovator drug] labeling before it is acceptable for use as model labeling for an [ANDA] product."  Letter from Douglas L. Sporn, Director, Office of Generic Drugs, Center for Drug Evaluation and Review (Ex. E); s*ee also* 57 Fed. Reg. at 17,957, 17,961; FDA Guidances at 24.

Less than a year ago, FDA reasserted this long-standing position in its Final Rule on Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics and Medical Devices, 73 Fed. Reg. 49603, 49605 (August 22, 2008) ("Final Rule") (Ex. F).  This Final Rule set out express guidelines for label changes through CBE supplements pursuant to 21 C.F.R. § 314.70(c)(6)(iii).  Notably, with respect to the argument about the ability of an ANDA holder to avail itself of this regulatory provision, as regards to pharmaceutical products, the Final Rule is directed <u>exclusively</u> to NDA holders.  By implication, this is yet more evidence, if any was needed, that warnings enhancement through CBE supplementation is *not* available to ANDA holders in this context.

In addition to rulemakings and guidance, FDA has also clearly explained its position in *amicus curiae* briefs.  *See* Brief for United States as *Amicus Curiae*, *Colacicco v. Apotex, Inc., et al.*, No. 06-3107, at 7-8 (3d Cir. Dec. 4, 2006) (Ex. G), in which FDA squarely addressed the issue:

---

generic manufacturers from relying on the CBE provision to make unilateral label changes – the analysis relevant to this case – differs dramatically from the deference analysis the Supreme Court employed in *Levine*.

For a generic drug manufacturer, there is no statutory or regulatory provision permitting a labeling change to be made without prior FDA approval. To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug. See 21 C.F.R. § 314.150(b)(10); see also 57 Fed. Reg. 17,950, 17953, 17,961 (1992). If a generic drug manufacturer believes that new safety information should be added to the label for its drug, it is directed to contact FDA with "adequate supporting information."

\* \* \*

The plaintiff asserts that 21 C.F.R. § 314.70(c) empowers a generic drug manufacturer to add a new warning to the label for its drug without prior FDA approval. That regulatory provision, however – like the other provisions of Title 21, Part 314, subpart B of the Code of Federal Regulations – applies to applications involving drug products for which a full application has been submitted, *i. e.*, innovator drug products. Drug manufacturers that submit abbreviated applications to market generic drugs are subject to the requirements set forth in Title 21, Part 3314, Subpart C. Although Subpart C contains a provision requiring applicants to "comply with the requirements of §§ 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application, 21 C.F.R. § 314.97, that provision does not modify the requirement that the drug label for a generic drug must be the same as the label for the approved innovator drug (with limited exceptions not relevant here). Any ambiguity in the regulatory text has been clarified by FDA, which explained at the time of promulgation that the regulations do not authorize generic drug manufacturers to add new warnings to the approved labeling for the innovator drug. *See* 57 Fed. Reg. at 17,961, 17,953, 17,955.[6]

This inability of an ANDA holder to make unilateral label changes under the CBE

provision is at the heart of the argument in favor of generic preemption, and as detailed below,

---

[6] FDA has recently withdrawn this amicus brief in order to conduct an analysis of its position on preemption issues in light of *Levine*. Letter from Sharon Swingle, U.S. Dep't of Justice, to Marcia M. Waldron, U.S. Court of Appeals for the Third Circuit (Apr. 28, 2009), No. 06-3107, Doc. 00319577893 (Ex. H). However, there is no indication that FDA intends to change its clear and consistent position on the proper interpretation of § 314.70, which it had set forth in this *amicus* brief. *See* FDA's discussion of the proper interpretation of § 314.70 contained in its *amicus* brief filed in the trial court, Brief for United States as *Amicus Curiae, Colacicco v. Apotex, Inc.*, Civ. Action No. 05-CV-05500, at 16-17 (E.D. Pa. May 10, 2006) (Ex. I), which had proved persuasive to the District Court. *Colacicco v. Apotex, Inc.*, 432 F. Supp. 514 (E.D. Pa. 2006), *aff'd*, 521 F.3d 253 (3d Cir. 2008), *cert. granted and vacated and remanded to* 521 F.3d 253, 129 S.Ct. 1578 (Mar. 9, 2009), *remanded to* 432 F. Supp. 514 (3d Cir. Apr. 28, 2009).

13

also distinguishes the recent ruling by the Supreme Court in Levine.  Accordingly, any

imposition of state tort liability on Teva for not including warnings differing from those

approved by FDA is clearly an impermissible violation of the Supremacy Clause of the United

States Constitution, and should not be countenanced by this Court.

