# EXHIBIT E



DEPARTMENT OF HEALTH & HUMAN SERVICES    Public Health Service

Rockville MD 20857

DEC 2 4 1996

TO ALL ANDA AND AADA APPLICANTS

Dear Sir or Madam:

As part of the ongoing initiatives to reinvent government, the Office of Generic Drugs (OGD), like most other Federal programs, is faced with reduced resources. In addition to diminishing resources, OGD experienced a significant increase in submissions in late 1995. This higher level of submissions has continued in 1996. These combined factors resulted in an increased backlog of pending submissions. In order to help minimize the impact of these factors on review times, OGD began a series of internal meetings to identify procedures that would help streamline the review process. In addition, OGD believes these efforts will improve communications with industry and reduce the overall time to approval of abbreviated applications.

This letter describes the first streamlining initiatives that affect the chemistry, bioequivalence and labeling review processes. OGD looks forward to implementing additional streamlining initiatives in the future. The letter also contains an update on a variety of application related matters that will be of interest to applicants.

The Office trusts the information will be useful to you. Your cooperation in these matters will assist us in our effort to improve the efficiency of the generic drug review process.

Sincerely yours,

Douglas L. Sporn
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

# INDEX

For ease in referencing the material contained in the letter, topics are presented in the following order at the specified pages:

| | |
|---|---|
| 1. Review Issues | Page 1 |
|     Communicating Not Approvable Determinations | Page 1 |
|     Phone Consultation Following Second Review Cycle with Major Deficiencies | Page 2 |
|     Alternate Drug Substance for Original Applications | Page 3 |
| 2. Bioequivalence Issues | Page 4 |
|     Electronic Submission Project | Page 4 |
|     Availability of Bioequivalence Protocol Reviews | Page 5 |
|     Update on Albuterol Inhalation Aerosol Guidance | Page 6 |
|     Bioequivalence Studies To Be Conducted in Appropriate Subjects | Page 6 |
|     In Vivo Studies Under SUPAC-IR | Page 7 |
| 3. Labeling Review Changes | Page 7 |
| 4. Application Process Issues | Page 8 |
|     Refuse to File | Page 8 |
|     Pending Petition for Determination of Reason for Voluntary Withdrawal of Reference Listed Drug | Page 11 |
|     Appropriate Authorization of Agents | Page 12 |
|     Information for Inspections | Page 12 |
| 5. Other | Page 12 |
|     Withdrawal of Applications | Page 12 |
|     New Plastic Containers Submitted in an Abbreviated Application | Page 13 |
|     Controlled Documents | Page 14 |

## REVIEW ISSUES

### COMMUNICATING NOT APPROVABLE DETERMINATIONS

Effective January 1, 1997, the Office of Generic Drugs (OGD) will provide most application related "not approvable" deficiencies, both major and minor, to ANDA/AADA holders via facsimile for unapproved original applications. This is expected to decrease time to final action on applications. However, for the present time, the Division of Bioequivalence will continue to issue deficiency letters as it has always done.

The facsimile will include the usual components of a deficiency letter, but not in the traditional letter format. It will include:

    A.   A list of chemistry, manufacturing, and controls (CMC) deficiencies followed by additional CMC comments regarding status of methods validation, pre-approval inspection, and other related points.

    B.   A list of labeling deficiencies.

    C.   A list of microbiology deficiencies, if applicable.

A cover sheet will accompany the deficiency list which will provide instructions on how to respond to the facsimile.

To assist the Office in providing the facsimiles, applicants are requested to provide or update the facsimile number for its Regulatory Affairs contact person.

### MAJOR NOT APPROVABLE DEFICIENCY PROCEDURES

Major CMC deficiencies identified by OGD will be sent to the applicant by facsimile. Responses from the applicant to these deficiencies will be regarded as a major amendment and should be submitted as an archival (hard) copy to OGD. OGD will not accept facsimile responses for major deficiencies.

### MINOR NOT APPROVABLE DEFICIENCY PROCEDURES

For CMC deficiencies defined as minor, OGD will also communicate to the applicant by facsimile. The facsimile cover sheet that OGD sends to an applicant will identify the deficiency response as either a "Facsimile Amendment" or a "Minor Amendment". Procedures for responding to these two

1

types of amendments are as follows:

A. Facsimile Amendment

There will be some minor deficiencies for which OGD believes a complete response can be provided by the applicant within 30 days. These deficiencies will be provided by facsimile and will NOT stop the regulatory review clock.

The applicant will be asked to respond directly to OGD's document room by facsimile, followed with a hard copy. Facsimile amendments will be reviewed ahead of other priority or routine submissions pending in the reviewer's queue.

