# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:   NEURONTIN MARKETING, SALES
            PRACTICES AND PRODUCTS
            LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

*Bulger v. Pfizer Inc.*, 1:07-cv-11425-PBS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:   MDL Docket No. 1629
:
:
:   Master File No. 04-10981
:
:
:   Proposed Document
:
:
:   Judge Patti B. Saris
:
:
:   Magistrate Judge Leo T.
:   Sorokin
:
:
:

**DEFENDANTS' PROPOSED CONSOLIDATED OPPOSITION TO PLAINTIFFS'
EMERGENCY MOTIONS TO STRIKE DEFENSE EXPERT ROBERT GIBBONS, PH.D.
AND, ALTERNATIVELY, TO STRIKE DR. GIBBONS' MARCH 2009 EXPERT
REPORT AND BIPOLAR STUDY AND FOR RECONSIDERATION OF THE
COURT'S NOVEMBER 2008 DECISION ALLOWING DR. GIBBONS' STUDY
AND ARTICLE AT TRIAL**

Defendants Pfizer Inc and Warner-Lambert Company LLC (together, "Pfizer" or
"Defendants"), by counsel, respectfully submit this consolidated opposition to Plaintiffs'
Emergency Motions to Strike Defendants' Expert Robert Gibbons, Ph.D. and, alternatively, to
Strike Dr. Gibbons' March 2009 Supplemental Expert Report and Bipolar Study and for
Reconsideration of the Court's November 2008 Decision to Allow Dr. Gibbons' Study and
Article at Trial.  For the reasons stated below, these outrageous motions charging Dr. Gibbons
with perjury and other wrongdoing should be denied in all respects, and Plaintiffs' motions and
supporting memoranda should be stricken from the record.

**PRELIMINARY STATEMENT**

Trial of this case is scheduled to commence July 27, 2009.  The Court has recently issued
rulings on general causation and the Defendants' motions for summary judgment.  Now, after the
parties have exchanged witness and exhibit lists and deposition designations pursuant to the

Court's Pretrial Order, and are otherwise preparing for trial, Plaintiffs have embarked on what can only be described as a desperate, no-holds barred, scorched earth attack on Defendants' statistical expert Dr. Robert Gibbons.  No doubt motivated by the strength of Dr. Gibbons' expert opinions and their vital importance to the defense of this and other Neurontin cases, Plaintiffs have filed two (essentially identical) "Emergency Motions" personally attacking Dr. Gibbons and calling him a liar in virtually every way imaginable.  Plaintiffs distort beyond recognition the facts regarding Dr. Gibbons' testimony and the voluminous materials he has produced to them, and denigrate not only Dr. Gibbons, but Dr. Kwan Hur, a biostatistician who provided assistance to Dr. Gibbons and is not an expert in this case, as well as Defendants' counsel.  Plaintiffs' baseless attack on Dr. Gibbons, a world renowned academic and authority in his field, is nothing short of reprehensible.[1]

With trial rapidly approaching, there is no line that Plaintiffs will not cross in attacking Dr. Gibbons, both personally and professionally.  Plaintiffs set out a seemingly endless laundry list of alleged perjury, deception, and other baseless charges against Dr. Gibbons.  As discussed below, these charges are demonstrably false.  Remarkably, Plaintiffs go on to indicate that, if they are unsuccessful in barring Dr. Gibbons on the basis of their present inflammatory accusations, they will file a motion to exclude him under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[2]  Finally, Plaintiffs

---

[1]   Dr. Gibbons' scientific integrity is widely recognized and his credentials are impeccable.  He is the Director of the Center for Health Statistics and Professor of Biostatistics and Psychiatry at the University of Illinois at Chicago; has received the Harvard Award for lifetime contributions to the field of Psychiatric Epidemiology and Biostatistics; and is a member of the Institute of Medicine (IOM) and served on the IOM's Committee on the Prevention of Suicide, as well as the IOM's Committee on U.S. Drug Safety.  He also served on the FDA Scientific Advisory Committee on Suicide and Antidepressants in Children and has authored over 175 peer reviewed scientific papers and four books.  Most recently, Dr. Gibbons was awarded an additional $3 million grant from the National Institute of Mental Health (NIMH) for statistical and pharmacoepidemiologic study of suicide, and accepted service on the Veteran's Administration's expert panel on reducing suicide in our U.S. military forces.  (Ex. K. at 5-6.)

[2]   The timing of Plaintiffs' decision to file two emergency motions seeking to strike Dr. Gibbons *before* moving on *Daubert* grounds is telling.  If Dr. Gibbons' opinions were susceptible to a *Daubert* challenge – which they clearly are not – why would Plaintiffs not simply move to exclude Dr. Gibbons on this basis now?  After all, they have recently secured a supplemental report from Dr. Greenland addressing Dr. Gibbons' opinions.  *See* Point IV, *infra*.  The reason is simple:  despite deposing Dr. Gibbons on four separate occasions, Plaintiffs (and
*(cont'd)*

recently served a May 31, 2009, Supplemental Expert Report from epidemiologist Dr. Sander Greenland, who piles on more of the same, charging Dr. Gibbons with "deceptive rhetoric," "deceptive claims," "attempts to obfuscate and conceal," and an "attempt to mislead." (5/31/09 Supplemental Report of Sander Greenland, Ex. A at 1,3,9.)

Defendants will respond to both of Plaintiffs' motions to strike in this consolidated opposition. While it may be impossible to separately address every one of the charges made in Plaintiffs' motions, Defendants will attempt to clarify the record regarding what Dr. Gibbons has – and has not – done in this litigation. It is abundantly clear that it is Plaintiffs' counsel, not Dr. Gibbons, who have engaged in flagrant deception and twisting of the factual record. Plaintiffs' vicious attacks on the integrity and honesty of Dr. Gibbons mark an unfortunate low point in this litigation.

## ARGUMENT

## I.   NO EXPERT IN THIS CASE HAS GONE TO THE HERCULEAN LENGTHS THAT DR. GIBBONS HAS TO PROVIDE A FULL EXPERT DISCLOSURE

As a threshold matter, it is important for this Court to appreciate the lengths to which Dr. Gibbons has gone to provide a full expert disclosure in this case. The fact that Plaintiffs now charge Dr. Gibbons (as well as Dr. Hur and Defense counsel) with hiding the ball or being intentionally misleading is absurd.

- Dr. Gibbons has been exhaustively deposed by Plaintiffs on four separate days for a total of nearly 25 hours. His first deposition took place on February 3, 2009, and the fourth day of his deposition was held on April 27, 2009. And Plaintiffs have recently indicated that they may move to compel a further deposition of him.

