# EXHIBIT A

**Expert Report of Sander Greenland, M.A., M.S., Dr.P.H., C.Stat.**

**May 31, 2009**

## 1. Introduction

The present report provides my review and comparisons of materials filed by Dr. Robert
D. Gibbons concerning the relation of gabapentin (Neurontin) to suicidal ideation and
behavior, especially his Supplemental Expert Reports of Nov. 5, 2008 and Mar. 19, 2009.
My overall impression of these materials is that these reports engage in deceptive rhetoric
(often couched in statistical jargon), and include a number of claims that are false when
interpreted in any manner reasonably consistent with common and scientific usage. My
view is supported by comparison of the Reports to the somewhat more cautiously phrased
paper by Gibbons et al. (2009) to appear in the *Archives of General Psychiatry*, and to
Dr. Gibbons testimony in his depositions, although the paper also appears to engage in
deceptive claims. I thus have concluded the Supplemental Expert Reports filed by Dr.
Gibbons are unreliable and invalid for scientific analysis, and are instead advocacy tracts
for gabapentin. I will document the basis for my conclusion below, which apply
regardless and independently of whether gabapentin has any harmful or protective effects
on suicidality.

Because a large portion of the materials concern analyses performed by Dr. Gibbons on
portions of the PharMetrics database purchased by the defense counsel for Dr. Gibbons, I
will begin with a general overview of problems in drawing inferences about the effects of
treatments based on statistical analyses.

## 2. General Limitations of Studies for Evaluating Treatments, Including Randomized Trials, and their Implications for Statistical Analyses

In evaluating any claims that there is harm, benefit, or no effect from a medical treatment
(such as a drug or device), great care must be taken in critically evaluating the limitations
of the data on which the claims are based. The topic of study limitations (also known as

validity or bias problems) is vast, and methodologic textbooks devote considerable space to the topic (such as Rothman, Greenland, and Lash, 2008; see especially Ch. 6-12 and 19). Only a few salient points are reviewed here.

All medical and epidemiologic data suffer from limitations. The distinguishing features among study types are the severity and number of limitations. For example, randomized clinical trials are often treated as a "gold standard" of studies, but usually suffer from problems such as:

1) Failure to enroll enough patients to allow precise estimation of effects, thus resulting in a wide range of effects compatible with the data even under ideal conditions (often described as the problem of random error or imprecision);

2) Failure of enrolled patients to comply with or adhere to their assigned treatment (often described as nonadherence);

3) Failure of patients to remain in the study for the full period requested (loss to follow-up); and

4) Failure to enroll patients that are representative of those who would receive the treatment in practice, which results in lack of generalizability of the results.

All of these problems can reduce the chance that the trial or a collection of trials will detect treatment effects (whether harmful or beneficial) that are important for practice. This reduced chance is often described as lack of power. In addition, loss to follow-up (problem 3), if severe, could lead to a spurious association of the treatment with the outcome, or could lead to a failure to find a true effect.

Unfortunately, statistical power calculations are based only on whether the numbers observed would offer a high chance of detecting an effect under ideal conditions, not whether an effect was indeed present in the study *as conducted*. They do not reveal the imprecision of the estimated effect (problem 1), and take no account whatsoever of biases that arise from nonadherence, loss to follow-up, or nonrepresentativeness (problems 2-4). Hence statistical power calculations provide a grossly overoptimistic picture of the true ability of the studies to find effects, and take no account of the risk of false conclusions due to biases. Specifically, as explained in both textbooks and peer-reviewed articles in

statistics journals (e.g., Greenland, 2005; Gustafson, 2006; Vansteeelandt et al., 2006; Rothman et al., 2008, Chapter 19), valid statistical power calculations and inferences about causation require accounting for biases. Because the power calculations offered by Dr. Gibbons take no account of biases (problems 2-4), these calculations do not establish his claims that the available studies were of adequate size to detect important effects of gabapentin.

Power calculations based on observed data also provide no picture of the range of effects compatible with the data.  In particular, they are no substitute for examining confidence intervals and other interval estimates, and in fact are considered misleading by many authors (Smith and Bates, 1992; Goodman and Berlin, 1994; Hoenig and Heisey, 2001; Rothman et al., 2008, Ch. 10). As explained in both peer-reviewed publications and in textbooks (e.g., Poole, 2001; Rothman et al., Chapter 10), random error (item 1) must be properly accounted for by examining the full range of values included in the confidence interval, as well as the width of the interval. Furthermore, because confidence intervals account only for random error and ignore bias (problems 2-4 above), confidence intervals at best provide a bare *minimum* range of effects compatible with the observations (Greenland, 2005).

