# EXHIBIT C



**Shook,**
**Hardy &**
**Bacon** L.L.P.

www.shb.com

Lori C. McGroder

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
816.474.6550
816.559.2290 DD
816.421.5547 Fax
lmcgroder@shb.com

November 26, 2008

<u>**VIA U.S. MAIL**</u>

Mr. Kenneth B. Fromson
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY 12550-3341

Dear Ken:

In response to your letter request of November 12, 2008, please find enclosed a disk containing the data and analyses pertaining to Dr. Gibbons' pharmacoepidemiologic study on the AEDs referenced in FDA's pooled dataset, as well as the Neurontin specific analyses, on which he bases opinions set out in his November 5, 2008, Rule 26 report.

Also enclosed in response to your document request are the following: a copy of the PharMetrics license agreement, a copy of Dr. Gibbons' retention agreement in the Neurontin litigation, and a copy of the manuscript entitled *The Relationship Between Antiepileptics and Suicide Attempts* authored by Gibbons, Hur, Brown and Mann. With the production of these materials, plaintiffs "document demand" is satisfied.

Have a good holiday weekend.

Very truly yours,

Lori C. McGroder
Partner

LMG:ks

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

# License Agreement

By signing in the space provided below, Robert D. Gibbons Ph. D. ("Licensee") with an address at 2021 North Mohawk, Chicago, IL 60614, agrees and acknowledges acceptance of the terms of this Agreement for the services as described in Exhibit A attached hereto ("the "Proposal"), and accepts and agrees to be bound by the terms and conditions of this Agreement.

1.    (a)  This Agreement is made as of the 20th day of May 2008 by and between Licensee and PharMetrics, Inc. ("PharMetrics") and shall remain in full force and effect from the date hereof, unless earlier terminated pursuant to Section 1(b) hereof.

(b)  In the event that either party commits a material breach or default in any of the terms or conditions of this Agreement and that party fails to remedy that default or breach within thirty (30) days after receipt of notice of that breach from the other party, the party giving notice may, at its option terminate this Agreement by sending written notice of termination to the other party. In the case of early termination of PharMetrics by Licensee, as provided above, PharMetrics will proceed in an orderly fashion to terminate any outstanding commitments and to phase-down the work as soon as practicable and shall not be entitled to any compensation for such termination other than for: (i) fees for services rendered and monies expended by PharMetrics prior to the effective date of termination not yet paid for; and (ii) reasonable non cancelable obligations incurred for the project by PharMetrics prior to the effective date of termination.   The obligations of the parties under Sections 1, 2, 5, 6, 7 and 8 hereof will survive termination of this Agreement. Any payment due under this section shall be made within thirty (30) days after termination or as soon as all work is phased down, whichever is later.

(c)  In the event this Agreement is terminated pursuant to Section 1(b), PharMetrics shall retain such sums as may have been paid to it by Licensee under the term of this Agreement to compensate PharMetrics for work performed in accordance with this Agreement. Licensee shall pay PharMetrics any additional amounts owed, but not yet paid, for authorized work performed.

2.    (a)  PharMetrics represents that it has the right to use and may use third party information when collecting, compiling and maintaining PharMetrics materials that PharMetrics furnishes to Licensee under this Agreement.

(b)  Licensee agrees to indemnify and hold harmless PharMetrics and its Affiliates, employees, directors and agents against and from any claims, proceedings, or investigations arising out of or in connection with Licensee's use of the Deliverables including amounts paid in settlement of claims, proceedings and investigations and agrees to bear all costs and expenses, including reasonable attorneys' fees, incurred in connection with the defense or settlement of any such claim, proceeding or investigation. For the purposes of this Agreement, "Affiliate" of a party hereto means a company which such party, or its parent, effectively controls, directly or indirectly, through the ownership or control of shares in the company.

3.    (a)  PharMetrics shall provide to Licensee analytic summary file cohort datasets as described in the Proposal, under the terms and conditions of this Agreement (collectively the "Deliverables"). For the purposes of Section 3 hereof, Deliverables includes, but is not limited to, the Proposal and the terms and conditions of this Agreement.

(b)  PharMetrics shall provide the Deliverables under this Agreement only as an independent contractor, and nothing contained herein shall be construed to be inconsistent with that relationship or status. PharMetrics, its employees, contractors, directors and agents shall not be considered employees or agents of Licensee. This Agreement shall not constitute, create, or in any way be interpreted as, a joint venture, partnership, or business organization of any kind.

4.    Neither Licensee nor PharMetrics shall be liable for delays in performing or any failure to perform any of the terms of this Agreement (other than payment obligations) caused by the effects of fire, strike, war (declared or undeclared), insurrection, government restriction or prohibition, force majeure or other causes reasonably beyond its control and without its fault, but the party failing to perform shall use all reasonable efforts to resume performance of this Agreement as soon as feasible.

5.    <u>License Grant; Use of Information.</u>

Subject to the terms and conditions set forth herein, and the additional terms governing the use of the Deliverables in a legal proceeding attached hereto as Attachment 1, PharMetrics hereby grants to Licensee a non-exclusive, non-transferable, non-sublicensable, perpetual (except to the extent that this Agreement is terminated pursuant to Section 1(b)) license to use the Deliverables solely for Licensee's own use and analyses as further defined in the Permitted Use section of the Proposal.

