# EXHIBIT E



**Shook, Hardy & Bacon L.L.P.**

www.shb.com

March 16, 2009

**Lori C. McGroder**

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
816.474.6550
816.559.2290 DD
816.421.5547 Fax
lmcgroder@shb.com

Mr. Keith Altman
Director of Adverse Event Analysis
Finkelstein & Partners, LLP
26 Willow Drive
Massapequa Park, NY 11762

Dear Keith:

Since February 5, following the first two days of plaintiffs' deposition of Dr. Gibbons, and in addition to materials previously provided (including the Pharmetrics database), he has provided the following to you:

1. SAS file inadvertently omitted from the original Pharmetrics disc;

2. FORTRAN programs Dr. Gibbons wrote to verify the SAS results;

3. The ASCII files containing the data read by the FORTRAN programs;

4. Original SAS output files for the gabapentin and bipolar cohorts (which were re-constructed by Dr. Gibbons on your behalf at your request, even though you easily could have done this yourself with the data and information you were provided);

5. Data files, descriptions, and output files for the following sensitivity analyses:

    5.1 new monotherapy definition (bipolar cohort);
    5.2 eliminating all suicide attempt events occurring on index data (bipolar cohort);
    5.3 limiting analyses to one suicide attempt per person (bipolar cohort);
    5.4 re-analyzing the primary analyses requiring minimum of 30 day supply of medication (bipolar cohort);
    5.5 eliminating all suicide attempt events occurring on index date (gabapentin cohort);
    5.6 limiting analyses to one suicide attempt per person (gabapentin cohort);
    5.7 re-analyzing the primary analyses requiring minimum of 30 day supply of medication (gabapentin cohort);
    5.8 person time logistic regression analysis using SuperMix program (bipolar cohort);

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

Keith Altman
March 16, 2009
Page 2

    5.9    all underlying data files used to create the monthly datasets for the SuperMix sensitivity analyses (which you requested at Dr. Gibbons' deposition Day 3);

6. A document created by Dr. Gibbons for you describing each SAS program to help in your understanding of the analyses;

7. A second disc containing materials previously sent (items 1-3 above);

8. Revised tables after correcting the ICD-9 code 311 for MDD (which do not change the results); and

9. Electronic and printed versions of Dr. Gibbons' PowerPoint presentation at Harvard in October 2008.

This does not include the items provided at Dr. Gibbons deposition, including the spreadsheets he obtained for examination of study level data in his May 2008 expert report, and all invoices, none of which, by the way, have been produced by any expert retained by plaintiffs notwithstanding that this is an agreed item on the subpoena *duces tecum* and that defense counsel has requested them.

As you can see from this list, and as you know from our numerous email exchanges in which Dr. Gibbons not only provided data but answered any questions you had about the data, Dr. Gibbons has been extremely forthcoming with all of his analyses regardless of whether they are related to his gabapentin study (performed for his work on this litigation), or his bipolar study (not performed for purposes of litigation and currently under submission for publication).

Science is not static, as you know. Dr. Gibbons' work on the AED analysis in the bipolar cohort evolves every day as he continues to revise the manuscript, working toward publication. This scientific process, however, is separate from the litigation, and these additional analyses are not and have not been performed for his testimony in this case. As Dr. Gibbons testified, he has never before provided all of his data and analyses for a scientific study before its publication. He has nevertheless obliged *all* of plaintiffs' requests related to this scholarly work -- even before it is published and irrespective of the fact that it is a scientific work in progress. Your complaints that Dr. Gibbons has not produced "all responsive materials" is unfounded.

Regarding your request for correspondence and documents from the peer review process, our position is set out in clearly in my letter to you of February 10, 2009, which I repeat here for your better understanding: Your request "invades the sanctity of the peer review process" and is contrary to First Circuit precedent protecting such materials from

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.


www.shb.com

Keith Altman
March 16, 2009
Page 3

disclosure in litigation. *In re Bextra/Celebrex Litig.*, 249 F.R.D. 8 (D. Mass. 2008). *See also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998); *In re Bextra/Celebrex Litigation*, C.A. No. 09C 402, 2008 U.S. Dist. LEXIS 21098 (N.D.Ill. March 14, 2008).[1] You have acknowledged as much in your August 21, 2008 letter, as well as objections asserted by counsel at deposition, related to Dr. Kruszewski's "case report" submitted for publication, in which you refused to produce even the draft article, let alone correspondence from peer reviewers or the journal.

