# EXHIBIT F



www.shb.com

Lori C. McGroder

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
816.474.6550
816.559.2290 DD
816.421.5547 Fax
lmcgroder@shb.com

February 10, 2009

Mr. Kenneth B. Fromson
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY  12550-3341

*Re:  Dr. Gibbons*

Dear Ken:

This acknowledges receipt of your letter of February 8 regarding the deposition of Dr. Gibbons.  Please find attached a disk that includes the following, all referenced in my letter to you of February 5:

1.    The additional SAS file(s) inadvertently omitted from the PHARMetrics disc provided on November 14.

2.    The FORTRAN programs Dr. Gibbons wrote to verify the SAS results.

3.    The ASCII files containing the data read by Dr. Gibbons' FORTRAN programs.

With respect to your additional requests, we agree to produce the following on or before February 18:

4.    The following sensitivity analyses conducted by Dr. Gibbons:

- using new monotherapy definition, i.e., monotherapy or no medication defined prior to suicide attempt only (bipolar cohort)
- eliminating all suicide attempt events that occurred on the index date (bipolar and gabapentin cohorts)
- limiting analyses to one suicide attempt per person even if there were multiple suicide attempts (bipolar and gabapentin cohorts)
- re-analyzing primary analyses requiring minimum of thirty day supply of medication (bipolar and gabapentin cohorts).

5.    Output files generated from SAS, although, as Dr. Gibbons testified, Mr. Altman can just as easily reproduce these himself with the data that has already been provided.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

3320876v2



www.shb.com

Mr. Kenneth B. Fromson
February 10, 2009
Page 2

6.    Your request for "the C-MED data file or alternatively the SAS Program that created said data file" is the same as number 1 above; accordingly, it has been produced along with this letter.

7.    The powerpoint slides used by Dr. Gibbons in his October 2008 presentation at Harvard regarding antidepressant and antiepileptic medications.

We disagree with your statement "that Dr. Gibbons' declaration for the aforementioned motion was not accurate . . . ." Quoting the exact words of Dr. Gibbons' Declaration, all "materials requested by plaintiffs in their letter of November 12, 2008, on which my co-authors and I relied in preparing the Manuscript," which was submitted to JAMA in September 2008, were, in fact, produced to you with my November 26 letter. The later-conducted sensitivity analyses for the bipolar cohort – on which I was not aware Dr. Gibbons intended to rely for purposes of his opinions in this case until he gave testimony to that effect at his deposition last week -- were not used in preparation of the September 2008 manuscript, but were performed after the fact as part of the peer review process.

Nor is the statement in your letter that "Dr. Gibbons also represented in his declaration to the court, dated January 21, 2009, that he had possession of all information associated with his manuscript" accurate. What the declaration states is "I do not believe that Drs. Hur, Brown and Mann have any information or possess any knowledge concerning either the Manuscript or any of the materials supporting the Manuscript that is not equally, if not more, available to me and within my own knowledge and expertise." The actual statement in Dr. Gibbons' declaration is clearly distinct from your characterization of it that "Dr. Gibbons represented he had possession of all information associated with his manuscript."

With regard to publication of the manuscript authored by Gibbons, Mann, Brown and Hur, your statement on page 2 that "Dr. Gibbons testified that the article had been rejected by JAMA" is also incorrect. The manuscript was not rejected by JAMA, but as Dr. Gibbons testified, was referred to JAMA's specialty journal, Archives of General Psychiatry. JAMA can do one of the following in response to a submission for publication: accept, reject or refer. Referral from the parent journal to its specialty journal means that the article is still under peer review based on the initial submission to JAMA.

In addition, your request for correspondence and other documents exchanged between Dr. Gibbons and JAMA, Archives of General Psychiatry, and any reviewers improperly "invades the sanctity of the peer review process" and is contrary to First Circuit precedent protecting such materials from disclosure in litigation. In re Bextra/Celebrex Litig., 249 F.R.D. 8 (D. Mass. 2008). See also Cusumano v. Microsoft Corp., 162 F.3d 708, 714 (1st Cir. 1998); In re Bextra/Celebrex Litigation, C.A. No. 09C 402, 2008 U.S. Dist. LEXIS

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



21098 (N.D.Ill. March 14, 2008). You have acknowledged as much in your August 21, 2008 letter, as well as objections asserted by counsel at deposition, related to Dr. Kruszewski's "case report" submitted for publication, in which you refused to produce even the draft article, let alone correspondence from peer reviewers or the journal.

