**DECLARATION OF KIMBERLY PLY MCDONOUGH, R.PH, Pharm.D.
REGARDING VARIOUS ISSUES CITED IN THE
MEMORANDUM AND ORDER DATED MAY 13, 2009**

1.   I have reviewed the transcript of the May 13, 2009 Memorandum and Order issued by Judge Saris regarding this case. I submit this Declaration to respond to Judge Saris' reliance on testimony by Dr. Bell in this case. It is my opinion that Dr. Bell's representations regarding the differences between TPP formulary procedures is overstated and does not reflect industry practices regarding coverage of Neurontin. Dr. Bell's assertion that health plans are able to limit off-label coverage for Neurontin is inaccurate and does not reflect practices within the industry during the class period.

2.   Dr. Bell indicates that "one quarter of TPPs place formulary restrictions on Neurontin"[1], however, he does not provide evidence that support this assertion. In fact, evidence in this case indicates the exact opposite: that TPPs and PBMs were unwilling or unable to implement restrictions on the use of Neurontin.

**Evolution of TPP Formulary Management Techniques**

3.   Dr. Bell describes many formulary management techniques including quantity limits, prior authorization and step therapy edits, suggesting that these tools have been a component of, and readily used by, TPPs throughout the class period. In fact, the willingness and ability of TPPs to use these tools has been limited. For example, prior authorization has historically been limited to expensive medications that have a high potential for non-medical uses. Drugs for which prior authorization was required included fertility products, growth hormones and drugs with cosmetics uses, such as Retin A[2].

---

[1] Declaration of Gregory Bell, 12-15-08, pg 30.

[2] The Wyeth-Ayerst Prescription Drug Benefit Cost and Plan Design Survey Report, 2000.

129889.00601/35944861v.1

4.      The implementation of drug management tools has also been affected by limitations and capabilities associated with claim processing technology. For example, introduction of step therapy tools did not occur until the mid-2000's when this capability was integrated into claim processing platforms.  The ability of a TPP to limit drug use to a particular provider was not possible until the introduction of the National Provider Identification (NPI) code in June 2007, and to this day, here is no indicator that provides the specialty of the provider.

5.      Although NCPDP claim transaction standards permit the inclusion of diagnosis as a component of the claim, diagnosis is not required on the prescription in any state. Pharmacists do not submit diagnostic information when adjudicating prescriptions and therefore TPPs have no mechanism to identify diagnosis during the claim transaction process.

6.      As a result of historical and continued limitations in the information supplied during claim transactions, TPPs are limited to prior authorization as the only viable method to limit drug use to approved indications.  As has been acknowledged by Dr. Bell, only 3% of TPPs reported using this tool when managing Neurontin.

7.      In my experience, market pressure has limited TPPs' use of drug coverage controls such as prior authorization and coverage limitations.  In the mid-1990's health plan attempts to impose more restrictive drug management techniques resulted in accusations that health plans were interfering with the physician's ability to treat patients.  In some states, regulations were proposed to limit widespread use of these tools.  The adverse publicity associated with attempts to control drug use prompted health plans and TPPs to scale back their drug management efforts.

8.      Widespread use of drug limits was not readily accepted until the introduction of the Medicare prescription drug program.  In enacting the Medicare drug program, Congress and CMS recognized value in the use of drug limitations, including step therapy and prior authorization as tools that can manage drug costs and reduce the potential for fraud, waste and abuse in the prescription drug program.  CMS specifically sanctioned and encouraged the use

2

of these tools in Medicare prescription drug programs.  As a result the acceptance of these tools for the Medicare program, market-based opposition to the programs has diminished and use of these tools has increased dramatically since 2006.

**Homogeneity of P&T Committee procedures**

9. Judge Saris has indicated that "formularies, and hence the decision making of the P&T Committee that created the formularies, became central to plaintiff's claims."  I agree with this statement, particularly as it related to the decision of TTPs to cover Neurontin.  TPPs and their PBMs recognize the limited options available to physicians when treating epilepsy and are reluctant to place restrictions on these products.  In fact, TPPs and PBMs overwhelmingly provided coverage of Neurontin without limits or restrictions.

10. TPPs and PBM use similar procedures for the evaluation of drug products during formulary deliberations.  This commonality is directly related to historical use of P&T Committees in hospitals.  As early as 1980, the Joint Commission for Accreditation of Hospitals – JCAH (now the Joint Commission for the Accreditation of Health Organizations – JCAHO) mandated the establishment of a P&T Committee, the membership make-up of the committee, use of a formulary, and procedures for formulary review as a requirement for accreditation.  As the managed care industry evolved in the early 1990's, these nationally-accepted standards were adopted in health plans.  Even to this day, standards for formulary review processes are published by national organizations and are the basis of formulary decision processes in both health plans and PBMs.

11. In my professional experience, TPPs are reluctant to remove medications from their formularies, absent a safety concern or replacement with a lower-cost generic. This is particularly true for those medications that are used for maintenance therapy of difficult to treat illnesses. TPPs recognize that for many difficult to treat chronic illnesses, such as epilepsy, control of the patient's illness is critical and is dependent on consistent drug therapy.   For this

3

reason, TPPs hesitate to make formulary changes or create formulary limitations on drugs, such as Neurontin, that are essential for the treatment of these conditions.

12. I understand that certain TPPs, such as Kaiser Permanente, had in some cases originally restricted the use of Neurontin, but gradually expanded the restrictions over time to allow the use of the drug by other specialties for the treatment of other indications. In my experience, I would not expect a TPP to reinstate restrictions once removed absent a safety issue. This is particularly true where the TPP's primary concern over the use of the branded products is that lower-cost alternatives of at least equivalent efficacy currently exist, but where a lower-cost generic version of the branded product is anticipated to be available shortly.

13. Furthermore, Kaiser is unique in its operation, in that it uses an integrated staff model HMO. Even with this model in place; however, Kaiser was susceptible to the marketing activities promoted by Pfizer and Warner-Lambert, and it is no surprise that most managed care plans and indemnity carriers, like Aetna and Guardian, who do not have such a defined and integrated structure, would be even more susceptible to the same practices.

**Reliance on Medical Literature**

14. P&T Committees often recognize the use of a medication for off-label purposes, based on information that is contained in the medical literature or in medical compendia. However, it is important to recognize that, to the extent that information presented in medical literature is incomplete or inaccurate, the P&T Committee relies on the incomplete or inaccurate material presented.

**Limitations to Approved Uses**

15. Dr. Bell stated that "[B]y 2000, 'approximately 30 percent of covered lives were under plans that excluded coverage for off-label prescriptions.'" Health plans often will pay for non-approved uses of drug, even when the health plan has policies that suggest otherwise. The reason for this is quite simple: when the claim is adjudicated, there is no mechanism to identify this unapproved use through the outpatient point-of-service pharmacy claim adjudication

process. Often, the policy limiting coverage of drugs to unapproved indications is maintained as a tool for managing drug coverage of infusion therapies in inpatient, physician offices and home care settings. These claims are adjudicated through the medical claim processing system which provides access to diagnostic information. Because medical claims are not adjudicated at the point of service, a TPP can append the claim and conduct a review without creating disruption in the patient's ability to obtain health care services.

I reserve the right to supplement this report and amend my opinions upon review of further information.

*Kimberly P. McDonough*

_____

Kimberly P. McDonough

June 18, 2009