# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEURONTIN MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARDEN MANUFACTURING CORPORATION;
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,
dba BLUECROSS/BLUESHIELD OF LOUISIANA;
INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and
LORRAINE KOPA, on behalf of themselves and all others
similarly situated, v. PFIZER INC. and WARNER-LAMBERT
COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and
AETNA, INC. v. PFIZER INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T.
Sorokin

**FILED UNDER SEAL**

**PROPOSED**

## OPPOSITION TO CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 4

I.   Plaintiffs Do Not Satisfy Or Even Address The Standards Applicable to Motions
     For Reconsideration ......................................................................................................... 4

II.  The Court Correctly Determined That Plaintiffs Cannot Establish Causation
     Through Common Proof .................................................................................................... 5

     A.   Plaintiffs' Belated Attempts To Distinguish Authorities Cited By This
          Court Are Not Grounds For Reconsideration ........................................................... 7

     B.   Plaintiffs' Repackaged Fraud-On-The-Market Arguments Are Not
          Grounds For Reconsideration .................................................................................. 11

III. The Court Correctly Held That The Third Party Payors' Claims Are Not
     Susceptible To Aggregate Proof .................................................................................... 15

IV.  Plaintiffs' Speculative Inferences And Baseless Credibility Attacks On The
     Prescribing Doctors' Testimony Do Not Negate Individual Issues Or Warrant
     Reconsideration .............................................................................................................. 17

V.   The Court's Denial Of Class Certification Applies To All Claims, Including
     Unjust Enrichment .......................................................................................................... 21

CONCLUSION ...................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Abdus-Samad v. Greiner*, No. 00 Civ. 3885, 2004 WL 1488529 (S.D.N.Y. July 2, 2004) ..........20

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) ........................................13

*Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374 (S.D. Ill. 2008) ..............................4, 7

*Cochran v. Quest Software, Inc.*, 328 F.3d 1 (1st Cir. 2003) ..............................................4, 7, 22

*Daniels v. Lafler*, 192 Fed. Appx. 408 (6th Cir. 2006) ................................................................21

*Duffin v. Exelon Corp.*, No. 06-1382, 2007 WL 1385369 (N.D. Ill. May 4, 2007) ......................5

*Holt v. Olmsted Township Board of Trustees*, 43 F. Supp. 2d 812 (N.D. Ohio 1998) .................20

*Horta v. Sullivan*, 4 F.3d 2 (1st Cir. 1993) .................................................................................19

*International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999)......................................................................15

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076 (N.J. 2007) ..........................................................................................7, 8

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) .........................................13

*Mahone v. Lehman*, 347 F.3d 1170 (9th Cir. 2003)....................................................................20

*Makuc v. America Honda Motor Co.*, 835 F.2d 389 (1st Cir. 1987) ..........................................18

*McLaughlin v. America Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ..............................................7

*In re Mercedes-Benz Tele Aid Contract Litigation*, No. 07-2720, 2009 WL 1101241 (D.N.J. Apr. 24, 2009)......................................................................................................22

*In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*, MDL No. 1629, Master File No. 04-10981, 2009 WL 1323835 (D. Mass. May 13, 2009) ...........*passim*

*In re Neurontin Marketing & Sales Practices Litigation*, 244 F.R.D. 89 (D. Mass. 2007)......................................................................................... 6, 15, 22

*In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6 (1st Cir. 2008) ............................................................................................ 6, 13, 18

*O'Donnell v. Robert Half International, Inc.*, 534 F. Supp. 2d 173 (D. Mass. 2008) ....................5

*Oshana v. Coca-Cola Co.*, No. 04-3596, 2005 WL 670522 (N.D. Ill. Mar. 16, 2005 .................5

*Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006)........................................................4

*Quaker Alloy Casting Co. v. Gulfco Industrial, Inc.*, 123 F.R.D. 282 (N.D. Ill. 1988)................5

*Scherer v. GE Capital Corp.*, 59 F. Supp. 2d 1132 (D. Kan. 1999), *aff'd*, 211 F.3d
    1279 (10th Cir. 2000) ...........................................................................................................20

*Service Employees International Union Heath & Welfare Fund v. Philip Morris Inc.*,
    249 F.3d 1068 (D.C. Cir. 2001) ............................................................................................15

*In re St. Jude Medical Inc. Silzone Heart Valve Products Liability Litigation*,
    522 F.3d 836 (8th Cir. 2008) .............................................................................................7, 8

*In re TJX Cos. Retail Security Breach Litigation*, 246 F.R.D. 389 (D. Mass. 2007) ...................7

*United States v. Alzanki*, 54 F.3d 994 (1st Cir. 1995)................................................................21

*United States v. Anguiano*, No. 89-10362, 1991 WL. 27450 (9th Cir. 1991) .............................21

*United States v. Cohen*, 631 F.2d 1223 (5th Cir. 1980) .............................................................21

*United States v. Kostopoulos*, 119 F. App'x 308 (2d Cir. 2004) ................................................20

*United States v. Peneaux*, 432 F.3d 882 (8th Cir. 2005)............................................................20

*Wallace Motor Sales, Inc. v. America Motor Sales Corp.*, 780 F.2d 1049 (1st Cir. 1985)...........13

*In re Watman*, 331 B.R. 502 (D. Mass. 2005), *aff'd*, 458 F.3d 26 (1st Cir. 2006) .......................13

*Williams v. York International Corp.*, 63 Fed. App'x 808 (6th Cir. 2003) ..................................20

## STATUTES

Fed. R. Evid. 802 ........................................................................................................................19

Fed. R. Evid. 803 ........................................................................................................................19

Fed. R. Evid. 803(4)....................................................................................................................19

Fed. R. Evid. 803(4) advisory committee's note (1972 Proposed Rules–Note to
    Paragraph (4)) .....................................................................................................................20

Fed. R. Evid. 805 ...........................................................................................................19

## MISCELLANEOUS

E.R. Berndt, et al., *Consumption Externalities and Diffusion in Pharmaceutical Markets: Antiulcer Drugs*, J. Indus. Econ., June 2003........................................................14

E.R. Berndt, et al., *Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market*, Am. Econ. Rev., May 1995 ...................................................................12

James S. Coleman, et al., *Medical Innovation: A Diffusion Study* (1966)...................14

Fuson F. Gonul, et al., *Promotion of Prescription Drugs and Its Impact on Physician Choice Behavior*, J. Marketing, July 2001 .........................................................12

Charles King, III, *Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs*, Boston MA: Harvard Business School Working Paper No. 01-014 (2000).............................................................................................................12

John A. Rizzo, *Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs*, 42 J.L. & Econ. 89, 101 n.39 (1999) ...........12

## PRELIMINARY STATEMENT

Plaintiffs' motion for reconsideration does not address and cannot satisfy the standards applicable to this type of motion.   Plaintiffs have not shown any intervening change in the controlling law, nor have they presented any newly-discovered evidence.   Indeed, the only new development is Plaintiffs' change of position.   They now seek to limit their request for certification of the putative consumer and TPP subclasses to claims pertaining to bipolar and mood disorder.  (Dkt. 1796 ("Pl. Mem.") at 1.)  Plaintiffs effectively concede that certification cannot be granted for any other off-label indication.  But as the Court has already held, the same principles that preclude certification of the other indication-specific subclasses also preclude certification of the putative bipolar and mood subclasses.  *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 1629, Master File No. 04-10981, 2009 WL 1323835, at *17 (D. Mass. May 13, 2009) (to be published in F.R.D.) (hereinafter, "*May 13 Order*").

