UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) ) MDL Docket No. 1629 Master File No. 04-10981 Judge Patti B. Saris Mag. Judge Leo T. Sorokin |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) |

**CLASS PLAINTIFFS' SURREPLY MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

821081.2

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................................... 1

II.     THE EVIDENCE IS MORE THAN SUFFICIENT TO RAISE A TRIABLE
        ISSUE OF FACT AS TO CAUSATION .......................................................................... 2

        A.      Plaintiffs Have Presented Compelling Evidence That the Consumer
                Plaintiffs' Physicians Were Exposed to and Influenced By Defendants'
                Fraudulent Off-Label Marketing............................................................................ 2

        B.      Plaintiffs Have Presented "Powerful" Evidence That the TPP Plaintiffs
                Were Damaged By Defendants' Fraudulent Off-Label Marketing ..................... 11

III.    PLAINTIFFS HAVE PROVEN THAT NEURONTIN IS INEFFECTIVE FOR
        THE RELEVANT OFF-LABEL USES ........................................................................ 14

IV.     PLAINTIFFS HAVE PRESENTED COMPELLING EVIDENCE OF
        SCIENTER ................................................................................................................... 19

V.      THE TPP PLAINTIFFS' INJURIES ARE NOT DERIVATIVE OF THEIR
        INSUREDS'................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

Bodett v. CoxCom, Inc.,
  366 F.3d 736 (9th Cir. 2004) ...................................................................... 6

Calmat Co. v. U.S. Dept. of Labor,
  364 F.3d 1117 (9th Cir. 2004) .................................................................... 9

Chisolm v. TranSouth Fin. Corp.,
  194 F.R.D. 538 (E.D. Va. 2000) ................................................................. 5

Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,
  57 F.3d 56 (1st Cir. 1995) ...................................................................... 4, 5

Essex Ins. Co. v. Fidelity & Guar. Ins. Underwriters, Inc.,
  2008 WL 2497700 (6th Cir. Jun. 23, 2008) ............................................... 9

Fincher v. County of Westchester,
  979 F. Supp. 989 (S.D.N.Y. 1997) ............................................................ 9

Glenn v. Scott Paper Co.,
  1993 WL 431161 (D.N.J. Oct. 20, 1993) ................................................... 9

In re Neurontin Marketing, Sales Practices, & Prods. Litig.,
  433 F. Supp. 2d 172 (D. Mass. 2007) ........................................................ 7

In re Tobacco II Cases,
  93 Cal. Rptr. 3d 559 (Cal. 2009) ........................................................... 6, 7

Klay v. Humana, Inc.,
  382 F.3d 1241 (11th Cir. 2004) ................................................................. 5

Kulick v. Pocono Downs Racing Ass'n, Inc.,
  816 F.2d 895 (3d Cir. 1987) ...................................................................... 9

Porter v. Reynolds Leasing, Inc.,
  No. 92 CIV. 5095 (SS), 1994 WL 24769 (S.D.N.Y. Jan. 24, 1994) .......... 6

Springer v. Durflinger,
  518 F.3d 479 (7th Cir. 2008) ..................................................................... 6

U.S. Dep't. of Justice v. Landano,
  508 U.S. 165 (1993) ................................................................................. 16

U.S. v. Ferber,
  966 F. Supp. 90 (D. Mass. 1997) .............................................................. 9

Washington Legal Found. v. Friedman,
  13 F. Supp. 2d 51 (D.D.C. 1998) .............................................................. 5

Washington Legal Found. v. Friedman,
  202 F.3d 331 (D.C. Cir. 2000) .................................................................. 5

Westways World Travel, Inc. v. AMR Corp.,
  218 F.R.D. 223 (C.D. Cal. 2003) .............................................................. 5

821081.2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Woodman v. Haemonetics Corp.,
  51 F.3d 1087 (1st Cir. 1995) ............................................................................... 8

Young v. Lincoln Nat. Corp.,
  937 F.Supp. 1326 (N.D. Ind. 1996) ................................................................... 9

**STATUTES**

21 U.S.C. § 360aaa ............................................................................................ 5, 8

Fed. R. Evid. 801(d)(2)(D) ...................................................................................... 8

Fed. R. Evid. 803(7) ........................................................................................... 8, 9

**OTHER AUTHORITIES**

Steinman MA, et al., "Of principles and pens: Attitudes and practices of medicine
  housestaff toward pharmaceutical industry promotions,"
  The American Journal of Medicine, 2001;110:551 ................................................. 3

Ziegler, et al., "The Accuracy of Drug Information from Pharmaceutical Sales
  Representatives,"
  JAMA (1995) 273:1296 ......................................................................................... 4

**TREATISES**

12A Fed. Proc., L. Ed. § 33:391 (2008) ................................................................. 9

Reference Guide on Epidemiology in Reference Manual on Scientific Evidence
  (Fed. Judicial Ctr. 2nd ed. 2000) ................................................................ 14, 17

# I.      <u>INTRODUCTION</u>

Contrary to Defendants' argument, Plaintiffs have presented compelling evidence that the consumer Plaintiffs' prescribing physicians were both exposed to and strongly influenced by Defendants' fraudulent off-label marketing, despite their inability to recall the exposure and their denial of the influence, which research shows is more common than not among physicians.

Defendants continue to labor under the false impression that the efficacy or inefficacy of a drug to treat a particular condition can be proven or disproven by reference to individual patients, when the scientific method, enshrined in medicine as well as law, considers such anecdotes as proof of nothing at all.  Multiple controlled trials establish that Neurontin is no more effective than placebo in treating the off-label conditions at issue, despite any and all subjective impressions to the contrary.

As the Court recently found in ruling on Plaintiffs' motion for class certification, *any* promotion of Neurontin for off-label uses for which Defendants were aware it had already been proven ineffective was necessarily fraudulent.  As to each off-label condition at issue, the corresponding subclass does not begin until *after* Defendants became aware of a negative study. Accordingly, as the Court has already found, Prof. Rosenthal's assumption that all off-label promotion during the respective subclass periods was fraudulent "has validity."

Defendants *themselves* concluded that Neurontin would have a 0% share of the bipolar market in the absence of an off-label marketing campaign.  Prof. Rosenthal's conclusion that over 99% of the Neurontin prescriptions written for bipolar occurred as a result of Defendants' fraudulent off-label marketing is fully consistent with, and cumulative to, Defendants' own projection.

