# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4    IN RE:                                     )
      NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
 5    AND PRODUCTS LIABILITY LITIGATION     ) Pages 107 - 360
 6
 7
 8
                       DAUBERT HEARING - DAY TWO
 9
                 BEFORE THE HONORABLE PATTI B. SARIS
10                    UNITED STATES DISTRICT JUDGE
                                 and
11                     JUSTICE MARCY S. FRIEDMAN
                         NEW YORK SUPREME COURT
12
13
14
15
                                  United States District Court
16                                1 Courthouse Way, Courtroom 19
                                  Boston, Massachusetts
17                                June 20, 2008, 9:10 a.m.
18
19
20
21
22
                             LEE A. MARZILLI
23                        OFFICIAL COURT REPORTER
                         United States District Court
24                      1 Courthouse Way, Room 3205
                             Boston, MA  02210
25                            (617)345-6787
```

Page 312

1  that gets answered. Rate ratio is a person-time analysis.
2      JUDGE SARIS: So you're testifying.
3      JUSTICE FRIEDMAN: I didn't think that I had asked
4  that. I thought I asked that odds ratio and risk ratio.
5      MS. McGRODER: Do you want to talk about what's on
6  Page 28?
7      JUSTICE FRIEDMAN: I don't know.
8      MS. McGRODER: Okay, I don't think you need to. I
9  mean, I think we can go on.
10 Q. What I'd like you to do really briefly, Dr. Gibbons, is
11 go back to this chart, but really quickly, can you explain to
12 the Court, on these what aren't really called tree plots --
13 what are they called?
14 A. They're called forest plots.
15 Q. Yes, on these forest plots, how do you read this?
16 Because I think this is really helpful. Can you see this?
17     JUDGE SARIS: What chart are you holding up?
18     MS. McGRODER: This is the odds ratio chart which
19 is on Page 24, just so you have a sense of how to read this
20 graph.
21 A. The centerline is the value 1, which indicates no
22 difference between placebo and active treatment. The
23 horizontal lines reflect the confidence intervals. If the
24 confidence interval includes the value 1, it is not
25 statistically significant. If you take a look at this chart

Page 313

1  and then the little squares, the filled-in squares, those are
2  the point estimates of what the odds ratio is. If you look
3  at this chart, you see that there are two drugs that are
4  statistically significantly associated with suicidality.
5  They are lamotrigine and topiramate.
6  Q. And how can you tell? How can you tell by looking at
7  that?
8  A. Because the entire confidence interval is greater than
9  1. It doesn't include 1. So the hypothesis of no difference
10 is the value of an odds ratio of 1. And if the lower
11 confidence limit is larger than 1, it means that there is
12 statistically significant risk associated with that drug
13 relative to placebo.
14 Q. So drugs that are on this side of the 1 and their
15 confidence interval doesn't cross back over the 1, those are
16 statistically significant, and you can tell it by reading the
17 confidence interval; is that right?
18 A. That's correct. And you can see that for all of the
19 other drugs, the confidence intervals include 1.
20 Q. Now, let's go back to this bar graph based on Table 13
21 in the report.
22 A. What this graph shows you is that the majority of the
23 events of suicidality, suicidal thinking and suicide
24 behavior, occurred for two drugs, those same two drugs that
25 were the only two drugs that showed a significant effect,

Page 314

1  lamotrigine and topiramate.
2      JUDGE SARIS: Are either of those GABAergic drugs?
3      THE WITNESS: Topiramate is considered GABAergic.
4  It's also considered to be a member of every one of the other
5  classes, so topiramate was in every single one of those
6  subclass analyses.
7      MS. McGRODER: Jennifer, can you put up Slide 22.
8  A. As you can see, under "Sodium channel-blocking drugs"
9  topiramate is a member. Under "GABAergic drugs," topiramate
10 is a member. Under "carbonic and hydrase inhibitors,"
11 topiramate is a member. Topiramate and lamotrigine are
12 completely driving FDA's analysis.
13     JUDGE SARIS: If you were to exclude topiramate,
14 have you done the analysis about if you took the other
15 GABAergic drugs and you combined them?
16     THE WITNESS: Yes, I have. Slide 10 shows that
17 topiramate when viewed by itself has a statistically
18 significant odds ratio, indicating increased risk over
19 placebo of two and a half times.
20     MR. LONDON: May I interrupt. Please excuse me.
21     JUDGE SARIS: This is what you haven't seen before.
22     MR. FINKELSTEIN: This is the first time we've seen
23 this. We have no idea how he calculated it.
24     MR. LONDON: I want to be respectful, your Honor.
25     JUDGE SARIS: No, no, no, no, that's fair. That's

Page 315

1  fair. Take it off, take it off. It's not fair.
2      MR. LONDON: Not one thing he said today was in his
3  report.
4      MS. McGRODER: Well, your Honor --
5      MR. LONDON: Excuse me. May I finish? I know you
6  like to -- everything he has said today he has come in and
7  told you for the first time after reading the statistical
8  review. Nothing that was in the report you authorized him to
9  write has been said by him today. He has come in and given
10 his spin to the FDA's numbers, and we're hearing it for the
11 first time.
