EXHIBIT G

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Gibbons, Robert D PhD (Defense Expert)**
2/4/2009

233

1  incorporate intensity of treatment"?
2      A.. Yes. It's different.
3      Q.  How is it different?
4      A.  What I'm talking about here is we don't
5  know specifically what the dosage of medication
6  was.  We don't know whether or not a person
7  prescribed a 90-day supply of medication, actually
8  took the medication that they were supposed to
9  take.  Unlike the other studies, here we do know
10  the risk period and, in fact, by definition, by
11  design, we've set the risk period to be equal for
12  all people.  At least the period of observation is
13  equal for all people in both cohorts.
14      Q.  Okay.  Did the information in the
15  PHARMetrics database include nonprescription
16  treatment?
17      A.  Such as?
18      Q.  Psychotherapy?
19      A.  We did not have data on psychotherapy.
20      Q.  Did it include information on
21  environmental factors that contribute to either
22  suicide attempts or reduced suicide attempts such
23  as the emotional stressors that may or may not be
24  associated with an immediate decision to attempt

234

1  suicide?
2      A.  No, those kinds of data are not
3  available.
4      Q.  Fourth, patients were not randomized.
5  Would you explain that limitation to me, patients
6  were not randomized to treatment and there may be
7  other factors that play a significant role in the
8  process by which specific treatments are selected
9  for patients?
10      A.  One of the key findings in the paper is
11  that patients who ultimately are treated with an
12  antiepileptic drug have a much higher suicide
13  attempt rate prior to the initiation of treatment
14  than those patients who don't seek treatment.  So
15  there is a selection effect in which probably the
16  more severely ill patients seek treatment or are
17  treated by their physician relative to those that
18  don't seek treatment.
19      So in a randomized study, we would assume
20  that that kind of baseline difference, if you will,
21  wouldn't exist because each subject would be
22  equally likely to receive treatment or a relative
23  control.
24      Q.  And then of course last, you do say

235

1  straight up that this is statistical data, not
2  psychiatric interviews or other structured requests
3  and that's a limitation?
4      A.  With respect to the diagnoses.
5      Q.  Yes, sorry, with respect to the
6  diagnoses?
7      A.  Right..  We don't know that, you know, a
8  trained psychiatric interviewer did a detailed
9  psychiatric evaluation to give the diagnosis of
10  bipolar.
11      Q.  And each of these limitations apply to
12  the bipolar -- I'm sorry -- to the gabapentin study
13  that was done for the November 5th expert report?
14      A.  Yes.
15      Q.  I'm not sure if this is a limitation or
16  simply a question.  But did you have any
17  information such as the PHARMetrics database
18  information for the period before the year 2000?
19      A.  No.
20      Q.  All right.  Are there any other
21  limitations that apply that now occur to you or
22  have occurred to you since the time you released
23  the paper into the wild that you didn't know of at
24  that time?

236

1      MS. McGRODER:  Object to form.
2      THE WITNESS:  Not that I -- not that I
3  can think of right now.
4  BY MR. LONDON:
5      Q.  All right.  To whom have you submitted
6  the paper, publications or editors for
7  consideration?
8      MS. McGRODER:  Well, I object on the
9  basis of confidentiality if there is one and I
10  leave that to you.
11      THE WITNESS:  I don't -- I don't know
12  what the appropriate thing of how to deal with that
13  kind of information is.  I'm not uncomfortable
14  telling you that if you're not uncomfortable.
15      MS. McGRODER:  Fine with it if you are.
16      THE WITNESS:  I submitted the paper -- we
17  submitted the paper to the Journal of the American
18  Medical Association who felt that the paper was
19  best suited to their -- their journal the Archives
20  of General Psychiatry and they passed that paper
21  onto the Archives of General Psychiatry due to its
22  content.
23  BY MR. LONDON:
24      Q.  Is the -- what is the relationship

297

1  Q. Is it more than 100 hours?
2  A. It's probably more than 100 hours.
3  Q. Is it less than 500?
4  A. I don't really know.
5  Q. So somewhere between 100 and 1,000?
6  A. That's a guess.
7  Q. I'm just trying to get a ballpark idea
8  since we don't have the bills, we just don't
9  understand what the issues are. We're going to
10  discuss it in more detail later, but the SAS
11  programs that were created to do both analyses
12  associated with the cohorts, did you write those
13  SAS programs?
14  A. They were written primarily by Dr. Hur.
15  Q. Did you have any part in writing those
16  SAS programs?
17  A. I worked with him from time to time on
18  constructing the logic of the code.
19  Q. Did you ever do the editing of the
20  program yourself or did you just have discussions
21  with him and he did the editing?
22  A. We might work together in front of the
23  same computer and going through that and making
24  sure that the logic of the programs were doing what

298

1  was intended and then he would do the editing of
2  the programs.
3  Q. Did you ever work on the programs
4  independently of Dr. Hur?
5  A. No, I did not. Not on the SAS programs
6  if that's what you're referring to.
7  Q. That's what I was referring to, the SAS
8  programs. You said that Dr. Hur extracted the data
9  out of the SAS data sets and gave them to you for
10  you to perform some independent analyses, is that
11  correct?
12  A. Yes, it is.
13  Q. And I think you said he provided it to
14  you as an ASCII format?
15  A. Correct.
16  Q. Which is A-S-C-I-I, by the way, all
17  capitals. Didn't know if you knew it.
18  What tool did you use to analyze that
19  data?
20  A. Fortran.
21  Q. Did those -- do you have those fortran
22  programs?
23  A. I do.
24  Q. Did you turn those over to your counsel

299

1  as part of the materials asked for in this case?
2  A. No, I didn't. I only used those to
3  verify the analyses that were done in the SAS
4  programs which were what we relied upon.
5  Q. Were you able to do all of the analyses
6  including the Poisson modeling and everything like
7  that within the fortran programs?
8  A. No, I did everything up until the
9  preparation of the summary statistics that would go
10  into the Poisson regression. I could do that.
11  I've written those kinds of programs before, but I
12  figured relying on SAS to do those appropriately
13  was okay.
14  Q. A lot more than three lines of code in
15  SAS?
16  A. Even in APL.
17  Q. Did those fortran analyses produce any
18  output -- I want to say output. I mean did you
19  output the information to a data file or did it
20  just literally come up on the screen?
21  A. Both.
22  Q. Do you have the output data files that
23  you created?
24  A. I do.

300

1  MR. ALTMAN: Lori, as part of the stuff
2  that we'll ask for, we'll ask for those working
3  files.
4  Q. In your conduct of running your
5  independent verification analyses, did you ever
6  find a time that you had a difference between what
7  you saw and what Dr. Hur saw?
8  MS. McGRODER: Wait. Object just because
9  I don't know, are we talking about the gabapentin
10  cohort or the bipolar cohort?
11  MR. ALTMAN: All of it.
12  MS. McGRODER: Does your question relate
13  to both?
14  BY MR. ALTMAN:
15  Q. Relates to both. Wait, time out, strike
16  it. You got me confused.
17  But with respect to either cohort, yeah,
18  with respect to either cohort, did you ever find a
19  difference in your analysis from what Dr. Hur had
20  which caused you to call Dr. Hur and say hey,
21  something's not right, either I got something wrong
22  or you got something wrong?
23  A. Yes.
24  Q. Do you remember any of those

329

1   page four or five studies that say that there were
2   no placebo controls, correct?
3       A.  That's correct.
4       Q.  So in fact, there were non-placebo
5   controlled studies included in that number,
6   correct?
7       MS. McGRODER:  No, object to form and
8   foundation.  You know, I think you're asking him
9   questions outside of his expertise and so you may
10  answer if you can.  But I think if you're --
11      MR. ALTMAN:  No, no.  Let's --
12      MS. McGRODER:  -- very reasonable
13  document to understand what those tables are.
14      MR. ALTMAN:  Lori, your objection --
15  let's take a step back.
16      MS. McGRODER:  I mean there's methodology
17  in this that he may not know.
18      MR. ALTMAN:  Lori, please.
19      Q.  You represented that this is the document
20  -- this submission is what you reviewed in writing
21  your original declaration and expert report,
22  correct?
23      MS. McGRODER:  Objection.
24      THE WITNESS:  No.

330

1       MS. McGRODER:  Misstates his testimony.
2       THE WITNESS:  This is not -- this is not
3   the source of the data that I reviewed.  As I told
4   you before, I received something else.  I had asked
5   for all of the placebo controlled studies that were
6   submitted to FDA and I received a spreadsheet, an
7   Excel file that had all of those.  Now, the total
8   numbers that are in my report that I got from that
9   are consistent with the 5,194 and the 2,682 that
10  are listed in this table in this report.  I don't
11  know whether or not those numbers are consistent
12  with all of the numbers here and maybe perhaps this
13  was misrepresented to me.  But my understanding of
14  the data that I received were that these were all
15  of the placebo controlled studies.
16  BY MR. ALTMAN:
17      Q.  Well, I'd like to point you to page 4
18  where it says contents of submission.  I'm sorry,
19  page 4 of the letter.  If you look at the bottom it
20  says contents of submission.  Do you see that?
21      A.  I do.
22      Q.  As requested, we are herein forwarding
23  the following table and basic study design.  Did I
24  read that correctly?

331

1       A.  I believe so.
2       Q.  Table 2, screening and key exclusionary
3   criteria.  Did I read that correctly?
4       A.  Yes.
5       Q.  And a false positive table.  Did I read
6   that correctly?
7       A.  Correct.
8       Q.  What I just had you read is labeled page
9   -- Table 1, basic study design, correct?
10      A.  That's correct..
11      Q.  Okay.  So is there any question in your
12  mind that this is the table that Pfizer submitted
13  with the FDA when they did their submission on
14  June 22 of 2006?
15      MS. McGRODER:  Object to form and
16  foundation.  I don't think he knows that.
17      THE WITNESS:  I don't know what Pfizer
18  submitted and I don't know that this table reflects
19  the total sample size that are listed here.  We
20  could certainly go through it and add them up and
21  see whether that's the case and again, the
22  information that I requested were from double-blind
23  studies.
24      Now, if we assume as a hypothetical that

332

1   in fact, a small subset of these studies were low
2   dose studies and were not placebo controlled,
3   although they were randomized studies, then in the
4   analysis that FDA conducted, I would assume that
5   those studies would have been removed as they had
6   removed those studies that were in here that might
7   have been single dose studies since FDA's analysis
8   has smaller numbers of total subjects in both the
9   gabapentin and the placebo arms, but the same
10  number of suicidality events, namely two and one,
11  then I don't believe that these studies that while
12  randomized, appear not to have a placebo arm,
13  contributed any events to that analysis.  So I
14  don't think that the presence of these studies
15  would have changed my conclusions.
16  BY MR. ALTMAN:
17      Q.  That's not -- all right.  Let me ask a
18  different question..  Would it have been correct --
19  hypothetically assume that those numbers, the 5,194
20  includes the studies listed in the attachment
21  that's part of the submission to the FDA.  Would it
22  have been correct to include the non-placebo
23  controlled studies?
24      MS.. McGRODER:  Objection to form and

396

1     Section 4 at the top "Percentage of
2  Gabapentin and Pregabalin Data Contributing to the
3  FDA Meta-analysis."
4     Did I read that --
5     THE COURT REPORTER:  I'm sorry.  The Pre?
6     MR. ALTMAN:  Gabalin.  I don't know if you have
7  it.  P-r-e-g-a-b-a-l-i-n.
8     THE COURT REPORTER:  Finish.
9  BY MR. ALTMAN:
10    Q.  -- "Pregabalin Data Contributing to the
11 FDA Meta-analysis."
12    Did I read that correctly?
13    A.  Could you read that again.
14    Q.  "Percentage of Gabapentin and Pregabalin
15 Data Contributing to the FDA Meta-analysis."
16    Did I read that correctly?
17    A.  Yes, you did.
18    Q.  The next sentence says:  "The number of
19 patients included in the June 22, 2006 submission to
20 the FDA are compared with the total number of
21 patients analyzed by the FDA in Table 2 below."
22    Did I read that correctly?
23    A.  Yes, you did.
24    Q.  Exhibit 17 is that data June 22, 2006?

