EXHIBIT B

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Rothschild, Anthony MD (Defense Expert)**
1/15/2008

Rothschild, Anthony MD (Defense Expert) 1/15/2008 9:09:00 AM

**Page 1**

1   UNITED STATES DISTRICT COURT
2   DISTRICT OF MASSACHUSETTS
3   MDL Docket No. 1629
4   Master File No. 04-10981
5
6   * * * * * * * * * * * * * *
7   IN RE: NEURONTIN MARKETING SALES        *
8   PRACTICES AND PRODUCTS LIABILITY        *
9   LITIGATION                              *
10
11  * * * * * * * * * * * * * *
12
13  VOLUME I
14  PAGES 1-222
15
16
17  VIDEOTAPED DEPOSITION OF
18  ANTHONY J. ROTHSCHILD, M.D.
19
20  DATE: TUESDAY, JANUARY 15, 2008
21  TIME: 9:09 A.M. TO 2:43 P.M.
22
23
24
25

**Page 2**

1   STATE OF NEW YORK
2   COUNTY OF NEW YOUR
3   Index No. 765000
4
5   * * * * * * * * * * * * * *
6   IN RE: NEURONTIN PRODUCT             *
7   LIABILITY LITIGATION                 *
8   * * * * * * * * * * * * * *
9
10  VIDEOTAPED DEPOSITION OF ANTHONY J.
11  ROTHSCHILD, M.D., a witness called on behalf
12  of the Products Liability Plaintiffs,
13  pursuant to the Federal and New York Rules
14  of Civil Procedure, before Jessica L.
15  Williamson, Registered Merit Reporter,
16  Certified Realtime Reporter, Certified CART
17  Provider and Notary Public in and for the
18  Commonwealth of Massachusetts, at the
19  Offices of Hare & Chaffin, 160 Federal
20  Street, Boston, Massachusetts, on Tuesday,
21  January 15, 2008, commencing at 9:09 a.m.
22
23
24
25

**Page 3**

1   A P P E A R A N C E S
2
3   FINKELSTEIN & PARTNERS
4   (By Andrew G. Finkelstein, Esq.
5   and Kenneth B. Fromson, Esq.)
6   436 Robinson Avenue
7   Newburgh, New York  12550
8   (800) 634-1212, ext. 9451
9   afinkelstein@lawampm.com
10  kfromson@lawampm.com
11  Counsel for the Products Liability
12  Plaintiffs
13
14  SHOOK, HARDY & BACON, L.L.P.
15  (By Lori Connors McGroder, Esq.
16  and Trey Alford, Esq. -
17  Present via Telephone)
18  2555 Grand Boulevard
19  Kansas City, Missouri  64108-2613
20  (816) 474-6550
21  lmcgroder@shb.com
22  talford@shb.com
23  Counsel for the Pfizer Defendants
24
25

**Page 4**

1   A P P E A R A N C E S, Continued
2
3   LAW OFFICES OF STEVEN D. HILLYARD
4   (By Elena Gold, Esq.
5   Present via telephone.)
6   345 California Street
7   Suite 1770
8   San Francisco, California  54104
9   (415) 334-6880
10  egold@hdmlaw.com
11  Counsel for Raymond Jennings, M.D.
12
13  ALSO PRESENT:
14  Bill Slater, Videographer
15
16
17
18
19
20
21
22
23
24
25

Rothschild, Anthony MD (Defense Expert)  1/15/2008  9:09:00 AM

Page 5

1        I N D E X
2     DEPONENT                    PAGE
3     ANTHONY J. ROTHSCHILD, M.D.
4     Examination By Mr. Finkelstein    9, 220
5     Examination By Ms. McGroder        218
6
7        E X H I B I T S
8     NO.                         PAGE
9     1 Bound document entitled    136
        "Pfizer Submissions to the
10      Food and Drug Administration"
11    2 Bound document entitled    137
        "Epilepsy Integrate Summary of
12      Safety, Summary and Appendix
        B.33"
13
14    4 Article entitled "Reexposure  180
        to Fluoxetine After Serious
15      Suicide Attempts by Three
        Patients:  The Role of
16      Akathisia"
17    3 Article entitled "Treatment of  195
        Social Phobia With Gabapentin:
18      A Placebo-Controlled Study"
19    5 Article entitled           195
        "Placebo-Controlled Study of
20      Gabapentin Treatment of Panic
        Disorder"
21    6 Special Review entitled "The  201
        clinical use of gabapentin in
22      bipolar spectrum disorders"
23    7 Folder with letters and      205
        correspondences
24
25

