# EXHIBIT D

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)
Jacobs, Douglas MD (Defense Expert)
1/23/2008

Printed : 5/5/2008

Jacobs, Douglas MD (Defense Expert) 1/23/2008 9:16:00 AM

### Page 1

```
 1   UNITED STATES DISTRICT COURT
 2        DISTRICT OF MASSACHUSETTS
 3        MDL Docket No. 1629
 4        Master File No. 04-10981
 5
 6   * * * * * * * * * * * * * *
 7   IN RE: NEURONTIN MARKETING SALES   *
 8   PRACTICES AND PRODUCTS LIABILITY   *
 9   LITIGATION                         *
10                                      *
11   * * * * * * * * * * * * * *
12
13            VOLUME I
14            PAGES 1-189
15
16
17        VIDEOTAPED DEPOSITION OF
18        DOUGLAS G. JACOBS, M.D.
19
20   DATE: WEDNESDAY, JANUARY 23, 2008
21   TIME: 9:16 A.M. TO 3:14 P.M.
```

### Page 2

```
 1   STATE OF NEW YORK
 2   COUNTY OF NEW YOUR
 3         Index No. 765000
 4
 5   * * * * * * * * * * * * *
 6   IN RE: NEURONTIN PRODUCT       *
 7   LIABILITY LITIGATION           *
 8   * * * * * * * * * * * * *
 9
10        VIDEOTAPED DEPOSITION OF DOUGLAS G.
11   JACOBS, M.D., a witness called on behalf of
12   the Products Liability Plaintiffs, pursuant
13   to the Federal and New York Rules of Civil
14   Procedure, before Jessica L. Williamson,
15   Registered Merit Reporter, Certified
16   Realtime Reporter, Certified CART Provider
17   and Notary Public in and for the
18   Commonwealth of Massachusetts, at the
19   Offices of Professional Psychiatric
20   Associates, One Washington Street, Wellesley
21   Hills, Massachusetts, on Wednesday, January
22   23, 2008, commencing at 9:16 a.m.
```

### Page 3

```
 1   APPEARANCES
 2
 3   FINKELSTEIN & PARTNERS
 4     (By Andrew G. Finkelstein, Esq.
 5     and Kenneth B. Fromson, Esq.)
 6     436 Robinson Avenue
 7     Newburgh, New York 12550
 8     (800) 634-1212, ext. 9451
 9     afinkelstein@lawampm.com
10     kfromson@lawampm.com
11     -and-
12   THE LANIER LAW FIRM
13     (By Kenneth S. Soh, Esq.)
14     6810 FM 1960 West
15     Houston, Texas 77069
16     (713) 659-5200
17     kss@lanierlawfirm.com
18     Counsel for the Products Liability
19     Plaintiffs
```

### Page 4

```
 1   A P P E A R A N C E S, Continued
 2
 3   SHOOK, HARDY & BACON, L.L.P.
 4     (By Lori Connors McGroder, Esq.
 5     and Trey Alford, Esq. -
 6     Present via Telephone)
 7     2555 Grand Boulevard
 8     Kansas City, Missouri 64108-2613
 9     (816) 474-6550
10     lmcgroder@shb.com
11     talford@shb.com
12     Counsel for the Pfizer Defendants
13
14   LAW OFFICES OF STEVEN D. HILLYARD
15     (By Elena Gold, Esq.)
16     345 California Street
17     Suite 1770
18     San Francisco, California 54104
19     (415) 334-6880
20     egold@hdmlaw.com
21     Counsel for Raymond Jennings, M.D.
22
23   ALSO PRESENT:
24     Sean Budd, Videographer
```

