UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
:   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,          :
       SALES PRACTICES AND          :   Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION :
:   Judge Patti B. Saris
---------------------------------------------------------------x
:   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO              :
:
*Bulger v. Pfizer Inc., 1:07-11426-PBS* :
:
---------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN
LIMINE TO PRECLUDE THE TESTIMONY OF ALL OF DEFENDANTS'
EXPERT WITNESSES OTHER THAN DR. GIBBONS CONCERNING THE
FDA ALERT AND RELATED FDA SUBJECTS OR, IN THE
ALTERNATIVE, TO PRECLUDE THE TESTIMONY OF DR. GIBBONS**

Plaintiff, RONALD J. BULGER, SR., moves to limit Defendants to that which they represented to this Court was needed — an expert report to rebut the FDA Alert on Suicidality and Antiepileptic Drugs and the FDA meta-analysis and committee review of such Alert and meta-analyis. Subsequent to their request for such a rebuttal expert, three of Defendants' other expert witnesses, namely Dr. Janet Arrowsmith-Lowe, M.D., F.A.C.P., Sheila Weiss Smith, Ph.D. and Alexander Ruggieri, M.D. and Gerald Sanacora, M.D. Ph.D. opined on this specific topic and testified that they were qualified and competent to do so, in direct contradiction to what Defendants represented to the Court. Moreover, not only did Defendants misrepresent their need for a rebuttal witness to the Court, but the supplemental reports of these three experts violate the scheduling orders of the Court regarding general causation expert witnesses. The Court should exclude the testimony of all Defendants' experts other than Robert D. Gibbons, Ph.D.,

concerning the FDA Alert and related FDA subjects for the reasons set forth in detail below or, alternatively, the Court should exclude Dr. Gibbons.

## **INTRODUCTION**

Defendants named three expert witnesses on general causation who have expertise in the FDA, epidemiology, and statistics, namely Dr. Arrowsmith-Lowe, Dr. Weiss Smith, and Dr. Ruggieri.  Each of them submitted expert reports in 2007 in which it was essentially opined that the FDA had concluded that Neurontin did not pose a risk of suicidality in off-label populations because the FDA had not issued any alerts or required any label changes to that effect.  On January 31, 2008, the FDA did issue an Alert exactly to that effect, alerting physicians that its analysis of random controlled trials disclosed that antiepileptic drugs, including Neurontin, doubled the risk of suicide over placebo.

Plaintiff's experts supplemented their reports to incorporate the FDA Alert.  Defendants re-deposed Plaintiff's experts on their supplemental reports.  The three defense experts, however, did not supplement their reports at that time to address the FDA Alert.  Instead, on April 10, 2008, Defendants filed a "Motion For Leave to Name a Rebuttal Expert," ECF Doc. # 1218, to add and designate Dr. Gibbons as a rebuttal expert to opine upon the FDA Alert.  Defendants expressly based their motion on the representation that Dr. Gibbons was *uniquely qualified:*

> Defendants are prepared to designate Dr. Robert Gibbons as a rebuttal expert. Dr. Gibbons is uniquely qualified to opine on plaintiffs' experts' reliance on the Alert, as well as FDA's analysis and methodology and their scientific reliability.
>
> . . .
>
> If defendants' motion for leave is granted, Dr. Gibbons will opine on the scientific validity of reliance on the FDA Alert for *general causation opinions*, limitations of pooled data analyses in general and specific to FDA's analysis, improper inferences plaintiffs make on the basis of the Alert, and analyze any data forthcoming from FDA in advance of the FDA Advisory Committee meeting. [ECF Doc. # 1218 at 10.]

2

On April 17, 2008, the Court granted Defendants' motion. Plaintiff filed an opposition, ECF Doc. # 1237, on April 24, 2008, along with a request for clarification of the April 17, 2008 order. On April 30, 2008 the Court entered the following order:

> Judge Patti B. Saris: Electronic ORDER entered regarding 1231 Emergency MOTION for Order to seek clarification of April 17, 2008 electronic order granting 1217 motion for leave to name a rebuttal expert by Members of the Plaintiffs Product Liability Steering Committee. "I read plaintiffs' memo, but will still permit a rebuttal expert report involving only the FDA Alert, which is a key finding in this case. I will also be sending a letter to the FDA asking for its i[n]put." (Alba, Robert) (Entered: 04/30/2008).

Then, much to Plaintiff's surprise, in November 2008, Defendants' experts Dr. Arrowsmith-Lowe, Dr. Alexander Ruggieri, Dr. Sheila Weiss Smith, and Dr. Sanacora provided extensive and almost identical general causation opinions concerning the FDA Alert, meta-analysis, and advisory committee supplemental disclosures.

