EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MASSACHUSETTS

 3

 4   In re:  NEURONTIN MARKETING,

 5   SALES PRACTICES AND PRODUCTS

 6   LIABILITY LITIGATION

 7   _____/

 8   THIS DOCUMENT RELATES TO:   MDL Docket No. 1629

 9   Bulger v. Pfizer, et al.    Master File No. 04-10981

10   07-11426-PBS

11

12   Smith v. Pfizer, et al.

13   05-CV-11515-PBS

14   Crone v. California State Court

15   _____/

16

17           The videotaped deposition of SHEILA WEISS

18   SMITH, PH.D. was held on Monday, December 22, 2008,

19   commencing at 9:17 A.M., at the Law Offices of Goodell,

20   DeVries, Leech & Dann, LLP, 20th Floor Commerce Place,

21   One South Street, Baltimore, Maryland  21202,

22   before Ronda J. Thomas, a Notary Public.

23

24   Job No.: 183061

25   REPORTED BY:  Ronda J. Thomas, RPR, CLR
```

```
 1      A     Not that I recall.
 2      Q     Safe to say you didn't participate in the
 3   development of any materials for such a meeting,
 4   correct?
 5      A     No.
 6      Q     Okay.  Are you qualified to review the
 7   FDA's statistical analysis in the advisory committee
 8   transcript?
 9      A     Excuse me?
10      Q     Do you believe that you are qualified to
11   have reviewed the FDA statistical review in the
12   advisory committee and render opinions?
13      A     Absolutely.  That's what I do for the FDA.
14   I often sit on these type of advisory committees.  I
15   couldn't sit on this one because I had already been
16   retained on this case.
17      Q     Do you believe that you were qualified to
18   do so in January when we took your deposition last?
19      A     Excuse me?
20      Q     Your qualifications to review this
21   information, is that a new found qualification or is
22   that something that you possessed back in January when
23   we took your deposition last time?
24      A     I believe I was qualified in January to sit
25   on the advisory committee and review the materials.
```

```
 1    Yes.  I think I've been qualified for years to do so.
 2         Q     Were you asked by Pfizer to review those
 3    materials within January -- in the January timeframe
 4    right after it came out?
 5         A     I was provided by --
 6               MR. BARNES:  Answer the question.
 7         A     By Pfizer?  Pfizer didn't -- I didn't
 8    directly talk to anyone at Pfizer about this case.
 9    Period.
10         Q     Were you asked by counsel to review that
11    FDA and render an opinion?
12         A     They provided me with the alert and the
13    information.
14         Q     Did they ask you to do anything with it?
15         A     Just to reread it.
16         Q     When the statistical review -- when did you
17    first see the FDA statistical review?
18         A     When did I see it?  When it was -- after it
19    was made available to the public on their web site.
20         Q     So you didn't see it before then?
21         A     No, I only saw it when it was made
22    available.
23         Q     Do you know if Pfizer had that document
24    before it was made publicly available?
25         A     I'm not aware.
```

```
 1      Q     Were you asked to ever review it at that
 2   time?
 3            MR. BARNES:  What time?
 4      Q     At the time it became publicly available.
 5   When we're talking about the FDA statistical review?
 6      A     Was I asked to look at it?  I think I had
 7   already looked at it as soon as it became available
 8   because I wanted to put the alert in January in
 9   context.  So I was very interested in what they said.
10      Q     When was the first time you were asked to
11   put down on a piece of paper an opinion based upon the
12   FDA alert?
13            MR. BARNES:  Objection.  We have a
14   stipulation in this case where drafting of expert
15   reports is not the subject of examination.  So I'll
16   instruct her not to answer that question.
17            MR. ALTMAN:  I'm not asking about the
18   drafting.  I'm asking when she was asked to do it.
19   That's not the drafting.
20            MR. BARNES:  That's a different question.
21            MR. ALTMAN:  I asked when was the first
22   time you were asked to opine upon the FDA alert.
23            MR. BARNES:  That's a different question.
24   You may answer that one.
25      A     I believe it was in early fall.
```

```
 1        Q      Okay.  When was the first time you were
 2   asked to render any opinions on the advisory committee
 3   meeting and the transcript and the discussions that
 4   took place?
 5        A      I believe it was around the same time.
 6        Q      Have you ever had any direct discussions
 7   with Dr. Robert Gibbons?
 8        A      No.
 9        Q      Do you believe that you are -- you're aware
10   that Dr. Gibbons did a pharmacoepidemiologic study of
11   the pharmametrics data, correct?
12        A      Yes, I'm aware of it.
13        Q      If you had been given that raw data as he
14   was, do you believe you could have done a similar
15   study?
16        A      Yes.
17        Q      So you pretty much see yourself as kind of
18   colleagues, same general qualifications?
19        A      I consider us colleagues.  He's a
20   biostatistician and I'm an epidemiologist.  We
21   typically work together on teams.
22        Q      We talked before about the AIRS G database
23   in this case.  Have you ever received similar data from
24   a company in the past?  What I mean by that a CD, et
25   cetera, that has their adverse event database or an
```