antiepileptic drugs, which explains why FDA only included data from randomized placebo controlled clinical trials in its meta-analysis.

**Opinion 4.  Using the published and accepted methods for calculating PRR, there was no signal of disproportional reporting (SDR) for reports of completed suicide with Neurontin until 2005 and suicide attempt until 2006.  This is consistent whether compared to a background of all drugs or the antiepileptic drugs in the FDA analysis.  There was no SDR for Suicide attempt when compared to the other ADES to date.  Based on my analysis of the evidence, Pfizer is correct in concluding that it did not see a signal for suicidality with Neurontin in the adverse event reports.**

FDA maintains a database of adverse event reports which they receive from manufacturers as well as directly from healthcare professionals and the public.  In November 1997, this Adverse Event Reporting Database (AERS) was significantly modified and many changes happened concurrently.  These included, but are not limited to, a change in dictionaries used to code adverse events (from COSTART to MeDDRA), a lifting of limits on the number of adverse event terms that could be listed on each adverse event report, and not entering (periodic) manufacturers nonserious adverse event reports into the database.  (Woodcock J. 2002)  Since its introduction, there have been numerous modifications to the MedDRA dictionary.  (MedDRA Release Archive)  Changes in reporting behavior, trends in the use of particular adverse event terms, the period report waiver program, and a high level of publicity surrounding certain drugs and adverse events complicates the evaluation of adverse event reporting rates and renders comparisons, particularly comparisons across individual drugs, highly problematic.

Data mining, as used in the field of pharmacovigilance, is the use of statistical algorithms to identify unexpected variations in reporting rates.  While it is currently being used and/or evaluated for use in a number of companies and regulatory agencies, its utility is still widely debated and methods vary substantially. (Weiss S. et al. 2008)  At a recent meeting (an invitation-only think tank held on June 2008) of approximately 100 pharmacovigilance experts from the United States, which I chaired, use and value of data mining in pharmacovigilance was widely debated.

Even in 2008, data mining is not considered standard practice in the pharmaceutical industry.  In the FDA Guidance to Industry on Pharmacovigilance and Pharmacoepidemiology, which was published in March 2005, it states "*Use of data mining techniques is not a required part of signal identification or evaluation.  If data mining results are submitted to FDA, they should be presented in the larger appropriate clinical epidemiological context.*" (FDA. Guidance to Industry on Pharmacovigilance and Pharmacoepidemiology 2005)

There was no consensus on what constitutes a significant difference in reporting rates (a signal of disproportional reporting or SDR) nor was there agreement on acceptable protocols or best practices.  Also, even when there is an alert or signal of disproportional reporting from a data mining excursion, it does not establish causality. It is generally accepted in pharmacovigilance that a finding of disproportional reporting is without any

20

clinical meaning. Only with careful clinical interpretation, considered within the context of why the drug is being used, the extent of drug use, and background rates of the event, can a statistical alert be turned into what is considered a signal of a potential risk. (Hauben M et al. 2005, FDA Guidance Pharmacovigilance and Pharmacoepidemiology 2005, Ahmad SR et al. 2005) A number of data mining algorithms (though not all) can be easily run on AERS data by anyone with a home computer and spreadsheet software, the interpretation of such analysis is complex. I see no evidence that Dr. Blume or Mr. Altman enlisted proper medical experts to interpret their purported signal.

Using a basic epidemiological formula for relative risk, I calculated what is called a proportional reporting rate (PRR) (Hauben M and Zhou X. 2003), comparing the proportion of gabapentin reports received by each time point that included the MedDRA term for "suicide" and "suicide attempt" to the proportion of all other AERS reports which included that term. The results are in my original report. My analysis was limited to reports received after gabapentin was approved for marketing (1994). The PRR was recalculated annually based on all the reports received by the FDA through that year.

