# EXHIBIT A

Page 1

1                UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3                  MDL Docket No. 1629

4                  Master File No. 04-10981

5    ***********************************

6    IN RE:  NEURONTIN MARKETING, SALES

7             PRACTICES AND PRODUCTS

8             LIABILITY LITIGATION

9    ***********************************

10   THIS DOCUMENT RELATES TO:

11   Bulger v. Pfizer, Inc., Et Al
     Case No. 07-11426-PBS
12         and
     Smith, Et Al v Pfizer, Et Al
13   Case No. 05-CV-11515-PBS

14   ***********************************

15

16      VIDEOTAPED DEPOSITION OF DAN W. BROCK, Ph.D.

17

18                  Held At:
                 Hare & Chaffin
19             160 Federal Street
            Boston, Massachusetts 02110
20

21             October 27th, 2008
                  9:06 AM
22

     Reported By:  Maureen O'Connor Pollard, RPR, CLR
23

24   Videographer:  Shawn Budd

Page 2

```
 1    APPEARANCES:
 2    FOR THE PLAINTIFF:
 3       BY:  MARSHALL P. RICHER, ESQ.
 4           FINKELSTEIN & PARTNERS
 5           80 Wolf Road, Suite 503
 6           Albany, New York 12205
 7           800-634-1212
 8           mricher@lawampm.com
 9
10    FOR THE DEFENDANTS:
11       BY:  NICHOLAS P. MIZELL, ESQ.
12           JAMES P. MUEHLBERGER, ESQ.
13           SHOOK, HARDY & BACON
14           2555 Grand Avenue
15           Kansas City, Missouri 64105
16           816-559-2991
17           nmizell@shb.com
18           jmuehlberger@shb.com
19
20
21
22
23
24
```

Page 3

```
 1    Present Via Speakerphone:
 2
 3    FOR DR. OBIEDZINSKI:
 4       BY:  LINDA FULOP SLAUGHTER, ESQ.
 5           DURAN & PANDOS
 6           1044 Route 22 West
 7           Mountainside, New Jersey 07092
 8           908-518-5000
 9           lslaughter@duranandpanos.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                    INDEX
 2
 3    EXAMINATION                        PAGE
 4    DAN W. BROCK, Ph.D.
 5     BY MR. MIZELL                      7
 6
 7                   EXHIBITS
 8
 9    NO.        DESCRIPTION         PAGE
10    Exhibit 1   Amended notice of videotaped
11                deposition...................    15
12    Exhibit 2   CV of Dan W. Brock...........   31
13    Exhibit 3   Professor Brock's expert
14                report.......................   61
15    Exhibit 4   9/23/08 letter from Kenneth
16                Fromson, with one page
17                attachment...................   73
18    Exhibit 5   Article titled
19                Characteristics and Impact
20                of Drug Detailing for
21                Gabapentin...................   94
22    Exhibit 6   Article from the Annals of
23                Internal Medicine............   97
24    Exhibit 7   Article titled Euthanasia.....   99
```

Page 5

```
 1    Exhibit 8    Article titled A Model State
 2                 Act to Authorize and
 3                 Regulate Physician-Assisted
 4                 Suicide......................   101
 5    Exhibit 9    Table of contents of binders..  124
 6    Exhibit 10   Set of handwritten notes......  126
 7    Exhibit 11   Group of e-mails..............  164
 8    Exhibit 12   Notes and declaration of
 9                 Meredith Rosenthal...........  170
10    Exhibit 13   Expert report of David A.
11                 Kessler, MD..................  174
12
13
14
15
16
17
18
19
20
21
22
23
24
```

VERITEXT CORPORATE SERVICES (800) 567-8658

1        Is this the expert report you
2   furnished in this case?
3        A.   I think so.
4        Q.   Well, go ahead and take a look and
5   confirm that for us.
6             (Witness reviewing document.)
7        A.   It certainly appears to be.
8        BY MR. MIZELL:
9        Q.   Is that your signature on Page 13 of
10  the report?
11       A.   Yes, it is.
12       Q.   I notice the cover pleading, the
13  second and third page, refer to the service of
14  this report on October 22nd, 2007?
15       A.   I'm sorry, where are you?
16       Q.   The second and third page of the
17  exhibit.
18       A.   Let's see here.  Oh, yes.
19            What about the second and third page?
20       Q.   You'll see it's dated October 22nd,
21  2007?
22       A.   Yes.
23       Q.   Is that consistent with your
24  recollection that you executed the final draft

1   of your report on or before October 22nd, 2007?
2        A.   It was certainly October, 2007.  I
3   can't tell you the exact date without checking.
4        Q.   And the very first page of the
5   exhibit, the second to last line, you'll see
6   that it states that you're expected to testify
7   in accordance with this report?  Is that
8   consistent with your understanding?
9        A.   Yes.
10       Q.   So this report contains all of the
11  expert witness opinions you intend to offer in
12  this litigation?
13       A.   Yes.  I -- yes.
14       Q.   Do you have any other expert opinion
15  work in progress for this litigation?
16       A.   No.
17       Q.   Were you asked to do any other expert
18  opinion work?
19       A.   No.
20       Q.   Do you have any expectation that
21  you'll be doing any other expert opinion work in
22  this litigation?
23       A.   No.
24       Q.   Have you drafted or prepared any other

1   material other than this report for use in this
2   litigation?
3        A.   Well, I took notes on some of the
4   things I read, and I gave you those.
5        Q.   Have you drafted or prepared any other
6   material?
7        A.   No.
8        Q.   You told us earlier today that your
9   compensation is $250 per hour?
10       A.   Mm-hmm.
11       Q.   Has that changed over time?
12       A.   Did that change over time?  No.  It
13  should have been higher, I learned when I saw
14  David Kessler gets $1,000 an hour.
15       Q.   Do you receive --
16       A.   It may change in the future if I ever
17  do this stuff again.
18       Q.   Do you receive any other compensation
19  in this litigation other than that hourly rate?
20       A.   No.
21       Q.   Have you received any other offers or
22  assurances of additional work from Plaintiffs'
23  counsel?
24       A.   No.

1        Q.   You may have answered this earlier
2   when we talked about the cases you've testified
3   in.  Have you ever been a party to a lawsuit?
4        A.   No.
5        Q.   And you were not retained in either of
6   those two cases that you testified by deposition
7   to produce an expert report?
8        A.   No.
9        Q.   I'll ask you a couple questions about
10  your professional background and experiences.
11            Did you obtain a Ph.D?
12       A.   Yes.
13       Q.   Would you please tell us when and
14  where and in what subject matter?
15       A.   My Ph.D is in philosophy from Columbia
16  University awarded in 1970.
17       Q.   So you consider yourself a
18  philosopher?
19       A.   Yes.
20       Q.   What was the subject matter of your
21  dissertation?
22       A.   Political philosophy, political
23  obligation.  I also have all the coursework
24  completed for a masters in business

17 (Pages 62 to 65)

1 administration as well which I did in the early
2 sixties while I was working in investment
3 banking for four years.
4    Q.    But you do not have an MBA?
5    A.    No.  When I decided to go to graduate
6 school in philosophy, I didn't finish that.
7 I've done all the coursework.
8    Q.    Did you ever obtain a medical degree?
9    A.    No.
10    Q.    Did you ever obtain a degree in
11 pharmacology?
12    A.    No.
13    Q.    Or a degree in public health?
14    A.    No.
15    Q.    Have you ever been licensed to
16 practice medicine?
17    A.    No.  I think I would have to have a
18 medical degree for that.
19    Q.    Have you ever prescribed a medication?
20    A.    No.
21    Q.    Is it safe to say you've never treated
22 anyone for the uses for which Neurontin has been
23 prescribed?
24    A.    I think it's safe to say.

