```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```
-------------------------------------------------------x
In re: NEURONTIN MARKETING, SALES
PRACTICES, AND PRODUCTS LIABILITY
LITIGATION                                              MDL Docket No. 1629
-------------------------------------------------------x
THIS DOCUMENT RELATES TO:                               Master File No. 04-10981
Bulger vs. Pfizer, et al., 1:07-cv-11426-PBS            Judge Patti B. Saris
-------------------------------------------------------x

## JOINT PRE-TRIAL MEMORANDUM

(1) A concise summary of the evidence with respect to both liability and damages that will be offered by:

  (a) plaintiff is as follows:

This is a wrongful death case arising out of the death of Susan Bulger. Plaintiffs allege that Susan Bulger died by suicide after taking the prescription medication Neurontin, also known as gabapentin, which is manufactured and marketed by the Defendants. Plaintiff will offer evidence to show that taking gabapentin causes an increased risk of suicidality in some patients; that Defendants were negligent and failed to disclose this risk to Susan Bulger and her prescribing physicians; that Defendants misrepresented information known to the defendants and suppressed or concealed material facts about gabapentin's capacity to cause depression and suicidality; and that Defendants did not take reasonable and necessary steps to investigate, research and disclose the risks of increased suicidality with Neurontin after it came on the market.

The Defendants are Pfizer, Parke-Davis, and Warner-Lambert, formerly a subsidiary of Parke-Davis. Parke-Davis and Warner-Lambert originally submitted Neurontin – gabapentin – for FDA approval and marketed Neurontin-gabapentin. Pfizer bought Parke-Davis and Warner –Lambert in 2001. In addition to its own conduct, Pfizer is responsible for the acts of Parke-Davis and Warner-Lambert.

Parke-Davis filed its New Drug Application for Neurontin solely for add-on therapy for epilepsy and not for any other illness, disease, or medical indication. When Parke Davis filed the Neurontin – gabapentin New Drug Application with the FDA, as part of its submission, Parke-Davis submitted data documenting patient adverse events observed and reported in its clinical trials. In the total exposed population of patients in the New Drug Application for Neurontin submitted to FDA in 1992, seventy-eight, or 5.3 percent, of the reported adverse events were of depression, including nineteen instances where the patient had no prior history of depression, twenty-two instances where the patient required treatment for his or her depression, and nine instances where the patient had to withdraw from the study due to depression. The seventy eight "serious" adverse events identified included seven reports of depression involving suicidal ideation, six of drug overdoses, and two suicide attempts. Six of the seventy eight "serious" adverse events, including the two suicide attempts, were deemed by the Defendants' own clinical

investigator to be "possibly or probably" related to gabapentin. There were also numerous mood and behavioral disturbances, or "psychobiologic" adverse events, reported in the studies.

Defendants' clinical trials reported within the New Drug Application included a report of a positive dechallenge/rechallenge event where the patient experienced severe depression and suicidal ideation while on gabapentin that resolved when he was taken off the drug and that re-appeared when the patient was given gabapentin again.

The FDA, in 1992-1993, as part of a medical-statistical review of the Defendant's New Drug Application for Neurontin, noted five "serious events", including depression, which could "limit the drug's widespread usefulness." Specifically, FDA stated that "depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts."  The FDA stated that in Defendants' clinical database of 2048 patients, gabapentin had a risk profile that was uncertain, with five groups of important adverse events that had not yet been fully characterized, including clinically important depression. The FDA also commented at that time about dropouts in the clinical trials and gabapentin's lack of sustained efficacy; the FDA stated the following: "Accumulated long range safety data are limited by the excessive attrition due to apparent lack of sustained efficacy."

Defendants had specific knowledge that Neurontin may contribute to depression and suicidality from clinical studies and trials conducted as part of this New Drug Application in 1992. Parke Davis and Warner Lambert had specific knowledge of the FDA's medical statistical review regarding Neurontin. On or about December 7, 1992, Dr. Richard Spivey, then Senior Director of Regulatory Affairs at Parke Davis, obtained the FDA review from the FDA.  Dr. Spivey provided the review to Janeth Turner, Parke-Davis' Director of Regulatory Affairs employee.  On December 7, 1992, Ms. Turner provided the FDA Review to Dr. Mark Pierce, Parke Davis's Vice President of Clinical Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of Drug Development.  Between December 7, 1992 and December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce and Mr. Fletcher read and became aware of the 1992 FDA Review.

Defendants' employee Janeth Turner also was a member of Defendants' Drug Development Team and New Product Committee whose stated purpose was to explore new uses for Neurontin beyond the epileptic population.  At no time did Defendants' employee Ms. Turner communicate to any other member of Defendants' Development Team, or New Product Committee, the FDA's concern that "[l]ess common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts."

On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services voted to recommend Neurontin for one very specific use in a limited population: the adjunctive

treatment for refractory epilepsy. Approximately one year later, on December 30, 1993, the company received FDA approval to market Neurontin only for the adjunctive treatment of epilepsy in adults. The FDA stated that the drug is only effective at 900 to 1800 milligrams per day.

