# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3                  MDL Docket No. 1629
 4                  Master File No. 04-10981
 5     ***********************************
 6   IN RE:  NEURONTIN MARKETING, SALES
 7           PRACTICES AND PRODUCTS
 8           LIABILITY LITIGATION
 9     ***********************************
10   THIS DOCUMENT RELATES TO:
11   RONALD J. BULGER, SR., as Administrator
12   of the Estate of Susan Bulger, Deceased
13     ***********************************
14           CONTAINS CONFIDENTIAL INFORMATION
15              VIDEOTAPED DEPOSITION OF
16              DINO A. CROGNALE, MD
17
18                    Held At:
                   Hare & Chaffin
19                 160 Federal Street
                Boston, Massachusetts 02110
20
                    March 25th, 2008
21                    10:24 AM
22
     Reported By:  Maureen O'Connor Pollard, RPR, CLR
23
24   Videographer:  Shawn Budd
```

Page 2

1  APPEARANCES:
2  FOR THE PLAINTIFF:
3      BY: ANDREW G. FINKELSTEIN, ESQ.
4          FINKELSTEIN & PARTNERS
5          436 Robinson Avenue
6          Newburgh, New York 12550
7          800-634-1212
8          fink33@mac.com
9
10 FOR THE DEFENDANTS:
11     BY: DAVID B. CHAFFIN, ESQ.
12         HARE & CHAFFIN
13         160 Federal Street
14         Boston, Massachusetts 02110
15         617-330-5000
16         dchaffin@hare-chaffin.com
17
18 FOR THE DEPONENT:
19     BY: JAMES A. BELLO, ESQ.
20         MORRISON MAHONEY LLP
21         250 Summer Street
22         Boston, Massachusetts 02210-1181
23         617-737-8803
24         jbello@morrisonmahoney.com

Page 3

1                  INDEX
2  EXAMINATION                          PAGE
3  DINO A. CROGNALE, MD
4  BY MR. CHAFFIN                        6
5  BY MR. FINKELSTEIN                  174
6  BY MR. CHAFFIN                      222
7
8                EXHIBITS
9  NO.       DESCRIPTION                PAGE
10 Ex. 1   Document Bates stamped BULG
11         00034 through 00110.............  4
12 Ex. 2   Documents Bates stamped
13         000376-28SPR-00003 through
14         00376-28SPR-00123...............  4
15 Ex. 3   Document dated 10/29/07 with
16         attachments....................  4
17 Ex. 4   Document dated 10/29/07 with
18         attachments....................  4
19 Ex. 5   Eight page document titled
20         Patient Chart: Vitals Problems
21         and Medications................  4
22 Ex. 6   Four page printout from US
23         Food and Drug Administration.... 208
24 Ex. 7   6/22/06 letter.................. 222

Page 4

1            PROCEEDINGS
2
3      (Whereupon, Crognale Exhibit Numbers 1
4      through 5 were marked for
5      identification.)
6
7      (Attorney Finkelstein present via
8  speakerphone.)
9      THE VIDEOGRAPHER: Okay. We are on
10 the record.
11     This is the video operator speaking,
12 Shawn Budd. Today's date is March 25th, 2008,
13 and the time is 10:24.
14     We are here at the offices of Hare &
15 Chaffin located in Boston, Massachusetts to take
16 the videotaped deposition of Dr. Dino Crognale
17 in the matter of In Re: Neurontin Marketing,
18 Sales Practices and Products Liability
19 Litigation.
20     Would counsel please introduce
21 themselves?
22     MR. CHAFFIN: Thank you.
23     MR. FINKELSTEIN: Andrew Finkelstein,
24 Finkelstein & Partners, on behalf of the

Page 5

1  Bulgers.
2      MR. CHAFFIN: Thank you, Shawn.
3      David Chaffin for the Defendants.
4  Good morning.
5      MR. BELLO: And Jim Bello on behalf of
6  Dr. Crognale.
7      MR. FINKELSTEIN: Doctor, would you be
8  kind enough to state your full name for the
9  record?
10     MR. CHAFFIN: Andrew?
11     MR. FINKELSTEIN: Yes?
12     MR. CHAFFIN: It's my deposition.
13     MR. FINKELSTEIN: Oh, is it? I'm
14 sorry.
15     MR. CHAFFIN: That's okay. Thank you.
16 But that was an excellent question.
17     MR. FINKELSTEIN: I'll even be faster.
18     THE VIDEOGRAPHER: Would Maureen
19 Pollard, the court reporter, please swear in the
20 doctor?
21
22
23
24

Page 38

1  patient's comprehension is they're only likely
2  to remember three or four things that you tell
3  them in an encounter.
4      Q.  Do you have a -- is it your general
5  practice that when you prescribe a drug you
6  analyze the available information concerning the
7  drug and do a cost/benefit analysis to determine
8  whether the potential benefit outweighs the
9  risks?
10     A.  Yes.
11         MR. FINKELSTEIN:  Objection to form.
12         David, you said a cost/benefit.  I
13 think you meant to say a risk/benefit?
