# EXHIBIT D

# PART I

# MARKETING NEURONTIN

Expert Report of Charles King III

22 October 2007

Charles King III
Greylock McKinnon Associates Inc.
One Memorial Drive, Suite 1410
Cambridge, MA  02142

## Table of Contents

I.    Summary ................................................................................................. 4

II.   Qualifications ........................................................................................ 6

III.  Assignment ............................................................................................ 9

   A.   Introduction ......................................................................................... 9

   B.   Scope of the Assignment ....................................................................... 10

   C.   Materials Relied Upon .......................................................................... 11

IV.   The Success of the Neurontin Off-Label Strategy ................................. 11

   A.   Growth in Neurontin Off-Label Prescriptions ....................................... 11

   B.   Growth in Neurontin Sales .................................................................... 18

V.    Marketing in the Pharmaceutical Industry ........................................... 19

   A.   The Drug Approval Process .................................................................... 20

   B.   FDA Approves Drugs Only for Specific Uses ......................................... 21

   C.   FDA Regulates Drug Promotion ............................................................ 21

   D.   Where Doctors Get Their Information About Drugs ............................... 22

   E.   Marketing Drugs .................................................................................... 23

   F.   Marketing Neurontin for Off-Label Uses .............................................. 24

   G.   Doctors Depend on the Integrity of the Scientific Process for Unbiased
        Information About Drugs ....................................................................... 24

   H.   How Drug Company Promotion Influences Doctors ............................... 25

   I.   How Economic Considerations Affect Drug Usage ................................ 26

VI.   Marketing Neurontin in the Warner-Lambert Era (1994 – 2000) .......... 27

   A.   Creation of the Off-Label Strategy ........................................................ 27

   B.   Marketing Masquerading As Research: The Publications Strategy ........... 31

      1.   Sponsored Research, Grants and Studies and Medical Education and
           Communication Companies ................................................................ 31

   C.   Marketing Masquerading As Education: The Dissemination Strategy ...... 32

      1.   "Peer-to-Peer Selling" ...................................................................... 32

      2.   Continuing Medical Education, Sponsored Educational Meetings and
           Conferences ...................................................................................... 33

3.   Advisory Boards and Consultants Meetings ............................................ 34

4.   Medical Liaisons.......................................................................................... 35

5.   Targeting Residents ................................................................................... 35

**VII.   Marketing Neurontin in the Pfizer Era (2000 – 2004) ................................. 36**

A.   *Pfizer Continued the Off-Label Promotion of Neurontin*.............................. 36

B.   *Health & Human Services Determinations that Pfizer's Representations About Neurontin Are False And Misleading* ............................................................... 39

**VIII.   Effects of Neurontin Off-Label Marketing Strategy................................ 39**

A.   *Marketing Effects Are Long-Lived* ................................................................ 39

1.   Evidence from Academic Studies............................................................. 39

2.   Evidence from Sales Calls......................................................................... 40

B.   *Pervasive Influence of Neurontin Marketing* ................................................ 41

1.   Neurontin Publications ............................................................................. 42

2.   Sales Calls.................................................................................................. 43

3.   Medical Education Programs and Conferences ....................................... 44

C.   *Indirect Influences* ......................................................................................... 44

D.   *Failure to Disclose Negative Information About Neurontin* .......................... 47

E.   *Failure to Disclose Known Risks of Neurontin for Depressed and Bipolar Patients* 49

F.   *Drug Risks Decrease Drug Sales*..................................................................... 50

**IX.   Conclusions....................................................................................... 51**

## I. Summary

1.      Pfizer Inc. markets and sells the prescription drug Neurontin®. In December 1993, the Food and Drug Administration (FDA) approved Neurontin only for the adjunctive treatment of partial seizures in persons with epilepsy older than 12 years of age at daily dosages up from 900 mg to 1800 mg. Parke-Davis Pharmaceuticals started selling Neurontin in January 1994. Neurontin subsequently received additional FDA approvals for use as adjunctive therapy for treatment of seizures in children (October 2000) and for the management of post-herpetic neuralgia in adults (May 2002). Pfizer acquired Warner-Lambert LLC (Warner-Lambert) and its Parke-Davis division in 2000.

2.      I have been retained by counsel to address certain marketing and economic issues with respect to the off-label promotion of Neurontin.

3.      It is my understanding that it is illegal for drug companies to promote drugs for other, so-called "off-label," uses that do not have FDA approval. I also understand the following. Beginning in the mid-1990s, Neurontin was heavily promoted and widely used for the off-label treatment of pain syndromes and psychiatric conditions, including bipolar disorder. In 2004, Warner-Lambert, the original developer of Neurontin, admitted guilt and settled litigation charging that during the 1990s Warner-Lambert violated federal regulations by promoting Neurontin for pain, psychiatric conditions, migraine, and other unapproved uses. Since acquiring Warner-Lambert in 2000, Pfizer has continued to promote Neurontin for these and other unapproved uses. Pfizer has failed to disclose the lack of efficacy of Neurontin for certain off-label uses, suppressed information about its serious adverse events, and made false and misleading statements about Neurontin and its unapproved uses.

4.      On the basis of the above understanding of facts, counsel has retained me to provide an expert opinion with respect to four main questions:

> a. Were the marketing and promotional efforts of Warner-Lambert and Pfizer significant contributing factors to the off-label sales of Neurontin?
>
> b. Would significant off-label sales of Neurontin have continued had Pfizer ceased off-label promotional activities for Neurontin?
>
> c. Did the suppression of information about serious adverse events enable growth in off-label sales?

    d. Did Pfizer's off-label marketing of Neurontin indirectly influence all physicians prescribing of Neurontin?

5.    In response to these questions, it is my opinion that:

    a. The marketing and promotional efforts of Warner-Lambert and Pfizer were significant contributing factors to the off-label sales of Neurontin.

    b. Off-label sales of Neurontin would have continued had Pfizer ceased off-label promotional activities for Neurontin.

    c. The suppression of information about serious adverse events enabled growth in off-label sales.

    d. Pfizer's off-label marketing of Neurontin indirectly influenced all, or substantially, all physicians prescribing of Neurontin.

