# EXHIBIT B

Landry, Linda (Bulger)  6/27/2008  3:33:00 PM

|  | 1 |  | 3 |
|---|---|---|---|
| 1 | Volume:  I | 1 | I N D E X |
| 2 | Pages:   1 to 91 | 2 | WITNESS:       DIRECT  CROSS  REDIRECT  RECROSS |
| 3 | Exhibits:  None | 3 | LINDA M. LANDRY |
| 4 | UNITED STATES DISTRICT COURT | 4 | (By Mr. Chaffin)     5          85 |
| 5 | DISTRICT OF MASSACHUSETTS | 5 | (By Mr. Rosenkranz)        68          89 |
| 6 | MDL Docket No. 1629 | 6 |  |
| 7 | Master File No. 04-10981 | 7 |  |
| 8 | - - - - - - - - - - - - - - - - - - - - - - - x | 8 |  |
| 9 | IN RE:  NEURONTIN MARKETING, SALES PRACTICES AND | 9 |  |
| 10 | PRODUCTS LIABILITY LITIGATION | 10 | E X H I B I T S |
| 11 | - - - - - - - - - - - - - - - - - - - - - - - x | 11 |  |
| 12 | THIS DOCUMENT RELATES TO: | 12 | None |
| 13 | RONALD J. BULGER, SR., as Administrator of the | 13 |  |
| 14 | Estate of Susan Bulger, Deceased | 14 |  |
| 15 | - - - - - - - - - - - - - - - - - - - - - - - x | 15 |  |
| 16 |  | 16 |  |
| 17 | VIDEOTAPED DEPOSITION OF LINDA M. LANDRY | 17 |  |
| 18 | Friday, June 27, 2008 | 18 |  |
| 19 | 2:14 p.m. through 3:33 p.m. | 19 |  |
| 20 | HARE & CHAFFIN | 20 |  |
| 21 | 160 Federal Street | 21 |  |
| 22 | Boston, Massachusetts | 22 |  |
| 23 |  | 23 |  |
| 24 | Reporter:  Lisa A. Moreira, RDR, CRR | 24 |  |

|  | 2 |  | 4 |
|---|---|---|---|
| 1 | A P P E A R A N C E S | 1 | P R O C E E D I N G S |
| 2 |  | 2 | THE VIDEOGRAPHER:  This is the video |
| 3 | FINKELSTEIN & PARTNERS | 3 | operator, Tom Tracy of Veritext.  Today's date is |
| 4 | (BY: RONALD ROSENKRANZ, ESQ. - via telephone) | 4 | June 27, 2008.  The time is 2:14 p.m., and we are on |
| 5 | 436 Robinson Avenue | 5 | the second witness for today's deposition in the |
| 6 | Newburgh, New York 12550 | 6 | matter of Neurontin Marketing and Sales Practices |
| 7 | 800.634.1212 | 7 | vs. Pfizer, Incorporated, in the U.S. District |
| 8 | rrosenkranz@lawampm.com | 8 | Court, District of Massachusetts. |
| 9 | Counsel for the Plaintiff | 9 | And I'm sorry, but I didn't get your |
| 10 |  | 10 | name. |
| 11 |  | 11 | THE WITNESS:  Linda Landry. |
| 12 | HARE & CHAFFIN | 12 | THE VIDEOGRAPHER:  And the witness's |
| 13 | (BY: DAVID B. CHAFFIN, ESQ.) | 13 | name is Linda Landry. |
| 14 | 160 Federal Street | 14 | Would the counsel please identify |
| 15 | Boston, Massachusetts 02110 | 15 | yourselves and state whom you represent. |
| 16 | 617.330.5000 | 16 | MR. CHAFFIN:  Sure, Tom.  Thanks. |
| 17 | dchaffin@hare-chaffin.com | 17 | Hi, David Chaffin.  I represent the |
| 18 | Counsel for the Defendants | 18 | defendants. |
| 19 |  | 19 | MR. ROSENKRANZ:  Ron Rosenkranz, |
| 20 | ALSO PRESENT: | 20 | Finkelstein & Partners, for the plaintiffs, the |
| 21 | Tom Tracy, Videographer | 21 | Bulgers. |
| 22 |  | 22 | THE VIDEOGRAPHER:  Thank you. |
| 23 |  | 23 | And would the court reporter please |
| 24 |  | 24 | swear in the witness. |

