UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
: MDL Docket No. 1629
In re: NEURONTIN MARKETING, :
       SALES PRACTICES AND : Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION :
: Judge Patti B. Saris
---------------------------------------------------------------x
: Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Egilman v. Pfizer Inc.*, 1:07-cv-11426-PBS :
:
---------------------------------------------------------------x

### PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S ETHICS EXPERT, DAN W. BROCK

#### INTRODUCTION

Plaintiff David S. Egilman (hereinafter "Plaintiff"), as Administrator of the Estate of Susan Bulger, deceased, by and through his attorneys, The Lanier Law Firm, P.L.L.C. and Finkelstein & Partners, LLP, respectfully requests, that the Court deny in its entirety Defendants' Motion *in Limine* to preclude Plaintiff's ethics expert Dan W. Brock from testifying at trial. Professor Brock is qualified as an ethics expert, and his testimony is reliable and relevant and will assist the trier of fact, in accordance with Fed. R. Evid. 702. As such, his testimony is admissible and should not be excluded.

#### ARGUMENT

The Federal Rules of Evidence afford district courts substantial latitude in the admission or exclusion of expert opinion evidence. *Crowe v. Marchand*, 506 F.3d 13, 16 (1st Cir. 2007).

The admission of expert evidence is governed by Fed. R. Evid. 702, which codified the United States Supreme Court's holding in *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993), and its progeny. *See United States, ex. rel. Loughren v. Unumprovident Corp.*, 604 F. Supp. 2d 259, 263 (D. Mass. 2009), *see also* Fed. R. Evid. 702 Advisory Committee Note.

Federal Rule of Evidence 702 assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical or other specialized knowledge both rests on a reliable foundation and is relevant to the issue at hand. *McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 422-23 (D. Mass. 2008). To fulfill this gatekeeping role, the trial judge must determine whether the expert possesses some specialized knowledge such that his testimony will be helpful to the trier of fact and, if so, whether that knowledge arises from reliable principles and methods applied in a reliable manner. *Id.* at 423, *quoting Daubert*, 509 U.S. at 590-91. Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case

Thus, pursuant to Rule 702, there are primarily three requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). The purpose of these requirements is to "ensure, as a condition of admissibility, that proffered expert testimony rests on a sufficiently trustworthy foundation." *Crowe*, 506 F.3d at 17, *citing Daubert*, 509 U.S. at 597.

**POINT I**

**PROFESSOR BROCK IS QUALIFIED TO RENDER AN OPINION ON DEFENDANTS' ETHICAL OBLIGATIONS WITH RESPECT TO NEURONTIN**

Under the first requirement, the Court must (1) determine whether the proffered expert has minimal qualifications through either education or experience in a field that is relevant to a subject that will assist the trier of fact; and (2) compare the expert's area of expertise with the proffered opinion to ensure its helpfulness to the jury.  *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 491 (D.N.J. 1998).  To qualify as an expert under Fed. R. Evid. 702, a formal degree, title, or educational specialty is not required.  *See Voilas v. General Motors Corp.*, 73 F. Supp. 2d 452, 457 (D.N.J. 1999).  A proposed expert witness' generalized knowledge or practical experience may be sufficient to qualify him or her as an expert.  *Waldorf v. Shuta*, 142 F.3d 601, 627 (3rd Cir. 1998); *see also Routhier v. Keenan*, 25 Mass. L. Rep. 50 (Sup. Ct. 2008) (a witness is qualified to render an expert opinion by virtue of his or her specialized experience, training or education relevant to the subject of the proposed testimony).  It is not essential that experts be "blue ribbon practitioners" with optimal qualifications.  *First Marblehead Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008), *citing United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006).

