# EXHIBIT B

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Brock, Dan PhD (Bulger)**
**10/27/2008**

**Printed : 11/6/2008**

Brock, Dan PhD (Bulger)  10/27/2008  9:06:00 AM

**Page 1**

```
 1      UNITED STATES DISTRICT COURT
 2     FOR THE DISTRICT OF MASSACHUSETTS
 3          MDL Docket No. 1629
 4         Master File No. 04-10981
 5   ************************************
 6   IN RE: NEURONTIN MARKETING, SALES
 7       PRACTICES AND PRODUCTS
 8       LIABILITY LITIGATION
 9   ************************************
10   THIS DOCUMENT RELATES TO:
11   Bulger v. Pfizer, Inc., Et Al
     Case No. 07-11426-PBS
12      and
     Smith, Et Al v Pfizer, Et Al
13   Case No. 05-CV-11515-PBS
14   ************************************
15
16      VIDEOTAPED DEPOSITION OF DAN W. BROCK, P
17
18          Held At:
          Hare & Chaffin
19        160 Federal Street
       Boston, Massachusetts 02110
20
21        October 27th, 2008
             9:06 AM
22
     Reported By: Maureen O'Connor Pollard, RPR, CLR
23
24   Videographer: Shawn Budd
```

**Page 2**

```
 1   APPEARANCES:
 2   FOR THE PLAINTIFF:
 3      BY: MARSHALL P. RICHER, ESQ.
 4         FINKELSTEIN & PARTNERS
 5         80 Wolf Road, Suite 503
 6         Albany, New York 12205
 7         800-634-1212
 8         mricher@lawampm.com
 9
10   FOR THE DEFENDANTS:
11      BY: NICHOLAS P. MIZELL, ESQ.
12         JAMES P. MUEHLBERGER, ESQ.
13         SHOOK, HARDY & BACON
14         2555 Grand Avenue
15         Kansas City, Missouri 64105
16         816-559-2991
17         nmizell@shb.com
18         jmuehlberger@shb.com
```

**Page 3**

```
 1   Present Via Speakerphone:
 2
 3   FOR DR. OBIEDZINSKI:
 4      BY: LINDA FULOP SLAUGHTER, ESQ.
 5         DURAN & PANDOS
 6         1044 Route 22 West
 7         Mountainside, New Jersey 07092
 8         908-518-5000
 9         lslaughter@duranandpanos.com
```

**Page 4**

```
 1              INDEX
 2
 3   EXAMINATION                       PAGE
 4   DAN W. BROCK, Ph.D.
 5    BY MR. MIZELL                      7
 6
 7            EXHIBITS
 8
 9   NO.      DESCRIPTION               PAGE
10   Exhibit 1   Amended notice of videotaped
11              deposition...............  15
12   Exhibit 2   CV of Dan W. Brock..........  31
13   Exhibit 3   Professor Brock's expert
14              report.....................  61
15   Exhibit 4   9/23/08 letter from Kenneth
16              Fromson, with one page
17              attachment.................  73
18   Exhibit 5   Article titled
19              Characteristics and Impact
20              of Drug Detailing for
21              Gabapentin..................  94
22   Exhibit 6   Article from the Annals of
23              Internal Medicine............  97
24   Exhibit 7   Article titled Euthanasia.....  99
```

5

| | |
|---|---|
| 1 | Exhibit 8     Article titled A Model State |
| 2 |              Act to Authorize and |
| 3 |              Regulate Physician-Assisted |
| 4 |              Suicide........................   101 |
| 5 | Exhibit 9     Table of contents of binders..   124 |
| 6 | Exhibit 10    Set of handwritten notes......   126 |
| 7 | Exhibit 11    Group of e-mails..............   164 |
| 8 | Exhibit 12    Notes and declaration of |
| 9 |              Meredith Rosenthal............   170 |
| 10 | Exhibit 13   Expert report of David A. |
| 11 |              Kessler, MD...................   174 |

