# EXHIBIT B

```
                                                              Page 1
 1                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3   In re:   NEURONTIN MARKETING, SALES   MDL DOCKET NO:  1629
              PRACTICES, AND PRODUCTS
 4            LIABILITY LITIGATION         Master File No. 04-10981

 5   _____/

 6   THIS DOCUMENT RELATES TO:

 7           ALL PRODUCTS LIABILITY
             ACTIONS
 8   _____/

 9
             VIDEOTAPED
10           DEPOSITION OF:      CHERYL D. BLUME, Ph.D.

11           DATE:               November 12, 2007

12           TIME:               9:25 a.m. to 6:07 p.m.

13           PLACE:              13902 North Dale Mabry Highway
                                 Suite 122
14                               Tampa, Florida

15           PURSUANT TO:        Notice by counsel for
                                 Defendants for purposes
16                               of discovery, use at
                                 trial or such other
17                               purposes as are permitted
                                 under the Federal Rules
18                               of Civil Procedure

19           BEFORE:             VALERIE A. HANCE, RPR
                                 Notary Public, State of
20                               Florida at Large

21                               Volume 1
                                 Pages 1 to 370
22

23

24

25
```

Page 2

```
 1  APPEARANCES:
 2     KENNETH B. FROMSON, ESQUIRE
        Finkelstein & Partners
 3      785 Broadway
        3rd Floor
 4      Kingston, New York 12401
        (800) 634-1212 Ext. 2755
 5         Attorney for Plaintiffs
 6     RICHARD M. BARNES, ESQUIRE
        MICHAEL J. WASICKO, ESQUIRE
 7      Goodell, DeVries, Leech & Dann, LLP
        One South Street
 8      20th Floor
        Baltimore, Maryland 21202
 9      (410) 783-4000
10     -and-
11     VINCENT E. GUNTER, ESQUIRE
        LORI C. McGRODER, ESQUIRE (via telephone)
12      Shook, Hardy & Bacon, LLP
        2555 Grand Boulevard
13      Kansas City, Missouri 64108-2613
        (816) 474-6550
14         Attorneys for Defendant, Pfizer, Inc.
15     ANNAMARIE A. DALEY, ESQUIRE (via telephone)
        Robins, Kaplan, Miller & Ciresi L.L.P.
16      2800 LaSalle Plaza
        800 LaSalle Avenue
17      Minneapolis, Minnesota 55402
        (612) 349-8500
18         Attorney for Plaintiff, Assurant
19     ELANA GOLD, ESQUIRE (via telephone)
        Law Office of Steven Hillyard
20      345 California Street
        Suite 1770
21      San Francisco, California 94104
        (415) 334-6880
22         Attorney for Raymond Jennings, M.D.
23  ALSO PRESENT:
        KEITH ALTMAN, Finkelstein & Partners
24      DAVID LEGGETT, Videographer
25
```

Page 3

```
 1              INDEX
                                                PAGE
 2  DIRECT EXAMINATION BY MR. BARNES................   6
 3  CERTIFICATE OF OATH............................. 369
 4  REPORTER'S CERTIFICATE.......................... 370
 5
 6              EXHIBITS
                                           ID    MARK
 7   1  First Amended Notice of ............   9     9
        Videotaped Deposition Duces Tecum of
 8      Cheryl D. Blume, Ph.D.
 9   2  Hard Drive (Retained by counsel).....  13    13
10   2A Directory of Contents on Hard Drive..  14
11   3  Disk of Neurontin/gabapentin ........  14    14
        Bibliography
12
     3A Directory of Documents Found on Disk.  15    14
13
14   4  Exhibit Number Skipped...............  35

15   5  Notebook.............................  36    36

16   6  Correspondence and Communications ...  36    36
        Removed from Notebook (Exhibit 4)
17   7  Disk In Re: Neurontin Keith Altman ..  45    45
        ADE Files (10/28/07)
18
     8  Yellow Legal Paper for Requested ..... 117   117
19      Formula
20   9  Guidance for Industry, Good .......... 118   118
        Pharmacovigilance Practices and
21      Pharmacoepidemiologic Assessment,
        March 19th, 2005, Clinical Medical
22
     10 Map of Terms for Suicidal and ........ 160   159
23      Self-Injurious Behaviors
24   11 Pharmacopeidemiology, Fourth Edition,. 164   164
        by Brian Strom (Page 171)
25
```

Page 4

```
 1              EXHIBITS (Continued)
                                           ID    MARK
 2  12  Composite, Graphs (7)................ 178   175
 3  13  Photograph........................... 196   196
 4  14  Photograph........................... 197   197
 5  15  PDG Financials....................... 249   249
 6  16  Collins-McFarland Research Report - .. 346   346
        Divalproex, lithium and suicide among
 7      Medicaid patients with bipolar
        disorder
 8
 9
10
...
25
```

