# EXHIBIT B

**Neurontin Track One (Plaintiff / Prescriber / Expert Depos)**
**Ruggieri, Alexander MD (Defense Expert-Bulger)**
**12/5/2008**

**Printed : 1/5/2009**

Ruggieri, Alexander MD (Defense Expert-Bulger)  12/5/2008  9:10:00 AM

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3
 4
 5   In re: NEURONTIN MARKETING, )
 6   SALES PRACTICES AND PRODUCTS )
 7   LIABILITY LITIGATION    )
 8   --------------------------- ) MDL Docket No. 1629
 9   THIS DOCUMENT RELATES TO:   ) Master File No.
10                               ) 04-10981
11   BULGER v. PFIZER, et al.,   )
12   07-11426-PBS        ) Judge Patti B. Saris
13                       ) Magistrate Leo T.
14   SMITH v. PFIZER, et al,   ) Sorokin
15   05-CV-11515-PBS         )
16   ---------------------------
17
18       DEPOSITION OF ALEXANDER RUGGIERI, taken
19       at 999 Enchanted Way, Board Room 3,
20       Simi Valley, California, commencing at
21       9:10 A.M., Friday, December 5, 2008,
22       before Kathleen E. Barney, CSR #5698.
23
24   Job No. 183324
25   PAGES 1 - 330
```

**Page 2**

```
 1   APPEARANCES OF COUNSEL:
 2
 3   FOR PLAINTIFFS:
 4
 5      FINKELSTEIN & PARTNERS
 6      BY: KEITH L. ALTMAN
 7      1279 ROUTE 300
 8      BOX 1111
 9      NEWBURGH, NEW YORK 12551
10      (845) 562-0203
11      KALTMAN@LAWAMPMMT.COM
12
13   FOR DEFENDANT PFIZER:
14
15      GOODELL, DEVRIES, LEECH & DANN, LLP
16      BY: RICHARD M. BARNES
17         MICHAEL WASICKO (Telephonically)
18      ONE SOUTH STREET
19      20TH FLOOR
20      BALTIMORE, MARYLAND 21202
21      (410) 783-4000
22      RMB@GDLDLAW.COM
23
24
25
```

**Page 3**

```
 1   FOR DEFENDANT RAYMOND JENNINGS, M.D.
 2
 3      LAW OFFICES OF STEVEN HILLIARD
 4      BY: KENDRA BERMAN (Telephonically)
 5      345 California Street
 6      Suite 1770
 7      San Francisco, California  94101
 8
 9   ALSO PRESENT:
10
11      DAVID WEST, Videographer
12
```

**Page 4**

