# EXHIBIT E

EXPERT REPORT OF JANET ARROWSMITH-LOWE, M.D.

I.    QUALIFICATIONS AND EXPERTISE

I am a physician licensed to practice in the state of New Mexico.  I am board certified in Internal Medicine, an elected member of the American College of Epidemiology, and an elected Fellow of the American College of Physicians.  I received my undergraduate degree at Duke University in 1972 and obtained my medical degree from Tulane University School of Medicine in 1979.

I have 11 years of experience with the United States Food and Drug Administration (FDA).  I was a Medical Review Officer in the Division of Blood and Blood Products in the FDA Center for Biologics Evaluation and Research at FDA and in the Division of Antiviral Drug Products in the Center for Drug Evaluation.  In both of these positions, I was responsible for reviewing premarket NDAs.  I served as a Staff Epidemiologist in the Office of Epidemiology and Biostatistics at the FDA.  In this position, I monitored the postmarket safety and effectiveness of marketed drugs, and I served as Consultant to the Centers for Drug and Biologics Evaluation and Research on epidemiologic issues and problems.  Further, I was Acting Director of the Office of Surveillance and Biometrics in the Center for Devices and Radiological Health at the FDA.  I was also an Epidemic Intelligence Service Officer at the National Centers for Disease Control (CDC) and Prevention in Atlanta, Georgia.  In this position, I participated in CDC and FDA epidemiologic investigations of problems of national and regional interest.

A copy of my Curriculum Vitae is attached as Exhibit A

A list of cases in which I have testified as an expert over the past four years is attached as Exhibit B.

I charge $ 400 per hour for review of medical records and $500 per hour for deposition and trial testimony.

My opinions, as set forth below, are expressed to a reasonable degree of medical and scientific certainty, and are based on my training and experiences as a medical doctor, epidemiologist, and FDA medical review officer and acting director of Office of Surveillance and Biometrics.  My opinions are also based on my knowledge of the requirements applicable to pharmaceutical manufacturers under the Federal Food, Drug, and Cosmetic Act and federal regulations pursuant to the Act; my knowledge of general FDA policies, procedures, and industry practices gained through my FDA and consulting experience; and my knowledge of practices in the pharmaceutical industry involving the development of innovative medicines.

II.     MATERIALS REVIEWED   I have reviewed a substantial number of documents relating to Neurontin®. These documents include, but are not limited to, documents from the Neurontin® IND, NDA and sNDAs; the medical officer's reviews of the NDAs; the affidavit of Cynthia McCormick, M.D., executed on September 13, 2007; documents relating to contacts between FDA and the sponsor, internal FDA documents, as well as regulations in 21 CFR part 300, which were in effect during the time Neurontin® was under development and throughout its marketing history; as well as relevant journal articles and other scientific publications. Attached, as Exhibit C, is a list of materials I have reviewed. I have also reviewed various medical articles and textbooks and rely on my professional training and experience in assessing the materials I have reviewed. In addition, I have reviewed the expert report, deposition testimony and materials considered by Cheryl D. Blume, Ph.D. I anticipate reviewing additional materials pertinent to my opinions, as they become available.

III.    FDA OVERSIGHT OF PRESCRIPTION MEDICINES

A.     FDA's Regulation of Prescription Medicines

The Food and Drug Administration ("FDA") is the expert federal agency charged by Congress to regulate prescription medicines. The Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.* ("FDCA"), established FDA as a component of the United States Department of Health and Human Services. 21 U.S.C. § 393. The FDCA also vests regulatory and enforcement authority in the Secretary of Health and Human Services. The Secretary has delegated this authority to the Commissioner of FDA. FDA Staff Manual Guides, Vol. II, § 1410.10 (available at http://www.fda.gov/smg/1410_10.html).

FDA's authority to regulate the manufacture, labeling and distribution of human medicines is aimed at promoting and protecting the public health, and FDA has been charged by Congress with the duty to ensure that medicines are "safe and effective" for their intended uses when used in accordance with the product label. 21 U.S.C. § 393(b)(2)(B). Under the FDCA, a medicine is "misbranded" if its labeling is false or misleading, or does not provide adequate warnings. *See* 21 U.S.C. § 352.

The FDA has clearly defined its role in ensuring that medicines are safe and effective. FDA has stated, "Under the act and FDA regulations, the agency makes approval decisions based not on an abstract estimation of its safety and effectiveness, but rather a comprehensive scientific evaluation of the product's risks and benefits under the conditions of use prescribed, recommended, or suggested in the labeling." 71 Fed. Reg. 3922, 3924 (Jan. 24, 2006) (citing 21 U.S.C. 355(d)). FDA has also clearly stated that it understands its role in ensuring that prescription medicines are safe and

effective to mean that the labeling requirements it establishes are not minimal standards:

> Another misunderstanding of the act encouraged by State law actions is that FDA labeling requirements represent a minimum standard…In fact, FDA interprets the act to establish both a 'floor' and a 'ceiling,' such that additional disclosures of risk information can expose a manufacturer to liability under the act if the additional statement is unsubstantiated or otherwise false or misleading.  Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk are not necessarily more protective of patients.  Instead they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use.  Exaggeration of risk could discourage appropriate use of a beneficial drug.

*Id.* at 3934 – 5.  FDA has also stated, "FDA believes that State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated."  *Id.* at, 3922-29.

The FDA has over 9,000 employees located in more than 150 U.S. cities. Among its staff, FDA has several thousand scientists, including physicians, chemists, pharmacologists, epidemiologists, statisticians, microbiologists and other professionals. Many of these scientists work in CDER (Center for Drug Evaluation and Research), the drug review, approval and monitoring section of the FDA.  CDER is the largest drug regulatory agency in the world.

