# EXHIBIT F

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3
 4
 5    In re:  NEURONTIN MARKETING,    )
 6    SALES PRACTICES AND PRODUCTS    )
 7    LIABILITY LITIGATION            )
 8    ----------------------------- ) MDL Docket No. 1629
 9    THIS DOCUMENT RELATES TO:       ) Master File No.
10                                    ) 04-10981
11    BULGER v. PFIZER, et al.,       )
12    07-11426-PBS                    ) Judge Patti B. Saris
13                                    ) Magistrate Leo T.
14    SMITH v. PFIZER, et al,         ) Sorokin
15    05-CV-11515-PBS                 )
16    -----------------------------
17
18          DEPOSITION OF ALEXANDER RUGGIERI, taken
19          at 999 Enchanted Way, Board Room 3,
20          Simi Valley, California, commencing at
21          9:10 A.M., Friday, December 5, 2008,
22          before Kathleen E. Barney, CSR #5698.
23
24      Job No. 183324
25   PAGES 1 - 330
```

Page 2

1  APPEARANCES OF COUNSEL:
2
3  FOR PLAINTIFFS:
4
5      FINKELSTEIN & PARTNERS
6      BY: KEITH L. ALTMAN
7      1279 ROUTE 300
8      BOX 1111
9      NEWBURGH, NEW YORK 12551
10     (845) 562-0203
11     KALTMAN@LAWAMPMMT.COM
12
13 FOR DEFENDANT PFIZER:
14
15     GOODELL, DEVRIES, LEECH & DANN, LLP
16     BY: RICHARD M. BARNES
17         MICHAEL WASICKO (Telephonically)
18     ONE SOUTH STREET
19     20TH FLOOR
20     BALTIMORE, MARYLAND 21202
21     (410) 783-4000
22     RMB@GDLDLAW.COM
23
24
25

Page 3

1  FOR DEFENDANT RAYMOND JENNINGS, M.D.
2
3      LAW OFFICES OF STEVEN HILLIARD
4      BY: KENDRA BERMAN (Telephonically)
5      345 California Street
6      Suite 1770
7      San Francisco, California 94101
8
9  ALSO PRESENT:
10
11     DAVID WEST, Videographer
12

Page 4

1       THE VIDEOGRAPHER: Good morning. We are on
2  the record at 9:10 a.m. on December 5, 2008. My name
3  is David West and I represent Veritext National
4  Deposition and Litigation Services. This deposition
5  is being held at the Grand Vista Hotel at 999          09:11
6  Enchanted Way, Board Room No. 3, Simi Valley,
7  California. The case is entitled In Re Neurontin
8  Marketing Sales Practices and Products Liability
9  Litigation, MDL Docket No. 1629. The deponent is
10 Dr. Alexander Ruggieri.                                09:11
11      Would all counsel please identify
12 themselves for the record, after which our court
13 reporter, Kathy Barney of Veritext, will swear in the
14 witness and we'll begin.
15      MR. ALTMAN: This is Keith Altman on behalf   09:11
16 of the Products Liability plaintiffs and also the
17 Crone plaintiffs in the case of Crone versus Pfizer.
18      MR. BARNES: Richard Barnes on behalf of
19 Pfizer and Parke-Davis and in MDL and in Crone.
20      MR. WASICKO: This is Michael Wasicko from    09:12
21 Goodell DeVries on behalf of the Pfizer defendants.
22      MS. BERMAN: This is Kendra Berman on behalf
23 of Dr. Jennings in the Crone matter.
24      THE VIDEOGRAPHER: Thank you.
25      Ms. Court Reporter.                          09:12

Page 5

1           ALEXANDER RUGGIERI,
2  a witness herein, having been duly sworn, was
3  examined and testified as follows:
4
5       MR. ALTMAN: Before we begin, I just want to   09:12
6  put one thing on the record.
