UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | : MDL Docket No. 1629 :  : Master File No. 04-10981 : |
| THIS DOCUMENT RELATES TO: | : : Judge Patti B. Saris : |
| *Bulger v. Pfizer Inc.*, Case No. 1:07-cv-11425-PBS | : Magistrate Judge Leo T. Sorokin : |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
IN LIMINE TO PRECLUDE THE TESTIMONY AND EXHIBITS
OF DEFENDANTS' EXPERT DR. GIBBONS**

Defendants Pfizer Inc and Warner-Lambert Company LLC (together, "Pfizer" or "Defendants"), by counsel, respectfully submit this opposition to Plaintiff's Motion *In Limine* to Preclude the Testimony and Exhibits of Defendants' Expert Dr. Robert Gibbons.

As this Court is aware, Dr. Gibbons is a rebuttal witness specifically addressing the January 2008 FDA Alert concerning antiepileptic drugs ("AEDs"). All of the work Dr. Gibbons has done in this litigation concerns that Alert. At trial he will opine that the FDA Alert was flawed in a number of significant ways, and that there was no basis to conclude that Neurontin causes suicidal thinking or suicidal behavior, or that Neurontin should have a class warning regarding suicide. Dr. Gibbons will also testify that two pharmacoepidemiological studies he conducted with PharMetrics data (referred to in prior briefing as the "Bipolar Study" and "Gabapentin Study") affirmed that there is no increased risk of suicidal behavior with the AEDs that were the subject of the FDA Alert or gabapentin, and therefore, no basis for the Alert or

class warning. Dr. Gibbons' detailed critique of the FDA Alert and the basis for his opinions are set forth in his reports. This Court has recognized that Dr. Gibbons' work provided a "powerful critique of the FDA's statistical analysis." (May 5, 2009 Order, [1775] at 45.) As more fully set forth below, Dr. Gibbons' methodology is reliable and meets the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and, accordingly, Plaintiff's *in limine* motion should be denied.

## PRELIMINARY STATEMENT

On April 28, 2008, the Court allowed Pfizer to introduce a rebuttal witness to address the limitations of the FDA Alert, "which is a key finding in this case." (4/28/2008 Electronic Order.) As a result, Defendants' statistical expert Dr. Robert Gibbons offered an opinion, not on whether Neurontin bore a causal nexus to Mrs. Bulger's suicide in particular, but rather on whether the findings of the FDA Alert are based on sound and scientifically reliable analysis. Relying on basic biostatistical tools routinely used in pharmacoepidemiological studies, which Plaintiff is free to challenge at trial, Dr. Gibbons' answer is a resounding "no." Indeed, Plaintiff has submitted a number of expert reports and declarations by Dr. Sander Greenland challenging all of Dr. Gibbons' analyses, including his analysis of the PharMetrics data.

A.   <u>Dr. Gibbons' Impeccable Credentials and Qualifications</u>

Dr. Gibbons is the Director of the Center for Health Statistics and Professor of Biostatistics and Psychiatry at the University of Illinois at Chicago; has received the Harvard Award for lifetime contributions to the field of Psychiatric Epidemiology and Biostatistics; is a member of the Institute of Medicine (IOM) and has served on both the IOM's Committee on the Prevention of Suicide, as well as the IOM's Committee on U.S. Drug Safety. He has also served on the FDA Scientific Advisory Committee on Suicide and Antidepressants in Children and has authored over 175 peer reviewed scientific papers and four books. Most recently, Dr. Gibbons was awarded an additional $3 million grant from the National Institute of Mental Health (NIMH) for statistical and pharmacoepidemiological study of suicide, and accepted service on the

Veteran's Administration's Blue Ribbon Working Group on Suicide Prevention in the Veteran's Population. (*See* Curriculum Vitae of Dr. Robert Gibbons at 2-4, Ex. A.)  On August 4, Dr. Gibbons will receive the prestigious American Statistical Association's Award of Outstanding Statistical Application in recognition of his scholarly efforts in "the development of new and innovative statistical approaches to drug safety, in general, and for clarifying the relationship between pharmacotherapy and suicide, in particular." (*See* Ex. B.)

