# EXHIBIT I

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2
     IN RE: NEURONTIN                )
 3   MARKETING SALES PRACTICES       )
     & PRODUCTS LIABILITY            )
 4   LITIGATION                      )
                                     )  MDL DOCKET
 5   BULGER VS. PFIZER, et al.       )  No. 1629
     07-11426-PBS                    )
 6                                   )  MASTER FILE
     SMITH VS. PFIZER, et al.        )  No. 04-10981
 7   05-CV-11515-PBS                 )

 8
          SUPERIOR COURT OF THE STATE OF CALIFORNIA
 9                     CITY OF LAKE

10   NICOLETTE CRONE, et. al,        )
                                     )
11           Plaintiffs,             )
                                     )
12      versus                       )  CV 400432
                                     )
13   PFIZER, INC., et al.,           )
                                     )
14           Defendants.             )

15   Job No.: 183059
                            VOLUME I
16        The videotaped deposition of ROBERT D.

17   GIBBONS, Ph.D.., called by the Plaintiffs for

18   examination, pursuant to Notice, and pursuant to

19   the Rules of Civil Procedure for the United States

20   District Courts, taken before Sandra L. Rocca, CSR,

21   CRR and Notary Public in and for the County of

22   DuPage, and State of Illinois, at 506 West

23   Harrison, Chicago, Illinois, on the 3rd day of

24   February, 2009, at the hour of 9:09 a.m..
```

Page 2

```
 1  APPEARANCES:
 2
    MR. JACK LONDON
 3  3701 Bee Cave, Suite 200
    Austin, TX  78746
 4  (512) 478-5858
    jlondon@texas.net
 5
         -and-
 6
    FINKELSTEIN & PARTNERS
 7  By:  MR. KEITH L. ALTMAN
    463 Robinson Avenue
 8  Newburgh, NY  12550
    (516) 456-5885/Fax: (951) 303-1222
 9  kaltman@lawampmmt.com
10       -and-
11  THE LANIER LAW FIRM
    By:  MR. KENNETH S. SOH
12  6810 FM 1960 West
    Houston, TX  77069
13  (713) 659-5200/Fax: (713) 659-2204
    Kss@lanierlawfirm.com
14
         appeared on behalf of
15       the Plaintiffs;
16
    SHOOK, HARDY & BACON, L.L.P.
17  By:  MS. LORI CONNORS McGRODER
    2555 Grand Blvd.
18  Kansas City, MO  64108-2613
    (816) 474-6550/Fax: (816) 421-5547
19  lmcgroder@shb.com
20       appeared on behalf of the
         Defendants;
21
    (continued)
22
23
24
```

Page 3

```
 1
         APPEARANCES: (Continued)
 2
 3  LAW OFFICES OF STEVEN D. HILLYARD, P.C.
    By:  MR. GERHARD WINKLER
 4  345 California Street, Suite 1770
    San Francisco, CA  94104
 5  (415) 334-6880
 6       appeared on behalf of Defendant
         Dr. Jennings.
 7
 8
    Also Present:
 9
    James Pierdzioch, Videographer
10
11
12
...
24
```

Page 4

```
 1            VIDEOGRAPHER:  My name is James
 2  Pierdzioch of Veritext.  The date today is
 3  February 3rd, 2009 and the time is 9:09 a.m.  This
 4  deposition is being held at the Holiday Inn located
 5  at 506 West Harrison Street in Chicago, Illinois.
 6  The captions for this case are In Re:  Neurontin
 7  Marketing Sales Properties and Products Liability
 8  Litigation in the United States District Court,
 9  District of Massachusetts and Nicolette Crone,
10  et al. versus Pfizer Incorporated, et al. in the
11  Superior Court of the State of California for the
12  County of Lake.
13            The name of the witness is Robert
14  Gibbons, Ph.D.  At this time the attorneys will
15  please identifies themselves for the record.
16            MR. LONDON:  I'm Jack London.  I
17  represent the multi-district litigation Plaintiffs,
18  product liability steering committee Plaintiffs.
19            MR. ALTMAN:  Keith Altman.  I'm here
20  representing Nicolette Crone and the Crone
21  Plaintiffs and I'll be asking questions on behalf
22  of Crone.
23            MR. SOH:  Ken Soh for the Plaintiffs.
24            MR. WINKLER:  Gerhard Winkler on behalf
```

Page 5

