```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS



IN RE:                              )
                                    ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 36
AND PRODUCTS LIABILITY LITIGATION    )




                             HEARING

               BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE




                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         July, 8, 2009, 11:10 a.m.




                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 7200
                        Boston, MA  02210
                         (617)345-6787
```

1   A P P E A R A N C E S:

2

   FOR THE PLAINTIFFS:
3
        KENNETH L. OLIVER, ESQ., Finkelstein & Partners, LLP,
4   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.

5        ROBERT E. LEONE, ESQ. and KENNETH S. SOH, ESQ.,
   The Lanier Law Firm, 6810 FM 1960 West, Houston, Texas,
6   77069.

7

   FOR THE DEFENDANTS:
8
        DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
9   100 Summer Street, Suite 2707, Boston, Massachusetts, 12110.

10        KATHERINE ARMSTRONG, ESQ., Skadden, Arps, Slate,
   Meagher & Flom, LLP, Four Times Square, New York, New York,
11   10036.

12   ALSO PRESENT:  Ronald Bulger, Sr.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE CLERK:  In Re:  Neurontin Marketing, Sales

3    Practices, and Products Liability Litigation, Civil Action

4    No. 04-10981, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6              MR. OLIVER:  Kenneth Oliver from New York for the

7    plaintiff.

8              MR. LEONE:  Bob Leone for the plaintiff, your

9    Honor.

10             MR. SOH:  Ken Soh from The Lanier Law Firm in

11   Houston.

12             MS. ARMSTRONG:  Katherine Armstrong for the

13   defendants.

14             MR. CHAFFIN:  Good morning, your Honor.  David

15   Chaffin for the defendants.

16             THE COURT:  Is anyone on the phone?

17             MR. OLIVER:  Pardon me?

18             THE COURT:  Is there anyone on the telephone?

19             MR. OLIVER:  No.  This is Mr. Bulger.

20             THE COURT:  All right, thank you.

21             Mr. Bulger, there are just two things I would like

22   to discuss with --

23             MS. ARMSTRONG:  Your Honor?

24             THE COURT:  Yes.

25             MS. ARMSTRONG:  Before we begin, we would like to

1    ask that the courtroom be closed to anyone not involved in

2    these proceedings.

3              THE COURT:  First of all, do we know everyone

4    who's here or no?

5              MR. OLIVER:  For our side, everyone is here that

6    plans to be here.

7              THE COURT:  There are some things I want to do on

8    the public record, and there are some things I don't

9    necessarily want to do on the public record.  So right now

10   I'm not concerned.  At some point we might be.

11             The first thing, Mr. Bulger, could you please

12   stand up.  As I understand it, you used to be the

13   administrator who is the plaintiff of this case and that you

14   are no longer the administrator.  Do you understand that?

15             MR. BULGER:  Yes.

16             THE COURT:  All right.  But what I'd like to talk

17   to you about is, counsel notified me, I think yesterday,

18   within the last week, that you've signed a waiver as to any

19   rights in the proceeds of this action.

20             MR. BULGER:  Yes.

21             THE COURT:  Did you do that voluntarily?

22             MR. BULGER:  Yes.

23             THE COURT:  And do you understand that it means

24   that you have no financial stake whatsoever in the outcome

25   of this lawsuit?

1            MR. BULGER:  Yup.

2            THE COURT:  And it was your signature?

3            MR. BULGER:  Yup.

4            THE COURT:  Did you have a few days to think about

5     it?

6            MR. BULGER:  I had time, yeah.

7            THE COURT:  So that it was a knowing and

8     intelligent waiver?

9            MR. BULGER:  Yup.

10            THE COURT:  All right, now, let me just move on to

11    part two, okay.  I don't know anything about you.  I've

12    never met you, I don't know anything about you, but I have

13    to say I've heard a lot about you in the last week or two.

14    And there are some allegations that you or your friends have

15    attempted to intimidate witnesses, and it's of enormous

16    concern to me as a court.  I've never asked you about it,

17    and I don't intend to ask you about it because if you did

18    intimidate any federal witnesses -- and I'm not assuming

19    that you did, but if you did, it is a felony under federal

20    law.  And I am concerned enough about the allegations that

21    I'm worried about having someone -- actually, I could

22    trigger an FBI investigation, or it would be certainly

23    something I would think about again.  I don't know if it was

24    you or someone else, but some potential witnesses in this

25    case have been harassed, just use it that way, threatened,

1    whatever word you want to use.

2           So I'm giving you a direct order right now to stay

3    away from any people who are witnesses in this case, who you

4    think might be witnesses in this case.  You can't have any

5    of your friends on your behalf contact any witnesses in this

6    case, and you cannot have any of your relatives or any

7    agents.  In no way can anyone associated with you be in

8    touch with anyone who is either a witness or a potential

9    witness in the case.  Do you understand?

10          MR. BULGER:  Yes, your Honor.

11          THE COURT:  And I'm going to do a written order to

12   that effect.

