UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>*Bulger v. Pfizer, et al.*<br>Case No. 1:07-cv-11426-PBS | Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin |

**RESPONSE TO PLAINTIFF'S OBJECTION TO MAGISTRATE JUDGE'S ORDER DENYING MOTIONS TO STRIKE DR. ROBERT GIBBONS FOR CAUSE**

Defendants Pfizer Inc and Warner-Lambert Company LLC ("Pfizer") respectfully submit this response to Plaintiff's Objection to Magistrate Judge Sorokin's Order Denying Plaintiff's Motions to Strike Dr. Robert Gibbons for Cause.

**INTRODUCTION**

For the past months, Plaintiff has filed one baseless motion after another with respect to Defense expert Dr. Robert Gibbons. Plaintiff's fourth and latest attack on Dr. Gibbons represents more of the same. Dr. Gibbons is the only expert in this case who has performed statistical analyses to test the validity of the FDA's findings that the eleven AEDs in its meta-analysis (Neurontin among them) increase the risk of suicidal thinking and behavior. Following FDA's meta-analysis, Dr. Gibbons performed two pharmacoepidemiologic analyses examining this very issue, which is at the heart of this case. The results of Dr. Gibbons' studies—one of which has been accepted for publication in the most prestigious peer-reviewed journal in

psychiatry in the country[1]—demonstrate that neither the AEDs in FDA's meta-analysis nor Neurontin is in fact associated with an increased risk of suicide behavior. Clearly fearful of Dr. Gibbons' opinions, Plaintiff has filed *four* motions (in addition to this Objection), attempting to limit or otherwise exclude Dr. Gibbons' testimony.[2] These motions go well beyond typical pre-trial motions and, as Magistrate Judge Sorokin recognized, accuse Dr. Gibbons, without factual bases, of lying and withholding discovery—all by way of selective citation to testimony and documents, and, in some instances, out-and-out distortion of the truth.

Still undeterred, Plaintiff continues to inundate this Court with more paper related to Dr. Gibbons, yet again asserting the same baseless allegations that were rejected by Magistrate Judge Sorokin in his Order denying Plaintiff's two motions to strike. This time, however, Plaintiff faults not only Dr. Gibbons, but also Judge Sorokin, arguing that his Order is "clearly erroneous." Rather than set forth any legitimate basis to support his claim of "clear error" (which is, of course, the standard), Plaintiff merely rehashes the factual distortions rejected by Judge Sorokin in relentless pursuit of his singular goal to try to keep Dr. Gibbons' opinions from the jury in this case. Such disruptive and time-consuming antics—particularly on the eve of

---

[1] That this study—"The Relationship Between Antiepileptics and Suicide Attempts in Patients with Bipolar Disorder," accepted for publication by *Archives of General Psychiatry*—relates to the FDA Alert is imminently clear on its face: The entire opening paragraph of the Introduction outlines the FDA's meta-analysis of the same eleven AEDs evaluated in Dr. Gibbons' study, the process leading up to it, and its conclusions. The article then goes on to address the only two previously published studies on the risk of suicide with AEDs in bipolar patients—which is recognized as the appropriate patient population for evaluating the risk of suicide behavior with AEDs, since patients with bipolar disorder have the highest risk of suicide of all psychiatric disorders and AEDs are often prescribed to bipolar patients. Notably, even the peer reviewers discuss how the study responds to the FDA Alert and meta-analysis. (*See* email from Dr. Coyle to Dr. Gibbons, attached as Ex. 1). The study is thus not "about bipolar patients" as much as it is about whether the AEDs identified by FDA increase the risk of suicide in a patient population where one would expect to find increased risk if there were any.

[2] As Plaintiff recently boasted in a motion *in limine* which also seeks to exclude Dr. Gibbons' testimony, he has, in addition to that motion, filed "separate motions concerning Dr. Gibbons to (1) strike him as an expert for lying; (2) strike his November 2008 report and manuscript for timeliness and for discovery abuse, and (3) strike his testimony as unreliable under Fed. R. Evid. 702 and 703 and *Daubert*," bringing the total of Plaintiff's Gibbons-related motions to four. (Doc. 1888 at 3-4).

trial—should not be countenanced. Magistrate Judge Sorokin's Order denying Plaintiff's motions because "[P]laintiff has not established a basis to warrant striking either Gibbons['] Report as a sanction" is clearly proper and Plaintiff has not shown otherwise.

