# EXHIBIT B

2009-07-20 PT Conference (Final).txt

0001
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS
2
3
4     IN RE:                            )
                                        ) CA No. 04-10981-PBS
5     NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 107
      AND PRODUCTS LIABILITY LITIGATION    )
6
7
8
9                    FINAL PRETRIAL CONFERENCE - DAY ONE
10                 BEFORE THE HONORABLE PATTI B. SARIS
                       UNITED STATES DISTRICT JUDGE
11
12
13
14
                                        United States District Court
15                                      1 Courthouse Way, Courtroom 19
                                        Boston, Massachusetts
16                                      July 20, 2009, 9:15 a.m.
17
18
19
20
21
22
                            LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                      United States District Court
24                    1 Courthouse Way, Room 7200
                          Boston, MA  02210
25                        (617)345-6787
0002
1     A P P E A R A N C E S:
2
3     FOR THE PLAINTIFFS:

4          ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
      and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
5     1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.

6          KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
      The Lanier Law Firm, 126 East 56th Street, 6th Floor,
7     New York, New York, 10022.

8     FOR THE DEFENDANTS:
9          DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
10    100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.

11         KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
      Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
12    Square, New York, New York, 10036.

13         WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
14    575 Lexington Avenue, 7th Floor, New York, New York, 10022.
15
16
17
18

Page 1

2009-07-20 PT Conference (Final).txt

```
19
20
21
22
23
24
25
0003
 1                    P R O C E E D I N G S
 2             THE CLERK:  In Re:  Neurontin Marketing, Sales
 3  Practices, and Products Liability Litigation, Civil Action
 4  No. 04-10981, will now be heard before this Court.  Will
 5  counsel please identify themselves for the record.
 6             MR. FINKELSTEIN:  Good morning, your Honor.
 7  Andrew Finkelstein, Finkelstein & Partners, on behalf of
 8  Dr. Egilman.
 9             MR. FROMSON:  Good morning, your Honor.  Kenneth
10  Fromson, Finkelstein & Partners.
11             MR. ALTMAN:  Good morning, your Honor.  Keith
12  Altman, Finkelstein & Partners.
13             MS. ARMSTRONG:  Good morning, your Honor.
14  Katherine Armstrong from Skadden Arps.
15             MR. CHEFFO:  Good morning, your Honor.  Mark
16  Cheffo from Skadden Arps.
17             MR. OHLEMEYER:  Good morning, Judge.  Bill
18  Ohlemeyer, Boise Schiller.
19             MR. GOODELL:  Good morning, your Honor.  Charlie
20  Goodell, Goodell DeVries.
21             THE COURT:  You're representing?
22             MR. GOODELL:  Pfizer.
23             MR. CHEFFO:  Good morning, your Honor.  Rick
24  Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25             MR. CHAFFIN:  Good morning, your Honor.  David
0004
 1  Chaffin.
 2             MR. SOH:  Ken Soh for the plaintiffs, your Honor.
 3             MS. HEGAR:  Dara Hegar, Lanier Law Firm.
 4             THE COURT:  Are you all going to be here next
 5  week?  That's huge.  All right.
 6             So we start with basics.  Next Monday we will be
 7  impaneling a jury.  The one thing I probably didn't tell you
 8  is, to make matters more complicated, I am sitting with the
 9  First Circuit by designation for four cases in the morning.
10  And so I'm not sure a hundred percent when that's going to
11  finish, and what I'm thinking of doing is asking the jury
12  clerk to bring in a group of people for a 2:00 o'clock
13  impanelment.  That might be just as easy for you all, it's a
14  Monday morning, rather than just having all the jurors
15  sitting downstairs stewing and annoyed until I'm done with
16  the First Circuit.  So they will have eaten lunch.  We will
17  impanel.  I do not expect that it should take longer than
18  three hours, but what it essentially does mean is that you
19  need to block off your afternoon.  So that's for starters.
20             The second thing is, I was thinking -- I saw
21  somewhere on the list -- you were possibly on the same page
22  with me -- of ten jurors.  Given the fact that we were going
23  into three weeks, I could possibly lose some.  So if that's
24  so, it's essentially five peremptories a side.  The way I do
25  things is, there are no back challenges.  So I'll first ask
0005
 1  plaintiffs to exercise their challenges, then defendants.
 2  We'll strike people.  We'll put people in the box for those
 3  empty seats.  The next time around defendants go first.  The
```

Page 2

2009-07-20 PT Conference (Final).txt

4  defendants will challenge, then plaintiffs will challenge,
5  and so on until you use up your peremptories.  But I don't
6  let you go back.  In other words, if you've already passed
7  on a juror, you're stuck with the juror.
8          Because it's vacation time, I wanted to play out a
9  procedure for you.  One of the things that annoys me no end,
10 but there seems to be no clear solution, is when I get my
11 pool of 50 jurors and half of them say, "I don't want to
12 serve because I'm going on vacation."  I was thinking of
13 giving the jury clerk essentially a questionnaire to be
14 filled in under oath so that we don't bring up jurors who
15 have already prepaid vacation plans.  I'm thinking about
16 that.  The problem is, it's too easy an out for people.
17 It's a three-week trial which would be hard for people
18 anyway.  So another way to do it is to simply ask for more
19 people, and then just have everybody who's got a vacation
20 plan come up and swear to me, and then just let them go.
21 Judge Gertner tried a technique which I really liked a lot,
22 which she had them fill it in under oath, a questionnaire
23 downstairs, and basically gave the -- I think brought up the
24 questionnaires, I okayed them so it was a judge's blessing,
25 and then we either sent them to another court or we
0006
1  discharged them for the day.  But do you have any strong
2  feelings, anybody, about that, to get rid of all the people
3  who have paid vacation plans?  I've never done this before,
4  but I anticipate a big problem this time of year.
5          MR. CHEFFO:  I don't disagree, your Honor.  I
6  don't think we feel strongly.  I think our inclination would
7  be to actually have them come in.  I think folks looking you
8  in the eye are probably likely to be more candid rather than
9  receive it somewhere else.  So I think, because of the
10 holiday, we'd probably rather have them come in.  If they
11 say there's a problem, then they can talk to you about it,
12 and if you agree, then you can dismiss them.
13         THE COURT:  All right, so what I'll do is --
14 there's that issue, there's the vacation -- I will bring in
15 a larger -- I will assume that at least a third of the
16 people will go off due to vacation plans, and I will see
17 them first.  "Is there anyone here," I'll ask something
18 like, "who has prepaid vacation plans and would prefer to
19 shift their jury service to another date?"  And I'll tell
20 them that it's pretty certain that we're going to finish in
21 the three weeks, simply because I'm going on vacation, so
22 I'll give them a certain time.
23         I do want there to be some flexibility for
24 everyone in the afternoons.  I've told Robert to keep my
25 afternoons really light.  So that first week is impossible.
0007
1  I've got some things that I can't shift off, but the first
2  weeks in August I've lightened up enormously, and we could
3  shift into the afternoon, if we needed to, just to finish
4  this trial.
5          The second thing is, I was thinking of at least
6  one question after I've gone through all the oral questions,
7  something along the lines of, "This case involves a suicide.
8  Is there anything about your personal life which would
9  prevent you from serving in a fair and impartial manner?"
10 and then have them write that down, because sometimes people
11 can't verbalize those things, but they can write it down.  I
12 tend to do that with racial prejudice cases, and I also do
13 that with child pornography cases, and I thought I would ask
14 that.  Other than that, I reject the request for those long
                                Page 3

2009-07-20 PT Conference (Final).txt
15  detailed questionnaires.  I think I foreshadowed that
16  before.
17           So is there any question about impanelment day?  I
18  don't expect that there will be enough time left over for
19  openings, but it's possible.  So how long would your opening
20  be?
21           MR. FINKELSTEIN:  Oh, at least an hour.
22           MR. OHLEMEYER:  An hour, your Honor, and I guess
23  that's a question.  We were operating under your standing
24  order or your procedures that suggest you limit them to an
25  hour.
0008
1           THE COURT:  Yes.
2           MR. OHLEMEYER:  So an hour certainly would be what
3  we expect.
4           THE COURT:  Well, that's all right.  I mean,
5  sometimes they're a half an hour.
6           So, now, let me ask you this.  I was recently at
7  one of these big national conferences on complex litigation.
8  One of the innovations which I thought might apply to this
9  case, I wanted you to think about, was to do shorter opening
10  statements, but then possibly after a very complex set of
11  witnesses, do sort of interim opening statements.  Have any
12  of you ever worked with that?
13           MR. OHLEMEYER:  Your Honor, I have, and, you know,
14  I think in a longer trial it may have some benefit; but in a
15  case like this that we basically are going to try in three
16  weeks and things are going to move pretty quickly, I think
17  it's easier just to let people have the big picture up
18  front, and then move on and finish with closings at the end
19  of the evidence.
20           THE COURT:  Well, things that worry me a little
21  bit as to how to deal with is, it took me six months to
22  understand general causation.  Maybe I don't even still.
23  It's very hard.  But certain things that you all put a lot
24  of emphasis on they might not.  For example, the difference
25  between an association with and causation, that's not
0009
1  intuitive, those kinds of things, and statistically maybe
2  understanding some things.  And maybe what I'll do is just
3  after one of these witnesses, just stop and specifically ask
4  the jurors if they have any questions of the witness.
5           MR. OHLEMEYER:  I think that's a procedure that's
6  a little better because it doesn't put prominence on things
7  that the lawyers want to highlight as opposed to what the
8  jury wants to know in the middle of the evidence.
9           THE COURT:  Yes, although I might ask a couple of
10  questions, like if they just use the word "associate," you
11  know, what does "associate" mean or something like that, or
12  you could do it, just because it's not intuitive, and it
13  takes a while to get through the differences.
14           All right, so that's the first thing.  We will
15  impanel at 2:00 in the afternoon.  I will bring a huge
16  number up here, and I will just quickly weed out, without
17  getting into anything, people who cannot sit for the three
18  weeks.  And then I will go through the process that I just
19  told you about, but I will hand out a written questionnaire
20  before I actually seat somebody after I've gone through all
21  the oral questions, just for that final tag so we can be
22  sure that there's nothing in someone's personal life which
23  would stop them.
24           MR. CHEFFO:  And to that point, your message is
25  loud and clear.  I think you did say if we had some
                              Page 4

2009-07-20 PT Conference (Final).txt

0010
1   written -- we actually put a few questions really just to
2   that point for the Court to consider.
3               THE COURT:  Good, thank you.  That's a good first
4   step.
5               MR. CHEFFO:  May I hand this up?  This is not a
6   joint question.  This is defendants', so --
7               THE COURT:  That's fabulous, okay.  So now what I
8   thought we would do is, we have tomorrow for Dr. Greenland,
9   and then we have the next -- when is it, Thursday morning?
10              MR. CHEFFO:  Thursday is Dr. Gibbons at 9:00
11  o'clock.
12              THE COURT:  Gibbons, all right.  So I've been
13  reading the expert reports, and I have to say I'm sort of
14  lost at some points between November, March, and May, how
15  they differ or whether it's significant.  I will have to ask
16  all that.  But I am sure I will let Dr. Gibbons criticize
17  the FDA report, the lamotrigine and Topiramate points.  I am
18  not sure what else I will let him do.  So I may not rule by
19  the time of the openings, and you should just not mention
20  it.
21              With respect to your bioethicist, I am unlikely to
22  allow him to testify.  I haven't really gotten there yet.
23  We can have the argument.  But the reality is, I may not
24  rule on that by the time we enter into that.
25              I'm not inclined, given the shortness of this
0011
1   trial, to bifurcate.  So it's something that you should not
2   mention in your opening statements.
3               So on those two -- there are certain areas that I
4   will just wait as I go through.  There may be also other
5   issues like that as we go through the motions in limine, but
6   I am almost positive I will not have had a time to think
7   through and rule on the Gibbons, what I will call not just
8   the critiques of the FDA but his affirmative studies, until
9   I've really had a chance to think about it more and
10  understand it a whole lot better.
11              So maybe what we could do now is, unless there's
12  something else about impanelment day, I will assume just
13  impanelment, my preliminary jury instructions, which are
14  very boilerplate.  And the opening statements will go an
15  hour apiece the next morning, which brings us to our first
16  witness, which is at 11:00 o'clock.
17              Who's your first witness going to be?
18              MR. FINKELSTEIN:  Well, we have subpoenas out,
19  either a corporate witness or Dr. Franklin.
20              MR. CHEFFO:  Well, I think your Honor had denied
21  their motion to compel, and we have a motion on
22  Dr. Franklin.
23              THE COURT:  Yes, all right.  We'll get to all of
24  that, so let's just start.
25              MR. FROMSON:  Okay.  On that issue, the motion
0012
1   that was denied that I believe Mr. Cheffo was referencing
2   was our request that you require Lloyd Knapp to appear at
3   trial.
4               THE COURT:  Yes.
5               MR. FROMSON:  Separate and distinct from that
6   motion, we have served subpoenas for a corporate rep within
7   a hundred miles of the court's radius in Cambridge,
8   Massachusetts, as well as Manhattan --
9               THE COURT:  Who?  Do you know?
10              MR. FROMSON:  Well, it was a general Rule 45
                        Page 5

2009-07-20 PT Conference (Final).txt
11 subpoena asking them to produce a witness to testify in this
12 court of law as to the matters of the complaint.  We haven't
13 received any motion to quash that subpoena.
14            MR. CHEFFO:  Your Honor, we went through a
15 process, as you know very well, May 22, June 22, designated.
16 They served just last --
17            THE COURT:  Let me just start this.  This isn't
18 even on the 3,000 motions that have been --
19            MR. CHEFFO:  No, it's not.
20            THE COURT:  Let me -- yes, but if they subpoenaed
21 you, you either have to move to quash or you have to produce
22 them.  So I denied your motion.  You can't force someone to
23 come in.  You have to live with it, either through a
24 deposition or through admissions, or you'll just wait till
25 they put their person on with that guy.  Who is it?
0013
1            MR. CHEFFO:  Lloyd Knapp, your Honor.
2            THE COURT:  Lloyd Knapp.  Are you bringing him in
3 as part of your case?
4            MR. CHEFFO:  He's listed as a witness.  Ultimately
5 whether he comes --
6            THE COURT:  All right, so you may have to put it
7 in through deposition testimony.
8            MR. FROMSON:  Your Honor, not only was he listed
9 as a witness, he was listed as a live witness, and he
10 offered --
11            THE COURT:  But they don't have to put on people.
12 You both listed lots of people.  So if I were you, I would
13 read his deposition in, or put in admissions, or do what you
14 need to do.  Okay?
15            MR. FROMSON:  Well, yes, your Honor.  Yes, your
16 Honor.
17            THE COURT:  There are a huge number of macro
18 issues that you do need to know before you go into the
19 closing statement.  The first is -- do you have any
20 particular order you want to go through them?  Do you want
21 to each take one that you care a lot about, and we'll go
22 back and forth?
23            MR. CHEFFO:  From my perspective, I think we'd be
24 guided by the Court, whatever --
25            THE COURT:  All right, a few things:  The
0014
1 plaintiffs will be allowed to introduce evidence about a
2 national marketing campaign.  That is relevant to not only
3 the issue of intent -- is fraud still part of this,
4 intentional --
5            MR. FROMSON:  Yes, your Honor.
6            MR. FINKELSTEIN:  Yes.
7            THE COURT:  -- as well as the duty to understand
8 that this was being nationally marketed for off-label in
9 areas that were not just epilepsy.  I think that's very
10 important, and I think the probative value substantially
11 outweighs the prejudicial value.
12            MR. CHEFFO:  Your Honor, may I just --
13            THE COURT:  Yes.
14            MR. CHEFFO:  They answered "yes" very quickly, but
15 your order on the fraud, this is, I think --
16            THE COURT:  It's fraud by omission.
17            MR. CHEFFO:  That's correct, but what your Honor
18 did say was, "The motions to dismiss the fraudulent
19 concealment claims are denied in all the complaints, except
20 to the extent that they are premised on the claim of
21 fraudulent omissions in the national advertising and
                                        Page 6

