EXHIBIT A

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS




IN RE:                                     )
                                           ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 107
AND PRODUCTS LIABILITY LITIGATION     )




             FINAL PRETRIAL CONFERENCE - DAY ONE

             BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE




                          United States District Court
                          1 Courthouse Way, Courtroom 19
                          Boston, Massachusetts
                          July 20, 2009, 9:15 a.m.




                      LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
                 United States District Court
                 1 Courthouse Way, Room 7200
                      Boston, MA  02210
                       (617)345-6787
```

```
 1    A P P E A R A N C E S:

 2
      FOR THE PLAINTIFFS:
 3
           ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
 4    and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
      1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
 5
           KENNETH S. SOH, ESQ. and DARA GRISBEE HEGAR, ESQ.,
 6    The Lanier Law Firm, 126 East 56th Street, 6th Floor,
      New York, New York, 10022.
 7

 8    FOR THE DEFENDANTS:

 9         DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
      100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
10
           KATHRINE ARMSTRONG, ESQ. and MARK S. CHEFFO, ESQ.,
11    Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
      Square, New York, New York, 10036.
12
           WILLIAM S. OHLEMEYER, ESQ., Boies, Schiller & Flexner,
13    575 Lexington Avenue, 7th Floor, New York, New York, 10022.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S
 2              THE CLERK:  In Re:  Neurontin Marketing, Sales
 3   Practices, and Products Liability Litigation, Civil Action
 4   No. 04-10981, will now be heard before this Court.  Will
 5   counsel please identify themselves for the record.
 6              MR. FINKELSTEIN:  Good morning, your Honor.
 7   Andrew Finkelstein, Finkelstein & Partners, on behalf of
 8   Dr. Egilman.
 9              MR. FROMSON:  Good morning, your Honor.  Kenneth
10   Fromson, Finkelstein & Partners.
11              MR. ALTMAN:  Good morning, your Honor.  Keith
12   Altman, Finkelstein & Partners.
13              MS. ARMSTRONG:  Good morning, your Honor.
14   Katherine Armstrong from Skadden Arps.
15              MR. CHEFFO:  Good morning, your Honor.  Mark
16   Cheffo from Skadden Arps.
17              MR. OHLEMEYER:  Good morning, Judge.  Bill
18   Ohlemeyer, Boise Schiller.
19              MR. GOODELL:  Good morning, your Honor.  Charlie
20   Goodell, Goodell DeVries.
21              THE COURT:  You're representing?
22              MR. GOODELL:  Pfizer.
23              MR. CHEFFO:  Good morning, your Honor.  Rick
24   Barnes for Pfizer as well, Goodell DeVries in Baltimore.
25              MR. CHAFFIN:  Good morning, your Honor.  David
```

