EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL Docket No. 1629

Master File No. 04-10981

**********************************

IN RE:  NEURONTIN MARKETING, SALES

PRACTICES AND PRODUCTS

LIABILITY LITIGATION

**********************************

THIS DOCUMENT RELATES TO:

RONALD J. BULGER, SR., as Administrator

of the Estate of Susan Bulger, Deceased

**********************************

VIDEOTAPED DEPOSITION OF

SANDER GREENLAND, Dr.P.H.

Held At:
White and Williams, LLP
100 Summer Street
Boston, Massachusetts 02110

July 21st, 2009
3:30 P.M.

Reported By:  Maureen O'Connor Pollard, RPR, CLR

Page 2

```
 1    APPEARANCES:

 2    FOR PLAINTIFFS:

 3         BY:  KEITH L. ALTMAN, ESQ.
                FINKELSTEIN & PARTNERS, LLP
 4              436 Robinson Avenue
                Newburgh, New York 12550
 5              800-634-1212
                kaltman@lawampmmt.com
 6

 7    FOR THE DEFENDANT PFIZER:

 8         BY:  RICHARD M. BARNES, ESQ.
                GOODELL, DeVRIES, LEECH & DANN, LLP
 9              One South Street, 20th Floor
                Baltimore, Maryland 21202
10              410-783-4004
                rmb@gdldlaw.com
11                   -and-
           BY:  STEVEN M. NAPOLITANO, ESQ.
12              SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
                Four Times Square
13              New York, New York 10036
                212-735-3000
14              snapolit@skadden.com
                     -and-
15         BY:  LORI CONNORS McGRODER, ESQ.
                SHOOK, HARDY & BACON LLP
16              2555 Grand Blvd
                Kansas City, Missouri 64108-2613
17              816-474-6550
                lmcgroder@shb.com
18

19    Videographer:  Bill Slater

20

21

22

23

24
```

Page 3

1                          INDEX

2     EXAMINATION                              PAGE

3     SANDER GREENLAND, Dr.P.H.

4       BY MR. BARNES                             5

5       BY MR. ALTMAN                           119

6       BY MR. BARNES                           120

7


8                         EXHIBITS

9     NO.              DESCRIPTION            PAGE

10    Exhibit 1    Dr. Greenland's CV............    6

11    Exhibit 2    Dr. Greenland's May 31, 2009

12                 expert report.................    8

13    Exhibit 3    Dr. Gibbons' March 19, 2009

14                 report.......................   45

15    Exhibit 4    Statistical Review and

16                 Evaluation...................   47

17

18

19

20

21

22

23

24

Page 4

1              P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:   This is video

4      operator speaking, Bill Slater of Budd Legal

5      Video.

6              Today's date is July 21st, 2009, the

7      time is 3:31 p.m..

8              We are here at the offices of White

9      and Williams located at 100 Summer Street,

10     Boston, Massachusetts to take the videotaped

11     deposition of Professor Sander Greenland in the

12     matter of In Re:   Neurontin Marketing, Sales

13     Practices and Products Liability Litigation as

14     it relates to Bulger versus Pfizer, Defendants,

15     in the United States District Court for the

16     District of Massachusetts, MDL Docket Number

17     1629, Master File Number 04-10981.

18             Will counsel please voice identify

19     yourselves for the record and state whom you

20     represent.

21             MR. BARNES:   Rick Barnes on behalf of

22     Pfizer.

23             MS. McGRODER:   Lori McGroder on behalf

24     of Pfizer.

1          MR. NAPOLITANO:  Steven Napolitano on

2     behalf of Pfizer.

3          MR. ALTMAN:  Keith Altman on behalf of

4     Plaintiffs.

5          THE VIDEOGRAPHER:  Will the court

6     reporter, Maureen Pollard, please swear in the

7     witness.

8

9          SANDER GREENLAND, Dr.P.H.,

10    having been identified by photo identification,

11    being first duly sworn, was examined and

12    testified as follows:

13          DIRECT EXAMINATION

14          BY MR. BARNES:

15     Q.    Good afternoon, Dr. Greenland.

16     A.    Good afternoon.

17     Q.    Would you please state your name and

18    professional address, please?

19     A.    Sander Greenland, professor of

20    epidemiology and statistics at the University of

21    California, Los Angeles.

22     Q.    And we spoke this morning, did we not?

23     A.    Yes.

24     Q.    And I'd like to ask you a few

1    questions about your experience.

2              First of all, you are a

3    pharmacoepidemiologist?

4         A.    I'm an epidemiologist and

5    statistician.

6         Q.    Do you consider yourself a

7    pharmacoepidemiologist?

8         A.    Some would I suppose, but I don't.

9         Q.    Do you consider yourself one?

10        A.    I actually never thought of that.

11        Q.    Okay.  Now, I'd like to mark as an

12   exhibit, I only have one copy, your CV.

13              (Whereupon, Greenland Exhibit Number 1

14              was marked for identification.)

15              BY MR. BARNES:

16        Q.    Can you identify that for the record,

17   please?

18        A.    Yes.

19              MR. ALTMAN:  And just to be complete,

20   that's dated March 29th, 2007, so it's

21   something --

22        A.    It's quite out of date.

23              MR. BARNES:  It was produced with his

24   report in this case, so if there's an updated

1    one I'd be delighted if you would update it for

2    me.  That would be great.  Thank you.

3              BY MR. BARNES:

4         Q.   You've been -- your hourly rate is

5    $500 an hour?

6         A.   Correct.

7         Q.   And how much have you been paid for

8    your services as an expert witness in this case?

9         A.   I don't know, but I would imagine it

10   must be somewhere, I'm guessing, somewhere in

11   the twenties at the moment.

12        Q.   And what is that guess based on?

13        A.   Just recollection.

14        Q.   When was your last invoice?

15        A.   What was it, a month ago perhaps, or a

16   month and a half.

17        Q.   So your best guess --

18        A.   I'm not sure.

19        Q.   Your best estimate as of a month and a

20   half ago was somewhere in the 20 to $30,000

21   range?

22        A.   I think.

23        Q.   Thank you.

24             And how much time have you put in to

Page 8

1    preparing for the Daubert hearing this morning

2    and for your deposition in terms of hours?

3        A.    I don't know, I would guess around

4    ten.

5        Q.    Ten hours.  So another five to six,

6    $7,000?

7        A.    Could be.

8        Q.    Now, I want to just follow up.

9              In your expert report, you indicate

10   that you have, you list as -- do you have a copy

11   of your expert report handy?

12       A.    No.

13       Q.    If counsel would provide you with the

14   expert report, which he has.

15             MR. ALTMAN:  I think you really do

16   need to mark one.

17             MR. BARNES:  I will.  Let's just mark

18   that one.  Thank you.

19             (Whereupon, Greenland Exhibit Number 2

20             was marked for identification.)

21             BY MR. BARNES:

22       Q.    This is your May 31st report.  If we

23   can get a binder clip.

24             MR. ALTMAN:  Do you have a small copy

Page 9

1    of it there?

2              MR. BARNES:  You tell me.  You handed

3    this to me this morning.

4              BY MR. BARNES:

5         Q.    Dr. Greenland, I'm going to hand you

6    what's been marked as Greenland Exhibit

7    Number 2.  Can you identify this for the record?

8         A.    My expert report of May 31st, 2009.

9         Q.    And you prepared that on behalf of

10   Plaintiff in this case?

11        A.    Correct.

12        Q.    And when were you asked to prepare

13   that?

14        A.    Sometime during May, I think.

15        Q.    Now, you said this morning that you

16   had reviewed the PharMetrics data.  Do you

17   remember that testimony?

18        A.    Yes.

19        Q.    Tell me precisely what it was you did

20   with the PharMetrics data.

21        A.    I was with Mr. Altman, we went through

22   the database on his computer.

23        Q.    And when was that done?

24        A.    It would have been March of this year,

1   I believe.

2       Q.    And did you keep any -- what was the

3   purpose of your review of the PharMetrics data,

4   sir?

5       A.    To familiarize me with the data

6   directly.

7       Q.    And what queries did you run?  How did

8   you address the PharMetrics database?

9       A.    We went through looking at the

10  structure of the data, the records on the

11  screen, and other details about documentation

12  about the structural file kind of information

13  was in it.

14      Q.    Were you given -- was Mr. Altman

15  leading the tour through the PharMetrics

16  database, or were you independently reviewing

17  the PharMetrics database yourself?

18      A.    Well, it was done on -- like I said, I

19  did not receive the data on my machine, it was

20  all done with me there and showing me the files,

21  where they were, how they were structured,

22  looking at the stuff that was submitted by

23  Dr. Gibbons, describing the data he'd received,

24  his data request, and what he had received and

1    checking those things out and so forth, just a

2    routine examination.

3        Q.    Specifically what do you recall

4    examining in the PharMetrics database, sir?

5        A.    Well, specific things I mentioned, for

6    example, the particular records, and that

7    showed, I think, patterns of exposure that I

8    talked about in this report.

9        Q.    Did you document any of those

10   examinations?  How did you record your

11   observations, and how were they maintained?

12       A.    No particular form, just what I've

13   talked about here.

14       Q.    Did you take any notes, for example?

15       A.    I'm trying to remember if I had any.

16   There may have been some notes.  I think I might

17   have taken some notes, and then used them for

18   information in this report.

19       Q.    So when you were there in March, you

20   spent time looking at the PharMetrics database

21   with Mr. Altman and you took some notes?

22       A.    Then he sent me copies of items, which

23   I think they were exhibits, I think they might

24   have been produced as exhibits.

1     Q.    Please look at your report, at Exhibit

2  2, and tell me what Mr. Altman sent you from

3  your report, please.

4     A.    Let's see.

5     (Witness reviewing document.)

6     A.    I guess not.  Okay.  Well, anyway,

7  that's what I recall.

8     BY MR. BARNES:

9     Q.    Describe what Mr. Altman sent you,

10  sir.

11     A.    Well, as I said, I thought that he --

12  I just remembered, it must be looking at the

13  screen, but these items.

14     Q.    What items were you referring to, sir?

15     A.    Those on Page 19 and 20.  Some of

16  these items were from the deposition, that's

17  right, the subsequent deposition of Robert

18  Gibbons, April 27th, e-mails, Coyle letter,

19  Robert Gibbons, April 29th, 2009.

20     Q.    Describe for me where your notes are

21  from your meeting with Mr. Altman where you

22  looked at the PharMetrics data.

23     A.    They're gone.

24     Q.    Where did they go to?

1     A.     They were just denotations that I

2  tossed after I typed them into this report,

3  information into this report.

4     Q.     So you took notes with Mr. Altman as

5  you were looking at the PharMetrics database.

6  Those notes were then destroyed?

7     A.     Yeah, they were used in this -- for

8  this report, the examination of the record for

9  this patient.

10     Q.     Who found that record for patient,

11  sir, was it you or Mr. Altman?

12     A.     Mr. Altman.

13     Q.     So he pointed it out to you, sir?

14     A.     Yes.

15     Q.     Did you find any other patient

16  specifically that was relevant to your review of

17  this report?

18     A.     No.

19     Q.     So the one patient you have in your

20  report was identified with Mr. Altman, and he

21  walked you through the various aspects of that

22  one patient, and you took notes of what he told

23  you, correct?

24     A.     Well, I took notes of what was there

Page 14

1    in this record.

2         Q.    But the process was Mr. Altman --

3         A.    He pointed them out.

4         Q.    He pointed them out, correct?

5         A.    Yes.

6         Q.    And then he walked through the various

7    aspects of that patient?

8         A.    Yes.

9         Q.    And you verified that, and you took

10   notes, and you put that into your report?

11        A.    Right.

12        Q.    Okay.  Now, other than that patient --

13   strike that.

14             That was the only patient that you

15   identified in the entire 131,000 --

16        A.    I didn't identify it.

17        Q.    He did?

18             MR. ALTMAN:  Objection.  Hold on.

19   Objection.  Misstates his testimony.

20             BY MR. BARNES:

21        Q.    He identified the patient?

22        A.    Yes.

23        Q.    Was there any other patient that was

24   of interest to you that Mr. Altman identified?

1     A.    Well, we looked at some others, I

2    believe, but I didn't actually take notes on

3    those.

4     Q.    Other than meet with Mr. Altman and

5    taking some notes, did you create any other

6    documentation leading up to your report?

7     A.    No.

8         MR. ALTMAN:  Objection.

9         Just pending agreement with counsel,

10   draft reports and --

11        MR. BARNES:  I didn't ask him about

12   draft reports.  I said notes, documentation.

13        Counsel, I would ask you to verify

14   that Dr. Greenland destroyed the notes of your

15   meeting where you showed him this patient who

16   ended up in his report, I want you to verify

17   that.  And if he has that, I want you to produce

18   all the notes pertaining to that patient and the

19   whole review he did with that.

20        MR. ALTMAN:  We'll take it under

21   advisement.

22        I will just point out to you, make it

23   a little bit easier for you, this was the same

24   patient that was discussed with Dr. Gibbons in

Page 16

1    his deposition.

2              MR. BARNES:   Thank you.

3              BY MR. BARNES:

4         Q.    Okay.  Can you be more precise; other

5    than going through the structure and the format

6    of the PharMetrics database with Mr. Altman on

7    his computer, did he actually give you the

8    PharMetrics database for you to use in your

9    office so you could look at it independently

10   sitting there with him?

11        A.    No.

12        Q.    So that was all done in New York with

13   Mr. Altman?

14        A.    Not New York, Chicago.

15        Q.    Chicago.  So he flew to Chicago with

16   the database, and he met you in Chicago?

17        A.    Correct.

18        Q.    Did you ask him for the database so

19   that you could look at it?

20        A.    No.

21        Q.    Sir, why didn't you ask him for the

22   database?

23        A.    Because I had no time, didn't have

24   enough time to do that sort of work.  I didn't

Page 17

1    commit to this case to spend that level of time.

2        Q.    Okay.  Now, historically, you can

3    correct me if I'm wrong, but your role in other

4    litigation has been to -- you're a

5    methodologist, is that fair to say?

6        A.    Correct.

7        Q.    So what you have generally done in the

8    course of your review of litigation of any kind

9    is generally comment on the methodologies

10   employed by others who are testifying in the

11   litigation, correct?

12       A.    Correct.

13       Q.    Okay.  I've seen that.

14             And hasn't most of -- hasn't all of

15   your work in this regard been on behalf of

16   Plaintiffs in personal injury cases?

17       A.    All the times I've been a named

18   expert.  I've consulted to defense, but I've

19   never become a named expert.

