UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL SALES & MARKETING ACTIONS | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER
<u>DENYING RENEWED MOTION FOR CLASS CERTIFICATION</u>**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     CLASS PLAINTIFFS HAVE SHOWN A SUFFICIENT BASIS FOR
        RECONSIDERATION ......................................................................................... 3

III.    PLAINTIFFS CAN DEMONSTRATE CLASS-WIDE CAUSATION
        THROUGH COMMON PROOF ........................................................................... 7

        A.      Class-Wide Causation Can Be Presumed Without Resorting to a
                Fraud-on-the-Market Theory of Causation. ............................................... 7

        B.      The Evidence in this Case Has Expressly Ruled Out The Existence
                or Impact of Any Factor Other Than Defendants' Fraudulent
                Marketing On Bipolar Prescriptions ........................................................ 15

IV.     IN THE ABSENCE OF OTHER PLAUSIBLE FACTORS TO EXPLAIN
        NEURONTIN BIPOLAR PRESCRIPTIONS, PROFESSOR
        ROSENTHAL'S REPORT DEMONSTRATES CLASS-WIDE
        CAUSATION ...................................................................................................... 18

V.      THIRD PARTY PAYERS CAN PROVE CAUSATION WITH
        COMMON EVIDENCE ..................................................................................... 21

VI.     PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS SUBJECT TO
        COMMON PROOF ............................................................................................ 24

VII.    CONCLUSION ................................................................................................... 26

# TABLE OF AUTHORITIES

**Page**

### Cases

Amchem Prods., Inc. v. Windsor,
  521 U.S. 591 (1997) .................................................................................... 25

Bank of Waunakee v. Rochester Cheese Sales, Inc.,
  906 F.2d 1185 (7th Cir. 1990) .................................................................... 5

Chisolm v. TranSouth Fin. Corp.,
  194 F.R.D. 538 (E.D. Va. 2000) ......................................................... 8, 9, 11

Cochran v. Quest Software, Inc.,
  328 F.3d 1 (1st Cir. 2006) ........................................................................... 4

Coffin v. Bowater Inc.,
  2005 WL 3021979 (D. Me. Nov. 10, 2005) .............................................. 5

Feeney v. Dell, Inc.,
  454 Mass. 192 (2009) ................................................................................. 25

Garner v. Healy,
  184 F.R.D. 598 (N.D. Ill. 1999) ............................................................. 9, 10

Greene v. Union Mutual Life Ins. Co.,
  764 F.2d 19 (1st Cir. 1985) ..................................................................... 5, 26

In re Mercedes-Benz Tele Aid Contract Litigation,
  257 F.R.D 46 (D.N.J. 2009) ......................................................... 7, 8, 24, 25

In re Neurontin Marketing, Sales Practices and Prods. Liab. Litig.,
  257 F.R.D. 315 (D. Mass. 2009) ........................................................ passim

In re Neurontin Mktg. and Sale Practices Litig.,
  244 F.R.D. 89 (D. Mass. 2007) ........................................... 6, 16, 22, 26

In re Neurontin Mktg., Sales Practices and Products Liability Litig.,
  433 F. Supp. 2d 172 (D. Mass. 2006) ...................................................... 24

In re St. Jude Medical Inc. Silzone Heart Valve Prods. Litig.,
  522 F.3d 836 (8th Cir. 2008) .............................................................. 13, 15

In re TJX Companies Retail Sec. Breach Litig.,
  524 F. Supp. 2d 83 (D. Mass. 2007) ........................................................ 14

In re TJX Cos. Retail Security Breach Litig.,
  246 F.R.D. 389 (D. Mass. 2007) ................................................. 11, 12, 14, 15

International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.,
  192 N.J. 372 (2007) ...................................................................... 7, 13, 15

**TABLE OF AUTHORITIES**
(continued)

Page

Kohen v. Pacific Investment Management Co. LLC,
--- F.3d ---, 2009 WL 1919013 (7th Cir. July 7, 2009) ........................................... 24

Mace v. Van Ru Credit Corp.,
109 F.3d 338 (7th Cir. 1997) ........................................................................................ 25

McLaughlin v. Am.Tobacco Co.,
522 F.3d 215 (2d Cir. 2008) ................................................................................... passim

Palmer v. Champion Mortgage,
465 F.3d 24 (1st Cir. 2006) .............................................................................................. 4

Pastula v. Lane Constr. Corp.,
2006 WL 696254 (D. Me. Mar. 17, 2006) ..................................................................... 5

Peterson v. H & R Block Tax Services, Inc.,
174 F.R.D. 78 (N.D. Ill. 1997) ...................................................................................... 10

Robinson v. Fountainhead Title Group Corp.,
257 F.R.D. 92 (D. Md. 2009) ..................................................................................... 2, 9

Ruiz Rivera v. Pfizer Pharm., LLC,
521 F.3d 76 (1st Cir. 2008) ............................................................................................. 5

Russo v. Merck & Co.,
21 F.R.D. 237 (D.R.I. 1957) .......................................................................................... 23

Sandoval Diaz v. Sandoval Orozco,
No. 01-1022, 2005 WL 1501672 (D.P.R. June 24, 2005) ............................................. 5

Spark v. MBNA Corp.,
178 F.R.D. 431 (D. Del. 1998) ................................................................................. 10, 11

Spencer v. Hartford Financial Services Group,
256 F.R.D. 284 (D. Conn. 2009) ................................................................................... 12

U.S. v. Roberts,
978 F.2d 17, 21 (1st Cir. 1992) ....................................................................................... 5

Wells v. State Manufactured Homes, Inc.,
2006 WL 120087 (D. Me. Jan. 12, 2006) ....................................................................... 4

Westways World Travel, Inc. v. AMR Corp.,
218 F.R.D. 223 (C.D. Cal. 2003) .................................................................................. 11

**TABLE OF AUTHORITIES**
**(continued)**

Page

**Other Authorities**

D. Himmelstein, et al., Medical Bankruptcy in the United States, 2007:
Results of a National Study, Am. J. Medicine (to be published August 2009,
available online at http://www.pnhp.org/new_bankruptcy_study/Bankruptcy-2009.pdf) ......... 1

J. Avorn, et al., "Scientific Versus Commercial Sources of Influence on the Prescribing
Behavior of Physicians,"Am. J. of Medicine, 73 (a), 4-8, 1982) ............................................ 17

J. Scully and J. Wilk, Selected Characteristics and Data of Psychiatrists in the
United States, 2001-2002, Academic Psychiatry 27:247-51 (Dec. 2003) ................................ 20

Steinman MA, et al., "Of principles and pens: Attitudes and practices of medicine
housestaff toward pharmaceutical industry promotions," Am. J. of Medicine,
2001;110:551 ........................................................................................................................ 17

Ziegler, et al., "The Accuracy of Drug Information from Pharmaceutical Sales
Representatives," JAMA (1995) 273:1296 ............................................................................. 18

**Rules**

Fed. R. Civ. Pro.
Rule 23 ................................................................................................................................... 18

**Treatises**

J. McLaughlin, Joseph M. McLaughlin on Class Actions: Law and Practice. (5th ed. 2009) ..... 11

**I.**   **INTRODUCTION**

Our country is reeling under the spiraling cost of health care.  It has hobbled our industrial giants; it is responsible for 62% of personal bankruptcies;[1] and it threatens to bankrupt the federal and state governments as well.  The President and leaders of Congress are on television talking about it every day.  While the debate rages on as to how to lower costs, all agree that the rampant waste, fraud, and abuse in our health care system must be brought under control, if we are to have any financial future at all.

