Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                    )
                                          ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,     ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION         ) Pages 1 - 142
----------------------------------------)
This document relates to:                 )
EGILMAN V. PFIZER, et al, 07-11426-PBS )



JURY TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    July 28, 2009, 9:00 a.m.




            DEBRA M. JOYCE and LEE A. MARZILLI
                OFFICIAL COURT REPORTERS
               United States District Court
               1 Courthouse Way, Room 7200
                   Boston, MA  02210
                    (617)345-6787

```
 1    A P P E A R A N C E S:
 2    FOR THE PLAINTIFFS:
 3         W. MARK LANIER, ESQ.
           DARA HEGAR, ESQ.
 4         ROBERT LEONE, ESQ.
           Lanier Law Office
 5         6810 FM 1960 Road W
           Houston, TX 77069
 6
           ANDREW G. FINKELSTEIN, ESQ.
 7         KENNETH B. FROMSON, ESQ.
           Finkelstein & Partners, LLP
 8         436 Robinson Avenue
           Newburgh, New York  12550
 9
           JACK W. LONDON, ESQ.
10         Jack W. London & Associates, P.C.
           3710 Bee Cave Road, Suite 200
11         Austin, TX  78746
12
      FOR THE DEFENDANTS:
13
           WILLIAM S. OHLEMEYER, ESQ.
14         Boies, Schiller & Flexner, LLP
           333 Main Street
15         Armonk, NY  10504
16         DAVID B. CHAFFIN, ESQ.
           White and Williams, LLP
17         100 Summer Street, Suite 2707
           Boston, MA  02110
18
           CHARLES P. GOODELL, JR.
19         RICHARD M. BARNES, ESQ.
           Goodell, DeVries, Leech & Dann, LLP
20         One South Street, 20th Floor
           Baltimore, MD  21202
21
           MARK S. CHEFFO, ESQ.
22         Skadden, Arps, Slate, Meagher & Flom, LLP
           Four Times Square
23         New York, NY 10036
24
25
```

f5ddb65d-0280-4f94-b517-80266a6ab59e

1                         I N D E X

2    OPENING STATEMENTS                              PAGE

3        By Mr. Lanier:                               8
         By Mr. Ohlemeyer:                           44
4

5    WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS

6

     DAVID FRANKLIN
7        By Mr. Lanier:        87

8

9    EXHIBITS                DESCRIPTION    RECEIVED IN EVIDENCE

10
     Plaintiff
11

12   2020 F               Decile List              123

13   2020 J               Snake Oil Slides         134

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE CLERK:  In Re:  Neurontin Marketing, Sales

3    Practices, and Products Liability Litigation, Civil Action

4    No. 04-10981, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6            THE COURT:  Are we ready for opening statements?

7    I need to deal with the juror issue, as you remember.

8            MR. LANIER:  Yes, your Honor.  We also have three

9    housekeeping issues, if we could deal with the Court quickly

10   on them.

11           THE COURT:  Does it have to do with the opening

12   statements?

13           MR. LANIER:  One of them does, your Honor;

14   specifically, whether I'm allowed to use the DDMAC letters

15   that you took under advisement yesterday and whether or not

16   I'm allowed to --

17           THE COURT:  Why don't you not use them in the

18   opening, and I'll deal with them later.

19           MR. LANIER:  Am I allowed to at least reference

20   them if I don't show them, your honor?

21           THE COURT:  I'd rather not take the time to argue

22   now.  It's not necessary for the opening statement.

23   Anything else?

24           MR. OHLEMEYER:  The only other thing was just,

25   Mr. Lanier had indicated they basically cut out all the

1   exhibits except for a few, which he gave them like five or

2   so, including a deck of cards that he said he may or may not

3   use.  We'd object to that.  And the operating plan, I think

4   we would just ask the Court -- I mean, it's literally about

5   a hundred pages.  I know the Court doesn't want to take the

6   time right now.

7             THE COURT:  What do you mean, the operating plan?

8             MR. OHLEMEYER:  There's an operating plan that he

9   referenced, and it's just got a lot of information that --

10            THE COURT:  Who's operating plan?

11            MR. OHLEMEYER:  It's a Pfizer in 2001 --

12            THE COURT:  Well, if it's your document, don't you

13  have to live with it?

14            MR. OHLEMEYER:  Well, it goes well beyond the

15  issues in this case, your Honor.  I mean, we could talk

16  about many of them, but there's third-party payor issues,

17  there's relevance, there's proprietary, things that --

18            THE COURT:  Well, maybe, but we can delete it

19  later, delete out the irrelevant pieces later.  I'm not

20  going to micromanage this for the opening statements.

21            MR. LANIER:  One page, your Honor.

22            THE COURT:  One page, all right?  So let me just

23  say this.  Stay away -- the issue is, I did read those

24  letters last night, and the problem I have is, there was one

25  I thought was admissible, and there was one that thought

1   wasn't, and I don't want to take the time to go through it

2   right now.  It's just opening statement.  I didn't know what

3   a Slim Jim or a Slim Jack was.  They were not

4   self-explanatory letters, and I don't think it's worth the

5   time right now to go through them.

6           So I need to deal with this juror issue.  Do you

7   each want to pick one person to deal with this?

8           MR. LANIER:  I will, your Honor.

9           THE COURT:  Okay, so why don't we bring her in,

10  please.

11          MR. LANIER:  And while she's coming, your Honor,

12  before we put on Mr. Franklin, there are several

13  housekeeping matters we need to deal with, but we can do

14  that whenever you want to during the break.

15          THE COURT:  Okay.  This is about the first

16  witness.  Let's bring her in and let's go.

17          (Side-bar conference with juror.)

18          (Juror dismissed.)

19          THE COURT:  You're going first?  Do you need the

20  podium?

21          MR. LANIER:  No, your Honor.  With the Court's

22  permission, I'll just stand right there.  I've turned the

23  microphone around.

24          THE COURT:  What about the charts?  Where are you

25  putting them?

1    MR. LANIER:  Your Honor, I don't have any.

2    THE COURT:  You don't have any, okay.

3    MR. LANIER:  No.  I'm not going to use any

4  PowerPoints.  I'm not going to use any charts.  I've got a

5  couple of documents.  Half of them are now gone, but the

6  others I'll just use on the Elmo, if I could speak from

7  there.

8    THE COURT:  Yes, okay.

9    MR. OHLEMEYER:  My plan, your Honor, was to put an

10  easel over there and then one here.

11    THE COURT:  Okay, yes.

12    (Jury enters the courtroom.)

13    THE COURT:  Good morning.  I want to thank you all

14  for coming on time, and as I've said I would, I want to ask

15  you all, did you speak about the case with anyone or see

16  anything in the press about it?  I find the jury has

17  complied.

18    Now, you may notice that one of the chairs is

19  empty.  One of the jurors told us she had trouble

20  understanding English, and she asked to be excused, which I

21  have done.  So because there are some very complicated

22  concepts here, that was agreed upon.  So at some point maybe

23  the two of you will move down, if you want to, so we can

24  just have one solid core here.  That's great.

25    All right, so now we're going to hear the opening

1    statements.  You all have notebooks, and essentially, if you

2    take notes, remember this is not evidence.  And each one

3    will take an hour.  It's 9:15.  At about 10:10, if he's not

4    done, I'll give a five-minute warning, then the hook, okay,

5    and then we'll do that for the next one, and then we'll have

6    our break afterwards.

7    OPENING STATEMENT BY MR. LANIER:

8              MR. LANIER:  May it please the Court, good

9    morning, ladies and gentlemen.  My name is Mark Lanier.

10   It's my honor today and throughout this trial to some

11   degree, at least, to be able to represent Regina Bulger.

12             Regina, would you stand up so they know who you

13   are, please.  She's that sweet little ten-year-old right

14   there, who's just finished fourth grade and is starting

15   fifth grade in the fall.  She's in the summer.  She's lives

16   with her grandmother, Grandma Pat.  Would you stand up,

17   please, and let them know who you are.  And they won't be

18   here for very much of the trial.  In fact, I'm going to ask

19   them to leave, if you don't mind, at this point now that the

20   jury has seen you, and thank you all for coming down here

21   this morning.

22             You'll get to know more about them and you'll get

23   to know more about why they leave as -- this gentleman who's

24   standing up now is Dr. David Egilman.  He teaches at Brown

25   and is a doctor nearby, and is the legal representative for

1    purposes of this lawsuit of the young lady that you've just

2    seen, Regina.  Thank you, Dr. Egilman.

3              This is a simple case, but it's a very serious

4    case.  It's a very serious case because it involves some

5    delicate issues, but it involves some important policy

6    issues as well.  And those at this point, eight of you --

7    no, nine of you, one, two, three, four, five, six, seven,

8    eight, nine of you that are left on this jury at this point

9    are actually doing something that's extremely important as

10   you make your way through this case.  And what I get to do

11   over the next 57 minutes at this point before I get the hook

12   is, I get to tell you what I anticipate the evidence is

13   going to be.

14             It's a case that evolves ultimately around that

15   young girl from here on out, but she's not the main

16   character in the past part of the story.  The past part of

17   this story involves her mother, Susan Bulger.  Susan

18   committed suicide, and it will be five years ago next week

19   on August 4.  Regina and her father, Ron, Sr., are who found

20   the mom dangling at the end of a wire in the basement.

21             It's a tough, tough thing when you're dealing with

22   suicide.  Suicide is not a simple matter.  And we're going

23   to have to probe in this case, what is it that allows a

24   person to kill themselves?  It's not something that's common

25   in the United States.  Oh, it happens, and I think most of

1   us, the older we get, we can find where we've brushed up

2   with awareness of it somewhere in our life, but what is it

3   that happens?

4            You know, the way we're made, the doctors will

5   explain, we've got within us kind of a wall of

6   self-preservation.  There's this will that says, "I don't

7   want to stick my hand in fire.  You know, it's going to

8   burn, it's going to hurt.  I don't want to do damage and

9   destruction to my body."

10           Now, some people have, some doctors call it the

11   will to live.  Some people have a really strong will to

12   live.  You probably heard stories about people the doctors

13   thought were going to die in the hospital, but they just

14   seemed to hang on.  And doctors might say they have a strong

15   will to live or they need to let go or something like that,

16   but there is this wall of self-preservation that we have.

17   And I think the evidence is going to indicate some people

18   have a bigger wall than others, some people have a really

19   strong will to live.  Some folks, their will to live is not

20   as strong.  Some people have a very low wall, and those

21   people are people who are susceptible to, in danger of

22   something that might hurt themselves, some type of a

23   suicide.

24           The evidence in this case is going to show you

25   that Susan Bulger, Regina's mom, had a very low wall.  She

1    had a very, very tough life.  She had a tough childhood.

2    She grew up in an abusive home.  Her parents abused her

3    verbally.  They may have abused her physically.  I don't

4    know.  But early in her life she got hooked up with a fellow

5    named Ron Bulger.  He wasn't the kind of guy that most

6    parents want their daughters to hook up with, a tough

7    husband.  And so she's in a marriage where her husband is a

8    drug user.  He used illegal drugs, cocaine, heroin, a number

9    of different illegal drugs.

10           Susan Bulger herself lived a very tough life, did

11   many of the same things as her husband.  She found herself

12   addicted at one point in life to cocaine.  She found herself

13   addicted at one point in life to heroin.  She tried to,

14   maybe -- I mean, this is some degree of speculation, but she

15   clearly tried to at least hurt herself and gain attention,

16   if not actually try to commit suicide, multiple times in her

17   life from a very early age, four, five, six times maybe,

18   depending on how you take certain events.

19           She and her husband Ron, they had a son, Ron, Jr.,

20   and you'll hear about Ron, Jr.  Ron, Jr. is now in his early

21   twenties.  I don't have him down here.  You'll understand

22   why more and more as we go through the trial.  You'll

23   understand my concern, and what you're going to hear my

24   evidence point to is what we need to do for this young lady

25   and not really for the husband --

1          MR. OHLEMEYER:  Objection, your Honor.

2          THE COURT:  Overruled.

3          MR. LANIER:  Not for the husband, and not even for

4    Ron, Jr., the older brother.  So the evidence is going to be

5    targeted around the young lady, around Regina, and what I

6    believe have been her damages and what we need to do to take

7    care of her and keep her on a road to a good life that she's

8    on right now.

9          As we look at this, though, you're going to see

10   that the mom, Susan, and the dad, Ron, Sr., they had a son,

11   this older brother.  Susan tried hard to be a good mom.  I'm

12   sure Ron, Sr. tried hard to be a good dad.  There were

13   limits to how good they were.  They were young for that

14   child, and they had struggles.  They lost custody of the

15   child for a while because of the drug abuse in their home.

16          It's a sad situation to sit and learn from.  If

17   you take that social sadness, add to it -- let me add

18   another layer now.  There's not just social sadness in her

19   life.  There are lots of other physical problems she had.

20   Susan Bulger, the mom, had rheumatoid arthritis, painful

21   advanced rheumatoid arthritis.  She had fifteen, sixteen,

22   seventeen surgeries in her life.  She lost all but four of

23   her teeth.  She had just had an elbow surgery within a few

24   years of her suicide.  She had aches and pains that required

25   her to be on more medicines, I'd almost say more than Pfizer

1   makes, but that's not true.  I mean, just lots of medicines.

2   I could give you big charts with 80 gazillion types of

3   medicines she'd been on all of her life.

4          At the time she committed suicide, she's on maybe

5   five or six medicines, but over her life she'd been on a ton

6   of them to try and deal with the pain.  She was on methadone

7   at the time of her suicide simply for pain relief.  I think

8   she was out of tablets at the time, so she was clearly

9   hurting actually.

10          But this is a woman who had physical pain.  She

11   had emotional difficulties from childhood.  This is a woman

12   who had a tough marriage.  She'd been talking to some people

13   about leaving her husband.  But she had a bright spot in her

14   life, and the bright spot was that little girl she named

15   Regina.  It's Latin for "queen."

16          I think the evidence is going to show you that in

17   some way, with the pregnancy of Regina, Susan Bulger tried

18   to turn her life around.  She went onto methadone and some

19   other drugs while she was pregnant so she wouldn't be using

20   heroin.  She did what she could do to try and make sure she

21   didn't lose this child the way she'd lost her son.  You

22   don't -- you know, there's the old expression, "You don't

23   turn a battle ship on a dime."  Well, you don't turn your

24   life around generally -- I know historically there have been

25   a few roads to Damascus, but you don't generally turn a life

1    around on a dime.  But you'll clearly see that there were

2    efforts made.  There weren't suicide attempts anymore.

3    There weren't issues of abject drug usage, illegal drugs,

4    cocaine, heroin, that kind of stuff.

5              You've got a woman who's trying to do her best

6    who's a good mother to the child, who loves the child.  And

7    my hope will be the Judge will let us put Regina on the

8    stand, and you'll get to see what a wonderful young lady she

9    is.  And that's going to be your task.  The stand is back

10   here in the courtroom.  I pointed the wrong way.  But you'll

11   get to judge that credibility, and I want you to.  I want

12   you to hear from her, and I want you to see what kind of

13   girl you sit in judgment on.

14             And that's the kind of evidence that we've got, so

15   what happens?  Why are we here?  Suicide is an unfortunate

16   thing, but you can rightly say to me, "Lanier, what does

17   that have to do with Pfizer?  It sounds like it's got to do

18   with everything unfortunate in this woman's life, but how

19   does Pfizer enter into the picture?"

20             Let me explain that to you.  You're not asked as

21   jurors to decide what the cause was of Susan Bulger's

22   suicide.  The issue that you're going to have before you is

23   whether or not the conduct from Pfizer and its predecessor

24   company, conduct was outside the boundaries of what's right

25   and wrong based on what the Court tells you.  You make that

1   decision, and then you decide whether or not it was a

2   significant contributing cause.

3           There's a difference between something being the

4   cause and a significant contributing cause.  If you're

5   baking bread even, you know, it rises in the oven --

6           MR. OHLEMEYER:  Your Honor --

7           THE COURT:  Overruled.

8           MR. LANIER:  -- it rises in the oven because of

9   yeast, but it needs more than just the yeast.  It needs the

10  moisture and the food for the yeast.  There are contributing

11  causes beyond just one sole cause in many events in life.

12  And so you'll hear the evidence and a chance to decide

13  whether or not this drug was a significant contributing

14  cause.  And when you start reading that evidence or hearing

15  the evidence -- you'll get to read it because there are

16  documents, as well as hear it from the witnesses, and maybe

17  from some videotapes that might play of witnesses that are

18  unavailable -- you're going to hear an interesting, sordid

19  tale.

20          I've told you a sordid tale about the Bulger life.

21  Let me tell you the tale as it stems from this drug.  It's

22  the drug Neurontin.  Some of you may have some familiarity

23  with it, some of you may not, but it's a fascinating story.

24  The story starts with a drug company called Parke-Davis,

25  which is actually the oldest pharmaceutical company in

1   America.  It was started in the 1800s right after the Civil

2   War.  But Parke-Davis at the time that we're interested in

3   is owned by Warner-Lambert, Warner-Lambert, the makers of

4   things like Listerine and other things like that.

5   Warner-Lambert buys Parke-Davis in 1970, I believe.  And so

6   Warner-Lambert is the company.

7           Now, in this case we're suing Pfizer because in

8   the year 1999, effective, I think, January 1 of 2000, Pfizer

9   bought Warner-Lambert and bought the right to Parke-Davis.

10  So all of the issues that were part of Warner-Lambert are

11  now going to be part of Pfizer, and we'll look at that.  And

12  Pfizer, I think the Court will tell you, will ultimately

13  have the responsibility for the actions before as well as

14  the actions after that merger, and we'll look at both of

15  them seamlessly.  I sometimes will refer to it as Pfizer.

16  That's just my shorthand way of not getting us all jumbled

17  up, but I'll try to be as deliberate and careful as I can.

18  It doesn't really make a legal difference, I guess is what

19  I'm driving at.

20          So you've got a company called Parke-Davis, a

21  division of Warner-Lambert.  They discover a drug in the

22  early '90s that they call Neurontin.  It's got a plain

23  scientific name called gabapentin.  And if you buy now a

24  generic version, for example, the pharmacist will sell you

25  gabapentin, and you'll save some bucks.  But Neurontin was

1   the real name, and for the first, oh, ten years or so the

2   drug was sold there were no generics, so it was really just

3   Neurontin.  As long as the patent existed on the drug,

4   nobody could make a generic.

5            And so you've got Neurontin.  And before a company

6   can start selling a drug they invent, the company has to go

7   to the Food and Drug Administration, the FDA.  They have to

8   say, "FDA, we'd like to sell this drug," and the FDA says,

9   "Well, show us what you want to do."  And there's an

10  elaborate, six-, seven-, eight-, ten-year process of

11  shepherding a drug through the FDA.  And what the company

12  has to do is say, "Here's what the drug is."  You walk

13  through animal testing, and then you walk through human

14  testing, and ultimately the FDA will either approve the drug

15  and approve it for certain uses, the label, or the FDA won't

16  approve the drug.

17           Now, the FDA might say, "We'll approve the drug,

18  but you'd like the drug to work for all four of these

19  things.  We're only going to say it's approved for one."

20  It's all a question of what the FDA chooses to do.

21           The FDA did an evaluation of this drug, and as the

22  FDA did an evaluation of the drug, they said, ultimately,

23  "We're going to approve the drug, but we're going to approve

24  the drug as a second-line epileptic drug."  A second line,

25  what does that mean?  It means doctors shouldn't use it as

1    the primary drug.  It shouldn't be the first go-to drug

2    because it doesn't seem to work as well as the other drugs

3    on the market for epilepsy.  But there may be circumstances

4    where the better-working drug doesn't work for a particular

5    individual, and in that situation, or maybe the best working

6    drug would work better in tandem with Neurontin, it's a

7    second-line drug.  It's a drug that can work along with, and

8    it's approved for that in the epileptic market for epilepsy,

9    for the convulsant type of seizures, a certain kind that are

10   epileptic seizures.  That's how the drug was approved.

11           Before the actual approval goes out, the FDA

12   submits -- and you're going to get a lot of exhibits.  I

13   don't have many to show you during my opening because I want

14   you to focus on the story.  The documents you'll get from

15   the witnesses, and we'll go through the documents in great

16   detail.  I think the documents are critically important.

17   The problem is, anytime someone starts to show you a

18   document in the opening, you don't get the whole thing.  You

19   get the snippets.  See, I'm going to show you some snippets

20   from this document, and ultimately you need the whole

21   document, you need witnesses so you can find out what's on

22   the pages I didn't show you to see if I was being fair and

23   up front about it.  So I'm careful about using documents

24   with you, but I do want to show you a couple of snippets

25   from this document.

1              MR. LANIER:  Your Honor, with your permission, if

2    I could use the Elmo?

3              THE COURT:  Yes.  Now, for those of you sitting in

4    the back row, pull up -- it's like an airline tray table

5    right in between there.  Pull it up.  You all get screens.

6    This is a high-tech courtroom.  Pull it all up.  And you'll

7    be using these a lot.  I think for the public, is it working

8    back there?

9              MR. LANIER:  Yes, your Honor, this screen is on.

10             THE COURT:  That screen is on?  Good, so everyone

11   can see?

