IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION    ) Pages 1 - 29
------------------------------------)
This document relates to:           )
EGILMAN V. PFIZER, et al, 07-11426-PBS )




                    JURY TRIAL - DAY THREE

             BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        July 29, 2009, 8:50 a.m.




                        LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
                  United States District Court
                  1 Courthouse Way, Room 7200
                      Boston, MA  02210
                        (617)345-6787

```
 1    A P P E A R A N C E S:
 2    FOR THE PLAINTIFFS:
 3         W. MARK LANIER, ESQ.
           DARA HEGAR, ESQ.
 4         ROBERT LEONE, ESQ.
           Lanier Law Office
 5         6810 FM 1960 Road W
           Houston, TX 77069
 6
           ANDREW G. FINKELSTEIN, ESQ.
 7         KENNETH B. FROMSON, ESQ.
           Finkelstein & Partners, LLP
 8         436 Robinson Avenue
           Newburgh, New York  12550
 9
           JACK W. LONDON, ESQ.
10         Jack W. London & Associates, P.C.
           3710 Bee Cave Road, Suite 200
11         Austin, TX  78746
12
      FOR THE DEFENDANTS:
13
           WILLIAM S. OHLEMEYER, ESQ.
14         Boies, Schiller & Flexner, LLP
           333 Main Street
15         Armonk, NY  10504
16         DAVID B. CHAFFIN, ESQ.
           White and Williams, LLP
17         100 Summer Street, Suite 2707
           Boston, MA  02110
18
           CHARLES P. GOODELL, JR.
19         RICHARD M. BARNES, ESQ.
           Goodell, DeVries, Leech & Dann, LLP
20         One South Street, 20th Floor
           Baltimore, MD  21202
21
           MARK S. CHEFFO, ESQ.
22         Skadden, Arps, Slate, Meagher & Flom, LLP
           Four Times Square
23         New York, NY 10036
24
25
```

1            P R O C E E D I N G S

2            THE COURT:  So it's ten of 9:00.  Should we be

3    discussing this at side bar?  What do you want to do?

4            MR. LANIER:  I think probably we should briefly,

5    if that's okay?

6            THE COURT:  Yes.

7    SIDE-BAR CONFERENCE:

8            (Discussion off the record.)

9            THE COURT:  Can we just go on the record for one

10   minute.  There has been a proposal for a nonsuit, and with

11   no Court blessing or anything, as I understand it.  Is that

12   right?  My concern is, on the one hand, an estate can

13   dismiss a suit like anything else.  On the other hand, I

14   don't think it's within my authority to say that whatever

15   money went into the estate would be given to one child as

16   opposed to the other child, or I don't know that I could say

17   at this point it's a fair settlement.  I'd have to think a

18   whole lot more about it because it isn't a settlement; it's

19   essentially a gift from one attorney, as I understand it,

20   into the estate for an amount of money that would be

21   significantly less than if she recovered.  On the other

22   hand, as I've said, and everybody here agrees, this is the

23   hardest case for plaintiffs.  It's the hardest probably of

24   the thousand.  I don't know that because I haven't looked at

25   the thousand, but it's the one that Pfizer has picked of the

1   thousand.  And I understand why you'd prefer this than a

2   goose egg, but I can't say I approve it.

3          MR. LANIER:  Your Honor, from that perspective,

4   things have changed since we were last in front of you.  At

5   the conclusion of court yesterday, after we had had a

6   side-bar discussion of this, I was approached by a friend of

7   the family, who doesn't know the family closely but wishes

8   to remain anonymous.  This gentleman came up to me, and he

9   offered to personally fund what he thought we were seeking

10  in this case, or a good bit of it, into an account for this

11  girl, as long as it was held in trust under Dr. Egilman for

12  the care and nurture of the girl.  He offered to do that to

13  keep from having to rehash through all of this in a trial.

14  If the case was ultimately going to be dismissed, he thought

15  he could meet some needs of the girl.  So we've got the

16  attorneys removed from this.  And this was not anybody

17  related to Pfizer.  We don't need the Court to bless a

18  settlement.  We don't need the Court to direct where the

19  money goes.  It will be set up in a way that is --

20         THE COURT:  As long as I don't have to bless it.

21  Now, here's the other question.  I mean, we were sitting

22  there looking through case law under the wrongful death

23  action.  I mean, I don't know if you all were doing it.  I

24  don't know that you can dismiss it unless I have

25  Dr. Egilman's approval.

1        MR. LANIER:  And we have him here ready to do

2   that.  We agree with you on that point.  That was our read

3   of the law as well.

