UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL SALES & MARKETING ACTIONS | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**RESPONSE TO DEFENDANTS' CROSS-MOTION FOR LEAVE TO FILE
SURREPLY MEMORANDUM OF LAW IN OPPOSITION TO
CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION**

Class Plaintiffs[1] do not oppose Defendants' Cross-Motion for Leave to File Surreply Memorandum of Law In Opposition to Class Plaintiffs' Motion for Reconsideration (Dkt. No. 2058).

Defendants argue that Class Plaintiffs unduly delayed filing their reply memorandum (Dkt. No. 2049-2).  There is no deadline for the filing of reply briefs provided by the Local Rules.  Defendants filed their opposition to Class Plaintiffs' motion for reconsideration on June 18, 2009.  Four days later, at a June 22, 2009 pretrial hearing before last month's Neurontin jury trial, the Court acknowledged to Mr. Greene, lead counsel for Class Plaintiffs, that the motion for reconsideration was "outstanding," and stated that "it's realistically not going to happen before this trial.  I'm going to hopefully get to it in August . . . but at this point, I'm totally focused on the product liability case."  *See* Partial Transcript of Motion Hearing dated June 22, 2009, at 11:4-8, attached hereto as Exhibit A.

As the trial grew closer, the Court was pelted with pretrial motions, and in a July 17, 2009 Electronic Order, ordered the parties to "Stop filing motions."  The jury was discharged on July 29, 2009, and Class Plaintiffs filed their proposed reply only four days later.  Given the absence of any deadline for filing a reply; the Court's statement that it would not be able to turn its attention to the motion until after the impending trial; its plea to the parties to "Stop filing motions;" Class Plaintiffs' prompt filing of their reply after the trial was over; and the absence of any prejudice to the Defendants, the Court should not decline to consider Class Plaintiffs' proposed reply on timeliness grounds.

Defendants accuse Class Plaintiffs of attempting to cure by reply their failure to address

---

[1] Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana, ASEA/AFSCME Local 52 Health Benefits Trust, Harden Manufacturing Corporation, Gary L.Varnam, and Jan Frank Wityk (collectively, "Plaintiffs" or "Class Plaintiffs").

the standards for reconsideration in their motion.  Class Plaintiffs' motion for reconsideration was sufficient because it *satisfied the standard* for reconsideration, even if that standard was not addressed in the initial briefing.  On reply, Class Plaintiffs address a number of recent decisions, which Defendants characterize as "decided long before Plaintiffs filed their opening brief," specifically, *Robinson v. Fountainhead Title Group Corp.*, 257 F.R.D. 92 (D. Md. 2009) (decided April 21, 2009) and *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009) (decided March 10, 2009).  The Court issued its May 13, 2009 opinion denying Plaintiffs' renewed motion for class certification only three weeks after the second of these opinions was issued (and only two months after the first), and Class Plaintiffs filed their motion for reconsideration only two weeks later.  The Court may judicially notice that there is often a delay between the issuance of an opinion and its publication.  These opinions were hardly "decided long before Plaintiffs filed their opening brief," as Defendants contend.

Defendants cite an even more recent decision, *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, Master File No. 2:06-cv-5774 (SRC), 2009 WL 2043604 (D.N.J. July 10, 2009), as support for their argument that causation can only be proven physician-by-physician.  However, far from supporting Defendants' argument, *Intron/Temodar* draws the very same distinction highlighted by Class Plaintiffs in both their motion for reconsideration and their proposed reply:

> By way of a hypothetical, consider a case in which a pharmaceutical manufacturer markets snake oil pills, labeled as "Drug X," for certain conditions when the manufacturer knows it is merely hocking snake oil.  Under this example, a purchaser of Drug X could plead RICO injury because the pills are have [*sic*] no efficacy whatsoever for the uses for which they are marketed.  In contrast, the prospective Plaintiffs in case [*sic*] at bar allege that Schering marketed Temodar and the Intron Franchise Drugs off-label for indications for which Schering had at least some data to support the claims that the Subject Drugs were safe and as

> effective or more effective than available alternative therapies.
> Marketing of this sort is commonly referred to as "puffery," not
> fraud. While puffery may be actionable under the FDCA, it is not a
> violation of RICO.

*Id.* at *13 (citations omitted). *See also Pennsylvania Employees Benefit Trust Fund v.*

*Astrazeneca Pharmaceuticals LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686, *1 (M.D.

