UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                   :   MDL Docket No. 1629
NEURONTIN MARKETING, SALES PRACTICES, AND               :
PRODUCTS LIABILITY LITIGATION                           :
                                                        :   Master File No. 04-10981
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x   Judge Patti B. Saris
                                                        :
THIS DOCUMENT RELATES TO:                               :
                                                        :   Magistrate Judge Leo T.
                                                        :   Sorokin
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
HARDEN MANUFACTURING CORPORATION;                       :
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,             :
dba BLUECROSS/BLUESHIELD OF LOUISIANA;                  :
INTERNATIONAL UNION OF OPERATING ENGINEERS,             :   UNREDACTED VERSION
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL            :   FILED UNDER SEAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and             :
LORRAINE KOPA, on behalf of themselves and all others   :
similarly situated, v. PFIZER INC. and WARNER-LAMBERT   :   Leave to Filed Granted on
COMPANY.                                                :   August 27, 2009
                                                        :
                                                        :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
THE GUARDIAN LIFE INSURANCE COMPANY OF                  :
AMERICA v. PFIZER INC. and                              :
AETNA, INC. v. PFIZER INC.                              :
                                                        :
                                                        :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

**SURREPLY MEMORANDUM IN FURTHER OPPOSITION
TO CLASS PLAINTIFFS' MOTION FOR RECONSIDERATION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ......................................................................................................................... 5

I.    Plaintiffs Do Not Satisfy The Standards Applicable To Motions For
Reconsideration .......................................................................................................... 5

II.    The Court Correctly Determined That Plaintiffs Cannot Establish Causation
Through Common Proof .............................................................................................. 7

        A.    Plaintiffs' Belated Attempts To Distinguish Authorities Cited By This
Court Are Not Grounds For Reconsideration .............................................. 7

        B.    Recent Authorities Confirm That Class Certification Was Properly Denied ........ 10

        C.    The Court Should Decline Plaintiffs' Invitation To Invent A New Rule Of
Law .............................................................................................................. 13

        D.    Plaintiffs' Speculative Inferences And Baseless Credibility Attacks On
The Prescribing Doctors' Testimony Do Not Negate Individual Issues Or
Warrant Reconsideration ............................................................................. 17

        E.    Plaintiffs Cannot Demonstrate Classwide Causation Based On
Defendants' Market Predictions And Patent Application .......................... 20

III.    The Court Correctly Held That The Third Party Payors' Claims Are Not
Susceptible To Aggregate Proof ............................................................................... 22

IV.    The Court's Denial Of Class Certification Applies To All Claims, Including
Unjust Enrichment .................................................................................................... 23

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)..........................................22

*In re Canon Cameras Litigation*, 237 F.R.D. 357 (S.D.N.Y. 2006)...............................................24

*Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538 (E.D. Va. 2000) ........................13, 15, 16

*Cochran v. Quest Software, Inc.*, 328 F.3d 1 (1st Cir. 2003) .......................................................23

*Coffin v. Bowater Inc.*, No. Civ. 03-227-B-C, 2005 WL 3021979 (D. Me. Nov. 10, 2005)...........6

*Colomar v. Mercy Hospital, Inc.*, 242 F.R.D. 671 (S.D. Fla. 2007).................................................7

*In re Duel*, 51 F.3d 1552, 1559 (Fed. Cir. 1995) ..........................................................................22

*Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*,
254 F.R.D. 68 (E.D.N.C. 2008) ................................................................................24

*Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365 (N.D. Ill. 1998)...........................................15

*Garner v. Healy*, 184 F.R.D. 598 (N.D. Ill. 1999)..................................................................13, 15

*Greene v. Union Mutual Life Insurance Co.*, 764 F.2d 19 (1st Cir. 1985)......................................5

*International Union of Operating Engineers Local No. 68 Fund v. Merck & Co.*,
929 A.2d 1076 (N.J. 2007)..............................................................................3, 8, 9

*Kings Choice Neckwear, Inc. v. FederalEx Corp.*,
No. 07-275, 2009 WL 689718 (D.N.J. Mar. 11, 2009) ...........................................24

*Kleinman v. Merck & Co.*,
Nos. ATL-L-3954-04, ATL-L-24-05, slip op. (N.J. Super. Ct. Aug. 13, 2009)..........10, 14, 19

*Kleinman v. Merck & Co.*,
Nos. ATL-L-3954-04, ATL-L-24-05, slip op.(N.J. Super. Ct. Mar. 17, 2009) ...........18, 19, 25

*Kohen v. Pacific Investment Management Co.*, 571 F.3d 672 (7th Cir. 2009).......................14, 16

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ..........................................................20

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ...........................................8, 9, 21

*In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009) ............13, 14, 24

*Muehlbauer v. GM Corp.*, No. 05 C 2676, 2009 WL 874511 (N.D. Ill. Mar. 31, 2009) .............25

*Moore v. Kulicke & Soffa Industrial, Inc.*, 318 F.3d 561 (3d Cir. 2003).......................................22

*Mullaney v. Delta Air Lines, Inc.*,
    No. 08-7324, 2009 WL 2337992 (S.D.N.Y. July 29, 2009) ...................................................24

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
    522 F.3d 6, 17 (1st Cir. 2008)...............................................................................................15

*In re Neurontin Marketing, Sales Practices & Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009).......................................................................... *passim*

*In re Neurontin Mktg., Sales Practices, & Prods. Litig.*,
    433 F. Supp. 2d 172, 186 (D. Mass. 2006) .........................................................................24

*In re Neurontin Marketing & Sales Practices Litigation*,
    244 F.R.D. 89 (D. Mass. 2007)............................................................................................13

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ...........................................20

*Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*,
    No. 6:09-cv-5003-Orl-22DAB, 2009 WL. 2231686
    (M.D. Fla. July 20, 2009)...............................................................................11, 14, 23, 25

*Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006) ........................................................5

*Pastula v. Lane Construction Corp.*,
    No. Civ. 05-133-B-W, 2006 WL. 696254 (D. Me. Mar. 17, 2006)............................................6

*Peterson v. H&R Block Tax Services, Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997)................13, 15, 16, 17

*Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275 (D. Md. 2008) ..........................15

*Robinson v. Fountainhead Title Group Corp.*, 257 F.R.D. 92 (D. Md. 2009) .......................13, 15

*Ruiz Rivera v. Pfizer Pharm., LLC*,
    521 F.3d 76 (1st Cir.), *cert. denied*, 129 S. Ct. 180 (2008) ..................................................6, 7

*Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1013 (10th Cir. 2008) .........................................22

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, Master File
    No. 2:06-cv-5774 SRC, 2009 WL 2043604 (D.N.J. July 10, 2009)..........11, 12, 14, 15, 23, 25

*Schutter Candy Co. v. Stein Brothers Paper Box Co.*, 338 F.2d 558 (7th Cir. 1964)....................20

*Scottsdale Insurance Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008) .............................................23

*In re Sears Roebuck & Co. Tools Marketing & Sales Practices Litigation*,
No. 05 C 4742, 2007 WL 4287511 (N.D. Ill. Dec. 4, 2007) ...................................................24

*Siegel v. Shell Oil. Co.*, 256 F.R.D. 580 (N.D. Ill. 2008) .......................................................24, 25

*Spark v. MBNA Corp.*, 178 F.R.D. 431 (D. Del. 1998) .........................................................13, 15

*Spencer v. Hartford Finance Services Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009)............14, 16

*In re St. Jude Medical Inc. Silzone Heart Valve Products Liability Litigation*,
522 F.3d 215 (2d Cir. 2008)...........................................................................................3, 8, 9

*Szabo v. Bridgeport Machines, Inc.*, 249 F3d 672 (7th Cir. 2001) ...............................................15

*In re TJX Cos. Retail Security Breach Litigation*, 246 F.R.D. 389 (D. Mass. 2007) ..................3, 9

*United States v. Bishop*, 66 F.3d 569 (3d Cir. 1995) ...................................................................20

*United States v. Roberts*, 978 F.2d 17 (1st Cir. 1992) ...................................................................5

*Wells v. State Manufactured Homes, Inc.*,
No. Civ. 04-169-P-DMC, 2006 WL. 120087 (D. Me. Jan 12, 2006) .......................................6

*Woodard v. Fidelity National Title Insurance Co.*,
No. 06-1170, 2008 WL. 5737364 (D.N.M. Dec. 8, 2008).......................................................25

## STATUTES

21 U.S.C. § 396.......................................................................................................................18

35 U.S.C. § 112.......................................................................................................................22

## OTHER AUTHORITIES

Brief for Plaintiffs-Appellees,
*In re St. Jude Medical Inc. Silzone Heart Valve Products Liability Litigation*,
No. 06-3860, 2007 WL 2123361
(Mar. 16, 2007) ..............................................................................................................8, 19

Memo in Support of Reconsideration of Denial of Class Cert.,
*Kleinman v. Merck & Co.*, Nos. ATL-L-3954-04, ATL-L-24-05
(N.J. Super. Ct. May 1, 2009). .........................................................................................9, 11

## PRELIMINARY STATEMENT

Though the consumer and third-party payor ("TPP") plaintiffs now seek to limit their request for certification to claims pertaining to bipolar and mood disorder (Dkt. 1796 ("Reconsid. Mot.") at 1), the Court has already held that the same principles precluding certification of the other indication-specific subclasses also preclude certification of the putative bipolar and mood subclasses. *See In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig. ("Neurontin II")*, 257 F.R.D. 315, 330-31 (D. Mass. 2009). The Court's holding applies with equal force to the TPP plaintiffs. *See id.* at 331. Plaintiffs' proposed reply brief continues to rehash their prior arguments without demonstrating any intervening change in the controlling law or any newly-discovered evidence that would warrant reconsideration.

