IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    ) CA No. 07-11426-PBS
NEURONTIN MARKETING, SALES PRACTICES,)        04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION    )        Pages 1 - 62



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
August 28, 2009, 2:14 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S:

2

    FOR THE PLAINTIFF:
3
        MARSHALL RICHER, ESQ., Finkelstein & Partners, LLP,
4   80 Wolf Road, Albany, New York, 12205.

5

    FOR THE DEFENDANT:
6
        DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
7   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.

8

    ALSO PRESENT:
9
        JAMES LANG, ESQ., Assistant United States Attorney,
10  Office of the United States Attorney, 1 Courthouse Way,
    Boston, Massachusetts, 02210.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TERRIE SLATER | | | | |
| By Mr. Chaffin: | 11 | | | |
| By Mr. Richer: | | 23 | | |
| By Mr. Chaffin: | | | 29 | |
| By Mr. Richer: | | | | 30 |
| MARIE MacDONALD | | | | |
| By Mr. Chaffin: | 34 | | | |
| By Mr. Richer: | | 41 | | |
| By Mr. Chaffin: | | | 43 | |

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Superior Court Restraining Order | 25 |

8e9dc2e9-829a-4bfb-b640-a52cdd350c49

1                   P R O C E E D I N G S

2           THE CLERK:  The case of Ronald Bulger, Sr. V.

3    Pfizer, Incorporated, Civil Action 07-11426 and 04-10981,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6           MR. RICHER:  Marshall Richer, Finkelstein &

7    Partners, for plaintiff in the original Bulger action and

8    the PI MDL.  And with the Court's permission, I'm

9    accompanied by Melissa Gardner.  Ms. Gardner is a

10   second-year law student and is an intern currently with the

11   Lanier Law Firm, our co-counsel in this case.

12          THE COURT:  Now, sir, I forget, you're a civil

13   attorney, right?

14          MR. RICHER:  I am a civil attorney.

15          THE COURT:  And you represent Mr. Bulger, I know

16   in the personal injury suit, but that suit is over.  So are

17   you representing him in this suit?

18          MR. RICHER:  That relationship is something I

19   would like to explore with the Court, your Honor.  And

20   during the pendency of not only this proceeding and with

21   regard to the Court's order that we're here on today, at the

22   time that order was originally entered, I believe our firm

23   still represented Mr. Bulger in his representative capacity

24   as personal representative of the estate of plaintiff

25   decedent.  Subsequently and just prior to trial, as your

1    Honor is aware, Mr. Bulger was substituted out as

2    representative of the estate and relinquished his

3    beneficiary claim with regard to the proceeds of the

4    lawsuit, and at the moment, at present, I would say I do not

5    represent him.

6             THE COURT:  Well, you both have flown in from

7    Texas, so for today you're representing him, and then we'll

8    talk about letting you out when this proceeding is over.

9             MR. RICHER:  I drove from Albany, your Honor.

10   Without regard to that issue, I also made sure that

11   Mr. Bulger was here, and I transported him.  I'm not here to

12   fight with the Court about that, but obviously --

13            THE COURT:  Going forward we'll talk about it.

14            MR. RICHER:  Thank you, your Honor.

15            MR. CHAFFIN:  Good afternoon, your Honor.  David

16   Chaffin for the defendants in the --

17            THE COURT:  No, wait a minute.  So you represent

18   Pfizer, right?

19            MR. CHAFFIN:  Exactly, your Honor.

20            THE COURT:  And you represent the estate of Susan

21   Bulger?

22            MR. RICHER:  That is correct, and --

23            THE COURT:  And for the purposes of these

24   proceedings, Mr. Ronald Bulger.  But for these proceedings,

25   are you entering an appearance for the two women who have

1   sought civil contempt?

2             MR. CHAFFIN:  I am not, your Honor.

3             THE COURT:  So let me meet these two women.

4   What's your name, ma'am?

5             MS. SLATER:  My name is Terrie Slater.

6             THE COURT:  And what's your name?

7             MS. MacDONALD:  Marie MacDonald.

8             THE COURT:  And you're both pressing for civil

9   contempt, is that right?

10            MS. SLATER:  Yes.

11            THE COURT:  Do you have your own lawyers because

12  Mr. Chaffin is the lawyer for Pfizer?

13            MS. SLATER:  No.  We're representing ourselves,

14  your Honor.

15            THE COURT:  All right, so I want to make sure

16  that -- Mr. Bulger I know is here and the two of you over

17  here.  Mr. Chaffin, what role do you want to play in this

18  because if you're not representing them, I don't know --

19            MR. CHAFFIN:  I'm just here to help if I can, your

20  Honor, help you.

21            THE COURT:  All right, so let me just talk over

22  you, if we will, to these two women.

23            MR. CHAFFIN:  Yes, and I'll sit in the back.

24            THE COURT:  Yes, I actually think you're not

25  representing them at this point, and I will look to you

1    perhaps regarding -- you filed nothing, right?

2              MR. CHAFFIN:  No, your Honor.

3              THE COURT:  And you filed nothing?

4              MR. RICHER:  That is correct, your Honor.

5              THE COURT:  All right, so what are you looking for

6    today?  Are you Mrs. Slater?

7              MS. SLATER:  Yes, Ms. Slater.

8              THE COURT:  Ms. Slater, all right.  What are you

9    looking for?

10             MS. SLATER:  Well, your Honor, after returning

11   home, actually the day of my return at home, I found a dead

12   rat at my doorstep.

13             THE COURT:  Well, let me just -- come up here,

14   these two chairs right here.  You're looking for a contempt

15   finding?

16             MS. SLATER:  A violation --

17             THE COURT:  I'll get to in a minute whether we

18   need to have testimony about what happened or not.  What are

19   you looking for from me?

20             MS. SLATER:  A violation of the restraining order.

21             THE COURT:  And then what?

22             MS. SLATER:  Putting that in order to have, you

23   know, so we can be safe.

24             THE COURT:  So let's assume for a minute -- I'm

25   not, I want to hear from the other side too -- that there

1   was a violation of my restraining orders and you felt

2   threatened.

3           MS. SLATER:  Correct.

4           THE COURT:  You essentially are looking for

5   another restraining order?  What are you looking for?

6           MS. SLATER:  No.  Your Honor, we're actually

7   hoping that you will violate Mr. Bulger because he's

8   violated the restraining order.

9           THE COURT:  And "violate" means what?

10          MS. SLATER:  Incarcerate him.

11          THE COURT:  All right, you want me to punish him?

12          MS. SLATER:  To punish him, correct.

13          THE COURT:  All right, so is that what you're

14  looking for as well?

15          MS. MacDONALD:  Yes.  Unfortunately, the local

16  police can't help us because it's a federal restraining

17  order, so when we call them to say that he's where he

18  shouldn't be, they say, "Sorry, we don't have the power to

19  arrest him."

20          MS. SLATER:  They have no right to arrest.

21          MS. MacDONALD:  So they basically can't help us.

22          THE COURT:  So you have sought from me -- this is

23  a very technical legal issue.  Neither of you have a lawyer,

24  right.

25          MS. SLATER:  No.

1        THE COURT:  Have you met with Mr. Chaffin to ask

2   about contempt?

3        MS. SLATER:  No.  Your Honor, I did this on my

4   own.  I wrote up the contempt on my own.

5        THE COURT:  The problem is, you asked for civil

6   contempt.  As soon as you put the word "civil" down, it

7   means I do not have the power to incarcerate.  The question

8   really will be -- and I've asked the U.S. Attorney's office

9   to be here, and a representative from the office is here --

10  the question really is whether, A, is there anything I can

11  do on a civil contempt basis?  And maybe it's going to be

12  rewriting this order to make it stronger.  But if what

13  you're seeking is a penalty, that is not something that I

14  can do here today.  And so criminal contempt involves a

15  trial, and it may be that I think that I should refer it for

16  criminal contempt or the U.S. Attorney's office

17  independently thinks that, but right now what I want to do

18  is hear evidence about what happened.  And are you both

19  prepared today to take the stand and do that under oath?

20       MS. SLATER:  Yes, your Honor.

21       MS. MacDONALD:  Yes.

22       THE COURT:  Have you talked to your client?

23       MR. RICHER:  I have, your Honor.

24       THE COURT:  Right now, I have not given notice for

25  a criminal contempt.  We've done some reading on the law.

1    I'm not sure I can do that.  I think that has to be done by

2    jury trial because it was outside the presence of the Court.

3    But because these two women -- am I correct, you were both

4    on the witness list for the trial that resolved otherwise?

5              MS. SLATER:  Correct.

6              THE COURT:  Because they were two witnesses for

7    Pfizer on the list and there had been prior threats, I

8    issued a restraining order, and there are allegations there

9    was a direct violation of it.  You've had had a chance to

10   talk to your client.  Is he denying that?

