UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
In re:   NEURONTIN MARKETING, SALES
           PRACTICES AND PRODUCTS
           LIABILITY LITIGATION
------------------------------------------------------------x

THIS DOCUMENT RELATES TO:

*Shearer v. Pfizer Inc., et al.*
Case No. 1:07-cv-11428-PBS

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

# MEMORANDUM IN SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR AN ORDER RESTRICTING COMMUNICATIONS WITH TREATING PHYSICIANS AND IMPOSING SANCTIONS AGAINST DR. DAVID EGILMAN

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively "Pfizer") respectfully move, on an emergency basis, for an order preventing Plaintiff's counsel and their agents, including consultant Dr. David Egilman, from engaging in improper communications designed to alter and tamper with the testimony of treating physicians. Pfizer also requests that the Court impose appropriate sanctions against Dr. Egilman based on his violation of this Court's protective order.

## PRELIMINARY STATEMENT

Plaintiff is attempting to alter and tamper with the deposition testimony of Mr. Shearer's treating physicians, and to saddle them with cherry-picked materials unrelated to the scope of their testimony as non-party fact witnesses. Equally troubling is that Plaintiff's counsel have again enlisted Dr. David Egilman – a discredited, twice-sanctioned professional witness with an unclear relationship with Plaintiff's counsel – to engage in this conduct. More specifically, Pfizer just learned that Dr. Egilman has improperly contacted at least one of Mr. Shearer's treating physicians, Lisa K. Catapano-Friedman, M.D., a psychiatrist and non-party fact witness in this case, in a transparent attempt to taint her perceptions of Pfizer shortly before her

deposition. Notably, Dr. Catapano-Friedman has not been designated as an expert, and it is undisputed that she never prescribed Neurontin to Mr. Shearer.

Dr. Egilman's unsolicited letter – on Brown University letterhead – makes his motivations clear. The letter provides negative, incomplete, and misleading information to Dr. Catapano-Friedman regarding Neurontin, and about Pfizer's marketing of Neurontin and other medicines, attaches multiple documents, questions her about her knowledge of the information, and offers to meet with her to discuss the information. In addition, Dr. Egilman's letter violates this Court's Amended Stipulated Protective Order ("Protective Order") [744] by quoting from and enclosing a confidential, internal email between Pfizer employees. As discussed below, Dr. Egilman's improper disclosure of this document was no fluke; his flagrant violation of protective orders is well documented, and has resulted in sanctions against him in two prior cases.

To be sure, this was not a legitimate *ex parte* effort to contact a treating physician in order to discuss her care and treatment of Mr. Shearer. Dr. Egilman's letter went far beyond the realm of permissible fact-gathering by a party and entered the realm of patent advocacy, closely tracking the style and substance of Plaintiff's counsels' opening statement to the jury in the recent *Bulger* trial. Dr. Egilman's provision of biased, incomplete, and negative information about Neurontin and Pfizer shortly before Dr. Catapano-Friedman's deposition can only serve, and was plainly calculated, to confuse this non-party witness and improperly color her testimony. It is undoubtedly intimidating, confusing, and burdensome for a non-party like Dr. Catapano-Friedman to receive an advocacy statement enclosing stacks of documents regarding a subject that may be completely unfamiliar to her, and certainly has no relevance to her knowledge as a fact witness in the case. It is perplexing that Plaintiff gave Dr. Egilman access to this treating doctor in the first place. But Dr. Egilman's tactics, while palpably improper, are not perplexing; they betray an unmistakable fear of the potential impact that treating doctors' truthful, untainted testimony would have on Plaintiff's case.

Pfizer is greatly prejudiced by its inability to respond to Dr. Egilman's biased and incomplete presentation of information. Notably, were Pfizer permitted to contact Dr. Catapano-

N/A
N/A

Friedman to address Dr. Egilman's letter, its response would require a lengthy rebuttal to Dr. Egilman's statements and characterizations of the documents he referenced and attached – likely entailing hundreds of additional pages of information.  Given that Plaintiff's counsel has indicated to Pfizer that a similar letter may have been sent to additional fact witnesses in this case, such a process could quickly become unwieldy and delay the prompt and efficient conduct of discovery in this case, which is already under a very tight timeline, with fact discovery scheduled to close on October 30, 2009.

The Court has the authority to, and should, put an end to any improper contact by Plaintiff's counsel, or their agents, with fact witnesses in this case.  Plaintiff's counsel and Dr. Egilman should also be required to disclose the identities of any fact witnesses who were contacted in a similar manner, and required to provide copies of any information or documents provided.  And Dr. Egilman should be sanctioned for his violation of this Court's Protective Order.

