UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
:      MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                :
       SALES PRACTICES AND                      :      Master File No. 04-10981
       PRODUCTS LIABILITY LITIGATION    :
                                                                          :      Judge Patti B. Saris
------------------------------------------------------------x
                                                                          :      Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:              :
                                                                          :
*Shearer v. Pfizer Inc.,* 1:07-cv-11428-PBS      :
                                                                          :
------------------------------------------------------------x

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S
# EMERGENCY MOTION TO COMPEL DISCOVERY

Plaintiff Linda B. Shearer, as Executrix of the Estate of Hartley Shearer, (hereinafter "Plaintiff"), pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, hereby moves, by emergency motion, for an order to compel discovery from Defendants Pfizer Inc., Warner-Lambert Company LLC, Parke-Davis and Warner-Lambert Company (hereinafter "Pfizer Defendants" or "Defendants"), relating to information and documents concerning Neurontin.

Plaintiff requests an Order to compel Defendants to produce disclosure relating to: (1) documents concerning Plaintiff's decedent Hartley Shearer's treating/prescribing physician, Keith Edwards, M.D.'s relationship and marketing/promotion/Continuing Medical Education ("CME") activities with Pfizer Defendants; (2) the in-house work and analyses of Pfizer Defendants' employee, Christopher Wohlberg, M.D., Ph.D., and other information and documents concerning his activities and involvement in the FDA 2008 Advisory Hearing on Suicidality; (3) the deposition testimony of both Dr. Edwards and Dr. Wohlberg; and (4) discovery of documents and deposition testimony of the district manager (currently unidentified

by Pfizer Defendants) who supervised and "coached" the underlying sales representative(s) who detailed Hartley Shearer's healthcare providers regarding Neurontin.

## FACTUAL BACKGROUND

Discovery Order No. 7, ECF Doc. # 582, mandates that paper discovery be concluded by April 30, 2007, and that fact discovery be closed on July 14, 2007.  Pursuant to this Order, Pfizer Defendants were to produce documents and information responsive to Plaintiff's demands for same up until the date of the last injury sustained by any of the Products Liability Plaintiffs, i.e., May 31, 2004.  *Id.*  Further, the Court issued an Order, ECF Doc. # 2047, dated July 29, 2009, in which the fact discovery deadline in the *Shearer* action was set as October 30, 2009.  Following the issuance of that discovery order, there have been both MDL and case-specific amended and supplemental disclosure statements filed by Defendants.

When Pfizer Defendants served their December 15, 2008 Amended Disclosure Statement in the MDL, Dr. Keith Edwards was not specifically named as a witness who may have information that Defendants may use to support their claims and defenses.  ECF Doc. # 2091-8.  Then, on September 9, 2009, Defendants served their First Supplemental Disclosure Statement in this *Shearer* case, which now lists Dr. Keith Edwards, under A3, as a healthcare provider and treating physician that may have information to support their claims and defenses.  Dr. Edwards' medical records and bills are also listed, under B3 of the Statement, as documents that Defendants may rely on at trial.  *See* Defendants' First Supplemental Disclosure Statement, annexed as Exhibit A to Declaration of Andrew G. Finkelstein, Esq.  As Mr. Shearer's treating healthcare provider, as well as a referenced prescriber of Neurontin for Mr. Shearer by another healthcare provider (Dr. Daniel Sullivan), Plaintiff is entitled to obtain discovery regarding Dr. Edwards' relationship and marketing activities with Defendants,.

2

Pfizer Defendants' First Supplemental Disclosure Statement in this <u>case-specific</u> action also now identifies Dr. Christopher Wohlberg, under A7, as a witness who attended the July 10, 2008 Joint Meeting of the Peripheral and Central Nervous System Drugs Advisory Committee (PCNS) and the Psychopharmacologic Drugs Advisory Committee (PDAC). Finkelstein Decl., Ex. A. Although Dr. Wohlberg had previously been named as a witness on the MDL general disclosure statements, Plaintiff was not provided with Dr. Wohlberg's custodial file responsive documents relative to the 2008 FDA hearing on suicidality. Plaintiff seeks discovery of Dr. Wohlberg's documents, as well as his deposition, regarding his presentations to the FDA on June 2, 2008, and July 10, 2008.

