UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-----------------------------------------------------------x
                                              :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                  :
        SALES PRACTICES AND                   :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION         :
                                              :   Judge Patti B. Saris
-----------------------------------------------------------x
                                              :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                     :
                                              :
Shearer v. Pfizer, Inc., 1:07-cv-11428-PBS   :
                                              :
-----------------------------------------------------------x
```

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'
EMERGENCY MOTION FOR AN ORDER RESTRICTING
COMMUNICATIONS WITH TREATING PHYSICIANS
AND IMPOSING SANCTIONS AGAINST DR. DAVID EGILMAN**

Plaintiff, Linda B. Shearer as Executrix of the Estate of Hartley Shearer ("Plaintiff")
hereby opposes the emergency motion by Defendants Pfizer Inc. and Warner-Lambert Company
("Defendants") for an order to restrict communications with treating physicians and imposing
sanctions against Dr. David Egilman for several reasons including:  (1) plaintiffs have a
longstanding right to conduct *ex-parte* communications, authorized by their client, with the
client's treating physicians concerning issues that are relevant to the litigation, such as the
publicly known fact that Pfizer Defendants pleaded guilty to off-label marketing and may have
illegally marketed Neurontin to Dr. Catapano-Friedman, one of Plaintiff's decedent's physicians;
(2) the e-mail document that Dr. Egilman provided to Dr. Catapano-Friedman was publicly
available, filed as an unsealed exhibit with this Court and listed as Exhibit 18 in the Declaration
of Ilyas Ronas under ECF Doc. # 1761; (3) heretofore, Pfizer Defendants have argued in
affirmative motions and before this Court that a Plaintiff should speak with the Plaintiff's or

Plaintiff's decedent's treating physicians directly, not just with regard to treatment, but also concerning off-label marketing/fraud issues; (4) Dr. Egilman did not make any derogatory remarks or taint Pfizer Defendants inasmuch as it cannot be disputed that Pfizer Defendants and their subsidiaries have been found guilty of marketing Neurontin and other drugs off-label; and therefore it was appropriate for Dr. Egilman to ascertain whether Plaintiff's decedent's treating psychiatrist, Dr. Catapano-Friedman, who was detailed by Pfizer Defendants for Neurontin, was aware that Pfizer Defendants and their subsidiaries illegally marketed Neurontin and other drugs off-label; and (5) Pfizer Defendants' demand for documents is overly broad, premature and inappropriate as expert disclosure on specific causation is not yet due, and such disclosure may be properly obtained from the treating physicians' files.

## BACKGROUND

On April 15, 2009, counsel for the Sales and Marketing Plaintiffs in this litigation filed a Declaration by Ilyas Rona, ECF Doc. # 1761, which listed an e-mail of Atul Pande (which Defendants claim is confidential) as Exhibit 18.[1]   Counsel for Sales and Marketing Plaintiffs advised that Exhibit 18, along with the other exhibits listed in the Rona Declaration, were filed **unsealed** with the Court.   *See* Declaration of Andrew G. Finkelstein, Exhibit A.   Furthermore, the substance of the e-mail in question was placed in a publicly available legal document; it was quoted in a Statement of Facts, filed by Sales and Marketing Plaintiffs, ECF Doc. # 1760, ¶ 21, that refers to the e-mail (Exhibit 018) and states the following regarding Defendants' scientist Atul Pande:

> After learning of the results of his own study, 945-209, as well as the results from the Frye and Guille studies, Dr. Atul Pande admitted that Neurontin has a "weak, if any, anti-manic effect" and that there is "negligible evidence" supporting its use

---

[1] The Rona Declaration does not indicate that Ex. 18 was filed under seal.  It is clear that when the Sales and Marketing Plaintiffs file declarations that include documents filed under seal, the declaration clearly denotes same in its contents.  *See, e.g.*, ECF Doc. # 1756.

in bipolar disorder.  Dr. Pande further admitted:  "There is pretty good consensus among experts in the area that gabapentin is not a good anti-manic treatment.

Pursuant to the discovery schedule established by the Honorable Patti B. Saris in this case, the timing of discovery is very tight.  The deadline for expert disclosure is November 30, 2009, just 30 days after the October 30, 2009 deadline for fact discovery.  ECF Doc. # 2048.  Plaintiff's experts are therefore reviewing documents and information, etc., at the same time that depositions are being conducted.

