UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------x
In re:  NEURONTIN MARKETING, SALES
        PRACTICES AND PRODUCTS
        LIABILITY LITIGATION
------------------------------------------------x

THIS DOCUMENT RELATES TO:

PRODUCTS LIABILITY ACTIONS

------------------------------------------------x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PRODUCT LIABILITY PLAINTIFFS' EMERGENCY MOTION TO REOPEN DISCOVERY

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") respectfully request that the Court deny Plaintiffs' emergency motion to reopen discovery.

### PRELIMINARY STATEMENT

With the close of case-specific fact discovery in *Shearer* a month away and trial set to begin in March, remand to the transferor court for trial already ordered in *Smith* and expected in all of the other non-Massachusetts Track One cases, preparation for trial in *Bulger* conducted without any issue as to generic fact discovery, and the deadline for such discovery long since passed, Plaintiffs seek to reopen, on a massive scale, fact discovery against Pfizer. Plaintiffs' motion should be denied. This Court and the parties devoted years to the exchange and oversight of discovery from Pfizer, amounting to millions of pages of documents, enormous electronic productions, and the deposition of, and custodial file exchange for, dozens of Pfizer employees and former employees. The Court properly imposed both temporal restraints (based on the dates of Plaintiffs' alleged ingestion of and injuries from Neurontin), to limit the volume of, and time required to produce, such discovery, and outer deadlines for discovery requests to and productions by Pfizer, to allow the cases to advance, as they have over the last two years, to case-specific discovery and trial, with the first trial completed this past July.

Indeed, Plaintiffs themselves recently relied upon – many months after the 2009 class-wide label change – the fact that "all discovery has been completed" in support of both their emergency motion to remand in *Smith*, which this Court recently granted, and their previous requests to remand nearly all the products liability cases for trial. (Pls.' Mem. in Support of Emergency Request for Issuance of Suggestion of Remand [2075] at 4; *see also* Joint Status Report on Products Liability Actions, dated June 12, 2009 [1832] at 5 (Plaintiffs asserting that, "[b]ecause common issue discovery in cases that pertain only to claims of suicidality filed solely against Pfizer Defendants is complete, this Court, in the proper exercise of its discretion, should issue a Suggestion of Remand now that allows Plaintiffs to move for remand before the JPML"); *id.* at 7 (Plaintiffs requesting "that this Court find that *pretrial proceedings have run their course* in regard to cases which pertain only to claims of suicidality filed solely against Pfizer Defendants," stating, "all that is left" is discovery "fact specific to each case") (emphasis added).) It was *Plaintiffs* who adamantly asserted, just a few months ago: "There is nothing further to be gained by the coordinated discovery process." (Joint Status Report [1832] at 7.)[1] Plaintiffs' counsel also urged the Court last Spring to set trial immediately in *Bulger* because discovery was done.

Plaintiffs' 360-degree reversal cannot legitimately be attributed to any subsequent change in circumstances. Neither the existence of the single complaint Plaintiffs cite with a 2007 date of alleged injury, nor the class-wide label change in 2009 (years after any Plaintiff was allegedly prescribed Neurontin) – both of which long preceded Plaintiffs' June 2009 request for remand of all cases – nor a recent settlement involving *other* Pfizer products, not Neurontin, warrants abrogating the timeframes and deadlines for generic discovery set by the Court. To permit Plaintiffs to engage in the new round of wholesale discovery they seek would require, among

---

[1] Defendants agreed, in the parties' June 2009 Joint Status Report, that common discovery was complete, but proposed that the Court limit the remand of cases in the first instance to the Track One cases and adopt an orderly procedure for sequencing initial discovery and remand in the other cases. (*See* Joint Status Report [1832] at 8-10.) The Court has adopted Defendants' proposal in large part. (*See* Scheduling Order and Status Report [2045].)

