IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                            )
                                  ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 98
AND PRODUCTS LIABILITY LITIGATION    )



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 18, 2009, 2:40 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S:

2

FOR THE PLAINTIFFS:

3

4       BARRY R. HIMMELSTEIN, ESQ., Lieff, Gabraser, Heifmann &
    Bernstein, LLP, Embarcadero Center West, 275 Battery Street,
    30th Floor, San Francisco, California, 94111-3339.

5

6       THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro, LLP,
    55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
    02142.

7

8       THOMAS M. GREENE, ESQ., Greene, LLP,
    33 Broad Street, 5th Floor, Boston, Massachusetts,02109.

9       LINDA P. NUSSBAUM, ESQ., Kaplan, Fox & Kilsheimer, LLP,
    850 Third Avenue, New York, New York, 10022.

10

11      GERALD LAWRENCE, ESQ., Lowey Dannenberg Cohen & Hart,
    P.C., One North Broadway, White Plains, New York,
    10601-2310.

12

13      MARK M. SANDMANN, ESQ., Rawlings & Associates,
    One Eden Parkway, LaGrange, Kentucky, 40031-1800.

14      W. SCOTT SIMMER, ESQ., Blank Rome, LLP,
    Watergate, 600 New Hampshire Avenue, N.W., Washington, D.C.,

15      20037.

16

FOR THE DEFENDANTS:

17

18      DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
    100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.

19       MARK S. CHEFFO, ESQ. and DAVID S. WEINRAUB, ESQ.,
    Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times

20      Square, New York, New York, 10036.

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S
 2           THE CLERK:  In Re:  Neurontin Marketing, Sales
 3  Practices, and Products Liability Litigation, Civil Action
 4  No. 04-10981, will now be heard before this Court.  Will
 5  counsel please identify themselves for the record.
 6           MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol
 7  for the class plaintiffs.
 8           MR. GREENE:  Tom.
 9           MR. HIMMELSTEIN:  Good afternoon.
10           MR. LAWRENCE:  Good afternoon, your Honor.  Gerald
11  Lawrence on behalf of Aetna.
12           MS. NUSSBAUM:  Good afternoon, your Honor.  Linda
13  Nussbaum on behalf of the Kaiser plaintiffs.
14           MR. SANDMANN:  Good afternoon, your Honor.  Mark
15  Sandmann on behalf of the coordinated plaintiff Guardian.
16           MR. SIMMER:  Your Honor, Scott Simmer on behalf of
17  the Assurant plaintiffs.
18           MR. CHAFFIN:  Good afternoon, your Honor.  David
19  Chaffin for the defendants.
20           MR. CHEFFO:  Good afternoon.  Mark Cheffo for
21  Pfizer.
22           MR. WEINRAUB:  Good afternoon, your Honor.  David
23  Weinraub for defendants.
24           THE COURT:  Good.  So today we will not be arguing
25  the motion for reconsideration on the class.  That's
</pre>

1   something I will have argument on but not today.  Today is

2   the summary judgment matter, and there's enough there for me

3   to have read.  But I have skimmed through the motion for

4   reconsideration just to understand the context in which this

5   is arising.  I thought we should, unless you had already

6   agreed on a schedule, that we should start with the

7   coordinated plaintiffs, unless one person was going to argue

8   for the entire group of plaintiffs.  I learned an enormous

9   amount from this, and one thing I did learn is, you actually

10  have some different views on things, so it's not, you know,

11  all for one and one for all on how you approach issues; for

12  example, damages.  So how do you want to do it?

13          MR. HIMMELSTEIN:  Your Honor, we had agreed

14  amongst ourselves that the class plaintiffs would take the

15  lead in the argument, if that's all right with the Court.

16          THE COURT:  I don't know.  I don't want an

17  argument on the class cert.

18          MR. HIMMELSTEIN:  No, your Honor.  This will be on

19  the summary judgment as set forth in the briefs.

20          THE COURT:  But here's my problem:  I think I need

21  to do this company by company and plaintiff by plaintiff.  I

22  think it's very fact-specific, and I think we're just -- so

23  I'm happy to have some common argument on proof of

24  ineffectiveness, but on the companies, are you prepared, for

25  example, to deal with Guardian and Aetna?

1          MR. HIMMELSTEIN:  No, your Honor.  They'll speak

2     for themselves.  We will speak on behalf of the consumer

3     plaintiffs, which we have a number of, and the class TPP

4     representatives.

5          THE COURT:  Are the coordinated third-party payors

6     prepared to argue?

7          MR. LAWRENCE:  Yes, we are, your Honor, and our

8     plan had been for me to present argument relating to

9     causation and standing and specific factual matters relating

10    to my client, Aetna, and also to Guardian on that issue.

11    And Ms. Nussbaum is going to present the specific factual

12    matters on causation and standing regarding her client,

13    Kaiser, and she was also going to address our theory of

14    cheaper and more optimal.  And then Mr. Sandmann is here and

15    prepared to present argument on scienter, to the extent your

16    Honor wants to hear argument on that topic.  We were going

17    to some extent, your Honor, rely on the argument that the

18    class plaintiffs intended to present about the drug trials

19    and some of the fraudulent conduct there, but --

20         THE COURT:  Let me back up.  I found the briefing

21    unhelpful in the sense of, I needed to get to each company;

22    I needed to understand what happened at each company and

23    with each plaintiff.  I understand, because I've been with

24    the case for so long, you know, some of the broad-brush

25    issues going on here.  I understand about the marketing

1   campaign.  I mean, I get it.  I understand there are

2   disputed issues of fact on effectiveness.  They may have a

3   different view of that.  I understand that.  But the issue

4   is, I've got to understand each company, and I found it took

5   a long time to get into the briefs to get there.  So I don't

6   know quite how to handle that.  What do you have as a

7   proposal?

8           MR. CHEFFO:  Your Honor, obviously we'll do

9   whatever is most helpful to the Court.  My view, you know,

10  if you were to ask me to start talking today, what I would

11  have basically told you is that I think the general issue of

12  causation, proximate and factual causation, cuts across all

13  of the claims of every single party here.  In other words,

14  we can talk on specifics all day, but to the extent that

15  we've never seen a single prescriber and we haven't seen any

16  evidence --

17          THE COURT:  Anyway, I don't want to get into the

18  argument here.

19          MR. CHEFFO:  Yes, so I'm happy to --

20          THE COURT:  If you want to all do the broad brush,

21  you can.  When I sat and read it, and it took me almost two

22  days to get through -- I didn't even read an exhibit -- I'm

23  talking about all the briefs -- what interested me the most

24  was each company and whether they did it differently, and

25  how much it matters, when it was approved and what kinds of

1    restrictions like in Kaiser that were opposed, and what were

2    the facts for each separate plaintiff, and that sort of

3    thing.  So I think what I'd like to do, I'll let you start,

4    but just know I'm going to get frustrated and jump in and

5    just force us to go company by company, all right?  Because

6    I think no one, if I could predict right now, is going to

7    win on a broad-brush argument.  I'm going to want to

8    understand what happened, Kaiser, Guardian, Aetna, each

9    plaintiff.  So why don't we start.  It's your motion.  How

10   much time do you want?

11             MR. CHEFFO:  I'll probably be off by five minutes,

12   but I probably can start in twenty minutes, twenty-five

13   minutes.

14             THE COURT:  Twenty minutes?

15             MR. CHEFFO:  Twenty minutes.

16             THE COURT:  Yes.  And I also know for some people

17   it's a holiday tonight.  How many people need to get back

18   early?  So, you know, we'll do twenty minutes and then

19   twenty minutes, and we'll see where it goes.  Go ahead.

20             MR. CHEFFO:  So let me jump right in, your Honor.

21   Thank you.  There has been an enormous amount of paper,

22   exhibits, briefing.  Where I think the Court can grant

23   Pfizer's motion with respect to all of the claims is on the

24   issue of causation.  There's no triable issue of fact, and

25   there's no dispute of law here with respect to the proximate

1   or actual causation.

2           There's three groups, as the Court is aware, but

3   I'll talk about them as the individual plaintiffs.  I'll

4   spend a few minutes talking about the class third-party

5   payors, of which it's Blue Cross-Blue Shield of Louisiana,

6   ASEA Harden, and then there's the coordinated folks, the

7   third-party payer insurers, Kaiser, Aetna, and Guardian.

8           With respect to the individuals, let's just start

9   there.  In order to raise a triable issue, plaintiffs have

10  to show and ultimately what they have to show is that there

11  was a fraudulent misrepresentation on which a doctor

12  received, saw, heard, relied on, prescribed the medicine,

13  Neurontin, to a patient.  We'll get into efficacy in a

14  minute, but also there has to be a lack of efficacy, no

15  benefit.  But with respect to causation specifically, there

16  has to be those elements.  There has to be that the doctor

17  received a message that --

18          THE COURT:  You'd agree with their standard of

19  utterly worthless?

20          MR. CHEFFO:  Well, this is what I would agree

21  with, your honor.  I think that the way they've set their

22  case up, they have to prove that there is no material issue

23  of fact that it is utterly worthless or absolutely

24  ineffective, and I can speak to that in two seconds.  I

25  think it all ties together.  But I would agree that that is

1    the standard as a result of the way they've set this case

2    up, by putting all of their eggs in the aggregate model

3    basket, that that's ultimately what they have to prove here.

4            So with respect to the individuals, as I said,

5    they have to show reliance, prescription.  Here, we don't

6    have to speculate.  We don't have to talk about what someone

7    may have said or what they heard.  Everyone -- this is

8    probably the way it should be done with every single

9    prescription and doctor.  We actually went and talked to

10   every single prescribing doctor and asked him or her, "Did

11   you rely on any off-label fraudulent message from Pfizer to

12   prescribe this medicine for your patient?"  And to a T,

13   every single one of them said "Absolutely not."

14           And they didn't just say "No," and that was the

15   end of the story.  As your honor may recall from the record,

16   and we can talk about the specifics, but generally some

17   said, "I continued to prescribe it because the prior doctor

18   had prescribed it, and the patient wanted it."  Some said,

19   you know, "Prior anticonvulsants were used for bipolar

20   disorder.  That was something that was generally known.

21   This was an anticonvulsant.  I prescribed it."  Other people

22   said, "I never heard of marketing.  I was in the Army

23   before."  So there's a whole constellation of reasons.

24           Two points that are most important that are really

25   undisputed, that the doctors who testified -- these are

1  nonparties, and this wasn't -- you know, I think in reading

2  the plaintiffs' papers -- and, again, they're very good

3  advocates, but this wasn't informal conversation.  These are

4  licensed doctors who were deposed under the penalties of

5  perjury in a Federal Court proceeding, and they testified to

6  a T unequivocally that they did not prescribe/rely on

7  anyone's off-label improper marketing.  They had independent

8  medical reasons why they prescribed.

9        These folks may disagree.  The lawyers may think,

10  well, that's not really what they meant, or perhaps they

11  were misled, or subconsciously maybe they saw something.

12  But that's not the way evidence and summary judgment works.

13  The record is clear, and there's no contrary evidence with

14  respect to those individuals.

15        Now, with respect to the class third-party payors,

16  Blue Cross-Blue Shield, ASEA --

17        THE COURT:  What do you do with the fact that the

18  plaintiffs have put forth evidence in the summary judgment

19  motions that the doctors were mistaken; they in fact had

20  been visited multiple times with consultants, had numerous

21  sales visits and the like, so they just were just wrong in

22  their memories?

23        MR. CHEFFO:  Well, let me address that, your

24  Honor.  I mean, I think, again, there's two issues here.

25  You know, as you've stated -- and, you know, we can talk

1    about the law, the AmGen case.  Virtually every court

2    there's been -- probably I think you talked about a quartet.

3    There's two additional cases.  Basically what the courts

4    have said is that even if you were to talk about, you know,

5    certainly marketing itself is not actionable.

6            THE COURT:  No, no, no, but just back up.

7            MR. CHEFFO:  Sure.

8            THE COURT:  So if in fact the doctors were never

9    detailed, which is a lot of what I had in the suicide cases,

10   absolutely no evidence the doctor ever even saw a sales rep,

11   you lose on that; or if there was a visit by a sales rep,

12   there's no evidence that the doctor himself spoke to the

13   sales rep as opposed to just leaving off a sample at the

14   door.  Here there are apparently -- I assume that's why

15   they're named plaintiffs -- copious, copious notes about

16   visits and the like, and consulting contracts and fees and

17   the like.  So that does it then become the credibility of

18   each doctor?

19           MR. CHEFFO:  No, it's not credibility.  They're

20   trying to turn it into that, your Honor, but let me talk

21   specifically.  First, let's be clear:  Only two of the

22   prescribers for two of the nine plaintiffs received,

23   according to the record, and all we can go on -- now,

24   discovery is closed here -- this is what's going to

25   ultimately go to the jury, right, so all we can go on is

1  what's in the record -- only two of them received

2  information that would arguably be off-label, okay?  The

3  rest talked about detailing and visits.

4           There's no evidence that, one, that it was

5  off-label, or certainly that it was fraudulent.  And the

6  next step would be, you know, you can't create an issue of

7  fact just because there's evidence that Pfizer detailed.  I

8  mean, perhaps if there was more, if these folks were never

9  deposed.  But we have now gone to these nonparties, and what

10  they're trying to do is take the standard -- let's assume

11  someone was accused of sexual harassment, and they said,

12  "No, I didn't do it."  If they were a party in a litigation,

13  that wouldn't necessarily be game over; there may be issues

14  of credibility.  But we cited cases here in our papers, when

15  you have a nonparty like this, you can't just raise a

16  credibility attack, like, "Oh, perhaps they were mistaken."

17  Even if you credit -- I guess, to answer your question

18  directly, your Honor, if you credit every single thing that

19  they say, it doesn't even raise a material issue that they

20  saw a fraudulent off-label prescription, or that they relied

21  on it, or that was the basis of the prescription, or that if

22  it was something other than that, they would have taken a

23  different course of action.  Those are the predicate facts

24  that they would have to get before a jury.

25           So if they were to come and we were having a trial

1    here today, what we'd have is the doctor's testimony, "No.

2    I knew about all that.  I was asked all those questions.  I

3    never relied on that."  But what we're essentially saying

4    is:  The lawyers for the plaintiffs know better, so we want

5    the jury to make a determination that in fact the doctor was

6    misguided.

7              THE COURT:  But it's more than that.  You've got

8    to be fair to their case.  So suppose you had a doctor who

9    said, "No, no, no, I prescribed it because I believed

10   anticonvulsants are good, or the doctor before prescribed

11   it, and I never, never got any details from Pfizer," and the

12   person is in psychiatry, so there's no reason why Pfizer

13   would be legitimately detailing him.

