# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:  NEURONTIN MARKETING, SALES          :      MDL Docket No. 1629
PRACTICES AND PRODUCTS                       :
LIABILITY LITIGATION                         :      Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:      Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                    :
:      Magistrate Judge Leo T.
*Shearer v. Pfizer Inc., et al.*            :      Sorokin
Case No. 1:07-cv-11428-PBS                    :
:      PROPOSED DOCUMENT
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' EMERGENCY MOTION FOR AN ORDER RESTRICTING COMMUNICATIONS WITH TREATING PHYSICIANS AND IMPOSING SANCTIONS <u>AGAINST DR. DAVID EGILMAN</u>

Plaintiff's opposition to this motion only bolsters Defendants' request, and need, for immediate relief.  Dr. Egilman has materially altered and disclosed a confidential document, and sought to tamper with the testimony of a treating physician.   Yet, Plaintiff characterizes his conduct as "reasonable and transparent."  (Pl. Mem. in Opp. to Emergency Mot. ("Pl. Opp.") [2104] at 11.)   And Dr. Egilman – a protective order recidivist who previously expressed "regret" for similar misconduct in the *Zyprexa* litigation, and who paid $100,000 to avoid civil and criminal proceedings against him for his willful violation of the *Zyprexa* court's protective order – is now utterly unrepentant and openly boasts of his conduct in *Zyprexa*, regretting only that he was caught and punished.  Defendants suggest that the Court carefully compare what Dr. Egilman said about *Zyprexa* at the time with what he says today.  (*See* chart attached Exhibit A to the accompanying Supplemental Declaration of Mark S. Cheffo.)  This comparison clearly demonstrates that Dr. Egilman's *post hoc* attempts to justify his behavior in this case cannot be taken at face value.  Defendants request that this Court put an end to Dr. Egilman's attempts to employ the same tactics here to taint witnesses' testimony and improperly alter the outcome of upcoming trials.

I.    **Plaintiff's Straw-Man Arguments and *Post-Hoc* Rationale for Dr. Egilman's Conduct Should Be Rejected**

Plaintiff's response to this motion sets up a straw man, arguing that Plaintiff's counsel and experts have the right to "contact," "interview," and engage in "substantive communications" with Mr. Shearer's treating doctors.  (Pl. Opp. at 3-5, 8-9.)  Plaintiff then accuses Defendants of "blatant hypocrisy" on the grounds that Defendants have also sought discovery and/or informal interviews from treating doctors and other non-party witnesses.  (*See id.* at 8, 15.)  This argument is a pure non-sequitur that fails to meet the substance of Defendants' motion.   Defendants do not argue that Plaintiff is barred from contacting or interviewing Mr. Shearer's treating doctors.  To the contrary, Defendants have acknowledged that *ex parte* fact-gathering regarding doctors' treatment of Mr. Shearer is perfectly legitimate.  (Def. Mem. in Supp. of Emergency Mot. ("Def. Mem.") [2094] at 2.)  What is not legitimate, and what this motion seeks to preclude, is improper and dishonest contacts that have no plausible connection with non-party doctors' treatment of Mr. Shearer and are instead transparently designed to taint doctors' perceptions of Defendants.   Dr. Egilman's letter to Dr. Catapano-Friedman falls squarely within this category.

Plaintiff's cobbled-together *post-hoc* justification for Dr. Egilman's conduct cannot be plausibly reconciled with the style or substance of his letter to Dr. Catapano-Friedman.  Plaintiff claims that, even though Dr. Catapano-Friedman undisputedly did not prescribe Neurontin to Mr. Shearer, Dr. Egilman needed to know whether she would have warned him about possible suicidality or taken him off Neurontin had she known of the "information" in Dr. Egilman's letter.  (Pl. Opp. at 5-6.)  Even assuming *arguendo* that this were a legitimate subject of discovery from a non-prescribing treating physician, Dr. Egilman's letter does not ask a single question regarding Dr. Catapano-Friedman's prescription decisions, warnings, or treatment of Mr. Shearer.  In other words, Dr. Egilman's letter never broaches the subject that Plaintiff now claims was its central purpose.  Nor does Plaintiff explain why Dr. Egilman could not have simply asked Dr. Catapano-Friedman to identify any information she received from Defendants

regarding Neurontin's safety or effectiveness in bipolar patients, rather that presenting her with an unsolicited, one-sided advocacy statement comprising Plaintiff's theory of the case before she had even agreed to be interviewed.

