# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
In re:  NEURONTIN MARKETING, SALES          :    MDL Docket No. 1629
        PRACTICES AND PRODUCTS              :
        LIABILITY LITIGATION                :    Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :    Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                   :
                                                        :    Magistrate Judge Leo T.
*Shearer v. Pfizer Inc., et al.*            :    Sorokin
Case No. 1:07-cv-11428-PBS                  :
                                                        :    PROPOSED DOCUMENT
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SUPPLEMENTAL DECLARATION OF MARK S. CHEFFO IN SUPPORT OF
DEFENDANTS' EMERGENCY MOTION FOR AN ORDER RESTRICTING
COMMUNICATIONS WITH TREATING PHYSICIANS AND
<u>IMPOSING SANCTIONS AGAINST DR. DAVID EGILMAN</u>**

I, Mark S. Cheffo, declare and state as follows:

1.      I am a partner with the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Defendants Pfizer Inc and Warner-Lambert Company LLC.  I make this declaration based on my own personal knowledge and information.

2.      Attached as Exhibit A is a chart comparing Dr. Egilman's sworn statements and admissions regarding his conduct in the *Zyprexa* litigation.

3.      Attached as Exhibit B is a true and correct copy of portions of the July 1, 2009, Deposition of David Egilman, M.D., MPH.

4.      Attached as Exhibit C is a true and correct copy of the Brief for Appellant, *Egilman v. District Court*, No. 01CA1982, 2002 WL 34150173 (Colo. Ct. App. Mar. 19, 2002).

5.      Attached as Exhibit D is a true and correct copy of the following article: Pamela A. MacLean, *Law Firms Not Liable in Alleged Web Hacking Case*, Vol. 28, No. 19, National Law Journal (Dec. 9, 2005).

I declare the foregoing statements are true and correct under the penalties of perjury, this the 2nd day of October, 2009.

/s/ Mark S. Cheffo
Mark S. Cheffo

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 2, 2009.

/s/ David B. Chaffin_____
David B. Chaffin

# EXHIBIT A

**COMPARISON OF DR. EGILMAN'S OWN STATEMENTS REGARDING
HIS VIOLATION OF THE *ZYPREXA* COURT'S PROTECTIVE ORDER**

| **Dr. Egilman's Sworn Statements and Admissions in *Zyprexa*** | **Dr. Egilman's Sworn Statements in this Litigation** |
|---|---|
| "I understood from reviewing materials produced in the litigation that there was another side to the Zyprexa story.  I also had seen information regarding the beneficial impact Zyprexa has on patients' lives." (Egilman *Zyprexa* Decl. ¶ 2.)<br><br>"After reading the documents, I released a set of documents that did not represent the entire set of information concerning Lilly's actions and knowledge." (*Id.* at ¶ 3.)<br><br>The materials Dr. Egilman released "were an incomplete subset of the material that had been produced by Lilly in the Zyprexa litigation, and would not have provided a complete picture of the issues related to Zyprexa." (*Id.* at ¶ 4.) | "I released every document I had."  (Egilman Dep. 151:10-11.)<br><br>"Lilly's perspective were [sic.] false and misleading and caused people to die.  So, it's absolutely true, I did nothing to assist Lilly in putting out their false arguments about what Zyprexa did . . . ."  (Egilman Dep. 151:15-19.) |
| "I recognize now that it was not in the public interest to only put out one side of the story." (Egilman *Zyprexa* Decl. ¶ 6.) | A.   That last sentence, by the way, refers to Lilly putting out one side of the story, since they never told the truth about the drug.<br><br>Q.  That wasn't talking about you?<br><br>A.  Oh, no.  That's talking about Lilly.  That's why it was written like that.  If it was talking about me, I would have said I recognize it was not in the public interest for me to put out one side of the story.<br><br>* * *<br><br>Q.   Is that a fair reading, Doctor, of this document?<br><br>A.  That was the exact intent of this document.<br><br>(Egilman Dep. 161:12-23, 164:24-165:3.) |

| Dr. Egilman's Sworn Statements and Admissions in *Zyprexa* | Dr. Egilman's Sworn Statements in this Litigation |
|---|---|
| "I make this declaration voluntarily in order to accept responsibility for my actions in the Zyprexa litigation, which I now regret." (Egilman *Zyprexa* Decl. ¶ 1.) | "I stand by my actions in [the Zyprexa] case." (Egilman Dep. 177:22-23.)<br><br>"I certainly didn't regret releasing documents that saved thousands of lives.  I meant regretting that it had been misinterpreted that I violated an order.  And I certainly regretted having to pay $100,000 to get the truth out about how the drug had been marketed to people who it was killing.  So, that's what I accepted  responsibility,  and  I  accepted responsibility for having gotten the truth out about the hazardous drug and how it was hurting people."  (Egilman Dep. 158:9-21.) |
| "WHEREAS the Honorable Jack B. Weinstein entered a Memorandum, Final Judgment, Order & Injunction on February 13, 2007, which found that Dr. Egilman 'deliberately violated this court's protective order.'" (Stipulated Order[1] at 1.) | "[T]his order had nothing to do with me." (Egilman Dep. 172:16.) |
| "WHEREAS  Dr.  Egilman  has  agreed  to dismiss his appeal of the Court's February 13, 2007, Memorandum, Final Judgment, Order & Injunction and March 6, 2007, Judgment & Order, with prejudice, and abide by their terms."  (Stipulated Order at 2.) | "I wasn't a party to the case.  I couldn't appeal it.  I couldn't appeal this order."  (Egilman Dep. 172:13-15.) |
| "WHEREAS  Dr.  Egilman  has  accepted responsibility for his violation of the protective order  [and]  has  agreed  to  pay  Lilly  One | "I was never sanctioned by Judge Weinstein in the Zyprexa case, as Defendants allege." (9/28/09 Egilman Decl. ¶ 13.)[2] |

---

[1] Although the Stipulated Order was executed by Dr. Egilman's counsel, rather than by Dr. Egilman personally, he acknowledges that "my lawyers represented me.  I don't think there's a distinction between me and my lawyers."  (Egilman Dep. 168:5-7.)

[2] Regardless of whether Judge Weinstein explicitly characterized the $100,000 payment as a sanction, Judge Weinstein executed the Stipulated Order requiring Dr. Egilman to pay this sum to Lilly. *See In re Zyprexa Prods. Liab. Litig.*, No. 07-cv-0504, ECF Dkt. 81 (E.D.N.Y. Sept. 7, 2007).  The Stipulated Order and the $100,000 payment mandated therein were explicitly based on Judge Weinstein's

| Dr. Egilman's Sworn Statements and Admissions in *Zyprexa* | Dr. Egilman's Sworn Statements in this Litigation |
|---|---|
| Hundred Thousand Dollars ($100,000.00), which will be donated by Lilly to a charity of its choosing . . . ." (Stipulated Order at 1.) | |
| "I invoked my Fifth Amendment right against self-incrimination and did not testify in those proceedings." (Egilman *Zyprexa* Decl. ¶ 2.) | "That's an error.  I didn't do that. . . . [I]t should really state my lawyers said I would invoke my Fifth Amendment right." (Egilman Dep. 140:7-8, 143:8-10.) |
| "I declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct." (Egilman *Zyprexa* Decl. ¶ 7.) | "This is a negotiated document.  All right?  It was, as in many negotiations, meant to be able to be interpreted variously.  And Lilly put their spin on it.  I wrote the document, I signed the document.  I went over every line and how it would be interpreted by me in cases like this when I would have to testify about it.   We wrote it carefully, exactly as you said, so that the interpretations that I've just been giving you would fit within the language of the document." (Egilman Dep. 165:19-166:7.) |

---

prior finding that Dr. Egilman had intentionally violated the court's protective order.  (*See* Stipulated Order at 1; *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 395 (E.D.N.Y. 2007).)

# EXHIBIT B

Confidential - David S. Egilman, M.D., M.P.H.

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4   IN RE:  NEURONTIN              )
    MARKETING SALES PRACTICES      )
5   & PRODUCTS LIABILITY           )
    LITIGATION                     )
6                                  ) MDL DOCKET
    BULGER vs. PFIZER, et al.,     ) No. 1629
7   07-11426-PBS                   )
                                   )
8   SMITH vs. PFIZER, et al.,      ) MDL DOCKET
    05-CV-11515-PBS                ) No. 04-10981
9              -   -   -
    CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER
10             -   -   -
             July 1, 2009
11             -   -   -

12

13        Videotaped deposition testimony of

14   DAVID STEVEN EGILMAN, M.D., M.P.H., held

15   in the offices of The Lanier Law Firm,

16   126 East 56th Street, New York, New York,

17   commencing at 10:09 a.m., on the

18   above-referenced date, before Linda L.

19   Golkow, a Federally-Approved Registered

20   Diplomat Reporter, Certified Shorthand

21   Reporter and Certified Realtime Reporter.

22             -   -   -

23

          GOLKOW TECHNOLOGIES, INC.
24      deps@golkow.com - 877.370.3377

Confidential - David S. Egilman, M.D., M.P.H.

---

Page 2

```
 1
 2   A P P E A R A N C E S :
 3
 4   THE LANIER LAW FIRM
       BY:  MARK LANIER, ESQUIRE
 5           and
           ROBERT E. LEONE, ESQUIRE
 6           and
           DARA G. HEGAR, ESQUIRE
 7   6810 FM 1960 West
     Houston, Texas 77069
 8   (713) 659-5200
     wml@lanierlawfirm.com
 9   rel@lanierlawfirm.com
     dgh@lanierlawfirm.com
10   Counsel for Plaintiffs
11
12   THE LANIER LAW FIRM
       BY:  RICHARD D. MEADOW, ESQUIRE
13   Tower 56
     126 East 56th Street, 6th Floor
14   New York, New York 10022
     (212) 421-2800
15   rdm@lanierlawfirm.com
     Counsel for Plaintiffs
16
17
18   FINKELSTEIN & PARTNERS
       BY:  ANDREW FINKELSTEIN,ESQUIRE
19   1279 Route 300
     PO BOX 1111
20   Newburgh, New York 12551
     (800) 529-2676
21   afinkelstein@lawampm.com
     Counsel for Plaintiffs
22
23
24
```

---

Page 3

```
 1   A P P E A R A N C E S (Cont.)
 2
 3   SKADDEN ARPS SLATE MEAGHER &
       FLOM LLP
 4     BY:  MARK S. CHEFFO, ESQUIRE
             and
 5         THOMAS E. FOX, ESQUIRE
     Four Times Square
 6   New York, New York  10036
     (212)735-3000
 7   mark.cheffo@skadden.com
     thomas.fox@skadden.com
 8   Counsel for the Defendant
 9
10
11   A L S O  P R E S E N T :
12
     Emily Ardolino
     Samson Egilman
13
14
             - - -
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1           - - -
 2        I N D E X
 3   WITNESS              PAGE NO.
 4   DAVID STEVEN EGILMAN, M.D., M.P.H.
 5    By Mr. Cheffo          7
 6           - - -
 7        E X H I B I T S
 8
     NO.     DESCRIPTION     PAGE NO.
 9
10   Egilman-1   Folder entitled "Ad  55
                 Litem Docs" and
11               contents
12   Egilman-2   Assent of           82
                 appoointment of
13               administrator of
                 Ronald J. Bulger,
14               Sr., 5/15/09
15   Egilman-3   Assent of economic  89
                 interest in monies
16               related to pending
                 lawsuit of Susan
17               Bulger ingesting
                 Neurontin of Robert
18               J. Bulger, Sr.,
                 undated
19
20   Egilman-4   Letter to Robert J.  104
                 Bulger, Sr. from
21               Lisa A. Carrigan,
                 May 28, 2009, with
22               attachments
23   Egilman-5   Stipulated Order,   140
                 February 13, 2007
24
```

---

Page 5

```
 1   DEPOSITION SUPPORT INDEX
 2
 3
     Direction to Witness Not To Answer
 4   Page Line  Page Line
     (None)
 5
 6
 7
 8
     Request For Production of Documents
 9   Page Line  Page Line
     (None)
10
11
12
13
     Stipulations
14   Page Line  Page Line
     (None)
15
16
17
18
     Questions Marked
19   Page Line  Page Line
     (None)
20
21
22
23
24
```

---

2 (Pages 2 to 5)

Page 6

1           - - -
2        THE VIDEOTAPE TECHNICIAN:
3     My name is Robert McDonald, member
4     of the National Legal Video
5     Association for Golkow
6     Technologies.
7        Today is July 1st, 2009, and
8     on the record at approximately
9     10:09 a.m. and here in the matter
10     of Bulger versus Pfizer, et al.
11        The witness is David
12     Egilman, M.D., M.P.H., and we are
13     at the offices of The Lanier Law
14     Firm, 126 East 56th Street, New
15     York, New York.
16        Will counsel introduce
17     themselves for the record, please.
18        MR. CHEFFO:  My name is Mark
19     Cheffo from Skadden Arps, and I
20     represent Pfizer.
21        MR. FOX:  Tom Fox from
22     Skadden Arps for Pfizer.
23        MR. LANIER:  My name is Mark
24     Lanier, and I represent Regina

Page 7

1     Bulger.  I have with me from my
2     office Bob Leone, Dara Hegar.  We
3     also have two of the folks that
4     work with Dr. Egilman here as
5     well.
6        MR. CHEFFO:  May I have
7     their names?
8        MR. LANIER:  Yeah.
9        MS. ARDOLINO:  Emily
10     Ardolino.
11        MR. EGILMAN:  Samson
12     Egilman.
13        MR. LANIER:  Sam is his son.
14     One of his sons.  He's got two.
15     Then, again, you can ask him these
16     things.
17        THE VIDEOTAPE TECHNICIAN:
18     Thank you.
19        Will the court reporter
20     please administer the oath.
21           - - -
22        DAVID STEVEN EGILMAN, M.D.,
23     M.P.H., after having been duly
24     sworn, was examined and testified

Page 8

1     as follows:
2           - - -
3           EXAMINATION
4           - - -
5     BY MR. CHEFFO:
6        Q.    As a housekeeping, do you
7     prefer Professor or Dr. Egilman?
8        A.    Dr. is fine.
9        Q.    Okay.
10        Dr. Egilman, you understand
11     you are under oath today?
12        A.    I do.
13        Q.    You've been deposed before?
14        A.    Yes, I have.
15        Q.    And you know that if you
16     have any questions or you don't
17     understand the question, you can let me
18     know, and I'll rephrase that, correct?
19        A.    Yes.
20        Q.    And I'll assume that if you
21     answer the question, you've understood
22     it.  Is that fair enough?
23        A.    Well, the latter I can't
24     assume, that your understanding of the

Page 9

1     question is the same as my understanding
2     of the question, but you can assume I
3     have some understanding of the question.
4        Q.    Okay.
5        Is there any reason that you
6     can't testify here truthfully and
7     accurately and honestly today?
8        A.    No.
9        Q.    What have you done to
10     prepare, if anything, for today's
11     deposition?
12        A.    I brought a bunch of
13     documents related to my ad litem position
14     guardianship for the estate.  And then I
15     brought and prepared -- well, I have
16     other materials that are not related to
17     the ad litem that were from my serving as
18     a consulting witness in this case, and so
19     I have several boxes with documents and
20     the hard drive.
21        Q.    Are you guardian ad litem
22     for someone in this case?
23        A.    Yes.
24        Q.    Who?

