# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | Master File No. 04-10981 |
| ALL ACTIONS | Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

## COORDINATED PLAINTIFFS' PROPOSED TRIAL PLAN

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page**

*Andre Strishak & Assocs. v. Hewlett Packard Co.,*
    300 A.D. 2d 608 (N.Y. App. Div. 2002) ...................................................................11

*Bardin v. DaimlerChrysler Corp.,*
    136 Cal. App. 4th 1255 (2006) ...........................................................................10

*Blakemore v. Superior Court,*
    129 Cal. App. 4th 36, 49 (2d Dist. 2005) ...............................................................9

*Californians for Disability Rights v. Mervyn's LLC,*
    39 Cal. 4th 223 (2006)……………………………………………………………9

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999)...........................................................................................9

*Champion Home Builders Co., v. ADT Sec. Servs., Inc.,*
    179 F. Supp. 2d 16 (N.D.N.Y. 2002)...................................................................12

*Commonwealth v. Monumental Properties,*
    459 Pa. 450 (1974)...............................................................................................11

*Computer Sales Int'l Inc. v. Lycos, Inc.,*
    No. Civ.A. 05-10017, 2005 WL 3307507 (D. Mass. Dec. 6, 2005)...........................9

*Cox v. Sears Roebuck & Co.,*
    647 A.2d 454 (1994)...............................................................................................8

*Dairy Queen, Inc. v. Wood,*
    369 U.S. 469 (1962) .............................................................................................13

*Dopp v. HTP Corp.,*
    947 F.2d 506 (1st Cir. 1991)...................................................................................9

*Furst v. Einstein Moomjy, Inc.,*
    860 A.2d 435 (N.J. 2004) .......................................................................................8

*In re Evergreen Mutual Funds Fee Litig.,*
    423 F. Supp. 2d 249 (S.D.N.Y. 2006) ..................................................................12

*In re Lupron® Mktg. & Sales Practices Litig.,*
    No. 01-10861, 2004 U.S. Dist. LEXIS 18512 (D. Mass. Sept. 16, 2004)................11

*In re Tobacco II Cases,*
  46 Cal. 4th 298 (2009)................................................................................................10

*Karlin v. IVF Am. Inc.,*
  93 N.Y. 2d 282 (1999)...............................................................................................12

*Libertad v. Welch,*
  53 F.3d 428 (1st Cir. 1995)..........................................................................................5

*Masland v. Bachman,*
  473 Pa. 280 (1977).....................................................................................................11

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank N.A.,*
  647 N.E.2d 741 (N.Y. 1995) .....................................................................................12

*Pastoria v. Nationwide Ins.,*
  112 Cal. App. 4th 1490 (2d Dist. 2003) ...................................................................10

*Plascencia v. Lending 1st Mortg.,*
  No. Civ.A. 07-4485, 2009 WL 2569732 (N.D. Cal. August 21, 2009)....................10

*Smith v. Jenkins,*
  626 F. Supp.2d 155 (D. Mass. 2009)...........................................................................8

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,*
  17 Cal. 4th 553 (1998).................................................................................................9

*Stutman v. Chem. Bank,*
  731 N.E.2d 608 (N.Y. 2000) ...............................................................................11, 12

*Taylor v. United States,*
  44 U.S. 197 (1844) ....................................................................................................11

## Statutes

18 U.S.C. § 1962(c).......................................................................................................4, 5

Cal. Bus. & Prof. Code § 17200................................................................................4, 9, 10

California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* .........................4, 9

New Jersey Consumer Protection Act, N.J. STAT. § 56:8-2 *et seq* ............................................4, 8

New York General Business Law §349(a) ...............................................................................4, 13

Pennsylvania Insurance Fraud Statute, 18 Pa.C.S.A. § 4117(a)(2) ..........................................4, 12

## Introduction

At the September 18, 2009 hearing, this Court requested that the Coordinated Plaintiffs submit a proposed trial plan for the Court's consideration. The Coordinated Plaintiffs accordingly submit a trial plan which contemplates that the parties commence a jury trial on February 8, 2010.

Our trial plan contemplates a trial of the claims of all three Coordinated Plaintiffs.[1] While the Court expressed the possibility of trying as a pilot case the claims of a single Coordinated Plaintiff on all indications, the Coordinated Plaintiffs respectfully submit that the approach contemplated here is the most efficient and economical approach to an early trial, in part because it would avoid multiple trials on what is alleged to be a single overarching scheme and because the three Coordinated Plaintiffs together represent the spectrum of managed care models. In the alternative, if the Court wishes to proceed with a single Coordinated Plaintiff, Plaintiff Kaiser will be prepared to proceed to trial on all indications on February 8, 2010.

