# Attachment A

# In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation

## Hearing on Motion for Reconsideration

**October 15, 2009**

**Plaintiffs' Slides**

1

# Liability Proof Is Common To The Class

- Proof Of Wrongdoing The Same For All Class Members

- Proof Of Lack Of Efficacy The Same For All Class Members

- Proof Of Absence Of "Other Factors" Causing Neurontin Sales for Bipolar The Same For All Class Members

2

# The Inefficacy of Neurontin for Bipolar

## Plaintiffs' Five Sources of Evidence

1. FDA Reviews (2)
2. Negative Clinical Trials (DBRCTs)(4)
3. <u>Zero</u> Positive DBRCTs
4. Expert Testimony
5. Defendants' Own Admissions

3

# The Inefficacy of Neurontin for Bipolar

## FDA Reviews

- FDA Clinical Review (1993)
  - "clinically important depression" limited "the drug's widespread usefulness" and could "require intervention or lead to suicide, as it has resulted in some suicidal attempts." (SOF ¶5)
- FDA Review on AEDs and Suicidality (2008):
  - "antiepileptic drugs," including gabapentin, "are associated with increased risk of suicidality relative to placebo in randomized placebo-controlled trials. The effect appears consistent among the group of 11 drugs." (SOF ¶12)

4

# The Inefficacy of Neurontin for Bipolar

### Negative Clinical Trials

- Four Negative Double Blind Controlled Trials ("DBRCTs")
  - Pande (945-209): (SOF ¶¶13-14, 27, 133-35)
  - Frye: (SOF ¶15)
  - Guille: (SOF ¶16)
  - Vieta (945-421-291): (SOF ¶¶17-18, 163-170)

- Defendants can point to no positive DBRCTs

5

# The Inefficacy of Neurontin for Bipolar

## Expert Testimony

Dr. Barkin:

- "I conclude that the clinical trial database of Level 1 Evidence consistently shows <u>lack of efficacy</u> of gabapentin for the treatment of bipolar disorder." (SOF ¶25) (emphasis added)

- "scientific evidence clearly shows that gabapentin is ineffective…Neurontin should never have been recommended as a treatment for bipolar disorder." (SOF ¶26)

6

# The Inefficacy of Neurontin for Bipolar

## Defendants' Own Admissions

- "[L]ack of scientific rationale" (SOF ¶19)

- "Different mechanism of action than mood-stabilizing antiepileptics" [Dkt 2087, at 21 n.30]

- "[W]eak, if any, anti-manic effect" (SOF ¶21)

- "[N]egligible evidence" supporting its use in bipolar disorder (SOF ¶21)

- "[E]thically unjustified" to include depressed patients in early trials because "absolutely no evidence whatsoever" for use as antidepressant (SOF ¶22)

- Opinion leaders called Neurontin "the drug that does not work" (SOF ¶23)

7

# There Are No "Other Factors" To Explain Neurontin Bipolar Prescription Writing

- Advances in Basic Science of Brain
- Informal Conversations
- Results of Clinical Trials
- Approval in other Countries
- Drugdex
- Reports of improved mood from epilepsy patients (spillover effect)
- Neurontin is an Anticonvulsant
  - Anticonvulsants are used as mood-stabilizers
  - Use was obvious to ordinary psychiatrists

8

# The Original "Other Factors" Did Not Exist

- Claimed Factors [Dkt 586, at 14]:
  - Advances in Basic Science of Brain
  - Informal Conversations and Web Postings ("Buzz")
- Factors already dismissed and abandoned:
  - "More likely that the increase [in off-label sales] was not due to the diffusion of new knowledge about the 'basic science' of the brain." [Dkt 831 (8/29/07 Memo & Order )]

9

# The Interim "Other Factors" Did Not Exist

- Claimed Factors [Dkt 1437, at 5 n.4]:
  - Results of Clinical Trials
  - Approvals in other Countries
- Factors Abandoned:
  - <u>No</u> favorable clinical trials
  - <u>No</u> approvals of Neurontin to treat mood disorders in <u>any country</u>

# The Current "Other Factors" Do Not Exist

- Claimed Factors [Summ. J. Hr'g Tr., at 70]:
    - Drugdex: "Evidence favors efficacy"
- Factor Inapplicable:
    - Drugdex part of the fraud (SOF ¶¶ 269, 377, 535)
    - Pfizer <u>never</u> provided any DBRCT results to Drugdex (SOF, Ex. 203)
    - Bipolar entry <u>not updated</u> since Franklin case

