# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) ) | |
| THIS DOCUMENT RELATES TO: ) ) ) ALL MARKETING AND ) SALES PRACTICES ACTIONS ) ) ) | MDL Docket No. 1629 Master File No. 04-10981 Judge Patti B. Saris Mag. Judge Leo T. Sorokin |

**DECLARATION OF GREGORY K. BELL, PH.D.
IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS
CERTIFICATION**

10. Fourth, utilization of prescription drugs, such as the utilization of Neurontin for specific conditions on an off-label basis, differs across TPPs due to differences in covered individuals' demographic characteristics (e.g., age, gender, health status) ), differences in exposure of covered individuals to health hazards associated with different industries, and due to regional differences in the practice of medicine.  These circumstances may have contributed to substantial differences in the use of Neurontin for specific off-label conditions, and thus individualized inquiry would be necessary to assess appropriately the alleged impact and injury.

## III.   BACKGROUND

### A.   Neurontin

11. Neurontin® (gabapentin) was launched in 1994 by Parke-Davis, a division of Warner-Lambert, as an antiepileptic drug.[1]  On December 30, 1993, the Food and Drug Administration ("FDA") approved Neurontin for adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.[2]  In October 2000, the FDA also approved Neurontin as adjunctive therapy in the treatment of partial seizures in pediatric patients, age 3 years and above.[3]  On May 24, 2002, the FDA approved Neurontin for the management of postherpetic neuralgia in adults, which is pain that persists for three or more months after healing of the herpes zoster skin rash, also known as shingles.[4]  Neurontin is also used off-label to treat other conditions including bipolar/mood disorder, migraines, and neuropathic and nociceptive pain.[5]

---

[1] "Neurontin cleared for marketing; uncontrolled epilepsy patients to benefit," *Business Wire*, January 3, 1994 ("Neurontin Launch").

[2] US Food and Drug Administration, Center for Drug Evaluation and Research: Drugs@FDA,FDA Approved Drug Products Search Engine, http://www.accessdata.fda.gov/scripts/cder/drugsatfda/, accessed on March 13, 2008 ("Drugs@FDA"); Neurontin Product Label, Revised January 2007; Neurontin Launch.

[3] Neurontin Product Label; October 12, 2000 Letter from Russell Katz, M.D. at the Office of Drug Evaluation, Center for Drug Evaluation and Research to Janeth L. Turner at Parke-Davis, http://www.pfizer.com/products/rx/rx_product_neurontin.jsp, accessed on March 13, 2008; Drugs@FDA: Neurontin Capsule Approval History, Letters, Reviews, and Related Documents).

[4] Drugs@FDA: Neurontin; "Pfizer Receives FDA Approval to Market Neurontin® for Post-Herpetic Neuralgia," *PRNewswire*, May 28, 2002.

[5] Bipolar disorders are characterized by mania and depression, which usually alternate. (The Merck Manual, http://www.merck.com/mmpe/sec15/ch200/ch200b.html#sec15-ch200-ch200b-511, accessed on March 13, 2008). A migraine headache is throbbing, moderate to severe pain, usually on one side of the head, that is

extent that TPPs were concerned about Neurontin prescribing for specific off-label conditions, they may have used DUR to identify those physicians and those prescriptions which might appear to be for those conditions in an attempt to influence such use. Individualized inquiry would be required.

72. Third, TPPs vary in the use of disease management ("DM") programs. DM involves coordinating and organizing health care delivery in order to optimize clinical and economic outcomes within a specific population, usually those with a chronic condition (e.g., diabetes, chronic pain). Central components of DM are the evidence-based practice of medicine and compliance with clinical guidelines, generally considered to be the best practices and promulgated by medical professional organizations and clinically-oriented governmental agencies. The use of DM has grown over the putative class period. The number of employers reporting that they offer DM to their employees increased from 14 percent in 1995 to 53 percent in 2002.[137]

73. A DM program could, for example, affect physician prescribing decisions for a given condition by identifying preferred therapeutic approaches or advising against the use of specific medications. For instance, BCBS-LA has two DM programs—a diabetes program that was used for a few self-funded groups, and a congestive heart failure program for all groups.[138] Horizon BCBS-NJ had a diabetes disease management program, which could have addressed the off-label use of Neurontin for diabetic neuropathy.[139] BCBS-AL provided disease management services to most of its clients.[140] Individualized inquiry would be required to determine the extent to which TPPs established and used DM (or could have established and used DM) to manage the prescribing of Neurontin for specific off-label uses.

