UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEURONTIN MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARDEN MANUFACTURING CORPORATION;
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,
dba BLUECROSS/BLUESHIELD OF LOUISIANA;
INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and
LORRAINE KOPA, on behalf of themselves and all others
similarly situated, v. PFIZER INC. and WARNER-LAMBERT
COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and
AETNA, INC. v. PFIZER INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T.
Sorokin

**RESPONSE TO COORDINATED AND CLASS PLAINTIFFS'
PROPOSED TRIAL PLANS**

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.      Trial Should Not Be Scheduled Until After The Court Has Decided Defendants'
        Pending Motion For Summary Judgment ....................................................................... 2

II.     Plaintiffs Expanded The Summary Judgment Record In Ways That Entitle
        Defendants To Additional Discovery ............................................................................. 6

III.    The Court Should Establish A Briefing Schedule For Daubert Motions Before
        Setting A Trial Date ........................................................................................................ 9

IV.     Plaintiffs' Proposed Trial Plans Fail to Address Critical Issues that the Court
        Specifically Told Them to Consider .............................................................................. 12

V.      A February Trial Would Not Allow Sufficient Time For Pretrial Designations,
        Objections And Motion Practice .................................................................................... 13

VI.     Plaintiffs' Proposal for a Joint Trial of Multiple TPPs' Claims Should Be Rejected ....... 16

VII.    The Coordinated Plaintiffs' Alternate Proposal for a Kaiser-Only Trial Should Be
        Rejected .......................................................................................................................... 19

## INTRODUCTION

While the Coordinated Third-Party Payors (the "Coordinated TPPs") contend that their claims can proceed to trial beginning in February 2010, they have failed to propose a meaningful or realistic trial plan. Beyond their suggestion that the Court try all three TPPs together or, alternatively, Kaiser's claims, the "trial plan" is long on rhetoric and short on detail. Significantly, in spite of the Court's charge to them, the Coordinated TPPs have not provided any specifics regarding what a trial would look like. The Court told Plaintiffs to think carefully about the problems presented by their aggregate model and to propose a specific plan to try to overcome them. The Coordinated TPPs have not even attempted to address the Court's concerns. Their failure to do so confirms that these cases are not ready for trial.

In fact, much work remains to be done to prepare these cases for trial. As a result, rather than providing guidance to the Court and the parties, a February trial would lead to hurried preparation and yield a result distorted by the compressed schedule. Initially, the significant legal issues raised by the parties in their summary judgment briefs will need to be decided in order for the parties to properly prepare for trial. Moreover, in opposition to Defendants' motion for summary judgment, Plaintiffs relied upon declarations from witnesses who have not yet been deposed, provided supplemental declarations from experts that expanded upon their prior opinions after they had been deposed, and provided declarations from fact witnesses that were inconsistent with their prior testimony. Defendants should be given an opportunity to depose any new witnesses and to re-depose experts who have expanded their opinions or fact witnesses who have changed their story.

In addition, both sides have designated numerous expert witnesses on the issues of efficacy, causation, and damages. Many of these will almost certainly be the subject of *Daubert* challenges, which must be resolved before the parties can effectively and efficiently prepare for trial. Also, from the thousands of documents that have been produced and dozens of depositions that have been taken, exhibits must be listed, witnesses identified for trial and deposition testimony designated and counter-designated. Issues of authenticity must be resolved and

objections made and ruled upon. Deadlines would also have to be established for filing and responding to non-expert motions in limine so that such motions can also be resolved in advance of trial.

Between now and February 8, the trial date proposed by the Coordinated TPPs, the Court would have to impose a schedule even more aggressive than the pre-trial schedule in *Bulger* in order just to allow time for designations, counterdesignations and objections. *Bulger*, however, was a much simpler case, involving only one patient's use of Neurontin for a single indication over a defined window of time. Even then, the Court did not schedule a trial until after generic summary judgment and *Daubert* motions had been fully briefed and argued, and the parties had the benefit of this Court's rulings on such motions before they filed their trial designations. Still, the *Bulger* schedule proved challenging for both the parties and the Court. The plaintiff initially filed a grossly overbroad designation of exhibits, witnesses and deposition testimony, requiring the Defendants to make a motion to compel compliance with the Court's pretrial order. After that, the Plaintiff, having insisted upon the earliest possible trial date, twice moved for continuance. Even beyond motions in limine, the parties continued to file motions virtually up until the pretrial conference, until the Court entered an order saying simply "no more motions." It cannot be expected that this far more complicated litigation will follow an easier path to trial.

Finally, the Court should reject the Coordinated TPPs' proposal that the claims of all three Coordinated TPPs be tried together. Such a trial would be hopelessly confusing for the jury. The confusion would only be magnified by adding a fourth TPP, as proposed by the Class Plaintiffs, particularly one who seeks to recover under a completely different theory of liability and causation.

