# EXHIBIT A

# In re Neurontin

# Hearing on Motion to Reconsider Denial of Class Certification

October 15, 2009

# Prior Ruling On Class Certification

- "Plaintiffs' main hurdle is the inability to identify which prescribing physician was exposed to defendants' fraudulent statements." (244 FRD 89, 111)

- "[T]he evidence of whether the fraudulent marketing resulted in a plaintiff's receipt of an off-label prescription for Neurontin rests in the minds of the prescribing physicians. …" (257 FRD 315, 322)

1

# Prior Rulings On Class Certification

- "[T]he questions that would need to be asked with respect to each doctor – was he or she ever exposed to any fraudulent off-label marketing regarding Neurontin?  Did the marketing play any role in his or her decision to prescribe Neurontin to a particular plaintiff? – seemingly defied proof by any common means." (257 FRD 315, 322)

- "Plaintiffs cannot rely on "fraud on the market" to demonstrate causation. (257 FRD 315, 325-27)

2

# Prior Ruling On Class Certification

- *Vioxx* precludes use of a single expert to establish causation for all TPPs in place of individualized proof of causation under the NJCFA. (257 FRD 315, 332)
- "Recent decisions handed down by federal courts are equally problematic for plaintiffs' proposed method for establishing classwide causation for the remaining RICO claims." (257 FRD 315, 332)
- "Differences among TPPs would still necessitate individualized inquiries into whether defendants' alleged fraudulent marketing caused each TPP any economic damages." (257 FRD 315, 332)

# Prior Ruling On Class Certification

- "To prevail, plaintiffs must prove that defendants' fraudulent omissions or representations caused these committees to approve the use and reimbursement of Neurontin for off-label indications in a manner that was different from what would have occurred absent the alleged fraudulent marketing." (257 FRD 315, 333)

- "Class certification of the TPP subclasses would inevitably result in a tsunami of individual, complex trials." (257 FRD 315, 333)

4

# Plaintiffs Rely On A Series Of Extreme And Unproven Assumptions

1.  **NO** psychiatrists would have prescribed Neurontin to bipolar patients except as a result of off-label promotion.

2.  **EVERY** Neurontin prescription by a psychiatrist to a bipolar patient was written specifically to treat bipolar disorder.

3.  **NO** bipolar patient derived any legitimate benefit from taking Neurontin.

4.  **ALL** promotion to psychiatrists was fraudulent.

# Plaintiffs Rely On A Series Of Extreme And Unproven Assumptions

Plaintiffs assert:

- "[A] jury may properly find that nearly all of the Neurontin prescriptions to treat bipolar and other mood disorders would not have been written but for Defendants' fraud." (Reply at 1)

- "[C]ausation may be … 'presumed' … where, as here, the purchased product or service is worthless." (Reply at 2)

- "Plaintiffs can prove class-wide causation based upon Defendants' own, internal assessment that *no* Neurontin prescriptions would have been written for bipolar disorder, absent promotion for that use, which the Court has already determined was a fraud." (Reply at 2)

# Plaintiffs Rely On A Series Of Extreme And Unproven Assumptions

Plaintiffs assert:

- *"[T]here are no other factors* that any minimally competent physician could have relied upon in writing a Neurontin prescription to treat bipolar and other mood disorders." (Reply at 3)

- "[T]here was *no plausible alternative basis* for their purchase decisions … ." (Reply at 12)

- "[T]here were no positive attributes that could have been innocently and truthfully communicated to physicians." (Reply at 15)

7

# Plaintiffs Have Not Proven Their Assumptions And Seek To Deprive Defendants The Opportunity To Rebut Them

- A single example logically suffices to negate Plaintiffs' absolute assumptions.

- Plaintiffs ask this Court to preclude Defendants from introducing any evidence that would rebut their assumptions.
  - Don't ask the doctors.
  - Don't believe the doctors.

- Plaintiffs: "[I]ndividual inquiry would only yield inaccurate information." (Reply at 18)

8

# Plaintiffs Have Not Proven Their Assumptions And Seek To Deprive Defendants The Opportunity To Rebut Them

- Plaintiffs' position requires the Court to assume that **ALL** doctors were ignorant, unaware, forgetful or willing to relinquish their independent medical judgment.

- The Court has recognized that physician testimony is problematic for Plaintiffs.

