UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : | MDL Docket No. 1629 |
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | : | Master File No. 04-10981 |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO: | : | Magistrate Judge Leo T. Sorokin |
| *Shearer v. Pfizer Inc., et al.* Case No. 1:07-cv-11428-PBS | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

**DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE'S ORDER DENYING
MOTION TO RESTRICT COMMUNICATIONS WITH TREATING PHYSICIANS AND
IMPOSE SANCTIONS AGAINST DR. DAVID EGILMAN**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

RELEVANT FACTS ..................................................................................................... 3

ARGUMENT ................................................................................................................. 7

MAGISTRATE JUDGE SOROKIN'S ORDER DENYING PFIZER'S MOTION
TO RESTRICT IMPROPER COMMUNICATIONS WITH TREATING
PHYSICIANS IS CLEARLY ERRONEOUS AND CONTRARY TO LAW ............................. 7

I.      Dr. Egilman's Letter Was Plainly Designed to Improperly Influence Dr.
        Catapano-Friedman's Deposition Testimony ..................................................... 8

II.     Plaintiff's Straw-Man Arguments and *Post-Hoc* Rationale for Dr.
        Egilman's Conduct Should Be Rejected .............................................................. 9

III.    The Document that Dr. Egilman Improperly Altered and Disclosed Is
        Confidential and Subject to the Protective Order ............................................. 12

IV.     Dr. Egilman's Attempt to Whitewash His Prior Misconduct Should Be
        Rejected .............................................................................................................. 14

        A.      Dr. Egilman Mischaracterizes the *Zyprexa* Proceedings ....................... 15

        B.      Dr. Egilman Mischaracterizes the *Ballinger* Proceedings .................... 17

V.      Courts Have the Inherent Power to Restrict and Sanction Improper
        Communications with Non-Party Witnesses ..................................................... 18

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

Cases                                                                                                      Page

*Ballinger v. Brush Wellman, Inc.*, Case No. 96-CV-2532 (Colo. Dist. Ct. June 22, 2001),
    *aff'd in part, vacated in part sub nom. Egilman v. District Court*, No. 01CA1982
    (Colo. Ct. App. Sept. 5, 2002) ...............................................................................................6, 7

*Berger v. Amchem Products*, 818 N.Y.S.2d 754 (Sup. Ct. 2006)...................................................6

*In re Currency Conversion Fee Antitrust Litigation*,
    361 F. Supp. 2d 237 (S.D.N.Y. 2005)....................................................................................19

*Dunn v. Owens-Corning Fiberglass*, 774 F. Supp. 929 (D.V.I. 1991), *aff'd in part sub*
    *nom. Dunn v. HOVIC*, 1 F.3d 1362, *and vacated in part en banc*, 1 F.3d 1371, *and*
    *modified in part*, 13 F.3d 58 (3d Cir. 1993)..............................................................................6

*Egilman v. District Court*, No. 01CA1982 (Colo. Ct. App. Mar. 19, 2002) ................................17

*Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105 (D.D.C. 2005)....................................18

*Garcia v. City of Springfield Police Department*, 230 F.R.D. 247 (D. Mass. 2005)......................9

*Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981)...............................................................................19

*Hall v. Babcock & Wilcox Co.*, 69 F. Supp. 2d 716 (W.D. Pa. 1999) ...........................................6

*Indemnity Insurance Co. of North America v. American Eurocopter LLC*,
    227 F.R.D. 421 (M.D.N.C. 2005) .............................................................................................9

*Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338 (S.D. Iowa 1993)..................................................8

*In re Lupron Marketing & Sales Practices Litigation*, MDL No. 1430,
    2004 WL 3049754 (D. Mass. Dec. 21, 2004).........................................................................19

*Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704 (E.D. Tenn. 2001) .....................................6

*Musser v. Gentiva Health Services*, 356 F.3d 751 (7th Cir. 2004).................................................9

*Parker v. Upsher-Smith Laboratories, Inc.*, No. 06-CV-0518 ECR (VPC),
    2009 WL 418596 (D. Nev. Feb. 18, 2009) .......................................................................18, 19

*Phillips v. Raymond Corp.*, 213 F.R.D. 521 (N.D. Ill. 2003) ........................................................8

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1 (1st Cir. 2007) .........................................16

*Sowell v. Burlington Northern and Santa Fe Railway Co.*, No. 03-3923,
2004 WL 2812090 (N.D. Ill. Dec. 7, 2004)..................................................................9

*Strahan v. Simon Property Group, Inc.*, Civil Action No. 08cv10764-NG,
2008 WL 5273684 (D. Mass. Dec. 11, 2008) ...........................................................18

*United States v. Kouri-Perez*, 187 F.3d 1 (1st Cir. 1999)...........................................18

*United States v. Bruck*, 152 F.3d 40 (1st Cir. 1998) ....................................................7

*United States v. Garcia*, 983 F.2d 1160 (1st Cir. 1993) ..............................................7

*VLT, Inc. v. Lucent Technologies, Inc.*, No. 00-11049-PBS, 2003 WL 151399
(D. Mass. Jan. 21, 2003) (Saris, J.)............................................................................8

*Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909 (Mass. 1998)...........................6

*Williamson v. Horizon Lines LLC*, 248 F.R.D. 79 (D. Me. 2008)..................................8

*In re Zyprexa Injunction*, 474 F. Supp. 2d 385 (E.D.N.Y. 2007) ............................6, 15

*In re Zyprexa Products Liability Litigation*, No. 1:07-CV-0504, Stipulated Order
(E.D.N.Y. Sept. 7, 2007) (ECF Docket Entry # 81) ................................................15

## STATUTES

28 U.S.C. § 636(b)(1)(A)...........................................................................................1, 7

Fed. R. Civ. P. 72(a) .......................................................................................................1

## MISCELLANEOUS

12 Charles Alan Wright et al., *Federal Practice and Procedure* § 3069 (2d ed. 1997)..................8

Pamela A. MacLean, *Firms Not Liable in Alleged Web Hacking Case*,
Nat'l L. J., Dec. 9, 2005 (web version Dec. 9, 2005)................................................18

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a), Defendants Pfizer Inc and Warner-Lambert Company LLC (together, "Pfizer"), by counsel, hereby object to Magistrate Judge Sorokin's October 14, 2009 Order [2125] ("Order") denying Pfizer's motion [2093] to restrict improper communications with treating physicians and impose sanctions against Dr. Egilman.  For the reasons discussed below, Pfizer respectfully asks that the Court set aside the Magistrate Judge's Order and grant the requested relief.

