## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | Judge Patti B. Saris |
| | Magistrate Judge Leo T. Sorokin |

## **PLAINTIFFS' JOINT REPLY IN SUPPORT OF PROPOSED TRIAL PLAN**

845787.1

## Introduction

Defendants' lengthy response to Plaintiffs' proposed trial plan boils down to the argument that meaningful progress in the Sales & Marketing cases must await the conclusion of three additional trials in the product liability cases, as well as the passing of "other significant deadlines" in cases pending in New York.  The massive litigation team assembled to defend the numerous actions arising out of Defendants' misleading marketing of Neurontin surely anticipated that a division of labor might be required, and the caliber and sophistication of that team render Defendants' argument close to frivolous.  Nor can the glacial pace advocated by the Defendants – who fail to offer an alternate date or alternate year by which they feel confident they will be "well prepared" to try a case against even a single Plaintiff – be justified in a case that has been pending before this Court since 2004.  Plaintiffs respectfully suggest that Defendants strategically underestimate their own impressive resources.

Defendants devote much of their response to supplemental case law that should have been set forth in their summary judgment briefing, the last deadline for which has passed.  Plaintiffs stand by their earlier briefing on that motion and will defer to the well-placed discretion of the Court on how best to manage the litigation before it in a manner both expeditious and efficient.  Plaintiffs will reply briefly here to only those arguments that go directly to the procedural issue at hand:  the parties' ability to prepare for and try the case of one or more of the Plaintiffs starting on February 22, 2010.[1]

---

[1] Many of the cases cited by Defendants involve dismissals for pleading deficiencies, a stage of the litigation Plaintiffs here have long-since survived.  Ignored are cases such as *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 579 (E.D.N.Y. 2007), in which the court found it appropriate to allowed direct purchasers to proceed to trial using aggregate proof that "Lilly intentionally engaged in a broad-based plan to misrepresent to the medical and scientific communities the nature of Zyprexa's benefits and risks, and that the scheme was successful in distorting the general body of knowledge about Zyprexa."

## I.     The Proposed Schedule Allows Ample Time for the Deposition of Trial Witnesses

Defendants wish to depose any new witness that executed a declaration in opposition to summary judgment and that had not previously been deposed.  While Defendants are not now entitled to reopen fact discovery,[2] Plaintiffs do not object to the deposition of any new witness that appears on the witness list of either party.  The plan contemplates that the parties will consult with each other to identify dates for the deposition of any new witness to appear at trial and that are within the control of the parties by December 4, 2009, leaving more than two months to complete those depositions prior to trial.[3]  This time period is sufficient for the number of new witnesses anticipated to be called.  Kaiser, for example, submitted only three declarations from new fact witnesses in connection with its defense of Defendants' motion for summary judgment and does not anticipate significantly increasing that number at trial.[4]

Coordinated Plaintiffs object to Defendants' demand for a third deposition of Dr. Mirta Millares.  In their Response, Defendants expand upon a fallacious argument originally made in their summary judgment reply brief [Dkt. No. 1785 at 21], which alleged that Dr. Millares' March 26, 2009 declaration [Dkt. No. 1749] offered testimony that contradicted her October 2, 2007 deposition testimony.  First, Defendants claim that Dr. Millares failed to discuss the suppressed Pande study in response to a question about facts that would undermine a drug

---

[2] Defendants' suggestion that they have been denied the opportunity to depose physicians is incorrect.  Defendants deposed as nonparties no fewer than five physicians associated with the Kaiser-affiliated Permanente Medical Group:  Dr. Robin Dea; Dr. Morris Maizels; Dr. Bruce McCarberg; Dr. David Chandler; and Dr. Mitchell Danesh.

[3] Any such deposition should be limited in duration to four hours and to the topics for which the witness is to testify at trial. For those witnesses not within the control of the parties, such as any physician employed by a nonparty, the party who intends to call the witness will endeavor in good faith to facilitate the witness's appearance at a pre-trial deposition.

