**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

HARDEN MANUFACTURING CORPORATION . CIVIL ACTION NO. 04-10981-PBS
    Plaintiff              .
                             . BOSTON, MASSACHUSETTS
                             . OCTOBER 5, 2009
        v.                .
PFIZER, INC., et al          .
    Defendants           .
. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

Kenneth B. Fromson, Esquire
Keith Altman, Esquire
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY 12550
800-634-1212

Ken So, Esquire
Lanier Law

David Chaffin, Esquire
White and Williams LLP
100 Summer Street
Suite 2707
Boston, MA 02110-1701
617-748-5200
chaffind@whiteandwilliams.com

Mark S. Cheffo, Esquire
Catherine Armstrong, Esquire
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036
212-735-3000
mark.cheffo@skadden.com

Chad Tolar, Esquire
Garcia & Karam LLP
820 S Main Street
McAllen, TX 78501
956-630-2882
@garciakaram.com

Levi Boone, III, Esquire
Boone Law Firm PA
401 West Sunflower Avenue
Cleveland, MS 38732-1772
662-843-7946
LBoone@BooneLawFirm.com

Timothy J. Perry, Esquire
Perry, Krumsiek & Jack, LLP
101 Arch Street
19th Flr.
Boston, MA 02110
617-720-4300
tperry@perrylegal.com

Paul S. Hughes, Esquire
2120 Commonwealth Avenue
Suite 200
Newton, MA 02466
617-244-5620
pashughes@aol.com

Newton B. Schwartz, Sr., Esquire
Jack Lang, Esquire
1911 Southwest Freeway
Houston, TX 77098
713-630-0708
nbs@nbslawyers.com


Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.


*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1

## <u>I N D E X</u>

2   Proceedings                                                          3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

P R O C E E D I N G S

1

2      CASE CALLED INTO SESSION

3          THE CLERK:  The Honorable Leo T. Sorokin presiding.

4   Today is October 5th.  The case of In Re:  Neurontin 04-10491

5   will now be heard before this Court.  Counsel please identify

6   themselves for the record.

7          THE COURT:  You can all be seated.

8          MR. FROMSON:  Good afternoon, Judge, Kenneth Fromson,

9   Finkelstein & Partners for--

10         THE CLERK:  04-10981, I'm sorry.

11         MR. FROMSON:  --product liability plaintiffs.

12         THE COURT:  All right, good afternoon, Mr. Fromson.

13         MR. ALTMAN:  Keith Altman, Finkelstein & Partners

14   with products liability plaintiffs.

15         THE COURT:  All right.

16         MR. SO:  Ken So (ph), Lanier Law Firm for the

17   plaintiffs, Your Honor.

18         THE COURT:  Okay.

19         MR. CHAFFIN:  Good afternoon, Your Honor, David

20   Chaffin for the defendants.

21         THE COURT:  Good afternoon.

22         MR. CHEFFO:  Good afternoon, Your Honor, Mark Cheffo

23   from Skadden, Arp for the defendants.  And again just briefly

24   thank you very much for indulging.  I'm sorry the Acela was

25   very delayed unexpectedly so I apologize for the inconvenience.

4

1        THE COURT:  That's all right.  I'm surprised you

2   guys weren't coming up on a jet.

3        MS. ARMSTRONG:  Good afternoon, Your Honor, Katherine

4   Armstrong for the defendants.

5        THE COURT:  All right, good afternoon.

6        MR. TOLAR:  Good afternoon, Your Honor, Chad Tolar

7   representing the plaintiffs from the law firm of Garcia & Karam

8   in McAllen, Texas.

9        THE COURT:  All right.  What did you say your name

10  was again?

11       MR. TOLAR:  Chad Tolar, T-O-L-A-R.

12       THE COURT:  Which plaintiffs?

13       MR. TOLAR:  Six plaintiffs that were, are here from

14  the Southern District of Texas.

15       THE COURT:  Oh, all right.

16       Mr. Boone?

17       MR. BOONE:  Yes, sir.  From the law firm Cleveland,

18  Mississippi.

19       THE COURT:  Good to see you, Mr. Boone.

20       MR. BOONE:  Yes, sir, the same.

21       THE COURT:  All right.

22       MR. PERRY:  Your Honor, my name is Timothy Perry.  I

23  have one of the plaintiffs, Mary Dorsey, here in Boston,

24  Massachusetts.

25       MS. DORSEY:  Hello, Your Honor.

5

1          THE COURT:  I said to come today, didn't I?

2          MR. HUGHES:  Your Honor, I'm Paul Hughes.  I'm

3   attorney of record for Alan Huberman which is one of the second

4   tier cases I understand in Massachusetts.

5          THE COURT:  Right.  So anyone else?

6          MR. SCHWARTZ:  Your Honor, Newt Schwartz and Jack

7   Lang (ph).  We have the MDL clients from--

8          THE COURT:  Yep.

9          MR. SCHWARTZ:  --six different transferors, Arkansas,

10  North Carolina, Nevada and Southern Pennsylvania, Your Honor.

11         THE COURT:  All right.  Welcome.

12         So I think there are a couple different things on.

13  There are three pending motions that have been filed by the

14  plaintiffs and the defendants in the products liability side of

15  the case, essentially one to compel, one to reopen and one

16  regarding Dr. Eagleman (ph).  And then – we'll do those first.

17  Then there's the question of timing of essentially the other

18  Massachusetts cases that are going to go forward now that

19  Bulger's done and Shearer is set in March, what the schedule

20  would be and we'll talk about the timing with those cases.  And

21  then we'll talk about, Mr. Boone and Mr. Schwartz, your cases

22  in relationship to how they fit in with the others.

23         All right.

24         I suppose, Mr. Fromson, you have two motions so you

25  can go first.

6

1      MR. FROMSON:  Thanks, Your Honor.  Respectfully, in

2  light of the time constraints, and I'm not sure how far past

3  five if at all you're intending on going forward, obviously I

4  would welcome the opportunity to address any questions you have

5  up front.  In the past you've asked very targeted--

6      THE COURT:  Yeah, all right.  I'll - give me a

7  minute.  Wait a minute, I do have some.

8      MR. FROMSON:  But I can tell you the crux of the

9  motion to reopen discovery in the MDL is twofold.

10     THE COURT:  Let me ask you this about that.

11     MR. FROMSON:  Absolutely.  Thank you, Judge.

12     THE COURT:  On the motion to reopen discovery, when

13  did the FDA change in label begin, and why is that timing of

14  that appropriate now?  Why shouldn't it have been done earlier?

15     MR. FROMSON:  The label change itself went into

16  effect in approximately March or early April 2009.  That's when

17  it became public and the label was promulgated at that time.

18  So in terms of why that - are you asking now why is that date a

19  good cutoff date essentially?

20     THE COURT:  No, no.  Essentially, you would say,

21  look, reopen discovery cause the FDA changed the label in March

22  or April `09.

23     MR. FROMSON:  Right.

24     THE COURT:  It's not two years ago but on the other

25  hand why now, why September, why not March or April?  I mean,

7

1  you probably had wind of it.  I mean at any rate you certainly

2  got wind of it in April or March.

3         MR. FROMSON:  Of course.  We had wind of the issues

4  since approximately January of 2008 when the FDA came out with

5  the alert--

6         THE COURT:  The alert, right.

7         MR. FROMSON:  --and had the advisory committee

8  hearing in July of `08, but what has happened since then is

9  that during that timeframe I, myself, did confer with defense

10  counsel other than Mr. Cheffo about our request for discovery

11  supplement--

12         THE COURT:  Before the label change or after?

13         MR. FROMSON:  Before the label change.  There were

14  discussions.  This is not something that just arose.

15         THE COURT:  Right.

16         MR. FROMSON:  So there were discussions about

17  discovery deficiencies plaintiffs believe should have been

18  resolved by defendants during 2008 during the *Daubert* hearings

19  that involve why aren't we being provided with discovery

20  leading up to your submissions to the FDA on suicidally.  To

21  put it in a practical perspective, you know, if there's a

22  document that they actually provide on their letterhead to the

23  FDA, there are underlying documents that formed the basis of

24  these.  There are underlying internal emails and communications

25  and meetings and therefore custodial file documents.  None of

8

1 that has been provided.

2   What has been provided essentially are the formal

3 submissions--

4   THE COURT:  So--

5   MR. FROMSON:  --and some very limited internal

6 documents.  Now then their expert comes along and renders

7 opinions based upon data and evaluations of the data he has

8 himself done bust which is inconsistent with the data in the

9 formal document, all right?  The formal document was presented

10 to the FDA in July by a gentleman named Dr. Wahlberg.  Dr.

11 Wahlberg essentially presents information A, B, and C while

12 defendant's expert, Dr. Gibbons, presents issues E, F, and G.

13 So we don't have any of the internal information that Dr.

14 Wahlberg presented to the FDA and, frankly, I think it was just

15 a few moments ago Mr. Cheffo told me that, and if I misquote

16 him, but basically he advised that he'd be willing to provide

17 certain custodial file responsive documents from Dr. Wahlberg.

18 So in part there is a recognition that there is some discovery

19 here that should be given.

20   THE COURT:  But suppose – yep?

21   MR. CHEFFO:  If I may, okay.  I'll characterize I did

22 say that, but I'll, maybe I can just characterize my side of

23 the story and Mr. Fromson will give his presentation.

24   MR. FROMSON:  So there is a willingness now to

25 provide some portion of Dr. Wahlberg's documents.

9

1          THE COURT:  I'll let you both give your own source

2   and you can characterize each other's source.

3          MR. CHEFFO:  Fair enough, fair enough.

4          MR. FRPMSON:  So, okay, so that's information that

5   pertains to general causation, suicide information that was not

6   in existence back in 2007 when discovery ended but only came to

7   light in an unanticipated fashion through 2008 and 2009 so we

8   should be entitled to it.  In fact we need it because the

9   defendants continue to deny and oppose the concept that

10  Neurontin can case suicidally.

11         THE COURT:  So suppose I agreed with you, what do you

12  want?

13         MR. FROMSON:  Well, I don't - that's a good question.

14  It's really what do they have and what would be discoverable,

15  anything that had to do with safety and efficacy of Neurontin

16  which pertains to suicidally.  So if they have information

17  about suicide and depression that they used to form their

18  response to the FDA we should get it.

19         THE COURT:  Well, do you want their positions,

20  document discovery, interrogatories or is there a more narrow

21  slice of what you--

22         MR. FROMSON:  I think it's certainly a more narrow

23  slice because the, it's hard to say in a vacuum.  I'm not

24  looking to blow open discovery with depositions of hundreds of

25  people but Dr. Wahlberg's one person who is the person in the

10

1   know.  They also employed certain statisticians for that

2   report, for example their names were doctors – for example, I

3   will do it in a targeted fashion, Judge, you know, the people

4   that are referenced in the actual submission to the FDA are

5   individuals named David Matadein, PhD (ph), Javier Cabrera,

6   PhD, Sharon Norman, PhD.  These are three individuals about

7   whom I conferred with defense counsel back in 2008 and they

8   were unwilling at that time to provide additional discovery.

9   And, again, when I say additional discovery I mean their

10  internal document, their emails, their communications to Pfizer

11  about suicide.  That's what the case is about.  That's the

12  targeted discovery about general causations that I wanted.

13          THE COURT:  Why do you need the settlement that they

14  did in the other litigation?

15          MR. FROMSON:  I'm sorry?

16          THE COURT:  The settlement – one of the other things

17  you wanted was settlement in the other litigation there was.

18          MR. FROMSON:  The recent $2.3 billion fine?

19          THE COURT:  Right.

20          MR. FROMSON:  Okay.  That certainly did not slip my

21  mind.  Judge, that's a marketing issue.  You see the general

22  causation goes to how the drugs contribute to killing people

23  and the $2.3 billion fine goes to their fraud and reckless

24  suppression of the suicide information.  What's real important

25  here is that there's a distinction that defendants make between

11

1   themselves, Pfizer, and the co-defendant, the successor to

2   Warner Lambert.  While they have to admit Warner Lambert did

3   some very bad things with what in their mind is a good drug,

4   they will not acknowledge that Pfizer took part in any off

5   label promotion or fraud or recklessness.  However. in the face

6   of a $2.3 billion for nothing other than off label promotion of

7   a drug Bextra for which they just recently pled guilty, the

8   settlement agreement also pertains to allegations involving

9   Lyrica pregabalin for off label use and it's intertwined with

10  Neurontin.

11         The allegations have been denied by the defendants.

12  I understand that.  The settlement specifically denies any

13  wrongdoing with respect to Lyrica or Neurontin.  The point is

14  it's in that settlement agreement that what their sales reps

15  were doing was walking into doctors' offices and saying hey,

16  Lyrica's good for off label.  Stop using Neurontin for off

17  label.  Start using Lyrica, which is essentially tantamount to

18  an admission that they knew Neurontin was being used off label

19  but now they don't make as much money off Neurontin because

20  they don't have a the patent.  Lyrica is the new drug, that's

21  why they would basically make – it makes sense.

22         THE COURT:  But are they disputing that they knew

23  that Neurontin was being marketed off label?

24         MR. FROMSON:  They're not disputing that.

25         THE COURT:  I assume that they knew that Neurontin

12

1    was being prescribed off label?

2          MR. FROMSON:  No, they're not denying that but it

3    goes to their corporate intent as Judge Saris recognized in her

4    decision that a company has an obligation to warn about suicide

5    particularly, A, if they're promoting it off label or, B, if

6    they know it's being used off label.  And through the Pfizer

7    error now, we can demonstrate through discoverable information

8    that not only did they know about it but arguably they were

9    still promoting it taking proactive steps to have Neurontin

10   used on an off label basis or now in fact it was Lyrica.

11         So I think what you're saying to me isn't, is it

12   moot.  They already know it's being used off label so why do I

13   need the discovery.

14         THE COURT:  It seems difficult for them to contend

15   from the bit that I've seen in the course of discovery, I

16   wouldn't think they'd be contending that they didn't know that

17   doctors were prescribing it for other than epilepsy.

18         MR. FROMSON:  I understand, but it violates the

19   corporate integrity agreement to basically do that.  in other

20   words they need to not off label promote Lyrica.  They need to

21   not off label promote Neurontin.  They have corporate integrity

22   agreements that say they will not do this anymore.  They all

23   becomes part and parcel of their actions and their failure to

24   act as a reasonable company, all right.  This also, and it's a

25   bit on the side, the Judge, the district Judge has already

13

1   ruled and you did as well at some point indicate that Lyrica

2   information is relevant.  And so the settlement agreement

3   pertains to Lyrica so this is very--

4          THE COURT:  I did rule that?

5          MR. FROMSON:  You basically said at first because the

6   requests for Lyrica information was too broad you said it's too

7   broad at this time but at some future time it could be

8   targeted.  Then Judge Saris granted in a more targeted fashion

9   and then we came back to you in other respects.  So the issue

10  of Lyrica when it's targeted discovery appears to have been

11  accepted by this Court.

12         THE COURT:  Uh-huh.

13         MR. FROMSON:  All right.  And so we're entitled to

14  the settlement agreement and the allegation that they – we'd

15  like to see the facts that led to the allegations regarding

16  Lyrica.

17         THE COURT:  Well what does that mean?

18         MR. FROMSON:  Well, again it depends.  They're

19  holding the card so there must have been a reason why the U.S.

20  Department of Justice made these allegations and it contributed

21  to a $2.3 billion settlement.

22         THE COURT:  But when you say the facts, you mean I

23  would imagine that in a, that Pfizer didn't hand over $2.3

24  billion without careful and thorough analysis of all the

25  potential issues.  I can imagine that the facts would be

14

1    lengthy.  There could have been years of Qui Tam litigation,

2    if that's what it was.  It could have been, it could be that

3    frankly the discovery in that case the facts so to speak in

4    that case could be more than the discovery in this case or a

5    third one.

6              MR. FROMSON:  I think in a nutshell it comes down to

7    this, Pfizer wants to stand up and say they're a good company

8    that doesn't do anything wrong.  And here allegedly they were

9    doing things wrong even through 2004 and 2005 and 2006.

10             THE COURT:  This was a criminal plea of guilty in--

11             MR. FROMSON:  Only as to Bextra was it a criminal

12   plea.  As to the DOJ settlement it involved approximately 11 to

13   12, even possibly more drugs of different kinds including

14   their--

15             THE COURT:  Civil settlement.

16             MR. FROMSON:  Correct.

17             THE COURT:  False claims?

18             MR. FROMSON:  I don't know how you'd phrase it under

19   False Claims Act but it was an issue of off label promotion.

20             THE COURT:  I see.

21             MR. FROMSON:  And again, it ties into the fact that

22   as part of a Neurontin settlement with the Department of

23   Justice they signed a corporate integrity agreement that said

24   they were going to be, you know, good students in school.  They

25   weren't going to do something bad but here they are.

