# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re:   NEURONTIN MARKETING, SALES   :  MDL Docket No. 1629
        PRACTICES AND PRODUCTS    :
        LIABILITY LITIGATION       :  Master File No. 04-10981

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:         :  Judge Patti B. Saris

*Shearer v. Pfizer Inc., et al.*         :  Magistrate Judge Leo T.
Case No. 1:07-cv-11428-PBS      :  Sorokin

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PROPOSED DECLARATION OF MARK S. CHEFFO IN SUPPORT
OF DEFENDANTS' REPLY REGARDING OBJECTION TO MAGISTRATE JUDGE'S
ORDER DENYING MOTION TO RESTRICT COMMUNICATIONS WITH TREATING
PHYSICIANS AND IMPOSE SANCTIONS AGAINST DR. DAVID EGILMAN**

      I, Mark S. Cheffo, declare and state as follows:

      1.      I am a partner with the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Defendants Pfizer Inc and Warner-Lambert Company LLC.  I make this declaration based on my own personal knowledge and information.

      2.      Attached as Exhibit A is a true and correct copy of excerpts from the hearing on October 5, 2009, before Magistrate Judge Sorokin.

      I declare the foregoing statements are true and correct under the penalties of perjury, this the 10th day of November, 2009.

                           s/ Mark S. Cheffo
                           Mark S. Cheffo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on November 10, 2009.


<u>/s/ David B. Chaffin</u>
David B. Chaffin

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
HARDEN MANUFACTURING CORPORATION . CIVIL ACTION NO. 04-10981-PBS
     Plaintiff                    .
                                  . BOSTON, MASSACHUSETTS
          v.                      . OCTOBER 5, 2009
                                  .
PFIZER, INC., et al               .
     Defendants                   .
. . . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

Kenneth B. Fromson, Esquire
Keith Altman, Esquire
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY 12550
800-634-1212


Ken So, Esquire
Lanier Law


David Chaffin, Esquire
White and Williams LLP
100 Summer Street
Suite 2707
Boston, MA 02110-1701
617-748-5200
chaffind@whiteandwilliams.com

Mark S. Cheffo, Esquire
Catherine Armstrong, Esquire
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036
212-735-3000
mark.cheffo@skadden.com

***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

Chad Tolar, Esquire
Garcia & Karam LLP
820 S Main Street
McAllen, TX 78501
956-630-2882
@garciakaram.com

Levi Boone, III, Esquire
Boone Law Firm PA
401 West Sunflower Avenue
Cleveland, MS 38732-1772
662-843-7946
LBoone@BooneLawFirm.com

Timothy J. Perry, Esquire
Perry, Krumsiek & Jack, LLP
101 Arch Street
19th Flr.
Boston, MA 02110
617-720-4300
tperry@perrylegal.com

Paul S. Hughes, Esquire
2120 Commonwealth Avenue
Suite 200
Newton, MA 02466
617-244-5620
pashughes@aol.com

Newton B. Schwartz, Sr., Esquire
Jack Lang, Esquire
1911 Southwest Freeway
Houston, TX 77098
713-630-0708
nbs@nbslawyers.com

Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

48

1    Rule 26 in Shearer in September of `09 so that's why this

2    issue is being brought to you now.  The first time they put Dr.

3    Edwards on their Rule 26 for their claims and defenses, all

4    right, and so they obviously have information about Dr.

5    Edwards.  We have nothing regarding his relationship to the

6    company.

7              MR. CHEFFO:  Wait a minute.  You--

8              MR. FROMSON:  We don't have the payment to Dr.

9    Edwards--

10             MR. CHEFFO:  You submitted – let's just be clear here

11   because that's just so disingenuous, Ken.  They first--

12             MR. FROMSON:  It's not you--

13             MR. CHEFFO:  They first gave the Rule 26 and you

14   listed him.

15             MR. FROMSON:  As a treating provider.

16             THE COURT:  I'll look it – whoa, whoa, whoa, I want

17   to move on cause – I may have more time then all of you but you

18   may not have an unlimited amount of time.  I want to turn to

19   the motion, the next motion which is Dr. Eagleman (ph)

20             MR. CHEFFO:  Yes, Your Honor.

21             THE COURT:  Is he here just out of curiosity?

22             MR. FROMSON:  No, he wasn't served.  He's not on

23   notice for the motion.  They didn't serve him yet they want

24   sanctions.

