UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : | MDL Docket No. 1629 |
|---|---|---|
| In re: | NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | : : : : Master File No. 04-10981 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Judge Patti B. Saris

THIS DOCUMENT RELATES TO:

:

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC., 04 CV 10739 (PBS)

Magistrate Judge Leo T.
Sorokin

:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO COMPEL IDENTIFICATION
OF NAMES AND ADDRESSES OF POTENTIAL TRIAL WITNESSES**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") submit this memorandum in support of their Motion to Compel Identification of Names and Addresses of Potential Trial Witnesses, seeking an order compelling Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser") to identify the names and last known addresses of physicians who prescribed Neurontin to Kaiser insureds, as well as patients who took Neurontin.

**ARGUMENT**

On November 16, 2009, counsel for Kaiser and Pfizer conferred by telephone regarding the trial of this matter scheduled for February 22, 2010, and the exchange of witness lists, exhibits lists and deposition designations prior to trial.  At that time, counsel for Pfizer advised Kaiser's counsel of its intent to list as potential trial witnesses a few Kaiser insureds who were prescribed Neurontin, as well as physicians who prescribed Neurontin to Kaiser insureds. Pfizer's counsel asked that Kaiser provide it with the names and addresses of all such persons so that the attendance of relevant witnesses could be obtained for trial.  Although such information is within the exclusive control of Kaiser, counsel for Kaiser declined to provide such

information.[1]

As the Supreme Court has repeatedly observed, it is a fundamental and ancient principle of law that the public and the parties are entitled to every man's evidence. *See Jaffee v. Redmond*, 518 U.S. 1, 9 (1996) ("For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence." (citations and internal quotation marks omitted) (alteration in original)); *United States v. Nixon*, 418 U.S. 683, 710 (1974) ("Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.").  Yet, in this case, Plaintiff seeks to obscure the actual clinical experience of treating physicians behind a statistical model and, thereby, deprive the jury of the opportunity to hear every man's evidence.

Pfizer will show that Plaintiff's statistical model fails to do even what it purports to do; that is, correlate Neurontin sales to alleged off-label promotion.  But, putting aside even this initial hurdle, Plaintiff has yet to make any attempt to show how its statistical model enables it to prove how many prescriptions were caused by *fraudulent* promotion, how many prescriptions were *ineffective* for the patients for whom they were prescribed, how may physicians would not have prescribed Neurontin in the absence of the alleged off-label marketing and how many physicians would have prescribed one of the alleged "cheaper, more optimal" drugs identified by Plaintiff.

Indeed, as this Court has observed, whenever Pfizer has been able to depose individual

---

[1] The scope of this pre-trial motion is much narrower than the previous discovery motions that this Court considered.  First, the information is not sought for purposes of discovery, but so that relevant fact witnesses can be contacted in order to secure their attendance at trial.  In addition, the earlier discovery motion [402] sought medical records, in addition to the identity of patients and physicians.  In contrast, the information sought at this juncture would impose little burden on Kaiser.  To reduce the burden even further, on a November 23, 2009 conference call, counsel for Pfizer indicated that Pfizer would accept a list of 75 to 100 randomly selected patients and physicians.  Counsel for Pfizer also stated that it would work to reduce any burden on patients by reaching agreement with Plaintiff on a protocol for communicating with them.  A HIPAA-compliant protective order is already in place and, therefore, there are no legitimate privacy concerns.

physicians in this litigation, their testimony has not supported the unrealistic assumptions that underlie Plaintiff's statistical model.  For example, this Court observed at the summary judgment hearing:

> I've been living with this case a long time – I've said, "Show me the doctor," you know, "Where's the doctor who says that he wouldn't have done it otherwise?  Get me a doctor."  And, you know, your doctors have all said it wrongly.  They just said, "I wasn't detailed."

(9/18/09 Hearing Tr. at 19:6-16.)  The Court further noted:

> Well, did you ask them point-blank, "Had you known that bipolar is no better than a placebo, and it hasn't been approved, and it has these depressive side effects, and there's now a little black box, would you have done it differently?"  I've not seen one doctor who said he would have done it differently.

(*Id.* at 20:21-21:1.)  Similarly, the jury has the right to hear from Kaiser's doctors and Pfizer has the right to present them in its defense.

