# EXHIBIT A

**Neurontin Pfizer Sales _Marketing Team**
**Kibbe, Laura (Pfizer 30b6)**
4/7/2008

**Printed : 5/6/2008**

Kibbe, Laura (Pfizer 30b6)  4/7/2008  9:14:00 AM

## Page 1

```
                            LAURA KIBBE
1       LAURA KIBBE
2       UNITED STATES DISTRICT COURT
3       FOR THE DISTRICT OF MASSACHUSETTS
4       -------------------------------x
5       IN RE NEURONTIN MARKETING AND
        SALES PRACTICES LITIGATION
6
        MDL Docket No. 1629
7       Master File No., 04-10981
        Judge Patti B. Saris
8       Magistrate Leo T. Sorokin
        -------------------------------x
9
10
11      SUPREME COURT OF THE STATE OF NEW YORK
12              COUNTY OF NEW YORK
13
        ------------------------x
14
        IN RE:  NEW YORK NEURONTIN
15      PRODUCTS LIABILITY LITIGATION
16      Case Management
        Index No. 765,000/2006
17      Hon. Marcy S. Friedman
        ------------------------x
18
19
20
21               April 7, 2008
                  9:14 a.m.
22
23
24
25
```

## Page 2

```
                    LAURA KIBBE

        Deposition of LAURA MARIE KIBBE, taken
    by Class Plaintiffs, at the offices of Davis,
    Polk & Wardwell, 450 Lexington Avenue, New York,
    New York, before Brandon Rainoff, a Federal
    Certified Realtime Reporter and Notary Public of
    the State of New York.
```

## Page 3

```
                    LAURA KIBBE
    A P P E A R A N C E S:

    FINKELSTEIN & PARTNERS
    Attorneys for Product Liability Plaintiffs
        785 Broadway, 3rd Floor
        Kingston, NY 12401
        800.634.1212
    BY:  KENNETH B. FROMSON, ESQ.
         KEITH ALTMAN

    BERNSTEIN LIEBHARD & LIFSHITZ, LLP
    Attorneys for Class Plaintiffs
        10 East 40th Street
        New York, New York 10016
        212.779.1414
    BY:  RONALD J. ARANOFF, ESQ.

    ROBINS KAPLAN MILLER & CIRESI
    Attorneys for Assurance Plaintiffs
        2800 LaSalle Plaza
        800 La Salle Avenue
        Minneapolis, MN 55402-2015
        612.349.8500
    BY:  ANNAMARIE DALEY, ESQ.
```

## Page 4

```
                    LAURA KIBBE
    A P P E A R A N C E S (Continued):

    DAVIS POLK & WARDWELL
    Attorneys for Pfizer and Warner Lambert
        450 Lexington Avenue
        New York, NY 10017
        212.450.4511
    BY:  JAMES ROUHANDEH, ESQ.
         CHRISTOPHER ROCHE, ESQ.

    SHOOK HARDY & BACON LLP
    Attorneys for Pfizer
        2555 Grand Blvd.
        Kansas City, Missouri 64108-2613
        816.474.6550
    BY:  JANE J. BARTLEY, ESQ.


    ALSO PRESENT:
    Vijay Bondada, Esq., Legal Division, Pfizer, Inc.
    Dan McClutchy, Videographer
```

Kibbe, Laura (Pfizer 30b6)  4/7/2008  9:14:00 AM

### Page 21

```
 1                LAURA KIBBE
 2      A.   SPI runs queries and -- at our
 3   direction as based upon our -- my team's
 4   discussion with counsel.  So, yes.  SPI provides
 5   objective information to us such as a hit
 6   analysis, how many items are hitting on
 7   particular terms.  Those reports, objective
 8   reports are then reviewed in conjunction with
 9   counsel and a final decision is made as to what
10   the search terms will ultimately be.
11      Q.   What about something that would not be
12   considered an objective evaluation, something
13   that would be considered a subjective
14   evaluation, did SPI do that?
15      A.   I'm not aware of anything that
16   wouldn't be totally objective in nature based
17   upon running queries or statistical percentages
18   from their systems.
19      Q.   Now, getting back to the list of
20   specific terms, whether they are restrictions or
21   boolean terms, whatever they are called, is
22   there a list that would document what terms were
23   actually utilized?
24      A.   There is.
25      Q.   Where is that list maintained?  Does
```

### Page 22

```
 1                LAURA KIBBE
 2   your team have a copy of it?
 3      A.   Yes, my team has a copy, counsel has a
 4   copy.
 5      Q.   Would there be a title for that
 6   document?
 7           What would you call it?
 8      A.   Search terms.
 9      Q.   Let me ask you some questions about
10   SPI.  Do you know why SPI was chosen as opposed
11   to a different vendor?
12      A.   The company went through a vendor
13   rationalization process starting in 2004 in
14   which we did RFPs and RFIs and identified
15   technology that we thought would be useful
16   across all of our cases as opposed to engaging
17   vendors on a case-by-case basis, and as a result
18   of that RFI in 2004, SPI was selected as our
19   processing vendor, our primary processing
20   vendor, and they are still our primary
21   processing vendor today.
22      Q.   Are you able to give me the full
23   contact information for SPI, where they are
24   located?
25      A.   I don't know their street address,
```

