IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 62
AND PRODUCTS LIABILITY LITIGATION    )



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 15, 2009, 3:30 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:
3
          BARRY R. HIMMELSTEIN, ESQ., Lieff, Gabraser, Heifmann &
4    Bernstein, LLP, Embarcadero Center West, 275 Battery Street,
     30th Floor, San Francisco, California, 94111-3339.
5
          THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro, LLP,
6    55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
     02142.
7
          THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ., Greene,
8    LLP, 33 Broad Street, 5th Floor, Boston, Massachusetts, 02109.

9         JAMES R. DUGAN, II, ESQ., Murray Law Firm,
     650 Poydras Street, Suite 2150, New Orleans, Louisiana, 70130.
10
          DON BARRETT, ESQ., Barrett Law Firm, 404 Court Square
11   North, P.O. Box 987, Lexington, Mississippi, 39095.

12

13   FOR THE DEFENDANTS:

14        KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     DAVID S. WEINRAUB, ESQ., Skadden, Arps, Slate, Meagher &
15   Flom, LLP, Four Times Square, New York, New York, 10036.

16

17

18

19

20

21

22

23

24

25

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1              P R O C E E D I N G S

2          THE CLERK:  In Re:  Neurontin Marketing, Sales

3    Practices, and Products Liability Litigation, Civil Action

4    No. 04-10981, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6          MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol

7    for the class plaintiffs.

8          MR. RONA:  Ilyas Rona for the class plaintiffs.

9          MR. GREENE:  Good afternoon, your Honor.  Thomas

10   Greene for the class plaintiffs.

11         MR. DUGAN:  Good afternoon, your Honor.  James

12   Dugan on behalf of the class plaintiffs.

13         MR. BARRETT:  Good afternoon.  Don Barrett on

14   behalf of the class plaintiffs.

15         MR. HIMMELSTEIN:  Good afternoon.  Barry

16   Himmelstein, class plaintiffs.

17         MR. CHEFFO:  Mark Cheffo for Pfizer.  I'm here

18   with my colleagues David Weinraub and Katherine Armstrong.

19         THE COURT:  Okay.  Where I would like to spend

20   most of my time today is on the third-party payor issues

21   rather than the consumers.  So you're welcome to make a few

22   comments about the consumers, but to the extent I am at all

23   considering a motion for reconsideration, after reading the

24   papers, it's primarily in the area of the third-party

25   payors.

1          MR. SOBOL:  With respect to that, your Honor, I

2     think that we're going to be focusing on the third-party

3     payors.  That's been your instruction.  That is what we are

4     going to do.  The only remark we would say is that I think

5     that you will find that the bulk of the arguments that we

6     make with respect to third-party payors, once you think

7     about it, probably also apply to the consumer class, but

8     we're focusing on the third-party payor issues here today.

9          I also have a housekeeping matter briefly.  On

10    summary judgment, the plaintiffs submitted 26 boxes of

11    backup material to the opposition on summary judgment.  Some

12    of those materials were relied upon in connection with the

13    motion for reconsideration on class certification, both from

14    the plaintiffs' memorandum in support of reconsideration and

15    in the plaintiffs' reply on reconsideration.  In preparing

16    for today, we realized that it's unfair to the Court, to

17    your staff, to have to hunt and peck through the 26 volumes

18    of materials for those things that we pinpointed on

19    reconsideration, so I had my office prepare an abridged

20    appendix which has only those materials from the summary

21    judgment materials that we used in connection with the

22    motion for reconsideration that we identify within the memo,

23    as a convenience to the Court.

24          THE COURT:  And have you given it to them?

25          MR. SOBOL:  I've identified it to Mr. Cheffo, and

1    we've discussed it earlier beforehand.  And it's

2    two volumes.  I'm going to have them for them also.  Again,

3    they have all these materials.  This is just a --

4              THE COURT:  Right.

5              MR. SOBOL:  Okay?

6              MR. CHEFFO:  I don't really object.  I think he's

7    just using it for ease of reference.

8              THE COURT:  That's fine.  That's a great idea

9    because, I mean, it was unrealistic on the motion for

10   reconsideration to say, "We were assuming you had read the

11   summary judgment record in deciding the class certification

12   motion."

13             MR. SOBOL:  Right.

14             THE COURT:  So --

15             MR. SOBOL:  We won't need this for the argument,

16   your Honor, but I'm just handing them to Mr. Alba.

17             THE COURT:  One box is better than the ones I've

18   received before.

19             MR. SOBOL:  Right.  And then you'll also see that

20   there are some slides for the plaintiffs' position on the

21   third-party payors, and Mr. Greene and I will handle the

22   argument for the TPPs, so I'll hand it over to Mr. Greene

23   now.

24             MR. GREENE:  Good afternoon, your Honor.  I was

25   going to address liability and causation for the TPPs, and

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1   Mr. Sobol is going to talk about expert proof of causation

2   for the TTPs.  And I'm mindful of the --

3           THE COURT:  You know what, bring up the mike,

4   Mr. Greene.

5           (Discussion off the record.)

6           MR. GREENE:  I'm mindful of your focus, what you

7   said on September 18 that you were willing to look at and

8   what you just said in terms of the TPPs.  And I think the

9   issue that we want to cut to and focus on today is whether

10  the fraudulent marketing caused the massive increase in

11  Neurontin prescriptions by psychiatrists, whether that can

12  be established through common proof.  And what I wanted

13  initially to touch upon is common proof of the wrongdoing

14  that's the same for all class members, and then, to the

15  extent you'll permit me, because we didn't get an

16  opportunity to do it at the summary judgment hearing,

17  comment a bit upon the proof of lack of efficacy, again,

18  which is the same for all class members.  And then I

19  would --

20          THE COURT:  I don't think we need to back into the

21  summary judgment hearing, but let me just say this:  I

22  reread before I walked in here the Bell affidavit and the

23  McDonough affidavits, and I'm wondering whether I actually

24  need an evidentiary hearing on it.  I'm having a hard time

25  figuring out whether in fact the third-party payors were

1    making decisions in a uniform way or in an individualized

2    way with respect to off-label Neurontin.  That was what held

3    me up last time.  I have no doubt there are common issues

4    with respect to efficacy.  I buy that.  Regardless of where

5    I come out on the merits, that's not a class action issue.

6    The issue is, what do I do with the fact that different

7    third-party payors had different ways of evaluating

8    off-label Neurontin?  So, I mean, you're welcome to spend --

9    I don't want to spend time on the efficacy because that's a

10   common question, I agree.

11           MR. GREENE:  Well, I think the third-party payors,

12   the fraud on the third-party payors that we seek to certify

13   is the same as the fraud on physicians.  In other words,

14   we're not relying on any false and misleading representations

15   that the defendants made that affected placement on the

16   formulary.  It was placed on the formulary because it was

17   approved for Neurontin, later approved in May, 2002, for --

18           THE COURT:  Approved for epilepsy, you mean.

19           MR. GREENE:  Yes, excuse, approved for adjunct

20   therapy for epilepsy.  So once it's on the formulary for

21   these third-party payors, they don't have any easy way of

22   determining whether payment is being submitted for an

23   off-label use, and this is something that the defendants

24   recognized and exploited and took advantage of.  And I

25   think, based upon reading your May 13, 2009 opinion, I'm not

1    sure that we had been clear about that, and again I take

2    responsibility that, you know, we supplemented the record

3    for summary judgment.  A lot of that evidence was in that

4    record and not brought to your attention.

5              THE COURT:  It became much clearer after reading

6    the summary judgment motion, but then I went back.  But

7    here's the issue:  As I understand it, Dr. Bell says

8    30 percent of all third-party payors ban off-label

9    reimbursement altogether, right?  Something like that.

10             MR. GREENE:  I don't have the exact --

11             THE COURT:  But some large percentage say no

12   off-label at all.

13             MR. GREENE:  Well --

14             THE COURT:  Is that wrong?  Would you agree?

15   Well, maybe you disagree on the percentage.

16             MR. SOBOL:  Well, I'm not sure whether or not

17   Mr. Bell and Ms. McDonough would agree on that percentage,

18   but I think the point is this:  Let's take the examples of

19   the different third-party payors and see if it matters,

20   third-party payor that has no --

21             THE COURT:  Am I morphing into your -- is that

22   what I'm doing?

23             MR. GREENE:  Well, yes, you've kind of --

24             MR. SOBOL:  That is going to a later part of

25   things, but that's fine.

1        THE COURT:  Well, let me do it your way, but what

2   I don't want to do is -- it's 3:30 now -- is lose the chance

3   for me to understand the differences between the third-party

4   payors and whether it matters.

5        MR. GREENE:  And I don't want to lose that

6   opportunity either.  I was prepared to talk about the

7   defendant's other factors, their so-called "other factors"

8   which they claim are the basis of the bipolar prescriptions.

9   And we've been hearing this "other factor" argument for

10  about almost five years now, and we've kind of summarized

11  them in this slide.  A number of these, Judge, you've

12  already addressed, so let me take them one at a time.

13        The first one where they claimed advances in the

14  basic science of the brain, well, you dismissed this in your

15  opinion of 8/29/07.  They talked about the informal

16  conversations around the watercooler, and you said, no, you

17  didn't think it was likely to be a factor in the

18  prescriptions; you thought more likely the marketing efforts

19  at the time.

