UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
                              :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,    :
         SALES PRACTICES AND     :  Master File No. 04-10981
         PRODUCTS LIABILITY LITIGATION  :
                                :   Judge Patti B. Saris
------------------------------------------------------------x
                                :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:    :
                                :
       FARRIS v. PFIZER INC.        :   <u>Demand for Jury Trial</u>
       1:06-CV-12063- PBS      :
                                :
------------------------------------------------------------x

## AMENDED COMPLAINT

Plaintiffs, JEFFREY FARRIS and KATHERINE FARRIS, residing at 1053 Curtis Hill Church Lane, Bethel Springs, TN 38315, through their attorneys, Andrew G. Finkelstein, Esq., Finkelstein & Partners, LLP, 1279 Route 300, P.O. Box 1111, Newburgh, NY 12551, and Gale D. Pearson, Esq., Pearson, Randall & Schumacher, P.A., 1012 Grain Exchange Building, 400 South Fourth Street, Minneapolis, MN 55414, and by and for their Amended Complaint against Defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY LLC and TEVA PHARMACEUTICALS USA, INC., hereby allege as follows:

## STATEMENT OF THE CASE

1.    This is an action to recover damages for personal injuries sustained by Plaintiff, JEFFREY FARRIS, (hereinafter "Plaintiff"), as the direct and proximate result of Defendants' wrongful conduct in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the prescription drug Neurontin,

which was marketed and sold by Defendants, PFIZER INC., PARKE-DAVIS, a Division of Warner-Lambert Company and Warner-Lambert Company LLC, (hereinafter referred to as "PARKE-DAVIS"), WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC, (hereinafter collectively referred to as the "Pfizer Defendants"), and the prescription drug gabapentin, the generic form of Neurontin, which was marketed and sold by Defendant, TEVA PHARMACEUTICALS USA, INC., (hereinafter referred to as "Teva"), especially for such "off-label" uses as the treatment of nerve damage uses for which Neurontin and Gabapentin had not received FDA approval, and at dosages higher than had been approved by the FDA and had been properly tested on humans, even though Neurontin and gabapentin had not been tested and studied for these purposes and had not been found to be safe and effective at any dosage for the treatment of nerve damage.

## PARTIES AND SERVICE OF PROCESS

2.     Plaintiffs, JEFFREY FARRIS and KATHERINE FARRIS, are natural persons and residents of the State of Tennessee.

3.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., was and still is a Delaware corporation and has its principal place of business at 235 East 42nd Street,  New York, New York 10017.

4.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of Minnesota.

5.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., was and still is a business entity actually doing business in the State of Minnesota.

6.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, was and still is a Michigan corporation and has its principal place of business at 201 Tabor Road, Morris Plains, New Jersey 07950.

7.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of Minnesota.

8.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, was and still is a business entity actually doing business in the State of Minnesota.

9.      That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, was and still is a Delaware corporation and has its principal place of business at 201 Tabor Road, Morris Plains, New Jersey 07950.

10.      That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation authorized to do business in the State of Minnesota.

11.      That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of Minnesota.

12.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a division of Defendant, WARNER-LAMBERT COMPANY.

13.      That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a subsidiary of Defendant, WARNER-LAMBERT COMPANY.

14.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a Delaware limited liability company and has its principal place of business at 201 Tabor Road, Morris Plains, New Jersey 07950.

15.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC was and still is a foreign limited liability company authorized to do business in the State of Minnesota.

16.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of Minnesota.

17.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is the sole shareholder and member of Defendant, WARNER-LAMBERT COMPANY LLC.

18.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a division of Defendant, WARNER-LAMBERT COMPANY LLC.

19.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is a subsidiary of Defendant, WARNER-LAMBERT COMPANY LLC.

20.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a division of Defendant, PFIZER INC.

21.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a subsidiary of Defendant, PFIZER INC.

22.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a successor in interest to Defendant, PARKE-DAVIS.

23.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a division of Defendant, PFIZER INC.

24.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of Defendant, PFIZER INC.

25.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to Defendant, PARKE-DAVIS.

26.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is a successor in interest to Defendant, PARKE-DAVIS.

27.     That on a date prior to February 15, 2005, Defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of Defendant, PARKE-DAVIS.

28.     That on a date prior to February 15, 2005, Defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

29.     That on a date prior to February 15, 2005, Defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

30.     That on a date prior to February 15, 2005, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY, merged with each other.

31.     That on a date prior to February 15, 2005, Defendant, PARKE-DAVIS, merged with Defendant, WARNER-LAMBERT COMPANY, and Defendant, PARKE-DAVIS, became a part of Defendant, WARNER-LAMBERT COMPANY.

32.     That on a date prior to February 15, 2005, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

33.     That on or about December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of Defendant, PARKE-DAVIS.

34.     That on or about December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

35.     That on or about December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

36.     That on or about December 31, 2002, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

37.     That on or about December 31, 2002, Defendant, PARKE-DAVIS, merged with Defendant, WARNER-LAMBERT COMPANY LLC, and Defendant, PARKE-DAVIS, became a part of Defendant, WARNER-LAMBERT COMPANY LLC.

38.     That on or prior to December 31, 2002, Defendant, PARKE-DAVIS, and Defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

39.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to Defendant, WARNER-LAMBERT COMPANY.

40.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of Defendant, WARNER-LAMBERT COMPANY.

41.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

42.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

43.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY, and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

44.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY, merged with Defendant, WARNER-LAMBERT COMPANY LLC, and Defendant, WARNER-LAMBERT COMPANY, became a part of Defendant, WARNER-LAMBERT COMPANY LLC.

45.     That on or prior to December 31, 2002, Defendant, WARNER-LAMBERT COMPANY, and Defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

46.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is a successor in interest to Defendant, PARKE-DAVIS.

47.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is a successor in interest to Defendant, WARNER-LAMBERT COMPANY.

48.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is a successor in interest to Defendant, WARNER-LAMBERT COMPANY LLC.

49.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., assumed the assets and liabilities of Defendant, PARKE-DAVIS.

50.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., assumed the assets and liabilities of Defendant, WARNER-LAMBERT COMPANY.

51.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., expressly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

52.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of Defendant, PARKE-DAVIS.

53.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., expressly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

54.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY.

55.     That on or prior to December 31, 2002, Defendant, PFIZER INC., assumed the assets and liabilities of Defendant, WARNER-LAMBERT COMPANY LLC.

56.     That on or prior to December 31, 2002, Defendant, PFIZER INC., expressly assumed all liabilities and obligations of Defendant, WARNER-LAMBERT COMPANY LLC.

57.     That on or prior to December 31, 2002, Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of Defendant WARNER-LAMBERT COMPANY LLC.

