## THE UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In Re: NEURONTIN MARKETING, : <br>     SALES PRACTICES AND : <br>     PRODUCTS LIABILITY LITIGATION : | **MDL Docket NO.  1629** <br><br> **Master File No. 04-10981** |

-----------------------------------------------------------:  Judge Patti B. Saris

                              :

**THIS DOCUMENT RELATES TO:**      :  Magistrate Judge Leo T. Sorokin

                              :

   **NEWBERRY V. PFIZER INC.**     :  <u>DEMAND FOR JURY TRIAL</u>

   **1:07CV11499 PBS**         :

## <u>FIRST AMENDED COMPLAINT</u>

Eric Newberry, Daniel Newberry, and Holly Newberry ("Plaintiffs"), Individually and as Personal Administrators, residing as follows, 69 Kirkland Rd., Colquitt, Georgia, 39827; 473 Newberry Chambers Rd., Colquitt, Georgia, 39837, and 109 Main St., Hedland, Alabama, 33645, by and though their attorneys, MR. DANNY S. SHEPARD, ESQ and POGUST & BRASLOW, LLC, and., as and for the Verified Complaint herein allege upon information and belief the following:

### <u>NATURE OF ACTION</u>

1.      This is an action to recover damages for personal injuries sustained by Plaintiffs as the direct and proximate result of the wrongful conduct of Defendants Pfizer Inc., Parke-Davis, a division of Warner-Lambert Company and Warner-Lambert Company and Warner-Lambert Company, LLC, Teva Pharmaceuticals Industries, Ltd., Teva Pharmaceuticals USA, Inc. as a subsidiary of Teva Pharmaceutical Industries, Ltd., and Ivax Pharmaceuticals, Inc., in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the prescription drug Neurontin® also sold under the generic name of Gabapentin.

## PARTIES

2.      At all times relevant herein, Plaintiffs were residents of the State of Georgia and Alabama, and Plaintiffs are currently residents of the State of Georgia and Alabama.

3.      Defendant Pfizer Inc. ("Pfizer") is a Delaware Corporation with its principle office and place of business located in the State of New York and, at all times relevant hereto, studied, tested, designed, developed, manufactured, mixed, inspected, produced, labeled, advertised, marketed, promoted, distributed, and sold Neurontin® throughout the United States and the world and does substantial and continuing business in Florida, which business included that giving rise to the claims in this case.

4.      Defendant Parke-Davis, a division Warner-Lambert Company and Warner-Lambert Company LLC ("Parke-Davis") is a Michigan Corporation and is authorized and does substantial business in the States of New York and Florida.

5.      Defendant Warner-Lambert Company is a Delaware Corporation and is authorized and does substantial business in the States of New York and Florida.

6.      Defendant Pfizer is the sole shareholder and member of Defendant Parke-Davis and Warner-Lambert Company is a division of Defendant Pfizer.

7.      On a date prior to February 2002, Defendant Pfizer as a successor interest, assumed the assets and liabilities of Defendant Parke-Davis, including Warner-Lambert Company and Warner-Lambert Company LLC.

8.      Defendant Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals, U.S.A., Inc ("TEVA"), as a subsidiary of Teva Pharmaceutical Industries, Ltd**.,** is an international and domestic pharmaceutical company with its

principal office and place of business located in Petah Tikva, Israel and 1090 Horsham Road, North Wales, Pennsylvania, 19454-1099, and at all times relevant hereto, studied, tested, designed, developed, manufactured, mixed, inspected, produced, labeled, advertised, marketed, promoted, distributed, and sold Gabapentin throughout the United States and the world and does substantial and continuing business in Georgia, which business included that giving rise to the claims in this case.

9.     Defendant Ivax Pharmaceuticals, Inc., ("IVAX"), upon information and belief, acquired as a subsidiary of Teva, is a Florida Corporation and is authorized and does substantial business in the States of Georgia and Florida.

