**In Re Neurontin Marketing and Sales Practices Litigation**

**MDL No. 1629**

**Declaration and Expert Report of Elizabeth A. Field, PhD**

## I.  Qualifications

1.  I was a founding member of the International Society of Medical Publication Professionals (ISMPP) and the chair of the Ethics Committee.  This organization brings together medical publication professionals from most pharmaceutical, biotechnology, and medical device companies and their allied agencies.

2.  I am a co-author of Good Publication Practice for Pharmaceutical Companies (Wager et al., CMRO 2003; 19:149-154), also known as GPP, and a member of the Steering Committee authoring the updated version of the GPP for publication on behalf of ISMPP.

3.  I am the founder and president of a medical communications agency, Field Advantage Medical Communications, LLC.  I develop communications for the biopharmaceutical industry and other clients, including manuscripts, abstracts, posters, slide sets, clinical study reports, New Drug Application documents, and deliver consulting and training.

4.  I designed, conducted and reported clinical trials for a major pharmaceutical company, GlaxoSmithKline ("Glaxo"), from 1989 to 1997. I managed teams of clinical research scientists, selected and oversaw the monitoring work of freelance clinical research scientists and, eventually, clinical research organizations in conducting numerous clinical trials. I oversaw the clinical team for NDA submissions of 3 drug applications and interacted with the FDA medical reviewers.

5.  I left clinical research to direct the International Medical Publications department at Glaxo.  We provided medical publication scientists for each major Glaxo product to assist with publication planning, tracking, and medical writing.

6.  When employed at EMD Pharmaceuticals, the US subsidiary of Merck KGaA, I oversaw the Merck KGaA publication teams for products in neurology, critical care, diabetes, and oncology and worked with authors and communication agencies to develop timely reports of clinical studies.

7.  I am a member of the American Medical Writers Association ("AMWA"), the Council of Science Editors ("CSE"), and the World Association of Medical Editors and became AMWA certified in medical writing/editing.  I attended annual meetings of AMWA and CSE and was appointed to the AMWA Task Force on the Contribution of Medical Writers to Scientific Publications.

8.  I received my PhD in neuroscience, specializing in developmental neuroendocrinology, from Duke University in 1985, with support from a predoctoral fellowship from the Pharmacology Training Program.

9.  A copy of my current curriculum vitae is attached as Appendix A. I have never testified or been deposed as an expert witness.

## II. Assignment

1. I have been asked by counsel for the defendants in this matter to undertake the following:

   a. address the assertions of Kay Dickersin and John Abramson concerning clinical trial practices and medical publications, and

   b. analyze the clinical trials and medical publications discussed in their reports.

2. In the course of my work on this case, I have reviewed a variety of materials including academic articles, legal pleadings, depositions, declarations, and other relevant materials. A list of the materials I have considered is attached as Appendix H. As this case is ongoing, I reserve the right to revise my opinions as new documents, data and testimony are made available to me. I am being compensated at an hourly rate of $350.

## III. Summary of Opinions

1. A large body of peer-reviewed and other literature, most of which is not attributable to the defendants, discusses the safety and efficacy of Neurontin for various off-label conditions.

2. My review of the evidence with respect to the small subset of studies discussed in the reports of Kay Dickersin and John Abramson and the reports of the study investigator/authors and others refutes Dickersin's and Abramson's claims of control and manipulation of these studies and publications by the defendants, reporting biases, or suppression of scientific truth.

   a. The authors state and the evidence shows that control, responsibility, and decisions regarding the content of these publications were those of the authors and journal editors.

   b. The charges of reporting biases are without merit. The publications and presentations were accurate, thorough, and placed the results in appropriate clinical context.

   c. The claim of suppression of study results is without basis. Of the 15 studies discussed by Abramson and Dickersin, two were not published – one that demonstrated efficacy in the primary endpoint and one that did not.

3. Dickersin and Abramson mischaracterize publication planning and the role of professional medical writers.

4. Dickersin and Abramson ignore the fact that the final publication is in the hands of the journal. The final publication reflects all changes required by the peer review process and the journal to satisfy their readers as to the accuracy of the findings and the clinical relevance of the work.

5. There is no requirement that a pharmaceutical company publish the results of all clinical trials. The evidence demonstrates that Pfizer's approach to Neurontin-related publications was consistent with or exceeded prevailing best practices in the industry at the relevant time. Pfizer repeatedly pursued publication of studies that failed in some respect to demonstrate efficacy of Neurontin, although there was no obligation to do so according to prevailing industry practice and expectations.

6. In conclusion, there is no evidence of misconduct on the part of the defendants with regard to Neurontin publications or evidence that they misled the biomedical community regarding the efficacy of Neurontin for these off-label indications.

4

## IV.   Brief Overview of Industry-Conducted Clinical Research and Peer-Reviewed Publication

1. Because the reports of Dickersin and Abramson refer repeatedly to clinical trial design and conduct and the peer-review publication process, I begin with an overview to provide the reader with a general understanding of the process employed by the pharmaceutical industry and others in conducting and publishing clinical research.

A. Industry-Conducted Clinical Research

1. Medical research, including clinical trials, is principally conducted by 1) biopharmaceutical companies, 2) academic medical centers and research institutions, 3) cooperative groups, and 4) the federal government. Pharmaceutical companies are the major source of funding for new medicines, from basic research and drug discovery to clinical research.  Those companies recruit academic medical centers, private and group medical practices, and research institutions to conduct clinical studies in human volunteers and patients on their behalf. The government also funds some clinical research studies, many of which are conducted under the auspices of the National Institutes of Health (NIH) and which may answer questions of national public health importance.  However, most of the NIH budget has always been devoted to basic research rather than clinical research; much of NIH funding supports exploring fundamental mechanisms that would otherwise not be pursued and key enabling discoveries that may translate eventually into marketable therapeutic applications.[NIH2004]

2. Clinical research is the last hurdle in the drug development process before the drug is submitted for marketing approval.  After approximately 3-6 years spent studying the drug's basic mechanisms and its actions within laboratory and animal systems and developing a drug form that can be delivered to the ailing human target organ, the preclinical data is submitted for review to the FDA and permission is sought to test the drug in human subjects.  With that Investigational New Drug (IND) submission, a Clinical Development Plan for all of the clinical trials and a study plan or protocol for the first trial is delivered for FDA review.

3. Clinical trials progress from Phase 1 to Phase 3 over a 6-7 year period in the following manner:[PhRMA2007]

Table 1.  Clinical Trial Phases

| Phase | Objective | Number/Trial | Number Tested During Phase |
|-------|-----------|--------------|----------------------------|
| Phase 1 | Initial human testing in a small group of healthy volunteers to discover if the drug is safe in humans; how it is absorbed, metabolized, and eliminated; whether it causes the desired effects and any side | 10-20 | 20-100 |

|  | | | |
|---|---|---|---|
|  | effects; and the safe dose range. | | |
| Phase 2 | Testing in a small group of patients with the disease or condition to see it it improves the condition and to assess the optimal dose and dosing schedule. | 20-100 | 100-500 |
| Phase 3 | Testing in a large group of patients to generate proof of safety and efficacy, establish the overall benefit-risk relationship, and provide the basis for labeling instructions. | 300-500 | 1000-5000 |

4. Once Phase 3 is completed, the New Drug Application (NDA) is prepared and submitted to the FDA. During the period of NDA preparation and FDA review, additional critical studies are conducted to further characterize the drug. Trials in new indications would start with Phase 1 or 2 in order to build the same level of information about the drug's effects in that patient population. Phase 4 trials are conducted in patients after a drug is approved for that indication. (If the study is begun after NDA submission, but prior to approval, it is often called a Phase 3B trial.) Phase 3B and 4 trials may assess drug effects in special populations, assess the drug's efficacy compared with other marketed drugs, evaluate endpoints not previously considered, look at long-term safety and efficacy, fulfill commitments to the FDA that were made during the approval process, etc.

5. The trials above would all be considered to be sponsored by the pharmaceutical company. Another type of trial that can be conducted with the sponsor's approved study medication is an investigator-initiated trial (IIT). Investigators who are interested in answering a particular research question about a drug or studying a new indication can request funding and medication from the company by providing a protocol and agreeing to particular conditions. An IIT is sponsored by the investigator, and it is the investigator's responsibility to see that the final results are published.

6. The choice of outcomes or endpoints to be measured in a clinical trial is not easy or straightforward. The endpoint that will be used by the FDA to establish proof of the drug's efficacy (e.g., cholesterol levels) is called the primary outcome or endpoint, and others (e.g., numbers of strokes, triglyceride levels) are called secondary endpoints. In some diseases and conditions, endpoints are objective and unlikely to be influenced by the patients' states of mind. Such endpoints include things that can be measured by someone other than the patient, such as blood levels of a particular marker like cholesterol or glucose. Other objective endpoints include tumor size or heart rhythms or body weight. Then there are endpoints that are subjective, such as itching or depression or pain. Whether measured by the patient, a caregiver or the physician, they will always be subjective. Subjective endpoints can be difficult to measure, and clinicians have

6

designed many tools to assist in measurement, including number or ruler scales and questionnaires.

7. Some Phase 2 trials and all Phase 3 trials involve statistical testing of the efficacy results and the enrollment of enough patients to allow statistical significance to be shown. An estimate of the number of patients required can be made statistically by knowing the degree of improvement previously shown by other drugs for that condition using the same outcomes. Once the number of patients required is known, the clinical scientists can estimate the number of study centers needed to recruit those patients, based on the number of patients in that physician's practice who meet the requirements for enrollment. If a trial incorporates patients from more than one study center, it is called a multicenter trial.

8. Statistical tests that will be used to assess the drug's efficacy are selected prior to study conduct, usually with FDA input, and are described in a Statistical Analysis Plan that accompanies the protocol. The measure of statistical significance most often used in clinical trials is a probability less than 5% (or p-value <0.05) that a result or difference between 2 treatments was obtained just by chance. Usually the endpoint agreed upon as primary or most important will be tested statistically along with the secondary endpoints. Generally, a sponsor must have positive results from at least two pivotal trials for a new drug application (NDA) to be approved.

9. However, science is more complex than that. Reasonable clinicians can disagree as to both the endpoints and the tools to measure them. And during the development and testing of interventions, the prevailing wisdom of the best tool and the primary endpoint can change with time. Science and medicine are also quickly learning about individual differences in treatment response, some of which may be due to genetic and physiological differences among people with a medical condition. In addition to looking for differences in the average levels of a particular endpoint for all patients treated with the study drug (for instance, mean serum cholesterol or mean pain score), it is also often important to consider the number of patients in each group that experienced clinically significant improvements. This may not be a regulatory endpoint but one that the medical community finds useful.

10. In a clinical trial, the study drug (Drug A) can be compared with other drugs currently on the market. Alternatively, the drug can be compared with a placebo (inactive form), with a non-pharmaceutical intervention (e.g., counseling), with a level of care being given prior to the trial, or with the absence of treatment. When the drug is compared with another drug or placebo, it is possible to keep the patient and/or the caregiver uninformed (i.e., blinded) as to the treatment he/she is receiving if the drugs are formulated and packaged appropriately. If only the patient is blinded, that study is called single blind. If both the patient and the caregiver are blinded, that study is called double blind. If the patients and caregivers are not blinded to treatment, the trial is called an open-label trial.

7

11. Clinical trials for drugs, biologics, and medical device products that are regulated by the FDA are overseen by the Office of Human Research Protections (OHRP) in the Department of Health and Human Services (HHS) with built-in safeguards to protect subjects. All clinical trial protocols, informed consents, and procedures are reviewed and approved by institutional review boards (IRBs) in a particular hospital or locale of the trial. Those IRBs include scientists, doctors, and lay people who approve the clinical trial before it begins and protect the rights and welfare of participants. In addition, all clinical trial protocols for Investigational New Drugs regulated by the FDA are submitted with the informed consent to the FDA for review prior to trial initiation. Each Phase 1, 2 or 3 clinical trial requires a plan or protocol that has a prescribed format based on FDA regulations. This plan will lay out the study objectives, study design, population to be studied, treatments (including controls), randomization and blinding procedures, numbers and timing of visits, procedures that occur at each visit, details on conducting the procedures, and rules about collection of information about side effects that occur during or after the study. The statistical analysis plan will be described in the protocol and in more detail in a separate Statistical Analysis Plan. A Case Report Form will be designed and reproduced for each patient's information to be collected at each study visit.

12. A clinical trial can last from days to years, depending on the disease, size, duration of treatment, and ease of identifying appropriate patients. A typical trial with a treatment duration of 3 months could take up to a year to conduct, as all study centers are not initiated at once and all patients do not enroll at once. Screening visits may eliminate one-third to one-half of potential patients because they do meet the eligibility criteria, such as the severity of their high cholesterol levels on that day. After the screening period is over, an eligible patient will have his first treatment visit at which time his baseline condition is recorded and he is provided with study medication according to the random code. Study visits will be spaced appropriately and planned procedures will be conducted to assess safety and efficacy. All information will be recorded in the Case Report Form. All patients are able to discontinue from a study at any time.

13. Patient information collected in a Case Report Form and returned to the sponsor is reviewed and queries about the accuracy or completeness of the information are resolved with the study site. A Clinical Study Report that summarizes all study results and puts the results into context is written, reviewed, and approved by the sponsor. The time from the last patient's last visit until the Clinical Study Report is finalized varies - usually from 3 months to 1 year, depending on the size and complexity of the study.

14. Many pharmaceutical companies began to employ contract research organizations (CROs) to assist them with certain clinical trial tasks in the late 1980's and early 1990's as an effective cost-reduction strategy. The principal use of CROs at first was to supplement or replace the use of company employees as clinical research monitors, those who visited each clinical study site to inspect the premises, train the staff, audit the case report forms of each enrolled patient, and inspect the drug supply. CROs could provide geographically-based monitors, thus reducing travel cost and time. Eventually

CROs developed and offered expertise in additional services, including data management, statistical analysis, investigator recruitment, and medical writing.  Some smaller pharmaceutical and biotechnology companies use many CRO services and keep their clinical research staff small.

15. CROs do not conduct studies or recruit patients.  That is still done at study sites by physicians in academic medical centers and private or group practice.  CROs have not replaced academic medical centers, but rather have replaced employees of pharmaceutical companies.

B.  The Peer-Review Process at Biomedical Journals

1.  Peer review, or refereeing, is the process of subjecting the work of the authors to the scrutiny or review of other experts in that field.  Journals have an editor, generally a well-regarded expert in the field, many assistant or associate editors who act on the editor's behalf, and editorial staff who manage the process.

2.  The process of peer review, once a manuscript is submitted to the journal, is illustrated in the following Figure:



**Figure 1**

3.  The editor or his assistant has the authority to reject manuscripts because, for example, the study was poorly designed or executed, the manuscript poorly written, or the topic is not of interest to particular readers.  Then, if the editor deems the manuscript worthy of further consideration, he selects the peer reviewers (usually 2-3), requests their participation, and sends it to them for review.  Peer reviewers might be well-regarded experts in the medical condition, intervention, or study techniques or could be statisticians whose opinions on statistical design and analysis are valuable.  The reviewers send back their comments and recommended edits.

4.  If, after receiving the peer reviews, the editor determines that the manuscript is still worthy of consideration, the author will be sent the peer reviewers' and editor's comments and invited to revise the manuscript.  Occasionally, new analyses or new approaches will be requested by the reviewers and often major editing is required, such

9

as adding points of discussion or trimming the length of a section.  Reviewers suggest additional references or ask questions about methodology that may need to be added to the manuscript or merely answered.  In some cases, authors may disagree with or not be able to make the requested change and state their reasons.

5. Journals vary in the speed at which they progress through the process of peer review. Prior to the advent of electronic review and publishing, it took from 6 months to 2 years to progress from manuscript submission to print publication.  And it was common to wait several months before receiving the peer reviewers' comments and several additional months to hear the journal's decision to publish it or not.

6. Journals also differ greatly as to the percentage of manuscripts they accept, ranging from the New England Journal of Medicine, which accepts only 7%, to some newer or less prominent journals that accept most submissions.  The types of manuscripts of interest also varies greatly by journal.  The most prestigious but general journals (e.g., the New England Journal of Medicine, Journal of the American Medical Association, British Medical Journal, Lancet) are interested in manuscripts that describe novel interventions or studies and issues of large public health importance.  Other journals are very specialized to a particular field of interest.

C. Evolving Publication Practices

1. The reporting of clinical research in the medical literature was not subject to any definitive rules or guidelines until quite recently.  In recent years, suggested guidelines for best practice have emerged, at least for clinical research conducted by the pharmaceutical industry. It remains the case that there are no legal or regulatory requirements that any manufacturer or researcher adhere to these guidelines.  Instead, they simply reflect current views on best practice.

2. In particular, there is no requirement that a pharmaceutical company publish the results of all clinical trials.  It has recently become more common for pharmaceutical companies to pursue publication of all studies, and Pfizer has similarly established policies that commit to assist investigators with publishing results of clinical trials.  However, the journal editors who make the final decisions regarding publication of studies may be uninterested in publishing the results of studies that are inconclusive, fail to demonstrate efficacy, or are less rigorously designed or conducted than other studies.  If a study is exploratory in nature, hypothesis-generating, or is unlikely to generate interest among academic journals, there may also be less enthusiasm among researchers to devote the substantial resources and time necessary to complete the stages of the publication process.

