# U.S. DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

IN RE NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION

CIVIL ACTION NO.: _____

United States District Court District of
Massachusetts
MDL Docket No. 1629
Civil Action No. 04-10981

## MOTION TO QUASH SUBPOENA *DUCES TECUM*

COMES NOW, Carol Janney, pursuant to Rules 26, 30 and 45 of the Federal Rules of

Civil Procedure, and moves to quash Plaintiffs' notice of the deposition and subpoena *duces

tecum*. In support of this Motion, your movant sets forth the following:

1.      This action arises out of a claims advanced by Kaiser Foundation Health Plan, Inc., and

Kaiser[1] Foundation Hospitals ("Kaiser") against Pfizer, Inc.,[2] in a multi-district litigation

(Multi-District Litigation") currently pending before the United States District Court for

the District of Massachusetts.[3]

2.      In 1993, Warner-Lambert received FDA approval to market in the United States a drug

called gabapentin under the brand name Neurontin;  Warner-Lambert did so through its

Parke-Davis division.

3.      Warner-Lambert was acquired by Pfizer, Inc., and the merged company continued to

market Neurontin.

---

[1]Kaiser Foundation Health Plan, Inc., is the parent company of and has brought this lawsuit on behalf of itself and its subsidiaries: (1) Kaiser Foundation Health Plan of Colorado; (2) Kaiser Foundation Health Plan of Georgia, Inc.; (3) Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; (4) Kaiser Foundation Health Plan of the Northwest; and (5) Kaiser Foundation Health Plan of Ohio.

[2]Warner-Lambert Company was acquired in June 2000 by Pfizer, Inc. This acquisition included Warner-Lambert's Parke-Davis division.

[3]*In re Neurontin Marketing and Sales Practices Litigation*, Civil Action No. 1:04-cv-10981-PBS, MDL No. 1629 (D. Mass)

5.      In the Multi-District Litigation, Kaiser has alleged, *inter alia*, that Pfizer, Inc., continued to market and promote Neurontin for off-label uses, while affirmatively delaying the release of studies which Kaiser contends brought the efficacy of Neurontin for such purposes into question.[4]

6.      By Order of July 19, 2007, Judge Saris, the presiding trial judge in the Multi-District Litigation set a closing date for fact discovery for this action for October 15, 2007. (Exhibit A, page 2).

7.      By Order of October 14, 2009, Judge Saris denied a requested extension for fact discovery except for very limited and inapplicable exceptions. (Exhibit B)

8.      On November 12, 2009, Judge Saris again ruled upon a motion seeking additional fact discovery, making clear that such discovery would only be permitted with respect to "**Any witnesses identified for the first time in summary judgment papers or on the witness list**." (Exhibit C, emphasis added).

9.      In direct defiance of Judge Saris' Orders, Kaiser nevertheless served a subpoena — on December 9, 2009 — on Carol Janney, a third-party witness located in the Western District of Pennsylvania, in an attempt to conduct additional fact discovery. (Exhibit D).

10.     Your Movant opposes the subpoena and seeks to have it quashed for the following reasons:

   a.   Said subpoena attempts to conduct fact discovery in defiance of Judge Saris' discovery order, fact discovery having been cut off in October 30, 2007, except for limited and inapplicable circumstances.

---

[4]The entirety of Kaiser's various allegations can be reviewed in In Re Neurontin Marketing and Sales Practices Litigation, U.S.Dist. Mass, Civil Action No. 04-10981, Docket ##29, 380, 583. The action includes the claims of third party payors, including Kaiser Health Plans Inc. and Kaiser Foundation Hospitals, to recover amounts paid for prescriptions of the drug of gabapentin and sold under the brand name "Neurontin."

1. Ms. Janney has long been known to Kaiser as one with personal knowledge of facts pertaining to Kaiser's allegations. Kaiser and its experts make allegations about the publication of information involving studies of gabapentin with bipolar disorder, including specific allegations about Dr. Pande's bipolar multicenter study and a resulting article.[5] Ms. Janney was the lead biostatistician on the study and a co-author of the article about which Plaintiffs and their experts complain. (See Exhibit E) Accordingly, Plaintiffs have known about Ms. Janney having direct knowledge pertaining to Plaintiff's allegations for many years.

2. Additionally, Ms. Janney is referred to in documents produced to Plaintiffs long ago about the study, as well as the article.

3. Additionally, a declaration of Carol Janney was provided to Plaintiffs as part of the expert report of Dr. Elizabeth Field in December 2008, nearly a year ago. (Exhibit F)

4. Carol Janney is referred to during Dr. Pande's deposition — conducted September 19-20, 2007 — and was named in documents used in that deposition.

5. Thus, Plaintiffs have long known that Ms. Janney was a person with knowledge about facts pertaining to Plaintiffs' and their experts' allegations, and there is no legitimate basis for Kaiser to subpoena Carol Janney or otherwise attempt to circumvent the Trial Court's November 12, 2009, Order prohibiting a deposition of someone such as Ms. Janney.

b. Said subpoena attempts to conduct fact discovery outside the time permitted by the Judge Saris without having obtained or even sought from that Court leave to conduct discovery beyond the Court's deadlines;

c. Said subpoena purports to impose upon your Movant an obligation to produce a wide range of documents and materials which are not practical to produce within the time permitted by the subpoena (Exhibit D, Attachment A), the subpoena having been served but 12 days prior to the date Kaiser scheduled for this deposition;

d. Your Movant is scheduled to begin a new 12-week course of chemotherapy, administered on a weekly basis, beginning December 17, 2009. While it is not certain how your Movant will respond to said treatments, your Movant has a substantial

---

[5]Atul C. Pande, et al., Gabapentin In Bipolar Disorder: A Placebo-Controlled Trial Of Adjunctive Therapy, Bipolar Disorders, 2000 (Exhibit E).

concern that such treatments may interfere with her ability to participate in the deposition at all, and is particularly concerned that such ill effects would interfere with her ability to collect the wide-range of documents sought by the subpoena on 12 days notice.[6]

e.   Your Movant, as a graduate research assistant, was the principle investigator for a pilot study investigating the effects of physical activity on certain adults with bipolar disorder. From 1996 to 1997, she worked as a contract biostatistician in the Clinical Research, CNS-Biometrics Department at Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan, under the supervision of a Parke-Davis biostatistician. From 1997 to 1999, she worked as a biostatistician in the Clinical Research, CNS-Biometrics Department at Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan. Her responsibilities as a biostatistician included analyzing and interpreting randomized clinical trials of gabapentin in adults with specific psychiatric diagnoses. As a Parke-Davis employee, she became the lead biostatistician for the gabapentin in bipolar disorder study. As part of her obligations attendant to performing services for Parke-Davis, your Movant signed various employment contracts which included confidentiality provisions. Responding to the subpoena would put your Movant to the task of attempting to obtain and review the terms of such confidentiality provisions and complying with terms, presently unknown to your Movant. Your Movant submits that such an exercise is unwarranted where, as here, it would simply be to assist a

---

[6]Your Movant is currently a doctoral candidate in Epidemiology at the University of Pittsburgh, with a primary focus on mental health and physical activity, and, additionally, is employed part-time (20 hours/week) as a Senior Research Principal at Western Psychiatric Institute and Clinic. As such, the Court can be assured that Ms. Janney has ample obligations concurrent with her course of treatment and is reluctant to make additional substantial commitments — such as compliance with wide-ranging and belated discovery requests such Kaiser attempts to advance in the instant matter.

litigant to engage in discovery outside the time permitted by the Massachusetts District Court.

11.    For these reasons, given Plaintiffs' decision not to take Ms. Janney's deposition when they were permitted to do so, the equities favor protecting Ms. Janney from the subpoena improperly issued by Plaintiffs, particularly absent leave to do so by the actual trial court.

WHEREFORE, and for the reasons set forth at greater length in the Brief filed in support of this Motion, Carol Janney moves this Honorable Court to issue an Order quashing the subpoena belatedly served on her by Kaiser.

ECKERT SEAMANS CHERIN & MELLOTT, LLC.

