Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                          )
                                ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 36
AND PRODUCTS LIABILITY LITIGATION   )



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 19, 2009, 2:00 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

0c9c2fd0-37db-4cf3-a772-aba993fe8034

1     A P P E A R A N C E S:

2

FOR THE PLAINTIFFS:

3

         KENNETH B. FROMSON, ESQ., Finkelstein & Partners, LLP,
4    1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.

5

FOR THE DEFENDANTS:

6

         U. GWYN WILLIAMS, ESQ., Goodwin Procter, LLP,
7    Exchange Place, Boston, Massachusetts, 02109, for Teva
     Pharmaceuticals USA.

8

         MARK S. CHEFFO, ESQ., Skadden, Arps, Slate, Meagher &
9    Flom, LLP, Four Times Square, New York, New York, 10036, for
     Pfizer, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0c9c2fd0-37db-4cf3-a772-aba993fe8034

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Neurontin Marketing, Sales

3   Practices, and Products Liability Litigation, Civil

4   Action No. 04-10981, will now be heard before this Court.

5   Will counsel please identify themselves for the record.

6          MR. FROMSON:  Kenneth Fromson for the product

7   liability plaintiffs.  Good afternoon, your Honor.

8          MS. WILLIAMS:  Gwyn Williams for Teva

9   Pharmaceuticals USA.

10          MR. CHEFFO:  Mark Cheffo for Pfizer.

11          THE COURT:  Why are you here?  Did you file

12   anything?

13          MR. CHEFFO:  No, your Honor.

14          THE COURT:  You just love it up here?

15          MR. CHEFFO:  I just came to visit.  Boston is such

16   a nice place.

17          THE COURT:  Okay.

18          MS. WILLIAMS:  Thank you, your Honor.  This is our

19   motion on preemption grounds, obviously.  As you may recall,

20   we waited for the branded manufacture to go through and

21   present its preemption arguments first.  That was then sort

22   of mooted by the Wyeth V. Levine decision, but, as we

23   explain in our papers, the Wyeth decision does not moot

24   arguments that are applicable only to the generics, so we're

25   here before you today to try to present what I hope will be

1    a relatively focused set of arguments about the preemption

2    issues that are specific to generics.  And before I get into

3    the preemption issues, I --

4              THE COURT:  Let me just ask you just on the global

5    thing.  I've read both briefs, as I tend to do.

6              MS. WILLIAMS:  Yes, sure.

7              THE COURT:  I haven't done extensive legal

8    research on my own, but it's fair to say that District

9    Courts have split over this thing.

10             MS. WILLIAMS:  Yes, your Honor.  The pendulum sort

11   of swung one way for a while.  It's, you know, admittedly

12   swinging back in favor of the plaintiffs a little bit more

13   since the Wyeth V. Levine decision, although Wyeth doesn't

14   actually say anything with regard to generic preemption,

15   so --

16             THE COURT:  No, but I'm simply saying, on this

17   exact issue, what's the countdown now?

18             MS. WILLIAMS:  I made a list.

19             MR. FROMSON:  You mean since the Wyeth decision,

20   your Honor, or you mean just overall?

21             THE COURT:  You've refined my question.  I can

22   take it both or either way.

23             MS. WILLIAMS:  Well, overall, just based on the

24   cases that are cited here in the brief, I think I just

25   counted, it's eight in favor of the generics and six in

1    favor of the plaintiffs.

2         THE COURT:  Right, so just on -- and you both did

3    excellent briefs, and I've read some of the opinions, which

4    were excellent.  Why would I reinvent the wheel?  Wouldn't

5    it make just some sense either to deny this without

6    prejudice or simply wait till some Circuit Court started

7    looking at this?

8         MS. WILLIAMS:  Well, I will --

9         THE COURT:  It's just I write so many opinions.  I

10   mean, I feel like I should apply for a new position for the

11   drug czars, I write so many.  I won't add to the literature,

12   and it's like an eight-to-six vote, if you will.  They're

13   reasonable positions both ways.  Why wouldn't I just wait?

14        MS. WILLIAMS:  Well, and your Honor is correct, I

15   mean, this exact question of generic preemption is now in

16   front of several Circuit Courts.  It was actually argued in

17   late October to the Eighth Circuit, so that's under

18   advisement.  And the Sixth Circuit has not been yet argued,

19   but the briefing I think will be finished in January.  And

20   then it's docketed in the Ninth and in the Fifth, but no

21   schedule yet in those cases.  So, you know, you certainly

22   have a point.  I think that many of us feel like this issue

23   is fairly likely to end up back in front of the Supreme

24   Court.  You know, they sort of went so far in

25    Wyeth V. Levine.  They didn't need to face the issue of

1  generics, so obviously they didn't.  But it is a fairly

2  logical conclusion to where the court has been going as to,

3  you know, so finish that last piece.  You know, it's not

4  going to get to the Supreme Court unless most likely there's

5  a split in the circuits, and, you know, we don't know right

6  now.  This issue comes up, obviously, in a lot of cases --

7          THE COURT:  Well, since somebody must have

8  appealed the D. New Hampshire case, right?

