UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:   NEURONTIN MARKETING, SALES
         PRACTICES AND PRODUCTS
         LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC., 04 CV 10739 (PBS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:   MDL Docket No. 1629

:   Master File No. 04-10981

:   Judge Patti B. Saris

:   Magistrate Judge Leo T.
:   Sorokin

:   **UNREDACTED**
:   **VERSION FILED**
:   **UNDER SEAL**

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**KAISER'S MOTION TO COMPEL DEPOSITION OF CAROL JANNEY**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") submit this memorandum in opposition to Kaiser's motion to compel the deposition of Carol Janney [2250]. Ms. Janney is a non-party witness who resides in Pennsylvania and has just begun a 12-week course of chemotherapy. Two days before Kaiser filed its motion to compel, Ms. Janney filed a motion to quash in the Western District of Pennsylvania. *See* Motion to Quash Subpoena Duces Tecum, *In re Neurontin Sales Practices Litig.*, No. 2:09-mc-00326-GLL, ECF Dkt. 1 (Dec. 15, 2009). Pfizer submits that this Court should defer to the Western District of Pennsylvania's decision with respect to Ms. Janney's first-filed motion. However, should the Court choose to entertain Kaiser's motion to compel, that motion should be denied for the reasons discussed below.

## ARGUMENT

### I.   The Court's Procedural Order Requires that Kaiser's Motion Be Denied

Kaiser's motion flies in the face of this Court's Procedural Order, which states:

Any witness identified for the first time in summary judgment papers or on the witness list may be deposed by December 22, 2009. Any witness on the list who was already identified in a court filing, document or deposition prior to the discovery deadline but not deposed may not be deposed during this time period.

Procedural Order November 12, 2009 [2172] ¶ 4.  Kaiser's brief does not even mention the Procedural Order, let alone show that its request for Ms. Janney's deposition comports with the order.  Kaiser concedes that it knew who Ms. Janney was and knew that she worked on a bipolar study that has long been a centerpiece of Kaiser's claims, but "chose" not to depose her during the discovery phase of this case.  (Pl. Mem. [2251] at 1-2.)  Thus, Kaiser does not and cannot claim that Ms. Janney was "identified for the first time in summary judgment papers or on the witness list," as the Procedural Order requires.  Procedural Order [2172] ¶ 4.  Nor does Kaiser deny that Ms. Janney was identified in numerous documents and in depositions prior to the discovery deadline, which means that she "*may not be deposed*" at this time.  *Id.* ¶ 4 (emphasis added).

Kaiser's failure to even address the Procedural Order is particularly glaring given its arguments in response to Pfizer's motion to compel the depositions of David Campen, M.D., Ambrose Carrejo, Pharm.D., and Sean Jones, M.D.  There, Kaiser argued:

> The Court's Procedural Order expressly precludes the deposition of '[a]ny witness on the list who was already identified in a court filing, document or deposition prior to the discovery deadline.' . . . The obvious intent of this provision is *not* to give parties who neglected to depose identifiable witnesses during discovery a second bite at the apple on the eve of trial.  In documents produced to Defendants by Kaiser during discovery, Drs. Campen, Carrejo, and Jones were each clearly identified as participants in Kaiser's Neurontin 're-education' campaign.  These documents alone are more than sufficient to have put Defendants on notice that these individuals were potential trial witnesses.

(Kaiser Mem. in Opp. to Def. Mot. to Compel [2247] at 2 (emphasis in original).)  The Court denied Pfizer's motion with respect to these three witnesses.

The *very next day* after filing the above response, Kaiser filed the present motion to compel the deposition of Ms. Janney, who was "clearly identified" "[in] documents produced to [Kaiser] by [Defendants] during discovery" as a "participant" in a bipolar study that Kaiser has prominently relied upon throughout this litigation.  *Id.*  Indeed, Ms. Janney is a co-author of an article that Kaiser and its experts claim was improperly suppressed.  *See* Section II, *infra.*  Kaiser is clearly unable to reconcile its present motion with the Procedural Order or its own arguments

2

quoted above, and so it ignores them and invites the Court to do likewise. The invitation should be declined. Having denied Pfizer the depositions of Drs. Campen, Carrejo, and Jones based on the contention that these witnesses were identified in depositions and documents produced during discovery, there is no analytical basis for permitting Kaiser to depose Ms. Janney.

