UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Judge Patti B. Saris |
| | Magistrate Judge Leo T. Sorokin |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE THE TESTIMONY OF KAY DICKERSIN, PH.D.**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................................ii

INTRODUCTION .............................................................................................................................1

STANDARDS ....................................................................................................................................4

DISCUSSION ....................................................................................................................................5

I.      Dr. Dickersin's Testimony is Inadmissible Pursuant to Federal Rule of
        Evidence 702 .........................................................................................................................5

        A.      Dr. Dickersin Impermissibly Opines About Intent and State of Mind ...................5

        B.      Dr. Dickersin's Opinion on Ethics and Scientific Conduct are Inadmissible .........9

        C.      Dr. Dickersin's Analysis of the Clinical Trial Reports is Unreliable ...................12

II.     Dr. Dickersin's Opinions are Irrelevant under Federal Rules of Evidence 401, 402
        and 702 .................................................................................................................................15

III.    Dr. Dickersin's Testimony is Inadmissible Pursuant to Federal Rule of Evidence
        403 .......................................................................................................................................16

CONCLUSION ................................................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

*In re Baycol Products Liability Litigation*, 532 F. Supp. 2d 1029 ............................................5, 9

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227 (10th Cir. 2005) ....................................................6, 15

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073 (10th Cir. 2006) ..........................18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)........................... 1, 4, 5, 16

*In re Diet Drugs Products Liability Litigation, No. MDL 1203*, 2001 WL. 454586
        (E.D. Pa. Feb. 1, 2001) .................................................................................................6

*Elcock v. K-Mart Corp.*, 233 F.3d 734 (3d Cir. 2000)................................................................18

*In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................5

*General Electric Co. v. Joiner*, 522 U.S. 138, 146 (1997)............................................................5

*Goebel v. Denver & Rio Grande Western Railroad.*, 346 F.3d 987 (10th Cir. 2003) .................10

*Harnett v. Ulett*, 466 F.2d 113 (8th Cir. 1972) ...........................................................................9

*Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997) ...................................................9

*Pelletier v. Main Street Textiles, LP*, 470 F.3d 48 (1st Cir. 2006) ...............................................9

*In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)... 5, 8, 9, 11, 16

*Sutera v. Perrier Group of America Inc.*, 986 F. Supp. 655 (D. Mass. 1997) ........................4, 15

*Tokio Marine & Fire Insurance Co. v. Grove Manufacturing Co.*,
        958 F.2d 1169 (1st Cir. 1992) .......................................................................................8

*U.S. Information Systems, Inc. v. International Brotherhood of Electric Workers Local
        Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213 (S.D.N.Y. 2004).......................................6

*United States v. Montas*, 41 F.3d 775 (1st Cir. 1994)..................................................................6

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987)........................................................5

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000) ..........................................................................4

**STATUTES AND RULES**

Fed. R. Evid. 401 ...................................................................................................16

Fed. R. Evid. 403 ............................................................................................. 16, 17

Fed. R. Evid. 702 ...................................................................................................1,4

Fed. R. Evid. 702 advisory committee's note (2000) ...................................................4

Fed. R. Evid. 702 advisory committee's note (2000 Amendments)............................7

**MISCELLANEOUS**

Gerd Antes & Iain Chalmers, *Under-reporting of Clinical Trial Is Unethical*,
    361 Lancet 978 (2003)........................................................................... 10, 17

Iain Chalmers, *Under-reporting research Is Scientific Misconduct*,
    263 J. Am. Med. Ass'n 1405 (1990) ........................................................ 10

S. Swaroop Vedula et al., *Outcome Reporting in Industry-Sponsored Trials of
    Gabapentin for Off-Label Use*, 361 N Eng. J. Med. 361; 20 (2009)......................... 14, 15

Pursuant to Federal Rules of Evidence 401, 402, 403, 702 and 703, Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer") submit this memorandum in support of their motion *in limine* to exclude at trial any opinion from Plaintiff's expert Dr. Kay Dickersin. As more fully set forth in Pfizer's memorandum of law submitted herewith, Dr. Dickersin's opinions on reporting bias, ethics, and Pfizer's supposed intent with respect to the publication of certain Neurontin studies are irrelevant, are not valid and reliable scientific evidence under *Daubert* and Rule 702,[2] and are highly inflammatory and likely to mislead the jury and unfairly prejudice Pfizer.  Indeed, many of Dr. Dickersin's "opinions" are merely her subjective interpretations of e-mails and memoranda that the jury is fully capable of reading and evaluating on its own.  For all these reasons, Dr. Dickersin's opinions should be properly excluded from the trial of this case.

