# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MDL Docket No. 1629 Master File No. 04-10981

In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION : Videotaped Deposition of: KAY DICKERSIN, PhD

---------------------------:

THIS DOCUMENT RELATES TO:

---------------------------:

HARDEN MANUFACTURING CORPORATION, LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/ BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL No. 68 WELFARE FUND; ASEA/ AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly similarly situated, v. PFIZER INC, and WARNER-LAMBERT COMPANY, :

---------------------------

THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., and :

AETNA, INC. v PFIZER INC. :

---------------------------

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
Index No. 765000/06

---------------------------:

In re: NEURONTIN PRODUCT LIABILITY LITIGATION :

---------------------------:

THIS DOCUMENT APPLIES TO: :

ALL CASES

---------------------------:

TRANSCRIPT of testimony as taken by and before PATRICIA A. SANDS, a Shorthand Reporter and Notary Public of the States of New York and New Jersey, at the offices of DAVIS POLK & WARDWELL, 450 Lexington Avenue, New York, New York, on Tuesday January 27, 2009, commencing at 9:07 in the forenoon.

REPORTING SERVICES ARRANGED THROUGH:
VERITEXT/NEW JERSEY REPORTING COMPANY
25B Vreeland Road, Suite 301
Florham Park, New Jersey 07932
Phone: (973) 410-4040 Fax: (973) 410-1313

APPEARANCES:

GREENE & HOFFMAN, PC
33 Broad Street, 5th Floor
Boston, Massachusetts 02109
BY: ILYAS J. RONA, ESQ.
PALKO GOLDMAN
617 261-0040
irona@greenehoffman.com
For the Class Plaintiffs

KAPLAN FOX & KILSHEIMER, LLP
850 Third Avenue
New York, New York 10022
BY: LINDA P. NUSSBAUM, ESQ.
212 687-19980
lnussbaum@kaplanfox.com
For the Coordinated Plaintiffs

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
BY: JAMES P. ROUHANDEH, ESQ.
MATTHEW B. ROWLAND, ESQ.
212 450-4000
mathew.rowland@dpw.com
For the Defendants

VIA TELEPHONE:

SHOOK HARDY & BACON
2555 Grand Blvd.
Kansas City, Missouri 64108
BY: CHRISTOPHER M. HARPER, ESQ.
816 474-6550
For the Defendants

ALSO PRESENT:
John Murdolo, Videographer

INDEX

| WITNESS | EXAMINATION |
|---|---|
| KAY DICKERSIN, PhD | |
| Mr. Rouhandeh | 6 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Dickersin 1 | Report | 7 |
| Dickersin 2 | E-mail re gift | 33 |
| Dickersin 3 | E-mail to Swaroop | 41 |
| Dickersin 4 | Telephone call notes | 53 |
| Dickersin 5 | Meeting notes | 64 |
| Dickersin 6 | Telephone call notes | 105 |
| Dickersin 7 | Subpoena | 121 |
| Dickersin 8 | Backonja article | 224 |

(Exhibits retained by reporter.)

KAY DICKERSIN, PhD,
Johns Hopkins Bloomberg
School of Public Health
615 N. Wolfe Street
Baltimore, Maryland 21217,
having been sworn, was examined and testified as follows:

THE VIDEO OPERATOR: Standby. Good morning, my name is John Murdolo, of Veritext. The date today is Tuesday, January 27, 2009 and the time is approximately 9:07 a.m. This deposition is being held in the office of Davis Polk, located at 450 Lexington Avenue, New York, New York.

The caption of the case is In Re Neurontin Marketing Sales Practices and Products Liability Litigation MDL Docket Number 1629, Master File Number 04-10981 in the United States District Court, District of Massachusetts.

The name of the witness is Kay Dickersin.

At this time the attorneys will identify themselves and the parties they represent, after which our court reporter, Patricia Sands of Veritext, will swear in

Page 10

had been fired from the case. Not the case, the study.

Q And what was your role in that case?

A I was the principal investigator of the study from which he was fired.

Q Were you responsible for the terminating?

A The Executive Committee of the study was responsible.

Q What was the name of the plaintiff?

A Michael Elman.

Q And you said that was prior to 1998?

A Yes.

Q Are there any other instances in which you have testified under oath?

A No.

Q Either as an expert witness or as a fact witness?

A No.

Q Have you ever been qualified as an expert in any litigation?

A No.

Q Have you ever been a party to a lawsuit?

A A small action, small claims court in

Page 11

1972 or 3 in California, asking for our security deposit back for rent.

Q Any other occasions?

A No.

Q Have you ever been asked to or attempted to be a lead plaintiff in a class action litigation?

A No.

Q To your knowledge, have you ever been a member of a class in a certified class action?

A I don't know.

Q If you would look at Appendix C to your report, which has been marked as Exhibit 1.

A (Referring to document.) Appendix C. What did it look like?

Q It's your CV.

A That will make if faster. All right.

Q Is this an up-to-date description of your business and professional career?

A As of the date that's on it, January 5, 2008.

Q Where were you looking at the date?

A The very last page.

Page 12

Q So it's little more than a year old?

A Yes.

Q Is there any significant professional experience -- well, strike that.

Is there any significant educational or training experience that you have had since January 5, 2008?

A No.

Q Is there any professional experience that you would -- significant professional experience that you have had since January 5, 2008?

A Do you mean as I have listed professional experience, is that your definition?

Q Yes. Yes.

A No.

Q What about professional activities, anything significant since January of 2008?

A I'm not sure what you mean "significant".

Q Well, if you were to update this as of today, would you add anything to the professional activities section?

A I would add some advisory panels. Do

Page 13

you know, I'm not sure I can remember what they are. But I am -- are you interested in hearing that?

Q Yes.

A I am on a new advisory panel related to breast cancer research.

MR. RONA: Dr. Dickersin, you can remove the clip if that's easier to work with the exhibit.

THE WITNESS: Okay.

A That's, ah -- there may be something I'm not remembering, but that's the major change.

Q Have you had any additional publications since January 2008?

A Yes, I have. I am not the first author on any of them. Do you still want to hear about them?

