UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC., 04 CV 10739 (PBS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:   MDL Docket No. 1629
:
:
:   Master File No. 04-10981
:
:   Judge Patti B. Saris
:
:   Magistrate Judge Leo T.
:   Sorokin
:
:
:
:

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE THE TESTIMONY OF JOHN ABRAMSON, M.D.**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT .............................................................................................................................3

I.     Dr. Abramson's Proposed Testimony Is Irrelevant and Unduly Prejudicial ......................3

II.    Dr. Abramson's Opinions Are Based Solely on Speculation and *Ipse Dixit*.....................5

III.   Dr. Abramson's Proposed Testimony Usurps the Role of the Jury ...................................7

       A.     Expert Testimony That Merely Provides a Narrative Summary of the
              Evidence Is Inadmissible .......................................................................................7

       B.     Expert Testimony Regarding the Intent or Purpose of Defendants' Alleged
              Conduct Is Inadmissible ......................................................................................10

IV.    Dr. Abramson's Proposed Testimony Usurps the Role of the Court ..............................11

V.     Dr. Abramson's Proposed Testimony Regarding the Thoughts of Non-Party
       Doctors Is Inadmissible ...................................................................................................16

CONCLUSION.........................................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

*In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230 (5th Cir. 1986)..............................7

*Andrews v. Metro North Commuter Railroad Co.*, 882 F.2d 705 (2d Cir. 1989).........................12

*In re Baycol Products Litigation*, 532 F. Supp. 2d 1029 (D. Minn. 2007) ..................................10

*In re Diet Drugs Products Liability Litigation,*
    No. MDL 1203, 2000 WL 876900 (E.D. Pa. June 20, 2000) .........................................10

*In re Diet Drugs Products Liability Litigation,*
    No. MDL 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001) .....................................13, 15

*In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...........10, 13

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ....................................................................5

*Goebel v. Denver & Rio Grande Western Railroad Co.*,
    215 F.3d 1083 (10th Cir. 2000) .........................................................................................6

*Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) ...........7

*Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.),
    No. 04-MD 1596, 07-CV-645, 2009 WL 4260857 (E.D.N.Y. Dec. 1, 2009) ...................4

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)................................................................................8

*Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525 (D.N.J. 2001) .............................................5

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009) .........................................................................4, 19, 20

*Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997) ..................................................12

*In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............*passim*

*Stafford v. Wyeth*, 411 F. Supp. 2d 1318 (W.D. Okla. 2006).................................................19, 20

*Sutera v. Perrier Group of America Inc.*, 986 F. Supp. 655 (D. Mass. 1997) .................1, 4, 6, 16

*Tuli v. Brigham & Women's Hospital, Inc.*, 592 F. Supp. 2d 208 (D. Mass. 2009) ...........2, 6, 7, 9

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ...........................................................14

*United States v. Buchanan*, 964 F. Supp. 533 (D. Mass. 1997) ....................................................7

*United States v. Fosher*, 590 F.2d 381 (1st Cir. 1979)........................................................5, 7, 9

*United States v. Shay*, 57 F.3d 126 (1st Cir. 1995) ...................................................................4

*In re Welding Fume Products Liability Litigation*, No. 1:03-CV-17000,
  MDL 1535, 2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) ............................................13

*In re Zyprexa Products Liability Litigation*, 493 F. Supp. 2d 571 (E.D.N.Y. 2007).....................4

## RULES

Fed. R. Evid. 402 ...................................................................................................................4

Fed. R. Evid. 403 .............................................................................................................5, 13

Fed. R. Evid. 702 .............................................................................................................4, 7

Fed. R. Evid. 703 ...................................................................................................................7

## MISCELLANEOUS

Jason Dana & George Loewenstein, *A Social Science Perspective on Gifts to Physicians
  from Industry*, 290 JAMA 252 (2003) ...........................................................................19

John Abramson & Barbara Starfield, *The Effect of Conflict of Interest on Biomedical
  Research and Clinical Practice Guidelines: Can We Trust the Evidence in
  Evidence-Based Medicine?*, 18 J. Am. Bd. Fam. Prac. 414 (2005) ...................................2

KRC Research, PhRMA, *Survey of Physicians About Pharmaceutical and Biotech
  Research Company Activities and Information* (2008), *available at*
  http://www.phrma.org/files/attachments/KRC%20Survey%20of%20Physicians%
  20for%20PhRMA%2007-09-2008%20FINAL.pdf. ......................................................17

Lahey Clinic, *available at*
  http://www.lahey.org/medical/multiplesclerosis/ms_treatment.asp (last visited
  Jan. 6, 2010) ........................................................................................................17, 18

Michael G. Ziegler et al., *The Accuracy of Drug Information from Pharmaceutical Sales
  Representatives*, 273 JAMA 1296 (1995)........................................................................20

## PRELIMINARY STATEMENT

Dr. Abramson is a self-proclaimed expert on "the disparity between the scientific evidence and the messages that are communicated to physicians and consumers" and on "the effect of marketing material on physicians' opinions about drugs." (Exh. A, Jan. 20-21, 2009, Dep. of John Abramson ("Dep.") at 55:18-21, 61:21-24.)  He opines that Pfizer disseminated "misleading scientific evidence" about Neurontin that "affected the traditionally independent and trusted sources of information upon which physicians rely in making informed prescription decisions." (Exh. B, Aug. 11, 2008, Report of John Abramson, M.D. ("Report") at 4.)

