1  understood, that I had had in my possession, that I
2  was familiar with.  This isn't the first time that
3  I've addressed this issue of the translation or
4  mistranslation of scientific evidence into doctors'
5  beliefs, and that body of literature addresses that,
6  some of which is in the bibliography for my book,
7  which was finished in March 2004, and some of it was
8  adopted later on.
9        And then there is some Neurontin-
10  specific information, and I think some of those
11  references would have been provided by plaintiffs'
12  counsel, and I think some of them I would have
13  found.
14        Q.  Okay.  Just stepping back for a second, what
15  is Exhibit 3?  It's obviously a list of documents,
16  but what is it?
17        A.  It's probably a list of the documents -- of
18  the publications that are footnoted in my report.
19        Q.  Well, it goes on and talks about research
20  report and Web pages and all sorts of things.
21        A.  Yes.
22        Q.  But is this -- I guess, is this a complete
23  list of all the documents you reviewed in connection
24  with preparing your report?

1        A.  I believe it's a list of the documents that
2  were cited in the report.
3        Q.  So were there additional documents that
4  you've reviewed that you didn't cite in this Exhibit
5  3?
6        A.  Yes.
7        Q.  Okay.  And did you rely on any of those
8  documents in forming your opinions?
9        A.  Yes.  I believe that the documents that I
10  relied upon are cited here.
11        Q.  Okay.  So you're not aware, sitting here
12  today, that there are any documents that you relied
13  upon that are not included in Exhibit 3?
14        A.  I'm not aware of any, I would tell you if
15  there were, and I'm sure there are.
16        Q.  Okay.  Maybe I misunderstood your answer.
17  So this is not a complete list of all the documents
18  you relied upon.  It's a list of documents that you
19  actually cited.
20        A.  Yes, and I used as the cutoff for "relied
21  upon" whether it merited being cited in the report.
22        So did I rely upon them to write my
23  report?  This would be the list.
24        Q.  Okay.  And if you relied on them to form

1  your opinion, would they be cited here or not?
2        A.  If they were important enough to warrant
3  inclusion.  I mean, this is sort of a functional
4  definition.  There were a lot of documents, and a
5  lot aren't cited and weren't included.
6        If I relied upon a document to support
7  an opinion that I presented in the report, I think
8  that I footnoted it.  That was my intention.
9        Q.  Do you have a collection somewhere of all
10  the documents that you reviewed but didn't cite in
11  the report?
12        A.  I have collections of documents.  Whether or
13  not each one was reviewed, I can't tell you.  In
14  fact, I'm sure there are documents that weren't
15  reviewed in that pile.
16        Q.  Okay.  And where did you get those
17  documents?
18        A.  Where did I get them?
19        Q.  Yes, the documents that you reviewed.
20        A.  From plaintiffs' counsel.  Well, the -- I
21  think the majority of Neurontin-specific --
22  certainly all the corporate documents that are
23  confidential came from plaintiffs' counsel.  There's
24  some -- I would be surprised if there weren't some

1  publicly available Neurontin documents that didn't
2  come from plaintiffs' counsel, but came from my own
3  research.
4        Q.  And can you identify those?
5        Let me put it this -- let me reask the
6  question.
7        Is there a section in Exhibit 3 that
8  identifies those?
9        A.  No.
10        Q.  The next -- after the publications, of which
11  there are 91, there's a list of research reports.
12        A.  Yes.
13        Q.  What are those?
14        A.  Those are the drug manufacturers' research
15  reports that I referred -- so a study is completed
16  -- excuse me.
17        When a study is completed, there is a
18  period between the completion of the study and the
19  issuing of a research report by the manufacturer
20  that presents the -- a summary of the study, usually
21  quite a lengthy summary of the study that includes
22  the protocol and the selection criteria, dosage and
23  statistical analysis, and what the primary outcome
24  measures are, and those research reports typically

Page 126

1   have up front a fairly quick summary and then are
2   very dense with data.
3       Q.  And where did you get these research
4   reports?
5       A.  From plaintiffs' counsel.
6       Q.  In the next section of Web pages, how did
7   you select the Web pages that you ultimately cited
8   in your report and are listed here?
9       A.  That is probably -- those probably are from
10  my own research.  I --
11      Q.  Go ahead.
12      A.  I can't be 100 percent sure, but I think the
13  majority of them, if not all of them, are from my
14  own research.
15      Q.  You don't recognize any of them as having
16  come from plaintiffs' counsel?
17      A.  I can't be sure.  The majority of them came
18  from my research.  I can't swear that none came from
19  plaintiffs' counsel, but I don't recognize any that
20  did.
21      Q.  The next section is called "Documents," and
22  there's 133 documents.  How were those selected?
23      A.  Those were a subset of -- let's see, Dr.
24  Jewell's report here is cited because I did look at

Page 127

1   it.  Those were a subset of the documents that were
2   provided by plaintiffs' counsel for me to review.
3       Q.  Can you give me an order of magnitude of
4   about how many documents were supplied by
5   plaintiffs' counsel?
6       A.  Order of magnitude would be between five an
7   ten times more than this.
8       Q.  Okay.  And that universe of five to ten more
9   times this number of documents -- in other words,
10  the documents that plaintiffs' counsel supplied you
11  with -- how were they selected?
12      A.  By plaintiffs or by me?
13      Q.  Well, I guess that's one question.  How were
14  they selected?  Were they selected by you, or were
15  they selected by plaintiffs' counsel?
16      A.  No, I'm sorry.  I don't understand the
17  question.
18      Q.  Okay.  The entire universe of documents,
19  which you said is five to ten times the 133
20  documents listed here, that entire universe, how was
21  that selected?
22      A.  That was selected by plaintiffs' counsel.
23      Q.  Okay.  And from that group of documents, is
24  it correct that you selected the 133 documents that

Page 128

1   you were going to rely upon in your report?
2       A.  That's correct.
3       Q.  Do you know how plaintiffs' counsel went
4   about selecting the documents that -- the totality
5   of documents that were supplied to you?
6       A.  I don't.
7       Q.  Did you ever ask for any documents from
8   plaintiffs' counsel that you did not receive?
9       A.  Yes.
10      Q.  What was that?
11      A.  I remember asking for documents -- slides of
12  CME conferences.
13      Q.  And those were not provided to you?
14      A.  I'm sorry, no.  No, I misunderstood your
15  question.  Let's start over again.
16      Q.  Maybe I misspoke.
17          Did you ever ask for any documents from
18  plaintiffs that they did not supply to you?
19      A.  That they had not supplied, or that they did
20  not comply with my request?
21      Q.  Yes, that they never complied with your
22  request?
23      A.  I see.  No, I was answering a different
24  question.

Page 129

1           I can't recall a request that wasn't
2   provided.
3       Q.  Did you take notes on the documents that you
4   reviewed?  Let me just rephrase that.
5           Did you take notes relating to the
6   documents that you reviewed?
7       A.  Well, you saw some of that in a one-note --
8   in a big one-note file.
9       Q.  That was Exhibit 3?  I'm sorry, Exhibit 4?
10      A.  Exhibit 4 is a small sample of a file that I
11  kept.  And I worked mostly digitally, so when I was
12  taking the documents, they would be -- it would be
13  either brought into one note or brought into a draft
14  of the report.
15      Q.  What did you do with the notes that you took
16  relating to documents that you reviewed?
17      A.  They either went into drafts or into one
18  note, yes.
19      Q.  Did you retain them?
20      A.  I didn't intend to retain them.
21      Q.  Let me strike that, because there are two
22  things you did with them.  Some, they went into the
23  drafts; and others, they went into a note.
24          Did you retain the note?  For example,

Page 130

1   Abramson Exhibit 4, did you make an effort to
2   obtain -- to retain documents like Abramson Exhibit
3   4?
4        A.  I can't tell you that I have a singular way
5   of working, but I used that one note file as a
6   parking lot for some issues that I wanted to go back
7   and get later.  You start to work on a project, it
8   doesn't take shape yet, you've got to kind of try to
9   get your arms around it, and you park some things;
10  and that's what one note was used for, I think.
11  Then at some point it just starts to get brought
12  into the drafts.
13       That's my typical way of working, and I
14  didn't delete one note.  I do delete notes, so it's
15  -- some of the stuff may have gotten effectively
16  deleted.  I didn't switch to the new computer until
17  later, so there may have been stuff that was deleted
18  and not carried forward.
19       Q.  And those would be -- that stuff you're
20  referring to is notes on documents and things that
21  you reviewed?
22       A.  There may be some that went that path.
23       Q.  It was -- that was your practice, was to
24  delete those; is that correct?

Page 131

1        A.  Yes.  My practice is to delete the notes
2   after the report is complete.
3        Q.  Have you communicated in any way with any of
4   the named individual plaintiffs in this case?
5        A.  No.
6        Q.  Have you communicated with their doctors?
7        A.  No.
8        Q.  Have you communicated with any of the third-
9   party payer plaintiffs in connection with this case?
10       A.  No.
11       Q.  Have you reviewed any of the documents
12  relating to any of the named individual plaintiffs
13  or their doctors in this case?
14       A.  No.
15       Q.  Have you reviewed any documents provided to
16  you by the third-party payer plaintiffs?
17       A.  No, I don't think so.
18       Q.  Have you reviewed any documents relating to
19  the third-party payer plaintiffs?
20       A.  I don't have a recollection of reviewing --
21  all these questions that you've asked me, I don't
22  have a recollection.  There was an enormous volume
23  of material.
24       I don't have a recollection of reviewing

Page 132

1   that, and I don't believe that I brought any of that
2   into my report.
3        Q.  Have you reviewed any transcripts of
4   testimony or depositions of any of the named
5   plaintiffs or their doctors in this case?
6        A.  I think there was -- I need to look in my
7   report, but the section from Mr. Knoop we talked
8   about in the report was from the deposition.
9        Q.  Yes.  I was limiting this question to
10  transcripts of testimony or depositions of the named
11  plaintiffs --
12       A.  Of the named plaintiffs.
13       Q.  -- or their doctors?
14       A.  No, I don't think I have.
15       Q.  Well, then the next question, since you
16  brought it up:  Have you reviewed any transcripts of
17  testimony or depositions of the defendants'
18  employees or former employees taken in this case?
19       A.  I -- there are depositions amongst --- in my
20  files, and I don't believe that I have reviewed
21  them, but let me say that there were clips of
22  deposition testimony in Dr. Field's report.  So I
23  didn't go to look for more than that, but did read
24  those clips in her report.

Page 133

1        Q.  Are there any other transcripts of testimony
2   or depositions that you reviewed in connection with
3   your work in this case?
4        A.  I can't recall.
5        Q.  Back to Exhibit 3 to your report, the last
6   page of it has an "Other" category, six items.
7        A.  Uh-huh, yes.
8        Q.  What is that?  How was that collection of
9   materials arrived at?  Is that something you looked
10  at in your independent research or something that
11  was provided to you?
12       A.  Well, 1 and 2 is my independent research.  I
13  have to see what -- 3 and 4 are from the U.S. Code,
14  and I'm going to have to see what that refers to.
15       Q.  Do you remember doing any research of the
16  U.S. Code?
17       A.  Yes.  This has come up -- these issues have
18  come up in other cases that I have been involved in,
19  and I'm not -- I have to go back into the report and
20  look at exactly what the issue is that these refer
21  to to tell you whether the reference to this
22  initially came from the plaintiffs' attorneys.
23       Q.  Okay.  Then Nos. 5 and 6?
24       A.  5 would be from plaintiffs' counsel, and 6

34 (Pages 130 to 133)

Page 134

1  would be from plaintiffs' counsel.
2      Q.  Have you -- I don't believe I asked this
3  before.  Have you communicated with any class
4  members in connection with your work in this case?
5      A.  No.
6      Q.  What did you do to prepare for this
7  deposition?
8      A.  Read through my report and many of the
9  references that are cited to refresh my memory about
10  what was in the reference, and made sure that I
11  understood its relationship and that it was brought
12  in accurately and so forth.  I met yesterday with
13  Ilyas and Palko in their office.
14      Q.  Okay.  Did you have any -- other than that
15  meeting yesterday, did you have any other meetings
16  with anybody in person or conversations over the
17  phone regarding your deposition in order to prepare
18  for it?
19      A.  Nothing except for administrative stuff.
20      Q.  How long did you meet yesterday?
21      A.  From 9:30 to quarter of 3:00.
22      Q.  And was that the only meeting or
23  conversation that you had with plaintiffs' counsel
24  regarding preparation for this deposition?

Page 135

1      A.  We talked on the phone.  I think it was
2  mostly administrative stuff.  What time?  Did they
3  get back to you about the scheduling?  Are we going
4  to do it 19 to 20, or 20 to 21?  Those kinds of
5  things.
6      Q.  Okay.  The meeting yesterday, who was
7  present?
8      A.  Ilyas, Palko -- Ed, you were on the phone --
9  and Tom Greene stopped in for a little while but
10  wasn't there for most of the time.
11      Q.  What was the subject matter of the meeting?
12      A.  Just reviewing the different issues that are
13  involved in the case.
14      Q.  Either at that meeting or prior to that
15  meeting were you given any documents by plaintiffs'
16  counsel to review in order to prepare for your
17  deposition?
18      A.  I asked for a document.
19      Q.  What was that?
20      A.  The DrugDex, D-r-u-g-D-e-x, reference.
21      Q.  And did you get a copy of that?
22      A.  I did.
23      Q.  And did you ask for anything else?
24      A.  I'm not sure.  I believe I asked for -- I'm

Page 136

1  not sure how it came up, but the section Knoop that
2  got brought into my report, the e-mail that I wrote
3  -- the e-mail that went between Ilyas and me I
4  reviewed.
5      Q.  The e-mail relating to Knoop?
6      A.  Yes.
7      Q.  Is there anything else that you were given
8  to review in preparation for the deposition?
9      A.  I can't remember.  I don't think so.
10      Q.  Did you do anything else to prepare for the
11  deposition that you haven't described already?
12      A.  No.  I went through the report carefully,
13  went through the references.
14      Q.  What about the Field report?  I believe you
15  said you reviewed that.  Was that in preparation for
16  your deposition, or for some other purpose?
17      A.  That's a good question.  I think it was
18  partially in preparation for the deposition.
19      Q.  And when did you review that?
20      A.  I don't know, when I received it.  Maybe two
21  or three weeks ago, and I have referred back to it
22  on several occasions.
23      Q.  Okay.  Just going back for a second -- and
24  did reviewing it change your opinion in any way

Page 137

1  other than what you've testified as to?
2      A.  Yes.
3      Q.  In what way did it change?
4      A.  She pointed out, on a number of occasions,
5  that I had assumed that there was a certain process
6  that went on between the writer of an article and
7  the drug company, and I think -- in some of those
8  instances I think that she was correct about those
9  particulars, and I spent a long time thinking about
10  that.
11          It doesn't change the basic argument
12  that the company was aware of these facts.  The
13  company was aware that what was being portrayed as
14  scientific evidence was not the best representation,
15  either for completeness or accuracy, depending on
16  the situation.  But who exactly did that, I had -- I
17  think I had made assumptions that perhaps the link
18  isn't there.
19          So I would bow to her on some of those
20  comments that she made about my report, but would
21  not -- it wouldn't -- it doesn't change the report
22  at all because the company was aware of the way the
23  science was being portrayed, and the company knew
24  what the science was.

