Page 250

1     activity, creating the belief in physicians, and
2     those beliefs are hard to undo. We know that. We
3     know that from other literature. We know that from
4     looking at reactions to black boxes that the FDA
5     puts up. Knowledge is sticky, and the order that
6     knowledge comes in is very important.
7     *Q. And you know this without ever talking to
8     any doctors who actually prescribed Neurontin for
9     bipolar; is that correct?
10     A. I know this because I see what the doctors
11     were told and I see, what, the, I think, 23-fold
12     increase in the use of Neurontin for bipolar
13     disease -- I can check and make sure I've got my
14     statistics right -- during that period when the
15     company was offering these continuing medical
16     education courses that they knew misrepresented the
17     science 180 degrees because they were sitting on
18     data that showed that patients did significantly
19     worse, and they're telling their doctors at CME
20     courses by, you know, having prestigious presenters
21     that they'll be doing -- serving their patients'
22     interests by prescribing Neurontin.
23     MR. ROUHANDEH: Can you read my question
24     back.

Page 251

1     *(Question read)
2     Q. Can you answer my question?
3     A. My answer -- I answered it. I mean, the
4     answer is yes, because I have seen what those
5     doctors were, quote, educated with, and it's a
6     misrepresentation of the evidence, and the
7     defendants knew it was a misrepresentation of the
8     evidence.
9     Q. I think this will go a lot smoother and
10     we'll get done in a reasonable time if you'd just
11     answer the question yes or no, and if you want to
12     expound on your answer, you can, but I actually
13     didn't hear a yes in your prior answer.
14     A. I just said yes.
15     Q. Yes, but before that you didn't. You just
16     went on your speech, and you didn't answer the yes
17     and no. So what I'm saying is, when I'm asking a
18     question -- we don't have a judge here. A judge
19     would make you answer the question yes or no, and
20     then Mr. Rona would be able to answer -- ask you all
21     sorts of questions to follow up, if he wanted, but
22     we don't have a judge here.
23     What I'm asking you is, if it calls for
24     a yes or no answer, can you answer yes or no. If

Page 252

1     you want to explain your answer, you can then
2     explain your answer.
3     MR. RONA: I object to that law school
4     lecture, and a judge would instruct him to answer
5     yes or no if that were possible. I think he did
6     answer the question, and I think it's been about ten
7     minutes since you said we could take a break in
8     about ten minutes, so I don't know if this is a good
9     stopping point. It looks like you're thumbing
10     through your outline.
11     MR. ROUHANDEH: Okay. Just one other
12     quick couple of questions.
13     Q. Do you think sales representatives --
14     communications from sales representatives influence
15     physicians' prescribing behavior?
16     A. Yes, in PhRMA's -- information on PhRMA's
17     website provides evidence that that's so.
18     Q. Okay. And it doesn't influence your
19     prescribing behavior, though; is that correct?
20     A. Well, that's a good question. Ask that
21     question again.
22     Q. You testified that sales representative --
23     communications from sales representatives influence
24     physicians' prescribing behavior, but I believe

Page 253

1     you've also testified that communications and
2     information from sales representatives doesn't
3     influence your prescribing behavior; is that
4     correct?
5     MR. RONA: Objection, compound.
6     A. And the answer is "sort of." In retrospect,
7     my prescribing behavior was affected by the samples
8     that the drug reps left and was affected by -- not
9     by drug reps, but by continuing medical education
10     courses, so I know that I was not immune from
11     marketing activity.
12     Q. Yes, but in what way does sampling affect
13     your prescribing?
14     A. I'm sorry?
15     Q. In what way does sampling affect your
16     prescribing?
17     A. Sampling affects prescribing because I,
18     speaking for myself, and -- I'm not sure where I've
19     read it, but I'm sure I've read it, docs keep about
20     three drugs in different classes in their heads.
21     There's a lot of information. There's doses.
22     There's titration. There's side effects. There's
23     drug interactions, allergies and so forth.
24     So we tend to keep a limited number of

Page 254

1  drugs for -- from each class in our heads, and just
2  speaking for myself now, I didn't talk very much to
3  the drug reps but did take the samples, so that the
4  samples obviously are the samples of the newer drugs
5  that are on brand.  And I did it because I wanted to
6  have samples to give to patients who couldn't afford
7  the medicines, but in retrospect, I realize that I
8  was being trained to use that brand of drug and
9  letting another brand of drug drift aside.  So that
10  did affect me.
11     Q.  Were there any samples that you -- of drugs
12  that you gave for indications that you don't believe
13  are effective?
14     A.  I hope not.
15     Q.  Okay.  You're saying here, in other words,
16  sampling didn't cause you to give somebody, a
17  patient -- to give a patient a drug that was not
18  effective in your view, in your analysis; is that
19  correct?
20     A.  Correct.  I only gave samples when I thought
21  that the evidence, the scientific evidence, showed
22  that that drug was similar in benefit; at least as
23  good in benefit and at least as not harmful as other
24  drugs in that class.

Page 255

1          But the real question here is, what did
2  doctors believe about the science around Neurontin?
3  And if they didn't have access to good science, they
4  couldn't make those decisions.
5     Q.  Okay.  I'm just asking about your
6  experience.
7     A.  Okay.
8     Q.  It didn't cause you -- sampling caused you
9  to choose between two effective drugs, not to choose
10  between an effective drug and an ineffective drug,
11  to your knowledge?
12     A.  But -- no, that's not -- let me change the
13  question just a little bit.  Hypertensive drugs were
14  -- antihypertensive drugs were sampled quite
15  heavily.  Those are drugs that people use for a long
16  time.  And I think, in retrospect, sampling caused
17  me to use more expensive drugs that actually, it may
18  be in retrospect, but were shown to be no more
19  effective and probably a little less effective than
20  cheaper drugs available as generic for hypertension.
21  So I can see that my pattern of prescribing drifted
22  in an -- "irrational" is too unkind a word, but in
23  a -- drifted in a direction that was not based on
24  the best available science because I had those

Page 256

1  samples in my office.
2     Q.  But in both cases, the drugs were drugs that
3  you believed had some sufficient level of efficacy
4  to warrant a prescription; is that correct?
5     A.  That's correct, but the science actually
6  showed that the less-expensive drug was the more
7  effective drug.
8     Q.  Okay.  So, again, just my question is -- and
9  which you changed slightly is, it didn't cause you
10  to prescribe an ineffective -- sampling didn't cause
11  you to prescribe an ineffective drug in place of an
12  effective drug?
13     A.  Let me give you an example.  Sampling --
14     Q.  Well, can you say yes or no, and then give
15  the example?
16     A.  Yes.
17     Q.  It did cause --
18     A.  Yes is the answer.  Yes.
19     Q.  It did?
20     A.  Yes.  Yes.
21     Q.  Now you can explain, if you want.
22     A.  Sampling caused me to prescribe Seldane,
23  which was a nonsedating antihistamine, for patients
24  who needed an antihistamine.  It turned out that

Page 257

1  Seldane had cardiac risks associated with it, and I
2  would not have prescribed an expensive drug that
3  wasn't clinically superior had I not had the
4  samples.
5     Q.  Okay.  But that's an issue of safety.  It's
6  not an issue of efficacy.  Is that correct, the
7  Seldane example?
8     A.  Right.
9     Q.  So can you think of any examples where you
10  -- where sampling caused you to prescribe a drug
11  that was ineffective in place of an effective drug?
12        MR. RONA:  Objection.
13     A.  Sampling may have caused me to prescribe
14  Fosamax to women who had osteopenia and not
15  osteoporosis when the scientific evidence actually
16  didn't show that that had a beneficial effect on
17  clinical outcomes.
18        And there is an effective way to prevent
19  fractures, which is the goal of treating people with
20  osteoporosis drugs, which is to encourage exercise,
21  weight training and balance, aerobic exercise,
22  weight training and balance exercises, and I would
23  think that having samples of that drug lowered my
24  threshold for utilizing`-- for responding to a woman

65 (Pages 254 to 257)

Page 258

1    with osteopenia with a drug instead of what was
2    proven to be effective, which was lifestyle
3    modification, calcium, and vitamin D.
4        Q. Okay. Can you think of any other examples?
5        A. There were samples of hormone replacement
6    products. I didn't prescribe much of them, but my
7    colleagues did.
8        Q. Okay. I'm just talking about you.
9        A. Okay. In the early -- early in my practice
10   I believe we had samples of antiarrhythmic drugs
11   which were not effective at preventing the negative
12   consequences of arrhythmias, and drugs like
13   Quinaglute come to mind, and having samples and
14   feeling that I had an effective clinical tool
15   probably caused me to start people on Quinaglute
16   when, in fact, it turned out not to achieve the goal
17   that it was intended to achieve.
18       Q. So those are examples -- that example and
19   the Fosamax example are situations where sampling
20   might have caused you to prescribe a medication as
21   opposed to some other nondrug solution to the issue?
22       A. For the cardiac arrhythmia, there might have
23   been other drug solutions.
24       Q. You just didn't have the samples available,

Page 259

1    so you didn't write that --
2        A. And it's -- when one has samples available,
3    one tends to think about using those samples, which
4    is the reason why they give out samples.
5        Q. So the Fosamax example is one where it might
6    have -- the sampling might have caused you to write
7    a prescription as opposed to propose some other
8    nonmedical -- medication intervention?
9        A. Well, calcium and vitamin D is sort of a
10   medication intervention.
11       Q. And this other one situation you're talking
12   about might have caused you to prescribe a different
13   medication --
14       A. Yes.
15       Q. -- through sampling?
16       A. Yes.
17       Q. Okay. Any other examples?
18       A. You're asking specifically about efficacy
19   and not safety?
20       Q. Yes.
21       A. Well, it's hard to separate those two
22   issues, because many times drugs are given to
23   achieve an outcome, and if they do more harm than
24   good, they haven't achieved the outcome. That would

Page 260

1    be the case with Rezulin, for example, which is a
2    diabetic drug that is reputed to sensitize a person
3    to insulin, the theory being that insulin resistance
4    is the cause of adult-onset diabetes, or a
5    contributor.
6            And having Rezulin samples, I'm sure,
7    led me to choose Rezulin as it was consistent with
8    what I was hearing. The problem was that Rezulin --
9    the goal of giving Rezulin was to prevent adverse
10   outcomes in Type 2 diabetics, and it actually
11   increased adverse outcomes.
12       Q. That's, again, a safety issue, not an
13   efficacy issue; is that correct?
14       A. Well, it depends what you mean by
15   "efficacy," because the outcome measure is to
16   improve health. Lowering blood sugar is a surrogate
17   outcome in diabetes. We're learning that with newer
18   -- with other drugs in the Rezulin class. So the
19   goal of treating diabetes is to prevent adverse
20   outcomes, so I think it's an efficacy issue.
21       Q. Okay. And that -- and what drug would you
22   have prescribed? But for having samples of Rezulin
23   available, what drug would you have prescribed?
24       A. I would have been back at basics with

Page 261

1    Sulfonylurea and Metformin.
2        Q. Okay. And did you actually prescribe
3    Rezulin to any patients?
4        A. I would be surprised if I didn't. I mean, I
5    can envision those samples in the sample room.
6        Q. But you don't -- you can't -- sitting here
7    today you can't think of any --
8        A. That was a long time ago. That was ten
9    years ago or more. It's more like twelve.
10       Q. So no, you don't recall it?
11       A. I recall that I prescribed Rezulin, and I
12   had samples of Rezulin.
13           THE VIDEOGRAPHER: We have to go off the
14   record. I have to change tapes.
15           MR. ROUHANDEH: Sure.
16           THE VIDEOGRAPHER: This is the end of
17   Tape No. 5. The time is twelve minutes after 5:00.
18   We're off the record.
19           (Recess taken)
20           THE VIDEOGRAPHER: Okay. We're back on
21   the record. This is Tape No. 6. The time is 5:29.
22           THE WITNESS: Can I add something to the
23   previous response?
24           MR. ROUHANDEH: Sure.

