Page 341

1  inadequate.
2      Q. Did --
3      A. Let me just finish.
4      Q. I thought you were finished.
5      A. No.
6          The design of the study -- the design of
7  the study was such that it used Neurontin against a
8  placebo, an inactive placebo, and as was pointed out
9  in the editorial, the results would have been much
10 heartier if either an active placebo or an active
11 control were used so that patients felt that they
12 were taking a drug, and the unblinding effect
13 wouldn't have compromised the subjective reporting
14 of pain relief.
15     Q. Is any part of your criticism of that
16 article based on the editorial by Dr. Low that
17 appeared in JAMA?
18     A. Dr. Low's editorial was helpful and is
19 consistent with company documents about the blinding
20 issue.
21     Q. Do you know Dr. Low?
22     A. I don't.
23     Q. Do you know that Dr. Low is in the
24 department of neurology at the Mayo Clinic?

Page 342

1      A. I believe I've read that.
2      Q. Do you -- the editorial by Dr. Low appeared
3  in the same issue that the Backonja article appeared
4  in; is that correct?
5      A. That's correct.
6      Q. And are you aware that Dr. Low concluded
7  that this gabapentin or Neurontin trial, along with
8  the one on PHN, confirmed the clinical impression
9  that Neurontin is efficacious in the treatment of
10 chronic painful neuropathies and that these studies
11 provide data that suggest that this agent may prove
12 to be the drug of first choice in most cases of PHN
13 and in some cases of diabetic peripheral neuropathy
14 or painful diabetic neuropathy?
15     A. I'm aware that he said that, and I think
16 it's very important to understand that in the -- in
17 context that "may prove" is in the future tense, and
18 that what he says in the conclusion -- I don't have
19 the editorial in front of me, but what he says in
20 the conclusion is that for the time being tricyclics
21 ought to be the treatment of choice for the vast
22 majority of patients with diabetic neuropathy.
23     Q. But would you also agree that Dr. Low --
24 well, do you -- do you agree or disagree with the

Page 343

1  conclusion that -- of Dr. Low that Neurontin may
2  prove to be the drug of first choice in most cases
3  of PHN and in some cases of painful diabetic
4  neuropathy?
5      A. What I agree with -- again, to place that
6  statement in context -- is that this study, flawed
7  as it is, provides some evidence that Neurontin is
8  beneficial in diabetic neuropathy, and that if
9  future studies that address the weaknesses of this
10 study confirm this in the future, it may prove to
11 be, but he says very clearly it's not now.
12     Q. And did you speak to Dr. Low or Dr. Backonja
13 about the Backonja study?
14     A. No.
15     Q. Or about the -- what you perceived to be the
16 shortcomings of the Backonja study?
17     A. No.
18     Q. You also refer to -- in your report to the
19 Reckless study.
20     A. Can -- before we get off that, there's one
21 -- the Low editorial was published simultaneously
22 with the two articles about Neurontin in JAMA. When
23 the defendants hired their PR firm to carry this
24 message forward, I didn't see any evidence that they

Page 344

1  carried forward the caveats and reservations of Dr.
2  Low, so the 85 million impressions that were created
3  of the positive results were not tempered by the
4  concerns that Dr. Low expressed about the potential
5  bias in the study.
6      Q. The Reckless study.
7      A. Yes.
8      Q. You argue that the company suppressed
9  publication of the Reckless study; is that correct?
10     A. Yes.
11     Q. Based on documents you reviewed?
12     A. Yes.
13     Q. And you did not speak to Dr. Reckless or any
14 of the other authors of that study; is that correct?
15     A. Correct.
16     Q. And are you aware that it was submitted --
17 that the -- an article -- strike that.
18         Were you aware that the Reckless study
19 was submitted to at least two different journals for
20 publication?
21     A. I am, and it was rejected from both of those
22 journals.  It was rejected for similar reasons.
23 Because of the way that the data was presented, the
24 reviewers felt was not a fair presentation of what

12 (Pages 341 to 344)

Page 345

1   the results of the study were, and at least one of
2   those journals said very clearly in the rejection
3   letter, "We have these concerns about the multiple
4   comparisons that you've done. You need to lower the
5   level of the threshold for statistical significance
6   because you're doing multiple comparisons on
7   secondary endpoints and claiming that they show
8   victory when the threshold for statistical
9   significance needs to be corrected for multiple
10  comparisons."
11         And most importantly, at least one of
12  those reviews said, "If you choose to address the
13  statistical issues that we've raised, we would re-
14  review" -- "we would accept a resubmission of the
15  article," and I saw no evidence that there was
16  resubmission of the article.
17     Q.  And you're also aware that the results of
18  the Reckless study were included in a review article
19  by Backonja and Glanzman; is that correct?
20     A.  Of sorts. The results were presented in a
21  very cursory manner. It was not -- this was in
22  2003. The study itself was completed in September
23  of 1999, so it's a little late in the game, but --
24     Q.  Well, in the interim it had been submitted

Page 346

1   to two other journals, is that correct, between
2   those two dates?
3      A.  But that -- you can't claim that the
4   submission to those journals --
5      Q.  I'm not claiming anything. I'm just asking
6   questions.
7      A.  One. One. One can't claim that submission
8   of the article as it was to those journals
9   constitutes a good faith attempt to get it
10  published.
11         In fact, one of those journals said very
12  clearly, "This is what you need to do to get this
13  article published," and they indicated that they
14  would -- they said that they would accept
15  resubmission, and that resubmission wasn't made, so
16  I don't know --
17     Q.  Well, you saw no evidence that the
18  resubmission was made?
19     A.  I saw no evidence that the resubmission was
20  made, so I don't think that it would be fair to one
21  -- for one to conclude that the authors or the
22  manufacturer, whoever was calling the shots on this,
23  made a good faith effort to get this article
24  published.

Page 347

1      Q.  Okay. You were saying -- in the Reckless
2   study, the results of the Reckless study and the
3   fact that it failed to show efficacy, that fact was
4   included in the review article by Backonja and
5   Glanzman; is that correct?
6      A.  Yes, it was very briefly included, but I
7   think it's very important to place that in context.
8   The Backonja article included the fact in the table
9   where it has statistical significance. For the
10  Reckless article it has "N/A," not applicable, or
11  the benefit -- the magnitude of the benefit not
12  applicable, but that article published -- authored
13  by Backonja and Glanzman concluded that the evidence
14  shows that Neurontin is effective for diabetic
15  neuropathy, and it concluded that the dose should
16  be -- the initiation of dosage should be -- the
17  dosage should be titrated up to 1800 milligrams
18  within two weeks and then brought forward up to 3600
19  milligrams.
20         Now, the important point here is that
21  the manufacturer knew that its own experts felt that
22  the Neurontin was not significantly efficacious in
23  diabetic neuropathy to get FDA approval. The FDA
24  said it wasn't, and the article itself -- there's a

Page 348

1   clear trail of this article coming forward from the
2   manufacturer's desire to publish its key messages.
3         So the fact that Reckless -- that
4   doctors were informed that Reckless was negative
5   when it's packaged in a misleading article claiming
6   that Neurontin is effective for diabetic neuropathy,
7   it doesn't constitute a reasonable presentation of
8   the most important study of diabetic neuropathy that
9   the manufacturer did. I mean, this article -- this
10  -- the Reckless study had three times more patients
11  in active treatment than did the Backonja article,
12  so it was certainly treated very differently.
13         To claim -- after Backonja's published
14  in JAMA, and a PR firm is hired, and there's 85
15  million impressions, to claim that presentation in
16  this company-coordinated review article that
17  misrepresents the totality of scientific evidence is
18  a reasonable presentation of the data, I think
19  that's a false claim.
20     Q.  You also refer to the Attal article in a
21  journal supplement on Page 70, Paragraph 174 --
22     A.  Yes.
23     Q.  -- of your report. And you say that the
24  Gorson study -- the overall negative findings of the

Page 349

1  study were not presented; is that correct?
2      A. Wait a second. Where are we?
3      Q. Paragraph 174 on Page 70.
4      A. Let me just get oriented for a second.
5          (Pause)
6          I'm sorry, your question?
7      Q. Doesn't Dr. Attal say, in fact, in the
8  journal supplement that, quote, one small randomized
9  trial reported no significant difference in efficacy
10 measures between 900 milligrams of gabapentin and
11 placebo in patients with diabetic neuropathy?
12     A. I would have to see the original article.
13     Q. Okay. Well, you saw the article, is that
14 correct, when you wrote --
15     A. Yes.
16     Q. -- Paragraph 174?
17     A. Yes, that's correct.
18     Q. What did you mean when you said, "The
19 overall negative study" -- "findings of the study
20 were not presented," referring to the Dr. Gorson
21 study?
22     A. When the article referred to Gorson, it said
23 that doses of 900 milligrams -- doses of Neurontin
24 higher than 900 milligrams were needed. That is a

Page 350

1  misrepresentation of the totality of the science
2  that was present at the time and a misrepresentation
3  of the Gorson article.
4          The Gorson article didn't show that
5  doses higher than 900 milligrams were needed to
6  provide effective treatment of diabetic neuropathy.
7  The Gorson article showed that doses of 900
8  milligrams were not effective for diabetic
9  neuropathy.
10     Q. And when you say "not effective," you mean
11 that there was no significant difference in efficacy
12 measures between 900 milligrams of gabapentin and
13 placebo; is that correct?
14     A. Correct. Correct, but that doesn't mean
15 that doses higher than that are needed.
16     Q. I see.
17         All right. Well, isn't that -- isn't
18 the -- your statement that "the overall negative
19 findings of the study were not presented," that's a
20 mistake, isn't it, in your report?
21     A. I would have to see the article that we're
22 referring to to...
23     Q. Well, what you were intending to say is --
24 well, as I understand your answer, your testimony is

Page 351

1  that when discussing Gorson, the Attal article or
2  supplement said higher doses are needed and didn't
3  disclose the fact that there was no significant
4  difference in efficacy measures between 900
5  milligrams of gabapentin and placebo. Do I have
6  that correct?
7      A. I don't think you do. I think what the
8  statement is is that the Gorson article does not
9  support the statement that doses higher than 900
10 milligrams are needed.
11     Q. Okay. But when you -- I mean, this
12 statement would be -- that "the overall negative
13 findings of the study were not presented" is
14 incorrect if, in fact, the Attal article said that
15 there was no significant difference in efficacy
16 between 900 milligrams of Neurontin and placebo; is
17 that correct?
18     A. I'd have to see the article to see how it's
19 presented. My impression was -- it could be wrong,
20 but my impression was that evidence -- the results
21 of the Gorson article were used to make the point
22 that doses higher than 900 milligrams were needed.
23     Q. Without saying that's the overall negative
24 result of the study?

Page 352

1      A. In that --
2      Q. If I'm misreading 174, tell me.
3      A. You are. Again, you have the article in
4  front of you, and I don't.
5          My impression was -- and I'd be happy to
6  look at the article to see this, but my impression
7  was that the article made the statement that Gorson
8  showed that doses higher than 900 milligrams were
9  necessary. It may be that there's another statement
10 somewhere else, but Gorson didn't show that.
11     Q. Well, but you're -- we're talking about your
12 statement. It says, "The Gorson article" -- in
13 Paragraph 174, "The Gorson article was cited, but
14 just in support of the position that doses of
15 Neurontin higher than 900 milligrams per day were
16 needed."
17         I mean, if I'm reading -- am I reading
18 that incorrectly? I mean, to me that says it was
19 cited, but the only thing it was cited for was
20 support that doses of Neurontin higher than 900
21 milligrams were needed.
22     A. Yes, you're reading --
23     Q. And that something was left out?
24     A. You're reading my report correctly. The

Page 353

1   point that I'm making -- and I may have been in
2   error that the results of Gorson are nowhere
3   presented as negative in that review article, and
4   that would be an omission on my part.
5        The point that I'm making is that my
6   impression -- and, again, I'm very happy to look at
7   the article and refresh my memory, but the point
8   that I'm making is that the results of Gorson cannot
9   be used to show that doses of 900 milligrams --
10  higher than 900 milligrams are necessary, are
11  needed.
12       MR. ROUHANDEH:  Let me ask the court
13  reporter to mark as Abramson 6.
14       (Exhibit No. 6, "Chronic Neuropathic
15       Pain: Mechanisms and Treatment," by N.
16       Attal, M.D., Ph.D., marked for
17       identification)
18   .  Q.  Is this the Attal article that you referred
19  to in Paragraph 174 of your report?
20       A.  Yes.
21       Q.  If you could turn to Page S122, and in the
22  right-hand column, if you could, go down sort of
23  near the bottom of the carryover paragraph at the
24  top of the right-hand column.

Page 354

1        A.  Yes.
2        Q.  Do you see the statement that, "Small
3   dosages may be less effective, because one small
4   randomized trial reported no significant difference
5   in efficacy measures between 900 milligrams of
6   gabapentin and placebo in patients with diabetic
7   neuropathy," and there's a Footnote 75.
8        If you turn to the "Notes" section on
9   Page S128, you'll see there's a cite to the Gorson
10  article that we've been discussing that was in the
11  Journal of Neurology, Neurosurgery and Psychiatry.
12       A.  Yes.
13       Q.  Do you see that?
14       A.  Yes.
15       Q.  So would you agree with me that the
16  statement you've made in Paragraph 174 of your
17  report is incorrect?
18       A.  Let me just take a look.
19       (Pause)
20       I agree that the statement that I made
21  that "the overall negative findings of the study
22  were not presented" is incorrect, and I stand by my
23  statement that says that the presentation in Attal
24  that concludes that small doses may be less

Page 355

1   effective in the paragraph that you pointed out and
2   in the -- and in the larger context, when we get to
3   the real meat of the article, "Recommendations For
4   Optimal Treatment of Neuropathic Pain" on Page S125
5   in the right-hand column, and the paragraph that
6   starts with "Current approach," "The choice of
7   specific treatments for neuropathic pain is
8   traditionally based on their established efficacy
9   and well-designed, double-blind, placebo-controlled
10  studies in disease-based groups of patients.  These
11  studies, as well as systematic reviews, provide
12  consistent support for the efficacy of TCAs" --
13  tricyclic antidepressants -- "gabapentin, and
14  current antiepileptics," et cetera.
15       That the negative results of Gorson are
16  used -- are presented but are used to show that
17  small doses may be less effective, when, in fact,
18  the truth was, had the results of Reckless been
19  included in this article -- and Reckless had been
20  completed 12 months before this supplement was
21  published -- it would have shown that this is not an
22  accurate representation of the totality of
23  scientific evidence, Level 1 scientific evidence,
24  that the manufacturer had, and instead of the -- the

Page 356

1   spin here is that instead of saying 900 milligrams
2   is not effective, they're saying other studies show
3   it's effective, so you've got to use more than 900
4   milligrams.
5        So I think not only is the scientific
6   evidence misrepresented as being conclusive that
7   there's -- that the randomized controlled trials
8   show that gabapentin is effective, but the spin is
9   not that Gorson adds evidence that it's not
10  effective, but Gorson adds evidence that you have to
11  use higher doses.
12       Q.  Is it your position that Dr. Attal was
13  spinning the Gorson results?
14       A.  My position is that, if you look at the
15  paragraph that says "Current approach" --
16       Q.  Can you just answer that yes or no and then
17  give your additional statement?  Is it your belief
18  that Dr. Attal spun the results of the Gorson study?
19       A.  I believe that the way the results of the
20  Gorson -- the way the results of the Gorson study
21  are presented here, the take-home message is small
22  doses may be less effective, and that higher doses
23  should be used.
24       Why should higher doses be used?

