# EXHIBIT C

```
 1                              VOLUME:  I
                               PAGES:  1-179
 2                            EXHIBITS:  1-3
 3          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
 4
            MDL DOCKET NO. 1629
 5          MASTER FILE NO. 04-10981
 6
    IN RE:  NEURONTIN            )
 7  MARKETING, SALES            )
    PRACTICES AND PRODUCTS      )
 8  LIABILITY LITIGATION        )
    ------------------------    )
 9  THE GUARDIAN LIFE           )
    INSURANCE COMPANY OF        )
10  AMERICA VS. PFIZER, INC.,   )
    ------------------------    )
11  04 CV 10739 (PBS)           )
12       VIDEOTAPED DEPOSITION of JOSHUA PETEET,
13  called as a witness by and on behalf of the
14  Defendant, pursuant to the applicable
15  provisions of the Federal Rules of Civil
16  Procedure, before Teresa E. Costello,
17  Certified Realtime Reporter, Registered
18  Professional Reporter, Certified Shorthand
19  Reporter No. 1452S98, and Notary Public
20  within and for the Commonwealth of
21  Massachusetts, at the offices of
22  Skadden, Arps, Slate, Meagher & Flom, LLP,
23  One Beacon Street, Boston, Massachusetts,
24  on Tuesday, December 29, 2009, commencing
25  at 8:42 a.m.
```

Page 2

```
1   APPEARANCES:
2
3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
     Four Times Square
4   New York, New York 10036
     BY:  Katherine Armstrong, Attorney-at-Law
5       katherine.armstrong@skadden.com
        212-735-2954
6       Attorney for the Plaintiffs.
7
8   HAGENS BERMAN SOBOL SHAPIRO, LLP
     55 Cambridge Parkway
9   Suite 301
     Cambridge, Massachusetts 02142
10  BY:  Edward Notargiacomo, Esquire
        ed@hbsslaw.com
11      617-482-3700
        Attorney for the Defendant.
12
13  George Dobrentey,
     Legal Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1          I N D E X
2   DEPONENT                    PAGE
3   JOSHUA PETEET
4   Examination by Ms. Armstrong       5
5
6
7
8
9
10
11         E X H I B I T S
12  NO.                 PAGE
13  1    Second Amended Notice       6
         of Videotaped Deposition
14  2    Curriculum Vitae        14
    3    Declaration of Joshua Peteet  37
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          S T I P U L A T I O N S
2          It is agreed by and between
3   counsel for the respective parties that the
4   deponent will read and sign the deposition
5   within thirty (30) days from receipt, and
6   the signing before a Notary Public is
7   waived.
8          It is further agreed that all
9   objections, except as to form and motions
10  to strike, are reserved for the time of
11  trial.
12         VIDEOGRAPHER:  Good morning.  My
13  name is George Dobrentey of Veritext, New
14  Jersey.  Today's date is December 29th,
15  2009, and the time is 8:42 a.m.  This
16  deposition is being taken at Skadden and
17  Arps, in Boston, Massachusetts.  The case
18  caption is In Re: Neurontin Marketing and
19  Sales Practices Litigation in the U.S.
20  District Court for the District of
21  Massachusetts, Case Number 04-10981.
22         The name of the witness is
23  Joshua Peteet.  At this time the attorneys
24  will identify themselves and the parties
25  they represent after which our court
```

Page 5

```
1   reporter, Teresa Costello, of Veritext, New
2   Jersey, will swear in the witness and we
3   can proceed.
4          MR. NOTARGIACOMO:  Ed Notargiacomo,
5   from Hagens, Berman, Sobol, Shapiro, for
6   the Class Plaintiffs in the Neurontin
7   Litigation and for the deponent.
8          MS. ARMSTRONG:  Katherine
9   Armstrong, for the defendant.
10  JOSHUA PETEET,
11      having been satisfactorily
12      identified by the production of
13      his driver's license, and duly
14      sworn by the Notary Public, was
15      examined and testified as
16      follows to direct interrogatories:
17  BY MS. ARMSTRONG:
18  Q.  Would you state your name and your work
19      address for the record, please?
20  A.  Sure.  My name is Joshua Oulund Peteet.  My
21      work address is One Memorial Drive,
22      Cambridge, Massachusetts 02142.
23  Q.  Okay.  Have you ever been deposed before?
24  A.  No.
25  Q.  Have you read depositions before?
```

2 (Pages 2 to 5)

1  Q. What is Mr. Augusteijn's position?
2  A. He's a senior associate.
3  Q. And is it Mr. or Ms. Rushnawitz?
4  A. Ms Rushnawitz.
5  Q. And what's her position?
6  A. She's the managing director.
7       MS. ARMSTRONG:  For the record,
8   Ed, we'd ask that all of the documents
9   requested in the Duces Tecum be produced,
10  and we'll reserve our right to resume the
11  deposition after we receive them.  Mark
12  this as the next.
13      MR. NOTARGIACOMO:  We can talk off
14  line about that.
15      (Curriculum Vitae marked
16       Exhibit Number 2.)
17 Q. I have marked as Exhibit 2 to your
18  deposition a copy of what was provided to
19  me by Mr. Notargiacomo prior to your
20  deposition.  Is this a current copy of your
21  CV?
22 A. Yes.  It appears to be.
23 Q. Okay.  Just briefly for the record would
24  you describe -- just give me a brief
25  summary of your educational and your work

1   history.
2  A. Yes.  So I went to college at Bowdoin
3   College in Maine and earned an
4   undergraduate degree in computer science
5   with a minor in economics.  I earned -- I
6   then went to Dartmouth College and earned a
7   Bachelor of Engineering and a Master of
8   Science in engineering in 2005.
9       Up until that point I worked at a
10  number of different places.  I worked at BA
11  Systems as an engineer while I was studying
12  at Dartmouth.  I worked at a boarding
13  school in Switzerland called the American
14  School in Switzerland while I was in
15  college and shortly after college, and then
16  I came to work at Greylock McKinnon
17  Associates beginning in 2005 right about
18  the time that I graduated from Dartmouth.
19 Q. And what is the position that you hold at
20  Greylock McKinnon?
21 A. I'm an associate.
22 Q. In terms of the hierarchy at Greylock
23  McKinnon, where does that place you?
24 A. I guess I would say I have a number of
25  analysts who report to me and do analysis

1   under my direction.  I do analysis, myself,
2   and then there are a number of senior
3   members of the firm that I report to
4   including the managing director and then
5   any academic affiliates or other associates
6   in the firm.
7  Q. Okay.
8  A. So I'd say I'm, sort of, right, sort of, in
9   the middle of analysts and then senior
10  members of the firm.
11 Q. Greylock McKinnon provides consulting
12  services in litigation, is that correct?
13 A. That's correct.
14 Q. Do they do other nonlitigational-related
15  work?
16 A. We -- I hesitate to say no just because I'm
17  not aware of everything that we've done.
18  Most, if not all, of the work that I've
19  done at the firm has been litigation
20  related.
21 Q. Okay.  And since you've never been deposed,
22  is it fair to say that the work that you've
23  done is usually an assistant to somebody
24  else at the firm?
25 A. That's correct, yes.

