# EXHIBIT A

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3

4      - - - - - - - - - - - - - - - - - X

5      IN RE:  NEURONTIN MARKETING, SALES        MDL DOCKET

6      PRACTICES, AND PRODUCTS LIABILITY         NO. 1629

7      LITIGATION                                MASTER FILE

8                                                NO. 04-10981

9      _____          JUDGE PATTI B.

10     THIS DOCUMENT RELATES TO:                 SARIS

11     SHEARER V. PFIZER, ET AL.;                MAGISTRATE

12     1:07-CV-11428-PBS                         JUDGE LEO T.

13     - - - - - - - - - - - - - - - - - X       SOROKIN

14     VOLUME I                                  Pages 1-212

15

16          VIDEOTAPED DEPOSITION OF DAVID P. FRANKLIN, Ph.D.,

17     a witness called by counsel for the defendant,

18     Pfizer, Inc., taken before Kimberly A. Smith,

19     Certified Realtime Reporter, Registered Diplomate

20     Reporter, and Notary Public in and for the

21     Commonwealth of Massachusetts, at the Law Offices of

22     Greene, LLP, 33 Broad Street, Boston, Massachusetts

23     02109, on Friday, December 18, 2009, commencing at

24     9:16 a.m.

1     Q.   Did you ever meet with any third-party

2  payers, like managed care facilities or hospitals or

3  insurance companies --

4     A.   No.

5     Q.   -- to talk about off-label or on-label use

6  of Parke-Davis products?

7     A.   No.

8     Q.   Did you -- Do you know whether you ever

9  spoke with or visited any doctor that was involved in

10  the care and treatment of Hartley Shearer?

11     A.   Who?

12     Q.   Hartley Shearer.

13     A.   I don't know who Hartley Shearer is.  So I --

14  I couldn't tell you because I don't -- I'm assuming

15  it's one of the clients associated with this case,

16  but I couldn't tell you if I met with -- with the

17  physicians involved in that case or not.

18     Q.   When you talked with a doctor about

19  Parke-Davis medicine, did the doctors know whether

20  the usages you were talking about were on-label or

21  off-label?

22     A.   Yes.  They knew that they were off-label.

23  I would tell them effectively that they were -- I

24  wouldn't say, "This is an off-label use," but I would

1   break I'll get a piece of paper.  I'm just trying to

2   figure out, Dr. Franklin, how many consumer business

3   units there were in the company.

4       A.   I believe there were five total.  So --

5   Yes.

6       Q.   And did each consumer business unit have

7   its own medical liaison program when you were at

8   Parke-Davis?

9       A.   I believe so.  I met other medical liaisons

10  from other CBUs, but I'm not sure that the North

11  Central CBU unit yet had a medical liaison program,

12  so I can't answer definitively.  But there were other

13  medical liaisons.

14      Q.   What were the other CBUs?  There was the

15  Northeast?

16      A.   I believe it was the Northeast -- I may get

17  these names wrong.  But I believe there was the

18  Northeast, the Southeast, and then the central part

19  of the company was like North Central, South Central,

20  and then there was the Western CBU, something like

21  that.

22      Q.   And each of those CBUs had a different

23  person in charge?  There was a different person in

24  charge of each CBU?

1      A.    And I'm sorry.   I don't mean to be arguing

2    with you.   But I'm just trying to clarify it.

3    In charge of the medical liaisons or --

4      Q.    No.   In charge of the CBU.

5      A.    -- in charge of the CBU?   Right.   So I

6    believe that each CBU had a president or vice

7    president that had responsibility for that business

8    unit.

9      Q.    And within each business unit, there either

10   was or there wasn't a medical liaison program?

11     A.    Yes.

12     Q.    And if there was, there was somebody in

13   charge of it?

14     A.    Yes.

15     Q.    Right.   And in your business unit, that

16   person was Phil Magistro?

17     A.    That's right.

18     Q.    Now, what kind of guy was Phil Magistro?

19           MR. ALTMAN:   Objection.   Vague.

20           THE WITNESS:   What kind of guy?

21   BY MR. OHLEMEYER:

22     Q.    Well, was he -- you know, was he an

23   outgoing guy?   Was he a shy guy?   Was he quiet?   Was

24   he loud?   What kind of guy was he?

