# EXHIBIT B

page 1

```
 1                UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3
 4    - - - - - - - - - - - - - - - -x
 5    UNITED STATES OF AMERICA       )
 6    ex rel. DAVID FRANKLIN,        )
 7                      Plaintiff, ) Civil Action
 8       v.                          ) No. 96-11651-PBS
 9    PARKE-DAVIS, DIVISION OF       )
10    WARNER-LAMBERT COMPANY,        )
11                      Defendant. )
12    - - - - - - - - - - - - - - - -x
13    VOLUME I                               Pages 1 - 347
14
15
16            DEPOSITION of DAVID PETER FRANKLIN,
17    Ph.D., a witness called by counsel for the
18    Defendant, taken under the provisions of the
19    Federal Rules of Civil Procedure before Jane M.
20    Borrowman, Registered Professional Reporter and
21    Notary Public, at the offices of Hare & Chaffin,
22    160 Federal Street, Boston, Massachusetts, taken on
23    Tuesday, September 12, 2000, commencing at 9:11
24    a.m., pursuant to Notice.
```

page 157

```
 1        it was a flat salary.
 2   Q.   Was it a flat salary or were there additional
 3        types of compensation?
 4   A.   No.  I just got a flat salary.
 5   Q.   Okay.  You say he congratulated you.  Why did
 6        he congratulate you?
 7   A.   Because, essentially, Mike Valentino decided
 8        to offer me the job.
 9   Q.   So, you were offered the position at the end
10        of the day?
11   A.   Yes.
12   Q.   Did you accept?
13   A.   I think I said I needed a couple of days.  I
14        accepted, I think, the next -- or a couple of
15        days later.
16   Q.   Going to page 8 of Exhibit 3, the second full
17        paragraph says:  "Dr. Franklin's first
18        indication that there was illegality of
19        Parke-Davis' marketing was, in retrospect,
20        during his interviews."
21             So, is it your testimony that you
22        didn't think that during the course of the
23        interview that you were being asked to do
24        anything improper?
```

page 158

```
 1   A.   During the interviews, I thought it was -- for
 2        example, this peer-to-peer interaction was
 3        legitimate, and I believed that to be the
 4        case.
 5   Q.   What caused you to later believe that, in
 6        retrospect, there was illegality in
 7        Parke-Davis' marketing, as evidenced by the
 8        initial interviews that you had?
 9   A.   I, later, learned that that peer-to-peer
10        interview -- or discussion needed to be
11        initiated by the physician, and it was not
12        initiated by the physician.
13   Q.   Okay.  Anything else about the earlier
14        interviews that now, in retrospect, indicated
15        to you that there was something illegal going
16        on, in your words?
17   A.   Yeah.  Bend the rules was, actually, break the
18        rules.
19   Q.   Okay.  And why did you -- what made you
20        believe that it was, actually, break the
21        rules?
22   A.   Because the FDA requirement is that it be
23        physician initiated.
24   Q.   Okay.
```

page 159

| | | |
|---|---|---|
| 1 | A. | And that I learned that, later on, that it |
| 2 | | needed to be physician initiated and it |
| 3 | | wasn't. In practice, it was not physician |
| 4 | | initiated. |
| 5 | Q. | Anything else? |
| 6 | A. | Meaning? |
| 7 | Q. | Well, you say that the "first indication that |
| 8 | | there was illegality in Parke-Davis' marketing |
| 9 | | was, in retrospect, during his interviews." |
| 10 | | What do you mean by that? |
| 11 | A. | That the fact that they were looking for |
| 12 | | people who would be comfortable working in a |
| 13 | | gray area, bending the rules. They were, |
| 14 | | essentially, feeling out my -- how |
| 15 | | conservative I was and how -- whether or not I |
| 16 | | would have been comfortable working where one |
| 17 | | interpretation of the law would be that I was |
| 18 | | breaking it. And, so, clearly, from my point |
| 19 | | of view, they knew that they were pushing the |
| 20 | | limits, at the very least, when they talked to |
| 21 | | me. |
| 22 | Q. | You're saying, in retrospect, you believe that |
| 23 | | what they were doing was what? |
| 24 | A. | Was going as close to -- pushing me as far as |

page 160

```
 1          they could, as close to possible, to ask if I
 2          was willing to do something that was illegal
 3          without actually saying "this is illegal."
 4     Q.   And you believe that they concluded that you
 5          would be?
 6     A.   That my eagerness to take the job and that my
 7          stating that I would be comfortable working in
 8          a gray zone seemed to be compatible with the
 9          fact that there would be a lot of conflict
10          with the law in this job.
11                  MR. GREENE:  Jim, I don't want to
12          break your train of thought, but when do you
13          want to break for lunch?
14                  MR. ROUHANDEH:  Let me see --
15          probably, in about a half hour or so.
16                  MR. GREENE:  Okay.  Mind if I go to
17          the men's room?
18                  MR. ROUHANDEH:  Off the record.
19                  (Brief pause.)
20     BY MR. ROUHANDEH:
21     Q.   Turning back to page 4 of Exhibit 3, at the
22          end of that paragraph on page 4, it states
23          that while you were in New Jersey, that you
24          were offered the position of medical liaison,
```