UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**KAISER'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY
OF PFIZER'S NON-RETAINED EXPERTS**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   THE TESTIMONY OF UNIDENTIFIED KAISER PHYSICIANS AND
      INSUREDS SHOULD BE EXCLUDED ............................................................ 1

III.  THE TESTIMONY OF "NON-RETAINED EXPERTS" NOT
      IDENTIFIED BY PFIZER DURING DISCOVERY SHOULD BE
      EXCLUDED ....................................................................................................... 2

IV.   NONE OF PFIZER'S WITNESSES SHOULD BE PERMITTED TO
      TESTIFY CONCERNING THEIR "CLINICAL EXPERIENCE" ...................... 7

      A.    None of Pfizer's Witnesses Have Produced Sanitized Patient
            Records ................................................................................................... 7

      B.    The Testimony of Individual Physicians Concerning Their
            "Clinical Experience" Is Inadmissible Under *Daubert* ............................. 9

V.    THE TESTIMONY OF "PATIENT Y" SHOULD BE EXCLUDED ................. 15

VI.   CONCLUSION ................................................................................................. 16

# TABLE OF AUTHORITIES

Page

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)................................................................ 9

*Dellinger v. Pfizer, Inc.*,
  2006 WL 2057654 (W.D.N.C. July 19, 2006)........................... 13, 14, 15

*Gautieri v. U.S.*,
  167 F. Supp. 2d 207 (D.R.I. 2001) ........................................ 6

*In re Paoli R.R. Yard PCB Litigation*,
  916 F.2d 829 (3d Cir. 1990) ................................................. 7

*Lama v. Borras*,
  16 F.3d 473 (1st Cir. 1994)................................................... 6

*Laplace-Bayard v. Batlle*,
  295 F.3d 157 (1st Cir. 2002)................................................. 6

*Lohnes v. Level 3 Comms., Inc.*,
  272 F.3d 49 (1st Cir. 2001).................................................. 5, 6

*Nutra-Sweet Co. v. X-L Engineering Co.*,
  227 F.3d 776 (7th Cir. 2000) ............................................... 6

*Prentiss & Carlisle Co., Inc. v. Koehring-Waterous Div. of Timberjack*,
  972 F.2d 6 (1st Cir. 1992)..................................................... 5

*Santiago-Diaz v. Laboratorio Clinico y de Referencia Del Este and Sara Lopez, M.D.*,
  456 F.3d 272 (1st Cir. 2001)................................................. 6

*Steinhilber v. McCarthy*,
  26 F. Supp. 2d 265 (D. Mass. 1998)...................................... 6

*Sullivan v. U.S. Dep't of Navy*,
  365 F.3d 827 (9th Cir. 2004) ............................................... 7

*Thibeault v. Square D Co.*,
  960 F.2d 239 (1st Cir. 1992)................................................. 6

*Wolak v. Spucci*,
  217 F.3d 157 (2d Cir. 2000) ................................................ 6

**Other Authorities**

D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the Federal Judicial
  Center's *Reference Manual on Scientific Evidence* (2d ed. 2000) .............................. 10, 11, 12

**Rules**

Advisory Committee Notes, 1993 Amendments, Fed. R. Civ. P. 26(a) ........................ 5

# TABLE OF AUTHORITIES
## (continued)

**Page**

Advisory Committee Notes, 1993 Amendments, Fed. R. Civ. P. 26(a)(2) ................................... 5

Fed. R. Civ. P. 26(a)(2)(A) ............................................................................................................ 5

Fed. R. Civ. P. 26(a)(2)(B) ............................................................................................................ 5

Fed. R. Civ. P. 26(a)(2)(B)(i) ........................................................................................................ 4

Local Rule 43.1(b)(3)(a) ................................................................................................................ 2

## I.    <u>INTRODUCTION</u>

On its witness list, Defendants identify thirteen previously undisclosed, "non-retained" experts, whom they intend to call to testify concerning their "clinical experience" in prescribing Neurontin for their patients.  The testimony of these witnesses should be excluded for three reasons:  (1) Defendants did not identify these experts in their expert disclosures, in violation of Rule 26, resulting in the automatic exclusion of their testimony; (2) these witnesses have not produced the sanitized records of the patients on which their testimony would be based, as previously ordered by the Court as a condition of admissibility; and (3) no scientifically valid conclusions can be drawn from case reports, or subjective "clinical experience."  The Court should also exclude the testimony of "Patient Y," who is not a Kaiser insured, whose prescriptions are not at issue, and who is no more capable of providing a scientifically valid opinion on efficacy with respect to his individual "case report" than his physician.

