# Exhibit
# B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF KAISER'S MOTION
*IN LIMINE* TO EXCLUDE TESTIMONY OF DR. ALAN RAPOPORT**

854073.1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE
      PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY ................. 4

III.  THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY
      BE DETERMINED THROUGH DBRCT........................................................... 5

IV.   DR. RAPOPORT'S OPINION THAT NEURONTIN IS EFFECTIVE IN
      PREVENTING MIGRAINES IS NOT THE PRODUCT OF RELIABLE
      PRINCIPLES AND METHODS ....................................................................... 9

      A.   All Three DBRCT Show That Neurontin Is Not Effective for
           Migraine Prophylaxis.................................................................................. 9

      B.   Dr. Rapoport Ignores One of the Three DBRCT, and Misrepresents
           the Results of a Second ............................................................................ 10

      C.   Dr. Rapoport Bases His Opinions On His "Clinical Experience,"
           and He Has Not Produced Sanitized Patient Records, As
           Previously Ordered ................................................................................... 12

V.    CONCLUSION.................................................................................................. 13

I.     **INTRODUCTION**

Kaiser's[1] indication experts, Drs. Barkin (bipolar and other mood disorders), Perry

(neuropathic and nociceptive pain), McCrory (migraine prophylaxis), and Alldredge (lack of

dose related effect at dosages over 1800 mg/day) rigorously apply the scientific method to the

best available data to reach their respective conclusions, as required for the admission of *any*

expert report.  This is especially true in the field of pharmaceutical research, where proper

methods of data collection and analysis are well-developed, standardized, and generally agreed.

Applying the scientific method to the task at hand, each of Kaiser's indication experts

thoroughly searched the available scientific literature for the highest quality evidence bearing on

the question—*i.e*., double-blind, randomized, controlled trials ("DBRCT"), which even Pfizer's

experts repeatedly acknowledge are not only the "gold standard," but the *only type of evidence*

*from which any scientifically valid conclusions can be drawn*.[2]  Kaiser's experts examined not

only the *published* DBRCT, but also Defendants' internal, *unpublished* research reports, the

withholding and distortion of which lie at the very heart of this case.  Where an unpublished

research report revealed information that undermined, contradicted, or exposed as an outright

falsehood the conclusion stated in the corresponding published study, Kaiser's experts based

---

[1] "Kaiser" is Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals.  Kaiser
Foundation Health Plan, Inc. is the parent company of the following companies and has brought
this lawsuit on behalf of itself and its subsidiaries:  Kaiser Foundation Health Plan of Colorado;
Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-
Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation
Health Plan of Ohio.

[2] As set forth below, only a DBRCT can provide any statistical measure whatsoever of the
likelihood of a cause and effect relationship between a treatment and the selected measure of its
effect.  For this reason, all other forms of evidence are merely "hypothesis-generating rather than
hypothesis-confirming."  (Slaby Report at 8.)  Relying on such evidence—which, by its very
nature, is *incapable* of proving efficacy—in preference to multiple negative, DBRCT on the
possibility that notwithstanding the consistently negative results, Neurontin *might* be effective
for some subset of the same patient population, is as dangerous to the public health as it is
antithetical to the scientific method.

their conclusions on the *actual* results of the study, not the results as distorted or

misrepresented.[3]

Finally, because multiple DBRCTs have been conducted as to each indication, and the

study results were consistently negative, Kaiser's experts formed and expressed their opinions

that Neurontin has been shown to be ineffective in treating these conditions.  It is no coincidence

that each of Kaiser's experts approached their task in the same general way, even though there

was little or no coordination or communication between them.  Each of them adopted this

approach *sua sponte*, because it is the approach dictated by science.

