# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: )
) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) Pages 1 - 107
AND PRODUCTS LIABILITY LITIGATION )

FINAL PRETRIAL CONFERENCE - DAY ONE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 20, 2009, 9:15 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1   very difficult causation case. That's why it was your pick,
2   not theirs. But I do think I'm going to force them to
3   answer those questions separately because I think that's
4   appropriate.
5           MR. CHEFFO: And perhaps, your Honor, you'd
6   consider also some limiting instructions with respect to the
7   appropriate time, obviously in your Honor's discretion, with
8   respect to what they can consider and what the evidence is.
9           THE COURT: Well, yes, I will do that, but
10  certainly at the end, by the end I will, but --
11          Do you want, just going through your list, I'll
12  get -- I think I should go back to plaintiffs at this point.
13  Dr. Gibbons, a very difficult issue. I just am not prepared
14  to rule on that. I was starting to read stuff over the
15  weekend. But the one question I wanted you to help me with
16  because I didn't have a red line, and I wasn't going to sit
17  yesterday and do this. What are the differences between the
18  three reports, the November, March, and May? I feel, I'll
19  tell you my initial instinct is, yes, I think it's fair game
20  for Gibbons to criticize the FDA and perhaps even do some of
21  his own work, but I thought November would be the end of it,
22  and then I see March, and then I see May. I feel like I
23  gave an inch and you took a mile. That's what sort of the
24  concern I have. What was May all about?
25          MR. BARNES: The scenario would be November and

1   March.

2            THE COURT:  And what's May?  I saw a report in
3   May.

4            MR. BARNES:  It's May of 2008, which was before
5   the first --

6            THE COURT:  So there's no new one in May?

7            MR. BARNES:  No.  No, ma'am.  It stops in March,
8   and that was a product after the first -- after the first
9   deposition in early March, in February and March, he
10  produced another report adding some additional information
11  based upon --

12           THE COURT:  Well, what was the additional
13  information?

14           MR. BARNES:  There was some additional sensitivity
15  analyses that he performed during the peer-review process
16  and as a result of reviewing the work that he was doing for
17  a published paper in the Archives of General Psychiatry.  It
18  was produced.  It was deposed very extensively by the
19  plaintiffs in February, March, and April.  There's been
20  complete disclosure of these --

21           THE COURT:  There was some argument that there was
22  no discovery on the bipolar.

23           MR. BARNES:  Total discovery on the bipolar.  They
24  have grilled him.  All the documents have been produced on
25  that.  They've had a chance to review it, have Dr. Greenland

1  primary results in the paper, and they all confirmed his

2  first report, his first analysis, which was published in the

3  November report.

4          THE COURT:  Dr. Greenland makes the comment that

5  it's much toned down in the article from the actual report.

6  In other words, one says it's possible, and one says clear

7  evidence of.

8          MR. BARNES:  During the peer-review process, the

9  process is, he submits the paper to peer review for the

10 Archives of General Psychiatry.  It goes in.  There are some

11 peer-review comments.  He makes some changes pursuant to the

12 peer-review process, and it's published.  There's a

13 scientific paper which has one set of requirements, and then

14 there's the report under the Federal Rules which are his

15 personal opinions based upon his work.  The changes are --

16         THE COURT:  I know, but he can't say one thing in

17 one place and one in another.  So one thing I'm going to be

18 asking him is, he says in the paper -- I put a big square

19 under the star -- "possible."  And he says in the other one

20 "clear evidence" or words to that effect.  So what I'm

21 worried about is -- I'm really worried about it.  You can

22 definitely refer in your opening to him, you know, this

23 world-renowned awarded biostatistician who refutes the FDA's

24 findings and explained lamotrigine and Topiramate and why

25 they're disproportionate, and why if you carve those out,

1  there's no differential.  But I am worried that I've got so
2  many iterations of what his opinion is -- I have to tell you
3  I hate doing this at the last minute like this.  And I was
4  really looking hard to find fault with one or the other so I
5  could rule with that, but actually there's fault on both
6  sides; that I didn't hear about it till two weeks ago and
7  that you kept changing it.  So I think it's a pox on both
8  your houses, but it leaves me with a bind in trying to
9  figure out what the right thing to do is.
10             MR. BARNES:  One other point to help your Honor.
11 The idea between the report and the published paper, the
12 report is for litigation, and it involves more than simply
13 the issue of what was published in the published paper.
14 Dr. Gibbons' expert report not only talks about the -- that
15 statement about possible --
16             THE COURT:  Can I tell you, once it's in a
17 peer-reviewed journal, it has a little blessing, a little
18 slick halo over it, which doesn't mean that it's right or
19 not, but at least it satisfies one big Daubert thing.  As
20 soon as it's for litigation only based on stuff that I'm
21 only seeing for the first time, I've got a little question
22 mark, a red flag --
23             MR. BARNES:  But, remember, the litigation report
24 goes to all the things he has reviewed, not just the report.
25             THE COURT:  I'm warning, I'm warning, that's all.

1    MR. ALTMAN:  Your Honor, one of the issues is
2 whether Dr. Gibbons' supplemental report exceeds the scope
3 of the Court's order in the first place, which has never
4 been clear.  Your Honor said that --
5    THE COURT:  I allowed that November report, and so
6 to the extent there's new stuff in the March, that may go
7 beyond it.  But it looked when I was reading it as if all he
8 did was -- it wasn't new as much as a sensitivity analysis.
9    MR. ALTMAN:  Well, he went and he fixed a bunch of
10 mistakes in his original report, which through a lot of hard
11 work we found.  He added a bunch of sensitivity analyses.
12 But one of the very telling things is that --
13    THE COURT:  Did you have discovery into the
14 sensitivity analyses?
15    MR. ALTMAN:  We did, but after his depositions,
16 we kept going -- we never even knew there was a sensitivity
17 analysis.  Dr. Gibbons said, "I turned over everything --"
18    THE COURT:  I don't think that they were pure on
19 this.  That having been said, at this point I'm not going to
20 resolve this on discovery sanctions.  So now I'm in the
21 merits.
22    MR. ALTMAN:  That's fine.  The one issue that is
23 very clear is, we never got -- Dr. Gibbons' original papers
24 he submitted to the journal was rejected.
25    THE COURT:  Right.