UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF KAISER'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. SHAWN BIRD**

# TABLE OF CONTENTS

**Page**

I.

## I.    **INTRODUCTION**

Kaiser's[1] indication experts, Drs. Barkin (bipolar and other mood disorders), Perry (neuropathic and nociceptive pain), McCrory (migraine prophylaxis), and Alldredge (lack of dose related effect at dosages over 1800 mg/day) rigorously apply the scientific method to the best available data to reach their respective conclusions, as required for the admission of *any* expert report.  This is especially true in the field of pharmaceutical research, where proper methods of data collection and analysis are well-developed, standardized, and generally agreed.

Applying the scientific method to the task at hand, each of Kaiser's indication experts thoroughly searched the available scientific literature for the highest quality evidence bearing on the question—*i.e.*, double-blind, randomized, controlled trials ("DBRCT"), which even Pfizer's experts repeatedly acknowledge are not only the "gold standard," but the *only type of evidence from which any scientifically valid conclusions can be drawn.*[2]  Kaiser's experts examined not only the *published* DBRCT, but also Defendants' internal, *unpublished* research reports, the withholding and distortion of which lie at the very heart of this case.  Where an unpublished research report revealed information that undermined, contradicted, or exposed as an outright falsehood the conclusion stated in the corresponding published study, Kaiser's experts based

---

[1] "Kaiser" is Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals.  Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries:  Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[2] As set forth below, only a DBRCT can provide any statistical measure whatsoever of the likelihood of a cause and effect relationship between a treatment and the selected measure of its effect.  For this reason, all other forms of evidence are merely "hypothesis-generating rather than hypothesis-confirming."  (Slaby Report at 8.)  Relying on such evidence—which, by its very nature, is *incapable* of proving efficacy—in preference to multiple negative, DBRCT on the possibility that notwithstanding the consistently negative results, Neurontin *might* be effective for some subset of the same patient population, is as dangerous to the public health as it is antithetical to the scientific method.

their conclusions on the *actual* results of the study, not the results as distorted or misrepresented.[3]

Finally, because multiple DBRCTs have been conducted as to each indication, and the study results were consistently negative, Kaiser's experts formed and expressed their opinions that Neurontin has been shown to be ineffective in treating these conditions. It is no coincidence that each of Kaiser's experts approached their task in the same general way, even though there was little or no coordination or communication between them. Each of them adopted this approach *sua sponte*, because it is the approach dictated by science.

Pfizer's experts, by contrast: (1) disclose no discernable methodology for the collection of the relevant scientific literature; (2) ignore completely one or more DBRCT; (3) consider one or more DBRCT that were actually negative as positive; and/or (4) give preference to inferior forms of evidence from which no scientifically valid conclusions can be drawn. As such, their reports, and the conclusions they draw, are not the result of a rigorous application of the scientific method; they are a result of its *abandonment*, and thereby a further extension of Defendants' fraud.[4] Whether as a result of the withholding by Pfizer of relevant information—

---

[3] The reports of Kaiser's indication experts were originally filed, and are most readily accessible, as exhibits to the Revised Supplemental Declaration of Ilyas J. Rona in Filed in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1457), as Exhibit J ("Kessler Report," Dkt. No. 1457-10), Exhibit K ("Barkin Report," Dkt. No. 1457-11), Exhibit L ("Perry Report," Dkt. Nos. 1457-12 through 1457-15), Exhibit M ("McCrory Report," Dkt. No. 1457-16), Exhibit N ("Abramson Report," Dkt. No. 1457-17), and Exhibit P ("Alldredge Report," Dkt. No. 1457-20). The reports were also re-filed non-electronically as exhibits in support of Plaintiffs' opposition to Defendants' motion for summary judgment. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exhibits 21 (Barkin Report), 23 (Abramson Report), 163 (Perry Report), 365 (Alldredge Report), 374 (Kessler Report), and 478 (McCrory Report).

[4] With one exception, Pfizer's indication expert reports are attached as exhibits to the Declaration of Rajesh S. James (Dkt. No. 1692), as Exhibit 47 ("Bird Report," Dkt. 1692-11), Exhibit 48 ("Brenner Report," Dkt. 1692-12), Exhibit 49 ("Rapoport Report," Dkt. No. 1692-13), and Exhibit 50 ("McLean Report," Dkt. No. 1692-14). As Defendants have not filed

one of the central allegations in the case being that Defendants co-opted "thought leaders" with incomplete and misleading information—deliberate ignorance, or mere neglect, their reports are fatally deficient, and their testimony on the efficacy issue is not sufficiently reliable to be admitted.

In addition to ignoring or misconstruing the truly relevant evidence, most of Pfizer's experts expressly ground their opinions on their own personal, undocumented "clinical experience" in prescribing Neurontin to patients. However, the Court previously ordered that no expert testimony based on the expert's own experience in treating patients would be admitted unless the relevant "sanitized patient records" were produced to the opposing party.[5] No such records have been produced by Pfizer's experts. Accordingly, the opinions of Pfizer's indication experts based on their "clinical experiences" should be excluded on this ground as well.

The principle defects in Pfizer's indication expert reports are summarized in the chart below:[6]

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| Slaby (bipolar) | X | Guille | Vieta | X | X |
| Bird | X | | Gorson | X | X |

Dr. Slaby's final report in support of or in opposition to any motion, that report, which has not been marked confidential by Defendants, is attached as Exhibit 1 to Kaiser's motion *in limine* to exclude Dr. Slaby's testimony.

[5] *See* Electronic Order, Sept. 27, 2006.

[6] Kaiser appreciates that the Court does not wish to venture too far "into the weeds" on scientific issues prior to trial, as one of the purposes of the trial is the airing of these issues. Accordingly, for purposes of this motion, Kaiser has limited itself to the more obvious, overarching problems that render the opinions of Pfizer's experts inherently unreliable, untrustworthy, and unscientific.

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| (neuropathic pain) | | | 945-271 945-306 | | |
| Rapoport (migraine) | X | 945-217 | 945-220 | X | X |
| Brenner (neuropathic and nociceptive pain) | X | Gorson 945-224 945-271 945-306 1032-001 1032-002 1035-001 1035-002 | | X | X |
| McLean (doses over 1800 mg/day) | X | 945-224 | 945-082 945-295 942-88 | X | X |

Any one of these defects would be sufficient to exclude the testimony of the corresponding expert. Taken together, these defects so undermine the integrity of Pfizer's indication experts' opinions that they should all be excluded under *Daubert*.

## II.   TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY

By its terms, Federal Rule of Evidence 702 precludes the admission of expert testimony unless it (1) "is based upon sufficient facts or data, (2) . . . is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id*. Accordingly, given the tremendous sway an expert may have over a jury in scientific or technical matters, the Court is required to exercise a "gatekeeping role." *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  As summarized by the First

Circuit:

> In *Daubert*, the Supreme Court set forth four general guidelines for
> a trial judge to evaluate in considering whether expert testimony
> rests on an adequate foundation: "(1) whether the theory or
> technique can be and has been tested; (2) whether the technique
> has been subject to peer review and publication; (3) the technique's
> known or potential rate of error; and (4) the level of the theory or
> technique's acceptance within the relevant discipline." *United
> States v. Mooney*, 315 F.3d 54, 62 (1st Cir.2002) (citing *Daubert*,
> 509 U.S. at 593-94, 113 S.Ct. 2786).  However, these factors do
> not "constitute a definitive checklist or test," and the question of
> admissibility "must be tied to the facts of a particular case."
> *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167,
> 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

*Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25-26 (1st Cir. 2006).

