UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS)<br>and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF KAISER'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. GARY BRENNER**

854077.1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY ................. 4

III. THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT ............................................................ 5

IV. DR. BRENNER'S OPINION THAT NEURONTIN IS EFFECTIVE IN TREATING NEUROPATHIC AND NOCICEPTIVE PAIN IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS ............................. 9

    A. All of the DBRCT Have Shown That Neurontin Is Ineffective In Treating Neuropathic and Nociceptive Pain ............................................... 9

    B. Dr. Brenner's Opinion That Neurontin Is Effective In Treating Neuropathic and Nociceptive Pain Is Not The Product of Reliable Principles and Methods ........................................................................... 11

    C. Dr. Brenner Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered ........................................................................................................ 12

V. CONCLUSION ................................................................................................. 12

I.  **INTRODUCTION**

Kaiser's[1] indication experts, Drs. Barkin (bipolar and other mood disorders), Perry (neuropathic and nociceptive pain), McCrory (migraine prophylaxis), and Alldredge (lack of dose related effect at dosages over 1800 mg/day) rigorously apply the scientific method to the best available data to reach their respective conclusions, as required for the admission of *any* expert report. This is especially true in the field of pharmaceutical research, where proper methods of data collection and analysis are well-developed, standardized, and generally agreed.

Applying the scientific method to the task at hand, each of Kaiser's indication experts thoroughly searched the available scientific literature for the highest quality evidence bearing on the question—*i.e.*, double-blind, randomized, controlled trials ("DBRCT"), which even Pfizer's experts repeatedly acknowledge are not only the "gold standard," but the *only type of evidence from which any scientifically valid conclusions can be drawn*.[2] Kaiser's experts examined not only the *published* DBRCT, but also Defendants' internal, *unpublished* research reports, the withholding and distortion of which lie at the very heart of this case. Where an unpublished research report revealed information that undermined, contradicted, or exposed as an outright falsehood the conclusion stated in the corresponding published study, Kaiser's experts based

---

[1] "Kaiser" is Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals. Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[2] As set forth below, only a DBRCT can provide any statistical measure whatsoever of the likelihood of a cause and effect relationship between a treatment and the selected measure of its effect. For this reason, all other forms of evidence are merely "hypothesis-generating rather than hypothesis-confirming." (Slaby Report at 8.) Relying on such evidence—which, by its very nature, is *incapable* of proving efficacy—in preference to multiple negative, DBRCT on the possibility that notwithstanding the consistently negative results, Neurontin *might* be effective for some subset of the same patient population, is as dangerous to the public health as it is antithetical to the scientific method.

their conclusions on the *actual* results of the study, not the results as distorted or misrepresented.[3]

Finally, because multiple DBRCTs have been conducted as to each indication, and the study results were consistently negative, Kaiser's experts formed and expressed their opinions that Neurontin has been shown to be ineffective in treating these conditions. It is no coincidence that each of Kaiser's experts approached their task in the same general way, even though there was little or no coordination or communication between them. Each of them adopted this approach *sua sponte*, because it is the approach dictated by science.

Pfizer's experts, by contrast: (1) disclose no discernable methodology for the collection of the relevant scientific literature; (2) ignore completely one or more DBRCT; (3) consider one or more DBRCT that were actually negative as positive; and/or (4) give preference to inferior forms of evidence from which no scientifically valid conclusions can be drawn. As such, their reports, and the conclusions they draw, are not the result of a rigorous application of the scientific method; they are a result of its *abandonment*, and thereby a further extension of Defendants' fraud.[4] Whether as a result of the withholding by Pfizer of relevant information—

---

[3] The reports of Kaiser's indication experts were originally filed, and are most readily accessible, as exhibits to the Revised Supplemental Declaration of Ilyas J. Rona in Filed in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1457), as Exhibit J ("Kessler Report," Dkt. No. 1457-10), Exhibit K ("Barkin Report," Dkt. No. 1457-11), Exhibit L ("Perry Report," Dkt. Nos. 1457-12 through 1457-15), Exhibit M ("McCrory Report," Dkt. No. 1457-16), Exhibit N ("Abramson Report," Dkt. No. 1457-17), and Exhibit P ("Alldredge Report," Dkt. No. 1457-20). The reports were also re-filed non-electronically as exhibits in support of Plaintiffs' opposition to Defendants' motion for summary judgment. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exhibits 21 (Barkin Report), 23 (Abramson Report), 163 (Perry Report), 365 (Alldredge Report), 374 (Kessler Report), and 478 (McCrory Report).

