UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF KAISER'S MOTION**
***IN LIMINE* TO EXCLUDE TESTIMONY OF DR. ANDREW SLABY**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE
PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY ................. 4

III. THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY
BE DETERMINED THROUGH DBRCT ............................................................. 5

IV. DR. SLABY'S OPINION THAT NEURONTIN IS EFFECTIVE IN
TREATING BIPOLAR DISORDER IS NOT THE PRODUCT OF
RELIABLE PRINCIPLES AND METHODS ...................................................... 9

    A.    All Four DBRCT Have Shown That Neurontin Is Ineffective In
Treating Bipolar Disorder ......................................................................... 9

    B.    Dr. Slaby's Report Is Inaccurate, Incomplete, Unscientific, and
Unreliable ................................................................................................ 10

V. CONCLUSION .................................................................................................. 14

## I.   INTRODUCTION

Kaiser's[1] indication experts, Drs. Barkin (bipolar and other mood disorders), Perry (neuropathic and nociceptive pain), McCrory (migraine prophylaxis), and Alldredge (lack of dose related effect at dosages over 1800 mg/day) rigorously apply the scientific method to the best available data to reach their respective conclusions, as required for the admission of *any* expert report. This is especially true in the field of pharmaceutical research, where proper methods of data collection and analysis are well-developed, standardized, and generally agreed.

Applying the scientific method to the task at hand, each of Kaiser's indication experts thoroughly searched the available scientific literature for the highest quality evidence bearing on the question—*i.e.*, double-blind, randomized, controlled trials ("DBRCT"), which even Pfizer's experts repeatedly acknowledge are not only the "gold standard," but the *only type of evidence from which any scientifically valid conclusions can be drawn.*[2] Kaiser's experts examined not only the *published* DBRCT, but also Defendants' internal, *unpublished* research reports, the withholding and distortion of which lie at the very heart of this case. Where an unpublished research report revealed information that undermined, contradicted, or exposed as an outright falsehood the conclusion stated in the corresponding published study, Kaiser's experts based

---

[1] "Kaiser" is Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals. Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[2] As set forth below, only a DBRCT can provide any statistical measure whatsoever of the likelihood of a cause and effect relationship between a treatment and the selected measure of its effect. For this reason, all other forms of evidence are merely "hypothesis-generating rather than hypothesis-confirming." (Slaby Report at 8.) Relying on such evidence—which, by its very nature, is *incapable* of proving efficacy—in preference to multiple negative, DBRCT on the possibility that notwithstanding the consistently negative results, Neurontin *might* be effective for some subset of the same patient population, is as dangerous to the public health as it is antithetical to the scientific method.

their conclusions on the *actual* results of the study, not the results as distorted or misrepresented.[3]

Finally, because multiple DBRCTs have been conducted as to each indication, and the study results were consistently negative, Kaiser's experts formed and expressed their opinions that Neurontin has been shown to be ineffective in treating these conditions. It is no coincidence that each of Kaiser's experts approached their task in the same general way, even though there was little or no coordination or communication between them. Each of them adopted this approach *sua sponte*, because it is the approach dictated by science.

Pfizer's experts, by contrast: (1) disclose no discernable methodology for the collection of the relevant scientific literature; (2) ignore completely one or more DBRCT; (3) consider one or more DBRCT that were actually negative as positive; and/or (4) give preference to inferior forms of evidence from which no scientifically valid conclusions can be drawn. As such, their reports, and the conclusions they draw, are not the result of a rigorous application of the scientific method; they are a result of its *abandonment*, and thereby a further extension of Defendants' fraud.[4] Whether as a result of the withholding by Pfizer of relevant information—

---

[3] The reports of Kaiser's indication experts were originally filed, and are most readily accessible, as exhibits to the Revised Supplemental Declaration of Ilyas J. Rona in Filed in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1457), as Exhibit J ("Kessler Report," Dkt. No. 1457-10), Exhibit K ("Barkin Report," Dkt. No. 1457-11), Exhibit L ("Perry Report," Dkt. Nos. 1457-12 through 1457-15), Exhibit M ("McCrory Report," Dkt. No. 1457-16), Exhibit N ("Abramson Report," Dkt. No. 1457-17), and Exhibit P ("Alldredge Report," Dkt. No. 1457-20). The reports were also re-filed non-electronically as exhibits in support of Plaintiffs' opposition to Defendants' motion for summary judgment. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exhibits 21 (Barkin Report), 23 (Abramson Report), 163 (Perry Report), 365 (Alldredge Report), 374 (Kessler Report), and 478 (McCrory Report).

