UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF KAISER'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DR. MICHAEL McLEAN**

854075.1

## **TABLE OF CONTENTS**

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY | 4 |
| III. | THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT | 5 |
| IV. | DR. McLEAN'S OPINION THAT NEURONTIN IS MORE EFFECTIVE AT DOSAGES OVER 1800 MG/DAY IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS | 9 |
| | A. All Four DBRCT Have Shown No Dose-Response Relationship Over 1800 mg/day | 9 |
| | B. Dr. McLean Ignores One of the Four Relevant DBRCT, and Cites the Other Three as Positive When They Were, In Fact, Negative | 10 |
| | C. Dr. McLean Relies on Neurontin's FDA-Approved Label, Which States That Greater Efficacy Over 1800 mg/day Has Not Been Demonstrated | 12 |
| | D. Dr. McLean Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered | 14 |
| V. | CONCLUSION | 15 |

I. **INTRODUCTION**

Kaiser's[1] indication experts, Drs. Barkin (bipolar and other mood disorders), Perry (neuropathic and nociceptive pain), McCrory (migraine prophylaxis), and Alldredge (lack of dose related effect at dosages over 1800 mg/day) rigorously apply the scientific method to the best available data to reach their respective conclusions, as required for the admission of *any* expert report. This is especially true in the field of pharmaceutical research, where proper methods of data collection and analysis are well-developed, standardized, and generally agreed.

Applying the scientific method to the task at hand, each of Kaiser's indication experts thoroughly searched the available scientific literature for the highest quality evidence bearing on the question—*i.e.*, double-blind, randomized, controlled trials ("DBRCT"), which even Pfizer's experts repeatedly acknowledge are not only the "gold standard," but the *only type of evidence from which any scientifically valid conclusions can be drawn.*[2] Kaiser's experts examined not only the *published* DBRCT, but also Defendants' internal, *unpublished* research reports, the withholding and distortion of which lie at the very heart of this case. Where an unpublished research report revealed information that undermined, contradicted, or exposed as an outright falsehood the conclusion stated in the corresponding published study, Kaiser's experts based

---

[1] "Kaiser" is Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals. Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[2] As set forth below, only a DBRCT can provide any statistical measure whatsoever of the likelihood of a cause and effect relationship between a treatment and the selected measure of its effect. For this reason, all other forms of evidence are merely "hypothesis-generating rather than hypothesis-confirming." (Slaby Report at 8.) Relying on such evidence—which, by its very nature, is *incapable* of proving efficacy—in preference to multiple negative, DBRCT on the possibility that notwithstanding the consistently negative results, Neurontin *might* be effective for some subset of the same patient population, is as dangerous to the public health as it is antithetical to the scientific method.

their conclusions on the *actual* results of the study, not the results as distorted or misrepresented.[3]

Finally, because multiple DBRCTs have been conducted as to each indication, and the study results were consistently negative, Kaiser's experts formed and expressed their opinions that Neurontin has been shown to be ineffective in treating these conditions. It is no coincidence that each of Kaiser's experts approached their task in the same general way, even though there was little or no coordination or communication between them. Each of them adopted this approach *sua sponte*, because it is the approach dictated by science.

Pfizer's experts, by contrast: (1) disclose no discernable methodology for the collection of the relevant scientific literature; (2) ignore completely one or more DBRCT; (3) consider one or more DBRCT that were actually negative as positive; and/or (4) give preference to inferior forms of evidence from which no scientifically valid conclusions can be drawn. As such, their reports, and the conclusions they draw, are not the result of a rigorous application of the scientific method; they are a result of its *abandonment*, and thereby a further extension of Defendants' fraud.[4] Whether as a result of the withholding by Pfizer of relevant information—

