# EXHIBIT A

**EXPERT REPORT OF CURT DANIEL FURBERG, M.D., Ph. D.**

The following is my expert report submitted in connection with the Neurontin Sales Marketing and Products Liability Litigation.

## I.   INTRODUCTION AND QUALIFICATIONS

1.     I am a medical doctor admitted to the practice of medicine in Sweden.  I received my medical training and a PhD-equivalent at the University of Umea, Umea, Sweden.  From 1974 through 1985, I was employed at the National Heart, Lung, and Blood Institute of the National Institutes of Health (NIH) in Bethesda, Maryland.  For the first nine (9) years, I worked in the Clinical Trials Branch and served as its Chief from 1979 to 1985.

2.     I received an academic appointment as Professor of Medicine in 1986 from Wake Forest University School of Medicine in Winston-Salem, North Carolina.  I was appointed Director, Center for Prevention Research and Biometry and Head, Section of Prevention Research and Biometry in the Department of Medicine.  In 1989, the Department of Public Health Sciences was established and I was appointed Chairman.  I served in this capacity until 1999.

3.     During my 13-year leadership and direction of the Center and the Department, we grew from one to approximately 300 persons.  Three Sections were established within the department -- Epidemiology, Biostatistics and Social Sciences and Health Policy.  We successfully competed for funding from the National Institutes of Health and, in recent years, we have ranked nationally as one of the top two departments of our type (for NIH funding).

4.     Currently, I am Professor of Public Health Sciences and Senior Advisor to the Dean for

Health Services Research and Health Policy at Wake Forest University School of Medicine. Attached hereto as Exhibit A is a true copy of my CV.

5.    I have more than three decades of expertise and experience in the areas of epidemiology and clinical trial design, conduct, monitoring, interpretation and reporting.    I am considered by my peers to be a national leader in this field.    The following are illustrative of my relevant experience and expertise:

a.       I have served as Principal Investigator or Scientific Project Officer on a large number of primarily cardiovascular clinical trials, having played a very active role in their design, conduct, monitoring, interpretation and reporting.    These trials documented the efficacy and safety of various interventions and led to improvements in the quality of care for millions of patients with coronary heart disease, heart failure, hypertension or other vascular conditions.    In addition, I am currently Principal Investigator (recipient) of a grant from the Attorney General Consumers and Prescriber Program to develop educational modules for healthcare professionals.    Funding for this program, coordinated by the Attorney General's office in Portland, Oregon, comes from a large settlement with Pfizer regarding the illegal off-label promotion of the drug Neurontin.

b.       I have served or currently serve on the Data Safety Monitoring Committee for over fifty clinical trials.    These committees monitor the efficacy and safety of treatment and prevention trials in progress and are charged with recommending early trial termination, if efficacy is clearly documented or if harmful effects outweigh the benefits.    These trials have been sponsored by the National Institutes of Health, Foundations, the pharmaceutical industry and others. Currently, I am

on the Data Safety Monitoring Committee of two industry-sponsored trials. Thus, I am very experienced in the generally accepted approaches to weighing favorable and unfavorable effects of interventions, primarily medications.

c.  I have frequently been consulted on clinical trial issues by colleagues at academic institutions and I have conducted trials sponsored by pharmaceutical companies. I consulted for Wyeth as an expert regarding the combination fenfluramine-phentermine (so-called "fen-phen") in determining the magnitude of the adverse effects associated with its use. I have also interacted with the World Health Organization. Currently I am involved in activities directed at non-communicable diseases in low and middle-income countries.

d.  I have also been retained as an expert witness for patients who claim that they have suffered harmful drug effects and for pharmaceutical companies defending themselves against such claims. I served as an expert on behalf of Wyeth in a case against a woman who claimed that her hormone replacement therapy had caused her stroke. I have also been retained as an expert for a pharmaceutical company involving litigation regarding a prescription drug in Canada. A list of cases in which I have provided testimony at deposition or trial is attached hereto as Exhibit B.

