# EXHIBIT B

# SUPPLEMENTAL REPORT ON THE USE OF NEURONTIN FOR BIPOLAR AND OTHER MOOD DISORDERS

## INTRODUCTION

I have been asked to provide a supplemental report as to whether Defendants[1] made materially false, misleading, omissive, incomplete and untruthful statements in early materials used for marketing gabapentin as an effective treatment for bipolar and other mood disorders. Specifically, I have been asked to comment on the materiality and relevancy of data, contained and summarized in the FDA's medical review of gabapentin (Neurontin) for the adjuvant treatment of epilepsy indicating the occurrence of clinically significant depression as a treatment-emergent adverse event, to a discussion of the effects of gabapentin on mood disorders. Furthermore, I have been asked to offer opinion on whether such data should have been disclosed to physicians in the course of discussion, presentations and marketing of gabapentin for mood disorders.

In arriving at my opinions, I will first discuss the evidence of gabapentin's effect on mood that was made available to Defendants through the FDA's review of their New Drug Application (NDA) for Neurontin. I will then discuss early marketing materials in light of that evidence.

In the course of preparing this supplemental report, I have reviewed the Expert Report of Curt Daniel Furberg.

The opinions offered in this supplemental report are wholly in concert with the opinions offered in my July 25, 2008 report entitled "Report on the Use of Neurontin for Bipolar and Other Mood Disorders." In fact, documents reviewed in the course of preparing this supplement report bolster my core opinions that gabapentin is an ineffective medication for the treatment of mood disorders that was misleadingly marketed as effective by Defendants who continually suppressed negative evidence.

## EARLY EVIDENCE OF GABAPENTIN'S EFFECT ON MOOD AVAILABLE TO DEFENDANTS

As part of Neurontin's NDA for the adjuvant treatment of partial seizures, the FDA conducted a medical review authored by Dr. Cynthia McCormick using data obtained from the clinical trials of gabapentin mostly in epilepsy. (Pfizer_LAlphs_0084338). In this review, Dr. McCormick discusses certain adverse events that were both serious and frequent, including a section on depression, suicidal ideation and suicide attempts. Dr. McCormick finds that "[i]n the total exposed population of the NDA 78 (5.3%) patients reported depression as an adverse event." Additionally, it appears that "numerous examples were identified among the CRF's [Case Report Forms] where a patient developed treatment emergent depression where pharmacological intervention was required and the report of a serious adverse event was not made." Within the 78 patients, 19 had no history of depression.

1

In Dr. McCormick's conclusion, she writes that "[l]ess common but more serious events may limit the drug's widespread usefulness," specifically "that depression, while it may be not an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." Dr. McCormick states that "gabapentin has a risk profile that is uncertain" and includes "clinically significant depression." Finally, Dr. McCormick recommends that the NDA is "approvable…for use in a specific population."

This medical review has an original receipt date of January 31, 1992 and appears to have been signed in 1993. I note that this review was enclosed as part of a Parke-Davis memorandum from Janeth Turner to employees from several departments on July 28, 1994. (Pfizer_LAlphs_0084338).

This medical review highlights a number of troubling points. In addition to the large number of patients with depression with or without suicidal ideation (an elevated relative risk of 60% compared to placebo), certainly very concerning in and of itself, investigators noted more often than not that these adverse events were related to exposure to gabapentin. In one particular case, a patient developed mood symptoms while taking gabapentin that abated upon withdrawal, only to return with a rechallenge. The fact that five FDA officials signed this review, not just Dr. McCormick, underscores the importance of this review. The safety signal found in the FDA's review warranted further study, which unfortunately was not done. I note that these conclusions are shared by Dr. Furberg who describes a "very strong signal that gabapentin increases the risk of depression with or without suicidal ideation"[2] in his report. Dr. Furberg writes that: "[t]his strong safety signal of serious adverse events should have been actively pursued in the testing of gabapentin prior to any marketing of the drug as effective for mood."[3]

The safety signal described by Dr. McCormick during the course of her review of gabapentin's potential use in one specific patient population (patients with epilepsy) provides the first systematically-obtained data from clinical trials evidencing gabapentin's effect on mood. This data indicates a lack of beneficial, and possible negative, effect on mood and is consistent with what later double-blind, randomized placebo-controlled (DBRCT) trials showed, that gabapentin is ineffective as a mood-stabilizing agent. When Defendants decided to market gabapentin as an effective treatment for mood disorders, including bipolar disorder, what was a safety signal noted in the epilepsy trials, became evidence that contradicted their marketing message. At a time devoid of DBRCT, when the marketing of gabapentin was based purely on anecdotal reports of positive outcomes, this evidence should have been disclosed as it would have been material to a physician making an informed prescribing decision.

