# EXHIBIT A

# In The Matter Of:

## IN RE: NEURONTIN MARKETING & SALES PRACTICE LITIGATION

### CHARLES ROY PHILLIPS
### December 16, 2009

# MERRILL CORPORATION
25 West 45th Street - Suite 900
New York, NY 10036
PH: 212-557-7400 / FAX: 212-692-9171

PHILLIPS, CHARLES ROY - Vol. I

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-oOo-

|  |  |
|---|---|
| IN RE NEURONTIN MARKETING AND ) <br> SALES PRACTICES LITIGATION ) <br> _____) <br>  ) <br> THE GUARDIAN LIFE INSURANCE ) <br> COMPANY OF AMERICA,  ) <br>  ) <br> Plaintiffs, ) <br>  ) <br> vs. ) <br>  ) <br> PFIZER INC., et al., ) <br>  ) <br> Defendants. ) <br> _____) <br>  ) <br> AETNA, INC.,  ) <br>  ) <br> Plaintiffs, ) <br>  ) <br> vs. ) <br>  ) <br> PFIZER INC., et al., ) <br>  ) <br> Defendants. ) <br> _____) | CASE NO. 04 CV 10739 (PBS) <br><br><br><br><br><br><br><br><br><br> CASE NO. 04 CV 10958 (PBS) |

DEPOSITION OF CHARLES ROY PHILLIPS, M.D., F.A.C.E.P.

FRESNO, CALIFORNIA

DECEMBER 16, 2009

REPORTED BY: RACHELLE L. GEHRKE-LEY, CSR NO. 13257

CHARLES ROY PHILLIPS, MD

Page 2

```
 1  APPEARANCES OF COUNSEL:
 2
    FOR THE PLAINTIFFS, KAISER:
 3
       Don Barrett, P.A.
 4     By: DON BARRETT
       404 Court Square North
 5     P.O. Box 987
       Lexington, Mississippi 39095
 6     TEL (662) 834-2376
       FAX (662) 834-2628
 7
 8  FOR THE DEFENDANTS, PFIZER, INC.:
 9     Skadden, Arps, Slate, Meagher & Flom, LLP
       By: STEVEN F. NAPOLITANO
10     Four Times Square
       New York, New York 10036
11     TEL (212) 735-2187
       FAX (917) 777-2187
12
13  ALSO PRESENT:
14     Andrea Baker, Videographer
15
16
17
18        Deposition of CHARLES ROY PHILLIPS, M.D.,
19  F.A.C.E.P., taken at the offices of Fresno Court Reporters &
20  Legal Video, 2377 West Shaw Avenue, Suite 206, Fresno,
21  California, on Wednesday, December 16, 2009, at 8:04 a.m.,
22  before Rachelle L. Gehrke-Ley, Certified Shorthand Reporter,
23  in and for the State of California.
24
25
```

Page 3

```
 1                    INDEX
 2
 3  WITNESS: Charles Roy Phillips, M.D., F.A.C.E.P.
 4
 5  EXAMINATION                              PAGE
 6  By Mr. Barrett                             7
 7  By Mr. Napolitano                        122
```

Page 4

```
 1  CHARLES ROY PHILLIPS, M.D., F.A.C.E.P.
 2  IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION
 3         WEDNESDAY, DECEMBER 16, 2009
 4
 5              INDEX TO EXHIBITS
 6
 7  EXHIBIT  DESCRIPTION                         PAGE
 8    1    Attachment A                    11
 9    2    Charles Phillips, M.D., Requirements    36
10    3    Rescue Health Care Day - The Killing Fields  54
11    4    Kaiser Permanente - The Unauthorized Tour   62
         and Document Summary - Page 3
12
         5    Kaiser Permanente - The Unauthorized Tour   67
13       and Document Summary - Page 37
14    6    Rescue Health Care Day - Talk About Kaiser  71
         Chutzpah (Nerve)
15
      7    03/13/2002 Letter              73
16
      8    The Amherst Student Online - The Dark Side  78
17       of Managed Care
18    9    Medical Board License Revocation      87
19   10    Medical Board Decision           89
20   11    Dr. Phillips' Curriculum Vitae       12
21   12    Dr. Phillips' Kaiser Permanente Card    19
22   13    Binder No. 1                21
23   14    Binder No. 2                24
24   15    Choice of Anti-Hypertensive Agents in   29
         Special Patient Groups and Selected
25       Anti-Hypertensive Drugs
```

Page 5

```
 1              INDEX TO EXHIBITS
 2                  CONTINUED
 3
 4  EXHIBIT  DESCRIPTION                         PAGE
 5   16    TPMG - Pool Physician Handbook      101
 6   17    Protective Order Agreement        126
 7   18    Kaiser Permanente Medical Service Agreement  175
 8   19    Selected Writings of Dr. Charles Phillips -  183
         Former Kaiser Permanente Physician
 9
     20    Kaiser Permanente 2009 Formulary     185
```

Page 26

1  describes the -- and the introduction is how they go about
2  making drug decisions, which I think is important, and then
3  they have every drug listed for its common use and sometimes
4  its off-label use and then they -- so they would introduce
5  how the doctor is to understand the book itself, which
6  outlines exactly how the system works, and then each drug,
7  including Neurontin, gets put in there. That's online at the
8  moment, one particular year of that book is online. If we
9  needed a copy of it or not we could refer to it that way.
10     Q. Right. Right.
11     A. Now the physicians themselves get pocket cards of
12  what to prescribe and so I have a sample of a physician
13  pocket card. For example, on a hypertension they steer
14  everyone into one medication, if possible. And so our
15  preferred medicine for hypertension is lisinopril and then
16  everyone goes there and then they -- on the same card will
17  often have splitting that when you want to give someone
18  20 milligrams of lisinopril you give them 40 and a splitter.
19     Q. Right.
20     A. So for the cost -- for the same cost they create
21  two pills.
22     Q. Right.
23     A. So I have been --
24     Q. You have documents that relate to those things?
25     A. I have a huge interaction with that because that's

Page 27

1  what first got me upset --
2     Q. Right.
3     A. -- when I was in the emergency room, including --
4  to show you as needed what it looks like when you open the
5  pill bottles and the fragments and --
6     Q. Right. Okay.
7     A. So -- and then -- okay. So we have formulary, we
8  have the pocket guideline. I have the clinical practice
9  guidelines by which they send out to every doctor what they
10  want to do in certain illnesses and within that it focuses
11  down to the medication to give and out pops the pocket card
12  as they receive these clinical guidelines.
13     Q. Okay. And is this a publication that Kaiser --
14  it's a Kaiser publication?
15     A. This is something Kaiser considers its most top
16  secret is its ways of organizing care.
17     Q. Uh-huh.
18     A. So they try not -- that's one thing they try never
19  to have available in any form.
20     Q. Let me -- let me see that.
21     A. Okay. I'm going to step away from the
22  microphone --
23     Q. Okay.
24     A. -- for a second. I don't know if we show empty or
25  if we --

Page 28

1     MR. BARRETT: We'll go off the record.
2     THE WITNESS: -- how to make this all in reach. I
3  haven't figured that out.
4     THE VIDEOGRAPHER: Going off the record. The time
5  is 8:45.
6     (Off the record.)
7     THE VIDEOGRAPHER: Going back on the record. The
8  time is 8:53.
9  BY MR. BARRETT:
10     Q. Okay. Dr. Phillips, we went off the record for you
11  to fetch a -- the documents you were talking about, the card,
12  and this is -- tell me what that is that you have there?
13     A. All right. This is a card that Kaiser Permanente
14  physicians, they prefer, have in their pockets so that when
15  they go to select something for hypertension, for example,
16  the card will, through dollar signs and other approaches seen
17  on the card, will direct them toward a particular medication
18  and it will --
19     Q. Okay.
20     A. -- sometimes encourage them to give the double dose
21  and split.
22     Q. Okay. May I -- may I see that?
23     A. Yes.
24     Q. All right. I'd like to have this marked -- this is
25  a -- you need to have a copy? You want this back; don't you?