## II. THE *LEVINE* DECISION DOES NOT CHANGE THE FACT THAT PLAINTIFF'S CLAIMS ARE PREEMPTED BY THE SUPREMACY CLAUSE OF THE CONSTITUTION AND FEDERAL LAW

### A. *Levine* Does Not Refute That State Law Claims Against Generic Manufacturers Create an Impermissible Conflict with Federal Regulations of Generic Drugs

In *Levine*, the Supreme Court held that conflict preemption did not apply to shield the

branded manufacturer Wyeth from liability because the CBE provision permitted the branded

manufacturer to strengthen the warnings in its product labeling without obtaining prior approval

from FDA.  *Levine*, 2009 WL 529172, at *7-9.  The Court held that FDA approval of Wyeth's

label warnings was a floor, but not a ceiling, to the strength and extent of such warnings.  As

such, the Court found that it was not impossible for the branded manufacturer to have complied

with both federal and state law with respect to the labeling of its branded drug.  But because the

CBE provision does not similarly authorize generic manufacturers to make changes to their

labeling without prior FDA approval, it is, in fact, <u>impossible</u> for a generic manufacturer, such as

Teva, to comply with both federal and state law.  Thus, whereas the *Levine* Court explained how

a branded manufacturer can in fact comply with both federal and state law, the Court provided

absolutely no guidance for how a generic manufacturer,[7] such as Teva, could possibly comply

---

[7] The Court's discussion of the 2008 amendment to the CBE regulation was limited to the issue of when a <u>branded</u> manufacturer may rely on the CBE regulation to add safety-related information.  *Levine*, 2009 WL 529172 at *7-8. The Court did not discuss how or whether the 2008 CBE regulation applies to generic drug manufacturers, and did not address the single footnote of the 2008 CBE regulation that specifically concerns generic drugs.  73 Fed. Reg. 2848 at 2849 n.1.

LIBNY/4828729.3

with what could be conflicting federal and state law duties.[8]  In the instant case, if Teva had

relied on the CBE provision to make changes to its gabapentin label, as Plaintiff proposes,

Teva's label would no longer have corresponded to the FDA-approved label of the reference-

listed drug Neurontin®, thereby violating federal law.  The holding of the *Levine* majority,

therefore, is not extendable to Teva, an ANDA holder to whom the CBE procedure is

unavailable, and a contrary result must therefore apply.  Accordingly, the *Levine* holding does

not impact a proper finding of conflict preemption in a case involving generic drugs, such as this

case.

> **B.**     ***Levine* Did Not Address and Does Not Change the Conclusion That State
> Law Claims Against Generic Manufacturers Obstruct the Purposes and
> Objectives of Congress in Regulating Generic Drugs**

To impose state law duties on Teva with respect to the labeling of its gabapentin product,

above and beyond Teva's existing labeling duties under federal law, would create an

impermissible "obstacle to the accomplishment and execution of the full purposes and objectives

of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), with respect to the regulation of

generic drugs.  Congress's stated purpose behind enacting the Hatch-Waxman Amendments was

to foster competition and promote the availability of affordable prescription drugs.  The Hatch-

Waxman Amendments purposely do not impose certain obligations on generic manufacturers –

such as the requirements to conduct time-consuming and costly safety and efficacy clinical trials

---

[8]  Permitting generic manufacturers to make unilateral changes to their drug labels is also impossible for many
practical reasons.  For example, if a generic manufacturer were to file a safety-related CBE amendment with FDA
Office of Generic Drugs – the department dedicated to generic drugs – the Office of Generic Drugs would not have
the scientific and technical resources necessary to evaluate this CBE amendment, since the Office is not designed to
handle safety-related issues.  For another example, if a generic manufacturer were to unilaterally strengthen
warnings on its drug label, resulting in different warning language from FDA-approved branded label and from
other generic labels for the same drug, a prescribing physician would need to be aware of the warning language in
each manufacturer's label for the same drug, and would have to determine which warning language is preferable and
which generic version of the same drug to prescribe.  Such a result is clearly illogical and fundamentally contrary to
the way generic drugs are prescribed, dispensed, and used in this country.

LIBNY/4828729.3

– so as to permit generic drugs to be brought to market quickly and at less expense.  This express

purpose would undoubtedly be undermined if additional state law duties were imposed on

generic manufacturers in connection with the labeling and marketing of their drugs, resulting in

extra expenses that will be passed on to consumers.