Should the complete response (facsimile and hard copy) not be received within 30 days, the applicant's response will be considered a minor amendment and placed into the reviewer's minor amendment queue.

B. Minor Amendment

There will be some minor amendments for which a response cannot be provided within 30 days. These will typically be for situations when the response is beyond the control of the applicant, e.g., Drug Master File (DMF) deficiencies. OGD will provide these deficiencies by facsimile and will STOP the regulatory review clock. In addition, the applicant's response (minor amendment) should be submitted as an archival (hard) copy to OGD and will be placed into the reviewer's queue according to OGD's first-in, first-reviewed policy. OGD will not accept facsimile responses for these minor amendments.

*In order to evaluate the expected benefits of this new process, the Office will be monitoring the impact on action times. However, reports of industry experiences with this process are encouraged.*

PHONE CONSULTATION FOLLOWING SECOND REVIEW CYCLE WITH MAJOR DEFICIENCIES

Applicants who find that an application continues to have major CMC deficiencies after the second review cycle are encouraged to call the appropriate Project Manager (PM) in OGD to discuss or clarify the deficiencies. Where appropriate the

2

PM will involve the chemistry reviewer and/or others in the discussion. The goal is to answer questions, assist the applicant to understand the identified deficiencies and, hopefully, eliminate further major deficiency reviews. In some cases meetings may be necessary to clarify these deficiencies. OGD will contact the applicant within approximately 30 days after issuance of the second major deficiency letter if the Office has not been contacted by the applicant. OGD will also use the same approach for subsequent reviews where major deficiencies remain.

Currently, OGD is unable to provide this level of service after the first review cycle due to the volume of such submissions and the Office's limited resources.

ALTERNATE DRUG SUBSTANCE FOR ORIGINAL APPLICATIONS

The Office of Generic Drugs has announced a change in policy regarding adding an alternate source of the new drug substance (NDS) to an original application prior to approval.

Previously, if an abbreviated application was otherwise approvable with the exception of an unsatisfactory inspection of Current Good Manufacturing Practices (cGMP) for the primary NDS supplier used to manufacture the exhibit/bioequivalence batch, it would not be approved until those cGMP issues were resolved. In order to qualify an acceptable alternate source of the NDS, a new exhibit batch based on the alternate source would be needed. Additionally, a bioequivalence study would be required (depending on dosage form) to support use of the alternate source.

For unapproved applications, OGD now allows substitution of an alternate source of the new drug substance based on assurance that the specifications and test data are essentially the same as those of the original source used in the exhibit batch (and bioequivalence study, if required) that would have been acceptable except for cGMP issues, etc. Additionally, the DMF must be found acceptable. Generally, a new in vivo bioequivalence study will not be required for the alternate exhibit batch, but it will be necessary to provide comparative dissolution data depending on the dosage form of the proposed product. This new policy is identical to the existing policy regarding post approval changes to provide for alternate sources of the NDS.

Note that there are some situations where this new policy would not apply and a new acceptable exhibit batch, an in vivo bioequivalence study, and comparative dissolution data would be required. This might be the case when there are significant differences in particle size or physicochemical

3

characteristics.

## BIOEQUIVALENCE ISSUES

### ELECTRONIC SUBMISSION PROJECT

Effective January 1, 1997, the Office of Generic Drugs will implement its program for electronic submission of bioequivalence data. The program was developed under contract with the University of Maryland (UM). Under the program, applicants that choose to, may prepare electronic submissions on diskette with the aid of a user-friendly program call Entry and Validation Program (EVA). EVA is free of charge to applicants through the UM's World Wide Web site (http://mundos.ifsm.umbc.edu/-fdacom). The Web site also permits applicants to register as participants and to obtain updated information on the program including any new versions of EVA. Companies can also ask technical questions through the Web site, which will be addressed by UM staff.

The program is expected to have a very positive impact on the efficiency of reviews, ultimately reducing review times. In addition, it is hoped the program will help reduce the time required to reach approval. Therefore, OGD strongly encourages firms to participate.

For most companies, the time to start planning the electronic submission is before study data are prepared. For those using Contract Research Organizations (CROs) to conduct bioequivalence studies, applicants could specify in their requirements that the CROs prepare the data in the requested format. CROs are encouraged to access the UM Web site and to become familiar with EVA and submission requirements. Applicants may also make electronic submissions for applications already submitted to the Office, but should contact the Bioequivalence Project Manager (Ms. Lizzie Sanchez, 301-594-2290) first, to make certain the electronic submission will be received in time for the review.