- Dr. Gibbons has produced at least 320 megabytes (which translates to a stack of paper more than *eight feet* high) of data to Plaintiffs – including the entire PHARMetrics database used for his pharmacoepidemiologic study, all the data, programs and output files for the primary analyses on both cohorts analyzed using PHARMetrics data, all the SAS and SuperMix data, programs and outputs for his multiple sensitivity analyses confirming the results of the primary analyses, and, additionally, helpful

_____
*(cont'd from previous page)*
their own expert) have been unable to put even a dent in the substance of Dr. Gibbons' ironclad opinions, and any *Daubert* motion will fail. Instead, Plaintiffs filed the instant motions attacking him personally, filled with much rhetoric and zero substance.

indices and descriptions of files prepared to assist Plaintiffs in their understanding of the data.[3]  Indeed, the expert now charged with misleading Plaintiffs has voluntarily created indices and other documents to assist them in understanding what he has done.

- And that is not all.  As will be more fully discussed below, Dr. Gibbons has produced additional materials in connection with his Supplemental Reports or in direct response to particular requests by Plaintiffs, including:

    (1)    The FORTRAN programs Dr. Gibbons wrote to verify the SAS results;

    (2)    The ASCII files containing the data read by Dr. Gibbons' FORTRAN programs;

    (3)    PowerPoint slides used by Dr. Gibbons in his October 2008 presentation at Harvard regarding antidepressant and antiepileptic medications;

    (4)    Correspondence from the Journal that accepted his article for publication, including comments of the peer reviewers;[4]

    (5)    Documents related to his analysis of the FDA Alert addressed at the *Daubert* hearing, not to mention all of his slides and demonstratives used at the hearing; and

    (6)    Thousands of pages of email attachments, many of which were already in plaintiffs' possession but nevertheless were produced on the basis of plaintiffs' request and the parties agreement.

None of Plaintiffs' experts has produced anywhere near this amount of expert discovery in such a directed and organized format.  In fact, much of the documentation supporting Plaintiffs' expert analysis has *never* been produced.[5]

---

[3]    The PHARMetrics analysis is comprised of two cohorts – one analyzing whether there is an increased risk of suicide attempt in over 47,000 bipolar patients taking the AEDs identified in the FDA Alert (called bipolar cohort) and one analyzing whether there is increased risk of suicide attempt in over 130,000 patients taking gabapentin (gabapentin cohort) stratified by condition – pain, psychiatric, etc.  The statistical methodology for both cohorts – as well as the primary analyses and the multiple sensitivity analyses conducted to test the primary results – is indistinguishable, with only minor variations based on the differences in the cohorts and the number of sensitivity analyses completed (to date, more were completed on the Bipolar cohort as a result of the peer review process).

[4]    These materials are highly confidential and were produced subject to the protective order of confidentiality in this case.  Plaintiffs' counsel have been notified of the highly confidential nature of these documents.

## II.   PLAINTIFFS' OUTRAGEOUS CHARGES AGAINST DR. GIBBONS ARE DEMONSTRATIVELY UNTRUE AND SHOULD BE STRICKEN

Because Dr. Gibbons' substantive opinions and analyses are so compelling, Plaintiffs have mixed fact with fiction in a last-gasp effort to avoid dealing with those opinions at trial head-on.  Plaintiffs are aware that Dr. Gibbons' testimony is particularly problematic for them. After all – unlike their own experts – Dr. Gibbons took the risk of conducting the pharmacoepidemiologic study that Plaintiffs' experts testified they could have conducted, but did not.  If Dr. Gibbons and his co-authors' study had produced conclusions that were unfavorable or indifferent to Pfizer, Plaintiffs certainly would not be filing court papers calling a highly distinguished scientist a liar.  Unable to refute the results of two indisputably reliable analyses conducted by Dr. Gibbons – one of which will soon be published in the country's most prestigious peer-reviewed psychiatry journal – Plaintiffs are forced to resort to charging Dr. Gibbons with "spin[ning] . . . tales of statistical import."  (Plaintiffs' Memorandum of Law ("Pl. Mem." [1808] at 19.)  This is a view the esteemed *Archives of General Psychiatry* obviously does not share.[6]

Throughout their papers, Plaintiffs repeatedly – and without any basis whatsoever – accuse Dr. Gibbons of lying.  Each of these highly unprofessional, and unsubstantiated, purported "lies" share one common theme – that of Plaintiffs telling the Court only half the story. To highlight the irresponsibility of Plaintiffs' allegations, some of the most glaring examples are set forth verbatim below, together with the remainder of the facts telling the rest of the story:

_____
*(cont'd from previous page)*

[5]   Indeed, Dr. Blume and Mr. Altman's new analyses and related documentation contained in their declarations have never been produced.

[6]   On April 29, 2009, the Dr. Gibbons and his co-authors' study regarding the bipolar cohort was accepted for publication by the *Archives of General Psychiatry*, the most prestigious peer-reviewed psychiatry journal in the country.  (*See* Apr. 29, 2009 email from J. Coyle to R. Gibbons, Ex. B.)  The study concludes that there is no increased risk of suicide attempt in Bipolar patients taking the AEDs identified by FDA in the Safety Alert, and that if anything, the data demonstrate that use of AEDs in these patients has a protective effect against suicidal behavior.  (*See The Relationship Between Antiepileptics and Suicide Attempts in Patients With Bipolar Disorder*, Ex. Q.)

***1.  Claim:*** *Dr. Gibbons testified to having produced everything that he had considered in connection with his supplemental expert report and that his Rule 26 list represented those materials.  Gibbons's testimony was completely false because there were hundreds of pages of undisclosed computer programs, data, and statistics in his possession on which he relied and considered in his expert report and in his bipolar paper that had not been produced to Plaintiffs at the time of his deposition. Dr Gibbons sworn declarations, answers under oath, and statement of counsel concerning the demanded disclosure were completely false.*  (Pl. Mem. [1808] at 3-4; *see also* [1805] at 4-5.)[7]

Plaintiffs' baseless accusation that Dr. Gibbons committed perjury and withheld his statistical sensitivity analyses is absurd.  To the contrary, Dr. Gibbons' January 21, 2009 Declaration states:

> 6.  I have provided to counsel for defendants ***all materials requested by plaintiffs on which I relied* in conducting the pharmacoepidemiologic study** of whether there is an association between Neurontin and suicide attempt.  I have also produced all materials requested by plaintiffs in their letter of November 12, 2008, **on which my co-authors and I relied in preparing the Manuscript.**  It is my understanding that defense counsel has provided all of these materials to the attorneys for the plaintiffs.

[1624 (emphasis added).]