It follows that the claims by Dr. Gibbons about the number of subjects tested with gabapentin being adequate are misleading and irrelevant for determining whether in fact a particular relative risk value is admissible based on observed data. In particular, confidence intervals show that the data used by Dr. Gibbons in his analyses in paragraph 8 of his Supplemental Expert Reports of Nov. 5, 2008 and March 19, 2009 are so weak that they allow for up to a 30-fold increase of suicidality due to gabapentin. This is not to argue that such a large effect has any credibility, but rather to demonstrate that the data on which Dr. Gibbons bases his claims are hopelessly imprecise with regard to producing any meaningful conclusion about the effect based on statistical analyses. His ensuing power calculations in that paragraph appear to me to be nothing more than attempts to obfuscate and conceal this fact via meaningless computations.

None of these considerations are accounted for in claims by Dr. Gibbons in paragraph 8, page 7 of his Supplemental Expert Reports Nov. 5, 2008 and March 19, 2009. In particular, his comment there that "our estimates of the incidence of suicidality for gabapentin are reliably obtained in a sample of the size used by FDA in their meta-analysis" is simply false, insofar as there is no accounting for the full range of values included in the confidence intervals, as well as no attempt whatsoever to account for biases that may have affected the studies. Accounting for random error requires presentation and admission of the full range of values contained in the confidence intervals, and bias analysis requires examining plausible ranges for the parameters governing the biases (Greenland, 2005; Vansteelandt et al., 2006). Dr. Gibbons carried out none of these analyses in support of his claims. I thus regard his calculations and claims as presented in paragraph 8, page 7 of his reports as devoid of scientific and statistical validity for evaluating gabapentin effects.


**3. General Limitations of Studies for Evaluating Treatments in Nonrandomized Studies, especially Studies of Claims Data**

In a randomized trial, differences or lack thereof between treated and untreated groups will reflect some combination of

   (1) chance (random error),

   (2) differences in adherence, and

   (3) differences in losses to follow up between the groups,

along with any genuine treatment effect that may be present. The chief advantage of randomized studies is that they reduce if not eliminate certain other problems that tend to occur in nonrandomized studies. In nonrandomized studies, differences between treated and untreated groups can arise or be concealed for these reasons. But differences may also arise or be concealed due to other reasons, for example

   (4) differences that existed before or at the time treatment was prescribed, such as
       differences in pain or depression.

Randomization makes large pretreatment differences improbable. But without randomization, there is no limit to the degree that pretreatment differences may affect the

observed difference between treatment groups. Without randomization, pretreatment differences may obscure a real treatment effect or may create the spurious appearance of a treatment effect; they may even make the treatment effect appear to be in the opposite direction of what it really is. In the epidemiologic literature, this problem is usually discussed under the heading of *confounding* (see Rothman et al., Ch. 4 and 9).

Further problems arise in pharmaceutical studies based on claims data, such as the PharMetrics analyses present by Dr. Gibbons in his Supplemental Expert Reports and related article (Gibbons et al., 2009). A major limitation of these studies is that we have only a record of what was *prescribed* for the patients; we do not know whether or how much of the prescription each patient took. As a result, we can only compare those patients or periods with a record showing the drug was prescribed, versus those patients or periods without such a record (or a subset of those without such a record, such as those prescribed another drug). This comparison may inaccurately reflect drug effects, not only because of confounding (as described above), but also because the effect in question (e.g., suicidal ideation or behavior) may be concentrated among those patients and times when the drug is in use or not in use.

Another problem is that claims data (such as the PharMetrics data relied on by Dr. Gibbons in his Supplemental Expert Reports, and by Gibbons et al., 2009) provide only dates of *claims*, not dates of events. This means that one cannot establish accurately from the data the timing of events. Inaccuracies in such data are well known, and their use to establish index dates is faulty. For example, consider the record for patient 6416AAAAAACAZJAF in the PharMetrics data supplied to and by Dr. Gibbons (Exhibit 28, Gibbons Deposition of Feb. 4, 2009). This patient is not shown as having any psychiatric diagnosis until September 1, 2005, and no diagnosis of bipolar disorder until 18 May 2006, which serves as the index date in the analyses by Dr. Gibbons in his Supplemental Expert Reports and by Gibbons et al. (2009). Yet the same patient is also shown as having a prescription for lithium carbonate over a year before, on 5 May 2005. This discrepancy is striking because lithium carbonate is listed in reference sources (e.g., Beers et al., 2006; Physician's Desk Reference, 2009) as being prescribed only for

psychiatric disorders, in particular for manic episodes associated with bipolar disorder. This discrepancy suggests immediately that the record fails to capture the true index (diagnosis) date of the patient, and illustrates the inaccuracy of event times determined from the records in the manner described by Dr. Gibbons and by Gibbons et al. (2009).