(a)  Licensee may not use the Deliverables for any other purpose including, but not limited to, modifying, copying, selling, transferring, quoting to, attributing, or distributing in whole or in part, without prior written consent of PharMetrics. Licensee acknowledges that PharMetrics is the owner of the Deliverables and rights therein, including but not limited to, all intellectual property rights therein, and no right, title or interest in any portion of the Deliverables or any modifications or enhancements thereto shall be conveyed to Licensee by release of such information, except as expressly provided herein.

(b)  Licensee shall not represent or imply to any third party that PharMetrics has provided any review, certification or endorsement of any reports or analyses prepared by Licensee or its clients or customers, or that PharMetrics makes any representation or warranty with respect to data underlying such reports or analyses.

(c)  Notwithstanding anything contained in this Agreement to the contrary, Licensee acknowledges and agrees that PharMetrics is in the business of providing information, materials and data similar to the Deliverables provided hereunder to third parties. PharMetrics retains the right and nothing shall prevent PharMetrics from using the ideas, concepts, methods, processes, data, know-how, organization, techniques, wording, modules and subroutines developed by PharMetrics as part of its provision of materials to third parties, so long as such work does not incorporate any confidential information of Licensee.

(d)  Licensee may only publish its findings and conclusions related to Licensee analysis of the Deliverables or a portion thereof, that has been approved by PharMetrics, which approval shall not be unreasonably withheld, and includes all appropriate disclaimers.   Licensee shall acknowledge PharMetrics as the source of data from the Deliverables contained in any such publication (attribute:  PharMetrics, Inc., a unit of IMS, Watertown, MA).

6.    <u>Confidentiality</u>

(a)  Licensee shall not, at any time during the term of this Agreement or thereafter, communicate, disclose or provide to any third party, any of the Deliverables, the contents thereof, any information or materials derived therefrom, information relating to current or future PharMetrics business plans, or any other information provided by PharMetrics to Licensee which PharMetrics identifies on or about the time of its disclosure as confidential or which, by the nature or type of information, reasonably should be regarded as confidential information of PharMetrics (collectively "PharMetrics Confidential Information"), except as expressly provided in this Agreement or otherwise expressly authorized by PharMetrics in writing.  PharMetrics shall not, at any time while this Agreement is in effect or thereafter, communicate, disclose or provide to any

third party, any information provided by Licensee to PharMetrics in connection with this Agreement which Licensee identifies on or about the time of its disclosure as confidential or which, by the nature or type of information, reasonably should be regarded as confidential information of Licensee (collectively "Licensee Confidential Information"), except as expressly provided in this Agreement or otherwise expressly authorized by Licensee in writing. Each party hereto agrees to treat the confidential information of the other as confidential, using the same degree of care used by the receiving party to protect the receiving party's own confidential information, but in any event not less than a reasonable degree of care.

(b) This Confidentiality provision does not apply to any information: (i) obtained from an issued or registered patent; (ii) available in the public domain through no fault of the receiving party of such information; (iii) independently developed by or on behalf of the receiving party without reference to the disclosing party's confidential information; or (iv) disclosed to the receiving party without restriction by a third party not having an obligation of confidence with respect to such information. No combination of information will be deemed to be within any of the above exceptions, whether or not the component parts of the combination are within one of the above exceptions, unless the combination itself is within one of the above exceptions.

7.   Limitation of Liabilities and Warranties

(a) IN NO EVENT SHALL PHARMETRICS BE LIABLE TO LICENSEE FOR ANY LOSS OF DATA, PROFITS, OR FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE USE OR PERFORMANCE OF THE SERVICES OR THE DELIVERABLES PROVIDED HEREUNDER FOR THIS AGREEMENT, EVEN IF PHARMETRICS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.

(b) THE DELIVERABLES ARE PROVIDED ON AN "AS IS" BASIS. PHARMETRICS MAKES NO WARRANTIES, GUARANTEES OR REPRESENTATION, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT WITH RESPECT TO THE SERVICES.

(c) PHARMETRICS' LIABILITY ARISING OUT OF THE SUPPLYING OF, OR ANY DELAY OR FAILURE TO SUPPLY, THE DELIVERABLES HEREUNDER OR THEIR USE OR DISPOSITION, WHETHER BASED UPON WARRANTY, CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AMOUNTS PAID BY LICENSEE PURSUANT TO THIS AGREEMENT UNDER WHICH SUCH DELIVERABLES WERE PROVIDED TO LICENSEE.

8.   Communications and Payments

(a) Licensee shall pay to PharMetrics the fees for the Deliverables within thirty (30) days of the invoice date except as otherwise set forth in the

Fees and Payment section of the Proposal. Licensee will also be responsible for paying applicable sales tax on the total amount as defined by operation of law, unless Licensee notifies PharMetrics in writing of Licensee's tax exempt status. In no event shall Licensee deduct or set-off any amount(s) from or against any amount(s) owed to PharMetrics under this Agreement without the prior written consent of PharMetrics. If Licensee fails to timely pay any amount in accordance with the terms of this Agreement, Licensee shall pay, in addition to the invoice amount, interest at the rate of twelve percent (12%) per annum on the unpaid balance beginning thirty-five (35) days form the date of the invoice until such amounts are paid.