Plaintiffs' request for this information has real-world consequences, as noted by Judge Sorokin, and Dr. Gibbons clearly testified that, as a scientist and peer reviewer, he would not agree to violate editorial confidentiality because he would not want his own confidential review of others' work produced in litigation or anywhere outside the peer review process. Any such disclosure would violate the journals' purpose in maintaining confidentiality, and would deter both scientists and reviewers from engaging in peer review. As a consequence, journals would have difficulty finding qualified reviewers, and the scientific process (and public interest) would suffer. This is exactly consistent with the position taken by plaintiffs' expert witness, Dr. Kruszewski.

If plaintiffs choose to file a motion to compel despite this unequivocal precedent from our own Magistrate Judge, please be advised that defendants will seek costs for litigating the motion when plaintiffs are unsuccessful.

---

[1] It is worth noting that the existence of a confidentiality order in this litigation does nothing to minimize or eliminate the bases for protecting free exchange of scientific ideas and analyses as part of the scientific peer review process. As Judge Sorokin held in *In re Bextra*, 249 F.R.D. 9, 14 (D. Mass. 2008), *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998):

> The NEJM disseminates medical information not only from its authors, but also from its peer reviewer sources in the medical field, who help to ensure that the articles disseminated to the medical and scientific communities are of the highest quality. Even the more limited NEJM materials now at issue (the NEJM's communications with authors) are of a more-clearly confidential nature than those that were at issue in the *Cusumano* case, which the First Circuit found to be "along the continuum of confidentiality at a point sufficient to justify significant protection." [citation omitted] Also, these comments are both part of scholarly research efforts as well as part of the editorial process of a print publication. . . . The batch or wholesale disclosure by the NEJM of the peer reviewer comments communicated to authors will be harmful to the NEJM's ability to fulfill both its journalistic and scholarly missions, and by extension harmful to the medical and scientific communities, and to the public interest.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

Keith Altman
March 16, 2009
Page 4

On the issue of Dr. Gibbons' declaration, this too is addressed in my letter to you of February 10. As you know from Dr. Gibbons' testimony and my letter, you are mistaken when you say "his representation at that time was not accurate." The sensitivity analyses he performed on the bipolar cohort -- all of which have been provided to plaintiffs -- were conducted <u>after the manuscript was submitted for publication in September 2008</u>. Thus, his statement in the declaration that all "materials requested by plaintiffs in their letter of November 12, 2008, on which my co-authors and I relied in preparing the Manuscript," were, in fact, produced to you with my November 26 letter.

Your statement that "Plaintiffs never limited the requests to materials relied upon" makes no sense to me. Dr. Gibbons' declaration was not prepared in response to any document request by plaintiffs, but was an affirmative statement made in the context of describing his familiarity with and principle responsibility for the Manuscript. You cannot now re-write it to exclude the word "relied" because you want it to somehow be broader than it was.[2]  Furthermore, we have never taken (or even articulated) the position that we would not produce materials that were not "relied on" by an expert witness, since Rule 26 is clear that the standard is "materials considered". Consistent with Rule 26, we have produced the materials considered by Dr. Gibbons for his opinions in this case. To the extent he considers additional materials, we will timely supplement as required by Rule 26. We expect your experts to do the same.

Your request for directories from the personal computers of Drs. Gibbons and Hur because "his dates from files that were produced [are] inconsistent with his testimony" is also unsupported and improper under the federal rules, which govern what you are entitled to discover in connection with expert depositions. Moreover, plaintiffs' request for information regarding the dates Dr. Gibbons "worked on certain files" is far afield from any issue having substantive relevance to this litigation or his opinions.[3]  Dr. Gibbons has spent months analyzing these data -- in particular, for the bipolar cohort, conducting many additional sensitivity analyses to prepare for publication. It is not at all surprising that he cannot precisely recall dates he "worked on certain files". This is hardly justification for production of his computer directory -- let alone the directory of

---

[2] Clearly, any "word games" related to this issue cannot be attributed to defendants.

[3] Not only that, but you have had three full days of deposition time with Dr. Gibbons and have spent virtually all of these nearly 21 hours on questions having nothing whatever to do with his substantive work and analyses. Indeed, plaintiffs' exclusive focus on issues such as what dates Dr. Gibbons worked on which files -- to the exclusion of any of his substantive work and opinions -- is a clear indicator that plaintiffs are unable to substantively challenge his statistical analyses and conclusions and so resort to allegations of insufficient discovery despite Dr. Gibbons' bending over backwards to give plaintiffs everything they ask for and more.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

3363558v2


www.shb.com

Keith Altman
March 16, 2009
Page 5

Dr. Hur who is not a witness in this case – and is, at best, a fishing expedition, and at worst, harassment.