It is worth noting that the existence of a confidentiality order in this litigation does nothing to minimize or eliminate the bases for protecting free exchange of scientific ideas and analyses as part of the scientific peer review process. As Judge Sorokin held in *In re Bextra*:

> The NEJM disseminates medical information not only from its authors, but also from its peer reviewer sources in the medical field, who help to ensure that the articles disseminated to the medical and scientific communities are of the highest quality. Even the more limited NEJM materials now at issue (the NEJM's communications with authors) are of a more-clearly confidential nature than those that were at issue in the *Cusumano* case, which the First Circuit found to be "along the continuum of confidentiality at a point sufficient to justify significant protection." [citation omitted] Also, these comments are both part of scholarly research efforts as well as part of the editorial process of a print publication. . . . The batch or wholesale disclosure by the NEJM of the peer reviewer comments communicated to authors will be harmful to the NEJM's ability to fulfill both its journalistic and scholarly missions, and by extension harmful to the medical and scientific communities, and to the public interest.

*In Re Bextra/Celebrex Litig.*, 249 F.R.D. 9, 14 (D. Mass. 2008). See also *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1ˢᵗ Cir. 1998).

Your letter also inaccurately summarizes Dr. Gibbons' testimony with respect to Dr. Hur. As Dr. Gibbons testified, Dr. Hur developed SAS programs for the PHARMetrics database, and was paid by Dr. Gibbons for his work in developing SAS programs for the gabapentin cohort. This does not suggest or even imply that Dr. Hur "possessed any knowledge concerning Dr. Gibbons' supplemental expert report" or had ever seen it, *see* Dr. Hur's declaration, or had been paid by Pfizer or Shook, Hardy & Bacon. (In my memory, that question was never asked by either Mr. London or Mr. Altman.) Dr. Gibbons will attempt to locate receipts of any payments he made to Dr. Hur for work on the SAS programs related to the gabapentin cohort and provide any such documents at the time of his deposition.

Plaintiffs' request for Dr. Hur's deposition on this basis remains far reaching and fails to meet the standard set by Judge Sorokin requiring plaintiffs to demonstrate need for any deposition of a co-author. Despite two 7 hour days of cross examination by two different lawyers, plaintiffs did not ask Dr. Gibbons a single substantive question he was unable to

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



www.shb.com

Mr. Kenneth B. Fromson
February 10, 2009
Page 4

answer, but that could only be answered by a co-author. To date, the showing required by the Court has not been made and defendants will not agree to produce Dr. Hur or any co-author absent such showing.

With respect to plaintiffs' request for affirmations and affidavits, these are not required under Rule 26 and we will not agree to provide them. If you insist on making this an issue in this litigation, we will pursue similar "affirmations of affidavits" from plaintiffs' counsel and plaintiffs' expert witnesses.[1]

Finally, defendants agree to one additional deposition day with Dr. Gibbons. While we appreciate and accept plaintiffs' agreement to avoid duplicative questioning, plaintiffs have already spent 14 hours with Dr. Gibbons -- very little of it, if any, was spent addressing substantive questions about his studies and analyses, some of which (such as his work on the FDA pooled analysis) plaintiffs have had for more than six months. At this time, there is no basis for plaintiffs to suggest a need to depose Dr. Gibbons for a total of twenty-eight hours, which is excessive under any circumstance. Dr. Gibbons is available for the completion of his deposition on either March 6 or 9. Please let me know as soon as possible which date works for you so we can secure it on his calendar.

Please call me with any questions or if you wish to discuss.

Sincerely,

Lori C. McGroder
Partner

LMG:lkw

---

[1] For example, Dr. Blume has never provided information regarding her relationship with "undisclosed companies" related to "undisclosed drugs" and the FDA which she claims "validate her methodology" but which is confidential and not subject to disclosure, despite the fact that she relies on it for her opinions in the Neurontin litigation. Likewise, at his deposition, Dr. Maris presented brand new, never-before-produced expert reports setting out all new methodologies and theories for a never-before-disclosed "general causation theory". He also re-wrote his expert report and Psychological Autopsy, and changed his expert opinions, throughout his depositions in *Smith, Bulger* and *Crone*.

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.