As Plaintiffs themselves acknowledge (Pl. Mem. at 3-4), the Court refused to certify a bipolar and mood disorder subclass for multiple, independently sufficient reasons.  As to the consumer plaintiffs, the Court held:

- "A quartet of cases decided after August 2007 . . . led the court to reconsider permitting the use of statistical evidence to establish a classwide presumption of causation." *May 13 Order*, 2009 WL 1323835, at *10.  These cases hold that, "[w]here plaintiffs (or plaintiffs' doctors) react differently to a misrepresentation, a presumption of reliance cannot be utilized to satisfy the predominance requirement." *Id.* at *10, *10-13.

- Plaintiffs, in any event, failed to present a valid statistical showing that could "function as common proof of causation for millions of disparate and varied human interactions that resulted in off-label prescriptions of Neurontin." *Id.* at *14.  In particular, "the record in the case demonstrates why [Prof. Rosenthal's] use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed." *Id.* at *16.

- The testimony of the prescribing physicians demonstrated that many of them were never detailed by defendants about Neurontin. *Id.*  As such, "the requirement that plaintiffs establish a nexus between the doctor and the sales team w[ould] create individualized issues that w[ould] inevitably predominate over the common questions." *Id.*

- Moreover, "[e]ven if this hurdle could be overcome, Professor Rosenthal's analysis does not take into account any other factors that may have led doctors to prescribe Neurontin for off-label indications." *Id.* at *17. Notably, "[t]he deposition testimony of the doctors for the bipolar/mood disorder class representatives show[ed] that their decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud." *Id.* (citing testimony of Dr. ████ and Dr. ████).

The Court also refused to certify a TPP bipolar and mood disorder subclass for the following reasons:

- The Court's reasons for denying certification of consumer bipolar/mood disorder subclasses apply with equal force to the TPPs. "[A]s with the indication-specific Consumer subclasses," a showing that most members of the proposed TPP subclasses paid for at least one off-label Neurontin prescription is not proof that "*fraud* caused the off-label prescriptions for which the TPPs paid" and "does not, by itself, demonstrate that common issues predominate with respect to the claims of the TPPs." *Id.* at *18 (emphasis in original).

- Because aggregate statistics cannot overcome the overwhelmingly individual issues regarding unidentified doctors' reasons for prescribing Neurontin to the TPPs' insureds, the TPPs must instead "prove that defendants' fraudulent omissions or representations caused [their P&T] committees to approve the use and reimbursement of Neurontin for off-label indications in a manner that was different from what would have occurred absent the alleged fraudulent marketing." *Id.* at *19. But TPPs' "heterogeneity" creates individualized issues that preclude class certification even under this "less onerous" theory of causation. *Id.* at *18-19.

Plaintiffs' present motion merely rehashes the same arguments that they have already made and that the Court has already rejected. For example, Plaintiffs argue with the Court's interpretation of cases that led the Court to "reconsider permitting the use of statistical evidence to establish a classwide presumption of causation." *Id.* at *10. These cases were fully briefed by the parties, and Plaintiffs' disagreement with the Court's legal analysis does not warrant reconsideration. Likewise, Plaintiffs restate their argument that Neurontin's purported inefficacy for the relevant off-label uses entitles them to a classwide presumption of causation (Pl. Mem. at 19-26)—an argument the Court carefully considered and rejected. *May 13 Order*, 2009 WL 1323835, at *13. Similarly, Plaintiffs attempt to reassert their rejected fraud-on-the-market arguments by simply relabeling them as a "contagion model" of causation—a theory for which

they cite no legal authority whatsoever. (Pl. Mem. at 26-29.)

The TPP Plaintiffs suggest that they are somehow exempt from the Court's predominance analysis (*id.* at 14-16), even though the Court clearly explained that individual issues would also predominate regarding whether the alleged fraud "caused the off-label Neurontin prescriptions for which the TPPs paid." *May 13 Order*, 2009 WL 1323835, at *18. And the TPPs accuse the Court of setting up a "straw man" by focusing on formulary placement issues, which they contend are irrelevant to their claims (Pl. Mem. at 16-19)—just as they did in prior briefing that was before the Court when it ruled. (Dkt. 1184, at 19-20.) In any event, the TPPs' professed inability to satisfy the "*less*" onerous" burden articulated by the Court is not grounds for reconsideration because it would require the TPPs to instead attempt to satisfy the *more* onerous burden of proving causation at the prescribing doctor level, which involves overwhelmingly individualized issues. *May 13 Order*, 2009 WL 1323835, at *18-19 (emphasis added).

Plaintiffs devote much of their brief to factual arguments regarding the prescription decisions of Mr. ▮▮▮ and Ms. ▮▮▮ prescribing doctors. These arguments cannot negate—and only serve to highlight—the overwhelmingly individual issues regarding the prescribing decisions of unidentified doctors who prescribed Neurontin to unidentified members of the putative bipolar and mood subclasses. Indeed, Plaintiffs now admit "the fact that not all physicians who wrote Neurontin prescriptions for bipolar or other mood disorders were detailed," and they also concede that "Defendants have the right to call individual physicians to testify that they prescribed Neurontin to treat bipolar based on something other than [the alleged] fraud." (Pl. Mem. at 25, 28-29.)

Moreover, Plaintiffs' arguments are not based on newly-discovered evidence. To the contrary, Plaintiffs claim that their summary judgment opposition and the Court's denial of their renewed motion for class certification "sailed past one another, like ships in the night." (Pl. Mem. at 5.) In reality, Plaintiffs' summary judgment opposition was filed on April 16, 2009, and sat in dock for nearly a month before the Court's class certification denial set sail on May 13, 2009. In any event, the evidence Plaintiffs now seek to rely on does not support Plaintiffs'

arguments and does not in any way suggest that the Court's denial of class certification was incorrect.

Finally, Plaintiffs argue that the Court failed to address their unjust enrichment claim. (*Id.* at 29.)  In reality, the Court's order explicitly addressed all of Plaintiffs' claims, including "unjust enrichment."  *May 13 Order*, 2009 WL 1323835, at *1.  Like all of their other claims, Plaintiffs' unjust enrichment claim requires proof of causation, which the Court correctly held cannot be determined on a classwide basis.  Plaintiffs' prior briefing did not argue that their unjust enrichment claim was subject to a different Rule 23 analysis than their other claims, and their belated and meritless attempt to do so now does not warrant reconsideration.

## ARGUMENT

### I.   Plaintiffs Do Not Satisfy Or Even Address The Standards Applicable to Motions For Reconsideration

Plaintiffs have not presented any newly discovered evidence or recent change in the law warranting reconsideration.  As the First Circuit has explained, "reconsideration is 'an extraordinary remedy which should be used sparingly.'"  *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted).  Reconsideration should not be granted unless the movant "demonstrate[s] either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law."  *Id.*  Plaintiffs cannot satisfy this standard by simply "rehashing the arguments they made in their motion for class certification."  *Cima v. WellPoint Health Networks, Inc.*, 250 F.R.D. 374, 386-87 (S.D. Ill. 2008).  Likewise, arguing that the court erred in its analysis of the facts or in its reasoning "is an improper basis on which to move for reconsideration."  *Id.* at 387.  Nor can Plaintiffs, "on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling."  *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003).  This is because "[l]itigation is not a game of hopscotch. . . . Litigants normally must frame the issues in a case before the trial court rules.  After that point, a litigant should not be allowed to switch from theory to theory like a bee in search of honey."  *Id.*  Court rulings "are

not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988).