The Court's stated reason for rejecting Prof. Rosenthal's methodology—that the consumer Plaintiffs' prescribing physicians denied being exposed to or influenced by

Defendants' off-label promotion—is undermined by the evidence presented in opposition to this motion. The Court has already found that the TPPs have presented "powerful" *factual* evidence of causation, in addition to Prof. Rosenthal's expert opinion.

In sum, the evidence adduced by Plaintiffs of Defendants' fraud, and its impact on Plaintiffs, is more than sufficient to support a jury verdict Plaintiffs' favor. Accordingly, summary judgment should be denied.

## II.     THE EVIDENCE IS MORE THAN SUFFICIENT TO RAISE A TRIABLE ISSUE OF FACT AS TO CAUSATION

### A.     Plaintiffs Have Presented Compelling Evidence That the Consumer Plaintiffs' Physicians Were Exposed to and Influenced By Defendants' Fraudulent Off-Label Marketing

Defendants argue that there can be no fraud where a treating physician testifies that he did not prescribe Neurontin "based on any fraudulent promotional statements." Reply at 5. This argument is flawed for three reasons. First, there is no evidence that any of the treating physicians involved in this litigation are even *aware* of what the precise fraud allegations—i.e., the suppressed and misrepresented study results—are for the different indications in this case. Second, while it has been demonstrated that physicians are influenced by marketing,[1] and they

---

[1] As Prof. Rosenthal summarized in her August 2005 declaration (Dkt. No. 202, Ex. B), a study:

> analyzed physician beliefs about the sources of influence on their prescribing as well as indirect evidence of the true source of physician information. Physicians were asked to report their beliefs about the pharmacologic effects of two classes of drugs where the scientific evidence had clearly shown little or no benefit while the manufacturers had advertised heavily to promote the products as superior to the therapeutic alternatives. The study showed that the majority of physicians held beliefs about the two classes of drugs that were consistent with the detailing message but at odds with the scientific evidence despite the fact that the same physician reported that commercial sources of information had little influence on their prescribing.

Id. ¶ 20 (citing J. Avorn, et al., "Scientific Versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," Am. J. of Medicine, 73 (a), 4-8, 1982). Indeed, as a result of Defendants' fraudulent promotional efforts, 43% of the physicians surveyed for Defendants in 2001 believed that Neurontin had been approved by the FDA for a broad neuropathic pain indication, when the FDA refused to allow Defendants to even *file* such an application. See Surreply Declaration of Barry Himmelstein in Opposition to Defendants' Motion for Summary

recognize that *their peers* are likely to be influenced, it has also been demonstrated that a physician is *unlikely* to be aware that he or she was influenced by the same promotion.  See Steinman MA, et al., "Of principles and pens: Attitudes and practices of medicine housestaff toward pharmaceutical industry promotions," The American Journal of Medicine, 2001;110:551-57 (61% of respondents stated that industry promotions did not influence their own prescribing, but only 16% believed other physicians were similarly unaffected).  This fact is underscored by the deposition testimony of Dr. Kylene Huler, who testified that she was above the influence of what she called "drug whores":

> But I'm saying I know of certain physicians.  We call them, you know, drug whores. I mean, basically they – they are paid tremendous amounts of money to tout a medication, and they will speak on behalf of the company with canned, premade slides and give a lecture that basically glorifies the medication they're being paid heavily by that pharmaceutical company to market the medication.  *I do not go to those lectures*.

Huler Depo. (Dkt. No. 586-1) at 158:2-10 (emphasis added).  Of course, Dr. Huler *did* go to those so-called "drug whore" lectures, twice—she just didn't know it.  She admitted that she attended two lectures where Dr. Beydoun was the speaker.  Id. at 17:22-18:7, 48:2-10.  Class Plaintiffs have demonstrated that Dr. Beydoun was one of the most frequent speakers at the various fraudulent CMEs held on the topic of pain, where he uniformly touted Neurontin as "first line therapy for the treatment of painful peripheral neuropathies," while failing to disclose the existence of numerous negative clinical trial results which supported the opposite conclusion.  See Class Plaintiffs' Statement of Disputed and Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("SOF") ¶ 380-81, 385-87, 389.  Thus, a jury could reasonably infer that Dr. Huler, a self-proclaimed "Pfizer Queen," was exposed to false and misleading statements about Neurontin, but was (and still is) completely unaware of this

---

Judgment ("Himmelstein Decl."), Ex. A (WLC_CBU_169332) at 20, 22; SOF ¶¶ 227-8.

exposure.

Third, research demonstrates that physicians are unlikely to recall inaccuracies in the marketing messages they receive from drug companies.  Ziegler, et al., "The Accuracy of Drug Information from Pharmaceutical Sales Representatives," JAMA (1995) 273:1296.  See also n.1, supra.  This fact is underscored by the testimony of Drs. Ragothaman and Arness.  Dr. Arness testified that he never discussed Neurontin with a sales representative.  This is, of course, incorrect, as Dr. Arness was detailed on Neurontin and received a false and misleading "Dear Doctor" letter.  Similarly, Dr. Ragothaman, whom Defendants concede incorrectly failed to recall that she was detailed on Neurontin, was in fact detailed three times.  Obviously, if Drs. Ragothaman and Arness are unable to even recall being detailed on Neurontin, neither is in a position to recall whether those details contained any inaccuracies.  Pfizer's contention, relegated to a footnote, that "[t]he fact that [Dr. Ragothaman] does not remember any promotional statements about off-label Neurontin use merely confirms her testimony that she did not base her prescription decisions on any such statements" (Reply at 7 n.6) does not merit a serious response.  Obviously, if she cannot remember being detailed on three separate occasions, or receiving the misleading "Dear Doctor" letter she purportedly requested, she is unable to isolate what she learned in those encounters from the rest of her knowledge base.