12     JUDGE SARIS: Is that correct?
13     MS. McGRODER: Well, your Honor, yes, it is
14 correct. They submitted the FDA statistical review to you as
15 soon as it came out last week, and every single one of their
16 experts who has been in here for the last day and a half has
17 used that FDA statistical review, including these very odds
18 ratio charts to support their opinions about causation in
19 this case. And so Dr. Gibbons got the review last week and
20 conducted his analysis on it. As I said, we'd be happy to
21 submit a supplemental report, but we thought your Honors
22 wanted to hear from the witness today what this meta-analysis
23 is about.
24     JUDGE SARIS: It's a little unfair. I can't expect
25 them to cross-examine him. They can't do it. That's unfair.

394

1  context for you.
2       You can start with page 83 -- I mean 81, where
3  they start talking about the main category that was
4  driving the difference in estimate between the two
5  subgroups, the table breaks down. You see all of this
6  type of information there on 81?
7  A.  Yes.  Would you like me to read it?
8  Q.  Well, I'm going to try to get the flow of it for
9  you.
10      I'll tell you what, we have an audio of it,
11 perhaps that will help your Honor if we boot up the
12 audio.  Audio and video.
13      MR. LANIER:  Okay.  Can we switch?
14      (Discussion off the record.)
15 Q.  Okay.  Sir, what I'm going to play for you is the
16 actual committee itself, the videotape with some of the
17 language where the statisticians are asked these
18 questions.  It's the framework that puts the answer into
19 perspective.  So I'd ask you to listen carefully and see
20 what you think.
21      (From videotape)  Again, before we have just a
22 general discussion, I'd like to give the
23 statisticians -- make sure we have them online about
24 this.  Are there issues related to the analyses that
25 were conducted or the other information that we heard at

395

1  the public comment time that would alter that in any
2  way, anything technical with the way the analyses were
3  done that you have issues with?
4       (New speaker)  I think I'm okay after the
5  discussion.  I think I concur with the analyses.  I put
6  more weight on the risk difference kinds of analyses.  I
7  think we've heard issues with regard to separating out
8  the suicidal categories into behavior versus ideation,
9  and I put a fair amount of weight on the behavioral
10 aspects.
11      (New speaker)  Dr. Lu?
12      (New speaker)  I don't have anything new to add.
13 I agree with the way it was done, and I focus more on
14 the risk differences.
15      (New speaker)  Dr. Leon?
16      (New speaker)  I agree with the analyses
17 wouldn't change.
18 MR. LANIER:
19 Q.  Were you aware of the testimony by the three
20 full-time bona fide statisticians, as the FDA called
21 them?
22 A.  Yes.
23      MR. LANIER:  Can we go back to the Elmo?
24      JUDGE SARIS:  Since you know these people,
25 having just looked at them, who are they?

396

1       THE WITNESS:  Well, Andy Leon is a professor of
2  psychiatry.
3       JUDGE SARIS:  Is he the first one that spoke?
4       THE WITNESS:  He's the last one who spoke.  He's
5  a professor of psychiatry at Cornell.  And has done some
6  work in psychiatric statistics.  I don't think he's ever
7  done anything in meta-analysis.
8       Skip Wilson, his name is Robert Wilson, I've
9  known him for a long time.  He's a clinical trial
10 specialist, good in analysis of data.  Doesn't have any
11 specialization in the area of meta-analysis.
12      The third person is a statistician who works in
13 the department of radiology.  I don't know him.
14      I don't think any of these people are experts in
15 meta-analysis.  I know that in my own experience working
16 on this committee we are given very little time to
17 review any of the data.  You know, I personally just
18 disagree with their conclusions based on the time that
19 I've had to look at the data.  I think there are some
20 problems.  I agree with their conclusion about the risk
21 differences being the primary method that should have
22 been used because it uses all of the data.  Again, in
23 the context of this case, that analysis shows very
24 clearly that there is no even signal for Neurontin.
25      MR. LANIER:  Okay.  Sir, could we go back to the

397

1  Elmo, please?
2  BY MR. LANIER:
3  Q.  So you take issue with -- by the way, are you sure
4  about the identity of those people?
5  A.  You mean Andy Leon and Skip Wilson and the other
6  person whose name I didn't remember who was in the
7  department of radiology?  I'm pretty sure.
8  Q.  Okay.
9       That's what preceded the FDA moderator saying,
10 "Again, the question is, given the information we have,
11 based on the analyses that we're presented personally,
12 are they valid?  Are there technical issues with the way
13 it was done that the statistical members of the
14 committee have an issue with?  And the answer to that
15 from what I'm hearing is 'no.'"
16      Your response to that now is, yes, but the
17 committee probably didn't have enough expertise to
18 properly answer the question or enough time to look at
19 the materials.  Is that what I'm hearing?
20 A.  What I'm saying is, the statisticians -- I think the
21 committee -- I think it was a sad day for statisticians
22 when the non-statistical members of the committee made
23 more on-target statistical comments about these data.
24 There were several --
25      JUDGE SARIS:  So who was the male asking the

PDF created with pdfFactory trial version www.pdffactory.com