397

1     A.  It is.
2     Q.  So that appears to be the document they
3  are talking about here, correct?
4     A.  Unless they submitted another document on
5  that same day.
6     Q.  Do you know of any other document for
7  Neurontin on that day?
8     A.  I haven't seen any.
9     Q.  Okay.  If you take Exhibit 17 and flip to
10 I think it's the third page maybe.  It's the -- it's
11 the table -- maybe -- no, it might be on this --
12 yeah, that's the page.  I'm sorry, page 4.  Okay.
13    Do you see that in Table 2 under the --
14 on Exhibit 16 right over here (indicating), do you
15 see that for the line titled "Gabapentin" it says
16 "Drug-Treated 5194"; is that correct?
17    A.  That's correct.
18    Q.  And that's the same number you used in
19 your report, correct?
20    A.  That's correct.
21    Q.  And it says "Placebo-Treated 2682."
22    Did I read that correct?
23    A.  Yes.
24    Q.  And that's the same as what you wrote in

398

1  your report, correct?
2     A.  Yes.
3     Q.  And it says "Total 7876," correct?
4     A.  Correct.
5     Q.  And that's the same number you used in
6  your report, correct?
7     A.  Yes, it is.
8     Q.  Now, you are pretty definitive in your
9  report when you tried to calculate the percentages
10 of the other drugs by backing out the Neurontin and
11 the pregabalin data.
12    You didn't put in your report that that
13 was not -- you didn't really know how much of the
14 pregabalin or Neurontin data the FDA used, correct?
15    MS. McGRODER:  Object to form and foundation.
16 It's argumentative.
17 BY THE WITNESS:
18    A.  My report was designed to look at the
19 available data that I had at that time.  I had the
20 information that Pfizer had submitted data for 7,876
21 subjects who participated in randomized clinical
22 trials with either placebo or -- and/or a low-dose
23 comparator drug, and those were the data that were
24 submitted to the FDA, and I did my analysis assuming

399

1  that those data were used by FDA given that I had no
2  reason to assume that they had excluded any data or
3  not.
4     Subsequent to that, I learned that they,
5  in fact, excluded some of these data, and I used the
6  figures that the FDA had used in their analyses and
7  subsequent expert and will supplemental reports.
8  BY MR. ALTMAN:
9     Q.  Would you go back to page 18 of Exhibit
10 16.  I am going to hand you back Exhibit 24, and I
11 have got it open at page 2 of Exhibit 4.  We only
12 have one -- this is the only copy we have.
13    MS. McGRODER:  Okay.  Thank you.  Exhibit 24?
14 BY MR. ALTMAN:
15    Q.  24, I'm sorry.  And you see there's the
16 study 945077?
17    A.  Yes.
18    Q.  Do you see any -- we talked before about
19 the line items one meant active, two meant placebo,
20 three, and four.
21    Do you see a two there in your chart?
22    A.  No, there isn't a two for that study.
23    Q.  Okay.  And if you see on to page 18 of
24 Exhibits 16, you see that's one of the studies that

Gibbons, Robert D PhD (Defense Expert) 2/4/2009 9:16:00 AM

468

1  the diagnostic code which is in a code, and then
2  there's another file mapped on to that that tells
3  you the name of the drug.
4    Q.  Okay.  And I think there's another file
5  for procedure codes which was not used in this
6  dataset, correct?
7    A.  Yeah, I think so, and I mean, there --
8  there were definitely more than four input files,
9  and those are all documented in the SAS files --
10    Q.  We are going to -- we are going to look
11  at that in a second.
12    Now, I'm curious why -- for the File 3,
13  the drug files, how come you didn't get all of the
14  drugs that those people were taking?
15    A.  For one, I think they would have, you
16  know, probably charged more; and, two, these were --
17  we wanted to define a priori which drugs we were
18  looking at.
19    We wanted to make sure that we could look
20  at the primary antiepileptic drugs, but at the same
21  time adjust for concomitant medication with other
22  anticonvulsants that were not a part of the 11 AEDs
23  or lithium, other antidepressants, and other
24  antipsychotic medications.

469

1    Q.  Are there other drugs that you can think
2  of that are used in treating psychiatric conditions
3  that are not an antidepressant, an antipsychotic, or
4  an anticonvulsant?
5    And by the way, you didn't get all
6  antipsychotics.  You only got atypical
7  antipsychotics, correct?
8    A.  I believe so.  These lists were compiled,
9  you know, in part based on our work with the VA
10  sample and consulting with the VA pharmacy people,
11  and then during that time, we also -- there were,
12  you know, lists were reviewed by Dr. Mann and lists
13  were reviewed -- we got with Rob Valuck's group, a
14  pharmacoepidemiologist, a couple of
15  pharmacoepidemiologists at the university.
16    These were lists that were compiled prior
17  to this work, and we used those lists here.
18    Q.  I'm curious.  Xanax is often used in
19  treating manic people or bipolar people, correct?
20    A.  I don't -- I'm not an expect on that.  I
21  know that Xanax is an anxiolytic with also, you
22  know, antidepressant qualities and properties, and
23  it -- I think it's used as an antidepressant.  I'm
24  not sure, you know, to the extent that it's used in

470

1  treating bipolar illness.
2    Q.  Do you know if Xanax was --
3    MS. McGRODER:  Bless you.
4  BY MR. ALTMAN:
5    Q.  Do you know if Xanax or other similar
6  drugs were included in your extract here?
7    A.  I would have to take a look and see if it
8  was.  I don't know the answer to that off the top of
9  my head.
10    Q.  If Xanax was not included, and I will
11  represent to you it's not.  I have looked.
12    A.  Okay.
13    Q.  Could that potentially bias the results
14  because there's a drug that's -- you know, that may
15  be used as an antidepressant that you are not able
16  to -- strike that.
17    How would you know that Xanax wasn't
18  prescribed to people in -- concomitantly with an
19  antiepileptic, and that the Xanax had the majority
20  or some influence over any potential efficacy of the
21  drug?
22    MS. McGRODER:  Object to form and foundation.
23  BY THE WITNESS:
24    A.  Obviously if Xanax is not a part of --

471

1  of, you know, the database and isn't used as a
2  covariate or as an exclusion in our -- in our
3  monotherapy or no drug conditions, then, you know,
4  potentially it could be used by somebody, and it
5  wouldn't be a part of our analysis.
6    In these kinds of analyses, you try to do
7  the very best you can with the available data.  You
8  don't always get every single different drug that
9  could be taken, and -- and there may be drugs that
10  are used concomitantly that -- that, you know, just
11  at that point in time, you just didn't know about.
12    We tried to cast a pretty wide net, and I
13  think we did a very good job in terms of looking at
14  a wide variety of different drugs that could be
15  taken as a concomitant therapy.
16    I will note that the results of both of
17  the studies are very, very similar whether you
18  adjust for concomitant therapy or not.
19    Q.  Understood.  But that would be a
20  limitation of your study that you don't know all the
21  drugs that these people were taking, correct?
22    MS. McGRODER:  Object to form.  Are you talking
23  now about the bipolar study or the gabapentin study?
24    MR. ALTMAN:  Either one.  He didn't buy the

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)        Page  468 - 471

496

1   BY MR. ALTMAN:
2       Q.   And on January 8th you show the same --
3   you show an event with the same code, correct?
4       MS. McGRODER:   Object to form.
5   BY THE WITNESS:
6       A.   That's correct.
7   BY MR. ALTMAN:
8       Q.   And January 9th you see the same event,
9   correct?
10      A.   Yes.
11      Q.   Do you have -- does this appear to be an
12  individual who attempted suicide five times on five
13  consecutive days and received treatment on each
14  one -- each day, was then released, and tried it
15  again?
16      A.   I don't know from what's given here
17  whether that's the case or not.
18      Q.   Okay. But do you have any feeling, any
19  opinion, any idea?
20      MS. McGRODER:   You are asking him for his
21  feelings. I object to that part. If you ask him
22  for his opinions.
23  BY MR. ALTMAN:
24      Q.   I'm asking for your opinion. Do you have

497

1   an opinion?
2       A.   I think this is a very unusual case, and
3   I don't know if these represent five separate
4   suicide attempts or one suicide attempt that's coded
5   five times in a row. This is a person who has made,
6   you know, several different suicide attempts at
7   different points in time.
8       Q.   And we see it's not the only -- it's not
9   the only instance where there are events on multiple
10  consecutive days, correct?
11      A.   That's correct.
12      Q.   Okay. How did you deal with this
13  individual in your studies? Would you have counted
14  each one of these as a separate attempt?
15      A.   I would have to go back and double-check.
16  In analyses that looked at -- that allowed patients
17  to have multiple attempts, they may have been. I
18  would have to double-check.
19      Q.   Okay. We're -- we will do that -- we
20  will do that probably after lunch.
21      A.   Okay.
22      Q.   Now, there also appears to be on the
23  second -- the first and second and the third and
24  fourth lines, they appear to be not only consecutive

498

1   days, but they appear to be consecutive -- they
2   appear to be multiple events on the same day,
3   correct?
4       If you see the first two items, the dates
5   are May the 2nd of 2006. One of them is suicide by
6   medicinals, and the other one is suicide by
7   tranquilizers, correct?
8       A.   That's correct.
9       Q.   Okay. Would you have considered that to
10  be two separate attempts when you did your analysis?
11      A.   Well, I think it's important to realize
12  that the -- you know, these analyses were done in a
13  variety of ways. There were sensitivity analyses as
14  well that have been performed to look at including
15  time to the events.
16      So where the analysis looked at just the
17  first of any suicide event and didn't do multiple
18  events in that analysis, the results of which were
19  quite similar. So, you know, I don't think we would
20  have used those two events on the same day as two
21  separate events.
22      Q.   Okay. That's fine. But we are not sure
23  whether you would have counted events on consecutive
24  days as distinct events or whether they would have

499

1   been one event?
2       A.   It is certainly possible in analyses that
3   looked at, you know, the total number of events that
4   a person made that they could have been counted as
5   five different events. I don't know. I would have
6   to go back and double-check. Certainly, a valid
7   question.
8       Q.   And you did not review any medical
9   records for these individuals, correct?
10      A.   I had no access to that kind of
11  information.
12      Q.   There are pharmaco -- are there
13  pharmacoepidemiological studies that are conducted
14  that also involve chart review?
15      A.   There may be some. Certainly, that's not
16  the kind of information you can get from PharMetrics
17  or medical claims databases.
18      Q.   Have you ever done such a study?
19      A.   No.
20      Q.   Okay.
21      MS. McGRODER:   Keith, are you at a good
22  stopping point?
23      MR. ALTMAN:   Let's go off the record for one
24  second.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

508

1  diagnosis and the first treatment of gabapentin,
2  there are 213 patient years for the 1229 people,
3  correct?
4      A.  That's correct.
5      Q.  And there are 1,016 patient years of
6  exposure to gabapentin, correct, after that?
7      MS. McGRODER:  Object to form.
8  BY THE WITNESS:
9      A.  There's 1,016 person years of
10  gabapentin – person years following the initiation
11  of gabapentin monotherapy with respect to the other
12  ten AEDs and lithium through the end of the what
13  turns out to be I believe 359-day follow up.
14  BY MR. ALTMAN:
15      Q.  And we talked about yesterday where you
16  used 359 and 360.
17      Within the precision of these kinds of
18  studies, that's not going to change results,
19  correct?
20      A.  I would agree with that.
21      Q.  Okay. I'm a little confused.
22      Are you saying there's a thousand six –
23  there's 1,016 patient years leftover or there's
24  1,016 patient years of gabapentin exposure in