Page 6

1        E X H I B I T S
      NO.                         PAGE
2
      8 Expert Report headed "In Re:   217
3       Neurontin, General Causation
        Report, Submitted by Anthony
4       J. Rothschild, M.D., December
        19, 2007"
5
6
7
8
9     Note:  Original Exhibits 1 - 8 were retained
10    by the court reporter and forwarded to
11    Veritext New Jersey for distribution.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  This is the
3     video operator speaking, Bill Slater of
4     Veritext.  Today's date is January 15th,
5     2008.  The time on the video screen is 9:09
6     a.m.  We're here at the offices of Hare &
7     Chaffin, located at 160 Federal Street,
8     Boston, Massachusetts, to take the
9     videotaped deposition of Dr. Anthony
10    Rothschild in the matter of In Re:
11    Neurontin Marketing Sales Practices and
12    Products Liability Litigation, United States
13    District Court, District of Massachusetts,
14    MDL Docket No. 1629, Master File
15    No. 04-10981.
16        Will counsel please voice identify
17    yourselves and state whom you represent.
18        MR. FINKELSTEIN:  Andrew
19    Finkelstein, Finkelstein & Partners, on
20    behalf of the products liability plaintiffs.
21        MR. FROMSON:  Kenneth Fromson,
22    Finkelstein & Partners, on behalf of the
23    products liability plaintiffs.
24        MS. McGRODER:  Lori McGroder of
25    Shook, Hardy & Bacon on behalf of Pfizer

Page 8

1     defendants.
2        MR. FINKELSTEIN:  And whoever's on
3     the phone, can you announce your appearance,
4     please.
5        MR. ALFORD:  Yes.  Trey Alford with
6     Shook, Hardy & Bacon on behalf of the Pfizer
7     defendants.
8        MS. GOLD:  Elena Gold, Law Offices
9     of Steven Hillyard for Raymond Jennings,
10    M.D.
11        MR. FROMSON:  Elena, you're in
12    California?
13        MS. GOLD:  Yes.
14        THE VIDEOGRAPHER:  Will the court
15    reporter, Jessica Williamson, please swear
16    in the witness.
17
18        ANTHONY J. ROTHSCHILD, M.D.,
19    a witness called on behalf of the
20    Plaintiffs, having first been duly sworn,
21    was deposed and testifies as follows:
22
23
24
25

65

1   A.  Their main charter?  No.
2   Q.  Would you agree that the literature does not
3     exclude the theory that Neurontin use may
4     lead to suicidal behavior?
5   A.  I have never seen any article in the medical
6     literature that even suggested that
7     Neurontin causes suicide.
8   Q.  My question was, not that it causes, have
9     you read any medical literature that it
10    excludes the theory that Neurontin may lead
11    to suicidal behavior?
12   A.  I've never seen any article in the medical
13    literature that even discussed a
14    relationship of Neurontin to suicide.
15   Q.  You agree it's important to be thorough in
16    what you've been retained to do here?
17   A.  Yes.
18   Q.  And if such an article exists, you would be
19    reticent (sic) with respect to your duties?
20       MS. McGRODER:  Object to form.
21   A.  If I missed something, I would be happy to
22    look at it, and I would be happy to comment
23    on it.
24   Q.  Okay.  Based on what you know in psychiatry,
25    would you agree that many knowledgeable

66

1     scientists and physicians accept a working
2     hypothesis that a pharmacological agent can
3     transition someone from being imminently
4     suicidal to not being suicidal?
5   A.  Is there a medication -- a pharmacologic
6    agent that can turn somebody from imminently
7    suicidal to not suicidal?  Over what time
8    period?
9   Q.  Any time period you want to provide.
10       MS. McGRODER:  Object to form.
11   A.  Well, "imminently suicidal" means -- let's
12    just make sure we're clear on the terms --
13    means somebody's about to commit suicide.
14    That's what psychiatrists might use to put
15    someone in a hospital; they're imminently
16    suicidal.  So --
17   Q.  Are there any FDA-approved medications for
18    that situation if someone presents at a
19    hospital that's imminently suicidal to be
20    given to that individual to relieve them of
21    their suicidal ideations?
22   A.  Well, getting back to your first question
23    over the time period.  I mean, you know, if
24    somebody's suicidal because they're
25    suffering from major depression, we give