Jacobs, Douglas MD (Defense Expert) 1/23/2008 9:16:00 AM

Page 5

1  PROCEEDINGS
2  THE VIDEOGRAPHER: Okay. We are on
3  the record. This is the video operator
4  speaking, Shawn Budd of Veritext Court
5  Reporting. Today's date is January 23rd,
6  2008, and the time is 9:16. We're at the
7  offices of Professional Psychiatric
8  Associates located in Wellesley,
9  Massachusetts to take the videotaped
10  deposition of Dr. Douglas Jacobs in the
11  matter of Neurontin Marketing Sales
12  Practices and Products Liability Litigation.
13  Would counsel please introduce
14  themselves.
15  MR. FINKELSTEIN: Andrew
16  Finkelstein, Finkelstein & Partners, on
17  behalf of the product liability plaintiffs.
18  MR. FROMSON: Kenneth Fromson,
19  Finkelstein & Partners, on behalf of the
20  products liability plaintiffs. Along with
21  me is Ken Soh from The Lanier Law Firm.
22  MS. McGRODER: Laurie McGroder of
23  Shook, Hardy & Bacon on behalf of Pfizer
24  defendants.
25  MR. FINKELSTEIN: And on the phone?

Page 6

1  MR. ALFORD: Trey Alford with
2  Shook, Hardy & Bacon on behalf of the Pfizer
3  defendants.
4  MS. GOLD: Elena Gold for Raymond
5  Jennings, M.D.
6  THE VIDEOGRAPHER: And will the
7  court reporter please swear in the witness.
8
9  DOUGLAS G. JACOBS, M.D.,
10  a witness called by counsel for the Product
11  Liability Plaintiffs, being first duly
12  sworn, was examined and testified as
13  follows:
14
15  DIRECT EXAMINATION
16
17  BY MR. FINKELSTEIN:
18  Q. Doctor, do you agree that if a drug causes a
19  physical disorder and the physical disorder
20  leads to depression and the depression
21  results in suicide, that there is a causal
22  link between the drug and the suicide?
23  MS. McGRODER: Object to form. Go
24  ahead.
25  A. The -- there are many questions I would need

Page 7

1  to ask to answer that question yes or no.
2  For example, what type of physical disorder?
3  Q. A physical disorder that renders somebody
4  who's employable unemployable, a
5  rheumatological disorder?
6  MS. McGRODER: Objection, improper
7  and incomplete hypothetical.
8  A. And, of course, it would depend upon the
9  nature of that rheumatologic disorder, the
10  severity of it, how it impacted the person,
11  but the -- are we -- so those would be other
12  questions I would need to know.
13  Q. I would ask you to assume that the
14  rheumatological disorder renders the person
15  unable to work, causes depression and the
16  depression leads to suicide. Would you
17  agree that the drug is related to the
18  suicide?
19  MS. McGRODER: Objection, improper
20  hypothetical.
21  A. What I would agree with is that the drug, if
22  it's demonstrated that it caused the
23  rheumatologic disorder and that that caused
24  the depression, that there is a link in that
25  way, but not due to the pharmacologic

Page 8

1  properties of the drug.
2  Q. Just so I'm clear, if you are confident that
3  the drug, in fact, causes the
4  rheumatological disorder and as a result of
5  the rheumatological disorder there is
6  depression which leads to suicide, you agree
7  that the drug is associated with the
8  suicide?
9  MS. McGRODER: Object to form.
10  A. Again, with the understanding that the
11  connection with the suicide is the --
12  whatever physical properties of the drug
13  caused the rheumatologic disorder and that
14  there's no link between the drug itself and
15  the depression, it goes through the
16  rheumatologic disorder.
17  Q. You don't think any drug causes a
18  psychiatric depression, do you?
19  MS. McGRODER: Object to form.
20  A. In terms of the diagnosis of depression,
21  that's correct.
22  Q. Do you think any drug causes any psychiatric
23  adverse event?
24  A. In terms of cause, I have not seen evidence
25  that it causes an adverse event. I've seen

Page 9

1   that it -- there's been reports of adverse
2   events on drugs.
3   Q. Have you, yourself, ever seen, any of your
4   patients report to you, an adverse --
5   psychiatric adverse event related to any
6   pharmacological agent they are on?
7   A. I've had patients report events. I have
8   not -- in my clinical practice I do not try
9   to determine if it's, quote, related to the
10  drug. I'll respond as a clinician, and I
11  may or may not adjust the medication. I may
12  change the medication depending upon the
13  clinical needs of the patient.
14  Q. Can you describe one drug in your clinical
15  practice that you prescribe for any
16  psychiatric illness?
17  A. Celexa.
18  Q. Related to Celexa -- and I'm just asking a
19  hypothetical with respect to Celexa -- if a
20  patient of yours undergoes a course of
21  medical treatment where you prescribe Celexa
22  and they report back to you that they are
23  feeling agitated while taking Celexa, do you
24  do anything as a clinician?
25  A. It would depend when they report that, what