None of these experts was uniquely qualified enough in April 2008 to give those opinions on the Defendants' behalf — Defendants told the Court that it was Dr. Gibbons who was uniquely qualified in this area. Unless Defendants misrepresented to the Court the qualifications necessary to form opinions about the FDA Alert and meta-analysis, these other experts are not qualified and their opinions on that subject should be struck for failure to meet the requirements of Fed. R. Evid. 702 and *Daubert v. Merrill Dow Pharms., Inc.*, 509 u.s. 579 (1993), as well as being cumulative and a year too late for general causation opinions under the scheduling order.

Conversely, if these experts were qualified, and at least three of them testified that they were, then Defendants misrepresented to the Court the need to name Dr. Gibbons as a rebuttal expert. In that case, Dr. Gibbons should be struck as a rebuttal expert. It should be noted that Plaintiffs have filed separate motions concerning Dr. Gibbons to (1) strike him as an expert for lying, ECF Doc. # 1807, (2) strike his November 2008 expert report and manuscript for un-

3

timeliness and for discovery abuse, ECF Doc. #1804, and (3) strike his testimony as unreliable under Fed. R. Evid. 702 and703 and *Daubert*, as one of Plaintiff's Motions ln Limine.

If the Court does not disallow all of the experts to testify concerning the FDA Alert and meta-analysis, the Court also should limit such testimony to one witness so that it is non-cumulative under Fed. R. Evid. 403.

## ARGUMENT

## POINT I

### DEFENDANTS' INITIALLY DISCLOSED EXPERTS WERE CAPABLE OF OPINING UPON THE FDA ALERT, THUS OBVIATING THE NEED FOR REBUTTAL EXPERT DR. ROBERT GIBBONS

The experts retained by Defendants maintained that they possessed the requisite qualifications to form opinions and testify about the FDA Safety Alert and meta-analysis. Dr. Arrowsmith-Lowe, a physician. elected Fellow of the American College of Epidemiology, and former FDA Medical Review Officer, testified:

Q. Are you aware that in the end of January of 2008, the FDA came out with an alert associated with anticonvulsant drugs and suicidality?

A. Yes, I'm aware of that.

Q. Have you read that alert?

A. Yes.

Q. Okay. Are you aware that in May of 2008, the FDA published a statistical review associated with that alert?

A. I'm aware of that, yes, of that statistical review, yes.

Q. Did you review that statistical review?

A. Yes, I've read it.

> Q. Okay. Are you aware that in July of 2008, the FDA convened an advisory committee to discuss what proposed label changes associated with the anticonvulsants and suicidality?
>
> MR. BARNES: Objection, incomplete question regarding what the advisory committee did. But go ahead and answer.
>
> THE WITNESS: I'm aware that FDA convened a joint advisory committee, yes, to discuss AEDs and suicide.
>
> BY MR. ALTMAN:
> Q. Okay. Did you review that transcript?
>
> A. Yes.
>
> Q. At the time the FDA alert came out, were you qualified to render opinions based upon the FDA alert?
>
> A. I don't understand what you're asking me.
>
> Q. Were you qualifying to render opinions concerning the FDA alert and what it means and what it meant for Neurontin?
>
> A. I believe so, yes.
>
> Q. When the statistical analysis came out in May of 2008, were you qualified to render opinions based upon the FDA's statistical review and its adequacy and completeness and appropriateness?
>
> A. Yes.
>
> Q. When the -- when you read the advisory committee transcript in July -- from July of 2008, were you qualified to render opinions based upon what was discussed at the advisory committee?
>
> A. In my opinion, yes.

Declaration of Andrew G. Finkelstein, Ex. A at 127:19-129:11.

Dr. Ruggieri, a board certified physician in Internal Medicine and Rheumatology, and an expert in pharmacovigilance and pharmacoepidemiology, testified:

> Q. At the time that alert came out, do you believe you possessed the requisite qualifications to discuss that alert and how to interpret that alert?

5

>   MR. BARNES:  Objection.  He had the requisite qualifications as a physician and drug safety expert to interpret the safety alert?
>
>   BY MR. ALTMAN:
>   Q.      Do you have the -- do you possess -- did you possess the requisite qualifications to interpret and comment upon the alert?
>
>   A.      Yes.
>
>   Q.      Okay.  So that's not some new skill you just obtained between then -- you could have done it back in January, correct?
>
>   A.      I don't understand the question.
>
>   Q.      Bad question.  Forget it.  Strike that.
>
>   MR. BARNES:  In January -- I think he answered in January he was qualified to interpret the safety alert.  He answered that already.  That was your question.
>
>   MR. ALTMAN:  That's fine.
>
>   MR. BARNES:  Yeah.  He's answered that.
>
>   MR. ALTMAN:  Okay.
>
>   BY MR. ALTMAN:
>   Q.      Do you believe you possess the qualifications to express opinions based upon the statistical analysis done by the FDA in response to that alert?
>
>   A.      Yes.  [Finkelstein Decl., Ex. B at  98:23-100:22.]