I understand that I was criticized by Mr. Altman, in his declaration for graphing values of zero. (Altman K. Declaration 2008, para 37). Zero is the software's default for no value. (Qscan User Manual Version 3.2) PRR cannot be calculated for terms that are not reported. The baseline value for a PRR – which signifies no difference in reporting rates – is 1.0. A PRR above 1.0 means that particular term is more common (proportionally) among reports for the drug under study than among the background (typically all other) drugs. There is no consensus in the pharmacovigilance community on what PRR value is considered to be in excess of expected (statistically significant), though a value of 2.0 or above, often with additional requirements such as a chi-squared above 4 and at least 3 drug-event pairs, is frequently cited in the literature. I graphed the PRR's, not cumulative percentages, as erroneously noted by Mr. Altman. The start date was selected because that was the year gabapentin was first approved and the reporting of the first suicide attempt reports. The jump in my graph from zero to 1.0 does not mean that there was an increase in the PRR, but that the PRR could now be calculated for that preferred term.

Mr. Altman also criticizes my analysis of completed suicide because events with that term are not in the AERS database prior to 1997. (Altman K. Declaration para 37) Prior to November 1997 adverse events were coded using the COSTART dictionary and not MedDRA. When this legacy data was merged with the newer AERS data, the more general COSTART terms were mapped to MedDRA terms. The suicides and suicide attempts from COSTART were mapped to the MedDRA PT "suicide attempt." In my original report the PRR for both completed suicides and suicide attempt are plotted. Contrary to Mr. Altman's argument, given that the first two suicide attempt reports were reported in 1994, it would have been misleading to throw out these reports which were received before 1997.

In my initial analysis, I compared reporting rates for Neurontin (generic and brand) to a background of all drugs in the FDA's database. Given the FDA's meta-analysis, I analyzed the AERS database to compare Neurontin to a background of those AEDs

included in FDA's study. This would have the impact of reducing bias in the PRR based on the indication for treatment (e.g. the elevated background rates of suicide among epileptics compared to the general population). Because of the changes in FDA's database over time, and the variable length of time these drugs have been marketed, I limited the analysis to reports received on or after November 1, 1997. Each data point accumulates reports from November 1, 1997 through October 30th of the year noted in the graph. If there were no reports for Neurontin the PRR could not be calculated and is not plotted.

Based on this analysis, there was no SDR for Neurontin (gabapentin) for the term "completed suicide" until 2005. (Figure 1) Indeed, the PRR remained below one, which would suggest that there were less completed suicide reports than would be expected, through 2003. By that time, it seems that reports of suicide and suicide attempt were inflated for Neurontin in the AERS database and the increased PRR was an artifact of reporting bias. (Altman K. Declaration 2008, para 24, Blume C. Deposition 2007, page 187)



Figure 1. PRR for the term Completed Suicide with Neurontin (gabapentin) against a background of the drugs in the FDA's AED meta-analysis, cumulatively by year.

Similarly, there was no SDR for the preferred term "suicide attempt" for Neurontin when compared to the other AED drugs. (Figure 2) Again, the PRR suggested that these events were reported less than expected through 2005.

22



Figure 2. PRR for the term Suicide Attempt with Neurontin (gabapentin) against a background of the drugs in the FDA's AED meta-analysis, cumulatively by year.

Mr. Altman implies that I should have used the "HLT" Suicide and self-injurious behavior" which includes a constellation of terms ranging from completed suicide to self-injurious ideation. While I disagree with this, I did look at the PRR for this HLT in the same analysis. Again, the PRR was at or below 1 (which is the baseline value indicating no difference) through 2004.

Therefore, data mining showed no statistical signal for Neurontin for these events until the reporting rates were changed by an influx of Neurontin reports in 2005.