1    Q.    Do you have any firsthand experience
2 conducting clinical trials, examining the safety
3 and efficacy of pharmaceutical product?
4    A.    I am on the data safety monitoring
5 board of a study, but it's not using
6 pharmaceutical products.
7    Q.    So that's a no?
8    A.    Pardon?
9    Q.    That would be a no to that question?
10    A.    That would be a no.
11    Q.    Okay.  Thank you.
12    A.    Sorry.
13    Q.    Have you ever published an article
14 reporting the results of one or more clinical
15 trials --
16    A.    No.
17    Q.    -- examining the safety and efficacy
18 of a pharmaceutical product?
19    A.    No.
20    Q.    Have you ever worked for a
21 pharmaceutical company?
22    A.    No.
23    Q.    Have you ever worked for a third party
24 payer that provides pharmaceutical insurance

1 coverage to its insureds?
2    A.    No.
3    Q.    Have you ever worked for a
4 pharmaceutical benefit manager?
5    A.    No.
6    Q.    Have you ever worked in the field of
7 pharmaceutical product development?
8    A.    No.
9    Q.    Any experience working in the field of
10 post-marketing surveillance of a pharmaceutical
11 product?
12    A.    No.
13    Q.    Have you ever supervised a
14 post-marketing surveillance system for any
15 pharmaceutical product?
16    A.    No.
17    Q.    Is it safe to say you've had no
18 responsibility for any aspect of a
19 post-marketing surveillance system for a
20 pharmaceutical product?
21    A.    Yes, it's safe to say that.
22    Q.    Have you ever been retained by a
23 pharmaceutical company to provide any services
24 related to the development, labelling or

1 marketing of a drug?
2    A.    No.
3    Q.    Have you ever participated in the
4 submission of a drug application to the FDA?
5    A.    No.
6    Q.    Have you ever participated in the
7 development of a label or package insert for a
8 pharmaceutical product?
9    A.    No.
10    Q.    Have you ever worked for the FDA?
11    A.    No.
12    Q.    Have you ever prepared a presentation
13 to an FDA advisory committee?
14        MR. MUEHLBERGER:  Hello?
15        MS. SLAUGHTER:  Hello.
16        MR. MUEHLBERGER:  Yes, this is a
17 deposition.
18        MS. SLAUGHTER:  Okay.  This is Linda
19 Fulop Slaughter from Duran & Pandos, I was
20 disconnected before.
21        MR. MUEHLBERGER:  We didn't do
22 anything, but you're back on.
23        MS. SLAUGHTER:  Okay.  Thank you.
24    A.    I think the answer to that is no.

1        BY MR. MIZELL:
2        Q.   Okay.  Have you ever reviewed a new
3    drug application for a pharmaceutical product
4    outside the context of this litigation?
5        A.   No.
6        Q.   Prior to your involvement in this
7    litigation, did you ever review an FDA clinical
8    review?
9        A.   No.
10       Q.   Do you consider yourself an expert in
11   drug design?
12       A.   No.
13       Q.   Or an expert in drug testing?
14       A.   No.
15       Q.   Or an expert in pharmaceutical drug
16   labelling?
17       A.   No.
18       Q.   Do you consider yourself an expert in
19   the field of pharmacology?
20       A.   No.
21       Q.   Do you consider yourself an expert
22   epidemiologist?
23       A.   No.
24       Q.   Do you consider yourself an expert

1    biostatistician?
2        A.   No.
3        Q.   Do you have any special skill or
4    training regarding the pharmacokinetics of
5    Neurontin?
6        A.   No.
7        Q.   Do you have any special skill or
8    training regarding the pharmacodynamics of
9    Neurontin?
10       A.   No.
11       Q.   Do you consider yourself an expert in
12   FDA regulations regarding the development or
13   marketing of pharmaceutical products?
14       A.   No.
15       Q.   Have you ever published any peer
16   reviewed articles regarding the drug development
17   process?
18       A.   No.
19       Q.   Have you ever published any peer
20   reviewed articles regarding the marketing and
21   promotion of pharmaceutical products?
22       A.   I believe no.
23       Q.   Have you ever published any peer
24   reviewed articles regarding the post-marketing

1    surveillance of a pharmaceutical product?
2        A.   No.
3        Q.   Do you have any formal training in the
4    field of pharmacoepidemiology?
5        A.   No.
6        Q.   Have you ever taken Neurontin?
7        A.   No.
8        Q.   Or gabapentin?
9        A.   No.  Same thing, isn't it?
10       Q.   Ever been directly involved in the
11   prescription of Neurontin?
12       A.   No.
13       Q.   I think you testified earlier, but
14   just to confirm, have you ever spoken with a
15   doctor about the prescribing of Neurontin?
16       A.   No.
17       Q.   We talked some about the mechanics of
18   writing a report.  With respect to your expert
19   report, what's your understanding as to what you
20   have been retained to do?
21       A.   Well, to evaluate the issues that I
22   addressed in the report from an ethical
23   perspective.
24       Q.   When you say "from an ethical

1    perspective," is that an analysis of what's
2    morally right and morally wrong?
3        A.   Yes.
4            (Whereupon, Brock Exhibit Number 4 was
5            marked for identification.)
6            BY MR. MIZELL:
7        Q.   Professor Brock, I'm handing you a
8    document that's been labeled Brock Exhibit 4.
9            Have you seen this before?
10       A.   The front page, no.
11       Q.   Have you seen the second page?
12       A.   No.
13           Well, did you have this?  I can't
14   remember whether you had.
15           MR. RICHER:  You have to answer based
16   on your own recollection.
17       A.   I do not recall having seen this.
18           BY MR. MIZELL:
19       Q.   Were any of the materials listed on
20   the second page available for your review before
21   you signed your expert report?
22       A.   Let me see what is here.
23           MR. RICHER:  Object to the form of the
24   question.