Defendants later sought approval from the FDA for additional prescription uses for Neurontin: Defendants' application to the FDA for approval of Neurontin as a monotherapy for partial seizures was denied on August 26, 1997.

Beginning in 1995, Defendants Parke-Davis and Warner Lambert engaged in a multi-faceted marketing strategy designed to increase sales of Neurontin for uses not approved by the FDA. Such uses are known as "off-label" uses. Defendants began to illegally market and promote the sale of Neurontin for "off-label uses" which were not approved by the FDA, such as the treatment of pain, bipolar disorder and anxiety. The illegal marketing and promotion included: a) sales representatives detailing Neurontin to prescribing physicians for those "off-label" uses and at higher doses than had been tested or approved; b) funding presentations by consultants and liaisons to encourage word-of-mouth recommendations for off-label uses within the medical community; c) increasing clinical testing and development for new unapproved (off-label) uses for Neurontin; d) affirmative promotional statements intended to conceal or misrepresent negative or contradictory data on the Neurontin's safety or efficacy for unapproved, off-label uses, and e), placing articles in publications to be read by doctors that stated that Neurontin was observed to improve patients who had been treated with Neurontin for "off-label" psychiatric and pain uses.

Clinical evidence from Defendants' studies did not support Defendants' promotion of Neurontin as safe and effective for off-label uses. However, Defendants and their representatives promoted off-label uses even where there was contradictory clinical evidence of its efficacy. Defendants' marketing campaign for Neurontin correlates with a substantial rise in Neurontin sales or off-label uses. Sales of Neurontin for non-FDA approved (offlabel) uses have skyrocketed steadily since 1998. From 2000 to at 2004, off-label usage constituted 93 to 94 percent off all Neurontin sales. This sharply contrasts with sales for approved uses where sales have declined during the relevant period.

Defendants sponsored a study at the Harvard Bipolar Research Program in 1998, which concluded that patients receiving Neurontin did worse than those patients on placebo sugar pills. Although Defendants were aware of the results of this study, they did not publish the study's results until 2000, after a significant number of physicians were induced to prescribe Neurontin.

From the time that Defendants began to market Neurontin to the public in 1993 through the time that Susan Bulger hung herself on August 4, 2004, Defendants did not disclose or warn that Neurontin may cause psychobiologic events including depression and suicidality, and Defendants did not disclose or warn that Neurontin increased the risk of suicidality.

Defendants' marketing strategy through at least May 2004, before Susan Bulger's death, was to compare and set apart Neurontin from competing drugs, such as Keppra, that already had a specific warning related to suicide. On January 16, 2003, Defendants' Senior Medical Director, Dr. Catherine Clarey, denied any association between Neurontin and depression or suicidality when, on National Public Radio ("NPR"), she stated, "[T]here is absolutely no evidence that Neurontin… with all these prescriptions that it has been associated with suicidal behavior or that it can cause suicidal behavior."

Without FDA approval of Neurontin for indications beyond epilepsy and post-herpetic neuralgia, the law prohibited Defendants from marketing or promoting Neurontin for other ("off label") uses.

However, the sale of the drug Neurontin was introduced in interstate commerce for unapproved uses and without prior FDA approval. The sale of the drug Neurontin was introduced in interstate commerce for unapproved uses without adequate directions being provided to physicians and consumers for such uses.

Warner-Lambert Company distributed an unapproved new drug, beginning as early as about April of 1995, and continuing thereafter until at least in or about August 20 of 1996 in the District of Massachusetts and elsewhere. Warner-Lambert Company distributed a misbranded drug, beginning as early as in or about April of 1995, and continuing thereafter until at least in or about August 20 of 1996 in the District of Massachusetts and elsewhere.

Defendant Warner-Lambert Company LLC was charged in the United States District Court for the District of Massachusetts with improper off-label marketing in violation of 21 U.S.C. §§ 331(a), 331(d), 333 (a)(2), 352 (f)(10) and 355 (a). Defendant Warner-Lambert Company LLC pled guilty to the charges on June 7, 2004. As part of its guilty plea in 2004, Defendants admitted that the Neurontin label provided inadequate directions for use. Defendant Warner-Lambert Company, LLC, as part of the guilty plea, was ordered to pay a criminal fine of 240 million dollars.

At all times before Susan Bulger's death, Defendants considered the term "suicide" to be an unlabeled adverse event, meaning an event that is not specifically identified in the label to warn or alert prescribing doctors of a known or expected side effect reported with the drug. Defendants submitted reports of suicide to the FDA as unlabeled adverse events on a 15-day expedited basis.

However, after Susan Bulger's death, on December 21, 2005, Defendants submitted a labeling change to the FDA in which "suicide" would be added to the label. On May 3, 2006, FDA approved the labeling change. Thereafter, Defendants considered "suicide" to be a labeled event and transmitted to the FDA reports of "suicide" as labeled adverse events on its periodic reports.