14         MR. CHAFFIN:  Thank you, Andrew.
15         BY MR. CHAFFIN:
16     Q.  Let me rephrase the question.
17         Do you do a risk/benefit analysis,
18 Doctor?  Is that your general practice?
19     A.  Yes.
20     Q.  Yes.
21         Now, the information that you consider
22 when you're doing that risk/benefit analysis
23 include the information in the PDR?
24     A.  Yes.

Page 39

1      Q.  Dear Doctor letters?
2      A.  I'm sorry, what's a Dear Doctor
3  letter?
4      Q.  A letter from a drug company
5  concerning updated information on a drug?  Are
6  you familiar with those?
7      A.  Can you clarify what that --
8          MR. BELLO:  Can you just repeat the
9  question?
10         BY MR. CHAFFIN:
11     Q.  Sure.
12         Do you consider Dear Doctor letters,
13 i.e. doctors -- letters from drug companies
14 concerning updated information on a drug?
15     A.  Only those that are talking about a
16 new specific piece of information like a new
17 warning or a new side effect or something.
18     Q.  And do you consider information you've
19 received from colleagues about their experiences
20 with drugs?
21     A.  Yes.
22     Q.  Do you consider published literature?
23     A.  Yes.
24     Q.  Do you consider what you've learned at

Page 40

1  seminars or conferences?
2      A.  Yes.
3      Q.  And your own experiences with the
4  drugs, you consider that as well, right?
5      A.  Yes.
6      Q.  Anything else that you take into
7  account when you do the risk/benefit analysis?
8          MR. CHAFFIN:  I thank you, again,
9  Mr. Finkelstein for the correction.
10     A.  The patient's record, the patient's
11 own history.
12         BY MR. CHAFFIN:
13     Q.  Is it fair to say that you only will
14 prescribe a drug for a patient when you've
15 satisfied yourself that the potential benefits
16 of the drug outweigh the potential risks?
17     A.  Yes.
18         MR. BELLO:  Note my objection.
19         BY MR. CHAFFIN:
20     Q.  And if that balance changes, i.e. it's
21 appearing that the risks are becoming greater
22 than the potential benefits or the benefits, you
23 just take the patient off the drug?
24         MR. BELLO:  Objection as well.

Page 41

1      A.  Yes.
2          BY MR. CHAFFIN:
3      Q.  Now, Doctor, you -- fair to say that
4  in 2002 when you started at Danvers Family
5  Doctors you were aware that all prescription
6  drugs have some risks?
7      A.  Correct.
8      Q.  And you knew that some of the drugs
9  have very serious risks, up to and including
10 death?
11     A.  Correct.
12     Q.  And with respect to the drugs that you
13 prescribed for Mrs. Bulger, some of them had
14 very serious risks?
15     A.  Correct.
16     Q.  Fair to say that not every symptom or
17 complaint that a patient experiences while
18 taking a drug is necessarily caused by that
19 drug, in your experience?
20     A.  Yes.
21     Q.  And would you agree that if a patient
22 who is on a drug reports certain side effects,
23 that you don't necessarily tie those side
24 effects to the drug that the patient is on?

## Page 170

1   A. That's right.
2   Q. Do you remember for what indication --
3   do you remember what indication was being
4   discussed at the time?
5   A. No, I do not.
6   Q. Again, I'm sorry --
7   A. That's okay.
8   Q. -- a year, two years, several years
9   ago?
10   A. I can say it was within the last five
11   years, but I can't be sure any more than that.
12   Q. Okay. Is that the only contact you
13   can recall with any representative of
14   Parke-Davis, Warner-Lambert or Pfizer concerning
15   Neurontin?
16   A. That's my only specific recollection.
17   Q. Okay. And you're sure it was
18   Neurontin and not Lyrica?
19   A. No, I'm sure it was Neurontin.
20   Q. Okay. How long did this meeting with
21   this representative take?
22   A. They probably would have been in the
23   office for 20 minutes to a half hour total.
24   Q. Have you had any recent discussions

## Page 171

1   with anyone else in your office about this
2   meeting with the representative?
3   A. No.
4   Q. No?
5   A. No.
6   Q. Okay. Now, your dosing decision with
7   respect to Mrs. Bulger and Neurontin, was that
8   based on what this Pfizer sales rep told you?
9   A. No.
10   Q. Do you make prescribing decisions
11   based on what drug company sales representatives
12   tell you?
13   A. No.
14   Q. Why?
15   A. Because I don't think they have the
16   medical knowledge to make that -- decisions made
17   medically are not simply about pharmacokinetics,
18   they're about patients, and so I don't think
19   that I can be directed by somebody that only
20   knows the pharmacology of the medication.
21   Q. Did you ever meet any medical liaisons
22   from Warner-Lambert?
23   A. Can you tell me what that means?
24   Q. Okay.

## Page 172

1   A. Medical liaison?
2   Q. You've answered my question.
3       Do you know what a medical liaison is?
4   A. No, I'm not sure I do.
5   Q. Okay. Good.
6       Other than sales representatives or
7   detailers --
8   A. No.
9   Q. -- for Pfizer?
10   A. For Neurontin, no.
11   Q. Okay.
12       MR. CHAFFIN: You need to change,
13   right?