## II. Qualifications

6.      I am a Special Consultant to Greylock McKinnon Associates, a consulting and litigation support firm located in Cambridge, Massachusetts. As an economist, I specialize in marketing, industrial organization, microeconomics and econometrics.

7.      I have taught economics, marketing and statistical methods in economics; conducted marketing and economic research; and provided economic and marketing consulting in my areas of specialization. As an Assistant Professor in Marketing at the Harvard Business School from 1997 to 2003, I taught courses in marketing, information and network economics, and organizational economics in the Masters and Doctoral programs. I also taught in Harvard Business School's executive education program for pharmaceutical companies and in IBM's Premier Program on competitive strategy. Since 1981, I have consulted to private corporations, nonprofit corporations, law firms, consulting companies and research organizations. Since 2001, I have served as a member of the Editorial Review Board for *Journal of Public Policy & Marketing*. I have been and continue to be a research referee for a variety of academic journals and the Robert Wood Johnson Foundation. I am the author of various refereed journal articles, working papers and consulting reports.

8.      My research activities include issues concerning health care and the pharmaceutical industry. For example, I have written an academic working paper[1] analyzing marketing, product differentiation and competition in the pharmaceutical drug market at issue in this case and published a case study[2] evaluating Pepcid's race against Zantac and other competitors to enter the over-the-counter market. I have published a variety of peer-reviewed articles and cases,[3] including applications of marketing and economic analyses to health care and pharmaceutical issues.

---

[1] C. King, "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Harvard Business School, Working Paper No. 0-014 (Sept. 2000).

[2] E.R. Berndt, C. King, L. Klein and A.J. Silk, "Pepcid AC: The Race to Enter the OTC Market," (9-500-073), Harvard Business School. Also published in *Problems and Cases in Health Care Marketing*, edited by J.T. Gourville, J.A. Quelch and V.K. Rangan, McGraw-Hill Irwin, 2003.

[3] *See* C. King and D. Narayandas, "Coca-Cola's New Vending Machine (A): Pricing To Capture Value, or Not?" (9-500-068), Harvard Business School; E.R. Berndt, C. King, L. Klein and A.J. Silk, "Pepcid AC: The Race to Enter the OTC Market," (9-500-073), Harvard Business School (also published *in Problems and Cases in Health Care Marketing*, edited by J.T. Gourville, J.A. Quelch and V.K. Rangan. McGraw-Hill Irwin, 2003).

9.      I have experience in applying economic and marketing theories to the pharmaceutical industry. I have submitted testimony and consulted in litigation involving health care and pharmaceutical markets and industries including:

◆   Consulting in the litigation brought by the Massachusetts Attorney General against the tobacco companies. Working with a team of health care experts, I submitted written testimony assessing and measuring the impacts of smoking on Medicaid health costs in The Commonwealth of Massachusetts.[4]

◆   Serving as an expert witness for the plaintiffs in *Daniels v. Philip Morris Cos.*[5] In that assignment I examined the magazine advertising patterns of cigarette manufacturers.

◆   Testifying before the United States Senate on the effect of the Master Settlement Agreement on the potential exposure of young people to cigarette advertising in magazines.[6]

◆   Testifying on the issues of liability and market definition in an antitrust case involving the prescription drug Relafen.[7]

◆   Submitting written testimony regarding discovery and class certification and consulting to counsel for the plaintiffs regarding damages in a case involving the prescription drugs Celebrex and Vioxx.[8]

◆   Submitting written testimony analyzing impact and class certification and consulting to counsel for the plaintiffs regarding damages for the class of direct purchasers of the anti-depressant Paxil[9] and for the class of

---

[4] The results of this work are described in D. Cutler, A. Epstein, R. Frank, R. Hartman, C. King, J. Newhouse, E. Richardson and M. Rosenthal, "How Good a Deal was the Tobacco Settlement?: Assessing Payments to Massachusetts," *Journal of Risk and Uncertainty* (2000), 21 (2/3).

[5] *Daniels v. Philip Morris Cos.*, 18 F. Supp. 2d 1110 (Southern District of California, 1998).

[6] C. King, Statement Before the Committee on Governmental Affairs, Subcommittee on Oversight of Government Management, Restructuring and the District of Columbia, United States Senate, May 14, 2002 (available at <http://hsgac.senate.gov/051302king.pdf> as accessed October 2007).

[7] *In re Relafen Antitrust Litigation,* United States District Court, D. Mass. Master File No. 01-CV-12222-WGY.

[8] *Heindel et al. v. Pfizer et al.* (hereafter *Heindel*), United States District Court, D. New Jersey, Civil Action, Case No. 02-3348 (GEB).

[9] *The Stop & Shop Supermarket Company et al. v. SmithKline Beecham Corporation,* United States District Court, Eastern District of Pennsylvania, C.A. No. 03-4578.

individual purchasers of the prescription drug Vioxx in two separate cases.[10]

♦ Submitting written testimony on behalf of Teva Pharmaceuticals USA, Inc., as defendant, determining whether Abbott Laboratories would suffer immediate "irreparable" harm unless granted an injunction.[11]

♦ Submitting written testimony concerning issues pertaining to class certification, liability and product market definition, and damages and consulting to counsel for the plaintiffs for the class of end payors of the prescription drug TriCor.[12]

♦ Consulting to Greylock McKinnon Associates on litigation involving a broad range of markets, including agricultural, financial[13] and pharmaceutical[14] markets, and legal issues. This consulting related to the following additional drug products: Augmentin,[15] Cipro,[16] K-Dur,[17] Lipitor,[18] Lupron,[19] Neurontin,[20] Relefan[21] and Remeron.[22]

---

[10] *Kleinman et al. v. Merck & Co., Inc.*, Superior Court of New Jersey Law Division: Camden County, Docket No. ATL-L-7894-04-MT and *Anderson et al. v. Merck & Co., Inc.*, Superior Court of the State of California, County Of Los Angeles, Central Civil West, Case No. BC 324384.