Neurontin Track One (Plaintiff / Prescriber / Expert Depos)                                             Page 1 - 4

### 69

1  Q. Did he have you sign or did you do a written
2  statement, or did he have a tape recorder or
3  anything like that?
4  A. To be honest with you, I don't remember. I
5  know he had a phone. He could have had a tape
6  recorder.
7      No, he was writing everything down.
8  Q. Okay. I just need to clarify a couple of
9  things. It's clear, at least from what I'm hearing
10 -- and you correct me if I'm wrong -- you don't like
11 Ron.
12 A. It's not that I don't like him. I don't
13 like what he did to my sister.
14 Q. Okay. Okay. Did you consider your sister a
15 good person?
16 A. Yes, I did.
17 Q. Do you consider Ron a bad person?
18     MR. CHAFFIN: Objection.
19 A. Not basically a bad person, just makes wrong
20 choices and just --
21 Q. Okay. But there's no question that your
22 sister was a good person?
23 A. Yes.
24 Q. Okay. And she loved the children dearly?

### 70

1      MR. CHAFFIN: Objection.
2  A. Yes, she did.
3  Q. Okay. Was there any doubt in your mind that
4  she loved her children dearly?
5      MR. CHAFFIN: Okay.
6  A. No doubt whatsoever.
7  Q. Okay.
8  A. She lived for her children.
9  Q. Would you say that her children were the
10 one -- if nothing else, one of the -- the one bright
11 spot in her life?
12 A. Yes, it was, especially after Regina was
13 born.
14 Q. Okay. You didn't like Ron, but did you say
15 that when you saw him last in a parking lot you took
16 a methadone pill from him?
17 A. He gave me a methadone pill because I was in
18 pain. He knew I was in pain.
19 Q. Okay.
20 A. I didn't take it. He just handed it to me.
21 Q. And you had taken a pill from him, from a
22 person who you don't like or trust?
23 A. He just handed it to me. I just took them.
24 I was there with my boyfriend. I wasn't starting

### 71

1  any trouble. I didn't know any of this was going
2  on.
3  Q. Okay. And did you say that you were married
4  at one point yourself?
5  A. Yes, I was.
6  Q. Did -- now, did I hear correctly that your
7  hus -- your ex had hit you with a frying pan, or
8  something like that?
9  A. Yes, he did.
10 Q. Oh, okay. So your marriage wasn't exactly
11 one of perfection either?
12 A. Oh, no, not at all.
13     MR. CHAFFIN: Objection.
14 Q. Okay. And notwithstanding everything you
15 knew about Ron and Susan, you actually brought your
16 child to them for them to babysit him?
17     MR. CHAFFIN: Objection.
18 A. This was before -- this is when she was
19 sober and stuff, before I basically really found out
20 everything that was going on. My son was 2 at the
21 time so that you're going back 11 years ago.
22 Q. You mean, you didn't know this, 11 years
23 ago, was going on?
24 A. She was sober then, and straight.

### 72

1  Q. She was sober and straight? Well, how many
2  periods of sobriety and straightness did she have?
3     MR. CHAFFIN: Objection.
4  A. Probably quite a few.
5  Q. Quite a few? Okay. All right.
6     Now, and you also said that he was very
7  controlling of her; is that correct, ma'am?
8  A. Yes, he was.
9  Q. But she had enough gumption to leave him and
10 go to California, did she not?
11     MR. CHAFFIN: Objection.
12 A. Yes, she did. She did that.
13 Q. The one thing that brought her back was the
14 children; is that correct?
15 A. Yes. Yes.
16     MR. CHAFFIN: Objection.
17 Q. And would one of the reasons be that she
18 didn't want to leave the children in the hands of
19 Ron?
20     MR. CHAFFIN: Objection.
21 A. I really could not say that. She wanted to
22 be with her child.
23 Q. Oh, she wanted to be with them. Okay.
24 A. Yes. I cannot say what other reason, but