It is undisputed that Professor Brock has impeccable qualifications to testify regarding the ethical standard of care in any field, including that of pharmaceutical marketing.  Professor Brock has spent his entire career, which spans over three decades, devoted to teaching, writing and lecturing on this specialized field, which at its core permeates corporate and personal decision-making.  *See* Curriculum Vitae of Dan W. Brock, attached as Exhibit A to the Declaration of Andrew G. Finkelstein, Esq., submitted herewith.  In addition to obtaining a Bachelor's of Arts Degree in Economics, Professor Brock obtained a Ph.D. in Philosophy in 1970.  He has written books, book chapters and journal articles on ethical issues such as

involuntary commitment, euthanasia, drugs, organ transplantation, termination of life-sustaining treatment, cloning and surrogacy.  He has presented over 400 lectures on various ethical issues, participated in research on issues like allocation and prioritization of health care resources, and is a member of and consultant for innumerable national and international committees and groups, such as the American Association of Bioethics.  Finkelstein Decl., Ex. A.

Defendants repeatedly claim that Professor Brock is not qualified to render an opinion on their unethical activity, clearly stating that he is not a physician and implying that he is an incompetent witness.  It is interesting to note that Harvard Medical School, perhaps the most prestigious medical school in the world, has employed this non-physician to teach medical students, our future doctors, a Medical Ethics and Professionalism course, which has now been made a mandatory part of the curriculum.  Professor Brock has also been the Director of Medical Ethics at Harvard Medical School since 2004.  Finkelstein Decl., Ex. A; Ex. B, Brock Dep. at 49:1-54:17.  Since Professor Brock can teach medical students about the ethical standards of the medical profession, it stands to reason that he has more than the minimum qualifications to render an opinion on Defendants' corporation's ethics, as mandated by Fed. R. Evid. 702, which will assist the trier of fact to determine whether Defendants' actions were unethical or not.

With respect to the issue of relevance, expert testimony must be relevant in the sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or to determine a fact in issue.  *First Marblehead Corp.*, 541 F.3d at 42.  Here is where Defendants completely mischaracterize Professor Brock's testimony.  Essentially, Plaintiff must prove that Defendants' failure to timely and properly warn about the suicidal risks associated with the ingestion of Neurontin caused Susan Bulger's death by suicide.  Many salient facts are disputed and expert testimony is pertinent to understanding those facts.  Professor Brock's testimony will

4

assist the jury to understand the ethical obligation of a drug company to the public. Contrary to Defendants' assertions, Professor Brock is not offering an opinion on the adequacy of the warning or the risks or benefits of Neurontin, but rather on the unethical behavior that precluded Defendants from providing a more accurate, timely warning, given the data on the risk of suicide associated with Neurontin, which were available to them. On page 3 of his report, annexed as Exhibit B to Defendants' Motion *in Limine*, Professor Brock indicates that the initial and primary ethical responsibility for new drug monitoring falls on the manufacturer and distributor of the drug since only it has initial access to the relevant data. ECF Doc. # 1892-3 at 3. This is not common knowledge and will assist the jury to determine where and when Defendants chose to pursue an unethical course in its manufacture and distribution of Neurontin.

**A.    Professor Brock's Opinion Is Reliable.**

The second requirement has been interpreted to mean that an expert's testimony is reliable so long as the process or technique the expert used in formulating the opinion is reliable. *In re Paoli RR Yard PCB Litig.*, 35 F.3d 717, 742 (3rd Cir. 1994). Experts of all kinds tie observations to conclusions through the use of what Judge Lerned Hand called "general truths derived from . . . specialized experience' . . .And whether the specific expert testimony focuses on specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'" *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148-49 (1999) (citation omitted).

In *Daubert*, the United States Supreme Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: (1) whether the theory or technique can be or has been tested; (2) whether the

5

theory has been subjected to peer review and publication; (3) whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or method has general acceptance in the scientific community. *In re Diet Drugs Prods. Liab. Litig.* 2001 U.S.Dist. LEXIS 1174, at *21 (E.D. Pa. Feb. 1, 2001), *citing Daubert*, 509 U.S. at 593-94. These factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999). Further, these factors are "not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability." *United States v. Mooney*, 315 F.3d 5, 62 (1st Cir. 2002), *citing Kumho Tire Co.*, 526 U.S. at 153.