6

1  P R O C E E D I N G S
2
3         THE VIDEOGRAPHER:  We are on the
4  record.
5         This is the video operator speaking,
6  Shawn Budd, of Veritext Court Reporting.
7  Today's date is October 27th, 2008, and the time
8  is six minutes after nine.
9         We are here at the offices of Hare &
10 Chaffin located in Boston, Massachusetts to take
11 the videotaped deposition of Dan Brock in the
12 matter of In Re:  Neurontin Marketing, Sales
13 Practices, and Products Liability Litigation,
14 Bulger versus Pfizer, Et Al and Smith, Et Al
15 versus Pfizer, Et Al, in the U.S. District
16 Court, District of Massachusetts.
17        Would counsel please introduce
18 themselves?
19        MR. MIZELL:  Nicholas Mizell of Shook
20 Hardy & Bacon for the Defendant.
21        MR. MUEHLBERGER:  Jim Muehlberger,
22 Shook Hardy, for the Defendant.
23        MR. RICHER:  Marshall Richer,
24 Finkelstein & Partners, for the personal injury

7

1  action Plaintiffs in the MDL and New York State
2  Court actions, and in the individual Bulger and
3  Smith versus Pfizer actions.
4         THE VIDEOGRAPHER:  The court reporter
5  is Maureen Pollard.
6         Would you please swear in the witness?
7
8         DAN W. BROCK, Ph.D.,
9  having been satisfactorily identified by photo
10 identification, being first duly sworn, was
11 examined and testified as follows:
12        DIRECT EXAMINATION
13        BY MR. MIZELL:
14 Q.   Good morning.
15 A.   Good morning.
16 Q.   Would you please state your full name
17 for the record?
18 A.   Dan W. Brock.
19 Q.   Would you prefer Professor Brock?
20 A.   Pardon?
21 Q.   Would Professor Brock suffice?
22 A.   Whatever you'd like.
23 Q.   Okay.  Would you please go ahead and
24 give us your business address?

8

1  A.   It's 640 -- we have just recently
2  moved, but 646 Huntington Avenue, FXB Building.
3  Q.   Is that in Boston?
4  A.   Yes.  I'm sorry.
5  Q.   And your home address?
6  A.   180 Washington Street in Newton, Mass.
7  Q.   Have you ever provided testimony by
8  deposition before?
9  A.   Yes.
10 Q.   How many times?
11 A.   I think two.
12 Q.   In what kinds of cases?
13 A.   Well, one was personal -- one was
14 personal injury.  And the other was, I don't
15 know how you'd characterize it, a violation of
16 confidentiality, I suppose.
17 Q.   And in the personal injury action,
18 were you a party to that litigation?  Were you a
19 Plaintiff or Defendant?
20 A.   No.
21 Q.   You were just a witness?
22 A.   No.
23 Q.   Were you testifying as an expert
24 witness?

Brock, Dan PhD (Bulger)  10/27/2008  9:06:00 AM

**41**

1  stopped.  So that's an example of what I mean.
2      Now, that is -- of course that doesn't
3  say anything about whether it's justified or not
4  justified to do it, it's just says it's an
5  obfuscation of what caused the outcome.
6      Q.   I understand.
7      Back on the third item about genetic
8  selection and enhancement, you said this is not
9  yet possible, I guess, given the state of
10 science.  But in these articles that you're
11 writing, have you taken positions regarding the
12 possibility of designing children?
13     MR. MIZELL:  Objection.
14     A.   Yes.  For example, if we could
15 significantly improve individual's memory or
16 selective aspects of memory, I think that would
17 be at least in general a benefit, and whenever
18 any of us forget things we can recognize that.
19 And so what I have -- the position I've taken is
20 that at least some possible enhancements could
21 be ethically justified.
22     BY MR. MIZELL:
23     Q.   When arriving at an ethical opinion,
24 what's the methodology for getting there?

**42**

1      A.   You analyze the question as carefully
2  as possible, and you analyze what moral
3  considerations bear on it, for example potential
4  harms or benefits to individuals, commitments
5  kept, promises kept and so forth, and then you
6  make a structured argument about how those moral
7  considerations lead to a particular conclusion.
8  In some cases you may -- you may not reach a
9  conclusion on every piece of the issue.
10     Q.   Some questions would remain open,
11 unresolved?
12     A.   Mm-hmm.  Or in some cases we lack the
13 empirical evidence that would be needed to come
14 to a conclusion.
15     Q.   When ethicists engage in this
16 exercise, is the analysis informed by their own
17 subjective judgments?
18     A.   Not principally.  It's principally
19 informed by a long literature on moral
20 philosophy and ethics.  It's principally
21 informed by, depending on the question at issue,
22 by codes of ethics that have been developed by
23 various professional organizations.  It's
24 informed by the debates, both public and