Page 5

```
 1      THE VIDEOGRAPHER: This is the videotaped
 2  deposition of Cheryl Blume, Ph.D., being held in
 3  the offices of Pharmaceutical Development Group
 4  located at 13902 North Dale Mabry Highway in Tampa,
 5  Florida, on November 12th, 2007. The time is
 6  9:25 a.m.
 7      My name is David Leggett. I'm the videotape
 8  specialist. And the court reporter is
 9  Valerie Hance. Will counsel introduce themselves.
10      MR. BARNES: Richard Barnes on behalf of
11  Pfizer.
12      MR. GUNTER: Vince Gunter on behalf of Pfizer,
13  defendants.
14      MR. WASICKO: Michael Wasicko on behalf of
15  Pfizer.
16      MR. FROMSON: Kenneth Fromson on behalf of the
17  product liability plaintiffs in the MDL, liaison
18  counsel in the New York coordinated litigation, and
19  counsel for plaintiffs in the action of Nicolette
20  Crone vs. Pfizer, Lake County, California.
21      MR. ALTMAN: Keith Altman, nonattorney with
22  Finkelstein & Partners.
23      MR. BARNES: Counsel on the phone, please
24  identify themselves.
25      MS. DALEY: Annamarie Daley, counsel for
```

Page 198

1  A. "1-800-LAW-FIRM."
2  Q. And would you describe the picture for the
3  record, please, that is between the word "Suicide" and
4  "1-800-LAW-FIRM."
5  A. I think it's a close-up of the picture that
6  was in the earlier one.
7  Q. And what -- what -- can you describe it for
8  the record, please.
9  A. It appears to be a lady's silhouette with her
10  hand on a loop of some sort.
11  Q. Is it -- and is it a loop or does it look like
12  a noose?
13  A. Well, I don't know. I don't know. I guess it
14  could be either. I don't know. I don't think I've ever
15  seen a real noose.
16  Q. Okay. Can you publish that to the jury,
17  please.
18      MR. FROMSON: Just note my objection to the
19      document. Lack of foundation.
20  BY MR. BARNES:
21  Q. Can you hold it up, please.
22      Do you understand this to be attorney
23  advertising that was referred to in your report at
24  page -- at paragraph 215?
25  A. I just --

Page 199

1      MR. FROMSON: Just note my objection to form.
2      Do you mean does she refer to this as this is
3      the advertising that's referenced or is it
4      advertising in general?
5  BY MR. BARNES:
6  Q. Is this attorney advertising for Neurontin
7  lawsuits and suicide?
8  A. This --
9      MR. FROMSON: Objection as to the form of the
10      question. Lack of foundation.
11      THE WITNESS: I refer here to a series of
12      documents that I think one of your in-house
13      counsel, last name Su, it's her records that I'm
14      referring to. And she discusses in one of these
15      that there has been an attorney placement --
16      placement by an attorney's firm for suicide. And
17      I'm pretty confident that that's to what I'm
18      referring.
19  BY MR. BARNES:
20  Q. So did you -- when did you -- when did you --
21  well, how did you -- so you know there was a document
22  that talks about attorney advertising in 2003 that
23  you've reviewed and put into your report, correct?
24  A. I reviewed this from your database, yes.
25  Q. Now, did you ask -- did you ask for more

Page 200

1  information concerning the nature and extent of the
2  attorney advertising in 2003 when forming your opinions
3  in this case?
4  A. I knew that there was attorney information in
5  2003.
6  Q. Advertising?
7  A. Advertising for cases, yes.
8  Q. And do you know if it ran nationwide? Did you
9  make any inquiry as to the extent of the advertising in
10  2003?
11  A. No.
12  Q. Did you make any inquiry as to the extent of
13  the attorney advertisement for Neurontin cases in 2004?
14  A. I don't even know if it was still going on. I
15  don't know.
16  Q. Did you make any inquiry as to the extent of
17  the plaintiff's attorney advertising for Neurontin cases
18  in 2005?
19  A. No.
20  Q. Did you make any inquiry as to the extent of
21  attorney advertising for Neurontin cases in 2006?
22  A. No.
23  Q. Did you make any inquiry as to the extent of
24  attorney advertising for Neurontin cases in 2007?
25  A. No.