```
 1          THE VIDEOGRAPHER: Good morning. We a
 2   the record at 9:10 a.m. on December 5, 2008. My n
 3   is David West and I represent Veritext National
 4   Deposition and Litigation Services. This deposition
 5   is being held at the Grand Vista Hotel at 999
 6   Enchanted Way, Board Room No. 3, Simi Valley,
 7   California. The case is entitled In Re Neurontin
 8   Marketing Sales Practices and Products Liability
 9   Litigation, MDL Docket No. 1629. The deponent is
10   Dr. Alexander Ruggieri.                       09:11
11          Would all counsel please identify
12   themselves for the record, after which our court
13   reporter, Kathy Barney of Veritext, will swear in the
14   witness and we'll begin.
15          MR. ALTMAN: This is Keith Altman on behalf
16   of the Products Liability plaintiffs and also the
17   Crone plaintiffs in the case of Crone versus Pfizer.
18          MR. BARNES: Richard Barnes on behalf of
19   Pfizer and Parke-Davis and in MDL and in Crone.
20          MR. WASICKO: This is Michael Wasicko from
21   Goodell DeVries on behalf of the Pfizer defendants.
22          MS. BERMAN: This is Kendra Berman on beh
23   of Dr. Jennings in the Crone matter.
24          THE VIDEOGRAPHER: Thank you.
25          Ms. Court Reporter.                    09:12
```

Ruggieri, Alexander MD (Defense Expert-Bulger)  12/5/2008  9:10:00 AM

### 5

1    ALEXANDER RUGGIERI,
2  a witness herein, having been duly sworn, was
3  examined and testified as follows:
4
5       MR. ALTMAN: Before we begin, I just want to
6  put one thing on the record.
7       Recently, in the last few days, this case
8  was noticed in the California State Court case of
9  Crone versus Pfizer. Under California rules, we are
10 not -- do not have the same time limitations as in
11 the MDL case. I'll do everything in my power to
12 conclude my examination by today, but in the event
13 that I'm unable to, under the California rules I will
14 hold the deposition open for follow-up questioning a
15 a later date to be determined.         09:13
16      MR. BARNES: We don't agree with that, but
17 we will talk about that at a later date, so -- we
18 have a course of dealing and understanding in this
19 case, but go ahead. I am very comfortable that you
20 can complete his deposition within the time allotted.
21      MR. ALTMAN: I will do my best.
22
23           EXAMINATION
24 BY MR. ALTMAN:
25   Q. Dr. Ruggieri, how are you today?      09

### 6

1    A. Good. Thank you.
2    Q. We met when I took your deposition about 11
3  months ago, in January of this year; is that correct?
4    A. It was January of 2008, yes.
5    Q. And since then you've continued working on
6  behalf of Pfizer in this matter?
7    A. Not continuously. Somewhat sporadically.
8  Most of the intensity of my work was around that
9  deposition in January.
10   Q. Okay. And just to clarify a couple of    09:
11 things. You are noticed in a couple of specific
12 cases, Bulger, Smith and Crone.
13      Do you have any opinions that are specific
14 to Bulger, Smith and Crone?
15   A. I have -- those terms -- those names don't
16 mean anything to me. I have no idea what those ca
17 are.
18   Q. So all of your opinions would be general and
19 would be applicable to any case involving Neurontin
20 is that correct?                09:14
21   A. My opinions relate to the scientific
22 questions put forth in the Neurontin case.
23   Q. Okay. Dr. Ruggieri, you submitted a
24 supplemental report recently in this case; is that
25 correct?                    09:14

### 7

1    A. Yes.
2    Q. And we'll take a look at it a little bit
3  later.
4       Have you had a chance to review that report?
5    A. Yes.                   09:14
6    Q. Do you want to make any changes to that
7  report or have you reviewed it and you're comfortab
8  with its accuracy?
9    A. I feel it's generally accurate. On
10 re-review there might have some things I might have
11 said slightly differently that may have been
12 ambiguous, but I think I could explain those if
13 they're brought up.
14   Q. Okay. Did you also review your original
15 report in this case?              09:15
16   A. Yes.
17   Q. Okay. Is there any changes you want to mak
18 to that, other than what we discussed at your
19 deposition last time?
20   A. No, I don't think so.           09:15
21   Q. Okay. In your current report you rely upon
22 a number of other expert reports; is that correct?
23   A. I include those in forming some of the
24 opinions in my report, yes.
25   Q. And that would include the reports of    09

### 8

1  Dr. Gibbons?
2    A. Dr. Gibbons.
3    Q. And reports of Dr. Weiss-Smith?
4    A. Dr. Weiss, yes.
5       MR. BARNES: Hyphenated.          09
6  BY MR. ALTMAN:
7    Q. And did you do anything to independently
8  verify any of the work done by Dr. Gibbons or
9  Dr. Weiss-Smith or did you take their reports at face
10 value?                     09:15