B.      FDA's Drug Review and Approval Process

1.      Investigational New Drugs

Since 1962, a pharmaceutical company must first submit to FDA an Investigational New Drug application ("IND") if the company intends to conduct clinical investigations with a new drug in the U.S.  21 C.F.R. § 312.20.  The central focus of an IND is "the general investigational plan and the protocols for specific human studies." 21 C.F.R. § 312.22(c).  FDA's "primary objectives" in reviewing an IND are to assure safety and rights of the clinical trial subjects and "to help insure that the quality of the scientific evaluation of drugs is adequate to permit an evaluation of the drug's effectiveness and safety."  21 C.F.R. § 312.22(a).  The IND application contains extensive information on the manufacture of the drug, animal studies demonstrating safety for humans, pharmacologic studies, and protocols for the first studies in humans.

As part of the IND review process, FDA will review details of the chemistry, manufacturing and controls for the new drug product, animal and other *in vivo* and in vitro investigations, data on human use from other countries, including adverse events associated with the use of the drug product, and the investigational plan for the new drug.  FDA scientists review and comment on the protocols submitted with the IND for the intial human use of the drug in the United States.  FDA requires that the sponsor make a commitment for Institutional Review Board oversight to assure human subjects protection.  The IND application must include an Investigator's brochure, which serves as labeling for the new application.

Based on initial safety information from the first clinical studies in healthy volunteers, the drug product may be studied in more extensive clinical trials to establish effectiveness as well as safety for the intended population.  The FDA can, and sometimes does, place a hold on further development at the IND stage when there are questions or concerns about the possible safety of the product for use in humans.  The foremost consideration for the FDA in clinical investigations is drug safety.

2.      New Drug Application

After FDA permits human testing to begin in the U.S., it monitors the results and safety data from the clinical trials, along with the manufacturer.  FDA may place a clinical hold on further development if a concern arises about the safety of the human subjects at any point in the drug development process.   As a practical matter, drug product sponsors usually request formal meetings with the FDA review division responsible for the premarket review of the IND or NDA for their drug product to discuss essential aspects of the drug development plan.  Typically, there may be a pre-IND meeting, and End-of-Phase 2 meeting and a pre-NDA meeting between representatives of the sponsor and FDA management and review scientists.  In these meetings, the sponsor proposes a development plan or protocols, receives advice from FDA scientists, and may seek agreement on specific aspects of the drug development plan.

Assuming that clinical drug development progresses to the point that the sponsor believes there is sufficient data to demonstrate safety and effectiveness of the drug for a specific indication, it can submit a new drug application ("NDA") to FDA, requesting permission to market the drug in the U.S.   The NDA includes, among other things, detailed descriptions of a) pre-clinical pharmacology and toxicology studies concerning the drug and its possible side effects; b) human pharmacokinetics and bioavailability studies concerning the drug; and c) clinical studies concerning the safety and effectiveness of the drug.  21 CFR § 314.50(d)(2), (3) and (5).  FDA reviews the scientific and clinical research submitted in the NDA to determine whether the drug meets the "statutory standards for safety and effectiveness…and labeling." 21 CFR § 314.105(c).  FDA "is required to exercise its scientific judgment to determine the kind

4

and quality of data and information an applicant is required to provide for a particular drug to meet the statutory standards." *Id.*

The NDA must contain: 1) reports of all investigations (preclinical and clinical); 2) a summary of the efficacy data and the safety data; 3) the composition of the drug; 4) methods and facilities used in the manufacture of the drug; 5) drug samples; 6) integrated assessment of benefit/risk; 7) proposed labeling; 8) and postmarket safety and other information concerning the drug's use in foreign markets.

Once the NDA has been submitted, FDA scientists determine whether the data are sufficient to establish that the drug meets FDA's safety and efficacy requirements. A team of physicians and other scientists conduct a careful review of the NDA and prepare detailed reports on their findings. FDA reviewers are all experts in their fields. After intensive assessment by the FDA review team, FDA then issues a letter to the sponsor indicating whether the NDA has been approved, not approved, or is approvable. If it is approvable but not approved, FDA identifies the deficiencies that must be corrected and the additional information required before approval can be reconsidered.

The U.S. drug development process is rigorous and scientifically sound. FDA estimates that of the 1,000 compounds initially identified as having potential as a new drug, five will enter clinical testing in the U.S. Of the five that reach the IND stage, three will reach the NDA stage, and of those, only one will eventually be marketed.

3.      Prescription Drug Labeling

Congress specifically provided FDA with the responsibility for assuring that prescription medicines marketed in the United States are safe and effective for use when used in accordance with the approved product label and contains adequate directions for use. 21 U.S.C. § 355(b)(1)(F). As an integral part of the NDA approval process, FDA evaluates and approves the exact language that appears on the package insert. *Id.* In general, a manufacturer must submit a supplement to FDA for approval of "any change in labeling." 21 CFR § 314.70(b)(3). Although a manufacturer can "add or strengthen a contraindication, warning, precaution or adverse reaction" to the label prior to approval of a supplement, the supplement must still be submitted. 21 CFR§ 314.70(c)(2)(i) [CHECK CITE]. FDA maintains strict control over prescription drug labels, and, in my experience, FDA does not compromise on safety issues.

A prescription medicine label is the primary means for FDA and the manufacturer to provide the essential information a health care provider needs to know in order to safely and effectively prescribe a drug to his or her patient. As FDA has stated in the Preamble in January 24, 2006,

> Under the act and FDA regulations, the agency makes approval
> decisions based not on an abstract estimation of its safety and
> effectiveness, but rather on a comprehensive scientific evaluation of
> the product's risks and benefits under the conditions of use
> prescribed, recommended or suggested in the labeling (21 C.F.R.
> 355(d))…The centerpiece of risk management for prescription drugs
> generally is the labeling, which reflects thorough FDA review of the
> pertinent scientific evidence and communicates to healthcare
> practitioners the agency's formal, authoritative conclusions regarding
> the conditions under which the product can be used safely and
> effectively . FDA carefully controls the content of labeling for a
> prescription drug, because such labeling is the principle tool for
> educating healthcare professionals about the risks and benefits of the
> approved product to help ensure safe and effective use. FDA
> continuously works to evaluate the latest available scientific
> information to monitor the safety of products and to incorporate
> information into the products' labeling when appropriate.

71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).