7       Recently, in the last few days, this case
8  was noticed in the California State Court case of
9  Crone versus Pfizer. Under California rules, we are
10 not -- do not have the same time limitations as in    09:12
11 the MDL case. I'll do everything in my power to
12 conclude my examination by today, but in the event
13 that I'm unable to, under the California rules I will
14 hold the deposition open for follow-up questioning at
15 a later date to be determined.                        09:13
16      MR. BARNES: We don't agree with that, but
17 we will talk about that at a later date, so -- we
18 have a course of dealing and understanding in this
19 case, but go ahead. I am very comfortable that you
20 can complete his deposition within the time allotted. 09:13
21      MR. ALTMAN: I will do my best.
22
23           EXAMINATION
24 BY MR. ALTMAN:
25      Q. Dr. Ruggieri, how are you today?           09:13

2 (Pages 2 to 5)

Page 122

1  don't always have the same number of placebo
2  patients. You don't -- there might be denominator
3  issues. So there are analyses which could perhaps
4  make one feel more comfortable with that proposition,
5  that there is a difference. And then some things by     12:18
6  virtue of regulatory practice in approving a drug,
7  so, for instance, you could have more deaths in a
8  placebo group, but if you have one death in the
9  treatment group, that is something that would -- is
10 almost always included in the product label.            12:19
11 BY MR. ALTMAN:
12     Q. What does the term "suicidal" mean?
13     A. Suicidal to me is a very broad term that
14 encompasses suicide gesture, suicide ideation,
15 suicide -- actual suicide attempt. Injurious           12:19
16 behavior. To me it means -- so if someone said,
17 "This patient is suicidal," it could mean that they
18 had either demonstrated or had the potential of
19 demonstrating those concepts.
20     Q. Does it mean that they've completed suicide?     12:19
21     A. No. They would say the patient is dead from
22 suicide. So if there is a corpse, then somebody
23 committed suicide. When they say that, it usually
24 means that -- it applies to a patient who is alive.
25     Q. So, in other words, does everybody who is --    12:19

Page 123

1  under your definition of suicidal, does everybody who
2  is suicidal actually commit suicide?
3      A. No, not necessarily.
4      Q. Do you have any idea what percent do
5  actually commit suicide?                                12:20
6      A. I'm not up on the statistics. I'm not a
7  suicidologist.
8      Q. By the term "suicidologist," does that -- do
9  you mean that there are people who spend their time
10 studying these statistics and the --                    12:20
11     A. Who study the epidemiology of suicide and
12 have these numbers on the tip -- that what's I mean
13 by that. But I know -- I know that -- I'm sorry. I
14 wasn't finished answering.
15     As a clinician --                                   12:20
16     Q. You didn't let me finish my question.
17     MR. BARNES: Well, let's finish both.
18     THE WITNESS: Who do you want to finish
19 first?
20 BY MR. ALTMAN:                                          12:20
21     Q. Go ahead. I think you were going to answer
22 what I was going to ask anyway, so that's fine.
23     A. As a clinician, the term "suicidal" to me
24 applies, A, to a live patient. And, number two, that
25 it indicates that a patient is at risk for any one of  12:20

Page 124

1  those things that I mentioned, including completed
2  suicide.
3      Q. What does the term "suicide gesture" mean?
4      MR. BARNES: To him? His opinion on that?
5      Go ahead.                                           12:21
6      MR. ALTMAN: Well, he has rendered an
7  opinion on the --
8      MR. BARNES: Sure.
9      MR. ALTMAN: -- adequacy of the label, so --
10     THE WITNESS: Suicide gesture to me means,          12:21
11 again, very broadly can mean any act, inclination,
12 hint, verbal threat, explicit or implicit, that could
13 suggest a risk for a suicide attempt.
14 BY MR. ALTMAN:
15     Q. Is that the same as suicidal ideation? Does    12:21
16 it -- strike that.
17     Does that include suicidal ideation?
18     A. Yeah, I would include features or
19 manifestations of the patient that would indicate
20 suicidal ideation. Ideation means their thoughts and   12:21
21 so those could be manifested in different ways in
22 patients.
23     Q. Would everybody who -- would the term
24 "suicide gesture" include suicide attempt?
25     A. I would imagine that some clinicians may       12:22

Page 125

1  interpret it that way. The gesture -- gestures, in
2  my mind, generally, you know, preclude the attempt.
3  So you could prevent an attempt by identifying
4  gestures.
5      Q. But if I understand what you said, a suicide   12:22
6  gesture is not the same as a suicide attempt?
7      MR. BARNES: Objection. He said it could,
8  but -- well, restate your answer.
9      THE WITNESS: It's -- this is my own, Alex
10 Ruggieri, the physician, I don't know that there is   12:22
11 any formal ontology or definitions that --
12 O-N-T-O-L-O-G-Y -- or definitions that show that --
13 that suicide attempt is a parent of suicide gesture
14 or vice-versa, if suicide gesture is a parent of
15 suicide attempt. Gestures -- a suicide attempt is an  12:23
16 almost completed suicide, and some people may
17 separate that. But suicide gesture could be
18 technically a suicide attempt. So even if it's an
19 attempt to scratch yourself with a dull knife, that
20 could be interpreted as an attempt and could be       12:23
21 interpreted as a gesture both. There is no formal
22 line. I think for the clinician anything with S-U-I
23 pretty much gets the message across.