B.     Dr. Gibbons Work in This Case Regarding the FDA Alert

Plaintiff's repeated attempts to somehow mischaracterize Dr. Gibbons' work as "junk science," (*see, e.g.*, Plaintiff's Memorandum of Law ("Pl. Mem.") [1876] at 2), ring hollow in every respect.  Notably, a number of Dr. Gibbons' studies utilizing the same basic methodology at issue here have been published in highly esteemed peer-reviewed scholarly journals.  Indeed, the very study analyzing the same eleven AEDs in the FDA's meta-analysis with respect to a bipolar cohort harshly criticized by Plaintiff and Dr. Greenland has been recently accepted for publication in the prestigious *Archives of General Psychiatry*.  (*See* Apr. 29, 2009 email from John Coyle to R. Gibbons, Ex. C.)  His methodology for the studies he has performed in connection with this litigation has also previously been used and accepted for publication in a study relating to anti-depressants in the *American Journal of Psychiatry* in 2007.  (Gibbons, R.D. *et al.*, The Relationship Between Antidepressants and Suicide, *Am. J. Psych.*, 164, 1044-1049 (2007).)

In his initial May 2008 report, Dr. Gibbons set forth a series of opinions related to the FDA Alert.  (5/19/08 Expert Report of Dr. Robert Gibbons, Ex. D.)  In that report, Dr. Gibbons identified certain limitations of the FDA Alert and concluded that "[n]one of the data [he has] reviewed provide[s] any evidence that gabapentin is associated with suicidal thoughts [or] behavior, indicating that the FDA [A]lert should not, based upon the available evidence, apply to gabapentin." (*Id*. at 15.)  At that time, the FDA had not released its Statistical Review providing details on the methodology it had actually employed in conducting the meta-analysis that was the basis for the FDA Alert.  After the FDA released its Statistical Review, Dr. Gibbons prepared a

3

more complete analysis of the FDA's methodology and conclusions in his report dated July 11, 2008, which was submitted in conjunction with his testimony at the *Daubert* hearing on July 23, 2008.

As the Court is aware, Dr. Gibbons, along with all of Defendants' other experts, prepared an expert report in the *Smith* and *Bulger* cases in November 2008. Dr. Gibbons' November 5 report was provided to the Court for consideration on the Defendants' challenges to Plaintiffs' expert causation opinions. Subsequently, on March 19, 2009, after several days of deposition, Dr. Gibbons issued a final supplement to the November report.

Both Dr. Gibbons' November 2008 and March 2009 reports supplement his opinions with respect to the FDA Alert. As an extension of, and in response to, the FDA's meta-analysis, Dr. Gibbons conducted a pharmacoepidemiological study that examined the largest medical records database in the country ("PharMetrics") to determine whether the AEDs identified in the FDA Alert are associated with an increased risk of suicidal behavior.[1] Specifically, Dr. Gibbons looked AED use in a population of approximately 47,900 persons with a diagnosis of bipolar disorder – the largest cohort study of its kind analyzing suicide risk of AEDs in a population at the highest risk of suicide. That study concluded that the AEDs evaluated by FDA in its Alert (including gabapentin) do not show an increased risk of suicide attempt in bipolar patients and, if anything, are associated with a statistically significant reduced risk, or protective effect.[2]  (*See*

---

[1] Notably, the FDA has made clear that further investigation and research are necessary with respect to AEDs. For example, in its *Amicus* brief in this case, the FDA stated that "[t]he Alert does not represent the final conclusion of FDA's consideration of the issue of suicidality and antiepileptic drugs," and that the study's disclaimer "should not be read to suggest that . . . FDA is precluded from further analysis that might lead to a more definitive finding and administrative action. Indeed, FDA continues to actively consider the issue of suicidality and antiepileptic drugs." ([1351] at 5.) Accordingly, the FDA essentially invited the kind of research that Dr. Gibbons has performed.

[2] Dr. Gibbons is not offering any opinion regarding what psychiatric disorders Mrs. Bulger may have suffered from, or bipolar disorders generally.

[1926-1] at 4.)  As noted, that study has been recently accepted for publication in the *Archives of General Psychiatry.*

Dr. Gibbons also examined the PharMetrics data specifically related to gabapentin ("the Gabapentin Study").  In a cohort of over 130,000 patients taking gabapentin, he examined whether there was an increased risk of suicide attempts in patients with various conditions, including pain and psychiatric illnesses.  Dr. Gibbons' gabapentin analysis demonstrated that there was no increased risk of suicide attempt in patients taking gabapentin, and that the FDA Alert as it specifically pertains to gabapentin is unsupported.  He concluded that "[b]ased on all the evidence that I have reviewed, and the data that I have personally analyzed, it is my opinion that there is no increased risk of suicidal thinking and behavior for gabapentin overall, and if anything, protective effects for psychiatric patients who are at increased suicidal risk." (11/5/08 Supplemental Report of Dr. Robert Gibbons, Ex. E, at 13.)