```
 1  for Defendant Dr. Jenning in the Crone case.
 2            MS. McGRODER:  Laurie McGroder on behalf
 3  of Pfizer.
 4            VIDEOGRAPHER:  The witness may now be
 5  administer the oath by Sandi Rocca.
 6            ROBERT D. GIBBONS, Ph.D.
 7  having been first duly sworn, was examined and
 8  testified as follows:
 9                    EXAMINATION
10  BY MR. LONDON:
11       Q.   Good morning, Dr. Gibbons.
12       A.   Good morning.
13       Q.   I'm Jack London.  I think we may have
14  said hello to one another in Boston, but apart from
15  that we've not met, have we?
16       A.   That's correct.
17       Q.   One of my suggestions is that I have a
18  soft voice and I'm just not as quick as a lot of
19  people and so I pause and stop and think about what
20  I'm saying and that sometimes causes witnesses to
21  not understand me.  If you don't, please tell me
22  and I'll try to give another go at the question so
23  that the question you answer is the question I got
24  out.  Fair enough?
```

Page 90

1  BY MR. LONDON:
2    Q.  Do you hold yourself out to be an expert
3  on the knowledge of the mechanism of actions of any
4  particular drug?
5    A.  No.
6    Q.  And is it fair to say that you do not
7  hold yourself out to be an expert on the mechanism
8  of actions of any GABAergic drug including
9  Neurontin?
10       MS. McGRODER:  Object to form, assumes
11  facts not in evidence.
12       MR. LONDON:  Say that again.  I'm sorry.
13       MS. McGRODER:  Assumes facts not in
14  evidence.
15       THE WITNESS:  Could you repeat the
16  question?
17  BY MR. LONDON:
18    Q.  I'll do my best.  Do you accept that you
19  are not an expert witness on the mechanism of
20  action of GABAergic drugs?
21    A.  I wouldn't be an expert on mechanism of
22  action of any drug, so I guess GABAergic drugs
23  would fall in that.
24    Q.  Are you -- okay, let's go back to your

Page 91

1  preamble.
2       You are not an expert witness on whether
3  a particular drug's action is caused by whether it
4  is a calcium channel active drug, a sodium channel
5  active drug, a GABAergic drug or an HT5AA receptor
6  drug, is that true?
7       MS. McGRODER:  Objection to form, asked
8  and answered.  Go ahead.
9       THE WITNESS:  I don't have that kind of
10  expertise.
11  BY MR. LONDON:
12    Q.  All right.  And you would not try to on
13  your own allocate whether a drug belongs in a class
14  with other drugs based on its scientific mechanism
15  of action, would you?
16    A.  I would have to rely on the expertise of
17  other people to make that determination.
18    Q.  All right.  Insofar as your studies in
19  this case have involved questions of comparing
20  statistical analyses among and between 11
21  antiepileptic drugs such as those studied by the
22  FDA in the statistical review of 2008, you would
23  not yourself make a determination as to whether any
24  of those 11 antiepileptic drugs belonged in one or

Page 92

1  more classes with any of the other 11 of those
2  drugs, would you?
3       MS. McGRODER:  Object to form.  Do you
4  mean a mechanistic class?
5       MR. LONDON:  Yes.
6       THE WITNESS:  I wouldn't have the
7  expertise to make that categorization on my own.  I
8  would have to rely on an expert in that area.
9  BY MR. LONDON:
10    Q.  All right.  To the extent that
11  gabapentin, Lamotrigine and Topiramate have
12  comparable or differing mechanisms of actions on
13  patients who take them, that is information that
14  you would get from others rather than making that
15  determination yourself, is that true?
16       MS. McGRODER:  Objection, asked and
17  answered.
18       THE WITNESS:  Yes.
19  BY MR. LONDON:
20    Q.  And is it fair to say that you believe
21  that one of the difficulties that the statistical
22  review generated by the FDA in its analysis of the
23  11 antiepileptic drugs is that Topiramate and
24  Lamotrigine drove the numbers in the studies in

Page 93

1  which those drugs were pooled with gabapentin?
2       MS. McGRODER:  Object to form.
3       THE WITNESS:  That is one -- one of the
4  concerns I have about their analysis.
5  BY MR. LONDON:
6    Q.  All right.  And the extent that pooling
7  those drugs with gabapentin was scientifically
8  correct or scientifically incorrect based on
9  whether their mechanisms of action are identical,
10  shared, overlap or distinct, that's also not a
11  distinction that you would call upon yourself to
12  decide, is that true?
13       MS. McGRODER:  Object to form.
14       THE WITNESS:  As I've said before, you
15  know, understanding the mechanisms of actions of
16  these drugs are issues that I would have to rely on
17  the expertise of others.  It's not any expertise
18  that I would have personally.
19  BY MR.. LONDON:
20    Q.  Do you know whether Neurontin has been
21  approved by the FDA for prescription -- for the
22  indication of bipolar disease?
23    A.  I'm certainly not an expert on the, you
24  know, regulatory approvals of Neurontin.  I don't

Page 162

1  identified the 11 primary antiepileptic drugs that
2  were currently in use and that was the population
3  of drugs, if you will, that they were trying to
4  derive an inference to.