13          MR. BULGER:  Yes, your Honor.

14          THE COURT:  I'm reluctant to ask you about it.

15   Have you been told that there were these allegations?

16          MR. BULGER:  No, your Honor, not at all.

17          THE COURT:  I am reluctant to ask you because

18   under the Fifth Amendment to the United States Constitution,

19   you have the right to remain silent because it would be a

20   felony, and so I am not going to ask you anything.  To the

21   extent that we ever get to that point, I will appoint you

22   counsel if you can't afford one.  I don't know if you've

23   even had an involvement with the criminal side of the

24   docket, but I wanted to talk to you personally because the

25   allegations are under oath, and they cause extreme concern

1    to me.

2            So the two things I wanted to accomplish today was

3    to make sure, which I do find, that the waiver was knowing

4    and intelligent; and, two, to make sure you understood it

5    was a federal felony to interfere with, or intimidate or

6    harass, or in any way be involved with witnesses or

7    potential witnesses in this case, or to have anyone do so on

8    your behalf.  So I don't know if someone else did it on your

9    behalf.  Maybe it wasn't you.  Maybe you had nothing to do

10   with it.  I'm simply saying, some witnesses are at this

11   point scared, and that triggers my concern as a federal

12   judge overseeing the case.

13           MR. BULGER:  I understand, your Honor.

14           THE COURT:  All right.  Yes, thank you.  You may

15   be seated.

16           You've prepared a draft order.  I think we should

17   probably talk about that in a different venue, but I just

18   wanted to make it really clear what the obligations are in

19   this case.

20           Now, to the extent that anybody needs to talk to

21   potential witnesses, it should be the attorneys and not you,

22   okay?

23           All right, now, is there anything I should be

24   adding here.

25           MR. OLIVER:  I would ask for a direction that that

1    be limited, of course, to defense witnesses.  Our own

2    witnesses, which involve family, it may be appropriate for

3    him to be discussing anything about the case with them.

4            THE COURT:  Well, help me out with that.  That's

5    an excellent, excellent point, but I caution that I don't

6    want it to be a gaping loophole.  I don't know exactly --

7    you've listed everyone in the -- I don't remember your list

8    of witnesses, but it's huge.

9            Let me start off with, he has a daughter Regina

10   who's being taken care of by her grandmother?  Is that what

11   I understood the other day?

12           MR. BULGER:  Yes.  I'm selling my home.

13           THE COURT:  Are you allowed to have visitation

14   with your daughter?

15           MR. BULGER:  Oh, yes.

16           THE COURT:  So it obviously doesn't include Regina

17   or your son Ron, Jr. or the grandmother.

18           MR. BULGER:  No.

19           THE COURT:  Is there anyone else he needs to be

20   talking to?

21           MR. OLIVER:  I would have to look at the entire

22   list and answer that.  My guess is, yes, every plaintiffs'

23   witness, there's a potential for prep for a trial for he to

24   be discussing issues with --

25           THE COURT:  Like what?  I can't think of any.  All

1   the experts should just come through you.  The emergency

2   workers, what happened to her, you know, all those kinds of

3   things, I don't see why he has to be talking to them.  You

4   can talk to them.

5             MR. OLIVER:  The issues that were raised by

6   defense counsel, which have not been discussed with

7   Mr. Bulger until after you lift the gag order, hopefully

8   after this hearing today, some of them are certainly going

9   to have to have discussions with us, certainly, about any

10  new issues --

11            THE COURT:  With you, yes.  With you, you can talk

12  to him about anything, but not with anyone else involved

13  other than -- unless you gave me the name of someone that

14  you could imagine.  Who else?

15            MR. OLIVER:  What I'm leading up to, Judge, is

16  that the issues that were raised by defense counsel would

17  have no bearing or relevancy to the slightest extent with

18  people that we've contacted on our behalf.

19            THE COURT:  Who?  Tell me who else he'd need to

20  talk to rather than you two.  I mean, his children, of

21  course.  That was a really good point.  I hadn't thought of

22  that.  Of course.  The mother-in-law -- is it your mother or

23  her mother?

24            MR. BULGER:  It's my mom.

25            THE COURT:  His mother he can talk to.  I mean,

1   who else?  If there's, like, a child-care helper in the home

2   with his daughter to organize a meeting, I mean, I just --

3           MR. SOH:  Yes, your Honor.

4           THE COURT:  I don't know who else, and if there's

5   somebody else, let me know.

6           MR. SOH:  Yes, if there's somebody else, an aunt

7   or something, we'll let you know before we do anything.

8           THE COURT:  He can go to a family barbecue.  I'm

9   not -- I'm simply saying, we can't have a situation where

10  with respect to fact witnesses that -- it's to his

11  protection as well as ours, as is the court's function, as

12  well as defendants, that he not be in touch with fact

13  witnesses in light of some of the allegations I've seen.

14          MR. OLIVER:  I understand.  The only reason I was

15  pushing it, your Honor, at this point is because the nature

16  of the allegations made, again, which have not been

17  discussed, are limited to a potential person disparaging

18  him.  That doesn't have anything to do with anything on the

19  plaintiffs' side or any witnesses on the plaintiffs' side.

20          THE COURT:  You know what, I've made my ruling.

21  It's protective of the world.  Did you want to add anything

22  about that?  To the extent that you want to -- and you don't

23  even have to tell them.  You can do it through an ex parte

24  in camera.  If there's a need for Mr. Bulger -- as opposed

25  to you.  You all can do whatever you need to do as an

1    attorney, and your private eye or whoever you might have,

2    investigator, can do whatever he wants to do, but not him.