## LEGAL ARGUMENT

Plaintiff challenges Magistrate Judge Sorokin's Order as "clearly erroneous" on numerous, unsupported grounds. First, Plaintiff claims that Judge Sorokin failed to: (1) articulate what legal standard he applied in denying Plaintiff's motions; (2) set forth his application of that legal standard; (3) schedule a separate hearing on Plaintiff's motions; and (4) address Plaintiff's arguments that Dr. Gibbons' reports were untimely and beyond Judge Saris' Orders. Plaintiff then proceeds to reiterate many of the allegations set forth in his original motions—allegations that Pfizer has previously shown are not based in fact, but are instead fanciful half truths and/or wholly fictitious. Plaintiff has not demonstrated in any respect that Judge Sorokin's Order is "erroneous" and his Objection should be denied.

**I.   MAGISTRATE JUDGE SOROKIN PROPERLY DENIED PLAINTIFF'S MOTIONS UNDER THE DISCRETIONARY STANDARD APPLICABLE TO DISCOVERY ORDERS.**

**A.   *The "Clearly Erroneous" Standard Applies.***

A district court may only set aside a non-dispositive pretrial order of a magistrate judge that is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72 (a); *Pagano v. Frank*, 983 F.2d 343, 346 (1st Cir. 1993). This is a high standard. Indeed, even if the court disagrees with the magistrate's conclusion, "[t]he clearly erroneous standard requires the district court to affirm the magistrate's order unless the district court has the definite and firm conviction from all the evidence that error has occurred." *Wilson v. Bradlees of New England, Inc.*, No. CIV. 93-47-JD, 1994 WL 263695 at *2 (D.N.H. Jan. 25, 1994) (citing *Denmon v. Runyon,* 151 F.R.D. 404, 405 (D. Kan.1993)). In conducting this review, the district court must

refrain from second guessing the magistrate judge's pre-trial discovery rulings. *Estates of Ungar and Ungar ex rel. Strachman v. Palestinian Auth.*, 325 F. Supp. 2d 15, 25-26 (D.R.I. 2004).

### B. *Judge Sorokin's Failure to Cite the Standard Applicable to Discovery Motions Is Not Clear Error.*

Plaintiff's claim that Magistrate Judge Sorokin's July 1, 2009 Order on Pending Discovery Matters is "clearly erroneous" because he did not expressly articulate the standard applied to Plaintiff's motions lacks merit. The applicable standard is not only well-settled, but one that Plaintiff should have been fully familiar with *prior to* filing their discovery motions. As the First Circuit has stated, "[w]e have long recognized that the decision as to whether discovery sanctions are warranted and the choice of what sanctions should be imposed *are matters within the sound discretion of the trial court*. *United States v. Soto-Beniquez*, 356 F.3d 1, 30 (1st Cir. 2003), *cert. denied*, 541 U.S. 1074 (2004) (emphasis added). This Rule applies equally to discovery motions decided by the magistrate judge. *Id.* It is thus no mystery what standard Magistrate Judge Sorokin applied in denying Plaintiff's discovery motions, and Plaintiff cites no law suggesting that Judge Sorokin was required to set forth a well-known legal standard in his Order. In short, Plaintiff's claim that Judge Sorokin's failure to expressly state this standard in his Order somehow makes it "clearly erroneous" is without any legal basis.

### C. *Judge Sorokin Correctly Ruled That Plaintiff's Motions Lacked Basis in Fact.*

Plaintiff next alleges that Judge Sorokin committed error because he "did not articulate his application of the legal standard . . . by which he evaluated the evidence in support of the motions or the applicable law." Judge Sorokin's Order, however, was quite clear that "plaintiff has not established a basis to warrant striking either Gibbons['] Report as a sanction." In other words, Judge Sorokin concluded, as Pfizer demonstrated in its Opposition (Doc. 1840), that Plaintiff's motions lacked basis in fact. Indeed, in Pfizer's Opposition, it revealed in explicit

4

detail—item by item—the many misrepresentations in Plaintiff's motions, with citation to deposition testimony and correspondence demonstrating that Plaintiff's allegations of withheld discovery and "lies" were without merit and simply untrue.[3] Plaintiff apparently believes he is entitled to a lengthy narrative opinion addressing each of his unsupported allegations and frank misrepresentations, but has failed to cite any authority suggesting that this type of opinion is required. Nor has it been the custom of this Court to issue lengthy orders on discovery matters. Far from committing error, Judge Sorokin correctly concluded that Plaintiff's allegations of misconduct did not provide a basis for excluding Dr. Gibbons.