2009-07-20 PT Conference (Final).txt
22  marketing campaign."  So it's our position, your Honor, that
23  you did rule on that with respect to national marketing.
24  And I would also just add --
25              THE COURT:  It goes to corporate intent, the
0015
 1  profit motive, why you would have an intent not to disclose
 2  certain things, as well as the extent of the information
 3  that you had available, you knew that it was being marketed
 4  off-label.
 5              MR. CHEFFO:  But, see, the issue --
 6              THE COURT:  Denied, denied.  Okay, now, that
 7  having been said, you only have a certain number of hours.
 8  You can't spend your life on the national marketing
 9  campaign.  The number of hours is going to circumscribe how
10  much time you can spend on it.
11              MR. FINKELSTEIN:  We're well aware of that, your
12  Honor, and we were waiting till today to understand what
13  our --
14              THE COURT:  So Franklin will probably come first.
15              MR. FINKELSTEIN:  Yes.
16              THE COURT:  Let me just go through defendant
17  first, since you're -- the motion with respect to the guilty
18  plea, that's admissible.  Why isn't that corporate intent?
19              MR. CHEFFO:  Well, your Honor, the issue here is
20  not whether there was -- well, first of all, we look at the
21  doctors who were deposed in this specific case, and none of
22  them talked about it, but they had an opportunity to depose
23  the doctors, and Crognale and Goldman testified.  There was
24  no testimony that they relied on marketing, advertising,
25  CME.  I mean, the plea talks about conduct back in, as your
0016
 1  Honor is well aware, back in the late '90s.  There's an
 2  absolute and total disconnect from a proximate causation
 3  perspective, and it's absolutely prejudicial with respect
 4  to -- if we're going to start talking about national
 5  marketing and what happened back in the '90s, the issue
 6  here, I think as your Honor had correctly said a few weeks
 7  ago, it's about causation, it's about Mrs. Bulger.
 8              THE COURT:  It's also about intent.  It's about
 9  corporate intent and a duty and whether a duty arose and
10  what the corporate course of conduct was with respect to
11  this drug.
12              MR. CHEFFO:  Here's the duty, I think, your Honor.
13  The duty issue is not whether there was knowledge or
14  information about off-label marketing.  To the extent, and
15  we may disagree, but to the extent that you think that
16  there's a heightened duty, okay, that arose as a result of
17  the use of off-label, that's the issue, so --
18              THE COURT:  Even put aside heightened, just a
19  regular duty.
20              MR. CHEFFO:  Okay, and there's no dispute here,
21  your Honor, that Pfizer understood that the products were
22  being used for off-label.  The issue here, you don't have to
23  then go to the next step and say what the actual marketing
24  was.  That's kind of a secondary irrelevant inquiry.
25              THE COURT:  Yes, maybe.  Let me just -- I think
0017
 1  you make one good point, which is, I'm not ruling that every
 2  single question asked is going to be admissible, every
 3  single question about a boondoggle in Boca.  I am simply
 4  saying that in general the corporate intent and the
 5  corporate course of conduct is relevant to not only the
 6  fraud issues but the duty of care, and certainly the
                              Page 7

                    2009-07-20 PT Conference (Final).txt
7   punitive issues, and I am going to allow both the plea and
8   the national marketing campaign.
9               As I understand it, there is no effort here to
10  separate off Pfizer from Warner-Lambert, is there?  Would
11  you want -- I was going to ask you that -- different
12  verdicts for both of them?
13              MR. CHEFFO:  I don't think so, your Honor, but the
14  one thing I would add is, there are 230 or 240 exhibits,
15  over 5,000 pages with respect to market --
16              THE COURT:  That's a very good point.  They're not
17  going to do a dump.
18              MR. CHEFFO:  But they have already.  They've
19  already --
20              THE COURT:  Excuse me, excuse me.  Not with me
21  they haven't.  If they think they're going to put in
22  Exhibits 1 through 100 on a national marketing campaign, I
23  am going to say, "Rule 403, it's cluttering the record."  So
24  the jury won't look at it, I won't look at it.  They can't
25  do it, I agree with that.  I'm doing this in a macro sense,
0018
1   not in a micro sense.  I'm allowing in the -- I deny
2   defendant's motion in limine to exclude all evidence or
3   references to Warner-Lambert's guilty plea.  Related
4   government investigations are different.  What are you
5   referring to?  I mean, I think it's just the guilty plea.
6   That's all it is.  You don't get to put in everything else.
7   Is there any other investigation we're talking about?
8               MR. FINKELSTEIN:  No.
9               THE COURT:  No.  All right, that's it, the plea.
10              Marketing or advertising, David Franklin, I
11  actually referred to laying my eyes on him since I first
12  heard about him in 1995.  But don't forget, it can't be -- I
13  don't know how much information he has about marketing going
14  forward.  Is there someone who can bring it forward till the
15  time where she was prescribed?  In other words, this is what
16  I meant I'm not doing micro.  What happened in -- do you
17  have somebody who's going to talk about marketing in 2000 to
18  2004?
19              MR. FINKELSTEIN:  Those are primarily through the
20  documents, through the corporate witnesses, and establishing
21  notice and duty and reasonableness.
22              THE COURT:  So you're going to bring it forward to
23  the present?
24              MR. FINKELSTEIN:  Correct.
25              THE COURT:  I mean, not to the present, through
0019
1   the death.
2               MR. FINKELSTEIN:  Through the death.
3               THE COURT:  All right, defendant's motion in
4   limine to exclude the testimony of decedent's minor
5   daughter, family photographs, and memorabilia.  I'll allow
6   some of it with respect to the daughter, but postmortem
7   photographs?  Do you have them here?
8               MR. FROMSON:  Yes, your Honor.
9               THE COURT:  I'm not inclined to allow those.  I
10  don't even do those in murder cases.
11              MR. FROMSON:  I understand, Judge.  The issue is,
12  they are alleging there was a murder.
13              THE COURT:  No, no, no, no.
14              MR. CHEFFO:  That's not true.
15              THE COURT:  Let's put it this way:  No postmortem
16  photographs.  Don't even discuss the issue.  You know, this
17  is an angry sister who blurted something out.  If it should
                                Page 8

2009-07-20 PT Conference (Final).txt

18  come up, maybe, but the prejudicial value far outweighs the
19  probative at this particular point in time, so no
20  post-mortem photographs unless you bring me up to side bar.
21          MR. FROMSON:  Just to preserve the record, your
22  Honor, the issue would also be relied upon by the experts
23  who will be testifying as to the manner of death, but
24  absolutely I understand your order, Judge.
25          THE COURT:  Well, let me just say, they can rely
0020
 1  on them without them being introduced.
 2          MR. FROMSON:  I understand, Judge, absolutely.
 3          THE COURT:  It's just we're not going to -- you
 4  should have them ready if it should come out.  Is the sister
 5  testifying?
 6          MR. FROMSON:  It's our understanding she will.
 7          THE COURT:  Well, does she still believe it was a
 8  murder?
 9          MR. FINKELSTEIN:  I'm not sure, your Honor.
10          MR. FROMSON:  The detective spoke with her last
11  week, so they would know.
12          THE COURT:  Are you going to do anything with an
13  allegation of murder?
14          MR. OHLEMEYER:  No.
15          THE COURT:  Okay, so allowed in part, denied in
16  part, defendants' motion in limine to exclude the testimony
17  of decedent's minor daughter, family photographs, and
18  memorabilia.
19          Four, defendant's motion in limine to exclude
20  evidence of post-incident regulatory actions, labeling, and
21  patient information guide.  You mean the FDA?  You want me
22  to exclude the FDA?  That's directly relevant to the
23  causation issue, a finding of a public agency.
24          MS. ARMSTRONG:  Your Honor, not the metaanalysis.
25  The motion doesn't go to that.  It goes to the actual
0021
 1  regulatory event of requiring a label.
 2          THE COURT:  Overruled.  So I deny the motion in
 3  limine with respect to the FDA.
 4          Now, the next one I was actually hoping for
 5  argument on, defendant's motion in limine to exclude
 6  evidence of foreign labels and regulatory actions.  What are
 7  you planning on doing?  I don't understand it well enough.
 8          MR. ALTMAN:  Your Honor, under the CFR, a
 9  manufacturer is required to inform the FDA about significant
10  foreign regulatory actions, including labeling changes.
11  They're also required to tell the FDA about certain foreign
12  adverse event reports.  Therefore, in the FDA's mind, what
13  goes on outside of the United States is relevant.  Our
14  experts are not going to opine that the company was
15  negligent --
16          THE COURT:  Well, what happened?  Just tell me.
17  Like what?
18          MR. ALTMAN:  Well, there were labels outside of
19  the United States that have information in it that is not in
20  the United States.
21          THE COURT:  Well, like what?  Excuse me.  I don't
22  know the case as well as you do.
23          MR. ALTMAN:  Like, for example --
24          THE COURT:  What do you want to put in?
25          MR. ALTMAN:  The effect on neurotransmitters, that
0022
 1  it's not in a United States label; it is in a label outside
 2  of the United States.

Page 9

2009-07-20 PT Conference (Final).txt
3          THE COURT:  All right, all right, so who, where?
4          MR. ALTMAN:  China, Great Britain, several -- in
5    fact, most of the labels --
6          THE COURT:  When timewise?
7          MR. ALTMAN:  Since the day the drug came out on
8    the market, since it was introduced in most of these
9    countries.  It was there right from day one.  It's not in
10   the FDA label --
11         THE COURT:  And who writes these labels?
12         MR. ALTMAN:  The company does.
13         THE COURT:  The company does.
14         MR. ALTMAN:  The company does.
15         THE COURT:  So the company reported this to these
16   foreign -- so you don't want actions by foreign entities.
17   You just want what this company reported to these foreign
18   regulatory bodies.
19         MR. ALTMAN:  That's correct.  Now, there's also
20   one particular --
21         THE COURT:  All right, so what's wrong with that?
22   It's an admission of a party opponent.
23         MR. GOODELL:  Your Honor, I'm not sure it's quite
24   that clean.  Just like the way a label is generated in the
25   U.S., it is generated on the basis of the regulatory
0023
1    environment in that country.  It's based upon how they
2    interpret the data they're getting.
3          THE COURT:  I know, but if they put in a predicate
4    and in fact Pfizer is the one who wrote the label and
5    reported the information, it does strike me like an
6    admission of a party opponent, and then you can rebut it.
7    But, you know, if it's not a third-party statement but
8    Pfizer's statement, or Pfizer had input into it, or Pfizer
9    didn't object to it, I think that that is something that's a
10   fair piece of evidence.
11         MR. GOODELL:  I think what that's going to lead us
12   to -- here's the issue as far as we're concerned, your
13   Honor.  We can break this down into a couple of categories,
14   and you're going to be ruling on a separate motion, I
15   believe, that relates to information that we get about
16   adverse events from a foreign regulatory agency.
17         THE COURT:  Could we hold that off just for a
18   second.  On the labeling -- I just need to sort of filter
19   this -- on the labeling, to the extent it was based on
20   information from the company, it's an admission of a party
21   opponent.  To the extent that the company had the right to
22   object and didn't, I will allow that in.  If, though -- this
23   is where it's hard because I don't know.  Who's going to put
24   this in for you?
25         MR. ALTMAN:  This will go in through Dr. Cheryl
0024
1    Blume.  There's also a particular document that's in
2    question.  There was a communication from Health Canada --
3          THE COURT:  All right, so Health Canada is what?
4          MR. ALTMAN:  Basically the Canadian FDA -- talking
5    to the company about certain suicidal adverse events.
6          THE COURT:  Yes, but that's Part B.  Can we just
7    hold on.  Labels in foreign companies, to the extent it's
8    based on company information or the company hasn't objected
9    or it's being using it for a while, can come in.
10         Part B, the Health Canada, I remember that e-mail
11   when I was reading the information.  So it's just an e-mail.
12   How can you put that in?  That's not even a finding.  I
13   don't think that would come in even from the FDA.
                                             Page 10

2009-07-20 PT Conference (Final).txt
14          MR. ALTMAN:  Well, what it is, though, it's a
15 communication to the company saying that "We think you
16 cannot --" it's notice -- "you cannot exclude a causal
17 relationship between certain suicidal adverse events."  It
18 talks about another dechallenge/rechallenge event which is
19 very much in play in this case.
20          THE COURT:  What year?
21          MR. ALTMAN:  It's like 2005.
22          THE COURT:  When was the suicide?
23          MR. ALTMAN:  2004, but --
24          THE COURT:  No, no.
25          MR. ALTMAN:  But from a causation perspective --
0025
1          THE COURT:  No.  It doesn't come in for notice.
2 It's hearsay.  No.
3          MR. ALTMAN:  What about for the
4 dechallenge/rechallenge from a causation perspective?
5          THE COURT:  No, no, no.  I mean, you can bring in
6 the person from Canada maybe, but you'd have to put in a
7 lot.
8          So at this point what we're going to do -- and I'm
9 not saying -- you all have, like, a lot of subparts to this,
10 so I am not ruling on everything.  The labels, yes.  Health
11 Canada, no.  Is there something else I'm --
12          MR. GOODELL:  Your Honor, I apologize.  I move a
13 little slower, and I couldn't keep up with you on some of
14 that.  May I be heard just for one second on the labels, and
15 I don't want to --
16          THE COURT:  Part of your problem is, I'm steeped
17 in this.  I spent the last three days just reading.  I don't
18 know if you received it yet.  I finally said, "Stop filing
19 motions."  I wasn't keeping up with you.
20          MR. OHLEMEYER:  Loud and clear.
21          MR. GOODELL:  We got that, your Honor.
22          THE COURT:  You know, every time I would finish
23 something, like, three more would come in, so --
24          MR. GOODELL:  What I wanted to do -- and I'll be
25 very brief, so please forgive me -- there is a case that's a
0026
1 very important case on this that we wanted to incorporate
2 and I hope your Honor has had an opportunity to look at in
3 this, and it is current, and it is the Seroquel case which
4 dealt with this very issue.
5          THE COURT:  With labels?
6          MR. GOODELL:  Yes.  And I would ask your Honor at
7 least to take a good look at that, understanding your mind
8 set at this point, but please take a good look at that.
9          THE COURT:  Seroquel was a label that was actually
10 prepared?
11          MR. GOODELL:  It's the same situation, your Honor.
12          THE COURT:  No, but I'm not talking about a
13 warning, but have you -- maybe I haven't seen the exact
14 label, but if here what it is is a statement by the company
15 that it reduces serotonin levels, that goes to science, and
16 it's an admission of -- as opposed to a warning that this is
17 dangerous.  So it may be that there are parts of the label
18 that I would exclude, but as I understood Seroquel, it was
19 because there were different regulatory standards in
20 different countries.
21          MR. GOODELL:  Well, that's the precise point, your
22 Honor, that --
23          THE COURT:  But if it's just a scientific
24 statement as to what we've been calling "mechanism of
Page 11

```
                         2009-07-20 PT Conference (Final).txt
25   action," I don't understand why that isn't an admission of a
0027
 1   party opponent.
 2              MR. GOODELL:  Because it involves and it requires
 3   a discussion of why that went in.  Just because it is a
 4   statement about a science issue doesn't mean that it is not
 5   dictated by, determined by the foreign regulatory agency,
 6   which is precisely the point in the Seroquel case.
 7              THE COURT:  Well, let me say this:  My basic
 8   instinct is, if Pfizer wrote it or if Pfizer didn't object,
 9   Pfizer agreed to it, it's a statement of a party opponent.
10   There may be other parts of the label where Seroquel may be
11   determinative.  I will reread Seroquel, and you can produce
12   the labels.
13              MR. GOODELL:  Thank you, your Honor.
14              THE COURT:  And then we'll see.  Are there parts
15   of the labels that maybe are the findings of a foreign
16   regulatory agency of causality?
17              MR. ALTMAN:  Your Honor, I believe we're pretty
18   much just going to put in for the mechanism-of-action
19   statements, so I don't think we're going to talk about the
20   warnings or any actions from that perspective.
21              MR. CHEFFO:  I mean, we'll produce this, but the
22   statement that the label is somehow an admission is just
23   flat wrong, your Honor.  I mean, basically the way the
24   labels work, as the Court is aware, it's dictated often by
25   the regulatories.  I think your point is well-taken, which
0028
 1   is to the extent that there was a document or a finding, an
 2   internal document.  But what I think counsel is trying to
 3   equate is a statement in a label as somehow being something
 4   that's affirmatively put forward by the company, which is
 5   not the way it works.
 6              THE COURT:  I would need a foundation about how
 7   that statement got there.  Maybe you need to discuss it with
 8   your experts.
 9              MR. ALTMAN:  We'll do that.
10              THE COURT:  But, in general, I guess what I'm
11   saying is, to the extent it is a statement of Pfizer, it
12   comes in.  To the extent it is a statement about science
13   from a foreign regulatory agency, I'd have to know more
14   about it.  To the extent it is a warning on a lower health
15   level, then I do have to think about the Seroquel concerns.
16   So I guess what we have to say here is denied without
17   prejudice, and I just maybe need to see more about it.
18              All right, Dan Brock, he's a doctor, right?  He's
19   at the Harvard Med School.
20              MR. FINKELSTEIN:  He's a Ph.D.
21              THE COURT:  But why isn't this something that
22   people know intuitively?  I mean, why do you need -- I'm
23   sure he's a very fine ethicist, but if you lie about your
24   drugs, or you commit a crime, or you don't disclose
25   depressive side effects, I think even somebody who doesn't
0029
 1   have a Ph.D. in ethics would know that, that that's a
 2   violation of the law.  I mean, why do I need it?
 3              MR. FINKELSTEIN:  It goes towards creation of a
 4   duty and recklessness.
 5              THE COURT:  No, he can't create the duty.
 6              MR. FINKELSTEIN:  Just what a reasonable drug
 7   manufacturer does with the information, not on a regulatory
 8   basis but on a nonstatutory basis, what a reasonably prudent
 9   pharmaceutical company does, first, explaining what
                                              Page 12
```