```
 1   you know, on the details of biostatisticians --
 2              THE COURT:  Yes, I mean, I think the other aspects
 3   of the regulatory process.
 4              Anyway, motion in limine to preclude any mention
 5   at trial by defendants of bad acts of plaintiff decedent and
 6   her family and the medical history.  Like what?  Of
 7   decedent's family?  I mean, that's got to be part of her
 8   workup, right?
 9              MR. FINKELSTEIN:  Well, as relates to Ron
10   Bulger --
11              THE COURT:  That she bought drugs, of course.
12              MR. FINKELSTEIN:  A lot of this motion, and we can
13   go point by point through it, but a lot of it relates to the
14   husband, that supposedly the husband was engaged in some
15   drug sales, things unrelated to her, or things related to
16   her that were so remote that when she was fourteen years
17   old, some event occurred.
18              THE COURT:  You know, that's a very good point
19   which is the following, which is the husband.  He's been the
20   big -- is he sitting here? -- purple elephant in the room
21   for the last month.  I think we have to figure out, and this
22   is the hardest part of it, what's hearsay, what isn't
23   hearsay, what comes in, what doesn't, because a lot of
24   this -- are these two women now definite witnesses?
25              MR. CHEFFO:  They're both listed, you know, as
```

1  witnesses.  I think the expectation is to call them.

2             THE COURT:  Because here's the issue I'm running

3  into:  In opening statements, what can you say and not say

4  about the husband?  And I thought one of the hardest pieces

5  I read was actually what is fairly construed as an admission

6  of a party opponent, what's fairly a medical record, what's

7  fairly in the DSS reports.  And I felt like I didn't really

8  understand that well enough, and it's really where I want to

9  spend a lot of time because that could be prejudicial

10 information that comes in and never gets backed up through

11 nonhearsay.  So maybe you can tell me, has someone scripted

12 through what you're planning on saying that you're now

13 claiming isn't hearsay about the husband?

14            MR. OHLEMEYER:  There will be evidence in the case

15 that --

16            THE COURT:  Who?

17            MR. OHLEMEYER:  Well, through cross-examination of

18 the plaintiffs' experts, who have talked about him in their

19 reports, that his behavior at times put her at risk for

20 other behaviors and for suicide, so --

21            THE COURT:  But the expert can't talk about it

22 unless there's a foundation.

23            MR. OHLEMEYER:  Well, the foundation would be,

24 your Honor, that throughout the medical records there are

25 discussions about Mrs. Bulger's husband being controlling,

1  being abusive, and that creating additional problems in her
2  life.
3             THE COURT:  So within the medical records, all
4  right, that's fine.  So how did they get into the medical
5  records?  Do you know?  So would the doctor say that
6  "Mrs. Bulger told me X"?
7             MR. OHLEMEYER:  The history is taken from
8  Mrs. Bulger.
9             THE COURT:  All right, so that seems to be
10 admissible.  Everyone agrees.  All right, so let's just go
11 through this.  Anything in the medical records that was
12 stated by Mrs. Bulger or that the doctor relied on is
13 admissible, A, for what the experts relied on, and, B, a
14 statement of state of mind/personal history of the
15 plaintiff.  All right, so does that cover -- what else?
16            MR. OHLEMEYER:  Well, then you have social service
17 records.
18            THE COURT:  All right, all right, DSS.  Now, those
19 are harder.
20            MR. OHLEMEYER:  Well, they're certainly public
21 records, and they contain, you know, matters observed
22 pursuant --
23            THE COURT:  No, not necessarily because I've been
24 through this with many cases.  So what are you planning on
25 putting in through DSS records?

1          MR. OHLEMEYER:  Well, there are Mr. Bulger's own
2   statements that are contained in those records.
3          THE COURT:  All right, so this is what I want to
4   do.  So are you putting someone on the stand from DSS?
5          MR. OHLEMEYER:  No.  Well, no.
6          THE COURT:  So what statements in the DSS records
7   are you thinking about?  These are the things I don't want
8   to do on the fly.
9          MR. OHLEMEYER:  Sure, sure.  Statements Mr. Bulger
10  made about his relationship with Mrs. Bulger.
11         THE COURT:  Like what?
12         MR. OHLEMEYER:  That they were abusive to each
13  other emotionally and physically, that she had substance
14  abuse problems that she was not --
15         THE COURT:  So he would say that she had substance
16  abuse problems?
17         MR. OHLEMEYER:  Yes.
18         THE COURT:  All right, so why is that not hearsay?
19         MS. ARMSTRONG:  Your Honor, we actually can
20  prepare a bench memorandum on Ron Bulger's statements and
21  why they're not hearsay for you because it is somewhat
22  complicated.
23         THE COURT:  You put it in a little footnote.
24         MS. ARMSTRONG:  It was in a little footnote, and
25  then we prepared a supplemental memorandum.  And we were

 1   prepared to file it, and you said, "Stop filing motions," so
 2   we didn't file it.
 3              THE COURT:  But I want to go through this now
 4   because we have opening statements, and I don't want
 5   anything in an opening statement where at least there's not
 6   a good-shot chance you're going to get in.  Bulger said to a
 7   DSS worker what, that Mrs. Bulger --
 8              MR. OHLEMEYER:  "My wife has a substance abuse
 9   problem.  She won't get help for it."
10              THE COURT:  All right, all right, all right, so
11   that seems fair enough.  We know she had substance abuse
12   problems.
13              MR. FINKELSTEIN:  It's all relative to time, your
14   Honor, as to when those statements were made and to who they
15   were made, and he contests that.
16              THE COURT:  Maybe timingwise, but let me just say,
17   there's no objection to him saying to DSS that his wife has
18   substance abuse problems.  What else?
19              MS. ARMSTRONG:  Your Honor, could I?
20              THE COURT:  Yes.
21              MS. ARMSTRONG:  There are several grounds for the
22   admission of Ron Bulger's statements.  The first is, in
23   terms of being a party, I understand your Honor has
24   determined that he made a knowing waiver.  However, his
25   waiver is ineffective or his disclaimer of the estate is

1  ineffective to the extent he has encumbered it, which there
2  is evidence that he has done so, or to the extent that he's
3  insolvent because his creditors are entitled to the money.
4  And if he still has an interest in the estate, even if that
5  is just to discharge his debts, he's a party-in-interest,
6  and he's a party for purposes of the hearsay rule.
7              THE COURT:  I do not accept that argument.  Now,
8  let's go through the other ones.  It may be that while he
9  was a party, if he made the statement while he was a party,
10 it may be a statement of a party opponent.  So the timing of
11 the statements may be relevant, right?  So --
12             MS. ARMSTRONG:  And there are certain statements,
13 for example, the ones that we've talked about in recent
14 hearings made to the two witnesses that were made while he
15 was still a party, while he was still the plaintiff.
16             THE COURT:  And some of those may come in as
17 excited utterances or statements against penal or pecuniary
18 interest, so I think you need to be thinking that way.  So
19 to the extent it's a statement against penal interest, "I
20 sell drugs" or "We sell drugs," it comes in.  To the extent
21 it is an excited utterance within usually 24 hours, it may
22 come in.
23             MS. ARMSTRONG:  For example, right after his
24 wife's death, he exclaimed, "I don't know what I'm going to
25 do now that I don't have her drugs to sell."