20       Q.    Thank you.  That's fair.

21             So in all the cases in which you have

22   performed the service of reviewing the

23   methodologies of defense expert witnesses, all

24   of your work where you've actually been named as

Page 18

1 an expert witness has been on behalf of

2 Plaintiffs' counsel in litigations?

3   A. That's correct.

4   Q. Okay.  So just to clarify it in this

5 case then, I think you said it this morning, but

6 in this case you did not undertake any

7 independent analysis of the PharMetrics data to

8 verify Dr. Gibbons' work, correct?

9   A. That's correct.

10   Q. You did not independently conduct any

11 analyses within the PharMetrics database of your

12 own to test the conclusions and the results of

13 Dr. Gibbons, correct?

14   A. That is correct.

15   Q. Okay.

16   A. I took his word.

17   Q. Okay.  And I want to spend a moment

18 with you -- I'm trying to organize my time here

19 since I know you're on a tight schedule.

20     I want to turn to the first page of

21 your report, if I might, sir.  And prior to

22 putting finger to keyboard rather than pen to

23 paper, how many times did you discuss your

24 May 31 report with Mr. Altman, sir?

1          MR. ALTMAN:  Objection.  That goes to

2     the drafting of the expert report.

3          MR. BARNES:  Let me rephrase the

4     question, I want to withdraw the objection.

5          BY MR. BARNES:

6      Q.    How many times did you meet with

7     Mr. Altman before May 31st, 2009 and after your

8     last report?

9          You did a report in July of 2008?

10     A.    Mm-hmm.

11     Q.    Then you did a report in May of 2009.

12     Are there any other reports that you drafted?

13     A.    No other reports drafted.  Any reports

14     that were drafted are things that were filed.

15     So you're asking how many times I physically met

16     with him?

17     Q.    Yes, how many times have you

18     physically met with Mr. Altman concerning the

19     May 31, 2009 report?

20     A.    Well, let's see, we met in March.  And

21     we met again, didn't we?  You came out, right?

22     Q.    Give me your best recollection.

23     A.    I'm a little spacey because I didn't

24     get -- my flight was late last night.

1    Q.    I understand.

2    A.    But I seem to recall we had -- anyway

3  we met, I think physically I may be mixing up,

4  but I think we met physically, might have

5  physically met again once, but I may be

6  misremembering.

7    Q.    In March, and then another time

8  between March and July?

9    A.    Yes.

10   Q.    Where was that meeting, sir?

11   A.    If I'm remembering correctly --

12   Q.    Give me your best recollection.

13   A.    I may be way off, it would have been

14  at my house in Malibu.

15   Q.    You have a house in Malibu?

16   A.    Yes.

17   Q.    And that's in California?

18   A.    Correct.

19   Q.    So you and Mr. Altman met at your

20  house in Malibu.

21        And for how long did you meet at your

22  house in Malibu?

23   A.    Oh, amount of time spent together

24  working on this, probably about a day's worth or

Page 21

 1    something.

 2         Q.    Okay.  And how many days did

 3    Mr. Altman spend with you in Malibu?

 4         A.    Well, I don't remember exactly.  But

 5    I'd say a total of two, I mean consecutive days.

 6         Q.    Two consecutive days.

 7               And then did you meet with Mr. Altman

 8    after you met with him at your house in Malibu

 9    for two days or so?

10         A.    I don't think we physically -- did we

11    physically meet again?  I don't recall.  I don't

12    think so.

13         Q.    Okay.  It's now July, late July, July

14    21st, correct?

15         A.    Mm-hmm.

16         Q.    So between your meeting for a day --

17    your two-day meeting where you spent a day

18    working with Mr. Altman and a day doing

19    something else, how many times did you speak

20    with Mr. Altman between that day and the time of

21    the hearing?

22         A.    The actual number of phone calls?

23         Q.    Yes, sir.

24         A.    Oh, I don't recall that.  It would be

Page 22

1    several.

2        Q.    Can you tell me what you talked about

3    in each of these phone calls?

4              MR. ALTMAN:   Objection.

5              He can answer to the extent that it

6    doesn't involve the drafting of the expert

7    report.

8              BY MR. BARNES:

9        Q.    Physically in terms of the subject

10   matter of your conversation with Mr. Altman,

11   what did you talk about?

12       A.    Well, we talked about this case, and

13   Gibbons' analysis, and what my opinions were

14   about his paper and his reports, and that sort

15   of stuff.   It was all matters related to this

16   case.

17       Q.    So other than saying you had several

18   telephone conversations, you can't give me a

19   number.

20             Can you give me a sense of how many

21   hours you spent with Mr. Altman on these

22   telephone conversations about the Gibbons

23   analysis?

24       A.    Well, there would be at least several

1    hours.  I'm sorry, I can't --

2        Q.    Do you intend to bill for this time,

3    sir?

4        A.    I already have.

5        Q.    So is that reflected, is that time

6    reflected in your bill?

7        A.    Yes.

8        Q.    By the number of hours spent?

9        A.    Yes.

10            MR. BARNES:  I would ask you produce

11   his invoices, please.

12            BY MR. BARNES:

13       Q.    Now, in terms of your -- how many

14   hours did you spend reviewing Dr. Gibbons'

15   deposition?

16       A.    Which one?

17       Q.    There were several.

18       A.    There were several, so I couldn't

19   really split them up.  I mean I spent quite a

20   few hours going over his depositions, so looking

21   them over.

22       Q.    Now, I want you to turn to Page 9 of

23   your report.

24       A.    Yes.

Page 24

1      Q.    And you were in the courtroom this

2   morning when I spoke to the judge about the

3   question that Mr. Altman asked Dr. Gibbons,

4   Dr. Gibbons' paper -- "If another expert were to

5   say that Dr. Gibbons' paper proves that

6   gabapentin is protective of suicide, would that

7   expert be wrong?"

8            And you gave an answer that was four

9   and a half lines long, correct?  Your report

10   only reflects an answer from line 20 to line 24,

11   correct?

12            MR. ALTMAN:  Objection.  Misstates the

13   report.

14      A.    I don't -- I've read through the line

15   13 to 24 that's printed on this page.

16            BY MR. BARNES:

17      Q.    Did you read between line 25 over to

18   the next page to line 18?

19      A.    Yes.

20      Q.    Why didn't you -- why did you split

21   his answer in half, sir, when he -- his answer

22   was actually much longer than this.  What led

23   you to pick this spot or interpretation?  Why

24   did you stop there?

1        A.      Because I thought that made my point,

2    that he agreed that we agreed on this issue.   It

3    indicates that he knows that the common usage of

4    the phrase -- "This passage indicates that

5    Dr. Gibbons knows that the common usage of the

6    phrase 'protective effects' would be interpreted

7    by both scientific and lay readers to mean

8    exactly what it sounds like."

9        Q.      But he went on, he went on much longer

10   than that in his answer to explain exactly what

11   he meant, isn't that true?

12       A.      Yes, he went on to explain other

13   things, but I don't think that's relevant to the

14   point I was making.

15       Q.      Do you think it's misleading, Doctor,

16   if you're accusing Dr. Gibbons of being

17   misleading, do you think it's misleading to only

18   include less than 25 percent of his answer that

19   was given in response to that question?

20       A.      I think that the judge or anybody

21   reading his report hand in hand with my comment

22   would be capable of reading further, and would

23   have and would see the rest of what he said.

24       Q.      But it's your obligation, according to

1    the standard you've set in your deposition that

2    it shouldn't be misleading, don't you think you

3    should have provided the Court the entire answer

4    in -- if you're going to accuse someone of

5    trying to be misleading, to give the entire

6    context and let the reader be the judge as to

7    whether or not his answer was misleading?

8             MR. ALTMAN:  Objection.  Misstates his

9    testimony.

10        A.    Yes, it certainly does.

11             No, I don't think so, I disagree.

12             BY MR. BARNES:

13        Q.    Here's what you say, sir.  It says it

14   appears -- you say that, on Page 9 of your

15   report, Exhibit 2, "In light of the fact that

16   Gibbons et al recognize several of the reasons

17   why the PharMetrics data cannot be claimed to

18   'demonstrate a protective effect of gabapentin,'

19   the use by Dr. Gibbons of this phrase in

20   Section 17 of his supplemental expert reports of

21   November 5, 2008 and March 19, 2009 appears to

22   me to be an attempt to mislead readers.

23   Furthermore, it appears from the Gibbons

24   deposition testimony of March 5, 2009 that

Page 27

1   Dr. Gibbons is well aware of the misleading

2   nature of his usage of 'protective' in his

3   supplemental expert reports.  Consider the

4   following exchange from Page 928 of that

5   deposition," and you added bolding.

6           My point is, don't you think that it

7   is important for an expert witness such as

8   yourself if you're going to quote from someone

9   in responding to an answer to give the entire

10  quote so the reader can understand the complete

11  answer as opposed to cherry picking less than

12  one quarter of the answer?

13          MR. ALTMAN:  Objection.

14  Argumentative, asked and answered.

15          MR. BARNES:  He used the word cherry

16  picking in this report, I'm using his words.

17          BY MR. BARNES:

18      Q.    Go ahead, Doctor.  You may answer.

19      A.    No, I don't.  No.  It makes my point.

20      Q.    Your point.  What's a fair point?

21          Isn't it fair to let the reader read

22  the entire answer as opposed to just a quarter

23  of it?

24      A.    Presumably the judge, who this was

Page 28

1  written for the Court, would have the entire

2  Gibbons report before them and would have read

3  it and would be able to compare it, and they

4  could judge whether I was being misleading or he

5  was.

6      Q.    Are you saying counsel provided the

7  entire quote elsewhere to the judge?

8      A.    That entire quote was provided to me

9  and I presume to the Court.  Wasn't the report

10 given to the Court?

11     Q.    I want you to assume that counsel did

12 not provide the entire answer to the Court in

13 the briefing in this case.  Wouldn't it be

14 appropriate for someone to have brought the

15 entire answer to the Court so she could see the

16 entire context?

17     A.    Didn't Gibbons bring the entire answer

18 to the Court?

19     Q.    This is your report, sir.

20     A.    And I'm quoting from Gibbons.

21     Q.    The question to you is; don't you

22 think in your report if you're accusing someone

23 of being misleading that your side should have

24 advised, you personally should have advised the

Page 29

1    Court of the entire answer so the Court could

2    have judged the entire answer as opposed to a

3    quarter of the answer?

4             MR. ALTMAN:  Hold on a second.

5             Objection.  Compound, vague and

6    ambiguous argumentative.

7             MR. BARNES:  That's fine.

8             MR. ALTMAN:  Go ahead.

9    A.    I disagree with you.

10            BY MR. BARNES:

11   Q.    So you believe providing the Court

12   with only less than 25 percent of an answer is

13   not misleading, is that correct?

14            MR. ALTMAN:  Objection.

15   Argumentative, asked and answered.  Now you're

16   starting to badger him.

17            MR. BARNES:  I'm not.  I'm asking that

18   question.

19            MR. ALTMAN:  You're badgering him.

20   You've asked him the same question three times.

21   Come on, move on.

22            BY MR. BARNES:

23   Q.    Answer that question.

24   A.    I'm going to answer the question with

Page 30

1    an analogy.

2            If I pull out of context a single

3    sentence, and this ended at a sentence, at a

4    period, not at a semi-colon, not at a comma, not

5    at a dash or an ellipses, it ended at a period,

6    full sentence, would I be pulling it out of

7    context saying, if I pulled a quote from

8    somebody saying "I believe that somebody should

9    shoot President Obama," and you say -- would you

10   start arguing that that's out of context?

11       Q.    My question to you is; do you believe

12   that an answer that --

13       A.    That's my answer.

14       Q.    Let me ask my question.  I want an

15   answer to my question, sir, and I will pursue

16   this.

17            Do you believe as an expert that it is

18   not misleading to put in an expert report only

19   25 -- less than 25 percent of your colleague's

20   answer whom you're criticizing for being

21   misleading?

22            MR. ALTMAN:  Hold on.  Objection.

23   Asked and answered.

24            I'm not allowing him to answer at this

Page 31

1      point.  You're now badgering him, and if you

2      continue we're going to end this deposition.

3                  MR. BARNES:  He gave me -- he answered

4      an analogy.

5                  MR. ALTMAN:  You keep asking him the

6      same question.

7                  MR. BARNES:  We're going to go off the

8      record.  We're going to call the magistrate.

9                  MR. ALTMAN:  No, we're not going to.

10                  MR. BARNES:  Yes, we are.

11                  MR. ALTMAN:  No, we're not going to

12      until I put my statement on the record.

13                  MR. BARNES:  That's fine.  Go ahead.

14                  MR. ALTMAN:  You've asked him four

15      times or five times the same question, he's told

16      you he doesn't agree, you continue going at it

17      over and over again and badgering him.  You keep

18      throwing 25 percent.  I'm now instructing him

19      not to answer it.  If you want to --

20                  MR. BARNES:  We're going to bring him

21      back.  We're going to bring him back.

22                  MR. ALTMAN:  You can make your

23      argument to the magistrate.  You're very short

24      on time, I suggest you ask the questions that

Page 32

1    you want.

2              MR. BARNES:  I did.

3              MR. ALTMAN:  I'm instructing him not

4    to answer at this point.

5              MR. BARNES:  You're going to instruct

6    him not to answer.  He's not answered that

7    question, Keith.

8              MR. ALTMAN:  Yes, he has.  He says he

9    doesn't agree with you.  You're badgering him

10   now.

11             MR. BARNES:  I'm happy to have you pay

12   his way back.  Okay.  Next question.

13             He's the one that called Dr. Gibbons'

14   intent to mislead, and he provided the

15   misleading quote, and we're going to get to the

16   bottom of it.

17             MR. ALTMAN:  Rick, I object to your

18   statements on the record.  Please move on and

19   ask him the questions.

20             MR. BARNES:  We're going to move on.

21             BY MR. BARNES:

22        Q.    I direct your attention to Page 2 of

23   your report.

24        A.    Yes.

1     Q.     Okay.   As a statistician with

2   expertise in the field of -- first of all, do

3   you claim expertise in the field of clinical

4   trial design?

5     A.     No.

6     Q.     So you're not a clinical trialist,

7   correct?

8     A.     Correct.

9     Q.     Okay.   You do agree that there were

10   serious limitations to even randomized

11   controlled clinical trials, correct?

12     A.     Yes.

13     Q.     And you would agree that randomized

14   controlled clinical trials, even though they're

15   treated as a gold standard, suffer from problems

16   which you list in your report at Page 2,

17   correct?