The Court has before it a blatant, multi-billion dollar health care fraud, committed by the world's largest pharmaceutical company.  Plaintiffs are aware of no other case in which a pharmaceutical company deliberately marketed a drug to treat a condition for which the company already knew the drug was ineffective.  That fact distinguishes this case from all others.  It is, quite simply, the "worst of the worst."  If there is to be *any* limit on the fraud that pharmaceutical companies can get away with, it must be dictated by a judge or jury in this case. If Defendants are permitted to escape liability for a decade of transgressions, and keep billions of dollars in ill-gotten gains, they might as well be granted a license to surreptitiously market "snake oil" as a cure for cancer, as there will be nothing to stop them but a slap on the wrist from the FDA.

The Court need not venture far from settled law, and a straightforward application of the rules of evidence, informed by good science, logic, and common sense, to come to the conclusion that a jury may properly find that nearly all of the Neurontin prescriptions to treat bipolar and other mood disorders would not have been written but for Defendants' fraud.

---

[1] See D. Himmelstein, et al., Medical Bankruptcy in the United States, 2007:  Results of a National Study, Am. J. Medicine ("Using a conservative definition, 62.1% of all bankruptcies in 2007 were medical . . . . Three quarters had health insurance.") (to be published August 2009, available online at http://www.pnhp.org/new_bankruptcy_study/Bankruptcy-2009.pdf).

Defendants themselves, the foremost experts on the subject, concluded that *no* doctors would prescribe Neurontin to treat these conditions unless and until they were exposed to Defendants' promotional efforts.  And the Court has already found that those efforts were a fraud.

In denying class certification, the Court expressed frustration at its perceived inability to hold Defendants accountable for their wrongs, proffering instead the possibility that individual, non-class lawsuits may do the job.  In response, Plaintiffs can do no better than point to words etched in stone on the courthouse walls:

> THERE IS NO SUCH THING AS HALF JUSTICE.  YOU
> EITHER HAVE JUSTICE OR YOU DON'T.  YOU EITHER
> HAVE A DEMOCRACY IN WHICH EVERYONE –
> INCLUDING THE POWERFUL – IS SUBJECT TO THE RULE
> OF LAW OR YOU DON'T.
>
> JOHN JOSEPH MOAKLEY, 1991
>
> * * *
>
> THE BEST ADMINISTRATION OF JUSTICE MAY BE MOST
> SAFELY SECURED BY ALLOWING THE
> REPRESENTATION OF ALL CLASSES OF THE PEOPLE IN
> COURTS OF JUSTICE.
>
> LELIA JOSEPHINE ROBINSON, 1881

Evidence and recent legal authority not yet considered by the Court require that the court reconsider its decision.  This evidence and case law allows Plaintiffs to prove causation on a class-wide basis in three different ways.  First, Plaintiffs can prove class-wide causation based on a distinct line of legal authority, upheld in several recent cases, that causation may be "self-proving," "presumed" or "inferred" where, as here, the purchased product or service is worthless, useless, or obsolete.  Second, Plaintiffs can prove class-wide causation based upon Defendants' own, internal assessment that *no* Neurontin prescriptions would have been written for bipolar disorder, absent promotion for that use, which the Court has already determined was a fraud.

Third, Plaintiffs can prove class-wide causation through Professor Rosenthal's econometric analysis, which *has* ruled out "other factors" besides Defendants' fraud, because *there are no other factors* that any minimally competent physician could have relied upon in writing a Neurontin prescription to treat bipolar and other mood disorders.  Professor Rosenthal's use of detailing data to measure the impact of the fraud is not flawed, as the record contains ample evidence that the consumer plaintiffs' physicians were detailed, as were *over 7,000 psychiatrists per month* at the height of Defendants' bipolar marketing effort, and that detailing was used to facilitate their various other marketing tactics, such as dissemination of misleading articles, "Dear Doctor" letters, and invitations to Neurontin marketing events disguised as "educational" seminars.

For all of these reasons, the court should reconsider its ruling, certify consumer and third party payer ("TPP") bipolar and other mood disorder classes, and allow justice to be done.

## II.   CLASS PLAINTIFFS HAVE SHOWN A SUFFICIENT BASIS FOR RECONSIDERATION

Defendants argue that Plaintiffs have not provided the Court with a sufficient basis to reconsider its ruling.  Specifically, Defendants complain that "Plaintiffs' arguments are not based on newly-discovered evidence," because "Plaintiffs' summary judgment opposition . . . sat in the dock for nearly a month before the Court's class certification denial . . . ."  Defendants' Opposition to Class Plaintiffs' Motion for Reconsideration (Dkt. No. 1928) ("Defs.' Opp.") at 5. While Plaintiffs' summary judgment opposition undoubtedly "sat" in the docket, all indications are that the Court did not *consider* the evidence presented therein in making its ruling,[2] despite

---

[2] For example, the Court found that "the testimony of the [consumer plaintiffs'] prescribing physicians . . . indicates that only one of them, Dr. Gregory A. Rogers [family doctor for nociceptive and non-neuropathic pain subclass representative Holloway], was ever detailed by defendants about Neurontin," and, on that basis, concluded that "the absence of evidence of detailing of the doctors at issue in this case" undermines a finding of predominance, defeating

Defendants' prior *insistence* that it do so.[3]  This is more than sufficient to warrant

reconsideration.

     Moreover, while "newly discovered evidence or recent change in the law" (Defs.' Opp. at

4) may well be the most *common* ground for seeking reconsideration, the standard is not so

limited.[4]  Instead, "[o]rdinarily, a district court faced with a motion to reconsider must apply an

---

class certification.  See In re Neurontin Marketing, Sales Practices and Prods. Liab. Litig., 257
F.R.D. 315, 330 (D. Mass. 2009) ("May 13 Order").  The *first five pages* of Plaintiffs' summary
judgment opposition were devoted entirely to a detailed exposition of the evidence that *all three*
of the bipolar subclass representatives' prescribing physicians (Drs. Arness, Ragothaman, and
Gray) were indeed detailed by Defendants on Neurontin's use for bipolar and other mood
disorders.  See Class Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. (Dkt. No. 1754),
at 1-5.  Pages 5-9 of Plaintiffs' summary judgment opposition likewise establishes that *all* of the
consumer plaintiffs' other prescribing physicians—Drs. Huler, Dhaduk, Rogers, and
Haynsworth—were detailed on Neurontin.  Id. at 5-9.  Defendants' implicit argument that the
Court considered this evidence before proclaiming categorically that no such evidence existed is
not a view to which Plaintiffs subscribe.

[3] As set forth in Plaintiffs' motion for reconsideration, on October 20, 2008, the Court directed
the parties to attempt to agree on a date for oral argument on Plaintiffs' Renewed Motion for
Class Certification.  Plaintiffs suggested a hearing in February 2009, while Defendants refused to
even propose a hearing date, suggesting instead that "if the Court continues to believe that it
needs additional development of the record before deciding the motion as to either the Consumer
or TPP purported class, defendants believe the only fair and appropriate means of accomplishing
this would be for the parties to brief summary judgment."  See Class Pls.' Submission Regarding
a Date for Further Oral Argument on Pls.' Renewed Mot. for Class Certification (Dkt. No.
1479); Defs.' Proposal Concerning Further Proceedings on Pls.' Second Mot. for Class
Certification (Dkt. No. 1780), at 3.  As no such hearing was scheduled prior to the filing of
Defendants' summary judgment motion and Plaintiffs' opposition, Class Plaintiffs assumed, not
entirely without justification, that the Court had acquiesced in Defendants' demand that it
consider the evidentiary record presented therein in deciding class certification.