12             MR. LANIER:  Now, let's see if it's working.

13   We'll ask it this way by putting something up.

14             THE COURT:  Is everyone seeing?  Yes, all right.

15             MR. LANIER:  So, for example, this is a document

16   that --

17             THE COURT:  I just want to make sure, everybody's

18   screen is up?  Good, all right.

19             MR. LANIER:  This document you'll see is from the

20   Division of Neuropharmacological Drug Products.  This is a

21   combined review that deals with the medical and the

22   statistical materials that Pfizer gave the FDA.  It deals

23   with NDA, that means a new drug application, and it gives

24   it.  It's that drug Neurontin which has the name gabapentin.

25   You're able to see that, I hope.

1          The snippets I want to show you from the review by

2     McCormack that was originally received January 31 of 1992,

3     the snippets that I want to show you deal with the issue of

4     suicide.  Ultimately the question becomes, one of the

5     questions you've got to deal with is, does Lanier have any

6     evidence that Pfizer had a warning or had reason to warn, or

7     reason to study, or reason to investigate, any reason at all

8     they might suspect this drug could have problems related to

9     suicide?  And so we look at this document, and we're going

10    to see -- let's see if I can figure out how to make it a

11    little bigger.  These are a summary of the serious adverse

12    events that occurred in the gabapentin, which is Neurontin,

13    treated patients.  These are ones that are considered

14    possibly or probably drug-related by the investigator.

15          So they want to look and see what they are.  They

16    separated them out.  There's a category of "neurological."

17    That's the epilepsy itself.  Maybe this causes epilepsy or

18    enhances it.  They want to know.

19          They look, though, at an area called

20    "psychiatric."  Psychiatric means -- well, this is the area

21    we want to go to to question the issue of depression and

22    suicide and things like that.  You'll see that they've got

23    the number of each patient.  They're going to have the age

24    and the gender, the dosage the patient is on and how long

25    the patient was on the drugs.  They break all of that out.

Page 21

1   But then they give information about the event.

2           And so if we go over to the events, you'll see

3   that there was this one person who was depressed and

4   attempted suicide.  You'll see here's another person who was

5   depressed.  The depression resolved when they reduced the

6   dose.

7           This was not treatment-emergent because they want

8   to note that the plaintiff had had depression in the past,

9   so this wasn't the first time this patient was depressed.

10  That's important.  You don't know if the drug is causing it,

11  or if the drug is bringing it back out, or if it's just

12  there and the drug is a coincidence.

13          There's another person who was depressed with

14  suicide ideation.  That means they actually thought about

15  killing themselves.  They improved on tapering.  That means,

16  as the drug was being removed from their system, they got

17  better.  And they didn't have -- or the DC, and

18  discontinuation.  So their condition improved, but then the

19  depression with suicide ideation recurred on rechallenge.

20  What that means is, you've got this person.  They're taking

21  the drug.  They're depressed.  They've got suicide ideation.

22  They're thinking about suicide.  The doctor tapers them off

23  the drug, and as he does so, it goes away.  And then he puts

24  them back on the drug, and it comes back.

25          You're going to hear evidence from some people

1    that that is an absolute key test and a huge warning sign

2    that the literature even writes up because it's very serious

3    when you have someone having a reaction they've never had

4    before when they're on the drug.  They take them off the

5    drug; the reaction leaves.  They put them back on the drug;

6    the reaction comes back.  They've got folks who tried to

7    drug overdose.  They've got people with depression and

8    attempted suicide.  They've got drug overdose.  All of this

9    is happening before the drug has ever been approved.

10              Pfizer -- well, Warner-Lambert is what they were

11   called at the time -- gets this information to the FDA

12   because they're required under law to submit the NDA, the

13   new drug application.  It's reams and reams and hundreds of

14   boxes' worth of material.  They give all of this to the FDA,

15   and the FDA works through it.

16              The FDA ultimately has what they call a section in

17   here entitled "Discussion of selected serious safety

18   findings."  Discussion of selected serious safety findings,

19   and these are certain adverse events that emerged as both

20   serious and frequent.  So we've got serious and we've got

21   frequent adverse events.  Due to the nature of the reporting

22   process, it was initially difficult to determine the

23   magnitude of these; therefore, how much of a safety issue

24   they represent.  These include, the serious and frequent

25   ones include seizures and status, depression/suicide/

1   overdose, and cancers.  And so the medical statistical

2   analysis by the FDA gives us this indication, gives it out

3   and gives it out early before the drug was even approved.

4        As we continue, they actually break out those

5   serious events in sections.  So there is a section for the

6   depression, the suicide ideation, which is idea, thinking

7   about or contemplating, and the actual attempted suicide.

8   It says, in the total exposed population -- that means out

9   of everybody who's taken this drug in the study group -- 78

10  of them, over 5 percent, 5.3 percent to be precise, of the

11  patients reported depression as an adverse event.  This

12  included one subject in a phase one study.  There were seven

13  reports of depression as serious adverse events, and nine

14  patients who withdrew from the study because of depression.

15       Now, they also go on to say that there may be some

16  underrepresentation of certain categories.  It may not have

17  as many people as there actually were.  It goes on.  For

18  example, in some cases depression was reported as a serious

19  adverse event, particularly if it resulted in

20  hospitalization or was associated with suicide.  You know,

21  you go to the hospital because you're that depressed, they

22  reported it, or suicide ideation.

23       But, however, numerous examples were identified

24  among the CRFs -- those are the case reports -- where a

25  patient developed treatment-emergent depression.  That means

1    depression that was oncoming after they started taking the

2    drug where pharmacological intervention was required, drug

3    intervention, and a report of a serious adverse event was

4    not made.  In other words, we got 5.3 percent suffering this

5    problem, but there may even be more.

6            If you get to the conclusions section of this

7    document as you work through it, or working toward the

8    conclusions -- you'll see it on Page 117.  It's where the

9    section is on the drug.  It's conclusions for the toxic

10   issues.  It says it doesn't look like it's got hepatic --

11   that's blood -- or bone marrow toxicity.  In other words,

12   it's not going to kill your bones or your bone marrow.

13           It says, "Less common but more serious events may

14   limit the drug's widespread usefulness."  Now, these words

15   are critical in this case.  One of these is, "Seizures may

16   become worse."  It's what you're giving it for.  A second is

17   malignancies.  But look at the third.

18           A third is that "Depression, while it might not be

19   an infrequent occurrence in the epileptic population --" in

20   other words, epileptics probably are depressed anyway to

21   some degree "-- but it may become worse, and it may require

22   intervention, and it may lead to suicide, as it has resulted

23   in some suicide attempts."

24           So this is the information that the drug company

25   has that's issued by the FDA's review of their product back

1    in 1992 before it's ever approved.  What does the FDA do?

2    Oh, they approved the product for epilepsy as a second-line

3    treatment.  That's the key.  They issue -- and they say,

4    "Okay, look, guys --" and it makes sense.  You'll hear the

5    evidence about this.  Epilepsy is a tough situation.  There

6    are not a lot of good drugs out there for epileptics, so the

7    FDA is always tending to approve drugs that -- I think that

8    you'll see that they will approve a drug more readily if

9    there's a limited usefulness and there's not a lot of drug

10   availability.  So, yes, they approved this drug.  And

11   they've got all the standard language that it's safe and

12   appropriate for approved uses, blah-blah-blah, within the

13   caveats or the warnings or the exceptions that are provided.

14           What happens from here?  Neurontin is approved for

15   epilepsy.  Warner-Lambert does an internal study trying to

16   figure out how much money they're going to make off this

17   drug.  So they do their market analysis, how big is the

18   market for epilepsy, and how much do you think we can make?

19   And they figure that they're looking at making maybe

20   $50 million a year, maybe not; maybe not that much, maybe a

21   little more.  I think that sounds like a lot of money to us.

22   If you take fifty of us, that gets us each $1 million, you

23   know, $50 million.  But in the world of drugs, that's not a

24   big one.  It's not what they call a blockbuster.  You've got

25   to top the billion-dollar mark for a blockbuster.

1    I'd love to show you the difference in stacks of

2  money between $50 million and a billion because it's a huge

3  difference.  Okay, we just think in terms of the words and

4  they both sound like a lot of money, but, I mean, it's the

5  difference between a -- it's big.  Do the math and you'll

6  just start -- it's lots of millions.  It's a thousand

7  millions instead of fifty.  It's the difference between

8  having $50 and $1,000.

9    They have a market of $50 million, so they start

10 trying to figure out what they can do to expand the market.

11 The drug company makes a conscious decision to do something

12 that is illegal.  The law says the drug company can only

13 market the drug for its approved purposes.  That law doesn't

14 apply to doctors.  Doctors can write prescriptions all the

15 time for whatever the doctor thinks is appropriate, but the

16 drug company can't go out there and market and sell the drug

17 for what's called "off-label."  Important words, if you

18 don't mind me just writing them down for a minute.

19 "Off-label."  Off-label marketing is "illegal."

20    Now, that may seem oversimplistic, and I'm not

21 trying to turn this into law school, but it's illegal.  You

22 can't do it.  The drug companies can't do it, and they know

23 it.

24    The thing is, the drug company figures out there's

25 a world of people paying big dollars for drugs for things

1   that Neurontin has not been approved for, but Neurontin

2   falls into this class of drugs called antiepileptic drugs,

3   AED.  Anti, against, epileptic, epilepsy, drugs.  And some

4   doctors have used antiepileptic drugs before to help people

5   with pain.  Well, that would be huge.  The pain market is

6   big.

7            So what the drug company starts doing is making a

8   deliberate effort to illegally market this drug off-label.

9   I don't know what it is in your life, there's got to be

10  something in your life that relates this way to you.  The

11  picture I always get in my brain is from cartoons growing

12  up.  When I grew up, you remember we had the Bugs Bunny --

13  some of you may be too young to remember that -- but the

14  Bugs Bunny cartoons and all of that?  Have you ever seen the

15  cartoon where they have the snowball that starts at the top

16  of the hill and it starts rolling down, and as it gathers

17  momentum, it just gets bigger and bigger; and then, you

18  know, you've got arms and legs of people in the way flying

19  out and all, and it's gets on down the hill.

20            What the drug company does is makes a

21  conscientious decision to market this off-label in a way

22  where it takes on a life of its own, and it becomes a

23  massive growing snowball that nothing really is going to get

24  in the way and stop.  They enter into an elaborate

25  programmed plan to deliberately get doctors and people

1    thinking that this drug is the wonder drug that will cure

2    anything that ails you.  There's actually a joke that's made

3    by the drug company bosses telling their salespeople to go

4    out and sell the drug for a myriad of diseases.  You know,

5    we saw that it looks like it may cause depression, you saw

6    that in the document.  They got their salespeople out

7    telling the doctors it's a cure for depression.  It may

8    cause different -- they've got them out there telling them

9    it works for -- "Oh, write it for this, that."  In fact, the

10   drug company executives themselves say, "When you show this

11   next slide to the doctors as you're selling them on it,

12   you've got to warn them ahead of time, 'Hey, this looks like

13   a snake oil salesman approach,' off of the old snake oil

14   salesmen, you know, that had the snake oil that was a cure

15   for everything.  They said, "Warn them.  Otherwise, the

16   doctors when they see that we're claiming it might cure all

17   these things, they'll laugh you out of the room.  But if you

18   warn them ahead of time and say, 'Hey, I look like a snake

19   oil salesman when I show you this next slide, but it's the

20   truth,' they won't laugh you out of the room."

21           Our first witness is a fellow named David

22   Franklin, and we'll start him with the Court's permission

23   before today is over, but it will take through tomorrow to

24   finish him up with all the questions that we've got and that

25   they've got.  David Franklin is an interesting fellow.  He

1   graduated with an undergraduate degree in microbiology from

2   the University of Rhode Island.  Then he gets his Ph.D. from

3   there, and he's working at Dana Farber as a cancer

4   researcher and doing cancer work over at Dana Farber.

5           He gets a job going to work for the drug company.

6   When he gets the job, he's being told -- now, he's not a

7   medical doctor.  You'll hear all about this.  He's just a

8   Ph.D.  He doesn't wear a stethoscope, he can't write

9   prescriptions, but gets hired at triple his former salary so

10  that on behalf of the drug company he can go into the

11  doctors' offices where he's introduced as a doctor, never

12  being told, well, not really a medical doctor.  And he sits

13  there and he's trained to teach these doctors and convince

14  these doctors to write prescriptions for Neurontin for

15  off-label reasons, to write prescriptions for Neurontin to

16  cure ADD in children, to write prescriptions for Neurontin

17  to do all sorts of different things.  I'll ask him; you'll

18  get to hear him.

19          He'll tell you that that wasn't the only thing;

20  that the drug company also told him to go out there and to

21  convince the doctors to write what's called megadosing.  You

22  see, it's not enough that the drug company is going to try

23  and expand their profit margins by selling it off-label.

24  The FDA only approves it in dosages up to, I think at the

25  time it was 1,800 milligrams, but the salespeople are told

1    to go out there and to convince the doctors that they can do

2    not 1,800.  "Give them 21, give them 25, give them 28, give

3    them 31, give them 4,000, give them 4,800 a day, more and

4    more and more pills.  Get it up as high as you can."

5            There's a joking memo about one woman who's on the

6    drug who winds up trying to commit suicide, and she's taken

7    hundreds of them to try and do it, and the joke within the

8    drug company was, "That was the world's most expensive

9    suicide attempt."  But they're pushing this drug in ways

10   outside the label and at dosages not approved.

11           Now, there are some restrictions on how they can

12   do this and what they can do with the doctors.  You, for

13   example, if you're a drug company are not allowed to pay a

14   doctor to write a prescription, and aren't we glad?

15   Wouldn't you hate -- golden rule, excuse me, your Honor.

16   It's a good thing that drug companies don't have the power

17   to pay doctors behind our back to write prescriptions for

18   us.  That's an important public health policy.  But the drug

19   company found what they thought was a way around that.  They

20   would go to the doctors, and they would say, "Doctor, I

21   can't pay you to write a prescription, but I'll tell you

22   what I can do.  If you'll let me watch you write the

23   prescription, we'll say that I'm learning from you.  I'm

24   learning how you sign your name.  I'm learning how you write

25   a prescription.  And I can pay you 350 bucks if you'll let

1   me do that, watch you write the prescription.  Be clear, I'm

2   not paying you for writing it.  I'm paying for the honor of

3   learning how you do it."

4            Or, "Hey, Doctor, would you like to be a paid

5   consultant for our drug company?  Here's what we're doing.

6   We're going to have a phone conference coming up, and you

7   can participate as a paid consultant.  We'll pay you 750

8   bucks to be in on this phone conference.  Now, if you want

9   to do it, though, the people on the conference are

10  consultants, and what that means is, you need to write a

11  couple of Neurontin prescriptions so that on the phone

12  conference you can say that 'Hey, I've written some

13  prescriptions,' and tell whether or not they're doing any

14  good.  We'll pay you money to do that."

15           And then the drug company goes to these doctors.

16  Now, they're not doing this to every doctor.  The drug

17  company has the information that enables them to know which

18  doctors are writing the biggest number of prescriptions for

19  pain, for depression, for all the different things they're

20  looking for.  And they find those doctors, they target those

21  doctors, and then they monitor through the record service

22  that they have how many prescriptions that doctor is writing

23  for Neurontin versus other drugs.  And so they keep very

24  clear tabs, and they target specific doctors.

25           Oh, they'll go to the doctors and say, "Doctors,"

1    we cannot pay you to write a prescription for Neurontin, but

2    would you like to come to a seminar?  It will be an

3    all-expense-paid trip for you and your family."  Let's say

4    the Olympics were in Atlanta in 1996.  "Why don't you come

5    down to Atlanta.  We'll get you into some Olympic games.

6    You can stay at the Chateau Elan," which is this wonderful

7    spa resort.  I mean, it looks like a castle.  "You can have

8    all the massages you want.  Don't pay for a thing.  Just

9    write 'Parke-Davis' on the ticket.  We'll pick up the tab.

10   And then what you'll need to do is to sit in to an hour or

11   two or three of doctors' presentations on how wonderful the

12   drug Neurontin is for reasons it's never been approved for

13   off-label."

14            I've got a list of things they did.  I hadn't

15   covered half of it.  You're going to hear this from David

16   Franklin.  It's the effort to get that snowball rolling down

17   the hill with some momentum.

18            Oh, here's one.  Doctors listen to other doctors

19   to get ideas on medicines, so the sales force was trained to

20   go to one doctor and to say, you know, "Can I get you to do

21   it?"  And when that doctor does it, then they'd go to the

22   next doctor, almost like a door-to-door book salesman, the

23   same technique, and say, "Hey, Dr. Smith, you know,

24   Dr. Jones down the hall, your buddy, he's writing these

25   Neurontin prescriptions, so excited about it.  We want to

1    give you a chance to get on the bandwagon too."  And then

2    they'd go to Dr. McDonald:  "Dr. McDonald, Dr. Smith and

3    Jones, you know those two guys, they're doing this, and,

4    man, this is the bandwagon you need."  And they'd do this

5    like an intense spiderweb, you know, interweaving of all of

6    the different doctors together.

7              Then that not being enough, they -- doctors not

8    only listen to other doctors, but doctors, some, read the

9    literature.  So they're thinking, "How do we get in the

10   literature, the medical journals, information that says our

11   drug is really good in all these areas where the FDA never

12   said it was good?  We didn't have enough proof for the FDA

13   to get it approved for any of these areas, but how can we

14   get the doctors to think it's good for them anyway?  We need

15   some people to write some articles."

16             So what the drug company did is, they hire a PR

17   firm, and they figure out how to write these articles, and

18   then they go find doctors and they pay doctors to put the

19   doctor's name on the article so it can be published under

20   the doctor's name, with no reference to the PR firm or to

21   the drug company that really authored it.  So they're

22   seeding the literature with that.

23             Now, I say seeding.  "Seeding" has a buzz word in

24   their industry because they also did what's called a

25   "seeding study," and they called it that internally.  Please

1  understand, you're not going to have a lot of documents on

2  this stuff because you will hear David Franklin explain that

3  the people in his job, he was told, "Do not be putting much

4  of this stuff we're doing in writing."  As one of the

5  coworkers said, "It just takes one phone call to turn us all

6  in."  They're not allowed to leave the slide, the snake oil

7  salesman slide, they're not allowed to leave those

8  presentations with the doctors.  They go to seminars where

9  they're taught how to do this, and they're handed tablets,

10  and across the tablets it says "Ladies and gentlemen of the

11  jury" to remind them what kind of trouble the company can

12  get in if people write stuff down.  So any note that they

13  would take they would take understanding ultimately a jury

14  may get to see it one day.  So a lot of what was done was

15  done by phone, it was done face-to-face.  Or there was a

16  time where they were taught how to give a fair and balanced

17  presentation on a videotape.  And so the videotape plays,

18  and as the videotape plays, the executives stop the

19  videotape, and they say to everybody, "Okay, now, ignore

20  everything you just heard, and let me tell you how we're

21  going to do it.  We were required to show you that."

22          This is what happens, and as it happens -- oh, the

23  seeding study, I got distracted.  Excuse me.  The seeding

24  study, what they do -- we think of studies, I hope, as the

25  scientist writing and devising a very clear study with

1    safety parameters.  When somebody is in a study for a drug,

2    an experimental study, we're supposed to have a full

3    disclosure of what that study is for, and what are the

4    possible consequences, and that we have read it and we

5    understand it and we're agreeing to be the guinea pig.  And

6    the scientists are supposed to set it out with very clear

7    standards so that the results can be very clear and can be

8    adequately analyzed and calculated.  That's the scientific

9    process that should be producing these drugs to our

10   benefits, or at least produce drugs that might benefit us

11   with a clear and fair warning so that we and our doctors can

12   make an adequate assessment of whether or not we want to

13   gamble and risk taking the drug.

14           No, they've got their marketing people devising

15   some of their studies.  The marketing people devised the

16   step study.  This is one that they internally called a

17   "seeding study" because it's like sewing seeds hoping for

18   that bumper crop.  You know, the seeds off of one ear of

19   corn ought to be able to produce enough to feed a family.

20   They're going to seed, they're going to plant the seeds and

21   just watch it grow.

22           Here's what they did:  They'd go find doctors and

23   say, "Doctors, would you like to participate in our step

24   study?  You could be one of the doctors.  Here's all you

25   need to do.  Just put a couple of people, we'd like you to

1   put ten, but put some people on Neurontin and keep up with

2   them for a period of time, and we'll pay you for each one of

3   those people in the study.  If at the end of the study you

4   decide Neurontin is helping them and you're going to keep

5   them on Neurontin, we'll pay you a bonus."

6          This is what the drug company would consider a

7   study, but it's not a study.  That's not a fair, rigorous

8   scientific study.  Trust me, nobody signed a consent form

9   saying, "Yes, I'll take this drug knowing I'm a guinea pig

10  by the marking department to see if they're going to be able

11  to sell more of these drugs by getting the doctors used to

12  writing the prescriptions and the patients used to taking

13  the drugs," but that's what we have.