4        THE COURT:  Okay, so we may all be on the same

5   page.  As I was stewing about it at 3:00 in the morning,

6   walking in, I wasn't sure you could fund it; I wasn't sure I

7   could carve out Ron, Jr. from an estate.  I'm not even

8   sure -- I would like him to -- where is Ron, Jr.?

9        MR. LANIER:  Ron, Jr. cannot be located right now.

10  He's being kicked out of the home by his father, and he

11  doesn't have his cell phone.  We do have his verbal

12  agreement that he wouldn't take any money, but that's all we

13  have from him is his verbal agreement.  Ron, Sr. has heard

14  about what's going on today and has signed off on it and

15  agreed and has given his clearance to it as well.

16       THE COURT:  Dr. Egilman, could you please come up.

17       I, by the way, looked only at the Globe, the Times

18  and the Wall Street Journal and saw nothing about the case.

19       MR. LANIER:  Bloomberg had an article last night

20  that we came across, but other than that --

21       THE COURT:  For some reason, it hasn't been picked

22  up, right?

23       MR. FINKELSTEIN:  I don't think so.

24       THE COURT:  Doctor, are you the administrator of

25  this estate?

1          DR. EGILMAN:  I am.

2          THE COURT:  Have you heard what the proposal is,

3     just to simply nonsuit this case?

4          DR. EGILMAN:  Yes.

5          THE COURT:  Do you view yourself as a

6     representative of Ron, Jr. as well as of the little girl?

7          DR. EGILMAN:  Yes.

8          THE COURT:  So what do we do about that?

9          DR. EGILMAN:  Well, based on my assessment of the

10    case and the value of the case and the potential expenses of

11    the case, it's unlikely that there will be a recovery to the

12    estate if we proceed.  If we proceed, the amount of money

13    that will go to the girl will go away.

14         THE COURT:  Why?

15         DR. EGILMAN:  Well, because I don't think the case

16    will win.

17         THE COURT:  All right, all right.

18         DR. EGILMAN:  Okay?  So from the estate

19    perspective, my options are to take $50,000 that go to

20    Regina or get nothing and be at risk for expenses.  The

21    estate has no assets to cover expenses.  So from my

22    perspective, it's the best thing for the estate and the best

23    thing for both parties that I'm responsible for.

24         THE COURT:  Okay.  Now, have you ever done this

25    before?

1          DR. EGILMAN:  Been an administrator of an estate?

2          THE COURT:  Of a wrongful death estate?

3          DR. EGILMAN:  No.

4          THE COURT:  I understand that I can't approve

5  this.  Essentially you live at the mercy of the Probate

6  Court.

7          DR. EGILMAN:  Yes.

8          THE COURT:  And I plan to take no action

9  whatsoever.  If she were to win, of course, she would have

10  substantially more, putting aside punitives.  The issue is,

11  as we've all recognized now since we all started focusing on

12  the facts of this case, it's a tough case to win.  So that's

13  something you need to tell the probate judge.  I can't bless

14  that.  Are you prepared to do that?

15          DR. EGILMAN:  Sure.

16          THE COURT:  So essentially what's in it for the

17  estate, in your view, is -- can I just play it out?

18          DR. EGILMAN:  You may.

19          THE COURT:  My guess is, she has nothing.  My

20  guess is, she has no money.

21          DR. EGILMAN:  Correct.

22          THE COURT:  So essentially, even if Pfizer could

23  collect costs from the estate, there's nothing there.  So

24  the real issue here is whether you use an extreme amount of

25  resources with a, you know, disputed issue.  I mean, I told

0475c3fb-bdbf-4bd0-9f00-89a7f2be1f09

1  my law clerks that they were outstanding openings, and they

2  were lucky to have witnessed both of them.  But essentially

3  as I hear you say, it's not worth going through it for a

4  likely recovery of zero, but there's not a real likelihood

5  that there's any estate, is there, that I know of?

6          DR. EGILMAN:  No.

7          THE COURT:  I mean, she doesn't have any trust

8  fund sitting somewhere, does she, that goes into this

9  estate?

10          DR. EGILMAN:  No.

11          THE COURT:  So --

12          DR. EGILMAN:  There's the clothes off her back.

13          THE COURT:  Huh?

14          DR. EGILMAN:  There's the clothes off her back.

15          THE COURT:  There's the clothes off her back, so

16  as a practical matter, Pfizer couldn't collect from this

17  estate.