Fla. July 20, 2009) (case involved defendant misrepresenting the "*comparative* efficacy" of its

product (emphasis added)).

Unable to counter the overwhelming evidence that the Consumer Plaintiffs' treating

physicians were detailed on Neurontin, and that their prescribing practices were strongly

influenced by Defendants' fraudulent off-label marketing efforts, Defendants argue that Class

Plaintiffs' bipolar expert, Dr. Jeffrey Barkin, continues to prescribe Neurontin to two of his

bipolar patients.  As Dr. Barkin explained at his deposition:

> I've prescribed Neurontin over the years to two of my patients [for
> bipolar disorder], and in both cases they were patients who had
> been started on Neurontin by somebody else and who were skittish
> about getting off it.
>
> In both of those patients they were on combination treatment with
> other mood stabilizers, and in both of those individuals their course
> had been so poor beforehand, before they were stable, that the
> mere insinuation of wanting to change something just engendered
> too much anxiety.
>
> These were patients who had been started on Neurontin who did
> not do well, who then had other medications added to the
> Neurontin who then did do well, who I later inherited on those
> combination treatments, and when I -- one of the first things I try
> to do when I know what's going on with a patient is try to strip
> unnecessary things away, when I had tried to strip away Neurontin
> or whatever else I felt ineffective, were reluctant to do so because
> of the stormy nature of their treatment history.
>
> I am continuing their prescriptions of Neurontin purely based on
> their anxiety about stopping it, their perception, which I believe to
> be false, that the Neurontin is doing anything useful in their
> pharmacotherapy.

Transcript of Deposition of Dr. Jeffrey Barkin, at 205:4-207:3, attached as Exhibit B.  As Dr.

Barkin's testimony makes plain, his Neurontin prescriptions for these two patients are merely the

"fruit of the poisonous tree," and in no way undermine Class Plaintiffs' argument that essentially

all of the Neurontin prescriptions written for bipolar and other mood disorders would not have

occurred but for Defendants' fraud.

In sum, Class Plaintiffs respectfully submit that their proposed reply does much to

elucidate the complex issues before the Court, and do not oppose Defendants' request to file a

surreply.  Class Plaintiffs respectfully request that the Court hold oral argument on their motion

for reconsideration, and suggest that argument be scheduled in close proximity to the argument

on Defendants' motion for summary judgment, calendered for September 18, 2009.

Dated: August 18, 2009                                  Respectfully Submitted,

By:      /s/ Thomas Greene
         Thomas Greene
         Greene & Hoffman
         33 Broad Street, 5th Floor
         Boston, MA 02109

By:      /s/ Barry Himmelstein
         Barry Himmelstein
         Lieff Cabraser Heimann &
           Bernstein, LLP
         Embarcadero Center West
         275 Battery Street, 30th Floor
         San Francisco, CA 94111-3339

By:      /s/ Thomas M. Sobol
         Thomas M. Sobol
         Hagens Berman Sobol Shapiro LLP
         One Main Street, 4th Floor
         Cambridge, MA  02142
         Boston, MA 02110

By:     */s/ Don Barrett*_____
        Don Barrett
        Barrett Law Office
        404 Court Square North
        P.O. Box 987
        Lexington, MS 39095

By:     */s/ Daniel Becnel*_____
        Daniel Becnel, Jr.
        Law Offices of Daniel Becnel, Jr.
        106 W. Seventh Street
        P.O. Drawer H
        Reserve, LA 70084

By:     */s/ James Dugan*_____
        James Dugan
        Dugan & Browne
        650 Poydras St., Suite 2150
        New Orleans, LA 70130

        ***Members of the Class Plaintiffs'***
        ***Steering Committee***

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on August 19, 2009.

                        */s/  Barry Himmelstein*
                        Barry Himmelstein

# EXHIBIT A

1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2

3
   ————————————————————————————

4
IN RE:  NEURONTIN MARKETING,
SALES PRACTICES AND PRODUCTS
5
LIABILITY LITIGATION,           Civil Action
                        No. 04-10981-PBS
6
                        June 22, 2009, 3:00 p.m.
7
   ————————————————————————————