Plaintiffs' present formulation of their previously-rejected arguments is that Neurontin is "worthless" as bipolar therapy, and thus, there were no "plausible" reasons other than the alleged fraudulent marketing for any "minimally competent" doctor to prescribe Neurontin to bipolar patients. (Dkt. 2049-2 ("Reconsid. Reply") at 3, 7, 12, 15, 18, 22.) But the Court denied class certification based on the predominance of individual questions relating to *causation*, not individual questions relating to *injury* – *i.e.*, whether Neurontin is "worthless." Even if Plaintiffs were able to show through common proof that Neurontin is always ineffective for all bipolar patients – which they cannot do, as explained in Defendants' briefing in support of their pending motion for summary judgment – that showing would in no way obviate the need for individual inquiries pertaining to causation. In particular, a showing that Neurontin is "worthless" would in no way undermine (much less justify the exclusion of) individual doctors' testimony (1) that they prescribed Neurontin for bipolar disorder for reasons unrelated to Defendants' allegedly fraudulent marketing, and (2) that despite their knowledge of studies that Plaintiffs contend demonstrate that Neurontin is "worthless," they continue to believe that Neurontin is an effective treatment for bipolar disorder.

Indeed, Plaintiffs' sweeping assumptions fly in the face of every single psychiatrist's

testimony in this case, including Plaintiffs' own bipolar expert.[1]  These psychiatrists all testified that they prescribed the drug for reasons unrelated to the alleged marketing.  Drs. ███ and ███ prescribed Neurontin to their patients because of the well-recognized practice of using anticonvulsants to treat bipolar disorder.[2]  Dr. ███ prescribed Neurontin to Ms. ███ only after she expressed interest in taking it.[3]  And Dr. ███ – much like Plaintiffs' bipolar expert – prescribed Neurontin to Ms. ███ because her prior physician had done so and she was unwilling to change medication.[4]  That Plaintiffs do not deem these doctors' *actual* reasons to be "***plausible***" does not negate the overwhelmingly individualized causation issues.

Even assuming *arguendo* that there was no plausible basis to market Neurontin as an effective treatment for bipolar disorder, that would not mean that there were no plausible reasons for doctors to believe that their bipolar patients might benefit from taking the drug.  Neurontin belongs to the anticonvulsant drug class, from which psychiatrists routinely prescribe drugs to treat psychiatric disorders.  *See Neurontin II*, 257 F.R.D. at 330.  Drs. ███ and ███ prescribed Neurontin to their patients for precisely this reason.  *See* note 2, *supra*.  There are no grounds for the Court to simply presume that no other doctors did the same.  Nor is there any basis for the Court to presume that no doctors would have construed the allegedly concealed studies differently than Plaintiffs' experts do, or to presume that no doctors would have prescribed Neurontin to their bipolar patients had those studies been made public sooner.  Even

---

[1] Dr. Jeffrey Barkin, Plaintiffs' bipolar expert, disputes Neurontin's effectiveness in treating bipolar disorder, but nevertheless prescribes the drug as adjunctive medicine for two of his bipolar patients.  (Dkt. 1857-1, 1/21/09-1/22/09 Dep. of Dr. Jeffrey S. Barkin at 204:21-207:22.)  Plaintiffs' only response to Dr. Barkin's admissions is to proclaim that his Neurontin prescriptions are "fruit of the poisonous tree" (Dkt. 2061 at 4) – a Fourth Amendment principle that does not apply or even make sense in this context.  Plaintiffs' nonsequitur cannot change the undisputed fact that their own bipolar expert has knowingly done and continues to do precisely what Plaintiffs contend no "minimally competent" physician would do.

[2] *See Neurontin II*, 257 F.R.D. at 330 (citing Dr. ███'s deposition); Dkt. 1692-1, 3/11/08 Decl. of Dr. ███ ("███ Decl.") ¶ 3.

[3] *See* 4/4/08 Dep. of Dr. ███ ("███ Dep.") at 31, 56-57, Ex. 13 to James Decl.

[4] *See Neurontin II*, 257 F.R.D. at 330 (citing Dr. ███'s deposition).

though the allegedly concealed studies were made public years ago, Mr. ████'s and Ms. ████'s doctors continue to believe that Neurontin is effective for patients with bipolar and mood disorders, and those doctors still in practice continue to prescribe Neurontin to their bipolar patients.[5]  Likewise, even though Plaintiffs' bipolar expert is intimately familiar with the allegedly concealed studies, he continues to prescribe Neurontin to bipolar patients for reasons unrelated to marketing.

    In any event, Plaintiffs' sweeping assumptions regarding what "minimally competent" doctors would do are completely irrelevant and do not distinguish the "quartet" of cases on which this Court relied.[6]  *See* Section II.A, *infra*.  The plaintiffs in *Vioxx* and *St. Jude* could easily have argued that there would have been no "plausible" basis for any "minimally competent" doctor to knowingly prescribe a drug or implant a medical device with safety concerns so severe that they prompted those products' complete withdrawal from the market. And the *TJX* plaintiffs could easily have argued that no "minimally competent" bank would have ignored the defendants' alleged failure to maintain proper security over the banks' credit card data.  Yet all three courts reversed or denied class certification based on individualized issues of causation.   Likewise, the issue in this case is not whether a hypothetical "reasonable" doctor *should* prescribe a drug, but why actual doctors *did* prescribe it.

    Lacking any on-point authority, Plaintiffs invite the Court to announce a new rule of law under which classwide causation can be presumed in consumer fraud cases whenever the plaintiffs claim that the product or service in question was "utterly worthless."  (Reconsid. Reply at 7.)  They rely on a series of inapposite cases, all but one of which was decided before this Court denied their renewed motion for class certification, and many of which were decided

---

    [5] *See* ████ Dep. at 31, 87-88; Dkt. 1692-1, 2/13/08 Dep. of Dr. ████ ("████ Dep.") at 24-26, 29; ████ Decl. ¶¶ 6, 7; Dkt. 1692-1, 2/6/08 Dep. of Dr. ████ ("████ Dep.") at 102-13.

    [6] *See Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076 (N.J. 2007) ("*Vioxx*"); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008); *In re St. Jude Med. Inc. Silzone Heart Valve Prods. Liab. Litig.* ("*St. Jude*"), 522 F.3d 836 (8th Cir. 2008); *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007) ("*TJX*").

- 3 -

several years ago. *See* notes 15 & 16, *infra*. None of Plaintiffs' belatedly-cited cases was decided on the grounds they assert. To the contrary, many these courts specifically limited their holdings to cases involving standardized written financial representations sent to every class member, and specifically distinguished their holdings from prescription drug cases. *See* Section II.C, *infra*. In any event, three subsequent on-point decisions confirm that class certification was properly denied and that reconsideration is unwarranted. *See* Section II.B, *infra*.

Plaintiffs also fail to demonstrate any newly-discovered evidence warranting reconsideration. They instead rely on a patent application and on market research documents that are more than 13 years old and that Plaintiffs previously cited in support of identical arguments before the Court ruled. These 1995 and 1996 documents are incapable of demonstrating why thousands of doctors chose to prescribe a particular drug during the decade that followed. *See* Section II.E, *infra*.