11             MR. RICHER:  Yes.  He denies the factual

12   allegations that are the basis of this complaint, the civil

13   contempt complaint.

14             THE COURT:  All right, so I'm going to ask -- and

15   I don't know, you will want to have the opportunity to

16   cross-examine them, I'm assuming, right?

17             MR. RICHER:  Well, I think that would depend upon

18   the Court's ruling as to the nature of their testimony.  In

19   other words, I have the same concerns that the Court may

20   have about some procedural issues here, and I don't claim to

21   be --

22             THE COURT:  This is right now a civil contempt

23   proceeding, not criminal.  That having been said, I am

24   deeply worried about the allegations that were made in here.

25   I looked Mr. Bulger in the eye last time, and I said, "Stay

1    away from these women," and then I issued a written order.

2    And so they're claiming it was violated.  They went to state

3    Superior Court.  They went to the local police.  They did

4    not have any kind of remedy.  I'm worried.  The trial is

5    over, but it is a continuing order.  You cannot punish and

6    intimidate somebody who was going to testify against you.

7             So why don't we put you on the stand right now.

8    Mr. Alba will put you under oath.  You tell us what

9    happened, okay?

10            MS. SLATER:  Okay.

11            THE COURT:  And then you'll have the opportunity

12   to cross.

13            Mr. Chaffin, do you want to play the role of

14   putting them on the stand, or do you want to represent them,

15   or do you want to stay by the wayside?

16            MR. CHAFFIN:  Your Honor, I probably need to get

17   authority to do that.

18            THE COURT:  All right, well, just put them on

19   right now, and I'll deal with that later.

20            Please, ma'am, why don't you go up.

21            MR. CHAFFIN:  Your Honor, will it assist you if I

22   do that?

23            THE COURT:  Yes, because you're a lawyer.  It's

24   either you or me, so --

25            MR. CHAFFIN:  Okay.

1                      TERRIE SLATER

2     having been first duly sworn, was examined and testified as

3     follows:

4            THE CLERK:  Would you please state your name and

5     spell it for the record.

6            MS. SLATER:  My name is Terrie Slater, S-l-a-t-e-r.

7            MR. CHAFFIN:  Thank you, your Honor.

8     DIRECT EXAMINATION BY MR. CHAFFIN:

9     Q.   Ms. Slater, where do you reside?

10    A.   194 Lafayette Road, 15N, Salisbury, Massachusetts,

11    01952.

12    Q.   There's a gentleman in the courtroom in the first row

13    on the far side of the courtroom from you.  Do you recognize

14    that gentleman?

15    A.   Yes, I do.

16    Q.   Who is that gentleman?

17    A.   Ronald Bulger.

18    Q.   And at one time, or perhaps currently, is Mr. Bulger a

19    neighbor of yours?

20    A.   At one time, yes.

21    Q.   Now, Ms. Slater --

22            THE COURT:  Where you live, is that a trailer

23    park?

24            MS. SLATER:  Yes, ma'am.

25    Q.   And, Ms. Slater, let me back up just a little bit.  You

1   had your deposition taken in connection with the action

2   taken by Mr. Bulger, correct?

3   A.   Yes.

4   Q.   And your deposition was taken by whom?

5   A.   Mr. Bulger's attorney.

6   Q.   Was that Mr. Lanier?

7   A.   Lanier, right.

8   Q.   At my offices, correct?

9   A.   Correct.

10  Q.   Right.  And shortly after your deposition, did you

11  move?

12  A.   We were temporarily moved, yes.

13  Q.   Where did you move to?

14  A.   In Portsmouth.

15  Q.   Into a hotel?

16  A.   Into a hotel, correct.

17  Q.   Now, you at some point returned back to your premises,

18  to your home, correct?

19  A.   Correct.

20  Q.   When was that?

21  A.   I don't know the exact date.  It was on a Thursday,

22  August -- two weeks ago, the 13th, I believe?

23  Q.   But before you went home, you went back to your --

24  A.   Several times.

25  Q.   You went back to your home several times.  And during

1  your return visits before moving back home, did you observe

2  Mr. Bulger?

3  A.   I have.

4  Q.   And what did you observe Mr. Bulger doing?

5  A.   Standing on the phone, on several occasions, he would

6  make eye contact with me.  One particular time -- I'd have

7  to check my notes --

8            THE COURT:  Well, the trial started the 27th of

9  July.  It resolved by being dismissed July 29.  Did you move

10  home after the trial?

11           MS. SLATER:  We moved home on -- yes, it was after

12  the trial, yes.

13           THE COURT:  All right, and so you think you didn't

14  move home for two more weeks?

15           MS. SLATER:  No, no, no.  We moved home on the

16  13th of August.  But prior to that, I would go back to my

17  house to check on the house, water the plants, you know, be

18  there for a very short period of time.

19           THE COURT:  So if the restraining order issued on

20  July 13, you're talking about a time period after the

21  restraining order and after the trial?

22           MS. SLATER:  Yes.

23  Q.   Is there some reason you didn't want to return home

24  immediately after the trial?

25  A.   Yes.

1    Q.   And what was that?

2    A.   Mr. Bulger was still in the park.

3    Q.   And you understood, didn't you, that Mr. Bulger

4    purportedly was going to be leaving the park, right?

5    A.   Yes.

6    Q.   But when you returned home, you observed him there?

7    A.   Yes, several times.

8    Q.   And did he make any contact with you on your visits?

9    A.   Not until after I moved home.

10   Q.   Now, have you made some inquiries concerning whether

11   Mr. Bulger is properly at the park?

12   A.   I have.

13   Q.   And what did you find out?

14   A.   I was told that he was, uhm -- please forgive me, I

15   have word retrieval problems.  I had a brain tumor.  He was

16   evicted from the mobile home park.

17   Q.   Now, you returned -- in an effort to refresh your

18   recollection, do you recall that you returned home on

19   August 13?

20   A.   Yes.

21   Q.   On a Friday?

22   A.   On a Friday.

23   Q.   And when you returned home, what did you find?

24   A.   That Mr. Bulger -- well, let me back up.  When I pulled

25   into the driveway, I immediately grabbed a suitcase.  I have

1    four steps to my deck to go into my home.  At the very

2    bottom of the deck, there was a dead rat.  And as I -- of

3    course, we were pretty grossed out because you could tell

4    the animals had gotten to it.

5            I instructed my daughter -- we went into the

6    house, found that there was no power on, so I immediately

7    called National Grid and asked them why my power was shut

8    off.  They advised me saying that I had phoned them to

9    terminate the power because I was moving to Florida.  So at

10   that point I gave my daughter a choice:  Take care of the

11   rat or take care of the refrigerator.

12   Q.   Had you called National Grid and told them you were

13   moving to Florida?

14   A.   No.

15   Q.   As a result of the power being off, what did you find,

16   if anything?

17   A.   When I walked into the house, there had to have been --

18   and I'm really not exaggerating -- at least a thousand flies

19   in there, at least, dead and alive throughout the whole

20   house.

21   Q.   And what about in the refrigerator?

22   A.   In the refrigerator, everything was spoiled.  Mildew

23   started, you know, started collecting.  The freezer,

24   everything in the freezer was melted.  You opened it up, and

25   it was like sitting in a dumpster.

1  Q.   Now, since the 13th and after Mr. Bulger's eviction,

2  have you seen him?

3  A.   Yes, I have.

4  Q.   Any contact?

5  A.   Not any physical contact.

6  Q.   Would you describe any incidents with Mr. Bulger since

7  the 13th, please.

8  A.   It was August 20th, the first -- it was twice that day.

9  The first one was at 9:45.  I had pulled into my parking lot

10  and noticed Mr. Bulger standing on the deck across the

11  street of my neighbor's at Lot 16N.  We had made eye

12  contact.  Mr. Bulger brought up his arm in front of himself

13  and made it look like he had a gun with his finger out

14  after -- after -- like a motion of shooting.

15            THE COURT:  Show me.

16            MS. SLATER:  He went up like this, and then came

17  back and blew his finger (Indicating).

18  Q.   You're reading from something, ma'am -- I'm sorry, go

19  ahead, Ms. Slater.

20  A.   And I noticed Ms. MacDonald coming up the street, and

21  I --

22            THE COURT:  Did he say anything to you, Bulger?

23            MS. SLATER:  No, he never said -- at that point --

24            THE COURT:  How far away was he from you to him?

25            MS. SLATER:  From here to that wall.

Page 18

1          THE COURT:  Okay.

2          MS. SLATER:  Not on this particular time, but that

3     afternoon there's another report that I also -- which was on

4     8/20 at 2:30.  I was pulling into the park itself, and I

5     drove by Mr. Bulger, and I had my daughter and my

6     granddaughter in the car.  And he again brought his arm up

7     as like if he had a gun and said -- excuse me, but this is

8     what he said -- that he was going to kill -- "I'm going to

9     kill you, you cunt."