## RELEVANT FACTS

Dr. Catapano-Friedman, a psychiatrist who practices in Bennington, Vermont, provided care and treatment related to Mr. Shearer's mental health over several years, including the time period leading up to his death.  She never prescribed Neurontin to Mr. Shearer.  Pfizer intends to depose Dr. Catapano-Friedman regarding her treatment of Mr. Shearer, and the parties recently agreed to set her deposition for October 23, 2009.  On September 15, 2009, Dr. Catapano-Friedman notified counsel for Pfizer that she had received a letter and certain documents from Dr. Egilman related to the Shearer case, and provided Pfizer with a copy of the letter.  (*See* September 11, 2009, Letter from Dr. David Egilman ("Egilman letter"), attached to the accompanying Declaration of Mark S. Cheffo ("Cheffo Decl.") as Exhibit A.)[1]

---

[1] Because the Egilman letter quotes from and encloses a confidential internal e-mail subject to this Court's Protective Order, Pfizer will hand-file the Declaration of Mark S. Cheffo and its attachments under seal on Thursday, September 17, 2009.

Dr. Egilman's letter provides biased characterizations of, and select quotations from, documents addressing Neurontin, and also encloses certain documents. For example, Dr. Egilman selectively quotes adverse event information from the FDA's 1992 Medical Statistical Review, and asks whether such information was ever provided to her by Pfizer. (*See id.* at 2.) Dr. Egilman's letter further questions whether Dr. Catapano-Friedman was "aware of the fact that Pfizer pled guilty to a felony crime for off-label marketing of Neurontin in 2004." (*Id.*) Dr. Egilman proceeds to erroneously inform Dr. Catapano-Friedman that "[t]his is separate from their guilty pleading for similar activities on 13 other drugs that occurred last week." (*Id.*)[2] The letter has no conceivable bearing on Dr. Catapano-Friedman's personal knowledge as a treating physician. Dr. Catapano-Friedman was not a prescribing doctor, and even if she were, this selection of documents had only one objective: to tamper with and alter her forthcoming deposition testimony.

Dr. Egilman's letter also violates this Court's Protective Order by quoting from and enclosing a confidential internal email between Pfizer employees. (*See* Egilman letter at 3.) Pfizer had designated this email as confidential pursuant to the Protective Order, as Plaintiff's counsel acknowledged in writing just three days before Dr. Egilman's improper disclosure. (*See* Cheffo Decl. ¶¶ 4-5.) The Protective Order strictly limits access to documents designated as confidential. (*See* Protective Order ¶ 6.) Parties may allow access to confidential documents by "deponents . . . and their counsel," but only "in preparation for and/or during deposition," and only if the deponent "has executed an Agreement of Confidentiality." (*Id.* ¶¶ 6(g) & 7.) As his letter's introductory paragraph makes clear, Dr. Egilman is a complete stranger to Dr. Catapano-Friedman who has no legitimate role in preparing her for her deposition, and he enclosed the

---

[2] While Pfizer recently settled certain criminal and civil government allegations related to medicines other than Neurontin, none of the Defendants in this case pleaded guilty to any charges in connection with that settlement or related investigations. The only guilty plea entered in connection with the settlement was by a Pfizer subsidiary, Pharmacia & Upjohn, to one count of violating federal law involving the promotion of the drug Bextra. Moreover, this Court has not even had an opportunity to rule on the discoverability, much less admissibility, of any information about that recent settlement agreement.

confidential email with his unsolicited letter without ever asking her to sign a confidentiality agreement.

Dr. Egilman's cavalier violation of the Protective Order stands in marked contrast to Plaintiff's counsel's treatment of the exact same document. Just three days before Dr. Egilman sent this confidential email to a non-party, Plaintiff's counsel, appropriately, sent the undersigned a list of documents – including the very same email – and requested that these documents be de-designated. (*See* September 8, 2009, Email and List of Confidential Documents from Kenneth Fromson to Mark Cheffo, attached to Cheffo Decl. as Exhibit B.)[3] Pfizer did not agree to de-designate any of these documents. (*See* Cheffo Decl. ¶ 6.) Given that Dr. Egilman has twice been sanctioned by courts for violating their protective orders, one might expect that he too would have asked Pfizer to de-designate or otherwise authorize the email's dissemination, or would have challenged the email's confidentiality in this Court, before unilaterally deciding to publish it to a non-party in violation of the Protective Order's clear terms. His failure to take such precautions continues a well-established pattern.