Plaintiff's Motion to Compel is also consistent with the Products Liability Plaintiffs' recently filed Motion to Re-Open Discovery based upon current events affecting this litigation. ECF Doc. # 2090. In particular, on December 16, 2008, the FDA advised Pfizer that "based on new safety information regarding the risk of suicidal thoughts or behaviors with AEDs, a Risk Evaluation and Mitigation Strategy (RES) (including a Medication Guide) is required for Neurontin." ECF Doc. # 2090-4. On March 17, 2009, the FDA informed Pfizer that the "Medication Guide should be comprehensive and should include all risk information reflective of your labeling that is necessary for patient's safe and effective use of Neurontin." *Id.* Consequently, the FDA-mandated 2009 Neurontin label and patient information guide contain some of the warnings that Plaintiff has advocated, and which Defendants should have provided for their drug Neurontin prior to Hartley Shearer's suicide. Thus, the information and documents that Dr. Wohlberg presented to the FDA are relevant as to the type and timing of Pfizer Defendants' knowledge of the suicidal risks of Neurontin and their failure to timely amend the label.

3

## **ARGUMENT**

A motion to compel discovery is entrusted to the sound discretion of the district court, *American Sav. Bank, FSB v. UBS Paine Webber, Inc.,* 330 F.3d 104, 108 (2nd Cir. 2003), where the district judge exercises responsible judgment when supervising the discovery process. *Arzuaga-Perello v. Shell Co. (Puerto Rico)*, 1999 U.S. App. LEXIS 2162 (1st Cir. Feb. 4, 1999); *Cruden v. Bank of New York,* 957 F.2d 961, 972 (2d Cir. 1992). Thus, a trial court may, upon motion, order the sequence and/or grant priority of the discovery process pursuant to Fed. R. Civ. P. 26(d). *Meisch v. Fifth Transoceanic Shipping Co. Ltd., Celebrity Cruises, Inc.,* 1994 U. S. Dist. LEXIS 14995 (S.D.N.Y. Oct. 21, 1994).

**1. Plaintiff Is Entitled to, and Defendants Have an Undeniable Duty to Provide Discovery of Documents and Information Regarding Dr. Keith Edwards' Marketing/Promotion Involvement With Defendants.**

As noted above, Dr. Keith Edwards was first named as a defense witness in this matter on September 9, 2009. Inasmuch as Dr. Edwards is a healthcare provider, as well as a referenced prescriber of Neurontin in medical records, and as one of Pfizer Defendants' Key Opinion Leaders involved in the investigation and marketing of Neurontin, Plaintiff is entitled to obtain documents from Defendants related to Dr. Edwards.

It is undisputed that Dr. Edwards was Hartley Shearer's treating healthcare provider. However, the parties dispute whether Dr. Edwards was a Neurontin prescriber. In 2001, Mr. Shearer, a stroke victim, was treating with Dr. Daniel M. Sullivan, of Williamstown Medical Associates, P.C. On Mr. Shearer's July 10, 2001 visit to Dr. Sullivan, the Doctor noted in his progress notes that Mr. Shearer wanted to temporarily stop taking Neurontin, which "was prescribed by Dr. Keith Edwards." *See* 2001 progress notes of Dr. Daniel M. Sullivan,

Finkelstein Decl., Ex. B.  Clearly, Plaintiff is entitled to the records and documents of one of Mr. Shearer's treating/prescribing physicians.