## ARGUMENT

I.    **Plaintiff's Experts Have a Right to Speak With Plaintiff's Decedent's Treating Physicians Concerning Salient Issues in this Case; to Deny Plaintiff This Right Would be Contrary to the Purpose of the Health Insurance Portability and Accountability Act and Would Deny Plaintiff from Effectively Prosecuting Her Causes of Action.**

In *In re: Vioxx Prods. Liab. Litig.*, Judge Eldon E. Fallon modified his previous ruling by reversing his decision that had restricted plaintiffs' *ex parte* communications with treating physicians who were not named as defendants in the actions because  "the practical effect has created unintended consequences that can cause more problems than it sought to solve."  230 F.R.D. 473, 475 (E.D. La. 2005).  Judge Fallon noted that there were "other MDLs as well as Vioxx litigation in various states in which courts have allowed plaintiffs' counsel to contact treating physicians."  *Id.* at 474.  The Court noted that plaintiffs' counsel's ability to interview their plaintiff's treating physician is important for several reasons including their determination of whether to take or retain a case.  *Id.* at 475.  Moreover, Judge Fallon stated that "the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting *ex parte* communications with Plaintiff's treating physicians but allowing Plaintiff's counsel to engage in *ex parte* interviews with those doctors who have not been named as defendants."  *Id.* at 477.

3

In *Kugel Mesh Hernia Repair Patch Litig.*, the District Court denied defendants' motion for an order that would allow defendants to "engage in substantive *ex parte* contacts" with plaintiffs' treating physicians.  2008 U.S. Dist. LEXIS 63475, at *10 (D.R.I. Jan. 22, 2008).  The Court basically concluded that it would follow Judge Fallon's lead in the *Vioxx* litigation which permitted plaintiffs' counsel to conduct *ex parte* interviews with treating physicians and noted that there were various "mechanisms for defendant to access treatment information." *Id.* at *11, 12.

In *In re Vioxx Litig.*, the Superior Court of New Jersey granted plaintiffs' motion to prohibit *ex parte* interviews of plaintiffs' treating doctors by counsel for the defense.  Finkelstein Decl., Ex. B.  Judge Carol E. Higbee responded to defendants' assertions that it would be unfair for plaintiffs to conduct interviews with the treating physicians and not provide defendants with the same opportunity in clearly stating that "[t]here is no decision known to this court where a Judge has restrained counsel from talking to their client's own doctors." *Id.* at p. 8.

A. **Plaintiff Is Entitled to Communicate With Decedent's Hearthcare Providers**

The Health Insurance Portability and Accountability Act (hereinafter "HIPAA") establishes that the patient is the gatekeeper of his own health information.  45 C.F.R. § 164.508(a)(1).  It logically follows that Plaintiff has the right to authorize her attorneys and Plaintiff's decedent's physicians to speak privately, and that such communications may be as restrictive or expansive as Plaintiff desires.  Plaintiff's counsel has a formal, fiduciary and professional relationship with the Plaintiff and acts on her behalf.  Plaintiff's counsel has the right to communicate and interview Plaintiff's decedent's treating physicians to the extent permissible via HIPAA or a valid deposition subpoena.  One of the purposes of HIPAA is "[t]o protect and enhance the rights of consumers by providing them access to their health information

and controlling the inappropriate use of that information." 6 5 Fed. Reg. at 82463.  To limit or order that Plaintiff be provided with anything less than her unfettered right to access Plaintiff's decedent's physicians would be contrary to the stated purpose of  HIPAA and would seriously impede Plaintiff's right to have her experts research and evaluate facts in anticipation of expert opinions in this case.

  **B. Plaintiff's Expert Is Entitled to Communicate With Mr. Shearer's<br>  Healthcare Providers, Whether or Not They Prescribed Neurontin,<br>  <u>On Issues That Form the Bases of Plaintiff's Causes of Action.</u>**

  Dr. Egilman's communication and request to interview Mr. Shearer's healthcare providers has everything to do with Mr. Shearer's case and ascertaining the following information for that purpose:  (a) Defendants' failure to warn or otherwise inform Dr. Catapano-Friedman of possible suicidality; (b) whether the physician was aware of Defendants' off-label marketing schemes perpetrated on the medical profession to influence their prescribing and treatment practices; and (c) whether the physician would have provided information to Mr. Shearer about Neurontin and suicidality had she known this.