other things, the collection, review, and production of virtually every category of generic discovery previously produced – from emails to custodial files to databases – for a time period of *five years* (from 2004 through 2009). It would not only impose enormous undue burden on Pfizer, but would also unnecessarily, but inevitably, divert the parties' and the Court's attention and efforts from trial preparation and case-specific discovery, and delay, potentially significantly, the trial and remand schedules that the parties and the Court have been working so hard to achieve and maintain. As set forth in detail below, none of Plaintiffs' arguments or authorities warrant such diversion and delay. The Court should deny Plaintiffs' motion.[2]

## ARGUMENT

### I. THIS COURT HAS BROAD DISCRETION TO LIMIT AND CLOSE DISCOVERY

As Plaintiffs' own cases establish, this Court has broad discretion to set and enforce discovery deadlines and other limitations on discovery. *See Arzuaga-Perello v. Shell Co. (Puerto Rico)*, No. 98-1834, 1999 U.S. App. LEXIS 2162, at *2-3 (1st Cir. Feb. 4, 1999) (affirming district court's denial of plaintiffs' request for additional time to conduct discovery on jurisdictional issue); *Cruden v. Bank of New York*, 957 F.2d 961, 972 (2d Cir. 1992) (affirming denial of plaintiffs' request for further discovery concerning advice of counsel that was not relevant to defendants' defense). In addition, Rule 26 *requires* a court to limit discovery if it determines that the requested discovery "is unreasonably cumulative or duplicative"; if the party who seeks discovery "has had ample opportunity to obtain the information"; or if the proposed discovery is overly burdensome. Fed. R. Civ. P. 26(b)(2)(C). Each of these factors applies and warrants denial of Plaintiffs' motion here. In particular, courts have consistently denied requests

---

[2] Pfizer strongly contends that Plaintiffs' motion and request to serve their Proposed Requests for Production (Ex. I to Finkelstein Decl. [2091-10]) should be denied in their entirety for the reasons set forth herein. Because Plaintiffs filed the instant motion and Proposed Requests on an "emergency" basis, requiring an expedited response, Pfizer has not had the opportunity to fully respond or object herein to those requests on an individual basis. Should the Court allow Plaintiffs to serve any of the requests, Pfizer reserves the right to assert all such objections and otherwise respond in writing within the timeframe provided by the Federal Rules, agreed to by the parties, or ordered by the Court.

for discovery outside court-set deadlines and limitations where, as here, the court "has already determined the appropriate scope of discovery," the parties "had ample opportunity to conduct discovery," and the litigation has advanced to the dispositive motion or trial stage. *FLOORgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, No. 04-3500, 2007 WL 1613217, at *3 (D.N.J. June 1, 2007) (granting defendants' motion for protective order where the subpoena issued by plaintiff was outside the scope of discovery permitted by the court and issued near the end of fact discovery, noting: "To permit further discovery now would necessarily prejudice both parties by incurring additional expense in an already expensive litigation and by diverting the focus from preparation of a Final Pretrial Order to a never-ending discovery process."); *see also Brown v. James*, No. 4:CV-03-0631, 2009 WL 743321, at *4 (M.D. Pa. Mar. 18, 2009) (denying *pro se* plaintiff's request for certain documents where defendants had already provided discovery for the time period relevant to plaintiff's claims).

Unlike in the cases on which they rely, Plaintiffs are not seeking a minor adjustment to a Rule 16 schedule or the reopening of discovery for a discrete purpose based on newly discovered or late-produced relevant information or witnesses. *See, e.g.*, *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, No. 2:04-CV-1069, 2008 U.S. Dist. LEXIS 108695, at *4-6 (S.D. Ohio Apr. 24, 2009) (granting defendants' motion to reopen two depositions on the issue of damages based on plaintiffs' belated disclosures); *O'Neal v. SmithKline Beecham Corp.*, No. CIV. S-06-1063, 2007 U.S. Dist. LEXIS 53684, at *2-7 (E.D. Cal. July 25, 2007) (granting motion "to re-open fact discovery for the limited purpose of allowing [defendant] to depose" one of decedent's healthcare providers whose deposition had been noticed before the close of discovery but postponed because of the witness's health issues); *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 233 F.R.D. 338, 340, 342-44 (S.D.N.Y. 2005) (granting motion filed "[s]hortly after the close of discovery" to depose witnesses subpoenaed before the close of discovery and another witness whose identity was not learned until just before the discovery deadline); *Federal Ins. Co. v. Imperial Int'l, Inc.*, Nos. 91-4873, 92-5615, 1993 U.S. Dist. LEXIS 9051, at *1-4 (E.D. Pa. June 29, 1993) (granting motion by plaintiff and joined by several defendants to reopen