14             MR. CHEFFO:  Well, I mean, that's not accurate,

15   your Honor, but let me --

16             THE COURT:  Wait.  Wait, wait.

17             MR. CHEFFO:  I'm sorry.

18             THE COURT:  And he's never prescribed/she's never

19   prescribed Neurontin before, and suddenly it jumps, like

20   300 percent more prescriptions, 500 percent, I forget the

21   numbers but just a jacked-up number.  So you can at least

22   infer, right, that there's no prescriptions before the

23   details, a gazillion -- isn't that Mr. Lanier's word? --

24   afterwards, and then suddenly, can't you at least infer

25   causation from that?

1          MR. CHEFFO:  No, certainly not.  I don't think

2     they've cited any case that particularly when you have --

3          THE COURT:  It's common sense:  Before the detail,

4     nothing; after the detail, a lot.

5          MR. CHEFFO:  But it's speculation because they

6     don't just have to prove that there was a detail visit and a

7     doctor wrote a prescription, okay?  You know, that happens.

8     I mean, I think you said in your class cert, that's kind of

9     Madison Avenue.  In other words, someone, you know,

10    advertises for Coca-Cola, and people buy Coca-Cola.  Here

11    we've had a whole litany of time in order to prove or

12    establish a factual basis that it wasn't just that they

13    wrote it but that they were deceived.  Many of these

14    doctors --

15         THE COURT:  Okay, fine, all right, you're at least

16    conceding step one.  So you can infer that they're selling

17    more because they were marketed to.  So now the question is,

18    were they relying on any kind of suppressed -- would they

19    have done it differently if there were material disclosed

20    that should have been?

21         MR. CHEFFO:  Well, and I also think here these

22    doctors, most of them testified not only that they

23    weren't -- I mean, we have to go on the facts of the record

24    here -- that they did not rely, and they were asked these

25    questions, but they said --

1          THE COURT:  They said they didn't even remember

2     seeing them.

3          MR. CHEFFO:  Well, that's right, how could they

4     have relied?  But they still when they were deposed after

5     the fact, they said, "Even today, after all this new

6     information is out, I still think it's effective.  I still

7     prescribe it for my --"

8          You know, and this is not just them, these fans,

9     we just happened to find the nine doctors in the world who

10    still -- I mean, it's still on the formularies.  At the same

11    time that they're coming into the court and saying, "This is

12    the most egregious fraud on the market, and no one could

13    ever prescribe it, including for bipolar," the third-party

14    payors, if a doctor were to write it --

15         THE COURT:  We're just dealing with the

16    individuals right now, right?

17         MR. CHEFFO:  I mean, but the point is -- and fair

18    enough, your Honor -- the point is, these doctors, they had

19    an opportunity to raise a material issue of fact.  If the

20    system were such that you can present the evidence, talk to

21    the doctors, they unequivocally addressed all of these

22    issues, there's no contemporaneous indicia or information

23    that they weren't telling the truth, they basically have

24    said -- and, frankly, combined with the fact that other than

25    two -- two of the doctors received letters from Pfizer in

1    response to requests for information, there's no evidence in

2    the record that all of the others were ever detailed on

3    anything relating to off-label usage.

4              THE COURT:  Well, were the rest of them

5    neurologists?

6              MR. CHEFFO:  Well, they were varied.  I mean, we

7    can talk about whether that means something or not, but --

8              THE COURT:  It does, at least for purposes of

9    summary judgment.

10             MR. CHEFFO:  Well, I mean, let's talk about the

11   issue of psychiatrists, let's address that head on, and

12   bipolar.  You know, I think that you have to understand how

13   both these plaintiffs and others, they're trying to

14   basically take away all of the individual issues, and I

15   don't want to morph too much --

16             THE COURT:  Sure they are, I mean, but what would

17   have been the legitimate basis -- I'm not talking about

18   fraud now --

19             MR. CHEFFO:  Sure.

20             THE COURT:  -- what would have been the legitimate

21   basis for Pfizer to have gone in and visited a psychiatrist

22   when the only approved use is epilepsy and shingles?

23             MR. CHEFFO:  I can give you five or so reasons.

24             THE COURT:  Okay, now is the time.

25             MR. CHEFFO:  Okay.  The first is, the record shows

1    that the people who detailed Neurontin also detailed

2    psychiatric drugs, so the fact that they find themselves in

3    a psychiatrist's office is not newsworthy.

4              THE COURT:  Is that in my record?

5              MR. CHEFFO:  Yes, and it's in the briefs, and I

6    could point to you.  So there is that issue.

7              There's also -- I mean, that in itself raises

8    issues, I mean, is a legitimate issue.

9              The other reason as to why doctors would prescribe

10   it are, it was used for anticonvulsants.  I mean, in other

11   words, anticonvulsants were used for bipolar.  Psychiatrists

12   do see epileptic patients, and that's in the record as well.

13   So, in other words, they do.

14             THE COURT:  Maybe, but, I mean, that would be a

15   fact issue for a jury, I mean, is that the primary motive?

16             MR. CHEFFO:  But here's the issue, your Honor.

17   You know, those are perfectly fair questions if the

18   plaintiffs, all of them had come forward -- and this morphs

19   a little bit into the class -- if they had come forward and

20   said, you know, "We have 37 or 300 or 3,000 prescriptions.

21   We talked to the doctors.  They told us they never would

22   have written these.  It's fraudulent.  We talked to the

23   individual insureds, who we know because they're our

24   insureds, and they said they got no benefit from it," then

25   we would come forward and we would basically say, now let's

1   talk about and have all these fact issues that you're

2   raising.  But what they've done is to say, "We're not going

3   to let you talk to the doctors.  We're not going to know

4   whether they talked to them.  We're not going to let you

5   talk to the insureds."  So, in other words, you have to

6   assume --

7          THE COURT:  I thought you all did talk to the

8   doctors.

9          MR. CHEFFO:  In the individual cases.

10          THE COURT:  Right.

11          MR. CHEFFO:  But only in the individual cases.

12          THE COURT:  Right.

13          MR. CHEFFO:  Well, I was moving to the third-party

14   payors.

15          THE COURT:  Oh, all right, so we're moving to --

16   before you do that, all right, you're done, hold on.  Who

17   wants to rebut on the individuals?  Whose job is that?

18   Otherwise I'll get confused.

19          MR. HIMMELSTEIN:  That's my job, your Honor, Barry

20   Himmelstein.  First of all, your Honor may be surprised to

21   learn that your assumption that we picked these individual

22   plaintiffs because there were all these good facts is not

23   true.  When we picked them, we knew none of this.  All we

24   knew is, they took the drug, they said it didn't work.  And

25   this evidence came to us long after this complaint was

1   filed.  What you have here is a true random sample and --

2           THE COURT:  All right, all right, so I have a

3   random sample, but what do you with the -- ever since

4   Mr. Greene came to me in 19 --

5           MR. GREENE:  '96 your Honor, August.

6           THE COURT:  I've been living with this case a long

7   time -- I've said, "Show me the doctor," you know, "Where's

8   the doctor who says that he wouldn't have done it otherwise?

9   Get me a doctor."  And, you know, your doctors have all said

10  it wrongly.  They just said, "I wasn't detailed."  They

11  were.  I'm not saying they lied; they forgot.  But they

12  clearly were, and their prescriptions clearly went up

13  afterwards.  I get that.  But the legal question that I'm

14  going to have to struggle with is, not one of them said they

15  would have done something differently, or at least not in

16  this record.

17          MR. HIMMELSTEIN:  Not one of them said they would

18  have done anything differently, but the question here,

19  causation is -- the standard is substantial factor.  It's

20  not anything else.  It's not even "but for" causation under

21  both RICO and the New Jersey Consumer Fraud Act.

22          THE COURT:  Fine, not one of them said it was a

23  substantial factor.  I grant you, it's substantial factor.

24          MR. HIMMELSTEIN:  And we've presented scientific

25  evidence that they really wouldn't know.  Professor Rosenthal

1   in her first declaration, Docket No. 202 -- and this is

2   quoted in our brief -- I will quote it because it's the

3   shortest way to make the point -- she described the study,

4   quote, "which analyzed physician beliefs about the sources

5   of influence on their prescribing as well as indirect

6   evidence of the true source of physician information.

7   Physicians were asked to report their beliefs about the

8   pharmacologic effects of two classes of drugs, for the

9   scientific evidence had clearly shown little or no benefit,

10  while the manufacturers had advertised heavily to promote

11  the products as superior to the therapeutic alternatives.

12  The study showed that the majority of physicians held

13  beliefs about the two classes of drugs that were consistent

14  with the detailing message but at odds with the scientific

15  evidence, despite the fact that the same physicians reported

16  that commercial sources of information had little influence

17  on their prescribing."

18          Your honor is troubled by the fact that these

19  physicians didn't say, "Had I known the truth, I would not

20  have prescribed it."

21          THE COURT:  Well, did you ask them point-blank,

22  "Had you known that bipolar is no better than a placebo, and

23  it hasn't been approved, and it has these depressive side

24  effects, and there's now a little black box, would you have

25  done it differently?"  I've not seen one doctor who said he

Page 21

1    would have done it differently.

2            MR. HIMMELSTEIN:  First of all, none of them to

3    this day know the truth.

4            THE COURT:  Well, why didn't you ask them at the

5    depositions?

6            MR. HIMMELSTEIN:  The depositions were taken early

7    in the case before Pfizer produced the bulk of its

8    documents.

9            THE COURT:  We knew way back when that there were

10   studies that said it was no better than a placebo for

11   bipolar and some of these other things, that it was not good

12   for diabetic neuropathy, and it was no better than a placebo

13   for bipolar, and that it was really not approved for general

14   neuropathy.  We knew back in the '90s that that was the

15   case, so why didn't -- I'm just trying to -- did you ask one

16   of these doctors, "If you knew it was no better than a

17   placebo, would you still have prescribed it?"  Did you ask

18   them what they would have said?

19           MR. HIMMELSTEIN:  As far as I know, your Honor,

20   that question was not posed.  The evidence is, they don't

21   know why they did what they did.  But look at this chart,

22   please.

23           THE COURT:  I know, I've seen it.  It's dramatic.

24   That's what I told him about.

25           MR. HIMMELSTEIN:  The prescriptions drop to zero

1    when the truth becomes public.  So whatever he said is not

2    what he did.  We've got here -- your Honor said common sense

3    comes into play.

4              THE COURT:  Actually, I thought that was a

5    tremendous chart, but let me ask you this:  Is that when it

6    went generic?  Is that why people would have gone for the

7    gabapentin?  Would it track Neurontin versus gabapentin?

8              MR. HIMMELSTEIN:  This is he pre-generic.  Generic

9    didn't come on until the fourth quarter of '04.  Dr. Arness'

10   prescriptions dropped to zero around January of '04.

11             MR. CHEFFO:  I think -- sorry to interrupt, but --

12             THE COURT:  I thought it was '03.

13             MR. CHEFFO:  I'm going to check, but I think he

14   retired from the practice of medicine, so we can --

15             THE COURT:  Is that true?

16             MR. HIMMELSTEIN:  Well, I don't know that, your

17   Honor.  That's not something I've heard before, and that's

18   not something that's in the brief.

19             THE COURT:  Do you know that?

20             MR. CHEFFO:  I'm going to look.  I think that

21   that -- and I think it also correlates with the generic

22   issue, your Honor.

23             THE COURT:  Although his basic point is, though,

24   that it drops dramatically, regardless of whether it goes to

25   zero.  While he's still practicing, obviously, it's

1   dropping.

2            MR. HIMMELSTEIN:  Yes, steadily, maybe because

3   he's finding it ineffective, maybe because he heard the

4   truth, but the question is not -- I mean, the question is,

5   was he influenced to make these prescriptions by the

6   fraudulent marketing?  Your Honor has found in the class

7   cert opinion that the assumption that all marketing to

8   non-neurologists was fraudulent has merit.  That's almost a

9   direct quote.  So the marketing was fraudulent.  He's

10   detailed sixteen times over fifteen months.  At the

11   beginning he's got virtually zero prescriptions.

12            THE COURT:  What is he?  Is he a psychiatrist?

13            MR. HIMMELSTEIN:  Yes.

14            THE COURT:  He's a psychiatrist.  And when does

15   the "no better than a placebo" study come out?

16            MR. HIMMELSTEIN:  There are a series of those, and

17   I have a chart.

18            THE COURT:  Have you ever tracked that to see if

19   that --

20            MR. HIMMELSTEIN:  I have a chart for that here.

21            THE COURT:  Where is that?  Do I have charts

22   somewhere?

23            MR. HIMMELSTEIN:  This is something we prepared as

24   a demonstrative for the hearing.  We will file copies of

25   these charts that we present promptly after the hearing.  We

Page 24

1    have here a time line of the prescriptions to our two

2    consumer class reps, the fraud, and the letters that were

3    sent to them which fail to disclose the negative studies.

4    We have --

5              THE COURT:  So which one was the "no better than a

6    placebo" study, Pande?

7              MR. HIMMELSTEIN:  Pande was, yes.  They were all

8    no better than placebo.  Pande, Frye, Guille all

9    concluded --

10             THE COURT:  And when do those go public?  Do we

11   know?

12             MR. GREENE:  They never really went public.  They

13   never went public like the fraudulent message went public.

14   Pande was known first --

15             THE COURT:  I know, but when were they published

16   in the peer-reviewed literature?

17             MR. GREENE:  Pande was known -- he wrote a letter

18   to his investigators in July of 1998 that it was negative.

19   They always knew it was ineffective.  They were never able

20   to prove it was effective.  The four studies just confirmed

21   what they knew, that it was ineffective.

22             THE COURT:  You're not catching my drift.  When

23   did it get out into the marketplace in terms of it was

24   published in a peer-reviewed journal or someplace that was

25   public in the medical word?

1          MR. GREENE:  Pande was finally published in a

2     journal of low circulation in the -- I think it was August

3     or the fall of 2002, August or September of 2002.

4          THE COURT:  So the stuff didn't start coming out

5     till 2002?

6          MR. GREENE:  That was the first one, yes.

7          MR. HIMMELSTEIN:  But meanwhile, your Honor, these

8     physicians requested and received after these details the

9     best current evidence that Pfizer had, and they provided

10    them with these medical information letters which make no

11    mention of these studies.  Instead, this medical information

12    letter has 14 citations to case studies, uncontrolled

13    trials, open-label series, and ignores three preexisting

14    negative trials, actually two before the Wityk prescription

15    you have here.  The Pande study, the Frye study were both

16    complete, and they had the results before this letter was

17    sent to Dr. Ragothaman in February of '99.  They sent her

18    the same letter again in September of '99 talking about all

19    of these positive case reports, making no mention of any one

20    of these studies and their negative results.  For

21    Dr. Arness, also in September, '99, after all three studies

22    were done, he got the same letter touting all these case

23    reports; no mention of these negative studies.  So these

24    doctors were directly given material -- they requested

25    information --

1    THE COURT:  Did all of the doctors -- is it true

2  that only two of them got this information?

3    MR. HIMMELSTEIN:  Well, we have only two

4  psychiatrists that are prescribing physicians for the

5  consumer bipolar reps.  I mean, we have two consumer bipolar

6  reps, and they got these letters.  The other doctors

7  prescribed for other conditions would have gotten other

8  letters, if they got any at all.  So we have the most direct

9  evidence you can imagine.