Dr. Egilman similarly dismisses these issues, claiming that he "know[s] no way of determining whether or not undisclosed information would have impacted a physician's use of a drug or warning to a patient without presenting the information and asking." (September 28, 2009, Declaration of David Egilman, M.D., MPH ("9/28/09 Egilman Decl.") [2106] ¶ 9.) Yet, in a letter to another treating physician who actually prescribed Neurontin to Mr. Shearer, Dr. Egilman simply requested an interview without enclosing or characterizing a biased selection of documents. (*See* September 9, 2009, Letter from Dr. David Egilman to Dr. Hynes, attached as Exhibit F to Declaration of Andrew G. Finkelstein [2105].)

Dr. Egilman's professed bewilderment at Defendants' motion is difficult to take seriously. His conduct in this case closely tracks his conduct in the *Zyprexa* litigation, wherein Dr. Egilman admitted in a sworn declaration that he had released an "incomplete" set of documents that "would not have provided a complete picture of the issues related to Zyprexa," that "there was another side to the Zyprexa story," and that "it was not in the public interest to only put out one side of the story." (Declaration of David Egilman, M.D., MPH, submitted in *Zyprexa* Litigation ("Egilman *Zyprexa* Decl.") ¶¶ 2-4, 6, attached as Exhibit C to Cheffo Decl. [2095].) The Court should carefully consider Dr. Egilman's conduct in *Zyprexa* when evaluating his current *post-hoc* efforts to justify his letter to Dr. Catapano-Friedman.

Moreover, Dr. Egilman recently gave a deposition in which he flatly contradicted the clear import of his *Zyprexa* declaration, claiming that he "stand[s] by [his] actions" in *Zyprexa*, that he "didn't regret releasing documents" in violation of a protective order, and that he did the right thing by disclosing a cherry-picked selection of documents to non-parties. (July 1, 2009, Deposition of David Egilman, M.D., MPH ("Egilman Dep.") 151:15-19, 158:9-21, 177:22-23, attached as Exhibit B to the accompanying Supplemental Declaration of Mark S. Cheffo ("Supp.

Cheffo Decl.").)[1]  Dr. Egilman now boasts that he carefully drafted his *Zyprexa* declaration so that he would be able to spin its plain language in his favor when confronted with it in future cases like this one.[2]  As his recent testimony makes clear, Dr. Egilman's declaration in this case should be viewed with a jaundiced eye and should not be taken at face value.  Moreover, he is clearly a dangerous influence on the legitimate discovery process, and for reasons known only to him, has lost any ability to remain objective.

## II.    The Document that Dr. Egilman Improperly Altered and Disclosed Is Confidential and Subject to the Protective Order

As discussed in Defendants' opening brief, Dr. Egilman's letter to Dr. Catapano-Friedman violated this Court's Amended Stipulated Protective Order ("Protective Order") [744] by quoting from and enclosing a confidential, internal email between Pfizer employees.[3]  Plaintiff's counsel and Dr. Egilman do not dispute that this email was designated confidential. They instead claim that the email's confidentiality was lost because plaintiffs in the sales and marketing litigation filed it as an unsealed exhibit to a declaration and quoted from it in a publicly available statement of facts.  (Pl. Opp. at 2; 9/28/09 Egilman Decl. ¶¶ 3, 5-6.)[4]  Plaintiff's counsel further argues that the email was used as an exhibit during a deposition without being marked confidential.  (Pl. Opp. at 14.)

---

[1] A chart comparing Dr. Egilman's sworn statements and admissions in *Zyprexa* with his current position is attached as Exhibit A to the accompanying Supplemental Declaration of Mark S. Cheffo.

[2] "This is a negotiated document.  All right?  It was, as in many negotiations, meant to be able to be interpreted variously.  And Lilly put their spin on it.  I wrote the document, I signed the document.  I went over every line and how it would be interpreted by me in cases like this when I would have to testify about it.  We wrote it carefully, exactly as you said, so that the interpretations that I've just been giving you would fit within the language of the document."  (Egilman Dep. 165:19-166:7.)

[3] Dr. Egilman signed the Protective Order before receiving documents in this litigation.  (Egilman Dep. 112:22-113:24.)

[4] The declaration in question attached ***687 exhibits***, of which the confidential email was but one. (*See* Exhibit C to 9/28/09 Egilman Decl.)  The statement of facts is ***314 pages and 805 paragraphs*** long, and the confidential email is discussed in a single paragraph at the bottom of a single page.  (*See* Exhibit D to 9/28/09 Egilman Decl.)