Confidential - David S. Egilman, M.D., M.P.H.

Page 110

1    Q.   What experts have you met
2 with who are going to testify at trial in
3 this case?
4    A.   Dr. Kruszewski, Dr. Blume,
5 Dr. Trimble, Dr. Greenland. I haven't
6 met with Dr. Greenland about this case,
7 but I met with him in the past.
8    Q.   And did those meetings occur
9 during the time that you were a
10 consulting expert?
11    A.   At the time that the
12 meetings happened with the first three, I
13 guess technically, yes.
14    Q.   When were they?
15    A.   Those would have been in and
16 around the time of the Daubert hearing.
17    Q.   Okay.
18    So, that was Blume,
19 Kruszewski and, I'm sorry, you said
20 somebody else?
21    A.   Trimble.
22    Q.   Trimble. Thank you.
23    Just as a general matter,
24 were these meetings social or were they

Page 111

1 in connection with the sum and substance
2 of the Daubert hearings?
3    A.   Both.
4    Q.   And was that the only time
5 that you met with these three folks in
6 connection with this case?
7    A.   Yes.
8    Q.   Did you also testify at the
9 FDA in connection with Neurontin?
10    A.   I was at the hearing, yes.
11    Q.   Didn't you provide a
12 statement?
13    A.   I did, I think so.
14    Q.   That's testifying, isn't it?
15    A.   Yes.
16    Q.   You were under oath, right?
17    A.   No.
18    Q.   You weren't?  It was just
19 more of in your -- what was your capacity
20 that you were testifying?
21    A.   Citizen.
22    Q.   Were you compensated?
23    A.   No.
24    Q.   Did you prepare your own

Page 112

1 materials or someone in your office?
2    A.   Yes.
3    Q.   It didn't come from lawyers?
4    A.   No.  And I can't -- I think
5 I did testify, but I don't have a
6 specific recollection.  But the record is
7 what the record is.
8    Q.   I'll represent to you that
9 you did.  Whether you want to call it
10 testifying or speaking, there is a
11 transcript of you talking at the hearing,
12 whatever you want to call it.
13    A.   I've been known to talk at
14 hearings.
15    Q.   So, is it fair to say at
16 that hearing you were not speaking or
17 providing information, your thoughts or
18 expertise in connection with any
19 litigation, you were testifying as a
20 citizen?
21    A.   That's correct.
22    Q.   Have you received any
23 confidential documents from Pfizer in
24 connection with this case for this

Page 113

1 litigation?
2    A.   Not from Pfizer.  I have
3 Pfizer confidential documents, yes.
4    Q.   You do?
5    A.   Yes.
6    Q.   That were produced by Pfizer
7 in connection with the Neurontin
8 litigation?
9    A.   Sure.
10    Q.   And you know they are
11 confidential because they probably have a
12 stamp on the bottom of it?
13    A.   Well, that's not necessarily
14 the case, but I know they were
15 confidential because they were told it
16 was going to be confidential.  They are
17 not all confidential, for example.  Even
18 some of the documents with stamps are not
19 confidential.
20    Q.   Have you signed a protective
21 order in this case?
22    A.   Yes.
23    Q.   When?
24    A.   Before I got the documents.

29 (Pages 110 to 113)

Confidential - David S. Egilman, M.D., M.P.H.

Page 138

1  cases, but I'm not working on any files
2  at the current time.
3      Q.   Okay.
4          And you didn't mention the
5  Zyprexa litigation.  Did you also work on
6  that?
7      A.   I was a consulting witness
8  in that.  That's correct.
9      Q.   And that was --
10     A.   You just asked me about from
11 May 29th.
12     Q.   Fair enough.  Fair enough.
13 I wasn't finding fault.
14         You were a consulting expert
15 also in the Zyprexa litigation?
16     A.   Correct.
17     Q.   Now, you know that in the
18 Zyprexa litigation, there was an order
19 entered by Judge Weinstein that was very
20 critical of your conduct; is that fair?
21     A.   Correct.
22     Q.   And what were the
23 circumstances leading up to Judge
24 Weinstein's issuing an order finding that

Page 139

1  you violated the protective order?
2      A.   What do you mean, what were
3  the circumstances?
4      Q.   What happened?
5      A.   He didn't make that
6  finding -- well, it is a finding.  Yes,
7  it is a finding.  Remember, the order
8  that he wrote that you are citing is a
9  TRO that I was not party to, just to be
10 clear, although he wrote that my lawyers
11 were there.  My lawyer stood up and said
12 they are not a party to that and they
13 weren't noticed of that hearing as me as
14 a defendant, just to make that clear.
15         What happened?  I had
16 documents that related to -- well,
17 Lilly's knowledge about the toxicity of
18 Zyprexa, and I released them.
19     Q.   And you knew that they were
20 subject to a protective order, right?
21     A.   No -- well, no, not exactly.
22     Q.   Well, you signed a
23 statement, right, under penalty of
24 perjury, correct?

Page 140

1      A.   Correct.
2      Q.   You basically said, amongst
3  other things, that in connection with the
4  proceedings, you invoked your Fifth
5  Amendment right against self
6  incrimination?
7      A.   That's an error.  I didn't
8  do that.
9      Q.   That's an error?
10     A.   That's right.  I didn't do
11 that.
12         MR. CHEFFO:  Let's mark
13     this.
14         - - -
15         (Whereupon, Deposition
16     Exhibit Egilman-5, Stipulated
17     Order, February 13, 2007, was
18     marked for identification.)
19         - - -
20         THE WITNESS:  My lawyer did
21     that.
22         MR. CHEFFO:  I'm sorry,
23     Mark, I haven't been giving you
24     copies.

Page 141

1          MR. LANIER:  I know all
2      these documents.
3          MR. CHEFFO:  Okay.
4  BY MR. CHEFFO:
5      Q.   This is a stipulated order?
6      A.   Correct.
7      Q.   Now, essentially there was a
8  motion that was filed against you for
9  criminal and civil penalties, right?
10     A.   Not true.  No motion was
11 ever filed.
12     Q.   Fair enough.
13         Where it says, "Whereas, Eli
14 Lilly & Company expressed its intent to
15 seek civil contempt...and the imposition
16 of criminal contempt penalties against
17 Dr. Egilman for his violation of the
18 protective order," right?
19     A.   That's true.
20     Q.   So, they said, we're going
21 to -- we believe that you violated the
22 protective order, we're going to seek
23 civil and criminal penalties against you,
24 right?

Golkow Technologies, Inc. - 1.877.370.3377

Page 142

1    A.   They threatened me, yes.
2    Q.   And in response to that, you
3  decided to try and resolve those issues
4  with them?
5    A.   Correct.
6    Q.   And there's a
7  seven-paragraph document attached to the
8  stipulation and order, right?
9    A.   That's correct.
10   Q.   And I take it you read this
11  extremely carefully because this is very
12  important to you?
13   A.   It is true, but I didn't
14  know the law at the time on the Fifth
15  Amendment.
16   Q.   So, is this declaration
17  inaccurate in any way?
18   A.   It is technically
19  inaccurate, because my lawyers said that
20  if I were deposed and there was a
21  criminal complaint pending, or possible
22  criminal complaint pending, that I would
23  take the Fifth Amendment.  But since that
24  time, I've learned, and there's case law

Page 143

1  on this, that as I understand the case
2  law, you have to invoke the Fifth
3  Amendment yourself.  A lawyer can't do
4  it.  And I never invoked the Fifth
5  Amendment myself in any proceeding.  I
6  was never present in the court or at a
7  deposition.  So, while this says I
8  invoked my Fifth Amendment right, it
9  should really state my lawyers said that
10  I would invoke my Fifth Amendment right.
11   Q.   What steps have you taken to
12  go back to Judge Weinstein and clarify
13  this?
14   A.   None.
15   Q.   You haven't gone back and
16  said, I now know that this is inaccurate,
17  I need to bring it to your attention?
18   A.   No, I don't think it's a big
19  difference.  But when I testify about it
20  now, since I think I know how it is, what
21  the real facts are, which I didn't know
22  then, I give the answers I just gave.
23   Q.   You wound up paying
24  $100,000, right?

Page 144

1    A.   That's correct.
2    Q.   Did you personally pay that?
3    A.   That's correct.
4    Q.   And as a result of your
5  conduct, you were fired by The Lanier Law
6  Firm, right?
7    A.   Not correct.
8    Q.   Did you cease involvement in
9  this litigation, in the Zyprexa
10  litigation?
11   A.   Which litigation?  The
12  Zyprexa litigation?
13   Q.   Yes, sir.
14   A.   I think so.  Well, no, I did
15  not cease involvement in the Zyprexa
16  litigation.
17   Q.   Were you --
18   A.   In other words, between the
19  time of the disclosure of the documents
20  and the time of this settlement
21  agreement, I was still involved in the
22  Zyprexa litigation or Zyprexa-related
23  litigation.
24   Q.   Doctor, I have just seen

Page 145

1  just, frankly, public reports, and it
2  reports that after this, the Lanier firm
3  ceased the relationship that they had
4  with you as a consultant.  I mean, is
5  that inaccurate?
6    A.   I think so.  That's not my
7  understanding.
8    Q.   So, you believe that you
9  continued to the end to work as a
10  consultant in connection with the Zyprexa
11  litigation?
12   A.   For sure I did.  Some of
13  it -- I'm not sure if it -- I didn't say
14  with the Lanier firm when I said it.  I
15  was doing other consulting on Zyprexa for
16  the U.S. attorney in Philadelphia.  So,
17  subsequent to my disclosure of the
18  documents, I served as a consultant, I
19  got all the documents back, okay, not --
20  but they weren't CMO 3 documents, and I
21  served as a consultant to the U.S.
22  Attorney for the criminal case where
23  Lilly pleaded -- paid $1.4 billion and
24  pleaded guilty to a criminal violation of

Page 146

1    FDA rules.  So, I served as a consultant
2    to the U.S. attorney.  This is not, by
3    the way, the entire settlement agreement.
4        Q.   Well, and I'm --
5        A.   Just so you know that.
6        Q.   I'm just asking, just so I
7    could understand about the relationship.
8    Is it accurate that after -- within a
9    reasonable time after this resolution
10   with Lilly and this declaration, you
11   ceased being a consultant in the civil
12   litigation against Lilly on behalf or at
13   the request of the Lanier firm?
14       A.   Certainly at some time after
15   this I did, because the cases settled.
16       Q.   It didn't have anything to
17   do with this?
18       A.   I don't know what it had to
19   do with.
20       Q.   I mean, you would agree with
21   me that this is a concession that you
22   violated a protective order, right?
23       A.   Correct.
24       Q.   And you did that knowingly?

Page 147

1        A.   Hang on.  Let's see what it
2    says.  Where are you reading from?
3        Q.   Well, I mean, it says,
4    "After reading the documents, I released
5    a set of documents that did not represent
6    the entire set of information concerning
7    Lilly's actions and knowledge.  I did not
8    want to do anything myself to publicize
9    Lilly's perspective on the side effects
10   of Zyprexa or to get Lilly's perspective
11   on the side effects publicized to doctors
12   or patients."
13       A.   You read that part, but if
14   you read section 5, it doesn't say
15   knowingly.  It says, "I violated Case
16   Management Order (CMO-3) which is in
17   force in the Zyprexa MDL."
18       Q.   Did you --
19       A.   No, I did not intentionally
20   violate, nor did I sign CMO-3.  But I did
21   violate CMO-3.  In other words, CMO-3
22   said that all the documents released
23   pursuant to the litigation should be
24   confidential.  I never signed that order

Page 148

1    as written.  And I got the documents
2    before I signed any release, any
3    confidentiality, if you want the time
4    sequence.  I got the documents.  I
5    haven't signed anything.  I was sent a
6    release form after that, and I refused to
7    sign it as written.  I signed a modified
8    form of that document.  Then it was sent
9    back again.  I changed it again.  Still,
10   in both cases, I said that I would
11   release the documents if I thought -- and
12   I told the lawyers this -- if I thought
13   that there was important public health
14   information or evidence of a crime, I
15   don't think I threw that in, I may have
16   thrown that in, but mostly public health
17   information in those documents.  I told
18   them that.  That's my rule all the time.
19   The only way I'll sign a confidentiality
20   agreement in a case is if I don't think
21   there's any public health import in the
22   documents.  That's why I signed one in
23   this case, because I felt that all the
24   relevant information had already been

Page 149

1    released in this case, with the criminal
2    penalties, et cetera, that Pfizer had
3    already signed and admitted to and with a
4    black box warning.  So -- I'm sorry, with
5    the warnings.
6        So, those issues related
7    to -- that's how a CMO-3 issue comes up.
8    And that's why I technically violated the
9    order.  It wasn't with intent.  In fact,
10   I intended not to violate the order.  I
11   followed -- even though I hadn't signed
12   the order, I provided Lilly with notice
13   that I received a subpoena.  They
14   received that notice of the subpoena.  I
15   made some efforts to see that they
16   actually got it to the right place.  And
17   after waiting -- there was no time --
18   there were two time periods in that
19   order.  One is if the documents were
20   going to be disclosed to a consultant for
21   other pharmaceutical companies, it was
22   specifically said there would be a
23   ten-day wait after the notice to the
24   other party in this case, the drug

Page 150

1  company. In the original CMO, there was
2  also a ten-day wait if you are going to
3  disclose the documents to someone other
4  than a consultant. That second ten-day
5  wait was removed from the final CMO that
6  I saw, and so I waited seven days before
7  the documents were allowed to be
8  disclosed to the public.
9       Q.   Did you tell all of this to
10 Judge Weinstein?
11      A.   No. I didn't tell Judge
12 Weinstein anything. I didn't testify in
13 front of Judge Weinstein.
14      Q.   You just paid $100,000 and
15 signed this?
16      A.   I just paid $100,000 and
17 signed this, which is compatible with
18 what I just said.
19      Q.   And you only gave half the
20 story. That's essentially what this
21 says, right? You withheld information
22 that you thought was --
23      A.   No, not exactly. What this
24 says is, this says that I only released

Page 151

1  the documents that I had. That's what it
2  says. Read it carefully. Because I
3  wrote it carefully. It says, "I released
4  a set of documents that did not represent
5  the entire set of information concerning
6  Lilly's action and knowledge," because
7  there were a lot of other documents that
8  I didn't have that I couldn't release
9  because I didn't have them in my
10 possession. So, I released every
11 document I had.
12      "I did not want to do
13 anything myself to publicize Lilly's
14 perspective." That's absolutely true.
15 Because Lilly's perspective were false
16 and misleading and caused people to die.
17 So, it's absolutely true, I did nothing
18 to assist Lilly in putting out their
19 false arguments about what Zyprexa did
20 and how lethal it was for the people they
21 were target marketing to off label. It
22 is absolutely true I didn't do that.
23      Q.   And if there was a document
24 in this case that you felt was -- you