The Coordinated Plaintiffs agree that economy and efficiency require that all indications be tried together. The testimony of many witnesses covers multiple indications; thus, conducting indication-specific trials would require repeated appearances from many witnesses. For example, Plaintiff Kaiser will present the testimony of multiple members of its P&T Committees, employees of its Drug Information Services department, and participants in remedial education campaigns undertaken to correct Defendants' misinformation. Almost all of these witnesses are based in California, and all are physicians with active practices and/or high-level employees with demanding schedules and responsibilities. All have knowledge relevant to

---

[1] The Coordinated Plaintiffs include Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (jointly, "Kaiser"), the Guardian Life Insurance Company of America ("Guardian"), and Aetna, Inc. ("Aetna").

multiple – if not all – of the indications at issue here.  Ensuring their availability for multiple trials in this Court would be impracticable and unduly burdensome to both Kaiser and the witnesses.

The Coordinated Plaintiffs are also cognizant of – and agree with – the Court's wish to streamline the presentation of evidence.  The Coordinated Plaintiffs believe that this goal can be most efficiently achieved by separating the trial of the Class Plaintiffs from the trial of the Coordinated Plaintiffs.  And while Kaiser, Aetna and Guardian each has its own story of the impact and cost of Defendants' unlawful marketing of Neurontin, all three will adduce nearly identical evidence to support the majority of elements in their claims.  Thus, allowing a joint trial is the optimal way of both streamlining the evidence and preserving the time and resources of the Court and the parties.

The majority of proof will be common among the Coordinated Plaintiffs and will be primarily sourced from Defendants' own documents and witnesses; the documents and witnesses provided by Defendants' third party co-conspirators; and the testimony of at least ten expert witnesses.  This common proof will be used to prove, among other things:

> ❖ Defendants' early decision to promote Neurontin with a fraudulent off-label marketing campaign rather than to seek FDA approval for indications other than epilepsy;
>
> ❖ Defendants participation in a unlawful conspiracy to promote Neurontin in the healthcare industry through a fraudulent publication strategy, along with a half dozen medical marketing firms and several dozen physicians;
>
> ❖ The unlawful role of medical marketing firms to promote Neurontin for inappropriate uses;
>
> ❖ Defendants' use of advisory board committees; continuing medical education classes; speakers' bureaus; field detailing; and other tactics to convey misleading messages about off-label uses of Neurontin;
>
> ❖ Defendants' use of peer-to-peer selling strategies to convey misleading messages

about off-label uses of Neurontin;

❖ Defendants' false and misleading statements about Neurontin's efficacy and effectiveness for neuropathic pain, nociceptive pain; migraine and bipolar disorder, and dosages above 1,800/mg;

❖ Defendants' suppression of negative studies pertaining to Neurontin's efficacy and effectiveness for neuropathic pain, nociceptive pain; migraine and bipolar disorder, and dosages above 1,800/mg;

❖ Defendants' intent to defraud and scheme to target third party payors as a key market for its misleading marketing campaigns;

❖ Neurontin's lack of efficacy or effectiveness for neuropathic pain, nociceptive pain; migraine and bipolar disorder, and dosages above 1,800/mg; and

❖ The existence of alternative treatments that are cheaper and more optimal than Neurontin for neuropathic pain, nociceptive pain, migraine, and bipolar disorder; and dosages above 1,800/mg.

The Coordinated Plaintiffs anticipate that the vast majority of trial time will be devoted to the issues that are common amongst them. And while the Coordinated Plaintiffs will rely on individual evidence to prove their reliance and damages theories, those theories are compatible and are unlikely to lead to juror confusion. For example, all three Coordinated Plaintiffs intend to rely on the expert testimony of Kimberly McDonough to explain the mechanisms of managed care, including formulary management techniques; the role of the P&T Committee; and how the different models of managed care were impacted by Defendants' conduct. Dr. McDonough's testimony will give context to the Coordinated Plaintiffs' individualized evidence of reliance and injury. In addition, allowing Aetna, Guardian and Kaiser to proceed to trial together will allow each to continue to combine their resources and comprehensiveness of pretrial and trial preparation, one of the primary benefits of coordination, and will make feasible an early 2010 trial in this complex litigation.