11

# The Current "Other Factors" Do Not Exist

- Defendants' Opposition [Dkt 1928, at 8-9]
  - Reports of improved mood from epilepsy patients
- Factor inapplicable:
  - If true, would have seen uses for bipolar in 1994 & 1995; in fact, few if any uses prior to Q4 1995 [Dkt 1142, Figure 7 (revised)]
  - April 1996 survey of psychiatrists: "Neurontin drug use for bipolar disorder is not significant [less than 1% of AED uses] …[and] is not expected to increase in the short term." (SOF ¶177)
  - Psychiatrists never prescribed Neurontin for epilepsy [Dkt 1142, Figure 19 (revised)]
  - Neurologists never prescribed Neurontin for bipolar [Dkt 1142, Figure 21 (revised)]

12

# The Current "Other Factors" Do Not Exist

- Defendants' Opposition [Dkt 1928, at 8-9]
  - Neurontin is an Anticonvulsant
    - "Accepted practice" of using anticonvulsants to treat psychiatric disorders
    - Use was obvious to ordinary psychiatrists
- Factor inapplicable:
  - Again, few if any uses for bipolar prior to Q4 1995 [Dkt 1142, Figure 7 (revised)]
  - April 1996 survey of psychiatrists: Neurontin use "not expected to increase in the short term." (SOF ¶177)
  - "Different mechanism of action than mood-stabilizing antiepileptics" [Dkt 2087, at 21 n.30]
  - Bipolar Patent: "novel use… which would not be obvious to a medical practitioner of ordinary skill." (SOF ¶40)

13



Privileged and Confidential

14

# Causation and Damages Has Been Shown Through Proof Common To All TPPs

- Evidence Shows Defendants' Wrongful Conduct Was a Substantial Contributing Factor To the Writing Of Virtually All Prescriptions Of Neurontin For Bipolar

- Lack Of Efficacy -- Coupled With Sound Healthcare Econometrics, the Absence of Other Explanatory Factors and Practical Before-and-After Evidence – Establish Satisfaction of Rule 23(b)(3)

15

# The "Plaintiffs Rely On A Single Expert" Issue:  Not Apply To This Record

- Medical Experts -- Relating to Efficacy and Non-disclosure

- Drug Marketing Experts --  John Abramson, M.D.

- Before and After Data Analysis – Rena Conti, PhD.

- Healthcare Econometrics – Meredith Rosenthal, PhD., Ray Hartman, PhD.

- Data Analysis of Detailing and Other Marketing Efforts – Josh Peteet Declaration

- Defendants' Own Documents

16

# Medical Expert Testimony:
# Pfizer Misrepresented The Efficacy of Neurontin

"…Defendants knew full well from their own protocol 945-209 that **there was no benefit of gabapentin compared to placebo in bipolar disorder**…[y]et, the funded numerous events all around the country which falsely stated that gabapentin was a safe and promising agent for treating bipolar disorder. This message was consistently and repetitively delivered.  As a direct result of this, psychiatrists and other mental health professionals became convinced that Neurontin was a safe and effective treatment for bipolar disorder and many patients were treated accordingly.  However, this conclusion is in direct contradiction to the Level 1 Evidence which clearly and definitively demonstrated lack of efficacy."

*Expert Report of Dr. Jeffrey S. Barkin, p. 20*

17

# Marketing Expert Testimony:
# Pfizer Corrupted All Information Channels

". . . [Defendants'] campaign was effectuated by dissemination of inaccurate, incomplete or misleading scientific evidence to physicians and payers through a number of means, including:

- Control and manipulation of research design, analysis, and publication of clinical trials…

- Withholding of material scientific evidence from physicians and payers;

- Sponsorship of continuing medical education ("CME") programs presenting inaccurate an/or incomplete scientific evidence on Neurontin's effectiveness…

- Use of favorably disposed and paid "Thought Leaders" and Advisory Boards to promote scientifically unsubstantiated use of Neurontin;

- Use of drug representatives to promote scientifically unsubstantiated use of Neurontin;

- Manipulation of physician, payer and public option by the use of misleading public relations campaigns; and

- Misrepresentation of the scientific evidence and regulatory status of Neurontin in the Formulary Dossier distributed to managed care organizations and other third party payers."