---

regularly disseminated statistics on drug utilization and physician's practice patterns. (Business and Health.)

[136] Dorrill Deposition, pp. 144–145, 152–153.
[137] Kaiser Family Foundation, March 2005, p. 65.
[138] Brower Deposition, pp. 93–94.
[139] Ferguson Deposition, pp. 46–47, 49–50.
[140] Dorrill Deposition, pp. 144–145.

74. Fourth, TPPs vary in their use of therapeutic substitution programs, which focus on the use of one chemical entity instead of another to treat a particular condition. A TPP that wanted to discourage Neurontin's use for neuropathic pain, for example, could have established a therapeutic interchange program for neuropathic pain medications, excluding Neurontin from the approved list.

75. If, however, a TPP member's physician had not prescribed Neurontin for a specific off-label use, presumably another product would have been prescribed instead. To the extent that that other product might have had a higher net reimbursement cost than Neurontin, one may conclude that the TPP did not suffer economic injury as a result of the off-label prescription for Neurontin. If, instead of prescribing Neurontin for a specific off-label use, a product with a lower net reimbursement cost would have been prescribed, then a determination of economic injury may require a comparison of the two net reimbursement costs. In such circumstances, individualized inquiry would be required to determine which alternative product would have been prescribed and what the net reimbursement cost difference would have been, if any.

### vi. TPPs vary in members' use of specific drugs

76. For a number of reasons, there is wide variation across TPPs in terms of covered individuals' use of prescription drugs. This variation is in part due to differences in the employers and the characteristics of their covered employees.[141] For instance, the prevalence of self-funding varies across states and across employers in various industries.[142] In 2004, only 35 percent of workers in the mining, construction and wholesale industries were covered under self-funded arrangements compared to 73 percent of workers in the manufacturing, transportation, communication and utilities industries who were covered under self-funded arrangements.[143] Neurontin use likely varies across industries because workers in some industries are more likely to be injured

---

[141] Cindy Parks Thomas, Stanley S. Wallack, et al, "Impact of Health Plan Design and Management on Retirees' Prescription Drug Use and Spending, 2001," *Health Affairs*, December 4, 2002, pp. W408–W419, at W411.

[142] Christina H. Park, "Prevalence of Employer Self-Insured Health Benefits: National and State Variation," *Medical Care Research and Review*, Vol. 57, No. 3, September 2000, pp. 340–360, at 347–353.

[143] Kaiser Family Foundation, 2004, "Exhibit 10.7 – Percentage of Covered Workers Under Different Funding Arrangements, by Industry, 2004,"p. 127.

41

or develop medical conditions that cause pain, for example, than those working in other industries.

77. TPP variation in benefit design often reflects efforts to achieve different balances between access to health care (e.g., broader or narrower networks, longer or shorter lists of approved medications[144]), the cost of care, and the varying needs of the insured population (e.g., a younger or older population with different disease prevalence). The variation occurs not only across employers within a market, but across geographic markets. Some TPPs have more covered lives under restrictive formularies in some markets than in other markets.[145] For example, TPP clients in Louisiana markets primarily use three- or five-tiered open formularies or HSA-style high deductible plans, while some of the Northeast and West Coast employer groups use closed formularies with more restrictions such as prior authorization.[146] Even though BCBS-LA was aware that Neurontin was being prescribed for off-label uses, and that instituting prior authorization programs would have been cost-effective, it did not implement such a program ostensibly because its clients in the Louisiana market did not want these restrictions on drug use.[147]

78. Two employers that purchase the same insurance product may have very different patterns of drug utilization due to differences in the age/sex distribution of their employees, due to differences in their occupations and associated risk (e.g., of injury and resulting pain), or due to differences (e.g., across states) in income, lifestyle, and environmental factors that may affect health status. For example, Express Scripts found wide regional variation in prescription drug use per capita; for some classes of

---

[144] The number of drugs on different formularies varies—even by a factor of two. See Trude and Christianson Study, p. 72.

[145] Ford Deposition, p. 22.

[146] Ford Deposition, pp. 27–28, 85–86 (Northeast markets); Brower Deposition, pp. 68–69 (West Coast markets).

[147] Ford Deposition, pp. 138–140.