## ARGUMENT

**I.    Trial Should Not Be Scheduled Until After The Court Has Decided Defendants' Pending Motion For Summary Judgment**

Plaintiffs seek to recover for expenditures incurred by them and which they attribute to the alleged fraudulent promotion of Neurontin for off-label uses. Significantly, a trial in this

action will not only be the first such trial involving Neurontin, it will be one of the first trials by any TPP seeking to recover under such a theory.  Most such cases have not survived dismissal due to the TPPs' failure to allege and identify specific transactions where a physician would not have prescribed the drug at issue absent the alleged fraud.  For example, in *Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals LP*, 585 F. Supp. 2d 1339 (M.D. Fla. 2008), TPPs sought to recover under RICO and the New Jersey Consumer Fraud Act ("NJCFA") for alleged off-label marketing of Seroquel, contending that they would have paid for cheaper alternative drugs absent the defendants' alleged fraud.  Dismissing the plaintiffs' claims, the court explained:

> [I]n the context of this case, establishing that Plaintiffs' injuries were caused by Defendants' misconduct would require an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit.  In other words, each physician who prescribed Seroquel to an individual consumer or health and welfare fund member would have to be questioned as to whether his or her independent medical judgment was influenced by Defendants' misrepresentations, and to what extent.

*Id.* at 1344.  Similarly, in *In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009), TPPs alleged that Actimmune had been fraudulently marketed for unproven indications.  *See id.* at 1040.  Holding that the plaintiffs' allegations were insufficient to plead causation under RICO, the court explained:  "Plaintiffs need to allege what specific information the individual plaintiffs or their physicians had about the drug, the extent to which they relied upon that information, and that the information relied upon was false, misleading or otherwise fraudulent." *Id.* at 1052.[1]

---

[1] *See also So. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175, 2009 WL 3151807, at *6-7 (S.D.N.Y. Sept. 30, 2009) (holding that TPPs seeking to recover for alleged off-label promotion of Lipitor failed to adequately plead causation and injury under RICO); *Pa. Employees Benefit Trust Fund v. Astrazeneca Pharm. LP*, No. 6:09-cv-5003, 2009 WL 2231686, at *6 (M.D. Fla. July 20, 2009) (holding the TPPs seeking to recover for off-label promotion of Seroquel failed to adequately plead causation, explaining that the plaintiffs' "claims would require onerous individualized inquiries into the specifics of each patient's medical history and the circumstances of each patient's alleged injury"); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *15 (D.N.J. July 10, 2009) (dismissing the plaintiffs claims and noting that "TPP plaintiffs do not identify even a single beneficiary who took Temodor or the Intron Franchise Drugs for an off-label use and they fail to describe circumstances under which any named plaintiffs received no benefit from the Subject Drugs"); *Cent. Reg'l Employees Benefit Fund v. Cephalon, Inc.*, No. 09-3418, 2009 WL 3245485, at *4 (D.N.J. Oct. 7, 2009) (dismissing claims of TPPs who sought to recover for alleged off-label promotion of various drugs on the grounds that they failed to

(cont'd)

So, too, this Court, in ruling on Defendants' motion to dismiss allegations of fraud by the product liability plaintiffs ("Product Plaintiffs"), explained:

> [I]n this case, doctors who are not parties to the litigation have control over the information as to whether there is a nexus between any misrepresentation made by defendant as part of a general marketing campaign and the decision to prescribe Neurontin for off-label conditions, including mood and anxiety disorders like bipolar. Courts have refused to relax the requirements of Rule 9(b) when the information necessary to plead with particularity is within the control of a third party.

*In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-10981, 2007 WL 609875, at *1 (D. Mass. Feb. 23, 2007). The Court allowed the plaintiffs to amend their complaints and to conduct discovery in ten pilot cases. *See id.* at *2. Thereafter, the Court held that, of the ten pilot cases, only one had sufficiently alleged affirmative acts of fraud. *See In re Neurontin Mktg. & Sales Practices Litig.*, 618 F. Supp. 2d 96, 112 (D. Mass. 2009). The Court also rejected the attempt by the Product Plaintiffs to rely on a fraud on the market theory. *See id.* at 111-12.

In this case, however, Defendants have been denied the opportunity to depose individual physicians with respect to the claims asserted by the Coordinated TPPs (or, for that matter, the Class TPPs). Whenever Defendants have had the opportunity to depose physicians, as in the individual consumer cases, the testimony has not supported the Plaintiffs' claims. As this Court observed as the summary judgment hearing:

> I've been living with this case a long time – I've said, "Show me the

---

*(cont'd from previous page)*

adequately allege fraud); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, Nos. 06-3044, et al., 2008 WL 5413105, at *6 (D.N.J. Dec. 23, 2008) (dismissing claims by TPPs who sought to recover for alleged off-label promotion of Risperdal; holding that plaintiffs' claims that doctors might otherwise have prescribed cheaper, equally efficacious alternatives was not sufficient to plead a concrete injury under RICO); *In re Rezulin Prods. Liab. Litig.*, 524 F. Supp. 2d 436, 441 (S.D.N.Y. 2007) (granting summary judgment and dismissing claims by the State of Louisiana, brought as a TPP, for alleged fraudulent marketing of Rezulin and holding that plaintiff could not recover under a fraud-on-the-market theory); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1088 (N.J. 2007) (reversing certification of TPP class and rejecting plaintiffs' causation theory as equivalent to fraud on the market).