  - "Well, did you ask them point-blank, 'Had you known that bipolar is no better than a placebo, and it hasn't been approved, and it has these depressive side effects, and there's now a little black box, would you have done it differently?' I've not seen one doctor who said he would have done it differently." (9/18/09 Tr. at 20–21.)

9

# Plaintiffs Have Not Proven Their Assumptions And Seek To Deprive Defendants The Opportunity To Rebut Them

- The Court has recognized that physician testimony is problematic for Plaintiffs.

  - "I've been living with this case a long time – I've said, 'Show me the doctor,' you know, 'Where's the doctor who says that he wouldn't have done it otherwise?  Get me a doctor.'" (9/18/09 Tr. at 10.)

  - "The deposition testimony of the doctors for the bipolar/mood disorder class representatives shows that their decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud." (257 FRD 315, 330)

# Plaintiffs' Proposed Aggregate Proof Would Deprive Defendants Of Their Due Process Rights

- The Court recognized that Defendants cannot be deprived the opportunity to rebut allegations of causation with individualized transaction specific evidence. (257 FRD 315, 325-26)

  - "The *McLaughlin*, *St. Jude*, and *TJX* courts were unwilling to deny defendants an opportunity to present evidence that their alleged fraud did not cause a particular plaintiff's injury.  As such, in all three cases, individual questions relating to exposure and causation predominated over questions common to the class as a whole." (257 FRD 315, 327)

11

## Plaintiffs' Proposed Aggregate Proof Would Deprive Defendants Of Their Due Process Rights

- Plaintiffs concede that "Defendants have the right to call individual physicians to testify that they prescribed Neurontin to treat bipolar based on something other than [the alleged] fraud." (Reconsid. Mot. at 25)

- Due process demands that Defendants be allowed to introduce the same evidence in TPP cases, especially where TPPs are relying upon alleged representations to physicians, rather than to themselves.

12

# Plaintiffs Seek To Use The Class Action Device To Alter Their Burden of Proof Under Substantive Law

- Plaintiffs' theory is indistinguishable from fraud on the market.
  - Plaintiffs assert that they are not relying upon representations made to them
  - Plaintiffs purport to rely upon representations made to physicians, but without any specifics as to the who, what, when or where of the representations
  - Plaintiffs:  "[T]he alleged scheme to promote the use of Neurontin for bipolar does not rely on a direct connection between the defendant and each and every doctor whose prescribing patterns were affected."

13

# Plaintiffs Seek To Use The Class Action Device To Alter Their Burden of Proof Under Substantive Law

- The Supreme Court has made clear that a class may not be certified when it would involve "'abridg[ing]'" the "'substantive right'" of a party or "'sacrificing procedural fairness.'"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612, 615 (1997); *see also McLaughlin*, 522 F.3d 215, 231.

- Calling their claims "fraud in the aggregate" does not change the fact that they are relying on fraud on the market.  As the First Circuit has said, painting a pumpkin green does not make it a watermelon.  (*Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 24 (1st Cir. 2002)

14

# Plaintiffs' Assumptions Must Be Supported By Evidence, Not Intuition

FIRST CIRCUIT in *New Motor Vehicles*:

"Plaintiffs seem to rely on an inference that any upward pressure on national pricing would necessarily raise the prices actually paid by individual consumers.  There is intuitive appeal to this theory, but intuitive appeal is not enough."

(522 F3d 6, 29)

15

# False:  No Psychiatrist Would Have Prescribed Neurontin To Bipolar Patients

- Psychiatrists prescribed Neurontin for its labeled indications.  Bipolar disorder is highly comorbid with epilepsy. (Ettinger, 65 Neurology 536 (2005))

- Psychiatrists prescribed Neurontin to treat comorbid conditions.