## PRELIMINARY STATEMENT

Plaintiff is attempting to improperly influence the deposition testimony of Mr. Shearer's treating physicians, and to prejudice them with cherry-picked materials unrelated to the scope of their testimony as non-party fact witnesses.  Equally troubling is that Plaintiff's counsel have again enlisted Dr. David Egilman – a discredited, twice-sanctioned professional witness with an unclear relationship with Plaintiff's counsel – to engage in this conduct.  Dr. Egilman has improperly contacted at least three of Mr. Shearer's treating physicians in a transparent attempt to taint their perceptions of Pfizer shortly before their depositions.  One of these physicians, Lisa K. Catapano-Friedman, M.D., is a psychiatrist and non-party fact witness who was deposed last Friday.  She has not been designated as a specially retained expert, and any opinion testimony she offers at trial will thus relate solely to her diagnosis and treatment of Mr. Shearer.

Dr. Egilman's unsolicited letter to Dr. Catapano-Friedman – on Brown University letterhead – provides negative, incomplete, and misleading information regarding Neurontin, and about Pfizer's marketing of Neurontin and other medicines, attaches multiple documents, purports to question Dr. Catapano-Friedman about her knowledge of the information, and offers to meet with her to discuss the information.  None of this information had any conceivable bearing on Dr. Catapano-Friedman's testimony as a non-party treating physician, because it is undisputed that Dr. Catapano-Friedman never prescribed Neurontin to Mr. Shearer.  In addition, Dr. Egilman's letter violates this Court's Amended Stipulated Protective Order [744] ("Protective Order") by quoting from and enclosing a confidential, internal e-mail between Pfizer employees.  As discussed below, Dr. Egilman's improper disclosure of this document was

no fluke; his flagrant violation of protective orders is well documented, and has resulted in sanctions against him in two prior cases.

Even more disturbingly, Dr. Egilman appears to have materially altered one of the documents enclosed in his letter. The document is a hard copy of an e-mail chain between several individuals. In its original form, as produced by Pfizer subject to a confidential designation, it is a two-page document containing several e-mails back and forth. Astonishingly, the document that Dr. Egilman sent to Dr. Catapano-Friedman is only one page long, does not contain the initial e-mail that started the chain and provided context for the chain, and gives no indication of the redaction.[1] Dr. Egilman's redaction had no conceivable purpose other than to unfairly emphasize ostensibly negative information about Neurontin, while eliminating any balance and context that was contained in the e-mail prior to redaction.

Pfizer recognizes that Plaintiff may engage in legitimate *ex parte* contacts with treating physicians to discuss their care and treatment of Mr. Shearer. But along with this right comes the potential for exploitation and abuse, and the corresponding need for judicially imposed limits to protect the fundamental fairness and integrity of the process. Just as a plaintiff's right to select the initial forum is not a license to engage in improper forum- or judge-shopping, a plaintiff's broad access to treating doctors is not a license to deluge those doctors with biased and misleading information, safe in the knowledge that defendants have no comparable access or ability to provide their side of the story. Such communications, if unchecked, would pollute the fairness of these proceedings. It goes without saying that the parties have starkly different views of the facts in this case. Though the jury can certainly consider the parties' interpretations, its function is to weigh the evidence and come to its own conclusions. Dr. Egilman's proselytizing of non-party treating doctors would interfere with the jury's function by depriving the jury of the opportunity to hear the previously untainted testimony of these key fact witnesses. And even

---

[1] A copy of the unaltered version of this e-mail is attached as Exhibit B to the 9/25/09 Declaration of Mark S. Cheffo [2113].

when such communications fail in their goal of influencing fact witnesses' testimony, they still foster distrust and disillusionment in the litigation process, as Dr. Catapano-Friedman's testimony makes clear.

> A.    My thoughts were that somebody was trying to influence my testimony.
>
> Q.    And how did that make you feel?
>
> A.    Insulted.

(10/23/09 Deposition of Lisa Catapano-Friedman, M.D., at 96:1-4.)[2] Dr. Catapano-Friedman had a similar reaction upon learning that Dr. Egilman had materially altered one of the documents he had sent to her.

> A.    It just reinforces my feeling that somebody was trying to influence my thinking and thereby my testimony.

(*Id.* at 99:18-20.)

Because the Magistrate Judge denied Pfizer's motion without explanation, the grounds for his decision are not clear.  During oral argument, the Magistrate Judge appeared to recognize that Dr. Egilman's conduct was problematic, but was concerned that it would be difficult to fashion appropriate relief.  Pfizer reiterates that it is not seeking a blanket ban on all contacts between Plaintiff and Mr. Shearer's treating physicians.  Pfizer only seeks to prevent further improper contacts.  Where, as here, a showing of abuse has been made, the Court can enter a targeted order directed at specific types of communications with non-party witnesses, and at specific abusers like Dr. Egilman.  (*See* Section V, *infra*.)  Any perceived difficulty of fashioning appropriate relief should not prevent this Court from addressing Dr. Egilman's misconduct and ensuring the integrity of these proceedings.

## RELEVANT FACTS

Dr. Catapano-Friedman, a psychiatrist practicing in Bennington, Vermont, provided care and treatment related to Mr. Shearer's mental health over several years, including the period

---

[2] Because Dr. Catapano-Friedman's deposition just took place late last week, it could not be submitted with Pfizer's underlying motion, which Magistrate Judge Sorokin had already denied.

leading up to his death.   Pfizer notified Plaintiff that it intended to depose Dr. Catapano-Friedman regarding her treatment of Mr. Shearer.   Thereafter, Dr. Catapano-Friedman notified Pfizer's counsel that she had received a letter and certain documents from Dr. Egilman related to this case, and provided Pfizer with a copy of the letter.   (*See* Letter from Dr. David Egilman (Sept. 11, 2009) ("Egilman letter"), attached as Exhibit A to 9/17/09 Cheffo Decl. [2095].)   Dr. Catapano-Friedman's deposition was held on October 23, 2009.