[4] One additional new witness submitted a declaration solely to authenticate data – an issue that can be addressed through a pre-trial stipulation rather than live testimony.

monograph Kaiser relied upon in approving a formulary expansion that approved the use of Neurontin for the treatment of bipolar disorder.   However, Dr. Millares stated that the monograph was undermined by information that came to light after its publication, in particular: "negative published clinical trials showing that gabapentin does not work well in bipolar affective disorder."   *See* Def. Exh. A at 76-77.   Nor is it a "contradiction" to testify that while Kaiser's formulary is nonbinding, inclusion of a drug on a formulary drives prescriptions.   As Dr. Millares explained in her October 2, 2007 testimony, to prescribe a nonformulary drug, a physician must indicate the drug is deemed medically necessary for the particular patient.   *See* Def. Exh. A  at 46-47.   As explained in her June 12, 2009 declaration, Kaiser's internal review has found that since 1994, at least 95% of prescriptions written by PMG physicians have been in compliance with the formulary.   *See* Dkt No. 1851, ¶¶ 4-5.  These declarations offer information that Dr. Millares was not asked about during her two prior depositions, which is not grounds for Defendants to receive the opportunity to rehearse their cross-examination with a third deposition of this witness.

Neither are Defendants entitled to re-depose two of Plaintiffs' experts, Drs. McCrory and Alldredge, merely because they provided brief declarations clarifying their testimony, in response to Defendants' effort to distort it, in a manner that falls squarely within the contours of their respective reports.   *See Messick v. Horizon Ind., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995) (in opposing summary judgment, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition"); Affidavit of Douglas C. McCrory, MDS, MHS (Dkt. No. 1757) ¶ 2 (Defendants' "memorandum mischaracterizes my opinion regarding the question of whether Neurontin is ineffective for migraine and headache by taking several quotations from my deposition testimony out of

context"); Declaration of Brian K. Alldredge, Pharm.D. in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1762) ¶ 2 ("Selected statements made by me during my deposition . . . were based on my clinical experience and I believe that these statements could lead one to misinterpret my expert opinion regarding the dose-response relationship for Neurontin."). Defendants are free to cross-examine Drs. McCrory and Alldredge at trial regarding any purportedly inconsistent statements, but there is no need to delay the trial so Defendants can rehearse their cross-examination.

Finally, Defendants' last-ditch effort to introduce the medical records of an individual patient (Dkt. No. 2123) as evidence that Neurontin is effective in treating bipolar disorder once again betrays a truly stunning ignorance of the scientific method by the world's largest pharmaceutical company. As Plaintiffs' experts—including a former head of the FDA, Dr. David Kessler—have testified *ad nauseum* in their reports, it is impossible to tell *anything* about a drug's efficacy based on the experience of an individual patient, who may get better for a variety of reasons having nothing to do with the drug (*e.g.*, the placebo effect).[5] The principal

---

[5] *See e.g.*, Class Plaintiffs' Statement of Disputed and Undisputed Material Facts in Opposition to Defendants' Motion for Summary Judgment (Docket No. 1760), ¶ 24:

> When determining a drug's effectiveness, the highest level of evidence, indeed the level of evidence upon which the FDA relies, comes from the double-blind randomized controlled trial. This "Gold Standard" is appropriately called "Level 1 Evidence." Lesser levels of evidence, including case reports and consensus guidelines, are fraught with potential confounders and biases, and are therefore *incapable* of testing a hypothesis.

*Id.* (emphasis added) (*citing* Ex. 021, Barkin Report at 6; Ex. 023, Abramson Report, ¶¶22-23; Ex. 163, Perry Report 5-6; Ex. 365, Alldredge Report at 1; Ex. 374, Kessler Report, ¶¶14-15). *See also* Class Plaintiffs' Surreply Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Docket No. 1859), at 15-16:

> Whether or not Neurontin is effective for the off-label indications at issue is a scientific question that simply cannot be determined through anecdotes. Dr.

value of such individual "case reports" is that they may lead to *controlled trials*, in which the efficacy or inefficacy of the drug can be established by having sufficiently large treatment and control (placebo) groups of patients that other factors *besides* the drug can be ruled out statistically. Defendants' presentation of "positive" individual case reports as evidence of Neurontin's efficacy, while in possession of *negative* controlled trials that prove its *inefficacy*, is what this case is all about. Apparently, Defendants intend to continue their fraud all the way through to final argument.