15

1        THE COURT:  So it's sort of like impeachment

2  information.  You want to show that they were off label

3  marketing after the date of the agreement in the Neurontin

4  case-

5        MR. FROMSON:  Yes.

6        THE COURT:  --to show that they - because that

7  corporate integrity agreement provided not only going off label

8  as to Neurontin, going off label at all?

9        MR. FROMSON:  Right.  And also why weren't they

10  stopping the off label use of Neurontin into the Pfizer era.

11  You know, they know about it.  as you said, look, they're going

12  to come and admit they know doctors prescribed it off label,

13  right?  Plaintiffs intend to show that they were still

14  promoting it off label.  We're going to use this information

15  that formed the basis of the DOJ settlement to show that off

16  label promotion.  And if we can't show the direct off label

17  promotion, we'll show it's reckless not to have stopped the use

18  by not warning about suicide.

19        And if I may go back to a much earlier point

20  regarding science, you know, why do we want discovery of

21  science information, how Neurontin can contribute to suicide.

22  And you asked, well how many depositions, are you intending to

23  get depositions?  Please keep in mind that we didn't depose, we

24  have not had an opportunity to depose one single witness after

25  the close of discovery from Pfizer even though the FDA alert

16

1   came out in `08 and a new label came out in `09.  This was

2   completely unanticipated information.  Discovery was limited to

3   a certain number of depositions as you know that we had to

4   share with the sales and marketing plaintiffs.  And now we're

5   left with not having any deposition of even a single employee

6   on a factual basis.  I'm not talking about a 30(b)(6)

7   deposition.

8          THE COURT:  Right.

9          MR. FROMSON:  You know, there's no fact witness who

10  has testified about the facts and circumstances of the FDA--

11         THE COURT:  So suppose I allowed your motion.  How

12  much time do I have to allow to reopen discovery and how much

13  discovery is--

14         MR. FROMSON:  Well, you've indicated in your

15  discovery order that this case should be out of here by

16  September of 2010 and that's the date that we would work with

17  with defendants.

18         THE COURT:  That's a fair number of depositions

19  between now and September 2010 on all the individual cases.

20         MR. FROMSON:  That's true, Your Honor.  But we're

21  capable of handling the depositions on the generic case.

22         THE COURT:  So you're saying essentially reopen –

23  I'll hear from you, don't worry Mr. Cheffo.

24         MR. CHEFFO:  I know you will, Your Honor.

25         THE COURT:  You're saying reopen discovery

17

1   simultaneous with the gen, these general issues, general

2   marketing, general causation discovery issues and allow the, to

3   go forward with the individual cases and what happens to,

4   continue, suggest to Judge Saris that she delay Shearer or that

5   it goes forward on that?

6           MR. FROMSON:  To go forward just as in other MDLs.

7           THE COURT:  Smith goes forward--

8           MR. FROMSON:  Goes forward.

9           THE COURT:  --on whatever time the Judge found in

10  Tennessee decides it to go forward.

11          MR. FROMSON:  That's correct.  And if I may say, Your

12  Honor, the motion may seem, it may seem large in terms of the

13  capacity of volume that we're looking for, we're willing to

14  discuss the defense parameters and come back with a plan as

15  long as we can both, all three of us, agree on the ideology

16  that there is discovery that should be provided.  All right.

17  When we went to the defendants and said can we reopen discovery

18  on issues, the answer was an in fact no, you're not getting

19  anything.  We made our motion.  Now you might see two extremes

20  in front of you.  They want to give nothing, we want

21  everything.  Today Mr. Cheffo came in and said hey, I'll give

22  you this olive branch, and I appreciate that and I'm willing to

23  work with him in that capacity to come to an agreement on the

24  targeted discovery, but we have to get through the Court's--

25          THE COURT:  Right.

18

1          MR. FROMSON:  --date that recognizes, yes, there's

2     some discovery that needs to be done.  Plus, we have only been

3     discussing this idea of reopening discovery.  There are

4     deficiencies in the discovery that was already provided for

5     which I have tried to include specific requests for production

6     in my proposed discovery request cause as you know--

7          THE COURT:  That's in the motion to compel.

8          MR. FROMSON:  That's in the motion to reopen.

9          THE COURT:  Uh-huh.

10         MR. FROMSON:  All right, I believe in the motion to

11    reopen discovery, because discovery is closed and we can only

12    seek more discovery with good cause, what we did was we added

13    to the motion a request for production that I think is quite

14    tailored.  And it's not like we're trying to find a needle in

15    the haystack.  We actually referenced in the proposed discovery

16    documents, Bates numbers to give them an easier opportunity to

17    find out the basis for our requests.  And it's Exhibit I

18    Document 2091 to our motion.  And what I mean by that is, you

19    know, when we say look, you know, we have this discovery and in

20    the discovery you did provide to us there were references to

21    things such as video news releases, you know, national public

22    radio, audio spots, and we say, you know, we found these

23    documents that reference these things.  Here is the Bates

24    numbered document, you know, this is what we want.  So we're

25    not looking for a needle in a haystack.  We found the needle

1   and this is exactly what we're looking for and it's targeted

2   so, so to that extent we don't think this opens a floodgate,

3   you know, Judge, that they can't handle.

4           MR. ALTMAN:  Supplementation.

5           MR. FROMSON:  Right.  And as my co-counsel indicates

6   this is really their duty to supplement, all right.  They

7   should be supplementing their disclosures as appropriate and

8   required under the federal rules.  Part of our motion practice

9   which is very important here to describe to you when they find

10  a witness that is strategically to their advantage they will

11  supplement their Rule 26 disclosures appropriately for their

12  claims and their defenses.  Well, by the same token if there's

13  information that's relevant and discoverable to our demands

14  that they come across they should be providing it.  So instead

15  as we come across that information, say this is something you

16  should have supplemented, the answer we get back is no,

17  discovery is over, you should have brought this up much

18  earlier.  And I don't see how this is an issue of latches.  To

19  let them have a windfall would be to say well they were

20  deficient in their discovery now let them reap the benefits,

21  let them have the reward of not providing discovery.  So if I

22  take the time and I'm able to tell them look, here's the page

23  on your discovery response where you reference a video news

24  release.

25          THE COURT:  Without being hyper technical—

20

1          MR. CHEFFO:  Yeah.

2          THE COURT:  --shouldn't I do that less there's

3  reopening in orders of a motion that, to demand that they

4  supplement a particular way that they haven't?

5          MR. FROMSON:  I think it's semantics but, yes, I

6  don't think I'm asking, in that respect on these documents

7  where I'm finding things in the documents they've produced and

8  I say, you know, you're missing this, this and this or you

9  missing an attachment to this email, you know, I should be able

10 to get it without hearing a response that says no, discovery is

11 over.  It would be tantamount to them calling me on an

12 individual plaintiff's case and saying, you know, we found a

13 reference to a Dr. Smith in this case, can we have an

14 authorization for that provider and we say, no, no, you should

15 have found it earlier.  There's no prejudice for me to give

16 them that inasmuch as there's no prejudice for them to

17 supplement.

18         THE COURT:  The doctor who you want, this is Edwards

19 is his name?

20         MR. FROMSON:  Dr. Keith Edwards was a physician that

21 we've referenced in the motion to compel in the case specific

22 Shearer case.  That's a separate motion.

23         THE COURT:  Was he treating Shearer – yes, I

24 understand.  Was he treating Shearer when, is it Mr. – is

25 Shearer a man or a woman?

1          MR. FROMSON:  Shearer, Mr. Shearer was a man,

2   Hartley Shearer was a man.

3          THE COURT:  Mr. Shearer - was he treating Mr. Shearer

4   when Mr. Shearer was on Neurontin?  I know he didn't prescribe

5   Neurontin.

6          MR. FROMSON:  Well, that's in dispute.

7          MR. CHEFFO:  It's not in dispute, Ken.  I mean it's

8   clear he stopped treating him two months before he ever

9   prescribed Neurontin.  The first time that – sorry to

10  interrupt, Ken, but this is factually in the record, and we can

11  show it to the Court, he treated him, he's a neurologist who

12  treated him after his stroke from 1999 until August of 2000.

13  The records are crystal clear that Mr. Shearer then went into

14  Brigham & Women's and by a pain clinic physician doctor was

15  prescribed Neurontin for the first time that doctor was

16  deposed.  So at least our position, now if that factually

17  changes I mean that's the basis for our objection.

18         THE COURT:  But is he, was Edwards continuing to

19  treat, no, was Edwards continuing to treat Shearer while

20  Shearer was receiving the Neurontin?

21         MR. CHEFFO:  Never treated him according to the

22  records while he was on Neurontin, never prescribed Neurontin.

23  He only treated him for a finite period of time both before

24  Neurontin and never treated him after.  In our papers what

25  we've said is, first of all we said, you know, depose Dr.

22

1  Edwards and you'll find out that in his records if you think

2  they're wrong.  If it turns out that he was a prescriber or

3  there's some other issue then of course we would talk to Mr.

4  Fromson about these issues.

5          THE COURT:  So, Mr. Fromson, Edwards, is your view

6  that he was prescribing it, that he was treating it while he

7  was prescribing it or you get him notwithstanding those two

8  things?

9          MR. FROMSON:  I get him notwithstanding those two

10  things as the fallback argument, but I believe that there's

11  evidence in this case that he was in fact a prescriber.

12          THE COURT:  And no--

13          MR. FROMSON:  Dr. Sullivan spoke with the descendant

14  himself.  The descendant indicated that Dr. Edwards had

15  prescribed Neurontin.  Dr. Edwards could have provided samples.

16  Dr. Edwards could have provided a prescription.  That's what

17  the record indicates, that the plaintiff has said Dr. Edwards

18  had given him the Neurontin.  I also, and I may stand corrected

19  as Mr. Cheffo has indicated to you there was no overlap, I was

20  under the impression, and I'll go back and check again, that

21  the time period for Neurontin did overlap when he was, when he

22  had seen Dr. Edwards and I'll go back and look at that, but my

23  understanding is that during the timeframe of treating with Dr.

24  Edwards he had been on Neurontin if not from Dr. Edwards from

25  other doctors during this time.

23

1          THE COURT:  So you think it was two ways.  One is

2    that there was an overlap in treatment time periods.  And

3    second that the Brigham and Women's doctor has a note that said

4    that plaintiff, that Shearer said--

5          MR. FROMSON:  Dr. Sullivan note says Shearer tells me

6    he was given Neurontin by Dr. Edwards, and so that at least

7    raises an issue--

8          THE COURT:  And even if they, he didn't get it from

9    Edwards and even if he didn't, Edwards treatment did not

10   overlap why do you get him anyway?

11         MR. FROMSON:  I get him anyway because number one,

12   again it goes to the defendant's proactive attempts to off

13   label market this drug, all right, to a health care provider

14   that my client treated with for someone - for all I know Dr.

15   Edwards discussed Neurontin with the plaintiff.  The

16   plaintiff's dead, I don't even know that.  But it also goes to

17   the defendant's corporate intent.  He's a key opinion leader

18   here in Massachusetts.

19         THE COURT:  Edwards is?

20         MR. FROMSON:  Edwards.

21         THE COURT:  Who is he?

22         MR. FROMSON:  I'm sorry?

23         THE COURT:  What makes him a key opinion leader?

24         MR. FROMSON:  Well that's what they call him.  They

25   pay him.

24

1          THE COURT:  Oh, I see.

2          MR. FROMSON:  He speaks on behalf of the defendant.

3  He speaks in video news releases and audio and news releases

4  for National Public radio.  He was I believe a co-author on

5  issues regarding Neurontin.  So this is one of the doctors

6  through which we will try to show the direct nexus of fraud.

7          MR. CHEFFO:  And just sort of quick--

8          THE COURT:  So is the case - hold on.  Is he case

9  specific or is he general?

10          MR. FROMSON:  He is case specific in this case.

11          THE COURT:  Even in the fallback?

12          MR. FROMSON:  Even in the fallback but if I may, if I

13  may have a moment to defer to my co-counsel?

14          THE COURT:  Yep.  All right.

15          MR. ALTMAN:  Your Honor, very simply Mr. Cheffo's

16  arguments, here he is arguing admissibility, okay.  We, this is

17  a treater of the plaintiff, all right.  We are entitled to -

18  I've never heard of a defendant or any party in a

19  pharmaceutical litigation objecting to a deposition of a person

20  who treated the plaintiff, okay.

21          MR. CHEFFO:  But I'm not, Ken.  I'm not objecting to

22  that, that's the point.  Just so we're clear here what I've

23  said is take his deposition, go ahead, take it.  What we're

24  talking--

25          MR. ALTMAN:  But we want the documents that you have

25

1   that relate to him, Mark.

2        MR. CHEFFO:  No.  Listen, what our position is which

3   is very clear is we've said take this man's, he's a non-party

4   treating physician.  Take his position.

5        THE COURT:  Take his deposition.

6        MR. CHEFFO:  We keep hearing tailored, everything's

7   tailored, Your Honor, I've heard so far.  I've heard it's

8   tailored to ask for everything about 11 medicines in a plea.

9   What they want is the sales reps for treating – do you know how

10  many treating physicians we're going to deal with in the

11  hundreds of cases that we have here.  And then we want also

12  it's tailored that we should not only give you the sales reps

13  but we should do extensive searches for all the custodial

14  records for the sales reps and then that's not it cause that's

15  tailored.  We're then going to go to the district reps of the

16  sales reps for treating physicians.  I mean this is just

17  absolutely absurd.

18       What we've in these cases is we said, and this is

19  not--

20       THE COURT:  Mr. Cheffo, hold on.

21       MR. CHEFFO:  Yes, Your Honor.

22       THE COURT:  Just I got the point with respect to the

23  deposition.  You don't oppose his deposition.  It's just you

24  don't want to give up the documents right now.

25       MR. CHEFFO:  We encourage the deposition.

26

1      THE COURT:  I understand that point.  I'll hear from

2 you in a minute but so--

3      MR. ALTMAN:  And that goes, Judge, it goes to

4 efficiency.  If we're going to take, not going to waste this

5 doctor's time give us the documents you have on Dr. Edwards.

6 Let's take his deposition and we'll go.  The standard is

7 reasonably calculated to lead to discoverable evidence.  Let's

8 go take his deposition and then Mr. Cheffo can come back and

9 argue admissibility, how it's not relevant, how there's no

10 causal nexus but we are entitled to make, get his deposition

11 and the documents the defendants have in his position in the

12 scope of discovery.

13      MR. CHEFFO:  Your Honor, this man is a treating

14 physician.  They're acting like I have all the records that are

15 relevant.  What is relevant is his medical records.  That's

16 what you take a deposition on.  You don't take a deposition on

17 well did he go to a seminar four years ago from Pfizer.  That's

18 what they want.  This is a man who, according to the records

19 that I've seen, and I'll represent as an officer of the court

20 if he was a prescriber than it's a different story with respect

21 to sales reps and others, we would produce that.  but basically

22 what they're saying is we have a treating doctor, one of

23 probably I don't know 10 in this case, probably 20 or 30 in

24 some other cases and it's not good enough to just have the

25 medical records for him.  What we somehow can't understand when

27

1   we're asking the question is we need to know about the sales

2   rep detailing five years ago any communications about any

3   product for this man.  You know what, that's an interesting

4   kind of position but that has never happened.  It's kind of

5   ironic that they come here and act like, well we can't do these

6   cases.  We had a trial in Bulger.  Mr. Fromson is now saying

7   no, no we're not going to deal with it for Shearer or even

8   Smith or even the next case.  So how can you, you know, how can

9   he stand up and basically say we absolutely need this

10  information.

11          THE COURT:  No, this is for?

12          MR. FROMSON:  This is for Shearer.

13          MR. CHEFFO:  For Shearer.

14          MR. FROMSON:  The fact that – and I'm bringing it on

15  a case specific bases because the facts and circumstances of

16  this case warrant it.  We have, in Bulger none of the treating

17  physicians were key opinion leaders hired by the defendants to

18  go out and influence the rest of the market as was Dr. Edwards.

19  It's a very different circumstance.  So I'm not saying that

20  every single case across this country are we going to ask for

21  every single one of these documents.  In this particular case

22  facts and circumstances warrant it.  This is a key opinion

23  leader, a man paid by the company essentially to promote this

24  drug for off label bases.  He influenced physicians in this

25  community.