25             THE COURT:  He had, they filed something.

49

1          MR. FROMSON:  He provided an affidavit but--

2          THE COURT:  Right.

3          MR. FROMSON:  --technically he's never been--

4          THE COURT:  I didn't know if that affidavit was

5    separate or was sort of with yours as an exhibit to--

6          MR. FROMSON:  He provided the affidavit to us.  We

7    provided it as part of our opposition.  But as far as seeking

8    sanctions against the man, they never even served him.  He's

9    under the jurisdiction of the Court because he signed a

10   confidentiality order yet they never served him with papers so

11   that he properly address it.

12         MR. CHEFFO:  Your Honor, if that's the game that

13   we're really going to play here, I mean they've given him the

14   documents--

15         THE COURT:  Can I ask one question?  Can you just

16   give me - you submitted and I have it but the practical problem

17   I'll tell all of you with sealed documents is sealed documents

18   are much more difficult for us to handle because the other

19   documents are on the, we just get them off the computer.

20         MR. CHEFFO:  Yes.

21         THE COURT:  But do you have, I had it, I had but I

22   don't have it in my pile right here, the original motion had an

23   affidavit from you, Mr. Cheffo, and attached as an exhibit was

24   the letter, the original letter from Dr. Eagleman to a doctor

25   up in Vermont and I just want to take another look at that.

50

1      MR. CHEFFO:  Yes.  I have that and I also have if I

2  can approach, Your Honor.

3      THE COURT:  You can.

4      MR. CHEFFO:  There's also, there's actually three

5  letters.  I submitted this and then Mr. Finkelstein submitted

6  two other letters to other doctors that Mr. Eagleman had sent.

7      THE COURT:  No, but this doesn't have – I'm sure that

8  I read the letter from Dr. Eagleman to Dr. Copa--

9      MR. FROMSON:  Catapono.

10     THE COURT:  --Catapono and this doesn't have that.

11     MR. CHEFFO:  I think that's right.  Isn't it right in

12  the first exhibit?

13     THE COURT:  Oh, I'm sorry, you're right.  It's on the

14  back side of the page.

15     MR. CHEFFO:  I'm trying to be green, Your Honor, I'm

16  sorry.

17     THE COURT:  I can see that.  You can see I'm not.

18  Okay.  So, I'll cut to the chase on Dr. Eagleman.  I read the

19  motion, Mr. Cheffo, and the rest of your papers and it struck

20  me a couple different issues.  One issue is as to the

21  protective order, okay, putting that aside for the moment.  The

22  other issue he wrote to a witness.  He told the witness facts.

23  He told the witness characterization of facts and he told the

24  witness he wants he wants to talk to the witness.  And he told

25  the witness his view of various information.  I would assume

51

1  that his facts, characterization of facts and the like you

2  heatedly disagree with.  And, but as to that I don't see

3  anything in terms of a penalty.  I don't see anything in terms

4  of, I don't see that he threatened the witness, that he offered

5  to pay the witness for a testimony.  Offered to pay for the

6  person's time, but in the context of a doctor that seems

7  something different, professionally basically says I'm willing

8  to talk to you and I'll pay you your going rate for that time.

9  It's like a deposition.  It's not being – you understand, Mr.

10  Cheffo, don't you?

11          MR. CHEFFO:  Sure, I do.

12          THE COURT:  And so was it wise, does it expose him to

13  cross examination?  Does it – there's a whole range of

14  potential choose it, hard for me to think about.  I know those

15  are strategic issues.  But all those things put aside from the

16  protective order, that's a whole different matter, what's, what

17  – absent the protective order issue, on what basis would I

18  intervene?

19          MR. CHEFFO:  It's a fair question, Your Honor.  I

20  think that--

21          THE COURT:  I mean he's been sanctioned before.  I'm

22  persuaded based on my general review that Judge Weinstein

23  sanctioned him in the form of a settlement agreement.  But--

24          MR. CHEFFO:  Well, let me just say – I'm sorry.

25          THE COURT:  So what, I mean not so what but what does

52

1   that have to do with this motion?