Likewise, in its decision on class certification, the Court noted that Professor Rosenthal's aggregate approach might have "some surface appeal," but "the record in this case demonstrates why the use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed."  *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 330 (D. Mass. 2009).  As the Court explained:

> Significantly, the testimony of the prescribing physicians for the bipolar/mood disorder, nociceptive pain (non-neurologist), and neuropathic pain (non-neurologist) subclass representatives indicates that only one of them, Dr. Gregory A. Rogers, was ever detailed by defendants about Neurontin. And Dr. Rogers testified that all of the Neurontin detailing of his office was with respect to **on-label** uses for the drug.

*Id.* (emphasis added).   In support of this statement, the Court cited the following physician testimony:

- "Dep. of Jerrold Gray ('Gray Dep.'), Ex. 14, Docket No. 1175 (containing no evidence that Dr. Gray, the primary care physician for bipolar/mood disorder class representative Wityk, was ever detailed by defendants about Neurontin);"

- "Dep. of John Arness ('Arness Dep.'), at 65-66, Ex. 18, Docket No. 1175 (containing affirmative testimony from Dr. Arness, the only psychiatrist who treated bipolar/mood disorder class representative Varnam and who was deposed, that he was

never detailed by defendants about Neurontin and never requested information from defendants about Neurontin);"

- "Dep. of Thaddeus Poe ('Poe Dep.'), Ex. 4, Docket No. 1175 (containing no evidence that Dr. Poe, family doctor for neuropathic pain subclass representative Smith, was ever detailed by defendants about Neurontin (or ever prescribed Neurontin for Smith)."

*Id.* The Court also noted that "[t]he deposition testimony of the doctors for the bipolar/mood disorder class representatives shows that their decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud." *Id.* As the Court explained:

> Dr. Gray, primary care physician for bipolar/mood disorder class representative Wityk, testified that the main reason he prescribed Neurontin for Wityk was that Wityk's prior physician had prescribed Neurontin and Wityk was unwilling to change medication. (Gray Dep. at 50; *see also id.* at 101-102 (explaining that Wityk ceased taking Neurontin for a four or five month period of time because she could no longer afford it with her insurance coverage).) Dr. Arness, psychiatrist for bipolar/mood disorder class representative Varnam, testified that he prescribed Neurontin because of information he had learned about Neurontin from fellow doctors, because of his personal experience in successfully using the drug with other patients, because anticonvulsants like Neurontin were "widely known and widely accepted as a treatment for bipolar disorder," and because Neurontin had a relatively benign set of side effects.  (Arness Dep. at 23-25, 62-64.)

*Id.*

Just as Pfizer was clearly entitled to depose the physicians who treated the proposed class representatives, Pfizer should be allowed to introduce at trial similar testimony from Kaiser physicians who prescribed Neurontin, as well as Pfizer insureds who were treated with Neurontin.  Towards this end, Pfizer asked Plaintiff to provide it with the names and addresses of such potential trial witnesses.  Plaintiff cannot refuse to provide such information based upon its assertion that it will prove its case by use of statistical model.[2]  Regardless of the strategic

---

[2] In fact, when it suits Kaiser's purposes, it does rely upon testimony from its self-selected physicians.  For example, in response to the Court's inquiry at the summary judgment hearing regarding the lack of corroborating physician testimony, counsel for Kaiser indicated that they had submitted affidavits from four Kaiser physicians.  (9/18/09 Hearing Tr. at 28:2-3.)  In other words, Kaiser believes that physician testimony is relevant *only* when it comes from its hand-picked witnesses and supports its

decisions made by Plaintiff regarding its own evidence, Plaintiff cannot dictate the manner in which Pfizer tries its case.  As one court has explained in another case where a third-party payor sought to recover from a pharmaceutical manufacturer for alleged off-label prescriptions:

> [I]n order to show causation, Plaintiff will have to prove, for each prescription for which it seeks a refund, that the prescription was for an off-label use, and that the prescribing physician based his or her decision to prescribe for an off-label use on a communication from [the defendant], rather than his or her clinical experience, training and independent medical judgment.  Such proof will necessarily require testimony by the prescribing doctors located in Florida.  Plaintiff argues that it can prove off-label use of the drugs via an examination of drug-identification and diagnosis codes in the records.  ***However, even if Plaintiff can adequately support causation with such proof, [the defendant] will still require physician testimony to defend itself from Plaintiff's claims.***  As [the defendant] points out, if "testimony indicates that the physician acted independently of any statement from or action by [the defendant], [Plaintiff] certainly could not seek a refund from [the defendant] for the prescription."