### Page 23

```
 1                LAURA KIBBE
 2   but, yes, they are based out of Austin, Texas,
 3   on Commerce Parkway.  And our primary contact at
 4   SPI is a gentleman by the name of Chuck Kelner.
 5      Q.   So as of today, what does SPI possess
 6   if anything related to this litigation?  In
 7   other words, do they have a hard drive of all
 8   the data?  Do they have nothing?  What do they
 9   have?
10      A.   The process that we follow once we
11   have collected the electronic information for an
12   individual or other collection of data, that
13   information is maintained on a lockdown server
14   within the company.  A copy is sent to SPI for
15   processing.  SPI retains that original pristine
16   copy that is sent to them.
17           They then make a copy for purposes of
18   running through the technology that was used.
19   In this case it was the Attenex Workbench
20   platform that was used to process, search and
21   cull the data.
22      Q.   Do they still have access to that
23   data?  In other words, it's still there?
24      A.   It is still at SPI.
25      Q.   So if today you wanted to run an
```

### Page 24

```
 1                LAURA KIBBE
 2   additional search, what would be entailed for
 3   you to do that?
 4      A.   Well, simply because of storage
 5   constraints, it would have to be reactivated and
 6   brought back on line and then an additional
 7   search query could be run.
 8      Q.   In the past you have provided at least
 9   two affidavits in the litigation that would
10   indicate what if any expenses or burdens could
11   be associated with producing electronic
12   material.
13           Do you generally recall those
14   affidavits you provided?
15      A.   Yes.
16      Q.   So similarly, my question is here,
17   what would be the burden if any associated with
18   running any individual search term if you or
19   counsel wanted to run an additional search for
20   documents today?
21           MR. ROUHANDEH:  Objection to the form.
22      A.   The process that would be followed,
23   again, there would be a charge for bringing it
24   back on line.  There is offline, near line and
25   online storage.  Given that most of the
```

Kibbe, Laura (Pfizer 30b6)  4/7/2008  9:14:00 AM

**25**

1         LAURA KIBBE
2    production activities are over in this case,
3    many of the Neurontin custodial materials are
4    what we have called near line.  So there is a
5    nominal charge to be brought back online.
6         There would be no charge for
7    physically running the additional query.  The
8    charge -- the burden is involved in the export
9    of that material, the loading of that material
10   to our review platform and the ultimate review
11   of that material by counsel.
12       Q.   How much time does that take to bring
13   that back from near line to online to run that
14   search term, in other words, to upload that
15   information so that it can be sent to your
16   counsel?
17       A.   Depending on the volume of
18   information, the number of custodians who had to
19   be searched, that kind of information, if we had
20   to bring back the entire 200 custodians that
21   were collected, that would be a sizable effort
22   and might take two or three weeks.  But if it
23   was one custodian it would be much quicker
24   obviously.
25       Q.   Approximately how much data does SPI

**26**

1         LAURA KIBBE
2    actually possess?
3         MR. ROUHANDEH:  Objection to the form.
4        Q.   In terms of whatever computer lingo
5    you want to use, how much data do they actually
6    have?
7        A.   Again, these are round numbers because
8    we have paper collections as -- that are -- that
9    have been scanned and are now electronic as well
10   as information that was originally electronic,
11   but my understanding is the starting point for
12   Neurontin was somewhere north of one and a half
13   terabytes of information on the electronic side.
14       Q.   My very basic understanding of doing
15   searches involves usually much -- software
16   that's much more basic than what you described.
17   For example, my knowledge of searching a
18   concordance database could still include that
19   much data but really just involves typing in my
20   search terms and I get the information I want in
21   minutes.
22        So why would your protocol take two
23   weeks if you are searching for certain
24   information pursuant to search terms, why so
25   long?

**27**

1         LAURA KIBBE
2         MR. ROUHANDEH:  Objection to form.
3        Q.   That's okay.
4        A.   That's if we had to do all 200 people,
5    because the way the electronic processes work is
6    that the information is collected, it is then
7    indexed and it sits in that repository to be
8    searched.
9         When the matter is nearing its end,
10   nearing the production end, it is not sitting,
11   to use your terms, in the equivalent of a live
12   concordance database, almost like you have to
13   get the information somewhere else, put it into
14   concordance, and then you can run the terms.  It
15   is simply a matter of volume.
16        If we are talking about one custodian,
17   that could be done in a day.  And I'm talking if
18   you wanted the entire collection of Neurontin
19   loaded, indexed and searched, it would take some
20   time.
21       Q.   So the time is in the upload, the time
22   is not in the actual search once the upload is
23   completed in terms of this two weeks?
24       A.   Exactly.
25       Q.   So once it is uploaded, the search

**28**

1         LAURA KIBBE
2    could still take all of thirty seconds or a
3    minute or whatever it might take like it would
4    on a general concordance database?
5        A.   Exactly.
6        Q.   Where was I?  Take off on a tangent
7    then it takes longer than I wanted.  Give me one
8    moment.
9         Aside from the electronic data, are
10   there actually hard copy documents maintained or
11   possessed by SPI?
12       A.   SPI has the images, they do not have
13   any of the hard copy documents themselves.
14       Q.   As to the actual images, are you able
15   to approximate for me how many images we are
16   talking about that they possess?
17       A.   I can't as I sit here today, total
18   volume, no.
19       Q.   Is that part of terabyte total data
20   that you described earlier or is that mixing up
21   two totally different terms?
22       A.   It is not part of the -- north of 1.5
23   terabytes was just the electronic information.
24   The paper is a separate collection.
25       Q.   Let's go back to what I think would be