20        The next what I call the "interim other factors."

21  They said, well, the scripts are based on the clinical

22  trials that are out there and approvals in other countries.

23  Well, there are no favorable double-blind randomized control

24  trials that support Neurontin use for bipolar or mood

25  disorder, none.  There are four scientific ones.  They're

1    all negative.

2            Approvals in other countries, there are no

3    approvals in other countries for mood disorders, not in any

4    other country for Neurontin for bipolar and mood disorder

5    use.

6            Then these were the next factors that they

7    advanced.  This latest one here, DrugDex, "Evidence favors

8    efficacy," we heard this from Mr. Cheffo at the summary

9    judgment hearing for the first time.  Well, you and I are

10   very familiar with DrugDex.  We had that in Franklin.  You

11   remember, DrugDex was not one of the statutory compendia

12   when I filed Franklin in '96.  It got added in 1997.

13           DrugDex is very liberal in its citations of

14   off-label use.  It is because the only way to get a

15   citation, Judge, into DrugDex is, the pharmaceutical

16   companies send in the citations.  So Pfizer could have sent

17   in the double-blind randomized control trials.  They didn't.

18   They never produced any of the negative evidence in DrugDex.

19   Bipolar entry hasn't been updated at all in DrugDex since

20   the Franklin case.

21           These next factors were advanced.  They said there

22   were reports of improved mood from epilepsy patients.

23   That's in the defendant's opposition.  Well, let's break

24   that down and look at it.

25           THE COURT:  Excuse me.  Why are you telling me all

1   this?  Is this going to the summary judgment issue again?

2           MR. GREENE:  No.  This is going to causation.

3   This is going to the issue of, are there any other plausible

4   factors that could explain the skyrocketing scripts for

5   bipolar?  Now, if you think that's something I don't have to

6   address, it's in the papers, but I thought it might be

7   something you want to hear today.  If not --

8           THE COURT:  We're here on class cert, right?  So

9   it's whether or not the common issues ---

10          MR. GREENE:  If there's common proof of causation.

11          THE COURT:  Right.

12          MR. GREENE:  We say we can prove it two different

13  ways:  We say we can prove it through expert testimony,

14  aggregate proof, Dr. Rosenthal.  Mr. Sobol is going to talk

15  about that.  We say, in addition to that, we can prove it

16  through evidence contained in the defendant's own documents.

17  If you examine that evidence in the defendant's own

18  documents, some of which I was going to outline today,

19  you'll see that these other factors that they recite and

20  they rely on were nonexistent when the marketing campaign

21  began.  In 1994, in 1995, and up into 1996, there were no

22  psychiatrists using Neurontin for bipolar.  There was no

23  scientific, preclinical evidence for its use in bipolar.

24  There was no scientific rationale for its use in bipolar.

25          Now, they knew all this when they were out there

1    marketing it.

2            If I could have that last slide that you had up

3    there for a moment.  If you just look at this for a moment,

4    Judge, the yellow represents the bipolar scripts by

5    psychiatrists.  Above the line are the marketing they did,

6    and below the time line is what they knew and concealed.

7    And it starts with the FDA analysis in 1993, which you are

8    familiar with that showed an increase risk of depression,

9    severe clinical depression, suicidal ideation.  They knew

10   that in '94, Judge, and that's when they started their

11   marketing campaign, in 1994.

12           Dr. Pande and an employee by the name of Dinan,

13   Judge, they were authors of an article that they started in

14   the summer of 1995 that looked at the same epilepsy data

15   that the FDA had looked at, and they wrote an article that

16   it improved mood, with no mention of what the FDA findings

17   were, and they got that published in June of 1996.  And in

18   '95 they started their teleconferences, in the fall of 1995

19   by Dr. Stein and Dr. Marcotte, and they had them give

20   favorable accounts of its use in treating bipolar.  They

21   never disclosed to Dr. Marcotte or Dr. Stein the FDA's

22   analysis that it could cause suicide or severe clinical

23   depression.  And so these were their marketing events, and

24   below the time line is what they concealed and failed to

25   disclose.

1          THE COURT:  So the debate you're trying to focus

2     me on is whether or not you can have aggregate proof of

3     causation as opposed to having to go doctor by doctor.  I'm

4     just trying to put it in my language for class certification.

5     That's what you're addressing right now.

6          MR. GREENE:  That's what I'm addressing.

7          THE COURT:  I thought when I was doing it that I

8     was talking about decision-making by the third-party payors

9     as to whether or not they were going to permit compensation

10    for off-label marketing, and what I had been focusing on was

11    not doctor by doctor but third-party payor by third-party

12    payor.  Is what you're trying to tell me now is, the

13    third-party payors should not even be part of this equation,

14    and I need to think about it in terms of doctor by doctor?

15         MR. GREENE:  No.  No, I'm not trying to tell you

16    that.  I'm trying to say that this is one method of proof.

17    But to come back to the third-party payors -- now, I'll

18    defer to Mr. Sobol on this, but to come back to the

19    third-party payors, we would say, no, that once it got

20    approved, it was placed on the formulary.  And once it was

21    on the formulary, the beneficiaries, the insureds'

22    physicians wrote, it got submitted, and it got paid for

23    bipolar, and there was nothing that they could do about it

24    at that time.

25         THE COURT:  Now, what Bell said is -- and maybe I

1    just keep coming back to this other issue.  If you're right

2    and the only point that matters is once it's put on the

3    formulary, that after that there's no method at all of

4    screening for it, and what you're trying to tell me here is

5    that I can look at this in an aggregate way rather than

6    going doctor by doctor.  What you're really trying to tell

7    me is, I was wrong by trying to look at the P and T

8    committees and what the third-party payors were thinking

9    about.

10            MR. GREENE:  Yes, I am.

11            THE COURT:  Because you're saying for the typical

12    TPP wasn't doing that.

13            MR. GREENE:  That's what I'm saying.

14            THE COURT:  That's what you're trying to get me

15    to -- so that's why you're telling me -- I'm just trying to

16    understand this -- about all this other stuff.

17            MR. GREENE:  Right, that is what I'm trying to

18    tell you.  And as I recall, Dr. Bell when he gave that

19    percentage, and I don't remember it, but I do believe that

20    it included Medicaid.  I don't think it was just the private

21    TPPs, but --

22            THE COURT:  I'm not sure he said that that way,

23    but --

24            MR. GREENE:  Okay.

25            THE COURT:  So --

1          MR. HIMMELSTEIN:  Your Honor, I hate to interrupt,

2     but I did write the brief we put in on this, a little

3     six-page brief just on this issue.  If you'd like, I can

4     address more precisely what you're asking.

5          THE COURT:  Well, I understand what you're trying

6     to -- they are saying, and they said it in every single

7     brief and they say it effectively, "It's been thirteen

8     years, and still, since you and I started together, not one

9     doctor has come forward and said that he relied on any

10    fraudulent misrepresentation."  That's what their refrain

11    has been right off the bat.

12         You're telling me that I don't have to go doctor

13    by doctor, that if I have a marketing campaign that's, you

14    know, based on a fraud, that I can look in the aggregate at

15    this chart, and that would be the common proof of the fraud,

16    even if no doctor said they relied on it.  That's what

17    you're telling me.

18         MR. GREENE:  That's part of what I'm telling you,

19    yes.  In addition to that, I'm saying -- and I think you

20    picked up at the last time -- with regard to this particular

21    indication, bipolar, it's what I refer to as the marketing

22    of snake oil.  They knew they had a drug that was ineffective.

23    Not only did they know it was ineffective, but they were

24    aware of the FDA analysis.  They knew --

25         THE COURT:  But I've already bought that in terms

1  of enough to go to a jury.  I mean, not that I'm ruling on

2  it.  I mean, there's enough there to go to a jury on it, but

3  their argument is, you have to go doctor by doctor as to

4  what he relied on, or she.

5             MR. GREENE:  But the counter to that, the point

6  that I'm trying to make is, if I took a jar of snake oil

7  pills and I put them there and I slapped on a Neurontin

8  script on it, and I gave it to Dr. Saris and said,

9  "Neurontin is good for bipolar," and I didn't tell you it

10 was snake oil pills and you prescribed it for your patients,

11 would there even be any need to ask you, "If you knew it was

12 a snake oil pill, would you have prescribed it?  If you knew

13 it was a snake oil pill that could worsen depression and

14 cause suicide, would you prescribe it?"  So I say in that

15 instance --

16            THE COURT:  What do you do when the doctor is

17 actually saying, "I would have prescribed it anyway"? which

18 you do have.

19            MR. GREENE:  Okay, so let's take your example.

20 Dr. Saris says, "Well, it wouldn't matter to me.  I would

21 have prescribed snake oil for bipolar, and I would have

22 prescribed it even if I knew it would have caused depression

23 in some of the patients."  Well, I think Dr. Saris would be

24 opening herself up to not just a malpractice suit but maybe

25 a malpractice suit for gross negligence.  I say that that's

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1   not reliable, it's not believable that a psychiatrist would

2   prescribe a medication that's totally ineffective.