58.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., and Defendant, PARKE-DAVIS, merged with each other.

59.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY, merged with each other.

60.     That on or before February 15, 2005, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

61.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., and Defendant, PARKE-DAVIS, merged with each other and Defendant, PARKE-DAVIS, became a part of Defendant, PFIZER INC.

62.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY, merged with each other and Defendant, WARNER-LAMBERT COMPANY, became a part of Defendant, PFIZER INC.

63.     That on or prior to December 31, 2002, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and Defendant, WARNER-LAMBERT COMPANY LLC, became a part of Defendant, PFIZER INC.

64.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., and Defendant, PARKE-DAVIS, consolidated with each other.

65.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., and Defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

66.     In the year 2000, Defendant, PFIZER INC., acquired Defendant, WARNER-LAMBERT COMPANY, and as the result of that acquisition, Defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of Defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

67.     In the year 2000, Defendant, PFIZER INC., acquired Defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, Defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of Defendant, PARKE-DAVIS, which occurred prior to such acquisition.

68.     On or prior to December 31, 2002, Defendant, PFIZER INC., acquired Defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that

acquisition, Defendant, PFIZER INC., is responsible for all acts or omissions of Defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior to such acquisition.

69.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., presently markets and sells the drug Neurontin.

70.     That on a date prior to February 15, 2005, Defendant, PFIZER INC., marketed and sold the drug Neurontin.

71.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Minnesota and contracts to provide goods and services in the State of Minnesota.

72.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., committed a tortious act inside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

73.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., committed a tortious act outside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

74.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of Minnesota, deriving substantial revenue from goods and products consumed in the State of Minnesota.

75.     That at all times hereinafter mentioned, upon information and belief, Defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of Minnesota, and derives substantial revenue from interstate or international commerce.

76.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

77.     That on a date prior to February 15, 2005, Defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

78.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Minnesota and contracts to provide goods and services in the State of Minnesota.

79.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, committed a tortious act inside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

80.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, committed a tortious act outside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

81.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of Minnesota, deriving substantial revenue from goods and products consumed in the State of Minnesota.

82.     That at all times hereinafter mentioned, upon information and belief, Defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of Minnesota, and derives substantial revenue from interstate or international commerce.

83.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

84.     That on a date prior to February 15, 2005, Defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

85.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Minnesota and contracts to provide goods and services in the State of Minnesota.

86.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, committed a tortious act inside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

87.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, committed a tortious act outside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

88.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent course of conduct in the State of Minnesota, deriving substantial revenue from goods and products consumed in State of Minnesota.

89.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of Minnesota, and derives substantial revenue from interstate or international commerce.

90.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

91.     That on a date prior to February 15, 2005, Defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

92.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Minnesota.

93.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act inside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

94.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act outside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

95.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of Minnesota, deriving substantial revenue from good and products consumed in the State of Minnesota.

96.     That at all times hereinafter mentioned, upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of Minnesota, deriving substantial revenue from interstate commerce.

97.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., was and still is a foreign corporation organized under the laws of the State of Delaware.

98.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., was and still is a foreign corporation authorized to do business in the State of Minnesota.

99.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., was and still is a business entity actually doing business in the State of Minnesota.

100.    That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., has its headquarters and principal place of business in the County of Montgomery, Commonwealth of Pennsylvania.

101.    That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., presently markets and sells the drug Gabapentin.

102.    That on a date prior to February 15, 2005, Defendant, TEVA PHARMACEUTICALS USA, INC., marketed and sold the drug gabapentin.

103.    That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., is engaged in the business of designing,

manufacturing, advertising, marketing, and selling pharmaceutical drugs, including the drug gabapentin, and in pursuance of this business, transacts business within the State of Minnesota.

104.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., committed a tortious act inside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

105.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., committed a tortious act outside the State of Minnesota, which caused injury to Plaintiff inside the State of Tennessee.

106.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., regularly does and solicits business and engages in a persistent course of conduct in the State of Minnesota, deriving substantial revenue from goods and products consumed in the State of Minnesota.

107.     That at all times hereinafter mentioned, upon information and belief, Defendant, TEVA PHARMACEUTICALS USA, INC., expects or should reasonably expects its acts to have consequences in the State of Minnesota, and derives substantial revenue from interstate or international commerce.

## JURISDICTION AND VENUE

108.     Jurisdiction exists as against Defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY LLC and TEVA PHARMACEUTICALS USA, INC., pursuant to:

(a)     28 U.S.C. Section 1332, in that Plaintiffs, JEFFREY FARRIS and KATHERINE FARRIS, are natural persons and resident of the State of Tennessee, Defendant,

PFIZER INC., is incorporated in business in the State of Delaware, and maintains its principal place of business in the State of New York, Defendant, PARKE-DAVIS, is incorporated in the State of Michigan, and maintains its principal place of business in the State of New Jersey, Defendant, WARNER-LAMBERT COMPANY, is incorporated in the State of Delaware and maintains its principal place of business in the State of New Jersey, Defendant, WARNER-LAMBERT COMPANY LLC, is a limited liability company organized under the laws of the State of Delaware, whose sole shareholder and member is Defendant, PFIZER INC., Defendant TEVA PHARMACEUTICALS USA, INC., is incorporated in the State of Delaware and maintains its principal place of business in the State of Pennsylvania, and the amount in controversy exceeds the sum of $75,000.00, and there is complete diversity of citizenship between Plaintiffs and Defendants;

(b)    28 U.S.C. Section 1391, in that jurisdiction is founded only on diversity of citizenship, and all Defendants are subject to personal jurisdiction in the Judicial District of the District of Minnesota and may be deemed to reside in the District of Minnesota.

## BACKGROUND

## STATEMENT OF THE CASE

109.    Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) and (d).

110.    However, the FDCA does not prevent doctors from prescribing a drug approved for a particular use for other uses that are different than those approved by the FDA ("off-label" usage).

111.   Nonetheless, even though physicians may prescribe drugs for "off-label" usage, the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a use that the FDA has not approved.  21 U.S.C. § 331(d).

112.   A manufacturer illegally "misbrands" a drug if the drug's labeling includes information about unapproved uses or if the manufacturer engages directly or indirectly in marketing or promoting the drug for unapproved uses.

113.    Instead, if a manufacturer desires to market and promote the drug for new uses in addition to those already approved, the materials on "off-label" usage must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

114.   The above-described statutory and regulatory system and process is designed to protect the public, including Plaintiff, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including Plaintiff, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

115.   PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

116. At no time prior to Plaintiff's being prescribed Neurontin and gabapentin did Defendants receive FDA approval for any other use of Neurontin and gabapentin except for the above-described treatment of epilepsy or for higher dosages for any purpose, and the FDA never approved the usage of Neurontin and gabapentin at any dosage for the treatment of nerve damage.