10.    Defendants were, at all times relevant to this action, responsible for studying, testing, designing, developing, manufacturing, mixing, inspecting, producing, labeling, advertisement, marketing, promoting, distributing and selling Neurontin® and generic Gabapentin throughout the United States and in the Georgia.

11.    As a result of its studies, testing, design, development, manufacture, mixing, inspection, production, labeling, advertisement, marketing, promotion, distribution, and/or sale of Neurontin® and Gabapentin, either directly or indirectly through third parties or related entities, Defendants obtained the benefits of the laws of Georgia and profited from Georgia commerce.

## JURISDICTION AND VENUE

12.    Jurisdiction is premised upon diversity of citizenship, pursuant to 28 U.S.C. §1332, in that: Plaintiffs are citizens of the State of Georgia and Alabama, where Plaintiffs' decedent's injuries occurred in Georgia, and Defendants are corporations incorporated under the laws of New York, Michigan, and Florida with principal places of

business in New York and Florida; and the amount in controversy exceeds, exclusive of interest and costs, Seventy-five Thousand Dollars ($75,000.00).

13.     Venue is proper in this judicial district because: (1) a substantial part of the events or omissions giving rise to Plaintiffs' claims, including but not limited to Defendants' fraud and concealment, occurred within Georgia and/or were intended to occur in or have consequences in Georgia; <u>see</u> 28 U.S.C § 1391(a)(2); and (2) Defendants are corporations subject to personal jurisdiction in this judicial district.  <u>See</u> 28 U.S.C. § 1391(c).

## **FACTUAL ALLEGATIONS**

### A.     **Neurontin® and Gabapentin and Suicide**

14.     Neurontin® is commonly identified in scientific literature as "Gabapentin" and serves to prevent pain-related responses including peripheral inflammation.

15.     Prior to 1993, Defendants, namely Pfizer, submitted a new drug application (NDA) for approval of a drug called Neurontin®, a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5).

16.     In that application, Defendants, namely Pfizer sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.

17.     On or about December 30, 1993 the FDA approved Neurontin® only for use in the treatment of seizures and epilepsy.

18.    Neurontin®, was approved as a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 505(j), by Pfizer, Inc. ("Pfizer").

19.    The mechanism by which Neurontin® exerts its "analgesic" action with respect to preventing pain-related responses including peripheral inflammation is unknown.

20.    Commencing in 1995, Defendants began to directly and indirectly advertise, market and promote Neurontin® for "off-label" uses for which FDA approval had not been obtained, including but not limited to chronic pain, anxiety, and mood disorder.

21.    Prior to the approval of Neurontin® by the FDA and in the last decade, there has been a host of peer-review scientific literature and data linking Neurontin® to increased irritability, agitation, suicidal ideation, violence, self-directed harm, psychosis, mania, and suicide.

22.    Defendants have been investigated by numerous State Attorney Generals and regulatory agencies for their illicit and unlawful marketing and promoting of Neurontin® for off-label and unapproved uses.

23.    Generic Gabapentin is commonly identified under its brand name of "Neurontin" and within scientific literature, serves to prevent pain-related responses including peripheral inflammation and neuropathy.

24.    Defendant Teva submitted an ANDA for gabapentin even though Teva knew or should have known that the great majority of use for gabapentin at the time was for off-label indications (i.e., unapproved by the FDA), but Teva did not know whether the product was safe or effective for off-label indications.  Teva's failure to determine

whether the product was safe or effective for off-label indications before submitting an ANDA for gabapentin is not preempted by federal law as it is based on common law negligence — there are no FDA regulations that apply to such negligent acts and omissions. This negligent act and omission by Teva is nothing more than reckless conduct and a breach of Teva's duty of care to Plaintiff's decedent, which is governed under common law theories of negligence — not subject to any possible claims of preemption.