3. As discussed in detail in the sections that follow, the evidence I have reviewed of Pfizer's approach to Neurontin-related publications demonstrates that the company's practices were consistent with or exceeded prevailing best practices in the industry at the relevant time.  On more than one occasion, Pfizer pursued publication of studies that failed in

some respect to demonstrate efficacy of Neurontin, although there was no obligation to do so according to prevailing practices and expectations in the industry.

## V. Dickersin and Abramson Mischaracterize Publication Planning and the Role of Professional Medical Writers

### A. Publication Planning is an Essential Step to Timely Publication

1. In their reports, Dickersin and Abramson mischaracterize the process of publication planning as conducted by the pharmaceutical industry. The publication plan or strategy is developed to facilitate the timely and accurate publication of the clinical trial results.

2. In particular, Abramson mischaracterizes one component, the probable conclusions, as "an orchestrated campaign to establish pre-determined marketing-favorable 'key messages' as the scientific evidence, and not the other way around."[Abramson,p.47] But a Publication Plan is prospective; therefore, the probable conclusions are stated as would occur if the study is positive. The key messages are revised, removed, or retained, depending on the study outcome.

### B. Using Professional Medical Writers Facilitates Timely, Accurate and Well-Written Publication

1. Because authors are frequently without sufficient time or writing skills to produce publication-ready manuscripts, scientists have increasingly turned to professional medical writers for assistance. Professional medical writers are trained to work with authors in planning content and interpreting results, to search the scientific literature for all relevant contextual material, to write clearly and accurately, to produce professional graphs and tables, to understand scientific and statistical methods, to write in the format required by a particular journal, to arbitrate differences of opinion among multiple authors, and to project manage the draft distribution and timelines. Just as scientists are frequently not well qualified to do their own statistical analysis and find assistance from a statistician or are not qualified to illustrate their own scientific texts and find assistance from a professional illustrator, scientists who know their limitations often find assistance from a professional medical writer.

2. The use of professional writers is not confined to industry-sponsored publications, but is used throughout the scientific community. For instance, senior researchers might seek assistance from their graduate students or even administrative assistants. Offices have been started in most major medical centers to assist physicians in writing their grants and manuscripts. I first noted this major development in the early 1990's at the Mayo Clinic; excellent writers and editors assisted physicians in composing their manuscripts. When multicenter clinical trials associated with drug development proliferated and neither external nor internal authors/scientists could keep up with writing up the results, companies started hiring professional writers or finding expertise externally in freelance writers and communication companies. Now the practice is considered essential to timely, accurate and well-written publications. Professional organizations for

professional scientific writers have emerged, such as the Society for Technical Communication, the American Medical Writers Association, the European Medical Writers Association, and the International Society of Medical Publication Professionals, and they provide important education, training, and sharing of best practice.

3. The services of a professional medical writer improve the accuracy, clarity, completeness and fair balance, and timeliness of publication of clinical trial results. In my personal experience, comparing clinical trial publications primarily written by professional medical writers, by internal authors, and external authors, the time from study conclusion to manuscript submission is fastest using professional medical writers. Most of these process improvements can be credited to improvements in planning and in setting expectations with authors and other stakeholders, and they were accompanied by increased numbers of manuscripts submitted and accepted. The practice of acknowledging the assistance of a professional medical writer has evolved over time and is now fairly standard, although it still varies across medical journals, which have their individual requirements over how and whether contributors to the publication are acknowledged.

## VI.   The Evidence and the Clinical Trial Investigators and Publication Authors Refute the Claims of Dickersin and Abramson

1. There are thousands of gabapentin-related journal articles and other publications. The National Library of Medicine's PubMed database currently lists over 2800 publications in peer-reviewed biomedical journals alone describing results of Neurontin research. The defendants played a role in only a small fraction of these publications.

2. As confirmed by several medical experts in these cases, within this vast body of literature there are numerous publications indicating that for many patients Neurontin can be a safe, effective and well-tolerated treatment for off-label conditions that have few and often undesirable alternative treatment options. These authorities have provided reports about their experience with Neurontin and its efficacy in their patients with migraine, bipolar disorder, and many pain conditions. [Bird Declaration; Gallagher Declaration; Rapoport Declaration; Slaby Declaration]

3. The expert reports of Dickersin and Abramson, on the other hand, focus solely on alleged circumstances in the development of a few company-sponsored publications in isolation and ignore this vast array of literature, experience, and scientific knowledge.

4. With respect to the small subset of studies discussed in Dickersin's and Abramson's reports, neither Dickersin nor Abramson considered the entire record nor is there any indication that they consulted with the clinical investigators or study authors regarding the roles played during the publication process by authors, sponsor, and journal. Had they done so, they would have found that plaintiffs' allegations are without merit. In fact,

12

Dickersin's and Abramson's conclusions are contradicted by the declaration and deposition testimony of numerous study authors who stand by both their studies and their published articles and uniformly state that they were in control of the decisions regarding publication.

A. Dr. Backonja's Study and Publication

1. The Backonja study (945-210) was a placebo-controlled, titrated-dose study conducted from 1996 to 1997 to evaluate the safety and efficacy of Neurontin in treating pain associated with diabetic peripheral neuropathy.

2. In their reports, Abramson and Dickersin allege that the published results from the Backonja study (945-210) are misleading because the positive findings were compromised and biased by potential "unblinding" of the patients to the drug they were taking due to adverse CNS events at higher gabapentin doses. They fault the study design for this problem. Abramson argues that if those unblinded patients are removed from the analysis, gabapentin is no more effective than placebo.

3. This argument is speculative and not supported by the evidence. Unblinding is a danger in every controlled trial where the active drug causes noticeable side effects at a higher rate than placebo or causes different side effects than another drug being compared. Both the research report and the published article described the potential unblinding and discuss the ways in which the authors controlled for this effect. The authors performed an additional analysis that excluded the patients with either of the two most common CNS side effects of dizziness and drowsiness. Following this analysis, gabapentin was still statistically significantly more effective than placebo. The authors concluded that the inclusion of these patients did not account for the overall efficacy of gabapentin for neuropathic pain in this study.

4. The Backonja study was published in the *Journal of the American Medical Association (JAMA),* one of the most highly-respected medical journals in the world. The editor and peer reviewers who reviewed this manuscript apparently did not believe that unblinding undermined the results of the study, or they would not have published the study in its present form. The accompanying editorial in *JAMA*[Low and Dotson,JAMA1998;280:1863-4] stated that the study and the companion study reporting efficacy for postherpetic neuralgia "demonstrated significant and clinically substantive amelioration of daily pain severity and improvement in important secondary end points, including sleep interference scores and quality-of-life measures. Gabapentin was well tolerated."

5. Dr. Backonja confirms the integrity of the study and the accuracy of the results and explains the difficulty of both finding efficacious treatments for pain and in designing appropriate studies to assess their efficacy, insofar as all endpoints are subjective. Dr. Backonja believes that the additional analyses performed were satisfactory in confirming that the CNS side effects did not unblind the study; the journal *JAMA* concurred.

6.  Dr. Backonja says in his declaration (attached as Appendix B):

"Between July 1996 and March 1997 I was the lead investigator for a clinical trial of the use of gabapentin (Neurontin) for the treatment of diabetic peripheral neuropathy, a type of neuropathic pain (Study 945-210).  The results of this study were presented at the October 1997 meeting of the American Pain Society, and an article based on this study was published in the December 1998 issue of the *Journal of the American Medical Association (JAMA)*, one of the most well-regarded peer-reviewed medical journals in the world.  Although Parke-Davis provided drugs and compensation for study expenses to the investigators, neither I nor any of the other non-Parke-Davis employee authors of the study were otherwise paid for our research, and I stand by the accuracy of the results reported in my article. (¶ 3)

Pain is a difficult and complex condition to treat, and clinical trials of pain medications are similarly complicated to design and administer. (¶ 4)

One issue that arises in clinical trials of pain medications is that the primary efficacy endpoint is often based on a subjective measure of pain, using tests such as the pain severity rating using an 11-point Likert-scale (recorded by patients in a daily diary), the Visual Analog Scale (VAS), or the Patient Global Impression of Change (PGIC).  The 945-210 study used all of these measures, as well as others.  Because the efficacy endpoints are based on subjective reporting of pain, we seek to ensure that patients remain blinded as to whether they are receiving placebo or active treatment (Neurontin).  Unblinding may occur when patients receiving active treatment experience significantly greater or more frequent side effects than patients receiving placebo. (¶ 5)

In our study, patients receiving Neurontin experienced certain central nervous system side effects, dizziness and somnolence, at a greater rate than patients receiving placebo.  In order to account for the possibility that unblinding had biased the efficacy analysis of our trial in some way, we performed an additional analysis in which we excluded the data for patients experiencing dizziness and somnolence and reanalyzed the efficacy data.  Excluding the data from patients who reported dizziness resulted in a mean pain score between groups that differed by -1.19 (p=0.002) favoring gabapentin.  Excluding the data from patients who reported somnolence yielded a difference in mean pain score between groups of -0.81 (p=0.03), also favoring gabapentin.  Thus, we concluded that inclusion of patients who experienced these central nervous system adverse effects in the original efficacy analysis did not account for the overall efficacy seen in the trial. (¶ 6)

Our study design and methods, including with regard to the possibility of unblinding, were presented transparently to and reviewed by the reviewers at *JAMA*, who accepted the article for publication.  Likewise, the article describes in detail the analysis we performed to determine that unblinding did not account for the overall efficacy seen in the trial. (¶ 7)

My conclusions in this regard are further supported by the fact that Neurontin continues to be widely accepted by both patients and prescribers as a first-line treatment for neuropathic pain.  Prior to the introduction of Neurontin, physicians had much more limited choice in medications to treat neuropathic pain; many of those medications were cruder and more difficult to use than Neurontin.  Neurontin, by contrast, is a safe and effective treatment for

14

neuropathic pain. A whole field of research has grown up around the study of gabapentinoids for better treatment of such pain. (¶ 9)

I have served as a consultant to Parke-Davis, Pfizer and other pharmaceutical companies because I believe it is important for manufacturers - and other members of the scientific community - to conduct research with the assistance of qualified researchers to increase our scientific understanding of medicines and their effects. For the same reason, I have previously and continue to participate in studies with various pharmaceutical companies. (¶ 12)

Neither Parke-Davis nor Pfizer ever pressured me about the content of my presentations or articles, or about the results of my studies. If they or any company ever tried to inappropriately influence the interpretation of the results of my research, that would be the end of my relationship with that company. If I make a statement, it is because I have a good reason to say it based solely on data and my scientific and clinical experience. (¶ 13)"

## B. Dr. Gorson's Study and Publication

1. Dr. Gorson received an unrestricted grant and drug supplies in 1995 to conduct a double-blind, placebo-controlled crossover study of Neurontin treatment for painful diabetic peripheral neuropathy.

2. Abramson and Dickersin claim that the company reframed the abstract reporting the results of the Gorson study of Neurontin treatment for neuropathic pain and suppressed the results because they were lackluster compared with more favorable results such as the Backonja study. These allegations are not supported by the evidence.

3. In his declaration, Dr. Gorson says (attached as Appendix C):

"It has been my personal experience (as well as those of others as related to published literature) that Neurontin has been effective in some individuals for the management of neuropathic pain, be it from diabetes or other causes. I have been using Neurontin fairly regularly in my practice, and it has been my own personal experience that the drug is effective in treating neuropathic pain in approximately 40% of patients when higher dosages are used, upwards of 3600 mg per day. I have found that Neurontin in low doses generally is not effective in the treatment of neuropathic pain. (¶ 3)

I performed a randomized, controlled, double-blind study of low-dose Neurontin in the management of neuropathic pain in 40 patients with diabetes mellitus. The study was designed as a cross-over trial, with patients being equally allocated to placebo or active drug at the onset of the study. There was no single unified endpoint, rather four endpoints were used, specifically the McGill Pain Questionnaire, average visual analogue score ("VAS"), present pain intensity ("PPI") score, and summary of patients reporting moderate or excellent pain relief, comparing Neurontin to placebo. Three of the four endpoints, specifically the VAS, PPI, and number of patients reporting moderate or excellent pain relief were not statistically significant when comparing the data from Neurontin to the placebo treated patients. In contrast, the mean change in the McGill Pain Questionnaire score was

significantly greater in the Neurontin treated group compared to placebo.  Therefore, one of the four endpoints of this study was positive.  The conclusion of this study was that Neurontin did not appear to be effective in the treatment of diabetic painful neuropathy in low doses. Indeed, in other randomized controlled trials, Neurontin was shown to be statistically superior to placebo in the treatment of neuropathic pain from diabetes when used in higher doses, with an average dose required for benefit noted to be 1800 mg per day, in contrast to my study of 900 mg per day. (¶ 4)

I continue to use Neurontin on a regular basis for off-label indications for the management of neuropathic pain, because of my personal experience of its effectiveness as well as the numerous reports in the literature indicating efficacy, despite the ongoing litigation difficulties with Neurontin associated with off-label usage. (¶ 5)"

4.   Dickersin states that she judged the primary efficacy variable to be the VAS,[Dickersin,p.45] as though the publication is misleading the reader with regard to this.  Dr. Gorson, on the other hand, states that "there was no single unified endpoint, rather four endpoints were used."[Gorson Declaration]  One of the four endpoints demonstrated efficacy, which was reported in both his publications.

5.   Dr. Gorson stated in both the original draft and published versions of his manuscript that higher doses of Neurontin may increase efficacy.[WLC_Franklin_0000240556-557, GorsonJNeurolNeurosurgPsychiatry1999;66:251]  Dr. Gorson concluded from his study that Neurontin was not effective in the treatment of diabetic painful neuropathy in low doses.  Dr. Gorson credits other studies showing that Neurontin is statistically superior to placebo in the treatment of neuropathic pain from diabetes when used in higher doses

6.   The claim that the company attempted to suppress the results of this study is without merit.  Soon after completion, an abstract of the results was presented at the 1998 Annual Meeting of the American Academy of Neurology.  When Dr. Gorson shared his draft manuscript, he declared his intention to submit it to a premier journal, *Neurology*, and the company appeared to provide feedback immediately.   In 1999, the data were published as a Letter to the Editor in the *Journal of Neurology, Neurosurgery, and Psychiatry*.[GorsonJNeurolNeurosurgPsychiatry1999;66:251]

7.   Dr. Gorson's agreement with Parke-Davis included the company's review of his manuscript,[WLC_Franklin_0000100237] which he sent to Phil Magistro on August 25, 1997, requesting to "Please review and feel free to make any suggestions in the text or margins."[WLC_Franklin_0000100272]  Those few suggestions were made in the margins.[WLC_Franklin_0000100273]  Abramson claims that Gorson's second draft manuscript circulated on January 7, 1998,[WLC_Franklin_0000088375] had been edited by Magistro, [Abramson, p.59] but Magistro denies this allegation in his sworn testimony.[MagistroDeposition,p.79-80]  Dr. Gorson conducted this study under an unrestricted grant, and he was solely responsible for the conduct, data analysis, and reporting of results.

C.  Dr. Vieta's Study and Publication

1. The Vieta study (945-291) was conducted by a collaborative group in Spain in subjects with bipolar disorder.

2. Dickersin and Abramson assert that the Vieta study (945-291) misrepresented the efficacy outcome and selected an inappropriate population for analysis in order to skew the results in favor of Neurontin. Dickersin and Abramson's allegations are wrong.