John H. Williams, Jr.
Pa.I.D. No. 59662

600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Phone:    (412) 566-6000
Fax:       (412) 566-6099

Attorney for Carol Janney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the within MOTION TO QUASH

SUBPOENA *DUCES TECUM* has been served on all parties, or their counsel of record,

this __15th__ day of December, 2009, as follows:


Elana Katcher, Esq.                     [ X ] Via Prepaid First Class United States Mail
Kaplan Fox & Kilsheimer, LLP            [ ] Via Overnight Courier Delivery
850 Third Avenue, 14th Floor            [ ] Via Facsimile Transmission:
New York, New York 10022                [ ] Via Hand Delivery
                                        [ X ] Via Email: ekatcher@kaplanfox.com
                                        [ ] Via Local Rule 5.5 re: e-filed documents



                                         _/s/ John H. Williams, Jr._
                                        John H. Williams, Jr., Esquire



## CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with counsel for the Kaiser with regard to the instant motion. I have provided to counsel for the Plaintiffs a copy of the within document in a form substantially identical to the forgoing, in an attempt to reach a resolution without court intervention. I have also spoken on two occasions in detail with counsel for Kaiser with regard to the issues raised in this Motion and its supporting brief without resolution. However, counsel for Plaintiffs has declined to withdraw the pending subpoena.

                                        John H. Williams, Jr., Esquire

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
IN RE NEURONTIN MARKETING, SALES          )
PRACTICES, AND PRODUCTS LIABILITY         )
LITIGATION                                )        MDL Docket No. 1629
_____    )        Master File No. 04-10981
                                          )
THIS ORDER RELATES TO:                    )        Judge Patti B. Saris
                                          )        Mag. Judge Leo T. Sorokin
ALL ACTIONS                               )
                                          )
_____    )

Discovery Order No. 13

July 19, 2007

SOROKIN, M.J.

The Court hereby makes the following rulings and orders on the matters before the Court

at the July 17, 2007 Motion Hearing.

1.      Sales and Marketing Plaintiffs' Motion to Extend Fact Discovery and For Leave to
        Take Additional Written and Deposition Fact Discovery (Docket # 776)

        Sales and Marketing plaintiffs request that the Court (1) extend the fact discovery period

by four months; (2) permit them to take an additional eight to ten depositions of defendant (above

and beyond the 30 depositions of defendant and the separate Rule 30(b)(6) depositions of

defendant); (3) permit them further written discovery in the form of motions to compel or follow-

up with defendant; (4) permit them to take depositions of third parties not previously noticed and

(5) push back all the subsequent dates in the schedule to accommodate the four month discovery

extension. Defendants oppose requests 2-4.

        The discovery in this MDL has been substantial.  The parties and, particularly, counsel

1

have worked hard to meet the deadlines established in the scheduling order. However, it is clear that a limited amount of additional time is required. Accordingly, the motion is <u>ALLOWED</u> in part, and <u>DENIED</u> in part. The period for the taking of depositions is extended from July 15, 2007 until October 15, 2007. During this time, the parties may conduct any already- noticed depositions. Plaintiffs may also depose third parties, whether or not they previously noticed those depositions. Plaintiffs' general request for eight to ten further depositions of the defendants' present or former employees is <u>DENIED</u>. The Court grants the extension with the expectation that counsel will meet the new deadlines.

The parties shall confer in order to resolve or to clarify any follow-up issues from the document discovery. Motions to compel arising out of the document discovery, if any, must be filed no later than the filing deadlines set for the September 20, 2007 Discovery Hearing, set forth below.

All of the deadlines in the Sales and Marketing Litigation are continued by a period of three months. Thus, the revised Sales and Marketing Schedule is as follows:

| | |
|---|---|
| Deadline for Filing Motions to Compel<br>    Re: Document Discovery | 09/06/07 |
| Close of Fact Deposition Period | 10/15/07 |
| Provision of Plaintiffs' Expert Reports: | 12/30/07 |
| Provision of Defendants' Expert Reports: | 01/30/08 |
| Provision of Rebuttal Reports: | 2/21/08 |
| End of Expert Discovery | 4/21/08 |
| Filing of Motions for Summary Judgment: | 5/21/08 |
| Opposition: | 6/21/08 |
| Reply: | 7/05/08 |

The Products Liability Plaintiffs sought no extension in the schedule pertaining to their cases, with the exception that they seek leave to complete Rule 30(b)(6) depositions of the

defendant which is granted.  Defendants oppose any schedule that would require simultaneous

fact and expert discovery.  The interests of judicial economy and efficient litigation management

do warrant a modest change in the Products Liability Schedule.  Thus, the Products Liability

Schedule is revised by approximately three weeks as follows.

| | |
|---|---|
| October 22, 2007 | Plaintiffs' Expert reports on general causation and the two designated Track One Cases. |
| November 12, 2007 | Deadline for plaintiffs to produce for deposition their designated experts. |
| December 3, 2007 | Deadline for defendants' expert reports regarding general causation and all remaining experts in the two designated Track One cases. |
| December 21, 2007 | Deadline for defendants to produce for deposition their designated experts. |
| January 11, 2008 | Motions for summary judgment on general causation and preemption, Daubert motions, and other dispositive motions pertaining to the two and ten designated Track One cases. |
| February 4, 2008 | Briefs in opposition due. |
| February 28, 2008 | Reply briefs due. |
| March 7, 2008 | Sur-Reply briefs due. |
| TBD | Hearing on summary judgment and Daubert motions. |

2.      Plaintiffs' Motion to Compel Cline Davis (Docket #772)

Plaintiffs request that the Court issue an Order to Show Cause why Sudler & Hennessey

and Cline Davis & Mann ("Non-Parties") should not be sanctioned for their refusal to comply

with this Court's December 20, 2006 Order requiring them to produce documents by February 1,

2007.  Plaintiffs request that the Court again order compliance by a date certain.  This Motion is

3

<u>DENIED WITHOUT PREJUDICE</u> in light of the fact that the documents sought by Plaintiffs

appear to have been made available, although Plaintiffs have not yet inspected the documents.

    3.    <u>Defendants' Motion for Protective Order Concerning Rule 30(b)(6) Deposition Notices (Docket # 780)</u>

This Motion is <u>DENIED WITHOUT PREJUDICE</u>.  The parties are to meet and confer to

resolve this matter.

    4.    <u>Defendants' Motion to Compel Response to One Interrogatory (Docket # 777)</u>

At the hearing, counsel for the Coordinated Plaintiffs indicated no objection to responding

to the Interrogatory as framed.  However, the parties dispute the appropriate deadline for a

response.  Defendants seek an immediate response, while Plaintiffs seek to defer answering until

they file expert reports.  The answer to the Interrogatory necessarily will involve expert opinion as

it asks Plaintiffs to state, by off-label use for each calendar year, the drug(s) that they contend

were "cheaper and more optimal" than Neurontin.  Thus, Plaintiffs shall supplement their response

to this Interrogatory no later than the date for serving their expert reports.  Defendants' Motion is

<u>ALLOWED IN PART</u> and <u>DENIED IN PART</u>.

5.    <u>Other</u>

The next Discovery Motion Hearing will be held on September 20, 2007 at 2:00 p.m.  All

motions shall be filed by September 6, 2007.  Oppositions must be filed by September 11, 2007,

and replies must be filed by September 17, 2007.


SO ORDERED.

/s/ Leo T. Sorokin

_____

United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
IN RE NEURONTIN MARKETING, SALES              )
PRACTICES, AND PRODUCTS LIABILITY             )
LITIGATION                                    )      MDL Docket No. 1629
_____     )      Master File No. 04-10981
                                              )
THIS ORDER RELATES TO:                        )      Judge Patti B. Saris
                                              )      Mag. Judge Leo T. Sorokin
ALL PRODUCTS LIABILITY ACTIONS                )
_____     )

PRODUCTS LIABILITY CASES SCHEDULING ORDER OCTOBER 2009

October 14, 2009

SOROKIN, M.J.

### 1. Massachusetts Products Trials

Judge Saris has scheduled trial in the Shearer case to commence March 23, 2010.

Counsel in Huberman v. Pfizer Inc., et al., 07-11336-PBS, and Dorsey v Pfizer Inc., et. al., No.

05-10639-PBS shall submit proposed schedules to complete discovery in these cases, equivalent

to the schedule governing the Shearer case by November 2, 2009, with the schedules to

commence no later than November 15, 2009.

### 2. Non-Massachusetts Products Cases

These cases (other than the Boone and Schwartz cases) are proceeding with core

discovery (depositions of prescribing physicians, sales representatives and plaintiff or plaintiff's

representative) to conclude by September, 2010. There are approximately 135 cases asserting

claims on behalf of the same number of plaintiffs in this group.