9          MS. WILLIAMS:  No, that has not.  I actually just

10  spoke this morning with the counsel for the generic

11  manufacturer there.  They've not finalized their decision,

12  but they believe it's unlikely that they're going to ask

13  Judge Laplante to certify under 1292(b).  I don't think

14  he'll do it, honestly, so they're not necessarily --

15          THE COURT:  It was just such a comprehensive

16  decision.  I wouldn't be able to improve on it in terms

17  of -- in fact, it was almost tedious reading.  It was so --

18          MS. WILLIAMS:  It was pretty detailed.

19          THE COURT:  It was so detailed in how it went

20  forward.  I mean, wouldn't that make a faster and better

21  vehicle?

22          MS. WILLIAMS:  Well, if that's not going to go up

23  on appeal.  So, I mean, if you're saying that you want to

24  adopt Judge Laplante's decision, you know, that's one thing.

25  There are a number of District Court judges who, you know,

1    when faced with this issue, have issued a ruling and have

2    then declined to send it up to the Circuit Court.

3    Judge Sessions in Vermont, we made a 1292(b) motion and

4    thought it was pretty good, and he declined.  I think that's

5    true as well in at least one or two of the other cases I can

6    think of.  So courts have been somewhat undecided about

7    whether they want to tackle the issues themselves and then

8    that's it, and you all live with my decision, or whether

9    they're sending it on, or whether it's obviously as of

10   right, depending on who wins.

11          THE COURT:  Has either side requested assistance

12   from the FDA from the new administration?

13          MS. WILLIAMS:  I mean, the FDA's position, I think

14   generally, is that they are working through a lot of

15   preemption issues.  So, for instance, the amicus brief that

16   had been submitted in the Colachico case in the Third

17   Circuit that set forth what was at the time, you know, the

18   then sort of current statement of the FDA's position on what

19   it thought about all these issues, that was withdrawn in the

20   wake of Wyeth V. Levine, where the Third Circuit sent it

21   back down to the District Court and said, "Hey, reconsider

22   this now."  And that's in front of the District Court, and

23   the District Court has not taken any further action yet.

24          I would suggest, though, that there are some other

25   issues anyway that are intertwined here with the preemption

1  question that exists that we would need to address.

2          THE COURT:  Well, I'll let you each say your

3  piece, if you will, but I have to say I'm unlikely to write

4  on this.  I will either deny without prejudice till the

5  Circuit Courts start hitting on it, or I would adopt

6  someone's opinion, so --

7          MS. WILLIAMS:  Fair enough, and the only thing

8  that I would suggest is, and I'm sure you noticed as you

9  read through the briefing, that it ends up meandering a

10  little bit away from the topic of just straight preemption

11  because then there's some colloquy back and forth about,

12  well, what are the claims really, and what if the claim is

13  not exactly this but it's that?  And so it becomes -- I

14  think our motion or what I think your Honor needs to resolve

15  is not only the straight issue of, is a claim like this

16  preempted or not?  But where the plaintiffs have tried to

17  kind of recast their claims a little bit as something

18  else --

19          THE COURT:  Well, you know, I noticed that, and I

20  don't know whether I want to go there.  The motion is the

21  motion to dismiss based on preemption.  And you're quite

22  correct; suddenly I ended up in a completely different place

23  by the surreply.  I don't know why I would rule on that

24  here.

25          MS. WILLIAMS:  Would your Honor suggest that we --

1   I mean, I know you don't want more paper, but, I mean, at

2   some point we're going to need to find out, well, if it

3   isn't a straight failure-to-warn claim on the basis of, you

4   know, the sort of prototypical "The manufacturer should have

5   changed the warning based on the information known to it,"

6   but it's a "You never should have submitted your claim, an

7   ANDA application to the FDA in the first place" or "You

8   violated pharmacovigilance requirements," I mean, how would

9   you suggest we address that?

10          THE COURT:  I've got too much to do to come off

11   "Maybe this, maybe that."  I will address it at summary

12   judgment.

13          MS. WILLIAMS:  Would your Honor be willing to

14   entertain a motion to dismiss prior to that because we don't

15   want -- haven't done discovery yet.

16          THE COURT:  No.  I've got too much work.  To have

17   two motions to dismiss on a possible theory?

18          MS. WILLIAMS:  Well, that's my point is, they

19   shouldn't be allowed to -- they actually haven't pled in

20   their complaint some of the theories that they've now kind

21   of wandered off into, especially this question of, "Well, we

22   think it was negligence for you to even submit an application

23   with the FDA in the first place because you should have

24   known."  That's not actually in the complaint.

25          THE COURT:  You know what, I'm not going to do an

1    advisory opinion.  So if they haven't adequately alleged it,

2    then you'll have to deal with that in summary judgment if

3    they morph into it.  If it's just -- is it just, I don't

4    remember, a boilerplate negligence claim?  I don't remember

5    what it is, or whether they specify one theory, I don't

6    know.

7              MS. WILLIAMS:  I guess I'd ask you -- I am

8    sympathetic with how much paper you have to deal with in

9    this case and kind of the related cases.  We're only in ten

10   cases.  We haven't done discovery yet, and if turns out that

11   there is no viable --

12             THE COURT:  Why haven't you done any discovery

13   yet?

14             MS. WILLIAMS:  Because we agreed that so much

15   turned on this preemption question that we would let this

16   issue be resolved.

17             THE COURT:  How long has this case been alive?

18             MR. FROMSON:  May I?  On that note, your Honor --

19             THE COURT:  That's crazy.

20             MR. FROMSON:  -- the Court's case management

21   orders have basically been focused on the discovery with the

22   primary defendant, that being the innovator, and so there

23   were no court orders dictating other discovery.  In fact,

24   the practical issue that's been going forward for the last

25   four years was discovery against Pfizer and only discovery

1  in the few Track One cases, no other discovery against any

2  other defendants, whether they be physicians, pharmacies --

3          THE COURT:  Don't you think we should start

4  changing that?