In a vague, perfunctory effort to distinguish Ms. Janney "from the Kaiser witnesses whose depositions were sought by Pfizer," Kaiser argues that Ms. Janney "is the only witness . . . whose declaration is attached to and specifically relied upon by a testifying expert [and] whose signed declaration makes statements that contradict and are otherwise unsupported by the record." (Pl. Mem. at 5.) Kaiser fails to explain how these self-serving statements make any difference under the clear terms of the Procedural Order. Moreover, as discussed in Section III, *infra*, Kaiser's self-serving characterizations of Ms. Janney's declaration are meritless because Ms. Janney's statements are perfectly consistent with Dr. Pande's September 2007 deposition testimony and with the record as a whole.

For the same reason, there is no merit to Kaiser's notion that submitting a substantially identical declaration from Dr. Pande would have involved "[c]hanging his testimony . . . and would have opened Dr. Pande to another deposition." (Pl. Mem. at 6.) First, Dr. Pande's deposition testimony is entirely consistent with Ms. Janney's declaration. *See* Section III, *infra*. Second, even after Kaiser's experts and 30(b)(6) witness submitted supplemental declarations that actually changed their prior testimony[1], the Court refused to allow Pfizer to re-depose those witnesses. *See* Procedural Order [2172] ¶ 4. The fact remains that Plaintiffs chose to depose Dr. Pande and chose not to depose Ms. Janney.

In sum, the Procedural Order requires that Kaiser's motion be denied, and Kaiser fails to show or even argue otherwise.

---

[1] *See* Response to Plaintiffs' Proposed Trial Plans [2133] at 6-8; Surreply to Plaintiffs' Proposed Trial Plans [2156-2] at 4-6.

II.     **Kaiser Was Well Aware of Ms. Janney's Identity and Involvement in a Bipolar Study Cited By Kaiser Throughout this Litigation**

Carol Janney was the lead biostatistician for the Parke-Davis-sponsored randomized placebo-controlled study of gabapentin as adjunctive therapy in patients with bipolar disorder, hereinafter referred to as the "209 bipolar study." (Janney Decl. ¶ 3, Exh. A to Cheffo Decl.) Throughout this litigation, Kaiser has repeatedly cited this study as evidence purportedly showing that Neurontin is ineffective in treating bipolar disorder, and has repeatedly argued that Defendants improperly suppressed the results of this study. Pfizer disputes these allegations, but there is no dispute that the 209 bipolar study has long been a centerpiece of Kaiser's claims.

Just as Kaiser has long known of the existence and alleged import of the 209 bipolar study, Kaiser has also long known of Ms. Janney's role in that study. Ms. Janney is prominently identified as an "Author" and "Statistician" of the March 26, 1999, Research Report containing the final analysis of the study data. (*See* Research Report at 1-2, Exh. B to Cheffo Decl.) Ms. Janney is also prominently identified as an author of the original article reporting the results of the 209 bipolar study. (*See* Pande AC, Crockatt JG, Janney CA, *et al.*, Gabapentin in Bipolar Disorder: A Placebo-Controlled Trial of Adjunctive Therapy, 2 *Bipolar Disorders* 249 (2000), Exh. C to Cheffo Decl.) The Research Report and *Bipolar Disorders* article were identified as exhibits during Dr. Pande's deposition, and Dr. Pande specifically testified that Ms. Janney had worked with him on the 209 bipolar study as well as other studies.[2] (Pande Dep. at 386:25-387:3, Exh. E to Cheffo Decl.) Indeed, Kaiser's own experts cited Ms. Janney as an author of the *Bipolar Disorders* article before Kaiser received Ms. Janney's declaration as an exhibit to Dr. Elizabeth Field's December 15, 2008, expert report. (*See, e.g.*, 8/11/08 Report of Abramson, at footnotes 194, 314, 353, 354, 375, Exh. F to Cheffo Decl.)