## <u>INTRODUCTION</u>

At the core of this case are Plaintiff's claims that Pfizer "embarked on a comprehensive campaign to promote Neurontin for unapproved and inappropriate uses through a fraudulent and deceptive marketing program" that included the "suppress[ion] or mischaracterize[ation] [of] negative studies of the drug."  (*E.g.*, Pl. Third Am. Compl. [583] ¶ 2; [583] ¶ 41 (Pfizer "deliberately conceal[ed] negative findings"); [583] at ¶103 (Pfizer "suppress[ed] unfavorable studies"); [583] at ¶117 (Pfizer "deliberately suppressed negative studies")).  In support of these allegations, Plaintiff seeks to proffer Dr. Dickersin, a professed advocate of clinical study registration and an academic who has made a career of criticizing how clinical trials are reported in the scientific literature.

Dr. Dickersin posits herself as an expert in "clinical trials, systematic reviews, publication and reporting biases."  (Exhibit A, Dickersin Deposition of January 27, 2009 at

---

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90, 592-93 (1993); Fed. R. Evid. 702.

158:24-159:3.)  Dr. Dickersin is not a medical doctor.  (Dickersin Dep. at 17:18-20.)  Nor has she ever conducted a randomized controlled clinical trial relating to prescription medication, served as an investigator in a clinical trial relating to prescription medication, designed a clinical trial related to prescription medication, or been involved in drafting or commenting on a clinical trial protocol regarding prescription medication.  (*See* Dickersin Dep. at 63:8-24.)  Dr. Dickersin admits that she reviewed only certain documents provided by Plaintiff's counsel, and further concedes that she has no knowledge of how those documents were selected.  (*See* Dickersin Dep. at 54:14-55:13.)  In fact, Dr. Dickersin has not reviewed a single deposition transcript from any witness in this case.  (*See* Dickersin Dep. at 130:19-131:9.)

Dr. Dickersin concedes that, from the very inception of her involvement in this case, Plaintiff's counsel has framed it as one "about fraud."  (*See* Dickersin Dep. at 58:22-59:1.)  Tellingly, Dr. Dickersin's notes from her first conversations with Plaintiff's counsel state that she was told that "this is [a] fraud case, [involving] misleading and deceptive conduct designed to mislead MDs."  (*See* Dickersin Dep. at 98:19-99:5; *see also* Exhibit B, Dickersin Notes.)  Although Dr. Dickersin concedes that she "[doesn't] know anything about fraud," (Dickersin Dep. at 99:4-6), her conclusions carefully track the language of Plaintiff's complaint.  In her expert report dated August 10, 2008 (Exhibit C, Report of Kay Dickersin, Ph.D), Dr. Dickersin concludes, among other things, that:

> The documents I reviewed represent a remarkable assemblage of evidence of reporting biases that amount to ***outright deception of the biomedical community and suppression of scientific truth*** concerning the effectiveness of Neurontin for migraine, bipolar disorders and pain.[3]

> A publication strategy, ***meant to convince*** physicians of Neurontin's effectiveness and ***misrepresent or suppress negative findings*** is clearly spelled out and executed when one views the Neurontin documents as a whole.[4]

---

[3] *See* Dickersin Rep. at 4 (emphasis added).

[4] *Id*. (emphasis added.)

> [T]hese cases reflect **clear intent to suppress information, deceive the medical community and manipulate messages** regarding the results of biomedical research.[5]

To arrive at these conclusions, Dr. Dickersin reportedly analyzed twenty-one clinical trials involving Neurontin, including their published results. (Dickersin Rep. at 22.) She purports to identify eight forms of "bias" in the studies: publication bias, selective outcome reporting, multiple publication bias, location bias, language bias, time lag bias, citation bias, and "ghost authorship." Dr. Dickersin is clear that each of these "biases" she has purportedly identified here are highly prevalent in clinical trial literature generally, and are not exclusive to the reports she reviewed in this case. (Dickersin Rep. at 7-17.)

In spite of her professed belief that bias is common in clinical trial literature generally, Dr. Dickersin repeatedly employs inflammatory and hyperbolic language to describe her observations with regard to the particular Neurontin studies she was provided, purporting to see a "shocking" frequency of intentional bias, "particularly insidious" examples of reporting biases, "outright deception of the biomedical community," "highly unethical" behavior," and a "clear and deliberate pattern of reporting biases." (Dickersin Rep. at 4; 22; 52.) Dr. Dickersin has provided no evidence or analysis supporting these bald accusations, and what scant evidence she does present in support of her conclusions is itself biased, inherently subjective, and methodologically flawed. Remarkably, Dr. Dickersin's analysis is driven in great part by her inclusion of six exploratory nociceptive pain trials she concedes were not a part of the "publication strategy" she purports to analyze, but were designed to study the efficacy of combination medications (gabapentin-hydrocodone and gabapentin-naproxen) that were never marketed. (Dickersin Dep. at 197:8-198:3.)