Q Sure.

A One is from a clinical trial we did comparing hysterectomy with endometrial ablation, and it's looking at the economic burden on women at baseline before they start the treatment.

I can't remember the exact date of the

Page 14

publication. Let me just see if it's on here. (Reviewing document.)
A publication from a randomized trial that we did comparing surgery to careful follow-up for people with ischemic optic neuropathy, and this was looking at visual field changes over time. A, uhm, a systematic review of, of studies of publication bias that came out this month.
Q Where was that published?
A In the Cochrane database of systematic reviews.
Q What did it relate to?
A It related to publication bias.
Q In any particular area?
A It was a systematic review of studies of publication bias across subject matter.
Q Did it relate in any way to Neurontin?
A No.
Q Did -- has your teaching, have your teaching responsibilities changed since January 2008?
A No. The major course that I teach is the third term every year, and I'm in the

Page 15

middle of teaching it.
Q What is that course?
A It's about how to do a systematic review.
Q Could you start with college and give me a brief history of your educational history?
A Okay. I started college at Bennington College in Vermont, where I had intended to study art. I left in my, in October of my junior year, because I decided I actually wanted to study science.
I worked for a year, and transferred to the University California at Berkeley. And I studied formally zoology, and cell biology was my interest. I continued and did a master's degree there. And --
Q What was the master's in?
A It was in the Department of Zoology in the area of cell biology. And I worked then for a number of years. And started graduate school at Johns Hopkins in 1979 in the Department of Epidemiology in the School of Public Health, or it was called the School of Hygiene at that time.
I left after two years, because of my

Page 16

husband went to medical school. And so I worked for four years, came back to graduate school and completed my PhD.
Q You left because your husband went to medical school; is that correct?
A That's correct.
Q You, ah -- so as I understand it, you have a bachelor in arts in zoology from the University of California at Berkeley; is that correct?
A That's correct.
Q And you have a master's in zoology also from Berkeley; is that correct?
A Yes.
Q And you have a PhD in epidemiology from Johns Hopkins; is that correct?
A Yes.
Q Where did you work after you obtained the master's in zoology?
A I taught at a community college called West Valley College in California, and a community college called Fullerton College in California. And then I worked at Dartmouth College in New Hampshire.
Q What did you do there at Dartmouth?

Page 17

A At Dartmouth I worked in a laboratory.
Q And how long did you work there?
A Two years.
Q What sort of laboratory?
A What sort of --
Q Laboratory.
A We were doing developmental biology.
Q And then you went in 1979 to Johns Hopkins; is that correct?
A Yes.
Q And you were there for two years, and then left for how long?
A Four years.
Q And then you resumed seeking a PhD when you returned; is that correct?
A Yes.
Q And Dr. Dickersin, you do not have any medical training; is that correct?
A That's correct.
Q Are you referred to as Dr. Dickersin?
A Yes.
Q I mean, do you refer to yourself as Dr. Dickersin in professional settings?
A Yes.

Page 46

it was around February.
Q Did you know --
A 2008.
Q Did you know Mr. Greene prior to the time he contacted you?
A No.
Q Do you know how he got your name?
A Not specifically. I think he just, it was recommended to him.
Q From whom?
A I don't know.
Q You have no idea?
A I don't know.
Q Do you know if it was from another expert in this case?
A I don't know.
Q What did -- can you please describe the conversation you had with Mr. Greene when he first contacted you.
A I will tell you what I can remember, which is that he explained that there had been a case in the past about a drug named Neurontin that had been settled in 2004, and that this was a new case about Neurontin and that he wanted to know if I would look at materials

Page 47

related to publication of results from clinical trials.
Q Anything else that you recall about that conversation?
A I don't think we talked about that much else. I mean, we may have, but that's what I remember.
Q How did you respond?
A I don't have enough time.
Q And you do you recall anything else about that conversation?
A I do remember that he said he had been working for 12 years on the case. Related. That's all I remember.
Q Was there -- do you recall anything else about that conversation?
A Do I recall anything else? I don't.
Q I take it from your answer you did not agree to be an expert at that time?
A I would not have agreed at that time. I'm -- what I remember then is -- I don't remember what I said, but it would have not been my practice to say yes, certainly because I didn't have time. What I would have said is I wanted to think about it.

Page 48

Q And did you think about it?
A Yes.
Q And did you -- what happened next?
A I said "yes" at some point.
Q You called him and said "yes"?
A I actually don't remember when that "yes" was exchanged.
Q Do you have subsequent conversations with him about the scope of the work?
A Yes.
Q Why did you say "yes"?
A The area of reporting biases is an area that's very important to me in my professional work, and I am concerned about it scientifically. And it's an area of reporting biases that I haven't personally collected data in, ever before. And so it was a new area for me, and I was interested in looking at an aspect of my work in a different population, if you will.
Q What area had you worked in prior to that?
A Well, I had done several studies following initiated studies that either came through Johns Hopkins institutional review

Page 49

boards or the NIH funding cycle. Those are two major examples. And followed those studies to see what the results were and whether they had been published.
So that was following -- those were major studies following cohorts of initiated studies. They were studies that came through Johns Hopkins. Those studies that came through Johns Hopkins, some were funded by industry, some were not. But what they had in common was that there were all conducted at Johns Hopkins. The studies that came through NIH were all funded by NIH. Some had joint funding, but they all were funded by NIH, and that's what they had in common. And they were clinical trials.
Q How did that differ from what you were going to be looking at in connection with this case?
A In two ways. These were all industry studies. And it was a small number of studies where I would be looking close in at what happened with those studies, instead of at a single question about where the study is published and what were the results.
Q Did you talk to anybody between the

Page 54

my interpretation now, but I don't know what I was thinking then. What's expected of me.
Q Okay, that was a question you were asking of the lawyers, what's expected of you?
A Yeah, what is, what will you expect me to do.
Q Do you recall what Mr. Greene said you were expected to do?
A Write an expert report after reviewing documents.
Q And anything else you recall about that?
A No.
Q Number 2 refers to "agreement only to get key documents". Do you know what that's referring to?
A I did not want to, ah -- I understand that there are many pages of documents related to this case. I did not want to have to read them all.
Q Because there were just too many and you didn't have enough time?
A I didn't have time. I wanted to focus on what I was supposed to do.
Q So this is reflecting your agreement