Even if this could be considered a "field" of expertise that exists anywhere outside of the courtroom, Dr. Abramson has no relevant credentials.  "To be sufficiently qualified to testify as an expert, a witness needs to have 'knowledge, skill, experience, training, or education' 'in the specific subject for which his testimony is offered.'"  *Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997) (Saris, J.) (citations omitted).  Dr. Abramson's credentials are in family medicine.[1]  He does not have a degree in marketing and has never taught a course in marketing.  (Dep. at 54:23-55:11.)  He has had no involvement in conducting randomized controlled trials of prescription drugs and has never written any peer-reviewed articles about any such trials.  (*Id.* at 53:22-54:22.)  He claims that, as a clinical instructor, he has been "asked by students to discuss . . . the drug industry effect on knowledge about drugs" (*id.* at 48:18-20), but his teaching has overwhelmingly involved training medical students in primary care (*id.* at 41:22-42:14, 45:23-46:4) and teaching an elective course called "Healing and Spirituality," which addresses "the nature of healing relationships" through "a somewhat philosophical argument about metaphysics and subjectivity and existential presence and I and thou and so forth" (*id.* at 35:2-36:13, 43:14-19).  In his only arguably pertinent publications in peer-reviewed

---

[1] Dr. Abramson's only board certification is in family medicine.  (Dep. at 30:6-12.)  His internship, residency, and fellowship were all in family medicine, and he practiced family medicine for 20 years until leaving the practice of medicine in 2002.  (*Id.* at 25:1-21, 27:11-28:2, 29:12-14, 31:16-32:3, 37:12-20.)

journals, Dr. Abramson editorializes on the purported evils of industry-funded clinical trials and recommends that medical journals create "sections . . . for the specific purpose of critically reviewing the results of published trials,"[2] but he presents no systematic methodology for critically evaluating the conclusions of published trials or their impact on physicians' opinions.

Nor does Dr. Abramson articulate or apply any methodology in reaching his opinions here. He simply reviewed documents produced in this case and selectively provided to him by Plaintiffs' counsel. (Dep. at 75:14-16, 76:1-18, 124:16-20.) Without performing any significant research or analysis of his own, he now proposes to offer a lengthy narrative of purported facts of which he has no first-hand knowledge, along with his *ipse dixit* conclusions regarding what these documents supposedly mean and how they supposedly buttress Kaiser's claims. (*Id.* at 333:10-15, 334:21-336:2; Report §§ V-VI.) In other words, Dr. Abramson proposes to weigh the evidence himself so the jury won't have to. His "intended role is more to argue the client's cause from the witness stand than to bring to the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 538 (S.D.N.Y. 2004).

The development of Dr. Abramson's report and proposed testimony confirms that he is doing nothing more than "putting his imprimatur on [Kaiser's] case." *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208, 212 (D. Mass. 2009) (Gertner, J.). Plaintiffs' counsel repeatedly changed the focus of Dr. Abramson's assignment and, in tune with counsels' developing strategy, his report "evolved," "went through at least three iterations" and "changed quite significantly." (Dep. at 97:5-23, 114:3-115:24, 117:19-22.) In addition, "[t]here was a lot of back-and-forth with [Plaintiffs'] attorneys" in preparing his report. (*Id.* at 83:8-11, 98:8-15.) Plaintiffs' counsel not only made suggestions regarding "the overall structure" of the report and "what [it] would look like," but actually wrote the first draft of various portions. (*Id.* at 86:17-

---

[2] *E.g.*, John Abramson & Barbara Starfield, *The Effect of Conflict of Interest on Biomedical Research and Clinical Practice Guidelines: Can We Trust the Evidence in Evidence-Based Medicine?*, 18 J. Am. Bd. Fam. Prac. 414, 417 (2005).

87:19, 119:10-120:13.)   Among other unattributed contributions, Plaintiffs' counsel wrote the first draft of a paragraph regarding alleged "marketing tactics for Neurontin," along with the footnote to that paragraph.  (*Id.* at 92:16-93:19; Report ¶ 70.)  Though he claims to have vetted Plaintiffs' counsels' drafts, Dr. Abramson could not definitively state which portions of "his" report he initially wrote himself.

- "I'm not sure what the boundary of what any of this information was from me or from plaintiffs' attorneys, but I think it would start on page 58." (Dep. at 88:14-17.)

- "I'm not sure whether any of the language about the Reckless study was brought in or whether this was all original with me." (*Id.* at 89:8-10.)

- "[T]he compare-and-contrast between the Morello study and the Dallocchio study was brought to my attention by plaintiffs' attorneys.  I don't know where that language originated." (*Id.* at 89:15-18.)

- "I can't recall any other information or any other written material that was – that became, in a final version, integrated in the report that originated with plaintiffs' counsel." (*Id.* at 91:23-92:3.)

- "To the best of my recollection, I wrote that.  I don't remember receiving – period.  To the best of my recollection, I wrote that." (*Id.* at 361:2-4.)

Beyond its patent advocacy, Dr. Abramson's proposed testimony must be excluded for several reasons.  First, Dr. Abramson's opinions are irrelevant because they address conduct with no demonstrated nexus to Kaiser's alleged harm.  Second, Dr. Abramson merely presents *ipse dixit* conclusions based on his subjective and speculative interpretation of documents regarding events of which he has no first-hand knowledge.  Third, Dr. Abramson's opinions invade the province of the jury by summarizing the evidence, telling jurors what it means, and speculating about the motives of parties and the thought-processes of non-party prescribing doctors.  Finally, Dr. Abramson's opinions invade the province of the Court because they are based on his own personal ethical views regarding drug companies' purported disclosure obligations.

## ARGUMENT

## I.   Dr. Abramson's Proposed Testimony Is Irrelevant and Unduly Prejudicial

As a threshold matter, "the court must first determine whether the proposed testimony is

relevant and fits the facts of the case." *United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995). As this Court has explained, "Rule 702's 'fit' requirement 'refers to the necessity of a connection between the expert's testimony and the facts of the case.'" *Sutera*, 986 F. Supp. at 661 (citation omitted). Dr. Abramson's opinions do not "fit" the facts because there is no demonstrated nexus between the conduct he describes – Pfizer's purported manipulation of clinical trials, journal articles, CME events and advisory boards – and Kaiser's alleged harm. Dr. Abramson defers to Professor Rosenthal – Kaiser's causation expert – to establish some nexus between Pfizer's purported manipulation of these "sources of information" and the off-label prescriptions written by non-party doctors. (Dep. at 81:3-10.) But Professor Rosenthal acknowledges that she is "unable to account systematically for these influences on prescribing," and thus cannot even opine that the purported misconduct Dr. Abramson describes had any "independent effect on prescribing" generally, let alone on prescribing to Kaiser's insureds in particular. (8/11/08 Rosenthal Decl. ¶ 53.)[3]  *See also In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 339 (D. Mass. 2009) (Saris, J.). Thus, Dr. Abramson's generalized opinions about the impact of Pfizer's alleged conduct on "sources of information" – but not on any of the doctors who actually prescribed Neurontin to Kaiser insureds – do not "fit" the facts of this case and are irrelevant under Federal Rules of Evidence ("Rule") 402 and 702.