35 (Pages 134 to 137)

1    So I would backtrack a little bit about
2  pointing an accusatory finger about it at an
3  individual and say that this science was
4  misrepresented, and the company was aware of its
5  misrepresentation, and I don't see evidence that the
6  company did anything to correct that
7  misrepresentation.
8    Q.  When you say it didn't change your report,
9  are you saying it didn't change your opinion?
10    A.  It didn't change the larger opinions, but
11  there is -- the one example that sticks out in my
12  mind is when I say Magistro's edit, it may not be
13  Magistro's edit.  She said Magistro said under oath
14  it's not his edit.  I don't doubt that.
15    So then I would say -- I would say that
16  saying Magistro's edit may have been overreaching --
17  overreading just because Magistro had a cover letter
18  on an edit, on an edited version.  I think that that
19  may have been a wrong conclusion.
20    But the reason why I'm saying it doesn't
21  change my opinion overall is because the content of
22  that edit did appear in an abstract in Neurology,
23  and the scientific misrepresentations, in my
24  opinion, did appear, and the company was aware of

1  them.  Whether the authors did it completely on
2  their own without any advice from the company,
3  whether the company did it without any advice from
4  the authors, I don't know, but I know the company
5  was aware of it.
6    So it doesn't change my opinion that the
7  company was aware of misrepresentations that served
8  their interests and didn't -- and I'm not aware of
9  any action they took to correct that.
10    Q.  Okay.  Can you think of any other examples?
11    A.  I don't know if it would change my opinion,
12  but the issue that we touched on before about the
13  transformation in Serpell where she identified
14  clearly in the research report where the criteria
15  for employing the transformation were outlined, it's
16  there, and as well is there is that the raw and the
17  transformed data will be discussed.  And they
18  weren't in the final article of Serpell, so readers
19  didn't know that the data was transformed.
20    So -- but I don't know that that changes
21  my report, because I don't think I talked about the
22  transformation, and I could be wrong.  But I did
23  learn something from that.
24    I can't think of anything else.  There

1  may be other things, and you may jog my memory.  I
2  think that was it.
3    Q.  Okay.
4    A.  That's what I recall now.
5    MR. ROUHANDEH:  It's 1:00 now.  This
6  might be a good place to take a break, so why don't
7  we take a break for lunch.
8    THE VIDEOGRAPHER:  It's two minutes
9  after 1:00.  We're off the record.
10    (Lunch recess taken)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    A F T E R N O O N   S E S S I O N
2    (Exhibit No. 5, Notice of service of
3    subpoenas, marked for identification)
4    THE VIDEOGRAPHER:  Okay.  We're back on
5  the record.  This is Tape No. 4.  The time is 2:13.
6    JOHN D. ABRAMSON, M.D., Resumed
7    DIRECT EXAMINATION, Continued
8  BY MR. ROUHANDEH:
9    Q.  All right.  Dr. Abramson, I'm going to show
10  you what the court reporter has marked as Abramson
11  Exhibit 5, which is a copy of a notice of service of
12  subpoena and a copy of a subpoena directed to you.
13    Have you ever seen this or any portion
14  of this document before?
15    A.  Yes, I believe I have.
16    Q.  And this subpoena -- included in Exhibit 5
17  to your deposition is a copy of the subpoena
18  pursuant to which you were testifying here today; is
19  that correct?
20    A.  I'm sorry, say that again.
21    Q.  Included in Exhibit 5 is the subpoena
22  pursuant to which you're testifying here today; is
23  that correct?
24    MR. RONA:  Objection.

36 (Pages 138 to 141)

Page 142

1     A. Yes.
2     Q. Okay. And the subpoena also requests
3  documents from you; is that correct?
4     A. Yes.
5     Q. And this is not the first time you were
6  aware of that. You knew that there was a subpoena
7  asking you to produce documents, correct?
8     A. Yes.
9     Q. Did you, pursuant to this subpoena, provide
10  any such documents to plaintiffs' counsel to be
11  produced --
12     A. I did.
13     Q. -- in this case?
14        When did you do that?
15     A. I would estimate about a month ago.
16     Q. Okay. Did -- when was the first time they
17  asked you to provide documents pursuant to the
18  subpoena?
19     A. I don't recall.
20     Q. The subpoena is dated -- do you know when
21  you first received a copy of the subpoena?
22     A. I don't.
23     Q. Was it more than a month ago?
24     A. I think so.

Page 143

1     Q. If you look at a couple of pages before
2  where you're looking before Schedule A, the
3  subpoena's dated August 13, 2008. Did you see a
4  copy of the subpoena around that time?
5     A. I don't know.
6     Q. You don't know when you first received a
7  copy of it?
8     A. Yes.
9     Q. When is the first time you discussed the
10  subpoena with plaintiffs' counsel?
11     A. I don't recall.
12     Q. The documents listed in Schedule A, did you
13  conduct a search for the documents identified at
14  Schedule A, the documents, and more specifically on
15  Page 3 there's a category called "Documents to Be
16  Produced," Page 3 of Schedule A.
17     A. Question?
18     Q. Did you conduct a search for the documents
19  identified on Schedule A?
20     A. I did.
21     Q. And what did you -- did you locate any
22  documents?
23     A. I did.
24     Q. What did you do with them?

Page 144

1     A. I turned -- I sent the relevant documents to
2  plaintiffs' counsel.
3     Q. When you say "the relevant documents," were
4  there some documents you located but did not send to
5  plaintiffs' counsel?
6     A. I shouldn't have said "relevant." I should
7  have said "requested."
8     Q. What did you do to locate the documents that
9  you ultimately provided to plaintiffs' counsel?
10     A. Went through computer files and personal
11  material.
12     Q. Do you recall when you did that?
13     A. Well, prior to my sending it to the
14  plaintiffs' counsel, but not too long before.
15     Q. Is there anywhere else that you looked
16  besides your computer?
17     A. And personal material.
18     Q. And when you say "personal material," hard
19  copy files?
20     A. Papers. Yes, hard copy.
21     Q. We're done with that for now, unless you
22  have a comment.
23     A. Well, I do.
24        "All documents you've reviewed or relied

Page 145

1  upon." There may be documents that I reviewed from
2  plaintiffs' counsel, did not rely upon, and were not
3  included in the material that I sent to plaintiffs'
4  counsel.
5     Q. And do you still have those materials?
6     A. Yes.
7     Q. And are they intact as a set that was
8  provided by plaintiffs' counsel?
9     A. Yes.
10        MR. ROUHANDEH: I'd ask plaintiffs'
11  counsel if we could get a set of those documents
12  produced to us.
13        MR. RONA: Well, first of all, I object
14  to the implication that Mr. -- excuse me -- Dr.
15  Abramson has withheld materials. There Is, as you
16  know, not only an objection filed in response to the
17  subpoena, but there is a stipulation negotiated
18  between defendants and plaintiffs --
19        MR. ROUHANDEH: If you're not --
20        MR. RONA: Hold on. Can you let me
21  finish what I'm saying?
22        MR. ROUHANDEH: No. You're taking up
23  time in the deposition.
24        MR. RONA: No, believe me, I --

37 (Pages 142 to 145)

Page 146

1    MR. ROUHANDEH:  You're mischaracterizing
2  what I said.  I didn't say that he was purposely
3  trying to withhold any documents.  I just simply
4  made a request.  You can say yes, no, and we'll
5  discuss it later.
6    MR. RONA:  If you'll let me finish, I
7  was getting to that.  And what I was going to say
8  was that there is a stipulation entered into between
9  defendants and plaintiffs, members of your firm, and
10  I'm sure you're well aware of the terms of the
11  stipulation that Bates-stamped documents --
12    MR. ROUHANDEH:  The stipulation you
13  didn't sign.  We're wasting time.  Let's just move
14  on with the questions.
15    MR. RONA:  Bates-stamped documents are
16  not to be produced.
17    Q.  Are you generally familiar with the role of
18  the FDA in the approval of prescription medications
19  in the United States?
20    A.  Yes.
21    Q.  You understand that pharmaceutical companies
22  seeking to offer or to promote new medications must
23  first seek FDA approval --
24    A.  Yes.

Page 147

1    Q.  -- before promoting those medications?
2    A.  I'm sorry, I interrupted you.
3    THE WITNESS:  Can you read it back?
4    Q.  It's not important.
5    Do you know if -- when a drug company
6  seeks to obtain approval for a particular
7  medication, is that limited to a particular use, or
8  do they say, "We want to get approval for this
9  medication for any use"?
10    MR. RONA:  Objection.
11    A.  I'm sorry.
12    Q.  You don't understand the question?
13    A.  I need you to repeat the question.
14    Q.  Okay.  When medications are -- well, when
15  medications are submitted to the FDA for approval
16  and applications are filed, is it generally the case
17  that medications are sought to be approved for a
18  particular use or uses?
19    A.  Yes.
20    MR. RONA:  Objection.
21    Q.  Is it also true that after a new drug is
22  approved doctors may legally prescribe that drug for
23  any use, including non-approved FDA -- non-FDA-
24  approved uses?

Page 148

1    MR. RONA:  Objection.
2    A.  Yes.
3    Q.  That's so-called off-label use; is that
4  correct?
5    A.  Correct.
6    Q.  Are you -- you're aware, aren't you, that no
7  medicine has ever been approved in the United States
8  by the FDA for the treatment of all kinds of
9  neuropathic pain?
10    A.  Yes.
11    MR. RONA:  Objection.
12    Q.  Do you know when the first medication was
13  proved to treat any type of neuropathic pain?
14    MR. RONA:  In the United States?
15    MR. ROUHANDEH:  Yes.
16    A.  No.
17    Q.  Are there certain kinds of neuropathic pain
18  for which no medicine has been approved?
19    MR. RONA:  Objection.
20    Q.  In the United States.  All my questions are
21  going to be in the United States unless I say
22  otherwise.
23    A.  Yes.
24    Q.  Okay.  Just so we have a clean record, are

Page 149

1  you aware that there are certain kinds of
2  neuropathic pain for which no medicine has been
3  approved by the FDA in the United States?
4    MR. RONA:  Objection.
5    A.  Yes.
6    Q.  Are there other conditions for which there
7  are no approved drugs that you can think of?
8    MR. RONA:  Objection.
9    A.  Any condition?
10    Q.  Yes, any condition.
11    A.  I'm not sure.
12    Q.  What about particular types of cancer?  Are
13  there some types of cancer where no drug is approved
14  to treat that particular type of cancer?
15    A.  I don't know that.
16    Q.  Okay.  Is it that you don't -- just going
17  back a question.  I think you said you couldn't
18  think of other conditions for which there are no
19  approved drugs.  Is that you know there are some,
20  you just can't think of them right now; or you're
21  not sure one way or the other?
22    A.  I would be very surprised if there weren't
23  conditions for which there were no approved drugs.
24    Q.  It's just none come to mind right now?

1    A.  None come to mind.
2    Q.  Would you agree that different patients
3  respond differently to a given medication?
4    A.  Yes, I would, and I would say that the
5  reason why randomized double-blind controlled trials
6  are developed is to determine whether patients are
7  more likely to respond positively to the drug than
8  placebo or to a comparator drug.
9    Q.  Where there is a drug that's shown efficacy
10  in a double-blind placebo-controlled study, that
11  doesn't mean it's going to work for every patient;
12  is that correct?
13    A.  That's correct.
14    Q.  Every patient is different; is that correct?
15    A.  To some extent and to some extent not, but
16  the way medical science works is that clinical
17  trials are done to inform physicians about whether a
18  drug is significantly better than an alternative.
19    Q.  And it's true that one medication might
20  relieve one patient's symptoms and not relieve the
21  symptoms of another patient; is that correct?
22    A.  That's possible.
23    Q.  And that's true even for FDA-approved drugs;
24  is that correct?

1    A.  Yes.
2    Q.  And some drugs, the medications have caused
3  certain side effects in some patients but not in
4  others; is that correct?
5    A.  That's correct.
6    Q.  And that might vary from patient to patient?
7    A.  It would, but clinical trials would inform
8  physicians about which drugs were worth trying and
9  which ones weren't worth trying.
10    Q.  Okay.  So if there's a clinical trial in
11  which a certain number of adverse events are
12  reported, that doesn't mean that everybody who takes
13  that drug is going to suffer that adverse event; is
14  that correct?
15    A.  That's correct, but it means that in the
16  physician's choice about whether or not to prescribe
17  that drug, the physician can make a prediction about
18  what the odds are that a given patient will have an
19  adverse event and/or a positive result and make an
20  informed decision in deciding what to prescribe.
21    Q.  Would you agree that there's no medicine
22  that's effective for everyone who takes it?
23    MR. RONA:  Objection.
24    A.  I'm not quite sure I would agree with that.

1  There may be new medicine that is the drug of choice
2  for every person with a given condition.
3    Q.  Well, can you think of a medicine that you
4  believe is effective for everyone who takes it?
5    A.  I think if you gave intravenous morphine,
6  you would decrease the pain of -- if you gave an
7  appropriate dose, you would decrease the pain of
8  whoever took it.
9    Q.  Can you think of any other medications?
10    A.  There are medicines that have a higher
11  likelihood of succeeding than others.  If you give
12  an antibiotic to a patient who has an infection with
13  a drug that's sensitive to that antibiotic, you have
14  a very high likelihood of treating the infection.
15    So I think physicians make choices based
16  on the likelihood -- from the scientific evidence,
17  the likelihood that that will provide a benefit to
18  the patient, and the benefit/risk ratio will be
19  advantageous.
20    Q.  So the question is, just so it's clear on
21  the record, can you think of any other medicine,
22  other than intravenous morphine, that you think is
23  effective for everyone who takes it?
24    MR. RONA:  Objection.

1    A.  The class of narcotics given along with
2  morphine would be -- I mean, the class of -- the
3  class of drugs called narcotics given in the
4  appropriate dose would fit into that category.  I
5  can't think of another class of drugs right now.
6    Q.  Would you -- do you agree that choosing the
7  right medicine for a given patient is a decision
8  made by a doctor -- well, strike that.
9    When choosing the right medication for a
10  given patient, do you make that decision in light of
11  the patient's medical history?
12    MR. RONA:  Objection.
13    Q.  Is that a factor you take into account?
14    A.  Yes.
15    Q.  Do you take into account concurrent
16  medications that the patient is taking?
17    A.  Yes.
18    Q.  Do you take into account contraindications
19  for those medications?
20    A.  Yes.
21    Q.  What else do you take into account in
22  considering what is the right medicine for a given
23  patient?
24    MR. RONA:  Objection.

Page 154

1   A. The scientific evidence, and one would want
2   to be able to trust randomized controlled trials
3   would be -- besides the idiosyncratic features of
4   the patient, the factors you mentioned, the
5   scientific evidence that supports the likelihood
6   that this drug will be beneficial is critically
7   important.
8   Q. With -- anything else?
9   A. Past history of response to drugs would be
10  important.
11  Q. Anything else?
12  A. The extent to which the patient's symptom or
13  disease has been studied in clinical trials with
14  this drug.
15  Q. How about how the patient has responded to
16  other medications that you or other physicians have
17  prescribed? Is that something you would take into
18  account?
19  A. Yes.
20  Q. Is there anything else that's sort of put in
21  the class of "unique to the patient" that you would
22  take into account in determining whether to
23  prescribe a medication to a given patient? And
24  obviously their diagnosis. Is that correct?