66 (Pages 258 to 261)

Page 262

1    THE WITNESS:  There were many different
2  cold remedies that were in the sampling room, and I
3  think many of them have been found to be
4  ineffective.
5    MR. ROUHANDEH:  Found to be ineffective?
6    THE WITNESS:  Ineffective, yes.
7  BY MR. ROUHANDEH:
8    Q.  I'm not sure what that was -- what question
9  that was a supplement to.
10    A.  I think you asked me, were there any
11  medicines that I prescribed -- any samples that I
12  used that turned out to have been ineffective that I
13  used because there were samples present.
14    Q.  Well, that was close, but in essence, are
15  you saying that cold remedies were an example where
16  you -- sampling caused you to use a medication that
17  was ineffective in place of an effective medication?
18    A.  No, I'm not.  That was ineffective, period.
19    Q.  You do not offer an opinion concerning
20  whether Neurontin was effective in treating any of
21  the conditions of the class representatives, do you?
22  You're not purporting to offer an opinion concerning
23  whether Neurontin was effective in treating any of
24  the class representatives' conditions, are you?

Page 263

1    A.  And those conditions were...?
2    Q.  Well, do you know who the class
3  representatives were?
4    A.  I don't.
5    Q.  Did you look at any of their medical
6  records?
7    A.  I did not.
8    Q.  So you're not purporting to offer an opinion
9  as to those individual class representatives and
10  whether or not Neurontin was effective in treating
11  the conditions that they were prescribing Neurontin
12  for, are you?
13    A.  If you tell me what the condition was, I
14  would have an opinion.
15    Q.  Well, you have an opinion as to whether or
16  not Neurontin is effective generally for certain
17  off-label conditions; is that right?  Is that what
18  you're saying?
19    A.  Yes.
20    Q.  Okay.  And you have not -- but you have not,
21  in the case of any class representatives, looked at
22  their medical records, looked at their symptoms,
23  looked at what they were prescribed the medication
24  for, or formed any opinion with respect to the

Page 264

1  individual class representatives; is that correct?
2    A.  That's correct.
3    Q.  You don't know -- and you didn't review
4  their medical records?
5    A.  That's correct.
6    Q.  And you don't know whether or not they had
7  been prescribed other medications that had failed to
8  work before they were prescribed Neurontin; is that
9  correct?
10    A.  That's correct.
11    Q.  And you don't know whether other medications
12  that could have been prescribed to them were
13  contraindicated for those patients; is that correct?
14    A.  That's correct.
15    Q.  And you don't know whether they -- other
16  medications could not be prescribed for the
17  conditions treated by Neurontin because those other
18  medications had drug interactions with other
19  medications being used to treat the patients?
20    A.  I don't know the specifics of the class
21  representatives, no.
22    Q.  If you could, turn, in your report, to Page
23  29, Paragraph 69.  You refer in Paragraph 69 to a
24  May 19, 1995 marketing assessment and a July 31,

Page 265

1  1996 marketing assessment.  Do you see that?
2    A.  I do.
3    Q.  And I take it you've reviewed that document
4  -- those two documents in connection with preparing
5  your report?
6    A.  Yes.  There may be three documents.
7    Q.  What's the third?
8    A.  There's May 19th, July 31, '95 --
9    Q.  Oh, I see, yes, yes.
10    A.  -- and July 31, '96.
11    Q.  Okay.  Let me rephrase the question then.
12    In Paragraph 69 it refers to three
13  marketing assessments, one dated May 19, 1995; one,
14  July 31, 1995; and one, July 31, 1996.  Do you see
15  that?
16    A.  I do.
17    Q.  And you reviewed those documents in
18  connection with preparing your report?
19    A.  Yes.
20    Q.  Did you speak to the author of any of those
21  documents?
22    A.  No.
23    Q.  Did you review any testimony from -- I'm
24  sorry, did you speak to any of the recipients of

67 (Pages 262 to 265)

Page 266

1  those three documents?
2      A.  What do you mean by "recipients"?
3      Q.  Well, those documents were written by and
4  sent to certain individuals, and I'm asking you
5  whether or not you talked to any of the individuals
6  that were sent it?
7      A.  I got it.  No.
8      Q.  Okay.  Did you -- have you spoken to anyone
9  at Parke-Davis about these three documents?
10     A.  I have not.
11     Q.  Did you review any testimony relating to
12 these three documents?
13     A.  I don't believe so.
14     Q.  And these are internal Parke-Davis
15 documents; is that correct?
16     A.  Yes.  I'm not sure whether they're internal
17 Parke-Davis documents or whether they're Dr.
18 Franklin's -- I guess, yes.  Yes.
19     Q.  Do you know whether these documents were
20 distributed to anybody outside the company?
21     A.  I don't.
22     Q.  Okay.  Do you know whether any of the
23 information contained in them were communicated to
24 physicians?

Page 267

1      A.  In these specific documents?
2      Q.  Yes.
3      A.  I don't.
4      Q.  And if you could turn to Paragraph 71,
5  there's a reference here to the Neurontin 2001 U.S.
6  Operating Plan.
7      A.  Yes.
8      Q.  I believe you referred to that same document
9  earlier today in your testimony; is that correct?
10     A.  I don't recall.
11     Q.  Do you know who prepared the 2001 operating
12 plan --
13         MR. RONA:  Objection.
14     Q.  -- that's referenced in Paragraph 71?
15     A.  I can't recall whether that's on the --
16 whether that information is on the document or not.
17     Q.  Other than what's contained in the document,
18 you don't have an understanding of who prepared it;
19 is that correct?
20     A.  No.
21     Q.  Did you talk to anybody who either prepared
22 or received a copy of the 2001 U.S. Operating Plan?
23     A.  No.
24     Q.  Do you know whether that document was final

Page 268

1  in any way?
2      A.  No.
3      Q.  Do you know whether the company adopted the
4  2001 U.S. Operating Plan?
5      A.  I don't.
6      Q.  Did you read any testimony regarding the
7  2001 Operating Plan?
8      A.  I don't believe so.
9      Q.  Okay.  If you could turn to Paragraph 76, it
10 refers to a Neurontin 2001 Situation Analysis dated
11 June 28, 2000.  Do you see that?
12     A.  Yes.
13     Q.  Did you -- do you know who the author of
14 that document was?
15         MR. RONA:  Objection.
16     A.  I don't recall, and I don't recall whether
17 it's on the document or not.
18     Q.  Did you speak to the author of that
19 document?
20     A.  I did not.
21     Q.  Did you speak to any of the recipients of
22 that document?
23     A.  I did not.
24     Q.  Do you know whether that document and the

Page 269

1  Operating Plan were disseminated -- or the
2  information contained in those two documents were
3  disseminated to doctors?
4      A.  I don't.
5      Q.  Do you know whether the Neurontin 2001
6  Situation Analysis described in Paragraph 76 was, in
7  fact, a represented or contained actual company
8  policy?
9          MR. RONA:  Objection.
10     A.  I don't understand the question.
11     Q.  Do you know whether that situation analysis
12 was adopted as company policy?
13         MR. RONA:  Objection.
14     A.  I don't know that, but I do know that it was
15 consistent with other documents that followed and
16 appeared to be consistent with what the company, in
17 fact, did.
18     Q.  In Paragraph 80 you refer to the 2002
19 Operating Plan being issued on October 5, 2001.  Do
20 you see that?
21     A.  Yes.
22     Q.  Did you speak to the author or recipients of
23 that document?
24     A.  I did not.

68 (Pages 266 to 269)

Page 270

1    Q. Do you know whether that document or the
2  contents were disseminated to physicians?
3    A. I don't.
4    Q. Did you read any deposition testimony
5  regarding that 2002 operating plan?
6    A. I don't believe so.
7    Q. In Paragraph 82 you refer to a September 6,
8  2001 Pfizer consultant meeting.
9    A. Yes.
10   Q. Did you talk to the -- any of the attendees
11 at that meeting?
12   A. I did not.
13   Q. Did you review any deposition testimony
14 relating to that meeting?
15   A. I did not.
16   Q. In Paragraphs 81, 82, 83 and 84 you refer to
17 some meetings between the company and the FDA and
18 communications between the company and FDA. Do you
19 see that?
20   A. Yes.
21   Q. Have you spoken with anybody at the FDA
22 regarding those meetings?
23   A. No.
24   Q. Have you read any testimony regarding those

Page 271

1  meetings?
2    A. No.
3    Q. Do you believe that -- is it your view that
4  any time the FDA does not approve a medication for a
5  given indication, that that's a conclusive
6  determination that the medication is not effective
7  for that condition?
8    A. I think that's an indication that the
9  medication has not been adequately documented --
10 that the efficacy and/or safety of the medicine has
11 not been adequately documented for that indication.
12 And the conclusion of that FDA meeting was
13 consistent with the conclusion of Pfizer's own
14 experts about the same issue.
15   Q. Just I'm asking in general about the fact of
16 FDA nonapproval. You'd have to know, wouldn't you
17 -- strike that.
18      There are all sorts of reasons a drug
19 might not be approved for a given condition; is that
20 correct?
21      MR. RONA: Objection.
22   Q. Approved by the FDA.
23   A. Yes. The primary reasons would be that
24 efficacy were not established or safety were called

Page 272

1  into question.
2    Q. And one of the reasons efficacy might not be
3  established is the company needs to do more tests to
4  establish that efficacy; is that correct?
5    A. That could be one reason, or another reason
6  could be that the company did tests and they came
7  out negative.
8    Q. And did you -- I believe you -- are you
9  familiar with what the FDA requires before approving
10 a drug for -- well, strike that.
11     You're aware, aren't you, that the FDA
12 has never approved a drug for all types of
13 neuropathic pain; is that correct?
14     MR. RONA: Objection.
15   A. Yes.
16   Q. Are you aware of what position the FDA is
17 taking on the issue of what types of tests and
18 clinical trials would have to be done before a drug
19 can be approved for neuropathic -- all types of
20 neuropathic pain?
21     MR. RONA: Objection.
22   A. That there needed to be a demonstration of
23 efficacy in, I believe it was, more than two models
24 or general efficacy in neuropathic pain.