15 (Pages 353 to 356)

Page 357

1 Because if you go to "Current approach," it says we
2 rely on randomized control trials, and it says that
3 the randomized control trials show that gabapentin
4 is effective, and therefore Gorson shows that lower
5 doses -- higher doses need to be used.
6          But it's incomplete.  It's not an honest
7 presentation of the scientific evidence.
8     Q.  So you think that Dr. Attal did not make an
9 honest presentation of the Gorson results?
10    A.  I think Dr. Attal did not make an honest
11 presentation -- excuse me, let me be very clear.
12         I think this article does not make an
13 honest presentation of the scientific evidence that
14 was available.  I don't know what Dr. Attal knew at
15 the time, but I know the manufacturer knew at the
16 time that this was not an honest, complete, and
17 unbiased presentation of the totality of evidence in
18 their possession at the time.
19    Q.  The question is whether Dr. -- you're saying
20 that Dr. Attal misrepresented or failed to make an
21 honest presentation of the Gorson results?  That's
22 my question.  Is that a yes or a no?
23    A.  There are two different presentations of the
24 results.  One is a yes, and one is a no.

Page 358

1          The yes is that it is accurately stated
2 -- it is accurately stated that one small randomized
3 trial reported no significant difference in efficacy
4 between 900 milligrams of gabapentin and placebo.
5 That is correct.
6          What is not correct is that the
7 randomized -- the preponderance of evidence from
8 randomized controlled trials showed that gabapentin
9 is effective.  That's wrong.  And the message, the
10 take-home message, here is that Gorson shows that
11 higher doses need to be used.
12         It says small doses may be less
13 effective, but higher doses work, and so yes, Gorson
14 is presented as being showing no difference at 900
15 milligrams.  That's correct.  But it's incorrect --
16 two other things are incorrect.  One is that the
17 preponderance of the evidence of randomized
18 controlled trial evidence shows that Neurontin is
19 effective at higher doses.  And the other is that,
20 therefore, Gorson's negative findings at 900
21 milligrams support the use of higher doses.  That's
22 incorrect.
23    Q.  Your statement that "small doses may be less
24 effective but higher doses work," that's not a --

Page 359

1 you weren't reading from this -- from the article,
2 were you?  It's not --
3    A.  No.  It says, "Small doses may be less
4 effective."
5    Q.  And you added the additional words, "higher
6 doses" -- "but higher doses work," right?  That's
7 not -- that's not in this -- you weren't reading --
8 you weren't quoting from the document?
9    A.  I am reading from the document.  I'm reading
10 from the document --
11    Q.  Well, I asked you if you were quoting from
12 the document.
13    A.  I'm not quoting, but I will quote from the
14 document, which is really important because in bold
15 letters it says, "Recommendations for optimal
16 treatment of neuropathic pain," and it says that
17 randomized controlled trial -- I'll quote it
18 exactly, but to save time I'll say that the article
19 says that randomized, double-blind -- well-designed,
20 double-blind, placebo-controlled studies in disease-
21 based groups of patients show that gabapentin is
22 effective, and when that is combined, a reasonable
23 reader, I believe, would conclude that when it says
24 "small doses may be less effective," and in the part

Page 360

1 of the article that tells you what to do it says,
2 "the randomized controlled trials show that it is
3 effective," that the conclusion would be that you
4 shouldn't use small doses, you should use higher
5 doses, which are effective.
6    Q.  Okay.  So you were not quoting from the
7 document when you said higher doses were; is that
8 correct?
9    A.  No.  I'm saying small doses are less
10 effective.  I think the only conclusion that one
11 could make from the -- it's less effective than
12 what?  And obviously it's less effective than higher
13 doses.
14         MR. ROUHANDEH:  Okay.  I think we're
15 running out of tape, so why don't we break.
16         THE VIDEOGRAPHER:  This is the end of
17 Tape No. 1.  The time is 10:34.  We're off the
18 record.
19         (Recess taken)
20         THE VIDEOGRAPHER:  Okay.  We are back on
21 the record.  This is Tape No. 2.  The time is 10:51.
22 BY MR. ROUHANDEH:
23    Q.  Dr. Abramson, did you write Paragraph 174 of
24 your report, or was that something originally

16 (Pages 357 to 360)

Page 361

1  drafted by the plaintiffs' counsel that you edited?
2      A. To the best of my recollection, I wrote
3  that. I don't remember receiving -- period. To the
4  best of my recollection, I wrote that.
5      Q. You refer to the -- in discussing migraine,
6  you refer to the Mathew study.
7      A. Yes.
8      Q. And you criticize the Mathew study in a
9  number of ways; is that correct?
10     A. Yes.
11     Q. And have you spoken with Dr. Mathew or any
12 of the investigators or authors of the published
13 study to discuss your concerns about the study?
14     A. No.
15     Q. Did you speak with the editors of the
16 journal Headache regarding their decision to publish
17 the Mathew study?
18     A. No.
19     Q. Have you spoken with the peer-reviewers of
20 Headache regarding their judgment that the study was
21 suitable for publication?
22     A. No.
23     Q. Are you aware that Dr. Mathew has stated
24 that Parke-Davis never made any attempt to alter or

Page 362

1  edit the findings of the study?
2      A. Let me just get oriented here. I believe,
3  in Dr. Field's report, that -- I believe that she
4  refers to Dr. Mathew having said that.
5      Q. Okay. Are you aware that Dr. Mathew stated
6  that the published article reflects his thoughts and
7  conclusions about the results of the study?
8      A. Again, I believe that I read that in Dr.
9  Field's report.
10     Q. And are you aware that Dr. Mathew has stated
11 that he continues to use gabapentin off-
12 label for migraine?
13     A. And I believe that that is in Dr. Field's
14 report.
15     Q. Are you aware of any other studies -- are
16 you aware of any studies -- strike that.
17         Are you aware of other studies which
18 have demonstrated the efficacy of Neurontin for
19 migraine prophylaxis?
20     A. Well, you can't make that statement, because
21 the Mathew study doesn't demonstrate efficacy of
22 Neurontin for migraine prophylaxis.
23     Q. Okay. Let me revise it.
24         Are you aware of any studies that have

Page 363

1  demonstrated the efficacy of Neurontin for migraine
2  prophylaxis?
3      A. Let me just refresh my memory.
4         Of the three randomized controlled
5  trials of which I'm aware were sponsored by the
6  manufacturer, none of them showed efficacy for
7  migraine prophylaxis.
8      Q. And what are those three studies, by
9  publication or study number?
10     A. Mathew is 945-220. There was an 879-200,
11 and 945-217.
12     Q. What, if anything, did you do to determine
13 whether there were other studies relating to
14 migraine prophylaxis in terms of preparing -- in
15 preparation of your report?
16     A. I'm sorry, there is another study. The
17 Di Trapani study that was published in 2000.
18     Q. Where is that?
19     A. I mention that when I talk about the
20 Cochrane review in Paragraph 191.
21     Q. Any others?
22     A. There aren't others of which I'm aware, and
23 what I did to prepare was to review the Cochrane
24 review of anticonvulsant drugs for migraine

Page 364

1  prophylaxis that was first published in 2004.
2      Q. Okay. So you didn't do an independent
3  literature search?
4      A. No. I let the Cochrane review do that.
5      Q. So if there are other studies relating to
6  gabapentin's or Neurontin's use in headache or
7  migraine or prophylaxis of headache or migraine,
8  you're not aware of them if they weren't cited in
9  the Cochrane review?
10     A. That's correct.
11     Q. Was the Di Trapani study -- did it show the
12 efficacy of Neurontin in migraine prophylaxis?
13     A. I believe it did.
14     Q. And do you have any criticism of the study
15 design?
16     A. I did not go into the Di Trapani study.
17     *Q. Do you think that study would provide a
18 sufficient basis for a physician to prescribe
19 Neurontin for migraine prophylaxis?
20     A. The question is...?
21         MR. ROUHANDEH: If you could just read
22 it again. Read it back.
23         *(Question read)
24     A. Absolutely not in the face of three

Page 365

1  randomized controlled trials that failed to show
2  efficacy.
3      Q. What about with a patient who has -- cannot
4  be controlled with other migraine medications or has
5  drug interactions with other migraine medications?
6      A. I think you have -- the overwhelming
7  preponderance of scientific evidence is that this is
8  not an effective therapy. It's conceivable to me
9  that on a very rare occasion, a physician, if -- had
10 a physician known that the results of Mathew,
11 regardless of who did it, were misrepresented in the
12 article, and the Mathew study did not show a
13 significant benefit, that 217 was never published,
14 not included in CME, didn't show a significant
15 benefit, and the first study that was completed, I
16 think, in the late '80s, not published, didn't show
17 a significant benefit, I think it would be an
18 extremely rare physician and a rare situation that
19 would warrant kind of a potshot use of a drug that
20 had been shown not to work.
21     Q. By the way, are you speaking for yourself or
22 for other doctors?
23     A. You asked me --
24         THE WITNESS: Maybe you can read back

Page 366

1  the question that he asked me.
2      Q. Well, what was your understanding of it?
3      A. Whether -- I thought the question was
4  whether I -- whether I believed that that would be
5  an appropriate treatment. My recollection of your
6  question --
7      Q. In your practice. You were answering -- I
8  just want to --
9          THE WITNESS: Read back the question.
10 I'm sorry.
11     Q. Well, I know. We can read it back. I don't
12 have any problem with that. I'm just -- it won't
13 the answer of what you were thinking when you
14 answered the question. Were you thinking this is
15 what I would do or this is what I think other
16 physicians would do?
17     A. I was thinking I was answering the question.
18     Q. What did you think the question was?
19     A. Well, why don't we go back.
20     Q. I think it was more general. I don't think
21 it was about you. It was a physician.
22     A. Let's go back. It's confusing.
23     Q. Well, I'll clear it up. I'm just answering
24 -- asking you what did you think.

Page 367

1          It's not up to the witness to control
2  the deposition in terms of what we read back. I'll
3  read it back at your request, but I'm just asking
4  you the question, and I'll -- I think the record
5  will satisfy it, but I think I was asking you
6  whether a physician -- whether it would be a
7  reasonable thing for a physician to do. And I was
8  just wondering if you understood that when you were
9  answering the question, or were you just answering
10 the question of just what you would do?
11     A. A reasonable physician.
12     Q. Did you want to have it read back? I'm
13 happy to have it read back.
14         MR. NOTARGIACOMO: Are you satisfied
15 that he understood the question and answered the
16 question that you asked?
17         MR. ROUHANDEH: Yes.
18         MR. NOTARGIACOMO: Then I don't think we
19 need to read it back.
20     Q. In your practice, did -- if you had somebody
21 with migraines that were severe and difficult to
22 treat, would you refer that patient to another -- or
23 did you refer patients like those to other
24 physicians?

Page 368

1      A. Yes. The refractory migraine patient I did
2  refer to neurologists.
3      Q. And if there were another study in addition
4  to the Di Trapani study that showed efficacy in
5  headache prophylaxis, would that be a basis for you
6  to prescribe migraine even in the face of what you
7  consider to be the other negative studies?
8          MR. NOTARGIACOMO: Objection.
9      A. I would want to see the scientific evidence.
10     Q. So it might or might not, depending on
11 looking at the --
12     A. Well, there are three -- there's a high
13 hurdle to go over. The three company-sponsored
14 trials were negative, so there's a high hurdle to go
15 over to make sure that subsequent scientific
16 evidence has a deficit to make up.
17         But I think science does perceive by
18 zigs and zags, and it would be important to know
19 that for the same reasons that it was very important
20 for physicians to know that Mathew actually showed
21 that Neurontin is not effective, and that 217 and
22 the earlier study weren't published, and doctors
23 never knew about that.
24     Q. With respect to the 217 study, do you know

18 (Pages 365 to 368)

Page 369

1 why -- have you spoken with any of the investigators
2 to determine why the study was not published?
3     A.  No.
4     Q.  Have you spoken with anybody at Parke-Davis
5 or Pfizer to determine why it was not published?
6     A.  No.
7     *Q.  Do you have any knowledge of whether efforts
8 were made to publish the study?
9     A.  Let me just refresh my memory.
10        (Pause)
11        The question was...?
12    Q.  I don't remember it actually.
13        MR. NOTARGIACOMO:  Now can we read back
14 the question?
15        MR. ROUHANDEH:  Can you read it back?
16 You can read this one back.
17        *(Question read)
18    A.  The knowledge that I have is that the study
19 was completed January 25, '99, and that in my
20 report, as of the 2001 Neurontin Situation Analysis,
21 the results had not been presented at any meetings,
22 and there were no plans for publication.
23    Q.  You also refer to Study 879-200.
24    A.  Yes.

Page 370

1     Q.  And have you spoken with any of the
2 investigators to determine why that study was not
3 published?
4     A.  No.
5     Q.  Have you spoken with anybody at Parke-Davis
6 as to why that study was not published?
7     A.  No.
8     Q.  Do you have any knowledge of whether or not
9 efforts were made to publish the study?
10    A.  No.
11    Q.  This was a Phase II study; is that correct?
12    A.  I would believe that that was true.  It was
13 before the drug was approved.
14    Q.  What is a Phase II study?
15    A.  A Phase II study is after the Phase I.  It
16 looks at how the drug is metabolized, and if there
17 are any gross adverse events.  Phase II studies are
18 generally dosing studies to find the dosage range
19 that then is brought forward in a Phase III.
20    Q.  And have you ever heard that -- or do you
21 know whether it's common to publish Phase II studies
22 on indications for which an NDA is never filed?
23    A.  It might not be common, but when a company
24 is promoting its drug in educational sessions as

Page 371

1 effective, and when one of its clinical trials is
2 being misrepresented as positive, it creates a
3 responsibility to provide clinicians who are
4 receiving this information with the full range of
5 knowledge about the drug that the company and only
6 the company has, and they didn't do that.
7     Q.  I believe your answer said it might not be
8 common, and I'm not -- I'm just asking for
9 clarification on that.  Are you saying, "I agree
10 it's not common but...," and then all the other
11 information you gave, or are you saying something
12 different?  Or are you saying, "I don't know whether
13 it's common or not"?
14    A.  My impression is that Phase II -- the
15 results of Phase II trials are sometimes brought
16 forward into other -- into published literature,
17 whether it's aggregated or disaggregated.
18        One could make the argument that this is
19 a Phase II trial -- it was ten years ago -- and let
20 it lie, except that the company was actively
21 promoting its drug for this off-label indication
22 claiming there was evidence that it was effective
23 when it knew there was evidence that it was not
24 effective.

Page 372

1     Q.  So sometimes Phase II studies are published,
2 and sometimes they're not, right?
3     A.  Let me just --
4     Q.  You think under all the circumstances this
5 one should have been published.  But my question --
6 you've made that clear twice.
7     A.  No, that's incorrect.  That's incorrect.
8     Q.  Okay.
9     A.  I don't think under the circumstances this
10 one should have been published.  I think under these
11 circumstances, when the company is promoting its
12 drug for an off-label use and misrepresenting data
13 from a randomized controlled trial claiming that it
14 shows efficacy when it doesn't, and it's not
15 presenting data from another randomized controlled
16 trial and it has yet more data from a Phase II
17 trial, that it ought to -- if it's claiming efficacy
18 in the CME and its communications, then it ought to
19 be presenting the totality of its evidence.
20    Q.  Okay.  So just going back, are you saying
21 that sometimes Phase II studies are published and
22 sometimes they're not?
23    A.  I am aware, I believe, of Phase II studies
24 having been brought in to groups of studies,

Page 373

1   meta-analyses, and published in that way. I can't
2   tell you that I remember specifically a Phase II
3   study being published independently.
4       Q. Okay. So certainly, at least sometimes
5   they're not published where no indication is ever
6   sought?
7       A. Yes.
8       Q. The Cochrane review which you refer to on
9   Page 76 of your report.
10      A. Yes.
11      Q. Have you ever had any personal involvement
12  in the publication of any Cochrane review?
13      A. No.
14      Q. Have you spoken to anybody involved in the
15  Cochrane reviews to determine how those reviewers
16  gathered information?
17      A. No.
18      Q. You refer, in Paragraph 192 of your report,
19  to the, quote, Pfizer's strategy in responding to
20  Cochrane. Have you reviewed Pfizer's response to
21  Cochrane?
22      A. I've reviewed documents that -- corporate
23  documents that address how the corporation will
24  respond to Cochrane's request.