1  Q. Have you ever provided a declaration in
2   litigation before?
3  A. No.
4  Q. Have you ever testified as an expert?
5  A. No.
6  Q. And you understand that you have not been
7   designated by the plaintiffs as an expert
8   in this case, is that correct?
9  A. That's my understanding, yes.
10 Q. Prior to the declaration that you rendered
11  in this litigation, you had already been
12  working on this litigation, is that
13  correct?
14 A. That's correct, yes.
15 Q. What type of work had you been doing?
16 A. I think generally I'd been doing -- well,
17  I'd begin by saying that I've worked on --
18  I've probably worked on this litigation in
19  one capacity or another for most of my time
20  at the firm.
21      So I've done a range of things on
22  this and related matters.  I think the
23  nature of that work is basically, you know,
24  ranges from, you know, reading documents,
25  reading depositions to performing analysis

1    there --
2  Q. Let me take them one at a time.
3  A. Okay.
4  Q. You say, What we could summarize from the
5    call notes database?
6  A. Ah-hah.
7  Q. I understand that that's what you were
8    going to do was to summarize data.
9  A. Right.
10  Q. And I'm trying to just understand what the
11    purpose of doing that was. What did they
12    think the summaries of the data would show?
13  A. So I think my recollection is that the one
14    goal of this or one part of this exercise
15    was to establish whether we could observe
16    anything and summarize anything in the call
17    notes to link, sort of, detail the behavior
18    of detailing with the challenged conduct.
19    And so whether there's anything reflected
20    in the call notes that could be tabulated
21    that would sort of make the connection
22    between detailing, sort of, generally,
23    sales reps visiting physicians and the
24    challenged conduct.
25  Q. What do you understand the challenged

1    conduct to be?
2  A. So my understanding and, again, I have not
3    reviewed the specifics of this in some
4    time. So I haven't reviewed the complaint
5    in preparation for this, but my
6    understanding of the challenged conduct is
7    that it relates to allegedly improper and
8    off-label marketing of Neurontin for uses
9    outside the FDA-approved label.
10       MR. NOTARGIACOMO: When you get to
11    a logical stopping point, could we take a
12    break?
13       MS. ARMSTRONG: Yes, I will, in
14    just a few minutes.
15  Q. Do you, personally, have any knowledge of
16    what is and is not permitted in terms of
17    off-label marketing?
18  A. I would say I have a general understanding
19    based on what I've learned in working on
20    this matter. I don't know. I'm not a
21    lawyer, so I don't know what -- as a legal
22    matter -- what is permitted or not. So
23    that's sort of a general sense, but I don't
24    have. You know, in terms of a specific
25    activity, I don't know if I could tell you

1    whether or not it's lawful or proper or
2    not.
3  Q. Do you have -- do you know why this -- the
4    plaintiffs' attorneys wanted to make this
5    link between, as you call it, between
6    detailing and the challenged conduct?
7  A. Ah-hah. My understanding is that they
8    wanted to bolster the use -- their use of
9    IMS data and basically connect the measures
10    that they were using in the rest of their
11    analysis to the challenged conduct.
12  Q. When you "bolster their use of IMS data,"
13    what do you mean by that?
14  A. So I mean by -- this, again, I should say
15    is just my understanding and may not
16    actually be what they intended. But my
17    understanding is that, you know, they've
18    summarized and used IMS data in this matter
19    that reflects detailing and promotion in
20    aggregate. And they intended and hoped to
21    make the point that that aggregate measure
22    included specific things related to the
23    challenged conduct.
24  Q. What specific things?
25  A. I think the specific things, as they've

1    described them to me, would include things
2    like -- and, again, for each of these I
3    don't -- I'm not saying whether I know or
4    believe that it's proper or improper or
5    lawful or unlawful, but leaving articles
6    about unapproved uses, mentioning, sort of,
7    speakers' bureaus and specific articles,
8    inviting physicians to different events.
9  Q. And do you know why they wanted to address
10    those specific types of challenged conduct?
11  A. I believe it was to make the point that
12    their aggregate -- their use of IMS data
13    was appropriate and appropriately included
14    and reflected measures of the challenged
15    conduct.
16  Q. Am I correct that the analysis that you did
17    would not allow anyone to draw a conclusion
18    about what the world would have looked like
19    or what the data would have looked like had
20    the challenged conduct not occurred?
21  A. That, I believe, in my opinion, that that
22    is right. I think my analysis summarized
23    data in a world where the things happened
24    as they happened. I didn't -- I don't have
25    an opinion about what would have happened

Page 82

1    sort of, drop down menu of codes.  Without
2    further information there, there was really
3    nothing we could do with those codes.
4  Q.  Did you request that data table?
5  A.  I requested.  I believe I did request
6    information on what those codes represent.
7  Q.  And what were you told?
8  A.  I was told, I believe, that there was not
9    information on that or that it was not
10   accessible.  I think I was told it was
11   either it had not been maintained or it did
12   not exist or it was not, you know, it was
13   not possible to get access to it.
14  Q.  Okay.  Who did you make the request to?
15  A.  I believe I made the request to Mr. Rona.
16  Q.  And who did you receive the response from?
17  A.  I believe it was Mr. Rona.  I think it may
18    have been in a conversation.
19  Q.  Okay.  So you started off with 2.6 million
20    records.  We're now down to 600,000
21    records, is that correct?
22  A.  That's correct.
23  Q.  And then you took that, and you restricted
24    it to psychiatrists by looking at the field
25    for certain specialties, correct?

Page 83

1  A.  That's correct.
2  Q.  And that takes us down to 17,000, is that
3    correct?
4  A.  That's correct.
5  Q.  Okay.  Then in paragraph eight you say:
6    "As instructed by counsel, we used the
7    fields CALL_DATE and CALL_NOTES and the
8    following list of keywords to tabulate the
9    number of call records per month where the
10    call notes contain one or more keywords
11    indicating an activity relating to the
12    challenged conduct."
13  A.  Ah-hah.
14  Q.  Is that correct?
15  A.  That's correct.
16  Q.  The keyword list, who gave you this keyword
17    list?
18  A.  I think that the keyword list that we used
19    here was ultimately agreed to at the
20    instruction of counsel.  I think, as a
21    practical matter, these databases were so
22    large that we were probably providing
23    index -- you know, indexes and lists of
24    words that appeared in the call notes to
25    counsel and then they were telling us --

Page 84

1    they were giving us guidance about which
2    words were of interest and which words we
3    should flag and mark.  And so the ultimate
4    lists here were agreed to by counsel.
5        We may have generated, you know, a
6    list of all the words appearing in the
7    database and then used that to, sort of,
8    help counsel to pick the words that they
9    were interested in.
10  Q.  Okay.  So you created an index of words
11    that existed in the 17,000 records,
12    correct?
13  A.  I believe that's right.
14  Q.  And then you gave that to counsel, is that
15    correct?
16  A.  We gave that or some subset of that to
17    counsel, I believe.
18  Q.  Okay.  And would counsel be Mr. Rona?
19  A.  It was likely Mr. Rona.  I don't remember
20    specifically.  It probably was Mr. Rona.
21        MR. NOTARGIACOMO:  His name is
22    Mr. Rona.
23        MS. ARMSTRONG:  I apologize.
24        MR. NOTARGIACOMO:  It was the
25    third time.