1    right?

2         A.    Well, when you say, "those people," it

3    would suggest that I had access to all of the people

4    that know that -- that thought that this was going

5    too far.  But there -- You said, "You talked" --

6    there were people --

7         Q.    I'll rephrase it.  Fair question.

8         A.    Okay.

9         Q.    There came a point in time while you were

10   at Parke-Davis where you became aware of a debate of

11   sorts between Magistro, Valentine [sic] and others

12   about how conservative or how aggressive medical

13   liaisons should -- should function; isn't that right?

14        A.    I don't know who the debate was between.

15   But I did know that there were other employees who

16   were concerned that the Northeast CBU was being too

17   aggressive and crossing the line.

18        Q.    For example, the man who was in charge of

19   the West CBU was somebody who told you that he

20   thought that the Northeast CBU was acting too

21   aggressively?

22        A.    Yes.

23        Q.    Suggesting to you that his CBU was not

24   doing the kinds of things that your CBU was doing;

1    isn't that right?

2         A.    Yes.

3         Q.    In fact, you were at a meeting where that

4    man -- and his name was Adrian Ball; is that right?

5         A.    Yes.

6                        (Telephone interruption.)

7    BY MR. OHLEMEYER:

8         Q.    Let me rephrase the question.  The man in

9    charge of the West Customer Business Unit was named

10   Adrian Ball?

11        A.    No.  I don't believe he was in charge of

12   the whole business unit.  I think he was Phil

13   Magistro's peer.

14        Q.    Thank you.  So the man who was in charge of

15   the medical liaison program in the West --

16        A.    Yes.

17        Q.    -- Customer Business Unit was a man named

18   Adrian Ball?

19        A.    Yes.

20        Q.    And you were at a meeting where he openly

21   criticized the way medical liaisons in the Northeast

22   business unit were being used; isn't that right?

23        A.    Yes.

24        Q.    And he had some pretty colorful language to

1  describe your group, didn't he?

2       A.   Yes.

3       Q.   He thought you all were doing things that

4  were wrong, and it was only a matter of time before

5  you get in trouble; isn't that right?

6       A.   Yes.

7       Q.   Right.  Do you recall having a conversation

8  with him about any of that?

9       A.   Yes.  At some point we had talked about this.

10  But I don't recall the specifics of it.

11       Q.   Did you ever ask him or anyone else for an

12  opportunity to transfer out of your business unit

13  into another business unit?

14       A.   No.

15       Q.   Did you ever ask him or anyone else what

16  you or your business unit could do to, you know, more

17  clearly or more effectively operate within the letter

18  and the spirit of the rules?

19       A.   No.  Not that I recall.

20       Q.   Were there other people at Parke-Davis who

21  pulled you aside at some point in your tenure there

22  and said that the Northeast medical -- the Northeast

23  business unit medical liaisons were too aggressive?

24       A.   Somebody referred to us as bottom dwellers

1   at one point.

2       Q.   That was not a term of endearment?

3       A.   No.

4       Q.   It was not a -- it was not a compliment?

5       A.   No.

6       Q.   And do you recall when that discussion

7   occurred?

8       A.   I don't.

9       Q.   Was it early in your tenure?  Late in your

10  tenure?  The middle of your tenure?

11      A.   Middle.

12      Q.   And what did you do to either investigate

13  or -- Well, strike that.

14             Did you -- Did you disagree with that

15  characterization?

16      A.   I didn't know whether or not I should

17  disagree with it at that point.  Lisa Kellett

18  spent -- you know, talked to Phil about it.  I relied

19  on Lisa Kellett as the person who on a day-to-day

20  basis tasked me with -- with investigating that.

21      Q.   Let me -- and we'll take a break here in a

22  second.  Let me see if I can kind of summarize some

23  of this.

24             At some point after you joined

1      allegation you made of improper conduct?