## II.    <u>THE TESTIMONY OF UNIDENTIFIED KAISER PHYSICIANS AND INSUREDS SHOULD BE EXCLUDED</u>

Defendants' Expected Trial Witness List (Dkt. No. 2180, "Defs. Witness List") includes unnamed "Kaiser insureds who were prescribed Neurontin between March 1995 and December 2004" (No. 49), unnamed "Physicians who prescribed Neurontin to Kaiser insureds between March 1995 and December 2004" (No. 51), unnamed "Kaiser insureds who were prescribed gabapentin after December 2004" (No. 52), and unnamed "Physicians who prescribed gabapentin to Kaiser insureds after December 2004" (No. 53).  Pfizer moved to compel Kaiser to provide the names and addresses of Kaiser physicians and insureds fitting these descriptions. *See* Dkt. No. 2181.  The motion was denied by Electronic Order on December 14, 2009.

As Kaiser argued in opposing the motion, the Court's November 12, 2009 Procedural Order (Dkt. No. 2172) required the identification of witnesses by name, and not merely by

category or abstract description, so that the parties may avail themselves of a brief and final

opportunity to depose any newly-identified witnesses, to avoid unfair surprise at trial.

Accordingly, as is standard practice, Pfizer should be precluded putting on the testimony of any

Kaiser physicians or insureds not identified by name on Pfizer's witness list.  *See* Local Rule

43.1(b)(3)(a) ("Except for good cause shown, no party shall be allowed to . . . use the testimony

of a witness other than the witnesses already listed on the filing with the court").

## III.   THE TESTIMONY OF "NON-RETAINED EXPERTS" NOT IDENTIFIED BY PFIZER DURING DISCOVERY SHOULD BE EXCLUDED

In connection with scheduling the deposition of Dr. Charles Phillips, a third-party

physician and Kaiser "gadfly" designated as a witness by Pfizer to testify "about the operations

and business practices of Kaiser" (Defs. Witness List, No. 49),[1] Pfizer took the position that

"[c]onsistent with Defendants' Rule 26 disclosure, Dr. Phillips is a non-retained expert from

whom expert opinions may be elicited.  As a non-retained expert, no prior report was required."

(Dec. 12, 2009 email message from Thomas Fox).  Pfizer unequivocally stated its intention to

solicit at trial the opinions of non-retained—*and previously undisclosed*—experts:  "To the

extent Dr. Phillips *or others* on our witness list and Rule 26 disclosures who are non-retained

experts are able to render expert opinions at trial, those opinions will be elicited."  (Dec. 11,

2009 email message from Thomas Fox) (emphasis added).

Pfizer served its expert reports on December 15, 2008.  *See* Electronic Order entered Oct.

22, 2008 (setting deadline).  Defendants' disclosure listed 13 experts (Nos. 24-35 and 37 on

Defs. Witness List); enclosed reports for ten of them; and noted that the expert reports of the

---

[1] Dr. Phillips is the subject of a separate motion *in limine* to exclude his testimony on multiple
grounds, including irrelevance.

remaining three had already been produced.  On March 18, 2009, Pfizer served a single rebuttal

report, and designated one additional expert, Dr. Rothschild, enclosing his report.

On November 23, 2009, Pfizer filed and served its witness list.  Kaiser can only guess

which of Pfizer's 28 proposed witnesses *not* identified in its expert witness disclosures[2] it

considers "non-retained experts" from whom it intends to elicit expert testimony at trial—as

Pfizer *still* has not identified its additional "non-retained experts" as such—but they appear to

include at least the following thirteen witnesses:

| No. | Name | Subject Matter of Testimony |
| --- | --- | --- |
| 11 | Mitchell Danesh, M.D. | "his clinical experience in prescribing medications, including gabapentin, for neuropathic pain and epilepsy" |
| 14 | Dr. Vithal Dhaduk | "his clinical experience in prescribing Neurontin off-label over many years for neuropathic pain and migraine" |
| 15 | Dr. Gregory Rogers | "his clinical experience in prescribing gabapentin" |
| 16 | Dr. John Arness | "his clinical experience in prescribing gabapentin as adjunctive therapy for bipolar symptoms" |
| 17 | Dr. Anthony Anderson | "his clinical experience in prescribing Neurontin off-label for patients that present with various neuropathic pain syndromes" |
| 18 | Dr. Mark Chaplick | "his clinical experience in prescribing gabapentin for various forms of nerve pain, including DPN, trigeminal neuralgia, and pinched nerves from surgical procedures or herniated disks in the back" |
| 19 | Dr. Ronald Ellis | "his clinical experience in continuing to prescribe gabapentin off-label for neuropathic pain" |
| 20 | Dr. Jeffrey Esper | "his clinical experience in continuing to prescribe gabapentin off-label for neuropathic pain, migraine, post-traumatic headaches, tension headaches, radiculopathies (i.e., pinched nerves), back pain, spinal stenosis, RSD, and RLS" |