Pfizer's experts, by contrast:  (1) disclose no discernable methodology for the collection

of the relevant scientific literature; (2) ignore completely one or more DBRCT; (3) consider one

or more DBRCT that were actually negative as positive; and/or (4) give preference to inferior

forms of evidence from which no scientifically valid conclusions can be drawn.  As such, their

reports, and the conclusions they draw, are not the result of a rigorous application of the

scientific method; they are a result of its *abandonment*, and thereby a further extension of

Defendants' fraud.[4]  Whether as a result of the withholding by Pfizer of relevant information—

---

[3] The reports of Kaiser's indication experts were originally filed, and are most readily accessible, as exhibits to the Revised Supplemental Declaration of Ilyas J. Rona in Filed in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1457), as Exhibit J ("Kessler Report," Dkt. No. 1457-10), Exhibit K ("Barkin Report," Dkt. No. 1457-11), Exhibit L ("Perry Report," Dkt. Nos. 1457-12 through 1457-15), Exhibit M ("McCrory Report," Dkt. No. 1457-16), Exhibit N ("Abramson Report," Dkt. No. 1457-17), and Exhibit P ("Alldredge Report," Dkt. No. 1457-20).  The reports were also re-filed non-electronically as exhibits in support of Plaintiffs' opposition to Defendants' motion for summary judgment.  *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exhibits 21 (Barkin Report), 23 (Abramson Report), 163 (Perry Report), 365 (Alldredge Report), 374 (Kessler Report), and 478 (McCrory Report).

[4] With one exception, Pfizer's indication expert reports are attached as exhibits to the Declaration of Rajesh S. James (Dkt. No. 1692), as Exhibit 47 ("Bird Report," Dkt. 1692-11), Exhibit 48 ("Brenner Report," Dkt. No. 1692-12), Exhibit 49 ("Rapoport Report," Dkt. No. 1692-13), and Exhibit 50 ("McLean Report," Dkt. No. 1692-14).  As Defendants have not filed

854073.1                                    -2-

one of the central allegations in the case being that Defendants co-opted "thought leaders" with incomplete and misleading information—deliberate ignorance, or mere neglect, their reports are fatally deficient, and their testimony on the efficacy issue is not sufficiently reliable to be admitted.

In addition to ignoring or misconstruing the truly relevant evidence, most of Pfizer's experts expressly ground their opinions on their own personal, undocumented "clinical experience" in prescribing Neurontin to patients.  However, the Court previously ordered that no expert testimony based on the expert's own experience in treating patients would be admitted unless the relevant "sanitized patient records" were produced to the opposing party.[5]  No such records have been produced by Pfizer's experts.  Accordingly, the opinions of Pfizer's indication experts based on their "clinical experiences" should be excluded on this ground as well.

The principle defects in Pfizer's indication expert reports are summarized in the chart below:[6]

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| Slaby (bipolar) | X | Guille | Vieta | X | X |
| Bird | X | | Gorson | X | X |

Dr. Slaby's final report in support of or in opposition to any motion, that report, which has not been marked confidential by Defendants, is attached as Exhibit 1 to Kaiser's motion *in limine* to exclude Dr. Slaby's testimony.

[5] *See* Electronic Order, Sept. 27, 2006.

[6] Kaiser appreciates that the Court does not wish to venture too far "into the weeds" on scientific issues prior to trial, as one of the purposes of the trial is the airing of these issues.  Accordingly, for purposes of this motion, Kaiser has limited itself to the more obvious, overarching problems that render the opinions of Pfizer's experts inherently unreliable, untrustworthy, and unscientific.

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| (neuropathic pain) | | | 945-271 945-306 | | |
| Rapoport (migraine) | X | 945-217 | 945-220 | X | X |
| Brenner (neuropathic and nociceptive pain) | X | Gorson 945-224 945-271 945-306 1032-001 1032-002 1035-001 1035-002 | | X | X |
| McLean (doses over 1800 mg/day) | X | 945-224 | 945-082 945-295 942-88 | X | X |

Any one of these defects would be sufficient to exclude the testimony of the corresponding expert.  Taken together, these defects so undermine the integrity of Pfizer's indication experts' opinions that they should all be excluded under *Daubert*.