In *Daubert* itself, the Court explained that:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible
> one.  Its overarching subject is the scientific validity—and thus the
> evidentiary relevance and reliability—of the principles that
> underlie a proposed submission.  *The focus, of course, must be
> solely on principles and methodology*, not on the conclusions that
> they generate.

509 U.S. at 594-95 (emphasis added).

Consistent with *Daubert*, Kaiser's focus in this motion is not on the conclusions reached

by Pfizer's experts, but on the defective methods by which they were reached—to the extent any

method is discernable from their respective reports.

## III.    THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT

There are *universally-accepted*, international standards for determining whether a drug is

effective for a given indication.  *See, e.g.*, International Conference on Harmonisation of

Technical Requirements for Registration of Pharmaceuticals for Human Use, *ICH Harmonised*

*Tripartitie Guideline, Statistical Principles for Clinical Trials,* (Feb. 5, 1998) (available at http://www.ich.org/cache/compo/475-272-1.html).[7]  The FDA's standard is the same.

As Dr. David Kessler, former head of the FDA, writes in his report, when determining efficacy, the FDA relies only on "'adequate and well-controlled clinical investigations.'" Kessler Report, at 5 (quoting 21 C.F.R. § 314.26).  Such trials need to be controlled, need to be randomized, need to be blinded, and need objective and prospectively determined trial endpoints. *See* Kessler Report, at 5-6.  These pillars of sound clinical trial design are not arbitrary; they are required to minimize the chance that any observed difference between the placebo and treatment groups is due to something *other* than the treatment itself.  Double-blind, randomized, controlled trials (DBRCT) are the standard—indeed, the *only* accepted method— for determining whether a drug is effective.  They are the foundation on which modern pharmaceutical medicine is based, even if they have little impact on the behavior of the world's largest drug company.

Clinical trials that are not controlled, not blinded, not randomized and/or whose endpoints are not prospectively and objectively determined, while possibly helpful in generating a hypothesis, cannot be used to determine a drug's efficacy.  *See* Kessler Report ¶ 17.  Of even lesser value in determining a drug's efficacy are anecdotal case reports.  Such reports, which again may useful in generating a hypothesis for study, are not reliable or adequate evidence of efficacy.  These "reports are obtained haphazardly or selectively, and the logic of 'post hoc, ergo propter hoc' does not suffice to demonstrate that the first event [the taking of a drug] causes the second [the effect]."  D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000), at 91(available online at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

---

[7] Additional international "Efficacy Guidelines" are available at http://www.ich.org/cache/compo/475-272-1.html.

In a nutshell, a cause-and-effect relationship is deemed established when it can be determined statistically that there is a 95% probability that the difference observed between the treatment and control (placebo) groups is a non-random event. This probability—expressed as "p < .05" in the language of statistics—is the "bottom line" of every clinical trial. If p < .05, a "statistically significant difference" exists between the treatment and control groups with respect to the variable being measured, and a cause-and-effect relationship is inferred.[8] If p > .05, no statistically significant difference has been shown, and no cause and effect relationship is or may be inferred. *See generally*, *Reference Guide on Statistics*, at 121-25 (discussing p-values and statistical significance).

Each of Kaiser's efficacy experts describes his method and well-established reasons for relying solely on DBRCTs in rendering an efficacy opinion. For each indication at issue, there are multiple DBRCTs, most of which were designed and conducted by Pfizer. Given such a wealth of high-quality evidence, there is simply no need—and therefore no reason—to rely on lesser levels of evidence. For these reasons, Kaiser's experts rely *solely* on the results of DBRCTs in rendering their efficacy opinions.

The essence of this litigation is that Pfizer suppressed or misrepresented the published results of multiple DBRCTs. For this reason, Kaiser's experts reviewed, where possible, the full underlying clinical research reports and their results, not just the published versions. Kaiser's

---

[8] This presumes, of course, that the results of the study have been analyzed as originally planned, and not distorted by changing the variable, primary endpoint, or patient population, a practice known as "moving the goalposts," which by its very nature undermines the conclusion that the statistical relationship observed is non-random. *See, e.g., Reference Guide on Statistics, at* 93-94 ("[I]f the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect. However, if the control group was created in any other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed.") (footnote and citations omitted).

experts revealed—as was the subject of a peer-reviewed article recently published in the *New England Journal of Medicine*[9]—that in many instances, the findings presented in the published literature did not match those found in the underlying research reports, and in many cases, entire trials went unpublished.

While Pfizer's experts readily agree that the highest level of evidence comes from DBRCTs, they abandon reliance on such high-quality evidence. Instead, they advocate a cafeteria-style approach to evidence-based medicine, wherein they highlight—without any recognizable method or principle—select pieces of evidence from the varying levels of evidence, including the lowest level: their own clinical experience. But in so doing, they either ignore entire DBRCTs, or rely on a published article, even when the underlying, internal research report exposes its fraudulently manufactured conclusion.

There is not a mere difference of opinion between Pfizer's and Kaiser's efficacy experts. Pfizer's experts do not even attempt to explain away the significant differences between the published articles and the underlying research reports; they simply ignore them. Nor do Pfizer's experts even acknowledge the existence of entire DBRCTs that were never published. The opinions of Pfizer's efficacy experts are not the product of reliable principles and methods. Rather, they are the product of exactly the type of unreliable, scientifically invalid evidence that the Supreme Court ruled should be excluded in *Daubert*.[10]

---

[9] Vedula, *et al.*, *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009).

[10] By way of example, in *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884-85 (10th Cir. 2005), the Court found that where there was epidemiological evidence supporting one conclusion, reliance on differential diagnosis "without supporting epidemiological evidence" was "misplaced," and excluded the expert testimony. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 474 (M.D.N.C. 2006), the Court rejected expert evidence testimony based on a literature review of peer-reviewed literature in which the expert's conclusions were "flatly contradicted" by the available epidemiological literature. Relying on *Norris*, the Court also

## IV.   DR. SLABY'S OPINION THAT NEURONTIN IS EFFECTIVE IN TREATING BIPOLAR DISORDER IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

Dr. Andrew Slaby is (or was) Pfizer's expert on the efficacy of gabapentin in treating

bipolar and other mood disorders. His December 15, 2008 report (Slaby Report) is the only

expert report Defendants did not cite in support of their motion for summary judgment.

Four DBRCT have been conducted studying Neurontin in bipolar disorder. Not one of

these studies indicates that Neurontin is any more effective than placebo in treating any aspect of

bipolar disorder. Dr. Slaby's opinion that "[g]abapentin is an effective treatment for some

patients suffering from bipolar and other mood disorders" (Slaby Report, at 1) repeatedly

acknowledges that such studies are the "gold standard" of evidence (Slaby Report, at 6, 9), but

he ignores one of them, misrepresents the results of a second, and considers the other two no

more important than scientifically inferior studies, which he acknowledges are merely

"hypothesis-generating rather than hypothesis-confirming" (i.e., they prove *nothing*). (Slaby

Report at 8.)