[4] With one exception, Pfizer's indication expert reports are attached as exhibits to the Declaration of Rajesh S. James (Dkt. No. 1692), as Exhibit 47 ("Bird Report," Dkt. 1692-11), Exhibit 48 ("Brenner Report," Dkt. No. 1692-12), Exhibit 49 ("Rapoport Report," Dkt. No. 1692-13), and Exhibit 50 ("McLean Report," Dkt. No. 1692-14). As Defendants have not filed

one of the central allegations in the case being that Defendants co-opted "thought leaders" with incomplete and misleading information—deliberate ignorance, or mere neglect, their reports are fatally deficient, and their testimony on the efficacy issue is not sufficiently reliable to be admitted.

In addition to ignoring or misconstruing the truly relevant evidence, most of Pfizer's experts expressly ground their opinions on their own personal, undocumented "clinical experience" in prescribing Neurontin to patients. However, the Court previously ordered that no expert testimony based on the expert's own experience in treating patients would be admitted unless the relevant "sanitized patient records" were produced to the opposing party.[5] No such records have been produced by Pfizer's experts. Accordingly, the opinions of Pfizer's indication experts based on their "clinical experiences" should be excluded on this ground as well.

The principle defects in Pfizer's indication expert reports are summarized in the chart below:[6]

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| Slaby (bipolar) | X | Guille | Vieta | X | X |
| Bird | X |  | Gorson | X | X |

---

Dr. Slaby's final report in support of or in opposition to any motion, that report, which has not been marked confidential by Defendants, is attached as Exhibit 1 to Kaiser's motion *in limine* to exclude Dr. Slaby's testimony.

[5] *See* Electronic Order, Sept. 27, 2006.

[6] Kaiser appreciates that the Court does not wish to venture too far "into the weeds" on scientific issues prior to trial, as one of the purposes of the trial is the airing of these issues. Accordingly, for purposes of this motion, Kaiser has limited itself to the more obvious, overarching problems that render the opinions of Pfizer's experts inherently unreliable, untrustworthy, and unscientific.

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| (neuropathic pain) | | | 945-271<br>945-306 | | |
| Rapoport (migraine) | X | 945-217 | 945-220 | X | X |
| Brenner (neuropathic and nociceptive pain) | X | Gorson<br>945-224<br>945-271<br>945-306<br>1032-001<br>1032-002<br>1035-001<br>1035-002 | | X | X |
| McLean (doses over 1800 mg/day) | X | 945-224 | 945-082<br>945-295<br>942-88 | X | X |

Any one of these defects would be sufficient to exclude the testimony of the corresponding expert. Taken together, these defects so undermine the integrity of Pfizer's indication experts' opinions that they should all be excluded under *Daubert*.

## II.   TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY

By its terms, Federal Rule of Evidence 702 precludes the admission of expert testimony unless it (1) "is based upon sufficient facts or data, (2) . . . is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* Accordingly, given the tremendous sway an expert may have over a jury in scientific or technical matters, the Court is required to exercise a "gatekeeping role." *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). As summarized by the First Circuit:

> In *Daubert*, the Supreme Court set forth four general guidelines for a trial judge to evaluate in considering whether expert testimony rests on an adequate foundation: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *United States v. Mooney*, 315 F.3d 54, 62 (1st Cir.2002) (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786). However, these factors do not "constitute a definitive checklist or test," and the question of admissibility "must be tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

*Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25-26 (1st Cir. 2006).

In *Daubert* itself, the Court explained that:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. *The focus, of course, must be solely on principles and methodology*, not on the conclusions that they generate.

509 U.S. at 594-95 (emphasis added).

Consistent with *Daubert*, Kaiser's focus in this motion is not on the conclusions reached by Pfizer's experts, but on the defective methods by which they were reached—to the extent any method is discernable from their respective reports.

### III. THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT

There are *universally-accepted,* international standards for determining whether a drug is effective for a given indication. *See, e.g.*, International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, *ICH Harmonised*

*Tripartitie Guideline, Statistical Principles for Clinical Trials,* (Feb. 5, 1998) (available at http://www.ich.org/cache/compo/475-272-1.html).[7] The FDA's standard is the same.