[4] As Defendants have not filed Dr. Slaby's final report in support of or in opposition to any motion, that report, which has not been marked confidential by Defendants, is attached as Exhibit 1 to this memorandum. Pfizer's other indication expert reports are attached as exhibits to the Declaration of Rajesh S. James (Dkt. No. 1692), as Exhibit 47 ("Bird Report," Dkt. 1692-11),

one of the central allegations in the case being that Defendants co-opted "thought leaders" with incomplete and misleading information—deliberate ignorance, or mere neglect, their reports are fatally deficient, and their testimony on the efficacy issue is not sufficiently reliable to be admitted.

In addition to ignoring or misconstruing the truly relevant evidence, most of Pfizer's experts expressly ground their opinions on their own personal, undocumented "clinical experience" in prescribing Neurontin to patients.  However, the Court previously ordered that no expert testimony based on the expert's own experience in treating patients would be admitted unless the relevant "sanitized patient records" were produced to the opposing party.[5]  No such records have been produced by Pfizer's experts.  Accordingly, the opinions of Pfizer's indication experts based on their "clinical experiences" should be excluded on this ground as well.

The principle defects in Pfizer's indication expert reports are summarized in the chart below:[6]

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| Slaby (bipolar) | X | Guille | Vieta | X | X |
| Bird (neuropathic | X | | Gorson 945-271 | X | X |

Exhibit 48 ("Brenner Report," Dkt. No. 1692-12), Exhibit 49 ("Rapoport Report," Dkt. No. 1692-13), and Exhibit 50 ("McLean Report," Dkt. No. 1692-14).

[5] See Electronic Order, Sept. 27, 2006.

[6] Kaiser appreciates that the Court does not wish to venture too far "into the weeds" on scientific issues prior to trial, as one of the purposes of the trial is the airing of these issues.  Accordingly, for purposes of this motion, Kaiser has limited itself to the more obvious, overarching problems that render the opinions of Pfizer's experts inherently unreliable, untrustworthy, and unscientific.

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| pain) | | | 945-306 | | |
| Rapoport (migraine) | X | 945-217 | 945-220 | X | X |
| Brenner (neuropathic and nociceptive pain) | X | Gorson 945-224 945-271 945-306 1032-001 1032-002 1035-001 1035-002 | | X | X |
| McLean (doses over 1800 mg/day) | X | 945-224 | 945-082 945-295 942-88 | X | X |

Any one of these defects would be sufficient to exclude the testimony of the corresponding expert. Taken together, these defects so undermine the integrity of Pfizer's indication experts' opinions that they should all be excluded under *Daubert*.

## II.   TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY

By its terms, Federal Rule of Evidence 702 precludes the admission of expert testimony unless it (1) "is based upon sufficient facts or data, (2) . . . is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* Accordingly, given the tremendous sway an expert may have over a jury in scientific or technical matters, the Court is required to exercise a "gatekeeping role." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). As summarized by the First Circuit:

> In *Daubert*, the Supreme Court set forth four general guidelines for
> a trial judge to evaluate in considering whether expert testimony
> rests on an adequate foundation: "(1) whether the theory or
> technique can be and has been tested; (2) whether the technique
> has been subject to peer review and publication; (3) the technique's
> known or potential rate of error; and (4) the level of the theory or
> technique's acceptance within the relevant discipline." *United
> States v. Mooney*, 315 F.3d 54, 62 (1st Cir.2002) (citing *Daubert*,
> 509 U.S. at 593-94, 113 S.Ct. 2786).  However, these factors do
> not "constitute a definitive checklist or test," and the question of
> admissibility "must be tied to the facts of a particular case."
> *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167,
> 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

*Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25-26 (1st Cir. 2006).

In *Daubert* itself, the Court explained that:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible
> one.  Its overarching subject is the scientific validity—and thus the
> evidentiary relevance and reliability—of the principles that
> underlie a proposed submission. *The focus, of course, must be
> solely on principles and methodology*, not on the conclusions that
> they generate.