---

[3] The reports of Kaiser's indication experts were originally filed, and are most readily accessible, as exhibits to the Revised Supplemental Declaration of Ilyas J. Rona in Filed in Support of Plaintiffs' Renewed Motion for Class Certification (Dkt. No. 1457), as Exhibit J ("Kessler Report," Dkt. No. 1457-10), Exhibit K ("Barkin Report," Dkt. No. 1457-11), Exhibit L ("Perry Report," Dkt. Nos. 1457-12 through 1457-15), Exhibit M ("McCrory Report," Dkt. No. 1457-16), Exhibit N ("Abramson Report," Dkt. No. 1457-17), and Exhibit P ("Alldredge Report," Dkt. No. 1457-20). The reports were also re-filed non-electronically as exhibits in support of Plaintiffs' opposition to Defendants' motion for summary judgment. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exhibits 21 (Barkin Report), 23 (Abramson Report), 163 (Perry Report), 365 (Alldredge Report), 374 (Kessler Report), and 478 (McCrory Report).

[4] With one exception, Pfizer's indication expert reports are attached as exhibits to the Declaration of Rajesh S. James (Dkt. No. 1692), as Exhibit 47 ("Bird Report," Dkt. 1692-11), Exhibit 48 ("Brenner Report," Dkt. No. 1692-12), Exhibit 49 ("Rapoport Report," Dkt. No. 1692-13), and Exhibit 50 ("McLean Report," Dkt. No. 1692-14). As Defendants have not filed

one of the central allegations in the case being that Defendants co-opted "thought leaders" with incomplete and misleading information—deliberate ignorance, or mere neglect, their reports are fatally deficient, and their testimony on the efficacy issue is not sufficiently reliable to be admitted.

In addition to ignoring or misconstruing the truly relevant evidence, most of Pfizer's experts expressly ground their opinions on their own personal, undocumented "clinical experience" in prescribing Neurontin to patients. However, the Court previously ordered that no expert testimony based on the expert's own experience in treating patients would be admitted unless the relevant "sanitized patient records" were produced to the opposing party.[5] No such records have been produced by Pfizer's experts. Accordingly, the opinions of Pfizer's indication experts based on their "clinical experiences" should be excluded on this ground as well.

The principle defects in Pfizer's indication expert reports are summarized in the chart below:[6]

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| Slaby (bipolar) | X | Guille | Vieta | X | X |
| Bird | X | | Gorson | X | X |

Dr. Slaby's final report in support of or in opposition to any motion, that report, which has not been marked confidential by Defendants, is attached as Exhibit 1 to Kaiser's motion *in limine* to exclude Dr. Slaby's testimony.

[5] See Electronic Order, Sept. 27, 2006.

[6] Kaiser appreciates that the Court does not wish to venture too far "into the weeds" on scientific issues prior to trial, as one of the purposes of the trial is the airing of these issues. Accordingly, for purposes of this motion, Kaiser has limited itself to the more obvious, overarching problems that render the opinions of Pfizer's experts inherently unreliable, untrustworthy, and unscientific.

| Expert | No stated methodology for collecting information | Ignores Negative DBRCTs known to Pfizer | Presents negative DBRCT as positive | Gives preference to inferior forms of evidence | Relies on clinical experience without producing records |
|---|---|---|---|---|---|
| (neuropathic pain) | | | 945-271 945-306 | | |
| Rapoport (migraine) | X | 945-217 | 945-220 | X | X |
| Brenner (neuropathic and nociceptive pain) | X | Gorson 945-224 945-271 945-306 1032-001 1032-002 1035-001 1035-002 | | X | X |
| McLean (doses over 1800 mg/day) | X | 945-224 | 945-082 945-295 942-88 | X | X |

Any one of these defects would be sufficient to exclude the testimony of the corresponding expert. Taken together, these defects so undermine the integrity of Pfizer's indication experts' opinions that they should all be excluded under *Daubert*.

## II.   TO BE ADMISSIBLE, EXPERT TESTIMONY MUST BE THE PRODUCT OF RELIABLE PRINCIPLES AND METHODOLOGY

By its terms, Federal Rule of Evidence 702 precludes the admission of expert testimony unless it (1) "is based upon sufficient facts or data, (2) . . . is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* Accordingly, given the tremendous sway an expert may have over a jury in scientific or technical matters, the Court is required to exercise a "gatekeeping role." *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). As summarized by the First Circuit:

> In *Daubert*, the Supreme Court set forth four general guidelines for a trial judge to evaluate in considering whether expert testimony rests on an adequate foundation: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline." *United States v. Mooney*, 315 F.3d 54, 62 (1st Cir.2002) (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786). However, these factors do not "constitute a definitive checklist or test," and the question of admissibility "must be tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

*Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25-26 (1st Cir. 2006).