6.  In addition, I am a past charter member of the U.S. FDA Drug Safety and Risk Management (DSRM) Advisory Committee. This Committee was established by the FDA to provide expert advice on drug safety issues. My term ended in May, 2006. It was as a member of the DSRM Committee that I participated in the FDA Hearing on COX-2 inhibitors in February, 2005. I have been invited as an *ad hoc* expert to serve on

two FDA hearings this year.

7.     In collaboration with four other Committee members, we reported our views about the FDA and drug safety in a recent article entitled "The FDA and Drug Safety:  A Proposal for Sweeping Changes" (*Arch Intern Med* 2006;166:1938-42).  I have also served on the State of North Carolina Drug Utilization Review for Medicaid.

8.     As an expert on drug safety, I have testified twice at Congressional Hearings.  I was invited in March, 2005 to provide a written testimony for the U.S. Senate Committee on Health, Education, Labor and Pensions regarding how well the pharmaceutical industry pursues safety signals and disseminates safety information to the medical community and to consumers.

9.     I also provided live testimony in March, 2007 for the U.S. House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations regarding the pharmaceutical companies' oversight of drug safety, including applicable laws, regulations and the consequences associated with violations thereof.

10.    At present, I am the Chair of the Steering Committee of the Cardiovascular Health Study sponsored by the National Heart, Lung, and Blood Institute.   This very large epidemiologic study was initiated almost twenty years ago to investigate risk factors (predictors) for coronary heart disease and stroke in people 65 years of age or older.  I am also Steering Committee Chair of the Ginkgo Evaluation of Memory Study sponsored by the National Center for Complementary and Alternative Medicine of the National Institutes of Health.

11.    Until recently I served as the Research Subject Advocate Advisor and as a member of the

General Clinical Research Center's Human Subject Protection Committee, which monitored high-risk studies conducted at Wake Forest University School of Medicine. My role was to help protect the safety and well-being of study participants by overseeing and monitoring ongoing trials for possible adverse treatment effects. As a result of my work, we promptly facilitated the termination of two local VIOXX trials soon after the drug was taken off the market. Currently, I chair an institutional Data Safety Monitoring Committee.

12.    I have authored numerous publications on the subject of clinical trials. Along with two colleagues from the National Institutes of Health, I co-authored a text book entitled *Fundamentals of Clinical Trials*, 3rd Edition, Springer 1996. A fourth edition is under preparation. This is considered a leading text and is used widely for teaching. A more recent text is entitled "*Data Monitoring in Clinical Trials - A Case Studies Approach,*" Springer 2006. All 29 cases reviewed in this text address issues of benefit, harm and benefit-to-harm balance.

13.    My most recent text entitled "*Evaluating Clinical Research -- All that Glitters is not Gold,*" Springer 2007, summarizes many of the clinical trial lessons I have learned over more than three decades. It contains many examples of violations of fundamental principles of medical research. I am currently finalizing a new book for patients entitled "*Knowing Your Medications – The Good and the Bad*".

14.    I am also the author or co-author of approximately 370 peer-reviewed articles and 60 book chapters on various topics, including epidemiology, clinical trials, non-steroidal anti-inflammatory drugs (NSAIDs), hormone replacement therapy, lipid disorders, and hypertension.

15. Since 1983, I have served on sixteen editorial boards. I am currently a member of the editorial board of one professional journal - *Trials*.

16. I have received the following awards:

> 1983 - *Director's Award* from the National Institutes of Health
>
> 1998 - *Women's Health Initiative Achievement Award*, NHLBI
>
> 2001 - *Established Investigator in Clinical Science Award* from Wake Forest University
>
> 2002 - *Ancel Keys Lecture Award*, American Heart Association
>
> 2004 - *Joseph Stokes III Award,* American Society of Preventive    Cardiology
>
> 2004 - Honorary degree *Doctor Honoris Causa* from Umeå University
>
> 2004 - *Rockefeller Foundation Residency Award*, Bellagio, Italy.
>
> 2005 - Elected *Fellow of the Society for Clinical Trials*.
>
> 2007 - *Health Care Heroes - Lifetime Achievement Award* from the Business Journal.