## DEFENDANTS' MARKETING OF NEURONTIN OMMITTED MATERIAL EVIDENCE OF NEURONTIN'S EFFECT ON MOOD

The marketing materials discussed here pre-date those discussed in my initial report. Nevertheless, these materials fit fully with the conduct described in my initial

2

report, specifically Defendants' non-disclosure of important evidence for the purpose of convincing physicians that Neurontin was a safe and effective treatment for mood disorders.

In May 1995 Defendants circulated a Marketing Assessment of Neurontin's use in psychiatric disorders. (WLC_FRANKLIN_0000179640). Janeth Turner and many of the recipients of her previously discussed memorandum were on the distribution list of this Marketing Assessment. The stated purpose of this document was to "provide assessment of the market potential for Neurontin® in the treatment of Bipolar Disorder." Despite "the lack of scientific rationale," one of the key motivating factors for such an assessment appears to be the "well noted patient reports of improved mood and decreased anxiety from epilepsy trials suggest[ing] Neurontin® may be effective in the treatment of acute mania and prophylaxis of bipolar disorder." Nowhere in this document is the FDA's finding of "clinically significant depression" occurring as a serious and frequent adverse event in the same epilepsy trials discussed. It is simply inexplicable how the FDA's findings could not have been germane to this assessment. Yet, it appears as if the FDA's findings were simply ignored; the assessment recommends an exploratory study in patients with bipolar disorder, the results of which were to be published "if positive." At this pivotal juncture, Defendants possessed evidence that gabapentin may *not* be an effective treatment for mood disorders, yet chose to ignore it, basing their decision to pursue marketing on patient reports alone and in the absence of scientific rationale. Moreover, Defendants, aware of the safety signal from the FDA's review, chose to study their drug in a patient population considered at high-risk of depression with or without suicidal ideation. This document represents a startling glimpse at the inception of a fraudulent marketing scheme where a company placed profits ahead of evidence, safety or even rationale. Defendants do not even appear to acknowledge the negative evidence in the course of arriving at their decision to pursue the marketing, and study the effect, of Neurontin for bipolar disorder.

Between October 24, 1995 and June 25, 1996, Defendants held 13 teleconferences where physician-listeners were exposed to claims that Neurontin was effective for bipolar and other mood disorders based only on favorable anecdotes. (WLC_FRANKLIN_0000199943; WLC_FRANKLIN_0000096571). Each call had as many as 25 physician listeners. (WLC_FRANKLIN_0000199943). The majority of calls were moderated by Dr. Marcotte, with the remainder moderated by Dr. Martin Stein. Defendants knew in advance that Dr. Marcotte and Dr. Stein would favorably present Neurontin as a treatment for mood disorders. Specifically, the company was aware that Dr. Marcotte would present Neurontin as a mood stabilizer. (WLC_FRANKLIN_0000199668). In fact, Defendants prepared the outline for Dr. Marcotte's presentation, and met with him before hand "to go over the information." (WLC_FRANKLIN_0000199997). The outline was limited to topics that favorably presented Neurontin's use for bipolar and other mood disorders. Specifically, Dr. Marcotte presented anecdotes on how "Neurontin evolved into a first line therapy option" in his practice, including the number of bipolar patients treated with Neurontin and the "success" achieved, in the form of "1 to 2 patients." (WLC_FRANKLIN_0000199997). The outline makes no mention of data from the FDA's review or that Neurontin could

3

lead to a worsening of mood symptoms. The company also had met with Dr. Stein prior
to the calls, and knew that he would present favorable anecdotes from his practice.
(WLC_FRANKLIN_0000220839). Similarly, there is no evidence that Dr. Stein was
furnished with data from the FDA's review. The data and conclusions present in the
FDA's review would have been relevant to these presentations. For moderating the calls,
Marcotte and Stein received $500 per talk. (WLC_FRANKLIN_0000065202). While
territory managers were not allowed to dial into the calls, they were encouraged to bring
lunch to the offices of physician-listeners at the time of the call or otherwise attempt to be
in the office to "insure that that the doctors call in at the appropriate time."
(WLC_FRANKLIN_0000199943).

On April 20, 1996, Defendants held a Consultants Conference on Affective
Disorders in Marco Island, Florida, attended by numerous psychiatrists in the southeast.
(WLC_FRANKLIN_0000199743). At the meeting, Medical Liaison Lee Anne
Fogleman reviewed the "retrospective data for Gabapentin in the treatment of affective
disorders, and the current and future prospective trials." (WLC_CBU_039398).
Subsequently, Drs. Stein and Marcotte gave presentations that were substantially similar
to the presentations they gave in the teleconferences. (WLC_CBU_039398). There is no
evidence that the data from the FDA's review was presented. The data and conclusions
reached by Dr. McCormick would have been relevant to the topics of these presentations.