Page 29

1  Or just --
2     A. I'd like all -- all these things copied and
3  returned, so ...
4     Q. Okay. All right.
5     MR. BARRETT: Can' -- I'd like to have this card or
6  we'll make a copy of it and mark the copy as Exhibit --
7     THE VIDEOGRAPHER: 15.
8     MR. BARRETT: -- 15. We won't stop the deposition
9  for that because that won't take but a second.
10     (Whereupon, Exhibit No. 15 was marked for
11  identification.)
12  BY MR. BARRETT:
13     Q. And you have a little --
14     A. Well, what -- what most physicians in the country
15  carry in their pocket is, instead of individual cards, is
16  this little book is probably the most popular in it's
17  variation.
18     Q. That's not a Kaiser publication?
19     A. No, I'm just saying that that's more commonly what
20  I've used ever since. But within Kaiser I didn't see -- I
21  never saw one, but perhaps there are some.
22     Q. Okay. And this -- and what this is is it's called
23  a Tarascon Pocket Pharmacopoeia?
24     A. Yes, for $10 a year you can get a book that has
25  every medication listed, it's common doses, it's off-label

Page 38

1  you your standard fee as set out in this --
2      A.  My --
3          MR. NAPOLITANO: Objection -- let me just --
4          THE WITNESS: Okay.
5          MR. NAPOLITANO: -- object to the form and make a
6  brief statement.
7          MR. BARRETT: No, no, no, wait a minute, Steve,
8  let -- I want Dr. Phillips to testify.
9  BY MR. BARRETT:
10     Q.  Just tell us -- first, tell us exactly what they
11  told you.
12     A.  My understanding is at a point in time that they
13  will advance the money to me at a point in time they will,
14  before the judge, ask for a split of time and represent what
15  I -- you'll next ask me is whether -- how I would come to
16  that figure.
17     Q.  By "split," do you mean part to us and part to
18  them?
19     A.  Yeah, in some way a portion, whatever that means,
20  winning or losing, at that point in time.
21     Q.  Okay. All right. Did any Pfizer attorney tell you
22  that you had been designated as a fact witness and that you
23  had not been designated as an expert witness?
24         MR. NAPOLITANO: Objection to form.
25         THE WITNESS: They said that I was not retained and

Page 39

1  there is no retainer, and I think that's in the first form, I
2  don't know the legalities of the terms, but I was not -- in
3  that category I was talking about things I knew about this.
4  So it sounds like your fact -- I don't remember the exact
5  words, but it was -- there are two types and I know --
6  anyway, it was in a mode in which there was to be no
7  prepayment. I at first was asking for prepayment, which is
8  common. But, in any case, I said, "Well, I'm available and
9  if someone can come up with this I'm available to be
10  deposed."
11  BY MR. BARRETT:
12     Q.  Okay.
13     A.  I understood there's nothing about preparation.
14  You can tell I've done 30 hours, but that's not -- in this
15  situation is not relevant.
16     Q.  Well, Dr. Phillips, you did get a -- you said it's
17  in that notebook and we'll see it when it comes back, but you
18  did say that my colleague, Barry Himmelstein, sent you an
19  email to advise you that we were going to be -- that is the
20  Kaiser lawyers would be not willing to pay you, you
21  understand that?
22     A.  I did get that.
23     Q.  Okay. All right.
24         MR. NAPOLITANO: Don, since there's not a question
25  pending and the witness is representing what Pfizer's lawyers

Page 40

1  position is, I'd like an opportunity to put it on the record
2  right now so there's no ambiguity from our point of view and
3  I am not taking any material issue with what Dr. Phillips has
4  testified about. I'm sure the correspondence that comes back
5  in the binder will reflect the fact that we did inform
6  Dr. Phillips that he is not a retained expert witness in this
7  case. Pfizer made a Rule 26 disclosure identifying Dr.
8  Phillips as a non-retained expert from which expert opinion
9  will be elicited. We did not provide an expert report.
10  There was no requirement that we do so. But in keeping with
11  the practice in the MDL Neurontin litigation as a whole as
12  well as California state practice it is opposition that the
13  doctor is entitled to be compensated for his time today as
14  treating physician away from his practice. We -- we're
15  disappointed to find out that the plaintiffs were not going
16  to honor that agreement. We will be paying Dr. Phillips for
17  his time today and we will be seeking compensation back and I
18  don't need to -- from the plaintiffs' counsel and I don't
19  need to talk any more on that at this time.
20  BY MR. BARRETT:
21     Q.  Okay. Dr. Phillips, would you have testified today
22  if Pfizer's attorneys had not told you that they would
23  compensate you for your time?
24     A.  No, I run a clinic that bills 10,000 a day and --
25  only if I'm there, and gets paid 5,000 a day, and while I've

Page 41

1  volunteered to a number of issues around the country, I am
2  not choosing to volunteer to this. I additionally know that
3  when I was in Kaiser, and I have it with me, I was guaranteed
4  payment should any issue ever come up relating to a Kaiser
5  issue during my time of service, which in somewhat this
6  includes, whereby I would be paid by Kaiser, if cooperating
7  with the general defense theory, at the standard rate by
8  which the profession is paid at that point in time. At that
9  point in time I was at $100 an hour.
10     Q.  Okay. We'll talk about that later.
11     A.  At any rate, so the Kaiser does pay -- all the
12  people appearing for Kaiser will be on salary however they're
13  designated --
14     Q.  Okay.
15     A.  -- and benefits and retirement credit.
16     Q.  Okay.
17         MR. BARRETT: Let me have Exhibit 2 back at this
18  time and we'll move to admit Exhibit No. 2.
19         (Whereupon, Exhibit No. 2 was introduced into
20  evidence.)
21  BY MR. BARRETT:
22     Q.  Dr. Phillips, is it a fair statement to say that
23  you have an abiding dislike for the Kaiser organization?
24     A.  I don't have that feeling. They have wonderful
25  buildings, they have always -- they really -- the emergency

Page 42

1  room at Kaiser Fresno is laid out well. I can see the
2  sickest patients, the age formation, as one of the better
3  settings, and I've worked in maybe 50. So physically that
4  works. There are good people always in every organization.
5  So there are many within Kaiser I would put my life in their
6  hands. They always have the capacity to give care. My only
7  problem becomes if they don't exercise that. I have many
8  friends within Kaiser, many people come up to me who are in
9  Kaiser thanking me for taking the pressure off the frontline
10 by trying to help Kaiser live up to their ads.
11     Q.  And you do try --
12     A.  So I don't have a global issue that Kaiser could
13 not get to its -- what it says in its ads.
14     Q.  But you do -- you have undertaken as a project to
15 make Kaiser live up to the promises of its ads as you just
16 said?
17     A.  And others. We're now turning to Blue Cross these
18 last three months. That we are --
19     Q.  I don't care about Blue Cross. I just care about
20 Kaiser.
21     A.  Well, I care about giving my answer thoroughly and
22 I know you want me to be complete and in the completeness of
23 what we do there's a manage care reform committee which talks
24 about various national topics, Kaiser being the template for
25 all HMO's and now PPO's and POS's across the country as