The *Levine* Court rejected Wyeth's argument that requiring it to comply with a state law

duty to provide stronger warnings obstructs the purposes and objectives of Congress in

regulating drug labeling.[9]  However, the Supreme Court's analysis and conclusion do not

preclude a finding of "purposes and objectives preemption" in a case involving generic drugs,

such as this case.  Because *Levine* involved a branded manufacturer and the regulatory

framework governing branded drugs, the Supreme Court did not examine the purposes and

objectives of Congress in regulating generic drugs and did not consider whether state law claims

pose an obstacle to the achievement of these purposes and objectives.  Specifically, the Supreme

Court did not reach the pertinent question of whether state law claims seeking to impose

additional duties and expenses on generic manufacturers undermine Congress's express purpose

of decreasing the burdens on generic manufacturers so as to encourage the availability of

affordable prescription drugs.  Teva contends that state law claims would, in fact, impede the

achievement of the purposes and objectives of the Hatch-Waxman Amendments to the Food,

Drug and Cosmetic Act (codified at 21 U.S.C. §355(j), 35 U.S.C. §§156, 271, 281).

In trying to ascertain the intent of Congress with respect to preemption, the Supreme

Court considered only regulations governing branded drugs and the conduct of branded

---

[9] Teva notes that the Supreme Court did not summarily dismiss the purposes and objectives argument, but rather devoted an entire section of its opinion discussing the particular purposes and objectives behind a long history of regulation of branded drugs and the interaction of state law claims with these purposes and objectives.  It should further be noted that virtually that entire discussion addressed statutory and regulatory history that predated the 1984 passage of the Hatch-Waxman Amendments and the very existence of a generic drug industry, as we know it today.

manufacturers.  *Levine*, 2009 WL 529172 at *6, 9-13.  The Court's opinion does not make a single mention of the Hatch-Waxman Amendments.  Thus, although the *Levine* Court concluded that state law claims do not undermine the purposes and objectives of federal regulations governing <u>branded</u> drugs, the Court did not consider or opine on whether state law claims undermine the distinct and well-established purposes and objectives of federal regulations governing <u>generic</u> drugs.

Indeed, Justice Breyer's concurring opinion in *Levine* touched upon precisely the policy underlying the passage of the Hatch-Waxman amendments outlined above:

> some have argued that state tort law can sometimes raise prices to the point where those who are sick are unable to obtain the drugs they need . . . The FDA may seek to determine whether and when state tort law acts as a help or a hindrance to achieving the safe drug-related medical care that Congress sought . . . It may seek to embody those determinations in lawful specific regulations describing, for example, when labeling requirements serve as a ceiling as well as a floor.  And it is possible that such determinations would have pre-emptive effect.

*Levine*, 2009 WL 529172 at *13.  This analysis constitutes a signpost for the Court's likely differential treatment of generic preemption, as distinct from the flavor of preemption before it in *Levine*, if, or more likely when, this issue comes before the Court.

### C.   The Recent Trend of Federal Case Law Finding In Favor of Generic Preemption Is Unaffected by the *Levine* Decision

The *Levine* decision does not vitiate the recent trend of federal case law finding in favor of generic preemption.  In 2008, numerous federal courts considered the issue of federal preemption with respect to generic drug products liability, and concluded that state law claims against generic drug manufacturers are indeed preempted.  *Mensing v. Wyeth, Inc., et al.*, 562 F.

17

Supp. 2d 1056 (D. Minn. June 17, 2008),[10]*appeal docketed*, No. 08-3850 (8th Cir. Feb. 20,

2009); *Mensing v. Wyeth, Inc.*, 2008 WL 4724286 (D. Minn. Oct. 27, 2008), *appeal docketed*,

No. 08-3850 (8th Cir. Feb. 20, 2009); *Gaeta, et al. v. Perrigo Pharmaceutical Company, et al.*,

562 F. Supp. 2d 1091 (N.D. Cal. June 13, 2008), *appeal docketed,* No. 09-15001 (9th Cir. Jan, 6,

2009); *Bolin v. SmithKline Beecham Corp.,* 2008 WL 3286973 (S.D. Fla. Aug. 7, 2008);

*Masterson v. Apotex Corp.,* 2008 WL 3262690 (S.D. Fla. Aug. 7, 2008); *Valerio v. SmithKline*

*Beecham Corp.,* 2008 WL 3286976 (S.D. Fla. Aug. 7, 2008); *Morris v. Wyeth, Inc., et al.*, 582 F.

Supp. 2d 861 (W.D. Ky. Oct. 24, 2008); *Wilson v. Wyeth, Inc*., 2008 WL 4696995 (W.D. Ky.