We hope to conduct training for applicants in conjunction with UM. Those applicants interested in such training are encouraged to register their interest through the UM Web site. Technical questions about the program may be addressed to the UM at 410-455-3888 or through the UM Web site. Regulatory questions may be addressed to the Bioequivalence Project Manager.

The electronic submission program is part of a larger strategy for Electronic Regulatory Submission and Review (ERSR) which will soon include the chemistry, manufacturing, and controls (CMC) portion of generic drug applications.

4

## AVAILABILITY OF BIOEQUIVALENCE PROTOCOL REVIEWS

Firms frequently submit proposed in vivo bioequivalence study protocols to OGD. Often these are duplicative of already submitted and reviewed protocols. In order to decrease the burden of reviewing several protocols for the same drug product, OGD is now making available copies of acceptable protocols and related review comments. OGD believes that by utilizing completed review comments, firms will need to submit fewer protocols, freeing time for evaluation of applications. Copies may be obtained from the Drug Information Branch, HFD-210, Center for Drug Evaluation and Research, 5600 Fishers Lane, Rockville, MD, 20857. The current phone number for the Drug Information Branch is (301) 827-4573. Please note that this number was recently changed because that branch re-located.

The list of protocols available may be accessed through "FAX on Demand" at (800) 342-2722 or (301) 827-0577. You are encouraged to obtain an updated list by this means. However, the Division of Bioequivalence will also maintain a listing.

There are caveats to be borne in mind regarding this new resource:

A.  The material available will be redacted protocols and letters transmitting the review comments.

B.  It will take some time to prepare protocols and reviews for distribution through this process. Therefore, the number of different product protocols and review will gradually increase, over time.

C.  The procedure is new and may require fine tuning. Thus, comments and suggestions are encouraged. These may be submitted to Ms. Lizzie Sanchez at (301) 594-2290.

C.  There will be a transition period during which firms with pending requests for protocol review may be contacted regarding the imminent availability of a review of another protocol regarding the product for which they had submitted a protocol. The firm may wish to withdraw its protocol and use information available from the previously acceptable review.

Please note that though this service is available, the Division may be contacted should there appear to be circumstances necessitating review of another protocol for the

5

same drug product.

## UPDATE ON ALBUTEROL INHALATION AEROSOL GUIDANCE

On January 27, 1994, OGD issued the guidance titled "Interim Guidance for Documentation of *in vivo* Bioequivalence of Albuterol Inhalation Aerosols (Metered Dose Inhalers)." Since its publication, the Office has had the opportunity to review additional information on various aspects of *in vivo* and *in vitro* testing conducted as described in the guidance and has concluded that a revision of the guidance is needed. A CDER working group developed recommendations for revision and presented them to a joint session of the Advisory Committee for Pharmaceutical Science (ACPS) (a re-configuration of the Generic Drugs Advisory Committee – GDAC) and the Pulmonary Drugs Advisory Committee in August of 1996.

Therefore, should studies for albuterol metered dose inhalers (MDI s) be under consideration, sponsors are strongly encouraged to wait for the revised-guidance, or, in the interim, discuss their planned study with the Division of Bioequivalence. The guidance will be developed as expeditiously as possible and the industry will be informed of its availability.

## BIOEQUIVALENCE STUDIES TO BE CONDUCTED IN APPROPRIATE SUBJECTS

Though it is preferable to conduct bioequivalence testing in normal healthy volunteers, there are certain products for which use in healthy persons might be an unacceptable risk.

A.  Cytotoxic drugs

   Certain conditions and considerations regarding bioequivalence studies of cytotoxic drugs need to be specified. Please note the following:

   21 CFR 320.31(a)(3) requires that any person planning to conduct an in vivo bioavailability or bioequivalence study in humans shall submit an investigational new drug application (IND). An IND provides assurance that studies proposed will have adequate safeguards for the safety of the subjects.

   It is therefore recommended that studies with the following products be conducted in the appropriate patient population. Note also that the listing (developed in conjunction with the Division of Oncologic Drug Products) is subject to updating and revision. Consultation with the Office is recommended if any questions arise.

6

| | |
|---|---|
| Bisulfan | Chlorambucil |
| Cyclophosphamide | Etoposide |
| Hexamethylmelamine | Lomustine |
| Melphalan | Pipobroman |
| Procarbazine | Thioguanine |
| Uracil Mustard | Methoxsalen |
| Estramustine Phosphate | |

B. Ipratroprium

In order to fully evaluate the bioequivalence of this product, studies should be conducted in the appropriate patient population.