The fact is, as Dr. Gibbons clearly testified, these "hundreds of pages of undisclosed computer programs, data, and statistics" to which Plaintiffs refer ***had not been completed*** at the time he prepared and submitted the Manuscript, the November 5 Supplemental Report, or the Declaration.  (*See* Tr. at 706:8-13.)  Dr. Gibbons testified:

Q. When did you begin doing the sensitivity analyses?

A. I started on several of those after the paper had been submitted.

Q. So that was after September 2008?

A. Yes.

(*Id.* at 514:7-20 (sensitivity analysis was conducted "since this paper was submitted"); *see also id.* at 698:18-700:19 (Dr. Gibbons explaining that he had done a "yeoman's job of giving you all

---

[7]   Plaintiffs' memorandum of law in support of their alternative motion to strike Dr. Gibbons' March 2009 report and bipolar study [1805] is largely repetitive in its irresponsible and unfounded allegations against Dr. Gibbons and Pfizer's counsel, and, accordingly, the arguments directed at Plaintiffs' memorandum in support of their motion to strike Dr. Gibbons [1808] are equally applicable with respect to that motion.

of the data in the files" and that, among other things, he had been doing further sensitivity analyses since his paper was submitted).)  Rather, these sensitivity analyses were conducted *later* and were neither considered nor relied upon by Dr. Gibbons at the time of his Bipolar paper and November 5 Supplemental Report.  (*Id.* at 521:2-523:17 (sensitivity analyses were prepared for or in anticipation of "comments that the reviewers might make to this paper or comments that [Dr. Gibbons] received in presenting this work . . . in scientific settings").)

Indeed, in response to Plaintiffs' November 12, 2008 letter, Pfizer produced to Plaintiffs what was *actually in existence* at the time the Supplemental Report was produced – specifically, (i) Dr. Gibbons' pharmacoepidemiologic study on the AEDs referenced in the FDA's pooled dataset and related Neurontin-specific analyses, including the entire PHARMetrics database and all the programs used at that time to analyze it; (ii) the PHARMetrics licensing agreement; (iii) Dr. Gibbons' retention agreement in the Neurontin litigation; and (iv) the original manuscript of the study, entitled *The Relationship Between Antiepileptics and Suicide Attempts*.  (*See* Nov. 26, 2008 letter from L. McGroder to K. Fromson and related attachments, Ex. C; Nov. 14, 2008 letter from L. McGroder to K. Fromson, Ex. D.)

Importantly, from this moment on, in November 2008, Plaintiffs had all the information they needed to conduct whatever analyses they desired – using the exact same data Dr. Gibbons used – in order to refute Dr. Gibbons' study or supply a competing pharmacoepidemiologic analysis.  Plaintiffs, however, have not done so, presumably because they know the analysis will obtain results that do not support their position.  Instead, Plaintiffs have chosen to ignore the substance and wage a discovery assault on the basis of immaterial and unfounded accusations, such as the claim that Dr. Gibbons' should have produced analyses to Plaintiffs before they were conducted or completed, and that the original Manuscript was produced shortly *after* his Report, rather than simultaneously with it.  Further, with the production of these materials on November 26, 2008, Plaintiffs' November 12, 2008 document demand was fully satisfied.  (*See* Exs. C and D.)

7

**2. <u>Claim</u>:** *Dr Gibbons' sworn declarations, answers under oath, and the statements of counsel concerning the demanded disclosure were completely false. . . . Dr. Gibbons had never seen the letter of November 12, 2008, in which Plaintiffs requested the discovery, although Gibbons's sworn declaration was provided to Magistrate Judge Sorokin in support of Defendants' motion for a protective order for the deposition of his three co-authors stated that he had complied with the discovery demands detailed in the letter.* (Pl. Mem. [1808] at 4.)

Once again, Plaintiffs' accusation that Dr. Gibbons lied in his Declaration is entirely false. As demonstrated by the deposition testimony of Dr. Gibbons – which Plaintiffs selectively quote in their brief – Dr. Gibbons did not testify he "had never seen the letter of November 12." He testified that he did not recall whether or not he had seen the November 12 letter but that he was aware of the substance of it through communications with Defense counsel:

> BY MR. LONDON:
>
> Q:    Had you ever seen [the letter] before?  And when I say before, before this deposition started yesterday.
>
> A:    I can't answer that yes or no.  It doesn't ring a bell.  You know, I may have seen it, but it doesn't ring a bell.
>
> *        *        *
>
> A.    I just said that I don't know that – I don't remember did I see this letter or not.  You know, I know what was asked of me by counsel to produce for you, and I tried to do that in the best faith possible.  And these issues – ***I may have had the letter, and we went over it point by point or maybe Lori [McGroder] read the letter to me over the telephone and said, you know, these are the things that they are looking for.***  Can you provide these.  And I said, yeah, the easiest way for me to provide it is why don't I just give them the entire PharMetrics database and I received it and give them all the programs that I used to analyze it and, you know, what would be better.

(Tr. 2/4/09 708:16-709:20 (emphasis added).)  In fact, Defense counsel read the letter – line-by-line – to Dr. Gibbons over the phone to ensure that Dr. Gibbons was familiar with the requests before he signed his Declaration indicating that he had complied with Plaintiffs' discovery demands outlined in the November 12 letter.  To suggest that Dr. Gibbons – a highly respected scientist – is lying merely because he could not remember whether he had actually seen a particular document or whether it was read to him verbatim over the phone is a highly

irresponsible (and irrelevant) allegation lacking any basis in fact.  Moreover, as discussed above, all of the vast materials requested in Plaintiffs' November 12, 2008 letter were promptly produced just 12 days later.  (*See* Nov. 26, 2008 letter from L. McGroder to K. Fromson, Ex. C.)

**3.  Claim:**  *Dr. Gibbons's [November 5, 2008 supplemental] report relied on a study by 'Gibbons et al. (2008)' wherein an exclusively bipolar cohort of 47,918 patients with the same method and goal were examined.  That paper/study was not disclosed with Gibbons's November 5, 2008 Supplemental Report.*  (Pl. Mem. [1808] at 2.)

This accusation is entirely misleading and irrelevant.  Just *two days after Plaintiffs' November 12 request*, on November 14, Defense counsel informed Plaintiffs' counsel that it would produce the Bipolar Manuscript, as well as the PHARMetrics database, and stated that the material would be available "within the next 7-10 days."  (*See* Nov. 14, 2008 letter from L. McGroder to K. Fromson, Ex. D.)[8]  Plaintiffs' complaints are immaterial, and they can show no prejudice.  Plaintiffs were provided the Manuscript and all the data that went with it *more than two months before they first deposed Dr. Gibbons* on February 3, 2009 – and nearly nine months following Defendants' first offer to produce Dr. Gibbons for deposition in May of 2008.