As an example of another problem, not all outcome events (e.g., suicidal behavior) may lead to a claim, further obscuring the relation of prescription to effects. For example, a suicide resulting in death before discovery (e.g., a fatal gunshot) would never be recorded in such data, since it generates no health-insurance claim. If such suicides are more frequent in one compared group relative to another, the difference will be missed in an analysis of the claims data.

## 4. Divergences Between Gibbons Expert Report and Gibbons et al. Paper Regarding the Conclusiveness of the PharMetrics Data

There is a disturbing difference between the strength of conclusions presented in the Supplemental Expert Reports of Nov. 5, 2009 and March 19, 2009 by Gibbons (2009) and the publication article for the *Archives of General Psychiatry* by Gibbons et al. (2009) based on the same data. The latter article presents some cautionary discussion regarding interpretation of the results from the PharMetrics database. In contrast, the Gibbons expert report omits any discussion of certain major alternative explanations of the results; instead it encourages the reader to draw a single conclusion favorable to gabapentin.

In particular, in his Supplemental Expert Reports of Nov. 5, 2009 and March 19, 2009, para. 17, bottom page 10-top page 11, Gibbons makes this extremely strong assertion:

> "However, among patients with a psychiatric disorder, who are at increased suicidal risk, statistically significant protective effects of gabapentin were clearly demonstrated."

This assertion is false for a number of reasons, several of which are given in the publication article by Gibbons et al. As Gibbons et al. state in their Discussion section

(page 19 of March 2009 version):  "...suicide is related to the indication for treatment (i.e., a psychiatric disorder) and is therefore difficult to disentangle from the possible effects of treatment." In other words, the observation of a statistically significant inverse association of a treatment (such as gabapentin) with suicide attempts does *not* demonstrate there is a protective effect. That is because there are many other explanations for the association that do not invoke protective effects. Some of these alternative explanations are even compatible with the treatment having a causal effect that is being masked by other, biasing effects.

In the Discussion section of their paper, Gibbons et al. provide the following alternative explanation for the inverse association of a treatment with a suicide attempt (SA):

> "a SA can lead to the identification of the psychiatric disorder that can in turn lead to treatment. It is not uncommon to find patients who have a SA, diagnosis of depression or bipolar disorder, and initiate treatment all on the same day. While this SA is not the consequence of initiating treatment, it can inflate the rate of SAs observed prior to initiation of treatment or in those patients that do not receive treatment."

To understand the implication of this observation, note that one of the key comparisons used in both the Gibbons report and the Gibbons et al. paper is as follows: The rate of attempts after gabapentin prescription is divided by the rate of attempts before the prescription. If the latter rates are inflated as described by Gibbons et al., the ratio of the attempt rate after gabapentin prescription to the rate before or without the prescription (mislabeled as "OR" by Gibbons et al.)  will be artificially deflated, making it appear as though there is a protective effect when in fact there is none. There is no mention of this deflation in the Gibbons expert report, even though that report was filed after the Gibbons et al. paper was written.

In the Discussion section of their paper, Gibbons et al. offer another important alternative explanation for the inverse association of a treatment (such as gabapentin) with suicide attempts:

> "the natural course of psychiatric illnesses exhibits a decrease in SAs over time from diagnosis. This can make it appear that the SA rate is higher prior to treatment initiation than after, giving the false appearance of a protective effect."

This observation further falsifies Gibbons claim in his expert report that "protective effects of gabapentin were clearly demonstrated." But there is no mention of the impact of the natural course of illness in the Gibbons Expert Report, even though that report was filed after the Gibbons et al. paper was written.

The Discussion section of the Gibbons et al. paper offers part of yet another explanation for the inverse association of treatment with suicide attempts:

> "patients who receive treatment often have increased severity of illness and may therefore be at increased suicidal risk to begin with."