(b) Licensee shall pay to PharMetrics reasonable and actual expenses, provided that such expenses are (i) pre-approved by Licensee and (ii) necessary to the performance of the services associated with the Deliverables.

(c) Checks will be made payable to: "PharMetrics, Inc.", Tax Identification Number: 04-3428516, and sent to the notice address for PharMetrics as follows: 311 Arsenal Street, Watertown, MA 02472.

(d) Any notice required or permitted hereunder shall be in writing and shall be delivered or mailed to the addresses set forth herein.

9.   Miscellaneous

(a) Assignment

Neither party shall have the right to assign this Agreement or any of the rights or obligations hereunder without the prior written consent of the other party, except that (a) PharMetrics may assign this Agreement to a successor or assignee of all or substantially all of its business related to this Agreement, whether by purchase, merger, consolidation or otherwise, and (b) either PharMetrics or Licensee may assign this Agreement to an affiliate or a subsidiary or a successor to that area of its business to which this Agreement is related.

(b) Entire Agreement; Modification

This Agreement constitutes the entire agreement between the parties on the subject matter and supersedes all prior contracts, agreements and understandings relating to the same subject matter between the parties. The parties intend this Agreement to be a complete statement of the terms of their agreement, and no change or modification of any of the provisions of this Agreement shall be effective unless it is in writing and signed by a duly authorized representative of PharMetrics and Licensee.

(c) This Agreement shall be governed by the laws of the Commonwealth of Massachusetts, without regard to its conflict of laws rules.

(d) This Agreement is executed in two counterparts each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Agreement has been accepted and agreed by the parties as of the date hereof. Each individual signing for a corporate entity hereby personally warrants his or her legal authority to bind that entity.

ROBERT D. GIBBONS PH. D.

By: _____
Name: Robert D. Gibbons LTD
Title:  President


Date: 5/21/2008_____

PHARMETRICS, INC.

By:_____
Name:
Title:


Date:_____

## ATTACHMENT 1

## Additional Terms and Conditions Governing Use of PharMetrics Deliverables in Legal Proceedings

**Permissible Use and Disclosure of PharMetrics Deliverables.** Licensee ("CLIENT") hereby agrees that PHARMETRICS owns all right, title and interest in any data ("Data"), software ("Software"), syndicated reports ("Reports") and other information or Service components supplied to CLIENT by PHARMETRICS collectively referred to herein as deliverables ("Deliverables"), in whatever form provided under the Agreement between Robert D. Gibbons Ph. D. and PHARMETRICS, dated May 20, 2008.

PHARMETRICS grants CLIENT a non-exclusive, non-transferable license to use the Deliverables internally, in conjunction with other information available to CLIENT. CLIENT may disclose the Deliverables to Pfizer and its employees having a need to know for the conduct of CLIENT's investigation. The Deliverables shall not be disclosed or used in legal proceedings unless compelled by court order, provided PHARMETRICS is given reasonable advance written notice for the purpose of obtaining the court's protection with respect to the Deliverables. The Deliverables may only be produced in the Legal Proceeding in connection with a Protective Order, issued by the court ("Protective Order") which limits dissemination of the Deliverables to Qualified Persons as defined in the Protective Order, the terms of which are not inconsistent with the terms set forth in these Terms and Conditions. Production of the Deliverables shall be limited to that portion of the Deliverables that is relevant to the Legal Proceeding, except where the context or applicable rules of civil procedure otherwise specifically requires. Any person or entity receiving the Deliverables in connection with the Legal Proceeding shall only use the Deliverables for purposes directly related to reaching an outcome in the Legal Proceeding. All documents containing the Deliverables shall be marked "CONFIDENTIAL", or marked in such other manner so as to be identified as a document requiring confidential treatment under the terms of the Protective Order.

When PHARMETRICS' Deliverables are used in or as part of a legal proceeding, PHARMETRICS will only act as an objective service provider and not as an expert on behalf of a CLIENT. PHARMETRICS' Deliverables may reflect projections, estimates, forecasts, or other analyses of the Deliverables are the result of either PHARMETRICS' standard processes or specifications developed or approved by the CLIENT.

PHARMETRICS will not offer testimony or other evidence regarding the interpretation of the results of the Deliverables provided by PHARMETRICS or the services performed by PHARMETRICS in connection with the Legal Proceeding. In addition, PHARMETRICS will not provide any advice or engage in any advocacy with respect to witness testimony or expert analysis of any other party. Also, PHARMETRICS will not provide any opinion as to the relative merits of the CLIENT's or other party's position in a Legal Proceeding.

In no event shall PHARMETRICS be liable for any consequential, special, exemplary, or similar types of damages, including but not limited to third party claims, whether foreseeable or not, arising in connection with the use of PHARMETRICS' Deliverables in the Legal Proceeding, even if PHARMETRICS has been advised of the possibility of such damages. Any reliance on or decision based on PHARMETRICS Deliverables is the sole responsibility of CLIENT and the entity that receives the PHARMETRICS Deliverables in the Legal Proceeding.

CLIENT agrees that 30 days after conclusion of the Legal Proceeding, including appeals, each person or entity having received PHARMETRICS Deliverables shall either (i) return such

PHARMETRICS Deliverables or copies then in their possession to the Law Department of PHARMETRICS located at 660 West Germantown Pike; Plymouth Meeting, PA 19462; or (ii) destroy all such documents or any copies then in their possession and control and provide the Law Department of PHARMETRICS with written attestation of their destruction. This paragraph reference to the conclusion of the Legal Proceeding refers to the period in time immediately following (i) the entry of the final judgement; or (ii) the passage of time in which an appeal may be filed; or (iii) the execution of the parties of the settlement agreement; or (iv) final determination of an appeal.