With respect to your request for a statistical plan for the bipolar study, you have already examined Dr. Gibbons on this twice, and he told you both times that the "plan" is attached to the Pharmetrics contract and there is nothing more.  Dr. Gibbons cannot produce documents that do not exist, and your repeated requests for documents he has already testified do not exist, border on harassment.

The same is true of your request for Dr. Hur's bills or invoices.  Dr. Gibbons testified very clearly that Dr. Hur did not bill or invoice for his work screening the Pharmetrics database for the gabapentin cohort.  But he gave you all the details concerning amounts paid to Dr. Hur for this work.  See Volume 3, pp. 7-12.  Given that Dr. Gibbons has already testified under oath to the hours worked and amounts paid, your request for copies of checks paid to Dr. Hur is overreaching.

Notably, plaintiffs' experts have not complied with the stipulated *duces tecum* regarding their invoices.  To date, we have received invoices only from Dr. Kruszewski (and only through October 2008), Dr. McFarland, and a one page summary from Mr. King.  Please update your production of invoices for Dr. Kruszewski and Mr. King, and immediately produce all invoices for all other experts – including, Drs. Blume, Trimble, Maris, Greenland, Roh, and Brock, as well as your billing records for all "expert" services, including but not limited to the extensive work you performed to prepare Dr. Blume.  In addition, please provide your billing records connected with the work you performed on the Citizen's Petition -- including your work on declarations such as the declaration you submitted with plaintiffs' opposition to defendants *Daubert* brief in which your represented your expertise to the court.

Plaintiffs' repeat request for defendants to withdraw the motion to quash the depositions of the Manuscript's co-authors is not well taken.  First, the motion already has been granted.  Second, as with the first two days of your examination of Dr. Gibbons, you have not asked Dr. Gibbons any substantive questions about the analyses in the Manuscript that he could not answer and that would meet the showing required by Judge Sorokin's order that plaintiffs demonstrate such depositions are "warranted and necessary."

Moreover, the deposition excerpt you selected for your letter omits the four pages preceding it and the fourteen pages following it where Dr. Gibbons answered all of your questions on the same subject.  Furthermore, you explicitly omitted Dr. Gibbons' answer to your question where he testified, *"With the information that I have in front of me, I cannot answer that question for you."*  There is no evidence in the record that Dr. Hur could have answered that single question without the same information Dr. Gibbons needed (but you did not provide) in order to respond.  As to Dr. Mann, Dr. Gibbons

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

3363558v2



Keith Altman
March 16, 2009
Page 6

clearly testified that Dr. Mann's input on the ICD-9 codes derived from their work together in the antidepressant context – he did not testify that Dr. Mann contributed to the expert report and, as Dr. Gibbons has told you several times, neither Dr. Mann nor Dr. Hur contributed to his expert report and the gabapentin analysis, and neither individual has been retained in connection with this litigation. They are individual scientists who have submitted their work to a peer-reviewed, scientific journal unrelated to this litigation. For all the reasons articulated in our briefing, you are not entitled to these depositions.

Last, the data files produced to you in response to your request during Day 3 of Dr. Gibbons' deposition do not relate to Dr. Gibbons' expert report, but to the Manuscript and, specifically, to one of many sensitivity analysis for the bipolar cohort . Part of the SuperMix data file was previously provided to you on February 23. Once again, you did not notify me in advance of the deposition that you believed something was "missing" from the original SuperMix data file, and if you had, we would have provided it *before* the deposition. More importantly, however, you did not ask Dr. Gibbons more than handful of questions regarding any of the nearly *ten* sensitivity analyses he performed. And, in fact, you terminated your examination early (by approximately 3pm), and passed the witness (back) to Mr. London. It is difficult to understand why you believe you need additional time to examine Dr. Gibbons on this one sensitivity analysis when you had full opportunity to examine him substantively on *any* of his sensitivity analyses, but chose not to. We do not agree to produce Dr. Gibbons for a fourth day.

I will be on vacation until March 23 and would be happy to discuss any of these points with you when I return. I do not agree that we have "met and conferred" on these issues as you state in your letter.

Sincerely,

*Lori McGroder*

Lori C. McGroder
Partner

LMG:lkw

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

3363558v2