Applying these principles, courts routinely deny motions for reconsideration of class certification denials where, as here, the plaintiffs' motion merely rehashes their original arguments and fails to present new evidence that was not available to them prior to the court's original ruling. *See O'Donnell v. Robert Half Int'l, Inc.*, 534 F. Supp. 2d 173, 179 (D. Mass. 2008) ("Because the plaintiffs point to no new facts that this Court has not already considered nor to any error of law with regard to [their] theory of liability, this Court will not reconsider [its denial of] certification . . . .").[1]

## II.    The Court Correctly Determined That Plaintiffs Cannot Establish Causation Through Common Proof

Plaintiffs take issue with the Court's reference to their reliance on "a single causation expert," *i.e.*, Professor Rosenthal, and claim that the Court disregarded charts prepared by Dr. Rena Conti and by a non-expert, Joshua Peteet. (Pl. Mem. at 1, 4, 14-15.) But the Court's focus on Professor Rosenthal was based on Plaintiffs' unfulfilled promise of what her report would show. "What plaintiffs requested, and what the Court permitted" following the denial of Plaintiffs' first motion for class certification, however, was "that plaintiffs be provided with an opportunity to show, through *well-established statistical methods* (*i.e.*, Professor Rosenthal's report), that all (or nearly all) doctors who chose to prescribe Neurontin off-label were affected by defendants' fraud." *May 13 Order*, 2009 WL 1323835, at *9 (emphasis added).

Neither Dr. Conti's nor Mr. Peteet's charts can be deemed to demonstrate classwide causation "through well-established statistical methods." *Id.* Indeed, Dr. Conti pointedly refused to opine that the charts she prepared could demonstrate causation and admitted that her report would not survive peer review. (Dkt. 1175-11, 2/12/08 Dep. of Dr. Rena Conti at 68, 438-49.)

---

[1] *See also, e.g., Duffin v. Exelon Corp.*, No. 06-1382, 2007 WL 1385369, at *3, *5 (N.D. Ill. May 4, 2007) ("Plaintiffs provide no truly new evidence to support their reconsideration motion."); *Oshana v. Coca-Cola Co.*, No. 04-3596, 2005 WL 670522, at *3 (N.D. Ill. Mar. 16, 2005) (reconsideration denied where court had not "misunderstood," but "expressly identified and rejected," plaintiff's argument for class certification).

Plaintiffs' charts in any event suffer from the same deficiencies as Professor Rosenthal's analysis in that they simply attribute all growth in Neurontin sales to Defendants' alleged misconduct without accounting for other factors. Even assuming, for sake of argument, that Plaintiffs' charts have any "intuitive appeal," it is clear that for purposes of satisfying Plaintiffs' burden on class certification, "intuitive appeal is not enough." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008). And in any event, the Court has "reconsider[ed] permitting the use of statistical evidence to establish a classwide presumption of causation," and concluded that it cannot be so used. *May 13 Order*, 2009 WL 1323835, at *10.

Without citing any legal authority or expert testimony, Plaintiffs' counsel now purport to instruct this Court on principles of "mainstream empirical economics." (Pl. Mem. at 27.) Plaintiffs' counsel's musings are not grounds for reconsideration. Moreover, this Court did not categorically "reject[] the use of econometrics to show causation" in all cases. (*Id.* at 26-27.) Rather, the Court held that "as a practical matter, plaintiffs cannot prove causation in this case without demonstrating reliance." *May 13 Order*, 2009 WL 1323835, at *12, *20 n.6. This requires Plaintiffs to prove "'which doctors prescribed Neurontin based on [the alleged off-label] promotion as opposed to lawful off-label prescribing by a doctor who is exercising his own medical judgment.'" *Id.* at *8 (quoting *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 113 (D. Mass. 2007)). Dr. Rosenthal's analysis does not and cannot prove causation on a classwide basis because the evidence shows that "many doctors were not detailed" and that doctors' "decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud." *Id.* at *17. There is no foundation for Professor Rosenthal's assumption that virtually all off-label prescriptions were caused by fraudulent promotion because her analysis "does not take into account any other factors that may have led doctors to prescribe Neurontin for off-label indications." *Id.* As a result, "Professor Rosenthal's analysis . . . does not suffice to defeat the predominance challenge." *Id.*

**A.    Plaintiffs' Belated Attempts To Distinguish Authorities Cited By This Court Are Not Grounds For Reconsideration**

Beyond Plaintiffs' failure to provide the promised econometric analysis, a "quartet of [recent] cases . . . has led the court to reconsider permitting the use of statistical evidence to establish a classwide presumption of causation." *May 13 Order*, 2009 WL 1323835, at *10.[2] The parties' prior briefing addressed all four of these cases. In their current brief, Plaintiffs argue with the Court's interpretation of these cases and "apologize for not doing a better job distinguishing this line of cases in the prior briefing." (Pl. Mem. at 19-26 & n.14.) Even if Plaintiffs were offering new arguments regarding these cases, their apology for not doing so earlier would not be grounds for reconsideration.    Parties cannot, "on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran*, 328 F.3d at 11.

But far from offering anything new, Plaintiffs merely rehash their prior arguments, which is likewise not grounds for reconsideration. *See, e.g., Cima*, 250 F.R.D. at 386. Plaintiffs claim that the "quartet" of recent cases is distinguishable because of Neurontin's alleged inefficacy for bipolar and mood disorders. The Court is well aware of Plaintiffs' inefficacy arguments, which they have asserted throughout this litigation and throughout the prior briefing. And the Court did not suggest that the recent quartet of cases involved similar allegations of inefficacy. There is simply no basis for Plaintiffs' assumption that the Court overlooked this so-called distinction. Nor do Plaintiffs cite any authority holding that this so-called distinction makes any legal difference. To be sure, Plaintiffs cite no authority suggesting that allegations of inefficacy entitle them to the very classwide "presumption of reliance" (Pl. Mem. at 25) that this quartet of cases emphatically rejects.

Instead, Plaintiffs rely on the conclusory assertion that "psychiatrists had no plausible

---

[2] *See May 13 Order*, 2009 WL 1323835, at *10-12 (discussing *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076 (N.J. 2007); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *In re St. Jude Med. Inc. Silzone Heart Valve Prods. Liab. Litig.*, 522 F.3d 836 (8th Cir. 2008); *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007)).

reason to prescribe Neurontin for bipolar, except as a result of Defendants' fraudulent promotion." (*Id.* at 23.)[3] They claim this distinguishes the case from *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076 (N.J. 2007), and *In re St. Jude Medical Inc. Silzone Heart Valve Products Liability Litigation*, 522 F.3d 836 (8th Cir. 2008), where the subject prescription drug and medical device were "FDA-approved" for the relevant uses. (Pl. Mem. at 21, 25.) No authority supports Plaintiffs' argument that evidence sufficient for FDA approval, such as double-blind randomized controlled trials, is a "primary hurdle" that must be cleared before physicians can prescribe a drug. (*Id.* at 20.) To the contrary, the FDA recognizes that drugs can be effective in patients even where evidence sufficient for FDA approval does not exist, and for this reason, physicians are permitted to prescribe drugs off-label. (*See* Reply Mem. in Supp. of Summ. J. at 23 & n.20-21.) Contrary to Plaintiffs' black-and-white image of doctors' decision-making process, there are a broad range of reasons why doctors might prescribe a drug for off-label indications, and those reasons can only be determined "doctor-by-doctor." *May 13 Order*, 2009 WL 1323835, at *17.