Defendants argue that there is no evidence Drs. Arness or Ragothaman reviewed or relied on the misleading "Dear Doctor" Medical Information Letter ("MIL").  In support of this argument, defendants rely entirely on Compagnie de Reassurance d'lle de France v. New England Reinsurance Corp., 57 F.3d 56, 86 (1st Cir. 1995), in which the court found insufficient evidence that the plaintiffs had read and relied upon a brief and unsolicited general announcement that the defendant had formed a new division to attract direct facultative

reinsurance business, where the terms of each reinsurance contract were separately negotiated and set forth in "slips" and "Treaty Wordings, formal contracts containing a more elaborate statement of the parties' agreements." Id. at 63.  It is one thing to presume that unsolicited sales materials, i.e., corporate "junk mail," were read and relied upon by counterparties who later entered into "elaborate" insurance contracts specifying their respective obligations.  By contrast, it was *against federal law* for Defendants to send such MIL letters to physicians absent their *affirmative request*.[2]  As all such MILs—as well as journal reprints, and all other written communications concerning off-label uses of Neurontin—may only be lawfully disseminated to a physician in response to an affirmative request, it is both reasonable and entirely permissible for the finder of fact to infer that Drs. Arness and Ragothaman—and *every other* doctor who requested and received a misleading MIL, journal reprint, or CME materials—reviewed and relied upon them, and Defendants should be equitably estopped from contending otherwise.[3] This common sense inference is fully supported by the facts of this case.  Less than one week after receiving the misleading bipolar MIL, Dr. Ragothaman recommended Neurontin to Ms. Wityk, despite *never* having prescribed the drug before, and went from a *non*-prescriber of Neurontin to a *steady* prescriber.  See SOF ¶¶ 204-08; Class Plaintiffs' Appendix of Charts in Opposition to Defendants' Motion for Summary Judgment ("Chart Appx.," Dkt. No. 1759), Chart 2.  The impact on Dr. Arness's prescribing activity was equally dramatic.  See SOF ¶¶

---

[2] See 21 U.S.C. §§ 360aaa, et seq. (pharmaceutical manufacturer may not disseminate written information on off-label uses unless application to approve use is pending and other conditions are satisfied), 3600aaa-6(a) (sole exception permits "disseminating information in response to an *unsolicited request* from a health care practitioner") (emphasis added).  See also Washington Legal Found. v. Friedman, 13 F. Supp. 2d 51, 58 (D.D.C. 1998) (explaining statute), appeal dismissed, vacated in part on other grounds, 202 F.3d 331 (D.C. Cir. 2000).

[3] Courts routinely presume reliance where there is evidence of an affirmative act, such as payment of a fee, related to the misrepresentation.  See, e.g., Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223, 238 (C.D. Cal. 2003); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004); Chisolm v. TranSouth Fin. Corp., 194 F.R.D. 538, 561 (E.D. Va. 2000).

195-99; Chart Appx., Chart 1.

Defendants' argument that this contemporaneous documentary evidence is insufficient to put the causation issue to the jury is patently frivolous.[4]  As the California Supreme Court explained last month in overturning the decertification of a tobacco consumer class:

> "[R]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury-producing conduct.  A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff 'in all reasonable probability' would not have engaged in the injury-producing conduct."
>
> While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause.  " 'It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. . . . It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.'  Moreover, *a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material.  A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question', and as such materiality is generally a question of fact unless the 'fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it*.'"

In re Tobacco II Cases, 93 Cal. Rptr. 3d 559, 581 (Cal. 2009) (citations omitted, emphasis added).  Plaintiffs have presented overwhelming expert testimony that the disclosure of negative,

---

[4] Clearly, Plaintiffs are *not* attempting to "defeat summary judgment by merely arguing that these non-party doctors' testimony is not credible" (Reply at 1); Plaintiffs are relying on documentary evidence from Defendants' own files, prescription records compiled and maintained by neutral third parties, and qualified expert testimony concerning the materiality of Defendants' misrepresentations and omissions to a reasonable physician.  Defendants' argument that a physicians' testimony, contradicted by contemporaneous documentary evidence, must nonetheless be taken as Gospel finds no support in the cases cited by Defendants.  See Porter v. Reynolds Leasing, Inc., No. 92 CIV. 5095 (SS), 1994 WL 24769, *4 (S.D.N.Y. Jan. 24, 1994) ("[d]espite having conducted extensive discovery, . . . [plaintiff] has not adduced any evidence even remotely" contradicting deposition testimony); Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008) ("when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts-no proof-to support his claims, summary judgment in favor of the defendant is proper") (citation omitted, emphasis in original); Bodett v. CoxCom, Inc., 366 F.3d 736, 740 n.3 (9th Cir. 2004) ("A party cannot create a dispute of fact by *simply* questioning the credibility of a witness.") (emphasis added).

controlled trials would have been *highly* material to *any* reasonable physician deciding whether to prescribe Neurontin to treat the corresponding condition.  See generally, K. Dickersin, MA, PhD, Reporting and other biases in studies of Neurontin for migraine, psychiatric/bipolar disorders, nociceptive pain, and neuropathic pain (Dkt. No. 1457, Ex. O); SOF ¶ 24. Accordingly, Defendants' misrepresentation or omission of the results of these studies in any promotional literature or other marketing effort gives rise to "a presumption, or at least an inference, of reliance," and this question of fact is for the jury to decide.  Tobacco II Cases, supra.

Defendants' attempt to rehabilitate the fraudulent bipolar "Dear Doctor" letter cannot be taken seriously.  First, without any support, and contrary to the record developed by Plaintiffs, Defendants contend that the bipolar "Dear Doctor" letters received by Drs. Arness and Ragothaman did not contain any false statements or fraudulent omissions.  This citation-less claim is absurd, as Plaintiffs have demonstrated that the "Dear Doctor" letter in question was false and misleading in its affirmative statements, and deceptive and misleading in its material omissions.  See SOF ¶¶ 98-99.  Because the letter made favorable statements about the use of Neurontin to treat bipolar and other mood disorders, the material omission of the Pande, Guille and Frye studies is sufficient to constitute fraud.[5]  Defendants' claim that they did not know about the negative results of the Frye and Guille studies at the time they disseminated the "Dear Doctor" letter (Reply at 6) has been disproven by Class Plaintiffs; the company knew the results of the Frye study in October 1998, well before sending "Dear Doctor" letters to either Dr.

---

[5] See In re Neurontin Marketing, Sales Practices, & Prods. Litig., 433 F. Supp. 2d 172, 184 (D. Mass. 2007) ("Plaintiffs have stated a claim with respect to *any theory* based on Defendant's misrepresentation of the results of scientific studies or *omission of existing negative studies*.") (emphasis added, citation omitted); Report & Recommendation (Dkt. No. 269) at 50 ("'half-truths, omissions, and non-disclosures are equally actionable'") (quoting Bonilla v. Volvo Car Corp., 150 F.3d 62, 70 (1st Cir. 1998)).

Ragothaman or Dr. Arness, and learned the results of the Guille study in May 1999, months before Dr. Arness received the letter.  See SOF ¶¶ 15-16, 98.