509

1  these – we are only talking about these 1229
2  people, not any other people. So we don't have to
3  qualify everything.
4      The 1,016 person years, is that the
5  person years of exposure on gabapentin?
6      A.  That's the person years of exposure after
7  the first initiation of gabapentin. So it's not the
8  amount of exposure to gabapentin in terms of, you
9  know, number of pills prescribed or anything. It's
10  the number of person years following the initiation
11  of gabapentin monotherapy.
12      That person could have been on gabapentin
13  or could have been prescribed gabapentin for one day
14  or 30 days or continuously throughout that same
15  period, and in this analysis that would be treated
16  all equally.
17      Q.  Why would you treat that all equally?
18      A.  Because the – and, again, we have done
19  sensitivity analyses that look at it in different
20  ways, but the primary analysis here was comparing
21  the risk of suicide attempt before and after the
22  initial exposure to a particular antiepileptic drug
23  knowing that there may be a very short period of
24  time after the initiation of treatment and some kind

510

1  of suicidal behavior.
2      So requiring, for example, 30 days of
3  exposure. If there was a suicide attempt prior to
4  30 days, that wouldn't be counted. So we wanted to
5  cast the widest net and indicate any exposure to the
6  drug followed up by a suicide attempt irrespective
7  of the length of that exposure.
8      Sensitivity analyses we have also looked
9  at the density of the exposure, whether or not you
10  have been on gabapentin, you know, from month to
11  month, and how does that relate to the likelihood of
12  a suicide attempt using the number of pills data,
13  but for this analysis, it's before and after the
14  initial exposure.
15      Q.  You say you did that sensitivity
16  analysis?
17      A.  Yes.
18      Q.  Where is it?
19      A.  I, you know, have it around someplace.
20      MR. ALTMAN:  Okay. I asked that that be
21  produced.
22      MR. LONDON:  To be – to be clear – I'm
23  sorry – the sensitivity analysis is not in the
24  manuscript?

511

1      THE WITNESS:  No, it's not at this point.
2  I've – I mean, I have continued to – for academic
3  purposes and for the purpose of preparing – you
4  know, anticipating requested revisions to this
5  manuscript for publication, that there will be a
6  series of other issues raised, and some of those
7  issues have been raised to questions when I
8  presented this.
9      I had some really good questions when I
10  presented this at Harvard, so I have been
11  interested in pursuing this, not so much in the
12  context of this litigation, but in the context of
13  this paper and in the context of proposing these –
14  this methodology for other applications.
15      MR. LONDON:  I apologize for the interjection
16  and clarification. Thank you. Thank you, Lori, for
17  letting me do that.
18  BY MR. ALTMAN:
19      Q.  So on this line over here, you have 13
20  attempts before – you have 13 attempts before – in
21  the period between the date of bipolar diagnosis and
22  the initiation of therapy, and then 13 attempts
23  after that, correct?
24      A.  That's correct.

524

1  you know, just saying, oh, I found something kind of
2  cool, but that work is -- you know, it's -- I
3  haven't really envisioned that work as really, you
4  know, that's been designed for this paper.  That's
5  been more academic work.
6      Q.   But if there was -- but there could be a
7  sensitivity analysis that could show -- throw
8  question at the -- the validity of the results here,
9  correct?
10      A.   There could be.  I mean, that's the whole
11  idea.  The important thing to note in all of this
12  stuff, and I think that, you know, in some way
13  Pfizer should be credited for it.  These analyses
14  there's no predetermination of how they would come
15  out.  These analyses could have come out in a way
16  that Pfizer probably would not have wanted to use me
17  as an expert witness in these cases.
18      Q.   By the way, there was no indication for
19  the drug that this -- any particular drug was given
20  for any particular condition, correct?
21      MS. McGRODER:  Object.  In the bipolar?
22      BY MR. ALTMAN:
23      Q.   In either one of the cohorts.  I mean,
24  there was no -- you didn't know why that person got

525

1  that particular prescription, correct?
2      A.   That's correct, and it's a good point.
3  In -- in the -- in my expert report one of the
4  things -- I think it's in Table 1 -- shows the
5  co-morbidities of people who might have had bipolar
6  illness with did they also have a pain disorder, did
7  they also have epilepsy, and it shows those
8  co-morbidities.
9          It's unclear to me whether or not a
10  patient receiving gabapentin who had bipolar maybe
11  70 percent of those people also had pain.  The
12  gabapentin may have been prescribed for the pain and
13  not for the bipolar, and you are correct.  I don't
14  have a way of knowing which indication it was
15  prescribed for.
16      Q.   And when we look at Table 1 in your
17  paper, which you might want to flip to, you show
18  a -- you show a reduction in the rate before and
19  after treatment, correct?  For -- just looking at
20  the gabapentin, the top line, correct?
21      MS. McGRODER:  I'm sorry.  Did you say weight?
22      MR. ALTMAN:  Rate.
23      MS. McGRODER:  Oh, rate.  Okay.  Thank you.
24

526

1  BY MR. ALTMAN:
2      Q.   Is that correct?
3      A.   That's correct.
4      Q.   You don't know that those people did not
5  get -- first of all, you don't know that those
6  people got the gabapentin for bipolar disorder,
7  correct?
8      A.   I have just testified to that.
9      Q.   You also don't know whether they were
10  taking gabapentin before they were diagnosed with
11  bipolar disorder, correct?
12      A.   There are patients that may have been
13  taking -- may have been prescribed gabapentin prior
14  to the index date.
15      Q.   You also don't know that they might not
16  have received a prescription specifically for
17  treating the bipolar disorder.  That is not one of
18  the ones that represented your three classes of
19  drugs you purchased, correct?
20      MS. McGRODER:  Object to form.
21      BY THE WITNESS:
22      A.   I didn't follow the question.
23      BY MR. ALTMAN:
24      Q.   You didn't buy all the drugs -- you

527

1  didn't get all the drugs that a person was taking.
2  You got a subset for which you selected upfront,
3  correct?
4      A.   That's correct.  I got the drugs that
5  were of interest, you know, for this.  They may have
6  received other medications.
7      Q.   So you don't know, for example, that some
8  of these people may have gotten Xanax -- I think we
9  talked about this earlier -- may have gotten Xanax
10  for the bipolar disorder, and that's why they were
11  prescribed Xanax, and that led to the decrease in
12  the rate, correct?
13      MS. McGRODER:  Objection, asked and answered.
14  BY THE WITNESS:
15      A.   As we discussed before, if there's a drug
16  that's relevant to this and I don't have it in the
17  database, then I can't say, you know, that it was
18  not relevant or that was the reason the person was
19  prescribed the medication.
20  BY MR. ALTMAN:
21      Q.   And you are not qualified to decide what
22  drugs would be relevant in the treatment of bipolar
23  disorder, correct?
24      MS. McGRODER:  Object to form.

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

576

1  are also withdrawal effects from going off of a drug
2  that there may be associations with withdrawing from
3  a medication in terms of the likelihood of a suicide
4  attempt.
5       And I also know that these are medical
6  claims data, and the information I have is the time
7  of the prescription, and just because the drug was
8  prescribed on a particular date doesn't necessarily
9  mean that the person took it on that date. They may
10  have actually started taking it two weeks later or
11  something like that.
12      The data are coarse in that -- in that
13  respect. So the most conservative approach to these
14  kinds of analyses is to identify the time of the
15  exposure and compare rates before and after that
16  exposure.
17 BY MR. ALTMAN:
18      Q.   You do -- the data provided to you by
19  PharMetrics did include how many days of
20  prescription a patient was given, correct?
21      A.   That's correct.
22      Q.   Do you think it would have been difficult
23  for you to have assessed each suicide event and
24  determined whether the person was on or off the drug

577

1  at that point in time?
2       A.   I did an analysis like that as a
3  sensitivity analysis, as I described before, of
4  looking at the exposure as a time varying monthly
5  covariate. Was the person on gabapentin in this
6  particular month, this month, or this month and was
7  the taking of gabapentin on that particular month or
8  any of these months when treated as a time varying
9  covariate associated with suicide attempts, and I
10  found very similar results.
11      Q.   How similar is similar?
12      A.   Statistically significant protective
13  effects.
14      Q.   And we will have to see -- take a look at
15  your sensitivity analysis to -- to really understand
16  that, correct?
17      A.   Of course.
18      Q.   Now, why is it that you wouldn't -- you
19  couldn't simply add up -- aside from doing it the
20  way you just described, simply adding up how much
21  time the person was exposed to the drug and how much
22  time they were not exposed to the drug and how many
23  events they had while exposed to the drug and how
24  many events they had while not exposed to the drug

578

1  and compared those?
2       A.   Well, first you would have to adjust for
3  the amount of the exposure. You would have to be
4  able to adjust for concomitant medications. You
5  would want to adjust for suicide attempts in the
6  year prior to the index episode and -- you know, so
7  there are a lot of different factors that you would
8  want to include in that model.
9       Simply adding that up or tallying those
10  results wouldn't be sensitive to those kind of
11  features that are preserved in all the analysis that
12  we -- we have done.
13      Q.   But they are not -- but those -- all
14  those aspects that you just described are not taken
15  into account in Table -- your Table 1 either, are
16  they?
17      A.   They are in Table 2.
18      Q.   In Table 2 but not in Table 1, correct?
19      A.   Well, Table 1 is just a description of
20  the data that went in to the actually statistical
21  analysis. All of the inferences in the paper are
22  based on statistical results, not the simple
23  tallying of the -- of the results.
24      These -- the entries in Table 1 are as

579

1  close to the basic data, if you will, or summary
2  statistics that are -- are preserved in the
3  statistical analyses. So I wouldn't, you know, do
4  the kind of thing that you did and then do a
5  statistical analysis that was more like the
6  treatment in Table 1.
7       Q.   And am I correct that in Table 2 you
8  never took exposure into account, correct?
9       A.   If by exposure you mean how long they
10  were on the drug or how many pills they were
11  prescribed, that's correct. Table 2 does not have
12  that.
13      The sensitivity analysis does have that,
14  and I'll prepare, you know, some discussion of that
15  for the final version of this paper.
16      Q.   Now, you could also include in that
17  sensitivity analysis what happens if you -- do you
18  think it would be unreasonable to run a sensitivity
19  analysis where you consider events on the same
20  day -- on consecutive days to be part of one event?
21      MS. McGRODER: Objection, asked and answered.
22 BY THE WITNESS:
23      A.   Well, I have already stated that one of
24  the sensitivity analyses that I did looked at the --

620

BY MR. ALTMAN:

Q.   And then a pretty sharp reduction after the bipolar diagnosis, right?

MS. McGRODER:  Object to form.

BY THE WITNESS:

A.   That's consistent with the column of your table that you have in here.

BY MR. ALTMAN:

Q.   But those people aren't taking any drug?

A.   That's true.

Q.   So why should they have this -- so if people who are not taking any drug can exhibit the same reduction, how do you know that whatever caused those people suicide attempts to go down is not the same thing that happened for the gabapentin people?

A.   That -- that may be the case. There may be other factors that are going on with these patients.  These patients may be receiving psychotherapy.  I don't know the answer to that.

Q.   So you don't -- and that's my point.  You have -- there's something -- I mean, clearly there can be a non-pharmacologic reason for the reduction in the suicide risk, right?

MS. McGRODER:  Object to form --

621

BY THE WITNESS:

A.   It could be --

MS. McGRODER:  -- calls for speculation.  Go ahead.

BY THE WITNESS:

A.   I'm sorry.  Could be, and again the -- the key here is that this paper provides a comparison between subjects in terms of the rate in these subjects who are taking medication versus those that are not, and then within subjects, to determine whether or not once they start taking medication is there an increase.