67

1     them antidepressants, but those can take
2     several weeks to work.  Lithium carbonate
3     has been shown to decrease risk of suicide
4     over time in long-term studies in people
5     with bipolar disorder.  There's some
6     suggestion in the literature that clozapine
7     decreases the risk of suicide in people
8     suffering from schizophrenia over a long
9     period of time, but there's no pill you can
10    give somebody that's going to work within 24
11    hours.
12   Q.  Let me restate -- I appreciate your concern
13    about the word "imminent," and I'll take
14    that word out.  Are you aware of any
15    pharmacological agents that are appropriate
16    to prescribe to individuals who are
17    suffering from suicidal ideation with the
18    purposes of transitioning from being
19    suicidal to not being suicidal?
20   A.  Yes.
21   Q.  And would you agree it's not novel for a
22    physician to take the position that a
23    pharmacological agent can transition someone
24    from being suicidal to not being suicidal?
25   A.  That would not be novel.  That's what we

68

1     call treatment.
2   Q.  Based on what you know in psychiatry, would
3    you agree that many knowledgeable physicians
4    and scientists accept a working hypothesis
5    that a pharmacological agent can transition
6    someone from not being suicidal to becoming
7    suicidal?
8       MS. McGRODER:  Objection.
9   A.  That would be novel.  Taking somebody who's
10    not suicidal and making them suicidal?
11    There's no evidence for that.
12   Q.  And if a physician took the position that a
13    pharmacological agent can transition someone
14    from not being suicidal to being suicidal,
15    you would disagree they would have that
16    capability?
17   A.  It would not just -- it would not just be me
18    who would disagree.  That is not the
19    accepted opinion of the medical and
20    scientific community, and that's my opinion,
21    that it wouldn't be accepted.  It would
22    be -- it would not be an -- that opinion
23    that a pharmacological agent could take
24    somebody who is not feeling suicidal and
25    make them suicidal would not -- is not the

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Rothschild, Anthony MD (Defense Expert-Bulger)**
12/4/2008

**1**

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF MASSACHUSETTS
3        MDL Docket No. 1629
4        Master File No. 04-10981
5
6    * * * * * * * * * * * *
7    IN RE:  NEURONTIN MARKETING SALES        *
8    PRACTICES AND PRODUCTS LIABILITY         *
9    LITIGATION                               *
10   _____      *
11   THIS DOCUMENT RELATES TO:                *
12                                            *
13   Bulger v. Pfizer, et al.                 *
14   07-CV-11426-PBS                          *
15   * * * * * * * * * * * *
16   Job No.: 181816
17            VOLUME I
18            PAGES 1-79
19       VIDEOTAPED DEPOSITION OF
20       ANTHONY J. ROTHSCHILD, M.D.
21
22   DATE:  THURSDAY, DECEMBER 4, 2008
23   TIME:  8:59 A.M. TO 10:27 P.M.
24
25       VIDEOTAPED DEPOSITION OF ANTHONY J.

**2**

1    ROTHSCHILD, M.D., a witness called on behalf
2    of the Products Liability Plaintiffs,
3    pursuant to the Federal Rules of Civil
4    Procedure, before Jessica L. Williamson,
5    Registered Merit Reporter, Certified
6    Realtime Reporter, Certified CART Provider
7    and Notary Public in and for the
8    Commonwealth of Massachusetts, at the
9    Offices of Hare & Chaffin, 160 Federal
10   Street, Boston, Massachusetts, on Thursday,
11   December 4, 2008, commencing at 8:59 a.m.
12
13   A P P E A R A N C E S
14
15   FINKELSTEIN & PARTNERS
16       (By Ronald Rosenkranz, Esq.
17       and Kenneth B. Fromson, Esq.)
18       436 Robinson Avenue
19       Newburgh, New York  12550
20       (800) 634-1212, ext. 9451
21       rrosenkranz@lawampm.com
22       kfromson@lawampm.com
23       Counsel for the Products Liability
24       Plaintiffs
25