Page 10

1   was the nature of their symptoms when they
2   first came in, what is the level of
3   agitation, are there any other -- what is
4   the other relevant symptomatology? And so
5   the course of action would be that I might
6   do nothing for several days, I might
7   decrease the Celexa to see if that's at
8   all -- or that I might decide that it's --
9   after three or four weeks and there's been
10  no response to the Celexa, I might say that
11  I think we should be changing medication,
12  and then I would taper the Celexa and start
13  a different medication.
14  Q. Is there a difference as a physician between
15  demonstrating a drug has the capacity to
16  cause an adverse event generally versus
17  whether the drug can cause an adverse event
18  in an individual case?
19  A. Well, I'm not sure I understand your
20  question when you say "as a physician,"
21  because most physicians are not, you know,
22  researchers, they're not involved in, you
23  know, demonstrating adverse events, if we're
24  talking about physicians. As clinicians
25  we're involved with prescribing medication

Page 11

1   to patients for certain disorders and/or
2   symptom complexes and treating that patient,
3   looking at the symptoms, whether or not
4   there are any -- how they're responding to
5   the medication. So we're not focused on
6   determining whether their symptoms that
7   occur subsequent to the administration of
8   medication are, quote, due to the
9   medication.
10  Q. How about your role in this litigation; do
11  you understand the difference between
12  whether or not Neurontin has the capacity to
13  lead to negative mood and behavioral changes
14  versus evaluating whether it does it in an
15  individual case?
16  A. Certainly I've -- in my role in this case
17  I've certainly been focused on whether or
18  not Neurontin has led to the suicides or
19  suicide attempts that have been reported in
20  the case, looking at both the general
21  issues. I have looked also at 10 specific
22  cases and determined whether or not there
23  was a relationship between Neurontin and
24  what happened, and it is my opinion that
25  there is no relationship on a general basis

Page 12

1   or in any of the specific cases, and that
2   Neurontin, in my opinion, does not have the
3   capacity to cause suicide, suicide attempts,
4   suicide ideation.
5   Q. Do you think any drug has the capacity to
6   cause suicide, suicide attempts or suicidal
7   ideation?
8   A. I have not -- I have reviewed a number of
9   medications, spending over this now close to
10  35 years in the field of suicide, and I have
11  not seen any evidence that any medication
12  causes suicide, suicide attempts or suicide
13  ideation.
14  Q. Who contacted you first, which lawyer?
15  A. Scott Sayler.
16  Q. And when did that happen?
17  A. I believe it would have been in the -- could
18  have been either in the summer or fall of
19  2005.
20  Q. And when he contacted you first, was it a
21  phone call, e-mail or in person or something
22  different?
23  A. Would be phone call.
24  Q. And when he contacted you first in 2005, did
25  you have the opinion that in your 35-year

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)
Jacobs, Douglas (Defense Expert-Bulger_Smith)
12/2/2008

Jacobs, Douglas (Defense Expert-Bulger & Smith) 12/2/2008 9:12:00 AM

### Page 1

VOLUME: I
PAGES: 1-277
EXHIBITS: 1-10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE: NEURONTIN           ) MDL DOCKET
MARKETING, SALES PRACTICES ) NO. 1629
AND PRODUCTS LIABILITY     ) MASTER FILE
LITIGATION                 ) NO. 04-10981
                           )
THIS DOCUMENT RELATES TO:  ) JUDGE PATTI
                           ) B. SARIS
BULGER VS. PFIZER, ET AL.  ) MAGISTRATE
07-11426-PBS               ) JUDGE LEO T.
                           ) SOROKIN
SMITH VS. PFIZER, ET AL.   )
05-CV-11515-PBS            )

VIDEOTAPED DEPOSITION OF DOUGLAS JACOBS, M.D., a witness called on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Jill Shepherd, Registered Professional Reporter, CSR, CLR and Notary Public, in and for the Commonwealth of Massachusetts, at the offices of Douglas Jacobs, M.D., One Washington Street, Suite 304, Wellesley Hills, Massachusetts, on Tuesday, December 2, 2008, commencing at 9:12 a.m.