Dr. Ruggieri further testified:

>   Q.      Were you -- do you possess the qualifications to discuss -- to render opinions based upon what was discussed in that advisory committee meeting?
>
>   A. Yes.  [Finkelstein Decl., Ex. B at 101:12-101:20.]
>
>   Dr. Weiss Smith,., a pharmacoepidemiologist and a Fellow of the International Society of

Pharmacoepidemiology, similarly testified:

>   Q.      Okay.  Are you qualified to review the FDA's statistical analysis in the advisory committee transcript?
>
>   A.      Excuse me?

6

Q.      Do you believe that you are qualified to have reviewed the FDA statistical review in the advisory committee and render opinions?

A.      Absolutely.  That's what I do for the FDA. I often sit on these type of advisory committees.  I couldn't sit on this one because I had already been retained on this case.

Q.      Do you believe that you were qualified to do so in January when we took your deposition last?

A.      Excuse me?

Q.      Your qualifications to review this information, is that a new found qualification or is that something that you possessed back in January when we took your deposition last time?

A.      I believe I was qualified in January to sit on the advisory committee and review the materials. Yes.  I think I've been qualified for years to do so.

Q.      Were you asked by Pfizer to review those materials within January -- in the January timeframe right after it came out?

A.      I was provided by –

MR. BARNES:  Answer the question.

A.      By Pfizer?  Pfizer didn't -- I didn't directly talk to anyone at Pfizer about this case. Period.

Q       Were you asked by counsel to review that FDA and render an opinion?

A.      They provided me with the alert and the information.

Q.      Did they ask you to do anything with it?

A.      Just to reread it.

Q.      When the statistical review -- when did you first see the FDA statistical review?

A.      When did I see it?  When it was -- after it was made available to the public on their web site.

Q.      So you didn't see it before then?

7

A.     No, I only saw it when it was made available.

Q.     Do you know if Pfizer had that document before it was made publicly available?

A.     I'm not aware.

Q.     Were you asked to ever review it at that time?

MR. BARNES:  What time?

Q.     At the time it became publicly available. When we're talking about the FDA statistical review?

A.     Was I asked to look at it?  I think I had already looked at it as soon as it became available because I wanted to put the alert in January in context.  So I was very interested in what they said.

Q.     When was the first time you were asked to put down on a piece of paper an opinion based upon the FDA alert?

MR. BARNES:  Objection.  We have a stipulation in this case where drafting of expert reports is not the subject of examination.  So I'll instruct her not to answer that question.

MR. ALTMAN:  I'm not asking about the drafting.  I'm asking when she was asked to do it. That's not the drafting.

MR. BARNES:  That's a different question.

MR. ALTMAN:  I asked when was the first time you were asked to opine upon the FDA alert.

MR. BARNES:  That's a different question. You may answer that one.

A.     I believe it was in early fall.

Q.     Okay.  When was the first time you were asked to render any opinions on the advisory committee meeting and the transcript and the discussions that took place?

A.     I believe it was around the same time.

Q.     Have you ever had any direct discussions with Dr. Robert Gibbons?

A.     No.

Q. Do you believe that you are -- you're aware that Dr. Gibbons did a pharmacoepidemiologic study of the pharmametrics data, correct?

A   Yes, I'm aware of it.

Q. If you had been given that raw data as he was, do you believe you could have done a similar study?

A. Yes.

Q. So you pretty much see yourself as kind of colleagues, same general qualifications?

A. I consider us colleagues. He's a biostatistician and I'm an epidemiologist. We typically work together on teams. [Finkelstein Decl., Ex. C at 60:6-63:21.]

There is no question that the expertise of these designated experts was sufficient to render opinions on the FDA Alert and following proceedings. Furthermore, in February 2008, Defendants updated the expert disclosures for all of their retained experts:

> Each of the aforementioned experts has reviewed and considered the U.S. Food and Drug Administration (FDA) Alert relating to antiepileptic drugs . . . .Further, each of the aforementioned defense experts shall review and consider the data, analyses and other documents as they become available relating to FDA's analysis of drugs identified in the FDA Alert, which may supply additional bases for their opinions on general causation and /or may form the basis for additional opinions once considered . . . . [Finkelstein Decl., Ex. D.]

### POINT II

### SEVERAL DEFENSE EXPERTS RENDERED EXTENSIVE OPINIONS ON THE FDA ALERT AND PROCEEDINGS, CONTRARY TO REPRESENTATIONS BY DEFENDANTS TO THE COURT

Although Defendants represented to the Court that Dr. Gibbons was necessary as a rebuttal expert because he was "uniquely qualified" to render opinions on the FDA Alert and further proceedings, several of Defendants' experts rendered these very opinions in their November 2008 supplemental disclosures.