**Opinion 5.   Plaintiffs have not provided a "corrected" version of the data mining exercise that I had included in my original report.  Rather, they present an entirely new analysis using methods that are not generally recognized as data mining, nor accepted as useful for postmarketing surveillance of adverse events.**

Mr. Altman's states that he created a "corrected version" of my data mining analysis. (Altman Declaration 2008 para 38).  But he did not calculate any recognized data mining statistic.  Furthermore, he makes a number of substantial methodological changes such that it is an entirely new and different analysis.  (Altman Declaration, 2008 para 39 sections A-F)  Therefore, his analysis (Altman Declaration 2008 – Exhibit D) is unrelated to, and not a correction of, the analysis in my original report.

**A. Primary Term versus Higher Level Term**
The analysis I conducted was at preferred term level of the MedDRA dictionary and included two terms, completed suicide and suicide attempt.  Both of these events meet FDA's regulatory definition of serious adverse events (21 C.F.R. 314.80)  Instead of doing the same, Mr. Altman used a higher level of the MedDRA dictionary (HLT) 19.23.1 "suicidal and self-injurious behavior" which includes all of the following

preferred terms; completed suicide, intentional self-injury, self injurious behaviour, self-injurious ideation, suicidal behaviour, suicide ideation, and suicide attempt. The use of this broad category includes events which would meet the regulatory definition of serious as well as those which would not, such as self-injurious and suicidal ideations. (21 C.F.R. 314.80) Limiting his analysis to "serious" reports based on the patient's outcome does not correct any alleged problem with my analysis.

In her declaration (Blume C. Declaration 2008, para 32), Dr. Blume justifies the use of the MedDRA HLT "suicidal and self-injurious behavior" by saying that because they are a "standard dictionary collection" in the MedDRA dictionary that together these terms represent a clinically meaningful concept. (Blume C. Declaration 2008. para 32) This is wrong. The ICH sanctioned working group on the use of MEdDRA for data retrieval which noted that HLT's *"should be viewed as an additional tool to aid in data retrieval." They recommend that users review all terms within a HLT to "ensure that all terms are suited for the purposes of the output."* (MedDRA Term Selection, page 9) They further state that *"Clinically related PTs in MedDRA might be overlooked or not recognized as belonging together as they might exist in different locations within a single SOC or within more than one SOC,"* (MedDRA Term Selection, page 11) and therefore they recommend that an individual with a medical background, who is also trained in the use of MedDRA review the data retrieval and presentation strategy. (MedDRA Term Selection, page 11) Recognizing the complexity of grouping MedDRA preferred terms into clinically meaningful concepts, there is an international working group assigned the task of creating such groupings, which are called Standardized MedDRA Queries (SMQ's). (MedDRA Term Selection, Page 11)

Dr. Blume (Blume Declaration 2008, para 39) further justifies her use of the HLT "suicidal and self-injurious behavior" based on her observation that in the company's "Gabapentin Data Capture Aid (Blume Declaration 2008. Exhibit G) the company used all of the preferred terms under this HLT "plus a few additional terms." In this document, the company listed a total of 10 terms under the heading "potentially suicide/self-injury related adverse events." By using the HLT, Dr. Blume used only 6 (60%) of the terms in Pfizer's data capture aid. One of the terms she did not include, depression suicidal is listed under the HLT "Depressive Disorders" under the SOC Psychiatric disorders. Two additional terms which she missed, intentional overdose and poisoning deliberate, are under a different SOC, Injury Poisoning. Furthermore, the company is using this as an aid for their medical staff to identify a pool of incoming reports that required more detailed information than typically collected. (Blume Declaration 2008. Exhibit G). This is to facilitate data capture of supplemental data for events deemed of particular interest, not data analysis for the purpose of signal detection. Therefore, her assertion that the company "did the very same thing" and that the company in some way "validated" her approach is incorrect. (Blume Declaration 2008, para 39)

Reviewing the Data Capture Aid Dr. Blume states that *"there is no technical reason why such a protocol could not have been implemented in 1994 based on the signals already existing with respect to Neurontin and suicidal behavior."* (Blume Declaration 2008, para

24

38)  This is incorrect.  Even if there were a signal in 1994, which there is no evidence to support, the Data Capture Aid could not have been done in 1994.  As the plaintiffs' stated in their critique of my analysis (Blume Declaration 2008 para 37 and Altman Declaration 2008, para 37 section a), the preferred term "completed suicide" was not in the database prior to 1997.  The majority of adverse event terms in the Data Capture Aid did not exist in the COSTART dictionary in 1994  (e.g. intentional self-injury, self-injurious ideation, poisoning, deliberate, self-mutilation, suicide ideation, completed suicide).  (Morse R. 1994).