Page 74

1    (Witness reviewing document.)
2    A.   I do not recall.  It's possible that I
3  saw an earlier version of Kay Dickersin's
4  report.  I'm not certain of that without
5  checking.
6    BY MR. MIZELL:
7    Q.   But you had not seen her August 10,
8  2008 report --
9    A.   No.
10    Q.   -- because your report was signed in
11  October of '07?
12    A.   October of 2007, right.
13    Q.   Is that the only item you might have
14  seen before executing your report?
15    A.   Yes.
16    Q.   So to the extent you might place any
17  reliance on the materials listed on the second
18  page, would that be in the form of finding
19  support for conclusions you've already stated in
20  your report?
21    A.   Repeat the question?
22    Q.   If you place any reliance on these
23  documents at this time, would that just be
24  providing support for conclusions you already

Page 75

1  stated in your October, 2007 report?
2    A.   Right.  Nothing in the 2007 report was
3  based on any of this material.  Some of this
4  bears on issues in the report, however.
5    Q.   Could you please describe the process
6  you employed for gathering information to
7  formulate the opinions expressed in your report?
8    A.   Well, most of it was gathered for me.
9  Those two large binders of materials came from
10  Kip King.  I think Andrew Finkelstein sent me a
11  few other things including some of the expert
12  reports that I did rely on.  But -- and I
13  probably saw either one or two articles in the
14  literature, I couldn't tell you which, or
15  reports in the press.  But mainly I relied on
16  materials that were provided to me.
17    Q.   Were the materials provided to you by
18  King and Finkelstein in response to requests
19  from you?
20    A.   I think not.
21    Q.   So you did not identify and obtain the
22  items listed on Pages 13 or 14 of the report?
23    A.   I have to see what those are.
24    (Witness reviewing document.)

Page 76

1    A.   That's correct.
2    BY MR. MIZELL:
3    Q.   Is that the extent of the methodology
4  employed to develop the opinions expressed in
5  your report?
6    A.   Well, I obviously drew on my knowledge
7  and experience with regard to ethics.
8    Q.   But as far as information considered
9  and analyzed, it's exclusively composed of the
10  information provided to you by King and
11  Finkelstein?
12    A.   Yes.  Although I said I may have seen
13  on my own a paper in the literature, or
14  certainly press reports.
15    Q.   That's just something you'd come
16  across occasionally?
17    A.   Right.
18    Q.   It's not something you were actively
19  searching for?
20    A.   That's correct.
21    Q.   Did anyone assist you with developing
22  the report?
23    A.   No.
24    Q.   How much time did you personally spend

Page 77

1  on developing the report?
2    A.   Whatever, in terms of the reviewing of
3  materials and so forth, whatever about 8,000
4  divided by 250 is.
5    Q.   I understand.  About 32 hours.
6    Did you review the testimony of any
7  current and former employees of the Defendants
8  in developing the opinions expressed in your
9  report?
10    A.   I don't think so.
11    Q.   Did you review the testimony of any
12  physician that has been deposed in this
13  litigation in developing your opinions?
14    A.   No.  A couple of the expert reports
15  that I read were, I think, by physicians.
16    Q.   But you didn't review any
17  transcripts --
18    A.   No.
19    Q.   -- of any physicians that prescribed
20  Neurontin to any Plaintiffs in this litigation?
21    A.   No.
22    Q.   Did you review the testimony of any
23  current or former employee of the third party
24  payer Plaintiffs in this litigation?

20 (Pages 74 to 77)

1   A.   No.
2   Q.   Did you ever review the testimony of
3   any current or former regulatory official
4   provided in this litigation?
5   A.   Well, I reviewed some correspondence
6   from Dr. Katz at FDA, but --
7   Q.   But you didn't review any deposition
8   transcripts --
9   A.   No.
10  Q.   -- or any other sworn testimony --
11  A.   No.
12  Q.   -- of a regulatory official?
13       Do you recall reviewing any deposition
14  transcripts that have been taken in this
15  litigation?
16  A.   No.
17  Q.   Did you review any of the expert
18  reports submitted by the Defendants when
19  developing your opinions?
20  A.   No.
21  Q.   Did you interview or consult with any
22  current or former employees of the Defendants in
23  developing your opinions?
24  A.   No.

1   Q.   Did you interview or consult with any
2   other persons or entities we've talked about,
3   like the prescribing physicians or third party
4   payer employees or regulatory officials, in
5   developing your opinions?
6   A.   No.
7   Q.   Did you request the opportunity to
8   conduct any keyword searches of the documents
9   produced by the Defendants in this litigation?
10  A.   No.
11  Q.   So you never conducted any kind of
12  comprehensive examination of the documents
13  produced in this case?
14  A.   Never conducted any?
15  Q.   Comprehensive examination of all the
16  documents produced in this litigation?
17  A.   Not -- I conducted a comprehensive
18  review of the documents that were provided to
19  me, and that I've provided to you.
20  Q.   Did you review any of the testimony of
21  the physicians deposed in the track one product
22  liability cases known as Bulger, Smith, Shearer,
23  Bentley, McGee, Owens, Roberson, Valentine,
24  Vercillo, Woolum, Huberman, Dorsey, Dixon and

1   Percy?
2   A.   No.
3   Q.   Okay.  So having testified that you
4   haven't reviewed any transcripts in this
5   litigation, you haven't reviewed the testimony
6   of any Plaintiffs deposed in any of those cases?
7   A.   No.
8   Q.   Or any of the sales representatives
9   deposed in those cases?
10  A.   No.
11  Q.   Did you review any of the documents
12  produced by the parties in those cases?
13  A.   No.
14  Q.   Did you review any of the complaints
15  filed by the Plaintiffs in those cases?
16  A.   In the Bulger and -- no, I hadn't
17  heard of those cases until yesterday.
18  Q.   So you hadn't heard of these
19  fourteen cases until yesterday?
20  A.   Well, I hadn't heard of Bulger, and I
21  think there was one other that was mentioned
22  earlier.
23  Q.   Bulger and Smith, and Shearer,
24  Bentley?

1   A.   Okay, well, I didn't know the --
2   Q.   Any of those?
3   A.   -- etceteras.
4   Q.   Okay.
5   A.   No.
6   Q.   You've published several peer reviewed
7   articles?
8   A.   I've published many peer reviewed
9   articles.
10  Q.   You've acted as a reviewer for peer
11  reviewed journals?
12  A.   For most journals in the field.
13  Q.   Based on that experience, does the
14  report provided in this litigation, does that
15  meet the kind of analytical rigor of a peer
16  reviewed study?
17  A.   Yes.
18  Q.   Have you submitted it for publication?
19  A.   No.
20  Q.   Why?
21  A.   I prepared it for this litigation.  I
22  have no intention of submitting it for
23  publication.
24  Q.   Why do you believe the report meets