On January 31, 2008, the FDA issued an Alert to healthcare professionals stating that: "[P]atients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or ideation…compared to patients receiving placebo." Neurontin is one of the

eleven antiepileptic drugs identified in the FDA Alert. The Alert reported that the increased risk of suicidal behavior or ideation was statistically significant and noted that "[f]our of the patients who were taking one of the antiepileptic drugs committed suicide, whereas none of the patients in the placebo group did." The Alert advised that all patients treated with AEDs (antiepileptic drugs) should be monitored closely for depression and suicidality and other unusual changes in behavior, explaining that "symptoms such as anxiety, agitation, hostility, mania and hypomania may be precursors to emerging suicidality."

In May 2008, the FDA issued a statistical review that concluded that "antiepileptic drugs are associated with increased risk of suicidality relative to placebo in randomized placebo controlled trials." The FDA placed gabapentin in the GABAergic/GABAmimetic drug group, the drug group that demonstrated a statistically significant association with increased risk of suicidal behavior or ideation.

On July 10, 2008, Dr. Russell Katz, the FDA Director of the Division of Neurology Products, stated on the record that the FDA study established causality between antiepileptic drugs and suicidality. The FDA study supports an association between Neurontin and suicidality. Neurontin increases the risk of suicidal thoughts or behavior in patients taking Neurontin for any indication. There is an association between Neurontin and an increased risk of suicidality.

On December 16, 2008, the FDA required all manufacturers of antiepileptic/ anticonvulsant drugs to include a warning in their labeling and to inform patients of the risks of suicidal thoughts and actions. Neurontin's labeling as of April 2009 includes language that "Antiepileptic drugs (AEDs), including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication."

Gabapentin is a GABAergic drug. GABAergic drugs have the capacity to contribute to negative effects on mood and behavior. GABA is the primary inhibitory neurotransmitter in the brain and spinal cord. Developed as an antiepileptic compound, gabapentin was originally conceived to be similar in chemical structure and therefore in function to GABA. Many antiepileptic drugs were designed to counteract the over-excitation in an epileptic's brain by increasing the amount of GABA in the brain. Such drugs are often referred to as "GABAergic". The FDA has documented a statistically significant association between GABAergic antiepileptic drugs and increased risk of suicide. Gabapentin has been presented by Defendants as a GABAergic drug. Defendants designed gabapentin as a GABAergic drug. Gabapentin has been shown to prompt an increase in whole-tissue brain concentrations of GABA. The presence of GABA in the nuclei where serotonin originates (the raphe nuclei) reduces the rate of serotonin release. Several animal studies have demonstrated that gabapentin decreases monoamine neurotransmitter (i.e., serotonin, norepinephrine and dopamine) release in vitro (experiments on cell and tissue cultures). Gabapentin has been shown to reduce the release of monoamine neurotransmitters under laboratory conditions. The decrease of serotonin and other monoamines in the brain is deleterious to mood, including depression and aggression. There is a causal relationship between low levels of serotonin in the brain and depression and suicide. Depression is associated with serotonin depletion in many

people. By altering the brain chemistry of its users, Neurontin has the biological capacity to cause mood and behavioral changes that contribute to suicidality. Neurontin increases the amount of GABA (gamma-aminobutyric acid), a neurotransmitter, in the brain. This increase of GABA leads to a decrease of other neurotransmitters in the brain, like serotonin, norepinephrine and dopamine. The decrease in serotonin and norepinephrine can prompt behavioral disturbances, depression, and suicidal behavior.

Plaintiff will offer evidence that Defendants' conduct was a substantial factor, also called a proximate cause, of Susan Bulger's injuries and death. Plaintiff will offer evidence to show that Susan Bulger's death resulted in damages to her family, including loss of consortium and loss of services, and that they are entitled to compensatory and punitive damages because of Defendants' conduct.

Prior to Mrs. Bulger's death, Defendants promoted Neurontin to Susan Bulger's physicians via direct sales representative detail visits to her doctors' offices. On 1/8/04, 2/4/04, 4/1/04 and 4/27/04, Defendants' sales representatives visited plaintiff's prescribing physician, Richard Goldman, M.D., an internist, and promoted the use of Neurontin. Prior to Mrs. Bulger's death, Defendants' sales representatives also visited Mrs. Bulger's prescriber, Dr. Dino Crognale, who was a general family medicine doctor. Pfizer acknowledges it was inappropriate to have their sales representatives promote Neurontin to physicians other than neurologists and epilepsy doctors regarding Neurontin.

Defendants' sales representatives never disclosed to Doctors Goldman and Crognale that suicidality is a risk with Neurontin. Defendants did not disclose to Mrs. Bulger's prescribing medical providers that Neurontin usage was associated with depression and/or suicidality. Defendants did not disclose to Mrs. Bulger's prescribing medical providers that Neurontin usage increased the risk of depression and/or suicidality. Defendants did not disclose to Mrs. Bulger's prescribing medical providers that the FDA, in 1992, was concerned that Neurontin usage may worsen depression or lead to suicide attempts. Defendants did not disclose to Mrs. Bulger's prescribing medical providers that Neurontin could increase the risk for suicidality in patients who were already pre-disposed or susceptible to committing suicide.