14       THE VIDEOGRAPHER: Yes.
15       MR. CHAFFIN: Okay. Let's take a
16   couple minute break if that's okay.
17   A. That's fine.
18       THE VIDEOGRAPHER: This is the end of
19   tape number two. The time is five minutes after
20   two. We are off the record.
21       (Whereupon, a recess was taken.)
22       THE VIDEOGRAPHER: Okay. We are back
23   on the record. This is tape number three. The
24   time is 2:13.

## Page 173

1       MR. CHAFFIN: Thank you, Shawn.
2       BY MR. CHAFFIN:
3   Q. Doctor, just a few more questions,
4   please.
5   A. Sure.
6   Q. Independent of the medical records, do
7   you have any recollection of why you prescribed
8   Neurontin for Mrs. Bulger?
9   A. No, I do not.
10   Q. Was it based on your, in an effort to
11   refresh your recollection, your experience with
12   the drug and your medical training?
13   A. Yes.
14   Q. Did it have anything to do with
15   anything any representative of Pfizer,
16   Warner-Lambert or Parke-Davis told you?
17   A. No.
18   Q. When you were prescribing Neurontin
19   for Mrs. Bulger, were you aware of the risks
20   associated with it?
21   A. I was aware of many of the risks.
22   Q. Is there anything that you'd like to
23   add to any of the prior testimony you've given
24   today concerning your decision --

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 174

1  A. Sorry, that's me.
2  Q. That's quite all right.
3  A. It's just my mailbox.
4     No, there is not.
5     MR. CHAFFIN: I thank you for your
6  time. I may have a few more questions after
7  Mr. Finkelstein finishes.
8     THE WITNESS: All right. Thanks.
9     MR. CHAFFIN: Thank you.
10    CROSS EXAMINATION
11    BY MR. FINKELSTEIN:
12 Q. Good afternoon, Doctor. I'm Andrew
13 Finkelstein, I represent Ron Bulger and his
14 daughter related to the death of his wife which
15 we claim is associated with Neurontin, and I'm
16 going to ask you questions regarding your
17 treatment and your general knowledge of
18 Neurontin. Okay?
19 A. Okay.
20 Q. Have you ever heard David Franklin?
21 A. No, I have not.
22 Q. Do you know who David Franklin is at
23 all?
24 A. No.

Page 175

1  Q. Did you know whether or not Pfizer,
2  Parke-Davis or Warner-Lambert pled guilty to
3  illegal promotion of Neurontin?
4     MR. CHAFFIN: Objection.
5     MR. BELLO: You can answer it.
6  A. I only --
7     MR. BELLO: Can I just preface one
8  thing? Any of these questions, to the extent
9  that any of these call for information that he
10 learned within the confines of our discussions
11 would be considered attorney/client privilege.
12    So you're certainly permitted to
13 answer the questions to the extent that you have
14 any independent knowledge of any of these
15 issues.
16 A. Okay. The only knowledge I have was
17 acquired as I was reviewing for this case.
18    BY MR. FINKELSTEIN:
19 Q. Which was when?
20 A. Last week.
21 Q. And today is March 25th, 2008?
22 A. Correct.
23 Q. So let's just pick March 1st, 2008.
24    Prior to March 1st, 2008, did you have

Page 176

1  any knowledge that Pfizer, Parke-Davis or
2  Warner-Lambert pled guilty to any criminality
3  associated with Neurontin?
4  A. I did not.
5     MR. CHAFFIN: Objection.
6  A. I did not.
7     BY MR. FINKELSTEIN:
8  Q. Do you know of any of the activities
9  that Parke-Davis, Warner-Lambert or Pfizer
10 engaged in regarding their underlying criminal
11 plea?
12    MR. CHAFFIN: Objection.
13 A. No, I do not.
14    BY MR. FINKELSTEIN:
15 Q. Do you know what off-label promotion
16 is?
17 A. I can guess, but no, I do not.
18 Q. Do you know what off-label illegal
19 distribution of a pharmaceutical substance is?
20 A. No.
21 Q. Do you know what misbranding is --
22 A. No.
23 Q. -- of a pharmaceutical substance?
24 A. No.

Page 177

1  Q. Did the Pfizer rep who came to visit
2  you tell you that they were under investigation
3  related to their sales practices of Neurontin?
4  A. No.
5     MR. CHAFFIN: Objection.
6     BY MR. FINKELSTEIN:
7  Q. I want to see -- I appreciate you said
8  you don't have a specific memory of that visit
9  by the Pfizer sales rep.
10 A. Right.
11 Q. I just want to try and hone it down a
12 little bit if we can.
13 A. Sure.
14 Q. Do you know what time of year it was?
15 I don't want you to guess if you don't know.
16 A. I just don't know. Sorry.
17 Q. Fine.
18    Prior to that visit, had you ever
19 prescribed Neurontin?
20 A. I can't say for sure.
21 Q. But you're certain that it was a man
22 who made the visit?
23 A. Yes.
24 Q. And if I have records from the