[11] *Abbott Laboratories v. Teva Pharmaceuticals USA Inc.*, United States District Court for the Northern District of Illinois, Eastern Division, C.A. No. 07 C 2213.

[12] *In re: TriCor Indirect Purchaser Litigation*, United States District Court, District of Deleware, C.A. No. 05-360.

[13] *Lynne A. Carnegie v. Household International, Inc., Household Bank, f.s.b., successor in interest to Beneficial National Bank, Household Tax Masters Inc., formerly known as Beneficial Tax Masters, Inc., Beneficial Franchise Company, Inc., H&R Block, Inc., H&R Block Services, Inc., H&R Block Tax Services, Inc., H&R Block Eastern Tax Services, Inc., Block Financial Corp. and HRB Royalty, Inc.*, No. 98 C 2178, United States District Court for the Northern District of Illinois Eastern Division.

[14] *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court for the District of Massachusetts, MDL, No. 1456, CIVIL ACTION: 01-CV-12257-PBS.

[15] *In re Augmentin Antitrust Litigation*, United States District Court for the Eastern District of Virginia, No. 02-CV-442.

[16] *In re Ciprofloxacin Hydrochloride Antitrust Litigation*, Master File No. 1:00-MD-1383, United States District Court for the Eastern District of New York.

[17] *In re K-Dur Antitrust Litigation*, Civil Action No. 01-1652 (JAG), (Consolidated Cases), MDL No. 1419, United States District Court for the District of New Jersey.

[18] *In re American Federation of State, County and Municipal Employees, et al., Plaintiffs, vs. GlaxoSmithKline plc, and SmithKline Beecham Corporation, Defendants*, Docket No. 2:02cv442, United States District Court Eastern District of Virginia Norfolk Division.

10.    I received a bachelor's degree in astronomy (*magna cum laude*) from Harvard University in 1974. I received a *juris doctor* degree in law from the Yale Law School in 1979 and a Ph.D. in economics from M.I.T. in 1997. Details of my professional experience, publications, and past testimony are described in my *curriculum vitae*, a copy of which is attached to this report as Exhibit A.

11.    Greylock McKinnon Associates Inc. bills my time on this matter at an hourly rate of $475.

### III. Assignment

####    A.    Introduction

12.    Pfizer Inc. markets and sells the prescription drug Neurontin.  The active pharmaceutical ingredient in Neurontin is known as gabapentin. In December 1993, the Food and Drug Administration (FDA) approved Neurontin only for the adjunctive treatment of partial seizures in persons with epilepsy older than 12 years of age at daily dosages up from 900 mg to 1800 mg.[23] This meant that Neurontin was approved only as a "second-line" or add on treatment for use in conjunction with another "front-line" epilepsy drug. Parke-Davis started selling Neurontin in January 1994. Neurontin subsequently received additional FDA approvals for use as adjunctive therapy for treatment of seizures in children

---

[19] *In re Lupron Marketing and Sales Practices Litigation,* United States District Court, District of Massachusetts, MDL No. 1430, CA No. 01-CV-10861.

[20] *In re Neurontin Marketing and Sales Practices Litigation,* MDL Docket No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts.

[21] *In re Relafen Antitrust Litigation,* United States District Court, District of Massachusetts, Master File No. 01-CV-12222-WGY.

[22] *In re Remeron End-Payer Antitrust Litigation,* United States District Court for the District of New Jersey, Master Docket No. 02-CV-2007.

[23] "Prior to seeking approval of the drug from the FDA, Warner-Lambert's Parke-Davis division filed a patent application on November 23, 1990, in which the company sought protection for the use of the drug has a method of treating neuro- degenerative diseases. … The [New Drug Application] submitted to the FDA sought approval on a much narrower basis that was presented the patent application." Sentencing Memorandum of the United States, Page 12. Warner-Lambert subsequently applied for and received a patent for "a novel therapeutic use of gabapentin for the treatment of mania in all its various forms," including treatment of bipolar disorder, on May 15, 1995. Pfizer APande 0000544-48.

(October 2000) and for the management of post-herpetic neuralgia[24] in adults (May 2002).[25] Pfizer acquired Warner-Lambert LLC (Warner-Lambert) and its Parke-Davis division in 2000.[26]

13.     It is illegal for drug companies promote drugs for other, so-called "off-label," uses that do not have FDA approval. Beginning in the mid-1990s, Neurontin was heavily promoted and widely used for the off-label treatment of pain syndromes and psychiatric conditions, including bipolar disorder.[27] In 2004, Warner-Lambert, the original developer of Neurontin, admitted guilt and settled litigation charging that during the 1990s Warner-Lambert violated federal regulations by promoting Neurontin for pain, psychiatric conditions, migraine, and other unapproved uses.[28] Since 2000 when Pfizer acquired Warner-Lambert and Neurontin, off-label uses continue to dominate Neurontin sales.

B.     Scope of the Assignment

14.     Counsel has asked me to address four main questions:

a. whether the marketing and promotional efforts of Warner-Lambert and Pfizer were significant contributing factors in the off-label sales of Neurontin,

b. whether significant off-label sales of Neurontin would have continued had Pfizer ceased off-label promotional activities for Neurontin,

c. whether the suppression of information about serious adverse events enabled the growth in off-label sales, and

---

[24] "Postherpetic neuralgia is a painful condition affecting your nerve fibers and skin. It's a complication of shingles, a second outbreak of the varicella-zoster virus, which initially causes chickenpox." Mayo Clinic, http://www.mayoclinic.com/health/postherpetic-neuralgia/DS00277.

[25] See, for example, Approval Letter, Center for Drug Evaluation and Research,

http://www.fda.gov/cder/foi/nda/2002/21-397.pdf_Neurontin_Approv.pdf, as accessed October 2007.