### Page 73

1  she missed them and wanted to be with them.
2  Q. Well, if she's dead, she can't be with them,
3  can she?
4  A. Pardon me?
5     THE COURT REPORTER: You know what? I'm
6  sorry. At this point I have to stop you because
7  she's talking, you're talking, and you're on the
8  phone, so I'm having a hard time getting your
9  question down.
10    MR. ROSENKRANZ: I'm sorry.
11 A. I didn't quite hear what you said.
12 Q. She came back from California knowing what
13 Ron was and knowing what she faced just so that she
14 could be with her children; is that correct?
15    MR. CHAFFIN: Objection.
16 A. Yes, because I did the same thing for my
17 children, knowing what I was facing with my ex.
18 Q. But when she's dead she can't be with her
19 children, can she?
20    MR. CHAFFIN: Objection.
21 A. That's a very rude thing to say. You know,
22 I think he killed her, if you want the honest to
23 God's truth there, pal. All right?
24 Q. I'm sorry, ma'am. I didn't hear what you

### Page 74

1  said.
2  A. I said, you know what, your remark was just
3  very rude. And I think he killed her, for your
4  information, because she would never hang herself.
5  He probably did it for money.
6  Q. Oh, wait a minute, are you saying that he
7  killed her?
8  A. I just, to my -- I would believe he did, for
9  money.
10 Q. Okay. And the reason was that he --
11 A. And your remark is that she can't be with
12 her because she's dead? Oh, my God.
13    MR. CHAFFIN: Slow down.
14    THE WITNESS: Don't put this guy in
15 front of me, boy.
16    MR. CHAFFIN: Slow down.
17    THE WITNESS: I'm sorry.
18    MR. CHAFFIN: That's okay.
19 Q. Ma'am, there's a reason that you -- you
20 believe he killed her because of the fact that
21 there --
22 A. He wanted money.
23 Q. Ma'am, let me just finish the question,
24 please.

### Page 75

1     MR. CHAFFIN: Let him just finish his
2  question.
3  Q. There's no way on God's earth that you would
4  believe that she would have done that in her own
5  mind, killed herself that way, hanging herself?
6  A. That is correct. Never would she have hung
7  herself.
8  Q. Okay.
9  A. Look at her history. Look at her history.
10 Q. I didn't mean to insult you, ma'am. I'm
11 just trying to -- I really didn't.
12 A. She was leaving him.
13 Q. I'm just trying to make a determination as
14 to what was going on in her mind when this happened
15 and how it happened and what caused it. That's all.
16 A. Okay.
17 Q. I wasn't trying to raise your ire or insult
18 you in any way. And if I did, I apologize.
19 A. Listen, she was leaving him.
20    MR. CHAFFIN: Time out. One at a --
21 one --
22 A. That's why it happened. She would never
23 hang herself. She was getting up to leave him, and
24 he knew she meant it this time because I was

### Page 76

1  standing behind her. He heard us on the phone.
2     She would never hang herself, not in the
3  house with her child or anything else.
4  Q. Ma'am, understand, I'm not disagreeing with
5  you, and I'm -- believe me, I'm not arguing with
6  you. Her plan was to leave him; is that correct?
7  A. Yes. Yes.
8  Q. Not to kill herself?
9  A. No, to leave him.
10 Q. Okay. She confided in you, correct?
11 A. That is correct.
12 Q. And her confiding in you was that her -- she
13 had a plan to leave him as opposed to killing
14 herself; is that correct?
15 A. Exactly. She was happy with her child.
16 Q. Okay.
17 A. Finally, for once in her life, she was
18 happy. And after my mother died, we got a lot
19 closer, and we planned everything out.
20 Q. Okay. And the plan was to take the children
21 with her?
22 A. Yes, and the perfect excuse was to babysit
23 over my house when I was in the hospital.
24 Q. Right. There's no way that she would have