Although the *Daubert* analysis applies to the testimony of experts who are not scientists, the "factors do not always fit neatly into or easily translate in the context of nonscientific testimony." *Voilas v. General Motors Corp.*, 73 F. Supp. 2d 461. When this non-scientific testimony is at issue, as in this case, and applying the *Daubert* factors is not practicable, the "court is guided by *Kumho's* forewarning that in certain cases the 'relevant reliability inquiry concerns may focus upon personal knowledge or experience.'" *Voilas,* 73 F. Supp. 2d at 461, *citing Kumho Tire Co.*, 526 U.S. at 141.

Defendants claim that "ethics' is not a proper subject for expert testimony but cite no support for said proposition. In fact, the testimony of business and legal ethicists have long been deemed admissible. In *Reis v. Barley, Snyder, Senft & Cohen LLC*, 2008 U.S. Dist. LEXIS 52010 (E.D. Pa. July 3, 2008), the district court permitted a legal ethics expert to testify whether a law firm breached a "recognized standard of professional conduct" by concurrently representing two or more parties in the same matter whose interests were materially adverse to each other. *Id.* at *6. The testimony of the *Reis* ethics expert was relevant to plaintiff's claims

against a law firm for breach of fiduciary duty, professional negligence, tortious interference with contractual relations and breach of contract.  *See also Interclaim Holdings Ltd. v. Ness, Motley, Loadholt, Richardson & Poole*, 298 F. Supp. 2d 746, 753 (N.D. Ill. 2004) (plaintiff's ethics expert testimony about defendant's improper conduct allowed); *Heinrich v. Sweet,* 308 F.3d 48, 64 (1st Cir. 2002) (Massachusetts federal court permitted the testimony of plaintiff's medical ethics expert that experimental treatment for terminally ill brain cancer patients should not have been approved).

Defendants also argue that Dr. Brock's opinions are nothing more than the parroting of Plaintiff's counsel.  This is absurd.  Dr. Brock relied upon the expert reports of Dr. Cheryl Blume and Dr. Stefan Kruszewski in this litigation ,of which this Court is well aware.  These experts have already been subjected to *Daubert* challenges and the Court has found that their testimony is admissible under Fed. R. Evid. 702.  Both Dr. Blume and Dr. Kruszewski did extensive research in preparing those reports and it was completely unnecessary for Dr. Brock to replicate the very same analysis.  In accordance with Fed. R. Evid. 703, it is well established that experts are permitted to rely on the reports and opinions of other experts where those reports are of a type "reasonably relied upon by experts in the particular field."  *350 W.A. LLC v. Chubb Group*, 2008 U.S. Dist. LEXIS 2848 at *8 (S.D. Cal. Jan. 15, 2008), *citing Turner v. Burlington N. Santa Fe R.R.*, 338 F.3d 1058, 1062-62 (9th Cir. 2003).

Likewise, it is uncontroverted that Professor Brock's opinion is based upon his specialized experience and observations, his knowledge of prevailing ethical standards and his vast experience as an ethicist on an exhaustive list of topics, as well as his extensive research.  He clearly attested regarding the documents that he reviewed and that his opinion is not

7

subjective. Finkelstein Decl., Ex. A; Ex. B at 42:15-44:14. His opinion is one that will provide the jury with specialized information not within the realm of common knowledge.

**B.      Professor Brock's Opinion Is Admissible.**

Under the third requirement, Fed. R. Evid. 702 requires that the expert's testimony must assist the trier of fact. Admissibility depends in part of the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case. Thus, an expert's proposed testimony must be "for purposes of the case." *In re Paoli RR Yard PCB Litig.*, 35 F.3d at 743.