**43**

1  professional, of these issues.
2      It is the case that one will typically
3  make an argument, but -- that one is prepared to
4  defend, but that is in effect an offering to
5  this larger debate on whatever the question is.
6  It is of no interest to anyone else, simply what
7  my subjective view is.  One hopes the arguments
8  are of interest.
9      Q.   You mentioned codes of ethics in
10 forming analysis.  Can you define an ethic?
11     A.   Can I define an ethic?
12     Q.   Yes.
13     A.   Well, I can define a code of ethics.
14     Q.   Okay.
15     A.   Codes of ethics have been developed by
16 various professional organizations.  American
17 Board of Internal Medicine, JAMA has -- the
18 American Medical Association has an ethical and
19 judicial council that issues opinions
20 periodically.  Probably most subspecialty groups
21 in medicine have codes of ethics.  I imagine
22 lawyers do, too.
23     Q.   I guess maybe another, better way to
24 ask that question is what is meant to say --

**44**

1  what do you mean when you say something is
2  ethical?
3      A.   You mean that there are strong reasons
4  of a sort which would be specified for doing or
5  not doing some particular action.
6      So, for example, it's widely agreed
7  that it is ethically required to get a research
8  subject or patient's informed consent before
9  either treating that patient or engaging him in
10 your research project, and that is usually
11 thought to rest in some notion of
12 self-determination, a notion that of course many
13 of the legal cases appeal to as well as the
14 ethical reasoning.
15     Q.   And have you taken a position on
16 discontinuing life-sustaining treatment?
17     MR. MIZELL:  Objection.
18     You can answer.
19     A.   I have a position that is consistent
20 with the conventional view and with my reading
21 of the law that patients or their surrogates
22 have rights to withhold or withdraw
23 life-sustaining -- make decisions to withhold or
24 withdraw life-sustaining treatment.  That is a

49

1  Q. Do you currently teach courses at
2  Harvard?
3  A. A course.
4  Q. What's the course?
5  A. Medical Ethics and Professionalism.
6  I'm the course leader. It's a required course
7  for all first year medical students. There are
8  ten instructors in it.
9  Q. Do you use any particular textbooks
10 for this course?
11 A. No. Harvard has something called My
12 Courses, which is an on-line -- what it enables
13 you to do is to take particular papers,
14 articles, but also pretty much anything else,
15 and put it on-line so that students can then
16 directly access it.
17    So the articles that we use in the
18 course are often from either medical journals,
19 like the New England Journal of Medicine, or
20 from bioethics journals, and we put them on My
21 Courses, or we have them put on just like you
22 have those copied.
23 Q. So you and the other nine instructors
24 assemble this My Courses material for the

50

1  Medical Ethics and Professional --
2  A. Right. Professionalism.
3  Q. -- Professionalism course?
4  A. Mm-hmm.
5  Q. Does the collection of articles change
6  over time?
7  A. Yes. The courses will be -- has been
8  given two years, and it will be given for the
9  third time this past -- this coming spring.
10 Q. So is that a wholesale change each
11 year, or --
12 A. Wholesale, no.
13 Q. Do you just add or take off one or two
14 at a time?
15 A. We tinker with it where we think it
16 needs to be tinkered with.
17 Q. Is the My Course material publicly
18 accessible?
19 A. Probably not. That is, you probably
20 need a Harvard ID to go in and get it.
21 Q. And the next section is your
22 professional service?
23 A. Right. Well, I'm on about fourteen or
24 so editorial boards in bioethics, health policy,

51

1  philosophy. As you can see, I've reviewed
2  manuscripts for almost every journal that
3  exists.
4     I think the committee memberships are
5  reasonably up to date. Yes. Rhode Island
6  obviously haven't changed on Page 44.
7  Q. Just going back to the last page about
8  the principal teaching at Harvard, are you
9  teaching any of these courses now, or will you
10 be next semester?
11 A. Let me see what's listed here.
12    Well, what I --
13 Q. The first one is the one we just
14 talked about?
15 A. The first item is what we just talked
16 about.
17 Q. Okay.
18 A. I will teach the first of those eight
19 sessions tomorrow at 1:00 o'clock in the second
20 item, that is a weekly seminar we have for our
21 post-doctoral fellows.
22    I have --
23 Q. Is that another course that uses the
24 My Course material?