Page 201

1  Q. Do you think that -- that attorney advertising
2  for Neurontin cases, as it pertains to suicide between
3  2003 and 2006, could artificially stimulate reports of
4  adverse events pertaining to Neurontin?
5      MR. FROMSON: Just note my objection as to the
6      form of the question.
7      THE WITNESS: Well, there is suicide events
8      with Neurontin from the beginning of time with
9      Neurontin. I mean, they were in the clinical
10      trials. But it's conceivably that the events, if
11      these indeed are true and were published, could
12      have stimulated reports. I mean, the events with
13      Dr. Franklin could have stimulated reports. I
14      don't know.
15      MR. BARNES: Move to strike. Would you read
16      back my last question. I want her -- I would like
17      for her to answer my question, please.
18      (The reporter read the portion requested.)
19  BY MR. BARNES:
20  Q. Please answer that question.
21      MR. FROMSON: Note my objection to the form of
22      the question. And I'll also object that it's been
23      asked and answered.
24      You can answer.
25      THE WITNESS: It is possible that advertising

Page 202

1   may have impacted the number of reports.
2   BY MR. BARNES:
3       Q.  Did you undertake any analysis to measure the
4   effect of attorney advertising on stimulating reports
5   after -- after January 1, 2003 --
6           MR. FROMSON: Objection.
7   BY MR. BARNES:
8       Q.  -- for Neurontin and suicide?
9           MR. FROMSON: Objection as to the form.
10          THE WITNESS: I didn't make an effort to
11  evaluate the impact of either events, either the
12  guilty plea or the suicide events.  But I broke one
13  of the databases at 2002, so that would come before
14  any of these issues.
15          MR. BARNES: Move to strike. Would you please
16  read back the last question. And I'd like an
17  answer to that question, please.
18          (The reporter read the portion requested.)
19          MR. FROMSON: Note my objection to the
20  question as being asked and answered.
21          THE WITNESS: Well, I feel that I've answered
22  it fully, but I will repeat the answer.
23          I did not make an attempt to look at any
24  impact, if there was an impact, if any, on
25  advertising, from 2003 on.

Page 203

1   BY MR. BARNES:
2       Q.  On -- on reporting of adverse events to FDA,
3   correct?
4       A.  I did not make an effort to look at if there
5   was an impact.
6       Q.  When you were retained in 2003, did you advise
7   Mr. Finkelstein's firm that attorney advertising could
8   have an adverse effect on the FDA database as it
9   pertains to reports of suicidal behavior?
10          MR. FROMSON: Just note my objection as to the
11  form of the question.
12          THE WITNESS: May I answer?
13          MR. FROMSON: Yeah, absolutely.
14          THE WITNESS: What I said with the attorneys?
15          MR. FROMSON: Yes.
16          THE WITNESS: I think it was discussed in one
17  conversation and we took that into consideration.
18  I took that into consideration, as I recall, when
19  we did -- we did somewhat of a data cut, an
20  arbitrary data cut at -- in 2002. And we did
21  another one at -- yeah, we did an -- it was
22  somewhat in 2002 to coincide with postherpetic, but
23  that was before the public announcement, both sets
24  of public announcements.
25  BY MR. BARNES:

Page 204

1       Q.  Where is that -- where is that documented in
2   your report?
3       A.  I did a cut at 2002?
4       Q.  Yes.
5       A.  Well, it's --
6           MR. FROMSON: Just note my objection as to the
7   form to the extent she's already answered.
8           THE WITNESS: I think the title of it is 2002
9   to 2000 -- 2002 to 2006.
10  BY MR. BARNES:
11      Q.  What analysis -- what analysis are you
12  referring to in that last answer, in your report? I'd
13  like to see it.
14      A.  Well, I did a whole section of the report from
15  2002 on and prior up until 2002 and then following 2002.
16      Q.  So you did a -- so you did a cut in 2002 that
17  stopped in 2002?
18      A.  Okay. Let me show you.
19          '94 to '96, '96 to 2002, 2003 to present. And
20  the 2002 would have been before both the guilty plea and
21  these advertisements, if what you're telling me is true,
22  in these brands in 2003.
23      Q.  So is the reason why you -- you did the cut
24  that stopped in 2002 was the -- is the potential effect
25  of notoriety bias on events reported after --

Page 205

1       A.  It was --
2       Q.  -- after December 31st, 2002?
3       A.  It was primarily to -- we had to find -- find
4   some way of breaking up this huge data set. So one of
5   the ways that we did it was that we did this cut at '94
6   to '96, and then did one at postherpetic neuralgia. And
7   I remember there was some discussion, because
8   postherpetic neuralgia is such a small indication,
9   whether it would make any significant difference in the
10  database. But it was also before the publicity of the
11  illegal activities by the Pfizer defendants and before
12  the advertising began.
13      Q.  So you would agree that after 2002 there were
14  significant concerns -- or you had concerns that were
15  significant enough that you wanted to do a cut prior to
16  2002 because of the possible effects of notoriety bias
17  on adverse event reporting to the FDA database, correct?
18      A.  Well, that --
19          MR. FROMSON: Objection as --
20          THE WITNESS: -- isn't what I said.
21          MR. FROMSON: Objection as to form. Misstates
22  her testimony.
23          THE WITNESS: That isn't what I said. What
24  I --
25          MR. BARNES: Read back that question. I want