11   A. I relied on their findings and their
12 methodology as they've described it.
13   Q. Okay. So you've done nothing independently
14 of them to look at any of the questions that they
15 looked at in terms of working with data?    09
16   A. I think that's correct, I did not retrieve
17 any data or collect any data myself or load any data
18 into my own analytic tools or capabilities.
19   Q. Okay. Did you also review your deposition
20 from your first --               09:16
21   A. Yes.
22   Q. In January?
23   A. Yes.
24   Q. And I think I asked you, you did not do a
25 report specifically in the Crone matter, correct?

**277**

1   A. No.
2   Q. Have you done one since you did this one to
3   the FDA?
4   A. You mean in the past six or seven months?
5   No.                                                  17:33
6   Q. Okay. So this is the only time you've ever
7   communicated directly with the FDA?
8   A. That's correct.
9   Q. Okay.
10  A. Well, let me take that back. I had filed    17:
11  adverse event reports. I have -- I think I've
12  requested information. I -- but this issue was kind
13  of close to the heart.
14  Q. Fair enough. You put a lot of time in on
15  it, I understand.                                    17:34
16     Approximately two months after that, you
17  received a report from the FDA, correct -- a respons
18  from the FDA; is that correct?
19  A. I received a response from Mr. Donald Dobbs
20  a consumer safety officer from the FDA, not from
21  Dr. Galson.
22  Q. Did you receive this e-mail through your
23  home computer?
24  A. Yes.
25  Q. Do you still have the e-mail on your home

**278**

1   computer?
2   A. I don't think I do.
3   Q. So you printed it out and then through
4   normal records retention activities did you delete
5   the e-mail?                                          17:34
6   A. I have cleaned my e-mail several times
7   since -- I have e-mail size issues and archiving, so
8   I don't think it's there at this time.
9   Q. Okay. The third paragraph, the second
10  sentence says:                                       17:35
11     "If you feel strongly about the
12     class labeling change being
13     implemented for antiepileptic
14     drugs, I would suggest that you
15     attend and/or present at the     17:35
16     upcoming meeting."
17     Did I read that correct?
18  A. Yes.
19  Q. Did you attend the advisory committee
20  meeting?                                             17:35
21  A. I wanted very much to, but I couldn't.
22  Q. Did you present at the meeting?
23  A. I wanted to attend, but I couldn't.
24  Q. Did you submit -- did you provide the FDA
25  with any submission?                                 17:35

**279**

1   A. No.
2   Q. Were you aware that you could do so?
3   A. No.
4   Q. The FDA's response, the last paragraph
5   discusses your question about why the FDA advers
6   AERS data was not used, correct?
7   A. Yes.
8   Q. Is that the sum and substance?
9   A. Yes.
10  Q. Is there anything in this paragraph from the
11  FDA that says that adverse events cannot be used f
12  detecting signals with respect to suicidality?
13  A. There's nothing in here that prohibits the
14  use of spontaneous adverse event reports for
15  incorporating in the portfolio of signal detection    1
16  approaches.
17  Q. When you say "the portfolio of signal
18  detection approaches," can we agree that some of
19  those involve automated methods, as we discussed
20  before, PRR and various other methods?
21  A. Yeah, they -- well, that could be considered
22  part of the portfolio. It could be looking at
23  individual cases. It could be doing case reviews.
24  It could be doing good quality studies in large
25  health care databases.                              17:37

**280**

1   Q. Okay. Could it also be understanding the
2   population that is using the drug?
3   A. As a -- understanding the population?
4   Q. Could it be evaluating whether the
5   populations using your drug are having detrimental
6   effects to your drug that may be specific to a
7   population?
8     MR. BARNES: Objection. Vague as to
9   "population".
10    THE WITNESS: I think you included what I
11  say. That is part and parcel of what I said.
12  Because reviewing adverse event reports is reviewi
13  the population that is using your drug.
14  BY MR. ALTMAN:
15  Q. Okay. Could it also include reviewing      1
16  questions that may have been unanswered during t
17  clinical trials?
18  A. What do you mean by reviewing questions th
19  are unanswered during clinical trials?
20  Q. Are there sometimes -- in clinical trials,   17
21  are there sometimes questions or concerns that ma
22  not be fully understood at the time of the clinical
23  trial and for which a company might implement a
24  schema to monitor going forward to see if they can
25  learn more information?                          17:38