Thus, the label of a prescription medicine is the main mechanism by which FDA
and the manufacturer communicate essential information to physicians or other health
care providers. The approved label allows the medicine to be used safely and
effectively. A draft label is submitted as part of an NDA, and is extensively reviewed
and revised by the sponsor and by FDA prior to product approval. Although
development of the label is a complex and iterative process between the company and
FDA, FDA makes the final determinations on the appearance, content, placement and
language of information in the label. The final draft of a product label is based on the
best judgment of both the manufacturer and FDA and in accordance with the
regulations. Both FDA and the product sponsor review the labeling throughout
marketing for possible revisions based on postmarketing safety data or other
information.

The labeling requirements in effect during the time Neurontin was under
consideration for approval are found in 21 C.F.R. § 201.57. These requirements, which
were in effect prior to a recent revision in the format for prescription drug labeling,
specified that safety information is to be included in the Contraindications, Warnings,
Precautions, and Adverse Events sections of the labeling 21 C.F.R. § 201.57(d) (f).

Additional safety information may found in boxed warnings, but such warnings
may only be added to the label when required by FDA. FDA has stated, "[T]o ensure

the significance of boxed warnings in drug labeling, they are permitted only when specifically required by FDA." 44 Fed. Reg. 37434, 37488 (June 26, 1979).  FDA has also stated:

> Under § 201.57(e) (21 C.F.R. § 201.57(e)), which lists specific requirements on content and format of labeling for human prescription drugs, the agency has the authority to require a 'boxed' warning on prescription drug packages for special problems, particularly those that may lead to death or serious injury...The agency's policy is to use restraint in requiring warnings to be boxed because overuse of the box will ultimately lead to reducing its effect.

51 Fed. Reg. 43900, 43902 (Dec. 5, 1986).  FDA has never suggested or required boxed warnings for the Neurontin label.

    4.    FDA and Industry Share Responsibility for Review and Revision of Prescription Medicine Labels

Virtually all prescription pharmaceutical product labels undergo changes over time as new information about safety or efficacy becomes available.  While all changes to a prescription medicine label must be approved by FDA, there are two mechanisms for obtaining approval of label changes.  One is the prior approval mechanism in which a company submits a proposed labeling change to FDA and the proposed change, with supporting data are reviewed, much as an initial review.  The change is either approved, not approved, or found to be approvable.

The second mechanism for obtaining a labeling change is known as the "changes being effected" (CBE) provision of 21 C.F.R. § 314.70(c).  Although a manufacturer may alter the labeling to add or strengthen a warning or to delete "false, misleading or unsupported indications," in practice most pharmaceutical companies consult with FDA prior to submitting a safety-related CBE supplement.  A sponsor may institute a labeling change under the CBE mechanism, but such changes are subject to FDA's finding that the change is not approvable.  As stated in the Preamble to FDA's January 24, 2006 change in the format for prescription drug labeling:

> While a sponsor is permitted to add risk information to the [package insert] without first obtaining FDA approval via a CBE supplement, FDA reviews all such submissions and may later deny approval via a CBE supplement, and the labeling and the labeling remains subject to enforcement action if the added information makes the labeling false or misleading under section 502(a) of the Act (21

U.S.C. 352).  Thus, in practice, manufacturers typically consult with
FDA prior to adding risk information to labeling.

71 Fed. Reg. at 3934

The CBE mechanism is generally used for minor changes in manufacturing or
materials and for certain types of safety-related labeling changes.  In general these are
safety-related changes that add or strengthen a contraindication, warning, precaution,
or adverse reaction; add or strengthen instructions about drug abuse, dependence, or
over-dosage; add or strengthen information about dosage and administration intended
to increase the safe use of the product: or to delete "false, misleading, or unsupported
indications for use or claims for effectiveness."

5.      Risk/Benefit Assessment

Virtually all prescription medicines have adverse side effects.  It is a well
accepted principal that the full spectrum of a medicine's effects, both positive and
negative are not, and probably cannot, be known at the time of initial marketing.  When
FDA approves an NDA or sNDA, it has reached a determination that the medicine has
been shown to be safe and effective when used in accordance with its approved label.
This means that FDA has found that the known benefits of the drug outweigh its known
risks when used in accordance with the approved labeling.  The benefit risk assessment
is a central and ongoing part of the drug approval process involving judgment by FDA
reviewers and the sponsor.

6. Post-market safety surveillance and monitoring

After a new drug is approved for marketing, the responsibilities of the sponsor
and FDA to assure the continued safety and effectiveness of the prescription medicine
are expanded to include post-market safety surveillance and monitoring.  Under 21 CFR
314.80, both FDA and the drug sponsor are required to monitor and review all reports of
adverse drug experiences or adverse drug events that are reported or otherwise come
to the attention of FDA reviewers or the sponsor.  Adverse events or adverse drug
experiences are any adverse or untoward outcomes associated with the use of a drug in
humans, whether the event is considered related to the drug or not (21 CFR 314.80(a)).
Adverse events may occur when a prescription drug is used in the professional practice
of medicine, in the event of overdose, abuse or withdrawal; or in the event of the failure
of the expected pharmacologic action of the drug.

FDA classifies adverse events as expected on unexpected based on the
presence of that event in the product label; if a reported adverse event is contained in
the approved product label, it is considered to be an 'expected" event.  Conversely, if
the event is not listed on the current product label, the event is considered to be

8

"unexpected". Adverse events are also classified as serious or non-serious. A serious event is defined in the regulations (21CFR314.8(a)) as an event that results in any of the following outcomes: death, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of a current hospitalization, a persistent or significant disability/incapacity, a congenital anomaly or birth defect, or an important medical event which, based on appropriate medical judgment, is felt to jeopardize the patient or may require medical or surgical interventions to prevent one of the outcomes listed above.

A drug sponsor is required to promptly notify FDA in the event of a serious, unlabeled adverse reaction. In fact, manufacturers have 15 days in which to report new, serious unlabeled adverse events to FDA. Such events may come to the sponsor's attention from reports submitted directly from physicians, pharmacists, consumers, or other sources, from reports in the medical or scientific literature, or from comments to a manufacturer's representative in a health care provider's office. Adverse event reports may come from domestic or foreign sources.