24 BY MR. ALTMAN:
25     Q. Is -- does everybody who is -- has a suicide  12:24

32 (Pages 122 to 125)

Page 126

1  gesture, do they all have suicide attempts?
2      A. Well, in some people's definition, a gesture
3  may be equivalent to an attempt. In the example I
4  just gave you.
5      Q. What about in your definition, though, is        12:24
6  there a difference?
7      A. Again -- and it's just my own personal --
8  I'm not a suicidologist. There may be more formal
9  terminologies around this. But a gesture to me --
10 well, first of all, suicidal kind of includes the     12:24
11 whole gamut for me. And gesture, I wouldn't object
12 if somebody stated that, you know, a gesture -- an
13 attempt is a type of gesture.
14     Q. If somebody were to take a gun out of the
15 drawer and put it on the table and look at it, would  12:25
16 you consider that a suicide gesture?
17     A. It would depend on what the clinical state
18 and background of that patient was, what their -- has
19 been going on with them.
20     Q. If somebody had thoughts of suicide --          12:25
21     A. Suicidal ideation?
22     Q. If somebody had suicidal ideation and went
23 and took a gun out of the drawer and put it on the
24 desk and sat there looking at it, would you consider
25 that a suicide gesture?                                12:25

Page 127

1       MR. BARNES: Objection.
2       If you have an opinion.
3       THE WITNESS: Potentially. Again, it would
4  depend on what other circumstances are going on with
5  the patient.                                          12:25
6  BY MR. ALTMAN:
7       Q. Well, is that something more than suicidal
8  ideation?
9       A. I'm sorry?
10      Q. Is that something more than suicidal          12:25
11 ideation?
12      A. Is what something more than suicidal
13 ideation?
14      Q. Taking a gun out of the drawer and sitting
15 there and putting it on the desk and looking at it.   12:25
16      MR. BARNES: I'm going to object right now.
17 He has not been offered as an expert on suicide per
18 se or -- and so I think you're asking questions that
19 would go more properly to Dr. Jacobs, who has been
20 deposed in this case. So to the extent -- I'm         12:26
21 objecting it's beyond the scope of his report.
22      If you can tie it in and let me know what
23 the -- how it ties into his labeling opinion as to
24 the actual conduct of a patient -- and we've not
25 offered him in this area -- I'd be happy to entertain 12:26

Page 128

1  it. But it's way beyond what he has been offered
2  for.
3       MR. ALTMAN: You know, I think we've -- we
4  don't need to go into so much of a thing, but he has
5  commented on the adequacy of the label.              12:26
6       MR. BARNES: Correct.
7       MR. ALTMAN: Okay. And so this goes to the
8  adequacy of the label, because we're talking about
9  the terms that were used in the label and whether
10 they are the same as what actually occurred.         12:26
11      MR. BARNES: That's not -- his testimony was
12 that the word "suicidal" runs the whole gamut, it's a
13 broad term. And suicide gesture can encompass
14 suicide attempt, in some people's minds. In his
15 mind, he gave you a definition.                      12:26
16      Now, as to how a patient -- what is a
17 clinical manifestation of whether there is a
18 requisite attempt for a gesture -- or requisite
19 intent for a gesture or an attempt, that's not his
20 area that he has been offered on. And you're getting 12:27
21 into specific clinical manifestations of suicide, and
22 that is not what he is going to talk about. So --
23      MR. ALTMAN: But -- well, here is my only
24 point. In his report he claims that the labeling was
25 adequate.                                            12:27

Page 129

1       MR. BARNES: Correct.
2       MR. ALTMAN: And we're exploring whether the
3  term "suicide gesture" and "suicidal" were adequate
4  to describe what was going on. And you're
5  questioning whether he is qualified to talk about    12:27
6  those differences. So my point is --
7       MR. BARNES: As a clinician, he is
8  absolutely qualified to do that. And you're asking
9  him now as to where he might draw the line as a
10 clinician looking at a specific patient situation.   12:27
11 And it has nothing to do with the label. It has to
12 do with how he would view clinically a situation.
13 And you've not even given him enough facts, so --
14      MR. ALTMAN: Then how does he determine if
15 the label is adequate with respect to those terms?   12:27
16      MR. BARNES: Why don't you ask him that
17 question and he will tell you.
18      MR. ALTMAN: We'll come to his opinion and
19 that's fine.