Plaintiff goes to great lengths to distort the record regarding Dr. Gibbons' expert reports, analyses and opinions – all of which are based on reliable methodologies and have been widely accepted and praised by Dr. Gibbons' peers and in his field's most prestigious journals.  Indeed, any allegation that Dr. Gibbons has made elemental errors in his reports or studies, and any allegation that Dr. Gibbons has received "heavy criticism" for his work, are specious.

As a result of the Plaintiffs' Steering Committee's ("Steering Committee") litany of unsuccessful filings with respect to Dr. Gibbons, this Court is now all-too familiar with Plaintiff's attack on this highly qualified witness.  The Steering Committee filed a series of last-second "emergency" motions to have him removed from the case.  (*See* [1804] and [1807].) Unable to gain any traction with those vitriolic attacks on Dr. Gibbons' character and credibility, Plaintiff has here repackaged them and renewed those unsuccessful broadsides against Dr. Gibbons under the guise of an eve-of-trial *Daubert* challenge.  Finally, Plaintiff's attempts to color Dr. Gibbons as beholden to the pharmaceutical industry and his opinions as somehow bought-and-sold are further confounded by his long, distinguished academic record.  In short, Dr.

Gibbons is a highly regarded scientist in his field, the work he has performed in this case is valid and reliable evidence, and Plaintiff's motion to preclude his testimony should be denied.

## ARGUMENT

As this Court noted in its May 5, 2009, Order, the determination of the admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; ([1775] at 23.)  In the First Circuit, an expert witness must also "be sufficiently qualified to assist the trier of fact" and the expert testimony must be both "relevant to the task at hand and rest on a reliable basis."  *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).  While the Court has broad discretion in determining admissibility, "rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 Advisory Committee's Note (2000).  Indeed, as this Court also noted in its May 5 Order, the Supreme Court has admonished that it is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [that] are the traditional and appropriate means of attacking shaky but admissible evidence," not pre-emptive *Daubert* motions.  (*See* May 5, 2009 Order [1775] at 26, citing *Daubert*, 509 U.S. at 596.)  Here, Dr. Gibbons' methodology and opinions are far from "shaky," and are valid, reliable, and generally accepted in the field of biostatistics.  But even if Plaintiff's criticisms were valid – which they are not – they are the province of cross-examination, not a pre-trial motion to preclude.

"If an expert's testimony is within 'the range where experts might reasonably differ,' the jury, not the trial court, should be the one to 'decide among the conflicting views of different

experts.'"  ([1775] at 26) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).) Indeed, "[a]s long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from juror's scrutiny . . . ." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (citation omitted).  *See United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) ("Accordingly, once a trial judge determines the reliability of the proffered expert's methodology and the validity of his reasoning, the expert should be permitted to testify as to the inferences and conclusions he draws from it, and any flaws in his opinion may be exposed through cross-examination or competing expert testimony.").

## I.   DR. GIBBONS' METHODOLOGY FOR REVIEW OF THE FDA ALERT AND RESULTING PHARMETRICS STUDIES ARE VALID AND RELIABLE NOTWITHSTANDING PLAINTIFF'S LITANY OF CRITICISMS

Plaintiff launches a long litany of unfounded criticisms of Dr. Gibbons' use of the PharMetrics Database.  In large part, Plaintiff's criticisms amount to nothing more than philosophical debate over the value and limitations of pharmacoepidemiological studies in general, and are not the proper subject of a *Daubert* motion.  Indeed, Plaintiff offers no evidence that pharmacoepidemiological studies using medical records databases, such as PharMetrics, are not generally accepted within the relevant scientific community.  To the contrary, such databases are a primary source of pharmacoepidemiological studies, and Dr. Gibbons has successfully published other studies using this same methodology which have appeared in esteemed peer-reviewed scientific journals.  (*See* Ex. A at 3-14.)  For example, using the same methodology and under similar factual circumstances to those presented here (an FDA Alert), Dr. Gibbons conducted a study analyzing whether suicide was related to antidepressant use in a 2007 article published in the *American Journal of Psychiatry.*  (Gibbons, R.D. *et al.*, The Relationship Between Antidepressants and Suicide, *Am. J. Psych.*, 164, 1044-1049 (2007).)  That study followed a 2006 FDA Advisory Committee hearing on suicide risk in young adults taking