5     Q.  Is it your understanding that the same
6  criteria that were applied to Neurontin as to the
7  random controlled trials that were to be submitted
8  to the FDA were applied to the other ten drugs,
9  that is the number of patients, the duration of the
10 trials, that sort of thing?
11    A.  My understanding is that FDA sent out a
12 letter requesting data that was the same letter
13 sent to everybody.  I'm not an expert on that.  I
14 haven't really -- I don't think I've ever seen the
15 letter, but I have no reason to believe that they
16 sent a different request to, you know, different
17 drug manufacturers.
18    Q.  You've operated under the assumption that
19 all 11 drug manufacturers were asked to produce the
20 same types of random control trials?
21    A.  That would be my assumption, yes.
22    Q.  And you've been on FDA panels yourself.
23 That would not only be your assumption, but it
24 would be your knowledge of how the FDA has operated

Page 163

1  on other occasions?
2     A.  It would certainly be a big problem if
3  they had sent out different kinds of letters and
4  committees would take some exception to that.
5     Q.  And my other sort of recollection is that
6  among your concerns were that Lamotrigine had 27 of
7  the events, Topiramate had 40 of the events and
8  that between the two of them, they had something
9  approaching 60 percent of the events of the on-drug
10 events in the meta-analysis.  Does that sound
11 approximately correct?
12    A.  That was certainly one of my concerns.
13    Q.  Well, it's not only that it's one of the
14 concerns, but that it's 40 and 27 approached almost
15 maybe more than 60 percent of all of the events?
16        MS. McGRODER:  Well, object to form.  You
17 can look it up in your report, if you like.
18        THE WITNESS:  One of the concerns I
19 stated in my report was that these two drugs
20 accounted for, I believe, over 60 percent of all of
21 the events from all of the studies, all of the
22 different drugs, and that led me to, you know,
23 question the homogeneity of the results.  That was
24 just one of the things.

Page 164

1  BY MR. LONDON:
2     Q.  And I recollect that.  And better said
3  than I could have done even though I was trying to
4  get it out in that way.
5         Do you have any scientific knowledge as
6  to how it could have been, apart from the
7  statistics, that Lamotrigine and Topiramate came to
8  account for some 60 percent plus or minus of all of
9  the events?
10    A.  There are lots of possible explanations,
11 but I don't have any firm idea and that's not
12 really my area of expertise.
13    Q.  You told me earlier that if the
14 explanation was clinical, that certainly would not
15 be something that you would be in a position to
16 analyze, as opposed to statistical?
17        MS. McGRODER:  Object to form.
18        THE WITNESS:  If there was a clinical
19 reason and it was, you know, one that I was unaware
20 of, there would be no reason I would necessarily be
21 aware of all the clinical determinants that could
22 have produced that kind of difference so I wouldn't
23 opine to the reason for it.  I can document that it
24 exists and I can show its effect on statistical

Page 165

1  analyses, but in terms of coming up with a clinical
2  reason, I wouldn't be an expert in that.
3  BY MR. LONDON:
4     Q.  Did you -- do you know whether -- I
5  believe I've asked you, but let's index this
6  question.
7         You believe that the FDA has not approved
8  Neurontin for bipolar patients, correct?
9         MS. McGRODER:  Objection, asked and
10 answered.
11        THE WITNESS:  That's my lay
12 understanding, but again I'm not an expert on that
13 and I haven't reviewed that in any serious way.
14 BY MR. LONDON:
15    Q.  And that your recollection was that one
16 or both of Topiramate and Lamotrigine had been
17 approved by the FDA for bipolar?
18        MS. McGRODER:  Objection, asked and
19 answered.
20        THE WITNESS:  Again from a lay
21 perspective I think I've heard, and I can't tell
22 you exactly where, that Lamotrigine was approved
23 for bipolar.  I may be right or wrong or on that.
24

Page 735

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MASSACHUSETTS
 3    IN RE; NEURONTIN                    )
 4    MARKETING SALES PRACTICES           )
 5    & PRODUCT LIABILITY                 )
 6    LITIGATION,                         )
 7                                        ) MDL DOCKET
 8    BULGER vs. PFIZER, et al.,          ) No. 1629
 9                                        ) MASTER FILE
10    SMITH vs. PFIZER, et al.,           ) No. 04-10981
11    05-CV-11515-PBS                     )
12        SUPERIOR COURT OF THE STATE OF CALIFORNIA
13                      CITY OF LAKE
14    NICOLETTE CRONE, et al.,            )
15             Plaintiffs,                )
16        vs.                             ) CV 400432
17    PFIZER, INC., et al.,               )
18             Defendants.                )
19               3/5/09   Job No.: 191803
20               9:09 a.m.
21          The videotaped deposition of ROBERT D.
22    GIBBONS, Ph.D., Volume III resumed pursuant to
23    adjournment at Suite 2800, 333 West Wacker Drive,
24    Chicago, Illinois.
```