3              MR. OLIVER:  Yes, your Honor.

4              THE COURT:  That is the best way I know how.  I

5    reach this issue in some hotly disputed civil cases as well

6    as lots and lots of criminal cases, a complete siloing of

7    him off from the factual investigation of this case.

8              MR. SOH:  Understood, your Honor.

9              THE COURT:  That's different from his family

10   obligations.

11             MR. SOH:  Understood.

12             MR. OLIVER:  Very good.

13             THE COURT:  Is there anything else that you would

14   request at this point while he is here?

15             MS. ARMSTRONG:  We would like Mr. Bulger to also

16   be instructed that he's not to reveal the identity of these

17   witnesses to any of his friends or acquaintances.

18             THE COURT:  Yes, I think that's a good addition.

19             Basically, don't talk about the case with anyone

20   other than the two lawyers for your daughter, for the

21   estate, actually.

22             MR. SOH:  Understood, your Honor.

23             THE COURT:  All right, an excellent idea.  You're

24   going to craft -- is your protective order the one you want

25   me to enter?

1          MS. ARMSTRONG:  I think so.  I want to make sure

2     that it has that provision in it.

3          THE COURT:  It's a good idea.

4          MS. ARMSTRONG:  I think so too.  That's why I want

5     to double-check it.

6          THE COURT:  Have any of you reviewed it?

7          MR. OLIVER:  I personally haven't seen it.

8          THE COURT:  Have you seen it?

9          MR. SOH:  No?

10          THE COURT:  All right, so maybe what we'll do

11     is -- do you have anyone you wanted me to talk to today?

12          MR. CHAFFIN:  No, your Honor.  We didn't bring

13     her.  I didn't think your Honor was interested.

14          THE COURT:  I certainly wasn't interested in

15     having both of them here at the same time.  That I certainly

16     wasn't interested in.  But in the meantime, you live in a

17     trailer park in Salisbury, is that right?

18          MR. BULGER:  Yes, but I'm moving.  Actually, in

19     30 days, I'll be out of there.

20          THE COURT:  Where are you moving to?

21          MR. BULGER:  Probably New Hampshire.

22          THE COURT:  Do you have a home now there?

23          MR. BULGER:  No.

24          THE COURT:  So --

25          MR. BULGER:  Salisbury, I do.  I'm just packing --

1    everything is packed up, and we're putting it in storage,

2    so --

3              THE COURT:  Well, where are you going to be living

4    in the next week or so?

5              MR. SOH:  The same place.

6              MR. BULGER:  There, the same place.  I'm moving in

7    30 days.

8              THE COURT:  Where does your daughter live, in the

9    trailer park as well?

10             MR. BULGER:  No.  I don't want her in the trailer

11   park, no.  She lives with my mom right now.

12             THE COURT:  And what town is that?

13             MR. BULGER:  Peabody.

14             THE COURT:  Peabody.  So I take it there's no

15   place else you could live for the next 30 days?  That might

16   obviate a lot of these problems.  There's no place in

17   New Hampshire you could live immediately?  Where are you

18   thinking of going up to, a trailer park up there?

19             MR. BULGER:  Yeah.  I've got animals too.  My

20   daughter's dog and her cats I've got to find places for.

21   They're still in that house, and, I mean, I --

22             THE COURT:  But I do think, if counsel could

23   facilitate a quicker move, that might eliminate a lot of

24   these problems, so --

25             MR. SOH:  We'll look into that, your Honor.

1           THE COURT:  Okay, thank you.

2           MS. ARMSTRONG:  Your Honor, would it be possible

3   for us to ask a few questions about the waiver issue?

4           THE COURT:  What questions do you want?

5           MS. ARMSTRONG:  We'd like to know whether he was

6   represented by counsel.

7           THE COURT:  Did you have separate counsel for your

8   waiver?

9           MR. BULGER:  No.

10          THE COURT:  All right, what's the next question?

11          MS. ARMSTRONG:  Did anyone explain the tax

12  consequences of it to him?

13          THE COURT:  What tax consequences?

14          MS. ARMSTRONG:  It may be treated as a gift by the

15  IRS.

16          THE COURT:  I'm not going into that.  No, I'm not

17  doing that.  So, okay, thank you very much.  I think at this

18  point, I don't see any reason to keep Mr. Bulger in the

19  courtroom.  I'd like him to stay outside in case another

20  question arose.  And there's no one else out there, right?

21          MR. CHAFFIN:  No, your Honor.

22          THE COURT:  No one's out there, good.  So why

23  don't you step outside for a moment.  I'd like to discuss a

24  few things with counsel.

25          MR. BULGER:  Thank you, your Honor.

1          (Mr. Bulger dismissed from the courtroom.)

2          THE COURT:  I've had this issue come up in two

3  very hotly disputed civil cases before, one of which was the

4  well-known, in this district anyway, the well-known Demoulas

5  case, and the following issue came up.  As I understand it,

6  Pfizer is right now paying for details.

7          MR. CHAFFIN:  We haven't started yet, your Honor.

8  We wanted to clear that with you.

9          THE COURT:  All right, I think that I would like

10  to discuss that issue of either providing protection at

11  Pfizer's expense or putting her up -- are we really talking

12  about one person or two people?