> **D.** *Judge Sorokin's Failure to Schedule a Separate Hearing to Address Plaintiff's Allegations of Purported Discovery Violations Was Not "Clearly Erroneous."*

Plaintiff also alleges that Judge Sorokin acted improperly when he heard oral argument on Plaintiff's motions at a discovery conference, but failed to give Plaintiff advance notice of argument on the motions at that time. This argument stretches the "clearly erroneous" standard to the point of absurdity. Not only is plaintiff *not* entitled to a hearing on discovery motions, *see* Local Rule 7.1(e),[4] but Plaintiff is likewise not entitled to a reply brief. *See* Local Rule 7.1. Nevertheless, Judge Sorokin allowed Plaintiff to file a sixteen-page reply brief. *See* Electronic Order dated 6/23/09 (granting leave to file proposed reply (Doc. 1862)). It is certainly not Judge Sorokin's fault that Plaintiff now criticizes his own counsel who attended the hearing for being unprepared to argue motions Plaintiff was well aware were fully briefed and pending before the

---

[3] Pfizer hereby incorporates its Corrected Consolidated Opposition to Plaintiffs' Emergency Motions to Strike Defense Expert Robert Gibbons, Ph.D. and Alternatively, to Strike Dr. Gibbons' March 2009 Expert Report and Bipolar Study and for Reconsideration of the Court's November 2008 Decision Allowing Dr. Gibbons' Study and Article at Trial, (Doc. 1840), into this response.

[4] Local Rule 7.1(e) states: **"*If*** the court concludes that there should be a hearing on a motion, the motion will be set down for hearing at such time as the court determines." (emphasis added).

Magistrate at the time of the hearing—a fact Plaintiff admits in his brief. (Pl. Br. at 3).[5]  Nor does Plaintiff's new criticism of his counsel render Judge Sorokin's Order "clearly erroneous," particularly in light of Plaintiff's extended briefing on the issues then-pending before Judge Sorokin.

### E. *Dr. Gibbons' Reports Were Timely Served In Accordance With This Court's Prior Orders.*

As a further objection to Judge Sorokin's ruling, Plaintiff again repeats his allegation that Dr. Gibbons' reports were not timely served.  Conspicuously absent from Plaintiff's pleadings, however, are the actual deadlines applicable to expert reports in this case.  Pursuant to Discovery Order No. 26, Plaintiff's expert reports in *Bulger* were due on August 7, 2008.   (Doc. 1337).  The parties then filed a joint request for extension of the deadlines (Doc. 1434), which Judge Sorokin granted on September 17, 2008, extending *inter alia*, the deadlines for service of all of Pfizer's expert disclosures in the *Bulger* case to November 10, 2008.  Dr. Gibbons' alleged "untimely" report, dated November 5, 2008, was *timely* served on November 10, 2008, in accordance with the Court's scheduling order which Plaintiff jointly sought.[6]  It is thus Plaintiff's claim that Dr. Gibbons' November report was "untimely" that is clearly erroneous—not Judge Sorokin's Order.  Plaintiff's claim that Judge Sorokin failed to consider Judge Saris' prior order regarding Dr. Gibbons' November report—particularly when plaintiff raised this very issue in his motion—likewise strains credibility.  *See a*lso 11/25/08 Electronic Order.

---

[5]  Notably, Defense counsel had the same "notice" as Plaintiff's counsel that any motions pending before Judge Sorokin—including the two motions filed by Plaintiff relating to Dr. Gibbons—might be considered at the hearing and came prepared to argue any motions Judge Sorokin wished to hear.

[6]  Subsequently, on March 19, 2009, after several days of deposition questioning by Plaintiff's counsel, Dr. Gibbons issued a final supplement to the November report, correcting two minor errors identified during the course of his depositions, and setting forth in writing the results of the sensitivity analyses for the gabapentin cohort—about which he had already testified in response to Plaintiff's counsel's questions, and as to which the underlying data were produced.  The resulting *two additional paragraphs* in Dr. Gibbons' report are far cry from Plaintiff's assertion that Dr. Gibbons' report was "completely change[d]."