2009-07-20 PT Conference (Final).txt

10  off-label/on-label is, that those concepts are not
11  germane --
12              THE COURT:  Excuse me.  I'm hoping that's what
13  Franklin and some of these other people are going to do.  I
14  thought he was on for the fact that he was going to say what
15  they did was unethical for the punitive piece of it.
16              MR. FINKELSTEIN:  Unethical and reckless and
17  careless, yes, all those components.
18              THE COURT:  I'm inclined not, but I will -- but
19  definitely don't put it into your opening statement.
20              MR. FINKELSTEIN:  Okay.
21              THE COURT:  Motion in limine to exclude anecdotal
22  adverse event reports, before I rule on this, what were you
23  planning on doing?
24              MR. ALTMAN:  Your Honor, the company is obligated
25  to conduct pharmacovigilance and monitor the safety of their
0030
1   adverse events.  It goes to the notice of, as information
2   was coming into the company --
3              THE COURT:  But what are you planning on doing
4   with it?
5              MR. ALTMAN:  Well, Dr. Blume has opined that the
6   information that was coming in over time established that
7   there was a signal.
8              THE COURT:  That's allowed, but are you planning
9   on introducing each adverse event report?
10             MR. ALTMAN:  We did not intend to produce each
11  adverse event report, but we might talk about the numbers,
12  you know --
13             THE COURT:  Well, the numbers would be fine, but
14  you're not planning on putting in each adverse -- any,
15  right?
16             MR. FINKELSTEIN:  No, your Honor.  It --
17             MR. ALTMAN:  There could be one or two that have a
18  certain specific characteristic, for example, like -- well,
19  not postmarketing but like the dechallenge/rechallenge that
20  has a particular place, but, no, we're not introducing
21  individual adverse event reports.  We're not going to
22  discuss --
23             THE COURT:  All right, in general, this motion is
24  allowed, and if you want one particular one, you're going to
25  have to come up to side bar.
0031
1              MR. ALTMAN:  That's fine.
2              THE COURT:  So you're not putting -- there are
3   hundreds of them, right?
4              MR. ALTMAN:  Yes.  The only one I can definitely
5   think of, your Honor, because it has relevance, there is the
6   first suicide report from 1994.  There's some expert
7   testimony that discusses that particular adverse event.
8              THE COURT:  And was it a report that went to
9   Pfizer?
10             MR. ALTMAN:  Yes.  It was reported by Pfizer to
11  the company, and there was the question -- it goes to the
12  issue of whether suicide was in the label or not.  For
13  example, the FDA didn't have a term for suicide at the time,
14  so FDA put it in as a suicide attempt, but Pfizer internally
15  called it a suicide.  Their expert, Dr. Weiss-Smith, said
16  that there were no suicides at that point in time because
17  she didn't read this particular suicide report, so --
18             THE COURT:  But is the report really gory?
19             MR. ALTMAN:  Oh, no, and we could --
20             THE COURT:  All right, so right now it's allowed
                              Page 13

2009-07-20 PT Conference (Final).txt
21  with the possible exception of this one report which I'm
22  going to have to see before you put it in.
23              MR. ALTMAN:  We could completely redact the
24  narrative if that's what was relevant.  It's just really the
25  fact that --
0032
1               THE COURT:  It's the notice that the suicide
2   happened?
3               MR. ALTMAN:  Correct.
4               THE COURT:  And then what the response was
5   internally in the company?
6               MR. ALTMAN:  Correct.  We don't care.  We can
7   completely redact any description --
8               THE COURT:  So would there be a problem with that?
9               MR. CHEFFO:  Yes, your Honor.  I mean, I think --
10  well, first of all, they're trying to use this ultimately
11  for causation, I mean, and I think it's very clear, the case
12  law is clear, even when you get these reports from a foreign
13  analysis, that they can't be used for causation.  In
14  addition, with respect to the notice prong, these are so
15  different and so distinct, and, you know, we know that
16  lawyers report adverse events, sometimes doctors,
17  health-cares.
18              THE COURT:  Well, who's was this?
19              MR. CHEFFO:  I'm not certain of the one he's
20  actually talking about.
21              THE COURT:  Why don't you share it.  It's possible
22  that if this adverse report is admitted just for notice
23  issues, if there's a problem, an important point in the
24  corporate history, then I would allow it in with the
25  individual aspects of it, certainly the name and private
0033
1   information redacted.  You show it to him, and then you'll
2   come up to side bar.
3               MR. CHEFFO:  Thank you, your Honor.
4               THE COURT:  That reminds me, by the way, of an
5   important issue.  I've been trying to get in in a big trial
6   like this about 8:30 every morning.  I know you're all
7   living here and enjoying our Boston weather, but if we
8   meet -- what I'd like you to do is every morning come in
9   with what exhibits you plan on using that day.  You'll take
10  a look at them, and then we'll start having the debate at
11  8:30 in the morning, rather than do it while the jury is
12  sitting out there.
13              MR. FROMSON:  Your Honor, for clarification, it
14  wasn't our intention to bring in exhibits that we would use
15  on cross-exam and show them to the defense before we
16  cross-examine a witness.  I don't think that's --
17              THE COURT:  For a while, though, it's just direct,
18  right?
19              MR. FROMSON:  For direct, I'm sure we could --
20              THE COURT:  You definitely will do it because I'm
21  not going to spend my life at side bar.  This is how I move
22  things along.  I'll meet you at 8:30 in the morning.  You
23  show them all the documents you plan on using on direct.
24  And if you have an objection, you can tell me.  I can start
25  vetting it earlier, at least get an idea of what the issues
0034
1   are.
2               MR. OHLEMEYER:  A suggestion that might expedite
3   that also, your Honor, if we were to exchange witnesses and
4   those exhibits 48 hours in advance of the day?
5               THE COURT:  I've been doing this a while.  It's a
                              Page 14

2009-07-20 PT Conference (Final).txt
6  little hard to do it 48 hours in advance.
7              MR. OHLEMEYER:  Twenty-four?
8              THE COURT:  But I do require witnesses to be
9  disclosed the day before, so both sides would do that.
10             MR. OHLEMEYER:  If we disclose the exhibits,
11  though, the day before, also then we would be able to --
12             THE COURT:  Yes, but you won't necessarily know.
13  I mean, if it's possible, sure, because what's courtesy on
14  your end you'll do in response.  So let's get to that in a
15  minute, but at the very least, at the end of every day at
16  1:00 or whatever time, I'm going to ask you what witnesses
17  are tomorrow so you can prepare and not have to prepare
18  anything beyond that.  To the extent that you've already got
19  a list of exhibits that you know about or are likely to
20  share it, I'll ask both sides to do it, but certainly by
21  8:30 the next morning you're going to turn over a pile of
22  them, and then --
23             MR. ALTMAN:  Your Honor, would you also want us to
24  share exhibits for which we've already agreed that there's
25  no objection to?  Are we only talking about stuff where
0035
1  there may be an objection?
2              THE COURT:  Sure, because then it's really great
3  for me because then you say "Exhibit 32," you say "No
4  objection," and it takes ten seconds rather than three
5  minutes before a jury.  It's just a way of moving it along.
6              So let's just move on.  So Brock is likely out,
7  but I'm not definitively ruling on it, but don't mention it
8  in your opening.  I have to actually sit and read that in
9  greater detail, the report itself.  One of the problems is,
10  you guys all battle over the -- do I have his report or just
11  the battle on the motions?
12             MR. FINKELSTEIN:  It's an attachment to the
13  defendants' motion.  You have it.
14             THE COURT:  All right, okay, because I didn't
15  bring with me all the attachments, so I will read it.  I'm
16  unlikely to allow it, but, in any event, don't mention it in
17  the opening.
18             I will definitely not allow in all the adverse
19  event reports.  I will allow experts to rely on them to the
20  extent it's appropriate, and there may be one or two adverse
21  event reports that you want to use, and you'll give me
22  heads-up notice beforehand.
23             Defendants' motion in limine to exclude various
24  evidence, references, and arguments, who was doing that?  I
25  don't remember what they all were.  There were a bevy of
0036
1  them.
2              MS. ARMSTRONG:  I can run through them, your
3  Honor.
4              THE COURT:  Most of them, I think -- oh, here we
5  go.
6              MS. ARMSTRONG:  The first one is reference to the
7  defendants' corporate status, size, profits, financial
8  condition, or employment compensation.  We realize that
9  financial information may come in to a limited extent for --
10             THE COURT:  Well, the profits that you make off
11  this -- isn't this the tenth largest-selling drug in the
12  world or something like that?
13             MS. ARMSTRONG:  I don't know.  I can't vouch for
14  that, your Honor, but --
15             THE COURT:  Something like that.
16             MS. ARMSTRONG:  It's really an issue of degree
                              Page 15

2009-07-20 PT Conference (Final).txt

17  here, if it is.  At some point, and the Supreme Court has
18  talked about this in it's punitive damages decision, at some
19  point where the emphasis becomes so great on the defendant's
20  size, the defendant's wealth, that you're basically asking
21  the jury to render a verdict just because this is a wealthy
22  company, it becomes improper.  So that's the first part of
23  that motion.
24              THE COURT:  What were you planning on doing?  I
25  mean, I --
0037
 1              MR. FROMSON:  Your Honor, the size of the company
 2  and the resources of the company and the profits of the
 3  company, maybe.
 4              THE COURT:  Well, I think the profits from the
 5  drug might make the most sense.
 6              MR. FROMSON:  I agree, your Honor.
 7              THE COURT:  I think it's billions and billions.  I
 8  remember someone made fun of me in a book because there was
 9  a fine of $450 million, which is one of the largest fines
10  I'd ever imposed ever, and someone made fun of me because it
11  was such a small piece of the profits of the actual drug.
12  So I think the profits from the drug but not the whole
13  company.
14              MR. FROMSON:  All right, Judge.
15              MS. ARMSTRONG:  Then the next issue is reference
16  to the entire pharmaceutical industry or drug companies.
17              THE COURT:  Yes, I agree.  No, we're not going to
18  paint by -- yes, I agree totally.
19              MS. ARMSTRONG:  And I think both sides have moved
20  to preclude references about the attorneys in the case,
21  referring --
22              THE COURT:  Yes, yes, we're not going to --
23  outstanding lawyers on both sides, and we're not going to --
24              MS. ARMSTRONG:  References to insurance?
25              THE COURT:  Is there insurance?
0038
 1              MR. FROMSON:  My understanding is, they're
 2  self-insured from their answers.
 3              MS. ARMSTRONG:  Whether it's self-insurance or
 4  whether it's an outside company, it's irrelevant.
 5              THE COURT:  Yes, we shouldn't discuss insurance.
 6              MS. ARMSTRONG:  Reference to the presence or
 7  absence of corporate representatives.
 8              THE COURT:  I'm assuming -- by the way, is someone
 9  from Pfizer here who will want to sit here, right?
10              MS. ARMSTRONG:  I'm not sure that there will be
11  somebody here every day.  I mean, there are other
12  commitments.  It's three weeks.  The representatives of
13  Pfizer have other commitments.
14              THE COURT:  Well, for starters, you're allowed to
15  have a corporate representative here and to sit in if you
16  want.  Also, if you want, you could have either Dr. Egilman
17  or a corporate representative sit on this side of the bar if
18  you wanted to.  So what is it?
19              MS. ARMSTRONG:  We don't want them, if for
20  example, a corporate representative is not here one
21  day because --
22              THE COURT:  No, we're not going to comment on that
23  stuff, no, of course not.  And I don't expect Dr. Egilman
24  to sit here.  In fact, I don't even know if he's going to
25  testify.  We'll get to that in a minute.  There seems to be
0039
 1  no need for him to testify.  I'll tell them what the law is
                              Page 16

                    2009-07-20 PT Conference (Final).txt
2  on wrongful death.  I don't know what he has to add.  He's
3  only been the administrator for three weeks, so --
4            MR. FINKELSTEIN:  Six.
5            THE COURT:  Six, huh?  Who's counting?  All right.
6  Anyway, what's the next one?
7            MS. ARMSTRONG:  The next one is references to how
8  plaintiffs will use any jury award.  When we took
9  Dr. Egilman's deposition, he talked at great length about
10  how any money or any recovery in this case was going to go
11  to the daughter's counseling and education, which is not
12  elements of their damages.
13            THE COURT:  They can argue about what the statute
14  gives you, support, counseling, whatever.  I forget the
15  litany.  They can argue that it's going to go -- and, by the
16  way, it's to the two children, right?
17            MR. FINKELSTEIN:  Yes, your Honor.
18            THE COURT:  To the two children, they can argue.
19            What's the next one?  Arguments and reference
20  about the effect of the jury's --
21            MS. ARMSTRONG:  The jury's answer.
22            THE COURT:  I don't --
23            MS. ARMSTRONG:  Well, if, for example, they say,
24  "If you do this, then my client will lose."
25            THE COURT:  I don't know, I'm not -- that's more
0040
1  of a closing argument.  Golden rule --
2            MS. ARMSTRONG:  Golden rule arguments, appealing
3  to the jury's self-interest, to place themselves in the
4  position of the plaintiff, to say, "what would you have
5  wanted your doctor to tell you, or what would you have
6  wanted the drug company to tell you?"  The First Circuit has
7  said "no."
8            THE COURT:  Well, all of this is inappropriate for
9  opening statements anyway, so, I mean --
10            Evidence of references to discovery disputes.
11            MS. ARMSTRONG:  Right, yes, your Honor.  They
12  should not be able to get up in front of the jury and say,
13  "We had to compel to get this document."
14            THE COURT:  I agree.  All right, so allowed in
15  part and denied in part.
16            Because of the shortness of the trial, I'm not
17  inclined to bifurcate the trial on punitive damages, so --
18            MR. CHEFFO:  Your Honor?
19            THE COURT:  Yes.
20            MR. CHEFFO:  If you've ruled on that, I'll sit
21  down, but I would just say that just going back to some of
22  the issues on the marketing and the plea, we do believe that
23  they really are only going primarily, if not exclusively, to
24  the punitive damage issue, and we believe they're incredibly
25  prejudicial, so we would just ask that --
0041
1            THE COURT:  Well, I disagree with that.  I think
2  it's relevant to the corporate intent, why it is that they
3  might not have wanted to have disclosed certain information,
4  because it was such a profitable drug, and it was being
5  marketed and it was so profitable, not dampening the sales,
6  their understanding of how widespread it was used across so
7  many indications.  I mean, it's relevant on so many issues.
8  My concern is more along the lines of the time frame.  It
9  can't just be what happened when I first got the case in the
10  mid-'90s.  It's got to be brought through the 2000s, and do
11  I have a proffer that's going to happen?
12            MR. FINKELSTEIN:  Absolutely, your Honor.
                                Page 17