```
 1              THE COURT:  That may well come in.  So there's
 2   excited utterance, there's state of mind, there's
 3   declaration against penal interest.  There are other things.
 4   Anything after he was a party I think you're not going to
 5   get, but he was a party for a while.  I'm trying to think
 6   what other kind -- you need to filter this.  In other words,
 7   before you put something in an opening, make sure that
 8   there's a basis.  DSS is a problem because sometimes DSS
 9   gets things -- I get these records all the time -- through
10   totem pole hearsay.  Someone says something to --
11              MR. OHLEMEYER:  And they investigate, and they
12   don't substantiate them, sure, I understand that.
13              THE COURT:  So I'm not going to let it in if it's
14   not clear that it was taken in the ordinary course of
15   business by the primary person, and also it's not clear
16   always that those are findings of an agency.
17              MR. OHLEMEYER:  Correct.
18              THE COURT:  So when in doubt, leave it out of your
19   opening.
20              MR. FINKELSTEIN:  Or that they're going to bring
21   in the person who the declaration was made to, and they
22   don't it on their witness list, so --
23              THE COURT:  Right, but right now all I'm hearing
24   is the drug -- everyone agreed she used drugs, everyone
25   agreed she used drugs.  Whether she was using them on the
```

1  night in question is a whole other story, but that's been a
2  persistent problem that's been documented many times, so --
3              MS. ARMSTRONG:  And then, your Honor, in terms of
4  what the experts can say, the law says that experts can talk
5  about hearsay or can base their opinions upon hearsay if you
6  establish a foundation for it that it is the type of
7  information that an expert in the field would reasonably
8  rely upon; and medical records, DSS records under certain
9  circumstances are the types of information that somebody
10 evaluating why somebody committed suicide would look at to
11 understand a woman's entire life history.
12             THE COURT:  Possibly, but there are two different
13 issues.  One is whether or not they can rely on it, and two
14 is whether or not you can introduce it separately.
15             MS. ARMSTRONG:  Agreed, your Honor.
16             THE COURT:  So you may not be able to introduce
17 the DSS records.  I'd have to know a whole lot more about
18 it.  The medical records are coming in, I'm assuming.
19 That's one thing I really --
20             MR. FINKELSTEIN:  Subject to redaction.
21             THE COURT:  Yes, but this is what I don't want to
22 be doing at side bar.  That's why I'm doing this little
23 exercise here.  So maybe you could have some people talking
24 about those medical records beforehand.
25             MR. FINKELSTEIN:  Those statements that are

1  attributed to Ron, Sr., I just don't want the Court to
2  overlook that he's not a party.  And he's available to
3  testify, so they can bring him in and present that.
4           THE COURT:  I take it you're not?
5           MR. FINKELSTEIN:  We probably are.
6           THE COURT:  You can ask about it.
7           MS. ARMSTRONG:  If you say we can ask about it, if
8  he's not here --
9           THE COURT:  How do you get past your basics -- I'm
10 just curious -- that she took the drugs, the Neurontin, if
11 he's not here?  Is there any other way to do that?
12          MR. FROMSON:  Your Honor, through Ron Bulger, Sr.,
13 through the dates of her prescription period, and the fact
14 that she --
15          THE COURT:  Excuse me.  I know Ron Bulger, Sr.
16 Ron Bulger, Sr. is the direct percipient witness.  But if
17 you don't have him --
18          MR. FROMSON:  Well, the police officers
19 investigated the scene of the accident and took statements
20 from Ron Bulger, which would be considered an excited
21 utterance as well.
22          THE COURT:  I don't know that I would allow it in.
23 I don't know.  See, that's what I don't want to do on the
24 fly.  So you're saying the police report.
25          MR. FROMSON:  It's the police officer who's --

1                    MR. FINKELSTEIN:  It's contained right in the
2    investigating police officer.  He arrives at the scene, says
3    something in sum and substance:  "I arrive at the scene.
4    The husband comes after me, said, she came up, asked for my
5    medication.  I gave her four Neurontin.  She went to the
6    basement."
7                    THE COURT:  An excited utterance maybe.
8                    MR. FINKELSTEIN:  "She went to the basement."
9    This is moments after finding his wife deceased with his
10   four-year-old daughter and --
11                   THE COURT:  That may well be admissible.
12                   MR. FINKELSTEIN:  And reports it right to the
13   police officer.
14                   THE COURT:  That may be admissible.
15                   MR. FINKELSTEIN:  And he takes it
16   contemporaneously right into his report.  It's his business
17   duty to do so, and we believe it gets in that way.
18                   THE COURT:  This is exactly the kind of issue --
19   you're doing all these other cosmic things -- that I need to
20   think about.
21                   MR. FINKELSTEIN:  We believe --
22                   MR. OHLEMEYER:  Can I say, your Honor, it is, if
23   you'll allow me 30 seconds of editorial, it is hard to
24   understand why we're working so hard to keep Mr. Bulger out
25   of the courtroom.

1           THE COURT:  No, it isn't.  It's easy to
2   understand.
3           (Laughter.)
4           MR. OHLEMEYER:  And I don't disagree, which I
5   think should give us all some pause when we start thinking
6   about some of these evidentiary issues, and whether people
7   are or aren't available to testify, or should or shouldn't
8   be here to explain what happens.
9           THE COURT:  Well, if anybody really wants him, I
10  just put him under subpoena.
11          MR. CHEFFO:  The only other issue I would add,
12  your Honor, is, and I don't think we really fully explored
13  this, but we know as a practical matter, as a technical
14  matter, he's not a party now, but that's really as a result
15  of the last few weeks.  I mean, to me looking at it, if
16  someone was a corporate representative, left the company,
17  you can't essentially distance yourself from -- you know,
18  the fact that during the entire discovery process, I mean,
19  for years when this case was worked up, all of the rules
20  that would apply with respect to parties, the way we
21  prepared our case, he was a party.
22          THE COURT:  I'm not disagreeing.  I said, all
23  through the period of time where he was a party, you get the
24  admission of a party opponent.  I don't know how much falls
25  under the rest of it.  So once he stopped being a party, I