18     A.     Can suffer.

19     Q.     Can suffer.

20            Did you do any qualitative assessment

21   of any of the clinical trials that are in the

22   FDA meta-analysis?

23            MR. ALTMAN:   Objection.   Goes beyond

24   the scope of his expert report.

1          MR. BARNES:  It does not.

2          MR. ALTMAN:  He didn't say that he

3     reviewed the FDA meta-analysis.  You're asking

4     him about stuff he didn't do.

5          MR. BARNES:  This witness looked at

6     Dr. Gibbons' report, this report, and he looked

7     at it, it's one of the references he considered,

8     Dr. Gibbons' report of July of 2008.  So he has

9     looked at it, that's what Dr. Gibbons is

10    addressing in his report, so it's fair game for

11    me to talk about the meta-analysis.  It's in his

12    report.  That's all Dr. Gibbons talked about.

13         MR. ALTMAN:  You can ask him about

14    what he opined upon in section two with respect

15    to one section of Dr. Gibbons' July report.

16    Dr. Gibbons doesn't --

17         MR. BARNES:  Let me ask the question,

18    Keith.  We're going to get to the bottom of

19    this.  Okay.  He's reviewed it, it's in his

20    report, and we're going to ask questions about

21    the clinical trials.  You can object, and we'll

22    just see where we go.

23         BY MR. BARNES:

24      Q.    First of all, did you do any

Page 35

1    qualitative assessment of the randomized

2    controlled trials in the FDA meta-analysis?

3            MR. ALTMAN:   Objection.   It's not the

4    topic in his report here.

5            MS. McGRODER:   He can answer.

6            MR. ALTMAN:   He comments upon the

7    elements.   I'm instructing him not to answer

8    because it's pending an agreement.   You can ask

9    him questions about what's in his report here.

10           BY MR. BARNES:

11      Q.    Did you or did you not review

12   Dr. Gibbons' July, 2008 report as represented in

13   your report of May 31st, 2009?

14      A.    Yes.

15      Q.    Okay.   And that report concerns the

16   FDA meta-analysis, correct?

17      A.    Correct.

18      Q.    Okay.   You testified this morning that

19   you had reviewed the FDA meta-analysis, correct?

20      A.    Correct.

21      Q.    Okay.   Now, did you do -- in

22   connection of criticizing Dr. Gibbons' report,

23   considering Dr. Gibbons report in 2008, July,

24   2008 report, did you undertake any review of

Page 36

1    Dr. Gibbons' work analyzing the FDA

2    meta-analysis?

3                MR. ALTMAN:  Objection.  He hasn't --

4                MR. BARNES:  We have an agreement.

5                MR. ALTMAN:  We have an agreement.  If

6    you want to ask him about the one section of

7    Dr. Gibbons' November, 2008 report.

8                MR. BARNES:  I'm going to get to that.

9    I'm going to lay a foundation.

10                MR. ALTMAN:  Don't ask him about July

11   then.

12                MR. BARNES:  It's in July.

13                MS. McGRODER:  It's in every report.

14   His opinions about the FDA meta-analysis are in

15   his May report, July report, November report,

16   and March report.

17                MR. ALTMAN:  It doesn't matter.  He

18   only opined about one paragraph in Dr. Gibbons'

19   November, 2008 report.  If you want to ask him

20   about his opinions about the one paragraph --

21                MR. BARNES:  You instruct him not to

22   answer?

23                MR. ALTMAN:  I instruct him not to

24   answer to the extent that you exceed beyond

Page 37

1    paragraph number eight.  If you want to ask him

2    about what he says about paragraph number eight,

3    I will not object.

4           MR. BARNES:  Keith, I'm going to take

5    my deposition.  You've now obstructed me twice

6    on legitimate grounds of examination.  And so,

7    you know, I'm going to be in Boston, I can file

8    a motion with Judge Saris or Judge Sarokin.

9           MR. ALTMAN:  Okay.

10          MS. McGRODER:  Can I interject one

11    thing, Keith?  This report does not limit any of

12    Dr. Greenland's opinions to Paragraph 8 of

13    Dr. Gibbons' report.

14          MR. ALTMAN:  With respect to the FDA

15    alert, he only discusses what Dr. Gibbons says

16    in Paragraph 8.

17          MS. McGRODER:  That is not evident

18    from this report.

19          MR. ALTMAN:  Really?  Why don't you

20    read right over here, if you go to Page 3, I

21    believe, okay, is the first time he talks about

22    Dr. Gibbons, and he's talking about what

23    Dr. Gibbons said in Paragraph 8.

24          MR. BARNES:  So he's reviewed the

 1    entire report from --

 2              MS. McGRODER:  It doesn't say that.

 3              MR. BARNES:  It doesn't say that.

 4              MR. ALTMAN:  Yes, it does.

 5              MS. McGRODER:  No, it doesn't.

 6              MR. ALTMAN:  Dr. Gibbons in his

 7    analysis in Paragraph 8.

 8              MR. BARNES:  Instruct him not to

 9    answer.

10              MR. ALTMAN:  If you want to ask him

11    about Paragraph 8 --

12              MR. BARNES:  I'm going to ask him the

13    questions I want to ask him, sir.

14              MR. ALTMAN:  I'll just telling you

15    what I won't object to.

16              MS. McGRODER:  So you're going to

17    strike Pages 1 through middle of 3 since --

18              MR. ALTMAN:  What do those have to do

19    with the FDA alert?

20              MS. McGRODER:  Why are they in here

21    then?

22              MR. ALTMAN:  They don't discuss the

23    FDA alert.

24              MS. McGRODER:  They discuss the

Page 39

1    randomized controlled trials that underlie the

2    FDA alert.

3              MR. ALTMAN:  Really?  Where does it

4    say that?

5              MS. McGRODER:  Why else would he be

6    talking about randomized controlled trials?

7              MR. ALTMAN:  He's talking about

8    Dr. Gibbons' power calculations in section 8.

9              MR. BARNES:  Let me continue.

10             BY MR. BARNES:

11        Q.     You specifically cite on Page 2 the

12   comment for "randomized controlled trials

13   usually suffer from problems such as," correct?

14        A.     Correct.

15        Q.     Now, does "usually" mean most of them?

16        A.     Well, let me explain and say probably

17   most trials suffer from some problem, not all of

18   them at once listed there.

19        Q.     So let me ask that question.

20             You would agree from your perspective

21   that randomized controlled trials usually suffer

22   from one or more of the problems listed on

23   Page 2 of 20 of your report, is that a fair

24   question?

Page 40

1      A.     That's what I would guess.

2      Q.     Okay.  That's fine.  I just want to

3 make sure I understood that.

4      A.     Yes.

5      Q.     And in terms of that would apply to --

6 so as a general -- so when you talk about on

7 number four "Failure to enroll patients that are

8 representative of those who would receive the

9 treatment in practice, which results in lack of

10 generalizability of the results," what do you

11 mean by that?

12      A.     I'm not sure what you're asking.

13      Q.     Well, you wrote that.  Explain to me

14 what generalizability -- what "lack of

15 generalizability" means?

16      A.     Oh, it means that the patients who are

17 enrolled in trials sometimes, quite often, are

18 different from -- for example, if a drug is

19 being used, being evaluated in a trial, say,

20 conducted for or by the manufacturer to get

21 approval for a particular condition, then the

22 patients enrolled in that trial will be the

23 people who have the condition that they're

24 developing the drug to get approval for for that

Page 41

1    condition, and then that means it's not going to

2    have been tested, and the trial, the results in

3    the trial may not apply to those who -- for whom

4    it may be prescribed for off-label use.

5                MR. BARNES:  Would you read back that

6    last sentence, please?

7                (Whereupon, the reporter read back the

8    above answer.)

9                BY MR. BARNES:

10   Q.    As an example?

11   A.    Yes.

12   Q.    But even, you would agree that even

13   those who are enrolled in a randomized trial in

14   patients who are taking them for the indication,

15   the patients in the clinical trial may not be

16   reflective of the population in the real world

17   that is actually taking the drug for the

18   indication; agree?

19   A.    That can happen, too.

20   Q.    Absolutely.  Okay.

21   A.    Yes.

22   Q.    Now, you criticize Dr. Gibbons'

23   opinion that gabapentin had an adequate number

24   of subjects in clinical trials to calculate

1    relative risk of suicidal behavior and thinking,

2    correct?

3              I'm trying to understand what your

4    criticism is here on Page 2 and 3.  It says

5    here -- the third paragraph on Page 3, maybe you

6    can help me understand this.

7         A.    Okay.  "Power calculations"?

8         Q.    Yes.  Well, this is what you say,

9    let's go up to the power calculations, the

10   previous paragraph.

11        A.    Previous paragraph?

12        Q.    On Page 3.

13        A.    On Page 3.  The one that begins" Power

14   calculations"?

15        Q.    Let me go up a little farther.  You

16   say "Because the power calculations offered by

17   Dr. Gibbons take no account of biases (problems

18   2 to 4), these calculations do not establish his

19   claims that the available studies were of

20   adequate size to detect important effects of

21   gabapentin."

22              Do you see that?

23        A.    Yes.

24        Q.    Okay.  Now, help me with this, all

Page 43

1     right?

2               Where did Dr. Gibbons obtain the

3     information by which he conducted the power

4     calculations in his expert report?

5               MR. ALTMAN:  Objection.  Foundation.

6               You can answer.

7               BY MR. BARNES:

8     Q.    You can answer.

9     A.    Do you mean the numbers that he

10    plugged in?

11    Q.    He did his power calculations, so

12    where did he get the effect size by which he

13    performed his power calculation?

14              MR. ALTMAN:  Object to foundation.

15    A.    Well, depends on which calculation.

16    Some of the calculations he got his numbers from

17    what happened in the lamotrigine and topiramate

18    groups, and then there were other places there

19    he was using numbers from other sources in the

20    data from the -- used in the FDA meta-analysis.

21              BY MR. BARNES:

22    Q.    Okay.  So part of it is from the FDA

23    meta-analysis, and part of it is specific from

24    the lamotrigine and topiramate trials in the

Page 44

1    meta-analysis, correct?

2         A.    As I recall it.

3         Q.    Now, what was the -- what was wrong

4    with Dr. Gibbons -- let's take them one at a

5    time.

6              Do you have a criticism of Dr. Gibbons

7    using the data from the lamotrigine and

8    topiramate trials for purposes of calculating

9    the power calculation?

10        A.    Yes, as it pertains to gabapentin.

11        Q.    Okay.  Now, why don't you believe the

12   effect size that was calculated for topiramate

13   and lamotrigine, why it was inappropriate for

14   Dr. Gibbons to use those results from the FDA

15   meta-analysis in calculating his power

16   calculations in his expert report?

17        A.    Because the background risk in those

18   trials was different because the indications in

19   the particular population selected for

20   application of those drugs appeared to be

21   different in their background risk than those

22   for the gabapentin trials.

23        Q.    Did you go and determine the

24   background risk that was in the lamotrigine and

Page 45

1    topiramate trials?

2         A.    I took Dr. Gibbons' numbers at face

3    value.

4              MR. BARNES:  Mark this as an exhibit.

5    This is Dr. Gibbons' report from March 19th,

6    2009.  Mark that as the next exhibit.

7              (Whereupon, Greenland Exhibit Number 3

8              was marked for identification.)

9              BY MR. BARNES:

10        Q.    Explain to me where you claim

11   Dr. Gibbons obtained his information from the

12   FDA meta-analysis.

13        A.    I'll have to -- well, there it is.

14        Q.    What page, sir, and what paragraph?

15        A.    I believe I'll find it on seven, but

16   let me read through it, please.

17        Q.    Take your time.  Thank you, sir.

18              (Witness reviewing document.)

19        A.    Well, this is how I read it.

20              BY MR. BARNES:

21        Q.    You're on Paragraph 7 or Page 7?

22        A.    Page 7, Paragraph 8.

23        Q.    Thank you.

24        A.    And I'm not sure where to start

1     reading, but I'm going to read from the sentence

2     that begins about a third of the way down

3     Paragraph 8.  At the start of the line, it says

4     "Second, for the combination of lamotrigine and

5     topiramate, the incidence of suicidality events

6     on the drug was .63 percent and .32 percent on

7     placebo."

8         Q.    Is that a true statement, sir?

9         A.    I'm simply taking his word at this

10    point.

11        Q.    Did you -- you accept his word on it?

12        A.    I accept his word.

13        Q.    Continue.

14        A.    "By contrast, for the so-called

15    GABAergic drugs excluding topiramate, the

16    incidence of suicidality events on the drug was

17    .18 percent and .18 percent on placebo."

18        Q.    Okay.  Now, I want you to look at the

19    FDA meta-analysis.

20           MR. BARNES:  Keith, if you would give

21    Dr. Greenland, I'll mark that as an exhibit, the

22    Medical Statistical Review, please.

23           MR. ALTMAN:  I'm going to object to

24    the use of this document.  He says he based his

1    opinion upon what was in Dr. Gibbons' --

2              MR. BARNES:  He's referencing the

3    doggone FDA meta-analysis.

4              MR. ALTMAN:  So?  But he says he

5    relied upon Dr. Gibbons' Paragraph 8.

6              MR. BARNES:  He has testified he has

7    reviewed the meta-analysis.

8              MR. ALTMAN:  There's not a question,

9    that's not a question whether he's ever looked

10   at the meta-analysis.  It's a question of what

11   did he talk about.

12             MR. BARNES:  I can't conduct a

13   deposition with you interrupting me, sir.

14             I'm going to mark my exhibit, you can

15   instruct him not to answer.

16             MR. ALTMAN:  That's fine.

17             MR. BARNES:  Or not.

18             (Whereupon, Greenland Exhibit Number 4

19             was marked for identification.)

20             BY MR. BARNES:

21   Q.    So as we go through this, you accept

22   Dr. Gibbons' calculation of a rate of

23   suicidality of .63 percent for the combination

24   of lamotrigine and topiramate and .23 percent,

1    correct?

2         A.    For placebo.

3         Q.    "By contrast, the so-called

4    suicidality events for GABAergic drugs including

5    topiramate, the incidence of suicidality events

6    on the drug was .18 and 1.8 on placebo,"

7    correct?

8         A.    .18 percent on placebo.

9         Q.    Do you agree the that the exclusion of

10   topiramate from GABAergic drugs eliminated the

11   increased risk of suicidal thinking and behavior

12   in the FDA meta-analysis for GABAergic drugs?

13             MR. ALTMAN:  Hold on a sec.  I don't

14   think he's expressed that opinion in this expert

15   report, so I'm going to instruct him not to

16   answer.