[4] In positing an overly-rigid standard, Defendants cite (in addition to district court cases from
outside the First Circuit) two cases that involved motions for reconsideration of dispositive
orders.  In Palmer v. Champion Mortgage, 465 F.3d 24 (1st Cir. 2006), the plaintiff moved for
reconsideration of an order dismissing the complaint.  In Cochran v. Quest Software, Inc., 328
F.3d 1 (1st Cir. 2006), the Court denied a motion for reconsideration of a summary judgment
order.  Other courts, however, have distinguished between such orders and orders which "can be
revisited without the degree of disruption to settled expectations entailed in reconsideration of a
final judgment."  Wells v. State Manufactured Homes, Inc., 2006 WL 120087, at *1 (D. Me. Jan.
12, 2006) (applying "interests of justice" standard to motion for reconsideration).

interests-of-justice test," and "[i]t is…impossible to list a series of integers that will necessarily dominate the interests-of-justice equation in every case." U.S. v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992).  This standard has been characterized as "highly amorphous," Pastula v. Lane Constr. Corp., 2006 WL 696254, at *1 (D. Me. Mar. 17, 2006), "broad," "highly discretionary," Coffin v. Bowater Inc., 2005 WL 3021979, at *1 (D. Me. Nov. 10, 2005) (citing Greene v. Union Mut. Life Ins. Co., 764 F.2d 19, 22 (1st Cir. 1985)), and covering "considerable ground." Roberts, 978 F.2d at 22.  Indeed, in Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008), *Pfizer itself* sought and obtained reconsideration, not on the basis of newly-discovered evidence or a change in the law, but merely on the basis that the district court had denied summary judgment on "legally insufficient" grounds.[5]  While the First Circuit identified "newly discovered evidence" as one of the *permissible* grounds for reconsideration (although not present in that case), it articulated and applied a much broader, alternative standard:  "a motion for reconsideration should be granted if the court 'has patently misunderstood a party ... or has made an error not of reasoning but apprehension.'" Id. at 82 (quoting Sandoval Diaz v. Sandoval Orozco, No. 01-1022, 2005 WL 1501672, at *2 (D.P.R. June 24, 2005) (quoting Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990)).  As a result of confusion over the evidentiary submissions that the Court would "apprehend" in ruling on Plaintiffs' renewed motion for class certification, Plaintiffs easily satisfy this Pfizer-endorsed

---

[5] Pfizer sought and obtained reconsideration of the district court's refusal to grant summary judgment on an Americans With Disabilities Act claim based solely on an argument that the plaintiff's "claim was legally insufficient if based solely on statements made in connection with her request for reasonable accommodation." 521 F.3d at 81.  As far as can be discerned from the opinion, no new facts or law were presented in connection with the motion.  Id.

standard.[6]

Defendants further complain that the motion for reconsideration "merely rehashes" old arguments. Defs.' Opp. at 2, 5. That is not a fair characterization. In its August 2007 ruling, the Court "conclude[d] that Professor Rosenthal's proposed methodology is a plausible way of determining aggregate class-wide liability," and that "[i]f only a de minimis number of doctors prescribed Neurontin for an off-label condition, and then off-label prescriptions skyrocketed after a fraudulent campaign for that indication (i.e., migraines or bipolar), the Court will consider statistical proof as sufficient to demonstrate that most purchasers in that period were injured." In re Neurontin Mktg. and Sale Practices Litig., 244 F.R.D. 89, 111, 114 (D. Mass. 2007) ("August 2007 Order") at 114. Plaintiffs' renewed motion for class certification was largely built on the foundation laid by the Court in its August 2007 Order. However, in its May 13 Order, the Court did an "about face" on this issue:

> In *Neurontin*, the Court held that if Professor Rosenthal's model could accomplish that difficult task, plaintiffs would be entitled to a presumption of causation to satisfy Rule 23's predominance requirement. [¶] A quartet of cases decided after August 2007 has led the court to *reconsider permitting the use of statistical evidence to establish a classwide presumption of causation.*

257 F.R.D. at 324 (emphasis added). Deprived of the opportunity to address the Court's newly-expressed concerns in writing or at oral argument, the "interests of justice" require that Plaintiffs be afforded an opportunity to address them in a motion for reconsideration.

Finally, as the Court reconsidered its approach based on four decisions issued after its August 2007 Order, Plaintiffs rely on *three even more recent opinions*, issued between March and July 2009 (discussed below), which certified consumer fraud classes based on a class-wide

---

[6] Plaintiffs appreciate that the 26 boxes of exhibit binders delivered to the Court in support of Plaintiffs' 314-page factual statement and supporting declarations (Dkt. Nos. 1755, 1759, 1761) presented the already-overburdened Court with a formidable task.

presumption of reliance, based on circumstantial evidence analogous to the evidence relied on by

Plaintiffs in this case.  As these cases were decided long after briefing on Plaintiffs' renewed

motion for class certification was complete, they provide an independent—and authoritative—

basis to grant reconsideration, even under the unduly narrow standard advanced by Defendants.

III.   **PLAINTIFFS CAN DEMONSTRATE CLASS-WIDE CAUSATION THROUGH COMMON PROOF**

   A.   **Class-Wide Causation Can Be Presumed Without Resorting to a Fraud-on-the-Market Theory of Causation.**

Defendants incorrectly argue that a finding of predominance of common issues of

causation necessarily requires the use of a "fraud on the market" theory.  Defs.' Opp. at 11.

Defendants' argument fails to comprehend the fundamental difference between a typical "fraud

on the market" case, such as Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v.

Merck & Co., Inc., 192 N.J. 372 (2007) ("Vioxx") or McLaughlin v. Am.Tobacco Co., 522 F.3d

215 (2d Cir. 2008), where the value of the product was allegedly overstated in comparison to

other alternatives, and this case, where the product is alleged to be utterly worthless.  In the

former type of case, *some amount* of the product would have been purchased absent the fraud; in

the latter, *no significant amount* of the product would have been purchased absent the fraud.  As

such, Class Plaintiffs do not need to resort to a "fraud on the market" theory to prove

causati      on.  Common proof of causation can be established by the facts and circumstances of

this case.

Seven cases—including three decisions issued after briefing on Plaintiffs' renewed

motion for class certification was complete—are instructive on this point.  First and foremost, in

In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D 46 (D.N.J. 2009) ("Mercedes"), the

court[7] certified a consumer class for violation of the New Jersey Consumer Fraud Act and unjust enrichment based on allegations that the manufacturer failed to disclose the impending obsolescence of an analog network on which the vehicle's emergency response system depended.  The court found that the causal nexus between the ascertainable loss and the fraudulent misrepresentation requirement under the NJCFA could be established on a class-wide basis by showing that, had the truth been disclosed, no consumer would have purchased a product that would soon become worthless.  See id. at 74.  Thus, the court concluded: "[i]f Plaintiffs demonstrate at trial that Mercedes failed to disclose the impending obsolescence of analog Tele Aid, that omission will be *presumed* to have caused Plaintiffs' loss and there will be *no need* for individualized evidence regarding causation."  Id. 74-75 (emphasis added).