14         Now, David Franklin figures this out and after

15  four months says "no" and quits.  He's what's called a

16  whistleblower.  And he went out and he sought legal help,

17  and he brought a complaint against at the time

18  Warner-Lambert.  Pfizer buys them in the middle of this

19  mess, and so we can start using the term "Pfizer" now.  And

20  ultimately Pfizer is fined and signs a guilty plea.  But

21  their fine is 400 and some odd million dollars.  Meanwhile,

22  this drug has started selling billions of dollars.  Just

23  between the time Pfizer bought the company in 2000 and the

24  time that the drug goes off patent, Pfizer sells $10 billion

25  of this drug, the drug that has a market of $50 million.

1  Oh, that market expanded.

2          A couple of the tests that Pfizer did, or

3  Warner-Lambert, showed that the drug might also have some

4  pain relief help for a condition we call "shingles."  The

5  doctors call it "postherpetic neuropathy."  Neuropathic pain

6  is a pain that's deemed to be part of the nerve system.

7          You're doing the hook at fifteen after?

8          THE COURT:  Yes.

9          MR. LANIER:  Okay.

10         You're going to hear tons about this at a later

11 time, but I will tell you, I want to take advantage of this

12 format to plug you into one more thing on that issue as I

13 get close to summing up, and that is, there is a whole area

14 of pain that's called "neuropathic pain."  I'll abbreviate

15 it as "neuropain," and it even gets that abbreviation in the

16 industry.  They'll call it NP sometimes, neuropathic pain.

17         One kind of neuropathic pain carries the

18 abbreviation PHN.  It's post, meaning after, herpetic, it

19 comes from herpes because it's the herpes virus of sorts,

20 postherpetic neuropathy, or neuropain.

21         Now, that's one kind of neuropathic pain, and

22 ultimately the drug company is able to get approval for

23 using this drug Neurontin in that one area, that slim part

24 of neuropathic pain, as well as in epilepsy, seizures.  Now,

25 that's it.  That's all this drug ever gets approved for.

f5ddb65d-0280-4f94-b517-80266a6ab59e

1          Boy, Pfizer takes it on the road.  Look what

2     Pfizer does.  This is from Pfizer's 2001 U.S. operating

3     plan.  And, again, I'm nervous about showing you an exhibit

4     when you don't get to see the whole thing.  I'll tell you

5     why in a minute in more detail, but I can only show you a

6     little bit right now.  I'll ask the Court to let this whole

7     exhibit go back into evidence.

8          The 2001 U.S. Operating Plan of Neurontin -- this

9     is by Pfizer at this point in time -- if we look on Page 503

10    by the Bates number, your Honor, for the record, here's what

11    we see:  The medical strategic plan for Neurontin in 2001 is

12    a neuropathic pain filing.  They want to ask the FDA to let

13    them use it for neuropathic pain, but here are the tactics

14    they're going to use.  To get it for neuropathic pain,

15    they're going to develop a relationship with the American

16    Pain Society.  They're going to publish and present new data

17    at key pain congresses.  They're going to have a so-called

18    independent group working.  They're going to develop and

19    publish diagnostic tools.  They're going to do things that

20    try to push this drug for the whole neuropathic pain

21    category, not simply folks suffering from shingles.

22          And the drug company continues to do it.  They

23    continue to sell this to people who never had epilepsy, who

24    never had shingles.  That's the minor part of their market.

25    The major part of the market is all this other stuff.  They

1    make a lot of money; they do a lot of damage.  I think we're

2    going to get into evidence some information where the FDA

3    continued to monitor some things, and we'll be able to show

4    you that Pfizer themselves are guilty of marketing it

5    off-label illegally.

6           MR. OHLEMEYER:  Objection, your Honor.  There will

7    be no evidence of that.

8           THE COURT:  As I said, this is not a substitute

9    for evidence.

10          MR. LANIER:  And the Judge will throw me in jail

11   if I say it's evidence because it's not.  I think that's

12   what the evidence will show.  I think that's what you'll

13   sea.  You hold me accountable.  You can write it down.  If I

14   can't show it, I can't show it, but I think you'll see the

15   evidence of it.

16          I think ultimately you're going to see the FDA

17   finally catches up and figures out what's going on because

18   the FDA finally reports, the FDA finally says, "All of these

19   antiepileptic drugs, these eleven that we looked at, all of

20   these seem to have some effect on depression and suicide

21   ideation and suicide."  And the FDA ultimately will say,

22   "Antiepileptic drugs are associated with increased risk of

23   suicidality.  The effect appears consistent among the group

24   of eleven drugs."

25          Oh, they're going to come in and say, "No, no, no,

1    no, the FDA, they were a bit dim-witted on that.  They

2    didn't realize that these two drugs seemed to be the bad

3    guys and that we are innocent because ours wasn't."  No,

4    we'll sort through all of that.  That's why we don't put

5    documents up on a select basis.  You've got to read the

6    whole document, and I'll put them in front of you, and we'll

7    sort through them with witnesses, but beware of anyone who

8    says that --

9                MR. OHLEMEYER:  I object to this, your Honor.

10   It's not proper.  It's argument.

11               THE COURT:  Overruled.  You have about five, seven

12   minutes.

13               MR. LANIER:  Thank you, Judge.

14               And so Neurontin now, now, after the drug is off

15   patent, now that most people can buy it as gabapentin and

16   buy it outside, after they've made all of the big money that

17   they're going to make on the drug, now the label is changed.

18   And now Pfizer, now Pfizer, 2009, tells people that, "By the

19   way, we still don't know how the drug works," and they

20   don't, just seems to, but under "Warnings," their first very

21   big warning is "suicidal behavior and ideation."  They said,

22   "Antiepileptic drugs, including Neurontin, increase the risk

23   of suicidal thoughts or behavior in patients taking these

24   drugs for any indication."

25               That warning should have been on there before.

1    You'll hear the doctors that wrote these prescriptions.

2    They had no idea.  This was not being told.  This is not

3    what's being published.  This is not the insight and

4    information people are getting.  It's not at all.

5            So as you listen to me try and present this

6    evidence, you've got to integrate it with what you're going

7    to be hearing from these drug company lawyers because

8    they've got their perspective that they want to give you.  I

9    think what you're going to hear and what I want you to sort

10   through is evidence that tries to put all of the blame on

11   this on Susan Bulger.

12           I suspect you're not going to hear them accept one

13   ounce of responsibility.  I suspect they're going to say,

14   "Hey, this woman was --" and they'll do it politely.  They

15   won't say "loser," but they're going to say this woman had,

16   you know, such a horrible life, she was -- I'll tell you

17   what.  Every time they point out something bad about Susan

18   Bulger or a difficulty in her life, what that tells me is,

19   this is the last person in the world who ought to be on a

20   drug that increases suicide ideation.  This is the last

21   person in the world, especially, especially if one of the

22   reasons her doctor is prescribing it is for depression.

23   Mood disorder, affective mood disorder, that's one of the

24   reasons the doctor is giving her the drug.  He's hoping this

25   drug will help treat the depression.  Little does he know

1   he's been beguiled by this world, and the drug is not going

2   to help treat the depression; it's going to make it worse.

3           If the truth had been in the label, if the label

4   had said what it should have said back when Susan Bulger was

5   taking it, the doctor would not have said, "Hey, you're

6   depressed.  I understand from this massive snowball rolling

7   down the hill that Neurontin is good for depression.  Let me

8   give you some Neurontin.  It will help."  Instead maybe he'd

9   have given her some drugs that would have helped.  I don't

10  know, but he shouldn't be adding fuel to the fire.  She's

11  the last person in the world that ought to be taking this

12  drug.

13          I think you'll hear from the defense side that the

14  FDA approved the drug, so it must be safe.  Well, they've

15  got -- and I almost brought a deck of cards, but I didn't

16  decide to use it, but if I took a deck of cards right here,

17  and I held up the 3 of diamonds, and you look at it and say,

18  "Hey, that's a diamond, isn't it?" and I put it down, and I

19  held up the jack of diamonds and said, "That's a jack of

20  diamonds," and then I set the whole deck of cards aside and

21  I said, "Well, now we know that deck is full of diamonds,

22  nothing else," you would laugh me out of the courtroom and

23  say, "Lanier, give me a break.  You just showed us two of

24  the cards."

25          What they're going to do is parade certain

Page 43

1    studies -- it's like parading certain pages of exhibits and

2    leaving out other pages -- they're going to parade certain

3    studies in front of you that all seem to show this to be a

4    jack of diamonds drug.

5         THE COURT:  You need to finish in about three

6    minutes.

7         MR. LANIER:  Okay, thank you, Judge.

8         And all I can say is just hold on and wait because

9    it's my obligation and duty to show you the rest of the deck

10   so that you know what all the cards are on the table, and

11   that's what my job is, and that's what I'll do.

12        So the final thing I have to say in the last two

13   minutes is, when you analyze this, don't ever be persuaded

14   that you're trying to look for the cause of the suicide.

15   The question is, in the great wealth of the world, was this

16   drug a significant contributing cause?  Was it a significant

17   contributing cause, not was it the cause?  The cause is way

18   too complicated.

19        So those are what I anticipate the trial is going

20   to unfold, both the themes that the parties will have as

21   well as how we're going to approach it.  We're going to do

22   it through witnesses.  We'll try and do it as quickly as

23   possible.  We've got a number of lawyers working on the

24   case, and we'll see how it all shakes out.  But we

25   appreciate very much your time and attention, and I look

Page 44

1  forward to getting to know you, indirectly, over the next

2  couple of weeks.

3              Thank you, your Honor.

4              THE COURT:  Thank you.  Why don't we stand up and

5  stretch.  You need to set up.

6              MR. OHLEMEYER:  Just for a minute, your Honor.

7  Thank you.

8              (Pause.)

9  OPENING STATEMENT BY MR. OHLEMEYER:

10              MR. OHLEMEYER:  May it please the Court,

11  counsel --

12              THE COURT:  Why don't we wait till everyone -- all

13  set?

14              MR. OHLEMEYER:  Thank you, your Honor.

15              THE COURT:  I can barely see you surrounded by all

16  those.

17              MR. OHLEMEYER:  Snippets.

18              Ten years before Mrs. Bulger died and before she

19  ever took Neurontin, she told her doctors that the disease

20  had made her depressed, that she was always depressed

21  because the disease had taken the life right out of her, a

22  life that had been active but now was one where she just

23  existed with no desire whatsoever, in which she was moody

24  each and every day.

25              THE COURT:  A little bit louder.

1          MR. OHLEMEYER:  The evidence you're going to hear

2     in this case, as Mr. Lanier said, is that suicide can be

3     difficult to explain, and at other times it has a sense of

4     inevitability about it, unfortunately.  But it's never far

5     from depression, pain, substance abuse, and the things that

6     make a life difficult.  And the evidence you'll hear in this

7     case is that Mrs. Bulger had medical conditions that are

8     known causes of suicide, that increased her risk of

9     committing suicide, and actually caused her to attempt

10    suicide before she ever took Neurontin.  The Neurontin

11    Mrs. Bulger was taking, you'll hear from the doctors, is

12    actually one of the few things in her life that was not

13    making it more difficult.

14          Now, I agree with Mr. Lanier that the life you're

15    going to hear about is a tragic life, and it raises a

16    question:  What caused this woman to commit suicide?  What

17    caused Susan Bulger to commit suicide?  The plaintiffs say

18    it's Neurontin, and that's what they've alleged, and that's

19    what they believe.  But beliefs and allegations aren't

20    evidence, and the evidence you're going to hear from the

21    witnesses who testify will have to prove those beliefs,

22    because at the end of the day, we're going to have to try to

23    answer my question, what caused Mrs. Bulger's suicide?

24          Good morning again.  My name is Bill Ohlemeyer,

25    and with Charlie Goodell and Rick Barnes, we're going to

1    present Pfizer's evidence to you.  And you're going to hear

2    about Pfizer and you're going to hear about Neurontin, but

3    you're going to hear a lot about Mrs. Bulger because it's

4    impossible to understand suicide without hearing the

5    personal history of the victim.  We're not going to present

6    that evidence to you to judge Mrs. Bulger, we're not

7    presenting that evidence to you to blame Mrs. Bulger, but

8    it's impossible to understand how Mrs. Bulger died unless

9    you understand how she lived, so we're going to present the

10   story of her life to you so you can answer the questions

11   that have to be answered in this case with confidence.

12            The evidence I'm going to present involves four

13   major issues, and the first one will discuss the

14   circumstances in Mrs. Bulger's life that may explain why

15   people make this tragic choice and why specifically

16   Mrs. Bulger may have made it.  You're going to hear evidence

17   about Neurontin and whether it or something else was a

18   substantial factor, or whether anyone can determine what the

19   substantial factor was in causing Mrs. Bulger's suicide.

20            Mr. Lanier described a company that you might

21   think sounds reckless, and we're going to present evidence

22   about Pfizer so that you can answer the question, is Pfizer

23   a reckless company?  And we're going to tell you what the

24   evidence is that connects Neurontin to suicide and what the

25   data is when people actually try to do these tests and

1    answer these questions.

2            So you're going to hear that Neurontin is an

3    important medicine that actually helped people who weren't

4    being helped by other medicines.  You're going to hear how

5    it was tested, how it was monitored, how it was labeled, and

6    you're going to hear how Pfizer helps doctors help their

7    patients.

8            I said it once and I'm going to say it again:

9    Mostly you're going to hear about Mrs. Bulger because this

10   is a case about Susan Bulger.  The plaintiff in this case is

11   the estate of Susan Bulger.  It's not Regina Bulger.  It's

12   the estate of Susan Bulger.  Mr. Lanier represents the

13   estate.  Mr. Egilman who you met is the administrator of the

14   estate.  And because it's a case about Mrs. Bulger, that's

15   what I want to start talking about this morning.

16           Susan Bulger lived a life filled with pain

17   beginning when she was about seventeen.  The doctors that

18   you'll hear testify will tell you that healthy people don't

19   understand what it's like to live in constant pain; not just

20   muscle aches and backaches and headaches, as difficult as

21   that can be, but what doctors call neuropathic, which is

22   pain in the nerves, or chronic pain, pain you can't treat

23   with aspirin or Tylenol.

24           Mrs. Bulger's difficult life began when she was a

25   child.  You'll see medical records.  And these are excerpts.

1   They're not snippets.  You'll see the whole record.  These

2   records are available to Mr. Lanier.  He's actually seen

3   these records before this morning.

4          Mrs. Bulger told her doctors she had a lousy

5   childhood in which she was constantly physically abused.

6   She ended up in a foster home.  She was diagnosed with

7   depression in the 1980s, and she suffered from it her entire

8   life.  Mrs. Bulger had substance abuse problems as you've

9   heard, alcohol and cocaine, crack cocaine, and even heroin.

10  And unfortunately she suffered from a degenerative,

11  incurable autoimmune disease called rheumatoid arthritis,

12  and she was diagnosed with rheumatoid arthritis when she was

13  seventeen.

14          Rheumatoid arthritis is a disease that causes the

15  body to slowly fall apart.  By the time she was thirty-nine,

16  Mrs. Bulger had more than a dozen surgeries, including two

17  complete elbow replacements, a wrist fusion, and an

18  amputation of one of her toes.  Rheumatoid arthritis is the

19  disease she was talking about when she told the doctors at

20  Brigham and Women's in 1993 that she was always depressed

21  because the disease had changed her life.

22          And sometimes you'll see handwritten medical

23  records in this case.  Sometimes it will be Mrs. Bulger's

24  writing.  Sometimes it will be doctors who are taking

25  information down from her.  And one of the challenges in

1   this case and one of the difficulties in this case is,

2   there's a lot of personal information we're going to have to

3   present to you, and it's difficult but it's important to

4   know it to understand the issues.  And this information came

5   from medical records.  It comes from conversations

6   Mrs. Bulger is having with her doctors, and we're going to

7   share that information with you so you can understand what

8   was going on in her life.

9           Mrs. Bulger also had serious and long-standing

10  problems with her husband.  She had an abusive and

11  controlling husband.  They had financial problems throughout

12  their marriage.  They even lost custody of their son for a

13  while in the '90s.  Mrs. Bulger also attempted to commit

14  suicide several times, long before she ever started taking

15  Neurontin.  And you'll hear doctors, every doctor who

16  testifies in the case will tell you that people who attempt

17  to suicide are at a significantly greater risk of actually

18  committing suicide in the future.

19          And Mrs. Bulger also had a variety of serious

20  medical problems for which she was taking a variety of

21  prescription drugs.  In the last five years of her life, she

22  took more than 30 different prescription drugs, including

23  antidepressants, pain pills, and pills that were designed to

24  help her with her anxiety disorder and some of her mood

25  problems.  You'll hear and you'll see testimony about

1   Mrs. Bulger and these medicines.

2            At the time of her death, Mrs. Bulger had

3   prescriptions for five prescription medicines.  Including

4   methadone, OxyContin, Effexor that she was taking in two

5   different doses, Klonopin, and Neurontin.  And the reason I

6   said she was supposed to be taking some of these is because

7   at the time of her death, the police asked Mr. Bulger to

8   provide them with all of the prescription medicine that was

9   in the house the night of her death.  And based on records

10  of her prescriptions, and you'll hear the doctors testify

11  about this, there should have been 84 methadone tablets in a

12  bottle in the home, but none were provided to the police.

13  There should have been somewhere between 18 to 21 OxyContin

14  tablets.  None were provided.  None appeared to be in the

15  home.

16           This is important medicine.  She's taking

17  methadone for substance abuse and pain.  She's taking

18  OxyContin for her pain.  The Effexor is an antidepressant

19  that the doctors were giving her in two different dosages.

20  Klonopin is an antianxiety drug, and Neurontin of course

21  you've heard about.  The Effexor, there should have been 12

22  of the 150-milligram pills.  There were only six.  And there

23  should have been none of the 37.5-milligram pills, and there

24  were six.  So it appears that Mrs. Bulger was taking the

25  methadone and OxyContin she was supposed to be taking and

1   wasn't taking the Effexor, the antidepressant, as directed.

2          Klonopin, there was nothing found, and nothing

3   should have been found.  If she took it as prescribed, she

4   would have run out of the prescription on that day.  And the

5   Neurontin, there were 44 pills provided to the police that

6   night.  There should have been 24, which again tells you

7   Mrs. Bulger was not taking Neurontin as directed.  There was

8   more medicine in the house than there should have been.

9          Now, Mrs. Bulger also had a history of not taking

10  medicine as directed.  You'll see and you'll hear more than

11  a dozen different times in the medical records she tells her

12  doctors that she stopped taking medicine on her own,

13  antidepressants, pain pills, other anti-anxiety medicines,

14  and even Neurontin a couple times.  You'll hear about that

15  in a minute.  She told the doctors that she didn't like the

16  way it made her feel, or she didn't like the side effects,

17  or she didn't think they were working, and you'll hear

18  testimony about this throughout the trial.

19         Let me tell you a little bit about the two doctors

20  who actually prescribed Neurontin to Mrs. Bulger.  These

21  doctors treated Mrs. Bulger for nearly four years prior to

22  her death.  They were trying to help her manage a variety of

23  medical conditions, including her pain.  Dr. Crognale went

24  to Salem State, got his M.D. at UMass, trained at Beverly

25  Hospital, and he's an internist in family practice.

1             Dr. Goldman got a bachelor of science at Wesleyan,

2     a master's in public health at UCLA, got his medical degree

3     at BU, trained at Boston City, and also has a family

4     practice.  Unfortunately, Dr. Goldman died recently, so

5     you'll hear his testimony through a videotape deposition.

6     Dr. Crognale has moved to Africa where he's actually working

7     in a village in Africa.  He too will testify through a

8     videotape deposition.

9             You'll hear these doctors tell you that they treat

10    people with chronic pain, with neuropathic pain.  And

11    everybody's different, so they use a variety of prescription

12    and over-the-counter medicines to treat their patients.  But

13    Neurontin is one of the medicines they use for people like

14    Mrs. Bulger who had problems that weren't being successfully

15    treated by other medicines.

16            Now, Neurontin is not something you can buy at the

17    CVS without a prescription.  Your doctor has to prescribe it

18    to you.  And to make a decision like that, these doctors had

19    to decide that it was going to help Mrs. Bulger.  They

20    thought Neurontin made sense for Mrs. Bulger because it

21    wouldn't interact with the other medicines she was taking,

22    and it wasn't addictive, and she had a problem with

23    substance abuse.

24            Now, you're going to hear that companies like

25    Pfizer, and Pfizer in particular, are in business to provide

1    doctors like these with tools they can use to help their

2    patients.  They do well by doing good.  They're not perfect,

3    and you're going to hear how they were called to account for

4    the mistakes they made, but they do well by doing good.

5    These doctors are trying to help Mrs. Bulger.  They were

6    well aware of her background, they were well aware of her

7    medical conditions, they were well aware of her problems,

8    but they thought Neurontin had the best chance of helping

9    her, and the evidence you will hear is that it did.