18          DR. EGILMAN:  I don't think he'd look good in the

19  dress.

20          THE COURT:  That's right, so -- I just want to

21  make sure everybody's on the table with what's going on

22  here.

23          DR. EGILMAN:  I wouldn't put it past him, but I

24  don't think it's his color.

25          THE COURT:  And maybe that's why they're waiving

1   because, as a practical matter, they would never collect

2   against.  From my point of view, it would be a huge amount

3   of resources to pour into it.  I would have the other

4   benefit of just getting a jury read on some of the other

5   issues, but I think that you're right to focus on the

6   interest of the parties rather than that.  And I will make a

7   commitment to try and move the other case as quickly as

8   possible, both to Tennessee and the one here, because I do

9   think we need to try a few of these cases.  You know, I've

10  got to get a read on it from some of these juries.  And I

11  don't know anything about the other case, zero, really

12  nothing.  Was that the lead case, the other one?

13              MR. FINKELSTEIN:  Smith?

14              THE COURT:  The reason I have it?

15              MR. FINKELSTEIN:  Shearer?

16              THE COURT:  Shearer?

17              MR. FINKELSTEIN:  You had asked for all

18  Massachusetts cases, and that was one of them.

19              THE COURT:  What brought them to me, do you

20  remember, from the MDL?

21              MR. FINKELSTEIN:  No, they were filed in

22  Massachusetts.

23              THE COURT:  They were all --

24              MR. CHEFFO:  Shearer is a D. Mass. case, so you

25  don't have to send it back anywhere.

1          THE COURT:  No, no, I understand.  I'm wondering

2     why the Multidistrict Litigation Panel sent it to me.  Is it

3     because it was related to my Neurontin case back in 1995?

4          MR. FINKELSTEIN:  Judge, I appeared at that

5     hearing.  You did not request it.  All counsel -- Pfizer had

6     counsel and I think requested it in Puerto Rico or

7     Philadelphia, another counsel, Puerto Rico.  Two counsels

8     requested here because you had familiarity with it, and then

9     they just issued a decision and gave it to you.

10          MR. CHEFFO:  It's kind of like that little ball

11     sometimes, you know, they have a --

12          THE COURT:  All right, so anyway.  All right, so I

13     think the jury should be here any minute now.  There's a

14     third matter while I've got you here that I --

15          MR. CHEFFO:  Could we just talk about the --

16          THE COURT:  Do you have a yellow script?

17          MR. CHEFFO:  I do.  On the point, we've had

18     some -- I think we're in general agreement.  There may be --

19     we're going to work together.  But with respect to Shearer

20     and Smith, to your Honor's point from yesterday, we've

21     talked more, Mr. Lanier and I, and we've agreed that the

22     first case should be before the Court, which would be the

23     Shearer case.  Right now, the schedule is very tight.  I've

24     asked for 60 days.  He's agreed to 30 days because all

25     discovery --

1    THE COURT:  What are we talking about now?

2    MR. CHEFFO:  The Shearer --

3    THE COURT:  I know, but have you done individual

4    discovery on it yet?

5    MR. CHEFFO:  No.  We just got the order on

6    July 24, and it says basically that all discovery needs to

7    be done by September 30, which is very, very tight.

8    THE COURT:  Absolutely, yes, but I think that the

9    hope was that it wouldn't be starting from scratch, right?

10    MR. CHEFFO:  Essentially, I mean, we have a few

11    depositions.  We're not asking for months and months.  We're

12    basically saying 30 days and --

13    THE COURT:  What's that situation?

14    MR. FINKELSTEIN:  It's a completed suicide.

15    THE COURT:  And?  It's just a random case?  It

16    doesn't favor one side or the other?

17    MR. CHEFFO:  Nobody picked it.  It's a random

18    pick.  And what we're proposing is that, of course, that

19    should be the first case you hang onto, the Smith case.  You

20    try the Shearer case, and then --

21    THE COURT:  As a practical matter, that's going to

22    happen anyway because I still need to write up

23    Maris-Kruszewski, because that will be common across the

24    cases, before I send everything off.  I was actually hoping

25    to hear them first, but that won't happen.  So do you agree

1    with that?  What I'll do is, I'll send Smith as soon as I'm

2    done with the opinion, which will probably be by the end of

3    the summer, and I'll leave it up to the Tennessee case.  But

4    I will hold onto Shearer, and I will try it as soon as

5    possible.  That's what I will do.  I can't schedule the --

6              MR. CHEFFO:  Can we at least get the 30 days so we

7    can all work on the scheduling?