8

9

10        **PARTIAL TRANSCRIPT OF MOTION HEARING**

11     BEFORE THE HONORABLE PATTI B. SARIS

12      UNITED STATES DISTRICT COURT

13    JOHN J. MOAKLEY U.S. COURTHOUSE

14       1 COURTHOUSE WAY

15       BOSTON, MA   02210

16

17

18

19

20        DEBRA M. JOYCE, RMR, CRR
         Official Court Reporter
21    John J. Moakley U.S. Courthouse
     1 Courthouse Way, Room 5204
22       Boston, MA   02210
        617-737-4410
23

24

25

1    where I understand the primary challenge isn't so much the

2    methodology as to how it's applied, but I don't know I'm going

3    to be able to write that.  I've tried to catch up with you on

4    almost everything else.  I know I have your thing outstanding,

5    but that's -- it's realistically not going to happen before

6    this trial.  I'm going to hopefully get to it in August before

7    the law clerk who handles this leaves, but at this point, I'm

8    totally focused on the product liability case.

9            And Judge Sorokin is going to be meeting with you all

03:32 10   to try and come up with schedules for all the other ones, but

11   what I was hoping is we'd have a couple of bellwether trials,

12   this one, maybe Smith in Tennessee --

13           MR. FINKELSTEIN:  Smith is ready to go.

14           THE COURT:  And is there another one in Massachusetts

15   that I could just do so it wasn't just one trial?

16           MR. FINKELSTEIN:  There is.  The name escapes me.

17           MR. CHEFFO:  Shearer.

18           MR. FINKELSTEIN:  Right, Shearer.  As a practical

19   matter, I can't ship Smith down until I've written Daubert

03:33 20   hearings on Maris and Kruszewski -- whatever his name is,

21   particularly Maris, I think.  Because his is the one where -- I

22   think -- what was his name --

23           MR. CHEFFO:  Kruszewski.

24           THE COURT:  Kruszewski was following more tried and

25   true methodologies, his was peer reviewed but it wasn't

# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2                      MDL Docket No. 1629
                        Master File No. 04-10981
 3
       ************************************
 4     In Re:  NEURONTIN MARKETING, SALES
       PRACTICES, AND PRODUCTS LIABILITY
 5     LITIGATION,
 6     ************************************
 7     THIS DOCUMENT RELATES TO:
 8     ************************************
       HARDEN MANUFACTURING CORPORATION;
 9     LOUISIANA HEALTH SERVICE INDEMNITY
       COMPANY, dba BLUECROSS/BLUESHIELD OF
10     LOUISIANA; INTERNATIONAL UNION OF
       OPERATING ENGINEERS, LOCAL NO. 68
11     WELFARE FUND; ASEA/AFSCME LOCAL 52
       HEALTH BENEFITS TRUST; GERALD SMITH;
12     and LORRAINE KOPA, on behalf of
       themselves and all others similarly
13     situated, v. PFIZER INC. and
       WARNER-LAMBERT COMPANY.
14
       ************************************
15
       THE GUARDIAN LIFE INSURANCE COMPANY
16     OF AMERICA v. PFIZER INC. and
17     AETNA, INC. v. PFIZER, INC.
       ************************************
18
           SUPREME COURT OF THE STATE OF NEW YORK
19                COUNTY OF NEW YORK
       ************************************
20
       In Re:  NEURONTIN PRODUCT LIABILITY
21     LITIGATION
22     ********************************* Index No.
23     THIS DOCUMENT APPLIES TO:        765000/06
24              ALL CASES
```

1                    VOLUME 1 OF THE

2        VIDEOTAPED DEPOSITION OF JEFFREY S. BARKIN, MD

3

4                Wednesday, January 21st, 2009

5                      9:11 a.m.

6

7                      Held At:

8                 Regus Business Center

9                  470 Atlantic Avenue

10                Boston, Massachusetts

11

12

13

14

15

16

17    REPORTED BY:

18    Maureen O'Connor Pollard, RPR, CLR, CSR

19

20

21

22

23

24

```
 1   APPEARANCES:

 2

 3   FOR THE CLASS PLAINTIFFS IN MDL:

 4        BY:  ILYAS J. RONA, ESQ.

 5             GREENE & HOFFMAN, PC

 6             33 Broad Street, 5th Floor

 7             Boston, Massachusetts 02109

 8             617-261-0040

 9             irona@greenehoffman.com

10

11   FOR THE DEFENDANTS:

12        BY:  KIMBERLY D. HARRIS, ESQ.

13             CHRISTOPHER J. ROCHE, ESQ.

14             DAVIS POLK & WARDWELL

15             450 Lexington Avenue

16             New York, New York 10017

17             212-450-4000

18             kim.harris@dpw.com

19             christopher.roche@dpw.com

20

21

22

23

24
```

```
 1    FOR COORDINATED NON-CLASS PLAINTIFFS:

 2          BY:   ERIC G. FIKRY, ESQ.

 3                BLANK ROME, LLP

 4                One Logan Square

 5                130 North 18th Street

 6                Philadelphia, Pennsylvania 19103-6998

 7                215-569-5495

 8                fikry@blankrome.com

 9

10

11    Also Present:

12

13    Bill Slater, Videographer

14    Palko Goldman, Non-Attorney

15

16

17

18

19

20

21

22

23

24
```

```
 1                        INDEX
 2
 3    EXAMINATION                           PAGE
 4    JEFFREY S. BARKIN, MD
        BY MS. HARRIS                         7
 5
                          EXHIBITS
 6    NO.           DESCRIPTION              PAGE
 7    Exhibit 1     Jeffrey S. Barkin, MD CV......    42
      Exhibit 2     Copies of ads, Bates
 8                  Barkin_000001 and 000002......    54
      Exhibit 3     Web site printout of Dr.
 9                  Barkin.......................    91
      Exhibit 4     Dr. Barkin's expert report....  218
10    Exhibit 5     Supplemental report of Dr.
                    Barkin.......................   219
11    Exhibit 6     Dr. Barkin's billing
                    records, Bates Barkin_000026
12                  through 000031...............   258
      Exhibit 7     Handwritten documents, Bates
13                  Barkin_000006 through 000024..  269
      Exhibit 8     Subpoena to Dr. Barkin........  277
14    Exhibit 9     Letter to the editor in
                    Journal of Clinical
15                  Psychopharmacology............  366
      Exhibit 10    February 2007 issue of The
16                  Carlat Psychiatry Report......  374
17
18
19
20
21
22
23
24
```

```
 1                P R O C E E D I N G S

 2

 3                THE VIDEOGRAPHER:  My name is Bill

 4     Slater of Veritext.  Today's date is January 21,

 5     2009.  The time is approximately 9:11 a.m..

 6                This deposition is being held at the

 7     offices of the Regus Business Center located at

 8     470 Atlantic Avenue, Boston, Massachusetts.

 9                The caption of this case is In Re

10     Neurontin Marketing, Sales Practices and

11     Products Liability Litigation, in the United

12     States District Court, the District of

13     Massachusetts, MDL Docket Number 1629, Master

14     File Number 04-10981, and In Re Neurontin

15     Marketing Liability Litigation in the Supreme

16     Court of the State of New York, County of New

17     York, Index Number 765000/06.

18                The name of the witness is Dr. Jeffrey

19     Barkin.

20                At this moment, if the attorneys will

21     identify themselves and the parties they

22     represent, after which our court reporter,

23     Maureen Pollard of Veritext, will swear in the

24     witness and we can proceed.
```

```
 1              MS. HARRIS:  Kim Harris from Davis

 2    Polk & Wardwell for the Pfizer Defendants.

 3              MR. ROCHE:  Christopher Roche, also

 4    from Davis Polk & Wardwell, also for the Pfizer

 5    Defendants.

 6              MR. RONA:  Ilyas Rona from Greene &

 7    Hoffman on behalf of the Class Plaintiffs, and

 8    I'm joined by Palko Goldman, non-attorney, also

 9    from Greene & Hoffman.

10              MR. FIKRY:  Eric Fikry from Blank Rome

11    on behalf of the Coordinated Non-Class

12    Plaintiffs.

13

14              JEFFREY S. BARKIN, MD,

15    having been satisfactorily identified by photo

16    identification, being first duly sworn, was

17    examined and testified as follows:

18              DIRECT EXAMINATION

19              BY MS. HARRIS:

20    Q.    Good morning, Dr. Barkin.

21    A.    Good morning.

22    Q.    For the record, could you please state

23    your full name and business address?