Plaintiffs seek to raise fact questions regarding the testimony of Mr. ██████'s and Ms. ██████'s prescribing doctors, using evidence that they submitted with their summary judgment briefing before the Court denied class certification, and which they "assumed" the Court would consider before ruling. (Reconsid. Reply at 4 n.3.) But these arguments cannot negate – and only serve to highlight – the overwhelmingly individual issues regarding the prescribing decisions of unidentified doctors who prescribed Neurontin to unidentified members of the putative bipolar and mood subclasses. Indeed, Plaintiffs have admitted "the fact that not all physicians who wrote Neurontin prescriptions for bipolar or other mood disorders were detailed," and have conceded that "Defendants have the right to call individual physicians to testify that they prescribed Neurontin to treat bipolar based on something other than [the alleged] fraud." (Reconsid. Mot. at 25, 28-29.)

As for Plaintiffs' unjust enrichment arguments, Plaintiffs concede that none of the five class certification briefs they filed prior to the Court's ruling argued or suggested that their unjust enrichment claims were subject to a different class certification analysis than their other claims. (Reconsid. Reply at 24.) There is no basis for Plaintiffs' nonsensical argument that the Court

was somehow required to *rule* on an issue that they were not required to *brief*. Plaintiffs do not and cannot cite any authority in which a court denied class certification with respect to statutory or common law fraud claims and then indulged a separate round of briefing regarding certification of unjust enrichment claims. In any event, the same individualized causation issues that preclude certification with respect to their other claims also preclude certification of Plaintiffs' unjust enrichment claims. Plaintiffs' belated and meritless arguments to the contrary do not warrant reconsideration.

## ARGUMENT

**I.      Plaintiffs Do Not Satisfy The Standards Applicable To Motions For Reconsideration**

As the First Circuit has held, "reconsideration is 'an extraordinary remedy which should be used sparingly,'" and should not be granted unless the movant "demonstrate[s] either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted). Plaintiffs concede that the applicable "standard was not addressed in [their] initial briefing." (Dkt. 2061 at 2.)

In their proposed reply, Plaintiffs argue that the Court should apply a standardless "interests-of-justice" test to this motion. (Reconsid. Reply at 4-5.) But Plaintiffs' lead authorities explicitly addressed the "belated filing" scenario in which the party seeking reconsideration had "failed to file a timely response" to the underlying motion and thus had never been heard on the merits before the court entered the order in question. *United States v. Roberts*, 978 F.2d 17, 21-22 (1st Cir. 1992); *see also Greene v. Union Mut. Life Ins. Co.*, 764 F.2d 19, 23 (1st Cir. 1985). The First Circuit's "interests-of-justice" test lists factors that specifically govern such "belated filing[s]."[7] Plaintiffs do not even mention these factors, let

---

[7] The factors are:

(1) the nature of the case, (2) the degree of *tardiness*, (3) the reasons underlying the *tardiness*, (4) the character of the *omission*, (5) the existence *vel non* of cognizable prejudice to the nonmovant in consequence of the *omission*, (6) the effect of granting (or denying) the motion on the administration of justice, and (7) whether the *belated filing* would, in any event, be

*(cont'd)*

- 5 -

alone explain how they could apply to the utterly inapposite circumstances of their motion. Instead, Plaintiffs misconstrue the phrase "interests of justice" to invite sweeping public policy arguments and melodramatic references to "words etched in stone on the courthouse walls." (Reconsid. Reply at 1-3.)

Two of Plaintiffs' authorities directly support Defendants.  In both cases, the court referenced the "interests of justice," but denied reconsideration on the grounds that the plaintiffs were merely rehashing arguments made in their prior briefs. *See Pastula v. Lane Const. Corp.*, No. Civ. 05-133-B-W, 2006 WL 696254, *1 (D. Me. Mar. 17, 2006); *Coffin v. Bowater Inc.*, No. Civ. 03-227-B-C, 2005 WL 3021979, *1-2 (D. Me. Nov. 10, 2005).  And in *Wells v. State Manufactured Homes, Inc.*, No. Civ. 04-169-P-DMC, 2006 WL 120087 (D. Me. Jan 12, 2006), the Court granted reconsideration of an *in limine* ruling only to the extent of clarifying the ruling so that it would not be given an overly broad interpretation at trial.  *See id.* at *2-3.  The court emphasized that "a ruling on a motion *in limine* is, by its nature, preliminary and can be revisited without the degree of disruption to settled expectations . . . of a final judgment." *Id.* at *1.  By contrast, this Court's class certification ruling addressed the most fundamental issues in the case, was made after extensive briefing, and was not inherently or otherwise designated as "preliminary."  Plaintiffs' desire to endlessly rehash their arguments until they get a different result would be profoundly "disrupt[ive]" to the Court and to Defendants.  Moreover, the *Wells* court emphasized that "the proffering of arguments or evidence that could have been, but were not, timely presented raises institutional concerns," and that parties should not treat court rulings as being "subject to change based on further developed argumentation."  *Id.*

Plaintiffs suggest that Pfizer previously sought and obtained reconsideration in an unrelated case based on a standardless interests-of-justice analysis. (Reconsid. Reply at 5 & n.5 (citing *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76 (1st Cir. 2008), *cert. denied*, 129 S. Ct.

_____

*(cont'd from previous page)*
    more than an empty exercise.

*Roberts*, 978 F.2d at 21-22 (emphasis added).

180 (2008))).  To the contrary, Pfizer's reconsideration motion showed that, in initially denying summary judgment, the trial court had committed a manifest error of law that would have required *de novo* review and reversal on appeal had the case proceeded to trial and the plaintiff prevailed.  *See Ruiz Rivera*, 521 F.3d at 86.  Plaintiffs plainly disagree with this Court's application of Rule 23 to the facts of this case, but they have not identified any reversible legal error.

For their part, Plaintiffs' counsel routinely seek reconsideration of class certification denials without satisfying the applicable standards.  Less than two weeks ago, one of these motions was denied in a prescription drug marketing case regarding Vioxx.  *See* Exhibit A, *Kleinman v. Merck & Co.*, Nos. ATL-L-3954-04, ATL-L-24-05, slip op. (N.J. Super. Ct. Aug. 13, 2009) ("*Kleinman II*").  As in this case, the court denied certification based on overwhelmingly individualized causation questions regarding doctors' decisions to prescribe the drug to putative class members.  *See id.* at 5.  The court also denied reconsideration, holding that the plaintiffs' "disagree[ment] with the court's interpretation of controlling decisions and of the evidence presented . . . is not appropriate subject matter for a motion for reconsideration."  *Id.* at 3-4. Likewise, in *Colomar v. Mercy Hospital, Inc.*, the court denied reconsideration of its class certification ruling where the plaintiffs' motion "[did] not rely on newly discovered evidence or intervening changes in the law" and "merely reargue[d] points previously considered and rejected by the Court and trie[d] to raise new arguments and point to new evidence that could have been raised earlier."  242 F.R.D. 671, 684 (S.D. Fla. 2007).

## II.     The Court Correctly Determined That Plaintiffs Cannot Establish Causation Through Common Proof

### A.      Plaintiffs' Belated Attempts To Distinguish Authorities Cited By This Court Are Not Grounds For Reconsideration

Plaintiffs' increasingly desperate attempts to distinguish the "quartet" of authorities on which this Court relied do not withstand scrutiny.  Plaintiffs argue that none of these cases involved products alleged to be "worthless."  (Reconsid. Reply at 7, 11.)  As discussed in Section II.C, *infra*, this semantic distinction makes no legal difference, and was not the basis for class

- 7 -

certification in the inapposite cases on which Plaintiffs rely.  Moreover, if the phrase "utterly worthless" had the talismanic power Plaintiffs assign to it, those words could have just as easily been applied to the authorities cited by the Court.

For example, in *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.* ("*Vioxx*"), the plaintiffs argued that the defendant had known, but concealed, "that its product was neither more effective nor safer than other available products," and that the nondisclosure caused the plaintiffs to pay for the drug at a higher price than they otherwise would have.  929 A.2d 1076, 1079, 1088 (N.J. 2007).  In other words, the defendant had allegedly charged a premium for nonexistent – and thus "worthless" – safety and efficacy benefits.  Likewise, in *McLaughlin v. America Tobacco Co.*, the plaintiffs allegedly paid "an artificially high price" for the nonexistent – and thus "worthless" – health benefits of light cigarettes.  522 F.3d 215, 220 (2d Cir. 2008).  And in *In re St. Jude Medical Inc. Silzone Heart Valve Products Liability Litigation*, the plaintiffs were allegedly implanted with the defendant's prosthetic heart valve based on its nonexistent – and thus "worthless" – safety and effectiveness in preventing heart infection.  522 F.3d 836, 837 (8th Cir. 2008).[8]  Rather than indulging in such pointless semantics, the courts in each of these three cases reversed the lower courts' orders granting class certification.