10          THE COURT:  So he said that to you?

11          MS. SLATER:  Yes.

12     Q.   There documents you're looking at, Ms. Slater, are

13     what?

14     A.   These are the offense reports that the Salisbury Police

15     Department did take from us.

16     Q.   So this was last Thursday?

17     A.   August 20, yes.

18     Q.   And you then filed your contempt complaints on him?

19     A.   Yes, I did.

20     Q.   And we had some contact and arranged for you to do that

21     through the court?

22     A.   Yes.

23     Q.   Have you seen Mr. Bulger since?

24     A.   I have not seen him at all this weekend, but --

25          THE COURT:  Do you have any proof, anything he

1  said or someone else said that would lead you to believe

2  that he left the rat or turned off your power?

3          MS. SLATER:  Well, there is another instance, your

4  Honor.  I've had my house up for sale for two years.  The

5  sign has been located at the same location for the two

6  years.  While I was gone, that sign was destroyed.  I'm not

7  sure if we have pictures.  Did you -- you didn't --

8          THE COURT:  So you're drawing the inference that

9  he turned off the power and --

10         MS. SLATER:  Somebody --

11         THE COURT:  -- just because you think he's angry

12  at you, but the only thing you have direct proof of is what

13  you saw on August 20?

14         MS. SLATER:  Right, correct.

15  Q.  But you do associate a rat with your testimony in this

16  case, right?

17  A.  Absolutely.  That was a strong -- it was a strong

18  message sent to me.

19         THE COURT:  Let me -- and I don't mean to be

20  insulting at all -- have you seen rats otherwise around your

21  home?

22         MS. SLATER:  No.

23         THE COURT:  Okay, so that was unusual to ever see

24  a rat?

25         MS. SLATER:  Absolutely.  I have a cat, so --

1    Q.    And, Ms. Slater, you live in your home with whom?

2    A.    My daughter and my granddaughter.

3    Q.    How old is your granddaughter?

4    A.    My daughter is twenty, and my granddaughter is three.

5    Q.    And how many times have you called the police over the

6    course of the last couple of weeks?

7    A.    I've called the police numerous times.  My last time

8    that I had called was when I was filling out this motion on

9    the 22nd requesting all the police logs and the other

10   offense reports so I can bring them today to show you today,

11   and they said that they could not give me those reports.

12   Apparently there's something else going on, that I would

13   have to go through the Newburyport District Court to have

14   those reports released.

15              THE COURT:  Let me ask this:  Was there anyone

16   else on the roof deck where Mr. Bulger was or where you were

17   that saw this?

18              MS. SLATER:  No.  He was on the deck himself on

19   the phone.

20              THE COURT:  And that you know of, was anyone else

21   standing by watching?

22              MS. SLATER:  Not that I'm aware of.

23              THE COURT:  So as far as you know, it was the two

24   of you?

25              MS. SLATER:  It was -- well, actually

1   Ms. MacDonald was walking up the street to my house.  We

2   live four trailers away from each other.

3               THE COURT:  All right, so we'll ask her, but she

4   was the only other person you know of who would have seen

5   it?

6               MS. SLATER:  Yes.

7               THE COURT:  Okay, thank you.

8   Q.   Right after this incident you just described, you

9   and/or Ms. MacDonald called my office right away, right?

10  A.   Yes.  We tried -- we're trying not to bug you as much,

11  but when we find that it's important, I mean, serious

12  issues, we'd call you because we don't know what to do.  I

13  mean, this man, I know this man.  I haven't had a chance to

14  testify.  I am very fearful of what his capability is, where

15  he's got a lot of associates out there that my daughter is

16  scared to death.  She wants -- she wants to just leave

17  Massachusetts.  She's scared.  And at twenty years old and a

18  three-year-old granddaughter, you know, I can only protect

19  them so much; and then when I found out that the police

20  department can't really help us and protect us, that puts a

21  fear in me even more.

22              THE COURT:  Did a Superior Court judge issue an

23  injunction as well?

24              MS. SLATER:  They did, your Honor.  I thought I

25  had an attachment.

Page 22

1          THE COURT:  I couldn't find it.  Which judge was

2    it?

3          MR. CHAFFIN:  Judge Feeney.

4          THE COURT:  Judge Feeney?

5          MR. CHAFFIN:  Yes, who knew Mr. Alba's phone

6    number by heart.

7    Q.   On how many other occasion, Ms. Slater, has Mr. Bulger

8    been within 100 feet of your person or residence?

9          THE COURT:  Feeney or Feeley?  Tim Feeley?

10          MR. CHAFFIN:  I thought it was Feeney.  Am I

11    wrong?  Feeley, I'm sorry, Feeley.

12    A.   At least ten times easily while within that 100 feet.

13          THE COURT:  Say it again.  What was it?

14          MS. SLATER:  At least ten times.

15          THE COURT:  That he was within --

16          MS. SLATER:  Within the 100 feet, or yards.  I

17    don't even --

18          THE COURT:  But let me just press it a little bit.

19    It is true that I issued an order saying he couldn't be

20    within 100 feet, but at least the two times you described to

21    me, he was somewhere, and then you drove up?

22          MS. SLATER:  The first time, when I drove into my

23    driveway, I got out of my car.  And as I got out of my car,

24    I happened to look over to, like I said, to where he was

25    standing would be at the wall.

1   THE COURT:  Right, but he didn't come into your

2   presence at 100?

3   MS. SLATER:  No.

4   THE COURT:  You drove in?

5   MS. SLATER:  No.  He was there.

6   THE COURT:  Is there any time where he approached

7   you and came within the 100 feet?

8   MS. SLATER:  No.

9   THE COURT:  All right, so primarily the violation

10  that you'd be contending is that he threatened you --

11  MS. SLATER:  Yes.

12  THE COURT:  -- in violation of the order, that the

13  shooting and "I'll kill you --"

14  MS. SLATER:  Yeah, and I apologize.

15  THE COURT:  Okay, thank you very much.  Did you

16  have anything else?

17  MR. CHAFFIN:  No.  Thanks, your Honor.

18  THE COURT:  Do you have any other questions?

19  MR. RICHER:  Yes.  Yes, your Honor.

20  CROSS-EXAMINATION BY MR. RICHER:

21  Q.  Ms. Slater, can you tell me what contact you had with

22  Mr. Chaffin or his firm, not about the trial in general but

23  just about this application that you've brought to the

24  Court, these problems?

25  A.  As far as printing it up?  I just simply called him

1   when we arrived at home advising him of the situation with

2   the rat and the electricity.  Other than that, I called

3   to -- I believe I called there to find out what I should --

4   what we should do, which we went to the Superior Court to

5   get that order.  And then other than that was to let him

6   know that I was filing this contempt, which apparently I did

7   it wrong.

8           THE COURT:  No, you didn't, but it's -- in any

9   event --

10  Q.   Did his firm assist you with either filing this

11  application or the one you did in Superior Court?

12  A.   No, no.

13  Q.   Did you get an order, a restraining order, from that

14  other court?

15  A.   I did, and the order is here.

16  Q.   Could I see that copy, please.

17          THE COURT:  I'm not sure that we did get copies of

18  that.

19          MR. RICHER:  Your Honor, I would just note for the

20  record that the papers I have make reference to attachments,

21  and there are some copies which are largely illegible that

22  are part of the docket, but I didn't see anything that

23  purported to be a state court order of any type.

24          THE COURT:  Maybe we should mark that as an

25  exhibit.  I'm not sure whatever I -- some of it was

1   illegible.

2          MS. SLATER:  As long as -- I just need a copy.

3          MR. RICHER:  Yes, your Honor, I would request that

4   this be marked, and I don't know how the --

5          THE COURT:  Mark it as Exhibit 1.

6          MR. RICHER:  Court's exhibit or --

7          THE COURT:  Yes.  Give it to Mr. Alba.

8          (Exhibit 1 received in evidence.)

9   Q.   Ms. Slater, in order to obtain this order which we're

10  marking as Exhibit 1 and appears to have been signed by

11  Timothy Feeley perhaps, Justice of the Superior Court, did

12  you have to submit any type of written application?

13  A.   Uhm. . .what we did is, we went down to the -- I can't

14  even remember.  There's just so much.  We went down to the

15  Superior Court because we -- we -- we initially thought we

16  were going to be able to go to the Superior Court in

17  Newburyport.  We were told we had to go to Salem.  We went

18  down to Salem and filled out a form, a motion.  Is that

19  right?  And at that point we were heard, and the judge

20  ordered for us to come back the following Tuesday, whatever

21  the date is on that.  You took my copy, so I don't have it.