As this Court is aware, Dr. Egilman is a career witness in personal injury tort litigation whose involvement as a consultant to Plaintiff's counsel in the Neurontin litigation came to light after he was substituted as the plaintiff, over Pfizer's objection, in the *Bulger* action shortly before trial. Over the last two decades, Dr. Egilman has offered purported expert testimony for plaintiffs in a large variety of toxic tort and product liability cases, including asbestos, beryllium exposure, radiation poisoning, pharmaceuticals, and breast implants.[4] Dr. Egilman has twice been sanctioned for violations of protective orders in cases where he purported to offer expert

---

[3] The email in question is identified as follows on the document list sent by Plaintiff's counsel: "93. Pfizer_LKnapp_0022176." (*Id.*)

[4] *See, e.g.*, *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 395 (E.D.N.Y. 2007) (pharmaceutical litigation); *Berger v. Amchem Prods.*, 13 Misc. 3d 335, 340-41 (N.Y. Sup. Ct. 2006) (asbestos litigation); *Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704, 717 (E.D. Tenn. 2001) (beryllium oxide exposure); *Hall v. Babcock & Wilcox Co.*, 69 F. Supp. 2d 716, 720 (W.D. Pa. 1999) (radiation poisoning); *Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909, 917 (Mass. 1998) (breast implants); *Dunn v. Owens-Corning Fiberglass*, 774 F. Supp. 929, 936 (D.V.I. 1991) (asbestos litigation).

testimony.  First, a Colorado court found that Dr. Egilman "knowingly, intentionally, deliberately, and willfully" violated a protective order by posting certain "scurrilous and inflammatory statements" on his website, which were "grossly inappropriate" and placed at "risk the fairness of the trial."  *Ballinger v. Brush Wellman, Inc.*, No. 96-CV-2532, slip op. at 1-2 (Colo. Dist. Ct. June 22, 2001), *aff'd in part, vacated in part*, No. 01CA1982 (Colo. Ct. App. Sept. 5, 2002) [1801-6].  The court stated that Dr. Egilman was so "clear[ly] . . . motivated by his personal agenda and by his animosity, bias, prejudice, hostility and vindictiveness" that he was "not a credible witness."  *Id.*  The court further held that his statements went "so far beyond the bounds of legitimate disagreement as to cast great doubt on his legitimacy and integrity as a witness," and sanctioned Dr. Egilman by barring him from testifying in that case or in any other before the Colorado court.  *Id.*[5]

Second, and more recently, Judge Weinstein sanctioned Dr. Egilman in the *Zyprexa* litigation for conspiring with a reporter and an attorney to violate a protective order by publicly disseminating confidential documents of defendant Eli Lilly.  *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 395 (E.D.N.Y. 2007).  Judge Weinstein found that Dr. Egilman,

> in violation of his legal obligations . . . deliberately violated this court's protective order and published sealed documents, intending that they be widely distributed. . . . Egilman . . . took particular pains to deny Lilly an opportunity to prevent the breach; they made the documents public before Lilly could move to preclude their release, after they had in effect assured Lilly that it had time to protect itself in court before any release would occur.

*Id.* at 395.  Judge Weinstein enjoined Dr. Egilman from further dissemination of the confidential documents subject to the protective order.  *Id.* at 429-430.  Although Dr. Egilman pleaded the Fifth Amendment privilege against self-incrimination in response to Judge Weinstein's inquiry, he later admitted that he had violated the protective order, and paid $100,000 to a charity to settle

---

[5] Although the Colorado Court of Appeals vacated the portion of court's order barring future testimony from Dr. Egilman because Dr. Egilman had not been provided with notice sufficient to satisfy due process, the court otherwise affirmed the decision below.  *See Egilman v. District Court*, No. 01CA1982 (Colo. Ct. App. Sept. 5, 2002) [1801-6].

contempt charges threatened by Eli Lilly.  (*See* Egilman Stip. & Decl. [1825-2], also attached to Cheffo Decl. as Exhibit C.)