Significantly, Dr. Edwards has also had substantial involvement with the study of Neurontin, for which he was paid by Pfizer Defendants.  Dr. Edwards was a neurological consultant at the Parke-Davis Neurontin Investigator Meeting in San Francisco, California on March 22-23, 1996.  *See* copy of Participant List of Neurontin Investigator Meeting, Finkelstein Decl., Ex. C.  Further, in a Business Week article on pain, Dr. Edwards was quoted as saying that "Gabapentin has been very effective in improving things like sleep patterns, energy levels, the ability to do more things with the family;" this was sent in an October 18, 1999 email from Defendants' Regional Marketing Director, Tom Albright to other Pfizer employees.  Finkelstein Decl., Ex. D.  Additionally, Dr. Edwards was an attendee at "Re-Evaluating Neuropathic Pain Treatment Algorithms," a 1997 Parke-Davis sponsored CME.  *See* list of participants of CME, Finkelstein Decl., Ex. E.  He was also Key Opinion Leader for Defendants' Northeast Advisory Board and participated in two "pregab" studies.  *See* March 29, 2004 email from Dr. Edwards to Suzanne Doft, Finkelstein Decl., Ex. F.

It is evident that Dr. Edwards has been participating in studies and CME's involving Neurontin, paid for by Pfizer Defendants, thus mandating disclosure of documents regarding his prescription, promotion, marketing and study of Neurontin.  The discovery requested would include, but not be limited to:  (1) financial records concerning payments made by Pfizer, Warner-Lambert or Parke-Davis; (2) any communications (written, audio or visual) retained by Defendants or within Defendants' custody or control regarding Dr. Edwards; (3) communications regarding any time Dr. Edwards spoke on behalf of Neurontin (and any

5

transcripts, video, or recordings of same); (4) any direct correspondences to Defendants from Dr. Edwards and vice versa, including all attachments.

If Plaintiff cannot uncover this information, Plaintiff will be prejudiced at trial as to her pursuit of causes of action related to Pfizer Defendants' failure to warn of suicidality, suppression and fraudulent conduct. Plaintiff will also be prejudiced from gaining information about what evidence Dr. Edwards may testify about at trial, or as to the information that forms the basis for Defendants having included Dr. Edwards on their Rule 26 disclosure. This "trial by ambush" approach is not permitted by the Federal Rules of Evidence, and Defendants should not be permitted to employ such tactics.

Unmistakably, Dr. Edwards has been affiliated with Pfizer Defendants, and specifically the study of Neurontin, for the past 15 years. Unquestionably, the information and documents that he possesses were ascertainable to Defendants prior to the deadline for the close of general discovery, but for some unknown reason they failed to include this witness on the original Rule 26 Disclosure. ECF Doc. # 2091-8. Instead, Defendants waited until submission of their First Supplemental Disclosure Statement on September 9, 2009, to name Dr. Edwards as a new witness. Finkelstein Decl., Ex. A. Certainly, this Court should find that it would be unjust for Pfizer Defendants to be allowed to amend their Rule 26 disclosure to include information that is advantageous to their strategic position and their claims and defenses, while at the same time allow Defendants to fail to meet their Rule 26 mandated obligations to supplement and to provide discovery when relevant information critical to the very core of this litigation arises. Such manipulation of the Federal Rules of Civil Procedure to facilitate an advantage in this litigation should not be allowed by this Court.

6

> **2.  As Part of Plaintiff's Case-Specific Discovery, Pfizer Defendants Should be Compelled to Produce Document Discovery and Deposition Testimony Related to the District Sales Manager Who Coached Those Sales Representative(s) That Detailed Mr. Shearer's Healthcare Providers Regarding Neurontin.**

As part of the initial phase of discovery in the Track 1 cases in this litigation, the parties initially deposed only individual plaintiffs, their Neurontin prescribers, and sales representatives who called upon prescribers.  Following this initial core discovery, the parties engaged in a trial selection process to choose their respective case selections for trial, and the parties also utilized the deposition testimony from the above referenced core discovery to address Pfizer Defendants' motions to dismiss Plaintiffs' fraud causes of action.