  Just like and to the same extent as Plaintiff's counsel, Plaintiff's experts are entitled to seek interviews and information from Plaintiff's decedent's treating physicians as they have been provided authorization to do so.  Any of Mr. Shearer's providers (whether a Neurontin prescriber or not), who knew of Mr. Shearer's use of Neurontin, if properly informed by Defendants, would have been in a position to recommend or otherwise provide guidance regarding Neurontin's association with depression and suicide.  For instance, using Dr. Catapano-Friedman as an example, had she known of Defendants' fraud/suppression activities and Neurontin's capacity to contribute to depression and suicide, she would have been in a position to provide a

recommendation to Mr. Shearer regarding his use of Neurontin.  It matters not whether Dr. Catapano-Friedman was a prescriber of Neurontin herself.

It matters, however, that the time period of Mr. Shearer's use of Neurontin overlaps with the time period for which Dr. Catapano-Friedman provided treatment to Mr. Shearer.  Moreover, Dr. Catapano-Friedman's medical file concerning Plaintiff's decedent indicate that Plaintiff's decedent was being prescribed Ritalin, Prozac, Ativan and Zyprexa during the same time period that he was being prescribed Neurontin.  It remains a salient question in this litigation whether Dr. Catapano-Friedman would have found important that Neurontin causes adverse mood and behavior changes while knowing that Plaintiff's decedent was also being prescribed these other drugs.  Indeed, it raises the question of possible interactions and side effects when the drugs are combined.  Finkelstein Decl., Ex. C.  Moreover, after ascertaining whether Plaintiff's decedent's psychiatrist was aware of Neurontin adverse effects, Plaintiff would be in a position to question Dr. Catapano-Friedman as to whether Neurontin may have affected, exacerbated or caused any of the conditions that were noted in Plaintiff's decedent's medical records.  Consequently, the subject matter included in Dr. Egilman's correspondence to Dr. Catapano-Friedman, or any other similarly situated healthcare provider, is relevant to Plaintiff's causes of action.

Ironically, Pfizer Defendants try to impede Plaintiff's right to communicate with non-Neurontin healthcare providers about the risks of Neurontin and off-label use, yet Pfizer Defendants have repeatedly inquired about the risks/benefits of Neurontin and off-label usage when deposing non-Neurontin prescribers.  For example, in *Bulger v. Pfizer Inc.*, 1:07-cv-11426-PBS, defense counsel deposed non-Neurontin prescriber Dr. Mark Mengel and inquired about a litany of issues regarding Neurontin benefits and off-label uses of drugs, despite the fact that Dr. Mengel testified he had not prescribed Neurontin to Mrs. Bulger:

Q.     Did you ever prescribe the medication Neurontin or it's generic form gabapentin to Susan Bulger?

A.     **I did not**.  [Finkelstein Decl. Ex. D. (p. 100, lines 5-7) (emphasis added).]

\* \* \* \*

Q.     Doctor, have you during your years of experience had the opportunity to prescribe medications for off-label uses?  [*Id*. at p. 35, lines 1-2.]

\* \* \* \*

Q.     Okay. Would you agree that it can be a proper exercise of a doctor's professional judgment to prescribe a drug off-label to a particular patient? [*Id*. at p. 35, lines 12-14.]

\* \* \* \*

Q     Doctor, do you believe there are some benefits of Neurontin?  [*Id*. at p. 41, lines 7-8.]

\* \* \* \*

Q.     What are some of the benefits of Neurontin?  [*Id*. at p. 41, line 10.]

\* \* \* \*

Q.     What about with respect to Neurontin's interactions or non-interactions with other medications?  [*Id*. at p. 41, lines 14-15.]

\* \* \* \*

Q.     So the fact is that when prescribing Neurontin for a particular condition, you believe that in the exercise of your medical judgment Neurontin was the appropriate treatment?  [*Id*. at pp. 41-41, lines 23-1.]

\* \* \* \*

Q.     What has been your experience in using Neurontin to treat patients with neuropathic pain?  [*Id*. at p. 48, lines 1-2.]