discovery for 30 days, based on defendant's disclosure, during a deposition on the last day of discovery, of information contradicting prior discovery responses). Indeed, Plaintiffs do not cite a single case that supports their request that the Court return this entire MDL to the generic discovery phase and require Pfizer to engage in substantial additional discovery efforts based on demands that are temporally and otherwise irrelevant to Plaintiffs' claims, or simply years belated, much less that it do so long after the close of discovery and after the Court has already begun trying cases and remanding others for trial in the transferor courts.

Moreover, many of Plaintiffs' Proposed Requests seek materials that are completely unrelated to the label change, recent settlement, or purported newly relevant time period of 2004-2009 on which they base their motion to reopen, and instead constitute a transparent effort by Plaintiffs to obtain materials that were at issue, and could have been sought, during the lengthy discovery period this Court already provided. (*See, e.g.*, Ex. I to Finkelstein Decl. [2091-10], Proposed Requests Nos. 1-7.) Under Rule 26, "the court must limit the frequency or extent of discovery . . . if it determines," as this Court already has, "that: . . . (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(2)(C). (*See* Discovery Order No. 6 [550] (finding: "All parties have had ample time to serve interrogatories and requests for the production of documents in the course of the litigation to date.").) Courts applying this Rule have repeatedly refused to reward a party's lack of diligence by extending or reopening discovery to allow the party to obtain materials that it failed to seek, by request or motion, before the close of discovery. *See, e.g.*, *Rafano v. Patchogue-Medford Sch. Dist.*, No. 06-CV-5367, 2009 WL 789440, at *12 (E.D.N.Y. Mar. 20, 2009) (affirming magistrate judge's denial of plaintiff's request to reopen discovery where plaintiff had over a year to conduct discovery, was granted multiple extensions of the discovery period, and failed to explain why the discovery at issue was not sought at an earlier date).[3]

---

[3] *See also FLOORgraphic*, 2007 WL 1613217, at *3; *Clark v. Baka*, No. 4:07-CV-00477, 2008 WL 4899479, at *2-3 (E.D. Ark. Nov. 10, 2008); *Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2008 WL 1925107, at *2 (W.D. Pa. Apr. 30, 2008).

Plaintiffs' contentions that permitting the discovery they request "will in no way delay this litigation" or prejudice Pfizer clearly fail the straight-face test. Plaintiffs argue that Pfizer will not be prejudiced because the Court has allocated a year for the completion of case-specific discovery and, therefore, this Court has retained jurisdiction over the MDL for at least another year. (Pls.' Mem. at 8.) But Plaintiffs mischaracterize the discovery that must be completed during this time frame. The Court has ordered the parties to complete the following discovery in the non-Track One cases before September 14, 2010: depositions of the plaintiff, prescribing physician, and sales representative. (Jt. Proposal for Completion of Initial Fact Discovery [2076] at 1.) There are approximately 130 cases remaining in the MDL, excluding the Boone and Schwartz cases. (*Id.*) Even if only three depositions are taken in each of these cases,[4] there would be 390 depositions to complete, just for initial fact discovery, within the next year. While this is going on, the parties will be involved in completion of case-specific discovery, motion practice, and trial preparation as the Track One cases are scheduled for trial and/or remanded. As noted above, this Court has already entered (at the Plaintiff's request) a suggestion of remand in *Smith*, and *Shearer* is scheduled for trial in March 2010, with a case-specific discovery deadline next month. Case-specific discovery is simultaneously ongoing in the New York consolidated state court litigation. The time and resources that would be required to respond to, and resolve disputes over, the incredibly broad requests Plaintiffs seek permission to serve would make it virtually impossible for the parties and the Court to maintain the current trial and case-specific discovery schedules. Plaintiffs' motion to reopen discovery is clearly calculated to divert Defendants' time and resources from trial preparation and should be denied, especially in light of Plaintiffs' representations to the Court that generic discovery was complete.