10    And for Ms. Wityk, I couldn't sit down and write

11  in my wildest dreams a more persuasive case for causation.

12  Dr. Ragothaman never in her life wrote a single Neurontin

13  prescription for anything until she was detailed at this

14  point and got and received this misleading letter.  She then

15  writes her very first Neurontin prescription ever to

16  Miss Wityk, the consumer bipolar class representative.  I

17  could sit there for a month trying to come up with a better

18  proof of causation.  I don't think I could do it.  I mean,

19  after that, does it really matter what doctor Ragothaman

20  says about what she would have done differently?  Don't we

21  have a material dispute of fact?

22    We are not, as Mr. Cheffo argues, trying to create

23  a dispute merely out of challenging their credibility.  This

24  is circumstantial evidence which your Honor, you know, says

25  it's just plain common sense.  And where your Honor saw

49263693-d686-464d-b9a5-32b96ae37575

1   similar trends in the macroaggregate --

2           THE COURT:  All right, so you've effectively

3   established that the marketing worked, the off-label

4   marketing worked.  And if you believe it was suffused with

5   fraud, you could even argue that the fraud was a substantial

6   factor.  But when the doctor himself says -- and this is

7   where I'm pushing you -- "I was not relying on anything he

8   said, I was relying on other experiences or what another

9   doctor did or what my own beliefs were about

10  anticonvulsants," is that enough to go to a jury?

11          MR. HIMMELSTEIN:  Your Honor, Mr. Cheffo argues

12  correctly:  If all we had was a credibility challenge, we

13  wouldn't have enough.  This is circumstantial evidence of

14  causation.  You have the direct testimony of the doctor

15  which goes in the other direction.  You have a scientific

16  study which proves to a value of P less than .05 that

17  doctors don't really know and can't differentiate whether

18  they're basing their prescription decisions on misleading

19  information provided by the pharmaceutical company for

20  off-label uses or legitimate scientific information.  For

21  whatever reason, they're unable to distinguish, and these

22  doctors never heard the truth.  They came to these

23  depositions thinking, I suppose, whatever --

24          THE COURT:  To answer my question, no one asked

25  them point blank that question based on what you know today?

1  Did you?

2         MS. NUSSBAUM:  Yes, your Honor.  In fact, there

3  are at least four affidavits in the record with respect to

4  Kaiser.  And I raise it now because I think that these

5  Kaiser physicians are really no different than the general

6  physicians, so I think it's somewhat germane to the inquiry

7  that you are asking.  And they're in the notebook that you

8  have, two of them, Slides 31 and 32.  These are well-educated

9  physicians, one of them the head of Kaiser's P&T Southern

10 California Committee, the other the Northern California

11 Committee.  So between the two of them, there are over

12 six million insureds in 1994, and what do they say?  They

13 say, "Had I known at the time that Neurontin was no more

14 effective and did not have a better safety profile than

15 existing less expensive treatments," then they go on, for

16 neuropathic pain, for bipolar, for each time that they did

17 an extension, that they would not have recommended that it

18 be included on the formulary, except as limited to its

19 FDA-approved indications.

20        So I think that from a Ph.D. in pharmacy, Mirta

21 Millares, also from the head of the P&T Committee,

22 Dr. Daniel, the head of the other California P&T Committee,

23 Dr. Weider, these are doctors in different specialties, and

24 this is what they all said.

25        THE COURT:  All right, thank you.  I think I've

1    got the lay of the land here on the individuals because I

2    think if we're going to finish today -- let me just ask you,

3    is there anyone here who has to be home at a certain time or

4    on a flight for the new year?  What time is your flight?

5            MS. NUSSBAUM:  We can do whatever flight.

6    Clearly, your Honor, we would like to, if possible, make a

7    5:30 flight, but if that's not possible --

8            THE COURT:  You will, so you'll be out of here at

9    4:30.  You're two minutes away, okay?

10           MS. NUSSBAUM:  Thank you.

11           THE COURT:  And if I can, even 4:15, all right?

12           MS. NUSSBAUM:  Thank you.

13           THE COURT:  Okay, go for it.  Do you want to

14   reply, or do you want to jump into TPP land?

15           MR. CHEFFO:  Thirty seconds just to reply?  I

16   mean, I just jotted down a few points.  I mean, we heard

17   that you couldn't have possibly written a more persuasive

18   case for causation ever.  Well, I could have.  You actually

19   could have the doctor who said, "Yeah, I prescribed this."

20           The other thing is, what we're asking the Court to

21   believe is that experts should be able to use reports about

22   what doctors believe when we talk to the doctors.  And the

23   final thing is, you know, even to the extent that we were to

24   entertain this, again, only two of the doctors,

25   Dr. Ragothaman and Dr. Arness, even received these letters.

1  Whether they got them, relied on them is total speculation.

2  And I would say, they were deposed, and they basically,

3  Dr. Arness testified, even in 2003 and 2004, well after this

4  publication, that they thought it was effective for bipolar,

5  they continued to prescribe it, and they --

6          THE COURT:  Well, did you show them those studies

7  and say, "If you knew that these three studies said it was

8  no better than a placebo, would you still use it?"

9          MR. CHEFFO:  The specific question, your Honor, I

10  can't stand here and represent that, but, I mean, frankly

11  their whole case was about the fact that there was fraud and

12  deception, and that's what they tried to elicit:  "Well,

13  wouldn't you have done something different?  Didn't you know

14  this?"  And the doctors steadfastly said, "No, we wouldn't."

15  I mean, that's what the whole deposition was about from the

16  plaintiffs' perspective.  They were trying to undercut --

17          THE COURT:  Did plaintiffs say that "If you saw

18  these studies and you heard that there was at least some

19  scientific suspicion as to its effectiveness, would you have

20  still used it?"

21          MR. CHEFFO:  You know, your Honor, I can't say

22  specifically.  I think answer to that is "yes" as a

23  good-faith matter.  In other words, they basically did ask,

24  "Well, could you have seen this, and weren't you influenced

25  by this, and did you know that?"  And they basically said at

Page 31

1    that time -- and, again, the issue is --

2            THE COURT:  At that time?

3            MR. CHEFFO:  At that time they would have -- they

4    thought it was effective, and they continued to prescribe it

5    and use it.  So that just goes to two issues.  There's no

6    evidence that they relied on anything untoward from Pfizer.

7    If they just continued -- even if there was no efficacy and

8    doctors continued to prescribe these medicines, you couldn't

9    hold Pfizer responsible for that.  And with respect to all

10   of the other folks, there's not even that sliver of

11   evidence.

12           Now, with respect to the third-party payors --

13           MR. HIMMELSTEIN:  Your Honor, may I respond on

14   other consumer points before we move to third-party payors?

15           THE COURT:  You know, the third-party payors is in

16   some ways the most complicated, so I think we need to jump

17   on it.  If you have one minute you want to say, you can.

18           MR. HIMMELSTEIN:  Well, I will quickly.  There are

19   a couple of points Mr. Cheffo said that are simply

20   incorrect.  He said that the psych reps could be there

21   detailing something else.  No, the records we got were the

22   records of Neurontin details.  They do not include details

23   of other drugs.  They were specified to be Neurontin

24   details.

25           Second, he makes the point that antiepileptic

Page 32

1    drugs are used as mood stabilizers, and therefore

2    psychiatrists might prescribe them even without the

3    detailing.  To quote from their own surreply in opposition

4    to our motion for reconsideration:  "Neurontin's mechanism

5    of action is different from other antiepileptic devices."

6            Dr. Pande, which is their director of clinical

7    research, has explained that Neurontin has a different

8    mechanism of action than mood stabilizing antiepileptics.

9    It's not in that class of drugs, so there's no reason that

10   anyone who knows what they're doing would think just on

11   their own to prescribe it for depression, and we have more

12   evidence on this in the record in the briefs.

13           THE COURT:  Thank you.  All right, third-party

14   payors.

15           MR. CHEFFO:  I'm going to move to the third-party

16   payors.  Again, we can get into the level of detail on the

17   specific facts, but I'm going to start a little bit higher,

18   your Honor, because I think it is consistent with virtually

19   every single case that deal with third-party payors that has

20   been decided in the last two years.  I mean, every single

21   case continues to get stronger and stronger.  And it deals

22   with the issue of causation.  Your Honor asked, you know,

23   "Where are the doctors?"  And if I can digress for a second

24   on pop culture, you know, we have "Where's the beef?"  I

25   mean, we don't have any beef; we don't even have tofu at

1    this point.  We've been going through the entire discovery

2    process, and we don't have a single prescription that was

3    written for an off-label purpose by a doctor to a

4    participant, not one.  It's even questionable at this point

5    how we'd even get past Article III standing.  But what they

6    did, and you warned them, your Honor, you said --

7              THE COURT:  There is standing.

8              MR. CHEFFO:  I'm sorry?

9              THE COURT:  There is standing.

10             MR. CHEFFO:  Well, if there's no injury and if

11   there's no -- but I don't want to argue that, your honor.

12   What I do want to argue is that your Honor made it very

13   clear, and I think put counsel on notice some time ago, and

14   you said, "If you're going to use an aggregate-type model

15   and you're going to promise me that it can do X, Y, and Z

16   and prove aggregate causation, if you come back at the end

17   of the day and that model doesn't do what you think it does

18   or it should do, or I think it should do as the Court, then

19   you may not be able to prove your case."  And that's exactly

20   where we are here today.  I mean, you're going to see tons

21   and tons of documents and charts and exhibits and

22   affidavits, but what you're not going to see ever in this

23   entire record is one doctor in the entire record who says,

24   "I received an off-label message, and I prescribed Neurontin

25   I otherwise wouldn't have as a result of fraudulent

1   purposes."

2          THE COURT:  You know what's compelling?  That's

3   why I found actually reading the statement of facts more

4   helpful in some ways than the briefs.  Didn't Kaiser or one

5   of the third-party payors, once they realized that it wasn't

6   effective for certain of these off-label indications, sent

7   out monographs, and the use dropped 30 percent?  Was that

8   you?

9          MS. NUSSBAUM:  Yes, your Honor.  We have two very

10  dramatic charts that I can show you on that issue, but that

11  is exactly correct.  And to answer Mr. Cheffo, there is an

12  affidavit and there was a deposition taken by your

13  predecessor of a Kaiser physician, Dr. Bruce McCarberg, who

14  at one point had actually been a paid speaker, a member of

15  the Pfizer Speaker Bureau, and he testified that the

16  information that he got as to off-label use was directly

17  from Pfizer representatives; that when he went to pain

18  meetings, and that was where he got his information upon

19  which he prescribed Neurontin, he was unaware that the

20  meetings were funded by the pharmaceutical companies --

21         THE COURT:  You know what, I think we'll jump to

22  you in a minute.  I want to give him his time.  But I've

23  always left room for an aggregate model, understanding how

24  difficult it is -- when you market, as Pfizer has, in an

25  aggregate way, and if there were a finding that there were a

1   fraud in suppressing the "no better than a placebo" studies,

2   I think it wouldn't be too hard to prove injury.  Now, it

3   may be hard to quantify it, but why wouldn't it be

4   reasonable for a jury to infer that at least some of the

5   prescriptions, that something as big as Kaiser or Aetna or

6   Guardian, were caused by not revealing the truth about these

7   drugs?

8          MR. CHEFFO:  Well, your Honor, I mean, with all

9   due respect, I mean, I think that's what the discovery

10  process is supposed to do.  I mean, you know, where is that

11  evidence?  I mean, if you're saying, infer that there's a

12  document out here and someone made a prescription, I don't

13  think that's the kind of trial that the Court would

14  entertain.  I mean, if --

15         THE COURT:  Hear me out.  They have six million --

16  I don't know how many people -- millions and millions of

17  patients, right?  Pfizer clearly violated the law in

18  engaging in off-label marketing.  I mean, there's a criminal

19  conviction for that.  Two, Meredith Rosenthal proves that it

20  was effective, that actually the off-label marketing

21  resulted in about 95 percent of the sales being off-label.

22  There's evidence -- it's hotly disputed and on which I don't

23  rule -- that there were definitive studies proving

24  ineffectiveness, and they've got doctors saying it was

25  ineffective, and there were studies showing ineffective.

1    You say, no, that's not true.  Let me just go with, at least
2    from their point of view on a motion for summary judgment, a
3    fraudulent marketing campaign.  Why can't I reasonably infer
4    that on an aggregate basis, that at least one prescription
5    was due to the fraudulent marketing?  And then it's just a
6    question of how you quantify it.

7                    MR. CHEFFO:  Because it's the same analysis that
8    you went through cogently in your class certification.  The
9    Rosenthal model, as you know, assumed that every single
10   interaction was fraudulent, and they said, assume every time
11   you went there it was fraudulent off-label marketing for any
12   purpose.  So, you know, as of today, if we were to have a
13   trial, if they have a lot of folks or they have very few
14   folks, we don't know which doctor got a prescription, why
15   they wrote it, why the patient -- I mean, there's no
16   information on that level.  If you had a model and it
17   worked, it would be able to tell you that there was a
18   certain level of causation as to the "why."  I mean, that's
19   the same analysis that your Honor went through with respect
20   to class certification.  That model doesn't begin to tell
21   you why any prescription was written.  And if we had a class
22   basis of nationwide folks, which your Honor denied, or
23   whether we had six million people in one fund, it's
24   essentially the same thing:  It's a mini class analysis.

25                    THE COURT:  Could it be reasonable to infer that

Page 37

1    no one was affected by it?

2            MR. CHEFFO:  Well, but that's not the question

3    because --

4            THE COURT:  It is.

5            MR. CHEFFO:  But they're saying you should infer

6    everyone was.

7            THE COURT:  No, no, answer my question.  Can't you

8    reasonably infer that at least one was?

9            MR. CHEFFO:  No, I don't think on this record you

10   can because every single person -- we have nine people who

11   were deposed, and we talked to their doctors.  You know what

12   they said?  "I wasn't."  We have their own experts who write

13   it for off-label purposes.  We have these, the same folks

14   who say that no one would ever write this, it's still on

15   their formulary today.  The United States government under

16   the DrugDex --

17           THE COURT:  Can I back up on the point?

18           MR. CHEFFO:  Yes, sure.

19           THE COURT:  One of the things that I learned, just

20   basic -- I learned a lot at this time around that I actually

21   did not fully understand last time -- is that there was a

22   hundred percent access to Neurontin because people were

23   worried about epilepsy, and everyone approved it.  I think

24   it was 1.6 percent of the third-party payors would not allow

25   Neurontin on the formulary.  Everyone did.  So unless you

49263693-d686-464d-b9a5-32b96ae37575

1    were particularly vigilant like Kaiser, and they had all

2    these little restrictions, for the most part, it fell under

3    the radar screen.  Basically Guardian, I'm told, just

4    allowed every drug that was written off-label to be

5    reimbursed.  Some 30 percent -- that was in Dr. Bell's

6    declaration -- 30 percent say "no off-label," but they never

7    check.  There are only a few of these companies that

8    actually made an effort to restrict, right?