Initially, these arguments are not just meritless, but moot, because Plaintiff's counsel acknowledged in writing that the internal email was a protected, confidential document just three days before Dr. Egilman sent it to Dr. Catapano-Friedman.  (Def. Mem. at 5; Cheffo Decl. ¶¶ 5-6.)  Plaintiff's opposition brief fails to even mention, let alone explain, this critical point.  And while Dr. Egilman claims that Plaintiff's counsel assured him to his satisfaction that the document was not confidential (9/28/09 Egilman Decl. ¶ 4), he contradicts his own story in a desperate attempt to explain why he deliberately and materially altered the document before sending it to Dr. Catapano-Friedman.  (*Id.* ¶ 7.)

As discussed in Defendants' Supplemental Memorandum in support of this motion (Dkt. 2103-1), the unaltered confidential document in question is a two-page email chain between several individuals.  Before sending the document to Dr. Catapano-Friedman, Dr. Egilman redacted the first email in the chain, which provided necessary context for the message that followed.  Plaintiff's counsel does not even attempt to justify or explain this deliberate alteration of a document.  Dr. Egilman, who has no such qualms, claims that he altered the document "out of an abundance of caution" ***regarding its confidentiality*** because other documents containing the redacted email message had been designated confidential.  (9/28/09 Egilman Decl. at ¶ 7.)  Beyond its patent absurdity, this purported explanation concedes that Dr. Egilman had lingering concerns about the document's confidentiality, and that he recognized that just because his copy of a document was not stamped "Confidential" did not mean it had not been so designated.

Dr. Egilman previously testified under oath that, given his past experiences in *Zyprexa* and *Ballinger*, he would seek guidance from this Court before disclosing documents whose status under the Protective Order was unclear.

> Q.      So is it fair to say, before you took any steps to disclose [any document that Pfizer had designated as confidential], you would want to seek some ruling from the Court or comfort from the Court that there was agreement that you were not in violation of a protective order?
>
> A.      I would certainly do that, right.  Absolutely.  I don't think I would have to do that, based on my understanding of the ruling.  But based on my past experience, which I'm looking at right in front of me, I would do that, absolutely.

(Egilman Dep. at 153:3-4, 154:7-19.)  Yet, despite his admitted concerns, Dr. Egilman simply chose to alter the document and publish it to a non-party.  Moreover, even Dr. Egilman does not attempt to explain why, after altering the document, he did not even stamp it "REDACTED" before mailing it to Dr. Catapano-Friedman.  Disclosing that he had deleted portions of an email exchange would certainly not have raised any confidentiality issues.

In any event, there is simply no basis for Plaintiff's counsel's and Dr. Egilman's apparent assumption that the sales and marketing plaintiffs could unilaterally destroy the confidentiality of this document by burying it in a stack of hundreds of other documents and factual statements filed with the Court.  Nor is there any basis for Plaintiff's counsel's assumption that Defendants waived confidentiality after they "learned" that the document had been used as an exhibit in a deposition.  (Pl. Opp. at 14.)  The Protective Order specifically addresses "inadvertent or unintentional disclosure," and provides:

> The inadvertent or unintentional disclosure by the producing party of Confidential Information, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information disclosed or as to any other information relating thereto or on the same or related subject matter.  ***Upon learning*** of an inadvertent or unintentional disclosure of Confidential Information, the producing party shall within thirty (30) days designate such information as Confidential.  The obligation to treat such information as Confidential shall run prospectively from the date of designation.  Nothing contained within this paragraph prevents a party from challenging such a designation of documents or information pursuant to the procedures contained in paragraph 8.

(Protective Order ¶ 12 (emphasis added).)  Plaintiff's counsel apparently assumes that Defendants automatically "learn[ed] of an inadvertent or unintentional disclosure" upon receipt of the deposition transcript.  In effect, Plaintiff's counsel reads a constructive notice provision into the above-quoted paragraph, which contains no such provision.  Regardless, Plaintiff's counsel acknowledged on September 8, 2009, that the email in question had been designated confidential, and was expressly informed shortly thereafter that it would retain that designation.  (Cheffo Decl. ¶¶ 5-6.)  Thus, as Plaintiff's counsel recognized, "[t]he obligation to treat such

information as Confidential" was in full force and effect when Dr. Egilman sent an altered version of the document to Dr. Catapano-Friedman just days later.