Page 152

1  made the personal determination that was
2  a public health issue or had not been
3  disclosed, you would do the same thing
4  again, wouldn't you?
5       A.   No, not the same way.
6       Q.   Well, I thought you just
7  told me that in this case --
8       A.   Well, first of all --
9       Q.   Let me -- let me --
10      A.   No, let me finish my answer.
11      Q.   Well, I didn't --
12      A.   Let me finish my answer,
13 because you asked me about this case.
14 All right?
15      This case has an order
16 that's already been given, that if
17 there's an expert in this case who wants
18 to use a document in a published paper,
19 that that document will be made
20 nonconfidential. That's an agreement in
21 this case. Therefore, I don't think the
22 confidentiality agreement in any way
23 impairs me from releasing information of
24 important public health need based on

Page 153

1  that order.
2       Q.   And you think that that
3  would apply to any document that Pfizer
4  had designated as confidential? If you
5  decided to write an article and use it or
6  cite to it, you believe that you would
7  have the ability to just do so?
8       A.   I don't know. I think it
9  certainly generally applies to any
10 scientific argument. In other words, if
11 there was information -- let's say
12 there's information in the disclosed
13 Pfizer documents that says, you know,
14 Neurontin causes cancer. It's clear it
15 causes lung cancer. There's a tripling
16 of the rate of lung cancer in the
17 patients who take Neurontin. I think
18 that under the order, I could certainly
19 publish that right now without going
20 anywhere that there were these studies
21 that indicated that Neurontin caused lung
22 cancer.
23      Now, certainly I would
24 follow the procedure where I would submit

39 (Pages 150 to 153)

Page 154

1   the paper, which is what I did with the
2   Vioxx papers, to the lawyers in the case
3   or to the judge directly so she could
4   rule as to whether or not those documents
5   that I wanted to use for public health
6   purposes should be released.
7       Q.    So, is it fair to say,
8   before you took any steps to disclose,
9   you would want to seek some ruling from
10  The Court or comfort from The Court that
11  there was agreement that you were not in
12  violation of a protective order?
13      A.    I would certainly do that,
14  right.  Absolutely.  I don't think I
15  would have to do that based on my
16  understanding of the ruling.  But based
17  on my past experience, which I'm looking
18  at right in front of me, I would do that,
19  absolutely.
20          MR. LANIER:  Mark, can I
21      interrupt and ask a quick question
22      of you?
23          MR. CHEFFO:  Yeah, sure.
24          MR. LANIER:  Are you pretty

Page 155

1       much just doing impeachment-type
2   junk from here on out so I can
3   leave and you just do it?
4           MR. CHEFFO:  I'm not sure
5   I'd characterize it that way.  But
6   I think I get your point, and the
7   answer is probably yes.
8           MR. LANIER:  Yeah.  I mean,
9   if you get to anything too
10  interesting, call me.  But
11  otherwise, I'm going to be
12  upstairs working or downstairs
13  working.
14          MR. CHEFFO:  Got it.
15          THE WITNESS:  Can I just ask
16  if we are going to -- I'm getting
17  a little hungry.
18          MR. CHEFFO:  We are not
19  going to be very long, but --
20          THE WITNESS:  But you said
21  that an hour ago.
22          MR. CHEFFO:  Well, you want
23  to take a five-minute break?
24          THE WITNESS:  Well, how long

Page 156

1   are you going to go?
2           MR. CHEFFO:  Probably not
3   too -- let's take a five-minute
4   break, and I think I can wrap up
5   in probably 10 or 15 minutes.
6           THE WITNESS:  Okay.
7           MR. CHEFFO:  It depends
8   on --
9           THE WITNESS:  Well, you got
10  anything --
11          MR. CHEFFO:  I'm not going
12  to quibble with you, Doctor, but,
13  you know, my questions are also
14  dependent on your answers.  So,
15  it's a two-way street.
16          THE WITNESS:  I'm not
17  complaining at all.  I just want
18  to, you know, feed my face.
19          MR. LANIER:  Why --
20          MR. CHEFFO:  I mean, I think
21  we're probably going to be done by
22  2:00.  If you want to eat, I'm not
23  going to say you can't.  We'll
24  probably be done in about 20

Page 157

1   minutes.
2           MR. LANIER:  Whatever y'all
3   want to do.  It is up to David.
4           THE WITNESS:  Well, let's
5   take a five-minute break and see
6   if I can get something upstairs to
7   mangia on.
8           THE VIDEOTAPE TECHNICIAN:
9   This completes Videotape 3.  Off
10  the record at 1:21 p.m.
11              - - -
12          (Whereupon, a recess was
13      taken from 1:21 p.m. until
14      1:34 p.m.)
15              - - -
16          THE VIDEOTAPE TECHNICIAN:
17  This is Videotape 4.  Back on the
18  record, 1:34 p.m.
19  BY MR. CHEFFO:
20      Q.    I would like to just ask you
21  a few more questions about your
22  declaration in connection with the
23  settlement that you had with Lilly by
24  which you paid the $100,000.  In

40 (Pages 154 to 157)

Confidential - David S. Egilman, M.D., M.P.H.

Page 158

1    Paragraph 1, it says, "I make this
2    declaration voluntarily in order to
3    accept responsibility for my actions in
4    the Zyprexa litigation, which I now
5    regret."
6         Do you see that?
7    A.   I do.
8    Q.   What did you mean by that?
9    A.   Well, I certainly didn't
10   regret releasing documents that saved
11   thousands of lives.  I meant regretting
12   that it had been misinterpreted that I
13   violated an order.  And I certainly
14   regretted having to pay $100,000 to get
15   the truth out about how the drug had been
16   marketed to people who it was killing.
17   So, that's what I accepted
18   responsibility, and I accepted
19   responsibility for having gotten the
20   truth out about the hazardous drug and
21   how it was hurting people.
22   Q.   Did you think it was in the
23   public interest when you disclosed those
24   documents?

Page 159

1    A.   Absolutely.  Not only do I
2    think it was in the public interest, but
3    apparently the U.S. attorney and Lilly
4    did too, eventually, since Lilly pleaded
5    guilty to a felony conviction, based on
6    the documents I released, and paid a $1.4
7    billion fine.  But more importantly, the
8    information about the side effects of the
9    drug, which had been previously hidden,
10   and the information about how the drug
11   had been target marketed for people who
12   were going to die -- in other words, what
13   was going on here is Lilly was marketing
14   this drug with a slogan called "Take 5 at
15   5" to demented patients, and they had
16   data that indicated there was a rate
17   ratio between 2 and 3.  That means that
18   there was a doubling or tripling of the
19   deaths.  So, basically, they were
20   marketing a drug that was actually
21   killing patients in large numbers, to the
22   extent that those patients were using the
23   drug.  So, I certainly thought it was --
24   and later on, I think at least partly

Page 160

1    because of the release of the documents,
2    a black box warning went on the label
3    saying exactly that, and Lilly was
4    prevented from continuing to market the
5    drug off label.  So, those are certainly
6    things that I thought happened as a
7    direct result of my releasing the
8    documents.
9    Q.   And you still think that it
10   was in the public interest to have
11   released those documents?
12   A.   It would have been in the
13   public interest to release those
14   documents to save one life.  In my view,
15   thousands or hundreds of thousands of
16   people's lives were saved because people
17   went to the doctor, the doctors became
18   informed about the fact that the drug
19   caused diabetes and that the drug was
20   actually lethal to demented patients, who
21   turned out to be a fairly large
22   percentage of the patients who were
23   target marketed by Lilly.
24   Q.   Can you just read the last

Page 161

1    sentence of Paragraph 6 out loud, please?
2    A.   Sure.
3         "My violation of CMO-3, which
4    undermined the purpose of CMO-3, which
5    was to effectively prosecute this
6    important litigation without unnecessary
7    breach of the parties' privacy.  I" now
8    recognize "that it was not in the public
9    interest to only put out one side of the
10   story."
11   Q.   Okay.  Thank you.
12   A.   That last sentence, by the
13   way, refers to Lilly putting out one side
14   of the story, since they never told the
15   truth about the drug.
16   Q.   That wasn't talking about
17   you?
18   A.   Oh, no.  That's talking
19   about Lilly.  That's the way it was
20   written like that.  If it was talking
21   about me, I would have said I recognize
22   it was not in the public interest for me
23   to put out one side of the story.
24   Q.   But it says, "I recognize

41 (Pages 158 to 161)

Confidential - David S. Egilman, M.D., M.P.H.

Page 162

1  now." You always believed, prior to
2  this, right, you believed that they were
3  telling one side of the story, right?
4  That wasn't a novel, new kind of news
5  story, was it?
6       A.   No, it was new. I didn't
7  know before I saw the documents. This
8  now refers to my reading the documents.
9       Q.   You basically --
10       The whole point of this
11  declaration, I mean, correct me if I'm
12  wrong here, but you signed this because
13  -- and you paid $100,000 because you
14  believe that you were going to be
15  criminally sanctioned. Isn't that what
16  you told or your lawyers told Judge
17  Weinstein?
18       A.   I don't know. I don't think
19  so, no. I signed this to get rid of this
20  issue. It was costing me a lot of money
21  in legal fees to defend the case, at
22  least another $70,000 in legal fees at
23  the time this was signed. So, $100,000
24  was going to be less money than it was

Page 163

1  going to cost me to continue to pursue
2  the matter. After all, at this time, I
3  hadn't even been charged with anything by
4  anybody, and I had spent $70,000 in legal
5  fees. So, $100,000 to me looked like a
6  bargain. And I was certainly willing,
7  and would be willing again, to pay
8  $100,000 to save hundreds of thousands of
9  people's lives if I had the money.
10       Q.   By violating a protective
11  order?
12       A.   I didn't say that. I said
13  that I would be willing to spend $100,000
14  to save hundreds of thousands of people's
15  lives.
16       Q.   You wrote here, "I did not
17  want to do anything myself to publicize
18  Lilly's perspective on the side effects
19  of Zyprexa or to get Lilly's perspective
20  on the side effects publicized to doctors
21  or patients," right?
22       A.   That's absolutely correct.
23  Because Lilly's perspective was the one
24  that it turned out to be, and I thought

Page 164

1  was at the time, criminal. Lilly was
2  doing criminal things. Their
3  perspective, they pleaded guilty to a
4  crime and paid a $1.4 billion, billion
5  with a B, dollar penalty for putting
6  their perspective out. So, why would I
7  want to get their perspective out, which
8  they subsequently admitted, and I thought
9  at the time was in violation of the law,
10  never mind, more importantly, in
11  violation of the good of the public
12  health of the community. There's no
13  reason in the world I would want to get
14  out -- I would be an irrational person if
15  I wanted to get out the fact that -- or
16  tell people -- you want me to tell people
17  what Lilly was saying, which is the drug
18  doesn't cause diabetes, when they knew it
19  did? Do you want me to tell people what
20  Lilly was saying, which is the drug
21  should be used on people with dementia,
22  when it actually killed them? Why would
23  I want to get those things out?
24       Q.   Is that a fair reading,

Page 165

1  Doctor, of this document?
2       A.   That was the exact intent of
3  this document.
4       Q.   Do you think that's a fair
5  reading?
6       A.   Absolutely.
7       Q.   Do you think if another
8  judge or somebody else reads it, they're
9  going to take away that the "I now
10  recognize that it was not in the public
11  interest" was not talking about you?
12  Seriously, you really think that that's
13  the takeaway?
14       A.   That was the message -- this
15  was a negotiated document --
16       Q.   You went to them, right?
17       A.   Excuse me. You cut my
18  answer off. Okay?
19       This is a negotiated
20  document. All right? It was, as in many
21  negotiations, meant to be able to be
22  interpreted variously. And Lilly put
23  their spin on it. I wrote the document,
24  I signed the document. I went over every

42 (Pages 162 to 165)

Confidential - David S. Egilman, M.D., M.P.H.

Page 166

1  line and how it would be interpreted by
2  me in cases like this when I would have
3  to testify about it. We wrote it
4  carefully, exactly as you said, so that
5  the interpretations that I've just been
6  giving you would fit within the language
7  of the document.
8        Now, Lilly, as soon as this
9  was signed, within minutes of this being
10  signed, put out a press release which
11  spun the document in the way that you
12  have apparently gotten the unfortunate
13  misperception of what this meant. But
14  it's not what the document says on the
15  face, and it's not what -- their spin is
16  not what I intended. And it's clear now
17  that everything I said at the time was
18  true. They pleaded guilty to a felony.
19  They -- I didn't plead guilty to
20  anything. I wasn't even charged with
21  anything. They paid a $1.4 billion
22  criminal penalty for putting out their
23  view of what their drug did.
24        Q.   Do you consider yourself a

Page 167

1  fighter, Dr. Egilman?
2        A.   A fighter?
3        Q.   Not a physical fighter. I
4  mean, are you a person of principal, a
5  person who fights for what you believe
6  in?
7        A.   I think so. I hope so.
8        Q.   You understood the facts,
9  and you or your lawyers went to Lilly and
10  said, I want to resolve this, right?
11        A.   Correct.
12        Q.   They didn't come to you, did
13  they?
14        A.   Well, you know, there was a
15  lot of discussion. This is written, I
16  think the initial approach was by my
17  lawyers, to Lilly.
18        Q.   Well, it says, "I approached
19  Lilly and asked it to consider amicably
20  resolving this." I mean, that's --
21        A.   I personally, as you know,
22  didn't approach anybody. My lawyers did
23  the discussions with Lilly.
24        Q.   That's not what it says

Page 168

1  here.
2        So, your lawyers did that.
3  But you authorized them to approach
4  Lilly?
5        A.   I -- look, my lawyers
6  represented me. I don't think there's a
7  distinction between me and my lawyers.
8        Q.   Right.
9        A.   All right? But I'm telling
10  you that I wasn't involved in the
11  conversations.
12        Q.   You wrote this document,
13  though, you said?
14        A.   I signed this document. I
15  wrote it with my lawyers. Lilly -- I had
16  the final say on whether I was going to
17  sign this document. Lilly wrote part of
18  this document. My lawyers wrote part of
19  this document. We went back and forth
20  for several months. But I signed this
21  document.
22        Q.   At the end of the day, you
23  made a decision to pay $100,000 rather
24  than fight the charges, the criminal and

Page 169

1  civil charges, that Lilly advised you
2  that they were going to prosecute against
3  you?
4        A.   No, not exactly. There were
5  never any charges filed.
6        Q.   Did they advise you? I said
7  that they were going to -- we covered
8  that before. They told you? I mean,
9  doesn't it say that right here? It says
10  --
11        A.   Well --
12        Q.   Hold on. You need to let me
13  ask the questions. I've let you answer
14  them.
15        It says, "Lilly expressed
16  its intent to seek civil contempt and
17  imposition of criminal penalties," right?
18        A.   You read that correctly. Do
19  you have a question?
20        Q.   Yes.
21        So, basically they told you
22  or your lawyers that they were going to
23  seek civil penalties and criminal
24  contempt, and, basically, you went to

43 (Pages 166 to 169)

Golkow Technologies, Inc. - 1.877.370.3377

Confidential - David S. Egilman, M.D., M.P.H.