3

## I.     Proposed Trial Plan

Although the following plan contemplates one trial of all the claims of the three Coordinated Plaintiffs, a trial of Kaiser's claims alone would not require a change to the substance or timing of the plan.

### A.     The Claims At Issue

The Coordinated Plaintiffs intend to proceed to trial under the United States RICO statute, 18 U.S.C. § 1962(c); under the New Jersey Consumer Protection Act, N.J. STAT. § 56:8-2 *et seq.*; and under the law of unjust enrichment. In addition, Plaintiff Kaiser will proceed with its claim under the California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; Aetna will proceed with its claim under the Pennsylvania Insurance Fraud Statute, 18 Pa.C.S.A. § 4117(a)(2); and Guardian will proceed with its claim under New York General Business Law §349(a). To prove each of these claims at trial, the Coordinated Plaintiffs intend to show that:

> [t]o increase their sales of Neurontin, Defendants embarked on a comprehensive campaign to promote Neurontin for unapproved and inappropriate uses through a fraudulent and deceptive marketing program. Defendants (a) deliberately misrepresented the scientific, medical and clinical data concerning the safety, effectiveness and usefulness of Neurontin; (b) suppressed and mischaracterized negative studies of the drug; and (c) caused misleading presentations to be made to Plaintiffs and physicians concerning Neurontin, its recommended and effective dosages, efficacious uses and lack of purported side effects.

TCAC ¶ 2. For each of these claims, the Coordinated Plaintiffs intend to show that the Defendants' misrepresentations and omissions caused them to pay for Neurontin prescriptions, a particularly expensive drug, rather than the cheaper and more optimal alternatives that were available.

### 1.     U.S. RICO, 18 U.S.C. § 1962(c)

In order to prevail on their RICO claim, the Coordinated Plaintiffs will prove four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Libertad v. Welch*, 53 F.3d 428, 441 (1st Cir. 1995).

### a.     Conduct of an Enterprise

At trial the Coordinated Plaintiffs will use common evidence to prove that as early as December 1993 and continuing throughout the relevant period, Defendants participated in as many as seven unlawful association-in-fact enterprises, each along with one medical marketing firm (Cline Davis, Physicians World, Sudler & Hennessey, MEDED, MES, HCC or AMM/Adelphi). The common purpose of each of these enterprises was to promote Neurontin for illegal, off-label uses. Common evidence utilized to prove the conduct of an enterprise will include, among other things:

- ❖ Evidence from documents and testimony provided by Defendants and other members of each enterprise that shows that the Defendants and marketing firms formed systematic linkages to demonstrate that each enterprise functioned as a continuing unit. Such evidence includes the ongoing formulation of tactical promotion plans; regular communication; and financial ties between the participants;

- ❖ Evidence from documents and testimony provided by Defendants and other members of each enterprise that Defendants and the medical marketing firms joined together throughout the relevant period to host or sponsor events designed to promote Neurontin for off-label uses through the use of well-regarded "thought leaders" who were surreptitiously paid to deliver only positive Neurontin messages to their peers, while maintaining the appearance of independence;

- ❖ Evidence from documents and testimony provided by Defendants and other members of each enterprise that Defendants and the medical marketing firms joined together throughout the relevant period to cause to be drafted and published misleadingly favorable articles concerning the off-label usage of Neurontin;

- ❖ Evidence from documents and testimony provided by Defendants and other members of each enterprise that Defendants and the medical marketing firms joined together throughout the relevant period to target managed care plans such as Coordinated

Plaintiffs with misleading information or fraudulent omissions concerning off-label usages of Neurontin; and

❖ Evidence from documents and testimony provided by Defendants and other members of each enterprise that Defendants exerted control over each enterprise through, among other things, directing the content of the Neurontin messages disseminated at each event; ensuring that only favorable Neurontin studies were disclosed and that unfavorable studies were suppressed; as well as selecting and approving the physicians tasked with delivering the misleading Neurontin messages at events and through articles.