*Expert Report of Dr. John Abramson, M.D., p. 4*

18

# Dr. Meredith Rosenthal: Pfizer's Promotional Efforts Caused More Than 99% of Neurontin Prescriptions



*Declaration of Meredith Rosenthal, Attachment E.1 See also, Attachment G*

19

# Data Analysis Of Psychiatrist Prescription Writing



*Expert Report of Dr. Rena Conti, Figure 15*

# Before-And-After Evidence

This Court found that the Plaintiffs—and especially, the TPPs—had presented compelling non-expert evidence that they were damaged by Defendants' fraud, which, in the Court's words, "even a lay judge can understand without an econometric model." Neurontin, 244 F.R.D. at 111.

# Before-And-After Evidence

Prior to the marketing strategy for bipolar, psychiatrists were not prescribing Neurontin, there was no scientific rationale to prescribe Neurontin and there was no expectation that they would begin to prescribe Neurontin:

- Psychiatric Marketing Assessment, May 1995 – Defendants concede Neurontin had "0%" of the Bipolar market Ex. 16, Pfizer_jmarino_0001274 at 1293

- Neurontin's mechanism of action vitiates any "scientific rationale" for psychiatrists to experiment with Neurontin to treat Bipolar *Id.* at 1278

- Market research conducted in April 1996 indicates psychiatrists were not using Neurontin and had no expectation that use would increase in the future Ex. 140, WLC_CBU_090238

22

# Before-And-After Evidence

The skyrocket in Neurontin's use corrosponds with the intense detailing of the psychiatric specialty

- By February 1999, Psychiatrists were being detailed at a rate of 7,300 per month (7,300 = 16% of all psychiatrists in the U.S.) Ex. 0176, Pfizer_AFannon_0008581 at 8588

- By third quarter of 1999, detailing to psychiatrists represented almost 40% of all detailing Ex. 56, INS Health

- As late as 2002 psychiatrists were still recruiting 43% of all details Pfizer_Rglanzman_000741

# Dr. Rena Conti: A Strong Correlation Between Defendants' Fraudulent Marketing and Neurontin Bipolar Prescriptions



*Based on Expert Report of Dr. Rena Conti, Figure 7*

24

# Prescribing Psychiatrists And Coverage Of  Marketing





Figure 5 (Revised)
Neurontin's On-Label Use vs Off-Label Use for All Physicians

Source: IMS NDTI data.

*Dr. Rena Conti Revised Declaration in Support of Plaintiffs' Renewed Motion for Class Certification 2/22/08, Docket No. 1142, Figure 5 (Revised)*

Privileged and Confidential



Figure 19 (Revised)
Neurontin Indications for Psychiatrists

Source: IMS NDTI Data.

*Dr. Rena Conti Expert Revised Declaration in Support of Plaintiffs' Renewed Motion for Class Certification 2/22/08, Docket No. 1142, Figure 19 (Revised)*

27

1/18/08

Privileged and Confidential



Figure 21 (Revised)
Neurontin Indications for Neurologists

Source: IMS NDTI Data.

*Dr. Rena Conti Revised Declaration in Support of Plaintiffs' Renewed Motion for Class Certification 2/22/08, Docket No. 1142, Figure 21 (Revised)*

28



Figure 15
Number of Physicians Writing New Prescriptions for Neurontin Each Month
Psychiatrists

*Privileged and Confidential*

Note: For data definitions see Conti Declaration, para 7.
Source: IMS Xponent, Wolters Kluwer, WLC FRANKLIN 41780 (not included in backcast)

*Dr. Rena Conti Revised Declaration in Support of Plaintiffs' Renewed Motion for Class Certification 2/22/08, Docket No. 1142, Figure 15*

29

Figure 11
Number of Neurontin New Prescriptions Per Month
Psychiatrists



Note: For data definitions see Conti Declaration, para 7.
Source: IMS Xponent, Wolters Kluwer

*Dr. Rena Conti Revised Declaration in Support of Plaintiffs' Renewed Motion for Class Certification 2/22/08, Docket No. 1142, Figure 11*

Privileged and Confidential

# Dr. Hartman's Estimate Of Monetary Damages

| TABLE 1 | | | | | | |
|---|---|---|---|---|---|---|
| | | SUMMARY OF DR. ROSENTHAL'S RESULTS * | | MONETARY DAMAGES BY CLASS, INDICATION AND SPECIALTY ($) ** | | |
| Indication | Class Period | Fraudulent Prescriptions | Percent of Fraudulent to Actual Prescriptions | TPP Class*** | Consumer Class | Total TPP & Consumer Classes |
| BIPOLAR | 11/95 - 12/04 | | | | | |
| Psychiatrists | | 11,710,680 | 99.4% | 623,312,892 | 253,506,376 | 876,819,268 |

\*   Source: Rosenthal Declaration, Attachment G.