Significantly, cases involved alleged fraudulent marketing of pharmaceutical products, which necessarily implicate the individual medical judgment of physicians, are very different than antitrust and pricing litigation (including the *AWP* litigation), where courts have sometimes permitted the use of aggregate models.

doctor," you know, "Where's the doctor who says that he wouldn't have done it otherwise? Get me a doctor." And, you know, your doctors have all said it wrongly. They just said, "I wasn't detailed."

(9/18/09 Hearing Tr. at 19:6-16). The Court further noted:

> Well, did you ask them point-blank, "Had you known that bipolar is no better than a placebo, and it hasn't been approved, and it has these depressive side effects, and there's now a little black box, would you have done it differently?" I've not seen one doctor who said he would have done it differently.

(*Id.* at 20:21-21:1.) In response to the Court's inquiry, counsel for Kaiser indicated that they had submitted affidavits from four Kaiser physicians. (*Id.* at 28:2-3.) Significantly, several of the declarants referred to by Kaiser's counsel have never been deposed. (*See infra,* Section II.) In other words, Plaintiffs believe that physician testimony is relevant *only* when it comes from their hand-picked witnesses and supports their theory, while, at the same time, Plaintiffs argue that Defendants should be denied the opportunity to discover and introduce contrary evidence, or even to depose their witnesses.

In addition to the physician testimony in the summary judgment record, Defendants recently moved to supplement the class certification record with medical records and deposition testimony of a patient that further demonstrates the need to examine individual physician/patient transactions. [2123] The patient was admitted to a psychiatric in-patient facility with a plan to attempt suicide, and was prescribed Neurontin for an off-label indication in 2007, when the physician's decision could not be attributed to the Defendants' marketing. Over the course of only a few days, the patient's condition improved while he was on Neurontin, worsened when he was taken off Neurontin, and improved when be began using Neurontin again. He was discharged with a prescription for Neurontin.

It is not Defendants' intent to re-argue here the merits of their motion for summary judgment, but to highlight the novelty and significance of the issues raised. Deferring a decision on summary judgment would not dispense with the need for pre-trial rulings on such issues. Plaintiffs seek to prove essential elements of their claims by offering expert testimony to support a series of extreme positions, namely:

- that virtually no doctors would have prescribed Neurontin for relevant off-label indications except as a result of fraudulent off-label promotion;

- that not one patient experienced any legitimate benefit from taking Neurontin for relevant off-label indications that could not be obtained from a less expensive, more optimal drug;

- that doctors' own testimony that they prescribed a drug for reasons unrelated to marketing is so inherently unreliable that the jury should not even be permitted to consider it.

The parties cannot realistically prepare for or conduct a trial of any TPP's claims until these fundamental issues are resolved.

Indeed, while the Court recently remarked that it has "always left room for an aggregate model" for the TPP plaintiffs, the Court also acknowledged that it "ha[s] not ruled definitively on an aggregate model. I've left that open somewhat." (9/18/09 Hearing Tr. 34:22-23, 56:3-4.) The Court recognized that it has not yet decided whether, or how, an aggregate model could be used. (*Id.* at 91:3-6.) Regardless of how the Court rules on the pending motion, the guidance that it provides will be critical to the parties' preparation for trial, if there even remains a need for trial.

## II. Plaintiffs Expanded The Summary Judgment Record In Ways That Entitle Defendants To Additional Discovery

In responding to Defendants' motion for summary judgment, the Plaintiffs supplemented the record with declarations from witnesses who have never been deposed. They also submitted declarations from experts that expanded their opinions, and a declaration from a Kaiser witness that contradicts her prior sworn testimony as Kaiser's 30(b)(6) witness. Defendants should be allowed to depose any new witnesses identified by Plaintiffs and to re-depose any witnesses who have altered their testimony.





Plaintiffs also submitted declarations from their proffered experts Brian K. Alldredge, Pharm. D., and Douglas C. McCrory, M.D.  In these declarations, Drs. Alldredge and McCrory not only offered new opinions, they contradicted their own expert reports and certain testimony given during their depositions.

---

[2] These are offered only as examples.  There are other inconsistencies between Ms. Millares' deposition testimony and her declaration.