- There was a recognized practice of using other AEDs to treat patients with bipolar disorder.
  - This Court noted in prior ruling:  "Dr. Arness … testified that he prescribed Neurontin … because anticonvulsants like Neurontin 'were widely known and widely accepted as a treatment for bipolar disorder'" (257 F.R.D. 315, 330; Arness Dep. 23:15-19, 24:2-7)
  - Neurontin was considered to be safer with fewer side effects than other AEDs. (Slaby Decl. at 9-11; Arness Dep. 31:6-24)

16

# Other AEDs Experienced Similar Levels Of Off-Label Usage During The Years At Issue

**Exhibit 1**

**All Off-Label Uses** [1]
**Top AEDs** [2] **vs. Neurontin**
Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note: [1] Off-label uses are all uses that are not FDA approved for a particular AED at a particular point in time.  For the purposes of this analysis only, the same ICD-9 indication categories employed by Dr. Conti are used in this exhibit, whether or not they appropriately reflect uses for these different indications.  Does not include uses at dosages above FDA-approved levels.
[2] Does not include uses at dosages above FDA-approved levels.
Contains branded AEDs and their generic equivalents from IMS therapeutic category "20200 SEIZURE DISORDERS" with average positive annual uses in excess of 150,000 for the period 1994 to 2004: Carbatrol, Depakote, Depakote ER, Dilantin, Gabitril, Keppra, Klonopin, Lamictal, Mysoline, Tegretol, Tegretol XR, Topamax, Trileptal, and Zonegran.

17

# Other AEDs Experienced Similar Levels Of Off-Label Usage During The Years At Issue

**Exhibit 2**

**Off-Label Uses At Issue in This Case** [1]
**Top AEDs** [2] **vs. Neurontin**
Source:  NDTI; Declaration of Dr. Rena Conti; Drugs@FDA



Note:  [1]  Off-label uses are uses that are not FDA approved for a particular AED at a particular point in time, and are limited to the indications addressed by Dr. Conti in her report.  For the purposes of this analysis only, the same ICD-9 indication categories employed by Dr. Conti are used in this exhibit, whether or not they appropriately reflect uses for these different indications.  Does not include uses at dosages above FDA-approved levels.

[2]  Contains branded AEDs and their generic equivalents from IMS therapeutic category "20200 SEIZURE DISORDERS" with average positive annual uses in excess of 150,000 for the period 1994 to 2004: Carbatrol, Depakote, Depakote ER, Dilantin, Gabitril, Keppra, Klonopin, Lamictal, Mysoline, Tegretol, Tegretol XR, Topamax, Trileptal, and Zonegran.

# False:  Every Prescription Written By A Psychiatrist To A Bipolar Patient Was Written To Treat Bipolar Disorder

- Neurontin is frequently prescribed as adjunctive therapy for comorbid conditions in bipolar patients, including anxiety, panic, post-traumatic stress, and substance abuse.

- Dr. Gray has prescribed Neurontin to treat "patients with a history of depression and chronic pain where I felt the depression was attributable, at least in part, to the pain." (Gray Dep. 44:25-45:12)

- Dr. Ragothaman still prescribes Neurontin to bipolar patients with comorbid anxiety
  (Ragothaman Dep. at 31-32, 86-88, 145)

19

# False:  Every Prescription Written By A Psychiatrist To A Bipolar Patient Was Written To Treat Bipolar Disorder

- Dr. Grimm's clinical experience is that "Neurontin could also be very effective for other, comorbid conditions such as chronic pain or anxiety disorder, which was another consideration in prescribing it to a patient." (Grimm Decl. ¶ 4)

- Plaintiffs' Bipolar Expert, Dr. Jeffrey Barkin disputes Neurontin's effectiveness in treating bipolar disorder, but nevertheless prescribes the drug as adjunctive medicine for two of his bipolar patients. (Barkin Dep. at 204-207)

20

# False:  No Bipolar Patient Derived Any Legitimate Benefit From Taking Neurontin

- Pfizer does not concede lack of efficacy.
  - Plaintiffs grossly distort a 1996 Pfizer document making a **near term** market prediction. (Reply at 16.)
  - Dr. Pande has explained that shorter clinical trials would have difficulty demonstrating effectiveness; that effectiveness of Neurontin would have to be evaluated over the long term.

- Plaintiffs' Bipolar Expert, Dr. Barkin concedes that the single study concerning the use of Neurontin in treating non-refractory bipolar disorder concluded that Neurontin "is likely to provide some benefits on the long-term outcome of the disorder, confirming what some clinicians and open-label studies have suggested before."  (Barkin Dep. at 226-27, 454-55)

- Dr. Barkin continues to prescribe Neurontin for co-morbid conditions.  (Barkin Dep. at 204-207)

# False:  No Bipolar Patient Derived Any Legitimate Benefit From Taking Neurontin

- The named TPPs still knowingly reimburse for gabapentin prescriptions written to bipolar patients.