Dr. Egilman's letter provides biased characterizations of, and select quotations from, documents addressing Neurontin, and also encloses certain documents.   For example, Dr. Egilman selectively quotes adverse event information from the FDA's 1992 Medical Statistical Review, and asks whether such information was ever provided to her by Pfizer.   (*See id.* at 2.) Dr. Egilman's letter further questions whether Dr. Catapano-Friedman was "aware of the fact that Pfizer pled guilty to a felony crime for off-label marketing of Neurontin in 2004." (*Id.*)   Dr. Egilman proceeds to erroneously inform Dr. Catapano-Friedman that "[t]his is separate from their guilty pleading for similar activities on 13 other drugs that occurred last week." (*Id.*)[3]   The letter had no conceivable bearing on Dr. Catapano-Friedman's personal knowledge or testimony as a non-party treating physician because it is undisputed that Dr. Catapano-Friedman never prescribed Neurontin to Mr. Shearer.   Dr. Egilman's letter had only one objective: to improperly influence and taint her deposition testimony.

Dr. Egilman's letter also violates this Court's Protective Order by quoting from, enclosing, and materially altering a confidential internal email between Pfizer employees.   (*See id.* at 3.)   Pfizer had designated this email as confidential pursuant to the Protective Order, as Plaintiff's counsel acknowledged in writing just three days before Dr. Egilman's improper

_____

[3] While Pfizer recently settled certain criminal and civil government allegations related to medicines other than Neurontin, none of the Defendants in this case pleaded guilty to any charges in connection with that settlement or related investigations.   The only guilty plea entered in connection with the settlement was by a Pfizer subsidiary, Pharmacia & Upjohn, to one count of violating federal law involving the promotion of the drug Bextra.   Moreover, Magistrate Judge Sorokin has denied Plaintiff's motion for discovery regarding the Bextra settlement.   (Order at 3.)

disclosure.  (*See* 9/17/09 Cheffo Decl. [2095] ¶¶ 4-5.)  The Protective Order strictly limits access to documents designated as confidential.  (*See* Protective Order ¶ 6.)  Parties may allow access to confidential documents by "deponents . . . and their counsel," but only "in preparation for and/or during deposition," and only if the deponent "has executed an Agreement of Confidentiality." (*Id.* ¶¶ 6(g), 7.)  As his letter's introductory paragraph makes clear, Dr. Egilman is a complete stranger to Dr. Catapano-Friedman, and he enclosed the confidential email with his unsolicited letter without ever asking her to sign a confidentiality agreement.

Dr. Egilman's cavalier violation of the Protective Order stands in marked contrast to Plaintiff's counsel's treatment of the exact same document.  Just three days before Dr. Egilman sent this confidential email to a non-party, Plaintiff's counsel, appropriately, sent the undersigned a list of documents – including the very same email – and requested that these documents be de-designated.  (*See* E-mail and List of Confidential Documents from Kenneth Fromson to Mark Cheffo (Sept. 8, 2009), attached as Exhibit B to 9/17/09 Cheffo Decl. [2095].)[4] Pfizer did not agree to de-designate any of these documents.  (*See* 9/17/09 Cheffo Decl. [2095] ¶ 6.)  Given that Dr. Egilman has twice been sanctioned by courts for violating their protective orders, one might expect that he too would have asked Pfizer to de-designate or otherwise authorize the email's dissemination, or would have challenged the email's confidentiality in this Court, before unilaterally deciding to publish it to a non-party in violation of the Protective Order's clear terms.  His failure to take such precautions continues a well-established pattern.

As this Court is aware, Dr. Egilman is a career witness in personal injury tort litigation whose involvement as a consultant to Plaintiff's counsel in the Neurontin litigation came to light after he was substituted as the plaintiff, over Pfizer's objection, in the *Bulger* action shortly before trial.  Over the last two decades, Dr. Egilman has offered purported expert testimony for

---

[4] The email in question is identified as follows on the document list sent by Plaintiff's counsel: "93. Pfizer_LKnapp_0022176."  (*Id.*)

plaintiffs in a large variety of toxic tort and product liability cases, including asbestos, beryllium exposure, radiation poisoning, pharmaceuticals, and breast implants.[5]

Dr. Egilman is also a protective order recidivist who has twice been sanctioned for violations of protective orders in cases where he purported to offer expert testimony. Most recently, in the *Zyprexa* litigation, Judge Weinstein found that Dr. Egilman had conspired with a reporter and an attorney to violate a protective order by publicly disseminating confidential documents of defendant Eli Lilly. *See In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 395 (E.D.N.Y. 2007). Judge Weinstein found that Dr. Egilman,

> in violation of his legal obligations . . . deliberately violated this court's protective order and published sealed documents, intending that they be widely distributed. . . . Egilman . . . took particular pains to deny [defendant] Lilly an opportunity to prevent the breach; [he] made the documents public before Lilly could move to preclude their release, after [he] had in effect assured Lilly that it had time to protect itself in court before any release would occur.

*Id.* Judge Weinstein enjoined Dr. Egilman from further dissemination of the confidential documents subject to the protective order. *See id.* at 391-92, 429-30. Although Dr. Egilman pleaded the Fifth Amendment privilege against self-incrimination in response to Judge Weinstein's inquiry, he later admitted that he had violated the protective order, and paid $100,000 to a charity to settle criminal and civil contempt charges threatened by Eli Lilly. (*See* Egilman Stip. & Decl. [1825-2], also attached as Exhibit C to 9/17/09 Cheffo Decl. [2095].)

In addition, a Colorado court found that "Dr. Egilman knowingly, deliberately, intentionally and willfully violated" a protective order by posting certain "scurrilous and inflammatory statements" on his website, which were "grossly inappropriate" and placed "at risk the fairness of the trial." *Ballinger v. Brush Wellman, Inc.*, Case No. 96-CV-2532, slip op. at 1-2

---

[5] *See, e.g.*, *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 395 (E.D.N.Y. 2007) (pharmaceutical litigation); *Berger v. Amchem Prods.*, 13 Misc. 3d 335, 340-41 (N.Y. Sup. Ct. 2006) (asbestos litigation); *Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704, 717 (E.D. Tenn. 2001) (beryllium oxide exposure); *Hall v. Babcock & Wilcox Co.*, 69 F. Supp. 2d 716, 720 (W.D. Pa. 1999) (radiation poisoning); *Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909, 917 (Mass. 1998) (breast implants); *Dunn v. Owens-Corning Fiberglass*, 774 F. Supp. 929, 936 (D.V.I. 1991) (asbestos litigation).