## II.     Coordinated Plaintiffs' Damages Theory

Coordinated Plaintiffs' methodology for proving its damages on an indication-specific basis was set forth by Dr. Raymond S. Hartman in his August 11, 2008 Declaration. *See* Pls. Exh. A, ¶¶ 24-33. Defendants claim that Dr. Hartman's analysis of damages under the alternate "cheaper and more optimal" theory is deficient because such damages were not calculated for Aetna or Guardian. In his Report, Dr. Hartman discusses his calculation of the costs of a "reasonable set of therapeutic substitutes," identified by counsel; a list that was disclosed by all Coordinated Plaintiffs during discovery. Dr. Hartman goes through the arithmetic exercise of calculating the difference between the "but-for" prices of these substitute and the amounts paid

---

Douglas McCrory, testified: "efficacy requires analyzing data between a treatment and control group, and looking at the aggregated data and statistics." Accordingly, one cannot "evaluate efficacy under that definition in an individual patient." As Dr. McCrory explained: "[Y]ou use a medicine in a patient, you observe a response afterward, and the response may be better or worse. But you don't have the certainty that there's a causal relationship between the medicine and the patient's response *in an individual case*. *That's why we do controlled trials*." Whether or not Neurontin is effective for the off-label uses at issue can only be determined through analysis of clinical trial data, not through conjecture as to apparent "benefit" in an individual patient. This litigation is not the appropriate venue for Defendants, or their attorneys, to take issue with the scientific method.

*Id.* (emphasis in original) (*citing* Himmelstein Decl. (Docket No. 1860), Exh. C at 177. 179-80).

by Kaiser for Neurontin, that same exercise can be mechanically performed by Dr. Hartman, a lay witness, or a fact finder based on the amounts paid by Aetna and Guardian. *See* Pls. Exh. A at 12 n.16 ("The extension would make use of the same methodologies and the same data sources" that Dr. Hartman relied upon for Kaiser). While Defendants may cross-examine Dr. Hartman on the suppositions underlying his estimates, Coordinated Plaintiffs intend to demonstrate those estimates are conservative. For example, Kaiser will show the historically high compliance rates by PMG physicians to its formulary decisions, decisions that were tainted by fraud here. Kaiser will also show steep drops in Neurontin prescriptions following its efforts to correct for Defendants' misinformation. Finally, Coordinated Plaintiffs will support their alternate theory with their own internal data and witnesses, as supported by Defendants' own documents, the opinions of the various medical experts in this case, and neutral third-party sources.[6] This is sufficient evidence to present to the jury: "'there is a clear distinction between the [relatively high] measure of proof necessary to establish that [a plaintiff] has sustained some damage and the [relatively low] measure of proof necessary to enable the jury to fix the amount.'" *Coastal Fuels of P. R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 200 (1st Cir. 1996).[7]

### III.   *Daubert* Hearings

Plaintiffs do not anticipate proffering a large number of *Daubert* challenges, but do not object to the Court's setting of a schedule for such motions. Plaintiffs strongly object, however,

---

[6] *See*, *e.g.* Pls. Exh. B. (July 25, 2008 Declaration of Jeffrey Barkin. at 5 (discussing bipolar medications with "demonstrated efficacy"); Dkt. No. 1749 ¶ 17 (setting forth a price comparison table of preferred alternative treatments for neuropathic pain as circulated by Kaiser to PMG physicians in July 2003).

[7] *See also In re Zyprexa*, 493 F. Supp. 2d at 578 ("Once fraud has been proven, the burden of proving specifics of damages by the claimant is reduced.") (citing cases).

to the Defendants' implied intention to overwhelm the Court with a flurry of motions on issues that appear to go to the weight rather than the sufficiency of expert testimony.[8]  The Court has tools to prevent the parties from protracting such proceedings, including the option to decide such issues on the briefs.[9]   Nor need such briefings be undertaken months prior to the commencement of other pretrial work; there is ample time in the proposed schedule for the efficient management of a reasonable number of *Daubert* proceedings, which may be filed, briefed, and ruled upon as any other motion *in limine*.

With respect to the methodology and aggregate damages calculations of Prof. Rosenthal, Dr. Hartman, and Dr. Conti, Plaintiffs respectfully submit that much of the briefing since the Court's August 2007 ruling on Class Plaintiffs' first motion for class certification has focused on these issues,[10] and there is little to be gained from beating them to death in yet another round of *Daubert* motions.

## IV.   Selection of Plaintiffs

An effective way to deploy the resources of the parties and the Court to meet the Court's stated goal of an early 2010 trial is to allow a joint trial on all indications by Kaiser and one or two additional Plaintiffs.

The Coordinated Plaintiffs propose that the trial also include Aetna, which like Kaiser was specifically targeted by the Defendants' marketing team.  As the summary judgment briefing demonstrates, the number of unique witnesses to be called by Aetna will be very few, and the

---

[8] *See In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 925 (N.D. Ill. 1996) (warning participants in a case characterized by delay that "[t]he regime established by *Daubert* and . . . was not intended to supplant the tools and techniques of the adversary system.").