28

1          THE COURT:  I got it.  Let me hear from Mr. Cheffo.

2          MR. ALTMAN:  One last word before--

3          THE COURT:  Yep.

4          MR. ALTMAN:  Judge, payments made to this doctor by

5    Pfizer go directly to bias, okay, go directly to – if this

6    doctor's got, I want to know does this doctor get paid $10,000?

7    I want to know that before I take his deposition.  I'm entitled

8    to that.  How many – what were his interactions, how much

9    training did he get from Pfizer again goes to bias.  And to

10   take his deposition cold then come back here--

11         THE COURT:  I understand.

12         MR. ALTMAN:  --and – it's just a waste of time, Your

13   Honor.

14         MR. CHEFFO:  Your Honor, let me try and knock off a

15   few of these issues.  This is the ultimate in Hail Mary's.  And

16   I think you asked the right question, why now?  And I think

17   there's two key issues.  Why now are we basically talking about

18   what is essentially years worth of additional discovery.  And I

19   think the other, the other thing--

20         THE COURT:  You're talking about which now, the--

21         MR. CHEFFO:  Well, I mean, we – let's talk about

22   Edwards first, okay.

23         THE COURT:  The timing.

24         MR. CHEFFO:  And then we can move to the broader

25   picture.  I mean I think in a nutshell the issue here is that

29

1   according to the records that we have, and there really is no

2   dispute, okay there is an offhanded reference from Dr.

3   Sullivan.  Now it's clear that this man had some issues but we

4   haven't even said don't take Dr. Edwards.  Really our position

5   is if he's a treater go take him.  If it turns out he's a

6   prescriber come back to us.  Now what they're saying is we need

7   to know if there was an influence.  Just think about how silly

8   that really is.  This is a man who according to the records

9   never even prescribed or treated him while he was on Neurontin.

10  So I mean really, really it's not an issue of admissibility.

11  It's just absurdity.  What does it matter if he did anything

12  with respect to – the only reason we'd depose this man is cause

13  he's a neurologist.  Mr. Shearer had a stroke, a very serious

14  stroke, and everybody wants to talk to him to find out what the

15  course of his treatment was, how he was doing, what happened

16  with him.  And then he moves on to the next case.  He goes to

17  Brigham & Women's and at that point he's prescribed Neurontin

18  for the first time.  That's what the case is about, Neurontin.

19  To basically say, you know, we want to get everything about a

20  non-prescribing treating physician prior to the drug at issue

21  just, I mean it really is not a straight-faced argument.  Now

22  that's with respect, that's with respect to Edwards.

23       What you've heard is a few different things with

24  respect to this, you know, everything.  I don't think there was

25  a single thing that you asked, Your Honor, that Mr. Fromson

30

1   didn't say well, no, of course that's relevant, of course

2   that's relevant, of course we'd want that.  That's the problem

3   here.  And I think we have to distinguish because, you know,

4   Ken and I talk a lot and we have, you know, we're I think

5   zealous advocates but we're not, you know, nutty people.  I

6   mean, if he's talking about missing a single page of a document

7   or something, I don't think I've ever said, you know, never

8   going to give you the missing copied page.  I mean that's not

9   what we're talking about here I hope because if he had--

10          THE COURT:  I kind of hope so too.

11          MR. CHEFFO:  Yeah, I mean I don't think we'd all be

12  up here for that.  I mean I think what we're talking about is

13  we had years of extensive millions of pages of documents of

14  custodial searches.  It wasn't – and this idea that, you know,

15  time stopped.  Well, a few things, Your Honor.  One is that was

16  agreed years ago, okay.

17          MR. FROMSON:  It wasn't agreed.  It was ordered.

18          MR. CHEFFO:  This is what – well it was ordered.

19          MR. FROMSON:  It was ordered.

20          MR. CHEFFO:  Exactly.

21          MR. FROMSON:  In `07 and lots of things--

22          MR. CHEFFO:  Can I--

23          MR. FROMSON:  --have happened since `07.

24          MR. CHEFFO:  Can I just finish now.  You've had--

25          MR. FROMSON:  Well you interrupted me.

31

1          MR. CHEFFO:  Two times, you did, you're right,

2     you're right, Ken and I apologize.

3          MR. FROMSON:  Thank you.

4          MR. CHEFFO:  Okay.

5          THE COURT:  In New York - (Inaudible - #4:46:17).

6          MR. CHEFFO:  I'm try, you know, and I had a long day

7     too.  I was on the train for about four hours.

8          MR. ALTMAN:  The won 103 games this year.  They've

9     got every right to be happy.

10         MR. CHEFFO:  I'm a Mets fan, okay, so let's not go

11    there.  I even got the pen to show it.

12         This is what they said when they said that they

13    wanted essentially, remember they made a motion, I don't know

14    what they called it but it's essentially get paid for the

15    pending cases.  As class counsel they said well, Judge - and

16    you ordered that.  They said, well, all discovery is done,

17    right.  They issued in a, plaintiff's motion for suggested

18    remand quote at page four, "All discovery has been completed."

19    In the joint status report, not a billion years ago but just

20    this summer they said "because combination of discovery in

21    cases that pertain only to claims of suicidally filed solely

22    against Pfizer defendants is complete, this Court in the proper

23    exercise of its discretion should issue a suggestive remand."

24    Then at page seven they said "All that is left," this is a

25    quote, "is fact specific to each case.  There is nothing

32

1   further to be gained by the coordinated discovery process."

2   So now--

3           MR. FROMSON:  That was August.

4           MR. CHEFFO:  I'm sorry?

5           MR. FROMSON:  That's before you supplemented your

6   disclosure to add Wahlberg to your case.

7           MR. CHEFFO:  Well let's – I'm going to take it in

8   order.  I promise I'll get to all these issues for you, Ken.

9           So the idea that if we have one or two documents or

10  specific issues that we need to basically un, you know, start

11  boiling the ocean again, would – and, you know, this is exactly

12  what frankly they did in the Bulger case.  They said we have 40

13  lawyers, we're ready to go and let's try the case.  Then all of

14  a sudden we're two months out and we get these motions to

15  continue.  You know, we have a 30-day schedule.  The timing of

16  this you have to I think, you know, is quite suspect.  I mean

17  let's open up all discovery just 30 days before the Shearer

18  case and you're going to set other cases for trial.  We have

19  our hands full with discovery and then that's not the only

20  reason why the Court should deny this motion.  It's not that

21  there's a resource issue, though that is one.  But the main

22  issue is timing has been set and we've all produced the

23  documents with respect.

24          Now you – let me talk about the alert for a second.

25  They knew about the FDA alert I think as he said in January of

33

1   2008, so again, not a new issue.  And this idea that they've

2   never talked to anyone is also not exactly accurate because

3   there have been expert reports.  I mean you remember Dr.

4   Gibbons and there's depositions and back and forth, a whole

5   other issue.  So this concept that we're kind of left and no

6   one knows anything about the alert is something that I just

7   don't think is accurate.  The experts have spent tons and tons

8   of time doing it.

9          I told Mr. Fromson at the beginning of the hearing

10  today, you know, again, he's an advocate, he's going to perhaps

11  spin it in his way.  I said look, there are two issues here.

12  One is to Phil Arena, okay.  He was candidly a new person that

13  was put on the Rule 26.  They've used Phil Arena and I think

14  they've used Wahlberg as kind of a hook to open everything up.

15  And I said to him, look, I don't feel strongly about this but

16  since he is new and since the Shearer case we have a limited

17  time period of discovery, and since I couldn't respond to, you

18  know, tons of broad discovery and you're going to make a big

19  deal about it, I'm willing to take Phil Arena off the table for

20  the Shearer case and let's deal with it in the next case when

21  we have more time.  And I committed to doing that today.  So we

22  will take him off so that's a non-issue.

23         With respect to Wahlberg, what I told Mr. Fromson was

24  I said, you know, you have to understand Mr. Wahlberg wasn't

25  just listed now.  He's been listed, and I think we pointed this

1   out in our papers, four or five times before.  And, you know,

2   these disclosures, there's literally hundreds on both sides,

3   there's hundreds of people.  So they've had an opportunity to

4   take Mr. Wahlberg's deposition sometime ago.  I said--

5           MR. FROMSON:  You mean, really you would have given

6   me, you would have said yes that I could depose Dr. Wahlberg--

7           MR. CHEFFO:  Well, you--

8           MR. FROMSON:  --once I had an opportunity.

9           MR. CHEFFO:  He was listed a long time ago.  Ken, you

10  know, I'm not the Court here.  Basically, what we do is if we

11  get to a point two years ago and there's a dispute you file a

12  motion to compel.  You don't wait two years.  You don't wait

13  till the trial is about ready to start and then say all of a

14  sudden we need millions of pages of documents.  That's just not

15  the way the system works in an MDL.  What I did say to him,

16  however, was with respect to Wahlberg, and I think Your Honor

17  put this more, I hadn't thought of it this way, but in the, you

18  know, the kind of bazooka when you need a tweezer approach.  In

19  other words, if there are deficiencies or areas where we can

20  kind of not agree that there's any need but work together, I

21  said what I would do is because Mr. Wahlberg did present at the

22  FDA hearing and I mean they were there so this wasn't a

23  surprise, this was back in I think July of 2008, and they've

24  made a big issue about getting documents that he used to

25  prepare for that hearing.  And I said, you know, off the record

35

1    to Mr. Fromson in the spirit of cooperation, I don't think

2    this opens up this door for everything and, you know, I don't

3    think it should be used against me because I'm trying to be

4    cooperative, but I said we will search for those files that he

5    used to prepare for it.  And again, in the spirit of

6    cooperation we will provide those to him.  Those are the kind

7    of I think dialogues, Your Honor, that to the extent there

8    should be any that we should be having, it shouldn't be, you

9    know, it's only about the plea for $2 billion and 11 drugs and

10   years of qui tams and that's all we're asking for.  I mean, we

11   would never in a million years begin to try any of these cases

12   if we had to go back at this point and do the kinds of

13   extensive discovery that they're asking for.  So I'll stop

14   talking unless Your Honor has any questions on those issues.

15           MR. FROMSON:  Your Honor--

16           THE COURT:  One second.  I just have sort of a couple

17   of quick questions for you, Mr. Cheffo.

18           MR. CHEFFO:  Yes, Your Honor.

19           THE COURT:  One is, the FDA changed the label.  It

20   may be not new in the sense that it's not something that

21   happened out of the blue.  It isn't something the

22   administration suddenly announced without any sort of

23   anticipation or it's just been a process that's percolating

24   since the beginning of `08.  But it's new in the sense that

25   it's, a lot of it's post discovery, putting aside the fact that

36

1   they took the position for whatever reason that discovery was

2   done.  It had been the subject of further discovery in the form

3   of Gibbons' reports which Judge Saris allowed after the close

4   of discovery for a period of time.  Then there was follow-up

5   discovery about that and motion practice and the like.  And so

6   at least as to some – why isn't that an appropriate topic for

7   some sort of discovery, whatever you call it--

8           MR. CHEFFO:  Well, you know--

9           THE COURT:  --reopening or not?

10          MR. CHEFFO:  Fair enough and let's not characterize

11  it.  I think to one extent, you know, I would answer your

12  question by saying that's what to some extent I've offered to

13  give the custodial files or the files that were used to prepare

14  for the man who testified.  I mean let's just, I mean I think

15  we can take a step back at what the position is.  You know, if

16  I--

17          THE COURT:  You know, the point really is not so much

18  whether it's, the question is not so much – done is done and

19  therefore the line is drawn and we shouldn't even get into it

20  as much as the question is how much?

21          MR. CHEFFO:  Well exactly.  I mean, you know, it's

22  just a matter of, you know, if this is – they've, this is what

23  they've pointed out in their papers.  They said this man

24  testified and we'd like to know what he relied upon in his

25  testimony.  There's really no – the issue of Pfizer's position,

37

1   I mean it's public.  We've said it with the experts.  It's not

2   an issue that, you know, is really hidden or they need a lot of

3   discovery.  Pfizer's position if from a general causation

4   perspective.  There's no causal nexus as Your Honor's well

5   aware.

6           Now, the company presented its positions in public

7   and, you know, at some length before the FDA.  The FDA who is

8   the regulator of the pharmaceutical company Pfizer said we

9   believe that there should be a label change and the company

10  said if that's what you believe then obviously we're going to

11  change our label.  We continue to believe in the scientific

12  discourse in the legal arena that there are legal reasons and

13  we've made those challenges and that's really what the experts

14  - we don't have—

15          THE COURT:  What about the settlement?

16          MR. CHEFFO:  Well, I mean the settlement, I mean I

17  think he's, Mr. Fromson's started to get to the point - I

18  shouldn't say that.  I think he generally characterized it

19  accurately which is it deals with Bextra Celebrex, okay.  It's

20  a totally other medicine.  There are, there were allegations in

21  I believe the information or the charging document or some

22  types of allegations which were denied with respect to Lyrica

23  not even Neurontin.  And, you know, now what we have is, we

24  have is we have alleged, you know wanting to get into off label

25  conduct on wholly unrelated conduct, drugs, medicines, time

38

1  parameters.  I mean this wouldn't – first of all Judge Saris

2  hasn't even addressed this issue about whether remotely she

3  would ever allow anyone to get into this.  I mean she did rule

4  in the Bulger case with respect to the 2004 plea as Your

5  Honor's certainly aware.  But here we're so far afield that it

6  can't even remotely even touch upon the Campbell factors.  I

7  mean, you wouldn't – our position is couldn't argue well, you

8  know, in 2008 in another drug with somebody else that there was

9  off label promotion and therefore somehow you should tag Pfizer

10 for a Neurontin case and conduct that happened in – I mean, I

11 think Hartley Shearer in this case, I think he was prescribed

12 in 2000 to 2001.

13         MR. FROMSON:  Two.

14         MR. CHEFFO:  2002, thanks, Ken.  So it's, you know, I

15 mean I can speak in more length--

16         THE COURT:  No, that's enough.  I get it.

17         MR. CHEFFO:  --but I think it's generally a

18 remoteness issue.

19         THE COURT:  What about the district managers?

20         MR. CHEFFO:  Well, I think again that's another one

21 that we've, is really water under the bridge.  I mean again,

22 you know, Ken's right, I mean I haven't been involved in years

23 but I certainly tried to get myself up to speed of what's

24 happened and I know that what's happened in this litigation is

25 that Tier I Track I discovery has included the prescribers.  It

39

1   has included the plaintiffs and the sales reps.  And I think

2   that's for a few reasons.  It may or may not be just an issue

3   of--

4           THE COURT:  Well that's the first pass right?

5           MR. CHEFFO:  It is the first pass but I also – well

6   there's no question you also limit it to 10 depositions.  I

7   think that what you have here--

8           THE COURT:  That's only cause I think you guys took

9   more depositions in the Bulger case then we took in the entire

10  litigation.  That began to make me think that maybe I should

11  step in and – I mean, I could be wrong about that fact but I

12  will tell you my impression was I limited the plaintiffs to

13  something like 40 depositions.

14          MR. FROMSON:  Overall between two, three separate

15  class--

16          THE COURT:  Sales and marketing the other side and

17  then I got the sense that in the Bulger case which struck me as

18  what bell weather and therefore very significant.  I understand

19  it's not the 84th or 840th out of 1,000 cases or what have you,

20  but nonetheless my impression was more of the cases were taken,

21  more depositions in the Bulger case.  Now they probably were

22  shorter and the like.

23          MR. CHEFFO:  And a very complicated, you know,

24  history as you know, Your Honor.

25          THE COURT:  Sure.

40

1          MR. CHEFFO:  I mean we don't--

2          THE COURT:  But nonetheless--

3          MR. FROMSON:  If I can jump in—

4          MR. CHEFFO:  But let me just say this about the—

5          MR. FROMSON:  If I may say one thing that's on point

6   with the issue, the core discovery of the Track case from my

7   recollection was so that the plaintiffs could go back and amend

8   their complaints to state with particularity their fraud

9   claims.  There was a motion to dismiss the fraud claims.  The

10  parties came in and the judge said go out--

11         THE COURT:  Yeah, to get it started.

12         MR. FROMSON:  Right.  Go out and--

13         THE COURT:  Right.

14         MR. FROMSON:  --depose your doctors.  It didn't – and

15  go out and depose the sales reps.  Didn't say you're stopped at

16  the sales reps.

17         THE COURT:  No, no, there was no – it was never my

18  view and I don't think it was Judge Saris' that it was three

19  depositions for everybody and you're done.

20         MR. FROMSON:  And I then, and I have been unable--

21         MR. CHEFFO:  I'm not suggesting, really what I'm

22  saying is, you know, we're not dealing with one case as Your

23  Honor knows.  I mean we have Shearer we're talking about right

24  now but we have, this is I think the perfect example though.