2          MR. CHEFFO:  There's two issues just to be clear, you

3   know, we're not basically, you know, saying he's been

4   sanctioned before so therefore anything he does we'll sanction

5   him--

6          THE COURT:  Right.

7          MR. CHEFFO:  --again.  And I also think that

8   notwithstanding what the plaintiffs said we understand that

9   people can interview people and talk to them.  That's not the

10  issue.

11         THE COURT:  Right.

12         MR. CHEFFO:  What I think here though is there is a

13  part of the process, and I don't want to sound corny or cliché

14  here but, you know, it's something I really do believe, Your

15  Honor, and that is there is a fair and appropriate way and an

16  honest way to deal with non-parties, and it's not just for

17  experts.  It's also, you know, and it's not just one case.  You

18  in this court has the imprimatur of this litigation.  And

19  doctors don't understand what's going on and we all have as

20  officers of the court and members of the judiciary an

21  obligation to make sure that people understand fairly what's

22  going on because they're not all lawyers.  They don't know when

23  they get this document whether a doctor has to read something,

24  whether they should take it as true.

25         The reason, the only reason we found out about it

53

1  frankly is Dr. Catapono because it was our job to schedule

2  with her called up and says oh, my gosh, you know, what is all,

3  why is all this?  Why am I receiving this information from a

4  doctor written on, you know, it says I'm a doctor from Brown

5  University.  So is it a situation, am I saying that he wrote –

6  he's says if you don't testify we're going to come to your

7  house, you know,--

8           THE COURT:  Yeah.

9           MR. CHEFFO:  --I'm going to – we're not saying that.

10          THE COURT:  Right.  I know.

11          MR. CHEFFO:  So this is more of a it's in your

12  inherent and the Court's inherent authority to have some

13  control over the litigation to make sure things are done in an

14  appropriate way.

15          THE COURT:  But what would I tell him, what would be

16  the instruction?

17          MR. CHEFFO:  The instruction would be each - I mean

18  this is a man who is a recidivist offender.  Let me just, let

19  me just tell you also in case I don't get a chance to--

20          THE COURT:  The other offense wasn't with respect to

21  a witness.

22          MR. CHEFFO:  Well, there's two issues that putting

23  aside the protective order for a second.  I don't know if you

24  had a chance to look at our supplement, but I mean that is the

25  most stark example of the most dishonest conduct.  If it was a

54

1  lawyer I think you'd refer us in about a second to the Bar

2  Association.  He takes an email string; it starts with a long

3  email string that goes through all this information, I'm not

4  going to get in detail because it's a sealed document, and it

5  then gets forwarded to somebody else, okay.  That person then

6  forwards it to the ultimate person to say can you comment on

7  it.

8          So basically in other words it's all a string and

9  it's referring to this big block of information.  What Dr.

10 Eagleman does is he literally wipes out all of the document, a

11 page and a half of the document, without saying redaction and

12 then just sends it across to the doctor.  Now, in his

13 declaration he says well, out of an abundance of caution I did

14 that.  Well, if you had to exercise an abundance of caution

15 about whether the document was confidential or half of it was

16 or email string, why would you send it to the doctor?

17         THE COURT:  Well, what would I--

18         MR. CHEFFO:  Well, I'll tell you what you could do,

19 Your Honor.  I think that, you know, this, you know, and we'll

20 assume we get another hearing if they really want to have a

21 hearing I think that's absurd and if this is their expert who

22 was, you know, who was Mrs. Bulger's administrator of the

23 estate who's calling people or giving documents.  Then all of a

24 sudden like oh, my gosh who's Dr. Eagleman, we have no control

25 over him.  But if we want to have that charade we can go

55

1  through a formal proceeding.  But what you would do is you

2  would say you are no longer, you have lost your ability to

3  contact witnesses in this case.  You cannot do that on behalf

4  of the plaintiffs.  You can't use privileged documents.  You

5  can't use; you've lost your ability.  We challenged his ability

6  as you'll recall when he became the administrator to see

7  documents under the protective order.