*Vista Healthplan, Inc. v. Amgen, Inc.*, No. CV 07-3711, 2007 WL 4144893, at *6 (C.D. Cal. Nov. 13, 2007) (emphasis added); *see also In re St. Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008) (noting that even if state law permitted plaintiffs to rely on aggregate proof of causation, defendants could not be precluded from presenting individual evidence "negating a plaintiff's direct or circumstantial showing of causation"); *Arnold v. Garlock, Inc.*, 278 F.3d 426, 443 (5th Cir. 2001) (noting that aggregate proof should not be permitted where it would "deprive[] [opposing parties of] the right to a full and fair opportunity to litigate their claims"); *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 396 (D. Mass. 2007) (holding that defendants would have the right to introduce individualized evidence at trial to rebut the plaintiffs' evidence of reliance).

In cases involving third-party payors ("TPPs"), courts have repeatedly recognized the relevance of individual physician testimony.  For example, in *Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals LP*, 585 F. Supp. 2d 1339 (M.D. Fla. 2008), TPPs sought to recover under RICO and the New Jersey Consumer Fraud Act ("NJCFA") for alleged off-label

---

theory and that only Kaiser should have access to such evidence.  Kaiser's reliance on these self-selected doctors has opened the door to Pfizer's request for a random list of prescribers.

marketing of Seroquel, contending that they would have paid for cheaper alternative drugs absent the defendants' alleged fraud.  Dismissing the plaintiffs' claims, the court explained:

> [I]n the context of this case, establishing that Plaintiffs' injuries were caused by Defendants' misconduct would require an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit.  In other words, each physician who prescribed Seroquel to an individual consumer or health and welfare fund member would have to be questioned as to whether his or her independent medical judgment was influenced by Defendants' misrepresentations, and to what extent.

*Id.* at 1344; *see also In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009); *S. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175, 2009 WL 3151807, at *6-7 (S.D.N.Y. Sept. 30, 2009);[3] *Pa. Employees Benefit Trust Fund v. AstraZeneca Pharms. LP*, No. 6:09-cv-5003, 2009 WL 2231686, at *6 (M.D. Fla. July 20, 2009); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *15 (D.N.J. July 10, 2009).

Testimony from Kaiser physicians regarding why they prescribed Neurontin, their clinical observations regarding Neurontin and its efficacy for their patients, and whether they would have prescribed one of the self-selected alternative drugs identified by Plaintiff is clearly relevant and admissible evidence, as is testimony from Kaiser insureds regarding their experience while taking Neurontin.  Plaintiff should, therefore, be required to provide to Pfizer the names and addresses of these potential trial witnesses.  Indeed, precluding Pfizer from calling key witnesses in defense of its case is so fundamentally unfair as to result in a denial of Pfizer's due process rights.

---

[3] Although the court in *Southern Illinois* allowed leave to amend when it dismissed the insufficient complaint, 2009 WL 3151807, at *7, the plaintiffs voluntarily dismissed their claims with prejudice.  *See* Joint Stipulation and Order of Dismissal with Prejudice, *S. Ill. Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175 (S.D.N.Y. Nov. 6, 2009).  The dismissal was not the result of a settlement.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that Pfizer be required to identify the names and addresses of Kaiser physicians who prescribed Neurontin and Kaiser insureds who took Neurontin.

Dated: November 25, 2009

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:    /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

     -and-

SHOOK, HARDY & BACON L.L.P.

By:    /s/ Scott W. Sayler
       Scott W. Sayler

2555 Grand Blvd.
Kansas City, MO 64108-2613
Tel:  (816) 474-6550

     -and-

WHITE AND WILLIAMS LLP

By:    /s/ David B. Chaffin
       David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on November 25, 2009.

/s/ David B. Chaffin_____
David B. Chaffin