3           THE COURT:  All right, I understand your point.

4   Okay, so you're basically saying, my big error last time

5   from your point of view -- not so much error.  You hadn't

6   really explained.  The supplemented record would show that I

7   can bypass the third-party payors because once it was on the

8   formulary --

9           MR. GREENE:  I think that's what the record

10  establishes, and I think that's what Dr. McDonough in her

11  report establishes.

12          THE COURT:  Well, her report, when I went back and

13  reread it, it's the tail end of a 40-page report, but she

14  doesn't quite ever say that there's no variances among

15  third-party payors.  She just says that they all went on a

16  formulary early on.  And then what Bell says is, as I

17  understand it, well, yeah, but some of them -- look at

18  Kaiser -- had all these other things, and others had -- this

19  kind of put it on Tier 2, and other people did this, and

20  that there was too much variation among the third-party

21  payors.  And what I'm trying to get a handle on is, was

22  there?

23          MR. SOBOL:  So let me --

24          THE COURT:  Because I understand your point if I

25  bypass the third-party payors.

1            MR. GREENE:  Well, that is a way to bypass the

2    third-party payors.

3            THE COURT:  What?

4            MR. GREENE:  That is a way to bypass the

5    third-party payors.

6            THE COURT:  Right.  So I think your argument to

7    me, which resonated, is, I understood it wrong, and that

8    most third-party payors never looked at the formulary again

9    when it came to off-label.  Is that your basic argument?

10            MR. SOBOL:  Correct, and it goes beyond that too.

11    So if you look at all third-party payors, third-party payors

12    have the following in common:  Their job is to cover

13    prescriptions or medical bills.  Their job is not to be

14    practicing medicine.  As a result, the vast bulk of the

15    third-party payors in most situations for most drugs,

16    including -- well, for most drugs -- are not going to

17    intervene in the patient-physician relationship.  They're

18    going to stay away from that.  That's number one.  Their job

19    is to cover.

20            The second thing is, there are many institutional

21    factors that are out there that would inhibit a third-party

22    payor from aggressively trying to intervene and saying,

23    "Well, we're going to allow you to prescribe this drug for

24    this cause under this circumstance, but we're not going to

25    let you do it in another," okay.

1          Then we talk about more specifically.  There are

2     certain therapeutic categories where third-party payors

3     won't intervene at all:  psychotropic drugs like

4     antipsychotics.

5          THE COURT:  But let's focus on Neurontin.  Both

6     Bell and McDonough confuse me because they do these joint

7     40-page affidavits which talk about every drug in the world

8     and every third-party payor.  What were they doing with

9     Neurontin?

10          MR. SOBOL:  Right, so for anticonvulsants, what

11     McDonough says -- and the record is replete on this -- is

12     that for anticonvulsants, third-party payors won't restrict

13     that category, given the nature of that kind of medication.

14          THE COURT:  But Kaiser does.  So how many are like

15     Kaiser?  How do we know?

16          MR. SOBOL:  Kaiser would be unique, and even in

17     this situation, we think we have that Kaiser let Neurontin

18     on its formulary and then engaged in activities later on to

19     curtail its use.  That was the 30 percent we have --

20          THE COURT:  Excuse me.  Thirty percent of

21     third-party payors, according to Bell, say no off-label

22     prescriptions.

23          MR. SOBOL:  As a general matter for all drugs.

24          THE COURT:  For all.

25          MR. SOBOL:  For all drugs.

1            THE COURT:  So there's that.  So what happens --

2            MR. SOBOL:  But that's not relevant.  Here

3    Neurontin is approved as an anticonvulsant, so it's going to

4    make its way onto the formulary -- hear me out -- because

5    then, once it's on the formulary, as McDonough says, all the

6    third-party payor gets is person, date, Neurontin script.

7    There's no diagnosis code that comes with it.  A person goes

8    into CVS, fills a prescription for Neurontin, the only thing

9    that hits the electronics is the fact that that person --

10           THE COURT:  I understand that.  That part I've

11   gotten.  You've explained it well.  But then there's the

12   issue of off-label Neurontin.  And at least the way Bell

13   puts it is, some third-party payors don't care.  They don't

14   care if Neurontin is off-label or not off-label.  They're

15   willing to pay for it.  In fact, I think Aetna or Guardian,

16   one of those say that:  "We're the gold standard.  If a

17   doctor wants to do off-label, we'll do off-label."

18           MR. SOBOL:  Right.

19           THE COURT:  All right, that's one group.

20           MR. SOBOL:  Right.

21           THE COURT:  Another group says, "We're never going

22   to pay for off-label," but they have no way to monitor it.

23   "We're never going to pay for it.  We don't believe in it.

24   We're never going to pay for it."

25           MR. SOBOL:  Correct.

1    THE COURT:  And then there's a third group, for
2    want of a better word, I'm going to say the Kaiser group,
3    who says, "Well, sometimes we'll pay for off-label, and
4    sometimes we won't, but we want to monitor it, and we want
5    to permit it, and we're going to discourage doctors."
6        MR. SOBOL:  Right.
7        THE COURT:  So in understanding whether or not I
8    can go right to where Mr. Greene wants me to go, to the
9    doctors, don't I have to understand whether there's a middle
10   filtering from the third-party payors to decide whether or
11   not the individual issues of the third-party payors
12   predominates over the common issues?
13       MR. SOBOL:  Sure, and the answer to that first is,
14   in this case, the only thing we do care about is when the
15   prescription was actually written and paid for.  In other
16   words, if there are third-party payors that are out there
17   that have policed and prevented Neurontin scripts from being
18   filled, they aren't in this case.
19       THE COURT:  Well, Kaiser is.
20       MR. SOBOL:  No, only to the extent that Kaiser has
21   paid, only to the extent that some other third-party payor
22   has paid for Neurontin --
23       THE COURT:  Well, how many people would you say --
24       MR. SOBOL:  -- for bipolar.
25       THE COURT:  What do your plaintiffs fall into,

1    what category?

2              MR. SOBOL:  They pay prescriptions that are --

3              THE COURT:  No policing, no policing.

4              MR. SOBOL:  -- regardless of whether it's on or

5    off-label.  They don't have prior authorization.  They don't

6    have, you know, step --

7              THE COURT:  Well, could you define a class, if you

8    will, narrower than you have, which is basically any

9    third-party payor that permits all off-label or no

10   off-label?

11             MR. SOBOL:  Well, one could, but I think what the

12   issue is, and just to make sure you understand, is there a

13   legal issue that is relevant to the extent to which a

14   third-party payor has been able to prevent off-label use for

15   Neurontin?  That's the question.  In the plaintiffs' case in

16   chief, that's irrelevant.  Is there a defense of what,

17   contributory negligence to a --

18             THE COURT:  No, no, no, no, no.

19             MR. SOBOL:  But all I'm saying is, legally it's

20   not relevant --

21             THE COURT:  Excuse me.  Legally it's incredibly

22   relevant to whether or not a class can be certified, whether

23   or not the common issues predominate over the individual

24   issues.  So if there are a lot of Kaisers out there, which

25   is very individualized, I can't have them in my class.

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1          MR. SOBOL:  Right.

2          THE COURT:  If there's a common kind of

3    third-party payor, then I can.

4          MR. SOBOL:  Right, so here's the answer to the

5    question.

6          THE COURT:  Am I not understanding the standard

7    correct?  That's the legal question.

8          MR. SOBOL:  Kaiser is relatively or almost unique

9    in the country in terms of it being a managed care

10   organization with a high involvement with the physicians in

11   the way that the coverages occur.  That is highly unique in

12   the country.  Having said that, okay, to the extent that you

13   have any question, we should handle this the way we've

14   handled it in every other class situation that we've had

15   with you, which is you can have an evidentiary hearing where

16   you can put Mr. Bell up -- he's testified here before -- put

17   Ms. McDonough up, and vet these issues to the extent that

18   you make sure that you know and you can understand it, okay?

19          I will say, though, having -- you know, and if

20   that's going to make you more comfortable, frankly, then,

21   from the plaintiffs' point of view, my experience with you

22   is, we're always much better doing something so you've been

23   able to eyeball the experts and get a much better feel for

24   an issue because that's what you've had.  Having said that,

25   I do believe that because this case, it is not relevant

Page 24

 1   whether or not a third-party payor was aggressively trying

 2   to monitor the off-label use or was lax in terms of trying

 3   to monitor the off-label use, because this case involves the

 4   fact that they covered it, they paid for it, and all the

 5   physicians were writing scripts for a drug for an indication

 6   that had no efficacy, we ought to be able to get certified

 7   on that basis.  And with all due respect, it's really not

 8   going to be terribly important whether or not a third-party

 9   payor was permissive in allowing off-label use to occur or

10   aggressive but some of it slipped through the cracks.  If it

11   slipped through the cracks through an aggressive third-party

12   payor, again, the script is being written by reason of the

13   defendant's wrongful --

14              THE COURT:  For example, the way you originally

15   phrased it, it included nociceptive and other kinds of

16   neurologic pain indications.

17              MR. SOBOL:  Correct.

18              THE COURT:  Defendants put forward evidence that

19   in 2000 and 2001, many third-party payors were aggressive in

20   trying to manage the costs with respect to those indications.

21   so that would be where the individual issues of each plan

22   would predominate over common issues.