117. Commencing in 1995, the Pfizer Defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for nerve damage and at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

118. The Pfizer Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of nerve damage and encouraged that higher dosages than those tested be prescribed, even though the Pfizer Defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of nerve damage, and even though the Pfizer Defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

119 At all times hereinafter mentioned, upon information and belief, the Pfizer Defendants marketed and promoted Neurontin for the treatment of nerve damage even though

the Pfizer Defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from nerve damage.

120.    At all times hereinafter mentioned, upon information and belief, the Pfizer Defendants marketed and promoted Neurontin for the treatment of nerve damage even though the Pfizer Defendants knew or should have known that Neurontin had no effect in relieving or correcting the symptoms or causes of nerve damage.

121.    The Pfizer Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of peripheral neuropathy, reflex sympathetic dystrophy and complex regional pain syndrome constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from peripheral neuropathy, reflex sympathetic dystrophy and complex regional pain syndrome.

122.    In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of nerve damage, the Pfizer Defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of nerve damage.

123.    The Pfizer Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of nerve damage and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

124.    Neurontin is not reasonably safe and effective for the treatment of persons suffering from nerve damage, and is not reasonably safe when consumed in higher dosages than

those approved by the FDA, and the Pfizer Defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was violative of the FDCA.

125.   By reason of the Pfizer Defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of nerve damage in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from nerve damage, frequently at dosages higher than those approved by the FDA.

126.   Upon information and belief, Defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "A" and incorporated into this complaint by reference.

127.   Upon information and belief, on or about the 7th day of June, 2004, Defendant, WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the Information.

128.   On October 8, 2004, Defendant Teva received approval from the Food and Drug Administration for its Abbreviated New Drug Application ("ANDA") to distribute gabapentin in capsule form.

129.   Defendant Teva was able to obtain approval to manufacture gabapentin, the generic version of the brand name drug Neurontin, without performing their own safety and effectiveness studies by submitting an ANDA to the FDA.  21 U.S.C. § 355 et seq.

130.   The ANDA process allowed Defendant Teva to submit data which demonstrated that the generic drug gabapentin is the same as the previously approved brand name drug Neurontin in regard to:  active ingredients; method of administration and dosage; prescribed

usage recommended in the labeling; and that the proposed drug is "bioequivalent" to the prior approved drug. 21 U.S.C. § 355(j)(2)(A).

131. In essence, in view of the regulatory scheme enacted by Congress and the FDA, the generic manufacturer adopts the studies, labeling, warnings and representations of the brand name manufacturer, without independent investigation in order to gain approval of the generic drug through an expedited process.

132. Pursuant to 21 C.F.R. § 314.70, manufacturers, such as Defendant Teva, who have received approval for a generic drug pursuant to the ANDA process, are allowed to amend a drug's labeling without receiving FDA prior approval in order to, inter alia, add or strengthen a contraindication, warning, precaution, or adverse reaction; add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product; and delete false, misleading, or unsupported indications for use or claims for effectiveness.

133. A Press Release posted on the internet site of Defendant Teva's parent, Teva Pharmaceuticals Industries Ltd., on October 8, 2004, demonstrates that Defendant Teva was well aware that Neurontin was a $1.7 billion dollar drug for just the twelve-month period ending in June 2004. It is reasonable to assume that a sophisticated manufacturer such as Defendant Teva also was well aware that due to the sheer volume of recorded sales of Neurontin, the brand name drug was being promoted and prescribed for off-label uses and for uses other than the sole use that was approved by the FDA, namely, for treatment for epilepsy.

134. That Defendant Teva was aware of the studies, off-label usage, etc., and did not change the label to caution against same demonstrates that Defendant Teva was a willing beneficiary of, and indirectly participated in, and continued to perpetuate the fraudulent, negligent and reckless conduct as alleged herein.

135.     Defendant Teva submitted an ANDA for gabapentin even though Teva knew or should have known that the great majority of use for gabapentin at the time was for off-label indications (i.e., unapproved by the FDA), but Teva did not know whether the product was safe or effective for off-label indications.  Teva's failure to determine whether the product was safe or effective for off-label indications before submitting an ANDA for gabapentin is not preempted by federal law as it is based on common law negligence — there are no FDA regulations that apply to such negligent acts and omissions.  This negligent act and omission by Teva is nothing more than reckless conduct and a breach of Teva's duty of care to Plaintiff, which is governed under common law theories of negligence — not subject to any possible claims of preemption.

136.     It is standard practice in the pharmaceutical industry to obtain all of the pertinent documents concerning the innovator drug from the FDA through the filing of a Freedom of Information Act (FOIA) request, as well as from publicly available documents, before a manufacturer submits an ANDA for FDA approval.  The documents and information that are the subject of such a FOIA request include the clinical reviews, advisory committee transcripts and post marketing safety data.  Common sense dictates that Defendant Teva had (or should have had) this information in its possession prior to submitting its ANDA for gabapentin to the FDA. It has already been judicially determined, in connection with resolving a *Daubert* challenge, that several of Plaintiff's experts who relied on similar information in forming their expert opinions concerning an association between gabapentin and suicide, including Dr. Cheryl Blume, may testify on general causation in this litigation.  Moreover, it also has been judicially determined that there was available scientific literature, including peer-reviewed animal studies, which indicated that gabapentin decreases the release of monoamines, *In re Neurontin Mktg., Sales Practices and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 149 (D. Mass. 2009); that it is

uncontroverted that "the decrease of serotonin and other monoamines in the brain is deleterious to mood including depression and aggression is supported by the literature," *id.* at 150; and that "[a]n association between low levels of serotonin in the brain and suicide is also well documented, appearing in peer-reviewed literature spanning several decades." *Id.* at 151.

137.    Defendant Teva was well aware and had ample knowledge that gabapentin caused adverse mood and behavioral changes, but Teva failed to apply to the FDA to make the requisite label changes to warn of the increase of the risks for suicide for all uses, including off-label uses that were not approved by the FDA.  The 1993 FDA Clinical Review for Neurontin, which was publicly available from the FDA through a FOIA request, noted in regard to gabapentin:  "[t]he report identified five 'serious events,' including depression, which could 'limit the drug's widespread usefulness,'" and stated, "depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts."  *Id.* at 151.

138.    Additionally, a 8.5.2005 Teva leaflet concerning gabapentin, approved by the Israeli Minister of Health under the Postmarketing and other Experience Sections for the treatment of Neuropathic Pain, stated that common possible side effects included abnormal thinking, that there were reports that patients on gabapentin had experienced mood and behavioral disturbances.  *See* www.health.gov.il/units/pharmacy/trufot/alonim/1191.PDF.