25.     It is standard practice in the pharmaceutical industry to obtain all of the pertinent documents concerning the innovator drug from the FDA through the filing of a Freedom of Information Act (FOIA) request, as well as from publicly available documents, before a manufacturer submits an ANDA for FDA approval. The documents and information that are the subject of such a FOIA request include the clinical reviews, advisory committee transcripts and post marketing safety data. Common sense dictates that Defendant Teva had (or should have had) this information in its possession prior to submitting its ANDA for gabapentin to the FDA. It has already been judicially determined, in connection with resolving a *Daubert* challenge, that several of Plaintiff's experts who relied on similar information in forming their expert opinions concerning an association between gabapentin and suicide, including Dr. Cheryl Blume, may testify on general causation in this litigation. Moreover, it also has been judicially determined that there was available scientific literature, including peer-reviewed animal studies, which indicated that gabapentin decreases the release of monoamines, *In re Neurontin Marketing, Sales Practices and Products Liab. Litig.*, 612 F. Supp. 2d 116, 149 (D. Mass. 2009); that it is uncontroverted that "the decrease of serotonin and other monoamines in

the brain is deleterious to mood including depression and aggression is supported by the literature," *id.* at 150; and that "[a]n association between low levels of serotonin in the brain and suicide is also well documented, appearing in peer-reviewed literature spanning several decades." *Id.* at 151.

26.     Defendant Teva was well aware and had ample knowledge that gabapentin caused adverse mood and behavioral changes, but Teva failed to apply to the FDA to make the requisite label changes to warn of the increase of the risks for suicide for all uses, including off-label uses that were not approved by the FDA.  The 1993 FDA Clinical Review for Neurontin, which was publicly available from the FDA through a FOIA request, noted in regard to gabapentin:   "[t]he report identified five 'serious events,' including depression, which could 'limit the drug's widespread usefulness,'" and stated, "depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicide attempts." *Id.* at 151.

27.     Additionally, a 8.5.2005 Teva leaflet concerning gabapentin, approved by the Israeli Minister of Health under the Postmarketing and other Experience Sections for the treatment of Neuropathic Pain, stated that common possible side effects included abnormal thinking, that there were reports that patients on gabapentin had experienced mood            and            behavioral            disturbances.            *See* www.health.gov.il/units/pharmacy/trufot/alonim/1191.PDF.

28.     The FDA does not prohibit a generic manufacturer from seeking FDA approval for a label change.  In the FDA Abbreviated New Drug Application Final Rule, 57 FR 17950, in reference to § 314.93 — Petition To Request a Change from a Listed

Drug, paragraph 20 expressly states that a generic manufacturer may apply to the FDA for a labeling change: "[a]n ANDA applicant who believes that the labeling for a proposed drug product should differ from that approved for the reference listed drug should contact FDA to discuss whether labeling for both generic and listed drugs should be revised." 57 FR 17950 (1992).

29.    Moreover, the FDA stated in its *amicus* brief submitted to the United States Court of Appeals for the Third Circuit in *Colacicco v. Apotex, Inc.*, No. 06-3107:

> If a generic drug manufacturer believes that new safety information should be added to the label for its drug, it is directed to contact FDA with "adequate supporting information." 57 Fed. Reg. at 17,961. The agency will consider this information and determine whether the labeling for both the generic drug and the innovator drug should be revised.

30.    Defendant Teva also failed to perform post-marketing pharmacovigilance and thus violated FDA regulations. The violations of FDA regulations "parallel" or supplement Plaintiff's common-law claims of negligence and/or state statutory law claims. Because these claims are parallel and do not impose different or additional requirements to FDA regulations, the claims pose no conflict and would not affect the FDA's enforcement of federal law.

31.    This claim is based in part on Defendant Teva's failure to comply with the Georgia Misbranding statute, GA. Stat. § 26-3-8. Plaintiff is not seeking to enforce the FDA regulations, but instead asserts claims premised on state common-law negligence and/or state statutory law. Teva's failure to comply with the Georgia Misbranding statute and common-law negligence duty runs parallel with its failure to comply with FDA Regulations. 21 C.F.R. §§ 314.80, 314.70(c) and 201.57(e).