3. Pfizer had no role in drafting or editing Dr. Vieta's manuscript – a fact confirmed by Dr. Vieta in his declaration (attached as Appendix D), in which he states:

> "I am a Professor of Psychiatry and Director of the Bipolar Disorders Program of the Hospital Clinic at the University of Barcelona, Spain. I am also Director of Research at the Clinical Institute of Neuroscience at the University of Barcelona. I live and work in Spain and my first language is Catalan. (¶ 1)
>
> Between April 5, 1999 and February 26, 2004, I was the lead investigator in a double-blind, randomized, placebo-controlled study of the prophylactic efficacy of adjunctive gabapentin in patients with bipolar disorder I and II. Parke-Davis, and later Pfizer S.A., provided funding to support this investigator-initiated study. (¶ 2)
>
> In March 2006, the *Journal of Clinical Psychiatry* published the results from this study. The published manuscript, which I authored in English, reports that gabapentin was statistically significantly superior to placebo in the primary efficacy measure. It concludes that despite an apparent lack of acute efficacy, gabapentin may provide some benefits in the long-term care of patients with bipolar disorder. (¶ 3)
>
> On October 6, 2008, a reporter from *The Wall Street Journal* contacted me in connection with a newspaper story that he was writing concerning this study. Implicit in the reporter's questions and his published newspaper story, which I understand were based on allegations made by plaintiffs in a lawsuit against Pfizer, was a challenge to my integrity as a clinician and author. I make this declaration to respond to that challenge and to address differences between my published manuscript in *Journal of Clinical Psychiatry* and the clinical study synopsis relating to this study, which the reporter provided to me. (¶ 4)
>
> I am not being compensated in connection with preparing this declaration. (¶ 5)
>
> I alone was responsible for interpreting the study's data and for authoring the manuscript that the *Journal of Clinical Psychiatry* published. Pfizer statisticians may have assisted me in executing certain statistical analyses that I specifically requested, but Pfizer was not otherwise involved in drafting the manuscript. I was not paid by Pfizer or anyone else for my work on the study or authorship of the published manuscript. (¶ 6)
>
> There are certain differences between the published manuscript and the clinical study synopsis. Those discrepancies, however, either do not affect the study's results or they are the result of differences between the statistical approach the clinical study synopsis reflects and the one I employed after applying standard definitions of "Intention-to-treat analysis" and introduction of relevant covariates that may get unevenly split after randomization, and which were clearly disclosed in the publication. Despite these differences, I believe that the

17

published manuscript accurately reflects the study's results and neither I, nor anyone at Pfizer, manipulated or attempted to manipulate the study results in any way. (¶ 7)

The clinical study synopsis describes the study's primary efficacy parameter as the change in Clinical Global Impression of Severity (GCI-S) from baseline to month 12. The published manuscript describes the study's primary efficacy parameter as the Clinical Global Impression Scale for Bipolar Illness (CGI-BP-M). This difference is in name only. The severity of the disorder component to the CGI-BP-M, which the manuscript identifies as the primary outcome measure, is in fact identical to the CGI-S. The change in terminology had to do with the fact that in Spain we call the CGI-S for bipolar disorder as CGI-BP-M. (¶ 8)

The change in CGI-S at month 12 in the per protocol population in the clinical study synopsis differs slightly from the change in CGI-BP-M at month 12 in the published article. This difference does not affect the statistical significance of the study results; the results in both the clinical study synopsis and the published article show that gabapentin was statistically significantly superior to placebo. I believe that the difference is the result of a covariate adjustment I made to account for a baseline difference in the number of prior episodes to randomization between the placebo and gabapentin groups. It is good statistical practice to introduce covariates if they happen to be unevenly distributed across treatment arms and they might have a potential impact on study results (which was not finally the case). (¶ 9)

Some investigators incorrectly enrolled patients in the study who failed to meet the study's inclusion criteria because they were not in remission at study entry. Because these patients were not intended to be and should not have been enrolled in the study, I excluded them from the statistical analyses performed and did not consider them as part of the Intent-To-Treat ("ITT") population. We designed the study to include only those patients who were in remission at study entry in order to accurately assess the actual prophylactic effects of gabapentin and I believe that it was appropriate and necessary to exclude from the ITT population those patients who failed to satisfy the study's inclusion criteria. The article clearly explains this. It states that some patients who were initially enrolled had to be excluded because they were not in remission at study entry and that the analyses were performed on "the 25 patients with bipolar disorder *in remission who were randomly assigned.*" (¶ 10)

4. Decisions regarding the endpoints and population reported were either Dr. Vieta's or in response to requests from the journal and in no way involved the defendant. *The Journal of Clinical Psychiatry,* which published these results after full peer review, apparently agreed with this approach and these analyses. It is the most-read psychiatry journal in the world, with over 35,000 subscribers.[http://www.psychiatrist.com/documents/authors.asp]

5. Lastly, contrary to Dickersin's assertion that the company 'spun' the other results of the study to bolster the suggestion of longer-term benefits,[Dickersin,p.26] the Discussion section was appropriately used to provide explanations and speculation regarding the research outcomes, especially as there were mixed results, some that demonstrated efficacy and some that did not. The *Journal of Clinical Psychiatry* requests that authors "present in the Discussion section the implications of the findings and their limitations, including implications for future research." [http://www.psychiatrist.com/documents/infoforauthors.asp]

D. Pande Study and Publication

1. The Pande study (945-209) was a placebo-controlled, flexible dose (600-3600 mg/day) exploratory 10-week trial in patients with bipolar disorder stabilized on their ongoing therapy.

2. Abramson's and Dickersin's claims that the publication and dissemination of the Pande study results were delayed because they were not positive are without merit. The study results were analyzed and publicized in a timely manner.

3. The documents, testimony by company witnesses, and declarations by study authors all indicate that no effort was undertaken to delay or suppress the publication and dissemination of the study results. The primary results of the trial were known internally in June 1998 and shared with investigators in July 1998.[Pfizer_LLAMoreaux_0035656-62]   The final results were available on March 26, 1999, and Dr. Pande presented the results at the Third International Conference on Bipolar Disorder on June 18, 1999.   Dr. Pande then submitted the study for publication in *Bipolar Disorders* in July 1999, the journal accepted the manuscript on November 22, 1999, and it was ultimately published in September 2000.   Dr. Pande testified that any delay after acceptance was solely the result of decisions by the journal.[PandeDeposition, at 667:2-6]

4. Dr. Robert Gerner, a co-investigator in the Pande study, states in his declaration (attached as Appendix E):

"I am a practicing psychiatrist in Los Angeles, California. I am also an Associate Research Psychiatrist at the UCLA School of Medicine and Founder of the Pacific Institute for Medical Research. (¶ 1)

In the late 1990s, I served as a member of the Gabapentin Bipolar Disorder Study Group. In this capacity, I served as a co-investigator of a randomized, placebo-controlled, double-blind study of adjunctive gabapentin in patients with a lifetime diagnosis of bipolar disorder (type 1) and who were currently suffering from symptoms of either mania, hypomania, or a mixed state despite ongoing therapy with lithium, valproate, or lithium and valproate in combination. The study was sponsored by the Parke-Davis Research Division of Warner-Lambert. (¶ 2)

The Group's goal from the study's outset was to publish and disclose the data regardless of the results. The results of the study were first disclosed to investigators in July 1998 by means of a letter from Dr. Atul Pande of Warner-Lambert (the lead investigator) to all investigators. The results of the study were then presented at the Third International Conference on Bipolar Disorder, in June 1999, and the study manuscript, "Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy," was submitted for publication in July 1999 to *Bipolar Disorders*, the official journal of the International Society of Bipolar Disorders. Several months later in November 1999 the editors of *Bipolar Disorders* accepted the manuscript for publication and published the manuscript in September 2000. (¶ 3)

19

The data from the gabapentin bipolar disorder study were timely and appropriately collected evaluated, and submitted for publication. The process by which this study was published, and the time taken from the treatment of the last patient to submission of a manuscript for publication (and eventual publication) were typical of other studies in which I've participated and comport with good scientific practice. To my knowledge, no person at Parke-Davis/Warner-Lambert ever sought to delay publication of the bipolar disorder study results. To the contrary, I recall that Dr. Pande and the other Parke-David/Warner-Lambert researchers worked diligently to disseminate the data to the medical and scientific community while adhering to good clinical practices." (¶ 4)

5. Carol Janney, M.S., a biostatistician in the clinical research department at Parke-Davis also stated in a declaration (attached as Appendix F) that analysis of the Pande study was performed "in an efficient and timely fashion" that "enhanced the scientific quality of the research" and expedited dissemination to the study group and submission to the journal. She states that "no one at Parke-Davis/Warner-Lambert attempted to delay publishing the bipolar disorder data or acted improperly in any manner."[JanneyDecl,p.2-3]

6. The results of the study failing to show efficacy were not altered or suppressed by the company. The conclusions as reported in the final publication matched those in the final publication: "The findings of this study did not demonstrate that gabapentin is an effective adjunctive treatment when administered to outpatients with bipolar disorder."[RR720-04174,p.8;PandeBipolarDisor2000;2:249] The primary efficacy results compared with placebo is also described in the final published version of the article as follows: "Both treatment groups had a decrease in total YMRS from baseline to endpoint, but this decrease was significantly greater in the placebo group (-9) than the gabapentin group (-6)(p<0.05). No difference between treatments was found for the total score on the HAM-D."[Pande2000,p.249] Indeed, in October 1999 the company received a fax from the journal in which the reviewers expressed surprise at the failure to demonstrate efficacy, since the finding was "at odds with the many clinical reports on nearly 200 patients in whom gabapentin was ostensibly beneficial."[Pfizer_LLaMoreaux_0036397] Plaintiffs' contention that the results of the study were altered or suppressed is false.

7. Contrary to Dickersin's allegations that Pande "spun" the negative results by offering reasons why gabapentin was not efficacious in his study, he identified factors that could potentially alter the study results one way or the other. This is particularly necessary when there have been many reports from physicians in the field that the drug is effective for bipolar disorder. Thus, it was entirely appropriate for Dr. Pande to present the results of the study along with known issues with studying patients with bipolar disorder – that they frequently do not complete the study, administer the medication incorrectly, and receive increased doses of their other medications during the stabilization period. Explaining these issues is not "spin," it is good science and is expected as part of the Discussion section. The readers expect the authors to put the results in context and explain their clinical implications.

8.  I also disagree with Dickersin that the defendants attempted to bury these results in a journal with limited circulation. *Bipolar Disorders* was an excellent journal choice because it would reach the right audience and was likely to accept a study failing to demonstrate efficacy.  It was created in 1999 as the official journal of the new International Society for Bipolar Disorders. Being specifically focused on bipolar disorders, it would be read by the correct audience. The journal had an international circulation, which was important since Neurontin was marketed globally.  As Dr. Pande pointed out, the publication had a very large impact and was highly cited by subsequent publications. Dr. Pande was informed that the article is among the top two percent of the most frequently cited papers and that at one point it was the most oft-cited paper ever published in *Bipolar Disorders*.[PandeDeposition,p.662-669]

E.  Dr. Mathew's Study and Publication

1.  The Mathew study (945-220) was a placebo-controlled study of Neurontin for the prophylactic treatment of migraine. The publication, subjected to peer review by the well-regarded journal *Headache*, concluded that "gabapentin is an effective prophylactic agent for patients with migraine." [MathewHeadache2001;41:119]  The plaintiffs' experts assert that the company manipulated the data in order to achieve a positive efficacy result, a claim that has no basis.

2.  In his Declaration (attached as Appendix G), Dr. Mathew defends the integrity and results of the study:

    "I am a practicing neurologist in Houston, Texas and the director of the Houston Headache Center.  I am also a former president of the International Headache Society and the American Headache Society.  I have published more than 170 scientific articles in headache and related fields. (¶ 1)

    In my practice, I have been contacted by sales representatives for Parke-Davis and later, Pfizer, with respect to gabapentin.  None of the sales representatives from either company encouraged me to use gabapentin off-label.  Nor did the sales representatives from either company ever discuss off-label uses of gabapentin with me. (¶ 2)

    I use gabapentin off-label in my practice based upon my own experiences with the drug and the experiences of other clinicians, as recorded in peer-reviewed journals.  Especially for difficult to treat conditions, or conditions for which there is no FDA indicated treatment, off-label prescribing by doctors is logical and common.  Off-label use, in my experience, is driven by physician use, not company promotion. (¶ 3)

    In 1996 or 1997, I was approached by Parke-Davis to do a multi-center, placebo controlled study on the use of gabapentin for migraine prophylaxis.  The study consisted of a four week, single blind placebo period followed by a 12 week, double-blind treatment period.  Our study concluded that gabapentin is an effective prophylactic agent for patients with migraine and that gabapentin is generally very well tolerated with mild to moderate dizziness and somnolence the most common side effects. (¶ 4)

21

The controlled, clinical trial we completed was of the quality and scientific rigor the Food and Drug Administration demands when considering the approval of a new drug based upon two controlled, scientifically valid studies demonstrating efficacy. (¶ 5)

The findings of our study were published in the February 2001 edition of the peer-reviewed journal, *Headache*. ....(¶ 6)

Parke-Davis never made any attempt to alter or edit the findings of the study, which demonstrated a reduced number of migraines in patients receiving gabapentin compared with those taking placebo. Parke-Davis pooled the data collected from all of the study centers and distributed the data to the participating authors. The authors reviewed the data and the draft of the study findings. The authors completed several rounds of revisions and edits to the article. The published article reflects my thoughts and conclusions about the results of the study. This process was substantially similar to the process that I have observed other pharmaceutical companies use in connection with other research. (¶ 7)

I was compensated by Parke-Davis for my work on the study, but not for the published article describing our study results. This was also consistent with my experiences performing studies in conjunction with other pharmaceutical companies." (¶ 8)

3. Abramson and Dickersin claim that the research report and the published article reported on different patient populations: the published article looked at those patients who achieved a stable dose of gabapentin 2400 mg/day during the relevant study period, while the research report looked to those patients who were stabilized on either 2400 mg/day or 1800 mg/day. The choice of populations was clearly a decision made by the authors and/or journal. Dr. Mathew also responded to the issue in *Newsweek* magazine, stating, "Higher doses are more effective generally in clinical practice, and there was not a hidden analysis or anything. It was spelled out in the publication."

## F.   Dr. Serpell's Study and Publication

1. The Serpell study (945-306) was a placebo-controlled trial to assess Neurontin efficacy in neuropathic pain patients with various pain syndromes.

2. Dickersin and Abramson allege that this study was not positive but rather inconclusive or negative. This misconception may reflect Dickersin's false perception that the primary efficacy variable is the pain score from the last week of the study (Week 8) rather than the final 7 days of data from each patient. While it is true that some weeks did demonstrate statistical separation of the Neurontin and placebo groups while some weeks did not (including Week 8), the primary efficacy endpoint planned and used (the last 7 days) was statistically significant in demonstrating Neurontin's efficacy. That method is carefully explained in the prospective Statistical Analysis Plan.[RR430-00125,p.194]

3. The plaintiffs' experts also allege that the study results were manipulated to imply efficacy. The manipulations that are alleged include 1) data transformation and other

statistical methods, 2) changing the analyzed population, and 3) excluding patients who had previously shown no response to gabapentin.  Such allegations are without merit.

4. The data transformation was not used, as Dickersin implies[Dickersin,p.31], to achieve statistical significance but rather to correct for heterogeneity as prospectively defined in the Statistical Analysis Plan.[RR430-00125,p.195]  Furthermore, the statistician planned that, in the case of data transformation failure (which occurred), a non-parametric rank-based ANCOVA would be applied.

5. Dickersin states that the analyzed populations were different than those presented in the protocol.[Dickersin,p.31] This criticism lacks merit. The primary efficacy variable was based on 304 of the 307 patients randomized.  Two patients withdrew prior to receiving any study drug, and one patient had no pre- or post-treatment diary entries.  They provided no data to analyze.  That is explained in the final study report.[RR430-00125,p.25]

6. Dickersin also alleges that the company engaged in "design bias" by excluding from the trial patients who previously had little or no response or were intolerant to gabapentin.[Dickersin,p.31]  This is a common exclusionary rule in clinical trials.  Further, out of the 24 patients who were excluded from the study, Serpell noted that very few of them were excluded due to non-responsiveness or intolerance to gabapentin, but for other reasons.[Serpell,Pain,2003;103:238]  Finally, the exclusion of the patients was disclosed.[Serpell,Pain2002;99:559]

7. Dickersin and Abramson fail to mention the subsequent steps that the company took to ensure that the results of the Serpell study were accurately reported.  The research report is consistent with the published article, as shown here:

   Final study report[RR430-00125,p.27]

   "The mean change in gabapentin treated patients was -1.5 (21%) compared to -1.0 (-14%) in placebo treated patients.  This difference was statistically significant (P=0.048, rank-based ANCOVA)."

   Serpell et al., 2002

   "In gabapentin treated patients the mean pain diary score decreased by 1.5 (21%) from 7.1 to 5.6.  In placebo-treated patients it decreased by 1.0 (14%), from 7.3 to 6.3.  There was a significant difference between the treatments (P=0.048, rank-based ANCOVA)"

8. The manuscript for the study was first submitted to the *British Medical Journal*, and, though rejected, was revised and submitted to *Pain*, another excellent peer-reviewed journal, where it was accepted following another round of revisions.[Pfizer_SPiron_0006886]

9. The plaintiffs' experts also assert that any positive results were due to the inclusion of patients with post-herpetic neuralgia (PHN) in this study of mixed neuropathic pain.[Dickersin, p.41; Abramson,p.85]   The record shows, however, that  an additional analysis was

undertaken by the study authors to satisfy reviewers at the journal (*Pain*), which showed that the study data did not support the conclusion that the treatment effect differed from one syndrome to the next (e.g., the treatment effect was not different between PHN, back pain, complex regional pain syndrome (CRPS), postsurgical pain, and other neuropathic pain). While omitting all patients with PHN from the study does render the results statistically insignificant, the authors stated that this was due to the reduced power of the study (PHN patients represented 14% of the total population) and that the same results applied if CRPS or "other" patients were omitted.[NRXE1012000897]

10. Dickersin goes on to allege that the company attempted to "spin" the results of the Serpell study to appear more positive than they were. Dickersin points to internal emails which she suggests show the company was attempting to spin the results of the Serpell study in a poster presentation.[Dickersin,p.43] However, the emails cited by Dickersin relate to a poster presentation by Rowbotham et al. that presented the results from the Serpell study and four other studies. Furthermore, the published Backonja/Glanzman article, also summarizing the results from these five studies, accurately presented the Serpell results and disclosed, "When analyzing these results in patients with mixed neuropathic pain states, it is notable that while gabapentin was significantly more efficacious than placebo, the response to both gabapentin and placebo was smaller than has been seen in similar trials in PDN or PHN. This effect may reflect the inclusion of a large number of patients with complex regional pain syndrome, who appeared to have a poor response to both gabapentin and placebo."[Backonja&Glanzman2003,p.96]

11. Dickersin further alleges that the other poster describing the Serpell study results alone was biased,[Dickersin,p.42-43] which is a claim without basis. Upon review of the poster[Serpell,ICMTNP2002], it is clear that the results disclosed are accurate and consistent with the final report and the later published article. It is impracticable for a poster to reflect the complete results of a lengthy and complex study. Interested parties can refer to the article for the complete results.