Regarding the Boone and Schwartz cases in which claims are asserted on behalf of

approximately 450 to 500 plaintiffs, counsel for the parties shall confer regarding how to complete core discovery in these cases. The parties shall submit their joint or competing proposals by November 2, 2009.

By the close of business December 1, 2009, counsel shall file a report informing the Court of the status of the core discovery in the non-Massachusetts products cases.

### 3. Defendants' Emergency Motion For an Order Restricting Communications with Treating Physicians (Docket #2093)

This Motion is DENIED.

### 4. Plaintiffs' Emergency Motion to Compel (Docket #2097)

In the Shearer case, 07cv11428-PBS, set for trial in March 2010, as part of the case specific fact discovery, Plaintiffs have filed a motion to compel certain additional discovery. The Court DENIES the motion as premature, given that plaintiffs have not submitted a formal discovery request. However, this denial is primarily procedural, as the failure is understandable in light of the fact that discovery had already closed.[1] The court hereby rules that plaintiffs are entitled to discovery of documents related to Dr. Keith Edwards, a person named as a potential witness by both sides of this litigation. Prior to Dr. Edwards's deposition, defendants shall produce the following: (1) any documents indicating the amount of payments made by defendants to, or on behalf of, Dr. Edwards from one year prior to the beginning of his treatment of Shearer up until the date of his deposition; (2) the purpose of these payments; and (3) all documents relevant to Dr. Edwards's marketing/promotion of Neurontin; attendance at Neurontin related continuing education seminars; or direct communications between defendants

---

[1] To clarify, the parties may serve case specific discovery requests in the individual cases proceeding through full discovery during the applicable time allowed for discovery. Requests to reopen discovery generally shall be made by way of motion as Plaintiffs did in another motion.

and Dr. Edwards for the period from one year prior to his treatment of Shearer's up until the conclusion of his treatment of Shearer.

In addition, the Court rules that plaintiffs are entitled to depose the district manager (or equivalent) who supervised the sales representatives that detailed Shearer's prescribing physicians. Defendants shall also produce the field coaching guide(s) or manual(s) applying to these interactions. This production must be made no later than November 15, 2009.

The request for discovery regarding Dr. Wohlberg is not case specific discovery. Accordingly, the Court addresses it in the context of the motion to reopen.

Accordingly, the Motion to Compel (Docket #2097) as construed above is DENIED for procedural reasons. However, defendants must produce the specific discovery Ordered by the Court by November 15, 2009.

### 5. Emergency Motion to Reopen Discovery

As a general matter, the Court is not reopening discovery. However, the Court recognizes that the scientific understanding of Neurontin continues to develop and that the litigation of most of the MDL continues in either the post-discovery stage or the case specific discovery stage. With this context in mind, I turn to the specific discovery requests Plaintiffs have made.

The request to reopen and revise the cutoff date for discovery to the latest date of sustained injury by a plaintiff is DENIED.

The request for discovery into the settlement agreement involving Bextra is DENIED. However, to the extent defendants possess documents, up to the date of the Bextra settlement, regarding the efficacy or side effects of Neurontin not previously produced, they shall produce the documents within forty-five days.

The request for discovery into the FDA label change is ALLOWED. The parties shall

confer and agree upon the discovery to occur.  In the absence of an agreement, the parties shall

file a joint report stating any discovery to which the parties agree as well as the parties competing

positions regarding disputed discovery.  This report shall be filed by the close of business on

October 23, 2009.

The request for discovery of the in-house work, analyses, files and documents upon

which Dr. Christopher Wohlberg relied or considered for his presentations to the FDA on

January 31, 2008, June 2, 2008 and July 10, 2008 is ALLOWED.  Plaintiffs may depose Dr.

Wohlberg for no more than one day regarding these matters.


SO ORDERED.