5          MR. FROMSON:  Yes, your Honor, and, frankly,

6  although it might be an issue of debate, given that this is

7  an Abbreviated New Drug Application, I would think the

8  discovery is going to be far less burdensome to the parties

9  and the Court.

10          THE COURT:  I will ask you the question she's

11  asking.  I mean, it morphed off into a completely different

12  debate by the surreply.  But let me give you a few minutes

13  to argue.  I mean, you're here, you're well prepared.  I've

14  read your brief.  I've read some of the cases.

15          MS. WILLIAMS:  Sure.

16          THE COURT:  So I'm familiar with the Wyeth case,

17  of course.  So maybe if you spent ten minutes on what's of

18  concern to you, and then you can respond, and then we'll

19  figure out where to go.  Does that make some sense?

20          MS. WILLIAMS:  Yes, absolutely, your Honor.

21          So, as I said, if you will, the kind of

22  prototypical claim here or the claim that really is kind of

23  the heart of what they started off by alleging is this idea

24  that "You, generic manufacturer, knew or should have known

25  about all this, you know, all the stuff in the literature,

1    and you should have changed the warning."  And the primary

2    focus is, "You should have changed the warning on your own

3    accord, without prior FDA approval, by using the changes

4    being effected, the CBE provision in the regs," which is

5    21 CFR 314.70(c).

6            Now, the answer to the question of whether the CBE

7    provision is or is not available to generic manufacturers

8    does not necessarily end our analysis, but it certainly is

9    where we should start our analysis, and if for no other

10   reason than the availability of the CBE provision was, if

11   your Honor has read the Wyeth V. Levine case, was a huge

12   part, obviously, of the court's conclusion that the claims

13   against the branded manufacturer were not preempted because

14   the court says, you could avail yourself --

15           THE COURT:  So under your theory, a generic

16   company could find out after it got its ANDA approved all

17   sorts of problems, bad reactions, adverse results, the like,

18   and you didn't have to either petition the FDA or change the

19   warning on your own?

20           MS. WILLIAMS:  So let's separate those out into

21   two different pieces because you're asking a good question,

22   but there's really two different things in there, right?

23   Actually, I guess there's three things in there.  First of

24   all, there's the question about, what is it that we find

25   out?  Okay, let's start there.  The plaintiffs have some

1   arguments sort of sprinkled through, and particularly by the

2   time you get down to the surreply, that would suggest that

3   the generic manufacturer's post-marketing surveillance

4   obligations are exactly the same as the branded

5   manufacturer, and it's quite clear in the regulations that

6   that is not the case.  The branded manufacturers have

7   significantly greater post-marketing obligations than does

8   the generic.  The generic's obligations are largely confined

9   to, if they receive actual adverse drug event reports, you

10  have to report those to the FDA.  And the same provisions

11  apply about when you have to report them.  If it's a serious

12  or unexpected, it's within fifteen days.  If it's not that

13  category, it's later.  So the same kind of framework applies

14  there, but it's CFR 314.98.  That is the specific provision

15  applicable to generic manufacturers on post-marketing

16  surveillance.  And that refers you back to the

17  post-marketing requirements for the branded manufacturer,

18  except that it specifies that it's only with regard to the

19  adverse drug reports.  So it's not everything else the

20  generic manufacturer has to do in terms of following up on

21  clinical testing, surveying the worldwide, you know,

22  scientific literature.

23              THE COURT:  So fair enough, but suppose you get a

24  number of these that you don't think the warning is enough;

25  everyone comes back and says, "I'm depressed when I take

1    it."

2              MS. WILLIAMS:  Right.  So focused only on that

3    which the generic manufacturer actually has an obligation to

4    report to the FDA, the CBE provision -- so then we'll just

5    break it out into the two pieces of your question, right:

6    Could you change the label by yourself without prior

7    approval?

8              THE COURT:  And that's where the courts have

9    split.

10             MS. WILLIAMS:  And that's where the courts have

11   split, and that's obviously what distinguishes it in the

12   first place from the Wyeth case because Wyeth says, "Well,

13   branded manufacturer, you can use the CBE provision," so

14   clearly there would not be an actual conflict.  If the

15   generic manufacturer cannot use as a matter of law the CBE

16   provision, then right there we're in a whole different

17   world, and to require us to do that would be an actual

18   conflict.

19             THE COURT:  But there's some pretty powerful

20   reasoning that you can.  You know, there's that Supreme

21   Court statement:  They couldn't imagine a provision that

22   would prevent a branded from being able to change something

23   if they think the drug is dangerous.  So let's suppose you

24   had -- I'm just -- I don't know that I'm willing to do this

25   on a motion to dismiss.  If Teva or the generics pool their

0c9c2fd0-37db-4cf3-a772-aba993fe8034

1   information, I don't know.  But if Teva gets a series of

2   adverse reactions that are depression-based, and you thought

3   that there should be a warning to say, "By the way, we've

4   had some experience that this caused depression," what would

5   prevent you from changing it?

6          MS. WILLIAMS:  Well, so two different questions

7   again:  Could we do it without prior FDA approval?  And then

8   a separate question, could we ask the FDA to do it?  Now,

9   there's not actually sort of a clear mechanism for doing an

10  application, but anybody, including you or me, can make a

11  citizen's petition to the FDA.  So should Teva have

12  submitted --

13         THE COURT:  But you have a special obligation

14  because you have to report these adverse events.