Additional documents produced during discovery provided further notice of Ms. Janney's

---

[2] Ms. Janney is also one of the authors of an article regarding gabapentin as treatment for social phobia. *See* Pande, A.C., Davidson, J.R.T., Jefferson, J.W., Janney, C.A., Katzelnick, D.J., Weisler, R.H., Greist, J.H. & Sutherland, S.M., *Treatment of Social Phobia with Gabapentin: A Placebo-Controlled Study*, 19 J. Clin. Psychopharmacology 341-48 (1999). Ms. Janney's authorship of this article was disclosed long ago. (*See, e.g.*, Parke-Davis letter, Exh. D to Cheffo Decl.)

4

involvement. 

Kaiser claims "Dr. Pande testified that the code was broken in April 1998." (Pl. Mem. at 7.)  In reality, Dr. Pande testified that he "[didn't] have a recollection of the dates," but that the code "*might* have been broken in April of 1998."  (Pande Dep. at 198:2-12 (emphasis added).)   Thus, after deposing Dr. Pande in September 2007, Kaiser knew that there was an open question as to when the randomization code was broken, understood "that Ms. Janney would have been the person that broke the code" (Pl. Mem. at 7), but made a deliberate, strategic decision not to depose her.

The notion that Kaiser had "no reason" to depose Ms. Janney before discovery closed, and "no reason" to expect that Pfizer might call her as a trial witness (Pl. Mem. at 6), is absurd. In effect, Kaiser is simply arguing that because the deposition limits imposed on *both* parties forced Kaiser to choose among potential deponents, those limits should be now expanded for Kaiser alone.   Kaiser's request for selective enforcement of this Court's orders should be rejected.

III.    **Ms. Janney's Declaration Is Fully Consistent with Dr. Pande's Testimony and the Record as a Whole**

Kaiser spuriously argues that Ms. Janney's declaration represents an attempt to alter the well-established factual record.  To the contrary, while Ms. Janney's declaration may contradict Kaiser's baseless allegations, it is wholly consistent with Dr. Pande's deposition testimony and with the record as a whole.  Kaiser's arguments to the contrary rest on gross mischaracterizations of Dr. Pande's testimony.

Kaiser argues that Dr. Pande's testimony demonstrates an unexplained "one year gap (July 1998 – July 1999) between when the final results were summarized and when the study was submitted for publication." (Pl. Mem. at 3.)  In fact, Dr. Pande thoroughly explained this so-called "gap" during his September 2007 deposition.   Kaiser may not like Dr. Pande's explanation, but the contention that "Defendants have not been able to explain this gap" (*id.*) is simply false.   More importantly for present purposes, Dr. Pande's explanation is perfectly consistent with Ms. Janney's, thus refuting Kaiser's claim that it is somehow being "sandbagged."

First, Dr. Pande repeatedly explained the so-called "gap" between his July 1998 letter to investigators, summarizing the *initial analysis* of the study data, and the March 1999 issuance of the Research Report containing the *complete analysis* of the study data.  (Pande Dep. at 195:12-196:21, 337:12-21.)  As Dr. Pande explained:

> The *initial analysis* of the study would have been known in 1998, maybe in the June time frame.
>
> * * *
>
> [W]hat I mean by [initial analysis] is that in all clinical trials, there are a variety of measurements that are taken on the patients who are in the study.  And some of these are considered to be primary efficacy or safety measures and others are considered to be secondary.
>
> And when . . . the study is analyzed, usually what we try to look at as soon as possible is the primary measures so that there is a general indication of whether the study is . . . showing the results that support the hypothesis on which the study was based or not.  So that would be the initial analysis.

> To complete the rest of the analysis it can take . . . anywhere from three to six, ***maybe nine months*** because of the effort involved.

(*Id.* at 195:14-196:10 (emphasis added).)   Though Kaiser argues that Dr. Pande's letter to investigators is "proof that the complete results of the study were available in July 1998" (Pl. Mem. at 8), Dr. Pande himself explicitly rejected any such interpretation:

> Q.   And at the time that you sent the letter to the investigators regarding Study 209 in July of 1998, did you have the complete analysis of all the study data?
>
> A.   No, I did not.