Finally, as Dr. Dickersin's report makes clear, the identification of scientific study bias does not, alone, prove any intentional pattern of deception. Nevertheless, her report repeatedly alleges motive and intent. Dr. Dickersin's attempts to side-step this inherent deficiency results in

---

[5] *Id.* at 33 (emphasis added).

her reliance on speculation, impermissible evidence, unreliable methodology and unsupported conclusions. Her opinions are nothing more than her personal, subjective opinions trying to pass under the guise of expert testimony. Not surprisingly, Dr. Dickersin has never even attempted to offer such unfounded and palpably improper opinions in any other litigation. (Dickersin Dep. at 10:17-22.)

## STANDARDS

This Court serves a vital "gatekeeping role" and must conduct a threshold assessment of "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. at 592-93. Throughout the evaluation, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. These "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000), require far "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

As a threshold matter, the testimony of expert witnesses – like any other witness – must be relevant under Federal Rules of Evidence 401 and 702. As this Court has recognized, in order for expert testimony to be relevant and admissible, "it must 'fit' the 'facts of the case.'" *Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997) (Saris, J.) quoting *Grimes v. Hoffmann-LaRoche, Inc.,* 907 F. Supp. 33, 34 (D.N.H. 1995) (citing *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995))). Courts must exclude expert evidence that is not "based upon sufficient facts or data," that is not "the product of reliable principles and methods," or whose methods are not applied "reliably to the facts of the case." Fed. R. Evid. 702. In fact, "'***any*** step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*.'" Fed. R. Evid. 702 advisory committee's note (2000)) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)) (emphasis and alteration in original).

Finally, "'[e]xpert evidence can be both powerful and quite misleading. . . . Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595 (citation omitted). To this end, an expert opinion's "lack of reliable support may render it more prejudicial than probative, making it inadmissible under [Rule] 403." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

## DISCUSSION

### I.    Dr. Dickersin's Testimony is Inadmissible Pursuant to Federal Rule of Evidence 702

Plaintiff bears the burden of showing that Dr. Dickersin's testimony satisfies the requirements of Federal Rule of Evidence 702. Where the subject of an expert's testimony is scientific knowledge, "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [and] the word "knowledge" connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.* As a result, any expert opinion must be grounded in a defined, verifiable methodology, and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 138, 146 (1997). Here, Dr. Dickersin has failed to meet these fundamental requirements.

### A.    Dr. Dickersin Impermissibly Opines About Intent and State of Mind

As a threshold matter, Dr. Dickersin's testimony about Pfizer's motives or intent is not admissible under Rule 702 because such testimony seeks to usurp the role of the jury. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). Simply put, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *Id.* at 547; *see also In re Fosamax Prods Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (precluding expert "from testifying as to the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials" because "[t]his is not a proper subject for expert or even lay testimony"); *In re Baycol Prods. Liab. Litig.*, 532

F. Supp. 2d 1029, 1067 ("Bayer's motives as to how it proceeded with evaluating Baycol's toxicity, and its reactions to its toxicologists's warnings are issues that can be decided by the jury, without expert assistance."); *U.S. Inf. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 226 (S.D.N.Y. 2004) ("Expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or of the motivations of the parties."); *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *2 (E.D. Pa. Feb. 1, 2001) ("[a]ny proffered *expert* testimony concerning the intent of AHP or any other entity (such as the FDA) shall be excluded on the basis that the question of intent is to be determined by the jury, not experts . . . ." (emphasis in original)).

Indeed, even if testimony about intent or motive were admissible – and it clearly is not – Dr. Dickersin's conclusions about intent and motive are both unsupported by the evidence and outside her expertise.  Here, Dr. Dickersin – having been instructed that the crux of Plaintiff's suit was fraud and a conspiracy to "deceive or mislead" – claims to have observed a "remarkable assemblage of evidence" that Pfizer intentionally manipulated its publications to deceive the medical community.  (Dickersin Rep. at 4.)  To be admissible, however, such testimony must be shown to have  a "'reliable basis in the knowledge . . . of [her] discipline.'"  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005) (citation omitted).  Further, an expert witness must be testifying to something that goes beyond simple lay experience.  *See United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994).  Dr. Dickersin's testimony fails on both counts.

At deposition Dr. Dickersin admitted that – to the extent that she claimed to have observed any intent or motive behind the bias she observed – her report goes well beyond her expertise:

> I'm not an expert at discerning the intent of a corporation.  But when I read a memo from a person, I can read whether it says they intend to do something or not.  It says nothing about the corporation.  But whether that person, what that person's intent was, I can't determine legally how that translates beyond that person.