Page 55

that you wouldn't get all of the documents, you would only get key documents; is that correct?
A Yes.
Q And are those key documents that would be identified by Mr. Greene and the lawyers?
A Yes.
Q Do you know how many documents you did receive in connection with your work?
A Yes, those documents are listed in the report. And include the research reports and the published literature that's in the public domain.
Q Did you receive any documents that aren't listed in the appendix to your report?
A No. No, everything that I received is listed.
Q And do you know how plaintiffs' counsel went about selecting those documents to provide to you?
A No.
Q Do you, when you say declaration -- number 3, "declaration, how long, is that 30 to 40 pages?" is that a question mark?
A I'm think I'm talking about this

Page 56

expert witness report.
Q When you say "what is my role? Not court?", what does that --
A It means do I have to go to court.
Q What was the answer to that question?
A Maybe.
Q And you are fine with that?
A Yes.
Q When it says "meet lawyers personally", I take it, then, you had not met Mr. Greene as of that time?
A Right. This must have been a phone call.
Q Is that something that you wanted to do?
A Yes.
Q Why did you want to do that?
A Because I would be working with him.
Q And why does that matter?
A I wanted to know them better so that I would know about what people want to know about one another when they are going to work together.
Q You say "what to do with" and there is a dollar sign "what is allowed?" What are

Page 57

you referring to there?
A I'm not sure, but the way I interpret this now is that I knew that I didn't want to get any fee. And I wasn't sure what would be allowed. Would they be comfortable with putting the money in a special account for educational purposes.
Q Allowed by who?
A Greene's company. The lawyers.
Q Number 7 says "why not original experts"; do you see that?
A Uh hum.
Q What are you referring to there?
A In the Franklin case.
Q Did you know who the experts were in that case?
A I wrote down their names there, Mike Steinman and Seth Landeman. And Meg, who I guess was an author. I don't know who she is. I have never met any of them.
Q Have you ever read anything about them?
A I hadn't before this case.
Q Was this a question you were asking on that?

Page 58

A Yes.
Q In other words, why aren't they, why isn't Mr. Greene using the original experts?
A Why me?
Q What was the answer, if you recall?
A That this topic that I was being asked to participate in was related to my area of expertise, and it's not specifically what I am asked to do, their area of expertise.
Q And then the next is "Pfizer - dirty tricks;" what does that refer to?
A I just wanted to know if they had any experience with the defendants trying to get back at people who testified against them.
Q What did they say?
A No.
Q When you say no, they didn't have any experience with defendants trying to get back at experts; is that correct?
A Right, they didn't think that was something that I should worry about.
Q When you say "This case is fraud"; what is that?
A That's from the phone call, and what Mr. Greene said is the case is fraud. It's,

Page 59

that's what it's about.
Q So that's a note from something that he said, that you took of something that he said?
A Yes. I said, you know, what is this case about, probably. And he said this case is about fraud.
Q Up at the top it says "how much to charge, $4-500 an hour", what is that referring to?
A This is, since I don't do this, I haven't done it before, I didn't know how much to charge. And so I asked how much do you pay.
Q And they said $4-500?
A It says they said 250 to 400.
Q And then there is a reference to Brian Strom, $800 an hour, what's that about?
A So someone told me, but it's in these notes, what these individuals charge.
Q Do you know Brian Strom?
A I have met him I think, at a meeting. I don't know him personally.
Q And who was Curt F?
A Curt Furberg.
Q And did he tell you he charges $500

Page 60

an hour?
A I think somebody told me.
Q At the, sort of the middle of the page there is a note that says "others" and a list of names.
Do you see that?
A Uh hum.
Q What is that a list of?
A I would say that at least down to Colin Begg, these are names of people I suggested instead of me.
Q To do this work?
A Hmm?
Q To prepare an expert --
A Instead of me, because as I said, I really didn't have time to do it.
Q Who is Eric Turner?
A He had written an article about, that had been published in 2008. I don't know him, but he had written an article on a related topic.
Q And who is Ida Sim?
A She's a University of California, San Francisco. Her speciality is really informatics, and getting clinical trials

Page 61

results out to the public using informatics.
Q And who is Peter Gotzsche?
A He is, he has done research on selective outcome reporting, and reference bias or citation bias. So he's done research in this area.
Q Jerry Avorn?
A Jerry Avorn, again, he is somebody I just know by reading. And I have met him. He does research related to drug company marketing, I believe. More of marketing, not publication bias.
Curt Furberg is a colleague that I teach with in the summers. He does clinical trials, and he has done them for many years and has written a book on clinical trials. And so he is highly regarded in the field of clinical trials.
Bruce Psaty, I don't think I have ever met him. He has published on topics similar I think from materials from litigation, in a sort of similar topics. He is on the west coast, either in Oregon or Seattle. I don't know him personally.
Charlie Poole, is University of North

Page 62

Carolina. He has published on meta-analysis.
Colin Begg, I don't know what his current research is on, but he has published in the past on publication bias. That was a number of years ago.
The last two must be names that Tom gave me, because I have never met either one of them.
Q Do you know who they are?
A I don't. They are not in my field.
Q Now, there is a reference to a Ray, do you know who the Ray is?
A That's not the first name of Barkin? I must have thought so.
MR. RONA: Jim, do you want to take a break now? It's been over an hour.
MR. ROUHANDEH: Sure.
THE VIDEO OPERATOR: We are going off the record, the time is now 10:18.
(Off the record.)
THE VIDEO OPERATOR: Standby. We're back on the record in the deposition of Kay Dickersin. The time is now 10:33, this is tape 2.
MR. ROUHANDEH: We've been joined by

Page 63

somebody on the phone.
Chris, do you want to identify yourself for the record.
MR. HARPER: Sure. This is Chris Harper from Shook, Hardy & Bacon on behalf of defendants.
BY MR. ROUHANDEH:
Q Dr. Dickersin, have you ever personally conducted a randomized controlled clinical trial relating to a prescription medication?
A What do you mean personally conducted?
Q Been an investigator?
A No.
Q Have you ever had any responsibility for designing a clinical trial for a prescription medication?
A Not that I can recall.
Q Have you ever been involved in drafting or commenting on the draft of a protocol for a clinical trial involving a prescription medication?
A Not that I can recall. Could you tell me what a protocol is.