The *Zyprexa* litigation is instructive. In a single paragraph containing no substantive analysis, the *Zyprexa* court denied the defendants' motion to exclude Dr. Abramson's testimony in that case. *See In re Zyprexa Products Liability Litigation*, 493 F. Supp. 2d 571, 580 (E.D.N.Y. 2007). But the same court later granted the defendants' motion for summary judgment against the State of Mississippi in its capacity as third-party payor, on grounds equally applicable here. *See Hood ex rel. Mississippi v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, — F. Supp. 2d

---

[3] Professor Rosenthal instead attempts to measure the impact of detailing expenditure, which Dr. Abramson does not substantively address. Just three paragraphs of Dr. Abramson's 314-paragraph report address the issue of detailing, and those paragraphs do not purport to show that sales representatives made any misleading statements during detailing visits. (Report ¶¶ 292-94.)

—, No. 04-MD 1596, 07-cv-645, 2009 WL 4260857 (E.D.N.Y. Dec. 1, 2009); (*see also* Notice of Supplemental Authority in Support of Summary Judgment [2205]).   *Zyprexa* thus demonstrates that even if Dr. Abramson's opinions were otherwise reliable, they are not relevant and do not support Kaiser's claims.

Moreover, if presented with these opinions, jurors would inevitably and erroneously infer that Pfizer may be held liable regardless of whether prescribing doctors were exposed to or relied upon these "sources of information."   Accordingly, Dr. Abramson's opinions are inadmissible under Rule 403 because any minimal probative value would be substantially outweighed by the danger of undue prejudice and jury confusion, particularly "given the aura of reliability that surrounds scientific evidence."   *United States v. Fosher*, 590 F.2d 381, 382 (1st Cir. 1979).

## II.   Dr. Abramson's Opinions Are Based Solely on Speculation and *Ipse Dixit*

Dr. Abramson claims that by reviewing documents produced in this litigation and selectively provided to him by Plaintiffs' counsel, he can reliably determine whether Pfizer's alleged marketing activities accurately reflected Pfizer's knowledge, and can reliably asses the impact of those activities on the medical community at large.

> I looked at company documents.   I looked at the science as it was published and as it was described in the company documents.   I looked at company marketing plans.   I looked at company e-mails where . . . there's clear language that says we're not going to make the evidence known to doctors. We're going to minimize the negative studies.   We're going to maximize the awareness of the positive studies.   We're going to create publications.

(Dep. at 219:11-20.)   But Dr. Abramson neither articulates nor applies any methodology distinct from his own subjective interpretation of the documents he reviewed; he simply offers his own inadmissible *ipse dixit* conclusions regarding what those documents supposedly show.

"Before a court can evaluate the reliability of an expert's methodology, the expert must employ one."   *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 535 (D.N.J. 2001). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."   *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).   The District of Massachusetts has excluded

similar testimony on grounds equally applicable here.  In *Tuli*, 592 F. Supp. 2d 208, the plaintiffs proffered expert testimony that hospitals use a "sham peer review" process to justify firing doctors for improper reasons.  *See id.* at 211.  After questioning whether any such "field" even exists, the court concluded that plaintiffs' expert had "created the field based on his own concerns about sham peer review."  *Id.* at 213.  Even though the expert had no relevant experience on any peer review committee, "[h]e purports to identify when ['sham peer review'] occurs and when it does not based on his own experiences . . . .  His judgments about what is and what is not a sham process are value judgments that cannot be reviewed; they are simply his conclusions, *ipse dixit*."  *Id.*  As in *Tuli*, Dr. Abramson's proposed testimony "will not assist the trier of fact," *id.* at 211 n.3, and is "profoundly prejudicial" because it "amounts to nothing more than [a] physician[] saying: 'Take my word for it,'" *id.* at 211.

Dr. Abramson's opinions are also inadmissible because they are based on rank speculation.  "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate."  *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1088 (10th Cir. 2000).  "'[An] expert's opinion [must] be based on the methods and procedures of science "rather than on subjective belief or unsupported speculation."'"  *Sutera*, 986 F. Supp. at 661 (citation omitted).  Here, Dr. Abramson speculates that Pfizer controlled the content of allegedly misleading articles, and concedes that in at least some instances his speculation is directly contrary to the facts.  (Dep. at 136:23-137:20.)  Likewise, without any "direct evidence," Dr. Abramson speculates that Pfizer controlled the content of CME events based on Pfizer's financial sponsorship of CMEs and his own personal incredulity that Pfizer would not exert control.  (*Id.* at 402:6-9, 403:5-24, 404:7-10, 405:3-406:1.)  Dr. Abramson does not even know what statements were made at CME events and advisory boards, but speculates about statements he considers "likely" or "unlikely" to have been made.  (*Id.* at 323:1-324:3, 406:12-408:4.)  Similarly, even though Dr. Abramson has no "information about what was said" by sales representatives during detailing visits and no "knowledge of any questions asked by doctors" during such visits, he simply speculates that "whatever [sales representatives] said, short of

6

recommending Neurontin for adjunctive therapy for seizure disorder, would have been off-label and scientifically unjustified."  (*Id.* at 408:14-15, 409:1-8.)  Because Dr. Abramson's proposed opinions are based on speculation and his own his *ipse dixit*, they must be excluded.

### III.    Dr. Abramson's Proposed Testimony Usurps the Role of the Jury

An expert's role is to "assist," not usurp, the role of the jury.  *See* Fed. R. Evid. 702.  Thus, an expert may not testify to matters within the realm of common knowledge and everyday experience.  *See Fosher*, 590 F.2d at 383 (experts must present a "system of analysis . . . beyond the ken of lay jurors to satisfy Rule 702"); *United States v. Buchanan*, 964 F. Supp. 533, 537 (D. Mass. 1997) (Gertner, J.) ("'Mere qualification as an expert is not license to invade the jury's function by telling the jury what result to reach . . . .'" (citation omitted)).  Narrative summaries of the evidence, testimony regarding the meaning of documents, and opinions about the intent of parties or witnesses are not proper subjects of expert testimony.