Page 155

1   A. Yes.
2   Q. And we talked about the medical history,
3   concurrent medications, contraindications. Anything
4   else that you can think of in that category?
5   A. The intensity of the symptoms might be a
6   factor, the extent to which nonpharmacological
7   therapies might be helpful, and, again, the extent
8   to which randomized controlled trials, if available,
9   inform the decision about whether that medicine is
10  likely to be helpful for the patient.
11  Q. Anything else?
12  A. I'm sure there are other factors that go
13  into a clinical decision.
14  Q. I'm just talking about your clinical
15  decision.
16  A. Do you want to read the list again?
17  Q. Well, I can add maybe co-morbidities.
18  A. Sure, did you talk about past medical
19  history? I thought you did.
20  Q. I think so, but --
21  A. So I would --
22  Q. -- you would agree that past medical history
23  and co-morbidities would be --
24  A. Yes.

Page 156

1   Q. -- issues you'd look into?
2   A. Yes.
3   Q. Drug interactions, I think we've covered.
4   A. Drug interactions, allergies,
5   symptomatology.
6   Q. Is there anything else you can think of
7   sitting here today?
8   A. I think the extent to which the symptoms
9   impede in the quality of somebody's life.
10  Q. Anything else?
11  A. There are other factors. I'm sure there are
12  other factors that as a clinician I would gestalt.
13  I think that covers the major issues.
14  Q. Have you ever told or promised a patient
15  that a medication would be effective?
16  A. No. I think I've told patients that the
17  scientific evidence shows that this is likely to be
18  effective, and that this is the best choice -- in my
19  opinion, the best choice of a therapeutic plan.
20  Q. But you stopped short of telling or
21  promising a patient that a medication would be
22  effective; is that correct?
23  A. I think it would be likely to be effective,
24  again, short of the class of drugs that are

Page 157

1   narcotics that you're giving in doses that are going
2   to decrease pain.
3   Q. You -- as a physician, you have obviously
4   prescribed medications, correct?
5   A. That's correct.
6   Q. Do you currently prescribe any medications?
7   A. No.
8   Q. When is the last time you wrote a
9   prescription?
10  A. I may have -- since I left practice in 2002,
11  I may have called in a handful of prescriptions.
12  Q. Was it for personal or family use?
13  A. Yes, for family use or friends that had a
14  very straightforward thing or ran out of their
15  prescription and couldn't get their doctor,
16  something like that.
17  Q. But not for patients that have -- that you
18  were treating?
19  A. Correct.
20  Q. When seeing a new patient, how do you
21  determine what medication will best meet that
22  patient's needs?
23  A. Do you want to give me an example of what
24  the complaint might be?

40 (Pages 154 to 157)

Page 158

1    Q.  Just what's the process that you'd go
2  through?
3    A.  Why did the patient come?  So you're talking
4  about any patient?
5    Q.  Yes, what's the -- in a general -- if you
6  can generalize, what is the process or method you go
7  through when you see a patient to try to determine
8  what medication would be best to treat the patient?
9    A.  Well, the first issue is why is the patient
10  there, because the patient may not be there for a
11  medication issue, so if -- going backwards, if we're
12  assuming that this is a new patient, de novo, and
13  that the visit ends in a prescription, is that --
14    Q.  Yes.
15    A.  -- a reasonable way to go?
16    Q.  Yes.
17    A.  I would do a history, which would include
18  the current problem, and I would want to know when
19  the problem started and what the associated factors
20  were, and I would want to know what the patient
21  thought about the problem.  I would want to know the
22  past history of the patient and the social history
23  of the patient, and the drugs or the allergies and
24  the family history.

Page 159

1         Then I would examine the patient and see
2  what my exam contributed to theories about what
3  might be wrong with the patient.  I might need to do
4  testing or might not need to do testing, depending
5  on the problem; would formulate a clinical
6  hypothesis and then review either in my head, if I
7  knew it, or in the literature, if I didn't, what the
8  scientific evidence showed about the effectiveness,
9  the risk and benefit in hopefully randomized
10  controlled trials, Level 1 evidence, that would
11  demonstrate whether -- or what the best choice of
12  medicine would be, if any medicine would be for the
13  patient.
14         And having made that decision about what
15  the scientific evidence showed, I would consider
16  about whether there were other factors involved in
17  the specific case that would inform that decision
18  beyond what the clinical trials showed.
19    Q.  And did you -- do you consider generally
20  what other medications the patient's taking at the
21  time?
22    A.  Yes, that -- if I didn't -- I think I said
23  that.
24    Q.  I think you did mention that.

Page 160

1    A.  I think I said that, yes.
2    Q.  And would you consider whether the patient
3  had responded to those other medications?
4    A.  That would be in the history of the illness,
5  yes.
6    Q.  When you decide or consider whether or not
7  to prescribe a given medication, do you consider the
8  label or package insert for the medicine?
9    A.  Yes.
10    Q.  So you consult that?
11    A.  Yes, that's -- yes.
12    Q.  How do you go about doing that?
13    A.  Through the PDR.
14    Q.  And the PDR is a collection of the labels
15  and package inserts for all approved medications in
16  the United States; is that correct?
17    A.  That's right.
18    Q.  Do you ever consider clinical practice
19  guidelines that are put out by national or
20  international medical bodies in determining what
21  medicine to prescribe to an individual patient?
22    A.  Sometimes clinical practice guidelines
23  inform those decisions; and sometimes they don't.
24    Q.  Can you think of any that, in your 20 years

Page 161

1  as a doctor, that you consulted; any clinical
2  guidelines that you consulted?
3    A.  Sure, the guidelines for prescribing --
4  deciding whether to -- or the guidelines for
5  treating people with elevated cholesterol.
6    Q.  Any others that you can think of?
7    A.  Guidelines for hypertension, the diagnosis
8  and treatment of hypertension.
9    Q.  And those -- these practice guidelines,
10  would you -- in general, do you consider practice
11  guidelines to be an important source of information
12  for physicians?
13    A.  They're an important, but -- they are an
14  important source because they -- in a functional
15  way, they set a standard of care, but the evidence
16  is clear that the majority of experts who
17  participate in formulating guidelines had financial
18  ties to the drug companies -- when the guidelines
19  are about drugs, have financial ties to
20  manufacturers of drugs that are being considered in
21  the guidelines, and the studies of guidelines
22  clearly show that the guidelines don't follow the
23  guidelines for guidelines.
24         So though guidelines do, in a sense,

41 (Pages 158 to 161)

Page 162

1  create a standard of care, they don't always reflect
2  the evidence, the scientific evidence.
3      Q.  When you -- at one point in one of your
4  draft reports I believe you included a section on
5  clinical practice guidelines, but your final report
6  does not.  Do you have a recollection as to why?
7      A.  I didn't -- as the report evolved, there
8  wasn't material about guidelines vis-a-vis
9  prescribing for Neurontin that I was aware of was
10  playing a role in clinical decision-making.
11      Q.  I'm not sure if I understand that.  Is it --
12  are you saying there weren't clinical practice
13  guidelines relating to Neurontin, or there were but
14  they didn't -- they weren't important to doctors'
15  decisions?
16      A.  I was not aware that there were.
17      Q.  That there were clinical practice
18  guidelines --
19      A.  Yes.
20      Q.  -- relating to Neurontin?
21      A.  Yes.  But I do want to be clear, that
22  guidelines -- just because there's a guideline
23  doesn't mean that those guidelines reflect the
24  scientific evidence, and I've written about that

Page 163

1  issue in the Lancet vis-a-vis the cholesterol
2  guidelines.
3      Q.  In writing a prescription, do you consider
4  whether a particular medication is covered by the
5  patient's healthcare insurer?
6      A.  Yes, that would be a factor.  It would be --
7  it would be a downstream factor.  The question about
8  whether the -- which medicine was the treatment of
9  choice would be the first issue, and then if a
10  prescription -- if a drug wasn't on the formulary,
11  then it would be a consideration.
12      My experience has been that generally
13  there are drugs on formularies that solve the
14  problems that the scientific evidence shows can be
15  solved.
16      Q.  Well, put it this way, are this occasions in
17  which you intended to prescribe a given medication
18  to a patient but, because it wasn't covered by their
19  healthcare coverage, you decided to prescribe a
20  different medication?
21      A.  Yes.  Typically those situations are between
22  members of a class where some -- some members of a
23  class have been given better coverage than other
24  members, and the switch between one member of a

Page 164

1  class and another is not that clinically relevant.
2      Q.  When you say "members of a class," you're
3  referring to a class of medications?
4      A.  Yes.
5      Q.  Like, for example, antiepileptic drugs or
6  anticonvulsant drugs, that's a class of medication?
7      A.  That would be a class.  As I was talking, I
8  was referring -- I was thinking in particular of a
9  time when an insurance carrier in Massachusetts
10  changed the priority statin from Pravachol to Zocor
11  when they were both on patent, and the patients who
12  were on one or the other -- I don't remember which
13  order it was -- had diminished coverage because of
14  this formulary change and made the change because
15  the drugs are virtually interchangeable.
16      Q.  And did you then give those patients a
17  different prescription, or are you talking about
18  your personal experience?
19      A.  No, I'm talking about patients.  And I did.
20      Q.  Your patients?
21      A.  My patients.
22      Q.  Okay.  So you moved them from one drug to
23  another given the cost considerations?
24      A.  Given cost considerations and given the

Page 165

1  considerations of the HMO and the pharmaceutical
2  benefit manager sort of creating an imperative to do
3  that.
4      Q.  How do you assess whether a medication is --
5  that you've prescribed is working for a given
6  patient?
7          MR. RONA:  Objection.
8      A.  That's a very hard question, because
9  patients tend -- for many conditions, patients tend
10  to come to you at their worst and regress to their
11  mean, so they tend to get better, and there are many
12  conditions that are self-correcting, like a viral
13  cold, for example, or an acute injury that's going
14  to resolve.
15          Then there are medicines for chronic
16  conditions, and I think the studies for Neurontin
17  actually help to see that when patients are put on
18  Neurontin, in some of the studies they get better,
19  and when they're put on a placebo, they get better;
20  so if a doctor asked the patient who was in one of
21  those clinical trials who was on a placebo, "Did the
22  medicine I give you help you?," the answer would be,
23  "Yes, it did."  So it's very hard to tell whether
24  the patient is better because you gave them a

42 (Pages 162 to 165)

Page 166

1  medicine.
2       Q.  Okay.  Let me rephrase my question.  What
3  -- because it really was something different, which
4  is, how do you make the assessment?  What steps do
5  you go through once you've prescribed a medication
6  to determine whether you believe it's working for
7  the patient?  For example, talk to the patient.
8  What else do you do?
9       A.  Yes, I think --
10           MR. RONA:  Objection.
11      A.  Yes, I think "working for the patient" is
12  hard because you're making a causal assumption that
13  a medicine was given and then the clinical state of
14  the patient at a later point in time is dependent
15  upon that therapeutic decision, and what I'm saying
16  is, there are many other factors that go into that.
17           So I think you do talk to the patient,
18  and you find out if they're better and if they're
19  having side effects, but you understand that their
20  improvement is not necessarily due to the medication
21  you gave them.
22      Q.  Okay.  Apart from talking to the patient
23  about their symptoms, about any side effects, what
24  else do you do to determine whether or not you

Page 167

1  should continue the individual on the medication?
2       A.  Well, it depends what the medication is and
3  what the condition is.  If it's a blood pressure
4  medicine, you'd be monitoring blood pressure, and if
5  you did get a very good response to the blood
6  pressure medicine and the blood pressure normalized
7  and the patient was stable, you might, at a point in
8  time in the future, try to decrease the dose and see
9  if the patient needed that medicine in an ongoing
10  way.
11           Some medicines have to do with
12  laboratory tests, thyroid medicine, for example,
13  where you -- for the vast majority of patients
14  taking thyroid medication, you're really treating
15  lab values and not clinical symptoms.  You don't
16  want to get to the point where you're treating
17  clinical symptoms, so you would measure the lab
18  values.
19           For symptomatic relief, you would ask
20  the patient.  You might have objective markers of
21  inflammation.  You might have objective or
22  subjective markers of pain and perception of pain or
23  interference with normal life processes, and you
24  could ask the patient.  But for those patients, you

Page 168

1  couldn't draw a causal inference.  That's why we do
2  randomized controlled trials, and that's what
3  doctors rely on in randomized controlled trials.
4       Q.  Well, just going back, you do, on occasion,
5  do -- depending on what the symptom is you're
6  treating, you administer an objective test of which
7  you can see where the patient, prior to taking the
8  medication, had cholesterol of X and after taking
9  the medication had cholesterol of Y.  Are you saying
10  you don't -- it's not a relevant thing to consider
11  in determining whether or not to continue the
12  patient on a medication?
13      A.  No, not --
14           MR. RONA:  Objection.
15      A.  That's not at all what I said.
16           What I said is that for certain
17  conditions -- I used thyroid, but we could use
18  cholesterol.  If the patient had elevated
19  cholesterol, and the risk score, the Framingham risk
20  score, and the risk factor picture was such that the
21  guidelines recommended a statin for therapy after
22  lifestyle intervention, and let's just assume that
23  the guidelines represent the scientific evidence for
24  the time being, you would measure the cholesterol

Page 169

1  level, the LDL and HDL and triglycerides and liver
2  function tests and so forth, and if there were a
3  drop in cholesterol, it would probably be safe to
4  assume that the statin played -- that whatever
5  medicine you gave the patient played a role.  But if
6  stable, over time you might decrease the dose and
7  see if that remained stable, and test the hypothesis
8  about whether it is, in fact, the statin, if this is
9  a patient for whom statins are recommended
10  regardless of what the cholesterol is, if the
11  recommendation is based on the cholesterol level.
12      *Q.  So apart from talking to the patient about
13  their symptoms, any potential side effects,
14  administering tests such as the thyroid test,
15  consulting the medical literature and scientific
16  evidence, is there anything else you do to determine
17  whether or not to continue a patient on a
18  medication?
19      A.  Can you give me the list again, I'm sorry.
20           MR. ROUHANDEH:  Maybe you can read it
21  back.
22           *(Question read)
23      A.  I think I would summarize those factors,
24  including the scientific evidence that's evolving,

43 (Pages 166 to 169)

Page 170

1  suggest to the patient that -- if it's the case,
2  that the medication appears to be working, and ask
3  the patient how they feel about that, how they feel
4  about staying on the medication.
5      Q.  Is there anything else?
6      A.  I'm sure there are other things that come
7  up.
8      Q.  If a patient who you prescribed a medication
9  told you --
10     A.  I'm sorry?
11     Q.  If a patient who you prescribed a medication
12 told you that the medicine was not working, can you
13 think of circumstances where you would continue the
14 patient on the medication?
15         MR. RONA:  Objection.
16     A.  It would depend on what the patient was
17 taking the medicine for, because there would be
18 things that a patient would be taking a medicine for
19 that they may not perceive it working but they
20 should take it.
21         For example, a patient might be taking
22 an antihypertensive medication, not believe that
23 it's working for them because they believe that
24 hypertension is symptomatic when it's serious and