Page 273

1    Q. And what do you base that on?
2    A. I forget whether it was the FDA -- the
3  documents about the FDA meeting or the documents
4  about Pfizer's consultants' meeting. I believe it
5  was one or the other.
6    Q. Okay. And these are documents that were
7  provided to you in connection with preparing your
8  report?
9    A. Correct.
10   Q. In Paragraph 90 of your report you refer to
11 two advisory board meetings; one held in New York
12 City, and one held in Arizona. Do you see that?
13   A. Which paragraph?
14   Q. Paragraph 90 on Page 40.
15   A. Yes.
16   Q. Did you attend either of those meetings?
17   A. No.
18   Q. Do you know who did attend either of those
19 meetings or who did attend those meetings?
20   A. It doesn't say in the report. I believe it
21 does in the document, and I would have to refresh my
22 memory with the document.
23   Q. Did you talk to anybody who attended those
24 advisory board meetings?

69 (Pages 270 to 273)

Page 274

1    A. No.
2        Q. Do you know what an advisory board meeting
3    is?
4    A. Yes.
5        Q. What is it?
6    A. It's a meeting that's sponsored by the
7    manufacturer that convenes influential individuals,
8    usually pays an honorarium, and presents information
9    that -- to potential thought-leaders that -- it
10   will -- presents information to potential thought-
11   leaders, communicating information about the
12   product, and solicits reaction from the so-called
13   advisors about how the company might -- what courses
14   of action the company might take in the future.
15       Q. And have you ever been a member of an
16   advisory board?
17   A. No.
18       Q. Have you ever been asked to be a member of
19   an advisory board?
20   A. No.
21       Q. Do you have a view generally on whether
22   members of advisory boards are well-qualified
23   physicians?
24       MR. RONA: Objection.

Page 275

1    A. My view is that advisory boards would be
2    perceived by the manufacturer to be potential
3    thought-leaders.
4        Q. And do you have a view as to -- what is
5    that -- that view's based on documents you reviewed
6    in the case; is that correct?
7    A. I believe so.
8        Q. Do you have a view as to what types of
9    physicians are members of an advisory board?
10       MR. RONA: Objection.
11       Q. Independent of your review of documents.
12   A. My view would be that the types of
13   physicians are physicians whose opinion would be
14   respected by their peers and whose opinion the drug
15   company would like to solicit.
16       Q. Have you ever been a member of an FDA
17   advisory committee?
18   A. No.
19       Q. You're aware that pharmaceutical companies
20   are not in any way prohibited from educating
21   doctors; is that correct?
22       MR. RONA: Objection.
23   A. Would you say that again, please.
24       Q. You're aware -- are you aware of whether

Page 276

1    pharmaceutical companies are prohibited from
2    educating doctors?
3        MR. RONA: Objection.
4    A. They're not prohibited from educating
5    doctors. I think the doctors who are educated by
6    the pharmaceutical companies expect that the
7    information that they get will be fair, reasonably
8    complete, and reasonably balanced, and I don't
9    believe that was the case with the indications and
10   dosages that we -- that I've discussed in my report.
11       Q. Do you know whether pharmaceutical companies
12   are permitted to fund continuing medical education?
13       MR. RONA: Objection.
14   A. They are.
15       Q. Does it violate any FDA or other federal
16   regulation for pharmaceutical companies to fund
17   research into their products?
18   A. I'm sorry?
19       Q. Does it violate FDA regulations for a
20   company to fund research into its medications?
21       MR. RONA: Objection.
22   A. No, but there is an obligation not to
23   misrepresent that research.
24       Q. Are you -- is it -- does it violate any FDA

Page 277

1    regulation for a pharmaceutical company to consult
2    with outside advisors who are doctors who might or
3    might not have prescribed the company's medications?
4    A. No --
5        MR. RONA: Objection.
6    *A. No, but, again, there would be a presumption
7    that the consult -- to the extent that the
8    consultation included information going from the
9    drug company to the advisors, that the drug -- that
10   the information would be a reasonable and accurate
11   and balanced portrayal of the scientific
12   information.
13       Q. And --
14       MR. ROUHANDEH: Can you read that answer
15   back.
16       *(Answer read)
17       Q. Whose presumption?
18   A. Certainly a presumption on the part of the
19   physicians who are going to receive information from
20   these advisors.
21       The communication of information about a
22   new drug from thought-leaders is an important means
23   of communication, and the reason why it's important
24   is because physician -- practicing physicians aren't

70 (Pages 274 to 277)

Page 278

1 able to read every piece of scientific information
2 and form independent opinions on every subject.
3 Thought-leaders are thought-leaders
4 because they're trusted to bring forth a fair and
5 balanced and reasonably accurate representation of
6 the scientific evidence. To the extent that the
7 advisors are not given accurate information, that
8 misrepresentation of the science has essentially a
9 logarithmic effect as it multiplies through
10 practicing -- from the thought-leaders to the
11 practicing physicians.
12 Q. How do you know what other doctors presume?
13 A. That's why the name "thought-leader" or "key
14 opinion leader." That's why docs are chosen to do
15 these things, because they are thought-leaders.
16 Q. Well, but how do you -- in your answer you
17 said doctors presume that the information is going
18 to be, and then you described what you thought the
19 information was going to be.
20 My question is, how do you know what
21 other doctors presume?
22 A. How do I know that doctors presume that a
23 responsible drug company like Pfizer is not going to
24 be dishonest?

Page 279

1 Q. No, I don't think that's what you said, but
2 maybe that's what you're saying now.
3 A. I think --
4 Q. How do you presume to know what other
5 doctors think and expect of the information they get
6 from a pharmaceutical company? What's your basis
7 for presuming that? Your own experience? You
8 talked to doctors? You did a study? What's your
9 basis for --
10 A. My own experience. PhRMA's own research
11 shows that. I mean, even the information that
12 doctors get from drug reps.
13 90 percent or 91 percent on PhRMA's
14 website right now -- I didn't include that document
15 in this, but 90-91 percent or more say that they
16 trust the information they get from drug reps
17 strongly or somewhat, and I think it's a standard of
18 care that physicians don't believe that responsible
19 drug companies will misrepresent the scientific
20 evidence that they have.
21 Q. I'm not arguing with you. I'm just asking
22 what your basis of your opinion is.
23 A. Yes.
24 Q. And you're saying, "Well, it comes from the

Page 280

1 website in PhRMA."
2 A. I'm saying that's what PhRMA says.
3 MR. RONA: Objection. That's a
4 mischaracterization of Dr. Abramson's testimony.
5 A. Yes, I'm saying that that's what PhRMA's
6 research shows that they post, and that's my
7 experience.
8 Let me finish for a second though.
9 Q. Sure. I thought you were done.
10 A. No, that's fair.
11 In the work that I did writing the book
12 that I wrote, and in the article that I wrote with
13 Barbara Starfield, "Can We Trust the Evidence in
14 Evidence-Based Medicine," I've addressed this issue
15 in a number of different contexts where drugs are
16 used in ways that are not justified by the science
17 and the manufacturer has portrayed a picture to the
18 prescribing physicians that it is effective, and
19 it's very clear that physicians have trusted that
20 picture.
21 So that it's not just what PhRMA's
22 research shows and it's posted on its website, and
23 it's not just what I experienced as a physician, but
24 as somebody who's spent several years reviewing this

Page 281

1 issue, that's my conclusion.
2 Q. Again, that doesn't come from you talking to
3 physicians who are conducting a survey of
4 physicians; is that correct?
5 A. I do talk to physicians. It doesn't come
6 from conducting a formal survey.
7 Q. Right, but you haven't talked to physicians,
8 have you, about Neurontin?
9 A. No.
10 Q. You've written in a section of your report
11 relating to bipolar disorder -- which I believe
12 begins on Paragraph 122, Page 52. You've written
13 here that Neurontin's use for bipolar increased
14 dramatically between February 1996 and November
15 1999, correct?
16 A. Yes.
17 Q. Did you speak to any of the physicians or
18 psychiatrists or others who prescribed Neurontin to
19 patients with bipolar disorder?
20 A. No.
21 Q. You refer to -- in this section to two
22 articles -- two reviews by Carta and Carey; is
23 that correct?
24 A. Where are you?

1     Q.  In the section beginning with Paragraph 122,
2  and Page -- Paragraph 131 on Page 54, Footnotes 187
3  and 188.
4     A.  I'm sorry?
5     Q.  I was referring to two reviews conducted by
6  Carta and Carey that are cited at Paragraph 131 on
7  Page 54.
8     A.  Yes.
9     Q.  Simply the question is, you reviewed those
10  reviews; is that correct?
11     A.  Yes.
12     Q.  And you used them as evidence, in your view,
13  that Neurontin is ineffective for bipolar disorder;
14  is that correct?
15     A.  That's not correct for Paragraph 131.  I'm
16  not using the article to show that Neurontin is
17  ineffective.  I'm using the article to show that the
18  article's -- I'm using the review to show that the
19  authors of the review concluded that most of the --
20  that there were -- the preponderance of the so-
21  called scientific evidence published between 1997
22  and 2007 were uncontrolled case series and single
23  cases, and the authors of the review article said
24  that these uncontrolled case series and single case

1  reports turned into kind of an echo chamber where
2  the results were quoted by people who then were
3  quoted by others quoting the original Level 3
4  evidence.
5     Q.  And I take it you're not an expert in
6  bipolar, I believe you testified earlier; is that
7  correct?
8        Let me put it this way.  There are other
9  experts in the case on the plaintiffs' side who are
10  addressing the efficacy of Neurontin or lack of
11  efficacy of Neurontin from bipolar; is that correct?
12     A.  I believe that's correct.
13     Q.  And I believe you just testified you're not
14  rendering an opinion on whether Neurontin is
15  effective or ineffective for bipolar?
16     A.  I'm rendering an opinion that the
17  information that was presented to physicians
18  misrepresented the efficacy of Neurontin and
19  misrepresented the state of scientific evidence
20  about the efficacy of Neurontin in bipolar disease
21  so that channels that physicians trust -- typically
22  trust to receive information from provided an
23  inaccurate view of the efficacy of Neurontin and
24  bipolar disease; and that that continuing education