Page 374

1       Q. But not the actual response?
2       A. Well, I think this provides pretty good
3   evidence that Elizabeth Mutisya wrote on April 5th,
4   2002, the month following the request from Cochrane,
5   "a general letter on migraine prophylaxis and the
6   published literature on Neurontin" -- excuse me.
7   She suggested sending a general letter on migraine
8   prophylaxis in the published literature on Neurontin
9   and added, "We would not be able to provide them
10  with our databases which is ultimately what they're
11  interested in."
12          And then Leslie Tive responded, "I don't
13  understand why Cochrane can't do a search to find
14  the literature they want. If they're looking for
15  unpublished data, I would be reluctant to send it."
16          And then if you look at the Cochrane
17  review that was published, it did not contain the
18  unpublished data from 217 or the earlier study, nor
19  did it contain -- nor did it show any evidence of
20  having received the company's research report on
21  Mathew and having had the opportunity to determine
22  that the results that were presented in the Mathew
23  article were not the way that the protocol called
24  for the results to be presented.

Page 375

1       Q. Okay. Have you reviewed the response from
2   Pfizer to Cochrane?
3       A. Let me just add, in addressing that
4   question, that Marino Garcia said, "We definitely
5   will not supply some internal data, we will agree on
6   that" -- "we all agree on that."
7           So what I reviewed is the discussion --
8   documents that show the internal discussion, and
9   what I've seen is the final in the output review,
10  and there's no evidence from what was published in
11  the Cochrane review that these three commentors that
12  were not going to provide them with any unpublished
13  data or corporate information that they can't get
14  publicly, that anything other than that was done.
15      Q. Okay. So you haven't reviewed the -- any --
16  the response to Cochrane; is that correct?
17      A. I answered the question.
18      Q. Well, can you answer that yes or no?
19      A. I've reviewed --
20      Q. Can you answer it yes and then explain your
21  answer, if you need to? I think you've already
22  explained your answer, but you haven't given the
23  answer yes or no.
24      A. Okay. The question --

Page 376

1       Q. It's a really simple question. Have you
2   seen a response from Pfizer to Cochrane?
3       A. I have not seen a letter. I have not -- I
4   don't believe I've seen that.
5       Q. And do you know what the reason was for Dr.
6   Tive's and Mr. Garcia's statement regarding whether
7   to provide unpublished data to Cochrane? Do you
8   know what they were thinking at the time?
9       A. I don't recall, no.
10      Q. Do you have any basis to believe that the
11  reason for those statements was they were trying to
12  hide something from Cochrane? Is that what you
13  think?
14      A. I think the statements speak for themselves.
15  I can't -- I'm not a mind-reader. They say if --
16  they say very clearly. It says let them do their
17  own search. They can find the literature they want.
18  We're not giving them anything that's unpublished.
19      Q. Right, that doesn't say -- there's nothing
20  in there that would lead you to conclude that there
21  was some improper intent on the part of Dr. Tive or
22  Mr. Garcia; is that correct?
23      A. The conclusion that I would have is that
24  there was intent not to provide Cochrane with

20 (Pages 373 to 376)

1 unpublished data and protocols that Cochrane was
2 interested in.
3     Q.  But you're not leaping to the conclusion
4 that the purpose of that decision was to prevent
5 Cochrane from getting unpublished data because they
6 didn't want Cochrane to see it; is that correct?
7     A.  Well, there was no other way for Cochrane to
8 get unpublished data but from them.
9     Q.  Well, are you saying that that was improper?
10 I mean, are you, in fact, a mind-reader and saying
11 Dr. Tive and Garcia had in their mind something
12 improper in trying -- that they were trying to hide
13 something from Cochrane in not giving unpublished
14 data to Cochrane?
15     A.  What I'm saying is that this is yet another
16 example of the company having scientific data that
17 was of major importance to clinicians who were
18 trying to practice evidence-based medicine that they
19 did not share and they did not take the opportunity
20 to share when asked to.
21     Q.  Do you know whether this company or any
22 other pharmaceutical companies have policies
23 regarding whether unpublished data should be shared
24 outside the company?

1     A.  I don't.  I do know that, for example, in
2 the Backonja/Reckless review article unpublished
3 data was included, and Glanzman was added as an
4 author to justify including that data.
5     Q.  Do you know what the reasons -- do you know
6 any reason why Pfizer or any other pharmaceutical
7 company might have for a policy that -- of not
8 providing unpublished data outside the company?
9     MR. NOTARGIACOMO:  Objection.
10     A.  I've read a response to that issue, which is
11 that the company is reluctant to make the data
12 available for fear that it will be misinterpreted
13 and used in ways that are inappropriate, and I have
14 some sympathy with that.  But when their own
15 research reports show -- we're not talking about
16 getting into raw data that might be misinterpreted.
17 Their own research reports show that Mathew and --
18 220 and 217 didn't show significant effects.  That's
19 what their research reports show in the summary of
20 their research reports.
21     I don't think -- my own opinion is that,
22 A, it wouldn't give away any corporate secrets or
23 control of the data if Pfizer had made that known;
24 and B, that they have an obligation to make that

1 known.
2     Q.  Okay.  But that obligation you think is just
3 a general obligation based on your view of ethics
4 and responsibility; is that correct?
5     A.  Yes, and Dr. Field's view.  I mean, Dr.
6 Field wrote an article in 2003 saying that --
7 stating the same position.
8     Q.  Are you an expert at discerning corporate
9 intent for reviewing company documents?
10     A.  No.
11     Q.  Have you spoken with the editors of Cochrane
12 to determine the totality of the evidence they
13 reviewed in composing their review?
14     A.  No, but the evidence that they reviewed I
15 assume is included in their review.
16     Q.  Have you spoken with the editors of the
17 Cochrane review to determine what their analysis was
18 of the Mathew study?
19     A.  It's stated in the article.
20     Q.  Have you talked to any other -- in
21 connection with preparing your report, did you talk
22 to any other physicians about their views regarding
23 a Cochrane review?
24     A.  No.

1     Q.  With respect to the Cochrane review relating
2 to neuropathic pain, have you spoken to any of the
3 editors of the Cochrane review to determine what
4 they had when they considered -- and what they
5 considered when composing their review?
6     A.  No.
7     Q.  Have you reviewed any responses from Parke-
8 Davis or Pfizer to the Cochrane reviewers regarding
9 the review?
10     A.  I'm sorry, the question?
11     *Q.  Did you review any responses -- strike that.
12 I'll ask it a different way.
13     Did you review any requests from
14 Cochrane to Parke-Davis or Pfizer regarding the
15 review?
16     A.  Let me just refresh my memory.
17     (Pause)
18     The question is...?
19     MR. ROUHANDEH:  You can just read it
20 back.
21     *(Question read)
22     A.  I don't recall.
23     Q.  Did you review any responses from Parke-
24 Davis or Pfizer to the Cochrane reviewers regarding

Page 381

1   the neuropathic pain review?
2       A.  I don't recall having seen any.
3       *Q.  Do you -- are you aware the Cochrane
4   reviewers generally did not seek unpublished data,
5   at least with respect to the neuropathic pain
6   review?
7       A.  One more time.
8       MR. ROUHANDEH:  If you could read that
9   back.
10          *(Question read)
11      A.  I'm not aware of that.
12      Q.  Would that change any of the -- of your
13  opinions or any portion of your report, if you -- if
14  that were the case?
15      A.  No, it wouldn't, because when we consider --
16  the purpose of the Cochrane review is to make
17  available to busy physicians who don't have time to
18  do the research, research the primary articles on
19  their own, to become aware through the work of an
20  unbiased nonprofit organization of the best summary
21  of the scientific evidence available to date.  And
22  given that that's the function of the Cochrane
23  review, it would not change my opinion that whether
24  Pfizer was asked or not, there was nothing about the

Page 382

1   Reckless study or the POPP study that made that
2   evidence less important or less meaningful than the
3   positive studies that they submitted.  And I don't
4   know how Cochrane ever thought that Gorson showed a
5   positive finding, but it did, and I'm not aware of
6   how that happened, but it is of note.
7       So the answer is no, I think that Pfizer
8   had an obligation to the medical community and to
9   the public at large to share scientific evidence
10  that it had, and the Cochrane review is an
11  opportunity to do that.
12      Q.  And it doesn't matter to you that the
13  Cochrane review -- that the -- strike that.
14      It doesn't affect your opinion one way
15  or the other what the reasons were for Cochrane
16  reviewers not seeking published data -- unpublished
17  data; is that correct?
18      A.  It's correct that this issue of published
19  and unpublished data is turned into a game of cat
20  and mouse where maybe it wasn't asked for, maybe it
21  was.
22      But this isn't a came of cat and mouse.
23  This is a matter of providing clinicians and the
24  public with the best scientific evidence, and when

Page 383

1   Pfizer is in control of much of that evidence,
2   especially the negative evidence, it's not a game of
3   strategy.  It's a game of -- it's not a game.  The
4   drug company owns the data, and they've not shared
5   it, and this was an opportunity to make -- to fill
6   in the record of the scientific evidence, and they
7   didn't use that opportunity.
8       Q.  So is it correct that you don't know and you
9   don't care why the Cochrane reviewers did not seek
10  unpublished data relating to neuropathic pain?
11      A.  I would be interested, but that doesn't
12  change -- what I don't care about is that doesn't
13  change the fact that the Cochrane review was an
14  opportunity for Pfizer to share its unpublished and
15  materially very important data, clinical results,
16  with the clinicians and the public.
17      Q.  So even though you don't know what the
18  reason was that the Cochrane reviewers didn't seek
19  unpublished data, you know it wouldn't make a
20  difference in your mind?
21      A.  I didn't say that.  I said I would be
22  interested.
23      Q.  I'm just asking the question.
24      A.  It wouldn't make a difference in my mind

Page 384

1   vis-a-vis Pfizer's responsibility to make what it
2   knew to be the best scientific evidence available,
3   and though it had not made that evidence available
4   in a timely way, this was an opportunity to make it
5   available, and Pfizer did not avail itself of that
6   opportunity.
7       Q.  And, again, this is just your general sense
8   of ethics and responsibility?  You're not looking at
9   some rule or regulation or --
10      A.  Well --
11      Q.  -- something that's written down somewhere?
12      A.  No, it is written down.  Dr. Field or Fields
13  wrote it down as a good -- was a co-author on a
14  paper on good publication practice.
15      And let's be clear, the Reckless study
16  had three times more patients on Neurontin than did
17  the Backonja study, and there is just no
18  justification for withholding that data.
19      Q.  So you're relying on Dr. Field for -- as the
20  source for what you think a responsible
21  pharmaceutical company should do; is that correct?
22      A.  No.  What I'm saying is even Pfizer's expert
23  says that's what a responsible drug company should
24  do.

22 (Pages 381 to 384)

Page 385

1    Q.  I'm just asking you what your basis is.  You
2  say even Pfizer's expert.  Are you saying, "That's
3  what I think, and even Pfizer's expert thinks"; or
4  are you saying, "There's a rule, there's a
5  regulation, there's a requirement"?
6    A.  There's not a regulation, which is the
7  problem, but there is an assumption that there's a
8  standard of care in the physician community that
9  drug companies will not systematically withhold
10  negative information, and Pfizer did not meet that
11  standard.
12    Q.  Do you know if the Cochrane reviewers are
13  well-qualified to make decisions about what should
14  and should not be included in the Cochrane reviews
15  that they publish?
16    A.  I think they are well-qualified, and one
17  caveat would be that there are sometimes conflicts
18  of interest that are not declared.
19    Q.  You refer to the Collins review in Paragraph
20  195 of your report.
21    A.  Yes.
22    Q.  Were you personally involved in the
23  composition of this review?
24    A.  The Collins review?

Page 386

1    Q.  Yes.
2    A.  No.
3    Q.  Have you spoken with any of the authors of
4  the Collins review?
5    A.  No.
6    Q.  Were you aware of what evidence -- are you
7  aware of what request the Collins authors made, if
8  any, to Parke-Davis?
9    A.  No, not that I recall.
10   *Q.  You state -- you state in the -- with
11  respect to the Cochrane review relating to bipolar
12  disorder that it was not completed due to the
13  company's failure to cooperate; is that correct?  If
14  you want to look at the last sentence of Paragraph
15  208.
16    A.  Yes, let me just read through it so I get
17  the context.
18      Question?
19      MR. ROUHANDEH:  Can you read it back?
20      *(Question read)
21    A.  I think I would modify that a little bit.  I
22  think I would say -- change that last sentence to
23  "Pfizer did not cooperate with Cochrane's request,
24  and the Cochrane reviewers weren't able to complete

Page 387

1  the review of the efficacy."
2    Q.  So you're not saying there was a cause-and-
3  effect there?
4    A.  I don't know that -- I don't have direct
5  evidence of a cause-and-effect, so I think it would
6  be more accurate to alter that last sentence just
7  slightly.
8    Q.  Alter it in your report?
9    A.  Yes.
10    Q.  The way that you just said?
11    A.  Yes.
12    Q.  Okay.
13    A.  If -- let me just say, if I were going to
14  alter that, I would go back and look at the relevant
15  documents and make sure that there's no evidence
16  that I missed.
17      But based on what's contained in this
18  section of the report, I think it's not fair to
19  attribute a causal relationship between Pfizer's
20  failure to cooperate and Cochrane canceling the
21  review.
22    Q.  Okay.  If you could look down the same Page
23  84, Mack, Journal of Managed Care Pharmacy.
24    A.  Yes.