Page 85

1  Q.  And I think you were doing it right.  I
2    think I'm the one who added the "S" to it.
3    And does that index of, sort of, the
4    overall universal keywords, does that still
5    exist?
6  A.  It may.  I don't recall whether it does or
7    not.  I think we --
8  Q.  Where would you look for it?
9  A.  It might be something that we maintained on
10    our system.  I mean, in terms of --
11    essentially I think what we did was there's
12    a number of data tables here, and we
13    manipulate them in SAS which is a program
14    for working with large datasets, and then
15    we probably ran a command to do a frequency
16    of all the words in there.
17        So it was a command that was run.
18    Whether or not the output file exists
19    somewhere, I'd have to look on our system.
20  Q.  Do you know if that SAS program was on the
21    disk that Mr. Notargiacomo provided?
22  A.  I don't believe that it was.
23  Q.  Do you know if it still exists?
24  A.  I -- I'm not positive.  I believe that it
25    may.

Page 86

1    MR. NOTARGIACOMO: I'm sorry. Are
2  you asking about the SAS program, itself,
3  or some command or code fed into the SAS
4  program to create the list that we're
5  talking about?
6    MS. ARMSTRONG: The latter.
7    MR. NOTARGIACOMO: Okay.
8  A. Yes. The command may exist to do that.
9  Q. You don't believe it was on the disk that
10   you gave me?
11  A. I don't believe it was on the disk.
12  Q. And the purpose of giving me the disk was
13   so that we could rerun and recreate what
14   you had done, correct?
15  A. Right.
16  Q. Okay. But we wouldn't be able to recreate
17   this initial frequency of keywords that you
18   created and gave to Mr. Rona, is that
19   correct?
20  A. Unless you ran the command -- I mean, it's
21   a standard command in SAS. It's the
22   frequency command. So presumably -- I
23   think we did provide the materials to get
24   these data into SAS, and then it's a
25   command that you run on that, but --

Page 87

1  Q. But you don't describe taking that step in
2   your declaration, correct?
3  A. That's right, yes.
4  Q. And you certainly haven't given us the
5   output result of that, is that correct?
6  A. That's -- I believe that's right. Yes, I
7   don't think that's on the disk.
8  Q. So you did what was basically a frequency
9   analysis of the words appearing in the call
10   notes field?
11  A. Ah-hah.
12  Q. Yet that's a yes?
13  A. Yes.
14  Q. Okay. And then you gave that to Mr. Rona?
15  A. Right.
16  Q. Okay. And then they went through that, and
17   they came back to you with a list of
18   keywords that they wanted you to use, is
19   that correct?
20  A. I think that's generally true. We may
21   have -- you know, we may have done some
22   things. In general, that was the sequence.
23   We may have, after running the frequency,
24   taken out some things like "the," "and,"
25   words that clearly aren't relevant or

Page 88

1  aren't useful, and we may have flagged some
2  things based on our understanding of the
3  issues, but at the end of the day, this
4  was the list that they, sort of, agreed to
5  or --
6  Q. Ultimately, you were being instructed to
7   use this list --
8  A. Right.
9  Q. -- by plaintiffs' counsel, correct?
10  A. Right, right.
11  Q. And did Doctor Hartman have any input into
12   the selection of this keyword list?
13  A. You know, I -- I don't recall. I think in
14   the -- I don't recall any specific input.
15   We may have discussed it. We may not have.
16  Q. You can't tell me that he said --
17  A. I can't tell you that he said, Include --
18  Q. Use this word, don't use that word?
19  A. -- this word. Correct, right.
20  Q. Did Doctor Rosenthal have any input into
21   the selection of this keyword list?
22  A. Again, it's possible we discussed it. I
23   don't recall any specific input that she
24   may have had.
25  Q. Did Doctor King?

Page 89

1  A. I think he -- I doubt he would have. I
2   don't think he even reviewed any of this.
3  Q. So as we sit here today, you cannot tell me
4   that any of plaintiffs' retained experts in
5   this case had any input whatsoever into the
6   selection of these keywords, is that
7   correct?
8  A. I can't tell you any specific input, yes.
9   That's correct.
10  Q. "D&D," what is the significance of that as
11   a keyword?
12  A. So, again, I don't -- I can't speak for
13   plaintiffs' counsel and for why they
14   believe different words here are
15   significant or not or how they relate to
16   challenged conduct. My understanding is
17   that "D&D" is an abbreviation for Dine and
18   Dash which, you know, which may relate to
19   challenged conduct.
20  Q. Okay. "Ad Board"?
21  A. Again, my understanding is that that may
22   relate to advisory board which may relate
23   to the challenged conduct.
24  Q. And how does advisory board relate to the
25   challenged conduct?

23 (Pages 86 to 89)

Page 90

1   A.  You know, I don't know specifically.  I
2       think each of these, to the extent that
3       either plaintiffs' counsel has reason to
4       believe or to represent that any of these
5       things were improper or reflected improper
6       behavior or challenged conduct, we were
7       asked to consider them.  Advisory board may
8       have been -- my understanding, and this is
9       not necessarily plaintiffs' understanding
10      or plaintiffs' counsel's understanding --
11      is that this could relate to an invitation
12      to appear on an advisory board or to be
13      part of an advisory board, but again --
14  Q.  Could it relate to a reference to an FDA
15      advisory board?
16  A.  It could.
17  Q.  "Article."
18  A.  Okay.
19  Q.  What is the significance?  Why is that a
20      keyword?
21  A.  Again, I think, you know, this could relate
22      to articles being left with doctors, you
23      know, reprints or materials discussing
24      different uses and different outcomes from
25      those uses.

Page 91

1   Q.  But it wouldn't tell you anything about
2       which article or what the articles were?
3   A.  Right, right.
4   Q.  "Attend"?
5   A.  Again, you know, it could relate to
6       inviting physicians to attend a conference,
7       to attend a workshop, to attend a CME
8       event.
9   Q.  What if somebody in a call note said his
10      son attends the University of Michigan, it
11      would also pick that up, correct?
12  A.  I believe the way this is done, it would
13      have to be "attend" strictly defined with
14      no "S," but, yes, in general, if there's
15      another context where "attend" is used
16      singular -- not "attends" -- then, yes,
17      then that would be.
18  Q.  Okay.  "Bureau"?
19  A.  I believe that relates to speakers'
20      bureaus.
21  Q.  "CME"?
22  A.  I believe that's Continuing Medical
23      Education.
24  Q.  "Co Med"?
25  A.  That -- that -- I don't recall what the