2          A.   I don't know.

3          Q.   So in fact, you don't know whether some of

4      the things that you thought were improper were, in

5      fact, improper?

6          A.   I just remember the Department of Justice

7      press release and that sort of stuff where they laid

8      out what was improper --

9          Q.   Right.

10         A.   -- and -- and what the company -- and the

11     company's guilty plea.

12              MR. OHLEMEYER:  Let me mark -- Hopefully we

13     can do this quickly and then take a break.  Let me

14     mark -- Well, I'll find it.  Here we go.

15                     Let me mark this as our next exhibit.

16                     (Franklin Exhibit No. 4 was

17                       marked for identification.)

18     BY MR. OHLEMEYER:

19         Q.   Dr. Franklin, I've handed you what we've

20     marked as Franklin Exhibit No. 4.  And I suspect

21     you'd agree with me it's a map of the United States?

22         A.   I do.

23         Q.   Can you tell me whether you ever visited a

24     doctor while you were employed at Parke-Davis in the

1    State of Washington?

2         A.    No.

3         Q.    Would you go ahead and write "no" in the

4    State of Washington for me?  Or put "No visit" for

5    me.  Write "No visit."

6              MR. SOH:  You know, I will interject with --

7    I will defer to Tom, but can we do like larger -- can

8    we just -- instead of doing 40 states, can we do

9    regions or something like --

10             MR. GREENE:  Can we just put a "Y" in the

11   state that he promoted in?

12   BY MR. OHLEMEYER:

13        Q.    Can you -- I'll rephrase the question.

14             Can you tell me, Dr. Franklin, which

15   states that you actually visited doctors in while you

16   were employed at Parke-Davis?

17        A.    I believe it was Maine --

18        Q.    Let me -- Let me stop you there.  Do you

19   recall how many doctors you visited in Maine?

20        A.    No.

21        Q.    All right.  Where else?

22        A.    Massachusetts, Rhode Island, Connecticut.

23   I believe Connecticut.  New Hampshire.  And possibly

24   New York.

1        Q.    Can you -- can you tell me how many doctors

2    you might have visited in Massachusetts?

3        A.    The bulk of them would have been in

4    Massachusetts, but I do not recall.

5        Q.    When you say "bulk," is that, you know,

6    90 percent --

7        A.    80 percent --

8        Q.    80 percent.

9        A.    -- 85 percent.

10       Q.    How many doctors do you recall seeing in

11   Rhode Island?

12       A.    I don't recall.

13       Q.    Let me ask you this.  After Massachusetts,

14   what would the second most --

15       A.    Rhode Island.

16       Q.    Rhode Island.  You saw more doctors in

17   Rhode Island than anywhere else.  All right.  Can I

18   then -- can we -- Do you remember the names -- If I

19   didn't ask you that --

20       A.    Yes.

21       Q.    -- do you remember the names of any of the

22   doctors you actually saw in any of these states?

23       A.    I don't.

24       Q.    And it's fair to say that any of these

1  doctors you saw you would have seen sometime between

2  April 1 and August 1 of 1996?

3      A.   Yes.

4      Q.   Can you go ahead then for me and write the

5  word "visit" -- or "no" --

6      A.   It will be tough to fit "visit" in Rhode

7  Island.

8      Q.   Let me ask you to do this.  Why don't you

9  take the pen and just kind of mark out the states

10  that you actually visited doctors in.

11      A.   (Witness complied.)

12               That I believe I visited?

13      Q.   Right.

14      A.   Right.

15      Q.   And you can even put a question mark in New

16  York if that makes you feel more comfortable.

17      A.   (Witness complied.)

18      Q.   So -- so without belaboring this, doctor,

19  am I correct that when you were employed at

20  Parke-Davis, you never visited a doctor in any state

21  besides Maine, Massachusetts, Rhode Island,

22  Connecticut, New Hampshire, and perhaps New York;

23  is that right?

24      A.   Yes.  I'm not sure about Vermont.  I'm not

1    sure if you mentioned Vermont.  But yes.

2        Q.   You do or you don't recall Vermont?

3        A.   I don't recall Vermont.

4        Q.   And am I correct that while you were

5    employed at Parke-Davis -- while you were -- strike

6    that.