---

[2] This total excludes the 13 witnesses on Pfizer's list affiliated with Kaiser, and the four categories of unidentified witnesses, discussed in Part II, *supra*.

| | | |
|---|---|---|
| 21 | Dr. Amy Fitzsimmons | "her clinical experience in prescribing gabapentin for neuropathic pain" |
| 22 | Dr. Terry Rolan | "his clinical experience in prescribing gabapentin off-label for peripheral neuropathies and other pain syndromes, occipital neuralgia, and epilepsy monotherapy" |
| 23 | Dr. Dragon Svrakic | "his clinical experience in prescribing gabapentin for off-label uses such as in the treatment of alcohol dependency (withdrawal), alcohol-related neuropathy and associated pain, adjunctive treatment of bipolar disorder, various neuropathic pain syndromes in addition to PHN, sleep disorders, impulsive syndromes, and benzodiazepine dependence" |
| 43 | Dr. Mark Buchfuhrer | "the need for patient access to medicines such as gabapentin and his own clinical experience prescribing gabapentin for patients with RLS" [Restless Leg Syndrome] |
| 44 | Dr. Charles Phillips | "the operation and business practices of Kaiser"[3] |

See Defs. Witness List, Nos. 11, 14-23, 43-44.

While Defendants are correct that they were not required to provide *reports* from non-retained experts, they were still required to *identify*—at the same time, not *a year later*—any non-retained experts whose testimony they intend to offer at trial, so that Plaintiffs would have an opportunity to depose them during the period set aside for expert discovery.[4] Rule

---

[3] Kaiser disputes that this is a proper subject of expert testimony, or that Dr. Phillips, who has not worked for Kaiser or its medical group affiliates in the last ten years, possesses the necessary qualifications to opine on Kaiser's "operation and business practices." However, as Pfizer itself has proffered Dr. Phillips' testimony as that of a "non-retained expert," his testimony should also be excluded due to Pfizer's failure to identify him as an expert witness. *See infra.*

[4] Pfizer may argue that Kaiser suffered no prejudice from this late disclosure, inasmuch as Plaintiffs declined to depose its disclosed, retained experts. However, it is precisely *because* those experts provided reports, containing "a complete statement of all opinions the witness will express and the basis and reasons for them" (Fed. R. Civ. P. 26(a)(2)(B)(i)), and the other information required by the Rule, that Plaintiffs, including Kaiser, found it unnecessary to depose them. By contrast, non-retained experts, from whom no report is required, must be

26(a)(2)(A) expressly requires that "a party must disclose to the other parties the identity of *any witness* it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." *Id*. (emphasis added).  Subpart (B), by contrast, provides that "this disclosure must be accompanied by a written report . . . *if the witness is one retained or specially employed to provide expert testimony in the case . . . .*"  Fed. R. Civ. P. 26(a)(2)(B).  Accordingly, while Pfizer may not have been required to produce *reports* from its "non-retained experts," it was required to "disclose to the other parties the[ir] identity . . . ."  Fed. R. Civ. P. 26(a)(2)(A).  As stated by the Rules Advisory Committee:  "The rule requires all parties . . . at an appropriate time *during the discovery period to identify expert witnesses* and provide a detailed written statement of the testimony that may be offered at trial through specially retained experts . . . ."  Advisory Committee Notes, 1993 Amendments, Fed. R. Civ. P. 26(a) (emphasis added).

The penalty for failing to make such disclosures is that no expert opinion testimony may be elicited from such witnesses at trial.  *See Prentiss & Carlisle Co., Inc. v. Koehring-Waterous Div. of Timberjack*, 972 F.2d 6, 7-9 & n.1 (1st Cir. 1992) (expert testimony of employee-witness properly excluded because employee was not designated as an expert witness during discovery, citing predecessor provisions of Rule 26).[5]  Accordingly, none of the foregoing witnesses should

---

deposed to avoid unfair surprise at trial.  *See* Advisory Committee Notes, 1993 Amendments, Fed. R. Civ. P. 26(a)(2) ("Since depositions of experts required to prepare a written report may be taken only after the report has been served, . . . in many cases the report may eliminate the need for a deposition.").  While the depositions of Drs. Dhaduk, Rogers, and Arness—prescribing physicians for three of the proposed consumer class representatives—were taken by *Defendants*, their cross-examination, conducted by and on behalf of the Class Plaintiffs, focused on their reasons for prescribing Neurontin to the class representatives in light of *the information known to them—i.e.,* information ultimately sourced from Defendants—*not* these physicians' opinion of Neurontin's efficacy in light of the full scientific record, with which they were not presented.