## II.   TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY

By its terms, Federal Rule of Evidence 702 precludes the admission of expert testimony unless it (1) "is based upon sufficient facts or data, (2) . . . is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Id*.  Accordingly, given the tremendous sway an expert may have over a jury in scientific or technical matters, the Court is required to exercise a "gatekeeping role."  *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  As summarized by the First

Circuit:

> In *Daubert*, the Supreme Court set forth four general guidelines for
> a trial judge to evaluate in considering whether expert testimony
> rests on an adequate foundation: "(1) whether the theory or
> technique can be and has been tested; (2) whether the technique
> has been subject to peer review and publication; (3) the technique's
> known or potential rate of error; and (4) the level of the theory or
> technique's acceptance within the relevant discipline." *United
> States v. Mooney*, 315 F.3d 54, 62 (1st Cir.2002) (citing *Daubert*,
> 509 U.S. at 593-94, 113 S.Ct. 2786).  However, these factors do
> not "constitute a definitive checklist or test," and the question of
> admissibility "must be tied to the facts of a particular case."
> *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167,
> 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

*Beaudette v. Louisville Ladder, Inc*., 462 F.3d 22, 25-26 (1st Cir. 2006).

In *Daubert* itself, the Court explained that:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible
> one.  Its overarching subject is the scientific validity—and thus the
> evidentiary relevance and reliability—of the principles that
> underlie a proposed submission.  *The focus, of course, must be
> solely on principles and methodology*, not on the conclusions that
> they generate.

509 U.S. at 594-95 (emphasis added).

Consistent with *Daubert*, Kaiser's focus in this motion is not on the conclusions reached

by Pfizer's experts, but on the defective methods by which they were reached—to the extent any

method is discernable from their respective reports.

### III.   THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT

There are *universally-accepted,* international standards for determining whether a drug is

effective for a given indication.  *See, e.g*., International Conference on Harmonisation of

Technical Requirements for Registration of Pharmaceuticals for Human Use, *ICH Harmonised*

*Tripartitie Guideline, Statistical Principles for Clinical Trials,* (Feb. 5, 1998) (available at

http://www.ich.org/cache/compo/475-272-1.html).[7]  The FDA's standard is the same.

As Dr. David Kessler, former head of the FDA, writes in his report, when determining

efficacy, the FDA relies only on "'adequate and well-controlled clinical investigations.'"

Kessler Report, at 5 (quoting 21 C.F.R. § 314.26).  Such trials need to be controlled, need to be

randomized, need to be blinded, and need objective and prospectively determined trial endpoints.

*See* Kessler Report, at 5-6.  These pillars of sound clinical trial design are not arbitrary; they are

required to minimize the chance that any observed difference between the placebo and treatment

groups is due to something *other* than the treatment itself.  Double-blind, randomized, controlled

trials (DBRCT) are the standard—indeed, the *only* accepted method— for determining whether a

drug is effective.  They are the foundation on which modern pharmaceutical medicine is based,

even if they have little impact on the behavior of the world's largest drug company.

Clinical trials that are not controlled, not blinded, not randomized and/or whose endpoints

are not prospectively and objectively determined, while possibly helpful in generating a

hypothesis, cannot be used to determine a drug's efficacy.  *See* Kessler Report ¶ 17.  Of even

lesser value in determining a drug's efficacy are anecdotal case reports.  Such reports, which

again may useful in generating a hypothesis for study, are not reliable or adequate evidence of

efficacy.  These "reports are obtained haphazardly or selectively, and the logic of 'post hoc, ergo

propter hoc' does not suffice to demonstrate that the first event [the taking of a drug] causes the

second [the effect]."  D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the

Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000), at 91(available

online at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

---

[7] Additional international "Efficacy Guidelines" are available at
http://www.ich.org/cache/compo/475-272-1.html.

In a nutshell, a cause-and-effect relationship is deemed established when it can be determined statistically that there is a 95% probability that the difference observed between the treatment and control (placebo) groups is a non-random event. This probability—expressed as "$p < .05$" in the language of statistics—is the "bottom line" of every clinical trial. If $p < .05$, a "statistically significant difference" exists between the treatment and control groups with respect to the variable being measured, and a cause-and-effect relationship is inferred.[8]  If $p > .05$, no statistically significant difference has been shown, and no cause and effect relationship is or may be inferred. *See generally*, *Reference Guide on Statistics*, at 121-25 (discussing p-values and statistical significance).