### A.   All Four DBRCT Have Shown That Neurontin Is Ineffective In Treating Bipolar Disorder

Defendants' protocol 945-209 ("Pande"), not only demonstrated that Neurontin is no

more effective than placebo at treating either the depressive or manic symptoms of bipolar

disorder, but also indicated that placebo is a *more* effective anti-manic agent than Neurontin. *See*

Barkin Report, at 7-8. A second trial, the lead investigator of which was Dr. Mark Frye, then of

---

excluded expert testimony based on differential diagnosis that contradicted the available epidemiological evidence. *Id.* at 477. In *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003), after cataloguing cases in which courts have held that epidemiology is the generally accepted methodology for demonstrating causation, *see id.* at 532 and n.7, the Court assessed and rejected the plaintiff's experts' reliance on other methods of showing causation, including anecdotal case reports, "causality assessments," animal studies, and differential diagnosis. *Id.* at 537-57.

the National Institute of Mental Health ("Frye"), demonstrated that Neurontin was no more

effective than placebo as a treatment for bipolar disorder. *Id.* at 9. A third trial, authored by

investigators associated with Harvard Medical School ("Guille"), demonstrated that Neurontin

was no more effective than placebo at treating mania. *Id.* A fourth trial, Defendants' own

protocol 945-421-291 ("Vieta"), demonstrated that Neurontin was no more effective than

placebo at improving bipolar symptom severity. *Id.* at 8-9.

Kaiser's bipolar expert, Dr. Jeffrey Barkin, a board-certified psychiatrist and Director of

Maine's Medicaid Drug Utilization Review Board, concludes that:

> The clinical trial database of Level 1 Evidence [DBRCT]
> consistently shows lack of efficacy of gabapentin for the treatment
> of bipolar disorder. . . . [¶] There is little ambiguity about the
> results discussed above. In none of the double-blind trials did
> gabapentin demonstrate any efficacy over placebo as a treatment
> for bipolar disorder and other mood disorders. Quite the opposite,
> the scientific evidence clearly shows that gabapentin is ineffective
> as a treatment for bipolar disorder.

*Id.* at 10.[11]

## B.    Dr. Slaby's Report Is Inaccurate, Incomplete, Unscientific, and Unreliable

At the outset of his report, Dr. Slaby announces his opinion that "Gabapentin is an

effective treatment for some patients suffering from bipolar and other mood disorders." Slaby

Report, at 1. While Dr. Slaby acknowledges that "[t]he gold standard for evaluating the efficacy

of a therapeutic intervention for psychiatric conditions is a double-blind placebo-controlled

---

[11] A second Kaiser expert, Dr. John Abramson, reaches the same conclusion: "In sum, four
randomized controlled clinical trials testing the efficacy of Neurontin for bipolar disorders have
been done. Of the two identified as sponsored by the manufacturer, one showed that Neurontin
is significantly worse than placebo [Pande], and one showed no benefit [Vieta]. The study done
by NIMH showed no benefit [Frye]. Another presented in 1999 [Guille] also showed no
benefit." Abramson Report, at 57.

crossover study with and without psychotherapy" (*id.* at 6),[12] he all but ignores these studies, relying instead on inferior forms of evidence. In his entire, 14-page report, only *two paragraphs* contain discussion of any actual studies of Neurontin's efficacy in treating bipolar disorder.[13] Dr. Slaby acknowledges that the Pande and Frye studies were negative (*id.* at 12); he makes no mention whatsoever of the Guille study, despite the fact that Dr. Barkin's report, to which Dr. Slaby's report is responsive, expressly criticized Dr. Slaby's prior report on that ground;[14] and Dr. Slaby cites the Vieta publication as "clearly indicat[ing] a role for gabapentin in bipolar disorder" (*id.*), without responding at all to Dr. Barkin's undisputed observation that the Vieta publication falsely reported that the results of the trial were positive, when in fact they were negative.[15] At the end of his report, Dr. Slaby acknowledges that "gabapentin is not a first-line agent in my practice . . . ." *Id.* at 14.

---

[12] *See also*, Slaby Report, at 9 ("randomized double-blind, placebo-controlled trials are the gold standard in proving efficacy").

[13] Dr. Slaby cites a number of other studies for the proposition that "[r]andomized controlled trials demonstrate that gabapentin is an effective alternative therapy for patients with panic disorder and social anxiety disorder." (Slaby Report, at 13.) As the Court may recall, the plaintiffs, including Kaiser, chose not to pursue these claims, given the relatively small number of prescriptions written for these conditions. *See, e.g.*, Memorandum of Law In Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1018) at 7 n.5 ("Plaintiffs have elected not to pursue subclasses for . . . anxiety disorders, due to the relatively small sales for these off-label conditions."). Accordingly, this testimony is irrelevant.

[14] *See* Barkin Report, at 19 ("He makes no reference to the negative Guille study."). Dr. Slaby's earlier report (Dkt. No. 586, Exh. 26), criticized by Dr. Barkin, was filed in opposition to plaintiffs' motion for class certification. The portions of the two reports discussing studies of gabapentin and bipolar disorder are identical in substance. *Compare id.* at 11-13 with Slaby Report at 11-13.

[15] As Dr. Barkin explained, the published Vieta article:

> fails to distinguish the original ITT [intent to treat] group from the PP subgroup. Instead, the 25 subjects in the PP subgroup are described in the absence of the original ITT group despite the fact that the authors falsely write that "all statistical analyses were done by intention to treat." The authors appear to have simply ignored the original ITT, creating an impression of efficacy from what is in

Dr. Slaby's report neither describes nor displays any discernable methodology for the collection and analysis of evidence; fails to distinguish between different levels of evidence; entirely omits to consider critical "Level 1" evidence (DBRCT); relies on one DBRCT published as positive even after he was referred to the internal research report showing that it was in fact negative; and elevates inferior quality studies[16] and anecdotal case reports over Level 1 evidence. As Dr. Barkin explains:

> [O]nly the section on pages 11-13 of the [Slaby] report addresses the use of gabapentin for bipolar and other mood disorders. My initial comment is on its face, the "Expert Report" does not appear to be utilizing any particular method. Although it does cite to "studies" in published literature, nowhere does the "Expert Report" identify whether any of those so-called studies are in fact randomized, placebo-controlled, double-blind studies, nor does it segregate the studies into the levels of evidence so that they can be appropriately analyzed. Moreover, the "Expert Report" appears to be basing its conclusion on "case reports, nonrandomized clinical trials, and small case studies," and not the available randomized, placebo-controlled, double-blind clinical trials. Based on part C of my section titled "Inefficacy of Gabapentin" above, such an approach is unscientific, potentially biased and clearly inappropriate.
>
> Second, it is clear that the author of the "Expert Report" did not receive all of the necessary Level 1 Evidence on gabapentin. He makes no reference to the negative Guille study. Moreover, he

---

> reality just the PP subgroup. If the original integrity of the ITT population had been maintained, this would be a failed trial with the conclusion that "[t]he primary efficacy parameter did not show statistically significant differences between gabapentin and placebo." Culling out or "cherry picking" a subpopulation that shows efficacy in lieu of the ITT population is dishonest, unethical and a far cry from demonstrating efficacy through the randomized ITT population.

*Id.* at 9 (quoting internal research report, available at http://www.clinicalstudyresults.org/documents/company-study_329_0.pdf, at 4).