As Dr. David Kessler, former head of the FDA, writes in his report, when determining efficacy, the FDA relies only on "'adequate and well-controlled clinical investigations.'" Kessler Report, at 5 (quoting 21 C.F.R. § 314.26). Such trials need to be controlled, need to be randomized, need to be blinded, and need objective and prospectively determined trial endpoints. *See* Kessler Report, at 5-6. These pillars of sound clinical trial design are not arbitrary; they are required to minimize the chance that any observed difference between the placebo and treatment groups is due to something *other* than the treatment itself. Double-blind, randomized, controlled trials (DBRCT) are the standard—indeed, the *only* accepted method— for determining whether a drug is effective. They are the foundation on which modern pharmaceutical medicine is based, even if they have little impact on the behavior of the world's largest drug company.

Clinical trials that are not controlled, not blinded, not randomized and/or whose endpoints are not prospectively and objectively determined, while possibly helpful in generating a hypothesis, cannot be used to determine a drug's efficacy. *See* Kessler Report ¶ 17. Of even lesser value in determining a drug's efficacy are anecdotal case reports. Such reports, which again may useful in generating a hypothesis for study, are not reliable or adequate evidence of efficacy. These "reports are obtained haphazardly or selectively, and the logic of 'post hoc, ergo propter hoc' does not suffice to demonstrate that the first event [the taking of a drug] causes the second [the effect]." D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000), at 91(available online at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

---

[7] Additional international "Efficacy Guidelines" are available at http://www.ich.org/cache/compo/475-272-1.html.

In a nutshell, a cause-and-effect relationship is deemed established when it can be determined statistically that there is a 95% probability that the difference observed between the treatment and control (placebo) groups is a non-random event. This probability—expressed as "$p < .05$" in the language of statistics—is the "bottom line" of every clinical trial. If $p < .05$, a "statistically significant difference" exists between the treatment and control groups with respect to the variable being measured, and a cause-and-effect relationship is inferred.[8] If $p > .05$, no statistically significant difference has been shown, and no cause and effect relationship is or may be inferred. *See generally, Reference Guide on Statistics*, at 121-25 (discussing p-values and statistical significance).

Each of Kaiser's efficacy experts describes his method and well-established reasons for relying solely on DBRCTs in rendering an efficacy opinion. For each indication at issue, there are multiple DBRCTs, most of which were designed and conducted by Pfizer. Given such a wealth of high-quality evidence, there is simply no need—and therefore no reason—to rely on lesser levels of evidence. For these reasons, Kaiser's experts rely *solely* on the results of DBRCTs in rendering their efficacy opinions.

The essence of this litigation is that Pfizer suppressed or misrepresented the published results of multiple DBRCTs. For this reason, Kaiser's experts reviewed, where possible, the full underlying clinical research reports and their results, not just the published versions. Kaiser's

---

[8] This presumes, of course, that the results of the study have been analyzed as originally planned, and not distorted by changing the variable, primary endpoint, or patient population, a practice known as "moving the goalposts," which by its very nature undermines the conclusion that the statistical relationship observed is non-random. *See, e.g., Reference Guide on Statistics*, at 93-94 ("[I]f the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect. However, if the control group was created in any other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed.") (footnote and citations omitted).

experts revealed—as was the subject of a peer-reviewed article recently published in the *New England Journal of Medicine*[9]—that in many instances, the findings presented in the published literature did not match those found in the underlying research reports, and in many cases, entire trials went unpublished.

While Pfizer's experts readily agree that the highest level of evidence comes from DBRCTs, they abandon reliance on such high-quality evidence. Instead, they advocate a cafeteria-style approach to evidence-based medicine, wherein they highlight—without any recognizable method or principle—select pieces of evidence from the varying levels of evidence, including the lowest level: their own clinical experience. But in so doing, they either ignore entire DBRCTs, or rely on a published article, even when the underlying, internal research report exposes its fraudulently manufactured conclusion.

There is not a mere difference of opinion between Pfizer's and Kaiser's efficacy experts. Pfizer's experts do not even attempt to explain away the significant differences between the published articles and the underlying research reports; they simply ignore them. Nor do Pfizer's experts even acknowledge the existence of entire DBRCTs that were never published. The opinions of Pfizer's efficacy experts are not the product of reliable principles and methods. Rather, they are the product of exactly the type of unreliable, scientifically invalid evidence that the Supreme Court ruled should be excluded in *Daubert*.[10]

---

[9] Vedula, et al., *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009).