509 U.S. at 594-95 (emphasis added).

Consistent with *Daubert*, Kaiser's focus in this motion is not on the conclusions reached

by Pfizer's experts, but on the defective methods by which they were reached—to the extent any

method is discernable from their respective reports.

## III.   THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT

There are *universally-accepted,* international standards for determining whether a drug is

effective for a given indication. *See, e.g.*, International Conference on Harmonisation of

Technical Requirements for Registration of Pharmaceuticals for Human Use, *ICH Harmonised*

*Tripartitie Guideline, Statistical Principles for Clinical Trials,* (Feb. 5, 1998) (available at
http://www.ich.org/cache/compo/475-272-1.html).[7]   The FDA's standard is the same.

     As Dr. David Kessler, former head of the FDA, writes in his report, when determining
efficacy, the FDA relies only on "'adequate and well-controlled clinical investigations.'"
Kessler Report, at 5 (quoting 21 C.F.R. § 314.26).   Such trials need to be controlled, need to be
randomized, need to be blinded, and need objective and prospectively determined trial endpoints.
*See* Kessler Report, at 5-6.   These pillars of sound clinical trial design are not arbitrary; they are
required to minimize the chance that any observed difference between the placebo and treatment
groups is due to something *other* than the treatment itself.   Double-blind, randomized, controlled
trials (DBRCT) are the standard—indeed, the *only* accepted method— for determining whether a
drug is effective.   They are the foundation on which modern pharmaceutical medicine is based,
even if they have little impact on the behavior of the world's largest drug company.

     Clinical trials that are not controlled, not blinded, not randomized and/or whose endpoints
are not prospectively and objectively determined, while possibly helpful in generating a
hypothesis, cannot be used to determine a drug's efficacy.   *See* Kessler Report ¶ 17.   Of even
lesser value in determining a drug's efficacy are anecdotal case reports.   Such reports, which
again may useful in generating a hypothesis for study, are not reliable or adequate evidence of
efficacy.   These "reports are obtained haphazardly or selectively, and the logic of 'post hoc, ergo
propter hoc' does not suffice to demonstrate that the first event [the taking of a drug] causes the
second [the effect]."   D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the
Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000), at 91(available
online at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

---

[7] Additional international "Efficacy Guidelines" are available at
http://www.ich.org/cache/compo/475-272-1.html.

In a nutshell, a cause-and-effect relationship is deemed established when it can be determined statistically that there is a 95% probability that the difference observed between the treatment and control (placebo) groups is a non-random event. This probability—expressed as "$p < .05$" in the language of statistics—is the "bottom line" of every clinical trial. If $p < .05$, a "statistically significant difference" exists between the treatment and control groups with respect to the variable being measured, and a cause-and-effect relationship is inferred.[8] If $p > .05$, no statistically significant difference has been shown, and no cause and effect relationship is or may be inferred. *See generally, Reference Guide on Statistics*, at 121-25 (discussing p-values and statistical significance).

Each of Kaiser's efficacy experts describes his method and well-established reasons for relying solely on DBRCTs in rendering an efficacy opinion. For each indication at issue, there are multiple DBRCTs, most of which were designed and conducted by Pfizer. Given such a wealth of high-quality evidence, there is simply no need—and therefore no reason—to rely on lesser levels of evidence. For these reasons, Kaiser's experts rely *solely* on the results of DBRCTs in rendering their efficacy opinions.

The essence of this litigation is that Pfizer suppressed or misrepresented the published results of multiple DBRCTs. For this reason, Kaiser's experts reviewed, where possible, the full underlying clinical research reports and their results, not just the published versions. Kaiser's

---

[8] This presumes, of course, that the results of the study have been analyzed as originally planned, and not distorted by changing the variable, primary endpoint, or patient population, a practice known as "moving the goalposts," which by its very nature undermines the conclusion that the statistical relationship observed is non-random. *See, e.g., Reference Guide on Statistics, at* 93-94 ("[I]f the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect. However, if the control group was created in any other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed.") (footnote and citations omitted).

experts revealed—as was the subject of a peer-reviewed article recently published in the *New England Journal of Medicine*[9]—that in many instances, the findings presented in the published literature did not match those found in the underlying research reports, and in many cases, entire trials went unpublished.