In *Daubert* itself, the Court explained that:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. *The focus, of course, must be solely on principles and methodology*, not on the conclusions that they generate.

509 U.S. at 594-95 (emphasis added).

Consistent with *Daubert*, Kaiser's focus in this motion is not on the conclusions reached by Pfizer's experts, but on the defective methods by which they were reached—to the extent any method is discernable from their respective reports.

### III. THE EFFICACY OF A DRUG TO TREAT A CONDITION CAN ONLY BE DETERMINED THROUGH DBRCT

There are *universally-accepted,* international standards for determining whether a drug is effective for a given indication. *See, e.g.,* International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, *ICH Harmonised*

*Tripartitie Guideline, Statistical Principles for Clinical Trials,* (Feb. 5, 1998) (available at http://www.ich.org/cache/compo/475-272-1.html).[7] The FDA's standard is the same.

As Dr. David Kessler, former head of the FDA, writes in his report, when determining efficacy, the FDA relies only on "'adequate and well-controlled clinical investigations.'" Kessler Report, at 5 (quoting 21 C.F.R. § 314.26). Such trials need to be controlled, need to be randomized, need to be blinded, and need objective and prospectively determined trial endpoints. *See* Kessler Report, at 5-6. These pillars of sound clinical trial design are not arbitrary; they are required to minimize the chance that any observed difference between the placebo and treatment groups is due to something *other* than the treatment itself. Double-blind, randomized, controlled trials (DBRCT) are the standard—indeed, the *only* accepted method— for determining whether a drug is effective. They are the foundation on which modern pharmaceutical medicine is based, even if they have little impact on the behavior of the world's largest drug company.

Clinical trials that are not controlled, not blinded, not randomized and/or whose endpoints are not prospectively and objectively determined, while possibly helpful in generating a hypothesis, cannot be used to determine a drug's efficacy. *See* Kessler Report ¶ 17. Of even lesser value in determining a drug's efficacy are anecdotal case reports. Such reports, which again may useful in generating a hypothesis for study, are not reliable or adequate evidence of efficacy. These "reports are obtained haphazardly or selectively, and the logic of 'post hoc, ergo propter hoc' does not suffice to demonstrate that the first event [the taking of a drug] causes the second [the effect]." D. Kaye & D. Freedman, *Reference Guide on Statistics*, contained in the Federal Judicial Center's *Reference Manual on Scientific Evidence* (2d ed. 2000), at 91(available online at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf).

---

[7] Additional international "Efficacy Guidelines" are available at http://www.ich.org/cache/compo/475-272-1.html.

In a nutshell, a cause-and-effect relationship is deemed established when it can be determined statistically that there is a 95% probability that the difference observed between the treatment and control (placebo) groups is a non-random event. This probability—expressed as "$p < .05$" in the language of statistics—is the "bottom line" of every clinical trial. If $p < .05$, a "statistically significant difference" exists between the treatment and control groups with respect to the variable being measured, and a cause-and-effect relationship is inferred.[8] If $p > .05$, no statistically significant difference has been shown, and no cause and effect relationship is or may be inferred. *See generally*, *Reference Guide on Statistics*, at 121-25 (discussing p-values and statistical significance).

Each of Kaiser's efficacy experts describes his method and well-established reasons for relying solely on DBRCTs in rendering an efficacy opinion. For each indication at issue, there are multiple DBRCTs, most of which were designed and conducted by Pfizer. Given such a wealth of high-quality evidence, there is simply no need—and therefore no reason—to rely on lesser levels of evidence. For these reasons, Kaiser's experts rely *solely* on the results of DBRCTs in rendering their efficacy opinions.