## II.   ASSIGNMENT AND OPINIONS

### A.   Assignment

17. I have been asked to provide an expert report containing my opinions related to the following questions:

> A.   From the safety data in FDA's combined medical-statistical review of gabapentin (Neurontin) for the indication "Adjunctive Medication in Refractory Partial Epilepsy" received January 31, 1992 -
>
> > a.   What conclusions can be drawn regarding the risks of depression with and

without suicidal ideation?

    b.    Are these findings relevant to the promotion and use of gabapentin in patients with bipolar and other mood disorders?

    c.    Do the findings contradict and/or undermine promotional claims of gabapentin's beneficial effects on mood?

    d.    Did the sponsor adhere to regulations, guidelines and generally accepted standards for dissemination of the safety information on gabapentin?

B.    What is the scientific quality and relevance of the article by KR Dimond et al. published in Progress in Neuro-Psychopharmacology & Biological Psychiatry in 1996?

18.    In conjunction with the assignment, this expert report includes my opinions regarding the Sponsor's actions related to a) adherence to established standards for the conduct of research, b) dissemination of trial results and c) obligations to inform and warn practicing physicians, research subjects and regular patients.

**B.    Basis for Opinions:**

19.    The bases of my opinions derive, in part, from my education, training, experience, research and what is accepted within the community of physicians, scientists and public health professionals who are knowledgeable in the proper conduct and reporting of clinical trials and in the proper dissemination of drug safety information to clinicians and to patients. I have also based my opinions on the review of various clinical studies and materials, many of which are exhibits to my expert report and others which are included in a list attached hereto as Exhibit C.

20.   I am uniquely qualified to render these opinions, based on my extensive experience in drug evaluation and all aspects of clinical trial methodology and based on my knowledge of regulations, including drug safety and labeling.

**C.   Summary of Opinions:**

21.   The following is a brief summary of my opinions:

a.   Gabapentin is associated with increased risks of depression with and without suicidal ideation when given as adjunctive medication in refractory partial epilepsy.   This association was known as early as 1992, but certainly by November 1995 when Plaintiffs contend that marketing of the drug for bipolar and other mood disorders began.

b.   This strong safety signal of serious adverse events should have been actively pursued in the testing of gabapentin prior to any marketing of the drug as effective for mood; the Sponsor certainly should not have marketed the drug to high-risk patients.

c.   The observed increased risks of depression with and without suicidal ideation should have been disseminated to all relevant parties in a timely and complete manner during any conversation, publication or presentation related to mood.

d.   The published article by Dimond et al. is seriously flawed and does not allow any valid scientific conclusions.

e.   The Sponsor engaged in a series of promotional events that failed to disclose critical safety information, which contradicted claims of beneficial effects on mood, to patients and prescribing physicians.

## III.    STANDARDS AND OBLIGATIONS

### A.    General

22.    The standards for the proper conduct of human clinical trials have been evolving since the 1930s.  One of the most significant advances in the conduct of clinical trials was the 1964 Declaration of Helsinki, which articulated that researchers conducting clinical trials must follow the letter and the spirit of the law (World Medical Association Declaration of Helsinki.  Ethical Principles for Medical Research Involving Human Subjects, Helsinki, Finland, June 1964).

23.    Good clinical trial practice relates to improving human life by conducting high-quality research in a manner that is consistent with the sanctity of life for the subjects being studied.  The Declaration defines the basic principles and generally accepted standards for biomedical research involving human subjects. It binds the physician to the words *"The health of my patient will be my first consideration."*

### B.    Pertinent Requirements and Obligations

24.    The pre- and post-approval processes for new drugs are governed by many federal regulations in the United States, as well as by other international standards and obligations, including those contained in the Declaration of Helsinki and the International Conference on Harmonization (ICH) Guidelines.  The following list reflects some of the most important requirements relating to the timely and accurate dissemination of safety data.