In February 1996, Defendants submitted an article entitled "Effect of Gabapentin
(Neurontin®) on Mood and Well-Being in Patients with Epilepsy" published in *Progress
in Neuro-Psychopharmacology & Biological Psychiatry[4]*. The article (authored by
several employees of Parke-Davis: Kate Dimond, Atul Pande, Linda LaMoreaux and
Mark Pierce) appears to examine pooled "global improvement data" from the five
controlled epilepsy trials to "assess the effects of gabapentin on mood"; these are the
same trials the FDA had reviewed as part of the NDA. The rating scales that are pooled
(global improvement and Activities of Daily Living (ADL)) are not scales used in clinical
practice to measure mood or affect. Rather, ratings scales specific for depression, such as
the Hamilton Depression Rating Scale, are employed when using rating scales. Despite
this methodological flaw, the article's abstract notes that "[f]indings support anecdotal
reports of improved affective status among patients taking gabapentin and suggest that
the study of gabapentin in psychiatric populations may be warranted." The discussion
goes even further: "In agreement with anecdotal reports of improved mood and cognition
in gabapentin-treated epileptics, present data suggest a beneficial effect of gabapentin on
mood" (internal citations omitted). The authors warn that "[s]ince the present study is a
retrospective examination of data from trials in epilepsy where psychiatric effects were
not the primary focus, only cautious conclusions must be drawn." Moreover, the authors
cite to limitations of their analysis from the pooling of "inadequately defined measures of
'well-being.'" Nevertheless, the article concludes: "the present analysis of general well-
being with add-on gabapentin therapy suggests that not only did gabapentin-treated
patients not fare any worse than placebo patients, they showed enhanced well-being. At
the very least, these findings support gabapentin's *lack of adverse effects on mental
functioning*" (emphasis added). The FDA's findings, garnered from *the same data
source*, are not disclosed.

4

The FDA's findings, specifically that clinically significant depression may become worse or occur *de novo*, are material facts that are not disclosed in this article. Given that two of the authors of this article were also recipients of Janeth Turner's memorandum enclosing the results of the FDA's medical review, I can only conclude that the FDA's finding were omitted misleading the reader to believe that gabapentin had both a beneficial effect on mood and was free of adverse effects on mood through an incomplete and flawed analysis of gabapentin's effect on mood in patients from the epilepsy trials. The authors, aware of contradictory evidence derived from the same data pool being studied, do not arrive at "cautious conclusions." Instead, this study of pooled secondary outcomes, some of which were started mid-study (when investigators "noted that patients' affective, cognitive, and social improvements were not being adequately captured"), sounds the illogical and unsupported message of gabapentin's efficacy and safety as a treatment for mood disorders. The authors of this study draw conclusions about gabapentin's effect on mood and affective function from data, not about mood, but mostly related to general functioning and activities of daily living, and ignore data indicating gabapentin's negative effect on mood.

## CONCLUSIONS

Systematically-derived data from Defendant-sponsored clinical trials in epilepsy, presented in the FDA's medical review of Neurontin's NDA for the adjuvant treatment of epilepsy, provide early evidence of gabapentin's lack of beneficial, and possible worsening, effect on mood. The FDA's medical review summarizing this evidence was available to Defendants before any marketing of Neurontin for mood disorders began. This evidence is consistent with what later DBRCT's showed and would have been material to the physician making an informed decision to prescribe gabapentin for a mood disorder. I find no documentation that this evidence was disclosed (a) during teleconferences providing anecdotal reports of gabapentin's positive effect on mood, (b) in the published Dimond et al. article that investigated the same epilepsy trials as the FDA and concluded that gabapentin improved mood, or at least did not adversely affect it, or (c) any of the published articles from the epilepsy trials. The suppression of the FDA's medical review, the safety signal contained therein and the underlying data concerning effect on mood, allowed the company to promote gabapentin as an effective and safe treatment for mood disorders, based solely on anecdotal reports and free from the impairment on sales that disclosure of this negative data would have created. The withholding of the negative data found in the FDA's review is further evidence that, during the course of promotion of gabapentin as a treatment for mood disorders through anecdotal reports of benefit, Defendants continually possessed and suppressed non-anecdotal negative evidence.

5

Please note that the foregoing is based on my experience, training, education and the information I have reviewed or am generally aware of.  A full list of information that I have reviewed is attached as Appendix A.  I reserve the right to supplement this report if additional information is made available.


_____
Jeffrey S. Barkin, M.D.


_____
Date

---

[1] For the sake of simplicity, I will use the term "Defendants" to apply to both Parke-Davis and Pfizer.
[2] Expert Report of Curt Daniel Furberg, M.D., Ph.D. dated December 9, 2009 (Furberg Report) p.13.
[3] Furberg Report p.8.
[4] Dimond KR, Pande AC, LaMoreaux L, Pierce MW, Effect of Gabapentin (Neurontin) on Mood and Well-Being in Patients with Epilepsy, *Prog Neuropsychopharmacol Biol Psychiatry* 1996;20:407-17.