Page 43

1  template as the one one would understand first. But one
2  instantly understands Aetna and other plans and our
3  particular focus this last two months has been -- well,
4  points its relationship to Anthem Blue Cross and we are
5  interested across the board in the national health scene.
6  And I participate both with congress as an invited person and
7  also the USA Today newspaper has invited me to participate.
8  And so I'm a participant to the national scene many times off
9  of Kaiser issues.
10     Q.  I want to talk about your experience with Kaiser.
11 You were a contract doctor, an on-call doctor, working in the
12 emergency room in the Kaiser Hospital in Fresno for about
13 18 months in 1997 through 1999; is that correct?
14     MR. NAPOLITANO:  Objection to form.
15     THE WITNESS:  I -- briefly, as I went to the
16 university first, because I've written textbooks and they
17 said, "We'll loan you to Kaiser."  So I was loaned by the
18 university to Kaiser as a subcontractor and paid through the
19 university at the -- but still put within the Kaiser's pool
20 group fire at will, in which one is an hourly doctor
21 performing emergency medicine services. So I was under
22 contract but -- and it was the -- I worked more than the
23 full-time and I did work on the days you -- I mean, the times
24 it was 18 months from September of 1997 to about March of
25 1999.

Page 44

1  BY MR. BARRETT:
2     Q.  And they would pay you by the hour when they needed
3  you? You were on-call; is that correct?
4     A.  It wasn't on-call. They called me and they would
5  formalize a schedule in advance around what I choose and
6  would pay first the university. But I found that I could be
7  paid directly by Kaiser twice a month and -- rather than once
8  a month, and at about halfway through they invited and I
9  said, "Fine, pay me directly."
10    Q.  And in 1999 Kaiser said that they didn't need you
11 anymore; is that correct?
12    MR. NAPOLITANO:  Objection to form.
13    THE WITNESS:  They kept me out -- it's a hard
14 question that always comes up, so thank you, is that, first
15 of all, I stayed on staff for like a whole other year and a
16 half. So that -- it wasn't like this is the end of the road.
17 They didn't give me anymore shifts and that occurred after a
18 letter I wrote to them about their ethical approach in the
19 emergency room and other areas. So that was the day after I
20 wrote a letter concerning their care.
21 BY MR. BARRETT:
22    Q.  And you've testified before that Kaiser no longer
23 calling on you or letting you go, however you want to express
24 it, cost you a month's income; is that right?
25    A.  Yeah, normally a physician board certified in

Page 45

1  emergency medicine can find a job within 30 days, it just
2  takes credentialing, and by stopping my income they
3  essentially took away 12, 15,000.
4     Q.  Was that a substantial cause of financial
5  difficulties you've had over the years, Dr. Phillips?
6     A.  It was an irritation at the time in the sense that
7  it led me to understand that -- not that act, but my general
8  experience led me to try to understand HMO's in general and
9  have been involved across the country and it's not been a
10 negative experience. By depositions alone with Kaiser I've
11 earned much more than that back from Kaiser and, as I say, I
12 have friends in Kaiser.
13    Q.  Okay.
14    A.  So in that it didn't -- it wasn't a negative
15 experience. At the time it was, it was irritating to lose a
16 month's salary.
17    Q.  Dr. Phillips, for a period of many years you've had
18 numerous federal tax liens and state tax liens and county tax
19 liens filed against you; have you not?
20    A.  Yes, I have.
21    Q.  Okay. As recently as January of 2007 you had a
22 federal tax lien of nearly $283,000; is that correct?
23    A.  That's correct.
24    Q.  Is it still outstanding? Has it been paid?
25    A.  I don't know if my personal taxes -- now, the

Page 130

emergency medicine so I hold that out as my specialty.
 Q. Okay. How many patients do you see on a typical day in your clinic?
 A. I might see 12. I'm responsible for 40. So the care is going on around me for which I am, by federal law, responsible to -- I've ordered the care but I also must watch over it.
 Q. Okay.
 A. So if I'm not there nothing happens.
 Q. Okay. How many years have you been a medical doctor now?
 A. You know, my only problem is where are we supposed to start the count? Do we do it at internship? I really don't know to this day. So, I mean, I graduated from medical school, that's sometimes used, in 1968. So that -- that would get us pretty close to above 40. So I don't -- so if anyone will ever tell me where to start, I'll do the math.
 Q. Okay. Are you licensed in any state other than California presently?
 A. I have been, but they each cost, so I just have California only, otherwise they all cost you each year to keep them up.
 Q. Okay. Could you just briefly describe for the jury very briefly your educational background, college leading up medical school?

Page 131

 A. Yes, I grew up in the Chicago area and went to New Trier High School, which was considered the best in the area, but more importantly went to Amherst College, I still think it's the best undergraduate college. There I was a biology major. I won math and physics awards. I was second in math and sixth in physics in my class. And vice business student council and tennis team and went on to Northwestern Medical School in Chicago. There I was organized care for an under privileged clinic while a student and we involved 300 medical students in giving care to the Puerto Rican community. And I was given the Upjohn Achievement award for -- by the dean personally for having changed the medical school to encompass that clinic, all it's pre-service. But I graduate in the top half of my class and greatly disappointed the dean that I was wasn't going to specialize. And I -- in fact, he put me in the Chicago Tribune against the neurosurgeon to show that I am something odd that being the top half of the class I don't want to specialize. I like the idea of every other doctor waiting for me to decide who needed what. So I very purposely stayed in general medicine and still liked that decision.
 Q. And where did you do your residency?
 A. Then I had two years in between because I had to work with a draft and chose that Vietnam was not an expression. And so I was consciously objective and worked in

Page 132

the emergency for two years and then chose a family practice residency that -- in Martinez, California, I think considered the best in the state at that point. While in the residency they made me head of the emergency room as a resident and I started teaching EMTs and paramedics. So by the time I was graduating as a resident I was already about to publish my first book.
 Q. And what was your first book on?
 A. My first book was for EMTs, emergency -- a basic life support skills manual. It was invited by the State of California because they said I'm one of the only doctors who's paying attention to emergency responders, that most doctors give that to nurses and they liked the idea that I was, as a physician, explaining what they should do, what the skills were. So the State of California and Nurse Lorraine Jitender called the east coast and connected me with publishers and then I got to choose who and that became a national skills book for EMTs published out of the east coast.
 Q. What year was it published?
 A. That was in 1976. And then the same company invited me to write my more famous book, which was the Paramedic Skills Manual, which went -- it's found around the world, and that was to lay out the skills for paramedic -- there was a lot of theory books, but no one was telling them

Page 133

what's the right time to do each skill and at what point are you taking too long and -- but to lay it out to the student by pictures. So paragraphed every step of every skill and then the testing criteria so that as they start a course they see the test, here is the skill, here is the time, this is what you need to do to pass, I thought was the fairest way to do it. So that led to national lectures and that's always been a calling card. If I take my book, which I have with me, and take it to Japan, for example, they let me ride out with the ambulances, as I've done, or Thailand, New Zealand, anywhere I show the book they say, "Well, you're part of the program, so go ahead and ride with us and learn more about it." So that's been part of my career up through and including Guam and where I set up paramedics.
 Q. Since graduating from medical school, have you continuously practiced medicine?
 A. Yes, in many variations. Occasionally administrative always, always tying back in to direct patient care.
 Q. Okay. Tell us again when the period of time was that you worked as a physician in the Kaiser Permanente system?
 A. Okay. I came back from Guam after setting up the paramedic system in 19 -- early 1997 and temporarily did what -- locums service until I established through the