Oct. 24, 2008); *Smith v. Wyeth, Inc*., 2008 WL 4697002 (W.D. Ky. Oct. 24, 2008).

In each of these decisions, the district court found that it was impossible for the generic

manufacturer to comply with state law commanding stronger labeling, while also complying

with federal requirements of the Hatch-Waxman Amendments and FDA implementing

regulations, including without limitation §§ 314.70(c), 314.94 and 314.150(b)(10).  Similar to the

instant action, the aforementioned district court decisions involved generic-specific arguments,

and not general preemption arguments rejected by the Supreme Court in *Levine.*  For the same

---

[10] The Court stated that:

"under the federal statutory scheme, the labeling for generic drugs must always remain the "same as" that of the name brand drug and that a generic drug manufacturer cannot unilaterally change its label without prior FDA approval.  Here, it is undisputed that at all relevant times, Actavis's and Pliva's MCP drug labels were the same as that of the listed drug Reglan. Plaintiff's failure to warn claims against Actavis and Pliva rely on state law imposing a duty on the generic drug manufacturers to provide adequate warnings that Actavis and Pliva allegedly did not provide. Any such duty to unilaterally heighten their warning labels, however, would directly conflict with the federal law requiring that their labels be the "same as" those of the listed drug, Reglan. Indeed, under these circumstances, it would be impossible for Actavis and Pliva to abide by both state and federal laws.  If Plaintiff's claims were not preempted, Actavis and Pliva would be forced to choose between complying with the federal law while being exposed to state tort liability, or unilaterally adding a heightened warning to their labels at the risk of exposing themselves to federal liability. This conflict would stand as an obstacle to the accomplishment and full purposes and objectives of the Hatch-Waxman Act, a key purpose of which is to increase the availability of low-cost generic drugs and to relax the generic approval and labeling process.

*Id.* at 1064-65 (emphasis added).

reasons that the *Levine* decision does not apply to this case, it does not vitiate the recent trend of federal case law finding in favor of generic preemption.  In fact, one court has already confirmed that "[t]he holding of the *Levine* decision does not alter the Court's analysis" or its prior ruling in favor of generic preemption.  *Morris v. Wyeth, et al.*, No. 1:07-cv-00176, 2009 WL 736200 (W. D. Ky. March 4, 2009), *appeal docketed*, No 1:07-CV-176-R (6th Cir. March 4, 2009).  These federal decisions continue to hold the same force and effect after *Levine* and support Teva's Motion to Dismiss on generic preemption grounds.[11]

## CONCLUSION

For all of the foregoing reasons, Teva respectfully requests that its Motion to Dismiss be granted in all respects.

Respectfully submitted this 12th day of June, 2009.

By:/s/ U. Gwyn Williams_____
    U. Gwyn Williams (BBO # 565181)
    GOODWIN PROCTER LLP
    Exchange Place
    53 State Street
    Boston, MA 02109-2881
    617.570.1000

    Counsel for Teva Pharmaceuticals USA, Inc.

---

[11] *But see Schrock v. Wyeth*, No. CIV-08-453-M, 2009 WL 635415 (W.D. Okla. March 11, 2009); *Stacel v. Teva Pharmaceuticals USA, Inc.*, No. 08-C-1143, 2009 WL 703274 (N.D. Ill. March 16, 2009).  Teva submits that the *Schrock* and *Stacel* cases are not persuasive.  In *Schrock*, the district did not distinguish between branded and generic manufacturers and – without any analysis of the relevant federal regulations – simply applied the *Levine* decision to permit state law claims against generic manufacturer defendants.  In *Stacel*, the court properly recognized that "[t]he [Supreme] Court's analysis in *Levine* is not directly controlling law since *Levine* dealt with a new manufacturer, whereas [the defendant] is a generic manufacturer."  *Stacel*, 2009 WL 703274 at *3.  However, in Teva's view, Judge Gottschall – without the benefit of post-*Levine* briefing – drew the wrong conclusion on the fundamental issue of the proper interpretation of § 314.70(c).  Teva has previously addressed this point at length and notes only that *Stacel*, which itself recognizes the conflict in the district courts on this issue, *id.* at *6, adds nothing new to the dispute.  Moreover, the *Stacel* court fails altogether to explain how it can reconcile its interpretation of the regulations with the express stricture of Hatch-Waxman Amendments that the generic label conform to the label for its reference-listed drug.

LIBNY/4828729.3

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 12, 2009.

            By: <u>/s/ U. Gwyn Williams</u>_____