## IN VIVO STUDIES UNDER SUPAC-IR

Under the Center's *Guidance for Industry: Immediate Release Solid Oral Dosage Forms* (SUPAC-IR) there are two types of post-approval changes for which *in vivo* bioequivalence testing is requested: Level 3 changes in components and composition as well as Level 3 manufacturing process changes. For generic drugs, the *in vivo* bioequivalence test should *always* compare the product after a post-approval change against the reference listed drug. However, in instances when a bioequivalence study is not necessary, dissolution studies should compare the applicant's generic product after a post-approval change against the same product prior to the change.

If there are any questions in regard to a reference product, please contact the Division of Bioequivalence for advice.

## LABELING REVIEW CHANGES

The abbreviated application regulations require that side-by-side labeling comparisons be included with the submission of the original, unapproved application, with all differences between the proposed ANDA/AADA and the reference listed drug (RLD) labeling annotated and fully explained [See 21 CFR 314.94(a)(8)]. Side-by-side comparisons enable reviewers to readily identify differences between the ANDA/AADA and the reference listed drug labeling and/or the previous version of the applicant's labels and labeling.

OGD is now requesting a side-by-side comparison for all labeling changes submitted, not only in original applications, but also for all amendments and supplements. This comparison will help reduce the time required to review each new version of proposed labeling.

Additional actions to streamline the labeling review process have resulted in the following changes:

7

A.  OGD will provide pen and ink comments directly on a applicant's proposed labeling and attach those comments to the Not Approvable facsimile. This will eliminate the time consuming task of identifying where in the labeling changes should be made and explaining the needed changes in letter format. This will conserve reviewer's time, thus making more efficient use of OGD resources.

B.  Effective immediately, when changes are needed in labeling because of changes in the RLD labeling, OGD will either identify the specific changes to be made or will provide a copy of the most recently approved labeling of the RLD. In the past when MAJOR changes were required in the labeling, the applicant was required to obtain a copy of the cited approved labeling from the Freedom of Information (FOI) staff, then submit a supplement or amendment. This process added 4 to 5 weeks to the process of updating the ANDA/AADA labeling.

Please note that OGD will NOT supply labeling of the RLD BEFORE an application is filed. The most recent APPROVED labeling should be obtained from the FOI staff prior to preparation and submission of the labeling in an ANDA/AADA.

The Division of Labeling and Program Support highly recommends that ANDA/AADA applicants NOT utilize the Physician's Desk Reference (PDR) as the source for the most recently approved labeling of the innovator's product. Although the PDR may represent labeling that is available in the marketplace, some of this labeling may have been submitted to the Agency as a "Special Supplement - Changes Being Effected" (SSCBE). As such, it would have been implemented prior to FDA approval in accordance with 21 CFR 314.70(c). The FDA must still review, possibly recommend changes and approve the labeling before it is acceptable for use as model labeling for an ANDA/AADA product. In addition, other changes may have been made in the approved labeling after the publication of the PDR.

## APPLICATION PROCESS ISSUES

### Refusal to File Issues

The Office evaluates abbreviated applications for completeness and acceptability prior to filing them for review. OGD has identified many issues which previously would have resulted in refuse to file determinations which can be easily resolved by applicants. These are now communicated by OGD by telephone

8

rather than issuing a letter which can take weeks. Such items include:

- No cGMP statement
- FDA Form 356h does not contain an original signature
- Improper patent certification
- Exclusivity rights not addressed
- No debarment/list of convictions statement
- No certification of field copy
- Need for additional copies of labeling

*Applicants are given 10 working days to respond. If a response is not received in that time, a refuse to file letter is issued.*

This approach has resulted in a decrease in refuse to file determinations and moves applications into the review queue more rapidly. Even with this approach, the refuse to file rate for applications remains high. Therefore, an update of the key reasons the Office refuses to file abbreviated applications follows:

A.  DMF Issues

   *No authorization for the Drug Master File (DMF) or incomplete information about the DMF.*

   The DMF authorization must be from the DMF holder or its U.S. agent to permit the agency to refer to the DMF on behalf of the applicant. If the authorization is from the agent, an additional letter of appointment of the agent must also be included from the holder of the DMF (link to DMF holder). The authorization for the agency to refer to the DMF must reference the specific applicant, not another corporate entity related to the applicant.

   *For further information please refer to the CDER Guideline for Drug Master Files.*

B.  Inactive Ingredient Issues

   *Inadequate information on the characterization of inactive ingredients.*

   The regulations related to parenteral, ophthalmic, otic and topical dosage forms [21 CFR 314.94(a)(9)] state that applicants shall identify and characterize the inactive ingredients in the proposed drug product and provide information

9 .

demonstrating that the inactive ingredients do not affect the safety of the proposed drug product. Additionally, OGD's Interim Inactive Ingredients Policy dated November 17, 1994, address inactive ingredient issues in more detail. The Interim Inactive Ingredient Policy is available in the OGD Docket (No. 9050308).