**4.  Claim:**  *During the course of his deposition it was revealed that the epidemiology studies had been programmed by Dr. Hur in SAS format but that Gibbons checked the work in FORTRAN. Neither Gibbons's FORTRAN program and his statistical sensitivity analyses, nor certain of the SAS output files and missing CMED files, and other documents had been disclosed.*  (Pl. Mem. [1808] at 4; *see also* [1805] at 4-5.)

This accusation is likewise misleading and irrelevant.  Dr. Gibbons conducted his FORTRAN analysis, not as part of his November 2008 Supplemental Report, but in a successful effort to re-confirm the primary analyses for both the gabapentin and bipolar cohorts in preparation for his February 3-4, 2009 deposition.  He testified that the FORTRAN code and associated work "was done for my own edification to make sure that the SAS files which formed the basis of the results that went into the paper and went into my expert report were simply done

---

[8]    As above, the *entire* PHARMetrics database – along with the originally submitted Manuscript – was produced to Plaintiffs on November 26, 2008, together with the other material specifically requested by Plaintiffs in their November 12, 2008 letter.  (*See* Nov. 26, 2008 letter from L. to K. Fromson and related attachment, Ex. C.)

for my own reassurance that was done by myself and my colleague was – was accurate." (Tr. 2/4/09 700:13-19.)  Contrary to Plaintiffs' misleading suggestion, as with the sensitivity analyses discussed above, this analysis *was not completed* at the time Dr. Gibbons' Bipolar Manuscript was submitted or his Supplemental Report was produced, so it obviously could not have been disclosed at that time.  As soon as Dr. Gibbons testified that he had conducted this validation exercise "for his own edification," Pfizer provided those materials to Plaintiffs on February 10.  Moreover, Plaintiffs had ample opportunity to ask any questions they wished to ask about Dr. Gibbons' FORTRAN validation at his subsequent deposition on March 5.  (*See* Mar. 16, 2009 letter from L. McGroder to K. Altman, Ex. E, at 1-2.)

**5.  Claim:**  *Approximately one week after Dr. Gibbons's depositions on February 3-4, 2009, defense counsel sent a letter to Plaintiffs agreeing to produce the undisclosed items and promising to produce others, particularly the missing sensitivity analyses.  On February 16, defense counsel sent an email to Plaintiffs' counsel attaching six previously undisclosed files, tests, charts and statistics including three sensitivity analyses.*  (Pl. Mem. [1808] at 5; *see also* [1805] at 4.)

Plaintiffs' reference to "missing sensitivity analyses" is absurd.  Such analyses were not "missing" at all, but instead were part of Dr. Gibbons' Bipolar Manuscript and the scientific work he continued to conduct on the Bipolar cohort in anticipation of peer review comments.[9]  Notwithstanding the very real discovery dispute regarding whether analyses conducted as part of the peer review process were discoverable in litigation (*see* Feb. 10, 2009 and Mar. 16, 2009 letters from L. McGroder to K. Fromson and K. Altman, Exs. F and E), the fact is that Plaintiffs received all but one of these five sensitivity analyses in advance of Dr. Gibbons' March 5 deposition, and *well before they were ever submitted to the peer reviewers* on March 15, 2009.  (*See also* Tr. 3/5/09 at 825:3-9 ("Q. Okay. Over the last several weeks, I have been receiving a

---

[9]    If by "missing" Plaintiffs are referring here to the single data file called "CMED" that was inadvertently not produced in November 2008, Plaintiffs waited more than 2 months to inform Defense counsel that this single file was not among the many already produced.  Indeed, in Defense counsel's letter of February 5, 2009, Plaintiffs' "lie in wait" strategy was specifically addressed.  Moreover, Dr. Gibbons testified that if Plaintiffs had informed him prior to the deposition that this file was not among those produced, he would have provided it in advance of the deposition so that Plaintiffs could have asked him about it at that time.  (*See* 2/4/09 Tr. at 699:2-16.)

number of sensitivity analyses from you which I assume—well, from Ms. McGroder which I'm assuming that you provided to her; is that correct?  A. I don't—I don't brush my teeth in the morning without sending you a file.").)  To say that these sensitivity analyses were "withheld" is akin to saying that Plaintiffs were somehow entitled to the "real time" scientific work of Dr. Gibbons on a daily basis as he performed these analyses for purposes of publication of a scholarly scientific study.  Clearly, this is not the standard under Rule 26.

**6.  <u>Claim</u>:** *Dr Gibbons surreptitiously performed more work* after *his deposition, including new sensitivity analyses, and a study on an undisclosed "Supermix" program.  These and eight new statistical tables superseded the two grossly flawed statistical tables of his November 5, 2008 supplemental report.  Gibbons, however, failed to produce the SAS program files necessary to read them.*  (Pl. Mem. [1808] at 5-6; *see also* [1805] at 4-6.) (alleging that Dr. Gibbons "changed the two data tables of his first report, then added six entirely new data tables, none of which were captioned or explained in the report in such a way as to make reproduction or testing of them possible without questioning Gibbons").)

That Plaintiffs refer to Dr. Gibbons' ongoing scientific work on a study under peer review as "surreptitious" is galling and, moreover, complete untrue.  First, Plaintiffs cannot stop Dr. Gibbons from performing scientific analyses simply because they do not like the results.  Second, Defense counsel in fact made it crystal clear to Plaintiffs that Dr. Gibbons' work was continuing:

> Science is not static, as you know.  Dr. Gibbons' work on the AED analysis in the bipolar cohort evolves every day as he continues to revise the manuscript, working toward publication.  This scientific process, however, is separate from the litigation, and these additional analyses are not and have not been performed for his testimony in this case.  As Dr. Gibbons has testified, he has never before provided all of his data and analyses for a scientific study before its publication.  He has nevertheless obliged *all* of plaintiffs' requests related to this scholarly work – even before it is published and irrespective of the fact that it is a scientific work in progress.

(*See* Mar. 16, 2009 letter from L. McGroder to K. Altman, Ex. E, at 2.)  In addition, Dr. Gibbons himself testified that he would continue to analyze these data "*hopefully for the next ten years* as an example of how to do the pharmacoepidemiologic work," since the issues were of significant scientific importance.  (Tr. 2/4/09 699:24-700:2 (emphasis added).)