To complete this explanation, one should consider the problem of "regression to the mean," which in common parlance refers to a tendency to return toward a normal or average value of a measurement or test among patients identified because of an abnormal value. For example, patients selected because they were high on a certain characteristic (such as blood pressure, cholesterol level, depression, or pain) will naturally fall farther back toward the average ("regress toward the mean") than other patients who have not been selected in that manner, *even if no treatment is given* (Senn, 2003).

Regression to the mean is a special pitfall in nonrandomized treatment studies. That is because treatments are usually given to those exhibiting more severe characteristics (such as depressive symptoms or pain), resulting in more regression to the mean (more improvement) among treated patients even if the treatment itself is ineffective. This natural regression to the mean will be mistaken for a beneficial effect of the treatment. The only secure way to control for regression to the mean is to randomize the patients to treatment versus placebo *after* they were selected for study based on the characteristic. Unfortunately there was no such randomization in the PharMetrics data on which Gibbons based his claims.

In light of the fact that Gibbons et al. (2009) recognize several of the reasons why the PharMetrics data cannot be claimed to "demonstrate a protective effect of gabapentin," the use by Dr. Gibbons of this phrase in section 17 of his Supplemental Expert Reports of Nov. 5, 2008 and March 19, 2009 appears to me to be an attempt to mislead readers. Furthermore, it appears from the Gibbons Deposition Testimony of March 5, 2009 that Dr. Gibbons is well aware of the misleading nature of his usage of "protective" in his Supplemental Expert Reports. Consider the following exchange from page 928:13-24 of that deposition (bolding added):

> 13 (Mr. Altman): If another expert were to say
> 14 Dr. Gibbons' paper proves that gabapentin is
> 15 protective of suicide, would that expert be
> 16 wrong?
> 17 MS. McGRODER: Object to form and
> 18 foundation.
> 19 BY THE WITNESS (Dr. Gibbons):
> 20 A. The expert -- it depends on how the --
> 21 how this expert was using the word protective.
> 22 **If they were using the word protective the way I**
> 23 **would use the word protective, then I think that**
> 24 **might be a misinterpretation**.

This passage indicates that Dr. Gibbons knows that common usage of the phrase "protective effects" would be interpreted by both scientific and lay readers to mean exactly what it sounds like, that gabapentin had a protective effect that was statistically significant – and that such an interpretation cannot be claimed based on the data presented, for the reasons enumerated above (including those in the Gibbons et al. paper). Yet, just two weeks after this testimony in his Supplemental Expert Report of March 19, 2009, Dr. Gibbons uses the phrase "protective effects" in exactly a way that invites misinterpretation favorable to gabapentin.

The concerns I have raised were also raised in the review of the original manuscript submission by Gibbons et al. (2008) to the *Archives of General Psychiatry*. For example, reviewer 4 wrote:

> "In observational studies such as the present, it is very difficult to separate an effect of the drug from the effect of confounding factors. Throughout the whole manuscript I think it will be more accurate to replace the term 'effect' with the more correct statistical term 'association'."

(see Coyle e-mail letter of Feb. 2, 2009). It is remarkable that although Gibbons et al. revised their manuscript to remove the term "effect" in reference to antiepileptics (including gabapentin), Dr. Gibbons did not do so when presenting his Supplemental Expert Report of March 19, 2009, and continued to refer to inverse associations of gabapentin with suicide attempts as "protective effects."

In paragraph 17 (page 11) of his Supplemental Expert Report of March 19, 2009, just before paragraph 18, Gibbons makes this observation:

> "Whether this protective effect is based on reducing the symptoms of the psychiatric disorder or by treating the concomitant pain disorder that is present in many of these patients remains an open question."

Allowing for the fact that a protective effect has not been demonstrated and remains speculation on the part of Dr. Gibbons, I can concur with the preceding statement in this sense: *If* there were a protective effect of gabapentin, it would be unclear whether that effect is from reducing psychiatric symptoms or from pain reduction. The reason for this ambiguity can be seen from the first and last lines of Table 1 of the Gibbons Expert Report: In the PharMetrics data on which Dr. Gibbons bases his analysis, pain disorder is reported by over 70% of the bipolar patients and over 80% of the patients on gabapentin monotherapy. Thus, if gabapentin did have a protective effect, it might be entirely within the patients who had pain disorder.