## EXHIBIT A

### Proposal

**Scope of Work**

PharMetrics will deliver two sets of analytic summary data files for two separate patient cohorts ("Cohort Datasets"). Some patients may be included in both cohorts. Each Cohort Dataset will be comprised of four files. In addition we will provide one drug reference file and one diagnosis reference file, (and one procedure code file if there are HCPCS codes).

Patient selection criteria:

Cohort 1 (Bi-polar Disorder): Using the index-window time frame January 1, 2001 – December 31, 2006 (inclusive) find the first occurrence of bi-polar diagnosis (ICD-9 296.0x, 296.1s, 296.4x-296.8x). This will define the index date for each patient.

Cohort 2 (Gabapentin users): Using the index-window time frame January 1, 2001 – December 31, 2006 (inclusive) find the first claim for gabapentin (GPI?). This will define the index date for each patient.

All patients with an index date will be validated for inclusion. They must have valid enrollment dates, valid gender, valid year of birth, and continuous enrollment in the 12 months prior to the index date (pre-index period) and 12 months after the index date (post-index period). Note that a month will be defined as having 30 days, so that 12 months equal 360 days.

Patients who are aged 65+ at any time during the pre- and post-index period must also be enrolled in a Medicare Advantage plan. Complete claims histories during intervals of continuous enrollment may not be available for individuals aged 65 years or older whose insurance coverage is not Medicare "risk" due to issues of coordination of benefits with traditional Medicare or another payer. Therefore, we will restrict the over 64 population to those who are identified as enrolled in Medicare "risk" plans.

Furthermore, only newly treated/diagnosed patients are of interest. Therefore, cohort 1 patients will be excluded if they have any bi-polar diagnosis during the pre-index period, and cohort 2 patients will be excluded if they have any gabapentin claims during the pre-index period.

Only plans with enrollment, days supplied and no mental health carve-out will be included.

Diagnosis codes used for patient selection or delivered in analytic files will only be selected from claims that are submitted by a clinician involved in the treatment/diagnosis of a patient, or a facility. Consequently, only medical (M), surgical (S), or facility (F)' record types will be considered, and thus 'A' and other record types will be ignored. Record type is not relevant when looking at drug claims used for patient selection or delivered in analytic files (since most have a record type of 'Pharmacy' (P).

**Deliverables and Timeline**

We will create four analytic files for each Cohort Dataset with the same structure. Thus a total of eight analytic files, plus the 2 (or 3) reference files will be delivered. All will be in SAS format.

File 1 will be a patient level file, while files 2, 3, and 4 will be claim-level files. Only claims within the pre- and post-index periods will be included in the claim-level files.

Robert D. Gibbons Ph. D. - 05 20 08

The Cohort Datasets (the "Deliverables" and each a "Deliverable") will contain the following fields:

File 1: Patient File (one record per selected patient):
> ID
> Year of birth (at index date)
> Gender
> Index Date

File 2: Diagnosis File (one record for every diagnosis in the claims history within the pre- and post-index periods):
> ID
> Date of diagnosis
> Diagnosis code

File 3: Drug File (one record for every drug of interest (AED, anti-depressants, lithium, and Atypical anti-psychotics within the pre- and post-index periods):
> ID
> Date of claim
> NDC code
> HCPCS code (for injectibles, if necessary)
> Days Supplied (for NDC only)
> Quantity Dispensed (for NDC only)

The final selection of drugs of interest will be done in consultation with Licensee.

File 4: Suicide and self-inflicted injury (optional?) (one record for every code of interest within the pre- and post-index periods. Note that these codes are already included in File 2):
> ID
> Date of diagnosis
> Diagnosis code

Timeline
The Cohort Datasets will be delivered to Licensee 10-15 business days upon Licensee's approval of the final drug list.

**Permitted Use**
The Deliverables are being provided by PharMetrics to Dr. Gibbons for the purpose of performing analyses solely for Pfizer Inc. for a project entitled "BP Suicide." Any other use of the Deliverables is strictly prohibited and requires PharMetrics' prior written approval.

**PharMetrics Fee and Payment Schedule**
PharMetrics' licensing fee for the Deliverables described above is $15,000, plus applicable sales tax. PharMetrics will invoice Licensee $15,000, plus applicable sales tax, upon execution of the Agreement.