Indeed, the Court previously considered and rejected Plaintiffs' argument, recognizing that doctors prescribed Neurontin for bipolar disorder for a "wide variety" of reasons "unrelated to the three components of defendants' alleged fraud." *May 13 Order*, 2009 WL 1323835, at *17. Plausible grounds for prescribing Neurontin to bipolar patients include, *inter alia*, the accepted practice of using anticonvulsants to treat psychiatric disorders, as well as patients' reports of

---

[3] Among other flaws, this conclusory assertion rests on Plaintiffs' unfounded assumption that Defendants' sales representatives would not have visited certain specialists for any reason other than promoting Neurontin for off-label uses. But according to the very data on which Plaintiffs rely, physicians in all specialty categories that Plaintiffs define, including psychiatrists, prescribed Neurontin for its labeled indications. (*See, e.g.*, 1/15/08 Report of Michael C. Keeley, Ph.D. ("Keeley Report") ¶ 37, Ex. 29 to 5/20/09 Declaration of James P. Muehlberger ("Muehlberger Decl.").) Moreover, Defendants' sales representatives detailing Neurontin were also responsible for detailing a number of other drugs, including Aricept, an Alzheimer's medication, and Celexa, an anti-depressant, that psychiatrists would routinely prescribe for their labeled indications. (10/4/07-10/5/07 Dep. of Tamela Martin at 80-81, 343-44, Ex. 30 to Muehlberger Decl; 6/19/07 Dep. of Allison Fannon, Ph.D. at 172, Ex. 31 to Muehlberger Decl.) Accordingly, the mere presence in a psychiatrist's office of a sales representative carrying Neurontin is not even evidence of off-label promotion, let alone fraud. Furthermore, psychiatrists could also have been detailed for anxiety disorder—a use that is not part of Plaintiffs' case and for which there is legitimate scientific evidence of efficacy.

- 8 -

improved mood while taking gabapentin for on-label indications.  *See id.* (citing testimony by Dr. ███ and Dr. ███).[4]  Though Plaintiffs have argued that such "[l]esser levels of evidence" are not proof of efficacy (Dkt. 1754 ("Class MSJ Opp.") at 12 n.8), this does not mean that doctors do not rely on such evidence when making prescription decisions.  To the contrary, such case reports typically precede and even prompt the epidemiological studies that can lead to FDA approval.  If adopted, Plaintiffs' argument would stifle such scientific advances and would effectively have this Court regulate the practice of medicine—something the FDA has specifically declined to do and which this Court has rejected doing to date.

Nor is there any basis for Plaintiffs' assumption that "no reasonable physician would prescribe Neurontin to treat bipolar" had they known of certain allegedly suppressed studies.[5] (Pl. Mem. at 25.)  Indeed, Plaintiffs' own bipolar expert prescribes Neurontin as adjunctive medicine for two of his bipolar patients.  (Barkin Dep. at 204:21-207:22, Ex. 1 to 6/18/09 Decl. of Mark Cheffo.)  Dr. Barkin disputes that Neurontin is an effective treatment for bipolar disorder and claims that he prescribes it to these patients at their request to avoid upsetting them by taking them off the drug.  *(Id.)*[6]  But this merely highlights the individual nature of doctors'

---

[4] As Dr. ███ explained, because two other anticonvulsants were already being used to treat bipolar disorder, "it made sense to try Neurontin for the same use."  (3/11/08 Decl. of Dr. ███ ("███ Decl.") ¶ 3, Ex. 10 to James Decl.)

[5] Citing these studies, Plaintiffs claim that Neurontin has been "proven no more effective in treating bipolar than a placebo."  (Pl. Mem. at 25.)  This is false.  Plaintiffs' bipolar/mood expert, Dr. Barkin, has only reviewed a single study that addressed the use of Neurontin in treating non-refractory bipolar disorder, which is the most common type of the disorder.  As Dr. Barkin concedes, that study concluded that Neurontin "is likely to provide some benefits on the long-term outcome of the disorder, confirming what some clinicians and open-label studies have suggested before."  (1/21/09-1/22/09 Dep. of Dr. Jeffrey S. Barkin ("Barkin Dep."), Dkt. 1692-8, at 226-27, 454-55, Ex. 44 to 3/2/09 Decl. of Rajesh S. James ("James Decl."), Dkt. 1692; *see also id.* at 490, Ex. 18 to 5/20/09 Declaration of James P. Muehlberger, Dkt. 1786-4.)  Plaintiffs' interpretation of Dr. Atul Pande's study is similarly flawed.  Dr. Pande has explained that Neurontin has a different mechanism of action than mood-stabilizing antiepileptics, that shorter clinical studies would have difficulty demonstrating its effectiveness, and that long-term outcome will be where the effectiveness of Neurontin would be seen.  (*See* Resp. to Class SOF ¶¶ 19-23.)  Far from suggesting that Neurontin is ineffective in treating bipolar disorder, Dr. Pande's study is entirely consistent with the conclusion of the study Dr. Barkin reviewed, *i.e.*, that Neurontin is likely to provide long-term benefits to patients with non-refractory bipolar disorder.

[6] Similarly, Dr. ███'s decision to prescribe Neurontin to Ms. ███ was informed by Ms. ███'s interest in taking Neurontin; Ms. ███ herself introduced the possibility of taking Neurontin to Dr. ███.  (*See* 4/4/08 Dep. of Dr. ███ ("███ Dep.") at 31, 56-57, Ex. 13 to
*(cont'd)*

prescription decisions and refutes Plaintiffs' categorical pronouncements. If "no reasonable physician" would prescribe Neurontin to treat bipolar patients unless he or she was misled by fraudulent promotional statements, then Plaintiffs' own bipolar expert is not a "reasonable physician." (Pl. Mem. at 25.) Moreover, even today, years after the studies and allegations in question were made public, some TPPs still approve of Neurontin's use for treating bipolar.[7] Likewise, Mr. ███'s and Ms. ███'s doctors continue to believe that Neurontin is effective for patients with bipolar and mood disorders, and those doctors still in practice continue to prescribe Neurontin to their bipolar patients.[8]

Plaintiffs' purported disagreement with doctors' prescription decisions does not mean that those decisions were based on fraudulent promotional statements. This is *not* a medical malpractice case, and Plaintiffs cannot establish classwide causation based on what some hypothetical "*reasonable* physician" (Pl. Mem. at 25 (emphasis added)) would have done. Indeed, the recent quartet of cases this Court cited held that class certification was improper because of the varied impact of promotional statements on *actual* (not "reasonable") doctors and consumers. Likewise, Plaintiffs must prove that the *actual* prescribing doctors were exposed to fraudulent promotional statements and prescribed Neurontin based on such statements, rather than on "'[their] own medical judgment.'" *May 13 Order*, 2009 WL 1323835, at *8 (citation omitted). Doing so necessarily involves individual issues that would overwhelm any common issues, as this Court correctly ruled. *See id.* at *16.

---

*(cont'd from previous page)*
James Decl.)