Finally, Defendants claim that the "Dear Doctor" letter received by Drs. Ragothaman and Arness was not false and misleading because a *subsequent* version of the letter, sent beginning in November 1999, did reference the negative Pande, Frye and Guille studies.[6]  However, there is no evidence that Drs. Ragothaman or Arness ever received the subsequent version of the letter.  See 21 U.S.C. § 360aaa-2 (requiring pharmaceutical manufacturers to maintain records of all written materials regarding off-label uses and the health care providers to whom they were disseminated); Fed. R. Evid. 803(7) ("[e]vidence that a matter is not included in" regularly kept business records admissible "to prove the nonoccurrence or nonexistence of the matter").  Drs. Ragothaman and Arness are typical in this regard, as the vast majority of physicians who received the false and misleading bipolar "Dear Doctor" letter never saw what Pfizer now claims was a "corrected" revision.  Compare SOF ¶ 98 with SOF ¶ 115.

With respect to Dr. Gray, Defendants argue that the only evidence he was influenced by their fraudulent marketing of Neurontin for bipolar is inadmissible hearsay. Defendants acknowledge, as they must, that the "sales representatives' purported statements to Dr. Gray were not hearsay . . . ."  Reply at 7.[7]  The repetition by Dr. Gray of the sales representatives' non-hearsay statements that they "were pleased with the off-label success of Neurontin for

---

[6] Plaintiffs do not concede that the November 1999 revision of the bipolar "Dear Doctor" letter removed all traces of fraud.  To the contrary, the revised letter still contained false and misleading statements.  See SOF ¶ 115. Defendants' admission that they did not seek to update their "Dear Doctor" letter until November 1999 with critical information concerning the results of the Pande, Frye and Guille studies, which began to become known to the company as far back as the first half of 1998, is a critical admission of fraud.

[7] See Fed. R. Evid. 801(d)(2)(D) ("A statement is not hearsay if . . .[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship"); Woodman v. Haemonetics Corp., 51 F.3d 1087, 1093-94 (1st Cir. 1995) (rule requires only "that the statement be shown to have been made by the employee at the instance of her employer").

people with bipolar disorder," had "seen amazing results," and that Dr. Gray "just needed to

titrate [Ms. Wityk] to a higher dose until [she] was receiving benefit," are not being offered for

the truth of the matters asserted, but only to establish that Dr. Gray was exposed to Defendants'

marketing practices and are therefore not hearsay under Rule 801(c).[8]

Finally, Defendants credit Dr. Rogers' testimony that he began prescribing Neurontin off-

label during his internship and military service, before speaking with a sales representative.

Defendants acknowledge that there are no records of any such prescriptions, and offer only

conjecture as to the reasons.  See Reply at 9.  At most, this presents a factual issue that should

not be resolved on summary judgment.  See Fed. R. Evid. 803(7) ("[e]vidence that a matter is not

---

[8] See, e.g., Calmat Co. v. U.S. Dept. of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay."); Essex Ins. Co. v. Fidelity & Guar. Ins. Underwriters, Inc., 2008 WL 2497700, at *5 (6th Cir. Jun. 23, 2008) (statement is not hearsay if being offered "merely to establish that he said those words"); Young v. Lincoln Nat. Corp., 937 F.Supp. 1326, 1335 (N.D. Ind. 1996) (overruling hearsay objection where statement is offered "simply for the fact that it was made, and not for the truth of the matter asserted therein").  It is also offered to show Dr. Gray's state of mind – his reasons for prescribing Neurontin and their relationship to Defendants' marketing.  As one treatise notes, "When a person's knowledge or state of mind is at issue, evidence that he or she has heard or read a statement may be relevant, and it lies beyond reach of a hearsay objection."  12A Fed. Proc., L. Ed. § 33:391 (2008) (citing Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist., 648 F.2d 761, (1st Cir. 1981), cert. granted, judgment vacated on other grounds, 454 U.S. 807, 102 S. Ct. 81, 70 L. Ed. 2d 76 (1981) (evidence of remarks made at meeting held admissible when not offered to prove truth of matters asserted therein, but rather to show that those present at meeting made or heard racially hostile remarks prior to voting for discriminatory actions).

Courts routinely apply these two exceptions – an admission by a party-opponent and the recognition that the statement is not offered for the truth of the matter stated – to find that a statement is admissible pursuant to Federal Rule of Evidence 805 (allowing multiple hearsay within hearsay to be admitted where each part of the statements conforms to an exception).  Admissions by party-opponents, while called non-hearsay in Rule 801, are treated as hearsay exceptions under a multiple hearsay analysis done pursuant to Rule 805.  See U.S. v. Ferber, 966 F. Supp. 90, 97 n.7 (D. Mass. 1997).

For example, in Kulick v. Pocono Downs Racing Ass'n, Inc., 816 F.2d 895 (3d Cir. 1987), the court found that a statement by a party opponent, relaying the statements of others, met Rule 805's requirements and would be admitted because it was, first, made by a party opponent and not hearsay under Rule 801(d)(2), and second, was being offered only to prove that the third parties had made the statement.  Id. at 897.  See also Fincher v. County of Westchester, 979 F. Supp. 989, 1005 (S.D.N.Y. 1997) (holding that records containing hearsay statements presented no multiple hearsay problem where the statements within the records were made by defendant officers and because they were relied on not for their truth, but to show that the statements were made); Glenn v. Scott Paper Co., 1993 WL 431161 (D.N.J. Oct. 20, 1993) (allowing a statement made by company employees and which passed through several levels under Rule 801(d)(2)(D) while noting that at one level the statement was nonhearsay under Rule 801(c) because it was offered to show that the statement was made).

included in" regularly kept business records admissible "to prove the nonoccurrence or nonexistence of the matter").

Moreover, Dr. Rogers' testimony that he prescribed Neurontin during his internship is simply not credible, as he completed his internship in 1984, 10 *years before Neurontin was even available to prescribe*.  See Rogers Depo. at 14 (Himmelstein Decl., Ex. B).  Given this demonstrable (and perfectly understandable) lapse in memory, a jury could infer that Dr. Rogers did *not* prescribe Neurontin during his military service for two reasons.  First, he served from 1989 to 1995, and Neurontin was unavailable for 5 of those 7 years.  Second, the records show that after entering private practice, he did not prescribe Neurontin until November 2002, *seven years* after leaving the military, but the *same month* that he was *first* detailed by a Pfizer sales representative.  See Chart Appx., Chart 3; see also SOF ¶ 467.[9]  In any event, even if Dr. Gray *did* prescribe Neurontin seven years earlier, his sudden resumption—and rapid escalation from $0 to over $4,500 a month in prescriptions—after being detailed on Neurontin by a Pfizer sales representative is more than sufficient to support a finding of causation.[10]

---

[9]Defendants claim that their Neurontin sales representatives were also responsible for detailing psychiatrists for a number of other drugs, including Aricept, an Alzheimer's medication, and Celexa, an antidepressant, and "[a]ccordingly, the mere presence in a psychiatrist's office of a sales representative carrying Neurontin is not even evidence of off-label promotion, let alone fraud."  Reply at 15.  This claim is based on the faulty memory of a single employee and overlooks the voluminous contemporaneous business records produced by Defendants in this litigation.