The finding of the paper, as articulated in the final paragraph of the discussion, is that there is no evidence that these drugs are leading to increases in suicide attempt rates, and if anything, what we are seeing are decreases following the initiation of treatment and --

MS. McGRODER:  Wait.  Are you finished with your answer because --

THE WITNESS:  Yes.

MS. McGRODER:  Let's go off the record for a minute.

THE VIDEOGRAPHER:  Okay.  The time is 3:27 p.m.

622

We are going off the record.

(WHEREUPON, a recess was had at 3:27 p.m. until 3:35 p.m.)

THE VIDEOGRAPHER:  This is beginning of tape No. 6, day 2.  The time is 3:35 p.m.

BY MR. ALTMAN:

Q.   Dr. Gibbons, before we went on the break, we were looking at Exhibit 31, and we were looking at the no medication group and how we saw similar picture, for lack of a better term, in terms of what happened around the date of the bipolar diagnosis as we did with the gabapentin group.

You also see a reasonably similar picture with the -- with the lamotrigine group, correct, which is column E?

MS. McGRODER:  Object to form, not that part but your preceding little summary.

BY THE WITNESS:

A.   Somewhat similar and that's -- that's shown as well in my Table 2.

BY MR. ALTMAN:

Q.   Let's put this aside for right now.  I'd like to go back to Exhibit 9 which is your actual expert report.

623

MS. McGRODER:  Well, there are multiple --

MR. ALTMAN:  Well, that's his expert report -- expert report.  Everything is either the declaration or the supplement.

MS. McGRODER:  May 19, 2008 expert report?

MR. ALTMAN:  Yes.

BY THE WITNESS:

A.   I have it.

BY MR. ALTMAN:

Q.   All right.  One of the things I forgot to ask about.  On page 3 when you calculated the confidence interval at the bottom, the odds ratio you say is 1.033 and the confidence interval is 0.135 to 7.884, correct?

A.   Correct.

Q.   Did you use exact methods for that or approximate methods?

A.   I used approximate methods.

Q.   Is that appropriate in that context?

A.   Well, it could be argued that an exact method giving the rarity of the event would have given you a more precise estimate.

Q.   I think Dr. -- Dr. Greenland ran the numbers with the exact method and came up with a

Gibbons, Robert D PhD (Defense Expert)  2/4/2009  9:16:00 AM

672

1  BY MR. ALTMAN:
2     Q.   And you also testified that you didn't
3  know whether you needed to have a statistical
4  justification to change a label, correct?
5     A.   That's correct.  I don't know the -- the
6  requirements to change a label --
7     Q.   Okay.
8     A.   -- or at least not all of them.
9     Q.   And the FDA Alert was Exhibit 12.
10       Overall, the FDA's analysis included --
11  the FDA's meta-analysis included many different
12  drugs, correct?
13    A.   Correct.
14    Q.   For each drug, many different
15  indications, correct?
16    A.   Correct.
17    Q.   And for those different indications, they
18  have many different background rates of suicidal
19  risks whether it's attempt or completed suicide or
20  ideation, correct?
21    A.   Well, I don't know that they have proven,
22  you know, that all of those are -- the true
23  underlying background rates are significantly
24  different than each other, but, you know, there are

673

1  certain observed differences in the rates across the
2  different indications.
3     Q.   And people with bipolar have a higher
4  risk than people who are epileptic, correct?
5     THE COURT REPORTER:  I'm sorry.  Than people
6  who?
7  BY MR. ALTMAN:
8     Q.   Who are epileptic, correct?
9     MS. McGRODER:  Object to the form and
10  foundation.
11  BY MR. ALTMAN:
12    Q.   And --
13    A.   I'm haven't -- I'm still considering the
14  question.
15    Q.   Oh, okay.  I'm sorry.
16    A.   I think it's true from the FDA Alert that
17  the -- the incidence between psychiatric indications
18  an epilepsy are pretty different.  There's a
19  five-fold difference, but the difference between
20  epilepsy and the pooling of all the others do not
21  seem to be very different.  Although, I don't know
22  if there are -- if anybody has actually done any
23  statistical test to compare them.
24    Q.   Well, just based on this here, placebo

674

1  patients it says one per 1,000 patients, correct?
2     A.   That's correct.
3     Q.   And for psychiatric, it says 5.2,
4  correct?
5     A.   Correct.
6     Q.   As for other, it says 0.8, correct?
7     A.   Correct.
8     Q.   Okay.  It appears at least from this
9  chart that there are differences between the
10  different populations?
11    A.   It appears that there's a difference
12  between the psychiatric populations and epilepsy and
13  other.  It's unclear to me whether or not there's
14  differences between other and epilepsy.  So I --
15  your state -- you stated the question in a very --
16  in the broadest possible way, and I'm just kind of
17  making it a little more evidence based.
18    Q.   That's fine.
19       Wouldn't it have been more appropriate if
20  you wanted to -- given what we just said:  Different
21  drugs, different indications, different risks for
22  those different indications, wouldn't it have been
23  more appropriate if you wanted to try to -- to work
24  in terms of patient years if you are going to try to

675

1  do comparisons with different drugs?
2     MS. McGRODER:  Is "you" in this question the
3  FDA?
4  BY MR. ALTMAN:
5     Q.   You or the FDA or --
6     MS. McGRODER:  Well, object to form.
7  BY THE WITNESS:
8     A.   Well, first of all, when I did the -- the
9  PharMetrics analysis, I worked with patient years
10  because that was essential because the risk periods
11  before and after initiating treatment for the
12  bipolar cohort were dissimilar, and that was really
13  important.  It wasn't important --
14  BY MR. ALTMAN:
15    Q.   I don't mean to interrupt you, but I was
16  only referring to your calculation.  I'm not talking
17  about your studies, and I wasn't clear.
18       I'm only talking about in terms of your
19  computations and analysis based on the FDA Alert --
20    A.   Oh.
21    Q.   -- and I didn't mean to interrupt you,
22  but I think you were --
23    A.   I appreciate that.
24    Q.   But clearly I know that you did patient

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)          Page  672 - 675

676

1 years with those studies. I'm talking about your
2 computations that you did with respect to the FDA
3 especially where you compared -- you know, let me
4 ask it a different way.
5      The .43 percent is that really an
6 incidence? The overall 4.3 percent finding, is that
7 really an incidence that you should be able to just
8 apply to any one of the groups?
9      A.   It's not an incidence with respect to a
10 period of exposure. The period of exposure for the
11 .43 is not taken into consideration in -- in that
12 computation. It is an incidence in terms of
13 patients who participated in randomized controlled
14 trials of a particular average length. I suppose
15 you could say it's that.
16      And you know, as I do in my own work, I
17 think it's important to show effects in terms of
18 rates in patients, and I think it is also important
19 to look at it in terms of rates in terms of patient
20 exposure times and see whether or not the findings
21 are consistent or is the methodology by which you
22 reach the answer change the answer and, you know,
23 that's consistent with the way that we did the VA
24 study as an example. We did it both ways.

677

1      Q.   Do you happen to know -- taking your
2 original analysis, do you happen to know how many
3 patient years of exposure there were in the active
4 group that makes up the 5194 patients?
5      A.   Not off the top of my head.
6      Q.   Was that information available for you to
7 calculate if you wanted it?
8      A.   I believe it was available in Exhibit 24.
9      Q.   And the same thing for placebo. You
10 could have calculated that as well?
11      A.   Yes.
12      Q.   Is there some reason why you didn't think
13 to do the same calculation using patient years once
14 again to see if there was a difference between what
15 Pfizer had sent to the FDA?
16      MS. McGRODER: Object to form, asked and
17 answered.
18 BY THE WITNESS:
19      A.   As we spoke about yesterday, I believe it
20 was, I, you know, didn't explore the analyses with
21 exposure days or patient years because I didn't have
22 those same data from the FDA Alert, and I also
23 really didn't have those data even after the FDA
24 statistical report came out.

678

1      So it wasn't going to help me in an
2 apples-to-apples comparison, and it really wasn't
3 going to help me at all really with the gabapentin
4 data because no matter what you put in the
5 denominator, the bottom line is we have three events
6 out of a lot of patients and a lot of patient years,
7 and whether I used patient years or number of
8 patients or, you know, the square root of their
9 mother's maiden name, it wasn't going to really
10 change the result at all.
11 BY MR. ALTMAN:
12      Q.   But your -- in your report where you talk
13 about that 1.033 is so close to one, that argument
14 really doesn't make sense anymore in light of the
15 real numbers, correct -- that the FDA used, correct?
16      MS. McGRODER: Object to form.
17 BY THE WITNESS:
18      A.   Well, I mean, I wouldn't necessarily say
19 that what the FDA used in their meta-analysis is
20 necessarily the gold standard. In fact, I can't
21 even replicate which patients they actually used.
22 They might have even made a mistake.
23      I think there -- I think it would be
24 invalid to include non-randomized studies and

679

1 randomized study in a pooled analysis. I don't
2 think it's invalid to -- to include randomized
3 studies that are placebo-controlled versus low-dose
4 comparator studies in a meta-analysis.
5      I think it's reasonable to do it both
6 ways, but I don't think there's anything inherently
7 wrong about the 5194 or whatever it is sample.
8 There are lots of other patients who agreed to be
9 randomized to gabapentin and take their chances that
10 they wouldn't get gabapentin in these studies and
11 did not have suicide attempts, did not have suicidal
12 ideation, did not have completed suicide.
13      So I don't think that's an invalid
14 comparison. It happens not to be the comparison
15 that FDA did, and so by my simple subtraction from
16 the -- from the Alert, you know, certainly I
17 overrepresented the number of gabapentin-treated
18 patients in my original expert report.
19 BY MR. ALTMAN:
20      Q.   Do you have any belief that Neurontin is,
21 for lack of a better term, toxic after a single
22 dose?
23      A.   I wouldn't be an expert on that. I don't
24 know. I have never taken Neurontin, and I'm not a

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

803

1  these numbers. I don't think you made up all
2  these numbers, but you might have. So is there a
3  language you can use that implies that what you
4  are giving to me here as what you are referring
5  to as my FORTRAN data, which may or may not be
6  my -- the dataset that I used in -- in
7  constructing my FORTRAN program, you know, can
8  you just use the language so that I don't have
9  keep going back and saying --
10      Q. That's fine. What --
11      A. -- what you are representing to me?
12      Q. Why don't we just call it the first
13  page of -- the second page from Exhibit 42. How
14  does that sound?
15      A. It works for me.
16      Q. Okay. The second page of Exhibit 42.
17  The first record there is on 8/24/2000 is pain,
18  correct?
19      A. Correct.
20      Q. The -- on the third page from the
21  PharMetrics database, if we scroll down on to the
22  group, the first one that says pain it's also
23  8/24/2000, correct?
24      A. Correct.

804

1      Q. That matches between the two, correct?
2      A. That's correct.
3      Q. The next one is on 9/25/2000 is pain,
4  correct?
5      A. Correct.
6      Q. Do you see those records match up?
7      A. I do.
8      Q. Okay. I will represent to you they
9  all match up. You can satisfy yourself.
10      Do you have any reason to suspect that
11  they don't match up based on what you have seen
12  here?
13      A. Not based on what I have seen here.
14      Q. Okay. So can we agree that these
15  appear to be the same person?
16      A. They appear to be the same person.
17      Q. Good. So we don't have to go through
18  that.
19      Now, I would like you to scroll
20  down -- if you take the -- go to the fourth
21  page -- I'm sorry -- the last -- the second page
22  of the PharMetrics data. You got it in your
23  hand, the other one.
24      I would like you to scroll down to the

805

1  bottom where is it says 29683. Do you see that?
2      It's the one that's got a blank for
3  the description.
4      Do you see that's 29683?
5      A. I do.
6      Q. The first page from this exhibit,
7  there was no code for 29683 for bipolar disorder,
8  correct?
9      A. Correct.
10      Q. Okay. Now, I would like you to go in
11  your data to that same date -- your data -- I'm
12  sorry. The second page of Exhibit 42 on
13  10/30/2001. It's about eight up from the bottom,
14  do you see that in the second page of two
15  thousand -- of Exhibit 42 that code on that date
16  is called bipolar, BPLD.
17      Do you see that?
18      A. I do.
19      Q. Okay. So this particular patient the
20  data, as you and Dr. Hur worked with it, you
21  consider that person to be bipolar based upon
22  this, correct?
23      MS. McGRODER: Well, object to form and
24  foundation.