**3**

1    A P P E A R A N C E S, Continued
2
3    SHOOK, HARDY & BACON, L.L.P.
4       (By Lori Connors McGroder, Esq.)
5       2555 Grand Boulevard
6       Kansas City, Missouri  64108-2613
7       (816) 474-6550
8       lmcgroder@shb.com
9       Counsel for the Pfizer Defendants
10
11   ALSO PRESENT:
12
13       Tom Tracy, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1            I N D E X
2    DEPONENT                      PAGE
3    ANTHONY J. ROTHSCHILD, M.D.
4    Examination By Mr. Rosenkranz        6
5
6        E X H I B I T S
7    NO.                           PAGE
8     1 Report dated 11/10/08      6
9     2 File Folder               17
10
11
12
13   Note:  Original Exhibit 1, along with a copy
14   of Exhibit 2, was retained by the court
15   reporter and forwarded on to Veritext New
16   Jersey for distribution.  Original Exhibit 2
17   was retained by the Deponent.
18
19
20
21
22
23
24
25

Rothschild, Anthony MD (Defense Expert-Bulger) 12/4/2008 8:59:00 AM

---

29

1    lectures at seminars or grand rounds.
2    Sometimes the grand rounds at a medical
3    school might -- the expenses might have been
4    paid by Pfizer.
5         I think at times the lectures focused
6    on -- particular in the early '90s when
7    Pfizer had an antidepressant that was com --
8    had come on the market called Zoloft, given
9    that there were only two antidepressants in
10   that class at the time, Prozac and Zoloft, I
11   mean, a lot of the lecture might have
12   focused on Zoloft.
13        As time went on, you know, the
14   lectures might have been more broadly about
15   the treatment of depression. So the
16   lectures actually for the most part were all
17   my slides, my content and so forth, and it
18   may have covered a Pfizer product, but it
19   wasn't primarily on a Pfizer product.
20   Q.  When it is Pfizer products, though, don't
21       they -- when you're -- I'm not talking about
22       a CME, I'm talking about being part of the
23       Speakers' Bureau -- doesn't Pfizer take a
24       look at what you intend to present and
25       either edit it or accept it or reject it?

---

30

1    Don't they have control over what you're
2    going to say about their products?
3    A.  Actually, during --
4         MS. McGRODER: Wait. Object to
5    form. Just give me a chance to object --
6         THE WITNESS: Sure.
7         MS. McGRODER: -- before you give
8    your answer.
9    A.  The answer is no. I mean, they were my own
10       slides, and they were not reviewed by
11       anyone.
12   Q.  When you're a part of their Speakers'
13       Bureau, do they train you?
14   A.  I'm trying to remember if Pfizer ever did
15       that. I actually don't recall ever going to
16       a speakers' training. I mean, nowadays I
17       think that companies do that, but back then
18       I don't recall going to a Pfizer speakers'
19       training.
20   Q.  So you never went to a class, you never
21       received any materials, you -- it was never
22       discussed with you how you should present --
23       in what light you should present their
24       products or anything of that nature?
25   A.  No.

---

31

1         MS. McGRODER: Object to form.
2    A.  No.
3    Q.  But when you did speak on behalf of their
4        products, you were in fact paid by them,
5        were you not?
6         MS. McGRODER: Object to form.
7    A.  Well, again, I never viewed it as speaking
8        on behalf of their products, but I did
9        receive an honorarium from them when I did
10       do these speaking engagements.
11   Q.  Okay. Now, what do you consider to be some
12       of the stronger suicidal risk factors?
13   A.  As I think I mentioned a moment ago, if you
14       look at, for example, the Moscicki article,
15       she wrote that 90 percent of all completed
16       suicides can be explained by the presence of
17       either a mood disorder or substance abuse
18       and access to lethal means. And I agree
19       with that. I mean, I think that the mood
20       disorders and substance abuse are big ones,
21       and then I think I also mentioned that a
22       past history of a suicide attempt is another
23       one.
24   Q.  Okay. Would you agree that notwithstanding
25       they are considered strong factors, that the

---

32

1    majority of people who have those factors do
2    not commit suicide?
3    A.  As you know, suicide is a rare event, so
4        that's -- there are -- there are many more
5        people who feel suicidal than commit
6        suicide. There are many more people that
7        make attempts than actually commit suicide,
8        so yes.
9    Q.  Okay. Do you know for what indication Susan
10       Bulger was prescribed Neurontin?
11   A.  Well, I believe that Susan Bulger was
12       prescribed Neurontin by her physicians for
13       pain, but I think your question said
14       "indication," so it would have been an off-
15       label use, I think.
16   Q.  Okay. Doctor, you're familiar with the
17       FDA's meta-analysis, are you not?
18   A.  Yes, I'm familiar with it.
19   Q.  The one I'm referring to is the basis of the
20       advisory board hearing in July of 2008?
21        MS. McGRODER: Object to form.
22   A.  Well, the FDA did a meta-analysis prior
23       to -- prior to the meeting that they had in
24       July, yeah.
25   Q.  Okay. Would you agree that the meta-