Job No. 181811

### Page 2

APPEARANCES:
FINKELSTEIN & PARTNERS
By: Ronald Rosenkranz, Esquire
    -- and --
    Kenneth B. Fromson, Esquire
1279 Route 300
P.O. Box 1111
Newburgh, New York 12551
Tel: 800.634.1212, ext. 9442
E-mail: rrosenkranz@lawampm.com
Attorney for the Plaintiff.

SHOOK, HARDY & BACON
By: Lori Connors McGroder, Esquire
2555 Grand Boulevard
Kansas City, Missouri 64108
Tel: 816.474.6550
E-mail: lmcgroder@shb.com
Attorney for the Defendant, Pfizer.

ALSO PRESENT: Shawn Budd, Videographer

### Page 3

INDEX
WITNESS                                    PAGE
DOUGLAS JACOBS, M.D.
Examination by Mr. Rosenkranz              5

EXHIBITS
NO.  DESCRIPTION                           PAGE
1    Report                                5
2    Notice of Deposition                  6
3    Peabody Police Report                 147
4    Police Report                         147
5    Doctor's Notes                        151
6    AtlantiCare Medical Record            168
7    Doctor's Notes                        185
8    Tax Returns                           223
9    JAMA Report                           233
10   Dr. Crognale's Records                241

### Page 4

PROCEEDINGS
    THE VIDEOGRAPHER: We are on the record. This is the video operator, Shawn Budd. Today's date is December 2, 2008, and the time is 9:22. We are here at the offices of Douglas Jacobs, M.D., located in Wellesley, Massachusetts, to take the videotaped deposition of Douglas Jacobs, M.D., in the In Re: Neurontin Marketing Sales Practices and Product Liability Litigation.
    Would counsel please introduce themselves.
    MR. ROSENKRANZ: Ron Rosenkranz, Finkelstein & Partners, for the plaintiff, Bulger.
    MS. McGRODER: Ken, do you --
    MR. FROMSON: Sure. Ken Fromson on behalf of plaintiff, Finkelstein & Partners.
    MS. McGRODER: Lori McGroder of Shook, Hardy & Bacon, on behalf of Pfizer defendants.
    THE VIDEOGRAPHER: The court reporter, Jill Shepherd, will you please swear in the witness.

**Page 41**

1  MS. McGRODER: Object to form.
2  MR. ROSENKRANZ: You want him to
3  answer that question?
4  MS. McGRODER: I'm sorry? What did
5  you --
6  MR. ROSENKRANZ: You didn't want
7  him to answer that?
8  MS. McGRODER: No, I wanted to get
9  my objection on the record. If I don't want
10  him to answer, I think it will be very clear
11  on the record. I will tell him not to
12  answer and then he will know and you will
13  know.
14  MR. ROSENKRANZ: Okay.
15  Q. Are you of the opinion that no drug can
16  cause clinical depression?
17  MS. McGRODER: Object to form.
18  A. The reason I'm struggling with the question,
19  because clinical depression -- because I
20  think that there are --
21  Q. As opposed to respiratory depression, I'm
22  talking about.
23  MS. McGRODER: Object to form. If
24  you don't understand the question --
25  A. I was trying to answer the question in terms

**Page 42**

1  of --
2  Q. Okay.
3  A. Clinical depression, in my view, means
4  satisfying criteria for a major depressive
5  disorder. Are there drugs that can mimic
6  some symptoms of depression? There are,
7  such as beta blockers can make a person feel
8  tired and lethargic. So there are examples
9  of drugs that can mimic symptoms to have
10  depression.
11  Q. Okay. Can I -- when you say mimic, can I
12  assume that you mean create symptomatology
13  that might appear to be depressive?
14  A. I would agree with that, yes.
15  Q. But really isn't?
16  A. Well, in terms of satisfying the full
17  criteria and being -- since depression is
18  correlated with suicide, I'm not aware, and
19  I do not believe that a drug that can cause
20  or is associated with some depressive
21  symptomatology leads to suicide.
22  Q. Okay. Well, I was going to take it one step
23  further, but you already answered that. You
24  do not believe that there is any drug that
25  can cause suicide?