9

Of the 14 pages of Dr. Arrowsmith-Lowe's report, Finkelstein Decl., Ex. E, pages two through five concerned the FDA Alert.  Dr. Ruggieri dedicated pages three to six of his 15 page report to the FDA Alert.  Finkelstein Decl., Ex. F.  Dr. Weiss Smith's supplemental report, Finkelstein Decl., Ex. G, consumed pages 2 to 16 of her 34-page report concerning the FDA.  Lastly, Gerald P. Sanacora, M.D., Ph.D.'s supplement report, Finkelstein Decl., Ex. H, addresses the Alert on pages 3 to 4 and 15 to 19 of his 23-page report.  Each of these reports consists of substantive opinions based upon each expert's extensive analysis of the FDA Alert.

The Court has stated that, "[t]o be sufficiently qualified to testify as an expert, a witness needs to have 'knowledge, skill, experience, training, or education,' Fed. R. Evid. 702, 'in the specific subject for which his testimony is offered.'"  *Sutera v. Perrier Group, Inc.*, 986 F. Supp. 655 (D. Mass. 1997) (citing *Whiting v. Boston Edison Co.*, 891 F. Supp. 12 (D. Mass. 1995).) An important requirement of the gatekeeping role is that a court "must, of course, ensure that the witness is qualified to offer an expert opinion." *United States v. Monteiro*, 407 F. Supp. 2d 351, 357 (D. Mass. 2006) (citing *Poulis-Minnot v. Smith,* 388 F.3d 354, 359, 373 (1st Cir. 2004).  "Unless the witness's opinions are informed by expertise, they are no more helpful than the opinions of a lay witness.  Thus, such opinions cannot be admitted pursuant to Rule 702 and instead must comply with the requirements of Fed. R. Evid. 701 governing the admissibility of opinion testimony by lay witnesses." *United States v. Shay*, 57 F.3d 126, 133 (1st "Cir. 1995) (citing for this general proposition, *United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995).  "Qualifications alone are insufficient to satisfy the rule's requirements if the expert's testimony is based on unreliable methodology or if it cannot reliably be applied to the facts in issue." *Grimes v. Hoffman-LaRoche, Inc.,* 907 F. Supp. 33, 35 (D.N.H. 1995).

The threshold issue for testimony under 702 is that the witness is qualified as an expert. Defendants' representations to this Court is that Dr. Gibbons is "uniquely qualified" to render opinions on the FDA Alert, then the other experts must be unqualified to do so. Therefore, under 702, any opinions by any expert, other than Dr. Gibbons, must be struck.

## POINT III

### IF DEFENDANTS' INITIAL EXPERTS WERE QUALIFIED TO RENDER OPINIONS ON THE FDA ALERT AND PROCEEDINGS, DEFENDANTS MISREPRESENTED THE NECESSITY FOR <u>DR. GIBBONS AS A REBUTTAL EXPERT, AND HE SHOULD BE STRUCK</u>

ThE Court allowed Dr. Gibbons as a rebuttal expert based upon Defendants' representations that he alone was uniquely qualified to render opinions on the FDA Alert and meta-analysis. However, given that Defendants have continued to maintain that their already-designated experts were qualified to render opinions on the FDA Alert, Dr. Gibbons was not necessary as a rebuttal expert. The Court should reconsider its Order and exclude Dr. Gibbons as a necessary late addition to the defense stable.

**CONCLUSION**

Therefore, thE Court should exclude the testimony of all defense experts other than Dr. Gibbons concerning the FDA Alert and related FDA subjects for the reasons set out above or, alternatively, the Court should exclude Dr. Gibbons because Defendants misrepresented to the Court the necessity for him as an expert witness, and order Defendants to proceed with the experts who were timely designated and are by Defendants' admissions and their testimony, as qualified to form and express the opinions Dr. Gibbons.

Dated:  June 22, 2009                                            Respectfully submitted,


By:     **/s/ W. Mark Lanier**
          W. Mark Lanier, Esquire
          THE LANIER LAW FIRM, P.L.L.C.
          126 East 56th Street, 6th Floor
          New York, NY  10022


By:     **/s/ Andrew G. Finkelstein**
          Andrew G. Finkelstein, Esquire
          Finkelstein & Partners, LLP
          1279 Route 300, P.O. Box 1111
          Newburgh, NY  12551

          *Attorneys for Plaintiff Ronald J. Bulger, Sr.*


**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on June 22, 2009.

           **/s/ Andrew G. Finkelstein**
           Andrew G. Finkelstein, Esquire