### B. Serious and suspect

Mr. Altman purports to limit his analysis to reports with serious outcomes as part of his alleged efforts to "correct" my analysis.  Serious is a regulatory definition based on patient outcome and not the reaction terms coded.  Serious is defined as events that lead to death, hospitalization (initial or prolonged), life threatening, persistent or significant disability, birth defect, or an important medical event that would have resulted in any of these outcomes if not for medical or surgical intervention. (21 C.F.R. 314.80)  Just because a case report meets the definition of a serious outcome, this does not mean that a suicidal event which might be listed in that report met the definition of "serious", nor that it was the event leading to the report being filed.  With the advent of AERS in November 1997, an unlimited number of event terms can be entered for any one report.  This led to information from the narrative, which included underlying conditions and indications for the medications, being coded as events in AERS reports.   That is why I limited my analysis to two preferred terms suicide and suicide attempt, which are far less ambiguous and uniformly serious.  Therefore, Mr. Altman's attempts to correct my analysis are misguided and his analysis is misleading.

Mr. Altman purports to limit his analysis to reports where Neurontin was indicated as the "suspect" drug, though it is not clear as written (Altman Declaration 2008, para 38 section d).  The use of the suspect label has two meanings, not just the one that Mr. Altman mentions.  When a report is received by the FDA directly from the public (health care professionals, patients, lawyers, etc.) the reporter may indicate which drug or drugs they suspect as causing or contributing to the event among all of the drugs that the patient was taking at that time.  However, when a manufacturer submits a report, they are required to indicate their drug as the suspect drug, regardless of whether or not that makes sense clinically.

Mr. Altman's inclusion of a broad and diverse groups of terms, and then limiting the reports to those which are "serious" based on outcome does not exclude all but "serious" reports of suicidality as he contends.  To illustrate this lack of sensitivity of limiting events to "serious" while using the broad HLT categoriy, I searched the FOI-AERS database for all Neurontin reports, for which the drug was marked as one of the suspect drugs, and reviewed reports which had the HLT 19.23.1, but not the preferred terms "completed suicide or suicide attempt".  Two examples (of many) of reports that would be included in Mr. Altman's analysis based on his "rules" are described below.

25

Case ID 3610385 is an expedited (follow-up) case reported to FDA on 11/9/2000 by Janssen Research Foundation, Division of Johnson & Johnson of a 48 year-old male. The outcomes included hospitalization, disability, required intervention to prevent permanent impairment/damage, and other. This patient had 44 concomitant drugs listed, of which the primary suspect drug was Propulsid and Neurontin was one of seven secondary suspect drugs. There were 88 reported reaction terms for this patient, of which suicide ideation was one. The reported terms included, "myocardial infarction," "ventricular fibrillation," cardiomegaly," "chest pain," "mitral valve incompetence," and "Q-T prolonged." From the report, it cannot be determined what triggered this case to be classified as "serious," but it is unlikely that it was suicide ideation.

Case ID 4546166 is an expedited (follow-up) case reported to FDA on 12/30/2004 by Pfizer of a 45 year-old female weighing 120 pounds. The outcomes include hospitalization (initial or prolonged). This patient had 28 concomitant drugs listed, of which Neurontin was one. There were 189 reported reaction terms for this patient, of which suicide ideation was one. However, the reported terms included "road traffic accident," "deafness," "viral infection," "multiple fractures," "fibrocystic breast disease," head injury." Because this case was reported by Pfizer, by regulation, Neurontin is coded as a suspect drug for this case. Again, from the report, it cannot be determined what triggered this case to be classified as "serious," but it is unlikely that it was suicide ideation.