Page 82

1  the analytical rigor for a peer reviewed study?
2      A.   Why do I believe that?  Probably it,
3  of course, would be a peer reviewed article in
4  ethics, not a peer reviewed article with regard
5  to a medical investigation, a scientific
6  investigation.
7           And the reason I believe that is
8  because I have -- I serve on the editorial board
9  of something like fourteen journals, I have
10 reviewed -- done peer reviews for probably way
11 over 100 articles for New England Journal of
12 Medicine, JAMA, almost all the journals in
13 bioethics and most -- and many other medical
14 journals.
15     Q.   Just so I understood your testimony,
16 it would suffice for publication in a journal
17 directed to topics on ethics, but not in a
18 medical or scientific journal?
19     A.   Well, for example, New England Journal
20 of Medicine has a prospectives section which is
21 -- where ethical issues are sometimes addressed.
22 It's not a section where there are reports of
23 clinical trials or clinical investigations.  So
24 they also have a sounding board section, and

Page 83

1  other journals also have something comparable in
2  many cases.  Sounding board section often
3  publishes ethical papers, papers on ethics.
4      Q.   If I could direct you to Page 2 of
5  your report.  In this bottom paragraph, third
6  line down you say you refer to Pfizer throughout
7  the report.
8           But do you know the time at which
9  Pfizer acquired Warner-Lambert?
10     A.   I believe it was about 2000.
11     Q.   So would you agree that references in
12 the report to events that predate that merger
13 relate to the Warner-Lambert era, and that
14 references to events that post-date the merger
15 relate to the Pfizer era?
16          MR. RICHER:  Objection to form.
17     A.   I would.
18          BY MR. MIZELL:
19     Q.   You would?
20     A.   I think I would.
21     Q.   Is it fair to say you intend to offer
22 an expert opinion regarding ethical standards
23 and the application of ethical standards to the
24 alleged conduct of the Defendants in litigation?

Page 84

1      A.   Yes.
2      Q.   And that as reflected in your report
3  you intend to comment on how the Defendants
4  failed to adhere to their ethical obligations to
5  practicing physicians and patients?
6      A.   Yes.
7      Q.   If I could direct you to the third
8  page of your report.  And there in the middle
9  right after you can see parenthesis 112 in the
10 middle of the page, you state that "the FDA
11 report clearly and explicitly put Pfizer on
12 notice about the FDA's concern about depression,
13 suicidal behavior, and suicide as adverse events
14 in the use of Neurontin"?
15     A.   Mm-hmm.
16     Q.   For the next page and a half you go on
17 to say that the Defendants failed to fulfill
18 ethical obligations that arose from the receipt
19 of this FDA report?
20     A.   Yes.
21     Q.   So essentially do you intend to offer
22 an expert ethical opinions that Warner-Lambert's
23 actions did not constitute reasonable and
24 prudent pharmaceutical company conduct in

Page 85

1  response to this FDA report?
2      A.   Yes.
3      Q.   Do you intend to offer an expert
4  ethical opinion that an ethical pharmaceutical
5  company would have acted in a different way?
6      A.   It could be put that way, yes.
7      Q.   The next section of your report begins
8  on Page 5, it runs from Pages 5 to 9.
9      A.   Right.
10     Q.   It discusses your opinion that your --
11 it discusses your opinion that the Defendants
12 failed to fulfill special ethical obligations
13 that arose from the alleged off-label promotion
14 of Neurontin?
15     A.   Mm-hmm.  Yes.  Sorry.
16     Q.   So in summary, is it a fair summary to
17 say that you intend to offer an expert ethical
18 opinion that the Defendants intentionally and
19 deliberately kept patients from using better
20 alternatives while also exposing them to serious
21 risks about which they were not adequately
22 warned?
23     A.   They -- I have not done the primary
24 investigation of the factual claim you just

22 (Pages 82 to 85)

1    noticed -- noted.  I will offer that if they did
2    a variety of things in promoting off-label use,
3    then I will offer an ethical assessment of their
4    having done that.
5        Q.    So you're not offering an opinion as
6    to whether that conduct occurred, you're
7    assuming it occurred --
8        A.    Right.
9        Q.    -- and then offering an opinion
10   about --
11       A.    Right.
12       Q.    -- its ethics?
13       A.    Yes.  Although I've referred to some
14   evidence that it did occur in the report.
15       Q.    And you're not offering an opinion as
16   to whether or not that evidence -- the
17   evidentiary value of these things?
18       A.    No.
19       Q.    You're just assuming those things to
20   be true for the purposes of your opinion?
21       A.    That's right.
22       Q.    In the third section of your report
23   from Pages 10 to 12, does that discuss your
24   opinion that the FDA failed its ethical

1    responsibility to take appropriate action to
2    protect the public in this matter?
3        A.    Until very recently.  At the point at
4    which I wrote the report, it expresses my
5    opinion to that effect.
6        Q.    So in summary, just your report in
7    total, would it be fair to say you intend to
8    offer an expert opinion that the Defendants
9    intentionally deceived or failed to adequately
10   warn physicians and patients regarding the
11   safety and efficacy of Neurontin?
12           MR. MIZELL:  Object to the form.
13       A.    Yes.
14           BY MR. MIZELL:
15       Q.    Turn your attention to Page 14 of the
16   report.  In that third entry, that's a citation
17   to the 1992 clinical review of Neurontin by
18   Dr. Cynthia McCormick, right?
19       A.    Yes.
20       Q.    Do you know Dr. Cynthia McCormick?
21       A.    No.
22       Q.    How did you obtain this clinical
23   review?
24       A.    From Finkelstein & Partners.

1        Q.    Are you aware that several months
2    after preparing her initial clinical review,
3    Dr. McCormick prepared two clinical reviews
4    regarding Neurontin?
5        A.    I have not seen those, no.
6        Q.    Are you aware that in 2002
7    Dr. McCormick prepared another clinical review
8    regarding Neurontin?
9        A.    I have not seen that either.
10       Q.    Would you like to have reviewed these
11   clinical reviews?
12       A.    It's a little hard to say without
13   knowing what's in them, isn't it?
14       Q.    Well, they're authored by the same
15   clinical reviewer as the 1992 clinical review
16   and they all pertain to Neurontin.
17       A.    Well, they -- I probably would have
18   been interested in seeing them, but they don't
19   bear on what was in the 1992 review, and what
20   Warner-Lambert was or Parke-Davis was informed
21   of as a result of that.
22       Q.    Since you haven't seen those three
23   clinical reviews, what would be your basis for
24   that testimony?

1        A.    What is in the 1992 review I take it
2    is what's in the 1992 review that I reviewed.
3    What is in later reviews was not presumably in
4    the 1992 review.
5        Q.    So are you saying that, maybe this is
6    a point, are you saying that the 1992 review, it
7    was important to you because it concerned the
8    state of mind of the Defendants?
9        A.    The 1992 review was important for,
10   with regard -- I mean it was important for lots
11   of -- it was important for explicitly noting the
12   concern about depression and suicidal behavior
13   from this medication.
14       Q.    And it's your opinion that that review
15   put the Defendants on notice about those risks?
16       A.    I believe so, yes.  I assume the
17   Defendants read the review.
18       Q.    So these three later reviews by
19   Dr. McCormick in May of '93 and December, '93
20   and May of 2002 regarding Neurontin, you
21   wouldn't know one way or the other whether or
22   not she raised any concern regarding Neurontin
23   and depression?
24       A.    In those later reviews, no.