Dr. Crognale provided Neurontin to Mrs. Bulger for her chronic pain related to rheumatoid arthritis, as well as for anxiety and depression -- all off-label uses.

When Susan Bulger took Neurontin, Defendants' labeling for Neurontin did not include any warning for Suicidal Behavior. When Susan Bulger took Neurontin, Defendants' labeling for Neurontin did not include language that Neurontin increases the risk of suicidal thoughts or behavior in patients taking Neurontin for any indication.

Susan Bulger reported adverse mood and behavioral side effects after having ingested Neurontin to her doctors and others. Susan Bulger reported to Dr. Crognale, on October 30, 2000, that Neurontin made her feel "completely out of it." By July 2002, Susan Bulger experienced major depression and panic attacks. On July 2, 2002, during the timeframe of her prescription for Neurontin, Dr. Crognale reports that Susan Bulger was demotivated, anhedonic, and had difficulty with sleep. On December 2, 2002, Susan

Bulger reported to Dr. Crognale that she stopped taking Neurontin because it was "making her more moody."

On December 20, 2002, Dr. Crognale restarted Susan Bulger's Neurontin. As of April 22, 2003, while on Neurontin, Dr. Crognale reported that Susan Bulger "has not done well in terms of her overall mood and spontaneous crying." As of April 21, 2004, Susan Bulger's doctor, Richard Goldman, prescribed Neurontin at a dose of 300 mg in the morning and 900 mg at bedtime.

Dr. Crognale testified that he relied on the Physician's Desk Reference (PDR), a commercially published compilation of drug company labels, before prescribing a drug. Dr. Crognale's practice was to discuss the side effects relevant to his patients as set forth in a drug company's label. Dr. Crognale, testifying about his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin); (b) suicide attempts during clinical trials; (c) depression adverse events during clinical trials; and (d) that patients taking Neurontin may suffer mood and behavioral disturbances.

Dr. Goldman testified that he relied on the Physician's Desk Reference (PDR) and on an online formulary reference called EPOCRATES for information in regard to prescribing medications. Dr. Goldman, in discussing his prescribing practices and risk/benefit analyses for prescribing a drug to Mrs. Bulger, wanted to know about (a) Neurontin's mechanism of action and Neurontin's effect on neurochemistry (serotonin); (b) suicide attempts during clinical trials; and (c) depression adverse events during clinical trials.

On June 17, 2004, Susan Bulger filled her prescription for Neurontin at the Medicine Shoppe in Beverly, MA; the prescription was for a 30 day supply of 90 pills at 300 mg per pill. On July 12, 2004, Susan Bulger's doctor, Richard Goldman, increased her Neurontin prescription from three 300 mg capsules, or 900 mg per day to one dose of 1200 mg at bedtime. On July 12, 2004, Susan Bulger filled her prescription for Neurontin at the Medicine Shoppe in Beverly, MA; the prescription was for a 30 day supply of 120 pills at 300 mg per pill. Susan Bulger committed suicide less than one month after the increase in her Neurontin prescription from Dr. Goldman.

On August 4, 2004, at the age of 40, Susan Bulger committed suicide by hanging herself in her basement bedroom while her husband and five year old daughter were in the home. At approximately 6:00 p.m., she requested her Neurontin, and her husband, Ronald Bulger, provided four Neurontin pills to her. Each pill was 300 mg for a total of 1200 mg. Susan Bulger was reported dead to the local police at 7:11 p.m.

(b) defendants is as follows:

Plaintiff, Ronald Bulger, Sr., seeks to recover damages for the death of his wife Susan Bulger. He alleges that Mrs. Bulger's use of Neurontin caused her suicide. Neurontin was approved by the FDA as adjunctive therapy in the treatment of partial seizures in patients with epilepsy (approved in 1993) and for treatment of post-herpetic neuralgia

("PHN") (approved in 2002). The FDA's approval of Neurontin for these indications followed years of review of extensive data on the safety and efficacy of Neurontin, including double-blind randomized controlled clinical trials, and specifically included consideration of data of depression and suicidality. In addition to the FDA's internal reviewers, the Neurontin data was evaluated by an independent panel of outside experts, the FDA's Peripheral and Central Nervous System Drugs Advisory Committee. At the time of the FDA's approval in December 1993 of the epilepsy indication for Neurontin, the FDA found that there was no scientific evidence supporting an increased risk of suicidal behavior and thinking with Neurontin and the agency did not include any such warning in the labeling. When it approved Neurontin for the treatment of PHN in May 2002, the FDA again concluded that the drug was safe and conditioned approval on the verbatim use of the FDA-approved labeling and warnings, which did not include warnings that Neurontin causes or increases the risk of suicide-related events. At no time prior to Susan Bulger's death in 2004 did the FDA conclude that there was reasonable evidence of an association between Neurontin and suicide. Likewise, the FDA did not, prior to 2004, require that the Neurontin label include a warning for suicidal behavior or depression.