[26] In the following, references to Warner-Lambert include its Parke-Davis subsidiary and references to Pfizer include Warner-Lambert following its purchase by Pfizer in 2000.

[27] Sentencing Memorandum, page 10.

[28] US Department of Justice. Warner-Lambert to pay $430 million to resolve criminal & civil health-care liability relating to off-label promotion. See "Warner-Lambert to Pay $430 Million to Resolve Criminal & Civil Health Care Liability Relating to Off-Label Promotion," available at http://www.usdoj.gov/opa/pr/2004/May/04_civ_322.htm, accessed October 14, 2007.

d. whether Pfizer's off-label marketing of Neurontin indirectly influenced all prescribing physicians of Neurontin.

C.     Materials Relied Upon

15.     In reaching my conclusions, I have relied upon the materials identified in Attachment B and throughout this report. I have also reviewed the results of analyses performed by Keith Altman, Finkelstein & Partners, LLP, and carried out under my direction of data requested from counsel.[29] My opinions are also based on my experience as an academic researcher in the pharmaceutical industry and my expertise as an economist specializing in marketing and industrial organization. I reserve the right to supplement my analyses and opinions in light of additional documents, data, expert reports, or testimony that may subsequently become available. I also reserve the right to prepare and use visual aids in connection with my testimony at trial.

## IV. The Success of the Neurontin Off-Label Strategy

A.     Growth in Neurontin Off-Label Prescriptions

16.     Warner-Lambert estimated that the "ultimate" sales potential for Neurontin over the life of its patent was only $500 million because of the limited adjunctive use for which it had been approved.[30] To expand the market for Neurontin, Warner-Lambert developed a "publication strategy."[31] Its goal was "to disseminate the information [about Neurontin's potential use for psychiatric disorders, including bipolar and mood and anxiety disorders] as widely as possible through the world's medical literature"[32] as a means of generating excitement in the market and stimulating off-label prescriptions despite the lack of FDA approval.[33]   Warner-Lambert calculated that this strategy would avoid

---

[29] Data requested from plaintiffs council. Data computations performed by Keith Altman, Finkelstein & Partners, LLP, under my direction.

[30] See Memorandum from Walker to Laesecke, Pierce and Ulrich, 5/18/94, V090268.

[31] For an overview of the public education strategy, see generally Sentencing Memorandum of the United States and Steinman et al. article.

[32] *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d  39 (D. Mass. 2001),  Exhibit 171. [Inner office memorandum from Atul Pande to John Boris, re: "Gabapentin Approvals", and handwritten response]; 28 March 1995: X029227.

[33] *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d  39 (D. Mass. 2001),  Exhibit  26. Marketing Assessments – Neurontin in Neuropathic Pain and Spasticity [and cover letter]; 24 July 1995: WL 07520 – 07547  and Exhibit 31 [Parke-Davis memo from John Boris to "Distribution," re:  "Marketing Assessments – Neurontin in Migraine," and cover letter]; 31 July 1996: V 082736 – 082761.

the costly and time-consuming clinical trials required for FDA approval.[34] Warner-Lambert, and later Pfizer, were aware that although other anticonvulsant drugs were approved for similar psychiatric applications, Neurontin worked through a different mechanism of action and that they lacked sufficient scientific evidence of Neurontin's efficacy to obtain FDA approval for these uses.[35]

17.   In the years following Neurontin's initial approval, Warner-Lambert and Pfizer implemented similar strategies to promote off-label uses of Neurontin at doses of more than 1800 mg per day and for neuropathic pain, epilepsy monotherapy,[36] migraine prophylaxis, Restless Leg Syndrome (RLS)/Periodic Limb Movement Disorder (PLMD), and nociceptive[37] and non-neuropathic pain. In each case, off-label Neurontin prescriptions sharply increased after the commencement of an off-label marketing campaign, as shown in the following graphs. Although Neurontin was approved only for a specific epilepsy indication, Warner-Lambert promoted Neurontin for pain; psychiatric conditions, such as bipolar disorder and anxiety; and other unapproved uses "from at least June of 1995 through the least April of 2000, across United States."[38] Promotion of Neurontin for off-label uses continued and Neurontin prescriptions for unapproved uses increased after Pfizer acquired Warner-Lambert, as shown in Figures 1 through 6.

---

[34]  Parke-Davis lacked time to do proper clinical trials in support of an application to the FDA for the approval of Neurontin for other uses, because the patent was due to expire in 1998 (later extended to 2000). See, e.g., Memorandum from Mi Dong to Neurontin Anticonvulsant Development Team of 3/16/95, X028957-62 at p. X028961; Memorandum from J. Pieroni to Anton, Brandner, Cadre, Evans, Gemelli, Montgomery, and Summers of 3/22/95, V086787-91 at V086789; Interoffice Memorandum from Pande to Boris of 3/23/95, X029226; Cover letter from Brandicourt to Development Team of 7/31/95 with attached Marketing Assessments: Neurontin in Neuropathic Pain and Spasticity of 7/24/95, WL 07520-47 at WL 07524; Memorandum from Boris to NPC Committee, Development Team, and Marketing Council of 7/31/96, V082736-61 at V082737; and Memorandum from Francie Kivel to J. Boris, O. Brandicourt, E. Guerrero, J. Knoop, L. Magnus-Miller, and L. Perlow, October 26, 1995, V053848-77 at V053853.

[35]  "Though no preclinical data support the efficacy of gabapentin in acute mania the observations of other anticonvulsants suggests that gabapentin may be effective in the treatment of acute mania and in the prophylaxis of bipolar disorder." Pfizer_JMarino_0001272.

[36]  Monotherapy refers to the use of Neurontin by itself, rather than in combination with another drug, to control epileptic seizures. Parke-Davis formally applied to the FDA for a monotherapy indication in 1996. The FDA rejected the application on the grounds that Parke-Davis had failed to demonstrate efficacy. Sentencing Memorandum of the United States, p. 24.