To be admissible, evidence must be relevant. Fed. R. Evid. 401; *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252 (1st Cir. 1998). Relevant evidence is defined as evidence which may tend to prove or disprove a material fact that is of consequence to the determination of the action. Fed. R. Evid. 401. Further, the Federal Rules of Evidence provide that "relevant evidence <u>may</u> be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added).

A central element of many of Plaintiff's claims is to what extent the actions of Defendants amount to reckless conduct. There is a strong overlap between conduct that is unethical and conduct that is reckless. Defendants have made it clear that they believe that none of the illegal conduct of Warner-Lambert/Parke-Davis is relevant to this claim because the conduct took place long before Pfizer purchased those companies, and because Pfizer did not engage in the same illegal conduct. However, it is apparent that when Pfizer purchased Warner-Lambert/Parke Davis, it was aware of the illegal activities with respect to Neurontin. Finkelstein Decl., Ex. C, E-mail from Pfizer employee Joe Fezcko.

Further, John Marino, Pfizer's Worldwide Team Leader for Neurontin, heralded Pfizer's success with Neurontin as he was leaving the Neurontin team in 2003:

> On July 10th, 2000, I started on a mission to bring NEURONTIN to its rightful place amongst the other Blockbusters of the New Pfizer. Ever since that first day, it has truly been an incredible journey.
>
> NEURONTIN is officially 30 years old this year, having first been formulated in 1973. Any person who has been associated with it for some time will tell you that it has survived many very unusual circumstances, well beyond any normal expectation. Perhaps it really has used up all of its "Nine Lives". Or maybe not just quite yet. Global sales in 1999 were just less than $1 Billion. Total sales since the first launch in 1993/94 were about $2 Billion. In the beginning of the Year 2000, it was expected that the Future Value of NEURONTIN was around $1 Billion, due to the expected launch of generics after July 16th, 2000. No one in Parke-Davis really gave it much of a chance to survive.
>
> Of course, that was until April 25th of that year, when Pfizer began to see its potential. But soon after the New Pfizer Team got started, there were many doubts and challenges that lay ahead. There was no Global strategy in place and ex-US sales were about $100MM. NEURONTIN never really had an appropriate life-cycle development plan, and the indications were limited to epilepsy. No one was really sure if the new patent protection would withstand significant challenges, and generics had threatened to launch. Most of the Pfizer colleagues did not know anything about the drug, except that it was "very special" and that it had "lots of legal problems".
>
> The reality now is that even if generics launch in the US in early 2004, as is expected, NEURONTIN will have generated an additional $10 Billion in sales beyond its original expected life (the Year 2000). Not too bad for a drug which had initial peak sales projections of $100MM. Pfizer's 2.2MM shareholders should be grateful for that contribution.

Finkelstein Decl., Ex. D, E-mail from John Marino.

Even if Pfizer did nothing wrong in generating an additional $9 billion dollars of revenue more than expected, what is clear from both e-mails is that there was no mention of ensuring that the drug was safe in the populations that were using the drug. What cannot be questioned by Defendants is that the product labels lacked adequate directions for use in off label populations, *see* ECF Doc. # 1900-2, Information, and that the label did not provide a warning for completed suicide. *See* ECF Doc. # 1885, Plaintiff's Memorandum in support of Motion in Limine re

9

Neurontin package insert. This blatant lack of concern rises to the level of recklessness, as Dr. Brock opines in his report at page 13:

> Pfizer's illegal and unethical promotion of Neurontin for non-approved uses also needlessly exposed patients to unknown risks of the use of Neurontin in patients for whom its safety had not been established, without warning them or their physicians of the risks of depression, suicidal behavior, and completed suicides from that use. Its failure to ever attempt to correct for the effects of these illegal and unethical actions is especially ethically egregious.

ECF Doc. # 1892-3 at 13.