52

1  A. No. We put those materials for that
2  directly on the website for the program in
3  Ethics and Health.
4  Q. Okay.
5  A. The next item is -- actually that
6  course is still in progress. I've done the two
7  sessions of it that I teach, I think there's one
8  more session to be done. That is for scholars
9  in clinical science program, those are
10 physicians who will be doing or are doing
11 clinical science, a clinical investigation, and
12 they are then people who have finished their
13 medical training, their residency training, and
14 are either post-doc fellows or are on the
15 faculty of one of the Harvard affiliated
16 institutions. The --
17 Q. Those are the students that are in
18 this course?
19 A. Yes. I mean they're advanced
20 students.
21    The Division of Medical Ethics, which
22 is one of the two --
23 Q. That's what DME stands for?
24 A. Yes. That's one of the two things

**53**

1  that I head up. That is a year long seminar,
2  meets weekly on a range of topics in medical
3  ethics. These again are people who are now
4  professionals, they're physicians in many cases,
5  nurses, we have one lawyer this year. And that
6  fellowship is run by one of my colleagues, and
7  is designed to provide training to these people
8  who are often on ethics committees in their
9  institutions but who have often not had the
10 training that would be desirable to do that.
11      And then, let's see, the last is a
12 miscellany of things that I teach in
13 periodically.
14     Q.   Can you describe the last two -- or I
15 guess the third and fourth entry and how the
16 course materials are assembled and provided to
17 the participants?
18     A.   In the third, Dr. Truog and I assemble
19 -- well, select the materials, they are then
20 provided to the students through the scholars in
21 clinical science program. Last year and the
22 previous year they were also on My Courses.
23 This year they had a rather -- they did not get
24 all the materials on My Courses because two of

**54**

1  the people in -- administrators in the program
2  left, and so we provided to them directly, the
3  same material that would have been on My
4  Courses. In the --
5      Q.   This is a collection of journal
6  articles and materials?
7      A.   Right. That's something that
8  specifically on research ethics, and so on
9  various topics on research ethics, right.
10     And the -- I don't think the -- I
11 think the -- for the DME fellowship seminar, the
12 materials are provided directly by the Division
13 of Medical Ethics to the fellows. Again, it's a
14 collection of articles, sometimes medical
15 journal articles, sometimes selections from
16 books, sometimes articles from bioethics
17 journals.
18     Q.   Okay. You mentioned that King's firm
19 retained you in this litigation?
20     A.   Right.
21     Q.   When did that occur?
22     A.   I don't have the exact date. Probably
23 in 2006, but I'm not -- I would have to check.
24     Q.   Approximate time of year? No?

**55**

1      A.   I don't recall.
2      Q.   And how did that come about? Did
3  somebody at King's firm contact you?
4      A.   Kip King contacted me.
5      Q.   And what did he say?
6      A.   He, again to the best of my
7  recollection in famous John Dean words, he
8  briefly described, I guess, the litigation and
9  his role, he had been retained by Finkelstein &
10 Partners, and asked if I would be interested in
11 participating in providing an expert opinion on
12 the ethical aspects of the litigation.
13     Q.   Did you know Kip King before this
14 call?
15     A.   No, I did not.
16     Q.   Did you come to understand how he
17 identified you?
18     A.   Yes. He asked a Professor Newhouse,
19 who had been, I believe, one of his supervisors
20 in his Ph.D work who's the editor of the Journal
21 of Health Economics and various other
22 distinguished positions for a recommendation,
23 and Professor Newhouse, as I understand it,
24 suggested me.

**56**

1      Q.   Do you know Professor Newhouse's full
2  name?
3      A.   Joseph.
4      Q.   Is he a professor at Harvard?
5      A.   Yes. He has an endowed chair. I
6  don't remember the name of the chair.
7      Q.   And what did Kip King ask you to do in
8  this litigation?
9      A.   Well, he -- both he and then I had at
10 least one or two telephone conversations before
11 I agreed to do it also with Andrew Finkelstein
12 about what they wanted me to do, and you have
13 the result of what they wanted me to do.
14     Q.   How was it conveyed to you?
15     A.   How was it conveyed to me?
16     Q.   Yes, what did they communicate to you
17 as far as what your objective would be?
18     A.   I mean I have no distinct memory of
19 how it was conveyed to me. I would imagine what
20 they asked me to do was what, in fact, I did,
21 which was to provide an evaluation of the
22 ethical issues in this litigation.
23     But as I say, I have no recollection
24 of the details of the conversation either with