Other reporting requirements include the submission of domestic serious labeled events, domestic non-serious events, in periodic reports as required in 21 CFR314.80(c)(iv)(2) and submission of annual reports as required in 21 CFR314.81(b)(2). Evaluation of reported adverse events must be based on well-established medical and scientific principles and sound clinical judgment.

Based upon my review of the company's postmarketing pharmacovigilence practices, including information provided by Pfizer to FDA after 2004, there is no evidence of a signal for suicide at any time following approval of the NDA in December of 2003. It also appears that no clinical information emerged during the postmarket use of Neurontin that changed the risk/benefit analysis of Neurontin for its labeled uses.

IV.    FDA's Initial Approval of Neurontin®

Warner-Lambert/Parke-Davis submitted the Neurontin IND on May 29, 1986. The initial Neurontin NDA, which includes 250 volumes of data, was submitted on January 15, 1992. The FDA approved the NDA on December 30, 1993. Letter from Robert Temple, M.D., Director, Office of Drug Evaluation, FDA, to Parke Davis Pharmaceutical Research (December 30, 1993) ("1993 Approval Letter").

1. Suicide, Depression and Suicidality in the initial NDA

As part of the initial NDA review and approval process, FDA medical officers reviewed safety information available in Integrated Summary of Safety ("ISS") and four safety updates, including the report of a suicide which had occurred in a controlled clinical trial, six months after the patient's discontinuation of Neurontin.

Further, the Integrated Summary of Safety (ISS) specifically addressed episodes of depression, suicidal ideation, and suicide attempt in a stand-alone section titled "Depression."  RR-Reg 720-02957, Integrated Summary of Safety, NDA 20-235 at p. 135 (November 19, 1991) ("Epilepsy ISS").  The section noted that "depression is commonly reported as a concurrent illness in the epileptic population" and that suicide attempt among epileptic patients is "estimated to be 4 to 5 times that expected in a nonepileptic population."  Id.

As required by FDA regulations, Warner-Lambert/Parke-Davis continued to provide safety data on Neurontin in the safety updates prior to approval and in periodic and other reports as required by FDA.  These safety updates included information on all patient deaths and serious adverse events.  They were provided to FDA in May 1992, November 1992, May 1993, and December 1993.  RR-Reg 720-03079, NDA 20-235 (May 29, 1992) ("First Safety Update"); RR-Reg 720-03132, NDA 20-235 (October 29, 1992) ("Second Safety Update"); RR-Reg 720-03236, NDA 20-235 (May 12, 1993) ("Third Safety Update"); RR-Reg 720-03315, NDA 20-235 (December 15, 1992) ("Fourth Safety Update").

In assessing the safety and efficacy of all prescription drug products, FDA relies on the clinical judgment and expertise of its medical officers.  Thus, reports of depression, suicidal behavior, and other psychiatric events were considered by FDA clinicians in their evaluation of the risk/benefit profile for Neurontin.  For example, Cynthia McCormick, M.D. noted in her initial report (Combined Medical Statistical Review) that one suicide had occurred six months after the patient's last dose of gabapentin and that this was one suicide among the estimated 2,096 subjects exposed to gabapentin that the suicide "occurred long after discontinuation of treatment."  Cynthia G. McCormick, M.D., FDA Division of Neuropharmacological Drug Products, Combined Medical-Statistical Review at p 77 (May 1993) ("Medical-Statistical Review").  As reflected on pages 102, 105, 107-09, 114, and 117 of this initial report, Dr. McCormick evaluated the reports of depression, suicidal ideation, and suicide attempt reported during the clinical trials.  Id.   However, she concluded that the clinical trial data did not demonstrate an increased risk for depression or suicidal behavior among the Neurontin treated patients.   In fact, there was a higher percentage of "psychobiologic events" reported for patients on placebo than those receiving Neurontin.

In Dr. McCormick's review of the Fourth Safety Update, she noted that "there is a higher incidence of depression among epileptics with partial seizures as compared to the general population."  Cynthia G. McCormick, M.D., FDA Division of Neuropharmacological Drug Products, Review and Evaluation of Safety Update #4 at p. 8 (December 28, 1993) ("FDA Review of Safety Update #4").  Cynthia Dr. McCormick also stated that "one cannot determine based on the available data, largely uncontrolled, whether the reports here represent an increase in incidence or intensity of

depression compared to that which is expected." *Id.* Dr. McCormick evaluated the full spectrum of adverse events, including episodes of depression and suicidal behavior, before concluding that Neurontin was safe and effective and should be approved for marketing.

Episodes of depression and suicide were also evaluated by Dr. McCormick's supervisor, Dr. Russell Katz. In his Supervisory Overview report, Dr. Katz pointed out that the only suicide had occurred "after having been off drug for a considerable time." Russell Katz, M.D., FDA Division of Neuropharmacological Drug Products, Supervisory Overview of Safety and Efficacy Data for NDA 20-235 at pp. 13-15 (October 11, 1993). Like Dr. McCormick, Dr. Katz did not suggest that gabapentin increased the risk for depression or suicidal behavior. Dr. Katz, who is currently the Director of the Neuropharmacological Drug Products Division, agreed with Dr. McCormick's conclusion that Neurontin was safe and effective for its intended use and should be approved. Dr. Katz's supervisor at the time, Dr. Paul Leber, Director of the Neuropharmacological Drug Products Division, agreed with Dr. Katz's and Dr. McCormick's recommendations regarding gabapentin's safety and efficacy. His report raised no concern about depression or suicidal behavior.