20 BY MR. ALTMAN:                                       12:28
21      Q. I think we said before not every suicidal
22 event includes completed suicide, correct?
23      A. Correct.
24      Q. So the term "suicide" is more specific than
25 the term "suicidal," correct?                        12:28

Page 222

1  Q. Okay. Does the FDA use spontaneous data
2  to -- for signal detection purposes?
3  A. I don't think so. You'd have to ask, but my
4  understanding is that the trend is moving away from
5  that type of data.                                    16:14
6  Q. And what is your basis for that?
7      MR. BARNES: Let him finish his answer.
8      THE WITNESS: My basis for that is the
9  Institute of Medicine Safety Report. The Scientific
10 Advisory Committee report on the FDA. The FDA's own  16:15
11 initiatives with the Sentinel Network with the VA,
12 with CNS to do signal detection in what the Institute
13 of Medicine report calls large health care databases.
14 BY MR. ALTMAN:
15 Q. Does the World Health Organization use       16:15
16 spontaneous data for signal detection purposes?
17 A. I do not think they do.
18 Q. Are you familiar with the Uppsala Monitoring
19 Center? U-P-P-S- --
20 A. Uppsala. Sweden.                             16:15
21     MR. BARNES: U-P-P-S-A-L-A, I think. It's a
22 city in Sweden.
23     THE WITNESS: No, I'm not familiar with that
24 institute. However, I am familiar with the Swedish
25 health care system and their collaboration in       16:16

Page 223

1  creating large-scale health care -- longitudinal
2  health care databases. It's a nationalized health
3  care system, so they have capabilities to access that
4  system very readily.
5  BY MR. ALTMAN:                                      16:16
6  Q. Does Pfizer conduct data mining activities?
7  A. At this time?
8  Q. At this time.
9  A. I would imagine they do, yes.
10 Q. Do you know when they started doing that?    16:16
11 A. No, I don't.
12 Q. Does Pfizer use spontaneous data for signal
13 detection?
14 A. I believe they do.
15 Q. Do you think that's inappropriate for them   16:16
16 to do so?
17 A. No, I don't think it's inappropriate. I
18 think you have to understand the limits of the data.
19 My feeling about spontaneous data is that it helps
20 you if it helps you, but it doesn't really get you   16:16
21 anywhere at the end of the day and that there are
22 more reliable data sources to -- unfortunately,
23 industry is -- doesn't have as ready access. So
24 industry is constrained oftentimes with being stuck
25 with the worst data source.                          16:17

Page 224

1      MR. BARNES: Are we done?
2      MR. ALTMAN: Not even close.
3      MR. BARNES: Are you getting tired?
4      MR. ALTMAN: Can't find what I'm looking for
5  here.                                               16:17
6  BY MR. ALTMAN:
7  Q. When did -- was suicide a labeled event in
8  the Neurontin label?
9  A. It was in the 1993 label.
10 Q. So if in Pfizer's opinion suicide was not    16:18
11 labeled, you would disagree with that?
12 A. Well, sorry, when you say "suicide" and when
13 you say "labeled," because the label -- with respect
14 to warnings, precautions, observed events, et cetera,
15 what do you mean when you say "labeled"? In any of   16:19
16 those?
17 Q. Are you familiar with the regulatory
18 definition of labeled versus unlabeled?
19 A. Yes.
20 Q. Okay. Was suicide a labeled event in the    16:19
21 1993 label?
22 A. I believe it was in the context of the
23 definition of labeled versus unlabeled, because it
24 was listed in adverse events observed.
25 Q. The term "suicide" was listed?              16:19

Page 225

1  A. I didn't say that.
2  Q. Okay. So if Pfizer disagrees with you that
3  suicide was labeled, you would disagree with them?
4  A. I'm dealing with it from the standpoint of a
5  clinician and there was sufficient labeling around   16:20
6  the notion of suicidal behavior, suicide or suicide.
7  And we -- this label -- this regulatory definition of
8  labeled, labeled, unlabeled, I don't think there is a
9  discreet labeled, unlabeled definition. That's a
10 term that's -- unfortunately means -- can mean       16:20
11 different things in different contexts.
12 Q. Okay. So if Pfizer considered suicide to be
13 unlabeled from a regulatory perspective, then they
14 were wrong?
15 A. No, I did not say that. I need to know what  16:20
16 Pfizer means by unlabeled versus labeled.
17 Q. Well, let's -- we're going to come back to
18 this, but one of the things I want to clarify --
19 A. The concept of suicide was in the '93 label,
20 was encompassed in that.                             16:21
21 Q. So from a regulatory perspective, the
22 company should have considered reports of suicide to
23 have been labeled events?