antidepressants, which resulted in a black box warning. Following that hearing, Dr. Gibbons wished to extend FDA's analysis to a larger population (beyond adolescents), and accordingly obtained and analyzed a large healthcare database to do so. Dr. Gibbons studied a cohort of 226,000 patients using the V.A. database applying the exact same methodology he used for the Bipolar and Gabapentin Studies. That is, in connection with an FDA meta-analysis, he analyzed suicide rates in a large database cohort before and after diagnosis and initiation of drug treatment.[3] Indeed, even Plaintiff's own expert, Dr. Sander Greenland, has co-authored studies utilizing medical records databases similar to the PharMetrics database used by Dr. Gibbons here.[4]

Plaintiff also contends that Dr. Gibbons' analysis somehow is "deficient" because the PharMetrics data do not allow him to account for the Neurontin dosage of the individuals in the study. (Pl. Mem. at 9.) However, dosage is irrelevant to Dr. Gibbons' analysis. The Bipolar and Gabapentin Studies were designed to determine whether there was an increased risk of suicide attempt regardless of the dosage of the drugs being studied. (*See* Mar. 19, 2009 Supplemental Report of Dr. Robert Gibbons at 9 ("[a]ll patients who took gabapentin and had continuous enrollment in the system one year before initiating treatment and one year following treatment initiation were included in the sample").) Thus, Plaintiff does not identify a deficiency or error in Dr. Gibbons' method or analysis, but rather proposes an entirely *different* study that examines

---

[3] Dr. Gibbons also co-authored a paper on suicide risk, using PharMetrics data, which was presented and peer reviewed at the 2005 American College of Neuropsychopharmacology Annual Meeting on adult suicide risk. (Ex. F.)

[4] *See e.g.*, D. Regidor, J. Kopple, C. Kovesdy, R. Kilpatrick, C. McAllister, J. Aronovitz, S. Greenland & K. Kalantar-Zadeh, *Associations between Changes in Hemoglobin and Administered Erythropoiesis-Stimulating Agent and Survival in Hemodialysis Patients*, J. Am. Soc. Nephrol. 178(4):1181-91 (2006); K. Kalantar-Zadeh, R. Kilpatrick, C. McAllister, S. Greenland & J. Kopple, *Reverse Epidemiology of Hypertension and Cardiovascular Death in the Hemodialysis Population: The 58th Annual Fall Conference and Scientific Sessions*, Hypertension, 45(4):811-817 (2005).

an entirely *different* question.[5]  Of course, Plaintiffs' experts could have performed their own analysis of PharMetrics data but apparently elected not to do so.

Plaintiff also makes sweeping and unfounded allegations of shoddy calculations and classifications.  Defendants do not deny that Plaintiff identified a coding error in the gabapentin cohort.  (Pl. Mem. at 9.)  Yet this error was promptly corrected by Dr. Gibbons in his March 19, 2009, report, a fact that Plaintiff ignores.  More significantly, however, once the coding error was corrected, the results of Dr. Gibbons' analysis were unchanged.  (Ex. G at 13.)  Thus, this small modification had little to no impact on the results or conclusions, nor did it affect the reliability of his methodology.

Similarly, to the extent that Plaintiff claims to have discovered a single "invalid" ICD-9 code in the bipolar cohort, (Pl. Mem. at 9), the ICD-9 code was provided by PharMetrics pursuant to a description of the diagnoses requested by Dr. Gibbons and his colleagues.  Plaintiff has offered no evidence that the ICD-9 code was invalid during the period of years that the study spans. Moreover, Dr. Gibbons subsequently reviewed the database after Plaintiff raised this issue and discovered that only one out of nearly 48,000 patients in the bipolar cohort was listed under this diagnostic code.  The variation in coding has no effect whatever on the results of Dr. Gibbons' analysis, nor does it make the results unreliable or inadmissible.