Page 736

1  PRESENT:
2     LAW OFFICES OF JACK LONDON,
3     (3701 Bee Cave, Suite 200,
4     Austin, Texas 78746,
5     512-478-5858), by:
6     MR. JACK LONDON,
7     jlondon@texas.net,
8     -and-
9     FINKELSTEIN & PARTNERS, LLP,
10    (463 Robinson Avenue,
11    Newburgh, New York 12550,
12    800-634-1212), by:
13    MR. KEITH L. ALTMAN,
14    kaltman@lawampmmt.com,
15    -and-
16    THE LANIER LAW FIRM,
17    (6810 FM 1960 West,
18    Houston, Texas 77069,
19    713-659-5200), by:
20    MR. KENNETH S. SOH,
21    kss@lanierlawfirm.com,
22       appeared on behalf of the Plaintiffs;
23
24

Page 737

1  PRESENT: (Continued)
2     SHOOK, HARDY & BACON, L.L.P.,
3     (2555 Grand Boulevard,
4     Kansas City, Missouri 6108-2613,
5     816-474-6550), by:
6     MS. LORI CONNORS McGRODER,
7     lmcgroder@shb.com,
8        appeared on behalf of the Defendants;
9
10    LAW OFFICES OF STEVEN D. HILLYARD, PC,
11    (345 California Street, Suite 1770,
12    San Francisco, California 94104,
13    415-334-6880), by:
14    MS. ELANA GOLD,
15       appeared telephonically on behalf of
16       Defendant Raymond D. Jennings, M.D.
17
18 VIDEOTAPED BY:
19    MR. NICK PAGE, Veritext Chicago
20       Reporting Company.
21
22
23 REPORTED BY: ANDREA L. CARTER,
24       Illinois CSR No. 84-3722.