13          MR. CHAFFIN:  It's two, your Honor.

14          THE COURT:  Are they living by themselves?

15          MR. CHAFFIN:  It's actually four because it's one

16  witness, daughter, and granddaughter who are all in the same

17  home.

18          THE COURT:  Okay.  I don't know if they'd want

19  this because, I mean, it's obviously -- Pfizer has

20  volunteered to provide a paid detail, is that right?

21          MS. ARMSTRONG:  We're still looking into various

22  options, but we would like to have --

23          THE COURT:  The issue that came up in my Demoulas

24  trial, an unfortunate comparison, was that the Demoulases

25  put up a witness in a hotel, and they provided police

1    escorts and this kind of thing, and then people started

2    cross-examining based on it.  If they end up doing it, I

3    would want it not to be a basis for cross-examination,

4    because once it is, then all of this comes in.  I can see

5    why they're terrified, and yet I don't see a way around not

6    disclosing their names.  At the very least, he's going to

7    find out as soon as they take the stand.  Are you planning

8    on subpoenaing them both or all three of them?

9              MS. ARMSTRONG:  We're planning on having at least

10   one of them there live at trial.

11             THE COURT:  Okay, it's going to come out.  And I

12   know why they're terrified, but I want it all out on the

13   table that if you provide a paid detail or paid protection

14   or you move them to a hotel room, or whatever you plan on

15   doing, I want a stipulation.  Otherwise I get into all this

16   threats.  I want this all -- I don't want to have to ask him

17   about it.  I don't want it to be a Fifth Amendment issue.  I

18   don't know if it's even true because she didn't see the

19   person who trashed her trailer, right?  We don't know

20   whether it's him.  We don't know whether it's a friend of

21   his.  We don't know whether she's got other problems

22   altogether.  So I'm assuming the trashing happened.

23             MR. CHAFFIN:  We've got more, your Honor.

24             THE COURT:  Which is what?

25             MR. CHAFFIN:  She drove by him yesterday, and

1    Mr. Bulger gave her the middle finger.

2              THE COURT:  I've had that come up in my courtroom

3    too, unfortunately not the only time I've seen all of this.

4    But I can see why she's terrified.  I don't know if he's

5    literally the one who trashed her trailer, but the timing of

6    it is really suspicious.  So if they provide protection --

7    well, let me clarify.  Are you going to provide protection?

8              MS. ARMSTRONG:  We're still looking into what the

9    best options would be, and --

10             THE COURT:  Do they want it?

11             MS. ARMSTRONG:  I think so, yes.

12             MR. CHAFFIN:  They do.  The preference is to be

13   moved right now.

14             THE COURT:  Because I would not disclose their

15   names until the protection was in place, and if they're

16   going to be moved and that if -- is Pfizer -- you don't know

17   whether you want to pay for that.  I just don't want it to

18   be a basis for cross.

19             MR. OLIVER:  I personally don't know the nature of

20   the trashing of the trailer.  What exactly is alleged that

21   was done to the trailer?

22             MS. ARMSTRONG:  I think it was not last night but

23   the night before last, rocks or some heavy object was thrown

24   at her trailer and a jar was broken on it.

25             MR. OLIVER:  What was broken?

1          MS. ARMSTRONG:  A jar, a glass jar.

2          THE COURT:  And the finger.  I mean, so far, I can

3    see why they're worried.  Are they single women living in

4    these trailers?  Is there a guy involved?

5          MS. ARMSTRONG:  It's a single mother with her

6    daughter and --

7          THE COURT:  I can see why they're terrified.

8    Well, let me put it this way:  I do not want to disclose

9    their names and issue this order -- that's why I did it

10   orally in the way I did it -- until protection is in place.

11   If you're not going to provide protection, then I'm thinking

12   of delaying the disclosure of the names to him until we can

13   at least get the police more involved, or maybe you can get

14   him moved.  How closely do they all live to each other?

15         MS. ARMSTRONG:  Very close.

16         MR. CHAFFIN:  Very.

17         THE COURT:  That's what I'm worried about.  Do you

18   have a solution for me?  I'm thinking out loud, guys, and

19   ladies.  I am trying to figure out, when will you know if

20   you can get protection?

21         MS. ARMSTRONG:  Well, we were happy that your

22   Honor brought this up because we wanted to make sure that it

23   would not lead to the types of things that --

24         THE COURT:  Well, if it backs into that, I can

25   assure you, then all gory stuff comes out.

1          MS. ARMSTRONG:   Okay.

2          THE COURT:  And I am right now under 403 inclined

3    to put it aside for the moment; and if you want to raise it,

4    it may bring in all of this.

5          MS. ARMSTRONG:  But if we can go back and report

6    to our client that there is going to be a stipulation, it's

7    not going to come into evidence, that type of thing, I think

8    that will facilitate the decision-making process.

9          THE COURT:  What it backs into is this ethical

10   concern, having run into it before, that somehow it's

11   payment to a witness, you know, that it's somehow -- you

12   know, you can't pay a fact witness kind of thing.  So that's

13   the concern I have.