F.      ***Both Dr. Gibbons' AED Study in Bipolar Patients and His Neurontin Expert Report Are Inexorably Tied to the FDA Alert.***

Plaintiff's claim that Judge Sorokin committed error by not considering that this Court previously limited Dr. Gibbons to testimony about the FDA Alert is equally unavailing. Dr. Gibbons' November 2008 report is intimately related and in response to the FDA Alert—*but for* the Safety Alert and FDA's conclusion regarding an increased risk of "suicidality" with eleven AEDs (Neurontin among them), Dr. Gibbons would not have sought to conduct a pharmacoepidemiologic analysis of the eleven AEDs and gabapentin, and likely would not have been consulted as an expert witness in this case. Indeed, as a result of the FDA's findings in the meta-analysis, which was the basis for the FDA Alert,[7] Dr. Gibbons conducted a pharmacoepidemiologic study—the largest of its kind accepted for publication to date, using the most comprehensive medical records database in the country ("PharMetrics")—to determine whether the eleven AEDs identified in the FDA Alert are associated with increased risk of suicide attempts in more than 47,000 patients with bipolar disorder, a population known for its high background risk of suicide behavior who also take AEDs (referred to in past briefing as the "Bipolar study" based on the underlying patient population taking any one of the eleven AEDs identified by FDA). The study found that the AEDs evaluated by FDA do not show an increased risk of suicide attempt and, if anything, are associated with a statistically significant decreased risk of suicide behavior. (*See* Doc. 1926-2 at 4).

Dr. Gibbons also examined the PharMetrics database specifically related to Neurontin ("Gabapentin study"), and summarized these results in his November 2008 expert report. In a

---

[7] Notably, in its *Amicus* brief in this case, the FDA stated that "[t]he Alert does not represent the final conclusion of FDA's consideration of the issue of suicidality and antiepileptic drugs," and that the study's disclaimer "should not be read to suggest that . . . FDA is precluded from further analysis that might lead to a more definitive finding and administrative action. Indeed, FDA continues to actively consider the issue of suicidality and antiepileptic drugs." (Doc. 1351 at 5). Thus, Dr. Gibbons' published work is specifically aimed at reaching the "more definitive finding" that FDA acknowledged might exist.

7

population of more than 130,000 patients taking Neurontin, he analyzed whether, as Plaintiff's experts opine on the basis of the FDA Alert, Neurontin increases the risk of suicide attempts in patients with various psychiatric illnesses, including major depressive disorder, and pain disorders. The Gabapentin study demonstrates no increased risk of suicide attempt in patients taking Neurontin—and , in fact, demonstrate a statistically significant decreased risk of suicide behavior in patients with psychiatric illness. Dr. Gibbons concludes on the basis of this analysis that "there is no increased risk of suicidal thinking and behavior for gabapentin overall, and if anything, protective effects for psychiatric patients who are at increased suicidal risk." (Gibbons Nov. 5, 2008 Report at 12, attached as Ex. 2).

In short, there is no part of Dr. Gibbons' opinion set forth in his November report that is unrelated to the FDA Alert.

## II. PLAINTIFF'S REPEATED ALLEGATIONS OF DISCOVERY VIOLATIONS, IMPROPER CONDUCT AND MISREPRESENTATIONS ARE NOT TRUTHFUL.

Unable to demonstrate that Judge Sorokin's Order should be reversed under the "clearly erroneous" standard, Plaintiff returns to familiar territory—proceeding yet again to attack Dr. Gibbons on the basis of factual misrepresentations. All of these allegations have been fully briefed, heard and rejected by Judge Sorokin when he expressly found that "plaintiff has not established a basis to warrant striking either Gibbons reports as a sanction."

Nevertheless, because Plaintiff insists on pressing these meritless allegations, Pfizer is compelled to respond. Set forth below are a few of the more egregious statements in Plaintiff's brief to this Court, along with the actual facts showing these statements to be untrue as addressed more fully in Pfizer's opposition to Plaintiff's two motions to strike.

- *Dr. Gibbons "completely changed his two reports without leave of Court. Dr. Gibbons changed his gabapentin report on March 19 but could not be deposed on it until he got back from Bali in late April, at which time it was learned that he also had changed his bipolar report on March 15 and not disclosed it at all. That report was disclosed in May 2009 but the*

*underlying work was withheld until June 2009 and, in either event, Dr. Gibbons has refused to be deposed on it." (Pl. Br. at 4).*

As Pfizer demonstrated in its Opposition Brief (Doc. 1840), the "bipolar report" is not a report at all, but rather a scientific study now accepted for publication in *Archives of General Psychiatry* and neither the article nor Dr. Gibbons' November 2008 report were "completely change[d]" at any time as Plaintiff asserts. The primary findings of both the AED study in bipolar patients and the gabapentin study have always remained the same, and the sensitivity analyses conducted in each study merely confirmed the primary results about which Plaintiff has had full knowledge—and vast discovery—since November 2008.[8] (s*ee* Doc. 1840 at 12-13,18.)