2009-07-20 PT Conference (Final).txt
13          MR. CHEFFO:  Your Honor, and I will sit down if
14     you tell me you're done with this, but, you know, when the
15     hear the number 240 million, 430, it's going to be such an
16     incredible prejudicial distraction that the jury is going to
17     think that this is about marketing and conduct.  They're
18     going to lose sight of the fact that it's dealing with
19     general and specific causation and Mrs. Bulger.
20          THE COURT:  I don't think -- I was actually
21     thinking of making, just to make sure that that's right, of
22     not just having a general verdict form, actually, and making
23     people walk through the different steps, just because of
24     that.  They're going to have to answer the causation issue.
25     And as I was thinking about the case, I mean, they've got a
0042
1     very difficult causation case.  That's why it was your pick,
2     not theirs.  But I do think I'm going to force them to
3     answer those questions separately because I think that's
4     appropriate.
5          MR. CHEFFO:  And perhaps, your Honor, you'd
6     consider also some limiting instructions with respect to the
7     appropriate time, obviously in your Honor's discretion, with
8     respect to what they can consider and what the evidence is.
9          THE COURT:  Well, yes, I will do that, but
10     certainly at the end, by the end I will, but --
11          Do you want, just going through your list, I'll
12     get -- I think I should go back to plaintiffs at this point.
13     Dr. Gibbons, a very difficult issue.  I just am not prepared
14     to rule on that.  I was starting to read stuff over the
15     weekend.  But the one question I wanted you to help me with
16     because I didn't have a red line, and I wasn't going to sit
17     yesterday and do this.  What are the differences between the
18     three reports, the November, March, and May?  I feel, I'll
19     tell you my initial instinct is, yes, I think it's fair game
20     for Gibbons to criticize the FDA and perhaps even do some of
21     his own work, but I thought November would be the end of it,
22     and then I see March, and then I see May.  I feel like I
23     gave an inch and you took a mile.  That's what sort of the
24     concern I have.  What was May all about?
25          MR. BARNES:  The scenario would be November and
0043
1     March.
2          THE COURT:  And what's May?  I saw a report in
3     May.
4          MR. BARNES:  It's May of 2008, which was before
5     the first --
6          THE COURT:  So there's no new one in May?
7          MR. BARNES:  No.  No, ma'am.  It stops in March,
8     and that was a product after the first -- after the first
9     deposition in early March, in February and March, he
10     produced another report adding some additional information
11     based upon --
12          THE COURT:  Well, what was the additional
13     information?
14          MR. BARNES:  There was some additional sensitivity
15     analyses that he performed during the peer-review process
16     and as a result of reviewing the work that he was doing for
17     a published paper in the Archives of General Psychiatry.  It
18     was produced.  It was deposed very extensively by the
19     plaintiffs in February, March, and April.  There's been
20     complete disclosure of these --
21          THE COURT:  There was some argument that there was
22     no discovery on the bipolar.
23          MR. BARNES:  Total discovery on the bipolar.  They
                              Page 18

2009-07-20 PT Conference (Final).txt
24   have grilled him.  All the documents have been produced on
25   that.  They've had a chance to review it, have Dr. Greenland
0044
1    review it, have expert reports prepared.  It is totally teed
2    up for trial.  The question before the Court, as I
3    understand the only issue --
4                THE COURT:  Well, what happened new in March?
5                MR. BARNES:  Only two additional analyses that
6    were done in connection with the preparation of the
7    published paper were done in the March report.
8                THE COURT:  So that was only with respect to the
9    bipolar?
10               MR. BARNES:  Only with respect to the bipolar
11   analysis.
12               THE COURT:  Because I was trying to read and
13   red-line between the two.  The two, I think Paragraphs 19
14   and 20 or 18 and 19, the two sensitivity analyses, is that
15   the only new piece?
16               MR. BARNES:  As I understand it, yes.  We're going
17   to be talking to Dr. Gibbons this week.
18               THE COURT:  Well, if you don't know it yet, I had
19   trouble figuring out what was new.
20               MR. BARNES:  It's the sensitivity analyses.
21               THE COURT:  It looked -- when I was trying to
22   compare them, there were two new paragraphs.
23               MR. BARNES:  It goes to verifying the primary
24   analyses that he had done on the bipolar paper.  He had
25   conducted two additional sensitivity analyses to confirm the
0045
1    primary results in the paper, and they all confirmed his
2    first report, his first analysis, which was published in the
3    November report.
4                THE COURT:  Dr. Greenland makes the comment that
5    it's much toned down in the article from the actual report.
6    In other words, one says it's possible, and one says clear
7    evidence of.
8                MR. BARNES:  During the peer-review process, the
9    process is, he submits the paper to peer review for the
10   Archives of General Psychiatry.  It goes in.  There are some
11   peer-review comments.  He makes some changes pursuant to the
12   peer-review process, and it's published.  There's a
13   scientific paper which has one set of requirements, and then
14   there's the report under the Federal Rules which are his
15   personal opinions based upon his work.  The changes are --
16               THE COURT:  I know, but he can't say one thing in
17   one place and one in another.  So one thing I'm going to be
18   asking him is, he says in the paper -- I put a big square
19   under the star -- "possible."  And he says in the other one
20   "clear evidence" or words to that effect.  So what I'm
21   worried about is -- I'm really worried about it.  You can
22   definitely refer in your opening to him, you know, this
23   world-renowned awarded biostatistician who refutes the FDA's
24   findings and explained lamotrigine and Topiramate and why
25   they're disproportionate, and why if you carve those out,
0046
1    there's no differential.  But I am worried that I've got so
2    many iterations of what his opinion is -- I have to tell you
3    I hate doing this at the last minute like this.  And I was
4    really looking hard to find fault with one or the other so I
5    could rule with that, but actually there's fault on both
6    sides; that I didn't hear about it till two weeks ago and
7    that you kept changing it.  So I think it's a pox on both
8    your houses, but it leaves me with a bind in trying to
                              Page 19

2009-07-20 PT Conference (Final).txt
```
 9   figure out what the right thing to do is.
10          MR. BARNES:  One other point to help your Honor.
11   The idea between the report and the published paper, the
12   report is for litigation, and it involves more than simply
13   the issue of what was published in the published paper.
14   Dr. Gibbons' expert report not only talks about the -- that
15   statement about possible --
16          THE COURT:  Can I tell you, once it's in a
17   peer-reviewed journal, it has a little blessing, a little
18   slick halo over it, which doesn't mean that it's right or
19   not, but at least it satisfies one big Daubert thing.  As
20   soon as it's for litigation only based on stuff that I'm
21   only seeing for the first time, I've got a little question
22   mark, a red flag --
23          MR. BARNES:  But, remember, the litigation report
24   goes to all the things he has reviewed, not just the report.
25          THE COURT:  I'm warning, I'm warning, that's all.
0047
 1   Okay, so I'm not ruling yet.  I'm just concerned.
 2          You said somewhere that you didn't get discovery
 3   on the bipolar.
 4          MR. ALTMAN:  Your Honor, let me just make one
 5   comment to answer one of your questions, and then if I can
 6   take a couple minutes for the history.  I asked Dr. Gibbons
 7   in his deposition exactly the question you want to ask, and
 8   the question was, "Dr. Gibbons, if an expert were to read
 9   your report and paper and conclude that Neurontin is
10   protective of suicide, would that be correct?"  And he said
11   "No."  They use protective as I --
12          THE COURT:  I understand, that's a very strong
13   point for you, but my point to you is, I'm not overruling
14   Judge Sorokin's ruling.  It's not clearly erroneous.  It was
15   done based on failure of discovery.  I understand that he
16   did not write an opinion, but, frankly, that was because I
17   said to him, "I need something fast because if you don't
18   allow this or deny it one way or another, I've got to do a
19   Daubert hearing," you know, like, "I've got to get to this,
20   so please don't wait for three weeks because I'm right up
21   against the back of it."  I mean, I read the whole thing
22   over Memorial Day weekend.  I thought it was more of a
23   discovery matter than it was a substantive matter.  I
24   referred it to him.  I'm not overturning this, but I do have
25   to get into the weeds.
0048
 1          MR. ALTMAN:  Your Honor, one of the issues is
 2   whether Dr. Gibbons' supplemental report exceeds the scope
 3   of the Court's order in the first place, which has never
 4   been clear.  Your Honor said that --
 5          THE COURT:  I allowed that November report, and so
 6   to the extent there's new stuff in the March, that may go
 7   beyond it.  But it looked when I was reading it as if all he
 8   did was -- it wasn't new as much as a sensitivity analysis.
 9          MR. ALTMAN:  Well, he went and he fixed a bunch of
10   mistakes in his original report, which through a lot of hard
11   work we found.  He added a bunch of sensitivity analyses.
12   But one of the very telling things is that --
13          THE COURT:  Did you have discovery into the
14   sensitivity analyses?
15          MR. ALTMAN:  We did, but after his depositions,
16   we kept going -- we never even knew there was a sensitivity
17   analysis.  Dr. Gibbons said, "I turned over everything --"
18          THE COURT:  I don't think that they were pure on
19   this.  That having been said, at this point I'm not going to
```
Page 20

2009-07-20 PT Conference (Final).txt

20  resolve this on discovery sanctions.  So now I'm in the
21  merits.
22            MR. ALTMAN:  That's fine.  The one issue that is
23  very clear is, we never got -- Dr. Gibbons' original papers
24  he submitted to the journal was rejected.
25            THE COURT:  Right.
0049
1            MR. ALTMAN:  And --
2            THE COURT:  Did you get that original paper?
3            MR. ALTMAN:  We got the original paper way back,
4   but at his second deposition -- in the middle of his first
5   deposition he received the rejection.  I give them the
6   benefit of the doubt, he didn't know about it.  I mean,
7   literally on the first day of his first deposition, he got
8   the rejection letter that day.  We didn't know about it, we
9   didn't find out about it.  At the second deposition, which
10  took place because we didn't get stuff, he told us he had
11  received a letter that they asked him to revise --
12            THE COURT:  You told me all this.
13            MR. ALTMAN:  Okay.  He then went and changed his
14  paper and revised his paper right after the second
15  deposition, never told us that it had been revised.  We
16  didn't even see the version that was ultimately accepted for
17  publication until after his third deposition, when they
18  wouldn't even let us ask him questions about it.  He went
19  and he changed his March report, goes and fixes a bunch of
20  errors in his first report.  Then he puts a bunch of things
21  about the sensitivity analyses --
22            THE COURT:  Did you not get deposition into the
23  sensitivity report?
24            MR. ALTMAN:  We did for the sensitivity but not
25  about his final peer-reviewed published paper because he had
0050
1   done it on March the 15th.  He had submitted that to the
2   journal on April the 20th.  We took his deposition.  They
3   got us to agree to certain topics because we didn't even
4   know he had submitted --
5            THE COURT:  Did you ask to inquire --
6            MR. ALTMAN:  At the deposition, yes.
7            THE COURT:  And they wouldn't let you?
8            MR. ALTMAN:  They would not let us.
9            THE COURT:  Why?
10            MR. ALTMAN:  They said we had an agreement that
11  said we were not going to ask about certain things.  For
12  example, Dr. Gibbons said we didn't have any e-mails, and
13  then the day before we find out he's got 1,000 pages of
14  e-mails --
15            THE COURT:  You know, I've heard that.
16            MR. ALTMAN:  But we didn't get to ask him any
17  questions about it.
18            THE COURT:  You didn't get to get about the
19  e-mails?  Did you ask to have another deposition?
20            MR. ALTMAN:  Yes.
21            THE COURT:  Did you move to compel it?
22            MR. ALTMAN:  We talked about it, and then --
23            THE COURT:  No, excuse me.  You know what, I'm
24  here all the time.  It's really a problem in my family.  And
25  Leo Sorokin is here.  So you can move to compel if you got
0051
1   e-mails you didn't get to ask questions about.
2            MR. ALTMAN:  We did, and we moved to compel the
3   deposition of Dr. Hur, and then we were granted a very
4   limited deposition of Dr. Hur --
                              Page 21

2009-07-20 PT Conference (Final).txt

```
 5            THE COURT:  Excuse me.  I'm talking about the
 6  e-mails.  Did you ask Judge Sorokin for an opportunity to
 7  take a deposition on the e-mails or the new paper?
 8            MR. ALTMAN:  No, we did not.
 9            THE COURT:  All right, so that's the end of it.
10            If there are a few smoking gun ones, you're going
11  to have him here Thursday, ask.  But at this point, if
12  anything, if I were you, I would want the peer-reviewed
13  paper because whatever I saw was a lot softer than the
14  expert declaration, so you don't want that excluded.  That
15  is -- he's saying it's only possible, so I'll hear about
16  that.
17            But let's go through.  The plaintiffs' motion in
18  limine to preclude any evidence proffered by defense at
19  trial that any drug other than Neurontin caused or was
20  associated -- how can I say that?  She was on Effexor.  She
21  was --
22            MR. FINKELSTEIN:  Well, just as we had to go
23  through an entire Daubert hearing and challenge to prove
24  that the drug has capacity to lead to suicide, they can't
25  just pick any drug and say, "This one causes suicide."
0052
 1            THE COURT:  No, of course they can't pick any
 2  drug, but she was taking Effexor, right?
 3            MR. FROMSON:  Believe me, your Honor, the makers
 4  of Effexor deny the drug causes suicide just as much as
 5  Pfizer does.  What --
 6            THE COURT:  Excuse me.  They're allowed to point
 7  out she was on other medications.  They're allowed to point
 8  out that there's evidence that she was taking cocaine.  Of
 9  course they can do that.  I would be reversed in a
10  millisecond.
11            MR. FINKELSTEIN:  We're not saying that -- we
12  simply ask for a motion in limine that they can't say that
13  cocaine leads to suicide.  It's a very limited -- we're not
14  saying the cocaine use is out.  We don't want them to stand
15  up and argue that she committed suicide because of cocaine,
16  because of Effexor, because of all these things.  They have
17  to withstand Daubert scrutiny if they want to argue that.
18            THE COURT:  Well, let me just put it this way:  Of
19  course you're allowed to point out that she was possibly a
20  drug addict and was on Effexor and all sorts of other meds,
21  but it is in fact true that you can't say "and Effexor has
22  depressive side effects" unless you have some medical expert
23  who talks about that that's a warning from the FDA or some
24  regulatory things.  In other words, I can't do a whole
25  Daubert thing on that.
0053
 1            MR. OHLEMEYER:  We have no expert who's going to
 2  come to court and say Effexor caused her suicide.  They have
 3  an expert who's actually said that in another case.
 4            THE COURT:  I know.
 5            MR. OHLEMEYER:  We also have testimony from their
 6  experts as well as our experts that substance abuse is a
 7  risk factor for suicide.
 8            THE COURT:  Sure, you can do all of that, but what
 9  you can't do is --
10            MR. OHLEMEYER:  I think we're all on the same
11  page.
12            THE COURT:  I can't start a whole Daubert hearing
13  on Effexor, so --
14            MR. OHLEMEYER:  Understood.
15            THE COURT:  I understand that Dr. Maris said that
```

Page 22

```
                         2009-07-20 PT Conference (Final).txt
16   was a tipping point in what, the Giles case?
17              MR. CHEFFO:  Correct.
18              THE COURT:  All right, so that's denied.
19              Motion to preclude any evidence proffered by
20   defendants at trial that any drug -- oh, that was --
21              Motion in limine to preclude any mention at trial
22   by defendants that the Neurontin package insert was labeled
23   to warn against completed -- what are you talking about?  Of
24   course they can put in what was in the label.
25              MR. ALTMAN:  Your Honor, up until December of
0054
1    2005, if the company received a report of completed suicide,
2    they sent it to the FDA saying that "This is an unlabeled
3    event, it's not in our label."  But yet all of their experts
4    want to get up in front of the jury and say, "But it really
5    was in the label."  The company --
6               THE COURT:  It does say that, "suicidal."  It says
7    "suicidal."
8               MR. ALTMAN:  But from a regulatory perspective,
9    the company considered a completed suicide report to be
10   unlabeled.  Their own records, there's a statement by the
11   company that suicide is an unlabeled event.
12              THE COURT:  Can I say something?  This is one of
13   these things where maybe you all put a lot of -- but when I
14   hear "suicidal" and when a jury hears it, they're going to
15   think that it means anything -- actually, I would have
16   thought it meant trying to commit suicide or committing it.
17   Now, if it doesn't, you've got to be careful how you word
18   this, but they're allowed to put in the package insert.
19              MR. ALTMAN:  But if that were true, your Honor,
20   then why did they tell the FDA it's not in the label?
21              THE COURT:  I don't know.  Ask them that question.
22              MR. FROMSON:  Your Honor, we're not saying they
23   can't utilize the package insert.  They just can't say "We
24   warn for suicide" as the term is used in the industry.  That
25   would be untrue.
0055
1               THE COURT:  Just say "suicidal."
2               MS. ARMSTRONG:  Your Honor, just to be clear, we
3    are not going to argue that the label in 2005 or in 2004
4    contained a warning for suicide.  They are confusing
5    different components of the label to the warning section and
6    an adverse events section.  Our experts are going to talk
7    about what was contained in the adverse events section,
8    which does include references to suicidal and suicidal
9    gesture; and they're going to explain why that was
10   appropriate in light of what was known at the time, what it
11   would mean to a reasonable physician.  That's going to be
12   the type of testimony we present.
13              THE COURT:  All right, fine.
14              Motion in limine to preclude any testimony or
15   discussion by defendants that they could not have amended
16   the Neurontin label or issued strengthened warnings without
17   prior FDA approval.  That's just a legal argument.
18              MR. FROMSON:  I don't really think there's a
19   disagreement.  After having read their papers, they didn't
20   deny that there were federal regulations --
21              THE COURT:  So allowed.
22              MR. FROMSON:  Thank you, Judge.
23              THE COURT:  Allowed.
24              MR. BARNES:  Your Honor, if I may?
25              THE COURT:  Yes, yes.
0056
                              Page 23
```