```
 1   think you stop getting the ability to use that rule, unless
 2   you find me some cases to the contrary, because he was
 3   basically ditched.  And so he knows that, he's waived his
 4   rights, he has no stake in it, none of the things that would
 5   be protective of why you would allow an admission of a party
 6   opponent.  But you have lots of other rules, declaration
 7   against penal interest, excited utterance, et cetera; and
 8   pecuniary interest because some of this, it's an interesting
 9   issue about whether or not it's a declaration against
10   pecuniary interest.  If it's your daughter's interest, it
11   might be, it might be.  So those are things that we probably
12   should look at as well, and you all should.
13           MS. ARMSTRONG:  Your Honor, can we submit a
14   supplemental memorandum on this issue?
15           THE COURT:  Yes.  On that issue, it would be very
16   helpful.
17           MS. ARMSTRONG:  Thank you.
18           THE COURT:  All right.
19           MR. FROMSON:  Your Honor, could we have a time
20   frame for that?
21           THE COURT:  That's also a really good idea.
22           MR. FROMSON:  Because if they're going to do it
23   today, we want to be able to (Inaudible) tomorrow.
24           MR. FINKELSTEIN:  And it would be awfully helpful
25   if they just outlined those statements that they intend to
```

Page 70

1  offer.
2           THE COURT:  And you too, though.  I think maybe --
3  it's a little hard to -- you know, I know it's like warfare,
4  and everyone's in their game rooms trying to figure out what
5  to do, but at least the following:  Figure out your opening
6  statement, and any statement that you plan on using in your
7  opening statement, you know, any evidence that may raise one
8  of these hearsay concerns, why don't you let me know by
9  Wednesday with a little reason why it's admissible.
10          MR. OHLEMEYER:  Can I make a suggestion also?
11          THE COURT:  Yes.
12          MR. OHLEMEYER:  Can we perhaps exchange any
13 demonstrative exhibits we're going to use in our openings by
14 Friday?
15          THE COURT:  Yes.  That's a great idea.
16          MR. FINKELSTEIN:  Well, I don't even know what
17 we'll be using yet.
18          MR. OHLEMEYER:  Let's do it by Friday.
19          THE COURT:  Are you planning on using anything,
20 any?
21          MR. OHLEMEYER:  Demonstrative exhibits?
22 Certainly.
23          THE COURT:  Like big, you know, HD --
24          MR. OHLEMEYER:  I'm low-tech, Judge.  Just posters
25 and easels.