17             MR. BARNES:  He has.  He's criticizing

18   a power analysis by a witness based upon his use

19   of these data.

20             MR. ALTMAN:  He did not render --

21             MR. BARNES:  Paragraph 8 is all about

22   that.  I'm entitled to inquire.  He's accused --

23             MR. ALTMAN:  Except that's in his

24   earlier report.  You guys had a full and fair

Page 49

1    opportunity to depose Dr. Gibbons on his earlier

2    report, you guys chose not to take his

3    deposition.

4              MR. BARNES:  You just told us I was

5    free to inquire anything about Paragraph 8.

6              MR. ALTMAN:  But his opinion on

7    Paragraph 8.  Read his opinion on --

8              MR. BARNES:  I'm allowed to test his

9    opinions, Keith.

10             MR. ALTMAN:  His opinion, he didn't

11   express any opinions about the --

12             MR. BARNES:  It's in his report.

13             MR. ALTMAN:  Where in his report is

14   the opinion that it was appropriate or not

15   appropriate to exclude topiramate or lamotrigine

16   in this report?

17             MS. McGRODER:  Are there certain

18   sentences in Paragraph 8 that you're limiting

19   his deposition to?

20             MR. ALTMAN:  I'm limiting his

21   deposition to his expert report.  If you could

22   point to me where he wrote about lamotrigine and

23   topiramate --

24             MR. BARNES:  This is unreal.

Page 50

1          MS. McGRODER:  You pointed to us, you

2     said his opinions about Dr. Gibbons' report are

3     in Paragraph 8.

4          MR. ALTMAN:  Are from Paragraph 8.

5          MS. McGRODER:  Now we're talking about

6     Paragraph 8.

7          MR. ALTMAN:  Show me where in his

8     expert report where he discusses the

9     appropriateness of lamotrigine and topiramate,

10    and you may ask him about it.

11         MR. BARNES:  I'm talking about the

12    power analysis.  I'm allowed to set a predicate

13    and test his opinions, and you're just

14    completing undermining my ability to do that.

15    How am I going to cross this witness at trial if

16    you keep saying "oh, you're getting close to

17    something I don't want him to talk about."

18         MR. ALTMAN:  Rick, it's not my fault

19    that you guys didn't take his deposition.

20         MR. BARNES:  Okay.  Instruct him not

21    to answer the question.

22         MR. ALTMAN:  I'm instructing him not

23    to answer.

24         MR. BARNES:  That's fine.

1          MR. ALTMAN:  Point to me in here where

2     he --

3          MR. BARNES:  I'm not going to point to

4     you.  I'm going to keep asking my questions.

5     You keep doing it, and we'll take it up.

6          MR. ALTMAN:  Okay.

7          BY MR. BARNES:

8          Q.   Okay.  So what is wrong about

9     Dr. Gibbons taking the effect size that was

10    measured for the combination of lamotrigine and

11    topiramate in his power calculation that you've

12    referenced?  What was your objection to that,

13    sir?

14         A.   That in a power calculation it depends

15    not only on the effect size, but also on the

16    background risk power.  That's one objection.

17    Not the only one that I had, but that's one.

18         Q.   What is the background risk of

19    lamotrigine and topiramate that you're saying

20    was not accounted for, do you know?

21         A.   It says -- I'm taking Dr. Gibbons'

22    writing at his face value.

23         Q.   Where is that?

24         A.   It says ".32 percent on placebo" in

1    Paragraph 8.

2         Q.    Is it your testimony, sir, that the

3    .32 percent on placebo includes what population

4    of patients?  Can you describe what population

5    of patients make up that placebo group?

6         A.    The population of placebo controls

7    used in the lamotrigine and topiramate trials.

8         Q.    What indication, sir?

9         A.    Come again?

10        Q.    What indications were those patients

11   tested for?

12        A.    I believe at some point it was

13   discussed, might have been discussed in some

14   materials I saw, it might have been discussed by

15   Dr. Gibbons, but I don't see it discussed in

16   this passage and it would take a while to locate

17   it.

18        Q.    As you sit here today, do you know the

19   background rate of the patients for suicidal

20   thinking and behavior for lamotrigine and

21   topiramate?

22             MR. ALTMAN:  Objection.  Asked and

23   answered.

24             MR. BARNES:  I'd like an answer,

Page 53

1   Keith.  We're going to be here until

2   6:00 o'clock.  You're interrupting this

3   deposition.

4            MR. ALTMAN:  He just told you several

5   times he relied upon the numbers in Dr. Gibbons'

6   report, and you keep asking him.

7            MR. BARNES:  He says he cannot give

8   me -- he said and the background rate.  He does

9   not know what patient populations were tested in

10  the lamotrigine and topiramate clinicals trials.

11           BY MR. BARNES:

12       Q.    Correct?

13           MR. ALTMAN:  Objection.

14           MS. McGRODER:  Let him answer the

15  question.

16           MR. ALTMAN:  Objection.  Asked and

17  answered.

18           He's told you four times or five times

19  that he has relied upon the numbers in Dr.

20  Gibbons' report.

21           MR. BARNES:  You're coaching him now.

22  Now you're in the process of coaching this

23  witness.  I've got two hours.  You're telling

24  him exactly what to say.  I try to ask the

Page 54

 1    question, you block me, what's the point?
 2    What's the point?
 3                MR. ALTMAN:  Rick, it's not my
 4    fault --
 5                MR. BARNES:  From now on you object,
 6    you do one thing, you object and instruct him
 7    not to answer, and I'll try and get this
 8    deposition done.
 9                MR. ALTMAN:  That's fine.
10                BY MR. BARNES:
11        Q.    Okay.  So it's your testimony, sir,
12    that the .32 percent on placebo is the
13    background rate?  Is that your answer?
14        A.    For whom?
15        Q.    For topiramate, topiramate and
16    lamotrigine.
17        A.    Lamotrigine and topiramate trials,
18    yes.
19        Q.    What do you base that on?
20        A.    The numbers that he presented.
21        Q.    Just .32 percent?
22        A.    Right.
23        Q.    Did Mr. Altman tell you before this
24    deposition that relate everything to

1    Dr. Gibbons' paper, is that something you told

2    you to do in this dep?  I mean it seems like

3    every time I'm trying to ask a question he says

4    keep it to the report.

5             I mean are you telling me you didn't

6    do any background research on the background

7    rate for lamotrigine and topiramate in terms of

8    criticizing Dr. Gibbons' report?

9             MR. ALTMAN:  Objection.  Asked and

10   answered.

11            MR. BARNES:  Background research has

12   not been asked.

13            BY MR. BARNES:

14        Q.   You may answer.

15        A.   As I said, I've read through all these

16   materials.  And as I recall, it had been

17   discussed about how, I believe Dr. Gibbons

18   raised the issue, in fact, about how these

19   trials involved different patients with

20   different indications, so that differences in

21   background risks were to be expected.  And he

22   presented a difference in background risk which

23   matched the numbers that I recall from the FDA

24   report, so presumably he was reporting the same

Page 56

1    numbers or reporting on the FDA numbers

2    accurately, and then proceeded to report on the

3    GABAergic drugs without topiramate.

4         Q.    So the GABAergic drugs without

5    topiramate was something you reviewed in the

6    context of criticizing Dr. Gibbons' report,

7    correct?

8              MR. ALTMAN:  Objection.

9              MR. BARNES:  You better just object

10   now, Keith, because he's already --

11             MR. ALTMAN:  Fine.  Objection.

12   Instruct him not to answer.

13             MR. BARNES:  Fine.  So you're not

14   going to let him answer that question.

15             BY MR. BARNES:

16        Q.    All right.  Where in the FDA

17   meta-analysis does it talk about the background

18   rate for the drugs absent topiramate?

19             MR. ALTMAN:  Objection.  Instruct him

20   not to answer.

21             BY MR. BARNES:

22        Q.    What are the indications tested for

23   topiramate and lamotrigine in these clinical

24   trials?

1          MR. ALTMAN:  Objection.  Instruct him

2     not to answer.

3          BY MR. BARNES:

4     Q.    You go on, the next sentence, "By

5     contrast, for the so-called GABAergic --" this

6     is Dr. Gibbons' report, "By contrast, for the

7     so-called GABAergic drugs excluding topiramate,

8     the incidence of suicidality events on the drug

9     .18 percent and .18 percent on placebo,"

10    correct?

11    A.    Yes.

12    Q.    You have no basis to challenge

13    Dr. Gibbons' calculation of the incidence of

14    suicidality events on GABAergic drugs excluding

15    topiramate, do you?

16    A.    I'm accepting his numbers.

17    Q.    You're accepting those numbers.  Okay.

18         So now if you go further, "The

19    sampling ratio of the GABAergic drugs (excluding

20    topiramate) to placebo is 1.8 to 1."

21         Do you see that?

22    A.    Yes.

23    Q.    So then Dr. Gibbons says "The

24    statistical power to detect the difference for

Page 58

1  topiramate is .85, or 85 percent, which exceeds

2  the traditional scientific standard of

3  85 percent," correct?

4       A.    Right.

5       Q.    Do you disagree with his statement

6  there?

7       A.    Yes, for lamotrigine and topiramate.

8       Q.    That's accurate, isn't it?

9       A.    I did not check his numbers, but I

10  didn't -- I don't think I challenged them, that

11  particular statement, if I'm reading it

12  correctly.

13       Q.    Okay.  Then Dr. Gibbons says "This

14  number is also used by the FDA."

15            You agree with that, don't you?

16       A.    Wait.  Now he's saying the standard of

17  80 percent is also used by the FDA.

18       Q.    Yes, that's my question.

19       A.    Yes, I know that's used sometimes.

20       Q.    And you would agree that power

21  calculations are routinely included in

22  discussions with the FDA in terms of reviewing

23  clinical trial protocols to obtain approval of

24  new medicines in NDAs, correct?

1       A.      Yes.

2       Q.      So power calculations are routinely

3   relied upon by companies and the FDA in

4   evaluating clinical trials, correct?

5       A.      Yes.

6       Q.      Okay.  So Dr. Gibbons then says "The

7   finding indicates that we would have more than

8   sufficient statistical power to detect and

9   effect equal to that found for the lamotrigine

10  or topiramate for the other so-called GABAergic

11  drugs that existed."

12              That's correct, too, isn't it?

13      A.      No.

14      Q.      Why not?

15      A.      That's what I object to.

16      Q.      Okay.  Now I got to it.

17              What's the problem?

18      A.      That when you go to the other

19  GABAergic drugs they have a lower background

20  risk and that would reduce their power.

21      Q.      So what you're saying, then, once you

22  exclude topiramate which has a much higher risk

23  of suicidal thinking and behavior, the other

24  GABAergic drugs do not have the same background

Page 60

1    risk, correct?

2        A.    Correct.

3        Q.    Topiramate is materially different in

4    terms of its risk of suicidal behavior and

5    thinking than the other GABAergic drugs --

6        A.    No.

7        Q.    Let me finish my question.

8              Has a higher risk of suicidal thinking

9    and behavior than the other GABAergic drugs in

10   the FDA meta-analysis, correct?

11             MR. ALTMAN:  Hold on.

12             Can you read back the question,

13   please?

14             (Whereupon, the reporter read back the

15   pending question.)

16             MR. ALTMAN:  Hold on.  I will object

17   unless he can answer the question based upon

18   what he reviewed in Dr. Gibbons -- if he can

19   answer it based on that, he can answer.

20             MR. BARNES:  You're asking him to

21   disaggregate information that he's had in his

22   head which he specifically relied upon in

23   creating his report of May 31, 2009 of

24   criticizing Dr. Gibbons' report of March and

Page 61

1    November.  I don't see -- he gave me an answer,

2    I'm following up, I'm entitled to follow up.  He

3    can't disaggregate things.

4              You're trying to dance on the head of

5    a pin, Keith.  He's reviewed the stuff, he

6    criticized him, he didn't do it in a vacuum.  I

7    want an answer to that question.

8              MR. ALTMAN:  You also had an

9    opportunity to depose him.

10             MR. BARNES:  That's not the question.

11   I'm deposing him on his report as we've agreed

12   to, and I'm deposing him on his criticism of

13   Paragraph 8, which you told me to have it at it,

14   so I'm having at it in my little two-hour window

15   that you've given me.

16             BY MR. BARNES:

17        Q.   So I want an answer to that question,

18   please, sir.

19             MR. ALTMAN:  I'll allow him to answer

20   it to the extent he can do it based on what is

21   in Dr. Gibbons' report.

22             BY MR. BARNES:

23        Q.   Answer the question, sir.

24             MR. BARNES:  You've now interrupted

Page 62

1    the entire deposition yet again.

2                (Whereupon, the reporter read back the

3    pending question.)

4                BY MR. BARNES:

5        Q.    Answer that question, sir?

6        A.    And again, that's not what I was

7    talking about here.  This is that the background

8    risk is different.  It's not that topiramate has

9    the higher risk which would be in effect, it's

10   that the patients in the trials had a higher

11   risk, regardless of whether they had received

12   topiramate or not, it's showing in the placebo

13   group they had a higher risk.  So it's a higher

14   risk group, and this would make the relative

15   risk of a particular size easier to detect in

16   the higher risk -- it's easier to detect in the

17   higher risk group.

18               MR. BARNES:  You were just showing

19   Dr. --

20               MR. ALTMAN:  I wasn't showing him

21   anything.

22               MR. BARNES:  You opened this and you

23   just put this right in front of him and you

24   pointed at this page.

Page 63

1           MR. ALTMAN:  I didn't point at

2    anything.

3           MR. BARNES:  Why did you pick this up

4    and put this, lay it and do that?

5           MR. ALTMAN:  I thought that was the

6    page it was open to.

7           MR. BARNES:  Counsel, counsel, you

8    just --

9           MR. ALTMAN:  Rick, if you're going to

10   accuse me of some impropriety, this deposition

11   is going to end.  I picked it up frankly to look

12   to see whether he even relied upon the FDA

13   meta-analysis in writing this report which, in

14   fact, he did not.

15          MR. BARNES:  Keith, I am surprised.

16   You just picked up a report and you placed it in

17   front of the witness.  You could have asked me

18   permission, and I probably would have --

19          MR. ALTMAN:  Excuse me.  You didn't

20   bring a copy of this to refer to myself.

21          MR. BARNES:  We have one right here

22   for you.

23          MR. ALTMAN:  You asked me to share

24   with him.  You asked me --

Page 64

1            MR. BARNES:  Don't signal to the

2     witness.

3            MR. ALTMAN:  I didn't signal anything

4     to the witness.  If you're going to accuse me,

5     I'm terminating this deposition.

6            MR. BARNES:  You can do whatever you

7     want.