The same reasoning was used in Chisolm v. TranSouth Fin. Corp., 194 F.R.D. 538 (E.D. Va. 2000) ("Chisolm"), where plaintiffs, whose cars were repossessed, paid deficiency judgments that were not legally owed based on notices that improperly stated the consumers' redemption rights in violation of statutory standards.  The court in Chisolm rejected the defendant's argument that individual inquires would be required as to each class member's reliance, and certified a RICO claim.  The court noted that "[o]ften reliance is a matter that is demonstrated inferentially and by circumstantial proof."  Id. at 563.  The court ruled that the class plaintiffs' proof of reliance on defendant's fraudulent mailing was "self-proving" for all class members who made deficiency payments on their loans, observing:

> It is difficult to conceive how those who made payments on the deficiency judgments could be found to have not relied.  Those individuals clearly made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were

---

[7] This decision was handed down on April 24, 2009—only three weeks before the Court issued the Order in this case—and consequently had not been discussed in any of the class certification briefing.

> taken in conformity with the law and that their rights were
> protected.  To conclude otherwise would deny human nature, run
> counter to the traditional presumption in favor of actors operating
> under rational economic choice, and leave the Court with an
> absurd conclusion.

Id.  at 561.  Accordingly, the Court refused to decertify consumer classes, finding that the predominance factor was satisfied via "self-proving" evidence of class-wide reliance.  Id.  at 562.

Similarly, in Robinson v. Fountainhead Title Group Corp., 257 F.R.D. 92 (D. Md. 2009), plaintiff sought certification of a RICO claim for a class of homeowners who were charged fees for title work by a bogus entity to facilitate and launder illegal referral fees and kickbacks—at the expense of the class.  As in this case, "Defendants assert[ed] that certification . . . is not proper because Plaintiff and the class members will not be able to prove proximate cause without resorting to individualized proof of reliance."  Id. at 94.  The court rejected this argument, citing a line of cases including Chisolm:

> Many courts, however, faced with similar reliance arguments have
> certified RICO claims for class action treatment, finding that
> common issues predominate over individualized ones.  The courts
> in these cases tend to find that "while each plaintiff must prove
> reliance, he or she may do so through common evidence (that is,
> through legitimate inferences based on the nature of the alleged
> misrepresentations at issue)."  *Klay v. Humana, Inc.*, 382 F.3d
> 1241, 1259 (11th Cir.2004). . . . Accordingly, like *Klay*, it would
> be a reasonable inference to assume that a class member who
> purchased services from Assurance Title relied on the legitimacy
> of that organization in paying the rate charged.

257 F.R.D. at 94-95 (citations omitted).

Along the same lines, in Garner v. Healy, 184 F.R.D. 598 (N.D. Ill. 1999), plaintiffs sought certification of claims under RICO, various consumer fraud acts and breach of warranty claims based on allegations that defendants engaged in deceptive practices by fraudulently advertising, marketing and selling "non-wax products of minimal value as 'car wax.'"  Id. at 599. Defendants argued that individual issues would necessarily predominate, because class members

had to show that the alleged misrepresentations proximately caused each member's injury and that their reliance on such misrepresentations was reasonable.  With respect to reliance and causation, the court concluded: "if Plaintiffs paid money for a 'wax' but instead received a worthless 'non-wax' product, then issues of proximate cause would be relatively simple to resolve on a classwide basis."  Id. at 602.

In Peterson v. H & R Block Tax Services, Inc., 174 F.R.D. 78 (N.D. Ill. 1997), plaintiffs sought certification of contract, RICO, Illinois Consumer Fraud and Deceptive Business Practices Act and restitution claims based on allegations that defendant defrauded its customers by inducing them to pay for tax-related services that defendant knew they could not receive. Defendant argued that issues of individual reliance would predominate in the RICO and Illinois consumer fraud counts.  The court dismissed the argument finding that reliance was apparent: "[i]t is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable, especially given that their income was sufficiently low to qualify for an EITC [Earned Income Tax Credit].  The only logical explanation for such behavior is that the class members relied on the [false representation] by paying the requisite fee."  Id. at 85.

In Spark v. MBNA Corp., 178 F.R.D. 431 (D. Del. 1998), the Court certified a class action alleging that defendant bank violated RICO while making misleading statements in credit card advertisements.  The court, rejecting defendant's argument that individual inquiry of each plaintiff would be required to prove reliance, found that whether each plaintiff relied upon the advertisement could be established by a presumption of reliance.  Specifically, the court held:

> …it is fair to assume that most individuals who opened up credit
> card accounts after receiving the offer from MBNA did so because
> of the advertisement, and specifically because of the low APR.
> MBNA's advertisement focuses on the APR.  The APR is one of
> the few ways to distinguish between credit cards.  Thus, the court
> finds that it is "logical" to presume reliance in this case, and

therefore that common questions of law and fact predominate over individual ones in this case.

Id. at 436.

It is important to note that in each of the above of cases, consumers would not have known about the existence of the product or service absent the fraudulent scheme. And because in Mercedes, Chisolm, Robinson, Garner, and Peterson the products or services were completely worthless, the fact that any consumers agreed to pay any money for them is persuasive circumstantial evidence of a causal nexus. Given the nature of this type of out-and-out fraud— *i.e.*, tricking consumers into giving *something* in exchange for *nothing*—such cases, while infrequent, cannot be lumped together with the more common cases involving puffery. Contrary to Defendants' arguments, neither the Second Circuit in McLaughlin nor Judge Young in In re TJX Cos. Retail Security Breach Litig., 246 F.R.D. 389 (D. Mass. 2007) ("TJX II") held that reliance could *never* be established with common proof.[8] To the contrary, the Second Circuit noted that "proof of reliance by circumstantial evidence may be sufficient under certain conditions" (McLaughlin, 522 F.3d at 225 n.7 (citing Westways World Travel, Inc. v. AMR Corp., 218 F.R.D. 223, 238 (C.D. Cal. 2003) (payment may constitute circumstantial proof of class-wide reliance upon a financial representation and injury)), and Chisolm (presuming that

---

[8] This conclusion is affirmed by one of the leading treatises on the subject. According to McLaughlin on Class Actions: "[i]ndividual issues of reliance and causation ordinarily will predominate unless consumers had *no potential basis* on which to make a purchase decision other that the allegedly misleading statements." J. McLaughlin, Joseph M. McLaughlin on Class Actions: Law and Practice. (5th ed. 2009) at 1193 (emphasis added). In such cases, however, which are admittedly "relatively infrequent," proof of individual reliance is not needed because "class members had no plausible alternate basis to make the relevant purchase or usage decision." Id. at 1172. Neurontin is precisely the infrequent, out-and-out fraud that McLaughlin contemplated. In the last several decades, no drug company has been brazen enough to knowingly market *nothing* as if it were *something*, which has resulted in an unfortunate dearth of guiding case law. However, Pfizer should not be rewarded for this paucity of case law simply because Pfizer was the first drug company to attempt such a feat.

plaintiffs who paid deficiency judgments "made payments in reliance upon the assurance that the process of repossession, sale and all subsequent steps were taken in conformity with the law")).

In TJX II, while Judge Young found that *under the circumstances of that case*, "'[p]roving the element of reliance will necessarily involve individual questions of fact,'" he did *not* hold that "where reliance is an element of a claim, a presumption of reliance is *never* appropriate …." 257 F.R.D. at 326 (quoting TJX II, 246 F.R.D. at 395). Instead, like the Second Circuit in McLaughlin, Judge Young expressly held that "reliance could, in some situations, be demonstrated for the class as a whole via circumstantial evidence…." TJX II, 246 F.R.D. at 396.