10              Now, Mrs. Bulger's pain is described in a letter

11   she wrote in her handwriting to a Dr. Jacobs in 2002, and

12   she told Dr. Jacobs that she was diagnosed in 1982 with

13   rheumatoid arthritis, and she hasn't had a day go by without

14   experiencing pain, pain she describes as excruciating, and

15   she told the doctor every day was a pain-filled challenge

16   for her.  This doctor was talking to Mrs. Bulger about

17   prescription medicines, particularly narcotics, and he

18   wanted her to make sure she understood the risks and the

19   benefits of those medicines, and she told him in this

20   letter, "There are drawbacks to pain medication such as

21   addiction, tolerance, and damage to organs.  That goes for

22   arthritis medicine too.  I have been on medicine that's made

23   my bones brittle, my hair fall out, made me gain a bit of

24   weight, put stress on my arthritis, and the side effects can

25   affect my liver.  But to me any medication, be it narcotics

1    or arthritis medication, has adverse effects, but I need the

2    medicine because of the pain."  And you'll see and hear more

3    testimony about this from Dr. Jacobs.

4          Not treating Mrs. Bulger's pain was not an option

5    for Drs. Crognale and Dr. Goldman.  Pain is important.  It

6    causes other problems.  It actually can increase depression.

7    So they had to do something for her.  Other medicine that

8    she was taking had side effects, it didn't work, or it was

9    addictive.  Fortunately for Mrs. Bulger the Neurontin that

10   they prescribed to her for per pain worked, and you're going

11   to see here why.

12         You'll see and you'll hear from doctors that

13   Mrs. Bulger had been treated with a variety of different

14   medications to treat her pain, none of them effectively.  In

15   1996 her doctors noted that she was overusing Percocet

16   because it was the only way she could get pain relief.

17   Again, it's an addictive narcotic.  You don't want your

18   patients overusing it, especially if there are other

19   alternatives.

20         So in 1999 an arthritis specialist noted that

21   Mrs. Bulger had tried numerous disease-modifying

22   antirheumatic drugs, but that either had bad side effects or

23   they didn't work, lack of efficacy.  "Efficacy" is the word

24   you'll hear a couple times.  It means they didn't work.

25   Methotrexate caused her hair to fall out.  That's what

1   alopecia is.  Imuran didn't help, and gold shots helped her

2   once but not again.

3        Then she sees Dr. Jacobs, as we just said, and in

4   that same letter she tells him, "The arthritis medicine I

5   was put on, such as gold shots, methotrexate, Imuran, took

6   weeks to work, and if and when they finally did, didn't seem

7   to last long or protect my joints.  Therefore I've had all

8   these operations."

9        She sees Dr. Goldman in 2003, and he notes that

10  she's been on everything for her pain; nothing has had any

11  long-term effect, but the Neurontin was helping her

12  significantly with both her affective disorder, with her

13  moods, and her pain.

14       These doctors prescribed Neurontin to Mrs. Bulger

15  because it made sense to them, and they'll tell you that

16  Neurontin doesn't have many side effects.  It's not

17  metabolized by the liver.  It basically leaves your body

18  unchanged.  It doesn't have toxicity risks.  It doesn't

19  interact with other medicines you're taking.  You can't

20  really overdose on it.  And Mr. Lanier's joke was based in

21  science in a sense.  You can't overdose on Neurontin, which

22  is important for a woman who's had a prior suicide attempt

23  by overdose, and you'll hear about that.  It has a speedy

24  half-life of five to seven hours, which means that it

25  doesn't stay in your body very long.  You can take multiple

1    doses.  It's not addictive, and it's a good option for

2    patients who are refractive.  And the doctors you'll hear

3    testify will tell you that refractive means nothing is

4    working for them.  So Neurontin, when you think about

5    Mrs. Bulger with a history of substance abuse, some possible

6    addiction problems, and prior suicide attempts, was the

7    choice that these doctors made.

8         Now, the reason they made this choice is not

9    because of something a salesman told them.  You heard a lot

10   of discussion from Mr. Lanier about evidence that he expects

11   to present about Pfizer and Warner-Lambert and doctors.  The

12   two doctors who testify about Mrs. Bulger are going to tell

13   you that they made this decision based on their background,

14   their education, their experience, what they knew about

15   Neurontin because they'd used it with other patients, what

16   they'd heard about it from other doctors, but not because of

17   anything that Pfizer told them or Warner-Lambert told them.

18   They will tell you that they were never at the Chateau Elan

19   in Atlanta, they were never involved in any of these things

20   you've heard talked about.  They prescribed Neurontin to

21   Mrs. Bulger because they were trying to help her and they

22   thought it would work, and the undisputed evidence is that

23   it did help her.

24        You'll see and you'll hear about all the

25   references in the medical records to Neurontin.  This is the

time line.  This is every reference to Neurontin in
Mrs. Bulger's medical records.  Dr. Crognale was not the
first doctor to prescribe it to her.  Another doctor
prescribed it to her in 1999.  She took it for about six
weeks, stopped taking it without telling that doctor.  In
October then she starts to see Dr. Crognale, and in that
time period from January to October, her medical conditions
got worse.  But she told Dr. Crognale the first time she saw
him, "I used to take Neurontin, but I stopped because it
made me feel out of it."

She sees Dr. Crognale from January of 2000 to May
of 2002, and you're going to see some of those records, and
her medical conditions don't get any better.  They continue
to get worse.  He puts her back on Neurontin in 2002, May of
2002.  She never says to him, "I don't want to take it."
She never says, "It made me feel depressed, it made me feel
suicidal."  She told him that "Way back when I stopped
taking it once because it made me feel out of it."

By August of 2002, the records that Dr. Crognale
is taking of each visit with Mrs. Bulger report that he's
getting good results with Neurontin for sleep.  It's helping
her sleep, helping her pain so she can sleep better.  By
November of 2002, Mrs. Bulger stops taking it again without
telling Dr. Crognale; and she later tells him, well, she
sees him a month later, she says, "It made me feel moody."

1          Now, the evidence in this case will be, there's
2    nothing unusual about a patient with the kind of medical
3    problems Mrs. Bulger suffered from feeling moody.  In fact,
4    you'll remember when she talked to the doctors at Brigham
5    and Women's in 1993, she told them, "I'm usually very moody
6    most days because of the arthritis."
7          Dr. Crognale puts her right back on Neurontin in
8    December of 2002 and increases her dose to 1,800 milligrams
9    a day.  So she's taking three pills in the morning, three
10   pills at night, and she does it for about a year at that
11   dose.  That's a higher dose than she was taking at the time
12   of her death, or was supposed to be taking at the time of
13   her death.
14          In April of 2003 Dr. Crognale continues to see
15   Mrs. Bulger.  He specifically notes she's not thinking about
16   suicide.  This is while she's on Neurontin at a higher dose.
17   By May of 2003, Mrs. Bulger is complaining to Dr. Crognale
18   that her insurance company isn't paying for her Neurontin.
19          Now, she's never, once again, said it made her
20   feel out of it, never once again said it made her feel
21   moody, never said it made her feel depressed, never said it
22   made her feel suicidal; and in fact she's complaining
23   because she's not getting it as quickly and as cheaply as
24   she'd like to get it.
25          He also points out in that same visit that it's

1    helping her with her mood stability, she's less depressed,

2    she's less anxious because in combination with another

3    medicine called Lexapro, she's feeling more even, and she's

4    having no side effects.  Neurontin is helping her sleep

5    better.  Unlike Klonopin -- remember, Klonopin was one of

6    the medicines she had a prescription for on the day of her

7    death, which she'd been taking but thought worsened her

8    depression.

9            By September of 2003 Mrs. Bulger starts to see

10   Dr. Goldman.  He continues to prescribe Neurontin for her

11   pain.  She sees him nearly every month in the year before

12   she dies.  In January 2004 she asks him to fill out some

13   paperwork to get something called Prescription Advantage.

14   Again, it's a way for her to get Neurontin at a reduced

15   cost, which Dr. Goldman says took a load off her mind and a

16   load off her wallet.

17           By April of 2004, Dr. Goldman notes that the pain

18   medication is not working as well as it used to because

19   she's developing tolerance to the antidepressant and the

20   methadone.  The entire time that Mrs. Bulger was taking

21   Neurontin after Dr. Crognale prescribed it to her in May of

22   2002, with one exception, she never stopped taking it, never

23   complained about taking it, never said, "I don't like the

24   way it makes me feel," never said, "It makes me feel

25   depressed," never said, "It makes me feel suicidal."

1        And these doctors were paying attention to those

2    kinds of things.  They were talking to her about depression

3    and about suicide at nearly every visit.  They were keeping

4    track of her medicines, and they were asking her how her

5    medicines made her feel.

6        Dr. Goldman in March of 2004 points out that

7    Mrs. Bulger is doing pretty well, but she ran out of her

8    Effexor and she started to feel lousy.  Effexor is the

9    antidepressant that he told her not to stop taking under any

10   circumstances, and, again, on the day of her death, it

11   doesn't appear she was taking it as directed.  These doctors

12   knew what to look for, they knew what to talk about with

13   their patients, and they kept track of Mrs. Bulger because

14   they were trying to help her.

15       Now let me turn to a more difficult subject in a

16   way, and that's suicide itself.  There are 30,000 suicides

17   in this country last year.  It's about 84 every day, which

18   means three times an hour somebody makes that choice.  And

19   people have studied it.  The American Psychiatric

20   Association, the National Institute of Mental Health have

21   determined that there are known causes of suicide.  people

22   who have depression, people who have anxiety disorders,

23   people who have pain are at increased risks for suicide.

24   It's not because of my medicines they're taking.  It's

25   because of their underlying medical conditions.  Those are

1    the same kinds of people, though, who have to take medicine

2    to try to treat those conditions.

3            There are other risk factors for suicide that

4    you'll hear about, and they are things that people have

5    studied and published, and the doctors who will testify will

6    tell you about that.  And you'll hear that some people, you

7    know, that some people have many risk factors for suicide

8    but don't commit suicide, and other people have very few or

9    no apparent risk factors and actually commit suicide.  It's

10   very difficult to know why, but what the doctors who testify

11   will tell you is, 20 to 40 percent of the people who commit

12   suicide don't even have depression or anxiety disorder.

13   Their substance abuse and their pain is enough of an

14   explanation.

15           You're going to hear testimony and you're going to

16   hear evidence that Neurontin has been prescribed to millions

17   of people since 1993.  Nearly 14 million people have taken

18   it, and in that time the suicide rate in the United States

19   has not gone up; it's actually gone down.  There have been

20   hundreds and thousands of studies published and you're going

21   to see and hear about them where people have actually looked

22   at the questions Mr. Lanier raised, and the evidence you're

23   going to see, and I'm going to show you some of it in just a

24   few minutes, is going to show that Neurontin doesn't cause

25   people to commit suicide, it doesn't contribute to their

1   suicides.

2           The one thing we do know about Mrs. Bulger,

3   though, is, before she ever took Neurontin, she was at an

4   increased risk of suicide.  She had medical conditions that

5   are causes and known causes of suicide, and she had tried to

6   commit suicide.

7           The American Psychiatric Association has published

8   a guidebook for doctors, Practice Guidelines for Assessment

9   and Treatment of Patients With Suicide Ideation.  And you're

10  going to hear a witness from Harvard, a witness from McLean,

11  local doctors who will tell you that they treat people with

12  these problems, they do research in this area.  You're even

13  going to hear from one of the doctors who was involved in

14  preparing this book for other doctors, and they will tell

15  you that the most significant risk factors for suicide are

16  anxiety disorders and depression, things like post-traumatic

17  stress disorder.  Physical illness including chronic pain is

18  a risk factor for suicide.  Psychosocial problems,

19  Mr. Lanier mentioned some of them; the lack of social

20  support, an unstable domestic situation, unemployment,

21  stressful life events, financial problems.  Childhood

22  traumas, whether it's sexual or physical abuse, can be an

23  increased risk for suicide.  And, of course, as I said,

24  people who think about and actually try to commit suicide

25  are at a significantly greater increased risk of actually

1   committing suicide.  And, unfortunately, when you see and

2   hear the evidence in this case, Mrs. Bulger's life never got

3   very far from that list, and let me show you in some time

4   sequence how some of these problems showed up in her life.

5          Mrs. Bulger was diagnosed with depression in 1986,

6   and every doctor you'll hear from and every medical record

7   you'll see was that depression was a constant theme

8   throughout Mrs. Bulger's life.  She told Dr. Crognale the

9   first time she saw him that she was significantly depressed,

10  that she'd had severe depression in the past, and she was

11  feeling that way at that visit.  Now, this is nearly a year

12  after she had stopped taking Neurontin.  It's four years

13  before her suicide.  She talks about the stress she has at

14  home, both financial and otherwise.  And you're going to

15  hear unfortunately that parenting was an issue for

16  Mrs. Bulger, in part because of her physical problems.  She

17  talked to her doctors frequently about her doubts about her

18  ability to be a parent with some of the physical and

19  psychological problems she had.

20          She told him that a doctor told her she might be

21  bipolar.  There's going to be a little bit of testimony

22  about that, but there's really no doctor who's going to say

23  that Mrs. Bulger was actually suffering from that.  She

24  tells her doctors that she was experiencing depression her

25  entire life.  She tells Dr. Crognale that medicine like

1    Prozac isn't helping her depression.  She has a long history

2    of abuse, and he and she agree she has post-traumatic stress

3    disorder related to that.  He encouraged Mrs. Bulger to seek

4    counseling.  You know, and she did seek counseling for a

5    while right after the birth of her daughter, and

6    unfortunately when her daughter was born, her daughter had

7    to be detoxed.  Mrs. Bulger was using illicit during her

8    pregnancy and --

9            MR. LANIER:  Objection, your Honor.  It wasn't

10   illicit drugs.  It was methadone she was on.

11           THE COURT:  Overruled.  You'll hear the evidence.

12   Remember, this isn't a substitute for the evidence.

13           MR. OHLEMEYER:  Thank you, your Honor.

14           You're going to hear that Mrs. Bulger was

15   encouraged to and actually did start going to counseling and

16   therapy after the birth of her daughter.  That lasted until

17   August of 2003.  And as part of that therapy, she had to get

18   urine tests and she had to keep the therapy treatments, and

19   you'll see some of those records.  Unfortunately she stopped

20   doing that in August of 2003, the year before she died, and

21   that might have contributed to some of the problems that led

22   to her death, but she did seek counseling and she was being

23   counseled during the time she saw Dr. Crognale.

24           Dr. Crognale was talking with her about depression

25   and pointed out to her that if she had increasing signs of

Page 65

1    depression, she should talk to him about that.   The

2    counseling records, the Center For Addictive Behaviors where

3    she was getting her counseling and therapy, discuss the

4    post-traumatic stress disorder, the anxiety, and her

5    problems with Mr. Bulger, all of which you'll see and you'll

6    hear about when the doctors come testify.

7              Pain was something we already talked about, and

8    Mrs. Bulger obviously had a significant amount of pain, and

9    she had a dozen surgeries before she died.   So depression

10   and pain were always a part of Mrs. Bulger's life, even

11   before she ever started taking Neurontin.   Dr. Goldman sees

12   her in December of 2003 and points out that even though

13   she's doing okay, she's never without pain.

14             Now, there are other issues that you'll hear about

15   that contribute to an increased risk of suicide, including

16   what are called psychosocial features.   And you'll see and

17   you'll hear testimony about the Bulgers' marriage.   You'll

18   see and hear testimony about their financial problems; they

19   have a couple of bankruptcies.   But most importantly you'll

20   see and you'll hear testimony that Mrs. Bulger unfortunately

21   didn't have a lot of friends.   She was very isolated.   She

22   didn't have the kind of support system that people who are

23   at risk for committing suicide need as a protective factor

24   to help prevent these things from happening.

25             You've seen Mrs. Bulger's reference already to her

1   childhood.  The doctors who will testify about suicide will

2   tell you that childhood abuse and childhood trauma is enough

3   in and of itself to cause somebody to think about and commit

4   suicide later in life.  It's unfortunately one of the most

5   difficult and hard things to overcome for people.

6          Substance abuse Mr. Lanier talked about and you'll

7   hear about.  Again, it's one of the unfortunate things that

8   cause or contribute to cause suicide in people, and

9   Mrs. Bulger had a long history of substance abuse, again,

10  before she ever started taking Neurontin, which put her at

11  risk for suicide.

12         And you'll see and you'll hear that Mrs. Bulger

13  attempted to commit suicide multiple times, again, before

14  she ever took Neurontin.  Remember, Mrs. Bulger only took

15  Neurontin from May of 2002 to 2004.  She took it for a few

16  months back in 1999 right at the end of the year; but all of

17  these problems, these known causes of suicide, these medical

18  conditions that increase your risk of committing suicide,

19  that caused her to attempt to commit suicide, occurred

20  before she ever started taking Neurontin.

21         Mrs. Bulger's first suicide attempt occurred in

22  1978.  She cut her wrists when she was fourteen.  It

23  followed some problems she had at home with her mother.  In

24  1982, she drove a car off a cliff with the intent to hurt

25  herself.  And you'll see a pattern in these attempts.  They

1   almost always follow a domestic disturbance and a substance

2   abuse problem, overuse of substances or being high and out

3   of control, as her sister testifies.

4           In September of 1989, she goes to the emergency

5   room and tells them, "I'm afraid I'm going to try to hurt

6   myself."  In 1990 she overdoses on Valium and cocaine and

7   cuts her wrists and has to be taken to the hospital.  In

8   1993 Mrs. Bulger was in a coma for four days because she

9   overdosed on an antidepressant drug called Elavil following

10  a dispute with her husband and an effort to stop taking it.

11  She was not taking it on her own.  She became more depressed

12  and overdosed and nearly died.  The doctors will testify

13  that Mrs. Bulger was very fortunate to have survived four

14  days in a coma.  There's another episode of cutting her

15  wrists in February of 1998, and then, unfortunately, as we

16  know, Mrs. Bulger committed suicide in September of 2004.

17          Now, there's no way to know for sure that

18  Mrs. Bulger took Neurontin on the day she died.  You'll hear

19  testimony about this, but there was no eyewitness who

20  actually saw her take it.  There was no autopsy conducted,

21  there was no blood test done, and there's evidence that she

22  wasn't taking Neurontin as directed.  But if -- if you want

23  to assume she did take Neurontin the day she died, you have

24  to assume she took it the day before, the week before, the

25  month before, and for two years without it causing any

1   problems for her.  She took Neurontin for nearly 600 days,

2   which is more than 2,300 tablets, without ever complaining

3   about it, without ever not taking it, without ever telling

4   her doctors it was making her depressed or suicidal, which

5   are subjects she was talking about with them all the time.

6          Now, evidence comes in a lot of different forms.

7   You know, in a DWI case, you have a blood alcohol test.  In

8   an asbestos case, you can look at an X ray to see the damage

9   that asbestos does to people's lungs.  In this case, you're

10  not you're not going to see any evidence that says this has

11  to have been a suicide caused by Neurontin.  There's no

12  signature or distinctive issue that shows us that this was

13  caused by Neurontin.

14         The evidence you're going to see and you're going

15  to hear is that Mrs. Bulger was taking Neurontin for nearly

16  two years before she died at a higher dose for a period of

17  that time than she was supposed to be taking at her death.

18  She never claimed it made her feel depressed, and her

19  doctors believed that it was helping her.  They never said

20  in those medical records it isn't helping her.

21         At the same time Mrs. Bulger has other issues in

22  her life that have put her at risk for suicide before she

23  ever takes Neurontin.  And pain increases somebody's risk of

24  suicide two to five times over the general population's

25  risk.  Substance abuse increase it fourteen to twenty times.

1   If you have major depression, you are twenty-one times more

2   likely to commit suicide than people who don't have that.

3          Now, as we know, Mrs. Bulger committed suicide on

4   August 4, 2004, and why she chose that moment to do that is

5   something that nobody is going to be able to answer for you

6   in this lawsuit.  The best we can do is look at the events

7   that led up to it to try to see what was going on in her

8   life at that time.  And we know that prior to August, 2004,

9   Mrs. Bulger had depression, pain, psychosocial problems,

10  childhood trauma, substance abuse, and prior suicide

11  attempts.  They were preexisting risk factors for suicide.

12         At the same time, in the weeks and months leading

13  up to her death, you're going to hear evidence and testimony

14  that she really was isolated from her friends and family.

15  In fact she and her sister were making some plans for her to

16  leave Mr. Bulger that he got in the way of and prevented

17  from happening.  They had a recent bankruptcy.

18         Mrs. Bulger was facing her fourteenth operation,

19  and it was one she knew was not going to solve her problems

20  or end her pain.  She was having a bad flare-up of her

21  arthritis.  Two days before her death she called her doctor

22  and says, "I'm out of methadone," which he thought was odd

23  because she should have had more, "and I'm having a bad

24  flare-up of arthritis.  I need something for my pain."  She

25  actually filled a prescription the day she died for

1    prescription-strength ibuprofen.  She was out of methadone.

2    She was missing prescriptions.  She might have been in

3    withdrawal because she wasn't taking the methadone, and

4    you're going to hear some disturbing testimony from a

5    neighbor of Mr. Bulger's that Mrs. Bulger might have been

6    actually abusing crack cocaine in the days and weeks leading

7    up to her death.  You'll also hear that same kind of

8    testimony from her sister.