8              THE COURT:  Yes.

9              MR. CHEFFO:  Great.

10             THE COURT:  But let me just, there's one other

11   issue.  Is Dr. Franklin here?

12             MR. FINKELSTEIN:  Yes.

13             MR. CHEFFO:  Yes.  He's in the back with Ken

14   Fromson.

15             THE COURT:  Let me just tell you what he reported

16   to Mr. Alba.  Whatever that guy, whoever he was and whatever

17   he said, I think Dr. Franklin is terrified, and, more

18   importantly, I think his daughter is terrified, and we have

19   a thousand more cases.  I can't imagine Dr. Franklin is

20   going to travel around the country testifying in all of

21   them, but maybe he will in a few of the lead cases.  I just

22   don't know.

23             I think we need to have a stay-away order from him

24   from any private eye.  I don't know who the man was, but

25   apparently he said -- what were the words?  I can bring him

1    up here and have him say it himself.

2              THE CLERK:  You may want to because he was very

3    upset.

4              THE COURT:  Yes.  Dr. Franklin, come on up here.

5              (Dr. Franklin at side bar.)

6              THE COURT:  Hey, how are you?  Actually, you look

7    taller when you're sitting up there.

8              (Laughter.)

9              THE COURT:  Anyway, let me just say this to you,

10   sir:  I'm really taken by what you told Mr. Alba this

11   morning, so why don't you repeat it for the --

12             DR. FRANKLIN:  I recognize that there are two

13   sides to every story and that I need to be fair and

14   balanced.

15             THE COURT:  Don't worry about that.  Just --

16             DR. FRANKLIN:  But sending a thug to my home to

17   wave at the window at my eight-year-old daughter was

18   unreasonable, guys.  It was unreasonable.

19             THE COURT:  Well, let me ask you, what were the

20   words?  Mr. Alba said they said something about, "We know

21   where your daughter lives"?

22             DR. FRANKLIN:  On the telephone, he said, "We know

23   all there is to know about you," and then cited the location

24   of my daughter 200 miles away at college.  How the hell am I

25   supposed to remain unbiased when you do that?  It feels like

1   a threat.  It feels like a threat.  Look, I know that you

2   guys didn't tell this person to do it, but you've got to --

3   I believe, your Honor, that it was horribly inappropriate,

4   and there was very few other ways of interpreting it other

5   than really scary.

6           THE COURT:  Dr. Franklin, this is what I'm going

7   to do.  This case, I don't know if you've heard about the

8   resolution of it.  It's likely to be dismissed.

9           DR. FRANKLIN:  Yes.  Yes, I understand.  I

10  understand, and I don't want to in any way complicate it.

11          THE COURT:  But there are hundreds, maybe a

12  thousand more cases, and you may be called upon to testify

13  again.  What would you like me to do at this point?  Would

14  you like a --

15          DR. FRANKLIN:  I don't know that there's anything

16  you can do.  I would like --

17          MR. CHEFFO:  I can make a representation.  I can

18  apologize to the extent -- see, I don't know the facts, your

19  Honor, but profusely, I mean, to the extent that that

20  happened, and I take you at your word.  We --

21          DR. FRANKLIN:  This can't happen 1,200 more times.

22          MR. CHEFFO:  It's not going to happen.  I'll give

23  you my word that that's not going to happen.

24          DR. FRANKLIN:  And I'll give you the benefit of

25  the doubt about what happened, and I recognize --

1          MR. FINKELSTEIN:  May I suggest, because I think

2    it's not just Dr. Franklin, it's the rest of his family, and

3    I think it will give him comfort to be able to walk away

4    with this --

5          THE COURT:  I think this is what I'm going to do

6    right now.  Until -- I understand there are two sides to

7    every story, and Pfizer probably needs --

8          DR. FRANKLIN:  And you had the right to

9    question --

10         THE COURT:  Has the right to question, I

11   understand that.  But until further order of the Court,

12   there should be a stay-away order from any private eye with

13   respect to Dr. Franklin or his family.  And you should -- I

14   don't know that you want to give me the names and addresses

15   of your family.  Let me just make it that specific.  He's

16   been deposed a gazillion times.  Isn't that "gazillion" your

17   term?

18         MR. LANIER:  Yes, your Honor.  It's an appropriate

19   word.