24    A.    Jeffrey Barkin, MD, 97A Exchange
```

1    question.

2              Have you ever prescribed Neurontin to

3    one of your patients?

4        A.    I've prescribed Neurontin over the

5    years to two of my patients, and in both cases

6    they were patients who had been started on

7    Neurontin by somebody else and who were skittish

8    about getting off it.

9        Q.    What were the indications for which

10   Neurontin had been prescribed to them?

11       A.    In both cases for bipolar disorder.

12       Q.    And you indicated that the patients

13   were skittish about being taken off.  Is that

14   because the patients perceived that Neurontin

15   was helping them with their bipolar disorder?

16       A.    In both of those patients they were on

17   combination treatment with other mood

18   stabilizers, and in both of those individuals

19   their course had been so poor beforehand, before

20   they were stable, that the mere insinuation of

21   wanting to change something just engendered too

22   much anxiety.

23       Q.    So those patients had been unstable,

24   were given a course of treatment that included

1    Neurontin, became more stable, is that correct?

2            MR. RONA:  Objection.

3        A.    These were patients who had been

4    started on Neurontin who did not do well, who

5    then had other medications added to the

6    Neurontin who then did do well, who I later

7    inherited on those combination treatments, and

8    when I -- one of the first things I try to do

9    when I know what's going on with a patient is

10   try to strip unnecessary things away, when I had

11   tried to strip away Neurontin or whatever else I

12   felt ineffective, were reluctant to do so

13   because of the stormy nature of their treatment

14   history.

15           BY MS. HARRIS:

16       Q.    Are those patients continuing to

17   receive Neurontin today?

18       A.    Yes, two of them.

19       Q.    And are they continuing to be stable?

20       A.    Yes.

21       Q.    So you are renewing their

22   prescriptions for Neurontin?

23       A.    I am continuing their prescriptions of

24   Neurontin purely based on their anxiety about

1    stopping it, their perception, which I believe

2    to be false, that the Neurontin is doing

3    anything useful in their pharmacotherapy.

4        Q.    How long have these patients been in

5    your care?

6        A.    Well, I'd have to get back to you on

7    that, but I would say generally speaking,

8    generally, three years, three and a half years.

9        Q.    And they've been on Neurontin that

10   whole time?

11       A.    Yes.  Some patients are on things that

12   make no sense, some patients will not accept

13   change, and sometimes you're stuck with it as a

14   prescriber.

15       Q.    But clearly you don't view it as

16   harmful, because you're allowing them to

17   continue on the drug?

18           MR. RONA:  Objection.

19       A.    In those two patients I'm not

20   perceiving a particularly dangerous signal that

21   is forcing me to enforce no Neurontin in those

22   two cases.

23           The concern that I've had with

24   Neurontin is the use of Neurontin initially in

1    lieu of mood stabilizers that work, that's

2    really the problem is lack of efficacy.  In

3    these two patients who are on a bunch of other

4    things, too, you know, the easiest, the path of

5    least resistance, if you will, is to continue

6    the gabapentin, Neurontin.

7              BY MS. HARRIS:

8         Q.    What else are they on?

9         A.    Oh, one is on quite a litany.  She is

10   on Seroquel, thyroid hormone, Lamictal, lithium,

11   Xanax, Ambien, Remeron and Rozerem.

12        Q.    That is a lot of medication.

13        A.    It is.

14        Q.    Are all of those prescribed for

15   bipolar?

16        A.    They're prescribed for bipolar

17   disorder and for anxiety and for sleep.  And

18   interestingly, because we talked about the

19   off-label use of drugs in the context of

20   substance abuse, this is a lady with a terrible

21   history of alcohol dependence who's a teacher,

22   somebody well-known in the community, who just

23   got her license back after losing it for four

24   years, and has spent 40 days and 40 nights in

1    jail, who is doing beautifully.  And I realize

2    yes, that's a large number of medicines and a

3    lot of medicine, but she's stable.

4         Q.    Are all of those medications approved

5    for, FDA-approved that is, for bipolar?

6         A.    The mood stabilizers, with the

7    exception of Neurontin, are all FDA-approved for

8    bipolar disorder.

9         Q.    And which of the mood stabilizers

10   among the list of drugs?

11        A.    Seroquel, lithium, Lamictal, the

12   anti-anxiety agent is the Xanax, the sleep aid

13   is the Ambien, and the Rozerem.  The

14   anti-depressant, also anti-anxiety agent, is the

15   mirtazapine.  I think I've covered all of them.

16        Q.    What's the thyroid one for?

17        A.    She has hypothyroidism.

18        Q.    It's actually to treat a thyroid

19   condition?

20        A.    Yes.

21             The other piece, she has a profoundly

22   bad hypothyroidism.  The other piece in that

23   equation is that when you have a mood disorder

24   patient and they're hypothyroid they almost