Plaintiffs also argue that, had the allegedly concealed information been disclosed, doctors would still have had good reasons for prescribing Vioxx and for implanting the medical device at issue in *St. Jude*, but would not have had any basis to prescribe Neurontin.  (Reconsid. Reply at 15 n.11.)  Plaintiffs' purely rhetorical argument could have been employed in any of these cases.  Both the medical device in *St. Jude* and the prescription drug in *Vioxx* were taken off the market after the allegedly concealed health risks were made public.[9]  The plaintiffs in these cases could

---

[8] *See also* Brief for Plaintiffs-Appellees, *In re St. Jude Medical Inc. Silzone Heart Valve Prods. Liab. Litig.*, No. 06-3860, 2007 WL 2123361 (8th Cir. Mar. 16, 2007) ("*St. Jude Brief*").

[9] *See St. Jude*, 522 F.3d at 837; Press Release, Merck, *Voluntary Worldwide Withdrawal of VIOXX®* (Sept. 30, 2004), *available at* http://www.merck.com/newsroom/vioxx/pdf/vioxx_press_release_final.pdf.

easily have argued that there would have been no "plausible" basis for any "minimally competent" doctor to knowingly prescribe a drug or implant a medical device with safety concerns so severe as to prompt their complete withdrawal from the market.  Indeed, in another Vioxx case, the plaintiffs recently (and unsuccessfully) argued for class certification on the grounds that, had the drug's risks been disclosed sooner, the drug "would [likely] never have been released," and that even if it had been, "virtually no doctors would have prescribed it."[10] Likewise, Plaintiffs point out that, in *In re TJX Cos. Retail Security Breach Litigation*, 246 F.R.D. 389 (D. Mass. 2007), there was evidence that banks would have reacted differently – and some banks would not have reacted at all – had the defendants disclosed their failure to maintain proper security over the banks' credit card data.  (Reconsid. Reply at 15 n.11.)  The *TJX* plaintiffs could easily have argued that no "minimally competent" bank would have ignored such information and knowingly subjected itself and its customers to widespread credit card fraud.  Such rhetorical arguments are beside the point, because putative class actions that require proof of reliance are not certified according to generalized assumptions regarding what some hypothetical "reasonable" doctor, consumer, or bank would do.

Finally, Plaintiffs argue that in *Vioxx*, *McLaughlin*, and *St. Jude*, the plaintiffs did not present "any evidence" that consumers or doctors would have chosen different products had they known of the allegedly concealed information.  (Reconsid. Reply at 14.)  They miss the point entirely.  The plaintiffs in these cases proffered the same types of evidence as Plaintiffs do here.[11]  Yet all three courts reversed class certification – not because there was no evidence *at all*,

---

[10] Exhibit B, Mem. in Supp. of Reconsid. of Denial of Class Cert. at 6, *Kleinman v. Merck & Co.*, Nos. ATL-L-3954-04, ATL-L-24-05 (N.J. Super. Ct. May 1, 2009) ("*Kleinman* brief").

[11] In *Vioxx*, the plaintiff third-party payors proposed to show classwide causation and damages through: evidence that each class member "received the same information and was a target of the same deceptive campaign"; expert testimony regarding third-party payors' formulary decisions; and expert testimony regarding the impact of the alleged marketing campaign on pricing.  *See* 929 A.2d at 1080-81, 1085, 1087-88.  In *St. Jude*, the plaintiffs purported to show classwide causation through evidence that the defendant's marketing materials "defrauded the medical community at large" and through expert testimony regarding "the effects such materials have on hospitals and physicians."  *St. Jude Brief*.  In *McLaughlin*, the plaintiffs presented evidence that class members were exposed to "uniform" misrepresentations that "distorted the body of public information," and presented expert testimony regarding the impact of the marketing
*(cont'd)*

but because causation and reliance could only be shown through *individualized* evidence.  The same is true in this case, as this Court correctly held.

**B.      Recent Authorities Confirm That Class Certification Was Properly Denied**

While Plaintiffs rely upon inapposite cases that did not involve prescription drugs and were decided prior to this Court's ruling (*see* Section II.C, *infra*), three subsequent on-point decisions confirm that class certification was properly denied and that reconsideration is unwarranted.

First, less than two weeks ago, the New Jersey Superior Court denied the plaintiffs' request for reconsideration of an order denying class certification in a prescription drug marketing case regarding the drug Vioxx.  *See Kleinman II*.  As here, the plaintiffs argued in *Kleinman* that the defendant had used a publication strategy to deceive the medical community about the drug's safety risks and had trained its sales force to mislead doctors regarding those risks.  *See* Exhibit C, *Kleinman v. Merck & Co.*, Nos. ATL-L-3954-04, ATL-L-24-05, slip op. at 2 (N.J. Super. Ct. Mar. 17, 2009) ("*Kleinman I*").  And, as here, the plaintiffs argued that causation could either be presumed or demonstrated on a classwide basis through Professor Rosenthal's econometric analysis.  *See id.* at 12-14.  The court rejected this argument, holding that

> [t]he decision of whether to prescribe a medication is made upon a host of individualized factors, including other risk factors the plaintiffs possessed and whether other drugs were effective in relieving the plaintiffs' pain.  Doctors react to medical warnings differently depending on the patient's condition and medical history.  An individualized determination would be required for each plaintiff to determine if the concealment of the . . . risk information had a causal relationship on the decision made as to whether or not the plaintiff used Vioxx.

*Id.* at 13.

The *Kleinman* court emphasized that even though Vioxx was withdrawn from the market due to the allegedly concealed safety concerns,[12] one of the named plaintiffs' doctors "testified

---

*(cont'd from previous page)*
campaign on pricing.  522 F.3d at 223, 228-30.

[12] *See Kleinman I*, slip op. at 2; *see also* Press Release, Merck, *Voluntary Worldwide Withdrawal of*
*(cont'd)*

that, if available, he would continue to prescribe this drug to his patients." *Id.* at 3. The court did not indulge in irrelevant speculation regarding whether a "minimally competent" doctor would have knowingly prescribed a drug whose safety concerns prompted a worldwide recall. The court also rejected the plaintiffs' attempts to negate individualized issues by accusing this doctor of having a "clear bias" in favor of the defendant.[13]

Second, in *Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686 (M.D. Fla. July 20, 2009) ("*PEBTF*"), the plaintiff third-party payor asserted claims for breach of express warranty and unjust enrichment, alleging that the defendant had engaged in fraudulent marketing that "duped [plaintiff] into expending millions of dollars in reimbursements for Seroquel prescriptions issued for medically unnecessary uses." *Id.* at *1. The court dismissed the plaintiff's claims for failure to establish proximate cause, *see id.* at *5-6, citing "serious concerns about the difficulties inherent in determining, on a transaction-by-transaction basis, whether and to what extent, Defendants' unlawful conduct caused each Seroquel prescription to be written by [plaintiff's] members' physicians." *Id.* at *5.

Finally, in *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action* ("*Schering-Plough*"), the court rejected the plaintiffs' argument that they could prove causation in an off-label marketing case through expert testimony and a statistical analysis of the defendants' data. *See* Master File No. 2:06-cv-5774, 2009 WL 2043604, at *23-25 (D.N.J. July 10, 2009). The plaintiffs represented a putative class, including consumers and third-party payors ("TPPs"), alleging that the defendants had "orchestrated a campaign to illegally market and promote the Subject Drugs for off-label uses . . . and, as a result, Plaintiffs paid for drugs at an inflated price or for drugs they would not have purchased but for the illicit marketing

---

(*cont'd from previous page*)
*VIOXX®* (Sept. 30, 2004), *available at* http://www.merck.com/newsroom/vioxx/pdf/vioxx_press_release_final.pdf.

[13] *Kleinman* brief at 18 n. 17.