22  Q.   This order is dated August 18 of 2009, this year.

23  A.   Right.

24  Q.   Do you understand -- it appears by its terms that it

25  says it shall expire a year from that date?

1   A.   One year.

2   Q.   August 18, 2010?

3   A.   10.

4   Q.   Did anything happen after you got this order that you

5   considered a problem with Mr. Bulger?

6   A.   Yes.

7   Q.   Any contact with him?

8   A.   The two -- the two on August 20.

9   Q.   And did you report those to the police?

10  A.   I did.

11  Q.   And at the time you reported them to the police, did

12  you inform them that you had this order?

13  A.   I --

14         THE COURT:  What is that?  Is that a 209A order?

15  Or is it just a regular TRO, a restraining order?

16         MR. RICHER:  By its terms, it doesn't make clear

17  what it is, your Honor.

18         THE COURT:  Okay.

19         MS. SLATER:  I'm having a problem because I -- I

20  think when we went down here, we hadn't gotten that yet.  We

21  went to -- we went into court, I believe, on the -- I just

22  don't remember.  That's why I try to write notes.

23         THE COURT:  All right, what's the next question?

24  Let's try and move through this.

25  Q.   Ms. Slater, at some point this year, you became a

1   potential witness in Mr. Bulger's case, correct?

2   A.   Yes.

3   Q.   And I'm not going to go into all that, but you had some

4   contact with Mr. Chaffin's law firm who represents the

5   defendant in that case, correct?

6   A.   Correct.

7   Q.   Before that happened, before you talked to anyone about

8   testifying, and I understand that you didn't testify at any

9   trial, but before all of that, what was the nature of your

10  relationship with Mr. Bulger?

11  A.   A friend.

12  Q.   You got along with him okay?

13  A.   Yup.

14  Q.   Had anything happened before that?  Did you have any

15  prior disputes, disagreements with Mr. Bulger that caused

16  you difficulty with him?

17  A.   Uhm, yeah.

18  Q.   Okay, are there any that you can think of?

19  A.   Yes, there is, but that situation was taken care of.  I

20  had an issue with Mr. Bulger.  He and I connected, and that

21  situation was no longer an issue.

22           THE COURT:  What was the problem?

23           MS. SLATER:  I was dating a sex offender, a

24  Level 2, and his daughter and a friend of the daughter

25  claimed that he tried to pick them up and take them to a

1   park.  He was never arrested, convicted, tried, none of

2   that.  But he and I sat down and talked about this.

3           THE COURT:  He and I, Mr. Bulger?

4           MS. SLATER:  I'm sorry.  Mr. Bulger and I have sat

5   down and discussed it in great detail, you know, to where we

6   were friends.  I would send food down to his house; his

7   daughter would come to my house.

8           THE COURT:  How long ago was this situation?

9           MS. SLATER:  Three years ago?

10          THE COURT:  Three years?

11          MS. SLATER:  Maybe longer.

12  Q.   Did you bear any animosity towards Mr. Bulger because

13  of that?

14  A.   In the beginning I did, but once we sat down, you know,

15  as adults, I understood, he understood; we became friends.

16  Q.   And it's your testimony today that you guys put that

17  behind you?

18  A.   Absolutely.

19  Q.   And you weren't having any trouble because of that?

20  A.   Absolutely.

21  Q.   Your boyfriend was incarcerated for a period of time

22  after that, wasn't he?

23  A.   Correct, but nothing to do with that.

24  Q.   Okay, and he was not allowed to come back to the

25  trailer park, correct?

1   A.   Yes, yes.  Ex-boyfriend.

2   Q.   With regard to the allegations that you've made in this

3   complaint, are you aware of any witnesses to them other than

4   yourself and other than Ms. MacDonald?

5   A.   I don't know.

6           MR. RICHER:  Thank you.  That's all I have at this

7   time, Judge.

8           THE COURT:  Anything else?

9           MR. CHAFFIN:  If I may, your Honor, just briefly.

10  REDIRECT EXAMINATION BY MR. CHAFFIN:

11  Q.   Ms. Slater, do you remember Mr. Lanier asked you some

12  questions about why you were afraid of Mr. Bulger --

13  A.   Yes.

14  Q.   -- during your deposition?

15  A.   Yes.

16  Q.   Could you tell Judge Saris why it was at that time in

17  June, before the trial ever began, you were afraid of

18  Mr. Bulger and you didn't want him to know that you were

19  going to be providing testimony?

20  A.   Yes, because he sat in my living room drinking coffee

21  and said that, figured there was an issue about this case,

22  and he sat in my living room --

23          THE COURT:  This is in June of this year?

24          MS. SLATER:  Yes.

25          THE COURT:  So in June of this year, Mr. Bulger

1   was sitting in your living room?

2         MS. SLATER:  In my living room.  This is prior to

3   the deposition.

4         THE COURT:  Yes.

5         MS. SLATER:  And said that there was an issue

6   going on with his case, and that if he finds -- when he

7   finds out who is causing his problems with the case, he was

8   going to kill them.  And I -- I've seen Mr. Bulger's anger.

9   I've seen him in action with his anger, and I -- I was very

10  fearful, and I still am.

11  Q.   And this conversation was before he knew you were a

12  witness, right?

13  A.   Yes.

14        MR. CHAFFIN:  Thank you.  Nothing further, your

15  Honor.

16  RECROSS-EXAMINATION BY MR. RICHER:

17  Q.   Ms. Slater, did you have any reasons -- other than that

18  conversation where he said he was going to kill the person

19  when he found out who they were, did you have any other

20  reasons, any other experiences that made you fearful of

21  Mr. Bulger other than that?

22  A.   Prior to us moving to the hotel in Portsmouth, there

23  was two incidents.  Something glass -- I couldn't tell you

24  what it was because it was just in too many pieces -- was

25  thrown at my mobile home.  Two days after that, my

1   daughter's tire was slashed.  The cat, our cat, she has long

2   whiskers.  The cat's whiskers were cut to half an inch.

3   Q.   Anything prior to this period of time?  You've told us

4   already today that you had a good relationship with

5   Mr. Bulger; isn't that true?

6   A.   Right, yes.

7   Q.   And how long did you know him?

8   A.   Uhm, I don't know, maybe eight months prior to -- I

9   mean, to get to know him as a friend, probably about eight

10  months, ten months.

11  Q.   Anything during that period of time that caused you to

12  fear him or be fearful of him or believe that he had a

13  propensity for violence?

14  A.   What made me fearful, made me scared about Mr. Bulger

15  is when he sat in my living room and told me he knew what

16  his wife was doing downstairs, and he let it happen.

17           THE COURT:  You mean the suicide?

18           MS. SLATER:  Yes.

19  Q.   Okay, well, I'm talking about -- well, when did that

20  happen?  What I want to do is this:  You've explained to me

21  about two separate things.  One is, you said that you

22  generally had a good relationship with Mr. Bulger, and that

23  you were friends with him, and you'd send food down to his

24  house.

25  A.   Correct.

1   Q.   And that you didn't have a beef with him about your

2   boyfriend being sent off, and everything was fine.

3   A.   Oh, he was never sent off.

4   Q.   He couldn't live there anymore, right?

5   A.   Correct.

6   Q.   Okay, your boyfriend had to leave.  And prior to that,

7   he was living with you, right?

8   A.   Yes.

9   Q.   Okay.  So there's facts here you're telling me about

10  that everything is okay?

11  A.   Yup.

12  Q.   But you're also telling me about a list of things about

13  why you're scared of him and he's a bad guy, just in common

14  language.

15  A.   Yes.

16  Q.   And I'm trying to make these two things go together.

17  A.   Okay.  When I first got to meet Mr. Bulger --

18  Mr. Bulger has two different personalities.  When I first

19  met him, I met the first personality, which was a nice, very

20  quiet man.  As you got -- as I got to know Mr. Bulger and

21  his doings of what he does, I found a different side of

22  Mr. Bulger.

23  Q.   Now, you testified about your belief that Mr. Bulger

24  has been convicted or is being evicted from the trailer

25  park, correct?

8e9dc2e9-829a-4bfb-b640-a52cdd350c49

1   A.   I believe he is already convicted.

2   Q.   Are you on good standing with the trailer park?

3   A.   I -- I -- I think so.  I have an issue going on with

4   the trailer park.  I had my pipes froze from the ground

5   under, which is the park's responsibility.

6   Q.   But you don't have any rent problems?  They're not

7   convicting you or anything like that?

8   A.   No.

9            THE COURT:  Is Mr. Bulger's daughter still living

10  there?

11           MS. SLATER:  No.  She was taken by DSS.

12           THE COURT:  So she's not living there?

13           MS. SLATER:  No.

14           THE COURT:  And, to your knowledge, does he still

15  have a trailer in the park?