These prior sanctions have plainly not deterred Dr. Egilman in the least.  His violation of this Court's Protective Order warrants the imposition of additional sanctions.[6]

## ARGUMENT

### I. DR. EGILMAN'S LETTER WAS PLAINLY DESIGNED TO IMPROPERLY INFLUENCE DR. CATAPANO-FRIEDMAN'S DEPOSITION TESTIMONY

Dr. Egilman's letter has no conceivable purpose other than to influence Dr. Catapano-Friedman's forthcoming deposition testimony by seeking to create a negative impression of Pfizer in her mind through a biased, incomplete, and erroneous presentation of information about Pfizer and Neurontin.  As numerous courts have held, when a treating doctor is not specially designated as an expert, her testimony is limited to her diagnosis and treatment of her patient. *See Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 248 (D. Mass. 2005) (holding that a treating physician must submit a Rule 26 report unless the physician's opinion is "based on personal knowledge and on observations obtained during the course of care and treatment, and he or she was not specially retained in connection with the litigation or for trial").[7]  As noted above, Dr. Catapano-Friedman never prescribed Neurontin to Mr. Shearer.  Accordingly, Defendants' alleged marketing activities and conduct with respect to Neurontin have nothing to

---

[6] Pfizer reserves its right to supplement the record regarding its request for sanctions as additional materials become available.  To date, Pfizer has not been able to obtain or review the documents enclosed with Dr. Egilman's letter to Dr. Catapano-Friedman.  Thus, for present purposes, Pfizer relies on Dr. Egilman's own description of those enclosures.  Also, because Plaintiff's counsel has indicated that a similar letter may have been sent to additional fact witnesses in this case, Pfizer's motion requests an order directing Plaintiff and Dr. Egilman to identify and produce copies of all such correspondence.  That production may demonstrate additional violations of this Court's Protective Order.

[7] *See also, e.g., Indemnity Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 423 (M.D.N.C. 2005) ("A treating physician is a participant or fact witness when it comes to describing the diagnosis and treatment of a party's condition."); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) ("[T]reating physicians . . . must be designated as experts if they are to provide expert testimony"); *Sowell v. Burlington Northern and Santa Fe Ry. Co.*, No. 03-3923, 2004 WL 2812090, at *1 (N.D. Ill. Dec. 7, 2004) (expert report requirements of Rule 26(a)(2)(B) do not apply to treating physicians so long as their testimony is limited to their diagnosis and treatment of the patient).

do with her treatment or diagnosis of Mr. Shearer and have no conceivable bearing on her forthcoming deposition testimony.

Beyond the substantive disconnect between the letter and Dr. Catapano-Friedman's treatment of Mr. Shearer, Dr. Egilman's letter is written in the style of a political push-poll – *i.e.*, propaganda masquerading as research. Rather than simply asking Dr. Catapano-Friedman to identify any information she received from Defendants regarding Neurontin's safety or effectiveness in bipolar patients, Dr. Egilman instead recites his own biased characterizations and select quotations from ostensibly negative studies and then asks whether this and other information "was ever communicated to you." There is no fig leaf capable of concealing Dr. Egilman's agenda in sending this letter.

## II.   COURTS HAVE THE INHERENT POWER TO RESTRICT AND SANCTION IMPROPER COMMUNICATIONS WITH NON-PARTY WITNESSES

It is well settled that "[a] district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or the issuance of monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior." *Strahan v. Simon Property Group, Inc.*, No. 08-cv-10764, 2008 WL 5273684, at *1 (D. Mass. Dec. 11, 2008) (citing, *inter alia*, *U.S. v. Kouri-Perez*, 187 F.3d 1, 6-8 (1st Cir. 1999)).

Pursuant to their inherent power, courts may restrict or sanction communications that are designed to frustrate an adverse party's efforts to obtain discovery from a plaintiff's treating physicians. *See Parker v. Upsher-Smith Labs, Inc.*, No. 06-cv-0518, 2009 WL 418596 (D. Nev. Feb. 18, 2009). In *Parker*, after the court entered an order permitting the defendant to interview the plaintiff's treating doctors, the plaintiff's counsel sent letters to those doctors informing them that they were not required to speak with defense counsel. *See id.* at *2. When the defendant moved for sanctions, the plaintiff's counsel argued that this was accurate information that he had a right to communicate to the doctors. *See id.* at *4. But the court found that these communications were made "for the improper purpose of influencing these witnesses not to cooperate with defendant's counsel in *ex parte* interviews, and it was done to gain a tactical

advantage." *Id.* at *8.  In so doing, the plaintiff's counsel "acted in bad faith or [engaged in] conduct tantamount to bad faith."  *Id.*  Accordingly, the court sanctioned the plaintiff's counsel pursuant to its inherent authority.  *See id.* at *9.  Here, while Dr. Egilman did not explicitly discourage Dr. Catapano-Friedman from speaking to defense counsel, the transparent purpose of his letter was to "influence[e]" her testimony by impugning and maligning Defendants, and to thereby "gain a tactical advantage."  *Id.* at *8.  As in *Parker*, this conduct should not be countenanced.