Now, in the next phase of this case, the parties are engaging in more expansive discovery of additional witnesses.  While Pfizer Defendants may seek to depose Mr. Shearer's treating (non-Neurontin prescribing) physicians, Mr. Shearer's family and others, Plaintiff similarly seeks to compel discovery and the depositions of defense witnesses who may possess relevant information related to Plaintiff's case-specific causes of action.  In this regard, Plaintiff seeks the deposition of the district sales manager who had responsibility to train, "coach" and otherwise supervise the underlying sales representative(s) who detailed Mr. Shearer's healthcare providers.

Here, Plaintiff's counsel has discussed with defense counsel certain sales representatives who detailed Hartley Shearer's Neurontin prescribers and treating healthcare providers.  These sales representatives (a/k/a Territory Managers) included Michael Fagan (who detailed Dr. Catapano-Friedman and Dr. Keith Edwards); Mark Poulin (who detailed Dr. Keith Edwards); and Paresh Desai (who detailed Dr. Daniel Sullivan).  Plaintiff has previously deposed Michael Fagan and Paresh Desai as part of the initial core discovery phase.

7

To date, Pfizer Defendants have not disclosed or otherwise provided discovery regarding the district manager(s) (or other supposed titled employees, if any) that supervised the underlying sales representatives who detailed Hartley Shearer's healthcare providers. District Managers played an integral role in the training and supervision of activities and details undertaken by the underlying sales representatives.

At his deposition on March 22, 2008, defense witness Paresh Desai, in the *Shearer* case, explained the hierarchy of Pfizer Defendants' sales force for which he was a sales representative:

> Q. Have you ever heard of the acronym ABM, or Area Business Manager?
>
> A. Yes, I have.
>
> Q. Where does the Area Business Manager -- let me rephrase that. Is the ABM an individual?
>
> A. Yes.
>
> Q. In what portion of this hierarchy does the ABM sit?
>
> A. They were different names at different times. But generally, that would be something that somebody would be, like, a district manager. So you would have sales representatives reporting in to this ABM or district manager.

Finkelstein Decl., Ex. G at 15:5-20.

Additionally, Pfizer Defendants' sales/marketing witness, Christopher Dowd, testified as follows during the general MDL discovery phase of this litigation regarding the "coaching" activities undertaken by managers to comment on and supervise underlying sales representatives. Mr. Dowd testified that the managers were the "ones that are really listening to the [sales representatives] in the offices, they are really the only ones, for the most part, that hear the reps presenting to the doctor. . . .That is their job to work with a rep every day. They go and watch

the final stuff." Finkelstein Decl., Ex. H at 182:15-21. Mr. Dowd testified further about Defendants' use of a field coaching guide that was specific to individual sales representatives:

> Q. So, there would be three key messages: One, the indication that there will be a study that was included and information about dosing?
>
> A. Um-hum.
>
> Q. And was there any, was there any prohibition, for instance, on discussing information other than those three things?
>
> A. It was -- it was something that every sales manager, whether it's a VP, an RM or a DM, would try to regulate. The way the DM regulates it, because they are the ones that are really listening to it in the offices, they are really the only ones, for the most part, that hear the reps presenting to the doctor. They are out there in the field. That is their job to work with a rep every day. They go and watch the final stuff. So, there would be a field coaching guide and that is common practice for then the manager to comment on how the rep is doing that day, and in there, if it was going off core message, if he wasn't getting the core messages that were agreed upon by the district, there would be a note in his field coaching guide that, hey, stay on core messages, or you are not getting the dosage message in. Please remind the doctors, 1800, that kind of thing. So, that's where it would be most realistically directed.
>
> Q. Let me ask you about the field coaching guide. What form did that take?
>
> A. You know, it varied by division, you know, and over time, but it wasn't a hard copy, triplicate form, it was a computer based thing. Computer based meaning like a Word doc template that would get filled out.
>
> Q. So, who would be filling out – would both the rep and the DM be filling out this –
>
> A. The DM would fill it out.
>
> Q. On a daily basis?
>
> A. Yeah. They didn't always do it, but the best managers would do it almost on every field trip, spend a day in the field, spend a good part of the day in the field and write it up to reflect the day and document the day.
>
> Q. The situation would be such that the District Manager was riding along with a particular sales rep in his district, his or her district –