Additionally, in line with Judge Fallon's decision in *Vioxx Prods. Liab. Litig.*, it is axiomatic that a plaintiff may require to speak with treating physicians at certain points in the litigation to ascertain whether there is a viable action or whether the action should be continued

at any point in the litigation.  In fact, although Defendants now argue to the contrary to suit their needs, in the past, defense counsel repeatedly remarked during this multidistrict litigation that the parties may have a need to communicate with a Plaintiff's doctor.  For example, in support of their motion to dismiss Plaintiff's complaint for failure to adequately plead fraud claims, Defendants argued that Plaintiffs had a duty to speak with providers:

> I think the circuits that have looked at that, at least the Fifth, Sixth, and Seventh, have said, where it's in the hands of a third party, there's no relaxation of any pleading requirement, **the plaintiffs should have to go out and get those facts**." [Finkelstein Decl. Ex E at 9) (hearing transcript, 12/11/06) (quoting defense counsel James P. Rouhandeh) (emphasis added).]

Similarly, defense counsel themselves have represented in this litigation their own intention to talk to doctors regarding marketing issues:

> However, to really adequately prepare for trial, I think we're going to want to go see who spoke at those meetings.  **We're going to want to talk to those  doctors**. **We may want to depose those doctors.**  There's a  whole bunch of other discovery that's going to go down the road." [*Id.* at 17 (emphasis added).]

* * * *

> JUSTICE FREEDMAN:  Mr. Rouhandeh, they say that the doctors aren't within their control.  What do you say about that?

> MR. ROUHANDEH:  Well, I think, as a legal matter, that's essentially been resolved already in these cases and in many other cases, which is, they use that argument to say that where the facts are within the defendant's control, some relaxed pleading standard is required.  **Here the facts are not within the control of the defendant.  They're within the control of the doctor.  The doctor is within the control of the plaintiff. . . .** [*Id.* at 8 (emphasis added).]

### C.  Plaintiff Is Not Obligated to Depose a Treating Physician Who Is Willing and Available to Communicate Directly With Plaintiff's Counsel or Expert.

Defendants' request that Plaintiff refrain from substantive communications with Plaintiff's decedent's treating physicians simply fails to account for the circumstance where Plaintiff may not intend to depose a given witness.  The practical effect of Defendants' request is

8

to prevent Plaintiff from speaking to a doctor unless or until a doctor is deposed.  Realistically, Plaintiff may choose not to depose every witness whom Plaintiff may call to testify in this case. Indeed, there are many witnesses on Plaintiff's Rule 26 disclosures who have never been deposed.  Common sense dictates that Plaintiff's counsel or agents acting on Plaintiff's behalf will have "substantive communications" with such witnesses in preparation for trial.  Plaintiff may seek affidavits from non-party witnesses, in lieu of deposition testimony.

Under such circumstances, Plaintiff will seek to communicate with such witnesses to understand the substance and bases for their statements.

## II. DR. EGILMAN'S CORRESPONDENCE WITH MR. SHEARER'S TREATING PHYSICIAN WAS APPROPRIATE AND BASED UPON PUBLICLY AVAILABLE INFORMATION

Dr. Egilman's correspondence was appropriate and, as noted in detail *supra,* based upon information that is publicly available.  Defendants' knowledge of Neurontin's off-label use, its association with suicidality, and Defendants' history of illegality (or history of settlements with the United States Department of Justice for millions and now billions of dollars) is not a misrepresentation of the facts.   Plaintiff's expert sought to determine whether Plaintiff's decedent's healthcare providers were aware of such information.

Similarly, Plaintiff's counsel has the right to investigate her claims prior to bringing suit, or during the suit as is the case here, as part of the pursuit of information relevant to Plaintiff's causes of action.  Defendants essentially seek to prevent Plaintiff's counsel or experts from discussing with witnesses the very facts that form the allegations in Plaintiff's complaint.  Such a request is patently absurd and interferes with Plaintiff's prosecution of her case.  Common sense dictates that Plaintiff's counsel or agents/experts acting on behalf of Plaintiff need to discuss with witnesses the facts related to Plaintiff's causes of action.  Unfortunately for Defendants,

these facts include their fraudulent, illegal actions, and negligent failure to warn patients and doctors of Neurontin's association with depression and suicidality.