---

[4] There may, of course, be more than one plaintiff, prescribing physician, or sales representative in a case.

## II. THE 2008 FDA ALERT AND 2009 CLASS-WIDE LABEL CHANGE DO NOT WARRANT REOPENING DISCOVERY

As Plaintiffs concede, this Court capped the time period for which Pfizer was required to produce documents and other information about Neurontin at May 31, 2004. (*See* Pls.' Mem. at 2.) This limitation was not arbitrary; it was based on the dates of Plaintiffs' alleged ingestion of Neurontin and tethered to their burden to prove that Pfizer knew or should have known, *at the time Plaintiffs were prescribed Neurontin*, of an increased risk of suicide. That the FDA issued an alert four years later, and required a class-wide label change (for eleven different antiepileptic drugs ("AEDs")) five years later, based on its pooled analyses in 2008 of data for the eleven AEDs, does not warrant reopening discovery against Pfizer in any form, much less from every custodian, database, and document category previously produced, "up until the date that the label was changed." (Pls.' Mem. at 5; *see also* Ex. I to Finkelstein Decl., Proposed Requests Nos. 8-12.)

Plaintiffs' conclusory assertions about their need for such discovery are nothing more than poorly veiled requests to engage in a fishing expedition through five years' worth of documents and data. The 2008 FDA advisory occurred over nine months ago and the 2009 labeling change has been extant for four months. The experts for both sides have addressed both events in depth. Plaintiffs have never before indicated that either event necessitated additional fact discovery and instead insisted that generic discovery was complete. Even now, Plaintiffs do not explain how "the process and events leading up to the label change" in 2009 (Pls.' Mem. at 5) bear on the issue of what Pfizer knew or should reasonably have known about Neurontin in 2004 or before. It is undisputed that the FDA Alert and label change are not based on specific conclusions about Neurontin, but rather on an analysis of pooled or combined placebo-controlled clinical trial data for eleven different AEDs, with different pharmacologic properties, chemical structures, mechanisms of action, and safety profiles. Significantly, the FDA pooled data is inconsistent with Neurontin-specific data: as Plaintiffs' own general causation experts have repeatedly admitted, unlike the pooled data, the Neurontin-specific clinical trial data analyzed by

the FDA shows no statistically significant increased risk of, or association with, suicide-related events.  Pfizer obviously did not possess such data on other AEDs prior to the FDA Alert, much less before May 31, 2004.  Plaintiffs do not identify any other information related to the FDA analysis or label change that they believe Pfizer has, that they do not have access to, and that they contend is relevant to their claims in this litigation.

In sum, Plaintiffs' experts are, of course, free to obtain, and have obtained, publicly available materials related to the FDA's analysis and conclusions, and have relied on them in reaching their opinions.  But Plaintiffs have demonstrated no good cause based on the FDA Alert or label change for a colossal onslaught of new discovery against Pfizer, and significant delay in this litigation, at this late date – long after not only the close of discovery in 2007 but also the date of the FDA Alert in April 2008.

### III.     PFIZER'S AUGUST 2009 SETTLEMENT AGREEMENT DOES NOT INVOLVE NEURONTIN OR ANY OF THE MATTERS IN DISPUTE IN THIS LITIGATION

Plaintiffs' argument that discovery should also be reopened based on a recent settlement agreement involving completely different medicines and unrelated charges is similarly defective.  Although the agreement is public and Plaintiffs have attached a copy to their motion (Ex. E to Finkelstein Decl.), Plaintiffs blatantly mischaracterize it in a desperate effort to link it to this litigation and obtain broad discovery "concerning Neurontin and Lyrica that [is] responsive to Plaintiffs' discovery demands, up until the date of the Settlement Agreement."  (Pls.' Mem. at 7.)