9              MR. CHEFFO:  Well, I think that makes the point,

10   and that's where there's a difference between the class

11   plaintiffs and the third parties because by saying we would

12   have done something different I think is incon- --

13             THE COURT:  No, but the point is, I think that

14   what I had assumed in the class certification motion is that

15   many, many of these places were like Kaiser, and that a lot

16   of the restrictions were put in place for off-label, and it

17   turns out that's not true for the vast majority.

18             MR. CHEFFO:  Well, I'm not sure that --

19             THE COURT:  So marketing directly to the doctors

20   is quite effective because you'd never actually pick it up.

21   The formulary committee would never understand it.

22             MR. CHEFFO:  I don't think that that's accurate.

23   I think the record does show that there's very significant

24   amongst the funds different characteristics.  And the point

25   is, they have an opportunity to change.  You know, we all

1    have insurance companies.  They can change anytime they

2    want.  And the fact to say that they would have changed

3    then, when these funds still haven't changed it now, is

4    absolutely inconsistent with their position.

5              So, I mean, I think we have to take it back to the

6    level of, what they're alleging that Pfizer did was to

7    somehow encourage a doctor to prescribe for an off-label

8    prescription based on fraudulent off-label marketing.  They

9    have to raise a material issue of fact as to that; and what

10   I'm suggesting, your Honor, is, on this record right now,

11   maybe if they'd done all the things that you're talking

12   about and found those doctors -- I mean, they have a lot of

13   relationships with doctors -- they would have come forward,

14   and they would have put those folks together.  But now

15   summary judgment is upon us.  The discovery phase has ended.

16   There's nothing in the record that shows us one single

17   prescription that they paid for that they claim is of

18   relative fraudulent off-label marketing, and they can't

19   overcome that.

20             And if it was so pervasive and everyone was doing

21   it and it was such a hardship, well, shouldn't there be

22   reams of boxes in front of your Honor as to showing all

23   these millions of off-label, ineffective, inappropriate

24   prescriptions?  But what happens is, when you talk to the

25   nine doctors, they say, "Of course not.  There's lots of

1   reasons why we do it.  We still do it now."  They still

2   prescribe for it.  Medicaid still, it's listed on this

3   year's -- as of now, if you were a Medicaid patient and you

4   were to look for bipolar and all of the others, it would say

5   that it is -- I'm trying to find the exact language --

6   "Evidence favors efficacy."  That's what it says in the

7   DrugDex listing, "Evidence favors efficacy" as of 2009.  So

8   you're a Medicaid patient.  You go in to your doctor.  He or

9   she writes a prescription.  The federal government pays for

10  it.  But yet they would have the Court believe that --

11          THE COURT:  Some of them aren't anymore, right?

12          MR. CHEFFO:  Well, we can talk specifics.  I think

13  that --

14          THE COURT:  That's why I'm saying, you need to get

15  into the specifics.

16          MR. CHEFFO:  Yes, I mean, I think what I can say,

17  and I'll give you the specifics, what I can say -- well,

18  I'll tell you right now, your Honor.  I have it in front of

19  me, I think.

20          THE COURT:  That's why I say, it's got to go

21  individual company by individual company.

22          MR. CHEFFO:  Yes, and I apologize.  I have too

23  much paper.  Okay, with respect to bipolar, "Kaiser's

24  current guidelines recognize that Neurontin may be effective

25  in treating resistant cases."  With respect to -- and

1   also --

2           THE COURT:  Does it need pre-approval?

3           MR. CHEFFO:  I'm not certain of that, your Honor.

4   I think that particularly some of the formularies, they

5   continue to have a more open formulary.

6           THE COURT:  But it seems there are three different

7   philosophies, right?  One is, "We'll pay for anything,"

8   Guardian.  "We want to serve our customers, so we're going

9   to pay for everything."  And so they're saying that they

10  were defrauded, as I'm understanding it, because they ended

11  up, they didn't have any screening.  There were no

12  misrepresentations to them, but instead it fell beneath the

13  radar screen, and the fraud on the doctors ended up costing

14  them money because they wouldn't have paid for it, as I

15  understand it.

16          Kaiser took a much more proactive role once they

17  started putting restrictions on, right?  And then there's

18  another one that said, "We didn't cover off-label at all,"

19  but they did nothing to police it.  I mean, those are the

20  three big bins I'm putting them in.

21          MR. CHEFFO:  I think that's fair.  And Kaiser is

22  the one that said, "We're going to be proactive," and,

23  according to the record, they recognize that Neurontin may

24  be effective.  And what they said, even when they talked

25  about their formulary, I think in the declaration of their

Page 42

1   30(b)(6) or the testimony, she said, "Even though we

2   encourage people to use a formulary, we will pay for

3   off-label prescriptions nonetheless."

4              THE COURT:  Well, of course.  They all do.  Some

5   of them have to by state law.  That's what Mr. Greene and I

6   found the first time around.  They all pay for off-label

7   when they're prescribed by a doctor for the good reasons.

8   So the question is, I mean, it was a below-the-radar-screen

9   marketing campaign by Pfizer because you couldn't get

10  caught.

11             MR. CHEFFO:  But as of the time of this

12  deposition, which is well after they filed the lawsuit, it

13  was still --

14             THE COURT:  Well, I'm going to ask him about that

15  because that was a good point in your quiver.

16             MR. CHEFFO:  We'll talk about, "Kaiser's current

17  guidelines recognize that AEDs such as Neurontin is

18  sometimes needed for migraine."

19             "In 2006, Aetna advised its insureds' physicians

20  that it identified Neurontin as a second-line treatment for

21  migraines."

22             "Plaintiffs' headache expert concedes that there's

23  a meta-analysis that shows some efficacy."

24             Again, all of these are also on the DrugDex.

25  They're listed as showing efficacy for the federal

49263693-d-686-464d-b9a5-32b96ae37575

Page 43

1    government.

2              "Neuropathic pain, Kaiser's current guidelines

3    recognize --"

4              THE COURT:  DrugDex I don't think is a federal

5    government publication.

6              MR. CHEFFO:  It's not, your Honor, but --

7              THE COURT:  It's not.  They pick up, because I've

8    had these cases before, it picks up whether there's a study

9    out there that will support it.

10             MR. CHEFFO:  Well, yes, and I think the way it

11   works is that Medicaid says if it's listed on one of these.

12   But it doesn't have to just be listed.  I think you wrote a

13   decision on this or a comment.

14             THE COURT:  I did.

15             MR. CHEFFO:  And that's why I was careful to say

16   it's not just listed.  When you actually look, there's a

17   distinction.  And someone will say "no support," and then it

18   will say "evidence supports efficacy."  And I went back and

19   looked at the relevant off-labels, and each of them have

20   that "supports efficacy."  And they have studies underneath

21   them, so it's not just a willy-nilly listing.  You know,

22   it's an indicia that they've done their research.

23             THE COURT:  But it's not a separate blessing.

24   They're just saying there's a study that supports the

25   efficacy.

1          MR. CHEFFO:  Exactly, and what I'm saying is, the

2    federal government relies on that in reimbursing.

3          THE COURT:  I understand.  Okay, I've got the gist

4    of what you're saying.  I want you to jump up.  So --

5          MR. HIMMELSTEIN:  Thank you, your Honor.

6          THE COURT:  No, not you.  I want to hear from some

7    of the third parties right now because he's focusing.

8    You're --

9          MR. LAWRENCE:  Your Honor, I'd like to start with

10   just two or three general observations.

11         THE COURT:  You're Guardian?

12         MR. SOBOL:  Aetna.

13         THE COURT:  Aetna.  All right, I just wanted to

14   know who you were.  You're from Aetna.

15         MR. LAWRENCE:  Oh, I'm sorry, your Honor.  Gerald

16   Lawrence from Aetna.

17         THE COURT:  All right.

18         MR. LAWRENCE:  Your honor is right, you've figured

19   this out that not only is this blatantly illegal conduct,

20   but that this is a three-part scheme.  And there's really

21   three frauds going on here.  The first fraud is:  Get the

22   drug on everyone's formulary.  Get open access for our drug.

23   The second fraud is --

24         THE COURT:  Wait.  That wasn't a fraud.  That was

25   because it was approved for epilepsy.

1          MR. LAWRENCE:  But that is part of the scheme,

2     your Honor.  That is one of the three steps of the scheme,

3     because they knew when they were getting it on open access,

4     they knew, and we could show you in 1995 they already had

5     documents that showed their intention to go out and to

6     market this for the other uses.

7          The second part was:  Once they were on, stay

8     below the radar screen.  You zeroed right in on that.  And

9     then the third part was to go out and do these promotions to

10    build their market share with the off-labels.

11         THE COURT:  This is a question for Aetna, which

12    is, they cited from something that said you're still

13    approving it.

14         MR. LAWRENCE:  That's the next point I wanted to

15    get to, your Honor.  So fundamental to this is an

16    understanding of, what does managed care do?  Managed care

17    delivers effective care, clinically effective care,

18    cost-effective care.  In 2004 this drug went generic.  But

19    once it goes generic, it's not cost-effective for us to

20    restrict it, to put in all these jumps through the hoops, to

21    fight it, because once it goes generic --

22         THE COURT:  Why do you have a monograph saying

23    it's effective for some of these uses?

24         MR. LAWRENCE:  Your Honor, I think what it says

25    with respect to Aetna is that as an adjunct therapy, on a

1  second-line treatment, on a tier three of our formulary

2  where it's very unlikely it's going to be used because when

3  it's on tier three of the formulary --

4          THE COURT:  What does that mean?

5          MR. LAWRENCE:  Here's how a formulary works

6  generally speaking.

7          THE COURT:  Okay.

8          MR. LAWRENCE:  Tier one, generic, low co-pay to

9  the consumer.  Tier two is a brand that's a preferred drug

10  where there's a higher co-pay.  Tier three, brand

11  unpreferred, highest co-pay.  It creates, hopefully, in

12  theory, an economic disincentive for somebody in the plan to

13  go take that drug.  You want to have as many drugs, and

14  you're right, you want to have as many drugs, perhaps all

15  drugs, on your formulary.  Really, the only drug that you

16  typically see banned from a formulary is a drug that's

17  dangerous, that's going to kill somebody, that's going to

18  hurt somebody.  If something is out on tier three, that's

19  the plan saying:  You know what, we're minimizing our plan's

20  cost for this drug because we're putting in a very high

21  co-pay, disincentive for people to get it.  And we, the

22  plan, have to pay substantially a smaller portion of the

23  cost than we would if it was a lower co-pay.

24          THE COURT:  When did it go to tier three?

25          MR. LAWRENCE:  Beginning in January, 2004, Aetna

1   put this drug -- began with quantity restrictions and tier

2   three formulary status.

3           Now, the defendants said, these plans can change

4   the terms of the plans whenever they want.  Well, they

5   really can't because you have to do it within the terms of

6   the plan.  You know, for instance, I defended Aetna when we

7   got sued because we took Viagra off our formulary in the

8   middle of a plan year.  You have to wait till the plan year

9   starts.

10          So what Aetna did was, in the third quarter and

11  the fourth quarter of 2003 -- and the evidence shows this --

12  they noticed that there was an excessive use of this drug.

13  They reviewed the drug class, and they took action effective

14  1/1/04 to put in limitations to control the usage of the

15  drug.  They put in the quantity limit.  They put in step

16  therapy.  They put it on the third tier of the formulary.

17  That has the effect of dramatically dropping what their cost

18  is going to be for this drug.

19          At the same time -- and it actually works out well

20  for this defense.  You know, this defense is like the bank

21  robber who says, "I robbed the bank because there weren't

22  enough guards and the vault wasn't thick enough."  But it

23  works out great for this defense:  "Hey, you're not doing

24  anything about it now."  Well, the plans aren't doing

25  anything about it now because after it goes generic, there's

1    no economic incentive to do anything about it.  The damages

2    in this case took place between 1994 and 2004.  Once the --

3              THE COURT:  How do you respond to their argument,

4    which is something I've worried about since 1996, that

5    essentially you don't get treating physicians saying, "I

6    wouldn't have prescribed it if I had known"?

7              MR. LAWRENCE:  Well, I think there's a couple of

8    responses to that, your Honor.  First -- and I think, you

9    know, your Honor had a great line earlier about the sort of

10   the law of common sense.  It's absolutely common sense that

11   a doctor is not going to walk into a courtroom and say, "I

12   was hoodwinked.  I was fooled.  I relied on what the

13   marketing rep came to my office and told me," rather than,

14   "I went and I spent years conducting my own clinical trial.

15   I went to the library and I did research.  I read every

16   medical journal ever published to find out about this drug."

17             The second point is, doctors are busy.  They're

18   detailed every day.  I don't think these physicians made

19   misrepresentations when they testified.  I think they're

20   being asked about something that happened five or six years

21   ago.  They don't remember what they were detailed on.  They

22   don't remember why they made these decisions.  They think,

23   "I'm a doctor.  I learned this somewhere.  I was educated on

24   this.  I made these."

25             But more importantly -- and I think that

49263693-d686-464d-b9a5-32b96ae37575

1   Ms. Nussbaum can really address this for you, not only with

2   the evidence that your Honor cited before but with other

3   evidence -- the facts show that there's two physicians at

4   Kaiser that said, "You know what, when I learned the facts,

5   I stopped doing it."  And, secondly, there's the data that

6   she can show you that says, "When we told our physicians,

7   'Here's the real facts,' dramatic decrease."  And, you know,

8   the data that the experts in this case have shown that

9   correlate that.

10          And you're right, there's not somebody who's in

11  here saying, "I was hoodwinked, I made this prescription, I

12  shouldn't have done it, I wouldn't have done it," but

13  there's two that said it by affidavit.  And, you know, it's

14  sort of unfair for the defendants to say when we --

15          THE COURT:  So just so I can understand basics, as

16  far as Aetna is saying, there were no direct

17  misrepresentations to you, Aetna, to your P&T Committee, to

18  your Formulary Committee.  What you're alleging is that sort

19  of the marketing fraud affected your plan in the aggregate,

20  not that there was specific misrepresentations made to you?

21  Is that right?

22          MR. LAWRENCE:  In a general sense, that's right,

23  your Honor.  But you also have to remember that to the

24  extent that they had labeling information that they put out

25  that didn't disclose these adverse effects, to the extent

1   that they put information generally into the marketplace

2   that omitted some of these facts, we rely on --

3            THE COURT:  Well, that's a tough issue.  It's

4   almost impossible to do one on one.  The question is whether

5   you can do it in the aggregate, so --

6            MR. LAWRENCE:  That's correct, your Honor, we do

7   not have evidence that somebody walked into Aetna and said,

8   "This is safe for bipolar," and put it on their formulary

9   for bipolar.  That did not happen.