Dr. Egilman further argues that confidentiality was lost because the declaration and statement of facts submitted by the sales and marketing plaintiffs were "part of the subject matter argued before Judge Saris the day after Defendants filed their motion accusing me of violating the Court's confidentiality order." (9/28/09 Egilman Decl. ¶ 8.)  This argument suggests that, even in the face of a sanctions motion against him, Dr. Egilman has not bothered to familiarize himself with this Court's Protective Order, which provides:

> <u>Use of Confidential Information at Trial or Hearing</u>.  Unless otherwise directed by the Court, a party may, subject to the rules of evidence and further orders of the Court, use any Confidential Information for any purpose at trial or at any hearing before a judicial officer in this litigation.

(Protective Order ¶ 9.)  Notably, Plaintiff's counsel – who clearly has read the order and at least attempted in good faith to comply with it – makes no such argument.

In sum, Defendants maintain that the document in question is confidential and protected under the Protective Order's clear terms.  To the extent that Plaintiff or Dr. Egilman wished to contest the document's confidentiality, the Protective Order provides clear mechanisms for doing so.  The proper procedure was not to unilaterally alter the document in a manner favorable to Plaintiff, send it to a non-party, and only then try to show that its confidentiality designation had somehow been lost.

## III.    Dr. Egilman's Attempt to Whitewash His Prior Misconduct Should Be Rejected

As discussed in Defendants' opening brief, Dr. Egilman has twice been sanctioned for violations of protective orders in cases where he purported to offer expert testimony. Dr. Egilman now seeks to justify his past misconduct by giving a grossly distorted account of both proceedings.  (9/28/09 Egilman Decl. ¶¶ 13-16.)  Dr. Egilman's response reveals that he is utterly unrepentant, that he has little or no respect for courts' protective orders or companies' confidentiality interests, and that he considers himself to be the final arbiter of whether, how, and to whom the facts and documents at issue in this case should be disclosed.  Both Dr. Egilman's

past misconduct and his attempts to explain it away have direct bearing on this motion.  Unless this Court intervenes, Dr. Egilman appears not just likely, but eager, to continue engaging in similar misconduct in this case.

### A.     Dr. Egilman Mischaracterizes the *Zyprexa* Proceedings

As in *Zyprexa*, Dr. Egilman provided Dr. Catapano-Friedman with an utterly biased, one-sided version of events and with an "incomplete subset of the material that had been produced by [Defendants, which] would not have provided a complete picture of the issues related to [Neurontin]."  (Egilman *Zyprexa* Decl. at ¶ 4.)

Dr. Egilman claims that he was "never sanctioned by Judge Weinstein" in *Zyprexa* (9/28/09 Egilman Decl. ¶ 13.)  But Judge Weinstein executed a "Stipulated Order" compelling him to pay $100,000 to the charity of the defendant's choice.  (*See* Exhibit C to Cheffo Decl.)[5] The Stipulated Order and the $100,000 payment mandated therein were explicitly based on Judge Weinstein's prior finding that Dr. Egilman had intentionally violated the court's protective order and on Dr. Egilman's recognition that he was paying the $100,000 to avoid Lilly going through the process of seeking criminal and civil sanctions against him.  (*See id.*)  Thus, for example, Judge Weinstein found that Dr. Egilman and two others "conspired to obtain and publish documents in ***knowing violation*** of a court order not to do so, and that they executed the conspiracy using other people as their ***agents in crime***."  *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 397 (E.D.N.Y. 2007) (emphasis added).  So, too, Dr. Egilman acknowledged that Lilly "intended to seek criminal and civil sanctions against [him]" and that "[he] approached Lilly . . . to . . . amicably resolve this dispute."  (Egilman *Zyprexa* Decl. ¶ 1.)  Whatever semantic distinction Dr. Egilman is trying to draw between this $100,000 payment and a "sanction" makes no substantive difference.

---

[5] The executed version of this Stipulated Order is available at *In re Zyprexa Prods. Liab. Litig.*, No. 07-cv-0504, ECF Dkt. 81 (E.D.N.Y. Sept. 7, 2007).