Page 170

1   them to try and resolve it, right?
2       A.   That's correct.
3       Q.   And then --
4       A.   But it's not -- but it's
5   clear at this point in time that they
6   never were going to do that.  Because
7   they made the same threat to Gottstein,
8   the lawyer, who also released the
9   documents.  And they have not to date,
10  five years later, filed any civil or
11  criminal charges against Gottstein, and
12  he's not settled anything with them.  So,
13  clearly, it was a threat that they did
14  not intend -- that they made against two
15  people.  Now, I settled, Gottstein
16  didn't, but they never followed through
17  with the same threat to him for the same
18  activity.  So, it was clearly a threat
19  that they apparently decided not to go
20  forward with.
21      Q.   And part of the settlement,
22  you paid them $100,000, right?
23      A.   Absolutely.  And I would do
24  it again if I could save people's lives.

Page 171

1       Q.   Didn't Judge Weinstein,
2   Federal District court judge in Brooklyn,
3   make a finding that you deliberately
4   violated the protective order?
5       A.   He did indicative -- it was
6   not part of any -- he wrote that as part
7   of the TRO.
8       Q.   Well --
9       A.   But it wasn't part of -- in
10  other words, it was not part of an
11  adjudication of a charge against me or a
12  complaint against me.  He found that as
13  he summarized what he thought were the
14  facts in the case.
15      Q.   Doctor, with all due
16  respect, this is a stipulated order,
17  right?  That's what you are looking at?
18      A.   Correct.
19      Q.   That means both parties
20  stipulate?
21      A.   Correct.
22      Q.   Doesn't the second paragraph
23  say, "Whereas, the Honorable Jack
24  Weinstein entered a Memorandum, Final

Page 172

1   Judgment, Order & Injunction on February
2   13, 2007 which found that Dr. Egilman
3   'deliberately violated this court's
4   protective order'."
5       A.   That's correct.  I said that
6   he found that, and that was part of his
7   finding.
8       Q.   Okay.
9            And that was not appealed,
10  was it?
11      A.   It was appealed.
12      Q.   What was appealed?
13      A.   Not by me.  I wasn't a party
14  to the case.  I couldn't appeal it.  I
15  couldn't appeal this order.  I was not --
16  this order had nothing to do with me.
17      Q.   Did you make any application
18  to the judge to revise that?
19      A.   No.  That was part of my
20  settlement agreement.
21      Q.   Did you move to intervene?
22      A.   No.  I wasn't part of the
23  case.  This was a temporary restraining
24  order, hearing and order, subsequent

Page 173

1   order, against parties that did not
2   include me, because I had already turned
3   over the documents.
4       Q.   So, you didn't take any
5   action to get Judge Weinstein to change
6   his view or change his decision, did you?
7       A.   No.
8       Q.   Now, also in --
9            Do you remember the
10  Ballinger case?
11      A.   Sure.
12      Q.   And this is another court
13  that says that "The Court finds that Dr.
14  Egilman knowingly, deliberately,
15  intentionally and willfully violated the
16  court's 5/30/01 order prohibiting certain
17  extrajudicial statements."
18           Do you remember that?
19      A.   Yes.
20      Q.   And the judge did make that
21  finding, right?
22      A.   Yeah, and it was overturned
23  on appeal.
24      Q.   The entire order was

Page 174

1  overturned?
2       A.   It was over -- the parts of
3  the order that I could appeal on were
4  overturned.
5       Q.   Was that finding overturned?
6       A.   That's my understanding.
7       Q.   He also found that you
8  couldn't testify in his court, right?
9       A.   No.  He was ambiguous as to
10  whether I couldn't testify anywhere,
11  Colorado, his court, anywhere.
12       Q.   And that part was
13  overturned, right?
14       A.   For sure that was
15  overturned.
16       Q.   Are you sure that the other
17  part, the finding was overturned?
18       A.   I'm not sure, but I think
19  so.
20       Q.   Now, did you give the
21  probate court either the stipulated
22  order, or did you tell the judge that The
23  Court in the Ballinger case found that
24  you intentionally violated orders or he

Page 175

1  also found that you were not a credible
2  witness?  Did you tell The Court that?
3       A.   No.
4       Q.   You didn't think it was
5  relevant to this case, right?
6       A.   I didn't tell The Court
7  anything.  But if -- it might be relevant
8  to this case, but -- or to -- well, I'm
9  not sure if it was relevant to this case.
10  It might be relevant to who I am and what
11  I'm about.  But, I mean, there was no
12  investigation of that.
13       Q.   Do you think that the
14  probate court should have had knowledge
15  about who you were about or information
16  before you were appointed administrator?
17       A.   I don't know what the
18  details of the procedure were.
19       Q.   Do you think that these
20  orders and these statements about you, do
21  they define who you are?
22       A.   Well, the Ballinger case has
23  nothing to do with who I am or what I am.
24       The Lilly case, yes, the

Page 176

1  Lilly case says that I'm somebody who's
2  going to put it on the line if I have to
3  to save people's lives.  So, I think
4  that's a pretty relevant thing about me.
5       Q.   Well, what would happen if
6  you want to disclose information and a
7  court said that they didn't think it was
8  appropriate to disclose?  What would you
9  do?
10       A.   I don't know.  It is too
11  ambiguous.  I would do the same thing
12  that people try to do first, which is try
13  to get the documents released.  Or what's
14  happened in this case, the documents are
15  released if they feel that -- if the
16  experts feel they merit publication.
17       Q.   And if you couldn't do it
18  that way, can you say today that you
19  would follow The Court's order?
20       A.   I can't say anything about
21  some unknown hypothetical.  I mean, I can
22  tell you this, that it is a wrong thing
23  to push someone.  It's really bad.  But
24  if you are in front of a bus and I push

Page 177

1  you so that the bus doesn't hit you, I
2  would do that.  I would push you so you
3  wouldn't get hit by the bus.  So, there's
4  no question I would do some wrong things
5  for right things, for right ends.  No
6  question about that.
7       Q.   Things you believed were
8  right?
9       A.   Things I, and in this case,
10  that apparently Lilly thought were right
11  because they pleaded guilty to criminal
12  penalties and admitting to a crime and
13  paid a $1.4 billion penalty.
14       Q.   Well, we're not talking
15  about Lilly.
16       A.   And because -- I'm not done.
17  And that the FDA thought were right,
18  because they put a black box warning on
19  the product so that everybody could see
20  what Lilly was previously hiding about
21  the side effects of Zyprexa.  So, that's
22  a case.  And I stand by my actions in
23  that case.  That's not -- I think that
24  case has been shown that the documents I

Confidential - David S. Egilman, M.D., M.P.H.

Page 178

1 released were important for public
2 health, they were evidence of a crime,
3 and that they should have been released.
4 So, I can give you that case. I can't
5 give you every case.
6     Q.   Done?
7     A.   Yes.
8     Q.   And I'm not asking you about
9 the Zyprexa. I know you want to talk
10 about that, but I'm moving on to just
11 another case. Because we do have a
12 protective order -- you know that there's
13 a protective order in this case, right?
14     A.   I signed the protective
15 order in this case as an expert.
16     Q.   If you believed that there
17 was information that you believe needed
18 to be disclosed and a judge disagreed
19 with you, what would you do?
20     A.   I don't know.
21     Q.   You can't say right now that
22 you would be absolutely governed by The
23 Court's order with certainty?
24     A.   Well, courts -- there are

Page 179

1 appeals processes.
2     Q.   Fair enough.
3     So, let's assume you went
4 through the appellate process --
5     A.   Let's assume we went all the
6 way to the Supreme Court, and the Supreme
7 Court said that the documents needed to
8 be sealed. Then I would keep my mouth
9 shut and let them stay sealed. I would
10 let people die.
11     Q.   And pending any judicial
12 process, there's no circumstances under
13 which you would violate a court order to
14 release documents; is that right?
15     A.   I can't think of any. I
16 can't think of all possible
17 circumstances.
18     Q.   Well, are there
19 circumstances that you think that you
20 would violate a judge's ruling if you
21 disagreed with it?
22     A.   I can't think of any.
23     Q.   Now, have any other courts,
24 other than the two we talked about,

Page 180

1 either struck you as an expert or
2 commented negatively on your disclosure
3 of confidential information?
4     A.   No.
5     Q.   You were accused of fraud in
6 some case some time ago for false
7 diagnosis?
8     A.   I was accused, it was an
9 and/or pleading. I was -- I either
10 falsely was accused of two things. One
11 was either I falsely represented myself
12 as an expert in occupational medicine or
13 I committed a fraud in writing medical
14 reports. One or the other. Those are
15 the two possibilities.
16     Q.   Have you ever been an
17 administrator before?
18     A.   Of an estate? No.
19     Q.   Are you aware -- well,
20 strike that.
21     I may have asked you this
22 before, Doctor, and forgive me. There
23 was a deposition on Friday. Did you tell
24 me you were aware generally that that

Page 181

1 occurred, of a neighbor or two neighbors?
2     A.   I was aware that it
3 occurred.
4     Q.   Do you know anything about
5 what the testimony was?
6     DR. LEONE: Hold it there.
7     Didn't Mark say that that was
8     privileged? I thought he was
9     objecting to that.
10     MR. CHEFFO: Okay. It's a
11     fair point.
12 BY MR. CHEFFO:
13     Q.   Other than what a lawyer
14 might have told you -- really, it was an
15 artful question.
16     It was basically, I mean,
17 have you seen the statement, have you
18 seen the rough transcript, have you seen
19 the video or anything like that?
20     A.   I still haven't seen it. I
21 was in court that day, but I think I came
22 in late. So, I didn't hear the
23 discussion.
24     Q.   And, again, other than

Confidential - David S. Egilman, M.D., M.P.H.

Page 198

```
1
2
3            CERTIFICATE
4      I, LINDA L. GOLKOW, a
    Certified Court Reporter and Notary
5   Public do hereby certify that, pursuant
    to notice, the deposition of DAVID STEVEN
6   EGILMAN, M.D., M.P.H., was duly taken at
    The Lanier Law Firm, 126 East 56th
7   Street, New York, New York on July 1,
    2009 at 10:09 a.m. before me.  The said
8   DAVID STEVEN EGILMAN, M.D., M.P.H. was
    first duly sworn by me according to law
9   to tell the truth, the whole truth and
    nothing but the truth and thereupon did
10  testify as set forth in the above
    transcript of testimony.  The testimony
11  was taken down stenographically by me.
12      I do further certify that the
    above deposition is full, complete and a
13  true record of all the testimony given by
    the said witness.
14
15
16      Linda L. Golkow
        Registered Diplomate Reporter
17      Certified Realtime Reporter
18      (The foregoing certification
    of this transcript does not apply to any
19  reproduction of the same by any means,
    unless under the direct control and/or
20  supervision of the certifying reporter.)
21
22
23
24
```

Page 200

```
1        - - - - - -
          E R R A T A
2        - - - - - -
3   PAGE  LINE  CHANGE
4   ____  ____  _____
5      REASON:  ____  _____
6   ____  ____  _____
7      REASON:  ____  _____
8   ____  ____  _____
9      REASON:  _____  _____
10  ____  ____  _____
11     REASON:  _____
12  ____  ____  _____
13     REASON:  _____  _____
14  ____  ____  _____
15     REASON:  _____  _____
16  ____  ____  _____
17     REASON:  _____  _____
18  ____  ____  _____
19     REASON:  _____  _____
20  ____  ____  _____
21     REASON:  _____  _____
22  ____  ____  _____
23     REASON:  _____  _____
24
```

Page 199

```
1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.  It will be
10  attached to your deposition.
11       It is imperative that you
12  return the original errata sheet to the
13  deposing attorney within thirty (30) days
14  of receipt of the deposition transcript
15  by you.  If you fail to do so, the
16  deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24
```

Page 201

```
1        ACKNOWLEDGMENT OF DEPONENT
2
       I,_____, do
3   hereby certify that I have read the
    foregoing pages, and that the same is a
4   correct transcription of the answers
    given by me to the questions therein
5   propounded, except for the corrections or
    changes in form or substance, if any,
6   noted in the attached Errata Sheet.
7
8   DAVID STEVEN EGILMAN, M.D., M.P.H. DATE
9
10
11
12
13
14
    Subscribed and sworn
15  to before me this
    _____ day of _____, 20_____.
16
    My commission expires:_____
17
18  _____
    Notary Public
19
20
21
22
23
24
```

51 (Pages 198 to 201)

# EXHIBIT C



For Opinion See <u>2002 WL 2027530</u>

Colorado Court of Appeals.

David EGILMAN, M.D., Appellant,

v.

District Court, First Judicial District, County of Jefferson; the Honorable Frank Plaut, one of the Judges thereof, Appellees,

v.

Michael D. Ballinger, et. al., Plaintiffs,

v.

BRUSH WELLMAN, INC., et.al., Defendants.

No. 01CA1982.

March 19, 2002.

Appeal from the District Court for the County of Jefferson, State of Colorado The Honorable Frank Plaut Case No. 96 CV 2532

Appellant David Egilman, M.D.'s Opening Brief

<u>Bruce D. Pringle</u>, Elzi Pringle & Gurr, 950 Seventeenth Street, Suite 1875, Denver, Co 80202, Telephone: 303-623-9111, Facsimile: 303-623-9191, Atty.Reg. #: 1877.