### b.    Pattern of Racketeering Activity

The Coordinated Plaintiffs will demonstrate that Defendants (i) knowingly devised and/or participated in a scheme to fraudulently market Neurontin for indications and dosages for which there is minimal, if any, evidence of efficacy, and for which there exist cheaper and more optimal alternative treatments; (ii) caused the Coordinated Plaintiffs to pay for Neurontin instead of cheaper alternatives or at excessive dosages; and (iii) used the mails or interstate wire facilities in carrying out the scheme. Such evidence will include:

❖ The communications of Defendants and their co-conspirators about their fraudulent marketing campaign and its implementation;

❖ Defendants' documents and testimony, and that of their co-conspirators, evidencing Defendants' intention to misstate Neurontin's efficacy for the off-label indications at issue and to misstate the evidence of increased efficacy at the higher dosages for which it was being touted;

❖ Expert testimony demonstrating Neurontin's lack of efficacy, or minimal efficacy, for the off-label indications at issue and in comparison with the available alternatives;

❖ Expert testimony demonstrating Neurontin's lack of increased efficacy at dosages above 1800/mg;

❖ Defendants' documents and testimony, and that of their co-conspirators, evidencing Defendants' intention to target managed care providers for the fraudulent scheme; and

❖ Evidence from the documents of Defendants, their co-conspirators, and the Coordinated Plaintiffs that show that Defendants' scheme was extraordinarily successful, in that by at least 2003, over 90% of Neurontin prescriptions were for off-label indications.

### c. Proximate Cause of Injury

The Coordinated Plaintiffs will demonstrate with both individualized and common evidence that their injury was proximately caused by Defendants' fraudulent scheme. Among the evidence to be relied upon will be:

❖ Expert testimony on the mechanisms and different models of managed care; and the known limitations (limitations well-known to Pfizer) of all managed care models to guard against the intentionally fraudulent conduct at issue here;

❖ Defendants' documents and testimony, and that of their co-conspirators, demonstrating that Defendants' knowingly and effectively exploited the limitations of the managed care models in order to maximize prescriptions of Neurontin for off-label indications and at excessive dosages;

❖ Expert testimony establishing that Neurontin is of minimal or no efficacy for the indications at issue, and of no increased efficacy at dosages above 1800 mg, and that cheaper and more optimal alternatives existed for each indication;

❖ Documents and testimony from each of the Coordinated Plaintiffs demonstrating, in the specific context of their own managed care model, how each relied to their detriment on Defendants' fraudulent misrepresentations and omissions; and showing that such reliance caused each Coordinated Plaintiff to pay for Neurontin prescriptions for indications for which their existed cheaper and more optimal alternatives, and for Neurontin prescriptions at dosages above 1800/mg; and

❖ Expert testimony and internal documents and data from each Coordinated Plaintiff establishing damages.

### 2. N.J. Consumer Fraud Act, N.J. STAT. § 56:8-2

The Coordinated Plaintiffs also intend to prove their claim under the New Jersey Consumer Fraud Act ("NJCFA"), which provides that:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or

7

> real estate . . . whether or not any person has in fact been misled,
> deceived or damaged thereby, is declared to be an unlawful
> practice . . . .

N.J. STAT. § 56:8-2.

The Coordinated Plaintiffs intend to rely on the same evidence for their NJCFA claim as for their U.S. RICO claims. However, the Coordinated Plaintiffs will be able to prevail on their NJCFA claim even if the jury finds that Plaintiffs have not shown that the Coordinated Plaintiffs relied on Defendants' misrepresentations or omissions, as the statute does not require proof that any person was in fact misled or deceived. *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (1994). Rather, all that is required is that the conduct has the capacity to mislead. *Id.*

Under the NJCFA, any person who suffers "ascertainable loss of moneys" as a result of a prohibited act is entitled to recover treble damages, attorney's fees, and the costs of the suit. N.J. STAT. § 56:8-19; *see Furst v. Einstein Moomjy, Inc.*, 860 A.2d 435, 442 (N.J. 2004); *Cox*, 647 A.2d at 464. "The purpose of [the] remedies is not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices." *Furst*, 860 A.2d at 441.

### 3. Unjust Enrichment

As an alternative to its remedies at law, the Coordinated Plaintiffs also intend to present evidence in support of its unjust enrichment claim. To succeed on this claim, the Coordinated Plaintiffs need only show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *See, e.g., Smith v. Jenkins*, 626 F. Supp. 2d 155, 170 (D. Mass. 2009).

Coordinated Plaintiffs need not make an election of remedies prior to a jury's verdict.

8

*See Computer Sales Int'l Inc. v. Lycos, Inc.*, No. Civ.A. 05-10017, 2005 WL 3307507 at *7(D. Mass. Dec. 6, 2005) (citing *Dopp v. HTP Corp.*, 947 F.2d 506, 515 (1st Cir. 1991)).