\*\*  As described below in Section III, Dr. Rosenthal's Fraudulent Prescriptions are the starting point for my analysis and these quantities are adjusted for use in my damage calculations.  For example, Medicaid units are removed for the calculation of TPP damages.

\*\*\* Damages to the TPP Class do not include damages to the Coordinated Plaintiffs.

*Declaration of Dr. Raymond Hartman, Table 1, p. 3*

31

# The "Some Physicians Were Not Detailed" Issue

- Some bipolar script writing physicians were not detailed.  We accept this, but it does not effect the conclusion that defendant's conduct substantially contributed to such prescriptions.

- Some bipolar script writing physicians were detailed, but claim it had no impact on them.  We accept this, but it does not effect the conclusion that defendant's conduct substantially contributed to such prescriptions.

- According to the defendant, some class representative psychiatrists might fit into one of the above.  We disagree, but again it would not impact the conclusion.

32

# The "Some Physicians Were Not Detailed" Issue

- Detailing and other marketing activities follow one another -- they work synergistically

- Pharmaceutical marketing impacts script writing both directly and indirectly -- the indirect effects are captured

- Self-reporting by physicians is notoriously unreliable -- documented in accepted healthcare literature

33





# The "Some Physicians Were Not Detailed" Issue

The Consumer plaintiffs' psychiatrists were *repeatedly* detailed on Neurontin's use for bipolar, immediately following which they were mailed misleading "Dear Doctor" letters that promoted Neutontin's use for bipolar, when Defendants knew that it was no more effective than a placebo, and the psychiatrists either *began* prescribing Neurontin, or sharply *increased*  their Neurontin prescriptions, immediately following these contacts.

36

# The "Some Physicians Were Not Detailed" Issue

The Court should not accept as conclusive the physicians' stated reasons for prescribing Neurontin.

The trier of fact should determine this question of fact in light of all the evidence bearing on the question, including the physicians' documented exposure to Defendants' fraudulent off-label detailing and the dramatic impact on their prescribing activity, even if they remain subjectively unaware of the influence. See In re Zyprexa Prods. Liab Litig., 253 F.R.D. 69, 174 (E.D.N.Y. 2008) (summarizing expert testimony that "[d]octors themselves are often unaware of the extent of commercial influence on information they believe to be objective and subsequently find it is biased and misleading.").

37

# Applied Econometrics Explains Complex Causal Questions

"The **bipolar and mood disorder Subclass is an[] indication for which Professor Rosenthal's model shows the type [of] causal nexus between defendants' off-label marketing efforts and the increase in Neurontin prescriptions that could support a conclusion that a fraud had been perpetrated** on the entire prescription market. According to Professor Rosenthal's report, 99.4 percent of Neurontin prescriptions written by psychiatrists for bipolar disorder were the direct or indirect result of defendants' unlawful marketing. In other words, absent defendants' fraudulent off-label promotion, only 0.6 percent of the Neurontin prescriptions given to patients with bipolar/mood disorders would have been written. [¶] **Because essentially all of the Neurontin prescriptions for these indications were, according to Professor Rosenthal's model, the result of fraudulent promotion, plaintiffs' claims for the indications would not require an individual inquiry into why a particular prescription was written**."

*Order at 37*

38

# Applied Econometrics Explains Complex Causal Questions

"**Professor Rosenthal . . . assumes that all detailing to specialists other than neurologists was both off-label and fraudulent. To be certain, this assumption has validity, especially as it might apply to the bipolar/mood disorder Subclass.** Evidence produced by plaintiffs indicates that defendants, at least by 1995, were aware that Neurontin (1) was no better than a placebo in treating bipolar/mood disorder and (2) was connected with an increased risk of depression and suicide. . . . **It is a short leap from that evidence to a reasonable conclusion that no plausible, nonfraudulent reason existed for defendants to detail psychiatrists.** Moreover, it is reasonable to infer that information about depression and suicidal side effects was material to a psychiatrist's decision-making about which drug to prescribe."