Plaintiffs also submitted a declaration executed by a Mr. Joshua Peteet of Greylock McKinnon Associates, someone who had never before provided a Rule 26 report in this action. The Peteet submission included eight never-before-seen line charts and three correlation coefficients that purported to depict "a number of calculations performed by Greylock McKinnon Associates on a number of voluminous databases produced by Defendants in this litigation and certain datasets purchased by plaintiffs from IMS Health Inc. for use in this litigation" (4/14/09 Peteet Decl. [1755] at 2.)  Mr. Peteet has never been deposed.



None of these witnesses have been deposed.  Significantly, in response to this Court's inquiry at the summary judgment hearing regarding the lack of physician testimony to support the TPP's, counsel for Kaiser cited to the declarations of Dr. Daniel and Dr. Weider.  (8/19/09 Tr. at 28:22-23.)

Plaintiffs clearly intend to rely upon such testimony at trial.  Defendants should be given a opportunity to depose these witnesses in advance of trial.

III.   **The Court Should Establish A Briefing Schedule For Daubert Motions Before Setting A Trial Date**

Apart from the issue of whether Plaintiffs should be allowed to rely upon an aggregate model *at all* to establish essential elements of their cause of action, including injury, causation and the amount of their damages, there remains the question of whether the Plaintiffs' experts have proposed a model that meets the standards for reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This Court has acknowledged that "[t]he Court's vigilant exercise of this gatekeeper role is critical" and the need for careful consideration of issues raised by a *Daubert* challenge. *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 130-31 (D. Mass. 2009).

In this case, a number of questions remain regarding Plaintiffs' proposed aggregate model that require thorough briefing and argument under *Daubert*. For example, this Court has repeatedly noted that, even if Prof. Rosenthal's model were sufficient to quantify the number of off-label prescriptions (an assertion Defendants dispute), Prof. Rosenthal cannot identify or quantify the number of *fraudulent* prescriptions. Instead, at the instruction of counsel, Prof. Rosenthal simply assumed that any off-label marketing was fraudulent. *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 329 (D. Mass. 2009). Moreover, as this Court has noted, "Professor Rosenthal's analysis does not take into account any other factors that may have led doctors to prescribe Neurontin for off-label indications." *Id.* at 330; *see also id.* ("While in the aggregate Professor Rosenthal's report has some surface appeal, the record in this case demonstrates why the use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed."). At the summary judgment hearing, the Court again noted that "[Prof. Rosenthal] can't tell what's due to the fraud." (9/18/09 Hearing Tr. 79:10-12.) Likewise, Prof. Rosenthal cannot address the issue of whether Neurontin was efficacious for any particular plaintiff and she does not attempt to quantify this factor on an aggregate basis.

Plaintiffs' other experts cannot fill the gaps in Prof. Rosenthal's aggregate model.

- 9 -

Initially, neither Dr. Conti nor Dr. Hartman provide a method for ascertaining on an aggregate basis the number of prescriptions allegedly due to fraud.



Like Dr. Conti, he does not attempt to provide a method for quantifying allegedly fraudulent prescriptions.

Further, Dr. Conti's and Dr. Hartman's analysis raise other issues that can only be resolved by *Daubert* motions. Such issues include whether they have resorted to national data sets without accounting for "differences in covered individuals' demographic characteristics (e.g., age, gender, health status);" "differences in exposure of covered individuals to health hazards associated with different industries;" and "regional differences in the practice of medicine." (3/14/08 Bell Decl. (attached as Exh. G) ¶¶ 10, 76-80.)[3] The error rate of the national data they rely upon must also be examined. For example, Dr. Conti resorts to national data that, according to its own reporting, has a wide margin of error. (*See* 3/13/08 Grabowski Decl. (attached as Exh. H) ¶ 45.) Dr. Conti argues that such margins of error are irrelevant to her trend analyses. (3/28/08 Conti Decl. [1186] at 3.) Without conceding the point, her "trend" argument does not address the issue of whether the margin of error is too great to permit conclusions regarding causation or damages as to any individual TPP.

Moreover, even putting these fundamental defects aside, Dr. Hartman admits that his damages analysis is not complete. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[3] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



The Coordinated TPPs have provided the Court with no expert report that explains how they purport to determine, on an aggregate basis, whether any prescriptions that physicians might have prescribed were both cheaper and more optimal than Neurontin.

In addition to Plaintiffs' damages experts, both Plaintiffs and Defendants have designated several other experts that are likely to be the subject of *Daubert* challenges. Issues regarding the admissibility of expert testimony should be resolved significantly in advance of trial to allow the parties to incorporate the Court's rulings into their trial preparations.