- Some TPPs continue to explicitly recognize that gabapentin can be effective in treating bipolar patients. Significant examples:

  - CIGNA recommended NTN as an adjunctive agent for bipolar disorder in 2000.  (Bell Decl. ¶ 59.3)

  - Guidelines approved by Kaiser recognize even today that "gabapentin may be effective as monotherapy or adjunctive therapy in some treatment resistant cases of bipolar affective disorders."  (Kaiser Drug Monograph; Millares Dep. at 78-80)

22

# False:  No Bipolar Patient Derived Any Legitimate Benefit From Taking Neurontin

- Drugdex – one of the Congressionally-designated gatekeepers of the Medicaid system – summarizes the scientific evidence regarding gabapentin's efficacy for treating bipolar disorder as follows: "Efficacy: Adult, Evidence favors efficacy."

- Plaintiffs cannot explain away current positions by the TPPs and government based on lack of information.

23

# Illustration: 2007 Treatment Of Bipolar Patient By Four Winds-Saratoga

## [REDACTED]

# Illustration: 2007 Treatment Of Bipolar Patient By Four Winds-Saratoga

- Plaintiffs and their experts would likely have categorized this complicated patient's Neurontin prescriptions as being written "for bipolar" – a gross oversimplification that does not survive review of the individualized facts

- Without individualized evidence, there is no way to determine how many other so-called "bipolar" prescriptions were actually written for comorbid conditions as to which Plaintiffs have not sought and cannot support any class-wide presumptions of fraud or inefficacy

# False:  All Promotion to Psychiatrists Was Fraudulent

The Court has recognized that Plaintiffs cannot establish with common proof their fraud allegations with respect to different indications.

- Plaintiffs' "proof of fraud varies considerably by indication." (244 FRD 89, 105)

- Plaintiffs' "approach is problematic, however, if TPPs are unable to distinguish between payments for on- and off-label prescriptions, or among the indications." (244 FRD 89, 114-15)

26

# False:  All Promotion to Psychiatrists Was Fraudulent

The Court has recognized that Plaintiffs cannot establish with common proof their fraud allegations with respect to different indications.

- "[I]f the jury said there was fraud in bipolar but no fraud in pain, you need to come up with a realistic way of thinking about that from all you third-party payors." (9/18/09 Tr. at 96-97)

- Plaintiffs have made no attempt to control for prescriptions to treat co-morbid conditions.
  - Compare *New Motor Vehicles*, 522 F.3d 6, 27 (Plaintiffs' aggregate model was insufficient where it could not account for legal, vertical restraints)

# False:  All Promotion to Psychiatrists Was Fraudulent

- Pfizer sales representatives had legitimate reasons for detailing psychiatrists.

    - Psychiatrists treat epileptics.

    - Neurontin sales representatives were also responsible for detailing a number of other drugs, including Aricept, an Alzheimer's medication, and Celexa, an anti-depressant, that psychiatrists would routinely prescribe for their labeled indications. (Martin Dep. at 80-81, 343-44, Fannon Dep. at 172)

# False:  All Promotion to Psychiatrists Was Fraudulent

- Court has recognized that Professor Rosenthal cannot show the number of prescriptions caused by fraud
  - "While in the aggregate Professor Rosenthal's report has some surface appeal, the record in this case demonstrates why the use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed."  (257 F.R.D. 315, 330)
  - "[Professor Rosenthal] can't tell what's due to the fraud."  (9/18/09 Hearing Tr. 79:10-12)
  - "I'm not sure [Professor Rosenthal's aggregate model] equates one for one.  In other words, a certain number of doctors might well have prescribed anyway."  (9/18/09 Hearing Tr. 78-79)

# False:  All Promotion to Psychiatrists Was Fraudulent

- Court has recognized that Professor Rosenthal cannot show the number of prescriptions caused by fraud
  - "Because of the limits of [her] data," Professor Rosenthal is "unable to account systematically" for the purported impact of promotional activity other than detailing expenditure.  (257 F.R.D. 315, 329)
  - "Professor Rosenthal's analysis does not take into account any other factors that may have led doctors to prescribe Neurontin for off-label indications." (257 F.R.D. 315, 330)
  - Professor Rosenthal "assumed on instruction of counsel that all detailing during the class period was both off-label and fraudulent." (257 F.R.D. 315, 329)

30

# False:  All Promotion to Psychiatrists Was Fraudulent

- ## Conti does not fill in the gaps in Rosenthal's analysis.