(Colo. Dist. Ct. June 22, 2001) [1801-6], *aff'd in part, vacated in part sub nom. Egilman v. District Court*, No. 01CA1982 (Colo. Ct. App. Sept. 5, 2002) [1801-6].  The court stated that Dr. Egilman was so "clear[ly] . . . motivated by his personal agenda and by his animosity, bias, prejudice, hostility and vindictiveness" that he was "not a credible witness." *Id.*  The court further held that his statements went "so far beyond the bounds of legitimate disagreement as to cast great doubt on his legitimacy and integrity as a witness," and sanctioned Dr. Egilman by barring him from testifying in that case or in any other before the Colorado court. *Id.* at 1, 3.[6]

These prior sanctions have plainly not deterred Dr. Egilman in the least.  Despite previously expressing "regret" for similar misconduct in the *Zyprexa* litigation, and despite paying $100,000 to avoid civil and criminal proceedings against him for that misconduct, Dr. Egilman now openly boasts of his actions in *Zyprexa*, regretting only that he was caught and punished.[7]  The stark contrast between what Dr. Egilman said about *Zyprexa* at the time with what he says today clearly demonstrates that Dr. Egilman's *post hoc* attempts to justify his behavior in this case cannot be taken at face value.  Pfizer requests that this Court put an end to Dr. Egilman's attempts to employ the same tactics here to taint witnesses' testimony and improperly influence the outcome of upcoming trials.

## ARGUMENT

### MAGISTRATE JUDGE SOROKIN'S ORDER DENYING PFIZER'S MOTION TO RESTRICT IMPROPER COMMUNICATIONS WITH TREATING PHYSICIANS IS CLEARLY ERRONEOUS AND CONTRARY TO LAW

A district court may reconsider a non-dispositive ruling of a magistrate judge "'where it has been shown that the . . . order is clearly erroneous or contrary to law.'" *United States v. Bruck*, 152 F.3d 40, 43 (1st Cir. 1998) (quoting 28 U.S.C. § 636(b)(1)(A)); *accord United States*

---

[6] Although the Colorado Court of Appeals vacated the portion of court's order barring future testimony from Dr. Egilman because Dr. Egilman had not been provided with notice sufficient to satisfy due process, the court otherwise affirmed the decision below.  *See Egilman v. District Court*, No. 01CA1982, slip op. at 4-5 (Colo. Ct. App. Sept. 5, 2002) [1801-6].

[7] A chart comparing Dr. Egilman's sworn statements and admissions in *Zyprexa* with his current position is attached as Exhibit A to the 10/2/09 Supplemental Declaration of Mark S. Cheffo [2117-2].

*v. Garcia*, 983 F.2d 1160, 1166 (1st Cir. 1993). "The 'clearly erroneous' standard" applies to factual findings, whereas "the more lenient 'contrary to law' standard" applies to legal conclusions. *Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338, 340 (S.D. Iowa 1993) (citation omitted); *accord Williamson v. Horizon Lines LLC*, 248 F.R.D. 79, 82 (D. Me. 2008).

The Court "should not be hamstrung by the clearly erroneous standard." 12 Charles Alan Wright et al., *Federal Practice and Procedure* § 3069, at 355 (2d ed. 1997). "[I]t would turn the jurisprudential system on its head to ascribe irrevocable finality (akin to that of a final judgment) to any unreviewed discovery or evidentiary rulings by a Magistrate Judge." *Phillips v. Raymond Corp.*, 213 F.R.D. 521, 525 (N.D. Ill. 2003). For example, courts carefully scrutinize magistrate rulings that would destroy the confidentiality of documents produced pursuant to a protective order. *See, e.g.*, *VLT, Inc. v. Lucent Techs., Inc.*, No. Civ. A. 00-11049-PBS, 2003 WL 151399, at *3-4 (D. Mass. Jan. 21, 2003) (Saris, J.) (reversing ruling that inadvertent production of certain privileged documents resulted in subject matter waiver); *Jochims*, 151 F.R.D. at 340-42 (reversing ruling that introduction of documents at trial destroyed confidentiality).

Here, the Magistrate Judge made no fact findings, but simply denied Pfizer's motion without explanation. (Order at 3.) Courts grant less deference to magistrate judges' rulings in these circumstances. For example, in *VLT, Inc.*, this Court reviewed a magistrate judge's ruling that a defendant's production of privileged documents was not "inadvertent" within the meaning of a stipulated protective order. *VLT, Inc.*, 2003 WL 151399, at *1-2. Because the magistrate judge "did not make fact-findings regarding different categories of documents," the Court reviewed the "full record before [it]" and found that the magistrate's ruling as to certain documents was "clearly erroneous." *Id.* at *4. The record in this case supports the same result.

**I.     Dr. Egilman's Letter Was Plainly Designed to Improperly Influence Dr. Catapano-Friedman's Deposition Testimony**

Dr. Egilman's letter had no conceivable purpose other than to influence Dr. Catapano-Friedman's deposition testimony by seeking to create a negative impression of Pfizer in her mind through a biased, incomplete, and erroneous presentation of information about Pfizer and

Neurontin.  As numerous courts have held, when a treating doctor is not specially designated as an expert, her testimony is limited to her diagnosis and treatment of her patient.  *See Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005) (holding that a treating physician must submit a Rule 26 report unless the physician's opinion is "based on personal knowledge and on observations obtained during the course of care and treatment, and he or she was not specially retained in connection with the litigation or for trial").[8]  As noted above, Dr. Catapano-Friedman never prescribed Neurontin to Mr. Shearer.  Accordingly, Pfizer's alleged marketing activities and conduct with respect to Neurontin had nothing to do with her treatment or diagnosis of Mr. Shearer and had no conceivable bearing on her deposition testimony.

Beyond the substantive disconnect between the letter and Dr. Catapano-Friedman's treatment of Mr. Shearer, Dr. Egilman's letter is written in the style of a political push-poll – *i.e.*, propaganda masquerading as research.  Rather than simply asking Dr. Catapano-Friedman to identify any information she received from Pfizer, Dr. Egilman instead recites his own biased characterizations and selected quotations from ostensibly negative studies and then asks whether this and other information "was ever communicated to you."  There is no fig leaf capable of concealing Dr. Egilman's agenda in sending this letter.