[9] *See, e.g. Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (holding that a district court need not conduct a hearing to resolve *Daubert* issues).

[10] *See, e.g.*, Dkt. Nos. 1018, 1184, 1453, 1754, 1796, 1859, 2071, 2126.

amount of additional trial time required by these witnesses is outweighed by the efficiencies gained by a joint trial.   A joint managed care expert will explain how Defendants' single overarching scheme was designed to exploit the vulnerabilities in each managed care model.

Class Plaintiffs support the inclusion of Aetna, but believe it is also important that the trial include a less sophisticated third party payor more typical of the class, such as ASEA.  As set forth in Class Plaintiffs' trial plan, ASEA would withdraw as a proposed class representative, and try its claims as to *all* indications (which it will be unable to do in a class trial, if any, which will be restricted to bipolar and other mood disorders) alongside the Coordinated Plaintiffs.  As ASEA had no direct dealings with Defendants concerning Neurontin, and did not manage its own formulary, its inclusion in a trial will have little impact on its complexity or duration.

Should the Court prefer the trial of a single Coordinated Plaintiff, Kaiser is in the best position to effectively prepare for a February 2010 trial.  A liability finding for Kaiser will have preclusive effects against Defendants on the core issues of whether Defendants' conduct was fraudulent and whether Neurontin was ineffective for the indications at issue.  Kaiser is also amenable to a joint trial with a Class Plaintiff, should the Court accept the Class's proposal.

Finally, Coordinated Plaintiffs continue to believe that holding separate trials for each indication would be unfairly burdensome to their clients.  Should the Court prefer to hold separate trials on each indication, instead of a common trial on all indications, Class Plaintiffs recommend that the first trial concern bipolar and other mood disorders.

## V.      Revised Proposed Schedule

To address Defendants' concern that the parties have sufficient time for pretrial designations, Plaintiffs modify their proposed schedule as follows:

| Event | Date |
|---|---|
| Dates for Trial Depositions | December 4, 2009 |
| List of documents, by Bates number, that Plaintiffs intend to introduce at trial that have not previously been authenticated or qualified as a business record pursuant to Docket No. 209 | January 4, 2010 |
| Witness lists for all Parties | January 4, 2010 |
| Deposition designations for all Parties | January 4, 2010 |
| Exhibit Lists for all Parties | January 4, 2010 |
| Objections to deposition designations and witness lists for all Parties | January 22, 2010 |
| Counter-designations of deposition testimony for all Parties | January 22, 2010 |
| Motions *in limine* for all Parties | January 22, 2010 |
| Joint Pretrial Memorandum pursuant to LR 16.5.(d) | February 5, 2010 |
| Proposed Jury Instructions; Jury Questionnaires and *Voir Dire* Questions | February 5, 2010 |
| Objections to counter-designations of deposition testimony for all Parties | February 5, 2010 |
| Oppositions to Motions *in limine* for all Parties | February 5, 2010 |
| Trial Briefs pursuant to LR 16.5 (f) for all Parties | February 12, 2010 |
| Final Pretrial Hearing | February 12, 2010 |
| Trial Commences | February 22, 2010 |

Dated: October 29, 2009

For the Coordinated Plaintiffs

*/s/ Linda P. Nussbaum*
KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

LOWEY DANNENBERG COHEN & HART,
PC
Gerry Lawrence, Esq.
Four Tower Bridge
200 Barr Harbour Drive, Suite 400
West Conshohocken, PA 19428-2977

RAWLINGS & ASSOCIATES, PLLC
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY 40202

Class Plaintiffs' Steering Committee:

*/s/ Thomas Greene*
GREENE & HOFFMAN
Thomas Greene
33 Broad Street, 5th Floor
Boston, MA 02109

LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
Barry Himmelstein
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
One Main Street, 4th Floor
Cambridge, MA  02142
Boston, MA 02110

BARRETT LAW OFFICE
Don Barrett
404 Court Square North
P.O. Box 987
Lexington, MS 39095

LAW OFFICES OF DANIEL BECNEL, JR.
Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

DUGAN & BROWNE
James Dugan
650 Poydras St., Suite 2150
New Orleans, LA 70130

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 29, 2009.

<u>*/s/ Barry Himmelstein*</u>
Barry Himmelstein