25  What they're talking about and harping on for some reason,

41

1   maybe they have, you know, some reason for it, but they're

2   talking about the sales reps and the district managers for

3   Edwards.

4           MR. FROMSON:  For which there might be two.

5           MR. CHEFFO:  But Edwards--

6           MR. FROMSON:  It's only two people.

7           MR. CHEFFO:  We're going to talk to the sales reps

8   who detail--

9           MR. FROMSON:  The district doesn't change.  It's the

10  geography.

11          MR. CHEFFO:  Can I – are you done?

12          MR. FROMSON:  Yes.

13          MR. CHEFFO:  But you're implying that there's going

14  to be hundreds of district managers in this case--

15          MR. FROMSON:  Well--

16          THE COURT:  I'll give you a chance, Mr. Fromson.

17          MR. CHEFFO:  What I'm implying here is we have as you

18  know just his case is I believe 130 or so in the MDL here.

19  There may be others we're talking about later today.  We then

20  have probably one or two prescribers.  We're already going to

21  give those sales reps.  Now, if we start to give, you know,

22  district managers and it's not just a matter of giving the

23  names because that's not good enough for them, they want, you

24  know, give me every document that the person ever touched and

25  their computer systems going back for people six years ago.  I

42

1    mean if it was just tell me who the names were, I'd probably

2    have an objection but I probably wouldn't be as exercised as I

3    am now I mean because it's like this is targeted, Judge.  All

4    we want is every document that this person may have had in any

5    computer ever seven--

6              MR. ALTMAN:  That's not true.

7              MR. CHEFFO:  --years ago.

8              MR. ALTMAN:  You'd object to the names.  You'd object

9    to giving us the names?

10             MR. CHEFFO:  At this point--

11             THE COURT:  Hold on, hold on.

12             MR. CHEFFO:  Well--

13             MR. ALTMAN:  I'm sorry, I'm sorry, Your Honor.

14             MR. CHEFFO:  First of all there's two issues.  I

15   mean, we're, you know, I didn't start with the procedural point

16   but there is the kind of procedural point that they've never

17   served this discovery.  I mean usually in my world you serve

18   the discovery, you get responses, then you meet and confer,

19   then you move to compel.  You don't kind of skip the procedural

20   part and go right to motion to compel.  So that's a problem.

21   So, you know, part of what I'm shooting at is this we want

22   this, we want this, we want this, when they've never actually

23   made the demands as far as I know.  So even with respect the

24   specifics, I guess like I'm saying is--

25             THE COURT:  So one thing I have to think about what

43

1  you're telling me which makes sense is that in the other cases

2  that at least those cases are going, in which discovery is

3  going to completion in this district that I should think about

4  what's the process for resolving the discovery issues that come

5  up to the extent it moves on a fast contract where it's not,

6  it's easy to serve a 30-day request, get a response and make a

7  motion in the time depending on how compressed the schedule is.

8  In other words, I got to think about how to handle that in a

9  practical matter both to give people a chance to focus the

10 issues in terms of the requests and the responses and also to

11 give time to litigate it and if anything's ordered to get it

12 done within the schedule.

13         MR. FROMSON:  It's unclear whether we even have our

14 hands free to serve a supplemental request for production

15 interrogatories because in I think your discovery order No.

16 550, Document 550 it said you've had enough time aside from

17 template interrogatories--

18         THE COURT:  That's to clarify.

19         MR. FROMSON:  So we would like to have the

20 opportunity in the upcoming case to serve additional demands

21 that are relevant to the issues.  Here we are on a tough and

22 tight time schedule.  So, you know, we'd call, we'd ask and

23 we'd inquire and the answer is no.

24         THE COURT:  All right.  Go ahead.

25         MR. CHEFFO:  I mean, I think I've, you know, I mean

44

1   basically it's an issue of, you know, both process.  I think

2   it's an issue of discoverability.  I think it's an issue of

3   case management.

4            THE COURT:  Well, let me ask you then both your

5   preference.  With respect to Shearer, the schedule, I think

6   Judge Saris set the schedule, right?

7            MR. FROMSON:  Yes.

8            MR. CHEFFO:  Yes.

9            THE COURT:  And fact discovery ends October 30th or

10  31st?

11           MR. FROMSON:  Yes.

12           MR. CHEFFO:  Yes.

13           THE COURT:  All right.  So she set that schedule, set

14  expert discovery time period, summary judgment motions and

15  trial at the end of March?

16           MR. FROMSON:  Right.

17           MR. CHEFFO:  Yes.

18           THE COURT:  Well, what's your, like how do you – and

19  I set the 10 deposition limit?

20           MR. ALTMAN:  I don't believe there's a 10 deposition

21  limit by you.  The federal rules account for 10--

22           MR. CHEFFO:  Well no, that--

23           MR. ALTMAN:  --and then if you want leave for more

24  you--

25           MR. CHEFFO:  I went back and looked.  Really what

45

1   happened was you initially sched – and we, Ken and I talked

2   about this earlier,  you sent an order out that had 10

3   deposition and it had some dates.  We actually pleaded for a

4   little bit more time with Judge Saris--

5            MR. FROMSON:  Yes, yes.

6            MR. CHEFFO:  --just a month or two and she

7   begrudgingly, she gave us a little more – I shouldn't say that,

8   she was, respectfully gave us more time.  And so you initially

9   did issue a 10 limit order whether that was, you know,

10  superseded I don't know.

11           THE COURT:  And then it's superseded by her order.

12  It didn't address the question to how many or not.

13           MR. CHEFFO:  Exactly.

14           THE COURT:  I see, okay.  All right.  Okay.

15           Mr. Fromson, very briefly any response?

16           MR. FROMSON:  With respect to the science issue,

17  general causation issues, they continuously supplement their

18  expert report with new information despite discovery having

19  ended in 2007.  Only last month did they indicate to Judge

20  Saris that their expert on science, Dr. Gibbons, has once again

21  done a new analysis, one we haven't had discovery for.  So

22  again it's an example when there's something that inures to

23  their benefit, new discovery, they will throw it into their

24  Rule 26 or advise the Court they're going to do something new.

25  Yet, when we want to get to the fact witnesses who are living

46

1    under the roof of Pfizer and having all the information

2    they're not letting us have it.

3            MR. CHEFFO:  No.

4            MR. FROMSON:  So you can't have it both ways.

5            MR. CHEFFO:  That's just - I mean I think--

6            MR. FROMSON:  And--

7            MR. CHEFFO:  --that's a prime example of what, you

8    know, of what really I'm talking about which is if an expert as

9    Dr. Gibbons did, I put them on notice, science is not stagnant

10   He continues to publish and he's not a fact witness in the

11   sense of, you know, Pfizer.

12           THE COURT:  Right.

13           MR. CHEFFO:  He issues a new report or submits it for

14   publication.  If they, every time they've done, he's done that

15   he's been deposed, I think three or four times, and I fully

16   expect that if we submit a new report and rely on it and they

17   ask us or move that we would probably have to put, you know,

18   put him up for a deposition.  That's different.  So the idea

19   that--

20           MR. FROMSON:  But his information is inconsistent

21   with what's under the roof of Pfizer.  That's the problem.

22           MR. CHEFFO:  That's called an argument that you make

23   at trial.

24           MR. FROMSON:  But I don't have the discovery, you

25   know, I don't have--

47

1          MR. CHEFFO:  Well--

2          MR. FROMSON:  Pfizer went – here's a prime example,

3   Pfizer went and submitted information to the FDA and the expert

4   has something different in his report.  We have to be able to

5   look to Pfizer's documents to see what formed the basis of

6   their information and compare it to what Dr. Gibbons has.

7          THE COURT:  One last question, with respect to the

8   Shearer case are you both taking the view that it's limited to

9   10 depositions because I'd make sure they meet – I'm not

10  inviting you to do more but--

11         MR. CHEFFO:  Yeah.

12         THE COURT:  --I'm--

13         MR. FROMSON:  I don't have a problem with 10 in this

14  particular case.

15         MR. ALTMAN:  I think it's been our plan to go with

16  10.  I mean I--

17         THE COURT:  Fine.

18         MR. ALTMAN:  --I don't think it's going to be 40.

19  You know, could there be 12 depositions that we try and agree

20  and a few, you know, Your Honor, was--

21         THE COURT:  Right.

22         MR. ALTMAN:  --you know, but we're not going to go

23  way beyond that.

24         THE COURT:  Okay.  All right.

25         MR. FROMSON:  Also, Judge, they did supplement their

48

1   Rule 26 in Shearer in September of `09 so that's why this

2   issue is being brought to you now.  The first time they put Dr.

3   Edwards on their Rule 26 for their claims and defenses, all

4   right, and so they obviously have information about Dr.

5   Edwards.  We have nothing regarding his relationship to the

6   company.

7              MR. CHEFFO:  Wait a minute.  You--

8              MR. FROMSON:  We don't have the payment to Dr.

9   Edwards--

10             MR. CHEFFO:  You submitted – let's just be clear here

11  because that's just so disingenuous, Ken.  They first--

12             MR. FROMSON:  It's not you--

13             MR. CHEFFO:  They first gave the Rule 26 and you

14  listed him.

15             MR. FROMSON:  As a treating provider.

16             THE COURT:  I'll look it – whoa, whoa, whoa, I want

17  to move on cause – I may have more time then all of you but you

18  may not have an unlimited amount of time.  I want to turn to

19  the motion, the next motion which is Dr. Eagleman (ph)

20             MR. CHEFFO:  Yes, Your Honor.

21             THE COURT:  Is he here just out of curiosity?

22             MR. FROMSON:  No, he wasn't served.  He's not on

23  notice for the motion.  They didn't serve him yet they want

24  sanctions.

25             THE COURT:  He had, they filed something.

49

1          MR. FROMSON:  He provided an affidavit but--

2          THE COURT:  Right.

3          MR. FROMSON:  --technically he's never been--

4          THE COURT:  I didn't know if that affidavit was

5  separate or was sort of with yours as an exhibit to--

6          MR. FROMSON:  He provided the affidavit to us.  We

7  provided it as part of our opposition.  But as far as seeking

8  sanctions against the man, they never even served him.  He's

9  under the jurisdiction of the Court because he signed a

10 confidentiality order yet they never served him with papers so

11 that he properly address it.

12         MR. CHEFFO:  Your Honor, if that's the game that

13 we're really going to play here, I mean they've given him the

14 documents--

15         THE COURT:  Can I ask one question?  Can you just

16 give me – you submitted and I have it but the practical problem

17 I'll tell all of you with sealed documents is sealed documents

18 are much more difficult for us to handle because the other

19 documents are on the, we just get them off the computer.

20         MR. CHEFFO:  Yes.

21         THE COURT:  But do you have, I had it, I had but I

22 don't have it in my pile right here, the original motion had an

23 affidavit from you, Mr. Cheffo, and attached as an exhibit was

24 the letter, the original letter from Dr. Eagleman to a doctor

25 up in Vermont and I just want to take another look at that.

50

1    MR. CHEFFO:  Yes.  I have that and I also have if I

2  can approach, Your Honor.

3    THE COURT:  You can.

4    MR. CHEFFO:  There's also, there's actually three

5  letters.  I submitted this and then Mr. Finkelstein submitted

6  two other letters to other doctors that Mr. Eagleman had sent.

7    THE COURT:  No, but this doesn't have – I'm sure that

8  I read the letter from Dr. Eagleman to Dr. Copa--

9    MR. FROMSON:  Catapono.

10    THE COURT:  --Catapono and this doesn't have that.

11    MR. CHEFFO:  I think that's right.  Isn't it right in

12  the first exhibit?

13    THE COURT:  Oh, I'm sorry, you're right.  It's on the

14  back side of the page.

15    MR. CHEFFO:  I'm trying to be green, Your Honor, I'm

16  sorry.

17    THE COURT:  I can see that.  You can see I'm not.

18  Okay.  So, I'll cut to the chase on Dr. Eagleman.  I read the

19  motion, Mr. Cheffo, and the rest of your papers and it struck

20  me a couple different issues.  One issue is as to the

21  protective order, okay, putting that aside for the moment.  The

22  other issue he wrote to a witness.  He told the witness facts.

23  He told the witness characterization of facts and he told the

24  witness he wants he wants to talk to the witness.  And he told

25  the witness his view of various information.  I would assume

1    that his facts, characterization of facts and the like you

2    heatedly disagree with.  And, but as to that I don't see

3    anything in terms of a penalty.  I don't see anything in terms

4    of, I don't see that he threatened the witness, that he offered

5    to pay the witness for a testimony.  Offered to pay for the

6    person's time, but in the context of a doctor that seems

7    something different, professionally basically says I'm willing

8    to talk to you and I'll pay you your going rate for that time.

9    It's like a deposition.  It's not being – you understand, Mr.

10   Cheffo, don't you?

11           MR. CHEFFO:  Sure, I do.

12           THE COURT:  And so was it wise, does it expose him to

13   cross examination?  Does it – there's a whole range of

14   potential choose it, hard for me to think about.  I know those

15   are strategic issues.  But all those things put aside from the

16   protective order, that's a whole different matter, what's, what

17   – absent the protective order issue, on what basis would I

18   intervene?

19           MR. CHEFFO:  It's a fair question, Your Honor.  I

20   think that--

21           THE COURT:  I mean he's been sanctioned before.  I'm

22   persuaded based on my general review that Judge Weinstein

23   sanctioned him in the form of a settlement agreement.  But--

24           MR. CHEFFO:  Well, let me just say – I'm sorry.

25           THE COURT:  So what, I mean not so what but what does

52

1   that have to do with this motion?

2          MR. CHEFFO:  There's two issues just to be clear, you

3   know, we're not basically, you know, saying he's been

4   sanctioned before so therefore anything he does we'll sanction

5   him--

6          THE COURT:  Right.

7          MR. CHEFFO:  --again.  And I also think that

8   notwithstanding what the plaintiffs said we understand that

9   people can interview people and talk to them.  That's not the

10  issue.

11         THE COURT:  Right.

12         MR. CHEFFO:  What I think here though is there is a

13  part of the process, and I don't want to sound corny or cliché

14  here but, you know, it's something I really do believe, Your

15  Honor, and that is there is a fair and appropriate way and an

16  honest way to deal with non-parties, and it's not just for

17  experts.  It's also, you know, and it's not just one case.  You

18  in this court has the imprimatur of this litigation.  And

19  doctors don't understand what's going on and we all have as

20  officers of the court and members of the judiciary an

21  obligation to make sure that people understand fairly what's

22  going on because they're not all lawyers.  They don't know when

23  they get this document whether a doctor has to read something,

24  whether they should take it as true.

25         The reason, the only reason we found out about it

53

1   frankly is Dr. Catapono because it was our job to schedule

2   with her called up and says oh, my gosh, you know, what is all,

3   why is all this?  Why am I receiving this information from a

4   doctor written on, you know, it says I'm a doctor from Brown

5   University.  So is it a situation, am I saying that he wrote –

6   he's says if you don't testify we're going to come to your

7   house, you know,--

8            THE COURT:  Yeah.

9            MR. CHEFFO:  --I'm going to – we're not saying that.

10           THE COURT:  Right.  I know.

11           MR. CHEFFO:  So this is more of a it's in your

12   inherent and the Court's inherent authority to have some

13   control over the litigation to make sure things are done in an

14   appropriate way.

15           THE COURT:  But what would I tell him, what would be

16   the instruction?

17           MR. CHEFFO:  The instruction would be each - I mean

18   this is a man who is a recidivist offender.  Let me just, let

19   me just tell you also in case I don't get a chance to--

20           THE COURT:  The other offense wasn't with respect to

21   a witness.

22           MR. CHEFFO:  Well, there's two issues that putting

23   aside the protective order for a second.  I don't know if you

24   had a chance to look at our supplement, but I mean that is the

25   most stark example of the most dishonest conduct.  If it was a

54

1   lawyer I think you'd refer us in about a second to the Bar

2   Association.  He takes an email string; it starts with a long

3   email string that goes through all this information, I'm not

4   going to get in detail because it's a sealed document, and it

5   then gets forwarded to somebody else, okay.  That person then

6   forwards it to the ultimate person to say can you comment on

7   it.

8           So basically in other words it's all a string and

9   it's referring to this big block of information.  What Dr.

10  Eagleman does is he literally wipes out all of the document, a

11  page and a half of the document, without saying redaction and

12  then just sends it across to the doctor.  Now, in his

13  declaration he says well, out of an abundance of caution I did

14  that.  Well, if you had to exercise an abundance of caution

15  about whether the document was confidential or half of it was

16  or email string, why would you send it to the doctor?