8            THE COURT:  Right.

9            MR. CHEFFO:  You denied that.  You said at this point

10  I don't think he's even going to see documents but I haven't

11  seen anything--

12            THE COURT:  I'm not the probate court.

13            MR. CHEFFO:  I haven't seen anything--

14            MR. FROMSON:  And that's a different case.

15            MR. CHEFFO:  I haven't seen anything that would

16  make--

17            MR. FROMSON:  Just so we're all clear this is the

18  Shearer case.  That was the Bulger.

19            THE COURT:  Well, right.

20            MR. CHEFFO:  No, I understand.  I understand that.

21  I'm aware of that, Ken.  I know the difference between the

22  cases.

23            So basically this is not a right.  This is a luxury.

24  This is an honor and it's an ability for an expert in this case

25  to see confidential documents to consult with officers of the

56

1   court and then to reach out and consult with, I mean he didn't

2   just know Dr. Catapono Friedman came to him like one night.  He

3   got the names of, because he has the names listed from these

4   guys of the treating physicians.  He then is essentially used

5   like the Trojan horse to go and give half truths to these

6   people.  That's the problem that I have is that the lawyers I

7   believe are fully ethical.  I believe they're zealous advocates

8   but they would not do what Dr. Eagleman is doing.  And I can't,

9   I can't go and find somebody else to do essentially unethical

10  dishonest conduct.  And I'm not suggesting that they, I told it

11  very clear, I have made this very clear to Ken, I'm not

12  suggesting that there's anything wrong with the conduct of the

13  counsel.  We've made that very clear.  What I am suggesting is

14  that Dr. Eagleman, and I think in the *Balenger (ph)* case that,

15  you know, what happened there the Court said that he, he barred

16  him from testifying because he essentially found that he was

17  vindictive, vexatious, and he basically – did you read the

18  chart?  I don't know if you had a chance to look at the chart?

19          THE COURT:  I looked at the chart.

20          MR. CHEFFO:  I mean, Your Honor, he's basically

21  turned out – if you've read that you would think that he had

22  won the Nobel peace prize for this practice of litigation.

23  Meanwhile, he had to pay $100,000 or he was going to face

24  criminal sanctions.  That's a sworn deposition that I took in

25  connection with the *Bulger* case which is under the auspices of

1 this Court in the MDL.  So you're asking me, you know, what

2 authority, I think you have inherent authority to control under

3 the administrator--

4         THE COURT:  I'm not so much worried about what my

5 authority is, but if I were to exercise that authority with

6 respect to him, what rule would I define because whatever I did

7 to him would essentially whatever boundaries that I drew that

8 either limited what he did or said he can't go beyond is in

9 some sense a boundary that you're suggesting everybody or he is

10 or should be living with and so the question is exactly what

11 boundary in the interaction between investigators, experts,

12 lawyers, putting aside professional responsibility, obligations

13 on all lawyers, should govern their interactions with the

14 witnesses and how would I craft that rule and what would it

15 say?

16         MR. CHEFFO:  Well at the very least, you know, I

17 think it wouldn't have to be for everyone because not everyone

18 has exhibited the outrageous conduct that Dr. Eagleman has on a

19 number of occasions so I think--

20         THE COURT:  But that something he did that's no good

21 presumably it's no good if done by anyone else.

22         MR. CHEFFO:  Well sure.  I mean, you know, I would

23 say you cannot be--

24         THE COURT:  Might not the same sanction consequences

25 because perhaps they come with a different record to the court,

58

1   but nonetheless they shouldn't be doing it.

2           MR. CHEFFO:  I think what, Your Honor, I mean it's –

3   and I can try and fashion and I will, I think the issue here

4   really is that this is such an anomalous type conversation, the

5   reason it's there when you try and find that one case people

6   don't, don't kind of hide half of emails and send them off and

7   write on brown letterhead of doctors and say did you know X, Y

8   and Z to non-treating physicians, did you know this, and then

9   tell you well I had to do that.  You know what's really

10  interesting the one, the one doctor--

11          THE COURT:  He didn't do it to the other doctor.

12          MR. CHEFFO:  The guy who prescribed it.

13          THE COURT:  Let me ask you about the protective

14  order.  So as I understand the facts as they are the email in

15  question which is that there are the following facts about it,

16  that it was at some point earlier this year filed by the sales

17  and marketing people as an exhibit to the statement of

18  undisputed facts.  It was not filed under seal at that time and

19  never, and no action was taken about that treatment.  That at

20  some deposition, again prior to the September 11th letter in

21  question it was used as an exhibit at that deposition and not

22  marked as confidential.