23              MR. SOBOL:  Correct.  If we had a pain indication

24   and we were looking at the pain therapy area, or if we were

25   in an area, for instance, of antibiotics where there's a lot

1    of activities, you know, where there's a lot of antibiotics,

2    there's a lot of pain medications, and in those areas

3    third-party payors can go in there, and they, relative to

4    other categories, are pretty aggressive in the way that

5    they'll tell physicians how to prescribe medicine.  In this

6    area, anticonvulsants, the door is wide open.  The drug goes

7    in, and that's it.

8             It's the same, by the way, issue also for

9    psychiatry and psychotropics for bipolar.  There are few, if

10   any, restrictions placed on psychiatrists in terms of the

11   medications that third-party payors will tell them they can

12   or cannot do.

13            So in this case, for this kind of drug,

14   anticonvulsant being used for the psychotropic, there aren't

15   going to be limitations.  And to the extent that there are,

16   in the rare situations where they are, those limitations

17   have failed because this case only involves when the script

18   is actually written.  That's our pitch.

19            Now, having said that, again, my history with this

20   Court is, if you want to feel more comfortable, we'll put

21   the experts in the box, and we'll have some more slide

22   shows, and we'll --

23            THE COURT:  I don't even need the bells and

24   whistles.  I want somebody to look at me and say, well, what

25   do they do for Neurontin?

1          MR. SOBOL:  Right, and --

2          THE COURT:  I see someone here.  He's dying.  You

3    can't see him.  He's dying.  He's, like, jumping up and

4    down.  No, your colleague here.

5          MR. HIMMELSTEIN:  We filed a six-page brief --

6          THE COURT:  What's your name again?

7          MR. HIMMELSTEIN:  Barry Himmelstein.

8          THE COURT:  All right, and when did you file it?

9          MR. HIMMELSTEIN:  It's entitled "Errata Re

10   Plaintiffs' Motion For Reconsideration," not obviously the

11   same thing, June 11, 2009.  I don't know the docket number

12   here, but we went through Dr. Bell's affidavit with a

13   fine-tooth comb, and he does say approximately 30 percent of

14   covered lives were under plans that excluded coverage for

15   off-label prescriptions.  He's obviously trying to put the

16   best face on things for defendants.  But when you look at

17   the examples that he gives of attempts to limit that for

18   Neurontin, they all fail.  And let's go just through the

19   specifics, okay.

20         The only examples he gives of any attempts to

21   restrict Neurontin prescriptions -- and he's working for

22   Pfizer.  Whatever restrictions there are, they know about

23   it.  They've got the information.  So from the entire

24   universe of restrictions, this is all he can do.  Within the

25   class period, before the story broke --

1          THE COURT:  The class period ends when again?

2          MR. HIMMELSTEIN:  May, 2004, after this all became

3    very public, there were lots of news stories and everything,

4    and then people got concerned.  But before that time, the

5    only examples in the entire universe he can come up with is,

6    one, in 2004 some Aetna plans required prior authorization

7    for larger than a 30-day supply of Neurontin at the maximum

8    dose of 18 milligrams a day.  And as Dr. McDonough says,

9    that's very common, not unusual, quote, "Most organizations

10   limit claim restrictions to refill timeliness (refill-too-

11   soon) quantity restrictions (30-days' supply) --"

12         THE COURT:  I read your brief.  It was excellent.

13   It's one of the reasons I decided to hold this hearing.  But

14   the issue is, do I have affirmative evidence from her that

15   she knows of no plans that restrict off-label other than

16   Kaiser, or that typically -- this is what she didn't

17   affirmatively provide for me.  She said that a hundred

18   percent coverage on the formulary basically for the

19   antiepileptic, but what was empty about what she said is,

20   she didn't quite say she didn't know of any plans that

21   imposed restrictions within the class period on the

22   off-label.

23         MR. HIMMELSTEIN:  Right.  Well, I'm going through

24   Dr. Bell's example.  This is -- you're flipping the burden.

25         THE COURT:  I know, you're saying Bell's stuff was

Page 28

1    after the class date.

2              MR. HIMMELSTEIN:  I'm saying Pfizer and Bell know

3    every restriction that ever existed with respect to

4    Neurontin.

5              THE COURT:  Well, I'll ask them that question.

6              MR. HIMMELSTEIN:  And all he can come up with is

7    basically nothing.  He comes up with this 30 percent

8    statistic.  It's very vague.  Does it mean plans restrict

9    off-label uses for some drugs, for all drugs?  I don't know

10   how reliable that statistic is.

11             THE COURT:  Well, 30 percent might actually help

12   you because it means they've done nothing.  They banned the

13   off-label; they don't do anything to police it.  And

14   basically, in some ways, in a way, isn't that your best-case

15   scenario, which is, they ban off-label, there's no policing

16   mechanism, there's a fraudulent marketing plan; and as far

17   as you're concerned, that's the ultimate because you would

18   never have paid for it anyway?

19             MR. HIMMELSTEIN:  That works.

20             THE COURT:  So I don't know why you're trying to

21   escape from that number.  But the real issue I want to know

22   is, to your knowledge -- and McDonough doesn't quite say

23   it -- is Kaiser typical of a group of plans that actually

24   police?

25             MR. HIMMELSTEIN:  First of all, Kaiser didn't

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1   start doing this until long after this fraud started, after

2   a bunch of this became public.  And, no, they're not

3   typical, they're completely unique, and if you give me two

4   minutes, I can convince you of that.

5               THE COURT:  All right.

6               MR. HIMMELSTEIN:  Because Dr. Bell, who knows

7   everything there is to know in the universe about what

8   restrictions plans, including Kaiser, put on, can't come up

9   with a darn thing that means anything besides Kaiser.  And

10  just let me just walk you through every single --

11              THE COURT:  I read it.  No, I know what you said.

12  I've read your brief.  You wrote a good brief.  That's why

13  we're here today, okay.  But what I need is some affirmative

14  evidence, and I'm going to go here and ask your question

15  directly to them, because if there is no policing and no

16  individualized issues for third-party payors, then you have

17  a stronger claim.

18              MR. HIMMELSTEIN:  You're asking us to prove a

19  negative.  You're flipping on us the burden of proof that

20  should be on them.

21              THE COURT:  You are moving for class certification.

22              MR. HIMMELSTEIN:  We are.

23              THE COURT:  So would she say, your expert say

24  that, to her knowledge, there are no organizations other

25  than Kaiser which police the use of off-label drugs?

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1            MR. SOBOL:  McDonough's --

2            THE COURT:  Or expressly agree by indication?

3            MR. HIMMELSTEIN:  I think she'll --

4            MR. SOBOL:  McDonough's report is clear that she's

5      gone -- I think that she's already indicated that

6      third-party payors do not police off-label prescriptions in

7      these two therapeutic areas.  Now, if we need to supplement

8      it or have an evidentiary hearing --

9            THE COURT:  Well, you're making that proffer here.

10     She doesn't quite say it that clearly.  All right.

11            Yes.

12            MR. DUGAN:  Your Honor, one point.  James Dugan on

13     behalf of plaintiffs.  I think I can say here in open court

14     that the three class reps that are involved in this case fit

15     that bill --

16            THE COURT:  Which is which bill?

17            MR. DUGAN:  -- which is Harden Manufacturing

18     Corporation, Louisiana Health Service, doing business as

19     Blue Cross-Blue Shield of Louisiana, which is my client, and

20     the ASEA/AFSCME Local 52 Health Benefits Trust.

21            THE COURT:  Do what?  Do what?  What is their

22     policy?

23            MR. DUGAN:  Their policy is, they just reimburse,

24     your Honor.

25            THE COURT:  On-label or off-label, they don't

1   care?

2           MR. DUGAN:  That's right.

3           THE COURT:  So it's a different group.  You all

4   reimburse on-label or off-label.  There are some groups who

5   at least their policy says we're not going to reimburse for

6   any off-label.  And then the question is whether there's a

7   group like Kaiser that have gone the next step and tried to

8   police.  That's really what we're talking about, is there a

9   typical TPP?  And you'd say all three of yours will

10  reimburse one way or another?

11          MR. DUGAN:  Those are typical TPPs, yes, your

12  Honor.

13          THE COURT:  And what you would say, those are the

14  typical ones?

15          MR. DUGAN:  Absolutely.

16          THE COURT:  All right, so now let me go to you

17  all.

18          MR. CHEFFO:  I have some slides today.

19          THE COURT:  So can I just start off, I feel as if

20  I misunderstood, or certainly Dr. Bell's report was a bit

21  misleading on a certain point, so I need to understand this

22  better.  He seemed to say that every TPP does it differently

23  with respect to Neurontin, and that turns out not to be

24  true.

25          MR. CHEFFO:  I think there's two issues, okay,

1    and, you know, I've heard a lot of different things.  First,

2    your Honor tried, I think what you were focusing on and

3    trying to get an answer -- I'm not sure that you've heard it

4    yet -- is you basically said, well, somebody has to have

5    reliance and causation, there has to be some fact there.

6    And essentially -- and you dealt with this, I think, very

7    well.  Your decision has been well cited, well regarded in

8    your class cert denial, and you basically said:  There are

9    differences between the third-party payors.  There's this

10   30 percent number.  And in fact, you know, it's not our

11   burden to come with the specific number.  There's been no

12   absent class discovery, but clearly there's no dispute -- I

13   mean, it's kind of ironic that now all of a sudden there's

14   this kind of uniformity, but the folks sitting in the back

15   are not members of the class because they have their

16   individual claims, and Kaiser has told you last week how

17   different they are and how they do it differently.  So

18   there's not a shred of evidence --

19              THE COURT:  Well, can I just --

20              MR. CHEFFO:  Yes, please.

21              THE COURT:  So his point is, though, or their

22   point is that Pfizer will know what the restrictions are.