139.    The FDA does not prohibit a generic manufacturer from seeking FDA approval for a label change.  In the FDA Abbreviated New Drug Application Final Rule, 57 FR 17950, in reference to § 314.93 — Petition To Request a Change from a Listed Drug, paragraph 20 expressly states that a generic manufacturer may apply to the FDA for a labeling change:  "[a]n ANDA applicant who believes that the labeling for a proposed drug product should differ from

that approved for the reference listed drug should contact FDA to discuss whether labeling for both generic and listed drugs should be revised." 57 FR 17950 (1992).

140.   Moreover, the FDA stated in its *amicus* brief submitted to the United States Court of Appeals for the Third Circuit in *Colacicco v. Apotex, Inc.*, No. 06-3107:

> If a generic drug manufacturer believes that new safety information should be added to the label for its drug, it is directed to contact FDA with "adequate supporting information." 57 Fed. Reg. at 17,961. The agency will consider this information and determine whether the labeling for both the generic drug and the innovator drug should be revised.

141.   Defendant Teva also failed to perform post-marketing pharmacovigilance and thus violated FDA regulations. The violations of FDA regulations "parallel" or supplement Plaintiff's common-law claims of negligence and/or state statutory law claims. Because these claims are parallel and do not impose different or additional requirements to FDA regulations, the claims pose no conflict and would not affect the FDA's enforcement of federal law.

142.   This claim is based in part on Defendant Teva's failure to comply with the Tennessee Misbranding statute, Tenn. Code Ann.. § 53-1-109. Plaintiff is not seeking to enforce the FDA regulations, but instead asserts claims premised on state common-law negligence and/or state statutory law. Teva's failure to comply with the Tennessee Misbranding statute and common-law negligence duty runs parallel with its failure to comply with FDA Regulations. 21 C.F.R. §§ 314.80, 314.70(c) and 201.57(e).

143.   Defendant Teva failed in its pharmacovigilance obligations related to gabapentin, including by **failing to develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA**. *See* 21 C.F.R. § 314.80. Had Teva been vigilant in its duty to perform post-marketing evaluation, Teva would have discovered reasonable evidence of an association of a serious hazard with gabapentin. *See* 21

C.F.R. § 201.57(e).  Teva's drug would thus be misbranded under the Tennessee  Misbranding Statute.

144.    The drugs Neurontin and gabapentin were ineffective in the treatment of the causes and symptoms of Plaintiff's nerve damage, and Plaintiff sustained injury and harm by reason of this reliance upon Neurontin and gabapentin to be effective in the treatment as prescribed by his physicians of such nerve damage.

145.    That at all times hereinafter mentioned, Plaintiff was diagnosed by his physician as suffering from nerve damage and was being treated by his physician for such condition.

146.    That at all times hereinafter mentioned, upon information and belief, in reliance upon Defendants' direct and indirect advertising, marketing and promoting of Neurontin and gabapentin as being safe and effective for the treatment of nerve damage, Plaintiff's physician prescribed Neurontin and gabapentin to treat Plaintiff's nerve damage.

147.    That at all times hereinafter mentioned, Plaintiff purchased and consumed Neurontin and gabapentin, as recommended and prescribed by his physician and in the dosages prescribed, in an effort to control the effects of nerve damage.

148.    The drugs Neurontin and gabapentin were not safe and effective for the treatment of Plaintiff's nerve damage, and Plaintiff sustained injury and harm by reason of his consumption of Neurontin and gabapentin as prescribed by his physician in an effort to treat his nerve damage.

149.    The drugs Neurontin and gabapentin were ineffective in the treatment of the causes and symptoms of Plaintiff's nerve damage, and Plaintiff sustained injury and harm by reason of this reliance upon Neurontin and gabapentin to be effective in the treatment as prescribed by his physician of such nerve damage.

150.    By reason of Plaintiff's consumption of Neurontin and  gabapentin in a manner and at a dosage prescribed by his physician in an effort to treat his nerve damage, on February 15, 2005, Plaintiff unsuccessfully attempted to commit suicide, thereby sustaining severe personal injuries.

151.    The injuries sustained by Plaintiff were caused by or were contributed to by Plaintiff's consumption of Neurontin and  gabapentin at a dosage prescribed by his physician for the treatment of nerve damage in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by Defendants.

## I. NEGLIGENCE
## AGAINST THE PFIZER DEFENDANTS

152.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

153.    That at all times hereinafter mentioned, the Pfizer Defendants were under a duty to exercise reasonable care in the design and development of Neurontin, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as nerve damage for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where the Pfizer Defendants knew or should have known that the user could sustain injuries and harm from the drug.

154.    That the Pfizer Defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that the Pfizer Defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of nerve damage, even though Neurontin had not been scientifically determined to be safe for the treatment of such use and even though Neurontin was, in fact, not reasonably

safe for such use, and furthermore, the Pfizer Defendants failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which the Pfizer Defendants knew or should have known about.

155.     That the Pfizer Defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self- destructive behavior including attempting to commit suicide and by failing to adequately warn the public of such risks.

156.     The aforesaid incident and the injuries sustained by Plaintiff were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including Plaintiff, on the part of the Pfizer Defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective in the treatment of nerve damage and by inducing the public, including Plaintiff, to believe that Neurontin was effective in the treatment of the causes and symptoms of nerve damage.

157     That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by the Pfizer Defendants was a proximate cause of injuries sustained by Plaintiff.

158.     That at all times hereinafter mentioned, Plaintiff did not contribute to his injuries by reason of any negligence or culpable conduct on his part.

159.     That by reason of the foregoing, Plaintiff was caused to sustain severe and serious personal injuries to his mind and body, some of which, upon information and belief, are

permanent with permanent effects of pain, disability, disfigurement and loss of body function. Further, Plaintiff was caused to expend and become obligated for diverse sums of money for the purpose of obtaining medical care and/or cure in an effort to alleviate the suffering and ills sustained as a result of this occurrence. Plaintiff further was caused to lose substantial periods of time from his normal vocation, and upon information and belief, may continue to be restricted in that manner into the future and suffer similar losses. In addition, Plaintiff was deprived of a chance for effective and/or successful treatment.

160. As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## II. BREACH OF WARRANTY AGAINST THE PFIZER DEFENDANTS

161. Plaintiffs repeat and reiterate the allegations previously set forth herein.

162. That at all times hereinafter mentioned, upon information and belief, the Pfizer Defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of nerve damage and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of nerve damage in reliance upon the representations of the Pfizer Defendants, expressly warranted to all foreseeable users of this drug, including Plaintiff, that Neurontin was safe and effective for the treatment of nerve damage.