32.     Defendant Teva failed in its pharmacovigilance obligations related to gabapentin, including by **failing to develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA**.  *See* 21 C.F.R. § 314.80.  Had Teva been vigilant in its duty to perform post-marketing evaluation, Teva would have discovered reasonable evidence of an association of a serious hazard with gabapentin.  *See* 21 C.F.R. § 201.57(e).  Teva's drug would thus be misbranded under the Georgia Misbranding Statute.

33.     Prior to July of 2005, Defendants, namely TEVA and IVAX submitted an Abbreviated New Drug Application ("ANDA") to FDA's Center for Drug Evaluation and Research ("CDER") for approval of generic Gabapentin as safe and effective for its recommended use, and prior to July of 2005, the FDA granted approval to Defendants for generic Gabapentin.

34.     It is submitted, upon information and belief, that the FDA's approval of Defendants' generic Gabapentin was based upon a review process that resulted in the FDA's findings that: (1) Defendants generic Gabapentin is the bioequivalent of Neurontin®; (2) Defendants' generic Gabapentin would be manufactured in a reproducible manner under controlled conditions; (3) Defendants' manufacturing, testing, and packaging facilities were in compliance with "Good Manufacturing Practice" regulations as outlined in 21 CFR § 211.1, *et seq.*; and (4) the labeling accompanying Defendants' generic Gabapentin was identical, in all material respects, to that accompanying Neurontin®.

35.     In Defendants' ANDA, the manufacturers sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in

the treatment of partial seizures with and without secondary generalization in adults with epilepsy.

36.     The mechanism by which Gabapentin exerts its "analgesic" action with respect to preventing pain-related responses including peripheral inflammation is unknown.

37.     Prior to July 2005, Defendants began to directly and indirectly advertise, market and promote Neurontin® for "off-label" uses for which FDA approval had not been obtained, including but not limited to neuropathy, chronic pain, anxiety, and mood disorder.

38.     Prior to the approval of generic Gabapentin by the FDA and in the last decade, there has been a host of peer-review scientific literature and data linking Neurontin® to increased irritability, agitation, suicidal ideation, violence, self-directed harm, psychosis, mania, and suicide.

**B.     Plaintiff's Injuries**

39.     Plaintiffs' decedent Stephen P. Newberry ("Stephen"), was born on September 1, 1945.

40.     In or around June 2005, Stephen was prescribed generic Gabapentin (100 mg) to be taken three times a day for peripheral neuropathy.  He was also given a number of sample packets of generic Gabapentin.

41.     In late June to early July of 2005, after continually taking generic Gabapentin, Stephen began to experience worsening depression, suicidal ideation, anxiety, irritability, and anxiousness.

42.     Despite Stephen's condition, he continued to take generic Gabapentin on the understanding that it was effective for the conditions prescribed.

43.     In early July 2005, Stephen verbalized threats of violence and self-harm.

44.     On July 7, 2005, Stephen committed suicide by a self-inflicted gun shot wound.  At the time, he was fifty-nine years old.

45.     Had Plaintiff or Plaintiff's family known of the lack of efficacy and increased risk of suicidal ideation and behavior for some adults taking generic Gabapentin, he would never have taken the drug.

46.     In late 2006 and early 2007, Plaintiffs became aware of a report that contained information about the dangers of Neurontin® and generic Gabapentin and how Defendants had hidden the side effects and dangers of such medication from physicians and the public.  For the first time, Plaintiffs realized the dangers associated with Neurontin® and generic Gabapentin.

47.     Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of material facts known by Defendants when they had a duty to disclose those facts.  Defendants kept Plaintiffs ignorant of vital information essential to their pursuit of these claims, without any fault or lack of diligence on Plaintiffs' part, for the purpose of obtaining delay on Plaintiffs' part in filing a Complaint on her causes of action.  Their fraudulent concealment did result in such delay.  Plaintiffs could not reasonably have discovered these claims until shortly before filing this complaint.