## G. The POPP Study and Publication

1. The POPP study (945-271) was an investigator-initiated multicenter study conducted in Northern Europe from 1998 to 2001 to evaluate the safety and efficacy of Neurontin in treating post-operative (traumatic nerve injury) pain. A substudy evaluated the effect of Neurontin on pain evoked by cold, touch, and pinprick. Neurontin was not statistically significantly superior compared with placebo for the primary outcome measure (change in weekly pain intensity score). Several secondary measures were, however, positive, including pain relief, quality of life, and sleep. The study was presented in August 2002 at the International Association for the Study of Pain ("IASP") meeting.[Pfizer_TMartin_0001965] It was published in August 2008 in the journal *Pain*.[Gordh,Pain2008;138:255]

2. Dickersin alleges that the company attempted to "spin" the negative primary outcome results by focusing on the positive secondary outcomes.[Dickersin,p.30,39] Dickersin cites the

24

Discussion and Overall Conclusions of the Final Report dated March 7, 2003, as support for her assertion the company was misleading in its conclusion that "gabapentin may be of benefit for patients with neuropathic pain."  However, Dickersin ignores more than five paragraphs that explain the conclusion of the study and fails to reference the portion of the conclusion that stated:

> "Gabapentin was superior to placebo in reducing mean sleep interference score, and improving certain dimensions of SF-36 (Vitality, Role-Emotional and Mental Health and a borderline significance was found for Bodily Pain).  More patients experienced a better pain relief during gabapentin treatment than during placebo treatment; more patients also reported that the pain had been reduced by at least half during gabapentin treatment than during placebo treatment."[RR945-271, p.__]

It is true that many secondary outcomes were positive; that's not spin, but merely reporting the results.  There is no perfect measure by which to judge pain, as is also the case with other neurologic disorders.  Depending on the company, the consultants, and the population, many different outcomes could be chosen as the primary endpoint.  There is no gold standard and no FDA-mandated primary outcome measure for every study.  That's why the studies vary as to primary outcome choice and why the secondary outcomes should be reported.  The positive results of the secondary variables in the POPP study explain why the final report said that "gabapentin may be of benefit." The full publication accurately states the primary outcome of the study: "There was no statistically significant difference between the treatments for the primary outcome efficacy variable." [Gordh,Pain2008;138:255]

3. Dickersin inappropriately frames a concern of the Nordic investigators about a visual adverse effect.  In quoting a message from Pfizer MD Elizabeth Mutisya, Dickersin states:

> "that some were concerned about the possibility of visual problems, "the conclusion being that we had a slightly effective drug with significant risks.""[Dickersin,p.40]

Dickersin's statement misuses Mutisya's message and takes it out of context.  The entire message was:

> "Of additional concern, was the link in some minds between the persistent monocular visual defect seen in one patient and the visual problems encountered with vigabatrin, the conclusion being that we had a slightly effective drug with significant risks."[Pfizer_RGlanzman_0040034]

In other words, one patient had a serious adverse event that was reminiscent of a problem with another neurology drug.  This event is the only visual problem reported in this study, is described in the clinical study report, and is reported in the publication. Dickersin's implication is that the company was hiding significant risk information, and she did not make it clear that this was an experience in a single patient.

H. Dr. Reckless' Study and Publication

1. The Reckless study (945-224), a placebo-controlled multinational study in patients with painful diabetic peripheral neuropathy, was conducted to compare the safety and efficacy of three doses of Neurontin.  A subset of patients entered a 4-month open-label extension.

2. Dickersin and Abramson suggest there was a delay in the publication of the results from the 945-224 study because it failed its primary endpoint. But the study did show efficacy of Neurontin in some of its secondary endpoints, including statistically significantly superior results favoring gabapentin 1200 mg/day with respect to response rates, a number of quality of life parameters, Clinician's Global Impression of Change (CGIC) scores, and favoring gabapentin 1200 mg/day and 2400 mg/day with respect to sleep interference scores.[RR 720-04130] And contrary to Dickersin's opinion that these results were suppressed, they were rapidly communicated to the study investigators.[Pfizer_LeslieTive_0020946] The results were then submitted to at least two highly-rated journals (*Diabetic Medicine* and *Diabetologia*) and rejected.[TiveDep,p.875]

3. In making these allegations, Dickersin and Abramson ignore the fact that it is ultimately a journal's decision whether to publish a manuscript and that a journal is less likely to publish studies with negative or mixed results.  In my experience, journals make publication decisions based on the quality of the submitted manuscript and issues such as limited space and the interests of their readers.

4. The results were included as part of a review article of Neurontin dosing in neuropathic pain treatment.[Backonja/Glanzman]  The outcomes were accurately reported and match the study report findings.

I.   The Nociceptive Pain Studies

1. The clinical development plan for CI-1032, a combination product of gabapentin with naproxen sodium[Pfizer_MPierce_0000704] and for CI-1035, a combination product of gabapentin with hydrocodone[Pfizer_MPierce_0000733] make it clear that Parke-Davis and Pfizer were investigating the possibility of new, combination drugs to treat nociceptive pain.  Parke-Davis' primary goal listed in the Exploratory Clinical Development Plan for CI-1032 was to "[i]dentify a fixed dose combination which is either superior to commonly used doses of naproxen sodium and/or ibuprofen in specific models of acute pain OR equivalent to naproxen sodium and/or ibuprofen with a favorable adverse even profile as well as a favorable global patient evaluation." Likewise, the Gabapentin-hydrocodone Analgesia: Clinical Development Plan for Exploration and Registration (for CI-1035) indicates that the purpose of these studies was to focus "on the exploratory development of a combination of gabapentin and the opioid hydrocodone."  In six completed clinical studies 1032-001, 1032-002, 1032-003, 1032-004, 1035-001, and 1035-002, the separate components were studied separately and combined to treat nociceptive pain.

These studies were intended to explore the possibility of developing a combination product.

2. Dickersin's allegations regarding the nociceptive pain studies are unjustified. Dickersin misleadingly implies that these studies were designed to test the efficacy of Neurontin, which was clearly not the case. Ultimately, development of these combination drugs was not pursued, thus explaining why the results were never formally published.

3. These exploratory results, using doses of gabapentin below those being used to treat real patients with epilepsy and with study designs not relevant or informative to the healthcare community, need not be published by the standards of good publication practice existent in 2000 nor even using today's standards. Such early work is often called hypothesis generating and is conducted to lead the way to potential further, larger studies. Those larger studies and that combination product were never pursued.

4. Furthermore, Dickersin mischaracterizes the nociceptive pain studies as negative studies, when, in fact, the studies showed some positive results regarding Neurontin. The results of the study on a combination of Neurontin and hydrocodone in patients with post-operative dental pain suggested that gabapentin actually potentiated the analgesic effects of hydrocodone.[RR720-04378,p.9,58] Similarly, the results of a study on a combination of Neurontin and naproxen sodium showed that gabapentin may potentiate the analgesic effects of naproxen sodium.[RR720-04455,p.49

## J.  Dr. Wessely's Study and Publication

1. The Wessley study (879-200) was conducted from 1985 to 1988 by Goedecke AG, a Warner-Lambert subsidiary in Germany and Austria, using prophylactic doses of gabapentin 900 mg/day to prevent migraine.

2. The allegations by Dickersin that the reporting of the Wessely study demonstrated publication bias and biases of selective analyses and spin[Dickersin,p.24] are without merit. Very early Phase II hypothesis-generating studies conducted prior to product approval are often not published. Furthermore, this exploratory study of migraine efficacy was poorly designed: the baseline of pre-treatment headache frequency, against which the treatment frequency was to be compared, was collected by retrospective recollection at the first visit of the number of migraine attacks over the last 3 months instead of during a run-in period.[RR4301-00066,p.4] Nevertheless, preliminary data from the first 45 of 87 patients were published in 1987 as a brief report or abstract.[Wessely,Cephalalgia1987:7]]

3. Contrary to Dickersin's allegations of reporting biases, Wessely did choose to report the primary outcome (the reduction in number of migraine attacks). According to Wessely's first sentence about results: "The frequency of migraine attacks was reduced from 6.5 to 4.1 per month in the Gabapentin-group and from 4.3 to 4.0 in the placebo group." [Wessely,Cephalalgia1987:7] That's reporting the primary outcome, and the primary endpoint was reported first.

K. Dr. Wang's Study and Publication

1. The Wang study (945-250) may have been an investigator-initiated pilot study; it evaluated adjunctive Neurontin therapy for bipolar disorder with dose escalation to 3600 mg/day in an open-label design.

2. Dickersin's claims of spin and design bias[Dickersin,p.26] are without basis. The decisions regarding design and reporting of this study were Wang's, not Pfizer's. Furthermore, Dr. Wang's conclusion has been lifted out of context. He stated "Open adjunctive GBP was effective and well tolerated in patients with mild to moderate bipolar depression. This open pilot study must be viewed with caution, and randomized controlled studies are warranted."[Wang,BipolarDisord2002;4:296] Note the word "open" used twice and his statement "was effective" rather than "is effective" as Dickersin incorrectly states.[Dickersin,p.26] The use of "was" indicates that Wang was speaking of this trial and this trial only. The fact that the primary outcome (decrease in HDRS from baseline) was significant led him to reach that conclusion, which was correct and was correctly put into context.

L. Dr. Caraceni's Study and Publication

1. This double-blind, placebo-controlled study was conducted from 1999 to 2002 by the Italian and Spanish subsidiaries to evaluate Neurontin as an adjuvant analgesic for cancer patients with neuropathic pain not controlled by opioids. In 2004, the results were published in the premier cancer journal, *Journal of Clinical Oncology*.

2. Dickersin's accusations of misrepresentation and reporting bias are without merit. Her point about differences in the study initiation date between study report and publication could reflect both the true date of site initiation and the true date of first patient visit. More importantly, the publication presented an even more rigorous approach to the primary efficacy outcome than had the study report by presenting results from both the ITT (n=120) and the modified ITT population (n=115) instead of just the latter, both of which were significantly positive for Neurontin. This is not a case of reporting bias or misrepresentation.

M. Dr. Gomez-Perez's Study and Publication

1. This open-label crossover trial was conducted in Latin America to evaluate the relative efficacy and safety of a fixed Neurontin dose (900 mg/day) versus a dose titrated up to a maximum of 3600 mg/day in treating painful diabetic peripheral neuropathy. For the primary efficacy endpoint, percent change from baseline in endpoint mean pain scores, the titrated dose group had significantly greater improvement than the fixed dose group.

2. The allegations of bias and ghost authorship by Dickersin and Abramson are without merit. Gomez-Perez cited Serpell correctly to confirm gabapentin's efficacy in treating painful neuropathy (see Serpell). The writers at Medical Action Communications and Fallon Medica were properly acknowledged in the publication. This open-label trial is not

a case of design bias but of selection of a less rigorous and less-costly alternative versus a more rigorous design, and the optional titration arm was planned to allow investigator and patient to decide to increase the dose if sufficient analgesia had not been achieved and to decrease the dose to reduce side effects. It would have been difficult to blind this study. The authors are transparent about the open-label study design. And Dickersin's accusation that CNS side effects could unmask patients to active intervention[Dickersin,p.32] is perplexing, since the patients are not masked.

## N. Dr. Dallocchio's Study and Publication

1. This study was an open-label pilot study. According to the publication, 25 patients with painful diabetic neuropathy were randomized to receive either Neurontin (titrated from 400 to 2400 mg/day) or amitriptyline (titrated from 10 to 90 mg/day) for 12 weeks. The primary efficacy parameter was pain score at the last visit, and Neurontin was significantly more effective than amitriptyline.

2. Dickersin's assertions of design bias and citation bias lack support. As previously stated, there is a place for open label trials in drug development, particularly with small pilot studies. It is not a case of design bias but of selection of a less rigorous, less costly alternative versus a more rigorous design. In this study, blinding would have required a double-dummy design, necessitating developing a placebo to match both Neurontin and amitriptyline. Dickersin also faults Dallocchio et al for not citing the report of Morello showing no difference in pain relief between Neurontin and amitriptyline.[Dickersin,p.32] That is insupportable, since the Morello paper was published in September 1999 and the Dallocchio paper was accepted in November 1999 and probably submitted months before.

## O. Unpublished Studies (945-217 and 945-1008)

1. Dickersin and Abramson overstate their accusation of publication bias and withholding scientific evidence from the biomedical community through nonpublication of negative results. Of the 15 trials singled out in their reports evaluating Neurontin for treatment of neuropathic pain, migraine, and bipolar disorder, two were not published, one that demonstrated efficacy in the primary endpoint (945-1008) and one that did not (945-217).

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of December, 2008.

Elizabeth A. Field, Ph.D.

# APPENDIX A

**Elizabeth Ann Field, Ph.D.**
**820 Jean Court**
**Chapel Hill, North Carolina  27514**

**Home:  (919) 929-6605**
**Work: (919) 949-6335**
**bfield1@nc.rr.com**

---

**SUMMARY OF QUALIFICATIONS**
- President and Founder of Field Advantage Medical Communications, LLC, a medical communications consulting company serving the pharmaceutical and biotech industry
- Global Director of Medical Communications, EMD Pharmaceuticals, establishing departments of Medical Publications, Medical Information, and Medical Writing
- Author and speaker on Publication Planning and Publication Ethics
- Global Director of Glaxo Wellcome Medical Publications, leading increases in staff, staff quality, and scope; improvements in productivity and cycle time; and development of 3 databases
- Author of manuscripts and clinical submission documents as first author, secondary author, and medical writer
- Project leader of 3 clinical research programs overseeing Phase I, II, III, and IV studies
- Clinical leader for the submission, review, and approval of the Flonase NDA
- Leader of developmental and reproductive toxicology programs in 3 species
- Researcher in neuropharmacology, establishing neuroendocrine pathways in the development and aging of female reproductive systems
- Faculty member of University of North Carolina member campus, teaching undergraduate and graduate level biology

**PROFESSIONAL ACHIEVEMENTS**

Medical Communications – Field Advantage Medical Communications, LLC
- Founded a new medical communications company based in Chapel Hill, NC, planning and writing communications in oncology, respiratory medicine, cardiology, critical care medicine, endocrinology, reproductive medicine, and neurology/psychiatry
- Assisted pharmaceutical companies by leading publication strategy, facilitating and leading publication teams, and overseeing publication plan development and implementation
- Wrote clinical manuscripts, abstracts, and posters for pharmaceutical clients that were submitted and accepted in peer-reviewed journals and congresses
- Project managed the review and revision of all drafts of publications for pharmaceutical clients to strict timelines
- Consulted with a major medical communications agency, providing training on best practice
- Worked on behalf of a medical communications agency as Medical Director for a major pharmaceutical company communications project, leading and overseeing the development of scientific communications and ensuring accurate and impactful content
- Partnered with graphics, statistics, and other writing agencies to create increased capabilities
- Coordinated and reviewed communications from a major congress for pharmaceutical client
- Oversaw medical writing agencies to edit, update, finalize and submit stalled communication projects for a major pharmaceutical company
- Oversaw database mining project, leading expert panel and statistical output generation to generate new publications for pharmaceutical client

**Elizabeth Ann Field, Ph.D. - page 2**

Medical Communications – EMD Pharmaceuticals (US affiliate of Merck KGaA)
- Established a new Medical Communications function within Merck KGaA Global Medical Affairs with component departments of Medical Publications, Medical Information, and Medical Writing
- Developed and chaired global cross-functional product Publication Teams and Publication Strategies/Plans for 10 corporate products
- Led a Global Task Force (TRUST) that developed and posted a corporate policy and SOPs for clinical trial registration and results disclosure
- Was the US nominee for the corporate innovation award (for the TRUST project)
- Developed a Publication Toolkit of 18 publication-related SOPs, guidelines, forms, and templates for easy access and use by Global Clinical R&D
- Enabled the submission, publication, and tracking of over 60 manuscripts, abstracts, and book chapters per year reporting clinical trial results of Merck/EMD products
- Designed web-accessible draft publication review sites for product publication teams
- Designed and launched a Microsoft Access contractor and project tracking system
- Participated in a pilot project to establish a Global Call Center for distribution of medical information to healthcare professionals
- Led a Global Task Force to collect and evaluate current delivery of medical information in each affiliate and to recommend best practice in 2002/3
- Received top-priority funding to lead a Global R&D Medical Information Initiative in 2004
- Created processes for development of global medical information documents on new products and proposals for a global team of medical information professionals
- Created a centralized database for storage and global access of medical information documents on top priority products
- Established an EMD medical library through site access to the top oncology, general, diabetes, cardiovascular and lipid journals and access/training to Merck Scientific Library services
- Established a Medical Regulatory Writing Skills Center to develop protocols, clinical study reports, investigator brochures, INDs, NDAs, BLAs, etc. and hired an Assistant Director of Medical Writing Services
- Oversaw the creation of an Author's Manual for regulatory writing projects and designed a website for distribution of its contents to all employees
- Led a task force that developed a US process for clinical study report production
- Established contracts with freelancers, CROs, and medical communication agencies to provide publication planning, medical information, and medical writing support
- Provided daily pharmaceutical, therapeutic, and business-related news to the company via the intranet