/s/ Leo T. Sorokin
LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
IN RE NEURONTIN MARKETING AND   )
SALES PRACTICES LITIGATION      )
_____ )   MDL DOCKET NO. 1629
                                )   CIVIL ACTION NO. 04-10981
THIS DOCUMENT RELATES TO:       )
 ALL ACTIONS                    )
                                )
_____ )
```

**PROCEDURAL ORDER**

November 12, 2009

Saris, U.S.D.J.

After a review of the various proposed trial plans, the
Court rules as follows:

1.  The trial in the action brought by coordinated plaintiff
Kaiser will begin on February 22, 2010.

2.  Each side will have 28 trial hours for direct
examination, cross-examination, re-direct and re-cross.  Short of
Murphy's law, the four-week trial (9:00 a.m. to 1:00 p.m.) will
end March 19, 2010.

3.  With this timing in mind, the list of trial witnesses
and the expected amount of time for direct examination shall be
filed on November 23, 2009.

4.  The Court denies Pfizer's request to re-depose
witnesses.  Any witnesses identified <u>for the first time</u> in
summary judgment papers or on the witness list may be deposed by
December 22, 2009.  Any witness on the list who was already
identified in a court filing, document or deposition prior to the

discovery deadline but not deposed may not be deposed during this time period.  The time period for each new witness is seven hours.

5.  All motions in limine (including <u>Daubert</u> motions) shall be filed by January 8, 2010.  All oppositions shall be filed by January 22.

6.  No more than 10 motions in limine shall be filed and all memoranda are limited to 20 pages in length.  Each motion in limine shall only address one issue.  In other words, the cap on motions shall not be circumvented by subparts.

7.  The final pretrial conference and hearing on the motions in limine shall take place on January 28, 2010 at 2:00 PM and January 29, 2010 at 2:00 PM.

8.  The Court will permit the parties to film a witness's testimony for use in subsequent trials.

9.  In addition, the Court will issue special jury instructions on fact issues so that the findings will have preclusive effect on subsequent litigation.  The Court encourages counsel for Aetna and Guardian to take part in litigating the cross-cutting scientific issues.  Counsel shall explore options for resolving all cross-cutting issues through the Kaiser trial.

10.  Given the trial date of February 22, 2010, counsel shall confer to set deadlines for deposition designations.  If there are objections which are not resolved after consultation, a transcript shall be filed with the disputed portion highlighted

and a brief statement of the reason for the objection.  I do not
have time to review hundreds of objections.

11.  A joint pretrial memorandum, trial briefs, proposed jury
instructions, jury questionnaires, and voir dire questions shall
be filed by February 15, 2010.  In addition, plaintiff shall
inform defendant about the first witness as well as exhibits
likely to be introduced through that witness.




                                   S/PATTI B. SARIS
                                   United States District Judge

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

### IN RE NEURONTIN MARKETING AND
### SALES PRACTICE LITIGATION

## SUBPOENA IN A CIVIL CASE

MDL Docket No. 04-MDL-1629
Master File No. 04-10981 [D. Mass.]

TO:
Carol A. Janney
5835 Alderson St #13
Pittsburgh, PA 15217

☐ YOU ARE COMMANDED to appear in the UNITED STATES DISTRICT COURT at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

X YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. The deposition will be recorded stenographically and by videotape.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Specter Specter Evans & Manogue, P.C. | December 21, 2009 |
| 436 Seventh Avenue, The 26th Floor Koppers Building | at 9:00 A.M. |
| Pittsburgh, PA 15219 | |

X YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list of documents or objects): **SEE ATTACHMENT A**

| PLACE | DATE AND TIME |
|---|---|
| Specter Specter Evans & Manogue, P.C. | December 21, 2009 |
| 436 Seventh Avenue, The 26th Floor Koppers Building | at 9:00 A.M. |
| Pittsburgh, PA 15219 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *E. Katche* | December 8, 2009 |
| Attorney for Plaintiffs | |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Elana Katcher, Esq.
Kaplan Fox & Kilsheimer, LLP
850 Third Avenue, 14th Floor
New York, New York 10022 (212) 687-1980

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                      DATE

SIGNATURE OF SERVER

_____

ADDRESS OF SERVER

_____

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court from which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2)(A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## **Attachment A**

The deponent is required to bring the following documents and things with her to the deposition and make them available for the purposes of inspection and copying:

1.    Your most recent curriculum vitae.

2.    All documents, records, correspondence, email, notes, and other materials pertaining to Neurontin.

3.    All documents, records, correspondence, email, notes, and other materials you created, reviewed, collected, or with which you were furnished in preparation for this deposition.

4.    All correspondence, including but not limited to emails, between you and Pfizer Inc., or its counsel, employees, former employees, consultants, retained experts, or agents, pertaining to Neurontin (gabapentin) or any clinical trial conducted concerning Neurontin (gabapentin).

5.    All correspondence, including but not limited to emails, between you and Atul Pande pertaining to Neurontin (gabapentin) or any clinical trial conducted concerning Neurontin (gabapentin).

6.    All correspondence, including but not limited to emails, between you and Elizabeth Field pertaining to Neurontin (gabapentin) or any clinical trial conducted concerning Neurontin (gabapentin).

7.    All documents, records, correspondence, emails, notes, and other materials you created, reviewed, collected, or with which you were furnished in connection with the Declaration of Carol A. Janney, M.S. dated July 26, 2008, which was attached to the Declaration and Expert Report of Elizabeth A. Field, PhD, including all drafts and outlines of said Declaration.

.2/9/2009 9:20 AM  FROM: Civil Action Group Civil Action Group, Ltd.  TO: +1 (412) 793-8282  PAGE: 004 OF 004

8.     All notes of any conversation involving you and Pfizer Inc., or its counsel, employees, former employees, consultants, retained experts, or agents, pertaining to Neurontin (gabapentin) or any clinical trial conducted concerning Neurontin (gabapentin).

9.     All notes of any conversation involving you and Atul Pande pertaining to Neurontin (gabapentin) or any clinical trial conducted concerning Neurontin (gabapentin).

10.     All notes of any conversation involving you and Elizabeth Field pertaining to Neurontin (gabapentin) or any clinical trial conducted concerning Neurontin (gabapentin).

Bipolar Disord (3 Pt 2)
Sept
Bipolar Disorders 2000: 2: 249–255
Printed in Ireland. All rights reserved

Copyright © Munksgaard 2000
BIPOLAR DISORDERS
ISSN 1398-5647

# Original Article

# Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy[1]

Pande AC, Crockatt JG, Janney CA, Werth JL, Tsaroucha G., Gabapentin Bipolar Disorder Study Group. Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy. Bipolar Disord 2000: 2: 249–255. © Munksgaard, 2000

***Objectives:*** To assess efficacy and safety of gabapentin in the treatment of bipolar disorder.

***Methods:*** This was a double-blind, placebo-controlled trial of adjunctive gabapentin (dosed flexibly between 900 and 3600 mg/day). Patients with a lifetime diagnosis of bipolar disorder (type I), and who were currently suffering from symptoms of either mania, hypomania or a mixed state despite ongoing therapy with lithium, valproate, or lithium and valproate in combination were eligible for inclusion. The primary efficacy measures were the baseline to endpoint change in total score on the Young Mania Rating Scale (YMRS) and the Hamilton Depression Rating Scale (HAM-D).

***Results:*** Both treatment groups had a decrease in total YMRS from baseline to endpoint, but this decrease was significantly greater in the placebo group (−9) than the gabapentin group (−6) (p < 0.05). No difference between treatments was found for the total score on the HAM-D. Secondary efficacy measures were not different between treatment groups. More patients in the placebo group had changes made to their ongoing lithium therapy (n = 12) compared to the gabapentin group (n = 4). When these patients are removed from the efficacy analysis, the YMRS treatment difference still favors placebo, but is no longer statistically significant. Based on gabapentin plasma levels at termination, some patients did not take the study drug as prescribed.

***Conclusions:*** The findings of this study did not demonstrate that gabapentin is an effective adjunctive treatment when administered to outpatients with bipolar disorder.

**Atul C Pande, Jerri G Crockatt, Carol A Janney, John L Werth, Georgia Tsaroucha and Gabapentin Bipolar Disorder Study Group[2]**

Parke-Davis Pharmaceutical Research, Division of Warner-Lambert Company, Ann Arbor, MI 48105, USA

Key words: bipolar disorder – clinical trial – gabapentin – mania – placebo-controlled – trial methods

Received 22 July 1999, revised and accepted for publication 22 November 1999

Corresponding author: Atul C Pande, Parke-Davis Pharmaceutical Research, Division of Warner-Lambert Company, 2800 Plymouth Road, Ann Arbor, Michigan 48105. Fax: +734 622 5100. e-mail: atul.pande@wl.com