15         MS. WILLIAMS:  Well, we are anyway, so --

16         THE COURT:  Well, let me ask you, have these

17  adverse events shown depression?

18         MS. WILLIAMS:  Teva has submitted any adverse

19  event reports that it has received to the FDA as it's been

20  required.

21         THE COURT:  Do they show depression?

22         MS. WILLIAMS:  We've not conducted discovery in

23  the case.

24         THE COURT:  Well, you must know, right?

25         MS. WILLIAMS:  You know, I probably looked at them

1  several years ago when we got our very first gabapentin

2  case.  I honestly can't tell you standing right here.  I

3  mean, first of all, to some extent --

4        THE COURT:  But suppose, let me draw all

5  reasonable inferences their way, and some of them show

6  depression, or --

7        MS. WILLIAMS:  Well, to have any claim here, it

8  has to be something that wasn't warned of, so it has to be

9  not just any adverse event drug report but adverse event

10 drug reports that raise something different or more serious

11 than that that was already warned of.

12       But let me come back for a second just to the,

13 could we have used the CBE provision, because obviously, as

14 you've identified, a number of courts have split on that.  I

15 would say I think that one of the things, probably the key

16 thing that I believe the courts who have gone against us

17 have missed on this point is, they're reading only two

18 provisions, and I think there's really three provisions that

19 you have to read together.  Most of the courts who have gone

20 in favor of the plaintiffs on this question have looked at

21 314.97, which is the provision specifically for ANDA holders

22 that says, "You, ANDA holder, must comply with the change

23 requirements applicable in --"

24       THE COURT:  They incorporate that.

25       MS. WILLIAMS:  They reference you back there,

1    okay?  So some courts just look at that and say, "Well, so

2    that means you can do anything that's back there in 314.70,"

3    which is, we're including the CBE provision.

4           I don't think it's as clear as that because I

5    think you also have to look at Section 314.150, which is the

6    provision that tells the FDA when it can withdraw an

7    approval; and one of the specific things when it can

8    withdraw approval is if an ANDA holder's labeling is out of

9    step with the branded manufacturer's labeling.  So it's kind

10   of contradictory to say on the one hand, "Hey, generic, you

11   can go do the same thing that the branded manufacturer

12   does," but on the other hand have another provision

13   somewhere else later on that says, "Oh, but if you change

14   your labeling and it's different than the branded

15   manufacturers, then we can withdraw your approval."  I think

16   that that creates an ambiguity that makes it reasonable, and

17   more than reasonable -- you know, it's what a court should

18   do -- to go look at what the FDA has to say about its own

19   regs.  And from almost the day --

20           THE COURT:  But they flip-flopped.

21           MS. WILLIAMS:  No, they really don't on this

22   point.  They have been consistent since the 1992 final rule

23   that put the ANDA provision into the regs in the first

24   place.  Up until the 2008 final rule that gives more

25   guidance around how to do a CBE, that -- and there's other

1    things in between, and they're all cited in our brief, so

2    I'm not going to bore you by going through in detail.

3    Exhibits C through F I think are the actual documents.  But

4    they're all consistent that the CBE provision is to be used

5    by the branded manufacturer and not by the generic

6    manufacturer.

7              THE COURT:  Well, I agree, if this were a claim

8    of, "Did you act in an absolutely outrageous fashion?" you

9    know, under 93A or some equivalent, the fact that the FDA

10   has supported your interpretation might help you a whole

11   lot.

12             What is the underlying claim here?  It's a product

13   liability, right?

14             MS. WILLIAMS:  It's the usual.  There's a

15   negligence claim, a strict product liability, an express

16   warranty.

17             THE COURT:  It's not like an unconscionability

18   kind of claim?

19             MS. WILLIAMS:  No.  It's your standard --

20             THE COURT:  Because you'd have a fabulous argument

21   if it was an unconscionability claim because the FDA

22   supported your position for years.  But on a duty to warn,

23   it's a strict legal obligation, right?  I mean, it's --

24             MS. WILLIAMS:  Right, but if the regulations have

25   an ambiguity in them, then the court has to decide, well,

1    then what's the law?  And, you know, construction says,

2    well, you go to pronouncements from the agency.  And these

3    are in fact contemporary pronouncements.  You know, you have

4    a pronouncement from the FDA at the exact time that these

5    provisions were inserted about what they meant them to say.

6            THE COURT:  You don't have a current statement,

7    right?

8            MS. WILLIAMS:  Well, the most recent thing would

9    be, as I said, the 2008 final rule that was put in place.

10   It's cited in our brief.  That, again, provides more --

11           THE COURT:  Under the Bush administration or the

12   Obama administration?

13           MS. WILLIAMS:  I don't remember exactly.  I mean,

14   it certainly was a proposed rule that was worked through

15   during the prior administration, although what's embodied in

16   that final rule, that has nothing to do with preemption.

17   It's not the stuff that was talking about, you know, FDA

18   saying, "We think we have preemptive effect."  The final

19   rule that I'm talking about is a rule that provides

20   additional detail about how and under what circumstances,

21   what rises to the level where a manufacturer should come in

22   and actually strengthen its warning using the CBE provision.