(Pande Dep. at 664:15-19; *see also id.* at 670:15-21.)

The final research report containing the complete study analysis was issued on March 26, 1999 – nine months after Dr. Pande's July 1998 letter summarizing the initial analysis. (*Id.* at 665:2-5; Research Report.) As Dr. Pande explained, the reason he did not disseminate the results of the 209 bipolar study in 1998, other than to the FDA, is that "[t]he completed analysis and the report weren't available until March of 1999."   (Pande Dep. at 670:15-21.)   Dr. Pande's testimony is fully consistent with Ms. Janney's statement that "[t]he complete study results and analyses were finalized in March 1999." (Janney Decl. ¶ 4.)   Moreover, Dr. Pande made clear that the analysis of study data was performed by "statisticians."   (Pande Dep. at 661:12-19, 662:16-20.)   To the extent Kaiser contends that the data analysis should have been completed sooner, the obvious course would have been to request the deposition of Ms. Janney, who was the lead biostatistician on the 209 bipolar study.

Second, Dr. Pande explained the so-called "gap" between the March 1999 issuance of the final research report and the July 1999 submission of a manuscript regarding the study to the journal *Bipolar Disorders*.

> Q.   And so what did you do between March of '99 and leading up to this submission in July of 1999 with respect to Study 209?
>
> A.   Yeah, in that intervening time, the presentation that was going to be made at the meeting in Pittsburgh was prepared and the manuscript preparation took place.  Most scientific manuscripts go through multiple drafts, particularly where there are so many investigators involved.  There are exchanges that take place between all of the authors as to what the final version of the manuscript should be.

And so that's what would have occupied that time.

(*Id.* at 665:19-666:6.)   Dr. Pande further explained that the time from when an article is submitted to a journal and actually published by that journal "is entirely up to the editorial board and the editor of the journal" (*Id.* at 667:2-6) – a point that even Kaiser does not appear to dispute.  Dr. Pande's testimony is fully consistent with Ms. Janney's statements regarding the preparation and submission of the manuscript to *Bipolar Disorders*.  (Janney Decl. ¶¶ 7-10.) Moreover, Kaiser ignores the undisputed fact that in June 1999 – very soon after the final research report was issued – Dr. Pande presented his results at the Bipolar Disorders Conference in Pittsburgh, "which is the largest such meeting on the research into bipolar disorders." (Pande Dep. at 329:17-330:3; *see also id.* at 671:22-672:25.)

Third, Dr. Pande testified that there was no attempt to delay the publication of the *Bipolar Disorders* article, and that "the intent always was to publish the article and disclose the study data," despite his belief that there was no "obligation" to publish it.  (*Id.* at 667:10-668:1.) Ms. Janney's declaration is perfectly consistent:

> To my knowledge, no one at Parke-Davis/Warner-Lambert attempted to delay publishing the bipolar disorder data or acted improperly in any manner relating to any aspect of the study's dissemination to the medical and scientific community.  It was always the intent and goal of all the researchers involved, including me, to publish and disseminate the study regardless of the findings.

(Janney Decl. ¶ 11.)

In sum, the record – both prior to and after the close of discovery – clearly demonstrates that the results of the 209 bipolar study were publicized in a timely manner and that no effort was undertaken to delay or suppress the publication and dissemination of the study results.  Dr. Pande's testimony and the record as a whole are perfectly consistent with Ms. Janney's declaration.  Kaiser's attempt to manufacture inconsistencies between Dr. Pande's testimony and Ms. Janney's declaration is based on gross distortions of the evidence that do not withstand scrutiny and do not support Kaiser's request for an eleventh-hour deposition of Ms. Janney, whose role in the study was fully disclosed to Kaiser, but whom Kaiser made the deliberate strategic decision not to depose during the discovery phase of this case.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that Kaiser's motion be denied in its entirety.

Dated: December 22, 2009      Respectfully submitted,

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

By:   /s/ Mark S. Cheffo
      Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000

    -and-

WHITE AND WILLIAMS LLP

By:   /s/ David B. Chaffin
      David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel: (617) 330-5000

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on December 22, 2009.

/s/ David B. Chaffin
David B. Chaffin