(Dickersin Dep. at 264:17-25.)  Dr. Dickersin later reiterated her lack of any "special expertise" in gleaning intent – personal or corporate – from the emails and memoranda on which she based

her conclusions.  (Dickersin Dep. at 270:10-16.)  She admits that her conclusions about intent and motive are based on nothing more than *an ability to read the English language*:

> Q.      Do you have some special expertise in reading documents and concluding what the intent is from those documents?
>
> A.      Well, I would like to ask what special expertise is.
>
> Q.      Well, do you have any expertise?
>
> A.      I can read English.
>
> Q.      So that's not a special expertise; is it – reading English?  In this country?
>
> A.      It is.

(Dickersin Dep. at 266:4-15.)  Dr. Dickersin's testimony about intent cannot aid the jury if it is based on skills and knowledge the jury indisputably possesses.  *See Montas*, 41 F.3d at 783.  In addition, Dr. Dickersin also concedes the analysis she presents "ha[s] not typically been examined collectively as part of an overall publication strategy" (Dickersin Rep. at 4), and that it involves an "area of reporting biases that I haven't personally collected data in, ever before . . . [a]nd so it was a new area for me."  (Dickersin Dep. at 48:11-18.)   Dr. Dickersin testified that she had never even heard the term "publication strategy" before beginning her work in this case.  (Dickersin Dep. at 197:5-8.)

Because interpreting the letters and memoranda are not within Dr. Dickersin's "special expertise" and because Dr. Dickersin's conclusions about motive and intent are not supported by the trial reports themselves, her testimony is inadmissible.  Indeed, Dr. Dickersin's leap from bias to intentional deception is at best outside her expertise and at worst strategic speculation.  Such testimony thus constitutes an obvious "'step that renders [her] analysis unreliable'" and her testimony inadmissible.  Fed. R. Evid. 702 advisory committee's note (2000 Amendments) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745 (3d Cir. 1994)).

The problems inherent in Dr. Dickersin's conclusions were highlighted repeatedly during her deposition.  For instance, when questioned, Dr. Dickersin backed away from her use of the word "intent," implying instead that it was simply one word among many that she could

have used to describe the deception she claims to have observed.  (Dickersin Dep. at 267:2-12 ("I would have to read those documents again to see how they stated it.  But I decided to use the word 'intent.'  But many words have synonyms, including intend.").)  Dr. Dickersin further admitted that – her conclusions about Pfizer's alleged deceptions aside – she was wholly unfamiliar with the terminology used by pharmaceutical employees in their internal memos and emails, and thus was unfamiliar with the terminology in the very documents on which she based her conclusions.  (Dickersin Dep. at 195:7-14.)

In sum, Dr. Dickersin's expert testimony both fails to aid the jury *and* drifts far afield from her traditional area of expertise.  Under First Circuit law, a witness may not testify as an expert where, as here, she professes specialized knowledge on one subject but in actuality offers testimony on a different subject.  *See Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F.2d 1169, 1174-75 (1st Cir. 1992).  Nor may Dr. Dickersin present her own argument and interpretation of any email and memoranda under the guise of expert testimony.  *Rezulin*, 309 F. Supp. 2d at 541 ("[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'  Examples of 'expert' testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivations of parties" (citation omitted)).  Finally, to the extent that Dr. Dickersin relies on the emails and memoranda, such testimony that "merely repeat[s] facts or opinions stated by other potential witnesses or in documents produced in discovery" "is improper . . . because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help.'"  *Id.* at 546 (citation omitted).  Thus, Dr. Dickersin "lacks personal knowledge [and thus] may 'only testify about the underlying facts if [she is] actually bringing to bear [her] scientific expertise.'"  *Id.*  Dr. Dickersin's conclusions are both beyond her ken and invade the province of the jury and are therefore inadmissible as a matter of law under Rule 702.

**B.      Dr. Dickersin's Opinion on Ethics and Scientific Conduct are Inadmissible**

Dr. Dickersin states repeatedly, and emphatically, that Pfizer's publication record with regard to the Neurontin clinical trials was unethical or constituted "scientific misconduct."  For instance, she notes:

- "[B]ias in reporting of study findings represents unethical behavior . . . ."[6]

- "I find the behavior and actions visible through these documents highly unethical. . . ."[7]

- "Failure to publish study findings is not only unethical, it is also scientific misconduct."[8]

- "When reporting biases favor commercial interests, and industry withholds or manipulates data from trials it has sponsored, ethical issues are of particular concern."[9]

Dr. Dickersin's opinions regarding ethics and scientific conduct are inherently personal, subjective, and standardless, and thus have no place in a court of law.[10]  *See Harnett v. Ulett*, 466 F.2d 113, 118 (8th Cir. 1972) (excluding ethics expert testimony because "it invaded the province of the jury," had "no clear-cut standards," and it "was the expression of personal opinion rather than that of an expert"); *see also In re Baycol*, 532 F. Supp. 2d at 1053 (holding that "[p]ersonal views on corporate ethics and morality are not expert opinions"); *In re Rezulin*, 309 F. Supp. 2d at 543 (excluding ethics testimony on the grounds that it was "based on [the

---

[6] Dickersin Rep. at 4.