Page 64

Q You don't know what a protocol is?
A What your definition of a protocol is.
Q Well, do you have an understanding of what a protocol is?
A Yes, I do.
Q What is it?
A It's, ah, describes the design of a study. The reason I am asking you this is that sometimes protocols, always protocols are submitted for grant funding. And it may be at some time I commented for grant funding, but not on a strict protocol.
Q Okay, using the first definition, let me ask the question again.
Have you ever been involved in drafting or commenting on the draft of a protocol for a clinical trial involving prescription medication?
A Not that I can recall.
MR. ROUHANDEH: Can I ask the court reporter to mark as Dickersin Exhibit 5, a document bearing Bates stamp numbers Dickersin 001437 through 1441.
(Exhibit Dickersin 5 marked for

Page 65

identification.)
Q Could you please identify Exhibit 5?
A Identify?
Q This exhibit, this document.
A These are notes that I took in March of 2008 at a meeting with Tom Greene and Ilyas Rona.
Q And do you believe this was a meeting as opposed to a phone call?
A Yes.
Q Where was that?
A In Baltimore.
Q Was anybody else there?
A No.
Q And this is your handwriting, I take it?
A Yes.
Q Does anybody else's handwriting appear on the document?
A No.
Q Along the left-hand column near the top, there's a -- first of all, there's a date, March 25, '08. Do you believe that was the date of this meeting?
A Yes.

Page 98

results --

MR. ROUHANDEH: Read the --

THE WITNESS: No, it's not correct to say.

MR. ROUHANDEH: Let's read the question back and get a clean answer. And I want you to answer this question yes, no or I don't know.

(The pending question was read back by the reporter.)

MR. RONA: Same objection.

THE WITNESS: No.

BY MR. ROUHANDEH:

Q Page 4 of Dickersin Exhibit 5 refers to Michael, Seth and Meg. Is it your testimony that you don't know any of those people personally?

A I don't know them personally.

Q Then the next statement says: "This is fraud case, misleading and deceptive conduct designed to mislead MDs."

Do you see that?

A Yes.

Q Is that a statement that Mr. Greene or Mr. Rona made to you?

Page 99

A I don't remember.

Q Is that a statement that you made?

A That I made?

Q Yes.

A I don't know anything about fraud, so.

Q So it's unlikely that was a statement --

A It's unlikely --

Q -- that you would have made?

A That that was a statement I made. I made the statement in writing, but it's unlikely something that I initiated.

Q There's a - two-thirds of the way down that page there is a reference where it says "need", underlined: "1) principal spokesman."

Do you know what that refers to?

A No.

Q Did Mr. Greene or Mr. Rona ever ask you to be a principal spokesman for anything?

A No.

Q Have you ever heard any of the other experts in this case referred to as principal spokesman?

Page 100

A No.

Q Under "Documents", that same page, there is a reference where it says "Marketing assessments - gateway."

Do you know what that means?

A No.

Q There is a reference to "look for ITT paper." Do you know what that means?

A Intention to treat.

Q What are you referring to there?

MR. RONA: Objection.

THE WITNESS: I don't know.

Q What's intention to treat?

A It's a way of analyzing results from a clinical trial.

Q And have you read any published articles relating to intention to treat?

A Yes, many.

Q Okay, and did you, as part of your work here, look at any and rely on them in connection with any of your opinions?

A In my report I give a definition of "intention to treat", as I recall.

Q In reliance on published literature?

A As I recall, the definition that I

Page 101

used came from the Cochrane Collaboration.

Q On page 5 of Exhibit 5, there is a reference where it says "experts", and underneath that it says "Curt Furberg - ask".

Do you know what that means?

A I may have still been wondering whether to do this, and wondering about others who could do it instead. Or -- I'm not sure.

Q Were you ever asked by Mr. Greene or Mr. Rona, or any other lawyers in this case to talk to Curt Furberg to see if he would become an expert?

A I wasn't asked in that way. I was, I said that I was concerned about the amount of time that this would take, and that I wasn't sure if I could do it. And that there might others who could take it on alone. I considered are there any others I could work with. And so I, those are all things I thought about, but didn't come to pass.

Q Did you say to Mr. Greene or Mr. Rona that you would ask Curt Furberg to see if he would become an expert?

A I don't recall whether I said that at this meeting. I don't recall.

Page 130

Q What kind of doctor is he?
A Pathologist.
Q Have you talked to anyone, any other doctors, other than your husband, other than experts in this case, about Neurontin?
A No.
Q Did you review any documents relating to any of the plaintiffs or their doctors in this case?
A After the documents were unsealed, I, as I said, I perused Dr. Abramson's report. And that's pretty much it.
Q Anything else?
A Any other, like what?
Q Did -- any other documents relating in any way to the plaintiffs or their physicians?
A No.
Q Did you review any testimony or deposition transcripts of anybody relating to Neurontin?
A The only thing I saw was what was in Elizabeth Field's report. She had some quotes from people.
Q But you didn't look -- other than

Page 131

looking at her report, you didn't look at any documents that were transcripts of testimony or deposition testimony?
A No.
Q Do you know if that, if any deposition testimony or transcripts of testimony were provided to you by the plaintiffs's counsel?
A I haven't seen any.
Q I believe you testified earlier today about preparing for this deposition. As I recall, you said you met with certain individuals from Mr. Greene's law firm in preparation; is that correct?
A Well, we talked on the telephone.
Q How many times -- well, let's step back for a second. What did you do to prepare for this deposition?
A I read Elizabeth Field's report, I reread my own report. Those are the two main things I did. I talked with Swaroop about just clarifying my memory on some aspects of it, but that's all.
Q On what aspects?
A It was mainly things that were