#### A.    Expert Testimony That Merely Provides a Narrative Summary of the Evidence Is Inadmissible

The bulk of Dr. Abramson's analysis and proposed testimony is nothing more than a historical narrative of facts as he interprets them based on documents produced in this case and selectively provided to him by Plaintiffs' counsel.  Dr. Abramson may not present his own summary and interpretation of these materials under the guise of expert testimony.  Testimony that "merely repeat[s] facts or opinions stated by other potential witnesses or in documents produced in discovery," *Rezulin*, 309 F. Supp. 2d at 546, "is improper . . . because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help,'" *id.* (citation omitted).  "Such material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence."  *Id.* at 551.[4]

---

[4] *See also, e.g., id.* at 541 ("[E]xperts should not be permitted to 'supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence.'" (citation omitted)); *Tuli*, 592 F. Supp. 2d at 211 (excluding experts whose reports "resonate as a lawyer's closing argument rather than an expert analysis" and would improperly present "a roadmap to a particular outcome"); *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) ("[A]n expert cannot be

In *Rezulin*, the plaintiffs designated expert witnesses to testify that "defendants allegedly suppressed the results of in-house scientific studies."   309 F. Supp. 2d at 553.   Like Dr. Abramson here, these experts opined – based on a review of "'in-house documents, memos and emails'" produced during discovery – that the defendant had suppressed the results of studies and manipulated the published scientific literature regarding the subject drug.   *Id.* at 554 (citation omitted).   But the *Rezulin* court held that "[p]laintiffs' experts are unqualified . . . to testify about the *facts* [regarding what scientific information the defendant did or did not disclose] because they lack first-hand knowledge."   *Id.* at 549.   Thus, the *Rezulin* court precluded the plaintiffs' experts from testifying that the defendant took a drug off the market for safety reasons and that the defendant had "'buried'" certain lab results.   *Id.* at 546-47, 549-50.   Such testimony merely presents arguments regarding the meaning of documents "which, if admissible, plaintiffs' counsel may present directly to the fact-finder while arguing his or her view as to their significance."   *Id.* at 550; *see also id.* at 554 ("It is for counsel to make the arguments about the significance of [defendant's] conduct or omissions with respect to its researchers and not for an expert to testify as to whether the company did or did not do something.").

Dr. Abramson's testimony is indistinguishable from that of the excluded experts in *Rezulin*.   The heart of Dr. Abramson's analysis and proposed testimony appears in Sections V and VI of his report, which comprise 90 of the report's 123 pages.[5]   In these sections, Dr. Abramson describes Defendants' "marketing strategies" for Neurontin, and describes various CME events, advisory boards, scientific studies and literature he claims were manipulated.

---

presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence."); *Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (summarizing the facts and opining on the purpose of the subject transactions "is what a lawyer does in his or her summation . . . [and] is not the function of an expert witness"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

[5] Dr. Abramson's report is divided into eight sections.   Sections I through III summarize Dr. Abramson's opinions, describe his qualifications, and give a general overview of the case.   Section IV is a generalized discussion of the sources of information prescribing doctors rely upon.   Section VII addresses a formulary dossier that Kaiser does not claim to have ever received or relied upon.   Section VIII is a short conclusion that briefly reiterates Dr. Abramson's opinions.

(Report §§ V-VI.)   These sections present and attempt to support Dr. Abramson's principal opinion, *i.e.*, that Defendants purportedly manipulated the sources of information regarding Neurontin that doctors rely upon when making prescription decisions.   (*Id.*)   This proposed testimony is inadmissible because Dr. Abramson concedes that it simply presents a "a lengthy narrative of the facts" as to which he has no first-hand knowledge.   (Dep. at 333:10-15.)   Dr. Abramson did not attend, or speak with any attendees, of the CME events he describes.   (*Id.* at 333:16-334:1.)   Likewise, Dr. Abramson did not speak with the doctors who conducted the clinical studies he describes, or with the authors or recipients of any of the documents he reviewed.   (*Id.* at 334:2-13.)   He has "no first-hand knowledge" of any of this material, and concedes that his knowledge of the purported "facts" set forth in his "lengthy narrative" merely "came from reading the documents."   (*Id.* at 334:2-336:2.)

Moreover, Dr. Abramson repeatedly denied adding any analysis of his own to what the corporate documents purportedly say regarding the alleged purposes and consequences of the marketing campaign.   He claims to have taken the corporate documents "at face value."   (*Id.* at 211:8-11, 213:1-2, 233:22, 234:9, 284:16.)   Thus, rather than performing any "independent analysis" of his own (*id.* at 234:11-24, 237:7-15), Dr. Abramson simply purports to provide the jury with his synopsis and interpretation of documents selected by Plaintiffs' counsel.   This would simply present a "'narrative of the case which a juror is equally capable of constructing.'" *Rezulin*, 309 F. Supp. 2d at 551 (citation omitted).   "Likewise, the glosses that Dr. [Abramson] interpolates into his narrative are simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case." *Id.*

In sum, Dr. Abramson's narrative summary is inadmissible because it simply "put[s] his imprimatur on [Kaiser's] case," *Tuli*, 592 F. Supp. 2d at 212, by attempting to invest Plaintiffs' counsel's arguments with "the aura of reliability that surrounds scientific evidence," *Fosher*, 590 F.2d at 382.   These concerns are particularly acute given that Plaintiffs' counsel are un-credited co-authors of Dr. Abramson's report in this case.