Page 171

1  their blood pressure might be in a normal range, and
2  I would recommend that patient continue the
3  medication.  I would say that if the blood pressure
4  stays in the normal range, we can try to taper it,
5  but I would recommend the patient stay on that
6  medication.
7          If it were a pain medicine, it would be
8  much less likely that I would recommend that a
9  patient stay on a medicine that the patient was
10 saying wasn't working.
11     Q.  Might you, rather than take the patient off,
12 increase the dose?
13     A.  You might try that, guided by scientific
14 evidence and FDA recommendation -- FDA -- the FDA-
15 approved label.
16         Let me just add that I wouldn't increase
17 the dose if there were no evidence that an increased
18 dose was efficacious.  I wouldn't just go on a flier
19 and say, "Gee, 500 milligrams didn't work, maybe
20 I'll try a thousand.  Even though there's no
21 evidence that a thousand works, maybe I'll just try
22 a thousand because what the hell."  I don't think
23 most doctors operate like that.
24     Q.  In other words, they -- before they increase

Page 172

1  the dose, they would want to satisfy themselves that
2  they believe the doctor -- that the medication
3  might -- or their symptoms might approve at a higher
4  dose -- improve at a higher dose?
5      A.  That there's clinical evidence, there's
6  scientific evidence, that a higher dose has a
7  higher -- is -- that there's evidence that a higher
8  dose would provide greater relief.  If there were no
9  such evidence, I would think it would be
10 irresponsible to push the dose.
11     Q.  Well, are you talking about yourself or
12 other doctors?  I mean, you feel it would be
13 irresponsible for you to do that, or are you saying
14 that other doctors would?
15     A.  If there's no scientific evidence that a
16 higher dose is efficacious, I don't think it's
17 responsible to give a higher dose.
18     Q.  And what do you base that on?  What would be
19 your sense of what would be responsible and not
20 responsible to do?
21     A.  Well, I think the vast majority of
22 physicians would have the goal of practicing
23 scientific- or evidence-based medicine, and
24 evidence-based medicine is a process that may not be

Page 173

1  perfect, but it's the best we've got to decide -- to
2  determine whether drugs are efficacious and whether
3  they're safe.  And when there's not evidence of
4  efficacy of a drug for a certain condition or a drug
5  in a certain dose, when we don't have any Level 1
6  evidence, barring a situation which is
7  irretrievable, like HIV or terminal cancer or
8  something where the patient is clearly in dire
9  danger and you have nothing better to offer,
10 excluding those situations, physicians in general,
11 and myself in particular, would be looking at the
12 scientific evidence that would show efficacy for a
13 given condition and in a given dose.
14     Q.  And my question was really simply, what do
15 you base your analysis on of what would be
16 responsible and not responsible?  Is that just sort
17 of your own personal subjective view of what you
18 think is responsible or not responsible, or is this
19 something that you -- some guideline or something
20 written down somewhere?
21     A.  Yes, there are guidelines about evidence-
22 based medicine.  There's an evidence-based medicine
23 center.  I don't know whether I cited it.  There is
24 an article that I did cite from the family practice

44 (Pages 170 to 173)

Page 174

1  literature that reviews that literature and sorts it
2  into Level 1, 2, and 3 evidence.
3      Q. Have you prescribed any medications off-
4  label?
5      A. I'm sure I have.
6      Q. Can you think of any you've prescribed off-
7  label?
8      A. I think before -- I believe that this is now
9  on label, but before it was on label, an
10  antidepressant called trazodone had been shown to be
11  effective for insomnia in very low doses, and I did
12  prescribe that, having reviewed the scientific
13  evidence.
14      Q. Can you think of any other drugs?
15      A. I'm sure there are others. I'm not thinking
16  of specific instances right now.
17      Q. Have you ever had a patient who presented
18  with a condition for which there are no approved
19  medications?
20      A. Sure. A fibromyalgia patient would be an
21  example.
22      Q. Any others that you can think of?
23      A. Say it again.
24      Q. Are there any other conditions that you can

Page 175

1  think of where a patient presented with that
2  condition and there was no approved medication to
3  treat it?
4      A. Sure, less-than-major depression would be an
5  example.
6      Q. Any others?
7      A. There are many others.
8      Q. That you can think of?
9      A. There were -- to go back to your other
10  question, there were probably drugs that I
11  prescribed to kids that hadn't yet received
12  pediatric approval.
13          I'm sure there are a myriad of
14  conditions that don't have approved therapies.
15      Q. And in those cases, at least in the case of
16  fibromyalgia and less-than-major depression, did you
17  prescribe a medication off-label for those?
18      A. No. Well, one at a time.
19          For less-than-major depression, the
20  answer would be I did not prescribe, I think because
21  of the advertising and the perception of efficacy of
22  these drugs, even though there is no shown efficacy
23  of antidepressants in less-than-major depression,
24  but there, I think, were times -- very few, but

Page 176

1  occasional times when a patient absolutely demanded
2  such medicine, and at the risk of breaking the
3  doctor/patient relationship and knowing the patient
4  would go elsewhere to get the medicine, I probably
5  prescribed.
6          Now, that's not many times. That's a
7  failure of my ability to negotiate with the patient
8  and have the patient understand the lack of evidence
9  and the importance of addressing the cause of
10  depression when it's less-than-major depression as a
11  problem in living.
12          So it would be -- I don't know if a
13  handful would be minimizing, but very few times.
14  But if you looked at my prescribing records, you
15  would probably find at least one example of that.
16      Q. What about for fibromyalgia?
17      A. For fibromyalgia nothing much worked. PRN
18  analgesic, but not in an ongoing way, and I'm not
19  sure whether you'd call that off-label or not. So I
20  would try to get those patients to use lifestyle
21  interventions and physical therapy and other
22  physical modalities.
23          And sometimes fibromyalgia patients have
24  other problems, like insomnia or major depression,

Page 177

1  and they're treated for those, but not -- I can't
2  recall using a drug the primary purpose of which was
3  to treat fibromyalgia.
4      Q. Do you know if there are drugs approved
5  today to treat fibromyalgia?
6      A. Yes, yes.
7      Q. Do you know how many?
8      A. I know at least one.
9      Q. What's that one?
10      A. Lyrica.
11      Q. I take it you've never prescribed Lyrica.
12      A. No. I think it came out after I was out of
13  practice.
14      Q. Is it fair to say that you would -- that you
15  exercise your own independent medical judgment in
16  deciding what medication to prescribe to a given
17  patient?
18      A. It is, and that independent medical judgment
19  is very much informed by the scientific evidence
20  that -- I would not exercise my independent medical
21  judgment with disregard to the scientific evidence.
22      Q. In other words, that's important to your
23  exercise of independent medical judgment, what the
24  scientific evidence says?

45 (Pages 174 to 177)

1     A. That's important to my assessment of what's
2  in the best interest of the patient.
3     Q. In your practice, prior to the time you
4  ceased seeing patients, did you have any sales
5  representatives from pharmaceutical companies visit
6  you?
7     A. I did.
8     Q. Was that a frequent occurrence?
9     A. That they came into my office?
10    Q. Yes.
11    A. Yes.
12    Q. And when you say came into your office,
13 you're distinguishing between coming into your
14 office and speaking to you?
15    A. Yes.
16    Q. Did -- are there occasions when sales
17 representatives not only came into your office but
18 you actually spoke with them?
19    A. Those were very rare.
20    Q. And do you remember the companies that those
21 pharmaceutical representatives were from, where you
22 actually had a conversation?
23    A. I can remember two such conversations.
24    Q. Can you tell me what they are.

1     A. Yes.  One was the manufacturer of Augmentin
2  when -- amoxicillin and clavulanic acid when it was
3  still on patent.
4     Q. Is that an antibiotic?
5     A. Antibiotic, yes.  It was a -- it's sort of a
6  super amoxicillin.  And another example is a
7  Celebrex salesman, and that was when I was writing
8  the book and wanted to hear what the Celebrex
9  salesman would say to see if it was consistent with
10 what the scientific evidence showed.
11    Q. Can you think of any other occasions where
12 sales representatives from pharmaceutical companies
13 spoke to you?
14    A. They would speak to you.  I mean, their job
15 is to engage you.  It's to sort of hook you into a
16 conversation.
17       Occasionally they would try to speak to
18 me, which they would speak to me, not try.  They
19 would say, "Dr. Abramson, do you know that the
20 latest blah, blah, blah?"  And I would say, "I don't
21 do it."  And then occasionally if they persisted, I
22 would say, "Come with me," and I would take them
23 into the waiting room and let them see if they
24 wanted to give their spiel in front of the patients

1  who were waiting.
2     Q. When you say you don't do it, what do you
3  mean?
4     A. I didn't talk to drug reps.
5     Q. Oh, you're saying -- so you generally had a
6  policy against speaking to them?
7     A. Yes, right.  I didn't speak with drug reps.
8       The policy in the office was that I
9  didn't speak with drug reps, and drug reps shouldn't
10 be allowed to get to where I was to hook me with
11 whatever their line was, but that we did accept
12 samples in the practice.  So the nurses would talk
13 to the drug reps and check what we had samples of or
14 what -- and if it was a new drug, whether we wanted
15 samples of that drug.
16    Q. So the two occasions where you did speak
17 with sales representatives, those were occasions
18 where you wanted to speak to them; is that -- you
19 wanted some information from them --
20    A. Yes.
21    Q. -- on Augmentin and Celebrex?
22    A. Yes.
23       Well, no.  Celebrex was the case.
24 Augmentin wasn't actually.

1        Somehow the Augmentin sales folks got me
2  in a conversation, and I said that I wanted to do a
3  study of bringing in alternative healers into my
4  practice to see if that was a -- if that modality
5  would contribute to patient care, but I didn't want
6  to charge patients for that.  I didn't feel right
7  charging patients for that.  And the Augmentin sales
8  folks said, "We will give you a grant" -- I forget
9  what it was, $1,000 or $1,500 -- "to cover that if
10 you will speak to us three times."
11    Q. And did you do that?
12    A. After the first time, they didn't want to
13 come back.
14    Q. You mean, you did do it, and you spoke to
15 them once, and --
16    A. I spoke to them once, and they didn't come
17 back.
18    Q. Okay.  And did they -- did you receive the
19 payment?
20    A. I did.
21    Q. Okay.  And what did you use it for?
22    A. To bring in alternative fields.  There was a
23 nurse who -- there was a -- excuse me, a nurse
24 practitioner and a nurse therapist.  The nurse

46 (Pages 178 to 181)

Page 182

1  practitioner, I think, was a family practice nurse
2  practitioner, and the therapist was working -- was a
3  nurse clinician at McLean, and they were doing like
4  talking and imagery therapy, the kinds of things
5  that were a little outside the mainstream, and I was
6  kind of curious about whether that would be
7  effective or not.
8      Q. What is an alternative healer?
9      A. An alternative healer is -- I think the real
10  definition is somebody who is not accepted by the
11  mainstream. It's kind of a functional -- so
12  acupuncture -- an acupuncturist would have been an
13  alternative healer back then. Now they're -- I
14  think people would give them a 50/50 on one side or
15  the other.
16      Q. They're not M.D.s?
17      A. Could be. So it's the alternative therapy,
18  not the individual.
19      Q. Who is doing it?
20      A. Yes.
21      Q. And what were the -- what sort of conditions
22  were you seeking to employ the alternative healers
23  on? Was it limited to a type of condition that you
24  were seeing in your practice?

Page 183

1      A. It was people who weren't responding.
2      Q. To medication?
3      A. To whatever. It might have been to
4  counseling. It might have been to lifestyle change.
5      Q. Why did the representatives relating to
6  Augmentin, why did they -- to the extent you know,
7  why didn't they come back after the first time? Was
8  it something you said?
9      A. It was.
10      MR. RONA: Objection.
11      Q. What was it?
12      A. They -- at our first meeting, there were
13  three reps, and they said, "Dr. Abramson, do you
14  know that..." something. I'm paraphrasing of
15  course, because it was many years ago. "Do you know
16  that Augmentin should be the first drug that you
17  should use to treat sinusitis in your patients in
18  your primary care practice?"
19      And I said, "I know you can't believe
20  that's true," and that kind of stopped the
21  conversation.
22      Q. So you rejected what their sales pitch was?
23      A. Yes.
24      Q. Did -- notwithstanding the fact that you

Page 184

1  didn't -- had a policy against speaking with sales
2  representatives, you said they still came into the
3  office and one of the things they did was drop off
4  samples; is that correct?
5      A. Yes.
6      Q. Was that a pretty regular occurrence?
7      A. Yes.
8      Q. Do you -- did they drop off any written
9  material relating to the drugs they were promoting?
10      A. Yes.
11      Q. And did you review that material?
12      A. Certainly not on a regular basis. I mean,
13  it's clearly -- the primary purpose of that material
14  is for sales, and that is not a dispassionate
15  representation of the scientific evidence related to
16  the treatment of the given condition that they're
17  talking about, so I didn't use that as a source of
18  information that I relied upon.
19      Q. Okay. So on what occasions -- given your
20  answer, what occasions did you review?
21      A. On the way to the trash can, I think.
22      Q. So whether you reviewed it or not, you
23  didn't rely on it in making prescription decisions?
24      A. I did not.

Page 185

1      Q. And the "it" being written material that you
2  were provided by sales representatives?
3      A. Yes.
4      Q. Okay. What about the samples? Did you
5  utilize samples in your practice that were supplied
6  by pharmaceutical companies?
7      A. I did.
8      Q. Are you aware of other doctors who, like
9  yourself, did not permit visits by sales
10  representatives?
11      A. Yes.
12      Q. Is that fairly common or uncommon, in your
13  experience?
14      A. What do you mean by "common or uncommon"?
15      Q. I don't know. You know, I guess, is that an
16  isolated event, or do you think that there are a
17  number of doctors who don't see sales
18  representatives?
19      A. No, there are a number. I think the
20  statistics show that somewhere between 15 and 20
21  percent don't talk to sales reps.
22      Q. And those that do, you have no way of
23  knowing whether they rely on what sales
24  representatives say, do you?