1  and publication strategy, as that unfolded,
2  coincided with physicians prescribing Neurontin for
3  bipolar disease.
4     Q.  And that opinion, as I believe you've
5  testified, comes from your review of company
6  documents and scientific literature; is that
7  correct?
8     A.  Yes.
9     Q.  In other words, you didn't go out and do any
10  original research into bipolar disorder?  You
11  haven't collected -- conducted any clinical studies
12  related to bipolar?
13     A.  No, the company -- the company did that for
14  us.
15     Q.  Right.  I mean, but you have not?
16     A.  No.  I'm trusting the company's research.
17     Q.  Okay.  But you're not somebody who's
18  qualified to go out and conduct a clinical study of
19  Neurontin and bipolar, are you?
20        MR. RONA:  Objection.
21     A.  I think I could participate in that study.
22  I don't think I would want to undertake it single-
23  handedly.
24     Q.  Okay.  So you -- what makes you think you're

1  qualified, not being a psychiatrist, to conduct,
2  even in part, a clinical study on bipolar?
3     A.  I understand something about the way studies
4  are conducted and the way research protocols are
5  designed and the way primary outcome measures are
6  designed and the way statistical analyses are
7  designed and the way data is analyzed so that I
8  would certainly make a contribution to such a study.
9     Q.  Okay.  And you haven't conducted any such
10  studies; is that right?
11     A.  I have not.
12     Q.  I think you testified you haven't conducted
13  any clinical research, double-blind placebo-
14  controlled studies of a prescription medication; is
15  that correct?
16     A.  Yes.
17     Q.  You've never sought funding to do that, and
18  nobody has ever asked you to do that; is that
19  correct?
20     A.  That's correct.
21     Q.  And in your review does -- could one study
22  prove that a drug is ineffective for a given
23  condition?
24        MR. RONA:  Objection.

Page 286

1  *A.  One study might provide evidence that a drug
2  is ineffective, and if that's the best evidence that
3  there is, then it's my opinion that that evidence
4  should be made known to physicians who might
5  prescribe the drug for that indication.  And it's my
6  opinion that lesser evidence that's supportive
7  shouldn't be presented and the evidence from a
8  negative clinical trial withheld; that that's an
9  example of distorting the information that
10 physicians are trained to receive so that they are
11 misled.
12      Q.  That was not responsive to my question.
13          MR. ROUHANDEH:  Can you read back my
14 question.
15          *(Question read)
16          MR. RONA:  Can you also read the answer.
17          *(Answer read)
18      Q.  You know, I understand in every answer you
19 want to throw that in, but my question was much more
20 narrow.
21          My question is, could one study, in your
22 view, ever prove that a drug is ineffective for a
23 condition?
24          MR. RONA:  Objection.

Page 287

1       A.  One study can provide evidence that a drug
2  is ineffective.  It depends what you mean by
3  "prove."  "Prove" is a statistical concept.
4          In statistics we tend to, rather
5  naively, accept proof as a probability of less than
6  0.05, probability of happening just by shear chance
7  of less than 0.05.  To the extent that that's the
8  definition of "proof," then one study can show --
9  provide evidence that a drug is ineffective.  It may
10 not be the last study, and the next study might not
11 come out like that, but that's why we do randomized
12 controlled trials.
13          And if a study shows that a drug causes
14 significant harm or doesn't cause a benefit, then
15 that evidence needs to be held -- it needs to be
16 presented in a current way so that physicians have
17 the best possible information to treat their
18 patients, to make decisions about how to treat their
19 patients.
20      Q.  So I take it you're agreeing with me that
21 although a study that doesn't show efficacy, one
22 study, may be evidence of ineffectiveness, it does
23 not conclusively prove that the drug is ineffective;
24 is that correct?

Page 288

1          MR. RONA:  Objection.
2       A.  It depends what you mean by "prove."
3       Q.  Well, do you have an understanding of what
4  it means to prove a drug to be effective?
5       A.  Well, to prove a drug to be effective, it's
6  a functional definition.  I mean, the FDA says that
7  two trials have to show efficacy of 0.05.
8       Q.  Is that the standard that you think is
9  appropriate?
10      A.  It may or may not be, but it -- for the time
11 being it's the law of the land.  I think that one
12 negative trial provides evidence that the drug is
13 not effective, and that it is imperative for a drug
14 company that knows the results of a negative trial
15 to make that information known.
16      Q.  I understand that because you've said it in
17 every answer to my questions, but what you haven't
18 said in your answer is, would you agree with me that
19 one study does not conclusively prove that a drug is
20 ineffective?
21          MR. RONA:  Objection, argumentative and
22 incorrect.
23      A.  You need to define what "conclusively prove"
24 means.

Page 289

1       Q.  Do you have an understanding of what
2  "conclusively prove" means?
3          MR. RONA:  I'm sorry, can he answer the
4  question?
5       A.  Does conclusively prove mean that it has a
6  probability of less than 1 in 20 of coming out the
7  other way if you repeat the study 20 times?  That
8  tends to be the threshold of statistical
9  significance, and tends to be used as proof on the
10 efficacy side.
11          When you have it on the harm side,
12 there's a symmetry, so that in this case I think one
13 study was used by the company as evidence of
14 efficacy; the Backonja study that was published in
15 JAMA in 1998.  To the extent that that shows
16 efficacy, then one study that comes out with a 95
17 percent certainty on the other side would show no
18 efficacy.
19      Q.  You say it's evidence of ineffectiveness, or
20 would it prove that it's ineffective, in your mind?
21      A.  I would say that it's symmetric on both
22 sides, that if --
23      *Q.  Neither one -- one study neither
24 conclusively proves effectiveness nor

73 (Pages 286 to 289)

Page 290

1  ineffectiveness; is that correct?
2         MR. RONA:  Which question is he
3  answering?
4         MR. ROUHANDEH:  The one I just asked.
5         MR. RONA:  Okay, because he was in the
6  middle of answering the first one, but...
7         MR. ROUHANDEH:  You can read it back.
8         MR. RONA:  Why don't you start again.
9         MR. ROUHANDEH:  Why don't you just read
10  that back.
11        *(Question read)
12     A.  Good science is built up like a wall that's
13  made out of small bricks, and one clinical science
14  -- clinical medicine has to go forward with
15  imperfect evidence, and good medicine goes forward
16  with the best available evidence, albeit imperfect.
17        So one study isn't going to conclusively
18  and forever prove that a drug works or doesn't work,
19  but it would be -- if that is the best study that
20  exists, it is imperative for that study to stand as
21  the best scientific evidence at that point in time.
22     Q.  And do you think that doctors make judgments
23  based on one study, either as evidence of
24  ineffectiveness or as evidence of efficacy --

Page 291

1     A.  Well, I think --
2     Q.  -- or do you know?
3     A.  I think there's pretty good evidence that
4  doctors, with the JAMA article about diabetic
5  neuropathy and the adoption of that study
6  selectively into CME and monographs and lectures and
7  so forth and PR amplification to create 85 million
8  impressions in the United States, I think there's
9  good evidence that that study caused -- that that
10  study contributed to doctors believing that
11  Neurontin was efficacious for diabetic neuropathy,
12  especially when the results of Reckless, which
13  became available soon after that, weren't presented.
14     Q.  Just getting back to the issue of whether
15  one study -- what one study can or can't prove.
16  Let's take a drug that's studied at 900 milligrams,
17  and let's say the conclusion is it failed to show
18  efficacy.  Does that mean the drug is ineffective at
19  any dose?
20     A.  No, it means that the drug failed to show
21  efficacy at 900 milligrams.
22     Q.  And might it be reasonable to conduct
23  another study in a higher dose?
24     A.  Yes, if there's evidence that a higher dose

Page 292

1  is safe, and in this case, there was.
2     Q.  In a drug that shows efficacy at a
3  thousand milligrams --
4     A.  I'm sorry.
5     Q.  A drug that shows efficacy for a given
6  condition at a thousand milligrams, for example,
7  doesn't necessarily prove that the drug is more
8  effective at a higher dose; is that correct?
9     A.  That's correct.
10     Q.  So in your view -- and this is your view?
11  Those answers were your personal view; is that
12  correct?
13     A.  Which answers?
14     Q.  Both -- the answers to the last two
15  questions.
16     A.  Yes.
17     Q.  In your view, does the study design
18  sometimes contribute to a failure to show efficacy
19  in a study?
20     A.  I would say it slightly differently, that
21  the study design determines the question that's
22  answered by the study if the data is accurately
23  recorded and presented.
24     Q.  Have you ever come across a situation where

Page 293

1  a drug failed to show efficacy because of a study
2  design flaw?
3         MR. RONA:  Objection.
4     A.  I'm not thinking of an example as I sit
5  here.  Studies answer questions.  The issue is, what
6  question do they answer?
7        So perhaps a study was flawed and it
8  looked at the wrong population.  The study answers
9  the question:  Does the drug work in that
10  population?  Maybe they looked at the wrong
11  population, but science provides answers to
12  questions.
13        So I think if you don't get the answer
14  you like, you can say there was a study design flaw,
15  but I think good science would suggest that you
16  answered a question.  Maybe you asked the wrong
17  question and should ask the question differently in
18  another well-designed study.
19     Q.  Okay.  Other than answering or asking the
20  wrong question, are there other instances where a
21  study design might contribute to the results of the
22  study where those results are a failure to show
23  efficacy?
24         MR. RONA:  Objection.