Page 388

1    Q.  Were you personally involved in the writing
2  of this review?
3    A.  I was not.
4    Q.  Did you ever speak with Mack regarding the
5  decisions made in the writing of the review?
6    A.  No.
7   *Q.  Mack includes that Neurontin is effective
8  for migraine prophylaxis, and I take it you disagree
9  with that conclusion?
10    A.  I disagree with -- I'm not sure I understand
11  your question.  Do you mean I disagree with the
12  conclusion that Mack drew based on the evidence that
13  was available to -- I think it's a her, or do I
14  disagree with the statement based on the evidence
15  that was available at the time?
16      MR. ROUHANDEH:  Let me just go back and
17  read the question again, and maybe I'll rephrase it.
18      *(Question read)
19    Q.  Okay.  Well, I think that's pretty clear.
20  Can you answer that question?
21    A.  If you're asking me -- I'm not sure what
22  you're asking me.
23    Q.  Okay.  I'm asking you, do you disagree with
24  the conclusion in the article, the Mack article,

Page 389

1  which is that there is -- that Neurontin is
2  effective for migraine prophylaxis?
3       A. Yes, I disagree with that statement. I
4  disagree with it because the Mathew study was not
5  positive. The Mathew study -- the population that
6  was evaluated in the Mathew study was twice changed
7  from the population that had been identified in the
8  research protocol as the population that would be --
9  from which the data would be taken, and the negative
10  study 217 was not included in that, in the earlier
11  study in the late '80s, was not included in that.
12       So the preponderance of scientific
13  evidence showed exactly the opposite, that migraine
14  -- that Neurontin is not effective for migraine
15  prophylaxis, and it shows the importance, A, of the
16  misrepresentation of the results of 220, and B, the
17  consequences of withholding negative data.
18       Q. Have you spoken with Mack about what
19  documents were reviewed in composing the review?
20       A. No, I haven't.
21       Q. Do you have any documentation of whether
22  Mack requested any information from the company?
23       A. No, I don't.
24       Q. Do you have any document or reviewed any

Page 390

1  documentation in which the company provided or
2  failed to provide information to Mack?
3       A. Well, I do in the sense that I have good
4  documentation that the Matthew article that is
5  reviewed and cited in the Mack review article
6  provides -- presents false results, and that 217 and
7  the earlier Phase II study aren't cited, so I think
8  the evidence is that they weren't provided by Pfizer
9  to Mack.
10       Q. None of that's based on any conversations
11  with Mack, I take it.
12       A. That's correct. I am -- it's based on the
13  assumption that Mack would have presented in the
14  review article the information that was available.
15       Q. Have you conducted any studies to determine
16  whether physicians consider CME an important source
17  of information about new therapies?
18       A. No.
19       Q. Are you aware of any studies which determine
20  the amount of weight that physicians put on
21  information learned during CMEs?
22       A. Yes.
23       Q. What studies are those?
24       A. The Wazna study addresses that. Let's see

Page 391

1  if it's in this. W-a-z-n-a.
2       (Pause)
3       It's Footnote 69.
4       Q. Okay. Anything other than that?
5       A. That is the primary article. That's a
6  review article of all the studies that had been done
7  to that point that included the effective
8  relationships between pharmaceutical companies and
9  physicians, and that includes a section on CME.
10       There is another study that's a smaller
11  study that shows the effect of CME on physicians,
12  and what it did was took 20 physicians who went to a
13  CME course and created a matched pair of 20
14  physicians who didn't go to that CME course that was
15  sponsored by a drug manufacturer, and then looked at
16  the subjective impressions of what the physicians
17  who went to the CME course were and whether or not
18  their prescribing habits changed.
19       And what the article -- what the study
20  showed is that the physicians who -- and the matched
21  group went forward through the same time pre and
22  post test, so there wasn't a change -- a change in
23  the attitudes about the drug didn't play a role.
24       And what that study showed is that the

Page 392

1  physicians who attended the CME course felt that
2  they were not affected by the information about the
3  drug, but, in fact, their prescribing habits showed
4  that they prescribed significantly more of the drug
5  after the course than did the physicians who didn't
6  go to the course.
7       Q. What were that -- what was that study?
8       A. It's -- I don't know that I cite it here. I
9  need to get that cite for you.
10       Q. Do you know who the lead author is?
11       A. I forget.
12       Q. Do you know where it was published?
13       A. It was published in a peer-reviewed journal.
14       Q. Do you know when?
15       A. My sense is around 2000, but I can get that
16  to you.
17       Q. And your recollection is it related to
18  attendance at CME; is that correct?
19       A. Correct.
20       Q. You state in Paragraph 238 of your report
21  that "When physicians attend CME activities, they
22  are in a receptive mode, poised to learn."
23       How do you know what sort of mode
24  physicians are in when they attend CME?

Page 393

A. Because that's what the industry says its purpose in presenting the CME is, because that's my experience as a physician, and that's my experience with my colleagues as a physician. And that is Pfizer's position in its 2001 Situation Analysis when it says that the increase in prescribing of Neurontin by 50 percent amongst -- or the number of primary care physicians who prescribed Neurontin increased by 50 percent in the year ending April 2000 was due to publications and CME.

So I think the evidence is pretty clear that CME is an effective way to communicate information about drugs to physicians.

Q. So you're -- if I understand your testimony, you gleaned that conclusion from documents you looked at and from your own experience and the experience of doctors in your -- that you've talked to?

A. And Pfizer's conclusions about the effect of its own programs.

Q. Okay. Did you go out and do a survey of doctors to see that they were -- if they felt they were in a receptive mode, poised to learn at CME meetings?

Page 394

A. Well, I just cited a study that showed physicians might have denied that, but that the drug -- that the so-called education did, in fact, significantly change their prescribing behaviors.

Q. Okay. But you didn't go out and do any sort of study in that area? You did no study -- in preparing your report and making that statement, you didn't conduct any original research to determine whether or not physicians are in a receptive mode, poised to learn at CME meetings?

A. I did no study, but I do accept Pfizer's conclusion that their CME effectively taught physicians to use -- primary care physicians to use Neurontin for neuropathic pain.

Q. And you're saying that you gleaned that from a document you read --

A. Yes.

Q. -- from Pfizer?

A. A Pfizer document.

*Q. Okay. And what document is that?

A. The 2001 Situation Analysis.

*Q. Okay. Is there anything else?

*A. I don't recall anything else.

Q. You state that the content --

Page 395

A. Wait, I'm sorry. I answered that question too quickly. Let me just...

THE WITNESS: What was that question?

*(Question read)

Q. Yes, what document -- I asked you what document went into the Situation Analysis.

*(Record read)

A. Is there anything else? What did the "anything else" refer to?

Q. Any other document --

A. That...?

Q. -- other than the situation analysis --

A. That...?

Q. -- that you used to support your conclusion that doctors are in a receptive mode poised to learn at CME?

A. Okay.

(Pause)

Q. You know, I can't help but notice you're thumbing through the report. Is there something you recall specifically?

A. Yes, I'm getting to it. I'm not thumbing through the report. I'm looking at my section on continuing medical education.

Page 396

This would be the largest medical education service supplier -- let me just set this straight.

The largest medical education service supplier, which is -- plays a large role in presenting commercially sponsored CME, is Phase V, and Phase V states that its philosophy is "Through thought-leaders, clinical and patient advocates, trial recruitment publicity, publication strategies, and other highly credible peer-to-peer channels, we disseminate your" -- "we disseminate evidence to [predisposed] target audiences toward a favorable view of your product...Collegial pressure is also a powerful influence: By understanding the often uncharted but very real professional networks that exist in every area of medicine, Phase V converts support in one quarter to influence in another." And they talk about the -- it goes on. I'll just quote it. "Phase V never loses sight of the strategic value of Speakers Bureau programs to enhance its client's corporate image and to strengthen brands."

Speakers Bureaus provide the speakers for CME activity, so I think that shows pretty

Page 397

1   clearly that the leading provider of CME is saying
2   that doctors are influenced by its activities.
3       Q.  Okay.  So that's something you're gleaning
4   from a review of a document written by Phase V, I
5   guess?
6       A.  Yes, exactly.
7           Let me just continue here for a sec.
8           And the article that I cited before
9   shows that doctors who attend drug-company sponsored
10  lectures, which are CME activities typically, are
11  far more likely predisposed to see the sponsor's
12  drug in a positive light and the competitor's drug
13  in a negative or neutral light than are doctors who
14  go to noncommercially sponsored lectures.
15          Excuse me.  I misstated that, that
16  commercially sponsored lectures are two and a half
17  to three times likely to mention the sponsor's drug
18  in a positive light than noncommercially sponsored
19  lectures, but that's not quite responsive to your
20  question.
21          And then finally -- I think this is the
22  article that I was referring to before -- Paragraph
23  59, "Evidence shows that doctors are not aware of
24  and deny that their prescribing habits are

Page 398

1   influenced by attendance at commercially sponsored
2   CME" --
3           THE COURT REPORTER:  I'm sorry, sir.
4           THE WITNESS:  Yes?
5           THE COURT REPORTER:  I do need to
6   understand what you're saying.
7           THE WITNESS:  I'm sorry.
8           THE COURT REPORTER:  "...prescribing
9   habits are..."
10      A.  -- "influenced by attendance at commercially
11  sponsored CME, but in fact such attendance does
12  increase their prescribing of sponsors' drugs in
13  comparison to other doctors working at the same
14  institutions who did not attend."  That is the
15  article I was citing before.
16          So the evidence is pretty clear that CME
17  is -- commercially sponsored CME is effective at
18  presenting drugs in a positive light.
19      Q.  So if I've got this correct, your conclusion
20  about what physicians think when they attend CME is
21  a conclusion you drew from looking at company
22  documents, a company document, the 2001 Situation
23  Analysis, this Phase V document, and also from the
24  studies that you mentioned and your own personal

Page 399

1   experience?
2       A.  Yes, my personal experience and my
3   experience with my colleagues at CME.
4       Q.  Right.  You didn't conduct any original
5   research in the area?
6       A.  No.
7       Q.  And you've never conducted any original
8   research in this area?
9       A.  No.
10      Q.  You refer to a CME grant provided to the
11  Dannemiller Memorial Foundation by Parke-Davis in
12  1998.  Do you have any documentation that Parke-
13  Davis controlled the content of that CME?
14      A.  Can you tell me what paragraph you're
15  looking at?
16      Q.  248.
17      A.  Can we take a break after this?
18      Q.  Sure.
19      A.  No, I don't.
20          Let me just say that I don't have any
21  evidence that it was directly under the control of
22  the manufacturer, but the information that was
23  presented about the treatment of neuropathic pain in
24  1998 would be affected by the information that was

Page 400

1   available that was -- that had been published or
2   made available to the CME presenters, and Gorson,
3   although finished in '97, wasn't presented and,
4   although completed before Backonja, the results
5   weren't available at that time.
6           MR. ROUHANDEH:  Okay.  So should we take
7   that break?
8           THE WITNESS:  Yes.
9           THE VIDEOGRAPHER:  The time is 11:56.
10  We're off the record.
11          (Lunch recess taken)
12
13
14
15
16
17
18
19
20
21
22
23
24

26 (Pages 397 to 400)

Page 401

1        A F T E R N O O N   S E S S I O N
2            THE VIDEOGRAPHER:  Okay.  We are back on
3    the record.  This is Tape No. 3.  The time is one
4    minute after 1:00.
5            BY MR. ROUHANDEH:
6        Q.  Dr. Abramson, in Paragraph 252 of your
7    report you describe a CME event in Coral Gables,
8    Florida which included an article written by Ahmad
9    Beydoun.  Do you see that?
10       A.  I do.
11       Q.  Do you have any documentation or other
12   information that Pfizer controlled the content of
13   this CME event?
14       A.  (Witness reviews document) There's indirect
15   evidence in that Pfizer's 2000 and 2001 Neurontin
16   Situation Analysis states that sponsorship of
17   medical education initiatives in neuropathic pain
18   for PCPs will continue to grow Neurontin's use in
19   this area, and if the facts were known -- if the
20   scientific evidence was known about the efficacy or
21   lack of efficacy of Neurontin for the treatment of
22   neuropathic pain, one would assume that the
23   conclusion that the FDA drew three weeks prior to
24   this CME event would be the same conclusion that was

Page 402

1    presented.
2            So the defendants are using medical
3    education in order to increase Neurontin
4    prescribing, and this is a defendant-sponsored
5    medical education program.
6        Q.  So the question is, do you see any direct
7    evidence that Pfizer controlled the content of this
8    CME event?
9        A.  No, I see indirect evidence.
10       Q.  And that indirect evidence is what you
11   referred to?
12       A.  Yes.
13       Q.  You haven't seen any documents in which
14   Pfizer said here's what should or shouldn't be said
15   at that CME event?
16       A.  I don't recall seeing such documents.
17       Q.  And you haven't seen any documents in which
18   Pfizer dictated or controlled what should be said at
19   the CME event; is that correct?
20       A.  I don't recall seeing such a document, but
21   it would be shocking to me that Pfizer wasn't aware
22   of what was said and didn't know of the deficiencies
23   in what was being presented.
24       Q.  You can return to -- and that's based on...?

Page 403

1    Are you just speculating, or is it based on some
2    document --
3        A.  It's based --
4        Q.  -- that you formed that conclusion?
5        A.  It's based on the financial relationship
6    between Pfizer and the companies that -- it's based
7    on Pfizer's financial support of these CME events,
8    the purpose of which is as stated, to increase PCP
9    prescribing of neuropathic pain.
10       Q.  Paragraph 255 you refer to a seminar
11   entitled "New Frontiers in Social Phobia and Bipolar
12   Disorders," which was supported by an unrestricted
13   grant from Parke-Davis.  Do you see that?
14       A.  I do.
15       Q.  Do you have any documentation showing that
16   Parke-Davis controlled the content of that seminar?
17       A.  I don't have direct evidence, but two
18   comments.  One is that the title of this CME seminar
19   is very similar to the title of many other CME
20   seminars, new frontiers, new approaches, new
21   treatments, and, again, it seems to me very highly
22   unlikely that Pfizer was not aware of the content
23   and aware that the results of the Pande study were
24   not being included.

Page 404

1        Q.  You discuss in that paragraph a lecture
2    given by Dr. John Zajecka, a physician, which -- in
3    which he discusses bipolar disorder.  Do you have
4    any documentation showing that Parke-Davis
5    controlled the content of that lecture?
6        A.  I don't, but it's consistent with other
7    lectures.  And, again, I would be very surprised if
8    Parke-Davis wasn't aware of the content of that
9    lecture and aware that it wasn't a full presentation
10   of the scientific evidence.
11       Q.  Have you spoken with Dr. -- well, that
12   opinion is based on your review of -- a conclusion
13   you formed from reviewing documents; is that
14   correct?
15       A.  Yes.
16       Q.  Okay.  Have you spoken with Dr. Zajecka
17   regarding the development of that lecture?
18       A.  No, I haven't.
19       Q.  In Paragraph 265 you refer to a slide
20   presented by -- well, actually in Paragraph 264 you
21   refer to a CME lecture provided by -- a lecture
22   given by doctor -- let me start over.
23           In Paragraph 264 you refer to a CME
24   lecture given by Dr. James Jefferson.  Do you see

27 (Pages 401 to 404)

Page 405

1 that?
2     A. I do.
3     Q. And do you have any evidence that or have
4 you seen any documentation that -- indicating that
5 Parke-Davis controlled the content of that
6 presentation, that lecture?
7     A. I don't, but indirect evidence would suggest
8 so. The title of the lecture is "New Options in
9 Bipolar Disorders," and the title of the lecture in
10 Orlando, Florida, November 15, 1997 was exactly the
11 same, "New Options for Bipolar Disorders" with a
12 different lecturer.
13     Q. Do you know whether -- do you know who
14 prepared the slide that you refer to in Paragraph
15 265?
16     A. No.
17     Q. Do you know whether the attendees at that
18 lecture knew of Neurontin's approved indications?
19     A. No. This slide doesn't talk about
20 Neurontin's approved indications; and reports of
21 benefit, I guess you could say that was true. But
22 that's a selective presentation of the scientific
23 evidence that's available, and it is highly unlikely
24 that the -- Parke-Davis wasn't aware that this was

Page 406

1 being presented.
2     Q. Do you have any basis to know whether or not
3 those who attended the seminar knew that Neurontin
4 was not approved for bipolar?
5     A. I don't.
6     Q. You refer in Paragraph 286 to several
7 advisory boards. Do you see that?
8     A. I do.
9     Q. Did you talk to anyone who was involved in
10 those advisory boards?
11     A. No.
12     Q. Do you know what was said during the course
13 of those advisory boards?
14     A. I don't know what was said, but I believe
15 that I -- that Footnote 410 refers to a slide set
16 that was presented.
17     Q. Okay. Do you -- you don't have knowledge of
18 every statement that was made at the advisory board,
19 do you?
20     A. I don't, but I do have knowledge that the
21 advisory board was presented with information about
22 neuropathic pain in the slides and was not presented
23 with the results of 945-224, 945-271, the two
24 studies there, so that negative studies were