Page 92

1       specific context was for that.  I think
2       that was, again, something that plaintiffs'
3       counsel -- it could be something related to
4       medical education, but each of those, I'm
5       just not sure what the context is.
6   Q.  Okay.  C-O-N-F?
7   A.  Ah-hah.
8   Q.  What does that relate to?
9   A.  That -- I believe that that was intended to
10      relate to -- to pick up references to
11      conference.  So invited physician to a
12      conference or some of these, I believe,
13      were done to be, sort of, wild cards in the
14      sense that if something began with
15      conference -- C-O-N-F, and then ended in
16      conference or conferences, some of those --
17      some of these are done in such a way to
18      pick up -- to pick up, you know, any ending
19      to "conference."  Some of these, I think,
20      are done to be a little bit more specific,
21      and that's reflected on that disk that we
22      provided.
23  Q.  Okay.  You indicated that attend was not
24      intended -- was not done to be a wild card?
25  A.  I think that's right.  Now that I'm going

Page 93

1       through these, that one may be one where
2       we -- you know, if it said "attends," that
3       may have been flagged also.  I'd have to
4       look at that.
5   Q.  So on conference or C-O-N-F, that would --
6       you think that would be done as a wild
7       card, so it would also pick up references?
8   A.  It might have been.  I can't recall without
9       looking at the disk for any one of these
10      specifically.
11  Q.  Would it also pick up words like
12      "confidence"?
13  A.  It might.
14  Q.  "Invite."  Do you know if that was done to
15      be a wild card so that it would pick up
16      words like "invited"?
17  A.  I don't know if that's true.  It might pick
18      up words like "invited."
19  Q.  What is the significance of the keyword
20      "Left"?
21  A.  I believe that that was intended to
22      capture, you know, left article, left, you
23      know, promotional materials, left samples.
24  Q.  Okay.  What about "Med Aff"?
25  A.  I believe that was intended to capture

24 (Pages 90 to 93)

Page 94

1      medical affairs, but I don't know what the
2      significance of that is.
3   Q.  What about "Phobia"?
4   A.  I believe that was intended to catch or to,
5      sort of, highlight, flag, social phobia and
6      papers relating to social phobia.
7   Q.  That's the only term on here that relates
8      to any kind of indication, isn't it?
9          MR. NOTARGIACOMO:  Objection.
10  A.  I don't know that that's true.  There may
11     be other things on here.  I think there's a
12     couple of specific paper references on
13     here.
14  Q.  That's not my question.  My question is, Is
15     there anything else on here where the term,
16     itself, is a description of an indication?
17         MR. NOTARGIACOMO:  Objection.
18  A.  That may be true.  I --
19  Q.  Can you point me to another one?
20  A.  I can't point you to another one where the
21     name discusses an indication that appears
22     to be true.
23  Q.  Okay.  Do you know why "phobia" was singled
24     out for that distinction?
25  A.  I don't know.  I don't recall.

Page 95

1   Q.  P-R-O-G.  Again, I'm assuming that this
2      would have been a wild card keyword,
3      correct?
4   A.  That's -- that's likely true.  I'd have to
5      look to tell you for sure.
6   Q.  Okay.  So that would also pick up words
7      such as "Progress"?
8   A.  If that's true, then that's right.  It
9      would.  It could.
10  Q.  Okay.  Why is "Talk" a keyword?
11  A.  I believe, again, that was similar to some
12     of these other ones intended to capture or
13     intended to, sort of, highlight inviting a
14     physician to a talk.
15  Q.  Do you know if it was a wild card search or
16     not?
17  A.  I don't know.
18  Q.  "Meeting."  Why is that a keyword?
19  A.  Again, I think inviting a physician to a
20     meeting.
21  Q.  But if the call reflected this was our
22     first meeting, it would pick that up as
23     well, correct?
24  A.  It could, right.
25  Q.  Was there any attempt to limit the searches

Page 96

1      that were run to Neurontin?
2   A.  I can recall looking at that.  Most of the
3      call notes, as far as I could tell, didn't
4      mention specific drugs.  Many of them did
5      not.  Most of the call notes were fairly
6      sparse.
7          So there were some that mentioned
8      Neurontin or things that looked like they
9      were Neurontin, NTN, or different
10     abbreviations of Neurontin, but we did not,
11     in this analysis, limit the call notes in
12     that way.
13  Q.  Okay.  So once you ran these keywords, you
14     created an output file, correct?
15  A.  Right.  There's sort of a tabulation of how
16     many records mention these keywords.
17  Q.  Well, did you create a spreadsheet that
18     would actually capture the records that
19     mention these keywords where you could
20     actually review what the call note said?
21  A.  We may have.  We may have done that.  I
22     know I did review call notes at different
23     points.  I think in the analysis reflected
24     here for these call notes, I think that the
25     output file for this would have been a

Page 97

1      count -- a tabulation by month or I think
2      this is tabulated by month in Excel.
3   Q.  Okay.  I'm not asking you in terms of the
4      output file that was made and captured as a
5      chart to your declaration.
6   A.  Right.
7   Q.  I'm saying, Did you create an output file
8      where you could actually go through the
9      records that were captured by this keyword
10     search and review the actual call notes?
11  A.  We probably did do that.  I know we did --
12     at different points, we did review a number
13     of call notes, many of which contained
14     these words.  I don't know if, for this
15     particular set, if we, you know, did an
16     output of these particular records and
17     reviewed some or all of them.
18         We reviewed call notes and I
19     reviewed the call notes, but for this
20     particular set, I don't know whether we
21     created an output file like that.
22  Q.  If that output file had been created, would
23     it still exist?
24  A.  It might.  It might not.
25  Q.  And where would you look for it?

25 (Pages 94 to 97)

Page 98

1   A. Look for it on our system if we had it.
2   Q. Do you know how many of the records that
3      were captured by this keyword search
4      referred to Celexa?
5   A. I don't know that.
6   Q. Was there any attempt to eliminate records
7      that referred to Celexa?
8   A. I believe that I considered -- I believe
9      that I raised that possibility that -- with
10     plaintiffs' counsel that there might be --
11     that there might be other drugs here.  I
12     have a specific memory of asking
13     plaintiffs' counsel if there was a way to
14     identify drugs other than by looking for
15     call notes that had the drug names spelled
16     out.  And my recollection is that there's
17     no way to do that short of looking for
18     records that specifically mention a drug or
19     multiple drugs to identify which drug a
20     call note relates to.
21  Q. So if your keywords -- so if your keyword
22     search created -- you created a list of
23     records --
24  A. Ah-hah.
25  Q. -- and those records have call notes

Page 99

1      associated with them?
2   A. Ah-hah.
3   Q. And if that call note referred to Celexa --
4   A. Right.
5   Q. -- there was no attempt to eliminate that
6      record from your chart, correct?
7   A. That's correct, in this analysis.  Now I
8      think we considered -- we considered it.
9      We may have looked at what the impact might
10     have been of reviewing different drugs in
11     these data, but the vast majority of the
12     records had no drug listed at all.
13  Q. But the answer to my question is no.
14  A. Right.
15  Q. If the call note specifically referred
16     to --
17  A. Right.
18  Q. -- Celexa, you made no attempt to eliminate
19     that call record?
20  A. Right.
21  Q. And you were told -- and you were given
22     that instruction by plaintiffs' counsel,
23     correct?
24        MR. NOTARGIACOMO:  Objection.
25  A. I believe that ultimately we were given