7                   While you were employed at Parke-Davis,

8    doctor, the bulk of the visits you made -- probably

9    85 percent of them -- were to doctors in Massachusetts?

10       A.   Yes.

11       Q.   And I'm also correct that you never visited

12   any doctor in any other state in the United States?

13       A.   That's true.

14            MR. OHLEMEYER:  Do you want to take a break?

15            MR. GREENE:  Sure.

16            THE VIDEOGRAPHER:  The time is 11:54 a.m.

17   This is the end of Tape 2 and we're off the record.

18                        (Whereupon, at 11:55 a.m.,

19                        the deposition was recessed,

20                        to reconvene at 12:45 p.m.

21                        this same date.)

22

23

24

1                  AFTERNOON SESSION

2                                    (12:52 p.m.)

3              THE VIDEOGRAPHER:   The time is 12:52 p.m.

4     This is the beginning of Tape 3, and we are back on

5     the record.

6                     DAVID P. FRANKLIN, Ph.D.,

7          the witness at the time of recess, having

8          been previously duly sworn, was further

9          deposed and testified as follows:

10                  EXAMINATION (continued)

11    BY MR. OHLEMEYER:

12         Q.   All right.  Again, David -- or

13    Dr. Franklin -- David -- if you want to take a break,

14    let me know.  If you don't understand a question, let

15    me know.

16         A.   Yes.

17         Q.   Can you tell me what states were within the

18    Northeast CBU?

19         A.   I -- It was the New England states, so

20    Maine, New Hampshire, Vermont, Connecticut, Rhode

21    Island, Massachusetts, parts of New Jersey and parts

22    of New York.  And I believe Pennsylvania, parts of

23    Pennsylvania also.  Perhaps all of Pennsylvania.

24         Q.   So there were parts of the Northeast CBU

1    that either you were not responsible for or didn't

2    visit during your Parke-Davis days?

3         A.   That's right.   There were medical liaisons

4    spread out throughout the Northeast.

5         Q.   And what states were part of the Southeast

6    CBU?

7         A.   I don't recall specifically.   But North

8    Carolina, South Carolina, Georgia, Florida.   The

9    Southeast.

10        Q.   Did you ever have any personal involvement

11   or firsthand involvement in the Southeast CBU?

12        A.   No, I did not.

13        Q.   Do you -- Would you agree with me that in

14   general, a medical liaison program serves a legitimate

15   purpose?

16             MR. ALTMAN:  Objection.  Form.

17             THE WITNESS:  I don't know.  I . . .

18   BY MR. OHLEMEYER:

19        Q.   Well, let me rephrase the question.

20        A.   Okay.  Okay.

21        Q.   If you wanted to put a program together to

22   provide information to doctors, and if you followed

23   all the rules, then there wouldn't be anything

24   inherently wrong with that kind of program?

1      Q.     Can you -- can you mark that on Exhibit 1

2   for me.

3      A.     What was the date again?

4      Q.     The date was June of 1996.  Oh.  So we

5   don't have a date, actually.  All right.  Well, we'll

6   come back to that if we can find the specific date.

7                  Who ran the program in Ann Arbor?

8   Was it a person who presented, or was it a group of

9   people?

10     A.     It was a group of people.

11     Q.     What role did Adrian Ball play in any of

12  that Ann Arbor training?

13     A.     I believe he did a presentation.  If I

14  recall, that he did a presentation on how the VA and

15  the medical healthcare system within the military

16  works.

17     Q.     He was a retired military man, wasn't he?

18     A.     Yes.  I believe so.

19     Q.     So at least at the point you went to Ann

20  Arbor, you knew who Adrian Ball was?

21     A.     I believe I learned who he was there in Ann

22  Arbor.

23     Q.     And was that the meeting where he told you

24  the Northeast CBU was operating its program

1    inappropriately?

2        A.    Yes.   I believe that's the only time I met

3    Adrian Ball, so yes.

4        Q.    Was that a one-on-one conversation or

5    something he said to the group?