[5] As the First Circuit has stated, "The expert disclosure requirements are not merely aspirational, and courts must deal decisively with a party's failure to deal with them."  *Lohnes v. Level 3 Comms., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001).  In that case, the First Circuit upheld the exclusion

be permitted to offer expert opinion testimony at trial, including, without limitation, any opinion

concerning Neurontin's efficacy in treating the off-label conditions at issue—either as to

individual patients, or as to patient populations generally.  As these thirteen witnesses have not

been put forward by Pfizer as percipient witnesses to any relevant facts, their testimony should

be excluded in its entirety.[6]  To allow Pfizer to smuggle into the trial thirteen previously

---

of an expert affidavit belatedly offered after summary judgment, noting that the lateness resulted in "exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate." *Id.  See also Primus v. U.S.*, 389 F.3d 231, 234-35 (finding no abuse of discretion in denying motion to belatedly identify an additional expert); *Laplace-Bayard v. Batlle*, 295 F.3d 157, 162 (1st Cir. 2002) (upholding exclusion of expert identified two months after deadline and approximately a week before trial); *Santiago-Diaz v. Laboratorio Clinico y de Referencia Del Este and Sara Lopez, M.D.*, 456 F.3d 272, 276 (1st Cir. 2001) (upholding preclusion of expert testimony where expert was belatedly identified).  Rule 26's directives concerning expert discovery "are mandatory and self-executing." *Lohnes*, 272 F.3d at 58; *see also Nutra-Sweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 785-86 (7th Cir. 2000) ("The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'") (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)).

Untimely identified experts will be excluded even without a showing of bad faith.  *Thibeault v. Square D Co.*, 960 F.2d 239, 245 (1st Cir. 1992); *see also Wolak v. Spucci*, 217 F.3d 157, 161 (2d Cir. 2000).

[6] To the extent Pfizer argues that the testimony of these non-retained experts is admissible not as expert opinion as to Neurontin's efficacy, but as evidence of why these particular physicians decided to prescribe Neurontin for their patients, it is irrelevant, as the prescriptions of these physicians are not at issue in this non-class, "bellwether" trial, which concerns only prescriptions written for Kaiser insureds.  To the extent that Pfizer intends to offer the testimony of its hand-picked group of physicians as evidence of what a hypothetical "reasonable physician" would do under similar circumstances, that would clearly be a subject of expert testimony, not percipient witness testimony, as the witness is being relied upon to define the scope of professional normative behavior.  *See Lama v. Borras*, 16 F.3d 473, 478 (1st Cir. 1994) ("Instead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care.") (applying law of Puerto Rico); *Gautieri v. U.S.*, 167 F. Supp. 2d 207, 215 (D.R.I. 2001) ("Because Rhode Island law requires that the standard of care and any deviation from the standard of care be established through expert testimony, the Court turns its attention to the expert witnesses and the opinion testimony they provided in this case.") (medical malpractice case brought under Federal Tort Claims Act); *Steinhilber v. McCarthy*, 26 F. Supp. 2d 265, 275 (D. Mass. 1998) (in a medical malpractice case applying Massachusetts law, stating that elements of duty of care include proving that "the information subject to disclosure is known or reasonably should have been

undisclosed, "non-retained" experts, would permit the very "trial by ambush" the Rule requiring

identification of experts during discovery was intended to prevent.

## IV.   NONE OF PFIZER'S WITNESSES SHOULD BE PERMITTED TO TESTIFY CONCERNING THEIR "CLINICAL EXPERIENCE"

### A.   None of Pfizer's Witnesses Have Produced Sanitized Patient Records

At the September 27, 2006 hearing on the parties' objections to Discovery Order No. 4,

the Court engaged in a lengthy colloquy with counsel concerning the manner of proving or

disproving efficacy at trial proposed by each side.  Plaintiffs stated their intention to rely on

controlled clinical trials, the universally-acknowledged "gold standard" before which lesser

forms of evidence (*e.g.*, case reports, open-label series) must yield; while Pfizer stated its

intention to rely on the testimony of individual physicians that Neurontin was effective in

treating individual patients.  As counsel for Pfizer explained:

> MR. ROUHANDEH:  Well, I think what we're going to show is, it
> was effective for at least a number of the patients.  They'll argue it
> was a placebo effect, and we'll argue, no, it was effective –
>
> And what they're trying to do is ask you to decide an evidentiary
> issue now in the context of discovery.  Whether or not your Honor
> is ever going to let it in in terms of whether it's going to be
> admissible -- and we think we'd like to be able to persuade you at
> the appropriate point in time that it is admissible -- *you should
> make that determination now, we would request*.