Each of Kaiser's efficacy experts describes his method and well-established reasons for relying solely on DBRCTs in rendering an efficacy opinion. For each indication at issue, there are multiple DBRCTs, most of which were designed and conducted by Pfizer. Given such a wealth of high-quality evidence, there is simply no need—and therefore no reason—to rely on lesser levels of evidence. For these reasons, Kaiser's experts rely *solely* on the results of DBRCTs in rendering their efficacy opinions.

The essence of this litigation is that Pfizer suppressed or misrepresented the published results of multiple DBRCTs. For this reason, Kaiser's experts reviewed, where possible, the full underlying clinical research reports and their results, not just the published versions. Kaiser's

---

[8] This presumes, of course, that the results of the study have been analyzed as originally planned, and not distorted by changing the variable, primary endpoint, or patient population, a practice known as "moving the goalposts," which by its very nature undermines the conclusion that the statistical relationship observed is non-random. *See, e.g., Reference Guide on Statistics, at* 93-94 ("[I]f the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect. However, if the control group was created in any other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed.") (footnote and citations omitted).

experts revealed—as was the subject of a peer-reviewed article recently published in the *New England Journal of Medicine*[9]—that in many instances, the findings presented in the published literature did not match those found in the underlying research reports, and in many cases, entire trials went unpublished.

While Pfizer's experts readily agree that the highest level of evidence comes from DBRCTs, they abandon reliance on such high-quality evidence. Instead, they advocate a cafeteria-style approach to evidence-based medicine, wherein they highlight—without any recognizable method or principle—select pieces of evidence from the varying levels of evidence, including the lowest level: their own clinical experience. But in so doing, they either ignore entire DBRCTs, or rely on a published article, even when the underlying, internal research report exposes its fraudulently manufactured conclusion.

There is not a mere difference of opinion between Pfizer's and Kaiser's efficacy experts. Pfizer's experts do not even attempt to explain away the significant differences between the published articles and the underlying research reports; they simply ignore them. Nor do Pfizer's experts even acknowledge the existence of entire DBRCTs that were never published. The opinions of Pfizer's efficacy experts are not the product of reliable principles and methods. Rather, they are the product of exactly the type of unreliable, scientifically invalid evidence that the Supreme Court ruled should be excluded in *Daubert*.[10]

---

[9] Vedula, *et al*., *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009).

[10] By way of example, in *Norris v. Baxter Healthcare Corp*., 397 F.3d 878, 884-85 (10th Cir. 2005), the Court found that where there was epidemiological evidence supporting one conclusion, reliance on differential diagnosis "without supporting epidemiological evidence" was "misplaced," and excluded the expert testimony. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc*., 440 F. Supp. 2d 465, 474 (M.D.N.C. 2006), the Court rejected expert evidence testimony based on a literature review of peer-reviewed literature in which the expert's conclusions were "flatly contradicted" by the available epidemiological literature. Relying on *Norris*, the Court also

IV.     **DR. RAPOPORT'S OPINION THAT NEURONTIN IS EFFECTIVE IN PREVENTING MIGRAINES IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS**

A.      **All Three DBRCT Show That Neurontin Is Not Effective for Migraine Prophylaxis**

Defendants have conducted the three DBRCT studying Neurontin for migraine prophylaxis (prevention).  All three of these studies were negative.

In 1990, the first trial studying Neurontin's use in migraine, Defendants' own protocol 879-200, found no statistically significant difference in the primary efficacy measure between placebo and Neurontin.  McCrory Report, at 7-8.  In 1998, the second trial studying Neurontin's use in migraine, Defendants' own protocol 945-220, also showed no significant difference between Neurontin and placebo in the primary outcome studied.  *Id*. at 10 (RR995-00074).[11] Finally, in 1999, the third trial studying Neurontin's use in migraine, Defendants' own protocol 945-217, again failed to demonstrate any statistically significant difference between Neurontin and placebo.  *Id*. at 9 (RR995-00085).

Kaiser's expert, Dr. Douglas McCrory, is a health services researcher experienced in the evaluation of clinical trials.  Dr. McCrory concludes that a meta-analysis of the results from the clinical trials "fail[] to show a statistically significant effect of gabapentin compared with placebo for migraine prophylaxis."  *Id*. at 1.