[16] While Dr. Slaby acknowledges that such "studies are referred to as hypothesis-generating rather than hypothesis-confirming" (*i.e.*, they *prove nothing*) (Slaby Report, at 8), he lumps them together with the Level 1 evidence, as if they were entitled to the same weight. *See* Slaby Report, at 11-13.

cites only Vieta's publication of the results of 945-421-291, which I demonstrated above are inaccurate, rather than citing to Pfizer's internal unpublished analysis. . . .

Third, consistent with the marketing efforts of Pfizer and Parke-Davis, the "Expert Report" elevates the lower tiers of evidence such as case reports and anecdotes over the Level 1 Evidence in order to falsely suggest that the evidence supporting the efficacy of gabapentin outweighs the negative. In one paragraph, the "Expert Report" cites to 17 different publications which "clearly indicate there may be a role for Gabapentin, especially for the depressive component of bipolar disorder." Of those 17 citations, only two are in fact Level 1 Evidence, and those studies (Frye and Vieta) were negative, i.e. not supportive of the use of gabapentin in mood disorders. Missing from this paragraph is a complete discussion of the Level 1 Evidence, including the studies of Pande and Guille, which would have rendered the conclusion of that paragraph unsupportable.

Pande and Frye are both referenced in a following paragraph as two of "[o]nly a few studies" that "have not found such promise." However, the actual findings of Pande and Frye are never reviewed, suggesting that these citations are equivalent to citations of the favorable anecdotal case reports. Additionally, that paragraph fails to include the results of Guille and 945-421-291, suggesting that the question of gabapentin's efficacy (or more properly inefficacy) is unsettled scientifically.

Dr. Slaby spends much of his report advocating the use of non-FDA approved treatments. This is not the issue. Rather, the issue is the purposeful and misleading withholding of Level 1 Evidence which clearly and definitively demonstrates the lack of efficacy of gabapentin in bipolar disorder.

Based on the foregoing, the undated "Expert Report" of Dr. Slaby submitted by Defendants is inaccurate, incomplete, unscientific and unreliable.

Barkin Report, at 19-20.

Because Dr. Slaby's report ignores one DBRCT, misconstrues a second DBRCT that was

actually negative as positive, and relies on inferior forms of evidence incapable of determining a

drug's efficacy, his opinion is, as Dr. Barkin states, "inaccurate, incomplete, unscientific, and unreliable" (*id.*), and should therefore be excluded under *Daubert*.[17]

## V.   DR. RAPOPORT'S OPINION THAT NEURONTIN IS EFFECTIVE IN PREVENTING MIGRAINES IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

### A.   All Three DBRCT Show That Neurontin Is Not Effective for Migraine Prophylaxis

Defendants have conducted the three DBRCT studying Neurontin for migraine prophylaxis (prevention). All three of these studies were negative.

In 1990, the first trial studying Neurontin's use in migraine, Defendants' own protocol 879-200, found no statistically significant difference in the primary efficacy measure between placebo and Neurontin. McCrory Report, at 7-8. In 1998, the second trial studying Neurontin's use in migraine, Defendants' own protocol 945-220, also showed no significant difference between Neurontin and placebo in the primary outcome studied. *Id.* at 10 (RR995-00074).[18]

Finally, in 1999, the third trial studying Neurontin's use in migraine, Defendants' own protocol

---

[17] By way of example, in *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884-85 (10th Cir. 2005), the Court found that where there was epidemiological evidence supporting one conclusion, reliance on differential diagnosis "without supporting epidemiological evidence" was "misplaced," and excluded the expert testimony. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 474 (M.D.N.C. 2006), the Court rejected expert evidence testimony based on a literature review of peer-reviewed literature in which the expert's conclusions were "flatly contradicted" by the available epidemiological literature. Relying on *Norris*, the Court also excluded expert testimony based on differential diagnosis that contradicted the available epidemiological evidence. *Id.* at 477. In *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003), after cataloguing cases in which courts have held that epidemiology is the generally accepted methodology for demonstrating causation, *see id.* at 532 and n.7, the Court assessed and rejected the plaintiff's experts' reliance on other methods of showing causation, including anecdotal case reports, "causality assessments," animal studies, and differential diagnosis. *Id.* at 537-57.

[18] Research Report RR9995-00074 reports the results of protocol 945-217. while Research Report RR995-00085 reports the results of protocol 945-217. *See* McCrory Report, at 7.

945-217, again failed to demonstrate any statistically significant difference between Neurontin and placebo. *Id*. at 9 (RR995-00085).

Kaiser's expert, Dr. Douglas McCrory, is a health services researcher experienced in the evaluation of clinical trials. Dr. McCrory concludes that a meta-analysis of the results from the clinical trials "fail[] to show a statistically significant effect of gabapentin compared with placebo for migraine prophylaxis." *Id*. at 1.

### B.    Dr. Rapoport Ignores One of the Three DBRCT, and Misrepresents the Results of a Second

Of the three DBRCT studying Neurontin in migraine prophylaxis, Dr. Rapoport was listed as an investigator on one (protocol 945-217, RR 995-00085), and as a co-author of a second (protocol 945-220). *See* McCrory Report, at 29-30. Remarkably, Dr. Rapoport makes no mention whatsoever of the first study in his report, despite having being "called out" on the point by Dr. McCrory:

> Dr. Rapoport was also listed as an investigator on Research Report RR 995-00085, therefore he should be aware of this study, too. However, he does not mention this study or the findings which are *negative* for the primary efficacy endpoints of the efficacy analysis (4-week migraine headache rate during SP2 and change from baseline to SP2 in 4-week headache rate). I think he is obliged to refer to these data in formulating his assessment, rather than limiting his assessment to the published or publically [sic] available reports.

McCrory Report, at 30 (emphasis added).[19]

Dr. Rapoport's only response to this criticism is "I have not previously seen the research report or unpublished studies mentioned by Dr. McCrory in his report." Rapoport Report, at 2. This research report was provided to Plaintiffs by Pfizer, near the outset of this litigation, and was presumably equally available to Dr. Rapoport. Burying one's head in the sand so as to

---

[19] As with Dr. Slaby, Dr. McCrory's report addressed an earlier report filed by Dr. Rapoport in support of Defendants' opposition to class certification. *See* Dkt. No. 586, Exh. 23.

ignore negative data is antithetical to the scientific method, especially where, as here, the study

ignored is one of only three "gold standard" trials from which *any* scientifically valid

conclusions may be drawn.[20]

> With respect to protocol 945-220, of which Dr. Rapoport was a co-author:

> > Dr. Rapoport describes data from only "The Mathew Paper" in his
> > section summarizing the clinical trial evidence supporting the use
> > of gabapentin for treatment of migraine. In his discussion of this
> > study, he cites the analysis described in Mathew et al. (2001),
> > which includes only the subgroup of patients in the mITT
> > population who achieved a stable dose of 2400 mg/day. As I
> > described earlier, this is a misrepresentation of Study 945-220
> > because it has redefined the study population according to a post
> > hoc reanalysis and selectively reports only positive findings.

> > * * *

> > In the Research Report, the primary analysis is based on the
> > efficacy population which include patient [sic] regardless of
> > whether they achieved a stable dose of 1800 mg/day or 2400
> > mg/day. However, he does not mention the discrepancy between
> > the design of the study and the ultimate reporting in the published
> > article.