[10] By way of example, in *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884-85 (10th Cir. 2005), the Court found that where there was epidemiological evidence supporting one conclusion, reliance on differential diagnosis "without supporting epidemiological evidence" was "misplaced," and excluded the expert testimony. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 474 (M.D.N.C. 2006), the Court rejected expert evidence testimony based on a literature review of peer-reviewed literature in which the expert's conclusions were "flatly contradicted" by the available epidemiological literature. Relying on *Norris*, the Court also

## IV. DR. BRENNER'S OPINION THAT NEURONTIN IS EFFECTIVE IN TREATING NEUROPATHIC AND NOCICEPTIVE PAIN IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

### A. All of the DBRCT Have Shown That Neurontin Is Ineffective In Treating Neuropathic and Nociceptive Pain

Defendants conducted five DBRCT studying Neurontin in neuropathic pain other than post-herpetic neuralgia (PHN), a condition for which it was eventually approved. The consistently negative results of these DBRCT establish that Neurontin is ineffective for the treatment of the other types of neuropathic pain studied, or for neuropathic pain generally.

The first trial, conducted by Dr. Gorson, demonstrated that Neurontin was no more effective than placebo at treating painful diabetic peripheral neuropathy (PDPN), a common neuropathic pain condition. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment ("Rona MSJ Dec.," Dkt. No. 1761), Exh. 111, WLC_FRANKLIN_0000100273 at -274, -279. The second trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-210, was irrevocably corrupted by a poor trial design that led to the unblinding of enrolled patients, a fact which was known to Defendants. *See id.*, Exh. 160 Pfizer_TMF_CRF_061889 at -890. Using Defendants' unpublished data, Plaintiffs' expert biostatistician, Dr. Nicholas Jewell, corrected this corruption in his report. He concludes that protocol 945-210 "provides no basis of any clinical efficacy of gabapentin over placebo in reducing pain." *See id.*, Exh. 157 (Jewell Report) at 1. About 945-210, Dr. Abramson writes: "for the remaining patients, still blinded to treatment allocation, Neurontin

---

excluded expert testimony based on differential diagnosis that contradicted the available epidemiological evidence. *Id.* at 477. In *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003), after cataloguing cases in which courts have held that epidemiology is the generally accepted methodology for demonstrating causation, *see id.* at 532 and n.7, the Court assessed and rejected the plaintiff's experts' reliance on other methods of showing causation, including anecdotal case reports, "causality assessments," animal studies, and differential diagnosis. *Id.* at 537-57.

failed to provide significant relief from the pain of diabetic neuropathy." Abramson Report ¶¶ 152, 162.

The third trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-224, the results of which were never published, showed "no beneficial effect on primary or secondary outcomes of any dose of gabapentin." *See* Rona MSJ Dec., Exh. 162, Research Report No. 720-04130 at 11-12, 49-58, 138. A fourth trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-306, failed to achieve statistical significance as to the primary endpoint, indicating that Neurontin was no more effective than placebo for the treatment of neuropathic pain. *See id.*, Exh. 167, Research Report No. 430-00125 at 26-27; Exh. 178, PFIZER_LKNAPP_0050385 at -386. A fifth trial studying Neurontin's use in neuropathic pain, Defendants' own protocol 945-271, the results of which Defendants suppressed for over seven years, demonstrated that Neurontin was no better than placebo at reducing mean pain scores, the primary endpoint.[11] *See id.*, Exh. 168, Pfizer_LCastro_0043325 at 5, 49.

Defendants have also studied Neurontin as a treatment for nociceptive pain in several clinical trials. Each of these trials has found that Neurontin is no more effective than placebo as a treatment for nociceptive pain. *See id.*, Exh. 663, 720-04378.pdf at 9-11, 37-39; Exh. 664, 720-04483_(Official).pdf at 27; Exh. 665, 720-04479.pdf at 11, 13, 70; Exh. 666, 720-04455.pdf at 8-9; Exh. 667, 720-04471.pdf at 8. None of the results from these trials have been published.