While Pfizer's experts readily agree that the highest level of evidence comes from DBRCTs, they abandon reliance on such high-quality evidence. Instead, they advocate a cafeteria-style approach to evidence-based medicine, wherein they highlight—without any recognizable method or principle—select pieces of evidence from the varying levels of evidence, including the lowest level: their own clinical experience. But in so doing, they either ignore entire DBRCTs, or rely on a published article, even when the underlying, internal research report exposes its fraudulently manufactured conclusion.

There is not a mere difference of opinion between Pfizer's and Kaiser's efficacy experts. Pfizer's experts do not even attempt to explain away the significant differences between the published articles and the underlying research reports; they simply ignore them. Nor do Pfizer's experts even acknowledge the existence of entire DBRCTs that were never published. The opinions of Pfizer's efficacy experts are not the product of reliable principles and methods. Rather, they are the product of exactly the type of unreliable, scientifically invalid evidence that the Supreme Court ruled should be excluded in *Daubert*.[10]

---

[9] Vedula, *et al.*, *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009).

[10] By way of example, in *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884-85 (10th Cir. 2005), the Court found that where there was epidemiological evidence supporting one conclusion, reliance on differential diagnosis "without supporting epidemiological evidence" was "misplaced," and excluded the expert testimony. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 474 (M.D.N.C. 2006), the Court rejected expert evidence testimony based on a literature review of peer-reviewed literature in which the expert's conclusions were "flatly contradicted" by the available epidemiological literature. Relying on *Norris*, the Court also

**IV.    DR. SLABY'S OPINION THAT NEURONTIN IS EFFECTIVE IN TREATING
        BIPOLAR DISORDER IS NOT THE PRODUCT OF RELIABLE PRINCIPLES
        AND METHODS**

Dr. Andrew Slaby is (or was) Pfizer's expert on the efficacy of gabapentin in treating

bipolar and other mood disorders. His December 15, 2008 report (Slaby Report) is the only

expert report Defendants did not cite in support of their motion for summary judgment.

Four DBRCT have been conducted studying Neurontin in bipolar disorder. Not one of

these studies indicates that Neurontin is any more effective than placebo in treating any aspect of

bipolar disorder. Dr. Slaby's opinion that "[g]abapentin is an effective treatment for some

patients suffering from bipolar and other mood disorders" (Slaby Report, at 1) repeatedly

acknowledges that such studies are the "gold standard" of evidence (Slaby Report, at 6, 9), but

he ignores one of them, misrepresents the results of a second, and considers the other two no

more important than scientifically inferior studies, which he acknowledges are merely

"hypothesis-generating rather than hypothesis-confirming" *(i.e.*, they prove *nothing)*. (Slaby

Report at 8.)

**A.    All Four DBRCT Have Shown That Neurontin Is Ineffective In Treating
        Bipolar Disorder**

Defendants' protocol 945-209 ("Pande"), not only demonstrated that Neurontin is no

more effective than placebo at treating either the depressive or manic symptoms of bipolar

disorder, but also indicated that placebo is a *more* effective anti-manic agent than Neurontin. *See*

Barkin Report, at 7-8. A second trial, the lead investigator of which was Dr. Mark Frye, then of

---

excluded expert testimony based on differential diagnosis that contradicted the available
epidemiological evidence. *Id*. at 477. In *Soldo v. Sandoz Pharms. Corp*., 244 F. Supp. 2d 434
(W.D. Pa. 2003), after cataloguing cases in which courts have held that epidemiology is the
generally accepted methodology for demonstrating causation, *see id*. at 532 and n.7, the Court
assessed and rejected the plaintiff's experts' reliance on other methods of showing causation,
including anecdotal case reports, "causality assessments," animal studies, and differential
diagnosis. *Id*. at 537-57.

the National Institute of Mental Health ("Frye"), demonstrated that Neurontin was no more

effective than placebo as a treatment for bipolar disorder. *Id.* at 9. A third trial, authored by

investigators associated with Harvard Medical School ("Guille"), demonstrated that Neurontin

was no more effective than placebo at treating mania. *Id.* A fourth trial, Defendants' own

protocol 945-421-291 ("Vieta"), demonstrated that Neurontin was no more effective than

placebo at improving bipolar symptom severity. *Id.* at 8-9.