The essence of this litigation is that Pfizer suppressed or misrepresented the published results of multiple DBRCTs. For this reason, Kaiser's experts reviewed, where possible, the full underlying clinical research reports and their results, not just the published versions. Kaiser's

---

[8] This presumes, of course, that the results of the study have been analyzed as originally planned, and not distorted by changing the variable, primary endpoint, or patient population, a practice known as "moving the goalposts," which by its very nature undermines the conclusion that the statistical relationship observed is non-random. *See, e.g., Reference Guide on Statistics, at* 93-94 ("[I]f the control group was obtained through random assignment before treatment, a difference in the outcomes between treatment and control groups may be accepted, within the limits of statistical error, as the true measure of the treatment effect. However, if the control group was created in any other way, differences in the groups that existed before treatment may contribute to differences in the outcomes, or mask differences that otherwise would be observed.") (footnote and citations omitted).

experts revealed—as was the subject of a peer-reviewed article recently published in the *New England Journal of Medicine*[9]—that in many instances, the findings presented in the published literature did not match those found in the underlying research reports, and in many cases, entire trials went unpublished.

While Pfizer's experts readily agree that the highest level of evidence comes from DBRCTs, they abandon reliance on such high-quality evidence. Instead, they advocate a cafeteria-style approach to evidence-based medicine, wherein they highlight—without any recognizable method or principle—select pieces of evidence from the varying levels of evidence, including the lowest level: their own clinical experience. But in so doing, they either ignore entire DBRCTs, or rely on a published article, even when the underlying, internal research report exposes its fraudulently manufactured conclusion.

There is not a mere difference of opinion between Pfizer's and Kaiser's efficacy experts. Pfizer's experts do not even attempt to explain away the significant differences between the published articles and the underlying research reports; they simply ignore them. Nor do Pfizer's experts even acknowledge the existence of entire DBRCTs that were never published. The opinions of Pfizer's efficacy experts are not the product of reliable principles and methods. Rather, they are the product of exactly the type of unreliable, scientifically invalid evidence that the Supreme Court ruled should be excluded in *Daubert*.[10]

---

[9] Vedula, *et al.*, *Outcome Reporting in Industry-Sponsored Trials of Gabapentin for Off-Label Use*, 361;20, New England Journal of Medicine, 1963 (2009).

[10] By way of example, in *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884-85 (10th Cir. 2005), the Court found that where there was epidemiological evidence supporting one conclusion, reliance on differential diagnosis "without supporting epidemiological evidence" was "misplaced," and excluded the expert testimony. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 474 (M.D.N.C. 2006), the Court rejected expert evidence testimony based on a literature review of peer-reviewed literature in which the expert's conclusions were "flatly contradicted" by the available epidemiological literature. Relying on *Norris*, the Court also

## IV. DR. McLEAN'S OPINION THAT NEURONTIN IS MORE EFFECTIVE AT DOSAGES OVER 1800 MG/DAY IS NOT THE PRODUCT OF RELIABLE PRINCIPLES AND METHODS

### A. All Four DBRCT Have Shown No Dose-Response Relationship Over 1800 mg/day

Defendants have conducted the three fixed-dose DBRCT capable of assessing Neurontin's efficacy at dosages over 1800 mg/day. The consistently negative results from these DBRCT establish that Neurontin is no more effective at dosages above 1800 mg/day.

The first trial, Defendants' own protocol 945-82, not only failed to provide evidence of enhanced efficacy at dosages above 1800 mg/day, but also failed to demonstrate *any* dose-response relationship (*i.e.*, improvement in efficacy with escalating dose) for the drug. Alldredge Report, at 11-13. The second trial, Defendants' own protocol 945-224, also failed to demonstrate a dose-response effect of Neurontin. *Id.* at 17-18. The third trial, Defendants' own protocol 945-295, specifically designed to garner data on the dose-response of Neurontin, once again demonstrated that there was no increased efficacy at doses above 1800 mg/day, while also failing to demonstrate a dose-response effect of Neurontin. *Id.* at 18-19.