### (a)    Obligations and Requirements Regarding Clinicians

All marketed drugs in the United States are required to have an FDA-approved

drug label, which constitutes the primary source of safety information for clinicians. It is also printed in the Physician's Desk Reference and may be distributed with the drug when dispensed to patients. This safety information provided by the pharmaceutical companies is used by clinicians to determine the risk-to-benefit balance of marketed drugs and must be complete and up-to-date. The requirement that pharmaceutical companies update the labeling in a timely manner when new adverse reaction information becomes available is critical for clinicians. Any unnecessary delays in such updates may harm patients prescribed the drug. Clinicians also get drug information from scientific articles published in medical journals. Any delays in reporting and/or publishing unfavorable safety data could also lead to unnecessary harm to patients.

**(b)**     **Obligations and Commitment Regarding Patients**

All patients receiving medical care have the right to know the favorable and unfavorable effects of the marketed drugs they are prescribed. This can only be achieved if their clinicians are fully informed by the drug manufacturers through an up-to-date drug label. The patients are the ultimate victims if the labels are incomplete, incorrect or out-of-date.

All patients also have the right to be informed by their clinicians whether a prescribed drug is FDA-approved for their underlying condition. They should be informed if the drug is prescribed off-label and what this means in terms of lack of documented benefit and harm.

(c)     **Obligations Regarding Medical Research**

The practice of medicine is based on evidence from well-conducted research studies or so-called evidence-based medicine.  It is critical that new research findings, good or bad, be reported and published in an unbiased and timely manner.  Delay in conveying or suppression of unfavorable trial results by drug sponsors violates the generally accepted standards and fundamental principles of medical research.  This obligation to publish results is recognized in Section B.27 of the Declaration of Helsinki, *"Negative as well as positive results should be published..."*

## IV.     SAFETY OF GABAPENTIN (NEURONTIN)

### A.     Background

25.     Gabapentin is an anticonvulsant initially available as 100, 200, and 400 mg capsules for oral administration.  It prevents seizures in a number of animal models.  Gabapentin has been shown to penetrate the blood-brain barrier effectively.  Its site of action in 1992 was not known.  The known fact that gabapentin reaches the brain should have alerted the sponsor to explore possible adverse central nervous system (CNS) effects.  The first FDA-approved indication for gabapentin was as adjunctive treatment of refractory partial epilepsy in adults.

### B.     Overall Safety

26.     The safety documentation for gabapentin in 1992 was limited to 43 clinical studies.  Only 8 of the studies in epilepsy were placebo-controlled while 23 were uncontrolled.  Twelve were studies in migraine and epilepsy.  1,607 patients received gabapentin in the clinical

studies.

The FDA review concluded that there were "several important concerns." The more serious events which "may limit the drug's widespread usefulness" included (a) seizures that may become significantly worse or lead to status epilepticus, (b) malignancies, (c) depression that "may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts" and (d) nephrotoxicity. Gabapentin has a risk profile that was considered uncertain with important adverse events that have not yet been fully characterized.

## C.  Depression

27.    A total of 78 (5.3%) of the 1,607 patients were reported to have incident depression and in nine cases treatment was withdrawn (p. 114). Seven cases were considered serious. These numbers do not include 4 suicidal cases with two withdrawals, 1 or 2 suicide gestures and 5 or 6 intentional overdoses (p.109). A large number of patients who were not withdrawn received medical treatment. According to a footnote to the Table on page 109, it appears that these cases were not fully accounted for by the Sponsor. "These patients appear to have fallen through the cracks."

Each investigator was asked to report the likelihood of drug attributability. Four of the nine reported serious adverse events of depression were considered unlikely to be drug-related (p.105). Five of those events (in four patients) were considered possibly or probably drug-related, plus two cases of drug overdose (p. 107).

One patient who developed depression with suicidal ideation was re-challenged. The serious adverse event of depression with suicidal ideation recurred when the patient was given gabapentin.

In the Summary section, the review stated that "accumulated long range safety data are limited by the excessive attribution due to apparent lack of sustained efficacy."