Page 134

1  university that Kaiser would be the highest paying setting
2  for me, and Kaiser did my credentials in one day and in the
3  fall of 1997 called and said, "We need you next week." And
4  so I started work somewhere in that neighborhood of September
5  of 1997 and worked 18 months for Kaiser. In the middle of
6  that they offered me a partnership.
7      Q.  What does it mean when Pfizer -- or, excuse me,
8  what does it mean when Kaiser offers somebody a partnership?
9      A.  Well, they -- first you're -- they would like the
10 doctors to be partners. It's a for-profit partnership in
11 which you have various gradations on the way to being a
12 senior partner, it's all been spelled out to Medicare, and
13 they get a bonus if they can get an hourly doctor that they
14 like to move partnership, they get an immediate bonus for
15 doing that. So my boss in the emergency room said, "Why
16 don't you go up and talk to Dr. Kobo, the physician in
17 charge, about joining as a -- and they have the various
18 steps -- but joining at the bottom level. And so I went up
19 to his office one-on-one and they made me an offer. The
20 problem that they said is, "You're going to have to give up
21 any private practice." And I said, "I like to keep my own
22 little world. So I have a little office that couldn't
23 possibly compete with you and I do want to keep it." And
24 then they said, "And, by the way, because you're, what, 55,
25 or whatever, we're going to pay you less than a new

Page 135

1  resident."
2      Q.  Did Kaiser explain to you at any point why it was
3  important for them that you gave up your private work that
4  you were doing, essentially?
5      A.  They gave me a reasoning that I've sense decided
6  was an illusion, that it was an insurance problem, that
7  somehow having two types of insurance would compete in some
8  way. I don't believe that at all now, but that's -- they
9  made it into. I would complain and say, "Well, I see someone
10 doing the reserves. I see some of these folks doing little
11 things here and there." But they just said, "Absolutely you
12 give up the -- whatever your connections are. In fact, you
13 must always give it up as you join and become a partner, you
14 never leave, even on retirement." That's part of the deal,
15 is that you can -- you retire at, let's say, 20 years is
16 the -- and then you come back hourly. But unless they give
17 permission you can never work anywhere in the rest of your
18 life or you will forego the two million dollar value of
19 retirement.
20     Q.  I was going to ask, is it lucrative for a young
21 doctor to become affiliated with the Kaiser system as a
22 partner?
23     A.  It's hugely -- the average medical student is
24 coming out -- even with residency they don't catch up. So
25 they're ending up with 100,000 in debt is the standard at

Page 136

1  this point that I know of, and qualifying for a house and
2  starting your life, most are married, and starting your life
3  out is very difficult, and if you're in the east coast in the
4  snow, which they get many of their recruits from the New York
5  area, New Jersey, and say, "Come out away from the snow and
6  we'll get you a house, a loan that if you ever leave it's due
7  the next day, but otherwise we give you this down payment
8  home loan, help you get a house, and we'll forgive it in ten
9  years and we're going to give you a good salary, great
10 benefits, and come to the retreat." The retreat then is to
11 tell -- and they want the spouse to come too to tell the
12 couple then what's out there at the -- and it's all public,
13 so I'm just explaining.
14     Q.  Is there a document out there that lays out in one
15 place what you're explaining as the benefits of a doctor
16 becoming a Kaiser partner?
17     A.  Not in one place. I can usually assemble seven
18 documents together which would show it clearly. They have re
19 recruitment retention and how to talk to a new recruit at the
20 retreat, how the spouse liked it, all published.
21     Q.  Okay. If a doctor becomes affiliated with -- as a
22 partner in the Kaiser system and subsequently becomes
23 disenchanted and is publicly critical of Kaiser, what would
24 the ramifications of that be in your experience?
25     A.  Well, the first thing that happens is that Kaiser

Page 137

1  has a particular paragraph in the retirement program, which
2  I'm going to hold out to be, let's see, 12,000 a month for
3  life, so it's been evaluated as like a two million dollar
4  value. There's an alienation paragraph whereby the physician
5  will give it all up if they ever say anything anywhere that
6  might limit Kaiser's expansion, which is everything. So
7  there is a -- the moment a doctor wants to leave then they
8  are at risk for losing whatever equity they built up in terms
9  of vesting in intervals. So the doctors vested five years,
10 twelve years, it's all laid out and I have it with me.
11     MR. NAPOLITANO:  Okay. I think we better take a
12 break. The court reporter needs to change the tape.
13     THE VIDEOGRAPHER:  Here marks the end of Videotape
14 No. 2 in the deposition of Dr. Charles Roy Phillips. Going
15 off the record. The time is 11:45.
16     (Off the record.)
17     THE VIDEOGRAPHER:  Going back on the record. The
18 time is 11:47.
19 BY MR. NAPOLITANO:
20     Q.  So please complete your answer.
21     A.  You had asked maybe if there's one source that puts
22 at least some of it together. There was a point where the
23 government froze all physicians salaries while they tried to
24 figure them out, there was a national freeze, and I'm going
25 to put it in the 1980s. At that point Medicare was assigned

Page 138

to go to every physician group in the country and try to figure out who is paid how. And they invited Kaiser as one of the many participants to write up exactly how the doctors are paid and what's -- what profit is and how it all works and that was submitted to Medicare and then it was published. So there is -- and keep trying to find it because I loan books and then I don't get them back, but it's easily obtainable secondhand as the -- about 1985 Medicare report on physician payment and in there they specify all -- most of what I'm saying, the partnership levels, they say they're not salary, that they get to draw. The salary is only a draw against the total partnership profit splitting. And that Kaiser and the physicians get together at the beginning of every year and pick the profit goal, generally five percent, and they split it such that the doctors get half. Most of the gradations in the system is written by Kaiser themselves to Medicare and then published, it's all available, explains the levels and pretty much how it's set out. And then another source is I would expand --

Q. Okay.

A. -- that would be my sort of essential document.

Q. How many years have you been studying the operation of Kaiser?

A. Somewhat within, because I had issues we might get to, and then also ten years since.

Page 139

Q. So at least a decade?

A. Over a decade, yes.

Q. Okay. Are you aware of anybody that has put together more information about Kaiser and made it as publicly available as you have with respect to the operations of Kaiser?

A. No, I keep hoping that someone else would be a compatriot in this in some way to divide the -- because I -- now have to focus to Blue Cross and other areas. But, no, I -- only scattering. In fact, the neurosurgeon Dr. Seidman who's wrote Inevitable Incompetence as a description of what happened to his wife within Kaiser. But it's a small part of the puzzle. So I speak to physicians but I know no one else has taken the risk of it. It is extremely risky business.

Q. Doctor, have you become rich -- have you -- beyond your wildest dreams because of the work you've done in exposing Kaiser?

A. I've become poor beyond my wildest dreams because of becoming -- having to become what I guess Hippocrates was at the end as basically a roaming physician, because I do speak to what I think he was speaking to is the patient guarantee of the white coat that you will do trustable things and that sets me, as I've explained already, pretty much in the rural market all of the time. And even therein it makes me have to keep an eye on where is the next program. For

Page 140

example, the USA Today invited me to do a story about hospital records being altered and -- they invited me, I didn't look for that, and I was their main expert, I have it with me. It was published in the spring of 2008. The moment it came out two hospitals instantly knocked me off staff.