Thus, applicants should demonstrate that the proposed drug product is qualitatively and quantitatively the same as the reference listed drug product for parenteral, ophthalmic, otic, and topical dosage forms. An applicant may seek approval of a drug product that differs from the RLD, in certain instances, as described in the regulations.

Generally, products for oral inhalation are considered topical products. Therefore, applicants for these products are requested to provide a qualitative and quantitative comparison. Please refer to the Interim Inactive Ingredient Policy for further guidance.

For other topical products, i.e., creams, lotions, gels, suspensions, and solutions an applicant is requested to provide the following information:

1. Qualitative Statement

   A list of ingredients (test drug and reference drug) to show a qualitative comparison.

2. Quantitative Statement

   The quantitative composition of the test drug and the results of analysis of the reference drug. It may not be possible to accurately analyze some inactive ingredients contained in the reference product. However, applicants should make their best efforts to quantitatively analyze the ingredients in the reference drug and submit the results in the application. If an ingredient cannot be analyzed, or if results are irrelevant or inconclusive, an explanation should be provided. Sponsors may use the Center for Drug Evaluation and Research Inactive Ingredient Guide (IIG) as a reference for safe maximum levels. If the ingredient levels are not listed, the sponsor may also refer to

10

>   other sources of information, such as other approved topical products where quantitative levels are known, recognized literature references or information from the ingredient manufacturer.
>
>   OGD does not require a quantitative or qualitative analysis beyond the normal analytical capabilities within the industry.
>
>   *If applicants have questions regarding inactive ingredients, they may submit a request for the opinion of the OGD on the acceptability of inactive ingredients prior to the submission of an application. The Office can provide certain information in response to such requests.*
>
> C.  Exclusivity Issues
>
>   Exclusivity right(s) or patent(s) not addressed.
>
>   Patents and exclusivity must be addressed. When there is no exclusivity or patent listed in the Orange Book, the applicant should provide a statement to this effect. It is also suggested that applicants verify they are using a current edition of the Orange Book and/or cumulative supplement as the basis for this information.
>
> D.  Packaging Information
>
>   No record of or incomplete packaging information on the exhibit batch.
>
>   This packaging information is requested in order for the application to be filed. This request is outlined in OGD's Policy and Procedure Guide #41-93.

**ACCEPTANCE OF ANDA BASED ON A PENDING PETITION FOR A DETERMINATION OF REASONS FOR VOLUNTARY WITHDRAWAL OF THE REFERENCE LISTED DRUG**

OGD can accept an Abbreviated New Drug Application that refers to a listed drug that has been voluntarily withdrawn from sales as long as the applicant provides evidence that a Citizen's Petition has been submitted to request a determination of whether a listed drug has been voluntarily withdrawn for safety or efficacy reasons. A Center response to that petition is not required for filing purposes. However, the Center must have made its determination on

11

relisting prior to the approval of the ANDA. (See 21 CFR 314.161 and 314.122)

## DOCUMENTATION OF APPROPRIATE AUTHORIZATION OF AGENTS

It is acknowledged that there are many circumstances that require applicants to have other parties interact with the OGD on their behalf relative to specific applications. Frequently, written authorization for these agents is not contained in an application when submitted. The Office wishes to be cooperative in its response to applicant needs but must assure submitted material remains confidential and is not released or discussed with unauthorized individuals.

In order to allow for prompt responses, it is requested that written authorization be submitted to the application when filed or well before contact by an authorized agent is expected. Examples of who requires such authorization include:

A. The U.S. agent of a foreign firm.

B. A consultant to the firm that is expected to interact directly with OGD.

C. Legal counsel to the firm on issues that may necessitate direct interaction with OGD.

## INFORMATION FOR INSPECTIONS

United States agents for foreign establishments are very helpful to the Office of Compliance in assigning foreign inspections. It is, therefore, important that complete information (name, address, phone/fax numbers) of the U.S. agent be included in an application.

Central File Numbers (CFN) as identifiers for facilities are also of value in the scheduling of inspections. Please provide these numbers for all facilities included in the application. CFN's are obtained by applying for them through the FDA District Offices.

## OTHER

### WITHDRAWAL OF APPLICATIONS

The Office requests that firms make periodic internal assessments and withdraw pending applications they may not wish to pursue to approval. This action will allow conservation of OGD's information tracking and document control resources.