11

Moreover, the "Supermix" sensitivity analysis for the Bipolar cohort was conducted *in response to peer review comments*, and yet was produced to Plaintiffs on March 10, 2009 – *even before it was submitted to the journal* as part of Dr. Gibbons' revised Manuscript on March 15. Plaintiffs' complaint that this analysis was not timely produced is completely without merit.[10]

Plaintiffs' complaint that Dr. Gibbons added six data tables and changed two additional tables in his March 2009 report in a way as to make testing of them "impossible" without questioning him is likewise misleading and meritless. What plaintiffs omit is that the six tables were not "entirely new" at all, but instead set forth Dr. Gibbons' sensitivity analyses that had been provided to Plaintiffs *more than a month earlier* (and which were summarized in *two* new paragraphs in Dr. Gibbons' March 19 report). (*See* Feb 10, 2009 letter from L. McGroder to K. Fromson, Ex. F.) Plaintiffs had every opportunity to analyze the data and question Dr. Gibbons about these analyses at the March 5 deposition. They failed to do so. Pfizer nevertheless offered to make Dr. Gibbons available for one additional deposition day in April related to the new paragraphs and corresponding tables in the Report.[11] And, contrary to Plaintiffs' allegation that these sensitivity analyses were "not explained," on February 23, 2009, Dr. Gibbons provided to Plaintiffs a "guide" to understanding what the data files were about. (*See* Feb. 23, 2009 email from L. McGroder to K. Altman and attachment, Ex. G.)

---

[10]   The SAS files as well as the "SuperMix" program were provided to Plaintiffs well in advance of Dr. Gibbons' March 5 deposition, and Plaintiffs had full opportunity to question Dr. Gibbons about them. Plaintiffs' allegation that Pfizer failed to produce the SAS files necessary to read Dr. Gibbons' data are similarly misleading and unavailing. *See* note 8, *supra*. Plaintiffs did not complain *one* time between November 26, 2008 and February 3, 2009 (the first day of Dr. Gibbons' deposition) about an incomplete or insufficient production. As Defense counsel stated in its letters of February 5, 2009 and February 10, 2009, Pfizer would have gladly provided this "read" file prior to the deposition had Plaintiffs' counsel simply informed defense counsel that it was needed. (*See* Feb. 5 and Feb. 10, 2009 letters from L. McGroder to K. Fromson, Exs. H & F.)

[11]   Plaintiffs' suggestion that Dr. Gibbons' April deposition was "shut down" is perhaps the most telling example of Plaintiffs' many half truths. (*See* Pl. Mem. [1808] at 17; *see also* [1805] at 4.) This allegation fails to inform the Court that Pfizer's counsel made numerous attempts to call Magistrate Judge Sorokin to resolve the dispute, and that the deposition continued after the Magistrate Judge indicated he could not entertain the call. (See 2/4/09 Tr: 1100:1-1104:11.) After much discussion, Plaintiffs' counsel finally agreed to continue with the deposition in compliance with the agreed scope, and pursued all the substantive questions they had regarding the new paragraphs in Dr. Gibbons' March 19 Report. Plaintiffs thus had a full and fair opportunity to depose Dr. Gibbons within the scope of their own agreement.

12

Plaintiffs' allegation that they were "blind-sided" when Dr. Gibbons "changed the two data tables" in his March report is similarly unavailing.  (Pl. Mem. [1805] at 6.)  These modifications were made based on a coding error *that Plaintiffs' counsel raised* at Dr. Gibbons' deposition, and which Dr. Gibbons clearly testified would not alter his conclusions.  Plaintiffs were no doubt fully equipped to contend with these modifications since it was Plaintiffs' counsel who raised the issue in the first place and, based on counsel's questioning of Dr. Gibbons, fully understood *how* the tables would be modified when the coding error was corrected.   (3/5/09 Tr. at 752:8-752:22.)

**7. Claim:** *Dr. Gibbons also knowingly withheld approximately 1,000 pages of documents that he had hoarded for almost a year, beginning in April 2008.  The late disclosures were the very items Plaintiffs had requested that Defendants produce and that Gibbons and defense counsel had misrepresented had complied with the production requests.*  (Pl. Mem. [1808] at 6; *see also* [1805] at 7.)

Plaintiffs' counsel's assertion that Dr. Gibbons "knowingly withheld" and "hoarded" documents requested by Plaintiffs "beginning in April 2008," and that were "misrepresented" as having been produced in compliance with discovery obligations, is reprehensibly misleading.  Importantly, Dr. Gibbons was under no obligation to produce emails at any time before his deposition in February of 2009 – if then – because this obligation arose solely out of the parties' agreed-upon deposition notice for expert depositions.  Consequently, Plaintiffs' accusation that discovery had been "withheld and hoarded" for nearly a year since April 2008 is nothing short of falsehood.  Moreover, Plaintiffs have not produced one shred of evidence that Dr. Gibbons and defense counsel "misrepresented" either the existence or the disclosure of these email attachments, or that there is anything "substantive" in the email attachments that was not already produced to Plaintiffs or that Dr. Gibbons considered or relied upon for purposes of his opinions.

What Plaintiffs do not tell the Court is that <u>none</u> of their own expert witnesses have produced their email correspondence, and that counsel for both sides abided by an implicit agreement to ignore this part of the notice to avoid having to chase down expert email correspondence from both sides' experts at the time of the depositions.  Ultimately, the

production of Dr. Gibbons' emails was made pursuant to a hard-fought and negotiated agreement that was not finalized until April 2009.  (*See* Apr. 13, 2009 letter from A. Seaton to K. Altman & J. London, Ex. I.)  In return for the production of Dr. Gibbons' emails, Plaintiffs agreed to forego a motion to compel additional documents from Dr. Gibbons and limit their examination at the April 27, 2009 deposition to the new sensitivity analyses and tables contained in his March 19 Report.  Plaintiffs have now gone back on their word on both points.

Plaintiffs brief is further misleading because, in fact, the vast majority – ninety eight percent – of these "1,000 pages of documents" are attachments to emails transmitting documents and materials that Plaintiffs already possessed – including the Plaintiffs' own experts' reports and declarations for Dr. Gibbons' review, deposition testimony of plaintiff and defense experts, materials related to the FDA Advisory Committee hearing (such as the transcript), Briefing Documents prepared by FDA (which plaintiffs filed with the Court even before the *Daubert* hearing), Pfizer's briefing documents (which were sent to Mr. Fromson before being sent to Dr. Gibbons, *see* June 4, 2008 correspondence, Ex. J), and various scientific literature.

**8. Claim:**  *Apart from the self-evident prejudice in not disclosing his data, programs, statistics, and spreadsheets, the practice of concealing the contents of [Dr. Gibbons'] lengthy email and correspondence files until after soliciting and getting an agreement to limit questions in his April 2009 deposition was deceptive.*  (Pl. Mem. [1808] at 7; *see also* [1805] at 5.)

This claim is likewise meant to mislead the Court.  The agreed limitation on the scope of Dr. Gibbons' April deposition was well understood by both parties, as evidenced by Defense counsel's correspondence to Plaintiffs' counsel, to which Plaintiffs' counsel raised no objection despite the invitation to do so if there was any question about the terms of the agreement.  Nor is there any evidence Plaintiffs' counsel were "deceived" – they knew full well that there would be a production of emails and, in exchange, a limitation on deposition questioning to the substantive information in Dr. Gibbons' Report.  Plaintiffs' counsel had every opportunity to raise any disagreement with the terms before Dr. Gibbons' deposition; indeed, Defendants' letter is explicit in stating that the production of Dr. Gibbons for a fourth day of deposition was expressly based on the agreement.  Plaintiffs' counsel were silent.