**5. Erroneous Classification of Exposure Time in Analyses of the PharMetrics Data by Dr. Gibbons**

In the present case of gabapentin and suicide attempts (SA), Dr. Gibbons labels gabapentin prescription as "initiation of treatment" and classifies time after the prescription as "patient exposure days" (paragraphs 12 and 13 of page 9 of his Supplemental Expert Reports Nov. 5, 2008 and March 19, 2009). I consider his classification to be erroneous, and it undermines the validity of his assertions concerning "protective effect" of gabapentin. I also find his labeling deceptive. Indeed, when questioned about this labeling on page 158 (4:16) of his deposition on Feb. 4, 2009 when discussing Table 1 of the Gibbons et al. paper), Dr. Gibbons admits that what he refers to as "patient exposure days" or "person-years of exposure" is not the actual days or years of exposure to gabapentin, and may be much less than the actual exposure (bolding added):

> 4   (Mr. Altman):  The 1,016 person years, is that the
> 5   person years of exposure on gabapentin?
> 6   (Dr. Gibbons):    That's the person years of exposure after
> 7   the first initiation of gabapentin.  **So it's not the**
> 8   **amount of exposure to gabapentin in terms of, you**
> 9   **know, number of pills prescribed or anything.**  It's
> 10  the number of person years following the initiation
> 11  of gabapentin monotherapy.
> 12       **That person could have been on gabapentin**
> 13  **or could have been prescribed gabapentin for one day**
> 14  **or 30 days or continuously throughout that same**
> 15  **period, and in this analysis that would be treated**
> 16  **all equally.**

There is no way to tell from the PharMetrics records whether patients took prescriptions as directed, and Dr. Gibbons made no use of information on the timing of suicide attempts after gabapentin prescriptions. His approach introduces bias in the statistics for

the association of gabapentin with suicide, and adds considerable uncertainty to the results. The type of bias introduced can be large enough to change a positive association or no association into an inverse association (what Dr. Gibbons observed and called a "protective effect").

Consider for example patients that did not have gabapentin prescription for the entire year and never attempted suicide. Dr. Gibbons analyzed these patients as if they contributed a year of exposure to the analysis, when in fact at most they had the exposure only for the days in their prescription supply (e.g., 30 days for a month's supply, if they got only one prescription). Furthermore, patients who did not use entirely their supply would have had even fewer exposure days than listed on their prescriptions. In particular, some patients may have had only a few days exposure, e.g., if they tried gabapentin but stopped taking it soon after because they didn't like the drug effect or they felt it was no longer needed.

I believe that Dr. Gibbons misclassified a considerable amount of unexposed person-time as person-time exposed to gabapentin. My reason for this assertion is as follows: The suicide-attempt (SA) rate over a period in a group is computed by taking the number of attempts over the period in the group and dividing by the number of person-days in the period. The vast majority of patients in the PharMetrics data base have no record of a suicide attempt. For those patients that did not take gabapentin throughout the year following first prescription, counting their days after prescription as "exposure" or "treatment" time adds truly unexposed person-days to the "gabapentin-exposed" group in Dr. Gibbons analyses. For example, a patient receiving just one prescription, say for 30 days, had at most 30 days exposure, but in Dr. Gibbons primary analysis is treated as and referred to as having a year of exposure. This practice artificially inflates the number of days of exposure to gabapentin in his analysis. I regard it as an outright error for the purpose of estimating the effect of gabapentin, because it leads to bias in the estimates.

The consequence of this error for the attempt rates calculated by Dr. Gibbons depends on the proportion of suicide attempts classified as exposed that were actually exposed to

gabapentin at the attempt time (that is, what proportion of attempts were correctly classified). If that proportion were *less* than the proportion of actual exposure time, the attempt rate among the exposed would be *inflated*, thus making gabapentin appear *less* inversely associated with attempts. If that proportion were *more* than the proportion of actually exposed time, the attempt rate among the exposed would be *deflated*, thus making gabapentin appear *more* inversely associated with attempts than it is.

Put another way: If suicide attempts tended to occur when gabapentin had not been in use, the actual association of gabapentin with suicide attempts would be even more strongly inverse than those given in the Gibbons Supplemental Expert Reports. Conversely, if the attempts tended to occur when gabapentin had been in use, the actual association of gabapentin with suicide attempts would be not as strongly inverse as those given in Gibbons Supplemental Expert Reports, and could even be positive. However, even if the proportion of suicide attempts on gabapentin was exactly the same as the proportion of "exposed" time actually on gabapentin, the statistical results would change upon proper classification of the exposure time. This is because the number of attempts classified as gabapentin exposed would drop upon reclassification, thus reducing the statistical significance of the association.