Word Count: 3421
Tables: 2
Figures: 1

# The Relationship Between Antiepileptics and Suicide Attempts

Robert D. Gibbons[1]
Kwan Hur[1,2]
C. Hendricks Brown[1,3]
J. John Mann[4]

[1]Center for Health Statistics, University of Illinois at Chicago
Rooms 455-457 (MC 912), 1601 W. Taylor, Chicago, IL 60612, USA

[2]Cooporate Studies Program Coordinating Center,
Hines VA Hospital, Hines, IL 60141

[3]Prevention Science and Methodology Group,
Department of Epidemiology and Biostatistics, College of Public Health MDC-56
University of South Florida, 13201 Bruce B Downs Blvd Tampa, FL 33612

[4]Department of Neuroscience, New York State Psychiatric Institute
Department of Psychiatry, Columbia University College of Physicians & Surgeons
1051 Riverside Drive, New York, NY 10032, USA

September 2008

**Corresponding Author:**
Robert D. Gibbons, Ph.D.
Director, Center for Health Statistics
University of Illinois at Chicago
1601 W. Taylor
Chicago, IL 60614
Phone: (312) 413-7755
Fax:    (312) 996-2113
Email: rdgib@uic.edu

**Acknowledgements:** This work was supported by NIMH grants MH062185 (JJM) and
R56 MH078580 (RDG and CHB), and MH40859 (CHB) and AHRQ grant
1U18HS016973.  Dr. Gibbons has served as an expert witness for the U.S. Department
of Justice, and Wyeth and Pfizer Pharmaceuticals, the latter involving gabapentin, one of
the drugs considered in this paper.  Dr. Mann has received research support from
GlaxoSmithKline and has served as an adviser to Eli Lilly and Lundbeck
Pharmaceuticals.  Dr. Brown directs a suicide prevention program at the University of
South Florida that is funded by JDS Pharmaceuticals.  Dr. Hur reports no competing
interests.  Dr. Gibbons had full access to all of the data in the study and takes

# ABSTRACT

**Context:** On January 31, 2008, FDA issued an alert regarding increased risk of suicidal thoughts and behavior with antiepileptic drugs (AED) (1). On July 10, 2008, an FDA scientific advisory committee voted yes that there was a significant positive association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality. **Objective:** To determine if AEDs increase risk of suicide attempt in patients with bipolar disorder. **Design:** A pharmacoepidemiologic study in which suicide attempt rates were compared before and after treatment and to a no medication control group. Analyses were restricted to AED and lithium monotherapy. **Setting:** We used the PharMetrics medical claims database to study the relationship between the 11 AEDs identified in the FDA alert and lithium to suicide attempts. **Main Outcome Measure:** Suicide attempts. **Patients:** A cohort of 47,918 patients with bipolar disorder with a minimum of a one-year window of information before and after the index date of their illness. **Results:** Overall, there was no significant difference in suicide attempt rates for patients treated with an AED (13/1000 person years) versus patients not treated with an AED or lithium (13/1000). In subjects treated with an AED, the rate of suicide attempts was significantly higher prior to treatment (72/1000) than after treatment (13/1000). In patients receiving no concomitant treatment with an antidepressant or antipsychotic, AEDs were significantly protective relative to no pharmacologic treatment (3/1000 versus 15/1000). **Conclusions:** Despite FDA reports regarding increased risk of suicidality associated with AED treatment, the current study reveals that as a class, AEDs do not increase risk of suicide attempts in patients with bipolar disorder relative to patients not treated with an AED or lithium. AEDs reduce suicide attempt rates both

## INTRODUCTION

Anticonvulsant medications are life saving in the treatment of seizure disorders and are also extensively used for other indications such as mood disorders and trigeminal neuralgia. In March of 2005, The Food and Drug Administration in the United States (FDA) sent letters to sponsors of 11 antiepileptic drugs (AEDs) requesting the submission of suicidality data from placebo-controlled randomized clinical trials (RCTs). The data consisted of suicide-related adverse event reports and a search for suicide-related terms in electronic data bases related to the studies. The 11 AEDs included gabapentin, divalproex, felbamate, lamotrigine, levetiracetam, oxcarbazepine, pregabalin, tiagabine, topiramate, zonisamide, and carbamazepine. FDA conducted a meta-analysis of 199 placebo-controlled trials including 43,892 patients (27,863 in drug treatment groups and 16,029 in placebo) for 11 antiepileptic drugs (2). They found that 0.43% of the patients in drug treatment groups reported suicidal behavior or ideation versus 0.22% of the patients in placebo groups, corresponding to an estimated 2.1 per 1000 (95% CI: 0.7, 4.2) more patients in the drug treatment groups who reported suicidal behavior or ideation than in the placebo treatment groups. Based on these findings, on January 31, 2008, FDA issued an alert to health care providers warning of increased risk of suicidal thoughts and behavior with AEDs (1). On July 10, 2008 FDA convened a meeting of two of their scientific advisory committees to determine the type and extent of the warning that FDA would promulgate regarding AEDs and suicidality. The committee voted that yes there was a significant association between AEDs and suicidality but voted against placing a black box warning on AEDs for suicidality.

person years for divalproex versus 10.8/1000 for lithium, a significant difference following adjustment for age, sex, comorbid medical and psychiatric conditions and concomitant use of other psychotropic drugs. Completed suicide rates were also higher for divalproex versus lithium (1.7/1000 versus 0.7/1000). Again, there was no adjustment for previous suicide attempts or comparison to patients that were not treated with either lithium or an AED.