[7] ███ recommended Neurontin for mood-cycling and as an adjunctive agent for bipolar disorder in 2000." (Dkt. 1438-7, 3/14/08 Decl. of Gregory K. Bell, Ph.D. ("Bell Decl.") ¶ 59.3.) And guidelines approved by ███'s regional P&T committees recognize even today that "gabapentin may be effective as monotherapy or adjunctive therapy in some treatment resistant cases of bipolar affective disorders." (Drug Monograph at KAIS-003261, Ex. 21 to James Decl.; 10/2/07 Dep. of Mirta Millares ("Millares Dep.") at 78-80, Ex. 22 to James Decl.).

[8] *See* ███ Dep. at 31, 87-88; 2/13/08 Dep. of Dr. ███ at 24-26, 29, Ex. 9 to James Decl.; ███ Decl. ¶¶ 6, 7; 2/6/08 Dep. of Dr. ███ at 102-13, Ex. 14 to James Decl.

**B.      Plaintiffs' Repackaged Fraud-On-The-Market Arguments Are Not Grounds For Reconsideration**

Plaintiffs now argue that Dr. Rosenthal's causation model does not depend on any "'nexus between the doctor and the sales team.'" (Pl. Mem. at 29 (quoting *May 13 Order*, 2009 WL 1323835, at *16).) Instead, Plaintiffs argue, "the fact that not all physicians who wrote Neurontin prescriptions for bipolar or other mood disorders were detailed points to the understanding that the alleged fraud was perpetrated by manipulating virtually all sources of decision support[, *i.e.*,] CME, opinion leaders, detail men and women, and peer-reviewed journals." (*Id.* at 28-29.) As this Court has already recognized, Plaintiffs' request for a presumption of reliance based on Defendants' alleged deception of the medical community at large is a "fraud-on-the-market" theory, which has no application here because "the instant suit does not involve price inflation or an efficient market." *May 13 Order*, 2009 WL 1323835, at *9. (*See also* Dkt. 745, 5/4/07 Hearing Tr. 14:17-25, 18:7-10 (inferring causation from alleged deception of the "medical community" is a "fraud on the market" theory, as Plaintiffs' counsel "candidly acknowledged").) "[C]ourts have been uniformly hostile to attempts to extend the fraud-on-the-market theory to consumer fraud cases . . . ." *May 13 Order*, 2009 WL 1323835, at *13.

Moreover, Plaintiffs offer no new evidence to support their latest iteration of the fraud-on-the-market theory. In fact, they offer no evidence at all of the purported impact of "CME, opinion leaders, . . . and peer-reviewed journals." (Pl. Mem. at 29.) Their expert, Dr. Rosenthal, merely attempted to measure the purported effect of detailing and journal advertising expenditures; she candidly admits that her analysis is "unable to account" for the influence of either "published literature" or alleged "off-label marketing events and campaigns." (Dkt. 1457 Ex. F, 8/11/08 Declaration of Meredith B. Rosenthal, Ph.D. ¶¶ 46, 53.)

Neither of Plaintiffs' belated attempts to avoid their own expert's admissions warrants reconsideration. First, Plaintiffs reiterate arguments made in their summary judgment opposition attempting to show that detailing expenditures are "highly correlated" with publication and peer-

- 11 -

to-peer marketing.  (Class MSJ Opp. at 30-32; Pl. Mem. at 6, 13 n.7; 9/14/09 Decl. of Joshua Peteet.)  None of the academic articles Plaintiffs cited in their summary judgment opposition support this proposition.[9]  While Professor Rosenthal's August 2005 declaration cites these articles, she does not characterize them as showing any link between detailing and either publication or peer-to-peer marketing.  (Dkt. 202, Ex. B, 8/8/05 Decl. of Meredith Rosenthal, Ph.D. at ¶ 27.)  As for the charts submitted with Mr. Peteet's declaration, Plaintiffs have not designated Mr. Peteet as an expert, nor have they proffered any expert testimony supporting their lawyers' interpretation of what these charts show.  Even as described by Plaintiffs' counsel, the charts show, at most, some degree of overlap between detailing and a subset of detailing in which sales representatives allegedly said or did things *incidental* to publication and peer-to-peer marketing.[10]  They do not show that detailing expenditure is a proxy for either publication or peer-to-peer marketing.

Second, Plaintiffs argue that "defendants have failed to produce data to allow Professor Rosenthal to quantify these [publication and peer-to-peer marketing] efforts systematically," and that this entitles them to a "relaxed standard of proof." (Pl. Mem. at 28 & n.22.)  There is simply no basis for Plaintiffs' assumption that there is any "data" capable of showing, *e.g.*, which

---

[9] Two of these articles say nothing whatsoever about CME events, the promotion of published studies, or any link between detailing and these types of promotion. *See* E.R. Berndt et al., *Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market*, Am. Econ. Rev., May 1995, at 100; Fuson F. Gonul et al., *Promotion of Prescription Drugs and Its Impact on Physician Choice Behavior*, J. Marketing, July 2001, at 79. The other two articles note a correlation between detailing and journal advertising expenditures, but they do not address, let alone find, any link between detailing and CME events or the promotion of published studies. *See* John A. Rizzo, *Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs*, 42 J.L. & Econ. 89, 101 n.39 (1999); Charles King, III, *Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs*, Boston MA: Harvard Business School Working Paper No. 01-014 (2000).

[10] For example, even assuming *arguendo* that some sales representatives **handed out** reprints of journal articles, that is merely incidental to Plaintiffs' overall "publication" theory, *i.e.*, that Defendants allegedly used medical marketing firms to **prepare and coordinate** misleading articles ghostwritten by non-physicians.  *See Neurontin*, 244 F.R.D. at 94-95.  Likewise, even assuming *arguendo* that some sales representatives invited psychiatrists to **attend** events where alleged misstatements were made, that is merely incidental to Plaintiffs' overall "peer-to-peer marketing" theory, *i.e.*, that Defendants allegedly used their sales and marketing departments to induce physicians to become "Neurontin experts" who would **deliver** "key messages" about Neurontin to their colleagues. *Id.* at 93.

- 12 -

unidentified doctors read which journal articles and what significance (if any) they attached to such articles.   To the contrary, Plaintiffs' claims by their very nature "def[y] proof by any common means." *May 13 Order*, 2009 WL 1323835, at *7.  Doctors' reasons for prescribing a drug "rest[] primarily in the minds of the prescribing doctors," *id.*, not in some centralized database.

Plaintiffs' antitrust authorities are inapposite.[11]  In the antitrust context, courts have applied a relaxed standard of proof as to the precise *amount* of damages, reasoning that because the defendant's conduct prevented competitive pricing, plaintiffs could not provide direct evidence of what the competitive price would have been "but for" the anticompetitive conduct. *See, e.g., Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 263-64 (1946).  None of these cases addressed or imposed a "relaxed" burden on the issue of causation prior to any finding of liability.   And none addressed a situation where direct evidence actually existed and was available; whereas in this case, direct evidence on the issue of causation can be obtained from the non-party prescribing doctors. *May 13 Order*, 2009 WL 1323835, at *7.  Moreover, as none of Plaintiffs' antitrust cases involved class claims, none supports a "relaxed" burden that would permit Plaintiffs to prove classwide causation through aggregate proof.  The First Circuit has explicitly rejected any such approach, holding that the plaintiffs' professed ability to prove aggregate damages did not relieve them of the burden of proving "which consumers were impacted by the alleged antitrust violation and which were not." *New Motor Vehicles*, 522 F.3d at 28.