First, Defendants rely on the flawed memory of one of its marketing managers, Allison Fannon, who testified in her deposition that, to her knowledge, Parke-Davis began detailing psychiatrists in 1999 when Celexa began to be marketed.  Her testimony, however, is contradicted by the document, a Neurontin quarterly brand, marked as Exhibit 2 in her deposition, which clearly shows *Neurontin* details to psychiatrists as far back as 1997 and growing steeply in 1998, before Celexa was even approved by the FDA.

Second, there is no ambiguity about why the Defendants' sales representatives were standing in a psychiatrist's office—they were there to detail Neurontin.  Defendants have produced multiple databases, all of which state in their title that they contain records of Neurontin details.  For example, the "Neurontin CMS Sherlock S2.mdb" data file produced by Defendants contains entries for 166,198 Neurontin details on psychiatrists from January 1999 through January 2002 alone.

[10] Defendants dismiss as "inapposite cases holding that the jury is free to disregard a party's stated motive or intent," because, in those cases, "the party's state of mind is the ultimate issue," whereas in this case, "the non-party

In sum, Plaintiffs have submitted more than sufficient evidence for a jury to infer that the consumer plaintiffs' prescribing physicians were both exposed to and influenced by Defendants' misleading off-label promotion.  See Reply at 9 n.11 (acknowledging that "Plaintiffs are entitled to the benefit of reasonable inferences").

**B.**      **Plaintiffs Have Presented "Powerful" Evidence That the TPP Plaintiffs Were Damaged By Defendants' Fraudulent Off-Label Marketing**

Plaintiffs have presented what the Court itself previously described as "powerful" factual, *non*-expert evidence of causation, as well as Prof. Rosenthal's and Dr. Hartman's expert reports, which apply standard econometric modeling and statistical techniques to industry-standard datasets to estimate the cost to the TPPs of off-label Neurontin prescriptions for the conditions at issue attributable to Defendants' misleading off-label marketing campaigns.  Defendants complain that Dr. Conti's analyses do not constitute evidence of causation, because she "is not offering an opinion on causation."  Reply at 16.  That is because Dr. Conti's charts and calculations are not an *opinion* at all, they are *facts*, admissible under Federal Rule of Evidence 1006,[11] which the Court itself described as "pretty darn powerful," *non*-expert evidence of causation.[12]  See Chart Appx., Charts 6-10.

---

prescribing doctors' states of mind are not the gravamen of the consumer plaintiffs' claims."  Reply at 12.  This distinction is without legal significance.  In either case, the question is one of fact, to be determined based on the evidence, and the cases cited by Plaintiffs do not depend in any way on the party or non-party status of the witness.  In both PNH Corp. v. Hullquist Corp., 843 F.2d 586 (1st Cir. 1988) and Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970), the court found that circumstantial evidence raised sufficient doubts about the witnesses' stated version of events to make summary judgment inappropriate.  There is nothing peculiar about the testimony of parties as opposed to non- parties that changes this calculus.  See, e.g., 10B Wright & Miller, Fed. Prac. & Proc. Civ. § 2730 (3d ed. 2008) ("Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ—a function traditionally left to the jury – summary judgment often will be an inappropriate means of resolving an issue of this character.").

[11] "The contents of voluminous writings . . . may be presented in the form of a chart, summary, or calculation."  Fed. R. Evid. 1006.

[12]      THE COURT:  I agree with you that it's exponentially more difficult Consumer by Consumer, but when you deal with these big plans where you know -- in other words, Neurontin was marketed as the tenth largest-selling drug in the country or something.  I don't know if it still is, but it was at some point.  You market it based on statistics.  I mean, the spikes based on the off-label are off the chart.

As set forth in Class Plaintiffs' Motion for Reconsideration of Order Denying Renewed

Motion for Class Certification (Dkt. No. 1796), according to Defendants themselves, because

there was a "lack of scientific rationale" to believe that Neurontin would be effective in treating

bipolar and other mood disorders, Neurontin would continue to have a 0% share of the bipolar

market absent a promotional effort for that indication.  SOF ¶ 44, 47; Ex. 16 to Declaration of

Ilyas Rona in Opposition to Defendants' Motion for Summary Judgment ("Rona Decl.," Dkt.

No. 1761) at Pfizer_JMarino_0001278, 0001293.  This authoritative estimate of Neurontin's "but

for" market share, representing the collective, well-informed judgment of senior management at

the world's largest pharmaceutical company, is the mirror image of Prof. Rosenthal's conclusion

that 99% of Neurontin bipolar prescriptions occurred as a result of Defendants' off-label

marketing effort.  This evidence should be sufficient—even *without* Prof. Rosenthal's report—to

defeat summary judgment on this issue as to that indication.  At a minimum, this evidence

---

. . . It's hard for me to believe that on a third-party payor basis, you can't prove at least causation, that there was an injury. . . . [O]n a statistical basis, you market on a statistical basis, they buy it, they have so many covered lives; but I think the plaintiffs will be able to prove, if there's a fraud, a big "if," that there's been injury caused by a fraud.

MR. ROUHANDEH:  Well, your Honor, those spikes, those aren't statistical proof.  As a legal matter, as –

THE COURT:  It's pretty darn powerful.

MR. ROUHANDEH:  Well, anybody can make up a chart and say, before something happened, here's what the situation was, and after, and then sort of assume causation.  But as a legal matter –

THE COURT:  Excuse me, excuse me.  What if you have no sales, then a fraud, and then a thousand percent spike, that's no proof?

MR. ROUHANDEH:  Well, that's not legal proof, and it's not economic proof either.  It wouldn't be accepted by -- it shouldn't be accepted.

THE COURT:  *It's proof.*  You would say it's not enough.  *You know, it's called circumstantial evidence.*  I mean, you may say it's not enough, and maybe it needs Dr. Rosenthal to gild it and to rule out other things, like, you know, that some other drug didn't go off the market; thereby, you know, there isn't some other factor causing the fraud.  *It's proof.*  You would say it's not enough, so that's a good position for you to take, but *it is something*.