806

1  BY THE WITNESS:
2      A. The SAS code that designated anything
3  with 2968 would have classified this patient who
4  had 29683 and a blank descriptor as bipolar,
5  that's correct.
6  BY MR. ALTMAN:
7      Q. And that is not a valid ICD code for
8  bipolar disorder, correct, according to the
9  PharMetrics database?
10      MS. McGRODER: Object to form and
11  foundation.
12  BY THE WITNESS:
13      A. I would have to consult with the
14  people at PharMetrics to find out what the --
15  what the meaning of 29683 was. They represented
16  to us that those would be the codes with any
17  extension would be bipolar disorder. I don't
18  know why they did that.
19      Maybe it was purely a mistake. Maybe
20  it was -- maybe it's a valid code. I don't know.
21  I would have to go back and consult with them
22  about that.
23  BY MR. ALTMAN:
24      Q. Do you have any idea how many codes

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)          Page  803 - 806

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

807

1  there are in the PharMetrics database which don't
2  match up -- how many diagnostic codes there are
3  actually assigned to patients that don't match up
4  to the ICD -- the list of ICD codes provided by
5  PharMetrics?
6      MS. McGRODER:  Well, object to form,
7  improper hypothetical, assumes facts not in
8  evidence, and calls for speculation.
9  BY THE WITNESS:
10     A.   I don't have any way of knowing that
11  sitting here right now.
12 BY MR. ALTMAN:
13     Q.   But you could have determined that,
14  correct?
15     MS. McGRODER:  Same objection.
16 BY THE WITNESS:
17     A.   It could be determined.  We would have
18  to go to a list of all ICD 9 codes and compare
19  that.  The data that we received from PharMetrics
20  did not have all ICD 9 codes.  So we would have
21  to go ahead and do that kind of verification.
22 BY MR. ALTMAN:
23     Q.   And I believe it's Exhibit -- is it
24  41?  Maybe it's not.

808

1      A.   This is Exhibit 41 (indicating).
2      Q.   Yeah, Exhibit 41 that same listing
3  that only -- only provided counts for ICD codes
4  that fell into your grouping.  You could do the
5  same thing for all ICD codes whether it was in
6  your grouping or not, correct?
7      MS. McGRODER:  Object to form and
8  foundation.
9  BY THE WITNESS:
10     A.   I don't understand your question.
11 BY MR. ALTMAN:
12     Q.   Okay.  We talked about running a
13  select diag count star, you know, to count how
14  many times each diagnostic code showed up within
15  the patient data, correct?
16     A.   That's correct.
17     MS. McGRODER:  Well, object to form.
18 BY MR. ALTMAN:
19     Q.   And we could run that for all
20  diagnostic codes, not just limited to the ones
21  that happen to fall into the groups as you
22  assigned them, correct?
23     A.   Correct, that could be done.
24     Q.   And then you would just simply do a

809

1  very simple join between that and the master list
2  of ICD codes that PharMetrics provided as one of
3  the subsidiary tables, correct?
4      MS. McGRODER:  Object to form.
5  BY THE WITNESS:
6      A.   That could be done.
7  BY MR. ALTMAN:
8      Q.   And if you do an outer join, you would
9  be able to see which records don't actually match
10  up to one of the PharMetrics ICD 9 codes,
11  correct?
12     MS. McGRODER:  Object to form.
13 BY THE WITNESS:
14     A.   What you are saying theoretically
15  sounds reasonable.
16 BY MR. ALTMAN:
17     Q.   Have you ever done that kind of
18  comparison between data tables?
19     A.   Not to my knowledge.
20     Q.   Do you have any idea how long it would
21  take to do it?
22     A.   No.
23     Q.   Do you think it would take a long
24  time?

810

1      MS. McGRODER:  Well, objection, calls for
2  speculation.  You just asked him if he knew and
3  he said no.
4      MR. ALTMAN:  I'm asking him if he has an
5  opinion of how long it might take.  That's not
6  the same thing.
7  BY THE WITNESS:
8      A.   I don't know specifically.
9  BY MR. ALTMAN:
10     Q.   Do you think that it's good practice
11  when you work with a dataset to check to make
12  sure that you have valid data?
13     A.   I think there are in a dataset of this
14  size so many different kinds of checks that can
15  and have been made, and at some point, you know,
16  there may be checks that in retrospect you might
17  want to have made that didn't make.  There are
18  lots and lots of possibilities.
19         You are dealing with medical claims
20  data that are subject to errors.  Some of these
21  we expect to be cleaned out and verified by
22  PharMetrics.  We spoke about in our last
23  deposition a patient who appeared to have made
24  suicide attempts on four consecutive days, and

823

1 change your confidence interval, couldn't it?
2 MS. McGRODER: Object to form, foundation,
3 improper hypothetical, calls for speculation, and
4 assumes facts not in evidence.
5 BY THE WITNESS:
6 A. Again, if -- if, in fact, 29683 is not
7 an index of bipolar disorder and I called it an
8 index of bipolar disorder, then the data for that
9 subject would have been included in the data for
10 bipolar disorder, and to some extent, probably
11 proportional to the number of cases of 29683, it
12 would change the estimates associated with the
13 subanalysis that was done for bipolar disorder.
14 BY MR. ALTMAN:
15 Q. And even -- and even changing one
16 patient potentially worse -- potentially could
17 change that confidence interval so that it is
18 over one and not .9953, correct?
19 MS. McGRODER: Object to form, foundation,
20 improper hypothetical.
21 BY THE WITNESS:
22 A. It could go either way. It could make
23 it so that it's, you know, less. It could make
24 it that it's more. It's hard for me to imagine

824

1 in a sample of that size one patient's data
2 making much of a difference, but, again, as I
3 said before, it's proportional to the number of
4 those.
5 BY MR. ALTMAN:
6 Q. But you don't know how many patients
7 there were with this problem, correct?
8 A. I don't know that it is a problem, and
9 I don't know how many patients there were with a
10 code of 29683. For me to determine if it was a
11 problem, I would have to go back to the folks at
12 PharMetrics and say why did you put that 29683 in
13 my nice database.
14 Q. And once, again, you didn't look to
15 see how many invalid -- how many -- the number --
16 not necessarily how many of each, but the number
17 of different codes in the diagnosis data that
18 don't match up to an ICD code as provided by
19 PharMetrics, correct?
20 MS. McGRODER: Well, object to form and
21 foundation and asked and answered four times.
22 BY MR. ALTMAN:
23 Q. Do you have any intention of going
24 back and checking this issue out now that I have

825

1 brought it to your attention?
2 A. Yes, I'd like to.
3 Q. Okay. Over the last several weeks, I
4 have been receiving a number of sensitivity
5 analyses from you which I assume -- well, from
6 Ms. McGroder which I'm assuming that you provided
7 to her; is that correct?
8 A. I don't -- I don't brush my teeth in
9 the morning without sending you a file.
10 MS. McGRODER: Pretty white.
11 BY MR. ALTMAN:
12 Q. Did you work with Dr. Hur on any of
13 these sensitivity analyses?
14 A. I did.
15 Q. Did you work with Dr. Hur on both the
16 bipolar and the gabapentin sensitivity analyses?
17 A. Yes.
18 Q. Will you be paying Dr. Hur for his
19 work on the gabapentin sensitivity analyses?
20 A. I plan to.
21 Q. At your last deposition we discussed
22 bipolar sensitivity analyses, but we did not
23 discuss any gabapentin sensitivity analyses.
24 At the time of your last deposition,

826

1 had you done sensitivity analyses of the
2 gabapentin collection?
3 MS. McGRODER: Well, object to form just to
4 the extent it misstates the record.
5 MR. ALTMAN: Well, if I have misstated the
6 record, then please correct me.
7 BY THE WITNESS:
8 A. I think --
9 MS. McGRODER: Well, he would have to get
10 out the deposition and review it in total. So I
11 objected just to the extent that it does. You
12 can still ask the question, and he can still
13 answer it.
14 MR. ALTMAN: No, that's fine. Then let's
15 ask it a different way.
16 BY MR. ALTMAN:
17 Q. You do recall that we discussed
18 sensitivity analyses you ran for the bipolar
19 cohort, correct?
20 A. Yes.
21 Q. Do you recall if we discussed any
22 sensitivity analyses you ran for the gabapentin
23 cohort?
24 A. I think I in my deposition referred to

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

867

1  suicide attempt, and do it that way?
2      A.   Because --
3      MS. McGRODER:  Asked and answered in the
4  last deposition, but go ahead.
5  BY THE WITNESS:
6      A.   Yeah, the -- you know, imagine
7  somebody who has been on drug for, you know,
8  three weeks, and then they make -- and then their
9  prescription was just for those three weeks and
10  then the next day they make a suicide attempt.
11  That would indicate that that person hadn't been
12  exposed to the drug.  Well, in fact, they had
13  been exposed to the drug.
14      Also, we don't know from medical
15  claims data that these people are necessarily
16  taking the drug or when they actually took the
17  drug.  They could have taken it -- you know, you
18  have 30 pills of the drug.  You don't necessarily
19  start it on the day of -- that the
20  prescription was filled.
21      So to be conservative, we, you know,
22  indicate -- I mean in the primary analyses that
23  are described in the paper, we are basically
24  saying once you were exposed to the drug, you

868

1  know, that's the post period.  You might have
2  been -- only had one day of a prescription but
3  it's post.  This analysis is a little more
4  molecular in the sense that it breaks things down
5  on a month-by-month exposure basis.
6      So it really allows you to say
7  somebody was taking the drug for two months, then
8  they stopped taking it for a month, then they
9  started taking it again.  What was the
10  association with suicide in terms of that pattern
11  of response.
12  BY MR. ALTMAN:
13      Q.   So going back to your first -- going
14  back to the paper Table 2, for gabapentin the
15  post versus predrug value of .15, does that
16  number -- what does that number mean?
17      How should somebody interpret that
18  number?
19      A.   That number means that the ratio
20  between the rate of preinitiation of the drug
21  suicide attempts was .15 following initiation of
22  drug then before.  So it's about one -- 1/6th of
23  the rate, and the previous column indicates an
24  event rate ratio of 6.11 in the comparison of

869

1  predrug versus no drug.
2      So what you are basically -- the
3  interpretation is that prior to initiating
4  therapy in those people who ultimately did take
5  the drug, in this case gabapentin, their suicide
6  attempt rate was six times higher than people who
7  didn't take any of those antiepileptic drugs.
8      However, following the rate --
9  following the initiation of drug, the rate went
10  down six-fold.  So it essentially eradicated that
11  increased elevated risk associated with people
12  taking a drug before they ever took the drug, and
13  that's kind of articulated in figure 1 where you
14  see the open squares.  This is on page 30 of 36.
15      The open squares are the predrug,
16  pretreatment suicide attempt rates, and you can
17  see that they are all uniformly much higher than
18  the post-drug, and that after the filled in
19  squares, which are the post treatment suicide
20  attempt rates, are all basically kind of at the
21  level that you observe for those people who
22  didn't take any medication.
23      So -- so, you know, really in terms of
24  interpretation, what I get out of all of this is