---

Rothschild, Anthony MD (Defense Expert-Bulger)  12/4/2008  8:59:00 AM

33

```
 1       analysis was scientific?  I'm not asking
 2       whether you agree or disagree with it.  I'm
 3       just asking you right now if you agree that
 4       it was scientifically done.
 5    A.  If you phrase the question that way, I'd
 6       have to answer no.
 7    Q.  You do not believe that it was
 8       scientifically done?
 9    A.  It was an analysis done by a regulatory
10       body, and they do things that, you know, are
11       not scientific in the sense -- you know, and
12       let me explain.  I mean, if you wanted to do
13       a meta-analysis to answer the question, you
14       know -- to say does Neurontin cause suicide,
15       you would look at the data on Neurontin, you
16       wouldn't bring in data from other drugs.  In
17       that sense it's not scientific.  I don't
18       mean to fault them.  They're a regulatory
19       body.  They have a job to do, and they do
20       things that are, quote-unquote, not
21       scientific, but if you asked the question,
22       you know, is it scientific, I'd have to
23       answer no for that reason.
24    Q.  Okay.  Can you tell me if there is any drug
25       that you're aware of that can cause or
```

34

```
 1       contribute to suicide?
 2    A.  No.
 3    Q.  Okay.  Would you agree that the FDA's
 4       meta-analysis, notwithstanding you do not
 5       believe it was scientific, that to at least
 6       the FDA it demonstrated that antiepileptic
 7       drugs as a class or as a -- have an
 8       increased risk or association of
 9       suicidality --
10             MS. McGRODER:  Object to form.
11    Q.  -- relative placebo?
12             MS. McGRODER:  Object to form.
13    A.  Well, first of all, they never said the word
14       "cause."  They said there was an
15       association.
16    Q.  I used the -- I used the word "association,"
17       but --
18    A.  Okay.  Just so we're clear --
19    Q.  Okay.
20    A.  -- they said that there was -- in their
21       meta-analysis that there was a statistical
22       association between the group of
23       antiepileptics -- I think it was around .4
24       percent -- versus the .2 percent on placebo
25       and -- with suicidality.
```

35

```
 1    Q.  Yes.
 2    A.  I know you said -- I mean --
 3    Q.  I think I said suicidality.
 4    A.  You did, yes.
 5    Q.  Okay.  And would you agree that the vote
 6       that was taken to come to that determination
 7       was 20 to zero with one abstention?
 8             MS. McGRODER:  Object to form.
 9    A.  The vote on what?
10    Q.  On whether or not, in fact, antiepileptic
11       drugs as a class are associated with
12       suicidality.
13             MS. McGRODER:  Same objection.
14    A.  Well, you know, they took a number of votes.
15       I mean, actually, if you may recall, at the
16       hearing the first thing they looked at is
17       whether or not the -- well, actually, I
18       don't know if it was the first thing, but
19       one of the things the FDA originally
20       proposed was to make this a black box
21       warning, and they voted that down, okay?
22       I actually don't recall if they
23       actually voted, you know, with the raise of
24       the hands and the count on the suicidality
25       question, but I mean, I certainly think the
```

36

```
 1       committee accepted that consensus.  I mean,
 2       you may be accurate.  I just don't recall if
 3       there was a vote, it was 20 to nothing or
 4       what it was.
 5    Q.  You recall the vote about the black box, you
 6       don't recall the vote about --
 7    A.  I definitely recall --
 8    Q.  -- the suicidality?
 9    A.  -- the black box because there were a lot of
10       strong -- I remember there were a lot of
11       strong opinions about not putting in a black
12       box, that it didn't rise to the level of the
13       black box, and so that I do recall.
14    Q.  Is it your testimony, as you sit here,
15       Doctor, on December 4th, 2008 that you do
16       not expect in the not too distant future
17       some change in the labels with respect to
18       antiepileptic drugs, including Neurontin,
19       that will very possibly include some type of
20       added warning or precaution?
21             MS. McGRODER:  Object to form.
22    A.  Well, I think -- I think there was
23       certainly, I mean, consensus in my take-away
24       from the hearing that there was going to be
25       some kind of a change.  What specifically
```