**Page 43**

1  A. That is my opinion, yes.
2  Q. Are you of the opinion that Neurontin has
3  been proven to be safe and effective?
4  A. Certainly it's been proven to be safe. I
5  think in terms of its efficacy in terms of
6  the -- as a monotherapy and seizure disorder
7  or post hepatic neuralgia, it's demonstrated
8  to be effective. I think there are studies
9  looking at anxiety or bipolar disorder that
10  have demonstrated that in some of the
11  studies, although I understand it's not
12  approved in those conditions or with
13  neuropathic pain for which it is a very
14  common usage today.
15  Q. Would you agree that Neurontin has never
16  been approved for neuropathic pain?
17  A. I would agree with that.
18  Q. Okay. Or for bipolar?
19  MS. McGRODER: Object to form. If
20  you are talking U.S. versus European.
21  Q. Has not been proved by the FDA for
22  neuropathic pain?
23  A. That's correct.
24  Q. Important for bipolar?
25  A. I believe that's correct. Although what's

**Page 44**

1  important, if one looks at the FDA alert
2  that it is acknowledged by the FDA that the
3  antiepileptics are used in psychiatric and
4  other conditions, and there's no prohibition
5  by the FDA.
6  Q. Well, there's no prohibition because doctors
7  can prescribe a drug for any kind of
8  off-label use if they think it's
9  appropriate, correct?
10  A. Although technically you're correct, that's
11  not how it works. Doctors just don't
12  prescribe for anything off-label.
13  Q. If they think it's going to work?
14  A. And if they've had some basis to --
15  Q. Okay.
16  A. -- to believe that.
17  Q. Do you know for what indication Neurontin
18  was prescribed to Susan Bulger?
19  A. I believe initially it was prescribed for
20  pain.
21  Q. And would that have been an indication that
22  it had been approved by the FDA?
23  A. For the specific indication, the answer
24  would be no.
25  Q. Okay. Would you agree that the FDA made an

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Jacobs, Douglas (Defense Expert-Crone)**
1/15/2009

Jacobs, Douglas (Defense Expert-Crone) 1/15/2009 9:06:00 AM

---

**Page 1**

```
 1   IN THE SUPERIOR COURT OF THE STATE OF CA
 2                  COUNTY OF LAKE
 3                     --oOo--
 4   NICOLETTE CRONE, INDIVIDUALLY        )
     AND AS GUARDIAN AD LITEM FOR         )
 5   CASSIE MARIE CRONE, A MINOR AND      )
     BENJAMIN JONATHAN CRONE, ALL         )
 6   INDIVIDUALLY AND AS SUCCESSORS IN    )
     INTEREST TO ESTATE OF RICK ARTHUR    )
 7   CRONE,                               )
                                          )
 8          Plaintiffs,    )
                                          )
 9        vs.              ) CASE NO. CV400432
                                          )
10   PFIZER, INC., PARKE-DAVIS, A         )
     DIVISION OF WARNER-LAMBERT           )
11   COMPANY AND WARNER-LAMBERT           )
     COMPANY, RAYMOND D. JENNINGS,        )
12   M.D., AND DOES 1-100,                )
                              ) VOLUME I
13          Defendants.    )
     _____)
14
15
16   Deposition of DOUGLAS JACOBS, M.D., at The
17   Edgar Law Firm, 408 College Avenue, Santa
18   Rosa, California 95401, commencing at
19   9:06 a.m., Thursday, January 15, 2009, before
20   Megan F. Alvarez, RPR, CSR No. 12470.
21
22
23
24   PAGES 1 - 73
25   Job No.: 185766
```

---

**Page 2**

```
 1   FOR THE DEFENDANT, RAYMOND JENNINGS, M.D.
 2
 3      LAW OFFICES OF STEVEN D. HILLYARD
 4      345 CALIFORNIA STREET
 5      SUITE 1700
 6      SAN FRANCISCO, CALIFORNIA 94104
 7      415.334.6880
 8      BY: GERHARD O. WINKLER, ESQ.
```