Therefore, because Mr. Altman's inclusion criteria for his analysis of "serious" cases lacks any specificity or sensitivity and would allow such cases as this one to be included in the analysis, any finding of a "signal" from his analysis would be erroneous and unreliable.

**C. Not calculating a PRR**
As discussed above, it is important to remember that percentages of adverse event reports are not interchangeable with PRR's or other data mining statistics. Data mining is used to identify particular adverse event terms which are reported more often than expected with the study drug. To do this requires one to calculate an expected value and then, using a statistical algorithm, calculate the test statistic. In my analysis, I used the PRR (with no additional constraints such as minimum case counts). While the various algorithms tend to give similar results when there are at least 20 cases (FDA Guidance Pharmacovigilance and Pharmacoepidemiology 2005, page 9), this is a very inclusive threshold.

Mr. Altman did no such analysis. Thus, in regards to Mr. Alman's graph in his Appendix D, I find that it provides no information that would establish a signal of disproportional reporting for any meaningful event. This graph is the results of a retrospectively determined process and is only one of a very large number of looks he made of the data. (Altman CD-ROM, 2007). Pfizer should not be faulted for not analyzing the data in a manner similar to Mr. Altman. The use of such imprecise and flawed methods would only serve to distract responsible parties from discovering relevant signals.

**Opinion 6.  Plaintiffs' interpretation of the postmarketing adverse event data is flawed and deviates from generally accepted concepts in pharmacoepidemiology.**

Evaluation of spontaneous reports needs to be conducted within the context of the number of patients being treated by the drug and how it is being used.  It is not appropriate to tally the number of events at a time point and not consider the population exposed.  The plaintiff's experts listed counts and percentages of some adverse event terms without any comparative analyses or accounting for changes in the patterns of drug use and adverse event reporting.  They state that their interpretation of the AERS data is somehow validated by the mere presence of similar tables in New Drug Applications (NDA's) that are submitted to the FDA for review. (Blume Declaration 2008 para 10)

While such descriptive statistics are often provided as context or background within NDA's and other regulatory submissions, they do not provide any evidence of an association.  To argue that the mere inclusion of similar data tables within NDA's or Integrated Safety Summary reports as evidence that they are a valid method to evaluate risk of a particular adverse event is without any scientific merit.  Indeed, in an evaluation of trends in the reporting of suicidal thoughts and behaviors among children and adolescents, FDA experts Drs. Mosholder and Palmer concluded that the evaluation of suicidal thoughts and behaviors reported in AERS were not "scientifically rigorous" due to many external factors that influence reporting. (Mosholder AD and Palmer 2006) Thus, raw counts and percentages of such events from spontaneous reports are not meaningful for the purposes of determining increases or decreases in risk with a drug exposure.

Dr. Blume states that analysis of "anecdotal case reports" can "support the existence of a causal link between patients who take Neurontin and suicidality."  (Blume Declaration 2008, para 23)  Mr. Altman states that PRR analysis can generate a "signal of a safety problem that, when combined with other information, supports the conclusion that Neurontin has the biological capacity to cause patients who take it to commit or attempt suicide." (Altman Declaration 2008, para 27)  Both are incorrect.  Data mining of spontaneous adverse event reports is used to generate an alert or signal of disproportional reporting (SDR).  These terms were selected very carefully, to make it clear that a statistical elevation in reporting rates for a particular drug-event combination is not the same as a "signal", which in pharmacovigilance implies clinical relevance. (Bates A and Edwards IR. 2006)  The mere finding of an SDR does not support the conclusion that a drug has the "biological capacity" to cause an event.  Nor does it, by itself, support the conclusion that a signal exists.  It merely identifies things that are reported at higher rates than expected but without any clinical context or meaning.  The finding of an SDR presents, at most, a hypothesis of a "signal" that requires expert clinical case review and interpretation before it can be deemed a signal.