Page 114

1 his own decision to end his life?
2     MR. RICHER: Objection to form, and
3 objection to the question itself.
4     A.   He is -- he is not, as you've
5 described him, undergoing suffering at all, much
6 less intractable suffering.
7     BY MR. MIZELL:
8     Q.   So your answer is no?
9     A.   So the answer is no, he would not have
10 a right under the statute to end his life.
11     Q.   Regardless of the statute, in your
12 view should such a person have the right to make
13 their own decision whether to end their life?
14     MR. RICHER: Objection.
15     A.   Only after substantial interventions
16 to determine what can be done by way of making
17 his life better for him, evaluating his
18 competence, potentially treating any depression
19 that's present, etcetera.
20         And in fact, in cases like you
21 describe, patients do quite consistently adjust
22 to their circumstances and want to continue
23 living. In fact, remarkably patients who are
24 paraplegic or even sometimes quadriplegic will

Page 115

1 tell you that their quality of life is just
2 fine.
3     BY MR. MIZELL:
4     Q.   Well, I asked you to assume that he
5 was competent, fully informed and acting of his
6 own volition.
7     A.   Right.
8     Q.   And he's had three years of
9 significant paralysis with no improvement, does
10 he still have the right to make his own decision
11 to end his life?
12     MR. RICHER: Objection.
13     A.   After the kinds of interventions that
14 I noted before to assure that steps had been
15 taken to try to make his life more acceptable to
16 him, and that could include rehabilitation and
17 therapy, then in the end my answer is yes.
18     BY MR. MIZELL:
19     Q.   How about given a 61-year old man who
20 has suffered for twenty years with intractable
21 pain, left him disabled and unable to work and
22 no prospect for recovery, if he met all of the
23 criteria, being competent, fully informed,
24 acting on his own volition, should he have the

Page 116

1 right to make his own decision to end his life?
2     MR. RICHER: Object to form, and
3 objection.
4     A.   Yes, with the same caveats that I
5 placed on my answer to your earlier questions.
6     BY MR. MIZELL:
7     Q.   Given a 38-year old man who has
8 suffered for eight years with chronic
9 intractable and unresolved pain that interfered
10 with his ability to work and no prospect for
11 recovery, and unable to provide for his family,
12 if he met all the criteria, such as being
13 competent, fully informed, acting on his own
14 volition, should he have the right to make his
15 own decision to end his life?
16     MR. RICHER: Objection.
17     A.   I don't think the age is going to
18 change the judgments, which seems to be the
19 major change in your different hypotheticals.
20 So yes, with all of the same qualifications to
21 my previous answers.
22         I would note that if that patient was
23 on a respirator, for example, there would be no
24 question that he would have the right to have

Page 117

1 the respirator removed both as a matter of law
2 in every state in this country and in my view as
3 a matter of ethics. And that removal of the
4 respirator would be a step taken with the
5 express understanding that it would end his
6 life.
7     BY MR. MIZELL:
8     Q.   But as you've testified before, even
9 if he's not on a respirator, he'd still have the
10 same right to end his life?
11     A.   I think ethically. Legally he doesn't
12 have the right to have a physician do it in any
13 state but Oregon.
14     Q.   But ethically?
15     A.   Ethically, yes.
16     Q.   So your answer would be the same for a
17 46-year old man who suffered chronic pain,
18 chronic intractable pain that was becoming
19 progressively worse, and he also met all your
20 other criteria, being competent, fully informed,
21 acting on their own volition, he still would
22 have the right to make a decision to end his
23 life?
24     MR. RICHER: Objection.

30 (Pages 114 to 117)

Page 118

1    A.   Yes.
2        BY MR. MIZELL:
3    Q.   You testified previously that you
4  completed all the coursework for an MBA --
5    A.   I'm sorry?
6    Q.   You testified previously you completed
7  all the coursework for the MBA?
8    A.   That's correct.
9    Q.   That you didn't obtain the MBA and
10  switched to pursuing a philosophy degree?
11   A.   Yes.
12   Q.   And why did you decide to pursue a
13  degree in philosophy?
14   A.   Because I decided first that I didn't
15  want to be an investment banker for the rest of
16  my life, and so I got a very large raise in
17  those days at Smith Barney and told them I was
18  resigning to go to graduate school in
19  philosophy.
20   Q.   Any other reasons?
21   A.   No. Well, a career change of that
22  sort is obviously a complicated decision. I
23  have not regretted it.
24   Q.   You testified earlier that until very

Page 119

1  recently the FDA was failing in its ethical
2  obligation to the public with respect to
3  Neurontin. What were you referring to when you
4  said "until very recently"?
5    A.   To the steps they took this, I guess
6  this past summer to provide an indication on, I
7  guess it's on the -- this is post my, all post
8  my -- but to provide an indication to physicians
9  about this risk.
10   Q.   When you say "this risk," to what are
11  you referring?
12   A.   The risk of suicidal ideation,
13  behavior, and completed suicide. I don't
14  remember exactly what their phrasing was. As I
15  say, that step was taken substantially after I
16  prepared my report.
17   Q.   Is it your opinion today that the FDA
18  has now fulfilled its ethical duties?
19   A.   I think that's a very difficult
20  question. I don't have a clear answer to that.
21  It has certainly taken a step in the right
22  direction in my view.
23   Q.   What else would the FDA need to do to
24  fulfill its ethical duty to the public with

Page 120

1  respect to Neurontin?
2    A.   I'm not sure. I don't -- I'm not an
3  expert with regard to exactly what steps the FDA
4  should take. Among other things, that's a
5  matter of law on which I'm not an expert.
6        THE VIDEOGRAPHER: We have to go off
7  the record to change tapes?
8        MR. MIZELL: Take a break.
9        THE VIDEOGRAPHER: This is the end of
10  tape number two. The time is 1:42. We're off
11  the record.
12       (Whereupon, a recess was taken.)
13       THE VIDEOGRAPHER: We are back on the
14  record. This is tape number three. The time is
15  1:49.
16       BY MR. MIZELL:
17   Q.   Professor Brock, what did you do to
18  prepare for your deposition testimony today?
19   A.   I'm sorry?
20   Q.   What did you do to prepare for your
21  testimony today?
22   A.   I met briefly with counsel yesterday,
23  I reviewed my report and a few of the documents,
24  certainly not all of them.