Pfizer has provided the FDA with all of its randomized controlled clinical trials data for Neurontin. There were a total of 49 clinical trials, which included 5,194 patients being treated with Neurontin. These studies found no completed suicides or suicide attempts. In all the clinical trials, there was 1 case of self-injurious behavior, which did not rise to the level of an attempt, and 2 suicidal thoughts. There was no statistically significant difference between the placebo and Neurontin in these events in the randomized controlled clinical trials. Researchers at Pfizer and other organizations have completed and published nearly 2000 separate studies and articles about Neurontin. None of those studies have demonstrated or concluded that taking Neurontin increases a patient's risk of committing suicide. Likewise, none of these studies support an association between Neurontin and depression or other mood disorder.

Mrs. Bulger was a 39-year old woman with a significant history of mental disorders, health problems, and substance abuse. Most notably, Mrs. Bulger attempted suicide multiple times before ever ingesting Neurontin. In 1978, at age 14, she attempted to cut her own wrists. On June 5, 1990, Mrs. Bulger was admitted to the emergency room after she overdosed on pills and cut her wrists. In 1993, she attempted to overdose on Elavil, went into cardiac arrest and required resuscitation. At another point she attempted suicide by driving her car off of a cliff.

At one time or another, Susan Bulger was described as suffering from bipolar disorder, borderline personality disorder, anxiety disorder with panic attacks and periods of agoraphobia, post-traumatic stress disorder, depression with suicidal ideation and multiple suicide attempts, rheumatoid arthritis, cervical subluxation with associated neck pain, low back pain, psychogenic pain, hepatitis C, and gastro-esophageal reflux disease.

From the time of her diagnosis with rheumatoid arthritis in 1982 until the time of her suicide on August 4, 2004, Mrs. Bulger suffered from chronic, severe pain, commenting as early as 1993: "I'm always depressed because this disease has taken the life right out

of me. Before I got arthritis I was very active. Now, I just exist. I feel I have no desire whatsoever. I'm usually very moody most days." By 1998, she had undergone multiple orthopedic operations and replacements and was on disability, but her pain was not relieved. Mrs. Bulger's life was also fraught with psycho-social stressors, including physical and mental abuse, long-term substance abuse and addiction to cocaine, heroin, Methadone, and OxyContin.

Mrs. Bulger had several risk factors, independent of Neurontin, which fully explain her suicide. It was the combination of these factors, and not Neurontin, that led to Mrs. Bulger's suicide. There is no evidence that Mrs. Bulger had suicidal ideation while she was taking Neurontin. Instead, the medical records show that Neurontin was helping in the management of Mrs. Bulger's pain. Any reports by Mrs. Bulger of depression while on Neurontin can be explained by the fact that she suffered from chronic depression long before ever taking Neurontin, her lack of response to or non-compliance with drugs (such as Prozac) prescribed for the treatment of her mood disorders, as well as the other factors discussed above.

(2) The facts established by pleadings or by stipulations or admissions of counsel are as follows:

1. Parke-Davis was an operating division of Warner-Lambert which was acquired by Pfizer in 2000. Pfizer Inc is the sole member of Warner-Lambert Company LLC, which is a Delaware limited liability company and the successor to Warner-Lambert Company.

2. Defendants manufacture and distribute the prescription drug Neurontin, also known as gabapentin as its generic name.

3. On January 15, 1992, Parke-Davis submitted a New Drug Application ("NDA") to the U.S. Food & Drug Administration (FDA) seeking approval for Neurontin as an adjunctive therapy for epilepsy. An adjunctive therapy is a secondary therapy intended to be used in conjunction with and as a supplement to a primary therapy.

4. On or about December 15, 1992, the Peripheral and Central Nervous System Drugs Advisory Committee to the Department of Health and Human Services voted to recommend Neurontin for the adjunctive treatment for refractory epilepsy.

5. Approximately one year later, on December 30, 1993, the company received FDA approval to market Neurontin only for the adjunctive treatment of epilepsy in adults, at the dose of 900 to 1800 milligrams per day.

6. In August 2001, Pfizer filed a New Drug Application, which ultimately led to an FDA approval in May 2002 for the use of Neurontin in the management of postherpetic neuralgia ("PHN") in adults.

7. Neurontin has not been approved by the FDA for any indications other than (1) adjunctive therapy in the treatment of partial seizures in patients with epilepsy and (2) management of PHN.

8. At the time Pfizer was seeking a PHN approval, both the FDA and Pfizer were aware that Neurontin was being prescribed for uses other than FDA-approved indications.

<u>Case-Specific Facts</u>

9. Susan Bulger was born on December 14, 1964.

10. On August 4, 2004, at the age of 39, Susan Bulger died. Her death was ruled a suicide by the medical examiner.

11. After a previous period during 1999 when Susan Bulger used Neurontin for a few months, Susan Bulger's doctor, Dino Crognale, prescribed Neurontin to Susan Bulger beginning in May of 2002.

12. Dr. Crognale is a medical doctor, board certified by the American Board of Family Practice, and Dr. Crognale specializes in family and adolescent medicine.