[37]  Nociceptive pain refers to pain caused by an injury to bodily tissues.

[38]  Sentencing Memorandum of the United States, p. 10.

**Figure 1: Off-Label Uses of Neurontin: Anxiety Disorder**



Source: Data provided by Keith Altman, Finkelstein and Partners

**Figure 2: Off-Label Uses of Neurontin: Bipolar and Mood Disorders**



Source: Data provided by Keith Altman, Finkelstein and Partners

**Figure 3: Off-Label Uses of Neurontin: Pain**



**Figure 4: Off-Label Uses of Neurontin: Migraine and Headache**



Source: Data provided by Keith Altman, Finkelstein and Partners

**Figure 5: Off-Label Uses of Neurontin: Non-Neuropathic Pain**



Verispan Projected Uses Non-neuropathic Pain

Source: Data provided by Keith Altman, Finkelstein and Partners   ■ Non-neuropathic Pain Unclear   □ Non-neuropathic Pain Nociceptive

18.    An unusually high percentage of Neurontin sales derived from its off-label uses.[39] In 2006, Radley et al.[40] conducted a study analyzing the off-label prescriptions of the 160 most commonly prescribed drugs.[41] The researchers found that gabapentin "had the highest portion of offlabel prescriptions"[42] of all the 160 drugs in the sample, with 83% of prescriptions being written for off-label indications. [43] The study found that in general a high proportion of all off-label drug usage lacked any clinical support, and that "[this] is especially true for

---

[39] Pfizer acknowledged Neurontin's high level of off-label sales was unusual: "Neurontin is the extreme example, with less than 10% of use for epilepsy, and the largest off-label use for pain management." Pfizer_CTaylor_0000414. One managed Medicaid plan found that "95% [of patients] received gabapentin for off-label diagnoses." Hamer et al., "Gabapentin use in a managed medicaid population", *Journal of Managed Care Pharmacy*, Vol. 8, No. 4, 2002, pp. 266-71.

[40] D.C. Radley, S. N. Finkelstien and S. Stafford, "Off-label Prescribing Among Office-Based Physicians", *Arch Intern Med.*, Vol. 166, May 8, 2006, pp. 1021-1026.

[41] Radley et al. (2006) used 2001 IMS Health National Disease and Therapeutic Index (NDTI) data in their study. In 2001, Neurontin was still under patent protection, therefore, it would have been the only source of gabapentin available to physicians, and all of the off-label prescriptions for gabapentin would essentially be off-label prescriptions for Neurontin.

[42] *Ibid*, p.1023.

[43] *Ibid*, p.1023.

gabapentin, where only 20% of its offlabel use had strong support compared with 80% with limited or no support."[44]

**Figure 6: On-Label and Off-Label Uses of Neurontin**



Source: Data provided by Keith Altman, Finkelstein and Partners

B.    Growth in Neurontin Sales

19.    Although Parke-Davis had predicted that Neurontin had an "ultimate" sales potential of $500 million over the life of its patent[45], Neurontin sales quickly passed this estimate. By 1999, only five years after its launch, Neurontin annual sales had already surpassed $500 million. By 2003, under Pfizer's ownership, annual sales of Neurontin were $2.4 billion.

---

[44] *Ibid*, pp. 1023-4. See also Affidavit of C. Seth Landefeld, M.D., and Michael Steinman, M.D., dated May 19, 2003, from Franklin case.

[45] See Memorandum from Walker to Laesecke, Pierce and Ulrich, 5/18/94, V090268.

**Figure 7: Total Annual Neurontin Sales**



Neurontin Sales (Dollars)

**Source:** Data provided by Keith Altman, Finkelstein and Partners

## V. Marketing in the Pharmaceutical Industry

20.     Drug marketing is pervasive and permeates the medical profession. Most marketing efforts are targeted at influencing doctors, since they are the ones who write prescriptions. The goal is to influence doctors' prescribing habits to increase drug company profits.

21.     To promote their products, drug companies spend a high percentage of their revenues on marketing. Pharmaceutical firms typically spend as much, or more, on marketing than they do on research and development.[46] Both Warner-

---

[46] Marcia Angell, *The Truth About the Drug Companies How They Deceive Us and What to do about it*, Random House Press, 2004.

Lambert and Pfizer spent more on promoting their drugs than they did on research and development.[47]

22.     Prescription drugs are not like ordinary consumer goods. People depend on them for their health and, in some cases, even their life. Unlike typical consumer goods, prescription drugs can only be purchased under the supervision of a physician. Although patient preferences play a role, doctors exercise primary influence over health-care decisions, particularly for serious medical conditions. Doctors, as learned intermediaries, select the best drug for the patient. Since doctors ultimately decide which drugs to prescribe, pharmaceutical companies concentrate their marketing efforts on them.

### A. The Drug Approval Process

---

Marketing expenses typically exceed research and development expenditures in the pharmaceutical industry. (See, e.g., Families USA Foundation, "Off the Charts: Pay, Profits and Spending by Drug Companies," Families USA Publication No. 01-104, July 2001, p. 1; M.A. Hurwitz and R.E. Caves, "Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics*, Vol. 31(2), Oct. 1988, p. 302; J. Sutton, *Technology and Market Structure*, Cambridge: The MIT Press, 1998, pp. 219-220 and footnote 17; Schweitzer, op. cit. From 1992 to 1994, the three largest U.S. pharmaceutical manufacturers – Merck, Pfizer and Eli Lilly – spent between 11% and 15% of their annual sales on research and development compared to 21% to 41% of their annual sales on marketing and promotional expenses, according to one academic study. (Schweitzer, op. cit., p. 43.)