This Court has already ruled that Plaintiffs may allege fraud by way of suppressing safety information. Fraud can be established by demonstrating that the company knowingly or *recklessly* withheld material information. *See* ECF Doc. # 1906, Plaintiff's Requests to Charge, at 21-24.

Since Professor Brock opines that Pfizer's conduct in not adequately investigating the safety for those individuals actually using the drug while the company was making *10* times what it thought it would make on the drug is unethical, his opinions are clearly probative on the reckless conduct of the company.

The Food, Drug and Cosmetic Act expressly requires a drug manufacturer to immediately inform the public of newly discovered dangers. *See* 44 Fed. Reg. 37,447 (1979). Plaintiff alleges that Defendants had an obligation to warn about the risks of its product and that it failed to timely do so, resulting in Susan Bulger's suicide. The FDA regulations are minimum standards, and drug companies have an obligation to meet and exceed those standards. *Hill v. Searle Labs.,* 884 F.2d 1064, 1068 (8th Cir. 1989). Thus, inasmuch as Pfizer's website, under the page aptly entitled "Responsibility," broadcasts to millions that it is continually improving its efforts to "uphold the highest ethical standards in everything from research and development to sales and marketing," and that it has an Independent Ethics Committee to assist with maintaining

10

this superior standard, Plaintiff is entitled to present testimony that Defendants' actions were not ethical, despite their assertions (emphasis added). *See* Finkelstein Decl., Ex. E, copies of pages from Pfizer's website about its ethical standards. Further, under the Research & Development portion of their website, Pfizer boasts that it "strives to maintain the highest ethical, scientific, and clinical standards in all our clinical research around the world." *Id.* Surely, Professor Brock's testimony will enlighten the jury on the ethical standards that Defendants profess to have adhered to.

Testimony that provides a necessary context and framework, especially in cases involving unfamiliar concepts, can be appropriate for expert testimony without improperly interfering with the jury's assessment of credibility. *First Marblehead Corp. v. House*, 541 F.3d at 42. Contrary to Defendants' claims, Professor Brock's testimony is not subjective, as noted above, nor unsupported speculation. Finkelstein Decl., Ex. B, at 42:15-44:14.

Further, a few of the cases cited by Defendants can be readily distinguished from the facts here. In *In re Baycol Prod. Litig.*, 532 F. Supp. 2d 1029 (D. Minn. 2007), Defendants moved to exclude the testimony of plaintiff's expert, Richard Kapit, M.D., about defendant Bayer's state of mind, the motives underlying its business decisions, and his personal views on defendant's ethical obligations. *Id.* at 1053. In excluding this testimony, the court noted that the expert's ethical opinion was personal and speculative. *Id.*

Again, in *In re: Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), the court precluded a portion of the opinions of three of plaintiffs' four physician witnesses, who admitted that their opinions concerning defendants' unethical behavior in conducting clinical trials were their own personal, subjective views. *Id.* at 542-43.

Here, Professor Brock is an expert in ethics, who has based his opinion on established ethical principles. Finkelstein Decl., Ex. A. He is not presenting a medical or scientific opinion and infusing it with his personal views. As such, Professor Brock has met all three requirements under Fed. R. Evid. 702 for admission of his expert report and testimony.

## CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* should be denied.

Dated: July 8, 2009                                    Respectfully submitted,


By:    **/s/ W. Mark Lanier**
       W. Mark Lanier, Esquire
       THE LANIER LAW FIRM, P.L.L.C.
       126 East 56th Street, 6th Floor
       New York, NY  10022


By:    **/s/ Andrew G. Finkelstein**
       Andrew G. Finkelstein, Esquire
       Finkelstein & Partners, LLP
       1279 Route 300, P.O. Box 1111
       Newburgh, NY  12551

       *Attorneys for Plaintiff David S. Egilman*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on July 8, 2009.

       **/s/ Andrew G. Finkelstein**
       Andrew G. Finkelstein