2. Peripheral and Central Nervous System Advisory Committee

Gabapentin was a new molecular entity and so it was brought before the Peripheral and Central Nervous System Advisory Committee on December 15, 1992. Prior to the meeting, the Advisory Committee members received a set of briefing materials, which included a draft of Dr. McCormick's medical officer's review. During the course of the meeting, Dr. McCormick provided a summary of her clinical assessment of the safety and efficacy of Neurontin. Transcript of Peripheral and Central Nervous System Drugs Advisory Committee, December 15, 1992, at pp. 18-61. ("PCNS Advisory Committee Meeting"). Included in Dr. McCormick's presentation was a discussion of the data on suicidal behavior and depression. Specifically, Dr. McCormick noted the suicide that had occurred six months after discontinuation of Neurontin. *Id.* at p. 43. Dr. McCormick also noted, among other things, that there had been two suicide attempts among 2,048 clinical trial patients treated with Neurontin. *Id.* at p. 52. She also noted that in controlled and uncontrolled studies, 5.3 percent of Neurontin exposed patients had reported depression, including seven serious adverse events of depression and nine patients withdrawn because of depression, some of whom had suicidal ideation. *Id.* at pp. 55, 58.

At no point during her presentation to the Advisory Committee did Dr. McCormick suggest that Neurontin causes or increases the risk for developing depression or suicidal behavior. With respect to depression, Dr. McCormick noted that "numerous examples were found on a spot check among case report forms where patients

developed treatment-emergent depression, pharmacological intervention was required, and a report of a serious adverse event was not made. Indeed, it wasn't required." *Id.* at p 59.

After considering both safety and efficacy data, including the data on depression and suicide, the Advisory Committee voted unanimously to recommend approval of Neurontin. *Id.* at 126. At no point did the Advisory Committee members suggest that there was an increased risk for suicide or suicidal ideation with Neurontin use.

3.     Neurontin® Label approved December 30, 1993

FDA had substantial involvement in developing the text of the Neurontin label approved on December 30, 1993. FDA correspondence and Warner-Lambert records of contact reflect at least 109 communications between Warner-Lambert and the FDA and 140 questions sent by FDA to Warner-Lambert. Robert Temple, M.D., Director, FDA Office of Drug Evaluation (December 21, 1993) WLC_CBU_119980 ("1993 FDA Approvable Letter"). Among these records of contact is a record concerning a meeting at FDA on January 28, 1993, attended by Jan Turner from Warner-Lambert and Dr. McCormick and Nancy Chamberlain from FDA. Record of FDA Contact (January 28, 1993) Pfizer_LAlphs_0087185. During this meeting, the FDA approved Warner-Lambert's proposal to modify certain COSTART preferred terms and also approved the sponsor's proposal to include rare adverse events in the "Other Adverse Events" subsection.

FDA's significant involvement in developing the package insert is also reflected in a record of contact following a phone conversation between officials from FDA and Warner-Lambert on October 6, 1993. Record of FDA Contact (October 6, 1993) WLC_JTurner_000717. The record of contact notes that FDA's delay in approving the NDA is because the agency is "fine tuning the labeling. They are reviewing every word . . . ." On October 15, 1993, FDA telephoned Warner-Lambert to request revisions to a table regarding efficacy data and a table regarding adverse events. Record of FDA Contact (October 15, 1993) WLC_JTurner_000688. FDA also asked that "convulsions" and "CNS Tumors" be added to the "Nervous System" section. On October 19, 1993, FDA asked Warner-Lambert to add back in the rare adverse events under the "Other Adverse Events" subsection. Record of FDA Contact (October 19, 1993) WLC_JTurner_000694. Rare events had earlier been removed from the package insert based on guidance from Dr. Robert Temple, Director of the Office of Drug Evaluation. WLC_JTurner_001685.

In December of 1993, there were a number of telephone conferences between FDA and Warner-Lambert regarding the Neurontin label. These calls included discussions regarding revising the package insert to include warnings about status

epilepticus and sudden and unexplained death (December 22, 1993), whether any events listed in the "Other Adverse Events" subsection should be moved to a different frequency category (December 27, 1993), revisions to the warnings regarding tumorigenic potential (December 29, 1993), and other changes to the preclinical pharmacology and toxicology sections (December 30, 1993). Records of FDA Contact, WLC_JTurner_000813-000828. At no time during these conferences did FDA request or require changes to the label regarding suicide, suicidal behavior, depression, or other psychiatric-related events be modified or moved to a different frequency category. On December 30, 1993, FDA approved the NDA and attached final approved label. As noted in the FDA's approval letter, dated December 30, 1993, the FDA required that the final printed label ("FPL") be identical to the draft labeling the FDA enclosed with its approval letter.

Prior to the revisions to the format of prescription drug labeling, published on January 24, 2006, adverse events were characterized in product labels as frequent (occurring 1/100 or more clinical trial participants), infrequent (occurring in between 1/100 to 1/1000 clinical trial participants), or rare (occurring in fewer than 1/1000 participants). 21 C.F.R. § 201.57(g), In the Neurontin label approved December 30, 1993, "suicidal" was listed as an infrequent event and "suicide gesture" was listed as a rare event. Neurontin U.S.P.I. (1993). The term "suicidal", a term from Warner-Lambert's modified COSTART dictionary, included the investigator-reported terms of attempted suicide and suicide ideation. Appendix B-1, Fourth Safety Update at p. 46. (November 16, 1993). "Suicide gesture" from this same modified COSTART dictionary, encompassed reports of self-injurious behavior without fatal intent and included the investigator-reported terms such as suicide gesture and wrist slashing gesture. *Id.* at 47. Both "suicidal" and "suicide gesture" were in Warner-Lambert's modified COSTART dictionary, which was authorized by FDA. The preferred terminology in FDA's COSTART dictionary for suicide attempt, suicide gesture, and suicide was "Overdose intent". Coding Symbols for Thesaurus of Adverse Reaction Terms, FDA (Second ed. 1985). However, not all suicide attempts involve overdose and not all overdoses are suicide attempts, therefore the Warner-Lambert modification was appropriate given the constraints of the COSTART dictionary terminology.