24 A. No. Again, this term -- there is no strict
25 definition of labeled versus unlabeled. In fact, one  16:21

Page 226

1  of the challenges that when conducting -- when
2  collecting information on spontaneous adverse events
3  is the extrapolation of what a -- is being presented
4  in the adverse event report to clinical concepts that
5  are in the label. Now, there are notions about        16:21
6  labeled versus unlabeled in the core data sheets. I
7  mean, this word is very ambiguous and you need to
8  define the context for me. So I'm not declaring
9  anybody wrong here, especially with a word that has
10 got variated meanings depending on context.           16:21
11     Q. All right. Let's change the words to
12 expected versus unexpected.
13     A. Okay.
14     Q. Do those have a regulatory definition?
15     A. Yes. But it's not -- it still doesn't get      16:22
16 you -- it's not completely precise.
17     Q. But do they have a regulatory definition?
18     A. No.
19     Q. Okay. Does the company have to report
20 spontaneous adverse events differently depending      16:22
21 whether they're expected or unexpected?
22     A. Yes.
23     Q. Okay. How does the company know whether --
24 how does the company determine whether something is
25 expected or unexpected?                               16:22

Page 227

1      A. Like I said, as I just explained to you that
2  there are clinical concepts which have correspondence
3  to but may not be precisely mapped to a given adverse
4  event as described in the label. So that's where
5  many times a company may actually call it unexpected, 16:22
6  even though it seems to have a semantic relationship
7  or conceptual relationship to an entity. And it
8  could be because of some more finer-grained issues.
9  This is something we encountered all the time in
10 deciding it's not a -- there's no scalpel definition  16:23
11 that let's you know one way or the other.
12     Q. Do you know whether Pfizer considered
13 suicide to be unexpected in the time period, lets's
14 say, from 1994 to 2000?
15     MR. BARNES: If you know.                         16:23
16     THE WITNESS: I don't know.
17 BY MR. ALTMAN:
18     Q. And one of the things we've been -- I want
19 to clarify. You say that you offer opinions
20 regarding Pfizer's conduct, but you do not mention    16:23
21 Warner-Lambert and Parke-Davis. Are you including
22 those entities under Pfizer's conduct or do you not
23 have opinions on Parke-Davis and Warner-Lambert?
24     A. Everything that I've based on Pfizer's
25 conduct has been based on what I've seen in the       16:23

Page 228

1  labels, what I've seen in Mr. Pacella's testimony.
2  Those have been -- and the testimony from other
3  people from Pfizer. That's what my testimony is
4  based on.
5      Q. Do your opinions apply to Parke-Davis and     16:24
6  Warner-Lambert in the period of time before Pfizer
7  acquired Parke-Davis and Warner-Lambert?
8      MR. BARNES: Which opinions are you
9  referring to? He has two reports and he has talked
10 about labeling going back to pre-approval. So you    16:24
11 should be very direct rather than a broad question,
12 ask specifically, because they are spelled out in his
13 report and --
14 BY MR. ALTMAN:
15     Q. Why don't we go to page 1 of your report.     16:24
16     MR. BARNES: Which one?
17 BY MR. ALTMAN:
18     Q. Of your supplemental report.
19     MR. BARNES: 14.
20     THE WITNESS: Page 1?                             16:24
21 BY MR. ALTMAN:
22     Q. Of Exhibit 14. About the third or fourth
23 sentence.
24     A. On page 1 or --
25     Q. On page 1. You say:                           16:25

Page 229

1          "I've also offered opinions
2          regarding Pfizer's conduct in the
3          development, testing and labeling
4          of Neurontin."
5      Do those opinions only apply to Pfizer's         16:25
6  conduct or do they include Parke-Davis and
7  Warner-Lambert?
8      A. To the extent that the testimony and the
9  sources that I referred to represent what happened
10 with Warner-Lambert, then they do.                   16:25
11     Q. On page 2, second paragraph, you state:
12         "All evidence that I have
13         reviewed in this case neither
14         suggests nor supports a causal
15         relationship of Neurontin to          16:26
16         suicide, suicidal behavior,
17         suicidal ideation and clinical
18         states related to suicidality."
19     Correct?
20     A. Correct.                                      16:26
21     Q. What does the term "clinical states related
22 to suicidality" mean, as you use it here?
23     A. That could mean suicide gestures. It could
24 mean suicide ideation. Or variations of the such
25 related to suicidality. The gestures, thoughts,      16:27