Plaintiff further argues that Dr. Gibbons' study does not account for confounding by other drugs or other diagnoses and treatment.  (Pl. Mem. at 9.)  Plaintiff is wrong on both counts. First, the Gabapentin Study is stratified or divided into diagnostic categories, so necessarily it accounts for patients taking gabapentin for different conditions, such as major depressive disorder, bipolar disorders, schizophrenia and various pain disorders – and examines the risk in

---

[5] This response also applies to Plaintiff's criticism of Dr. Gibbons' use of "patient years" rather than years spent "on" or "off" of gabapentin.  (Pl. Mem. at 12-13.)  Dr. Gibbons' primary analysis examines associations between Neurontin and suicidal behavior, regardless of duration.  Plaintiff's preference for a different type of analysis is just that – a preference, not a criticism valid under Fed. R. Evid. 702 or *Daubert*.

each of these diagnostic groups. (*See*, *e.g.*, Mar. 19, 2009 Gibbons Supplemental Report at 19, Ex. G, Table 3.) It was by this very stratification that Dr. Gibbons found a statistically significant <u>decreased</u> risk of suicide attempt in the "subpopulation" that Plaintiff claims are most "vulnerable to the effects of gabapentin": patients with depressive disorder and bipolar disorder. Second, Dr. Gibbons specifically analyzed the effect of concomitant medication use through his sensitivity analysis focused on gabapentin monotherapy – a fact Plaintiff again completely ignores.

A significant portion of Plaintiff's criticisms of Dr. Gibbons' expert opinions are, in fact, criticisms of the very FDA statistical meta-analysis that Plaintiff relies upon and has offered into evidence in this case. Rather than demonstrate or offer insight into alleged flaws with Dr. Gibbons' analysis, Plaintiff's criticisms largely confirm Dr. Gibbons' conclusion that the FDA meta-analysis was too heterogeneous to be reliable. For example, Plaintiff criticizes Dr. Gibbons for "comparing suicide rates from different populations" and "calculating odds ratios by mixing results from placebo-controlled random trials and from non-placebo controlled trials" (Pl. Mem. at 3.) Yet, these criticisms would apply in exactly the same manner to the FDA meta-analysis, which incorporated studies of disparate AEDs used under different circumstances in different populations, and combined "placebo controlled trials" with "non placebo controlled trials" (otherwise known as low-dose comparator studies in FDA's analysis).[6]

Indeed, it is the FDA's approach that drove Dr. Gibbons' detailed analysis and subsequent criticism of FDA's meta-analysis. It is also what led him to conduct his

---

[6] Plaintiff charges that Dr. Gibbons mistakenly calculated an odds ratio of 1.033. This was not an error, but merely reflects a timing issue: Dr. Gibbons' May 2008 report providing this analysis preceded FDA's release of the Statistical Review. Once the FDA's Statistical Review was released, Dr. Gibbons was able to more fully critique both FDA's methodology and results and determine that FDA's exclusion of zero event studies resulted in an inflated odds ratio for gabapentin and the other drugs. (*See* July 11, 2008 Supplemental Expert Report of Dr. Gibbons (Ex. H).)

pharmacoepidemiological studies to test the FDA's conclusions about AEDs generally and Neurontin specifically. And it was the FDA's flawed approach combined with his own statistical analyses that resulted in his conclusion that the FDA's "meta-analysis cannot be used for drawing causal inferences, especially with respect to any individual drug within the pooled dataset." Nor does it provide any "statistical justification for FDA's labeling decision. (*See* Mar. 19, 2009 Supplemental Report of Dr. Robert Gibbons at 8, Ex. G.)

Finally, Plaintiff contends that Dr. Gibbons' removal of lamotrigine and topiramate from his analysis was arbitrary. Such a conclusion is not supported by the facts. Dr. Gibbons testified repeatedly about his concerns that the elevated incidence rates from those two drugs "drove" the FDA Alert's results. (*See* Feb. 3, 2008 Dep. of R. Gibbons at 93:3-4; 163:5-12, Ex. I.) Further, as this Court has acknowledged, Pfizer has "presented scientific evidence to support the view that Neurontin may differ from traditional GABAergic antiepileptic drugs" – such as those grouped in the FDA Alert. (*See* May 5, 2009 Order [1775] at 57.) Thus, Dr. Gibbons' decision to analyze the numbers absent the disproportionate presence of lamotrigine and topiramate, rather than arbitrary, is a judgment call based on sound statistical principles, which Plaintiff is free to challenge on cross-examination.[7]