Page 738

1     THE VIDEOGRAPHER: My name is Nick Page in
2  association with Veritext National Court
3  Reporting Services. The date today is March 5,
4  2009, and the time is 9:09 a.m.
5     This deposition is being held in the
6  offices of Mandell Menkes, LLC, located at 333
7  West Wacker Drive, Chicago, Illinois. The
8  caption of the case is In Re: Neurontin
9  Marketing and Sales Practices and Product
10 Liability Litigation, Bulger versus Pfizer, et
11 al, Smith versus Pfizer, et al., 05-CV-11515-PBS,
12 MDL Docket No. 1629, Master File No. 04-10981,
13 and in the Superior Court of the State of
14 California, City of Lake, Nicolette Crone, et
15 al., plaintiffs versus Pfizer Incorporated, et
16 al, defendants, No. CV 400432.
17    The name of the witness is Robert
18 Gibbons. This is Volume III. At this time will
19 the attorneys please identify themselves and the
20 parties they represent.
21    MR. ALTMAN: Keith Altman, Finklestein &
22 Partners. I'll be asking questions on behalf of
23 the Crone plaintiffs.
24    MR. LONDON: Jack London, I represent Bulger

Page 739

1  and Smith and the plaintiffs' products liability
2  steering committee in the MDL.
3     MR. SOH: Ken Soh for the plaintiffs.
4     MS. McGRODER: Lori McGroder on behalf of
5  Pfizer.
6     MS. GOLD: Elana Gold for Raymond Jennings
7  M.D. in the Crone matter.
8     (WHEREUPON, the witness was duly
9     sworn.)
10    ROBERT D. GIBBONS, Ph.D.,
11 called as a witness herein, having been first
12 duly sworn, was examined and testified as
13 follows:
14       EXAMINATION
15 BY MR. ALTMAN:
16    Q. Dr. Gibbons, how are you this morning?
17    A. Good, thank you. How are you?
18    Q. Okay. We were here just about a month
19 ago, and we are going to be resuming your
20 deposition. Before we get started, I just want
21 to you have identify something very quickly.
22    I am going to hand you to what's been
23 marked as Exhibit 40 which is the materials
24 considered by you, and I just would like you to

Page 980

1    MS. McGRODER: Objection to form. It's
2 argumentative, and it misstates the testimony he
3 just gave you.
4    BY THE WITNESS:
5    A.  Well, first of all, I don't think that
6 item number two on this bill says that I billed
7 for the analyses that went into the -- into the
8 paper. What it does say is computing summary
9 statistics and screening analyses.
10   And screening analyses to me means
11 something very, very different than the analyses
12 that were the subject of the paper. So
13 my response to Judge Saris would be simply we
14 were looking at all of the data that we received
15 from PharMetrics. We were getting up to speed
16 with using those data. We were doing internal
17 consistency checks. We were exploring those
18 data. There's a huge amount of data. It took
19 some time to do so, and that's what that bill was
20 for.
21   And as I have testified in my previous
22 deposition last time, that there were screening
23 analyses, internal consistency checks, and so
24 forth that were performed on both the gabapentin

Page 981

1 and the bipolar cohort, and the only thing that's
2 misleading in this invoice is that it says
3 bipolar cohort, and it should have said both
4 cohorts.
5 BY MR. LONDON:
6    Q.  Were you paid money by the defense
7 counsel for working with the bipolar cohort?
8    MS. McGRODER: Objection, asked and
9 answered.
10 BY THE WITNESS:
11   A.  I have testified both on this
12 deposition and the previous deposition that I was
13 paid money for working with the data, getting up
14 to speed with the data, reviewing the data, but I
15 was not paid by counsel for the analyses that I
16 performed that in all of the work that was done
17 and all of the sensitivity analyses that were
18 done in support of the paper in question.
19 BY MR. LONDON:
20   Q.  Well, we know you weren't paid before
21 the paper was published for the sensitivity
22 analyses because there weren't any before the
23 paper was submitted to JAMA.
24   A.  That's correct.

Page 982

1    Q.  Okay. So I'm back to these bills --
2    MS. McGRODER: His answer included both.
3 His answer included both sensitivity analyses and
4 primary analyses. He just said that. You are
5 just being argumentative.
6 BY MR. LONDON:
7    Q.  I am back to the bills, and the bills
8 are all that I have, and the bills show, as you
9 have just testified, that at least in part some
10 of the bill you sent to Ms. McGroder and some of
11 the money Ms. McGroder sent to you was for
12 working on the bipolar cohort, true?
13   A.  True.
14   MS. McGRODER: Objection, asked and
15 answered.
16 BY MR. LONDON:
17   Q.  Okay. Okay.
18   MS. McGRODER: You need to clarify that.
19 BY THE WITNESS:
20   A.  I mean, I think that what's really --
21 the key is that those analyses and all of the
22 work that was done in production for that paper
23 were not billed for, and that's what I would tell
24 Judge Saris.