14          My other option is simply to wait to as close to

15   trial as I can possibly get when he's going to find out

16   anyway, and then have you discuss it with him, but that

17   curtails -- that has concerns which just you can't do your

18   own investigation.  So that's why I'd like -- I'm working

19   out loud with you to try and figure out what's the best

20   option here.

21          My hope is that Pfizer will provide protection

22   ASAP, either move them or provide protection; that then as

23   soon as they do so, I issue the protective order with the

24   names.  Then you both can discuss this with Mr. Bulger and

25   get your own private eye to do whatever investigation they

2b9b9968-7e05-4a2e-b204-ebd359f613e7

1    think is appropriate.  That's sort of what I'd like to

2    happen.

3             And as soon as you agree that it wouldn't somehow

4    be an argument for violating the ethical rules or fodder for

5    cross, at least until you come up here and we talk about it.

6    I could see how the door could be opened in certain ways,

7    but at least the starting premise out of the gate is, it's

8    going to be not used.  And then I will issue that protective

9    order in writing, and then you can start doing your own

10   research and your private eye.

11            So when do you think you can tell me?  Well, first

12   of all, do you think right now, what's your reaction?

13            MR. OLIVER:  I don't think it would be appropriate

14   for us to raise the protection issue or any of that, the

15   nature of what you've just discussed.  And I think it's

16   probably best that we don't even discuss with him giving

17   anybody the finger at this point because he'll wind up

18   making the connection.  We'll just say, "Don't make any

19   motions, don't speak to anybody about this case, per the

20   Court's order."

21            THE COURT:  No, but you're not going to -- if they

22   provide protection, I want a stipulation that you will not

23   use it at trial.

24            MR. SOH:  Without talking to your Honor first.

25            THE COURT:  Without talking to us first.

2b9b9968-7e05-4a2e-b204-ebd359f613e7

1      MR. SOH:  I think that's okay, your Honor.  I'm

2  only a little concerned because I'm not sure at this point

3  who the person is, and I know that Mr. Bulger has had --

4      THE COURT:  Yes, you are.  You've had the

5  depositions of the two of them.

6      MR. SOH:  Well, I personally.

7      THE COURT:  He did.  It's one of the two women you

8  deposed.

9      MR. OLIVER:  Yes, we're aware of those two

10  individuals.

11      THE COURT:  When you sent me that whatever you

12  sent yesterday, did you serve it on them?

13      MS. ARMSTRONG:  We e-mailed it to Mr. Fromson.

14      THE COURT:  Have you seen it yet?  Maybe you were

15  in transit.

16      MR. OLIVER:  I haven't seen it.

17      THE COURT:  Well, show it to them so they know.  I

18  mean, it's --

19      MR. SOH:  Well, it won't help me at this point.

20  My point was going to be that I know Mr. Bulger has had a

21  variety of different kind of relationships with different

22  people in the trailer park, and I don't know if --

23      THE COURT:  According -- and this part, let me

24  just do this at side bar so you can read.  Why don't you

25  just stand there for a minute and read the quote in

1   Paragraph 4.

2               (Pause.)

3               MR. SOH:  Well, I think that might be the person

4   that -- he was romantically involved with that lady, and I

5   think he might suspect --

6               MS. ARMSTRONG:  Your Honor, there's no evidence of

7   that, and I'd like to not get into personal attacks.

8               THE COURT:  Excuse me.  No, no, you've gotten into

9   personal attacks.

10              Did Mr. Bulger have sexual relations with this

11  woman?

12              MR. SOH:  I think he very well may have, your

13  Honor.

14              MR. OLIVER:  We have no personal knowledge one way

15  or the other about that or the truth or the falsity of any

16  of the allegations that have been made.

17              THE COURT:  So that's what Bulger said.

18              MR. OLIVER:  And I have to say that would be true

19  for both sides.

20              MR. CHAFFIN:  Your Honor, (Name redacted) was --

21  I'm sorry.  The witness --

22              THE COURT:  I've been so good.

23              MR. CHAFFIN:  I'm sorry.  The witness was asked

24  this at deposition and categorically denied it.  How would

25  they know?

1      THE COURT:  They could have asked --

2      MR. SOH:  He has said that he suspects that

3 someone he was -- I think had slept with, had been in a

4 relationship with was now out to --

5      THE COURT:  I see.

6      MR. SOH:  So there's a whole of, you know, "He

7 said, she said," and I'm not sure --

8      THE COURT:  Let me put it this way.  This is what

9 I want.  I cannot order Pfizer to pay for police details.

10 It will not be used during the trial unless somehow the door

11 is opened.  And you can't always predict with certainty, but

12 at the very least, I will not view it as -- plaintiffs have

13 not now taken the ethical position that there's anything

14 unethical about it, so you go ahead with the knowledge that

15 I will not view it as an ethical breach.  You've asked

16 permission from the Court, and they're not objecting.

17      Okay, now, whether it comes up on cross is a

18 separate thing, and sometimes it depends how things come up,

19 so it may slip out.  I mean, you don't know how it would

20 come out, and if it came out, it came out.  And if it comes

21 out, it all comes out.  So that's my concern.  When will you

22 know?