- *"When his 'completing' deposition was resumed in March 2009, Dr. Gibbons admitted that he had . . . withheld the programs necessary to read a new 'Supermix' program, and other documents." (Pl. Br. at 4).*

Not only has Plaintiff provided no evidence that Dr. Gibbons knowingly withheld anything, but the "'SuperMix' program and other documents" to which Plaintiff refers were provided to Plaintiff well in advance of Dr. Gibbons' March 5 deposition. Plaintiff's counsel was in no way restricted from asking any questions he wanted about the Supermix analysis, or conducting his own Supermix analysis to validate or dispute Dr. Gibbons' results. (Doc. 1840 at 12 n.10, 13).

- *Dr. Gibbons misrepresented that "he had disclosed all of his underlying data when he knew that he had not." (Pl. Br. at 7).*

The entire PharMetrics database on which Dr. Gibbons' two studies were based was produced to Plaintiff in November 2008. Plaintiff's identification of an inadvertent omission of a singe file was just that—inadvertent, not intentional (*see* Doc. 1840 at 10, n. 9, and deposition of Dr. Gibbons at 699:10-16, attached as Ex. 3)—and the file was timely produced upon learning

---

[8]      *See* note 6, *supra*.

of the accidental nondisclosure, after which Plaintiff was again provided another opportunity to depose Dr. Gibbons.

- *Dr. Gibbons misrepresented that "Dr. Hur had not done any work on the gabapentin report when in truth Dr. Hur had performed all the computer programming, a misrepresentation made successfully to induce the same Magistrate to quash Dr. Hur's deposition."*

Contrary to Plaintiff's assertion, what Dr. Gibbons actually stated was: "I do not believe that Drs. Hur, Brown and Mann possess any knowledge or have formed any opinions concerning the specific expert issues that have been raised in this litigation, or the content of my expert reports," a fact confirmed at the deposition of Dr. Hur and which Plaintiff ignores. (Doc. 1840 at 19-20). Nor is there any evidence whatsoever that Magistrate Judge Sorokin denied Plaintiff's initial attempt to depose Dr. Hur on the basis of this single (misrepresented) statement in Dr. Gibbons' Declaration. And Dr. Hur was subsequently deposed by Plaintiff.

- *Dr. Gibbons misrepresented that "there were no emails with substantive information in them when in truth Dr. Gibbons had hundreds of pages of emails, some of which contained notes sent by defense counsel the night before his deposition . . . ." (Pl. Br. at 7).*

Ninety-eight percent of the documents produced to Plaintiff pursuant to the parties' agreement regarding Dr. Gibbons' emails are non-substantive emails transmitting large attachments that Plaintiff already possessed. Moreover, the notes transmitted by email to which Plaintiff refers are comprised of a two-page document containing nothing more than Dr. Gibbons' *own hand-written notes* (not notes created by counsel as Plaintiff implies) analyzing Plaintiff's expert Dr. Sander Greenland's untimely Declaration produced by Plaintiff at the *Daubert* hearing. Dr. Gibbons read his notes into the record at the hearing pursuant to Judge Saris' request, and thus, Plaintiff had notice of the content of these notes since July 2008. Tellingly, Plaintiff never asked Dr. Gibbons a single deposition question about this testimony.

10

(Doc. 1840 at 13-14, 16).  Equally untrue is Plaintiff's allegation that information about Neurontin data upon which Dr. Gibbons relied was first disclosed to Plaintiff in the email production.  The two documents Plaintiff cites were produced to Plaintiff both during and immediately after the first two days of Dr. Gibbons' deposition, and in fact, Plaintiff's counsel marked one of them as Exhibit 24 to the deposition.  (Doc. 1840 at 15-16).

It is beyond comprehension why Plaintiff would carry these same accusations forward in this brief when the facts so clearly belie Plaintiff's accusations.  Once again, Plaintiff repeats his unsuccessful attempts to manufacture an illusory discovery issue, attacking Dr. Gibbons on grounds that are baseless and untrue.

## CONCLUSION

Plaintiff has not demonstrated that Judge Sorokin's Order is "clearly erroneous."  Instead, Plaintiff insists on repeating the very arguments already rejected by Judge Sorokin as lacking factual basis.  As such, Plaintiff's Objection to Judge Sorokin's Order should be denied.

Dated:  July 17, 2009	Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:	/s/ Mark S. Cheffo
	Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

-and-

11

SHOOK, HARDY & BACON L.L.P.

By: /s/ Scott W. Sayler
 Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
 David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## **CERTIFICATE OF SERVICE**

       I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on July 17, 2009.

                                              /s/ David B. Chaffin_____
                                              David B. Chaffin