2009-07-20 PT Conference (Final).txt
```
 1              MR. BARNES:  We're not going to argue that we were
 2    legally prohibited from putting in a CBE.  We do want to
 3    talk about, and it goes with what Katherine was saying, we
 4    do want to talk about the whole context of what we did and
 5    why we did it and why we did not feel it was appropriate.
 6    We're not making a legal argument we couldn't have, but we
 7    want to explain the context.
 8              THE COURT:  All right, that's got to be part of
 9    your -- just as they're putting in all this marketing stuff,
10    you've got to be able to put in what the corporation was
11    thinking about.
12              MR. BARNES:  Absolutely.  Okay, thank you.
13              THE COURT:  Fair enough.
14              Plaintiffs' motion in limine to preclude the
15    testimony of all the defendants' expert witnesses other than
16    Dr. Gibbons concerning the FDA alert and related FDA
17    subjects.  I don't know --
18              MR. CHEFFO:  I mean, I'm not sure I really
19    understand.  I mean, I think that they say that because he
20    was somehow qualified, that no one else can refer to it?  I
21    mean --
22              THE COURT:  Well, let me put it this way:  This is
23    denied, but to the extent it starts getting cumulative, you
24    don't have that much time.  I mean, time is a fabulous
25    discipline.
0057
 1              MR. CHEFFO:  We don't disagree with that at all,
 2    your Honor.
 3              MR. FROMSON:  Judge, very briefly -- and I
 4    understand your order clearly -- they went out and got
 5    Gibbons for the FDA alert because he was the only one in the
 6    world uniquely qualified to do it.
 7              THE COURT:  You know, come on, that's just all
 8    litigation posturing.
 9              MR. FROMSON:  Well, that's the way to posture to
10    the Court in order to get the Court to allow him to do the
11    rebuttal.
12              THE COURT:  He's a statistician, just like
13    Greenland is.  It's very hard stuff.  So, I mean, he's the
14    only guy who's qualified, as far as I know, on statistics,
15    but there may be other aspects about the regulatory system
16    that other people can comment on.
17              MR. FROMSON:  So then I think we're in agreement
18    that all the other experts couldn't come in and give
19    statistical opinion.
20              THE COURT:  They can't give a statistical analysis
21    unless they're qualified.
22              MR. FROMSON:  Thank you, Judge.
23              THE COURT:  I mean, I don't think any --
24              MR. CHEFFO:  But that's how this motion was.  I
25    don't think we're going to have nonstatisticians talking,
0058
 1    you know, on the details of biostatisticians --
 2              THE COURT:  Yes, I mean, I think the other aspects
 3    of the regulatory process.
 4              Anyway, motion in limine to preclude any mention
 5    at trial by defendants of bad acts of plaintiff decedent and
 6    her family and the medical history.  Like what?  Of
 7    decedent's family?  I mean, that's got to be part of her
 8    workup, right?
 9              MR. FINKELSTEIN:  Well, as relates to Ron
10    Bulger --
11              THE COURT:  That she bought drugs, of course.
```
Page 24

2009-07-20 PT Conference (Final).txt
```
12              MR. FINKELSTEIN:  A lot of this motion, and we can
13   go point by point through it, but a lot of it relates to the
14   husband, that supposedly the husband was engaged in some
15   drug sales, things unrelated to her, or things related to
16   her that were so remote that when she was fourteen years
17   old, some event occurred.
18              THE COURT:  You know, that's a very good point
19   which is the following, which is the husband.  He's been the
20   big -- is he sitting here? -- purple elephant in the room
21   for the last month.  I think we have to figure out, and this
22   is the hardest part of it, what's hearsay, what isn't
23   hearsay, what comes in, what doesn't, because a lot of
24   this -- are these two women now definite witnesses?
25              MR. CHEFFO:  They're both listed, you know, as
0059
1    witnesses.  I think the expectation is to call them.
2               THE COURT:  Because here's the issue I'm running
3    into:  In opening statements, what can you say and not say
4    about the husband?  And I thought one of the hardest pieces
5    I read was actually what is fairly construed as an admission
6    of a party opponent, what's fairly a medical record, what's
7    fairly in the DSS reports.  And I felt like I didn't really
8    understand that well enough, and it's really where I want to
9    spend a lot of time because that could be prejudicial
10   information that comes in and never gets backed up through
11   nonhearsay.  So maybe you can tell me, has someone scripted
12   through what you're planning on saying that you're now
13   claiming isn't hearsay about the husband?
14              MR. OHLEMEYER:  There will be evidence in the case
15   that --
16              THE COURT:  Who?
17              MR. OHLEMEYER:  Well, through cross-examination of
18   the plaintiffs' experts, who have talked about him in their
19   reports, that his behavior at times put her at risk for
20   other behaviors and for suicide, so --
21              THE COURT:  But the expert can't talk about it
22   unless there's a foundation.
23              MR. OHLEMEYER:  Well, the foundation would be,
24   your Honor, that throughout the medical records there are
25   discussions about Mrs. Bulger's husband being controlling,
0060
1    being abusive, and that creating additional problems in her
2    life.
3               THE COURT:  So within the medical records, all
4    right, that's fine.  So how did they get into the medical
5    records?  Do you know?  So would the doctor say that
6    "Mrs. Bulger told me X"?
7               MR. OHLEMEYER:  The history is taken from
8    Mrs. Bulger.
9               THE COURT:  All right, so that seems to be
10   admissible.  Everyone agrees.  All right, so let's just go
11   through this.  Anything in the medical records that was
12   stated by Mrs. Bulger or that the doctor relied on is
13   admissible, A, for what the experts relied on, and, B, a
14   statement of state of mind/personal history of the
15   plaintiff.  All right, so does that cover -- what else?
16              MR. OHLEMEYER:  Well, then you have social service
17   records.
18              THE COURT:  All right, all right, DSS.  Now, those
19   are harder.
20              MR. OHLEMEYER:  Well, they're certainly public
21   records, and they contain, you know, matters observed
22   pursuant --
```
                               Page 25

2009-07-20 PT Conference (Final).txt

23          THE COURT:  No, not necessarily because I've been
24 through this with many cases.  So what are you planning on
25 putting in through DSS records?
0061
 1          MR. OHLEMEYER:  Well, there are Mr. Bulger's own
 2 statements that are contained in those records.
 3          THE COURT:  All right, so this is what I want to
 4 do.  So are you putting someone on the stand from DSS?
 5          MR. OHLEMEYER:  No.  Well, no.
 6          THE COURT:  So what statements in the DSS records
 7 are you thinking about?  These are the things I don't want
 8 to do on the fly.
 9          MR. OHLEMEYER:  Sure, sure.  Statements Mr. Bulger
10 made about his relationship with Mrs. Bulger.
11          THE COURT:  Like what?
12          MR. OHLEMEYER:  That they were abusive to each
13 other emotionally and physically, that she had substance
14 abuse problems that she was not --
15          THE COURT:  So he would say that she had substance
16 abuse problems?
17          MR. OHLEMEYER:  Yes.
18          THE COURT:  All right, so why is that not hearsay?
19          MS. ARMSTRONG:  Your Honor, we actually can
20 prepare a bench memorandum on Ron Bulger's statements and
21 why they're not hearsay for you because it is somewhat
22 complicated.
23          THE COURT:  You put it in a little footnote.
24          MS. ARMSTRONG:  It was in a little footnote, and
25 then we prepared a supplemental memorandum.  And we were
0062
 1 prepared to file it, and you said, "Stop filing motions," so
 2 we didn't file it.
 3          THE COURT:  But I want to go through this now
 4 because we have opening statements, and I don't want
 5 anything in an opening statement where at least there's not
 6 a good-shot chance you're going to get in.  Bulger said to a
 7 DSS worker what, that Mrs. Bulger --
 8          MR. OHLEMEYER:  "My wife has a substance abuse
 9 problem.  She won't get help for it."
10          THE COURT:  All right, all right, all right, so
11 that seems fair enough.  We know she had substance abuse
12 problems.
13          MR. FINKELSTEIN:  It's all relative to time, your
14 Honor, as to when those statements were made and to who they
15 were made, and he contests that.
16          THE COURT:  Maybe timingwise, but let me just say,
17 there's no objection to him saying to DSS that his wife has
18 substance abuse problems.  What else?
19          MS. ARMSTRONG:  Your Honor, could I?
20          THE COURT:  Yes.
21          MS. ARMSTRONG:  There are several grounds for the
22 admission of Ron Bulger's statements.  The first is, in
23 terms of being a party, I understand your Honor has
24 determined that he made a knowing waiver.  However, his
25 waiver is ineffective or his disclaimer of the estate is
0063
 1 ineffective to the extent he has encumbered it, which there
 2 is evidence that he has done so, or to the extent that he's
 3 insolvent because his creditors are entitled to the money.
 4 And if he still has an interest in the estate, even if that
 5 is just to discharge his debts, he's a party-in-interest,
 6 and he's a party for purposes of the hearsay rule.
 7          THE COURT:  I do not accept that argument.  Now,
                        Page 26

                        2009-07-20 PT Conference (Final).txt
8    let's go through the other ones.  It may be that while he
9    was a party, if he made the statement while he was a party,
10   it may be a statement of a party opponent.  So the timing of
11   the statements may be relevant, right?  So --
12              MS. ARMSTRONG:  And there are certain statements,
13   for example, the ones that we've talked about in recent
14   hearings made to the two witnesses that were made while he
15   was still a party, while he was still the plaintiff.
16              THE COURT:  And some of those may come in as
17   excited utterances or statements against penal or pecuniary
18   interest, so I think you need to be thinking that way.  So
19   to the extent it's a statement against penal interest, "I
20   sell drugs" or "We sell drugs," it comes in.  To the extent
21   it is an excited utterance within usually 24 hours, it may
22   come in.
23              MS. ARMSTRONG:  For example, right after his
24   wife's death, he exclaimed, "I don't know what I'm going to
25   do now that I don't have her drugs to sell."
0064
1               THE COURT:  That may well come in.  So there's
2    excited utterance, there's state of mind, there's
3    declaration against penal interest.  There are other things.
4    Anything after he was a party I think you're not going to
5    get, but he was a party for a while.  I'm trying to think
6    what other kind -- you need to filter this.  In other words,
7    before you put something in an opening, make sure that
8    there's a basis.  DSS is a problem because sometimes DSS
9    gets things -- I get these records all the time -- through
10   totem pole hearsay.  Someone says something to --
11              MR. OHLEMEYER:  And they investigate, and they
12   don't substantiate them, sure, I understand that.
13              THE COURT:  So I'm not going to let it in if it's
14   not clear that it was taken in the ordinary course of
15   business by the primary person, and also it's not clear
16   always that those are findings of an agency.
17              MR. OHLEMEYER:  Correct.
18              THE COURT:  So when in doubt, leave it out of your
19   opening.
20              MR. FINKELSTEIN:  Or that they're going to bring
21   in the person who the declaration was made to, and they
22   don't it on their witness list, so --
23              THE COURT:  Right, but right now all I'm hearing
24   is the drug -- everyone agreed she used drugs, everyone
25   agreed she used drugs.  Whether she was using them on the
0065
1    night in question is a whole other story, but that's been a
2    persistent problem that's been documented many times, so --
3               MS. ARMSTRONG:  And then, your Honor, in terms of
4    what the experts can say, the law says that experts can talk
5    about hearsay or can base their opinions upon hearsay if you
6    establish a foundation for it that it is the type of
7    information that an expert in the field would reasonably
8    rely upon; and medical records, DSS records under certain
9    circumstances are the types of information that somebody
10   evaluating why somebody committed suicide would look at to
11   understand a woman's entire life history.
12              THE COURT:  Possibly, but there are two different
13   issues.  One is whether or not they can rely on it, and two
14   is whether or not you can introduce it separately.
15              MS. ARMSTRONG:  Agreed, your Honor.
16              THE COURT:  So you may not be able to introduce
17   the DSS records.  I'd have to know a whole lot more about
18   it.  The medical records are coming in, I'm assuming.
                              Page 27

```
                      2009-07-20 PT Conference (Final).txt
19   That's one thing I really --
20              MR. FINKELSTEIN:  Subject to redaction.
21              THE COURT:  Yes, but this is what I don't want to
22   be doing at side bar.  That's why I'm doing this little
23   exercise here.  So maybe you could have some people talking
24   about those medical records beforehand.
25              MR. FINKELSTEIN:  Those statements that are
0066

1    attributed to Ron, Sr., I just don't want the Court to
2    overlook that he's not a party.  And he's available to
3    testify, so they can bring him in and present that.
4              THE COURT:  I take it you're not?
5              MR. FINKELSTEIN:  We probably are.
6              THE COURT:  You can ask about it.
7              MS. ARMSTRONG:  If you say we can ask about it, if
8    he's not here --
9              THE COURT:  How do you get past your basics -- I'm
10   just curious -- that she took the drugs, the Neurontin, if
11   he's not here?  Is there any other way to do that?
12             MR. FROMSON:  Your Honor, through Ron Bulger, Sr.,
13   through the dates of her prescription period, and the fact
14   that she --
15             THE COURT:  Excuse me.  I know Ron Bulger, Sr.
16   Ron Bulger, Sr. is the direct percipient witness.  But if
17   you don't have him --
18             MR. FROMSON:  Well, the police officers
19   investigated the scene of the accident and took statements
20   from Ron Bulger, which would be considered an excited
21   utterance as well.
22             THE COURT:  I don't know that I would allow it in.
23   I don't know.  See, that's what I don't want to do on the
24   fly.  So you're saying the police report.
25             MR. FROMSON:  It's the police officer who's --
0067
1              MR. FINKELSTEIN:  It's contained right in the
2    investigating police officer.  He arrives at the scene, says
3    something in sum and substance:  "I arrive at the scene.
4    The husband comes after me, said, she came up, asked for my
5    medication.  I gave her four Neurontin.  She went to the
6    basement."
7              THE COURT:  An excited utterance maybe.
8              MR. FINKELSTEIN:  "She went to the basement."
9    This is moments after finding his wife deceased with his
10   four-year-old daughter and --
11             THE COURT:  That may well be admissible.
12             MR. FINKELSTEIN:  And reports it right to the
13   police officer.
14             THE COURT:  That may be admissible.
15             MR. FINKELSTEIN:  And he takes it
16   contemporaneously right into his report.  It's his business
17   duty to do so, and we believe it gets in that way.
18             THE COURT:  This is exactly the kind of issue --
19   you're doing all these other cosmic things -- that I need to
20   think about.
21             MR. FINKELSTEIN:  We believe --
22             MR. OHLEMEYER:  Can I say, your Honor, it is, if
23   you'll allow me 30 seconds of editorial, it is hard to
24   understand why we're working so hard to keep Mr. Bulger out
25   of the courtroom.
0068
1              THE COURT:  No, it isn't.  It's easy to
2    understand.
3              (Laughter.)
                              Page 28
```