8            MR. ALTMAN:  That's fine.

9            This is ridiculous.

10            MR. BARNES:  You can do whatever you

11     want.

12            MR. ALTMAN:  That's fine.  You either

13     withdraw that off the record or this deposition

14     is over.

15            MR. BARNES:  I'm asking you --

16            MR. ALTMAN:  You're accusing me of

17     improprieties.  You either withdraw it --

18            MR. BARNES:  I asked you not to

19     place -- you could have asked me for permission.

20            MR. ALTMAN:  I'm sorry, I didn't need

21     to ask you.  When you provided this report and

22     said share this --

23            MR. BARNES:  I could have gotten you

24     one right here.

1          MR. ALTMAN:  Did you not say to me to

2    share this?

3          MR. BARNES:  You weren't sharing it.

4          MR. ALTMAN:  I was checking to see

5    something.  Don't accuse me of things you're not

6    sure of, Rick.  Continue on.

7          MR. BARNES:  My golly.

8          I want to hear the last question,

9    please.

10          (Whereupon, the reporter read back the

11    above answer.)

12          BY MR. BARNES:

13    Q.    So is it your opinion, sir, that the

14    patients in the lamotrigine and topiramate

15    trials have a higher background rate than the

16    other GABAergic drugs?

17    A.    It does appear that way to me based on

18    the data that Dr. Gibbons discusses in that

19    paragraph.

20    Q.    And that's a comparison of the two

21    placebo populations only?

22    A.    Correct.

23    Q.    And you did no other background

24    research to see if that was an accurate

Page 66

1    statement?

2         A.    Which was an accurate statement?

3         Q.    Forget that.

4               Are you critical of Dr. Gibbons'

5    decision to use the background rate of -- to use

6    the FDA meta-analysis data for purposes of

7    obtaining his effect size?  In other words, he

8    obtains the effect size for his power

9    calculation he says from the FDA meta-analysis,

10   correct?

11        A.    Yes, from part of it anyway.

12        Q.    Yes.

13              And it is your belief that the effect

14   size that he utilizes is somehow unreliable for

15   purposes of power calculations, correct?

16        A.    May I refer back to --

17        Q.    You certainly may.

18        A.    -- exactly what you're referring to

19   and what I said?

20              MR. BARNES:  Please get Keith his own

21   copy of the report.

22        A.    So now we're on page of my report, it

23   would help me if you could point to exactly what

24   you're saying.  I'm saying -- there, okay.  So

Page 67

1   it's Page 2 and 3.  And now, Page 3.  Okay.  So

2   could you --

3               BY MR. BARNES:

4       Q.    What I'm understanding you to say, and

5   trying to get to the bottom of it just so I

6   understand your criticism, is that you're

7   criticizing Dr. Gibbons for taking information

8   from the FDA meta-analysis in the pursuit of

9   conducting a power calculation to determine the

10  adequacy of the number of patients in the

11  gabapentin clinical trials; is that a fair

12  understanding of where we are at this point?

13              MR. ALTMAN:  Objection.  Misstates his

14  testimony.

15      A.    I don't think I stated things that

16  way.

17              BY MR. BARNES:

18      Q.    You state for me what your criticism

19  is then.

20      A.    Well, if you could point to me in this

21  report what it is you're questioning me about,

22  it would help.  I'm finding or following --

23      Q.    State in your own words what your

24  criticism of Dr. Gibbons' use of the FDA

Page 68

1    meta-analysis in terms of his power analysis?

2         A.    Okay.  Again, he's taking and using a

3    background risk which does not apply to the

4    drugs in which gabapentin -- the drug group

5    which he created in which gabapentin falls.

6         Q.    Who created?

7         A.    Dr. Gibbons.

8         Q.    What's the drug group you're referring

9    to?

10        A.    This GABAergic excluding topiramate.

11        Q.    Well, there's a GABAergic drugs

12   excluding topiramate in the FDA meta-analysis?

13        A.    Yes, but I'm saying he's using this

14   here.  I'm talking about his report, not the FDA

15   meta-analysis, as I've been instructed this is

16   all we're concerned about here.  I can only go

17   by the instructions.

18        Q.    I'm not blaming you at all, Doctor.

19   You've been more than fair.

20             Did you consult the FDA meta-analysis

21   itself to see what the GABAergic drugs to

22   include topiramate, what the risk was?

23             MR. ALTMAN:  Objection.  Instruct him

24   not to answer.

1          MR. BARNES:  He just referred to the

2     meta-analysis.  Dr. Gibbons didn't create that.

3     There is a group in the meta-analysis which

4     actually deals with that.

5          MR. ALTMAN:  You don't want me to say

6     any more.  I just instruct him not to answer.

7          MR. BARNES:  And that is fair.  That's

8     fine.

9          BY MR. BARNES:

10    Q.     What are your other criticisms of

11    Dr. Gibbons' efforts to conduct a power

12    analysis, other than using a background rate

13    which does not apply to the other drugs in the

14    GABAergic group?

15    A.     Okay.  Well, to go back to my Page 3.

16    Q.     Let me catch up to you.

17    A.     Okay.  This does not take account of

18    biases.

19    Q.     What's that now?

20    A.     To quote from my -- the sentence from

21    my report which is near the top of Page 3,

22    "Because the power calculations offered by

23    Dr. Gibbons take no account of biases," and then

24    "(problems 2-4), these calculations do not

Page 70

1    establish his claims that the available studies

2    were of adequate size to detect important

3    effects of gabapentin."

4        Q.    Okay.

5        A.    That's one more.  Should I continue?

6        Q.    Let's keep track of that.  Let's talk

7    about that one and then we'll go to the next

8    one.  We'll go, as you said, seriatim.

9              So because the power calculations

10   offered by Dr. Gibbons take no account of biases

11   problem 2 through 4, biases, what are you

12   referring to?  What biases are you referring to

13   there?

14       A.    On the previous page, problems two to

15   four are as follows.  "Failure of enrolled

16   patients to comply with or adhere to their

17   assigned treatment (often described as

18   non-adherence)."

19             Number three, "Failure of patients to

20   remain in the study for the full period

21   requested (lost follow-up)."

22             Number four, "Failure to enroll

23   patients that are representative of those who

24   would receive the treatment in practice, which

Page 71

1    results in lack of generalizability of the

2    results."

3         Q.    How did these biases, two, three and

4    four, are these biases that you believe may or

5    may not have existed in the FDA meta-analysis

6    trials which he was working with in creating the

7    power calculations?

8              MR. ALTMAN:  Objection.

9              Instruct him not to answer.

10             BY MR. BARNES:

11        Q.    What biases are you referring to?  Are

12   these two through four, is this -- what biases

13   are you referring to?  What is the studies

14   you're referring to that are biased?

15        A.    Okay.  The studies that could be

16   suffering from these problems would include

17   randomized trials that Dr. Gibbons was referring

18   to from the original FDA report.

19        Q.    From the original FDA meta-analysis?

20        A.    Right.

21        Q.    Just so I understand this criticism,

22   you're criticizing Dr. Gibbons for using the

23   FDA -- the clinical trials and the FDA

24   meta-analysis in conducting his power

Page 72

1    calculations because those trials were probably

2    biased due to limitations two, three and four as

3    you set forth on Page 2 of your report, correct?

4            MR. ALTMAN:   Objection.   Misstates his

5    testimony.

6        A.    Yes, that does misstate what I said.

7            BY MR. BARNES:

8        Q.    May have?

9        A.    It's a possibility.

10       Q.    Okay.   Then let me restate it.   That's

11   fair.   I want to understand that.

12           Your criticism of Dr. Gibbons is that

13   in conducting his power calculations he did not

14   account for the potential biases in the

15   randomized controlled clinical trials in the FDA

16   meta-analysis that he relied upon in conducting

17   his power analysis, correct?

18       A.    That's fair.

19       Q.    That's fair enough.   And that's fine.

20           And so he did not account for it, nor

21   did you in your report either, correct, is that

22   what you're saying?   You didn't go back --

23   strike that.

24       A.    I say all of these problems can reduce

Page 73

1    the chance that the trial or a collection of

2    trials will detect treatment effects, whether

3    harmful or beneficial.

4        Q.    And where is that, sir?

5        A.    This is following item four on Page 2.

6        Q.    Okay.  So a collection of trials

7    refers to a pooled analysis such as the

8    meta-analysis, correct?

9        A.    Correct.

10       Q.    So at least you would concede then

11   that the collection of trials in the FDA

12   meta-analysis potentially are infected with

13   biases two, three and four in your report,

14   correct?

15       A.    Yes.

16       Q.    And that Dr. Gibbons should have not

17   relied upon these results of these trials in

18   creating his power analyses because they may be

19   infected with FDA -- the randomized trials and

20   the FDA meta-analysis may be infected with bias?

21            MR. ALTMAN:  Objection.  Misstates his

22   testimony.

23       A.    Yes, it misstates my testimony.

24            BY MR. BARNES:

Page 74

1      Q.     Correct me, please.

2      A.     That he in making his assessment of

3   power should have taken into account the

4   possibilities that these biases existed and

5   therefore --

6      Q.     In the FDA meta-analysis?

7      A.     Yes.

8             -- therefore his power calculations

9   would be over-optimistic.

10     Q.     Okay.  Was there any way that you are

11  aware of that Dr. Gibbons could have accounted

12  for the potential biases in the randomized

13  trials that were collected in the FDA

14  meta-analysis when conducting his power

15  analysis?

16     A.     There are methods for doing so.

17     Q.     Do you believe that would have

18  adequately accounted for the biases in the

19  randomized controlled trials in the FDA

20  meta-analyses?

21            If he used these methods, would that

22  adequately in your view adjust for the potential

23  biases that were in the randomized clinical

24  trials used by the FDA in conducting its

1    meta-analysis of anti-epileptic drugs?

2              MR. ALTMAN:  Objection.  Calls for

3    speculation.

4              BY MR. BARNES:

5         Q.    You may answer.

6         A.    Well, to -- I must explain that these

7    methods require a considerable amount of

8    judgment in their use, in decisions and care,

9    and that if those -- there could be a lot of

10   controversy about whether they were used with

11   that, with the appropriate amount of judgment

12   and care, and so whether they would succeed in

13   correcting the bias the way you've described

14   would depend entirely on how they were applied.

15   Since nobody has done that that I know of in

16   this matter, not me or Dr. Gibbons or anyone

17   else that I know of, there's no way I could give

18   you an evaluation.

19        Q.    Of its potential to correct for these

20   biases?

21        A.    It has a potential to, but how well it

22   would would depend on how it was applied.

23        Q.    Do you know if Dr. Gibbons -- let me

24   ask you.

1    Do you know if FDA has been willing to

2    actually give researchers such as yourself or

3    Dr. Gibbons access to the underlying data in the

4    meta-analysis of these randomized trials so that

5    these sorts of adjustments could be considered

6    and applied to attempt to adjust for these

7    biases that you set forth in your report that

8    may infect the FDA meta-analysis?

9        MR. ALTMAN:  Objection.  Compound.

10       BY MR. BARNES:

11   Q.   Do you understand my question?  Let me

12   ask it simply.

13       If the FDA won't give the underlying

14   data to its meta-analysis, a researcher such as

15   yourself or Dr. Gibbons could not even attempt

16   the adjustments which you said might be able to

17   account for the biases in the randomized trials

18   that make up the FDA meta-analysis, correct?

19   A.   Not exactly correct, no.  They could

20   still use the methods, but they would have to be

21   performed much more crudely absent the actual

22   data being available, they would have to be

23   based on the numbers that were supplied and that

24   would be less, therefore less accurate.

1      Q.    And maybe not meaningful?

2      A.    Well, or at least not as, I would say,

3    reliable.

4      Q.    Reliable might be a word.

5            But without having actually -- so

6    would you recommend -- if Dr. Gibbons had used

7    these cruder methods, I think that's what you

8    said, I don't want to put words in your mouth,

9    but if Dr. Gibbons had tried to adjust for these

10   biases without the actual underlying data, it

11   would not have the effect of reliably, as

12   reliably controlling for these biases, correct?

13     A.    As reliably.

14     Q.    Until you actually saw the analyses,

15   it might be that these matters may not even be

16   effective in controlling for these biases in the

17   FDA trial, correct?

18     A.    Correct.

19     Q.    Okay.  I understand that.

20     A.    It's part of -- all this was by way of

21   listing the reasons, my objections to his power

22   analysis.  If I could return to the next item.

23     Q.    Yes, I think we finished that.

24     A.    That's one item, one more item down.

1        And then another objection, and I'm

2   going to quote from Page 3, second paragraph of

3   my May 31st report.

4        Q.    Yes, sir.

5        A.    "Power calculations based on observed

6   data also provide no picture of the range of

7   effects compatible with the data.   In

8   particular, they are no substitute for examining

9   confidence intervals and other interval

10  estimates, and in fact are considered misleading

11  by many authors."  I won't read the authors

12  listed on the record.

13       Q.    I understand.

14       A.    "As explained in both peer reviewed

15  publications and in textbooks, random error must

16  be properly accounted for by examining the full

17  range of values included in the confidence

18  interval, as well as the width of the interval.

19  Furthermore, because confidence intervals

20  account only for random error and ignore bias,

21  (problems 2 to 4 above), confidence intervals at

22  best provide a bare minimum range of effects

23  compatible with the observations."

24       Q.    So now in English for a history major.

1      A.    I love history.

2      Q.    You love this stuff.

3      A.    I love history.

4      Q.    Good.  Maybe next time we'll have a

5    drink and we'll talk about history, but I can --

6    you probably know a lot about that, too.

7            Can you kind of break that down into a

8    more lay explanation as to what your objection

9    is?

10     A.    The problem with power calculations is

11   that to assert as, for example, Dr. Gibbons

12   does, that a study had, say, an 85 percent

13   power, say I took his calculation face value --

14   I don't take that calculation face value, most

15   of his calculations I do but sometimes I hit

16   one, I say no, I don't.

17     Q.    Okay.  Fair.

18     A.    And that one, even if I accepted it,

19   that's like saying that the, after a horse race,

20   that the odds on this horse was 85 percent that

21   it would win, they were giving 85 to 15 odds at

22   the booth.

23     Q.    So you're complaint is he's doing a

24   post-hoc power assessment?

1    A.    Correct.

2    Q.    I understand.

3    A.    And then going up to the booth -- but

4  if that horse lost and I went up to the booth

5  and started complaining saying "but I had

6  85 percent chance of winning so pay off," they

7  would usher me off the grounds, rightfully so,

8  because as many authors have argued, what

9  matters after the studies have been done is not

10  what power they had, but whether they actually

11  succeeded in detecting the effect.