The absence of the blanket rule advocated by Defendants was recently confirmed by Spencer v. Hartford Fin. Servs. Group, 256 F.R.D. 284 (D. Conn. 2009), where the court rejected an expansive reading of McLaughlin, and certified RICO and common law fraud claims based on circumstantial evidence giving rise to a class-wide presumption of reliance:

> Nationally, courts have rarely certified nationwide fraud classes on a "presumed reliance" theory outside of the context of securities litigation. **But *McLaughlin* explicitly declined to adopt the rule of some other circuits that a requirement to prove individual reliance necessarily defeats certification in a proposed fraud class action.** 522 F.3d at 224-25. **It made clear that "proof of reliance by circumstantial evidence may be sufficient under certain conditions,"** pointing specifically to examples of certification where "payment" was held to "constitute circumstantial proof of reliance upon a financial representation." 522 F.3d at 225 & n. 7.

256 F.R.D. at 302 (emphasis added).

Plaintiffs are aware of no authority, and Defendants can point to none, where consumers provided evidence that there was *no plausible alternate basis* for their purchase decisions other than the fraud, and a reliance requirement was *not* satisfied. The "quartet of cases" cited by the Court are not "highly analogous," because in none of those cases could plaintiffs demonstrate the lack of a plausible alternate basis for the purchasing decision. In fact, in each one of those cases,

the evidence showed that the product's specific use was obvious absent the fraud and consumers would have purchased *some* quantity of the product *regardless* of the fraud.

For example, in <u>Vioxx</u>, there was no evidence that the drug was ineffective for pain; to the contrary, Vioxx was FDA-approved for that use.  By virtue of its FDA approval,[9] physicians could have and did in fact learn about Vioxx and its labeled use from a variety of non-fraudulent channels such as the *Physicians' Desk Reference*, and they could have decided whether to prescribe Vioxx regardless of whether it was *safer* (or less safe) than other alternatives.

Similarly, in <u>McLaughlin</u>, plaintiffs did not even allege that, absent the fraud, they would not have purchased *any* light cigarettes.  Rather, the "gravamen of plaintiffs' complaint was that defendants' implicit representation that Lights were healthier led them to buy Lights in *greater quantity* than they otherwise would have." <u>McLaughlin</u> at 220 (emphasis added).  This is an important admission that, absent defendants' conduct, plaintiffs still would have purchased light cigarettes as a result of some other factor.[10]

<u>In re St. Jude Medical Inc. Silzone Heart Valve Prods. Litig</u>., 522 F.3d 836 (8th Cir. 2008), is yet another case where the fraud involved a claim of a product's purported advantage over similar products.  As in <u>Vioxx</u>, the Silzone heart valve was FDA-approved, and

---

[9] Contrary to Defendants' assertions, Plaintiffs are not arguing that there must be evidence sufficient for FDA approval before a physician can prescribe a drug.  (Defs.' Opp. at 8).  Rather, Plaintiffs are simply stating that physicians do not knowingly prescribe ineffective medications. To do so would violate the Hippocratic Oath: "I will use those dietary regimens which will benefit my patients according to my greatest ability and judgment, and I will do no harm or injustice to them."  The latter clause is particularly appropriate here as Neurontin, as evidenced in the FDA's 1992 review and Defendants' own protocol 945-209, increased the risk of depression and suicide, and underperformed placebo as an anti-manic agent.

[10] This is similarly true in <u>Vioxx</u> where the plaintiff did not even allege that, absent the defendant's representation, it would not have paid for Vioxx.  Hence, had defendant not misrepresented Vioxx's safety, plaintiff still would have paid for Vioxx as a result of some other factor(s).

consequently, patients and surgeons learned about its availability through many non-fraudulent channels.  Like Vioxx and McLaughlin, there was no allegation that the Silzone heart valve was useless or ineffective.  Nor was there any evidence that consumers and surgeons would have opted for a different type of heart valve had they known that the Silzone heart valve did not reduce the risk of infection over other heart valves.

In the TJX case, there were no plausible allegations that banks would have categorically refused to have issued 45.7 million credit and debit cards had they known of TJX's inadequate security procedures.  See In re TJX Companies Retail Sec. Breach Litig., 524 F. Supp. 2d 83, 86-87 (D. Mass. 2007).  In fact, the TJX case could hardly be less relevant, because there was no evidence that the fraud had any involvement in even a single decision to issue credit cards, which in many cases were made before the data breaches were even known.  Individual issues would have inevitably predominated, because defendants could prove that: some banks issued cards for reasons unrelated to the negligent representations; some banks were aware at the relevant times that merchants in general violated security standards; some banks were even aware of TJX's noncompliance; some banks were comparatively negligent; and finally, that some banks would not have altered their behavior with regard to card issuance, participation in the credit card networks, or in honoring transactions from that merchant.  TJX II, 246 F.R.D. at 396-98.  Accordingly, Judge Young found that, if all of these other factors were in fact true, "then TJX and Fifth Third's alleged negligent misrepresentations by omission would not appear to be the but-for reason that the issuing banks were in a position to be harmed by the data breaches."  Id. at 398.

Established case law demonstrates that individualized inquiries concerning causation and reliance are not needed where no plausible alternative reasons exist to explain consumer

purchases.

**B.     The Evidence in this Case Has Expressly Ruled Out The Existence or Impact of Any Factor Other Than Defendants' Fraudulent Marketing On Bipolar Prescriptions**

It is compelling that this Court was able to find that "no plausible, non-fraudulent reason existed for defendants to detail psychiatrists."  257 F.R.D. at 331.  This is a dramatic finding which underscores the point that the "quartet of cases" is not relevant to the bipolar subclasses' fraud claims.  It bears repeating that in each of those cases, there were plausible, non-fraudulent reasons for defendants to promote their products, and, in the case of drugs or medical devices, for doctors to prescribe or use them.[11]

In stark contrast to those cases, here, individualized issues are simply incapable of overwhelming the common questions of causation, because, as the Court has correctly found, there were no positive product attributes that could have been innocently and truthfully communicated to psychiatrists.  The evidence supporting this proposition is clear and uncontroverted.  In their Psychiatric Marketing Assessment, issued in May 1995, Defendants conceded that Neurontin was capturing "0%" of the bipolar market and would continue to do so unless they disseminated fraudulent information.  (See Class Plaintiffs' Statement of Disputed and Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment ("SOF") ¶ 47.)  No other factor is cited as contributing to Neurontin prescriptions for bipolar.  In

---

[11] For example, in McLaughlin, so-called "light" cigarettes could have been truthfully marketed as cigarettes that allowed smokers "to obtain just as much tar and nicotine as they would if they smoked full-flavored cigarettes."  McLaughlin, 522 F.3d at 220-21.  In Vioxx, Merck could have truthfully marketed its pain reliever to physicians as "neither more effective nor safer than other [traditional pain medications]."  Vioxx, 929 A.2d at 1079.  In St. Jude, uniquely-coated Silzone heart valves could have been truthfully marketed to surgeons and patients merely as heart valves that did not "reduce the risk of infection" over other heart valves.  St. Jude, 522 F.3d at 837, 838.  Finally, in TJX II, there was evidence that Fifth Third Bank and TJX could have notified third parties about their failure "to maintain proper data security" without causing an issuing bank "to alter its behavior" or "influence what security steps it adopted." TJX II, 246 F.R.D. at 396.

fact, the Marketing Assessment specifically rejected the significance of the so-called "factor"

Defendants now embrace—that psychiatrists routinely experiment on their bipolar patients with

anticonvulsants, including Neurontin—because Neurontin's different mechanism of action

vitiated any "scientific rationale" for such experimentation.  (SOF ¶ 19.)  Moreover, Defendants

declared under oath in a patent application that Neurontin's use as a bipolar treatment "would not

be obvious" to physicians.  (SOF ¶ 40.)  Even by May 1996, Defendants admitted, based on what

psychiatrists told them, that psychiatrists were not using Neurontin and saw no reason to start

using it in the future.  An internal "Situation Analysis" noted:

> Neurontin drug use for bipolar disorder is not significant.  It
> represented less than 1% (3/96 MAT) of the uses within the AED
> class...the use of Neurontin in this area *is not expected to increase
> in the short term*.  This was confirmed by market research
> conducted at the APA annual meeting in New York in April 1996,
> where over a hundred psychiatrists were surveyed.  They indicated
> that at the present time their use of Neurontin is not significant and
> that *they do not expect it to increase in the near future*.