9          So there are a lot of things, unfortunately, going

10   on in Mrs. Bulger's life in August of 2004 that are better

11   explanations for what happened than the Neurontin that she

12   might have been taking, the Neurontin that she was taking

13   that there is no evidence, and there will be no evidence,

14   was making any of these problems that she had any worse, and

15   in fact the evidence will be that it was actually helping

16   her.

17         All right, let me shift gears for a minute now and

18   talk about Pfizer and Neurontin.  As Mr. Lanier told you,

19   Pfizer didn't invent Neurontin.  It wasn't the first company

20   to manufacture Neurontin.  It was developed by a company

21   called Warner-Lambert.  Pfizer merged with Warner-Lambert,

22   and Neurontin then became a Pfizer product.

23         Neurontin was approved by the FDA, as Mr. Lanier

24   told you, to treat epileptic seizures.  It's an

25   antiepileptic drug.  It was also approved again in 2002 to

1    treat postherpetic neuralgia, the pain associated with

2    postherpetic neuralgia.  And you're going to see and hear

3    that the development of Neurontin began a long time before

4    that.  The development of a medicine like Neurontin begins

5    with a scientist who discovers something in the laboratory

6    that he or she thinks is going to help improve human health.

7    It's a compound at that point.  And then it goes through

8    preclinical testing, usually with animals, and that took

9    seven years.  Then you go into clinical trials, which are

10   studies in people, and you're going to hear a lot more about

11   that than the evidence Mr. Lanier talked with you about.

12   And then, finally, the FDA reviews that information and

13   approves the drug for specific uses.

14          You're going to hear that Dr. McCormack, the

15   Dr. McCormack who was involved at the FDA, who was involved

16   in some of those things Mr. Lanier showed you where there

17   were some questions about depression and suicide in those

18   clinical trials, looked at the information, and a year and a

19   half later reported that, no, there is no evidence to

20   suggest that those problems were caused by the medicine.

21   And that's because the people who were in these trials and

22   the people who take these medicines have medical problems

23   that in and of themselves cause those kinds of problems.

24   There's a background rate of these kinds of medical problems

25   in the population of people who take Neurontin.

1           So the reason the FDA requires you to submit these

2    trials, these tests, is to demonstrate that the medicine

3    does what it's supposed to do but doesn't cause any

4    unnecessary risk to the people who are taking it.  And the

5    way you do that and the way the FDA requires you to do that

6    is to do a controlled study, a randomized placebo-controlled

7    clinical trial.  It's a long way of saying that you measure

8    it instead of looking at it.  Just because somebody who

9    takes Neurontin or any other medicine has a problem doesn't

10   mean that problem was caused by the medicine.  It might be

11   something else, or it might be something that they're taking

12   the medicine for that is producing the problem.  So you do a

13   study like this:  You take a group of people who are

14   identical in every way.  You divide them into two groups

15   randomly.  You give one group the medicine; you give one

16   group something called a placebo, a sugar pill.  Nobody

17   knows what they're taking.  You give them the medicine, you

18   keep track of them, and you record how they react, positive

19   and negative.  And then at the end of it all, you do some

20   statistical analysis to make sure what you are seeing is not

21   a coincidence or is not what you expect to find in that

22   group of people but is actually a difference caused by the

23   medicine.

24           Those kinds of studies were done, and you're going

25   to see and you're going to hear a lot of testimony and a lot

1    of evidence about them.  They're the most reliable and

2    scientific way to answer the question this lawsuit raises,

3    which is, can Neurontin cause suicide in anyone, before we

4    even start asking the question, what about Mrs. Bulger?

5             These kinds of studies were conducted, and they

6    were submitted to the FDA multiple times.  They were

7    reviewed by the FDA.  All of the information you're going to

8    see comes from Pfizer or Warner-Lambert and was given to the

9    FDA, and it was analyzed for a variety of different reasons.

10   And never before Mrs. Bulger's death did anyone look at that

11   information and say, there should be more information in

12   this label that is given to doctors that tells them about

13   suicide and suicidal thinking, because there was no evidence

14   to suggest there was.

15            When you go back and look at that data from the

16   controlled clinical trials for suicide and suicide attempts,

17   the evidence you'll see is that there was nobody in those

18   clinical trials, those controlled studies, who committed

19   suicide or attempted to commit suicide.  In fact, suicidal

20   ideation, which is thinking about suicide, the people on the

21   medicine, on Neurontin, were essentially no different than

22   the people on the placebo.  There were two out of 5,200

23   versus one out of 2,600.  You see that statistically it's

24   about the same.  So when you do the controlled study, you

25   don't see people thinking about suicide more often who are

1    taking Neurontin than people who are taking the placebo.

2         They looked a little closer at the issue of

3    depression.  When you look at depression -- and this was

4    something that was submitted to the FDA and that the FDA

5    looked at back in 1992, and this is where Dr. McCormack, who

6    said before we should be careful about this, looked at it,

7    looked at the data, and then said later, "There's no

8    evidence here to suggest people who take this drug are more

9    depressed than we would expect them to be."  1.8 is more

10   than 1.1, but you'll hear that's a statistical tie, that

11   essentially that's no difference.

12        They looked a little harder at what are called

13   psychobiologic events.  These are events like hostility,

14   anger, you know, things that change your behavior.  And,

15   again, when you look in the epilepsy trials, people who have

16   medical problems who are being given Neurontin, that the

17   placebo patients actually had a higher incidence of adverse

18   psychobiologic events than the Neurontin patients.

19        In the postherpetic neuralgia application that

20   Mr. Lanier told you about, and these are the patients who

21   are closer to people like Mrs. Bulger, you'll see that the

22   placebo patients again had essentially the same or a little

23   bit higher incidence of depression than people on the pill,

24   which again tells you that the medicine is not causing new

25   or additional problems in the people who are taking it.

1           Now, the FDA reviews all of this, and this label

2    that Mr. Lanier showed you and talked about is the label

3    that goes to doctors.  It's the information the doctors get.

4    The FDA reviews this.  They tell the company where to put

5    these results and how to describe them.  And nowhere in this

6    label before 2004, before Mrs. Bulger died, did the FDA tell

7    Pfizer or anyone else that you have to tell people that

8    Neurontin causes suicide or suicidal thinking because the

9    evidence didn't suggest it did.

10          Now, Mr. Lanier also talked to you about this

11   challenge-rechallenge kind of test where you give somebody

12   the medicine, and you take it away, and you give it back.

13   You'll see and you'll hear that the people who were on

14   placebo had the same kind of phenomenon.  You could see the

15   same kind of results when you give somebody the placebo.

16   They say, "Oh, I think it's making me feel more depressed."

17   You take the placebo away, they feel better; you give them

18   the placebo back, it makes them feel worse.

19          So there's going to be a lot of evidence about

20   scientific data, and the two things I think are important to

21   remember is that there are controlled studies that measure

22   things.  We compare two groups of people in a controlled

23   setting to see whether there's really a difference.  And

24   then there are observations, things that we observe in

25   people.  And the fact that you observe something in someone

1    doesn't mean it's a cause of what you're observing.  There

2    might be other explanations, or there might be more

3    information that needs to be reviewed.

4              Now, the idea that you are going to use an

5    antiepileptic drug to treat pain is not something that

6    Pfizer thought up on its own.  Doctors have been using

7    antiepileptic drugs to treat pain since the 1960s.  It was

8    reported in the medical literature for a variety of reasons.

9    It seemed to help people with pain.  That kind of

10   prescription, as Mr. Lanier told you, is called an off-label

11   use of a medicine.  It is not illegal to prescribe medicine

12   off-label.  There are strict rules, though, about how you

13   can promote medicine off-label, and you're going to hear

14   about the violation of those rules.

15             Off-label medicine is allowed because the FDA

16   doesn't regulate the practice of medicine.  They want

17   doctors to be free to use their judgment to help their

18   patients.  The FDA has said that off-label prescriptions are

19   accepted, rational, and of great value.  They're not

20   illegal.  But there are rules, again, about how you can

21   promote medicines for off-label.

22             Off-label helps patients who aren't being helped

23   by other medicines.  It gives doctors the ability to treat

24   people with medicine and to take advantage of medical

25   developments that occur faster than the FDA process.

1          It's very common.  Using oral contraceptives to

2     treat acne is an off-label use of a medicine.  Using blood

3     pressure medicine to treat migraines is an off-label use of

4     medicine.  In fact the majority of prescriptions for

5     antiepileptic drugs are off-label prescriptions for the most

6     part to treat pain.

7          Now, as Mr. Lanier pointed out, there are rules

8     about how you can promote off-label use, and Warner-Lambert

9     violated those rules.  And it's a strict liability

10    violation.  Even if what you tell the doctor is absolutely

11    true, you're not allowed to do it, and they were held to

12    account for it.  They paid a fine for it.  But there was no

13    charge that they'd said anything false or misleading.  There

14    was no claim of fraud.  It was a violation of the rules.  It

15    was a serious violation.  They paid a serious fine.

16         None of that has anything to do with Mrs. Bulger.

17    It occurred before Mrs. Bulger ever took Neurontin.  It

18    occurred before Warner-Lambert and Pfizer merged.  It

19    occurred in 1995 and 1996 in a limited part of the country,

20    and the doctors who prescribed Neurontin to Mrs. Bulger,

21    Dr. Goldman and Dr. Crognale, will tell you that they

22    prescribed Neurontin to Mrs. Bulger because of their

23    judgment, not because of something anyone from Pfizer or

24    Warner-Lambert told them.  In fact, they had a hard time

25    remembering specifically ever seeing anyone from Pfizer or

1  Warner-Lambert, and they specifically said they had no

2  recollection of anyone trying to promote Neurontin to them

3  for off-label uses.

4        Neurontin was tested in controlled studies in

5  people who were part of a vulnerable population, people who

6  had medical problems that put them at risk for other

7  problems.  The fact that Mrs. Bulger took Neurontin while

8  she had other problems or at the time she committed suicide

9  doesn't prove it was a substantial factor in causing her

10  disease.  You have to look at controlled data.  People who

11  studied this look at controlled data, and the data didn't

12  prove that Neurontin had anything to do with those problems.

13        So without data, without results from these tests,

14  you're going to hear testimony from some witnesses that

15  Mr. Lanier is going to call about a theory that somehow

16  Neurontin might increase depression and therefore contribute

17  to suicide.  You're going to hear that that's a theory, that

18  it's contradicted by what scientists and other doctors have

19  read and written about and researched, but it really doesn't

20  answer the question that has to be answered here.  And in

21  fact you're going to see and you're going to hear testimony

22  that when you do a controlled study to see what happens when

23  people take Neurontin, that it does not increase the

24  chemicals in the brain that those doctors will tell you

25  contribute to depression and contribute to suicide.

f5ddb65d-0280-4f94-b517-80266a6ab59e

1            So the last thing we're left with are statistics,

2    and Mr. Lanier told you about the FDA's recent statistical

3    analysis of antiepileptic drugs.  And what the FDA did is,

4    they asked the manufacturers of eleven different

5    antiepileptic drugs to "Send us your controlled data, send

6    us your clinical trials.  We're going to analyze this

7    because we're concerned that this medicine might have

8    something to do with people thinking about suicide."

9            Now, when they looked at that data, they saw some

10   things that have to be considered if you're going to answer

11   the question, what does this have to do with Mrs. Bulger?

12   The first thing that you have to understand is that

13   Neurontin, gabapentin, is a different chemical than the

14   other ten drugs that were looked at.  They're all different

15   drugs.  They're made differently.  They do different things

16   in the brain.  They have different chemical structures.

17   They're different chemical compounds.

18           Well, why is that important?  Because when you

19   look at the data from each of those eleven drugs, they don't

20   behave the same way.  Remember I showed you earlier the

21   controlled clinical trial data from Neurontin as it related

22   to suicide and suicidal thinking, and there was really no

23   difference between the Neurontin and the placebo when those

24   tests were conducted.  When you look at those other eleven

25   drugs, you'll see that two drugs, lamotrigine and

f5ddb65d-0280-4f94-b517-80266a6ab59e

1  Topiramate, actually accounted for a large number of cases

2  of suicidal thinking.  If you study the other drugs by

3  themselves, you don't see the same kinds of results.  The

4  Neurontin data is different than the lamotrigine data.  It's

5  different than the Topiramate today.  The FDA, though,

6  says -- and this is what the FDA does, and you're going to

7  hear there's nothing wrong with this, but it's different

8  than the question we have to answer -- the FDA says, "We're

9  going to treat all eleven drugs the same.  In fact, we're

10 going to treat all antiepileptic drugs the same, whether

11 they were in the study or not."  So if you make an

12 antiepileptic drug, you have to put this label on it, and

13 the label is:  It might cause someone to think about suicide

14 who wouldn't otherwise have done it.  In fact, the

15 statistics are that one out of 530 people might have had a

16 suicidal thought who wouldn't otherwise have had one if

17 they'd taken an antiepileptic drug.  That means 99 percent

18 of the people won't, but it doesn't change the fact that the

19 Neurontin data is inconsistent with that.

20        If the question you have to answer is, from a

21 public policy or public health perspective, should

22 antiepileptic drugs all have the same label and should they

23 say you might have an extra suicidal thought, it's a

24 different question than did Neurontin have anything to do

25 with Mrs. Bulger's suicide?

1         The evidence you're going to hear about Pfizer and

2    the evidence you're going to hear about Neurontin is going

3    to prove at least this much, and you're going to hear more

4    and it will prove more:  Neurontin really helps people with

5    pain.  It was studied for years in thousands of patients.

6    There's no scientific evidence -- I shouldn't say

7    scientific.  There's no controlled studies, there's no

8    reliable evidence that shows it causes suicide or makes

9    depression worse.  I mean, the observations you're going to

10   hear about and the challenge-rechallenge, that's scientific.

11   It's just not controlled, and there's a difference.  That's

12   an observation, not a measurement.

13        Neurontin has always had FDA-approved language on

14   suicide and depression.  The FDA has reviewed those labels.

15   They've asked the company to make minor changes in them, and

16   it wasn't until just recently that they said, "Make this

17   change that we're making in all antiepileptic drugs."  And

18   even today after years of use with millions of patients and

19   close scrutiny, even the FDA statistical analysis doesn't

20   say antiepileptic drugs cause suicide.  It says it may cause

21   suicidal thinking in a small number of people, again, all

22   based on data from two drugs, not eleven different drugs.

23        So let me summarize and thank you for your time

24   and attention.  I know it's warm up here.  This is going to

25   be a difficult case, in that we're all going to learn more

1    over the next three weeks about suicide, I think, than we

2    probably want to know.  And the reason we're going to do it,

3    again, is because we're trying to answer the question of

4    what caused Susan Bulger to make this decision, and the

5    evidence you're going to see and the evidence you're going

6    to hear is that she had risk factors for suicide.  We know

7    that because she tried to commit suicide before she ever

8    took Neurontin.

9           If she had never taken Neurontin but committed

10   suicide, doctors will tell you that they could explain this

11   to the best of their ability as doctors.  And, of course,

12   they will also tell you that you don't need Neurontin to

13   make sense of what happened to Mrs. Bulger.  Neurontin

14   actually might have been helping Mrs. Bulger, and it

15   probably was helping her because there was never a reference

16   to suggest it wasn't.

17          Mrs. Bulger had a short, difficult life, and it

18   was full of a lot of difficult, challenging circumstances

19   that alone or in combination you'll hear are explanations

20   for what happened to her.  There's going to be evidence to

21   answer the questions that are raised by this lawsuit, and

22   the answer to that question is going to be that Neurontin

23   was not a substantial factor in causing Mrs. Bulger's

24   suicide.  Thank you.

25          Thank you, your Honor.

1           THE COURT:  Thank you.  We'll stand in recess.

2    We'll be back in about a half an hour.

3           THE CLERK:  All rise for the jury.

4           (Jury excused.)

5           (A recess was taken, 10:13 a.m.)

6           (After recess.)

7           JUDGE SARIS:  Before we call the first witness,

8    someone was puffing out of his seat.

9           MR. LANIER:  That would have been me, your Honor.

10          JUDGE SARIS:  What's the issue here?

11          MR. LANIER:  Your Honor, I had a couple of matters

12   that need to be dealt with on the record, one off the record

13   that's very important to me.

14          JUDGE SARIS:  Let's go talk over here off the

15   record.

16          (Discussion off the record.)

17          MR. LANIER:  Your Honor, this is Mark Lanier.

18   We're going to ask this jury for something in the range of

19   $100,000 for this young lady.  That's what this case is

20   about, because I'd like money to be on the side for the

21   Court to give her a shot at life.  Please, your Honor, all

22   I'm saying to you, Judge, is if you look at how much both

23   sides are spending, I understand we need to try the first

24   case in here, and we need to try the first case in front of

25   you and it's very important to do so.  I've learned a ton

Page 84

1    from you and the way you want your Court handled and what

2    witnesses and exhibits are coming in, and you've made a lot

3    of rulings that will assist us from here on out, for

4    instance, about the Shearer case.  I will personally put

5    $50,000 into a trust account.  That is a thumbnail of what

6    we're going to be spending on this trial.

7              JUDGE SARIS:  Okay.  If this is about settlement,

8    we should probably talk about it later.  But I'm about to

9    bring Dr. Franklin in, or you are.

10             MR. LANIER:  Yes, your Honor.

11             JUDGE SARIS:  Let's talk about settlement later.

12   I do understand --

13             MR. LANIER:  It's not an offer of settlement.  I'm

14   just saying before I put Dr. Franklin on --

15             JUDGE SARIS:  No, we're not doing that.  We're

16   putting Dr. Franklin on.  This may be something to do this

17   afternoon, appropriate.

18             MR. OHLEMEYER:  Then I have a couple of matters on

19   the record.

20             JUDGE SARIS:  What?  Let's do it now, quick.

21             MR. OHLEMEYER:  Two big ones.  Number one, we're

22   very concerned that the ruling you made on the plea has been

23   expanded upon in terms of talking about the amount of money

24   in the plea.  We don't think that should have been raised in

25   the opening.

1        THE COURT:  Overruled.  I found the brief that was

2   given to me yesterday was a rehash, except it added the due

3   process argument over the others.  I actually thought it was

4   a fully appropriate opening statement, I wasn't sure what to

5   expect after yesterday, but it was fully appropriate.  It

6   wasn't overblown, it was only mentioned in a line or two.  I

7   have nothing wrong with it.

8        What's the next one?

9        MR. OHLEMEYER:  In light of the opening

10  statements, I think you now know from what's been said that

11  Dr. Franklin's testimony is going to be about a time frame

12  in 1996 -- let me just make my point, your Honor, please --

13  that has no connection with the doctors in this case.

14        JUDGE SARIS:  You have raised this point now three

15  times, and I've overruled it three times.  It goes to the

16  corporate intent.  Besides, a plea can be used to impeach

17  someone testifying, and that the corporation's agents are

18  testifying.  I am not going to preclude Dr. Franklin from

19  testifying.  It goes to corporate intent, corporate motive,

20  the scope of the understanding of where it was being sold,

21  so the scope of the duty.  I am not excluding the testimony.

22        I understand you've now ramped it up by claiming

23  it's a due process violation.  It's not a due process

24  violation.  This isn't even 404(b).  This is about this drug

25  and the efforts to market this drug and how it may or may

1    not relate to corporate intent.

2             You both did -- I'm telling my law clerks -- two

3    of the best opening arguments I have heard in a very long

4    time.  The interns were here, honored to hear it.  Let's

5    just hear the evidence.  Let's go.

6             MR. LANIER:  Judge, one last point that I do need

7    to put on the record.

8             JUDGE SARIS:  What?

9             MR. LANIER:  David Franklin is going to testify

10   about yesterday a private investigator calling himself a

11   detective sent by Pfizer to his house would not leave his

12   house until the police were called with 911 because of his

13   persistence in trying to get Franklin to visit with the

14   Pfizer people before he testified today, specifically

15   blocking the driveway saying he would not leave, would not

16   let anybody --

17            JUDGE SARIS:  All right.

18            MR. LANIER:  I just want to on the record.

19            JUDGE SARIS:  Was it Pfizer's person?

20            MR. LANIER:  His name was James Danforth.

21            MR. GOODELL:  James Danforth was asked to find --

22            JUDGE SARIS:  Who's Danforth?

23            MR. GOODELL:  He's an investigator.  He was never

24   instructed to do that.

25            JUDGE SARIS:  Well, then you're going to have to

Page 87

1    put him on the stand.

2              (End of discussion at sidebar.)

3              (Jury entered the courtroom.)

4              MR. LANIER:  Your Honor, the plaintiffs at this

5    time would call Dr. Dave Franklin to the stand.

6              DAVID FRANKLIN, having been duly sworn by the

7    Clerk, was examined and testified as follows:

8              THE CLERK:  And would you please state your name

9    and spell it for the record.

10             THE WITNESS:  David Franklin, D-a-v-i-d,

11   F-r-a-n-k-l-i-n.

12             MR. LANIER:  May it please the Court?  Your Honor,

13   may I be free to write a few things on the tablet?

14             JUDGE SARIS:  Of course.

15             Can you all see it?

16             Good.

17                        DIRECT EXAMINATION

18   BY MR. LANIER:

19   Q.   Mr. Franklin, would you please tell the jury -- you

20   just did it.  Would you tell them your name, please,

21   introduce yourself to the jury.