20         THE COURT:  And people know what he has to say,

21   and there will be a stay-away order from anybody from Pfizer

22   having to do with Dr. Franklin.

23         And you may want to do your own investigation and

24   put your own version on the record for future -- you know,

25   like, it may come up in Texas or Tennessee, you know,

1   whatever.  I mean, this is not the -- but I'm not

2   necessarily saying that there isn't another side to the

3   story.  I am saying I see a terrified witness.  Something

4   happened.  So whether or not he's overreacting or not, I

5   don't know, but he's terrified, and there was a reference to

6   his child.

7            And so why don't we do this:  There will be a

8   stay-away order until further order of the Court, and we

9   will inform you of any -- I'm sure you'll want to talk to --

10  has anyone here talk to the private eye?

11           MR. CHEFFO:  Well, we had a conversation last

12  night, and, I mean, there are two sides to the story, but I

13  think we're kind of past that right now.  And, as I said, I

14  can't say it any more, I do apologize if there was anything

15  inappropriate.  That was never an intent.  Certainly we

16  didn't advise that.  There will be no more private eyes.

17  The only thing I would ask is, to the extent that he is

18  going to be a witness, we would like a mechanism, if he has

19  a lawyer, a place that we can serve so there is no disputes.

20           THE COURT:  Yes, I think Mr. Greene has

21  historically been his lawyer, right?  Tom Greene has been

22  here since 1995.  I mean, I had this case before any of you

23  existed, so -- I think it's been that long.  Isn't it Greene

24  still?  I saw him sitting back there.

25           DR. FRANKLIN:  Yes.  And in this case, I don't

1  understand why Mr. Greene wasn't asked to talk.  I had

2  already told him, I told everybody that I will talk to

3  anybody --

4           THE COURT:  Yes, from now on, all communications

5  should be through Mr. Greene.

6           DR. FRANKLIN:  I don't understand why a private

7  detective showed up at my home.

8           THE COURT:  All right, so there's a stay-away

9  order from you or any member of your family.  All

10 communications should flow through counsel.  And if Pfizer,

11 because I haven't heard the other side of the story, and if

12 Pfizer should for the record want to put anything in and

13 oppose this and move to vacate it, they can do that.  Okay?

14 But right now, I want to respect what you've said to me

15 under oath yesterday and your continuing concern.  And I am

16 going to dismiss this case, but there will be another one in

17 January-ish, February.

18           MR. CHEFFO:  February or March we're thinking.

19           DR. FRANKLIN:  And the only reason why I spoke to

20 you this morning is, I know that this needs to be

21 sustainable, if you would, like, this is going to take a

22 long time for me --

23           THE COURT:  I should probably get the jury, yes.

24           DR. FRANKLIN:  All right, thank you.

25           MR. LANIER:  Your Honor, if I might add one thing

0475c3fb-bdbf-4bd0-9f00-89a7f2be1f09

1    on the record.  When you were asking about the cost to the

2    estate of proceeding through this trial, we looked at the

3    economic cost, and I think we failed to understand that

4    there is a value to the children, and to everyone involved

5    in the Susan Bulger case, in not having a negative jury

6    finding after an ordeal that rehashes through the life of

7    Susan Bulger.

8             THE COURT:  Bulger.  You're in Massachusetts.

9    It's like "cohog."

10            MR. LANIER:  It's killing me.  But I do think the

11   emotional cost of this trial and the long-term ramifications

12   of a jury finding on the fragile state of the young lady

13   might also be something in play, and so I just add that for

14   the record.

15            THE COURT:  Well, I remember when I first read

16   this case, I understood why Pfizer picked it.  So I do

17   think, for the record, there was at least a likelihood of a

18   defense verdict.  That having been said, you both gave

19   fabulous opening statements.

20            MR. LANIER:  You should see me with my slides.

21            (Laughter.)

22            MR. CHEFFO:  Hopefully you never will.

23            THE COURT:  And you were just wonderful with those

24   openings.  So, I mean, you could just say "yes," and then

25   you say "no."  It was in play.

1        MR. LANIER:  Thank you, Judge.  That is

2  appreciated.

3        MR. FINKELSTEIN:  I didn't hear it on the record.

4  I just wanted to make sure that all parties are in agreement

5  this is without cost to any party.  That's all.