- 11 -

scheme." *Id.* at *1 & n.2. Like Plaintiffs here, the *Schering-Plough* plaintiffs asserted RICO, statutory consumer fraud, common law fraud, and unjust enrichment claims, among others. *See id.* at *1. Rather than making "individualized allegations," *id.* at *25, the plaintiffs "propose[d] to demonstrate causation through expert testimony and a statistical analysis of [defendants'] sales data." *Id.* at *23. The court granted the defendants' motion to dismiss, holding that the plaintiffs could "not prove causation by way of generalized allegations and aggregate proof." *Id.* at *25. "Instead, a court or jury would have to determine whether each prescribing physician received fraudulent marketing information from the [d]efendants and whether each physician was influenced to prescribe the Subject Drugs on account of [defendants'] conduct. This sort of inquiry is impermissible." *Id.* at *26.

Plaintiffs argue that the *Schering-Plough* court's ***dismissal*** of similar class claims somehow supports their position. (Dkt. 2061 at 2-3.) In *dicta*, the *Schering-Plough* court discussed the "hypothetical" situation of a "manufacturer market[ing] snake oil pills." *Schering-Plough*, 2009 WL 2043604, at *13. But the purpose of this hypothetical was to illustrate that the plaintiffs had not adequately alleged a RICO violation. *See id.* The court did not remotely suggest that classwide causation could be presumed in such a hypothetical case. Moreover, calling a product "snake oil" does not make it so. The *Schering-Plough* court emphasized that, wholly apart from any causation issues, the plaintiffs could not prove fraud simply by showing that the subject drugs "were not FDA approved for certain conditions or that the relative effectiveness of [those drugs] had not been proven through conclusive evidence." *Id.* To rebut the plaintiffs' fraud allegations, the defendant merely needed to show that it had "some data" to support its claims that the drugs were safe and effective. *Id.* There is considerable data that Neurontin can be and has been beneficial for bipolar patients.[14] Plaintiffs may argue that these

---

[14] Neurontin is an FDA-approved drug belonging to a class of drugs that doctors routinely prescribe to bipolar patients. *See Neurontin II*, 257 F.R.D. at 330. Plaintiffs' bipolar expert concedes that the only study he has reviewed regarding Neurontin's use in treating the most common type of bipolar disorder concluded that Neurontin is likely to provide long-term benefits. (*See* Dkt. 1928 ("Reconsid. Opp.") at 9 n.5.) Pfizer's expert has explained why the studies Plaintiffs rely upon are incapable of showing that Neurontin has no long-term benefits for bipolar patients. (*See id.*) Years after the allegedly concealed studies were made public, 
*(cont'd)*

- 12 -

types of data do not conclusively prove Neurontin's efficacy for bipolar disorder, but they cannot argue the data out of existence. And even if Plaintiffs could somehow show that Neurontin was wholly ineffective in treating bipolar disorder, that would not negate the overwhelmingly individualized causation issues, which are vividly illustrated by the named Plaintiffs' doctors' and Plaintiffs' bipolar expert's testimony that they prescribed the drug to bipolar patients for reasons unrelated to marketing.

### C.    The Court Should Decline Plaintiffs' Invitation To Invent A New Rule Of Law

Plaintiffs invite the Court to announce a new rule of law under which classwide causation can be presumed in consumer fraud cases whenever the plaintiffs claim that the product or service in question was "utterly worthless." (Reconsid. Reply at 7.) Plaintiffs' argument is purely semantic and unsupported by any legal authority. If adopted, Plaintiffs' proposed rule would improperly extend classwide presumptions of causation far beyond the extremely narrow contexts in which such presumptions have been permitted.

Initially, most of the authorities Plaintiffs cite for this proposition cannot remotely be characterized as "new," and thus cannot support reconsideration.[15] Plaintiffs cite only four recent authorities, three of which were decided between March and April of this year, well before the Court issued its ruling on May 13, 2009.[16] The only truly "new" authority Plaintiffs

---

*(cont'd from previous page)*
doctors continue prescribing Neurontin to bipolar patients and continue to believe their patients benefit. (*See id.* at 10 n.8.) Likewise, some TPPs still approve of Neurontin's use for treating bipolar. (*See id.* at 10 n.7.)

[15] *Garner v. Healy*, 184 F.R.D. 598 (N.D. Ill. 1999), was decided ten years ago, and is clearly not new authority. Indeed, while Plaintiffs never cited or discussed *Garner* in any of their seven prior class certification briefs, the Court cited *Garner* in its order *denying* Plaintiffs' original motion for class certification. *See In re Neurontin Mktg. & Sales Practices Litig.* ("*Neurontin I*"), 244 F.R.D. 89, 110 (D. Mass. 2007). Likewise, Plaintiffs never cited the nine-year-old *Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538, 559-50 (E.D. Va. 2000) decision in any of their seven prior class certification briefs, but the Court cited a different decision from the same litigation when it denied Plaintiffs' original motion for class certification. *See Neurontin I*, 244 F.R.D. at 103. Plaintiffs cited both *Peterson v. H&R Block Tax Services, Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997), and *Spark v. MBNA Corp.*, 178 F.R.D. 431 (D. Del. 1998), in support of their original motion for class certification, (Dkt. 678 at 21 n.31), but failed to cite either case in support of their renewed motion or even in their opening brief in support of reconsideration.

[16] *See In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009) (decided Apr. 24, 2009); *Robinson v. Fountainhead Title Group Corp.*, 257 F.R.D. 92 (D. Md. 2009) (decided Apr. 21, 2009);
*(cont'd)*

cite is *Kohen v. Pacific Investment Management Co.*, 571 F.3d 672 (7th Cir. 2009), which involved the cornering of futures markets in U.S. Treasury notes, did not involve any alleged misrepresentations or reliance thereon, and has no bearing on the causation issues here. *See id.* at 674.

In any event, the proposed new rule Plaintiffs advocate was not the basis for these belatedly-cited decisions and is not supported by them. Plaintiffs describe *In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46 (D.N.J. 2009) ("*Mercedes-Benz*"), as their "foremost" authority. (Reconsid. Reply at 7.) But the plaintiffs in *Mercedes-Benz* did not claim that the defendants' products or services were "utterly worthless," and the court did not rule on that basis. Instead, the plaintiffs' claims were based on promotional statements regarding an emergency response system that was installed in vehicles sold to plaintiffs between "August 8, 2002," and "November 28, 2006," but that subsequently became obsolete on "December 31, 2007." *Id.* at 52. Thus, every single class member received the system's advertised benefits for between one and five years before it became obsolete. The plaintiffs' claim was not that the system was "utterly worthless," but that its acknowledged benefits did not last for the full life of their cars. The real grounds for class certification in *Mercedes-Benz* were that the misrepresentations were made through standardized written documents, that plaintiffs' claims did not require proof of reliance, and that plaintiffs were not claiming that "but for the alleged misrepresentations, they would not have purchased [the defendant's products]." *Id.* at 74. Underscoring the fundamental difference between *Mercedes-Benz* and this case, the same court later dismissed an off-label

---

(cont'd from previous page)
*Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284 (D. Conn. 2009) (decided Mar. 10, 2009). Plaintiffs ask the court to take "judicial notice" that they could not have obtained these decisions during the three to nine weeks before this Court ruled on May 13, 2009. (Dkt. 2061 at 2.) As with the other presumptions Plaintiffs request, there is no basis for this one. Defendants recently filed a brief alerting the Court to recent on-point authority decided just 23 and 33 days prior. (Dkt. 2057 at 7-8 (citing *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, Master File No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009); *Pa. Employees Benefit Trust Fund v. Astrazeneca Pharms. LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686, at *5 (M.D. Fla. July 20, 2009)).) And this brief cites on-point authority decided just 11 days ago. *See Kleinman II* (denial of reconsideration of order denying class certification in prescription drug marketing case).

marketing putative class action after rejecting the plaintiffs' argument that they could prove classwide causation through expert testimony and statistical analysis. *See Schering-Plough*, 2009 WL 2043604, at *23-25.