16           MS. SLATER:  The trailer is there, but it's up for

17  sale.  However, though, your Honor, I do want to tell you

18  that Mr. Bulger's daughter did live with me for two weeks

19  prior to DSS taking her, being taken.

20           THE COURT:  All right, thank you.  You may step

21  down.

22           (Witness excused.)

23                    MARIE MacDONALD

24  having been first duly sworn, was examined and testified as

25  follows:

1    THE CLERK:  Would you please state your name and

2    spell it for the record.

3    MS. MacDONALD:  Marie MacDonald,

4    M-a-c-D-o-n-a-l-d.

5    MR. CHAFFIN:  Thank you, your Honor.

6    DIRECT EXAMINATION BY MR. CHAFFIN:

7    Q.   Ms. MacDonald, where do you live?

8    A.   I live on 194 Lafayette Road, 25N, which is right

9    beside Ron.  He's my neighbor.

10   Q.   And did you also live in Portsmouth, New Hampshire, for

11   a month or so this summer?

12   A.   Yes.

13   Q.   And why did you live there?

14   A.   We were in fear for what was going on.

15   Q.   Now, Ms. MacDonald, you read the restraining order that

16   Judge Saris issued?

17   A.   Yes.

18   Q.   Could you describe, if you would, please, any incidents

19   involving Mr. Bulger that you believe --

20   THE COURT:  Speak up just a little bit.

21   Q.   I'm sorry -- that you believe were prohibited by the

22   terms of the order.

23   A.   Well, the order said that he couldn't be within 100

24   feet of my home or 50 feet of me, and he lives 20 feet away.

25   So we were coming home two or three times a week because my

1   husband has issues, and we had to pick up prescriptions or

2   whatever.  And the week ending August 7, I believe,

3   August 6, three times we were home, and three times

4   Mr. Bulger was at my next-door neighbor's.  If you face the

5   trailers, Mr. Bulger lives to the right, I live in the

6   middle, and the neighbor he was at was to my left.  Now,

7   Terrie lives at the last trailer in the park.  So according

8   to your order, he can't be on the street because he would be

9   within 100 feet of either one of our houses if he left his

10  house and walked down my street --

11          THE COURT:  Let me just ask you.  You had moved

12  out to a hotel, right --

13          MS. MacDONALD:  Right.

14          THE COURT:  -- during the trial because you were

15  afraid, and Pfizer put you up someplace to get you out of

16  the trailer park, right?

17          MS. MacDONALD:  Correct.

18          THE COURT:  So was there any way he would have

19  known that you were coming back to the house at that point?

20          MS. MacDONALD:  No.  But when I called the police

21  after the third time, he said that your restraining order

22  said 100 feet.  That's it.  Whether I'm here, there or not,

23  he's not supposed to be there.  He was already evicted from

24  the park.  There was no reason for him to be there, and he

25  couldn't get where he was without being --

1    THE COURT:  All right, so now I'm confused.  So at

2    the time that he was in the trailer park 100 feet from your

3    home, at that point he had been evicted?  There was no

4    reason for him to be there?

5    MS. MacDONALD:  Yes, from when I understand he was

6    evicted on that date.

7    Q.   Focusing, Ms. MacDonald, on when you moved back on the

8    13th -- you moved back on the same date as Ms. Slater; is

9    that right?

10   A.   Yes.

11   Q.   And was that Friday, the 13th?

12   A.   Yes, but we had an issue on the 11th.

13   Q.   You had an issue on the 11th?

14   A.   Yes.

15   Q.   What happened?  You have some police reports you're

16   looking at?

17   A.   Yes.  I have police reports that were filed on the

18   11th.

19   THE COURT:  When you say "we," that means you

20   personally?

21   MS. MacDONALD:  Me and my boyfriend.  I call him

22   my husband.  William Locke, he filed one also.  I had called

23   the police the week before and talked to Officer Levitt and

24   told him what was going on.

25   THE COURT:  No, I just want to know.  You tell me

1    what happened.  What happened?

2            MS. MacDONALD:  The fact that he was still there,

3    and he was just, like, within 50 feet of me, within 100 feet

4    of my house.  There's a restraining order.  I don't

5    understand why he's still there.

6            THE COURT:  Well, did he say something to you?

7            MS. MacDONALD:  No.

8            THE COURT:  Did he threaten you?

9            MS. MacDONALD:  No.

10           THE COURT:  Did he in any way come and approach

11   you?

12           MS. MacDONALD:  No.

13           THE COURT:  So your claim of a violation is --

14           MS. MacDONALD:  Well, on this particular date, I

15   was just calling --

16           THE COURT?  -- was just that he was within the

17   100 feet?

18           MS. MacDONALD:  Right, and we were coming home,

19   and I knew we were coming home next week, so I wanted this

20   all straightened out before we came home, to make sure that

21   the police knew we had a restraining order and I didn't want

22   him to be there.  So the 11th we went home.  This was two

23   days before we were supposed to go home, we started bringing

24   some stuff home.  And I was assured by Officer Levitt that

25   he was going to have a talk with Mr. Bulger and make sure he

1   wouldn't be there.  Bill dropped me off at the post office

2   boxes, which is right beside -- opposite the street of

3   Mr. Bulger's house that he had been evicted from.  And I

4   came around the corner, and there's Mr. Bulger standing in

5   between the trailers with another person.

6           I went past him, and he didn't say anything or do

7   anything to me.  I went into the driveway.  Bill said,

8   "Let's get out of here.  We did what we had to do."  We

9   started backing out.  Now, Mr. Bulger knows that I'm there;

10  and as we backed out of the driveway, he almost hit him as

11  he was passing my driveway.  He obviously isn't listening to

12  the restraining order.  I mean, he saw me, he knew I was

13  there, but he still walked right past my driveway.

14          And Bill has a report too.  I don't know if you

15  want me -- it says in here that when he went in the house,

16  the reason he saw Mr. Bulger is because if you walk in my

17  trailer and you look out the window, you see Mr. Bulger's

18  trailer.  Well, Mr. Bulger was standing there, and he gave

19  him the finger.  That's the extent of that.

20          THE COURT:  So he gave your boyfriend the finger?

21          MS. MacDONALD:  Yes, which is --

22          THE COURT:  On the 13th?

23          MS. MacDONALD:  That was on the 11th.

24          THE COURT:  All right, the 11th.

25          MS. MacDONALD:  Then on the 20th, we had the issue

1  of Mr. Bulger being just everywhere all day.  He knew we

2  were home.  He knew we were living there.  He's been

3  evicted.  He has a restraining order that says he can't be

4  within 100 feet of my house, but he's everywhere.

5  Everywhere I turn around, there he is.

6          Terrie had driven into the park, and I saw her car

7  go by my house, which is why I headed to her house, which is

8  the only reason I saw him do what he did with the pointing.

9          THE COURT:  You saw that?

10         MS. MacDONALD:  Yes.

11         THE COURT:  Did you hear him say, "I'll kill you"?

12         MS. MacDONALD:  No.  I saw it in the morning.  I

13  think he said he was going to kill her that afternoon.  I

14  wasn't --

15         THE COURT:  So you just saw the --

16         MS. MacDONALD:  Right.  And I basically was just

17  starting to run down to her house to let her know he was

18  across the street from her house.

19         THE COURT:  I want you to show me what you saw.

20         MS. MacDONALD:  I saw him look at her like this.

21  (Indicating.)  And I also called the management corporation

22  to see if they could do anything, and they told me that he's

23  selling the place and he has so many days to sell it.  But a

24  real estate agent is selling the house, so I don't

25  understand why he has to be there.  If he has a restraining

1   order and the case is over and he's been evicted, then he

2   shouldn't even be in the park.  There's no reason.

3              THE COURT:  Were you on the witness list as well?

4              MS. MacDONALD:  Yes.

5              THE COURT:  And had you had any prior encounters

6   with Mr. Bulger about this case?

7              MS. MacDONALD:  About this case?  No.

8              THE COURT:  Where he said he was going to kill

9   anyone who caused him problems or anything like that?

10             MS. MacDONALD:  He -- he said in our house -- he

11  started coming over to my house.  Somebody told him that the

12  investigator came to my house, and I kept telling him, no,

13  they didn't.  And then he started showing up at my house at,

14  like, 11:00 o'clock at night.  And one day he asked me if I

15  had the phone number to the police, and I said, "No, but

16  I'll look it up for you."

17             "Oh, I thought you would."

18             And I kept getting, "Well, I know the detective

19  was here for a very long time at your house."  And I said,

20  "Well, you need to look for who he was because he wasn't,"

21  and I just kept trying to blow him off.  But he did say to

22  me, "When I find out, I'll kill him," in my house that week.