Courts have also restricted communications with non-parties in other contexts.  For example, in uncertified class actions, courts have the power to restrict communications by the parties and their counsel with putative class members.  Such restrictions are appropriate where there is a clear record of improper communications, and where the order is appropriately tailored to balance "'the need for a limitation [against] the potential for interference with the rights of the parties.'"  *In re Lupron Mktg & Sales Practices Litig. ("In re Lupron")*, MDL No. 1430, 2004 WL 3049754, at *1 (D. Mass. Dec. 21, 2004) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99-100 (1981)) (precluding intervenor from posting "blatantly misleading" information on its website in an attempt to scuttle a proposed class settlement).  Thus, courts have supervisory authority to prevent parties from engaging in "misleading communications" with putative class members, including biased, one-sided accounts that "omit[] critical information."  *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005).

Just as courts must protect the interests of putative class members, the First Circuit has recognized that courts must protect non-party witnesses from undue burden and harassment.

> Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation.  Non-parties have a different set of expectations.  Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.

*Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) (affirming denial of motion to compel discovery from non-party).

Here, Dr. Egilman has presented Dr. Catapano-Friedman with a cherry-picked, one-sided, and extremely misleading account of facts that have nothing to do with her treatment of Mr. Shearer. The obvious purpose of Dr. Egilman's letter was to portray Pfizer as a bad actor in order to influence Dr. Catapano-Friedman's deposition testimony.[8] It would be unduly burdensome to expect Dr. Catapano-Friedman to comb through the documents attached to Dr. Egilman's letter in order to determine whether he characterized them accurately, or to perform additional research to determine whether his failure to attach other documents was misleading. Yet, to leave Dr. Egilman's account unchallenged is unduly prejudicial to Pfizer, who is not permitted equal *ex parte* access to treating physicians. Non-party witnesses' "expectations" plainly do not include refereeing the parties' disputes on issues that have nothing to do with their personal knowledge of the case.

## CONCLUSION

For all the foregoing reasons, Pfizer requests that the Court enter an order directing that Plaintiff's counsel and their agents and consultants, including David Egilman:

(1) refrain from any further substantive communications with the treating physicians of Mr. Shearer or of other products liability plaintiffs or decedents in this MDL, except to the extent that such communications specifically relate to the treatment rendered by those physicians;

(2) refrain from making derogatory remarks or providing ostensibly negative information about Defendants or Neurontin to treating physicians of Mr. Shearer or of other products liability plaintiffs or decedents in this MDL; and

(3) disclose all prior communications with treating physicians of Mr. Shearer or of other products liability plaintiffs or decedents in this MDL, including copies of all correspondence previously sent to those physicians.

---

[8] Should Plaintiff or Dr. Egilamn deny that this was the letter's purpose, and claim that it would be "highly unlikely" to affect a doctor's testimony, the *Parker* court provides the apt response: "[If] true, why send the letter in the first place?" *Parker*, 2009 WL 418596, at *8.

     Pfizer also requests that the Court impose appropriate sanctions against Dr. Egilman based on his violation of this Court's Protective Order.


Dated: September 17, 2009                 Respectfully submitted,

                                                   SKADDEN, ARPS, SLATE,
                                                     MEAGHER & FLOM LLP

                                                   By:    <u>/s/ Mark S. Cheffo</u>
                                                                    Mark S. Cheffo

                                                   Four Times Square
                                                   New York, NY 10036
                                                   Tel:  (212) 735-3000

                                                                 -and-

                                                   SHOOK, HARDY & BACON L.L.P.

                                                   By:    <u>/s/ Scott W. Sayler</u>
                                                                  Scott W. Sayler

                                                   2555 Grand Blvd.
                                                   Kansas City, MO 64108-2613
                                                   Tel:  (816) 474-6550

                                                                 -and-

                                                   WHITE AND WILLIAMS LLP

                                                   By:    <u>/s/ David B. Chaffin</u>
                                                                 David B. Chaffin

                                                   BBO # 549245
                                                   100 Summer Street, Suite 2707
                                                   Boston, MA 02110
                                                   Tel:  (617) 748-5200

                                                   *Attorneys for Defendants Pfizer Inc and*
                                                   *Warner-Lambert Company LLC*

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on September 17, 2009.

                                              /s/ David B. Chaffin_____
                                              David B. Chaffin