> A. Um-hum.
>
> Q. – and then would write up some evaluation at the end of the day –
>
> A. Um-hum.
>
> Q. – as to how that sales rep performed?
>
> A. Um-hum, exactly.
>
> Q. Other than sharing that, did that get shared with the sales rep?
>
> A. Yes. They got a copy.
>
> Q. Other than sharing it with the sales rep, who else, if anybody, received copies of those?
>
> A. It was common practice for the manager to have to send a copy up to the regional manager, but it wasn't some mandated policy. It was -- normally just depended on the RM. If the RM wanted to see them, he got them; if not, then he didn't get them.
>
> Q. How would those be transmitted?
>
> A. Most of the time they were copied and mailed in a packet at the end of the month. Otherwise, they would Zip them up to the RM in an e-mail as they went. It depended on what the RM set down as the standard and expectation.

Finkelstein Decl., Ex. H at 182-185.

Here, Plaintiff requests this Court to compel Pfizer Defendants to produce the field coaching guide, and the data from the field coaching guide applicable to the sales representatives who detailed Mr. Hartley's healthcare providers. Plaintiff also is entitled to depose the managers, if any, who supervised, trained or otherwise "coached" the sales representatives. Inasmuch as Plaintiff seeks to demonstrate (a) Defendants' knowledge of the off-label use of Neurontin, (b) Defendants' intentional promotion of Neurontin for off-label uses, and (c) Defendants' reckless suppression and inaction in failing to advise Plaintiff's physicians of evidence of suicidality with Neurontin use, the discovery of which is crucial to Plaintiff Linda

Shearer's causes of action in this case. Clearly, Defendants do not dispute the hierarchy of their sales force and Plaintiff only seeks discovery of the very individual(s) charged with the responsibility to train, supervise and "coach" the very sales representatives who called upon Hartley Shearer's healthcare providers regarding Neurontin.

> **3. Plaintiff Is Entitled to, and Defendants Have an Irrefutable Obligation to Provide Discovery Including, But Not Limited to, Dr. Christopher Wohlberg's In-House Work, Analyses, Files and Documents Regarding His Presentations to the FDA on January 31, 2008, the FDA Alert, on June 2, 2008, Suicidality, and on July 10, 2008, Regarding the Safety and Risks of Neurontin.**

Plaintiff is entitled to the materials involved, including documents, analysis and correspondence with the FDA, in the preparation of the slide presentation and briefing document that were presented by Dr. Wohlberg on behalf of Pfizer at Defendants' January 31, 2008, June 2, 2008, and July 10, 2008 presentations to the FDA.

On July 10, 2008, Products Liability Plaintiffs filed a motion to compel Dr. Wohlberg's records regarding his presentation on January 31, 2008. ECF Doc. # 1354. On July 28, 2008, Plaintiffs received an Electronic Order that Judge Saris had granted Plaintiffs' motion and ordered Pfizer Defendants to produce all information that formed the basis of Defendants' June 22, 2008 submission to the FDA, and any non-privileged documents regarding Defendants' presentations on June 2, 2008, and June 10, 2008. At that point, Plaintiffs had only received 56 pages from Dr. Wohlberg's custodial file.