III.   **DEFENDANTS' REQUEST FOR DISCLOSURE OF ALL PRIOR COMMUNICATIONS WITH TREATING PHYSICIANS OF MR. SHEARER'S OR OTHER PRODUCTS LIABILITY PLAINTIFFS OR DECEDENTS INCLUDING CORRESPONDENCE PREVIOUSLY SENT TO THOSE PHYSICIANS IS OVERLY BROAD, UNWARRANTED AND PREMATURE AT THIS JUNCTURE IN THE LITIGATION**

Defendants' request is unworkable and unwarranted.  First, Defendants' request is overbroad and would result in Plaintiff's counsel having to provide copies of correspondence, such as requests for documents, HIPAA authorizations, and copying costs, which would be an undue burden.  Similarly, Plaintiff's counsel is not capable of providing "disclosure of all prior communications" to the extent that such a broad sweeping request could include telephone calls, personal contacts or other communications for which Plaintiff's counsel simply does not maintain a record and/or the burden of providing such disclosure outweighs the benefits of such disclosure apparently claimed as needed by Defendants.

In any event, it is an unnecessary request because any such written communications to a healthcare provider can equally be recovered by Defendants from the providers themselves.  The parties have thus far coordinated on recovering records from healthcare providers, and it is undisputed that each party throughout this litigation has seen the other's record requests within a given provider's medical file.  Moreover, to the extent that such communications concern Plaintiff's experts, Defendants' demand for such communications is premature as the deadline for expert disclosure in this case is not until November 30, 2009.[2]  Moreover, if such a request was granted by this Court, Plaintiff would request and be entitled to the same reciprocal

---

[2] At footnote 6 of Defendants' Memorandum, ECF Doc. # 2094, they seek production of Dr. Egilman's correspondence to any other providers in this case.  Although Plaintiff objects to the request and reserves all rights to oppose future requests, Plaintiff attaches this correspondence as Finkelstein Decl., Ex. F.

disclosure from Defendants and a further order that Defendants not communicate with Plaintiff's decedent's physicians without their notice or their presence as has been instituted by numerous courts in other MDLs.

## IV.   DR. EGILMAN IS PLAINTIFF'S EXPERT CONSULTANT IN THIS LITIGATION, HIS ACTIONS WERE REASONABLE AND TRANSPARENT, AND DEFENDANTS HAVE NO RIGHT TO ASK THIS COURT TO LIMIT OR PROSCRIBE THE METHODOLOGY HE UTILIZES TO OBTAIN FIRST-HAND INFORMATION FOR HIS EXPERT OPINION

Dr. Egilman, whom Plaintiff's counsel does not represent as counsel in this matter, is an expert-consultant for Plaintiff who set out to participate in a retrospective evaluation (psychological autopsy) regarding Mr. Shearer's suicide and  research Plaintiff's case-specific failure to warn/suppression causes of action.  Plaintiff and her counsel and expert have every right to speak with Plaintiff's decedent's treating physician.  Dr. Egilman's actions were reasonable, transparent, and Defendants' motion should be denied in its entirety.

Plaintiff's expert-consultant, Dr. Egilman, reached out to the decedent's healthcare providers and disclosed his relationship to the litigation.  He disclosed that he was consulting on the case against Pfizer related to Mr. Shearer's suicide.  Dr. Egilman requested a meeting with three of the healthcare providers so he could interview the providers on a first hand basis. Finkelstein Decl., Ex. F.  He offered to compensate the healthcare providers for their time and provided materials for their consideration.  The communication was reasonable.  This Court has previously considered a case-specific expert's interviews of witnesses as sound methodology in reaching an opinion.

In *Smith v. Pfizer Inc.*, 1:05-cv-11515-PBS, this Court denied Defendants' motion to preclude Plaintiff's case-specific expert, Dr. Ronald Maris.  The Court recognized Dr. Maris' psychological-autopsy and application of a differential diagnosis as sound methodology:

In preparing his opinion, Dr. Maris reviewed a variety of records and documents, including Mr. Smith's medical records (doctor, pharmacy, and physical therapy records), Mr. Smith's suicide note, and the post-suicide reports of police officers and medical examiners. (Expert Report of Ronald Wm. Maris, Ph.D. in Richard Smith v. Pfizer, at 2-3 [Docket No. 1633, Ex. 15]) (hereinafter "Maris Rep."). Dr. Maris also interviewed Mrs. Smith and reviewed the depositions of family members, doctors, and other fact witnesses in this case. (*Id.*) Finally, Dr. Maris consulted literature on Neurontin and the various general causation expert reports produced for this litigation. (*Id.*) [ECF Doc. # 2059, 8/14/009.]