The August 31, 2009, agreement involves the settlement of certain criminal and civil allegations related to medicines *other than Neurontin*.  Contrary to Plaintiffs' contention, nothing in the agreement "demonstrates that Pfizer Defendants' sales representatives advised physicians that Lyrica was better than Neurontin for off-label uses."  (Pls.' Mem. at 6.)  The language on which Plaintiffs rely involves the government's contention – which Pfizer disputes – that Pfizer made "unsubstantiated and/or false representations about the safety and efficacy of Lyrica, including claims that it was superior to Neurontin and its generic equivalent, gabapentin."  (Pls.' Mem. at 3 (quoting Agreement at 5).)  Plaintiffs have freely elaborated on that contention,

8

adding, without any support, the allegation that sales representatives promoted Lyrica to doctors as "better than Neurontin for off-label uses," and claiming that this fabricated charge provides evidence "that Pfizer Defendants were utilizing a comparison of Neurontin for off-label uses in order to market the drug Lyrica or illegally market other drugs off-label." (Pls.' Mem. at 6-7.) Significantly, none of the Defendants in this case pleaded guilty to any charges in connection with the settlement or related investigations. The only guilty plea entered in connection with the settlement was by a Pfizer subsidiary, Pharmacia & Upjohn, to one count of violating federal law involving the promotion of the drug Bextra. (*See* Agreement, Ex. E to Finkelstein Decl., at 5-6.)

This Court need not and should not countenance Plaintiffs' unsubstantiated leaps from the disputed contention in the agreement to their demand for massive new discovery about both Neurontin and Lyrica. Indeed, even if Plaintiffs' distorted representation of the agreement were accurate, it would not support reopening discovery here. Even if it were "implicit" in the agreement "that Pfizer was well aware that Neurontin was being extensively prescribed for . . . off-label uses" (Pls.' Mem. at 6), it would certainly not constitute new information or evidence justifying reopening discovery: Pfizer *does not dispute* its awareness that Neurontin was extensively prescribed off-label. This Court has previously held, over Pfizer's objection, that off-label marketing of Neurontin was relevant to the issues of motive and intent. While Pfizer respectfully disagrees with the Court's conclusions,[5] the Court's reasoning clearly does not support the additional discovery sought by Plaintiffs at this time. Plaintiffs have offered no explanation whatsoever how alleged statements that Lyrica was better than Neurontin are relevant to Pfizer's alleged intent or motive with respect to the marketing of Neurontin.

Plaintiffs' second conclusory argument for reopening discovery based on the settlement agreement – that it "provides evidence of a pattern of off-label marketing by Pfizer regarding Neurontin" and other drugs (Pls.' Mem. at 6-7) – fails for multiple reasons. First, it is

---

[5] Pfizer continues to object to the introduction of such evidence and reserves all of its prior arguments. It will not, however, repeat such arguments here.

indisputable that the agreement *does not* address "off-label marketing by Pfizer regarding Neurontin"; it does not address the marketing of Neurontin at all, much less any marketing or promotion of the medicine during the time period relevant to Plaintiffs' claims.  Second, to the extent that the government's contentions in the agreement, which, as noted, are disputed in large part, provide any evidence off-label promotion of *other* medicines, discovery about such matters falls well outside the scope of information relevant to this personal injury litigation alleging a failure to warn about Neurontin.

Plaintiffs cannot manufacturer "relevance" arguments for discovery of evidence of off-label marketing of other products by arguing that such evidence is relevant to their claims for punitive damages.  The Supreme Court has made clear that courts should not countenance desultory attempts to find a relevance hook that only obscures the real − and impermissible − purpose for which such evidence is offered:  to induce the jury to punish a defendant for conduct that is not before them.  In *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), the United States Supreme Court held that, as a matter of due process, "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages."  *Id.* at 422-23.  The Court explained that "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."  *Id.* at 423.  Moreover, the Court stated that "[d]ue process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis."  *Id.*

In *Campbell*, the Supreme Court held unconstitutional the lower court's punishment of twenty years of various dissimilar conduct by the defendant, explaining that courts are not permitted "to expand the scope of the case so that a defendant may be punished for any malfeasance."  *Id.* at 424.  Punishment based on dissimilar conduct "creates the possibility of multiple punitive damages awards for the same conduct" since "nonparties are not bound by the judgment some other plaintiff obtains."  *Id.* at 423.  A punitive damages award based on conduct unrelated to the plaintiff's harm enters the "zone of arbitrariness" that violates due process.  *See*

10

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996).