10            THE COURT:  So when you approved it way back when,

11   it was in 1994 or so for epilepsy, and then it was allowed

12   for shingles; but you didn't at that point have any

13   misrepresentations made to you about any of the off-label

14   uses?

15            MR. LAWRENCE:  That's right, your Honor.  And it

16   was on our formulary as an AED in the epilepsy section.  It

17   wasn't on our formulary for treatment for bipolar.

18            THE COURT:  I just want to understand this.  And

19   was there any way in which you could have screened for when

20   a psychiatrist prescribed it?

21            MR. LAWRENCE:  No, your Honor.  We've had

22   affidavits on that.  That came up earlier in the discovery

23   sections of this case, and we had testimony that it is

24   impossible at that time for this to happen.  And, you know,

25   just think about it, your Honor.  If I was to go to my

1   doctor, Dr. Flanigan writes me a prescription for Neurontin,

2   I travel two minutes up the street to CVS.  I hand them that

3   prescription.  It's electronically adjudicated, which is the

4   fancy way to say the computers at CVS go through a whole

5   series; they talk to Aetna's computers.  It comes back to

6   CVS within four seconds and says pay that claim or don't pay

7   that claim.  I get my Neurontin, and I walk out the door.

8        THE COURT:  So that makes you different from

9   Kaiser because they did limit it to neurologists.

10       MR. LAWRENCE:  Well, and you're right, your Honor,

11   Kaiser because of their structure is a little different.

12       THE COURT:  So they could do it and you couldn't

13   is what you're saying to me?

14       MR. LAWRENCE:  Well, I don't know that they could

15   have done it that effectively.  They could instruct their

16   doctors what to do it perhaps.  And Ms. Nussbaum is really

17   the expert.  I don't want to put words in her mouth.

18       THE COURT:  But, in any event, you couldn't?

19       MR. LAWRENCE:  We couldn't.

20       THE COURT:  Okay, I get --

21       MR. LAWRENCE:  We have a network of physicians

22   that are out there.  We don't tell them how to practice

23   medicine.  We just pay the claims.

24       THE COURT:  All right, thank you.  So I think I've

25   got Aetna.  Do you want anything else on Aetna, or do you

1    want to jump into Kaiser?

2            MR. CHEFFO:  The only thing I would say is, I

3    mean, I don't think there's anything in the record to show

4    that they couldn't.  I mean, this is a matter of, that's the

5    way their plan was set up as a business model.  I've been

6    involved in cases.  I mean, just to, I think, dispel a few

7    misnomers, it's not impossible to do this.  We've had cases

8    where we've actually had discovery motions, and the

9    magistrates have said, "You need to come forward and show on

10   an individual basis."  And they have access in their

11   agreements with these people.  They can talk to the doctors,

12   they can get medical records, and they can try and prove

13   individually.  That's what they do in subrogation cases.  In

14   other words, you know, a fire happens --

15           THE COURT:  I think he was referring more to at

16   the point of sale, not going backwards.

17           MR. LAWRENCE:  That's it, your Honor, is there's a

18   business here.  How can Aetna run a business --

19           THE COURT:  You know what, it's his turn.  We'll

20   never get out of here, never.

21           MR. CHEFFO:  I've made my point on that, your

22   Honor.

23           You hit the nail on the head.  I think we can kind

24   of cut to the chase on some of this, and they'll correct me

25   if I'm wrong.  My understanding is, five of the six funds

1   were similarly situated in that regard to Aetna.  In other

2   words, there's no evidence of, you know, direct

3   misrepresentations or information.  It's essentially this

4   fraud on the market:  Other people did it, so we did it.  I

5   think Aetna has tried to -- and, you know, your Honor did

6   address this kind of less-onerous standard of not specific,

7   and Kaiser has tried to meet that standard.  In other words,

8   they said, "We did something different.  In other words, we

9   did receive some information."  Now, we dispute that, but

10  they're the only ones who said, "We did something different

11  and received some information from Pfizer that would have

12  affected our formulary."  And I think, you know, our answer

13  to that, your Honor, from a dispositive legal perspective

14  is, in their own affidavit, what they said is, we had a

15  formulary -- am I going too fast?  I'm sorry.

16          (Discussion off the record.)

17          MR. CHEFFO:  In their formularies, they put

18  certain medicines on a formulary.  But what they also said

19  is that "If you're not on formulary, we're going to pay

20  that."  So you'll recall your Honor articulated what I'll

21  call this less onerous where they had to show that there was

22  some reason why they were put on the formulary.  The third

23  prong was that they would have had to show that there was

24  some economic harm.

25          THE COURT:  But, you see, I had a fundamentally

1    incorrect assumption at the time I wrote that, which is, I
2    thought that the formulary status was at the time that all
3    the off-label marketing was happening.  I think, at least
4    the way this came out -- tell me if I'm wrong -- is what
5    makes sense, you got approved for epilepsy, which was a
6    perfectly valid indication.  Epilepsy, every doctor in the
7    world is worried about it.  Somebody has a seizure, so you
8    go to every plan in America and say, "Will you approve it on
9    your formulary?"  And they say "Of course, a hundred percent
10   access, of course."

11            And so there were no misrepresentations by you.  I
12   don't know if you can prove a fraud from the get-go.  You
13   got it on as a great epilepsy drug.  Maybe you got it
14   expanded for shingles.  But at that time, it wasn't the
15   off-label marketing was happening maybe immediately
16   afterwards but afterwards.  And so there would be no reason
17   to go back and make misrepresentations; it was already on
18   the formulary.  That was sort of the brainstorm I came up
19   with when I sat and read everybody's statement of facts.
20   There were no misrepresentations made to these formulary
21   committees because it was a perfectly valid reason to put it
22   on.

23            MR. CHEFFO:  You didn't make -- but that was their
24   claim, that they put it on the formulary because of this
25   conduct.  So, I mean, that may be where you come out from

49263693-d686-464d-b9a5-32b96ae37575

1   the record --

2          THE COURT:  No, as I'm understanding it better,

3   and I keep refining my understanding -- they're arguing

4   more, you saw this opening -- not you personally -- the

5   company saw the opening -- and they're brilliant marketers,

6   right, Pfizer? -- and they went, "Boom, they'll never catch

7   it."

8          MR. CHEFFO:  Well, I mean, I think that's

9   perhaps --

10         THE COURT:  That's their theory.

11         MR. CHEFFO:  I don't think that's really what

12  their theory has been, but let's for purposes of time, let's

13  talk about why that theory, again, on summary judgment

14  doesn't address the issue of causation, because nothing that

15  they've said here today would let a jury find which

16  prescriptions were written for which off-label purposes.

17  And this concept of, you know, doctors wouldn't tell the

18  truth, I mean, in fact you know this from our other trials;

19  I mean, if doctors feel like they've been hoodwinked or they

20  feel like they haven't gotten the accurate information from

21  pharmaceutical companies, it's just the opposite reaction:

22  They will tell you that they think that they received

23  improper information.  So this just goes, again, because I

24  started and I will end today, you know, with this issue of

25  causation because -- I'm sorry.

1          THE COURT:  And I think causation is very

2     important because it affects both the class action issue and

3     the third-party payor.  And I have not ruled definitively on

4     an aggregate model.  I've left that open somewhat.  One on

5     one is different but -- so with Kaiser, they actually argue

6     causation directly with comments.

7          MR. CHEFFO:  Well, I don't know that they do.  I

8     mean, they basically --

9          THE COURT:  They argue both, but --

10         MR. CHEFFO:  But what they say is, "It was somehow

11    on our formulary, and somehow we think we may have paid for

12    some off-label promotion."  And, again, there's the analysis

13    that you went through and other courts, both class cert,

14    motion to dismiss, summary judgment, are, okay, now

15    discovery has closed.  The next step is either you grant the

16    motion, or we have a trial.  And there is no ability because

17    the Court precluded -- and we're not second-guessing that --

18    to talk to individual doctors or patients.  We haven't even

19    gotten to efficacy, but just on an individual why a doctor

20    wrote it.  So how would they -- they've had this entire

21    period of time to produce information showing which

22    prescriptions, which doctors.  So this fact of maybe there

23    are some out there, the time to have proved that, your

24    Honor, was now.  What they tried to do was, they promised

25    you that they were going to do that by a model.

49263693-d686-464d-b9a5-32b96ae37575

1             THE COURT:  We're talking Kaiser now, so --

2             MR. CHEFFO:  Well, okay, but I think this

3    causation issue goes to everybody because Kaiser, even if

4    you credit that they would have changed their formulary,

5    okay, they also tell you --

6             THE COURT:  But as soon as they say they found

7    out, they started taking all these steps to counter-market.

8             MR. CHEFFO:  Well, but it's also still on their

9    formulary for bipolar.  And the other most important thing

10   is --

11            THE COURT:  As a second line?  What did you say it

12   was, as a -- Kaiser for bipolar-resistant cases?  Is that

13   what it was?

14            MR. CHEFFO:  This is what I have:  "Kaiser's

15   current guidelines recognize that Neurontin may be effective

16   in treating resistant cases of bipolar."

17            So the issue here is not -- I mean, Kaiser's

18   position is, "Well, you know, we may have heard something

19   that others did, and that affected our formulary placement."

20   But what they also said in their depositions and in their

21   affidavits is, it's not this panacea; in other words, if

22   you're on the formulary, you get paid, and if you're not,

23   you don't, because what they said is, "Even if you're not on

24   the formulary, we'll pay off-label uses."  So then we would

25   have to ask a doctor, "Well, why did you prescribe it?  Did

1    you prescribe it because the prior doctor did?  Did you

2    think it was like an anticonvulsant?  Did you prescribe it

3    because some other doctor thought it might work?"  Totally

4    unrelated to Pfizer's -- there's a million reasons why

5    doctors would prescribe medicines, a million legitimate

6    reasons.

7              And, you know, your Honor or the plaintiffs or

8    others may in retrospect think, that wasn't a good medical

9    decision, or we didn't think it was aptly supported.  But

10   that's not the issue here.  The issue here is, they are

11   trying to essentially hold Pfizer responsible for every one

12   of those prescriptions on an aggregate basis.  And in order

13   to do that, they both have to show that it was either

14   absolutely and totally inefficacious and every doctor only

15   prescribed it as a result of Pfizer's, or they have to carve

16   out prescription by prescription.  They can't do both.  They

17   have no model.  They haven't been able to give any kind of

18   aggregate causation proof.  So therefore we either have to

19   get into specifics of patients, or there would have to be

20   some way that they can show that this essentially was like a

21   placebo as --

22             THE COURT:  Well, I think that's what their claim

23   is.

24             MR. CHEFFO:  Well, we can talk about efficacy when

25   you want to move to that.

1          THE COURT:  I mean, I've read everything.  I don't

2     know why that -- I can't figure that out on this record.  I

3     mean, that's just a fact dispute.  The causation thing is a

4     legal question.

5          MR. CHEFFO:  This is why -- if I can just take

6     30 seconds, I promise I will sit down after this.  The

7     efficacy is not a fact dispute, okay, it really is not,

8     because what they've done is, they've said, you can't look,

9     okay, you can't look at the individual doctor or the

10     prescription because we can't talk to the doctor, "Why did

11     you prescribe it?  Was there a reason?"  And we can't talk

12     to the patient.  I've had other cases where we actually go

13     to the patient who were members of the insurance companies,

14     and they say, "Are you kidding me?  I love this drug.  This

15     is totally effective.  I can't believe my insurance company

16     wants money back for it."  So we can't do that in this case.

17     That's the way the record has been set.

18          So, in other words, they want to assume that every

19     single prescription written for bipolar or these others, you

20     almost have to presume that they are all written for

21     improper purposes based on improper effect.

22          Then they also have, as Judge Sorokin pointed out,

23     they have the other hurdle to say, let's say a doctor did

24     prescribe this based on some improper impact, but it worked,

25     but the person, it benefited them, it was efficacious.  The

1    only way to find out and make us pay for every one of those

2    prescriptions is if it's not efficacious as to every single

3    person, because otherwise, even if there's one, you know,

4    why should a defendant pay for one efficacious prescription?

5    So the only way they can to this, because this is the model

6    they have set up -- it's an all-or-nothing model -- so,

7    therefore, to prove to the Court that they should be able to

8    tell a jury that Pfizer should have to reimburse for every

9    single prescription, there has to be no triable fact that

10   it's absolutely not efficacious.  In other words, we don't

11   have to prove to you that it is efficacious.  It's not a

12   question of fact.  It's the way that they have set up the

13   paradigm in order to get past summary judgment because

14   they --

15              THE COURT:  They have to prove it's ineffective.

16              MR. CHEFFO:  They have to prove at this stage that

17   there's no --

18              THE COURT:  They say they have that evidence, that

19   there are these studies, they have doctors.  They're

20   willing -- somebody said "wholly ineffective."

21              MR. CHEFFO:  But, you know, your Honor, and what I

22   would tell you is, you know, we have the government, we

23   have -- I mean, how can they really argue that it's

24   ineffective when if one of their plan doctors prescribes it,

25   they're going to reimburse for it?  These are very reputable

Page 61

1    companies.  I mean, they're not in the business of just

2    paying for medicines that hurt people or don't work.

3             THE COURT:  I mean, that's an argument for a jury.

4    But, anyway, let me just get to Kaiser because you've been

5    partly quiet.  So it's your turn now.  I've just got to get

6    through everybody to get you out of here.

7             MS. NUSSBAUM:  Yes, and I'm going to try to hit a

8    few things very quickly.  First, there are two different

9    issues that have just been raised by Mr. Cheffo.  One is the

10   causation issue, which I am prepared to talk about.  The

11   second is the cheaper and more optimal issue, and that is,

12   as your Honor said earlier today, a difference between the

13   class cases and the coordinated classes.  We pled that

14   cheaper and more effective is the standard.  This Court has

15   held us to that standard.  That has been in our complaint

16   since the very beginning, so we need not prove inefficacy.

17   We think the class has proven it, and that's fine.  But we

18   have a lower standard here.

19             But let me start with the causation issue --

20             THE COURT:  You start with causation because I

21   don't totally understand -- I understand their damages model

22   because theirs is quite straightforward:  "It's snake oil.

23   We shouldn't have to pay a penny for it," okay.  And so it's

24   easy, it gets around some of the issues that you have.

25             MS. NUSSBAUM:  But we have both.  We have the

1   snake oil, but we say, assuming, arguendo, the Court finds

2   or a jury finds that it's not snake oil, then --

3          THE COURT:  I see, you have an alternative --

4          MS. NUSSBAUM:  Exactly.  And that's in

5   Dr. Hartman's report.  In our complaint we have the

6   alternative theory.

7          But let me, first, your Honor was exactly

8   recollect when you analyzed the situation that what these

9   defendants saw -- and this starts with their 1993 marketing

10  plan with respect to Neurontin -- they targeted the ten

11  biggest plans in the United States, and they targeted them

12  to get access to their formularies immediately.  Number two

13  on their hit list was Kaiser.  Number four was Aetna.