Dr. Egilman further contends that Defendants somehow "misrepresented the facts" of the *Zyprexa* case.  (9/28/09 Egilman Decl. ¶ 13.)  While "the facts" in *Zyprexa* speak for themselves, Defendants suggest that the Court carefully compare what Dr. Egilman said about *Zyprexa* at the time with what he says today, and then draw its own conclusions.   A chart comparing Dr. Egilman's sworn statements and admissions in *Zyprexa* with his current position is attached as Exhibit A to the accompanying Supplemental Declaration of Mark S. Cheffo.  As this chart reveals, Dr. Egilman's current position grossly distorts and often flatly contradicts the sworn statements he made when still faced with the prospect of civil and criminal penalties in *Zyprexa*. Dr. Egilman's Alice-in-Wonderland approach to defining the words in his sworn declaration – "When I use a word, it means just what I choose it to mean, neither more nor less," Lewis Carroll, Through the Looking Glass, Ch VI, Humpty Dumpty (1872) – should be rejected.  The most material of these distortions are discussed below.

First, while Dr. Egilman previously stated under oath that he "***accept[ed] responsibility for my actions in the Zyprexa litigation, which I now regret***" (Egilman *Zyprexa* Decl. ¶ 1 (emphasis added)), he now openly boasts of those actions, portrays them as heroic, and regrets only that he was caught and punished for them.  At a recent deposition in *Bulger*, Dr. Egilman testified:

> ***I stand by my actions in [the Zyprexa] case***.
>
> * * *
>
> ***I certainly didn't regret releasing documents*** that saved thousands of lives.  I meant regretting that it had been misinterpreted that I violated an order.  And I certainly regretted having to pay $100,000 to get the truth out about how the drug had been marketed to people who it was killing.  So, that's what I accepted responsibility, and I accepted responsibility for having gotten the truth out about the hazardous drug and how it was hurting people.

(Egilman Dep. 158:9-21, 177:22-23 (emphasis added).)

Second, Dr. Egilman previously admitted under oath that he had released an "incomplete" set of documents that "would not have provided a complete picture of the issues related to Zyprexa," that "there was another side to the Zyprexa story," and that "it was not in the

public interest to only put out one side of the story." (Egilman *Zyprexa* Decl. ¶¶ 2-4, 6.) But Dr. Egilman now claims that he did the right thing by only disclosing a cherry-picked subset of documents because the defendant's side of the story was "false and misleading and caused people to die." (Egilman Dep. 151:15-19.) In other words, while conceding that there may be two sides to the story, Dr. Egilman unilaterally designates his side as the objective and unassailable truth, and the opposing side as "false and misleading." Having already played the role of judge and jury to his own satisfaction, Dr. Egilman has no qualms about portraying his opinions as settled fact to non-parties while omitting or redacting all contrary information – just as he did in his letter to Dr. Catapano-Friedman.

Equally important, Dr. Egilman's practice of intentionally applying his own private and idiosyncratic interpretations to his sworn declarations, *see* note 2, *supra*, demonstrates that one cannot vest confidence in the plain meaning of Dr. Egilman's sworn declarations, such as the one currently before this Court on this motion.

### B.  Dr. Egilman Mischaracterizes the *Ballinger* Proceedings

As in *Ballinger v. Brush Wellman, Inc.*, Dr. Egilman's letter to Dr. Catapano-Friedman, and his enclosure and material alteration of a confidential internal email appears "clear[ly] . . . motivated by his personal agenda and by his animosity, bias, prejudice, hostility and vindictiveness." No. 96-CV-2532, slip op. at 1-2 (Colo. Dist. Ct. June 22, 2001), *aff'd in part, vacated in part*, No. 01CA1982 (Colo. Ct. App. Sept. 5, 2002) [1801-6].

Dr. Egilman mischaracterizes the *Ballinger* proceedings in several material respects. First, he claims that the gag order in question merely "call[ed] for all parties and witnesses to remove any information related to beryllium and [the defendant] from their websites," and that he "complied" with this order. (9/28/09 Egilman Decl. ¶ 15.) But in his appellate brief challenging the sanctions against him, Dr. Egilman admitted that the gag order was much broader: "The Gag Order, among other things, prohibited [Dr. Egilman] from publishing any statements on internet web sites concerning the trial proceedings, any opposing party, and opposing party's counsel, or any witnesses or evidence in the case." (Brief for Appellant at 6,

*Egilman v. District Court*, No. 01CA1982, 2002 WL 34150173 (Colo. Ct. App. Mar. 19, 2002) ("*Ballinger* Appellate Brief"), attached as Exhibit C to Supp. Cheffo Decl.)  This is the provision Dr. Egilman was sanctioned for violating.  (*See id.* at 9.)