***i** TABLE OF CONTENTS*

I. ISSUES PRESENTED FOR REVIEW ... 1

 A. Whether the gag order entered by the trial court failed to comply with the Constitutional criteria for a government imposed prior restraint on freedom of speech ... 1

 B. Whether the sanctions order entered by the trial court failed to comply with the Colorado Rules of Civil Procedure; due process, and the substantive Constitutional requirements for government imposed punishment of pure speech ... 1

II. STATEMENT OF CASE ... 1

 A. Nature of the Case, the Course of Proceedings, and Disposition in Lower Court ... 1

 B. Statement of the Facts ... 3

III. SUMMARY ARGUMENT ... 12

IV. ARGUMENT ... 13

 A. The trial court's order prohibiting certain extrajudicial statements violates the First and Fourteenth Amendments to the United States Constitution and Article II, Section 10 of the Colorado Constitution ... 13

B. The trial court's sanction imposed on Dr. Egilman for allegedly violating the gag order was unauthorized, procedurally deficient, and unconstitutional ... 24

V. CONCLUSION ... 30

*ii* TABLE OF AUTHORITIES

CASES

Albuquerque Journal v. Jewell, 17 P.3d 437 (N.M. 2001) ... 15

Bailey v. Systems Innovation, Inc., 852 F.2d 93 (3d Cir. 1988) ... 14, 15

Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485 (1984) ... 14

Breiner v. Takao, 835 P.2d 637 (Haw. 1992) ... 16, 21

Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175 (1968) ... 15, 18

CBS, Inc. v. Young, 522 F.2d 234 (6th Cir. 1975) ... 19

Chase v. Robson, 435 F.2d 1059 (7th Cir. 1970) ... 19

Chicago Council of Lawyers v. Bauer, 522 F.2d 242 (7th Cir. 1975), cert. denied, 427 U.S. 912 (1976) ... 16, 30

Connecticut Magazine v. Moraghan, 676 F.Supp. 38 (D. Conn. 1987) ... 18

Cooke v. United States, 267 U.S. 517 (1925) ... 27

Cox v. Louisiana, 379 U.S. 536 (1965) ... 29

Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975) ... 19

Craig v. Harney, 331 U.S. 367 (1947) ... 14

Davenport v. Garcia, 834 S.W.2d 4 (Tex. 1992) ... 18

Dorfman v. Meiszner, 430 F.2d 558 (7th Cir. 1970) ... 14

Dow Jones & Co., Inc. v. Kaye, 90 F. Supp.2d 1347 (S.D. Fla. 2000), appeal dismissed and order vacated as moot, 256 F.3d 1251 (11th Cir. 2001) ... 18, 19, 21

Edwards v. South Carolina, 372 U.S. 229 (1963) ... 20

Gentile v. State Bar of Nevada, 501 U.S. 1030 (1991) ... 14, 15

*Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418 (1911) ... 27

*Grigsby v. Coker,* 904 S.W.2d 619 (Tex. 1995) ... 21

**\*iii** *Hiett v. United States,* 415 F.2d 664 (5th Cir. 1969), *cert. denied,* 397 U.S. 936 (1970) ... 29

*Hirschkop v. Snead,* 594 F.2d 356 (4th Cir. 1979) ... 20

*Hurvitz v. Hoefflin,* 191 Cal. Rptr.2d 558 (Cal. Ct. App. 2000), *review denied,* 2001 Cal. LEXIS 1843 (Mar. 21, 2001) ... 14

*In re A Minor,* 537 N.E.2d 292 (Ill. 1989) ... 21

*In re Hearing Concerning Canon 35,* 132 Colo. 591, 296 P.2d 465 (1956) ... 13

*In re Matter of P.R. v. District Court,* 637 P.2d 346 (Colo. 1981) ... 26

*In re Providence Journal Co.,* 820 F.2d 1342 (1st Cir. 1986), *mod. en banc on other grounds,* 820 F.2d 1354 (1st Cir. 1987), *cert. dismissed,* 485 U.S. 693 (1988) ... 28

*Keene Corp. v. Abate,* 608 A.2d 811 (Md. App. 1992) ... 24

*Kemner v. Monsanto Co.,* 492 N.E.2d 1327 (Ill. 1986) ... 16, 19, 20

*Kucinich v. Forbes,* 432 F.Supp. 1101 (N.D. Ohio 1977) ... 29

*Levine v. U.S. Dist. Court for Cent. Dist.,* 764 F.2d 590 (9th Cir. 1985), *cert. denied,* 476 U.S. 1158 (1986) ... 13

*McIntyre v. Ohio Elections Comm'n,* 514 U.S.334 (1995) ... 28

*National Broadcasting Co. v. Cooperman,* 501 N.Y.S.2d 405 (N.Y. App. Div. 1986) ... 19, 21

*Nebraska Press Ass'n v. Stuart,* 427 U.S. 539 (1976) ... 14, 15, 19

*New York Times Co. v. United States,* 403 U.S. 713 (1971) ... 13

*People ex rel. Tooley v. Seven Thirty-Five East Colfax, Inc.,* 697 P.2d 348 (Colo. 1985) ... 13, 20

*People v. Dietze,* 549 N.E.2d 1166 (N.Y. 1989) ... 29

*Procunier v. Martinez,* 416 U.S. 396 (1974) ... 18

*Rodriguez v. Feinstein,* 734 So.2d 1162 (Fla. App. 1999) ... 24

*Schenck v. United States,* 249 U.S. 47 (1919) ... 29

*Sherrill v. Amerada Hess Corp.,* 504 S.E.2d 802 (N.C. App. 1998) ... 18, 21

**\*iv** *Smith v. Goguen,* 415 U.S. 566 (1974) ... 15

*Star Journal Pub. Corp. v. County Court,* 197 Colo. 234, 591 P.2d 1028 (1979) ... 13, 14, 15

*State ex rel. The Missoulian v. Montana Twenty First Judicial Dist.,* 933 P.2d 829 (Mont. 1997) ... 15, 18

*State v. Barnett,* 911 P.2d 385 (Wash. 1996) ... 24

*State of Connecticut v. Culmo,* 642 A.2d 90 (Conn. Super. 1993) ... 29

*Twohig v. Blackmer,* 918 P.2d 332 (N.M. 1996) ... 16, 18

*United States v. Ford,* 830 F.2d 596 (6th Cir. 1987) ... 14

*United States v. Salameh,* 992 F.2d 445 (2d Cir. 1993) ... 13, 15, 24

*United States v. Scarfo,* 263 F.3d 80 (3rd Cir. 2001) ... 14

*White v. Adamak,* 907 P.2d 735 (Colo. App. 1995) ... 26

*Young v. United States,* 481 U.S. 787 (1987) ... 26

*CONSTITUTIONAL PROVISIONS AND RULES*

United States Constitution, First Amendment ... 13, 14, 15, 18, 19, 20, 25, 28, 29, 30

United States Constitution, Fourteenth Amendment ... 13

Colorado Constitution, Article II, Section 10 ... 3, 30

Colorado Constitution, Article II, Section 25 ... 25, 28

Colo. R.Civ.P. 54(b) ... 3, 5

Colo. R.Civ.P. 107 ... 13, 26, 27

Colo. R.Civ.P. 107(a) ... 26

Colo. R.Civ.P. 107 (a)(3) ... 26

Colo. R.Civ.P. 107 (a)(4) ... 26

Colo. R.Civ.P. 107 (c) ... 27

**\*v** Colo. R.Civ.P. 107 (d) ... 27

Colo. R.Civ.P. 107 (d)(1) ... 27

Colo. R. Evid. 403 ... 6

Colo. R. Evid. 702 ... 6

**\*1** Appellant, Dr. David Egilman, by his attorneys Elzi Pringle & Gurr, hereby submits the following Opening Brief:

ISSUES PRESENTED FOR REVIEW

I. WHETHER THE GAG ORDER ENTERED BY THE TRIAL COURT FAILED TO COMPLY WITH THE CONSTITUTIONAL CRITERIA FOR A GOVERNMENT IMPOSED PRIOR RESTRAINT ON FREEDOM OF SPEECH.

II. WHETHER THE SANCTIONS ORDER ENTERED BY THE TRIAL COURT FALIED TO COMPLY WITH THE COLORADO RULES OF CIVIL PROCEDURE; DUE PROCESS; AND THE SUBSTANTIVE CONSTITUTIONAL REQUIREMENTS FOR GOVERNMENT IMPOSED PUNISHMENT OF PURE SPEECH.

STATEMENT OF THE CASE

A. *Nature of the Case, the Course of Proceedings, and Disposition in Lower Court*

This is an appeal from two Orders in the case of *Ballinger v. Brush Wellman, Inc.,* 96-CV-1205. The first, entitled Order Prohibiting Certain Extrajudicial Statements (the Gag Order), was entered on May 30, 2001. It prohibited the parties, attorneys, expert witnesses, and witnesses within the control of the parties from making any extrajudicial statements concerning the case on internet web sites, regardless of whether the site was accessible to the public or to jurors (Vol. III pp. 501-03). The second Order, entitled Findings, Conclusions, and Orders Concerning Sanctions (the Sanctions Order), was entered on June 22, 2001, without notice to Dr. Egilman or an opportunity to be heard. It sanctioned Dr. Egilman for allegedly violating the Gag Order by barring him from testifying in any other case the might later come before the court (Vol. III pp. 532-34).

The Complaint in *Ballinger* was filed on November 7, 1996 by numerous Plaintiffs against Brush Wellman Inc. and Coors Porcelain Company (Vol. I pp. 1-16). On February 13, 1998, Coors Porcelain Company was dismissed (Vol. I p. 72). Several amended complaints were filed (Vol. I pp. 17-34, 35-56), and the issues ultimately were joined by the Third Amended Complaint and Jury Demand (Vol. I pp. 86-114) and the Answer of Brush Wellman Inc. to Third Amended Complaint (Vol. I pp. 120-145). Plaintiffs claimed that while employed at Rocky Flats by a federal government contractor, they were exposed to beryllium products manufactured and sold by Brush Wellman. The Plaintiffs asserted that Brush Wellman failed to properly warn of the dangers of beryllium exposure, and that it conspired with the federal government and others to conceal the danger posed by beryllium (Vol. I pp. 86-114).

The trial court determined to resolve the Plaintiffs' claims through a series of trials. On July 13, 2000, Plaintiffs filed and Amended Designation of Initial Trial Plaintiffs, identifying eight Plaintiffs whose claims would be presented in the initial trial (Vol. I pp. 149-50).

On December 22, 2000, Plaintiffs filed their Expert Witness Designation. Among the experts designated was Dr. Egilman (Vol. I pp. 152-59). On April 1, 2001, Brush Wellman moved *in limine* to exclude portions of Dr. Egilman's proposed testimony on the grounds that they were not within Egilman's areas of expertise and/or were not proper subjects for expert testimony (Vol. I pp. 160-239).

A hearing was held on Brush Wellman's Motion *In Limine* to Exclude Certain Evidence on May 22, 2001 (Vol. IV pp. 1-130). During the hearing, the matter of whether a gag order should be entered against Dr. Egilman was raised for the first time (Vol. IV pp. 94 li. 7--95 li. 2). On May 30, 2001, the trial court entered the Gag Order (Vol. III pp. 501-503). Dr. Egilman filed an Original Proceeding in the Colorado Supreme Court attacking the constitutionality of the Gag Order. On June 28, 2001, the Supreme Court declined to accept the Petition (Vol. III p. 535).

The initial trial of the eight Plaintiffs commenced on June 4, 2001 (Vol. III p. 651). Dr. Egilman presented his expert testimony on June 7, 2001 (Vol. V). On or about July 12, 2001, defense counsel asserted that Dr. Egilman had violated the Gag Order by posting materials which defense counsel represented were from Dr. Egilman's web site. [FN1] (Vol. VI). After a series of hearings at which no evidence was presented other than the material itself (Vols. VI, VII, VIII, and IX), the trial court entered the second Order at issue in this appeal, the Sanctions Order (Vol. III pp. 532-34). The trial concluded on June 26, 2001, when the jury returned defense verdicts in favor of Brush Wellman (Vol. III pp. 508-531, and pp. 564-65).

> FN1. Because Dr. Egilman was not given notice of the hearing or an opportunity to be heard, no explanation was provided to the trial court as to how defense counsel obtained the materials. In fact, they were unlawfully purloined from Dr. Egilman's computer system after he had shut down his internet web site and protected access to his computer by means of a password.

Dr. Egilman filed a Notice of Appeal on July 11, 2001 (Vol. III pp. 537-53). The appeal was dismissed on September 27, 2001 for lack of a final judgment (Vol. III 598-99). On September 6, 2001, the trial court denied the Plaintiffs' Motion for New Trial (Vol. III p. 595), and on September 17, 2001, entered Judgment pursuant to Colo. R.Civ.P. 54(b)(Vol. III p. 596-97). Dr. Egilman filed the Notice of Appeal in the instant appeal, 01-CA-1982, on October 18, 2001 (Vol. III pp. 600-16).

B. *Statement of the Facts*

*1. Introduction*

Without any notice or opportunity to be heard, Dr. Egilman, an expert witness for the Plaintiffs, was subjected to a gag order (Vol. III pp. 501-03). The Gag Order, among other things, prohibited him from publishing any statements on internet web sites concerning the trial proceedings, any opposing party, and opposing party's counsel, or any witnesses or evidence in the case (Vol. III pp. 501-03). Thereafter, again without notice or opportunity to be heard, the trial court sanctioned Dr. Egilman for allegedly violating the Gag Order by barring him from testifying in any future case that might come before the trial court (Vol. III pp. 532-34).

The facts material to Dr. Egilman's appeal are as follows:

*2. The Underlying Lawsuit*

Twenty-six workers at the Rocky Flats plant in Golden, Colorado and seven workers at the Coors Porcelain Company, along with their spouses, sued Brush Wellman, a company engaged in the mining, processing, manufacturing, sale and distribution of beryllium products (Vol. I pp. 1-16). All of the Plaintiffs had been exposed to beryllium products manufactured and sold by Brush Wellman, and all had contracted chronic beryllium disease (Vol. I pp. 12-13). They contended that Brush Wellman's beryllium products were defective and unreasonably dangerous because the company failed to adequately warn of the hazards of beryllium; failed to provide instructions for safe use; and failed to adequately test, research and develop safety guidelines (Vol. I pp. 87-88). In addition, Plaintiffs alleged that Brush Wellman had conspired with other companies and the United States government to conceal the dangers of beryllium exposure (Vol. I pp. 88-94).

Because of the large number of Plaintiffs, the trial court decided to sever them into smaller groups for trial. Plaintiffs'

counsel designated Salvador and Josephine Valencia, James and Joan Tooley, Ronald and Joanne Roerish, and Theorthia and Olivia Scott as the parties whose claims would be tried first (Vol. I pp 146-48 and 149-51). A jury trial on the claims of these Plaintiffs commenced on June 4, 2001, and concluded on June 26, 2001 (Vol. III pp. 651-55), when the jury returned defense verdicts on all claims (Vol. III pp. 508-31). Judgment in favor of Brush Wellman was entered on September 17, 2001 pursuant to Rule 54(b) of the Colorado Rules of Civil Procedure (Vol. III pp. 596-97). To our knowledge, Plaintiffs have not appealed the verdict.

### 3. Dr. David Egilman

Dr. Egilman is a medical doctor. He received an undergraduate degree in molecular biology and a medical degree from Brown University. Dr. Egilman is board certified in both internal medicine and occupational medicine, and also has received a masters degree in public health from the Harvard School of Public Health. He has done post-graduate training at the National Institute of Health, as well as a residency at the National Institute of Occupational Safety and Health (Vol II pp. 341-45). Dr. Egilman is a Professor in the Department of Community Health at Brown University (Vol. II. p. 345).

Plaintiffs retained and identified Dr. Egilman as a testifying expert. The Expert Witness Designation indicated that Dr. Egilman would render opinions on a variety of subjects relating to the health hazards of beryllium exposure; the warnings and instructional materials that should have been provided by Brush Wellman; and the scientific and medical literature on the hazards of beryllium exposure available to Brush Wellman. Additionally, Dr. Egilman was prepared to testify concerning Brush Wellman's relationship with the Beryllium Corporation, the United States Atomic Energy Commission, and the contractors who controlled the Plaintiffs' employment. Finally, Plaintiffs proffered Dr. Egilman to explain how government specifications and standards for beryllium exposure levels were set, and Brush Wellman's participation in that process (Vol. I pp. 152-54).

### 4. The Gag Order

Four months after Plaintiffs designated Dr. Egilman as one of their experts, Brush Wellman filed a Motion *In Limine* to Exclude Certain Evidence (Vol I pp. 160-87). The motion sought an order excluding a laundry list of evidence (Vol. I pp. 161-62), including portions of Dr. Egilman's testimony (Vol. I p. 161). In its motion and brief, Brush Wellman asserted that these portions were either beyond the scope of Egilman's expertise or were not proper subjects for expert opinion (Vol. I pp. 163 and 188-239). The legal basis for Brush Wellman's request was Rules 702 and 403 of the Colorado Rules of Evidence (Vol. pp. 188-207). Neither the motion nor the supporting brief mentioned a gag order, or suggested that the entry of a gag order would be appropriate or necessary (Vol. I pp. 160-239). Likewise, Plaintiffs' Brief in Opposition to Defendant's Motion *in Limine* focused exclusively on the evidentiary issues raised by Brush Wellman's motion and supporting brief (Vol. II pp 327-80). It did not discuss Dr. Egilman's web site, nor did it address the propriety of a gag order (Vol. II pp. 327-80).