### 4.  California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*

Kaiser intends to pursue a claim under California's Unfair Competition Law ("UCL"), which broadly prohibits any "unlawful, unfair or fraudulent" business act or practices. CAL. BUS. & PROF. CODE § 17200.

Because the UCL is written in the disjunctive, a business act or practice need only meet one of the three criteria – unlawful, unfair, *or* fraudulent – to be considered unfair competition under the UCL. *Buller v. Sutter Health*, 160 Cal. App. 4th 981, 986 (2008) (citations omitted). "Unlawful" refers to any practice that is forbidden by law. *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 559-60 (1998), *overruled on other grounds, Californians for Disability Rights v. Mervyn's LLC, 39 Cal. 4th* 223 (2006). A business act or practice is "fraudulent" if members of the public are likely to be deceived. *Blakemore v. Superior Court*, 129 Cal. App. 4th 36, 49 (2d Dist. 2005). There are two tests of whether an act is "unfair." First, conduct is unfair if it "threatens an incipient violation of a [] law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999). The alternative test for unfairness is to assess whether the "[p]ractice offends an established public policy" or "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and the "gravity of the harm to the victim outweighs the utility of the defendant's conduct." *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1268-69 (2006). Omissions can be unfair under either test.

*Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1498 (2d Dist. 2003).

The standard for showing reliance under the UCL is liberal:

> While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision. Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be "material" if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

*Plascencia v. Lending 1st Mortg.*, No. Civ.A. 07-4485, 2009 WL 2569732, at \*10 (N.D. Cal. August 21, 2009) (*citing In re Tobacco II Cases*, 46 Cal.4th 298, 326-27 (2009)) (internal quotation marks, alteration marks and citations omitted).

The available remedy under the UCL is restitution. CAL. BUS. & PROF. CODE § 17203.

### 5.    Pennsylvania Insurance Fraud Statute, 18 Pa.C.S.A. § 4117(a)(2)

Plaintiffs also intend to prove violations of Pennsylvania's Insurance Fraud Statute, 18 Pa.C.S.A. § 4117(a)(2). Under this statute a person commits an offense if the person . . .

> (2) knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

*Id.* The intent of the Insurance Fraud Statute is to protect insurers from all fraudulent claims, whether directly submitted by an insured, or submitted at the instigation of a third party not

directly involved in the claims process. *In re Lupron® Mktg. & Sales Practices Litig.*, No. 01-CV-10861, 2004 U.S. Dist. LEXIS 18512, at *7-9 (D. Mass. Sept. 16, 2004).

As constructed, the Insurance Fraud Statute is penal in nature and most of its provisions relate to criminal prosecutions. Subsection (g), however, authorizes an insurer that is injured as a result of a violation of the statute's criminal provisions to bring a civil action to recover compensatory damages, investigative costs, and attorneys' fees. Treble damages may also be awarded where a defendant "has engaged in a pattern of violating this section." Under Pennsylvania law, non-penal provisions of a penal statute are liberally construed. *See Commonwealth v. Monumental Properties*, 459 Pa. 450, 460 (1974); *see also Masland v. Bachman,* 473 Pa. 280, 293 n. 29 (1977) ("Laws enacted for the preventing of fraud, for the suppression of a public wrong, or to effect a public good, are not in the strict sense, penal acts, although they may inflict a penalty for violating them.") (quoting *Taylor v. United States,* 44 U.S. 197, 210 (1844*)*).

### 6.    New York General Law §349(a)

Guardian intends to pursue claims under New York General Business Law §349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce..." N.Y. Gen. Bus. Law §349(a).  Under GBL §349, Guardian must prove that that the defendants (1) engaged in a deceptive consumer oriented practice which was (2) misleading in a material respect and that (3) it suffered an injury as a result. *See, e.g, Andre Strishak & Assocs. v. Hewlett Packard Co.,* 300 A.D. 2d 608, (N.Y. App. Div. 2002); *Stutman v. Chem. Bank,* 731 N.E.2d 608 (N.Y. 2000).

With respect to the first element, New York courts have held that GBL §349 applies to "virtually all economic activity" and should be liberally construed.  *Karlin v. IVF Am. Inc.,* 93

11

N.Y. 2d 282, 290 (2d 1999). Guardian need only demonstrate that the conduct of the defendants had a "[broad] impact on consumers at large." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank N.A.,* 647 N.E.2d 741, 744 (N.Y. 1995). The requirement is met by showing that "the acts or practices" are "directed to consumers" or "potentially affect similarly situated consumers." *Id.* at 744.