*Order at 42-43.*

39

# Applied Econometrics Explains Complex Causal Questions – Use Of Detailing Data Only Is Reasonable

**The correlation between spending on detailing and other promotional activities is supported by well accepted economic literature in the field.**

Defendants used sales representatives to hand out journal reprints that were central to the "publication strategy." See SOF ¶¶ 105, 114, 373, 382. Defendants also used sales representatives to invite physicians to peer-to-peer marketing events. See SOF ¶¶ 380, 790, 793, 798, 799, 805, 807, 808, 810, 812, 816, 817.

**There is an extremely high correlation coefficient between the amount Defendants spent on detailing psychiatrists, the number of invitations to CME events, and the number of misleading journal reprints handed out during a detail.  SJ Opposition, pp.30-32**

The number of misleading "Dear Doctor" letters on bipolar sent per month by Defendants to psychiatrists has an extremely high correlation coefficient with both the number of details per month and the amount spent on detailing, and virtually all such letters were sent to physicians within 7 days of a detail.

40

# No Differences Amongst TPPs With Respect to Neurontin Formulary Placement

**When prescribed by a licensed physician, virtually every TPP in the country reimburses for it, and always has, *never even knowing* the condition for which it was prescribed.** See Expert Report of Kimberly P. McDonough (Dkt. No. 1457, Exh. H ("McDonough Report").

Whether TPPs paid more or less for the drug due to relative placement on their formularies is irrelevant to Plaintiffs' damages theory, which seeks to recoup the cost of the prescriptions in their entirety, *whatever they were* (less the copayments made by the Consumer Subclass), which amounts are accurately recorded by IMS, the pharmacy benefit managers, and/or the TPPs themselves. See In re Zyprexa Prod. Liab. Litig., 253 F.R.D. 69, 189 (E.D.N.Y. 2008) ("reasonably accurate estimates can be made of the total out-of-pocket payments made by the class for Zyprexa over the class period. . . . [I]n the 'data rich' pharmaceutical field, expenditure information by year, source of payment (e.g., third-party payors, government payors, insurance copay or cash consumers), . . . are available.").

41

# No Differences Amongst TPPs With Respect to Neurontin Formulary Placement

"TPPs rarely adopt coverage limitations for drug categories such as oncologics, anti-convulsants, and ant-retroviral therapy that are used to treat serious diseases . . . . **Because Neurontin is indicated for the treatment of epilepsy, a disease that is very serious and sometimes difficult to treat, it has been widely accepted in a preferred position on most TPP formularies . . .** .In my experience working with TPPs and their P&T Committees, these organizations are very hesitant to create any barriers that would prevent access to effective products for patients suffering from seizures."

*McDonough Report, at 15-16.*

42

# No Differences Amongst TPPs With Respect to Neurontin Formulary Placement

"**TPPs and PBMs are unable to use the pharmacy point-of-service claim processing system to limit coverage of Neurontin to FDA approved indications.** Physicians and other prescribers are not required to include the patient's diagnosis on the prescription, and pharmacists do not have access to this information when they submit drug claims to the TPP or PBM. [¶] TPPs and PBMs are typically unwilling to require a prior authorization for Neurontin. Doing so would create significant disruption to providers and patients when Neurontin is prescribed and use for the treatment of epilepsy and other FDA-approved conditions. . . . [¶] All TPPs and PBMs are subject to the limitations and constraints described above."

*McDonough Report, at 5.*

43

# All TPPs Paid For Bipolar Scripts For Neurontin

**Table 2. Number of Total Members a TPP would Need to Cover During the Class Period to Be Represented with 99%, 95% and 90% Probability**

|                 | Bipolar (population incidence during period=0.5%) |
| --------------- | ---- |
| 99% probability | 997  |
| 95% probability | 649  |
| 90% probability | 499  |

*Declaration in Support of Plaintiffs' Renewed Motion for Class Certification at 24*

44

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:  NEURONTIN MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION

MDL Docket No.  1629

Master File No. 04-10981

THIS DOCUMENT RELATES TO:

ALL MARKETING AND SALES PRACTICES
ACTIONS

Judge Patti B. Saris
Mag. Judge Leo T. Sorokin

DECLARATION OF JOSHUA PETEET IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

45



46



Figure 4B: Neurontin Letters to Psychiatrists Matched in Call Notes Database
Source: Merlin and Sherlock Databases

47





49