Significantly, in the product liability actions, resolution of Defendants' *Daubert* motions took several months. Defendants filed their motion to exclude the testimony of the Product Plaintiffs' generic causation experts on March 7, 2008. [1157] Plaintiffs responded approximately one month later. [1191] Around the same time, Defendants moved for the appointment of an independent expert [1213], which was opposed by the Product Plaintiffs [1236]. Defendants' reply brief was filed on April 25, 2008 [1239], and the Product Plaintiffs' Sur-Reply was filed on May 2, 2008 [1254]. A few days later, the Product Plaintiffs filed a motion to exclude a rebuttal expert offered by Defendants, and this motion entailed another round of briefing. [1270, 1275, 1286] The Product Plaintiffs filed supplemental briefing in

opposition to Defendants' *Daubert* motion on June 13, 2008. [1334] The Court held a three-day evidentiary hearing on June 19, 20, and 23, 2008. [1358, 1359, 1368]   On May 5, 2009, the Court issued its ruling. *See In re Neurontin Mktg. & Sales Practices Litig.*, 612 F. Supp. 2d 116 (D. Mass. 2009).

So, too, in this case, sufficient time should be allowed for consideration of *Daubert* issues. A further pretrial conference could be scheduled following *Daubert* motions to evaluate the work that remains to be done in the case and establish realistic deadlines.

## IV. Plaintiffs' Proposed Trial Plans Fail to Address Critical Issues that the Court Specifically Told Them to Consider

The vague and amorphous "trial plan" presented by the Coordinated Plaintiffs, and endorsed by the Class Plaintiffs, is no plan at all.  Coordinated Plaintiffs simply list the substantive elements of their causes of actions, state in notice-pleading terms the general allegations they intend to prove, and identify generic categories of evidence they plan to introduce.  Most glaringly, the Coordinated Plaintiffs devote less than a page to explaining how they plan to prove "Proximate Cause of Injury." (Coordinated TPPs' Proposed Trial Plan [2118] at 7.)  Their brief treatment of these essential elements is utterly devoid of any useful information. For example, with respect to efficacy, the Coordinated Plaintiffs' trial plan merely states that they intend to rely on "[e]xpert testimony establishing that Neurontin is of minimal or no efficacy for the indications at issue." (*Id.* at 7.)  Likewise, with respect to damages, their trial plan merely states that they will rely on "[e]xpert testimony and internal documents and data from each Coordinated Plaintiff establishing damages." (*Id.*)  This is plainly not what the Court had in mind when it directed the Coordinated Plaintiffs to think in detail about what a trial would actually "look like." (9/18/09 Hearing Tr. 87:6-8, 96:21.)  Far from providing the Court with any new information or insight, the Coordinated Plaintiffs' proposed *"trial plan"* provides fewer specifics than their December 2006 *pleadings* regarding how they propose to prove their claims. The Court specifically directed the Coordinated Plaintiffs to prepare a trial plan that would explain in detail how they propose to quantify their alleged damages for each relevant off-label

indication.

> THE COURT: I don't know. I simply know this: I want you to think about what it would look like and how you would do it because [defense counsel's] very good point is that even if I disagree with him on the aggregate thing, I mean, you'd have to come up with – if the jury said there was fraud in bipolar but no fraud in pain, you need to come up with a realistic way of thinking about that from all your third-party payors. You can't say in the aggregate there was fraud in bipolar, so we get every single indication of –
>
> MS. NUSSBAUM: We will do that, your Honor.

(9/18/09 Hearing Tr. 96:20-97:5.) This assurance notwithstanding, here is the sole reference to damages in the Coordinated Plaintiffs' proposed trial plan: "Among the evidence to be relied upon will be: . . . Expert testimony and internal documents and data from each Coordinated Plaintiff establishing damages." (Coordinated TPPs' Proposed Trial Plan at 7.) The deficiency of this non-response to the Court's direct question speaks for itself.

Plaintiffs' inability to explain how they intend to prove damages is telling. Plaintiffs concede that to prove their alleged damages, each TPP would "have to show how many prescriptions they paid for because of the fraud." (9/18/09 Hearing Tr. 78:16-18.) As discussed above, the expert reports that Plaintiffs have provided fail to address this issue.

Though the proposed trial plans do not even address these issues, Class Plaintiffs' counsel suggested at the summary judgment hearing that Dr. Raymond Hartman has quantified the TPPs' damages and that "[t]here's nothing new to do there is what I'm saying. It's done." (*Id.* at 97:10-16.) However, as discussed above, Dr. Hartman's damages calculations are explicitly based on his assumption that Professor Rosenthal has accurately quantified the total number of Neurontin prescriptions written as a result of fraudulent promotional activities, an unfounded assumption that the Court has already rejected. Without the benefit of this unfounded assumption, Dr. Hartman's figures are meaningless. In addition, as discussed above, his analysis is incomplete.