  - Conti did not analyze causation issues and does not "offer[] any opinion . . . on the cause or causes" of the prescription trends discussed in her report.  (Conti Dep. at 432.)

  - Conti's figures are meaningless unless the Court assumes that all Neurontin prescriptions for bipolar disorder were caused by fraud – a question Dr. Conti was not asked to consider and on which she has no opinion.  (Conti Dep. at 68, 432-35, 438-439)

# False:  All Promotion to Psychiatrists Was Fraudulent

- Hartman does not fill in the gaps in Rosenthal's analysis.
- At the summary judgment hearing, when the Court asked Plaintiffs' counsel how Plaintiff would prove fraud in the aggregate, by indication, Plaintiffs' counsel responded that Dr. Hartman had done that.
    - "Dr. Hartman has calculated that . . . . There's nothing new to do there is what I'm saying.  It's done." (9/18/09 Tr. at 97.)
- Hartman's damages calculations are explicitly based on his assumption that Professor Rosenthal has accurately "quantified" the total number of Neurontin prescriptions paid for by TPPs "as a result of the unlawful promotional activities."  (Hartman Decl. at 3.)
- Hartman adds nothing to Rosenthal's analysis, which this Court has held is insufficient to ascertain the effect of any alleged fraud.  (257 F.R.D. 315, 330; 9/18/09 Tr. at 78-79)

32

# The Court Has Recognized The Significance Of Variations Among TPPs

- "But here's my problem:  I think I need to do this company by company and plaintiff by plaintiff.  I think it's very fact- specific." (9/18/09 Tr. at 4)

- "[W]hat interested me the most was each company and whether they did it differently, and how much it matters, when it was approved and what kinds of restrictions like in Kaiser that were opposed, and what were the facts for each separate plaintiff, and that sort of thing." (9/18/09 Tr. at 6)

33

# The Court Has Recognized The Significance Of Variations Among TPPs

- The Court has explained that there are at least three broad "buckets" of TPPs.

  - "One is, 'We'll pay for anything,' Guardian. "We want to serve our customers, so we're going to pay for everything."  And so they're saying that they were defrauded, as I'm understanding it, because they ended up, they didn't have any screening. …"

  - "Kaiser took a much more proactive role once they started putting restrictions on, right?"

  - "And then there's another one that said, 'We didn't cover off-label at all,' but they did nothing to police it.  I mean, those are the three big bins I'm putting them in."  (9/18/09 Tr. at 41)

34

# The Court Has Recognized The Significance Of Variations Among TPPs

- Dr. Bell explains that "individualized inquiry would be necessary to assess appropriately the alleged impact and injury" because prescription drug use varies among different TPPs due to:

    - "differences in covered individuals' demographic characteristics (e.g., age, gender, health status);"

    - "differences in exposure of covered individuals to health hazards associated with different industries;" and

    - "regional differences in the practice of medicine."  (Bell Decl. ¶¶ 10, 76-80)

- COURT: "Such criticisms are certainly relevant to the class certification analysis [and] speak . . . directly to the typicality and predominance requirements."  (257 F.R.D. 315, 320)

35

# In re Schering-Plough Corp., 2009 WL 2043604, at *15-15 (D.N.J. July 10, 2009)

- "Eschewing facts, Plaintiffs do not identify or otherwise describe with specificity any instances in which a named plaintiff actually purchased, paid for or consumed an ineffective drug."

- "TPP plaintiffs do not identify even a single beneficiary who took Temodor or the Intron Franchise Drugs for an off-label use and they fail to describe circumstances under which named plaintiffs received no benefit from the Subject Drugs."

36

# PEBTF v. Astrazeneca, 2009 WL 2231686, *5 (M.D. Fla. July 20, 2009)

- "[P]hysicians use their independent medical judgment to decide whether Seroquel is the best treatment for a given patient.  This independent judgment can be influenced by a number of things, only one of which may be representation by a manufacturer as to a particular drug's relative safety and efficacy.  Thus, in the context of this case, establishing that Plaintiffs' injuries were caused by Defendants' misconduct would require an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit." (cit. om.)