## II.   Plaintiff's Straw-Man Arguments and *Post-Hoc* Rationale for Dr. Egilman's Conduct Should Be Rejected

Plaintiff's response to this motion sets up a straw man, arguing that Plaintiff's counsel and experts have the right to "contact," "interview," and engage in "substantive communications" with Mr. Shearer's treating doctors.  (Pl. Mem. in Opp. to Emergency Mot. ("Pl. Opp.") [2104] at 3-5, 8-9.)  Plaintiff then accuses Pfizer of "blatant hypocrisy" on the

---

[8] *See also Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 423 (M.D.N.C. 2005) ("A treating physician is a participant or fact witness when it comes to describing the diagnosis and treatment of a party's condition."); *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) ("[T]reating physicians . . . must be designated as experts if they are to provide expert testimony."); *Sowell v. Burlington N. & Santa Fe Ry. Co.*, No. 03 C 3923, 2004 WL 2812090, at *1 (N.D. Ill. Dec. 7, 2004) (expert report requirement of Fed. R. Civ. P. 26(a)(2)(B) does not apply to treating physicians so long as their testimony is limited to their diagnosis and treatment of the patient).

grounds that Pfizer has also sought discovery and/or informal interviews from treating doctors and other non-party witnesses.  (*See id.* at 8, 15.)  This argument is a pure non-sequitur that fails to meet the substance of Pfizer's motion.  Pfizer does not argue that Plaintiff is barred from contacting or interviewing Mr. Shearer's treating doctors.   To the contrary, Pfizer has acknowledged that *ex parte* fact-gathering regarding doctors' treatment of Mr. Shearer is perfectly legitimate.  (Def. Mem. in Supp. of Emergency Mot. [2094] at 2.)  What is not legitimate, and what this motion seeks to preclude, is improper and dishonest contacts that have no plausible connection with non-party doctors' treatment of Mr. Shearer and are instead transparently designed to taint doctors' perceptions of Pfizer.  Dr. Egilman's letter to Dr. Catapano-Friedman falls squarely within this category.

Plaintiff's cobbled-together *post-hoc* justification for Dr. Egilman's conduct cannot be plausibly reconciled with the style or substance of his letter to Dr. Catapano-Friedman.  Plaintiff claims that, even though Dr. Catapano-Friedman undisputedly did not prescribe Neurontin to Mr. Shearer, Dr. Egilman needed to know whether she would have warned him about possible suicidality or taken him off Neurontin had she known of the "information" in Dr. Egilman's letter.  (Pl. Opp. at 5-6.)  Likewise, Dr. Egilman claims that he "know[s] no way of determining whether or not undisclosed information would have impacted a physician's use of a drug or warning to a patient without presenting the information and asking."  (Declaration of David Egilman, M.D., MPH (Sept. 28, 2009) [2106] ¶ 9 ("9/28/09 Egilman Decl.").)   But even assuming *arguendo* that this were a legitimate subject of discovery from a non-prescribing treating physician, Dr. Egilman's letter does not ask a single question regarding Dr. Catapano-Friedman's prescription decisions, warnings, or treatment of Mr. Shearer.  In other words, Dr. Egilman's letter never broaches the subject that he now claims was its central purpose.

Moreover, in a letter to another treating physician who actually prescribed Neurontin to Mr. Shearer, Dr. Egilman simply requested an interview without enclosing or characterizing a biased selection of documents.  (*See* Letter from Dr. David Egilman to Dr. Hynes (Sept. 9, 2009), attached as Exhibit F to Declaration of Andrew G. Finkelstein [2105].)  Dr. Egilman fails to

explain why he did not send a similar letter to Dr. Catapano-Friedman, or why his letter did not simply ask her to identify any information she received from Pfizer, rather than presenting her with a one-sided advocacy statement comprising Plaintiff's theory of the case before she had even agreed to be interviewed. There is no need and no justification for experts to manipulate the results of their purported research in such a blatantly leading and biased manner.

Plaintiff also claims that Dr. Egilman was performing a "psychological autopsy" regarding Mr. Shearer's suicide, and that his letter to Dr. Catapano-Friedman somehow related to this purpose. (Pl. Opp. at 11.) Dr. Egilman makes no such claim in his declaration, which focuses instead on the completely different subject of "warnings" and "risk communication." (9/28/09 Egilman Decl. ¶¶ 9-12.) In any event, Dr. Egilman's letter posed no questions pertaining to any purported "psychological autopsy." Nor is there any reason why Dr. Catapano-Friedman – a board-certified psychiatrist with over 25 years experience – would need guidance from Dr. Egilman – a purported "warnings" expert who is not a psychologist or psychiatrist – in understanding what factors may have contributed to a patient's suicide.

Dr. Egilman's professed bewilderment at Pfizer's motion is difficult to take seriously. His conduct in this case closely tracks his conduct in the *Zyprexa* litigation, wherein Dr. Egilman admitted in a sworn declaration that he had released an "incomplete" set of documents that "would not have provided a complete picture of the issues related to Zyprexa," that "there was another side to the Zyprexa story," and that "it was not in the public interest to only put out one side of the story." (Declaration of David Egilman, M.D., MPH, submitted in *Zyprexa* Litigation ¶¶ 2-4, 6 ("Egilman *Zyprexa* Decl."), attached as Exhibit C to 9/17/09 Cheffo Decl. [2095].) The Court ought not turn a blind eye to Dr. Egilman's conduct in *Zyprexa* when evaluating his current *post-hoc* efforts to justify his letter to Dr. Catapano-Friedman.

Moreover, Dr. Egilman recently gave a deposition in which he flatly contradicted the clear import of his *Zyprexa* declaration, claiming that he "stand[s] by [his] actions" in *Zyprexa*, that he "didn't regret releasing documents" in violation of a protective order, and that he did the right thing by disclosing a cherry-picked selection of documents to non-parties. (July 1, 2009

Deposition of David Egilman, M.D., MPH ("Egilman Dep.") 151:15-19, 158:9-21, 177:22-23, attached as Exhibit B to 10/2/09 Supp. Cheffo Decl. [2117-2].)  Dr. Egilman now boasts that he carefully drafted his *Zyprexa* declaration so that he would be able to spin its plain language in his favor when confronted with it in future cases like this one.[9]  As his recent testimony makes clear, Dr. Egilman's declaration in this case should be viewed with a jaundiced eye and should not be taken at face value.  Moreover, he is clearly an insidious influence on the legitimate discovery process, and for reasons known only to him, has lost any ability to remain objective.