17          THE COURT:  Well, what would I--

18          MR. CHEFFO:  Well, I'll tell you what you could do,

19  Your Honor.  I think that, you know, this, you know, and we'll

20  assume we get another hearing if they really want to have a

21  hearing I think that's absurd and if this is their expert who

22  was, you know, who was Mrs. Bulger's administrator of the

23  estate who's calling people or giving documents.  Then all of a

24  sudden like oh, my gosh who's Dr. Eagleman, we have no control

25  over him.  But if we want to have that charade we can go

55

1   through a formal proceeding.  But what you would do is you

2   would say you are no longer, you have lost your ability to

3   contact witnesses in this case.  You cannot do that on behalf

4   of the plaintiffs.  You can't use privileged documents.  You

5   can't use; you've lost your ability.  We challenged his ability

6   as you'll recall when he became the administrator to see

7   documents under the protective order.

8          THE COURT:  Right.

9          MR. CHEFFO:  You denied that.  You said at this point

10  I don't think he's even going to see documents but I haven't

11  seen anything--

12         THE COURT:  I'm not the probate court.

13         MR. CHEFFO:  I haven't seen anything--

14         MR. FROMSON:  And that's a different case.

15         MR. CHEFFO:  I haven't seen anything that would

16  make--

17         MR. FROMSON:  Just so we're all clear this is the

18  Shearer case.  That was the Bulger.

19         THE COURT:  Well, right.

20         MR. CHEFFO:  No, I understand.  I understand that.

21  I'm aware of that, Ken.  I know the difference between the

22  cases.

23         So basically this is not a right.  This is a luxury.

24  This is an honor and it's an ability for an expert in this case

25  to see confidential documents to consult with officers of the

56

1   court and then to reach out and consult with, I mean he didn't

2   just know Dr. Catapono Friedman came to him like one night.  He

3   got the names of, because he has the names listed from these

4   guys of the treating physicians.  He then is essentially used

5   like the Trojan horse to go and give half truths to these

6   people.  That's the problem that I have is that the lawyers I

7   believe are fully ethical.  I believe they're zealous advocates

8   but they would not do what Dr. Eagleman is doing.  And I can't,

9   I can't go and find somebody else to do essentially unethical

10  dishonest conduct.  And I'm not suggesting that they, I told it

11  very clear, I have made this very clear to Ken, I'm not

12  suggesting that there's anything wrong with the conduct of the

13  counsel.  We've made that very clear.  What I am suggesting is

14  that Dr. Eagleman, and I think in the *Balenger (ph)* case that,

15  you know, what happened there the Court said that he, he barred

16  him from testifying because he essentially found that he was

17  vindictive, vexatious, and he basically – did you read the

18  chart?  I don't know if you had a chance to look at the chart?

19          THE COURT:  I looked at the chart.

20          MR. CHEFFO:  I mean, Your Honor, he's basically

21  turned out – if you've read that you would think that he had

22  won the Nobel peace prize for this practice of litigation.

23  Meanwhile, he had to pay $100,000 or he was going to face

24  criminal sanctions.  That's a sworn deposition that I took in

25  connection with the *Bulger* case which is under the auspices of

1    this Court in the MDL.  So you're asking me, you know, what

2    authority, I think you have inherent authority to control under

3    the administrator--

4              THE COURT:  I'm not so much worried about what my

5    authority is, but if I were to exercise that authority with

6    respect to him, what rule would I define because whatever I did

7    to him would essentially whatever boundaries that I drew that

8    either limited what he did or said he can't go beyond is in

9    some sense a boundary that you're suggesting everybody or he is

10   or should be living with and so the question is exactly what

11   boundary in the interaction between investigators, experts,

12   lawyers, putting aside professional responsibility, obligations

13   on all lawyers, should govern their interactions with the

14   witnesses and how would I craft that rule and what would it

15   say?

16             MR. CHEFFO:  Well at the very least, you know, I

17   think it wouldn't have to be for everyone because not everyone

18   has exhibited the outrageous conduct that Dr. Eagleman has on a

19   number of occasions so I think--

20             THE COURT:  But that something he did that's no good

21   presumably it's no good if done by anyone else.

22             MR. CHEFFO:  Well sure.  I mean, you know, I would

23   say you cannot be--

24             THE COURT:  Might not the same sanction consequences

25   because perhaps they come with a different record to the court,

58

1    but nonetheless they shouldn't be doing it.

2         MR. CHEFFO:  I think what, Your Honor, I mean it's -

3    and I can try and fashion and I will, I think the issue here

4    really is that this is such an anomalous type conversation, the

5    reason it's there when you try and find that one case people

6    don't, don't kind of hide half of emails and send them off and

7    write on brown letterhead of doctors and say did you know X, Y

8    and Z to non-treating physicians, did you know this, and then

9    tell you well I had to do that.  You know what's really

10   interesting the one, the one doctor--

11        THE COURT:  He didn't do it to the other doctor.

12        MR. CHEFFO:  The guy who prescribed it.

13        THE COURT:  Let me ask you about the protective

14   order.  So as I understand the facts as they are the email in

15   question which is that there are the following facts about it,

16   that it was at some point earlier this year filed by the sales

17   and marketing people as an exhibit to the statement of

18   undisputed facts.  It was not filed under seal at that time and

19   never, and no action was taken about that treatment.  That at

20   some deposition, again prior to the September 11th letter in

21   question it was used as an exhibit at that deposition and not

22   marked as confidential.

23        MR. ALTMAN:  This is a copy of that exhibit if you

24   want it, Your Honor.  It's not stamped con - may I approach?

25        THE COURT:  Yes.

59

1           MR. ALTMAN:  It's not stamped.

2           THE COURT:  And so it's not clear to me that there's

3  a provision in the protective order that governs this kind of,

4  specifically governs this kind of alleged waiver or not.

5  There's a communication between counsel here requesting of the

6  plaintiffs to de-designate the document, make the document not

7  confidential early in September and the response, no, we won't.

8  So there's a couple – and so with respect to that I guess my

9  question is how did that bear on the protective order?

10          MR. ALTMAN:  Before you answer the question there's

11  one more piece of preliminary history.

12          THE COURT:  Yeah.

13          MR. FROMSON:  When that document was disclosed to the

14  sales and marketing plaintiffs in 2007, February of 2007--

15          THE COURT:  That's when they filed then their

16  exhibit?

17          MR. FROMSON:  No, no.

18          THE COURT:  Oh.

19          MR. FROMSON:  Well before that.

20          THE COURT:  Oh, it was given to them.

21          MR. FROMSON:  It was given to Tom Greene law firm.

22          THE COURT:  Yeah, but--

23          MR. FROMSON:  It was not designated confidential.

24          MR. ALTMAN:  That's the version you have, Your Honor.

25          MR. FROMSON:  So, but--

60

1          THE COURT:  Oh, I see.  This is--

2          MR. FROMSON:  Right.

3          MR. ALTMAN:  Yes.

4          MR. FROMSON:  So the database that was given to the

5   sales and marketing plaintiffs, all right, it was originally

6   confidential.  They then had to go and remove--

7          THE COURT:  What do you mean it was originally

8   confidential?

9          MR. FROMSON:  They over-designated it is what the

10  claim was by plaintiffs, by sales and marketing plaintiffs'

11  attorneys that defendants had over-designated as confidential

12  certain documents and had redacted things like Lyrica.

13          THE COURT:  I see.

14          MR. FROMSON:  So they had to go and give a production

15  to the sales and marketing plaintiffs.  And that production

16  which was provided on or about February 15th of 2007 to Tom

17  Greene's law firm included that document before you which did

18  not have a confidential designation.  However, the documents

19  that were provided to my law firm it did have a confidential

20  designation.  So Dr. Eagleman was working with a document from

21  a deposition where based upon a document that was not

22  confidential, used at a deposition where it wasn't

23  confidential--

24          THE COURT:  I see.  Okay.  So--

25          MR. FROMSON:  --it had nothing to do with me having a

61

1   separate set of the documents where I wonder why was I given--

2          THE COURT:  Right.

3          MR. FROMSON:  --documents that have a designation.

4          THE COURT:  So what about--

5          MR. CHEFFO:  Again, we don't know who Dr. Eagleman is

6   apparently.  He's just the expert in our case, but I think

7   we've been, we've tried to be very candid.  I think, you know,

8   you obviously read the record very closely, Your Honor, and I

9   think there's no excuse here, you know, we got this letter, we

10  moved quickly I think and we were very careful to say there was

11  a confidential document.  When Ken called me and said well

12  there's this confusion I said okay, I understand that.  That's

13  why if you note in our reply we've still taken the position, I

14  spoke with Tom Greene and I said we'd like to pursue the

15  inadvertent disclosure.

16         I think the key issue really here is it's not

17  ultimately whether this is, you know, you need to decide today,

18  although I don't want to avoid that issue, but I think the real

19  issue here is that, you know, you don't shoot first, ask

20  questions later.  If you're in doubt at all you do what Mr.

21  Fromson did is you send a letter, you call the parties, you ask

22  about it.  You don't just kind of send it off to an expert,

23  kind of hope and then when you get caught--

24         MR. FROMSON:  I didn't send it off.

25         MR. CHEFFO:  --say that I - I'm sorry?

62

1          MR. FROMSON:  I didn't send anything off.

2          MR. CHEFFO:  I'm not talking about you Ken, you know

3  that.  I'm talking about--

4          MR. FROMSON:  Well, you said when you send it off to

5  an expert.

6          MR. CHEFFO:  Okay.

7          MR. FROMSON:  I didn't send it off to an expert.

8          MR. CHEFFO:  Ken, I can't say enough times that I'm

9  not dealing with you on this issue.  I'm talking about Dr.

10  Eagleman, okay?  Now, it clearly, you know, he - Mr. Fromson

11  three days earlier had asked me to de-designate so someone

12  thought it was.  It's also, I mean it's not like this was a

13  newspaper article.  I mean it's an internal document.  It's

14  stamped for--

15          MR. FROMSON:  It's not stamped confidential.

16          MR. CHEFFO:  It's an internal, it's an internal email

17  that at least quest - well that's why - you don't have to

18  believe me.  The reason why there was suspicion about it was

19  that obviously that's why Dr. Eagleman claims now he redacted

20  it.  I think he redacted it because you can't understand the

21  complete story.

22          MR. FROMSON:  Actually, Judge, in Mr. Cheffo's

23  defense it's his successor counsel, he's a successor counsel to

24  Davis Polk.  It was Polk has firsthand knowledge that this

25  document was actually not exchanged as confidential.  Ileus

63

1  Rona (ph) in the back from the Tom Greene law firm and Davis

2  Polk by Attorney Chris Roache are the only ones who really have

3  firsthand knowledge.  No offense, Mark, you basically were as

4  in the dark as much as I was.  That document was disclosed to

5  Ileus Rona's (ph) law firm and it was not confidential.

6          THE COURT:  I got it.  so my question is given that

7  history, I mean I guess the question first is it confidential

8  or not confidential putting aside, I mean we can all imagine

9  the circumstances where documents were produced in one fashion

10  and in another fashion and in the end they might be

11  confidential, they might not be, and that that may be that a

12  violation of a protective order occurred but that might also

13  bear on what the consequences are for a violation, it might

14  also depend on the circumstances.

15          MR. CHEFFO:  Right.

16          THE COURT:  I guess the question is given that

17  history is it your view that it is confidential notwithstanding

18  that those productions as not confidential or--

19          MR. CHEFFO:  Yes, it is.  Yes, and here's just very

20  briefly why.  Because I mean, you know, let's just talk about

21  the sales and marketing and again, I'm not here to impute bad,

22  you know, conduct of the lawyers.  Things happen, that's why we

23  have an inadvertent production.  Again, wasn't a motion made on

24  that document?  If you've seen that list it's I think 37 or 39

25  pages of single box--

64

1        THE COURT:  What about the deposition though.  It

2   was used in a deposition.  There was a lawyer for Pfizer at the

3   deposition, right?

4        MR. CHEFFO:  Fair enough.  And I will tell you that

5   and I, Ken and I again talked about this, I spoke to the lawyer

6   who handled that deposition.  Her best recollection was that

7   she sent a letter after the deposition saying that it was

8   confidential.  I don't have the copy of that record.  That was

9   her practice.  She said that she believed she made that.  so

10  the issue is, and that's a generalized practice that I think –

11  the fact that it wasn't stamped at a deposition wouldn't cause

12  what the protective order says is you have 30 days, everything

13  remains confidential, and then you're supposed to basically

14  have a letter so.

15        THE COURT:  Right.

16        MR. CHEFFO:  So I mean, again that's, these ate

17  issues when you have millions of pages of documents.  Should

18  they happen?  No, you know, it never should happen.  Everything

19  should be stamped but--

20        THE COURT:  I'm sure it happens.

21        MR. CHEFFO:  This is, I mean this is the real world

22  and we're human beings not computers.  And I guess, you know,

23  the thing I would come back to if this was so crystal clear Mr.

24  Fromson, a terrific lawyer, writes me a letter saying de-

25  designate it.  You know, why would he do that?

65

1        MR. FROMSON:  Because I'm dealing with the wrong

2    production database.

3        THE COURT:  Whatever.  Okay.

4        MR. ALTMAN:  Your Honor, if I may, just one quick

5    thing though.  He says it was inadvertently produced but the

6    fact is I'm the person who received most of the production from

7    the products liability production, The version that we have it

8    is stamped confidential.  The sales and marketing people

9    complained about the confidentiality of these documents.

10   Another set was produced to them.  The confidentiality was

11   removed.  So how can they say it was inadvertent when it

12   originally was confidential and they took the stamp off of it?

13       THE COURT:  Does Mr. Rona's affidavit detail the

14   production or only the filing on the statement of undisputed

15   facts or disputed facts?

16       MR. RONA:  Your Honor, could I approach?

17       THE COURT:  Yes.

18       MR. RONA:  Good afternoon by the way.  My affidavit

19   which I have only one copy of just merely lists the documents

20   that were filed, and I was very careful to not file anything

21   that was confidential.  You have a copy of the email in

22   question which I can show in open court because it's not

23   stamped confidential and subject to the protective order

24   entered in this case.  Only documents that have a legend that

25   says confidential can be confidential.  This doesn't even--

66

1          THE COURT:  But does your affidavit address the

2    question that Mr. Altman just said which is that there was one

3    production, it's undisputed there was one production that went

4    to the products liability people stamped that it's

5    confidential, that you got a subsequent, a later production

6    from the defendants which didn't designate it as confidential?

7          MR. RONA:  Correct.  It was produced in the Young

8    case which is a personally injury case.  It had an improper

9    redaction on the face of it and I think you've seen it.  I have

10   a copy of it but they redacted the word pregabalin.  No secret

11   there.  They, and they designated it as confidential.  We

12   complained, and I believe the motion was before you and they

13   were told you can't just redact well, you know, the other drug

14   preferences and you have to hue close to the line of what

15   confidentiality really means.

16         THE COURT:  So they got another production.

17         MR. RONA:  They got another production.  And of

18   course this is a history that predates Mr. Cheffo from the

19   Franklin case by--

20         THE COURT:  But did it have separate Bates stamps on

21   it?

22         MR. RONA:  Same Bate stamp.

23         MR. CHEFFO:  I have the same Bate stamp number.  My

24   production is older with the word confidential on it.  His is

25   newer.