23          MR. ALTMAN:  This is a copy of that exhibit if you

24  want it, Your Honor.  It's not stamped con – may I approach?

25          THE COURT:  Yes.

59

1          MR. ALTMAN:  It's not stamped.

2          THE COURT:  And so it's not clear to me that there's

3  a provision in the protective order that governs this kind of,

4  specifically governs this kind of alleged waiver or not.

5  There's a communication between counsel here requesting of the

6  plaintiffs to de-designate the document, make the document not

7  confidential early in September and the response, no, we won't.

8  So there's a couple – and so with respect to that I guess my

9  question is how did that bear on the protective order?

10          MR. ALTMAN:  Before you answer the question there's

11  one more piece of preliminary history.

12          THE COURT:  Yeah.

13          MR. FROMSON:  When that document was disclosed to the

14  sales and marketing plaintiffs in 2007, February of 2007--

15          THE COURT:  That's when they filed then their

16  exhibit?

17          MR. FROMSON:  No, no.

18          THE COURT:  Oh.

19          MR. FROMSON:  Well before that.

20          THE COURT:  Oh, it was given to them.

21          MR. FROMSON:  It was given to Tom Greene law firm.

22          THE COURT:  Yeah, but--

23          MR. FROMSON:  It was not designated confidential.

24          MR. ALTMAN:  That's the version you have, Your Honor.

25          MR. FROMSON:  So, but--

60

1            THE COURT:  Oh, I see.  This is--

2            MR. FROMSON:  Right.

3            MR. ALTMAN:  Yes.

4            MR. FROMSON:  So the database that was given to the

5    sales and marketing plaintiffs, all right, it was originally

6    confidential.  They then had to go and remove--

7            THE COURT:  What do you mean it was originally

8    confidential?

9            MR. FROMSON:  They over-designated it is what the

10   claim was by plaintiffs, by sales and marketing plaintiffs'

11   attorneys that defendants had over-designated as confidential

12   certain documents and had redacted things like Lyrica.

13           THE COURT:  I see.

14           MR. FROMSON:  So they had to go and give a production

15   to the sales and marketing plaintiffs.  And that production

16   which was provided on or about February 15th of 2007 to Tom

17   Greene's law firm included that document before you which did

18   not have a confidential designation.  However, the documents

19   that were provided to my law firm it did have a confidential

20   designation.  So Dr. Eagleman was working with a document from

21   a deposition where based upon a document that was not

22   confidential, used at a deposition where it wasn't

23   confidential--

24           THE COURT:  I see.  Okay.  So--

25           MR. FROMSON:  --it had nothing to do with me having a

61

1    separate set of the documents where I wonder why was I given--

2              THE COURT:  Right.

3              MR. FROMSON:  --documents that have a designation.

4              THE COURT:  So what about--

5              MR. CHEFFO:  Again, we don't know who Dr. Eagleman is

6    apparently.  He's just the expert in our case, but I think

7    we've been, we've tried to be very candid.  I think, you know,

8    you obviously read the record very closely, Your Honor, and I

9    think there's no excuse here, you know, we got this letter, we

10   moved quickly I think and we were very careful to say there was

11   a confidential document.  When Ken called me and said well

12   there's this confusion I said okay, I understand that.  That's

13   why if you note in our reply we've still taken the position, I

14   spoke with Tom Greene and I said we'd like to pursue the

15   inadvertent disclosure.

16             I think the key issue really here is it's not

17   ultimately whether this is, you know, you need to decide today,

18   although I don't want to avoid that issue, but I think the real

19   issue here is that, you know, you don't shoot first, ask

20   questions later.  If you're in doubt at all you do what Mr.

21   Fromson did is you send a letter, you call the parties, you ask

22   about it.  You don't just kind of send it off to an expert,

23   kind of hope and then when you get caught--

24             MR. FROMSON:  I didn't send it off.

25             MR. CHEFFO:  --say that I - I'm sorry?

62

1    MR. FROMSON:  I didn't send anything off.

2    MR. CHEFFO:  I'm not talking about you Ken, you know

3 that.  I'm talking about--

4    MR. FROMSON:  Well, you said when you send it off to

5 an expert.