23   So other than Kaiser, in the class period, are there any

24   other third-party payors that you know that impose any kind

25   of policing on off-label use?

1          MR. CHEFFO:  The answer is, I think Bell's report

2    deals with that, but let me just --

3          THE COURT:  But when I went back and read it in

4    the context of their criticism, I wasn't sure it had because

5    almost every example was after the class period.

6          MR. CHEFFO:  Well, I think he does deal with it.

7    And, again, they're moving for class certification.  They

8    need to come forward and say, this is a nonissue.  See, what

9    they said in their briefs, they said two things, and they

10   seem to have taken a very different position now because I

11   think they're following your Honor's lead.  They initially

12   before they came into in this 160 pages of briefing said,

13   "We're different, but it doesn't really matter," okay.

14   They're saying, "We're not even alleging any misrepresentation

15   or differences or actions with respect to the third-party

16   payors."  Why not?  And I think Mr. Sobol just said it,

17   which is consistent with what they said in their brief.  He

18   said, "The only thing we care about is what doctors did."

19   So we, I think, today need to talk about two separate

20   issues.  One is the third-party payors, are there

21   differences?  I think the record shows there are

22   differences.  They haven't provided any information --

23          THE COURT:  Sure, but just back up.  I'm not sure

24   I was right on that because as I'm -- I mean, I relied on

25   that, that there were differences, because I relied on Bell

1    because he kept talking about all the differences; but in

2    the context of Neurontin, I'm not sure there are

3    differences.

4            MR. CHEFFO:  Well, I think they told you that

5    there are differences.  We know, for example, that there's

6    Kaiser.  We know there's the three buckets that you

7    indicated you were interested in.  I mean, they've conceded

8    that.

9            THE COURT:  Kaiser is definitely something I'm

10   worried about.  They're saying that's sui generis.

11           MR. CHEFFO:  But, I mean, they may be saying that

12   today, your Honor, but where is the evidence of that?

13   There's nothing in the record to basically support that.

14           THE COURT:  When I went back and looked at

15   Dr. Bell's examples, all of them were after the class

16   period.  So their basic argument to me now -- and just tell

17   me if this is wrong -- is that Neurontin was covered a

18   hundred percent on every single formulary for its on-label

19   uses; and that once it went on-label, it was the rare, not

20   the typical, it was the rare TPP that did any policing.

21           MR. CHEFFO:  I think there's not -- I don't think

22   there's a shred of evidence in the record to support that,

23   your Honor.  I mean, in other words, that's speculation.  I

24   mean, they don't know.  They don't have a list.  They

25   haven't done any -- I mean, essentially in order to get past

1   these class cert issues, they have to say and show proof --

2   I mean, as you said, we've been going at this for years and

3   years and years.  They represent these folks.  They need to

4   come forward and say, "This is not an issue that you,

5   Judge Saris, need to address because we generally do it."

6   What we've heard is, "Well, notwithstanding Kaiser, we think

7   that's an anomaly."  We do have these other folks that they

8   agree.  We just even heard amongst the seven TPPs now

9   there's three different buckets, but yet they're saying you

10  should assume that they all did something different prior to

11  2004.  In other words, we can't go on speculation of what I

12  say or what the lawyers say.  We have to go on the record.

13  There is nothing in the record that I'm aware of that

14  basically says there is a reasonable belief for your Honor

15  to determine that there is no distinctions, that there was

16  no distinctions between the way TPPs treated Neurontin.  In

17  other words, I mean, they're telling you now Kaiser is an

18  anomaly, but there's no record of that.  And I do want to

19  just put a footnote because I think that that is a key

20  issue.  We could stop now, but I think that's just --

21  there's another, I think, key point I'd like to address

22  because -- unless you'd like to, you know, talk more about

23  that.

24            THE COURT:  Well, I went back and made the effort

25  to reread Dr. Bell's affidavit, and also the one in the

1    reconsideration, and when you reread it, it's very lengthy

2    and very dense, but he actually talks primarily in

3    generalities and not so much about Neurontin.  And when you

4    actually read the Neurontin-specific information, he only

5    provides maybe five examples of TPPs which have been more

6    activist in monitoring, and only one of those was during the

7    class period, or two of them.  I can't remember.

8              MR. CHEFFO:  Your Honor, with all due fairness, I

9    mean, it's not our burden to kind of survey the third-party

10   payors.

11             THE COURT:  Yes, but they've got McDonough saying

12   they're all the same, that there's no policing.

13             MR. CHEFFO:  But I don't think that that's true at

14   all.  I mean, in fact, how can that be?

15             THE COURT:  They say it.  She says it.  You say

16   "no," but then when I looked at the "no" -- and it did look

17   like from his affidavit everyone does it differently --

18   that's true, but not in the context of Neurontin.

19             MR. CHEFFO:  But I think with respect to --

20   they're talking about -- they're trying to carve out and say

21   specific.  Some of them say with respect to all off-label.

22   So if you look at McDonough, I mean, maybe there's no

23   specific rules as to Neurontin, but what they've told you --

24   and I don't think I've heard anything different -- is that

25   some people said, "We pay for everything."  I think you went

1   through this a few weeks ago.

2           THE COURT:  Yes.

3           MR. CHEFFO:  And others say, with respect to -- it

4   doesn't matter Neurontin, but all medicines, we don't

5   provide for off-label.  And then with respect to certain --

6   and maybe Kaiser is the anomaly, maybe it's not -- we have

7   much more aggressive controls.  And that's consistent.

8   They're not saying anything different.  And that's an issue

9   in itself which I think is one of the reasons why your Honor

10  denied certification.

11          Now, I think, you know --

12          THE COURT:  It was the primary reason, but it's

13  turning out not to be so true.

14          MR. CHEFFO:  Well, I don't think that that's true,

15  your Honor.  In other words, they have not put forth any

16  evidence to support that.

17          THE COURT:  Well, why doesn't it make sense, since

18  I'm obviously so uncertain about this -- as Mr. Sobol says,

19  I like to eyeball the expert, I mean, because otherwise the

20  affidavits are sometimes, I don't know, I mean, not directly

21  on point, and I don't learn from them.

22          MR. CHEFFO:  I have no objection to that, your

23  Honor, but if you just give me five -- they had their

24  chance -- to highlight the few issues --

25          THE COURT:  Yes, okay.

1        MR. CHEFFO:  -- because I think that's actually a

2   secondary issue.  I'll tell you why.  I mean, I think it

3   fully supports your decision, but the real issue, okay, they

4   say -- and they've said this a hundred times in their

5   briefs -- they say, "It doesn't matter what we did.  No

6   reasonable doctor would have prescribed."  We've now heard

7   Mr. Sobol say it's what the doctors did, because, again, I

8   think we all agree, under the law, we have to have causation

9   and we have to have some type of reliance.  In their briefs,

10  as I understood it, they said, "Well, not withstanding the

11  fact that there may be differences, it doesn't matter

12  because we're relying on what the doctors did," and they

13  basically make -- but then they want you to make some

14  assumptions.

15        If you look at Page 5 of the slides, your Honor,

16  basically they want you to assume that no psychiatrist would

17  have prescribed Neurontin to bipolar patients as a result of

18  off-label.  They want you to assume that every Neurontin

19  prescription written by psychiatrists for bipolar was

20  specifically to treat bipolar, there was no legitimate

21  basis, and that all promotion to psychiatrists were

22  fraudulent.  The point is, once we get past the TPPs, I

23  think the case is much easier with respect to denial of

24  certification because, as Mr. Sobol correctly said, it

25  becomes a doctor-by-doctor, patient-by-patient analysis,

1  which is exactly what you found with respect to the

2  consumers and others, which virtually every court has found

3  with respect to denial of the class certification.  At some

4  point, when we go down the funnel and we have to look at

5  whether or not a particular -- and for class certification --

6  we're not arguing summary judgment -- but whether or not a

7  TPP has restrictions, doesn't have restrictions, we think

8  that that's enough to defeat class certification.

9          THE COURT:  So let's assume I find that at least

10  there's some group of TPPs who didn't rely on anything,

11  unlike Kaiser or unlike -- and so there's at least some

12  group that you could say is sufficiently common, then you

13  jump me into the doctors, which is where Mr. Greene started

14  me off.

15          MR. CHEFFO:  Well, and I think, you know, and,

16  again, Mr. Greene, you know, I think you stopped him and

17  said, are we talking about -- and, you know, this is no

18  disrespect to Mr. Greene, but, you know, it sounded very

19  much like a summary judgment argument because that's exactly

20  the issue.  I was kind of jotting down some of the points.