163 That the Pfizer Defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including Plaintiff, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by the Pfizer Defendants, including for the treatment of nerve damage,

and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of nerve damage.

164.    That at all times hereinafter mentioned, Plaintiff relied upon the aforesaid express and implied warranties by the Pfizer Defendants.

165.    That at all times hereinafter mentioned, Plaintiff's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which the Pfizer Defendants directly and indirectly advertised, marketed and promoted Neurontin, and Plaintiff's use of Neurontin was reasonably contemplated, intended and foreseen by the Pfizer Defendants at the time of the distribution and sale of Neurontin by the Pfizer Defendants, and, therefore, Plaintiff's use of Neurontin was within the scope of the above-described express and implied warranties.

166.    The Pfizer Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of nerve damage and because Plaintiff's use of Neurontin for the treatment of nerve damage caused or contributed to the incident described herein.

167.    Plaintiff gave appropriate notice to the Pfizer Defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

168.    As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

### III.  STRICT PRODUCTS LIABILITY <br> AGAINST THE PFIZER DEFENDANTS

169.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

170.    That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of nerve damage and was not safe and effective for the treatment of nerve damage even

though the Pfizer Defendants directly and indirectly advertised, marketed and promoted Neurontin for such use.

171.    That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for which the Pfizer Defendants, directly and indirectly, advertised, marketed and promoted the drug at the time the Pfizer Defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

172.    That at all times hereinafter mentioned, upon information and belief, the Pfizer Defendants assumed a strict products liability to users and to persons using Neurontin, including Plaintiff, who sustained injuries, harm and damages by reason of the use of Neurontin for purposes directly and indirectly advertised, marketed, and promoted by the Pfizer Defendants, including for the treatment of nerve damage.

173.    As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## IV.  FRAUDULENT MISREPRESENTATION AGAINST THE PFIZER DEFENDANTS

174.    Plaintiff repeats and reiterates the allegations previously set forth herein.

175.    The Pfizer Defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of nerve damage.

176.    The Pfizer Defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

177.    In or about 1993, the Pfizer Defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "Gabapentin"), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5). In that application, the Pfizer Defendants sought to demonstrate the drug's safety and efficacy

30

for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.  On or about December 30, 1993, the FDA approved Neurontin for that specific use only.  Because the Pfizer Defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

178.    Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

179.    The Pfizer Defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

180.    The Pfizer Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to:  post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

181.    In or about the fall of 1995, the Pfizer Defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled:  "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

182.    Certain of the Pfizer Defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and

tactics for increasing sales of the unapproved uses of the drug.  The marketing plans budgeted for and funded these tactics.

183.   Commencing in early 1995 and continuing at least through the date of this incident, the Pfizer Defendants determined not to seek FDA approval for certain unapproved uses.

184.   In or about April and May of 1995, the Pfizer Defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, the Pfizer Defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios:  with and without FDA approval. The Pfizer Defendants' Neurontin Development Team and New Product Committee reviewed the potential uses and concluded that the Pfizer Defendants would not seek approval to promote and sell the drug for these unapproved uses.

185.   In or about July of 1995, the Pfizer Defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to the Pfizer Defendants' Neurontin Development Team and to Defendants' Vice President for marketing.  That assessment stated that "there is no intention to fully develop the indication at this point."  Full development would have required submission of an NDA to the FDA for approval.

186.   One of the principal factors the Pfizer Defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin.   Another factor was the negative impact such approval might generate on potential sales of another drug that the Pfizer Defendants were developing.   The Pfizer Defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

187.     Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin.  Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in the Pfizer Defendants' original NDA approval for Neurontin.  If the Pfizer Defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses.  The Pfizer Defendants were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

188.     Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, the Pfizer Defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

189.     In October 1995, a member of the Pfizer Defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of the Pfizer Defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of the Pfizer Defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin.  Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

190.     On or about July 10, 1996, the Pfizer Defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

191.     Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure.  This same document, entitled "Neurontin Can Do/Can't Do," stated that sales

representatives could present lunch programs on Neurontin and pain.  The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

192.    The Pfizer Defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department.  On the following occasions, which are not all-inclusive, the Pfizer Defendants' medical liaisons promoted Neurontin for unapproved uses:

(a)     In or about June of 1996, the Pfizer Defendants' sales representative requested that the Pfizer Defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b)     The sales representative and the medical liaison selected the topic for the presentation to the local medical society.  After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)     Among the topics of the presentation was the use of Neurontin for unapproved uses.

(d)     During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

(e)     After the presentation, Defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

193.    The Pfizer Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996.  Approximately 42 physicians attended the

meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

194. The Pfizer Defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs. As part of this event, Defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

195. Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

196. Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

197. On or about May 8, 1996, following the Jupiter Beach conference, the Pfizer Defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

198. From August 1-5, 1996, the Pfizer Defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics. Defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

199. During that meeting, the Pfizer Defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and

their spouses to attend the Olympics, including tickets to the closing ceremonies.  The Pfizer Defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on the Pfizer Defendants' behalf at prior meetings.

200.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

201.    On or about March 1, 1996, the Pfizer Defendants sponsored a teleconference moderated by Defendants' employee with a pain specialist as a speaker on Neurontin.  The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

202.    In or about May, 1996, the Pfizer Defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

203.    The Pfizer Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits.  Such consultants' meetings included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Mar. 8-10, 1996 |

| | | |
|---|---|---|
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande, Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

204. The Pfizer Defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by the Pfizer Defendants. In 1996, the Pfizer Defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that the Pfizer Defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers

retained by the Pfizer Defendants and the Pfizer Defendants had the right to control the content of all the articles.  the Pfizer Defendants paid all expenses in connection with the creation of these publications.