48.     Defendants are and were under a continuing duty to disclose the true character, quality, and nature of Neurontin® and generic Gabapentin that Plaintiffs'

decedent ingested, but instead they concealed them.  As a result, Defendants are estopped from relying on any statute of limitations defense.

## COUNT I – BREACH OF EXPRESS WARRANTY

49.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

50.     Defendants expressly represented to users and their physicians that Neurontin® and generic Gabapentin was safe and fit for its intended use and purposes, that it was of merchantable quality, that it did not produce any side-effects dangerous to life, and that it was adequately tested and fit for its intended use and purposes.

51.     Defendants knew or should have known that said representations and warranties were false, misleading or untrue, in that, *inter alia*, Neurontin® and generic Gabapentin was not safe and fit for its intended use and purposes, and, in fact, that each can cause suicidality, violence, aggression, and/or suicidal ideation to the user.

52.     Plaintiffs' decedent's treating and/or prescribing physicians relied upon Defendants' representations and warranties in recommending, prescribing, and/or dispensing to Plaintiffs' decedent and relied upon said representations and warranties in purchasing and ingesting Neurontin® and generic Gabapentin.

53.     As a result of the aforementioned breaches of express warrant Plaintiffs' decedent was caused to ingest Neurontin® and generic Gabapentin, which caused him to commit suicide, and Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT II – BREACH OF IMPLIED WARRANTY

54.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

55.     Defendants impliedly represented to users and their physicians that Neurontin® and generic Gabapentin was safe and fit for its intended use and purposes, that it was of merchantable quality, that it did not produce any side-effects dangerous to life, and that it was adequately tested and fit for its intended use and purposes.

56.     Defendants knew or should have known that said representations and warranties were false, misleading or untrue, in that, *inter alia*, Neurontin® and generic Gabapentin was not safe and fit for its intended use and purposes, and, in fact, that each can cause suicidality, violence, aggression, and/or suicidal ideation to the user.

57.     Plaintiff's treating and/or prescribing physicians relied upon Defendants representations and warranties in recommending, prescribing, and/or dispensing Neurontin® and generic Gabapentin to Plaintiff's decedent; and relied upon said representations and warranties in purchasing and ingesting Neurontin® and generic Gabapentin..

58.     As a result of the aforementioned breaches of implied warranty by Defendant, Plaintiff's decedent was caused to ingest Neurontin® and generic Gabapentin, which caused him to commit suicide, and Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT III – FRAUD BY INTENTIONAL MISREPRESENTATION AND CONCEALMENT

59.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

60.     Defendants intentionally, knowingly, and recklessly misrepresented and concealed material facts concerning the risks that Neurontin® and generic Gabapentin posed to adults, such as Plaintiff's decedent by, *inter alia*, failing to adequately inform the general public, the FDA, the medical community, Plaintiffs' decedent's treating and/or prescribing physicians, and/or Plaintiff that clinical trials showed that: (1) Neurontin® and generic Gabapentin showed no efficacy in some adults, especially when prescribed for an off-label use such as peripheral neuropathy, bipolar, chronic pain, anxiety, and mood disorder; and (2) Neurontin® and generic Gabapentin causes an increased risk of akathesia and suicidality in some adults.

61.     Said misrepresentations and concealments by Defendants were made with the intent of misleading the general public and the medical community for the purpose of more effectively advertising, marketing, and selling Neurontin® and generic Gabapentin.

62.     Said misrepresentations and concealments by Defendants, with the intent of misleading the FDA for the purpose of obtaining the FDA's approval, and continued approval, of Neurontin® and generic Gabapentin.

63.     Said misrepresentations and concealments by Defendants were made with the intent of misleading Plaintiffs' decedents' prescribing physicians and Plaintiff; and to induce Plaintiffs' decedent's treating and/or prescribing physicians to recommend, prescribe, or supply Neurontin® and generic Gabapentin to Plaintiff and induced Plaintiff to purchase and/or ingest.