Medical Communications – External Organizations
- Co-founded the International Society of Medical Publication Professionals (ISMPP) in 2005 with others from the pharmaceutical industry, served as Chair of the Ethics Committee and on the Board of Directors, and co-authored the Member Ethics Principles
- Delivered addresses or participated in panels at ISMPP Annual Meetings in 2005-2007
- Published "Good Publication Practice for Pharmaceutical Companies" in 2003
- Delivered addresses entitled "Good Publication Practices (GPP) for the Pharmaceutical Industry" and "A Toolkit for the Clinical Research Team: Publishing the Results of a Clinical Trial" at 2 PEA-sponsored national Publication Planning meetings
- Spoke on 2003 DIA panel on Careers
- Taught AMWA course "Ethics of Authorship and Editorship"
- Served on AMWA Task Force on Ghostwriting
- Cowrote in 2001 (with a cross-industry Working Party) "Good Publication Practice: guidelines for pharmaceutical companies", which was adopted by 8 major companies
- Wrote 2 accepted abstracts on journal timeliness and departmental performance metrics  for International Peer-Review Congress and DIA, respectively
- Organized DIA symposium on medical writing for 2001 Annual Meeting

**Elizabeth Ann Field, Ph.D. - page 3**

Medical Publications -- GlaxoSmithKline
- Developed and agreed with principle stakeholders and upper management the reorganization of a new Medical Publications department in the merged GlaxoSmithKline company, designed to develop primary and secondary manuscripts from all globally funded Phase 2-4 clinical studies
- Recruited and hired new staff, including 4 site directors, to build a 40-member department at 4 locations in the US and UK
- Presented and recommended endorsement of industry-wide Good Publication Practices (GPP) to the New Product Development Executive Committee and the R&D Executive Committee
- Wrote and implemented company-wide interim publication approval policy
- Led task force, liaising with each new therapeutic leader and communication director, to develop new paradigm for publication strategy team format and responsibilities

Medical Publications – Glaxo Wellcome
- Led department in developing medical publications in peer-reviewed journals reporting primary/secondary results and reviews of major Glaxo Wellcome clinical studies on 22 drugs (all of Glaxo Wellcome's blockbuster and priority programs)
- Developed and managed $3 mil budget for global Medical Publications department, including all infrastructure (personnel, travel, training/development costs, equipment) and external costs
- Hired, directly supervised, and conducted quarterly performance reviews for 7 direct reports and oversaw performance review for 18 other employees (not direct reports) of Medical Publications department
- Developed training and mentorship program for all new employees, with online training manual, weeklong coursework, and individual peer mentors
- Participated in monthly cross-therapeutic Communication Forum to develop best practice and common systems for all GW external clinical communications
- Oversaw design, development, and implementation of a 102-step process map and working practice to guide management of Medical Publications projects
- Led process improvement initiative for Medical Publications, resulting in improvements over 2 years of 32% for productivity, 80% for timeliness and 27% for cost (hours spent)
- Led development of approximately 150 new manuscripts per year
- Quadrupled size of department from 6 to 24 in two years
- Established a UK Medical Publications department
- Established and implemented a US Medical Publications Residency Program for 1-year post-doctoral residents
- Developed a publication tracking database, producing automated monthly status reports and metrics on manuscript development cycle times
- Developed a time tracking database, producing metrics on hours spent per manuscript draft, hours spent managing contract writers and overhead hours and ensuring correct chargeback and competitive pricing in alternative support models for Medical Publications department
- Developed a contractor database to track contact information, experience, expertise, cost, and payment
- Wrote and implemented GW Publication Policy (ethical practices) and participated in development of GW Publication Approval Policy and Authorship Guidelines
- Led company workshops on manuscripts for peer-reviewed biomedical journals
- Personally wrote and developed publications, including abstracts and manuscripts, in support of Lamictal, Wellbutrin, and Zyban
- Organized and facilitated cross-functional matrix publication strategy teams for Lamictal, Wellbutrin, and Zyban, determining and tracking project deliverables, timelines, resourcing, and prioritization

Clinical Research
- Designed clinical research programs and managed clinical teams in conducting successful Phase I, II, III and IV trials showing the safety and efficacy of 3 new drugs (Flonase, Flovent HFC MDI, Flovent Diskus) to treat rhinitis and asthma

**Elizabeth Ann Field, Ph.D. - page 4**

- Led and managed global cross-functional MPG (Medical Project Group) with membership from clinical research, clinical pharmacology, data management, biostatistics, regulatory affairs, commercial, clinical supplies, medical writing, and health outcomes
- Led MPG in developing Clinical Development Plan for US clinical program and managing program timelines, budgets, and deliverables
- Led clinical compilation, submission and support of Flonase NDA and negotiated with FDA medical reviewers to achieve successful labeling and approval
- Pioneered cost-cutting measures such as standardized investigator budgets and in-house CRF production
- Wrote Clinical Study Reports and sections of ISS, Clinical Pharmacology, and Summary Volume for Flonase and Flovent NDAs
- Co-authored 38 publications/abstracts of clinical trial results in peer-reviewed journals
- Made presentations at external international respiratory meetings
- Participated (with clinical key opinion leaders) in international symposia with subsequent development of publications from symposium proceedings
- Served as an effective member representing US clinical interests on 3 international project teams (Flonase, Flovent, non-CFC propellant project)
- Negotiated clinical grants with principal investigators for approximately 20 clinical trials and oversaw all grant payments
- Developed new strategies for driving patient enrollment and meeting timelines
- Led NDA submission team for Flovent Diskus, developing and delivering TOCs, team responsibilities, timelines, and project plans for all clinical study reports, integrated efficacy and safety summaries, study tables, preclinical summaries, clinical pharmacology summaries, and other NDA sections
- Hired, directly supervised, and conducted quarterly performance reviews for 8-12 clinical research scientists overseeing all clinical trials for 3 different US clinical programs
- Hired and directly supervised in-house contract monitors and contract data management personnel
- Led task force which developed Glaxo Contract Management department designed to select and oversee CROs in conducting clinical trials
- Set project scope and negotiated 12 major contracts for multicenter clinical trials to contract research organizations, overseeing project budgets and timelines
- Developed and managed total budget for respiratory clinical research department at US Glaxo Wellcome, including clinical grant payments and CRO payments (1993/4)
- Presented project plans, results, and recommendations to senior management in formal and informal meetings and to pre- and post-study investigator meetings

Developmental and Reproductive Toxicology
- Authored proposals and negotiated long-term contracts with industry and government to conduct developmental and reproductive toxicity testing
- Wrote protocols and oversaw toxicology study conduct and reporting
- Led team of 12 scientists doing toxicology research in 3 species
- Established the developmental toxicity of acrylamide, boric acid, diethyl phthalate, dimethyl phthalate, and butyl benzyl phthalate
- Co-authored 8 publications/abstracts of toxicology results

Pharmacology Research
- Established ontogeny of opiatergic and noradrenergic control of female luteinizing hormone secretion
- Described changing opiate/luteinizing hormone tone in reproductive aging
- Established neuroendocrine correlates of cannabinoid-induced delayed puberty
- Co-authored 21 publications/abstracts of neuroendocrine research results

**Elizabeth Ann Field, Ph.D. - page 5**

University Teaching
- Taught principles of general biology and developmental biology to undergraduate and graduate students
- Developed and oversaw innovative audiotutorial (self instruction) program in general biology, allowing student scheduling flexibility
- Collaborated with French department to write audiotutorial program for biology taught in French
- Mentored and directed graduate teaching assistants
- Taught microanatomy to medical students

## LANGUAGES

Spanish and French: Written and spoken proficiencies

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2006-present: | President and Founder, Field Advantage Medical Communications, LLC |
| 2001-2006: | Director and Global Head, Medical Communications, EMD Pharmaceuticals |
| 2000-2001: | Global Director, Medical Publications, GlaxoSmithKline |
| 1997-2000: | Director, International Medical Publications, Glaxo Wellcome Research & Development, Research Triangle Park, NC |
| 1992-1997: | Associate Director, Clinical Program Head, Respiratory Clinical Research, Glaxo Wellcome Research & Development, Research Triangle Park, NC |
| 1989-1992: | Senior Clinical Research Scientist, Clinical Research Manager, Assistant Director, Respiratory Clinical Research, Glaxo Inc., Research Triangle Park, NC |
| 1987-1989: | Developmental and Reproductive Toxicologist, Center for Life Sciences and Toxicology, Research Triangle Institute, Research Triangle Park, NC |
| 1985-1987: | Postdoctoral Fellow, Department of Pharmacology and Research Training Program in Aging, Center for the Study of Aging and Human Development, Duke University Medical Center, Durham, NC |
| 1980-1985: | Predocoral Trainee, Pharmacology Training Program and Research Assistant in Reproductive Neuroendocrinology, Department of Anatomy, Duke University Medical Center, Durham, NC |
| 1983-1984: | Teaching Assistant, Department of Anatomy, Duke University Medical Center, Durham, NC |

## EDUCATION

Ph.D., Anatomy (Reproductive Neuroendocrinology), Duke University, Durham, NC. Dissertations: Effects of delta-9-tetrahydrocannabinol on the neuroendocrine control of sexual maturation in the female rat.

**Elizabeth Ann Field, Ph.D. - page 6**

M.S., Zoology (Embryology), Iowa State University, Ames, Iowa.   Minor in counseling.  Thesis:  Chorio-allantoic grafting of embryonic chick gonads in relation to sexual differentiation.

B.S. with Distinction, Zoology, Iowa State University, Ames, Iowa.

## PROFESSIONAL AFFILIATIONS

Sigma Xi
Phi Kappa Phi
International Society of Medical Publication Professionals
Council of Science Editors
Drug Information Association (SIAC Member: Medical Communications, Medical Writing)
American Medical Writers Association (Certification: Core Curriculum Program, Multidisciplinary)
World Association of Medical Editors

## ACADEMIC AWARDS

Research Training Program in Aging Postdoctoral Fellowship, Center for the Study in Aging and Human Development, Duke University

Pharmacology Training Program Predoctoral Fellowship, Duke University

**Elizabeth Ann Field, Ph.D. - page 7**

## FULL PUBLICATIONS

1.  Field E and Tyrey L.  Delayed sexual maturation in the female rat during chronic exposure to delta-9-tetrahydrocannabinol. Life Sci 35:1725-1730, 1984.

2.  Field E and Tyrey L.  Delay of pubertal developmental after chronic exposure to delta-9-tetrahydrocannabinol.  In:  Marihuana '84, Proceedings of the Oxford Symposium on Cannabis, D. Harvey, ed., pp. 518-527, IRL Press, Ltd., Oxford.

3.  Field E and Tyrey L.  Blockade of first ovulation in pubertal rats by delta-9-tetrahydrocannabinol: requirement for advanced treatment due to early initiation of the critical period.  Biol Reprod 34:512-517, 1986.

4.  Field E and Tyrey L. Tolerance to the luteinizing hormone and prolactin suppressive effects of delta-9-THC develops during chronic prepubertal treatment of female rats.  J Pharmacol Exp Ther 238:1034-1038, 1986.

5.  Kuhn CM, Bero LA, Ignar DM, Field E and Lurie S.  Endocrine consequences of perinatal methadone exposure. Fed Proc 46(7):2448-2449, 1987.

6.  Braude MC, Szeto HH, Kuhn CM, Bero L, Ignar D, Field E, Lurie S, Chasnoff IJ, Mendelson JH, Zuckerman B.  Perinatal effects of drugs of abuse. Fed Proc 46:2446-2453, 1987.

7.  Field E and Kuhn C.  Opiatergic inhibition of luteinizing hormone release declines with age and acyclicity in female rats. Endocrinology 123:2626-2631.

8.  Field E and Kuhn C.  Opiate antagonist treatment reinstates estrous cycles in middle-aged persistent estrous rats.  Biol Reprod 40:714-719, 1989.

9.  Field E and Kuhn C.  Delayed suppression of serum luteinizing hormone after naloxone treatment in neonatal female rats. Life Sci 44:2025-2032, 1989

10. Field E, Price C, Sleet RB, Marr M, Schwetz B, and Morrissey R.  Developmental toxicity evaluation of acrylamide in rats and mice.  Fundam Appl Toxicol 14:502-512, 1990.

11. Field E, Selub M and Hughes CL.  Reproductive effects of environmental agents.  Seminars in Reprod Endocrinol 8:44-54, 1990.

12. Field E and Tyrey L.  Delayed sexual maturation during prepubertal cannabinoid treatment: importance of the timing of treatment.  J Pharmacol Exp Ther 254:171-175, 1990.

13. Heindel JJ, Price CJ, Field EA, Marr MC, Myers CB, Morrissey RE, and Schwetz B. Developmental toxicity of boric acid in mice and rats. Fundam App Toxicol 18:266-277, 1992.

14. Field EA, Price CJ, Sleet RB, George JD, Marr MC, Meyers CB, Schwetz BA, Morrissey RE. Developmental toxicity evaluation of diethyl and dimethyl phthalate in rats.  Teratology 48:33-44, 1993.

15. Grossman J, Banov C, Bronsky E, Nathan R, Pearlman D, Winder J, Ratner P, Mendelson L, Findlay S, Kral K, Field E, Rogenes P.  Fluticasone propionate aqueous nasal spray is safe and effective for children for seasonal allergic rhinitis. Pediatrics 92(4):594-599, 1993.

16. Banov C, Woehler T, LaForce C, Pearlman D, Blumenthal M, Morgan W, Frazer H, Southern DL, Gold B, Field E, Kral K, Rogenes P.  Once daily intranasal fluticasone propionate is effective for perennial allergic rhinitis. Ann Allergy 73:240-246, 1994.

**Elizabeth Ann Field, Ph.D. - page 8**

17.   LaForce C, Dockhorn R, Findlay S, Meltzer E, Nathan R, Stricker W, Weakley S, Field E, Rogenes P.  Fluticasone propionate:  an effective alternative treatment for seasonal allergic rhinitis in adults and adolescents.  J Fam Pract 38:145-152, 1994.

18.   Munk Z, Pearlman D, Graft D, Green D, Hampel F, Pleskow W, Stempel D, van As A, Field E, Rogenes P.  Intranasal fluticasone propionate is effective and well-tolerated in adolescents with seasonal allergic rhinitis.  Pediatr Asthma Allergy Immunol 8(1):39-46, 1994.

19.   van Bavel J, Findlay S, Hampel F, Martin B, Ratner P, Field E.  Intranasal fluticasone propionate is more effective than terfenadine tablets for seasonal allergic rhinitis.  Arch Int Med 154:2699-2704, 1994.

20.   Fluticasone Propionate Collaborative Pediatric Working Group.  Treatment of seasonal allergic rhinitis with one-daily intranasal fluticasone propionate therapy in children.  J Pediatr 125:628-634, 1994.

21.   Meltzer E, Oirgel A, Rogenes P, Field E.  Nasal cytology in patients with allergic rhinitis: effects of intranasal fluticasone propionate.  J Allergy Clin Immunol 94:708-715, 1994.

22.   Howland WC, Hampel FC, Martin BG, Ratner PH, van Bavel JH, Field EA.  The efficacy of fluticasone propionate aqueous nasal spray for allergic rhinitis and its relationship to topical effects.  Clin Ther 18:1106-1117, 1996.

23.   Bronsky EA, Dockhorn RJ, Meltzer EO,  Shapiro G, Boltansky H, LaForce C, Ransom J, Weiler JM, Blumenthal M, Weakley S, Wisniewski M, Field E, Rogenes P.  Fluticasone propionate aqueous nasal spray compared with terfenadine tablets in the treatment of seasonal allergic rhinitis.  J Allergy Clin Immunol 97:915-921, 1996.

24.   Alvarado-Valdes CA, Blomgren J, Weiler D, Gleich GJ, Reed CE, Field EA, Wisniewski ME, Pobiner BF.  The effect of fluticasone propionate aqueous nasal spray on eosinophils and cytokines in nasal secretions of patients with ragweed allergic rhinitis.  Clin Ther 19:273-281, 1997.

25.   Vargas R, Dockhorn RJ, Findlay SR, Korenblat PE, Field EA, Kral KM.  Effect of fluticasone propionate aqueous nasal spray versus oral prednisone on the hypothalamic-pituitary-adrenal axis.  J Allergy Clin Immunol 102:191-197, 1998.

26.   Wager E, Tumas JA, Field EA, Glazer NB, Schulz G, Grossman L.  Improving the conduct and reporting of clinical trials (letter).  JAMA 283:2788-2789, 2000.

27.   Wager E, Field EA, Grossman L.  Good publication practice for pharmaceutical companies.  Curr Med Res Opinion 19:149-154, 2003.

**ABSTRACTS**

1.   Field E and Tyrey L.  Potentiation of DA inhibition of PRL secretion in vitro by THC.  The Pharmacologist 25:199, Abstract #508, Program and Abstracts, American Society for Pharmacology and Experimental Therapeutics, Philadelphia, 1983.

2.   Field E and Tyrey L.  Delay of pubertal development after chronic exposure to delta-9-tetrahydrocannabinol, Presented at the 3rd Satellite Symposium on Cannabis, 9th International Congress of Pharmacology, Oxford, England, 1984.

**Elizabeth Ann Field, Ph.D. - page 9**

3.  Field E and Tyrey L.  Early initiation of the critical period during the first proestrus in the pubertal rat.  Abstract #586, Program and Abstracts, 67th Annual Meeting of the Endocrine Society, p. 147, Baltimore, 1985.