[1] This study was funded by the Parke-Davis Research Division of Warner-Lambert Company.
[2] The following are members of the Gabapentin Bipolar Disorder Study Group: L. Altshuler, MD and R. Gerner, MD, Los Angeles. CA; C.L. Bowden, MD and L. Rhodes, MD, San Antonio, TX; J.R. Calabrese, MD and M. Shelton, MD, PhD, Cleveland, OH; D.L. Dunner, MD and H. Hendrickson, MD, Seattle, WA; L. Gyulai, MD, Philadelphia, PA; R. Hirschfeld, MD, Galveston, TX; G.B. Kaplan, MD, Providence, RI; T. Ketter, MD, Stanford, CA; R.B. Lydiard, MD, PhD, Charleston, SC; S.L. McElroy, MD and P.E. Keck, Jr., MD, Cincinnati, OH; G. Sachs, MD, Boston, MA; P. Suppes, MD, PhD, Dallas, TX; J. Zajecka, MD, Chicago, IL; C. Zarate, MD, Belmont, MA.

The treatment of bipolar disorder has changed considerably in the past decade. Whereas lithium was the mainstay of treatment through most of the 1970s and 1980s, the role of anticonvulsants is now firmly established and widely practiced. Anticonvulsant drugs were originally used mainly as adjuncts to lithium, but valproate is now commonly used as first-line therapy (1). Even though the acceptance of valproate and carbamazepine by clinicians has expanded the treatment options for patients, a substantial proportion of patients responds inadequately to available drug treatments.

249

Pande et al.

Once patients prove resistant to treatment with lithium, valproate, or carbamazepine, given alone or in combination, further treatment is associated with a diminishing likelihood of response. Additionally, many patients are unable to adhere to these treatments because of intolerance or the persistence of symptoms. It is not surprising, then, that in long-term follow-up studies, more than half of patients have a poor outcome (2).

In the past few years, several reports have described improvement in patients with bipolar disorder treated with the anticonvulsant gabapentin in addition to standard therapies (3–8). These reports were predated by the observation of beneficial effects of gabapentin on mood and anxiety symptoms in studies of gabapentin as add-on therapy for patients with epilepsy (9). Based on these observations, we conducted a study to test the efficacy of adjunctive gabapentin in patients with bipolar disorder.

## Patients and methods

This study was carried out at 14 centers in the USA. The study sample consisted of outpatients (n = 117) of either gender, aged 16 years or older. Patients were required to have a diagnosis of bipolar I disorder based on DSM-IV criteria with manic/hypomanic or mixed symptoms. A structured clinical interview was not required for diagnosis. In accordance with the Declaration of Helsinki and Good Clinical Practice guidelines, participating patients signed a written informed consent, approved by the Institutional Review Board at each center. To be included in this study, patients had to meet criteria for a lifetime diagnosis of bipolar disorder (type I) and score $\geq 12$ on the Young Mania Rating Scale (YMRS) at the initial clinic visit, despite ongoing therapy with lithium, valproate or lithium and valproate in combination. Patients were required to have a plasma lithium level of $\geq 0.5$ mEq/L, or a plasma valproate concentration of $\geq 50$ μg/mL. Patients were excluded if they suffered from uncontrolled medical illnesses, met criteria for a current diagnosis of other DSM-IV Axis I disorders, or if they were taking any medication other than lithium and/or valproate that could alter the assessment of efficacy.

The study began with a 2-week, single-blind, placebo lead-in, during which the doses of lithium and/or valproate could be adjusted to the clinician's satisfaction and the minimum threshold concentrations mentioned above could be obtained. If patients continued to meet entry criteria at the end of the placebo lead-in, they were randomized to

double-blind treatment with either gabapentin (dosed flexibly between 600 and 3600 mg/day, given t.i.d.) or placebo for 10 weeks. After randomization, the doses of lithium and valproate were required to be held steady unless dose changes were required to ensure patient safety. Patients were evaluated at weekly visits for the first 4 weeks after randomization, and biweekly for the next 6 weeks. Efficacy and safety assessments were performed during each visit according to a predetermined schedule. The efficacy assessments included the YMRS (10), Hamilton Depression Rating Scale (11) (HAM-D), Hamilton Anxiety Rating Scale (12) (HAM-A), Clinical Global Impression of Severity (CGIS) and Clinical Global Impression of Change (CGIC). Patients also performed self-assessments using the internal state scale (ISS) (13), Life Chart for Recurrent Affective Illness (Life Chart) (14) and the SF-36 Quality of Life Questionnaire (15). Safety was assessed through monitoring of vital signs, laboratory assessments, and spontaneously reported adverse events.

The efficacy analyses were carried out on the intent-to-treat (ITT) population that included all randomized patients who received at least one dose of study medication. Change in each efficacy score was calculated by subtracting the baseline score from endpoint score. For all analyses, endpoint was defined as the week-10 (termination visit) score for patients who completed treatment or the last available post-randomization score (last observation carried forward, LOCF) for patients who withdrew from the study.

All analyses were performed using SAS 6.12 (16) with a significance level of 0.05 (two-tailed).

Analysis of covariance (ANCOVA) was performed to compare gabapentin to placebo in reducing the symptoms of bipolar disorder for all efficacy assessments except for the CGIC and ISS responders. In the ANCOVA models, the dependent variable was the efficacy change score, with treatment and center as the independent variables, and baseline score as the covariate. Assumptions underlying the models were examined. ISS responders were defined as patients scoring $\geq 125$ on the wellbeing subscale, and $< 200$ on the activation subscale. CGIC responders were defined as patients whose overall status was rated as 'much improved' or 'very much improved'. The differences in response rates between treatment groups for CGIC and ISS responders were assessed by Cochran–Mantel–Haenszel $\chi^2$ analysis stratified by center.

## Results

The ITT population for this study comprised of 117 patients randomized, 114 of whom had a post-randomization observation on either placebo (n = 59) or gabapentin (n = 55). More than half of the patients completed the study; 64% of placebo-treated and 53% of gabapentin-treated patients completed the 10-week study. A total of 12 patients withdrew due to adverse events, seven gabapentin-treated and five placebo-treated.

Table 1. Characteristics of ITT population

| Characteristic | Placebo n = 59 | Gabapentin n = 58 |
|---|---|---|
| Gender, n (%) | | |
| Men | 32 (54) | 29 (50) |
| Women | 27 (46) | 29 (50) |
| Age (years) | | |
| Mean (SD) | 38.2 (10.5) | 40.7 (9.4) |
| Range | 17–73 | 17–66 |
| Disposition | | |
| Withdrawn, any reason, n | 21 | 27 |
| Withdrawn, adverse event, n | 5 | 7 |
| Withdrawn, lack of efficacy, n | 7 | 8 |
| Bipolar I diagnosis (most recent episode) | | |
| Hypomanic/manic, n | 28 | 27 |
| Manic, n | 12 | 15 |
| Depressed, n | 1 | 2 |
| Mixed, n | 17 | 12 |
| Unspecified, n | 1 | 2 |
| Ongoing treatment for bipolar disorder | | |
| Lithium only, n | 17 | 22 |
| Valproate only, n | 31 | 26 |
| Lithium and valproate, n | 11 | 10 |
| Baseline YMRS | | |
| Mean (SD) | 18.4 (7.1) | 18.8 (7.3) |

The two treatment groups were similar in demographic characteristics and baseline disease severity (Table 1).

Fig. 1 shows the unadjusted mean YMRS scores for the weekly observed cases. The difference between the treatment groups appeared approximately proportional over time. However, comparison of YMRS change scores from baseline to endpoint (LOCF) by ANCOVA revealed a significant difference that favored placebo treatment (Table 2). Comparison of other efficacy measures revealed no significant differences between the treatment groups (Tables 2 and 3).

Since this was an add-on study, we sought to determine if ongoing treatment (lithium, valproate, or lithium and valproate) had an effect on treatment efficacy. Mean YMRS total and change scores were comparable between treatment groups, regardless of ongoing therapy. Similarly, ongoing therapy did not appear to influence any of the secondary efficacy measures.

On *post hoc* analysis, it was noted that during the placebo lead-in phase, adjustments in lithium dosing were made in more (n = 12) placebo-treated patients than gabapentin-treated patients (n = 4). (p < 0.01). Of the 12 placebo patients whose lithium dose changed, the dose was increased in nine and decreased in three patients. Among these 12 patients who were randomized to placebo, 11 showed a decrease in YMRS scores over the course of the study (mean change from baseline to endpoint, −9.5, Table 4). Only one patient worsened on the YMRS. In contrast, among gabapentin patients, of the four who had changes in lithium dosing, three showed improvement in YMRS scores and one showed worsening (mean change = 0.5).



YMRS Mean scores by week, observed cases



*Fig. 1.* Mean ± SE YMRS total scores for the weekly observed cases.

Pande et al.

Table 2. YMRS and HAM-D change scores: results of analysis of covariance: ITT population

| Parameter | | | | Treatment comparison | | |
|---|---|---|---|---|---|---|
| Treatment group | n | Adjusted means | SE | Difference[a] | 95% CI | p-value |