23   And that final rule, everything in it is directed to the NDA

24   holder, the branded manufacturer.  So I think it's pretty

25   good evidence, you know, sort of by implication, that if

1   they thought that the generics had this obligation too, they

2   might have said somewhere in the one-and-a-half-inch-thick

3   rule that by its own terms is directed everywhere you read

4   to the NDA.

5            THE COURT:  Okay, thank you.  I understand your

6   legal position.

7            Let me ask you this.  You can argue on the merits

8   and that.  I was a little worried at the end about -- I'm

9   not sure I'm going to rule on it on this motion, but I am

10  going to open up discovery and set a discovery schedule

11  today.  And what my biggest concern really is, if you are

12  moving off into a new direction that they had certain

13  obligations apart from what the statute requires for an ANDA

14  application, if I'm saying that correctly, that could be a

15  legal question.  I'm not talking about the post-approval

16  period.  I don't think this has been teed up.  I'm not going

17  to work it through in a reply and a surreply, but if that is

18  your theory, you need to -- I don't think you pled that in

19  the complaint, did you?

20           MR. FROMSON:  Your Honor, respectfully, if the

21  Court is in any way inclined or concerned about that aspect

22  of the claim, we are so early on in the discovery against

23  these defendants, we could replead.

24           THE COURT:  But here's the thing:  It really will

25  make a difference as to the scope of discovery, which I am

1    going to open up today.  So if you really are pursuing it,

2    I'm not saying "thumbs up" or "thumbs down," and I'm sure

3    not ruling on it on the basis of a surreply, which wasn't

4    teed up to begin with; but if it is your theory, you're

5    going to want to go back in discovery to their application

6    process, right?

7             MR. FROMSON:  Well, I think even on the other

8    theories I have to go back to the discovery process.

9             THE COURT:  I don't know that that's right.

10            MR. FROMSON:  This is why, your Honor.  Their

11   knowledge about the drug being used on an off-label basis,

12   right, was something that they took into consideration, or

13   should have taken into consideration, when they applied --

14            THE COURT:  I don't know if that's true or not,

15   but, in any event, is one of your theories going to be that

16   they breached a duty when they applied for the ANDA?

17            MR. FROMSON:  Yes, your Honor, it's one of the

18   theories.  I don't think that it affects the discovery --

19            THE COURT:  Is that in the complaint?

20            MR. FROMSON:  Your Honor, I think that it's not as

21   articulately pled as it should be.

22            THE COURT:  So you go back and amend on that

23   point.  You're going to do it, and then I can tee that up.

24   That legally is an important issue.

25            MR. FROMSON:  I agree that it should not be

1    preempted, and if you --

2           THE COURT:  Well, I don't know if I'm going to

3    rule that way because there are certain -- as I saw the

4    statutory scheme, they don't have to do a whole lot of

5    investigation at all.  They just are piggy-backers, and then

6    they have certain obligations once they're on board.  You

7    know, I'm not going to let them off the hook probably in

8    terms of, if they had actual knowledge of a dangerous side

9    effect, I mean, I don't know if they get off the hook.  But

10   right at the get-go, I think you're trying to change the

11   statutory scheme, or at least there's a plausible argument

12   that you are.

13          MR. FROMSON:  I think the argument -- you

14   obviously think maybe the argument is creative or it

15   certainly doesn't have merit, but one way or the other, I

16   can make a plausible argument for why it's so important and

17   that it has nothing to do --

18          THE COURT:  All right, but I don't want to do that

19   here today.  I'm just narrowing.  We have an eight-to-six

20   vote, so the question is, do we make it?

21          MR. FROMSON:  Have you granted me leave to amend,

22   or do I have to make a motion for leave to amend?

23          THE COURT:  I've granted you leave to amend.

24          MR. FROMSON:  Thank you.

25          THE COURT:  If that is your theory, you state it,

1    and then you can move to dismiss, and I have it teed up in

2    an appropriate way rather than on maybe you're going to

3    assert this theory, whatever.  Do it within twenty days.

4              MR. FROMSON:  Thank you, Judge.

5              THE COURT:  Do you want to argue on the basic

6    issue that's in front of me now, which is preemption under

7    Wyeth of the existing claims, which I'm taking as post-

8    applications?

9              MR. FROMSON:  Your Honor, in light of your

10   comments in colloquy, I don't know if it's necessary.  Your

11   comments and guidance from the Court is that you're not

12   likely to grant their motion.

13             THE COURT:  I'm likely to either wait or deny

14   without prejudice and quote the New Hampshire case.

15             MR. FROMSON:  And my argument would be to adopt

16   the New Hampshire case.  If there's any specific question

17   you have in that regard, I'd be happy to address it.  I

18   don't want to waste your time.

19             THE COURT:  No.  The only question I had was, I

20   thought, while I'm not here to sort of give advisory

21   opinions on possible theories, if in fact you're going to

22   assert it, assert it.

23             MR. FROMSON:  Okay, Judge.

24             THE COURT:  And she's quite right, you know, we

25   should address it before we go off in a whole different

Page 24

1    direction on discovery.

2           Now, speaking of discovery, these cases, the AWP

3    case I'm now going on nine years.  I think Neurontin is a

4    newer baby for me.  I think it's 2004.

5           MR. FROMSON:  Right.

6           THE COURT:  But we actually this year should

7    hopefully have a few critical bellwether trials to get

8    things going.  I don't see -- let me just play this out --

9    how this would work here.  Yours is a -- is the case against

10   Teva a sales and marketing case, or is it a product

11   liability case?