[7] Dickersin Rep. at 4.

[8] *Id*. at 8.

[9] *Id*. at 17.

[10] To the extent that Dr. Dickersin attempts to substitute her ethics opinions about Pfizer's duties and conduct for the law of the case, she likewise intrudes upon the province of the jury.  *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997)("It is black-letter law that "'[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge'. . . . [I]n our legal system, purely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge.") (citations omitted) (footnote added); *see also Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 54 (1st Cir. 2006) ("[I]t is the judge's role, not a witness's, to instruct the jury on the law."). Dr. Dickersin may not "communicate 'a legal standard – explicit or implicit – to the jury.'"  *Rezulin*, 309 F. Supp. 2d at 541 (citation omitted).

proposed experts'] personal, subjective views"). In order "[to] be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'mere subjective belief or unsupported speculation.'" *Goebel v. Denver & Rio Grande W. R.R.*, 346 F.3d 987, 991 (10th Cir. 2003) (citation omitted). Here, Dr. Dickersin's testimony is not grounded *in* the methods and procedures of science, but rather reflects her personal, subjective opinion about how those methods and procedures **should** be implemented.

The subjective nature of Dr. Dickersin's testimony regarding publication "ethics" and conduct is no more evident than in her allegation that Pfizer's "failure to publish study findings is not only unethical, it is also scientific misconduct." (Dickersin Rep. at 8.) Dr. Dickersin's sole support for this sweeping statement, however, only **suggests** that "both of these phenomena **should** be treated as scientific misconduct." Iain Chalmers, *Under-reporting research Is Scientific Misconduct*, 263 J. Am. Med. Ass'n 1405 (1990) (emphasis added).[11] Dr. Dickersin acknowledges, however, that the failure to publish a study violates no law or regulation. (*See* Dickersin Dep. at 176:6-11.) Dr. Dickersin offers zero evidence that Pfizer's publishing decisions during the relevant period in any way deviated from the best industry practices. (*See* Exhibit D, Report of Elizabeth Field, Ph.D at 4.) Finally, Dr. Dickersin has not identified any instances where any participant in a clinical trial was admonished or even charged with scientific misconduct for electing not to publish the results of a clinical trial. In sum, although the publishing record regarding the Neurontin studies may not reach Dr. Dickersin's personal standards, this purported failure of ethics and conduct is ultimately unhelpful to the trier of fact. As the *Rezulin* court explained:

> At their core, however, the witnesses' opinions regarding ethical standards for reporting or analyzing clinical trial data or conducting clinical trials articulate

---

[11] She offers similar, limited support for the proposition that failing to publish results is unethical: one article, advocating that research ethics committees should begin to consider the failure to publish results both unethical and a form of misconduct. *See* Gerd Antes & Iain Chalmers, *Under-reporting of Clinical Trials Is Unethical*, 361 Lancet 978, 978-79 (2003).

> nothing save for the principle that research sponsors should be honest.  Even if
> charitably viewed as a "standard," the testimony nevertheless is "so vague as to be
> unhelpful to a fact-finder."

*In re Rezulin*, 309 F. Supp. 2d at 543 (footnote omitted) (citation omitted).  Dr. Dickersin's

testimony about ethics is equally subjective and irrelevant.

The biases allegedly observed by Dr. Dickersin, which form the basis of her ethics

opinions, are likewise subjective and standardless.  For instance, Dr. Dickersin uses the word

"bias" at least 165 times in her report – but she never once defines it, nor does she offer any

methodology by which to measure its impact.  As her expert report suggests, bias exists in any

publication decision that does not comport with the "true state of research."  (Dickersin Rep. at

16.)  But Dr. Dickersin does not define what constitutes a "true state of research," either, nor

does she offer any insight into when, exactly, a deviation from the "true state of research"

becomes a bias, or – by extension – when that bias becomes "unethical."