Page 132

written down -- and just I'm trying to think here, ah, what we actually -- you know, we just we talked for about an hour on Sunday. And I guess we just sort of walked, it was just sort of like a refresher.
Q Other than talking -- how long was that?
A About an hour.
Q So other than talking to Swaroop, reading the report of Dr. Field, and rereading your own report, you didn't do anything else to prepare for the deposition?
A I'm trying to think what I would have done. That's really it. Reading.
Q Did you talk to Mr. Greene or anybody else from his firm?
A Well, yes, we talked for about two hours. Mr. Greene and Mr. Rona, Mr. Goldman.
Q When was that?
A Sunday.
Q And what did you talk about?
A They told me, uhm --
Q Just general topics.
A -- what it would be like. You would ask me questions. There would be a video

Page 133

recorder and a court reporter. How many people would be in the room. It was a lot of generalities about the process, because I had never really done this in the same way before.
Q Anything else, general topics that you discussed?
A Ah, we went over things again and again about that, since I'm bit of a neophyte here.
Q I'm just asking this, but I understand you're saying, what you testified to, you went over more than once, but any other general topics?
A Not that I can recall.
Q And that was on Sunday you said?
A Yes.
Q Were you given any documents to review?
A No.
Q Did you ask your graduate student, the graduate student who assisted you, to search for documents?
A To search for documents -- uhm, where we looked for documents was to check for publications that, for example, there was a,

written less about?

A Well, these are the major ones. There are probably others that I'm not thinking of off the top of my head, but these are, I think, what the major reporting biases are.

Selective outcome reporting, there wasn't much -- I mean, one question is what's written about versus where is their research. So selective outcome reporting, there wasn't much research about it until 2004. And it's become a big topic, but it may be written less about not because it's less important or less of a hot topic, but because it's a new idea that's been researched.

MR. ROUHANDEH: Okay, why don't we take a lunch break.

THE VIDEO OPERATOR: We are going off the record. The time is now 12:44.

(Lunch recess.)

THE VIDEO OPERATOR: We are back on the record. Again, the time is 1:51, this is tape 4.

BY MR. ROUHANDEH:

Q Good afternoon. What do you consider yourself an expert in?

A Clinical trials, systematic reviews, publication and reporting biases. Those are my main areas.

Q Who else would you consider an expert in those areas?

A Some people may be an expert in one of those areas, but not another. So what, you want a list of names?

Q Yeah.

A All right. Clinical trials, Curt Minert, Jim Tannasha, Barbara Hawkins, Dave DeMetts, Larry Friedman, Janet Wites, Susan Elenberg, Steve Goodman, Colin Begg -- to name a few.

Q And the next area?

A And reporting biases, I would say Jessie Berlin, An Win Chan, probably Peter Gotzsche. I think Lisa Bero is, as well. Those are some of the people.

Q Can you think of others?

A I'm sure I can. Let's see. I think his name is Su Gin Fong, or Fu Gin Song. He is in the UK. I just have to think I little. I can look at my reference list, that will help me. Could I look?

Q Sure.

A (Referring to document.) So I think Mathias Egger has done some work in reporting biases, not exactly publication bias, but related to different reporting biases.

Peter Juny, Peter Gotzsche, Sally Hopewell, John Ionnidis, Joe Lexchin. Bobby Scherer, specifically related to abstracts.

I would say those are the people who have done the bulk of the work, when I'm talking about a large body of work. Many other people have contributed a great deal, but it's not necessarily their main area of expertise.

Q And what's there a third area?

A Systematic reviews. Lots of people there. Ian Chalmers -- all right, let me look. Gary Antes, Lisa Bero, Druman Rennie, Doug Altman. Did I say Ian Chalmers? Julian Higgins, Sally Green, Mathias Egger, Doug Altman, David Moher, Peter Gotzsche, Christian Gluud, Dibena Gersey (phonetic), John Ionnidis, Joseph Lau, Chris Schmidt. David Sackett, Peter Juny, Eric Von Elm.

That's a smattering.

Q Are there others that come to mind

sitting here now?

A That come to mind? I really would need to sit and think. If you would like a list, I could do it between now and the next time I talk to you.

Q Sure, that would be helpful. You refer to -- in the executive summary of your report, you refer, on page 4 in the fourth paragraph, to an "outright deception of the biomedical community".

Do you see that?

A Paragraph 4?

Q Yeah. Second line.

A Okay.

Q Did you speak to any doctors about whether they -- about their experience with neurontin?

A No.

Q Did you ever speak to them, any doctors about whether they believed they were deceived by anything the company did?

A No.

Q Did you conduct a survey of doctors to establish whether the biomedical community was deceived?

Page 174

A I was.
Q So you're saying you were the lead author with respect to those three. And then you refer to those three in the --
A Right.
Q -- "How Important is Publication Bias?"
A The two Johns Hopkins studies were reported in one paper. The data were reported separately.
Q Okay. And the cite to that is included in "How Important is Publication Bias?"
A Yes.
Q And the NIH?
A That's a separate publication, also. That's separate from the other publication.
Q Where is it?
A It's published in an online journal that is no longer operating.
Q Can you -- is it something that somebody got onto the Internet could find?
A That somebody could find? I'm not sure of that. I'm not sure how it's available now. The National Library of Medicine has the

Page 175

online journal.
Q We would ask if you could produce a copy of that.
A Of course.
Q Are you aware of any research, other than your own, as to asking the question of why investigators didn't publish the results of their research?
A There is a study, I may cite it in here. Let me look. There is a study, it's an abstract follow-up study where they followed abstracts to see how many became full publications. Yes, I did cite it, by Timor.
Q What page is that on?
A Fifty-seven.
Q That's the publication bias on gastroenterological research?
A Yes.
Q Can you think of any others?
A I can't offhand. I would have to look it up.
Q Are there lots of others?
A I don't know.
Q Just so it's clear: In this case you did not do -- strike that.