### B.      Expert Testimony Regarding the Intent or Purpose of Defendants' Alleged Conduct Is Inadmissible

Dr. Abramson proposes to testify that Defendants "developed and executed a comprehensive campaign to increase off-label prescriptions of Neurontin for neuropathic pain… [by] lead[ing] doctors to believe that the use of Neurontin for these off-label indications and in unapproved doses was supported by high quality scientific evidence." (Dep. at 207:1-12.) Initially, this proposed testimony is inadmissible because Dr. Abramson did not disclose any such opinion in his report. Dr. Abramson's report presents the above statements as an assumption on which his opinions were based, not as an opinion that he had reached himself.[6] But even if it had been adequately disclosed, opinion testimony regarding the intent or purpose behind a party's conduct is inadmissible. It is well settled that "[t]he question of intent is a classic jury question and not one for experts." *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000). Opinion testimony regarding "the intent, motives or states of mind of corporations, regulatory agencies and others ha[s] no basis in any relevant body of knowledge or expertise." *Rezulin*, 309 F. Supp. 2d at 546.[7]

Though he denies opining on Defendants' "state of mind" and acknowledges that he is not "an expert at discerning corporate intent [from] reviewing company documents" (Dep. at 207:19-21, 379:8-10), Dr. Abramson explicitly opines on these issues:

- "[T]he ***intent*** of the corporation was to increase off-label prescriptions of Neurontin."

---

[6] "***Assuming the fact-finder concludes***, as alleged in the Third Amended Class Action Complaint and other filings, that Parke-Davis and later Pfizer developed and executed a comprehensive campaign to increase off-label prescriptions of Neurontin for neuropathic pain, nociceptive pain, bipolar disorder, migraine headache and in doses above the maximum recommended by the FDA, ***I am of the opinion that*** . . . ." (Report at 4 (emphasis added).)

[7] *See also, e.g.*, *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (precluding expert "from testifying as to the knowledge, motivations, intent, state of mind, or purposes of Merck, its employees, the FDA, or FDA officials" because "[t]his is not a proper subject for expert or even lay testimony"); *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1067 (D. Minn. 2007) (expert's criticisms of drug manufacturer's conduct "d[id] not qualify as expert testimony under Rule 702" because, *inter alia*, "Bayer's motives as to how it proceeded with evaluating Baycol's toxicity, and its reactions to its toxicologist's warnings, are issues that can be decided by the jury, without expert assistance").

(*Id.* at 208:13-16 (emphasis added).)

- The alleged "comprehensive campaign . . . was effectuated by ***purposeful activity*** of the drug-maker" designed to "caus[e] physicians to believe that the evidence showed benefit when that benefit was inaccurate or incomplete or exaggerated." (*Id.* at 208:19-209:10 (emphasis added).)

- "[T]here was ***intent*** not to provide Cochrane with unpublished data and protocols that Cochrane was interested in." (*Id.* at 376:23-377:2 (emphasis added).)

- "[Defendants'] ***intention*** was to delay the publication of Reckless at least until Rice and Serpell were – 25 and 26 were published . . . because they ***wanted*** to create the belief that Neurontin was useful for neuropathic pain conditions before they allowed evidence to be introduced that it was not." (*Id.* at 412:7-13 (emphasis added).)

- "[D]efendants ***understood*** that medical knowledge is sticky . . . ." (*Id.* at 412:14-15 (emphasis added).)

During his deposition, Dr. Abramson sought to "backtrack" from the issue of "intent" and claimed that he was "simply saying what happened" based on his review of corporate documents. (*Id.* at 209:24-211:2.) Despite this semantic hairsplitting, Dr. Abramson's view of "what happened" clearly incorporates and expresses his inadmissible opinions regarding the "intent" and "purpose[]" of various alleged marketing activities. In any event, Dr. Abramson's narrative of "what happened" is inadmissible. (*See* Section III.A, above.)

## IV.   Dr. Abramson's Proposed Testimony Usurps the Role of the Court

Dr. Abramson's opinions regarding Defendants' purported manipulation and suppression of scientific information about Neurontin are inadmissible because they are based on his own personal views regarding drug companies' disclosure obligations. Dr. Abramson believes that Pfizer "had an obligation to the medical community and to the public at large to share scientific evidence that it had" and that "it is imperative for a drug company that knows the results of a negative trial to make that information known." (Dep. at 288:11-15, 382:7-11; *see also id.* at 286:1-5 ("[I]t's my opinion that that evidence should be made known to physicians who might prescribe the drug for that indication.").) Further, while Dr. Abramson has no knowledge as to whether Defendants controlled the content of allegedly misleading publications, he claims that even if Defendants "had no editorial control," they "still could have and had an obligation to

11

write a letter to the editor of the journal" in order "to straighten out the scientific record." (*Id.* at 331:14-333:9.)  Dr. Abramson likewise opines that drug companies are obligated to disclose negative studies even when there is legitimate evidence that the studies' results may be tainted by trial design shortcomings. (*Id.* at 313:19-315:11, 323:22-324:3, 327:23-329:14.)

Dr. Abramson admits that his opinions regarding Pfizer's purported disclosure obligations are based on nothing more that his personal "view of ethics and responsibility." (*Id.* at 379:2-5; *see also id.* at 333:2-3 ("I think it's an ethical and standard of care issue.").)  Far from basing his opinions on any recognized legal duty, Dr. Abramson advocates using his personal ethical views to cure what he sees as deficiencies in the FDA regulations: "There's not a regulation, which is the problem . . . ." (*Id.* at 385:6-11.)

The issue is not whether Pfizer lived up to Dr. Abramson's personal standards of corporate conduct, but whether Pfizer met its legal obligations (if any) to Kaiser.  The existence and scope of legal duties are questions of law for the Court,[8] and thus are not proper subjects of expert testimony.  *See, e.g.*, *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) ("It is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'" (alteration in original) (citations omitted)).  Likewise, "[expert testimony] should not be received if it is based on 'inadequately explored legal criteria'" because of the risk of "'conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.'" *Andrews v. Metro North Commuter Railroad*, 882 F.2d 705, 709 (2d Cir. 1989) (citations omitted).