47 (Pages 182 to 185)

Page 186

1    A. Well, PhRMA's data shows that the majority
2  of physicians -- the vast majority of physicians, I
3  forget the exact language, feel that the information
4  is helpful and, separate question, accurate.
5    Q. Do you read medical -- the medical journals
6  that you read, you testified -- that you read
7  regularly you testified to earlier.
8    A. Uh-huh.
9    Q. In those medical journals, do you read the
10  advertisements in those journals that are in there
11  paid for by pharmaceutical companies?
12    A. Well, when you're looking at the hard copy,
13  it's hard to avoid completely. The paid-for
14  subscriptions will generally have the advertisements
15  at the back and the front, and not in the middle.
16  The nonpaid-for journals will often have the
17  advertisements intermixed. So it's impossible to
18  have a medical journal in your hand that has
19  advertisements in it and not have the advertisement
20  catch your eye as you flip through, so yes, it
21  caught my eye.
22    Did I look at it for information? The
23  answer is I would think not.
24    Could the marketing people provide

Page 187

1  evidence that it affected me? I don't know the
2  answer to that.
3    Q. Okay. But you didn't make a point of
4  reading those advertisements; is that correct?
5    A. I did not.
6    Q. And did you make a point of trying to avoid
7  reading those advertisements?
8    A. It was just a page that was in the way, yes.
9    Q. I mean, maybe I'm hypothesizing this. You
10  tell me if I'm wrong, but I was getting the sense
11  that you were saying when it's paid for it's at the
12  front or the back, and that way you could avoid it
13  more -- avoid those journal ads more easily; is that
14  correct?
15    A. It's somewhat correct, but it's impossible
16  to avoid them completely, and there are some ads
17  that are intermixed. They're mostly at the front or
18  the back, I should say.
19    Q. And were those journal ads an important
20  source of information for you in making prescription
21  decisions?
22    A. I don't believe so, but they clearly are an
23  important source. They are effective, which is why
24  they are --

Page 188

1    Q. Okay, yes. I was just asking really about
2  you.
3    A. About me?
4    Q. Yes, whether they're an important source for
5  you in making prescribing decisions?
6    A. Consciously, I don't believe so. Whether
7  the pretty colors and the quick-read graphs got into
8  my subconscious as I flipped through, I --
9    Q. Do you view those journal advertisements
10  with skepticism?
11    A. I do.
12    Q. Okay. You said "I do"?
13    A. I did.
14    Q. I mean, sort of -- I guess what I'm trying
15  to get at is, was your practice with respect to
16  those advertisements similar to your practice with
17  respect to seeing sales representatives, which is, I
18  don't take a lot of interest in those, and they're
19  not going to influence me very much?
20    MR. RONA: Objection.
21    A. I'm sorry, do it again. I was actually
22  thinking of another situation where I think that I
23  did speak to drug reps, so why don't we just go back
24  to that.

Page 189

1    Q. Sure.
2    A. And I talk about this in my book, but I did
3  go on a junket once, I confess. It was in '86 or
4  '87. It was sponsored by the drug rep -- the drug
5  company that was making the anti-inflammatory drug
6  Orudis. And the so-called educational conference
7  was down at the Cape, and the Celtics had just been
8  in this wonderful '86 or '87 finals with the Lakers,
9  and the conference was basically about the medical
10  injuries of the Celtics as the series progressed
11  sponsored by Orudis, and I confess that I bit for
12  that.
13    Q. And did that conference affect your
14  prescribing decisions in any way?
15    A. I don't think it did.
16    Q. Did it affect your ability to get Celtics
17  tickets in any way?
18    A. I know it didn't.
19    Q. So the question, I'll just rephrase it, was
20  -- I'm trying to get -- see if there's any analogy
21  or commonality between your view of sales
22  representatives and journal advertising. It sounded
23  to me like you were skeptical of what sales
24  representatives say. I didn't know if that was true

48 (Pages 186 to 189)

1  with respect to journal advertisements?
2      A. I think they're both part of marketing, the
3  marketing effort of the drug company.
4      Q. But in just -- I'm only talking about your
5  personal experience.
6      A. I'm missing this. I'm sorry.
7      Q. I guess the question is, with respect to --
8  you don't rely on journal advertising to exercise
9  your medical judgment in choosing what prescription
10 to make --
11     A. No.
12     Q. -- is that correct?
13     A. No.
14     Q. Now, putting aside Neurontin for a second,
15 did you ever prescribe -- while you were a
16 practicing physician, did you ever prescribe other
17 antiepileptic drugs?
18     A. Yes. I prescribed Tegretol for trigeminal
19 neuralgia.
20     Q. Anything else?
21     A. I did prescribe a number of antiepileptic
22 drugs for group home patients that I took -- that I
23 cared for. That was in conjunction with a
24 neurologist or a psychiatrist so that it wasn't -- I

1  would -- my name might have been on the
2  prescription, or it might not, but it wouldn't have
3  been me making that decision. I would just be the
4  scribe in the operation.
5      Q. Any other situations where you've prescribed
6  anticonvulsant or antiepileptic drugs?
7      A. I can't think of any.
8      Q. Do you or did you see or treat individuals
9  with epilepsy in your family practice?
10     A. The vast majority of people with epilepsy
11 were in group homes, so they were being treated by
12 neurologists, and I was providing primary care. And
13 we would sometimes draw levels and titrate meds, but
14 we weren't calling the shots.
15         And there were some patients in my
16 practice who had seizure disorder, but they would be
17 treated in conjunction with a neurologist.
18     Q. So you were not treating those patients in
19 your practice for their epilepsy, they were being
20 seen by another doctor for that. You were treating
21 them for other conditions; is that correct?
22     A. Right, so the two would intermix at times.
23 As a primary care doc, you'd take care of whatever
24 the problem might be, and there might be a problem

1  related to the epilepsy or epilepsy medicine that
2  would require communication with the neurologist, an
3  adjustment or a referral.
4      Q. In that setting though -- I'll go back to
5  the use of Tegretol in the group home, but in the
6  setting where you saw patients who you were treating
7  in conjunction with a neurologist who was treating
8  their epilepsy, in those situations was there a drug
9  of choice with respect to epilepsy as far as you
10 could tell?
11     A. It wasn't my choice.
12     Q. In the Tegretol, the trigeminal neuralgia,
13 that's an approved indication, the Tegretol?
14     A. Pardon?
15     Q. Is that on label or off-label?
16     A. I believe it's on label. I know there's
17 good evidence that it's effective.
18     Q. The group home patients who you might or
19 might not have prescribed antiepileptic drugs to,
20 were those all epilepsy patients?
21     A. I believe so.
22     Q. And what were you treating those group home
23 patients for? What conditions were you treating?
24     A. Well, again, I was the primary care doc, so

1  I was providing primary care.
2      Q. And in connection with providing primary
3  care, did you write prescriptions of antiepileptic
4  drugs to treat any of the conditions you identified
5  in your primary care practice?
6      A. No.
7      Q. Okay. So to the extent those people were
8  getting antiepileptic drugs, it was -- they were
9  prescribed by other physicians?
10     A. Correct.
11     Q. And those were physicians who were treating
12 the epilepsy conditions in those group home
13 patients?
14     A. That's correct.
15     Q. To your knowledge, have you prescribed any
16 antiepileptic drugs for any off-label uses?
17     A. Not that I know of.
18     Q. Are you aware that antiepileptic drugs as a
19 class were and still are prescribed for a number of
20 off-label uses?
21     A. I am.
22     Q. You are?
23         And that would include drugs other than
24 Neurontin; is that correct?

49 (Pages 190 to 193)

1    A. That's correct.
2    Q. Have you ever -- have you ever compared the
3    drug interactions or adverse events in patients with
4    Neurontin, compared it to patients taking other
5    antiepileptic drugs?
6        MR. RONA: Objection.
7    A. Have I compared --
8    Q. Yes.
9    A. -- in the sense of through the scientific
10   literature?
11   Q. Yes, or looked at their labels or tried to
12   assess whether -- the differences in terms of
13   adverse events and drug interactions between
14   Neurontin and the other drugs in the same class?
15   A. One more time.
16   Q. Yes, have you ever -- have you ever compared
17   the adverse events and drug interactions that
18   accompany Neurontin with those that accompany
19   other --
20   A. Yes.
21   Q. -- antiepileptic drugs?
22       MR. RONA: Objection.
23   A. Yes.
24   Q. Have you formed a view on that comparison?

1    was on Neurontin and you just can't remember whether
2    you wrote the prescription or not?
3    A. No. I'm saying I probably didn't write the
4    prescription, and I can't remember -- I'm sure there
5    were patients amongst those group home patients, in
6    particular, who were on Neurontin as an adjunct to
7    their seizure medicine.
8    Q. Do you -- so sitting here today, do you
9    recall ever writing a prescription for Neurontin for
10   any use?
11   A. I don't recall.
12   Q. Have you ever treated patients who were on
13   Neurontin?
14   A. I think so.
15   Q. And is that the patients who were in the
16   group home?
17   A. Yes.
18   Q. And was Neurontin being prescribed in those
19   situations on label, for an on-label use?
20   A. It's a long time ago. My recollection is
21   yes.
22   Q. So to your knowledge, you've never
23   prescribed Neurontin off-label or ever treated a
24   patient who has been on Neurontin for an off-label

1    A. I think there are differences.
2    Q. Can you describe the differences.
3    A. Yes. Neurontin has a fairly high frequency
4    of CNS symptoms like somnolence and dizziness, up to
5    about 50 percent incidence. Other drugs have other
6    problems, hepatic toxicity. Blood levels will need
7    to be monitored.
8    Q. Hepatic toxicity?
9    A. Yes.
10   Q. Is that liver functioning?
11   A. Yes, liver functions.
12   Q. Okay. Any other adverse events that have
13   other -- that other drugs have that you're not aware
14   Neurontin has?
15   A. Drug-drug interactions.
16   Q. And so there are other antiepileptic drugs
17   that have more drug interactions than Neurontin
18   does; is that correct?
19   A. Yes.
20   Q. Have you ever prescribed Neurontin?
21   A. I can't recall whether I ever initiated a
22   prescription for Neurontin.
23   Q. When you say whether you ever initiated, are
24   you thinking of some other situation where a patient

1    condition; is that correct?
2    A. I would be surprised if patients who I had
3    treated had not been put on Neurontin by other
4    physicians for off-label indications.
5    Q. When you say patients that you've treated,
6    is there some group of patients apart from the group
7    home patients that you typically see that are also
8    seen by other doctors?
9    A. No, but some significant portion of primary
10   care practice would be seen by other physicians, and
11   then you -- the medicines that the other physicians
12   start they tend to manage, and the primary care doc
13   manages the prescriptions that he or she initiated.
14   Q. Have you ever referred a patient to a
15   neurologist?
16   A. Sure.
17   Q. To a psychiatrist?
18   A. Sure.
19   Q. In what sort of situations have you referred
20   patients to a neurologist?
21   A. To a neurologist? For headache, for back
22   pain at times, for reflux sympathetic dystrophy,
23   RSD, for radiating pain, neuropathic pain, for
24   weakness, tingling, stroke. There's an enormous

Page 198

1    number of diagnoses.
2        Q.  How about for migraine?  You said headache.
3        A.  Yes.
4        Q.  Migraine as well?
5        A.  Yes.
6        Q.  What sort of patients or what sort of
7    conditions have you referred your patients to a
8    psychiatrist for?
9        A.  For more intensive therapy than would be
10   appropriate in a primary care setting.  For
11   treatment of schizophrenia and treatment of bipolar
12   disease, for complex situations that require
13   diagnostic work before therapeutic -- you know,
14   diagnostic evaluation, for emotional and behavioral
15   problems that don't -- aren't diagnosable or
16   treatable in a primary care practice.  Behavioral
17   problems in kids and ADD problems would often get
18   referred to a psychiatrist.
19       Q.  What about anxiety?
20       A.  I'm sure there were referrals to a
21   psychiatrist for anxiety.  Sometimes -- often
22   anxiety is a primary care kind of problem.
23       Q.  Did you write any prescriptions for anxiety?
24       A.  Yes.

Page 199

1        Q.  What medications did you prescribe?
2        A.  Benzodiazepines, Xanax-type drugs.
3        Q.  Any others?
4        A.  Others of that class, Valium, Serax,
5    depending on the variables, the duration of action
6    that you want.
7        Q.  And what about for bipolar?  Did you ever
8    prescribe any medications for bipolar?
9        A.  I don't believe so.  I think I let the
10   psychiatrists take care of bipolar disorder.
11       Q.  And what about for neuropathic pain?
12       A.  There are many different kinds of
13   neuropathic pain.  Back pain?
14       Q.  Yes.  Did you write any prescriptions for
15   neuropathic pain?
16       A.  Are you including back pain in "neuropathic
17   pain"?
18       Q.  Yes.
19       A.  Yes.
20       Q.  Other than for back pain, any other types of
21   neuropathic pain that you prescribed medications
22   for?
23       A.  Yes, post-herpetic neuralgia, trigeminal
24   neuralgia.

Page 200

1        Q.  Any others that you can think of?
2        A.  Sure.  There are a lot of musculoskeletal --
3    neuropathic pains of musculoskeletal origin that I
4    prescribed for.
5        Q.  Did you -- what did you use to treat PHN,
6    post-herpetic neuralgia?
7        A.  My memory is foggy.  I would guess that it
8    was a tricyclic antidepressant.
9        Q.  Did you -- what did you use to -- can you
10   think of any others, drugs that you used to treat
11   post-herpetic neuralgia?
12       A.  A pain reliever.
13       Q.  Such as...?
14       A.  Such as either an anti-inflammatory drug or
15   Tylenol with codeine on an as-needed basis.
16       Q.  What about for back pain?
17       A.  Back pain, we'd try to use physical
18   modalities.  But sometimes people needed pain
19   medicine; sometimes they need sleeping medicine.
20       Q.  So what kind of pain medication did you
21   prescribe?
22       A.  It depended on what people needed.  Anywhere
23   from aspirin or Tylenol up to nonsteroidal anti-
24   inflammatories into drugs like Ultram and then into

Page 201

1    codeine and hydrocodone with an oxycodone.
2        Q.  And that's also where the back pain was
3    neuropathic in nature, you'd prescribe those
4    medications?
5        A.  Yes.
6        Q.  And for trigeminal neuralgia, I seem --
7        A.  Tegretol.
8        Q.  Any other drugs?
9        A.  I think as-needed pain medicine as a
10   supplement.
11       Q.  Have you ever taken Neurontin yourself?
12       A.  No.
13       Q.  Have you ever prescribed it for any family
14   member?
15       A.  No.
16       Q.  Have you prescribed it for any friend?
17       A.  No.
18           MR. ROUHANDEH:  Okay.  It looks like
19   we're about to run out of tape, so why don't we take
20   a brief break.
21           THE VIDEOGRAPHER:  This is the end of
22   Tape No. 4.  The time is 3:34.  We're off the
23   record.
24           (Recess taken)

1    THE VIDEOGRAPHER:  Okay.  We're back on
2  the record.  This is Tape No. 5.  The time is ten
3  minutes to 4:00.
4    BY MR. ROUHANDEH:
5    Q.  Dr. Abramson, you testified that you saw
6  patients in a group home, epilepsy patients in a
7  group home who were treated by other physicians for
8  their epilepsy; is that correct?
9    A.  That's correct.
10    Q.  When was that?
11    A.  That would have been from the early '80s
12  through 2000 or 2001.
13    Q.  And is this one group home or more than one
14  group home?
15    A.  I think there were two group homes.
16    Q.  Where were they located?
17    A.  They were local.  One was in Wenham.  I'm
18  not sure -- I don't recall where the other one was.
19    Q.  And who were the physicians who treated
20  those patients for epilepsy, if you recall?
21    A.  It would have been local neurologists.
22    Q.  Do you have any of the names of those?
23    A.  I don't.
24    Q.  You say local neurologists.  Neurologists

1  near where you practice?
2    A.  From the area, yes.  And whether they were
3  from Beverly or the Gloucester area, I don't recall.
4    Q.  And you treated those patients from a family
5  practice perspective, family medicine perspective;
6  is that correct?
7    A.  That's correct.
8    Q.  And what did you -- how many patients did
9  you see in those group homes?
10    A.  I would guess it would have been around 20
11  total, between 10 and 20.
12    Q.  Prior to your involvement in this
13  litigation, had you read any of the published
14  articles relating to Neurontin?
15    A.  I was aware of the settlement that had
16  occurred in the whistle-blower suit.
17    Q.  What about any of the -- did you -- prior to
18  your involvement in this litigation, did you read
19  any of the scientific literature relating to
20  Neurontin?
21    A.  I saw the articles that came out of JAMA
22  when they came out in '98.
23    Q.  Anything else?
24    A.  I am not sure that I saw the other articles.