74 (Pages 290 to 293)

1    A.  I can think of a claim of such an example,
2  though I'm unconvinced by it.
3    Q.  You can't think of any examples that you
4  agree with?
5    A.  A study design answers a question.  If the
6  -- we're assuming the science is done accurately and
7  honestly and portrayed honestly.  It answers a
8  question.
9        It may not answer the question that was
10  intended to be asked.  That happens.  We don't get
11  everything right.  I'm not attributing any
12  malfeasance or anything.  And if that's found out,
13  then one reports the results and says, "This was a
14  problem that we didn't foresee, and our conclusion
15  is that the study should be done this way so that we
16  can answer the question properly."
17    Q.  Let's say you have a study that has a
18  washout period.  Have you ever heard of a situation
19  where that washout period wasn't long enough and
20  that might have contributed to the results or
21  conclusions of the study?
22    A.  I have heard of such a study.
23    Q.  And so isn't that an example of where the
24  design, as opposed to the question you asked, but

1  the design had a flaw in it that led to results that
2  were not reliable?
3    A.  That could be.  I mean, that's what is
4  alleged to have happened in the Gorson study, and
5  then they -- what they did with the Gorson study is
6  they took the first half of the washout prior to the
7  alleged confounding, and took those results and
8  analyzed those results, and I think that's a very
9  reasonable thing to do.
10    Q.  Okay.  Can you think of any other study
11  design flaws that might contribute to the result in
12  a study?
13        MR. RONA:  Objection.
14    A.  There are all sorts of design flaws that
15  could contribute to...
16        You could give a dose that was later
17  proven to be ineffective.  It would answer a
18  question.  It would answer the question, "Does this
19  dose work?"  The answer would be no.  It doesn't
20  answer the question that was intended to be asked,
21  which is, "If we used a dose that now appears to be
22  more in the therapeutic range, would the drug work?"
23        It doesn't answer that question, but you
24  answered a question, "Does that dose work?"  And

1  such a study was done with a drug called Atromid
2  that lowered cholesterol.
3    Q.  Can you think of any other design flaws in
4  studies?
5        MR. RONA:  Objection.
6    A.  Finish the sentence.
7    Q.  Well, can you think of any other design
8  flaws in studies that contributed to the results of
9  the study; for example, where the study failed to
10  show efficacy?
11        MR. RONA:  Objection.
12    A.  They all have studies, as an example, where
13  it was claimed that that was the case.  I'm not sold
14  on that argument, where people who were at risk --
15  do you want me -- are you interested in this?
16    Q.  Well, I'm just -- I'm asking you if you can
17  think of any other flaws, design flaws, in a study
18  that could contribute to a drug failing to show
19  efficacy?
20        MR. RONA:  Objection.
21    A.  You could have too low a dose.  You could
22  have the wrong population.  You could have too short
23  a time.  There are a number of flaws that could fail
24  to show efficacy that could be shown with a

1  different dose, a different population, a different
2  time, but that doesn't mean that it's bad science.
3  You've answered a question, you just answered the
4  wrong question.
5        You didn't answer the question you meant
6  to ask, which is, "Does a reasonable dose of this
7  drug exert a positive effect?"  You've answered a
8  different question, "Does a dose that we later found
9  out was subtherapeutic provide a benefit to
10  patients?"
11        MR. RONA:  Jim, I think we're roughly at
12  seven hours.  We can get the exact time.
13        THE VIDEOGRAPHER:  We're exactly at 55
14  minutes.
15        MR. ROUHANDEH:  Okay.  Why don't we
16  break for today and start up at 9:00 tomorrow
17  morning.
18        THE VIDEOGRAPHER:  The time is 6:24, and
19  we're off the record.
20        (Whereupon the deposition was
21        suspended at 6:24 p.m.)
22
23
24

75 (Pages 294 to 297)

Page 298

```
 1              C E R T I F I C A T E
 2   I, JOHN D. ABRAMSON, M.D., do hereby certify that I
 3   have read the foregoing transcript of my testimony,
 4   and further certify that said transcript is a true
 5   and accurate record of said testimony (with the
 6   exception of the following corrections listed
 7   below):
 8   Page   Line        Correction/Reason
 9   ____   ____    _____
10   ____   ____    _____
11   ____   ____    _____
12   ____   ____    _____
13   ____   ____    _____
14   ____   ____    _____
15   ____   ____    _____
16
17          _____
18             JOHN D. ABRAMSON, M.D.
19      Sworn and subscribed to before me this _____
20   day of _____, 2009.
21
22          _____
23             NOTARY PUBLIC
24   My commission expires:
```

Page 299

```
 1   Commonwealth of Massachusetts
 2   Suffolk, ss.
 3
 4        I, Lisa A. Moreira, Registered Merit Reporter,
 5   Certified Real-Time Reporter and Notary Public in
 6   and for the Commonwealth of Massachusetts, do hereby
 7   certify that JOHN D. ABRAMSON, M.D., the witness
 8   whose deposition is hereinbefore set forth, was duly
 9   sworn by me and that such deposition is a true
10   record of the testimony given by the witness.
11        I further certify that I am neither related to or
12   employed by any of the parties in or counsel to this
13   action, nor am I financially interested in the
14   outcome of this action.
15        In witness whereof, I have hereunto set my hand
16   and seal this 26th day of January, 2009.
17
18          _____
19
20             Lisa A. Moreira, RDR, CRR
21             Notary Public
22             CSR No. 146299
23   My commission expires
24   December 25, 2009
```

76 (Pages 298 to 299)

1                                        Volume:  II

2                                    Pages:  300 to 471

3                                    Exhibits:  6 to 9

4                    UNITED STATES DISTRICT COURT

5                     DISTRICT OF MASSACHUSETTS

6                          MDL Docket No. 1629

7                          Master File No. 04-10981

8     - - - - - - - - - - - - - - - - - - - - - - - x

9     In Re:  NEURONTIN MARKETING, SALES PRACTICES, AND

10    PRODUCTS LIABILITY LITIGATION

11    - - - - - - - - - - - - - - - - - - - - - - - x

12    THIS DOCUMENT RELATES TO:

13    - - - - - - - - - - - - - - - - - - - - - - - x

14    HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH

15    SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD

16    OF LOUISIANA; INTERNATIONAL UNION OF OPERATING

17    ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME

18    LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH and

19    LORRAINE KOPA, on behalf of themselves and all

20    others similarly situated, v. PFIZER, INC. and

21    WARNER-LAMBERT COMPANY.

22    - - - - - - - - - - - - - - - - - - - - - - - x

23

24    (CONTINUED ON NEXT PAGE)

Page 301

```
 1    - - - - - - - - - - - - - - - - - - - - - x
 2    THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v.
 3    PFIZER, INC. and AETNA, INC. v. PFIZER, INC.
 4    - - - - - - - - - - - - - - - - - - - - - x
 5
 6         SUPREME COURT OF THE STATE OF NEW YORK
 7              COUNTY OF NEW YORK
 8                 Index No. 765000/06
 9    - - - - - - - - - - - - - - - - - - - - - x
10    In Re: NEURONTIN PRODUCT LIABILITY LITIGATION
11    - - - - - - - - - - - - - - - - - - - - - x
12    THIS DOCUMENT APPLIES TO ALL CASES:
13    - - - - - - - - - - - - - - - - - - - - - x
14
15
16
17      CONT'D VIDEO DEPOSITION OF JOHN D. ABRAMSON, M.D.
18           Wednesday, January 21, 2009
19            9:12 a.m. to 2:44 p.m.
20             Regus Business Center
21              470 Atlantic Avenue
22              Boston, Massachusetts
23
24        Reporter:  Lisa A. Moreira, RDR, CRR
```

Page 302

```
 1    A P P E A R A N C E S
 2    FOR THE CLASS PLAINTIFFS IN MDL:
 3      BY:  EDWARD NOTARGIACOMO, ESQ.
 4           HAGENS BERMAN SOBOL SHAPIRO LLP
 5           One Main Street, Fourth Floor
 6           Cambridge, Massachusetts 02142
 7           617.482.3700
 8           ed@hbsslaw.com
 9
10    FOR THE DEFENDANTS:
11      BY:  JAMES P. ROUHANDEH, ESQ.
12           DAVIS POLK & WARDWELL
13           450 Lexington Avenue
14           New York, New York 10017
15           212.450.4000
16           james.rouhandeh@dpw.com
17           and
18      BY:  CHRISTOPHER HARPER, ESQ. (VIA SPEAKERPHONE)
19           SHOOK, HARDY & BACON LLP
20           2555 Grand Boulevard
21           Kansas City, Missouri 64108-2613
22           816.474.6550
23           charper@shb.com
24
```

Page 303

```
 1    FOR THE ASSURANCE PLAINTIFFS (VIA SPEAKERPHONE):
 2      BY: LEASA M. WOODS, ESQ.
 3          BLANK ROME
 4          600 New Hampshire Avenue, N.W.
 5          Washington, D.C. 20037
 6          202.772.5970
 7          Woods@BlankRome.com
 8
 9    FOR DR. OBIEDZINSKI (VIA SPEAKERPHONE):
10      BY: LINDA FULOP-SLAUGHTER, ESQ.
11          DURAN & PANDOS
12          1044 Route 22 West, Suite 5
13          Mountainside, New Jersey 07092
14          lslaughter@duranandpandos.com
15
16
17    Also Present:
18      Shawn Budd, Videographer
19      Katherine Swan, Non-Attorney (Davis Polk)
20
21
22
23
24
```

Page 304

```
 1              I N D E X
 2    WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
 3    JOHN D. ABRAMSON, M.D., Resumed
 4    (By Mr. Rouhandeh)  305
 5
 6          E X H I B I T S
 7    NO.        DESCRIPTION          PAGE
 8    6   "Chronic Neuropathic Pain:      353
 9        Mechanisms and Treatment," by N.
10        Attal, M.D., Ph.D.
11    7   Excerpt from Lahey Clinic's website   445
12    8   List of prescriptions written by Dr.  458
13        Abramson
14    9   Listing of new prescriptions      464
15
16
17
18
19    *Original exhibits returned to Veritext
20
21
22
23
24
```

2 (Pages 301 to 304)

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER: Okay. We are back on
3    the record. This is Day 2 in the videotaped
4    deposition of Dr. John Abramson. Today's date is
5    January 21, 2009, and the time is twelve minutes
6    after 9:00. You may continue.
7        JOHN D. ABRAMSON, M.D.,
8    a witness called on behalf of the Defendants, having
9    been previously satisfactorily identified by the
10   production of his driver's license and duly sworn by
11   the Notary Public, was deposed and further testified
12   as follows:
13       DIRECT EXAMINATION
14   BY MR. ROUHANDEH:
15       Q. You understand you're still under oath; is
16   that correct?
17       A. I do.
18       Q. Have you ever seen a patient who suffered
19   from a condition where there was no drug approved to
20   treat that condition and no randomized controlled
21   studies supporting the use of that drug to treat the
22   condition?
23       A. I'm sure I have.
24       Q. Did you prescribe a medication in that

1    circumstance?
2        (Telephone interruption)
3        A. There may have been times that I did. I'm
4    thinking particularly we talked yesterday about the
5    cold medicine samples that were in the --
6        Q. You can go ahead.
7        A. The cold medicine samples that were in the
8    sample closet.
9        MR. ROUHANDEH: Okay. Why don't we just
10   take a quick break here.
11       THE VIDEOGRAPHER: The time is 9:14.
12   We're off the record.
13       (Recess taken)
14       THE VIDEOGRAPHER: Okay. We're back on
15   the record. The time is 9:15.
16       MR. NOTARGIACOMO: Maybe you could
17   repeat the question that was before the witness.
18       MR. ROUHANDEH: Yes.
19   BY MR. ROUHANDEH:
20       Q. Have you ever seen a patient who suffered
21   from a condition where there was no drug approved to
22   treat that condition and no randomized controlled
23   studies supporting the use of that drug -- of any
24   drug to treat that condition?