Page 407

1 selectively withheld.
2         And furthermore, the title "Neuropathic
3 Pain Management Issues in Primary Care and Neurology
4 Advisory Board" shows that the purpose of this
5 advisory board was to discuss the use of
6 neuropathic -- discuss the use of Neurontin for the
7 treatment of neuropathic pain for primary care
8 physicians and neurologists, and this advisory board
9 meeting was held two months after the manufacturer's
10 own experts said that the evidence was insufficient
11 to support a claim of efficacy for neuropathic pain
12 in the broad sense, and one of the consultants said,
13 when he heard the data, "You're done," meaning your
14 application to the FDA will be denied for
15 neuropathic pain management.
16     Q. Do you -- you don't have knowledge of --
17 well, let me strike that.
18         Isn't it possible, and indeed likely,
19 that statements were made at the advisory board
20 which do not appear on the slide decks?
21     A. It's very --
22         MR. NOTARGIACOMO: Objection.
23     A. It's very likely that statements were made,
24 but when key studies are not presented at slides,

Page 408

1 even if the results were mentioned, the importance
2 of those studies would be diminished, and
3 diminished -- the impact of those negative trials
4 will be diminished on the participants.
5     Q. Do you have any knowledge of the
6 conversations between doctors and sales
7 representatives regarding Neurontin during
8 detailing?
9     A. I'm going to have to review.
10         (Pause)
11         In Paragraph 292 of my report, I show
12 that detailing to psychiatrists went from close to
13 zero in September of '97 to 7,300 calls to
14 psychiatrists by February of '99. Now, I don't have
15 information about what was said in those details,
16 but there was no on-label use for psychiatrists at
17 that time, unless they were providing adjunctive
18 seizure therapy, which is unlikely; not impossible,
19 but unlikely.
20         And Neurontin's use for bipolar disorder
21 increased about 17-fold during that period or
22 approximately during that period, 23-fold during
23 that period, and though I don't know what the drug
24 rep said to the psychiatrists that coincided with

28 (Pages 405 to 408)

Page 409

1  the 23-fold increase in prescribing, whatever they
2  said, short of recommending Neurontin for adjunctive
3  therapy for seizure disorder, would have been
4  off-label and scientifically unjustified.
5      Q.  Have you reviewed or have any knowledge of
6  any questions asked by doctors of sales
7  representatives regarding Neurontin?
8      A.  No, I haven't.
9      Q.  So you're guessing when you say it would
10  have been -- the discussion would have been off-
11  label; is that correct?
12      A.  Well, there was no on-label reason for the
13  doctors -- for the drug reps to be there.
14      Q.  You would agree --
15      A.  So I'm not guessing.
16      Q.  Well --
17      A.  If they said anything about Neurontin to
18  psychiatrists, they did see the psychiatrists, and
19  the use did go up 23-fold during that period, and
20  there was no on-label use for psychiatrists.
21      Q.  Are you aware of any co-morbidities between
22  epilepsy and psychiatric illnesses?
23      A.  There can be.
24      Q.  Did you -- you talk about this increase in

Page 410

1  off-label prescribing of Neurontin for bipolar.
2  Have you spoken to any of the psychiatrists about
3  why they prescribe Neurontin for bipolar during the
4  period of time that you reference?
5      A.  No, I haven't, but I know what the
6  information available to psychiatrists was.
7      Q.  Do you know what psychiatrists -- what
8  literature psychiatrists read?
9      A.  I know what literature was available to
10  psychiatrists.
11      Q.  My question is, do you know what -- whether
12  they ever read literature, and if so, what
13  literature they read?
14      A.  I know the universe of literature that was
15  available.
16      Q.  Okay.  So you don't know what literature
17  they read; is that correct?
18      A.  I don't, but I do -- well, in part I do.  I
19  know that they did not read about the results of the
20  Pande study because they weren't published until
21  2000, even though the study was completed in July of
22  '97.
23          And I know that they --
24      Q.  So you don't --

Page 411

1      A.  I know that they were -- in the literature,
2  there were cases, case reports, of success, either
3  individual case reports or open-label trials, that
4  they were reading about.
5      Q.  And I'll ask you again.  Have you spoken to
6  any psychiatrist about what literature they read or
7  what literature they relied on, if any, during that
8  relevant time period in prescribing Neurontin for
9  bipolar?
10      A.  My answer is, I haven't spoken to any
11  psychiatrists, but they had to -- to the extent that
12  they read anything, they had to have read what was
13  available in the literature, and that did not
14  include the single randomized controlled trial that
15  showed that bipolar patients treated with Neurontin
16  did significantly worse than those treated with a
17  placebo.  They didn't read that, and there was
18  available, it they read anything, the case studies
19  and open-label studies.
20      Q.  Have you at any time discussed with any
21  psychiatrist why they prescribed Neurontin for
22  bipolar?
23      A.  No.
24      Q.  Have you discussed with any psychiatrist why

Page 412

1  they prescribed Neurontin for bipolar after the
2  Pande study was published?
3      A.  I haven't, but I want to reiterate something
4  I said this morning, that medical knowledge is
5  sticky, or beliefs, medical beliefs, are sticky, and
6  we saw that the defendants understood that very well
7  because they were -- their intention was to delay
8  the publication of Reckless at least until Rice and
9  Serpell were -- 25 and 26 were published, and that
10  was a very rational strategy on their part because
11  they wanted to create the belief that Neurontin was
12  useful for neuropathic pain conditions before they
13  allowed evidence to be introduced that it was not.
14          So the defendants understood that
15  medical knowledge is sticky, and that is, I believe,
16  why prescribing continued after the Pande study
17  results became available.
18      Q.  It's not very sticky with you, is it?
19      A.  It was as a clinician.
20      Q.  I thought you testified if you saw a study
21  or failed to see a study of a randomized placebo
22  controlled study that showed efficacy, you wouldn't
23  prescribe a drug.  Now you're saying if you saw a
24  study that, in your view, demonstrated that the drug

29 (Pages 409 to 412)

Page 413

1  is not effective, you'd continue to prescribe the
2  drug.  Is that correct?  Is that what you're saying?
3      A.  I think the two things you just said is a
4  non sequitur.  The second is a non sequitur from the
5  first.
6      Q.  Well, can you answer the question?
7      A.  What's the question?
8      Q.  Is it true that if you saw a study that in
9  your mind demonstrated a lack of efficacy, would you
10  continue to prescribe a drug for that condition?
11      MR. NOTARGIACOMO:  Objection.
12      A.  Is it true now?  Is it true -- was it true
13  when I was a clinician?  Would it be true now?
14      Q.  All of the above.
15      A.  I've learned a lot since I was a clinician
16  about how the evidence that is available to doctors
17  is manipulated -- is controlled, parcelled out and,
18  unfortunately, at times manipulated.  As a
19  practicing physician, I know that information was
20  sticky.
21      When there was a commonly held belief
22  about diabetes drugs and it was found that they
23  weren't beneficial, it was hard to accept that.  It
24  gradually sunk in, but it didn't turn around.  The

Page 414

1  studies show very clearly that physicians' behavior
2  is little affected by the -- by adding a black box
3  warning on an FDA-approved label.
4      So the evidence is very clear that
5  knowledge is sticky and even clear-cut knowledge of
6  harm that's identified in a black box warning takes
7  -- in the case of Propulsid, I think it -- I forget
8  whether it was Propulsid or Rezulin, but it took
9  five Dear Doctor letters before a change was seen.
10  So there's very solid evidence that knowledge is
11  sticky, and the way it's layered in has to do with
12  the way beliefs persist.
13      Q.  Doctor, respectfully, you're not answering
14  my question.  I know that you want to talk about
15  other doctors.
16      I'm asking about you, and the question
17  is, did you continue to prescribe drugs off-label
18  even when there were studies that failed to show
19  efficacy?
20      A.  I don't recall such an example.
21      Q.  Okay.  So, in other words, that medical
22  knowledge wasn't sticky with you.  You stopped
23  prescribing medication when you saw a study; is that
24  correct?

Page 415

1      A.  I'm saying I don't recall an example where I
2  saw -- where I saw a study and continued to
3  prescribe the medicine, but I am answering a
4  question that when I saw studies for drugs that were
5  on-label that suggested they weren't as effective as
6  they were, it took me a while to be able to accept
7  that.
8      Q.  And you said that your knowledge has changed
9  since the time you were a clinician, so your view
10  that information is sticky is something that's been
11  formed through your work as an expert; is that
12  correct?
13      A.  No, as a researcher and writer when I was
14  writing the book, and then confirmed in my work as
15  an expert.
16      Q.  Okay.  So during the course of your book,
17  that's when you learned -- writing your book, that's
18  when you learned or formed this view, not when you
19  were a clinician; is that correct?
20      A.  And then reflected back on my work as a
21  clinician and realized that there was an inertia to
22  my changing in response to new information.
23      Q.  Okay.  There was inertia, but you can't
24  think of a single example where you saw a study that

Page 416

1  was negative and yet continued to prescribe the
2  medication?
3      A.  I've answered this question three times now,
4  and I'm telling you that there was a study that came
5  out about the efficacy of certain diabetes
6  medicines, and it was a bitter pill to swallow, and
7  it sank in slowly into my clinical practice.
8      Q.  So you did continue -- in that case you
9  continued to prescribe the medication even after
10  there was a study that failed to show efficacy?
11      A.  And the prescriptions waned, but they didn't
12  stop immediately.
13      Q.  And what was the basis for continuing to
14  write those prescriptions in that case?
15      A.  The belief -- the inertia of the belief that
16  the -- that what I had learned about the efficacy of
17  those medicines had been superseded by new
18  information.
19      Q.  And did you take into account your personal
20  or your clinical experience in using the product?
21      A.  Therein lies the problem, because this was a
22  diabetes drug, and the diabetes drug lowered blood
23  sugar.  The question was, were we benefiting by
24  lowering the blood sugar?

30 (Pages 413 to 416)

Page 417

1    So my experience was that it lowered
2  blood sugar, yes, but the real question that needed
3  to be considered in deciding whether to prescribe or
4  not was whether I was actually benefiting the
5  patient.
6    Q. So the studies that came out didn't show
7  that the drug failed to lower blood sugar; is that
8  correct?
9    A. That's correct.
10    Q. Okay. And that's the only example you can
11  think of?
12    A. Once again, the question...?
13    Q. Is that the only example of a time where you
14  can think that you continued to prescribe a drug
15  after you saw a study that, in your view, related to
16  the lack of efficacy?
17    A. I don't think my prescribing habits turned
18  on a dime when information started to come out that
19  certain antiarrhythmic drugs did not provide an
20  overall clinical benefit. It took a little bit of
21  time for me to turn around.
22    Q. And so in those cases, you did continue to
23  prescribe a drug after a study that failed to show
24  efficacy; is that what you're saying?

Page 418

1    A. What I'm saying is there was a process in
2  the decline of my prescribing. And I can't tell you
3  how many months it took, but it's hard to give up
4  beliefs, and it's just -- I think, speaking just for
5  myself, as a part of human nature, when you believe
6  what you've been doing to help somebody because the
7  scientific evidence led you to believe that, the
8  scientific evidence that was available to you, it's
9  hard to give that up and understand that either you
10  were wrong or that you had been manipulated, as in
11  the case with Pande, where this study comes out in
12  2000 and they knew the results in '97.
13    Q. Well, you weren't manipulated by -- relating
14  to Pande, were you? You weren't prescribing
15  medication --
16    A. No. Pande wasn't on my radar screen at the
17  time.
18    Q. No, but you were -- I thought you said you
19  weren't prescribing Neurontin?
20    A. That's what I'm saying. I'm agreeing with
21  you.
22    Q. In other words, you were not manipulated in
23  any way with respect to anything that occurred or
24  failed to occur with the Pande study?

Page 419

1    A. No, but you can see that the use of
2  Neurontin for bipolar disease goes up 23-fold
3  between -- in the 21 months starting in May of '97
4  it goes up 23-fold, and you don't have scientific
5  evidence that supports that. In fact, you have --
6  the only scientific -- the only Level 1 scientific
7  evidence you have says Neurontin is significantly
8  worse, so -- and you've got details going on to
9  psychiatrists where there's virtually no on-label
10  use.
11    You know, perhaps there are epilepsy
12  patients that might have mood disorders, and there
13  might be a belief that that off-label use was
14  efficacious, but in essence, you've got the
15  overwhelming majority of these 27 -- 275,000 uses of
16  Neurontin by psychiatrists with the only Level 1
17  evidence showing that it's significantly harmful, so
18  I think the only conclusion -- and the company knew
19  that, so I think the only conclusion that you can
20  draw from that set of facts is that the physicians
21  were manipulated.
22    Q. And that's how you formed the conclusion, is
23  by looking at those various documents; is that
24  correct?

Page 420

1    A. Yes, that series of events and the science
2  and the detailing documents and putting those things
3  together.
4    *Q. Do you know -- do you have a view on whether
5  Neurontin's effective for anxiety?
6    A. Do I have a view? Let me just -- I want to
7  backtrack. I didn't finish my last answer.
8    Neurontin -- the company's own report on
9  Neurontin acknowledges that over half of the
10  psychiatric uses of Neurontin were for bipolar
11  disorder, so the company itself knows that over half
12  of the drug being used by psychiatrists is being
13  used on patients for whom the only controlled
14  evidence shows -- the two pieces of controlled
15  evidence show that it either doesn't work or it's
16  actively harmful.
17    So the company knew that. So when you
18  say what evidence do I have, I say it's clear the
19  company knew that sequence of -- that -- knew those
20  facts.
21    Q. You've arrived at that conclusion by reading
22  the company's documents; is that correct?
23    A. That's correct.
24    Q. So just back to my question.

31 (Pages 417 to 420)

Page 421

MR. ROUHANDEH: Could you read my last question.
*(Question read)
A. I can't recall seeing any randomized controlled trials that addressed that issue.
Q. And you haven't done any research in that area --
A. Correct.
Q. -- to form a conclusion?
So you have not formed a conclusion?
A. Correct.
Q. You refer to a formulary dossier in Section 7 of your report.
A. What paragraph would that be?
Q. Paragraph 305?
A. Yes.
Q. Do you know whether the formulary dossier that you refer to was a Pfizer document?
A. I know that the dossier was attached to a Pfizer e-mail.
Q. Okay. Do you know whether the formulary dossier was prepared by Pfizer?
A. I don't know whether it was prepared by Pfizer. I know that Pfizer was aware of it because

Page 422

it was attached to a Pfizer e-mail.
Q. Do you know whether Pfizer distributed the dossier outside of the company?
A. I would have to review Footnote 431 to make a comment on that.
Q. Okay. So sitting here today you don't know, or you don't recall?
A. I'd have to see what footnote -- what the e-mail to which the document was attached said.
Q. To know whether or not it was distributed outside the company?
A. No, to see if there's evidence in that document that it was distributed outside of the company.
Q. Okay. So apart from looking at that document, you'd have no way of knowing whether it was disseminated outside the company or not?
A. Correct.
Q. Okay. Are you aware of the decision-making process that psychiatrists went through in determining whether to prescribe Neurontin for bipolar?
A. Well, I'm aware of the education -- some of the continuing medical education that they were

Page 423

presented with that contributed to that decision-making process.
Q. Well, do you know what relative weight doctors give to different sources of information?
A. Doctors give relative -- different doctors give relative weight to different sources of information. The question is, is there a single source from all -- from which all those sources that are differently weighted emerge, and from the documents that I've reviewed and the scientific evidence that was available, the information that -- the positive information that would contribute to a physician's prescribing of Neurontin originated with the manufacturer.
Q. Are you aware that the Lahey Clinic currently has a document on its website that refers to neuropathic pain being treated by a number of medications -- strike that.
Are you aware that the Lahey Clinic has a document on its website that says, "In treating neuropathic pain a variety of medicines can be used, and include among those medicines a number of anticonvulsants"?
A. Is that the end?