Page 100

1      that instruction.  I think I can recall
2      raising the possibility of, you know, if we
3      did want to look at just, you know, is
4      there a way to look at just Neurontin call
5      notes?  And I believe I was told no.
6   Q. So that was a decision that was made by
7      plaintiffs' counsel?
8   A. Essentially, yes.
9   Q. Same question.  Do you know whether the
10     drug, Zoloft, is -- by the way, do you know
11     what Celexa is used to treat?
12  A. Celexa is a -- I believe Celexa is an
13     antidepressant.
14  Q. Do you know whether or not any of the call
15     notes referred to Zoloft?
16  A. I believe some of them may.  I recall
17     seeing Zoloft mentioned.
18  Q. And what is Zoloft used to treat?
19  A. I believe Zoloft is also an antidepressant.
20  Q. And, again, there was no attempt made to
21     eliminate records that referred to Zoloft,
22     correct?
23  A. That's correct.
24  Q. And, again, that was a decision that was
25     made by plaintiffs' counsel, correct?

Page 101

1   A. Correct.
2   Q. Do you know if the records referred to
3      Lexapro?
4   A. Some of them may.  I don't recall
5      specifically seeing Lexapro, but it may be
6      in there.
7   Q. Do you know what Lexapro is used to treat?
8   A. I believe Lexapro is also an
9      antidepressant.
10  Q. Again, there was no attempt made to
11     eliminate records that referred to the
12     Lexapro, correct?
13  A. That's correct.
14  Q. And, again, that decision was made by
15     plaintiffs' counsel.
16  A. That's correct.
17  Q. Do you know if there are records that refer
18     to Relpax?
19  A. I don't.  I don't.
20  Q. Do you know what Relpax is used to treat?
21  A. I don't.
22  Q. And, again, there was no -- there was no
23     attempt made to eliminate records that
24     referred to Relpax?
25  A. No.

26 (Pages 98 to 101)

Page 102

1  Q. And, again, that decision was made by the
2     plaintiffs' counsel?
3  A. Yes.
4  Q. Do you know if there are records that refer
5     to Aricept?
6  A. I don't know that.
7  Q. Do you know what Aricept is used to treat?
8  A. No.
9  Q. And, again, there was no attempt made to
10    eliminate records that refer to Aricept?
11 A. No.
12 Q. And, again, that decision was made by
13    plaintiffs' counsel?
14 A. Yes.
15 Q. Did you do any kind of analysis where you
16    attempted to count the number of records
17    that referred to drugs other than
18    Neurontin?
19 A. I may have at different points. I think
20    it's likely that I looked at whatever, you
21    know, index we had of the words and noticed
22    a few other drugs in there. I do remember
23    seeing Zoloft listed, and I think that's
24    what prompted me to ask that question of
25    plaintiffs' counsel. But other than that

Page 103

1     and maybe, you know, pulling out some of
2     those records or ones that I happened to
3     notice, the answer is no.
4  Q. Okay. And if that analysis where you
5     actually ran the counts on the other
6     drugs -- does that still exist?
7  A. It may. I don't know.
8  Q. But you could check your network and find
9     out if it still exists?
10 A. Yes. If I did look, that's where I would
11    look, and perhaps I would find something,
12    but perhaps not.
13 Q. I think you indicated that the majority of
14    the records had no drug indication one way
15    or the other?
16 A. I believe that's true. That's my
17    recollection.
18 Q. So as to those where there's no drug
19    indicated at all, do you have any way of
20    knowing whether the drug being referred to
21    is Neurontin, Celexa, Aricept, Zoloft, or
22    some other drugs?
23 A. Not to my knowledge.
24 Q. And am I correct that after you ran this
25    keyword search, you did not undertake any

Page 104

1     attempt to review the call notes themselves
2     that were generated as a result of this
3     keyword search and eliminate those that
4     were clearly not related to challenged
5     conduct? There was no qualitative review
6     of the call notes, if that's another way of
7     saying it?
8  A. There was qualitative review of the call
9     notes. Ultimately, in the numbers and the
10    counts that are reflected in these charts,
11    we did not remove any on that basis.
12 Q. Okay. So, for example, if one of the call
13    notes said, Using Celexa over all others to
14    see if there are less sexual side effects,
15    does not care about research papers -- if
16    that had been picked up by your keyword
17    search, it wouldn't have been eliminated at
18    any point, correct?
19 A. That -- under these criteria, a call note
20    like that could have been counted. I
21    don't -- I don't recall seeing that one,
22    but.
23 Q. If the call note said, On way out to
24    meeting, quick Celexa reminder, that could
25    have been counted, correct?

Page 105

1  A. That also could have been counted. I don't
2     recall that keyword.
3  Q. And if a call note said --
4  A. Sorry. That's call note rather.
5  Q. And if a call note said, Say we wrote a
6     letter to Medica to place Celexa on the
7     formulary, would that have been counted?
8  A. Again, it could have been counted.
9  Q. It would have been picked up by the keyword
10    letter, correct?
11 A. It could have been, yes.
12 Q. And you don't have any protocol in place
13    for eliminating it, correct?
14 A. That's correct.
15 Q. One of the keywords is Program, correct, or
16    P-R-O-G is intended to pick up the word
17    Program, correct?
18 A. I think that's right.
19 Q. So if the call note reflected claims she
20    was trying to put patients on an assistance
21    program, that would have been picked up,
22    correct?
23 A. If that were a call note, then that could
24    have been picked up, yes.
25 Q. And there's no protocol in place for

27 (Pages 102 to 105)

Page 114

1   you're not sure?
2   A.  Right.
3   Q.  And you chose whatever the way to do it was
4        already in the Excel program?
5   A.  Right.
6   Q.  Is correlation the same thing as causation?
7            MR. NOTARGIACOMO:  Objection.
8   A.  Well, let me begin by saying, yes, that
9        that's -- causation and correlation are, as
10       a statistical matter and as an econometric
11       matter, are, sort of, outside the scope of
12       my expertise.  I've taken statistics
13       courses; I've taken econometric courses,
14       economics courses, but I'm not a Ph.D.
15       statistician; I'm not a Ph.D. economist.
16           My understanding -- and this is as
17       a, sort of, lay person in this regard, that
18       correlation is not the same as causation.
19   Q.  Whose idea was it to overlay these two
20       lines?
21   A.  Again, I think it was -- it was done in
22       connection -- you know, probably at the
23       request of one of plaintiffs' counsel.  It
24       may have been it was sort of -- in
25       reviewing these data and discussing these

Page 115

1        data, we discussed this with plaintiffs'
2        counsel.  It could have been one of them.
3        I don't have a specific recollection of who
4        asked for these two things to be overlaid.
5   Q.  You don't recall if it was Mr. Rona or not?
6   A.  I don't.  It could have been.  I don't
7        recall specifically that it was.
8   Q.  And what is the significance of overlaying
9        these two datasets?
10   A.  And, again, this is my understanding, I
11       think, in terms of what Mr. Rona or any of
12       the other plaintiffs' counsel hope to show;
13       it's sort of a different matter.  But my
14       understanding is that the point of doing
15       this or one reason for doing this was to
16       connect the variable that I -- as measured
17       by IMS to some measure of challenged
18       conduct or, in other words, to make a
19       connection between detail visits, as
20       measured by IMS, and the content of those
21       detail visits as measured by the detailer's
22       own notes subsequent to that visit.
23   Q.  Okay.  You understand that the plaintiffs
24       are arguing that from this data, one should
25       draw an inference of causation, correct?