6        A.    No.   I believe it was at a dinner table.

7        Q.    How many people were at the dinner?

8        A.    Medical liaisons.   Ten?   I don't --

9        Q.    Were any of your superiors at that dinner?

10       A.    I do not believe that Phil was there.

11       Q.    Did Mr. Ball -- Is it Dr. Ball or Mr. Ball?

12   General Ball?

13       A.    It was General Ball.

14       Q.    Did General Ball indicate that he'd had

15   that same conversation with your superiors?

16       A.    Not that I recall.

17       Q.    At the time you started taping the voicemails

18   from Mr. Magistro, did you believe that you were doing

19   something improper?

20       A.    Doing something improper . . .

21       Q.    I'm sorry.   I understand your confusion.

22   At the time you started taping the voicemails from

23   Mr. Magistro, did you think that the work you were

24   doing as a medical liaison was violating rules and

1    Q.    Well --

2    A.    So what -- You had asked me earlier whether

3  or not a medical liaison program in and of itself is

4  inappropriate.

5    Q.    Right.

6    A.    At that time the only medical liaison

7  program I had ever had exposure to was the one I was

8  part of.  And so at that time did I think this was

9  something that could be fixed and turned into one of

10  those appropriate programs you asked me about or

11  whether or not medical liaisons were wrong, period, I

12  didn't know.  Because I didn't have exposure to a

13  good medical liaison -- an ethical medical liaison

14  program.

15    Q.    Well, during the time you were at

16  Parke-Davis, you didn't have exposure to the entirety

17  of Parke-Davis's medical liaison program; isn't that

18  right?

19    A.    That's true.

20    Q.    And during the time you were at Parke-Davis,

21  whatever exposure you had to the Northeast CBU's

22  medical liaison program occurred sometime between

23  July 1 -- I'm sorry, April 1 and August 1, 1996?

24    A.    Right.

1      A.    I believe that was the time.

2      Q.    And he responded to you in a tape -- in a

3 voicemail that you recorded on about July 1?  Do you

4 recall that?

5      A.    I don't recall what that voicemail was, but

6 it sounds right.

7      Q.    Fair enough.  And again, I don't want to

8 belabor this.  I think I might have asked this, but I

9 just want to make sure.  Can you tell me which states

10 were in the West CBU while you were at Parke-Davis?

11      A.    I don't recall specifically.  But I --

12 This is going to sound silly, but the western states.

13 But you know, Washington, Oregon, California, and I

14 believe Nevada.  Whereas this group of states here

15 were North Central and South Central.

16      Q.    The states between Nevada and --

17      A.    Oh, yes, that does nothing for you.  That's

18 right.  So the -- essentially the northern Midwest

19 states would be the North Central.  The southern

20 Midwest states were South Central.  And then the

21 western states -- and I don't recall which ones

22 specifically -- I'm unclear on Nevada, but I believe

23 the coastal western states were all --

24      Q.    Washington, Oregon, California?

Page 208

1      A.   Yes, at least.  And perhaps -- As a matter

2  of fact, perhaps Nevada and Idaho.  For some reason

3  I'm thinking about the massive territories that they

4  covered.

5      Q.   And just one last question.  The follow-up

6  to that -- the meeting we just talked about --

7      A.   Yes.

8      Q.   -- as I recall now from looking at my

9  notes, Lisa having a conversation -- Lisa Kellett

10 having a conversation with Phil Magistro and then

11 Lisa reporting back to you in a voicemail, not Phil.

12 Does that refresh your recollection?

13     A.   It -- it's in there.

14     Q.   It does or it doesn't, right?

15     A.   Yes.

16          MR. OHLEMEYER:  Fair enough.  Those are all

17 the questions I have, Mr. Franklin.  I appreciate

18 your patience this morning.  And thank you.

19          THE WITNESS:  Thanks.  Thank you.

20          MR. GREENE:  All set.

21          MR. OHLEMEYER:  I'm done.

22          MR. CHEFFO:  All done.

23          THE VIDEOGRAPHER:  The time is 2:38 p.m.

24 This is the end of Tape 4, and the deposition is