Transcript of Sept. 27, 2006 Motion Hearing (Dkt. No. 502), at 17:22-18:11 (emphasis added).

The Court accommodated this request, and announced its determination no less than three times:

---

known by the doctors," something "ordinarily… established with expert testimony") (internal
quotations omitted); *Sullivan v. U.S. Dep't of Navy*, 365 F.3d 827, 834 (9th Cir. 2004) (in
Federal Tort Claims Act case, stating that "In a case involving specific surgeries, the district
court is to proceed as a good surgeon would in determining what is reliable knowledge in the
surgical profession."); *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 852 (3d Cir. 1990)
(stating that elements to establish medical monitoring claim, including "increased risk mak[ing]
period diagnostic medical examinations reasonably necessary," must "be proven by competent
expert testimony").
.

THE COURT:  . . . To the extent you're putting on doctors or experts to say something and they're relying on individual patient experience, that will have to be produced.  Similarly, to the extent you're going to put on doctors based on individual patient experience, you know, just like any expert, you've got to put on the factual basis.

\* \* \*

If . . .there's a specialist in the field who's a doctor who would support [Defendants'] theory and they have reason to believe it, and he's got specific patient experiences that he's relying on, obviously those records, and deleted and sanitized portions, subject to a protective order to protect their privacy, are going to have to be produced, all right?  I'll protect the privacy up the gazoo, of course.  We'll delete the names.  We'll also do a protective order.  We'll put them under seal.  They will not show up anywhere.  But if there's a particular doctor that's going to testify for either side and it's based on his experience with patients, you've got to understand what that experience is.

\* \* \*

This is what I'm going to do. . . . If a doctor gets called as an expert on either side and is going to be relying on the patient base, the doctor should at least have to produce the patients that he's relying on for his experience that would dictate one way or another, you know, what he would have done otherwise versus not. . . . .[W]hen there are individual doctors called, . . . they should have to be able to support their opinions through their own experiences or through other scientific data.  To the extent they're relying on their own experiences, they should be able to produce those.

*Id*. at 39:16-50:24.  Later that day, the Court formalized its ruling in an Electronic Order:

If either party intends to call a treating physician to give an opinion on effectiveness, sanitized patient records shall be produced to the extent the physician is relying on his experience with treating that patient (as opposed to a clinical trial).

Sept. 27, 2006 Electronic Order.

Over three years after this Order was entered, and almost a year after the close of expert discovery, Pfizer included on its witness list  twelve previously undisclosed, "non-retained experts" to testify concerning their "clinical experience" in prescribing Neurontin to their

patients (listed in Part III, *supra*).[7]  Pfizer has not produced the relevant, "sanitized patient records" maintained by *any* of these physicians.  Given the Court's clear and unequivocal determination regarding the admissibility of this type of testimony—which Pfizer expressly requested—any such records should have been produced at the same time these witnesses should have been identified, *i.e.*, during expert discovery, not on the eve of trial.  Accordingly, the testimony of these witnesses should be excluded on this additional ground.

      B.      **The Testimony of Individual Physicians Concerning Their "Clinical Experience" Is Inadmissible Under *Daubert*[8]**

As Plaintiffs and their experts (including Dr. David Kessler, a former head of the FDA) have explained several times during the course of this litigation,[9] whether or not Neurontin is effective in treating the off-label conditions at issue is a *statistical* question that cannot be answered through the "clinical experience" of individual physicians and patients not subjected to the rigors of the scientific method.  As the authoritative *Reference Manual on Scientific Evidence* explains:

> "Anecdotal evidence" means reports of one kind of event following another.  Typically, the reports are obtained haphazardly or selectively, and the logic of "post hoc, ergo propter hoc" does not suffice to demonstrate that the first event causes the second.  Consequently, while anecdotal evidence can be suggestive, it can also be quite misleading.

---

[7] The only exception is Dr. Phillips.

[8] The specific requirements of Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), are discussed in the accompanying motion to exclude the testimony of Pfizer's *retained* experts.  The mountain of case law holding that "case reports" are inadmissible as evidence of a cause-and-effect relationship requires no further analysis.

[9] *See, e.g.*, Plaintiffs' Objections to Discovery Order No. 4 (Dkt. No. 462), at 11-14; Class Plaintiffs' Surreply Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1859), at 14-16; Plaintiffs' Joint Reply in Support of Proposed Trial Plan (Dkt. No. 2149), at 4-5.