---

excluded expert testimony based on differential diagnosis that contradicted the available epidemiological evidence.  *Id*. at 477.  In *Soldo v. Sandoz Pharms. Corp*., 244 F. Supp. 2d 434 (W.D. Pa. 2003), after cataloguing cases in which courts have held that epidemiology is the generally accepted methodology for demonstrating causation, *see id*. at 532 and n.7, the Court assessed and rejected the plaintiff's experts' reliance on other methods of showing causation, including anecdotal case reports, "causality assessments," animal studies, and differential diagnosis.  *Id*. at 537-57.

[11] Research Report RR9995-00074 reports the results of protocol 945-217. while Research Report RR995-00085 reports the results of protocol 945-217.  *See* McCrory Report, at 7.

B.    **Dr. Rapoport Ignores One of the Three DBRCT, and Misrepresents the Results of a Second**

Of the three DBRCT studying Neurontin in migraine prophylaxis, Dr. Rapoport was listed as an investigator on one (protocol 945-217, RR 995-00085), and as a co-author of a second (protocol 945-220).  *See* McCrory Report, at 29-30.  Remarkably, Dr. Rapoport makes no mention whatsoever of the first study in his report, despite having being "called out" on the point by Dr. McCrory:

> Dr. Rapoport was also listed as an investigator on Research Report RR 995-00085, therefore he should be aware of this study, too. However, he does not mention this study or the findings which are *negative* for the primary efficacy endpoints of the efficacy analysis (4-week migraine headache rate during SP2 and change from baseline to SP2 in 4-week headache rate).  I think he is obliged to refer to these data in formulating his assessment, rather than limiting his assessment to the published or publically [sic] available reports.

McCrory Report, at 30 (emphasis added).[12]

Dr. Rapoport's only response to this criticism is "I have not previously seen the research report or unpublished studies mentioned by Dr. McCrory in his report."  Rapoport Report, at 2. This research report was provided to Plaintiffs by Pfizer, near the outset of this litigation, and was presumably equally available to Dr. Rapoport.  Burying one's head in the sand so as to ignore negative data is antithetical to the scientific method, especially where, as here, the study ignored is one of only three "gold standard" trials from which *any* scientifically valid conclusions may be drawn.[13]

---

[12] As with Dr. Slaby, Dr. McCrory's report addressed an earlier report filed by Dr. Rapoport in support of Defendants' opposition to class certification.  *See* Dkt. No. 586, Exh. 23.

[13] Dr. Rapoport's approach can fairly be analogized to the White House's refusal to open an email message containing the Environmental Protection Agency's conclusion that greenhouse gases are pollutants that must be controlled, so as not to have to act on the determination.  *See* F. Barringer, *White House Refused to Open Pollutants E-Mail*, New York Times (June 25, 2008).

With respect to protocol 945-220, of which Dr. Rapoport was a co-author:

> Dr. Rapoport describes data from only "The Mathew Paper" in his section summarizing the clinical trial evidence supporting the use of gabapentin for treatment of migraine.  In his discussion of this study, he cites the analysis described in Mathew et al. (2001), which includes only the subgroup of patients in the mITT population who achieved a stable dose of 2400 mg/day.  As I described earlier, this is a misrepresentation of Study 945-220 because it has redefined the study population according to a post hoc reanalysis and selectively reports only positive findings.
>
> * * *
>
> In the Research Report, the primary analysis is based on the efficacy population which include patient [sic] regardless of whether they achieved a stable dose of 1800 mg/day or 2400 mg/day. However, he does not mention the discrepancy between the design of the study and the ultimate reporting in the published article.
>
> * * *
>
> Given his role in helping to design the study (as he states in his report) and as an investigator (as listed on the cover page of the Research Report), I believe that he should take public responsibility for the discrepancies between the design described in the Research Report and discrepancies with the reporting in the published article.
>
> Were he to quote from the efficacy population as defined in the Research Report, the corresponding p-values would be $p=0.332$ for change in migraine headache rate from baseline to SP2, and, for the mITT population the p-value would be $p=0.339$, neither of which represents a statistically significant difference between gabapentin-treated and placebo-treated patients.