> > * * *

> > Given his role in helping to design the study (as he states in his
> > report) and as an investigator (as listed on the cover page of the
> > Research Report), I believe that he should take public
> > responsibility for the discrepancies between the design described in
> > the Research Report and discrepancies with the reporting in the
> > published article.

> > Were he to quote from the efficacy population as defined in the
> > Research Report, the corresponding p-values would be p=0.332 for
> > change in migraine headache rate from baseline to SP2, and, for
> > the mITT population the p-value would be p=0.339, neither of
> > which represents a statistically significant difference between
> > gabapentin-treated and placebo-treated patients.

McCrory Report, at 29-30.

---

[20] Dr. Rapoport's approach can fairly be analogized to the White House's refusal to open an
email message containing the Environmental Protection Agency's conclusion that greenhouse
gases are pollutants that must be controlled, so as not to have to act on the determination. *See* F.
Barringer, *White House Refused to Open Pollutants E-Mail*, New York Times (June 25, 2008).

Dr. Rapoport's response to this rather serious allegation that he fraudulently misrepresented the study's actual results is equally deficient: "I have not previously seen the research report or unpublished studies mentioned by Dr. McCrory in his report." Rapoport Report, at 2. Rather than actually *reviewing* the Research Report, on which he is listed as an investigator, and confronting Dr. McCrory's criticism head-on, Dr. Rapoport states his "recollection"—then ten years old—that "we were only interested in the 2400 mg dose of gabapentin based on our collective clinical experience . . . ." Rapoport Report, at 2. Dr. Rapoport's ten year old, self-serving "recollection" is flatly inconsistent with the actual research report, which he might have realized, had he taken the trouble to review it. *See* McCrory Report, at 11 ("[T]he Research Report makes no such restriction regarding the dose when describing the primary and secondary outcome measures.").

Because Dr. Rapoport completely ignores one of the three DBRCT studying migraine prophylaxis—even though he is listed as an investigator on the study—and misrepresents the results of a second DBRCT—even though he is listed as an author, his opinions are not the product of reliable principles and methods, and should therefore be excluded under *Daubert*.

C.    **Dr. Rapoport Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered**

Dr. Rapoport's report makes it clear that while Dr. McCrory bases his opinions on the actual DBRCT data—the *only* data from which any scientifically valid conclusions may be drawn—Dr. Rapoport's opinions are instead based primarily on his personal "extensive clinical experience":

> The McCrory report focuses on data, unpublished reports, research reports and the intricacies of various papers. The opinions I offer in this report are based on my extensive clinical experience of 36 years in private practice and teaching at major medical institutions, my knowledge of the literature relating to the treatment of headache, my review of the literature relating to the use of

gabapentin in treating headache, and my review of Dr. McCrory's
report.

* * *

Dr. McCrory, by his own admission, is a specialist in trial design
and evaluation, not as a clinician. He analyzes studies and
concentrates on data, and I care for patients with migraine who are
in severe pain and concentrate on their improvement. . . . [¶] The
type of evidence I look to as a clinician is whether the patient
improves. Dr. McCrory looks at the primary and secondary
endpoints and whether they are met.

Rapoport Report, at 2, 4.

As the prior section indicates, and Dr. Rapoport boasts, his opinions are not based on

"studies," "data," or "analysis"—subjects in which Dr. McCrory "admits" he is a specialist, but

on his own experience in treating individual patients. As set forth at length in the accompanying

Motion *In Limine* to Exclude Testimony of Pfizer's Non-Retained Experts, however competent

the practitioner, and however extensive their experience, no scientifically valid conclusions can

be drawn from such an amalgamation of "case reports" not subjected to the rigors of statistical

analysis. Accordingly, as discussed in the accompanying motion, incorporated by reference

herein, such testimony is routinely excluded under *Daubert.*

In addition, as discussed at length in the accompanying motion, the Court expressly

ordered that any of Pfizer's experts who based their opinion on their own experience, "as

opposed to a clinical trial," would be required to produce the underlying, "sanitized patient

records" as a condition of admissibility. Electronic Order, Sept. 27, 2006. Dr. Rapoport has not

produced any such records. Accordingly, his opinions should be excluded on this ground, as

well.

## VI.   DR. McLEAN'S OPINION THAT NEURONTIN IS MORE EFFECTIVE AT DOSAGES OVER 1800 MG/DAY IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

### A.   All Four DBRCT Have Shown No Dose-Response Relationship Over 1800 mg/day

Defendants have conducted the three fixed-dose DBRCT capable of assessing

Neurontin's efficacy at dosages over 1800 mg/day. The consistently negative results from these

DBRCT establish that Neurontin is no more effective at dosages above 1800 mg/day.

The first trial, Defendants' own protocol 945-82, not only failed to provide evidence of

enhanced efficacy at dosages above 1800 mg/day, but also failed to demonstrate *any* dose-

response relationship (*i.e.*, improvement in efficacy with escalating dose) for the drug.

Alldredge Report, at 11-13. The second trial, Defendants' own protocol 945-224, also failed to

demonstrate a dose-response effect of Neurontin. *Id.* at 17-18. The third trial, Defendants' own

protocol 945-295, specifically designed to garner data on the dose-response of Neurontin, once

again demonstrated that there was no increased efficacy at doses above 1800 mg/day, while also

failing to demonstrate a dose-response effect of Neurontin. *Id.* at 18-19.

Kaiser's expert, Dr. Brian Alldredge, is a Professor of Clinical Pharmacy at the

University of California at San Francisco School of Pharmacy and Health Sciences Clinical

Professor of Neurology at the UCSF School of Medicine. Dr. Alldredge reviewed all of the

Defendants' trials studying Neurontin at doses above 1800 mg/day, and concludes that "the

highest quality evidence [DBRCT] failed to establish a dose-related effect (*i.e.*, continued

improvement in efficacy) at dosages above 1800 mg/day." *Id.* at 1. As Dr. Alldredge explained:

> Of the three designs employed here, the fixed-dose, parallel group
> study is the most appropriate design to establish a dose response
> effect. Studies 945-05, 945-77, 945-82, 945-88, 945-224, and 945-
> 295 are examples of this study design. As can be seen from Table
> 1, only 4 of these studies used doses above 1800 mg/day (945-82,
> 945-88, 945-224 and 945-295). Results of all four of these studies

fail to support a dose-response relationship for gabapentin at
dosages above 1800 mg/day.

*Id.* at 27-28.[21]

### B.    Dr. McLean Ignores One of the Four Relevant DBRCT, and Cites the Other Three as Positive When They Were, In Fact, Negative

In his report, Dr. McLean correctly identifies the proper hierarchy of evidence—and then

proceeds to ignore it:

> Evidence-based medicine aims to make medical decision-making
> more deliberate and methodical. The evidence-based approach
> involves a critical appraisal of the medical literature, including data
> from the pivotal trials; formulation of the question to be answered
> by the research; and, integration of the research into clinical
> practice. Evidence-based medicine attempts to assign levels of
> confidence in the data and in conclusions and recommendations
> that can be drawn from them. A variety of schemata have been
> developed to assist in the evaluation of different types of
> information and stratify them by quality. The different types of
> information include (1) evidence derived from one or more
> randomized placebo-controlled trials; (2) evidence from well-
> designed controlled trials without randomization or from cohort or
> case-controlled studies, preferably from multiple centers; and, (3)
> evidence consisting of expert opinion based on clinical experience
> in the form of reviews or committee reports.