---

[11] More recent clinical trials have also demonstrated that Neurontin is no more effective than placebo as a treatment for neuropathic pain. In 2005, a trial involving neuropathic pain patients published in the *New England Journal of Medicine*, authored by Dr. Ian Gilron *et al.*, reported that "gabapentin did not produce significantly better results than placebo with regard to the primary outcome of this trial [reduction in pain scores]." The April 2009 issue of the journal *Pain* contains a trial, authored by Dr. Robert Dworkin *et al.*, which demonstrated that "gabapentin did not provide significantly greater pain relief than placebo" in the group of neuropathic pain patients studied. *See* SOF ¶¶ 236-7.

### B. Dr. Brenner's Opinion That Neurontin Is Effective In Treating Neuropathic and Nociceptive Pain Is Not The Product of Reliable Principles and Methods

Dr. Brenner employs no discernible method for collecting or analyzing relevant scientific evidence. In fact, Dr. Brenner claims that a scientific review of the literature cannot be done: "Due to the large number of studies of gabapentin and neuropathic pain, it would be extremely cumbersome to address the primary medical literature in its entirety." Brenner Report, at 4.

Dr. Brenner acknowledges that the most reliable type of expert "report relies wholly on randomized clinical trials — universally considered the most reliable source of medical evidence." *Id.* at 4. Unfortunately, Dr. Brenner neither cites nor discusses *any* of the relevant DBRCTs in his report, although he includes several in the attached list of references.[12] The entirety of Dr. Brenner's expert analysis of the "large number of studies of gabapentin and neuropathic pain" consists of the following: "There are a large number of studies addressing and supporting the utility of gabapentin in the control of a variety of types of neuropathic pain." Brenner Report, at 3. Dr. Brenner's failure to even present, much less discuss, the "most reliable source of medical evidence" (Brenner Report, at 4) is plainly insufficient to survive a *Daubert* challenge.

Because it would be too "cumbersome" for Dr. Brenner, Pfizer's chosen expert, to actually look at the data himself, he relies instead—and exclusively—on a 2005 Cochrane Collaboration meta-analysis titled "Gabapentin for acute and chronic pain." Brenner Report, at 4. As a threshold matter, if Dr. Brenner is being called merely to regurgitate opinions offered by others he considers more expert then himself, this is little more than expert testimony by

---

[12] Omitted even from his reference list are the Gorson study, protocol 945-306 (Serpell), and 1035-002. *See* Brenner Report, at 14-16.

hearsay.[13] Moreover, as Dr. Perry explained in his report, "[t]he Cochrane review had no access to the unpublished reports obtained by Greene & Hoffman, which contain large amounts of data and include studies which **did not find a significant benefit from gabapentin**." Perry Report, at 22 (emphasis in original). Dr. Perry concludes that:

> Unfortunately, despite the eminence of its authors, the Cochrane 2005 review is generally too sloppy to be considered reliable, even if one were not aware of the omitted unpublished studies which comprise a very substantial fraction of all patients experimentally exposed to gabapentin in DBRCT.

Perry Report, at 24.

Remarkably, Dr. Brenner completely ignores Dr. Perry's deconstruction of the Cochrane review, and lauds it instead as based on only "the most reliable source of medical evidence." Brenner Report, at 4. Thus, Dr. Brenner's opinion fails that basic test for reliability that is required to formulate an opinion on efficacy.

### C.   Dr. Brenner Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered

As with Pfizer's other experts, Dr. Brenner's opinions are based in large part on his "clinical experience" in treating individual patients. *See* Brenner Report, at 5. As with Pfizer's other experts, Dr. Brenner has not produced any of the relevant, sanitized patient records, as previously ordered by the Court. As set forth above, his testimony should be excluded on both of these additional grounds.

---

[13] Kaiser recognizes that under Federal Rule of Evidence 703, expert testimony may be *based* on hearsay, but that is a far cry from expert testimony that *is* mere hearsay, relying entirely on the expertise of an out-of-court declarant.

## V. CONCLUSION

For the foregoing reasons, the testimony of Dr. Brenner should be excluded.

Dated: January 12, 2010                          Respectfully submitted,

                                                 By:    /s/ Linda P. Nussbaum
                                                        Linda P. Nussbaum

                                                 KAPLAN FOX & KILSHEIMER LLP
                                                 Linda P. Nussbaum, Esq.
                                                 850 Third Avenue, 14th Floor
                                                 New York, New York 10022

                                                 *Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 20, 2010.

/s/ *Elana Katcher*
Elana Katcher

854077.1                           -14-