Kaiser's bipolar expert, Dr. Jeffrey Barkin, a board-certified psychiatrist and Director of

Maine's Medicaid Drug Utilization Review Board, concludes that:

> The clinical trial database of Level 1 Evidence [DBRCT]
> consistently shows lack of efficacy of gabapentin for the treatment
> of bipolar disorder. . . . [¶] There is little ambiguity about the
> results discussed above. In none of the double-blind trials did
> gabapentin demonstrate any efficacy over placebo as a treatment
> for bipolar disorder and other mood disorders. Quite the opposite,
> the scientific evidence clearly shows that gabapentin is ineffective
> as a treatment for bipolar disorder.

*Id.* at 10.[11]

## B.    Dr. Slaby's Report Is Inaccurate, Incomplete, Unscientific, and Unreliable

At the outset of his report, Dr. Slaby announces his opinion that "Gabapentin is an

effective treatment for some patients suffering from bipolar and other mood disorders." Slaby

Report, at 1. While Dr. Slaby acknowledges that "[t]he gold standard for evaluating the efficacy

of a therapeutic intervention for psychiatric conditions is a double-blind placebo-controlled

---

[11] A second Kaiser expert, Dr. John Abramson, reaches the same conclusion: "In sum, four
randomized controlled clinical trials testing the efficacy of Neurontin for bipolar disorders have
been done. Of the two identified as sponsored by the manufacturer, one showed that Neurontin
is significantly worse than placebo [Pande], and one showed no benefit [Vieta]. The study done
by NIMH showed no benefit [Frye]. Another presented in 1999 [Guille] also showed no
benefit." Abramson Report, at 57.

crossover study with and without psychotherapy" (*id.* at 6),[12] he all but ignores these studies,

relying instead on inferior forms of evidence. In his entire, 14-page report, only *two paragraphs*

contain discussion of any actual studies of Neurontin's efficacy in treating bipolar disorder.[13]

Dr. Slaby acknowledges that the Pande and Frye studies were negative (*id.* at 12); he makes no

mention whatsoever of the Guille study, despite the fact that Dr. Barkin's report, to which Dr.

Slaby's report is responsive, expressly criticized Dr. Slaby's prior report on that ground;[14] and

Dr. Slaby cites the Vieta publication as "clearly indicat[ing] a role for gabapentin in bipolar

disorder" (*id.*), without responding at all to Dr. Barkin's undisputed observation that the Vieta

publication falsely reported that the results of the trial were positive, when in fact they were

negative.[15] At the end of his report, Dr. Slaby acknowledges that "gabapentin is not a first-line

agent in my practice . . . ." *Id.* at 14.

---

[12] *See also*, Slaby Report, at 9 ("randomized double-blind, placebo-controlled trials are the gold standard in proving efficacy").

[13] Dr. Slaby cites a number of other studies for the proposition that "[r]andomized controlled trials demonstrate that gabapentin is an effective alternative therapy for patients with panic disorder and social anxiety disorder." (Slaby Report, at 13.) As the Court may recall, the plaintiffs, including Kaiser, chose not to pursue these claims, given the relatively small number of prescriptions written for these conditions. *See, e.g.*, Memorandum of Law In Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1018) at 7 n.5 ("Plaintiffs have elected not to pursue subclasses for . . . anxiety disorders, due to the relatively small sales for these off-label conditions."). Accordingly, this testimony is irrelevant.

[14] *See* Barkin Report, at 19 ("He makes no reference to the negative Guille study."). Dr. Slaby's earlier report (Dkt. No. 586, Exh. 26), criticized by Dr. Barkin, was filed in opposition to plaintiffs' motion for class certification. The portions of the two reports discussing studies of gabapentin and bipolar disorder are identical in substance. *Compare id.* at 11-13 with Slaby Report at 11-13.

[15] As Dr. Barkin explained, the published Vieta article:

> fails to distinguish the original ITT [intent to treat] group from the PP subgroup. Instead, the 25 subjects in the PP subgroup are described in the absence of the original ITT group despite the fact that the authors falsely write that "all statistical analyses were done by intention to treat." The authors appear to have simply ignored the original ITT, creating an impression of efficacy from what is in

Dr. Slaby's report neither describes nor displays any discernable methodology for the collection and analysis of evidence; fails to distinguish between different levels of evidence; entirely omits to consider critical "Level 1" evidence (DBRCT); relies on one DBRCT published as positive even after he was referred to the internal research report showing that it was in fact negative; and elevates inferior quality studies[16] and anecdotal case reports over Level 1 evidence. As Dr. Barkin explains:

> [O]nly the section on pages 11-13 of the [Slaby] report addresses the use of gabapentin for bipolar and other mood disorders. My initial comment is on its face, the "Expert Report" does not appear to be utilizing any particular method. Although it does cite to "studies" in published literature, nowhere does the "Expert Report" identify whether any of those so-called studies are in fact randomized, placebo-controlled, double-blind studies, nor does it segregate the studies into the levels of evidence so that they can be appropriately analyzed. Moreover, the "Expert Report" appears to be basing its conclusion on "case reports, nonrandomized clinical trials, and small case studies," and not the available randomized, placebo-controlled, double-blind clinical trials. Based on part C of my section titled "Inefficacy of Gabapentin" above, such an approach is unscientific, potentially biased and clearly inappropriate.
>
> Second, it is clear that the author of the "Expert Report" did not receive all of the necessary Level 1 Evidence on gabapentin. He

---

> reality just the PP subgroup. If the original integrity of the ITT population had been maintained, this would be a failed trial with the conclusion that "[t]he primary efficacy parameter did not show statistically significant differences between gabapentin and placebo." Culling out or "cherry picking" a subpopulation that shows efficacy in lieu of the ITT population is dishonest, unethical and a far cry from demonstrating efficacy through the randomized ITT population.

*Id.* at 9 (quoting internal research report, available at http://www.clinicalstudyresults.org/documents/company-study_329_0.pdf, at 4).

[16] While Dr. Slaby acknowledges that such "studies are referred to as hypothesis-generating rather than hypothesis-confirming" (*i.e.*, they *prove nothing*) (Slaby Report, at 8), he lumps them together with the Level 1 evidence, as if they were entitled to the same weight. *See* Slaby Report, at 11-13.

makes no reference to the negative Guille study. Moreover, he cites only Vieta's publication of the results of 945-421-291, which I demonstrated above are inaccurate, rather than citing to Pfizer's internal unpublished analysis. . . .

Third, consistent with the marketing efforts of Pfizer and Parke-Davis, the "Expert Report" elevates the lower tiers of evidence such as case reports and anecdotes over the Level 1 Evidence in order to falsely suggest that the evidence supporting the efficacy of gabapentin outweighs the negative. In one paragraph, the "Expert Report" cites to 17 different publications which "clearly indicate there may be a role for Gabapentin, especially for the depressive component of bipolar disorder." Of those 17 citations, only two are in fact Level 1 Evidence, and those studies (Frye and Vieta) were negative, i.e. not supportive of the use of gabapentin in mood disorders. Missing from this paragraph is a complete discussion of the Level 1 Evidence, including the studies of Pande and Guille, which would have rendered the conclusion of that paragraph unsupportable.

Pande and Frye are both referenced in a following paragraph as two of "[o]nly a few studies" that "have not found such promise." However, the actual findings of Pande and Frye are never reviewed, suggesting that these citations are equivalent to citations of the favorable anecdotal case reports. Additionally, that paragraph fails to include the results of Guille and 945-421-291, suggesting that the question of gabapentin's efficacy (or more properly inefficacy) is unsettled scientifically.

Dr. Slaby spends much of his report advocating the use of non-FDA approved treatments. This is not the issue. Rather, the issue is the purposeful and misleading withholding of Level 1 Evidence which clearly and definitively demonstrates the lack of efficacy of gabapentin in bipolar disorder.

Based on the foregoing, the undated "Expert Report" of Dr. Slaby submitted by Defendants is inaccurate, incomplete, unscientific and unreliable.

Barkin Report, at 19-20.

Because Dr. Slaby's report ignores one DBRCT, misconstrues a second DBRCT that was actually negative as positive, and relies on inferior forms of evidence incapable of determining a drug's efficacy, his opinion is, as Dr. Barkin states, "inaccurate, incomplete, unscientific, and unreliable" (id.), and should therefore be excluded under *Daubert*.

## V.   **CONCLUSION**

For the foregoing reasons, the testimony of Dr. Slaby should be excluded.

Dated:  January 12, 2010

Respectfully submitted,

By:    */s/ Linda P. Nussbaum*
        Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

854070.1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management Order #3 on January 20, 2010.

/s/  Elana Katcher
Elana Katcher