Kaiser's expert, Dr. Brian Alldredge, is a Professor of Clinical Pharmacy at the University of California at San Francisco School of Pharmacy and Health Sciences Clinical Professor of Neurology at the UCSF School of Medicine. Dr. Alldredge reviewed all of the Defendants' trials studying Neurontin at doses above 1800 mg/day, and concludes that "the

---

excluded expert testimony based on differential diagnosis that contradicted the available epidemiological evidence. *Id.* at 477. In *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003), after cataloguing cases in which courts have held that epidemiology is the generally accepted methodology for demonstrating causation, *see id.* at 532 and n.7, the Court assessed and rejected the plaintiff's experts' reliance on other methods of showing causation, including anecdotal case reports, "causality assessments," animal studies, and differential diagnosis. *Id.* at 537-57.

highest quality evidence [DBRCT] failed to establish a dose-related effect (*i.e.*, continued improvement in efficacy) at dosages above 1800 mg/day." *Id.* at 1. As Dr. Alldredge explained:

> Of the three designs employed here, the fixed-dose, parallel group study is the most appropriate design to establish a dose response effect. Studies 945-05, 945-77, 945-82, 945-88, 945-224, and 945-295 are examples of this study design. As can be seen from Table 1, only 4 of these studies used doses above 1800 mg/day (945-82, 945-88, 945-224 and 945-295). Results of all four of these studies fail to support a dose-response relationship for gabapentin at dosages above 1800 mg/day.

*Id.* at 27-28.[11]

### B. Dr. McLean Ignores One of the Four Relevant DBRCT, and Cites the Other Three as Positive When They Were, In Fact, Negative

In his report, Dr. McLean correctly identifies the proper hierarchy of evidence—and then proceeds to ignore it:

> Evidence-based medicine aims to make medical decision-making more deliberate and methodical. The evidence-based approach involves a critical appraisal of the medical literature, including data from the pivotal trials; formulation of the question to be answered by the research; and, integration of the research into clinical practice. Evidence-based medicine attempts to assign levels of confidence in the data and in conclusions and recommendations that can be drawn from them. A variety of schemata have been developed to assist in the evaluation of different types of information and stratify them by quality. The different types of information include (1) evidence derived from one or more randomized placebo-controlled trials; (2) evidence from well-designed controlled trials without randomization or from cohort or case-controlled studies, preferably from multiple centers; and, (3) evidence consisting of expert opinion based on clinical experience in the form of reviews or committee reports.

McLean Report, at 11-12.

---

[11] With respect to 945-88, the only one of these four studies not discussed above, Dr. Alldredge explains that "[s]tudy 945-88 also does not illuminate the issue of a dose-response relationship for gabapentin at doses greater than 1800 mg/day, since 3600 mg/day was the only gabapentin dosage shown to be effective in this trial." Alldredge Report, at 14.

In addition, while he acknowledges that the highest quality of evidence consists *exclusively* of DBRCT, of the four DBRCTs identified by Dr. Alldredge as the only studies capable of showing "a dose-response relationship for gabapentin at dosages above 1800 mg/day" (Alldredge Report, at 27-28), Dr. McLean ignores one entirely, Defendants' protocol 945-224, despite the fact that Dr. Alldredge had previously alerted him to its existence and importance,[12] and Dr. McLean cites the other three, which *failed* to show any dose-response relationship over 1800 mg/day, as "show[ing] efficacy, and/or increasing efficacy . . . of gabapentin doses greater than 1800 mg/d for epilepsy and pain." McLean Report, at 15-16.[13]

While Dr. McLean acknowledges that evidence-based medicine requires that the "different types of information" on which he relies be "stratify[ied] . . .by quality" (McClean Report at 11-12), he does no such thing, and lumps the relevant DBRCT together with open-label and observational studies. In fact, rather than following through on his own prescription for the practice of "evidence-based medicine," and giving the relevant DBRCTs the much greater weight to which they are entitled, Dr. McLean contends that the purpose of such trials is merely "to support an approval for marketing, not to determine what dose a physician should prescribe." McLean Report, at 4 (emphasis in original).