The review was signed by the medical and statistical reviewers and three superiors.

28.   In my opinion, there is a very strong signal that gabapentin increases the risk of depression with or without suicidal ideation and may lead to intentional drug overdosing. My reasons are as follows:

a.   the large number of reported events of depression with or without suicidal ideation, many of which were considered serious and led to treatment withdrawal.

b.   The higher rate of depression in the gabapentin-treated patients compared to the placebo controls.

c.   the fact that more than half of the serious events were considered drug-related by the investigators.

d.   the rechallenge case who had the depression and suicidal ideation recur when given gabapentin a second time.  This is considered evidence of causation.

e.   the fact that the FDA review highlighted depression as a safety concern that could lead to limited usefulness of gabapentin.

f.   the lack of long-term safety data for a drug intended for long-term use.

g.   the fact that five FDA officials signed the review.

29.   The strong safety signal of depression observed in 1992 was subsequently confirmed. The FDA issued a Safety Alert concluding that patients receiving gabapentin and other antiepileptic drugs have approximately twice the risk of depression with suicidal ideation attached hereto as Exhibit D.

### D.      Pursuit of Safety Signal

30.      Identification of safety signals by the FDA for any drug places the burden on the Sponsor to conduct more research prior to promoting the drug. The goal is to determine whether this signal can be confirmed (as was the case with gabapentin) or whether it can be refuted.

This pursuit should be:

a.      timely to limit the extent of harm to patients if the drug is shown to be harmful. The timeliness is more important for marketed drugs. The extraordinary delay of 16 years, in confirming that gabapentin doubles the risk of serious depression, is totally unacceptable and reflects the Sponsor's failure in pursuing the safety signal.

b.      sufficient in scope to improve the precision of the testing.

c.      applied to the use of the drug for any indication, since adverse effects typically are unrelated to the purpose of its use. The fact that gabapentin enters the blood-brain barrier makes assessment of CNS effects such as depression even more relevant.

During the pursuit, the drug's use should be specifically avoided in high-risk patients, that is those who already have the condition that the drug may cause or those who otherwise are at an increased risk of that event. Patient safety should be a high priority by sponsors and investigators. Moreover, during the pursuit, it is misleading and unethical for a Sponsor to claim that the drug has a therapeutic benefit while denying the existence of evidence that the drug may lead to a worsening of outcomes in the same

therapeutic area.

31.     In testing and promoting gabapentin in patients with bipolar and mood disorders, the
        Sponsor violated accepted moral, regulatory and scientific principles.

32.     The failure by the Sponsor to disseminate openly the evidence that gabapentin may cause
        depression with and without suicidal ideation, while promoting the drug with claims of
        benefit for mood, is equally appalling.

        A responsible Sponsor would have:

        a.      included promptly in the Investigator Brochure a warning that participants in
                research projects should be on alert to the risk of depression with and without
                suicidal ideation.  This information was delayed for two years in the U.S.  It is
                unclear why non-U.S. investigators were properly informed in 1992.

        b.      included in the Informed Consent form a statement that depression with and
                without suicidal ideation was a significant risk.  It is remarkable that the Informed
                Consent form for protocol 945-209 "Gabapentin adjunctive treatment in patients
                with bipolar disorder" fails to alert potential trial participants and the Institutional
                Review Boards (IRBs) about the higher risk of depression with and without
                suicidal ideation.  This is a serious violation of regulations of research.

        c.      added to the initial package insert a proper warning that gabapentin may cause
                serious depression with and without suicidal ideation.  A drug company can make
                changes in the drug label at anytime without FDA approval, if they are necessary
                for safety purposes.  The patients are the ultimate victims, if the labels are
                incomplete, incorrect or out-of-date.

d.      disseminated through scientific articles and presentations safety information about the risk of depression with and without suicidal ideation.   The practice of medicine is based on evidence from research studies.   It is critical that research findings, good or bad, be reported and published in an unbiased and timely manner.   Delay in conveying or suppression of unfavorable findings by Sponsors violates the generally accepted standards and fundamental principles of medical research.   The Sponsors failed miserably on this account.