Q. Why was that?

A. Well, they -- each -- it was almost amusing because it was the day after and each gave their separate reason. Saint Agnes, a great hospital here, said, "This is our second warning. You haven't shown us a paper about malpractice," or something irrelevant. And I said, "You really don't want to do this." It became -- you're doing this because you're part of the California Hospital Association and two hospitals can't take this simultaneous action in the probability of things unless there's been a bit of a coordination, but in any case, there's not been one warning and you will never prove that I was warned that I needed to do anything. So I spoke to the chief of staff and I said, "You may go ahead with this if you wish but you might be the next story in the USA Today front page to follow up on what happens when you're with the first story." He said, "I think we've made a mistake here. There never was a first warning. You're fine. And that's okay." So I -- when you interact in these areas and you take risk -- the previous doctor three years early that helped the USA Today was driven out of his practice in

Page 141

Texas. When you generally nationally speak up to the patient issues really, that I think I speak clearly and openly, it's a high-risk issue to which you get poor beyond your wildest dreams.

Q. All right. Being this public face of patient issues, has it ever caused you on any occasion to feel that your physical harm was at risk for either you or your family?

A. Well, this is where they love to bring in that somehow this is the paranoid side of this occupation. So I want to lay out my answer carefully to you, is that when I was in Guam I knew that while we were going to succeed with paramedics that there was an opposition forming because a large group didn't want paramedics to occur. And right about that month the environmental person that arrived in Guam committed suicide, but it was a shotgun blast to -- whereby he couldn't possibly have held the gun. So there was some tension on the island that people that are standing up for things had a problem. I then had -- this was way before Kaiser, so I'm trying to give you a reference to your answer, is that -- the next thing there was a bomb threat to Guam Memorial Hospital coming to be on the shift I was going to come on. Now it could be coincidence. I did meet officially with the FBI who evaluated it and said, "We don't think so," but I was concerned about it. Then -- and these were random things that may not connect and are easy to be linked

Page 142

1  together that there is something about me. But in any case,
2  when the person who invited me to testify for congress, which
3  is a large notebook, we've already seen it anyway, you
4  borrowed it, she in 2000 -- about 18 months later was at her
5  home, hit with a baseball bat by somebody, stitches, and the
6  FBI is still and the capitol police are still working on it,
7  Emily DeSanto. And why she was hit, nobody knows. Why
8  she -- under her Senator Grassley -- Grassley she has done
9  many controversial issues. So connection? Probably no, but,
10 I mean, it's out there.
11     Q.  Well, explain --
12     A.  So, anyway, there has been lots of reasons if I --
13 which a normal person might say that "It's time to close your
14 blinds at night."
15     Q.  That's what I was going to ask. Why -- explain for
16 the ladies and gentlemen of the jury why you have sacrificed
17 professionally and personally so greatly in order to bring
18 public information with respect to Kaiser and how it treats
19 it's patients, how it practices medicine, how it treats
20 doctors?
21        MR. BARRETT: Object to the form of the question.
22        THE WITNESS: Well, every doctor who gets a
23 specialty signs a -- about the same document as they would
24 with the AMA, because it's required, that you will, one way
25 or the other, expose problems in medicine, that that's one of

Page 143

1  your duties, you sign that as a contract in getting a board
2  certification. And so I would reverse the question, how can
3  any doctor not do this? Because if we are the only ones to
4  see it, only the bridge builders will know if the bridge is
5  not built right. There is a duty to a doctor that we all
6  singed to that we must if we see pills that are destroyed on
7  the way to patients that we just can't walk away from it.
8     Q.  Is it a profound disappointment for you that many
9  of your colleagues in the same esteemed field of medicine
10 don't honor this commitment?
11     A.  Yes and no. I know it is always family versus
12 patient. Is that basically as you stand up the patient, you
13 put your family at risk, and I understand that, and I
14 appreciate those that help me silently. And so it's not that
15 no one participates, it's just that it's a high-risk
16 occupation. Of course I would love to have others standing
17 up for issues like this anywhere in the world and the only
18 way to get there is to keep doing it --
19     Q.  Okay. Does --
20     A.  -- and see if others will also do it.
21     Q.  Does Kaiser put profits ahead of patient care?
22     A.  Well, if I could give an expanded answer to that --
23     Q.  Please.
24     A.  -- but not going too long, is that Kaiser really
25 goes back to the depression and was always for-profit in

Page 144

1  their initial -- in all their initial formations Henry Kaiser
2  was Mr. Warbacks basically -- Daddy Warbacks -- Warbucks.
3  Anyway, he was hugely rich and the initial founder physician,
4  is still revered, was hugely successful for-profit. So all
5  of the organizations were for-profit. About 1945 they
6  decided this wasn't very good because of the tax laws and so
7  they split into the three groups that worked together and two
8  became not-for-profit, but they agreed right at the same time
9  that the docs would always get $0.50 of every profit dollar.
10 So Kaiser -- I can track its profit, but in any case, because
11 the Fitch Rating people track the profit, and so one can and
12 with enough time pretty much map out the profit every year
13 and it's at about the two billion level now. And I know that
14 they don't ever use the word "profit," it's excess revenue.
15 And the doctors don't use the words "receiving the
16 fifty percent," they call it "participation." Medicare
17 defined this. This is not secret. None of this is secretly
18 to me. It's -- I'm a tour guide to show that this is all
19 clear.
20     Q.  But does --
21     A.  But in any case -- I'm sorry.
22     Q.  But does Pfizer -- does -- strike that.
23        Does Kaiser perpetuate the idea that they're a
24 nonprofit organization?
25     A.  Now that is -- that's something I just have

Page 145

1  intensely studied because I saw up to about two years ago
2  that all over the internet they would project the idea that
3  Kaiser Permanente is a nonprofit organization. And I think I
4  understand it best each year, even this week in trying to get
5  ready again, is that if -- if you want a detailed answer.
6     Q.  Well, I'll come back to it.
7     A.  Yeah, they project that they're -- they tried to
8  project as almost an ad tag line that they are nonprofit as a
9  group, that the doctors are only salary, that because of that
10 it gives them the independence that the care is in the hands
11 of doctors and that the patient, therefore, can have 60 years
12 of trust. And it is all a series of what they themselves
13 calls "ad tag lines" whereby they get seniors to enroll. The
14 one curious thing, and I'll drop it, is that I collect their
15 ads around the country and never in the mail will they ever
16 say that Kaiser Permanente is nonprofit. They know that
17 would be federal mail fraud and so they put it in every other
18 way. Now in the last two years, and I think I had something
19 to do with it, they split apart, reporters stopped using
20 their paragraph. And so now you will see after about 2008
21 that there are two nonprofit units and the physicians are at
22 least separated from that and then 2009 they're starting to
23 admit the physicians are for-profit.
24     Q.  Okay. Are you aware of the fact that the lawsuit
25 that we're sitting here today in reference to is based in

CHARLES ROY PHILLIPS, MD

Page 170

1  specifically refer to?
2      A.  Well, it started out as the Kaiser Permanente
3  Medical Care Program. They then elevated it to a brand name,
4  Kaiser Permanente. It is of itself not a business and that's
5  part of the tricky part is that it gives the illusion that
6  the Kaiser Plan is -- that's where they start to mix the
7  words. As a brand name they can say, "It's nonprofit because
8  it's another name for the Kaiser Plan."
9      Q.  That's what I wanted to ask you about, is Kaiser
10 Permanente a for-profit entity?
11     A.  I believe it is. The official Medicare and I --
12 and which I have somewhere in the room and I'm sorry we
13 just -- there's no time to look at it, it's fine.
14     Q.  Okay.
15     A.  But if you go on Medicare and look at all the
16 contracting groups and you get down to Kaiser and then you
17 see brand name in the second column and under brand name is
18 Kaiser Permanente. So it's taking me almost to the last year
19 after all this study to figure out what it is myself. It's a
20 brand name. It's not a recognized entity. It doesn't have
21 profit/nonprofit. Kaiser Permanente is a shortened form of
22 the longer phrase, Kaiser Permanente Medical Care Program and
23 it's a brand.
24     Q.  So you're saying it's basically a marketing term?
25     A.  Absolutely.