Further, as Defense counsel's correspondence and email files unequivocally demonstrate, there has not been a single data file considered by Dr. Gibbons that has not been produced to Plaintiffs (some of them multiple times, after Plaintiffs' counsel misplaced them).  Defense counsel provided multiple email responses to Plaintiffs' requests and questions – often going back to Dr. Gibbons to get answers in order to assist Plaintiffs in understanding the data without forcing Plaintiffs to wait and ask these questions formally at deposition.  (*See, e.g.*, various emails from L. McGroder to K. Altman, Ex. K.)  Moreover, Dr. Gibbons has consistently tried to help Plaintiffs by, *inter alia*, (i) re-running programs for Plaintiffs' counsel that they could have done themselves (*see* Feb. 10, 2009 letter from L. McGroder to K. Fromson, Ex. F; Mar. 16, 2009 letter from L. McGroder to K. Altman, Ex. E), and (ii) creating indices or guides to the analyses to help Plaintiffs' counsel understand them.  (*See, e.g.,* Feb. 23, 2009 email, Ex. G.)  In sum, despite Plaintiffs' scurrilous allegations, Dr. Gibbons has gone out of his way to be helpful, indeed to the point of actually doing Plaintiffs' work for them.

*9. **Claim**: As noted above, on April 23, 2009, defense counsel sent, belatedly, 1,000 pages of material to Plaintiffs one day before the concluding session of Gibbons's deposition. . . . There was an email string dated June 9-11, 2008 enclosing to Gibbons various charts and spreadsheets that purport to contain the number of patients in various Neurontin Studies.  There were emails from May 2008, some three weeks* after *Judge Saris had ordered that he was limited to the FDA analysis discussing the use of a dataset to support Pfizer.  There also were emails in June, 2008, attaching records pertaining to one of Plaintiffs' experts and a Gabapentin random controlled trial summary Excel spreadsheet.  All of these materials should have been disclosed at the outset. The materials were not privileged and were directly related to Dr. Gibbons's expert work that he performed for Defendants.*  (Pl. Mem. [1808] at 8-9; *see also* [1805] at 7, 10.)

Like all the others, this allegation also strains credibility.  Though they claim that emails that should have been "disclosed at the outset" were "withheld," Plaintiffs fail to cite a single email attachment that is substantive or that could have affected Plaintiffs' understanding of Dr. Gibbons' opinions or that was not previously produced.  The only two documents Plaintiffs cite that even *remotely* related to Dr. Gibbons' analysis of the FDA Safety Alert were produced to Plaintiffs *before* the email production, and even before Dr. Gibbons' March 5 deposition.  In fact, the "controlled trial Excel spreadsheet" was provided to Plaintiffs on February 4, 2009 *during* Dr Gibbons' deposition, and was marked by Plaintiffs' counsel as deposition Exhibit 24.  (*See* Ex.

L.)  The other document, that "purport[ed] to contain the number of patients in various Neurontin studies," was produced to Plaintiffs by email on February 18, well in advance of Dr. Gibbons' March 5 deposition.  (*See* Feb. 18, 2009 email from L. McGroder to K. Altman, Ex. K.) Plaintiffs, thus, had ample opportunity to question Dr. Gibbons about these two documents, but they declined to do so.  If these documents were so critically important, it is curious that Plaintiffs declined to ask Dr. Gibbons a *single question* about them during more than six hours of questioning at his March 5 deposition.  In addition, the "records pertaining to one of plaintiffs' experts" refers merely to correspondence about a study published by Dr. Sander Greenland – one of Plaintiffs' own experts.  Had plaintiffs desired information about this study, they could have asked their own expert.

**10.  <u>Claim</u>:** *The materials [withheld] also included lengthy notes sent by counsel to Gibbons via attachments to email on February 2, 2009, two days* before *Gibbons testified under oath that there were no such emails.*  (Pl. Mem. [1808] at 9; *see also* [1805] at 10-11.)

This claim is untrue.  Not only did Dr. Gibbons never "testify under oath that there were no such emails," but the "lengthy notes" to which Plaintiffs refer  (but do not attach to their papers) are not "lengthy notes" at all – rather, they are a two-page document merely containing Dr. Gibbons' own hand-written notes – not notes created by counsel as Plaintiffs imply – analyzing Plaintiffs' expert Dr. Sander Greenland's untimely Declaration.  (*See* Ex. M.)  The notes were read into the record nearly verbatim by Dr. Gibbons at the *Daubert* hearing.[12] (*Compare* Ex. M *with Daubert* Tr. at 531-535, Ex. N.)  Thus, far from Plaintiffs' representation, Plaintiffs have had these notes as part of the *Daubert* hearing transcript since July of 2008, and they could have cross examined Dr. Gibbons on this testimony on any of the four days they have deposed Dr. Gibbons.  They chose not to.[13]

---

[12]   When Dr. Greenland's declaration was produced without notice during the July 23, 2008 *Daubert* hearing, Judge Saris asked Dr. Gibbons to respond during the hearing.  (*See Daubert* Tr. at 431-434.)

[13]   While Plaintiffs, by agreement, did not ask Dr. Gibbons questions about these documents on the fourth day of his deposition, since that subject was outside the agreed scope of substantive issues related to the new paragraphs of his Report, Defense counsel nevertheless informed Plaintiffs' counsel on the record that she would respond to any questions they had concerning the documents produced, and Dr. Gibbons in fact read his
*(cont'd)*

**11. Claim:** *Dr Gibbons proffered false testimony concerning the Journal's reception to his manuscript.  In the February deposition sessions, Gibbons testified to not having heard back from the scholarly journal about whether the article was accepted.  But the* Archives of General Psychiatry *emailed him during the deposition.  However, since Gibbons did not admit that he had heard from the Archives and failed to produce their letter, Plaintiffs did not further inquire about the Journal's response in February.  Dr Gibbons [lied] about what the* Archives *told him [about whether his manuscript was accepted].  [Dr. Gibbons testified that the* Archives *told him to "revise and resubmit" when in fact he had been told that the* Archives *"must reject your manuscript."]*  (Pl. Mem. [1808] at 13-14; *see also* [1805] at 3, 6-7, 10.)