There is no way to tell from the Gibbons Supplemental Expert Reports which of these scenarios is closer to the truth. The key questions left unanswered by these reports are thus: What proportion of time following first gabapentin prescription (used by Dr. Gibbons to define "exposure") was actually spent on the drug? And, what proportion of suicide attempts occurred during time on gabapentin after the first recorded prescription? The PharMetrics data supplied to Dr. Gibbons cannot definitively answer these questions. They could however be used to obtain some indication, for example by examining all gabapentin prescriptions and by classifying as exposed only the time covered by the prescription.

Dr. Gibbons did not conduct these analyses. Instead, in paragraph 19 and Table 2B of his Supplemental Expert Report of March 19, 2009, he provides one "sensitivity analysis" in

which he restricts "exposure" to those receiving at least a 30 days supply of gabapentin, and emphasizes that the relation of gabapentin monotherapy to suicide appears "significant." Unfortunately, this analyses leaves open the questions raised above, because we still cannot see whether the suicide attempts occurred when patients were on or off gabapentin.  As Dr. Gibbons admitted in his deposition of April 27th, 2009 (page 1133:14-23):

> 14. (Mr. Altman): Did you run any analyses for the
> 15 gabapentin studies to look at whether a person was
> 16 on or off the drug at the time of the attempt?
> 17 (Dr. Gibbons): No.
> 18 (Mr. Altman): Why not?
> 19 (Dr. Gibbons): Didn't get round to it.
> 20 (Mr. Altman): So I think it's safe to say you don't
> 21 know what effect that has on these numbers if you
> 22 would have looked that way, correct?
> 23 (Dr. Gibbons): That's correct.

Thus we are left with complete uncertainty as to the direction and magnitude of bias produced by treating all time after first prescription as if it were "exposed" to gabapentin.

This criticism applies not only to the analyses given the Gibbons Supplemental Expert Reports, but also to the paper by Gibbons et al. (2009). For example, in the "Primary Analysis" section of their Methods section (page 9 of the March 2009 version) they state that they use "patient exposure days" as an offset (the offset corresponds to the denominator for their suicide-attempt rates). Similarly, at the start of their Results section of that paper (page 11 of March 2009 version) Gibbons et al. state

> "Table 1 presents number of patients at risk, number of SAs, PY [person-years] of exposure and rate of SAs per 1000 PY of exposure before and after initiation of treatment during the year following the index diagnosis."

However, their "patient exposure days" and "person-years of exposure" are in fact nothing more than the time before and after the first prescription of each drug (gabapentin is analyzed in line 1 of Table 1 of the paper). As explained above, the latter time will seriously exaggerate the actual time on gabapentin spent by these patients.

## 6. Limitations of Adjustments for Concomitant Treatments

Another deceptive aspect of the analysis descriptions given in the Gibbons Supplemental Expert Reports as well as in the Gibbons et al. (2009) paper is that they attempt to convey the impression that all concomitant psychotropic medications were accounted for in the analysis.

Consider this statement from paragraph 12 of the reports of Nov. 5, 2008 and March 19, 2009: "Analyses also adjusted for age, sex, and concomitant treatment (other AEDs, antidepressants, antipsychotics, and lithium)."  Similarly, the closing sentence of the abstract of the Gibbons et al. paper (March 2009 version) states that "AEDs [anti-epileptic drugs] reduce suicide attempt rates both relative to patients not receiving any psychotropic medication and relative to their own pre-treatment levels." Close inspection of the description of the PharMetrics data obtained by Dr. Gibbons and colleagues reveal that these statements are false: Those data identified only a small subset of concomitant treatments. According the PharMetrics purchase contract shown in Exhibit A of the Gibbons Deposition of Feb. 3, 2009, Dr. Gibbons and colleagues did *not* obtain data on nonpharmacologic treatments such as psychotherapy, and they did *not* obtain data on all psychotropic medications. In fact it appears that they failed to obtain data on most psychotropic medications including stimulants, hypnotics, anti-anxiety drugs (such as Xanax and other commonly prescribed tranquilizers and sleep aids), and various antipsychotics. Highly relevant to the confounding issues, they also did not obtain data on pain medication.