Completed suicide and attempted suicide are major concerns for people with bipolar disorder (5-8). In the absence of treatment, approximately 10 per thousand individuals with bipolar disorder complete suicide annually and about 40 per thousand attempt suicide (5). These risks are approximately one hundred-fold higher (completed suicide) and ten-fold greater (suicide attempts) than those for the general population (5). That makes this a population of interest in detecting the effect on suicide risk of AEDs in comparison to a no-treatment group. Further, the FDA warning implicated all 11 AEDs as a whole, which is surprising given their often quite different modes of action. This paper examines the effect on risk of different types of AEDs on a full population of bipolar patients. Therefore the purpose of this study is to both replicate and expand the previous findings of the Collins and McFarland and Goodwin studies. First, we examined a much larger cohort of bipolar patients than the previous studies. Second, we investigated a much larger set of AEDs, i.e., the 11 AEDs in the FDA analysis. Third, with respect to the 11 AEDs and lithium, we considered monotherapy only, thereby reducing the confounding effect of treatment resistance from the analysis. Fourth, we adjusted for concomitant therapy including antidepressants, anticonvulsants, and other

**METHODS**

Data for this study came from the PharMetrics Patient Centric Database, the largest

national patient-centric database of longitudinal integrated health care claims data

commercially available from PHARMetrics®, Inc., under unrestricted license. These

national data are not statistically different from the 2000 U.S. Census distributions of age,

gender, and region.  The universe of data are comprised of medical, specialty, facility,

and pharmacy paid claims from more than 85 managed care plans nationally,

representing more than 47 million covered lives.


Data were collected during fiscal years 2000 through 2006.  All patients with an ICD 9

diagnosis of bipolar disorder (ICD-9 codes: 296.0x, 296.1x, and 296.4x-296.8x) who

were continuously enrolled in the same health care plan for at least one year before and

after the index diagnosis date were included in the sample.   A total of 47,918 patients

met these criteria, and there were 1,226 patients with at least one suicide attempt.   The

ICD 9 codes used to identify suicide attempts were E950-E959, where subcategories are

E950-E952 (self-inflicted poisoning), E953 (self-inflicted injury by hanging), E954

(drowning), E955 (self-inflicted injury by firearms), E956 (self-inflicted injury by

cutting), E957 (self-inflicted injury by jumping from high places), E958

(other/unspecified self-inflicted injury), and E959 (late effects of self- inflicted injury).


Analysis of these data was based on Poisson regression models using the number of

patient exposure days as an offset.   The method of generalized estimating equations

## RESULTS

Table 1 presents number of patients at risk, number of suicide attempts, person years of exposure and rate of suicide attempts per 1000 person years of exposure before and after initiation of treatment during the one year observation period following the index date of the bipolar disorder diagnosis.  These summary statistics are provided for each of the 11 AEDs, lithium, the combination of all AEDs and the no medication condition, which consists of subjects not treated with any of the 11 AEDs or lithium.  Table 1 also presents results for treatment with one of the 11 AEDs only and no pharmacologic treatment (i.e., no antidepressant, or antipsychotic or second AED).  Table 1 reveals that there were a total of 13,385 patients who received either one of the 11 AEDs or lithium and 25,432 patients that did not receive any of the 11 AEDs or lithium.  Post treatment suicide attempt  rates for AEDs (13/1000 person years) and lithium (18/1000 person years) were comparable to no treatment rates (13/1000 person years).  Of the 25,432 patients who did not receive any of the 11 AEDs or lithium, 11,207 (44%) also did not receive any other AED, antidepressant or antipsychotic medication.  The rate of suicide attempts in this group was 15/1000 person years, slightly higher than those who did not receive one of the 11 AEDs or lithium.  Table 1 reveals that for five of the drugs there was an insufficient number of cases for a meaningful individual drug-level statistical analysis (felbamate, levetiracetam, pregabalin, tiagabine, and zonisamide).  Figure 1 presents a graphical summary of suicide rates by treatment type, before and after treatment.

were associated with lower suicide attempt rates than lithium (13/1000 versus 18/1000, ERR=0.62, (CI: 0.44-0.89), p<0.008); however, pre-treatment suicide attempt rates were not significantly higher for patients treated with lithium (99/1000 person years) relative to AEDs (72/1000 person years; adjusted ERR is 0.80, (0.51-1.25), p = 0.325).   While not statistically significant, the increased rate of suicide attempts observed before treatment for lithium might account for the modestly higher post treatment rate for lithium relative to AEDs.

In our within-subject analyses comparing attempts before and after receiving treatment with an AED, the rate of suicide attempts was significantly greater prior to treatment (72/1000 person years) than after treatment (13/1000 person years), ERR=0.19, (CI: 0.11-0.26), p<.0001.  Similar protective effects of AEDs were seen for the individual drugs and lithium, although the effects of topiramate (60/1000 vs. 27/1000, ERR=0.52, (CI: 0.18-1.48), p<0.22) and carbamazepine (50/1000 vs. 29/1000, ERR=0.76, (CI: 0.10-6.01), p<0.80) were not statistically significant (see Table 2).   The pre-treatment rate of suicide attempts in patients who ultimately received AED treatment was significantly higher than the no treatment suicide attempt rate (ERR=4.88, (CI: 3.91-6.09), p<0.0001) suggesting that patients who receive AED treatment  are more severely impaired.  A similar result was found for lithium (see Table 2).

attempt rates relative to those patients with a diagnosis of bipolar disorder that received

no pharmacologic treatment.  This finding is further highlighted by the fact that the pre-

treatment suicide rate among those treated exclusively with one of the 11 AEDs, was

significantly higher relative to the "pre-treatment" rate in those not pharmacologically

treated (44/1000 versus 15/1000, ERR=2.85, (CI: 1.46-5.57), p<0.002).  Within

individuals treated exclusively with one of the 11 AEDs, significant protective effects of

treatment were also observed (44/1000 versus 3/1000, ERR=0.05, (CI: 0.02-0.18),

p<0.0001).   This finding indicates that following treatment with one of the 11 AEDs

alone, the covariate adjusted rate of suicide attempts was approximately one twentieth of

the suicide rate before treatment in those patients that were previously diagnosed as

having bipolar disorder.