Lacking any evidence of the purported impact of publication or peer-to-peer marketing, Plaintiffs instead claim that "the literature presents something like a contagion model to more accurately describe the influence of marketing on medical practice." (Pl. Mem. at 28.)  Plaintiffs' "contagion model" is yet another repackaging of their "fraud-on-the-market" arguments.  The

---

[11] *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981); *Wallace Motor Sales, Inc. v. Am. Motor Sales Corp.*, 780 F.2d 1049 (1st Cir. 1985); *In re Watman*, 331 B.R. 502, 510 (D. Mass. 2005), *aff'd*, 458 F.3d 26 (1st Cir. 2006).

only difference is that, whereas Plaintiffs' previously cited inapposite authorities from the securities context, they cite no legal authority at all in support of their "contagion model." Instead, in a footnote, Plaintiffs cite a 246-page textbook, a 518-page textbook, and an economics journal article[12] without providing any quotations or page references to assist the Court in evaluating this baseless argument. (*Id.* at 28 n.21.)  At the risk of stating the obvious, this "literature" is not legal authority, it is hearsay.  As Plaintiffs' counsel are not expert witnesses, they cannot offer opinion testimony based on hearsay.  Moreover, Plaintiffs' "contagion model" explicitly seeks to shift the burden of proof to Defendants.  For example, Plaintiffs argue:

- "The fact that some physicians who wrote bipolar prescriptions were not themselves detailed . . . *does not prove* that all of the off-label detailing captured in the model was not fraudulent." (*Id.* at 27 (emphasis added).)

- "[E]ven if physicians accurately report that their off-label prescribing was the result of hearing about Neurontin from a colleague, or a discussion that occurred in psychiatric Grand Rounds, this *does not imply* that the causal chain does not lead back to the alleged fraud." (*Id.* at 29 (emphasis added).)

Vague references to "the literature" notwithstanding, it is Plaintiffs' burden to prove these elements, not Defendants' burden to disprove them.  This Court correctly held that in attempting to carry their burden, Plaintiffs cannot use Dr. Rosenthal's econometrics model as a "shortcut," and that causation must be proved "doctor-by-doctor." *May 13 Order*, 2009 WL 1323835, at *17. And in any event, Plaintiffs now concede that "Defendants have the right to call individual physicians to testify that they prescribed Neurontin to treat bipolar based on something other than [the alleged] fraud." (Pl. Mem. at 25.)  Accordingly, both Plaintiffs' and Defendants' evidence will raise individualized issues that would overwhelm any common issues. *May 13 Order*, 2009 WL 1323835, at *16-17.  Plaintiffs have offered no new evidence or legal authority warranting reconsideration.

---

[12] J.S. Coleman, et al., Medical Innovation: A Diffusion Study (Bobbs-Merrill 1996); E.M. Rogers, Diffusion of Innovation (Free Press 1962); E.R. Berndt, et al., *Consumption Externalities and Diffusion in Pharmaceutical Markets: Antiulcer Drugs*, J. Indus. Econ., June 2003.

**III.    The Court Correctly Held That The Third Party Payors' Claims Are Not Susceptible To Aggregate Proof**

The Court's reasons for denying certification of consumer bipolar/mood disorder subclasses apply with equal force to the TPPs. Indeed, the Court clearly explained that "as with the indication-specific Consumer subclasses," a showing that most members of the proposed TPP subclasses paid for at least one off-label Neurontin prescription is not proof that "*fraud* caused the off-label prescriptions for which the TPPs paid" and "does not, by itself, demonstrate that common issues predominate with respect to the claims of the TPPs." *May 13 Order*, 2009 WL 1323835, at *18 (emphasis in original). The TPPs suggest that the Court previously resolved causation issues in their favor. (Pl. Mem. at 15.) But in the very language they quote, the Court stated that the TPPs' attempt to prove causation through aggregate statistics "needs Dr. Rosenthal to gild it and rule out" factors unrelated to the alleged fraud (*id.* at 15), which she has not done. *May 13 Order*, 2009 WL 1323835, at *16.[13]

Moreover, the Court previously stated that it was "unclear" if the TPPs could prove causation or injury through aggregate statistics and that the TPPs would not be able to do so if they "are unable to distinguish between payments for on- and off-label prescriptions, or among the indications.'" *May 13 Order*, 2009 WL 1323835, at *18 (quoting *Neurontin*, 244 F.R.D. at 114). The TPPs admit that they reimbursed for Neurontin prescriptions "*never even knowing* the condition for which it was prescribed" (Pl. Mem. at 16 (emphasis in original)) and they have not provided any plausible way to determine this information other than through individualized evidence. Myriad individual circumstances, including variations in the demographics of the TPPs' covered populations, would necessitate individual inquiries into the uses for which the

---

[13] To the extent Plaintiffs contend that TPPs who reimbursed their insureds for losses allegedly caused by Defendants' misconduct can recover damages without supplying the same proof that their insureds themselves would be required to supply, that contention is contrary to law. *See, e.g., Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) (rejecting "[r]eliance on aggregate statistical proof" in this context); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th Cir. 1999) (causation is "a central question in tort litigation, a question that cannot be dodged by the device of an insurers' direct suit").

Neurontin prescriptions that each TPP reimbursed were written.  (*See* Dkt. 1180, Mem. in Opp. to Renewed Mot. for Class Cert. at 37-40.)

Because aggregate statistics cannot overcome the overwhelmingly individual issues regarding unidentified doctors' reasons for prescribing Neurontin to the TPPs' insureds, the Court held that the TPPs must instead "prove that defendants' fraudulent omissions or representations caused [their P&T] committees to approve the use and reimbursement of Neurontin for off-label indications in a manner that was different from what would have occurred absent the alleged fraudulent marketing."  *May 13 Order*, 2009 WL 1323835, at *19.  The TPPs claim that the Court's reference to formulary placement issues sets up a "straw man."  (Pl. Mem. at 16.)  To the contrary, the Court was offering them a life line in the form of a "less onerous" burden—though the Court ultimately concluded that TPPs' "heterogeneity" creates individualized issues that preclude class certification even under this "less onerous" theory of causation.  *May 13 Order*, 2009 WL 1323835, at *18-19.

The TPPs' remaining arguments are not grounds for reconsideration.  They accuse the Court of "adopt[ing] Dr. Bell's declaration chapter and verse" and of misconstruing that declaration in various respects.  (Pl. Mem. at 17-19.)  Plaintiffs now admit that they were not even looking at the right document when they made these assertions.  (Errata Br. at 1.)[14]  The TPPs also argue, based on the declaration of their putative TPP expert Dr. Kimberly McDonough, that "formulary placement is irrelevant" to their claims.  (Pl. Mem. at 16-19.)  Initially, this merely rehashes an identical argument made in Plaintiffs' prior briefing and disputes the Court's analysis of a declaration cited in Plaintiffs' prior briefing.  (Dkt. 1184 at 19-20; Dkt. 1453 at 16 n.33.)  Moreover, Dr. McDonough's declaration does not contradict the aspects of Dr. Bell's declaration that the Court cited.[15]

---

[14] Two weeks after filing their motion for reconsideration, Plaintiffs filed an "Errata" brief that purports to correct various errors in their reconsideration brief.  *See* Dkt. 1827 ("Errata Br.").  Without leave of Court, Plaintiffs' Errata brief proceeds to add five more pages of argument to their already overlength reconsideration brief.