Apr. 16, 2008 Transcript at 27:5-28:20 (emphasis added).

provides independent evidentiary support for Prof. Rosenthal's conclusion.

Defendants argue that Prof. Rosenthal's assumption that all detailing to specialists other than neurologists was both off-label and fraudulent "is both irrelevant and unsupported."  Reply at 15.  However, the Court has already held otherwise, finding that Prof. Rosenthal's assumption that "all detailing to specialists other than neurologists was both off-label and fraudulent . . . *has validity, especially* as it might apply to the bipolar/mood disorder Subclass," because "no plausible, nonfraudulent reason existed for defendants to detail psychiatrists," since "defendants, at least by 1995, were aware that Neurontin . . . was no better than a placebo in treating bipolar/mood disorder . . . ."  May 13, 2008 Memorandum and Order (Dkt. No. 1780) at 42-43 (emphasis added).  Implicit in the Court's finding that Dr. Rosenthal's assumption has validity "especially" with respect to bipolar is that the assumption has validity for the other indications as well.  Indeed, Plaintiffs have put forward compelling evidence that Defendants were *equally* aware that Neurontin was ineffective to treat neuropathic and nociceptive pain, migraine and headache, and at doses in excess of 1800 mg per day at the start of each indication-specific class period, and the Court expressly *required* Plaintiffs to begin each class period following Defendants' receipt of a negative study.  While Defendants may contest these dates—as they are in denial on the issue of efficacy generally—by the Court's own logic, the receipt by Defendants of a negative study prior to the commencement of each class period is sufficient to validate Prof. Rosenthal's assumption.  With respect to each indication, Plaintiffs have provided more than sufficient evidence of this to defeat summary judgment.  See also id. at 37

As set forth in the pending motion for reconsideration, the Court's stated reason for rejecting Prof. Rosenthal's conclusion—"the absence of evidence of detailing of the [consumer plaintiffs'] doctors in this case" (id. at 41)—is undermined by evidence that was not considered

by the Court, presented in opposition to this summary judgment motion.  See Opposition at 1-8.

As further set forth in the pending motion for reconsideration, the Court's alternative reason for

rejecting Prof. Rosenthal's analysis—that physicians might prescribe Neurontin for the

indications at issue for reasons other than exposure to Defendants' fraudulent off-label

marketing—only makes sense where a physician has *some* reason to believe the drug is effective

for the indication.  See Motion for Reconsideration, Part III-C.  As no such information exists

*except* for the misleading information widely disseminated by Defendants, this criticism is

unfounded.[13]

## III.   PLAINTIFFS HAVE PROVEN THAT NEURONTIN IS INEFFECTIVE FOR THE RELEVANT OFF-LABEL USES

Plaintiffs have presented the results from the numerous double-blind placebo-controlled

randomized trials (DBRCT) studying Neurontin for the relevant off-label indications.  These

trials constitute the highest-quality *scientific* evidence available.  See SOF ¶ 24; see also

Reference Guide on Epidemiology in Reference Manual on Scientific Evidence (Fed. Judicial

Ctr. 2nd ed. 2000) at 338.  These trials demonstrate, repeatedly and without exception, that

Neurontin is ineffective (i.e., no more effective than placebo) for the relevant off-label

indications.  As this court has previously found, this fact alone is more than sufficient to create a

triable issue of fact as to whether Neurontin is ineffective.  See Opposition at 12 n.7.  There is

simply no valid legal or scientific argument that multiple, repeated, high-quality DBRCT, all of

which fail to show that Neurontin outperforms placebo, do not constitute evidence that Neurontin

is ineffective.  Nevertheless, Plaintiffs have presented additional evidence that Neurontin is

---

[13] Defendants appear to have abandoned their primary criticism of Dr. Rosenthal's model—that it uses expenditures on detailing as a proxy to measure the extent of Defendants' off-label marketing efforts—in light of the extremely high correlation coefficients between detailing and Defendants' other off-label marketing efforts, including CMEs, MILs, and distribution of misleading journal articles pursuant to Defendants' "publication strategy."  See Opposition at 30-31.

ineffective from qualified experts, the FDA, and Defendants themselves.  The totality of the evidence overwhelmingly establishes that Neurontin is an ineffective medication for *all* patients suffering from the indications at issue in this litigation.  At an absolute minimum, this evidence is adequate to withstand summary judgment.

Despite the mountain of evidence that Plaintiffs provided with their opposition, Defendants persist in arguing that there is no genuine issue of material fact as to whether Neurontin is ineffective.  By Defendants' logic, a drug company that fraudulently marketed a placebo as an active drug could obtain summary judgment because some patients "benefited" from the placebo effect, even though it would be indisputable that all patients received an ineffective drug.  Defendants' counsel continue to labor under a fundamental misconception that any drug can be demonstrated to be effective or ineffective in a single patient.[14]  Plaintiffs have relied on the highest-quality evidence, derived from clinical trials, expert meta-analysis and FDA review, all of which are capable of demonstrating whether or not Neurontin is effective. Defendants, instead, rely on vague assertions and claims of "benefit" and "positive change" in mythical patients.  In the absence of a DBRCT, such claims are irrelevant, since they cannot be distinguished from the placebo effect.  Whether or not Neurontin is effective for the off-label indications at issue is a *scientific* question that simply cannot be determined through anecdotes. As one of Plaintiffs' experts, Dr. Douglas McCrory, testified: "efficacy requires analyzing data between a treatment and control group, and looking at the aggregated data and statistics." McCrory Depo. (Himmelstein Decl., Exh. C) at 177.  Accordingly, one cannot "evaluate efficacy under that definition in an individual patient."  Id.  As Dr. McCrory explained:

---

[14] This is unsettling, given that they represent the world's largest drug manufacturer. Clinical trials demonstrate efficacy and clinical trials study groups of patients, not individuals. See SOF ¶ 24.

> [Y]ou use a medicine in a patient, you observe a response afterward, and
> the response may be better or worse.  But you don't have the certainty that
> there's a causal relationship between the medicine and the patient's
> response *in an individual case.  That's why we do controlled trials.*"

Id. 179-180 (emphasis added).  Whether or not Neurontin is effective for the off-label uses at issue can only be determined through analysis of clinical trial data, not through conjecture as to apparent "benefit" in an individual patient.  This litigation is not the appropriate venue for Defendants, or their attorneys, to take issue with the scientific method.