870

1  that there's no evidence at all that these drugs
2  are increasing the rate of suicide attempts, and
3  that the people who ultimately get on these drugs
4  are at much higher risk of a suicide attempt
5  before they ever take them, and the drugs
6  decrease that risk to the level seen in people
7  who don't take these drugs.
8      Q.   If -- for gabapentin on Table 2, if
9  the post-drug versus predrug, whatever the ERR is
10  and the confidence interval includes one, that
11  allow you -- would that allow you to conclude
12  that gabapentin is protective of suicide
13  attempts?
14      If instead of .15 with a confidence
15  interval of .05 to .47, whatever the ERR is, the
16  confidence intervals included one, would that
17  allow you to conclude that gabapentin is
18  protective of suicide attempt?
19      A.   No. 1, if the -- if the confidence
20  interval included one and, of course, the -- if
21  the probability value -- now, this probability
22  value is related to the confidence interval, but
23  if the confidence -- if the probability value is
24  greater than .05, then we could not reject the

883

1　adjust for that, particularly the person-time
2　logistic model.  That's one of the primary
3　reasons for doing that model.  It allows one to
4　model the sort of exponential decay, if you will,
5　in the rate of the suicide attempts over time in
6　the total population including those people who
7　don't receive treatment and then determine the
8　extent to which the treatment changes that hazard
9　function over time.
10　　　That's an important part of why, you
11　know, I did those.  I did those person-time
12　logistic models to try and tease that part of the
13　puzzle apart.
14　BY MR. ALTMAN:
15　　Q.　Let me give you two other exhibits,
16　and then we are going to put those aside for now
17　just because they have already been marked, and
18　then we are going to come -- I am going to talk
19　to you about a different exhibit.
20　　　What I'm handing are you Exhibits 53
21　and 54 -- I'm sorry 54 -- 55 and 56.  These are
22　the gabapentin cohort sensitivity analyses.
23
24

884

1　　　　(WHEREUPON, certain documents
2　　　　were marked Gibbons Deposition
3　　　　Exhibit Nos. 55, 56, for
4　　　　identification, as of 3/5/09.)
5　MS. McGRODER:  Thank you.
6　BY MR. ALTMAN:
7　　Q.　And I'll just ask you very quickly for
8　now.  Do those appear to be the analyses that you
9　provided?
10　　A.　Yes, they do.
11　　Q.　Okay.  Let's put those aside for right
12　now.  We are going to come back to those.  I will
13　hand you the next exhibit.
14　　　　(WHEREUPON, a certain document
15　　　　was marked Gibbons Deposition
16　　　　Exhibit No. 57, for
17　　　　identification, as of 3/5/09.)
18　BY MR. ALTMAN:
19　　Q.　Dr. Gibbons, I have handed to you what
20　has been marked as Exhibit 57 as a text file
21　entitled "AE2OUT."  It was dot txt which I
22　believe is the output file from the second of
23　your SuperMix analyses; is that correct?
24　　A.　Right.  It says AED2OUT.

885

1　　Q.　I thought that's what I said, but if I
2　was wrong, you corrected me.
3　　A.　Sorry.  I didn't hear the D.
4　　Q.　You are right.  I didn't.  Okay.
5　　　Does this appear to be the output file
6　from the SuperMix computation?
7　　A.　Yes, it does.
8　　Q.　And this is the gabapentin only
9　collection, correct?
10　　A.　This is treating gabapentin as the
11　time varying drug effect.  So gabapentin only.
12　　Q.　And if we go to -- page 2 and on
13　to page 3, that's where you get the results of
14　your analysis, correct?
15　　A.　That's correct.
16　　Q.　And I assume the one that we are
17　interested in here is the GAB analysis, correct?
18　MS. McGRODER:  I will object to form.
19　BY THE WITNESS:
20　　A.　You are referring to the parameter GAB
21　listed under results for the model without any
22　random effects?
23　BY MR. ALTMAN:
24　　Q.　Well, all the way down at the bottom

886

1　where it says:  "Odds Ratio 95 Percent, Odds
2　Ratio Confidence Intervals."
3　　A.　Okay.  So just before that are the
4　estimated regression weights, and then those
5　regression weights, the estimates are reiterated
6　on the second and third page and include odds
7　ratios and the confidence intervals for the odds
8　ratio.
9　　Q.　And the reiterated -- the reiterated
10　results are frankly the ones that count.  That's
11　the end result of the analysis, correct?
12　　A.　Well, no.  I mean, the probability
13　value, for example, for gabapentin -- the overall
14　probability value is -- is provided under the --
15　on the far column of the estimated regression
16　weights.
17　　Q.　Right.  If we go to the odds ratio,
18　though, starting at the bottom of page 2 where we
19　get to gabapentin, the odds ratio as provided
20　here for gabapentin is .6269, correct?
21　　A.　That's correct.
22　　Q.　Which would be rounded to .63,
23　correct?
24　　A.　Okay.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

875

1  things like that, that's your initial estimate
2  into the GEE model, correct?
3      A.   Well, it's not even an initial
4  estimate for the confidence.  I mean, the
5  confidence interval for the GEE is derived by a
6  particular -- you know, it comes out of something
7  like an information matrix for the GEE.  So it's
8  a totally different way of getting the confidence
9  interval in the standard error than the simple
10  rate.
11      Q.   And my point is that if I go and I
12  calculate the confidence interval, I'm not going
13  to get the same thing as what the GEE model is
14  going to provide, correct?
15      A.   That's correct.
16      Q.   The confidence interval from the GEE
17  would tend to be larger than the one you would
18  get from just the standard calculating the --
19      A.   I don't think --
20      MS. McGRODER:  Can you finish the question
21  just so it is clear on the record?
22  BY MR. ALTMAN:
23      Q.   That you would get from the basic
24  statistical, you know, computation?

876

1      A.   Remember that the GEE is a model.  So,
2  you know, if -- if you have got lots of -- in the
3  GEE, I have got covariates in here.  So some of
4  these covariates may be minimizing the
5  variability.
6      So you could have a situation where
7  part of, you know, age, for example, is -- is
8  adding a lot of uncertainty and a lot of
9  variability.  The GEE, which is a regression
10  model, is adjusting for age.  So what's left over
11  is much tighter.
12      So I could imagine a situation where
13  the -- where the GEE estimate is -- is -- is the
14  smaller of the confidence interval than you would
15  get in the sort of usual approach.
16      You couldn't even really do it,
17  though, because remember at least in the -- where
18  we are using GEE in Table 2 is for the pre versus
19  post, and that's taking into consideration that
20  these are the same people before and after.  So,
21  you know, you would really have to use something
22  quite different in terms of this -- you know,
23  there isn't really even a good simple estimator
24  of that rate ratio for within subject kind

877

1  comparisons.
2      Q.   Okay.  But I think after this whole
3  thing here is that it turns out here when you
4  check with a calculator, that you don't get the
5  same as the simple ratios from Table 1 when you
6  like at your pre versus post here which is --
7  which is obviously a function of the regression
8  analysis and all the adjustments, correct?
9      A.   I would believe so, yes.
10      Q.   Is there some general relationship?  I
11  mean, would you expect that doing the regression
12  could change the simple ratio by a factor of two?
13      A.   That would totally depend on what you
14  have in the analysis.  I mean, think about the
15  effect that's associated with prior suicide
16  attempts.  You know, it's a 12-fold increase in
17  the likelihood of future suicide attempts.
18      So having that term in the model
19  versus not could have a really big effect.  You
20  know, an effect that is marginal like maybe some
21  of these age effects or something, you know,
22  might not change things too much.
23      MR. ALTMAN:  Why don't we break for lunch at
24  this point.  It's 20 after 1:00.  See if you

878

1  can -- I don't know how long you want to take.
2      MS. McGRODER:  Well, there's a place --
3  let's go off the record.
4      THE VIDEOGRAPHER:  This is the end of tape
5  No. 3.  We are off the record at 12:17.
6      (WHEREUPON, a recess was had at
7  12:17 p.m. until 1:14 p.m.)
8      THE VIDEOGRAPHER:  This is the beginning of
9  tape No. 4.  We are back on the record at 1:14.
10  BY MR. ALTMAN:
11      Q.   Dr. Gibbons, I just want to clarify
12  something.  We were talking earlier about what
13  the AP field meant.  That was antipsychotic, but
14  just to be clear, when you got the PharMetrics
15  dataset, you only got atypical antipsychotics and
16  not all antipsychotics, correct?
17      A.   I don't remember the answer to that
18  right now.  I would have to go back and check.
19      Q.   Why don't we do that just to be sure
20  we are talking the same language.
21      MR. ALTMAN:  Jack, can you get the
22  PharMetrics contract.
23  BY MR. ALTMAN:
24      Q.   You know what, why don't just to be

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

887

1    Q.  Is that correct?

2    A.  Yes.

3    Q.  And the confidence intervals as shown

4  as .3278 which would round to .33, correct?

5    A.  That's correct.

6    Q.  And the upper would be 1.1990,

7  correct?

8    A.  Correct.

9    Q.  That would round to 1.20, correct?

10    A.  Correct.

11    Q.  So according to this analysis of just

12  the gabapentin data, this does not show

13  that gaba -- these are not statistically

14  significant results for gabapentin, correct?

15    A.  That's true, and that's reiterated

16  under the P values where the probability value

17  testing whether or not the regression weight is

18  one or the odds ratio -- the -- the regression

19  weight is -- the logarithm of the odds ratio is

20  equal to -- is equal to zero is .1581. So that's

21  not statistically significant.

22      So we can't conclude that, you know,

23  gabapentin in this analysis -- the presence of

24  gabapentin is significantly decreasing the risk

888

1  of suicide attempts. The purpose of the analysis

2  is to show if we were to -- you know, obviously

3  we are reducing the sample size by quite a bit by

4  just looking at gabapentin as opposed to looking

5  at all of the AEDs, and what we are seeing is, I

6  believe, that the risk ratio -- the estimated

7  odds ratio for the overall AED was .59, and

8  that's looking at all of the AEDs simultaneously,

9  and that was statistically significant. And this

10  effect is quite similar to it, but it's not

11  statistically significant because of the lower

12  sample size.

13    MR. ALTMAN:  Let me take a break for a

14  minute. Can we go off the record?

15    THE VIDEOGRAPHER:  Off the record at 1:26.

16      (WHEREUPON, a recess was had at

17      1:26 p.m. until 1:29 p.m.)

18    THE VIDEOGRAPHER:  We are back on the record

19  at 1:29.

20  BY MR. ALTMAN:

21    Q.  Dr. Gibbons, I forgot to ask you one

22  thing.

23      Before the lunch break, we were

24  talking about trying to locate the SAS programs

889

1  that extracted the data. Did you have any luck?

2    A.  I put in a request to get them. I'm

3  not sure that, you know, we will be able to get

4  them, but I'm waiting for a return phone call. I

5  put my phone on -- on mute. So as soon as I hear

6  back, I am expecting a call one way or the other.

7    Q.  Who did you call to ask them?

8    A.  Dr. Hur.

9    Q.  Okay. Do you think he might not have

10  them at all or --

11    A.  Today he is at the VA, and the VA with

12  recent issues related to data security doesn't

13  necessarily allow you to plug an external data

14  storage device into their network. So he would

15  have to be able to do it elsewhere. So he is

16  investigating (No. 1) does he even have it around

17  with him, and (No. 2) can he plug it into a

18  computer where he can have access to send it to

19  me. So if he doesn't have it, you know, or isn't

20  able to do that, surely, I'll be able to get it

21  tonight and forward it on.

22    Q.  Is all the work that was done with

23  these data analyses on an external drive or a

24  discrete external drive?