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR THE PLAINTIFFS:
 4
 5      EDGAR LAW GROUP
 6      408 COLLEGE AVENUE
 7      SANTA ROSA, CALIFORNIA 95401
 8      707.545.3200
 9      REX@CLASSATTORNEYS.COM
10      BY: REX GRADY, ESQ.
11
12   FOR THE DEFENDANT, PFIZER:
13
14      SHOOK, HARDY & BACON, LLP
15      2555 GRAND BLVD.
16      KANSAS CITY, MO 64108-2613
17      816.474.6550
18      LMCGRODER@SHB.COM
19      BY: LORI CONNORS MCGRODER, ESQ.
```

---

**Page 3**

```
                      I N D E X
                INDEX OF EXAMINATIONS

Examination by Mr. Grady .......................5

                       ---oOo---

         EXHIBITS MARKED FOR IDENTIFICATION
No.    Description                       Page
 1   6 pages, Notice of Deposition of ............6
     Douglas Jacobs, M.D.

 2   13 pages, NDA to Pfizer; Robert Clark, .....64
     Department of Health & Humans Services,
     FDA, NDA for Neurontin (gabapentin)


                       --oOo--

                  CERTIFIED QUESTIONS
                         None.
```

---

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)    Page - - 3

**68**

1    We'll work on that together.
2    MS. MCGRODER: Okay.
3    BY MR. GRADY:
4    Q. Yes.
5    You have appeared as an expert in cases
6    dealing with allegations of suicide resulting from drug
7    use; is that true?
8    A. Yes, I have.
9    Q. And certainly those other Neurontin cases, the
10   Bulger case, Smith case, would fall into that class of
11   cases that you've been an expert in; is that true?
12   A. That's correct.
13   Q. Okay.
14   How many other occasions or cases have you
15   appeared in as an expert dealing with the same kind of
16   issues, allegations of suicide arising from drug use?
17   MS. MCGRODER: Well, are you asking some tir
18   period? Are you just asking --
19   MR. GRADY: Ever.
20   MS. MCGRODER: Ever. Answer if you can.
21   THE WITNESS: I've appeared in matters
22   involving the drug Accutane, Wellbutrin, Prozac, Zoloft.
23   BY MR. GRADY:
24   Q. And --
25   A. And those in terms of when I say appeared,

**69**

1    that would be less than -- collectively less than 10.
2    Q. On whose behalf were you appearing in those
3    cases?
4    A. On behalf of the manufacturer.
5    Q. Was your testimony, if testimony was given by
6    you, for your expert conclusion in those cases, however
7    given, that the drug in question did not cause suicide
8    or contribute to it?
9    A. That would be -- that would have been my
10   opinion.
11   Q. Have you ever provided testimony or opinion in
12   a legal case wherein you concluded that a drug did, in
13   fact, contribute or in your opinion contribute to or
14   cause suicide?
15   A. No, I did not. No, I have not.
16   Q. Do you believe that a drug could cause
17   suicide?
18   A. No, I do not.
19   Q. So it's your opinion that drugs do not
20   contribute to suicide ever?
21   A. That is my opinion.
22   Q. And it is your conclusion or expert opinion
23   that Neurontin does not cause suicide or contribute to
24   it?
25   A. That is correct.

**70**

1    Q. And that it did not do so in the case of Rick
2    Crone?
3    A. That is correct.
4    MR. GRADY: Okay.
5    Doctor, I believe I am finished.
6    If counsel present have any questions they
7    wish to ask you, they're free to.
8    MR. WINKLER: I have no questions. Thank you
9    very much.
10   MS. MCGRODER: No. Thanks very much.
11   MR. GRADY: Okay.
12   THE REPORTER: Same copy orders as yesterd
13   Counsel?
14   MS. MCGRODER: Yes.
15   MR. WINKLER: Yes.
16
17   (Whereupon, the deposition was adjourned
18   at 11:08 a.m.)

**71**

1
2    I declare under penalty of perjury that the
3    foregoing is true and correct. Subscribed at
4    _____, California, this _____ day of
5    _____, 2009.
6
7                    DOUGLAS JACOBS, M.D.