Mr. Altman presents a graph (Altman Declaration 2008. Exhibit C) which compares the proportion of adverse event reports with at least one event within the HLT category "Suicide and self-injurious behavior" as a proportion of something undefined. As he states (Altman Declaration 2008 para 36) the chart shows variation in proportions, with the highest proportion of this HLT category among those who reportedly took the drug for "psychiatric indications." His work clearly illustrates the importance of considering confounding by indication. Suicidal behavior is expected to be higher among patients who are being treated for psychiatric conditions than epilepsy and other indications (e.g. neuroleptic pain), though all have elevated rates of suicide compared to the general population. (Pfizer_Mpatel_0039743, Christensen et al. 2007, Tondo L. et al. 2003)

Mr. Altman compares the number of completed suicide events reported from 1997-2002 (n=8) with the number reported during the first half of 2003 (n=17), which he states a 20-fold increase in the reporting rate of suicide (Altman Declaration 2008 para 21). An increase in reports, in itself, is meaningless. Mr. Altman's methods are unscientific and not appropriate, as he fails to put his numbers within the context of reporting trends during this time period. Thus, his statement without any such context is misleading. While the absolute numbers may be correct, there are a number of flaws in his interpretation.

One flaw in Mr. Altman's comparison is the assumption that the reporting rate for gabapentin was constant during 2003. It actually increased almost 50% from the first to second half of the year. His interpretation of the data is also flawed. For example, reporting rates for any one event are typically calculated as a proportion of all reports for that same drug to correct for changes in reporting volume. Report volume has increased substantially for the AERS database overall and is highly variable for individual drugs. So this "20-fold" or 200% increase in suicide reports must be interpreted within the context of a 360% increase (from 803 to 2896) in adverse event reports that mentioned gabapentin from 1997 to 2003, a 615% increase (from 2.6 to 16 million) in gabapentin prescriptions, and a 174% increase (from 212,978 to 370,898 reports in 1997 and 2003, respectively) in total postmarketing adverse event reports submitted to the FDA during the same period. Thus, a 20-fold increase in the absolute number of suicide reports is less than would be expected within the context of gabapentin adverse event reporting rates. The percentage of reports in which gabapentin was noted as a suspect drug by the reporter remained stable at about one-third (34.4% in 1997 and 34.4% in 2003) of reports which noted the patient had used gapabentin. This suggests that increased number of reports in which the patient used gabapentin tracks with the increased use of the drug over time.

Using published signal detection methods on the FOI-AERS postmarketing database I was able to confirm that Pfizer's conclusions regarding the absence of a signal of suicide for Neurontin were appropriate (Pfizer_Regulatory_001621). Mr. Altman and Dr. Blume did not establish a signal for Neurontin, as they employed methods and interpretations that pharmacoepidemiology experts do not except as reliable or valid.

28

Mr. Altman declares that there was no notoriety bias in reporting of suicides based solely on the timing of his involvement and the involvement of his law firm.  (Altman Declaration 2008, para 30) This ignores the fact that there are many other people and entities reporting events to the FDA.  Indeed, the evidence suggests that there was significant "notoriety bias" surrounding the reporting of suicide-related adverse events during the period in question.



Figure 3.  Reports of suicide in AERS for all drugs and for gabapentin

As shown in Figure 3, the number of suicides (completed suicides) reported to the FDA regardless of drug more than doubled from 1027 in 2002 to 2119 reports in 2003, while suicide reports mentioning gabapentin increased 2.3-fold from 40 in 2002 to 92 in 2003.  The reporting of completed suicides (all drugs) appears to have peaked in 2005 at 2899 reports.  Also during this same time period both the FDA and European regulators issued warnings about a possible link between SSRI antidepressants and suicidal behaviors in children and adolescents in 2003 and FDA held an advisory committee meeting on this subject in early (February 3rd) 2004.  Such events are known to stimulate reporting. (FDA Drug Safety Newsletter 2008)  Mr. Altman's "analysis" does not account for this increase in the reporting of suicides in the AERS database.