Page 121

1    Q.   How long did you meet yesterday?
2    A.   An hour and a half, I guess, something
3  like that.
4    Q.   And what was discussed?
5    A.   What a deposition is like.
6    Q.   Anything else?
7    A.   What you would likely pursue.
8    Q.   And what was that?
9    A.   Well, it didn't include euthanasia.
10   Q.   What did it include?
11   A.   It included the ethical claims that
12  are central in my report.
13   Q.   Anything else?
14   A.   No.
15   Q.   What about the ethical claims in your
16  report did you discuss?
17   A.   We discussed that the ethical claims
18  in my report assumed a certain factual context,
19  and that it was not my -- that I was not an
20  expert on those factual contexts, but rather it
21  was assuming them for the purpose of drawing
22  moral judgments.
23   Q.   You said drawing moral judgments?
24   A.   Yes, to making moral judgments to the

31 (Pages 118 to 121)

Page 122

1   ethical conclusions that are in the report.
2       Q.   So in other words, you are assuming
3   the allegations are true and then making --
4   offering an opinion as to their ethical
5   implications?
6       A.   Well, I'm not sure that I would call
7   them allegations.  I'm assuming that the facts
8   that I cite in the report are true, and then
9   making ethical judgments with regard to the
10  actions that those facts concern.
11      Q.   Did you meet with anyone else to
12  prepare for the deposition today?
13      A.   Nope.
14      Q.   Talk to anyone else to prepare for it?
15      A.   Nope.
16      Q.   Do anything else than review your
17  report and some documents?
18      A.   No.
19      Q.   We have previously talked about
20  whether or not you were aware of Dr. McCormick's
21  other reviews other than the ones cited in your
22  report, and you said you had not read them.  But
23  were you otherwise aware of them?
24      A.   I'm not sure what the answer is to

Page 123

1   that.  I may not have been, but I'm not sure.
2   I'm not certain.
3       Q.   Prior to your meeting yesterday with
4   counsel, how many other meetings have you had
5   with counsel in the process of developing your
6   report?
7       A.   None.
8       Q.   Did you meet with anyone else in the
9   process of developing your report?
10      A.   No.  I probably talked with Charles
11  King briefly on the telephone at one point, but
12  it was mostly about the documents that he
13  provided me.  It certainly wasn't with regard to
14  the content of the report.
15      Q.   Did you ever meet with Mr. King to
16  prepare your report?
17      A.   No.  I met with Mr. King when he first
18  approached me about becoming involved in this.
19  I never -- I don't think I ever met with him
20  after that, certainly not in connection with the
21  preparation of the report.
22      Q.   You testified previously that Mr. King
23  sent you two, the two binders that we previously
24  identified as the Neurontin Litigation Marketing

Page 124

1   Documents Binders 1 and 2?
2       A.   Right.
3            (Whereupon, Brock Exhibit Number 9 was
4            marked for identification.)
5       BY MR. MIZELL:
6       Q.   And I've handed you what's been marked
7   Brock Exhibit 9.  Could you confirm that's a
8   copy of the table of contents of these binders?
9       A.   I would have to -- I assume you just
10  copied them.
11           (Witness reviewing document.)
12      A.   I would have been willing to take your
13  word for it, but since you asked me to confirm
14  it, I'm doing so.
15       BY MR. MIZELL:
16      Q.   Thank you.
17           (Witness reviewing documents.)
18      A.   Well, I assume that the last page of
19  what you just gave me was from the other binder,
20  I don't know.
21       BY MR. MIZELL:
22      Q.   I think if you turn one more page in
23  behind your table of contents in the binder.
24      A.   Oh, yes.  So yes, it represents the

Page 125

1   table of contents.
2       Q.   This is the table of contents that was
3   supplied when you received the notebooks from
4   King?
5       A.   Yes.  The notebooks are in the form
6   now that they were when I received them from
7   King.
8       Q.   Did you have any role in selecting the
9   documents that appear within the binders?
10      A.   No.
11      Q.   So this collection of documents sent
12  to you, they were not sent to you pursuant to
13  any requests that you made of Mr. King?
14      A.   Mr. King was who approached me to be
15  involved in this.  And I think probably -- my
16  recollection is that Andrew Finkelstein probably
17  told me that I would get documents from
18  Mr. King.
19      Q.   Do you recall, other than your report,
20  which documents you reviewed yesterday?
21      A.   I think mostly -- well, I certainly
22  reviewed my report.  I looked at your subpoena
23  to make sure I brought everything that I was
24  supposed to bring.  I reviewed my, mostly my

Page 142

1 the points advanced in the Mack paper?
2    A.   Yes.
3         This is an article in the Boston
4 Globe, I would have to go back to my stack of
5 things, November 25th, '02. I assume this
6 refers now to probably Pfizer.
7         "Held a meeting on monotherapy after
8 the FDA had rejected it for that. Hired company
9 to draft articles on non-approved uses." These
10 are claims out of that Globe article. "Doctors
11 view it as mild," and I assume the "placebo"
12 means almost like placebo.
13         "A different source, "'92 review,
14 concern re depression and suicide." That comes
15 out of obviously the FDA's NDA.
16         "Andrew Finkelstein's petition." I
17 didn't take any notes on that, but that's the
18 petition that his law firm sent to the FDA.
19         "Kruszewski. Causes suicide. GABA
20 primary inhibitor neurotransmitter. Gabapentin
21 acts on GABA which increases nerve transmit
22 levels." Reference to "animal and human
23 studies," and references to "decreased
24 monoamines, dopamine, serotonin, creating

Page 143

1 behavior and mood effects" on Page 7 of that
2 report.
3         "Evidence enhanced GABA results in
4 self-injurious behavior, and animal and human
5 studies and also depression. Strong link to
6 multiple mood and behavior problems. Cause
7 negative mood effects in susceptible users,
8 behavior," reference to Page 11. "PD," that
9 refers to Parke-Davis, "data shows mood effects.
10 Relation known in 1989, including from challenge
11 and rechallenge cases. 1989 clinical trial.
12         "Can't predict effects." What that
13 refers to is that you can't predict its effects
14 on individual patients by any of the other
15 markers that would distinguish one group of
16 patients from another. "Other drugs that
17 increase GABA caused depression. Trimble in '95
18 noted link to depression." At that point
19 Trimble, I believe, was working for Parke-Davis
20 and Warner-Lambert. That's out of, I guess,
21 Kruszewski, is that right? Yes.
22         The next are notes in Trimble's
23 report. "A number of studies link AEDs," that
24 anti-epileptic drugs, "to depression. Other

Page 144

1 GABA drugs increase depression. Suicide five
2 times higher in epilepsy. Short studies, low
3 incidence." I think what that refers to is that
4 many of the studies were short and also had not
5 large numbers, so you're going to have a low --
6 you're going to have limited evidence of a very
7 low incidence effect.
8         "Most cases leading to depression had
9 had a history of it," so Trimble's supposition
10 was that these were people vulnerable to the
11 effects of the drug, as I recall it.
12         "Interim summary on Page 8. The
13 relation of GABA to mood disorders" in reference
14 to Page 10 and 11, "is long known," for example
15 from '96, and GABA, gabapentin acts on GABA.
16 Also on SHT system," and I don't recall what
17 that refers to at this point, although I could
18 find out.
19         "Note to Andrew Finkelstein, need
20 accurate account of what Pfizer pled to." That
21 refers to the Department of Justice proceedings.
22    Q.   Did you request that information?
23    A.   I don't remember at this point. But
24 it was a matter of public record, I think.