13. Dr. Crognale provided treatment to Susan Bulger for rheumatoid arthritis, chronic pain, depression and anxiety.

14. Dr. Crognale prescribed Neurontin to Mrs. Bulger for her chronic pain related to rheumatoid arthritis.

(3) Contested Issues of Fact

(a) The plaintiff's contested issues of facts are as follows:[1]

1. Whether Defendants were negligent with respect to the research and development of Neurontin in the manner in which they investigated or tested the association between Neurontin and suicidality.

2. Whether Defendants failed to adequately warn doctors and patients of risks of suicidality that Defendants knew or should have known were associated with taking Neurontin for off-label uses.

3. Whether Defendants failed to adequately monitor the effect of Neurontin on patients taking the drug after Neurontin was approved by the FDA and entered the marketplace.

---

[1] Defendants agree that the issues identified by Plaintiff are contested. Defendants contend, however, that certain issues present issues of law (duty) or are redundant and subsumed within other issues.

10

4. Whether Neurontin is defective as marketed or otherwise.

5. Whether Neurontin causes depression and suicidality in some patients.

6. Whether Defendants had a duty to disclose the depressive and suicidal side effects of Neurontin when they knew of Neurontin's substantial off-label usage.

7. Whether Defendants had a duty to disclose to prescribing physicians how Neurontin works (e.g., its "mechanism of action") so that prescribing physicians could perform a risk-benefit analysis when prescribing Neurontin and could carefully monitor its results.

8. Whether Defendants withheld medical and scientific data regarding psychobiologic side effects, including depression and suicidality, by concealing the information from the medical community and consumers, including Susan Bulger and her medical providers.

9. Whether Defendants intentionally withheld material information about the side effects of Neurontin from both consumers and their prescribing physicians with the intent to deceive.

10. Whether Defendants breached their duty to disclose to physicians and patients material facts about the risks of psychobiologic side effects, including depression and suicidality, with Neurontin use.

11. Whether Defendants breached their duty to disclose that Neurontin had an association with adverse psychobiologic effects, such as depression and suicidality, in its details to doctors' offices.

12. Whether Defendants breached their duty to disclose that Neurontin had an association with adverse psychobiologic effects, such as depression and suicidality, in its product labeling and package inserts.

13. Whether Defendants failed to exercise reasonable care to warn of the risks of Neurontin.

14. Whether Defendants' conduct was a substantial factor, also known as a proximate cause, of Susan Bulger's injuries and death.

15. Whether the Susan Bulger's husband, son and daughter suffered a loss of consortium, loss of services, and other damages, as a result of Susan's death.

16. The amount in dollars of damages incurred in the past and future that should be awarded to Susan Bulger's daughter, son and husband.

17. Whether punitive damages should be assessed as a result of Defendants' actions or failure to act, and if so, the amount of punitive damages to be awarded.

(b) The Defendants' contested issues of facts are as follows:

1. Whether Neurontin increases the risk of suicide or suicidal behavior (generic causation).

2. Whether Neurontin was a proximate cause of Susan Bulger's death (specific causation).

3. Whether Neurontin was accompanied by adequate warnings.

4. Whether any failure to provide adequate warnings with Neurontin, if found by the jury, was done with scienter.

5. Whether Susan Bulger's surviving husband and children have sustained compensable damages as a result of Susan Bulger's death and, if so, in what amount.

6. Whether Susan Bulger experienced compensable conscious pain and suffering prior to her death and, if so, in what amount.

7. If the jury finds that Defendants failed to provide adequate warnings for Neurontin and that such failure proximately caused Susan Bulger's death, whether Defendants' failure was malicious, wanton, willful, reckless, or grossly negligent.

8. If the jury finds that Defendants failed to provide adequate warnings for Neurontin and that such failure proximately caused Susan Bulger's death, whether punitive damages should be awarded and, if so, in what amount.

(4) Any jurisdictional questions.

Jurisdiction in this case is based on diversity of citizenship under 28 U.S.C. § 1332. While it is not disputed that there is diversity of citizenship and that the amount-in controversy exceeds $75,000, it is Defendants' position that Plaintiff's recent motion to amend raises questions regarding who is the proper party to prosecute this action, which could implicate the jurisdictional requirement of standing. Defendants have requested an opportunity to conduct discovery on the issues raised by Plaintiff's motion to amend.

(5) Questions raised by pending motions are as follows:

(a) By Plaintiff:

1. Products Liability Plaintiffs' filed a motion to establish a Plaintiffs' personal injury litigation expense fund. ECF Doc #1129.

2. Products Liability Plaintiffs' Motion in Limine to Exclude Weiss Smith. ECF Doc. #1625.

3. Defendants' motion to exclude the specific causation testimony of doctors. Maris and Kruszewski in Bulger. ECF Doc #1634.

4. Products Liability Plaintiffs' emergency motion to strike defendants expert Gibbons for providing false testimony and making false statements in his declarations. ECF Doc #1807.