Pharmaceutical firms spend an uncommonly large percentage of their revenues promoting their products. Promotion-to-sales ratios for prescription drugs typically range from 10 to 30 percent or more of sales, making them among the most heavily promoted of all manufactured goods. (See, e.g., K. Leffler, "Persuasion or Information? The Economics of Prescription Drug Advertising," *The Journal of Law and Economics*, Vol. 24, April 1981, pp. 45-74.) This stands in sharp contrast to advertising in the median manufacturing industry, which devotes less than 1 percent of its sales revenues to advertising. (F.M. Scherer and D. Ross, *Industrial Market Structure and Economic Performance*, Third Edition, Boston: Houghton Mifflin Company, 1990, p. 573.)

The high marketing-to-sales ratios observed in the pharmaceutical industry can be explained in terms of the underlying industry economics. Marginal production costs, the additional costs of producing one more unit of output, are typically small for pharmaceuticals. An additional dollar in sales consequently results in nearly an additional dollar in profits. Pharmaceutical companies therefore have strong incentives to increase the demand for their products. (E.R. Berndt et al., "Information, Marketing, and Pricing and the U.S. Antiulcer Drug Market," *American Economic Review*, Volume 85(2), 1995, Papers and Proceedings of the 107th Annual Meeting of the American Economic Association, Washington D.C., pp. 100-5.)

[47] Warner-Lambert's selling, distribution and administration expenses represented between 46.1 percent and 46.9 percent of its total revenues between 1998 and 2000, when it was acquired by Pfizer. During the same period, Warner-Lambert spent between 8.9 percent and 9.7 percent on research and development. Pfizer also spends more on marketing than research. From 2000 to 2006, Pfizer's selling, distribution and administrative expenses ranged between 32.2 percent and 41.1 percent of its total revenues compared to expenditures varying between 14.4 percent and 17.1 percent on research and development.

23.     By law, before a new drug can be marketed, it must be approved by the Food and Drug Administration. Drugs must meet efficacy and safety standards before they can be sold. The pharmaceutical company must prove to the FDA that the drug is reasonably safe and effective for a specific use or indication. That proof typically requires a series of clinical trials to evaluate the safety and efficacy of the drug among a group of patients and nearly always includes a comparison group who do not receive the drug.

24.     Drug companies generally do not conduct their own clinical trials but rely on doctors in teaching hospitals and private practice to do the studies, using either their own patients or volunteers recruited through solicitation. In the past, medical schools and teaching hospitals conducted most clinical trials. Pharmaceutical companies would provide research grants to physicians on their faculties to carry out clinical trials under institutional supervision. More recently, private companies have sprung up in the pharmaceutical industry with the sole purpose of organizing and administering drug trials. These contract research organizations (CROs) assemble and supervise groups of doctors who are paid to administer the study drugs and collect data on their effects. To obtain human subjects for clinical trials, drug companies or contract research organizations routinely pay doctors money on a per patient basis.

25.     After clinical trials are completed, the drug company must file a new drug application (NDA) with the FDA to obtain approval to market the new drug. The agency and its advisory committees of outside experts review the application, the outcomes of the clinical trials, and other evidence provided by the drug company in support of its application. Only after the FDA approves the drug is it allowed on the market.

### B.  FDA Approves Drugs Only for Specific Uses

26.     By law, drug companies are permitted to market and promote drugs only for approved uses. The FDA approves new drugs only for the specific uses, or indications, and the doses spelled out in the label or package insert that accompanies the drug. This prevents drug companies for marketing drugs for other uses, not approved by the FDA, without clinical data demonstrating the safety and efficacy of the drug for that use. It is illegal for drug companies to promote drugs for these "off-label" uses, although doctors may prescribe drugs for any use at any dosage they consider appropriate. In addition to reviewing drug labeling for accuracy, the FDA is empowered to check advertisements and promotional materials for accuracy and balance.

### C.  FDA Regulates Drug Promotion

27.     Under the Federal Food, Drug, and Cosmetic Act and related regulations, the FDA regulates the promotion of prescription drugs.[48] Promotional materials may only make claims are supported by strict scientific evidence, and they may not be false or misleading. To ensure that doctors and consumers understand both the benefits and limitations of a drug, FDA regulations call for "fair balance" in all marketing claims and materials. The drug's risks as well as its benefits must be clearly identified, and the risks must be given appropriate prominence. All promotional materials must also be consistent with the FDA-approved product labeling. Drugs may only be marketed and promoted for their approved uses.

### D. Where Doctors Get Their Information About Drugs

28.     Given the pace of technological innovation and new treatments in modern medicine, physicians must keep abreast of a continuous stream of new medical developments. Doctors might be able to keep up by assiduously studying the latest medical journals and textbooks, but most do not have the time[49]. Where then do doctors get their information on which drugs to prescribe for their patients? Physicians rely upon the published medical literature as "the ultimate basis for most treatment decisions."[50] "[P]hysicians prefer to obtain information from journals and books, but also ... they often consult colleagues to get answers to clinical and research questions."[51] Most depend, at least in part, on the scientific integrity of the medical process to provide them with unbiased sources of information. They scour medical journals for the latest research. They participate in conferences, meetings, and continuing medical education (CME) events to learn from experts and "opinion leaders" in the field.[52] They consult

---

[48] Federal regulations for prescription drug advertising are outlined in 21 CFR 202.1.

[49] Continuing education meeting polls found "most physicians spend less than an hour a week reading." J. M. Grimshaw et al., "Changing physicians' behavior: What works and thoughts on getting more things to work", *Journal of Continuing Education in the Health Professions*, Vol. 22, 2002, pp.237-43.

[50] F. Davidoff, C.D. DeAngelis, J.M. Drazen, M.G. Nicholls, J. Hoey, L. Hojgaard, *et al.* "Sponsorship, Authorship, and Accountability," *The New England Journal of Medicine*, Volume 345(11), September 2001, 825-82 and *The Journal of the American Medical Association*, Volume 286(10), September 2001, 1232-1234. An editorial in *The American Journal of Psychiatry* notes: "[s]urveys of physicians find that over 90% of us look to original articles in medical journals as our most preferred source of new information for help in treating patients." (D.A. Lewis, R. Michels, D.S. Pine, S.K. Schultz, C.A. Tamminga, R. Freedman, "Conflict of Interest," *The American Journal of Psychiatry*, Volume 163(4), April 2006, 571-3.)