As noted above, data from the adult epilepsy ISS, related safety updates, and FDA clinical reviews confirms that suicidal adverse events were infrequent and that suicide gesture events were rare  Given the background rate of suicidal episodes in patients with epilepsy and the low frequency of suicidal adverse events reported in the clinical studies, it is my opinion that the FDA and Warner-Lambert appropriately listed the data regarding suicidal adverse events and suicide gesture in the "Other Adverse Events Observed During All Clinical Trials" subsection. The final approved label also appropriately identified data on all other psychiatric-related terms, including episodes of

depression, psychosis, and thinking abnormal. The final printed label that was attached to FDA's approval letter dated December 30,1993 used the modified COSTART terms "suicidal" and "suicidal gesture" to describe the adverse events involving suicidal behavior that occurred in the clinical trials. From the time of initial approval of the Neurontin NDA, the Neurontin package insert adequately described the occurrence of suicidal behavior that had been reported to the company during the clinical trials, in accordance with FDA regulations and policies.

4.    Warnings, Precautions, and Contraindications

It is my opinion that addressing suicidal behavior or other psychiatric-related events in a warning, precaution, contraindication, or other prominent listing in the Neurontin package insert is not necessary or appropriate.. A warning or other prominent listing on these events would misstate the clinical trial data and mischaracterize the risks associated with Neurontin. In addition, a warning or other prominent listing could harm the public health by discouraging the use of Neurontin by patients who would otherwise benefit from the use of the drug.

The FDA is careful to limit the use of boxed warnings to clearly appropriate situations, thereby avoiding a proliferation of warnings that will dilute their impact. FDA has stated, "[T]o ensure the significance of boxed warnings in drug labeling, they are permitted only when specifically required by FDA." 44 Fed. Reg. at 37488. In addition, FDA is concerned that patients will be discouraged from using potentially useful medications because of inappropriate warnings, precautions, or contraindications. Language in the package inserts for other prescription medications cited in the Blume report have no bearing on the need to change the Neurontin package insert to include information including warnings, precautions or contraindications concerning suicidal behavior or depression.

5.    FDA's Approval of Neurontin® for Postherpetic Neuralgia

Neurontin underwent additional regulatory review when Pfizer submitted an NDA in August of 2001 for Neurontin in the management of neuropathic pain. Letter from Drusilla Scott, Ph.D., Pfizer to FDA (August 6, 2001) Pfizer_AGarrity_0002519. The neuropathic pain indication was revised to post-herpetic neuralgia ("PHN") in October 2001. Letter from Drusilla Scott, Ph.D., Pfizer to FDA (October 22, 2001) Pfizer_LKnapp_0025817. FDA's clinical reviewers carefully evaluated the clinical safety and effectiveness information submitted in this NDA. The clinical review of these data was performed by Sharon Hertz, M.D., and Dr. McCormick submitted her own evaluation of the post-herpetic neuralgia (PHN) submission as the "Division Director Review and Basis for Approval Action."

14

As with the previous NDA for the treatment of epilepsy, Pfizer's PHN regulatory submissions included data on adverse events reported during the neuropathic pain studies.  In the PHN ISS, dated December 13, 2001, Pfizer provided cumulative data and patient narratives for all reports of deaths and serious adverse events resulting in patient withdrawal from the controlled trials.  RR-Reg 720-30135, PHN Integrated Summary of Safety, (December 13, 2001) ("PHN ISS").  The data from the two controlled trials in PHN and the five controlled trials for neuropathic pain indicated that more patients randomized to placebo reported serious depression than patients randomized to Neurontin.  Sharon Hertz, M.D., FDA Division of Anesthetic, Critical Care, and Addiction Drug Products at Table 7.20 (May 24, 2002) ("Dr. Hertz Clinical Review").  Specifically, 2.2 percent of placebo patients in the neuropathic pain studies reported depression as a serious adverse event as compared to 1.3 percent of patients on Neurontin.  Id.  The same held true for reported episodes of depression leading to patient withdrawal.  PHN ISS at Table 24.

Dr. Sharon Hertz's Medical Officer Review paid appropriate attention to data on depression and suicide attempt.  In her report , she discusses the sole report of suicide attempt of a patient in the neuropathic pain clinical trials.   Dr. Hertz Clinical Review at 66.  Dr. Hertz remarked on the fact that the ingestion was only 4500 mg of Neurontin; Dr. Hertz appropriately attributed the somnolence reported in that case as being the drug-related event, not the overdose itself.  Id.

Dr. Hertz further summarized the depression data in a chart identifying all serious adverse events reported in the neuropathic pain and epilepsy studies.  In addition to the summary data above indicating a higher rate of serious reports of depression in placebo patients than in the Neurontin patients, Dr. Hertz's chart also provides a comparison of serious depression events reported from all controlled epilepsy and neuropathic pain trials.  Id. at Table 7.20.  The results of this comparison again show a numerically higher rate of depression reported among placebo patients than among patients on Neurontin; 1.7 percent of patients on placebo reporting depression as compared to 1.5 percent of Neurontin patients.  Id.

Furthermore, Dr. McCormick's "Division Director Review and Basis for Approval Action" dated May 22, 2002 raises no concerns about depression or suicidal adverse events and states "there has been adequate demonstration of safety and effectiveness of Neurontin in the treatment of postherpetic neuralgia".  Cynthia McCormick, M.D., Director, FDA Division of Anesthetic, Critical Care, and Addiction Drug Products, Division Director Review and Basis for Approval Action (May 22, 2002) ("Division Director Review").

Both Drs. Hertz and McCormick concluded that Neurontin's safety and efficacy in treating patients with PHN was established in two adequate and well-controlled clinical

trials. Accordingly, on May 24, 2002, FDA approved the use of Neurontin in the management of postherpetic neuralgia, when used in accordance with the approved labeling. Letter from Cynthia McCormick, M.D., Director, FDA Division of Anesthetic, Critical Care, and Addiction Drug Products, to Drusilla Scott (May 24, 2002). Again, the approved package insert for the postherpetic neuralgia indication adequately disclosed information concerning suicidal behavior in accordance with FDA regulations and policies.