---

[7] The case law cited by Plaintiff does not support its attacks on Dr. Gibbons' testimony. In *Phillips v. American Honda Motor Co.*, 238 F. App'x. 537, 540 (11th Cir. 2007), for example, the court excluded an expert due to his failure to replicate the conditions of a plaintiff's injury – a flaw neither present in, nor relevant to, Dr. Gibbons' methodology. Similarly, *In re Rezulin Products Liability Litigation.*, 369 F. Supp. 2d 398 (S.D.N.Y. 2005), the court excluded the testimony of one of plaintiffs' experts because the expert opinion relied on a study of rats, while failing to mention contrary – and more relevant – studies in humans and monkeys, including one such study co-authored by another of plaintiffs' own experts. 369 F. Supp. 2d at 425. Yet, Dr. Gibbons has not ignored contrary, reliable data. Quite the opposite, he has made clear that the gold standard Neurontin randomized controlled trial data analyzed by the FDA are consistent with his study and likewise fails to support Plaintiff's experts' theory of causation. Plaintiff's invocation of *General Electric v. Joiner*, 522 U.S. 136 (1997) is equally misplaced. Plaintiff argues that, because "the U.S. Supreme Court found that certain studies did not account for confounding factors such as exposure to other carcinogens," that Dr. Gibbons' failure to account for a number of confounding factors renders his testimony inadmissible. (Pl. Mem. at 15.) This is clearly wrong. Instead, the Supreme Court found only that the lower court did not abuse its discretion in rejecting expert causation opinions that relied on a faulty, third-party epidemiological study that failed to account for confounding factors. 522 U.S. at 143. As discussed above, Dr. Gibbons' testimony is aimed at the flawed nature of the evidence underlying the FDA Alert, and is not offered as an expert opinion that his analyses demonstrate that Neurontin is causally unrelated to Mrs. Bulger's suicide.

## II. PLAINTIFF'S RENEWED ATTACKS ON DR. GIBBONS' CREDENTIALS, REPUTATION, AND CREDIBILITY ARE BASELESS

Seeking to discredit Dr. Gibbons' testimony, Plaintiff again misstates numerous facts regarding his reputation and credibility. For instance, Plaintiff repeatedly accuses Dr. Gibbons of failing to inform the journal that accepted his study for publication about his payment for his work as an expert witness. To the contrary, Dr. Gibbons was explicit in a letter to the *Archives of General Psychiatry* that he had performed expert work for Pfizer in litigation involving Neurontin, one of the drugs addressed in the study. (*See* Mar. 15, 2009 Letter from Robert Gibbons to Dr. Joseph T. Coyle at 1, Ex. J.) It is indisputable that the *Archives* accepted the manuscript with full knowledge of Dr. Gibbons' expert work in this case based on his comprehensive disclosures.

Plaintiff's attempts to characterize Dr. Gibbons' methodology and results as "heavily criticized" by his peers are equally off base. (Pl. Mem. at 2.) Indeed, although Plaintiff repeatedly contends that Dr. Gibbons has been the recipient of substantial criticism from his peers, Plaintiff points to only two sources of criticism, one an editorial which mentions Dr. Gibbons' SSRI/suicide study in the same journal that published it (*American Journal of Psychiatry*), and the other a single-author letter to the editor also published in the *American Journal of Psychiatry*. Plaintiff's reliance on the editorial is telling: rather than being a critique of Dr. Gibbons' methodology – as Plaintiff implies – the portions of the editorial cited actually discuss a study utilizing an entirely different design than his Bipolar and Gabapentin Studies here. The editorial does not "reach the same result" as Plaintiff, (Pl. Mem. at 15), and does not even focus on the statistical association of SSRIs with suicides. (*See* J. Leckman and R. King, *A Developmental Perspective on the Controversy Surrounding the Use of SSRIs to Treat Pediatric Depression*, Am. J. Psych. 164:9 (Sept. 2007), Ex. K.) Even so, the authors admit that they find Dr. Gibbons' analysis "compelling." (*Id.* at 1.)