Page 983

1    What I stated before and I stated in
2 this deposition is that our initial startup with
3 all of the data that we received from PharMetrics
4 which did include the bipolar data were supported
5 by this work. It was a part of -- a part of the
6 acquisition of the data. Just like the purchase
7 of the data was reimbursed by -- by counsel and
8 that included the bipolar data as well.
9 BY MR. LONDON:
10   Q.  Well, but that's an expense as opposed
11 to payment for time, isn't it, the reimbursement
12 for the PharMetrics database?
13   A.  Well, it's an expense, but there's a
14 very -- at least I draw a very strong distinction
15 between, you know, having to be brought up to
16 speed on the analysis of a new and very large
17 stream of data which included both the bipolar
18 data and the gabapentin data from doing a series
19 of research-related analyses of the bipolar
20 cohort data for the purpose of publishing a
21 report.
22   We spent a huge amount of time on
23 that, much more time on that than on the
24 gabapentin analyses, and I have not billed for

Page 984

1  that, and that's what I will tell you, and that's
2  what I told you before, and that's what I will be
3  happy to tell Judge Saris.
4      Q.   And I'm sure you will, but the problem
5  that I am coping with is that I can hear you, but
6  I don't have any documents from you that many
7  people in the ordinary course of business would
8  maintain such as time slips, computer records to
9  show when work was done, that sort of thing.
10     MS. McGRODER:  Object.  You are asking
11 for the time slips --
12 BY MR. LONDON:
13     Q.   And so I'm trying to find out from
14 you --
15     MS. McGRODER:  -- and computer records that
16 you didn't give us.
17 BY MR. LONDON:
18     Q.   So I am trying to find out from you --
19 I'm trying to find out from you without
20 Ms. McGroder asking to testify whether there's
21 any objective data you have that I can look at
22 that can validate your answer?
23     MS. McGRODER:  Well, objection, asked and
24 answered.  It's argumentative.  It assumes that

Page 985

1  he needs to validate his answer, and that he is
2  somehow not telling the truth.  So it's an
3  improper question.
4      MR. LONDON:  That's what you are hearing.
5  I'm just hearing what the witness is telling me.
6      MS. McGRODER:  Well, I'm telling you that's
7  an improper question, and if you ask it another
8  time --
9  BY MR. LONDON:
10     Q.   Please answer.
11     MS. McGRODER:  -- we will finish.
12 BY MR. LONDON:
13     Q.   Please answer.
14     MS. McGRODER:  Asked and answered.
15 BY THE WITNESS:
16     A.   As I have said before, I don't have
17 any of the records that you are looking for.  All
18 I have is -- is my experience in doing this and
19 to tell you that this is not inconsistent with
20 the way that I work with -- with people in the
21 real world from day-to-day.
22 BY MR. LONDON:
23     Q.   The next exhibit -- pardon me -- the
24 next invoice I found going forward is the July

Page 986

1  29th invoice.
2           Do you see that?  That's the one that
3  I have next.  That may not be the actual next
4  one.
5      A.   There look to be two of them.  Yes, I
6  see that.
7      Q.   Are there two different ones, or are
8  they duplicate copies?
9      A.   Two with the same date.
10     Q.   Are these different items?
11     A.   Yes.
12     Q.   Let's look at the one that I have in
13 mind.  It's 80710.
14          Do you see that?
15     A.   Yes.
16     Q.   And it is for the expense for the data
17 from the PharMetrics database $15,000?
18     A.   That's correct.
19     Q.   Is that the date on which you received
20 the PharMetrics database?
21     MS. McGRODER:  Objection, asked and
22 answered.
23 BY THE WITNESS:
24     A.   I don't recall.  You know, as we have