23      MS. ARMSTRONG:  I will try to get an answer for

24 your Honor as soon as possible, but I have not personally

25 had the discussions with the client on this issue, so I

Page 24

1   don't know where they stand on it.

2           THE COURT:  They may not want to.  If they do, as

3   soon as the protection is provided, I will issue that

4   protective order naming the names, so to speak.  If in fact

5   they decide not to do this, I've only got two weeks left

6   before this trial.  I'm away next week.  That's another

7   problem.  I'm at a Budget Committee meeting in Washington.

8   I'll be here Monday morning.  What I need to do is, I still

9   need -- I will disclose the names, but I'm thinking I will

10  wait until the last week before trial.

11          MR. SOH:  Will our investigator be able to talk to

12  investigate this?

13          THE COURT:  Yes.

14          MR. OLIVER:  If we want a deposition of any

15  further disclosed witnesses, then --

16          THE COURT:  You can have your investigator

17  investigate whatever you want now.

18          MR. OLIVER:  No, no, but if we want --

19          THE COURT:  The issue is disclosing to him.

20          MR. SOH:  Yes, understood.

21          MR. OLIVER:  Well, I understand there's two other

22  names to be disclosed, as far as I know.  All I'm saying is,

23  if we need to take any further depositions of any other

24  disclosed witness, we'll have to do it the last week before

25  trial.

1        THE COURT:  Since I'm at this point not allowing

2   any of this in, I'm unlikely to allow another deposition.

3        MR. OLIVER:  I apologize for not understanding.

4   When you said not allowing any of "this" in, "this" being

5   what part of it, the protection or the statements?

6        THE COURT:  As far as I'm concerned, at this

7   point, until I do a voir dire of the witnesses here, I'm not

8   going to allow any of these allegations in.

9        MS. ARMSTRONG:  Your Honor, the allegations

10  concerning the threats or --

11       THE COURT:  Witness intimidation.

12       MS. ARMSTRONG:  But their testimony, subject to

13  whatever objections that they have testified to, the

14  substantive --

15       THE COURT:  What he said about the suicide,

16  absolutely, that's admissible.  Or, well, let me back up on

17  that.  I don't know if it's admissible or not under the

18  hearsay rules, but it's certainly -- because he's not a

19  party, but you can certainly cross him on it.  And some of

20  this may be declaration against penal interests or

21  declaration against interest.  I just haven't worked out

22  those hearsay issues yet.  I mean, you can seek to introduce

23  it.  Let's more accurately put it that way.  Fair enough?

24       MS. ARMSTRONG:  Fair enough.

25       MR. SOH:  Yes, your Honor.

1        THE COURT:  Okay, so my basic view of things.

2   Now, I understand from Robert that someone is here from the

3   press, is that right?  If by accident Mr. Chaffin mentioned

4   someone's name, please don't put that in.

5        MR. CHAFFIN:  My apologies.

6        THE COURT:  Okay.  So at this point, I think I've

7   gone about as far as I can go.  I can issue the order on

8   Monday, if it takes that long.  But if not, it can't be

9   disclosed, the names, until I say it can.  So it

10  unfortunately puts us off into the 20th.  And this is so

11  sensitive, I don't want this handled by an emergency judge.

12  I am reachable.  I'm just in Washington.  It's not like some

13  great vacation somewhere.  So, I mean, Robert can reach me

14  via Blackberry if something really serious comes up.  And

15  also, as you know, Judge Sorokin is pretty close to the

16  case, so, you know, he can maybe handle an emergency, but I

17  am worried enough to not want to just hand it off to the

18  emergency judge on duty.

19        And, now, last but not least, I am here on Monday,

20  and I understand that your witness, your statistician cannot

21  be here?

22        MR. OLIVER:  I don't know.  I apologize.  I wasn't

23  involved in that.

24        THE COURT:  For some reason Robert got the message

25  that -- what's his name, Green?

1          THE CLERK:  Ken Fromson said that Mr. Greenland

2     could not be here.

3          THE COURT:  Mr. Greenland can't be here.  Did you

4     know yet whether your witness can be here?

5          MS. ARMSTRONG:  Yes, I'm trying to find my notes

6     as to what his availabilities are.

7          MR. CHAFFIN:  The 21st.  He's not available the

8     13th or the 20th.  He's available the 21st.

9          THE COURT:  Just as a practical matter, it just

10    may be too late to reach this Daubert challenge if I can't

11    get everybody in here.  I'm just putting it right out there.

12    It will have to wait for post-trial motions.  I'll do what I

13    can do, is the best that I'm going to be able to deal with.

14    Whether the stuff is relevant or not -- I mean, I have a lot

15    to do on the 20th.  I have a lot to do.  I mean, you all

16    have raised some serious issues.  So some I can just, I

17    think, whip through, but some I'm not -- I haven't even read

18    the oppositions yet.  I just skimmed the motions themselves

19    to see if there were any huge purple elephants in the room,

20    and the big Gibbons report is the only one I saw that

21    actually would require a huge amount of work on my part.

22    I'm just not sure we can do this.  So why don't you try and

23    work out schedules with Robert, and if we can't, we can't.