2009-07-20 PT Conference (Final).txt
```
 4                 MR. OHLEMEYER:  And I don't disagree, which I
 5    think should give us all some pause when we start thinking
 6    about some of these evidentiary issues, and whether people
 7    are or aren't available to testify, or should or shouldn't
 8    be here to explain what happens.
 9                 THE COURT:  Well, if anybody really wants him, I
10    just put him under subpoena.
11                 MR. CHEFFO:  The only other issue I would add,
12    your Honor, is, and I don't think we really fully explored
13    this, but we know as a practical matter, as a technical
14    matter, he's not a party now, but that's really as a result
15    of the last few weeks.  I mean, to me looking at it, if
16    someone was a corporate representative, left the company,
17    you can't essentially distance yourself from -- you know,
18    the fact that during the entire discovery process, I mean,
19    for years when this case was worked up, all of the rules
20    that would apply with respect to parties, the way we
21    prepared our case, he was a party.
22                 THE COURT:  I'm not disagreeing.  I said, all
23    through the period of time where he was a party, you get the
24    admission of a party opponent.  I don't know how much falls
25    under the rest of it.  So once he stopped being a party, I
0069
 1    think you stop getting the ability to use that rule, unless
 2    you find me some cases to the contrary, because he was
 3    basically ditched.  And so he knows that, he's waived his
 4    rights, he has no stake in it, none of the things that would
 5    be protective of why you would allow an admission of a party
 6    opponent.  But you have lots of other rules, declaration
 7    against penal interest, excited utterance, et cetera; and
 8    pecuniary interest because some of this, it's an interesting
 9    issue about whether or not it's a declaration against
10    pecuniary interest.  If it's your daughter's interest, it
11    might be, it might be.  So those are things that we probably
12    should look at as well, and you all should.
13                 MS. ARMSTRONG:  Your Honor, can we submit a
14    supplemental memorandum on this issue?
15                 THE COURT:  Yes.  On that issue, it would be very
16    helpful.
17                 MS. ARMSTRONG:  Thank you.
18                 THE COURT:  All right.
19                 MR. FROMSON:  Your Honor, could we have a time
20    frame for that?
21                 THE COURT:  That's also a really good idea.
22                 MR. FROMSON:  Because if they're going to do it
23    today, we want to be able to (Inaudible) tomorrow.
24                 MR. FINKELSTEIN:  And it would be awfully helpful
25    if they just outlined those statements that they intend to
0070
 1    offer.
 2                 THE COURT:  And you too, though.  I think maybe --
 3    it's a little hard to -- you know, I know it's like warfare,
 4    and everyone's in their game rooms trying to figure out what
 5    to do, but at least the following:  Figure out your opening
 6    statement, and any statement that you plan on using in your
 7    opening statement, you know, any evidence that may raise one
 8    of these hearsay concerns, why don't you let me know by
 9    Wednesday with a little reason why it's admissible.
10                 MR. OHLEMEYER:  Can I make a suggestion also?
11                 THE COURT:  Yes.
12                 MR. OHLEMEYER:  Can we perhaps exchange any
13    demonstrative exhibits we're going to use in our openings by
14    Friday?
```

2009-07-20 PT Conference (Final).txt
```
15              THE COURT:  Yes.  That's a great idea.
16              MR. FINKELSTEIN:  Well, I don't even know what
17   we'll be using yet.
18              MR. OHLEMEYER:  Let's do it by Friday.
19              THE COURT:  Are you planning on using anything,
20   any?
21              MR. OHLEMEYER:  Demonstrative exhibits?
22   Certainly.
23              THE COURT:  Like big, you know, HD --
24              MR. OHLEMEYER:  I'm low-tech, Judge.  Just posters
25   and easels.
0071
 1              THE COURT:  Speaking of which, have you all
 2   practiced using this equipment?
 3              MR. FROMSON:  Yes, your Honor.  I've been here for
 4   four years with you.  We've used this equipment many times.
 5   And my point is, we do the PowerPoints on the fly.  I do my
 6   demonstratives based upon the testimony --
 7              THE COURT:  But don't do it on the fly for your
 8   opening.  Show it to him.
 9              MR. OHLEMEYER:  Can we exchange on noon Friday?
10              THE COURT:  Noon Friday sounds very good.
11              MR. FINKELSTEIN:  I can tell you, Judge, we won't
12   have it.
13              THE COURT:  Then don't use it.  Otherwise, I can't
14   rule on it.  It's in your interest to do it by noon on
15   Friday.
16              MR. FINKELSTEIN:  8:30 Monday morning, your Honor?
17   Just give us the weekend to work through it?  There is a
18   time element --
19              THE COURT:  Let me put it this way:  If you want
20   to do it at 8:30, I guarantee you, though, that if I rule
21   against you because something is prejudicial, you won't have
22   time to edit it.
23              MR. FROMSON:  We take it out.
24              MR. FINKELSTEIN:  We'll be able to edit, no
25   problem.  No problem.  We have PowerPoint, no problem.
0072
 1              THE COURT:  I hate to destroy someone's weekend,
 2   but let me ask you this:  Are you all working all weekend
 3   anyway?
 4              MR. FINKELSTEIN:  Yes, your Honor.
 5              MR. CHEFFO:  Yes, your Honor.
 6              THE COURT:  Last weekend was the last hurrah?
 7   Maybe two weekends?  So not 8:30 Monday morning.  That just
 8   seems too unfair for them to read it and to respond to it.
 9   Pick a date over the weekend that you'll get it to them.
10              MR. FINKELSTEIN:  Sunday at 5:00?
11              MR. FROMSON:  Your Honor, if the parties are able
12   to discuss exhibits at 8:30 in the morning on various
13   issues --
14              THE COURT:  No, no, no, because just everyone's
15   nervous, it's your first day.  You know what, actually,
16   actually, though, I'm wrong, I'm wrong because we're picking
17   a jury Monday.  Fair enough, 8:30 on Monday.
18              MR. FROMSON:  Thank you, Judge.
19              THE COURT:  8:30 on Monday.  I forgot about that
20   we're not doing openings till the next day.  When you come
21   in on Monday, maybe you can share everything Monday morning,
22   all right, both of you.  I forgot that we're not doing it
23   till Tuesday.
24              MR. FINKELSTEIN:  And in the spirit of sharing, we
25   are going to offer Ron Bulger, Sr.'s statement to the police
```
Page 30

2009-07-20 PT Conference (Final).txt
0073
1   officer as an excited utterance, so they can get working on
2   that, at the accident scene.
3          THE COURT:  So the motion in limine to preclude
4   any mention at trial by defendants of bad acts of plaintiff
5   decedent and her family and the medical history of
6   decedent's family, well, it's certainly denied with respect
7   to decedent.  And the medical history of decedent's family?
8          MR. FINKELSTEIN:  As to her mother and issues
9   relating to her mother, and they raise issues of Ron, Sr.'s
10  drug use, and these ancillary --
11         THE COURT:  But that could be stressors on her in
12  terms of her suicide.  I mean, to the extent it's otherwise
13  relevant, denied.  I don't think I'm going to go back to the
14  beginning of time.  To the extent it was happening --
15         MR. FROMSON:  That's a very important point, your
16  Honor, as opposed to going back thirty years.
17         THE COURT:  Right, we're not going back thirty
18  years, but what you could go back to is, you know, what was
19  happening -- don't forget, she tried to kill herself,
20  depending on how you count it, three times or so.
21         MR. OHLEMEYER:  Exactly, your Honor.
22         THE COURT:  And so what was going on in her life
23  then, I think that's all relevant, and her medical history.
24  It is true what happened to her mother as a girl.
25         MR. OHLEMEYER:  No, but what happened to her as a
0074
1   girl because of her mother may be relevant.
2          THE COURT:  Sure, sure.
3          MR. OHLEMEYER:  Thank you.
4          THE COURT:  So I think I've gone through all the
5   motions in limine except Gibbons, which is the hard one out
6   there.
7          MR. FINKELSTEIN:  Your Honor, there's a motion,
8   plaintiffs' motion, miscellaneous subjects.
9          THE COURT:  Oh, what is it?
10         MR. FINKELSTEIN:  I just don't know off the top of
11  my head.
12         THE COURT:  I can't remember either, so, I mean --
13         MR. ALTMAN:  Your Honor, there's also the
14  Weiss-Smith motion as well, which has been sitting out for a
15  while which you deferred until this point in time.
16         THE COURT:  I have not reread the Weiss motion.  I
17  haven't seen -- what I said was, don't ask me to micromanage
18  each area.  It's clear that she's qualified to talk about
19  certain things and not other things, and you wanted me to go
20  line by line through her report, which I'm not going to do.
21  And at some point I should reread her -- thank you for the
22  reminder -- I will reread the Weiss report, which I haven't
23  done in a very long time.  So I need to read the Weiss
24  report again and the -- it's clear she can say some things
25  and not other things.  This is a partial, and I'm not going
0075
1   to go line by line.
2          MR. ALTMAN:  Okay, we just don't have any
3   guidance.
4          THE COURT:  Yes, you do.  I'm not going to do
5   that.  You'll object, like in any expert, and if I think
6   it's beyond her report or expertise, I'll worry about it.
7          When is Maris and Kruszewski going to update their
8   reports, or aren't they?  Do you know yet?
9          MR. FROMSON:  Your Honor, I believe we sought
10  leave to amend Dr. Roh's report regarding toxicology issues.
                              Page 31

2009-07-20 PT Conference (Final).txt
11   I don't know if that was one of the motions you denied
12   saying, "Stop filing motions."  I just don't recall.
13              THE COURT:  No, I think that's fine.  I allowed
14   you to do that.
15              MR. FROMSON:  Okay.  And as far as Dr. Kruszewski
16   and Dr. Maris, I simply don't know if they've had an
17   opportunity to complete their review of depositions, those
18   witnesses.  And I've apprised them of the 48 hours before
19   they hit the stand, if they have anything extra on those
20   issues, which shouldn't be much.
21              THE COURT:  But before we go through this
22   exercise, are the two women going to testify?  At some point
23   you need to put your stake in the ground because I don't
24   want to make them go through --
25              MR. OHLEMEYER:  I think it's our intention -- it's
0076
1   our intention that one of them would, at least one.
2              THE COURT:  And the general drift of it being?
3              MR. OHLEMEYER:  The discussion of --
4              THE COURT:  The one I heard about?
5              MR. OHLEMEYER:  Correct.
6              MR. FROMSON:  Your Honor, I believe there's only
7   an issue of one being a witness.  You said we could depose
8   the other witness if they were going to call her, so I
9   presume they're not calling --
10              THE COURT:  Are you calling Samantha?
11              MR. OHLEMEYER:  No.
12              THE COURT:  All right.  So I think you probably --
13   well, do you want to supplement?
14              MR. FROMSON:  Your Honor, I believe at the
15   previous conference, I did not attend, but my understanding
16   from reviewing the conference transcript was that you had
17   said we could have them supplement within 48 hours of
18   hitting the stand, so I would simply rely upon that guidance
19   from the Court.
20              MR. FINKELSTEIN:  And they're actively working on
21   it.
22              THE COURT:  I just don't want to play games, cat
23   and mouse.  They are going to change --
24              MR. FINKELSTEIN:  They're actively working on it.
25   They're going to supplement.  It's going to be very brief.
0077
1   It's not a long --
2              THE COURT:  So what are the various miscellaneous
3   subjects?
4              MR. OHLEMEYER:  Are we at the loose ends section,
5   your Honor?  I've got a couple of housekeeping.  Do you
6   exclude witnesses, fact and expert?
7              THE COURT:  Can we just -- no, I think they --
8   just like you had your golden rule objections, I think --
9              MR. FROMSON:  Ours are similar in nature, your
10   Honor.
11              THE COURT:  Yes, they're similar.  Yes, you
12   shouldn't argue that plaintiff adversely impacts -- no one
13   should talk about the pharmaceutical industry in general.
14              MS. ARMSTRONG:  Your Honor, our only issue on some
15   of these were, some of them would go to proportionality of
16   punitive damages.  Punitive damages, to the extent awarded,
17   have to be limited, have to be an amount reasonably
18   necessary to accomplish the deterrent effect, should not be
19   overdeterrent; and the fact that a punitive damage award
20   would reduce innovation, would reduce the availability of
21   medicines, that's relevant to how much of a punitive damage
                                        Page 32

2009-07-20 PT Conference (Final).txt
22  award would be sufficiently deterrent or overdeterrent.
23          THE COURT:  I think that's fair, I mean, in the
24  context of punitive damages only.
25          MR. FROMSON:  If they meet that burden, your
0078
1   Honor, then I can understand that.  I don't think they will,
2   but certainly the deterrent should be passed on to the
3   consumer.  They shouldn't be allowed to come in to the jury
4   say, "We did something wrong, we're going to get punished,
5   and guess what, we're going to pass it on to you."  Then
6   there would be no deterrent.
7           THE COURT:  No, no, no.  It's got to be the
8   punitive piece of it.  It's only about make it proportionate
9   so that if it's too great.  I think that's fair, to the
10  extent you're sending messages to the industry or to --
11  which is part of what punitive is about, right?  So fair
12  enough.  Not on the stock price of Pfizer.
13          MS. ARMSTRONG:  No, your Honor.
14          THE COURT:  Okay, or not on insurance.
15          MS. ARMSTRONG:  No, your Honor.
16          THE COURT:  I think cost of purchasing
17  medications, cost of innovation, that is --
18          MS. ARMSTRONG:  The same rationale on over-
19  deterrence.
20          THE COURT:  There is an interesting legal argument
21  here which I won't get to, which is we will send -- let me
22  ask you this:  The Massachusetts statute penalizes with
23  punitive damages gross negligence.  They've made a
24  constitutional argument.  I don't want to rule on that
25  before trial because I think that's an interesting and
0079
1   innovative question.  So either you can drop the gross
2   negligence, and we just leave it with recklessness and
3   intentional, or I would just ask them to check off what the
4   grounds were for doing it, and we could deal with the
5   constitutional issue later.
6           MR. FROMSON:  Your Honor, can I consider that
7   because I can't give you an answer right now?
8           THE COURT:  If you try and explain to someone the
9   difference between gross negligence and recklessness, they
10  look at you as if you're speaking another language.  So my
11  personal preference is to leave it where it's very safely
12  placed in intent and recklessness, but I think the Supreme
13  Court is giving strong signals in this area.
14          MS. ARMSTRONG:  Your Honor, they did not actually
15  request a gross negligence instruction in their jury
16  instructions.  We did a simultaneous exchange.  But we agree
17  that it's the difficulty in explaining the concept of gross
18  negligence that is the basis for our constitutional
19  challenge.
20          THE COURT:  So maybe you weren't planning on it
21  anyway.  I missed that, I missed that.
22          MR. FROMSON:  I believe she's accurate, which is
23  why this threw me for a loop because I'm focusing on the
24  reckless and conscious disregard.  And I believe she's
25  accurate.  I don't think there is an issue.  That's why I
0080
1   couldn't say one way or the other because I --
2           THE COURT:  I'm just going to assume it's a
3   nonissue until you tell me otherwise.  We have so much to
4   deal with that I'm just going to put that one to bed unless
5   you resurrect it at some point, all right?
6           And, yes, nothing about the litigation crisis or
                              Page 33

                        2009-07-20 PT Conference (Final).txt
 7   about lawyers or about the FDA rules.  That will just all be
 8   done as a matter of law.  Okay, I think we've dealt with
 9   miscellaneous.
10            MS. ARMSTRONG:  Your Honor, could I just raise a
11   couple of issues on the miscellaneous?  Part of their motion
12   went to lawyer advertising.  We do have an issue in this
13   case that certain adverse event reports were generated as a
14   result of lawyer advertising.  And, also, if they're going
15   to offer --
16            THE COURT:  Well, how many -- I'm glad you
17   mentioned it.  I forgot that issue.  How many came in after
18   the advertisements?
19            MS. ARMSTRONG:  There's hundreds.
20            MR. CHEFFO:  Yes, I think they filed over 200, 250
21   or so that were essentially, I think, fairly correlated with
22   the advertising, and in fact may have been filed by counsel
23   themselves.
24            THE COURT:  So that might -- if you're planning to
25   put in the volume of AEDs, which are appropriate -- AERs?
0081
 1            MR. ALTMAN:  Your Honor, we have no intention of
 2   introducing a number of adverse events after the second half
 3   of 2003.  Lawyer advertising didn't begin until later that
 4   part of the year --
 5            THE COURT:  Well, I'll wait and hear your thing,
 6   and then just don't mention it in the opening.  I'll wait
 7   and hear.  I'll wait.
 8            So, all right, trial procedures, do we want to
 9   sequester witnesses?
10            MR. OHLEMEYER:  Do you draw a distinction, your
11   Honor, between fact witnesses and expert witnesses?
12            THE COURT:  I'm looking to all of you.  Sometimes
13   lawyers care; sometimes they don't.  For sure fact
14   witnesses, fact witnesses except parties, so one corporate
15   representative is allowed to be here, and Dr. Egilman is
16   allowed to be here.
17            MR. FROMSON:  An expert shouldn't have to be
18   sequestered, your Honor.
19            THE COURT:  Experts in general I don't sequester
20   unless anybody sees a strong reason for it.
21            MR. OHLEMEYER:  Not here, your Honor.
22            THE COURT:  So "yes" to fact witnesses, "no" to
23   experts.  Are either of the treating physicians coming in?
24            MR. FROMSON:  Your Honor, one treating physician
25   is dead.
0082
 1            THE COURT:  That's Goldman?
 2            MR. FROMSON:  Yes, and the other one is out of the
 3   country.
 4            MR. FINKELSTEIN:  In Africa.
 5            MR. FROMSON:  And Dr. Akabane is local, and I
 6   don't believe he's on our live witness list.
 7            THE COURT:  Proposal for witness exhibits and
 8   demonstrative exchange.  So all the witness exhibits will be
 9   exchanged by 8:30 the morning the witness comes on the
10   stand.  The demonstratives, at least for openings, will be
11   Monday morning, and to the extent demonstratives are
12   planning on being used, by 8:30 that morning.
13            My goal is that each witness will have a pile of
14   exhibits right there so you don't have to go back and forth.
15   You don't have to say, "Can I approach the witness?  Yes,
16   you can."  If it gets too aggressive, I might change that
17   rule, but you're all very polite and well-polished.  So
                                Page 34