12    Q.    Okay.

13    A.    And what their final result was in

14  terms of what could be said in terms of what

15  could be excluded based on what they saw and

16  what couldn't be excluded.  And what can be

17  included -- not excluded falls -- everything

18  that's within the confidence interval is what

19  can't be excluded based on that study.

20    Q.    Okay.  So is there any power

21  calculation that Dr. Gibbons could have

22  conducted that would have satisfied you based

23  upon the fact he was -- he chose the FDA

24  meta-analysis as the effect size for some of his

1     power calculations?

2        A.    That final objection that we just

3     discussed about the need for an interval

4     estimate and discussing its full width and upper

5     limit and lower limit and also that it doesn't

6     take account of biases, all that could not be

7     addressed by any power calculation, that's

8     beyond the reach of a power calculation, and why

9     even though if one wants to present a power

10    calculation post-hoc as he does, okay, go ahead,

11    I could object to how he did it, and I did, but

12    even if I accepted it still wouldn't satisfy me

13    because it does not address this final issue and

14    no power calculation could.

15       Q.    You're not a fan of power calculations

16    at all, are you?

17       A.    Pre-trial they're meaningful, they're

18    helpful for planning a study.  But after the

19    study, it's like after the horse race, it's like

20    who won and who lost.

21       Q.    So your objection is that after the

22    FDA had finished its calculations on the various

23    effect sizes, picking one after those trials

24    were completed was something you would not do?

Page 82

1      A.    It's something that I don't think is

2   very informative.  What's really important is

3   the intervals.

4      Q.    Okay.  Now, isn't it true that many

5   statisticians such as Dr. Gibbons actually do

6   post-hoc power calculations?

7      A.    Yes.

8      Q.    So it's common in the

9   pharmacoepidemiologic literature that

10  statisticians do go back and do post-hoc power

11  calculations to determine effect size for power

12  calculations, right?

13     A.    Well, we have to divide two classes of

14  calculations.  One would be a calculation done

15  to try and interpret the study, which is one

16  that the authors I cited are really objecting

17  to, and the other is doing the calculation to

18  say that in the future, this was clearly

19  underpowered, and in the future we we're going

20  to have to do better, do a larger study, for

21  example, that would be a use for planning

22  purposes which I don't know anybody with --

23          MR BARNES:  This is my family, one

24  second.

```
 1              THE VIDEOGRAPHER:   The time is 4:48.
 2     We're off the record.
 3              (Pause.)
 4              THE VIDEOGRAPHER:   This is the
 5     beginning of tape number two.  We're back on the
 6     record.   The time is 4:53.
 7              BY MR. BARNES:
 8        Q.   Okay.  Moving on to Page 4 of your
 9     report, sir, you talk about the limitations of
10     non-randomized studies, correct?
11        A.   Yes.
12        Q.   And so what are non-randomized
13     studies?
14        A.   Studies in which the persons in the
15     study were not randomized to the treatment being
16     studied, medication or whatever device.
17        Q.   Is it generally true that all -- I
18     might overstate this, and help me; is it true to
19     say that all pharmacoepidemiologic studies are
20     non-randomized?
21        A.   That's a matter of semantics of how,
22     dialects, of how one would define
23     pharmacoepidemiology as to whether it would
24     include clinical trials or not.
```

Page 84

1      Q.     Let's exclude randomized controlled

2  clinical trials for pharmacoepidemiology for

3  purposes of my question.

4      A.     Okay.

5      Q.     So excluding randomized non-clinical

6  trials, randomized controlled clinical trials,

7  would you agree that pharmacoepidemiologic

8  studies, all of them do not have -- do not

9  employ randomization?

10     A.     If we exclude randomized studies

11  explicitly, then yes, I'd certainly agree

12  logically.

13     Q.     So there's a vast field of

14  epidemiologic literature that is non-randomized,

15  correct?

16     A.     Correct.

17     Q.     And people use those for various

18  studies, and you've done that yourself, correct?

19     A.     Yes.

20     Q.     Now, so would you apply these --

21  strike that.

22            Would you agree that there's a

23  hierarchy of reliability for randomized -- for

24  non-randomized studies in terms of their

1    reliability?

2         A.    There are hierarchies.  I do not think

3    there's complete consistency or agreement on

4    exactly how the hierarchy should go.

5         Q.    I'll just -- I want your testimony as

6    to how you think it goes then.

7              If you were going to rank studies,

8    non-randomized studies in terms of their

9    reliability, it would be a cohort study?

10        A.    Well, I would put it this way.  There

11   are many, many dimensions that determine the

12   degree of reliability in the study, and that

13   usually, not 100 percent of the time, but

14   usually cohort studies will meet more -- satisfy

15   more of those dimensions in terms of being more

16   reliable than, for example, a case control

17   study.  This is not 100 percent, and this is one

18   of the reasons why there's some controversy or

19   ambiguity about these hierarchies, is that

20   they're more like if you imagine like galaxies

21   and inter-overlapping.

22        Q.    So there's going to be a diagram where

23   you've got an area where it may or may not be --

24   the hierarchy may not apply?

1       A.     Right, or shades of ambiguity.

2       Q.     In sources of data, you talk here

3  about claims data, and we talked about that this

4  morning.  Are there hierarchies of reliability

5  for various sources of data?

6       A.     Again in the same fashion, that

7  there's -- there are qualities that --

8  dimensions of reliability that we would expect

9  to be satisfied better, to a greater degree more

10  often with certain data sources than others.

11       Q.     Describe in your own words the design

12  Dr. Gibbons used.  Is that a -- it's a proper

13  epidemiological study of claims data; if you

14  were going to describe it, is it a cohort study,

15  a case controlled study, how would you describe

16  it?

17       A.     I would call it a claims database

18  cohort.

19       Q.     Study?

20       A.     Yes.

21       Q.     Okay.  And it's retrospective?

22       A.     Yes.

23       Q.     Okay.  How does that compare to a

24  study of just simply looking at other, let's

1    say, spontaneous adverse event reports without

2    any comparison, what's more reliable?

3         A.    We would generally consider, again

4    this is -- when I say generally, I mean most of

5    the time aside from specific circumstances that

6    might diverge from this, but most of the time

7    it's considered a claims database study to be

8    more reliable, especially with regards to -- I'm

9    trying to think of the right way of describing

10   this.  The problem -- one of the issues is that

11   with spontaneous adverse events is reporting

12   system studies based on that they can suffer a

13   lot of false positives, whereas the claims can

14   suffer a lot of false negatives, so there would

15   be the question entered as to what do we think

16   is the greater danger or risk here, false

17   positive, false negative.  So, but most of the

18   time people are more concerned about false

19   positives, and so there's a natural preference

20   for a study that would be at greater risk of

21   false negative than false positive, and that

22   would make the claims database study superior in

23   a situation like this.  Plus there are many more

24   logical reasons to assume that it would give a

Page 88

1     less biased answer than something based on

2     spontaneous adverse events reports.

3          Q.     Have you ever done an analysis of

4     spontaneous adverse event reports yourself for

5     purposes of a health study?

6          A.     Not for publication.

7          Q.     Why not?

8          A.     Just hasn't happened that I was part

9     of a task that I recall.  Actually I've done --

10    I've been involved in hundreds of studies now

11    over three and a half decades, so I may have

12    forgotten one.  But not that I recall offhand,

13    so just hasn't happened.

14         Q.     Okay.  This morning you had a -- you

15    said you had worked with PharMetrics database in

16    the past for some work?

17         A.     Not PharMetrics.

18         Q.     I misunderstood you.

19         A.     I've taken studies -- I've worked with

20    other databases that are similar, and I've taken

21    studies that use PharMetrics and used them as

22    part of my material, for example in the

23    meta-analysis.

24         Q.     Okay.

1       (Whereupon, the reporter read back the

2    above answer.)

3       BY MR. BARNES:

4       Q.    What meta-analysis was that?

5       A.    Well, for example, a meta-analysis of

6    paroxetine and paroxetine and cardiac

7    malformations that was done by the Engenics

8    group that used the PharMetrics database

9    extensively.  I think the first author in that

10   was Cole, and one of the authors was

11   GlaxoSmithKline, I think F. Ross might have been

12   on that, and Alexander Walker who is a

13   well-known pharmacoepidemiologist, so that's a

14   study that I considered a useful study in

15   examining that issue.

16      Q.    So to make sure, so basically you

17   conducted a meta-analysis, and one of those

18   studies had a PharMetrics database analysis?

19      A.    Yes.  I've also looked at other

20   studies in other contexts where again one of the

21   major studies was a PharMetrics based study.

22      Q.    It's a good healthcare database,

23   right?

24      A.    Well, it's a well-known healthcare

Page 90

1    database that's been used extensively for these

2    sorts of studies, and its limitations and

3    advantages are well-known.

4         Q.    Okay.   I want to talk to you a little

5    bit about your concomitant medications.   We

6    spent some time speaking about that this morning

7    and I didn't really have much of a chance to

8    talk to you about it.

9              Would you look at Page 15 of 20 of

10   your report, please?

11        A.    Yes.

12        Q.    You state here that "Another deceptive

13   aspect of the analysis descriptions given in the

14   Gibbons supplemental expert reports as well as

15   the Gibbons paper is that they attempt to convey

16   the impression that all concomitant psychotropic

17   medications were accounted for in the analysis."

18             Do you see that?

19        A.    Yes.

20        Q.    Do you know what medications were

21   actually included in the adjustments for

22   concomitant treatments by Dr. Gibbons?

23        A.    According to this statement there's a

24   quote, it's "other AEDs, antidepressants,

1    antipsychotics, and lithium."  However, the data

2    didn't actually include all psychotropic

3    medications, and they did not include

4    stimulants, if not ACE anti-anxiety drugs, and

5    various anti-psychotics weren't included, or

6    pain medications.

7         Q.    What do you base that on, sir?

8         A.    Based on both what -- both the

9    description of the database that was included by

10   -- I think submitted by Dr. Gibbons, and the way

11   it was described, various materials, there were

12   various points at various times, there was some

13   data, at some point I saw a data request that

14   was given to PharMetrics and what they were

15   going to be giving him, and it only included a

16   limited set of medications, and then the

17   deposition Dr. Gibbons confirmed that indeed

18   that was -- it was limited in that fashion.

19        Q.    Here's my question.

20              As far as you know, did you actually

21   see the list of medications that were, in fact,

22   adjusted for in the analysis?

23        A.    Yes, at one point.

24        Q.    And who gave that to you?

1    A.    Well, I think it was an exhibit in one

2  of his depositions.  Actually that's where I

3  most prominently recall seeing it.

4    Q.    A list in the deposition?

5    A.    Yes.

6    Q.    And how many medications did he adjust

7  for?  What's the list?

8    A.    I think it was, I think it was eight

9  or something, that was the number.

10    Q.    Eight different prescription

11  medications?

12    A.    If I recall correctly.  I'm not sure.

13    Q.    So how far -- so is it your testimony

14  that Dr. Gibbons only adjusted for eight

15  different medications?

16          MR. ALTMAN:  Objection.  Misstates his

17  testimony.

18          MR. BARNES:  I'm asking him.  I want

19  to understand his testimony.

20    A.    No, I didn't make that testimony.

21          BY MR. BARNES:

22    Q.    Okay.  That's why I followed up.  It

23  was unclear to me.

24    A.    I'm saying that he adjusted for a

Page 93

1    limited list, whatever it was.

2        Q.    What is the list?

3        A.    Again, I don't have that in front of

4    me.  I don't have it memorized.  But in any

5    event, it was a relatively short list, and there

6    are thousands of medications out there

7    literally.

8            In fact, you can find some database

9    studies that come out of some

10   pharmacoepidemiology groups where they have

11   lists that exceed a thousand medications from

12   their databases, and they attempt to adjust for

13   all of them in some fashion.

14       Q.    How many -- let me ask you this.

15           You make a statement down here, you

16   say, going further down the page here on

17   Page 15, you may want to follow along.

18       A.    Yes.

19       Q.    You say "Close inspection of a

20   description of the PharMetrics data obtained by

21   Dr. Gibbons and colleagues reveal that these

22   statements are false," I need to know, what did

23   you inspect?

24       A.    According to the PharMetrics purchase

Page 94

1    contract shown in Exhibit A of Gibbons

2    deposition of February 3rd, 2009, that's it.

3         Q.    So when you say "close inspection of

4    the description of PharMetrics data obtained by

5    Dr. Gibbons," your source for that statement is

6    Exhibit A of the purchase contract of the

7    Dr. Gibbons' deposition, correct?

8         A.    Correct.

9         Q.    Okay.  And that is what you base your

10   opinions on, correct?

11        A.    That and the other confirming

12   materials.

13        Q.    What other confirming materials?

14        A.    Again the comments, I believe there

15   was some discussion of it in the deposition,

16   which is why that was attached as an exhibit.

17             MR. ALTMAN:  For clarification, Rick,

18   he says Exhibit A here, it's exhibit -- it's

19   called Exhibit A, but I think he may not have

20   correctly notated the exhibit number from the

21   Gibbons deposition.

22             MR. BARNES:  I couldn't find it.

23             MR. ALTMAN:  It is one of the

24   exhibits.  I'll give you the exhibit number.

1    It's one of the early exhibits in Gibbons.

2              MR. BARNES:  That helps.

3              BY MR. BARNES:

4         Q.    Just so, I'll move off this, just so I

5    understand it, you're basing your opinion on the

6    inadequacy of the list based upon what is

7    described in your report as Exhibit A of the

8    Gibbons deposition of February 3rd, plus

9    Dr. Gibbons' testimony, is that fair to say?

10        A.    Fair.

11        Q.    I'm sorry, I didn't hear you, is that

12   fair to say?

13        A.    Can we refer to his -- are we

14   talking -- by the way, I'm a little lost.  Are

15   we talking about, let me just --

16        Q.    We're talking about your criticism of

17   his adjustments of concomitant medication.

18        A.    I want to see what we're referring to,

19   the Gibbons supplemental expert report as well

20   as the Gibbons, Et Al 2009 paper.

21        Q.    That's right.

22        A.    So again in reading those materials,

23   too, that was again that it was -- it appeared

24   clear that they did not, in fact, obtain a full

Page 96

1    list of all medications in the database.

2         Q.    What do you believe is a full list;

3    every medication possible?

4         A.    Well, it would include just about.  It

5    would include certainly major groups, at least

6    the most common medications from major groups

7    like pain medication, for example.  And in a

8    study of psychotropic effects I would expect to

9    get all psychotropic drugs like tranquilizers

10   and so forth.