SOF ¶ 177 (emphasis added).  This evidence demonstrates that there were no non-fraudulent

factors that explained a psychiatrist's decision to prescribe Neurontin.

The only support that Defendants have for their conjecture that so-called "other factors"[12]

actually resulted in prescriptions for bipolar disorder is the now-debunked testimony of Dr.

Ragothaman and Dr. Arness.  The unreliable testimony of Dr. Ragothaman and Dr. Arness

---

[12] The supposed "other factors" have, throughout this litigation, been a moving target.  In their
most current briefing, Defendants cite the "accepted practice of using anticonvulsants to treat
psychiatric disorders" and "patients' reports of improved mood while taking gabapentin" without
any evidence that such practices actually resulted in any prescriptions.  See Defs.' Opp. at 8-9.
Previously, as the Court noted, they had argued that "'postings on medical websites, advances in
basic science, and informal conversations'" created a buzz about Neurontin.  August 2007 Order
at 52-53 quoting from Defendants retained econometrics expert, Professor Fiona Scott-Morton.
In the August 2007 Order, again quoting from Professor Morton, the Court rejected Defendants'
"other factors" argument, arguing that "it seems more likely that the increase was not due to the
diffusion of new knowledge about the 'basic science' of the brain."  *Id.* at 53.

underscores why an individualized inquiry into the thoughts and feelings of psychiatrists is

unnecessary and would be fruitless.  First, it was simply not possible for psychiatrists to even be

aware of the *complete and accurate* scientific record until it was compiled and distilled in the

reports of Drs. Barkin, Furberg, Abramson and Dickersin.[13]  These reports hadn't even been

prepared when Drs. Ragothaman and Arness were deposed.  Second, while it has been

demonstrated that physicians are influenced by marketing, and they recognize that their peers are

likely to be influenced, it has also been demonstrated that a physician is unlikely to be aware that

he or she was influenced by the same promotion.[14]  Obviously, if Drs. Ragothaman and Arness

are unable to even recall being detailed, they are in no position to opine whether such detailing

influenced their behavior.  Third, research has demonstrated that physicians like Drs.

---

[13] Pfizer has never publically admitted that Neurontin is an ineffective treatment for mood disorders.  To the contrary, Pfizer blocked the Cochrane Collaboration's independent review of the evidence of Neurontin in mood disorders (see SOF ¶¶ 147-162), they continue to contest the findings of the FDA and its advisory committee that Neurontin increases the risk of suicide and depression, and they continue to misrepresent the scientific record demonstrating Neurontin's inefficacy.

[14] As Professor Rosenthal summarized in her August 2005 declaration (Dkt. No. 202, Ex. B), a study:

> analyzed physician beliefs about the sources of influence on their prescribing as well as indirect evidence of the true source of physician information.  Physicians were asked to report their beliefs about the pharmacologic effects of two classes of drugs where the scientific evidence had clearly shown little or no benefit while the manufacturers had advertised heavily to promote the products as superior to the therapeutic alternatives.  The study showed that the majority of physicians held beliefs about the two classes of drugs that were consistent with the detailing message but at odds with the scientific evidence despite the fact that the same physician reported that commercial sources of information had little influence on their prescribing.

Id. ¶ 20 (citing J. Avorn, et al., "Scientific Versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," Am. J. of Medicine, 73 (a), 4-8, 1982).  See also Steinman MA, et al., "Of principles and pens: Attitudes and practices of medicine housestaff toward pharmaceutical industry promotions," Am. J. of Medicine, 2001;110:551-57 (61% of respondents stated that industry promotions did not influence their own prescribing, but only 16% believed other physicians were similarly unaffected).

Ragothaman and Arness are unlikely to recall inaccuracies in the marketing messages they receive.  See Ziegler, et al., "The Accuracy of Drug Information from Pharmaceutical Sales Representatives," JAMA (1995) 273:1296; n.14, supra.  Fourth, because of the overwhelming evidence that there were no factors independent from the fraud that could have caused psychiatrists to prescribe Neurontin, individual inquiry would only yield inaccurate information. Under Rule 23, Plaintiffs need not demonstrate that there are *never* any individualized factors; rather they only need to show that such factors are *inevitably subordinate* to the common questions of fact.  Because there was no independent font of knowledge suggesting the utility of Neurontin to treat mood disorders, psychiatrists' idiosyncratic recollections of why they prescribed Neurontin will inevitably be subordinate to the common questions of fraud that first alerted them to the use.  Contrary to Defendants' argument, the testimony of Drs. Ragothaman and Arness exemplifies the common nature of the inquiry.

IV.     **IN THE ABSENCE OF OTHER PLAUSIBLE FACTORS TO EXPLAIN NEURONTIN BIPOLAR PRESCRIPTIONS, PROFESSOR ROSENTHAL'S REPORT DEMONSTRATES CLASS-WIDE CAUSATION**

As demonstrated above, because Class Plaintiffs can prove that there were no other factors that could have reasonably accounted for Neurontin bipolar prescriptions, Professor Rosenthal's expert report did not wrongfully exclude any relevant factors.  To the contrary, Professor Rosenthal's conclusion that 99.4% of Neurontin bipolar prescriptions are the product of the fraud directly supports and is entirely consistent with Defendants' own forecasts that Neurontin would have captured 0% of the bipolar market absent their fraud.  It would have been speculative for Professor Rosenthal to assign any weight to any of the so-called "other factors" that Defendants claim were inappropriately excluded in the absence of any factual support that such factors in the real world resulted in any prescriptions.   This is especially true of factors that

are rendered moot by virtue of Neurontin's inefficacy for bipolar.[15]  For example, no physician would prescribe an ineffective drug because of its drug-drug interaction profile, side-effect profile, dosing regimen, pill size or whatever other "factor" Defendants are inclined to suggest. Defendants' unsubstantiated argument that Neurontin would inevitably have been prescribed because it was an anticonvulsant is false.  Physicians clearly knew that Neurontin was an anticonvulsant as far back as 1993, when it was approved by the FDA to treat seizures, and yet the evidence shows that such knowledge alone did not trigger any bipolar prescriptions over the next two years (1993-1995).