22   A.   David Franklin, my name is David Franklin.

23   Q.   Do you go by Dave or David?

24   A.   David is fine.

25   Q.   What kind of doctor are you?

1  A.   I'm not a medical doctor at all.  I have a PhD in

2  microbiology from the University of Rhode Island.

3  Q.   And a PhD, a doctor of philosophy?

4  A.   That's what it means, but it means essentially that I

5  studied the sciences.  In my particular case microbiology,

6  which is the biology of microorganisms.

7            (Discussion off the record.)

8  Q.   Are you a little nervous about being here today?

9  A.   Little puts it mildly, yes.

10 Q.   You had an interesting afternoon yesterday, didn't you?

11 A.   Yes.

12 Q.   Was yesterday the first time you and I ever had a

13 chance to visit?

14 A.   Yes.  Yeah, I met you yesterday.

15 Q.   You met us after court yesterday and we had a chance to

16 visit?

17 A.   Yes.

18 Q.   Did you deal with this case a little bit yesterday

19 before you and I met?

20 A.   Yes.

21 Q.   Would you please tell us what you personally

22 experienced yesterday morning as you got ready to deal with

23 this case?

24 A.   My wife and my daughter Sophie were home, relaxing.  I

25 was anxious about this experience.

Page 89

1    Q.    How old is Sophie?

2    A.    Eight.  She's eight years old.

3    Q.    Okay.

4    A.    So horsing around with Sophie, playing with Sophie when

5    my wife noticed she had a voicemail.  It was from someone

6    who said he was a detective working on a federal case, and

7    he was searching for someone who lived in Massachusetts that

8    he believed she knew, and that he needed to contact this

9    person immediately and needed to hear back from her

10   immediately.  This came --

11   Q.    Did you have a chance to hear the message yourself?

12   A.    Yes, I did.

13   Q.    What did you observe next in regards to this message?

14   What happened next?

15   A.    She called back.  We -- the only federal case that

16   investigators have ever contacted me about was involved with

17   my experience working at Warner-Lambert, so we assumed it

18   had something to do with that.  The fact that the call came

19   in on my wife's cell phone was unusual in that everybody

20   else, when they try could contact me, contacts my attorney.

21   Q.    Your wife -- did she used to work for Pfizer?

22   A.    She did.

23   Q.    What -- did you ever find out who this fellow was?

24   A.    Yes, he called back again, called back, I was standing

25   there with my wife and he called back and told him -- told

1   my wife -- this time -- well, actually, let me correct that.

2   My wife called him and -- returning the call, and he

3   reiterated that he was a detective working on a federal

4   case, the federal case was Bulger v. Pfizer, and my wife is

5   an attorney, she doesn't practice any longer, but she did go

6   to law school, and recognized that wasn't the way a federal

7   agent would identify themselves.  So she asked the person,

8   Well, who -- you know, what agency do you work for?  He said

9   he didn't work for an agency.  She said, Well, who do you

10  work for?  He said, A large group of law firms.  And she

11  goes, Who ultimately do you work for?  He said, I work for

12  Pfizer.

13  Q.   Did this gentleman at any point in time come out to

14  your house yesterday?

15  A.   Yes.  At that point my wife said I'm sorry, I don't

16  have anything to say to you, and hung up on him.  He called

17  back about 30 minutes later and insisted that he speak to

18  her and that he had an urgent message to deliver to me and

19  needed to see me face to face, and that he wasn't going to

20  accept no from her if she didn't put us in contact, he

21  would -- he would not let it go, he would come to what he

22  believed to be her home.  He would -- this was -- the quote

23  was, you will see me, this isn't going to end.

24          So at that point my wife is now a combination of

25  agitated and terrified, and hangs up on him again.

1            Getting to your question, later on in the

2      afternoon, my daughter was getting ready for karate, she has

3      karate on Mondays and Fridays in the afternoon, it was time

4      to leave.  I was changing to meet you for the first time and

5      noticed that there was an individual with his truck parked

6      at the top of our driveway, and he was standing at the top

7      of the driveway pacing back and forth, speaking on the

8      telephone.  Now, in the context of the two earlier

9      conversations, we were alarmed that it was him.

10     Q.   What did he look like?

11     A.   Big guy.  Granted, I'm a short guy, so everybody seemed

12     big to me, but he was a large individual.  He had said to my

13     wife in that second conversation that he was a police --

14     that he had been -- he was a retired police detective, but

15     he was a big strapping guy.  He wore black -- those black

16     kind of aviator sunglasses that obscured much of his face.

17            So he was at the top of the driveway, apparently

18     it looked like he was waiting for us, pacing back and forth.

19     Q.   What did you do next?

20     A.   Well, at that point my wife was -- we were all, quite

21     frankly, terrified.  I left Pfizer 13 years ago tomorrow,

22     and when I was leaving, I -- we received threats that there

23     was no way the company was going to just let this go, so

24     after 13 years, having a Pfizer representative standing at

25     our driveway scared the hell out of us.  Couldn't believe

Page 92

1   that it was happening after 13 years.

2   Q.   So what did you do?  By the way, you said you left

3   Pfizer 13 years ago --

4   A.   I'm sorry, I left Warner-Lambert.  I left

5   Warner-Lambert, yes.

6           Well, while we were trying to figure out what to

7   do, I took Sophie upstairs immediately, we didn't want her

8   exposed to any of this at all, and he disappeared.  What he

9   had actually done was came down our driveway so he was so

10  close to the house we couldn't see him anymore, and so

11  I from the second floor yelled down to my wife that the car

12  is still there, he must be coming to the house, and my wife

13  went to the front door and found him -- we have -- I'm

14  sorry -- our front door and on either side of our front door

15  we have a stack of windows on either side, and he was

16  looking into the windows, saw my wife and was waving his

17  business card at her, smiling that -- he didn't say this,

18  but he was clearly signalling that he was indeed following

19  through with the threat that he would show up at the house

20  earlier.

21          We called 911 at that point, called the police,

22  said that there was this person doing this.  My wife

23  explained to them that I was -- in 24 hours I was scheduled

24  to testify here and we were scared.  The police showed up.

25  So my wife had 911 on the phone and actually pressed the

1    phone -- because he was barking things at her, she held the

2    phone up to the pane of glass that he was looking through to

3    demonstrate to the dispatcher on the other side that this

4    was real, you know what I mean, this guy was angry.

5              So she yelled at the guy -- the dispatcher --

6    yelled at the guy that she had called the police, this was

7    the police, the police were on their way and he needed to

8    leave.  And he walked up the driveway, got in his car, drove

9    away, and the police stopped him -- I didn't see this, but

10   the police came to our house --

11   Q.   We're not allowed to get into hearsay of what the

12   police told you, so I'm going to set that aside.

13   A.   Okay.

14   Q.   Did you have anymore intrusions into your life from

15   this gentleman or is that the end of your direct involvement

16   with him?

17   A.   That was the end of -- he did not come back.

18   Q.   And this is right before you and I met for the first

19   time yesterday afternoon to discuss what you had to say to

20   the jury today?

21   A.   Yeah, literally -- I noticed that he was there was I

22   was pulling my pants up in my bedroom.  So, yeah -- we would

23   have --

24   Q.   You weren't doing that in front of that window pane,

25   were you?

Page 94

1    A.    No, but he -- he was blocking the driveway, so in just

2    a matter of moments my daughter going to karate -- my

3    daughter would have encountered first, she was on her way to

4    karate, they would have encountered first.

5    Q.    At some point in time did you hear your wife say to him

6    something to the effect of how do you even know who I am or

7    something like that?

8    A.    He was saying that he -- he described to her when he --

9    when he called the second time, that there was -- that he

10   knew everything there was to know about her, but seemed to

11   be confused about whether or not we were actually married.

12   And so he was asking questions about whether or not she was

13   married to me.  But he then rattled off my wife's -- lots of

14   details about my wife, about her business, that she was --

15   had gone to law school, that -- so he -- he demonstrated

16   that he did know a great deal about my wife, but he was

17   confused about whether or not we were married.

18   Q.    In light of all of this, as I asked you yesterday

19   afternoon, I'll ask you today in front of the jury in court,

20   are you still willing to testify and tell the jury what

21   happened about your time at Warner-Lambert?

22   A.    Yes -- I've been subpoenaed, but, yes, I am.  My

23   daughter's afraid of the guy at the door, so we didn't get

24   much sleep last night, but absolutely, no, I need to do

25   this, yes.

Page 95

1    Q.   Very good.  Then, sir, with that I want to ask you some

2    questions.  Let's start with your background.

3              Why don't you tell the jury a little bit about you

4    and who you are.

5    A.   I'm 47 years old, I've got a 19-year-old daughter that

6    attends Hofstra University, she starts her junior year, and

7    an eight-year-old that starts third grade in September.  I

8    grew up in Rhode Island, in Warren, Rhode Island.  Went to

9    the University of Rhode Island both for my undergraduate

10   degree and for my graduate degree.  I worked throughout

11   undergraduate and undergraduate degree, so by staying at the

12   same school for undergraduate and graduate it allowed me to

13   keep working throughout school.

14             From there I went to the Dana-Farber Cancer

15   Institute, which is right here in Boston.  I spent three

16   years there working on single transduction host disease in

17   children.

18   Q.   Time-out.  For those of us who don't use those words

19   every day, what kind of work were you doing at Dana-Farber?

20   A.   Dana-Farber, I worked in the unit at Dana-Farber called

21   pediatric oncology.  Dana-Farber treats people with both --

22   both adults and children but has a unit focused specifically

23   on children with cancer.  So I was in the department of

24   pediatric oncology.

25   Q.   Were you treating children as a medical doctor?

1   A.   No, no, again, I have a PhD.  So I was trained as a

2   scientist, not at all as a clinician, I am trained as a

3   scientist.  So what I -- my job there was to help -- was to

4   do the research, do my little bit of this larger scale of

5   research that eventually could develop new treatments for

6   kids with cancer.

7   Q.   What kind of hours were you working?  What kind of

8   money were you making?  Tell us a little more about the job.

9   A.   Dana-Farber is a fantastic research institution, but it

10  does require a lot of hours.  On a typical day I would work

11  12 hours, start at 9:00 and end at 9:00 is a typical

12  workday.  And I made -- my income was based on what grants I

13  was able to -- grants or awards, academic scholarships or

14  post-doctoral scholarships and grants from the National

15  Institutes of Health, organizations like that dictated my

16  salary.  But the salary for the most part was around

17  $18,000.

18  Q.   $18,000.  Did you have -- you had a child at this point

19  in time?

20  A.   Yes, Hillary, my oldest.

21  Q.   She's the girl at Hofstra?

22  A.   That's right.

23  Q.   And $18,000, a PhD, I'm assuming you had some student

24  loans?

25  A.   Yeah, yeah -- well, I worked through school, I

1    bull-raked quahogs.

2    Q.    You did what?

3    A.    I bull-raked quahogs.  You guys are from New England.

4    They're hard shelled clams.  When I was in high school, I

5    actually bought an 18-foot skiff.  So I would go out on

6    Narragansett Bay, when I grew up in Warren, and you

7    essentially drop this rake into the mud in deep water and

8    rake up quahogs.

9    Q.    Rake up what?

10   A.    Hard shell clams.

11   Q.    Okay.  That's okay, I'm just --

12   A.    It's not your fault.

13   Q.    Okay.  So I think we got off into this because I was

14   asking you about --

15   A.    I'm sorry.

16   Q.    -- student loans.  Where were you economically at this

17   time?

18   A.    So when I went to graduate school and the latter years

19   when I was moving towards getting my bachelor's degree, the

20   amount of money I made doing that didn't pay for all of

21   graduate school, so I had to take student loans, both as an

22   undergraduate and as a graduate student, and so, yes -- I'm

23   sorry for the long answer, but the short answer is yes, I

24   had lots of student loans.

25   Q.    I think what's useful for us all is did you reach a

1   point in time where you decided it would be helpful to make

2   more than the $18,000 a year you were making?

3   A.   Yeah, useful, it was necessary.  So $18,000 a year

4   wasn't -- was barely enough just to cover -- if my only

5   expense were the student loans, the $18,000 would just

6   about -- after taxes and all of that would just about cover

7   the student loans.  So it had become actually necessary for

8   me to earn more -- have more stable income.

9   Q.   So what did you do?  How did you find another job?

10  A.   For scientists, somebody with a PhD, either -- there

11  are scientific journals, Science is probably the most

12  prominent one, in the back of Science -- it's a magazine --

13  they'll have lots of scientific articles in there, it's

14  actually a very prestigious magazine, but in the back of it

15  they'll have job classifieds, just like every other industry

16  has.  So there would be job classifieds there, and I would

17  apply for those jobs.

18        To be straight with you, though, that's a

19  prestigious magazine, they're pretty hard -- the jobs --

20  there are two different types of jobs there, they're

21  good-paying jobs, but are very hard to get.  They're kind of

22  very prestigious jobs, or they're good jobs that still pay

23  about 18 to 20 thousand dollars a year.  So I needed to be

24  creative about what job I took because of -- I did need more

25  than the 18 or even 25 thousand dollars a year.

1    Q.    Did you have any luck at getting one of the good,

2    high-paying, quality jobs out of the back of the magazine?

3    A.    Straight scientific job, no, I did not.

4    Q.    So what did you do instead?

5    A.    I applied for a job at Warner-Lambert as a sales

6    representative.

7    Q.    Where did you come across information Warner-Lambert

8    was looking to hire someone?

9    A.    I had -- every Sunday I would go through Science, and

10   then I would move on to the Boston Globe, and I was

11   literally flipping through the Boston Globe looking for

12   jobs.  We have a pretty good biotech industry here in

13   Massachusetts, so those biotech companies would hire for

14   jobs.  And I would look through those and eventually found

15   this position.

16   Q.    But how does a -- or why does a PhD microbiologist,

17   cancer researcher at Dana-Farber apply for a job as a sales

18   rep at Warner-Lambert?

19   A.    It was a foot in the door.  It was -- I never -- I

20   didn't think -- I didn't see my career being permanently a

21   sales position, but I did see it -- this is an opportunity

22   to land a position with a pharmaceutical company that I

23   could prove myself through my own skills and experience, and

24   then once inside the company I'd have access to other

25   opportunities within the company, and therefore, be able to

1  move from a sales position into some other clinical or

2  scientific position.

3  Q.   So was your goal when you went to work for

4  Warner-Lambert to be a sales rep or was your goal to get

5  into your field somehow more directly inside that drug

6  company?

7  A.   Yeah, ultimately it was to get back to my field, but I

8  recognized that the initial job that I was applying for was

9  a sales job, and it was quite a leap to go from a sales job

10  to that.  It was admittedly an unconventional approach.

11  Q.   Did -- when you applied for the job, how did you go

12  about applying for it?  Is this just send in a resume'?  Is

13  it make a phone call?  What do you do?

14  A.   It was send in a resume'.  It was literally how

15  everybody else applies for a job that they see in the Globe.

16  Q.   What happened after you sent in your resume'?

17  A.   I got a phone call from Parke-Davis.

18  Q.   Parke-Davis is a part of Warner-Lambert?

19  A.   Yes, yes, right.

20  Q.   Okay.

21  A.   So I got a phone call from Parke-Davis saying that they

22  were interested in me, not only from a sales point of view,

23  but they had another position called a medical liaison, that

24  they had a group of medical liaisons that were going to meet

25  here in Boston, that the medical liaisons that were actually

1   dedicated to Boston were going to meet and that they wanted

2   to -- and very quickly set up an impromptu meeting where I

3   could actually get to meet these people on the spot.  It was

4   essentially a casual meet and greet sort of interview.  It

5   wasn't really the true job interview.

6   Q.   I want to digress just for a moment and make sure that

7   I understand you clearly.

8           You were talking to people at a company that was

9   Parke-Davis?

10  A.   Right.

11  Q.   But you've always used the name Warner-Lambert?

12  A.   Right, I'm sorry --

13  Q.   Are those one and the same, in essence?

14  A.   Right.  Parke-Davis was the pharmaceutical division of

15  Warner-Lambert.  So at the time Warner-Lambert made things

16  like Listerine, but it also owned this company -- a division

17  of the company was called Parke-Davis that had a whole

18  portfolio of drugs.

19  Q.   So you understood Parke-Davis to be the drug part of

20  Warner-Lambert?

21  A.   Right.

22  Q.   Okay.  The second thing you said that I want to make

23  sure I'm clear on is that you applied for a job as -- in

24  sales?

25  A.   Right.

1    Q.    But you wound up taking a job as a medical liaison?

2    A.    Right.

3    Q.    Did I get those words right?

4    A.    That's right.  I think technically my business card

5    said medical and scientific liaison?

6    Q.    Medical and scientific.  There.

7              I want you to explain the difference --

8              JUDGE SARIS:  So what year was this?

9              THE WITNESS:  1996.

10             MR. LANIER:  Thank you, Judge.

11   BY MR. LANIER:

12   Q.    1996.

13             Would you please explain the difference between

14   what it meant to be a salesperson and what it meant to be a

15   medical and scientific liaison?

16   A.    It's more -- if you could have some patience with me,

17   it's more complicated than it may seem because there were

18   two different descriptions.  The sales job --

19   Q.    Keep talking loud, please.

20   A.    The sales job is what everybody thinks of as a sales

21   job, is you go out there, a sales representative selling any

22   other product, representing the company's product, telling

23   the customers about the features and benefits of the product

24   and selling it.  The medical liaison position, there were

25   really two different descriptions of it.  The one -- the

1    official description, if you would, was that I was there to

2    answer the physician's questions about Parke-Davis drugs and

3    help them to offer the best possible clinical practice to

4    their patients.

5              So, for example, if a new drug is launched, the

6    FDA approves a drug, launches it, how does a physician learn

7    about that drug?  Typically they -- when it's an approved

8    drug, they learn it through the sales force.  So the sales

9    force will detail, actually meet with physicians and explain

10   the features and benefits of the new drug.  But there are

11   times when a physician will need to use the drug in a way

12   that the directions that come with it -- sometimes you've

13   seen these directions when you get something from the

14   pharmacy, they used to be this long, thin sheets with lots

15   of chemical formulas on it.  Sometimes physicians will have

16   questions about those approved uses, everything from

17   potential side effects to other ways of using the drug, and

18   they'll have those questions.  That exceeds what a sales rep

19   typically is trained to do, so that's where a medical

20   liaison can get involved.

21             The other element of a medical liaison -- or the

22   official description is sometimes physicians are interested

23   in running clinical trials, particularly here in the

24   Massachusetts area, and the medical liaison was somebody

25   that could act -- that's what the liaison was, gave

1  reference to, act as a conduit between the physician and the

2  clinical development department at the company that could

3  help facilitate that clinician actually running a medical

4  trial.  The purpose of a clinical trial would be, again, to

5  benefit patients ultimately.

6  Q.   Mr. Franklin, when you first took the job, did you

7  think you were applying for a job as a salesperson?

8  A.   Yes, yes, I -- yes.

9  Q.   As you were moving -- hoping to move into a scientific

10  role, what was the effect when you found out they were

11  interested in you instead as a medical and scientific

12  liaison?

13  A.   I was thrilled about it.  So as I had mentioned

14  earlier, I was applying for a sales job, ultimately wanted

15  to move into a clinical -- or scientific position.  As naive

16  as I was at that point, I knew that was going to be a very

17  difficult leap.  However, the medical and scientific liaison

18  position seemed to solve that problem, or I believed at

19  least during those interviews that I would be working

20  closely with the medical -- the clinical development

21  department and directly with physicians.  It was actually

22  quite thrilling, because I -- at Dana-Farber I worked side

23  by side with physicians every day, so it seemed like a very

24  nice transition, actually.

25  Q.   All right.  Once you got the call back asking about an

1  interest in scientific medical liaison, how did the ball

2  move forward in getting that going?

3  A.   So I had the casual meet and greet at Parke-Davis

4  asking me to attend, it was held right here in Boston at the

5  Ritz Carlton Hotel.  The medic liaisons in the area, as well

6  as the person that I would ultimately be working for, were

7  here running what they called a consulting meeting.  During

8  one of the breaks during the consulting meeting, they would

9  be able to meet with me.  And so I showed up, they were

10  already -- when I got there, they were already sitting in

11  the lounge, the break had taken place, and we sat in the

12  lounge at the Ritz Carlton Hotel, and we literally discussed

13  life.  It was clearly just do you like me, do I like you

14  sort of session.

15  Q.   After that session, did you actually get called back or

16  something for interviews within the company itself?

17  A.   Yes, yes.

18  Q.   Would you tell the jury briefly about those -- what

19  happened when you got called back for interviews?

20  A.   So I got called back --

21  Q.   You had to buy a suit, didn't you?

22  A.   Yeah, I did have to buy a suit.  So I got called

23  back -- I wasn't quite sure how that meet and greet had

24  gone, but I did get a call back a few days later from

25  Parke-Davis saying that they wanted me to spend a full day

1    in the Northeast CBU headquarters in New York -- Parsippany,

2    I'm sorry, and to fly down there and interview all day long.

3    As he just pointed out, I wasn't actually prepared for that.

4    At Dana-Farber it was a hyper casual sort of environment.

5    So I did need to scramble and go out and buy a suit and that

6    sort of thing.  But did fly down there and was picked up by

7    a limousine and driven to the headquarters in Parsippany.