6        THE COURT:  Right, right.

7        MR. CHEFFO:  And just while we're here, and really

8  this will just take a second, just the restraining order,

9  we'd like to just ask -- I don't think there's any

10  dispute for -- with respect to Terrie Slater and Marie

11  MacDonald.

12        THE COURT:  That should stay in play too, and if

13  you could pass that on.  He's been a wild card, Mr. Bulger,

14  in this.  And the one thing I am concerned about is, as I

15  understand it on the record, no one has been able to get in

16  touch with the son.

17        MR. CHAFFIN:  He was served, your Honor.

18        THE COURT:  Maybe.  I'm just saying, he doesn't

19  know about the settlement, so that's a problem, but that's

20  your problem.

21        MR. OHLEMEYER:  Dismissal, not a settlement.

22        THE COURT:  Yes.  So I'm not approving it just

23  because I don't know what his status is.

24        (End of side-bar conference.)

25        THE COURT:  We're missing a juror.  I propose,

1    even though we're missing a juror --

2              THE CLERK:  She called and said she was running

3    like ten minutes late.

4              THE COURT:  She's running ten minutes late.  Does

5    anyone have a problem with me simply bringing in the

6    remainder of the jury?

7              MR. LANIER:  No problem from the plaintiffs' side.

8              MR. CHEFFO:  No, your Honor.  Do you have a

9    preference, would we be able to poll the jury if they would

10   like to talk to us?

11             THE COURT:  That would be just fine with me.

12   Would you all be interested in that?

13             THE CLERK:  She's here.

14             MR. LANIER:  I think that could be done privately

15   instead of publicly.

16             THE COURT:  Not poll them here.  Go into the jury

17   room.  I'll ask them if they want it.

18             MR. CHEFFO:  That's fine.

19             THE COURT:  Privately.  Is that of interest to you

20   all, everybody?

21             MR. LANIER:  Yes, that would be fine.

22             (Jury enters the courtroom.)

23             THE COURT:  Good morning to everyone.

24             THE JURY:  Good morning.

25             THE COURT:  I have a surprise for you.  This

1   morning the attorneys informed me that plaintiff decided to

2   dismiss the case.  Pfizer didn't settle it and has not paid

3   plaintiff to dismiss it, and that is what I am about to tell

4   you.  So you need not sit for three weeks.  On the other

5   hand, the attorneys have asked for the opportunity, since

6   you heard those fabulous opening statements yesterday, to

7   talk to you.  And I put this in the context that this isn't

8   the only case like this, and so they both -- not both -- all

9   of them could learn from you about your reactions one way or

10  another.  And I know you've allocated the morning, at least,

11  to this case.  You are not required to stay.  You can leave,

12  and you can reject it, you can decide not to.

13          I will come back and thank you personally anyway,

14  but one thought I would like to ask you to do, since this is

15  your last morning of service is, your first bit of

16  deliberations is to decide whether or not you want to talk

17  to the lawyers because there's absolutely no requirement.

18  You can also talk to the press.  You can talk to whomever

19  you want about this case now, your family, one another.

20          So why don't you go back.  Mr. Alba will ask you

21  whether you want to talk with them.  If the answer is "no,"

22  I'll come back anyway and thank you personally.

23          THE CLERK:  All rise for the jury.

24          (Jury excused.)

25          THE COURT:  Do you have any young associates out

0475c3fb-bdbf-4bd0-9f00-89a7f2be1f09

1    there who have worked on this case who might enjoy this?  I

2    hope you'll come.  And is there anyone from your team?

3             MR. LANIER:  Dara likes to be called young.

4             (Laughter.)

5             THE COURT:  Of course.

6             MR. CHEFFO:  Your Honor, we'd be remiss also if we

7    didn't thank the Court, and, frankly, your staff and clerks,

8    for the tremendous amount of paper and orders and things you

9    essentially churned out in a short period of time.  We do

10   appreciate that.

11            THE COURT:  You're welcome.  Thank you, and we'll

12   all be together again.

13            (Discussion off the record.)

14            THE COURT:  Okay, come on in.

15            (A recess was taken, 9:17 a.m.)

16            (Resumed, 8:52 a.m.)

17            MR. LANIER:  Your Honor, may I take leave of

18   Court?  Can I go home?

19            THE COURT:  Well, No.

20            MR. LANIER:  They're here to handle everything.

21            THE COURT:  Yes, but just hold on one second

22   because I just don't -- are you going to be the trial

23   lawyer?

24            MR. LANIER:  Yes, ma'am, so I'll stay right here.

25            THE COURT:  Yes, all right.  It will just take

1    another few minutes.  What have we agreed on?