*Garner v. Healy* is also inapposite. The plaintiffs in *Garner* alleged that the defendants had uniformly, and in writing, mislabeled non-wax car polishing agents as being "wax." 184 F.R.D. 598, 599 (N.D. Ill. 1999). In granting class certification, the court expressly distinguished prescription drug cases, which "involve much more complex factual and legal determinations than those in this case." *Id.* at 602. In particular, the court distinguished authority denying class certification in a prescription drug case where "individual questions" regarding the prescription decisions of class members' doctors would have "overwhelm[ed]" any common issues. *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 370-71 (N.D. Ill. 1998). In *Garner*, there were no such "'subsidiary concepts' . . . lurking in the background." *Garner*, 184 F.R.D. 602-03 (citation omitted). Instead, *Garner* was a "straight-forward consumer fraud case involving . . . standardized conduct by Defendants." *Id.* at 603.[17]

Plaintiffs' remaining authorities involved alleged standardized written financial misrepresentations and overpricing,[18] which this Court and other courts have repeatedly

---

[17] In addition, *Garner* was decided under class certification standards incompatible with those now controlling in both the First and Seventh Circuits. In particular, the *Garner* court stated that, "[i]n considering a motion for class certification, the Court accepts as true all well pleaded factual allegations." 184 F.R.D. at 599 n.1. The Seventh Circuit has since held that "[c]ertifying classes on the basis of incontestable allegations in the complaint moves the court's discretion to the plaintiff's attorneys – who may use it in ways injurious to other class members, as well as ways injurious to defendants." *Szabo v. Bridgeport Machines, Inc.*, 249 F3d 672 (7th Cir. 2001); *accord In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (courts addressing class certification motions may "probe behind the pleadings" and "'test disputed premises,'" and must "'evaluate the plaintiff's evidence . . . critically'" (citations omitted)).

[18] In *Chisolm v. Transouth Financial Corp.*, defendants made financial misrepresentations regarding defaulted consumer loans via standardized written forms "directed uniformly to all of the subclass members." 194 F.R.D. 538, 559-50 (E.D. Va. 2000). In *Peterson v. H&R Block Tax Services, Inc.*, defendant charged plaintiffs for tax-related services they were not eligible to receive, using "standard" "written misrepresentations . . . furnished to every class member." 174 F.R.D. 78, 83 (N.D. Ill. 1997). In *Robinson v. Fountainhead Title Group Corp.*, plaintiffs did not claim the title services they received were worthless; they claimed they were overcharged for those services through an illegal kickback scheme employing standardized written financial misrepresentations. *See* 257 F.R.D. 92, 94-95 (D. Md. 2009); *see also Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 278, 280-81 (D. Md. 2008). In *Spark v. MBNA Corp.*, credit card holders alleged that the defendant bank had misrepresented the applicable annual percentage rate
*(cont'd)*

distinguished from Plaintiffs' off-label marketing claims. *See Neurontin II*, 257 F.R.D. at 323-24, 327 n.7. Indeed, many of Plaintiffs' own authorities strictly limited and/or distinguished their holdings from cases like this one. For example, in *Chisolm v. TranSouth Financial Corp.*, the defendants allegedly made misrepresentations regarding consumer loans via standardized written forms "directed uniformly to all of the subclass members." 194 F.R.D. at 559 (E.D. Va. 2000). The court held that these allegations fit within the extremely "narrow contexts" in which courts have permitted a classwide presumption of reliance – *i.e.* "securities litigation," "credit card schemes, consumer loans, prescription drug *pricing*, breach of commission contract claims, and Truth in Lending Act actions." *Id.* at 560 (emphasis added) (footnotes omitted). Plaintiffs' claims fit none of these "narrow contexts."

Likewise, in *Spencer v. Hartford Financial Services Group, Inc.*, the court recognized that "courts have rarely certified nationwide fraud classes on a 'presumed reliance' theory outside of the context of securities litigation," and that the rationale for such a presumption "'does not easily extend to general fraud claims.'" 256 F.R.D. 284, 302 (D. Conn. 2009) (citation omitted). The court did not grant class certification based on the purported worthlessness of any product or service. Indeed, the plaintiffs emphasized that their claims had nothing to do with the sale of a product, and were instead based on standardized written "financial representation[s]" regarding the payment of structured insurance settlements. *Id.* at 288, 302. In granting class certification, the court explicitly distinguished between such standardized written "financial representation[s]" and "consumer purchases." *Id.* at 302-03.

And in *Peterson v. H&R Block Tax Services, Inc.*, the court certified a class based on

---

(cont'd from previous page)
(APR) in standardized written advertisements. *See* 178 F.R.D. 431, 433-34 (D. Del. 1998). In *Spencer v. Hartford Financial Services Group, Inc.*, the plaintiffs claimed that the defendant insurance companies sent substantially "uniform" written "financial representation[s]" to each class member in order to pay class members less than the agreed amount of structured insurance settlements. 256 F.R.D. 284, 302-03 (D. Conn. 2009). Finally, in *Kohen v. Pacific Investment Management Co.*, plaintiffs asserted price inflation claims alleging that the defendant investment firm had cornered the futures market in ten-year U.S. Treasury notes in violation of the Commodities Exchange Act; these claims had nothing to do with any alleged misrepresentations or reliance thereon. *See* 571 F.3d 672, 674 (7th Cir. 2009).

"written misrepresentations contained in standard documents furnished to every class member."
174 F.R.D. 78, 83, 85 n.7 (N.D. Ill. 1997).  Moreover, in *Peterson*, class certification was not
based on the purported worthlessness of any product or service the plaintiffs actually received,
but on allegations that the defendant charged plaintiffs for services it knew they were not
"eligible" to receive at all.  *Id.* at 85.  Here, Plaintiffs do not claim they did not actually receive
Neurontin.  Though they dispute Neurontin's benefits, causation requires them to prove that
thousands of non-party doctors would not have prescribed the drug to putative class members but
for Defendants' alleged unspecified and non-uniform marketing statements.  Neither *Peterson*
nor any other authority supports any such presumption.

Plaintiffs further distinguish their own authorities by pointing out that, in each of the
cases they cite, "consumers would not have known about the existence of the product or service
absent the fraudulent scheme."  (Reconsid. Reply at 11.)  By contrast, Neurontin is an FDA-
approved drug belonging to the anticonvulsant drug class, from which psychiatrists routinely
prescribe drugs to treat psychiatric disorders.  *See Neurontin II*, 257 F.R.D. at 330.  Moreover,
according to the very data on which Plaintiffs rely, physicians in all specialty categories that
Plaintiffs define, including psychiatrists, prescribed Neurontin for its labeled indications.  (*See,
e.g.*, Dkt. 1786-18, 1/15/08 Report of Michael C. Keeley, Ph.D. ¶ 37.)  Psychiatrists were plainly
aware of Neurontin's existence regardless of the allegedly fraudulent marketing.

**D.      Plaintiffs' Speculative Inferences And Baseless Credibility Attacks On The
        Prescribing Doctors' Testimony Do Not Negate Individual Issues Or
        Warrant Reconsideration**

Throughout their brief, Plaintiffs continually repeat the mantra that there were no
"plausible" reasons other than the alleged fraudulent marketing for doctors to prescribe
Neurontin to bipolar patients.  Every single psychiatrist to testify in this case, including
Plaintiffs' bipolar expert, has testified that he or she prescribed the drug for other reasons.  Drs.
█████ and █████ prescribed Neurontin to their patients because of the well-recognized practice

of using anticonvulsants to treat bipolar disorder.[19]  Dr. ███████ prescribed Neurontin to Ms. ███ only after she expressed interest in taking it.[20]  And Dr. ███ – much like Plaintiffs' bipolar expert – prescribed Neurontin to Ms. ███ because her prior physician had done so and she was unwilling to change medication.[21]  Moreover, even though the allegedly concealed studies were made public years ago, Mr. ███'s and Ms. ███'s doctors continue to believe that Neurontin is effective for patients with bipolar and mood disorders, and those doctors still in practice continue to prescribe Neurontin to their bipolar patients.[22]  The *Kleinman* court found similar testimony by just one doctor to be compelling evidence of individualized issues precluding class certification.  *See Kleinman I* at 13.  None of Plaintiffs' attempts to overcome this evidence warrants reconsideration.

First, Plaintiffs attempt to conflate two completely distinct concepts.  They argue that if a drug company allegedly lacked legitimate grounds to market a drug to doctors for a particular indication,[23] then the Court can simply presume that no doctors prescribed the drug to any of their patients for any reason unrelated to marketing – even in the face of direct testimony to the contrary by every single doctor who has testified on the issue.  Plaintiffs cite no authority for this attempted sleight-of-hand, which flies in the face of clear law distinguishing between off-label marketing and off-label prescribing.[24]

---

[19] *See Neurontin II*, 257 F.R.D. at 330 (citing Dr. ███'s deposition); ███ Decl. ¶ 3.

[20] *See* ███ Dep. at 31, 56-57.

[21] *See Neurontin II*, 257 F.R.D. at 330 (citing Dr. ███'s deposition).  Plaintiffs continue to rely on Ms. ███'s inadmissible testimony regarding out-of-court statements purportedly made to her by Dr. ███.  (Reconsid. Reply at 19 n.15).  They fail to respond to Defendants' arguments and authorities explaining precisely why this testimony is inadmissible hearsay not subject to any exception.  (Reconsid. Opp. at 18-21.)