23             THE COURT:  "When I find out who talked to the

24  investigator --"

25             MS. MacDONALD:  Right, "I'm going to kill him."

1    But he kept insisting it was me.  He truly believed it was

2    me.  And that was two days before we moved out.

3            THE COURT:  Anything?

4    CROSS-EXAMINATION BY MR. RICHER:

5    Q.   Ms. MacDonald, other than yourself, do you know anyone

6    who -- and other than, I gather, is it your boyfriend or

7    your husband?

8    A.   My boyfriend.  He's my ex-husband.

9    Q.   Okay.  Other than your boyfriend, do you know any

10   witnesses to this conduct on the part of Mr. Bulger, someone

11   other than you, someone other than Ms. Slater who saw this?

12   A.   No.

13   Q.   Did you have any prior disputes or problems with

14   Mr. Bulger before you became involved as a potential witness

15   in this case?

16   A.   Yes, once.

17   Q.   Can you tell the Court about that.

18   A.   He had a dog, and he used to let it out the side, which

19   part of the yard is his and part of it's mine.  And it would

20   poop, and he would just leave it there.  And the first

21   couple of years I would just knock on his door and ask him

22   if he could pick it up, and he said, "Sure, no problem.  You

23   shouldn't have to deal with that.  I really understand."

24   And then a year and a half ago, I did the same thing.

25   Actually, I started picking it up and putting it on his

1   walkway so he could step in it because I was sick of

2   stepping in it.  And I went over and knocked on the door

3   like I always did and said, "Could you please pick up the

4   poop from your dog."  And he flipped opened the door, and he

5   stormed outside and told me he was going to pull all my

6   plants up, and he owned to here, and just went off the wall

7   on me.

8   Q.   Other than the dog, did you have any disputes with him?

9   A.   No.

10  Q.   Did you have a boundary line dispute with him?

11  A.   I have a boundary line dispute with the park, not with

12  him, no.

13  Q.   Wasn't there an issue about a shed on his property you

14  thought was over the line on your property?

15  A.   I believe he -- he and I went out and Bill and measured

16  and all agreed that his shed is one foot onto our property,

17  so I didn't think that was an issue.  The board of directors

18  is more of the issue.  Ron actually offered to move the shed

19  to the other side of the house, so I wouldn't say that's an

20  issue.

21  Q.   So it's your testimony today that that was never an

22  issue between you, that --

23  A.   It was an issue that was taken care of between him and

24  I.  The board of directors is the issue.

25  Q.   Well, I'm just talking about between the two of you

1   now.

2   A.   Right, the two of us, it was very easy.  He said, "I'll

3   move it if you want me to move it."

4   Q.   You're in good standing with the park?  Everything's

5   okay between you and the park?

6   A.   I have my rent paid.  I pay it on time every month.  I

7   mow my lawn, and I don't have any dogs pooping on the lawn,

8   so, yeah.

9            MR. RICHER:  That's all I have.

10           MR. CHAFFIN:  Just briefly, your Honor?

11   REDIRECT EXAMINATION BY MR. CHAFFIN:

12   Q.   Ms. MacDonald, why does Mr. Bulger scare you?

13   A.   Because he has a lot of really scary friends.  I see

14   who goes over there.  I have been speaking to the narcotics

15   division of the Salisbury Police Department for two years

16   now, writing license plate numbers down because of the drug

17   activity they suspect that's going on over there.

18   Q.   Do you suspect it?

19   A.   Absolutely.

20   Q.   On what basis?

21   A.   Uhm, how many cars are coming and going, and the fact

22   that Attorney Baldassari, who is attorney for the park, Bill

23   and I went to talk to him about the lot line; and

24   Mr. Baldassari actually said to me face to face that he saw

25   five drug deals go on while he sat in the president's house.

1   So, yeah, I think it's pretty -- it's a pretty well fact

2   that there's some drug dealings going on over there.

3   Q.   I was with you at Salem when Judge Feeley issued the

4   orders, right?

5   A.   Yes.

6   Q.   And you said to me on the 18th that Mr. Bulger was --

7   it was a big day for him, a calendar day for him.  Do you

8   remember?

9   A.   The 18th, yeah.

10  Q.   What were you referring to?

11  A.   Well, Terrie had told me that on the 18th he goes to

12  Boston to pick up his 300 methadone tablets.  And then he

13  stops at his brother's house in Beverly to sell half of

14  them, and then he comes home, and he has a lot of money,

15  which is what we were concerned about coming home on the

16  13th.

17  Q.   So this drug-dealing activity has you more concerned

18  than you would be than if Mr. Bulger were just, you know, a

19  working guy?

20  A.   A normal person, right.

21          MR. CHAFFIN:  Thank you.  Nothing further, your

22  Honor.

23          MR. RICHER:  I would note an objection for the

24  record on that portion of the witness's testimony.  That was

25  clearly hearsay, and I would note that a good deal of it

1   went to allegations that are not part of this complaint.  I

2   understand issues about credibility and basis for the

3   witness's feelings, but I would just ask that the objection

4   be noted in that regard.

5             THE COURT:  It's not directly relevant to a

6   violation of the restraining order, but I'll take it only

7   for what her state of mind was, why she was afraid, not

8   whether it was true or not.  So thank you.

9             MS. MacDONALD:  Thank you

10            (Witness excused.)

11            THE COURT:  Are there any other witnesses that you

12  two, Ms. Slater, Ms. MacDonald, would want?

13            (Discussion between Mr. Chaffin, Ms. Slater, and

14  Ms. MacDonald.)

15            THE COURT:  Wait.  I don't know if I want to take

16  the time.  Is it simply that he was within the 100 feet of

17  the house?

18            FROM THE FLOOR:  I don't think I have anything.

19            THE COURT:  Were there any threats apart from the

20  fact that he was within the distance?

21            FROM THE FLOOR:  Right, that's the only thing.

22            THE COURT:  All right, I don't know that we need

23  that right now.

24            Do you want to put on any evidence?

25            MR. RICHER:  I do not, your Honor.  I think it

1   would be more accurate to say I can't, given the Court's

2   comments and given the present ambiguity of the legal

3   proceedings here, I can't recommend that he --

4          THE COURT:  No, these legal proceedings are civil.

5   I am not imposing a penalty on it.  There are currently no

6   criminal charges.  I am simply greatly worried.

7          MR. RICHER:  Well, my understanding is that

8   there's more than great worry.  My understanding is that

9   some type of inquiry has been made by the Court with the

10  United States Attorney's Office.

11         THE COURT:  Somebody from the U.S. Attorney's

12  office is sitting here.

13         MR. RICHER:  Exactly.  And my understanding, under

14  the Federal Rules of Criminal Procedure, in a criminal

15  contempt proceeding, those charges would normally be

16  prosecuted by the United States Attorney's Office.

17         THE COURT:  Or someone else designated by me, but

18  that has to be a jury trial or the like, so --

19         MR. RICHER:  And given that fact, that Mr. Bulger

20  is potentially facing federal criminal charges arising out

21  of these allegations, and because of the fact that today for

22  the first time I've seen documentation that there is an

23  existing state court protective order, it's possible, based

24  on some of these allegations, that Mr. Bulger could face

25  criminal charges in the Commonwealth of Massachusetts

1    because of some of these factual allegations.  I can't

2    recommend that he testify, given those circumstances.  My

3    recommendation would be that he assert his --

4              THE COURT:  Well, why don't you go talk to him.

5              MR. RICHER:  I would like an opportunity to do

6    that.

7              THE COURT:  I'd let him do it.  I just want to

8    make sure that he feels comfortable.

9              MR. RICHER:  Thank you.

10             (Discussion off the record between Mr. Richer and

11   Mr. Bulger.)

12             MR. RICHER:  Thank you, Judge.  I appreciate the

13   opportunity to consult with Mr. Bulger.  After consulting

14   with him, it's his intention to assert his Fifth Amendment

15   right against self-incrimination and not testify in this

16   civil contempt proceeding.

17             THE COURT:  All right, this is a civil contempt

18   proceeding.  So, now, here's the issue:  I did issue a

19   restraining order prior to the start of my trial on July 27,

20   essentially ordering the defendant not to have any contact

21   with or to speak to Terrie Slater or Marie MacDonald, who

22   were both going to be adverse witnesses in the Neurontin

23   trial.  The Neurontin trial was dismissed on the third day

24   of trial, and they turned out not to have to be witnesses.

25   Nonetheless, the order was not limited in time.

1          What I think needs to happen is the following:

2     First of all, at least with respect to Ms. MacDonald, I find

3     based on the evidence in front of me -- excuse me -- at

4     least with respect to Ms. Slater -- you're the first one who

5     spoke, right? -- I find that there is contempt of my order

6     because I have corroborating evidence that there was

7     contact.  There was a physical motion indicating that he was

8     going to shoot her, and he said to her something to the

9     effect of, "I'm going to kill you --" let me get it

10    exactly -- "I am going to kill you, you cunt."  And so those

11    are words spoken in violation of that order.