To date, Products Liability Plaintiffs have only received documents from Dr. Wohlberg's file dating up to 2005, and Plaintiffs have received copies of the formal submissions to FDA regarding Neurontin and suicidality. However, Plaintiffs have not received Dr. Wohlberg's underlying internal analyses, internal correspondence and/or communications with other Defendant employees (e.g., emails and/or memoranda). It is apparent that Dr. Wohlberg is a key

individual with regard to issues concerning the safety and risks of Neurontin, as he has been a speaker at these multiple FDA meetings on Neurontin. ECF Doc. # 1355-9. And, although Dr. Wohlberg has been named as a witness in Defendants' general MDL disclosures, he has now been named a witness specifically in this *Shearer* case. Finkelstein Decl., Ex. A; ECF Doc. # 2091-8. In light of the fact that Pfizer Defendants never fully complied with their continuing obligation to produce Dr. Wohlberg's files with respect to all of his 2008 presentations to the FDA, Plaintiff requests that this Court compel Defendants to produce documents (including email and other internal documents) contained in any of Dr.Wohlberg's files, not heretofore produced, concerning Neurontin, the FDA Alert and the FDA Advisory Hearing on Suicidology.

Plaintiff will be severely prejudiced in her prosecution of this action if she is denied the right to receive, examine and analyze all of the materials involved, including not just the formal, final documents submitted to FDA, but Dr. Wohlberg's internal email or memo communications to/from Defendant employees relating to Neurontin.

Pfizer Defendants should also be compelled to produce Dr. Wohlberg for deposition, so that Plaintiff can question him on the above referenced documents and information he possesses related to Neurontin. If Plaintiff cannot uncover this information, then Plaintiff will be prejudiced at trial as to the information Dr. Wohlberg possesses, about which he may testify at trial, and as to the bases for which Defendants' supplemented their witness disclosure in this *Shearer* case regarding their own claims and defenses.

### 4. **Plaintiffs Has Been Diligent in Her Discovery Efforts Throughout the Course of This Litigation, Plaintiff Has a Right to Such Discovery, and Defendants Will Not Be Prejudiced by Production of the Discovery Requested.**

Plaintiff has been diligent in her efforts to comply with the discovery deadlines instituted or have moved for the appropriate extensions. Just as Judge Saris recognized, after the close of

12

discovery in 2007, that the FDA Alert and subsequent FDA actions were critical to this litigation, here the discovery related to Dr. Edwards and Dr. Wohlberg are critical to Plaintiff's prosecution. The Court's discovery schedule was formally ordered on July 29, 2009, and Defendants' supplemental disclosure was served only in September 2009. There is no way that Plaintiff could have brought this application sooner to obtain this discovery. Plaintiffs has a right to documents and information which are of such critical significance to this case.

## CONCLUSION

Plaintiff respectfully requests that this Court grant her motion for an Order to compel Defendants Pfizer Inc., Warner-Lambert Company LLC, Parke-Davis and Warner-Lambert Company to produce disclosure relating to: (1) documents related to decedent Hartley Shearer's treating physician, Keith Edwards, M.D.'s relationship and marketing/promotion/Continuing Medical Education ("CME") activities with Defendants; (2) the in-house work and analyses, and custodial file responsive documents of Defendants' employee, Christopher Wohlberg, M.D., Ph.D., and other information and documents relating to his activities and involvement in the FDA 2008 Advisory Hearing on Suicidality (e.g., email and internal memoranda not disclosed to FDA); (3) deposition testimony of both Dr. Edwards and Dr. Wohlberg; and (4) discovery of documents and deposition testimony of the district manager (currently unidentified by Defendants) who supervised and "coached" the underlying sales representative(s) that detailed Hartley Shearer's healthcare providers regarding Neurontin.

Dated: September 18, 2009                                   Respectfully submitted,

                                                                                       By:    **/s/ W. Mark Lanier**
                                                                                                W. Mark Lanier, Esquire
                                                                                                THE LANIER LAW FIRM, P.L.L.C.
                                                                                                126 East 56th Street, 6th Floor
                                                                                                New York, NY  10022

By:    **/s/ Andrew G. Finkelstein**
       Andrew G. Finkelstein, Esquire
       Finkelstein & Partners, LLP
       1279 Route 300, P.O. Box 1111
       Newburgh, NY  12551

*Attorneys for Plaintiff Linda B. Shearer*

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on September 18, 2009.

Dated:  September 18, 2009

       **/s/ Andrew G. Finkelstein**
       Andrew G. Finkelstein, Esquire