At that time, Pfizer Defendants in *Smith* argued vehemently that Dr. Maris' opinion was unreliable, in part, because Plaintiff's lawyers had participated in the retrospective psychological autopsy relied upon by Dr. Maris:

Dr. Maris did not conduct any face-to-face interviews or even fill out the psychological autopsy form. In fact, he did nothing other than send the form to plaintiff's law firm to fill it out . . . . The law firm employee who completed the form is neither a suicidologist nor an 'appropriate healthcare professional,' but in fact, has no medical background whatsoever and was not provided any sort of training by Dr. Maris. . . .By allowing plaintiff's law firm to fill out the psychological autopsy form, Dr. Maris let the law firm subjectively decide which facts were and were not pertinent to the case." [ECF Doc. # 1629 (1/23/09) at 13-14.]

Now, when Plaintiff's consulting expert personally participates in the communication and interview of witnesses, Defendants make an about face, and disingenuously cry foul. Defendants cannot have it both ways.

Next, Defendants throw stones from their own glass house. Recently, in *Bulger v. Pfizer Inc.,* 1:07-cv-11425-PBS, Defendants employed a private investigator to purportedly visit with Dr. David Franklin only one day before Dr. Franklin was scheduled to testify at trial regarding Defendants' illegal, off-label marketing activities. Dr. Franklin and his family were terrified:

THE COURT: Let me just tell you what he reported to Mr. Alba. Whatever that guy, whoever he was and whatever he said, I think Dr. Franklin is terrified, and, more importantly, I think his daughter is terrified, and we have a thousand more cases. [*Bulger* Trial Transcript, 7/29/09, Finkelstein Decl., Ex. G at p. 12.]

Nevertheless, defense counsel Mark Cheffo explained to the media in a public quote: "Parties in litigation often use investigators to serve papers, **interview nonparty witnesses**, or to determine availability." The American Lawyer, at law.com, 8/10/09 (emphasis added).

Defendants have also reached out to witnesses prior to their deposition testimony. Linda Landry, who provided deposition testimony in the *Bulger* case testified that Pfizer Defendants' agent Mr. Danforth contacted her on not one, but two occasions, and they had in depth discussions. Finkestein Decl., Ex. H at pp. 68-69. Moreover, Amanda Cavallaro testified that a few days before her deposition, Mr. Danforth had met with her and asked some of the same questions that counsel for Pfizer Defendants had asked during her deposition. Finkeslstein Decl., Ex. I at pp. 72-73.

Apparently, Defendants embrace the notion of communication with non-party witnesses when such action may inure to their benefit but seek to prejudice Plaintiff's consulting expert from communicating with third party witnesses who may have relevant information regarding Mr. Shearer's case.

## V.   DEFENDANTS' ASSERTIONS AGAINST DR. EGILMAN ARE UNFOUNDED AND NOTHING MORE THAN A SMEAR CAMPAIGN IN AN OBVIOUS ATTEMPT TO UNDULY DISPARAGE DR. EGILMAN AND HAMPER THE METHODOLOGY EMPLOYED BY PLAINTIFF'S EXPERT TO RENDER AN EXPERT OPINION IN THIS CASE

As a preliminary matter, Pfizer Defendants' motion is procedurally deficient and should not be considered by this Court because Defendants have not served Dr. Egilman with a copy of this motion even though they have requested that this Court sanction Dr. Egilman personally.

Dr. Egilman is a renowned expert on warnings and risk communications, and he required certain information from Plaintiff's decedent's treating physicians in order to adequately render an opinion in this case. *See* Declaration of David Egilman MD, MPH, ¶¶ 2, 9-12. Dr. Egilman

provided certain documents to Plaintiff's Decedent's treating physicians in order to provide them sufficient time to read and consider the materials prior to his meeting with the physicians to discuss the issues in this case.  Egilman Decl., ¶ 11.