Later, the Supreme Court explicitly clarified that due process "forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties . . . , *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007); *see also Campbell*, 538 U.S. at 423 ("Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . ."). First, to allow punitive damages to be based upon harm to nonparties would violate due process by denying the defendant "'an opportunity to present every available defense.'" *Philip Morris*, 549 U.S. at 353 (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)). In any trial, the ability of a defendant to present evidence showing, for example, that the other parties' injuries were not caused by its product, is impossible. *See id.* at 353-54. The Supreme Court further explained that "to permit punishment for injuring a nonparty victim would add a near standardless dimension to the punitive damages equation," magnifying the due process risks of "arbitrariness, uncertainty and lack of notice." *Id.* at 354. Finally, the Court stated, there is "no authority supporting the use of punitive damages awards for the purpose of punishing a defendant for harming others." *Id.* The Court "made clear that the potential harm at issue was harm potentially caused *the plaintiff*." *Id.*

Plaintiffs cannot avoid the dictates of *BMW*, *Campbell*, and *Philip Morris* by arguing that information about the marketing of other drugs is relevant to the issue of reprehensibility. The Supreme Court in *Campbell* made clear that dissimilar conduct has no place in the analysis of a defendant's reprehensibility for purposes of punitive damages and should be excluded as irrelevant. *See Campbell*, 538 U.S. at 422-23. Under the Supreme Court's punitive damages jurisprudence, only evidence of conduct that is similar to the conduct that resulted in harm to the plaintiff may have any relevance to establishing the reprehensibility of a defendant's conduct toward the plaintiff. *See id*. at 423-24. Dissimilar conduct cannot be used to show repeated misconduct or "recidivism" on the part of a defendant. As the Supreme Court stated in

11

*Campbell*, if punitive damages are to be justified on the grounds that the defendant is a "recidivist," "courts must ensure the conduct in question *replicates* the prior transgressions." *Id.* at 423 (emphasis added).

In this case, Plaintiffs are attempting to construct a daisy-chain of purported relevance indistinguishable from that rejected by the Supreme Court in *Campbell*. There, the plaintiffs argued that the evidence of other conduct was probative of a general scheme to reduce the amount of money paid to claimants, both as a result of first party and third party claims. *See id.* at 423-24. Holding that liability should have been imposed only for the conduct that harmed the plaintiffs, the Supreme Court explained that the trial court committed error when it allowed the plaintiffs to use the case "as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country." *Id.* at 420.

The conduct that allegedly **caused harm** to the Plaintiffs here (the cornerstone of *Campbell's* analysis) was the alleged failure to warn of a risk of suicide. Even if this Court has ruled that Neurontin marketing may be relevant to motive and intent, Plaintiffs do not, in this action, seek to hold Defendants liable for off-label marketing. Indeed, this Court has dismissed all claims based upon alleged national marketing. (Mem. & Order [1790] at 28, 33, May 26, 2009.) The conduct at issue in the recent settlement between Pfizer and the government involved the marketing of drugs *other than Neurontin* and, therefore, is not evidence of motive or intent. And, because it did not involve the alleged failure to provide a suicide warning, it does not replicate the conduct that allegedly caused harm in this case. The evidence is, therefore, inadmissible under *Campbell* and cannot serve as a basis for reopening discovery.