14         Within a year, okay, by 1995, defendant's own

15  document, their situation analysis, they refer to Neurontin

16  as "the gravy business."  It's going to be "under the

17  radar."  And their intent is to sell it then at that point

18  for pain, psychiatric, and similar markets.

19         By 1994, they have almost full access, and by

20  October of 1995, they have one hundred percent access.  So

21  that was a brilliant strategy and a brilliant plan by these

22  defendants, and they achieved what they wanted, and they got

23  on these formularies.

24         Now, this Court in its May 13 decision said that

25  there were three things that needed to be shown for

1    causation.  The Court wanted individualized evidence that

2    what information a P&T committee was exposed to; the absence

3    of fraudulent information would have altered the placement

4    within that formulary; and that there would be an alternative

5    classification that would have saved the TPP money.  And I

6    want to just go through very quickly the evidence before

7    this Court.  The affidavits, the documents address this in

8    enormous detail, and it is very clear that with respect to

9    Kaiser, the standard has been met on all three issues.

10            The first is whether or not there were actually

11   misrepresentations to Kaiser.  Now, Kaiser has a drug

12   information service, and they do a monograph.  Before they

13   put something on their formulary, they look at all of the

14   information available.  Are they detailed?  Yes, they are

15   detailed.  We have that in affidavits.  We've given the

16   Court copies of logbooks that show the detailers there.  Do

17   they receive information from Pfizer or any other drug

18   company?  They do.  They have an inquiry service.  They make

19   inquiries.  They receive back inquiries.  We have attached

20   to our affidavits inquiry information that we've gotten back

21   from these defendants that specifically misrepresent.  The

22   monographs indicate that they reached out to Parke-Davis.

23   They reached out to find out, for example, about bipolar.

24   They were told a half truth, that Parke-Davis was not going

25   to ask for FDA approval for bipolar.

1          What they weren't told was anything about the 1992

2     FDA analysis.  They weren't told about any suppressed

3     studies.  They weren't told about the Pande study.  They

4     weren't told about the Mellnick situation.

5          THE COURT:  And what if they had?

6          MS. NUSSBAUM:  And if they had -- and this is in

7     the affidavit of Mirta Millares, who is the head of DIS and

8     a doctor of pharmacy -- and other affidavits in addition,

9     had they known the truth, they would not have made the

10    decisions that they made.

11         THE COURT:  Which was what?  This is what I don't

12    understand how --

13         MS. NUSSBAUM:  Which was to put it on the

14    formulary and then to keep on expanding the use on the

15    formulary.  They kept on expanding the use because they were

16    getting pressure from their doctors who were attending

17    these --

18         THE COURT:  Just you need to help me.  So unlike

19    Aetna which originally put it on for all purposes, how did

20    Kaiser originally put it on?

21         MS. NUSSBAUM:  Kaiser originally put it on more

22    limited to the on-label use.  Within a year they were

23    getting pressure --

24         THE COURT:  How would you monitor that?

25         MS. NUSSBAUM:  Well, at Kaiser, there is

1  95 percent compliance with the formulary, and that is,

2  95 percent of the prescriptions that have been written since

3  1994 have been for drugs on the formulary.  But if a doctor

4  wants to prescribe outside the formulary restriction, they

5  make a check on the prescription that says "outside the

6  formulary restriction."  And if in their medical judgment

7  that is the appropriate prescription, then Kaiser will pay

8  for it.

9         Kaiser is a charitable nonprofit corporation.

10 Their desire is to give the best medical care.

11        THE COURT:  All right.  But unlike these other

12 ones, you actually said it has to be on-label; and you're

13 saying that because of this, you expanded the bipolar.  Is

14 that it?

15        MS. NUSSBAUM:  Pain, bipolar.  It kept on

16 expanding to basically no restrictions, within several years

17 to no restrictions at all because there was repeated

18 pressure by different physician groups to expand the

19 formulary because they had been subject to detailing

20 information.  And what we have in the affidavit of Mirta

21 Millares and others is both a specific list of the

22 suppressed studies; for example, the Pande study that at the

23 time Kaiser did their multiple monographs and studies of

24 this drug were not available.  There was a suppressed study

25 with respect to diabetic peripheral neuropathy, 945244; a

1    study with respect to migraines, CT 879200; another study

2    with respect to migraine.  The list goes on, and this is all

3    in the affidavits, and we've given you the monographs.  And

4    you can see we had regular contact with these defendants

5    requesting information, and we got misleading information

6    time and time again.

7            So with respect to the first prong, individualized

8    evidence about what the P&T Committee was exposed to, we

9    think that Kaiser has more than met its burden and that

10   minimally we go to the jury on that issue.

11           With respect to the second, how the access of

12   fraudulent information would have altered the placement, we

13   have four affidavits from the head of the two P&T

14   Committees, from the head of the Drug Information Services,

15   and from a physician who actually at one point was on the

16   speaker series for Pfizer, all of which say that in the

17   absence of the fraudulent information, they would have acted

18   differently, that Pfizer's misinformation tainted the

19   formulary decision, that they can only make a decision based

20   on the information out there.

21           And then the last prong, what your Honor asked,

22   what would they have done about it?  Well, what Kaiser would

23   have done about it I think is very clear.  And these are

24   also documents held in the ordinary course of business, your

25   Honor.  These are not things produced for litigation.  Once

1   the truth started to come out, there is a Wall Street

2   Journal article, the Franklin case starts to break.  People

3   at Kaiser see this, and they say, "Hey, we've been

4   hoodwinked here.  Something is going on."  And they try to

5   start correcting, they try to start reeducating their

6   physicians.

7          They don't yank it from the formulary.  Why not?

8   They tell us why not in an affidavit.  Unless it's a drug

9   that has been recalled, basically they don't do it,

10  particularly because of the nature of this drug, which

11  people can be on for many years, which a patient can be on

12  and want to stay on, where you can have a patient with a

13  delicate medical condition, and just changing one in several

14  drugs might affect their health.  So instead what they

15  started was what they called their DUAT and their drug

16  campaigns.  These are informational campaigns to reeducate

17  their doctors to try to get the misinformation out of the

18  knowledge.  And those campaigns were extremely successful.

19         As stated in the Mirta Millares affidavit and in

20  an annexed Kaiser document, they had the 30 percent falloff.

21  Okay, we have a second document here, but this document is

22  even clearer.  This is attached to the affidavit of Mitchell

23  Cohn, and this is one of their documents concerning

24  internally how successful is their reeducation process.  And

25  you can see where the campaign starts --

49263693-d686-464d-b9a5-32b96ae37575

1          THE COURT:  Would that be a good measure of what

2     the damages would be is for you a 30 percent drop?  In other

3     words, that 70 percent would have prescribed it anyway?

4          MS. NUSSBAUM:  No, your Honor, we think not.  We

5     think, as Dr. Hartman has indicated in his report, that is

6     not the appropriate measure of damages.  We think this goes

7     to the causation issue.  I mean, prescribing continued to

8     fall.  You then did have the issue of the drug becoming

9     generic.  And there is a certain amount of misinformation in

10    the marketplace that you're never going to correct out

11    because doctors who may have never used this drug initially

12    started the drug.  These defendants were clever enough to

13    know this drug is somewhat benign for a lot of people, maybe

14    not people with psychiatric conditions but for other people.

15    For example, for the excess dosage, they knew that advising,

16    and Kaiser is specifically advised to give very high excess

17    doses, that that's not going to kill people.  And so what

18    happens here is, I don't think you can ever really get all

19    of the damage out of the market here because this

20    misinformation was out there.  But certainly --

21         THE COURT:  Mr. Cheffo says that you have a

22    monograph that's still out there that says that Neurontin is

23    appropriate for certain resistant cases of bipolar?

24         MS. NUSSBAUM:  I don't think that's exactly

25    accurate.  I think that that is a quote from one of the

1    30(b)(6) witnesses in a whole series of questions, and that

2    that is kind of one answer that was taken out of context.

3    We have a very detailed answer to that in our papers, and I

4    think, more tellingly, more importantly, we actually have

5    the physicians --

6              THE COURT:  Just because there are boxes and boxes

7    and boxes, so what's the short answer to that?  Do you

8    remember?  You may not remember because you've probably --

9              MS. NUSSBAUM:  The short answer to that is that

10   the reeducation program at the time that that program

11   started indicated that there was not proof of efficacy for

12   that point, so I think that that is the answer to it.

13             THE COURT:  So no proof of efficacy, but in some

14   cases it might be appropriate?

15             MS. NUSSBAUM:  It might be possibly appropriate.

16   There may have been some physicians that wanted to continue

17   to prescribe it.

18             THE COURT:  Okay, thank you.  Is there anything

19   else you wanted to say?  Did you know the answer to that?

20             MR. LAWRENCE:  Actually, your Honor, I had one

21   minor thing I wanted to correct in your thinking.

22             THE COURT:  No, no, no, no, let her finish.

23             MR. LAWRENCE:  You said that Aetna had it on for

24   all purposes.  It was always listed as an anticonvulsant on

25   Aetna's formulary from the time it went on in 1994.

Page 70

1          MS. NUSSBAUM:  Your Honor, one last point, and

2     that's just with respect to Kaiser.  They have the 17200

3     claim.  The defendants have not moved with respect to that

4     claim, but I just wanted to --

5          THE COURT:  Okay, I'm assuming that means the

6     California Unfair Trade Practice.

7          MS. NUSSBAUM:  Yes, I'm sorry, your Honor, that's

8     correct.

9          THE COURT:  You must be from California?

10          MS. NUSSBAUM:  No.  Mr. Himmelstein is.  I'm from

11     New York, but Kaiser is in California.

12          MR. CHEFFO:  And I'm not really sure where that

13     comes from.  I take counsel at her word, but, I mean, we

14     have an omnibus summary judgment motion on causation, and

15     I'm not really sure why they think that wouldn't apply to

16     17200.  17200 requires causation like every other statute in

17     the world that I know of.

18          THE COURT:  I don't know, California used to be

19     pretty out there.

20          MR. CHEFFO:  I can't comment on the record, your

21     Honor, but suffice it to say that we did move --

22          THE COURT:  Does it now have causation?

23          MR. CHEFFO:  Well, whether it does or not, we have

24     moved against it because we think it does.

25          Can I respond to Kaiser?  Are you done?

1       THE COURT:  Yes, just as long as we have enough

2  time for the other.

3       MR. CHEFFO:  Oh, yes, I'll try and be brief.  I

4  mean, okay, in all of this, we've not heard, the Court

5  hasn't heard on summary judgment where these prescriptions

6  are.  The Proheus case, and there's probably a litany of

7  other cases, have said, where plaintiffs continue to use

8  products, you can't then say it's ineffective and seek your

9  money back.  I mean, whether it was on a year or two later,

10  there's evidence in the record, it's all cited, as to when

11  some of these were -- and we can kind of give you that if

12  it's not clear enough for your Honor.

13       I would also say that --

14       THE COURT:  Is that an issue of mitigation,

15  though?

16       MR. CHEFFO:  No.  I think it's an issue of

17  causation.  I mean, basically, if you continue to use or

18  prescribe a drug, you can't say, "I would have done

19  something different way back when."

20       THE COURT:  I hit that in AWP case.  I don't know.

21  I mean, if you commit fraud, you can expect people at some

22  point not to be able to reasonably rely on it anymore once

23  they know, so maybe it cuts off causation once they knew in

24  2002.  Maybe that's the answer.  I mean, you can admit it as

25  evidence and argue the inferences.

1           MR. CHEFFO:  I think the cases have said -- again,

2    Proheus is one that I can recall of --  that if you continue

3    to you use the product, you can't say it's not efficacious,

4    and then kind of sue the manufacturer and say, "The product

5    that I continue to buy and pay for has no efficacy, and I

6    want my money back."  I think that's a matter of common

7    sense.

8           I think that this also doesn't address any of the

9    issues of efficacy and how that there was damage.  We've

10   heard a lot, but we still don't know why anyone wrote it.

11   We had this long list of potential other drugs that might

12   have been more optimal under this newer standard, but we

13   still don't know as to any one of those prescriptions why a

14   doctor -- I mean, some people we know from a recent case,

15   some people might not be an appropriate candidate for

16   opioids or narcotic medicines.  That's on the list.

17          So in order to figure out, even under that

18   standard, which, with all due respect, we don't adopt, but

19   even under that standard, it still doesn't help --

20          THE COURT:  You're in the "wholly ineffective"

21   camp?

22          MR. CHEFFO:  I'm sorry?

23          THE COURT:  You think the standard should be

24   wholly ineffective?

25          MR. CHEFFO:  Well, I think at the end of the day

1    it boils down to that because if you have fifty different

2    medicines, and you're saying, here they are, just generally,

3    these are ones that in some cases may be more optimal or

4    more efficacious or cheaper, unless you're going to go and

5    talk and look at specific cases and figure out why, the

6    lowest common denominator will drive.  And essentially you

7    have to say, the only way you can prove that all fifty of

8    these medicines are categorically more optimal and cheaper

9    is if you prove absolutely that Neurontin is ineffective and

10   there's no question about it.

11              THE COURT:  Okay, thank you.

12              Does Guardian want to jump in?

13              MR. SANDMANN:  Yes, Judge.  Being the last or the

14   smallest I guess has its advantages, but Guardian being the

15   smallest plan at this table is also representative of

16   probably the vast majority of plans that were subjected to

17   the defendants' fraud insofar as the fact is that they used

18   a PBM to administer their pharmacy benefit and really relied

19   on honesty in the marketplace by the pharmaceutical

20   manufacturers.  In fact, there's a great quote which I

21   should have put on the slide from Ariel Fernando's

22   deposition.  He was a 30(b)(6) designee for Guardian, and he

23   states that "Guardian acted in good faith in providing this

24   rich benefit for its members," you know, "We'll pay for the

25   drug if it's FDA approved essentially.  And we expect that

1    the pharmaceutical marketplace and doctors acted in good

2    faith."

3              And I think that's what this case, quite frankly,

4    boils down to.  We've talked about "fraud in the aggregate,"

5    which I think is a term that you used, which I much prefer

6    to "fraud on the market," which conjures notions of the

7    securities-type fraud.  But Guardian clearly meets the

8    causation standard.  Ariel Fernando testified that had

9    Guardian known the truth or it could have instructed its PBM

10   to take steps, it would have done so at the point that it

11   found out.

12             THE COURT:  Well, did it once it found out?

13             MR. SANDMANN:  No, it did not, and that goes back

14   to something that was mentioned previously, that in 2004 --

15   Guardian is not, and I don't like to use this word

16   "vigilant" as Aetna and Kaiser merely because of the fact

17   that they do rely on the PBM to administer its pharmacy

18   benefit.  So in 2004 when, you know, all the articles

19   started appearing in the Wall Street Journal, I believe that

20   Ariel Fernando testified that he looked at it, but there was

21   no reason to because, again, there was now a generic on

22   market, and it wouldn't be cost-effective to implement any

23   coverage management rules, which they can't even do

24   internally.  They have to go to their PBM and pay their PBM

25   to implement these rules on their behalf.