Second, Dr. Egilman argues that he was sanctioned in *Ballinger* only because the defense counsel in that case told the court that Dr. Egilman's website was "publicly available," and that subsequent evidence "not available at the time" revealed that the website was password-protected.  (9/28/09 Egilman Decl. ¶¶ 15-16.)  But in his appellate brief, Dr. Egilman admitted that the trial court knew his website was password-protected when it imposed sanctions.  The *Ballinger* plaintiffs' counsel had already informed the trial court that Dr. Egilman had made his website "unavailable to the public, by means of password protection, even before the Gag Order had been entered, so that only persons to whom he had given the password could access the secured site."  (*Ballinger* Appellate Brief at 9.)  The trial court accepted this representation, and observed that because of the password-protection, two of the gag order's three provisions "probably did not apply" to Dr. Egilman's conduct.  (*Id.*)  But the trial court "indicated that Dr. Egilman apparently had violated [the remaining provision], which was not limited to statements expected to be publicly disseminated, and that he was guilty of misconduct."  (*Id.*)

Moreover, Dr. Egilman has admitted in a sworn affidavit that the documents on his website were "accessible by . . . dues-paying subscribers (including corporations, companies, law firms, lawyers, and other individuals), and his students."  *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 108 n.1 (D.D.C. 2005).  Dr. Egilman fails to explain why permitting these non-parties to access the materials in question would not violate the *Ballinger* court's gag order.

Finally, Dr. Egilman references the fact that he sued the defense firm in *Ballinger* "for hacking my computer" (9/28/09 Egilman Decl. ¶ 15), but fails to note that his lawsuit was dismissed on the pleadings after the United States District Court for the District of Columbia held, as a matter of law, that the defense firm's alleged conduct did not violate the Digital

Millennium Copyright Act.  *Egilman*, 401 F. Supp. 2d at 113.[6]  That Dr. Egilman filed a meritless lawsuit after being sanctioned is hardly a vindication of his misconduct in *Ballinger*.

## **CONCLUSION**

The parties have much work ahead of them in a relatively short time.  Discovery in this case and other pending cases should proceed in a manner that allows the parties and the Court to uncover and evaluate the unvarnished facts.  Dr. Egilman's aggressive proselytizing to non-party fact witnesses shortly before their depositions directly undermines that goal and impedes the fair administration of these proceedings.  The Court should exercise its inherent power to put a stop to these tactics.

For all the foregoing reasons, Defendants request that the Court enter an order directing that Plaintiff's counsel and their agents and consultants, including David Egilman:

(1) refrain from any further substantive communications with the treating physicians of Mr. Shearer or of other products liability plaintiffs or decedents in this MDL, except to the extent that such communications specifically relate to the treatment rendered by those physicians;

(2) refrain from making derogatory remarks or providing ostensibly negative information about Defendants or Neurontin to treating physicians of Mr. Shearer or of other products liability plaintiffs or decedents in this MDL; and

(3) disclose all prior communications with treating physicians of Mr. Shearer or of other products liability plaintiffs or decedents in this MDL, including copies of all correspondence previously sent to those physicians.

---

[6] In response to this federal district court ruling, Dr. Egilman lashed out at the "legal system," claiming that it "is designed to benefit people in power. That is why courts said it was legal for blacks to be slaves or ruled it legal to deny women the vote."  (Pamela A. MacLean, *Law Firms Not Liable in Alleged Web Hacking Case*, Vol. 28, No. 19, Nat'l L. J. (Dec. 9, 2005), attached as Exhibit D to Supp. Cheffo Decl.)

Dated: October 2, 2009                    Respectfully submitted,

                                          SKADDEN, ARPS, SLATE,
                                            MEAGHER & FLOM LLP

                                          By:      /s/ Mark S. Cheffo
                                                   Mark S. Cheffo

                                          Four Times Square
                                          New York, NY 10036
                                          Tel:  (212) 735-3000

                                                   -and-

                                          SHOOK, HARDY & BACON L.L.P.

                                          By:      /s/ Scott W. Sayler
                                                   Scott W. Sayler

                                          2555 Grand Blvd.
                                          Kansas City, MO 64108-2613
                                          Tel:  (816) 474-6550

                                                   -and-

                                          WHITE AND WILLIAMS LLP

                                          By:      /s/ David B. Chaffin
                                                   David B. Chaffin

                                          BBO # 549245
                                          100 Summer Street, Suite 2707
                                          Boston, MA 02110
                                          Tel:  (617) 748-5200

                                          *Attorneys for Defendants Pfizer Inc and*
                                          *Warner-Lambert Company LLC*

- 13 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 2, 2009.

/s/ David B. Chaffin_____

David B. Chaffin