A hearing on Brush Wellman's *in limine* motion was held on May 22, 2001. Most of the hearing simply dealt with the evidentiary issues raised by the parties, such as the admissibility of certain statements by Secretary of Energy Bill Richardson; the admissibility of portions of Dr. Egilman's expert testimony; and the admissibility of opinion testimony by Richard Hennessey, another of the designated experts (Vol. IV). However, the hearing veered off course in two respects. First, Brush Wellman's counsel tendered some material from a web site maintained by Dr. Egilman (Vol. IV pp.36-40).[FN2] The material was never offered as an exhibit, nor was it ever made part of the record. The description of it by defense counsel suggests that it was uncomplimentary of some of Brush Wellman's experts and Bush Wellman's counsel (Vol. IV pp. 36-40). The reason stated by defense counsel for submitting the web site materials to the trial court was to show that Dr. Egilman was "an advocate" (Vol. IV p. 36 li. 6-21).

> FN2. As a professor of Community Medicine at Brown University, Dr. Egilman maintained a web site for students in his course. The course deals with controversies in science, including the use of scientific infor-

mation in regulatory and tort proceedings. The web site provided students access to original corporate documents, and legal briefs on scientific matters He allowed his students to use the site to develop demonstrative projects for the distribution of health information. The material was intended to be thought provoking and provocative.

Second, after ruling on the admissibility of aspects of Dr. Egilman's testimony, the trial court expressed concern about the jury accessing Dr. Egilman's web site and indicated that a gag order might be appropriate (Vol. IV pp. 97 li. 25-p. 26 li. 10). On the other hand, the court ruled that defense counsel could utilize any of Dr. Egilman's statements for cross-examination (Vol. IV p. 101 li. 18-p. 102 li. 23). Additionally, the judge explained his procedure for admonishing the jury against viewing, hearing, or reading anything about the pending trial, and noted that he was unaware of any instance where a juror violated the admonition (Vol. IV p. 99 li.17-p. 100 li. 5). The trial judge directed counsel to submit proposed forms of gag orders for the court's consideration (Vol. IV p. 100 li. 15- p. 101 li. 10).

No notice was given to Dr. Egilman that the trial court was considering a gag order adversely impacting his web site. No evidence was presented at the hearing as to whether or in what manner Dr. Egilman's web site posed a substantial threat to the integrity of the prospective jury. No presentation was made by counsel, and no statements were made by the trial court regarding the likelihood that jurors would access Dr. Egilman's web site. No evidence was offered on the question of potential alternatives to a gag order, or why any particular alternative was inadequate to address the threat of jury prejudice (*See* Vol. IV, pp. 93-103).

On May 29, 2001, the trial court entered a written Order Prohibiting Certain Extrajudicial Statements (Vol. III pp 501-03). The order takes judicial notice of the widespread availability of the internet (Vol. III p. 502), and contains a few conclusory findings, such as (a) "there is a reasonable likelihood that information relating to the trial in the media and over the Internet will prejudice the parties' right to a fair trial;" and (b) "[t]he Court has considered possible alternative methods to protect the parties' interests in a fair trial and finds that there are no less restrictive means reasonably available to the Court than those set forth in this Order" (Vol. III pp. 501-02). However, no facts are set forth demonstrating a likelihood that jurors would access any Internet site; none of the alternative methods purportedly considered by the court are identified; and no explanation is given as to why alternative methods would be inadequate (*See* Vol. III, pp. 501-03).

The Gag Order goes on to prohibit the parties, their attorneys, their expert witnesses, and witnesses within the parties' control from (1) making extrajudicial statements concerning the case "that reasonably can be expected to be publicly disseminated by the media and that have a substantial likelihood of materially prejudicing the parties' right to a fair trial;" (2) "publishing any statements on Internet websites over which they have control concerning the trial proceedings, concerning any opposing party or any opposing party's counsel, or concerning any witnesses or evidence in the case;" and (3) "making any extrajudicial statements on matters that that have been excluded *in limine* or at trial on Internet websites over which they have control or that reasonably can be expected to be publicly disseminated by the media and that have a substantial likelihood of materially prejudicing the parties' right to a fair trial" (Vol. III pp. 502-03).

*5. The Sanctions Order*

Trial of the claims of the initial eight Plaintiffs commenced on June 4, 2001 (Vol. III p. 651). Dr. Egilman presented his expert testimony on June 7, 2001 (Vol. V). On June 12, 2001, a hearing was held outside the presence of the jury regarding Dr. Egilman's web site (Vol. VI). The hearing was not initiated by any pleading, and there is nothing in the record suggesting that Dr. Egilman received notice of the proceeding.

The hearing commenced with defense counsel asserting that Dr. Egilman had violated paragraph two of the Gag Order by placing materials pertaining to the case and to defense counsel on his web site (Vol. VI p. 3 li. 24-p. 4 li 17). The only evidentiary materials tendered in support of this contention were certain exhibits, which defense counsel represented had been downloaded from Dr. Egilman's web site (Vol. VI p. 4 li. 1-2; Def. Ex. 2000). The materials contained information concerning beryllium, asbestos, portions of Egilman's expert report, and parts of a deposition from the

case (Def. Ex. 2000). Interspersed were a few derogatory comments about defense counsel, the trial judge, and two defense experts (Def. Ex. 2000).

Plaintiffs' counsel responded by indicating that one-half hour before the hearing, she had attempted to access Dr. Egilman's web site, but was unable to do so because it required a password (Vol. VI p. 7 li. 9-14). She also informed the court that Dr. Egilman had told her that he had made his web site unavailable to the public, by means of password protection, even before the Gag Order had been entered, so that only persons to whom he had given the password could access the secured site (Vol. VI p. 7 li. 15-24).[FN3] In light of this, Plaintiffs' counsel asserted that she did not believe the postings on Egilman's site violated the Gag Order because the password protection of his computer eliminated the potential that jurors could gain access (Vol. VI p. 16 li. 14-p. 191i. 10).

> FN3. As soon as he was informed that defense counsel had complained about his web site, and a week before the Gag Order was entered, Dr. Egilman essentially shut the internet website down. Thereafter, Dr. Egilman's students could only access his computer remotely with a password.

In response, the trial court observed that because paragraphs one and three of the Gag Order were restricted to statements that reasonably could be expected to be publicly disseminated, they probably did not apply (Vol. VI p. 10 li. 19-p. 12 li. 5). Nevertheless, the court indicated that Dr. Egilman apparently had violated paragraph two of the Gag Order, which was not limited to statements expected to be publicly disseminated, and that he was guilty of misconduct (Vol. VI p. 20 li. 8-21). After making this finding, the trial court brought the jury into the courtroom and asked each juror whether he or she had "obtained any information from any web site or any other internet information that relates in any way to this case" (Vol. VI p. 25 li. 15-17). Each of the jurors responded "No" (Vol. VI p. 25 li. 19-p. 26 li. 9). Despite these responses, the trial court decided to pursue the question of sanctions, and directed the parties to submit a list of a "hierarchy" of sanctions for his consideration (Vol. VII p. 5 li. 8-p. 7 li 18).

A further hearing regarding the appropriate sanctions was held on June 18, 2001 (Vol. IX). The record does not reflect that Dr. Egilman was given notice and/or an opportunity to be heard; that he was represented at the hearing; or that any defense was presented on his behalf. Much of the hearing was devoted to statements by Plaintiffs' counsel as to why she and her law firm should not be sanctioned. Counsel explained (a) why she had assumed that Dr. Egilman's password protected site did not violate the Gag Order; (b) how Dr. Egilman had led her astray by enlisting her aid in a plan to obtain evidence that the Jones Day law firm was unlawfully breaking into his password secured site; and (c) how Dr. Egilman had recently threatened to disrupt the trial proceedings (Vol. IX p. 5 li. 18-p. 43 li. 21).

At the conclusion of the hearing, the trial court found that Dr. Egilman had posted "scurrilous and inflammatory statements" on his web site, in violation of the Gag Order (Vol. IX, p. 56 li. 15-23). The judge considered "the appropriate sanction to levy in this case against Dr. Egilman, and, if applicable, plaintiffs' counsel or any of them as individuals" (Vol. IX, p. 60 li. 15-18). The court stated: "It should be abundantly clear, but in case it isn't, Dr. Egilman will not be permitted to testify with regard to the cases of any other plaintiffs in this case, or in any other case before this Court" (Vol. IX, p. 61 li. 11-15)(Emphasis added.).

Further proceedings were held on the question of whether Plaintiffs' counsel should also be sanctioned. Then, the trial court entered written Findings, Conclusions, and Orders Concerning Sanctions (Vol. III pp. 532-34). In them, the court found that Dr. Egilman had violated the Gag Order, and that Dr. Egilman's "vituperative" web site statements were "grossly inappropriate" and placed "at risk the fairness of the trial" (Vol. III p. 533). No explanation was provided as to how the password protected site adversely impacted trial fairness (See Vol. III, pp. 532-34). Part of the sanctions consisted of striking Dr. Egilman's testimony, and instructing the jury to disregard it. In addition, the Sanction Order punished Dr. Egilman directly by providing that he "shall not be permitted to testify with regard to the claims of any other plaintiff in this case, or in any other case which may later come before this Court" (Vol. III, pp. 533-34).[FN4]

> FN4. The Sanctions Order does not explain whether the term "this Court" is intended to refer to Judge Plaut's court, the Jefferson County District Court, or the entire First Judicial District.

## SUMMARY OF THE ARGUMENT

This appeal attacks the constitutionality of two orders entered by the trial court; the Gag Order and the Sanctions Order. The Gag Order was directed not only at parties and their counsel, but also at nonparty witnesses and experts, including Dr. Egilman. In fact, the face of the Gag Order and the transcript of the proceedings leading up to its entry establish that it was specifically targeted at Egilman.

This Order, which as a matter of law constituted a prior restraint on Dr. Egilman's freedom of speech, fails to meet any of the constitutionally mandated criteria for a government imposed prior restraint on freedom of speech. It recites no facts supporting the conclusory finding that there was a danger of jurors accessing Internet web sites of expert witnesses, nor any facts supporting the conclusory finding that other less restrictive measures would be inadequate. Indeed, the Order does not even identify what, if any, alternatives were considered by the trial court. Furthermore, even if the few conclusory findings in the Gag Order are sufficient to meet constitutional muster, there is no evidence in the record to support them. Finally, the Gag Order is unconstitutionally vague, as well as unconstitutionally overbroad on its face and as applied.

The Sanctions Order punished Dr. Egilman for allegedly violating the Gag Order. The sanction imposed on Dr. Egilman consisted of an order forever barring him from testifying in any case that might come before the court in the future. This sanction against Dr. Egilman was entered without notice to him and without providing him with an opportunity to be heard. He was not represented by counsel at the hearings leading up to the entry of the sanction against him. Although the basis for the sanction was Dr. Egilman's alleged violation of a court order (i.e., the Gag Order), a contempt proceeding was not initiated. None of the procedural requirements under Colo. R.Civ.P. 107, nor any of the procedural mandates of due process were followed. Finally, the Sanctions Order punished Dr. Egilman for exercising his constitutional right of free speech without any evidentiary showing that his password protected site posed a real or even potential threat of contaminating the jury.

## ARGUMENT

### I. THE TRIAL COURT'S ORDER PROHIBITING CERTAIN EXTRAJUDICIAL STATEMENTS VIOLATES THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE II, SECTION 10 OF THE COLORADO CONSTITUTION

*A. The Constitutional Requirements for Imposing Prior Restraints on Speech in the Form of Gag Orders*

An order prohibiting trial participants from making extrajudicial statements is a direct governmental prior restraint upon the constitutional right to freedom of expression. *United States v. Salameh,* 992 F.2d 445, 446-47 (2d Cir. 1993); *Levine v. U.S. Dist. Court for Cent. Dist.,* 764 F.2d 590, 595 (9th Cir. 1985), *cert. denied,* 476 U.S. 1158 (1986). As such, it carries with it a "heavy presumption against its constitutionality." *New York Times Co. v. United States,* 403 U.S. 713, 714 (1971), and must be subjected to strict scrutiny. *Levine,* 764 F.2d at 595. The Colorado Supreme Court has held in a related context that prior restraints on free speech rights can only be justified by a clear and present danger to the fairness of the trial. *Star Journal Pub. Corp. v. County Court,* 197 Colo. 234, 237, 591 P.2d 1028, 1030 (1979). Indeed, the Colorado courts have stated that the protection afforded speech in Article II section 10 of the Colorado Constitution is even broader than that provided by the First Amendment. *People ex rel. Tooley v. Seven Thirty-Five East Colfax, Inc.,* 697 P.2d 348, 356 (Colo. 1985); *In re Hearing Concerning Canon 35,* 132 Colo. 591, 592, 296 P.2d 465, 466-67 (1956).

**\*14** Gag orders, such as the one at issue here, are the most drastic, but not necessarily the most effective judicial tool for enforcing the right to a fair trial. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 572-73 (Brennan, J. concurring); *Bailey v. Systems Innovation, Inc.,* 852 F.2d at 99. If any method other than a prior restraint can be effectively employed to protect the governmental or private interest threatened by extrajudicial statements, a gag order is uncon-

stitutional. *Bailey,* 852 F.2d at 98.

An order prohibiting extrajudicial statements cannot be justified by a mere possibility of juror prejudice. Any prior restraint on First Amendment rights must be confined to those activities that create a substantial likelihood of material prejudice (*Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1037 (1991)), or a clear and present danger to judicial proceedings (*Hurvitz v. Hoefflin,* 191 Cal. Rptr. 2d 558, 565 (Cal. Ct. App. 2000), *review denied,* 2001 Cal. LEXIS 1843 (Mar. 21, 2001)), and cannot be extended to those activities that are merely potentially threatening. *Craig v. Harney,* 331 U.S. 367, 378 (1947); *United States v. Ford,* 830 F.2d 596, 600 (6th Cir. 1987); *Dorfman v. Meiszner,* 430 F.2d 558, 563 (7th Cir. 1970); *Star Journal,* 591 P.2d at 1030. There must be a clearly identifiable risk of juror contamination before a gag order is warranted. *United States v. Scarfo,* 263 F.3d 80, 95 (3rd Cir. 2001).

In cases raising First Amendment issues, an appellate court has a constitutional obligation to make an independent examination of the whole record. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 (1984). In evaluating whether a gag order meets constitutional muster, a court is required to consider (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger. The precise terms of the restraining order are also important. We must **15** then consider whether the record supports the entry of a prior restraint on publication [or speech], one of the most extraordinary remedies known to our jurisprudence.
*Nebraska Press Ass'n,* 427 U.S. at 562.

Any order imposing a prior restraint must include specific factual findings on each of the constitutionally mandated factors. *Bailey,* 852 F.2d at 99; *Star Journal,* 591 P.2d at 1029-30. Additionally, the order must be narrowly tailored, rather than a blanket prohibition that extends to any statements involving the case. *Salameh,* 982 F.2d at 447. As the United States Supreme Court stated in *Carroll v. President and Comm'rs of Princess Anne,* 393 U.S. 175, 183 (1968): "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by the constitutional mandate ..."