The second element does not distinguish between acts or practices that are perpetrated through affirmative misrepresentations or omissions. *See In re Evergreen Mutual Funds Fee Litig.,* 423 F. Supp. 2d 249 (S.D.N.Y. 2006) *relying on, Stutman v. Chem. Bank,* 731 N.E.2d 608 (N.Y. 2000). Further, the relevant inquiry involves an objective determination of whether a "reasonable consumer would have been misled by the defendant's conduct." *Champion Home Builders Co., v. ADT Sec. Servs., Inc.,* 179 F. Supp. 2d 16, 27 (N.D.N.Y. 2002). As such, Guardian does not have to prove any intent to deceive or reliance on any misrepresentation or omission. *See Oswego Laborers' Local 214 Pension Fund, supra* at 745.

Finally, in order to recover under the statute, a plaintiff must prove actual injury, although not necessarily pecuniary harm, *Stutman v. Chem. Bank,* 731 N.E. 2d at 608, and may recovery the greater of actual damages or fifty-dollars ($50.00). If the deception is found to be knowing, the court may, in its discretion, treble the actual damages up to one-thousand dollars. N.Y. Gen. Bus. Law §349(h). The court may also award attorney fees to the prevailing plaintiff. *Id.*

**B.     Jury Request**

As set forth in their Third Coordinated Amended Complaint, the Coordinated Plaintiffs request a jury trial on each of their claims for which a right to such exists. Coordinated Plaintiffs further request the jury issue an advisory verdict to the Court on their claims for equitable relief

12

to the extent the underlying issues do not overlap. When there are factual issues common to both legal and equitable claims, "the legal claims involved in the action must be determined prior to any final court determination of [the] equitable claims." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962).

### C.    Proposed Schedule

The Coordinated Plaintiffs propose that a trial commencing February 8, 2010 would allow sufficient time for the parties to prepare and for the trial to conclude prior to the March 29, 2010 start of the next trial in the related products liability cases. The Coordinated Plaintiffs estimate that each side will need 10 trial days (about 40 trial hours) to present their case. The Coordinated Plaintiffs further respectfully propose the following pretrial schedule:

| Event | Date |
|---|---|
| Requests for Admission Pursuant to Fed. R. Civ. P. 36 Regarding Authenticity of Documents | December 4, 2009 |
| Witness Lists | December 4, 2009 |
| Deposition Designations | December 4, 2009 |
| Exhibit Lists | December 4, 2009 |
| Dates for Trial Depositions | December 4, 2009 |
| Objections to Deposition Designations and Exhibit List | January 5, 2010 |
| Counter-Designations of Deposition Testimony | January 5, 2010 |
| Motions in Limine | January 5, 2010 |
| Proposed Jury Instructions; Jury Questionnaires and Voire Dire Questions | January 5, 2010 |
| Joint Pretrial Memorandum Pursuant to Local Rule 16.5(d) | January 5, 2010 |

13

| Trial Briefs Pursuant to Local Rule 16.5(f) | January 5, 2010 |
| Opposition or Objections to Counter-Designations of Deposition Testimony | January 19, 2010 |
| Opposition to Motions in Limine | January 19, 2010 |
| Final Pretrial Hearing | February 1, 2010 |
| Trial Commences | February 8, 2010 |

## II.    Settlement

Per the Court's suggestions, the parties have initiated preliminary discussions about a possible settlement of some or all of the coordinated claims.

## III.    Status Conference

Defendants' response to this Trial Plan is due on October 16, 2009. The Coordinated Plaintiffs respectfully request the Court schedule a status conference to discuss the proposed Plans shortly thereafter.

For the Coordinated Plaintiffs:                    Dated: October 2, 2009
/s/ Linda P. Nussbaum
KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022


RAWLINGS & ASSOCIATES, PLLC          LOWEY DANNENBERG COHEN & HART,
Mark D. Fischer, Esq.                              PC
Mark Sandmann, Esq.                               Gerry Lawrence, Esq.
325 W. Main Street                                Four Tower Bridge
Louisville, KY 40202                              200 Barr Harbour Drive, Suite 400
                                                  West Conshohocken, PA 19428-2977