## V.   A February Trial Would Not Allow Sufficient Time For Pretrial Designations, Objections And Motion Practice

In the *Bulger* trial, the parties initial witness lists, exhibits lists and deposition

- 13 -

designations, as well as any requests to admit the authenticity of documents, were due on May 22, 2009, approximately nine weeks prior to trial. [1739] A similar schedule for a February 8 trial in this case would require initial pre-trial designations to be due on December 4, 2009, the week after Thanksgiving. Counterdesignations and objections would be due on January 4, just after the Christmas and New Years holidays. *Bulger*, which involved a single patient who used Neurontin for only a couple of years and for a single indication, was a less complicated case than a trial involving the claims of even one TPP covering a ten-year period, let alone the claims of three TPPs. Even so, the pretrial schedule in *Bulger* proved challenging for the parties and required substantial intervention by the Court. The winnowing of voluminous discovery materials into realistic trial designations is difficult and time-consuming. The Plaintiff in *Bulger* initially filed pretrial designations that would have been grossly overbroad even for a trial lasting several months. As a result, Defendants had to move to compel compliance with the Court's Pretrial Order to force the Plaintiff to make realistic pretrial designations.

Here, as in *Bulger*, the parties are faced with an extensive discovery record. Defendants produced about 3.3 million pages of documents, excluding sizeable database extracts and other non-document discovery. Approximately 35 current or former employees of the Defendants were deposed, together with 15 current/former company witnesses deposed in the *Franklin* litigation. Defendants took 9 depositions of the Coordinated TPPs or their PBMs. Defendants offered reports from 11 experts; while Plaintiffs offered reports from 12 witnesses that they seek to call as experts. Just in opposition to summary judgment, Plaintiffs submitted a 314-page Statement of Disputed and Undisputed Material Facts, and 26 boxes of supporting evidentiary material. (Class Plaintiffs' Proposed Trial Plan [2119] at 2.)

Completing pre-trial designations is made even more difficult here due to the competition for the Court's time and the parties' resources as the result of another trial scheduled for the near future and other significant deadlines in the MDL product liability cases and the New York coordinated litigation. Trial in the *Shearer* case is scheduled to begin on March 23, 2010. In addition, Magistrate Judge Sorokin has put the parties on an expedited track to complete

discovery and briefing in *Huberman* and *Dorsey*.[4]   Discovery is also commencing in the coordinated New York litigation.  A review of the calendar between now and the middle of April reveals the following:

| | |
|---|---|
| Oct. 30 | Completion of all fact depositions and discovery in *Shearer* |
| Nov. 6 | Deadline for completion of initial discovery in certain New York cases |
| Nov. 15 | Discovery to commence in *Huberman* and *Dorsey* |
| Nov. 26 | Thanksgiving holiday |
| Nov. 28 | Deadline to produce additional documents re: safety and efficacy of Neurontin |
| Nov. 30 | Deadline for Plaintiff's expert disclosures in *Shearer* |
| Dec. 7 | Deadline for completion of initial discovery in two additional selected cases in New York litigation |
| Dec. 14 | Selection of one or more of cases for full fact discovery in New York litigation |
| Dec. 21 | Deadline for Defendant's expert disclosures in *Shearer* |
| Dec. 24 | Christmas Eve |
| Dec. 25 | Christmas |
| Dec. 31 | New Years Eve |
| Jan. 1 | New Years |
| Jan. 10 | Deadline for expert depositions in *Shearer* |
| Jan. 15 | Completion of all fact depositions and discovery in *Huberman* and *Dorsey* |
| Feb. 2 | Daubert and summary judgment motions due in *Shearer* |
| Feb. 18 | Opposition to Daubert and summary judgment motions due in *Shearer* |
| Feb. 22 | Daubert and summary judgment reply briefs due in *Shearer* |
| Mar. 1 | Completion of all expert depositions and discovery in *Huberman* and *Dorsey* |
| Apr. 5 | Completion of full fact discovery in selected New York cases |
| Apr. 12 | Completion of all summary judgment briefing in *Huberman* and *Dorsey* |

It is within this already crowded schedule that the Court would have to establish deadlines for (1) admissions as to authenticity of documents, (2) exchange of exhibit lists, (3) designation of deposition testimony, (4) counterdesignations of deposition testimony, (5) objections to exhibits and designation testimony, (6) motions in limine, (7) hearing on objections and motions in limine, and (8) a final pre-trial conference.  In light of all that remains

---

[4] On October 14, 2009, Magistrate Judge Sorokin ordered the parties to prepare scheduling orders to complete discovery in *Huberman* and *Dorsey* similar to the scheduling deadlines in *Shearer*.  Proposed scheduling orders are to be submitted November 2, 2009.  The dates listed in *Huberman* and *Dorsey* are approximate deadlines based on the scheduling in *Shearer*.

to be done, and given the competing deadlines confronting both the parties and the Court, a trial in February is not feasible and will not advance the interests of justice.