**III.    The Document that Dr. Egilman Improperly Altered and Disclosed Is Confidential and Subject to the Protective Order**

Dr. Egilman's letter to Dr. Catapano-Friedman violated this Court's Protective Order by quoting from and enclosing a confidential, internal email between Pfizer employees.  Plaintiff's counsel and Dr. Egilman do not dispute that this email was designated confidential.  They instead claim that the email's confidentiality was lost because plaintiffs in the sales and marketing litigation filed it as an unsealed exhibit to a declaration and quoted from it in a publicly available statement of facts.  (Pl. Opp. at 2; 9/28/09 Egilman Decl. ¶¶ 3, 5-6.)[10] Plaintiff's counsel further argues that the email was used as an exhibit during a deposition without being marked confidential.  (Pl. Opp. at 14.)

Initially, these arguments are not just meritless, but moot.  Plaintiff's counsel acknowledged in writing that the internal email was a protected, confidential document just three days before Dr. Egilman sent it to Dr. Catapano-Friedman.  (9/17/09 Cheffo Decl. [2095] ¶¶ 5-6.) And while Dr. Egilman claims that Plaintiff's counsel assured him to his satisfaction that the

---

[9] "This is a negotiated document.  All right?  It was, as in many negotiations, meant to be able to be interpreted variously.  And Lilly put their spin on it.  I wrote the document, I signed the document.  I went over every line and how it would be interpreted by me in cases like this when I would have to testify about it.  We wrote it carefully, exactly as you said, so that the interpretations that I've just been giving you would fit within the language of the document."  (Egilman Dep. 165:19-166:7.)

[10] The declaration in question attached ***687 exhibits***, of which the confidential email was but one. (*See* Exhibit C to 9/28/09 Egilman Decl.)  The statement of facts is ***314 pages and 805 paragraphs*** long, and the confidential email is discussed in a single paragraph at the bottom of a single page.  (*See* Exhibit D to 9/28/09 Egilman Decl.)

document was not confidential (9/28/09 Egilman Decl. ¶ 4), he contradicts his own story in a desperate attempt to explain why he materially altered the document before sending it to Dr. Catapano-Friedman. (*Id.* ¶ 7.) Dr. Egilman claims he redacted portions of the document "out of an abundance of caution" ***regarding its confidentiality*** because other documents containing the redacted portions had been designated confidential. (*Id.*)

Beyond its patent absurdity, this purported explanation concedes that Dr. Egilman had lingering concerns about the document's confidentiality, and that he recognized that just because his copy of a document was not stamped "Confidential" did not mean it had not been so designated. Dr. Egilman previously testified under oath that, given his past experiences in *Zyprexa* and *Ballinger*, he would seek guidance from this Court before disclosing documents whose status under the Protective Order was unclear. (Egilman Dep. at 153:3-4, 154:7-19.) Yet, despite his admitted concerns, Dr. Egilman simply chose to alter the document and publish it to a non-party. Moreover, even Dr. Egilman does not attempt to explain why, after altering the document, he did not even stamp it "REDACTED" before mailing it to Dr. Catapano-Friedman. Disclosing that he had deleted portions of an email exchange would certainly not have raised any confidentiality issues.

In any event, there is simply no basis for Plaintiff's counsel's and Dr. Egilman's apparent assumption that the sales and marketing plaintiffs could unilaterally destroy the confidentiality of this document by burying it in a stack of hundreds of other documents and factual statements filed with the Court. Nor is there any basis for Plaintiff's counsel's assumption that Pfizer waived the document's confidentiality. (Pl. Opp. at 14.) The Protective Order specifically addresses "inadvertent or unintentional disclosure," and provides that "***[u]pon learning*** of an inadvertent or unintentional disclosure of Confidential Information, the producing party shall within thirty (30) days designate such information as Confidential." (Protective Order ¶ 12 (emphasis added).) Plaintiff's counsel apparently assumes that Pfizer automatically "learn[ed] of an inadvertent or unintentional disclosure" upon receipt of a deposition transcript in which the document was referenced. In effect, Plaintiff's counsel reads a constructive notice provision into

- 13 -

paragraph 12 of the Protective Order, which contains no such provision.  Regardless, Plaintiff's counsel acknowledged on September 8, 2009, that the email in question had been designated confidential, and was expressly informed shortly thereafter that it would retain that designation. (9/17/09 Cheffo Decl. [2095] ¶¶ 5-6.)  Thus, as Plaintiff's counsel recognized, "[t]he obligation to treat such information as Confidential" was in full force and effect when Dr. Egilman sent an altered version of the document to Dr. Catapano-Friedman just days later.

Dr. Egilman further argues that confidentiality was lost because the declaration and statement of facts submitted by the sales and marketing plaintiffs were "part of the subject matter argued before Judge Saris the day after Defendants filed their motion accusing me of violating the Court's confidentiality order."  (9/28/09 Egilman Decl. ¶ 8.)  This argument suggests that, even in the face of a sanctions motion against him, Dr. Egilman has not bothered to familiarize himself with this Court's Protective Order, which provides that parties "may . . . use any Confidential Information for any purpose at trial or at any hearing before a judicial officer in this litigation." (Protective Order ¶ 9.)  Notably, Plaintiff's counsel – who clearly has read the order and at least attempted in good faith to comply with it – makes no such argument.

If Plaintiff or Dr. Egilman wished to contest the document's confidentiality, the Protective Order provides clear mechanisms for doing so.  The proper procedure was not to unilaterally alter the document, send it to a non-party, and only then try to show that its confidentiality had somehow been lost.

## IV.    Dr. Egilman's Attempt to Whitewash His Prior Misconduct Should Be Rejected

In response to Pfizer's motion, Dr. Egilman tried to justify his past misconduct in *Zyprexa* and *Ballinger* by giving a grossly distorted account of both proceedings.  (9/28/09 Egilman Decl. ¶¶ 13-16.)  Dr. Egilman's response reveals that he is utterly unrepentant, that he has little or no respect for courts' protective orders or companies' confidentiality interests, and that he considers himself to be the final arbiter of whether, how, and to whom the facts and documents at issue in this case should be disclosed.  Unless this Court intervenes, Dr. Egilman appears not just likely, but eager, to continue engaging in similar misconduct in this case.