67

1           THE COURT:  All right, same Bate stamp.

2           MR. RONA:  And I don't think there's any nefarious

3    conduct here.  I don't mean to impute anything for Mr. Cheffo

4    or Mr. Fromson.  I think that they're both dealing with older

5    databases cause I don't think you'd ever file a motion on a

6    document claiming it's confidential when you know it's not.  I

7    think what happened was this is the wake of the tactics of

8    prior counsel, Davis Polk, making this thing unbelievably

9    complicated with having different versions of documents, some

10   redacted, some not.  So it's simpler to work with the current

11   version, the state of the art version.  That's what--

12          THE COURT:  I got it.

13          MR. RONA:  --needed to be filed.

14          THE COURT:  All right.

15          MR. FROMSON:  Can I just say one thing, Your Honor.

16          THE COURT:  Yep.

17          MR. FROMSON:  And I think it's in our, I won't go at

18   length on it, but I do think you had asked earlier and I

19   inartfully responded about the relief, and I know this probably

20   goes to your authority, but I think the *Gulf Oil* case is a

21   helpful case for the Court because it does talk about kind of

22   tailored specific type relief or instructions for single people

23   or single instances depending on, you know, certain specific

24   facts.  So I think, you know, we're all governed by the general

25   rules but when we step outside of them so far several times and

68

1  have a history, I think the Court, you know, and again if you

2  were to issue--

3          THE COURT:  Well, here's the thing that confused me

4  about what Dr. Eagleman filed in his affidavit.  It says before

5  transmitting the document to anyone - what I understand the

6  state of the record to be at this point is there's some amount

7  of confusion among counsel as to whether it was or wasn't

8  confidential because of the various productions at different

9  times and some are stamped confidential and some not.  And I

10 was reading Dr. Eagleman's affidavit and he says before

11 transmitting this document, I was advised by counsel to the

12 plaintiff that the document was not confidential and was not

13 sealed.  And he refers to an email which he quotes in his

14 affidavit that, from Mr. Greene to you, Mr. So--

15         MR. SO:  That is correct, Your Honor.

16         THE COURT:  --and, but that email is on September 14th

17 and the emails attached, the full emails attached I think as an

18 exhibit somewhere and it appears to be on September 14th as well

19 and the letter was sent on September 11th.  So I was a little

20 confused how with respect to the confirmation prior to sending

21 the letter to Dr. Catapona on the 11th you could have had the

22 confirmation, the conformation came before the email.

23         MR. SO:  What I can tell you, Your Honor, I don't

24 know about the dates but he, before he sent the letter to Dr.

25 Catapona Friedman he and I had a discussion, all right, and he

69

1    said are these documents confidential?  And I said, David, I

2    do not think they're confidential because they're not stamped

3    confidential and that they were filed at the courthouse, all

4    right, in open court and they were available to anyone that

5    wanted to go down to the court and review it, wade through the

6    boxes at the courthouse.  That - so, Your Honor, about the

7    timing, my best, without looking and investigating it further

8    my guess is David, Dr. Eagleman and I had that discussion.  I

9    did an investigation.  I called Dr. Tom Greene then I sent a

10   confirm, an email to Tom Greene afterwards.  That would be my

11   best guess but before you hold me to that, but what I can tell

12   the Court is that Dr. Eagleman spoke to me and I said that I do

13   not think the documents are confidential for those two reasons.

14          MR. FROMSON:  Your Honor, This is an interesting,

15   this is - I mean I think and I don't dispute what Ken said, but

16   this is interesting because what Dr. Eagleman attached was

17   again, and I think this time he actually had half of the email,

18   but he attached an email from Tom Greene.  This is from Exhibit

19   A to Mr. Finkelstein's declaration.  Basically Tom Greene is

20   writing back to Ken saying he thinks that some, the ones that

21   have numbers were not filed under seal.  And that's what Dr.

22   Eagleman attaches.  But interestingly Ken, because he

23   understands the way litigation works and he filed, and in fact

24   that it wasn't necessarily sealed he went the next step, and he

25   wrote back to Mr. Greene and he said Tom, did you ever get a

70

1   chance to confirm whether the exhibits to the long statement

2   were also made, were also in the public domain, I think that

3   they were but wanted to check with someone.  I admit that it

4   was Friday and my memory was fuzzy.  The point of this is not

5   to in any way deal with Ken.  It's exactly what I'm saying,

6   it's that next step.  You know, before you kind of have this

7   one email and start sending documents that you may or may not

8   be offering, you do a little due diligence and particularly if

9   you're a man who's paid $100,000 for willfully violating

10  protective orders.

11          UNIDENTIFIED:  Your Honor--

12          MR. ALTMAN:  Judge, there's no greater--

13          THE COURT:  Yeah, all right.  I think you made--

14          MR. ALTMAN:  When documents, documents with the court

15  are filed at the courthouse, Judge, is a first Amendment issue.

16  Those are public records.

17          THE COURT:  Right.

18          MR. RONA:  And all I just wanted to add is I was

19  specifically asked by both Mr. Fromson and Mr. So to check the

20  deposition exhibits which I'm also the keeper of.  And if you

21  looked at the deposition exhibits as filed by the court

22  reporter, the copy that's there in the court reporter's records

23  does not have a confidentiality designation on it.  I mean that

24  was the, you know, separate and apart from the long statement

25  of facts.  Before that long statement of facts was the

1    deposition and so anybody that looked at that deposition

2    exhibit would have seen it's not confidential.

3              MR. FROMSON:  One last comment, Judge, before you

4    shut us down, I promise I'll be brief, is that I hope that you

5    would come to the conclusion that documents were not

6    confidential and this is a much ado about nothing and it's a

7    glorified smear job of Dr. Eagleman before he hits the stand.

8    But what I will tell you is that if you do, if you're inclined

9    to craft any order that there are First Amendment

10   considerations associated with this.  Secondly, we have not

11   objected to Pfizer's sales reps. Going in and talking to these

12   doctors in the course of their business.  If you're going to

13   goose gander it we'd like that.  and then my last comment is,

14   Judge, I'm entitled with regard to a learned intermediary

15   defense to go meet with the doctor or prescriber and show him

16   documents and say doctor, if you had known this would you have

17   prescribed the drug prior to that deposition.  Mr. Cheffo's

18   attorney – prior counsel in the *Smith* case scheduled meetings

19   with doctors and third parties and showed them documents.

20             THE COURT:  I'm done on this issue.

21             MR. FROMSON:  All right.  Thank you.

22             THE COURT:  And moving on.  Thank you.

23             MR. FROMSON:  Thank you.

24             THE COURT:  With respect to Dorsey and Hubert, those

25   are the other two Massachusetts cases, right--

1          UNIDENTIFIED:  Yeah.

2          THE COURT:  --from you, remind me again, wait a

3    second, you've done the Track I - do you all need to leave,

4    because I don't need to keep you here for the rest if you need

5    to go.

6          MR. FROMSON:  We're happy to stay, Judge.

7          THE COURT:  Okay.  All right.  You've done the Phase

8    I discovery, that's the three depositions essentially; is that

9    right?

10          UNIDENTIFIED:  Yes, Your Honor.

11          THE COURT:  All right.  So I guess the question is

12    timing.  You have Shearer before Judge Saris on a schedule end

13    of March.  Am I correct that essentially the schedule for

14    Dorsey and Hubert would be similar amount of time between, to

15    get from the end of Phase I to trial and the question is when

16    do you set the trial and how does it mix with everything else

17    that's going on.

18          UNIDENTIFIED:  I think, I think the Shearer as we're

19    finding is a very aggressive schedule.  Let's assume for

20    arguments sake that we stick with what you did before, you

21    know, I think certainly I would not lessen it by any stretch

22    but we could--

23          THE COURT:  I want to tell you--

24          UNIDENTIFIED:  Yeah.

25          THE COURT:  --I probably would, I mean I had it a

73

1   little shorter.  Judge Saris extended it.  I don't have, I

2   mean--

3            UNIDENTIFIED:  Sure.

4            THE COURT:  --that's the rule.  She did it.  That's

5   done.  But I mean it seems reasonable.  That's fine.  I'm not

6   looking to shorten it and I would impose, probably impose a

7   similar schedule.  The real question is when would trial be?

8   You know, does that schedule start today?  Does that schedule

9   start on March, on April first, right, or somewhere in between?

10  How long does the Shearer trial if it doesn't get settled by

11  somebody in the audience.

12           UNIDENTIFIED:  Well I think--

13           UNIDENTIFIED:  The Shearer trial will likely be 21

14  hours per side.  Similar to what was done in Bulger.

15           THE COURT:  Twenty-hours; is that--

16           UNIDENTIFIED: Each side.

17           UNIDENTIFIED:  Right.

18           UNIDENTIFIED:  So about we figured about three weeks

19  with a nine to one schedules, you know, somewhere around there.

20           THE COURT:  Okay.  So you're done the 14th of April.

21  All right.  So in terms of the general framework does that make

22  sense to the three of you about those two cases?

23           UNIDENTIFIED:  I'm not sure I understand what

24  framework.

25           THE COURT:  Well, the framework is there's going to

74

1    be some work fact discovery, right, and so set a schedule that

2    is a period of time for a further fact discovery.  Fact

3    discovery closes.  Have a period of time for expert discovery

4    which is basically going to be you guys produce you reports;

5    they produce their reports then depositions.  That's pretty

6    much how we've done it I think in every one.  Done with that

7    and then they're going to move for, you're going to want time

8    to move for summary judgment, right?

9            MR. CHEFFO:  Presumably, Your Honor.  I haven't seen

10   the papers so I can't say we definitely would.

11           UNIDENTIFIED:  Oh.  Oh, you can say definitely, Mark,

12   we won't hold you to it.

13           THE COURT:  You can waive the right to file—

14           MR. CHEFFO:  No, no, no, that I'm not going to do,

15   Your Honor.

16           THE COURT:  People waive all sorts of rights all the

17   time.

18           MR. CHEFFO:  No, I'm good with those rights.  Thank

19   you.

20           THE COURT:  Yeah, all right.  So then they're going

21   to want summary judgment.  You're going to file opposition and

22   then a day for trial.  So the schedule that was ultimately

23   arrived at in Shearer began sometime what, it was in the

24   beginning of July or August?

25           MR. CHEFFO:  I think you, yeah, I think probably you

1  issued your order probably mid-July, Ken, right?

2         MR. FROMSON:  July 24th through the 28th you issued

3  your order and Judge Saris issued just a few days thereafter,

4  it might have been on the 28th or 29th of July.

5         THE COURT:  So it began then, so it began by August

6  1st?

7         MR. FROMSON:  Right.

8         THE COURT:  So you had August to end of March for

9  that whole process to unfold and the trial to happen on March

10  23rd, begin on March 23rd.

11        MR. FROMSON:  What I would answer on, in this one,

12  not a ton of time but maybe, you know, at least a month in

13  between because we were working together.  Shearer had been

14  raised before.  It was on everyone radar screen just, I think

15  for both parties, I mean we probably have to regroup, go back

16  and, you know, get up to speed a little bit on the cases.

17        THE COURT:  Does anybody have any idea – oh, before I

18  get, I'm sorry, I'll hear on that but what about Smith.  That's

19  the one that was--

20        MR. CHEFFO:  Smith has received a what they call a

21  suggestion to remand to Tennessee but I have not seen it go

22  through the--

23        THE COURT:  MDL hands.

24        MR. CHEFFP:  The MDL.

25        THE COURT:  To send it back.  So you don't have any

76

1    word from down there.

2           MR. CHEFFO:  Not yet.  The panel will presumably send

3    it back.

4           THE COURT:  But that one, is that one stand where

5    these gentlemen stand?

6           UNIDNEITIFED:  The expert disclosure is done and--

7           MR. ALTMAN:  Depositions we've all worked out

8    together.

9           UNIDENTIFIED:  That's more like Bulger.

10          THE COURT:  Oh that's all worked out.

11          UNIDENTIFIED:  All worked out.

12          THE COURT:  That's like Bulger, it's ready to go.

13          UNIDENTIFIED:  Right.

14          THE COURT:  All right.  So presumably that's going to

15   get back to Tennessee what's this, by November sometime, right?

16          MR. CHEFFO:  I would hope.

17          THE COURT:  I mean, you've been in front of the MDL

18   panel more than me, but I would think that would be--

19          UNIDENTIFIED:  The wheels of the district clerks

20   moves very slowly, Your Honor.

21          THE COURT:  And then – well do you want us to try, I

22   mean is that something – it's the MDL panel is the MDL panel.

23   But after that you've got to wait for the file to go from here

24   to there.

25          UNIDENTIFIED:  These days, okay my experience has

1  been--

2          THE COURT:  I would think that would happen pretty

3  quickly.

4          UNIDENITIFED:  --things are pretty quick these days

5  with electronic, it usually is a few weeks.

6          THE COURT:  So from what I'm hearing you want the

7  Shearer, do you want these two to start the eight-month

8  schedule which is what, it's about eight months with what it

9  wants, a eight month schedule starting in mid-April or even in

10  May?  That's what you're saying?

11          MR. FROMSON:  Well, I'm saying, yeah, use the Shearer

12  schedule or you know, but don't start it for another month or

13  so--

14          THE COURT:  Oh, another month from now?

15          MR. FROMSON:  Right, just to get us--

16          THE COURT:  Oh.

17          MR. FROMSON:  Because, you know, there hasn't been an

18  active case, Your Honor, so I thought that both parties might,

19  you know, contact witnesses, find out all that good stuff.

20          THE COURT:  So if we did a similar schedule starting

21  November 1st which one should go first?  Is there a difference

22  between the two?

23          UNIDENTIFIED:  I would do them together, Judge.

24  Judicial efficiency.

25          MR. FROMSON:  Well, I think it's their case first.

78

1          UNIDIENTIFIED:  Well I'm throwing it out there,

2   gentlemen.  I mean--

3          MR. FROMSON:  Okay.  Well thanks for the suggestion

4   but I think we can handle it.

5          UNIDENTIFIED:  --joint party, I mean--

6          MR. FROMSON:  First of all I think—

7          UNIDENTIFIED:  Move things along faster.

8          MR. FROMSON:  --that, you know, consistent with the

9   way Your Honor has always addressed issues, you know, I think

10  we'd both like an opportunity to see if we can agree on the

11  case.  If we can't then it'll either be your pick or some

12  random pick but I don't think plaintiff should—

13         THE COURT:  Why don't do random.

14         MR. FROMSON:  Well one or the other.  But in other

15  words my point is just, you know, I don't think the

16  plaintiffs--

17         THE COURT:  Why don't you do this, why don't you

18  propose a schedule.  I'm, content to start on November 1st,

19  something like that.  I'm going to give you just about a month

20  from now to start it.  So why don't you talk to each other.

21  Why I'm envisioning is a schedule with various dates, start on

22  November 1st.  If I did my finger math correctly it was eight

23  months for Shearer, approximately from the end of July,

24  beginning of August to the end of March.  So an eight month

25  schedule, that will take you from November 1st to trial in the

79

1    first one.  The second one – and some of this is going to

2    depend on obviously Judge Saris' trial calendar whether she can

3    try the case eight months from November 1st.  And then the

4    second one a similar schedule, not starting at the trial date

5    of the next one.  Start it at least the discovery process

6    somewhat simultaneously sort of, you know, if you want to

7    stagger it a month fine.  And then I'm not sure that she's

8    going to necessarily try them back to back.  I'll talk to Judge

9    Saris about what she wants to do and submit some proposal and

10   if you think one of these makes more sense to go first then the

11   other, you know, you can address that.  And you don't have to

12   write a long brief and I'll talk to Judge Saris in terms of her

13   trial schedule and where that fits in and then I'll look at it

14   and you can get it in in two weeks.  That'll give me time to

15   look at it and see where we are and – does that sound

16   reasonable?

17            MR. CHEFFO:  It does, Your Honor, I would just be

18   remiss if I didn't speak on behalf of Justice Friedman in the

19   New York Court and the only reason I would say there is because

20   she's been working very hard to coordinate as you know--

21            THE COURT:  Yes.

22            MR. CHEFFO:  --with this Court.  We have, Ken and I

23   have five cases and she's scheduling one.  So again, you know,

24   I'm not saying one should beat the other but I think she--

25            THE COURT:  No, we've tried hard to coordinate.

80

1      MR. CHEFFO:  I think she wants to have a case being

2  tried in New York so to the extent that we have, you know,--

3      THE COURT:  If you think that this poses conflicting

4  issues with Justice Friedman's calendar addressing it there--

5      MR. CHEFFO:  Yes.

6      THE COURT:  --tell me because we've tried very hard

7  to work, to coordinate so that you were not, you, all the

8  lawyers, were not under conflicting responsibilities.  And so I

9  certainly wouldn't want this to end up meaning that there's a

10  trial on a date when she's already set a case for a trial and

11  that that would cause a conflict and put you all between our

12  court and her court.  All you can work that out.

13      MR. CHEFFO:  I appreciate that.  Thank you, Your

14  Honor.

15      THE COURT:  Those are the only two other

16  Massachusetts cases, right?

17      UNIDENTIFIED:  I believe so, Your Honor, yes.

18      THE COURT:  Okay.  All right.  That leaves Mr. Boone

19  and Mr. - before Mr. Boone and Mr. Schwartz's case, just in

20  terms of the - we have before here, us in this court, in the

21  MDL essentially the Finkelstein cases.  That's what I'm

22  thinking about.  Those are the ones that are going first in the

23  discovery, am I right?

24      MR. FROMSON:  Well, you indicated in your order in

25  July I think you wanted to see the Finkelstein cases originally

81

1  towards the front, but you've given a one year timeframe and

2  it's our position and plaintiffs' counsel that have come here

3  today from around the country they want to get working on their

4  cases.  Some have 50 cases, some have four cases, some have 10

5  cases and they don't want to be sitting and waiting while

6  witnesses become unavailable, records become destroyed, people

7  die.