6    MR. CHEFFO:  Okay.

7    MR. FROMSON:  I didn't send it off to an expert.

8    MR. CHEFFO:  Ken, I can't say enough times that I'm

9 not dealing with you on this issue.  I'm talking about Dr.

10 Eagleman, okay?  Now, it clearly, you know, he – Mr. Fromson

11 three days earlier had asked me to de-designate so someone

12 thought it was.  It's also, I mean it's not like this was a

13 newspaper article.  I mean it's an internal document.  It's

14 stamped for--

15    MR. FROMSON:  It's not stamped confidential.

16    MR. CHEFFO:  It's an internal, it's an internal email

17 that at least quest - well that's why – you don't have to

18 believe me.  The reason why there was suspicion about it was

19 that obviously that's why Dr. Eagleman claims now he redacted

20 it.  I think he redacted it because you can't understand the

21 complete story.

22    MR. FROMSON:  Actually, Judge, in Mr. Cheffo's

23 defense it's his successor counsel, he's a successor counsel to

24 Davis Polk.  It was Polk has firsthand knowledge that this

25 document was actually not exchanged as confidential.  Ileus

63

1  Rona (ph) in the back from the Tom Greene law firm and Davis

2  Polk by Attorney Chris Roache are the only ones who really have

3  firsthand knowledge.  No offense, Mark, you basically were as

4  in the dark as much as I was.  That document was disclosed to

5  Ileus Rona's (ph) law firm and it was not confidential.

6          THE COURT:  I got it.  so my question is given that

7  history, I mean I guess the question first is it confidential

8  or not confidential putting aside, I mean we can all imagine

9  the circumstances where documents were produced in one fashion

10  and in another fashion and in the end they might be

11  confidential, they might not be, and that that may be that a

12  violation of a protective order occurred but that might also

13  bear on what the consequences are for a violation, it might

14  also depend on the circumstances.

15          MR. CHEFFO:  Right.

16          THE COURT:  I guess the question is given that

17  history is it your view that it is confidential notwithstanding

18  that those productions as not confidential or--

19          MR. CHEFFO:  Yes, it is.  Yes, and here's just very

20  briefly why.  Because I mean, you know, let's just talk about

21  the sales and marketing and again, I'm not here to impute bad,

22  you know, conduct of the lawyers.  Things happen, that's why we

23  have an inadvertent production.  Again, wasn't a motion made on

24  that document?  If you've seen that list it's I think 37 or 39

25  pages of single box--

64

1          THE COURT:  What about the deposition though.  It

2     was used in a deposition.  There was a lawyer for Pfizer at the

3     deposition, right?

4          MR. CHEFFO:  Fair enough.  And I will tell you that

5     and I, Ken and I again talked about this, I spoke to the lawyer

6     who handled that deposition.  Her best recollection was that

7     she sent a letter after the deposition saying that it was

8     confidential.  I don't have the copy of that record.  That was

9     her practice.  She said that she believed she made that.  so

10    the issue is, and that's a generalized practice that I think –

11    the fact that it wasn't stamped at a deposition wouldn't cause

12    what the protective order says is you have 30 days, everything

13    remains confidential, and then you're supposed to basically

14    have a letter so.

15          THE COURT:  Right.

16          MR. CHEFFO:  So I mean, again that's, these ate

17    issues when you have millions of pages of documents.  Should

18    they happen?  No, you know, it never should happen.  Everything

19    should be stamped but--

20          THE COURT:  I'm sure it happens.

21          MR. CHEFFO:  This is, I mean this is the real world

22    and we're human beings not computers.  And I guess, you know,

23    the thing I would come back to if this was so crystal clear Mr.

24    Fromson, a terrific lawyer, writes me a letter saying de-

25    designate it.  You know, why would he do that?

65

1      MR. FROMSON:  Because I'm dealing with the wrong

2  production database.

3      THE COURT:  Whatever.  Okay.

4      MR. ALTMAN:  Your Honor, if I may, just one quick

5  thing though.  He says it was inadvertently produced but the

6  fact is I'm the person who received most of the production from

7  the products liability production, The version that we have it

8  is stamped confidential.  The sales and marketing people

9  complained about the confidentiality of these documents.

10  Another set was produced to them.  The confidentiality was

11  removed.  So how can they say it was inadvert when it

12  originally was confidential and they took the stamp off of it?