21  And, you know, your job and my job today is not to convince

22  you that we would ultimately win these on an individual

23  case.  If there was an individual case, you don't need to

24  decide who's right or who's wrong.  But as we start going,

25  what did DrugDex know, what did a doctor do, what did they

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1   see, were there AEDs, all of those issues ultimately, no

2   matter who the TPP is, just like the class action --

3            THE COURT:  But suppose there's a fraudulent -- I

4   mean, once I get past in my mind the fact that what I had

5   believed before, which is many of the third-party payors

6   actually had -- the P and T committee made independent

7   decision-making with respect to the off-label as in Kaiser,

8   and subsequently some of the other plans, once I get past

9   that, then the question is, suppose -- the law school exam

10  question is, if you have a fraudulent marketing campaign,

11  let's say out-and-out fraud, and -- I'm not saying yours was

12  but at least enough evidence -- an out-and-out fraudulent

13  marketing campaign, no third-party payor did anything to

14  police the off-label, at least for, you know, most of the

15  class period and not the typical one, and then the issue is

16  whether or not you can say that any doctor was affected.

17  You would say "no."

18           MR. CHEFFO:  I think, you know, the law school

19  exam, your Honor, I think if -- with all due respect, I

20  think if the student wrote, you know, yes, you can assume

21  that no one relied, the doctors didn't rely, even people who

22  weren't detailed, there's liability, I think that's an F for

23  the law school.  I don't think any court, particularly when

24  we're dealing with -- the claims in this case are --

25           THE COURT:  That's from your summary judgment

1    argument with respect to the big TPPs, and I'm not sure --

2    that's what your argument is, that you can't even assume one

3    did, because once you can assume that one did, then it's

4    just a question of damages.

5              MR. CHEFFO:  No, it's not.  I strongly disagree,

6    your Honor, because this is not an issue -- and I think the

7    Court may have looked at that with respect to standing:  If

8    there's one, we can figure out.  But I think the issue here,

9    they're not suing for one -- these are very individual

10   issues.  So, in other words, it's no different than saying,

11   if we could have found one person in the United States who

12   would have been, therefore we could certify a nationwide

13   class.  That's the analogy here.  Just like a class action

14   doesn't change the procedure or the substantive rights of

15   the parties, being a third-party -- they've tried to attach

16   some kind of talismanic position to being a TPP.  All it is,

17   and I'm not being pejorative, but they are an insurance

18   company that through subrogation or other rights has a whole

19   bunch of folks just like the individuals.  So, in other

20   words, each of those six or seven individuals that were

21   before you -- we submitted something in the record here of

22   Mr. Y -- all of those people are exactly the kind of folks

23   who these companies insure.  And in order to determine

24   whether or not you can have a class action to find out

25   whether each one of those claims of each one of those good

1   members of these plaintiff companies, you have to do the

2   same analysis.  So, you know, you can decide this and I

3   think have appropriately.  There's enough in the record, and

4   they certainly haven't showed you on a motion for

5   reconsideration.  You know, you would think that if they

6   said that there was this incredible uniformity in the

7   TPPs -- now, I'm going back to the first point -- that, you

8   know, with all this paper and everything, there would be a

9   huge amount of paper and documents.  There's nothing to

10  justify reconsideration.

11          But even more importantly, even if, and I don't

12  concede this, but even if they were to show that there was

13  some level of absolute uniformity prior to 2004 of every

14  single third-party payor in the country, which is

15  astonishing to believe, but even if that was true, where

16  does it get you?  It gets you to looking at each of the

17  individual claims.

18          Now, this is not a novel issue, your Honor.  In

19  fact, every single case that I'm aware of -- and Mr. Sobol

20  and I have litigated these issues in some of the cases --

21  the courts -- now, your case, in fairness, this case was

22  filed much before, but I think the recent cases, everyone

23  that I'm aware of has dismissed these cases on the motion to

24  dismiss stage, not even getting to -- not even getting with

25  respect to --

1          MR. SOBOL:  Have I done that badly?

2          MR. CHEFFO:  No, they're not all Mr. Sobol's

3    cases, but the point is, the courts have recognized that if

4    you can't identify, particularly under RICO, which is what

5    they're seeking here, if you can't identify a single

6    patient, a single provider, a single claim, okay, you can't

7    even do that with respect to one -- and none of these

8    articulate it because once they do that, they're concerned

9    about class certification -- then certainly you don't have

10   the kind of RICO standing, RICO damages that would even get

11   past a motion to dismiss.  There's SIL, there's the

12   Ironworkers cases, there's the Schering-Plough cases,

13   there's the Vioxx cases, there's Prohias, there's Amgen,

14   there's about a dozen cases, and none of them, none of them

15   go the other way.  And, you know, again, your Honor, none of

16   these cases are individuals.  These are all third-party

17   payor cases, and the courts recognize that there's no magic

18   to them.  They don't get worse treatment; they don't get any

19   better treatment.  But ultimately what these TPPs are saying

20   is that "We have a bunch of folks who we paid for."  And the

21   courts say "Okay," just as if it was any subrogation claim.

22   If it was a house fire or something, we can't assume on a

23   classwide basis and somehow take away the defendant's rights

24   to look at those individual claims.

25              I mean, you spent a lot of time and effort in your

1    class cert denial as to why there's so many individual

2    issues.  And I think, again, not to pick on Mr. Sobol, who's

3    a fine lawyer, but he said or Mr. Greene said earlier this

4    analysis applies both to the individual cases and to the

5    third-party payors.  I think that was one of the first

6    responses he gave to you.  And in this regard, we agree with

7    that because --

8              THE COURT:  Well, I just think, when I was

9    thinking about it, I thought there was an easy form of

10   analysis because I thought third-party payors were making

11   decisions third-party payor by third-party payor about which

12   off-label indications they were going to permit, like Kaiser

13   or like Aetna eventually did, and they took different

14   policing mechanisms or different cost-saving mechanisms; and

15   it turns out all of that came after the class period, most

16   of it anyway.

17             MR. CHEFFO:  Again, I'm not certain, your Honor.

18   You know, I'm not an expert in all TPPs, so I don't -- you

19   know, I want to give you information that I have.

20             THE COURT:  But it sounds like the typical one did

21   nothing, so I can't decide it based on what a third-party

22   payor may or may not have relied on.  What we end up doing,

23   which is probably where Mr. Greene started, is leapfrogging

24   over the TPP, and the legal question becomes, can you do

25   something in the aggregate?

1          MR. CHEFFO:  Well, I mean, I wouldn't concede.  I

2    think there is -- again, my position, and we can move on,

3    is, I think the record is what it is.  I think there is --

4    you know, again, we didn't have absent class discovery.  You

5    know, you can't expect, you know, an expert to know about

6    what thousands of different third-party --

7          THE COURT:  But Pfizer would know what

8    restrictions were put on.

9          MR. CHEFFO:  No, that's not true, your Honor.

10          THE COURT:  Why?

11          MR. CHEFFO:  Well, because these are the

12    Union 593, Union Health and Benefit Fund.  I mean, they

13    could have fifty members.  They could be in for the

14    plumbers, and why would Pfizer know that?  Basically Pfizer

15    doesn't sell directly to --

16          THE COURT:  Sure, but the biggies Pfizer would

17    know.

18          MR. CHEFFO:  Well, but the biggies are here, but

19    there's thousands of health and welfare funds, I mean, I

20    think you literally thousands.

21          THE COURT:  But the evidence I have in the record

22    is that they primarily did nothing and --

23          MR. CHEFFO:  But there's --

24          THE COURT:  The little guys.

25          MR. CHEFFO:  I mean, I don't think that that's

1    what the evidence says.

2              THE COURT:  That's what McDonough says.

3              MR. CHEFFO:  I think what Bell basically offers is

4    that there are significant distinctions, and, again, all I

5    can say, your Honor, is that we know that -- it's kind of

6    like with respect to these, when we were talking about the

7    seven or eight different individuals, they were saying,

8    well, ignore the fact that every one of their doctors said

9    that they didn't rely, and ignore the fact that we have

10   no -- but let's ignore the evidence before us.  We have --

11             THE COURT:  The problem, the reason I found

12   Bell's, and when I went back and reread it in the new light,

13   misleading, is, yes, he highlights all these differences

14   among them, but that's in general.  That wasn't with respect

15   to Neurontin.

16             MR. CHEFFO:  But that's not -- see, your Honor, I

17   mean, I think you know this, but no formulary, no -- they

18   don't have -- you know, there's millions of drugs and

19   there's different -- you know, they don't make specific

20   rules typically for Neurontin.  What they say is medicines

21   off-label, on-label.

22             THE COURT:  But this is unique because of its

23   off-label status.  That's the thing that makes this

24   different from all the differences that he was -- as far as

25   I can tell, the typical TPP did not do individualized review

1   for off-label indications.

2           MR. CHEFFO:  But I may stand corrected on this,

3   and we can supplement, but I don't think that with respect

4   to any of the AEDs -- in other words, you know, we've talked

5   about Neurontin, but, you know, we're talking about other

6   controls, and, you know --

7           THE COURT:  Say that again.  With respect to

8   any --

9           MR. CHEFFO:  In other words, I don't --

10          THE COURT:  Antiepileptic drugs?

11          MR. CHEFFO:  Right, right.  I'm sorry,

12  antiepileptic drugs.  So, in other words, you know, we've

13  talked about -- one of the reasons they say is that

14  essentially something came out from the sky, and all of a

15  sudden doctors just started kind of prescribing Neurontin,

16  and no reason could have occurred except for fraudulent

17  off-label marketing, and every doctor was duped in the

18  United States.  But of course we also know from all the

19  charts that for years prior -- and this is what their own

20  doctors have said -- for years prior they were using other

21  medicines in the class, other antiepileptic drugs -- I think

22  there's ten or eleven of them -- for bipolar disorder, for

23  anxiety, for depression.  And the doctors, some of them who

24  were the same doctors for the individual consumers, said,

25  "Well, you know, it was in the class, and that's why.  I

1   never --"

2           THE COURT:  I do understand that, but I think --

3   and I may end up in the same place, but I think where I

4   can't end up is where I was, which is that it was up to

5   each third -- the issue is whether a third-party payor

6   relied or didn't rely on the misrepresentations because it

7   turns out most of them did nothing.