205.     The Pfizer Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

206.     The Pfizer Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

207.    The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel of the Pfizer Defendants:

a.      *Bipolar Disorder.* Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day.  No such results existed.

b.      *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported.  No such body of evidence existed.  The Pfizer Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

c.      *Reflex Sympathetic Dystrophy ("RSD").* Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD.  The only such evidence that existed was anecdotal reports of nominal scientific value.

d.      *Attention Deficit Disorder ("ADD").* Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.

e.     *Restless Leg Syndrome ("RLS")*.  RLS was another condition where the Pfizer Defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

f.     *Trigeminal Neuralgia*.  Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

g.     *Post-Herpetic Neuralgia ("PHN")*.  Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

h.     *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*.  Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

i.     *Migraine*.  Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value.  Most of the case reports were either created or sponsored by the Pfizer Defendants.

j.     *Drug and Alcohol Withdrawal Seizures*.  Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

208.    The Pfizer Defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though the Pfizer Defendants were fully aware of these results from the tests which they sponsored, the Pfizer Defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

209.    At each of the presentations known to Plaintiff concerning Neurontin on pain, at least one of the presenters expressly stated or implied that Neurontin was effective for the treatment of pain.  A representative statement was made by Dr. David Longmire, a participating physician, at the Jupiter Beach Consultants Meeting in April 1996 when he stated that Neurontin was effective for the treatment of pain.  Dr. Longmire repeated that statement at a May 1996 Consultants Meeting at the Ritz Carlton in Boston.  Another physician participant, Dr. Steven Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective."  Comparable statements were made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach Consultants Meeting, in May 1996 at the Boston Ritz Carlton Consultants Meeting, and in June 1996 at a Philadelphia Consultants Meeting.  Upon information and belief, similar statements were made at all events presented by the Pfizer Defendants that discussed Neurontin's use for pain indications.  These events include, but are not limited to the following events:

| Topic | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | Apr. 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |

| | | |
|---|---|---|
| Neurontin Consultants Meeting | May 10-11, 1996 | Boston, MA |
| Advisory Board Meeting | Apr. 14-16, 2000 | Grand Wailea Resort Hotel & Spa, Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Apr. 2000 | Four Seasons Irving, TX |
| Advisory Board Meeting | May 26, 2000 | Disney Yacht Club Orlando, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 24, 2001 | Plaza Hotel New York, NY |
| New Directions in the Understanding and Treatment of Pain | Mar. 2-3, 2001 | Hilton Novi Detroit, MI |
| New Directions in the Understanding and Treatment of Pain | May 4-5, 2001 | Westin Galleria Houston, TX |
| New Directions in the Understanding and Treatment of Pain | Feb. 9-10, 2001 | Harbor Court Hotel Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain | Mar. 9-10, 2001 | Fairmont Kansas City Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain | May 11-12, 2001 | Peabody Memphis Memphis, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 16-17, 2001 | Fairmont San Francisco San Francisco, CA |
| Advisory Board Meeting | June 16-18, 2000 | Westin Resort Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Sheraton Universal City Universal City, CA |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Miami Biltmore Miami, FL |

| | | |
|---|---|---|
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Ritz Carlton New Orleans New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Sheraton Music City Nashville, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 30-31, 2001 | Ritz Carlton St. Louis St. Louis, MO |
| New Directions in the Understanding and Treatment of Neuropathic Pain | Oct. 9-11, 1998 | Madeira, Portugal |

210.    At events produced by the Pfizer Defendants, physician participants routinely stated that Neurontin was effective for the treatment of restless leg syndrome or RSD.  Events presented by the Pfizer Defendants that discussed Neurontin's use as a treatment for restless leg syndrome or RSD include, but are not limited to, the following event:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

211.    At events produced by the Pfizer Defendants, physician participants routinely stated that Neurontin was effective for the treatment of bipolar affective disorder.   Events presented by the Pfizer Defendants that discussed Neurontin's use as a treatment for bipolar affective disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |

| | | |
|---|---|---|
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

212.    At events produced by the Pfizer Defendants, physician participants routinely stated that Neurontin was effective for the treatment of social phobia.  Events presented by the

Pfizer Defendants that discussed Neurontin's use as a treatment for social phobia include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

213.   Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder.   Nonetheless, at events produced by the Pfizer Defendants, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder.   Events presented by the Pfizer Defendants that discussed Neurontin's use as a treatment for panic disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert<br>Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill<br>Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe<br>Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro<br>St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel<br>Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club<br>Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago<br>Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel<br>San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant<br>Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia<br>New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

214.    On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve Neurontin as monotherapy for partial seizures.  The FDA determined the application to be non-approvable on August 26, 1997, because of insufficiency of evidence of Neurontin's effectiveness.   The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness.  Parke-Davis did not make public that its application for monotherapy had been denied.  Representative events at which the Pfizer Defendants continued to make presentations

that Neurontin was effective for monotherapy without disclosing that the FDA had denied its application for a monotherapy indication include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Monotherapy Speakers Bureau Meeting | September 1997 | La Quinta Resort Palm Springs, CA |

215.    Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis and the Pfizer Defendants, the Pfizer Defendants regularly presented programs in which physician participants touted Neurontin as being effective for the treatment of migraine.  Events where such presentations were made include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NJ |

216.    Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater than 1800 mg per day, the Pfizer Defendants presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above 1800 mg. All such representations were false and misleading.  Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day.  The Pfizer Defendants' failure to provide this information was a violation of the Pfizer Defendants' duties to provide fair and balanced information, and made any prior representations about use of Neurontin at dosages greater than 1800 mg per day false and misleading.  In addition to the events identified above, other events

where these false and misleading statements were made include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting on Neurontin | Feb. 4-6, 2000 | Royal Sonesta<br>New Orleans, LA |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent<br>Beverly Wilshire<br>Beverly Hills, CA |
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel<br>San Antonio, TX |

217.    On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and Communications (DDMAC) advised the Pfizer Defendants that through routine monitoring and surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the FDCA and applicable regulations, in that this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

218.    On or about July 1, 2002, the DDMAC advised the Pfizer Defendants that through routine monitoring and surveillance, the DDMAC has identified a model (#NE 102254) for Neurontin (gabapentin) that is in violation of the FDCA and applicable regulations because it makes representations about Neurontin which are false or misleading, in that this suggestion of proof of the mechanism of action is false and contrary to the language in the approved product labeling that states "[t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant

action is unknown," and that, furthermore, the full presentation of the areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of central nervous system conditions than has been demonstrated by substantial evidence.

219.     From July 1995 through at least August 5, 2002, the Pfizer Defendants engaged in a marketing program to promote the use of Neurontin, and to induce physicians to prescribe Neurontin, for medical conditions for which the FDA had not approved Neurontin to be used (i.e., "unapproved" or "off-label" uses). That program included: (a) illegally promoting the sale and use of Neurontin for a variety of conditions other than the one condition for which its use was approved by the FDA and for which the Pfizer Defendants had not performed the required FDA testing or established safety and efficacy, in violation of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.; (b) offering and paying illegal remuneration to doctors, either directly or through third parties, to induce them to promote and prescribe Neurontin for off-label uses, in violation of the federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) making and/or disseminating false statements in presentations and marketing literature sales personnel provided to doctors concerning, among other things, the uses for which the FDA had approved Neurontin, the conditions for which the use of Neurontin was otherwise medically accepted and/or the existence of adequate evidence of the safety and efficacy for such use.