64.     Plaintiffs' decedent justifiably relied on said misrepresentations and concealments, and as a direct and proximate result of such reliance, he was caused to ingest Neurontin® and generic Gabapentin, which caused him to commit suicide, and Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT IV – NEGLIGENT MISREPRESENTATION AND NON-DISCLOSURE

65.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

66.     Defendants negligently misrepresented and failed to disclose material facts concerning the risks that Neurontin® and generic Gabapentin posed to adults, such as Plaintiff, by, *inter alia*, failing to adequately inform the general public, the FDA, the medical community, Plaintiff's treating and/or prescribing physicians, and/or Plaintiff that clinical trials showed that: (1) Neurontin® and generic Gabapentin showed no efficacy in some adults, especially when prescribed for an off-label use such as peripheral neuropathy, bipolar, chronic pain, anxiety, and mood disorder; and (2) Neurontin® and generic Gabapentin causes an increased risk of akathesia and suicidality in some adults.

67.     Defendants knew or should have known, under the circumstances, that said misrepresentations and failures to disclose were false.

68.     Said misrepresentations and concealments by Defendants were made with the intent to more effectively advertise, market, and sell Neurontin® and generic Gabapentin.

69.    Said misrepresentations and concealments by Defendants were made with the intent of obtaining the FDA's approval, and continued approval, of Neurontin® and generic Gabapentin.

70.    Said misrepresentations and concealments by Defendants were made with the intent to induce Plaintiffs' decedent to recommend, prescribe, or supply Neurontin® and generic Gabapentin to Plaintiff and induce Plaintiff to purchase and/or ingest Neurontin® and generic Gabapentin.

71.    Plaintiff justifiably relied on said misrepresentations and concealments, and as a direct and proximate result of such reliance, he was caused to ingest Neurontin® and generic Gabapentin which caused him to attempt to commit suicide, and Defendants are liable to Plaintiff.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

72.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

73.    Plaintiffs justifiably relied on said misrepresentations and concealments, and as a direct and proximate result of such reliance, Plaintiffs' decedent was caused to ingest Neurontin® and generic Gabapentin which caused him to commit suicide, and Defendants are liable to Plaintiffs.

74.    Plaintiffs' decedent suffered, prior to and during his suicide, severe emotional distress, which was the direct and proximate result of the extreme, outrageous, intentional, willful, and reckless conduct by Defendants in studying, testing, designing,

developing, manufacturing, mixing, inspecting, producing, labeling, advertising, marketing, promoting, distributing, and/or selling Neurontin® and generic Gabapentin.

75.     Plaintiffs suffered, prior to and during their father's suicide, severe emotional distress, which was the direct and proximate result of the extreme, outrageous, intentional, willful, and reckless conduct by Defendants in studying, testing, designing, developing, manufacturing, mixing, inspecting, producing, labeling, advertising, marketing, promoting, distributing, and/or selling Neurontin® and generic Gabapentin.

76.     As a result of the foregoing, Defendants are liable to Plaintiffs.

WHEREFORE, Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT VI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

77.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

78.     Plaintiffs' decedent suffered, prior to and during his suicide, severe emotional distress, which was the direct and proximate result of the negligent conduct of Defendants in studying, testing, designing, developing, manufacturing, mixing, inspecting, producing, labeling, advertising, marketing, promoting, distributing, and/or selling Neurontin® and generic Gabapentin®.

79.     Plaintiffs' suffered, prior to and during their father's suicide, severe emotional distress, which was the direct and proximate result of the extreme, outrageous, intentional, willful, and reckless conduct by Defendants in studying, testing, designing, developing, manufacturing, mixing, inspecting, producing, labeling, advertising, marketing, promoting, distributing, and/or selling Neurontin® and generic Gabapentin.