4.  Field E and Tyrey L.  Tolerance to the LH and PRL suppressive effects of THC develops during chronic prepubertal treatment.  Biology and Reproduction 32, Suppl 1:179, Abstract #284, Program, 18th Annual Meeting of the Society for the Study of Reproduction, Montreal, 1985.

5.  Field E and Kuhn C.  Effects of naloxone and naltrexone on serum LH levels across the life span and contrast with duration of analgesia blockage.  Abstract #375, Program, Annual Meeting of the Society for Neuroscience, Washington, DC, 1986.

6.  Field E and Tyrey L.  Delayed sexual maturation during prepubertal chronic cannabinoid treatment: associated reduction in serum prolactin.  1st International Congress of Neuroendocrinology, San Francisco, 1986.

7.  Field E, Doron M, and Kuhn C.  Tolerance develops to naloxone-induced LH secretion in neonatal female rats.  Abstract, Annual Meeting of the Committee on Problems of Drug Dependence, Philadelphia, 1987.

8.  Field E, Kuhn C, and Doron M.  Changing role of NE in EOP inhibition of LH secretion in neonatal female rats.  Abstract, Program, Annual Meeting of the Society for Neuroscience, New Orleans, 1987.

9.  Doron M, Field E, and Kuhn C.  Neonatal steroid environment influences opioid and adrenergic control of LH.  Abstract, AOA Symposium, Duke University, Durham, NC, 1987.

10. Kuhn C, Ignar D, Field E, Lurie S. Doron M, Bero L.  Maturation of different opioid control of hormone secretion and the effects of chronic perinatal opiate treatment.  Abstract, Annual Meeting of the Committee on Problems of Drug Dependence, Philadelphia, 1987.

11. Field E, Hughes C, and Kuhn C.  Chronic naltrexone prolongs corpus luteum function in cycling rats.  Program (Abstract #C16), Brain Opioid Systems in Reproduction, Cambridge, England, 1987.

12. Field E, Price C, Marr M, Morrissey R, and Schwetz B.  Teratologic evaluation of acrylamide (ACRL) in CD-1 rats and CD mice.  Abstract, Annual Meeting of the Society of Toxicology, Atlanta, 1989.

13. Field E, Sleet R, Price C, Marr M, Myers C, Morrissey R, and Schwetz B.  Developmental toxicity evaluation of dimethyl phthalate (DMP) in CD rats.  Abstract, Annual Meeting of the Teratology Society, Richmond, 1989.

14. Price CJ, Field EA, Marr MC, Myers CB, Morrissey RE, Heindel JJ, and Schwetz B.  Developmental toxicity of butyl benzyl phthalate (BBP).  Abstract, Annual Meeting of the Teratology Society, Victoria, 1990.

15. Price CJ, Field EA, Marr MC, Myers CB, Morrissey RE, and Schwetz B.  Developmental toxicity of boric acid (BORA) in mice and rats.  Abstract, Annual Meeting of the Society of Toxicology, Miami, 1990.

16. Orgel HA, Meltzer EO, Doyle VR, and Field EA.  Topical intranasal corticosteroid (fluticasone propionate) decreases cells of allergy and inflammation in nasal mucosa of patients with seasonal allergic rhinitis.  J Aller Clin Immunol 85:162, Abst 76, 1990.

**Elizabeth Ann Field, Ph.D. - page 10**

17.   Grossman J, Banov C, Bronsky E, Findlay S, Mendelson L, Nathan R, Pearlman D, Ratner P, Winder J, Smitten T, Field E.  Fluticasone propionate is safe and effective for children with seasonal allergic rhinitis.  Ann Allergy, 66(1):97, Abst p47; 1991.

18.   Lumry W, Ahrens R, Dockhorn R, Galant S, Martin B, Meltzer E, Munk Z, Ransom J, Southern D, Stricker W, Field E, Kral K, Simonetto T, Rogenes P.  Fluticasone propionate is safe and effective for children with seasonal allergic rhinitis.  J Allergy Clin Immun, 87(1):152, 1991.

19.   Meltzer EO, Orgel HA, Kemp JP, Welcher MJ, Ostrum NK, Rogenes PR, Field E.  Effect of topical intranasal fluticasone propionate in Rhinitis and Intranasal Fluticasone Propionate (Glaxo sponsored); Royal Society of Medicine Services Ltd., London, 1990.

20.   Orgel HA, Meltzer EO, Doyle VR, Field E.  Topical intranasal corticosteroid (fluticasone propionate) decreases cells of allergy and inflammation in nasal mucosa of patients with seasonal allergic rhinitis.  J Allergy Clin Immunol; 85(1, Pt 2):162, Abst 76, 1990.

21.   Weakley S. Rogenes P, Field E.  Intranasal fluticasone propionate treatment for perennial non-allergic rhinitis.  J Allergy Clin Immunol, 87(1):218, Abst 316, 1991.

22.   Grossman J, Banov C, Bronsky E, Findlay S, Mendelson L, Nathan R, Pearlman D, Rather P, Winder J, Simonetto T, Field E.  Fluticasone propionate is safe and effective for children with seasonal allergic rhinitis.  Ann Allergy, 66(1):97, Abst p47, 1991.

23.   Lumry W, Ahrens R, Dockhorn R, Galant S. Martin B, Meltzer E, Munk Z, Ransom J, Southern D, Stricker W, Field E, Kral K, Simonetto T, Rogenes P.  Fluticasone propionate is safe and effective for children with seasonal allergic rhinitis.  J Allergy Clin Immunol, 87(1, Pt 2):152, Abst 56, 1991.

24.   van Bavel J, Findlay SR, Hampel F, Martin B, Ratner P, Simonetto T, Beam J, Field E, Rogenes P, Kral K.  Intranasal fluticasone propionate once daily is more effective than terfenadine twice daily in relieving symptoms of seasonal allergic rhinitis.  J Allergy Clin Immunol, 89(1):302, 1992.

25.   Banov C, Rogenes P, Field E.  Studies of once-daily treatment with fluticasone propionate aqueous nasal spray in children with seasonal allergic rhinitis.  Allergy, 47(12, Suppl):346, 1992.

26.   van As A, Rogenes P, Kral K, Field E.  Intranasal steroid treatment and pulmonary function.  Am Rev Respir Dis, 145(4, Pt 2):A500, 1002.

27.   Meltzer EO, Jalowayski AA, Field EA, Rogenes PR, Kral KM.  Intranasal fluticasone propionate reduces histamine and tryptase in the mucosa of allergic rhinitis patients.  J Allergy Clin Immunol, 91(1, Pt 2):298, Abst 629, 1993.

28.   Bronsky E, Dockhorn R, Meltzer E, Shapiro G, Boltansky H, LaForce C, Ransom J, Weiler J, Blumenthal M, Weakley S, Field E, Wisniewski M, Milwee S.  Intranasal fluticasone propionate is more effective than terfenadine for treatment of seasonal rhinitis.  Ann Allergy 72:86, 1994.

29.   Field E, Harding A, Kral K.  Fluticasone propionate aqueous nasal spray is effective due to topical, not systemic, activity.  Allergy Clin Immuno News Supp 2:66, 1994.

30.   Hampel F. Howland W, Martin B, Ratner P, van Bavel J, Field E, Kral K, Scott C. The efficacy of fluticasone propionate nasal spray for treatment of rhinitis is dependent on topical application.  J Allergy Clin Immunol 93:165, 1994.

**Elizabeth Ann Field, Ph.D. - page 11**

31. Lemanske R, Dunn K, Galant S, Hampel F, Lumry W, McCain F, Noonan M, Pearlman D, Ransom J, Southern L, Rogenes P, Field E, Wisniewski M, Scott C. Fluticasone propionate aqueous nasal spray is more effective than astemizole in the treatment of seasonal allergic rhinitis. J Allergy Clin Immunol 93:165, 1994.

32. Selner J, Banov C, Boltansky H, Bronsky E, Chervinsky P, Druce H, Georgitis J, Kaiser H, LaForce C, Meltzer E, Munk Z, Webb D, Field E, Hamedani A, Milwee S. Intranasal fluticasone propionate effectively treats perennial non-allergic rhinitis. J Allergy Clin Immunol 93:165, 1994.

33. Stricker W, Klimas J, Mendelson L, Morris R, Reed C, Shapiro G, Tomasko M, van Bavel J, Weiler J, Whitehead S, Field E, Wisniewski M, Pobiner B. Intranasal fluticasone propionate is more effective than astemizole for seasonal allergic rhinitis. Ann Allergy 72:86, 1994.

34. Vargas R, McMahon F, Dockhorn R, Dock R, Findlay S, Korenblat P, Rogenes P, Field E, Kral K. An Assessment of HPA axis effects of fluticasone propionate aqueous nasal spray using 6-hr ACTH infusion. Clin Pharm Therap 55(2):184, 1994.

35. Ransom J, Rogenes P, Field E, Wisniewski M, Pepsin P. Fluticasone propionate aqueous nasal spray increases mean total nasal airflow compared with astemizole or terfenadine. Ann Allergy Asthma Immunol 74:104, 1995.

36. Galant S, Lincourt WR, Rogenes PR, Field EA, Wisniewski M. Fluticasone propionate aqueous nasal spray versus antihistamines for sneezing and nasal itching. Ann Allergy Asthma Immunol 74:104, 1995.

37. Li J, Lyles K, Halstenson C, Dockhorn R, Howland W, Pobiner B, Field E, Kral K. Long-term safety study of fluticasone propionate aqueous nasal spray. Ann Allergy Asthma Immunol 74:58, 1995.

38. Ratner P, Scott C, Milwee S, Field E, Kral K. Effectiveness of fluticasone propionate aqueous nasal spray during three mountain cedar pollen seasons. Ann Allergy Asthma Immunol 74:58, 1995.

39. Alvarado C, Reed C, Gleich T, Field E, Pobiner B, Wisniewski M. Fluticasone propionate aqueous nasal spray reduces nasal eosinophils and cytokine activity of patients with allergic rhinitis. J Allergy Clin Immunol 95:193, 1995.

40. Dockhorn R, Field E, Harding S, Rogenes P, Pobiner B, Scott C, Kral K. Short- and long-term assessment of HPA axis effects of fluticasone propionate aqueous nasal spray (FP). J Allergy Clin Immunol 95:194, 1995.

41. Howland W, Field E, Harding S, Rogenes P, Pobiner B, Scott C, Milwee S. Fluticasone propionate aqueous nasal spray (FPANS) Is an anti-rhinitic with topical but not systemic activity. J Allergy Clin Immunol 95:196, 1995.

42. Falcoz C, Mackie AE, Moss J, Horton J, Ventresca GP, Brown A, Field E, Harding SM, Wire P, Bye A. Pharmacokinetics of fluticasone propionate inhaled from the Diskhaler and the Diskus after repeat doses in healthy subjects and asthmatic patients. J Allergy Clin Immunol 99:S505, 1997

# APPENDIX B

# DECLARATION OF MIROSLAV BACKONJA, M.D.

1.      I am a Professor of Neurology, Anesthesiology, and Rehabilitation Medicine at the University of Wisconsin-Madison. I am also a Clinical Trials Investigator in the area of neuropathic pain.

2.      In addition to being an educator and researcher, I am a clinical practitioner with board certifications in Neurology and Pain Medicine, practicing in Madison and Mauston, Wisconsin. I have treated thousands of patients in my more than twenty years of practice. Approximately 80% of my time is spent treating patients, and the remainder on clinical and scientific research. I also serve on the editorial boards of *Pain, Journal of Pain, Clinical Journal of Pain, European Journal of Pain* and *Pain Medicine*, and as a reviewer by invitation on a regular basis for an additional dozen or more journals.

3.      Between July 1996 and March 1997 I was the lead investigator for a clinical trial of the use of gabapentin (Neurontin) for the treatment of diabetic peripheral neuropathy, a type of neuropathic pain (Study 945-210). The results of this study were presented at the October 1997 meeting of the American Pain Society, and an article based on this study was published in the December 1998 issue of the *Journal of the American Medical Association (JAMA)*, one of the most well-regarded peer-reviewed medical journals in the world. Although Parke-Davis provided drugs and compensation for study expenses to the investigators, neither I nor any of the other non-Parke-Davis employee  authors of the study were otherwise paid for our research, and I stand by the accuracy of the results reported in my article.

4.      Pain is a difficult and complex condition to treat, and clinical trials of pain medications are similarly complicated to design and administer.

5.      One issue that arises in clinical trials of pain medications is that the primary efficacy endpoint is often based on a subjective measure of pain, using tests such as the pain severity rating using an 11-point Likert-scale (recorded by patients in a daily diary), the Visual Analog Scale (VAS), or the Patient Global Impression of Change (PGIC). The 945-210 study used all of these measures, as well as others. Because the efficacy endpoints are based on subjective reporting of pain, we seek to ensure that patients remain blinded as to whether they are receiving placebo or active treatment (Neurontin). Unblinding may occur when patients receiving active treatment experience significantly greater or more frequent side effects than patients receiving placebo.

6.      In our study, patients receiving Neurontin experienced certain central nervous system side effects, dizziness and somnolence, at a greater rate than patients receiving placebo. In order to account for the possibility that unblinding had biased the efficacy analysis of our trial in some way, we performed an additional analysis in which we excluded the data for patients experiencing dizziness and somnolence and reanalyzed the efficacy data. Excluding the data from patients who reported dizziness resulted in a mean pain score between groups that differed by -1.19 (p=0.002) favoring gabapentin. Excluding the data from patients who reported somnolence yielded a difference in mean pain score between groups of -0.81 (p=0.03), also favoring gabapentin. Thus, we concluded that inclusion of patients who experienced these central nervous system adverse effects in the original efficacy analysis did not account for the overall efficacy seen in the trial.

2

7.      Our study design and methods, including with regard to the possibility of unblinding, were presented transparently to and reviewed by the reviewers at *JAMA*, who accepted the article for publication. Likewise, the article describes in detail the analysis we performed to determine that unblinding did not account for the overall efficacy seen in the trial.

8.      I have reviewed a copy of the expert report of Dr. Nicholas Jewell, who I understand has been hired by plaintiffs in litigation against Pfizer and Warner-Lambert relating to the marketing of Neurontin. Dr. Jewell is not an expert on pain research, nor is he a clinician focusing on the treatment of pain. As discussed above, the criticisms that he levels at our study were already fully addressed by the analysis my co-authors and I conducted after discussion with the reviewers at *JAMA*, which concluded that unblinding *could not* explain our efficacy results. Furthermore, based on my experience as both a study author and a journal referee, it is possible to level *post hoc* criticisms based on statistical reanalysis at almost any study (and, in this case, Dr. Jewell does so by reference to articles published in 2002, years after our study was complete). Such criticisms, however, do not provide a basis to disregard prior work that was conducted carefully, using then-current state-of-the-art design, and which appropriately accounted for the issues raised by the criticisms. Instead, such questioning simply generates the new hypotheses that provide the basis for future studies. For all of these reasons, Dr. Jewell's litigation analysis does not lead me to question my judgment, the judgment of my co-authors, and the judgment of the reviewers at *JAMA* about the validity of the conclusions presented in the published study of the 945-210 trial.

9.      My conclusions in this regard are further supported by the fact that Neurontin continues to be widely accepted by both patients and prescribers as a first-line treatment for neuropathic pain. Prior to the introduction of Neurontin, physicians had much more limited

3

choice in medications to treat neuropathic pain; many of those medications were cruder and more difficult to use than Neurontin. Neurontin, by contrast, is a safe and effective treatment for neuropathic pain. A whole field of research has grown up around the study of gabapentinoids for better treatment of such pain.

10. Because I am a researcher and educator, I am frequently invited by scientific committees and others to make presentations.

11. The presentation I gave at the Fourth International Conference on Mechanisms and Treatment of Neuropathic Pain was a presentation of the results of the very studies on gabapentin and neuropathic pain that led to Neurontin's approval for treatment of nerve pain that follows shingles in adults (postherpetic neuralgia). I stand by the accuracy and completeness of all conclusions I expressed at the meeting. I was not paid for my presentation. The organizers of the meeting reimbursed me in the form of an honorarium for time away from clinical activities and for expenses related to my trip to the meeting.

12. I have served as a consultant to Parke-Davis, Pfizer and other pharmaceutical companies because I believe it is important for manufacturers – and other members of the scientific community – to conduct research with the assistance of qualified researchers to increase our scientific understanding of medicines and their effects. For the same reason, I have previously and continue to participate in studies with various pharmaceutical companies.

13. Neither Parke-Davis nor Pfizer ever pressured me about the content of my presentations or articles, or about the results of my studies. If they or any company ever tried to inappropriately influence the interpretation of the results of my research, that would be the end of

4

my relationship with that company.  If I make a statement, it is because I have a good reason to say it based solely on data and my scientific and clinical experience.