| YMRS | | | | | | |
| Placebo | 59 | −9.9 | 1.23 | | | |
| Gabapentin | 55 | −6.5 | 1.21 | −3.34 | −6.35, −0.32 | 0.03 |
| HAM-D | | | | | | |
| Placebo | 59 | −1.3 | 1.27 | | | |
| Gabapentin | 54 | 0.01 | 1.26 | −1.32 | −4.40, 1.77 | 0.40 |

[a] Difference (placebo/gabapentin) in adjusted means based on ANCOVA model with treatment and center in the model and YMRS baseline score as a covariate.

Table 3. Secondary efficacy parameters

| Efficacy parameter | Placebo | Gabapentin | Treatment comparison | |
|---|---|---|---|---|
| | Change score[a] | | Test statistic | p-value |
| Hamilton Anxiety Scale (HAM-A) total score | −1.05 | 0.36 | | 0.24 |
| Clinical Global Impression of Severity (CGIS) | −0.98 | −0.63 | | 0.10 |
| | Percentage of patients | | | |
| Internal States Scale (ISS)[b] | | | Chi-square test | 0.83 |
| Manic (≥70) | 8 | 9 | | |
| Depressed (≤30) | 17 | 17 | 0.05 | |
| Normal (31–69) | 75 | 74 | | |
| | Percentage of responders | | | |
| Clinical Global Impression of Change (CGIC)[c] | 47 | 37 | Chi-square test 1.08 | 0.30 |

[a] Baseline to Last Observation Carried Forward (LOCF).
[b] Based on average daily scores on global scale for the last 7 days prior to termination.
[c] Responders defined as 'much improved' or 'very much improved'.

When the data from all patients who had changes in lithium dosing during the placebo lead-in phase (n = 16) were excluded from the analysis, the treatment group difference in YMRS change score was no longer significant.

Of the 47 gabapentin patients who had plasma gabapentin concentrations measured, eight had plasma drug levels below the limit of detection (0.5 μg/mL), suggesting that some patients did not take the study drug as prescribed, thereby reducing their likelihood of responding to treatment.

Safety

Gabapentin was generally well tolerated. Most adverse events were consistent with known side effects of gabapentin, the most common being somnolence and dizziness (Table 5). Thirteen patients experienced a serious adverse event (Table 6). Five placebo-treated patients and 7 gabapentin-treated patients withdrew due to adverse events. There were no deaths during the study. One patient who had received 1200 mg/day gabapentin for 10 days died 10 months after discontinuing

from the study. The immediate cause of death was indeterminate, attributable to atherosclerosis.

Discussion

The findings of this study did not demonstrate that gabapentin is an effective adjunctive treatment when administered to patients with bipolar disorder who have moderate to severe symptoms that are persisting despite treatment with lithium and/or valproate. This finding is at odds with the numerous clinical reports (on a total of nearly 200 patients) in whom gabapentin was ostensibly beneficial (3–8). There are several potential explanations for this apparent discrepancy. Most of these studies lacked a placebo control. In this study, patients receiving placebo showed a robust response (nine point decrease in mean YMRS score). We enrolled patients with a diagnosis of bipolar disorder I, whereas others enrolled patients with acute mania, bipolar disorder I, bipolar disorder II, or cyclothymic disorder. Furthermore, efficacy was assessed differently between studies. To understand our data and reconcile the apparent

252

Table 4. Lithium dose adjustments during lead-in

| Patient number | Lithium Dose (mg/day) | | YMRS change (baseline to LOCF) |
|---|---|---|---|
| | Initial | Final | |
| Placebo | | | |
| 2002 | 1500 | 1800 | −14 |
| 5003 | 900 | 1200 | −6 |
| 7004 | 1200 | 900 | −12 |
| 7007 | 300 | 1350 | −11 |
| 9001 | 1200 | 1500 | −8 |
| 10007 | 600 | 900 | −10 |
| 10009 | 1200 | 1500 | −2 |
| 10017 | 600 | 300 | −2 |
| 10020 | 900 | 1350 | 18 |
| 11012 | 1200 | 1500 | −10 |
| 12001 | 1200 | 900 | −17 |
| 14006 | 900 | 1200 | −13 |
| Gabapentin | | | |
| 5004 | 2400 | 2100 | −2 |
| 7002 | 1500 | 1200 | −2 |
| 13003 | 1200 | 600 | −10 |
| 14002 | 900 | 1200 | 16 |

Table 5. Most frequent adverse events[a] in all patients

| Adverse event | Patients, n (%) | |
|---|---|---|
| | Placebo, n = 59 | Gabapentin, n = 58 |
| Somnolence | 7 (11.9) | 14 (24.1) |
| Dizziness | 3 (5.1) | 11 (19.0) |
| Diarrhea | 7 (11.9) | 9 (15.5) |
| Headache | 7 (11.9) | 6 (10.3) |
| Amnesia | 2 (3.4) | 6 (10.3) |

[a] ≥ 10% of the gabapentin-treated patients.

Table 6. Listing of serious adverse events

| Adverse event | Patient number | Treatment group[a] |
|---|---|---|
| Pericarditis | 2007 | PBO |
| Manic depressive reaction | 2008 | NR[b] |
| Manic reaction | 4002 | PBO |
| Manic reaction | 5003 | PBO |
| Manic reaction | 7006 | GBP |
| Manic reaction | 8004 | GBP[b] |
| Manic reaction | 9001 | PBO |
| Manic depressive reaction | 9005 | GBP[b] |
| Cervix carcinoma | 11003 | GBP[b] |
| Manic reaction | 12007 | PBO |
| Psychosis | 12015 | GBP |
| Manic reaction | 13005 | GBP |
| Manic depressive reaction | 13008 | NR[b] |

[a] PBO, placebo; GBP, gabapentin; NR, not randomized.
[b] AE began during single-blind placebo lead-in.

inconsistency with reported clinical experience, we carried out additional (previously unplanned) analyses of the data.

Since this was an add-on treatment study, we examined if any changes were made to the on-going treatments (lithium, valproate or the combination). By protocol, clinicians were allowed to adjust the lithium or valproate doses during the placebo lead-in period. More patients in the placebo group than the gabapentin group had their lithium dose adjusted during the lead-in phase. When all patients who had a change in lithium doses are removed from the efficacy analysis, the YMRS treatment difference numerically favors placebo, but is no longer statistically significant. This suggests that the patients whose lithium dose was adjusted during the baseline period have a disproportionately large influence on the overall results.

Another potential factor that may influence outcome in patients with bipolar disorder is treatment non-compliance. No gabapentin was detected in the plasma of some patients assigned to that treatment arm, suggesting poor compliance. This is a major problem for adjunctive treatment studies of this type in which out-patients with moderate to severe symptoms must take multiple medications daily.

This study included a heterogeneous patient population who, despite being 'refractory' to mood-stabilizing treatments, showed a robust response to placebo. Given the uncontrolled clinical observations of the utility of gabapentin in bipolar disorder, it is possible that gabapentin may have some clinically beneficial effects such as anxiolysis that were not adequately captured in this study. Recent reports have demonstrated that gabapentin is efficacious for the treatment of social phobia (17) and may be efficacious for some patients with panic disorder (18). Although gabapentin was not superior to placebo in this study, there was no evidence of patients on gabapentin showing a worsening of symptoms either.

Some methodological lessons from this study are of interest. One of the challenges in this study was defining the eligible patient population. For a phasic disorder like bipolar illness, one is immediately confronted with having to choose the phase of illness to study. We chose the study population based on perceived clinical need (i.e. patients who are treated yet remain symptomatic). Because we had no hint that gabapentin would have significant antidepressant effects, we excluded those patients whose symptoms consisted only of depression at the time of entry into the study. This may have been an erroneous assumption and we may have

Pande et al.

excluded patients who could potentially be treatment responders. A suitable alternative might have been to stratify the sample into three levels by presenting symptoms: manic, depressive, and mixed. Though this would have inflated the sample size required, it may have permitted us to test which component of bipolar illness may be more amenable to modification by gabapentin.

Further, the use of an add-on treatment design deserves some comment. Such designs are common in many other areas of medicine where the ethical issues require that any new treatment be tested for an incremental effect over and above the background of standard therapy. Although the ethical position is well served by this approach, significant hurdles are presented in detecting a drug effect when the signal-to-noise ratio is low, as in most psychiatric disorders. An alternative study design that may address the ethical and clinical issues is to apply the new treatment adjunctively in an open-label manner for a period of time considered 'adequate' for a treatment trial. At that point, treatment responders would be randomized to either continue the drug or be switched to placebo in a double-blind fashion. This discontinuation design may then reveal a true drug effect, if any, by showing a differential rate of relapse/recurrence between the treatment groups. To our knowledge, this design has never been tested with bipolar disorder.

A final methodological point that presents some difficulty for studies in bipolar disorder is the lack of a well-defined and easily usable measure of 'euthymia'. Because euthymia or mood stability is arguably the ultimate goal of treatment for bipolar disorder, measuring the effect of a new treatment against the depressive or manic symptoms may not give a true measure of disease state. We used the internal states scale and the National Institute of Mental Health (NIMH) Life Chart to determine mood stability. Both of these rely on daily patient self-report and could be subject to systematic error based on the patient's state at the time of rating (e.g. rating oneself 'well' when manic or hypomanic and rating oneself worse when mildly or moderately depressed). The use of these instruments also underestimates the difficulty of patient compliance over long periods of study. An alternative approach to this problem might be to simply use global clinical ratings that are applied to reasonable periods in a study (days, weeks, or months). It remains to be demonstrated how sensitive such ratings would be to modest, but clinically relevant, changes in a patient's clinical condition. For example, a treatment may simply reduce the amplitude of mood swings in a