12          MR. FROMSON:  It's a product liability case that

13   does involve an aspect of the marketing.

14          THE COURT:  So the only people that you've sued on

15   behalf of are individuals?  Well, tell me, what is the case

16   about?

17          MR. FROMSON:  Your Honor, it's essentially the

18   same failure-to-warn case as you have against Pfizer.  The

19   difference is that traditionally, as Gwyn -- Ms. Williams,

20   I'm sorry -- as --

21          THE COURT:  I've always wanted to know what "U"

22   is, and someday I'll find out.

23          MS. WILLIAMS:  I'll tell you if you rule in my

24   favor.

25          MR. FROMSON:  As Ms. Williams would probably

1    concur, an ANDA company does not traditionally have sales

2    representatives that go out to physicians.  Instead they go

3    to institutions, pharmacies, sometimes some insurance

4    companies, and so they have a much more limited marketing

5    base, so the discovery therefore is less intensive.  But to

6    the extent those representatives do go to those institutions

7    and do represent that the drug should be on a formulary for

8    off-label uses, it becomes an issue of the same arguments as

9    we had against --

10            THE COURT:  How many plaintiffs do I have?

11            MR. FROMSON:  I think there are approximately ten?

12            MS. WILLIAMS:  Yes, nine or ten, your Honor.

13            THE COURT:  Are they suicides?

14            MR. FROMSON:  They should be suicide or suicide

15   attempt cases, your Honor, and there may be a few against

16   her client in the New York litigation as well.  There is

17   pending --

18            MS. WILLIAMS:  About an equal number.

19            MR. FROMSON:  So there could be approximately

20   twenty cases, and we have the same motion pending before

21   Justice Freedman in New York.

22            THE COURT:  And they're all depressive side effect

23   cases?

24            MR. FROMSON:  They should be.  If someone has

25   filed something other than that, I'm not aware of it.  There

1    have been claims made in this overall litigation for such

2    injuries as weight gain.

3              THE COURT:  I know that kind of stuff, but these

4    are all suicide/depression cases?

5              MR. FROMSON:  That would be the discovery that the

6    steering committee would be seeking.

7              THE COURT:  So can I play this through.  Let's

8    assume for a minute I've got one bellwether case, Shearer,

9    coming up.  What's happening in Tennessee?  I'm glad you're

10   here.

11             MR. FROMSON:  Your Honor, I called the clerk of

12   the court just yesterday and left a message.  My understanding

13   is --

14             THE COURT:  Do they have everything?

15             MR. FROMSON:  They have everything that came from

16   you, and they had to send it to the Judicial Panel because

17   it was technically supposed to go to the Judicial Panel

18   first, then to Tennessee.  So she called the Judicial Panel

19   and advised them, and the Judicial Panel said they're taking

20   it under advisement and should be officially remanding it to

21   her in the very near future.

22             THE COURT:  So as soon as you all find out who the

23   judge is, I'll call, so just -- but to find out timing.

24             MR. CHEFFO:  And I don't know if it will impact

25   this, but I know just in some other cases that the MDL panel

1    actually met I think at Harvard today, so there may be the

2    time that there's activity going on with the MDL panel.

3              THE COURT:  Can you all just adjourn to down

4    there?  So my point is, let's say there's the Tennessee

5    case, the Shearer case, maybe a New York case goes before

6    you even finish up discovery, does that as a practical

7    matter settle your cases, or is there a whole other set?  In

8    other words, my dream is that we'll do about three of these,

9    and the rest of them will go away.  Maybe this is just

10   dreaming, but --

11             MS. WILLIAMS:  It doesn't seem totally implausible

12   to me, your Honor.  I think it's hard to know.  You know, we

13   obviously have a small number of cases.  They are cases that

14   are not Track One cases, so we know very little about the

15   cases as well, you know, sort of beyond what's in the

16   complaint.  You know, if one of the bellwether cases went to

17   trial and it was just like, you know, one of the ten cases

18   that we have against us, would Teva pay a lot of attention

19   to that decision, whichever way it went?  You know, of

20   course we would.  Obviously there are events --

21             THE COURT:  The unique things to you, I mean,

22   because you may not have the same knowledge base, for

23   example.

24             MS. WILLIAMS:  Right, so there's some of the same

25   issues and some not, right?  I mean, obviously we watched,

1   for instance, we watched your Honor's Daubert hearings with

2   great interest because if, you know, some of the plaintiffs'

3   evidence was kept out, it obviously would have redounded to

4   our benefit as well.  So there is obviously -- you know, I

5   always think of them as sort of Venn diagrams, right?

6   They're overlapping circles, but they're not completely

7   subsumed.  And certainly it's a very -- I mean, I'm actually

8   a little bit surprised to hear from Mr. Fromson that there's

9   sort of a sales and marketing aspect to the case against us

10  because that's not how we read the complaint.

11            THE COURT:  How do you sell?

12            MS. WILLIAMS:  Typically what a generic

13  manufacturer does, especially for a drug like this that has

14  a well-established market already, is there is almost no

15  sales effort.

16            THE COURT:  No detailing?

17            MS. WILLIAMS:  Absolutely no detailing.  The

18  company does not have a sales force down to the level of

19  detail men.  There is a very small sales force that, to my

20  knowledge, has probably never called on an individual

21  doctor, clinic, or the like.

22            THE COURT:  So it's all the stuff I see in my

23  other case, which is the pricing war?  That's how you get

24  market share?