The subjective nature of Dr. Dickersin's analysis reveals itself again and again.  For

instance, Dr. Dickersin accuses Pfizer of "time lag bias" on multiple occasions (*see* Dickersin

Rep. at 24, 25, 30, 32), and yet she confesses that "it is difficult to assign a uniform time that it

should take to report study findings after data collection has been completed."  (Dickersin Rep.

at 15.)  Instead, she asserts "an overarching scientific goal [] to make knowledge generally

available as quickly as possible."  (*Id.*)  She does not define "generally available," nor does she

explain how she measures or applies the requirement that a study be published "as quickly as

possible."  (*Id.*)  Similarly, Dr. Dickersin claims to have observed selective outcome reporting on

numerous occasions (*see*, *e.g.*, Dickersin Rep. at 24, 26, 30), and yet admits that "[b]y and large,

[Pfizer's] published reports were consistent in accurately stating their *a priori* choice of primary

outcome."  (Dickersin Rep. at 22.)  Instead, Dr. Dickersin locates selective outcome reporting in

Pfizer's clinical trial publications anytime and anywhere a "focus" is "placed" on the secondary

outcome.  As with her time lag analysis, she makes no effort to explain how "focus" is defined,

or just how much "focus" is too much.  In sum, although Dr. Dickersin appoints herself the final

arbiter of both bias and ethical conduct, her subjective opinion is not a "standard" which qualifies her to offer expert opinion.

C.   **Dr. Dickersin's Analysis of the Clinical Trial Reports is Unreliable**

Dr. Dickersin alleges that "[t]he documents [she] reviewed represent a remarkable assemblage of evidence of reporting biases that amount to outright deception of the biomedical community and suppression of scientific truth." (Dickersin Rep. at 4.)  But the "assemblage" of the reports themselves do not reveal any strategy to deceive the medical community.   For instance, although the two central planks of her report are the suppression of publication of clinical trials resulting in negative results and the manipulation of primary and secondary outcomes, a closer look at her data reveals no significant difference in either the publication rates or outcome reporting between Pfizer's trials and other studies undertaken both with and without the support of the pharmaceutical industry.  As Dr. Elizabeth Field, Pfizer's expert, noted in her rebuttal to Dr. Dickersin's report, "[t]he evidence demonstrates that Pfizer's approach to Neurontin-related publications was consistent with or exceeded the prevailing best practices in the industry at the relevant time."  (Field Rep. at 4.)

Dr. Dickersin makes three declarations about publishing rates in general:  (i) "depending on the setting, only 21% to 93% of all studies are published"; (ii) "that overall, the odds of publication for studies with positive findings was about two and one half times greater than the odds of publication of studies with negative or null results"; and (iii) that "almost all failure to publish is due to failure of the investigator to submit."  (Dickersin Rep. at 10.)   In each case, these studies were not confined to pharmaceutical industry-funded clinical trials, and thus the numbers represent publication rates free of any allegation of a strategy designed to mislead the medical public.  Although Dr. Dickersin believes the various forms of bias she identifies in her expert report are widely prevalent throughout the medical research community, she purports to have located "good evidence of *publication bias*" in her observation that, "[w]hile 4/5 studies with positive findings were published in full, only 6/16 of the studies with negative results were published and 2/6 of these were published in a format other than a full journal article."  (*Id*. at 22.)

12

In doing so, she makes no effort to compare the Neurontin studies against any general publication rates, nor does she make any effort to contextualize the risks or effects of the biases she purports to observe.

Initially, Dr. Dickersin concedes that her report miscalculates the number of published articles because it failed to account for the POP study published in August, 2008.  (Dickersin Dep. at 216:10-217:2.)  Further, Dr. Dickersin ignores the vast array of reasons why studies do not get published.  As she admitted during deposition, there are a number of reasons why studies do not get published, including, but not limited to, the lack of interesting results, issues with timing, and rejection by journals.  (Dickersin Dep. at 176:22-179:20.)  Dr. Dickersin made no effort to determine if any of these reasons were applicable.  (Dickersin Dep. at 176:1-5.)

More importantly, six of the ten studies that Dickersin counted as unpublished negative results relate to a single indication, nociceptive pain.  But Dr. Dickersin's report fails to mention that the nociceptive pain trials were exploratory in nature, and involved not gabapentin but gabapentin *and* hydrocodone and gabapentin *and* naproxen, <u>combinations that were *never* produced and *never* marketed.</u>  Dickersin acknowledges in her report, and acknowledged again at deposition, that there is no evidence of a "publication strategy" regarding nociceptive pain.  (Dickersin Dep. at 197:9-198:3.)  In spite of the fact that Dr. Dickersin herself describes this "publication strategy" as a "key element" in Pfizer's strategic deception, and in spite of the fact that Dr. Dickersin concedes that the gabapentin-hydrocodone and gabapentin-naproxen trials were not a component of this publication strategy, she nonetheless chooses to include those exploratory trials in her analysis.  The fact that the drug combinations were never produced, let along marketed, explains why the results of the trials were never published.  (Field Rep. at 26-27.)

Once those six irrelevant nociceptive pain studies are removed from her analysis, it turns out that four out of five studies with positive results were published and seven out of ten studies with negative results were published.  In both cases, the publication rates are not only within the general range that Dr. Dickersin herself identifies in her expert report, but actually exceed general publication rates.  Clearly, then, Dickersin's perception of an intentional bias from the

publication rates of the Neurontin's studies is predicated on her inclusion in the numbers of a discrete series of studies which not only were not part of the "publication strategy" she claims was central to Neurontin's misconduct, but which did not in actuality create any bias-risk as she defines it.