Page 176

In this litigation, you did not do what you did in the two Johns Hopkins studies and the NIH study, which is ask the investigators why they didn't publish; is that correct?
A That's correct.
Q Were you aware of any legal or regulatory requirement that the results of all clinical studies be published?
A There is no -- I know of no legal or regulatory requirement. It's not, no, I don't know.
Q And you're aware that there are many reasons why a study might not be published; is that correct?
A Yes.
Q That's what your research showed --
A Right.
Q -- is that correct?
A Many, I was struggling with "many".
Q It wasn't a trick question.
A Okay.
Q I mean, your research showed that there were a number of --
A A number.
Q A number of reasons why --

Page 177

A Correct.
Q -- the results of clinical studies are not published.
Is one of those that, ah -- is one of those reasons that perhaps a journal rejected publication of the article?
A It is a reason. When you look at the data, it's a tiny reason.
Q Tiny, as a percentage?
A Two percent of the time.
Q What's the 2 percent? Two percent of the time that --
A Unpublished -- that when we asked investigators with unpublished research why they did not publish, 2 percent of the respondents say because the paper was rejected.
Q Was one of the reasons given that the results were, of the study, were unreliable?
A Unreliable? Not -- it wasn't specifically said that way.
Q Was something like that said?
A Well, I don't remember a response that would have been classified unreliable. So, I guess I'm -- could you help me with what "reliable" means?

Page 194

Q How have you heard it used?
A I have heard it used, for example, ah, it, it -- when we talk about trial registration and whether trials should be registered at inception, I have heard people discuss whether exploratory trials would be included.
And the discussion that invariably ensues is what is an exploratory trial. It's a term, people don't know what it means, and so that's why I'm asking you what does it mean.
Q Have you ever heard the term "pilot study, pilot trial?"
A Yes, I have. Not pilot trial. I have never heard of a pilot trial, I have heard of a pilot study.
Q What's a pilot study?
A A pilot study is a study where you're examining the methodology that you're going to use. So you might be testing forms, you might be testing recruitment methods, etcetera. But you are not testing whether something works or not, that's not a pilot study.
Q Have you ever heard it referred to, a pilot study referred to a test that involves

Page 195

determining whether a medication works or not?
A I have never -- I have never heard that. I believe I did see it in one of the memos that I reviewed, but it's not a term that that's ever used for testing a drug. In my experience.
Q Okay. And when you say your experience, you are not familiar with the terminology used by pharmaceutical company employees; are you?
A Not what they would use in internal memos, but certainly in my studies and the people that I work with, including people of the Society for Clinical Trials who are people from the government, from drug companies, etcetera. We tend to use the same language, and early clinical trials are not called pilot studies in that, in any of the settings I have been in. I don't know what employees use in their internal e-mails.
Q What society were you referring to?
A The Society for Clinical Trials.
Q And did you say that there are people from pharmaceutical companies who participate in that society?

Page 196

A Yes.
Q Is there anybody from Pfizer who participates in that society?
A I'm sure there probably is.
Q Do you know who?
A I don't know.
Q Do you know of any individuals from other pharmaceuticals companies who participate in that society?
A Yes.
Q What companies?
A J&J. Uhm, I would have to look. I really would have to look. I don't tend to know which companies people are associated with. They are colleagues.
Q And what is the -- what is the purpose of that society?
A I would have to look up the exact mission, but it's something like to, uhm, to provide a place for people in the profession of doing clinical trials to keep, to report methods, new methods, methods they are using, and maintain their knowledge base and meet with others of the same interests.
Q You refer in your report to the term

Page 197

"publication strategy".
A Yes.
Q Page 19 of your report.
A (Referring to document.)
Q Have you -- prior to preparing your report, have you heard of the term "publication strategy"?
A No.
Q You say on page 21 of your report that the marketing assessment that you reviewed for nociceptive pain does not discuss a publication strategy per se.
Do you see that?
A Yes.
Q What does that mean "per se"? Is that, does it discuss a publication strategy or doesn't it?
A It, it -- what I believe I mean there is it did not use the term "publication strategy".
Q But does it propose what you understand to be a publication strategy, it just doesn't use those words; is that what you're saying?
A I would have to look again at the

Page 198

marketing assessment. Based on what I have said here, it doesn't appear that they discuss a publication strategy.

Q Turning page 22 of your report.

A (Referring to document.)

Q In the second paragraph on section 2.2 on page 22 of your report, you refer to some numbers here, the numbers 16, 21, 4, 5, 6, 16, what are those numbers referring to?

A Numbers of studies.

Q And is it correct that you looked at -- the highest number here is 21. You looked at 21 studies related to Neurontin; is that correct?

A Yes.

Q Yes?

A Yes.

Q And are those 21 studies listed in tables 1, 2, 3, 4 -- 1, 2, 3 and 4 on pages 24, 25, 26, 27, 28, 29, 30, 31 and 32 of your report?

A I would have to look back to see how a sub study -- I know there is a sub study in here, how that was counted. Okay, I need to add things up.

Page 199

Q If you can just tell us what you're adding up?

A I'm adding up the numbers in each of the tables.

Q So in table 1 there are three studies?

A Three. So, and then in table 3 --

Q What about table 2?

A Table 2 there are three. Table 3, it depends on how you count a sub study. I believe we merged them. 1, 2, 3, 4, 5, 6. So that would be six for nociceptive pain. And then 1, 2, 3, 4, 5, 6, 7, 8, 9, so that should be 21. Correct? Yeah, 21.

Q So in table 3 you said there was a sub study. What's the sub study?

A It was done on a subset of patients. And that's, ah, I'm sorry. It says 1035001, addendum B, postop dental pain.

Q On the bottom of page 28, the last --

A Exactly.

Q So just to recap here, in doing the analysis that you do in the second paragraph on page 22, you looked at three studies in the area of migraine; is that correct?

Page 200

A Yes.

Q You looked at three studies in the area of bipolar; is that correct?

A Yes.

Q You looked at six studies in the area of nociceptive pain; is that correct?

A Yes.

Q And you looked at nine studies in the area of neuropathic pain; is that correct?

A Yes.

Q Okay, if I'm reading this correctly on page 22, I believe you're saying that there were ten negative -- ten studies with negative results that were not published; is that correct?

A Where are you here?