Applying these settled principles, several courts have excluded opinion testimony indistinguishable from Dr. Abramson's.  For example, the *Rezulin* court precluded plaintiffs' experts from "communicat[ing] 'a legal standard – explicit or implicit – to the jury,'" 309 F. Supp. 2d at 541 (citation omitted), and from offering opinions regarding "the duties of pharmaceutical companies," *id.* at 557.  The court likewise precluded testimony about "the

---

[8] *See, e.g.*, *Andrews v. Metro North Commuter Railroad.*, 882 F.2d 705, 709 (2d Cir. 1989).

ethical obligations of pharmaceutical companies and whether the defendants' conduct was ethical." *Id.* at 542-43.[9]  Because the experts' "opinions concerning purported ethical standards are based on their personal, subjective views," they did not meet Rule 702's "core requirement . . . that expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or speculation.'"  309 F. Supp. 2d at 543 (citation omitted).  The opinions were also irrelevant because the issue was whether the defendants had breached legal duties, not ethical duties.

> While the defendants may be liable in the court of public opinion, or before a divine authority for any ethical lapses, expert opinion as to the ethical character of their actions simply is not relevant to these lawsuits.

*Id.* at 544; *see also, e.g.*, *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, MDL 1535, 2005 WL 1868046, at *20 (N.D. Ohio Aug. 8, 2005) ("[T]he critical question for the jury in this case is whether the defendant corporations did what the law *required* them to do, not whether, from a societal perspective, they did what an 'ethical corporation' *should have* done.").

Even if marginally relevant, opinion testimony regarding ethical standards is inadmissible under Rule 403 because such testimony "would be likely unfairly to prejudice and confuse the trier by introducing the 'experts'' opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards." *Rezulin*, 309 F. Supp. 2d at 545.[10]  Accordingly, due to "[t]he risk that the legal standard of care and the purported 'ethical' standards will be blurred," 309 F. Supp. 2d at 545 n.37, "plaintiffs are precluded from offering any testimony . . . concerning ethical standards and the application of ethical standards to the alleged conduct of the defendants and others," *id.* at 545.

Dr. Abramson's personal ethical views cannot be smuggled in under "standard of care" rubric for four reasons.  First, even if Dr. Abramson's personal opinion that drug companies

---

[9] *See also, e.g.*, *Fosamax*, 645 F. Supp. 2d at 194 (granting motion to exclude "testimony about purported general ethical standards governing the conduct of clinical trials); *Baycol*, 532 F. Supp. 2d at 1053 ("Personal views on corporate ethics and morality are not expert opinions.").

[10] *See also, e.g.*, *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *9 (E.D. Pa. Feb. 1, 2001) ("[Witness's] expertise and experience in clinical medical ethics are, at best, only marginally relevant to [defendant's] conduct in the manufacturing and marketing of diet drugs.").

should, *e.g.*, "share scientific evidence" and "straighten out the scientific record" could be "charitably viewed as a 'standard,' the testimony nevertheless is 'so vague as to be unhelpful to a fact-finder.'" *Id.* at 543 (citation omitted).

Second, rather than claiming to know or understand the prevailing standard of care, Dr. Abramson explicitly seeks to supplant any such standard with his own personal views. For example, he testified that any pharmaceutical industry standard regarding the confidentiality or trade secrecy of unpublished data can simply be ignored in favor of his own personal opinion – based on his "view of ethics and responsibility" – that "it wouldn't give away any corporate secrets or control of the data if Pfizer had made that known [and] they have an obligation to make that known." (Dep. at 378:5-379:5.) Other courts have rejected similar testimony regarding purported "standards of conduct" on the grounds that such standards are "at best thinly-disguised legal or quasi-legal principles" that "communicate[] a legal standard and so would encroach on the court's prerogative to instruct on the law." *Rezulin*, 309 F. Supp. 2d at 558; *see also United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice.").

Third, Dr. Abramson is unqualified to testify about the standards applicable to promotional activities, or about whether Pfizer met any such standards. Though Dr. Abramson considers himself to be an expert on the "***effect*** of marketing," he does not claim to be an expert on "marketing" generally or "on the marketing of prescription drugs" in particular. (Dep. at 55:13-21 (emphasis added).) Similarly, while Dr. Abramson claims to "have some knowledge" regarding FDA regulations, and considers himself "qualified to render an opinion about what transpired in a given situation," Dr. Abramson does not claim to be an expert on the regulations governing the labeling and marketing of prescription drugs. (*Id.* at 58:20-60:4.) Moreover, Dr. Abramson has never had any involvement in designing, conducting, analyzing, or reporting the results of controlled trials of prescription drugs (*id.* at 53:22-54:22, 285:12-20), and thus has no relevant experience or expertise regarding the standards applicable to these activities.

14

In *Diet Drugs*, the court precluded similar testimony by a similarly unqualified witness who, despite his experience as a "practicing physician," had "little or no knowledge" of the "extensive regulations" governing pharmaceutical company conduct and had "only incidental experience with pharmaceutical industry standards regarding what information should be communicated by drug companies to physicians." *Diet Drugs*, 2001 WL 454586, at *9. Notably, even witnesses who have the experience Dr. Abramson lacks have been precluded from testifying. *See Rezulin*, 309 F. Supp. 2d at 543 n.27 ("Dr. Kronmal's experience in working on clinical trials and consulting for pharmaceutical companies does not transform his admittedly subjective views on ethical standards into appropriate subjects of expert testimony.").

Fourth, Dr. Abramson addresses the wrong community. He purports to testify about the "standard of care *in the physician community*" regarding what doctors purportedly expect from drug companies. (Dep. at 385:6-11 (emphasis added).) But as discussed in Section V, below, Dr. Abramson's opinions regarding other doctors' thoughts and expectations are inadmissible. Moreover, the practice of medicine and the development, manufacture, marketing and sale of prescription drugs are distinct industries. Dr. Abramson has no basis to testify that *doctors'* purported expectations dictate a reciprocal standard of care for *pharmaceutical companies*. Thus, in *Diet Drugs*, the plaintiff's expert's "experience as a practicing physician" who was frequently detailed, and who claimed to have "'found that the information to be provided [by drug companies] must be comprehensive and reliable and accurate and truthful,'" was not qualified to offer opinions about "pharmaceutical industry standards." *Diet Drugs*, 2001 WL 454586, at *9 (citation omitted). Likewise, any such opinion testimony by Dr. Abramson in this case would extend not just beyond Dr. Abramson's specific practice area,[11] but beyond the entire practice of medicine and into an industry in which Dr. Abramson has no experience whatsoever.