1    Q.  The articles in JAMA in 1998, those are the
2  PHN and diabetic peripheral neuropathy articles?
3    A.  Correct.
4    Q.  What else did you know about Neurontin prior
5  to becoming involved in this litigation?
6    A.  I knew that it was very widely prescribed.
7  It had been discussed in one of the primary care
8  sessions that I participated in at Harvard Medical
9  School, that it was being very widely prescribed
10  off-label.
11    Q.  And you knew that from the one primary care
12  session, and what was the other source, if any, of
13  that information?
14    A.  Actually, students were observing that, that
15  Neurontin was being widely used, and students
16  actually brought up that there seemed to be a
17  paucity of scientific evidence to support its use.
18    Q.  And what students are you talking about?
19    A.  Harvard medical students.
20    Q.  And where did they bring that up?
21    A.  In the primary care course.
22    Q.  And what primary care course?  What years
23  were you talking about?
24    A.  That would probably have been somewhere

1  between '96 and '98, I would think.
2    Q.  If you could turn to Exhibit 1, which is
3  your report in this case, Page 4 -- well, Page 3 of
4  4 sets forth in summary form the opinions you've
5  offered in this report; is that correct?
6    A.  Yes.
7    Q.  The first paragraph is just -- of that
8  section called "Opinions" is simply an introductory
9  paragraph.  It doesn't actually contain any of your
10  opinions; is that correct?
11    A.  Correct.
12    Q.  It's the second paragraph which appears on
13  Page 4 that contains a summary of your opinions; is
14  that correct?
15    A.  Yes.
16    Q.  Okay.  The beginning of that paragraph
17  states, "Assuming the finder of fact concludes, as
18  alleged in the Third Amended Class Action Complaint
19  and other filings, that Parke-Davis and later Pfizer
20  developed and executed a comprehensive campaign to
21  increase off-label prescriptions of Neurontin," and
22  then it goes on.
23    When you say "assuming the finder of
24  fact concludes," you're not expressing an opinion,

52 (Pages 202 to 205)

Page 206

1  are you, that Parke-Davis and later Pfizer did, in
2  fact, develop and execute a comprehensive campaign
3  to increase off-label prescriptions of Neurontin?
4        A.  Once again?
5        Q.  The question is, this is an assumption
6  you're making, and your opinion is stated in the
7  latter half of that sentence; is that correct?
8           MR. RONA:  Objection.
9        Q.  This sentence outlines an assumption
10  followed by an opinion; is that correct?
11          MR. RONA:  Objection.
12       A.  Okay.  Yes, it's an assumption and then an
13  opinion.
14       Q.  Okay.  So you were not, in fact, opining
15  that Parke-Davis and later Pfizer developed and
16  executed a comprehensive campaign to increase off-
17  label prescriptions of Neurontin for neuropathic
18  pain, nociceptive pain, bipolar disorder, migraine
19  headache and in doses above the maximum recommended
20  by the FDA; isn't that correct?
21       A.  No.
22       Q.  It's not?
23       A.  It's not.
24       Q.  You are offering an opinion?

Page 207

1        A.  That Pfizer -- that Parke-Davis and later
2  Pfizer developed and executed a comprehensive
3  campaign to increase off-label prescriptions of
4  Neurontin for neuropathic pain, I am offering that
5  opinion in a qualitative way.
6        Q.  Could you elaborate.
7       *A.  Uh-huh, that the manufacturer did, in fact,
8  carry out a campaign to increase the -- to lead
9  doctors to believe that use of Neurontin for these
10  off-label indications and in unapproved doses was
11  supported by high quality scientific evidence.  I'm
12  of the opinion that the defendants did that.
13          MR. ROUHANDEH:  Can you just read back
14  the answer.
15       *(Answer read)
16       Q.  Okay.  And so you're saying that the
17  defendants had a particular intent or state of mind;
18  is that correct?
19       A.  Well, I can't comment on their state of
20  mind.  I can comment that they did, in fact, do
21  that.
22       Q.  Well, you said "to increase off-label
23  prescriptions."  Do you know what was in the mind of
24  the corporation, that it was the company's purpose

Page 208

1  to increase off-label prescriptions of Neurontin?
2        A.  I'm not understanding.  I'm sorry.
3        Q.  Are you opining that it was the intent of
4  Parke-Davis and later Pfizer to increase off-label
5  prescriptions of Neurontin?
6        A.  Well, that's not what this says.  Are you
7  asking me a separate question?
8        Q.  Let's start with, is that what you're
9  saying?
10       A.  That it was their intent --
11       Q.  Yes.
12       A.  -- to -- one more time.
13       Q.  Is it your opinion that the intent of the
14  corporation was to increase off-label prescriptions
15  of Neurontin?
16       A.  Yes.
17       Q.  Okay.  Is that opinion expressed in this
18  report?
19       A.  I don't know whether we're parsing this too
20  finely.  The latter part of that very long sentence
21  says, "I am of the opinion, based on the evidence
22  reviewed and detailed in my report, that this
23  campaign" -- which "this campaign" refers to this
24  comprehensive campaign to increase off-label

Page 209

1  prescriptions of Neurontin for off-label and above-
2  dose indications, this campaign was effectuated by
3  purposeful activity of the drug-maker.
4        Q.  So are you -- when you say "purposeful
5  activity," are you saying it was the intent of the
6  corporation to increase off-label prescriptions of
7  Neurontin?
8        A.  Yes, by causing physicians to believe that
9  the evidence showed benefit when that benefit was
10  inaccurate or incomplete or exaggerated.
11       Q.  And how do you determine what the intent of
12  the corporation is?
13       A.  Well, their own statements say -- I mean,
14  after they had been informed by the FDA and their
15  own advisors -- the FDA in May of 2001 and their
16  advisors in September of 2001 -- that the scientific
17  evidence did not support the broad indication of
18  neuropathic pain, their own reports say that their
19  marketing is effectively increasing those
20  prescriptions and that their goal is to continue to
21  increase the use of those drugs by a multiplicity of
22  activities that exaggerate the benefits and I think
23  -- I opine misrepresent the scientific evidence.
24       Q.  So is it correct that you're opining what

53 (Pages 206 to 209)

Page 210

1   the company's intent is by looking at documents
2   produced by the company?
3       A. I'm not sure that going down the -- I'm not
4   sure what the intent issue -- let me backtrack from
5   the intent. I'm simply saying what happened.
6       Q. Well, when you say "I'm backtracking from
7   the intent," are you not -- this is really -- the
8   point of these questions is, are you, in effect,
9   expressing an opinion on the intent of the
10  corporation, that the intent was to increase off-
11  label sales?
12      A. They're stated in -- they stated that their
13  intention was to increase off-label sales.
14      Q. Okay. So you're just describing what's in
15  the document. You're not --
16      A. Yes.
17      Q. You're not opining that that was, in fact,
18  the intent of the corporation?
19          MR. RONA: Objection.
20      A. I'm stating what the corporation did, and
21  amongst the things that the corporation did, on the
22  one hand we've got the misrepresentation of science,
23  either adding, subtracting or whatever; on the other
24  hand we have the statements by the corporation that

Page 211

1   their goal was to do that, and that their activities
2   were successfully accomplishing that.
3       Q. So you were simply summarizing what the
4   statements or what statements appear in the
5   company's own documents; is that correct?
6           MR. RONA: Objection.
7       Q. As opposed to opining what their intent is?
8       *A. I'm answering that from two different
9   angles. One is they state clearly that that's their
10  intent, and I take that at face value. So I'm not
11  offering opinion, I'm stating a fact.
12          The other thing -- part of the opinion
13  that I'm offering is that the company engaged in a
14  comprehensive campaign to create beliefs in
15  physicians that would lead them to believe that
16  Neurontin was in their patient's interest and that
17  the science showed that, when, in fact, those
18  representations were inaccurate, incomplete, or
19  biased.
20      Q. Okay. So you are, in effect, expressing
21  opinion as to what the purpose and intent of the
22  corporation was?
23      A. I'm saying what they did.
24      Q. Okay.

Page 212

1           MR. ROUHANDEH: If you can read back his
2   last answer.
3           *(Answer read)
4       Q. So just going to this question, you're doing
5   one of two things or both. You're either saying,
6   "I'm just describing what I saw in the documents,
7   that this is what I saw in the documents was an
8   intent of the corporation" --
9       A. I'm sorry, I didn't hear.
10      Q. You're either saying, "I'm simply looking at
11  the documents and stating a fact that in some of
12  these documents it says it's the intent of the
13  corporation to increase off-label sales," and/or
14  you're saying in fact, "I'm opining that that was,
15  in fact, the purpose and intent of the corporation."
16  I'm trying to figure out, are you expressing an
17  opinion on both, one, or the other?
18          MR. RONA: Objection.
19      A. I don't understand the difference.
20      Q. You don't understand the difference between
21  "I read the document and this is what the document
22  says" as opposed to "I'm forming an opinion that I
23  know what the company's intent was"?
24      A. What I'm saying is, on your left hand I read

Page 213

1   the document. The document stated that was their
2   intent, and I take it at face value.
3           On the other hand, I'm not saying I
4   know -- I'm not saying I'm a mind-reader. I'm
5   saying I have looked at what they did in comparison
6   to what the scientific evidence showed and what
7   their plans were, and they did, in fact, create the
8   belief in physicians that Neurontin -- that the
9   scientific evidence showed that Neurontin was useful
10  for off-label conditions and in doses that the
11  scientific evidence didn't support.
12      Q. Okay. And you don't know whether they
13  intended to create that impression?
14      A. I said that they said they intended to.
15      Q. You're not opining that the intent of the
16  corporation was to create that impression; is that
17  correct?
18      A. The intent of the corporation was stated in
19  their documents to increase off-label prescribing.
20      Q. Okay. So the sole basis of your expressing
21  an opinion on what the intent of the corporation was
22  was reviewing the documents that were provided to
23  you; is that correct?
24          MR. RONA: Objection.

54 (Pages 210 to 213)

Page 214

1    A. And looking at the science.
2    Q. And looking at the science. When you say
3  "looking at the science," looking at published
4  journal articles?
5    A. Yes.
6    Q. Going back to this first sentence where it
7  says, "Assuming the finder of the fact concludes,"
8  and it goes on, "I am of the opinion that...," You
9  say it's parsing it very carefully, but they're your
10  words. I'm just trying to understand what they
11  mean.
12    To me it sounds like you're saying
13  assuming X, I am of the opinion Y. And I guess my
14  question is, is it sounds like you're now saying I'm
15  not just assuming X, I'm opining X. And in light of
16  that, if you can look at the structure of the
17  sentence and tell me, is the first half of that
18  sentence an assumption or an opinion?
19    A. I believe that Parke-Davis and Pfizer did
20  that.
21    Q. Did what is in the clause --
22    A. That they executed a comprehensive campaign
23  to increase off-label prescriptions of Neurontin for
24  neuropathic pain, nociceptive pain, bipolar

Page 215

1  disorder, migraine headache and in doses above the
2  maximum recommended by the FDA.
3    Q. So I understand it, you're expressing two
4  opinions in that introductory clause before the
5  bullet points; is that correct?
6    A. Tell me what you think they are.
7    Q. Well, first is there two? And then I'll ask
8  you what those two are.
9    A. I'm sorry?
10    Q. First let me ask you if there's two.
11    A. I'm not sure.
12    Q. Okay. Well, the first is that Parke-Davis
13  and later Pfizer developed and executed a
14  comprehensive campaign to increase off-label
15  prescriptions, and the second is that this campaign
16  was effectuated by the dissemination of inaccurate
17  blah, blah, blah information.
18    A. Yes.
19    Q. Okay. And I take it from your earlier
20  testimony, you're not expressing an opinion as to
21  whether either that campaign -- well, you're not
22  expressing opinion that this comprehensive campaign
23  that you referred to actually caused off-label
24  prescriptions; is that correct?

Page 216

1    A. Right. I'm expressing an opinion that this
2  comprehensive campaign caused physicians to believe
3  that Neurontin was in their patient's best interest
4  when, in fact, a full and unbiased look at the
5  science would have led to a different conclusion.
6    Q. That really wasn't my question. My question
7  was, is it correct that -- I thought I understood
8  from your prior testimony that you were not
9  expressing the opinion that this so-called
10  comprehensive campaign caused physicians to write
11  off-label prescriptions; is that correct?
12    *A. I am not opining on that issue. I am
13  opining on whether this campaign effectively created
14  the belief in physicians that the drug used in the
15  ways that are laid out here wasn't -- that the
16  scientific evidence showed that the drug, as used as
17  described in this paragraph, was in their patient's
18  best interest.
19    MR. ROUHANDEH: Okay. Can you just read
20  that answer back.
21    *(Answer read)
22    Q. Okay. Just so the record is clear, I want
23  you to answer this question. You can go on and
24  elaborate as much as you want, but so the record's

Page 217

1  clear, you're not opining that the so-called
2  comprehensive campaign that you describe caused
3  physicians to write off-label prescriptions of
4  Neurontin; is that correct?
5    A. I am opining in a qualitative way that the
6  campaign affected the beliefs of physicians in a way
7  that was discordant with the science that led to
8  prescriptions. I am not opining about the quantity
9  of prescriptions that were caused by that behavior,
10  those actions, those actions.
11    Q. Okay. So you -- what is your methodology
12  that you employed in connection with preparing this
13  report to determine what other doctors believed?
14    A. The first methodology is to look at the
15  prescribing patterns, the sales and the indications
16  from the company's documents, and to see how those
17  prescribing patterns changed over time in
18  conjunction with the activities of Parke-Davis and
19  Pfizer in terms of doing the science, making the
20  science known, publishing the science, providing
21  continuing medical education, providing monographs
22  that are sent out, creating advisory boards and
23  organizing symposia and hiring companies to organize
24  publications and all those activities; that those

55 (Pages 214 to 217)

Page 218

1  activities created the impression of scientific
2  evidence when that was not a reasonable view of what
3  the scientific evidence that Parke-Davis and Pfizer
4  knew to be.
5      Q. So the basis for your determination that
6  this so-called comprehensive campaign caused
7  physicians to think a certain way about Neurontin
8  was looking at prescribing patterns?
9      A. Looking at prescribing patterns, looking at
10 the evidence that the defendants had and that they
11 brought forth to physicians in an active way,
12 looking at defendants' own documents. For example,
13 in the 2001 situation analysis, it says very clearly
14 that a third of Neurontin is prescribed by primary
15 care docs. The number of primary care docs who are
16 writing prescriptions for Neurontin has gone up 50
17 percent in the year ending somewhere around April of
18 2000, and states very clearly that the primary
19 reason why the number of prescribing primary care
20 docs is going up is because of our marketing and
21 publication activity. So they take credit for it.
22     Q. Okay. So, again here, none of that
23 marketing activity caused you to write any
24 prescriptions for Neurontin; is that correct?