1        A. I'm sure there were times when that
2    happened.
3        Q. And in those circumstances, did you
4    prescribe any medication?
5        A. There were probably times when I prescribed
6    a cold medicine or used a cold medicine sample.
7        I shouldn't say that. I shouldn't say
8    that.
9        I can't recall a time when I prescribed
10   a medicine -- I'm sorry, repeat the question.
11       Q. On those occasions where you saw patients
12   who suffered from a condition where there was no
13   drug approved to treat that condition and no
14   randomized controlled study supporting the use of
15   any drug to treat those conditions, did you
16   ultimately prescribe a medication?
17       A. Sitting here, I can't recall a situation
18   where I've done that.
19       Q. Do you -- in your view, would it be
20   inappropriate for a doctor in such circumstances to
21   prescribe a medication even though there's no
22   approved drug and no double-blind placebo-controlled
23   study showing efficacy for the condition?
24       A. If there was no scientific evidence that the

1    drug was of benefit, I think it would be
2    inappropriate.
3        Q. Well, do you think the existence of
4    randomized controlled studies are the only type of
5    scientific evidence necessary to justify a
6    prescribing decision?
7        A. I think if there's a very serious situation
8    that -- and nothing else has worked and there are no
9    other alternatives, then one might resort to
10   prescribing a drug for which there was evidence but
11   evidence of a lesser nature than a randomized
12   controlled trial.
13       Q. Okay.
14       A. But if the randomized controlled study -- if
15   there were a random -- evidence from randomized
16   controlled trials that override or differed from the
17   lesser -- from evidence of lesser -- from lower
18   quality evidence, then it would be imperative to be
19   informed by the randomized controlled trial.
20       Q. If you had a patient with a particular type
21   of cancer and there's no drug approved for that type
22   of cancer, and there are no studies showing efficacy
23   for any drug treating that type of cancer, would you
24   still prescribe a medicine to treat the cancer even

Page 309

1 if there were -- you only had anecdotal or open
2 label studies?
3    MR. NOTARGIACOMO: Objection.
4    A. If there were anecdotal data, and the
5 patient were clearly -- the clinical course was
6 clearly going downhill if you did nothing, and there
7 was some anecdotal data, in a situation -- in a
8 critically -- in a critical clinical situation, one
9 might need to lower one's standards so that the
10 consequences of doing nothing would be
11 irretrievable.
12    On the other hand, it's important to
13 know -- and this happens with many cancer patients
14 -- that they're treated, and the treatment itself
15 becomes more of a problem than the disease would
16 have been, and it's important to respect that that's
17 a possibility.
18    Q. Okay. In your report, which is marked as
19 Exhibit 1, Paragraph 31, which appears on Page 14,
20 you say, "In today's health market doctors face
21 significant time constraints in determining which
22 drugs and treatments are in the best interest of
23 their patients." Do you see that?
24    A. Which paragraph again?

Page 310

1    Q. Paragraph 31.
2    A. Yes.
3    Q. First sentence.
4    A. Yes.
5    Q. What do you base this statement on, that
6 doctors face significant time constraints in
7 determining which drugs and treatments are in the
8 best interest of their patients?
9    A. My own observations as a physician and my
10 observations in discussing these issues with doctors
11 and lecturing to physicians.
12    Q. So it's based on your own personal
13 experience --
14    A. Yes.
15    Q. -- in part; is that correct?
16    A. Yes.
17    Q. And from discussing the issue with other
18 doctors?
19    A. And from lecturing to physicians in
20 educational contexts and having interaction with
21 physicians in those contexts as a lecturer.
22    Q. You would agree with me, wouldn't you, that
23 it's a pretty important issue for doctors to take
24 the time to determine which drugs and treatments are

Page 311

1 in the best interest of their patients?
2    A. It's very important to do that, and how
3 that's done is the issue, not that it's done. So
4 that one way to do that would be for physicians to
5 review the literature, read all the original
6 scientific articles that are available, and draw
7 independent conclusions. Another way that's done is
8 to turn to thought-leaders for their opinions,
9 either in writing or in continuing education.
10 Another way is to receive monographs on these
11 issues. Another way is to read textbooks on the
12 issues.
13    So the point of this is not that doctors
14 can't engage in a process by which -- which is
15 acceptable to determine what the best treatment is.
16 The point of this statement is that it is impossible
17 for physicians to go to the original research even
18 if it were available to make those determinations
19 independently for each situation that they treat.
20    Q. In your practice, when you saw patients
21 present with similar conditions, over time did you
22 feel like you had done enough research to know what
23 were the drugs and medications that you thought were
24 best to treat that type of condition?

Page 312

1    A. Yes, and I would -- each physician develops
2 a pattern of accessing information that he or she
3 deems adequate to answer those questions.
4    So the answer is yes, I would become --
5 I would be satisfied that I had done enough
6 research. What might that research -- that research
7 would have been unlikely to have done an exhaustive
8 search of the literature. It would depend on
9 reviews. It would depend -- when I was in practice,
10 it was just before the computer access to medical
11 information really became practical, and I would use
12 a service called Scientific American Medicine, which
13 was a lengthy, very thick three-page -- three-binder
14 set that would be updated monthly, and it would be a
15 compendium of experts' opinions about what the
16 current literature showed, so -- and I liked that
17 because it got updated every month, but it depended
18 on what experts -- how experts distilled the
19 scientific evidence.
20    Q. On Page 33 of your report, Paragraph 77,
21 there's a quote from a document described here as a
22 Neurontin 2001 Situation Analysis, and the quote --
23 the end of the quote -- and this is referring to use
24 of Neurontin in bipolar and the studies that have

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 313

1   examined the use of Neurontin in bipolar.  Do you
2   see that?
3       A.  I do.
4       Q.  One of the statements from that document,
5   the 2001 Situation Analysis, is that, "Among
6   psychiatric thought-leaders, trial design
7   shortcomings were responsible for the outcome."  Do
8   you see that?
9       A.  I do.
10      Q.  Do you agree or disagree with that
11  statement?
12      A.  That that was the opinion among the thought-
13  leaders who they had accessed?
14      Q.  Yes.
15      A.  I can believe that among psychiatric
16  thought-leaders that the manufacturer had discussed
17  this with, there was a belief that there were
18  shortcomings.
19      Q.  And do you think there were design
20  shortcomings in those trials?
21      A.  I think there are always design
22  shortcomings.  There's no such thing as a perfect
23  trial.  So you can look at the shortcomings in the
24  trial, or you can look at the -- what the trial

Page 314

1   tells you.  When you set up a randomized controlled
2   double-blind trial, it tells you something, and that
3   something can't be ignored.  That's what science is.
4           So could you say that there were
5   shortcomings because the patient selection wasn't
6   optimal because the screening of patients wasn't
7   optimal?  Of course you can, but that doesn't deny
8   that there is now a fact that Neurontin is
9   significantly worse -- was shown -- that in this
10  study, designed as it was, that Neurontin came out
11  -- patients who took Neurontin did significantly
12  worse than patients who took placebo.
13      Q.  You're referring to the Pande study?
14      A.  Uh-huh.
15      Q.  Do you -- so you agree with the first part
16  of that statement that there were trial design
17  shortcomings because you think there are always
18  trial design shortcomings, but the statement goes on
19  to say that the trial design shortcomings were
20  responsible for the outcome.  Do you agree they were
21  responsible for the outcome?
22      A.  I don't know that.  One doesn't know that.
23  One only knows what the outcome was and what the
24  trial was, and if you felt -- I mean, there's kind

Page 315

1   of an implication there that had the trial been
2   designed differently, the outcome would have been
3   different, and that's a very reasonable hypothesis
4   that should have been tested.
5           But to have a result that shows your
6   drug is significantly worse and not be sharing that
7   result in an enormous educational campaign for
8   psychiatrists and others who might use Neurontin for
9   bipolar -- for the treatment of bipolar patients, to
10  not inform them that this information exists is
11  withholding critically important information.
12      Q.  You're not disputing that the Pande study
13  was published; is that correct?
14      A.  I am not disputing that the Pande study was
15  published.  It was published -- the Pande study was
16  completed, I believe, in July of '97, and it was
17  published in 2000.  There was a two-year lag time
18  between the time the study was published -- excuse
19  me, there was a two-year lag time between the time
20  the study was completed and the time the manuscript
21  was submitted for publication.  During that two-year
22  lag period, there was an enormous campaign carried
23  out by the manufacturer to educate psychiatrists
24  about new treatments for bipolar disorder that

Page 316

1   brought forward case studies and other-than-
2   randomized controlled trial evidence.  When they
3   knew that this evidence showed that their drug was
4   significantly worse, flaws or no flaws, they were
5   sitting on this data.
6           Now, the two-year lag time in Pande from
7   the completion of Pande to the submission of the
8   article is in comparison to the one-year lag time of
9   the completion of the Backonja and Rowbotham
10  articles that were submitted to JAMA.  So favorable
11  results got submitted in one year.  Unfavorable
12  results got submitted in two years.  And the
13  manufacturer carried on an intensive education --
14  miseducational campaign during that two-year period.
15      Q.  Did you know that during that two-year
16  period Dr. Pande went to a meeting of psychiatrists
17  and explained that his study failed to show
18  efficacy?  Were you aware of that?
19      A.  Yes, I was, but that doesn't get into the
20  evidence that clinicians are -- the scientific
21  evidence that clinicians base their decisions on,
22  and that shows that it's all the more egregious that
23  Dr. Pande went to a psychiatric meeting and said
24  that there was no benefit, meanwhile the company

5 (Pages 313 to 316)

Page 317

1  itself is carrying on continuing education seminars
2  affecting thousands of prescribers not presenting
3  that data and presenting data from open-label trials
4  or case studies that show exactly the opposite.
5      So that Dr. Pande presented that at, I
6  think, two professional meetings, that's a good
7  thing, but it only shows how bad it was that the
8  company didn't integrate what Dr. Pande said at
9  those professional meetings in their continuing
10  education that they were very actively carrying on.
11     Q.  Did you -- certainly the clinicians, as you
12  referred to them, who attended those sessions in
13  which Dr. Pande explained his results, they
14  certainly knew the results; is that correct?  They
15  could take those into account in their prescribing
16  decisions.
17     A.  They could, and yet the -- when this data is
18  presented and the other, whatever it is, 40 studies
19  that had been published that were open label and
20  case studies -- I don't know how many were published
21  at that point, but the data can be presented so that
22  it looks overwhelmingly positive, and then you have
23  this one negative study that was negative because of
24  design flaws, and that information can be