Page 424

Q. Yes.
A. I was not aware of that.
Q. At any time that you were affiliated with the Lahey Clinic, do you know whether that same statement was on its website?
A. I don't know. I never saw that, and I think that such a statement, on the Lahey Clinic website or on any other website, is indicative of the biased information that's available to people, experts, who are trying to make rational decisions. So the negative Reckless study, the conclusions of Pfizer's own consultants that you can't claim it's effective, Pfizer's own consultants got to look at this and say that it's not effective.
So to the extent that Lahey Clinic or any other institution believes that it is effective is demonstrative of their not having access to the information that the experts had, that Pfizer gave to its own experts in order to get the opinion they needed about whether there was enough evidence that it was effective to make that claim to the FDA.
*Q. Do you -- so, in your view, not having talked to anybody and not even knowing whether the Lahey Clinic even had this, that the Lahey Clinic

Page 425

1  put this on -- this statement on their website not
2  knowing about the Reckless study, is that what
3  you're saying?
4      A. Can you repeat the question.
5          MR. ROUHANDEH: You can read it back.
6          *(Question read)
7          MR. NOTARGIACOMO: Objection.
8          MR. ROUHANDEH: I'll restate it.
9      Q. So prior to my asking you the questions, you
10  had no idea whether the Lahey Clinic said anything
11  about neuropathic pain on its website; is that
12  correct?
13      A. That's correct.
14      Q. And you've never talked to anybody at the
15  Lahey Clinic about what their thought process was in
16  determining to put that statement on its website?
17      A. That's correct.
18      Q. But you've drawn the conclusion that those
19  at the Lahey Clinic who did put this statement on
20  their website didn't know about the Reckless study;
21  is that what you're saying?
22      A. No, the conclusion I've drawn is that the
23  Lahey Clinic -- the information -- I haven't seen
24  it, so I assume that you're reading it right.

Page 426

1          The information that -- in the document
2  that you have from Lahey Clinic that says gabapentin
3  is among treatment options for neuropathic pain, did
4  I paraphrase that correctly?
5      Q. Yes.
6      A. That the information that was available and
7  the way it was available to the people at Lahey
8  Clinic, pharmacists and doctors who wrote that --
9  and/or doctors who wrote that, had to have been
10  different than the information that was available
11  and the way it was available to Pfizer's own pain
12  consultants. And if you look at the Cochrane review
13  that was published in 2005 for acute and chronic
14  pain, their conclusion is that there is evidence to
15  show that gabapentin is effective for neuropathic
16  pain, and it would be reasonable -- in my opinion,
17  it would be reasonable, though it would be a
18  mistake, to trust Cochrane review to do the best
19  possible analysis.
20          Now, the Cochrane review didn't include
21  224 and 271, Reckless or POPP. Now, the results of
22  Reckless, as presented in the Backonja/Glanzman
23  article, that's the only place that they were
24  presented. They were buried in that article, and

Page 427

1  the conclusion of the article was, when you look at
2  all the data, Neurontin is effective for neuropathic
3  pain and it's effective in doses beyond 1800
4  milligrams. There's no data that's included in that
5  article that wasn't available to Pfizer's pain
6  experts. Pfizer's pain expert says no go.
7          So I understand that Lahey -- this
8  document that you're showing me, if it says what you
9  say it says, which is that the Lahey Clinic is
10  endorsing the use for neuropathic pain, Neurontin
11  for neuropathic pain, what that says to me is shame
12  on the defendants for allowing this wrong belief
13  about the efficacy of Neurontin for neuropathic pain
14  to continue.
15          And there's very good evidence that the
16  defendants knew that was going on and, in fact,
17  encouraged it. In one of their situation analyses
18  they say 80, 90 percent of PCPs are using it, and 40
19  percent of PCPs -- for neuropathic pain, and 40
20  percent of PCPs believe that it's FDA-approved.
21  They certainly didn't do anything to discourage that
22  belief.
23      Q. Do you know whether individuals at the Lahey
24  Clinic were aware of results of the Reckless study?

Page 428

1      A. I think I answered that question. If they
2  were aware of it --
3      Q. You don't know. You're saying now if. You
4  don't know whether they were aware of it; is that
5  correct?
6      A. I'm answering your question. If they were
7  aware of it, it would be in the Backonja/Glanzman
8  article, and there it's buried in an article that
9  claims to present scientific evidence that claims to
10  show that the evidence shows that Neurontin is
11  effective for neuropathic pain when Pfizer knew very
12  well that the consultants that it paid for expert
13  opinion said that was not the case.
14      Q. So my question is, do you know whether the
15  individuals at the Lahey Clinic who put this
16  statement on here had -- were aware of the Reckless
17  study?
18      A. And my answer is, if they knew about it, it
19  would have been through the Backonja/Glanzman
20  article.
21      Q. Does that mean no, you don't know? It's a
22  simple question. It can be answered "Yes" or "No"
23  or "I don't know."
24      A. One more time.

1    Q. Do you know whether the individuals at the
2 Lahey Clinic who were responsible for putting this
3 statement on the website knew the results of the
4 Reckless study?
5    A. The answer is I don't know. But if they
6 knew, it would have been in the context that
7 misrepresented the scientific evidence, and, in
8 fact, the corporate documents show purposefully
9 misrepresented the scientific evidence.
10    Q. You're an expert in divining corporate
11 purpose and intent; is that correct?
12    A. No, I'm not. I'm an expert in reading
13 corporate documents, seeing what the goals of key
14 message development were, that the key messages that
15 were included in that review article were preplanned
16 prior to the inception of that article, and that the
17 key messages that were identified prior to the
18 inception of that article are published as the
19 conclusion of that article disregarding the
20 scientific evidence.
21    Q. And the process and the conclusions that you
22 came to in preparing your report, you've never done
23 anything like that and submitted it to a journal for
24 a -- a peer-reviewed journal for publication; is

1 that correct?
2    MR. NOTARGIACOMO: Objection.
3    Q. The type of report and analysis that you put
4 forth in your expert report, you've never done any
5 of that type of analysis like that before?
6    A. What type of analysis?
7    Q. What you did in your report, whatever it
8 was. You know what it was. I don't know what it
9 was.
10    But whatever analysis you went through
11 and conclusions you drew, you've never done anything
12 similar to that, packaged it up in an article,
13 submitted it to a peer-reviewed journal and asked
14 them to publish it; is that correct?
15    A. I'm not understanding your question.
16    Q. The -- your report takes a look at a whole
17 bunch of documents and a whole bunch of studies and
18 forms some conclusions based on them; is that
19 correct?
20    A. Yes.
21    Q. Have you ever done anything like that
22 before; taken the results of it, taken it to a
23 journal and said, "I would like your to publish
24 this," something like your report, and they

1 published it?
2    A. Well, you can't do it, because you can't
3 have confidential documents published.
4    Q. So you haven't? You have not done that?
5    A. Again, I'm not understanding your question.
6 I'm sorry I'm being thick.
7    *Q. Okay. Well, I think it's pretty clear. You
8 looked at a bunch of documents. You looked at a
9 bunch of studies. You prepared a report. You've
10 never done that before outside the context of
11 litigation, have you?
12    THE WITNESS: Can you read that again,
13 please.
14    *(Answer read)
15    A. No, that's wrong. I wrote a book by doing
16 that.
17    Q. Okay, and you said you looked at a bunch of
18 -- have you ever submitted anything like that to a
19 peer-reviewed journal --
20    A. Like...?
21    Q. -- a medical or scientific journal?
22    A. Like...?
23    Q. Like what you did in your book and like what
24 you've done in these litigation reports you've

1 prepared.
2    A. Yes, I have.
3    Q. You have?
4    A. I have.
5    Q. Okay. What article?
6    A. It's pending.
7    Q. Okay. So you've submitted -- what have you
8 submitted, to what journal?
9    A. I don't know --
10    Q. You have to answer that question, if that's
11 what you're looking for.
12    MR. NOTARGIACOMO: I haven't discussed
13 this with him. I don't --
14    MR. ROUHANDEH: Well, that's -- there's
15 no -- you can't discuss it with him during a pending
16 question.
17    Q. You have to answer the question. Have you
18 submitted any article -- what article have you
19 submitted to a journal, and what journal?
20    A. I submitted an article based on my unsealed
21 Neurontin report.
22    Q. Okay. So you've submitted this for
23 publication to what journal?
24    MR. NOTARGIACOMO: I'm not aware -- I

Page 433

1   just don't know whether there's confidentiality
2   issues involved.  I haven't that information.
3       Q.  This goes directly to your credibility, to
4   bias, to your expertise, so you have to answer the
5   question.
6           MR. NOTARGIACOMO:  Objection.
7       Q.  Have you submitted it to a journal?
8           MR. NOTARGIACOMO:  That is not for you
9   or me or him to determine at this stage in
10  litigation, so that statement is irrelevant.
11      Q.  What journal have you submitted the report
12  to?
13          MR. NOTARGIACOMO:  Can we take a break?
14  I just don't know whether --
15          MR. ROUHANDEH:  There's a pending
16  question.  I would like an answer to the question.
17          MR. NOTARGIACOMO:  I don't think it
18  matters whether there's a pending question or not.
19          MR. ROUHANDEH:  It does matter if
20  there's a pending question.  It's not appropriate.
21          MR. NOTARGIACOMO:  No, I think that's
22  often said, but I don't think there's any rule that
23  says that, you know, the question has to be
24  answered.

Page 434

1           If there are issues of confidentiality,
2   I'd like to explore that with Dr. Abramson so that,
3   A, he doesn't violate, you know, anything.  I just
4   -- we're not trying to hide anything.  I just want
5   to make sure there's no issue.
6           MR. ROUHANDEH:  Well, you're not his --
7   you're not his counsel, and you don't -- you're
8   not -- there's no attorney-client relationship here
9   so...
10          He's an expert.  He's an expert, and he
11  should answer the question.
12          MR. NOTARGIACOMO:  Well, I'd like -- I'd
13  request a break so we can discuss it.
14      Q.  Are you refusing to answer the question?
15      A.  I'm awaiting an answer from plaintiffs'
16  counsel.
17      Q.  Okay.  So you're not -- you're refusing to
18  answer that question; is that correct?
19      A.  I just said I'm awaiting a response from
20  plaintiffs' counsel.
21      Q.  What response?  You didn't ask a question.
22          MR. NOTARGIACOMO:  Can we take a break?
23  We may be able to clear this up.
24      Q.  What's your hesitation in answering the

Page 435

1   question?
2       A.  I don't want the process to be tinkered
3   with.  It's a sensitive process, when an article is
4   submitted.
5       Q.  You're saying that -- when you say the
6   process can be tinkered with, by whom?
7       A.  By defendants.
8       Q.  That's your concern?  It's not
9   confidentiality, I take it, then.
10      A.  No, it may be confidentiality.  I don't
11  know.
12      Q.  Well, it's going to be -- if it's published,
13  it will be published in an article for everybody to
14  read.
15      A.  It's pending.  I didn't say it had been
16  accepted.  I said it had been submitted.
17      Q.  But the purpose of you submitting it is
18  so it can be read --
19      A.  Yes.
20          THE COURT REPORTER:  Wait, please.  One
21  at a time.
22      Q.  The purpose of you submitting it is so that
23  it can be read widely, the article; is that correct?
24      A.  That's correct.

Page 436

1       Q.  So your intent is to make it known publicly.
2       A.  That's correct.
3       Q.  Okay.  And your report is known publicly;
4   isn't that correct?
5       A.  That's correct.
6       Q.  So what confidentiality issue is there?
7   It's a matter of public record.
8       A.  It's not a --
9           MR. NOTARGIACOMO:  First of all, that
10  calls for a legal conclusion.  That's why I wanted
11  to discuss this with Dr. Abramson.
12          We may be able to clear this up, and
13  we'll come back, answer your questions, and there
14  won't be an issue.  But if you'll allow me to take a
15  break, I think we can shortcut the back-and-forth
16  between the two of you about this issue and get to
17  the bottom of it, clear it up, and move on.
18          MR. ROUHANDEH:  I just want to ask these
19  follow-up questions.
20          MR. NOTARGIACOMO:  Well, I think --
21      Q.  So the purpose of you submitting that is to
22  get it published to make it public; is that correct?
23      A.  Correct.  It's already public.
24      Q.  It's already public, that's correct.

Page 437

1    A. Yes.
2    Q. Yes, but you won't disclose -- you're
3  refusing to disclose what journal you've submitted
4  it to without talking to plaintiffs' counsel; is
5  that correct?
6    A. I want to talk to plaintiffs' counsel first.
7    Q. Okay. Meaning you're not going to answer
8  the question until you talk to plaintiffs' counsel;
9  is that correct?
10    A. I think it makes sense -- I don't understand
11  the legal ramifications here.
12    Q. I'm just asking, are you going to answer the
13  question without talking to plaintiffs' counsel?
14    A. I don't understand the legal ramifications,
15  and I'm going to wait and talk to plaintiffs'
16  counsel.
17    Q. Right. So you're not going to answer the
18  question until you talk to plaintiffs' counsel.
19  That's a yes or a no. You're either about to answer
20  the question, or you're not.
21    A. I would like to discuss the question with
22  plaintiffs' counsel.
23    Q. Well, I'm not agreeing that you can. So
24  what I'd like to know is whether or not --

Page 438

1        MR. NOTARGIACOMO: It's not up to you.
2        MR. ROUHANDEH: It's not up to me. If
3  I'm asking him whether he's going to answer --
4        THE WITNESS: Excuse me, I didn't hear
5  what you --
6        MR. NOTARGIACOMO: I just said it's not
7  up to him.
8    Q. I'm asking you whether you're going to
9  answer the question or not. I can't force you to
10  answer the question here. I can't tell you, without
11  calling a judge forcing you to answer the question
12  right now.
13        So my question is, are you going to
14  answer the question, or are you refusing to answer
15  the question until you talk to plaintiffs' counsel?
16  It's a simple question.
17    A. And the answer is, I would like to talk to
18  plaintiffs' counsel.
19    *Q. Well, you would like to or you're going to,
20  you're not going to answer the question until you
21  do? It's a pretty simple question.
22        Is there something about the question
23  you don't understand? You're saying I would like
24  to. You're just...