Page 116

1            MR. NOTARGIACOMO:  Objection.
2   A.  I don't -- I don't know how plaintiffs are
3        using these charts.  I haven't seen briefs
4        that they've written and I haven't seen
5        analysis that they've -- you know, work
6        that they've done following this.
7   Q.  Do you believe that this data permits one
8        to draw an inference of causation?
9            MR. NOTARGIACOMO:  Objection.
10   A.  That is something that I'd begin by saying
11       that that inference is outside of my
12       expertise, but that my understanding is
13       that correlation is not the same as
14       causation.
15   Q.  Would you agree with me that any attempt to
16       draw an inference of causation is something
17       that would probably be the subject of
18       expert testimony?
19            MR. NOTARGIACOMO:  Objection.
20   A.  That, I think, is, again, something that I
21       don't have an opinion about.  That's, I
22       think, sort of a legal threshold.  I don't
23       know what the standard is for expert
24       testimony.
25   Q.  To your knowledge, have either Doctor

Page 117

1        Rosenthal or Doctor Hartman drawn any
2        opinions about causation based upon this
3        data that they've expressed in
4        declarations?
5   A.  My -- as I said earlier, my belief would be
6        no, because I don't believe they filed a
7        declaration subsequent to this.
8   Q.  Okay.  Who decided what time frame to use?
9   A.  I believe that this time frame is whatever
10       time frame it was available from the data.
11       In other words, I don't believe there was a
12       decision.  I believe there was it was --
13       the decision was to present all the data
14       that was available.
15   Q.  Do you know whether the defendants were
16       detailing to psychiatrists after 2000?
17   A.  I don't have specific knowledge about that.
18       I believe I was told that they may have
19       changed some of their detailing practices
20       at some point, but I don't have specific
21       facts that I could tell you about that.
22   Q.  Was there any discussion with plaintiffs'
23       counsel about limiting this dataset to the
24       time frame when psychiatrists were actually
25       being detailed?

30 (Pages 114 to 117)

Page 138

1    respect to the IMS data and, you know,
2    there's two detailing variables here,
3    number of contacts and cost of contacts,
4    and so we showed both.
5    Q.  And, again, you calculated the correlation
6    coefficient.  You did that the same way as
7    you described to me for the prior chart?
8    A.  That's right.
9    Q.  And, again, you included the time period
10   after 2000, is that correct?
11   A.  I believe that's right.  I think in each of
12   these -- and I don't know if I mentioned it
13   on the earlier chart -- but on each of
14   these I think I described the period in
15   which we calculate the correlation
16   coefficient.
17       We only do it in periods where we
18   have both pieces of data.  So in Figure 1
19   we limited that to where we had both
20   datasets available.  Here we also limit it
21   to October '98 through August 2003.  So
22   that's the period where we calculate it.
23   Q.  But there was no attempt to restrict the
24   calculation to the time period when
25   psychiatrists were actually being detailed,

Page 140

1    analysis.
2    Q.  And any inference about causation is
3    something that would have to be addressed
4    by expert testimony, correct?
5           MR. NOTARGIACOMO:  Objection.
6    A.  You know, I don't -- I don't know the
7    answer to that.  I think that's a legal
8    standard.  I don't know what the standard
9    is.
10   Q.  But your understanding is that correlation
11   and causation are not the same thing?
12   A.  That's my personal understanding, but I
13   don't have an expert opinion on that.
14   Q.  And then Figure 5B, I think you started to
15   tell me earlier, is basically the same
16   thing, except that the IMS line is cost of
17   detail visits rather than the count of
18   detail visits, correct?
19   A.  I believe that's correct, yes.  And I
20   believe, though it's not noted here, I
21   believe it's the same series from the
22   previous graph.  That's something that
23   should be clear from the materials on the
24   disk that I provided.
25   Q.  Okay.  But once again, you don't recall

Page 139

1    correct?
2    A.  We may have calculated other correlation
3    coefficients over subsets, but --
4    Q.  If you did that --
5    A.  -- but we did not do that here.  There's no
6    attempt to do that here.
7    Q.  When you say you may have attempted to do
8    it, is it possible that you did it, but it
9    did not make its way into your declaration?
10   A.  It's possible, but I don't recall
11   specifically.
12   Q.  If you did do the -- calculate the
13   correlation coefficient on any subsets,
14   would that data still exist?
15   A.  It might.  It might not.
16   Q.  But you can check for it and you can find
17   out, correct?
18   A.  I could check.  I don't know.  I don't know
19   what that would show, but I could -- I
20   might, yes.
21   Q.  Okay.  But, once again, any inference that
22   one would want to make about causation,
23   there's no regression analysis done here,
24   correct?
25   A.  That's correct.  There's no regression

Page 141

1    whether you attempted to calculate the
2    correlation coefficients on any subset of
3    this data, correct?
4    A.  You know, I don't -- I don't recall.  I may
5    have.  I may not have on these data.
6    Q.  So you don't know how that kind of
7    restriction would affect the calculation?
8    A.  Looking at this, yes, I don't know.
9    Q.  Okay.  And once again, you know, this is
10   correlation that's not causation, correct?
11          MR. NOTARGIACOMO:  Objection.
12   A.  It's correlation, and my personal
13   understanding is that it's not the same
14   thing.
15   Q.  And you can't point me to any expert
16   declaration in this case where this data is
17   being relied upon by that expert to draw an
18   opinion regarding causation, correct?
19   A.  Can you be specific about what you mean by
20   "this data"?
21   Q.  This chart.
22   A.  This chart.  That's correct, though the
23   data underlying it may be used in various
24   ways.
25   Q.  Yes, but if the data underlying it was

36 (Pages 138 to 141)

Page 142

1    subjected to a regression analysis, that
2    would be completely different --
3  A. That would be separate.
4  Q. -- than what you're trying to do here,
5    correct?
6  A. That's correct.
7  Q. I want to go back to page five of your
8    report, the keyword list. One of the
9    keyword lists that you use is "CME," is
10   that correct?
11 A. That's correct, yes.
12 Q. Okay. Am I correct that your -- the
13   analysis that you've done, number one, your
14   analysis doesn't permit anyone to
15   disaggregate between these different
16   keywords, is that correct? Your chart
17   doesn't do it?
18 A. The chart does not do it. Right. You -- I
19   believe, in reviewing the disk of materials
20   that I provided, I believe the criteria is
21   that if one or more of these words exists
22   in a record, that record is flagged. If
23   one or more of the keywords in this list is
24   included in a particular call note, that
25   record is flagged and counted once in the

Page 143

1    chart in Figure 1.
2  Q. Okay.
3  A. But there's no -- right. There's no
4    disaggregation there.
5  Q. But, for example, your chart wouldn't tell
6    me whether or not detailing was correlated
7    with any particular CME event, is that
8    correct?
9  A. I believe that's right. Yes. There's not
10   a disaggregation to permit that.
11 Q. And it wouldn't provide any sort of
12   correlation with any -- with a particular
13   number or the total number of CME events
14   where Neurontin was discussed, correct?
15 A. I think that's also true in the sense that
16   these -- this pink line in Figure 1, you
17   know, may contain multiple things. It may
18   contain multiple different things.
19 Q. And it's not even correlated with whether
20   Neurontin was even discussed at a
21   particular CME event, is that correct?
22 A. It -- that's unclear. I don't know whether
23   or not that's true. It's certainly not --
24   it's not possible to observe that from this
25   chart.