D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the Federal Judicial

Center's *Reference Manual on Scientific Evidence* (2d ed. 2000), at 91 (citations omitted)

(available online at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

        In a nutshell, a cause-and-effect relationship is deemed established when it can be

determined statistically that there is a 95% probability that the difference observed between the

treatment and control (placebo) groups is a non-random event.  This probability—expressed as

"p < .05" in the language of statistics—is the "bottom line" of every clinical trial.  If p < .05, a

"statistically significant difference" exists between the treatment and control groups with respect

to the variable being measured, and a cause-and-effect relationship is inferred.[10]  If p > .05, no

statistically significant difference has been shown, and no cause and effect relationship is or may

be inferred.  *See generally*, *Reference Guide on Statistics*, at 121-25 (discussing p-values and

statistical significance).

        As Plaintiffs' expert, Dr. Douglas McCrory, explained:  "efficacy requires analyzing data

between a treatment and control group, and looking at the aggregated data and statistics."

Surreply Declaration of Barry Himmelstein in Opposition to Defendants' Motion for Summary

Judgment (Dkt. No. 1860), Exh. C (McCrory Depo.) at 177.  Accordingly, one cannot "evaluate

efficacy under that definition in an individual patient."  *Id.*  For this reason, no scientifically

valid conclusions can be drawn from case reports, as patients may get better for a variety of

---

[10] This presumes, of course, that the results of the study have been analyzed as originally planned, and not distorted by changing the variable, primary endpoint, or patient population, a practice known as "moving the goalposts," which by its very nature undermines the conclusion that the statistical relationship observed is non-random.  *See, e.g., Reference Guide on Statistics*, *at* 93-94 ("[I]f the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect.  However, if the control group was created in any other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed.") (footnote and citations omitted).

reasons having nothing to do with the drug (*e.g.*, the placebo effect or spontaneous remission).[11]
The principal value of such individual "case reports" is that they may lead to *controlled trials*, in
which the efficacy or inefficacy of a drug can be established by having sufficiently large
treatment and control groups of patients that other factors *besides* the drug can be ruled out
statistically.  *See Reference Guide on Statistics*, at 90-91 & n.20 ("[A]necdotal reports . . . are
more useful as a stimulus for further inquiry that as a basis for establishing association. . . .
"'[A]necdotal case reports appearing in medical literature . . . can be used to generate hypotheses
about causation, but not causation conclusions' because 'scientifically valid cause and effect
determinations depend on controlled clinical trials and epidemiological studies,'" quoting
*Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1163-64).  As Dr. McCrory explained:

> [Y]ou use a medicine in a patient, you observe a response
> afterward, and the response may be better or worse.  But you don't
> have the certainty that there's a causal relationship between the
> medicine and the patient's response in an individual case.  That's
> why we do controlled trials."

---

[11] As the *Reference Guide on Statistics* explains:

> The following illustration brings together the points made thus far
> Many doctors think that taking aspirin helps prevent heart attacks,
> but there is some controversy.  Most people who take aspirin do
> not have heart attacks; this is anecdotal evidence for the protective
> effect, but proves very little.  After all, most people do not suffer
> heart attacks—whether or not they take aspirin regularly.  A
> careful study must compare heart attack rates for two groups:
> persons who take aspirin (the treatment group) and persons who do
> not (the controls).  An observational study would be easy to do, but
> then the aspirin-takers are likely to be different from the controls.
> If, for instance, the controls are healthier to begin with, the study
> would be biased against the drug. Randomized experiments with
> aspirin are harder to do, but they provide *much better evidence*. *It
> is the experiments that demonstrate a protective effect*.

*Id*. at 93.

*Id.* at 179-80.[12]

As Pfizer argued six months ago in *this very litigation,* such "case reports" and similar

anecdotal evidence are inadmissible *per se* as evidence of a cause and effect relationship:

> As one district court succinctly observed, case reports are
> "universally recognized as insufficient and unreliable evidence of
> causation."  *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203,
> 2001 WL 454586, at *15 (E.D. Pa. Feb. 1, 2001) (collecting
> cases); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1411
> (D. Or. 1996) ("[C]ase reports and case studies are universally
> regarded as an insufficient scientific basis for a conclusion
> regarding causation because case reports lack controls.").  *See also
> McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir.
> 2005) (noting that adverse event reports are "[u]ncontrolled
> anecdotal information offer[ing] one of the least reliable sources to
> justify opinions about both general and individual causation"); *In
> re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 808 (N.D.
> Ohio 2004) (adverse event reports held "irrelevant to establish a
> material issue of fact"); *In re Accutane Prods. Liab. Litig.*, No.
> MDL 1626, 2007 WL 1288354, at *3 (M.D. Fla. May 2, 2007)
> (noting that adverse event reports "reflect[] nothing more than an
> assessment of a possible relationship, not an actual relationship");
> *Dunn v. Sandoz Pharms. Corp.*, 275 F. Supp. 2d 672, 682
> (M.D.N.C. 2003) ("[Adverse event reports] are not scientific proof
> of causation."); *Nelson v. Am. Home Prods. Corp.*, 92 F. Supp. 2d
> 954, 969, (W.D. Mo. 2000) ("[adverse event reports] do not
> demonstrate a causal link sufficient for admission to a finder of
> fact in court."); *Saari v. Merck & Co.*, 961 F. Supp. 387, 394
> (N.D.N.Y. 1997) (noting that adverse event reports "neither
> confirm[] nor deny[] that there is any relationship" between
> alleged symptoms and a product); *Casey v. Ohio Med. Prods.*, 877
> F. Supp. 1380, 1385 (N.D. Cal. 1995) ("[C]ase reports are not
> reliable scientific evidence of causation, because they simply
> describe[] reported phenomena without comparison to the rate at
> which the phenomena occur in the general population or in a
> defined control group; do not isolate and exclude potentially
> alternative causes; and do not investigate or explain the mechanism
> of causation."); *Caraker v. Sandoz Pharms. Corp.*, 172 F. Supp. 2d
> 1046, 1050 (S.D. Ill. 2001) (noting that experts' case reports

---

[12] *See also* Declaration of Ilyas Rona in Opposition to Defendants' Motion for Summary
Judgment (Dkt. No. 1761), Exh. 021 (Barkin Report) at 6; Exh. 023 (Abramson Report) ¶¶ 22-
23; Exh. 163 (Perry Report) at 5-6; Exh. 365 (Alldredge Report) at 1; Ex. 374 (Kessler Report)
¶¶ 14-15.

> "make little attempt to isolate or exclude possible alternative
> causes, lack adequate controls, and lack any real analysis");
> *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156
> (D. Mont. 1999) ("Neither case reports nor adverse drug reaction
> reports contain scientific analysis with the safeguards of a
> controlled experiment. . . . Unlike epidemiological studies, they do
> not contain a testable and systematic inquiry into the mechanism of
> causation."); *Haggerty v. Upjohn Co*., 950 F. Supp. 1160, 1164
> (S.D. Fla. 1996) ("[A]ccording to the FDA, [such reports provide]
> no certainty that the suspect drug caused the reaction."), *aff'd*, 158
> F.3d 588 (11th Cir. 1998).

Memorandum of Law In Support of Defendants' Motion to Exclude Anecdotal Adverse Event

Reports (Dkt. No. 1916), at 4-5 & n.3.[13]

   In other personal injury litigation concerning Neurontin, *Dellinger v. Pfizer, Inc.*, 2006

WL 2057654 (W.D.N.C. July 19, 2006),[14] Pfizer prevailed in a *Daubert* motion to exclude the

same type of testimony based on anecdotal case reports that it intends to call *over a dozen*

*witnesses* to present here:

> Keys' opinion is based primarily on eleven (11) abstract cases
> which deem gabapentin as the principle cause of injury.  However,
> Keys himself concedes that case reports are not scientific proof of
> causation.  . . . . Furthermore, courts have found case reports to be
> merely anecdotal accounts of observations in particular individuals
> which are not controlled tests, frequently lack analyses and often
> make little attempt to screen out alternative causes for a patient's
> condition.
>
> * * *
>
> . . . The abstract cases relied upon by Keys have not been tested
> or subject to peer review and lack a known potential rate of error.
> The abstract reports simply describe reported drug cases without
> comparing them to the general population or a control group.
> Moreover, the reports fail to isolate potential alternative causes and
> neglect to investigate or explain the mechanism of causation.

---

[13] As both Pfizer's argument and the authorities it cited make plain, adverse drug reaction reports are merely "a type of case report . . . ."  *Dunn*, 275 F. Supp. 2d at 682.

[14] In that case, the plaintiff, who was prescribed Neurontin for pain, argued that it caused his pancreatitis.  *See id.*

* * *

        In conclusion, without objective sources such as clinical studies or medical literature that are subject to factors set out in *Daubert* such as testing, peer review, and publication, Keys' opinion fails to offer reliable methodologies that support the hypothesis that Neurontin is generally capable of causing Plaintiffs injuries.