McCrory Report, at 29-30.

Dr. Rapoport's response to this rather serious allegation that he fraudulently misrepresented the study's actual results is equally deficient:  "I have not previously seen the research report or unpublished studies mentioned by Dr. McCrory in his report."  Rapoport Report, at 2.  Rather than actually *reviewing* the Research Report, on which he is listed as an investigator, and confronting Dr. McCrory's criticism head-on, Dr. Rapoport states his "recollection"—then ten years old—that "we were only interested in the 2400 mg dose of

gabapentin based on our collective clinical experience . . . ." Rapoport Report, at 2. Dr.

Rapoport's ten year old, self-serving "recollection" is flatly inconsistent with the actual research

report, which he might have realized, had he taken the trouble to review it. *See* McCrory Report,

at 11 ("[T]he Research Report makes no such restriction regarding the dose when describing the

primary and secondary outcome measures.").

Because Dr. Rapoport completely ignores one of the three DBRCT studying migraine

prophylaxis—even though he is listed as an investigator on the study—and misrepresents the

results of a second DBRCT—even though he is listed as an author, his opinions are not the

product of reliable principles and methods, and should therefore be excluded under *Daubert*.

C.     **Dr. Rapoport Bases His Opinions On His "Clinical Experience," and He Has
       Not Produced Sanitized Patient Records, As Previously Ordered**

Dr. Rapoport's report makes it clear that while Dr. McCrory bases his opinions on the

actual DBRCT data—the *only* data from which any scientifically valid conclusions may be

drawn—Dr. Rapoport's opinions are instead based primarily on his personal "extensive clinical

experience":

> The McCrory report focuses on data, unpublished reports, research
> reports and the intricacies of various papers. The opinions I offer
> in this report are based on my extensive clinical experience of 36
> years in private practice and teaching at major medical institutions,
> my knowledge of the literature relating to the treatment of
> headache, my review of the literature relating to the use of
> gabapentin in treating headache, and my review of Dr. McCrory's
> report.
>
> &ast; &ast; &ast;
>
> Dr. McCrory, by his own admission, is a specialist in trial design
> and evaluation, not as a clinician. He analyzes studies and
> concentrates on data, and I care for patients with migraine who are
> in severe pain and concentrate on their improvement. . . . [¶] The
> type of evidence I look to as a clinician is whether the patient
> improves. Dr. McCrory looks at the primary and secondary
> endpoints and whether they are met.

Rapoport Report, at 2, 4.

As the prior section indicates, and Dr. Rapoport boasts, his opinions are not based on "studies," "data," or "analysis"—subjects in which Dr. McCrory "admits" he is a specialist, but on his own experience in treating individual patients. As set forth at length in the accompanying Motion *In Limine* to Exclude Testimony of Pfizer's Non-Retained Experts (*see* Dkt. No. 2351, Part IV), however competent the practitioner, and however extensive their experience, no scientifically valid conclusions can be drawn from such an amalgamation of "case reports" not subjected to the rigors of statistical analysis. Accordingly, as discussed in the accompanying motion, incorporated by reference herein, such testimony is routinely excluded under *Daubert.*

In addition, as discussed at length in the accompanying motion, the Court expressly ordered that any of Pfizer's experts who based their opinion on their own experience, "as opposed to a clinical trial," would be required to produce the underlying, "sanitized patient records" as a condition of admissibility. Electronic Order, Sept. 27, 2006. Dr. Rapoport has not produced any such records. Accordingly, his opinions should be excluded on this ground, as well.

## V.      CONCLUSION

For the foregoing reasons, the testimony of Dr. Rapoport should be excluded.


Dated:  January 12, 2010                    Respectfully submitted,


                                            By:     */s/ Linda P. Nussbaum*
                                                    Linda P. Nussbaum

                                            KAPLAN FOX & KILSHEIMER LLP
                                            Linda P. Nussbaum, Esq.
                                            850 Third Avenue, 14th Floor
                                            New York, New York 10022

                                            *Attorneys for Plaintiffs Kaiser Foundation*
                                            *Health Plan, Inc. and Kaiser Foundation*
                                            *Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*