McLean Report, at 11-12.

In addition, while he acknowledges that the highest quality of evidence consists

*exclusively* of DBRCT, of the four DBRCTs identified by Dr. Alldredge as the only studies

capable of showing "a dose-response relationship for gabapentin at dosages above 1800 mg/day"

(Alldredge Report, at 27-28), Dr. McLean ignores one entirely, Defendants' protocol 945-224,

---

[21] With respect to 945-88, the only one of these four studies not discussed above, Dr. Alldredge
explains that "[s]tudy 945-88 also does not illuminate the issue of a dose-response relationship
for gabapentin at doses greater than 1800 mg/day, since 3600 mg/day was the only gabapentin
dosage shown to be effective in this trial." Alldredge Report, at 14.

despite the fact that Dr. Alldredge had previously alerted him to its existence and importance,[22] and Dr. McLean cites the other three, which *failed* to show any dose-response relationship over 1800 mg/day, as "show[ing] efficacy, and/or increasing efficacy . . . of gabapentin doses greater than 1800 mg/d for epilepsy and pain." McLean Report, at 15-16.[23]

While Dr. McLean acknowledges that evidence-based medicine requires that the "different types of information" on which he relies be "stratify[ied] . . .by quality" (McClean Report at 11-12), he does no such thing, and lumps the relevant DBRCT together with open-label and observational studies. In fact, rather than following through on his own prescription for the practice of "evidence-based medicine," and giving the relevant DBRCTs the much greater weight to which they are entitled, Dr. McLean contends that the purpose of such trials is merely "to support an approval for marketing, <u>not</u> to determine what dose a physician should prescribe." McLean Report, at 4 (emphasis in original).

Dr. McLean's opinion epitomizes Pfizer's experts' cafeteria-style approach to evidence-based medicine: "the task of practitioners [is] to *blend* data from studies of different design and quality with one's own clinical experience." McLean Report, at 12 (emphasis added). Nowhere in his report does Dr. McLean disclose just what recipe he followed in "blending" these

---

[22] *See* Alldredge Report, at 17-18 ("no dose-response effect was seen, and this study does not provide substantial evidence of increased efficacy of gabapentin . . . at doses above 1800 mg/day). This research report remains unpublished. *See id.* at 32. Dr. McLean cites only to published studies. *See* McLean Report, at 15-16.

[23] Specifically, Dr. McLean cites: (1) 945-82, published as Beydoun, *et al.*, Gabapentin Monotherapy: II. A 26-week, Double-Blind, Dose-Controlled, Multicenter Study of Conversion from Polytherapy in Outpatients with Refractory Complex Partial or Secondarily Generalized Seizures, *Neurology* 49: 746-752, 1996 (*see* Alldredge Report, at 31, 56); (2) 945-88, published as Bergey, *et al.*, Gabapentin monotherapy: I. An 8-day, double-blind, dose-controlled, multicenter study in hospitalized patients with refractory complex partial or secondarily generalized seizures. *Neurology* 49:739-45, 1997 (*see* Alldredge Report, at 31, 56); and (3) 945-295, published as Rice, *et al.*, Gabapentin in Postherpetic Neuralgia: A randomized, Double Blind, Placebo Controlled Study. *Pain* 94:215-24, 2001 (*see* Alldredge Report, at 32, 56).

ingredients to arrive at his efficacy opinion.  Moreover, his opinion is not even based on any

such "blending," as he categorically *rejects* all DBRCTs.  Dr. McLean is unabashed in

describing the evidence-base for Neurontin's efficacy at high-dose as arising from case reports

and experience:

> Once [Neurontin] was approved for marketing, practitioners and
> clinician scientists began to obtain *experience* with gabapentin in
> patients in general population and in different kinds of studies.
> Manuscripts published in the medical literature contain data
> derived *from this experience*.  These publications constitute
> evidence-based medicine that can be used to guide clinical
> decision making.

McLean Report, at 9 (emphasis added).

Because Dr. McLean ignores one of four relevant DBRCTs, cites the other three as

positive when they were, in fact, negative, and relies on lesser forms of evidence contradicted by

*all four* DBRCTs, his opinions are not the product of reliable principles and methods, and should

therefore be excluded under *Daubert.*

### C.     Dr. McLean Relies on Neurontin's FDA-Approved Label, Which States That Greater Efficacy Over 1800 mg/day Has *Not* Been Demonstrated

In addition to ignoring and misrepresenting the results of clinical trials, Dr. McLean

bases his opinion on the following statements in the current Neurontin Package Insert:

**Postherpetic Neuralgia**

. . . . The dose can . . . be titrated up as needed for pain relief [up]
*to a daily dose of 1800 mg* . . . .  In clinical studies, efficacy was
demonstrated over a range of doses from 1800 mg/day to 3600
mg/day with *comparable effects across the dose range.  Additional
benefit of using doses greater than 1800 mg/day was not
demonstrated.*

**Epilepsy**

If necessary, *the dose may be increased . . . up to 1800 mg/day.*
Dosages up to 2400 mg/day have been well tolerated in long-term
clinical studies.  Doses of 3600 mg/day have also been

administered to a small number of patients for a relatively short
duration, and have been well-tolerated.

McLean Report, at 10.

Dr. McLean cites these statements for the following propositions:

Thus, the package insert includes doses higher than 1800 mg/d up
to 3600 mg/d.  The FDA presumably would not have included this
language if there were no utility of doses greater than 1800 mg/d
for any patient.  This is an implicit recognition that it maybe
appropriate to prescribe doses above 1800 mg/d even though the
label also notes that does above 1800 mg/d were not shown to
provide additional efficacy in the pivotal trials.

McLean Report, at 10-11.

These statements are truly remarkable, not only in light of the label's express disclaimer

that no additional benefit has been shown, but also in light of the FDA's *repeated refusal* to

allow Defendants to raise the maximum recommended dosage above 1800 mg/day.[24]  Certainly,

it would come as a surprise to the FDA that its refusal to raise the maximum recommended dose

of Neurontin because increased efficacy at higher doses has *not* been shown was being cited as

tacit support for a contrary expert opinion.  Dr. McLean's opinion is as incredible as it is

unreliable.

---

[24] On August 26, 1997, the FDA rejected Defendants' request to change the effective and
maximum recommended dose of gabapentin. *See* Declaration of Ilyas Rona In Opposition to
Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exh. 373, Non-Approvable Letter
from FDA to Jan Turner dated August 26, 1997 (WLC_FRANKLIN_0000090128).  Similarly,
in May 2002, the FDA rejected Defendants' submitted dosing instructions of gabapentin for
PHN which stated: "The dose can subsequently be titrated up as needed for pain relief to a
maximum daily dose of 3600 mg" and that there was "greater efficacy with increasing dose."
*Id.*, Exh. 436, Email from FDA to Drusilla Scott dated May 23, 2002 re: changes to the product
labeling (PFIZER_LCASTRO_0011868); Exh. 437, FDA draft product labeling dated May 23,
2002 (Pfizer_MPatel_0077867); Exh. 438, Email from FDA to Drusilla Scott dated May 21,
2002 attaching FDA draft product labeling dated May 16, 2002 (PFIZER_LCASTRO_0011563).