---

[12] *See* Alldredge Report, at 17-18 ("no dose-response effect was seen, and this study does not provide substantial evidence of increased efficacy of gabapentin . . . at doses above 1800 mg/day). This research report remains unpublished. *See id.* at 32. Dr. McLean cites only to published studies. *See* McLean Report, at 15-16.

[13] Specifically, Dr. McLean cites: (1) 945-82, published as Beydoun, *et al.*, Gabapentin Monotherapy: II. A 26-week, Double-Blind, Dose-Controlled, Multicenter Study of Conversion from Polytherapy in Outpatients with Refractory Complex Partial or Secondarily Generalized Seizures, *Neurology* 49: 746-752, 1996 (*see* Alldredge Report, at 31, 56); (2) 945-88, published as Bergey, *et al.*, Gabapentin monotherapy: I. An 8-day, double-blind, dose-controlled, multicenter study in hospitalized patients with refractory complex partial or secondarily generalized seizures. *Neurology* 49:739-45, 1997 (*see* Alldredge Report, at 31, 56); and (3) 945-295, published as Rice, *et al.*, Gabapentin in Postherpetic Neuralgia: A randomized, Double Blind, Placebo Controlled Study. *Pain* 94:215-24, 2001 (*see* Alldredge Report, at 32, 56).

Dr. McLean's opinion epitomizes Pfizer's experts' cafeteria-style approach to evidence-based medicine: "the task of practitioners [is] to *blend* data from studies of different design and quality with one's own clinical experience." McLean Report, at 12 (emphasis added). Nowhere in his report does Dr. McLean disclose just what recipe he followed in "blending" these ingredients to arrive at his efficacy opinion. Moreover, his opinion is not even based on any such "blending," as he categorically *rejects* all DBRCTs. Dr. McLean is unabashed in describing the evidence-base for Neurontin's efficacy at high-dose as arising from case reports and experience:

> Once [Neurontin] was approved for marketing, practitioners and clinician scientists began to obtain *experience* with gabapentin in patients in general population and in different kinds of studies. Manuscripts published in the medical literature contain data derived *from this experience*. These publications constitute evidence-based medicine that can be used to guide clinical decision making.

McLean Report, at 9 (emphasis added).

Because Dr. McLean ignores one of four relevant DBRCTs, cites the other three as positive when they were, in fact, negative, and relies on lesser forms of evidence contradicted by *all four* DBRCTs, his opinions are not the product of reliable principles and methods, and should therefore be excluded under *Daubert*.

### C. Dr. McLean Relies on Neurontin's FDA-Approved Label, Which States That Greater Efficacy Over 1800 mg/day Has *Not* Been Demonstrated

In addition to ignoring and misrepresenting the results of clinical trials, Dr. McLean bases his opinion on the following statements in the current Neurontin Package Insert:

**Postherpetic Neuralgia**

> . . . . The dose can . . . be titrated up as needed for pain relief [up] *to a daily dose of 1800 mg* . . . . In clinical studies, efficacy was demonstrated over a range of doses from 1800 mg/day to 3600 mg/day with *comparable effects across the dose range. Additional*

> *benefit of using doses greater than 1800 mg/day was not demonstrated.*
>
> **Epilepsy**
>
> If necessary, *the dose may be increased . . . up to 1800 mg/day.* Dosages up to 2400 mg/day have been well tolerated in long-term clinical studies. Doses of 3600 mg/day have also been administered to a small number of patients for a relatively short duration, and have been well-tolerated.

McLean Report, at 10.

Dr. McLean cites these statements for the following propositions:

> Thus, the package insert includes doses higher than 1800 mg/d up to 3600 mg/d. The FDA presumably would not have included this language if there were no utility of doses greater than 1800 mg/d for any patient. This is an implicit recognition that it maybe appropriate to prescribe doses above 1800 mg/d even though the label also notes that does above 1800 mg/d were not shown to provide additional efficacy in the pivotal trials.

McLean Report, at 10-11.