## V.     THE DIMOND ET AL. ARTICLE

33.     Over the past decades, scientists have developed questionnaires designed to capture indices of health-related quality of life. These instruments are commonly used in evaluating drugs effects.   It is obviously important to learn whether and to what extent drugs improve or worsen patients' quality of life.   Two of the domains relate to patient's well-being and emotional state, respectively.   There are a large number of questionnaires available.

34.     One aspect of health-related quality of life relates to functioning.   A commonly used questionnaire focuses on Activities of Daily Living (ADL).   This self-maintenance scale addresses seven functions:

1.      Toilet

2.      Feeding

3.      Dressing

4.      Grooming

5.      Physical Ambulation

6.      Bathing

7.      Responsibility

The ADL instrument does not measure mood or well-being!

35.    The title of the article by Dimond et al. is "Effect of gabapentin (Neurontin) on mood and well-being in patients with epilepsy."  The major flaw of the article is that it does not have any valid data on mood or well-being.

36.    In spite of the fact that the study didn't present any data on the gabapentin effect on mood and well-being, the authors misleadingly concluded that:

a.      gabapentin improved general well-being

b.      the findings supported reports of improved affective status

c.      patients reported improved general condition

d.      more patients treated with gabapentin reported global improvement than those treated with placebo in all five add-on therapy trials.

e.      data suggest a beneficial effect of gabapentin on … "the cognitive, affective and social aspects of the QoL measure."

f.      their findings "support gabapentin's lack of adverse effects on mental functioning," a false claim directly contradicted by the FDA's medical review.

37.    The unsubstantiated claims from this flawed study have no scientific or clinical value. One can't make claims for something that was not measured.  The investigators in one of the studies included in the article even admitted that "patients' affective, cognitive and social improvements were not being adequately captured by the ADLs rating."

Page  17

38.   Other flaws or limitations of the article are:

    a.    post-hoc analyses which mean that no conclusions regarding treatment benefit should be drawn.

    b.    multiple comparisons, which complicate the statistical analysis.

    c.    sponsorship with all authors being employees of the manufacturer of gabapentin, creating an enormous conflict-of-interest concern.

    d.    most remarkable is the complete omission of any reference to the evidence that gabapentin increases the risk of depression with and without suicidal ideation. Depression is clearly a measure of mood!

39.   A thorough review of the clinical trial evidence regarding the effect of gabapentin in bipolar disorder by Dr. Jeffrey Barkin concluded appropriately that the drug has no documented benefit. In spite of this lack of benefit, the Sponsor marketed gabapentin for this indication.

40.   The off-label promotion of a drug when the Sponsor conceals evidence that directly contradicts the promotional claims is fraud on the medical and scientific communities and the patients they treat. As a result, prescribers and patients are provided an expensive and harmful drug with no expected benefit. It is wasteful to society and health plans. What's worse, by prescribing gabapentin, other beneficial treatment alternatives may have been withheld. There is no defense for the sponsor's inexcusable behavior.

## V.    CONCLUSIONS

41.    a.    An FDA review in 1992 showed evidence that gabapentin is associated with a higher risk of serious depression with and without suicidal ideation.

b.    The Sponsor failed to actively pursue this strong safety signal.

c.    The Sponsor also delayed or suppressed dissemination of this important safety information to investigators, physicians in clinical practice and patients in violation of fundamental regulatory, scientific and ethical principles.

d.    The Sponsor engaged in the fraudulent off-label promotion of gabapentin for indications, including bipolar and other mood disorders, even when there was no evidence of treatment benefit and despite the existence of evidence of treatment worsening.

42.    I reserve the right to amend, edit and supplement my opinions upon review of

additional information produced from this litigation.


My consultant fee for the Plaintiff is $500 per hour.

Signed this 9th day of December, 2008


Curt Daniel Furberg, M.D., Ph. D.

Page  20