Page 171

1      Q.  Okay. Similar to Coca-Cola?
2      A.  That's right.
3      Q.  Okay. It does not have a legal basis unto itself?
4      A.  Right. So you therefore can't give it a -- it's
5  kind of hard to say what it is. The actual plan and the
6  literature to the patients is all full of now "Kaiser
7  Permanente. Thrive." So a patient thinks -- it's all
8  branding --
9      Q.  Okay.
10     A.  -- like Coca-Cola. It is not the entity. The
11 entity is the plan.
12     Q.  Is it your opinion that the entire Kaiser
13 organization viewed as a whole is an operation generated and
14 run for-profit?
15     A.  Yes, it is -- at one point it's three separate
16 entities and at another entity it's alter egos of one entity
17 and the alter ego sets the profit, and told Medicare they
18 did, it's not a secret, that they're setting the profit every
19 year so that they will get to their two billion goal or more
20 in profit. They set it and they go for it and everyone has
21 to work hard to get there, which is the only way they can get
22 there is giving less care.
23     Q.  Kaiser Permanente as you have -- strike that.
24         Kaiser, as you have mentioned before, is an
25 organization much of which is based in the State of

Page 172

1  California.
2      Q.  Is it your opinion that Kaiser, as it exists today,
3  cannot function on the east coast. For example, because
4  there is not a sufficient ability for it to make a profit.
5      A.  It pulled out of a good part of the east coast.
6  What it does is it supplements the -- they pay extra to keep
7  it in Washington, DC and the mid Atlantic zone for its
8  political purpose. They lose money on mid Atlantic unit of
9  Kaiser, but they like leaving their magazines on the
10 congressional offices and they -- that unit is always lost
11 when they bought it from Humana, but they keep it there
12 knowing it doesn't make profit because it makes political
13 profit.
14     Q.  Is it your opinion that referring to Kaiser
15 Foundation Health Plans, Inc., and Kaiser Foundation
16 Hospitals as nonprofit foster an image of Kaiser that is less
17 than accurate with respect to profits?
18     A.  Absolutely, because they are so crystal clear that
19 they agree upon a profit that half goes to the hospitals,
20 although hospitals are allowed to make a profit, but it's a
21 misuse of -- from the publics understanding, but particularly
22 the idea that doctors are only salaried is huge lie.
23     Q.  So you're essentially saying that your
24 investigation has determined that Kaiser essentially directs
25 profits away from these nonprofit entities to other

Page 173

1  for-profit entities?
2      A.  The Kaiser plan by definition will come out zero at
3  the end of the year because that's -- that's the way they're
4  going to always do it. I mean, they just give it away so if
5  you have -- you try to get the two billion and then you give
6  it to the two other entities so you come to zero so you're
7  nonprofit but you coordinated every decision that year to get
8  the two entities their billion.
9      Q.  What is the -- you made reference to two billion
10 and one billion, where do these numbers come from?
11     A.  The numbers can be tracked particularly -- because
12 everything I'm saying I can get a document if we ever get
13 to --
14     Q.  Tell me the name of the document. We may not have
15 time right now to get to that.
16     A.  Okay. I understand. Okay.
17     Q.  Tell me the name of the document.
18     A.  So one place I go to, and anyone can, is go to
19 Fitch Rating and Fitch Rating is a -- it rates companies all
20 over the world, it's in New York, and they go to Kaiser and
21 they are paid to rate Kaiser for the bond market. So while
22 Kaiser said, "We're not involved in the stock market," the
23 same banks are selling bonds in New York City, so you know,
24 just down the street, probably same bank. All right.
25 Anyway, within the same sort of Wall Street area you can --

44 (Pages 170 to 173)

CHARLES ROY PHILLIPS, MD

Page 174

1  that's where the auction of the Kaiser bonds occur. So Fitch
2  has to rate the Kaiser bonds as three billion in Kaiser bonds
3  at any point in time and the Fitch has to tell investors what
4  to expect and what the rules are and then I called Fitch and
5  said, "If I ever get rich I might give you a dollar." They
6  send me ten bond booklets, and I have all of those. So in
7  any case, the Fitch Rating will rate the profit and the best
8  answer sometimes to the profit is to go far away. Kaiser
9  gets more careless as -- so if you look internally to the
10 profits you'll get it more clearly. But we can at this point
11 track by other sources all of the profits for the last ten
12 years.
13    Q. Are there written agreements that reflect the
14 arrangements between the Permanente Medical Groups and other
15 Kaiser entities?
16    A. Yes.
17    Q. What are they called?
18    A. The biggest document is the Medical Service
19 Agreement. I have an abbreviated copy of it legally because
20 I flew to Kansas City to get it in Johnson County Court, so
21 one copy exists there.
22    Q. Did you bring a copy of that with you today?
23    A. I think so. I haven't even gotten back over to
24 that area --
25    Q. Okay.

Page 175

1     A. -- but I -- we can easily achieve that.
2     Q. What I'll do is I'll do similar to what Mr. Barrett
3  did earlier today, so as to not waste time, I will mark that
4  as Plaintiffs' 18 and upon reviewing your deposition
5  transcript if you could locate that and attach it to the
6  deposition as an additional exhibit, I'd be greatly --
7     A. Sure. If someone will keep track of my assignments
8  so I don't -- and I've got two on my list here.
9     Q. That's just two. Okay.
10    A. I'm writing it down.
11    Q. Okay. That's two so far.
12       (Whereupon, Exhibit No. 18 was marked for
13 identification.)
14 BY MR. NAPOLITANO:
15    Q. You've seen an abbreviated copy of the master
16 agreement, you haven't seen the complete --
17    A. I have seen -- okay. Now I have to go into a
18 protected area, so I don't know if anyone in this room can --
19 it's possible that I have the complete version of the Kaiser
20 Master Plan that's ever been written, that's conceivable, but
21 if it was protected then I couldn't share it with you unless
22 it was unprotected.
23    Q. I don't, sitting here right now, have knowledge as
24 to whether it's protected or unprotected. So why don't --
25    A. It was in a particular case and therefore --

Page 176

1     Q. Oh, to a confidentiality legal agreement?
2     A. Therefore, if I know --
3     Q. Okay.
4     A. -- its existence and location I can't -- I can't
5  speak about it.
6     Q. That's fine. So let's -- okay. Let's stick to the
7  abbreviated version.
8     A. We'll stick to the one that's -- the one we use
9  online is the one that's public in Kansas City sitting in a
10 courtroom.
11    Q. The plaintiffs in this lawsuit and, again, they are
12 Kaiser Foundation Health Plans, Inc., and Kaiser Foundation
13 Hospitals -- let me backtrack a little bit.
14       We've asked for the deposition of various
15 Permanente Group physicians and these two groups now, the two
16 plaintiffs, the Kaiser Foundation Hospital and the Kaiser
17 Foundation Health Plan have come back and taken the position
18 legally that they have no control over these doctors and that
19 they cannot make them appear for a deposition in this case.
20       I'm not asking you for a legal judgment, but what
21 is your understanding as to the level of control that these
22 entities would have over the Permanente Group physicians?
23    A. At one level the physicians do actually run Kaiser,
24 but at yet another level they're all linked to this profit
25 system. Could they compel the doctors? I guess it gets