Despite Plaintiffs' absurd allegation that Dr. Gibbons somehow "proffered false testimony" concerning the journal's "reception" of the Manuscript (Pl. Mem. [1808] at 13), they were aware all along that the Manuscript was being "revise[d] and resubmit[ted]" for publication (a common request from scholarly journals[14]).  (Tr. 3/5/09 837:12-16.)  Further, Plaintiffs have adduced absolutely no evidence that Dr. Gibbons saw the email from the *Archives* in the midst of two long and grueling days of deposition questioning.  Even so, Plaintiffs have again attempted to mislead the Court by proffering a half-truth.  Beyond what Plaintiffs ever-so conveniently and selectively quote above, the letter from the *Archives* goes on to state:

> However, if you believe that you can respond to the concerns of the reviewers, ***we will consider a revised manuscript***.  If you choose to submit a revised manuscript, please submit it online to [web address].  In addition to the revised manuscript file(s), please provide a point-by-point response to the concerns of the reviewers and indicate in the manuscript where these changes have been made. . . . ***If the revised manuscript is not received within 90 days, any revision will be treated as a new manuscript and will be subject to peer review.***

(Feb. 2, 2009 email from Joseph T. Coyle, MD. to Dr. Gibbons (emphasis added).)  Thus, it is obvious that – despite Plaintiffs' habit of selective quotation to the Court – the *Archives* editors

---

*(cont'd from previous page)*

handwritten notes into the record for Plaintiffs to make sure they could understand all of them.  (Tr. 4/27/2009 at 1092:5-17).

[14]   In fact, Dr. Gibbons testified that "if they had found critical flaws, I would not have been invited to revise and resubmit.  I will tell you that in publishing well over 200 papers that I would – you know, you are always asked to revise and resubmit."  (Tr. 3/5/09 843:17-22.)

contemplated and even welcomed the revision and resubmission of Dr. Gibbons' manuscript, exactly as Dr. Gibbons testified.

**12. Claim:** *Dr. Gibbons refused to disclose a completely new pharmacoepidemiology report on the bipolar cohort until May 7, 2009. . . .  The new manuscript report radically changes his previous study.  For example, it contains a "hazard function" analysis, complete with graphs.  It also contains a purported new sensitivity analysis of "1:1 propensity score matching."  Those are only two of the previously undisclosed studies that Gibbons brought out in his new May 7, 2009 disclosure.*  (Pl. Mem. [1808] at 7; *see also* [1805] at 7.)

This is yet another incredibly misleading and irresponsible allegation.  First, there was not a "new pharmacoepidemiology report" as Plaintiffs allege.  Instead, this so-called "report" is actually the revised Manuscript that Dr. Gibbons clearly testified – more than once – was being "revised and resubmitted" pursuant to the *Archives of General Psychiatry*'s request.  Plaintiffs' suggestion that this is a "new report" is a thinly-veiled attempt to confuse the record by making a scholarly article appear to be an expert "report" prepared in litigation.

In addition, it is wildly inaccurate to say that the "new manuscript report radically changes [Dr. Gibbons'] previous study" because it contains more than "two new studies."  The revised Manuscript is neither "radically change[d]" nor contains "new studies."  Rather, Dr. Gibbons' primary analysis in the originally submitted Manuscript and in the revised Manuscript arrive at *exactly* the same conclusions – the only thing "new" about the revised and accepted Manuscript is that it contains sensitivity analyses (not "studies") that have all been produced to Plaintiffs, which confirm the findings in the primary analysis.

**13. Claim:** *Dr Gibbons's claim that the manuscript was supported by the NIM grants stretched the truth to a falsehood.  Despite Gibbons's declaration, he admitted under oath that Pfizer had indeed paid for his work on the manuscript. . . . Dr. Gibbons was paid money by Defendants for working with the data, getting up to speed with data, reviewing the data, constructing a statistical database, computing summary statistics, and performing screening analyses for the bipolar cohort are [sic] far different than what he represented to JAMA and to the* Archives of General Psychiatry, *that is, that he was funded by a NIM grant and that Pfizer paid only for the purchase of the database.*  (Pl. Mem. [1808] at 13.)

Despite Plaintiffs' twisting of Dr. Gibbons' words, Dr. Gibbons testified *at least twice* under oath that he was *not* paid by Pfizer to work on the Bipolar cohort study and Manuscript.

Specifically, Dr. Gibbons testified: "They didn't pay for any of the analysis.  They didn't pay for the writing of the paper.  They didn't pay for sensitivity analyses that I performed after the paper ha[d] been submitted."  (Tr. 2/4/2009 713:13-16.; *see also* Tr. 2/3/09 229:23-230:1.  In addition, Plaintiffs' allegation concerning Dr. Gibbons' representation to the *Archives of General Psychiatry* is not only misleading and incorrect, but also completely irrelevant to this case.  Indeed, Dr. Gibbons sent an extensive letter to the *Archives*' editor explaining in detail his connection to the *Neurontin* litigation.  (*See* Mar. 15, 2009 letter from R. Gibbons to J. Coyle, Ex. O.)  The *Archives* accepted the Manuscript with full knowledge of Dr. Gibbons' expert work in this case based on his comprehensive disclosure.

## II.   DR. GIBBONS' STATEMENTS REGARDING DR. HUR'S ASSISTANCE WERE TRUTHFUL AND WERE AFFIRMED BY DR. HUR AT HIS DEPOSITION

Plaintiffs assert that "Dr. Gibbons knowingly made false statements in his declaration regarding the work that Dr. Hur performed at his request."  (Pl. Mem. [1808] at 1).  Namely, Plaintiffs claim that Dr. Gibbons' statement, "I do not believe that Drs. Hur, Brown and Mann possess any knowledge or have formed any opinions concerning the specific expert issues that have been raised in this litigation, or the content of my expert reports,"[15] (Declaration of Dr. Robert Gibbons ("Gibbons Decl.") [1624] at 4), is a lie.  But it is Plaintiffs who distort the truth.  Remarkably, Plaintiffs fail to cite a single word from Dr. Hur's May 21, 2009, deposition, which they moved to compel and which was ordered by Magistrate Judge Sorokin for the sole purpose of giving Plaintiffs an opportunity to question Dr. Hur on his methodology in assisting Dr. Gibbons with respect to the bipolar and gabapentin projects.[16]  Plaintiffs' failure to acknowledge Dr. Hur's recent deposition is telling.  In his deposition, Dr. Hur unequivocally testified that he

---

[15]   Dr. Hur made a similar statement in his Declaration of the same date, stating that "I do not possess any knowledge concerning Dr. Gibbons' supplemental expert report submitted in this litigation.  In fact, I have never seen his supplemental report."  (Hur Decl. [1623] at 4.)