What this means is that the adjustments for concomitant treatments employed by Gibbons in his Supplemental Expert Reports and by Gibbons et al. in their paper (March 2009) could not have come close to complete adjustment or control for confounding by

concomitant treatments. Because there is no way to tell from the data what the impact of this lack of control would be, the consequences of this lack of control are a major source of uncertainty about the results by Dr. Gibbons in those reports, which further undermines his claim in paragraph 17 that "statistically significant protective effects of gabapentin were clearly demonstrated." For example, suppose the treatments not included in the analysis were on average effective in reducing suicide attempts. If those patients prescribed gabapentin also received more of these treatments, then these additional treatments and not the gabapentin would be at least partially and perhaps wholly responsible for the inverse associations reported as "protective effects" by Dr. Gibbons (downward confounding). On the other hand, if those patients not prescribed gabapentin received more of these treatments, the inverse associations could understate the protective effect of gabapentin (upward confounding).

Note that the very fact that some patients were prescribed gabapentin and others were not indicates that there is some background difference between these patients that leads to different prescriptions for them. These background differences as well as differences in prescription would lead to confounding, as described earlier. Regarding this confounding problem, as part of his sensitivity analyses Dr. Gibbons offers only analyses with various added restrictions, plus an analysis that uses propensity-score matching. Because these analyses operate entirely and only on items in the data set obtained by Dr. Gibbons, they do not address the problem of uncontrolled confounding from unmeasured concomitants and other unmeasured factors.

The concerns I have raised about uncontrolled confounding were also raised in the review of the original manuscript submitted by Gibbons et al. (2008) to the *Archives of General Psychiatry*. As noted earlier, reviewer 4 wrote: "In observational studies such as the present, it is very difficult to separate an effect of the drug from the effect of confounding factors." The best one can do to address this problem is to incorporate uncertainty about uncontrolled confounding into sensitivity analysis. Methods to do so have existed for decades and are reviewed in textbooks (for example in Chapter 19 of Rothman et al., 2008). Modern methods that allow the incorporation of uncertainty about uncontrolled

confounding into risk and rate regression models (such as those used by Dr. Gibbons) have been available for years (e.g., Greenland, 2003, 2005). Their absence from the sensitivity analyses offered by Dr. Gibbons in his Supplemental Expert Reports and in the paper by Gibbons et al. is therefore striking, especially given the strength of the claims Dr. Gibbons makes, and further undermines his claim that "statistically significant protective effects of gabapentin were clearly demonstrated." It also renders false his claim in paragraph 19, top of page 12 of his Supplemental Expert Report of March 19, 2009 that "the findings of the primary analysis were not due to changes in concomitant pharmacotherapy prior to and then after initiation of gabapentin treatment," for Dr. Gibbons had no information on most of the concomitant pharmacotherapies used for these patients, and so he could not have accounted for changes in those therapies as he claimed.

## 7. Conclusions

As explained in the peer-reviewed literature and textbooks (Smith and Bates, 1992; Goodman and Berlin, 1994; Hoenig and Heisey, 2001; Rothman et al., 2008), power calculations are misleading for making inferences about the range of effects compatible with statistical data, even if those data are perfect. Thus claims by Dr. Gibbons about the power of the studies are misleading and irrelevant for determining whether in fact a particular relative risk value is admissible based on observed data. Such determinations require at a minimum consideration of the full range covered by confidence intervals, and their width (Poole 2001; Rothman et al., 2008, Ch. 10).

Also, as explained at length in the peer-reviewed statistics literature and textbooks (e.g., Greenland, 2003, 2005; Vansteelandt et al., 2006; Gustafson, 2006; Rothman et al., 2008, Ch. 9 and 19), sources of uncontrolled bias (such as exposure misclassification, regression to the mean, and unmeasured confounders) invalidate statistical computations and inferences that do not explicitly account for those biases. In particular, all the confidence intervals and claims of statistical significance presented by Dr. Gibbons take no account of the extensive problems with the PharMetrics data base, as discussed above; yet several of these problems are conceded to be threats to validity by Gibbons et al.

(2009) in their Discussion section and by Dr. Gibbons in his deposition. I have identified several more threats above.

These problems imply that the statistics presented by Dr. Gibbons are not valid for making statements about the actual size and direction of the *effect* of gabapentin. They only refer to the *associations* observed in the data as compiled and used by Dr. Gibbons. These associations reflect the impact of the problems documented above as well as any gabapentin effect (whether harmful or protective), and could easily be large enough to greatly distort the true effect of gabapentin on suicide attempts. If these sources of bias were accounted for, they would greatly expand the intervals of uncertainty left by the data.