Figure 1: Suicide Attempt Rates Before and After Treatment

Since prior suicide attempt greatly increases the risk of future suicide, that effect would favor higher post-treatment suicide attempt rates in the AED-treated group, an effect that was outweighed by the apparent therapeutic effect of this treatment.

Possible exceptions are topiramate and carbamazepine which did not show significant reduction in suicide attempt rates with treatment and had post treatment suicide attempt rates significantly higher than no treatment levels.  Nevertheless, even for these two AEDs, there was no evidence that they increased suicide rates, just that they did not appear to significantly reduce the already elevated pre-treatment suicide attempt rate.

The question arises as to the source of the difference between the results reported here and the findings of the FDA meta-analysis of RCTs.  There are several possibilities. First, FDA's analysis was based on adverse events reports of suicidal thoughts and behavior, whereas our analysis is based exclusively on suicide attempts.  Suicidal thinking and suicide attempts that are of sufficient magnitude to make it into the medical claims record reflect quite different levels of suicidal intent and may have different relationships to AED treatment.  Second, FDA's meta-analysis combined several indications including psychiatric, pain, and epilepsy, but that may not be important because their sub-analysis for psychiatric indications did not provide evidence of significantly increased risk with AED treatment (OR=1.51, CI=0.95-2.45).  Third, the majority of the suicidality events in the FDA analyses were observed for only 2 of the 11 AEDs, lamotragine and topiramate.   Sixty-one percent of all of the events were observed for these two drugs, despite the fact that these two drugs account for only 38%

respectively, whereas our post-treatment incidence rates were 18, 9, 13, and 29

respectively.   Rates reported by Goodwin and colleagues (4) were generally higher than

those found by Collins and McFarland (3) and somewhat closer to our study with the

exception of divalproex: 11, 31, and 22 per 1000 person years for lithium, divalproex,

and carbamazapine respectively.


The major differences between our study and the two previous studies are that (a) we

were able to adjust for pre-treatment suicide attempts, (b) we considered AEDs and

lithium monotherapy whereas they designated patients in terms of their first treatment, (c)

we included a no treatment comparator group, and (d) we had pre-treatment data which

permitted a within-subject analysis.


Finally, our estimates of the untreated suicide attempt rate of 13 per 1000 person years

for no treatment with any of the 11 AEDs or lithium and 15 per 1000 person years for no

treatment with any AED, antidepressant, or antipsychotic medication is considerably

below the rate of 40 per 1000 reported by Baldessarini and colleagues (5).  Note

however, that among those bipolar patients who go on to be treated with an AED, the rate

is 72 suicide attempts per 1000 patient years and for those who are ultimately treated with

lithium, the suicide attempt rate is 99 per 1000 patient years.  As such their reported rate

of 40 per 1000 may be a reasonable estimate of the overall rate of suicide attempts in

untreated bipolar patients averaging over the entire range of severity of illness.

# REFERENCES

1. Information for Healthcare Professionals Suicidality and Antiepileptic Drugs. http://www.fda.gov/CDER/Drug/InfoSheets/HCP/antiepilepticsHCP.htm, January 31, 2008.

2. Statistical review and evaluation. http://www.fda.gov/ohrms/dockets/ac/08/briefing/2008-4372b1-01-FDA.pdf, May 23, 2008.

3. Collins JC, & McFarland BH. Divalproex, lithium, and suicide among Medicaid patients with bipolar disorder. *Journal of Affective Disorders.* 2008;107:23-28.

4. Goodwin, FK, Fireman, B, Simon, GE, Hunkeler, EM, Lee, J, Revicki, D. Suicide risk in bipolar disorder during treatment with lithium and divalproex. *JAMA.* 2003; 290:1467–1473.

5. Baldessarini RJ, Pompili M, Tondo L. Suicide in bipolar disorder: risks and management. *CNS Spectr.* 2006;11:465–471.

6. Goodwin FK. 1999. Anticonvulsant therapy and suicide risk in affective disorders. *J. Clin. Psychiatry.* 1999;60 (Suppl 2):89–93.

7. Baldessarini, RJ, Tondo, L. Suicide risk and treatments for patients with bipolar disorder. *JAMA.* 2003;290:1517–1519.

8. Müller-Oerlinghausen, B, Berghöfer, A, Bauer, M. Bipolar disorder. *Lancet.* 2002;359:241–247.

9. Posner K, Oquendo MA, Gould M, Stanley B, Davies M: Columbia classification algorithm of suicide assessment (C-CASA): Classification of suicidal events in the FDA's pediatric suicidal risk analysis of antidepressants. *American Journal of Psychiatry.* 2007;164:1035-1043.