[15] Plaintiffs argue that Dr. Bell found only a few examples of TPPs "*restricting*" access to Neurontin
*(cont'd)*

Most importantly, Dr. McDonough's report does not support the certification of a TPP class on any theory of causation. The thrust of the TPPs' argument and Dr. McDonough's declaration is that TPPs had no way of controlling for off-label Neurontin use (Pl. Mem. at 19; Errata Br. at 2) and thus cannot prove that they would have made different reimbursement decisions but for the alleged fraud. Arguing that TPPs suffer from a common inability to satisfy the "*less* onerous" burden articulated by the Court is not grounds for reconsideration because it would require the TPPs to instead attempt to satisfy the *more* onerous burden of proving causation at the prescribing doctor level, which involves overwhelmingly individualized issues. *May 13 Order*, 2009 WL 1323835, at *18-19 (emphasis added). Dr. McDonough's report does not obviate the need for individualized, doctor-specific inquiries.

## IV.   Plaintiffs' Speculative Inferences And Baseless Credibility Attacks On The Prescribing Doctors' Testimony Do Not Negate Individual Issues Or Warrant Reconsideration

Echoing their summary judgment opposition, Plaintiffs argue that the Court should not accept their prescribing doctors' testimony as "conclusive" and should "permit the jury to consider this question of fact in light of all of the evidence bearing on the question." (Pl. Mem. at 14.) Plaintiffs mistakenly assume that if they could raise fact questions regarding the prescribing decisions of Ms. ███'s and Mr. ███'s doctors, this would somehow negate similar individual issues regarding the prescribing decisions of the myriad unidentified doctors who prescribed Neurontin to unidentified members of the putative bipolar and mood subclasses. To the contrary, even if Ms. ███'s and Mr. ███'s doctor-specific evidence could raise fact questions, it would merely highlight the individual nature of the inquiry. Indeed, Plaintiffs now concede that "Defendants have the right to call individual physicians to testify that they

---

(cont'd from previous page)

for off-label uses. (Errata Br. at 3 (emphasis added).) But Plaintiffs fail to address Dr. Bell's examples of TPPs *encouraging* Neurontin's use for off-label indications, including bipolar disorder. *See May 13 Order*, 2009 WL 1323835, at *19 (citing Bell Decl. ¶ 59); *see also* n.7, *supra*. TPPs that, to this day, still encourage Neurontin's use to treat bipolar disorder plainly cannot establish causation or injury, and TPPs' varying policies regarding off-label Neurontin use preclude class certification. *May 13 Order*, 2009 WL 1323835, at *18-19. Dr. McDonough does not contest this aspect of Dr. Bell's declaration.

prescribed Neurontin to treat bipolar based on something other than [the alleged] fraud." (Pl. Mem. at 25.)  And while Plaintiffs attempt to show that Ms. ███ 's and Mr. ███ 's doctors were detailed, they admit "the *fact* that not all physicians who wrote Neurontin prescriptions for bipolar or other mood disorders were detailed." (*Id.* at 28.)  Thus, the Court correctly ruled that "many doctors were not detailed, and even if they were, the plaintiffs would have to demonstrate doctor-by-doctor that [the allegedly] fraudulent misrepresentations or omissions during the off-label promotion caused the doctor to prescribe the medication." *May 13 Order*, 2009 WL 1323835, at *17.  Rather than warranting reconsideration, Plaintiffs' own arguments merely confirm the correctness of the Court's holding that "the requirement that plaintiffs establish a nexus between the doctor and the sales team will create individualized issues that will inevitably predominate over the common questions." *Id.* at *16.

Plaintiffs also confuse the standards applicable to motions for summary judgment and class certification.  In contrast to a defendant's burden on a summary judgment motion, Plaintiffs "ha[ve] the burden of showing that all the prerequisites for a class action have been met." *Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir. 1987).  Plaintiffs cannot meet their burden by (unsuccessfully) attempting to raise fact questions, and the Court is not required to construe any such questions in their favor.  Rather, the Court "'must evaluate the plaintiff's evidence . . . critically,'" *New Motor Vehicles*, 522 F.3d at 17 (ellipsis in original; citation omitted), and must perform a "searching inquiry" of the facts relevant to class certification even where they overlap with the merits. *Id.* at 24-26.

Moreover, Plaintiffs' speculative inferences and credibility attacks do not raise fact issues for trial, even as to Ms. ███ 's and Mr. ███ 's doctors, much less warrant reconsideration of the Court's decision regarding class certification issues.  For a further discussion of the reasons Plaintiffs' arguments are substantively without merit, please see Defendants' summary judgment reply at pages 5-14, incorporated herein by reference.

One of Plaintiffs' doctor-specific arguments warrants further discussion.  Like all of the other consumer plaintiffs' doctors, Dr. ███ specifically denies prescribing Neurontin based on

- 18 -

any fraudulent promotional statements.  (Reply to Class Resp. to Defs' SOF ¶¶ 58-64.)  In

arguing to the contrary, Plaintiffs rely solely on Ms. █████'s hearsay testimony.  Ms. █████

claims Dr. ████ told her that he had spoken with Parke-Davis sales representatives about

Neurontin and that the sales representatives told him they had seen positive results in using

Neurontin to treat bipolar disorder.  (Pl. Mem. at 10.)  Initially, the fact that Plaintiffs seek to

rebut the direct, *case-specific* testimony of a treating physician with equally *case-specific*

hearsay testimony from a plaintiff only confirms that the issue of causation will require the jury

to consider evidence that is unique to each individual claim. Ms. ████'s hearsay statement can

by no means supply the basis for Professor Rosenthal's assumption that detailing was the

principal driver of all doctors' decisions to prescribe Neurontin for off-label uses or otherwise

supply the classwide proof of causation that the Court has already found lacking.

In any event, Ms. ████k's testimony regarding what Dr. ████ said is not admissible.

Certainly, Dr. ████ himself can testify as to any discussion that he had with sales representatives

and whether they influenced his prescribing decisions.  But Ms. ████ cannot testify that

Dr. ████ purportedly made out-of-court statements to her relaying any such discussions. *See* Fed.

R. Evid. 802, 803, 805; *see also Horta v. Sullivan*, 4 F.3d 2, 8-9 (1st Cir. 1993) (potentially non-

hearsay statements contained in newspaper article were "hearsay within hearsay," and "not a

proper part of the record for summary judgment purposes").

Plaintiffs argue that Dr. ████'s purported statements are admissible under the hearsay

exception governing "[s]tatements made for purposes of medical diagnosis or treatment." Fed. R.

Evid. 803(4) (Pl. Mem. at 10 n.5).  But as discussed in Defendants' summary judgment reply

(Reply Mem. in Supp. of Summ. J. at 8 n.7), Dr. ████'s purported statements fall outside that

rule's plain text because they do not "describe[e] medical history, or past or present symptoms,

pain, or sensations, or the inception or general character of the cause or external source thereof."

Fed. R. Evid. 803(4).  Moreover, the rule clearly addresses statements made by patients or their

family members, and is not a vehicle for the introduction of hearsay statements by non-party

- 19 -

doctors.[16]   Plaintiffs ignore these arguments and authorities, and their own authorities are completely off-point.   The advisory committee's note to Rule 803(4) explicitly addresses statements made by patients, not by doctors.   *See* Fed. R. Evid. 803(4) advisory committee's note (1972 Proposed Rules–Note to Paragraph (4)).   Likewise, in *U.S. v. Peneaux*, 432 F.3d 882 (8th Cir. 2005), the court addressed statements "of the type reasonably *relied on* by a physician," *id.* at 893 (emphasis added), not statements purportedly *made* by a physician.