While Defendants repeat their mantra that "legitimate scientific evidence" undermines Plaintiffs' claim that Neurontin is ineffective (Reply at 4, 22 & n.19, 27, 28 & n.19, 31), they point to *no* such evidence that would contradict the results of the numerous DBRCTs demonstrating Neurontin's ineffectiveness, or that would provide a basis to claim that Neurontin was effective for any of the relevant off-label indications.  Rather, they distort Plaintiffs' experts' deposition testimony and reports (e.g., by citing the expert's mere identification of Defendants' misrepresentations as an endorsement of their substance).  Defendants also mischaracterize Plaintiffs' opposition as attempting to enforce the FDA's regulatory requirements on off-label prescribing.  Plaintiffs are not attempting to shift the burden onto Defendants to prove that Neurontin is effective; Defendants have already attempted to do that, and have failed, consistently.  Nor are Plaintiffs claiming that Neurontin is ineffective simply because it has not been proven effective.[15]  Rather, Plaintiffs proffer scientific evidence, qualified expert reports

---

[15] Although unnecessary in this case due to the overwhelming evidence that Neurontin is ineffective to treat the off-label conditions at issue, the Court should entertain an evidentiary presumption that in the absence of controlled trials establishing efficacy for a particular use, a drug should be *presumed* ineffective—i.e., the burden to prove efficacy should be shifted to the manufacturer, just as it is in the regulatory context.  The Supreme Court has endorsed the use of evidentiary presumptions supported by considerations of "fairness, public policy, and probability, as well as judicial economy."  U.S. Dep't. of Justice v. Landano, 508 U.S. 165, 174-75 (1993) (citation omitted).  The Court further noted that it has "recognized the propriety of judicially created presumptions under federal statutes that make no express provision for their use."  Id.  In this case, the FDA's standard for establishing efficacy, the universally accepted scientific standard, and the legal standard are one and the same.  See Expert

and analyses, the FDA's reviews, rejections and comments, and Defendants' own admissions as

evidence that Neurontin has been proven to be, at best, no more effective than placebo.

Defendants' distortions of Plaintiffs' experts' testimony and analyses do not undermine

the overwhelming scientific evidence that Neurontin is ineffective:

- Dr. Barkin in no way conceded that the study to which Defendants refer (Pfizer-sponsored protocol 945-291) demonstrated any "benefit" for specific patients.  Citing to the portion of the transcript where Dr. Barkin was asked to recite the false and misleading conclusion of this Pfizer-sponsored protocol as proof of such a concession is grossly misleading. Pfizer-sponsored protocol 945-291 was negative.  See SOF ¶ 18.  As Dr. Barkin wrote in his report, the published article falsely presented the negative results as positive, a conclusion shared by both Dr. John Abramson and Dr. Kay Dickersin.  See SOF ¶¶166-170.

- Defendants use of the word "trend," with regards to the expert work of Dr. McCrory, is misleading.  As Dr. McCrory explains, and as the scientific method demands, the evidence he reviewed, and the statistical tests he performed, were insufficient to reject the "null hypothesis" that Neurontin is no more effective than placebo, thus his conclusion that Neurontin is ineffective.[16]  See Ex. 481 to Rona Decl.  Moreover, Dr. McCrory testified that he does not "think that the data demonstrates that gabapentin is an effective agent for migraine prophylaxis in *any* patients."  See McCrory Depo. at 175 (emphasis added).[17]

---

Report of David A. Kessler, M.D. (Dkt. No. 1450, Exh. J); Reference Guide on Epidemiology in Reference Manual on Scientific Evidence (Fed. Judicial Ctr. 2nd ed. 2000).  This standard is necessary for the protection of the public health.  Accordingly, fairness and public policy justify placing the burden to establish efficacy on manufacturers who market their products for unapproved uses.

[16] Dr. McCrory employed the standard methods and principles necessary for this type of analysis or any scientific experiment.  *See* Reference Guide on Statistics in Reference Manual on Scientific Evidence (Fed. Judicial Ctr. 2nd ed. 2000) at 123.

[17] Defendants argue that the Court should disregard the brief declarations submitted by Drs. McCrory and Alldredge in opposition to summary judgment as expressing new or contradictory expert opinions.  On the contrary, both declarations are fully consistent with, and fall squarely within the contours of, the corresponding reports opining that the best available evidence demonstrates that Neurontin is ineffective for the conditions at issue.  See Messick v. Horizon Ind., Inc., 62 F.3d 1227, 1231 (9th Cir. 1995) (in opposing summary judgment, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition"); Affidavit of Douglas C. McCrory, MDS, MHS (Dkt. No. 1757) ¶ 2 (Defendants' "memorandum mischaracterizes my opinion regarding the question of whether Neurontin is ineffective for migraine and headache by taking several quotations from my deposition testimony out of context"); Declaration of Brian K. Alldredge, Pharm.D. in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1762) ¶ 2 ("Selected statements made by me during my deposition . . . were based on my clinical experience and I believe that these statements could lead one to misinterpret my expert opinion regarding the dose-response relationship for Neurontin.").

- Defendants' anecdote that Dr. McCrory has prescribed Neurontin for neuropathic pain is no more relevant than the anecdote that he stopped taking Neurontin for his back pain "because of side effects and lack of efficacy." McCrory Depo. at 129:17-18. Whether or not Neurontin is effective for the off-label indications at issue in this case is a *scientific* question, not to be answered with anecdotes.

- Defendants improperly characterize the conclusions of Dr. Jewell. In the trial that Dr. Nicholas Jewell analyzed (Defendants' protocol 945-210), the declared endpoint was mean pain score change from baseline. See Ex. 156 to Rona Decl. at 14. Protocol 945-210 "provides no basis of any clinical efficacy of gabapentin over placebo in reducing pain." See SOF ¶ 215. Elevating secondary endpoints or *post hoc* analyses, over negative primary endpoints, was a common false and misleading marketing tactic of Defendants. See generally Ex. 117 to Rona Decl. (Expert Report of Kay Dickersin).