890

1    MS. McGRODER:  Object to form. "These

2  analyses" you mean, the sensitivity analysis?

3  BY MR. ALTMAN:

4    Q.  All the work that's been done in this

5  case by Dr. Hur, does he keep that on a separate

6  external drive?

7    A.  Not to my knowledge.

8    Q.  Does he keep -- he keeps it on his

9  laptop, on the hard drive on the laptop?

10    A.  Some of it is at the computer at the

11  university. Some of it is on an external drive

12  that he keeps, you know, those sort of things.

13  Some of it obviously is on my computer or on my

14  external drives.

15    Q.  So there may be some data on his

16  drives or his computer that is not on your

17  computer?

18    A.  There shouldn't be at this point. I

19  don't think I have on my computer the SAS program

20  that you are looking for that generated the

21  monthly data file that I used in my analysis, and

22  I also want to double-check. There may be -- I

23  may have taken that file and then modified that

24  file for the purpose of putting it into the

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

927

1  do not increase the risk of suicide attempts
2  whatsoever, and, if anything, they decrease.  As
3  we've seen for the overall analysis, they
4  significantly decrease the risk of suicide
5  attempts following the initiation of drug.
6       There can be other explanations beyond
7  the fact that the drug is itself responsible for
8  decreasing the suicide attempt rate, and the
9  sensitivity analyses that I have performed
10  specifically look at those questions.
11       MR. ALTMAN:  Objection, non-responsive.
12  BY MR. ALTMAN:
13       Q.  Does your manuscript allow you to
14  conclude that gabapentin is protective for
15  suicide attempts?
16       MS. McGRODER:  Objection, asked and
17  answered.  You can answer it the same way, if you
18  want.
19  BY THE WITNESS:
20       A.  Just keeping answering it in the same
21  way.  Where we -- the manuscript shows that there
22  are statistically significant decreases
23  associated with the use of antiepileptic drugs in
24  general and gabapentin in particular from the

928

1  period prior to the initiation of drug to
2  following the initiation of drug.
3       What my manuscript does not say is
4  that one can draw a causal inference that this
5  protective effect, this significant decrease is,
6  in fact, a protective effect of the drug, and --
7  and the goal of all of this work, what makes this
8  scientifically interesting is to try to figure
9  out which combination of sensitivity analyses
10  would allow you to draw that kind of inference
11  from these kind of observational data.
12  BY MR. ALTMAN:
13       Q.  If another expert were to say
14  Dr. Gibbons' paper proves that gabapentin is
15  protective of suicide, would that expert be
16  wrong?
17       MS. McGRODER:  Object to form and
18  foundation.
19  BY THE WITNESS:
20       A.  The expert -- it depends on how the --
21  how this expert was using the word protective.
22  If they were using the word protective the way I
23  would use the word protective, then I think that
24  might be a misinterpretation.  If you were using

929

1  the word protective to show that there was a
2  statistically significant reduction associated
3  with the use of gabapentin in these data, the
4  answer would be they would be correct.  There is
5  a statistically significant reduction in the
6  rate.
7       Is it a causal effect?  Is it really
8  because they took the drug, or is it because in
9  part the time period after taking gabapentin is
10  further away from the index episode then -- then
11  the time point before and there's a natural
12  decline.  That's another alternative explanation.
13  That's why I did the person-time logistic
14  regression models to try and control for that.
15       The results of that analysis are
16  consistent showing a very similar odds ratio,
17  very similar protective effect.  So it's kind of
18  the best I can answer your question.
19       MS. McGRODER:  I need to take a break.  I
20  apologize.
21       MR. ALTMAN:  Yes.  Let's -- let's go off the
22  record.
23       THE VIDEOGRAPHER:  This is the end of tape
24  No. 4.  Off the record at 2:12.

930

1       (WHEREUPON, a recess was had at
2       2:12 p.m. until 2:30 p.m.)
3       THE VIDEOGRAPHER:  This is the beginning of
4  tape No. 5.  We are back on the record at 2:30.
5  BY MR. ALTMAN:
6       Q.  Dr. Gibbons, we just talked about --
7  spent quite a bit of time talking about the
8  bipolar analysis -- the bipolar manuscript.  The
9  discussions we had, would they essentially apply
10  to the gabapentin -- the gabapentin analysis as
11  well?
12       A.  I think that statement is probably,
13  you know, a little too broad for me to answer --
14       Q.  Okay.  That's fine.
15       Just like with the bipolar analysis
16  where you said you could not conclude that the
17  AEDs cause a protective effect, is that -- is
18  that the same -- can you say the same thing in
19  terms of the gabapentin study that you did in
20  your expert report?
21       MS. McGRODER:  Object to form, misstates --
22  that misstates his testimony.
23  BY THE WITNESS:
24       A.  I think that -- I mean, if what you

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

979

1  Ms. McGroder.
2  BY MR. LONDON:
3     Q.   How can I have reliability in that?
4  How can I hear what you are saying, read what you
5  are writing, know what you are getting paid for,
6  and reconcile those?
7     MS. McGRODER:  Objection.  That's an
8  argumentative question --
9     MR. LONDON:  It's all right.
10    MS. McGRODER:  -- and it calls for
11 speculation and it's improper.  He doesn't know
12 how you can have reliability, how you feel about
13 reliability, Jack.  How would he know that?
14 BY MR. LONDON:
15    Q.   What can you tell the judge -- what
16 can you tell Judge Saris that says even though I
17 said in my deposition under oath I was not paid
18 for the analyses and even though my bills page
19 showed that I was paid for the bipolar analysis
20 that was the subject of the paper, you really
21 shouldn't believe the bill.  You ought to believe
22 what I say.
23         What can you tell Judge Saris so she
24 will have comfort in that?

980

1     MS. McGRODER:  Objection to form.  It's
2  argumentative, and it misstates the testimony he
3  just gave you.
4  BY THE WITNESS:
5     A.   Well, first of all, I don't think that
6  item number two on this bill says that I billed
7  for the analyses that went into the -- into the
8  paper.  What it does say is computing summary
9  statistics and screening analyses.
10        And screening analyses to me means
11 something very, very different than the analyses
12 that were the subject of the paper.  So
13 my response to Judge Saris would be simply we
14 were looking at all of the data that we received
15 from PharMetrics.  We were getting up to speed
16 with using those data.  We were doing internal
17 consistency checks.  We were exploring those
18 data.  There's a huge amount of data.  It took
19 some time to do so, and that's what that bill was
20 for.
21        And as I have testified in my previous
22 deposition last time, that there were screening
23 analyses, internal consistency checks, and so
24 forth that were performed on both the gabapentin

981

1  and the bipolar cohort, and the only thing that's
2  misleading in this invoice is that it says
3  bipolar cohort, and it should have said both
4  cohorts.
5  BY MR. LONDON:
6     Q.   Were you paid money by the defense
7  counsel for working on the bipolar cohort?
8     MS. McGRODER:  Objection, asked and
9  answered.
10 BY THE WITNESS:
11    A.   I have testified both on this
12 deposition and the previous deposition that I was
13 paid money for working with the data, getting up
14 to speed with the data, reviewing the data, but I
15 was not paid by counsel for the analyses that I
16 performed that in all of the work that was done
17 and all of the sensitivity analyses that were
18 done in support of the paper in question.
19 BY MR. LONDON:
20    Q.   Well, we know you weren't paid before
21 the paper was published for the sensitivity
22 analyses because there weren't any before the
23 paper was submitted to JAMA.
24    A.   That's correct.

982

1     Q.   Okay.  So I'm back to these bills --
2     MS. McGRODER:  His answer included both.
3  His answer included both sensitivity analyses and
4  primary analyses.  He just said that.  You are
5  just being argumentative.
6  BY MR. LONDON:
7     Q.   I am back to the bills, and the bills
8  are all that I have, and the bills show, as you
9  have just testified, that at least in part some
10 of the bill you sent to Ms. McGroder and some of
11 the money Ms. McGroder sent to you was for
12 working on the bipolar cohort, true?
13    A.   True.
14    MS. McGRODER:  Objection, asked and
15 answered.
16 BY MR. LONDON:
17    Q.   Okay.  Okay.
18    MS. McGRODER:  You need to clarify that.
19 BY THE WITNESS:
20    A.   I mean, I think that what's really --
21 the key is that those analyses and all of the
22 work that was done in production for that paper
23 were not billed for, and that's what I would tell
24 Judge Saris.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

995

```
1    choices.
2        MR. LONDON:  Lori, Lori, you can either --
3    time out.  Time out.
4        MS. McGRODER:  We have an agreement, and you
5    are -- and you are violating it and exceeding it.
6        MR. LONDON:  Well, you may have thought you
7    had some idea in your mind of what I was going to
8    do.  It's not my fault if you didn't understand.
9        MS. McGRODER:  I actually am being quite
10   gracious letting you ask anything because you
11   passed the witness and you were done, and I told
12   you at the end of that day once you pass the
13   witness, you are done.
14       MR. LONDON:  Ms. McGroder, after you
15   withhold the disclosures from me being able to
16   ask the questions --
17       MS. McGRODER:  I didn't withhold anything
18   from you.
19       MR. LONDON:  Other than all these bills that
20   you paid.
21       MS. McGRODER:  I gave you those bills at the
22   deposition.  What bills have you provided me?
23   Which of your experts have provided me a single
24   invoice, none, zero.
```

996

```
1        MR. ALTMAN:  Lori, I think we are wasting
2    time.  We are wasting Dr. Gibbons --
3        MR. LONDON:  I have about 15 minutes of
4    questions.  I am going to ask them.
5        MS. McGRODER:  Well, I object to all of
6    them.  Go ahead.
7        MR. LONDON:  I understand.  I understand.
8    Do you have the exhibit marked, please?  Would
9    you please mark the exhibit I handed you.
10           (WHEREUPON, a certain document
11            was marked Gibbons Deposition
12            Exhibit No. 61, for
13            identification, as of 3/5/09.)
14       MS. McGRODER:  What number is this?
15   BY MR. LONDON:
16       Q.  Dr. Gibbons, if you would take a quick
17   look at Exhibit 61.  The part I'm going to ask
18   you about begins under the bold part of the
19   center that says "50.601 Purpose."
20           Do you see that?  If you would just
21   take a moment and read that.
22       A.  I have read it.
23       Q.  Were you aware before just now that
24   that regulation existed?
```

997

```
1        A.  I don't think I was -- you know, would
2    have been able to cite it based on 40 CFR, but
3    certainly I know through the conflict of interest
4    training and IRB training and being on -- on, you
5    know, grant review, internal review groups that,
6    you know, this is certainly the spirit of -- I
7    don't know if I have called it a regulation, but
8    it's the -- it's the way we are supposed to work.
9        MR. LONDON:  All right.  I'm going to ask
10   the reporter to mark the next exhibit, and just
11   before you mark it, I am going to point out that
12   this is also a CFR.  It is all of them, but I
13   have only circled off, and you will see that
14   circled off 602.  Fair enough?
15       THE WITNESS:  Yes.
16       MR. LONDON:  Please mark it.
17           (WHEREUPON, a certain document
18            was marked Gibbons Deposition
19            Exhibit No. 62, for
20            identification, as of 3/5/09.)
21   BY MR. LONDON:
22       Q.  In the center section shows "50.602
23   Applicability."
24           Will you take just a moment and read
```

998

```
1    that.
2        A.  I am reading it.  Yeah, I read it.
3        Q.  Does the University of Illinois or --
4    pardon me -- the University of Illinois at
5    Chicago where you are employed, is it an
6    institution that applies for Public Health
7    Service grants for scholarly papers by employees
8    such as yourself?
9        A.  Well, I guess I'm not sure -- I'm
10   reading this, and I'm not expert on the law
11   obviously.  It says:  "Provided, that this
12   subpart does not apply to an SBIR Program Phase I
13   application," which clearly it doesn't, and "in
14   those few cases where an individual, rather than
15   the institution, is an applicant for the PHS
16   grant, they will take a case-by-case
17   determination."
18           I'm -- I guess I'm not -- neither of
19   those cases apply to me, and I guess I am not
20   sure I am fully understanding, you know, what you
21   are asking.
22       Q.  At the moment I'm only asking if you
23   know whether the University of Illinois or
24   yourself applies for Public Health Service grants
```

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                    Page  995 - 998

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

999

1  for the scholarly research that you did?
2      A.   As you can see from my -- from my CV,
3  I have numerous grants from the National
4  Institute of Health which is part of the Public
5  Health Service, and, you know, these grants have
6  supported my research for many, many years.
7      Q.   And is that true of the scholarly
8  paper in this case, the bipolar cohort paper, was
9  it funded in part a Public Health Service
10 grant?
11     A.   That's correct.
12     Q.   Okay.  What I think I don't understand
13 is whether that grant went directly to you or
14 whether it was administered through the
15 university.
16     A.   It's to the university.
17     Q.   Okay.  And then my next question is
18 going to start 5063 -- or 50.603.
19     MR. LONDON:  Would you mark that as an
20 exhibit, please.
21          (WHEREUPON, a certain document
22          was marked Gibbons Deposition
23          Exhibit No. 63, for
24          identification, as of 3/5/09.)