These data are consistent with data recently published by Bridge, et al. (Bridges et al. 2008)   In this paper, the authors evaluated data on deaths for which suicide was listed as the underlying cause of death among 10-19 year olds in the National Vital Statistics Systems.  They found that although the overall rate of suicide decreased by 5.3% between 2004 and 2005, the rate of suicide during these years was significantly greater than expected based on the 1999-2003 trend.  (See Figure 4)  Thus, there was a significant increase in suicide rates between 2003 and 2004, at the same time as the increase in overall reports of suicide in AERS (for all drugs).



Figure 4.  National Trends in suicide from 1996 through 2005.  (Bridge JAMA 2005)

The failure of Mr. Altman or Dr. Blume to put any of their "looks" at AER reports for Neurontin within the context of overall reporting trends and national trends in suicide demonstrates the incomplete nature of their analysis and the fallacy of using such data to infer a causal relationship between Neurontin and suicidality.

Mr. Altman further notes (paragraph 29) that the percentage of serious adverse events "exploded" by the 4th quarter of 2002, when "off-label use of Neurontin is at its peaks (sic)."  In addition to not defining the term "exploded" in this context he fails to mention that the percentage of serious adverse event reports increased for the entire AERS database, not just Neurontin.  Mr. Altman bases his opinion on a flawed interpretation of an increase in serious reports for Neurontin, which is meaningless when looked at properly, within the context of changes to the entire AERS database.  This occurred because of a number of processes and policies implemented by FDA beginning in November 1997 with the implementation of the AERS system.  This included an abrupt drop in the entering of individual case reports for nonserious events received as periodic reports from manufacturers into AERS and the initiation of a waiver program by which companies could receive waivers from the requirement to submit such individual reports under 21 CFR 314.90.

Mr. Altman does mention the waiver program later in his declaration (Altman 2008 para 38.c.). Based on FDA's Office of Drug Safety's 2002 Annual Report, by September 2002 over 2700 NDA and ANDA's from more than 70 companies had such waivers. (FDA. 2004). Neurontin was one of the drugs which had a waiver. (Confirmed by Counsel upon my inquiry.)

These two factors resulted in a large and rapid drop in individual manufacturer's periodic reports entered into the AERS database, from 73.7% of reports received by FDA in 1997 to 31.1% of reports received in 2003. The proportion of expedited reports, which by their definition are serious, rose from 18.0% of reports in 1997 to 55.4% in 2003. By 2006, the proportion of expedited to periodic reports had almost completed reversed as the FOI-AERS database contained 62.9% expedited reports, 28.7% periodic and 8.3% direct reports. Thus, an increase in the proportion of serious reports for Neurontin mirrors what was happening in the entire AERS database. It can be linked to an intentional process initiated by the FDA to increase the proportion of serious adverse events. Thus, Mr. Altman's assertion that the percentage of serious adverse events "exploded" by the 4th quarter of 2002 is misleading and inaccurate.

Mr. Altman and Dr. Blume conclude that increases in serious adverse event reports in the 4th quarter 2002 were due to off-label uses and is therefore evidence of a link between Neurontin and suicidality. This ignores that the total prescriptions for Neurontin were also increasing during this time period and that reporting of all events and particularly serious adverse events to the FDA were also increasing during this same time period. Also, if there was an increase in the use of this drug for the off-label indication that is associated with an elevated risk of suicidal thoughts and behaviors, such as bipolar disease, then there should be an increase in the reporting of these same events because they are increasing in the background. This is an example of confounding by indication. If it were scientifically valid to jump to the same conclusions that Mr. Altman and Dr. Blume did upon their review of spontaneous reporting trends, then surely the FDA would not have had to spend upwards of three years to conduct a secondary analysis of randomized clinical trial data for 11 antiepileptic drugs and convene an advisory committee meeting to help them interpret the meaning of such analysis. In fact, FDA decided to analyze only randomized placebo-controlled clinical trial ("RCT") data in its analysis of suicidality and AEDs. FDA concluded that post-marketing spontaneous adverse event data were inappropriate for a study of suicidality in the population of patients taking AEDs, as such patients have a high background rate of suicide. As Russell Katz of FDA pointed out at the July 10, 2008 FDA Advisory Committee meeting,