Page 145

1    Q.   So did you obtain that information?
2    A.   I think I got it only secondhand,
3 although nothing in my report concerns
4 specifically -- well, no, that's not true. It
5 refers to the fact that Pfizer pled to the
6 non-approved uses.
7    Q.   And you're referring to Warner-Lambert
8 because of the conduct of '96?
9    A.   I used Warner-Lambert, but Pfizer was
10 then the company involved in the Department of
11 Justice proceedings, as I understand it.
12    Q.   And they pled to events that
13 related -- that took place in 1996?
14    A.   Right.
15         Some of the materials in here do refer
16 to activities that extended beyond 1996, though
17 I'm fully aware that the pleading was only to
18 pre-1996.
19         Then "Fromson, 8/28/08." I think that
20 may have referred to initial -- we had a lot of
21 different scheduling for this deposition.
22         Now, there's one thing that I had
23 notes on that is missing here, and that is
24 simply the notes I took on Blume's report which

Page 146

1 concerns the -- I could produce it for you, it
2 must be in my office because I remember I have
3 notes on it, but that was the report concerning
4 the obligation to monitor post-approval events,
5 and also included claims that reported adverse
6 events constituted only a small -- in general
7 only a small proportion of such events.
8         And that's it.
9     Q.    Those are notes you can provide to
10 counsel that can be produced to us?
11     A.   Yes, I think so.  I mean I believe I
12 can.  They were on a separate sheet that seems
13 not to have made it here.
14     Q.    You said, you previously testified the
15 last page are your notes from yesterday's
16 meeting?
17     A.   Yes.  Goals of the deposition.  I was
18 informed about the multi-district litigation,
19 track one, and I guess the two other cases which
20 I guess are Bulger and Smith.  That was the
21 first time I had heard of Bulger and Smith.
22         Issues of general causation, and then
23 issues of badness.  Badness referring to what I
24 might testify with regard to, but not general

Page 147

1 causation.  And then three big issues.
2     Q.    So your goal would be to testify to
3 badness?
4     A.   Badness was an abbreviation for the
5 ethical evaluation.  I take it unethical
6 behavior could loosely be characterized as bad.
7         And then "three big issues.  Link
8 between Neurontin and suicide, non-approved
9 marketing, Pfizer didn't correct, and FDA facts
10 at that time," which is notes that I made from
11 our discussion.
12     Q.    Is it your opinion that when the FDA
13 approved the Neurontin epilepsy new drug
14 application in December, 1993 the FDA believed
15 there was an association between Neurontin and
16 depression?
17     A.   Well, the 1992 new drug application
18 questioned, as I recall it, I'd have to go back
19 to look at the application to get the exact
20 wording, but questioned that there may be a
21 relation between depression and Neurontin.
22 That's my recollection, but I would have to go
23 back to see exactly what the claim was.
24     Q.    And is it your opinion that when the

Page 148

1 FDA approved the Neurontin epilepsy NDA in
2 December, '93 that the FDA believed there was an
3 association between Neurontin and suicidal
4 behavior?
5     A.    They believed there was a question
6 about whether there was.  And, of course, they
7 approved it for the very limited use, class of
8 patients who were refractory to other
9 treatments, and where then the risk/benefit
10 ratio is going to be different than it would be
11 for other classes of patients.
12     Q.    But as you've testified previously,
13 when a drug obtains FDA approval, physicians are
14 free to prescribe it off-label?
15     A.   Right.
16     Q.    When the FDA approved Neurontin in
17 December, 1993, did the agency ever suggest
18 there should be a warning in the package insert
19 for depression?
20     A.   Not to my knowledge.
21     Q.    When the FDA approved Neurontin in
22 December, 1993, did the agency suggest there
23 should be a warning in the package insert for
24 suicide-related events?

Page 149

1     A.    Not to my knowledge, but I don't know.
2     Q.    I believe during one of the breaks
3 today there was -- you were talking about how
4 the -- you were talking about the Catholic
5 Church and its position on withholding
6 life-sustaining treatment.  What is the Church's
7 position on that issue?
8         MR. RICHER:  Objection.
9     A.   As I understand it, the Church's
10 position is that what it characterizes as
11 extraordinary measures, makes a distinction
12 between so-called ordinary and extraordinary
13 measures, that extraordinary measures need not
14 be pursued by a patient.
15         And my understanding of how they
16 characterize extraordinary measures is measures
17 that are unduly burdensome to the patient.
18         BY MR. MIZELL:
19     Q.    Can you provide examples?
20     A.   Well, some last chance chemotherapies
21 for some cancers that have significant side
22 effects and little evidence of benefit.
23         Respirator treatment would be another
24 example in some cases.  Many patients find

Page 174

1    (Whereupon, Brock Exhibit Number 13
2    was marked for identification.)
3    BY MR. MIZELL:
4    Q.   I'm going to hand you what's been
5    marked Brock Exhibit 13, it's the July 31, 2008
6    expert report of David A. Kessler (handing).
7    Is this another report that --
8    A.   I received --
9    Q.   -- you made some notes about?
10   A.   Mm-hmm. It's a report I received, I
11   think, August as well, roughly that period.
12   Q.   August of '08?
13   A.   Yes.
14   Q.   Another report you received almost a
15   year after completing your report for the case?
16   A.   Mm-hmm. This again is -- my
17   understanding is this report was not prepared
18   for this case.
19   Q.   And could you review and read your
20   notes into the record for us, please?
21   A.   Sure.
22   "Approved for adjunctive therapy for
23   epilepsy. Not approved for monotherapy for
24   epilepsy or neuropathic pain, it's too broad a

Page 175

1    category. Not approved for diabetic neuropathic
2    pain. Not approved for doses above
3    1,800 milligrams.
4    "1996, FDA began investigation of
5    non-approved promotion.
6    "2001, FDA to Pfizer, promotional
7    materials being used were in violation of the
8    approval."
9    Q.   And these are your notes of the points
10   advanced by David Kessler in his declaration, or
11   his expert report?
12   A.   Yes. He was the former director of
13   FDA, as you know.
14   Q.   And as with the Rosenthal declaration,
15   the Kessler report has no bearing on your expert
16   report?
17   A.   No, I didn't receive it until nearly a
18   year after I did my expert report. Some of the
19   information in some of these other reports bears
20   on the issues in my expert report, but it does
21   not bear on the preparation of that report.
22   Q.   Professor Brock, do you recall, I
23   believe it's the first page -- second page of
24   your report, we've had a few references to this