5. Products Liability Plaintiffs' emergency motion to strike new March 2009 expert report and bipolar study of Robert Gibbons, Ph.D. and for reconsideration of Judge Saris's November 2008 decision to allow Dr. Gibbons's study and article at trial. ECF Doc #1817.

6. Plaintiff's emergency motion for leave to file an amended complaint in Bulger. ECF Doc #1819.

(b) by Defendant:

1. Whether evidence of or references to Warner-Lambert Company LLC's guilty plea or any related government investigations or agreements should be excluded.

2. Whether evidence of marketing or advertising materials and conduct, David Franklin and the *Franklin* litigation, and other claims or actions should be excluded.

3. Whether evidence of post-incident regulatory actions, labeling, and patient information guides should be excluded.

4. Whether evidence of foreign labels and regulatory actions should be excluded.

5. Whether the testimony of the decedent's minor daughter, family photographs and memorabilia, and post-mortem photographs should be excluded.

6. Whether the testimony of Plaintiff's expert Dan Brock is admissible.

7. Whether the testimony of Plaintiff's expert Charles King is admissible.

8. Whether evidence of adverse event reports should be excluded.

9. Whether Plaintiff should be precluded from introducing evidence of or referring to (a) Plaintiff's pleadings, (b) Defendants' corporate status, size, profits, financial condition or employee compensation, (c) "the pharmaceutical industry," or "drug companies," (d) comments about the parties' respective counsel, (e) Defendants' insurance, (f) the presence or absence of corporate representatives, (g) how Plaintiff will use any jury

     award, (h) the effect of the jury's answers, (h) "Golden Rule" arguments, or (i) discovery disputes or activities.

    10. Whether trial should be bifurcated into compensatory and punitive damages phases.

(6) Issues of law, including evidentiary questions, together with supporting authority:

 (a) By Plaintiff

There are numerous disputed issues of law, both substantively and with response to the laws of evidence. Outstanding motions are set forth above. Further issues of law include all issues raised by Plaintiff's motions in limine, as set forth in section 5(a) above, and the admissibility of any other evidence objected to by Plaintiff's objections to Defendants' exhibit and deposition designations.

 (b) By Defendant[2]

   1. Whether Pfizer had a legal duty at any time between 2002 and August 2004 to warn physicians of any alleged risk of suicide or suicide behavior associated with Neurontin.

   2. Whether Plaintiff's expert testimony on the issue of generic causation satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 703.

   3. Whether Plaintiff's expert testimony on the issue of specific causation satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 703.

   4. Whether Plaintiff's expert testimony on the issue of pharmacovigilence and duty to warn satisfies the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 703.

---

[2] The legal authority for many of these issues has previously been provided to this Court. Defendants incorporate by reference their prior Motion for Summary Judgment (*Bulger*) [1637]; Motion to Exclude the Specific Causation Testimony of Doctors William Maris and Stefan Kruzekski (*Bulger*) [1634]; Motion for Summary Judgment (*MDL*) [1161]; Motion to Exclude the Testimony of Doctors Trimble, Kruszewski and Blume on the Issue of General Causation (*MDL*) [1157]; Defendants' Motion to Dismiss the Personal Injury Plaintiffs' Claims Based Upon Allegedly Improper Marketing (*MDL*) [363]; Defendants' Motion to Dismiss Product Liability Plaintiffs' Fraud Claims Based Upon Allegedly Improper Marketing (*Track One Cases*) [1232], together all memoranda of law filed in support of such motions. Additional legal authority is provided in Defendants' Trial Brief, which is also being filed this date. Legal authority for the issues raised by Defendants' motions in limine are contained within the supporting memoranda of law being filed today with such motions.

5. Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that the Neurontin warning provided to physicians between 2002 and 2004 was inadequate.

6. Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that the Neurontin can cause suicide or suicide behavior.

7. Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that the Neurontin caused Susan Bulger's death.

8. Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that the Defendants are liable to Plaintiff for compensatory damages.

9. Whether the damages sought by Plaintiff in this action are legally compensable under Massachusetts wrongful death statute.

10. Whether there is a legally sufficient evidentiary basis for a reasonable jury to find that the Defendants are liable to Plaintiff for punitive damages.

11. Whether the imposition of punitive damages on the facts of this case is constitutionally permissible.

12. Whether punitive damages may be constitutionally imposed based upon gross negligence.

13. Whether the Constitution requires clear and convincing evidence to support the imposition of punitive damages.

14. Whether the amount of any award of punitive damages on the facts of this case is constitutionally permissible.

15. All issues raised by Defendants' motions in limine, as set forth in section 5(b) above.

16. The admissibility of any other evidence objected to by Defendants, as set forth in Defendants' objections to Plaintiff's exhibit and deposition designations.

(7) Any requested amendments to the pleadings.

Plaintiff seeks to amend the complaint to substitute David Egilman in place of the decedent's husband as the named plaintiff in this action. Defendants oppose this motion as untimely, prejudicial and seek an opportunity for discovery on the issues raised by the motion.