[51] Haug,James, "Physicians' preferences for information sources: a meta-analytic study", *Bull Medical Library Association*, Vol.85, July 1997.

[52] Within the medical community there is a hierarchy of influence. The opinion of medical specialists, for example, generally carries more weight within the profession than those of general practitioners.

textbooks and medical references for expert recommendations on best practice derived from the body of scientific evidence.

29.    As a practical matter, doctors are constrained in their abilities to absorb the continuous stream of information about new treatments by their limited time and cognitive abilities.[53] Doctors are often not aware of the latest scientific evidence on treatments and rely heavily on information provided by drug companies in marketing and promoting their products.[54] Marketing's role in informing physicians has been widely studied over the years.[55] A recent study of the United States market for antiulcer drugs found that marketing had more of an impact on demand than clinical research.[56]

### E.  Marketing Drugs

30.    Drug companies employ six primary marketing tools to promote their products to physicians and consumers: personal selling (or "detailing"), direct mail, medical journal advertising, free samples to physicians, medical education events and direct-to-consumer advertising. Drug sales representatives are ubiquitous in the medical world.[57] Drug company sales representatives visit doctors in their offices and hospitals to promote their products. Drug company sales representatives have traditionally played a role in informing doctors about

---

[53] F.M. Scherer, "The Pharmaceutical Industry" in eds. A.J. Culyer and J.P. Newhouse, *Handbook of Health Economics*, Elsevier, 2000, pp. 1300-1302.

[54] See, e.g., S. Schweitzer, *Pharmaceutical Economics and Policy*, New York: Oxford University Press, 1997, p. 43. From E.R. Berndt, "The U.S. Pharmaceutical Industry: Why a Major Growth in Times of Cost Containment?" *Health Affairs*, Vol. 20(2) 2001, pp. 111-2:

> Marketing provides technology-transfer information to patients and providers on efficacy in the treatment of specific medical disorders based on clinical trial data; the incidence of side effects, adverse interactions, and contraindications; pharmacokinetic properties involving half-life and dosage; and, in the naturalistic environment outside the clinical trial setting, effectiveness information on post-launch product surveillance evidence, actual dosages, off-label usage (when appropriate), subpopulation differentials, tolerability, and cost effectiveness.

[55] See, *e.g.*, Schweitzer's discussion of academic and marketing studies, Schweitzer, *op. cit.*, p. 46.

[56] P. Azoulay, "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economics & Management Strategy*, Volume 11, No. 4, Winter 2002, pp. 551-594.

[57] Currently, there approximately 100,000 pharmaceutical sales representatives in the United States. M. Adams, "Drug reps use psychological tactics to successfully influence doctors' prescribing habits", *News Target Network*, July 30, 2007, http://www.newstarget.com/021956.html, accessed September 21, 2007.

the new medicines, products and therapies;[58] providing free drug samples; answering physicians' questions and maintaining goodwill. The distribution of free drug samples ("sampling") also targets doctors directly. Sampling is designed to increase sales by building a physician's personal experience with the drug and increasing his or her confidence in prescribing it.[59] Medical education events, such as symposia, conferences, and lectures, have a substantial influence on prescribing behavior.[60] Pharmaceutical companies subsidize and sponsor these programs as one component of their overall promotion strategy.[61]

### F.   Marketing Neurontin for Off-Label Uses

31.    Since the drug company educates the medical profession and the public about its drugs and the conditions they treat, this creates an inherent conflict of interest between selling drugs and evaluating them. Most of these medical educational activities are directed towards doctors. In the case of Neurontin, it was crucial for Warner-Lambert and allegedly Pfizer to maintain that these expenditures were for education, not promotion, so that it could evade legal constraints on its marketing activities.[62] Drug company sponsorship does not mean that research is necessarily biased, but in the case of Neurontin, the drug company allegedly influenced the research, subverted the scientific process, and biased the sources that doctors relied upon for unbiased information.[63]

### G.   Doctors Depend on the Integrity of the Scientific Process for Unbiased Information About Drugs

32.    Doctors depend on the integrity of the scientific process for accurate and reliable information about the drugs they prescribe. Warner-Lambert and Pfizer allegedly subverted the scientific process in two ways: by what they did and by what they did not do. Warner-Lambert and Pfizer allegedly promoted off-label uses of Neurontin by making false claims about its uses and efficacy. Warner-

---

[58] See, e.g., D. Dogramatzis, *Pharmaceutical Marketing: A Practical Guide*, Colorado: IHS Health Group, 2002.

[59] Schweitzer, *op. cit.*, p. 49

[60] "One study of prescribing decisions by general physicians found that seminars, conferences, and lectures organized by pharmaceutical companies had more influence than advertisements, promotional material (e.g., samples, calendars, or diaries), or direct mail. Moreover, many of the doctors surveyed did not interpret such 'educational' activity as promotion (Pitt and Nel 1988)." Schweitzer, *op. cit.*, p. 52.

[61] Schweitzer, *op. cit.*, p. 52

[62] Sentencing Memorandum of the United States, pp 40-42;  Steinman et al. (2006), pp. 286-288.

[63] See, e.g., Sentencing Memorandum of the United States;  Steinman et al. (2006).

Lambert and Pfizer allegedly failed to disclose or omitted information about Neurontin's lack of efficacy and its side effects. Both these actions would have affected the prescribing habits of physicians.