6.    Labeling Change in December 2005

In December 2005, Pfizer agreed to update the Neurontin package insert by replacing the terms "suicidal" and "suicide gesture" with the terms "suicide attempt" (infrequent) and "suicide" (rare). Pfizer_Regulatory_000031; Neurontin U.S.P.I. (December 2005). Both FDA and Plaintiffs' own retained expert, Cheryl Blume, considered these changes to be "minor." Pfizer_Regulatory_000003; Report of Cheryl Blume, Ph.D. at paragraphs 214 and 287. Additionally, replacing the Warner-Lambert modified COSTART terms with preferred terms from the MedDRA Dictionary in the "Other Adverse Events" subsection was appropriate. FDA did not request any other labeling changes. That the FDA did not require further revisions (such as a Black Box warning or any warning at all) or request the issuance of a "Dear Healthcare Provider" letter, suggests that the FDA did not believe there was an increased risk for suicide or suicidal behavior in patients using Neurontin.

The purpose of providing safety information in the label is to inform prescribers and patients of the most important information related to a particular medicine. It is my opinion that the Neurontin package inserts before and after December 2005 adequately informed prescribers of the risks and benefits of Neurontin, particularly with respect to suicide-related events. For these reasons, I believe the Neurontin U.S. package insert at all times relevant to this litigation adequately and appropriately disclosed the potential risks of Neurontin, including suicidal thinking and behavior.

7.    FDA Involvement with Neurontin Labeling

It is clear from the record of FDA's evaluation of the various regulatory submissions, that the agency understood the labeling issues associated with Neurontin and suicidal behavior and depression in the clinical trials. It is also clear that FDA was intimately involved with the drafting of the Neurontin label, not only at the time of the initial approval, but also for subsequent submissions to the NDA. FDA's substantial involvement with the development of the Neurontin label is confirmed by Dr. McCormick in her affidavit, which I have reviewed. Her affidavit is consistent with my review of these documents in the record. I agree with Dr. McCormick's clinical assessment that "given the relatively low frequency of suicidal adverse events reported in the clinical

trials and the high background rate of suicidal behavior in patients with epilepsy . . . it would have been inappropriate to address suicidal behavior in the warnings, precautions, or contraindications sections." Affidavit of Cynthia McCormick, M.D. at p. 9 (September 13, 2007). I also agree with Dr. McCormick's clinical assessment that "the final printed labeling approved by FDA in May 2002 appropriately and accurately identified the data on psychiatric-related events in the neuropathic pain clinical trials. *Id.* at p. 15.

V..     Plaintiff's Expert Cheryl Blume, Ph.D.

I have reviewed the report submitted by plaintiffs' retained expert, Cheryl Blume, Ph.D, as well as her deposition testimony.  There are a number of errors and misconceptions in both her expert report and in her testimony at deposition.  For instance, she alleges that Pfizer failed to acknowledge "psychobiologic" adverse events that she claims indicate significant adverse events predictive of suicidal behavior. There is no evidence that the clinical reviewers at FDA in any way considered this disparate group of adverse events as predictive of suicide or suicidality.  Nor is there evidence that such events were ignored by the company or FDA.  Dr. Blume provides no discernable scientific rationale for her assertions about any of  the "psychobiologic" events, such as depersonalization, which she claims are somehow predicative of an increased risk for depression, suicidal ideation, suicidal behavior or suicide.  Diagnosis of a major depressive episode (according to Cecil's Textbook of Medicine,  20th edition, p. 1999) can include suicidal ideation, suicidal attempt, or recurrent thoughts of dying as one of the diagnostic criteria, under certain circumstances.   The numerous events listed by Dr. Blume have not been shown to be predictive of depression or suicidal behavior.

Dr. Blume also alleges that Pfizer failed to include information in the Neurontin label about the effects of gabapentin on monoamine neurotransmitters within the central nervous system.  Blume Report at p. 184.   A review of the draft labels submitted to FDA by Warner-Lambert prior to the initial approval of Neurontin indicates that this allegation misrepresents the facts.   The January 1992, draft label submitted by Warner-Lambert with the Neurontin NDA includes a statement in the Mechanism of Action section submission that "Gabapentin slightly reduces the release of monoamine neurotransmitters *in vitro*."  Gabapentin Annotated Package Insert, NDA 20-235 at p. 3 (January 1992).  This sentence appears in a number of subsequent drafts of the product label before being removed by FDA in December 1993.  Neurontin Revised Package Insert (January 26, 1993) WLC_CBU_118839; Neurontin Revised Package Insert (September 2, 1993) WLC_CBU_122636.

Similar language regarding mechanism of action was included in the draft label submitted as part of the PHN NDA.  The draft labels provided to FDA in August 2001 and January 2002, included the following: "Gabapentin reduces the stimulated release of noradrenaline, dopamine, and glutamate under laboratory conditions.  Annotated Neurontin Labeling at (August 2001) Pfizer_LAlphs_0080557; Neurontin Revised

17

Package Insert (January 2001) Pfizer_LKnapp_0066074.  Gabapentin administration to humans increases the total brain content of GABA after a single dose.  However the relevance of these findings to clinical use is not yet clear."  *Id.*  Again FDA deleted this language during its review of the draft package insert prior to approving Neurontin for the treatment of post-herpetic neuralgia.  FDA Revised Draft of Neurontin U.S. Package Insert, FDA, Division of Neuropharmacology, HFD-120 (May 16, 2002) Pfizer_LCastro_0011566.  It is my opinion that FDA would not have removed this language if FDA scientists and clinicians believed it had any relevance to the safe or effective use of the product.  I believe Dr. Blume is mistaken in her assertion that Neurontin's possible effects on transmitters within the central nervous system has any bearing on the safety of Neurontin, an opinion that is supported by FDA's deletion of this language from the Neurontin labels.  After May of 2002, there has been no reason, or scientific basis, for Pfizer to resubmit similar labeling to FDA on this issue.