Plaintiff strongly implies that Dr. Gibbons' work as an expert witness has been a flashpoint of criticism from his peers – but neither the editorial nor the single (and single-

authored) letter to the editor makes any mention of Dr. Gibbons' trial work, or any reference to inherent biases in Dr. Gibbons' analyses arising from his expert work. In fact, Plaintiff points to no peer review or peer criticism of Dr. Gibbons' work that alleges that his work as an expert witness resulted in any bias in his well-published and respected scholarly work.

Similarly, Plaintiff baselessly contends that it is Dr. Gibbons' "*modus* to concoct statistical articles for publication that coincidentally contradict the FDA and medical journal articles to support his client's economic position." (*Id*. at 16 (emphasis in original).) Plaintiff has offered no such evidence. In fact, in stark contrast to Plaintiff's experts, it is Dr. Gibbons whose scholarly articles on suicide and drug safety have been subject to the peer-review process for publication – the very process designed to weed out "junk science." Although Plaintiff frames this allegation, too, as if it is criticism from Dr. Gibbons' peers, in fact neither the editorial nor the letter to the editor makes mention of it. Finally, Plaintiff attempts to tie Dr. Gibbons to Defendants' alleged "method of placing medical journal articles to multiply the Neurontin message in the marketplace." (Pl. Mem. at 16.) This comment is both inappropriate and irrelevant: although Plaintiff's affirmative fraudulent marketing allegations have been dismissed in this case (*see* May 26, 2009 Order [1790]), Plaintiff is apparently unable to refrain from trying to sneak the issue back before the Court.

Plaintiff also argues that Dr. Gibbons' studies are "solely-litigation driven and paid for by Pfizer," and thus lack credibility. (Pl. Mem. at 16.) Plaintiff misrepresents the facts. The truth is, Dr. Gibbons has been the recipient of grants from numerous research institutes and universities, and as he clearly testified at his deposition in this case, Defendants did not pay him for the work performed on the bipolar cohort. (*See* Dep. of R. Gibbons at 981:11-18; 983:22-984:3; 988:10-992:2, Ex. I.) In any event, that reputable scientists accept funding for their work from research institutes, universities, and industry hardly establishes unreliability of their research.

Finally, Plaintiff also discusses at great length Dr. Gibbons' statement in his March 19, 2009 supplemental report that "'statistically significant protective effects of gabapentin were

13

clearly demonstrated.'" (Pl. Mem. at 10-12.)  The Court should not be distracted by Plaintiff's red herring:  as it noted in its May 5, 2009, Order, the general causation issue before the Court is "whether Neurontin is capable of causing suicide-related events," ([1775] at 6), not whether Neurontin is effective in preventing it.  Dr. Gibbons' evaluation of the statistical evidence at hand – in both the FDA Alert and the PharMetrics analysis – is offered to demonstrate that Plaintiff's theory that Neurontin increases the risk of suicide – and, in fact causes it – is not supported by statistical analysis.  In fact, the data Dr. Gibbons reviewed reveal a reduction in suicide risk in certain conditions.  This is compelling evidence that, in a large population of real world use, the data suggest a very different situation than the one reached by the FDA with respect to AEDs in general, and Neurontin specifically.[8]

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that Plaintiff's Motion to Preclude The Testimony and Exhibits of Defendants' Expert Dr. Gibbons be denied in all respects.

Dated:  July 8, 2009                                     Respectfully submitted,

---

[8]  Dr. Gibbons' observation that there is statistical evidence of a positive association between gabapentin and reduced risk of suicide is not offered to show that a "causal" protective link has been established.  Thus, contrary to Plaintiff's contentions, Dr. Gibbons was not contradicting himself when he testified that his paper did not "prove[ ] that gabapentin is protective of suicide."  (Pl. Mem. at 11.)  In fact, Dr. Gibbons clearly testified that a statistical association between gabapentin and reduced risk of suicide (*i.e.,* protective effect) cannot be considered "causal" without more – which has been Defendants' position (consistent with reliable science) all along.  Nor is it Defendants' burden to establish a "causal protective effect" in order for Plaintiff's causation theories in this case to fail.

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:     /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

        -and-

SHOOK, HARDY & BACON L.L.P.

By:     /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550

        -and-

WHITE AND WILLIAMS LLP

By:     /s/ David B. Chaffin
        David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

15

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on July 8, 2009.

                                      /s/ David B. Chaffin_____
                                      David B. Chaffin