Page 987

1  gone through this before, the date that I
2  received the PharMetrics database that's the date
3  I invoiced them for it, but it's probably not the
4  date that I received it.
5      MR. LONDON:  Okay.  We need to switch tapes.
6      THE VIDEOGRAPHER:  This is the end of tape
7  No. 5.  We are off the record at 3:37.
8           (WHEREUPON, a recess was had at
9           3:37 p.m. until 3:39 p.m.)
10     THE VIDEOGRAPHER:  The beginning of tape No.
11 6.  We are back on the record at 3:39.
12 BY MR. LONDON:
13     Q.   Between August 6th and September 2nd,
14 your September 2nd bill reflects that you did 40
15 hours of work on the -- analytic work on the
16 PharMetrics data.
17          I assume that's after the August 6th
18 bill.  Fair enough?
19     A.   Yes.
20     Q.   So on the August 6th bill, we have at
21 least 50 hours of work on the two cohorts, and by
22 September 2nd, we have another 40 hours on the
23 PharMetrics data.  A total of 90 hours on the
24 PharMetrics data that comprises the two cohorts.

64 (Pages 984 to 987)

Page 988

1    Are you with me so far?
2    MS. McGRODER: Well, object to form. That
3 is misleading and misstates his testimony.
4 BY MR. LONDON:
5    Q.   Are you with me so far?
6    A.   Well, except for the part that you are
7 talking about the two cohorts. The first bill
8 reflects both cohorts, and the second bill is
9 purely the gabapentin cohort.
10    Q.   What evidence do we have of that, if
11 any?
12    A.   My statement under oath.
13    Q.   All right. Now, of the 90 hours, what
14 proportion of that was allocated to the
15 gabapentin cohort, and what proportion of that
16 was used in the bipolar cohort?
17    MS. McGRODER: Well, object to form and it
18 misstates his testimony about how those analyses
19 were done. Answer if you can.
20 BY THE WITNESS:
21    A.   All the analyses with respect to the
22 September 2nd invoice were for the gabapentin
23 cohort, and I can't really provide like a full
24 breakdown between the bipolar and gabapentin

Page 989

1 components under item two in the August 6, 2008.
2 BY MR. LONDON:
3    Q.   Well, in the August bill it said, as I
4 understand that bill, that there were
5 specifications for statistical databases.
6      Do those statistical databases exist
7 as they appeared after you created the
8 specifications on August the 6th?
9    A.   Those specifications were discussions
10 I was having back and forth with PharMetrics
11 answering some of their questions, and they are
12 asking -- answering some of my questions in
13 preparing the specifications for the data.
14    Q.   It says you computed summary
15 statistics and performed screening analyses for
16 the BP cohort.
17      Do those summary statistics exist now
18 in the form in which they existed when you
19 submitted the August 6th bill to Ms. McGroder?
20    A.   I'm not --
21    MS. McGRODER: Object to form.
22 BY THE WITNESS:
23    A.   I'm not sure what form they -- they
24 exist in. These were largely just -- this was --

Page 990

1 this was a bill for time familiarizing ourselves
2 with that database with doing, you know, some
3 screening analyses to look at overall incidents,
4 suicide attempts, different -- did people take --
5 take -- what was the -- you know, were there
6 enough monotherapy subjects to support these kind
7 of analyses, what were the overlap between
8 different diagnoses, and things like that.
9      There were a whole host of things. So
10 they were done in a variety of different ways.
11 None of this -- you know, some of this may
12 actually be reflected in my expert report in
13 summary tables, but, you know, I don't --
14 BY MR. LONDON:
15    Q.   When -- when did you disclose to
16 anybody in the defense counsel side that you were
17 working on the bipolar cohort paper?
18    A.   Not until it was submitted.
19    Q.   Not until sometime in September of
20 2008?
21    A.   I believe so.
22    Q.   All right. And are you aware that
23 in -- within the Public Health Service, there's
24 at least the standard that principal

Page 991

1 investigators ought to take steps to avoid any
2 chance that the design or the conduct or the
3 execution of a scholarly investigation should
4 avoid the appearance even of being under the
5 influence by conflicting interest by payments
6 from outside payers such as pharmaceutical
7 companies or their lawyers?
8    MS. McGRODER: Object to form.
9 BY THE WITNESS:
10    A.   No. The -- the key is that -- I mean,
11 there are many people who have -- I mean, people
12 who work for pharmaceutical companies publish
13 papers in the peer-reviewed scientific
14 literature. They are obviously paid for their
15 time.
16      The key for conflicts is to ensure
17 that the design and analysis of the study was not
18 dictated by an outside party, and at no point did
19 Pfizer or counsel have any role whatsoever in the
20 design or analysis of any of the data in the
21 bipolar cohort. I was, in fact, the person who
22 recommended doing all of this in the first place,
23 and they did not see the paper prior to its
24 submission. They didn't edit the paper prior to