24    This is all very late-rising.

25          MR. OLIVER:  How do we go forward without

1    prejudicing a jury and require just a post-trial Daubert

2    motion after the verdict?

3            THE COURT:  You raised it so late.  That's your

4    fault.  I can only be human here.  I will read it on the

5    papers.  If I don't understand it -- you raised it three

6    weeks before trial or something or four weeks before trial

7    in a motion in limine.  You could have raised it anytime

8    since November, or, more accurately, probably after you had

9    the first deposition in January.  I can't do the impossible.

10   This date has been -- I don't know why you alerted it to me

11   so late in the game.

12           MR. OLIVER:  I honestly am not prepared to address

13   that.  I wasn't involved in it, so I can't give you a

14   reason.  Mr. Fromson will.  My apologies.

15           THE COURT:  I'm not precluding you.  I'm just

16   saying I don't know when I'm going to do it.  The trial date

17   has been set.  You're going forward with the trial, right?

18           MR. OLIVER:  Based on what we were just talking

19   about, my motion would be to adjourn it for a time just to

20   resolve all those --

21           THE COURT:  No.  I'm afraid more issues will come

22   up.  I think, if anything, I'm more inclined to get it

23   going.  I'm just so worried factually.  But I do think that

24   as far as I'm concerned, if I can't get these people in

25   here, I will have to do it on basically a paper record, and

1    I'll do the best I can.  And if I don't understand it, you

2    lose.  You've got the burden.

3              MR. OLIVER:  The only other issue that wasn't

4    covered -- it's probably self-evident, but I figured let's

5    touch all bases -- is that once the disclosures take place

6    and the decision is made on the security issue, you'll lift

7    your so-called gag order as to us, so we will be able to

8    discuss all issues that arose from the very first allegation

9    that --

10             THE COURT:  Yes, absolutely.

11             MR. OLIVER:  Okay, with our client.  Very well.

12             THE COURT:  Can I ask this, do we know this:  Does

13   he have a criminal record?

14             MR. SOH:  No, your Honor.

15             MR. OLIVER:  No, your Honor.

16             MR. CHAFFIN:  Does he have a criminal record?  He

17   does.

18             THE COURT:  What does he have?

19             MR. CHAFFIN:  They are somewhat dated.

20             THE COURT:  Like what?

21             MR. SOH:  No, your Honor, he doesn't have a

22   criminal --

23             MR. OLIVER:  Convictions you're talking about?

24             MR. CHAFFIN:  I believe so.  In the '90s?

25             MR. OLIVER:  Not that we're aware of.

1          MR. CHAFFIN:  -- not impeachment material, your

2     Honor, and there's --

3          THE COURT:  Like what?

4          MR. SOH:  No, your Honor, he does not.

5          MR. CHAFFIN:  Multiple recent arrests, but mostly

6     traffic violations.

7          THE COURT:  Like what?

8          MR. SOH:  He had a thing for not paying his excise

9     tax on his car, and that's the only thing that I know of

10    that he --

11         THE COURT:  What do you think you know about?

12         MR. CHAFFIN:  I've forgotten, your Honor, I

13    deposed him so long ago, but I think there was a record of

14    something in the '90s.

15         THE COURT:  Involving what, though?  Like a crime

16    of violence?

17         MR. SOH:  No, your Honor.

18         MR. CHAFFIN:  It escapes me, your Honor.

19         THE COURT:  Well, would you just both --

20         MR. CHAFFIN:  I'm sorry?

21         THE COURT:  I just want to make sure that I don't

22    have a situation with somebody with a track record for any

23    violence.  It sounds like there isn't in --

24         MR. SOH:  Your Honor, I read his deposition

25    yesterday.  He had an excise tax.  He had his license

1    suspended for excise tax violations, and that's the only

2    thing I know.

3              THE COURT:  Any 209As, our restraining order

4    statute?

5              MR. OLIVER:  I don't know what that is.

6              THE COURT:  You're both from out of town, right?

7              MR. OLIVER:  Yes.

8              THE COURT:  Where are you from?

9              MR. OLIVER:  New York.

10             MR. SOH:  Houston.

11             THE COURT:  Houston.  You must have this law that

12   if a wife or a girlfriend complains about her husband

13   hitting her, there's a restraining order.

14             MR. OLIVER:  There was some issue in his

15   background when the wife and the husband in the '90s were at

16   each other's throats, but there was no criminal issues.

17             MS. ARMSTRONG:  There are suggestions in the

18   medical record, and also her brother testified to potential

19   spousal abuse, but I don't believe he --

20             THE COURT:  You don't know if it ended up in the

21   courts?

22             MS. ARMSTRONG:  I don't know if it ended up in the

23   courts.

24             THE COURT:  Nobody knows whether it ended up in

25   the courts.  Okay, so, I mean, there are allegations and

1   cross-allegations flowing all over the place, but as far as

2   we know, there is no criminal record involving a crime of

3   violence of any kind?

4           MR. OLIVER:  Not that I'm aware of.

5           THE COURT:  That's important to me because --

6           MR. OLIVER:  We've done a search, and there was

7   none that we could see.