                         2009-07-20 PT Conference (Final).txt
18  just, you know, have a pile of exhibits.  Each side will
19  have a pile.  You can go through them.  Ideally I'll have a
20  pile, and then we can go through them.
21          I do want to say on witnesses, I know this is an
22  incredibly important case for both sides, but to the extent
23  there are young associates or young partners, I won't eat
24  them alive if you want to put on some small, you know, some
25  witness or part of a witness through somebody just for the
0083
1   trial experience of it.  So it's worth trying.
2          On the witness access to daily transcript, you
3   all -- are both sides ordering daily transcripts?
4          MR. FINKELSTEIN:  Yes.
5          MR. CHEFFO:  I assume we are, your Honor.
6          MS. HEGAR:  We are.
7          MR. CHEFFO:  We are.
8          THE COURT:  I don't have a problem with a witness
9   seeing the daily transcript of what he or she said the day
10  before but not showing it to other witnesses, right,
11  because --
12          MR. OHLEMEYER:  I think it's just parallel with
13  the exclusion.  I assume, if you don't exclude the experts,
14  the question is, rather than have the expert have to be here
15  to see the witness, could the expert see --
16          MR. OHLEMEYER:  Absolutely.  And there's
17  technology, by the way.  They can be sitting in their
18  office.  I mean, you know, we're not allowed under the rules
19  to broadcast or send out to the public, but there's
20  technology that, you know, if the expert wants to be
21  watching, can do.  So if they want to sit here, fine.  If
22  they want a transcript, fine.  But not fact witnesses.
23  That's a whole different --
24          The process for qualifying experts is, I think you
25  put on all their qualifications, and then you just keep
0084
1   going.  I don't think there are any challenges to any of the
2   witnesses as being qualified, although like with the Weiss
3   report, you have challenges to her qualifications for
4   certain things and not for other things.
5          MR. FINKELSTEIN:  Right.
6          THE COURT:  And that may be true for other people,
7   but am I right that none of the witnesses are being
8   challenged for qualifications?
9          MR. OHLEMEYER:  I think it depends, your Honor, on
10  Dr. Roh.  I mean, there might be some witnesses who there
11  may not be a foundation.  I just don't know.
12          THE COURT:  Roh is who, the toxicologist?
13          MR. OHLEMEYER:  Correct.  Well, he's not a
14  toxicologist.  He's a forensic pathologist actually.
15          MR. FINKELSTEIN:  A forensic pathologist.
16          MR. OHLEMEYER:  I think he's the only one that
17  there might be a qualification.
18          THE COURT:  A forensic pathologist can't know
19  what's in the blood?
20          MR. OHLEMEYER:  It depends on the foundation.
21          THE COURT:  I don't know.  Well, you'd better let
22  me know.  That's a biggy.  It makes sense that somebody
23  who's a forensic pathologist will know how to read a
24  pathology report.
25          MR. FINKELSTEIN:  A toxicologist.
0085
1          THE COURT:  Storage of boxes in the courthouse,
2   that you'll have to deal with Robert on.
                         Page 35

2009-07-20 PT Conference (Final).txt
3      All right, 48-hour witness disclosure rule.  Juror
4  note-taking, I allow and encourage jurors to take notes.
5          MR. FROMSON:  Unless I misheard, Judge, you
6  changed the 48 to 24 hours.
7          THE COURT:  Oh, 24, I did.  It's 48 only with
8  respect to the Maris and Kruszewski reports.
9          Ten jurors, yes.  Juror strikes I talked about.
10         Robert keeps the time during trial.  What did we
11 agree on, 21 hours a side?
12         MR. OHLEMEYER:  Correct.
13         THE COURT:  But I would strongly encourage some
14 enterprising paralegal to correlate with him by the end of
15 the day.  I mean, I don't do it literally down to the
16 minute, but I do at some point -- what I'd love to do is
17 send this to the jury on the Thursday of that last week, and
18 I plan to try and scale it, but if the jurors consistently
19 come in at 9:15 or one of the lawyers gets sick or a witness
20 shows up late, I mean, we may have to go into a few
21 afternoons to meet that schedule.  So we're keeping our
22 afternoons light in August, and I'd encourage you to do the
23 same.
24         I don't need every lawyer here every day, so if
25 one of you needs to leave, fine.  I'm not going to comment
0086
1  on it, you know.  That's very expensive.  Why do you all
2  need to be here?
3          MR. OHLEMEYER:  Can I ask a question?  What's your
4  intention, Judge, with respect to the jury and the time?
5  Are you going to tell them it's a timed trial?  And the
6  reason I ask is, you know, you wonder whether it might help
7  them understand why certain things are being done and not
8  done.
9          THE COURT:  I'm happy to tell them.  I think
10 they're usually thrilled.  They don't compliment me on much,
11 but they like the fact that the trial is exactly on
12 schedule.  I mean, they like that, and so I'm happy to tell
13 them that I'm the bad guy.
14         MR. OHLEMEYER:  Well, I think, in terms of your
15 venire, I think telling them that the case will be a
16 three-week trial, not a three-week trial that turns into a
17 six-week trial, might be helpful in generating --
18         THE COURT:  That's a great idea.  Are you all
19 having jury consultants?
20         MR. CHEFFO:  Yes.
21         THE COURT:  Are they going to be up at side bar?
22         MR. OHLEMEYER:  Not likely.
23         MR. FINKELSTEIN:  No.
24         MR. CHEFFO:  On the 48-, now 24-hour rule, the
25 only thing I wanted to get some guidance from the Court on
0087
1  is, I think we get it with respect to the live witnesses and
2  documents.  You've covered that.  But to the extent that
3  it's witness by deposition, can we also have an agreement
4  that when they're disclosed, that their testimony is also,
5  because that's going to be a little more difficult perhaps
6  at 8:30 in the morning to go line by line.  If we can try
7  and work some of this out.
8          THE COURT:  Let's get to that right now.  I
9  haven't ruled -- how much is coming in by deposition from
10 plaintiffs?
11         MR. ALTMAN:  Your Honor, we're not exactly sure,
12 and we've been working with the other side very carefully on
13 this, and it really was very dependent on your rulings on
Page 36

2009-07-20 PT Conference (Final).txt
14  motions in limine so that we could know a lot of the
15  objections and issues were tied up with it.  Now that we've
16  gotten the answers to most of the motions in limine, we plan
17  to go back, sit down, see what we still have disagreements
18  on so that we can focus --
19               THE COURT:  So one of the things I find very
20  difficult and frustrating, and it happens a lot, is that the
21  morning that you want some deposition testimony read in,
22  I've got fifteen or fifty objections to get through.  So how
23  are we going to make sure that I get it 48 hours in advance
24  to be able to rule?  Are they all videotaped, or is it just
25  reading in?
0088
1               MR. ALTMAN:  They're all videotaped, your Honor.
2               THE COURT:  So you're going to need it in advance
3  anyway in order to edit.  That's really a serious issue.  So
4  if you could just work out any differences.  And then what's
5  easy for me is, when you designate on a transcript, then you
6  cross-designate in different Magic Markers, or whatever they
7  call them, Flairs.  And then to the extent that there's an
8  objection, just say "Objection, hearsay."  I'll go "Allowed,
9  denied, allowed."  I'll go through it all, and if you get
10  that to me 48 hours in advance, I'll try and do it.
11               MR. FROMSON:  Your Honor, the only hitch is, my
12  experience tells me I might not know what I'm going to be
13  playing two full days in advance of that witness.
14               THE COURT:  You know, I know you say this to me.
15  Do your best.  And if something else sneaks in and you need
16  it, you'll tell me.  I just can't rule that -- I'm fond of
17  using the metaphor, "I'm not ATM justice."  You can't spit
18  it in and spit it out.  I need to sit up in my office and
19  just read it.
20               MR. FROMSON:  I appreciate that.  So we're not
21  bound by 48 if there's something else I need to put in, I
22  find it --
23               THE COURT:  Of course, it's fluid.
24               MR. FROMSON:  Thank you, Judge.
25               THE COURT:  I'm just saying work out as much as
0089
1  you can.
2               MR. FROMSON:  Thank you, your Honor.
3               THE COURT:  I won't rule on 150 objections.
4  That's always silly.  But there tend to be certain big
5  issues that I need to rule on, and then I'll rule and go
6  "Allowed, denied," and you'll be able to edit.  Otherwise
7  it's impossible.
8               MR. FROMSON:  May I ask a question then on this
9  note about designations?  We did submit a motion to
10  designate additional testimony of approximately two pages,
11  and you denied it outright and said "No more motions."
12  Would that be the type of designations you would now be
13  willing to reconsider?
14               THE COURT:  I don't even remember.
15               MR. FROMSON:  Well, I can understand that.
16               THE COURT:  At some point I stopped.
17               MR. FROMSON:  But we have two pages of testimony
18  which literally is less than three minutes of testimony.
19  That was my fault.  It was my oversight.  I did not
20  designate it.  We reached an impasse.  And so I would like
21  to at least bring that to the Court's attention and have the
22  Court at least reconsider it.
23               THE COURT:  I am hoping that you will be -- I
24  don't remember what I ruled on that.  Was that before I
                              Page 37

2009-07-20 PT Conference (Final).txt
```
25  closed down?
0090
 1              MR. FROMSON:  Denied, no further motions.
 2              MR. CHEFFO:  It's not quite that simple.  They
 3  already have about fifteen witnesses they probably have ten
 4  hours of, so this is, it's actually substantive.  I told --
 5  Ken knows it --
 6              THE COURT:  If he just did it by oversight, I'm
 7  going to allow him to do it.
 8              MR. CHEFFO:  But it wasn't oversight.  If it was
 9  oversight, I would certainly have allowed it.  If it was a
10  missing word, we have a --
11              THE COURT:  And I'll do the same for you.  It's a
12  big trial.  I'm going to let them do it.  Now, if it's not
13  admissible for other reasons, that's another story.  But it
14  wasn't.  If I remember correctly, it was a doctor.
15              MR. FINKELSTEIN:  A doctor and a sales rep.
16              MR. CHEFFO:  Okay.  I mean, your Honor, I think
17  you'll see it when we -- we'll present it and we'll have our
18  objections.  It wasn't technical.
19              THE COURT:  There may be other objections.  I'm
20  just simply saying, if it was just an oversight, just be
21  flexible.
22              Media communications, so what's that about?
23              MR. CHEFFO:  I think we put it on the list,
24  frankly, out of an abundance of caution just to find out,
25  frankly --
0091
 1              THE COURT:  There was a little article in
 2  Boston Magazine someone sent me, but other than that, I've
 3  seen nothing.  Is the press all over this?
 4              MR. CHEFFO:  I don't think that they are.  I
 5  think, frankly, we just put it jointly on there to find out
 6  if the Court had any guidance/preference.  If not, then I
 7  think -- we just wanted to make sure, I think both sides, we
 8  didn't run afoul of any of the Court's guidance or rules.
 9              THE COURT:  I've seen almost nothing on it.  There
10  was a little tiny blurb in Boston Magazine.  Am I missing
11  something?
12              MR. CHEFFO:  No.
13              MR. FROMSON:  No.
14              MR. CHEFFO:  But the trial hasn't started yet.
15  Again, it may be a nonissue, your Honor.
16              THE COURT:  I think we have a local rule on
17  communication with the press, and in general that should
18  govern.  I haven't looked at it in so long, I don't even
19  remember.  So I think I don't want to try to the press,
20  let's put it this way.  And if we get to the point where
21  people, plaintiffs or defendants, are trying it to the
22  press, I'd be upset.  I don't think I'm going to put a gag
23  order on the witnesses or that sort of thing.  Lawyers have
24  certain obligations.  Have you been in touch with the press,
25  anyone from the plaintiffs' side?
0092
 1              MR. FINKELSTEIN:  No, not recently, not in the
 2  last two months.
 3              THE COURT:  Okay.  Have you?
 4              MR. CHEFFO:  To my knowledge, I don't --
 5              THE COURT:  Anyone issuing press releases?
 6  Anyone?  All right, so just no press releases.  You know,
 7  there are certain limits.  I mean, if someone just simply
 8  asks some procedural question, I don't really care very
 9  much, but we shouldn't try it in the press.
                              Page 38
```

2009-07-20 PT Conference (Final).txt
10          MR. FROMSON:  Your Honor, there's an issue that
11 you brought up this morning regarding the number of jurors.
12 What we haven't had a clarity on is, we would want the
13 confirmation that the jury verdict would not have to be
14 unanimous.  We had suggested twelve jurors with a verdict
15 requirement of nine.  You had mentioned ten today.  We were
16 going to suggest eight out of ten.  And we also didn't know
17 whether you were going to have alternates.
18          THE COURT:  No alternates, and the rule in Federal
19 Court is unanimous.
20          MR. FROMSON:  So it's going to be ten unanimous?
21          THE COURT:  Yes.  If I don't get enough jurors, I
22 might go down to eight, but I need at least two that could
23 fill in.  I need six.  Generally, on a one-week trial, I do
24 eight.  This is a three-week trial, so I'm going to try for
25 ten just so we don't have to retry the thing.  If in fact I
0093
1 start running out of jurors because of vacation schedules
2 and the like, I can go down as low as eight, but I'd hate to
3 go below that.
4          MR. FROMSON:  Understanding that, your Honor, if
5 you ultimately get ten jurors who make it through the trial
6 and you didn't have any difficulties with people's health or
7 vacations or conflict, then I would have thought it could
8 make sense to only require eight to reach a unanimous
9 verdict out of the ten.
10          THE COURT:  I'll stick with the ten.
11          MR. FROMSON:  Thank you, Judge.
12          THE COURT:  So you are quite correct, I have not
13 yet written the motion to exclude the specific causation
14 testimony of Drs. William Maris and Stefan Kruszewski.  That
15 motion is denied.  I haven't written it yet, the motion to
16 exclude.
17          Now, let me just say this about that:  Both the
18 psychological autopsy and the differential diagnosis are
19 used in multiple cases, in fact, and appear in peer-reviewed
20 literature.  I haven't written this up yet because most of
21 the challenges go to the weight, but the concern I have is,
22 it's a soft science.  I don't know how else to say this.
23 It's not like what we were talking about with serotonin.
24 It's a scientific methodology, but it isn't scientific in
25 the same way that a hard science is.  It's psychiatry.  I
0094
1 mean, it is what it is.  And so I think you can't overbill
2 it in how you're describing it.  It's just a method of
3 organizing information, as I understand it:  Here are the
4 records, here are the reports, here's what's seems
5 protected, here's what seems risk.  It's not like a science
6 that's going to predict; you know, that's going to tell you
7 with definitive certainty that this is it and not this.  I
8 mean, it's basically his opinion as a psychiatrist, right?
9          MR. FINKELSTEIN:  Yes.
10          THE COURT:  So what I'm most concerned about is
11 overbilling of what it is, and so I do worry -- I have the
12 sex offender cases, and it's the same kind of thing, it's a
13 way of organizing information, but it is not a science in
14 the sense of a lab experiment.  So the motion to exclude the
15 testimony of Sheila Weiss-Smith --
16          MR. FINKELSTEIN:  Your Honor, I'm sorry, just
17 before we move off of No. 1, I'm completely changing topics,
18 I apologize in advance.  I just want to bring to the Court's
19 attention, we're also waiting on your decision as relates to
20 the Smith matter because once we receive that decision on
                              Page 39