11        Q.    If Dr. Gibbons consulted with a

12   pharmacoepidemiologist and a psychiatrist in

13   selecting the list of concomitant medications to

14   be adjusted for in this database, would you be

15   critical of him for doing so?

16             MR. ALTMAN:  Objection.  Calls for

17   speculation.

18             BY MR. BARNES:

19        Q.    You may answer.

20             MR. ALTMAN:  Go ahead.  You can

21   answer.

22        A.    I wouldn't be critical of him for

23   consulting with them, not for consulting with

24   them.

Page 97

1          I would be critical -- could be

2     critical of him for simply excluding things

3     solely on the basis of dismissal of importance.

4          BY MR. BARNES:

5          Q.    Do you have any basis to say that the

6     list that he employed for concomitant

7     medications for his adjustments, do you have an

8     opinion that a more, a more complete list that

9     you were indicating should have been obtained

10    could have influenced his result one way or the

11    other?

12         MR. ALTMAN:  Objection.  Calls for

13    speculation.  Well, sorry, I'll withdraw that

14    objection.

15         A.    I mean it would be speculation.

16         But knowing how these adjustments

17    work, that the more things you adjust for, the

18    wider your confidence intervals would be at, and

19    so that's the usual rule of thumb.

20         BY MR. BARNES:

21         Q.    Okay.  You make the statement here, go

22    down to -- after you cite this illusive Exhibit

23    A which I spent last night trying to find --

24         A.    My apologies.

1     Q.    You are forgiven.  Keith is not.

2           -- "Dr. Gibbons and colleagues did not

3     obtain data on non-pharmacologic treatment such

4     as psychotherapy and they did not obtain data on

5     all psychotropic medications," is it your

6     opinion that you have to have all psychotropic

7     medications adjusted for to have a reliable

8     study?

9     A.    I wouldn't put it that way.  I would

10    say that the claim that you adjust for both

11    relevant patients not receiving any psychotropic

12    medication relative to -- to be able to state

13    with assurance that they're not receiving any

14    psychotropic medication, you'd certainly have to

15    have a list of their prescriptions to get some

16    assurance of that.

17    Q.    If Dr. Gibbons adjusted for

18    anti-epileptic medications, atypical

19    anti-psychotics, lithium, anti-depressants,

20    benzodiazapines, and had very, you know, large

21    numbers of medications in each of those

22    categories, would you be of the opinion that if

23    it didn't include all, every anti-psychotic,

24    that it would be a somehow unreliable report?

Page 99

1      A.    No, because if some of those were

2  never prescribed or were known to be things that

3  were off the market or never used anymore or so

4  rare to discount, no, it would depend entirely

5  on --

6      Q.    What was excluded?

7      A.    -- what was excluded.

8      Q.    Okay.  Now, you then go down and say

9  that "what this means," very end of it, "what

10  this means is that adjustments for concomitant

11  treatments employed by Gibbons in his

12  supplemental expert reports and by Gibbon et al

13  in their paper (March, 2009) could not have come

14  close to complete adjustment or control for

15  confounding by concomitant treatments."

16          Did you do any calculations?  Or you

17  make almost a quantitative statement there.

18  What did you do to justify your, or to support

19  your statement here that Dr. Gibbons could not

20  have come close to a complete adjustment?  How

21  did you measure that?

22      A.    Okay.  That's based on noting that the

23  degree of compounding you have would be the

24  amount, determined by the amount of things you

Page 100

1    had not adjusted for that were important.

2        Q.    Did you do any calculations or any

3    quantitative assessment to say would not come

4    close to a complete adjustment in making this

5    opinion?

6        A.    Well, by taking the number of

7    medications that they adjusted for, which was a

8    relatively small number relative to the numbers

9    that I've seen adjusted for in other

10   pharmacoepidemiologic studies, I know that it

11   was a small proportion of medications that were

12   available.

13       Q.    I need to know what the numbers you

14   should -- he should have and what he actually

15   did adjust for.  You're making a statement he

16   didn't come close, I want to know quantitatively

17   how did you make that comparison?  What is the

18   basis for that?

19       A.    Well, that there are hundreds of

20   commonly used prescribed medications, including

21   if you just take all these categories of those

22   that have potential impact on psychological

23   states of a patient, and that I don't believe

24   that their adjustment included anything

1    approaching hundreds of medications.

2         Q.    What do you base that on?

3         A.    The materials I was shown.

4         Q.    Exhibit A of the --

5         A.    Yes, that, for example.

6         Q.    Anything else?

7         A.    And again, those things that I read in

8    the course of going through all these materials,

9    there are papers.

10        Q.    What other things?  Supplemental

11   report.  I want the list.

12        A.    The supplemental report.

13        Q.    The supplemental report of March 15th,

14   and Exhibit A which counsel will provide me.

15   What else did you read?

16        A.    The paper that was accepted for

17   publication.

18        Q.    The paper for publication.

19              What else did you read to make this

20   assessment?

21        A.    Again what was discussed in

22   deposition, the exhibit it's attached to.

23        Q.    This Exhibit A that's attached to?

24        A.    Yes.

1 Q. Anything else?

2 A. I don't recall anything else.

3 Q. Okay.  You said in court this morning

4 that many of your criticisms, the result could

5 swing one way or the other, either towards a

6 more protective effect or more harmful effect,

7 correct?

8 A. That's correct.

9 Q. And when I use the word "protective

10 effect," I'm saying that a statistically

11 significant decrease in suicide attempts as

12 opposed to -- and the harmful effect would be a

13 statistically significant increase in suicide

14 attempts, correct?

15 A. If you left off the statistically

16 significant part, then I would be fine.

17 Q. Okay.  I'm not quite sure --

18 A. Because an effect can be there even if

19 it's not statistically significant.

20 Q. Okay.  So even if a result does not

21 obtain a statistically significant beneficial

22 effect, it still may be there, you just didn't

23 measure it?

24 A. Well, you just didn't reach the

Page 103

1    commonly used detection threshold.

2        Q.    Limits of detection?

3        A.    Declaring it so far off from the null

4    that you could no longer reasonably by current

5    standards say chance alone could have produced

6    this deviation from the null.  But it's a very

7    weak statement that's become used as a very

8    strong criterion.  It's very, very weak.

9        Q.    Statistical significance?

10       A.    Yes.

11       Q.    So let me go back.

12             If the result of a trial shows a --

13   you're measuring for suicide attempts, we'll

14   just talk about Dr. Gibbons paper, no reason to

15   beat around the bush.

16       A.    Okay.

17       Q.    If it measures a decrease in suicide

18   attempts, that would trend towards protective,

19   correct?

20       A.    If it found an inverse association.

21       Q.    You use the word inverse association

22   from harm?

23       A.    Right.

24       Q.    So, but I want to understand what that

1    means.  So that if -- bear with me, I don't want

2    to interrupt you, but let me make sure I ask the

3    question I want to ask.

4              If a study shows a decrease in suicide

5    attempts, and you would describe it as an

6    inverse correlation?

7         A.    Inverse association.

8         Q.    Inverse association.  What does that

9    mean, sir?

10        A.    That means that, well, you'd see a

11   relative risk that's less than one or risk

12   difference less than zero that's negative.  So

13   the ratio of the risk in the treated group

14   versus the placebo group or the untreated group,

15   that ratio of risk, if that's less than one,

16   that's an inverse association.

17        Q.    And what does that mean to -- what

18   does inverse association mean; that it's less

19   than the null value?

20        A.    It's less than the null value.

21        Q.    Which means the 0, 1, 0 if it's risk

22   difference analysis, 1 if it's an odds ratio?

23        A.    Or risk ratio.

24        Q.    Or risk ratio.

1          Okay.  Now, would an inverse

2     association be the equivalent of a protective

3     effect?

4          A.    No.

5          Q.    Why not?

6          A.    Well, because the inverse association

7     could come about from all these other factors.

8     It could even be that the medication is harmful,

9     but you see an inverse association because of

10    all these other forces, biases coming in, and

11    changing the size of the ratio.

12         Q.    Would you agree with the statement

13    that Dr. Gibbons' study, his PharMetrics paper,

14    supports the hypothesis that there's no

15    increased risk for suicidal thinking behavior

16    associated with anti-epileptic drugs?

17         A.    I would say that, yes, I would say

18    that it supports the hypothesis that it

19    provides weaker scale than statistical

20    significance indicates, but it's not a

21    randomized trial.

22         Q.    Fair enough.

23              And with regard to the gabapentin

24    paper, would you agree with the statement that

Page 106

1    Dr. Gibbons' findings in the gabapentin study in

2    his supplemental reports supports the hypothesis

3    that gabapentin does not increase the risk of

4    suicide attempts?

5        A.    Again, same comment.  Again, I would

6    say in the direction of supporting, but again

7    it's much weaker than the statistical

8    significance would suggest, because again it's

9    not a randomized trial, and it has all these

10   problems.

11       Q.    It has the limitations of a

12   pharmacoepidemiologic study?

13       A.    Correct.

14       Q.    As to the psychiatric subpopulation

15   where he found an odds ratio of less than the

16   null value for certain psychiatric populations,

17   would you -- do you know what I'm talking about,

18   this gabapentin paper?

19       A.    Yes.

20       Q.    Would you agree with the statement

21   that Dr. Gibbons' gabapentin study supports the

22   hypothesis that gabapentin does not increase the

23   risk of suicide attempt, suicide

24   behavior/thinking in psychiatric populations,

1    support the hypothesis?

2         MR. ALTMAN:  Objection.  Foundation.

3         BY MR. BARNES:

4    Q.    You may answer.

5    A.    I think I may have gotten lost in some

6    of that.

7    Q.    Let me ask it again.  That's fair.

8    A.    Well, also again, the study you're

9    referring to, I just want to be sure.

10   Q.    The Judge was having trouble this

11   morning, I was having trouble.  It's late.  I

12   know you've been up late.

13        In the gabapentin study which is in

14   his supplemental report there was a finding by

15   Dr. Gibbons that in psychiatric populations

16   there was a statistically significant decrease

17   in the rate of suicide attempts --

18   A.    After the --

19   Q.    -- after initiation of gabapentin

20   therapy.  Do you understand?

21   A.    Yes.

22   Q.    You know where I am?

23   A.    Yes.

24   Q.    He found that, correct?

Page 108

1      A.    Yes.

2            MR. ALTMAN:  Objection.  Foundation.

3            BY MR. BARNES:

4      Q.    So the question then becomes; is it

5      fair to say also that this finding supports the

6      hypothesis that gabapentin does not increase the

7      risk of suicidal thinking and behavior in

8      psychiatric patients?

9      A.    Again, subject to all the very same,

10     it's weakly supported because of all these

11     problems that we've been discussing, it's not

12     randomized, and all the other issues that I've

13     raised here about with pharmacoepidemiologic

14     database studies.  Again I liked when -- I was

15     very pleased this morning when the judge seemed

16     to be getting a lot of these things saying it's

17     a piece of a puzzle, it goes in and must be

18     looked at with many other things and evaluated

19     in light of its flaws, its weaknesses,

20     especially given that this is not like some huge

21     randomized trial.

22     Q.    So you would agree it would support

23     the hypothesis with the limitations you

24     discussed?

1    A.    With extensive limitations, yes, very

2    important.

3    Q.    Yes.

4    A.    You haven't mentioned those, but --

5    then given all that, I'd say okay, this is

6    weakly supported, has to be evaluated in this

7    context.

8    Q.    But it is supported?

9    A.    Well, again --

10    Q.    With the limitations?

11    A.    -- with the limitations attached.

12    Q.    Okay.  Now, as you've gone through the

13    concomitant medications issue, when you were

14    with Mr. Altman, did you actually look at the

15    issues of concomitant medications with him when

16    you were either at Malibu at your home or in

17    Chicago when you met with him?

18    A.    Well, we talked about that issue at

19    different points.  But when you say go through

20    it, you mean actually when we were looking at

21    the data?

22    Q.    Yes.

23    A.    We only did the data looking, as I

24    recall, when we were in Chicago, so I don't know

Page 110

1    if that's relevant.

2         Q.    So in Chicago, did you look at the

3    concomitant medications when you were in

4    Chicago?

5         A.    I don't recall if we actually looked

6    at -- what we looked at on the screen, looked at

7    on the screen versus descriptions on paper in

8    this exhibit and so forth, I really -- it's a

9    fog now for me.

10        Q.    Did you exchange e-mails with

11   Mr. Altman concerning your review of the

12   materials?

13        A.    No.

14        Q.    So there were no e-mails?

15        A.    No, I mean --

16             MR. ALTMAN:  Objection.  Misstates his

17   testimony.

18             MR. BARNES:  I want to find out.

19             BY MR. BARNES:

20        Q.    Were there any e-mails between you and

21   Mr. Altman?

22        A.    They were of the form "are you

23   available on this date" or "could we arrange a

24   call at this time," they're like, how would you

1    call those, administrative?  I don't know what

2    you call those.

3              MR. BARNES:  I'd like to request that

4    you produce the e-mails between you and

5    Dr. Greenland as well.

6              MR. ALTMAN:  To the extent that

7    Dr.  Greenland has them in his possession.

8              MR. BARNES:  You have them in your

9    possession as well.  If he's destroyed them, I

10   have to ask you to produce them.

11             MR. ALTMAN:  I don't know if we'll

12   agree to that.  Certainly Dr. Greenland will

13   produce e-mails concerning the drafts of his

14   report.

15             MR. BARNES:  My request is that to the

16   extent you have them in your possession,

17   Counsel, you produce them as well.

18             MR. ALTMAN:  We'll take it under

19   consideration.

20             MR. BARNES:  I'm sure you will.

21             How much more time do I have, Keith?

22   I've got a whole other section.

23             MR. ALTMAN:  I think you've got about

24   ten minutes.  Is it about ten minutes?  We're

Page 112

1      about 1.50 now.

2                  THE VIDEOGRAPHER:  Yes.

3                  BY MR. BARNES:

4          Q.    Doctor, I want to go back, I got

5      sidetracked on the generalizability.

6                  You say -- go back to Paragraph 2 --

7      I'm sorry, Page 2.

8          A.    Page 2 of my report?

9          Q.    Yes.

10         A.    Okay.

11         Q.    Did you do any power calculations

12     yourself when you were looking at Dr. Gibbons'

13     report to criticize -- when you were criticizing

14     Dr. Gibbons with power calculations, did you

15     actually do any power calculations yourself?