Defendants also argue that Professor Rosenthal's analysis does not and cannot prove causation on a class-wide basis because the evidence shows that "many doctors were not detailed." (Defs.' Opp. at 6).  This assertion ignores the veritable mountain of evidence amassed as part of Plaintiffs' opposition to summary judgment which clearly indicates that most psychiatrists were detailed.  Not only were Dr. Ragothaman and Dr. Arness detailed,[16] but Class Plaintiffs have also demonstrated that the number of monthly details to psychiatrists skyrocketed in close correlation with the growth in Neurontin prescriptions.  For example, in September

---

[15] Defendants do not seriously contest the fact that Neurontin is ineffective in treating bipolar and other mood disorders, as any such claims are now relegated to a footnote (Defs.' Opp. at 9 n.5).  Such claims rely exclusively on misrepresentations of expert testimony and clinical trial results.  In their most recent briefing, Defendants brought this to a new level, arguing that their own protocol 945-209, which demonstrated that *placebo* was more effective than Neurontin as an anti-manic agent, is somehow consistent with the fraudulent conclusion of their own protocol 945-291.  Plaintiffs are still trying to understand this logic.  The results of 945-291 fully support the conclusion of 945-209: Neurontin is ineffective.  Further, Defendants reiterate Dr. Barkin's simple identification of a misrepresentation as if it were some sort of concession of substance.

[16] With respect to Dr. Gray, the admissibility of his statements to Ms. Wityk is addressed in Plaintiffs' surreply in opposition to Defendants' motion for summary judgment (Dkt. No. 1859, at 9).  As explained therein, Dr. Gray's statements are offered not to show the truth of the matter asserted, but to show that he was in fact detailed and exposed to Defendants' marketing messages (which Plaintiffs are clearly *not* arguing were true).

1997, there were close to zero details on psychiatrists.  Expert Report of John Abramson, M.D. ("Abramson Report," attached as Ex. 023 to SOF) ¶ 292.  Between 1997 and 1998, there was a 238% increase in the number of details to psychiatrists, who became the single most detailed specialty for Neurontin.  (SOF ¶ 95.)  By February 1999, psychiatrists were being detailed at a rate of 7,300 per month.[17]  (SOF ¶ 181.)  By the third-quarter of 1999, detailing to psychiatrists represented almost 40% of all detailing to any specialists.  (SOF ¶ 184).  As late as Pfizer's 2002 operating plan, Pfizer noted that psychiatrists were still receiving 43% of all details.  Abramson Report ¶ 18.

This abundant evidence of psychiatric detailing should lead the Court to reconsider its finding that Professor Rosenthal's statistical analysis does not suffice to establish a causal nexus between Defendants' fraud and Neurontin prescriptions.  Even if some psychiatrists were not detailed, the evidence shows that Defendants' fraudulent bipolar marketing message permeated all of the traditional channels through which physicians obtained information about drugs, such that a psychiatrist need not have been detailed to have received the fraudulent message.[18]   In his report, Dr. Abramson catalogued the pervasive influence that Defendants' "dissemination of inaccurate, incomplete or misleading" information had on the "traditionally independent and trusted sources of information upon which physicians rely in making informed prescribing

---

[17] In 2002, the middle of the proposed class period, there were approximately 45,615 psychiatrists in the United States.  See J. Scully and J. Wilk, Selected Characteristics and Data of Psychiatrists in the United States, 2001-2002, Academic Psychiatry 27:247-51 (Dec. 2003). Accordingly, Defendants were detailing approximately 16% of the psychiatrists in the U.S. *every month*.  At that rate, Pfizer could have detailed all of them in six months.

[18] This should not be surprising as Professor Rosenthal has testified numerous times that, to the extent that these other vehicles through which Defendants disseminated their fraudulent message are exerting an effect *independent* from expenditures on promotion, her estimates are conservative.  Her conclusion that 99.4% of bipolar and other mood disorder prescriptions resulted from the fraud would indicate that her model is indeed capturing the effect of these other fraudulent endeavors.  See 257 F.R.D. at 329.

decisions." Abramson Report, at 4. Dr. Abramson demonstrated that Defendants' strategy "to exert control and influence" over the available information on mood disorders extended beyond mere detailing to include clinical trials, journal articles, and CME programs. Id. at 123. Similarly, Dr. Barkin documented the countless misrepresentations and omissions Defendants uniformly made throughout their reporting of research results, journal article writing, sponsorship of teleconferences and CMEs, and communications with independent reviewers. See Report on the Use of Neurontin for Bipolar and Other Mood Disorders (attached as Ex. 021 to SOF) at 10-19, 20-1; Supplemental Report on the Use of Neurontin for Bipolar and Other Mood Disorders (attached as Ex. 006 to SOF) at 3-5. Accordingly, Class Plaintiffs' evidence, chronicled in multiple expert reports and Defendants' own internal documents, demonstrates that psychiatrists were exposed to the fraud through a variety of channels, of which detailing was one of the largest.[19] Professor Rosenthal's findings establish a causal nexus between the fraudulent marketing and bipolar prescriptions, even if some psychiatrists were not detailed.

## V.   THIRD PARTY PAYERS CAN PROVE CAUSATION WITH COMMON EVIDENCE

As the Court has repeatedly recognized—contrary to Defendants' argument—the TPPs need *not* prove *which* Neurontin prescriptions were written as a result of Defendants' fraudulent marketing efforts; to establish liability and warrant certification, Plaintiffs need only prove that TPP class members paid for *some* quantity of Neurontin prescriptions that would not have been

---

[19] Plaintiffs have provided ample evidence that detailing was also the springboard for most of those other fraudulent channels. For example, Defendants used sales representatives to hand out journal reprints that were central to the "publication strategy." See SOF ¶¶ 105, 114, 373, 382. Defendants also used sales representatives to invite physicians to peer-to-peer marketing events. See SOF ¶¶ 380, 790, 793, 798, 799, 805, 807, 808, 810, 812, 816, 817. To require doctor-by-doctor evidence of detailing would violate the First Circuit's prohibition against "allowing the defendant to turn the class-certification proceeding into an unwieldy trial on the merits." In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 17 (1st Cir. 2008).

written absent Defendants' fraud.[20]  As the Court found in the May 13 Order, "[a]t the 99 percent

confidence interval, . . . all of the other indications [including bipolar and other mood disorders]

necessitated less than 1,600 members to ensure that at least one individual in a plan received a

Neurontin prescription for each off-label indication."  257 F.R.D. at 320.[21]  Accordingly, the

Court concluded that "the plaintiffs have put forward sufficient evidence to support a conclusion

that all or nearly all of the members of the proposed indication-specific TPP subclasses paid for

at least one off-label Neurontin prescription."  257 F.R.D. at 331.

        The Court continued that "[t]o prevail on the merits, the TPPs must prove that defendants'

*fraud* caused the off-label Neurontin prescriptions for which the TPPs paid."  Id. at 331-32.

Defendants contend that Plaintiffs have failed in this effort, because, as the Court found,

"Professor Rosenthal's analysis does not take into account any other factors that may have led

doctors to prescribe Neurontin for off-label indications."  257 F.R.D. at 330.  As set forth above,

*there were no other factors* that would have led any minimally competent physician to prescribe

Neurontin for bipolar and other mood disorders.  As a consequence, there were virtually no

Neurontin prescriptions for that indication prior to the onset of Defendants' fraudulent marketing

efforts, and Defendants themselves concluded, after an extensive and thorough marketing

assessment carefully vetted by senior management, that *there would be no significant Neurontin*

---

[20]  See Apr. 16, 2008 Transcript at 27:5-17 ("I agree with you that it's exponentially more
difficult Consumer by Consumer, but . . . [i]t's hard for me to believe that on a third-party payor
basis, you can't prove at least causation, that there was an injury); August 2007 Order at ("If Dr.
Rosenthal has an accurate methodology for calculating that, say, 85% of all Neurontin
prescriptions for migraines resulted from a fraudulent marketing campaign, it seems reasonable
for a TPP to allege that 85% of its reimbursements for that indication were a result of the fraud).