8    Q.   One of the reasons I asked about a suit, I want to

9    know, did you get exposed to a different culture and a

10   different approach to things as you were going to

11   Warner-Lambert versus what you were exposed to when you were

12   working at Dana-Farber?

13   A.   Yeah.  Yeah, so -- so I was sitting on the plane

14   preparing -- typically how a scientist interviews for a job

15   is they talk about their scientific credentials.  They

16   actually present prior work.  So it's a series of

17   PowerPoints and publications, very complicated scientific

18   discussion.  Typically you're talking to somebody's that's

19   outside of your field, so it can be a challenging

20   conversation, but you essentially try to prove yourself by

21   the innovative ideas behind your science.

22            And so I was prepared for that type of very

23   technical scientific conversation, even though I knew that I

24   was applying for -- I had initially applied for a -- excuse

25   me, a sales job.  At this point I knew that I was actually

1   applying for the medical and scientific liaison position.

2   So I expected a science sort of discussion.

3                The problem -- I bought the suit too late and that

4   sort of thing, so I had to tailor it myself with that tape

5   which everybody seems to get a charge out of, but I

6   recognized when I was sitting in -- I got there and there

7   was a guy standing at the gate -- back then you could still

8   stand at the gate and pick up people, there was a guy there

9   with Dr. Franklin on his tag and I got in the limousine.

10  The difference in terms of the culture in the pharmaceutical

11  industry and the culture in at Dana-Farber are -- could not

12  be any more different.  They are -- they're dramatically

13  different.

14  Q.   When you got off -- out of the limo they sent and you

15  got there, how did the interviews go?  Was it the scientific

16  interview you expected?

17  A.   No, not at all.  No, no, there was no -- so I had my

18  briefcase and all that sort of stuff.  I was prepared -- I

19  sweated bullets on that plane going down there, because I

20  was really prepared for a scientific discussion, and I had

21  even bought one of those how to interview books and so I was

22  studying up on that sort of.  I was so self-conscious at

23  this point I actually left the how to interview book on the

24  airplane because I was afraid somebody would see it on the

25  briefcase when I was taking out my scientific presentations.

f5ddb65d-0280-4f94-b517-80266a6ab59e

1   But they -- I got there and it was not -- there was no

2   discussion of my science, the science that I had worked at

3   Dana-Farber at all.

4   Q.   What did they discuss with you?

5   A.   You know, the -- more of that meet and greet, feeling

6   out my personality.  Before I had gone down, the person

7   from -- her name was Zona Hodge from HR.

8   Q.   HR being human resources?

9   A.   I'm sorry, human resources.  Her advice to me was that

10  in this meet and greet at the Ritz Carlton I wasn't

11  aggressive enough, I wasn't selling myself.  She was

12  coaching me I had to sell myself on this.  I needed to be

13  much more out -- not outgoing, but I needed to demonstrate

14  why they needed to give me the job.  And so when I had

15  gotten that input, I recognized that I needed to figure out

16  how to actually do that.  I had never applied for a job that

17  wasn't based on your credentials, the other scientific jobs

18  that I had applied for but I had been turned down were

19  really based -- they were scientific interviews.

20           So when I got down there, the conversations were

21  much more, in retrospect, sales oriented.  The primary theme

22  of the -- the theme that stood out was -- everybody that I

23  interviewed with was -- either asked me or prepared me to

24  answer questions about times when I've had to bend the

25  rules.  Give me examples of when you found yourself in

Page 109

1   conflict or you found yourself in a place where you were

2   working in a gray area, how did you handle that?  And boy,

3   that wasn't in the how to interview book, and I really -- I

4   had a difficult time.  I struggled with coming up with an

5   example of a case of where I had been in a gray area or I

6   had to bend the rules.

7   Q.   And did this come up once?  You called it a theme.  How

8   often were you talking -- asked about or discussed with in

9   this interview process bending rules or gray areas?

10  A.   Three separate times.

11  Q.   What did you tell them?

12  A.   I -- the most difficult conversation was with Mike

13  Valentino is the person who actually I had been told was --

14  he was the vice president -- he was responsible for the

15  Northeast CBU.

16  Q.   Time-out, one second.  Mike Valentino, e-n or i-n?

17  A.   e.

18  Q.   You said he was in charge of what?

19  A.   The Northeast CBU.  So that's the Northeast customer

20  business unit.

21  Q.   C is customer?

22  A.   Yeah.

23  Q.   Business unit?

24  A.   Yes.

25  Q.   So when we hear you or someone else talk about the

1  Northeast CBU, talking about the customer business unit.

2  And Mike Valentino headed that up?

3  A.   That's right.

4  Q.   Okay.  Would you please continue now the conversation

5  you were having with Mike Valentino that you thought was the

6  most unusual, or difficult?

7  A.   So what Mike was -- he asked me directly to give him an

8  example of where I needed to bend the rules or work in the

9  gray area, and I struggled with it.  I did one of those

10  awkward sort of sweating trying to come up with the -- an

11  example.  And the example I had come up with, I had as a

12  graduate student I had designed an exam and made the

13  rules -- I structured the question and instructed the

14  grading of the exam so that the student -- one of the

15  students -- this was a microbiology class, actually figured

16  out -- found a loophole in the way I had structured the exam

17  so that if you didn't answer any questions, he actually

18  got -- he would get an A.  And so he handed in a blank exam

19  and then pointed out to me that the way I had structured the

20  exam there was no way I could fail him, and he was correct.

21  He was right on that.

22  Q.   Did you become most popular professor on campus at that

23  point?

24  A.   I corrected that error quickly, and he was the only one

25  who figured it out.  So I attempted -- I explained that,

1    where I had created the problem and had somebody that was

2    taking advantage of a mistake that I had made that was

3    clearly not within the spirit of exam taking, but it clearly

4    did not -- that kind -- that conversation of how I dealt

5    with the student, talked to the student about him not

6    appreciating the point of taking an exam, he might

7    clearly -- that was not my -- what my response did not

8    answer his question.

9    Q.   Ultimately did you get the job?

10   A.   Yes, Mike gave me the job offer in the same

11   conversation.

12   Q.   In that conversation?

13   A.   Yes.

14   Q.   How -- what did he offer you?

15   A.   $55,000 a year and the job as medical liaison in the

16   Northeast CBU, and I would start at $55,000 a year.

17   Q.   Okay.  This is 1996, right?

18   A.   Mm-hmm.

19   Q.   And in 1996 -- I'm abbreviating your last name -- in

20   1996 you had been working at Dana-Farber doing work 12 hours

21   a day, you said, how many days a week?

22   A.   Six.

23   Q.   And you were making how much?

24   A.   About 18 -- it varied, but about $18,000 a year.

25   Q.   And didn't own a suit?

1  A.    It seems to bother you.

2  Q.    Occupational hazard to me.

3  A.    Just so you understand at Dana-Farber.

4          JUDGE SARIS:  No, I don't think we need to --

5          THE WITNESS:  Okay.

6  BY MR. LANIER:

7  Q.    But that was rigorous scientific environment for you,

8  wasn't it?

9  A.    Arguably one of the most scientific environments in the

10 country.

11 Q.    You went to work at Warner-Lambert Parke-Davis.  What

12 did your hours wind up being?

13 A.    They were short.  I believe that technically it was an

14 eight-hour day, but Lisa Kellet, the person I worked with

15 most of the time pointed out to me that it was rare you had

16 to work past 2:00, if you planned your day correctly.

17 Q.    Okay.  So somewhere less than eight hours in general?

18 A.    Significantly less than eight hours in general.

19 Q.    Did you work six days a week?

20 A.    No.

21 Q.    How many?

22 A.    Five.

23 Q.    And how much were they willing to pay you?

24 A.    $55,000.

25 Q.    Did you get any perks you didn't have at Dana-Farber?

1    A.    I got a car.  I got a car, gas, that sort of thing.

2    Q.    Did you take the job?

3    A.    Yes.  Yes, I did.

4    Q.    How long did you think about it?

5    A.    I accepted it right away.

6    Q.    Did you find the same type of scientific invigorating

7    environment in your job as the medical liaison at

8    Warner-Lambert Parke-Davis as you had at Dana-Farber?

9    A.    No, not at all.  I did recognize that my job at

10   Warner-Lambert was different, it was clearly different, I

11   knew I was applying for a job that was different than it was

12   at Dana-Farber.  So, no, they weren't remotely comparable.

13   Again, at Dana-Farber I was doing bench top science, at

14   Warner-Lambert I was not.

15   Q.    By the way, you told me yesterday afternoon when I was

16   visiting with you about this, you got another perk that you

17   didn't know you were going to get.  You got a subscription

18   to a magazine, what was that?

19   A.    Yeah, it was -- I got a subscription to Selling Power

20   magazine.

21   Q.    Was that a surprise to you?

22   A.    Yeah -- it was.  I had earlier given you the

23   description of -- there was an official job description that

24   I was not a sales representative, that I was there really to

25   serve -- to act as a liaison, that's what the job title

1    said.  A connection between Warner-Lambert Parke-Davis and

2    its scientists, its clinical development, its R&D, it's a

3    management team and physicians who actually practice

4    medicine on a day-to-day basis, that was my official job

5    description.  But in actual practice I was a sales rep

6    through and through.  So Selling Power -- in the context of

7    in the day-to-day practice of my job, Selling Power made

8    perfect sense, but --

9    Q.   In the context of your thinking process when you had

10   thought that you'd already in a sense bumped past sales and

11   were moving into the scientific area, was it kind of a bit

12   of a letdown when you realized that maybe you had a

13   different title but you were still expected to do sales?

14   You got the selling magazine?

15   A.   No -- I think the question -- that doesn't capture --

16   how do I put it?  It wasn't a letdown.  I knew I was

17   applying -- I had applied for a sales job.  Eventually I

18   realized that I was in a sales position.  If I had taken the

19   sales job and found myself, you know, four months later in a

20   sales position, I would have gotten what I expected, where

21   the disappointment or the letdown was that the sales

22   position -- the sales that I was responsible for were sales

23   that were prohibited by the -- by law.  And so my letdown,

24   if you will, was that I was selling products illegally.  So

25   it -- how do I put it -- that -- I guess I've answered it

1  with a long answer, is the letdown, because I applied for a

2  sales job, I found myself in a sales job would be -- letdown

3  wouldn't actually capture that.  That would be what I

4  actually expected.  What the letdown actually was, was that

5  I was in a sales job where my responsibility was to sell

6  products illegally.

7  Q.   How did you find out that you were expected to sale

8  products illegally?

9  A.   I was trained on it from day one I was trained on it.

10  Q.   Let's start out with day one then.  Tell us a little

11  bit of how you were trained when you got this amazing paid

12  new job?

13  A.   I followed -- I worked directly with the individual --

14  the other medical liaisons in the Northeast CBU, so I

15  followed around primarily an individual named Lisa Kellet,

16  whose job responsibility was for me to go side by side with

17  her to visit doctors and see how -- and she showed me how

18  she would sell doctors on the off-label use of drugs,

19  particularly Neurontin, and then I was -- we had official

20  training sessions where Phil Magistro, the person that Lisa

21  Kellet and I reported to, he would train us, he would give

22  us new information and show us how to use the slides that he

23  would give us.  And then we actually had official -- all the

24  medical liaisons in the entire country got together in Ann

25  Arbor at one point for national training.

1   Q.   All right.  You've used some names.  I would like you

2   to help us, please, put those names into a context so that

3   we can remember them as they recur during the trial and we

4   have something we can go back to.

5          You are a medical liaison.  Was Lisa also a

6   liaison?

7   A.   Yes.

8   Q.   All right.  So the liaisons would have been Lisa --

9   what was her last name?

10  A.   Kellet.

11  Q.   K-e --

12  A.   -- l-l-e-t.

13  Q.   And you, Dave Franklin.

14  A.   And another, Mike Davies.

15  Q.   And a third, Mike Davies?

16  A.   Yes.

17  Q.   And who did you three report --

18  A.   These were just the three that were located here in the

19  Massachusetts area.

20  Q.   All right.  So this was the Massachusetts area

21  liaisons?

22  A.   Right, yes.

23  Q.   And who did you three report to?

24  A.   Phil Magistro.

25  Q.   Phil, can you spell his last name, please?

1   A.   M-a-g-i-s-t-r-o.

2   Q.   What was his job title?

3   A.   He was director of medical affairs, I believe.

4   Q.   Did you have regular interaction with anyone else?

5   A.   Many other people.

6   Q.   Where would they fit on this parameter, or on this

7   diagram, paradigm?

8   A.   Again, just as I had an official and unofficial job

9   description, there were two different org charts, also.  So

10  I technically -- Phil Magistro -- so the medical liaisons

11  were part of an organization called medical affairs.  Phil

12  Magistro reported into someone named Bill Sigmund, who was a

13  physician and who I believe was vice president of medical

14  affairs.

15  Q.   Bill Sigmund?

16  A.   Right, MD.

17  Q.   And he's an MD?

18  A.   Yes.

19  Q.   And he's a vice president of medical affairs?

20  A.   I believe -- I believe that was his title, yes.

21  Q.   Okay.  So you said there were two organization charts,

22  org charts?

23  A.   Right.

24  Q.   This one -- explain how there are two.

25  A.   So on a day-to-day practice point of view, and what I

1   was actually told -- what Phil Magistro explained to me in

2   that all-day interview session was that while he technically

3   reported to Bill Sigmund, in all practice he reported in to

4   Mike Valentino, the vice president of the Northeast CBU.

5   And so it was Mike Valentino who would actually decide

6   whether I would get the job.  In fact, that's what it turned

7   out, that Mike Valentino offered me the job.

8   Q.   Now, what was Mike Valentino's job in medical affairs?

9   A.   He didn't work in medical affairs.  He was -- he was

10  part of the -- separate organization org structure.  The way

11  that Parke-Davis was set up was that it had regional

12  business units.  So I was obviously in the Northeast, but

13  there was a southeast, there was a western, and so there

14  were different geographic regions, and they would run

15  somewhat independently.  So Mike Valentino was responsible

16  for all sales, marketing, that type of operational stuff in

17  the Northeast.  So he ran it more or less as a business.

18  But he was -- all the sales and marketing guys reported in

19  through Mike Valentino.

20  Q.   So even though by the main org chart you seemed to go

21  through medical affairs up to the medical doctor vice

22  president, in actual practice, was it the head of sales who

23  was running your liaison area?

24  A.   Yes, yes.  And so when -- when we would have conference

25  calls and training periods, it was actually the sales

1   people, the directors of sales that actually -- the sales

2   and marketing that would actually run the meetings, John

3   Krukar and John Ford.

4   Q.   You said a little bit earlier that you were told to

5   sell a product, in essence, illegally.  Really?  And were

6   they that blunt about it?

7   A.   Yeah, so the -- I know that's an inflammatory term, but

8   the -- what I was responsible for doing -- so any given -- I

9   was responsible for selling Neurontin off-label.  I had a

10   list of 13 indications of we would call the snake oil list.

11   It was a list of 13 indications that I was supposed to go

12   out and tell physicians that they should use this drug in

13   their patients, that we had a large and growing body of data

14   that showed that this drug was safe and efficacious in those

15   patients, and that I should encourage those physicians to

16   actually use the drug in patients.

17           So that may sound ludicrous, but it's -- you have

18   to think of it from a doctor's point of view.  A doctor has

19   a patient that he's been seeing, in some cases, for years,

20   and he's struggling.  Let's say that person is suffering

21   from pain.  It's very frustrating for a physician to time

22   after time again try to treat a patient who is suffering

23   from pain and they come back every month still having -- in

24   some cases debilitating pain.  Other people with bipolar

25   disease who are -- he's treating with lithium and the

1    patient is still experiencing symptoms can be very -- it's

2    troubling.  Physicians want to cure, and they hate to see

3    their patients suffering.  So when you see someone named

4    Dr. David Franklin coming into your office saying, look,

5    we've got clinical data that shows this drug is effective in

6    treating bipolar disease, those docs are actually quite

7    motivated to benefit their patients.  And so it actually is

8    easier -- it's actually quite easy to convince a physician

9    to use a drug off-label.  Why I say it was illegal in this

10   case was that we did not -- the problem with that is because

11   the drug has never been actually tested and evaluated by the

12   Food and Drug Administration to see if it is generally safe

13   and efficacious.  That physician is experimenting on that

14   patient.  And when you do that sort of thing, you're going

15   to have -- the physician needs to have a very heightened

16   awareness of the things that can go wrong for that patient.

17   That's why the FDA says while the physician has the right to

18   do that, a company cannot promote for it.  And my job was to

19   promote, to encourage, and to actually greatly encourage, to

20   motivate in a number of different ways physicians to

21   experiment like that.

22   Q.   All right.  I want to segment out some of the things

23   you've put into that answer because first of all, you say

24   when I was introduced as Dr. David Franklin, what -- what do

25   you mean by that?  Explain the importance of that to the

1    jury, what was really going on?

2    A.    So part -- part of the Hippocratic oath says that a

3    good doctor --

4    Q.    Hippocratic oath being what doctors take?

5    A.    The Hippocratic oath that doctors take --

6    Q.    Medical doctors?

7    A.    Medical doctors take when they graduate from med

8    school.  Really it's just a body of medical ethics, what

9    makes a good doctor, what makes a good person, a good

10   physician.  And an important part of that is a physician

11   recognizing his own limitations, recognizing that I don't

12   actually know how to treat this patient, and therefore,

13   reach out to their other physician friends.  So the modded

14   version of the Hippocratic oath actually specifically states

15   that a physician should be able to reach out to his other

16   physician friends, his peers.

17            So by a sales rep introducing me as Dr. Franklin,

18   it right away would give the physician the impression that

19   he was dealing with a peer.  It was inaccurate, but it would

20   appear --

21   Q.    When they introduced you as Dr. Franklin, was it

22   under -- did you feel an impression was being left that you

23   were actually a medical doctor?

24   A.    Yeah, at the very least a medical doctor, someone that

25   was bound by that same oath, or, and at the far other end of

f5ddb65d-0280-4f94-b517-80266a6ab59e

1    that, I was at the very least an expert at what I was

2    conveying to him.  So my business card would say PhD on it,

3    it did not say MD on it.  Most physicians did not get my

4    business card, but if they did, they would see PhD and at

5    the very least I was an expert in neurology.  One of the

6    issues came up is that we would cold call physicians --

7    Q.   Cold call?

8    A.   Cold call, so we would go to a medical building --

9    Q.   I'm sorry to interrupt.  How would you pick the doctor

10   that you are going to cold call?

11   A.   I had lists, something called decile lists, so a list

12   of every physician in the state.  They're actually in some

13   cases the entire Northeast.

14   Q.   Decile, d-e-c --

15   A.   -- i-l-e.

16   Q.   And who gave you the decile list?

17   A.   The marketing team.

18   Q.   What is a decile list?

19   A.   When you get a prescription and bring to any CVS,

20   Walgreens, any of those pharmacies, those pharmacies take

21   that prescription data and sell it to a company, in this

22   case it was IMS, there are a number of different companies

23   that handle them, but they actually sell your doctor's

24   prescribing behavior through prescriptions you have filled,

25   sell it to another company.  That company then -- or the

1    pharmaceutical company, in my case, Warner-Lambert, then

2    buys that data from this third company.  That data has,

3    like, the doctor's name, his address, and his actual

4    prescribing behavior for any particular drugs that you want

5    to buy.  So if you're interested in his prescribing of

6    antiepileptic drugs, you can see exactly how many

7    antiepileptic prescriptions that physician wrote over any

8    time period.

9                So I was getting to your question, I would choose

10   the doctors based on their decile, which was the volume of

11   prescriptions they wrote.

12               MR. LANIER:  Your Honor, at this point in time

13   we'd move into evidence Plaintiff's Exhibit 2020 F, which is

14   one of the decile lists of this witness.

15               MR. GOODELL:  Your Honor, no objection, other than

16   those that we've already raised with you.

17               THE COURT:  All right.

18               (Exhibit 2020 F received into evidence.)

19   BY MR. LANIER:

20   Q.   Sir, you've got a little screen in front of you, the

21   jury has some screens.

22               MR. LANIER:  Mr. Alba, if I can impose on you to

23   give me some Elmo.

24               JUDGE SARIS:  It's basically the document camera,

25   not a creature from Sesame Street.

1          (Discussion off the record.)

2    BY MR. LANIER:

3    Q.   Okay.  I just randomly -- and the jury is going to have

4    the whole exhibit so they can look it -- but just randomly

5    grabbing a sheet of paper out --

6          THE COURT:  This is something you received?

7          THE WITNESS:  Yes, yes.  This was an integral part

8    of my job.  This list that he's showing here actually is how

9    I would decide who would I go see.  So if you --

10   BY MR. LANIER:

11   Q.   Okay.  So let's just start with a column on this list

12   and we'll work our way across to understand what it is.  The

13   territory seems to have numbers.