2            MR. FROMSON:  Your Honor, we have a proposed

3    scheduling order for the discovery and trial of the Shearer

4    case.  I've conferred with Mr. Cheffo, and I would like to

5    recite those proposed dates to you, if you would be kind

6    enough to listen.

7            Working back from a proposed trial date of Monday,

8    March 29, these are the dates:  Fact discovery to end on

9    October 30; the plaintiff expert disclosure, 30 days

10   thereafter, that being November 30; defendant's expert

11   disclosure, having 30 days following, that being

12   December 21, or we can work for additional days if we need

13   on that to make it 30 days.  Deadline for expert depositions

14   to be completed would be January 11, Monday.  A motion for

15   summary judgment would be filed, if at all, by February 2,

16   opposition by February 18, replies by February 22, oral

17   argument on a date to be set by the Court, thereafter

18   leaving the trial date of March 29, which would provide the

19   parties enough time to do their pretrial order, exhibit

20   submissions, and motions in limine, and begin the trial on

21   March 29.

22           THE COURT:  The problem that I run into is, if you

23   do it that way, there's no way I'm going to be able to rule

24   on any motions, for starters.  I had thought that the

25   discovery would be a lot closer to being completed.

Page 24

```
1              MR. FROMSON:  The discovery, as I understand it,

2    has been limited to the prescribing physicians and the

3    plaintiffs and the sales reps, if any.  Other medical

4    doctors within the practices or peers of the physicians

5    haven't been deposed.  Friends, family, or character

6    witnesses have not been deposed, so that there are

7    additional depositions I envision will be done as well as

8    paper discovery.

9              THE COURT:  Well, fact discovery I don't have a

10   problem with.  I don't have a serious problem with that

11   whole schedule, but it can't be pushed back, and I won't

12   rule on the motions in that short a time period.  That's

13   your biggest problem.

14             MR. FINKELSTEIN:  We'd offer, if they want to just

15   do away with making motions, we can just speed up the trial

16   date.

17             THE COURT:  No, they can't agree with that.

18             MR. FROMSON:  I think you made a reference earlier

19   this morning that the motions would be preserved, and I

20   imagine the motions in limine on a general issue would be

21   the same.  So therefore I don't know that the Court --

22             THE COURT:  Yes, but I'm not holding up Smith for

23   that.

24             MR. FROMSON:  I appreciate that.  We would ask

25   that you would not hold up Smith.  It should be remanded and
```

1    go to the Tennessee docket.

2           THE COURT:  And all the other cases are going to

3    start being spun out.  Is that what you're all aiming to do?

4           MR. FROMSON:  "Spun out" meaning remanded, your

5    Honor?

6           THE COURT:  As soon as I rule on Maris and

7    Kruszewski.  I really have been deferring until I heard from

8    them.

9           MR. CHEFFO:  Well, I think we had a fairly -- I

10   think we worked on a proposal with the Magistrate Judge

11   about the cases; in other words, working them up and having

12   them -- I think he's contemplated -- as opposed to just

13   sending all these cases back.  Many of the cases haven't

14   been worked up at all.  There's been no discovery.

15          THE COURT:  Right, so he set a whole schedule for

16   every case, right?

17          MR. FROMSON:  He set a schedule for the track

18   cases, not for every case in the MDL.

19          THE COURT:  So how many cases are on a discovery

20   track?

21          MR. FROMSON:  There's approximately ten to twelve

22   cases, I believe, that made up the discovery track of the

23   Track One cases or pilot cases, if you will, and that has

24   been whittled down to what was before you today, and the

25   Smith case, which is ready for remand.  Those are the ones

1   that were trial-ready, and these others are at that halfway

2   stage, that some fact discovery was done, but there's more

3   that needs to be done.

4           THE COURT:  Okay.  Well, what are you proposing I

5   do with respect to those twelve track cases?

6           MR. FROMSON:  My position is, on behalf of

7   plaintiffs, they should be remanded back to their transfer

8   jurisdictions.

9           THE COURT:  And then we start having trials around

10  the country?

11          MR. FROMSON:  Yes, your Honor.

12          MR. CHEFFO:  And I think our position is a little

13  different.  I think it makes sense, from what your Honor

14  says, it's a lot of paper, not to have to deal with all the

15  dispositive motions in the individual cases.  Our point

16  would be to get them worked up here.  That's the proposal I

17  think we made with the Magistrate Judge, to get them worked

18  up at least to the point of being sent back.  That's

19  consistent with --

20          THE COURT:  Well, Smith will be sent back right

21  away.