[22] *See* ███ Dep. at 31, 87-88; ███ Dep. at 24-26, 29; ███ Decl. ¶¶ 6, 7; ███ Dep. at 102-13.

[23] Plaintiffs offer no response to undisputed evidence demonstrating that there were legitimate reasons to detail psychiatrists regarding Neurontin's on-label indications, and that sales representatives detailing Neurontin were also responsible for detailing a number of other drugs that psychiatrists routinely prescribe for their labeled indications.  Thus, the mere presence in a psychiatrist's office of a sales representative carrying Neurontin is not even evidence of off-label promotion, let alone fraud.  (Reconsid. Opp. at 8 n.3.)

[24] *See, e.g.*, 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the
*(cont'd)*

Second, Plaintiffs argue that no "minimally competent" doctor would prescribe Neurontin unless he or she was exposed to and deceived by allegedly fraudulent marketing. If this were true, it would mean that Plaintiffs' bipolar expert is not a "minimally competent" doctor. But the issue is irrelevant, because this is not a medical malpractice case. The issue is not whether reasonable doctors should prescribe a drug, but why actual doctors did prescribe it. As discussed in Section II.A, *supra*, arguments identical to Plaintiffs' could have been made in *Vioxx* and *St. Jude*, where the defendants were accused of concealing risks that, once disclosed, prompted the complete withdrawal of those products from the market. Indeed, in *Kleinman*, another Vioxx case, the plaintiffs argued that no fully-informed doctor would have prescribed the drug. Certification was properly reversed or denied in each of these cases.

Third, Plaintiffs attack the credibility of Ms. ███'s and Mr. ███'s doctors – a tactic also unsuccessfully tried in *Kleinman*.[25] They further argue that asking other doctors why they prescribed Neurontin "would only yield inaccurate information" – better described as first-hand accounts that conflict with Plaintiffs' purely speculative, absurdly generalized assumptions. (Reconsid. Reply at 18.) They ignore this Court's holding that doctors' reasons for prescribing a drug "rest[] primarily in the minds of the prescribing doctors," *Neurontin II*, 257 F.R.D. at 322, which is consistent with a line of cases cited in Defendants' prior briefing[26] that Plaintiffs likewise ignore.

Plaintiffs' hearsay medical journal articles and impermissibly speculative expert opinions regarding other doctors' decision-making cannot refute Ms. ███'s and Mr. ███'s doctors' testimony regarding their own decisions, nor can it negate similar individual issues regarding the

---

*(cont'd from previous page)*
authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").

[25] *See Kleinman I* at 13 (denying class certification; emphasizing plaintiff's doctor's testimony as example of individualized issues); *Kleinman* brief at 18 n. 17 (arguing that plaintiff's doctor had a "clear bias" in favor of the defendant); *Kleinman II* (denying reconsideration).

[26] *See* Dkt. 1785 at 10-12 (citing cases).

prescribing decisions of the myriad unidentified doctors who prescribed Neurontin to unidentified members of the putative bipolar and mood subclasses. Plaintiffs apparently hope the Court will forget their prior concessions that "not all physicians who wrote Neurontin prescriptions for bipolar or other mood disorders were detailed" and that *Defendants have the right to call individual physicians to testify that they prescribed Neurontin to treat bipolar based on something other than [the alleged] fraud.*" (Reconsid. Mot. at 25, 28 (emphasis added).) The fact that Plaintiffs believe they will be able to offer expert testimony that might convince a factfinder to disbelieve the individual testimony of a physician does not change the predominance calculus. An individual inquiry is still required. Throughout their opposition, Defendants explained why Plaintiffs' binding admissions are fatal to their motion. (Reconsid. Opp. at 3, 14, 17-18). Unable to articulate any response, Plaintiffs' so-called "reply" simply ignores the issue.

### E.   Plaintiffs Cannot Demonstrate Classwide Causation Based On Defendants' Market Predictions And Patent Application[27]

Plaintiffs argue that classwide causation can be presumed because, in the first years after Neurontin went on the market, Defendants predicted that Neurontin's share of the bipolar market was unlikely to increase significantly. (Reconsid. Reply at 15-16, 18, 22-23.) But such predictions are necessarily based on assumptions regarding future contingencies, and are inherently fallible.[28] Unsurprisingly, Plaintiffs cite no authority treating a company's market

---

[27] These documents are more than 13 years old, and are plainly not newly-discovered. Plaintiffs cited these same documents and made these same arguments in support of their renewed motion for class certification. (*See, e.g.*, Dkt. 1018 at 16-17.)

[28] "[N]o reasonable conclusion as to state of mind may be drawn from the fact that the market price of a security deviated from earlier expectations. It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 776 (2d Cir. 1991); *accord Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996). *See also United States v. Bishop*, 66 F.3d 569, 582 n.20 (3rd Cir. 1995) (Legislature often must "'forecast future events and . . . anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable;'" despite being rational and "evidence"-based, such predictions may still "not come true." (citation omitted)); *Schutter Candy Co. v. Stein Bros. Paper Box Co.*, 338 F.2d 558, 560 (7th Cir. 1964) (where "[n]o dissatisfied customers testified," merely comparing sales forecasts to actual sales was an "insufficient evidentiary basis" to prove that candy manufacturer lost customers because of supplier's defective candy boxes).

predictions as admissions of fact regarding how subsequent events actually unfolded. Just as Plaintiffs' *post hoc* speculations about doctors' decision-making is no substitute for the doctors' own testimony, market share predictions made in 1995 and 1996 are incapable of demonstrating why thousands of doctors chose to prescribe a particular drug during the decade that followed.[29] To be sure, these ***predictions*** cannot somehow refute the testimony of every psychiatrist who has testified in this case – including Plaintiffs' own bipolar expert – that they ***actually*** prescribed Neurontin to their bipolar patients for reasons unrelated to marketing. Plaintiffs are standing in a rainstorm with no umbrella, pointing to last week's sunny forecast as proof that they are dry.

Nor can Plaintiffs demonstrate classwide causation based on a 1995 patent application stating that Neurontin's use as bipolar therapy was not "obvious" at that time to "medical practitioner[s] of ordinary skill." (Reconsid. Reply at 16.) Plaintiffs grossly mischaracterize the patent law standard of "obviousness." Neurontin is an antiepileptic drug, and the undisputed evidence shows that many psychiatrists prescribed drugs of this class to treat bipolar disorder before this patent application was filed. That AEDs were often prescribed in this manner did not make Neurontin's use as bipolar therapy "obvious" under the patent law when Defendants applied for this patent in May 1995 – little more than a year after Neurontin went on the market – because Neurontin's mechanism of action is different from other AEDs.[30] But while Neurontin's different mechanism of action made its use as bipolar therapy non-obvious in May 1995, this does not remotely imply that the idea would not have occurred to psychiatrists absent the alleged fraudulent marketing. When the patent application was filed in 1995, courts had long held that patents that combined previously known elements in the prior art were not proved obvious even

---

[29] The *McLaughlin* and *Vioxx* courts held that the testimony of a single expert, even one opining with the benefit of hindsight, cannot obviate the necessity for individual inquiries. *See Neurontin II*, 257 F.R.D. at 325 (citing *Vioxx*, 929 A.2d at 1076); *McLaughlin*, 522 F.3d at 228-30. There is certainly no authority suggesting that a market forecast, created without the benefit of clairvoyance, can obviate this necessity.

[30] Dr. Pande has explained that Neurontin has a different mechanism of action than mood-stabilizing antiepileptics, that shorter clinical studies would have difficulty demonstrating its effectiveness, and that long-term outcome will be where the effectiveness of Neurontin would be seen. (*See* Dkt. 1787, Resp. to Class SOF ¶¶ 19-23.)

if the new combination was "obvious to try." *In re Duel*, 51 F.3d 1552, 1559 (Fed. Cir. 1995). Plaintiffs also ignore the disclosure of the patent to the public, including practicing physicians. Adequate public disclosure is a cornerstone of the patent laws. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 151 (1989). Patent applications must disclose sufficient information to enable someone skilled in the relevant art to make and use the invention. *See* 35 U.S.C. § 112. Thus, for patent law purposes, Neurontin's use to treat bipolar disorder became "obvious" to ordinary medical practitioners no later than when the patent was granted on April 23, 1996.