12          Now, with respect to the restraining order on feet

13    differences, that's a much harder issue for me because at

14    the time I actually didn't realize that his trailer was

15    itself within 100 feet of where he lived, or if I did, I

16    didn't focus on it.  And you had lived somewhere else and

17    you were driving back in, so he wasn't deliberately coming

18    within feet of you.  You were coming back from the hotel,

19    and he happened to be in his own trailer or his own friend's

20    house.  So I don't know whether I can say that's an

21    intentional violation, although it is a violation.

22          I need to bring this order current now that the

23    trial is no longer here.  Is there any reason he has to be

24    in the trailer park at all?  He's now been evicted, as I

25    understood.  Part of the difficulty here is, he lives next

1    to where Ms. MacDonald lives and not very far from where

2    Ms. Slater lives, and so almost by definition, if he's in

3    his trailer, he's violating my order.  As I understand it,

4    he has been evicted and shouldn't even be there, so why

5    don't I just ban him from the trailer park?

6              MR. RICHER:  He's still an owner there, your

7    Honor.

8              THE COURT:  I know, but this isn't working.  The

9    100 feet doesn't work, and I am deeply worried, deeply

10   worried about the threat of killing.

11             (Discussion off the record between Mr. Richer and

12   Mr. Bulger.)

13             MR. RICHER:  My understanding is that he has not

14   been evicted.  I'm not sure that that language would be

15   accurate language in any event.

16             THE COURT:  Is there any reason he has to be

17   there?

18             MR. RICHER:  Well, he needs to cooperate both with

19   the realty company in selling this and with his obligations

20   towards the park, who my understanding is has been

21   cooperating with him in an attempt --

22             THE COURT:  Has he moved out already?

23             MR. RICHER:  He is not presently living there, but

24   he has possessions that are there, personal possessions that

25   are stored there.  So he is not at present residing in the

1    trailer.

2           THE COURT:  Well, I can't have -- this isn't

3    working.  Let me also say this:  Nobody likes to spend their

4    life -- there's no money in it for these women, so there's

5    no motive to lie that way.  They spent a day in Superior

6    Court.  They immediately pursued Mr. Alba.  I was on

7    vacation.  And despite getting a Superior Court order, they

8    then come in to get a Federal Court order.  They're afraid.

9    People don't spend their life running around to courthouses

10   in the middle of a beautiful summer for the heck of it.  No

11   monetary motive, no motive I can find to lie.  So they're

12   scared, and I've got to do something about this, especially

13   since I believe her that there was some threat.  I have two

14   people saying there was a threat of shooting.  One person is

15   saying there were actually words spoken.  I need him out of

16   the trailer park.  I need them not to have interaction.  But

17   the trial is over.  So at some point, we can't be here when

18   we're eighty, so I need some separation from the two of

19   them.

20          MR. RICHER:  Your Honor, I would just raise the

21   issue -- I don't want to argue with the Court.  Based on the

22   Court's finding, I understand that concern.  My concern is

23   essentially a jurisdictional one.  Given the fact that there

24   is a state court order apparently in effect --

25          THE COURT:  No, this is me, my trial, Federal

1    Court, multidistrict litigation.  This Federal Court in

2    Massachusetts has been worrying about Neurontin, whether

3    it's the criminal prosecution against Pfizer, whether it's

4    the whistleblower, Dr. Franklin, whistleblower money,

5    whether it's me personally who spent four years of my life

6    on this multidistrict litigation, this is a Federal Court

7    matter.  And when a witness is intimidated, I worry, even if

8    it's a threat after trial that they're going to get them.

9    There's a threat before trial and now a threat after trial.

10   I'm worried, so I think I need him out of this trailer park

11   because the 100 feet thing doesn't work.

12          MR. RICHER:  I understand that concern.  The only

13   issue I wish to raise with the Court is the wisdom of

14   entering into essentially a permanent management over the

15   relationship between these people in a case that no longer

16   exists.  And I just raise that, especially where there is a

17   state court order in effect, and you may have conflict

18   between a state order and a federal order, and where the

19   best enforcers of all of this, assuming bad contact is

20   taking place, are the local law enforcement personnel.

21   Local law enforcement --

22          THE COURT:  But they've turned them down.  Listen,

23   I do agree with one point, though.  I don't want to be here

24   forever with the problems with the two of them.  So I'm

25   thinking of what happens when domestic partners get into

1  these fights, that there are occasions when the husband,

2  let's say, or the boyfriend have to come in, and they come

3  in with the escort of a police officer so that there's no

4  conflict.  So one thought is that he may have to come in.

5  It may be within 100 feet.  He may have to do something to

6  sell his place or to move his stuff out or whatever.  So

7  what he should do is come in with the escort of a police

8  officer.  That way it protects everyone, no misunderstandings,

9  no nothing.  He comes in.  He doesn't have to live there.

10 There's no reason for him to be there.  His daughter is

11 gone.  As far as I understand, there's no reason for him to

12 be in that trailer park other than to tie up loose ends with

13 respect to the sale of his trailer home.  That's what I

14 understand.

15         So what I'm going to ask Mr. Chaffin to do is to

16 help me out a little bit here and draft a restraining order

17 that essentially bans him from the trailer park.  And it

18 will end in, let's say, a year because I don't want to be

19 here forever, but a year is a while to get past this.

20         And then I am deeply concerned about the threats.

21 There were threats before trial, not directly to you because

22 he didn't know at that point you were the one, Ms. Slater.

23 But once there were threats, that's what triggered this

24 whole proceeding and the restraining order to begin with.

25 Did he actually threaten you once the restraining order

1   issued before trial?  I don't think so, right?

2          MS. SLATER:  Not to me directly.  He just said

3   when he finds out.  And, you know, he's sitting in my house,

4   and I'm thinking to myself, "Oh, my God."

5          THE COURT:  Yes, and that was verified by

6   Ms. Slater.  So what I'm going to do is, I am also going to

7   refer it, and the U.S. Attorney's office can do with it what

8   it chooses to.  He's appropriately taken the Fifth.  I'm not

9   sure they're going to do anything with it, but I'm worried

10  enough.

11         MS. SLATER:  Can I ask one question?

12         THE COURT:  Yes.

13         MS. MacDONALD:  Who would this be enforceable?  I

14  don't want to have the same problem we're having now.  So

15  if he comes into the trailer park and I call the police, are

16  they going to tell me again that it's a federal order, they

17  can't do anything?

18         THE COURT:  I think what I need to do is probably

19  a warrant for arrest, and I can initiate the criminal

20  contempt proceedings myself.

21         MS. SLATER:  Your Honor, that's what I'm scared to

22  death of.  I'm very frightened that he comes in because he's

23  free to come in, and he's already threatened me.

24         THE COURT:  It's a state crime to threaten anyone.

25  You don't even have to be a witness in a federal proceeding.

Page 54

1    Threats to kill is a state crime.  I used to be a state

2    court judge, threats to kill.  So, I mean, you may want to

3    just go and ask the clerk magistrate judge to issue a

4    criminal complaint on a threat.  But I have limited

5    jurisdiction, and at this point I am referring it to the

6    U.S. Attorney's office.  They can do what they choose to.

7    If there is another threat that I see like this with an

8    affidavit, I will immediately issue a warrant if it's under

9    oath, so a word to the wise.  I am worried.  I can't think

10   of a motive for them to be doing this.  No one loves to

11   spend their afternoon in Federal Court.  I just can't figure

12   it out.

13              So in the meantime, you have Judge Feeley who is

14   very experienced, both as a civil and a criminal lawyer.

15   You can go in and seek a violation of his order as well.

16   But the next time it will be a criminal contempt proceeding.

17   You've styled it, is the problem, as a civil contempt

18   proceeding, and I did not give the right notice to be able

19   to, as we've been doing legal research, to be able at this

20   point transform it into a criminal proceeding.  I don't know

21   if you've done that work as well, but I think I can't do

22   that.

23              MS. MacDONALD:  So if he should break it this

24   time --

25              THE COURT:  Next time around it's a criminal

1    contempt.

2         MS. MacDONALD:  We'd have to do a criminal

3    complaint.

4         THE COURT:  And there may be one anyway, but

5    that's something else.  Okay?

6         Do you understand, Mr. Bulger, out of the trailer

7    park, no contact?  Thank you.

8         MS. SLATER:  Thank you, your Honor.

9         MS. MacDONALD:  Thank you, your Honor.

10        MR. CHAFFIN:  Thank you, your Honor.

11        THE CLERK:  Court is in recess.

12        THE COURT:  Oh, wait a minute.  Excuse me, I need

13   to let you out of here.  You need to file a motion to

14   withdraw as counsel.