Defendants are simply wrong when they claim that Dr. Egilman violated this Court's Protective Order by quoting from and enclosing an internal email between Pfizer employees.  As noted above, Dr. Egilman included a document, Exhibit 18, that was filed with the Court "unsealed," and the substance of the document was quoted in Sales and Marketing Plaintiffs' Statement of Material Facts, which is retrievable from PACER and therefore is in the public domain.  Egilman Decl., ¶¶ 3-7.

Additionally, the aforementioned Exhibit 18 was effectively de-designated in terms of confidentiality by Defendant's own waiver.  Pursuant to paragraph 4(a) of the Stipulated Protective Order entered by Judge Saris on January 10, 2005, ECF Doc. # 27, and the Amended Stipulated Protective Order, ECF Doc. # 744, endorsed by Judge Saris on May 11, 2007 (collectively, the "Protective Orders"), a document must have been designated confidential by placing the following legend on each page:  "CONFIDENTIAL."  The document that Dr. Egilman provided to Mr. Shearer's doctor was an exhibit previously marked at a deposition and which bore no such legend.  Finkelstein Decl., Ex. J.  Even if the failure to designate the document could be claimed to be inadvertent, Pfizer Defendants had 30 days from the date they learned of the error to designate the document as confidential under paragraph 12.  Because the document in question was marked as an exhibit at Atul Pande's deposition on September 20, 2007, Pfizer Defendants had until October 20, 2008, to claim the document was mistakenly not designated.

Under paragraph 4(c), Pfizer Defendants also had 30 days from transcript availability to send a letter claiming that the exhibit and related portions of the transcript were confidential. Products Liability Plaintiffs do not possess any such letter received from Defendants.

It is clear from Dr. Egilman's Declaration that Defendants have unjustly and falsely disparaged Dr. Egilman's reputation in their moving papers. Dr. Egilman was never sanctioned by Judge Weinstein, and on all issues where Dr. Egilman had standing to appeal in the *Ballenger* case, the appellate court reversed the sanction. Egilman Decl., ¶¶ 12-15.

In Judge Saris' May 26, 2009 Order, the Court succinctly described the heightened duty to warn that a pharmaceutical manufacturer bears when it engages in off-label marketing of a drug:

> Based on the reasoning of this caselaw, the Court concludes that a manufacturer of a pharmaceutical has a duty to disclose to physicians and patients material facts about the risks of the drug, <u>particularly when it is engaged in off-label marketing</u> for uses not approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts.

ECF Doc. # 1790 at 25 (emphasis added).

Dr. Egilman's letter mentioned that Pfizer Defendants twice pled guilty to illegal off-label marketing of their drugs. In fact, Judge Saris also noted in her Order that Pfizer Defendants engaged in illegal off-label marketing. The facts are the facts in this case, and whether Pfizer Defendants are ashamed or otherwise embarrassed by their illegal actions, the question of whether or not Plaintiff's decedent's treating physicians were aware that Neurontin was being marketed off-label without patients and physicians being apprised of the attendant risks is of great import to every expert in this case, including case-specific consulting experts. This Court should not countenance such a misrepresentation of the facts and blatant hypocrisy by the Defendants and should deny Defendants' motion in its entirety.

Dated:  September 28, 2009                          Respectfully submitted,


                                         By:     /s/ W. Mark Lanier
                                                 W. Mark Lanier, Esquire
                                                 THE LANIER LAW FIRM, P.L.L.C.
                                                 126 East 56th Street, 6th Floor
                                                 New York, NY  10022


                                         By:     /s/ Andrew G. Finkelstein
                                                 Andrew G. Finkelstein, Esquire
                                                 Finkelstein & Partners, LLP
                                                 1279 Route 300, P.O. Box 1111
                                                 Newburgh, NY  12551

                                                 *Attorneys for Plaintiff Linda B. Shearer*


                            **CERTIFICATE OF SERVICE**

       I certify that this document filed through the ECF system has been served pursuant to

Case Management Order No. 3 on September 28, 2009.

Dated:  September 28, 2009

                                                 /s/ Andrew G. Finkelstein
                                                 Andrew G. Finkelstein, Esquire