For example, in *Shugart v. OEA, Inc.*, No. A099649, 2005 WL 1503812 (Cal. Ct. App. June 27, 2005), which involved a workplace explosion, the plaintiff sought to introduce evidence "that in 1994 defendant had been indicted on, and subsequently pled guilty to, six federal felony counts relating to 'two explosions involving explosive materials which injured several [of defendant's] employees.'" *Id.* at *16 (alteration in original). While noting that the plaintiff's vague description may have created the illusion of similarity, the court held that evidence of such

prior incidents must be excluded under *Campbell*. *See id.* at *16-17. "To introduce evidence of the hazardous waste infractions during the proceedings at which the amount of punitive damages was set would have been to invite the jury to punish defendant for actions that 'bore no relation to the [plaintiff's] harm', in violation of due process." *Id.* at *17 (alteration in original) (citation omitted).

Numerous other courts have similarly rejected attempts by plaintiffs to link evidence of other conduct through claims of relevance that did not satisfy the stringent dictates of *Campbell*. *See, e.g.*, *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 313-14 (4th Cir. 2003) (holding that evidence that the defendant engaged in a scheme to put the plaintiff out of business could not support a punitive damage award under *Campbell* when the conduct alleged was independent of the acts upon which liability was based); *Stroud v. Abington Mem. Hosp.*, 546 F. Supp. 2d 238, 259 (E.D. Pa. 2008) (allegations of a cover-up, which were independent of the basis for imposing liability on the defendant, could not support punitive damages); *Estate of Embry v. GEO Transp. of Ind., Inc.*, 478 F. Supp. 2d 914, 922-23 (E.D. Ky. 2007) (excluding evidence of dissimilar out-of-state conduct because it lacked any proximate relationship with the in-state harm and thus served "no deterrent purpose"); *Richardson v. Tricom Pictures & Prods., Inc.*, 334 F. Supp. 2d 1303, 1324 (S.D. Fla. 2004) (applying *Campbell* and holding that prior allegations of sexual harassment made against company employee involved dissimilar conduct and were irrelevant to determination of a punitive damages award against company), *aff'd*, 183 F. App'x 872 (11th Cir. 2006); *Ky. Farm Bureau Mut. Ins. Co. v. Rodgers*, 179 S.W.3d 815, 819-20 (Ky. 2005) (holding that evidence of an insurance company's handling of another case was inadmissible under *Campbell*); *Holdgrafer v. Unocal Corp.*, 73 Cal. Rptr. 3d 216, 234 (Cal. Ct. App. 2008) (evidence of other oil spills, which occurred under dissimilar circumstances, were inadmissible under *Campbell*); *Durham v. Vinson*, 602 S.E.2d 760, 766-67 (S.C. 2004) (ordering new trial where court admitted in a malpractice action evidence that physician prescribed valium to plaintiff's daughter with instructions that she share them with other family members); *Utz v. Johnson*, No. Civ.A. 04-CV-0437, 2004 WL 2812050, at *3 (E.D. Pa. Dec. 8, 2004) (excluding

13

evidence of prior acts of verbal abuse in case alleging physical assault).  In addition, much of the conduct that is at issue in the current settlement occurred *after* the time during which Neurontin was marketed by Defendants or prescribed to Plaintiffs and, therefore, is inadmissible under *Campbell*.  *See Pedroza v. Lomas Auto Mall, Inc.*, No. CIV 07-0591, 2009 WL 1300944, at *5 (D.N.M. Apr. 2, 2009); *Gober v. Ralphs Grocery Co.*, 40 Cal. Rptr. 3d 92, 106 (Cal. Ct. App. 2006); *see also Wohlwend v. Edwards*, 796 N.E.2d 781, 787 (Ind. Ct. App. 2003); *see also Campbell,* 538 U.S. at 410 (holding that "courts must ensure the conduct in question replicates the ***prior*** transgressions" (emphasis added)).[6]

Thus, because evidence involving the completely unrelated conduct addressed by the 2009 settlement agreement may not, as a matter of constitutional due process, be admitted or considered for purposes of punitive damages, and Plaintiffs have not shown how it might lead to the discovery of admissible evidence, it is not discoverable under Rule 26 and certainly does not warrant reopening discovery at this late date.