1           THE COURT:  Well, but they can.  I mean, they're

2       the principal, and the PBM is the agent.

3           MR. SANDMANN:  Yes, they could, but they made a

4       decision, and this is in the testimony, not to because there

5       was a generic out there, and it wouldn't be cost effective.

6           THE COURT:  But you're like Aetna, in that you

7       were willing to pay for off-label on the assumption that

8       there was no fraudulent off-label marketing, right?

9           MR. SANDMANN: Yes, yes.  I mean, there's no way

10      to really not pay for off-label unless you prior authorize

11      every prescription that comes through because off-label

12      prescriptions are written, often with Neurontin, written all

13      the time.  And the only way you can determine whether or not

14      its being written off-label is call the doctor and ask him

15      why he is prescribing this.  It doesn't come through in the

16      realtime transaction.

17          THE COURT:  So do you agree that there were no

18      specific material misrepresentations made to your P&T

19      Committee or to your PBMs as opposed to the doctors?

20          MR. SANDMANN:  Nobody walked in the door and made

21      a misrepresentation that we relied on.  That's why I liked

22      your term earlier, "fraud in the aggregate."  That's a great

23      way to put it, because Pfizer well knows that the information

24      we get isn't from somebody walking through the door and

25      making a sales presentation to a P&T Committee.  It's

1    through the dissemination of widely read medical journal

2    articles.  It's through dissemination of information through

3    other services.  So it's just not the traditional buyer/seller

4    paradigm of salesman/buyer.  It's, here's how we sell our

5    product, here's how we market our product.  It's through

6    this overarching method of dissemination on how we get it

7    out there.  So, no, we're not going to have somebody that

8    specifically walks in and says, "Here's Neurontin.  It's

9    good for this.  Take it.  Yes, we relied on it."  I don't

10   think that would happen with respect to any drug.  That's

11   just not how a decision is made on whether or not to, one,

12   put it on the formulary, or, two, continue to pay for it.

13              THE COURT:  Thank you.  Did you want to say

14   anything in response?  I'm not sure that raised any new

15   issues.

16              MR. CHEFFO:  I don't think it does.  I was just

17   going to sum up one or two points, but if you're --

18              THE COURT:  I think I need to make sure that the

19   individual --

20              MR. CHEFFO:  Oh, yes, absolutely, your Honor.  I'm

21   sorry.

22              THE COURT:  Unless there was something specific.

23              MR. CHEFFO:  No.  I can wait, your Honor.  Thank

24   you.

25              THE COURT:  Did someone want to talk about the --

1          MR. HIMMELSTEIN:  Yes, your Honor, ASEA, Blue

2    Cross-Blue Shield of Louisiana, and --

3          THE COURT:  You know, you need to speak up, or Lee

4    will never get it.

5          MR. HIMMELSTEIN:  I'm sorry.  Just to respond

6    first to a couple of --

7          THE COURT:  No, no, tell her, who are you

8    representing?  She didn't hear.

9          MR. HIMMELSTEIN:  ASEA, Harden Manufacturing, Blue

10   Cross-Blue Shield of Louisiana.  Just to respond first to a

11   few discrete points Mr. Cheffo made about DrugDex still

12   recommending this, we put in an extensive report from our

13   expert, Kay Dickerson, about how they so thoroughly

14   contaminated the publicly available literature, withholding

15   things from DrugDex, misrepresenting things to DrugDex.  And

16   we put in our statement of facts, 147 to 161, how the

17   Corcoran Group, which is known for being able to parse drug

18   company spin and get to the truth, beginning in 2001 tried

19   to get them to give them all the information so they could

20   do an independent review.  They jerked them around.  They

21   stalled them.  They refused to give them anything.  Finally,

22   in 2007 Corcoran Group gave up saying Pfizer was being

23   completely uncooperative.

24          The reason DrugDex -- and if Medicaid or whatever

25   else follows DrugDex, just as a matter of statute or

1    regulation, it's going to be relying on bad information

2    because that's what's in DrugDex because they put it there,

3    and they kept the good information out, and they made sure

4    only the wrong information went in.

5              There was a study we submitted earlier in the case

6    by a professor, Dr. Finkelstein of Harvard, that was done in

7    2008 studying off-label uses of drugs and looking at

8    DrugDex; and he found that Neurontin was the number one drug

9    of all drugs in the United States prescribed off-label, and

10   that 83 percent, he quantified, of the uses had "little to

11   no evidentiary support."  He didn't have a category for no

12   evidentiary support, but he put 83 of those uses in the

13   bottom category based on reviewing what was in DrugDex.

14             A fundamental misconception Mr. Cheffo has is that

15   the TPPs have to show which prescriptions would not have

16   been written but for the fraud.  No.  The TPPs only have to

17   show how many prescriptions they paid for because of the

18   fraud.  They get the benefit --

19             THE COURT:  So that's an interesting question

20   right there.  I think you can show in the aggregate that it

21   caused damage.

22             MR. HIMMELSTEIN:  Exactly.

23             THE COURT:  But then, assuming you can prove a

24   fraud, you don't have to be as precise in your damage model.

25   However, I'm not sure it equates one on one.  In other

1    words, a certain number of doctors might well have

2    prescribed anyway.  So the question is, can you just say --

3    you want to do one for one in your damage model:  "It's

4    snake oil," that's your theory, "so we don't have to pay

5    anything."

6              MR. HIMMELSTEIN:  Well, your Honor,

7    Professor Rosenthal came up with different numbers for the

8    different indications.  For bipolar, she came up with

9    99.4 percent being due to the fraud.  But the fact that --

10             THE COURT:  The problem with Dr. Rosenthal is,

11   she's a fabulous health economist, but she can't tell what's

12   due to the fraud.  She can only tell statistically what was

13   due to the off-label marketing.  I kept trying to make that

14   point on and on again.  I mean, we've got to be intellectually

15   rigorous about this.  She can tell what was due to the

16   off-label marketing; and then the issue is, was the fraud so

17   pervasive that you can prove it was a substantial factor in

18   the decisions of the doctors in any given plan?  Now, you're

19   right, you don't have to prove each doctor.  You do with the

20   individual plaintiffs, you do, individual one on one, as I

21   understand the law, and I don't think that's going to change

22   my mind on that.  But the issue is, what if you just can

23   prove that the TPPs were damaged by the fraud, how do you

24   then quantify how much damage?

25             MR. HIMMELSTEIN:  Well, first of all, all we have

1    to prove to survive summary judgment is the fact of damage.

2    And your Honor noted that when you were saying, can't they

3    prove even one prescription with all these prescriptions?

4    So on this motion, if we can just prove the fact of damage,

5    we should be able to survive summary judgment.

6              THE COURT:  For the TPPs?

7              MR. HIMMELSTEIN:  For the TPPs.  And we have put

8    in figures from Dr. Conti that show how much they paid.  And

9    if you look at the bottom table, you'll see BC-BS LA paid,

10   you know, $1.1 million for bipolar prescriptions.  At about

11   $200 per prescription, that translates into about 5,000

12   prescriptions.  They paid for about 13,000 neuropathic pain

13   prescriptions, 4,000 nociceptive pain, 2,000 migraine, 4,000

14   prescriptions for doses over 1,800.

15             Even for ASEA, a very small state employee plan,

16   the numbers range from 500 at the high end prescriptions for

17   neuropathic pain to about 65 at the low end, at about $200 a

18   script.  Even tiny Harden paid for many multiple

19   prescriptions.  So we should certainly be able to show the

20   fact of damage based on all of the marketing.

21             As to the precise quantification of how much would

22   have happened anyway, yes, we have our snake oil argument.

23   There was no good reason for any doctor to prescribe a

24   medication if they knew it was ineffective, and we hold to

25   that argument.  Dr. Rosenthal's model was not able to pick

1  up a hundred percent because neurologists, who have on-label

2  use for the drug, were detailed as well early on, and she

3  had to extrapolate the effect of that detailing out.  So for

4  that very important --

5          THE COURT:  And also wasn't for some of that, in

6  Europe, it was approved for some indications that weren't

7  approved here, so there could have been word of mouth?  I

8  mean, it was harder for that, right?

9          MR. HIMMELSTEIN:  Yes.

10          THE COURT:  That's why you dropped everything in

11  your class cert petition except bipolar?

12          MR. HIMMELSTEIN:  Well, we thought that was our

13  strongest claim.

14          THE COURT:  Yes.

15          MR. HIMMELSTEIN:  Your Honor said, and I don't

16  like to quote back but just one sentence in the class cert

17  ruling:  "Professor Rosenthal, at the instruction of

18  plaintiffs' counsel, assumes that all detailing to

19  specialists other than neurologists was both off-label and

20  fraudulent.  To be certain, this assumption has validity."

21          If it has validity, it ought to be enough to get

22  to trial.  And your Honor has said Dr. Rosenthal can tell

23  how much was caused by the off-label promotion.  Your Honor

24  has already found all the off-label promotion to the

25  non-neurologists was fraudulent, so I think we have a

1    logical syllogism there, and we're done.

2            THE COURT:  You might.  Okay, thank you.

3            Do you want one reply?

4            MR. CHEFFO:  Yes, your Honor.  They say that they

5    have the fact of damages a given, but, again, you know, I

6    was hoping I'd hear, you know, at some point that we're

7    going to say we have all these people out here, you know,

8    where's the evidence?  We haven't seen any of this.  A jury

9    cannot assume some number, that there's this bad conduct and

10   we're going to assume what that number is.  We haven't in

11   any way established proximate causation to any specifics.

12   That's what you're supposed to do during discovery.  I'm

13   aware of no court that has allowed this theory that there

14   was an aggregate fraud.  I mean, that's fraud on the market.

15           THE COURT:  No, but I don't know -- maybe I'm

16   wrong -- whether anyone's addressed it in the context of

17   Kaiser or -- in other words, I've left open the possibility

18   of doing it for individual TPPs.

19           MR. CHEFFO:  And I was just addressing -- I mean,

20   I think that, you know, again, I think it would apply at the

21   same -- what we've heard from Kaiser is, they've said that

22   there was some conduct that had formulary place, but you

23   haven't heard that they wouldn't pay for other formulary.

24   But, again, at the end of the day, Judge, we have to have

25   that bolus of prescriptions and those doctors.  They say,

1   you know, that you don't have to show which; but if you

2   don't know which, how are you going to show how many?  How

3   are we supposed to refute that evidence?  You know, where is

4   the discovery to say --

5            THE COURT:  Isn't there some line of cases, once

6   you've committed a fraud -- assuming, I mean, the jury would

7   have to find that -- your damages don't have to be so

8   precise?  I mean, they have to not be speculative, but they

9   don't have to be --

10           MR. CHEFFO:  This is causation, though, your

11  Honor.  This is not --

12           THE COURT:  But I think there's enough you can

13  infer that they were harmed to some degree.

14           MR. CHEFFO:  But, your Honor, well, everything we

15  have in the record, everything we have in the record, the

16  doctors for the nine patients, they said they weren't

17  harmed.  We have it, it's on their formulary, so where --

18           THE COURT:  Individual patients are a hard call.

19           MR. CHEFFO:  But they're indicative, your Honor.

20  See, that's the --

21           THE COURT:  Maybe, and that's an argument for a

22  jury.  I don't know what I'm going to do.  I mean, I don't

23  know what I'm going to do, but let me just say, I've got the

24  lay of this land.

25           MR. CHEFFO:  Yes, your Honor.

1        MS. NUSSBAUM:  May I possibly address Mr. Cheffo's

2   point for a moment?

3        THE COURT:  One minute, and then we need to figure

4   out step two.

5        MS. NUSSBAUM:  Okay, your Honor, literally one

6   minute.  Dr. Hartman's report in Footnote 16 articulates

7   very clearly the alternative theory.  I won't summarize it

8   now, but it's Page 9.  That's first.

9        Second, the alternative drugs not only come from

10  Kaiser, but in fact they come from research that came out of

11  the defendant's settlement with the AGs.  And as part of

12  that settlement, in reeducation, there was funding at the

13  University of North Carolina at Chapel Hill, and they have

14  come up with the list of alternative drugs.

15        And in terms of the lesser cost, I just want to

16  put this up once more.  This is from an internal Kaiser

17  document that just shows, almost as soon as they start the

18  reeducation program --

19        THE COURT:  I know, I've seen that.

20        MS. NUSSBAUM:  -- the savings.

21        THE COURT:  So Part B.  I have read the motion for

22  reconsideration, and I'm not prepared to argue it now.

23  There's already enough on my plate.  I am highly unlikely to

24  change my mind about individuals.  In fact, I'm not going to

25  change my mind about individuals.  Put it right out there.

1   If anything, this has reinforced it's person by person,

2   doctor by doctor.  And even if you survive summary judgment,

3   which I'm thinking about, it would be doctor by doctor,

4   person by person.

5           You have now dramatically refined your case, and

6   you're asking me to reconsider about third-party payors and

7   bipolar.  I have a refined understanding of the case just

8   working through these summary judgment documents.  You

9   improperly assumed I would have read all the summary

10  judgment motions in the context of the class cert.  You must

11  think I have no other cases.  Just Sobol alone keeps me busy

12  on the AWP case a huge chunk of my time.  I don't go out of

13  my way to read other motions.  However, now that I've read

14  them, I understand the case better.  So, you know, I think

15  we should have another oral argument only on TPPs and

16  bipolar.  I will not be reconsidering about individuals.  If

17  anything, this completely reinforced my individual by

18  individual issue.

19          On TPPs, I do think there are different categories

20  of TPPs, but as I'm understanding it, the vast majority

21  didn't have anything like the sophistication of a Kaiser.

22  But I need that addressed.  Dr. Bell referred to a lot of

23  restrictions that were eventually put in place, but I

24  couldn't tell what kinds of third-party players those were.

25  I found him persuasive that each drug had to be placed on a

Page 86

1    P&T Committee, I found that fully persuasive until I

2    realized that essentially they were all put on for the

3    epilepsy and that this was not part of that discussion.  So

4    I should have another oral argument on that.

5              But let's assume for a minute -- I find this very

6    difficult to resolve on summary judgment in its entirety,

7    and if I wanted -- I was trying to think it through -- if I

8    wanted to have a trial -- I'm not definite on that -- I'm

9    not talking about the individual plaintiffs at this point --

10   if I wanted to have a trial, is it even feasible to do all

11   three, or do you do one of the coordinated plaintiffs?  I

12   don't know if I could completely have the class, if I ever

13   decide to certify one, with the coordinated plaintiffs

14   because they have somewhat different theories.  I actually

15   thought one neat little one would be Kaiser just because

16   it's most at this point -- but I'm not wedded to this

17   because it's unique, and they were most proactive, and they

18   actually had communications with Pfizer, and I -- but I

19   don't know if you want one to be out there or whether you

20   would want all three.