An order which imposes a restraint on free speech must meet heightened standards of specificity. Such an order is unconstitutionally vague if it fails to give clear guidance regarding the types of speech for which an individual may be punished. *See Smith v. Goguen,* 415 U.S. 566, 572-73 (1974).

Finally, the cases have pointed out that while a gag order directed at officers of the court, such as attorneys, is subject to strict scrutiny, a similar order imposed on ordinary citizens is even more problematic. *Gentile v. State Bar of Nevada,* 501 at 1037-38.

*B. The Order Prohibiting Certain Extrajudicial Statements is Facially Unconstitutional Because it Contains no Specific Findings on the Constitutionally Required Criteria*

Specific and detailed findings are essential to the constitutionality of a gag order. *Albuquerque Journal v. Jewell,* 17 P.3d 437, 440 (N.M. 2001); *State ex rel. The Missoulian v. Montana Twenty First Judicial Dist.,* 933 P.2d 829, 841 (Mont. 1997). Furthermore, the specific and detailed findings must demonstrate that the statements sought to be restrained pose a clear **16** and present danger or a serious and imminent threat to the fairness and integrity of the trial. *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 251 (7th Cir. 1975), *cert. denied,* 427 U.S. 912 (1976); *Breiner v. Takao,* 835 P.2d 637, 641 (Haw. 1992); *Kemner v. Monsanto Co.,* 492 N.E.2d 1327, 1336-37 (Ill. 1986). Generalized conclusions that the restrained conduct poses some threat to the trial, or that other alternatives are inadequate, do not meet the constitutional standard. *Twohig v. Blackmer,* 918 P.2d 332, 340-41 (N.M. 1996).

The instant Gag Order contains no findings, specific or otherwise, that internet web sites in general, or Dr. Egilman's site in particular pose either a clear and present danger or a substantial threat to the fairness of the trial. The Order

merely expresses "concerns" about access by jurors, and indicates that if jurors do access the information during the trial, it "would likely" jeopardize the parties' right to a fair trial. "Concerns" and "likelihoods," however, do not meet the constitutional standard. Furthermore, even the conclusory finding of a "likelihood" of prejudice apparently was based only upon the trial court's observations that Dr. Egilman maintained a web site and that there was "widespread availability" of the internet.

Conspicuously absent from the Gag Order are any findings or explanation as to why there is any clear and present danger or even any reasonable likelihood that jurors will attempt to access Dr. Egilman's web site, or any other web site containing information that could prejudice the case. Because the Gag Order was entered even before a jury was impaneled, no inquiry could be undertaken concerning crucial matters such as (a) whether any juror had already accessed or attempted to access an internet web site containing information about the case; (b) whether any the jurors actually used the internet; (c) whether any of the jurors had an internet service provider; or (d) whether any of the jurors even utilized a computer on a regular basis.

*17 Further, even assuming that Gag Order adequately addresses the danger of jury contamination, it contains no explanation as to why a such a gag order would be effective to prevent Dr. Egilman's web site materials from reaching the jury. This omission is particularly significant in light of the trial court's decision allowing defense counsel to utilize Dr. Egilman's materials in cross-examination (*See* Vol. IV pp. 101 li 18-102 li. 23).

Even more problematic is the lack of any specific findings in the Gag Order on the question of reasonable alternatives. Such findings are key, because they implement the second prong of the constitutional requirement for government imposed prior restraints on free speech; namely, that a prior restraint cannot be employed unless there are no other less restrictive alternative measures available. There are, of course, a variety of commonly used measures to guard against jury prejudice from extrajudicial statements. These include voir dire, cautionary admonitions to the jury, and jury instructions.

The Gag Order merely states, in conclusory fashion, that "[t]he Court has considered possible alternative methods to protect the parties' interests in a fair trial and finds that there are no less restrictive means reasonably available to the Court than those set forth in this Order." None of the "possible alternative methods" purportedly considered by the trial court are identified in the Gag Order. Thus, on appellate review it is impossible to determine what alternatives were considered and discounted. For example, we can only speculate as to whether the normally effective alternatives of voir dire, or admonitions to the jury not to use the internet or not to access web sites relating to the case or beryllium exposure were taken into account.

Nor does the Gag Order provide any specific findings or explanation as to why alternatives such as voir dire, jury admonitions, and/or jury instructions would have been *18 inadequate to insure a fair trial. It is difficult to understand why these typically employed methods for protecting against juror access to media reports about a case would have been ineffective here.

In short, the Gag Order fails to identify the specific reasons why internet web sites posed a clear and present danger or a substantial threat to the fairness of the trial. It is silent as to the effectiveness of such a gag order in protecting the jury. It fails to identify any less restrictive alternatives considered by the trial court. It omits any explanation as to why less restrictive alternatives would be inadequate. These deficiencies are of constitutional proportions, and render the Gag Order fatally defective. *See State ex rel. The Missoulian v. Montana Twenty-First Judicial Dist.,* 933 P.2d at 841-42 (a gag order may issue only when "the court describes what reasonable alternatives have been considered and explains why those reasonable alternatives cannot adequately protect the defendant's fair trial rights ...."). *See also Connecticut Magazine v. Moraghan,* 676 F. Supp. 38, 43 (D. Conn. 1987); *Twohig v. Blackmer,* 918 P.2d at 340; *Davenport v. Garcia,* 834 S.W.2d 4, 20-21 (Tex. 1992);; *Sherrill v. Amerada Hess Corp.,* 504 S.E.2d 802, 808 (N.C. App. 1998).

*C. The Order Prohibiting Certain Extrajudicial Statements is Unconstitutionally Overbroad on its Face*

It is fundamental constitutional doctrine that a governmental restraint on First Amendment freedoms must be narrowly tailored, and can be no broader than absolutely necessary to accomplish its legitimate objective. *Procunier v. Martinez,* 416 U.S. 396, 413 (1974). This principle applies with full force to restraining orders, *Carroll v. President and Com'rs of Princess Anne,* 393 U.S. at 183, and judicially imposed gag orders. **19***Dow Jones & Co., Inc. v. Kaye,* 90 F. Supp. 2d 1347, 1360 (S.D. Fla. 2000), *appeal dismissed and order vacated as moot,* 256 F.3d 1251 (11th Cir. 2001).

Paragraph two of the Gag Order prohibits the parties, attorneys, expert witnesses, and witnesses from "publishing any statements on Internet websites ... concerning the trial proceedings, concerning any opposing party or any opposing party's counsel, or concerning any witnesses or evidence in the case." The broad sweep of this Order encompasses all reports and commentary relating to the trial, whether prejudicial or innocuous, whether subjective or objective, whether reportorial or interpretive. Even internet reporting of precise statements of testimony and argument given in open court is banned, in violation of settled principles of constitutional law. *Nebraska Press Assn. v. Stuart,* 427 U.S. 539 (1976); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469 (1975).

Gag orders of similar breadth have been consistently struck down by the courts as unconstitutionally overbroad. *E.g., CBS, Inc. v. Young,* 522 F.2d 234, 236 (6th Cir. 1975)(gag order prohibiting all discussions about a case held to be overbroad); *Chase v. Robson,* 435 F.2d 1059, 1060 (7th Cir. 1970)(order prohibiting parties and counsel from making public statements concerning the jury, the witnesses, the evidence, the merits, and the court rulings was overbroad and unconstitutional); *Dow Jones & Co., Inc. v. Kaye,* 90 F. Supp. 2d at 1360-61 (gag order forbidding trial participants from making any public statement which pertains to any court proceedings in the case violates First Amendment); *Kemner v. Monsanto Co.,* 492 N.E. 2d at 1337-38; *National Broadcasting Co. v. Cooperman,* 501 N.Y.S.2d 405 (N.Y. App. Div. 1986).

**20 *D. The Order Prohibiting Certain Extrajudicial Statements is Unconstitutionally Vague***

When First Amendment interests are at stake, only a precise order evincing judicial judgment that certain specific conduct be limited or proscribed is permissible. *E.g., Edwards v. South Carolina,* 372 U.S. 229, 236 (1963). Consequently, prior restraints on freedom of speech must meet the requirement of specificity necessary to apprise a person of what conduct may be proscribed. *People ex rel. Tooley v. Seven Thirty-Five East Colfax, Inc.,* 697 P.2d at 356..

Paragraph one of the Gag Order prohibits parties, attorneys, expert witness, and witnesses from making extrajudicial statements "that reasonably can be expected to be publicly disseminated by the media and that have a substantial likelihood of materially prejudicing the parties' right to a fair trial." Likewise, Paragraph three of the Order precludes the making of extrajudicial statements on internet web sites about matters excluded *in limine* "that have a substantial likelihood of materially prejudicing the parties' right to a fair trial." Compliance with the Gag Order is dependent upon guessing correctly as to what statements "have a substantial likelihood of materially prejudicing the parties' right to a fair trial." The uncertainty in making this assessment results in precisely the chilling affect on freedom of speech that the First Amendment protects against. *See Kemner v. Monsanto Co.,* 492 N.E.2d at 1339. *See also Hirschkop v. Snead,* 594 F.2d 356, 371 (4th Cir. 1979).

*E. There Is No Evidence in the Record to Support the Conclusory Findings in the Order Prohibiting Certain Extrajudicial Statements*

There is no need to venture beyond the face of the Gag Order itself to conclusively demonstrate its constitutional deficiencies. The lack of specific findings, its overly broad sweep, and its vagueness each constitute a sufficient ground to strike it down. Nevertheless, a review of the record made prior to the entry of the Gag Order provides additional basis for attack, because **21 there is simply no evidentiary support for the trial court's conclusory findings. This absence of an evidentiary basis for the Gag Order renders it unconstitutional. *E.g., Dow Jones & Co., Inc. v. Kaye,* 90 F. Supp. 2d at 1359-60 (findings made in support of gag order must be based on the available evidence); *Breiner v.*

*Takao,* 835 P.2d at 642; *In re A Minor,* 537 N.E.2d 292, 302 (Ill. 1989)(specific findings for gag order must be supported by "substantial evidence."); *Grigsby v. Coker,* 904 S.W.2d 619, 620 (Tex. 1995) (gag orders must be supported by evidence); *Sherrill v. Amerada Hess Corp.,* 504 S.E.2d at 808; *National Broadcasting Co. v. Cooperman,* 801 N.Y.S.2d at 409.

The record fails to establish that internet web sites posed any serious threat to the fairness of the trial, and it is silent on whether other less restrictive alternatives to a broad gag order might suffice. On May 22, 2001, the trial court held a hearing to deal with certain *in limine* evidentiary issues raised by the parties. None of the matters scheduled for consideration at the May 22, 2001 hearing involved the issuance of a gag order. The great majority of the May 22, 2001 hearing focused on the admissibility of Secretary Richardson's statements; Dr. Egilman's ability to render expert opinions on various subjects; and the admissibility of Mr. Hennessey's expert testimony. Brush Wellman tendered certain material from Dr. Egilman's computer that apparently contained derogatory statements about defense counsel's law firm, Brush Wellman, and certain defense experts. This material was never marked as an exhibit and was not made part of the court record. Nevertheless, the description of this material in the transcript of the May 22nd hearing constitutes the only factual information ever presented to the trial court that might arguably relate to the necessity for a gag order.

**\*22** The matter of a gag order was first raised in the middle of the March 22nd hearing, when the court expressed concern that Dr. Egilman apparently felt free to "put on whatever he wants on his web site." The court itself quantified the risk of juror taint posed by Egilman's website as a mere "possibility," if jurors became aware of it (Vol IV p. 100 li 15-22 and p. 101 li 11-17). However, the court never addressed the key question of why jurors would attempt to access the web site, particularly if a strong admonition were given. Indeed, the court expressly noted that, in its experience, admonitions to the jury had always been sufficient to prevent jurors from being tainted by extrajudicial materials:
This Court does not admonish jurors before every recess to refrain from viewing or hearing or reading anything in the media about a pending trial, but it does admonish them very strongly at the beginning of the trial, and generally goes beyond that and explains to jurors of the reason for that admonition, and that being that the lawyers on each side of the case need to know what information the jury is receiving or has the possibility of receiving so that if there is an appropriate objection, they can raise it and the Court can rule on it. *I find jurors understand and appreciate the reason for that admonition. I am not aware of jurors having violated that admonition.* (Emphasis added.)

After the hearing, Plaintiffs tendered a detailed brief pointing out that an admonition to the jury and searching voir dire would suffice to remove the risk of jurors accessing the web site. More importantly, Plaintiffs suggested that if the court intended to enter a gag order, it could be narrowly tailored to protect against the perceived risk by requiring Dr. Egilman to establish password protection for the site so that it could not be accessed by the public at large. The trial court makes no mention in the record or in the gag order as to why the more narrow restriction of requiring password protection would not have sufficed.

In sum, the record supporting the entry of the trial court's gag order is woefully inadequate. It consists of a description of a few items from Dr. Egilman's web site that were not **\*23** even made part of the record, and some observations and comments by the trial judge during a hearing that was scheduled to consider issues unrelated to a gag order. The only matters in the record even arguably pertinent to the constitutionally mandated criteria for entry of a gag order are (a) the trial court's observation of a "possibility" of a mistrial if jurors accessed Dr. Egilman's web site (but with no explanation of why there was a real, serious, and immediate threat a juror would do so); (b) the trial judge's statement, based on his own experience, that juror admonitions had always sufficed to eliminate the risk; and (c) the very reasonable alternative suggested by Plaintiff's counsel, but never acknowledged by the trial court, that an order requiring web sites to be password protected would serve the goals sought to be achieved. Far from supporting the sweeping Gag Order entered by the trial court, the record, such as it is, weighs heavily against the need for any type of prior restraint on freedom of speech.

   *F. The Order Prohibiting Certain Extrajudicial Statements, As Applied, Is Unconstitutionally Overbroad*

The Gag Order on its face is unconstitutionally overbroad because it prohibits publication on internet web sites of any statements concerning the trial proceedings. *See* Section I(B) of the Argument *supra*. Additionally, the Order, as applied by the trial court, is unconstitutionally overbroad for another reason. Either shortly before or immediately after the trial court entered the Gag Order, Dr. Egilman shut his internet web site down, and restricted access to his computer through password protection. As a result, no one could lawfully view the materials without first obtaining the password from Dr. Egilman.[FN5]

> FN5. In fact, unless the password was obtained from Dr. Egilman, access to the materials on the site could only be accomplished by unlawfully hacking into it (which appears to be how Jones Day obtained the materials) or by theft of the computer itself.

**\*24** Shortly after the Gag Order was entered, the trial court commenced proceedings to determine if Dr. Egilman had violated Order and, if so, what sanctions should be imposed. The trial judge concluded that Dr. Egilman had violated paragraph two of the Gag Order by posting "inflammatory" and "intemperate" materials on his web site. Significantly, the court made it perfectly clear that the postings violated paragraph two of the Gag Order, despite the fact that no juror had seen the site and, because the site had been closed to public access through password protection, no juror could have accessed it.