## VI.   Plaintiffs' Proposal for a Joint Trial of Multiple TPPs' Claims Should Be Rejected

The three Coordinated TPPs propose to have a joint trial of all of their claims regarding all relevant off-label indications.  (Coordinated TPPs' Proposed Trial Plan [2118] at 1.)  The Class Plaintiffs propose to include ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA") instead of or in addition to Aetna.  (Class Plaintiffs' Proposed Trial Plan [2119] at 2.)  This proposed joint trial would hopelessly confuse the jury.  The Court has recognized that evaluating each TPP's claim requires consideration of numerous company-specific issues, such as:

> whether [each company] did it differently, and how much it matters, when it was approved and what kinds of restrictions like in Kaiser that were opposed, and what were the facts for each separate plaintiff, and that sort of thing.  So I think what I'd like to do, I'll let you start, but just know I'm going to get frustrated and jump in and just force us to go company by company, all right?  Because I think no one, if I could predict right now, is going to win on a broad-brush argument.  I'm going to want to understand what happened, Kaiser, Guardian, Aetna, each plaintiff.

(9/18/09 Hearing Tr. 6:24-7:9.)  The Court also recognized that TPPs generally, and the named TPP plaintiffs in particular, had very different "philosophies" regarding reimbursement for off-label prescriptions.

> [I]t seems there are three different philosophies, right?  One is, "We'll pay for anything," Guardian.  "We want to serve our customers, so we're going to pay for everything."  And so they're saying that they were defrauded, as I'm understanding it, because they ended up, they didn't have any screening.  There were no misrepresentations to them, but instead it fell beneath the radar screen, and the fraud on the doctors ended up costing them money because they wouldn't have paid for it, as I understand it.
>
> Kaiser took a much more proactive role once they started putting restrictions on, right?  And then there's another one that said, "We didn't cover off-label at all," but they did nothing to police it.  I mean, those are the three big bins I'm putting them in.

(*Id.* at 41:6-20.)  Because of these company-specific issues, the Court repeatedly emphasized the need to address the TPPs' claims "individual company by individual company" and to "understand what happened at each company."  (*Id.* at 4:20-21, 5:20-23, 6:3-6, 40:20-21.)

Consistent with its approach to summary judgment, the Court made clear that if it were to hold a preliminary trial, its inclination would be to address "one TPP and all the indications." (*Id.* at 90:25; *see also id.* at 89:5-6 ("Why don't I do one TPP first?").) The Court recognized that a jury could easily be confused and overwhelmed by a joint trial of multiple TPPs' claims, particularly if the trial also involved multiple indications.

> MR. SOBOL: [Y]ou also have to think about the jury and the fact that they'll probably hear from three or four people from each third-party payor. They're going to have to remember Mr. Smith from Kaiser --
>
> THE COURT: And I get it, and then you also have five different indications. So that in itself is very difficult.

(*Id.* at 87:25-88:7.)

The Coordinated Plaintiffs' proposed trial plan seeks to evade these concerns without addressing them. It states that "[w]hile Kaiser, Aetna and Guardian each has its own story . . . , all three will adduce nearly identical evidence to support the majority of elements in their claims." (Coordinated TPPs' Proposed Trial Plan at 2.) But the proposed trial plan goes on to say that the three Coordinated Plaintiffs will "rely on individual evidence to prove their reliance and damages theories" and that they will prove reliance "in the specific context of their own managed care model." (*Id.* at 3, 7.) Most notably, Kaiser intends to "present the testimony of multiple members of its P&T Committees, employees of its Drug Information Services department, and participants in remedial education campaigns undertaken to correct Defendants' misinformation." (*Id.* at 1.) These witnesses' testimony could only pertain to Kaiser's claim, and would needlessly complicate and confuse the jury's consideration of the fundamentally different claims of Aetna, Guardian, and ASEA. And regardless of how Plaintiffs purpose to affirmatively present their claims, they cannot restrict the evidence that Defendants will offer in opposition and which will include significant evidence that is specific to each TPP. The evidence that Defendants' offer to negate the Plaintiffs' claims will, therefore, highlight the wide array of differences between the various TPPs.

The Coordinated Plaintiffs' only response to these serious concerns is to claim that they

will present expert testimony to "give context to the Coordinated Plaintiffs' individualized evidence of reliance and injury." (*Id.* at 3.) But Defendants would also present expert testimony that would provide a competing "context." The Coordinated Plaintiffs fail to explain how dueling experts would alleviate, rather than compound, the juror confusion that would inevitably result from individualized evidence regarding the inner workings of three different insurance companies and how they relate to five different off-label indications.

For similar reasons, the proposal of the Class Plaintiffs that one of the putative class representatives be included in the first TPP trial should also be rejected. Initially, the Court requested a trial plan from the Coordinated Plaintiffs, and asked them to consider such issues as whether an initial trial would involve "one of the coordinated plaintiffs" or "all three," and if so, how many indications. (9/18/09 Hearing Tr. 86:7-11.) The Court expressed no interest in a trial plan from Class Plaintiffs. (9/18/09 Hearing Tr. 88:23-89:2.)