A.      **Dr. Egilman Mischaracterizes the *Zyprexa* Proceedings**

Dr. Egilman claims that he was "never sanctioned by Judge Weinstein" in *Zyprexa* (9/28/09 Egilman Decl. ¶ 13.)  But Judge Weinstein executed a "Stipulated Order" compelling him to pay $100,000 to the charity of the defendant's choice.[11]  The Stipulated Order and the $100,000 payment mandated therein were explicitly based on Judge Weinstein's prior finding that Dr. Egilman had intentionally violated the court's protective order and on Dr. Egilman's recognition that he was paying the $100,000 to avoid Lilly seeking criminal and civil sanctions against him.  (*See id.*)  Thus, for example, Judge Weinstein found that Dr. Egilman and two others "conspired to obtain and publish documents in ***knowing violation*** of a court order not to do so, and that they executed the conspiracy using other people as their ***agents in crime***." *Zyprexa Injunction*, 474 F. Supp. 2d at 397 (emphasis added).  So, too, Dr. Egilman acknowledged that Lilly "intended to seek criminal and civil sanctions against [him]" and that "[he] approached Lilly . . . to . . . amicably resolve this dispute." (Egilman *Zyprexa* Decl. ¶ 1.)  Whatever semantic distinction Dr. Egilman is trying to draw between this $100,000 payment and a "sanction" makes no substantive difference.

Dr. Egilman further contends that Pfizer somehow "misrepresented the facts" of the *Zyprexa* case.  (9/28/09 Egilman Decl. ¶ 13.)  While those facts speak for themselves, Dr. Egilman's current position grossly distorts and often flatly contradicts the sworn statements he made when still faced with the prospect of civil and criminal penalties in *Zyprexa*.  (*See* chart attached as Exhibit A to 10/2/09 Supp. Cheffo Decl. [2117-2].)  For example, while Dr. Egilman previously stated under oath that he "***accept[ed] responsibility for my actions in the Zyprexa litigation, which I now regret***" (Egilman *Zyprexa* Decl. ¶ 1 (emphasis added)), he now openly boasts of those actions, portrays them as heroic, and regrets only that he was caught and punished for them.  At a recent deposition in *Bulger*, Dr. Egilman testified:

---

[11] *See* Exhibit C to 9/17/09 Cheffo Decl. [2095].  The executed version of this Stipulated Order is available at *In re Zyprexa Products Liability Litigation*, No. 1:07-CV-0504, Stipulated Order  (E.D.N.Y. Sept. 7, 2007) (ECF Docket Entry # 81).

> ***I stand by my actions in [the Zyprexa] case***.
>
> \* \* \*
>
> ***I certainly didn't regret releasing documents*** that saved thousands of lives.  I meant regretting that it had been misinterpreted that I violated an order.  And I certainly regretted having to pay $100,000 to get the truth out about how the drug had been marketed to people who it was killing.  So, that's what I accepted responsibility, and I accepted responsibility for having gotten the truth out about the hazardous drug and how it was hurting people.

(Egilman Dep. 158:9-21, 177:22-23 (emphasis added).)

Likewise, Dr. Egilman previously admitted under oath that he had released an "incomplete" set of documents that "would not have provided a complete picture of the issues related to Zyprexa," that "there was another side to the Zyprexa story," and that "it was not in the public interest to only put out one side of the story."  (Egilman *Zyprexa* Decl. ¶¶ 2-4, 6.)  But Dr. Egilman now claims that he did the right thing by only disclosing a cherry-picked subset of documents because the defendant's side of the story was "false and misleading and caused people to die."  (Egilman Dep. 151:15-19.)  In other words, while conceding that there may be two sides to the story, Dr. Egilman unilaterally designates his side as the objective and unassailable truth, and the opposing side as "false and misleading."  Having already played the role of judge and jury to his own satisfaction, Dr. Egilman has no qualms about portraying his opinions as settled fact to non-parties while omitting or redacting all contrary information – just as he did in his letters to Mr. Shearer's treating doctors.

Dr. Egilman's *Alice in Wonderland* approach to defining the words in his sworn declaration – """When I use a word . . . it means just what I choose it to mean, neither more nor less,""" *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007) (quoting Lewis Carroll, *Through the Looking Glass* (1871)) – should be rejected.  Equally important, Dr. Egilman's practice of intentionally applying his own private and idiosyncratic interpretations to his sworn declarations, *see* note 9, *supra*, demonstrates that one cannot vest confidence in the plain meaning of Dr. Egilman's sworn declarations, such as the one currently before this Court on this motion.

- 16 -

B.      **Dr. Egilman Mischaracterizes the *Ballinger* Proceedings**

Dr. Egilman mischaracterizes the *Ballinger* proceedings in several material respects. First, he claims that the gag order in question merely "call[ed] for all parties and witnesses to remove any information related to beryllium and [the defendant] from their websites," and that he "complied" with this order.  (9/28/09 Egilman Decl. ¶ 15.)  But in his appellate brief challenging the sanctions against him, Dr. Egilman admitted that the gag order was much broader, and prohibited him "from publishing any statements on internet web sites concerning the trial proceedings, any opposing party, and opposing party's counsel, or any witnesses or evidence in the case."  Brief for Appellant, 2002 WL 34150173, at *3-4, *Egilman v. District Court*, No. 01CA1982 (Colo. Ct. App. Mar. 19, 2002) ("*Ballinger* Appellate Brief") (attached as Exhibit C to 10/2/09 Supp. Cheffo Decl. [2117-2]).  This is the provision Dr. Egilman was sanctioned for violating.  *See Ballinger* Appellate Brief, 2002 WL 34150173, at *9.