8           THE COURT:  The only reason I suggested the

9  Finkelstein cases go first was I just thought from an

10  efficiency standpoint--

11          MR. FROMSON:  I don't know that it is efficient at

12  this point.  I mean the--

13          THE COURT:  All right.

14          MR. FROMSON:  I mean the Newman and the Dorsey cases

15  are not Finkelstein cases and they'll be--

16          THE COURT:  No, those are separate cause they're

17  going to get tried here.

18          MR. FROMSON:  And so the other firms they're not

19  being remanded so they don't want to sit idle.  They want to do

20  their plaintiff's depo, their daughter's depo themselves.

21          THE COURT:  So what I understood from sort of the

22  joint filing that you all made was that there are some document

23  issues which I thought were most, were done pretty much except

24  for a little cleanup here and there, and that you'd sort of do

25  it in a timeframe.  I guess the question is where do we stand

82

1   and how we doing and what can I do about it?

2           MR. FROMSON:  When we talk of document issues on a

3   case specific basis that we think are outstanding--

4           THE COURT:  So we're clear, what I'm envisioning in

5   these cases is that essentially the three depositions.  We're

6   not going to do all the--

7           MR. FROMSON:  The core discovery issue as you call

8   it.

9           THE COURT:  The core discovery, that's right.  Core

10  discovery, we'll do all of them and then the expectation and

11  goal is to get them all done other than the Boone and Schwartz

12  cases which we haven't talked about yet within the 12 months

13  that--

14          MR. FROMSON:  And that leaves

15          THE COURT:  --core discovery.

16          MR. FROMSON:  That leaves open the fact that

17  plaintiffs' attorneys, plaintiffs are going to seek more

18  expansive discovery on their individual cases not just the

19  defendants seeking--

20          THE COURT:  No, there's going to be more, presumably

21  there's the more, the case specific discovery in each case and

22  that I'm not contemplating is necessarily going to happen here,

23  but I'll be honest with you what I was thinking is that, you

24  know, we're trying to get the Track I cases ready for trial

25  first and Bulger happened, Smith is en route, Shearer is on the

83

1  way.  The two Mass. cases are heading there.  The other Track

2  I cases the core discovery is done.  Where do they stand in

3  terms of suggestions for remand?

4        MR. FROMSON:  They have not been, well I don't think

5  there's a motion for remand pending for all those because you

6  have your order which says everything's got to stay here until

7  the core discovery is done--

8        THE COURT:  Oh, right.

9        MR. FROMSON:  --and then be – I think you made a

10  reference that then they could be remanded.

11        THE COURT:  All right.

12        MR. CHEFFO:  And again, I think that was for lots of

13  reasons consisting with the New York cases where they are

14  scheduling.  There's also the, which most – I don't see anyone

15  here from the other cases, there's also the third party payer

16  cases that--

17        THE COURT:  Sales and marketers then.

18        MR. CHEFFO:  Sales and marketing cases that we argued

19  summary judgment.  Judge Saris is talking about--

20        THE COURT:  Let me ask you a practical question—

21        MR. CHEFFO:  Yes.

22        THE COURT:  --to all of this, suppose at, at the pace

23  we're going right now by the end of the year, by June 1st you'll

24  have had Bulger, Shearer, Smith presumably, hopefully, maybe

25  one more, maybe not depending on how they eight months works

84

1   out.  You're not, on the present rubric you're not going to

2   have any other trials between now and June 1ˢᵗ other than any in

3   New York.

4           MR. CHEFFO:  Right.

5           THE COURT:  And how many--

6           MR. CHEFFO:  I wouldn't say June 1ˢᵗ but I mean if you

7   used, you know, September first, you know, I might say Justice

8   Friedman may schedule a trial before that, she may not.

9           THE COURT:  Okay, so she might have her first one

10  you're guessing, the earliest she'd probably have her first one

11  would be between May and September?

12          MR. CHEFFO:  I think that's fair, right.

13          MR. FROMSON:  That's reasonable.

14          THE COURT:  Okay.  So are you likely to be in any

15  position to begin to think about a more global resolution at

16  that point or not?

17          MR. SO:  You want to handle this, Mark, or would you

18  like me to address this?

19          MR. CHEFFO:  No, you can answer for me.  Go ahead.

20          MR. SO:  I believe that Judge Saris indicated in the

21  early portion of the Bulger case, that after Bulger, Smith and

22  Shearer she was going to, what's the right word, get us all

23  into a room and start talking.  That was my impression from

24  Judge Saris.

25          MR. CHEFFO:  Yeah, I don't remember the exact words.

85

1   I don't think that's inaccurate.  I mean I think at this

2   point, you know, obviously we don't see these as necessarily

3   bell weather cases nor do we see that as irrelevant.  I think,

4   you know, we take the cases and we'll see how the litigation

5   shapes up in the next, you know, six to nine months.

6          THE COURT:  All right, so we can just cross that

7   bridge when we get there.  I guess the question to think about

8   since that's not at all surprising to me that statement, you

9   might think about when that happens, we'll put it now when that

10  happens what kind of process you might want.  I mean one

11  process obviously exactly as described therein but there might

12  be some other processes you can invoke, you might want to think

13  about that that's coming.

14         All right, so getting back to - so where do we stand

15  then on moving forward on all these cases?

16         MR. FROMSON:  We're, well the defendants have

17  provided a sales call database which basically has the call

18  notes for sales reps.

19         THE COURT:  All right.

20         MR. FROMSON:  And if a plaintiff in any given case

21  reaches out to us and says my prescribers were doctor Smith and

22  Dr. Johnson we have a sales call database that's only up to a

23  certain year, to maybe 2005.

24         MR. ALTMAN:  I think 2004, May of 2004.

25         MR. FROMSON:  So we have a limited database for any

86

1    plaintiff whose cause of action arose after 2004 we would need

2    additional data from the defendant to match up that prescriber

3    and that sales rep.  That's an example of the type of discovery

4    that needs to be supplemented on a case specific basis or else

5    each specific plaintiff has no idea what the call notes are

6    since we have never seen them.

7          MR. CHEFFO:  And again--

8          MR. FROMSON:  Then there'd be the--

9          MR. CHEFFO:  Not to interrupt you, but that's exactly

10   the kind of thing that we are given them and understand so, you

11   know, there's no objection to that.

12         MR. ALTMAN:  Your Honor, but one of the difficulties

13   with that is that often they want to limit it to just the

14   individual doctor and sometimes it's necessary to look at the

15   doctors practice or the people in the same building because,

16   you know, maybe one day they went in, they talked to the

17   doctor's partner; they didn't talk to the doctor himself.

18         MR. FROMSON:  So that'll be an issue we'll probably

19   resolve or bring before you.

20         THE COURT:  All right.

21         MR. FROMSON:  All right, the second issue is the

22   response, the custodial files of the sales reps.  In the Track

23   I cases defense counsel would go to the sales rep and see if

24   they kept any records or they'd go to the sales reps files if

25   the sales rep sent records back to the company and they would

87

1   cull through them and give us the responsive documents about

2   the case.  So in every one of the cases in the country where

3   there's a plaintiff who needs to get ready for the sales rep

4   depo they're waiting for those documents to come.  What we were

5   inclined to do was basically send a reminder letter saying

6   look, here's our demands, you know, your 30 days runs now or

7   they were served back in `06 so they already have the

8   originally core template logs for the demand.

9            THE COURT:  So how from a coordination perspective,

10  in my big picture overview, I don't want to micromanage this

11  process.

12           MR. CHEFFO:  No.

13           MR. FROMSON:  And we think we provided a schedule

14  that was pretty broad, that the two of us, we do talk often,

15  that we could--

16           THE COURT:  Right.

17           MR. FROMSON:  --make it--

18           THE COURT:  Right.  You have 12 months but what I

19  don't want to happen at the end 12 months is find out that

20  you're just finishing up the production of the files of all

21  these people and that 300 remaining depositions are just

22  beginning to happen.  I imagine there's a lot of coordination

23  because can't, as far as you know you're not going to do the

24  depositions till you get the documents on the deponent and

25  you're them in whatever fashion and then people got to do them

88

1    and so is that, is there some – do you have a method to that?

2          MR. FROMSON:  Well, I think the world of documents

3    for the core discovery is pretty limited and pretty targeted.

4          THE COURT:  Yeah.

5          MR. FROMSON:  It's proof of prescription, proof of--

6          THE COURT:  Right.

7          MR. FROMSON:  --prescriber records and sales rep

8    custodial file.  It doesn't mean that the individual cases

9    won't seek more discovery and come back--

10          THE COURT:  Well, in terms of--

11          MR. CHEFFO:  To give you an – I think what you're

12    asking is, you know, should you be concerned that in a year

13    we're going to come back and say we haven't done anything.  No,

14    you shouldn't be concerned.  You know, should you – are there

15    going to be hiccups, of course there are.

16          THE COURT:  Yeah.

17          MR. CHEFFO:  But in the general course the reason why

18    there hasn't been a flurry of depositions yet is because we're

19    trying to coordinate and send out all the records.  We have a

20    service that's kind of collecting them for both of us, all the

21    medical, the doctors.  Once we get those, some of them we have

22    and we'll, you know, we'll put those on a quicker track.

23          THE COURT:  So do you think they're on track?

24          MR. CHEFFO:  I'm sorry?

25          THE COURT:  Notwithstanding the fact that you haven't

89

1   done any which I understand why.

2          MR. CHEFFO:  Yeah.

3          THE COURT:  Do you think you're on track?

4          MR. CHEFFO:  I think at this point I don't say we're

5   behind the eight ball yet.  We're on track.  I think we are.  I

6   think we are where we should be which is it started September

7   15th was the year.  It's only two weeks ago and we've now sent

8   out tons of authorization requests.  That'll take a few months.

9   We're going to start to identify people to be deposed, and

10  we'll start to produce witnesses.

11         MR. FROMSON:  And there's no order.  In other words

12  there's no strict – we'll work it out.  There's no order that

13  says plaintiff must go first or defendant must go first or a

14  doctor must go first.  Everybody has to meet and confer and get

15  going in whatever order you have to.

16         THE COURT:  Right.  And then that encompasses

17  basically everybody's cases other than Mr. Schwartz and Mr.

18  Boone.

19         MR. FROMSON:  Well, unless you say otherwise, Mr.

20  Schwartz will--

21         THE COURT:  I'm content about doing all of that.

22         MR. FROMSON:  Right because Mr. Schwartz and Mr.

23  Boone are here and they want to move forward on their case.

24         THE COURT:  And I want to talk about that.  The only

25  reason I cut them out at the beginning when I first set it up

90

1   was that my memory was Mr. Boone had something in the

2   neighborhood of five to 700 plaintiffs and, maybe it was 300?

3            MR. BOONE:  Three hundred, Your Honor.

4            THE COURT:  Three hundred, all right.  And Mr.

5   Schwartz you have how many plaintiffs?

6            MR. SCHWARTZ:  116, actually 132 but we have 116 that

7   we're in touch with.  The rest are nomadic and we have to, you

8   know, trace them down periodically but they're in five states

9   essentially.

10           THE COURT:  So is a 132 you're moving forward on or

11  it's 116 and the 16 who are nomadic are not.

12           MR. SCHWARTZ:  The 132 are--

13           THE COURT:  I mean unless they're dismissed they're

14  moving forward.

15           MR. SCHWARTZ:  132 are present but 116 we have actual

16  direct contact with, Your Honor.

17           THE COURT:  All right.  So the only reason I frankly

18  with Mr. Boone and Mr. Schwartz it was no effort to

19  disadvantage your clients as much as that's another four to 500

20  more plaintiffs and my memory – what is it 135 for everything

21  else?

22           MR. FROMSON:  We have approximately, we have

23  somewhere around that range and then we have our New York

24  plaintiffs as well that—

25           THE COURT:  Right, but I mean in terms of what I have

91

1    to manage, 135.

2              MR. FROMSON:  It might be less.  I think it – but--

3              THE COURT:  No more.

4              MR. FROMSON:  No more.

5              THE COURT:  So 135 times three is three to 400

6    depositions, 500 times three is 1,500.  It's a lot more.  In

7    managing the case it just struck me as more efficient to take

8    care of the 135 first.  I guess the question I have for you,

9    Mr. Boone, and you, Mr. Schwartz, is what do you propose?  I

10   mean there are I guess two scenarios.  Your cases can proceed

11   in this process with the 135 you're proceeding in or your cases

12   can proceed after that process.  And--

13             MR. SCHWARTZ:  I prefer to an alternative, sending

14   them back to the district.  Isn't that a viable alternative?

15             THE COURT:  Send them back now.

16             MR. SCHWARTZ:  Oh, okay.

17             THE COURT:  Is that what you're asking?

18             MR. SCHWARTZ:  No, I said that's a third.

19             THE COURT:  Yeah, sure, I suppose that's an

20   alternative.  Would that proposal be to send them back now?

21             MR. SCHWARTZ:  Well--

22             THE COURT:  Here's the problem I have with sending

23   them back now.

24             MR. SCHWARTZ:  You'll have to confer we have counsel

25   in each of those six states.

92

1          THE COURT:  Here's the concern I have with sending

2   them back now, that the whole, to be honest with you the

3   reason, one of the reasons for keeping the cases here was

4   because I thought it would be more efficient and I think Judge

5   Saris agreed that it'd be more efficient to manage the common

6   discovery here than it would be if it were spread across the

7   country in front of a variety of judges with a variety of

8   calendars.

9          MR. FROMSON:  But I'm still here and you still retain

10  jurisdiction over the common discovery even if every case is

11  remanded.

12         MR. BOONE:  Judge, we agree with that.

13         MR. FROMSON:  It still would be able to share it.

14         THE COURT:  Wait, I don't understand.

15         MR. CHEFFO:  Well--

16         MR. FROMSON:  Meaning if there's common discovery or

17  deficiencies or supplements in the general case, the MDL

18  doesn't just go away because the case--

19         THE COURT:  No, no.  What I mean is in terms of

20  managing these 300 or 1,800 depositions, right, that's what

21  we're talking about.

22         MR. CHEFFO:  Yeah.

23         THE COURT:  It struck me – I know you wanted me to

24  remand them all and I understand why but one of the reasons,

25  it's not the only reason, but one of the reasons they were kept

93

1   was the judgment that they'd be more expeditiously, they'd be

2   done faster and more efficiently here to manage the process.

3   If I sent their four or five hundred cases back what does that

4   do to the process?

5           MR. FROMSON:  I don't think it changes the process.

6   The process is met with by phone calls and correspondence and--

7           THE COURT:  So from your perspective you, no problem

8   for you.

9           MR. FROMSON:  That would be the position I took two

10  months ago--

11          MR. CHEFFO:  Well of course it's no problem for him

12  cause--

13          MR. FROMSON:  --which is remand my cases.  Remand my

14  cases but as far as common discovery if there is any the Court

15  still retains jurisdiction over--

16          THE COURT:  No, but if I were to keep yours and

17  remand theirs?

18          MR. FROMSON:  I'd be frustrated by that.  I would

19  want mine remanded as well as every other counsel wants--

20          THE COURT:  They should be all the same.

21          MR. FROMSON:  Right.

22          THE COURT:  Remand them all or keep them all?

23          MR. SCHWARTZ:  Your Honor, if we may be heard?

24          THE COURT:  Yep.

25          MR. SCHWARTZ:  We've been here, missed our plane

94

1   flights tonight because of this.

2          THE COURT:  Oh, I'm sorry.

3          MR. SCHWARTZ:  But we, it's more efficient obviously

4   in this judicial economy to keep them here and our, 22 months

5   ago when we were here selecting the bell weathers I offered to

6   put one two of ours in and participate and because Mr.

7   Finkelstein and Mr. Fromson had taken the lead, it was their

8   show and I'll, my fellow Texan Mark Lanier got to the head of

9   the list with Bulger but he did, we're obviously more efficient

10  for you to retain jurisdiction over--

11         THE COURT:  All right.

12         MR. SCHWARTZ:  --the matters and we can abate ours

13  to, you know, use common discovery for uniformity purposes if

14  nothing else.

15         THE COURT:  Well what do you - I mean, what about

16  you, Mr. Boone, what do you think?

17         MR. BOONE:  Judge, we'd actually like to have our

18  cases remanded so that we can get on with the litigation.

19         THE COURT:  All right.

20         MR. BOONE:  You know, if we could get on, because our

21  plaintiffs are just sitting still.  We're sitting still.