13      THE COURT:  Does Mr. Rona's affidavit detail the

14  production or only the filing on the statement of undisputed

15  facts or disputed facts?

16      MR. RONA:  Your Honor, could I approach?

17      THE COURT:  Yes.

18      MR. RONA:  Good afternoon by the way.  My affidavit

19  which I have only one copy of just merely lists the documents

20  that were filed, and I was very careful to not file anything

21  that was confidential.  You have a copy of the email in

22  question which I can show in open court because it's not

23  stamped confidential and subject to the protective order

24  entered in this case.  Only documents that have a legend that

25  says confidential can be confidential.  This doesn't even--

66

1          THE COURT:  But does your affidavit address the

2     question that Mr. Altman just said which is that there was one

3     production, it's undisputed there was one production that went

4     to the products liability people stamped that it's

5     confidential, that you got a subsequent, a later production

6     from the defendants which didn't designate it as confidential?

7          MR. RONA:  Correct.  It was produced in the Young

8     case which is a personally injury case.  It had an improper

9     redaction on the face of it and I think you've seen it.  I have

10    a copy of it but they redacted the word pregabalin.  No secret

11    there.  They, and they designated it as confidential.  We

12    complained, and I believe the motion was before you and they

13    were told you can't just redact well, you know, the other drug

14    preferences and you have to hue close to the line of what

15    confidentiality really means.

16         THE COURT:  So they got another production.

17         MR. RONA:  They got another production.  And of

18    course this is a history that predates Mr. Cheffo from the

19    Franklin case by--

20         THE COURT:  But did it have separate Bates stamps on

21    it?

22         MR. RONA:  Same Bate stamp.

23         MR. CHEFFO:  I have the same Bate stamp number.  My

24    production is older with the word confidential on it.  His is

25    newer.

67

1          THE COURT:  All right, same Bate stamp.

2          MR. RONA:  And I don't think there's any nefarious

3   conduct here.  I don't mean to impute anything for Mr. Cheffo

4   or Mr. Fromson.  I think that they're both dealing with older

5   databases cause I don't think you'd ever file a motion on a

6   document claiming it's confidential when you know it's not.  I

7   think what happened was this is the wake of the tactics of

8   prior counsel, Davis Polk, making this thing unbelievably

9   complicated with having different versions of documents, some

10  redacted, some not.  So it's simpler to work with the current

11  version, the state of the art version.  That's what--

12          THE COURT:  I got it.

13          MR. RONA:  --needed to be filed.

14          THE COURT:  All right.

15          MR. FROMSON:  Can I just say one thing, Your Honor.

16          THE COURT:  Yep.

17          MR. FROMSON:  And I think it's in our, I won't go at

18  length on it, but I do think you had asked earlier and I

19  inartfully responded about the relief, and I know this probably

20  goes to your authority, but I think the *Gulf Oil* case is a

21  helpful case for the Court because it does talk about kind of

22  tailored specific type relief or instructions for single people

23  or single instances depending on, you know, certain specific

24  facts.  So I think, you know, we're all governed by the general

25  rules but when we step outside of them so far several times and

68

1  have a history, I think the Court, you know, and again if you

2  were to issue--

3          THE COURT:  Well, here's the thing that confused me

4  about what Dr. Eagleman filed in his affidavit.  It says before

5  transmitting the document to anyone - what I understand the

6  state of the record to be at this point is there's some amount

7  of confusion among counsel as to whether it was or wasn't

8  confidential because of the various productions at different

9  times and some are stamped confidential and some not.  And I

10  was reading Dr. Eagleman's affidavit and he says before

11  transmitting this document, I was advised by counsel to the

12  plaintiff that the document was not confidential and was not

13  sealed.  And he refers to an email which he quotes in his

14  affidavit that, from Mr. Greene to you, Mr. So--

15          MR. SO:  That is correct, Your Honor.

16          THE COURT:  --and, but that email is on September 14th

17  and the emails attached, the full emails attached I think as an

18  exhibit somewhere and it appears to be on September 14th as well

19  and the letter was sent on September 11th.  So I was a little

20  confused how with respect to the confirmation prior to sending

21  the letter to Dr. Catapona on the 11th you could have had the

22  confirmation, the conformation came before the email.