8           MR. CHEFFO:  Well, I would just say this, your

9   Honor.  I would just say, I don't think you can draw that

10  conclusion based on counsel's representation.  So, in other

11  words, we think there's two ways that you can deny this.

12  The first is the third party, and if you'd like to have

13  testimony on that --

14          THE COURT:  I may.  I may well.  I'm not going to

15  get to this before I decide the other stuff anyway.  I want

16  to see these other cases play out.  That's what I want to

17  do.  But at some point, I mean, that's of concern to me.

18  And then the other question, which is, if I jump over the

19  third-party payors because in fact they don't re -- do I --

20  that's a very hard issue that you and Mr. Greene want me to

21  say is, can you do anything in the aggregate?

22          MR. CHEFFO:  Well, particularly here -- and it's

23  not just these cases.  You know, I think what they've cited

24  is a case of like wax, right?  So somebody, you know,

25  basically says, "We made a million wax candles," and they're

1    really paper mache.  And if you decide that, you know, gosh,

2    they're paper mache, they're not wax, then you can treat

3    them all the same.  But this is not wax.  This is not the

4    same kind of analysis.  If not a million, there's at least a

5    dozen reasons that you articulated in your decision and

6    further as to why physicians would have written these

7    prescriptions and in fact did, many who were not even

8    detailed at all by Pfizer.

9            And, you know, the real issue here is not the

10   merits.  It's not whether you're ruling at this point

11   whether they have a claim or not.  It's just they think that

12   this can be done on a nationwide class action basis, and the

13   point is, it can't.

14           THE COURT:  All right, I understand the issue now,

15   I think.  Yes?

16           MR. SOBOL:  May I be heard just briefly, your

17   Honor?  The McDonough report does get into this, and she

18   indicates three sources of information from the defendant

19   where the defendant acknowledges that as of the beginning of

20   1998, there was one hundred percent formulary.  So she goes

21   into the fact that she can document from Pfizer's files one

22   hundred percent or near one hundred percent formulary

23   placement for Neurontin early on.  And then her declaration

24   does go on to indicate all of the institutional reasons why

25   in a therapeutic category such as this, third-party payors,

1    speaking about them as a class and not about any

2    individuals, have every reason not to be telling doctors

3    what further to do with respect to the drug.

4            THE COURT:  Maybe I'm not remembering, but she

5    never goes the next step and says, "And as far as I can

6    tell, the typical TPP --" you know, that Kaiser was atypical

7    and that the typical TPP did nothing with respect to

8    off-label.  I mean, that's what you're arguing here.

9            MR. SOBOL:  Well, you know, maybe it's better to

10   have her come in regardless of what it says in the

11   declaration, but I do think, in fairness, what she indicates

12   is that because --

13           THE COURT:  So read me what you're talking about.

14   She says there's no reason to, but that's different from

15   she's looked at the TPPs and --

16           MR. SOBOL:  Well, and also there's the inability

17   in terms of the electronics claims processing, and that, you

18   know, there are administrative and cost considerations --

19           THE COURT:  Yes, she did go through all that, but

20   what would have been useful was, "And I know TPPs, and other

21   than Kaiser, I don't know any TPP that actually did anything

22   about it."

23           MR. SOBOL:  Right, and also, in fairness too, she

24   does not, nor I don't think there was any reason for her to

25   set up Kaiser, which is the unique staff model HMO where the

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1    physicians are actually involved in the formulary decision --

2            THE COURT:  But there may be others.  There are

3    also other networks that are mentioned, so, I mean, there

4    may be a certain group.

5            MR. SOBOL:  Sure.  I'm just saying that, in any

6    event, I do think that that's part of --

7            THE COURT:  I may end up doing a hearing on it.

8    What did you want to say because I -- yes, go ahead, because

9    he's just standing there.

10           MR. HIMMELSTEIN:  I just had a couple discrete

11   points.  They know what all the PBMs do.  Almost all the

12   TPPs use PBMs.  There's only a handful of them.  If they

13   were imposing restrictions, they would know it, they would

14   be able to tell you about it.  And in your Honor's judgment

15   in the AWP case, which the First Circuit recently affirmed,

16   Mr. Sobol's AWP case, I think they speak to this issue at

17   Page 89 to 90 -- I just have the slip opinion here -- where

18   they say, "The District Court's aggregate determination as

19   to knowledge and expectations was permissible" because the

20   defendants, they know what's going on with this stuff, and

21   they didn't put in contrary evidence that the class

22   representatives were not typical in this regard.  Now, we

23   have a different issue here, not knowledge and expectations,

24   but you're trying to flip the burden to us to prove a

25   negative.  The First Circuit says, "No.  They can prove

1    something."

2             MR. CHEFFO:  Can I --

3             THE COURT:  No, no.  At this point, finish here,

4    then finish here, and then I'm leaving.

5             MR. SOBOL:  I just want to bring a couple -- since

6    there could be some planning things, I think it makes sense

7    just to bring your attention to some things I want you to

8    keep in mind when you're thinking about this.  Can you go to

9    Slide 15 for a moment.  This then gets into the issue of the

10   exhaustive way -- and I'm only going to flag for you the

11   exhaustive way we have tried to document and have documented

12   that the evidence shows that the defendant's wrongful

13   conduct with respect to bipolar was a substantial contributing

14   factor to virtually every prescription that was written for

15   Neurontin.  That's what we have to prove.  In other words --

16   and the way we do that is, first, if you go to the next

17   slide, we have done this through a layering approach, if you

18   will.  We have a variety of medical experts that have

19   testified regarding the complete lack of any scientific

20   basis showing efficacy, the nondisclosure of that, and the

21   absence of any legitimate science that would have warranted

22   any doctor, who would at least need some medical or

23   scientific basis to do it, that none of that existed, such

24   that the only sources of information that would have led any

25   doctor, either directly or indirectly, to write a

1  prescription for Neurontin for bipolar would have come from

2  the defendant and the defendant's lies.  We have marketing

3  experts that have testified this way.  We've gone through

4  reams of before and after data analysis --

5          THE COURT:  But why hasn't one doctor come forward

6  and said that "I wouldn't have prescribed it if I had known

7  this"?

8          MR. SOBOL:  Well, first of all, I don't think

9  there are many doctors that have been deposed.  There have

10 been a handful --

11         THE COURT:  It's been 1996.

12         MR. SOBOL:  Well, yeah, and I've gone back and

13 I've spoken to people, and people were deposed early on, and

14 some doctors were asked the question, well, what about this,

15 what about that?  You know, there's a handful of doctors

16 that have been asked the questions.  But if you actually

17 look at what in fact happened, which we now go to Slide --

18 if you look at those doctors who were prescribed -- and we

19 do have a couple of the slides here on that.  Go to Slide 34

20 and 35.  These were two physicians who were physicians for a

21 couple of the consumer reps, and the physicians either said,

22 "I was never detailed," or, "I don't remember being detailed,

23 and nothing ever impacted me."

24         And then you look at what actually happened with

25 respect to both these doctors:  They were detailed.  One

1   doctor was detailed twelve times, and another was detailed

2   six times, both in a period of time less than two years.

3           THE COURT:  Well, let me ask you this.  If --

4           MR. SOBOL:  And their scripts go up, so --

5           THE COURT:  At the very least, so the question at

6   the end of the day is, if you had plans who don't police, so

7   there's nothing individualized about them, and they never

8   pay for off-label knowingly, why wouldn't that be at least

9   common questions?  Because they never would have paid if it

10  weren't for this marketing campaign, they never would have

11  paid a penny.

12          MR. CHEFFO:  You're suggesting that they didn't

13  police and --

14          THE COURT:  But they have a strong policy

15  against -- against -- any kind of payment for off-label,

16  which your expert, if I take him at his word, that

17  30 percent of all plans ban all off-label, why wouldn't at

18  least that circumvent your reliance situation?

19          MR. CHEFFO:  Because I think -- well, I think, you

20  know, I think your question basically assumes -- I don't

21  think anyone disputes here, right, that when a doctor wrote

22  a prescription for Neurontin for some off-label use, he or

23  she knew that it was off-label, right?  That's not the issue

24  here.  The issue is why they were writing it.  So the fact

25  that they wrote a prescription just like you could write for

1    an oncology drug or something else, if it was written and

2    the fund paid for it, okay, when they said they weren't

3    supposed to, that doesn't attribute any bad motive or any

4    causation or any fraud.  So that really wouldn't even get us

5    anywhere.  So that basically just says that they had some

6    policies; they don't have very good procedures in place.