220.     In order to avoid sanction and regulation by the FDA, the Pfizer Defendants' off-label marketing scheme depended on their concealment of their involvement in off-label promotion of Neurontin, and to make it appear to the public that the Pfizer Defendants did not have any hand in any discussions of off-label use. In addition, the Pfizer Defendants performed off-label promotion in the semblance of legitimate consultants' meetings, continuing education

seminars, journal articles and medical education events.   Also, the Pfizer Defendants' involvement was hidden because the Pfizer Defendants hid their financial connections between the participating physicians and used the vendor participants as payment intermediaries.   These activities and others described herein concealed the Pfizer Defendants' off-label promotional activities, and Plaintiff could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence.   Much of the scheme to this day remains concealed by the Pfizer Defendants.

221.   In May 2003, the details of the Pfizer Defendants' interactions with the other participants were disclosed through the filing by a former medical liaison, Dr. David Franklin, of previously sealed materials in opposition to the Pfizer Defendants' motion for summary judgment in the qui tam action.   This "off-label" promotion scheme remained hidden until, the United States District Court for the District of Massachusetts Court unsealed Dr. Franklin's Amended Complaint in the qui tam case in April or May 2002.

222.   In addition, the Pfizer Defendants fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts.

223.   Any applicable statutes of limitation have been tolled by the Pfizer Defendants' knowing and active concealment and denial of the facts alleged herein.   Plaintiff and other members of the public who were prescribed and ingested Neurontin for off-label uses  have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part, and could not reasonably have discovered the fraudulent nature of the Pfizer Defendants' conduct, and information and documents concerning the safety and

efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts. Accordingly, the Pfizer Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiff's claims.

224.    Similarly, due to the Pfizer Defendants' fraudulent concealment of the aforesaid documents and/or information, the scientific and/or medical community was not apprised of vital information concerning safety and efficacy of the drug Neurontin.    Furthermore, due to the aforesaid allegations, Plaintiff may rely on the discovery rule in pursuit of this claim.

225.    On information and belief, the Pfizer Defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues.  For example, through the third quarter of 2002, there were no published scientific studies to support Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label."  Despite this lack of scientific evidence, Neurontin sales for these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of Medical Marketing & Media, 90% of Neurontin sales are for "off-label" use.  No other drug in the United States has such a high percentage of "off-label" use.  The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses.  This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by the Pfizer Defendants' sales force.

226.   As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin.  As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

227.   On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications.  "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

228.   This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses.  Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by the Pfizer Defendants.  This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

229.   First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

230.   Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where the Pfizer Defendants focused their illegal marketing efforts:   bipolar disorder, peripheral neuropathy, migraine, etc.

231.   Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments).  Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies

to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities. If any company was to simply pack its tent and discontinue programmatic promotional effort in any therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur. For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

232. Fourth, Pfizer, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Pfizer would be concerned about a drop in sales within a certain therapeutic regime not after a yearly look-back, or even a quarterly look-back, but over just weeks. The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion of Neurontin to each of those approved therapeutic areas.

233. For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction. This increase is a direct result of the Pfizer Defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials. These promotional efforts did not stop in 1999, but continued thereafter. There are no valid scientific studies that support Neurontin's use for bipolar disorder. Dr. C. Seth Landefeld has submitted an expert opinion in the <u>Franklin</u> litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . bipolar disorder." As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin. These prescriptions for this purpose are still being written

and as a direct result of the Pfizer Defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

234.    Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications.  Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for" any of these indications or in an increased dose.

235.    Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales.  Actual sales for approved uses have declined.  Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by the Pfizer Defendants to promote "off-label" use.

236.    The Pfizer Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

237.    The Pfizer Defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of bipolar affective disorder when, in actuality, Neurontin was ineffective in treating bipolar affective disorder and instead influenced users to engage in self-destructive behavior.

238.    The Pfizer Defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when in actuality, Neurontin influenced users to engage in self-destructive behavior.

239.   Defendants knew that Neurontin was not safe and effective in the treatment of bipolar affective disorder and that Neurontin was not safe for human consumption in general because such drug influenced users to engage in self-destructive behavior.

240.   The Pfizer Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon the Pfizer Defendants' misrepresentations in prescribing Neurontin in the treatment of nerve damage and in prescribing Neurontin for human consumption in general for the treatment of illnesses and medical and mental conditions and that the public, including persons such as Plaintiff, would justifiably rely upon the Pfizer Defendants' misrepresentations in using Neurontin as prescribed by physicians, health care providers and mental health care providers in the treatment of nerve damage and for other prescribed uses.

241.   Plaintiff justifiably relied upon the Pfizer Defendants' misrepresentations and, accordingly, consumed Neurontin as prescribed by Plaintiff's physician in the treatment of nerve damage

242.   By reason of Plaintiff's consumption of Neurontin in justifiable reliance upon the Pfizer Defendants' fraudulent misrepresentations, Plaintiff sustained injuries.

243.   As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## V. VIOLATION OF TENNESSEE CONSUMER PROTECTION STATUTE AGAINST THE PFIZER DEFENDANTS

244.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

245.   The Pfizer Defendants acted, used and employed deception, unfair and deceptive acts and practices, fraud, false promises, misrepresentations, concealment, suppression and omission of material facts with intent that physicians and medical providers rely upon such concealment, suppression and omission, and for the purpose of influencing and inducing

physicians and medical providers to prescribe Neurontin, at excessively high dosages, for unapproved "off-label" uses, including treatment for nerve damage to patients/consumers such as Plaintiff, and causing such patients/consumers to purchase, acquire and use Neurontin, at high dosages, for unapproved "off-label" uses, including treatment for nerve damage, as prescribed by their physicians and medical providers, in connection with the sale and advertisement of the drug Neurontin, n violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et seq.

246.     By reason of the Pfizer Defendants' acts, uses and employment of deception, unfair and deceptive acts and practices, fraud, false promises, misrepresentations, concealment, suppression and omission of material facts, reasonable patients/consumers acting reasonably, such as Plaintiff, were caused to attempt to commit suicide.

247.     As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## VI. NEGLIGENCE
## AGAINST DEFENDANT TEVA

248.     Plaintiffs repeat and reiterate the allegations previously set forth herein.

249.     That at all times hereinafter mentioned, Defendant Teva was under a duty to exercise reasonable care in the design and development of gabapentin, in particular, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, in the advertising, marketing and promoting of gabapentin, both directly and indirectly, to ensure that gabapentin was not used in the treatment of conditions such as nerve damage syndrome for which it was not effective and to ensure that gabapentin was not used in a manner or to treat conditions where Defendant Teva knew or should have known that the user could sustain injuries and harm from the drug.