80.     As a result of the foregoing, Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiff claims of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT VII – NEGLIGENCE

81.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

82     efendants knew or should have known, by the exercise of reasonable care or the application of reasonable, developed human skill and foresight, that: (1) Neurontin® and generic Gabapentin showed no efficacy in some adults, especially when prescribed for an off-label use such as peripheral neuropathy, bipolar, chronic pain, anxiety, and mood disorder and (2) Neurontin® and generic Gabapentin causes an increased risk of akathesia and suicidality in some adults.

83.     Defendants owed to Plaintiff the following duties:

(a)     to exercise reasonable care in ensuring that Neurontin® and generic Gabapentin was not used in the treatment of adults for whom it was not effective;

(b)     to exercise reasonable care in ensuring that Neurontin® and generic Gabapentin was not used in the treatment of adults who could be injured or harmed from the drug(s);

(c)     to adequately warn Plaintiff and her treating and/or prescribing physicians, of the risks of suicide associated with Neurontin® and generic Gabapentin.

84.     Defendants breached said duties by the manner in which they studied, tested, designed, developed, manufactured, mixed, inspected, produced, labeled, advertised, marketed, promoted, distributed, and/or sold Neurontin® and generic Gabapentin.

85.     As a direct and proximate result of the aforesaid breaches, Plaintiffs' decedent was caused to ingest Neurontin® and generic Gabapentin, which resulted in him committing suicide, and Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT VIII – NEGLIGENCE *PER SE*

86.     Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

87.     Defendants owed a duty to Plaintiffs and Plaintiffs' decedent, to adequately warn him, and his treating and/or prescribing physicians, of the risks of suicide associated with Neurontin® and generic Gabapentin.

88.     Defendants breached said duty by failing to comply with federal regulations concerning the study, testing, design, development, manufacture, mixing, inspection, production, labeling, advertisement, marketing, promotion, distribution, and/or sale of prescription drugs, including but not limited to, 21 CFR §§ 201.57 and 314.70 and the FDCA in promoting the drug for off-label use.

89.     As a direct and proximate result of the aforesaid breaches, Defendants caused Plaintiffs' decedent to ingest Neurontin® and generic Gabapentin, which resulted in him committing suicide, and Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT IX– STRICT PRODUCTS LIABILITY

90.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

91.     Defendants' Neurontin® and generic Gabapentin was unreasonably dangerous, and Defendants are strictly liable to Plaintiffs and Plaintiffs' decedent, as a result of the following conduct by Defendants:

> a)     studying, testing, designing, developing, manufacturing, mixing, inspecting, producing, labeling, advertising, marketing, promoting, distributing, and/or selling Neurontin® and generic Gabapentin in a defective manner;
>
> b)     failing to supply adequate warnings with Neurontin® and generic Gabapentin.

92.     As a direct and proximate result of the foregoing conduct by Defendants, Plaintiff's decedent was caused to ingest Neurontin® and generic Gabapentin, which resulted in him committing suicide, and Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT X – VIOLATION OF CONSUMER PROTECTION LAW

93.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

94.     Defendants violated Georgia's State Consumer Act,  O.C.G.A. § 10-1-393, by representing that Neurontin® and generic Gabapentin possessed uses and/or benefits that each did not possess and engaging in fraudulent conduct, including but not limited to the off-label promotion, which created the likelihood of confusion or misunderstanding with respect to Neurontin® and generic Gabapentin.

95.     As a result of said violations, Plaintiff's decedent was caused to ingest Neurontin® and generic Gabapentin, which resulted in him committing suicide and caused Plaintiff's decedent to suffer an ascertainable loss of money.  Defendants are liable to Plaintiffs.

*WHEREFORE,* Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

## COUNT XI – WRONGFUL DEATH

96.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

97.     Plaintiffs, as Personal Administrators of the Estate of their Decedent, Stephen P. Newberry, brings this action under and by virtue of O.C.G.A. § 51-4-2, "full value of life of decedent" or in the alternative, under and by virtue of the wrongful death laws of O.C.G.A. § 1-2-10, or any applicable wrongful death statute.