14.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___10___ day of ___DEC___, 2008

_____
Dr. Miroslav Backonja

5

# APPENDIX C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
---------------------------------- x
                                    :
In re:  NEURONTIN MARKETING AND     :
        SALES PRACTICES LITIGATION  :
                                    :
---------------------------------- x
                                    :
THIS DOCUMENT RELATES TO:           :
                                    :
---------------------------------- x
                                    :
HARDEN MANUFACTURING                :
CORPORATION, et al. v. PFIZER INC. and :
WARNER-LAMBERT COMPANY.             :
                                    :
---------------------------------- x
                                    :
THE GUARDIAN LIFE INSURANCE         :
COMPANY OF AMERICA v. PFIZER INC. and :
                                    :
AETNA, INC. v. PFIZER INC.          :
                                    :
---------------------------------- x
```

MDL Docket No. 1629

Master File No. 04-10981
(D. Mass.)

Judge Patti D. Saris
Magistrate Judge Leo T. Sorokin

DECLARATION OF
DR. KENNETH GORSON

## DECLARATION OF DR. KENNETH GORSON

1.    I am a practicing neurologist in Boston, Massachusetts at St. Elizabeth's

Medical Center, which is affiliated with Tufts University School of Medicine. I am also

an Associate Professor of Neurology and Director of the Neuromuscular Service.

2.    I freely prescribed Neurontin, of my own volition, without any interaction

with the individuals from Pfizer or Warner-Lambert Company, as it relates to those

representatives recommending the use of Neurontin for off-label indications. In all of my

previous dealings with representatives from Warner-Lambert and Pfizer, no individual, at

any time, recommended that I use Neurontin for the management of neuropathic pain or any other indication.

3.      It has been my personal experience (as well as those of others as related to published literature) that Neurontin has been effective in some individuals for the management of neuropathic pain, be it from diabetes or other causes. I have been using Neurontin fairly regularly in my practice, and it has been my own personal experience that the drug is effective in treating neuropathic pain in approximately 40% of patients when higher dosages are used, upwards of 3600 mg per day. I have found that Neurontin in low doses generally is not effective in the treatment of neuropathic pain.

4.      I performed a randomized, controlled, double-blind study of low-dose Neurontin in the management of neuropathic pain in 40 patients with diabetes mellitus. The study was designed as a cross-over trial, with patients being equally allocated to placebo or active drug at the onset of the study. There was no single unified endpoint, rather four endpoints were used, specifically the McGill Pain Questionnaire, average visual analogue score ("VAS"), present pain intensity ("PPI") score, and summary of the number of patients who reported moderate or excellent pain relief, comparing Neurontin to placebo. Three of the four endpoints, specifically the VAS, PPI, and number of patients reporting moderate or excellent pain relief were not statistically significant when comparing the data from Neurontin to the placebo treated patients. In contrast, the mean change in the McGill Pain Questionnaire score was significantly greater in the Neurontin treated group compared to placebo. Therefore, one of the four endpoints of this study was positive. The conclusion of this study was that Neurontin did not appear to be

2

effective in the treatment of diabetic painful neuropathy in low doses.  Indeed, in other randomized controlled trials, Neurontin was shown to be statistically superior to placebo in the treatment of neuropathic pain from diabetes when used in higher doses, with an average dose required for benefit noted to be 1800 mg per day, in contrast to my study of 900 mg per day.

5.      I continue to use Neurontin on a regular basis for off-label indications for the management of neuropathic pain, because of my personal experience of its effectiveness as well as the numerous reports in the literature indicating efficacy, despite the ongoing litigation difficulties with Neurontin associated with off-label usage.

6.      I declare under penalty of perjury that the foregoing is true and correct. Executed on this 30 day of October, 2006.

Dr. Kenneth Gorson

3

# APPENDIX D

## DECLARATION OF EDUARD VIETA

1.  I am a Professor of Psychiatry and Director of the Bipolar Disorders Program of the Hospital Clinic at the University of Barcelona, Spain. I am also Director of Research at the Clinical Institute of Neuroscience at the University of Barcelona. I live and work in Spain and my first language is Catalan.

2.  Between April 5, 1999 and February 26, 2004, I was the lead investigator in a double-blind, randomized, placebo-controlled study of the prophylactic efficacy of adjunctive gabapentin in patients with bipolar disorder I and II. Parke-Davis, and later Pfizer S.A., provided funding to support this investigator-initiated study.

3.  In March 2006, the *Journal of Clinical Psychiatry* published the results from this study. The published manuscript, which I authored in English, reports that gabapentin was statistically significantly superior to placebo in the primary efficacy measure. It concludes that despite an apparent lack of acute efficacy, gabapentin may provide some benefits in the long-term care of patients with bipolar disorder.

4.  On October 6, 2008, a reporter from *The Wall Street Journal* contacted me in connection with a newspaper story that he was writing concerning this study. Implicit in the reporter's questions and his published newspaper story, which I understand were based on allegations made by plaintiffs in a lawsuit against Pfizer, was a challenge to my integrity as a clinician and author. I make this declaration to respond to that challenge and to address differences between my published manuscript in *Journal of Clinical Psychiatry* and the clinical study synopsis relating to this study, which the reporter provided to me.

5.  I am not being compensated in connection with preparing this declaration.

6. I alone was responsible for interpreting the study's data and for authoring the manuscript that the *Journal of Clinical Psychiatry* published. Pfizer statisticians may have assisted me in executing certain statistical analyses that I specifically requested, but Pfizer was not otherwise involved in drafting the manuscript. I was not paid by Pfizer or anyone else for my work on the study or authorship of the published manuscript.

7. There are certain differences between the published manuscript and the clinical study synopsis. Those discrepancies, however, either do not affect the study's results or they are the result of differences between the statistical approach the clinical study synopsis reflects and the one I employed after applying standard definitions of "Intention-to-Treat analysis" and introduction of relevant covariates that may get unevenly split after randomization, and which were clearly disclosed in the publication. Despite these differences, I believe that the published manuscript accurately reflects the study's results and neither I, nor anyone at Pfizer, manipulated or attempted to manipulate the study's results in any way.

8. The clinical study synopsis describes the study's primary efficacy parameter as the change in Clinical Global Impression of Severity (GCI-S) from baseline to month 12. The published manuscript describes the study's primary efficacy parameter as the Clinical Global Impression Scale for Bipolar Illness (CGI-BP-M). This difference is in name only. The severity of the disorder component to the CGI-BP-M, which the manuscript identifies as the primary outcome measure, is in fact identical to the CGI-S. The change in terminology had to do with the fact that in Spain we call the CGI-S for bipolar disorder as CGI-BP-M.

9.  The change in CGI-S at month 12 in the per-protocol population in the clinical study synopsis differs slightly from the change in CGI-BP-M at month 12 in the published article. This difference does not affect the statistical significance of the study results; the results in both the clinical study synopsis and the published article show that gabapentin was statistically significantly superior to placebo. I believe that the difference is the result of a covariate adjustment I made to account for a baseline difference in the number of prior episodes to randomization between the placebo and gabapentin groups. It is good statistical practice to introduce covariates if they happen to be unevenly distributed across treatment arms and they might have a potential impact on study results (which was not finally the case).

10. Some investigators incorrectly enrolled patients in the study who failed to meet the study's inclusion criteria because they were not in remission at study entry. Because these patients were not intended to be and should not have been enrolled in the study, I excluded them from the statistical analyses performed and did not consider them as part of the Intent-To-Treat ("ITT") population. We designed the study to include only those patients who were in remission at study entry in order to accurately assess the actual prophylactic effects of gabapentin and I believe that it was appropriate and necessary to exclude from the ITT population those patients who failed to satisfy the study's inclusion criteria. The article clearly explains this. It states that some patients who were initially enrolled had to be excluded because they were not in remission at study entry and that the analyses were performed on "the 25 patients with bipolar disorder *in remission who were randomly assigned.*"

11. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of December, 2008



Dr. Edward Victor

# APPENDIX E

## DECLARATION OF ROBERT GERNER, M.D.

1.      I am a practicing psychiatrist in Los Angeles, California.  I am also an Associate

Research Psychiatrist at the UCLA School of Medicine and Founder of the Pacific Institute for

Medical Research.

2.      In the late 1990s, I served as a member of the Gabapentin Bipolar Disorder Study Group.

In this capacity, I served as a co-investigator of a randomized, placebo-controlled, double-blind

study of adjunctive gabapentin in patients with a lifetime diagnosis of bipolar disorder (type 1)

and who were currently suffering from symptoms of either mania, hypomania, or a mixed state

despite ongoing therapy with lithium, valproate, or lithium and valproate in combination.  The

study was sponsored by the Parke-Davis Research Division of Warner-Lambert.

3.      The Group's goal from the study's outset was to publish and disclose the data regardless

of the results.  The results of the study were first disclosed to investigators in July 1998 by means

of a letter from Dr. Atul Pande of Warner-Lambert (the lead investigator) to all investigators.

The results of the study were then presented at the Third International Conference on Bipolar

Disorder, in June 1999, and the study manuscript, "Gabapentin in bipolar disorder: a placebo-

controlled trial of adjunctive therapy," was submitted for publication in July 1999 to *Bipolar

Disorders*, the official journal of the International Society of Bipolar Disorders.  Several months

later in November 1999 the editors of *Bipolar Disorders* accepted the manuscript for publication

and published the manuscript in September 2000.

4.      The data from the gabapentin bipolar disorder study were timely and appropriately

collected evaluated, and submitted for publication.  The process by which this study was

2764688v1

published, and the time taken from the treatment of the last patient to submission of a manuscript for publication (and eventual publication) were typical of other studies in which I've participated and comport with good scientific practice. To my knowledge, no person at Parke-Davis/Warner-Lambert ever sought to delay publication of the bipolar disorder study results. To the contrary, I recall that Dr. Pande and the other Parke-Davis/Warner-Lambert researchers worked diligently to disseminate the data to the medical and scientific community while adhering to good clinical practices.

5.      I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12 day of June, 2008.


Robert Gerner, M.D.

# APPENDIX F

## DECLARATION OF CAROL A. JANNEY, M.S.

1.      I am a doctoral candidate in Epidemiology at the University of Pittsburgh in Pittsburgh,

Pennsylvania, with a primary focus on mental health and physical activity.  As a graduate

research assistant, I am the principle investigator for a pilot study investigating the effects of

physical activity on rapid cycling or moderately depressed patients with bipolar disorder.  In

addition, I have been the lifestyle coach for patients with bipolar disorder and conducted

statistical analyses for physical activity interventions in overweight individuals.  A copy of my

curriculum vitae is attached.  Exhibit 1.

2.      From 1997 to 1999, I worked as a biostatistician in the Clinical Research, CNS-

Biometrics Department at Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan.  From

1996 to 1997, I worked as a contract biostatistician in the Clinical Research, CNS-Biometrics

Department at Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan under the

supervision of a Parke-Davis biostatistician.

3.      One of my responsibilities as a biostatistician (contract and Parke-Davis) was a double-

blind, placebo-controlled clinical study that evaluated adjunctive gabapentin in patients with a

lifetime diagnosis of bipolar disorder (type 1) and who were currently suffering from symptoms

of either mania, hypomania, or a mixed state despite ongoing therapy with lithium, valproate, or

lithium and valproate in combination.   When I became a Parke-Davis employee in 1997, I

became the lead biostatistician for this study.

4.      The complete study results and analyses were finalized in March 1999.  Exhibit 2,

Research Report 720-04174, Gabapentin Adjunctive Treatment in Patients with Bipolar Disorder

(March 26, 1999).

1

5.      The safety results from the bipolar disorder study showed that gabapentin was generally well-tolerated and that most adverse events were consistent with known side effects of gabapentin. Exhibit 2 at 6. The most common adverse events were somnolence and dizziness. Exhibit 2 at 6. There were no deaths during the study. Exhibit 2 at 6.

6.      The study did not find that gabapentin was effective as an adjunctive therapy in patients with bipolar disorder. Compared to the placebo treatment group, the Gabapentin treatment group did not experience greater improvements in mania symptoms as measured by the Young Mania Rating Scale or depressive symptoms as measured by the Hamilton Depression Rating Scale. Although both treatment groups experienced a reduction in mania symptoms, the decrease in mania symptoms was significantly greater for the placebo treatment group than the Gabapentin treatment group. Exhibit 2 at 9. Although speculative, adjustments in lithium dosing may have accounted for or contributed to the greater improvement in mania symptoms for the placebo treatment group compared to the Gabapentin treatment group. This hypothesis is tenable since more patients in the placebo treatment group had adjustments to their lithium dosing than the Gabapentin treatment group. Lack of compliance in taking Gabapentin may have biased the results by underestimating the difference in the reduction of mania symptoms between the two treatment groups. With or without the bias, the conclusions of the study would be 1) gabapentin was not an effective adjunctive treatment for mania symptoms and 2) a greater reduction in mania symptoms was observed among patients with bipolar disorder treated with placebo than those treated with gabapentin. There was no evidence that gabapentin caused a worsening of symptoms. Exhibit 2 at 8.

6.      As the lead biostatistician, I performed and/or supervised the analysis of this study. The planned and post-hoc analyses were performed in an efficient and timely fashion that 1)

2

enhanced the scientific quality of the research and 2) supported the dissemination of the study results as quickly as possible to the Gabapentin Bipolar Disorder Study Group and publication of the study results.

7.     The findings were summarized in a research article entitled "Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy." Exhibit 3, Atul Pande, et al. "Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy," 2 Bipolar Disorders 249-255 (2000).

8.     The manuscript, which I co-authored along with Atul Pande, M.D., John L. Werth, Ph.D., Jerri Crockatt, M.A., R.N., Georgia Tsaroucha, M.S.P.H. and Gabapentin Bipolar Disorder Study Group was submitted for publication in July 1999 to *Bipolar Disorders,* which is a peer-reviewed journal published by the International Society for Bipolar Disorders. Exhibit 3.

9.     Once a manuscript is submitted for publication, neither the authors nor the sponsor have control over its publication, including if and when the manuscript is actually published. The journal's editors determine if and when a manuscript is ultimately published, which was precisely the case with the gabapentin bipolar disorder study. The editors of *Bipolar Disorders* accepted the gabapentin manuscript for publication on November 22, 1999 and did in fact publish it several months later in 2000. Exhibit 3.

10.     The gabapentin bipolar disorder study results were analyzed and submitted for publication in accordance with good clinical and research practices.

11.     To my knowledge, no one at Parke-Davis/Warner-Lambert attempted to delay publishing the bipolar disorder data or acted improperly in any manner relating to any aspect of the study's dissemination to the medical and scientific community. It was always the intent and goal of all

3

2764688v3

the researchers involved, including me, to publish and disseminate the study results regardless of the findings.

12.     In summary, the results from the gabapentin bipolar disorder study were submitted for publication in a timely fashion.  To my knowledge, no one at Parke-Davis/Warner-Lambert tried to delay publishing the results from the bipolar disorder study.  In addition, my colleagues and I acted appropriately at all times and in accordance with good clinical and research practices in disseminating the study results to the medical and scientific community.