bipolar patient without noticeably affecting the frequency or duration of such swings. This change may be clinically meaningful but might be missed by a global rating, particularly when the latter is applied by different raters in a multicenter clinical trial.

With the current level of activity in treatment research in bipolar illness, we believe that many of these issues of methodology will take center stage and demand resolution before significant breakthroughs are possible.

## References

1. American Psychiatric Association. Practice guideline for the treatment of patients with bipolar disorder. Am J Psychiatry 1994; 151: 1a–36a.

2. Keck PE, Jr, McElroy SL, Strakowski SM, West SA, Sax KW, Hawkins JM, Bourne ML, Haggard P. Twelve-month outcome of bipolar patients following hospitalization for a manic or mixed episode. Am J Psychiatry 1998; 155: 646–652.

3. Ryback RS, Brodsky L, Munasifi F. Gabapentin in bipolar disorder [letter]. J Neuropsychiatry Clin Neurosci 1997; 2: 301.

4. Schaffer CB, Schaffer LC. Gabapentin in the treatment of bipolar disorder [letter]. Am J Psychiatry 1997; 154: 291–292.

5. McElroy SL, Soutullo CA, Keck PE, Kmetz GF. A pilot trial of adjunctive gabapentin in the treatment of bipolar disorder. Ann Clin Psychiatry 1997; 9: 99–103.

6. Young LT, Robb JC, Patelis-Siotis I, McDonald C, Joffe RT. Acute treatment of bipolar depression with gabapentin. Biol Psychiatry 1997; 42: 851–853.

7. Erfurth A, Kammerer C, Grunze H, Normann C, Walden J. An open label study of gabapentin in the treatment of acute mania. J Psychiatric Res 1998; 32: 261–264.

8. Knoll J, Stegman K, Suppes T. Clinical experience using gabapentin adjunctively in patients with a history of mania or hypomania. J Affect Disorders 1998; 49: 229–233.

9. Dimond KR, Pande AC, LaMoreaux L, Pierce MW. Effect of gabapentin on mood and well-being in patients with epilepsy. Prog Neuropsychopharmacol Biol Psychiat 1996; 20: 407–417.

10. Young RC, Biggs JT, Ziegle VE, Meyer DA. A rating scale for mania: reliability, validity, and sensitivity. Br J Psychiatry 1978; 133: 429–435.

11. Hamilton MW. A rating scale for depression. J Neurol Neurosurg Psychiatry 1960; 23: 56–60.

12. Hamilton MW. The assessment of anxiety states by rating. Brit J Med Psychol 1959; 32: 10–16.

13. Bauer MS, Crits-Christoph P, Ball WA, Dewees E, McAllister T, Alahi P, Cacciola J, Whybrow PC. Independent assessment of manic and depressive symptoms by self-rating. Scale characteristics and implications for the study of mania. Arch Gen Psychiatry 1991; 48: 807–812.

14. Leverick GS, Post RM. The Life Chart Manual (self version). Bethesda, MD: NIMH Biological Psychiatry Branch, 1995.

15. Ware JE, Jr, Snow KK, Kosinski M, Gandek B. SF-36 Health Survey: Manual and Interpretation Guide. Boston, MA: The Health Institute, New England Medical Center, 1993.

16. SAS Institute, Inc. SAS/STAT® Software: Changes and Enhancements Through Release 6.12. Cary, NC: SAS Institute INC.

17. Pande AC, Davidson JRT, Jefferson JW, Janney CA, Katzelnick DJ, Weisler RH, Greist JH, Sutherland SM. Treatment of social phobia with gabapentin: a placebo-

controlled study. J Clin Psychopharmacol 1999; 19: 341–348.

18. Pande AC, Pollack MH, Crockatt J, Greiner M, Chouinard G, Lydiard RB, Taylor CB, Dager SR, Shiovitz T. Placebo-controlled study of gabapentin treatment in panic disorder. J Clin Psychopharmacol (in press).

## DECLARATION OF CAROL A. JANNEY, M.S.

1.      I am a doctoral candidate in Epidemiology at the University of Pittsburgh in Pittsburgh,

Pennsylvania, with a primary focus on mental health and physical activity.  As a graduate

research assistant, I am the principle investigator for a pilot study investigating the effects of

physical activity on rapid cycling or moderately depressed patients with bipolar disorder.  In

addition, I have been the lifestyle coach for patients with bipolar disorder and conducted

statistical analyses for physical activity interventions in overweight individuals.  A copy of my

curriculum vitae is attached.  Exhibit 1.

2.      From 1997 to 1999, I worked as a biostatistician in the Clinical Research, CNS-

Biometrics Department at Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan.  From

1996 to 1997, I worked as a contract biostatistician in the Clinical Research, CNS-Biometrics

Department at Parke-Davis Pharmaceutical Research in Ann Arbor, Michigan under the

supervision of a Parke-Davis biostatistician.

3.      One of my responsibilities as a biostatistician (contract and Parke-Davis) was a double-

blind, placebo-controlled clinical study that evaluated adjunctive gabapentin in patients with a

lifetime diagnosis of bipolar disorder (type 1) and who were currently suffering from symptoms

of either mania, hypomania, or a mixed state despite ongoing therapy with lithium, valproate, or

lithium and valproate in combination.   When I became a Parke-Davis employee in 1997, I

became the lead biostatistician for this study.

4.      The complete study results and analyses were finalized in March 1999.  Exhibit 2,

Research Report 720-04174, Gabapentin Adjunctive Treatment in Patients with Bipolar Disorder

(March 26, 1999).

1

2764688v3

5.     The safety results from the bipolar disorder study showed that gabapentin was generally well-tolerated and that most adverse events were consistent with known side effects of gabapentin. Exhibit 2 at 6. The most common adverse events were somnolence and dizziness. Exhibit 2 at 6. There were no deaths during the study. Exhibit 2 at 6.

6.     The study did not find that gabapentin was effective as an adjunctive therapy in patients with bipolar disorder. Compared to the placebo treatment group, the Gabapentin treatment group did not experience greater improvements in mania symptoms as measured by the Young Mania Rating Scale or depressive symptoms as measured by the Hamilton Depression Rating Scale. Although both treatment groups experienced a reduction in mania symptoms, the decrease in mania symptoms was significantly greater for the placebo treatment group than the Gabapentin treatment group. Exhibit 2 at 9. Although speculative, adjustments in lithium dosing may have accounted for or contributed to the greater improvement in mania symptoms for the placebo treatment group compared to the Gabapentin treatment group. This hypothesis is tenable since more patients in the placebo treatment group had adjustments to their lithium dosing than the Gabapentin treatment group. Lack of compliance in taking Gabapentin may have biased the results by underestimating the difference in the reduction of mania symptoms between the two treatment groups. With or without the bias, the conclusions of the study would be 1) gabapentin was not an effective adjunctive treatment for mania symptoms and 2) a greater reduction in mania symptoms was observed among patients with bipolar disorder treated with placebo than those treated with gabapentin. There was no evidence that gabapentin caused a worsening of symptoms. Exhibit 2 at 8.

6.     As the lead biostatistician, I performed and/or supervised the analysis of this study. The planned and post-hoc analyses were performed in an efficient and timely fashion that 1)

2

enhanced the scientific quality of the research and 2) supported the dissemination of the study results as quickly as possible to the Gabapentin Bipolar Disorder Study Group and publication of the study results.

7.      The findings were summarized in a research article entitled "Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy." Exhibit 3, Atul Pande, et al. "Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy," 2 Bipolar Disorders 249-255 (2000).

8.      The manuscript, which I co-authored along with Atul Pande, M.D., John L. Werth, Ph.D., Jerri Crockatt, M.A., R.N., Georgia Tsaroucha, M.S.P.H. and Gabapentin Bipolar Disorder Study Group was submitted for publication in July 1999 to *Bipolar Disorders,* which is a peer-reviewed journal published by the International Society for Bipolar Disorders. Exhibit 3.

9.      Once a manuscript is submitted for publication, neither the authors nor the sponsor have control over its publication, including if and when the manuscript is actually published. The journal's editors determine if and when a manuscript is ultimately published, which was precisely the case with the gabapentin bipolar disorder study. The editors of *Bipolar Disorders* accepted the gabapentin manuscript for publication on November 22, 1999 and did in fact publish it several months later in 2000. Exhibit 3.

10.     The gabapentin bipolar disorder study results were analyzed and submitted for publication in accordance with good clinical and research practices.

11.     To my knowledge, no one at Parke-Davis/Warner-Lambert attempted to delay publishing the bipolar disorder data or acted improperly in any manner relating to any aspect of the study's dissemination to the medical and scientific community. It was always the intent and goal of all

3