25            MS. WILLIAMS:  No.  Actually, basically what it

1   is, basically what a generic company's "sales force" does --

2   and I sort of use it in quotes -- mostly what they're doing

3   is actually contract enforcement.  So if a GPO has a

4   contract for its members that they should buy -- you know,

5   they got a better deal on pricing of Teva's generic product,

6   we obviously want to make sure that they're getting their

7   members to buy our product and not somebody else's generic

8   product.

9            THE COURT:  So you market to GPOs?

10           MS. WILLIAMS:  It's not marketing.  It's contract

11   enforcement, so we're not trying to convince --

12           THE COURT:  Let's say Novation, Novation will have

13   a contract with Teva, right?

14           MS. WILLIAMS:  Yes, or often with our distributor,

15   but, yes, for Teva's products, yes, right.

16           THE COURT:  So for what, for all your generics?

17           MS. WILLIAMS:  No, it doesn't necessarily work

18   that way.  Sometimes it's a select portfolio.  Typically it

19   would be a select portfolio, so it's not --

20           THE COURT:  Do you market based on the quality of

21   the product or based on price?

22           MS. WILLIAMS:  It's based on price because the

23   quality is exactly the same.

24           THE COURT:  Sure, because it's generic.

25           MS. WILLIAMS:  Correct.

0c9c2fd0-37db-4cf3-a772-aba993fe8034

1          THE COURT:  So, I mean, what I found on my AWP

2     case is, the generics then just battle over who can provide

3     the biggest spread for reimbursement -- you know, who gets

4     the lowest actual acquisition cost -- but it's not about the

5     merits:  This is a great drug because. . .

6          MS. WILLIAMS:  Right, and the reason that the

7     detailing doesn't come into play is because the market is

8     already established.  We're just trying to get the market to

9     shift to our version of the product rather than creating the

10    market.  That's sort of how we talk about it, is that the

11    branded drug creates the market.  Once the market is

12    established --

13         THE COURT:  So there's really unlikely to be fraud

14    issues or reliance issues, right?

15         MR. FROMSON:  I would say that traditionally it is

16    unlikely that there will be such discovery, that there will

17    be some finding in discovery like that.  It's more of an

18    issue of, they are providing a product to a patient through

19    a formulary or a pharmacy or Wal-Mart.

20         THE COURT:  And they didn't warn?

21         MR. FROMSON:  And they didn't warn.

22         THE COURT:  Okay, so actually -- I can't remember

23    which of you said this -- it's quite correct this is just

24    going to be a much easier discovery situation.

25         MR. FROMSON:  I said that.

1          THE COURT:  You said that.  It's going to be

2     minimal.  So the real discovery here is not going to be at

3     her end; it's going to be at your end, which is the -- what

4     do you call them, psychological autopsy of each person?  And

5     what I hate to do is wait till the tail end of all this

6     because witnesses -- didn't we just have a case where one of

7     the psychiatrists died?  I mean, you know, we -- that was

8     your case where the shrink died?

9          MR. FROMSON:  I don't think it happened in any of

10    the cases.

11         THE COURT:  Is it not where one of the

12    psychiatrists wasn't around anymore?

13         MR. CHEFFO:  I don't recall that.  You have a

14    pretty good memory, your Honor, so you're probably

15    remembering something that I don't, but it wasn't in Bulger,

16    at least.

17         MR. FROMSON:  What's happening, though --

18         THE COURT:  What we need is the individual

19    discovery going on the individual cases, and I can send you

20    to Judge Sorokin to get it going, or you can just come up

21    with a discovery schedule right now.

22         MR. FROMSON:  The individual case discovery is

23    going forward through September of 2010.  We need to sit and

24    work out a discovery schedule along the same lines for our

25    discovery against Teva.

1          THE COURT:  Right, and how many other Tevas are

2     there?

3          MR. FROMSON:  I think there's -- is it IVAX or

4     Apotex that is also a generic defendant?

5          THE COURT:  Well, why don't you sit down with

6     everyone and get it teed up for the individual case so that

7     I can push you -- once I've got -- I think Pfizer is doing a

8     great job with you all in just getting three or four cases

9     going, and then I'm hoping to push it into some sort of

10    global mediation effort, even if it doesn't -- if it's

11    unsuccessful, it is, but just to have some key cases.  But

12    there will be nothing special about doing a case with Teva,

13    right?  Right?  In other words, there would be nothing that

14    would --

15         MR. FROMSON:  There would be nothing different.

16         MS. WILLIAMS:  The plaintiff would be the same.

17    We'd be in the position of making the same arguments, I

18    think, as Mr. Cheffo would if it was a Pfizer case.  The

19    plaintiffs' case against us is going to be somewhat

20    different because Teva is going to have significantly less

21    knowledge, is going to have, you know, no knowledge of,

22    prior to or at the time of the ANDA application, of any of

23    the, you know, clinical studies or the like because that

24    information is not available to the ANDA applicant.  So it's

25    a very different legal framework.  And I think you mentioned

1   this before about we have different obligations, but, you

2   know, the obligation is to demonstrate to the FDA that the

3   generic drug that we want to sell is the bioequivalent, and

4   we are allowed and indeed basically required by law to rely

5   entirely on it, so -- and then, as I explained to your Honor

6   earlier, obviously there are different post-marketing

7   obligations as well.  So the defense is, our defense is,

8   "Gee, we knew a lot less than Pfizer knew, both before and

9   after."  And so the defense is going to be different in that

10  regard about the who knew what when, what should you have

11  known, what action should you have taken based on that

12  knowledge?