Dr. Dickersin's observations and conclusions about alleged outcome reporting in the Neurontin clinical trials fall prey to the same errors.  Dr. Dickersin's published research states that shifting emphasis onto a secondary outcome is not unethical or impermissible *per se*. S. Swaroop Vedula et al., *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361 N Eng. J. Med. 361; 20 at 1963 (2009).  Instead, she alleges that Pfizer's failure to conform to **her** particular, preferred method of outcome reporting is proof of a "strategy" to deceive.  As with her observations regarding publication bias, Dr. Dickersin does not offer any alternative explanations for the selective outcome reporting she claims to have observed.  As Dr. Fields explained in her expert report, the difficult and often subjective nature of clinical trials means that there are any number of reasons why endpoint focus might shift during a clinical trial.  (Field Rep. at 6-7.)

Dr. Dickersin turns her back on these real world concerns.  For instance, she alleges that the selective outcome reporting in the Neurontin publications was "particularly insidious." (Dickersin Rep. at 22.)  And yet, Dr. Dickersin makes no effort to compare the frequency or extent of this bias with that found in other publications and as a result she fails to explain what is "particular" about the bias she claims to have observed here.  In fact, the risk she identifies as "particular" – "the fact that most clinicians are untrained in recognizing and understanding most forms of bias and have little time to devote to reading an article in detail" – is true of any selective outcome reporting.  (Dickersin Rep. at 23.)  As Dr. Dickersin concedes, selective outcome reporting is widespread.  Her expert report notes that one study – conducted by a reputable expert in reporting biases, AW Chan [12] – has shown "primary outcomes differed

---

[12] AW Chan was listed by Dr. Dickersin as an "expert" in the study of reporting biases during her deposition.  (Dickersin Dep. at 159:15-19.)

between the protocol and published article 40% of the time" in trials funded by the Canadian Institutes of Health Research.  (Dickersin Rep. at 12; *see also* S. Swaroop Vedula et al., *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361 N Eng. J. Med. 361; 20 at 1964 (2009).  Contrary to the prevalence reported in the Chan trial, Dr. Dickersin acknowledges that "[b]y and large, [Pfizer's] published reports were consistent in accurately stating their *a priori* choice of primary outcome as described in the protocol."  (Dickersin Rep. at 22.) [13]   As with the purported publication bias, there is simply no evidence to support Dr. Dickersin's claim that the "focus" on secondary outcomes in the Neurontin reports is either "shocking" or evidence of a campaign of deception.   Not surprisingly, given the threadbare evidentiary support for her conclusions, Dickersin acknowledges in her report that the biases she analyzed for this study "have not typically been examined collectively as part of an overall 'publication strategy' taken on by product sponsors."  (Dickersin Rep. at 4.)

## II.    Dr. Dickersin's Opinions are Irrelevant under Federal Rules of Evidence 401, 402 and 702

As this Court has recognized, in order for expert testimony to be relevant and admissible, "it must 'fit' the facts of the case." *Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. at 661.  To determine whether or not an expert's testimony "fits" the factual context of the case, the Court should look at "the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact."   *Bitler*, 400 F.3d at 1234; *see also Sutera*, 986 F. Supp. at 661 ("Rule 702's 'fit' requirement 'refers to the necessity of a connection between the expert's testimony and the facts of the case.'") (quoting *Grimes*, 907 F.Supp. at 35).

Dr. Dickersin's testimony fails this fundamental test.  The presence of what she believes is reporting bias is in no way evidence of any intentional deception of the medical community,

---

[13] In fact, Dr. Dickersin's main criticism is the fact that "more focus was frequently placed on secondary outcomes." (Dickersin Rep. at 22.)  But Dr. Dickersin's emphasis on degree of emphasis is in stark contrast with the reality of clinical trial reporting.  As Dr. Fields notes, "[r]easonable clinicians can disagree as to both the endpoints and the tools to measure them." (Fields Rep. at 7.)

nor does it make the existence of any material fact "more probable or less probable." Fed. R. Evid. 401. Dr. Dickersin's opinion also falls short of the requirements of Rule 702, which "'goes beyond mere relevance [by] requir[ing] expert testimony to have a valid connection to the pertinent inquiry.'" *In re Rezulin*, 309 F. Supp. 2d at 540 (citation omitted). First, Dr. Dickersin concedes the widespread and pervasive presence of bias throughout the clinical trial literature, including clinical trials with no connection to, and certainly not under the control of, the pharmaceutical industry. (*See* Dickersin Rep. at 10, 12.) If such evidence is admissible here, it must – by extension – be admissible evidence of fraud against any and all doctors, researchers, laboratories, and institutes of health, who – as Dr. Dickersin concedes – are widely guilty of contributing to these same biases. Second, although her allegations of intentional deception are central to her conclusions, Dr. Dickersin admits that she cannot identify from the memoranda and emails any actual "intentional," concerted pattern of deception by Pfizer. (*See* Dickersin Dep. at 264:17-25.) (But . . . "**what that person's intent was, I can't determine legally how that translates beyond that person"**) (emphasis added).