Q Second paragraph of, on page 22. You say well, four out of -- 4/5, does that mean 4 out of 5?

A Yes.

Q And when you say -- well, 4 out of 5 studies were positive findings were published in full, only 6 out of 16 of the studies with negative results were published; is that correct?

Page 201

A That's correct.

Q So that means that ten studies with negative results were not published, according to your analysis; is that correct?

A So 1 plus 10, right? The -- or are you only looking at the negative results?

Q Only looking at studies with negative results.

A Yes, that's right.

Q Okay. If you look at page 27, table 3, which carries over a couple of pages, and relates to nociceptive pain, those six studies. Those six studies were all of, ah, a combination of a product of Neurontin and another medication; is that correct?

A Not all of the groups were a combinations, some were one product alone.

Q In table 3?

A Yes.

Q Okay, so which one?

A I would have to get the original. Well, I might be able to get it from the tables, or we could get the original protocol.

Q And you're saying one of these six?

A No, I'm saying that in some -- there

Page 214

THE WITNESS: No, no, I have negative results here. I want to go back and refresh my memory about each of those studies. Because this is a summary table and I stand by my report, but I want to go back. And I would feel most comfortable if I could look at each of those reports and refresh my memory.

Q But as far as table 2 of the nociceptive pain section of the appendix, this shows either six studies -- it's either seven studies or six studies and an addendum, as being negative with no publication; is that correct?

A That's correct.

Q What are the other three or -- well, you counted those as six studies, because you said there were 21. So that's six nociceptive pain studies that you say had negative results and were not published, according to your report.

What are the other four studies that had negative results that were not published?

And if you could refer, at least in the first instance to tables 1 through 4 in the

Page 215

main body of your report.

A Okay.

Q And if you need to go back to the appendix, that's fine, but if we could just start with the migraine studies, table 1.

A All right, so, Wesley final results were not published. They only published the preliminary results, they never published the final results.

Q So you are counting that as a study with negative results that was not published; is that correct?

A I did not count that as not published.

Q That's not one of the ten?

A I don't believe so. You know, ah, I don't have a chart of each of these counts and so I could reconstruct my counting.

Q Well, that's essentially what I'm asking you to do right here.

A Okay, all right.

Q Why don't you use this piece of paper, which is slightly bigger than your napkin.

A Thank you. (Reviewing document.)

Page 216

See it was page 23 did you say?

Q Yes.

A So 6 -- so it's 3, 3, 6 and then 9. Okay, so in migraine, one out of three were not published.

Q Which one is that?

A Excuse me?

Q Which one is that?

A It just has a number, 217.

Q All right, 945-217?

A Right. And bipolar, they were all published. And the nociceptive pain, none of the six were published.

In the neuropathic pain, at the time this report was written, to my knowledge, the POP study was not published, but it was published in August. And I did not see it until after this report was submitted, so that's listed as a non-publication, but it was published in that month, and we identified it later on in December, I believe. Sometime around the fall.

271 is not published. That's the first number there.

Q That's the POP study?

A That's the one that where we

Page 217

discovered a publication, was POP. Oh, sorry, 271 and POP are one and the same, you're right.

The 224, that is a case where the original study was not published in a full article, but the data were incorporated into a selective pooled analysis in Backonja 2003. And the rest were published.

Q That's nine including POP; isn't it?

A That's nine, if I have that right. It depends how you count that. Let's see, I haven't counted the 1008 A945-1008, that's no publication.

Q That is a, ah, the results were, ah -- did you consider that a study with negative results?

A I will look and see how I, what I called it on table 2, which is where I classified it. Let's see. I did not call that -- so 1008, I did not call publication bias.

Q Okay, so that's not the, ah -- that's not the 10th of the 10 studies that you say had negative results that were not published?

A Okay, so let's look again. Uhm, so, 917 was negative results, not published, that's

Page 262

THE WITNESS: I just don't know enough about what Johns Hopkins having a subscription means to people at Johns Hopkins, and whether, ah, you know, access and having a possibility of seeing something is different from actually seeing something.

So there are many subscriptions to journals that people never look at, so I don't know how to answer your question, because "access" has two separate meanings, in terms of, you know, do the poor have access to health care. What's access? You know. And it's the same thing here, what's access to a journal.

So that's, I don't -- it's not my field, I don't know what it means if you have a subscription to a journal to say whether there is real access, whether people use that journal, what the connection between a subscription by a university and an individual's use. We don't know about the individual. Just as when we do population studies, we don't know what happens to an individual.

Page 263

Q You have access to JAMA?
A Yes.
Q Through a subscription by Johns Hopkins; is that correct?
A Yes.
MR. RONA: Objection.
Q That's what I mean by "access". The ability to go online or go into a library and pull a copy of a journal off a shelf and look at it.
So using that as a definition of access, isn't it true that if Johns Hopkins has a subscription -- well, put it this way.
It's true that the journals that Johns Hopkins has access to, or has subscriptions to, means that there are many, many people at Johns Hopkins who have access to those journals?
MR. RONA: Objection.
MS. NUSSBAUM: Objection.
THE WITNESS: It means they could look at the journal sitting in their chairs at Johns Hopkins.
Q And when you use the term "circulation" does that mean, to your knowledge, number of subscriptions or number of

Page 264

people who have access?
A That's a number of subscriptions.
Q Look at page 33 of your report. You referred to some case studies in this section of your report; correct?
A Yes.
Q And you say in the third sentence of the first paragraph on page 33, "Taken both individually and together, these cases reflect clear intent to suppress information."
Do you see that?
A Yes.
Q You are not an expert in discerning the intent of a corporation are you?
MR. RONA: Objection. Asked and answered.
THE WITNESS: I'm not an expert on discerning the intent of a corporation. But when I read a memo from a person, I can read whether it says they intend to do something or not. It says nothing about the corporation. But whether that person, what that person's intent was, I can't determine legally how that translates beyond that person.