---

[11] Dr. Abramson was a family medicine practitioner who referred patients to specialists for treatments of relevant off-label conditions. (Dep. at 197:14-198:22.) While he wrote prescriptions for certain types of neuropathic pain, such as back pain, he never prescribed drugs for bipolar disorder: "I let the psychiatrists take care of bipolar disorder." (*Id.* at 199:7-24.)

Experts are prohibited from testifying outside the scope of their expertise in this manner.[12]

## V.     Dr. Abramson's Proposed Testimony Regarding the Thoughts of Non-Party Doctors Is Inadmissible

Dr. Abramson proposes to testify that "[Pfizer's] comprehensive campaign caused physicians to believe that Neurontin was in their patients' best interests when, in fact, a full and unbiased look at the science would have led to a different conclusion."  (Dep. at 216:1-5; *see also id.* at 216:12-217:10.)    Initially, this proposed testimony is inadmissible because Dr. Abramson did not disclose any such opinion in his report.  Dr. Abramson's report states that that the alleged marketing campaign affected "sources of information upon which physicians rely" (Report at 4), but does not address effects on the minds or beliefs of prescribing doctors.  Even when adequately disclosed, opinion testimony regarding the thoughts and beliefs of non-party prescribing doctors is inadmissible.

> "[An expert's] surmising as to what physicians would do with different information is purely speculative and not based on scientific knowledge."  Similarly speculative is Dr. Furberg's testimony as to whether physicians would have prescribed Rezulin if different information about Rezulin had been available. Accordingly, his testimony on this subject is inadmissible.

*Rezulin*, 309 F. Supp. 2d at 557 (quoting *Diet Drugs*, 2001 WL 454586 at *18).

As in *Rezulin*, Dr. Abramson's opinions regarding the decisions of non-party prescribing doctors are speculative on their face.  For example, he considers it "unlikely" that doctors would have prescribed Neurontin off-label based on their positive experiences with other AEDs.

> [H]ad doctors been informed in a timely fashion, they wouldn't have come to that conclusion.  I don't think they did anyway.  You know, I can't quantify it.  It seems to me unlikely.

(Dep. at 244:19-23.)  And he speculates on how doctors would react to particular CME events, even though he did not attend or speak to any doctors who did attend and does not know what

---

[12] "To be sufficiently qualified to testify as an expert, a witness needs to have 'knowledge, skill, experience, training, or education' 'in the ***specific*** subject for which his testimony is offered. . . . [A] scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease.'"  *Sutera*, 986 F. Supp. at 661 (emphasis added) (citations omitted).

statements were made.  (*Id.* at 319:7-22, 323:1-324:3, 333:19-334:1.)  Dr. Abramson further speculates that doctors presume the information they get from pharmaceutical companies is complete and balanced (*id.* at 277:6-279:20), even though the research that he cites found that: (1) "[b]y far, most physicians make decisions about what to prescribe to patients based on their clinical knowledge, experience, and each patient's unique situation";[13] (2) "[p]hysicians read information [from drug representatives] critically";[14] and (3) "[m]any practices have office policies to manage interactions with [drug] representatives,"[15] just as Dr. Abramson did when he was in practice.  (Dep. at 180:8-12.)

Even more troubling is Dr. Abramson's resort to speculation as a means to make his conclusions untestable and unfalsifiable.  For example, he claims that fully informed doctors who continue to prescribe Neurontin years after allegedly suppressed information was made public do so because "medical beliefs[] are sticky," and the doctors must still be under the influence of early impressions formed before the information was disclosed.  (*Id.* at 411:24-412:17.)  Indeed, at his deposition in January 2009, Dr. Abramson was unaware that the Lahey Clinic – where he chaired the Department of Family Practice from 1994 to 2001 – currently states on its website that "in treating neuropathic pain a variety of medicines may be used including: Anticonvulsants (such as Neurontin . . . )."[16]  (*See also* Dep. at 423:19-424:2, 446:1-5.)  Dr. Abramson had no knowledge of this statement, had not spoken to his former colleagues about it, and had no idea whether his former colleagues were aware in 2009 of allegedly suppressed studies made public years ago.  (*Id.* at 425:9-17, 429:1-5.)  Yet he leaped to the unfounded confusion that the Lahey Clinic must have somehow been deceived by Defendants.

---

[13] KRC Research, PhRMA, *Survey of Physicians About Pharmaceutical and Biotech Research Company Activities and Information*, at 6 (2008), *available at* http://www.phrma.org/files/attachments/ KRC%20Survey%20of%20Physicians%20for%20PhRMA%2007-09-2008%20FINAL.pdf.

[14] *Id.* at 21.

[15] *Id.*

[16] Lahey Clinic, http://www.lahey.org/medical/multiplesclerosis/ms_treatment.asp (last visited Jan. 6, 2010).

> [I]f it says what you say it says, which is that the Lahey Clinic is endorsing . . . Neurontin for neuropathic pain, what that says to me is shame on the defendants for allowing this wrong belief about the efficacy of Neurontin for neuropathic pain to continue.

(*Id.* at 427:8-14.)   Even though the Lahey Clinic's still-current online statement plainly undermines Dr. Abramson's speculations regarding what fully-informed doctors would conclude, he portrays it as supporting evidence that "shows how successful Pfizer's misrepresentation of the scientific evidence has been."  (*Id.* at 453:20-22.)[17]

Dr. Abramson did no research to test any of his speculative assumptions.  He did not speak with any doctors who prescribed Neurontin or patients who took Neurontin and did not review the medical records of any patients who took Neurontin.  (*Id.* at 131:3-14, 219:6-8, 281:7-20.)  Nor did Dr. Abramson perform any studies or surveys of doctors who prescribed Neurontin.  (*Id.* at 220:16-18, 221:6-8.)  Likewise, he did not read the depositions of any of the doctors who prescribed Neurontin to the named consumer plaintiffs (*id.* at 132:3-14), all of whom specifically deny basing their prescription decisions on any marketing statements.