Page 219

1      A. That's correct.
2      Q. But you're certain that it -- you're opining
3  that it caused other physicians to write
4  prescriptions for Neurontin; is that correct?
5      A. Yes.
6      Q. And did you talk to any physicians about why
7  they prescribed Neurontin?
8      A. No.
9      Q. Instead, you looked at company documents to
10 determine that; is that correct?
11     A. I looked at company documents. I looked at
12 the science as it was published and as it was
13 described in the company documents. I looked at
14 company marketing plans. I looked at company
15 e-mails where there were clearly -- there's clear
16 language that says we're not going to make the
17 evidence known to doctors. We're going to minimize
18 the negative studies. We're going to maximize the
19 awareness of the positive studies. We're going to
20 create publications.
21     Q. Those are all company documents you're
22 referring to, right?
23     A. Those are company documents.
24     Q. I'm referring to other than company

Page 220

1  documents --
2      A. Yes.
3      Q. -- and the medical scientific literature
4  that you looked at, is there anything else you
5  looked at to form the conclusion that the company's
6  marketing caused other physicians to write Neurontin
7  prescriptions?
8      A. The company documents and the science.
9      Q. Did you do any studies -- well, did you
10 speak to any physicians about the reasons for
11 prescribing Neurontin?
12         MR. RONA: Objection. I thought that
13 was asked and answered.
14     Q. You can answer.
15     A. No.
16     Q. Did you conduct any studies or surveys of
17 doctors who prescribed Neurontin?
18     A. I didn't, but the company did.
19     Q. Did you do any -- did you do any statistical
20 analysis of the prescribing patterns of physicians
21 who prescribed Neurontin?
22     A. Just as they're presented in the aggregate,
23 in the company reports.
24     Q. Okay. You didn't independently perform any

Page 221

1  analysis?
2      A. No.
3      Q. Did you perform any econometric analysis
4  relating to prescribing patterns of doctors?
5      A. No.
6      Q. Did you conduct any surveys yourself of any
7  physicians who wrote prescriptions for Neurontin?
8      A. No.
9      Q. Did you look into whether there were other
10 potential causes for Neurontin prescriptions apart
11 from marketing efforts by the company?
12     A. I did look for other sources of positive
13 information on the Web about Neurontin. Now, this
14 is late and probably not an effective way to do it,
15 but I'm not aware of any other significant source of
16 positive information and haven't found it to support
17 these off-label uses in these doses that didn't
18 originate either directly or indirectly from the
19 company's own campaign.
20     Q. Other than looking on the Web, did you do
21 anything else to determine whether there was other
22 information that might have caused doctors to write
23 prescriptions for Neurontin?
24     A. No.

56 (Pages 218 to 221)

Page 222

1    Q. Did you look to see whether other
2  antiepileptic drugs other than Neurontin were
3  written for off-label uses?
4    A. They were, but not in the -- not to the
5  extent that Neurontin was.
6    Q. Did you look at whether, prior to the time
7  Neurontin even came on the market, whether there
8  were other antiepileptic drugs being written for
9  off-label uses?
10    A. I didn't.
11    Q. Do you know whether -- strike that.
12        If you look at the last sentence on Page
13  4, it says, "These activities, if proven, affected
14  the traditionally independent and trusted sources of
15  information upon which physicians rely in making
16  informed prescribing decisions." Do you see that?
17    A. Yes.
18    Q. You've actually here in your testimony gone
19  one step beyond that and said that it actually
20  affected those prescribing decisions; is that
21  correct?
22    *A. I'm saying that the activities that were
23  conducted by the defendants caused physicians to
24  believe that Neurontin, for these off-label

Page 223

1  indications and above the FDA-recommended doses,
2  caused physicians to believe that such prescriptions
3  were in their patients' best interest, that the
4  science showed that, when, in fact, the science
5  didn't show that.
6    Q. Okay. Can you show me where in your report
7  you express that opinion?
8    A. (Witness reviews document) Can we either
9  read back what I just said, or would you like to
10  summarize it?
11        MR. ROUHANDEH: Why don't you read it
12  back, please.
13        *(Answer read)
14    A. I think the last sentence of the report gets
15  very close to that. "Prescribers needed -- but were
16  not provided -- balanced, accurate and reasonably
17  complete information, critical and material to their
18  determination of Neurontin's efficacy for the off-
19  label uses at issue, in order to adequately fulfill
20  their role as learned intermediaries."
21    Q. Would you agree with me that that sentence
22  does not say that the activities of the defendants
23  caused physicians to write prescriptions for
24  Neurontin?

Page 224

1    A. It says that prescription -- that physicians
2  were not provided with the information that they
3  needed to make an accurate determination of
4  Neurontin's efficacy for off-label uses at issue,
5  and the entire body of the report shows that the
6  direction of the misrepresentation was to create the
7  belief in the learned intermediaries that Neurontin
8  was more effective than it, in fact, was.
9    Q. Other than that sentence, is there anywhere
10  else in your report where you express the opinion
11  that the activities of the defendants caused
12  physicians to write prescriptions for Neurontin?
13    A. In a qualitative way.
14    Q. I'm not sure -- I don't know what that
15  means.
16    A. That means that I'm not opining that -- I'm
17  going to leave that to the economists -- that the
18  activities of Parke-Davis and Pfizer caused a
19  certain amount of prescriptions. What I'm opining
20  is that the activities of Parke-Davis and Pfizer
21  caused physicians not to be able to function in
22  their role as learned intermediaries because they
23  were being provided with information from the
24  sources that they trust and are known by the

Page 225

1  defendants to trust that created false beliefs, and
2  that the defendants understood that they were
3  creating this false belief. They understood that 80
4  to 90 percent of primary care docs were prescribing
5  for neuropathic pain; that 40 percent of primary
6  care docs thought neuropathic pain was an FDA
7  approved indication. They knew that and were
8  building on it.
9        So I'm saying that the defendants caused
10  physicians to believe that Neurontin was -- that the
11  science showed that Neurontin was in their patients'
12  interest compromising the physician's ability to act
13  as a learned intermediary.
14    Q. Okay. And I'm asking just a very
15  straightforward question, which is, where do I go in
16  your report to find the opinion that the defendants'
17  activities caused physicians to write prescriptions
18  for off-label uses of Neurontin? You've pointed to
19  the last sentence of the report. I was asking if
20  you can point to anything else?
21        MR. RONA: Dr. Abramson, do you need to
22  look at the -- it's a 123-page report. Do you want
23  to look at the whole thing? Do you feel you need to
24  to answer that question?

57 (Pages 222 to 225)

Page 226

1    MR. ROUHANDEH: Can you just not prompt
2  the witness? I mean, it's clearly improper what you
3  just did, and I'd ask you not to do it anymore.
4    MR. RONA: Why is that improper?
5    MR. ROUHANDEH: Because you're
6  suggesting an answer to him.
7    MR. RONA: I didn't suggest an answer.
8    MR. ROUHANDEH: Yes, you did.
9    A. I think the last paragraph -- this isn't a
10  complete answer, but the last paragraph of my
11  "Opinions" section, "The result of the above
12  tactics," which has to do with controlling research
13  and providing continuing medical education and
14  paying drug reps to carry inaccurate information and so
15  forth, that the results of these "tactics was the
16  delivery of inaccurate, incomplete and overly
17  positive information about the efficacy of
18  Neurontin, for the indications that are the subject
19  of this case, to potential prescribers"; and "These
20  activities, if proven, affected the traditionally
21  independent and trusted sources of information upon
22  which physicians rely in making informed prescribing
23  decisions."
24

Page 227

1    Now, I think it's pretty clear from the
2  context of this report that I'm not saying that
3  these misrepresentations that seem to occur all in
4  one direction caused physicians to write fewer
5  prescriptions for Neurontin off-label. I think to
6  the extent that they had an effect, it was to cause
7  more prescriptions to be written off-label.
8    Q. Okay. And that opinion is not stated in
9  your summary of opinions, is it? Other than with
10  respect to the last sentence of the summary opinion
11  on Page 4 and the last sentence of your report,
12  nowhere else is there an indication that you're
13  opining as to what caused physicians to write
14  prescriptions, are you?
15    MR. RONA: Objection.
16    A. We're going to have to go through the
17  report.
18    Q. Well, didn't you undertake an effort to
19  summarize your opinions in this section of the
20  report?
21    A. I did, but this is a summary, and if you
22  want me to go through the report, I'm sure there are
23  places where it's very clear that what I'm saying is
24  that these activities caused physicians to write

Page 228

1  more prescriptions, caused them to believe that the
2  drug was more effective than the science really
3  showed, and that that led to more prescriptions, and
4  that was, in fact, what the company itself said.
5    Q. And what was the basis of the opinion that
6  that's what caused physicians to write
7  prescriptions?
8    A. Too broad categories of information. One
9  is, this is, in fact, what happened, and this is, in
10  fact, the overwhelming majority of information that
11  physicians received about Neurontin. There was no
12  independent groundswell of support for unscientific
13  use of Neurontin that didn't originate directly or
14  indirectly from the manufacturer.
15    Q. And you know that why?
16    A. I have not seen -- A, the scientific
17  evidence didn't support it. The science that the
18  defendants knew did not support the claims that they
19  were presenting, so I don't -- it may be that there
20  were thought-leaders who thought they had the
21  complete science and became independent advocates of
22  Neurontin use, that's possible, but they thought
23  that because they didn't see the whole picture.
24    Now, we can go into individual

Page 229

1  indications, and you'll see that this theme is
2  repeated throughout the report.
3    Q. Did you consult with any neurologist to
4  determine what neurologists thought about Neurontin
5  and what caused those neurologists to write their
6  prescriptions?
7    A. I didn't, but I see from -- I think I have a
8  more accurate representation of what caused
9  neurologists to write their prescriptions from what
10  the companies say they did and said to neurologists,
11  and when you see that the companies are providing
12  continuing medical education to neurologists that is
13  incomplete, imbalanced, by no stretch of the
14  imagination a fair representation of the scientific
15  knowledge that the company had, that, I think,
16  stands as quite good evidence as to why neurologists
17  were prescribing this given that the science didn't
18  support those prescriptions.
19    If the science supported those
20  prescriptions, you could say, "Well, gee, maybe they
21  didn't get it from the company. Maybe they got it
22  independently from the science." But virtually all
23  of what -- the information that was coming was
24  coming from the company, and the science didn't show

58 (Pages 226 to 229)

1    it. When you get to see the science, the science
2    does not show efficacy for these indications, so
3    then you say, "Well, did you ask a neurologist what
4    he or she believed, why they believe that?" All
5    roads lead back to the manufacturer.
6        Q. Well, you don't even know if doctors believe
7    that the science showed efficacy in Neurontin for
8    off-label uses, do you?
9            MR. RONA: Objection.
10       A. I believe that the vast majority of doctors
11   who you ask will say that their goal is to practice
12   medicine in accord with the best medical science,
13   evidence-based medicine.
14       Q. My question is, did you ever ask any
15   neurologist if they believed that the scientific
16   evidence demonstrated that Neurontin was effective
17   for the relevant off-label uses here?
18       A. I didn't, but I see -- I can do better than
19   that, because I can see in some of the documents
20   what the company told the neurologists.
21       Q. So your opinion is based on your review of
22   the company's documents and your review of the
23   scientific literature and that's it?
24       A. And the actual consequences of this

1    campaign, which was to have Neurontin be prescribed
2    for indications and in doses for which there was not
3    scientific justification.
4        Q. What prescribing information are you talking
5    about, what the prescriptions were written for? Is
6    it listed in Exhibit 3 to your report?
7        A. Wait one second.
8            If you look on Page 10 of the report --
9        Q. Well first, let me just ask you. Are the --
10           MR. RONA: Hold on. Were you in the
11   middle of answering?
12           MR. ROUHANDEH: That's not -- Page 10 --
13   there's no Page 10 in Exhibit 3, so I don't think he
14   was in the middle of answering.
15           THE WITNESS: I said Page 10 of the
16   report.
17           MR. ROUHANDEH: Yes, and my question
18   was --
19           MR. RONA: Well, you asked him a
20   question before that.
21           MR. ROUHANDEH: Okay.
22           THE COURT REPORTER: One at a time.
23           MR. ROUHANDEH: Let me rephrase it so we
24   have one question at a time.

1        Q. Is there prescription -- prescribing
2    information listed in Exhibit 3 in your report?
3        A. Yes. If you look at Footnote 12 on Page
4    9 -- I'm getting to your answer about Exhibit 3. If
5    you look at Footnote 12 on Page 9, that --
6        Q. Why don't you answer my question first, and
7    then you can add anything you want.
8        A. I'm answering your question.
9            MR. RONA: Can you let the witness
10   answer the question, please.
11           MR. ROUHANDEH: He's not answering the
12   question.
13       Q. But go ahead.
14       A. I am answering your question. If you'll
15   indulge me for 30 seconds, you'll see that I'm
16   answering your question.
17       Q. I will.
18       A. If you look at Footnote 12 on Paragraph 7,
19   this is -- the graph on Page 10 which provides that
20   information is from the 2001 Global Operating Plan
21   for Neurontin, and that reference is in Exhibit 3
22   listed under No. 33 of documents. I believe it's
23   Pfizer_CGrogan_0005042, and I believe that there are
24   enough pages in 5042 so that it includes 5052.

1        Q. Do you know where companies get prescribing
2    information, pharmaceutical companies get
3    prescribing information?
4        A. This prescribing information came from Scott
5    Levin PDDA.
6        Q. Do you know what that is?
7        A. It's a company that collects sales data.
8        Q. Did you ask the plaintiffs' counsel to
9    provide you with any data from Scott Levin?
10       A. No. This, I think, is the 2001 Global
11   Operating Plan for Neurontin from the defendants.
12   It's their data.
13       Q. The company's data or Scott Levin's data?
14       A. The company has adopted Scott Levin's data
15   into its 2001 Global Operating Plan.
16       Q. Okay. The question is, did you ask the
17   plaintiffs' counsel for any information from Scott
18   Levin or any other provider of prescribing
19   information?
20       A. No.
21       Q. Okay. Why not?
22       A. Because I took this at face value.
23       Q. You didn't do any analysis of the
24   prescribing information provided by Scott Levin or

Page 234

1    IMS or any of the other vendors that provide it,
2    correct?
3        A.  I --
4            MR. RONA:  Objection.
5        A.  I took the data that the defendants brought
6    into their own reports, in whatever form they -- I
7    don't know whether they made this graph or whether
8    the graph was made by Scott Levin, I'm not sure.
9    But I took that data at face value given that it
10   came from the defendants.
11       Q.  Okay.  So whatever you know about
12   prescribing patterns of doctors came from documents
13   provided to you by plaintiffs' counsel from the
14   company; is that correct?
15       A.  That's correct.
16       Q.  Okay.  Do you know whether that -- do you
17   have a view as to whether that prescribing
18   information is reliable?
19           MR. RONA:  Objection.
20       A.  It appeared to me from the corporate
21   documents that they believed it was reliable.
22       Q.  Yes, but have you formed an opinion as to
23   whether you believe it's reliable?
24       A.  I'm trusting their opinion on that.