Page 318

1  overwhelming depending on how the presentation is
2  spun.
3      Q.  But you wouldn't know how a doctor would
4  factor that into prescribing decisions; is that
5  correct?  Because if you had had a bipolar patient,
6  you'd refer them to psychiatrists.  So you don't
7  know when what -- if you were a clinician who
8  attended the meeting, you wouldn't know how they
9  take into account the result of Pande's study in
10  comparison with open-label studies?  You don't know
11  what that -- what that calculus was in the mind of a
12  psychiatrist, do you?
13     A.  Well, I think we have some pretty good
14  evidence.
15     Q.  Well, do you know the answer to that?  Do
16  you know --
17     A.  Well, let me -- let me...
18        I think we have some pretty good
19  evidence of the kinds of information that
20  psychiatrists were being exposed to.  If you look at
21  Paragraph 266 on Page 104, this is a slide from a
22  presentation from November 21, 1998, so this would
23  be around the time that Dr. Pande had presented his
24  information publicly.  This, I don't think, is the

Page 319

1  conference where he did.
2      And we see that the evidence in support
3  of gabapentin in Paragraph 266, the evidence in
4  support of the use of gabapentin shows that it's an
5  add-on, that the dose is 300 to 2400 milligrams per
6  day, and that 20 percent and 33 percent had a marked
7  increase.  And there's a reference to Biological
8  Psychiatry, and that's pretty impressive.  And if
9  you had a bipolar patient who was doing badly, you
10  would be swayed by that.
11     But there's no way for the doctors to
12  know that that study was not a randomized controlled
13  trial, that that study was an open-label trial, and
14  that the Pande -- in this case the Pande information
15  wasn't presented.  But if this were presented in
16  conjunction with the Pande information, that's very
17  hard for clinicians to sort out, and when a thought-
18  leader is extolling the virtues of a drug, even in
19  the face of mixed evidence and, in fact, evidence
20  that -- where the Level 1 evidence should weigh more
21  heavily than others, it's hard for physicians to
22  sort out.
23     Q.  That wasn't my question.  My question was,
24  do you know how psychiatrists would weigh the

Page 320

1  results of the Pande study with other information,
2  including open-label studies?
3      A.  I know that psychiatrists were -- that the
4  rate of use of Neurontin for bipolar disease was
5  going up very fast, I think 23-fold, in these years
6  between '97 and '99.  And while the Pande study had
7  been presented to some -- at least two -- I think
8  two professional meetings, and yet the use of this
9  drug was going up rapidly in the face of the
10  negative randomized controlled trial, so I think the
11  facts speak for themselves.
12     Q.  Right, but you don't know -- you don't
13  purport to say what's in the mind of a psychiatrist
14  and how they made prescribing decisions with the
15  information that they had, do you?
16     A.  No, I just purport to say that the single
17  randomized controlled trial shows that this drug --
18  the people that took Neurontin did significantly
19  worse than the people who took placebo, and the
20  company engaged in a continuing medical education
21  campaign, and the number of prescriptions went up
22  17- or 23-fold during that period.
23     Q.  Okay.  So that's the basis for your
24  statement about what psychiatrists did.  It's not

6 (Pages 317 to 320)

Page 321

1  based on being able to know what was in the minds of
2  the psychiatrist.  Is that correct?
3      A.  That is what psychiatrists did.
4      *Q.  Well, but you don't know what their thought
5  process was in terms of what evidence they took into
6  account or didn't take into account in making
7  individual prescribing decisions?
8      A.  One more time, I'm sorry.
9      *(Question read)
10     A.  I don't know what individual thought
11 processes were, but I know the information to --
12 that they were provided with, and I know what the
13 consequences -- I know what the end result was, and
14 I know what the science showed.
15     Q.  Okay.  If you look at Paragraph 266 that you
16 referred to, you said there was no way of knowing --
17 somebody seeing this lie, there would be no way of
18 knowing this was an open-label study.  I have two
19 questions.
20         First, there's a citation on the very
21 slide, isn't there, to an article --
22     A.  Yes, there is.
23     Q.  -- in a journal?
24     A.  Yes.

Page 322

1      Q.  And would you agree with me that if somebody
2  went to read that journal they would see that it's
3  open-label?
4      A.  They would, but that's not what doctors do.
5  Doctors go to continuing education so they can hear
6  the opinion of thought-leaders who are trusted.
7  They are thought-leaders because they are trusted.
8  That's their job, to present an unbiased view of the
9  scientific evidence, and it's -- I've not seen it,
10 that doctors went back to check references.
11         I give a lot of lectures to a lot of
12 doctors.  It's extraordinarily rare that a doctor
13 will ask me to send them a reference or that there
14 will be any follow-up communication that a doctor
15 checked a reference.  It happens occasionally, but
16 it's extremely rare.
17         So to have that be evidence that the
18 company fully disclosed the quality of the
19 scientific evidence that they were presenting,
20 forget the evidence that they withheld, which was a
21 randomized controlled trial, but to have that be the
22 defense and not to have, very clearly if they're
23 presenting evidence, them say that it's an open-
24 label trial, I think, is deceptive.

Page 323

1      Q.  How do you know whether -- what was said at
2  this meeting?
3      A.  I don't know, but --
4      Q.  So for all you know, the person who stood up
5  and presented this slide said, "This is an open-
6  label study."
7      A.  That could be, but it doesn't say it here,
8  and also what it didn't say in the slide
9  presentation is that we have open-label trials, but
10 most importantly, we have a randomized controlled
11 trial.  And that's Level 1 evidence, and that should
12 be the information -- that's the most important
13 information upon which you should be basing your
14 decisions.  You don't see any evidence of that.
15     Q.  Well, you don't -- you don't -- the
16 statement that you just made, you don't see evidence
17 that that's what was said at this particular
18 meeting, do you?
19     A.  I don't, and there's no evidence that the
20 results of Pande were presented.  So it's pretty
21 unlikely, without Pande in the slide set, that the
22 lecturer said, "And the most important information
23 is a randomized controlled trial.  We think there
24 were design flaws that may have impacted the

Page 324

1  results, but this is a randomized controlled trial,
2  and this is the most important data we have to
3  date."
4      Q.  I'm just going to read a statement and ask
5  you to agree with it.  Once a drug or medical device
6  has been approved or cleared by FDA, generally
7  healthcare professionals may lawfully use or
8  prescribe that product for uses or treatment,
9  regimens, that are not included in the products'
10 approved labeling.
11         Do you agree with that statement?
12     A.  I do, and I would add to it that the
13 evidence about the off-label use of the drug has to
14 be scientifically balanced, and there's a burden on
15 a physician -- the burden is on the physician to
16 make that determination in an off-label situation,
17 but there is an obligation on the provider of the
18 information to provide balanced information.
19     Q.  Would you agree with the following
20 statement, that these off-label uses or treatment
21 regimens may be important and may even constitute a
22 medically recognized standard of care?
23     A.  I think there may well be times when an off-
24 label treatment regimen -- when the scientific

7 (Pages 321 to 324)

Page 325

1    evidence supports the use of an off-label treatment,
2    but it's very important, when we're now outside the
3    realm of FDA oversight, to make sure that the
4    science that is presented to the decision-maker is
5    fair, accurate and complete.
6        Q. So I just wasn't clear if you were saying
7    you agree with it and then adding that
8    qualification, or whether you answered the question
9    or not, so let me just ask it again.
10        Do you agree with the statement that
11    these off-label uses or treatment regimens may be
12    important and may even constitute a medically
13    recognized standard of care?
14        A. I agree with it if there is science that
15    backs it up.
16        Let me just modify that; if the -- if,
17    upon consideration of all the scientific evidence
18    that's reasonably available, the conclusion is that
19    the science supports that. If there are randomized
20    controlled trials that show that such treatment is
21    not effective or significantly worse than nothing,
22    then I would not agree with that statement in a
23    particular instance.
24        Q. You would agree with me that a

Page 326

1    pharmaceutical company or clinical investigator
2    cannot force a journal to publish a study that it
3    does not want to publish; is that correct?
4        A. Yes.
5        Q. And have you ever heard that some journals
6    don't want to publish articles with negative or
7    inconclusive results?
8        A. I have.
9        Q. And you've spent some time here today and
10    yesterday discussing the Pande study, and you claim
11    that the results of the Pande study were -- that the
12    publication of that was delayed or the submission to
13    the journal was delayed. What is your basis for
14    saying that?
15        A. That there was a two-year lag time between
16    the completion of that study and the submission of
17    the article to the journal. I think that it may
18    well be that there are factors -- once the article
19    is submitted, there are factors that could be
20    controllable by the authors who submit it and maybe
21    out of the author's control, but the time between
22    the completion of the study and the submission is in
23    the author's or the drug company's control.
24        So there was a two-year lag time during

Page 327

1    that period, '97 to '99, when the drug-maker was
2    actively sponsoring continuing medical education
3    courses for people who -- doctors who prescribe for
4    bipolar patients. There was an active campaign to
5    show that it was effective when the article wasn't
6    being submitted.
7        When there were two positive articles
8    that were submitted to JAMA about post-herpetic
9    neuralgia and diabetic neuropathy, the lag time
10    between completion of the study and the submission
11    to JAMA was one year.
12        Q. Okay. So you're just making a comparison
13    that two years seems like a long time compared to
14    other studies that were published faster; is that
15    correct?
16        A. I'm making a comparison of a study that
17    showed there are drugs significantly worse that took
18    two years to submit an article, and two studies that
19    showed -- that purported to show the drug was
20    effective, and that only took one year for
21    submission. So it took twice as long to submit the
22    negative article.
23        Q. Okay. In the Pande study, do you dispute
24    the author's finding that some patients who took

Page 328

1    gabapentin or what I'll call in the gabapentin arm
2    did not take the study medication as prescribed?
3        A. Do I...?
4        Q. Do you dispute that?
5        A. No.
6        Q. Do you disagree with the author's conclusion
7    that that might have affected the study's results?
8        A. It always does, in every study. That
9    doesn't distinguish this study from other studies.
10    In fact, that's why intention-to-treat analysis is
11    such an important standard for Level 1 evidence,
12    because these things happen when patients take
13    medicines. And the question that you're asking
14    isn't, "What happens in the ideal?" The question
15    is, "What happens in a clinical situation?"
16        Q. And in that study, patients were also taking
17    lithium?
18        A. I believe so.
19        Q. And you do not dispute, do you, that -- the
20    author's finding that more patients in the placebo
21    arm had their lithium dose adjusted during the lead-
22    in phase than those who were taking gabapentin or
23    Neurontin?
24        A. No, I don't.