Page 439

1        MR. NOTARGIACOMO: Jim --
2        MR. ROUHANDEH: It's a simple question.
3  I want an answer to this question, and if so -- if
4  he says, "No, I'm not going to answer the question,"
5  then we'll take a break. If he says, "Yes, I'm
6  going to answer it," then I want the answer.
7        It's pretty simple. "Yes, I will answer
8  the question without talking to plaintiffs'
9  counsel," you'll give me the answer; "No, I won't
10  answer the question without talking to plaintiffs'
11  counsel," we'll take a break, you'll talk to
12  plaintiffs' counsel.
13        MR. NOTARGIACOMO: Dr. Abramson, you can
14  answer that question.
15    Q. Yes or no.
16    A. What was the question?
17    Q. Are you going to answer the question
18  before --
19        MR. ROUHANDEH: Why don't you read it
20  back.
21        *(Question read)
22        MR. ROUHANDEH: I'll just ask the
23  question.
24    Q. Are you refusing to answer the question as

Page 440

1  to what journal you have submitted your report to
2  until you talk to plaintiffs' counsel?
3    A. And I want to ask plaintiffs' counsel
4  whether I should call my attorney.
5        MR. NOTARGIACOMO: Well, I'm not going
6  to discuss that on the record, but my advice is to
7  answer his question, and then we can take a break,
8  and we can discuss it.
9    A. I'm going to discuss it with plaintiffs'
10  counsel.
11    Q. So you're refusing to answer until you talk
12  to plaintiffs' counsel about it?
13    A. Yes.
14    Q. Okay.
15        MR. ROUHANDEH: We'll take a break.
16        THE VIDEOGRAPHER: The time is 1:53.
17  We're off the record.
18        (Recess taken)
19        THE VIDEOGRAPHER: Okay. We are back on
20  the record. This is Tape No. 4. The time is one
21  minute after 2:00.
22        MR. NOTARGIACOMO: Before we continue
23  questioning, I just wanted to -- I know when we
24  started his deposition you had designated the entire

36 (Pages 437 to 440)

Page 441

1   thing as confidential for purposes -- under the
2   protective order in the case, so to the degree -- to
3   that degree, defendants control the confidentiality
4   of the deposition up to this point.
5        MR. ROUHANDEH:  Well, we might withdraw
6   some of that, and I think there have been a lot of
7   testimony about Dr. Abramson's, you know,
8   prescribing patterns and habits and things like
9   that, so he may have an interest in designating
10  portions as confidential.
11       MR. NOTARGIACOMO:  That's what I was
12  just about to say.  There are portions of the
13  deposition that, for purposes of plaintiffs, we
14  would designate as confidential, including what I
15  suspect are going to be the answers to the following
16  questions, so I just want to get that on the record.
17       MR. ROUHANDEH:  Yes, and maybe we can
18  work through that after the deposition at some
19  point.  We might come to an agreement on what should
20  be confidential and what should not.
21       Q.  Doctor, can you answer the question as to
22  what journal you've submitted the Neurontin
23  litigation report to?
24       A.  The British Medical Journal.

Page 442

1        Q.  That's the full name of it, The British
2   Medical Journal?
3        A.  Yes.
4        Q.  Okay.  Have you submitted it to any other
5   publication, any other journal?
6        A.  No.
7        Q.  Is that a peer-reviewed journal?
8        A.  Yes.
9        Q.  Prior to submitting this report to The
10  British Medical Journal, had you submitted any other
11  report to a journal for publication?
12       MR. NOTARGIACOMO:  Objection.  I'm not
13  sure he testified that he submitted his report in
14  the MDL to the journal.
15       MR. ROUHANDEH:  Okay.
16       Q.  Did you submit something different than your
17  report to The British Medical Journal?
18       A.  Yes.
19       Q.  Have you -- do you have a copy of that?
20       A.  Not with me.
21       Q.  Do you have any objection to providing a
22  copy of what you submitted?
23       A.  I don't.  I would talk to my attorney.
24       Q.  Okay.

Page 443

1        MR. ROUHANDEH:  Perhaps you can do that,
2   and we can see what the response -- you can talk to
3   the doctor and see what the response is.
4        Q.  Prior to the submission to The British
5   Medical Journal, had you ever submitted for
6   publication in a peer-reviewed journal any similar
7   report?
8        A.  Well, I didn't submit the report so --
9        Q.  Well, any similar analysis.
10       A.  Of...?
11       Q.  Well, I guess you've testified that you
12  reviewed company documents, you looked at medical
13  literature, and you formed conclusions which are
14  reflected in your report, which is marked as Exhibit
15  A.
16       A.  Yes.
17       Q.  And question -- the original question was,
18  have you ever submitted anything like that to a
19  medical journal?  And as it turns out, yes, you
20  have.  You've submitted something like your report
21  to The British Medical Journal.
22            And I'm asking you now, is that the only
23  occasion on which you've submitted something like
24  the report that you've done in this case to a

Page 444

1   medical journal for publication?
2        A.  I've not submitted anything to a medical
3   journal that was based upon confidential documents
4   that I had access to that were later unsealed.  I
5   have submitted to medical journals information that
6   is publicly available that was also used in
7   litigation.
8        Q.  And was that published?
9        A.  Yes.
10       Q.  Okay.  And what article is that?
11       A.  Well, there would be two articles.  One is
12  the article that I wrote with Barbara Starfield,
13  "Can We Trust the Evidence in Evidence-Based
14  Medicine," and the other article would be the Lancet
15  article about our lipid-lowering guidelines
16  evidence-based.
17       Q.  Okay.  Other than that you haven't submitted
18  to a peer-reviewed journal any other work that
19  you've done since the time that you left practicing
20  medicine; is that correct?
21       A.  There was a paper that was submitted to a
22  health policy journal, not a medical journal, that
23  was peer-reviewed.  I don't know if that counts.
24       Q.  What did that relate to?

37 (Pages 441 to 444)

Page 445

1    A. That related to -- I wrote it with a
2 colleague. The title of the article is "When Health
3 Policy is the Problem."
4         He's a health policy guy, and the part
5 of the paper that I wrote had to do with the
6 inability of health policy makers to make rational
7 decisions when the knowledge about pharmaceuticals
8 is controlled by the manufacturers and there's a
9 commercial distortion of the knowledge.
10        MR. ROUHANDEH: I'm going to ask the
11 court reporter to mark as Exhibit 7 a printout from
12 the Lahey Clinic website.
13        (Exhibit No. 7, Excerpt from Lahey
14        Clinic's website, marked for
15        identification)
16    Q. Have you ever seen this document before?
17    A. (Witness reviews document) No, I haven't.
18    Q. Have you ever looked at the Lahey Clinic
19 website before?
20    A. Sure.
21    Q. And is that website www.Lahey.org?
22    A. Yes.
23    Q. If you look at Page 3 of 4 under "Pain."
24    A. Yes.

Page 446

1    Q. There's a reference there to treating
2 neuropathic pain with a variety of medicines,
3 including anticonvulsants which include Neurontin
4 and several others. Do you see that?
5    A. Yes.
6    Q. Do you intend to tell the Lahey Clinic that
7 they should take the reference to Neurontin out of
8 this website?
9    A. I hadn't set as a goal to correct every
10 erroneous mention of Neurontin, but the reason why I
11 wrote the article about Neurontin was to help
12 physicians to understand that sometimes what is
13 believed to be an effective therapy, and at times
14 widely believed to be an effective therapy, that
15 that shared belief can be based upon a systematic
16 misrepresentation of the scientific evidence. And
17 my impression is that one of the positive goals that
18 can be served by litigation is to allow physicians
19 to understand that the evidence-based medicine that
20 they are trying to practice is at times distorted by
21 the withholding of adverse information or
22 manipulation of information.
23        So indirectly I would hope to show
24 physicians that widely held beliefs about Neurontin

Page 447

1 for neuropathic pain in particular and, in general,
2 evidence-based medicine is compromised by commercial
3 control of the communication.
4    Q. Do you intend to have a communication with
5 the Lahey Clinic about the reference to Neurontin in
6 this document on their website?
7    A. To answer your question, the answer is no.
8 I don't have a relationship with Lahey Clinic
9 anymore. My relationship with Lahey Clinic ended
10 when I stopped practicing medicine.
11    Q. I note here that they don't -- that this
12 document, this website, doesn't refer to what the
13 approved indications of Neurontin are.
14    A. I'm sorry?
15    Q. Is that correct?
16        There's no reference to the approved
17 indications of Neurontin or any of the other drugs;
18 is that correct?
19    A. I didn't read it. I would read it. I can
20 read it and answer your question, or I can take your
21 word for it.
22    Q. Well, that's the only reference in this
23 website to Neurontin, the one that you're looking at
24 on Page 3 of 4. And so certainly there you'd say

Page 448

1 there's -- you'd agree with me there's no indication
2 as to what Neurontin's approved for and not approved
3 for; is that correct?
4    A. Not there, no.
5    Q. Is that misleading?
6    A. Yes, I think readers should be told whether
7 a drug -- whether a recommendation for a drug is --
8 whether a recommended drug is approved by the FDA
9 for the indication for which it is being approved --
10 recommended.
11    Q. Okay. So you think this is misleading?
12    A. I think -- my personal opinion is that Lahey
13 Clinic should have identified which of its
14 recommendations were approved by the FDA for the
15 indications, and which ones weren't.
16    Q. Tricyclic antidepressants aren't approved
17 for neuropathic pain, are they?
18    A. I don't believe so, but there is much better
19 evidence that they're effective for neuropathic pain
20 than there is for Neurontin.
21    Q. The question is, is amitriptyline approved
22 for neuropathic pain?
23    A. I don't believe so.
24    Q. So you think readers of this website will be

38 (Pages 445 to 448)

Page 449

1  mislead into thinking that amitriptyline is approved
2  for neuropathic pain?
3      A.  I would think that whether any of these
4  indications are FDA-approved or not -- excuse me.
5      I would think that a more responsible
6  way to provide this information would be to identify
7  whether any of the recommended -- recommendations
8  are not FDA-approved, to identify those.
9      Q.  You say to determine, in your own case,
10  whether something's FDA approved you can look in the
11  PDR; is that correct?
12      A.  Yes, you look at the indications in the PDR.
13      Q.  Okay.  And that's something that a lot of
14  doctors have on their bookshelves, correct?
15      A.  That's correct.
16      Q.  And so the fact that you could take the book
17  off the shelf and determine whether something's
18  approved or not approved, does that lead you to
19  believe -- why do you think any other doctor is any
20  different?  I mean, can't all doctors just simply
21  pull the book off the shelf and determine what the
22  drug is approved for and what it's not approved for?
23      A.  It's really two different things.  One is
24  the issue of whether the drug is FDA-approved or

Page 450

1  not, and doctors should know that.  And if there's a
2  recommendation, the recommendation ought not to have
3  packaged in it a requirement to go and double-check
4  and determine for themselves whether any or all of
5  these indications are FDA-approved.
6      I think there is an assumption, when a
7  drug is listed on a trusted organization like Lahey
8  Clinic, Mayo Clinic, whatever, that the
9  recommendations are evidence-based, leaving aside
10  the FDA approval issue for a second.  I mean, it
11  stands that my opinion is that when a recommendation
12  is made to use a drug for non-FDA approved
13  indication, that that should be so stated.
14      And, in addition to that, the assumption
15  is when people read information on a respected
16  website like this, they would believe that experts
17  have determined that the predominance of evidence is
18  that there's efficacy.  Now, that's a problem
19  because Pfizer's own experts know there's not
20  efficacy, so this leads me to believe that the
21  people who formulated this recommendation at Lahey
22  Clinic did not have access to the information in the
23  way that it was presented at the consultants'
24  meeting in September of 2001, that the Lahey Clinic

Page 451

1  folks didn't have that kind of access that the
2  Pfizer consultants had.
3      Q.  Do you think the readers of this document,
4  this website, are going to be misled into thinking
5  that the various drugs here that are listed are all
6  approved by the FDA for the uses --
7      A.  There may or may not be an assumption, and
8  probably most of the readers, that won't be on their
9  radar screen.  But there will be an assumption that
10  there's a predominance of scientific evidence to
11  support that recommendation when that is not true
12  for Neurontin, and Pfizer knows that its consultants
13  opined that that's not true.
14      Q.  So simply listing a number of potential uses
15  for a drug you don't think would mislead somebody
16  into thinking it's approved for all those uses; is
17  that correct?
18      A.  I didn't say that.
19      Q.  Well, I thought you were saying you don't
20  think people would be misled.
21      A.  I didn't say that.
22      Q.  Okay.  So you think people would be misled,
23  reading the Lahey Clinic website, into thinking all
24  the drugs listed here are approved for all the uses

Page 452

1  that they're listed next to?
2      MR. NOTARGIACOMO:  Objection.
3      A.  I think that that assumption could certainly
4  be made, and I think because that assumption could
5  be made -- I don't think 100 percent of the people
6  would make that assumption.  I think the vast
7  majority of people would never think about it.  But
8  I think that when the Lahey Clinic is making
9  recommendations for nonapproved drugs, that they
10  should state that.
11      Q.  Why would the vast majority of people not
12  even think that?
13      A.  Because they would -- most people reading
14  this would be lay people, first of all, and in the
15  lay community, the belief would be that a trusted
16  organization would review the scientific evidence
17  and that that would be the filter through which the
18  determination was made about whether this Neurontin
19  should be listed for neuropathic pain or not.
20      Q.  What about doctors reading this?  Do you
21  think they would think that the drugs are approved
22  for each of the uses that they're listed next to?
23      A.  Well, the best answer I can give you to that
24  is Pfizer's own data would show that 80, 90 percent

Page 453

1  of PCPs were prescribing Neurontin for neuropathic
2  pain, and half of them thought it was FDA-approved,
3  so that is the answer to your question.
4      Q. So a document like this on the Lahey Clinic
5  website, you think, would be misleading; could
6  mislead doctors into believing that these drugs are
7  approved for the uses that they're listed next to?
8      A. It could lead doctors -- it could lead
9  readers to believe that. It could.
10     Q. It might not. It could; might not. Depends
11  on --
12     A. Might not, and many people might not even
13  think of it, because what they're thinking of is
14  that regardless of whether the drug is FDA-approved
15  or not for that indication, if Lahey Clinic says
16  that -- lists Neurontin first as the anticonvulsant
17  that they would recommend for -- to treat
18  neuropathic pain, that the predominance of
19  scientific evidence supports that. I think that's
20  the key factor here, and that that's wrong shows how
21  successful Pfizer's misrepresentation of the
22  scientific evidence about Neurontin has been.
23     Q. Okay. So I think you are saying different
24  doctors -- it would depend on the doctor to know

Page 454

1  whether or not they might form the conclusion that
2  Neurontin is approved --
3          MR. NOTARGIACOMO: Objection.
4      Q. -- for all neuropathic pain?
5      A. Again, we're going in circles, but Pfizer's
6  data shows that half of PCP prescribers believe
7  that Neurontin is FDA-approved, and I have no reason
8  to believe that somewhere around that percentage
9  would draw that conclusion if they looked at a
10  document like this. But I think all would draw the
11  conclusion that a prestigious organization
12  evaluating the scientific evidence available would
13  do a better job than they could do individually
14  about determining whether a drug is effective, and
15  -- whether the scientific evidence shows that it's
16  effective, and that Pfizer knew that its own pain
17  experts said it wasn't, and that the people at Lahey
18  Clinic say it is shows that the people at Lahey
19  Clinic did not have access to the same information
20  in the same way that the Pfizer's consultants had.
21     Q. You don't know what information they
22  actually had, right, at Lahey Clinic?
23     A. I don't, but they've concluded that it's
24  effective, so I know that they don't have access to

Page 455

1  the same information that Pfizer's consultants had
2  because Pfizer's consultants unanimously decided
3  it's not.
4      Q. You're saying that Pfizer's consultants
5  decided it's not effective?
6      A. No, they decided that there was not evidence
7  to support its efficacy.
8      Q. They decided that there wasn't sufficient
9  evidence to get approval from the FDA or they
10  decided that it's not efficacious?
11     A. They decided -- the former is true. The
12  latter is -- we can look at the document.
13         My recollection, without looking at the
14  document -- I'd be happy to look at the document.
15  My recollection is that the pain experts said that
16  given the negative results of Reckless, the fact
17  that Serpell is -- the positive effect of Serpell is
18  dominated by post-herpetic neuralgia and not -- yes,
19  post-herpetic neuralgia and not by the other
20  indications, causes, of neuropathy, that POPP is
21  negative, and I forget whether they looked at Gorson
22  or not. But given that evidence they could not --
23  that evidence did not support the claim that
24  Neurontin is effective for the broad indication of