Page 144

1  Q. If they made reference to a Celexa CME
2    event, it would still be picked up, and
3    there's no basis for eliminating that
4    event, correct?
5  A. It could be -- Celexa CME event could be
6    picked up, yes.
7  Q. Okay. And your analysis doesn't -- doesn't
8    provide any sort of correlation with
9    respect to whether or not off-label use is
10   discussed at a particular CME event, is
11   that correct?
12 A. That's -- yes, that's right. There's no
13   specific disaggregation that would permit
14   that.
15 Q. On Figure 3B, this is "Distribution of
16   Selected Neurontin Letters by Title."
17   You've eliminated from the analysis of
18   letters any letters that could not be
19   associated with a particular detail visit,
20   is that correct?
21 A. In Figure 3B, I believe the answer is no,
22   and I can look at this and tell you more
23   specifically.
24 Q. Well, let's go back to the first, the blue
25   line.

Page 145

1  A. Right.
2  Q. Because everything breaks down from the
3    blue line, correct?
4  A. That blue line presented in 4A is the basis
5    for --
6  Q. This is the first line, the blue line up
7    here, or no, no.
8        MR. NOTARGIACOMO: Blue line on
9    what chart?
10 A. Yes. On what chart?
11 Q. Let me back up. Let me back up. Let's go
12   to 4A.
13 A. Okay.
14 Q. The blue line on 4A is "Letters to
15   Psychiatrists Matched In the Call Notes,"
16   correct?
17 A. That's correct.
18 Q. So if there were any letter requested by
19   psychiatrists and you could not match them
20   to a record in the call notes, you didn't
21   include it, correct?
22 A. In figure -- with respect to figure 4A,
23   that's correct.
24 Q. Okay. So to the extent that there were
25   physicians who were not detailed or

37 (Pages 142 to 145)

1      psychiatrists who were not detailed and
2      made requests for information, they're not
3      captured, correct?
4   A. That's correct with respect to 4A.  It's
5      not correct with respect to 3B or 3A or
6      Figure 2.
7   Q. Okay.  But is the line in 4A, that blue
8      line gets carried over to 4B?
9   A. That's right.
10  Q. And it gets carried over to 5A?
11  A. That's correct.
12  Q. And it gets carried over to 5B, is that
13     correct?
14  A. That's correct.
15  Q. So, for example, in 4B where you're trying
16     to draw the correlation between temporality
17     and the letter request, that's what you're
18     trying to do, correct?
19  A. Ah-hah.
20  Q. If you had included in this all of the
21     letter requests by psychiatrists, rather
22     than those that were correlated with a --
23     that were matched up with a call event,
24     that would have changed the analysis,
25     wouldn't it?

1          MR. NOTARGIACOMO:  Objection.
2   A. It might have.
3   Q. Well, I mean, it would show that that --
4   A. To the extent that there are -- I don't
5      know to what extent there are letters to
6      psychiatrists where there is not -- where
7      that psychiatrist never was detailed or
8      never showed up.
9   Q. Right, right.
10  A. I don't know what.  Even if the answer is
11     zero, if that's a null set, then there
12     would be no change in the analysis.
13  Q. But you don't know if it's a null set?
14  A. But I don't know it's a null set.
15  Q. If it is twice this number, it would
16     significantly impact the correlation,
17     wouldn't it?
18         MR. NOTARGIACOMO:  Objection.
19  A. It could.  It could.  Yes.  I mean, if you
20     run -- if you run these data differently,
21     you could get different results.
22  Q. I mean, you're building in a relationship
23     already when you restrict it to the
24     matching set, correct?
25  A. It's correct that you build in a

1      relationship there.
2   Q. Well, you're not accounting at all for the
3      fact that there are psychiatrists who
4      requested letters that were not detailed?
5          MR. NOTARGIACOMO:  Objection.
6      Assumes facts not in evidence.
7   A. Can you repeat the question?
8   Q. You're not accounting for the fact at all
9      that there may have been psychiatrists who
10     requested letters that were never detailed?
11  A. In this chart, that's correct.  There's no
12     reflection of psychiatrists who were never
13     detailed.
14  Q. And to the extent that's true of the blue
15     line in this chart, that's true of every
16     chart where the blue line is incorporated,
17     correct?
18  A. It's correct with respect to the blue line
19     in each of 4A, 4B, 5A, 5B.
20  Q. Now I think you're trying to tell me that
21     3A and 3B were not restricted to those
22     matched in the call set, is that correct?
23  A. I believe that's right.
24  Q. But there's no attempt in any of the
25     subsequent charts to match up those lines

1      with detailing, is there?
2   A. There is an attempt in figure 4A.  I mean,
3      that red line in 4A is the subset of
4      letters from 3A and 3B that match up to
5      something in the call notes.
6   Q. Right, but then it's this line that you
7      then try to match up with detailing, not
8      any line from 3A or 3B, correct?
9          MR. NOTARGIACOMO:  Objection.
10     Vague.  "This line."
11         MS. ARMSTRONG:  The blue line.
12  A. The blue line from figure 4A?
13  Q. Right.
14  A. That's right.
15  Q. In their memorandum in opposition to our
16     motion for summary judgment the class
17     plaintiffs, Mr. Notargiacomo's clients,
18     state that defendant's sales -- that these
19     charts of the physician letter show that
20     defendant's sales representatives were, in
21     fact, pushing Neurontin for off-label uses.
22     You don't try to draw that inference from
23     the charts, do you?
24         MR. NOTARGIACOMO:  Objection.
25  A. I -- in the charts I summarize the data as

Page 150

1    I've described.  I don't have an opinion as
2    to whether the summaries that I've provided
3    presented support of particular position or
4    not.  I don't present that opinion here.
5  Q.  Okay.  Can you point me to any retained
6    expert that does present that opinion based
7    upon your data?
8  A.  Based upon my data, I cannot.
9  Q.  I mean, if, for example, a sales
10    representative visited a physician with the
11    intent of detailing Celexa, and the
12    physician said, Could you send me
13    information on this about Neurontin?  I've
14    heard such and such about Neurontin; you
15    don't know how that would relate to the
16    challenged conduct at all, do you?
17  A.  That's right.  For any particular call
18    note, I don't know, you know.
19  Q.  And none of your data attempts to capture
20    that kind of effect in any way or eliminate
21    that kind of circumstance in any way?
22  A.  I think that's correct in the sense that
23    all we represent that we're doing is
24    counting records where specific words show
25    up.