*Id*. at *9-*11 (citations omitted).[15]

---

[15] In support of its argument, Pfizer cited—and the court credited (*see id*. at *9)—yet another raft of cases for the proposition that individual case reports do not provide admissible evidence of causation:

        *See Soldo*, 244 F. Supp. 2d at 537 ("the great weight of authority -- and the most current authority -- squarely rejects the use of [adverse drug events] and case reports for the purpose of establishing general causation"); *Nelson*, 92 F. Supp. 2d at 969 ("reports themselves do not contain a testable and systemic inquiry into the mechanism of causation ... they do not demonstrate a causal link sufficient for admission to a finder of fact in court"). . . . *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) ("Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation"); *Rider*, 295 F.3d at 1199 (case reports "reflect only reported data, not scientific methodology"); *Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015, 1030 (E.D. Mo. 2000) ("a number of courts have concluded that case reports are not a scientifically reliable basis for a causation opinion .... Such case reports are not reliable, because normally, such reports 'record nothing more than a temporal association between an exposure and a particular occurrence'"); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1157 (D. Mont. 1999) ("anecdotal reports are not generally accepted as reliable scientific evidence to establish causation"); *Jones v. United States*, 933 F. Supp. 894, 899 (N.D. Cal. 1996) ("anecdotal case reports ... are not derived through the scientific method"), *aff'd*, 127 F.3d 1154 (9th Cir. 1997), *cert. denied*, 524 U.S. 946 (1998); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) ("case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation").

Kaiser need not add to the mountain of authorities cited to this Court by Pfizer for the proposition that "case reports are 'universally recognized as insufficient and unreliable evidence of causation.'"  Dkt. No. 1916 at 4 (citations omitted).  The testimony of Pfizer's "non-retained expert" physicians concerning their "clinical experience" in prescribing Neurontin is inadmissible *per se* under *Daubert*.

## V.       THE TESTIMONY OF "PATIENT Y" SHOULD BE EXCLUDED

In addition to offering the testimony of previously undisclosed, "non-retained experts" concerning their clinical experience in treating patients, Pfizer offers the testimony of an individual identified as "Patient Y," described only as "a patient who was prescribed Neurontin." Defs. Witness List, No. 46.  In a supplemental filing in support of its motion for summary judgment, Pfizer indicated that it intends to offer the testimony of this individual as evidence of Neurontin's efficacy in treating bipolar disorder.

Individual case reports do not become reliable or admissible evidence of efficacy, merely because they are presented by a patient instead of by his or her physician.  The Court ruled on the admissibility of this evidence as well at the September 27, 2006 hearing:

> THE COURT: . . .  I'm not going to let them [Plaintiffs] put on individual people, all right?  No one's putting on any one individual, "This didn't work for me."  I don't think you're [Defendants] going to put on individual people unless you have them through your doctors. . . . This is going to rise and fall on expert testimony on the effectiveness of it . . . . [F]or you to prove effectiveness or lack of effectiveness through these people is just not going to be -- I wouldn't allow it in at court.
>
> * * *
>
> THE COURT:  [I]n effect aren't you essentially saying, "Well, you know, Sam Smith, Patient X, thought it worked for him.  What about him?"  And then he's going to have the comeback, "Well, no,

---

Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Testimony By Christopher Keeys, *Dellinger v. Pfizer Inc.*, 2006 WL 826302, 8-9 (W.D.N.C. Feb. 14, 2006).

that's a placebo effect."  Well, you're not going to really know
about it unless you put Patient X on the stand, which I'm not going
to allow to happen.

MR. ROUHANDEH: No, no, we're not talking about putting
Patient X on . . . .

Transcript at 22:8-23:15, 28:9-17.

Apparently, the Court neglected to inquire about "Patient Y."  However denominated, a

"case report" presented by a patient is no more relevant or admissible evidence of causation than

the presentation of the same case report by the patient's physician.  *A fortiori*, this testimony

should also be excluded.

**VI.    CONCLUSION**

For the foregoing reasons, the testimony of Pfizer's non-retained experts, and Patient Y,

should be excluded.


Dated:  January 8, 2010                              Respectfully submitted,


                                                     By:     */s/ Linda P. Nussbaum*
                                                             Linda P. Nussbaum

                                                     KAPLAN FOX & KILSHEIMER LLP
                                                     Linda P. Nussbaum, Esq.
                                                     850 Third Avenue, 14th Floor
                                                     New York, New York 10022

                                                     *Attorneys for Plaintiffs Kaiser Foundation*
                                                     *Health Plan, Inc. and Kaiser Foundation*
                                                     *Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management Order #3 on January 8, 2010.

<u>/s/  Elana Katcher</u>
Elana Katcher