**D.     Dr. McLean Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered**

At the outset of his report, Dr. McLean states the evidence on which his conclusion is

based:

> It is my opinion that gabapentin at doses greater than 1800 mg/d can be effective in treating patients for epilepsy or pain for whom the medicine is not effective, or less effective, at lower doses. *I base this conclusion on my years of clinical experience prescribing gabapentin, the experience of my colleagues,* the research I have done and a review of the medical literature.
>
> * * *
>
> *It is my experience that some patients I have treated with gabapentin did not begin to benefit until the dose was titrated above 1800 mg/d.* Colleagues of mine have told me of similar results. Also, many of my own patients have not achieved, optimum seizure or pain control with doses less than 1800 mg/d; higher doses were needed and tolerated.

McLean Report, at 3, 19 (emphasis added).

As these passages make plain, Dr. McLean's opinions are based more on his own,

personal experiences in treating patients, and the experiences relayed to him by his colleagues,

than they are based on an analysis of the available data based on relative scientific merit.  As set

forth at length in Kaiser's accompanying Motion *In Limine* to Exclude Testimony of Pfizer's

Non-Retained Experts, no scientifically valid conclusions of any kind can be drawn from case

reports and other forms of anecdotal experience.  Crediting one's personal beliefs over contrary,

scientific evidence is, once again, the antithesis of the scientific method, not the fruit of its

careful application.  Any opinion based in significant part on such unscientific evidence, as Dr.

McClean's clearly is, should be excluded as insufficiently reliable under *Daubert*.[25]

---

[25] Dr. McLean's experienced-based approach to resolving the question obviously forms a substantial part of the basis for his opinion, and is not merely additive to his view of the scientific literature. *See* McLean Report, at 3-9 20-21

Finally, as set forth at length in the accompanying motion to exclude the testimony of

Pfizer's "non-retained experts" based on their "clinical experience," the Court previously ordered

that any of Pfizer's experts who based their opinions on such experience would be required to

produce the underlying patient records as a condition of admissibility. Dr. McLean has not

produced any such records. Accordingly, his opinions should be excluded on this ground, as

well.

## VII.   DR. BRENNER'S OPINION THAT NEURONTIN IS EFFECTIVE IN TREATING NEUROPATHIC AND NOCICEPTIVE PAIN IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

### A.   All of the DBRCT Have Shown That Neurontin Is Ineffective In Treating Neuropathic and Nociceptive Pain

Defendants conducted five DBRCT studying Neurontin in neuropathic pain other than

post-herpetic neuralgia (PHN), a condition for which it was eventually approved. The

consistently negative results of these DBRCT establish that Neurontin is ineffective for the

treatment of the other types of neuropathic pain studied, or for neuropathic pain generally.

The first trial, conducted by Dr. Gorson, demonstrated that Neurontin was no more

effective than placebo at treating painful diabetic peripheral neuropathy (PDPN), a common

neuropathic pain condition. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion

for Summary Judgment ("Rona MSJ Dec.," Dkt. No. 1761), Exh. 111,

WLC_FRANKLIN_0000100273 at -274, -279. The second trial studying Neurontin's use in

neuropathic pain, Defendants' own protocol 945-210, was irrevocably corrupted by a poor trial

design that led to the unblinding of enrolled patients, a fact which was known to Defendants.

*See id.*, Exh. 160 Pfizer_TMF_CRF_061889 at -890. Using Defendants' unpublished data,

Plaintiffs' expert biostatistician, Dr. Nicholas Jewell, corrected this corruption in his report. He

concludes that protocol 945-210 "provides no basis of any clinical efficacy of gabapentin over

placebo in reducing pain." *See id.*, Exh. 157 (Jewell Report) at 1. About 945-210, Dr.

Abramson writes: "for the remaining patients, still blinded to treatment allocation, Neurontin

failed to provide significant relief from the pain of diabetic neuropathy." Abramson Report ¶¶

152, 162.

The third trial studying Neurontin's use in neuropathic pain, Defendants' own protocol

945-224, the results of which were never published, showed "no beneficial effect on primary or

secondary outcomes of any dose of gabapentin." *See* Rona MSJ Dec., Exh. 162, Research

Report No. 720-04130 at 11-12, 49-58, 138. A fourth trial studying Neurontin's use in

neuropathic pain, Defendants' own protocol 945-306, failed to achieve statistical significance as

to the primary endpoint, indicating that Neurontin was no more effective than placebo for the

treatment of neuropathic pain. *See id.*, Exh. 167, Research Report No. 430-00125 at 26-27; Exh.

178, PFIZER_LKNAPP_0050385 at -386. A fifth trial studying Neurontin's use in neuropathic

pain, Defendants' own protocol 945-271, the results of which Defendants suppressed for over

seven years, demonstrated that Neurontin was no better than placebo at reducing mean pain

scores, the primary endpoint.[26] *See id.*, Exh. 168, Pfizer_LCastro_0043325 at 5, 49.

Defendants have also studied Neurontin as a treatment for nociceptive pain in several

clinical trials. Each of these trials has found that Neurontin is no more effective than placebo as

a treatment for nociceptive pain. *See id.*, Exh. 663, 720-04378.pdf at 9-11, 37-39; Exh. 664,

---

[26] More recent clinical trials have also demonstrated that Neurontin is no more effective than placebo as a treatment for neuropathic pain. In 2005, a trial involving neuropathic pain patients published in the *New England Journal of Medicine*, authored by Dr. Ian Gilron *et al.*, reported that "gabapentin did not produce significantly better results than placebo with regard to the primary outcome of this trial [reduction in pain scores]." The April 2009 issue of the journal *Pain* contains a trial, authored by Dr. Robert Dworkin *et al.*, which demonstrated that "gabapentin did not provide significantly greater pain relief than placebo" in the group of neuropathic pain patients studied. *See* SOF ¶¶ 236-7.

720-04483_(Official).pdf at 27; Exh. 665, 720-04479.pdf at 11, 13, 70;  Exh. 666, 720-04455.pdf

at 8-9; Exh. 667, 720-04471.pdf at 8.  None of the results from these trials have been published.

**B.     Dr. Brenner's Opinion That Neurontin Is Effective In Treating Neuropathic and Nociceptive Pain Is Not The Product of Reliable Principles and Methods**

Dr. Brenner employs no discernible method for collecting or analyzing relevant scientific

evidence.  In fact, Dr. Brenner claims that a scientific review of the literature cannot be done:

"Due to the large number of studies of gabapentin and neuropathic pain, it would be extremely

cumbersome to address the primary medical literature in its entirety."  Brenner Report, at 4.

Dr. Brenner acknowledges that the most reliable type of expert "report relies wholly on

randomized clinical trials — universally considered the most reliable source of medical

evidence." *Id.* at 4.  Unfortunately, Dr. Brenner neither cites nor discusses *any* of the relevant

DBRCTs in his report, although he includes several in the attached list of references.[27]  The

entirety of Dr. Brenner's expert analysis of the "large number of studies of gabapentin and

neuropathic pain" consists of the following:  "There are a large number of studies addressing and

supporting the utility of gabapentin in the control of a variety of types of neuropathic pain."

Brenner Report, at 3.  Dr. Brenner's failure to even present, much less discuss, the "most reliable

source of medical evidence" (Brenner Report, at 4) is plainly insufficient to survive a *Daubert*

challenge.