These statements are truly remarkable, not only in light of the label's express disclaimer that no additional benefit has been shown, but also in light of the FDA's *repeated refusal* to allow Defendants to raise the maximum recommended dosage above 1800 mg/day.[14] Certainly, it would come as a surprise to the FDA that its refusal to raise the maximum recommended dose

---

[14] On August 26, 1997, the FDA rejected Defendants' request to change the effective and maximum recommended dose of gabapentin. *See* Declaration of Ilyas Rona In Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 1761), Exh. 373, Non-Approvable Letter from FDA to Jan Turner dated August 26, 1997 (WLC_FRANKLIN_0000090128). Similarly, in May 2002, the FDA rejected Defendants' submitted dosing instructions of gabapentin for PHN which stated: "The dose can subsequently be titrated up as needed for pain relief to a maximum daily dose of 3600 mg" and that there was "greater efficacy with increasing dose." *Id.*, Exh. 436, Email from FDA to Drusilla Scott dated May 23, 2002 re: changes to the product labeling (PFIZER_LCASTRO_0011868); Exh. 437, FDA draft product labeling dated May 23, 2002 (Pfizer_MPatel_0077867); Exh. 438, Email from FDA to Drusilla Scott dated May 21, 2002 attaching FDA draft product labeling dated May 16, 2002 (PFIZER_LCASTRO_0011563).

of Neurontin because increased efficacy at higher doses has *not* been shown was being cited as tacit support for a contrary expert opinion. Dr. McLean's opinion is as incredible as it is unreliable.

### D. Dr. McLean Bases His Opinions On His "Clinical Experience," and He Has Not Produced Sanitized Patient Records, As Previously Ordered

At the outset of his report, Dr. McLean states the evidence on which his conclusion is based:

> It is my opinion that gabapentin at doses greater than 1800 mg/d can be effective in treating patients for epilepsy or pain for whom the medicine is not effective, or less effective, at lower doses. *I base this conclusion on my years of clinical experience prescribing gabapentin, the experience of my colleagues,* the research I have done and a review of the medical literature.
>
> * * *
>
> *It is my experience that some patients I have treated with gabapentin did not begin to benefit until the dose was titrated above 1800 mg/d.* Colleagues of mine have told me of similar results. Also, many of my own patients have not achieved, optimum seizure or pain control with doses less than 1800 mg/d; higher doses were needed and tolerated.

McLean Report, at 3, 19 (emphasis added).

As these passages make plain, Dr. McLean's opinions are based more on his own, personal experiences in treating patients, and the experiences relayed to him by his colleagues, than they are based on an analysis of the available data based on relative scientific merit. As set forth at length in Kaiser's accompanying Motion *In Limine* to Exclude Testimony of Pfizer's Non-Retained Experts, no scientifically valid conclusions of any kind can be drawn from case reports and other forms of anecdotal experience. Crediting one's personal beliefs over contrary, scientific evidence is, once again, the antithesis of the scientific method, not the fruit of its

careful application. Any opinion based in significant part on such unscientific evidence, as Dr. McClean's clearly is, should be excluded as insufficiently reliable under *Daubert*.[15]

Finally, as set forth at length in the accompanying motion to exclude the testimony of Pfizer's "non-retained experts" based on their "clinical experience," the Court previously ordered that any of Pfizer's experts who based their opinions on such experience would be required to produce the underlying patient records as a condition of admissibility. Dr. McLean has not produced any such records. Accordingly, his opinions should be excluded on this ground, as well.

## V. CONCLUSION

For the foregoing reasons, the testimony of Dr. McLean should be excluded.

Dated: January 12, 2010                             Respectfully submitted,

                                                    By:   /s/ Linda P. Nussbaum
                                                          Linda P. Nussbaum

                                                    KAPLAN FOX & KILSHEIMER LLP
                                                    Linda P. Nussbaum, Esq.
                                                    850 Third Avenue, 14th Floor
                                                    New York, New York 10022

                                                    *Attorneys for Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

---

[15] Dr. McLean's experienced-based approach to resolving the question obviously forms a substantial part of the basis for his opinion, and is not merely additive to his view of the scientific literature. *See* McLean Report, at 3-9 20-21.

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 20, 2010.

/s/ Elana Katcher
Elana Katcher