Page 177

1  close to legal.
2       Try it one more time.
3     Q. I'm not asking for a legal opinion.
4     A. Yeah.
5     Q. I'm just asking you what level of control generally
6  would the plaintiffs in this case have over individual Kaiser
7  Permanente doctors?
8     A. Well, they wouldn't do it individually. They
9  basically walk across the hall on the 27th Floor of the
10 Ordway Building, Mr. Halvorson would walk over and talk to
11 the new head of the Permanente Medical Foundation --
12 Federation and say, "We do or do not want you guys to show
13 up" --
14    Q. Okay.
15    A. -- "in Boston."
16    Q. And sitting here today do you have even the
17 slighter doubt that if Kaiser wanted those doctors to testify
18 in this case they would arrange it to happen?
19       MR. BARRETT: Excuse me, I'm going to object to the
20 form of the question.
21       THE WITNESS: See, the physicians have all by
22 contract contracted their legal rights over to the plan. So
23 that's a sense of control is the -- in their general MSA all
24 legal matters are to be handled by the plan and, therefore,
25 the plan does have control. In that sense they can tell

45 (Pages 174 to 177)

CHARLES ROY PHILLIPS, MD

Page 178

doctors to come and go in the sense that they've made them their attorney, basically.
BY MR. NAPOLITANO:
    Q.  Okay.
    A.  The plan represents the doctor at all things.
    Q.  Okay. One of the things that we've touched upon today and we haven't gone into any level of detail and I'd like to follow up with some questions, is the issue of pill splitting.
        When did you become aware of the fact that Kaiser was encouraging patients to split pills in order to save money.
    A.  I was an emergency room doctor and so we go right back to 1998. And I tend to open up pills just to normally look at them and see what's going on to see what my patient is on. And I would open up and I would see crumbled dust and all sizes of pieces and I got -- I said, "What's that all about?" And they said it was system-wide. So I said, "Well, let me just try it." I wrote a prescription for myself for 20-milligrams of lisinopril, so it wasn't a trap, that's what I take, and I get free medicine as a doctor. So I said, "I'd like some free medicine." I walked over and they handed me 40-milligrams and a pill splitter and no safety sheet and no discussion. I said, "Well, there it is." Now at least it's Fresno. So I went up to the pharmacist and I said, "Can you

Page 179

give me any" -- he said, "It's policy." I said, "Well, can you give me a copy of the policy?" The next thing he goes over to his fax machine, which can also be a copier and he cops out -- he copies the system-wide paper and gives it to me, which is Oakland, and then I called Oakland and I said, "Do you have any research on splitting a lisinopril being safe?" And the -- and I have a faxed copy where they faxed back, "No, we don't."
    Q.  Does this -- does this practice continue to this day?
    A.  It has expanded. We -- at one point the question came to me earlier, "Did we win or lose the lawsuit?" I said, "We reduced 37 pills down to 7." Now it's back up -- it appears to me it's back up in the 25 range.
    Q.  What is Kaiser's motivation in instructing its patients to cut pills?
    A.  Well, first of all, the nurses would never do it. So in any head Kaiser unit the hospital nurses never cut one pill. So if it were safe they would, of course, do it because it would save money. The pill costs the same. 40-milligrams of lisinopril must be within a few cents of 20-milligrams. So the -- if you're purely economic then you would split the 40 into two pieces and you basically make -- whether you've ruined the pill or not you have created two pills, and then you give them out by the hundreds and you

Page 180

have reduced your pharmacy budget, basically, from three billion to two billion.
    Q.  Is it your opinion that this practice of pill splitting has led to deaths and other serious injuries in America?
        MR. BARRETT: Objection, calls for speculation.
        THE WITNESS: I call it the slow -- the slow death of the illness -- of the things being treated. So if hypertension is treated with bouncing medication, it doesn't take a lot of understanding to know that they won't have a longer life. It's hard to tie it to the instant moment because they swallow the evidence. The typical senior, just to finish it, gets 100 --
        MR. BARRETT: Oh, I'm sorry. Excuse me.
        THE WITNESS: Yeah.
        MR. BARRETT: May I borrow it?
        THE WITNESS: Sure.
        The typical senior get's 100 medicines at a time. They -- first of all, Northern California, they come into Livermore by 100,000 or bigger. They are then divided up into 100-pill units of 1,000 of those. They get shipped to pharmacy as 100s. The doctors like to prescribe 100. And the 100 that are given to the seniors, or whomever, often to split. So now suddenly they've created 200 pills. The trouble is they're fragments. And its' -- at the end it's

Page 181

leaking up dusk. So the senior basically -- if you ask a senior, separate from me now, you say, "What did you do with your pills?" "I went home with my 100, I split them into 200 pieces, and I put them all back in." "And then did you take the littlest fragment or the biggest?" They say, "I always" -- most of the seniors tell me, "I always start with the biggest because it looks better and I work my way down to the fragments and at the end there is a lot of fragments in my pill splitter, so that's a dose, and I" -- one patient would lick the last -- we had an ABC News the picture of the patient licking the last piece of dust at the end of that. That is not medicine. I'm sorry if I would be unhappy with this, but I saw it in '98, I tracked it, I know the history of it, I know which doctors first decided it where, I've tracked it around the United States, and I've gone to the pharmacy board on my own time to fight it. The head of the pharmacy board now was in Kaiser five years, so he has a five-year vesting with Kaiser, so he's moved down to United Health Care, the other big splitter. So Dr. Shell chaired the meeting when I went up to speak about pill splitting and I asked him to leave the room and he did once but he came back to chair at the end and then all they did at the pharmacy board is put 100 pages of information no patient will ever read. So basically it's been a 12-year, 11-year issue whereby medicines are wrecked. And I have them with

46 (Pages 178 to 181)

Page 182

1  me, you don't have time, but I could display real Kaiser
2  fragments so that it would get visual.
3     Q. Does the practice of splitting pills affect the
4  efficacy of the drugs?
5     A. Well, drugs -- all my understanding as a
6  non-pharmacist are based on the idea that they go to receptor
7  sites. So in any particular pill there might be ten million
8  receptor sites -- in any particular -- well, let's say a
9  pill, I'm going to guess, one pill might have ten million
10 molecules of medicine going somewhere and they're going to go
11 to the body's receptor sites and basically -- yeah, if you
12 bounce the medicine, you're bouncing the illness.
13    Q. Okay. Doctor, let me just move on quickly to --
14       MR. BARRETT: You said you bounce? I was trying to
15 listen.
16       THE WITNESS: If you bounce the medicine, high and
17 low, high and low, or start high and work down to dust, you
18 have wrecked it -- and wrecked the illness.
19       MR. BARRETT: I've got it.
20       THE WITNESS: The illnesses that the split for are
21 cholesterol, hypertension. I ever have proof they've split
22 medicine for cardiac arrythmia as anti-seizure medicines,
23 so ...
24       MR. NAPOLITANO: Doctor, let me show you what I've
25 just marked as Exhibit 19.