[16]   Dr. Hur is a Senior Biostatistician at the Cooperative Studies Program Coordinating Center at Hines Veterans Hospital in Hines, Illinois.  (*See* Declaration of Dr. Kwan Hur ("Hur Decl.") [1623] at 1.)  Dr. Hur is not an expert witness in this case or any other Neurontin litigation.

did not learn that certain work he had done for Dr. Gibbons regarding the gabapentin cohort was connected to Dr. Gibbons' expert report until he received the Plaintiffs' December 29, 2008, subpoena for a deposition, (Tr. 39:2-10, 76:18-77:12) and that he had never seen Dr. Gibbons November 5, 2008 or March 19, 2009 Supplemental Reports.  (Tr. 23:7-23:11; Tr. 22:18-22:22.) In other words, Dr. Hur confirmed that Dr. Gibbons' statements were true.

In short, consistent with Plaintiffs' overall approach in their motions to strike, Plaintiffs' claim that Dr. Gibbons and Dr. Hur lied about Dr. Hur's involvement in this litigation is completely baseless and nothing short of outrageous.[17]

## III.   PLAINTIFFS' BASELESS PERSONAL ATTACKS ARE INAPPROPRIATE AND UNFOUNDED, AND SHOULD BE STRICKEN FROM THE RECORD

Rather than attack Dr. Gibbons' work on the merits (because they cannot), Plaintiffs have spun the above examples of brazen half-truths and personal attacks in an attempt to smear the reputation of a highly regarded scientist.  Such personal attacks should be stricken from the record.  *See MacDonald v. Town of Windham*, Civil No. 06-cv-245-JD, 2007 WL 3353424, at *1-2 (D.N.H. Nov. 9, 2007) (striking from defendants' reply brief statements that plaintiff edited videotape); *Estate of Ungar v. Palestinian Auth.*, No. 00-CV-105L, 2003 WL 22012475, at *1 (D.R.I. Aug. 4, 2003) (striking materials constituting personal attacks on counsel from motion and exhibits).  Indeed, the above discussion demonstrates that – even if Plaintiffs' allegations

---

[17]   Equally untrue is Plaintiffs' claim that Dr. Gibbons sent a letter to *The Archives* with his revised manuscript indicating "that Dr. Hur had assisted him with the expert report."  (Pl. Mem. [1808] at 11.)  What Dr. Gibbons actually stated was that "Dr. Hur assisted Dr. Gibbons in some analyses of data related to the above listed expert testimony work."  (Gibbons Manuscript, Ex. Q, at 1-2.)  This is a far cry from Plaintiffs representation to this Court that "Dr. Hur had assisted him with the expert report."  The point is not whether Dr. Hur assisted Dr. Gibbons with the data.  He did.  But whether he knew that assistance concerning the gabapentin cohort was for litigation.  Dr. Hur has made now made clear in his Declaration and at his deposition that he absolutely did not.

were true, which they obviously are not, – they have suffered *absolutely no prejudice*.[18]  In short,

they will sink to any level – however irresponsible or unprofessional – to eliminate Dr. Gibbons'

opinions from this case.  They should not be permitted to do so.[19]

IV.     **DR. GREENLAND'S MAY 31, 2009 SUPPLEMENTAL REPORT BELIES PLAINTIFFS' CLAIMS THAT THEY HAVE NOT HAD AN OPPORTUNITY TO CHALLENGE DR. GIBBONS' OPINIONS**

As part of their last-ditch effort to exclude Dr. Gibbons' opinions, Plaintiffs have resorted

to soliciting a Supplemental Report from their expert, Dr. Sander Greenland.  (Pl. Trial Exhibit

5660.)  Unable to fashion a cogent attack on Dr. Gibbons' scientific analysis, this report is

riddled with highly inappropriate personal attacks against Dr. Gibbons, such as allegations Dr.

Gibbons "engage[d] in deceptive rhetoric (often couched in statistical jargon)."  (*Id*. at 1.)  Such

inflammatory claims are misleading and unhelpful to the Court and jury, and entirely

inappropriate in an expert report.  Moreover, Dr. Greenland opines for pages concerning the

alleged shortcomings in Dr. Gibbons' November 2008 and March 2009 Supplemental Reports

and other analyses.  To the extent that Plaintiffs' motions suggest that they have not had a full

and fair opportunity to oppose Dr. Gibbons' opinions, this most recent Greenland report provides

---

[18]   *See* Fed. R. Civ. P. 37(c)(1) (no automatic sanction where discovery "failure was substantially justified or is harmless"); *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004) ("Rule 37(c)(1) 'allows the court to admit belatedly proffered expert evidence if the proponent's failure to reveal it was either substantially justified or harmless.'") (citation omitted); *Poulin v. Greer*, 18 F.3d 979, 985 (1st Cir. 1994) (no abuse of discretion in declining to sanction defendants where any alleged discovery violation did not prejudice plaintiffs); *Northern Voyager Ltd. P'ship v. Thames Shipyard & Repair Co*., No. Civ.A. 99-12243-RWZ, 2005 WL 1631065, at *1 (D. Mass. July 8, 2005) (denying motions regarding late disclosures where court was "not persuaded that [movants were] seriously prejudiced thereby"); *see also Beal Bank, S.S.B.  v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 692 (D. Mass. 2000) (Saris, J.) (no abuse of discretion in denying sanctions request where there was no prejudice demonstrated).

[19]   Only two cases cited by Plaintiffs in their alternative motion to strike Dr. Gibbons' March 2009 report actually involved the exclusion of expert witness testimony for failure to comply with discovery provisions, and those cases are readily distinguishable from this case.  In *Oritz-Lopez v Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29 (1st Cir. 2001) (cited in [1805] at 13), the district court excluded the expert because plaintiffs unjustifiably failed to produce certain materials, claiming that the information did not exist when in fact it did.  *Id*. at 32.  Here, in contrast, huge amounts data and information were timely produced.  Similarly, in *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir, 2001) (cited in [1805] at 13-14), the expert was excluded because defendant waited more than a year after the plaintiffs' expert last supplemented his report before disclosing an initial rebuttal report.  *Id*. at 1105.  No such comparable delay is present here.

further evidence that any such claims ring hollow.  Plaintiffs, and Dr. Greenland, have had a full opportunity to challenge Dr. Gibbons in this case.


## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that Plaintiffs' Emergency Motions to Strike Defendants' Expert Robert Gibbons, Ph.D., and, alternatively, to Strike Dr. Gibbons' March 2009 Supplemental Expert Report and Bipolar Study and for Reconsideration of the Court's November 2008 Decision to Allow Dr. Gibbons' Study and Article at Trial be denied in all respects, and that Plaintiffs' motions and supporting briefs be stricken from the docket.

Dated:  June 12, 2009                          Respectfully submitted,


SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:      /s/ Mark S. Cheffo
         Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

        -and-

SHOOK, HARDY & BACON L.L.P.

By:      /s/ Scott W. Sayler
         Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550

        -and-

WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on June 12, 2009.

/s/ David B. Chaffin
David B. Chaffin