Again, based on comparison of the statements made by Dr. Gibbons in his Supplemental Expert Reports against the actual data available and their profound limitations, I conclude that these reports violate precepts of scientific neutrality and are unreliable and invalid as scientific documents, and are instead advocacy tracts for gabapentin. My harsh evaluation applies regardless and independently of whether gabapentin has any harmful or protective effects on suicidality. In light of the data and analysis problems I have described above, it is my opinion that no statistically or scientifically reliable inference or conclusion about the effects of gabapentin can be drawn from the statistical analyses presented by Dr. Gibbons in his Expert Reports and by Gibbons et al. (2009), and that no statistical analysis could salvage a reliable conclusion from the data employed by Dr. Gibbons.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of May, 2009, at Topanga, California.

Sander Greenland, M.A., M.S., Dr.P.H., C.Stat.

REFERENCES AND LIST OF MATERIALS CONSIDERED FOR THIS REPORT:

Beers, M.H., Porter, R.S., Jones, T.V. (2006). *The Merck Manual*, 18th edition.

Coyle, J.T. (2009). Letter to Robert D. Gibbons (e-mail) dated Feb. 2, 2009.

Coyle, J.T. (2009). Letter to Robert D. Gibbons (e-mail) dated April 29, 2009.

*Deposition of Robert Gibbons*, February 3-4[th], 2009, and Exhibits.

*Deposition of Robert Gibbons*, March 5th, 2009, and Exhibits.

*Deposition of Robert Gibbons*, April 27th, 2009, and Exhibits.

Gibbons, R.D. (2008). *Expert Report of Robert D. Gibbons Ph.D*. May 19, 2008. Neurontin Litigation.

Gibbons, R.D. (2008). *Supplemental Expert Report of Robert D. Gibbons Ph.D*. July 11, 2008. Neurontin Litigation.

Gibbons, R.D. (2008). *Supplemental Expert Report of Robert D. Gibbons Ph.D*. Nov. 5, 2008. Neurontin Litigation.

Gibbons, R.D. (2009). *Supplemental Expert Report of Robert D. Gibbons Ph.D*. March 19, 2009. Neurontin Litigation.

Gibbons, R.D., Hur K., Brown, C.H., Mann, J.J. (2008). The relationship between antiepileptics and suicide attempts in patients with bipolar disorder. Manuscript, Sept. 2008.

Gibbons, R.D., Hur K., Brown, C.H., Mann, J.J. (2009). The relationship between antiepileptics and suicide attempts in patients with bipolar disorder. *Archives of General Psychiatry* 2009, in press.

Gibbons, R.D. (2009). Letter to Editor of the *Archives of General Psychiatry* dated March 15, 2009.

Goodman, S.N., Berlin, J. (1994). The use of predicted confidence intervals when planning experiments and the misuse of power when interpreting results. *Annals of Internal Medicine*, 121, 200–206.

Greenland, S. (2003). The impact of prior distributions for uncontrolled confounding and response bias: A case study of the relation of wire codes and magnetic fields to childhood leukemia. *Journal of the American Statistical Association*, 98, 47-54.

Greenland, S. (2005). Multiple-bias modeling for analysis of observational data (with discussion). *Journal of the Royal Statistical Society*, Series A, 168, 267-308.

Gustafson, P. (2006).  Sample size implications when biases are modelled rather than ignored. *Journal of the Royal Statistical Society,* Series A, 169, 883-902.

Hoening, J.M., Heisey, D.M. (2001). The abuse of power: The pervasive fallacy of power calculations for data analysis. *The American Statistician,* 55, 19–24.

PharMetrics data (2008). *Deposition of Robert Gibbons*, February 3-4[th], 2009, Exhibit 4. Produced by Robert D. Gibbons, Ph.D., Nov. 2008.

*Physician's Desk Reference* (2009). 63rd edition. Thomson Reuters.

Poole, C. (2001). Low P-values or narrow confidence intervals: Which are more durable? *Epidemiology* 2001;12:291–294.

Rothman, K.J., Greenland, S., Lash, T.L. (2008). *Modern Epidemiology*, 3rd ed. Philadelphia: Lippincott.

Senn, S. (2003). *Dicing with Death: Chance, Risk and Health*. Cambridge: Cambridge University Press, 15-24.

Smith, A.H., Bates, M. (1992). Confidence limit analyses should replace power calculations in the interpretation of epidemiologic studies. *Epidemiology*, 3, 449–452.

Vansteelandt, S., Goetghebeur, E., Kenward, M.G., Molenberghs, G. (2006).  Ignorance and uncertainty regions as inferential tools in a sensitivity analysis.  *Statistica Sinica*, 16, 953-980.