10. Gibbons R.D., Brown C.H., Hur K., Marcus S., Bhaumik D.K., Mann J.J.  The relationship between antidepressants and suicide: Results of analysis of the Veterans Health Administration datasets. *American Journal of Psychiatry,* 2007;164:1044-1049:2007.



www.shb.com

**Lori C. McGroder**

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
816.474.6550
816.559.2290 DD
816.421.5547 Fax
lmcgroder@shb.com

March 25, 2008

Robert D. Gibbons, Ph.D.
Director, Center for Health Statistics
University of Illinois at Chicago
1601 W. Taylor
Chicago, IL 60612

Re:  Pfizer Inc/Neurontin

Dear Dr. Gibbons:

Thank you for agreeing to consult with the law firm of Shook, Hardy & Bacon L.L.P. ("SHB") in connection with our representation of Pfizer Inc. in litigation involving Neurontin. This letter, if acceptable to you, and signed and returned to me, will constitute the agreement under which you will consult with SHB in this matter. Your services (hereinafter the "engagement") will include providing us with your impartial professional opinion in connection with pending and potential litigation involving Neurontin. The engagement may also include your preparation of a written report, testifying at deposition or trial, or some combination of these.

We will compensate you for your time spent on this engagement at your customary rate of $500.00 per hour. We will also reimburse you for reasonable out-of-pocket expenses incurred in connection with your work with us and Pfizer. Please send statements for services rendered directly to Kerry Stufflebean at the following address:

> Kerry Stufflebean
> Shook, Hardy & Bacon L.L.P.
> 2555 Grand Blvd.
> Kansas City, MO 64108-2613
> 816-474-6550
> Fax: 816-421-5547
> kstufflebean@shb.com

Please forward your statements on a monthly basis. Our agreement includes the following additional terms:

### A.   Confidentiality

To enable you to carry out your engagement, it may be necessary for SHB or other attorneys representing Pfizer or agents of either, to disclose to you their legal theories, as well as other privileged information and attorney work product, and for Pfizer, its employees, representatives, or agents to disclose to you other confidential information or

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

2874527v1



www.shb.com

March 25, 2008
Page 2

documents having commercial value. Accordingly, you agree that, during and after the period of your engagement, you will not disclose to any person or entity any theories, opinions, facts, data, or other confidential information, or any document or other material provided to you, or generated or prepared by or for you, in connection with your engagement, unless the document or material has previously been made public or disclosure by you has been authorized in advance by SHB or ordered by a court.

All communications by you in connection with your engagement shall be addressed to SHB, except as otherwise authorized by SHB. All documents and other materials generated or prepared by you in connection with your activities for this engagement shall be prepared pursuant to requests by SHB and shall be protected as privileged and work-product materials until such time, if any, as SHB informs you otherwise. All such documents and materials, and all non-public documents or materials provided to you in connection with your engagement, shall remain the property of SHB and shall be maintained in secure files.

Notwithstanding the foregoing, you may make such disclosure to other personnel in your employ as you deem necessary to perform your services pursuant to this engagement, provided that (1) all such personnel have first read and agreed, by signing a copy of this agreement, to be bound by and abide by the provisions of this agreement, and (2) copies of all such signed agreements have been provided by you to SHB.

If any person or entity, including any governmental agency, to whom disclosure has not been authorized by SHB requests, subpoenas, or otherwise seeks to obtain any non-public theories, opinions, facts, data, information, documents, or other materials within your possession or control that have been acquired or generated in the course of your engagement, you shall immediately inform SHB and, at the request of SHB, take such legal measures as SHB may deem necessary or appropriate to resist disclosure of such theories, opinions, facts, data, information, documents, or other materials. Except for measures requiring immediate action to preserve the status quo, you shall consult with SHB before taking any legal measures or making any decision in connection with any such request or subpoena. Should legal measures prove necessary, SHB shall have the right to represent you or to designate other attorneys to represent you in connection with such legal measures to the extent that they involve materials or information provided or generated in connection with this engagement, and SHB shall pay all legal fees and expenses incurred as a result of such representation.

Documents or information received by SHB or other attorneys in the course of the litigation may be subject to a protective order issued by a court barring disclosure of the documents or information except as permitted by the order. You agree to be bound by the terms of any such order so that you may have access to such documents and information in carrying out your responsibilities under your engagement.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

2874527v1


www.shb.com

March 25, 2008
Page 3

**B.    Return of Materials to SHB**

When this engagement concludes, you will deliver to us all documents and materials that were provided to you and any materials prepared by you in connection with your work pursuant to this engagement letter.  Alternatively, you may destroy all documents and materials at the conclusion of this engagement if authorized in advance by SHB.

This agreement may be terminated at any time by mutual agreement, or by you, or by Pfizer.  Whether or not this agreement is terminated, you agree not to consult with, testify for, or assist any person or entity other than Pfizer (or any law firms representing Pfizer) in connection with legal proceedings involving Neurontin or other AEDs unless authorized in advance by SHB.  The confidentiality obligations discussed above will continue subsequent to the termination of your engagement.

All of your obligations under this agreement shall survive the termination or expiration of this agreement or the engagement.  The validity, interpretation and performance of this agreement shall be governed by the laws of the State of New York.

If the terms and conditions set forth are acceptable to you, please sign and date this letter and return it to me by U.S. Mail.

We look forward to working with you.

Sincerely,

Lori C. McGroder
Partner

LMG:lkw


AGREED AND ACCEPTED:

Robert D. Gibbons, PhD.

DATE: 3/25/08

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

2874527v1