Plaintiffs also argue that they are offering Dr. █████'s purported statements not for their truth, but to show that he was detailed and to show why he prescribed Neurontin to Ms. █████. (Pl. Mem. at 10 n.5.)   However, it is not the fact of any alleged detailing that creates the hearsay problem.   As noted above, Dr. ████ can testify directly as to this issue.   But when Plaintiffs attempt to prove such allegation not through Dr. ████, but through a plaintiff testifying as to what Dr. ████ told her, then the alleged out-of-court statement of Dr. ████ is, in fact, being offered for the truth of the matter asserted.   Dr. ████'s purported statement that he had spoken with drug representatives about Neurontin could only show that he "was detailed" if the statement were true.   Likewise, Dr. ████'s purported statement that he was recommending Neurontin to Ms. █████ because of things "drug reps" supposedly told him could only show "why he chose to prescribe Neurontin to Ms. █████" if the statement were true.   When the relevance of an out-of-court statement ostensibly offered for "state of mind" or other nonhearsay purposes depends on the truth of the matter asserted, the statement is hearsay.   *See, e.g., United States v. Kostopoulos*, 119 F. App'x 308, 310, 311 (2d Cir. 2004) (declarant's statements that he

---

[16] *See, e.g., See Abdus-Samad v. Greiner*, No. 00 Civ. 3885, 2004 WL 1488529, at *2 (S.D.N.Y. July 2, 2004) ("As neither Dr. Paolano nor the physical therapist is a party to this action, Plaintiff's hearsay accounts of their alleged statements to him do not constitute admissible evidence of such a diagnosis."); *Holt v. Olmsted Twp. Bd. of Trs.*, 43 F. Supp. 2d 812, 819 (N.D. Ohio 1998) ("[S]tatements by a patient regarding medical opinions and diagnoses made by doctors who have examined a patient are not admissible under Fed. R. Evid. 803(4).").*Mahone v. Lehman*, 347 F.3d 1170, 1173 (9th Cir. 2003) (reversible error to permit plaintiff to testify, over hearsay objection, about purported diagnosis); *Williams v. York Int'l Corp.*, 63 Fed. App'x 808, 814 (6th Cir. 2003) (6th Cir. 2003) (plaintiff's affidavit, purporting to relay doctor's diagnosis, was inadmissible hearsay); *Scherer v. GE Capital Corp.*, 59 F. Supp. 2d 1132, 1135-36 (D. Kan. 1999) (plaintiff's deposition testimony about purported diagnosis ruled inadmissible), *aff'd*, 211 F.3d 1279 (10th Cir. 2000).

had been "tipped" with non-public information about an impending merger "are hearsay because they have no evidentiary value unless they are true"); *United States v. Anguiano*, No. 89-10362, 1991 WL 27450, at \*3 (9th Cir. 1991) (drug prescription was inadmissible to show defendant's whereabouts on the date the prescription was written to him; prescription was not relevant for this purpose "unless the jury accepts the truth of the matter asserted").  Nor are the statements admissible under Rule 803(3).  That exception applies to a declarant's "contemporaneous statements as to her state of mind—that she was afraid, hungry, exhausted." *United States v. Alzanki*, 54 F.3d 994, 1008 (1st Cir. 1995).  But the rule does not "allow more expansive statements elaborating upon the underlying reasons for the declarant's state of mind." *Id.*[17] Plaintiffs are explicitly offering hearsay statements regarding Dr. ███'s "underlying reasons" for prescribing Neurontin rather than to show his state of mind.

In sum, Plaintiffs' evidence does not even raise fact issues for summary judgment purposes.  But regardless of how the court views the merits of the consumer plaintiffs' claims, the arguments advanced by both Plaintiffs and Defendants make clear that an individual inquiry is required to resolve these disputes and that these "individualized issues . . . will inevitably predominate over the common questions." *May 13 Order*, 2009 WL 1323835, at \*16.

## V.   The Court's Denial Of Class Certification Applies To All Claims, Including Unjust Enrichment

Plaintiffs incorrectly contend that this Court's denial of class certification failed to address their unjust enrichment claim.  (Pl. Mem. at 29.)  In reality, the Court's order explicitly addressed all of Plaintiffs' claims, including "unjust enrichment." *May 13 Order*, 2009 WL 1323835, at \*1.  Nowhere in Plaintiffs' prior briefing have they ever suggested that their unjust enrichment claim was subject to a different Rule 23 analysis than their other claims.  The term

---

[17] *See also, e.g., United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) (the rule does not allow a "declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind") (cited with approval in *Alzanki*, 54 F.3d at 1008).  Otherwise, "any hearsay statement would be admissible if it were preceded by the statement, 'I am (insert state of mind) because X.'  Such an interpretation would completely destroy the general prohibition against the admissibility of hearsay statements." *Daniels v. Lafler*, 192 Fed. Appx. 408, 425 (6th Cir. 2006).

"unjust enrichment" does not even appear in Plaintiffs' opening or reply briefs in support of their renewed motion for class certification.[18] Thus, Plaintiffs are improperly seeking reconsideration based on "a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran*, 328 F.3d at 11.

In addition to being untimely, Plaintiffs' argument lacks merit. Initially, there is no basis for Plaintiffs' contention that the denial of class certification as to their other claims means that they "no longer have adequate legal remedies." (Pl. Mem. at 29.) Plaintiffs can still attempt to individually pursue any claimed legal remedies. Equity does not provide an alternate route to class certification whenever plaintiffs feel that pursuing individual legal remedies would be too inconvenient or burdensome. Moreover, Plaintiffs' unjust enrichment claims require proof of causation, which implicates the same individual issues that preclude certification of all their other claims. Thus, in denying Plaintiffs' original motion for class certification, this Court held that "[f]or *all of their claims*, plaintiffs will be required to prove that defendants' fraudulent promotion caused physicians to prescribe Neurontin to the plaintiffs for an off-label condition and that they were injured (*i.e.*, suffered economic loss) by virtue of Neurontin's inefficacy for that condition." *Neurontin*, 244 F.R.D. at 104 (emphasis added). Notably, this statement appears immediately after the Court's discussion of Plaintiffs' unjust enrichment claim. *See id.* Plaintiffs have not supplied any authority to the contrary. Their reliance on *In re Mercedes-Benz Tele Aid Contract Litigation*, No. 07-2720, 2009 WL 1101241 (D.N.J. Apr. 24, 2009), is misplaced because that case involved allegedly misleading promotional statements made to the plaintiffs themselves that affected the value of cars sold to the plaintiffs. *See id.* at *1. Causation in *In re Mercedes-Benz* did not depend upon the decisions of learned intermediaries.

---

[18] Plaintiffs make a single, fleeting reference to unjust enrichment on the final page of their Response to Defendants' Supplemental Memorandum of Law in Opposition to the renewed motion for class certification. (Dkt. 1453, at 20.) They did so in response to Defendants' argument that TPPs' alleged damages would have to be reduced by any additional premiums charged to their insureds to cover the projected costs of increased Neurontin use. The Court did not reach this issue in denying class certification.

## CONCLUSION

For the foregoing reasons, Class Plaintiffs' Motion for Reconsideration should be denied.

Dated:  June 18, 2009

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:     /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

-and-

SHOOK, HARDY & BACON L.L.P.

By:     /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550

-and-
WHITE AND WILLIAMS LLP

By:     /s/ David B. Chaffin
        David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

- 23 -

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on June 18, 2009.


/s/ David B. Chaffin
David B. Chaffin