- Defendants mischaracterize and misreport the testimony and findings of Dr. Perry. Dr. Perry found that "Neurontin is not an effective drug for the treatment of Neuropathic pain" and has "at best a clinically insignificant average effect on pain scores" that is "essentially clinically meaningless." See SOF ¶ 238. Dr. Perry only conceded that in the case of "mild postherpetic neuralgia [an FDA-approved use of Neurontin], it could be reasonable to try [Neurontin] briefly." Perry Depo. at 339. Using a recent patient of his with a bad *staphylococcal* infection impinging on nerve roots resulting in neuropathic pain as an example, Dr. Perry testified in his deposition: "[i]f somebody proposed to try gabapentin on them and said 'let's titrate it up to a reasonable dose,' I would think they're absolutely crazy or terribly misinformed and completely unethical to leave a patient suffering that way." Id. Defendants also claim that Dr. Perry admits that some patients would obtain a "meaningful response" from Neurontin, misleadingly suggesting that it is Dr. Perry's opinion that this has been demonstrated through clinical trials. This is not the case. In fact, Dr. Perry explicitly prefaced the portion of his comment quoted by Defendants by limiting it to a "real world setting," where some number of patients will likely *appear* to benefit from any treatment, even if just from the placebo effect. Perry Depo. at 280. Dr. Perry explicitly warns in his report that such observations are "unreliable" in "modern medical science." For this reason, Dr. Perry's opinions are based entirely on the evidence from DBRCT, and expressly exclude any anecdotal observations that Dr. Perry, or any other physician, may have formed. See Expert Report of Dr. Perry (attached as Ex. 163 to Rona Decl.) at 5-6.

- Dr. Alldredge's opinion is that the "highest quality evidence failed to establish a dose-related effect" (i.e., continued improvement in efficacy) at dosages above 1800 mg/day, an assertion supported by FDA rulings. See SOF ¶¶ 582, 575-578. Individual observations, especially those based on

an incomplete scientific record, do not undermine the findings from the
highest-quality scientific evidence.  <u>See</u> SOF ¶ 24; <u>see also</u> Ex. 553 to
Rona Decl. at ¶¶ 3-4.

Even if any of the above mischaracterizations of testimony were accurate, given the
totality of evidence that Plaintiffs' have amassed that Neurontin is ineffective, including most
importantly the *non*-testimonial evidence, there would still be a genuine issue of material fact as
to whether Neurontin is ineffective for each of the off-label uses at issue.

## IV.   PLAINTIFFS HAVE PRESENTED COMPELLING EVIDENCE OF SCIENTER

Defendants argue that "the legitimate scientific evidence of Neurontin's efficacy for the
relevant off-label uses precludes Plaintiffs' assumption that every representation about efficacy
is inherently misleading."  Reply at 31.  As set forth above, *there is no such evidence*.  Indeed,
the Court has already held, with respect to bipolar, that *any* effort to encourage the use of
Neurontin was necessarily fraudulent, because "defendants, at least by 1995, were aware that
Neurontin . . . was no better than a placebo in treating bipolar/mood disorder . . . ."  May 13,
2009 Memorandum and Order (Dkt. No. 1780), at 42-43.

Defendants further argue that "doctors' accurate accounts at presentations regarding their
positive experiences prescribing Neurontin are not misleading because they do not represent that
Neurontin has been proven effective or that all patients will benefit. Information purportedly
showing that other patients did not derive a benefit does not 'contradict [these doctors'] apparent
results.'"  Reply at 31-32 (quoting Report & Recommendation at 50).  That is both true and
irrelevant, as far as competing anecdotes are concerned.  As set forth above, individual case
reports—both positive and negative—are not scientific evidence of efficacy.  However, a
negative DBRCT for the indication—of which there were many—*does* flatly "contradict [these
doctors'] apparent results," and renders their presentation misleading, without an accurate (and
equally prominent) disclosure of the negative results of the DBRCTs.  Defendants' argument that

"Plaintiffs cannot even show materiality" of the omitted DBRCTs further displays a genuinely disturbing ignorance of the scientific method on the part of the world's largest pharmaceutical company.

As set forth in Plaintiffs' opposition, with respect to bipolar, Plaintiffs have also presented compelling *direct* evidence of Defendants' specific intent to defraud.  At a March 2000 meeting of the psychiatrist-speakers that Defendants trained and paid to recommend Neurontin to their colleagues, one speaker complained that they were being forced to "get up in front of clinicians and say, look, trust us that these things do work" based almost entirely on "letters to the editor or open case series," in the absence of positive DBRCTs, which he described as "the data we would consider gold standard."  See Opposition at 38 n.37.  This meeting took place long after Defendants became aware of the negative results of *several* DBRCTs for bipolar, the last of them in May 1999.  See SOF ¶¶ 14-16.  Defendants cannot insulate themselves from liability by withholding (or misrepresenting) this *most* material, "gold standard" evidence from its paid speakers.  See Opposition at 38 n.36 (citing authorities).

## V.       THE TPP PLAINTIFFS' INJURIES ARE NOT DERIVATIVE OF THEIR INSUREDS'

Defendants repeat their argument that the TPPs' injuries are too remote to permit recovery because they are derivative of the injuries of their insureds.  As set forth in Plaintiffs' opposition, the Court has already expressly rejected this argument, finding it "without merit," and holding that "the harm alleged by Defendants' alleged actions is visited directly upon the end-payor Plaintiffs . . . ."  See Opposition at 39-40 (quoting Report & Recommendation at 20).  Defendants simply ignore this law of the case.[18]

---

[18] Although unnecessary to the Court's conclusion, Plaintiffs stand by their characterization of the cases relied upon by Defendants as sounding primarily in personal injury, despite passing references to the cost of the drug or device

Dated: June 18, 2009                              Respectfully Submitted,

By:      /s/ Thomas Greene
         Thomas Greene
         Greene & Hoffman
         33 Broad Street, 5th Floor
         Boston, MA 02109

By:      /s/ Barry Himmelstein
         Barry Himmelstein
         Lieff Cabraser Heimann &
         Bernstein, LLP
         Embarcadero Center West
         275 Battery Street, 30th Floor
         San Francisco, CA 94111-3339

By:      /s/ Thomas M. Sobol
         Thomas M. Sobol
         Hagens Berman Sobol Shapiro LLP
         One Main Street, 4th Floor
         Cambridge, MA  02142
         Boston, MA 02110

By:      /s/ Don Barrett
         Don Barrett
         Barrett Law Office
         404 Court Square North
         P.O. Box 987
         Lexington, MS 39095

By:      /s/ Daniel Becnel
         Daniel Becnel, Jr.
         Law Offices of Daniel Becnel, Jr.
         106 W. Seventh Street
         P.O. Drawer H
         Reserve, LA 70084

By:      /s/ James Dugan
         James Dugan

---

at issue.  See Opposition at 40 n.39.  The remainder of Section V of Defendants' reply brief is devoted to theories of recovery advanced by only the Coordinated Plaintiffs (Aetna, Guardian, and Kaiser) relating to formulary placement and the availability of "cheaper and more optimal" medications.  Accordingly, it is unnecessary for Class Plaintiffs to respond to these arguments.

Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

***Members of the Class Plaintiffs'
Steering Committee***