1000

1  BY MR. LONDON:
2      Q.   May I ask you to take a moment and
3  read 50.603, these definitions.  They continue on
4  down through the end of the first column on the
5  second page.  Then for some reason they just
6  repeated the print job.
7      A.   Okay.  I have read the definitions.
8      Q.   All right.  Under "Significant
9  Financial Interest," do you see where a
10 significant financial interest does not include
11 an equity interest that does not exceed $10,000
12 or is not expected to exceed $10,000.
13     Do you see that?
14     MS. McGRODER:  Objection to form and
15 foundation.  There's no foundation for the use of
16 this document with this witness.
17 BY THE WITNESS:
18     A.   I see where it says $10,000.
19 BY MR. LONDON:
20     Q.   All right.  Were you aware before
21 reading this regulation that there was a
22 regulation which set a $10,000 number at the
23 amount by which it would be assessed whether or
24 not an investigator had a significant financial

1001

1  interest --
2      MS. McGRODER:  Objection --
3  BY MR. LONDON:
4      Q.   -- in regard to some outside source
5  that may be a potential conflict of interest with
6  any systematic investigation the investigator
7  undertook?
8      MS. McGRODER:  Objection to form and
9  foundation.
10 BY THE WITNESS:
11     A.   I don't see anything in here that is
12 saying anything about -- I mean, these are
13 definitions.
14 BY MR. LONDON:
15     Q.   That's right.
16     A.   And --
17     Q.   I'm only asking you --
18     A.   -- I mean, my understanding of all of
19 this is whether or not there is a conflict of
20 interest or whether or not that conflict of
21 interest -- there are lots of people who have
22 potential conflicts of interest.
23     I mean, there are people who get
24 grants who work in industry or there are

1002

1  consultants or there are people who, you know,
2  spend a lot of their time on speaker bureaus and
3  things like that.
4      The question is whether or not that
5  activity has provided a bias in the way that the
6  study has been conducted or designed or whether
7  or not they have shared that information with
8  people who are directly benefiting from the
9  result of that.  I don't see any of that as
10 being --
11     Q.   Did you share with the University of
12 Illinois that you had received an excess of
13 $10,000 from Pfizer as an expert witness in
14 relation to your work that involved the cohorts,
15 the bipolar and gabapentin cohorts?
16     MS. McGRODER:  Object to form and
17 foundation, to the extent it misstates his
18 testimony and assumes facts not in evidence.
19 BY MR. LONDON:
20     Q.   I'm just asking if you did.
21     MS. McGRODER:  Same objection.
22 BY THE WITNESS:
23     A.   The university requests a -- what are
24 the kinds of outside work that you are doing.

Gibbons, Robert D PhD (Defense Expert)  3/5/2009  9:09:00 AM

1007

1     MS. McGRODER:  My objection stands.
2   BY MR. LONDON:
3     Q.   And it does.  I hear you.  Go forward.
4     A.   So (No. 1) there's a specific
5 requirement that we do not put the amounts or
6 specifically the instructions of our form say do
7 not tell us how much, tell us what you are doing,
8 and the university will determine whether or not
9 they believe that to be a conflict of interest.
10 I have always been compliant with that and will
11 continue to be so.
12     The grant that I have that started out
13 long before this project, my participation in
14 this project is about antidepressants and
15 suicide.  It has nothing to do with -- please,
16 let me finish.
17     Q.   I am.  I'm just trying -- I want to
18 make sure I understand which grant you're talking
19 about.
20     A.   Okay.  I have a grant that originated
21 its life as an R-56 award.  It's a merit award
22 that has now matriculated into an R-01, and it
23 goes for another four years.  So it's about
24 antidepressants in suicide, but more generally

1008

1 it's about drug adverse event interactions.
2     The bipolar cohort was never proposed
3 as a part of that grant.  It is not part of my
4 work product.  It is related to the general ideas
5 of that grant, and as we talked about on the last
6 deposition, when I do something that's related to
7 suicide in any way possible, I will acknowledge
8 the support of the grant, but this is not one of
9 the projects of the grant.
10     I could just as easily say it has, you
11 know, nothing to do with the grant, and it's --
12 I'm, you know -- it's just -- it is just an
13 academic pursuit.  It's an interest and so, but
14 I'm acknowledging the support of the grant
15 because it's part of that whole body of research.
16     Q.   All right.  And when I said time out,
17 I want to be sure -- I wanted to make sure you
18 were talking about the bipolar paper that you and
19 your co-authors completed in September.
20     That was the paper you were talking
21 about when you said that you acknowledged that it
22 was part of I believe it was the R-56 grant?
23     A.   R-56 which --
24   MS. McGRODER:  Object to form and foundation

1009

1 and to the extent it misstates his testimony --
2   MR. LONDON:  Please let him finish.
3   BY THE WITNESS:
4     A.   The R-56 grant which is now an R-01
5 grant, and, yes, I was referring to the
6 bipolar -- bipolar paper which acknowledges
7 support of those two grants and also other grants
8 to John Mann and to Hendricks Brown and also
9 acknowledges potential conflicts of interest with
10 being an expert witness for Pfizer, for Wyeth,
11 and for the U.S. Department of Justice.
12   BY MR. LONDON:
13     Q.   Well, you typed on the front page of
14 the paper what those grants were and listed what
15 you listed about your role as an expert witness,
16 true?
17     A.   True.
18     Q.   We can pull the exhibit and see that,
19 but there's no quarrel that you did that, true?
20     A.   True.
21     Q.   Okay.  The quarrel is did you tell the
22 university or the Public Health Service that you
23 had been paid more than $10,000 by Pfizer in
24 connection with this litigation which involves

1010

1 both the gabapentin and bipolar cohorts?
2   MS. McGRODER:  Object to form and to the
3 extent it misstates his testimony.
4     Go ahead.
5   BY THE WITNESS:
6     A.   No. 1, the university specifically
7 does not require that you report whether or not
8 you have made $1 or $10 million.  The university
9 requires that you provide a report of outside
10 work that you are doing, and I did report to the
11 university that this was one of the outside
12 projects that I was working on.
13   BY MR. LONDON:
14     Q.   And I'm not quarreling whether you
15 told them about this outside project of yours.
16 It's the -- it's the dollars that I am asking
17 about.
18   MS. McGRODER:  Objection --
19   BY THE WITNESS:
20     A.   We are not required to do that, and I
21 didn't -- I didn't report the dollars, and I'm
22 not asked to report the dollars and nobody -- you
23 know, we don't do that.
24

Gibbons, Robert (Defense Expert)  4/27/2009  10:49:00 AM

1139

1    MR. LONDON:  That level of what?
2    THE WITNESS:  Inference.
3  BY MR. ALTMAN:
4    Q.  Did you do any kind of a sensitivity
5  analysis to see how much the data might change if
6  you were to assume that a person never took the
7  last prescription or took only part of the last
8  prescription?
9    MS. McGRODER:  Object to form.
10    THE WITNESS:  No.
11  BY MR. ALTMAN:
12    Q.  Why not?
13    A.  Didn't think it was meaningful.
14    Q.  Wouldn't it be useful to see how much of
15  an effect that might have on the drug if you assume
16  that somebody only took it for 15 days out of the
17  30?
18    A.  You could do hundreds of sensitivity
19  analyses.  I didn't find that one to be, you know,
20  anything that even occurred to me to do.  The ones
21  -- the sensitivity analyses we did were, I believe,
22  the important ones.
23    Q.  Paragraph 21 of your report, you did make
24  a change from the last version of your report which

1140

1  was -- it originally had said -- if you want to
2  take either one of the earlier versions, the first
3  sentence there said, "More broadly, in connection
4  with FDA's public health alert on the entire class
5  of AEDs, Gibbons, et al. (2008 examined)" then for
6  this version of the report you changed that.
7  Instead of Gibbons, et al. 2008, you changed that
8  to under review.  Correct?
9    A.  Correct.
10    MS. McGRODER:  Wait, wait.  I'm going to
11  give you a little leeway here based on the
12  conversation I had with Jack at lunch, but this
13  kind of question and this scope of questioning is
14  outside of our agreement.  So I'm giving you a
15  little leeway, Mr. Altman, and hope you don't abuse
16  it.
17    MR. ALTMAN:  I just want why he changed
18  from what it was to what it says now.
19    MS. McGRODER:  Is that your question?
20  I'll allow that and nothing further on paragraph 21
21  because it's outside the scope of the agreement.
22    THE WITNESS:  The revised -- the
23  supplement was done in 2009 and the paper was not
24  accepted for publication or in press, so the

1141

1  original one was done in 2008.  So 2008
2  corresponded to the expert -- the time of the
3  expert report.  And in this one, it would have been
4  wrong to list 2008 because that would have implied
5  that it had been published in 2008 and it still
6  wasn't published.  It was still under review.  So I
7  changed the 2008 to under review to update the
8  status of the paper.
9  BY MR. ALTMAN:
10    Q.  In the data, that data set that you had
11  from PHARMetrics, it included the -- for the
12  prescription information it included the dosage,
13  the number of pills and the -- the dosage and the
14  number of pills, correct, for each prescription?
15    A.  It included the number of pills of the
16  prescription.  I don't remember if it included the
17  dosage or not.
18    Q.  That would have come from the NDC code,
19  correct?
20    A.  Could have, sure.
21    Q.  So for example, somebody could have had a
22  30-day supply of 120 pills of 300 milligrams that
23  would tell you that they were taking -- prescribed
24  4 pills of 300 milligrams per day, correct?

1142

1    A.  Could you repeat the question?
2    Q.  If the prescription data said the person
3  received a 30-day prescription, got 120 pills of
4  300 milligrams of gabapentin, would it be a
5  reasonable inference that that person was
6  prescribed 1200 milligrams per day?
7    A.  Yes.
8    Q.  Did you do any sensitivity analysis to
9  see the effect on -- the effect of dosage on any of
10  the results?
11    A.  No.
12    Q.  Could you have done so?
13    A.  If that information was available.  At
14  this point I just don't remember at this point from
15  the data what was available, but if there was
16  dosage information, certainly could include dosage
17  information.  Generally it's not done where we
18  don't really know who took what.  And generally in
19  the pharmacoepidemiologic literature really what's
20  done is kind of what I did here, look at exposure
21  of the time when someone initiated treatment and
22  then as a sensitivity analysis look at some form of
23  duration.  Particularly true when studying suicide
24  since, you know, it's been argued that one of the