> *"...we had long ago decided that postmarketing data are not the right data to look at, or we don't believe that these sorts of things where there is a high background rate of suicidality so defined in these populations, I think that we have concluded that postmarketing data is uninterpretable, and that is why we went to placebo-controlled trials."* (FDA Transcript 2008, Dr. Katz. Page 103)

31

**Opinion 7.  There is no evidence that there are subpopulations at increased risk for suicidality with Neurontin use.**

As stated in my initial report, and in this report, Neurontin has been prescribed for conditions that have elevated rates of suicide compared to the general population.  In paragraph 36 and Exhibit C of his declaration, Mr. Altman presents data that he purports to show that there is a higher percentage of serious reports for events coded with the HLT "Suicidal and Self-Injurious Behavior" for patients taking Neurontin for psychiatric indications, compared to those taking Neurontin for "anti-epileptic," "other," "unspecified," and "all indications."  (Altman K. Declaration 2008, Exhibit C)  Once again, Mr. Altman merely presents crude percentage counts and infers that the data show an increased risk for suicide in those patients taking Neurontin for psychiatric indications.  Such an inference may not be made from these data. (FDA Drug Safety Newsletter 2008)

Because of the increased risk of suicide among patients for whom Neurontin is generally prescribed, uncontrolled trials and spontaneous reporting data is of no use in making causal inferences or comparisons.

> *"FDA suggests that a comparison of two or more reporting rates be viewed with extreme caution and generally considered exploratory or hypothesis-generating. Reporting rates can by no means be considered incidence rates, for either absolute or comparative purposes.*"  (FDA Guidance Pharmacovigilance and Pharmacoepidemiology 2008, page 11)

Therefore, the comparisons that Mr. Altman made (Altman, K. Declaration. Para 36 and Exhibit C) provide no evidence of differential risk.  They merely show reporting rates of one MedDRA category by the "indication" for which the reporter said that Neurontin was being prescribed.   The high proportion of suicidal events is most likely reflecting the elevated risk of suicide and suicidal thoughts among patients with psychiatric conditions.  This is called confounding by indication and is a widely recognized problem in the design of pharmacoepidemiology research studies. (Strom BL and Melmon KL. 2005)

> *For any individual case report, it is rarely possible to know with a high level of certainty whether the event was caused by the product. To date, there are no internationally agreed upon standards or criteria for assessing causality in individual cases, especially for events that often occur spontaneously (e.g. stroke, pulmonary embolism). Rigorous pharmacoepidemiologic studies, such as case-control studies and cohort studies with appropriate follow-up, are usually employed to further examine the potential association between a product and an adverse event.*  (FDA Guidance Pharmacovigilance and pharmacoepidemiology 2005, page 7)

This helps explain why the FDA did not rely on evaluations of spontaneous reports and asked sponsors to submit only randomized controlled clinical trials to examine the

hypothesis the antiepileptic drugs are associated with suicidal risk.  FDA did an analysis by trial indications, the shortcomings of which I discussed earlier. (Opinion 1, section C) Even if you ignore the shortcomings of the FDA analysis, there is no elevated odds ratio for suicidality in any trials except those with an epilepsy indication. (Levenson M. 2008. Figure 8, page 33)

Submitted:

_Sheila Weiss Smith, Ph.D._

Date: 11 / 07 / 08

34