Page 176

1    during the deposition today about your use of
2    Pfizer to refer collectively to Parke-Davis,
3    Warner-Lambert and Pfizer throughout your
4    report?
5    A.   Right.
6    Q.   Was that change suggested to you by
7    Plaintiffs' counsel?
8    A.   No. I did it for -- I did it on my
9    own initiative for ease of presentation and
10   because, as I understood, the lawsuit concerns
11   Pfizer at this point.
12   MR. MUEHLBERGER:  Should we go off the
13   record for a minute?
14   MR. MIZELL:  Sure.
15   THE VIDEOGRAPHER:  The time is 3:42.
16   We're off the record.
17   (Whereupon, a recess was taken.)
18   THE VIDEOGRAPHER:  We're back on the
19   record. The time is 3:49.
20   BY MR. MIZELL:
21   Q.   Professor Brock, you have Exhibit 11
22   in front of you, your stack of e-mails that you
23   produced today.
24   If you'd come in about, I'd say,

Page 177

1    fifteen or so pages to an October 12th, 2007
2    e-mail from Andrew Finkelstein to you, starts
3    out "by way of background."
4    A.   Right.
5    Q.   And does this relate to the inclusion
6    in the sentence in your report about referring
7    to the Parke-Davis, Warner-Lambert and Pfizer
8    entities collectively as Pfizer?
9    A.   Yes, it does. I guess he did ask me
10   to do that. That's when he asked me to sign it
11   as well.
12   Q.   I have a somewhat related question to
13   that. If you can get your expert report in
14   front of you, and turn to Page 4 of the report,
15   do you see in the middle of the page on kind of
16   the right side where the sentence starts "Pfizer
17   failed in its ethical obligation"?
18   A.   Mm-hmm.
19   Q.   And at this point in the report are
20   you referring to Warner-Lambert?
21   A.   Well, as I said, I used that as a
22   generic term, but yes.
23   Q.   And can you identify the basis for the
24   statement that "Warner-Lambert failed to

Page 178

1  seriously monitor for the occurrence of
2  depression, suicidal behavior and suicide"?
3      A.   I had no evidence when I reviewed the
4  documents that they did so, and so I inferred a
5  failure.  That's a factual claim, but not an
6  ethical claim.
7      Q.   So you inferred a failure to seriously
8  monitor for these adverse events because you
9  weren't provided evidence --
10     A.   I had no evidence that they did.
11     Q.   -- that the monitoring occurred?
12     A.   Of course, one way of monitoring would
13 be to inform patients and physicians about the
14 possibility of this adverse event since then
15 you're more likely, as I note in the report at
16 some point, you're more likely to have somebody
17 associate an adverse event with the drug if
18 they've been warned about the risk.
19     Q.   And the only evidence you were
20 provided when developing your report is the
21 documents provided to you by Kip King and
22 Plaintiffs' counsel?
23     A.   Yes.  As I say, I looked at a few
24 others on my own, for example from the New York

Page 179

1  Times and the Globe.  And I can't remember
2  whether I got Steinman's on my own or not, I had
3  seen it, it may also have been provided to me by
4  Andrew.
5      Q.   By Andrew?
6      A.   Finkelstein.
7      Q.   Okay.
8      A.   I would be inclined to say that --
9      Q.   I'll just say I don't have a question
10 pending.
11     A.   Okay.
12     Q.   I think we've talked before and you
13 agreed that there are several factors that could
14 influence a physician's decision to prescribe --
15     A.   Of course.
16     Q.   -- a particular pharmaceutical product
17 off-label?
18     A.   Yes.
19     Q.   Would those factors include attending
20 independently accredited CMEs that discuss the
21 off-label use of a pharmaceutical product?
22     A.   Certainly could.
23     Q.   And would those factors include
24 formulary policies of their patients' insurance

Page 180

1  companies?
2      A.   Certainly could.
3      Q.   Or news of drugs in the same class
4  receiving approvals for that particular
5  indication?
6      A.   Certainly could.
7      Q.   Could those factors include a benign
8  side effect profile for the drug in question?
9      A.   Certainly could.
10     Q.   Or the absence of drug-drug
11 interactions for the drug in question?
12     A.   Could as well.
13     Q.   Postings made available on the
14 Internet for particular populations?
15     A.   Postings available?
16     Q.   Yes, say a bulletin board for a
17 particular patient advocacy group?
18     A.   Could.  I take it there's no end to
19 what could, in fact, influence a doctor's
20 prescribing, including many things that
21 shouldn't.
22          (Pause.)
23          BY MR. MIZELL:
24     Q.   Professor Brock, do you have a copy of

Page 181

1  the 2007 Steinman article in your stack?
2      A.   Probably.  Yes.  I'm not sure which
3  one the 2007 is.  Is that the PLoS?  Yes,
4  Characteristics and Impact?
5      Q.   Yes.
6          We've discussed some of the
7  limitations on this research?
8      A.   Mm-hmm.
9      Q.   And would that also include the fact
10 that forms were only collected from 97
11 physicians, and that being a relatively small
12 sample size?
13     A.   Yes.  I believe they acknowledge that
14 as a limitation.
15     Q.   Fair to say this is a case study based
16 on limited data?
17     A.   Yes.  There is a lot of additional
18 data with regard to drug detailing in general
19 and its effects on prescribing.
20          MR. MIZELL:  Thank you for your time.
21 We have no further questions, unless any
22 redirect after your examination.
23          MR. RICHER:  I have no questions for
24 Professor Brock.

46 (Pages 178 to 181)

Page 182

```
1        MR. MUEHLBERGER:  Thank you very much.
2        MR. MIZELL:  Thank you very much.
3        THE VIDEOGRAPHER:  The time is four
4   minutes after four.  We are off the record.
5        (Whereupon, the deposition was
6        concluded.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 184

```
1   COMMONWEALTH OF MASSACHUSETTS )
2   SUFFOLK, SS.              )
3
4        I, MAUREEN O'CONNOR POLLARD, RPR, CLR,
5   and Notary Public in and for the Commonwealth of
6   Massachusetts, do certify that on the 27th day
7   of October, 2008, at 9:06 o'clock, the person
8   above-named was duly sworn to testify to the
9   truth of their knowledge, and examined, and such
10  examination reduced to typewriting under my
11  direction, and is a true record of the testimony
12  given by the witness.  I further certify that I
13  am neither attorney, related or employed by any
14  of the parties to this action, and that I am not
15  a relative or employee of any attorney employed
16  by the parties hereto, or financially interested
17  in the action.
18       In witness whereof, I have hereunto
19  set my hand this 30th day of October, 2008.
20
21       _____
22       MAUREEN O. POLLARD, Notary Public
23       CSR No. 149108
24
```

Page 183

```
1   ATTACH TO DEPOSITION OF DAN W. BROCK, Ph.D.
2   CASE:  Re:  Neurontin Marketing, Sales Practices
3        And Products Liability Litigation
4   DATE TAKEN:  October 27th, 2008
5
6        ERRATA SHEET
7   PAGE    LINE    CHANGE    REASON
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15       I have read the foregoing transcript
16  of my deposition and except for any corrections
17  or changes noted above, I hereby subscribe to
18  the transcript as an accurate record of the
19  statements made by me.
20
21       Executed this____day of_____, 2008.
22
23       _____
24       DAN W. BROCK, Ph.D.
```

47 (Pages 182 to 184)