(8) Any additional matters to aid in the disposition of the action.

    1.    The parties propose the use of juror questionnaires to prospective jurors. Attached as Exhibit 7 is a sample questionnaire proposed by Plaintiff. Attached as Exhibit 8 is a sample questionnaire proposed by Defendants. The parties propose that prospective jurors prepare responses to the questionnaire on July 24, 2009. The parties will then have time to review the responses before jury selection on July 27, 2009.

    2.    Plaintiffs propose that the parties conduct voir dire, as opposed to the Court being the sole inquirer. Defendants oppose this request and ask that voir dire be conducted consistent with the Court's usual practice.

    3.    During trial, Plaintiffs propose that the parties each have an opportunity to provide summaries (interim arguments) after certain witnesses complete their testimony (e.g., 10 min per side). Defendants oppose this request.

    4.    Jurors should be allowed to take notes.

    5.    The parties should be allowed and encouraged to provide notebooks (e.g., a binder) to the Court and jury containing key exhibits that the parties intend to introduce into evidence.

    6.    Plaintiff proposes a jury of 12 individuals, plus 2 alternates. Plaintiff proposes that 12 jurors would deliberate and a verdict of 9 of the 12 jurors would be sufficient. Defendants object to Plaintiff's proposal and do not consent to a verdict by less than a unanimous jury. Defendants propose a jury of 12 individuals where all jurors deliberate and a unanimous verdict would be required.

(9)    The probable length of the trial is 3 weeks. Per this Court's order of June 9, 2009, each side is limited to approximately 21 hours for direct, cross, re-direct and re-cross.

(10)    List of witnesses:

Plaintiff's List of Trial Witnesses is attached as Exhibit 1 to this Pre-Trial Order.

Defendants' List of Trial Witnesses is attached as Exhibit 2 to this Pre-Trial Order.

Plaintiff's Deposition Designations are attached as Exhibit 3 to this Pre-Trial Order.

Defendants' Deposition Designations are attached as Exhibit 4 to this Pre-Trial Order.

(11)    List of proposed exhibits:

Plaintiff's List of Exhibits is attached as Exhibit 5 to this Pre-Trial Order.

Defendants' List of Exhibits is attached as Exhibit 6 to this Pre-Trial Order.

(12)    The parties respective positions on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is as follows:

(a) Plaintiff's position on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is set forth in his objections to Defendants' witness lists, exhibits and designated deposition testimony, as well as motions in limine which are being filed today.  In addition, pursuant to Federal Rule of Evidence 103, Plaintiffs incorporate and preserve any prior objections to evidence as to which the Court has already ruled.

(b) Defendants' position on any remaining objections to the evidence identified in the pretrial disclosure required by Fed. R. Civ. P. 26(a)(3) is set forth in their objections to Plaintiffs' witness lists, exhibits and designated deposition testimony, as well as their motions in limine which are being filed today.  In addition, pursuant to Federal Rule of Evidence 103, Defendants incorporate and preserve any prior objections to evidence as to which the Court has already ruled.

Dated: June 22, 2009

| | |
|---|---|
| FINKELSTEIN & PARTNERS, LLP | JACK W. LONDON AND ASSOCIATES, P.C. |
| By:*/s/Kenneth B. Fromson*_____ | |
| KENNETH B. FROMSON, ESQ. | By:*/s/Jack W. London*_____ |
| Attorneys for Plaintiff | JACK W. LONDON, ESQ. |
| 1279 Route 300 | 3701 Bee Cave Rd., Suite 200 |
| Newburgh, NY 12551 | Austin, TX 78746 |
| Tel: (845) 562-0203 | Tel: (512) 478-5858 |
| THE LANIER LAW FIRM, PLLC | |
| By:*/s/W. Mark Lanier*_____ | |
| W. MARK LANIER | |
| 126 East 56th Street, 6th Floor | |
| New York, NY 10022 | |
| Tel: (212) 421-2800 | |
| Attorneys for Plaintiff | |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | BOIES, SCHILLER & FLEXNER LLP |
| By:     /s/ Mark S. Cheffo                       | By:     /s/ William S. Ohlemeyer_____ |
|         Mark S. Cheffo |         William S. Ohlemeyer |
| Four Times Square | 333 Main Street |
| New York, NY 10036 | Armonk, NY 10504 |
| Tel:  (212) 735-3000 | Tel: (914) 749-8200 |

| | |
|---|---|
| SHOOK, HARDY & BACON L.L.P. | WHITE AND WILLIAMS LLP |
| By:   /s/ Scott W. Sayler | By:   /s/ David B. Chaffin |
|       Scott W. Sayler |       David B. Chaffin, BBO # 549245 |
| 2555 Grand Blvd. | 100 Summer Street, Suite 2707 |
| Kansas City, MO 64108-2613 | Boston, MA 02110 |
| Tel:  (816) 474-6550 | Tel:  (617) 748-5200 |

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on June 22, 2009.

                              /s/ David B. Chaffin
                              David B. Chaffin