### H. How Drug Company Promotion Influences Doctors

33. The effect of drug promotion on physician beliefs, knowledge, and self-reported behavior has been widely studied.[64] Although doctors generally do perceive pharmaceutical marketing to be effective, they do not appear to recognize their own susceptibility to commercial influences.[65] Academic studies suggest that inaccurate, incorrect or misleading information about drugs may be frequently conveyed in promotional settings,[66] that doctors do not consistently distinguish between correct and incorrect information,[67] and that the perceived –

---

[64] See footnotes 65 - 73 and E. Clayton, "'Tis Always the Season for Giving," CALPIRG Report, September 2004; Editorial Staff, "Pharmaceutical Marketing to Physicians: Free Gifts Carry a High Price," *American Medical News*, 10 June 2002; A. Wazana, "Physicians and the Pharmaceutical Industry," *The Journal of the American Medical Association*, 283:373-380, 2000; A. Fugh-Berman, "The Corporate Coauthor," *Journal of General Internal Medicine*, 20(6):546-8, June 2005.

[65] J. Avorn, M. Chen, and R. Hartley, "Scientific Versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," *American Journal of Medicine*, 73 (1), 4–8, 1982.

[66] M. Bowman and D. Pearle, "Changes in Drug Prescribing Patterns Related to Commercial Company Funding of Continuing Medical Education," *Journal of Continuing Education in the Health Professions* 8:13–20, 1988; M. G. Ziegler, P. Lew, B. C. Singer (1995) "The Accuracy of Drug Information from Star Pharmaceutical Sales Representatives," JAMA 273: 1296-1298; E. Hemminki (1997), "Content Analysis of Drug-Detailing by Pharmaceutical Representatives," Med Educ 11:210-215; D. Stryer and L.A. Bero, "Characteristics of Materials Distributed by Drug Companies. An Evaluation of Appropriateness," J. Gen Intern Med 11: 575-583; H.A. Waxman, (2005), "Memorandum to Democratic Members of House Government Reform Committee: a Marketing of Vioxx to Physicians," available: HTTP://www.democrats.reform.house.gov/documents/20050505114932-41272.pdf; E.E. Roughead, A. L. Gilbert and K.J. Harvey (1998), "Self-Regulatory Codes of Conduct: Are They Effective in Controlling Pharmaceutical Representatives' Presentations to General Medical Practitioners?" Int J Health Serv 28:269-279; J. Lexchin (1997), "What Information do Physicians Receive from Pharmaceutical Representatives?" Can Fam Physician 43: 941-945.

[67] M. G. Ziegler, P. Lew, B. C. Singer (1995) "The Accuracy of Drug Information from Star Pharmaceutical Sales Representatives," JAMA 273: 1296-1298; D. Stryer and L.A. Bero, "Characteristics of Materials Distributed by Drug Companies. An Evaluation of Appropriateness," J. Gen Intern Med 11: 575-583; A. E. Shaughnessy, D. C. Slawson and J.H. Bennett (1994), "Separating the Wheat from the Chaff: Identifying Fallacies in Pharmaceutical Promotion," J Gen Intern Med 9: 563-568; W. Molloy, D. Strand, G. Guyatt et al. (2002), "Assessing the Quality of Drug Detailing," Journal of Clinical Epidemiology 55:825-832.

rather than the actual – quality of information changes doctor behavior.[68] Doctors typically deny that gifts and payments influence their prescribing behavior.[69]

34.     Research studies have investigated the association between specific types of physician behavior and free samples, contact with drug company sales representatives, attendance of company-sponsored events, and gifts. These studies have demonstrated a positive effect of drug promotion and company-sponsored continuing medical education (CME) on a) prescription of the specific drug promoted,[70] b) prescription of new drugs in place of older, generic products,[71] and c) formulary requests.[72]

35.     In the case of Neurontin, drug company representatives frequently promoted unapproved uses, and their sales calls often resulted in doctors planning to increase their use Neurontin.[73]

I.   How Economic Considerations Affect Drug Usage

36.     Widespread insurance coverage means that doctors and their patients will be relatively insensitive to drug prices and will rationally experiment with therapies with relatively low expected benefits.[74] Doctors and their patients also face an information problem in choosing the right drug that may prevent the market from functioning efficiently.[75] Drugs, like Neurontin, are "credence goods," which means their effect may never be known because multiple factors

---

[68] J. E. Calfee and D. J. Ringold (1994), "The 70% Majority: Enduring Consumer Beliefs about Advertising," *Journal of Public Policy and Marketing*, Volume 13, pp. 228-28; C. I. Hovland and W. Weiss (1951), "The Influence of Source Credibility on Communication Effectiveness," *Public Opinion Quarterly*, Volume 15, pp. 635-650.

[69] A. Wazana, op. cit., 2000; W. Sandberg et al., "The Effect of Educational Gifts from Pharmaceutical Firms on Medical Students' Recall of Company Names or Products," *Academic Medicine*, 72:916-918, 1997; B. Hodges, "Interactions with the Pharmaceutical Industry: Experiences and Attitudes of Psychiatry Residents, Interns and Clerks," *Canadian Medical Association Journal*, 1:153(5):553-9, September 1995.

[70] *Ibid.*

[71] M.Y. Peay and E.R. Peay, "The Role of Commercial Sources in the Adoption of a New Drug," *Social Science & Medicine.*, 26:1183-1189, 1988.

[72] M. Chren and C. Landefeld, "Physicians' Behavior and Their Interactions with Drug Companies: A Controlled Study of Physicians Who Requested Additions to a Hospital Drug Formulary," *The Journal of the American Medical Association*, 271, 684-689, 1994.

[73] Michael A. Steinman, G. Michael Harper, et al. (2007), "Characteristics and Impact of Drug Detailing for Gabapentin," *PLoS Medicine*, April 2007, Volume 4, Issue 4, pp. 0743-0751.

[74] J.P. Newhouse and the Insurance Experiment Group, *Free for All? Lessons from the RAND Health Insurance Experiment*, Cambridge: Harvard University Press, 1993.

[75] Nobel prize winning economist Kenneth Arrow first recognized this problem (K. Arrow, "Uncertainty and the Welfare Economics of Medical Care," *The American Economic Review*, 53:941-73, 1963).