I have reviewed the reported methods and data upon which  Dr. Blume appears to base the opinions she offers in her report.  At a number of places in her report, Dr. Blume presents what are essentially line listings of adverse events, and thendraws inferences and conclusions from those line listings.  I see no evidence that she preformed any analyses to determine if the differences she claims to have identified in rates of events between the comparison groups (treated patients or placebo-treated patients) are more likely to be real differences or simply due to chance alone. The types of comparisons she makes, comparing numbers of events in one population and numbers of similar events in a different population, in the absence of any statistical analyses, could not be relied upon as demonstrating true differences between the Neurontin-exposed population and the placebo-exposed population, much less establishing causation.  The "analyses" she reports are not consistent with generally accepted epidemiological principles and are not reliable as measurements of the association between those events and an exposure of interest.   Such comparisons not used by epidemiologists, clinical scientists or regulatory agencies, such as FDA, to evaluate whether a medicine is causally associated with an adverse event. The presentation of lists of adverse events, as set forth in the Blume report, does not contribute to the assessment of an association between Neurontin and suicide.

Dr. Blume opines that reports of positive "dechallenge" and "rechallenge" events provide support for her claim that  Neurontin plays a causal role in the occurrence of suicide or suicidal behavior among patients exposed to the drug.  A positive dechallenge occurs when a patient is withdrawn from a drug suspected as associated with a particular adverse event and the adverse event regresses or disappears.  A positive rechallenge means the suspect drug is re-introduced and the event recurs. Dechallenge and rechallenge are most meaningful when the event reported is an objectively documented or measured event, such as abnormal kidney function tests that

improve on discontinuation of a suspect drug and then become abnormal again when the drug is re-introduced. Thus, dechallenge or rechallenge data are most useful in measuring changes in an objective sign or laboratory test rather than in the case of subjective events. The dechallenge and dechallenge/rechallenge reports involving highly subjective adverse experiences like several of those cited by Dr. Blume, are subject to biases which render them more difficult to interpret than are changes in objective adverse events upon dechallenge alone or dechallenge and then rechallenge. Girard, M., "Oral Provocation Limitations," Br. J. Clin. Pharmac. (1987) 23, 73-79.

In addition, the "psychobiological" events discussed by Dr. Blume are not rare in the patient populations exposed to Neurontin in the absence of Neurontin exposure. Therefore, based on the data used and the methodologies proposed by Dr. Blume, the dechallenge/rechallenge data from which she infers a causal association between Neurontin and suicide or suicidal behavior could not be considered a reliable basis from which to draw such inferences.

Dr. Blume testified at her deposition that the Neurontin package insert should have contained warnings or other labeling changes that would discourage physicians from prescribing Neurontin based on safety issues she has identified. Blume Deposition at 216, 682. She also noted in her report that Pfizer should have warned healthcare professionals about a possible lack of efficacy in certain off-label indications. Blume Report at 9. I do not agree with these opinions.

Under 21 C.F.R. § 201.57(e)(2005) "{i}f there is a common belief that the drug may be effective for a certain use of if there is a common use of the drug for a condition, but the preponderance of evidence related to the use or condition shows the drug is ineffective" FDA may require that the label state that there is a lack of evidence demonstrating efficacy for that use. In the recently published revisions to the format for prescription drug labels, FDA may require the addition of warnings to a package insert if it believes the medication poses an increased risk in certain patient populations using the drug off-label. Section 201.57(e) (2006) states, in part, that "A specific warning relating to a use not provided for under the 'Indications and Usage' section of the labeling may be required by the Food and Drug Administration if the drug is commonly prescribed for a disease or condition, and there is lack of substantial evidence of effectiveness for that disease or condition, and such usage is associated with serious risk or hazard." 21 C.F.R. § 201.57(c)(6)(i)(2006). In addition, Section 201.57(c)(3)(iii) states, in part, that "If there is a common belief that the drug may be effective for a certain use or if there a common use of the drug for a condition, but the preponderance of evidence related to the use or condition shows that the drug is ineffective or that the therapeutic benefits of the product do not generally outweigh its risks, FDA may require

that this section state that there is a lack of evidence that the drug is effective or safe for that use or condition." 21 C.F.R. § 201.57(c)(2)(ii)(2006).

Dr. Blume testified that FDA has known for at least several years that physicians were prescribing Neurontin for off-label indications. Blume deposition at 694. First, FDA does not regulate the practice of medicine, meaning that once a product is approved for marketing in the U.S., prescribers are permitted to prescribe or use the product as they feel is in their patients' best interests. Furthermore, had FDA believed that Neurontin posed an increased risk of injury only in certain patient populations using the medication off-label, it had the full authority to require Pfizer to include in the Neurontin labeling a specific warning regarding efficacy or safety concerns associated with off-label uses. 21 C.F.R. § 201.57(e) (April 2002). To date, FDA has not requested that this type of a warning be added to the Neurontin labeling and it is my opinion that such a warning would have been inappropriate and unsupported by the available clinical data.

Dr. Blume's report sets forth a purported "Proportional Reporting Rate" ("PRR") of the FDA AERS database in support of her contention that the postmarketing surveillance data revealed a "signal" for suicide. The analysis presented in Dr. Blume's report is not a PRR. Rather, Dr. Blume merely presents the percentage of suicide events for each drug relative to the total number of adverse events for that drug. This is not the generally accepted method for calculating a PRR, which would require an analysis of the entire AERS database. Even if her analysis were a generally accepted-type of PRR, Dr, Blume has not followed generally accepted methodology in interpreting the information. As stated by Dr. Brian Strom (who Dr. Blume has acknowledged as an authority in the field of pharmacoempidemiology), "...true signals should emerge from clinical judgment and that statistical algorithms, such as PRRs, should be used as supplements to clinical and epidemiological judgment, not replacements." Brian L. Strom, "Evaluation of Suspected Adverse Drug Reactions – Reply," JAMA 293:1324 – 1325 (2005).

Dr. Blume has not applied reliable methodologies for analyzing adverse event data or interpreting her data analyses. Indeed, because she is neither a clinician nor an epidemiologist, she is not qualified to apply clinical or epidemiological judgment to her purported PRR results.  It is well established that:

> Disproportionality measures are formal statistical analyses of poor, incomplete, and based data (i.e., SRS data).  No matter how sophisticated, formal analyses of such data can easily be misleading; they cannot correct for imperfections in the data source.  Proper interpretation also requires clinical judgment before one even considers there to be a signal.  However, the use of such statistical