Page 992

1  its submission. They didn't participate in any
2  way prior to its submission.
3  BY MR. LONDON:
4      Q.  Did counsel go over with you the code
5  of federal regulations which set out what the
6  obligations of an investigator are in regard to
7  conflicts of interest in regard to papers and
8  scientific investigations that are funded by the
9  Public Health Service?
10     MS. McGRODER: Well, object to form. That
11 assumes that counsel would go over --
12     MR. LONDON: I'm just asking --
13     MS. McGRODER: -- conflict of interest,
14 federal regulations regarding a paper that we had
15 nothing to do with. So it's misleading, and I
16 object.
17 BY MR. LONDON:
18     Q.  I'm just asking if you went over that
19 with counsel?
20     A.  No.
21     Q.  Okay. Do you know those regulations?
22     A.  I only know, you know, what is
23 required of me at the university and what is
24 required of me in terms of -- of providing

Page 993

1  disclosures on scientific, peer-reviewed
2  publications that I have, you know, quite a --
3  quite a few of.
4      Q.  Okay. Well, we are going -- we are
5  going to visit about it briefly.
6      MS. McGRODER: Well, Jack --
7      MR. LONDON: May I have be marked the next
8  exhibit, please.
9      MS. McGRODER: -- our -- our so-called
10 agreement, which I think you probably overstated,
11 was that you go back -- back and ask about the
12 invoices. This is far afield from the invoices,
13 and -- and you had your opportunity to depose
14 this witness. You took seven hours to do it, and
15 when you passed the witness, I told you that's
16 it.
17     We are not going to have a revolving
18 door of plaintiffs' counsel representing the same
19 parties deposing Dr. Gibbons. So I let you ask
20 your questions about the invoices, and now we are
21 finished.
22     MR. LONDON: We are not finished. We are
23 going to ask these questions --
24     MS. McGRODER: Does it relate to the

Page 994

1  invoice?
2      MR. LONDON: Yes.
3      MS. McGRODER: In what way?
4      MR. LONDON: We will find out when we ask
5  the question --
6      MS. McGRODER: Well, I object.
7      MR. LONDON: I'm not going to send you my
8  list of questions.
9      MS. McGRODER: Well, I object. You had your
10 opportunity. You could have asked every single
11 one of these questions on your
12 cross-examination --
13     MR. LONDON: No, actually -- actually, I
14 could not have done --
15     MS. McGRODER: The federal regulations on
16 conflict disclosure. That's not something you
17 needed to wait to get an invoice to ask him.
18     MR. LONDON: Lori, we need to stop this
19 discussion --
20     MS. McGRODER: No, we don't need to stop it.
21     MR. LONDON: You have two choices here.
22 Okay --
23     MS. McGRODER: You don't need to give me my
24 choices because I won't listen to you hand me

Page 995

1  choices.
2      MR. LONDON: Lori, Lori, you can either --
3  time out. Time out.
4      MS. McGRODER: We have an agreement, and you
5  are -- and you are violating it and exceeding it.
6      MR. LONDON: Well, you may have thought you
7  had some idea in your mind of what I was going to
8  do. It's not my fault if you didn't understand.
9      MS. McGRODER: I actually am being quite
10 gracious letting you ask anything because you
11 passed the witness and you were done, and I told
12 you at the end of that day once you pass the
13 witness, you are done.
14     MR. LONDON: Ms. McGroder, after you
15 withhold the disclosures from me being able to
16 ask the questions --
17     MS. McGRODER: I didn't withhold anything
18 from you.
19     MR. LONDON: Other than all these bills that
20 you paid.
21     MS. McGRODER: I gave you those bills at the
22 deposition. What bills have you provided me?
23 Which of your experts have provided me a single
24 invoice, none, zero.

66 (Pages 992 to 995)