8           THE COURT:  Because I don't know whether this was

9   all giving someone a finger and throwing a rock or whether

10  he actually potentially could hurt the person, you know.  So

11  that's important to me that there's no violent track record.

12          MR. SOH:  Your Honor, one of the first things the

13  investigator is going to want to do is talk to Ron about his

14  relationship with this person, so I guess that's pending as

15  soon as they decide what they're going to do with the

16  protective order because that would be the first person --

17          THE COURT:  But don't forget, she has the right to

18  decline to talk to your investigator.

19          MR. SOH:  No, Ron's going to -- the investigator

20  is going to want to talk to Ron first off the bat, what's

21  your relationship --

22          THE COURT:  I understand that.  She has the right

23  to decline, and just what I might do is something like a

24  little voir dire under oath one day in court or something

25  because we're done at this point with depositions.  At this

1    point, I'm not even planning on going into it, and the only

2    way I'd allow anyone to go into it is, we'd do a little

3    voir dire first so it wasn't -- you'd have a chance to ask

4    before so you're not walking into it blind.

5              MR. SOH:  Right.  Their relationship would be

6    impeachment material for anything she wanted to testify

7    about.

8              THE COURT:  Sure, sure.  I mean, yes.

9              MR. SOH:  So it would be fair game.

10             THE COURT:  Yes, of course.

11             All right, so at this point I'm not seeing you

12   till the 20th, and hopefully everything will come in through

13   communications with Mr. Alba.  Okay?  And you're going to

14   amend that order to include that thing about not telling any

15   friends or relatives.  Is Regina coming in to testify?  Do

16   we know?  I know that's a motion in limine, but were you

17   planning on it?

18             MR. OLIVER:  I would think so.

19             MR. SOH:  I would think so, but I'm not sure it's

20   been decided yet.

21             MR. OLIVER:  It hasn't been decided.

22             THE COURT:  Well, I'm likely to allow her to

23   testify to damages.  The real issue is --

24             MR. OLIVER:  I think, personally, we have to put

25   her on for that purpose.

1      THE COURT:  I don't see how -- I know there's a

2  motion in limine.  I'm of course going to allow her in for

3  damages.  To the extent, though -- has she been deposed?

4      MS. ARMSTRONG:  She has been deposed.

5      THE COURT:  Of course I'm going to allow that in.

6  Is Ron, Jr. going to testify?

7      MR. OLIVER:  As far as we know, yes.

8      THE COURT:  Okay.  And the only reason I ask that

9  is, that's one area where I did allow contact, and it's hard

10  to -- I take it they're on record.  You wouldn't want

11  coaching from the dad.  Maybe the grandmother could sit in

12  the room while they were talking rather than the father.

13      MR. OLIVER:  I can tell you they've been talking

14  for years, Judge, and we went through depositions, and they

15  conferred.  I can't see any new issues coming up, but if

16  that's what your order is, we'll abide by it.

17      THE COURT:  Well, in general, I have a

18  sequestration order anyway of witnesses, and I tend to make

19  an exception when there's a child on the stand, since it's

20  so scary for a kid to be -- how old is she now?

21      MR. OLIVER:  Ten.

22      MS. ARMSTRONG:  Ten.

23      THE COURT:  It's scary.  I think maybe what we

24  could do is have the grandmother in the room rather than the

25  father or something like that.

1           MR. OLIVER:  I just lost you.  In the room when

2    what discussions are taking place?

3           THE COURT:  When the testimony happens.

4           MR. OLIVER:  Oh.

5           THE COURT:  I sequester witnesses as a normal

6    matter, but it's hard for a child not to have somebody --

7           MR. OLIVER:  Oh, I see, you're talking about

8    courtroom testimony.

9           MR. SOH:  We'll also talk to her, your Honor,

10   about who she'd be most comfortable having in the room for

11   her.  She might be happier to have her dad there or both.

12          THE COURT:  That's what I'm a little worried

13   about, but I'll worry about that when the time comes.  It

14   would be useful -- I don't know when your oppositions are

15   coming in to the motions in limine.

16          MS. ARMSTRONG:  Today.

17          THE COURT:  Is it today?  So go back, finish.  All

18   right.  So I will wait to hear from you all on what to do.

19          MS. ARMSTRONG:  Thank you, your Honor.

20          THE COURT:  All right, thank you.

21          MR. CHAFFIN:  Thank you, your Honor.

22          MR. SOH:  Thank you.

23          THE COURT:  But as far as I'm concerned, the trial

24   is still going forward on the 27th.

25          MR. SOH:  Yes.

1          MR. CHAFFIN:  Thank you, your Honor.

2          (Adjourned, 11:50 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS   ) ss.
CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court

8   Reporter, do hereby certify that the foregoing transcript,

9   Pages 1 through 36 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 04-10981-PBS, In Re:  Neurontin Marketing, Sales

12   Practices, and Product Liability Litigation, and thereafter

13   by me reduced to typewriting and is a true and accurate

14   record of the proceedings.

15           In witness whereof I have hereunto set my hand

16   this 9th day of July, 2009.

17

18

19

20

21           /s/ Lee A. Marzilli
                 _____
22           LEE A. MARZILLI, CRR
             OFFICIAL FEDERAL COURT REPORTER
23

24

25