                          2009-07-20 PT Conference (Final).txt
21  only that one issue, then we can move for remand and get
22  moving on the plaintiff's case down in --
23              THE COURT:  That's right, and the reason it hasn't
24  been remanded is because I've been busy with everything else
25  under the sun, so I have just not written it.  That's the
0095
 1  problem.  I need to write it in a way that another court
 2  will understand, and I'm not -- I've been doing -- let's say
 3  about 30 percent of my court time right now is on Neurontin,
 4  so just I haven't had a chance to write it.
 5              MR. FINKELSTEIN:  And in no way was I trying to
 6  put any additional pressure.  I just want to bring it to
 7  your attention.
 8              THE COURT:  And do you know the AWP cases are
 9  flowing in this week?  So I'm really busy on this stuff.
10  But you're right, it is holding up.  I've told the
11  magistrate judge, Judge Sorokin, to hold up on remanding
12  Smith till I can write it.
13              MR. FINKELSTEIN:  Thank you.
14              THE COURT:  And that's important because we need
15  this case tried, we need Smith tried, and I want the
16  Shearer -- is that the other Massachusetts case? -- tried,
17  and then I want to send this to some sort of global
18  resolution.  I think, until you see your best case, their
19  best case, and maybe a second Massachusetts case I have some
20  control -- what's that, sort of a middle-of-the-road, no
21  one's picked, isn't it?  Is that right?
22              MR. FROMSON:  That's right, it was picked by the
23  Court.
24              THE COURT:  Yes.  And then I'm hoping that we can
25  do some global resolution or at least start talking that
0096
 1  way.  If you lose everything, it's one number.  If you lose
 2  everything, it's another.  And we'll just see where it goes.
 3              Motion to exclude the testimony of Sheila
 4  Weiss-Smith, I'm not going to micro, go through opinion by
 5  opinion.  I will reread her report so I'll be up to speed on
 6  that.
 7              Motion regarding no new witnesses, what was that
 8  about?
 9              MR. FROMSON:  Your Honor, a witness who was on our
10  Rule 26 disclosure, whose name I do not recall off the top
11  of my head, she was the plaintiff's employer where the
12  plaintiff worked, and we disclosed the plaintiff's employer
13  but not the individual's name.  Then the individual was
14  named in a deposition, all right.  Then we supplemented our
15  Rule 26 disclosure in May to give the individual's name.
16  You said "no new witnesses."  I don't know if that would be
17  the type of witness you would consider as new considering
18  they knew about --
19              THE COURT:  I don't know.  You were trying to
20  shovel in a huge number of new people.  I didn't focus on
21  any individual one.
22              MR. FROMSON:  So this one, this motion which is
23  before you, this memorandum which is very short just gives
24  the names of these two individual witnesses, excluding all
25  the others who we don't have a problem with.  In other
0097
 1  words, we understood your order, we understand what's new,
 2  but these we don't --
 3              THE COURT:  Was this on the Rule 26 disclosure?
 4              MR. FROMSON:  It is in May of 2000.  Yes, we did
 5  do that.  We put it on our Rule 26 disclosures.
                              Page 40

2009-07-20 PT Conference (Final).txt
6          MR. CHEFFO:  These were the -- I mean, again,
7    first, now we have a few pages of here, we have new
8    witnesses.
9          THE COURT:  A few pages is different.  No new
10   witnesses is different.  So if the name was disclosed on the
11   26 disclosure, it comes in.  If it wasn't disclosed, it
12   doesn't.
13         MR. CHEFFO:  Well, I mean, if it was a disclosure
14   after the witness lists were due?
15         MR. FROMSON:  It was done contemporaneously.
16         THE COURT:  No, if it was -- he says it was
17   disclosed in May of 2000.
18         MR. FROMSON:  May of 2009, this year.
19         THE COURT:  No.
20         MR. FROMSON:  Well, your Honor, it's still within
21   the time frame of --
22         THE COURT:  No.  The theory is that you should be
23   able to do discovery on the people.
24         MR. FROMSON:  They did.  They had the names of
25   these witnesses.  They --
0098
1          THE COURT:  No, no, no.
2          Motion for additional time to present trial
3    testimony at the July -- I am going to try if we start
4    running a little late, but I can't do it on July 27.  We
5    just have other things.  The 27th is hopeless.  I'm on the
6    First Circuit, and then we're impaneling.  And, besides,
7    that first week in July we probably won't stay late.  It's
8    the next two weeks in August that I'm making really light
9    because we need the flexibility.
10         Motion to supplement trial testimony.  For that
11   small number, yes.
12         Emergency motion to compel defendants' to
13   produce -- that was denied.
14         Emergency motion to compel defendants not to
15   release -- that was denied.  At some point I just got
16   frustrated.  I can't remember when I denied and said "no
17   more motions."
18         Motion under seal to compel further deposition of
19   witness, what was that on?
20         MR. FROMSON:  You ruled that we -- denied as to
21   the mom, allowed as to the daughter, if she was --
22         THE COURT:  Oh, right, okay.
23         Motion for leave to supplement expert on
24   toxicology, allowed.
25         And then objections to depositions, we talked
0099
1    about getting those to me in advance.
2          All right, jury instructions and verdict sheet,
3    have you both given me verdict sheets?
4          MR. FROMSON:  Your Honor, plaintiffs did.  I
5    honestly haven't seen one from the defendants.
6          MS. ARMSTRONG:  We have not yet, your Honor.  It
7    wasn't include in the pretrial order, and we were looking
8    for some additional guidance in terms of what was in, and
9    we've gotten some guidance today that the Court anticipates
10   a very specific series of questions, and we --
11         THE COURT:  And I say that for two reasons.  One
12   is, I think it is important to make sure that the jury --
13   it's a very important first case.  And the second is, as
14   I've mentioned here several times, I'm hoping after three
15   cases we can settle this thing.  So that it's helpful to
16   find out on which issue the jury weigh in one way or another
                              Page 41

2009-07-20 PT Conference (Final).txt
17  on.  I think it's helpful to everyone.
18              So, for example, on Bulger, it's a very tough case
19  for plaintiffs because of her personal history on causation.
20  So it would be useful to know if that's where the case
21  found, or whether they never got past base one, which is
22  that there was a false statement.  I think that's helpful
23  for people to know.  It affects settlement, how you'd even
24  think about it.  In fact, I was thinking of, you know, was
25  there a misrepresentation or omission?  Was it intentional
0100
1  or negligent?  Did it cause her death?
2              MS. ARMSTRONG:  I mean, you can break it down into
3  generic causation and to specific causation.
4              THE COURT:  We could, and those are the things we
5  need to think about.  You know, like, what would help you
6  all think about a macro settlement?  How many cases are
7  there all together?
8              MR. FROMSON:  There's a thousand individual
9  plaintiffs in the MDL, approximately.
10             THE COURT:  I didn't realize.  I thought there
11 were only hundreds.
12             MR. FROMSON:  Some plaintiffs are brought in one
13 complaint.
14             THE COURT:  I see.  I think we need to understand
15 a little bit, and then obviously we get down to amounts.  Is
16 it just an aggregate amount, and then we go 50/50 each kid?
17 I don't think they allocate, right?  It just goes to the
18 estate.
19             MR. CHEFFO:  Some of it is allocated, and some of
20 it -- I mean, basically under the statute, I think, under
21 the presumption of 30 percent, that basically the way -- if
22 he doesn't take it, the spouse would get 50 percent, and
23 then the kids --
24             THE COURT:  Get 25.
25             MR. CHEFFO:  -- Get 25 each, and the surrogate --
0101
1              THE COURT:  And if he waives it, then I'm assuming
2  it's 50/50.
3              MR. CHEFFO:  Well, again, the surrogate court will
4  determine.  If the surrogate court were to determine that
5  there wasn't a waiver, it wasn't a gift and all of that,
6  then it would be 50/50, but that's with respect to the
7  estate, your Honor.
8              MR. FROMSON:  We don't agree with that.  We
9  believe that it's a more complex issue than that and that
10 the surrogate court would have to deal with the allocation
11 from the jury.  If the jury is being asked to allocate loss
12 of services, guidance and education to the next of kin in
13 accordance with the wrongful death statute, then it's the
14 evidence they will hear that will guide them as to how much
15 to give each of the next of kin.  So they may in fact give
16 Regina more or less than Ron, Jr.  So that then goes to the
17 surrogates, Judge.
18             THE COURT:  Excuse me.  You are flagging the
19 reasons we need a special verdict form.  I haven't done a
20 wrongful death action in fifteen years, and I don't remember
21 whether I have to ask separately about each child or whether
22 I just aggregate it to the estate and do 50/50.  I just
23 don't remember.
24             MS. ARMSTRONG:  It depends upon which category of
25 damages.  The conscious pain and suffering, punitive
0102
1  damages, the jury is not allowed to allocate those.  As to
                            Page 42

2009-07-20 PT Conference (Final).txt
2   the financial value of the decedent to her beneficiaries,
3   there is a presumption in the statute, so you do not have to
4   allocate if you decide not to, but the jury can be asked to
5   do an allocation as to that.
6               THE COURT:  All right, so those are the things a
7   verdict form would be really helpful on what you want, and
8   then obviously there's the punitive damage thing.  I'm going
9   to treat Pfizer, Warner-Lambert, Parke-Davis as one entity.
10  Isn't that right?  Or from a corporate point of view, do you
11  need to have it decided separately?
12              MR. CHEFFO:  I'll confer with my colleagues, but I
13  think the answer is "yes," you can treat them all unless you
14  hear otherwise from us, your Honor.  But I did want to
15  address your Honor's comment with respect to potential
16  resolution.  I do think that -- and I'm not going to get up
17  every day and repeat this, but I understand the Court's
18  concerns, but I would just kind of elaborate -- the issue of
19  what we're trying to find out what these cases are worth,
20  you know, I can't overestimate whether how the marketing and
21  plea issues.  To the extent that they overcome everything
22  else in this case, the case will be of no value to anyone if
23  people don't understand the specific science and the
24  specific facts of each case.
25              Again, I know your Honor understands our position,
0103
1   but I think, as we talk about how this case is going to be
2   in the aggregate, if all of a sudden they just can't even
3   get past, as happens in many other litigations -- that's why
4   these types of issues are kept out -- then it's not going to
5   be a particularly helpful exercise for plaintiffs or
6   defendants.
7               THE COURT:  Maybe you can argue that to another
8   judge, but at some point I'm planning on -- my goal would be
9   to have three of these things tried, have the rest of them
10  perking around getting some of the discovery done, and then
11  asking you all to come up with a mediator to see if you can
12  put a value on it.  And maybe not.  Isn't it Vioxx?  One of
13  these cases the company just went around and tried all over
14  the country, and others have settled.  I can't -- I can
15  only -- if there's another thing that you think would be
16  helpful for me to get to you -- I mean, the key is dealing
17  with the Bulger family at this point, but as I do that, I
18  think, to the extent that the jury answers different
19  questions, then it does.
20              MR. CHEFFO:  And I don't disagree with that at
21  all, your Honor.
22              THE COURT:  All right, at this point I think I've
23  gone through everything.  I don't think I need you this
24  afternoon.  I'm actually a little disappointed that none of
25  the experts -- none of the experts could be here this
0104
1   afternoon?
2               MR. CHEFFO:  I think their expert wasn't available
3   this afternoon, and our expert wasn't available tomorrow.
4   It's just a busy schedule.
5               THE COURT:  All right, so maybe what we'll do is
6   take a break, and the question is, should we just -- what
7   time are we meeting tomorrow morning?
8               MR. FROMSON:  Nine again, I believe, your Honor.
9               THE COURT:  And this is to Greenland?
10              MR. FROMSON:  Greenland's testimony, and I guess
11  oral argument, opening and closing, or opening, at least,
12  for that argument.
                              Page 43

2009-07-20 PT Conference (Final).txt
13        THE COURT:  So we'll plan on taking the morning
14   for Greenland tomorrow?
15        MR. FROMSON:  And could you give us some guidance
16   on the format in terms of -- I think you did -- thirty
17   minutes direct, thirty minutes cross?
18        THE COURT:  That's what I'm hoping and then some
19   argument.  Well, actually not, right?
20        MR. FROMSON:  Well, for an opening, we would want
21   to give an opening, the standard traditional opening.
22        THE COURT:  Now that we've done -- I mean, I
23   actually, as you saw, was able to read through not all the
24   attachments but all the briefs and all of these motions, so
25   I think we're done earlier than expected.  And there's no
0105
1    way he could come in this afternoon?
2         MR. FROMSON:  Not that I'm aware of, given his
3    schedule, Judge.  Sorry.
4         MR. ALTMAN:  He's in transit.
5         THE COURT:  I'm just not as crammed for time
6    tomorrow.
7         MR. ALTMAN:  Unfortunately, your Honor, he's
8    traveling from the West Coast.
9         THE COURT:  I understand that, but I am a little
10   crammed for time.  Unfortunately, Gibbons couldn't come in
11   any other time.  I think I have another hearing right after
12   his, so he's going to be a little tighter.  But I've seen
13   him before, and I've never seen Dr. Greenland before, so
14   that would be useful.  And the one thing to urge them is, I
15   took college statistics, that's it.  It isn't intuitive to
16   me.  Now, maybe it's intuitive to all of you, but they need
17   to teach me.
18        MR. OHLEMEYER:  Well, we're all lawyers, your
19   Honor.  If it was intuitive to us, we would have been
20   scientists and engineers.
21        THE COURT:  I have to read each sentence three
22   times to even make sure I've got it.  So I think it's
23   important, both for the jury and for me, is to just teach
24   me.  And I'm not going to -- the first report he did was
25   just a nitpick:  "Well, Dr. Gibbons worded it in this way,
0106
1    and he should have worded it that way."  I'm talking about
2    the big-picture stuff like patient years, exposure, I mean,
3    the big issues that you think would undermine the overall
4    validity of the report, not just the nitpicks.
5         MR. FROMSON:  Would it be appropriate after the
6    hearing, your Honor, because I don't know how much time you
7    have before 2:00 o'clock tomorrow or 1:00 o'clock, that the
8    parties could then go over the verdict sheet if defense
9    counsel is able to submit one to me later this afternoon?
10        THE COURT:  I don't know -- that's not going to be
11   really until three weeks down the road, so --
12        MR. FROMSON:  Okay.
13        THE COURT:  I'm not so worried about it.  But what
14   I do need is the voir dire for the jury.  That is something
15   that if you could go through right now even afterwards,
16   maybe come up with an agreed-upon form, one on vacation --
17   well, actually, vacation I'll just ask.  You don't need
18   that.  Just on the suicide issue.
19        MR. FROMSON:  I think we could definitely go back
20   to our camp and draft some questionnaires similar --
21        THE COURT:  You could just sit here right now.
22        MR. FROMSON:  We could do that.
23        MR. CHEFFO:  We could work off these questions,
                              Page 44

2009-07-20 PT Conference (Final).txt

24  see if they have any issues, your Honor?  Is that what
25  you're talking about?
0107
1          THE COURT:  Yes, they may have additional ones,
2  and you give it to me.  And then I obviously care a lot
3  about not giving them overly intrusive questionnaires.  I'm
4  thinking of a yes/no, one or two questions.  So that's
5  great.
6          Now, can we can go off the record for one minute.
7  Lee has been working all morning.
8          (Discussion off the record.)
9          (Adjourned, 11:25 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0108
1              C E R T I F I C A T E
2
3
   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5
6
7          I, Lee A. Marzilli, Official Federal Court
8  Reporter, do hereby certify that the foregoing transcript,
9  Pages 1 through 107 inclusive, was recorded by me
10  stenographically at the time and place aforesaid in Civil
11  Action No. 04-10981-PBS, In Re:  Neurontin Marketing, Sales
12  Practices, and Product Liability Litigation, and thereafter
13  by me reduced to typewriting and is a true and accurate
14  record of the proceedings.
15          In witness whereof I have hereunto set my hand
16  this 21st day of July, 2009.
17
18
19
20
21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23
24
25