16         A.    Yes, I recall doing some.

17         Q.    Are they in your report, sir?

18         A.    I thought I had put them in one of the

19     earlier reports.  Maybe we can go through and

20     check that.

21         Q.    Okay.

22                 MR. ALTMAN:  If it's in his --

23                 MR. BARNES:  I'm going to honor that.

24                 BY MR. BARNES:

1          Q.     In preparing this report, when you

2     were criticizing Dr. Gibbons' report with regard

3     to his power calculations, did you conduct any

4     power calculations yourself in the preparation

5     of this report?

6          A.     This report?  Oh, I'd done it earlier.

7     I didn't hear the "this report" part.

8          Q.     This report.

9          A.     Right.  Well, this report at that

10    point, I had done no further ones for this one.

11         Q.     Okay.  But any power calculations you

12    have done you would have done in connection with

13    the other reports, correct?

14         A.     Yes.

15         Q.     Okay.  Do you consider Dr. Brian Strom

16    an authority on pharmacoepidemiology?

17         A.     I understand that he's recognized as

18    an authority on pharmacoepidemiology.

19         Q.     When you criticized Dr. Gibbons on

20    Page 5 of 20 of your report, and this one

21    patient here you reviewed with Mr. Altman, would

22    you explain to me how this case actually

23    affected Dr. Gibbons' conclusions in either --

24    in the supplemental expert report?  I'm assuming

Page 114

1    this was in the gabapentin.

2         A.    You're talking about the patient at

3    the bottom of the page?

4         Q.    Yes.  I'm sorry, this is an AED study,

5    is it not?  Which cohort is this patient?

6         A.    PharMetrics is by Dr. Gibbons.

7         Q.    Is it the bipolar group, or the AED

8    group, or is it in the gabapentin group?

9         A.    Clearly there were bipolar patients.

10   It's not clear from my report which study

11   specifically they're -- which studies they're

12   in.

13        Q.    So you have no information as to how

14   this -- what study this patient actually

15   impacted, if at all, either the bipolar study or

16   the gabapentin study, correct?

17             MR. ALTMAN:  Objection.  Misstates his

18   testimony.

19             I have the report, I can help you if

20   you want.

21             MR. BARNES:  We'll talk later.  I have

22   two more minutes with the doctor.

23        A.    It must be in the bipolar study, the

24   question is whether they were in the gabapentin

Page 115

1    study.  For me the question, not your question.

2                 BY MR. BARNES:

3        Q.    Do you know?

4        A.    I don't know.  Reading this, I don't

5    recall.

6        Q.    So as to how it affected either study,

7    you just wouldn't know, correct?

8        A.    No.

9                 MR. ALTMAN:  Objection.  Misstates his

10   testimony.

11       A.    No.  For the bipolar study, published

12   study, I would presume they're in that cohort,

13   this is the bipolar person, and how it would

14   affect them.  Let me see.

15                 The point of this patient, the point

16   of citing this patient was to show that there

17   are inaccuracies in the true index, the

18   diagnosis data of a patient, and showing that

19   the event times determined from the records in

20   the manner described by Dr. Gibbons is subject

21   to these inaccuracies, so that's one more source

22   of uncertainty that isn't accounted for in his

23   analysis.

24       Q.    We spoke about that this morning?

1      A.    Yes.

2      Q.    Okay.  I've got to find one other

3   thing here, I've lost my note.

4           MR. ALTMAN:  Rick, I have about two

5   questions.  If you want to let me ask my

6   questions, I'll give you a few minutes to deal

7   with this in your questions while you find your

8   stuff.

9           MR. BARNES:  Just give me one second.

10           BY MR. BARNES:

11      Q.    Do you agree that the use of a bipolar

12   population for Dr. Gibbons' AED analysis was a

13   good population to study for suicide attempt?

14      A.    I have no opinion.

15           MR. ALTMAN:  Objection.  Foundation.

16           BY MR. BARNES:

17      Q.    No opinion on that?

18      A.    I have no opinion on that.

19      Q.    Would you agree that one of the

20   advantages of using a PharMetrics database is

21   that it measures and evaluates real world use of

22   medicines in studies; it studies drugs that are

23   actually used in real patients as opposed to a

24   clinical trial?

1      A.      I'm sorry, would you repeat it?

2      Q.      Yes, I'm getting tired, and you've had

3  a long day, too.

4              I guess going back to the bipolar

5  population, do you believe using the PharMetrics

6  database is actually more generalizable than a

7  randomized controlled clinical trial to the real

8  world population?

9              MR. ALTMAN:   Objection.   Foundation.

10     A.      I would agree that issues of

11 generalizability would be possibly less severe

12 for PharMetrics than a typical trial population,

13 yes.

14             BY MR. BARNES:

15     Q.      Would you be critical of

16 Dr. Gibbons -- let me take a step back.

17             Let's focus on his published paper,

18 March, 2009 paper.   You would agree that

19 Dr. Gibbons set forth many limitations in his

20 published paper on the study, correct?

21     A.      Yes.

22     Q.      And you think that's good practice,

23 correct?

24     A.      Yes.

Page 118

1    Q.    And you don't criticize Dr. Gibbons

2    for that, do you?

3    A.    No.

4    Q.    We agree on that?

5    A.    Yes.

6    Q.    And if Dr. Gibbons on deposition,

7    which you reviewed, advised counsel, Mr. Altman,

8    that the same limitations that were stated in

9    his published paper on the anti-epileptic drugs

10   applied to the gabapentin study of his

11   supplemental report, would you agree with his

12   statement?

13   A.    Yes.

14   Q.    You would not be critical of

15   Dr. Gibbons for accepting the limitations of his

16   paper to his gabapentin study, would you?

17   A.    I would not be.

18   Q.    And so did you see that in his

19   deposition where he actually accepted the

20   limitations?

21   A.    Yes.

22   Q.    And that's appropriate, isn't it?

23   A.    Yes.

24   MR. BARNES:  Okay.  Counsel, you may

Page 119

1    ask your two questions.

2             MR. ALTMAN:  If you need a couple

3    questions on redirect.

4             CROSS EXAMINATION

5             BY MR. ALTMAN:

6        Q.    A question that Mr. Barnes just asked

7    you about the limitations; there are limitations

8    in his published paper that are not listed in

9    the gabapentin expert report, correct?

10       A.    Correct.

11       Q.    Would the reader have any way to know

12   that those limitations apply by reading the

13   gabapentin expert report if they weren't there?

14            MR. BARNES:  Objection.

15       A.    Answer?

16            MR. BARNES:  You may answer.

17       A.    Not that I could see if they only had

18   that report.

19            BY MR. ALTMAN:

20       Q.    Okay.  If according to the data

21   purchased by Dr. Gibbons from PharMetrics he did

22   not purchase all of the drugs taken by each

23   individual in his cohort, is there any way that

24   Dr. Gibbons could have adjusted for the drugs

1  that he didn't purchase?

2      A.    Not that I see.

3      Q.    And my last question is; if you had

4  taken the PharMetrics database yourself, is

5  there any analysis that you could have done with

6  the PharMetrics database that would allow you to

7  conclude that the data establishes that there's

8  no increased risk of suicidality?

9             MR. BARNES:  Objection.

10     A.    No.

11            BY MR. ALTMAN:

12     Q.    Is there anything you could have done

13 with the PharMetrics database that would allow

14 you to conclude that the data demonstrates that

15 there is a protective effect of gabapentin for

16 suicidality?

17            MR. BARNES:  Objection.

18     A.    No.

19            MR. ALTMAN:  That's all I have.

20            REDIRECT EXAMINATION

21            BY MR. BARNES:

22     Q.    Okay.  Doctor, you don't know whether

23 or not Dr. Gibbons purchased all of the drugs

24 each patient were on or not, do you?  You don't

1    know if what he -- in other words, you have no

2    information whether or not Dr. Gibbons did or

3    did not purchase all the medications, the list

4    of all the medications that each patient was on,

5    do you?

6              MR. ALTMAN:  Objection.  Misstates his

7    testimony.

8         A.   I think what I said was that based on

9    the materials that I was given and I've seen,

10   the exhibit that we've referred to and all that,

11   it appeared that he got only a very small subset

12   of the drugs the patients would have been on,

13   could have been on, likely that they had.

14             BY MR. BARNES:

15        Q.   What do you say "likely" for?  What do

16   you base likely?

17        A.   For example, pain medications aren't

18   listed, and pain medications are very commonly

19   prescribed.  There are a hundred thousand

20   people, there must be a lot of them on pain

21   medication.

22        Q.   Are you saying that pain medications

23   are associated with suicidal behavior and

24   thinking?

1    A.    That's a question that would only be

2    answerable in the PharMetrics database.  That's

3    the key thing, is whether they're associated

4    with, by getting those drugs in the PharMetrics

5    database and doing the adjustments and seeing if

6    they're associated.

7    Q.    If a psychiatrist that Dr. Gibbons was

8    working with did not believe pain medications

9    were appropriate to be included in this study of

10   anti-epileptic drugs to adjust for pain

11   medications, do you have a clinical basis to

12   disagree with that judgment?

13        MR. ALTMAN:  Objection.  Foundation.

14   A.    Statistical basis.

15        BY MR. BARNES:

16   Q.    But not a clinical basis?

17   A.    Statistical, epidemiological

18   statistical.

19   Q.    But not a clinical basis?

20   A.    Not a clinical basis.

21   Q.    What is your epidemiologic statistical

22   basis for disagreeing with the judgment of a

23   psychiatrist as to what medicines should be

24   adjusted for?

1      A.    The basis would be empirical.  If we

2   see some things indeed associated with the

3   outcome that is existing at the baseline,

4   whatever is taken at the baseline, Dr. Gibbons

5   used a baseline, then it is an indication, or

6   could either be itself be having an effect or

7   not having an effect, being picking up another

8   indication that does have an effect that was

9   also the basis for the prescription of, say,

10   gabapentin.

11      Q.    Then going to your statement about

12   pain medications, is it your belief as a

13   statistician and epidemiologist that pain

14   medicines are, in fact, associated with suicidal

15   thinking and behavior?

16      A.    Again, I couldn't answer that without

17   looking at the PharMetrics database, because

18   that's the relevant database for this study in

19   that question.

20      Q.    What would the PharMetrics database

21   tell you about whether or not pain medications

22   are associated with increased risk of suicidal

23   thinking and behavior?

24      A.    By looking at that directly.

1     Q.    So you would want to test it in the

2    database as to whether pain medications are

3    associated with suicide attempts?

4     A.    Or the alternative.

5     Q.    Yes or no to that.  Would you want to

6    test -- my question was, you said or, you didn't

7    answer my question.

8     A.    I'm sorry.

9     Q.    I understand.

10     A.    The answer is yes.  Well, I should

11    actually, the way I would put it is yes, and.

12     Q.    Yes, and.  Okay, that's fine.

13     A.    It's really associated with

14    prescription for gabapentin, because it's become

15    more and more recognized over the last few

16    decades, and now very, very commonly recognized

17    in a lot of pharmacoepidemiology as well as in

18    other fields.  It's also important to look at

19    what's associated with the prescription for the

20    drug that you're studying.

21     Q.    Okay.  So you would accept, then, the

22    possibility that pain medications are associated

23    with increased risk of suicidal thinking and

24    behavior as an epidemiologist?  Yes?

1    A.    Could be.  Or associated with

2    prescription for gabapentin, and its prescribing

3    patterns that are actually considered by some to

4    be the most important variables that you have to

5    adjust for.

6    Q.    And as to the effects of gabapentin --

7    strike that.

8    MR. BARNES:  Okay.  That's all the

9    questions I have.  Thank you very much.

10   MR. ALTMAN:  Before we go off the

11   record, one thing I want to put on the record

12   that just came out that I think is very

13   important, it appears to me that, and this

14   doesn't have anything directly to do with

15   Dr. Greenland, but it appears to me that at some

16   point on Thursday with Dr. Gibbons you may argue

17   that a psychiatrist advised him on what drugs to

18   purchase or not purchase, and I believe that

19   psychiatrist will be Dr. Mann.

20   Earlier this year we noticed the

21   deposition of Dr. Mann, and Dr. Gibbons signed a

22   declaration to say Dr. Mann had absolutely

23   nothing to do with his expert report.

24   If at some point you intend to say

Page 126

1    Dr. Gibbons picked the drugs that Dr. Mann told

2    him he should pick, or any psychiatrist told him

3    he should pick, we're going to raise with the

4    judge that we're going to need to take the

5    deposition of Dr. Mann which Dr. Gibbons filed a

6    declaration, and a motion was granted to quash

7    the subpoena.

8            MR. BARNES:  I think that's your

9    right.

10           All right.  No further questions.

11           Dr. Greenland.  Thank you very much

12   for flying to the East Coast and spending the

13   day with us.  I hope you have a safe trip home

14   tonight.

15           THE WITNESS:  Thank you.

16           THE VIDEOGRAPHER:  This is the end of

17   tape two.  The deposition time is 5:41.  We're

18   off the record.

19           (Whereupon, the deposition was

20   concluded.)

21

22

23

24

Page 127

1    ATTACH: DEPOSITION OF SANDER GREENLAND, Dr.P.H..

2    CASE:  NEURONTIN MARKETING, SALES PRACTICES AND

3          PRODUCTS LIABILITY LITIGATION

4    DATE TAKEN:  July 21st, 2009

5

6                    ERRATA SHEET

7    PAGE      LINE      CHANGE        REASON

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14        I have read the foregoing transcript

15   of my deposition and except for any corrections

16   or changes noted above, I hereby subscribe to

17   the transcript as an accurate record of the

18   statements made by me.

19

20        Executed this____day of_____, 2009.

21

22              _____

23              SANDER GREENLAND, Dr.P.H.

24

Page 128

1    COMMONWEALTH OF MASSACHUSETTS )

2    SUFFOLK, SS.                )

3

4         I, MAUREEN O'CONNOR POLLARD, RPR, CLR,

5    and Notary Public in and for the Commonwealth of

6    Massachusetts, do certify that on the 21st day

7    of July, 2009, at 3:30 o'clock, the person

8    above-named was duly sworn to testify to the

9    truth of their knowledge, and examined, and such

10   examination reduced to typewriting under my

11   direction, and is a true record of the testimony

12   given by the witness.  I further certify that I

13   am neither attorney, related or employed by any

14   of the parties to this action, and that I am not

15   a relative or employee of any attorney employed

16   by the parties hereto, or financially interested

17   in the action.

18        In witness whereof, I have hereunto

19   set my hand this 22nd day of July, 2009.

20

21        _____

22        REGISTERED PROFESSIONAL REPORTER

23

24