[21]  Indeed, for bipolar, the number is less than 1,000  members.  See Revised Declaration of Rena
Conti in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1142) ¶ 54,
Table 2 (997 members at the 99% confidence level, and only 499 members at the 90%
confidence level).

*prescriptions for bipolar unless and until they promoted it for that use*.  See SOF ¶ 47.

Defendants' own carefully-considered estimate of Neurontin's 0% "but for" market share for bipolar and other mood disorders is sufficient, even *without* Professor Rosenthal's report, to support a factual finding that all (or nearly all) such prescriptions would not have occurred absent their promotional efforts.  See, e.g., Russo v. Merck & Co., 21 F.R.D. 237 (D.R.I. 1957) (plaintiff may elicit expert opinion testimony of defendant's employees).  The Court has already found, with respect to bipolar and other mood disorders, that all such efforts were necessarily fraudulent, in light of Defendants' prior knowledge that Neurontin was ineffective for that use.[22] See 257 F.R.D. at 331.

The mere possibility that some small number of physicians may have *sua sponte* experimented on their patients by prescribing a drug they had no reason to believe would help their patients is insufficient to defeat class certification.  As Judge Posner explained in affirming certification of an allegedly overbroad class earlier this month:

> What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown.  Such a possibility or indeed inevitability does not preclude class certification, *Carnegie v. Household Int'l, supra*, 376 F.3d at 661; 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 2:4, pp. 73-75 (4th ed.2002), despite statements in some cases that it must be reasonably clear at the outset that all class members were injured by the defendant's conduct. . . . Those cases focus on the class definition; if the definition is so broad that it sweeps within it persons who *could not* have been injured by the defendant's conduct, it is too broad.

---

[22] Defendants' only critique of this syllogism is that "variations in the demographics of the TPPs' covered populations, would necessitate individual inquiries into the uses for which the Neurontin prescriptions that each TPP reimbursed were written."  Defs. Opp. at 15-16.  Plaintiffs have responded fully to this argument in prior briefing.  See Reply Memorandum of Law in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1184) at 5.

Kohen v. Pacific Inv. Mgmt. LLC, --- F.3d ---, 2009 WL 1919013, *5 (7th Cir. Jul. 7, 2009) (citations omitted, emphasis added).  Here, the proposed TPP class definition is not overbroad, as it does not include any TPPs who "could not" have been injured by Defendants' fraud.  Id.

## VI.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS SUBJECT TO COMMON PROOF

Defendants' arguments with respect to unjust enrichment are without merit.  First, Defendants' claim that the Court's Order "explicitly addressed all of Plaintiffs' claims, including 'unjust enrichment'" cannot be taken seriously because, as they concede, the only reference to unjust enrichment fell in the very first page of the Court's Order in an "Introduction" where the Court merely recited the Class Plaintiffs' claims: "Plaintiffs claim violations of…"  257 F.R.D. at 316.  The Court did not discuss at all whether Class Plaintiffs could meet the predominance requirement with respect to their unjust enrichment claim, which under New Jersey law is analyzed under a different standard.  See Mercedes, 257 F.R.D. at 72-73.  Conversely, the Court specifically analyzed the predominance requirement for both the RICO and NJCFA claims.  See 257 F.R.D. at 322.

Second, Defendants' contention that Class Plaintiffs' unjust enrichment argument is untimely is similarly spurious, as the Court has previously indicated that it would not act on the claim unless and until Class Plaintiffs lacked other adequate legal remedies.  In re Neurontin Mktg., Sales Practices and Products Liability Litig., 433 F. Supp. 2d 172, 186 (D. Mass. 2006).  Defendants' suggestion that a denial of certification leaves Class Plaintiffs with an alternative remedy in the form of individual actions is disingenuous.  In cases where individual claims are relatively modest, but the expenses of litigation, and the resources necessary to marshal proof,

are great, individual claims are not a realistic alternative.[23]  As the Seventh Circuit noted in an analogous situation:  "The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."  Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004).  In the last month, relying in part on federal precedents, the Supreme Judicial Court of Massachusetts reached the same conclusion, noting that "the right to a class action in a consumer protection case is of particular importance where, as here, aggregation of small claims is likely the only realistic option for pursuing a claim." Feeney v. Dell, Inc., 454 Mass. 192, 202, 908 N.E.2d 753 (2009).[24]

Finally, Defendants' effort to distinguish the Mercedes case is without merit, as they fail to explain why a consumer who subscribed to a service that did not work, or who as a result was forced to pay $1000 more to make the system work as promised, has a legally-cognizable expectation of not being defrauded that is any different than the same legally-cognizable expectation of a physician or patient.  Defendants compound this error by making the illogical claim that physicians, as learned intermediaries, have no legally-cognizable expectation of receiving information about the known *in*efficacy of a drug product.  In this case, the information needed to fulfill this role lay in Defendants' exclusive possession and was not disclosed.

---

[23] Indeed, as the Court itself witnessed last week, the cost of trying even an individual *wrongful death* case against Defendants for the same misconduct alleged by Class Plaintiffs was deemed prohibitive.

[24] The Supreme Court has also recognized that without the ability to bring class actions, there is no incentive to pursue claims where there may be serious injustices, but where individual claims are small.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617, 117 S. Ct. 2231, 138 L. Ed.2d 689 (1997), quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's [usually an attorney's] labor").

## VII.    <u>CONCLUSION</u>

The Court has now twice noted how troubled it is by Defendants' actions.  <u>See</u> 257

F.R.D. at 333; 244 F.R.D. at 114.  Defendants have profited tremendously from their off-label

marketing to psychiatrists, marketing for which this Court has found "no plausible, non-

fraudulent reason" for Defendants to engage in.  Countless consumers, already burdened with the

diagnosis and stigma of a mood disorder, have paid dearly for a worthless remedy, to the unjust

enrichment of Pfizer.  If the Court does not reconsider its earlier opinion, the Court will have

created new legal precedent essentially authorizing pharmaceutical companies to fraudulently

market drugs that they know are ineffective, or even placebos, for any condition imaginable.


Dated:  August 3, 2009                                  Respectfully Submitted,


                                        By:      <u>/s/ Thomas Greene</u>
                                                 Thomas Greene
                                                 Greene & Hoffman
                                                 33 Broad Street, 5th Floor
                                                 Boston, MA 02109


                                        By:      <u>/s/ Barry Himmelstein</u>
                                                 Barry Himmelstein
                                                 Lieff Cabraser Heimann &
                                                   Bernstein, LLP
                                                 Embarcadero Center West
                                                 275 Battery Street, 30th Floor
                                                 San Francisco, CA 94111-3339


                                        By:      <u>/s/ Thomas M. Sobol</u>
                                                 Thomas M. Sobol
                                                 Hagens Berman Sobol Shapiro LLP
                                                 One Main Street, 4th Floor
                                                 Cambridge, MA  02142
                                                 Boston, MA 02110

By:    */s/ Don Barrett*

       Don Barrett
       Barrett Law Office
       404 Court Square North
       P.O. Box 987
       Lexington, MS 39095

By:    */s/ Daniel Becnel*

       Daniel Becnel, Jr.
       Law Offices of Daniel Becnel, Jr.
       106 W. Seventh Street
       P.O. Drawer H
       Reserve, LA 70084

By:    */s/ James Dugan*

       James Dugan
       Dugan & Browne
       650 Poydras St., Suite 2150
       New Orleans, LA 70130

***Members of the Class Plaintiffs'
Steering Committee***