14   A.   Right, so that makes reference to a particular sales

15   territory.  That's how the company would track commissions

16   back to sales reps, keep -- it's --

17   Q.   Sales reps are getting commissions off of these sales

18   you're generating?

19   A.   That is how the sales reps were compensated.

20        MR. GOODELL:  Could you give me a page?

21        MR. LANIER:  Yes, I'm on, it looks like,

22   11426-PBS.  Here's the Bates number down at the bottom,

23   11426 -PBS.

24   BY MR. LANIER:

25   Q.   All right.  So you've got a territory to get the

f5ddb65d-0280-4f94-b517-80266a6ab59e

1    bonuses to the sales reps, and then last name is the next

2    column.  What does that mean?

3    A.   It's the physician's last name.

4    Q.   All right.  So we could find a Dr. Holzer, I we'll

5    throw in the first name at the same time, a Dr. Donald

6    Holzer in that area?

7    A.   That's right, in that sales area.  His zip code is a

8    couple of columns over.  So geographically he would be in

9    11772, and I have no idea where that is.

10   Q.   All right.  So the specialty is an N.  What does that

11   tell us about him?

12   A.   Neurology.

13   Q.   AED decile 7.  Do you remember what that is?

14   A.   Antiepileptic drug decile.  So this is a measure of how

15   large his prescribing base is.  So if you can imagine a

16   physician with a relatively small practice -- a good way of

17   looking at this would be a physician with a small practice

18   that has 150, 200 patients, that would more or less cap how

19   many potential prescriptions for antiepileptic drugs that

20   physician could write.  However, a physician with a much

21   larger practice or a practice that's solely focused on --

22   let's say general practitioner has 200 patients and eight of

23   them have a need for an antiepileptic drug, so they have

24   epilepsy.  That would be a very low need prescription,

25   because the number of prescriptions that doc writes each

f5ddb65d-0280-4f94-b517-80266a6ab59e

1    month for antiepileptic drug is very small.

2           However, if you took a same -- a neurologist now,

3    who had still just 200 patients but they were all epilepsy

4    patients, he would be a much higher decile physician,

5    because he would write many, many more prescriptions for

6    antiepileptic drugs.

7           So this is a measure of not just the doctor's

8    practice, but their focus in clinical areas that we're

9    interested in.

10   Q.   Were you trying to find doctors that had a lot of

11   potential to write prescriptions?

12   A.   Yes.  So this decile is on a 1 to 10 scale, so you can

13   see where the decile is, they're all 7s, 8s, you can see

14   Dr. -- his first name is Stanley, is a decile 10, so that

15   would be one of the largest practices.  This isn't

16   necessarily a linear scale.  Dr. Stanley's practice is

17   significantly larger than Dr. Donald's practice, given that

18   he's a decile ten.  When I say practice measure, the real

19   measure I was taught to be interested in is how many

20   prescriptions they write, not how many patients they have.

21   Q.   I don't want to get bogged down in this.  If we look at

22   the entire paper we see some other doctors that are GP, CHN,

23   CHP, what are they?

24   A.   Different types of physicians, general practitioners,

25   psychiatrists.

1  Q.   Why would you be interested in what a psychiatrist is

2  doing?

3            Time-out.  At this point in time, what is this

4  product approved for on the label?

5  A.   Adjunctive therapy of seizures.  So adjunctive therapy

6  is if a person has a seizure disorder, epilepsy, and they

7  have incomplete control using another drug, the Neurontin

8  was approved that you could add that -- add Neurontin to

9  those people.  So it was not a mono -- so monotherapy is

10 when you take a drug to treat a disease.  Neurontin was

11 approved for adjunctive therapy, which meant there had to be

12 some other therapy in place, then you could add Neurontin to

13 it.

14 Q.   Is that the length and breadth and depth and height of

15 what it had been approved for when you were working?

16 A.   Post-herpetic neuralgia was an indication also that it

17 was eventually approved for.

18           JUDGE SARIS:  What's that in common language?

19           THE WITNESS:  I'm sorry.  When you have diabetes

20 for long periods of time, the diabetes slowly works on your

21 nerves throughout your body, and oftentimes your feet and

22 your hands start to tingle.  It's almost -- you can think of

23 it as a painful tingling, like when your arm falls asleep,

24 your leg falls asleep, that's that unpleasant -- it's a very

25 unpleasant experience.  It's not simply, oh, my leg fell

Page 128

1   asleep.  You have to imagine, oh, my leg fell asleep and it

2   doesn't go away and it hurts when I step on it.

3   BY MR. LANIER:

4   Q.   A psychiatrist, did you ever meet any psychiatrists

5   that were effectively dealing with issues of epilepsy and

6   how to treat epileptic conditions or how to treat the

7   neuropathy condition you're talking about?

8   A.   No, psychiatrists would be what I just called the

9   illegal component of my job.  There was no reason why we

10  should be calling on psychiatrists whatsoever in any kind of

11  legal format.

12          Psychiatrists were on that list, and you don't --

13  I don't know -- I'm sure you have it somewhere, but there is

14  a list that's dedicated just to psychiatrists.

15  Q.   It's at the very beginning of the exhibit for the

16  jury's sake, they'll get to see it, but if we go to page 1

17  of the exhibit, it actually starts out talking about

18  psychiatrists in NE CBU?

19  A.   Right, that's the Northeast CBU.  So this is a list of

20  all the physicians -- all the psychiatrists in the Northeast

21  CBU.  You can see this is set up a little bit differently

22  where we've got their names and addresses.  So --

23  Q.   And then if we look at the columns themselves, both of

24  the psychiatrists on that sheet -- and I go back to these

25  other doctors similarly because it's a little more readable

Page 129

1   were you charting how much they would write Neurontin on a

2   monthly basis?

3   A.   Oh, yeah.  Yeah.  So what we could do is using this,

4   you could actually -- I'm sorry, if you could slide it over

5   a little bit so we lose the zip code -- there you go.

6          JUDGE SARIS:  If you touch the screen, they'll be

7   able to see where you're touching.  Just touch it.  At least

8   theoretically.  There you go, you can see it.

9   A.   So here we are tracking -- this is a physician -- so

10  this line moving across this way across the page is --

11  represents a single physician's prescribing behavior.  You

12  can see in September this was a measure of how many

13  prescriptions he wrote.  Actually, I believe in this case

14  it's new months of therapy.  In October he dropped off, went

15  back up in November and went way up in December.

16          Excuse me, just for -- you can see then farther

17  down the page is -- are the other anti- -- Dilantin and

18  Depakote and those sorts of things are the other

19  antiepileptic drugs that physicians would be using.

20          If you look at this row that I already drew this

21  line through, this physician is writing a lot of -- he has a

22  lot of antiepileptic prescriptions here and here, but no

23  Neurontin.  So the issue would then be to come -- to decide

24  we already know this is a high-decile physician, so this

25  would be somebody that I would need to target.  I'd have to

f5ddb65d-0280-4f94-b517-80266a6ab59e

Page 130

1    get him to stop using these other two drugs and start using

2    Neurontin.

3    Q.   Okay.  Now, you have -- you have some tape recordings

4    of some of the instructions and messages and things from

5    your superiors on how to do this process; is that right?

6    A.   Yes.

7              MR. LANIER:  Your Honor, we've got one we'd

8    introduce into evidence right now and play to question the

9    witness about, it's Exhibit 5655 entitled "The Neurontin

10   Push."  If we could have the Court's permission to play it,

11   move it into evidence as well.

12             MR. GOODELL:  Could we just get a little

13   foundation, please?

14             JUDGE SARIS:  Yes.

15   BY MR. LANIER:

16   Q.   Sir, you're familiar with the phone conversation from

17   Phil Magistro entitled -- that we've been calling the

18   Neurontin push do you remember that conversation?

19   A.   Yes.

20   Q.   Did you tape that phone conversation yourself?

21   A.   Yes.

22   Q.   Did you provide that tape to your lawyers who

23   ultimately have given it to us?

24   A.   I --

25   Q.   You don't know?

1    A.   I gave it to my lawyers, I have no ideas how you got

2    it.  I thought you got it from the government.

3    Q.   Fair enough.

4              The Phil in that conversation, was it Phil

5    Magistro?

6    A.   Yes.

7    Q.   Was he working for the company at the time?

8    A.   Yes.

9              MR. LANIER:  Your Honor, with that, I move it into

10   evidence.

11             JUDGE SARIS:  Sure.  Just -- how long is it going

12   to be?

13             MR. LANIER:  Fifty-six seconds.

14             JUDGE SARIS:  All right.

15             MR. GOODELL:  Your Honor, no objection, other than

16   the one we've previously raised.

17             MR. LANIER:  With the Court's permission I've got

18   a transcript, can I put that up as well?

19             JUDGE SARIS:  Sure.

20             MR. LANIER:  It's a little scratchy as well.

21             THE WITNESS:  So do I press clear to get those

22   lines off?

23             THE CLERK:  Bottom right.

24             MR. LANIER:  Yes.

25             Mr. Alba, is there some magic to making the audio

Page 132

1    play?

2                    (Played tape.)

3                    JUDGE SARIS:  I think -- you couldn't see the

4    transcript on there.  I had trouble hearing some of it, so I

5    think you need to put that on.

6    BY MR. LANIER:

7    Q.   Let's take a moment, sir, and look through this with

8    the transcript of it up as a reference.

9                    Mr. Alba, if I could go back to the Elmo, please.

10                   I think I can come close to getting it all on

11   there where it's still readable if we take out the date and

12   time signal.

13                   Medical liaisons, this is Phil.  Is that your boss

14   Phil Magistro?

15   A.   Yes.

16                   JUDGE SARIS:  We can all read.  What exhibit

17   number is this?

18                   MR. LANIER:  Your Honor, it's 5655.

19                   JUDGE SARIS:  All right.

20                   (Pause.)

21   BY MR. LANIER:

22   Q.   Sir, when you were receiving this message, were you

23   understanding that you were to be going out there and

24   pushing Neurontin for these illegal, off-label matters you

25   discussed earlier?

Page 133

1   A.   Yes, this is an admonishment to actually -- to take

2   responsibility for driving off-label, illegal sales.

3                JUDGE SARIS:  Do you remember exactly --

4   approximately when this message took place?

5                THE WITNESS:  I could find it, your Honor, but --

6                MR. LANIER:  I believe there was a time insignia

7   on the tape that we listened to said that May 23rd.

8                JUDGE SARIS:  May 23rd --

9                MR. LANIER:  1996.

10               THE WITNESS:  I'm sorry.

11               MR. LANIER:  Your Honor, recognizing if I could,

12  recognizing I have two more minutes before I get the hook --

13  if I could move into evidence as well Exhibit 2020 J, which

14  are the slides that he had for presentation.

15               JUDGE SARIS:  All right.

16               MR. GOODELL:  Your Honor, other than the normal

17  objection, I don't know that he's actually identified these

18  yet.

19               JUDGE SARIS:  No, he has not.

20               MR. GOODELL:  It may well be, I just don't know.

21  BY MR. LANIER:

22  Q.   Sir, I'm going to hand you a document that's marked

23  2020 J and ask you if these are the slides that you talked

24  about when you were referencing the snake oil slides?

25  A.   Yes.

Page 134

1   Q.   You can't show them to the jury yet.

2   A.   This is the snake oil slides.

3        MR. LANIER:  With that predicate, your Honor, I

4   move into evidence 2020 J.

5        MR. GOODELL:  No further objection.

6        JUDGE SARIS:  All right.

7        (Exhibit 2020 J received into evidence.)

8   BY MR. LANIER:

9   Q.   Sir, when you in for opening statements this morning?

10  A.   No, I wasn't.

11  Q.   The jury had a chance to hear some discussion about the

12  difference between an observation that may be made and valid

13  clinical science.  Do you know the difference between those

14  terms?

15  A.   Yes.  Yes, I do.

16  Q.   The drug company lawyer spent some time talking about

17  those.  Did you have experience with those terms when you

18  were working at the drug company?

19       MR. GOODELL:  Your Honor, I object.  This is not

20  appropriate examination.

21       JUDGE SARIS:  Yes, why don't you ask it a

22  different way.

23  BY MR. LANIER:

24  Q.   Sir, were you taught by the drug company -- were you

25  instructed by the drug company to use anecdotal stories as

1    opposed to science when you were selling the drug?

2    A.   I was actually taught how to use anecdotal science,

3    make them look -- anecdotal stories, make them look like a

4    scientific data base supporting clinical use.

5    Q.   So this slide that is entitled, "Anecdotal Uses of

6    Neurontin," was this an new slide prepared by your drug

7    company and given to you to use with doctors?

8    A.   Yes.

9    Q.   Reflex sympathetic dystrophy.  Was that on-label or

10   off?

11   A.   Off.

12   Q.   Was that something you thought you could legally sell?

13   A.   No.

14   Q.   Peripheral neuropathy, on-label or off?

15   A.   Off-label.

16   Q.   Diabetic neuropathy, on-label or off?

17   A.   At some point it became approved for diabetic

18   neuropathy.

19   Q.   Trigeminal neuralgia?

20   A.   Off-label.

21   Q.   Post-herpetic neuralgia?

22   A.   Post-herpetic neuralgia, yes.

23          JUDGE SARIS:  That means it was on-label, that

24   means it was legal.

25          THE WITNESS:  At some point, yes.  I don't recall

Page 136

1    the specific date that Pfizer -- Warner-Lambert did get

2    approval for post-herpetic neuralgia.

3    A.   Essential tremor, that was off-label.  Restless leg --

4    Q.   You can go through these quicker than I can.  Go

5    through each one and tell us --

6    A.   Restless leg syndrome, off-label; attention deficit

7    disorder, off-label; limb movement disorder, migraine,

8    bipolar, ALS is what most of us think of as Lou Gehrig's

9    disease, and alcohol and drug control seizures, all of those

10   were off-label and had no clinical data -- no scientific

11   valid data to support use by a physician.  A physician using

12   these drugs for those things was effectively experimenting

13   on their patient.

14          JUDGE SARIS:  Is this a good place to break?

15          MR. LANIER:  Yes, your Honor.

16          JUDGE SARIS:  See you tomorrow morning at 9:00.  I

17   do note that there are one or two people here from the

18   media, which is totally appropriate and legal for them, but

19   I don't want you reading anything that shows up in the media

20   tomorrow.

21          Remember 9:00 to 1:00 all this week, and next week

22   I may start going into afternoons, but I will certainly give

23   you plenty of heads up.

24          Thank you.

25          THE CLERK:  All rise for the jury.

1                (Jury left the courtroom.)

2                JUDGE SARIS:  I'll see counsel at sidebar on the

3      record for one minute and then we'll go off.

4                (At sidebar on the record.)

5                THE COURT:  One of the jurors told Robert she had

6      a daughter that was epileptic.  Of course that's something

7      we didn't ask about.  The child or the person was not on

8      Neurontin.  So I wanted to report that to you.

9                MR. OHLEMEYER:  Thank you, Judge.

10               MR. LANIER:  Okay.

11               JUDGE SARIS:  The second is, as far as I'm

12     concerned, this procedure worked fairly well, but I do know

13     that there are two exhibits that may come up at some point

14     tomorrow which are those two --

15               MR. OHLEMEYER:  DDMAC letters.

16               JUDGE SARIS:  I know I cut you short this morning.

17     Are those likely to come in tomorrow?

18               MR. LANIER:  No, ma'am.

19               JUDGE SARIS:  When are they going to come in?

20               MR. LANIER:  Day after tomorrow.

21               JUDGE SARIS:  They're not self-explanatory.

22               MR. LANIER:  Okay.

23               JUDGE SARIS:  There's one that talks about

24     mechanism of action, and it did seem to be on point.  It was

25     2001 notice to Pfizer.  The other one I had no idea what he

1   was talking about, Slim Jims, I just didn't understand

2   quality of life and why it was or wasn't relevant.  I just

3   didn't get it.

4              MR. LANIER:  I'll have a witness that can either

5   explain it or I won't use it.

6              JUDGE SARIS:  Well, I don't want to get into it

7   until I understand it better.

8              MR. LANIER:  I understand.

9              JUDGE SARIS:  So the one seemed relevant, it was

10  mechanism of action, it says we don't understand it, it

11  increases GABA, seemed to be an agency statement.  I don't

12  know why that wouldn't be --

13             MR. OHLEMEYER:  Obviously, the Seroquel case

14  speaks directly to this, tied to the doctor from this case,

15  it's something from years ago about a generalized --

16             JUDGE SARIS:  Help me on that if the date is 2000.

17             MR. OHLEMEYER:  What the judge said, unless there

18  was some evidence the doctor had seen the offending

19  marketing material, it's absolutely irrelevant to talk about

20  the fact there may have been some newspaper clipping or -- I

21  don't want to demean it, there may be some marketing, but

22  unless the doctor actually saw it, heard it, or relied on

23  it --

24             THE COURT:  That's overruled.  But the Slim Jim I

25  don't understand.  I don't get it.  I tried to read it

1    myself, it was very thick, I don't get it.  So let me just

2    now go off the record.  Actually, stay on one more minute.

3              Have I gotten a deposition --

4              MR. LANIER:  No, your Honor --

5              JUDGE SARIS:  Then we can go off the record.

6              (Discussion off the record.)

7              JUDGE SARIS:  Who sent out the private eye?

8              MR. OHLEMEYER:  I'll say this, your Honor:  I

9    don't know the details of what happened, but it's not

10   unusual, obviously, to try and find fact witnesses to talk

11   to them.

12             JUDGE SARIS:  This guy --

13             MR. OHLEMEYER:  There's a right way do it, there's

14   a wrong way do it.  The way it was done here sounds like it

15   was done wrong, and if it was done the way he described it,

16   we owe him an apology and we'll deliver it.

17             THE COURT:  At this point, let me just say no one

18   should be going after Dr. David Franklin anymore.

19             MR. OHLEMEYER:  Understood.

20             JUDGE SARIS:  There was that feel, that old

21   movie --

22             MR. OHLEMEYER:  Understood.

23             JUDGE SARIS:  There was that feel that was really

24   wrong.

25             MR. OHLEMEYER:  Understood.

1           JUDGE SARIS:  Franklin is known.  Everyone's

2    known -- I've never seen him before, but I've known him

3    since 1995.  He must have been deposed more than anybody --

4           MR. LANIER:  1,100 pages.

5           JUDGE SARIS:  So there's no need to go out and see

6    him.  He's not some brand new fact witness like those women

7    you found.  No one should be going to him.  In fact, I think

8    at this point no one should be going to any witness that's

9    been deposed, somebody that's been around.  I think we know

10   what they're going to say.

11          Do you need something else on the record?

12          MR. OHLEMEYER:  You could make the argument that

13   standing with the marker writing down words that the witness

14   says is argumentative and highlighting things for the jury,

15   some judges think it's fine, some don't, I just want to

16   know --

17          THE COURT:  I think it's very effective.

18          MR. OHLEMEYER:  We'll all be guided by it.

19          JUDGE SARIS:  I think that's the way people learn,

20   particularly when we hit the science -- when you wrote

21   down -- but when it comes to the scientific terms, I think

22   it's helpful to actually see what they look like.  And the

23   names, to see an organization chart.  I encourage both sides

24   to do this.  These aren't going into the jury.

25          MR. OHLEMEYER:  All right.  Very good.  Thanks,

1   Judge.

2           MR. LANIER:  Then the last matter that we had

3   addressed earlier that -- I just want the Court to know that

4   it is my request that we be allowed, we being the

5   plaintiffs' lawyers, to put aside money for this girl and

6   set this case aside, non-suit this case, and move on and try

7   the next case up here in front of you before we go to the

8   defense --

9           JUDGE SARIS:  That was a very different -- you can

10  dismiss this case whenever you want.

11          MR. LANIER:  Well, I don't want to be in a

12  position where the lawyers for the other side say we're

13  going to incur expenses for their expenses --

14          THE COURT:  If you want to settle it, settle it.

15          MR. OHLEMEYER:  I think he's saying something

16  else.  I think what he's saying, if he wants to set money

17  aside for Regina Bulger, will we waive costs.  That's a

18  conversation I'd be willing to have with my client, but I

19  have to do that.

20          MR. LANIER:  I mean, that's absolutely what I'm

21  saying.

22          This girl has got a shot at getting some money,

23  I've got a shot at winning this case.

24          JUDGE SARIS:  By the way, what you just said is

25  different from what you just said two hours ago.  You said

Page 142

1   you come up with 50 and they come up from 50.

2           MR. LANIER:  That's what I said.  I'm asking the

3   jury for a hundred, and I'm sitting here saying I'm spending

4   half a million dollars putting this case on and these

5   experts.

6           THE COURT:  Let me go off the record for this.

7           (Discussion off the record.)

8           (Court adjourned at 1:15 p.m.)

9

10              - - - - - - - - - -

11                    CERTIFICATION

12          We certify that the foregoing is a correct

13  transcript of the record of proceedings in the

14  above-entitled matter to the best of our skill and ability.

15

16

17  /s/Debra M. Joyce           July 28, 2009
    Debra M. Joyce, RMR, CRR    Date
18  Official Court Reporter

19

20

21

22  /s/Lee A. Marzilli          July 28, 2009
    Lee A. Marzilli, RPR, CRR   Date
23  Official Court Reporter

24

25