22          MR. CHEFFO:  Smith is a separate issue, right.

23          THE COURT:  And we'll do Shearer, and then when

24  the track cases are done -- when did you say that was going

25  to be?

 1          MR. FROMSON:  Well, when you say that they're

 2    done, there's no -- I'm not aware of a current schedule

 3    other than the one we just worked out for the other

 4    remaining Track One cases, unless, and tell me if I'm wrong,

 5    unless we're going to use this for the other --

 6          MR. CHEFFO:  Frankly, I think the Magistrate

 7    Judge, actually, this is under consideration.  We actually

 8    briefed this and argued this.

 9          THE COURT:  Oh, I see.  It hasn't been ruled on.

10          MR. CHEFFO:  I don't think he's issued a ruling

11    with respect to what he --

12          THE COURT:  I just think these cases are getting

13    old, and we needed this bellwether case today, and it didn't

14    happen.  I mean, I'm worried about pushing this off so long.

15    I mean, you all need a break.  Two months for fact discovery

16    isn't so crazy, nor the expert.  I'm just wondering what you

17    say, six months is what it takes.  I just don't want every

18    single time I have a case to have it six months from then.

19    So at least the track cases should be ready to go and have

20    me remand them to their various districts.

21          MR. FINKELSTEIN:  The track cases are all in the

22    exact same position as Shearer, and really the only

23    distinction is, we're saying send that back to the

24    transferee court.

25          THE COURT:  Absolutely.

 1            MR. FINKELSTEIN:  That's all we want to do, and

 2      then enter the same guidelines and then move forward

 3      contemporaneously with this.  We'll do it with the other

 4      cases as well so we can tee up all these cases.

 5            MR. CHEFFO:  Our position, your Honor, and

 6      certainly you can do that, but --

 7            THE COURT:  Well, it's before the Magistrate

 8      Judge, but my biggest issue is, I haven't issued at least

 9      one of the big Daubert hearings.  And it's not so big

10      actually, not compared to the biggest one.

11            MR. CHEFFO:  You know, the practical matter is, we

12      understand both sides want the cases to move, the Court

13      does.  There's a lot of efficiencies about having the

14      discovery, at least as it was done up until the Smith and

15      Bulger case, done here, just because of the way the process

16      works, access to your Honor, to the Magistrate Judge who

17      knows the issues.  You know, certainly it's within your

18      Honor's discretion to --

19            THE COURT:  Well, I'll talk to Judge Sorokin about

20      it, but at the very least, the next Massachusetts case will

21      be in March, and the Tennessee case will be as soon as --

22      I'll have to call the judge down there, but I'm not quite

23      ready to send it there yet.  It will happen probably by the

24      end of August.  And is all the discovery done in Smith,

25      everything?

Page 29

1          MR. FINKELSTEIN:  Yes.

2          THE COURT:  It's trial-ready?

3          MR. FINKELSTEIN:  Yes.

4          MR. CHEFFO:  I think that's generally correct.  I

5   think that's right.

6          THE COURT:  Okay.

7          MR. FINKELSTEIN:  The same position that Bulger

8   was in.

9          THE COURT:  And you're doing the March one?

10          MR. LANIER:  Your Honor, I could at that date.

11   I've got spring break plans with the family, which for us

12   falls the second week of March, so if that's the date, then

13   I would like to try the March one.  My request was that I

14   get to try the next one in your court.  I'm still aiming for

15   redemption on the slides.

16          THE COURT:  God knows what they would have said

17   about the slides.  We should have shown them.  Anyway, all

18   right, have a nice summer.

19          MR. LANIER:  Thank you, Judge.

20          MR. CHEFFO:  Thank you, your Honor.

21          MR. LANIER:  Have a good vacation, your Honor.

22          (Adjourned, 10:00 a.m.)

23

24

25

1              C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8  Reporter, do hereby certify that the foregoing transcript,

9  Pages 1 through 29 inclusive, was recorded by me

10 stenographically at the time and place aforesaid in Civil

11 Action No. 04-10981-PBS, In Re:  Neurontin Marketing, Sales

12 Practices, and Product Liability Litigation, and thereafter

13 by me reduced to typewriting and is a true and accurate

14 record of the proceedings.

15          In witness whereof I have hereunto set my hand

16 this 30th day of March, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
           _____
22         LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
23

24

25