Finally, one of the principal reasons for obtaining patents, rather than relying on trade secret protection, is to avoid "'the risk of independent discovery by others,'" which would not only deprive inventors of the exclusive right to use their inventions, but could subject inventors to the prospect of having to pay royalties to use their own invention because someone else independently discovered and obtained a patent for it. *See Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561 (3d Cir. 2003) (citation omitted); *accord Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1013 (10th Cir. 2008).

## III.   The Court Correctly Held That The Third Party Payors' Claims Are Not Susceptible To Aggregate Proof

The TPP plaintiffs' arguments fail for the same reasons as the consumer plaintiffs' arguments. Plaintiffs argue that all members of the proposed TPP class paid for at least one Neurontin prescription written for bipolar disorder. (Reconsid. Reply at 22.) Even assuming this were true, the Court correctly held that a showing that most members of the proposed TPP subclasses paid for at least one off-label Neurontin prescription is not proof that "*fraud* caused the off-label prescriptions for which the TPPs paid" and "does not, by itself, demonstrate that common issues predominate with respect to the claims of the TPPs." *Neurontin II*, 257 F.R.D. at 331 (emphasis in original). Recent on-point decisions confirm that a TPP cannot recover for deception allegedly practiced on its insureds' physicians without alleging and ultimately proving the same, individualized facts that would be needed to support recovery by their insureds. *See*

*Schering-Plough*, 2009 WL 2043604, at *23-25; *PEBTF*, 2009 WL 2231686, at *5-6.

Plaintiffs have not presented evidence that a *single* Neurontin prescription paid for by a *single* TPP was written because of fraudulent promotional statements made to that TPPs' insured's prescribing doctor. Plaintiffs concede that this lack of evidence and the undisputed variations in the demographics of the TPPs' covered populations could only be overcome by indulging in the sweeping presumption that no psychiatrists would have prescribed Neurontin to bipolar patients for any reason other than the alleged fraudulent marketing. (Reconsid. Reply at 22-23.) As discussed above, the presumption Plaintiffs request is impermissible, unsupported by any authority, and flatly contradicted by the testimony of every psychiatrist to testify in this case, including Plaintiffs' own bipolar expert.

## IV. The Court's Denial Of Class Certification Applies To All Claims, Including Unjust Enrichment

Plaintiffs concede that none of the five class certification briefs they filed prior to the Court's ruling argued or suggested that their unjust enrichment claims were subject to a different class certification analysis than their other claims. (Reconsid. Reply at 24.) Yet Plaintiffs nonsensically argue that the Court was somehow required to *rule* on an issue that they were not required to *brief*. They cannot have it both ways. Even if their belated unjust enrichment argument had any merit (which it does not), the argument is waived and cannot be raised for the first time in a reconsideration motion.[31]

Plaintiffs contend that they were not required to brief any separate arguments regarding the certification of unjust enrichment claims because the Court "previously indicated that it "would not act on the [unjust enrichment] claim unless and until Class Plaintiffs lacked other adequate legal remedies." (Reconsid. Reply at 24.) The Court "indicated" no such thing. It merely held that Plaintiffs were not required to elect between theories of recovery at the motion-

---

[31] Plaintiffs may not, "on a motion for reconsideration, advance a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003). Issues are waived for appeal "when they are raised for the first time in motions requesting reconsideration." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

to-dismiss stage. *See In re Neurontin Mktg., Sales Practices, & Prods. Litig.*, 433 F. Supp. 2d 172, 186 (D. Mass. 2006). The Court never suggested that Plaintiffs could make their class certification arguments in successive rounds of briefing. Putative consumer fraud class actions routinely include unjust enrichment claims, and class certification motions are routinely determined in a single order following a single round of briefing.[32] Plaintiffs do not and cannot cite any case in which a court denied class certification with respect to statutory or common law fraud claims and then indulged a separate round of briefing regarding certification of unjust enrichment claims.[33]

Moreover, many courts have held in cases like this one that the same individualized causation issues that preclude certification with respect to consumer fraud also preclude certification of unjust enrichment claims. For example, in *In re Sears Roebuck & Co. Tools Marketing & Sales Practices Litigation*, the court denied class certification, holding that "Plaintiff's unjust enrichment claim is based on wrongful conduct – fraud," and that proving the elements of unjust enrichment in this context would require individualized evidence "that they were deceived by [defendant's] advertising and marketing [and] that as a result they conferred a benefit on [defendant]." No. 05-C-4742, 2007 WL 4287511, at *9 (N.D. Ill. Dec. 4, 2007); *accord Siegel v. Shell Oil Co.*, No. 06 C 0035, 2009 WL 449073, *3 (N.D. Ill. Feb. 23, 2009) (certification denied because unjust enrichment claims would require individualized evidence of deception and proximate cause). Similarly, in *Schering-Plough*, the court dismissed putative

---

[32] *See, e.g., Mullaney v. Delta Air Lines, Inc.*, No. 08-7324, 2009 WL 2337992, *3, 13-14 (S.D.N.Y. July 29, 2009) (denying certification of statutory consumer fraud and unjust enrichment claims based on individualized issue of whether class members relied on non-standard representations); *accord In re Canon Cameras Litig.*, 237 F.R.D. 357, 359-60 (S.D.N.Y. 2006); *Kings Choice Neckwear, Inc. v. FedEx Corp.*, No. 07-275, 2009 WL 689718, *1, 3-4 (D.N.J. Mar. 11, 2009); *In re Sears Roebuck & Co. Tools Mktg.& Sales Practices Litig.*, No. 05 C 4742, 2007 WL 4287511, at *10 (N.D. Ill. Dec. 4, 2007); *Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc.*, 254 F.R.D. 68, 69, 73-75 (E.D.N.C. 2008).

[33] Plaintiffs' own "foremost" (though distinguishable) authority granted certification regarding both consumer fraud and unjust enrichment claims in a single order after a single round of briefing. *See Mercedes-Benz*, 257 F.R.D. at 49. If the bifurcated approach Plaintiffs now advocate had any merit, the *Mercedes-Benz* court would not even have addressed the certification of unjust enrichment claims after granting certification of their statutory consumer fraud claims.

class consumer fraud and unjust enrichment claims, holding that "[t]he remoteness of the alleged injury to Defendants' actions also dooms Plaintiffs' unjust enrichment claim." 2009 WL 2043604, at *34. And in *PEBTF*, the court dismissed the third-party payor's unjust enrichment claim based on the same causation and remoteness grounds as the consumer fraud claims. *See* 2009 WL 2231686, at *6.

Plaintiffs cite various cases for the principle that aggregating small claims is one of the reasons for the class action device. (Reconsid. Reply at 24-25.) None of these cases held the *denial* of certification as to consumer fraud claims, based on overwhelmingly individualized issues, is somehow *grounds* for certifying unjust enrichment claims that allege the exact same conduct and seek the exact same damages. Where, as here, individualized issues predominate, courts deny certification of unjust enrichment claims notwithstanding the fact that class members' alleged damages may be too small to warrant individual lawsuits.[34]

Finally, contrary to *Mercedes-Benz*, "[c]ourts have long held that the laws of unjust enrichment vary from state to state and therefore are not appropriate for nationwide class action treatment." *Muehlbauer v. GM Corp.*, No. 05 C 2676, 2009 WL 874511, at *5 (N.D. Ill. Mar. 31, 2009).[35]

## CONCLUSION

For the foregoing reasons, Class Plaintiffs' Motion for Reconsideration should be denied.

---

[34] *See, e.g., Kleinman I* at 17 ("This decision may indeed be a death knell to the claims of most individual consumers. However, [because of predominance of individualized causation issues,] the court cannot find that a class action is a superior form of resolution either.").

[35] *See also, e.g., Siegel v. Shell Oil. Co.*, 256 F.R.D. 580, 584-85 (N.D. Ill. 2008) (describing significant variations in unjust enrichment law); *Woodard v. Fidelity Nat. Title Ins. Co.*, No. 06-1170, 2008 WL 5737364, *6 (D.N.M. Dec. 8, 2008) ("[T]he different showings required by putative class members from different jurisdictions to prove unjust enrichment would undermine Plaintiff's ability to present generalized proof for all putative class members' unjust enrichment claims.").

Dated:  August 27, 2009

Respectfully submitted,

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

By:    /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

     -and-

SHOOK, HARDY & BACON L.L.P.

By:    /s/ Scott W. Sayler
        Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550

     -and-
WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
        David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on August 27, 2009.


/s/ David B. Chaffin
David B. Chaffin