15        MR. RICHER:  Yes, because I did undertake to

16   represent him here today, I wouldn't be doing my job unless

17   I asked whether the Court wants that order to be on notice

18   to me so I can provide input to the Court.

19        THE COURT:  Yes, that would be very helpful, and

20   then as soon as that is completed, you can file a motion to

21   withdraw as his attorney.

22        MR. RICHER:  I appreciate that, Judge.

23        THE COURT:  I didn't expect to have to fly someone

24   in from Texas.

25        MR. RICHER:  No, I didn't come from Texas.  I came

1   from Albany, New York.

2          THE COURT:  You came from Texas.  No?  Where did

3   you come from?

4          MS. GARDNER:  Cambridge.

5          THE COURT:  Cambridge I can handle.

6          And you are representing Pfizer, not these women,

7   right?  So understand, he's not your lawyer.

8          MS. SLATER:  We know, we know.  We tried to do

9   this on our own.

10         THE COURT:  So he's off the hook, all right, at

11  this point.  At some point I don't know what I'm going to

12  do, but I just didn't want to wait any longer.  I was

13  worried enough by the threat to kill.  I don't know who put

14  the rat there.  Maybe it was him, maybe someone else, but we

15  have two witnesses doing the "this" thing.  All right, so

16  we'll stand -- anything else?

17         MR. RICHER:  Yes, I do just have a procedural

18  inquiry, not with regard to this matter but with regard to

19  something that Mr. Chaffin and I --

20         THE COURT:  Yes.

21         MR. RICHER:  We had discussion earlier, not you

22  and I, your Honor, but other counsel in court about remand

23  of the Smith matter post-Daubert decisions.  Do we need to

24  make a written application to you?

25         THE COURT:  Well, why don't the two of you make

1    sure I've got everything signed, sealed, and delivered.  Has

2    everything been resolved, and I just need to send it back at

3    this point?  I think it is.  Why don't you move to remand to

4    the transferor court, and as soon as you do that, and I'll

5    call the Chief Judge in that district.

6            And while you're on that subject, okay, one of the

7    concerns I have on the civil matter is, I'm worried that my

8    case in March and the one case in Tennessee is not going to

9    be enough to give us the goalposts that we're looking for.

10   And maybe we should have two or three more just to have

11   five, and then you can decide how to settle it.  You know

12   what I mean?  We'll do Smith as soon as possible.  What was

13   the other one?

14           MR. CHAFFIN:  Shearer.

15           THE COURT:  I know nothing about these two cases,

16   but the two won't be enough.  We were looking for more.

17   That was a shock to me when that case was dismissed on day

18   three.  I didn't see that coming.  So I need -- the goal in

19   this is to try and resolve the thousand cases.

20           MR. RICHER:  Judge, might I suggest -- that's

21   probably a great idea -- I am certainly not the person with

22   authority to talk to you -- then maybe scheduling a

23   conference so that everybody can talk to their clients.

24           THE COURT:  Why don't you do this:  File your

25   motion for remand.  I'm going to call the chief in

1   Tennessee, just so he doesn't get this in and get very upset

2   with me, and hopefully -- and the one other thing I wanted

3   to flag for the two of you which worries me hugely is, the

4   one cross-cutting issue that remains is actually what to do

5   about that statistical dispute involving the bipolar.  I

6   didn't actually definitively and finally rule on that, but

7   that might be something that might be a little bit

8   intimidating to a trial judge who hasn't been involved with

9   it at all, and yet the way we have it teed up for Shearer,

10  it isn't coming in till November.  Do you remember that

11  issue?

12          MR. CHAFFIN:  I do, your Honor.

13          THE COURT:  Remember we were rushing at the end,

14  we were rushing, rushing, and I gave some tentative oral

15  rulings, but then I never did anything with it because it

16  ended so fast.

17          MR. CHAFFIN:  Right.

18          THE COURT:  So I don't know if that would come up

19  in the Tennessee case, but if it did, I think that's a

20  little unfair to dump on someone.  That's just the concern I

21  had when I was thinking about it.  That's why I didn't

22  instantly do that, and I then went on vacation.  So just

23  something to think about.  Maybe you can confer on how to

24  handle that?

25          MR. CHAFFIN:  Has it been mooted by the dismissal,

Page 59

1    your Honor?

2         THE COURT:  Yes.  Yes, it's been mooted.  I don't

3    know what to do with it now.  Is it going to be teed up for

4    Shearer that I can at least deal with it?  Maybe I can move

5    that up a little bit?  I don't know whether it's even

6    relevant for Shearer.  I've got to assume it's going to be

7    relevant to almost all of the proceedings.

8         MR. CHAFFIN:  It's a suicide case.

9         THE COURT:  Yes, and so --

10        MR. CHAFFIN:  I don't think it's bipolar, though.

11   I think it's pain, so --

12        THE COURT:  I don't remember.  My point is, that

13   was the one reason I didn't instantly do that is --

14        MR. CHAFFIN:  No, Shearer is a pain case.

15        THE COURT:  -- because it's mooted now.  I

16   couldn't rule on it if I wanted to.

17        MR. RICHER:  Should we confer with the Court then

18   prior to making that application to remand Smith?

19        THE COURT:  I'd like to remand it.  Mostly I want

20   to get it on the table, but then I'm also thinking I don't

21   have jurisdiction to -- not jurisdiction, that's the wrong

22   word.  I don't have a case in which it's a live controversy

23   right now.  Maybe you can think of a practical solution for

24   that, move it up in Shearer or pre-vet it for Smith?

25        MR. RICHER:  Well, I think we will certainly make

1    an application for a remand of Smith.  We can confer with

2    counsel with regard to whether or not there's anything we

3    can do cooperatively to resolve that issue or bring that

4    issue to the Court's attention, but it may be that --

5            THE COURT:  Either under the Smith rubric before I

6    remand it or under the Shearer rubric, but faster than we

7    otherwise were going to be talking about it, not that I

8    really want to write it, but that is part of, I think, my

9    mandate, the crosscutting issues as opposed to the -- and I

10   sort of told you what I was going to do orally, and then

11   there was some back-and-forth, and before I could even get

12   there, the case was dismissed.  So I just wanted to flag

13   that issue.

14           MR. CHAFFIN:  Okay.

15           THE COURT:  Okay?

16           MR. CHAFFIN:  Understood.

17           THE COURT:  Thank you.  All right, so our game

18   plan is, you're going to come up with an order.  You're

19   going to confer with him.  I'm going to issue an order so

20   it's in writing.  You will get it directly to Mr. Bulger

21   about getting him out of the trailer park, and basically

22   ending this within a year, my jurisdiction over this thing.

23           In the meantime, on the Smith or Shearer case,

24   you'll find a vehicle, if you want me to, to resolve the

25   Daubert issue with respect to the statistics so that some

1    judge won't be dealing with that cold.  Does that --

2              MR. CHAFFIN:  Understood.

3              THE COURT:  Okay?

4              MR. RICHER:  And, Judge, on the issue of my

5    status, in addition to reviewing that order, it's understood

6    on the record that you will remain his counsel long enough

7    so that any order eventually signed can be served on

8    Mr. Bulger through us.

9              THE COURT:  Yes, and then you're out of it if you

10   want to be.

11             But, similarly, you're in a sort of dangerous and

12   gray area yourself because you don't represent these women.

13   You represent a major corporation.  So I thank you for

14   helping me out on that, but the reality is, they can't

15   assume they're going to come to you for every problem.  And

16   I am always reluctant to take on these things pro se, but as

17   a practical matter, neither of them have lawyers once you're

18   out of it.

19             MR. RICHER:  Our application to withdraw won't be

20   made until after the Court's order is served on Mr. Bulger

21   through our office.

22             THE COURT:  Thank you very much.  All right, have

23   a nice weekend.

24             MR. CHAFFIN:  Thank you, your Honor.

25             MR. RICHER:  Thank you, Judge.

1           (Adjourned, 3:22 p.m.)

2            C E R T I F I C A T E

3

4

UNITED STATES DISTRICT COURT )
5   DISTRICT OF MASSACHUSETTS   ) ss.
CITY OF BOSTON          )
6

7

8        I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 62 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action Nos. 07-11426-PBS and 04-10981-PBS, In Re:  Neurontin

13  Marketing, Sales Practices, and Product Liability Litigation,

14  and thereafter by me reduced to typewriting and is a true

15  and accurate record of the proceedings.

16       In witness whereof I have hereunto set my hand

17  this 3rd day of September, 2009.

18

19

20

21

22        /s/ Lee A. Marzilli

           _____
23        LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
24

25

8e9dc2e9-829a-4bfb-b640-a52cdd350c49