## IV. PLAINTIFFS PROVIDE NO BASIS FOR A WHOLESALE REOPENING OF DISCOVERY BASED ON A SINGLE CASE IN WHICH INITIAL DISCOVERY HAS NOT EVEN BEEN COMPLETED

Plaintiffs' third and final "scenario" (Pls.' Mem. at 8) for reopening generic discovery is just as flawed as their first two.  Plaintiffs do not and cannot support their assertion that the mere existence of a single case (*Monsue*) with a 2007 alleged date of injury warrants reopening virtually all discovery against Pfizer more than two years after the discovery deadline set by the

---

[6] Discovery and admission of such evidence would also contravene the holding in *Campbell* that, as a matter of due process, state sovereignty and comity, punitive damages may not be based on a defendant's conduct in other states.  *See Campbell*, 538 U.S. at 422.  The Court explained that "[a] basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."  *Id.*  Therefore, the Court concluded both that a jury "may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred" and that a State has no "legitimate concern in imposing punitive damages to punish a defendant for *unlawful* acts committed outside of the State's jurisdiction."  *Id.* at 421-22 (emphasis added).  Punishment that serves no legitimate State interest and adjudication of conduct occurring outside the State and affecting persons not before the court offend due process.  *See id* at 422-23.

14

Court and after the trial phase of this MDL has commenced. If, as Plaintiffs ask the Court to find, every new complaint filed in an MDL could dictate the scope and timeframe for generic discovery, it would be impossible to set and maintain reasonable discovery limitations and deadlines. Indeed, despite having filed *Monsue* over a year ago, and a number of other actions since the generic discovery deadlines were set and then passed, Plaintiffs' counsel have never before taken this position before the Court. Their request comes only after the first Neurontin trial ended in a voluntary dismissal and only as a half-hearted tag-along to their other arguments for reopening discovery.

*Monsue* was filed by a Tennessee resident against Pfizer Defendants and other pharmaceutical defendants in New York state court and subsequently removed to the Southern District of New York. It is not a Track One case, there has been only minimal template discovery in the action, and additional case-specific discovery remains to be done to explore critical issues, including, for example, whether Plaintiff's decedent was prescribed Neurontin or generic gabapentin and for what indication, and on what his prescribing physician(s) based his or her decision. To the extent Plaintiff there believes she is entitled to additional generic discovery from Pfizer, such a request would more properly be made and addressed within the context of that action, and based on an actual record, not mere allegations.

## V. PFIZER HAS PROPERLY SUPPLEMENTED ITS DISCLOSURES

Plaintiffs tack on to the end of their motion several non sequitur arguments and unfounded accusations about Pfizer's having supplemented its Rule 26 Disclosures to include a Pfizer witness, Phil Arena. Both parties have supplemented such disclosures in recent months, and Plaintiffs cannot identify any prejudice from Pfizer's listing of Mr. Arena as a witness more than six months before the next scheduled trial, much less explain how it warrants reopening all generic discovery. Pfizer will, of course, make Mr. Arena available for deposition. The need to take a specific witness's deposition is, of course, vastly different from the broad reopening of discovery Plaintiffs seek. Plaintiffs' charges about disclosures by Pfizer expert Dr. Gibbons are

15

similarly misplaced.[7]

## CONCLUSION

For all the foregoing reasons, Pfizer respectfully requests that the Court deny Plaintiffs' emergency motion to reopen discovery.

Dated: September 28, 2009          Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:   /s/ Mark S. Cheffo
      Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000

-and-

SHOOK, HARDY & BACON L.L.P.

By:   /s/ Scott W. Sayler
      Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel: (816) 474-6550

-and-

---

[7] Pfizer has previously informed the Court and Plaintiffs' counsel that Dr. Gibbons has undertaken certain additional research activities related to Neurontin. The Court has directed the parties to engage in a separate briefing process to address any supplemental disclosures by Dr. Gibbons.

WHITE AND WILLIAMS LLP

By: /s/ David B. Chaffin
David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on September 28, 2009.

/s/ David B. Chaffin
David B. Chaffin