21             So essentially what I'm asking for is for you all

22   to confer on both sides as to what a trial plan would look

23   like.  What would you even think about?  I have one suicide

24   case coming up in March.  I've shipped the other one off,

25   which should be in Tennessee.  But as I'm understanding it,

1    they're really very unique and different cases, just

2    completely different.  With one tiny overlap on whether

3    there was a failure to disclose depressive side effects, the

4    rest of it is very different.

5              So I don't know when you could make those

6    proposals to me.  What would it even look like?  How long

7    would it be?  I mean, with all these indications, wouldn't

8    it be like a month anyway?

9              MR. SOBOL:  We've given it quite a bit of thought,

10   your Honor, but without --

11             THE COURT:  So what's your off-the-cuff?  What

12   would it look like?

13             (Laughter.)

14             MR. SOBOL:  My off-the-cuff is that, and if you

15   think back also about the AWP trial, one of the issues in

16   the AWP trial was giving enough time just for the

17   fact-finder, you, to understand the workings of the

18   organization, Blue Cross-Blue Shield of Massachusetts.  If

19   this were to be a jury case, that issue gets complicated --

20             THE COURT:  It would be.

21             MR. SOBOL:  -- if you have more than one

22   third-party payor, so that's something that has to be

23   considered.

24             THE COURT:  Right.

25             MR. SOBOL:  And particularly -- you're just

Page 88

1   thinking of the substantive issues, but you also have to

2   think about the jury and the fact that they'll probably hear

3   from three or four people from each third-party payor.

4   They're going to have to remember Mr. Smith from Kaiser --

5                    THE COURT:  And I get it, and then you also have

6   five different indications.  So that in itself is very

7   difficult.  And plus they are fabulous.  Have you seen what

8   they did in these suicide cases?  They got a million --

9                    MR. SOBOL:  Right, their slide shows are always

10  better than our slide shows.

11                   THE COURT:  Always.  And they don't have the snake

12  oil -- have you seen some of the slides from the suicide

13  case, anyone?

14                   MR. SOBOL:  Yes, right.

15                   THE COURT:  But they have fabulous experts, who

16  they're going to disagree vehemently on effectiveness, on

17  everything else under the sun.  So should I take one?

18                   MR. SOBOL:  You were thinking, keep it to an

19  indication because if you get beyond one indication, you

20  have too much science --

21                   THE COURT:  No, one TPP -- or, I don't know, I'm

22  asking you, one TPP with all the indications.

23                   MS. NUSSBAUM:  Your Honor, we would very much like

24  the opportunity to talk to the class and --

25                   THE COURT:  I'm not sure I'd have the class with

1    it, let me just be clear, because I think the class has all

2    sorts of other issues.

3              MS. NUSSBAUM:  Before responding, if we could have

4    a week or so.

5              THE COURT:  Why don't I do one TPP first, my own

6    little bellwether TPP case, and then --

7              MR. SOBOL:  I wasn't purporting to speak for

8    everybody.  You asked for off-the-cuff, okay?

9              THE COURT:  Yes.

10             MR. SOBOL:  And the thinking that we've had is,

11   there's complications when you have more than one TPP, and

12   there are complications when you have more than one

13   indication.  Being able to say what the position is of all

14   the plaintiffs on this side, we would want to be able to

15   confer and get back to you.

16             THE COURT:  Sure.

17             MR. SOBOL:  If you're asking Tom Sobol, one

18   indication, one plan, get it marked up early 2010.  But

19   that's just me.  You need a more intelligent non-Tom-Sobol

20   response.

21             (Laughter.)

22             MR. CHEFFO:  I would just say, I think we do need

23   some time to digest this.  You know, again, I don't want to

24   reargue this, but if we talk about one, we still haven't

25   figured out what the measure of damage is, how we'd even --

Page 90

1    do we --

2            THE COURT:  It would take us the entire clerkship

3    year -- I have a brand-new law clerk who's dying to learn

4    this -- just to write a summary judgment on all of this.  We

5    have a whole storeroom, storeroom.  I mean, if anything,

6    this has been overkill.  She says, "Read Footnote 16 in the

7    Hartman report."  It took me two full days just to read the

8    briefs without the exhibits, and I've been with this case

9    since 1996.  So I need some way to cut through this and have

10   some jury just make some -- and I can sit and listen and

11   understand.  And then if there need to be post-trial

12   motions, there do.  So I just need a -- I know it's in the

13   interest to go forever, but --

14           MR. CHEFFO:  It's not going forever, your Honor,

15   but I do think, you know, these are very complicated.  It's

16   going to be a very expensive, very lengthy trial.  I mean, I

17   think that at this point we really do need the Court's

18   guidance, you know, from a legal perspective --

19           THE COURT:  I've been writing and writing and

20   writing.  I mean, at some point --

21           MR. CHEFFO:  To have a month trial when we don't

22   even know if the case is going to --

23           THE COURT:  A month sounds better to me than the

24   six months it would take to write the summary judgment.  And

25   I was thinking one TPP and all the indications really soon,

1    and I just get some findings, just some findings.  I don't

2    want to go the TPP route for the class.  I have to say I'm

3    not sure, I've been flip-flopping, I think that would be

4    fair, on what to do because I think it's such a difficult

5    issue, and partly because I keep understanding it better the

6    further I get in it.  And it will go up on appeal, and it

7    will take forever.  And it's difficult law.  Either way I

8    go, it will probably go up on appeal.  I want to just get

9    some findings.  I want something that will bring you all to

10   a jury, and that's my instinct for the whole thing.

11              MR. CHEFFO:  And I understand that, your Honor,

12   and I want to be agreeable on this, but my discomfort --

13              THE COURT:  You don't have to.  You're so pleasant

14   generally, you can be --

15              MR. CHEFFO:  You know, again, a trial is going to

16   be -- someone's going to have to stand up and say, "These

17   3,000 prescriptions were written, and here's what we did."

18   We haven't done any of that type of discovery in this case.

19              THE COURT:  Fact discovery is closed.

20              MR. CHEFFO:  Right, but that's the point, you

21   know, that's the point.  Unless you basically -- they

22   haven't even told us how they would prove on some kind of

23   aggregate level or your Honor has endorsed such a thing.

24   So, in other words, if we were to start a trial in three

25   weeks from now, they get up and they -- and Dr. Rosenthal

1    hasn't done anything as to the "why" question, so basically

2    we still would never know -- you haven't decided, and I

3    think you have to look at this very carefully -- why

4    individual prescriptions were written because --

5            THE COURT:  Well, we know 99 percent were

6    off-label in bipolar.

7            MR. CHEFFO:  But we don't know that.  What we know

8    is that Dr. Rosenthal was told to assume that every visit to

9    a doctor, even if they dropped off samples, there was no --

10   that's what you wrote in your class cert decision.  She

11   assumed that every one was off-label and every prescription

12   was written.

13           THE COURT:  Right, like to a shrink or something.

14   I carve off neurologists.  I mean, that is something I'd

15   have to deal with Kaiser on.

16           MR. CHEFFO:  But we know from the record that

17   that's not even true, the psychiatrists admit.  So even if

18   you don't adopt what I'm saying, your Honor, the point is,

19   there's no expert --

20           THE COURT:  How many people visit a psychiatrist

21   expecting that they're treating epileptics?

22           MR. CHEFFO:  No, but the question is not based on

23   how many people are visiting.  The point is, why did the

24   doctor write the prescription?  It doesn't matter if --

25           THE COURT:  I understand about the damage issue.

1          MR. CHEFFO:  But that's what the whole case is

2     going to be about, so unless we figure out --

3          THE COURT:  But at this point there may be enough

4     evidence to get a fact question on a fraud --

5          MR. CHEFFO:  As to --

6          THE COURT:  -- on the effectiveness, whether it's

7     no better than snake oil, for example, in bipolar, a fact

8     question on a fraud -- if you disagree, fine -- I mean, you

9     have great scientists -- a fact question on whether or not

10    it caused damage to the third-party payor.  And then you

11    have a problem, and I understand that, is the measure that

12    once people knew it dropped 30 percent, or is it one for

13    one?  I understand that there will a damage problem.

14         MR. CHEFFO:  It's an advisory ruling, though, your

15    Honor.  I mean, if there's a fraud in the air, you're

16    adopting a kind of fraud on the market --

17         THE COURT:  Fraud on the market has got a problem.

18    I understand the legal problem.  I view the class issue as a

19    very close question, not on the individuals where it's not

20    close at all, but on the third-party payor one, I think it's

21    a very -- but at least when you're going -- can't Aetna,

22    can't they sue and say, you know, "We were reimbursing for

23    snake oil"?

24         MR. CHEFFO:  They can if they say, "Here's the

25    fifty prescriptions that we think that you --"

49263693-d686-464d-b9a5-32b96ae37575

1           THE COURT:  But they don't have to go doctor to

2    doctor.

3           MR. CHEFFO:  Of course they do, your Honor.

4           THE COURT:  I know, and that may be the difference

5    we're disagreeing on.  I mean, it may be just that simple,

6    but I don't know that I want to spend the next six months

7    writing the summary judgment.  So I will think about that

8    issue which is under advisement, but in the meantime what I

9    want is a trial plan.  I want to know how to think about

10   this.  I have problems with the -- for example, you're

11   claiming the 1,800, that anything over 1,800 is a fraud,

12   right?  I'm looking across you.  So there are some areas

13   where how are you going to figure out -- you can figure out

14   in bipolar that virtually all, but how about some of these

15   other areas which the class has dropped, how are you going

16   to prove what your damages are for that?  How many of them

17   were actually for pain?  How do you know?

18           MS. NUSSBAUM:  I think it's in the aggregate, your

19   Honor.  I think --

20           THE COURT:  No, no, no.  No, we can't.  We're

21   going to do it indication by indication, so that is an issue

22   for you, so --

23           MS. NUSSBAUM:  There is evidence in the record

24   with respect to that, I mean, just as --

25           THE COURT:  Like, if I said to a jury, "Okay, you

1   find bipolar is a fraud."  This is what I want you to think

2   about in the trial, bipolar is a fraud.  I mean, that's the

3   one that really is the strongest one.  Can you then say --

4   and even if I bought the aggregate model, 99 percent of the

5   bipolar prescriptions are fraudulently induced, how are you

6   going to come up with a number for how many were actually

7   bipolar?

8           MR. HIMMELSTEIN:  Your Honor, if I may?

9           THE COURT:  No, let me just ask her.  So she needs

10   to figure out, how are you actually going to say that?

11          MS. NUSSBAUM:  Well, your Honor, I think that

12   there's two ways.  The first is, we have some internal

13   documents that I think address that point.  You have

14   internal documents of the defendants that address the point

15   of the sale of this drug and what percentage of the drug is

16   for each indication, and we would do it in the aggregate.

17          THE COURT:  You can do it in the aggregate, but

18   then ten percent of what, you know, this is what we lost

19   based on bipolar.  But if they say there was no fraud in

20   pain or no fraud in nociceptive indications, then you've got

21   to carve that out.

22          MS. NUSSBAUM:  That's correct.

23          THE COURT:  So you have to come up with a theory,

24   but right now, if all I've got is fraud and proximate -- you

25   know, there's enough for material misrepresentation, enough

1   for scienter, and enough for causing some damage, that

2   you're right, they are going to have to come up with a

3   reliable damage model that can carve it out indication by

4   indication.  I agree with that.

5           MR. CHEFFO:  And the only thing I would just say

6   on that, I think that what we would add, you know, I think

7   their whole theory of the case is different.  So the

8   discovery that if they're talking about documents -- and I'm

9   not sure if they're produced, nor am I saying that there was

10  documents that should have been produced -- but, again, if

11  this theory has morphed a bit, you know, if a doctor

12  prescribes 55 percent or 90 percent of Medicaid patients,

13  and he goes and he reads this and he says there's efficacy,

14  and he also prescribes for -- he's also a member of the

15  Kaiser plan, and that's why he prescribes for bipolar.  Now,

16  you know, they've made this argument that it's

17  inefficacious, but, again, if we're going to have that level

18  of these were the duped, we're going to need discovery to

19  know did that doctor --

20          THE COURT:  I don't know.  I simply know this:  I

21  want you to think about what it would look like and how you

22  would do it because his very good point is that even if I

23  disagree with him on the aggregate thing, I mean, you'd have

24  to come up with -- if the jury said there was fraud in

25  bipolar but no fraud in pain, you need to come up with a

1    realistic way of thinking about that from all your

2    third-party payors.  You can't say in the aggregate there

3    was fraud in bipolar, so we get every single indication

4    of --

5              MS. NUSSBAUM:  We will do that, your Honor.  I

6    believe that --

7              THE COURT:  You're sitting here dying over here.

8              MR. HIMMELSTEIN:  The reports are in.

9              THE COURT:  What?

10             MR. HIMMELSTEIN:  Dr. Hartman has calculated that

11   it's based on the NDTI data, which he says --

12             THE COURT:  Well, maybe there is.  I'm just simply

13   saying you have to think about it.  I don't know.  Okay,

14   so --

15             MR. HIMMELSTEIN:  There's nothing new to do there

16   is what I'm saying.  It's done.

17             THE COURT:  When can you do these proposed

18   trial --

19             MR. SOBOL:  October 2, your Honor?  Two weeks?

20             MR. LAWRENCE:  That's fine with us, your Honor.

21             THE COURT:  Do you want to respond, or do you want

22   to do it right away?

23             MR. CHEFFO:  Yes, I think if they can do a --

24   because normally I like to be cooperative.  I just

25   fundamentally don't see how you would have a trial, so I

1    think if they can give it in two weeks, if we could have two

2    weeks to respond or even ten days.

3              THE COURT:  Fine, fine.  We're on for you in

4    March, right?

5              MR. CHEFFO:  I think March 27 or 29, right?

6              THE CLERK:  29th.

7              MR. CHEFFO:  The only thing, I think there's

8    something with the holidays or something in there, so you

9    may want to look at that, but we're generally --

10             THE COURT:  Somebody was upset about private

11   school vacation week, so I try to be accommodating all

12   around.

13             MR. CHEFFO:  At this point, you know what, there's

14   too many players.  We're on for March 29, and we'll assume

15   it is.  If we have any problems, we'll come back to you.

16             THE COURT:  Okay, great.  Thank you.  What did you

17   say, Robert?

18             THE CLERK:  Passover.

19             THE COURT:  Maybe it was Passover?

20             MR. CHEFFO:  That's what I thought, it was one of

21   the high holy days.

22             THE COURT:  Now, off the record for a minute.

23             MR. SOBOL:  Did you want to set up a class

24   certification hearing today or no?

25             THE COURT:  You can set it up off the record.

1            (Discussion off the record.)

2             (Adjourned, 4:41 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 100

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 98 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 04-10981-PBS, In Re:  Neurontin Marketing, Sales Practices, and Product Liability Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 30th day of September, 2009.

/s/ Lee A. Marzilli
_____
LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER

49263693-d686-464d-b9a5-32b96ae37575