The validity of the proceedings in which Dr. Egilman was found to have violated the Gag Order are the subject of another section of this Brief. *See* Section II of the Argument, *infra*. Nevertheless, the trial court's interpretation of paragraph two of the Gag Order as extending to statements on sites that could not be accessed by the jurors graphically demonstrates that the Gag Order, as applied, goes well beyond any legitimate governmental interest in preventing jury contamination from extrajudicial statements. *See Salameh,* 992 F.2d at 447; *State v. Barnett,* 911 P.2d 385, 388 (Wash. 1996); *Rodriguez v. Feinstein,* 734 So.2d 1162, 1165 (Fla. App. 1999); *Keene Corp. v. Abate,* 608 A.2d 811, 815 (Md. App. 1992).

## II. THE TRIAL COURT'S SANCTION IMPOSED ON DR. EGILMAN FOR ALLEGEDLY VIOLATING THE GAG ORDER WAS UNAUTHORIZED, PROCEDURALLY DEFICIENT, AND UNCONSTITUTIONAL

### A. Introduction

Contrary to the arguments made by Appellees in their previously filed Motion to Dismiss the Appeal, there can be no doubt that the Sanctions Order entered on June 22, 2001, imposes sanctions directly against Dr. Egilman. Arguably, the portions of the Sanctions Order striking Dr. Egilman's testimony and directing that the jury be instructed to disregard it may impact the **\*25** Plaintiffs more than Egilman. However, the portion of the Sanctions Order that bars Dr. Egilman from ever testifying "in any other case which may later come before this Court" is targeted at, and affects no one but Dr. Egilman.[FN6]

> FN6. The trial court's sanctions Order has severely damaged Dr. Egilman's reputation. It has been used by other counsel to discredit or attempt to disqualify him in cases outside of Colorado when he has appeared as an expert witness.

Furthermore, it is beyond peradventure that the trial court's sanction forever banishing Dr. Egilman as a witness was imposed because Dr. Egilman allegedly "knowingly, deliberately, intentionally and willfully violated the Court's 5/30/01 Order Prohibiting Certain Extrajudicial Statements. (Vol III p. 532). This is confirmed not only by the face of the Sanctions Order itself, but also by the hearings leading up to the sanction against Dr. Egilman. Consequently, if the Gag Order cannot pass constitutional muster, then the sanction imposed upon Dr. Egilman for its violation must fall as well.

Even if the Gag Order somehow survives constitutional scrutiny, the Sanctions Order cannot be sustained. First, there

is no authority, other than the power of contempt, for a trial judge to enter sanctions against a nonparty for violation of a court order unrelated to discovery, and the Sanctions Order fails to comply with any of the procedural requirements for contempt proceedings. Second, the sanction against Dr. Egilman was entered without affording him notice or an opportunity to be heard, in violation of the Due Process Clauses of the United States and Colorado Constitutions. Finally, the Sanctions Order violates the First Amendment to the United States Constitution and Article II, section 25 of the Colorado Constitution because it is content based, and further because Dr. Egilman's exercise of his right to freedom of speech posed no risk to any substantial government interest.

**\*26** B. _Colo. R.Civ.P. 107 and the Due Process Clauses of the United States and Colorado Constitutions Define the Procedures Which Must be Employed to Sanction a Nonparty for Allegedly Violating a Non-Discovery Related Court Order._

On its face, the June 22, 2001 Sanctions Order imposes a sanction (a prohibition against testifying in any future case) against a nonparty (Dr. Egilman) for violation of a prior court order (the Gag Order) unrelated to discovery. The authority vested in a trial court to impose sanctions for such conduct is its power of contempt, as embodied in Colo. R.Civ.P. 107. _See_ Colo. R. Civ. P. 107(a)(defining contempt to include "disobedience ... to any lawful ... order of the court"). _See also In re_ Matter of P.R. v. District Court, 637 P.2d 346, 350 (Colo. 1981); White v. Adamak, 907 P.2d 735, 737 (Colo. App. 1995).

There is nothing in the record to suggest that the trial judge ever directly viewed Dr. Egilman's site. Rather, the alleged postings on the site and the circumstances surrounding them were all provided to the court by defense counsel. Consequently, the alleged violation of the Gag Order was not directly seen or heard by the trial judge, and thus, falls within the category of "indirect contempt" under Rule 107(a)(3). It is also clear that the Sanctions Order was not entered to "force compliance" with or "compel performance" of the Gag Order. Rather, the sanction imposed on Dr. Egilman was punishment for conduct that was found to be offensive to the authority and dignity of the court. As a result, the sanction must be deemed "punitive," within the meaning of Colo. R.Civ.P. 107(a)(4).

The principles underlying the procedural requirements of Colo. R.Civ.P.. 107 are not premised merely upon convenience or judicial efficiency. They are of constitutional magnitude. All of these procedural requirements are mandated by the Due Process Clauses of the United States and Colorado Constitutions. _E.g.,_ **\*27**Young v. United States, 481 U.S. 787, 794 and 808 (1987)(right to notice; advisement of the charges and assistance of counsel); Cooke v. United States, 267 U.S. 517, 537 (1925)(presumption of innocence); Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444 (1911)(proof beyond a reasonable doubt; the privilege against self-incrimination; and the right to cross-examine witnesses).

Rule 107 mandates that a proceeding which results in a sanction for an indirect contempt must be initiated by a motion supported by affidavit. An order to show cause must issue and be served directly upon the alleged contemnor at least twenty days before he or she is to appear. Colo. R.Civ.P. 107(c). Furthermore, if the sanction to be imposed is punitive, the contemnor must be advised of the right to be represented by an attorney; the right to plead either guilty or not guilty; the presumption of innocence; the proof beyond a reasonable doubt standard; the right to present witnesses and to cross-examine adverse witnesses; the right to testify at trial, as well as the right to remain silent; and the right to appeal any adverse decision. Colo. R.Civ.P. 107(d)

The trial court complied with none of the procedural safeguards mandated by Rule 107 for imposing punitive sanctions for an indirect contempt. For example, the record demonstrates that no motion supported by an affidavit was filed, and no show cause citation was issued to or served upon Dr. Egilman (Rule 107(c)). Furthermore, Dr. Egilman was never advised of his right to counsel; his right to plead guilty or not guilty; the presumption of innocence; his right to require proof beyond a reasonable doubt; his right to present witnesses and evidence; his right to cross-examine adverse witnesses; his right to have subpoenas issued; or his right to testify or, alternatively his right to remain silent (Rule 107(d)(1)).

2002 WL 34150173 (Colo.App.)                                                                                    Page 17

In fact, Dr. Egilman was never given notice or an opportunity to be heard before the June 22, 2001 Sanctions Order was entered. The transcripts of the hearings that preceded the entry of **28** the Sanctions Order demonstrate beyond doubt that none of those present was acting on behalf of Dr. Egilman. Although Plaintiffs' counsel initially advanced a defense based on the password protected nature of Dr. Egilman's computer, she quickly abandoned this position and attempted to portray herself as a victim who was duped by Egilman. Once Plaintiffs' counsel jumped on the bandwagon, the unanimous view of those participating in the hearings was that Dr. Egilman was guilty as charged. Essentially, he was tried, convicted, and sentenced *in abstentia,* with arguments of counsel taking the place of evidence.

The trial judge apparently believed that by simply disclaiming any intent to initiate contempt proceedings against Dr. Egilman, he could justify imposing a punitive sanction through an *ad hoc* procedure devoid of even the most rudimentary procedural or constitutional safeguards (*See* Vol. IX p. 61 li 16-20). Such reasoning, however, is flawed. There is no authority provided by either statute or court rule, other than the power of contempt, for imposing sanctions upon a nonparty for allegedly violating an order unrelated to discovery. More importantly, the procedural and constitutional protections afforded to those accused of contumacious conduct become hollow rights if they can be negated by merely categorizing the proceedings as something other than contempt.

### C. The Sanctions Order violates the First Amendment to the United States Constitution and Article II, Section 25 of the Colorado Constitution

The materials on Dr. Egilman's password protected web site that formed the basis for the Sanctions Order are comprised solely of noncommercial writings. The written word is considered "pure speech," as opposed to "speech plus conduct." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 345 (1995); *In re Providence Journal Co.,* 820 F.2d 1342, 1349 (1st Cir. 1986), *mod. en banc on other grounds,* 820 F.2d 1354 (1st Cir. 1987), *cert. dismissed,* **29**485 U.S. 693 (1988). As such, it is afforded the highest degree of protection under the First Amendment. *Cox v. Louisiana,* 379 U.S. 536, 555 (1965); *Kucinich v. Forbes,* 432 F. Supp. 1101, 1115 (N.D. Ohio 1977). Pure speech may not be prohibited or punished absent a showing that it constitutes a clear and present danger to a substantial governmental interest. *Schenck v. United States,* 249 U.S. 47, 52 (1919); *Hiett v United States,* 415 F.2d 664, 667 (5th Cir. 1969), *cert. denied,* 397 U.S. 936 (1970); *People v. Dietze,* 549 N.E.2d 1166, 1168 (N.Y. 1989); *State of Connecticut v. Culmo,* 642 A.2d 90, 101 (Conn. Super. 1993).

The Sanctions Order utterly fails the clear and present danger test. In fact, there has been no showing that any legitimate governmental interest is implicated by the speech giving rise to the Order punishing Dr. Egilman. The only legitimate governmental interest justifying restriction on or punishment of extrajudicial statements of witnesses, parties, and/or attorneys is the prevention of jury contamination. Plaintiffs' counsel represented on the record during the hearings leading up to the Sanctions Order that Dr. Egilman's site was secured by password protection.[FN7] Because it was password protected, jurors could not view the site. No evidence was adduced that any juror had received the password, or had seen the materials on Dr. Egilman's secured site. Indeed, a polling of the jury conclusively demonstrated to the contrary.

> FN7. Had Dr. Egilman been given notice and an opportunity to be heard, he could have conclusively demonstrated that the representations of Plaintiffs' counsel were correct. For example, the Addendum attached to this Brief contains the image that would have appeared on the monitor of anyone attempting to gain remote access to Dr. Egilman's computer after he had established password protection.

To be sure, the materials on Dr. Egilman s computer were not complimentary of the trial judge, defense counsel, or the defendant. However, it is apodictic that constitutionally protected speech cannot be punished simply because its content may be distasteful or offensive. **30** *Chicago Council of Lawyers v. Bauer,* 522 F.2d at 257 ("We read the Supreme Court general contempt cases as indicating that the First Amendment does not authorize restrictions on 'pure speech' merely for the purpose of protecting judges from criticism.").

CONCLUSION

The Gag Order entered by the trial court fails to meet any of the constitutional criteria under the First Amendment to the United States Constitution and <u>Article II section 10</u> of the Colorado Constitution for a government imposed prior restraint on free speech. The Sanctions Order punishing Dr. Egilman was entered without providing him with the protections afforded by the Colorado Rules of Civil Procedure and Due Process, and violated Dr. Egilman's constitutional right to freedom of speech. We respectfully request this Court to reverse the Gag Order and that portion of the Sanctions Order directed at Dr. Egilman, and to remand to the trial court with instructions to vacate said Orders.

Appendix not available.

David EGILMAN, M.D., Appellant, District Court, First Judicial District, County of Jefferson; the Honorable Frank Plaut, one of the Judges thereof, Appellees, Michael D. Ballinger, et. al., Plaintiffs, v. BRUSH WELLMAN, INC., et.al., Defendants.
2002 WL 34150173 (Colo.App. ) (Appellate Brief )

END OF DOCUMENT

⤸  2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT D

LAW.COM

**Copyright 2009. Incisive Media US Properties, LLC. All rights reserved.**

Page printed from: http://www.law.com

**Law Firms Not Liable in Alleged Web Hacking Case**

Pamela A. MacLean

12-09-2005

Two law firms that allegedly surreptitiously accessed the password-protected Web site of an expert witness in order to show a judge that the witness violated a gag order cannot be held liable under the Digital Millennium Copyright Act.

A District of Columbia federal judge has dismissed the suit by Boston occupational illness expert Dr. David Egilman, who accused the law firms Jones Day and Keller & Heckman of Washington, and Keller attorney Douglas Behr, of misappropriating his protected work.

Egilman accused the Keller firm and Behr of hacking into his Web site by acquiring a password and sharing it with Jones Day lawyers in the midst of a 2001 landmark Colorado state toxics trial. Egilman had testified on behalf of the first four of 50 workers at Rocky Flats nuclear weapons plant who unsuccessfully claimed that the federal government colluded with the world's largest beryllium maker, Brush Wellman Inc., to hide the health dangers of the metallic element.

Despite a broad gag order by a Colorado state court judge, Frank Plaut, in *Ballinger v. Brush Wellman Inc.*, No. 96-CV-2532, Egilman had posted critical material about Jones Day and Brush Wellman on his password-protected Web site in what Plaut ruled was a violation of the gag order.

Plaut ordered jurors to disregard Egilman's testimony as a sanction after learning from Jones Day that the posting included accusations of potential illegal conduct by Jones Day, and allegations that a Brush Wellman medical doctor was educated in Nazi Germany, according to press accounts at the time.

Plaut called the information "scurrilous and inflammatory" at the time.

Egilman, who has testified in dozens of toxics trials and was the expert in the recent Texas Vioxx trial that resulted in a $253 million verdict, limited Web site access to his staff and his Brown University students. He posted uncensored information on occupational illness and related litigation, including previously confidential corporate internal documents related to many toxic torts.

Jurors ultimately sided with Brush Wellman and, without Egilman's testimony, rejected the workers' claims that lung damage from exposure to radioactive beryllium could have been avoided.

**EFFECTIVENESS COMPROMISED?**

But Egilman pursued his fight against the law firms. Egilman sued Jones Day and Keller & Heckman, first in Texas and later in the District of Columbia, saying that his reputation was

besmirched and his effectiveness compromised.

He argued that the law firms and Behr circumvented measures installed to deny access to his copyright-protected work on the Web site, in violation of the 1978 Digital Millennium Copyright Act.

U.S. District Judge Henry Kennedy Jr. in D.C. ruled that obtaining a username and password from a third party that has authorized access does not violate the DMCA. Kennedy cited the only other court to rule on improper use of a legitimate password, holding that gaining access to a third party's legitimate password is not the same as hacking.

"It is irrelevant who provided the username/password combination to the defendant, or, given that the combination itself was legitimate, how it was obtained," Kennedy wrote in *Egilman v. Keller & Heckman*, No. 04-876HHK. Use of a legitimate password does not "circumvent" a technology used to control access, Kennedy concluded.

"This is not really about the DMCA," Egilman said. "It is about how the legal system is designed to benefit people in power. That is why courts said it was legal for blacks to be slaves or ruled it legal to deny women the vote," he said.

Accessing his computer "was illegal conduct. It was breaking and entering. It is simple theft," he said.

As for Egilman's alternate claim that unauthorized use of the password violated the Computer Fraud and Abuse Act, the court found that he had filed that claim too late. Egilman said he is not sure whether he will appeal. "I spent $150,000 of my money doing this case. At some point I can't afford to represent the interests of regular people against criminal law firms," he said.

Behr said only, "I don't want to talk about it," when asked about the case. Attorneys for Jones Day and Keller & Heckman declined to comment.

2