Adding an additional TPP to the mix would only add to the complexity of a first trial and juror confusion. The Coordinated TPPs have elected to proceed on a theory of recovery that is distinctly different than the Class TPPs. As this Court observed when ruling on Defendants' earlier motion to dismiss, "a direct allegation that Neurontin was not effective for Coordinated Plaintiffs' insured patients does not appear anywhere else in the complaint, nor is one associated with any other causes of action." *See In re Neurontin Mktg. & Sales Practices Litig.*, 433 F. Supp. 2d 172, 185 (D. Mass. 2006.) Instead, the Coordinated TPPs argued "that they sustained an economic injury because Defendants' fraudulent activities caused Plaintiffs to pay for Neurontin prescriptions at excessive doses and instead of cheaper alternatives." *See id.* at 186. Likewise, in response to Defendants' Motion for Summary Judgment, the Coordinated TPPs, in response to Defendants' argument that Plaintiffs had failed to raise a triable issue regarding whether Neurontin was ineffective for the indications for which it was prescribed stated: "[T]hat is not the standard that the Coordinated Plaintiffs have pled, nor to which this Court has held them." [1744 at 18.]

Class Plaintiffs argue that ASEA should be included in the first trial precisely because it

- 18 -

has pursued a different theory of causation and damages. (Class Plaintiffs' Proposed Trial Plan at 2.) Class Plaintiffs' argument makes no sense and further underscores the need for individual TPP trials. They appear to concede that a trial of both Kaiser and Aetna would significantly increase the scope and duration of any trial, and potentially overwhelm and confuse the jury. (*Id.* at 2.) But other than their own say so, they offer no compelling reason why a Kaiser/ASEA trial does not present the same risks. In fact, asking a jury to appreciate the subtle gradations in causation and damage theories pursued by the varying TPPs is not realistic. As a result, forcing Defendants to respond to the disparate theories and evidence of different TPPs would be fundamentally unfair.[5]

Moreover, the individual Class TPPs have yet to offer any evidence of their individual damages. ██████████████████████████████████████████████████ ██████████████████████████████████, he does not provide calculations for any of the individual named Class TPPs. Defendants should not be forced to trial against one of the Class TPPs, before there has even been completion of expert discovery with respect to the individual TPPs' damages.

For all of these reasons, Plaintiffs' proposal for a joint trial of multiple TPPs' claims should be rejected.

## VII.   The Coordinated Plaintiffs' Alternate Proposal for a Kaiser-Only Trial Should Be Rejected

The Coordinated TPPs alternatively propose a Kaiser-only trial regarding all relevant off-label indications. (Coordinated TPPs' Proposed Trial Plan [2118] at 1.) However, the reason the Court suggested an initial trial was to provide the Court an opportunity to "sit and listen and understand" the factual, legal, and management issues likely to occur in any subsequent trials

---

[5] Moreover, the Class Plaintiffs' proposal that they be permitted to test drive their liability theory while their motion for reconsideration of this Court's class certification ruling is pending has the earmarks of a fail-safe class, or prohibited one-way intervention, where class members would be bound only to a successful outcome, while the defendant would receive no res judicata benefit as to the members of the putative class should it prevail at trial while a motion for class certification is pending. *See Ramirez v. DeCoster*, 194 F.R.D. 348, 355 (D. Maine 2000).

and to "get some findings" that would guide the Court's and the parties' approach to any subsequent trials.  (9/18/09 Hearing Tr. 86:5-91:10.)  Defendants continue to maintain that each TPP is unique and each TPP's claim would require consideration of numerous company-specific issues.  Nonetheless, Plaintiffs have asserted that Kaiser is the most atypical of the named TPPs. Plaintiffs' own statements indicate that a Guardian-only trial would be far more likely than a Kaiser-only trial to provide useful guidance to the Court regarding the legal, factual, evidentiary, and trial management issues likely to arise in any subsequent trials.   For example, at the summary judgment hearing, Counsel for Guardian stated: "Guardian being the smallest plan at this table is also representative of probably the vast majority of plans that were subjected to the defendant's fraud insofar as the fact is that they used a PBM to administer their pharmacy benefit and really relied on honesty in the marketplace by the pharmaceutical manufacturers." (9/18/09 Hearing Tr. at 73:14-20.)

In sum, while Defendants maintain that summary judgment is required, at least as to any TPP whose claim the Court intends to try first, and that no trial should proceed before the Court rules on the pending summary judgment motion, only a single-TPP trial involving either Guardian or Aetna could even conceivably further the Court's stated objectives.  In contrast to Plaintiffs' unrealistic and artificially compressed proposal for a February trial, a trial date that follows the trials of *Shearer*, *Huberman* and *Dorsey* would provide the parties with ample time to prepare this important case for trial, allow the Court to decide important, threshold legal controversies.  A well prepared trial, rather than one forced into a compressed window of time before the *Shearer* trial, will best achieve the Court's objective of providing guidance to the Court and parties.

Defendants respectfully request that the Court schedule a hearing on the issues raised herein and the Plaintiffs' proposed trial plans.

Dated:  October 19, 2009

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:    /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

       -and-
WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 19, 2009.


/s/ David B. Chaffin
David B. Chaffin