Second, Dr. Egilman argues that he was sanctioned in *Ballinger* only because the defense counsel in that case told the court that Dr. Egilman's website was "publicly available," and that subsequent evidence "not available at the time" revealed that the website was password-protected.  (9/28/09 Egilman Decl. ¶¶ 15-16.)  But in his appellate brief, Dr. Egilman admitted that the trial court knew his website was password-protected when it imposed sanctions.  The *Ballinger* plaintiffs' counsel had already informed the trial court that Dr. Egilman "had made his website unavailable to the public, by means of password protection, even before the Gag Order had been entered, so that only persons to whom he had given the password could access the secured site."  *Ballinger* Appellate Brief, 2002 WL 34150173, at *9.  The trial court accepted this representation, and observed that because of the password-protection, two of the gag order's three provisions "probably did not apply" to Dr. Egilman's conduct.  *Id.* at *9-10.  But the trial court "indicated that Dr. Egilman apparently had violated [the remaining provision], which was not limited to statements expected to be publicly disseminated, and that he was guilty of misconduct."  *Id.* at *10.

Moreover, Dr. Egilman has admitted in a sworn affidavit that the documents on his website were "accessible by . . . dues-paying subscribers (including corporations, companies, law firms, lawyers, and other individuals), and his students." *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 108 n.1 (D.D.C. 2005). Dr. Egilman fails to explain why permitting these non-parties to access the materials in question would not violate the *Ballinger* court's gag order.

Finally, Dr. Egilman references the fact that he sued the defense firm in *Ballinger* "for hacking my computer" (9/28/09 Egilman Decl. ¶ 15), but fails to note that his lawsuit was dismissed on the pleadings after the United States District Court for the District of Columbia held, as a matter of law, that the defense firm's alleged conduct did not violate the Digital Millennium Copyright Act. *See Egilman*, 401 F. Supp. 2d at 113-14.[12] That Dr. Egilman filed a meritless lawsuit after being sanctioned is hardly a vindication of his misconduct in *Ballinger*.

## V. Courts Have the Inherent Power to Restrict and Sanction Improper Communications with Non-Party Witnesses

It is well settled that "[a] district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or the issuance of monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior." *Strahan v. Simon Prop. Group, Inc.*, Civil Action No. 08cv10764-NG, 2008 WL 5273684, at *1 (D. Mass. Dec. 11, 2008); *see, e.g.*, *United States v. Kouri-Perez*, 187 F.3d 1, 6-8 (1st Cir. 1999).

Pursuant to their inherent power, courts may restrict or sanction communications that are designed to frustrate an adverse party's efforts to obtain discovery from a plaintiff's treating physicians. *See Parker v. Upsher-Smith Labs, Inc.*, No. 3:06-CV-0518-ECR (VPC), 2009 WL 418596, at *1, *6-9 (D. Nev. Feb. 18, 2009). In *Parker*, after the court entered an order permitting the defendant to interview the plaintiff's treating doctors, the plaintiff's counsel sent

---

[12] In response to this federal district court ruling, Dr. Egilman lashed out at the "'legal system,'" claiming that it "'is designed to benefit people in power. That is why courts said it was legal for blacks to be slaves or ruled it legal to deny women the vote.'" Pamela A. MacLean, *Firms Not Liable in Alleged Web Hacking Case*, Nat'l L.J., Dec. 9, 2005, at 6 (web version Dec. 9, 2005) (attached as Exhibit D to 10/2/09 Supp. Cheffo Decl. [2117-2]).

letters to those doctors informing them that they were not required to speak with defense counsel. *See id.* at *2-3.  When the defendant moved for sanctions, the plaintiff's counsel argued that this was accurate information that he had a right to communicate to the doctors.  *See id.* at *3-4.  But the court found that these communications were made "for the improper purpose of influencing these witnesses not to cooperate with defendant's counsel in *ex parte* interviews, and it was done to gain a tactical advantage." *Id.* at *8.  In so doing, the plaintiff's counsel "acted in bad faith or [engaged in] conduct tantamount to bad faith." *Id.*  Accordingly, the court sanctioned the plaintiff's counsel pursuant to its inherent authority.  *See id.* at *9.  Here, while Dr. Egilman did not explicitly discourage Dr. Catapano-Friedman from speaking to defense counsel, the transparent purpose of his letter was to "influence[e]" her testimony by impugning and maligning Pfizer, and to thereby "gain a tactical advantage." *Id.* at *8.  As in *Parker*, this conduct should not be countenanced.

Courts have also restricted communications with non-parties in other contexts.  For example, in uncertified class actions, courts have the power to restrict communications by the parties and their counsel with putative class members.  Such restrictions are appropriate where there is a clear record of improper communications, and where the order is appropriately tailored to balance "'the need for a limitation [against] the potential for interference with the rights of the parties.'" *In re Lupron B Mktg. & Sales Practices Litig.*, MDL No. 1430, 2004 WL 3049754, at *1 (D. Mass. Dec. 21, 2004) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981)); *see Lupron Mktg.*, 2004 WL 3049754, at *1-2 (precluding counsel for intervenors from posting "blatantly misleading" information on its website in an attempt to scuttle a proposed class settlement).  Thus, courts have supervisory authority to prevent parties from engaging in "'misleading communications'" with putative class members, including biased, one-sided accounts that "omit[] critical information." *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (citation omitted).

Here, Dr. Egilman has presented treating doctors with a cherry-picked, one-sided, and extremely misleading account of facts that – particularly with respect to Dr. Catapano Friedman

– have nothing to do with their treatment of Mr. Shearer.  The obvious purpose of Dr. Egilman's letter was to portray Pfizer as a bad actor in order to influence these treating doctors' deposition testimony.  It would be utterly unreasonable to expect non-party witnesses to comb through the documents attached to Dr. Egilman's letters in order to determine whether he characterized them accurately, or to perform additional research to determine whether his failure to attach other documents was misleading.  Yet, to leave Dr. Egilman's account unchallenged is unduly prejudicial to Pfizer, who is not permitted equal *ex parte* access to treating physicians.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should set aside Magistrate Judge Sorokin's Order denying Pfizer's motion and issue an Order finding that Dr. Egilman's communications with these treating doctors were improper, directing him to refrain from similar communications with treating doctors in the future, and imposing appropriate sanctions against Dr. Egilman based on his violation of this Court's Protective Order.


Dated: October 28, 2009                    Respectfully submitted,

                                           SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP

                                           By:     <u>/s/ Mark S. Cheffo</u>
                                                   Mark S. Cheffo

                                           Four Times Square
                                           New York, NY 10036
                                           Tel:  (212) 735-3000

                                                   -and-

WHITE AND WILLIAMS LLP

By:    <u>/s/ David B. Chaffin</u>
        David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 28, 2009.

/s/ David B. Chaffin_____

David B. Chaffin