22  Really we can't do anything.  We've, you know, complied with

23  our discovery requests but we can't do anything definitively.

24         UNIDENITIFED:  And co-plaintiff steering committee

25  member Jack London from Texas has a case called Barlow and he

95

1   asked me to make clear on the record he would like his case

2   remanded as well.

3           THE COURT:  All right.  His case is just one of the

4   individual cases--

5           UNIDENTIFIED:  Yes, sir.

6           THE COURT:  --as opposed to--

7           UNIDENTIFIED:  Right.

8           THE COURT:  Okay.

9           MR. CHEFFO:  I'm getting shot at from all sides here,

10  Your Honor.  Even Mr. Fromson in that case he doesn't even

11  represent the plaintiffs but maybe, let me, let me see if I can

12  state what I think my position is.

13          THE COURT:  You don't look like you're bleeding.

14          MR. CHEFFO:  I'm ducking, Your Honor.  You know, in

15  all seriousness I think that, you know, for the same reasons

16  that you didn't, you know, remand any of them I think what you

17  hear from at least two of the three counsel is it makes sense

18  to keep all these cases at least for Tier I Track I, then

19  you'll decide what you're going to do with them.  The issue

20  with respect to timing is, you know, we understand that there

21  is a desire by counsel to try and move the cases but on the one

22  hand, you know, Mr. Fromson and his firm are co-lead counsel

23  for this MDL and they basically said we can do 130 cases in a

24  year.  There's 500 depositions--

25          THE COURT:  Well let me ask you this.

96

1       MR. CHEFFO:  Now they're trying to pile everything

2  in and say let's use the same year and that's kind of like

3  changing the rules in the game.

4       THE COURT:  For the plaintiffs it's not hard to add

5  more cases into the mix.  In other words Mr. Boone goes through

6  the sales database, identifies he's going to be there for his

7  deponents.  He's going to take the depositions for his people

8  and Mr. Schwartz will do that.  It really comes down to from a

9  perspective of it's not more work for me particularly.  The

10  question is for you if I add in those 432, something like that,

11  people for you is that, what does that do to you?  What do you

12  say?

13       MR. CHEFFO:  I think that's--

14       THE COURT:  If I don't add what do you propose I do

15  with those 432?

16       MR. CHEFFO:  Yeah.  Well, I think it is unworkable on

17  that.  I think what we came to with the year was really what

18  the, you know, and I didn't get up here and say they should

19  only be Mr. Finkelstein's or Fromson's cases.  He said there's

20  130.  I mean if I basically said we're going to do a hundred--

21       THE COURT:  No, that was my suggestion.

22       MR. CHEFFO:  No, and I'm not finding fault.  I'm just

23  saying that that number was driven by the three times 130, the

24  400 or so depositions which was daunting but said, okay, we can

25  do that in a year.  So to answer your question directly, if we

1   were to put 500 other cases we certainly couldn't work on that

2   schedule.  What I proposed to counsel before is, you know, we

3   had the opportunity, we didn't necessarily see eye to eye on

4   all the issues but Mr. Fromson and I had the opportunity to

5   confer before and then either submit a joint proposal to those

6   areas where we could agree to timing and if we couldn't agree

7   then we would submit kind of competing.  So perhaps that system

8   would work where we take a few weeks.  I have an opportunity to

9   talk to counsel; see if we can work out a schedule that's

10  agreeable and then if not you'll be the arbiter of timing.  But

11  I would think that they have to go on a separate, some type of

12  separate schedule.  Either that or take some of, you know, Mr.

13  Fromson's cases out the year and put some of their cases in if

14  that's what they want to be doing.

15          THE COURT:  All right.  I'll give you a couple

16  thoughts, and then I don't have an objection if you want to

17  spend a little time talking to, the three of you talking to

18  each other and submit some sort of proposal that could have

19  competing.  I mean I hear basically Mr. Schwartz is content to

20  proceed here for the comment.  Mr. Boone would like remand.  I

21  wouldn't, I mean I don't expect you to reach agreement on that,

22  but in the event they stay – but, Mr. Boone, you could also

23  address with them if I keep your – (inaudible – #5:55:27) –

24  then what schedule without prejudice do you request that I, you

25  don't have to give up that request in order to talk about the

1    schedule.  So you can talk about the schedule too.

2            I would like to move forward on - I recognize the

3    practical issue of adding 1,500 depositions on top of 300 or

4    400.  It's just a lot more.  On the other hand, you all are

5    educating me that in a sense that in addition to the sort of

6    initial template discovery there's a certain amount of, there's

7    obviously, there's this document discovery that has to happen

8    before you actually do the depositions and so, you know, phase

9    I in those cases is going to be identifying who are the

10   deponents and producing the documents, right.  Phase II is

11   scheduling all the depositions and doing them.

12           MR. CHEFFO:  Right.

13           THE COURT:  And finding the people.  And then--

14           MR. CHEFFO:  And to that point there may, and I don't

15   want to kind of speak out of school here because, you know, I

16   would need to confer with my client, but I mean I can envision

17   a situation from just in frankly Pfizer's interest that if

18   there's a sales rep who detailed a certain prescriber and they

19   prescribed five or nine different plaintiffs, then I might well

20   want to say you know what why don't you guys join and do this

21   deposition today once and you can all ask your questions at

22   that as opposed to having to be deposed and Ken and I have

23   already talked about that in the 130 cases.  But I think--

24           THE COURT:  See I think that makes sense and I think

25   in that regard it makes sense in including Mr. Boone and Mr.

1   Schwartz in that because there's no reason if there's a Pfizer

2   witness – I mean we're talking about--

3          MR. FROMSON:  If you have a common sales rep or a

4   sales rep common--

5          THE COURT:  A common sales rep.

6          MR. FROMSON:  --to a number of plaintiffs, yes, we

7   all would--

8          THE COURT:  You should do it and you might as well--

9          MR. FROMSON:  It would be a joint notice.

10         THE COURT:  --Mr. Schwartz and that moves their cases

11  forward and the three depositions are the sales rep, the

12  descendant or administrator of the estate kind of person and

13  then the prescribing physician or physicians.

14         MR. FROMSON:  Yes.  And we have had, we have a bone

15  of contention as to whether you'd call the sales rep a sales

16  rep, a territory manager or if there was a medical liaison

17  there but generally that's--

18         THE COURT:  Those are the categories.

19         MR. FROMSON:  --the core.

20         MR. CHEFFO:  Threes a minimum because I mean that's

21  assuming one prescriber, one--

22         THE COURT:  Yes, I understand.

23         MR. CHEFFO:  --sales rep so, you know--

24         THE COURT:  But the common – from the plaintiffs'

25  perspective the overlap is going to be with the person or

1  people who work for Pfizer.

2          MR. FROMSON:  Correct.

3          THE COURT:  What's the likelihood of there being

4  overlap Mr. Boone or Mr. Schwartz for prescribing physicians.

5          MR. FROMSON:  Anything's possible.

6          THE COURT:  Within Mr. Boone's cases I suppose it's

7  more likely because many of them are from Mississippi, right?

8          MR. BOONE:  Yes.

9          THE COURT:  So, but across plaintiffs other than

10  that.

11          MR. SHWARTZ:  Your Honor, one thing I'd, you know,

12  defer to that goal is I can make available to plaintiffs'

13  counsel the listing of all the doctors that are in the database

14  which has the names of the sales rep.  it would be a real

15  efficient way to send that out to each plaintiff, check off the

16  doctors that are involved and then we'd go up to sales reps.

17          THE COURT:  Well, it makes sense to try to include,

18  factor that in some sort of process so that number one)  when

19  all the Pfizer people who are, relate to Mr. Boone or Mr.

20  Schwartz are being deposed they can join in the deposition, do

21  it at the same time.  If there's doctors, you can easily figure

22  out with that, send it out to the people and if there's a, they

23  can participate if there's a prescribing physician who did more

24  than, prescribed to more than one plaintiff, then they could do

25  that. and you mine as well do that, maybe spend a little time –

101

1    do that and then see what that means in terms of, actually

2    how much might be left in Mr. Boone and Mr. Schwartz's cases

3    that isn't going to happen in the time period we've already

4    contemplated and then propose something.  File it by November

5    1st.  Is that enough time?

6              MR. CHEFFO:  I think so.  I mean if Mr. Altman has

7    that information and we can work together to find out the

8    overlap sure.  I mean I think that would be a helpful start.

9              THE COURT:  Does that make sense, Mr. Schwartz?

10             MR. SCHWARTZ:  Yes.

11             THE COURT:  Mr. Boone?

12             MR. BOONE:  Yes, Your Honor.

13             THE COURT:  All right, fine.

14             Anything else for today?

15             MR. CHEFFO:  I think that's it, Your Honor.

16             MR. FROMSON:  One thing that was discussed today was

17   the clarity or lack thereof about whether we can serve

18   additional case specific demands because we don't want to be

19   put in a timeframe later down the road where you didn't amend.

20             THE COURT:  Oh, right.

21             MR. FROMSON:  So if I can at least serve case

22   specific demand and then be able to confer with him on them and

23   not have to, I would appreciate that.

24             THE COURT:  This is in Shearer essentially.

25             MR. FROMSON:  Well, no, actually in other cases that

102

1  will go forward if there are additional demands that have

2  since come to light, you know, reasons – additional demands

3  over and above the template interrogatories for documents,

4  there might not be many but there could be a few more issues

5  that have arisen since those were prepared in 2006.

6          THE COURT:  That are core discovery or non-core

7  discovery?

8          MR. FROMSON:  They reveal what the sales

9  representatives or possibly their supervisors and the training

10  that they received.  So they would be at issue at a sales rep's

11  deposition.  And so or they could deal, actually it also deal

12  with health care providers and not just prescribers.  I want

13  documents from health care providers that were contacted by the

14  company, not just the prescribers themselves.  I'm not looking

15  for the depositions of those providers now but certainly why

16  not get a head start on my discovery.

17          MR. CHEFFO:  This is the motion to compel again, Your

18  Honor.  It's the same thing.  We he says, you know, he starts

19  with, you know, I'm going to do case specific which we all

20  understand as the specific sales rep.  But then he's like I

21  want sales reps and documents and, you know, it's not case

22  specific.  It's the exact issue of opening everything up and

23  now we have, you know, a thousand cases.  So I think that with

24  respect to these issues we have to be very, very clear and very

25  careful about giving plaintiffs an avenue to again serve more

103

1   written paper and more discovery.  I think--

2          MR. FROMSON:  More like the wake of Sept. 2010 to

3   then go and serve those demands.

4          THE COURT:  Well, I think first you should talk to me

5   and find out what it, you know, what it is that he wants.

6          THE COURT:  I think what you guys should do is talk

7   about this and this is a question, I'm not sure you really

8   particularly thought out or addressed in the course of these

9   proceedings, which is for the further discovery in all of these

10  cases what's going - how's that going to be resolved when

11  there's disputes or what's the scope of that?  In a way it's

12  easier in Shearer, Dorsey and Huber (ph) because they're all

13  getting full discovery here.  Whatever you're going to do

14  you're going to do here and it happens and any disputes will be

15  resolved by me.  In the other cases, you have core discovery

16  versus non-core discovery and we're certainly going to do the

17  core discovery here but I don't want to do the, if there's a

18  motion to do, I'm not saying there is but, you know, want to

19  depose these people beyond the 10 in Case No. 242, the fact

20  specific discovery that's going to be for I think the district

21  judge who has that case when it gets remanded cause that's

22  beyond the core discovery.  If it relates to the - I mean, I

23  guess you should think about this.  I'm just thinking aloud

24  whether on--

25          MR. CHEFFO:  Sure.

104

1          THE COURT:  --core discovery if there are disputes

2    how are we going to resolved those.  And what I'm hearing you

3    saying is that there might be documents you want that relate to

4    core discovery depositions and how do you get those documents

5    or not?

6          MR. FROMSON:  Right, because they're beyond right now

7    what the template interrogatories and document requests have

8    asked for.  And so I want to bring--

9          THE COURT:  Mr. Boone, you had something you wanted

10   to say?

11         MR. BOONE:  Yes, Your Honor, I'm just going to say

12   that unless the Court has something to ask me I can make my

13   7:13 flight if I'm permitted to leave now.

14         THE COURT:  You're excused.  Go right ahead.

15         MR. BOONE:  Thank you, Your Honor.

16      PAUSE

17         MR. BOONE:  Thank you, Your Honor.

18         MR. CHEFFO:  Your Honor, the – again, I think that in

19   light of the hour and the fact that there's so many complicated

20   – I think that it would make sense to talk.  I actually do have

21   one issue again.  You tell me how you want to raise it.  You

22   know this is in specific to the Shearer case.  With respect--

23         THE COURT:  Is specific to Shearer or--

24         MR. CHEFFO:  Is.  It's actually Mrs. Shearer.  We

25   believe her deposition was not continued.  In fact. I mean

1   amongst other things at the time of her deposition there's a

2   suicide note.  She didn't have it in her position.  She said

3   she lost it.  It later came to light that she has it.  I think

4   it's been produced.  Again, not imputing any bad motive but the

5   fact of, you know, that was a long time ago.  We've asked for a

6   targeted limited continue deposition.  We can file papers on

7   this if you don't want to deal with it now.  I don't want to,

8   you know, sandbag Mr. Fromson on this so I did raise this with

9   him.  He told me, no, make your motion if you're going to do

10  it.  So in light--

11          THE COURT:  The issue is that, your position as to

12  the position it was just concluded, done.  It wasn't

13  continued--

14          MR. CHEFFO:  Well, it wasn't concluded.

15          MR. FROMSON:  Well, they always reserve their right

16  to come forward at every deposition.  They'll say at the end of

17  deposition I reserve my right to continue.

18          MR. CHEFFO:  Right, but when someone says--

19          MR. FROMSON:  I think the deposition was full, entire

20  and complete.

21          MR. CHEFFO:  --I don't have a suicide not in a

22  suicide case, the wife, and then later has a suicide note that

23  the find.

24          THE COURT:  Here's what I'm going to do.  If you want

25  to file a motion on it, file a motion on it.  Keep it short.

106

1    You don't need to--

2            MR. CHEFFO:  Absolutely.

3            THE COURT:  File an opposition.  I'll look at it.  If

4    you want to do a reply you can do a reply but no replies over

5    five pages.

6            MR. CHEFFO:  Fair enough, Your Honor.

7            THE COURT:  And I'll look at it.  I'll either rule on

8    the papers or if I think it's just full, I'll have a hearing

9    held.  Something like that I don't know if you have to come

10   back here.  You can probably do it by phone if I needed to ask

11   questions.

12           MR. FROMSON:  And can I have leave to make an

13   application of the Court for an additional discovery demand

14   that's--

15           THE COURT:  Yes.  So the questions this with respect

16   to the issue raised Mr. Fromson.  I think what the two of you

17   should do is talk a little bit about the process.  In other

18   words this, with respect to core discovery and so that – I

19   don't know if there's going to be, if it were just one motion

20   with respect to one thing then I might resolve it but in a

21   sense of what's the, I want to think about – I don't want to

22   create the process after the fact in the form of resolving one

23   issue.  I want to think about have the two of you and then you

24   need a chance to think about how to handle it generally, you

25   know, in terms of these kinds of issues that might come up.

107

1    MR. FROMSON:  I just want to, I'm glad I preserved

2    on the record my, you know, the plaintiff's position that

3    there's definitely more discovery that each individual

4    plaintiff can seek over and above the sales reps, custodial

5    file and a bunch of call notes because that's all they get.

6    THE COURT::  Into, before trial?

7    MR. FROMSON:  Before trial.  And if you are going to

8    keep all of these cases here for an entire year, we can get

9    started on that additional document discovery cause the sales

10   court notes is a database.  They gave it, it's done.  The

11   individual custodial files for the sales reps, that's work.

12   I'm not denying, they have to go to a number of sales reps.  If

13   I'm now asking for something above that I understand that it

14   might not be core discovery for a deposition now, but it will

15   be a deposition we'll seek possibly in a case after you

16   remanded it so we don't want to wait a year and a half to at

17   least get that ball rolling.

18   THE COURT:  All right, 11 months.

19   MR. FROMSON:  11 months.

20   THE COURT:  All right, talk to each other about that

21   and if you want you can submit something on that after you talk

22   to each other.

23   COUNSEL:  Thank you, Judge.

24   THE COURT:  We're adjourned.

25                         CERTIFICATION

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

108

1        I, Maryann V. Young, court approved transcriber, certify

2   that the foregoing is a correct transcript from the official

3   digital sound recording of the proceedings in the

4   above-entitled matter.

5

6   /s/ Maryann V. Young                November 4, 2009

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24