23          MR. SO:  What I can tell you, Your Honor, I don't

24  know about the dates but he, before he sent the letter to Dr.

25  Catapona Friedman he and I had a discussion, all right, and he

69

1    said are these documents confidential?  And I said, David, I

2    do not think they're confidential because they're not stamped

3    confidential and that they were filed at the courthouse, all

4    right, in open court and they were available to anyone that

5    wanted to go down to the court and review it, wade through the

6    boxes at the courthouse.  That – so, Your Honor, about the

7    timing, my best, without looking and investigating it further

8    my guess is David, Dr. Eagleman and I had that discussion.  I

9    did an investigation.  I called Dr. Tom Greene then I sent a

10   confirm, an email to Tom Greene afterwards.  That would be my

11   best guess but before you hold me to that, but what I can tell

12   the Court is that Dr. Eagleman spoke to me and I said that I do

13   not think the documents are confidential for those two reasons.

14        MR. FROMSON:  Your Honor, This is an interesting,

15   this is – I mean I think and I don't dispute what Ken said, but

16   this is interesting because what Dr. Eagleman attached was

17   again, and I think this time he actually had half of the email,

18   but he attached an email from Tom Greene.  This is from Exhibit

19   A to Mr. Finkelstein's declaration.  Basically Tom Greene is

20   writing back to Ken saying he thinks that some, the ones that

21   have numbers were not filed under seal.  And that's what Dr.

22   Eagleman attaches.  But interestingly Ken, because he

23   understands the way litigation works and he filed, and in fact

24   that it wasn't necessarily sealed he went the next step, and he

25   wrote back to Mr. Greene and he said Tom, did you ever get a

1    chance to confirm whether the exhibits to the long statement

2    were also made, were also in the public domain, I think that

3    they were but wanted to check with someone.  I admit that it

4    was Friday and my memory was fuzzy.  The point of this is not

5    to in any way deal with Ken.  It's exactly what I'm saying,

6    it's that next step.  You know, before you kind of have this

7    one email and start sending documents that you may or may not

8    be offering, you do a little due diligence and particularly if

9    you're a man who's paid $100,000 for willfully violating

10   protective orders.

11              UNIDENTIFIED:  Your Honor--

12              MR. ALTMAN:  Judge, there's no greater--

13              THE COURT:  Yeah, all right.  I think you made--

14              MR. ALTMAN:  When documents, documents with the court

15   are filed at the courthouse, Judge, is a first Amendment issue.

16   Those are public records.

17              THE COURT:  Right.

18              MR. RONA:  And all I just wanted to add is I was

19   specifically asked by both Mr. Fromson and Mr. So to check the

20   deposition exhibits which I'm also the keeper of.  And if you

21   looked at the deposition exhibits as filed by the court

22   reporter, the copy that's there in the court reporter's records

23   does not have a confidentiality designation on it.  I mean that

24   was the, you know, separate and apart from the long statement

25   of facts.  Before that long statement of facts was the

71

1  deposition and so anybody that looked at that deposition

2  exhibit would have seen it's not confidential.

3          MR. FROMSON:  One last comment, Judge, before you

4  shut us down, I promise I'll be brief, is that I hope that you

5  would come to the conclusion that documents were not

6  confidential and this is a much ado about nothing and it's a

7  glorified smear job of Dr. Eagleman before he hits the stand.

8  But what I will tell you is that if you do, if you're inclined

9  to craft any order that there are First Amendment

10  considerations associated with this.  Secondly, we have not

11  objected to Pfizer's sales reps. Going in and talking to these

12  doctors in the course of their business.  If you're going to

13  goose gander it we'd like that.  and then my last comment is,

14  Judge, I'm entitled with regard to a learned intermediary

15  defense to go meet with the doctor or prescriber and show him

16  documents and say doctor, if you had known this would you have

17  prescribed the drug prior to that deposition.  Mr. Cheffo's

18  attorney – prior counsel in the *Smith* case scheduled meetings

19  with doctors and third parties and showed them documents.

20          THE COURT:  I'm done on this issue.

21          MR. FROMSON:  All right.  Thank you.

22          THE COURT:  And moving on.  Thank you.

23          MR. FROMSON:  Thank you.

24          THE COURT:  With respect to Dorsey and Hubert, those

25  are the other two Massachusetts cases, right--