7    They probably paid for a million different off-label drugs.

8    The only issue is, did somehow there was fraudulent

9    information given to that doctor that caused him or her to

10   write that that they otherwise wouldn't have?  Again, back

11   to the doctors.

12           So if they decide to have restrictions that they

13   don't enforce, then, you know, that wouldn't impact -- in

14   other words, if there was no fraud, right, or no allegations

15   of fraud, you wouldn't expect pharmaceutical company X, Y,

16   and Z just to turn over money for every off-label prescription

17   written.

18           THE COURT:  The flip side is, if there had been no

19   marketing campaign, they'd be down at that almost nothing

20   percentage.

21           MR. CHEFFO:  I don't think that's true.  Look,

22   your Honor, at -- do you have these slides in front of you?

23           THE COURT:  Yours, yours.  Which set of slides?

24   I'm sorry.  What page?

25           MR. CHEFFO:  I think it's on Page --

1          THE COURT:  17?

2          MR. CHEFFO:  17.

3          THE COURT:  I'm one step ahead of you, Mr. Cheffo.

4          MR. CHEFFO:  Basically there's two charts here.

5    And, you know, again, we've heard so much that it's almost

6    become lore, I think, in this case that, two things; that

7    we've admitted that it's not efficacious, which is simply

8    not true, and that no doctor ever would have written.  And I

9    think there's about five reasons why doctors -- this is a

10   perfect chart.  This basically shows -- the top line are all

11   of the other AEDs that are written for off-label uses.  So

12   this is an AED in the class, and they essentially would like

13   to just absolutely ignore the fact that there's a huge

14   amount or a significant number of off-label prescriptions.

15   And then when you go to the next page, that even narrows it

16   down to the off --

17          THE COURT:  Is that all off-label or just bipolar

18   for psychiatric?

19          MR. CHEFFO:  Well, there's two things.  The first

20   is all off-label.  The second is off-label uses at issue in

21   this case.

22          THE COURT:  So that's the real --

23          MR. CHEFFO:  Well, but I was going to say, to be

24   fair, this is not bipolar.  This was from a chart that was

25   done prior to the fact when they -- I'm sorry?

1          THE COURT:  I see.

2          MR. CHEFFO:  Okay.  So the point is, to suggest

3    that it's only as a result of marketing, when you see that

4    the lines are very -- I mean, so, in other words, are all of

5    these companies, is there an allegation that they're

6    off-label marketing too?  Should we look in a vacuum only at

7    the AED Neurontin when there's significant use for bipolar

8    and others?  So these are all factual issues.

9          THE COURT:  Thank you.  So when am I getting your

10   trial plan?

11         MR. CHEFFO:  You are getting it tomorrow, your

12   Honor.

13         THE COURT:  I'm looking forward to it.

14         MR. CHEFFO:  And I think what both -- and I think

15   some of the same lawyers are here.  I think what they've

16   asked for and we certainly think makes sense is, we'll file

17   it, and then perhaps you can schedule a time that's

18   convenient for the Court where we can talk about it.

19         THE COURT:  And you remind me in there about the

20   other Neurontin suicide cases?

21         MR. CHEFFO:  Oh, absolutely.

22         THE COURT:  You may have to take out a condominium

23   here.

24         MR. CHEFFO:  Yeah, we won't be shy about pointing

25   out the amount of work that we have in the next year.

1          THE COURT:  The other case was shipped down to

2     Tennessee?  Has that happened?

3          MR. CHEFFO:  You signed a remand order, a

4     suggestion of remand.  It hasn't been formally, but that's

5     in the MDL JPML process.  We have Shearer.  You moved the

6     trial up I think to avoid the Passover holiday --

7          THE COURT:  It was in March or something?

8          MR. CHEFFO:  March 23.  We also had a hearing two

9     weeks or so ago with the magistrate judge, and he instructed

10    us to basically have a plan in place with respect to the

11    Dorsey or other case, which will essentially follow

12    immediately after or soon after -- we haven't worked that

13    out -- the Shearer case.  And in addition, we have a number

14    of litigation issues with respect to New York also.

15         THE COURT:  What's happening with Judge Freedman's

16    case?

17         MR. CHEFFO:  Well, I know that you and she have

18    been very good about coordinating with each other.  She has

19    picked five cases to essentially do Tier One/Track One on a

20    very expedited basis.

21         THE COURT:  So you may need two firms.  Either

22    that or you can hire all these unemployed lawyers out there.

23         MR. CHEFFO:  So we have a fair amount of work to

24    do, your Honor.

25         THE COURT:  Where are you from, New York or

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1   Washington?

2            MR. CHEFFO:  I'm from New York.

3            THE COURT:  I'm told there are like hoards of

4   them, so -- you don't have to comment.  Washington is

5   somehow hiring lawyers, but New York is having troubles, as

6   is Boston.  So, anyway, I've got it.  I don't think I need

7   more argument on it.

8            MR. SOBOL:  No, no, just --

9            THE COURT:  I'm likely to do some sort of an

10  expert hearing at some point on this, if I get past the

11  legal question.

12           MR. SOBOL:  Right.  What I hear you saying,

13  though, too, is that you might want to defer ruling on class

14  certification until you either have an opportunity for an

15  evidentiary hearing or see how the other case goes.

16           THE COURT:  Yes, I might, I might.

17           MR. SOBOL:  Do you want to set a date for a status

18  conference on the trial dates?

19           THE COURT:  No.  I may just do it on the papers.

20           MR. SOBOL:  Okay.

21           THE COURT:  I don't know.  I haven't seen yours

22  yet.  I've read the other two.

23           MR. CHEFFO:  Yes, we will have it tomorrow, your

24  Honor.

25           MR. SOBOL:  Your Honor, because my understanding

1    is that the coordinated plaintiffs have filed a plan and the

2    class plaintiffs have filed a plan, if we could have three

3    pages to respond to what the defendant submits and give us a

4    half a week, we'd be very grateful.

5              THE COURT:  So I shouldn't rule off the --

6              MR. SOBOL:  Don't spend the weekend, in other

7    words.

8              MR. CHEFFO:  I take Mr. Sobol's word, but all I

9    saw actually was -- and I thought it was only a plan that

10   was filed by the --

11             THE COURT:  No, there are two of them, there are

12   two of them.

13             MR. CHEFFO:  Are there two?  Okay, I'll look.

14   Okay, thanks.

15             THE COURT:  Just so you know.

16             MR. CHEFFO:  No, I appreciate that.  Thank you,

17   your Honor.

18             THE COURT:  And if you need an extra day to --

19             MR. CHEFFO:  Yeah, I hadn't seen that until now.

20   I'm sorry.

21             THE COURT:  Okay, great.  Thank you very much.

22   This was as usual --

23             MR. GREENE:  Your Honor, just one thing.  I've

24   been asked to bring to your attention that there was a

25   supplemental declaration of Dr. McDonough filed on --

1          FROM THE FLOOR:  June 18, '09, with the summary

2     judgment papers.

3          MR. GREENE:  -- that addresses this issue that

4     you were --

5          THE COURT:  I'm glad you -- I'm not sure I saw

6     that, so thank you.  You don't happen to, since you seem to

7     know all, know the docket number?

8          FROM THE FLOOR:  Well, it's --

9          THE COURT:  Could you e-mail Robert?

10         FROM THE FLOOR:  I could get you the docket

11    number.

12         THE COURT:  If you could, that's very useful.

13    We've had to do that in the AWP case in order for me to find

14    anything.  It's useful to always put in the docket number.

15    It would be very useful.  Thank you.  You're Kaiser, right?

16         FROM THE FLOOR:  We put it in the affidavit, your

17    Honor, but I think it goes to the point that your Honor is

18    asking, so I think your Honor should know that.  I mean, it

19    is Dr. McDonough, but we will get the information to

20    Mr. Sobol and Mr. Greene.

21         THE COURT:  That's great.  I hadn't seen that

22    separate one.  I reread what she submitted last time around.

23    That would be very useful.

24         MR. SOBOL:  Can we file something on the trial

25    plan by next Wednesday?

2b7a5f9d-acd3-47d1-b1fc-4721f1f4967d

1          THE COURT:  Yes.

2          MR. SOBOL:  Thank you.

3          THE COURT:  Okay, and why don't you just talk.

4    You actually do very well together.  If you haven't seen his

5    trial plan and you need an extra day beyond tomorrow, do it

6    on Monday, and then you have till Thursday, all right.  Just

7    work it out.  That's fine.

8          MR. CHEFFO:  I appreciate that.  Thank you.

9          THE COURT:  Thank you.

10          THE CLERK:  Court is in recess.

11          (Adjourned, 4:41 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     ) ss.
CITY OF BOSTON               )



        I, Lee A. Marzilli, Official Federal Court

Reporter, do hereby certify that the foregoing transcript,

Pages 1 through 62 inclusive, was recorded by me

stenographically at the time and place aforesaid in Civil

Action No. 04-10981-PBS, In Re:  Neurontin Marketing, Sales

Practices, and Product Liability Litigation, and thereafter

by me reduced to typewriting and is a true and accurate

record of the proceedings.

        In witness whereof I have hereunto set my hand

this 2nd day of December, 2009.




              /s/ Lee A. Marzilli
              _____
              LEE A. MARZILLI, CRR
              OFFICIAL FEDERAL COURT REPORTER