250.    That Defendant Teva negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that Defendant Teva, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, directly and indirectly, advertised, marketed and promoted gabapentin for the treatment of nerve damage, even though gabapentin had not been scientifically determined to be safe for such use and even though gabapentin was, in fact, not reasonably safe for such use, and furthermore, Defendant Teva failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which Defendant Teva knew or should have known about.

251.    That Defendant Teva was further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting gabapentin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self- destructive behavior including attempting to commit suicide and by failing to adequately warn the public of such risks.

252.    The aforesaid incident and the injuries sustained by Plaintiff were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including Plaintiff, on the part of Defendant Teva, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, in the design, manufacture, distribution, advertising, marketing and promoting of gabapentin as being safe and effective in the treatment of nerve damage and by

inducing the public, including Plaintiff, to believe that gabapentin was effective in the treatment of the causes and symptoms of nerve damage.

253.     That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by Defendant Teva was a proximate cause of injuries sustained by Plaintiff.

254.     That at all times hereinafter mentioned, Plaintiff did not contribute to his injuries by reason of any negligence or culpable conduct on his part.

255.     That by reason of the foregoing, Plaintiff was caused to sustain severe and serious personal injuries to his mind and body, some of which, upon information and belief, are permanent with permanent effects of pain, disability, disfigurement and loss of body function. Further, Plaintiff was caused to expend and become obligated for diverse sums of money for the purpose of obtaining medical care and/or cure in an effort to alleviate the suffering and ills sustained as a result of this occurrence.  Plaintiff further was caused to lose substantial periods of time from his normal vocation, and upon information and belief, may continue to be restricted in that manner into the future and suffer similar losses.  In addition, Plaintiff was deprived of a chance for effective and/or successful treatment.

256.     As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from Defendant Teva as alleged herein.

## VII.  BREACH OF WARRANTY
## AGAINST DEFENDANT TEVA

257.     Plaintiffs repeat and reiterate the allegations previously set forth herein.

258.     That at all times hereinafter mentioned, upon information and belief, Defendant Teva, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, by directly and indirectly advertising, marketing and promoting

gabapentin for the treatment of nerve damage, and by placing this drug in the stream of commerce knowing that gabapentin would be prescribed for the treatment of nerve damage in reliance upon the representations of Defendant Teva, expressly warranted to all foreseeable users of this drug, including Plaintiff, that gabapentin was safe and effective for the treatment of nerve damage.

259.    That Defendant Teva, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting gabapentin to all foreseeable users, including Plaintiff, that gabapentin was safe and effective for the purposes for which it had been placed in the stream of commerce by Defendant Teva, including for the treatment of nerve damage, and that gabapentin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of nerve damage.

260.    That at all times hereinafter mentioned, Plaintiff relied upon the aforesaid express and implied warranties by Defendant Teva.

261.    That at all times hereinafter mentioned, Plaintiff's use of gabapentin prior to and up to the time of the above-described incident was consistent with the purposes for which Defendant Teva directly and indirectly advertised, marketed and promoted gabapentin, and Plaintiff's use of gabapentin was reasonably contemplated, intended and foreseen by Defendant Teva at the time of the distribution and sale of gabapentin by Defendant Teva, and, therefore, Plaintiff's use of gabapentin was within the scope of the above-described express and implied warranties.

262.    Defendant Teva breached the aforesaid express and implied warranties because gabapentin was not safe and effective for the treatment of nerve damage and because Plaintiff's

use of gabapentin for the treatment of nerve damage caused or contributed to the incident described herein.

266.    Plaintiff gave appropriate notice to Defendant Teva of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

264.    As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## VIII.  STRICT PRODUCTS LIABILITY
## AGAINST DEFENDANT TEVA

265.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

266.    That at all times hereinafter mentioned, the drug gabapentin was not suited for the treatment of nerve damage and was not safe and effective for the treatment of nerve damage even though Defendant Teva directly and indirectly advertised, marketed and promoted gabapentin for those purposes.

267.    That at all times hereinafter mentioned, the drug gabapentin was not safe and was not suited for the purposes for which Defendant Teva, directly and indirectly, advertised, marketed and promoted the drug at the time Defendant Teva designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

268.    That at all times hereinafter mentioned, upon information and belief, Defendant Teva assumed a strict products liability to users and to persons using gabapentin, including Plaintiff, who sustained injuries, harm and damages by reason of the use of gabapentin for purposes directly and indirectly advertised, marketed, and promoted by Defendant Teva, including for the treatment of nerve damage.

269.    As a result of the foregoing acts and omissions, Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## IX.  LOSS OF CONSORTIUM
## AGAINST ALL DEFENDANTS

270.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

271.    That as a result of the aforementioned, this Plaintiff, KATHERINE FARRIS, the lawful wedded spouse of the Plaintiff in the First, Second, Third, Fourth, Fifth, Sixth, Seventh and Eighth Causes of Action, has and will suffer the loss of impairment of the spouse's services, society, and consortium, all to the damage of this Plaintiff in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter.

272.    As a result of the foregoing acts and omissions, this Plaintiff seeks actual and compensatory damages from the Pfizer Defendants as alleged herein.

## GENERAL DAMAGES

273.    Plaintiff has been injured in many ways as a result of Defendants' actions. Plaintiff is alleging and can prove that Plaintiff has sustained serious injuries resulting from the ingestion of Neurontin and gabapentin as described above.

274.    Plaintiff, who attempted to commit suicide as a result of the ingestion of Neurontin and gabapentin, has suffered serious injuries in the past, and it is anticipated that Plaintiff will suffer in the future, medical testing, invasive exploratory surgeries, chemical treatments, medical monitoring, pain, suffering, mental anguish, physical impairment, medical bills and expenses as well as loss of wage earning capacity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants, jointly and severally, and award relief in an amount in excess of $75,000.00 as follows:

A.      Compensatory damages in an amount supported by the evidence at trial;

B.      Past and future medical care according to proof;

C.  Past and future loss of income and earning capacity according to proof;

D.  Pain and suffering according to proof;

E.  An award of attorney's fees, pre-judgment and post-judgment interest, and costs

of suit, as provided by law; and

F.  Such other legal and equitable relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Respectfully submitted,

Dated:  December 7, 2009                    By:

Andrew G. Finkelstein, Esq.
Finkelstein & Partners, LLP
1279 Route 300, P.O. Box 1111
Newburgh, NY  12551
Telephone:    (800) 634-1212
Facsimile:    (845) 562-3492


Gale D. Pearson, Esq. #244763
Pearson, Randall & Schumacher, P.A.
1012 Grain Exchange Building
400 South Fourth Street
Minneapolis, MN  55415
Telephone:    (612) 332-0351
Facsimile:    (612) 342-2399

**ATTORNEYS FOR PLAINTIFFS**