98.     Defendants' conduct, as detailed above, was the direct and proximate cause of Plaintiffs' decedent's wrongful death.

99.     As a direct and proximate result of Plaintiffs' decedent's wrongful death, he has been prevented from performing all of his usual duties, occupations, recreational activities and avocation, all to his and his beneficiaries' loss and detriment.

101.    As a direct and proximate result of Plaintiffs' decedent's wrongful death, his beneficiaries have suffered, will continue to suffer for an indefinite period of time in the future, and are entitled to recover for, the following:

      (a)    a loss of financial support;

      (b)    a loss of love, affection, consortium, and services;

      (c)    any other damages recoverable under the applicable law.

*WHEREFORE,* Plaintiffs claim of Defendant compensatory and punitive damages in an amount in excess of $75,000.00, exclusive of interest and allowable costs of suit.

## COUNT XII – SURVIVAL ACTION

101.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

102.    Plaintiffs, as Personal Representative of the Estate of their Decedent, Stephen P. Newberry, brings this action on his own behalf and on behalf of the Estate of Stephen P. Newberry, under and by virtue of O.C.G.A. § 51-4-2, or in the alternative, under and by virtue of the survivorship laws of Georgia, Ga. Stat. § 9-2-40 , or any applicable successor statute.

103.    As a direct and proximate result of Defendants' conduct, Plaintiffs' decedent, suffered and Defendants are liable for the following:

      a.   pain and suffering;

      b.   loss of earning and right to earn a living; and

      c.   other financial losses to Plaintiff as a result of his death.

104.    As a result of the foregoing, the Estate of Stephen P. Newberry, is entitled to recover compensatory and punitive damages for their above-stated losses.

*WHEREFORE,* Plaintiffs claim of Defendant compensatory and punitive damages in an amount in excess of $75,000.00, exclusive of interest and allowable costs of suit.

## COUNT XIII - PUNITIVE DAMAGES

105.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

106.    The acts and/or omissions of Defendants were intentional, wanton, willful, and outrageous, and said acts and/or omissions were committed with gross negligence, reckless disregard of, and deliberate, callous and reckless indifference to the rights, interests, welfare and safety of Plaintiffs' decedent.

107.    As a direct and proximate result of said conduct, Plaintiffs' decedent was caused to ingest Neurontin® and generic Gabapentin, which resulted in him committing suicide.

108.    As a result of the foregoing, Plaintiffs are entitled to an amount of punitive damages required by justice.

*WHEREFORE*, Plaintiffs claim of Defendants compensatory damages, punitive damages, interest and allowable costs of suit.

Respectfully submitted,

BY:   /s/ Harris L. Pogust
          Harris L. Pogust, Esquire, PA # 52721
          Derek T. Braslow, Esquire, PA # 78994
          POGUST & BRASLOW, LLC
          Eight Tower Bridge
          161 Washington Street, Suite 1520
          Conshohocken, PA 19428

          Danny S. Shepard, Esquire, GA # 640950
          P.O. Box 585
          154 South First Street
          Colquitt, GA 39837

                   **Attorneys for Plaintiffs**

**Dated: December 8, 2009**

## JURY TRIAL DEMANDED

Please take notice that the Plaintiff demands a trial by jury as to all issues in the above matter.


Respectfully submitted,


BY:  /s/ Harris L. Pogust
     Harris L. Pogust, Esquire, PA # 52721
     Derek T. Braslow, Esquire, PA # 78994
     POGUST & BRASLOW, LLC
     Eight Tower Bridge
     161 Washington Street, Suite 1520
     Conshohocken, PA 19428

     Danny S. Shepard, Esquire, GA # 640950
     P.O. Box 585
     154 South First Street
     Colquitt, GA 39837

       **Attorneys for Plaintiffs**

**Dated: December 8, 2009**