13.     I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 26 day of July, 2008.

Carol A. Janney, M.S.

# CAROL A. JANNEY

5835 Alderson St #13
Pittsburgh, PA 15217

Telephone (home): 507-271-0982
email (work):caj19@pitt.edu
email (home):nduku_janney@hotmail.com

EDUCATION   **PhD in Epidemiology** (Expected April 2009)
Focus: **Mental health and physical activity**
UNIVERSITY OF PITTSBURGH, Pittsburgh, PA

**Master of Science in Biostatistics** (May 1996)
UNIVERSITY OF MICHIGAN, Ann Arbor, MI

**Master of Science in Epidemiology** (September 1991)
**Master of Science in Exercise Science** (May 1991)
UNIVERSITY OF MASSACHUSETTS at Amherst, Amherst, MA

**Bachelor of Science in Nutritional Science** (August 1984)
CORNELL UNIVERSITY, Ithaca, NY

COMPUTER   Statistical analysis on PC, UNIX: **SAS, Splus, Egret.** Graphics:
SKILLS     **Sigmaplot, Splus.** Data management: **KeyEntry III, Excel.** Word
processing: **Word for Windows**

## PROFESSIONAL EXPERIENCE

2006-08 **Graduate Research Assistantship** – University of Pittsburgh, PA
Lifestyle coach for individuals with bipolar disorder. PI for pilot study investigating the effects
of physical activity on rapid cycling or moderately depressed patients with bipolar disorder.
Statistical analyses for physical activity interventions in obese and overweight individuals.

2003-   **Statistician III, Department of Biostatistics --**
2006    Mayo Foundation, Rochester, MN.
2001-   **Statistician II, Department of Biostatistics --**
2003    Mayo Foundation, Rochester, MN.
1999-   **Statistician I, Department of Biostatistics --**
2001    Mayo Foundation, Rochester, MN.
Statistical consultations with cancer epidemiologists; performed survival analysis using SAS and
S-Plus; performed sample size and power calculations; co-authored papers for publication;
prepared figures for publication and presentations; manager of data analysis team; mentored data
analysts and post-docs; interviewed candidates.

2002-   **Co-instructor introductory statistics course for nurse anesthetists --**
2006    Mayo Graduate School, Rochester, MN.
Eight lectures on descriptive statistics and linear regression.

CAROL A. JANNEY

1984-85  **Research Assistant** -- Center for Sports Medicine and Health Fitness, Peoria, IL. Conducted 14-week strength training studies in prepubescent males, administered graded exercise stress testing and underwater weighings for corporate physical and performance evaluations.

1983     **Student Teacher of Health and Home Economics** - - Penfield High School, Penfield, NY.

PUBLICATIONS

Mental Health
Janney CA, CR Richardson, RG Holleman, C Glasheen ,SJ Strath, MB Conroy, AM Kriska. Gender, mental health service use and objectively measured physical activity: data from the National Health and Nutrition Examination Survey (NHANES 2003-2004).  **Mental Health and Physical Activity** (In press).

Pande AC, DE Feltner, J Jefferson, J Davidson, M Pollack, MB Stein, RB Lydiard, R Futterer, P Robinson, M Slomkowski, E DuBoff, M Phelps, CA Janney, JL Werth.  Efficacy of the novel anxiolytic pregabalin in social anxiety disorder: a placebo-controlled, multicenter study. **Journal of Clinical Psychopharmacology**. 2004 Apr;24(2):141-9.

Pande AC, Crockatt JG, Janney CA, Werth J, Tsaroucha G, Gabapentin Bipolar Disorder Study Group.  Gabapentin in bipolar disorder, a placebo-controlled trial of adjunctive therapy. **Bipolar Disorder**. 2000;2:249-255.

Pande AC, JRT Davidson, JW Jefferson, CA Janney, DJ Katzelnick, RH Weisler, JH Greist, SM Sutherland.  Treatment of social phobia with Gabapentin: a placebo-controlled study. **Journal of Clinical Psychopharmology**. 1999;19:341-348.

Physical Activity
Janney CA, JM Jakicic. The influence of BMI and exercise on injuries and illnesses in overweight and obese individuals.  Submitted for publication.

Jakicic JM, BH Marcus, W Lang, C Janney. 24-month effect of exercise on weight loss in overweight women. **Archives of Internal Medicine**. (In press).

Washburn RA, KW Smith, AM Jette, CA Janney. The physical activity scale for the elderly (PASE): development and evaluation.  **Journal of Clinical Epidemiology**. 46: 153-162, 1993.

Washburn RA, AM Jette, CA Janney. Using age-neutral physical activity questionnaires in research with the elderly. **Journal of Aging and Health**. 2: 341-356, 1990.

Washburn RA, CA Janney, JR Fenster.  The validity of objective physical activity monitoring in older individuals. **Research Quarterly**. 61:114-117, 1990.

Weltman A, S Tippett, C Janney, K Strand, CB Rians, BR Cahill, FI Katch.  Measurement of isokinetic strength in prepubertal males. **The Journal of Orthopaedic and Sports Physical Therapy**. 9:345-351, 1988.



# CAROL A. JANNEY



PUBLICATIONS (continued)

Cerhan JR, KE Anderson, CA Janney, CM Vachon, TE Witzig, TM Habermann.  Association of aspirin and other non-steroidal anti-inflammatory drug use with incidence of non-Hodgkin lymphoma.  **International Journal of Cancer**. 2003:106:784-788.

Pande AC, JG Crockatt, DE Feltner, CA Janney, WT Smith, R Weisler, PD Londborg, RJ Bielski, D Zimbroff, JRT Davidson, M Liu-Dumaw.  Pregabalin in generalized anxiety disorder: a placebo-controlled trial.  **American Journal of Psychiatry**. 2003:160(3):533-540.
Parker AS, JR Cerhan, CA Janney, JC Cheville.  High expression levels of the insulin-like growth factor-I receptor predict poor survival among female clear-cell renal cell carcinomas.  **Human Pathology**.  2002:33:801-805.

Cerhan JR, CM Vachon, TM Habermann, SM Ansell, TE Witzig, PJ Kurtin, CA Janney, W Zhang, JD Potter, TA Sellers, AR Folsom. Hormone replacement therapy and risk of non-Hodgkin lymphoma and chronic lymphocytic leukemia. **Cancer Epidemiology, Biomarkers & Prevention**. 2002:11:1466-71.

Cerhan JR, CA Janney, CM Vachon, TM Habermann, NE Kay, JD Potter, TA Sellers, AR Folsom. Anthropometric characteristics, physical activity, and risk of non-Hodgkin's lymphoma subtypes and B-cell chronic lymphocyctic leukemia: a prospective study. **American Journal of Epidemiology**. 2002;156:527-35.

Olson JE, CA Janney, RD Rao, JR Cerhan, PJ Kurtin, D Schiff, RS Kaplan, BP O'Neill.  The continuing increase in the incidence of primary central nervous system Non-Hodgkin Lymphoma: A Surveillance, Epidemiology and End Results (SEER) analysis.  **Cancer**. 2002;95:1504-10.

Calhoun ES, RM McGovern, CA Janney, JR Cerhan, SJ Iturria, DI Smith, BS Gostout, DH Persing.  Host genetic polymorphism analysis in cervical cancer.  **Clinical Chemistry**. 2002:48:8:1218-1224.

Olson JE, JR Cerhan, CA Janney, KE Anderson, CM Vachon, TA Sellers.  Postmenopausal cancer risk after self-reported endometriosis in the Iowa Women's Health Study.  **Cancer**. 2002;94:1612-18.

Vachon CM, PJ Mink, CA Janney, TA Sellers, JR Cerhan, L Hartmann, AR Folsom. Association of parity and ovarian cancer risk by family history of breast and/or ovarian cancer in a population-based study of postmenopausal women. **Epidemiology**. 2002;13:66-71.

Sowers MF, D Zhang, BW Hollis, B Shapiro, CA Janney, M Crutchfield, MA Schork, F Stanczyk, J Randolph. Role of calciotrophic hormones in calcium mobilization of lactation. **American Journal of Clinical Nutrition**. 1998;67:284-91.

Sowers MF, D Zhang, CA Janney. Interpregnancy weight retention patterning in women who breastfed. **The Journal of Maternal-Fetal Medicine.** 1998;7:89-94.

Janney CA, D Zhang, MF Sowers.  Lactation and weight retention. **American Journal of Clinical Nutrition**. 1997;66:1116-24.

## CAROL A. JANNEY

GRANTS

Pilot Study: Physical activity as an intervention for rapid cycling or moderately depressed bipolar I and II individuals. Funds ($4000) from private donor and Dow Chemical Company. Fall 2007.

Mayo Clinic Rochester Catchment Area for Selected Cancers 1998-2003. Funds ($5220) requested from the Biostatistics Core of the Mayo Clinic Comprehensive Cancer Center Support grant: P30CA 15083. Spring 2005.

Analysis of long-term lymphoma survivors pilot study. Funds ($5220) allocated from the Biostatistics Core of the Mayo Clinic Comprehensive Cancer Center Support grant: P30CA 15083. Spring 2005.

COLLEAGUE RECOGNITION AWARD

In support of the CNS Technical Operations Team in 1997, especially your work on the 945-203 and Gabapentin pediatric submission

PUBLIC SERVICE AND COMMUNITY ACTIVITIES

NAMI (National Alliance for Mental Illness) Board of Directors for Olmsted County. 2002-2004
    Vice-President for 2003-4
    Finance Committee 2003-4
    Strategic Planner 2003-4
    Community Relations Committee 2002

# APPENDIX G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------ x
                                      :
In re:  NEURONTIN MARKETING AND       :
        SALES PRACTICES LITIGATION    :
                                      :
------------------------------------ x
                                      :    MDL Docket No. 1629
THIS DOCUMENT RELATES TO:             :
                                      :    Master File No. 04-10981
------------------------------------ x    (D. Mass.)
                                      :
HARDEN MANUFACTURING                  :
CORPORATION, et al. v. PFIZER INC. and :   Judge Patti D. Saris
WARNER-LAMBERT COMPANY.               :    Magistrate Judge Leo T. Sorokin
                                      :
                                      :    DECLARATION OF
------------------------------------ x    DR. NINAN T. MATHEW
                                      :
THE GUARDIAN LIFE INSURANCE           :
COMPANY OF AMERICA v. PFIZER INC. and :
                                      :
AETNA, INC. v. PFIZER INC.            :
                                      :
------------------------------------ x

## DECLARATION OF DR. NINAN T. MATHEW

1.      I am a practicing neurologist in Houston, Texas and the director of the Houston Headache

Center.  I am also a former president of the International Headache Society and the American

Headache Society.  I have published more than 170 scientific articles in headache and related

fields.

2.      In my practice, I have been contacted by sales representatives for Parke-Davis and later,

Pfizer, with respect to gabapentin.  None of the sales representatives from either company

encouraged me to use gabapentin off-label.  Nor did the sales representatives from either

company ever discuss off-label uses of gabapentin with me.

3.      I use gabapentin off-label in my practice based upon my own experiences with the drug

and the experiences of other clinicians, as recorded in peer-reviewed journals. Especially for

difficult to treat conditions, or conditions for which there is no FDA indicated treatment, off-

label prescribing by doctors is logical and common. Off-label use, in my experience, is driven

by physician use, not company promotion.

4.      In 1996 or 1997, I was approached by Parke-Davis to do a multi-center, placebo

controlled study on the use of gabapentin for migraine prophylaxis. The study consisted of a

four week, single blind placebo period followed by a 12 week, double-blind treatment period.

Our study concluded that gabapentin is an effective prophylactic agent for patients with migraine

and that gabapentin is generally very well tolerated with mild to moderate dizziness and

somnolence the most common side effects.

5.      The controlled, clinical trial we completed was of the quality and scientific rigor the Food

and Drug Administration demands when considering the approval of a new drug based upon two

controlled, scientifically valid studies demonstrating efficacy.

6.      The findings of our study were published in the February 2001 edition of the peer-

reviewed journal, *Headache*. A true and correct copy of the article is attached here as Exhibit A.

7.      Parke-Davis never made any attempt to alter or edit the findings of the study, which

demonstrated a reduced number of migraines in patients receiving gabapentin compared with

those taking placebo. Parke-Davis pooled the data collected from all of the study centers and

distributed the data to the participating authors. The authors reviewed the data and the draft of

the study findings. The authors completed several rounds of revisions and edits to the article.

The published article reflects my thoughts and conclusions about the results of the study. This

2

process was substantially similar to the process that I have observed other pharmaceutical companies use in connection with other research.

8.    I was compensated by Parke-Davis for my work on the study, but not for the published article describing our study results.  This was also consistent with my experiences performing studies in conjunction with other pharmaceutical companies.

9.    For preparing this affidavit, I was compensated at an hourly rate of $650.  This rate reflects my average hourly earnings in my practice.

10.    I declare, under penalty of perjury, that the forgoing is true and correct.  Executed this 23 day of May, 2007.

Ninan T. Mathew

3

# APPENDIX H

**Documents Considered for Expert Report of Elizabeth A. Field, PhD**

**Academic Journals**

Backonja M, Beydoun A, Edwards KR, et al., Gabapentin for the symptomatic treatment of painful neuropathy in patients with Diabetes Mellitus. *Journal of the American Medical Association*, 1998;280:1831-6.

Mathew NT, Rapoport A., Saper J., et al. Efficacy of gabapentin in migraine prophylaxis, *Headache*, 2001; 41:119-28.

Vieta E, Goikolea JM, Martinez-Aran A, et al., A double-blind randomized, placebo-controlled, prophylaxis study of adjunctive gabapentin for bipolar disorder, *Journal of Clinical Psychiatry,* 2006; 67: 473-7

Low PA, Dotson RM, Editorial: The Treatment of Painful Neuropathy, *Journal of the American Medical Association,* 1998; 280:1863-4

Gorson KC. et al. Gabapentin in the treatment of painful diabetic neuropathy: a placebo controlled, double blind, crossover trial. *Journal of Neurology, Neurosurgery & Psychiatry*, 1999; 66(2): 251-2.

Pande AC, Crockatt JG, Janney CA, et al., Gabapentin in Bipolar Disorder: A Placebo-Controlled Trial of Adjunctive Therapy, *Bipolar Disorders*, 2000; 2: 249-255.

G.J. McCleane, Comment on: Serpell et al., Gapabentin in Neuropathic Pain Syndromes: A Randomised Double-Blind, Placebo Controlled Trial, *Pain*, 2003 103: 227.

M.G. Serpell, Gabapentin in Neuropathic Pain Syndromes: A Randomised, Double-Blind, Placebo-Controlled Trial, *Pain*, 2002; 99: 557.

Backonja M, Glanzman R, Gabapentin dosing for neuropathic pain: Evidence from randomized, placebo-controlled clinical trials, *Clinical Therapeutics*, 2003; 25: 81.

Gordh, Gabapentin in traumatic nerve injury pain: a randomized, double-blind, placebo-controlled, cross-over, multi-center study, *Pain*, 2008; 138:255

Wessely, P. et al., Preliminary Results of a Double Blind Study with the New Migraine Prophylactic Drug Gabapentin, *Cephalagia*, 1987; 7:477.

Wang PW, Santosa C, Schumacher M, Winsberg ME, Strong C, Ketter TA. Gabapentin augmentation therapy in bipolar depression, *Bipolar Disorders*, 2002; 4: 296.

Gomez-Perez FJ, Perez-Monteverde A, Nascimento O, Aschner P, Tagle M, Fichtner K, Subbiah P, Mutisya EM, Parsons B for the Latin American Diabetic Neuropathy Study Group, Gabapentin for the treatment of painful diabetic neuropathy: dosing to achieve optimal clinical response, *The British Journal of Diabetes and Vascular Disease*, 2004: 4(3): 173-178.

Dallocchio C, Buffa C, Mazzarello P, Chiroli S. Gabapentin vs. amitryptiline inpainful diabetic neuropathy: an open-label pilot study. *Journal of Pain and Symptom Management*. 2000; 20(4): 280-285.

Morello CM, Leckband SG, Stoner CP, et al. Randomized Double-blind Study Comparing the Efficacy of Gabapentin With Amitriptyline on Diabetic Peripheral Neuropathy Pain, *Arch Intern Med.* 1999;159:1931-37.

Caraceni A, Zecca E, Bonezzi C, Arcuri E. Yaya Tur R, Maltoni M, Visentin M, Gorni G, Martini C, Tirelli W, Barbieri M, De Conno F., Gabapentin for neuropathic cancer pain: a randomized controlled trial from the Gabapentin Cancer Pain Study Group, *Journal of Clinical Oncology*, 2004; 22(14): 2909-2917

Dickersin K, et al., Factors influencing publication of research results. Follow-up of applications submitted to two institutional review boards, *Journal of the American Medical Association*, 1992; 267:374.

Easterbrook PJ, et al., Publication Bias in Clinical Research, *Lancet*, 1991; 337:867.

Patsopoulos NA, Origin and funding of the most frequently cited papers in medicine: database analysis, *BMJ*, 2006, 332(7549):1061-4.

Mellegars, MA. et. al.  Gabapentin for Neuropathic Pain: Systematic Review of Controlled and Uncontrolled Literature, *Clin. J Pain*, 2001; 17(4): 284-295.

Carta MG, Hardoy MC, Hardoy MJ, et al., The clinical use of gabapentin in bipolar spectrum disorders, *Journal of Affective Disorders*, 2003; 75:83-91.

**Clinical Trials and Research Reports**
Backonja (945-210) – RR720-03908
Gorson
Vieta (945-291)
Pande (945-209) - RR720-04174
Mathew (945-220) – RR995-00074
Serpell (945-306) - RR430-00125
POPP (945-271) - RR945-271
Reckless (945-224) – RR720-04130
1032-001 – RR720-04378
1032-002 – RR720-04479
1032-003 – RR720-30044
1032-004 – RR720-04481
1035-001 – RR720-04455
1035-002 – RR720-00471
Wessely (879-200) - RR4301-00066
Caraceni (945-276)
Gomez-Perez (945-411) – RR720-30154
945-217 – RR995-00085
Final Study Report: Gabapentin Protocol A945-1008


**Plaintiffs' Expert Reports**
John Abramson, MD
Kay Dickersin, PhD

**Declarations**
Dr. Miroslav Backonja
Dr. Kenneth Gorson
Dr. Eduard Vieta
Dr. Ninan Mathew
Dr. Robert Gerner
Carol Janney

**Defense Expert Reports**
Dr. Shaw Bird
Dr. Rollin Gallagher
Dr. Alan Rapoport
Dr. Andrew Slaby

**Depositions**
Phil Magistro
Dr. Atul Pande
Leslie Tive
Lloyd Knapp
John Boris
Christine Grogan
John Marino
Allison Fannon
Robert Glanzman
Avanish Mishra
Stephen Valerio
Michael Vinegra
David Cooper

**Other Documents**
WLC_Franklin_0000240556-557
WLC_Franklin_0000100237
WLC_Franklin_0000100272-73
Pfizer_LLAMoreaux_0035656-62
Pfizer_LLaMoreaux_0036397
Pfizer_LLaMoreaux_0038148
Pfizer_SPiron_0006886
Pfizer_TMartin_0001964-5
Pfizer_RGlanzman_0040034
Pfizer_LeslieTive_0020946
Pfizer_LeslieTive_0014808-0014812
Pfizer_LeslieTive_0051701
Pfizer_LKnapp_0079460
Pfizer_MPierce_0000701
Pfizer_MPierce_0000733
Pfizer_LKnapp_0050502

Pfizer_LCastro_0005072
Pfizer_APande_0000714-729
NRE0014017037-39, 41
NRXE1012000901
NRXE1012000897
NRXE1011003376
Serpell, ICMTNP2002 (Poster)
http://www.psychiatrist.com/documents/authors.asp
http://www.psychiatrist.com/documents/infoforauthors.asp
http://www.pfizer.com/research/clinical_trials/clinical_trials.jsp


**Pleadings**
Third Amended Class Action Complaint
Third Amended Coordinated Complaint