the researchers involved, including me, to publish and disseminate the study results regardless of the findings.

12.     In summary, the results from the gabapentin bipolar disorder study were submitted for publication in a timely fashion. To my knowledge, no one at Parke-Davis/Warner-Lambert tried to delay publishing the results from the bipolar disorder study. In addition, my colleagues and I acted appropriately at all times and in accordance with good clinical and research practices in disseminating the study results to the medical and scientific community.

13.     I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26 day of July, 2008.

Carol A. Janney, M.S.

2764688v3

4

# CAROL A. JANNEY

5835 Alderson St #13
Pittsburgh, PA  15217

Telephone (home): 507-271-0982
email (work):caj19@pitt.edu
email (home):nduku_janney@hotmail.com

EDUCATION   **PhD in Epidemiology** (Expected April 2009)
Focus: **Mental health and physical activity**
UNIVERSITY OF PITTSBURGH, Pittsburgh, PA

**Master of Science in Biostatistics** (May 1996)
UNIVERSITY OF  MICHIGAN, Ann Arbor, MI

**Master of Science in Epidemiology**  (September 1991)
**Master of Science in Exercise Science**  (May 1991)
UNIVERSITY OF MASSACHUSETTS at Amherst, Amherst, MA

**Bachelor of Science in Nutritional Science**  (August 1984)
CORNELL UNIVERSITY, Ithaca, NY

COMPUTER     Statistical analysis on PC, UNIX: **SAS, Splus, Egret**. Graphics:
SKILLS       **Sigmaplot, Splus**. Data management: **KeyEntry III, Excel**. Word
processing: **Word for Windows**

PROFESSIONAL EXPERIENCE

2006-08 **Graduate Research Assistantship** – University of Pittsburgh, PA
Lifestyle coach for individuals with bipolar disorder.  PI for pilot study investigating the effects
of physical activity on rapid cycling or moderately depressed patients with bipolar disorder.
Statistical analyses for physical activity interventions in obese and overweight individuals.

2003-     **Statistician III, Department of Biostatistics --**
2006      Mayo Foundation, Rochester,  MN.
2001-     **Statistician II, Department of Biostatistics --**
2003      Mayo Foundation, Rochester,  MN.
1999-     **Statistician I, Department of Biostatistics --**
2001      Mayo Foundation, Rochester, MN.
Statistical consultations with cancer epidemiologists; performed survival analysis using SAS and
S-Plus; performed sample size and power calculations; co-authored papers for publication;
prepared figures for publication and presentations; manager of data analysis team; mentored data
analysts and post-docs; interviewed candidates.

2002-     **Co-instructor introductory statistics course for nurse anesthetists --**
2006      Mayo Graduate School, Rochester, MN.
Eight lectures on descriptive statistics and linear regression.

# CAROL A. JANNEY

1984-85  **Research Assistant** -- Center for Sports Medicine and Health Fitness, Peoria, IL. Conducted 14-week strength training studies in prepubescent males, administered graded exercise stress testing and underwater weighings for corporate physical and performance evaluations.

1983      **Student Teacher of Health and Home Economics** - - Penfield High School, Penfield, NY.

PUBLICATIONS

Mental Health
Janney CA, CR Richardson, RG Holleman, C Glasheen ,SJ Strath, MB Conroy, AM Kriska. Gender, mental health service use and objectively measured physical activity: data from the National Health and Nutrition Examination Survey (NHANES 2003-2004). **Mental Health and Physical Activity** (In press).

Pande AC, DE Feltner, J Jefferson, J Davidson, M Pollack, MB Stein, RB Lydiard, R Futterer, P Robinson, M Slomkowski, E DuBoff, M Phelps, CA Janney, JL Werth.  Efficacy of the novel anxiolytic pregabalin in social anxiety disorder: a placebo-controlled, multicenter study. **Journal of Clinical Psychopharmacology**. 2004 Apr;24(2):141-9.

Pande AC, Crockatt JG, Janney CA, Werth J, Tsaroucha G, Gabapentin Bipolar Disorder Study Group.  Gabapentin in bipolar disorder, a placebo-controlled trial of adjunctive therapy. **Bipolar Disorder**. 2000;2:249-255.

Pande AC, JRT Davidson, JW Jefferson, CA Janney, DJ Katzelnick, RH Weisler, JH Greist, SM Sutherland.  Treatment of social phobia with Gabapentin: a placebo-controlled study. **Journal of Clinical Psychopharmology**. 1999;19:341-348.

Physical Activity
Janney CA, JM Jakicic. The influence of BMI and exercise on injuries and illnesses in overweight and obese individuals.  Submitted for publication.

Jakicic JM, BH Marcus, W Lang, C Janney. 24-month effect of exercise on weight loss in overweight women. **Archives of Internal Medicine**. (In press).

Washburn RA, KW Smith, AM Jette, CA Janney. The physical activity scale for the elderly (PASE): development and evaluation.  **Journal of Clinical Epidemiology**. 46: 153-162, 1993.

Washburn RA, AM Jette, CA Janney. Using age-neutral physical activity questionnaires in research with the elderly. **Journal of Aging and Health**. 2: 341-356, 1990.

Washburn RA, CA Janney, JR Fenster.  The validity of objective physical activity monitoring in older individuals. **Research Quarterly**.  61:114-117, 1990.

Weltman A, S Tippett, C Janney, K Strand, CB Rians, BR Cahill, FI Katch.  Measurement of isokinetic strength in prepubertal males. **The Journal of Orthopaedic and Sports Physical Therapy**. 9:345-351, 1988.

# CAROL A. JANNEY

PUBLICATIONS (continued)

Cerhan JR, KE Anderson, CA Janney, CM Vachon, TE Witzig, TM Habermann. Association of aspirin and other non-steroidal anti-inflammatory drug use with incidence of non-Hodgkin lymphoma. **International Journal of Cancer**. 2003:106:784-788.

Pande AC, JG Crockatt, DE Feltner, CA Janney, WT Smith, R Weisler, PD Londborg, RJ Bielski, D Zimbroff, JRT Davidson, M Liu-Dumaw. Pregabalin in generalized anxiety disorder: a placebo-controlled trial. **American Journal of Psychiatry**. 2003:160(3):533-540.
Parker AS, JR Cerhan, CA Janney, JC Cheville. High expression levels of the insulin-like growth factor-I receptor predict poor survival among female clear-cell renal cell carcinomas. **Human Pathology**. 2002:33:801-805.

Cerhan JR, CM Vachon, TM Habermann, SM Ansell, TE Witzig, PJ Kurtin, CA Janney, W Zhang, JD Potter, TA Sellers, AR Folsom. Hormone replacement therapy and risk of non-Hodgkin lymphoma and chronic lymphocytic leukemia. **Cancer Epidemiology, Biomarkers & Prevention**. 2002:11:1466-71.

Cerhan JR, CA Janney, CM Vachon, TM Habermann, NE Kay, JD Potter, TA Sellers, AR Folsom. Anthropometric characteristics, physical activity, and risk of non-Hodgkin's lymphoma subtypes and B-cell chronic lymphocyctic leukemia: a prospective study. **American Journal of Epidemiology**. 2002;156:527-35.

Olson JE, CA Janney, RD Rao, JR Cerhan, PJ Kurtin, D Schiff, RS Kaplan, BP O'Neill. The continuing increase in the incidence of primary central nervous system Non-Hodgkin Lymphoma: A Surveillance, Epidemiology and End Results (SEER) analysis. **Cancer**. 2002;95:1504-10.

Calhoun ES, RM McGovern, CA Janney, JR Cerhan, SJ Iturria, DI Smith, BS Gostout, DH Persing. Host genetic polymorphism analysis in cervical cancer. **Clinical Chemistry**. 2002:48:8:1218-1224.

Olson JE, JR Cerhan, CA Janney, KE Anderson, CM Vachon, TA Sellers. Postmenopausal cancer risk after self-reported endometriosis in the Iowa Women's Health Study. **Cancer**. 2002;94:1612-18.

Vachon CM, PJ Mink, CA Janney, TA Sellers, JR Cerhan, L Hartmann, AR Folsom. Association of parity and ovarian cancer risk by family history of breast and/or ovarian cancer in a population-based study of postmenopausal women. **Epidemiology**. 2002;13:66-71.

Sowers MF, D Zhang, BW Hollis, B Shapiro, CA Janney, M Crutchfield, MA Schork, F Stanczyk, J Randolph. Role of calciotrophic hormones in calcium mobilization of lactation. **American Journal of Clinical Nutrition**. 1998;67:284-91.

Sowers MF, D Zhang, CA Janney. Interpregnancy weight retention patterning in women who breastfed. **The Journal of Maternal-Fetal Medicine.** 1998;7:89-94.

Janney CA, D Zhang, MF Sowers. Lactation and weight retention. **American Journal of Clinical Nutrition**. 1997;66:1116-24.

# CAROL A. JANNEY

GRANTS

Pilot Study: Physical activity as an intervention for rapid cycling or moderately depressed bipolar I and II individuals.  Funds ($4000) from private donor and Dow Chemical Company.  Fall 2007.

Mayo Clinic Rochester Catchment Area for Selected Cancers 1998-2003. Funds ($5220) requested from the Biostatistics Core of the Mayo Clinic Comprehensive Cancer Center Support grant: P30CA 15083. Spring 2005.

Analysis of long-term lymphoma survivors pilot study. Funds ($5220) allocated from the Biostatistics Core of the Mayo Clinic Comprehensive Cancer Center Support grant: P30CA 15083. Spring 2005.

COLLEAGUE RECOGNITION AWARD

In support of the CNS Technical Operations Team in 1997, especially your work on the 945-203 and Gabapentin pediatric submission

PUBLIC SERVICE AND COMMUNITY ACTIVITIES

NAMI (National Alliance for Mental Illness) Board of Directors for Olmsted County. 2002-2004
      Vice-President for 2003-4
      Finance Committee 2003-4
      Strategic Planner 2003-4
      Community Relations Committee 2002

# Proposed Order

# U.S. DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Bailey-P.V.S. Oxides, L.L.C., and Bailey-P.V.S. Oxides (Delta), L.L.C., <br>    Plaintiffs, <br> v. <br> S AND K Packaging, Inc., <br>    Defendant. | CIVIL ACTION NO.: 08-01596 <br> Jury Trial Demanded <br><br> Honorable Donetta Ambrose |

### ORDER OF COURT

AND NOW, to wit, this _____ day of December, 2009, the MOTION TO QUASH DEPOSITION NOTICE AND SUBPOENA *DUCES TECUM* is granted and the Subpoena issued to Carol Janney is quashed.

_____

By the Court