13          MR. FROMSON:  Your Honor, I believe the Drinkwine

14  complaint references a 2006 suicide.  I believe they were

15  approved for the ANDA approximately 2004.

16          MS. WILLIAMS:  That's right, that's right.

17          THE COURT:  So, I mean, what would be very

18  important is what was coming out into the public, what they

19  knew in that short two-year span.  And there might be a

20  stronger case, just trying to play it out, for someone who

21  has a suicide, let's say -- I don't know if some of these

22  cases are also in there -- four or five years later rather

23  than just two years later; I mean, for purposes of valuing

24  the case, maybe.

25          MS. WILLIAMS:  Right.  And I will also -- I think

0c9c2fd0-37db-4cf3-a772-aba993fe8034

1    this is apparent, but, I mean, we filed this motion in the

2    Drinkwine case.  There's no magic there.  I mean, it could

3    have been any one of the other ten.  We didn't want to

4    inundate you with ten versions of the same motion, so --

5            THE COURT:  Sure.  Well, good.  All right, so this

6    is useful.  So the one to-do list for you all will be to go

7    and come up with individual discovery schedules.  You can

8    just agree on it and submit it to Judge Sorokin, I'm sure,

9    rather than having you both come back here.

10           MR. FROMSON:  Off the top of my head, I would

11   consider making the same September deadline for discovery

12   against the generics, but we'll obviously reach out to the

13   other defendants.

14           THE COURT:  Well, why don't you just talk with all

15   of them and just come up with a schedule that's doable for

16   all of you.  And are you participating in any of the

17   discovery with Pfizer, or should we just incorporate all

18   those depositions?

19           MR. FROMSON:  Your Honor, in the past the

20   codefendants have come to depositions with Pfizer witnesses.

21   I'm not sure what you would mean otherwise.

22           MS. WILLIAMS:  We've not, I think for quite a

23   while, we were -- maybe early on we went to a few of the

24   depositions.  We discovered pretty rapidly that it wasn't a

25   good expenditure of our client's money, so --

1    THE COURT:  Like, I don't want to reinvent the

2    wheel on the Daubert motion, for example, the number one

3    example that pops into mind.

4    MS. WILLIAMS:  Sure.  I mean, we will obviously,

5    unless we could reach some agreement with Pfizer, but that

6    doesn't usually happen, we'll obviously need to have our own

7    set of experts.

8    THE COURT:  Well, for example, there could be a

9    set of experts not with respect to the key Daubert thing --

10   I'm unlikely to revisit that unless you have something

11   brand-new, for example, with the post- --

12   MS. WILLIAMS:  Sure.  I mean, we'll --

13   THE COURT:  What do you call them?

14   MS. WILLIAMS:  Pharmacovigilance.

15   THE COURT:  -- pharmacovigilance obligations that

16   could be new.

17   MS. WILLIAMS:  Right, that's a good example, your

18   Honor.  We will absolutely have an FDA regulatory expert who

19   explains how, you know, not only do the regs say it's

20   different, but in practice this is how the FDA worked.

21   THE COURT:  Are you having that same woman?

22   MR. FROMSON:  I'm not sure, your Honor.

23   THE COURT:  I will not take 100 pages single-spaced

24   again.  That was crazy.

25   MR. FROMSON:  Okay, Judge.

0c9c2fd0-37db-4cf3-a772-aba993fe8034

Page 36

1          THE COURT:  Okay.  I mean, the --

2          MR. FROMSON:  I hear you.

3          THE COURT:  The other ones managed to do it in a

4    succinct fashion.

5          MR. FROMSON:  And I won't double space it to make

6    it longer.  We will make sure it's concise.

7          THE COURT:  Okay.  I mean, I don't like to put

8    page limits on expert reports, but that was not digestible.

9    And then that's crazy because then I don't really read it in

10   detail as you want me to.

11         So anything else?  You're just sitting there so

12   quiet.  I'm not used to Mr. Cheffo not saying a word.

13         MR. CHEFFO:  This is a holiday, this is a great

14   day.  I get to sit here.  I have two very skilled counsel,

15   and I can --

16         MR. FROMSON:  I haven't argued today.  I haven't

17   done anything.

18         THE COURT:  Okay, I think that's it.  Anything

19   else I need to do?

20         MS. WILLIAMS:  No, although if you really wanted

21   to know, the "U" is for Ursula.

22         THE COURT:  All right.  Thank you.

23         MR. CHEFFO:  Thank you, your Honor.

24         MR. FROMSON:  Thanks, Judge.

25         (Adjourned, 2:41 p.m.)

Page 37

1                    C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6

7           I, Lee A. Marzilli, Official Federal Court

8    Reporter, do hereby certify that the foregoing transcript,

9    Pages 1 through 36 nclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 04-10981-PBS, In Re:  Neurontin Marketing, Sales

12   Practices, and Product Liability Litigation, and thereafter

13   by me reduced to typewriting and is a true and accurate

14   record of the proceedings.

15           In witness whereof I have hereunto set my hand

16   this 21st day of December, 2009.

17

18

19

20

21           /s/ Lee A. Marzilli
             _____
22           LEE A. MARZILLI, CRR
             OFFICIAL FEDERAL COURT REPORTER
23

24

25