As such, there is no "logical connection" between Dr. Dickersin's opinion and the ultimate issues of fact. The only connection between the evidence reviewed by Dr. Dickersin and her conclusions is speculative, beyond her expertise, and unreliable.

## III. Dr. Dickersin's Testimony is Inadmissible Pursuant to Federal Rule of Evidence 403

Under Rule 403, "otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Thus, even if this Court finds that Dr. Dickersin's testimony is relevant to this action – and Pfizer contends it is not – it still should be excluded due to its prejudicial and confusing nature. This general rule applies equally to expert testimony. "'Expert evidence can be both powerful and quite misleading. . . . Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595 (citation omitted).

16

What little probative value Dr. Dickersin's testimony possesses – and Pfizer contends it possesses none – is far outweighed by the likelihood that it will prejudice Pfizer, or confuse or mislead the jury.  *See* Fed. R. Evid. 403.  Dr. Dickersin repeatedly plays to this prejudice by relying on inflammatory rhetoric when such rhetoric is clearly unwarranted by the evidence.  Although Dr. Dickersin professes to see "shocking" prevalence of intentional bias, "particularly insidious" examples of reporting biases, "outright deception of the biomedical community," "highly unethical" behavior, and refers to a "clear and deliberate pattern of reporting biases," those conclusions are clearly unsupported by the data.   (Dickersin Rep. at 4; 22, 52.) Dr. Dickersin has provided no evidence in support of her claims that the Neurontin trials were "shockingly" biased.  When the irrelevant exploratory studies regarding gabapentin-hydrocodone and gabapentin-naproxen combination therapies for nociceptive pain are removed from the analysis the publication rates for the Neurontin studies actually exceed the industry norms.  Similarly, Dr. Dickersin's claim that "research funded by the pharmaceutical industry was less likely to be published than research funded by other sources" is irrelevant to this case and likely to prejudice the jury.  (Dickersin Rep. at 11.)  Worse, she offers no comparison between the pharmaceutical industry and the clinical trial population at large.  Likewise, Dr. Dickersin has offered no evidence suggesting that the frequency of the selective outcome reporting she observed in any way deviated from industry norms.

Dr. Dickersin's opinions will likely prove to be deeply confusing to the jury, who may mistake her conclusions – conclusions true of nearly any group of clinical trial studies – for evidence that Pfizer has intentionally deceived the medical community.  Dr. Dickersin actively courts this confusion, both by misstatement and by omission.  For instance, Dr. Dickersin never once in her report defines or contextualizes "bias."  As Dr. Dickersin's report makes clear, however, statistical bias is represented in any deviation from the "true state of research evidence."  (Dickersin Rep. at 16); *see also* Gerd Antes & Iain Chalmers, *Under-reporting of Clinical Trials Is Unethical*, 361 Lancet 978, 978-79 (2003) (decrying failure to publish because it allows "no general access to all relevant evidence.")  But, as stated above, and contrary to

17

Dr. Dickersin's apparent conclusions, the failure to attain this level of perfect information does not constitute – in any way, shape or form – a strategy to deceive or defraud.

"[T]he opinion of a witness impressed by the court with the label of 'expert' may carry a great deal of weight. . . . [P]ermitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which Rule 403 defends." *Elcock v. K-Mart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) ("Expert testimony that fails to make clear that certain facts the expert describes as true are merely assumed for the purpose of an economic analysis may not assist the trier of fact at all and, instead, may simply result in confusion."). Although Dr. Dickersin presents herself as a meticulous and independent watchdog of the public trust, her analysis in this case is anything but meticulous and independent.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant their motion *in limine* to exclude any opinions from Dr. Kay Dickersin at trial.

Dated: January 8, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:     /s/ Mark S. Cheffo
         Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

18

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:      /s/ Raoul D. Kennedy
         Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

         -and-

WHEELER TRIGG O'DONNELL LLP

By:      /s/ James E. Hooper
         James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

         -and-

WHITE AND WILLIAMS LLP

By:      /s/ David B. Chaffin
         David B. Chaffin

BBO # 549245
100 Summer Street, Suite 2707
Boston, MA 02110
Tel:  (617) 748-5200

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 8, 2010.

/s/ David B. Chaffin
David B. Chaffin