Page 265

Q So your conclusion here about a clear intent, that came from reviewing documents; is that correct?
A Yes.
Q Those are the documents listed in, ah --
A Appendix B.
Q -- Appendix B to your report; is that correct?
A Yes.
Q And in determining that intent, you didn't talk to the authors of any of those documents; did you?
A No.
Q And you didn't talk to any of the recipients of those documents; did you?
A No.
Q Do you have some special expertise in reading documents and concluding what the intent is from those documents?
MR. RONA: Objection.
THE WITNESS: No.
MS. NUSSBAUM: Objection.
MR. ROUHANDEH: Did you say "no"?
THE WITNESS: I said no, but it

Page 266

depends on what intent is. I, just reading the documents in English and what they say.

Q Right. The question I think you said no to is, do you have some special expertise in reading documents and concluding what the intent is from those documents?

MR. RONA: Same objection.

THE WITNESS: Well, I would like to ask what special expertise is.

Q Well, do you have any expertise?

A I can read English.

Q So that's not a special expertise; is it -- reading English? In this country?

A It is.

SPEAKER 1: Objection.

Q Well, you would agree that there are hundreds of millions of people in the United States that can read English; is that correct?

A All right, then I would ask what's intent.

Q As you use it here.

A So if someone writes "I intend to mail a letter tonight", since I read English, I interpret that to mean that the person intends

Page 267

to write a letter tonight.

Q So if you're, ah -- what about if they don't use the word "intent"?

Is that only based on documents where -- is your conclusion based only on documents where people stated "this is my intent"?

A I would have to read those documents again to see how they stated it. But I decided to use the word "intent". But many words have synonyms, including intend. You know, there might be phrases that a person who speaks English would translate to intend.

Q So your only, your conclusion that there is a clear intent is only based on situations where the author of a document says "I intend to do something" or using some synonym?

MR. RONA: Objection.

Q Is that correct?

MR. RONA: Objection. Mischaracterizes.

THE WITNESS: I didn't say that.

Q Are you expressing an opinion? What did you say?

A I believe I said that -- well, let's

Page 268

hear what I said.

Q (Reading from reporter's realtime screen.) "I would have to read those documents again to see how they stated it, but I decided to use the word intent, but many words have synonyms. There might be phrases that a person who speaks English would translate to intend."

A If we could look at some examples. I mean, I would -- I would have to look through this report and find examples. But my statement stands.

Q But where the person doesn't use "intend" or a synonym, did you draw the conclusion as to what the intent was of the author?

A Well, I mean, let me look here. (Reviewing document.)

Here is an example on page 34 at the bottom: "What is critical is that 224 is not submitted to any publication until we know when the two UK studies are going to be published." I would interpret that as "intend".

Q Do you have any special expertise to read that document and form conclusions based on that?

Page 269

MR. RONA: Objection.

THE WITNESS: I do not know what kind of special expertise one would have to have to be able to read that and give a different interpretation that's written in English.

Q So if you don't know what kind of special expertise you would have, then you don't have it; do you?

MR. RONA: Objection.

Q You're not claiming to have special expertise in reading a document and determining what the author intended?

MR. RONA: Objection.

MS. NUSSBAUM: Asked and answered.

THE WITNESS: If an expertise doesn't exist, then how could a person not have it? So, you know, I don't understand your question in that way.

I don't know of the expertise you're referring to, and so I don't believe you can say I don't have it. It's not an expertise I've ever heard of.

Q If something doesn't exist, you can't have it; is that right?

Page 270

MR. RONA: Objection.

Q You don't know of any special expertise in reading documents to determine what the author intended; correct?

MR. RONA: Objection.

MS. NUSSBAUM: Objection.

THE WITNESS: I do not know of an expertise that determines a person's intent.

Q And, therefore, you have no special expertise on reading documents to determine what the author intended; is that correct?

A I don't claim --

MR. RONA: Objection.

THE WITNESS: I don't claim to have that expertise.

MS. NUSSBAUM: Asked and answered, I suggest we move on.

Q I just want to make sure you got the answer to that.

I believe you said "I do not claim to have such expertise"; is that correct?

A That's right. Because I never heard of such expertise, so I am not claiming to have something I have never heard of.

Page 271

Q What methodology did you use to read documents and form a conclusion as to what the intent of the author was?

A In this section, what I'm doing is I'm taking documents that I read and I am interpreting those documents. I'm not saying what anybody intended, I'm saying what my interpretation is from reading that.

Q One of the case studies that you refer to is relates to the study conducted by Dr. Cirpele (phonetic); is that correct?

A That's correct.

Q Page 31 of your report, you say that the Cirpele report was written by hired medical writers.

Do you see that?

A Yes.

Q What's the basis for that statement?

A What's the basis of the statement -- (Reviewing document.) So there are e-mails, on page 42 at the bottom there is communication between medical action communications talking about finding language for poster presentations. There is an e-mail from a person at Quintile is talking about problems

Page 272

they are having with quote "spinning Cirpele" unquote, and how they are going to make a case in the poster.

So this is from the case, that's not necessarily what's referred to in the, on page 31 that you referred to.

Q Okay, page 31 suggests -- well, states that medical writers at Synergy wrote the Cirpele article; is that correct?

A I, ah -- to get the specific place and document in which that was noted, I would have to look at the original documents again.

Q You stand by that view that medical writers at Synergy wrote the Cirpele article; is that correct?

A I want to look at my exact wording and make sure what I'm saying "yes" or "no" to what's written. I stand by my report. Yes, full-length article written by hired medical writers, Synergy.

Q So, yes, you stand by the statement that the Cirpele report was written by medical writers at Synergy?

A I'm standing by that report.

Q But you can't identify --

Page 273

A I, I --

Q Just let me finish so the court reporter can get it down.

You can't identify the source that you relied upon to make that statement; is that correct?

MR. RONA: Objection.

THE WITNESS: At this moment I do not have the exact memo in which this information is presented.

Q Do you think that -- well, that information came from documents that you reviewed; is that correct?

A Yes.

Q And those documents are listed in Appendix B?

A Those documents are listed in Appendix B.

Q Were the results of the Cirpele study positive or negative?

MR. RONA: Objection.

THE WITNESS: I would like some clarification as to whether we are referring to -- which outcome we're referring to, for one thing.