These are critical omissions because Dr. Abramson concedes that many doctor- and patient-specific factors play in to prescribing decisions.   For example, he repeatedly acknowledged that "doctors differ in their style about how they receive [information about prescription drugs]," that "different doctors give relative weight to different sources of information" and that "each physician develops a pattern of accessing information that he or she deems adequate."  (*Id.* at 118:6-18, 310:22-312:3, 423:3-7.)  Dr. Abramson also admits that, while still in practice, he based his own prescribing decisions on numerous patient-specific factors, and that he has no idea whether these same factors may have prompted Neurontin prescriptions to patients who, *e.g.*, had already tried alternative drugs without success or who were not candidates for those alternative drugs.  (*Id.* at 153:9-156:13, 263:20-264:21.)

---

[17] The myriad flaws in Dr. Abramson's response to the Lahey Clinic's continued endorsement of off-label Neurontin use – his rank speculation, piling of unsupported inferences, utter lack of supporting data or reliable methodology, presupposition of legal duties based on nothing more than his personal views of corporate ethics, and his transparent advocacy – are but a microcosm of the fundamental defects of Dr. Abramson's report and proposed testimony as a whole.

Moreover, Dr. Abramson has personally prescribed drugs off-label for conditions as to which he claims there has been no showing of efficacy – not because of any marketing he may have been exposed to, but because the patient demanded it. (*Id.* at 175:19-176:11.)

Dr. Abramson's various explanations for his failure to test any of his speculative assumptions do not withstand scrutiny. First, he apparently bases those assumptions on his notion of what a reasonable doctor would prescribe if presented with certain information. But the issue for causation purposes "is not what an objective physician would decide, but rather what [each patient's] doctor would determine based on his knowledge of the drug in question and the [patient's] risk factors." *Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1322 (W.D. Okla. 2006) (granting summary judgment in failure-to-warn case where prescribing doctor testified that he would have prescribed the drug even if adequately warned of alleged risks). Likewise, this court has recognized that doctors' prescribing decisions "rest[] primarily in the minds of the prescribing doctors." *Neurontin*, 257 F.R.D. at 322.

Second, Dr. Abramson offers the *ipse dixit* statement that he can get "better" information about prescribing doctors' decisions by drawing inferences from a review of cherry-picked corporate documents rather than talking to the actual prescribing doctors. (Dep. at 230:14-20.) Dr. Abramson's sole basis for this statement is a single article regarding a study that compared the subjective impressions and actual prescribing habits of "20 physicians who went to a CME course and . . . a matched pair of 20 physicians who didn't go to that CME course." (*Id.* at 391:10-392:6; *see also* Report at 26 n.75.) Dr. Abramson materially misstates the results of this study: He claims the doctors who attended the CME course "felt they were not affected by the information about the drug." (Dep. at 391:24-392:6.) In reality, most doctors in the study had "denied that the seminars ***would*** influence their behavior ***prior to attending***."[18] The article says nothing to indicate that doctors are incapable of understanding, in hindsight, whether the actual

---

[18] Jason Dana & George Loewenstein, *A Social Science Perspective on Gifts to Physicians from Industry*, 290 JAMA 252, 254 (2003) (emphasis added).

statements made at CME classes influenced their prescribing decisions. Other studies cited by Plaintiffs refute Dr. Abramson's notion that promotional activity affects doctors in some subliminal way that they are incapable of recognizing or explaining.[19]  Likewise, Dr. Abramson himself was highly skeptical of drug representatives while still practicing medicine, and did not base his own prescription decisions on marketing materials, journal advertising, or industry sponsored CME conferences, yet he assumes that other unidentified doctors are credulous and easily manipulated.  (Dep. at 180:8-12, 184:12-24, 187:19-190:11, 218:22-219:8.)  Even if it could be shown that doctors generally underestimate the influence of marketing on their decisions, and even if this could support *discounting* doctors' stated reasons, it would not provide a basis for *ignoring* those stated reasons altogether in favor of Dr. Abramson's sweeping speculations.  *See Rezulin*, 309 F. Supp. 2d at 556; *Stafford*, 411 F. Supp. 2d at 1322; *see also Neurontin*, 257 F.R.D. at 322.

Third, Dr. Abramson engages in transparently circular reasoning by assuming that doctors prescribed Neurontin as a "consequence[]" of Pfizer's alleged conduct, and then inferring that prescribing doctors' thinking must have been "manipulated."  (Dep. at 321:10-14, 419:11-21.)  But as discussed in Section I, above, there is no evidence that the conduct Dr. Abramson describes had any "independent effect on prescribing" (8/11/08 Rosenthal Decl. ¶ 53), and thus no support for Dr. Abramson's initial assumption that off-label Neurontin prescriptions are "consequences" of that purported conduct.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court enter an order *in limine* precluding Dr. Abramson from offering opinion testimony at trial.

---

[19] *See, e.g.,* Michael G. Ziegler et al., *The Accuracy of Drug Information from Pharmaceutical Sales Representatives*, 273 JAMA 1296, 1296 (1995) (significant percentages of doctors report that marketing is "moderately to very important in influencing their prescribing habits" and that "they change their practice based on information from pharmaceutical representatives").

Dated: January 8, 2010    Respectfully submitted,

           SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP

           By:  /s/ Mark S. Cheffo
              Mark S. Cheffo

           Four Times Square
           New York, NY 10036
           Tel:  (212) 735-3000

           SKADDEN, ARPS, SLATE, MEAGHER
            & FLOM LLP

           By:  /s/ Raoul D. Kennedy
              Raoul D. Kennedy

           Four Embarcadero Center
           San Francisco, CA 94111
           Tel:  (415) 984-6400

             -and-

           WHEELER TRIGG O'DONNELL LLP

           By:  /s/ James E. Hooper
              James E. Hooper

           1801 California Street
           Suite 3600
           Denver, CO 80202-2617
           Tel:  (303) 244-1800

             -and-

           WHITE AND WILLIAMS LLP

           By:  /s/ David B. Chaffin
              David B. Chaffin

           BBO # 549245
           100 Summer Street, Suite 2707
           Boston, MA 02110
           Tel:  (617) 748-5200

           *Attorneys for Defendants Pfizer Inc. and*
           *Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 8, 2010.

/s/ David B. Chaffin
David B. Chaffin