Page 235

1        Q.  Well, I'm asking you whether you formed an
2    opinion.  Trusting the opinion, I think that's a
3    different answer.
4            Did you form -- have you formed an
5    opinion?  Do you believe that the prescribing
6    information provided by Scott Levin and others is
7    reliable?
8            MR. RONA:  Objection.
9        A.  And given that the defendants accepted the
10   data as reliable, I used that data as they used it.
11       Q.  And do you know how that data -- how
12   prescribing information is collected by Scott Levin
13   and other vendors?
14       A.  It can be collected different ways,
15   different sampling methods.
16       Q.  Can you tell me some of the sampling
17   methods.
18       A.  One sampling method is to, I think, follow a
19   certain number of docs in an attempt to random-
20   sample and see what their prescriptions are and then
21   extrapolate to the rest of the country.  I believe
22   that one is to look at pharmacy sales and
23   extrapolate up from that.
24       Q.  And do you believe those are accurate means

Page 236

1    to determine what prescriptions for Neurontin or
2    other drugs were written by which doctors?
3        A.  I assume that it's a pretty close
4    approximation.
5        Q.  Okay.  You haven't done any independent
6    analysis to determine that?
7        A.  No.  I trusted defendants.  It's their job.
8    It's their business.
9        Q.  It's the business actually of the vendors to
10   create the data, and they sell it to the
11   pharmaceutical companies; is that correct?
12           MR. RONA:  Objection.
13       A.  That's correct, but it's the business -- let
14   me finish.  It's the business of the pharmaceutical
15   company to know what its sales are and to make
16   reports and plans based on the most accurate data it
17   can get.
18       Q.  And did you form any independent view as to
19   whether the -- whether the vendors have an accurate
20   means to determine whether or not -- what the
21   prescriptions of Neurontin were?
22       A.  Whether this graph on Page 10 is accurate?
23       Q.  No.  Do you have a view as to whether the
24   prescription information provided by vendors is

Page 237

1    accurate?  Have you formed an independent view on
2    that apart from whatever the company's view is?
3        A.  I'm assuming that it's the best
4    approximation you can get.
5        Q.  Okay.  You have no reason to doubt it?
6        A.  I have no -- I have no reason to assume that
7    there's a systematic bias in this.  There may be
8    inaccuracies of sampling built into the system, but
9    I have no reason to believe that it is not -- that
10   it is other than the best attempt to gather this
11   data in a cost-effective way.
12       Q.  Okay.  And do you -- but you haven't done
13   any independent analysis of that?  It's an
14   assumption on your part.
15       A.  Yes.
16       Q.  Okay.  And you're relying at least -- well,
17   you're relying on the fact that the company relies
18   on that information to form your opinion; is that
19   correct?
20       A.  Yes.
21           MR. NOTARGIACOMO:  Jim, if you're at a
22   reasonable stopping point, can we take a very short
23   break?
24           MR. ROUHANDEH:  Well, can we go a little

60 (Pages 234 to 237)

Page 238

1  bit longer? I've got -- I'd like to put in more
2  time so that the next one is not as long. Can we go
3  another 10 or 15 minutes, if that's good for you.
4       MR. NOTARGIACOMO: Sure.
5       Q. You -- earlier versions of your report
6  concluded that it was, quote, overwhelmingly likely
7  that the information relied upon by doctors when
8  prescribing Neurontin for off-label uses came from
9  defendants, and I certainly, in my review, didn't
10  see that in your final report. Is that -- is there
11  a reason why you omitted that language from your
12  final report?
13       A. Can you read that sentence one more time,
14  please.
15       Q. Yes, earlier drafts of your report or
16  earlier iterations of your report concluded that it
17  was, quote, overwhelmingly likely, close quote, that
18  the information relied upon by doctors when
19  prescribing Neurontin for off-label uses came from
20  defendants, yet your final report omits that
21  language. Do you have an explanation as to why?
22       A. Yes. I think that my assignment from
23  plaintiffs' attorneys was to address this issue in a
24  qualitative way -- what did the defendants -- what

Page 239

1  did the science show, who knew what when, how was
2  the science presented or misrepresented to
3  physicians, and did that cause false beliefs in
4  physicians -- and to leave the quantification of the
5  consequences of that to the economist.
6       Q. So did you omit that language regarding
7  overwhelmingly likely -- did you omit the
8  "overwhelmingly likely" language as a result of
9  conversations with plaintiffs' counsel?
10       A. I believe so. And I'm not sure whether it
11  was that -- whether it was a specific recommendation
12  to omit those two words or whether it was the
13  change -- the refining of my focus to stay on the
14  qualitative side of what happened and not make the
15  transition over to the quantitative side of what
16  happened.
17       Q. At one point in time, did you make an
18  assessment quantitatively as to what number or
19  percent of prescriptions were caused by information
20  provided by the company to doctors?
21       A. I didn't.
22       Q. What was the basis for your statement in
23  earlier iterations of your report that it was
24  overwhelmingly likely that the information relied

Page 240

1  upon by doctors when prescribing Neurontin for off-
2  label uses came from defendants?
3       A. Because the information was not supported by
4  scientific evidence, and the information from the
5  defendants' documents show that they were, in fact,
6  a source of incorrect information, and I'm not aware
7  of any significant other source of positive
8  incorrect information except the defendants.
9       Q. Do you know what information caused
10  physicians to write prescriptions for other
11  antiepileptic drugs for the same uses Neurontin was
12  prescribed for?
13       A. I didn't look into that.
14       Q. So might that be one source of information
15  that would cause physicians to write prescriptions
16  for off-label uses of Neurontin?
17       MR. RONA: Objection.
18       A. I don't -- can we talk about -- do you want
19  to talk about one indication so that we're not
20  talking hypothetically?
21       Q. Well, let's start with neuropathic pain.
22       A. Uh-huh.
23       Q. Do you have any understanding as to whether
24  the fact -- whatever caused physicians to write

Page 241

1  prescriptions of other AEDs for neuropathic pain,
2  even before Neurontin came on the market, might have
3  caused physicians to write prescriptions for
4  Neurontin for neuropathic pain?
5       A. I think it might have made them more
6  amenable to the false claims that were made by the
7  defendant, but I don't think that would have caused
8  physicians to simply write prescriptions for
9  neuropathic pain when the science showed that there
10  wasn't adequate justification for that when
11  defendants' own consultant said there wasn't
12  adequate justification for that.
13       Q. Did you look at the science to determine
14  whether there is scientific evidence with respect to
15  the use of other antiepileptic drugs for any of the
16  off-label uses that Neurontin was prescribed for?
17       A. No. I just looked at the Neurontin.
18       Q. So you don't know whether there was --
19       A. Well, no, I shouldn't say that. I shouldn't
20  say that. In the bipolar study done by Frye, there
21  was evidence that I think it was Lamictal is
22  beneficial and Neurontin as adjunctive therapy to
23  prevent bipolar or to treat bipolar disease, and in
24  some of the other indications there were approval of

61 (Pages 238 to 241)

Page 242

1  other antiepileptic drugs to be used.
2     Q.  So if I'm understanding correctly, there is
3  scientific information that other antiepileptic
4  drugs -- for example, Lamictal for bipolar -- are
5  effective?
6     A.  Correct, and if you're saying, "Well,
7  wouldn't it be reasonable for a physician to
8  conclude on his or her own that because one
9  antiepileptic drug is effective in the treatment of
10 bipolar disease, that others are," then I would want
11 to say, "But if the physician knew that the
12 company's own study had shown not only that
13 Neurontin wasn't effective but was significantly
14 worse than placebo, if the physician had known that
15 in a timely fashion, that there would
16 be any halo effect from Lamictal," so that when it
17 came out that Lamictal was effective, even though
18 Neurontin wasn't, physicians didn't have access to
19 the information from the -- what was published
20 eventually as the Pande article that showed a
21 significant harm.
22     Q.  When you say "significant harm," what are
23 you referring to?
24     A.  I'm saying -- well, let me be more precise

Page 243

1  -- that the patients who took Neurontin in the Pande
2  study did significantly worse than the patients who
3  took placebo.
4     Q.  So you're saying that if -- are you
5  suggesting that Neurontin worsens the condition of
6  bipolar?  Is that what your conclusion is?
7     A.  What I'm saying is that in an apparently
8  well-designed randomized controlled trial, what we
9  call Level 1 evidence, patients who were treated
10 with placebo did significantly better on the primary
11 outcome measure than patients who were treated with
12 Neurontin, and had physicians known that in a timely
13 fashion, before this article was published in 2000,
14 it's pretty unlikely that any halo effect of other
15 antiepileptic drugs would have carried over to
16 Neurontin, doctors would have known that this is
17 significantly worse than nothing, why would you add
18 it on?
19     Q.  What do you base that opinion on, as to what
20 the halo effect would be?
21     A.  I'm just assuming -- you brought up the
22 issue, not I.
23     Q.  Well, I'm not expressing the opinions here;
24 you are.

Page 244

1     A.  You asked -- well, you asked me a question.
2  Might it -- this is what I thought you asked,
3  perhaps I'm wrong, so you can tell me.  But I
4  thought you were asking me whether evidence that --
5  that other antiepileptic drugs were used off-label,
6  and that there was some scientific evidence to
7  support that use off-label of other antiepileptic
8  drugs, and on-label, too, and might it be reasonable
9  that doctors assumed that Neurontin, given the claim
10 that it caused less side effects, was easier to use
11 or had less drug-drug interactions, isn't it
12 reasonable to assume that doctors would have said,
13 "Hey, it makes sense to try Neurontin.  Bipolar is a
14 bad disease, and I'm hearing that the side effects
15 are rather minor, so why don't I try it?"  And I
16 thought that was sort of the scenario that you were
17 laying out and saying, "How do you know doctors
18 didn't come to their own conclusion?"
19     And what I'm saying is, had doctors been
20 informed in a timely fashion, they wouldn't have
21 come to that conclusion.  I don't think they did
22 anyway.  You know, I can't quantify it.  It seems to
23 me unlikely.  But had they known that Neurontin is
24 significantly worse than nothing, then that leap of

Page 245

1  faith wouldn't have been made to say, "I'm going to
2  Neurontin even though there's no science."  There
3  was science.
4     Q.  So you're saying there's no halo effect, or
5  you're saying that the halo effect would have ended
6  when the bipolar study was made public?
7     A.  Yes, that's what I'm saying.  That if
8  continuing education -- I mean, there's all these
9  continuing education courses --
10    Q.  Well, there's an "or."  When you say,
11 "That's what I'm saying," I gave you two options.
12    A.  I'm sorry, start again.  Start again.
13    Q.  I'll ask it again.  Are you saying that
14 there was no halo effect from the fact that other
15 antiepileptic drugs were found to be effective by
16 doctors for bipolar, or are you saying any halo
17 effect would have ended when the Pande bipolar study
18 was published?
19    A.  No, I'm not saying either.  I'm saying I
20 think you're hypothesizing.  I said --
21    Q.  Well, so are you.
22    A.  Right.
23    Q.  I'm not accusing you.
24    A.  No, you're breaking my thought.  You're

62 (Pages 242 to 245)

Page 246

1 breaking my thought.
2          MR. RONA: I'm sorry. I'm sorry. Can
3 you let him get the answer out?
4          MR. ROUHANDEH: I thought he had put
5 his --
6     A. No, no, no.
7          MR. RONA: I think he was just starting.
8     A. No. Maybe you could start again, and I
9 could get my train of thought back.
10    Q. Well, you're hypothesizing as to what
11 doctors felt about Neurontin and whether it might be
12 effective and whether they should prescribe it,
13 aren't you?
14    A. All right. Let me just go back and say, I
15 assumed that you were -- that -- you were asking me
16 questions, and I think you asked me how do you know
17 there weren't other sources -- other causes -- other
18 sources of information that led physicians to decide
19 to prescribe Neurontin for bipolar patients given
20 that other AEDs were being used; some with science,
21 probably some without.
22          And my response was that I can
23 understand the question, but had physicians been
24 informed -- let's assume that there might have been

Page 247

1 some tendency for that. That's an assumption. But
2 had physicians been informed when the Pande clinical
3 trial data was available -- the study was completed,
4 I think, in July of '97 -- had they been informed
5 that if they treat their bipolar patients with
6 Neurontin, they will do significantly worse than if
7 they treat them with nothing, then any kind of halo
8 effect would have been completely nullified by the
9 scientific evidence.
10    Q. Was it nullified?
11    A. It wasn't, no, because those patterns are
12 sticky. Once you get doctors to believe something,
13 then when you get your -- when you put the buzz out
14 that it was because the study was poorly designed
15 and there are other studies in progress and all
16 these case studies are good, and when you get that
17 stuff going, this knowledge is sticky. So you can
18 see in defendants' e-mails that they clearly were
19 interested in delaying -- if you look at the
20 Reckless study, for example, they clearly were
21 interested in delaying this study until two other
22 positive studies came -- delaying the publication of
23 this, of 224, until 25 and 26 were published. They
24 know that this knowledge has a stickiness to it.

Page 248

1     Q. So are you saying that doctors wrote
2 prescriptions for bipolar before the Pande study was
3 published as a result of information provided by the
4 company when the company publishes the study on
5 bipolar that, in your words or your opinion, failed
6 to show efficacy, that doctors continued to
7 prescribe Neurontin for bipolar?
8     A. That is, in fact, what happened, and in the
9 interim, not only was the company sitting on this
10 data that showed that Neurontin -- patients taking
11 Neurontin do significantly worse than patients who
12 take placebo, but the company was sponsoring these
13 CME courses, "New Frontiers in Psychiatry" and
14 "Bridging the Psychiatry/Neurology Divide," and the
15 company is clearly actively engaged in creating the
16 belief in prescribers that they will be serving the
17 patients' interest by prescribing Neurontin for
18 bipolar patients when the company knows that that's
19 not true.
20    Q. And you've divined all of that from looking
21 at the company documents?
22          MR. RONA: Objection, argumentative.
23    Q. Is that right?
24    A. I looked at the company documents, I think,

Page 249

1 with a fair eye.
2     Q. Well, when you say with a "fair eye," what
3 do you mean by "fair eye"?
4          MR. RONA: I'm sorry, Dr. Abramson, were
5 you finished answering your question?
6          THE WITNESS: No.
7          MR. RONA: Okay. Can you please -- this
8 is the third or fourth time you've not let him
9 answer a question.
10          MR. ROUHANDEH: You just object. You
11 just object.
12          THE WITNESS: Should I talk through if
13 I'm not done?
14    Q. Continue.
15    A. There are slides and monographs from '98,
16 '99, '97, "New Frontiers in Bipolar Diseases" -- I
17 forget the exact names. We can look in the report
18 if you want them. But the company clearly is
19 holding CME activities to increase the use of
20 Neurontin when the company knows that its own
21 studies show that Neurontin does significant harm,
22 that people who take Neurontin do significantly
23 worse than placebo.
24          The company is carrying on this

63 (Pages 246 to 249)