8 (Pages 325 to 328)

Page 329

1     Q. And do you disagree with the conclusion that
2 this might have affected the study's results?
3     A. It is possible that it affected the study's
4 results, but, again, that's why randomized
5 controlled trials are done, and to the best of my
6 knowledge, the Pande article did a reasonable job of
7 presenting the results, which is that the patients
8 that took Neurontin did significantly worse.
9     When one presents an intention-to-treat
10 analysis, there might be events that occurred in a
11 random way that distributed unequally in the two
12 populations, and then one makes a comment and one
13 could do further studies, but it is very important
14 to present the results that occurred.
15     Q. In the Carter article that you cite in your
16 report, there's a statement that in the second
17 controlled study, Pande, a heterogeneous patient
18 population, poor compliance and the effects of
19 concomitant treatment, lithium was adjusted in 11
20 placebo patients but in none of the gabapentin/
21 Neurontin patients just prior to randomization, and
22 that that might have compromised the results. Do
23 you agree with that statement?
24     A. I think it might have -- it might have

Page 330

1 affected the results, and other things might have
2 affected the results the other way. What I don't
3 agree with is that there's any justification for
4 presenting lower levels of scientific evidence when
5 this evidence exists, and if the manufacturer wanted
6 also to present those caveats and say, as a --
7 "Given these negative results, there may be some
8 factors that contributed to that," that's, I think,
9 good science.
10     But to withhold the results of the
11 randomized controlled trial from the prescribing
12 community, that is, I think, a violation of the
13 expectations of how companies that do -- drug
14 companies that do research will behave.
15     Q. You also refer to the Viatha study.
16     A. Uh-huh.
17     Q. And that reported efficacy; is that correct?
18     A. Yes.
19     Q. Are you suggesting in any way that the
20 results of that study were not presented truthfully?
21     A. Yes.
22     *Q. So do you -- on what do you base -- well,
23 let me clarify that.
24     I guess I'm asking you, do you think

Page 331

1 that Dr. Viatha failed to present the results
2 truthfully in the actual published article?
3     A. Let me just refresh my memory for one
4 moment.
5     Your question again?
6     MR. ROUHANDEH: Could you read it back.
7     *(Question read)
8     A. I think the article fails to present the
9 results truthfully, and I don't know how that -- who
10 contributed to that or how it occurred.
11     Q. And you haven't talked to Dr. Viatha; is
12 that correct?
13     A. I have not.
14     Q. And if he were to tell -- were to say that
15 he wrote the results up himself without any
16 influence from Pfizer, would you have any reason to
17 doubt that?
18     A. I would not, but I would add, and the reason
19 why I said -- I don't know who wrote the results or
20 who is responsible for the misrepresentation of the
21 results as intention-to-treat results when they're
22 per protocol results. I don't know who did that or
23 how it happened, but the bottom line is that it
24 happened and that the manufacturer knew that it

Page 332

1 happened and that the manufacturer did not take
2 steps to correct the misrepresentation.
3     So however it got to that point, I don't
4 know, but the manufacturer certainly had the
5 opportunity, either through review of the
6 manuscript, if they had review, or through a letter
7 to the editor. If they had no editorial control
8 over Dr. Viatha or input to Dr. Viatha, if they had
9 -- if they -- if Dr. Viatha had complete control of
10 this and the manufacturer had nothing to do with it,
11 the manufacturer still could have and had an
12 obligation to write a letter to the editor of the
13 journal and say, "Umm, it's important to understand
14 that the intention-to-treat analysis was identified
15 in the protocol as the primary analysis, and that
16 results of that preidentified primary outcome
17 measure and analysis show a nonsignificant -- no
18 significant difference -- no significant benefit to
19 Neurontin."
20     Q. And where do you say that responsibility
21 comes from? What's the basis of your statement that
22 they have a responsibility to do that? Is there a
23 law? A regulation?
24     A. There's a --

9 (Pages 329 to 332)

1    Q.  Is it an ethical --
2    A.  I think it's an ethical and standard of care
3  issue.  I think that the physician community has to
4  trust that the drug companies who hold the data on
5  these clinical trials will make sure that the
6  results are reasonably presented, and if they are
7  not reasonably presented because of events out of
8  their control, they have an obligation to straighten
9  out the scientific record.
10   Q.  Okay.  In your report, if you look at
11 Sections 5 and 6, in those sections there's a
12 lengthy narrative of the facts as you see them and
13 as you gleaned them from the documents that you
14 reviewed; is that correct?
15   A.  Yes.
16   Q.  And you didn't attend any of the events
17 described in those sections of your report, did you?
18   A.  I did not.
19   Q.  And, in fact, you didn't attend any of the
20 events described in other sections of the report; is
21 that correct?
22   A.  Correct.
23   Q.  And you did not speak with anyone who
24 attended those events; is that correct?

1    A.  Correct.
2    Q.  You also refer in the report to a number of
3  documents relating to clinical studies.
4    A.  Yes.
5    Q.  And you did not speak to any of the doctors
6  who conducted those studies; is that correct?
7    A.  I did not.
8    Q.  You also refer to a number of company
9  documents in your report; is that correct?
10   A.  Yes.
11   Q.  And you did not speak to any of the authors
12 or recipients of those documents; is that correct?
13   A.  Yes.
14   Q.  Yes, that's correct?
15   A.  Yes, that's correct.
16   Q.  Okay.  You did not read any testimony from
17 the authors or recipients of those documents, did
18 you?
19   A.  Only to the extent that they were excerpted
20 in Dr. Field's report.
21   Q.  Okay.  And you have no first-hand knowledge
22 of any of the events or studies or documents
23 described in the report, do you?
24   A.  No.

1         MR. NOTARGIACOMO:  Object to the
2  question.
3    A.  Wait one second.  Can you ask the question
4  again?
5    Q.  Yes.  You don't have any firsthand knowledge
6  of the events -- I'll break it down.
7         You don't have any firsthand knowledge
8  of the events described in the report, do you?
9    A.  Only from the documents -- from what is
10 presented in the documents.
11   Q.  Okay.  And you don't have any firsthand
12 knowledge of studies described in the report?
13        MR. NOTARGIACOMO:  Objection.
14   A.  Well, I have firsthand knowledge of what was
15 published in those studies.
16   Q.  Which comes from your reading the studies?
17   A.  Yes.
18   Q.  Okay.  And you don't have any firsthand
19 knowledge of the events and statements and
20 communications described in the company documents,
21 do you?
22   A.  Just as -- not beyond what's in the
23 documents.
24   Q.  In other words, your knowledge came from

1  reading the documents; is that correct?
2    A.  That's correct.
3    Q.  Okay.  You refer to the Gorson study, and I
4  believe you testified about it yesterday.
5    A.  Yes.
6    Q.  Same answer here, right?  That you didn't
7  speak to Dr. Gorson about his study?
8    A.  I did not.
9    Q.  So do you know whether Dr. Gorson believes
10 that Neurontin is an effective treatment for
11 diabetic peripheral neuropathy at doses higher than
12 what he studied?
13   A.  The only evidence I have of that is the
14 original manuscript that he sent to the manufacturer
15 in August of 1997 which concluded that gabapentin at
16 a dose of 900 milligrams is probably no more
17 effective than placebo in the treatment of painful
18 diabetic neuropathy.
19   Q.  Okay.  Well, my question was, do you know
20 whether he believes that Neurontin is an effective
21 treatment for diabetic peripheral neuropathy at
22 doses higher than what he studied; in other words,
23 higher than 900 milligrams?
24   A.  The question is...?

Page 337

1    Q.  Do you know whether he believes that
2  Neurontin is effective for DPN at a dose higher than
3  900 milligrams?
4    A.  I don't.  I don't know how he interprets the
5  scientific evidence about the Neurontin, and I don't
6  know that -- whether he agrees or disagrees with the
7  company's experts that were convened in September of
8  2001.
9    Q.  You state that Dr. Gorson's original draft
10  indicated a desire to publish in the journal
11  Neurology.
12    A.  Yes.
13    Q.  And ultimately it was published in the
14  Journal of Neurology, Neurosurgery and Psychiatry;
15  is that correct?
16    A.  As a letter to the editor.
17    Q.  Yes.
18    A.  Not as an article.
19    Q.  Do you attribute that change from one
20  journal to the other as something that you attribute
21  to the defendants?
22    A.  Difficult question, because when an article
23  is submitted, and if it's submitted and accepted or
24  rejected is not independent of the author and the

Page 338

1  manufacturer's control.  So if an article is
2  submitted with the presentation of the results in a
3  way that are deemed not acceptable by a journal,
4  then it's a hard question to say whether it's in the
5  author's and manufacturer's control or the journal's
6  control.
7    Q.  Well, do you know whether the article --
8  whether an article was submitted by Dr. Gorson to
9  the journal Neurology?
10    A.  I know that the abstract was.  I don't know
11  whether an article was.
12    Q.  Okay.  And you don't know why that abstract
13  was not published, do you?
14    A.  Well, it was.
15    Q.  Oh, you're saying an abstract was submitted
16  and published?
17    A.  Yes.
18    Q.  Okay.  So you just don't know if a full
19  journal article was presented or submitted to
20  Neurology?
21    A.  Correct.
22    Q.  Okay.  And if it was, why it was rejected?
23  You don't know that either, do you?
24    A.  I don't know that, but I do know that the

Page 339

1  abstract that was published in Neurology was
2  significantly materially different than the draft
3  that Dr. Gorson initially sent in August of 1997 and
4  presented the results in a very different way.
5    Q.  Okay.  Turning to the Backonja study, which
6  on your report I think your discussion begins at
7  Page 60, although there may be other references to
8  it.  That study was published in what we've referred
9  in shorthand to as JAMA; is that correct?
10    A.  Correct.
11    Q.  And that's the Journal of the American
12  Medical Association?
13    A.  Correct.
14    Q.  That's a highly respected and prestigious
15  peer-reviewed journal; isn't that correct?
16    A.  Correct.
17    Q.  In fact, that's one of the two that you
18  regularly read.
19    A.  Correct.
20    Q.  Your main criticism of that study is based
21  on Dr. Jewell's analysis; isn't that correct?
22    A.  No.
23    Q.  Oh, it's not?  Is any of your analysis of
24  the Backonja study based on analysis that Dr. Jewell

Page 340

1  has conducted?  Let me strike that.
2    Is any of your criticism of the
3  published journal article based on the analysis of
4  Dr. Jewell?
5    A.  Dr. Jewell's analysis contributes -- it is a
6  contributing factor to my analysis, but not the
7  primary factor.
8    Q.  Okay.  What is the primary factor?
9    A.  The primary factor is that the way the trial
10  was designed with a forced titration dosage schedule
11  brought patients up to 3600 milligrams.  Regardless
12  of whether or not they needed that therapy, they had
13  improved, and that created a situation where more
14  than 50 percent of the people had central nervous
15  system type side effects.
16    It's clear that the manufacturer
17  understood that there was a potential unblinding
18  effect of that many -- that high a percentage of
19  patients in the study having CNS side effects, and
20  the technique that was used to -- by -- in the
21  article to ensure that unblinding didn't contribute
22  to the patients' subjective perception of
23  improvement was inadequate and, as shown in the
24  company documents, I believe they knew was

11 (Pages 337 to 340)