Page 456

1  neuropathic pain.
2      Q. And could not seek approval on that -- could
3  not satisfy the FDA, is that what you're saying?
4      A. Well, and -- no, I'm saying both. That's
5  two different things.
6          One is that the evidence did not lead
7  one to conclude -- it did not show that Neurontin is
8  effective for neuropathic pain, and the other is
9  that it would not lead to FDA approval for that
10  indication.
11     Q. And so just going back to this document,
12  whether a doctor would think that all of these drugs
13  are approved for the indications that they're listed
14  next to depends on the doctor. Some would; some
15  wouldn't. Is that correct?
16     A. I think some would and some wouldn't believe
17  it was FDA-approved, but I think all would believe
18  that doctors and pharmacists who had greater access,
19  more time, and more expertise than they did in the
20  vast majority of cases concluded that the evidence
21  shows that Neurontin is effective for neuropathic
22  pain when, in fact, Pfizer knows that's not true.
23     Q. Doctor, you testified yesterday, I believe,
24  that you've never prescribed Neurontin off-label; is

40 (Pages 453 to 456)

Page 457

1 that correct?
2      A. I think that's right. To the best of my
3 recollection.
4      Q. And you also testified that you don't treat
5 epileptics; is that correct?
6      A. Not as the primary -- I did not as the
7 primary caregiver.
8      Q. Okay. Have you ever prescribed Neurontin to
9 somebody with epilepsy to treat their epilepsy?
10      A. I wouldn't -- let me be clear. I would not
11 have been the primary prescriber for epilepsy in
12 somebody for whom I was the primary care physician,
13 so the only reason -- the only circumstance under
14 which I would have prescribed any drug for an
15 epileptic patient -- I may have titrated a drug
16 based on levels; in fact, I'm sure I did. But the
17 only reason for which I would have initiated -- the
18 only circumstance in which I would have initiated a
19 new prescription to treat an epileptic for epilepsy
20 would have been under the guidance of a neurologist.
21      Q. And can you think of a circumstances where
22 that occurred? Like how many times that occurred?
23      A. I think it would be unusual. It would have
24 been very unusual. I mean, it might have occurred

Page 458

1 if the patient had become unstable. I had the
2 patient in my office. I called the neurologist on
3 the phone, said, "Look, I'm here, the primary drug
4 is this. This is the dose." If the level was
5 appropriate, "This is the level. What should I do?"
6      Q. How often do you think that occurred?
7      A. Very rarely, if at all.
8      Q. Do you have an order of magnitude?
9      A. Very rarely, if at all. A handful of times.
10      Q. "A handful" meaning five or less?
11      A. Yes.
12      Q. Okay.
13           MR. ROUHANDEH: I'm going to ask the
14 court reporter to mark as Abramson Exhibit 8.
15           (Exhibit No. 8, List of prescriptions
16           written by Dr. Abramson, marked for
17           identification)
18      Q. Your full name, I believe, is John David
19 Abramson; is that correct?
20      A. Yes.
21      Q. And you reside at 39 Spring Street in
22 Ipswich --
23      A. I do.
24      Q. -- correct?

Page 459

1      A. I didn't when I practiced.
2      Q. Where did you reside then?
3      A. On Farrington Lane, and on Topsfield Road.
4      Q. Do you know what your ME number is?
5      A. ME number is Mass. prescribing number or --
6      Q. I'm just asking. I don't know.
7      A. I don't know.
8      Q. Okay. And your area of specialty is family
9 medicine; is that correct?
10      A. That's correct.
11      Q. This is a list of prescriptions that you
12 wrote for Neurontin, and if you'll flip through it,
13 you'll see that you wrote 25 prescriptions for
14 Neurontin.
15      A. What are these numbers?
16      Q. What are which numbers?
17      A. The TRx 200811.
18      Q. "TRx" is total prescriptions, and the rest
19 is -- numbers under that or next to that are the
20 year followed by the month.
21           And this shows that you wrote 25
22 prescriptions of Neurontin. Any reason to doubt
23 that?
24      A. Let me explain, but first I want to

Page 460

1 understand the data. TRx is 200811, 200810?
2      Q. Yes.
3      A. And what is it that I'm looking at here?
4 How do you get 25? These are months.
5      Q. These are months, and every time there's a
6 number, that's a prescription.
7      A. No, these are months in order, and the
8 number of prescriptions are the zeros below.
9      Q. Yes. Look at Page 9.
10      A. I see, uh-huh.
11      Q. Do you see there that you prescribed
12 Neurontin twice in January of 2000, once in
13 September of 1999, three times in August of '99,
14 twice in July of '99, four times in June of '99,
15 once in May of '99, and so forth it continues, three
16 times in April 1999?
17      A. Yes.
18      Q. Do you see that?
19      A. Yes.
20      Q. And if you add up all the numbers here, it
21 shows 25 prescriptions of Neurontin. Is that
22 consistent with your recollection?
23      A. Well, I don't -- it is beyond my
24 recollection, but let me make a couple of comments

41 (Pages 457 to 460)

Page 461

1   about it.  First of all --
2       Q.  Well, let me just ask you a question, and
3   then you can make any comments.
4           Is your testimony here under oath that
5   you never prescribed Neurontin for any off-label
6   use?  I believe that's what you said yesterday.
7       A.  That's my recollection.
8       Q.  Okay.  And so you think all these
9   prescriptions for Neurontin were for epilepsy?
10      A.  No, that's not what I said.  I think two
11  things.  Number one is, I would expect that whatever
12  prescription was written and refilled counts in
13  subsequent months, so these aren't unique
14  prescriptions.
15          Are these -- is there any evidence that
16  these are new prescriptions, or are these total
17  prescriptions?
18      MR. ROUHANDEH:  Well, why don't we mark
19  as Abramson Exhibit 9 --
20      A.  You said "TRx" is total --
21      Q.  Yes, "TRx" is new prescriptions and refills.
22      A.  It's marked 8.
23      Q.  Yes.  That's number 8.  Well, let's finish
24  this, and then I'll mark another document.

Page 462

1       A.  Oh, I see, okay.
2       MR. NOTARGIACOMO:  Just for the record,
3   I've gone through and counted them up a number of
4   times now, and I could be wrong, but I see 22
5   prescriptions, not 25.
6       MR. ROUHANDEH:  Well, it is what it is.
7       MR. NOTARGIACOMO:  It is what it is.  I
8   just wanted to put that --
9       MR. ROUHANDEH:  Your addition may be
10  better than mine.
11      MR. NOTARGIACOMO:  -- I'm not sure
12  you've got it right.
13      A.  So two comments.  One is these are probably
14  not new prescriptions, but they're total
15  prescriptions.  The other comment is that I worked
16  with nurse practitioners, and nurse practitioners
17  prescribing would go under the supervising
18  physician's name.  Nurse -- but there weren't always
19  consults.  Nurse practitioners would consult when
20  they thought it appropriate, and it may well be that
21  nurse practitioners prescribed Neurontin, and that I
22  was listed as the supervising physician.
23          I don't recall prescribing Neurontin
24  off-label.

Page 463

1       Q.  Okay.  So these nurse practitioners, do they
2   work for you?
3       A.  They work for Lahey Clinic.
4       Q.  Okay.  And they were under your supervision;
5   is that correct?
6       A.  Mine and three other physicians.
7       Q.  And did you have -- and nurse practitioners
8   -- did you have a nurse practitioner in your office
9   before you joined the Lahey Clinic?
10      A.  Yes.
11      Q.  And what time -- what date did you join the
12  Lahey Clinic?
13      A.  End of '93, I think.
14      Q.  Okay.  And these -- so you're saying some of
15  these prescriptions might have been written by nurse
16  practitioners and not, in fact, written by you?
17      A.  Correct.
18      Q.  Okay.  And do you know whether those nurse
19  practitioners -- if that were true hypothetically,
20  whether they wrote -- what they wrote the
21  prescriptions for?
22      A.  I don't.
23      Q.  Okay.  When was the last time that you dealt
24  with any of these nurse practitioners?

Page 464

1       A.  The end of 2001.  No, it could have been
2   into February 2002.  No later than February 2002.
3       Q.  Okay.  You're aware, aren't you, that this
4   -- so you would say that this is inaccurate?  To the
5   extent somebody would read this and say that you
6   wrote 20-some prescriptions of Neurontin, you don't
7   believe this is correct?
8       A.  Well, two comments.  One is I want to know
9   whether these are new prescriptions or -- how many
10  of these are new prescriptions.  In other words, we
11  talked about a scenario before where I might
12  prescribe Neurontin under somebody else's
13  recommendation, and I don't know how many of these
14  carry forward.
15          And the other is that I think that to
16  the extent there are new prescriptions here, and
17  more than just a few, my guess is that they
18  originated with nurse practitioners and not with me.
19      MR. ROUHANDEH:  I'm going to ask the
20  court reporter to mark as Abramson Exhibit 9 a list
21  of new prescriptions.
22          (Exhibit No. 9, Listing of new
23          prescriptions, marked for
24          identification)

42 (Pages 461 to 464)

Page 465

1     Q. If you look at Page --
2         MR. NOTARGIACOMO: Do you have a copy?
3         MR. ROUHANDEH: Oh, I'm sorry.
4     Q. Look at Page 11, Pages 10 and 11. Do you
5 see a number of new prescriptions there?
6     A. Yes, uh-huh, I do.
7     Q. And so those would not be prescriptions
8 where you're simply -- you or a nurse practitioner
9 is simply refilling a prescription written by some
10 other doctor; is that correct?
11     A. I don't know that. You can't tell that from
12 this data, because if that were the case -- I don't
13 know that it was the case, but if it was the case,
14 then it would be listed as a new prescription under
15 the new provider. The new prescription would have
16 been signed by somebody who hadn't previously
17 prescribed it, so I would be fairly confident that
18 that would be called a new prescription.
19     Q. So would you agree -- or is it your view
20 that these prescription records showing a number of
21 prescriptions written by you are inaccurate?
22     A. No, I think that they don't show
23 prescriptions written by me. I think they show
24 prescriptions that were written by me or nurse

Page 466

1 practitioners.
2     Q. Okay. So in that sense, they're inaccurate,
3 right, because they're not showing prescriptions
4 written by Dr. John David Abramson; is that correct?
5         MR. NOTARGIACOMO: Objection.
6     A. I can't be certain. I think that probably
7 they include prescriptions that were written by a
8 nurse practitioner and me.
9     Q. And if they do include prescriptions by a
10 nurse practitioner, then they are inaccurate in that
11 they reflect prescriptions written by you; is that
12 correct?
13         MR. NOTARGIACOMO: Objection.
14     Q. In your view.
15     A. Unless the intent is -- you know, I don't
16 know what this shows because it is like -- it is
17 likely that prescriptions -- there were nurse
18 practitioners in our office and four doctors, and
19 doctors' names were on prescription pads. Doctors
20 signed prescription pads for nurses, and the nurse
21 practitioners were veterans, and when they had a
22 question, they consulted with us.
23         The ultimate responsibility for the
24 prescription is by the person who signed it, but I

Page 467

1 don't know that I was the doctor that was
2 supervising -- to the extent that these are nurse --
3 this includes nurse practitioner prescriptions, I
4 don't know that I was the doctor -- in fact, I would
5 be very surprised if I was the doctor who supervised
6 those prescriptions.
7         So my hunch is, if you look at the
8 prescribing records for the physicians that I was
9 working with at the time, that you'll see a lot more
10 Neurontin prescribed, and piecing this together -- I
11 don't have a recollection of prescribing Neurontin
12 off-label at all, and piecing this together, I think
13 the most likely explanation is that these
14 prescriptions are written by nurse practitioners
15 whose prescription may have been signed by me
16 beforehand who might have been actively being
17 supervised for that patient by another physician.
18     Q. So, in other words, these documents are
19 inaccurate in reflecting the number of prescriptions
20 written by you; is that correct?
21     A. I believe that would be right.
22     Q. Okay.
23     A. And let me add, I'm not positive, but I am
24 sure, sitting here, that I have no recollection of

Page 468

1 writing a Neurontin prescription off-label. It's
2 conceivable it happened, but I don't have a
3 recollection of it.
4     Q. Could you turn to Page -- on Abramson
5 Exhibit 9, turn to Page 5. You didn't have any
6 nurse practitioners working for you in June 2005,
7 did you?
8     A. No.
9     Q. You weren't treating any epileptics in June
10 2005, were you?
11     A. No.
12     Q. Do you see that this indicates that you
13 wrote a new prescription for Neurontin in June 2005?
14     A. I do.
15     Q. Do you know who you wrote that prescription
16 for?
17     A. I don't think I wrote that prescription.
18     Q. So you think this document is incorrect?
19     A. I think that's incorrect.
20     Q. You have no -- it's your testimony you have
21 no recollection of writing a Neurontin prescription
22 in June 2005?
23     A. That's my testimony, yes.
24     Q. And you have no recollection of writing any

43 (Pages 465 to 468)

Page 469

1  prescription for Neurontin after the time you
2  stopped practicing medicine in 2002?
3      A.  That's correct.
4          MR. ROUHANDEH:  Okay.  Why don't we take
5  a break, and we'll see if we're done.
6          THE VIDEOGRAPHER:  Okay.  The time is
7  2:37.  We're off the record.
8          (Recess taken)
9          THE VIDEOGRAPHER:  Okay.  We're back on
10 the record.  The time is 2:44.
11         MR. ROUHANDEH:  Thank you, Dr. Abramson.
12 I have no further questions.
13         MR. NOTARGIACOMO:  Plaintiffs' counsel
14 has no questions for Dr. Abramson.
15         THE VIDEOGRAPHER:  Okay.  The time is
16 2:44.  We are off the record.
17         (Whereupon the deposition was concluded
18         at 2:44 p.m.)
19
20
21
22
23
24

Page 471

1  Commonwealth of Massachusetts
2  Suffolk, ss.
3
4      I, Lisa A. Moreira, Registered Merit Reporter,
5  Certified Real-Time Reporter and Notary Public in
6  and for the Commonwealth of Massachusetts, do hereby
7  certify that JOHN D. ABRAMSON, M.D., the witness
8  whose deposition is hereinbefore set forth, was duly
9  sworn by me and that such deposition is a true
10 record of the testimony given by the witness.
11     I further certify that I am neither related to or
12 employed by any of the parties in or counsel to this
13 action, nor am I financially interested in the
14 outcome of this action.
15     In witness whereof, I have hereunto set my hand
16 and seal this 26th day of January, 2009.
17
18         _____
19
20         Lisa A. Moreira, RDR, CRR
21         Notary Public
22         CSR No. 146299
23 My commission expires
24 December 25, 2009

Page 470

1      C E R T I F I C A T E
2  I, JOHN D. ABRAMSON, M.D., do hereby certify that I
3  have read the foregoing transcript of my testimony,
4  and further certify that said transcript is a true
5  and accurate record of said testimony (with the
6  exception of the following corrections listed
7  below):
8  Page    Line        Correction/Reason
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16
17         _____
18         JOHN D. ABRAMSON, M.D.
19     Sworn and subscribed to before me this _____
20 day of _____, 2009.
21
22         _____
23     NOTARY PUBLIC
24 My commission expires:

VERITEXT CORPORATE SERVICES (800) 567-8658