Page 151

1  Q.  Have you -- other than the all physician
2    charts, have you done this analysis for any
3    specialties other than psychiatrists?
4  A.  I may have.  I don't have a -- I recall
5    considering it.  I don't recall whether I
6    ran it or what the results might have
7    shown.  My recollection with all of this,
8    particularly starting at 4A, is that
9    looking at other specialties there's -- the
10    numbers get very small in terms of number
11    of letters that one could look at because
12    so many of them are to psychiatrists.  So I
13    don't recall -- I recall considering it.  I
14    don't recall what, you know, results might
15    have been.
16  Q.  Do you recall discussing with plaintiffs'
17    counsel whether you should do it for other?
18  A.  I recall discussing -- having discussions
19    about specialty and about what specialties
20    to look at.  I don't recall the substance
21    of those other than I described what I
22    observed in the data and what I had seen in
23    the database, and, you know, to discuss
24    what other -- we may have discussed what
25    other specialties plaintiffs' counsel were

Page 152

1    interested in or what may have been an
2    issue in their legal theory of the case,
3    but, you know, other than what's presented
4    here, I don't have a specific memory of
5    that.
6  Q.  Okay.  And the only charts that pertain to
7    all physicians is Figure 2, Figure 3A,
8    Figure 3B, is that correct?
9  A.  So 2, 3A, 3B, 4A, the top line in 4A, the
10    red line in 4A --
11  Q.  Okay, okay.
12  A.  -- is broader.  Is broader than just
13    psychiatrists.
14  Q.  Okay.  But there's no attempt to correlate
15    the data that's tracked in those charts
16    with respect to all physicians?  There's no
17    attempt to correlate them to either number
18    of detailing visits or cost of detailing?
19  A.  That's correct.
20  Q.  So you have no idea what the level of
21    correlation would be for other specialties,
22    is that correct?
23  A.  I may -- I may have considered it.  I have
24    no idea, looking at this, what it would be.
25  Q.  Is it possible that you actually ran those

Page 153

1    statistics?
2  A.  It's possible.  I don't --
3  Q.  And I say "statistics" --
4        MR. NOTARGIACOMO:  Can you let him
5    finish his answer before?
6        MS. ARMSTRONG:  Yes.
7  Q.  I just wanted to amend my question because
8    I said "statistics" and it's probably
9    better to refer to it as a calculation?
10  A.  Yes.  By that do you mean the correlation
11    coefficient?
12  Q.  Yes.
13  A.  It's possible.  It's certainly possible
14    that we ran a correlation coefficient on
15    different summaries of the data.  Perhaps
16    physicians and aggregate though, I don't --
17    you know, as you said, most of these charts
18    don't present the aggregate data.  I think
19    the only IMS data presented in here is by
20    psychiatrists.  So I couldn't look at this
21    and tell you what that correlation
22    coefficient would be.
23  Q.  Okay.  If that still existed, you could
24    search for it and search your network or
25    your various records and find out?

39 (Pages 150 to 153)

Page 154

```
 1   A.  Yes, I might.  If we had done this, I might
 2       be able to look for it, but I don't know.
 3   Q.  You can't tell me that you didn't to it, so
 4       it would make sense to look for it, right?
 5   A.  Yes.  I can't tell you that I definitely
 6       did not run it.
 7   Q.  Do you know whether or not the purpose or
 8       the goal of using these charts was to try
 9       to account for the impact of publication or
10       peer-to-peer marketing on Neurontin sales?
11   A.  I don't know what the full extent of the
12       intent of this analysis was other than what
13       I was told regarding the desire to look at
14       these databases and to try to summarize
15       what was contained within them.
16           Now I think my personal opinion is
17       that I think that publications appear to be
18       reflected in the keyword list, but I don't
19       know that that was what plaintiffs' counsel
20       desired in requesting this analysis or even
21       what it ultimately shows.
22           I mean, I think the impact of
23       publication on sales is a causal question,
24       and these charts don't present causal
25       analysis.
```

Page 155

```
 1   Q.  You used the word "opinion," I think, a
 2       couple of times today about your personal
 3       opinion.  When you say that, you mean your
 4       understanding?
 5   A.  My -- yes.
 6   Q.  You're not trying to offer an expert
 7       opinion on anything, is that correct?
 8   A.  That's correct.  This is my response to
 9       your questions are just prefaced with the
10       fact that I don't have an expert opinion or
11       an opinion other than -- I don't have an
12       opinion, period.
13           I've been asked to look at these
14       databases.  I've looked at them, and these
15       are the results and how I did it.
16   Q.  Are you aware that Doctor Rosenthal has
17       stated in her declaration or in her
18       March 2008 declaration that she is unable
19       to account systematically for the impact of
20       publication and peer-to-peer marketing on
21       off-label prescribing of Neurontin?
22   A.  I don't have a specific recollection of
23       that.  I don't know whether or not that's
24       in there or not.  I don't recall, but it's
25       possible.
```

Page 156

```
 1   Q.  And if she says that she can't do it, you
 2       don't have any basis for disagreeing with
 3       her, correct?
 4   A.  Could you repeat the statement again?  The
 5       statement was that --
 6   Q.  She is unable to account -- if I can find
 7       it and take a second to find the actual
 8       statement.  She says:  "It is alleged that
 9       defendants relied not only on detailing to
10       transmit messages about off-label use, but
11       also leveraged an array of other tactics
12       including manipulation of the published
13       literature to which physicians look for
14       impartial information and influencing
15       thought leaders.  Because of the limits of
16       my data, I am unable to account
17       systematically for these influences on
18       prescribing."
19   A.  Okay.
20   Q.  Do you have any basis for disagreeing with
21       that statement?
22           MR. NOTARGIACOMO:  First, let me
23       object that you're reading something he
24       doesn't have in front of him.  There's no
25       context to it.
```

Page 157

```
 1   Q.  Assuming I've read it correctly, do you
 2       have any basis for disagreeing with it?
 3   A.  I don't -- I don't -- without reading what
 4       you've read to me, I don't have any basis
 5       for disagreeing with those statements, but,
 6       again, I haven't read the full context.
 7   Q.  I mean, you haven't had --
 8   A.  I don't know the full context of it.
 9   Q.  You haven't had any discussions with Doctor
10       Rosenthal where you said, Here, look at my
11       chart.  You should amend your report, and
12       this will enable you to account for
13       publication and peer-to-peer marketing?
14   A.  No.  I've not had that conversation with
15       Professor Rosenthal, no.
16   Q.  And she's not amended her report to do so,
17       correct?
18   A.  To my knowledge, she's not amended her
19       report.
20           MS. ARMSTRONG:  Do you want to
21       take a five-minute break just to let me
22       review my notes?
23           VIDEOGRAPHER:  The time is
24       12:11 p.m.  This is the end of tape three,
25       and we're off the record.
```