Because it would be too "cumbersome" for Dr. Brenner, Pfizer's chosen expert, to

actually look at the data himself, he relies instead—and exclusively—on a 2005 Cochrane

Collaboration meta-analysis titled "Gabapentin for acute and chronic pain."  Brenner Report, at

4.  As a threshold matter, if Dr. Brenner is being called merely to regurgitate opinions offered by

---

[27] Omitted even from his reference list are the Gorson study, protocol 945-306 (Serpell), and 1035-002.  *See* Brenner Report, at 14-16.

others he considers more expert then himself, this is little more than expert testimony by

hearsay.[28]  Moreover, as Dr. Perry explained in his report, "[t]he Cochrane review had no access

to the unpublished reports obtained by Greene & Hoffman, which contain large amounts of data

and include studies which **did not find a significant benefit from gabapentin**."  Perry Report,

at 22 (emphasis in original).  Dr. Perry concludes that:

> Unfortunately, despite the eminence of its authors, the Cochrane
> 2005 review is generally too sloppy to be considered reliable, even
> if one were not aware of the omitted unpublished studies which
> comprise a very substantial fraction of all patients experimentally
> exposed to gabapentin in DBRCT.

Perry Report, at 24.

Remarkably, Dr. Brenner completely ignores Dr. Perry's deconstruction of the Cochrane

review, and lauds it instead as based on only "the most reliable source of medical evidence."

Brenner Report, at 4.  Thus, Dr. Brenner's opinion fails that basic test for reliability that is

required to formulate an opinion on efficacy.

### C.   Dr. Brenner Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered

As with Pfizer's other experts, Dr. Brenner's opinions are based in large part on his

"clinical experience" in treating individual patients.  *See* Brenner Report, at 5.  As with Pfizer's

other experts, Dr. Brenner has not produced any of the relevant, sanitized patient records, as

previously ordered by the Court.  As set forth above, his testimony should be excluded on both

of these additional grounds.

---

[28] Kaiser recognizes that under Federal Rule of Evidence 703, expert testimony may be *based* on hearsay, but that is a far cry from expert testimony that *is* mere hearsay, relying entirely on the expertise of an out-of-court declarant.

**VIII.  DR. BIRD'S OPINION THAT NEURONTIN IS EFFECTIVE IN TREATING
NEUROPATHIC PAIN IS NOT THE PRODUCT OF RELIABLE PRINCIPLES
AND METHODS**

As with the other Pfizer experts, Dr. Bird employs no discernible method for collecting or

analyzing reliable evidence.  As support for his contention that Neurontin is effective, Dr. Bird

states that "[t]he specific studies that confirm the clinical effectiveness of gabapentin in

neuropathic pain are numerous."  Bird Report, at 5.  Dr. Bird then singles out a handle of studies

that are "particularly worthy of mention," but omits from his discussion the negative Reckless

(945-224) and POPP (945-271) DBRCT studies, apparently concluding that they are not worth

mentioning. *Id.*  More troubling is that when Dr. Bird does mention or discuss negative trials, he

claims that they are in fact positive.  He cites the Gorson study as being positive, when it in fact

is clearly negative.  He also claims near the end of his report to have "reviewed all of that data

[the unpublished studies: 945-224, -271 and -1008] and it reinforces my opinion that gabapentin

is effective and safe for neuropathic pain."  Exactly how negative studies can reinforce an

opinion of efficacy is neither disclosed nor presented terms that allow for independent scrutiny of

Dr. Bird's report.  It is thus an exercise in *ipse dixit*, just like the other Pfizer reports, and should

be excluded under *Daubert*.

### A.    Dr. Bird's Opinion That Neurontin Is Effective In Treating Neuropathic Pain Is Not The Product of Reliable Principles and Methods

Like the other Pfizer experts, Dr. Bird advocates comingling of scientific evidence with

unscientific evidence with standards for ranking or weighing this evidence.  Dr. Bird opines:

> As I reviewed in this report, there are a *variety of levels* of
> *evidence*, not limited to RCTs, that gabapentin is effective for the
> treatment of neuropathic pain. This includes case reports, case
> series and expert opinion based on extensive real-life experience
> with the treatment of patients with neuropathic pain. In addition,
> *there are RCTs and systematic reviews (meta-analyses), that*
> *support* gabapentin's off-label use for neuropathic pain.

Bird Report, at 10 (emphasis added). Thus, in Dr. Bird's view, lesser tiers of scientific evidence—including unscientific anecdotes—provide support for a finding of efficacy. These findings are then supported by DBRCTs. If this could be considered an analytical model, it certainly turns the FDA standard for drug approval on its head.

Interestingly, while Dr. Bird does recognize a Cochrane-style meta-analysis as the "highest level of evidence," his report is devoid of a discussion as to the impact that the unpublished negative DBRCTs would have had on this review. This, of course, is precisely the task that Dr. Perry took on. Rather than articulating a way to analyze the impact of the new, hitherto suppressed studies, on the body of scientific knowledge of Neurontin, Dr. Bird merely sweeps them under the rug, claiming that those studies "reinforce" a finding of efficacy. This is an illogical and unsupportable finding. Because Dr. Bird offers no discussion of the effect that the negative and unpublished Reckless and POPP studies had on the Cochrane review for Neurontin, Dr. Bird attempts to pass off speculation and *ipse dixit* masquerading as expert analysis concerning scientific evidence of Neurontin' efficacy.

Dr. Bird's deviation from the scientific method is revealed by his first and perhaps most important criticism of Dr. Perry, which is that "Dr, Perry appears to stand alone in his stated conclusion that gabapentin is ineffective in neuropathic pain. This is the opposite conclusion of the numerous reviews and book chapters I detailed above." This is the classic logical fallacy of an appeal to authority. Accepted scientific principles require findings based on evidence, regardless of the messenger, rather than on the eminence of messenger, regardless of the evidence. Because Dr. Bird employs no clear methodology, his opinions should be excluded under *Daubert*.

**B.** **Dr. Bird Bases His Opinions On His "Clinical Experience," But He Has Not Produced Sanitized Patient Records, As Previously Ordered**

Dr. Bird's conclusions based on clinical experience mirror those of the other Pfizer

experts:

- "*[i]n my experience,* gabapentin is an effective drug for pain and is very well tolerated;"

- "it clearly is as effective *in my experience*, if not more so, than any other drug available for this use."

*Id.* at 15. Because Dr. Bird has neither compiled nor produced any records that would support

such conclusions, his opinions should be excluded on this ground as well.

**IX.  CONCLUSION**

For the foregoing reasons, the testimony of Pfizer's efficacy experts should be excluded.

Dated:  January 8, 2010                                      Respectfully submitted,

                                                             By:     */s/ Linda P. Nussbaum*
                                                                     Linda P. Nussbaum

                                                             KAPLAN FOX & KILSHEIMER LLP
                                                             Linda P. Nussbaum, Esq.
                                                             850 Third Avenue, 14th Floor
                                                             New York, New York 10022

                                                             *Attorneys for Plaintiffs Kaiser Foundation*
                                                             *Health Plan, Inc. and Kaiser Foundation*
                                                             *Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
 BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
 SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management Order #3 on January 20, 2010.

*/s/ Elana Katcher*
Elana Katcher