Page 183

1        THE WITNESS: Okay.
2        (Whereupon, Exhibit No. 19 was marked for
3  identification.)
4  BY MR. NAPOLITANO:
5     Q. I'd like to jump to something slightly different.
6        This is an article entitled The Misuse of
7  Evidence-Based Medicine.
8        I assume this is obviously an article you've
9  written and I assume you're very familiar with it; correct?
10    A. Yes.
11    Q. Okay. Can you very briefly explain to the jury
12 what we mean by the concept of evidence-based medicine and
13 talk about -- well, let's leave it at that, give us a summary
14 of what --
15    A. Okay. Well --
16    Q. -- evidence-based medicine is?
17    A. -- evidence-based medicine could -- theoretically
18 it would be a good idea in the sense that you gather the
19 world's evidence together and you try to then see if you can
20 get all the best articles, decide which articles are a
21 highest level of the evidence, which ones not to believe, and
22 think that out of that you can come up with a conclusion, you
23 then take your conclusion and study it, and then you tell the
24 doctors that, "We got it. We got it figured out."
25    Q. Is something wrong with the idea of evidence-based

Page 184

1  medicine?
2     A. If we weren't humans, no. If -- if -- I guess if
3  we're trying to build a car, which they often talk about a
4  patient is like a car, probably making a veer to a certain
5  specification does make sense. The human body is -- each
6  cell is 100,000 genes with enzymes and we are very different
7  people. And so it doesn't fit the person, but also there is
8  11 levels of decision-making on the way to the doctor and
9  each one can be influenced by whether it saves or it doesn't
10 save money.
11    Q. Has Kaiser taken the concept of evidence-based
12 medicine and used it to the harm of patients?
13    A. I believe so and when -- yes.
14    Q. Does the way that Kaiser uses this concept of
15 evidence-based medicine in effect handcuff its doctors from
16 exercising independent medical judgment?
17       MR. BARRETT: Object to the form.
18       THE WITNESS: Yes, the simplest, quick answer is
19 the American Diabetic Association says -- says, "Tests couch
20 potato people for sugar." It's an easy concept to
21 understand. If you're sitting and watching stuff and you're
22 heavy you should have your sugar tested. That gets to Kaiser
23 and they change that particular sentence to say, "Don't test
24 that group." They know they're missing one-third of their
25 diabetics. You make more money if you catch them just before

Page 185

1  dialysis. It's that's simple. It's not evidence anymore.
2  It's twisting the world's evidence into what makes economic
3  sense. And I do this for hundreds of topics, but the couch
4  potato is one of the easier ones.
5        MR. NAPOLITANO: All right. Let me mark as -- do
6  we have any more exhibit tabs? What did I just mark? I just
7  marked 19?
8        THE REPORTER: 20 is the next one.
9        MR. NAPOLITANO: 20 is the next one?
10       (Whereupon, Exhibit No. 20 was marked for
11 identification.)
12 BY MR. NAPOLITANO:
13    Q. Let me show you what I've marked as Exhibit 20,
14 which is a -- and I won't ask you to peruse the whole thing,
15 it's a copy of the Pfizer 2009 Formulary.
16       Have you seen the 2009 Formulary before?
17    A. I've seen one like this. I don't know if I looked
18 up this year, but I've seen this many times. So I'm aware of
19 this type of document.
20    Q. Okay. Are you aware of the fact that Neurontin to
21 this day remains on the Kaiser Formulary?
22    A. Not only it remains, I called -- I went into
23 Bakersfield Kaiser two days ago and asked about their
24 Neurontin, because I was interested in which brand. And then
25 I call it the "Kaiser Whys." So of course they're still

CHARLES ROY PHILLIPS, MD

Page 186

1  using Neurontin and of course it's on their formulary and of
2  course it's in their handbooks. So I just asked, "Do you
3  ever split the 600 into pieces?" And the tech went to the
4  pharmacist, "That's fine." So not only do they have
5  Neurontin, they use Neurontin in at least two of their seven
6  places.
7      Q. Okay.
8      A. But the pharmacist has no problem with splitting
9  it, meaning they can use uneven Neurontin.
10     Q. Okay. At the trial of this case the jury may very
11 well hear testimony and evidence from Kaiser claiming that
12 Neurontin is -- has no efficacy for various medical uses and
13 is, in fact, a sugar pill and to the extent it's helping
14 people at all it's a placebo effect.
15     Is that consistent with them having the drug to
16 this day on their formulary?
17     THE WITNESS: Well --
18     MR. BARRETT: Object to the form.
19     THE WITNESS: -- if they thought a pill wasn't
20 good, they'd have to vote it out. In the beginning and
21 online is one of their formulary books, we had it scanned
22 entirely, and in the first ten pages you will see how the
23 committees vote on medications, pharmacists can't vote, only
24 physicians, and, in fact, they rule about everything and you
25 will find Neurontin in their formulary if you ever could get

Page 187

1  a copy of their current formulary. It's in every emergency
2  room. They won't give to you easily but in any case it would
3  have Neurontin and it would explain what it's used for.
4  BY MR. NAPOLITANO:
5      Q. Would you be surprised to learn that Kaiser
6  requires its doctor in certain instances to prescribe
7  Neurontin before they turn to drugs that are indicated for
8  particular uses?
9      A. They basically will aim people into the cheapest
10 pathway possible. So it wouldn't surprise me at all.
11     Q. Okay. Just give me one second.
12     Does that formulary indicate to you that Kaiser
13 continues to recognize that Neurontin is in fact efficacious
14 for patients for its indicated uses?
15     A. Yes, I'd have to qualify it only to see -- Medicare
16 has certain requirements, whether this is a list prepared
17 related, but it doesn't say, "Medicare only." So I believe
18 so.
19     Q. Okay.
20     A. But I think -- yeah, getting a copy of their drug
21 book would be even better, but, yes.
22     Q. Do you have an opinion as to whether Kaiser in this
23 lawsuit is misusing evidence-based medicine to try to reap a
24 profit windfall?
25     MR. BARRETT: Object to the form.

Page 188

1      THE WITNESS: Well, I think they've used that on
2  every area and if they're saying Neurontin is a sugar pill
3  they're clearly not being consistent to themselves.
4  BY MR. NAPOLITANO:
5      Q. Okay. Have all of the opinions you've given here
6  today at this deposition been to a reasonable degree of
7  medical certainty?
8      A. Yes, that's why I brought, which won't show on the
9  camera, 12 feet of backup to make sure it wasn't about my
10 opinion.
11     MR. NAPOLITANO: I have no other questions at this
12 time. Thank you very much.
13     THE WITNESS: Thank you.
14     MR. BARRETT: Thank you, Doctor.
15     THE WITNESS: Thank you.
16     MR. BARRETT: I appreciate it.
17     MR. NAPOLITANO: Good luck to you.
18     THE VIDEOGRAPHER: Here marks the end of Videotape
19 No. 3 in the deposition of Dr. Charles Roy Phillips. Going
20 off the record. The time is 1:02.
21            -oOo-
22     (Whereupon, the deposition of
23 CHARLES ROY PHILLIPS, M.D., F.A.C.E.P.,
24     concluded at 1:02 p.m.)
25            -oOo-

Page 189

1       DECLARATION UNDER PENALTY OF PERJURY
2
3      I, CHARLES ROY PHILLIPS, M.D., F.A.C.E.P., do
4  hereby declare under penalty of perjury that I have read the
5  foregoing transcript of my deposition taken on December 16,
6  2009; that I have made such corrections as noted herein in
7  ink, initialed by me; that my testimony as contained herein,
8  as corrected, is true and correct.
9
10     Dated this _____ day of _____, 2010,
11 at _____, California.
12
13
14
15     _____
16     CHARLES ROY PHILLIPS, M.D., F.A.C.E.P.
17