Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
------------------------------)
In re: NEURONTIN MARKETING,   )MDL Docket No. 1629
SALES PRACTICES AND PRODUCTS  )
LIABILITY LITIGATION          )Master File No.
------------------------------)04-10981
THIS DOCUMENT RELATES TO:     )
THE GUARDIAN LIFE INSURANCE   )Judge Patti B. Saris
COMPANY OF AMERICA v. PFIZER  )
INC., 04 CV 10739 (PBS)       )Magistrate Judge Leo
------------------------------)T. Sorokin
```

       Videotaped Deposition of

  NICOLAS WIEDER, D.O., at 300 S. Grand Avenue,

  Los Angeles, California, commencing at

  9:22 p.m., Tuesday, January 12, 2010, before

  Janice Schutzman, CSR No. 9509.

Job No: 234602

PAGES 1 - 536

Page 18

 1  then a -- worked as well in -- I was a prepartner in
 2  another practice that included interventional pain
 3  and some neurology.
 4     Q.  So that was approximately from 1992 or 1993
 5  to 1997?                                    09:35AM
 6     A.  That's right.
 7     Q.  And during that period of time, you became
 8  board certified in neurology?
 9     A.  Yes.
10     Q.  And you were not at that point certified   09:35AM
11  in -- board certified in pain medicine; is that
12  right?
13     A.  No, I was actually.  I don't -- that's
14  actually -- thanks for pointing that out.  This is
15  actually a misprint.  I forgot -- I was -- I think   09:36AM
16  it was 1996, actually, that I was board certified in
17  pain medicine, but this is a recertification --
18     Q.  Okay.
19     A.  -- I believe.
20     Q.  And that's been -- so just so we're clear,   09:36AM
21  in 1995, approximately, you were board certified in
22  neurology?
23     A.  Yes.
24     Q.  In 1996, thereabouts, you were board
25  certified in pain management?                09:36AM

Page 19

 1     A.  Yes.
 2     Q.  You either were required or determined to
 3  recertify both your neurological boards and your
 4  pain medicine boards, and that happened on or about
 5  2005?                                        09:36AM
 6     A.  Right.  The neurology boards had to be
 7  tested.  The pain boards did not.
 8     Q.  When you came to Kaiser, were you a
 9  partner?
10     A.  No.  It requires three years.          09:37AM
11     Q.  And were you made a partner after your
12  three-year tenure?
13     A.  Yes.
14     Q.  So approximately 2000 is when you became a
15  partner?                                     09:37AM
16     A.  Yes.
17     Q.  In the structure of your partnership, are
18  there certain things or responsibilities that a
19  partner has that nonpartners don't have?  In other
20  words, what's the difference about being a Kaiser   09:37AM
21  partner than being a person who is not a partner who
22  practices for Kaiser?
23     A.  Mostly it's related to, but not precisely,
24  vesting.  It has more to do with your future -- your
25  financial future than it actually does with your    09:37AM

Page 20

 1  practice future.
 2     Q.  Is it more of an economic issue?
 3     A.  I think so, yeah.  I think that's the way I
 4  would characterize it.
 5     Q.  You share in the profits as a partner would   09:37AM
 6  as opposed to being an employee?
 7     A.  We're nonprofit, so we don't share in
 8  profits, but we're part of a -- what you could call
 9  a retirement plan that we wouldn't be -- we're also
10  allowed to use -- invest in a Keogh, whereas prior   09:38AM
11  to that time, you contribute to a 401(k).  So those
12  kinds of differences.
13     Q.  Your partnership is nonprofit?
14     A.  The -- I don't know if the partnersh- -- I
15  don't know if -- yeah, I don't know.  The Kaiser   09:38AM
16  Permanente is nonprofit.  Our partnership is hired
17  by them --
18     Q.  Right.
19     A.  -- to provide services.  My understanding
20  is that it's a nonprofit, yes.              09:38AM
21     Q.  Okay.  What -- do you know one way or the
22  other whether your --
23     A.  Not clearly.
24     Q.  Okay.
25     A.  Not clearly.  Not with the partnership   09:38AM

Page 21

 1  specifically because it's the -- the medical
 2  services are divided up among different entities, so
 3  I don't know precisely.
 4     Q.  So what -- your understanding is Kaiser
 5  itself is a nonprofit entity; right?         09:38AM
 6     A.  Yes.
 7     Q.  And it contracts with various other
 8  entities to perform services right?
 9     A.  It's contractual only with us.  We're -- we
10  have an exclusive service contract for physician   09:39AM
11  services, but yes, they have contracts with unions
12  and other people to provide services.  I think
13  that's actually health plan.  It's a little
14  confusing, actually.
15     Q.  Okay.  And what you're not sure of is    09:39AM
16  whether your actual partnership made up of doctors
17  is a nonprofit 501(c) --
18     A.  Yeah, yeah, exactly.
19         THE REPORTER:  Excuse me.  You need to wait
20  until the questions are completed before you answer.
21  BY MR. CHEFFO:
22     Q.  You're not sure whether your own medical
23  group is a profit entity or not?
24         MR. SOBOL:  Objection.
25         THE WITNESS:  Yes.                    09:39AM

Page 274

1  A. Yes.
2  Q. Who?
3  A. I don't recall who. In general, a request
4  is made, and then Drug Information Systems gives us
5  all the literature and gives us what the nature of      02:59PM
6  the discussion is, and then we review it.
7  Q. How did you make the recommendation in
8  1997?
9  A. By email.
10 Q. So --                                                02:59PM
11 A. And also, yes, by email, but more than just
12 me giving it. There's a discussion that goes on.
13 Q. Are there also chiefs of neurology and
14 chiefs of anesthesiology who meet?
15 A. Yes.                                                 02:59PM
16 Q. Were you a member of those committees?
17 A. No.
18 Q. Do you know if anybody else recommended
19 reflex sympathetic dystrophy?
20 A. Well, clearly, because they adopted it. I            03:00PM
21 don't think they would -- that it would be adopted
22 solely on my recommendation. Although I -- like I
23 said, I was -- I don't think there was anybody else
24 who was fellowship trained at the time, so I think
25 my recommendation would have had some weight.           03:00PM

Page 275

1  Q. Okay. But there are a lot of other people
2  who were involved in this decision; is that fair?
3  A. I don't know how many, but there --
4  certainly more than me and --
5  Q. It doesn't discuss any of them in your              03:00PM
6  declaration, does it?
7  A. No, it doesn't.
8  Q. It just says that you made the
9  recommendation.
10 A. Well, it's -- it can -- I have English as a         03:00PM
11 second language, but I read that as meaning that
12 that's an act that I took. It doesn't describe any
13 other acts anyone else may have taken, but maybe I
14 don't understand the language as well as I should.
15 Q. Okay. And I don't think we need to be               03:00PM
16 sarcastic.
17 A. I'm not being sarcastic. I'm being honest.
18 I have a gap sometimes in learning -- in -- because
19 I have English as a second language, so I take
20 sometimes things very concretely grammarwise, and      03:01PM
21 I'm -- often have poor grammar.
22 Q. Well, somebody else -- a lawyer wrote this
23 for you; right?
24 A. Yes, and I -- when I read that, that's what
25 I assumed, is that, yes, I did make the                03:01PM

Page 276

1  recommendation. I didn't think at the time that
2  that meant that I was the only one who ever made the
3  recommendation.
4  Q. You could see that someone could say this
5  looks like you made a recommendation to the P&T       03:01PM
6  committee and then all of a sudden they adopted it;
7  right?
8      MS. NUSSBAUM: Objection.
9      THE WITNESS: I don't think a reasonable
10 person would, but I guess somebody could.             03:01PM
11 BY MR. CHEFFO:
12 Q. So, in fact, what -- do you know the
13 history about reflex sympathetic dystrophy with --
14 before it got to the P&T committee and before it got
15 to you?                                               03:01PM
16 A. In what -- what do you mean the history?
17 In what way?
18 Q. Well, in other words, do you know whose
19 idea it initially was, who --
20 A. Oh, no.
21 Q. -- suggested it?
22 A. No. I don't know.
23 Q. Do you know who was supporting it, who was
24 against it?
25 A. I don't recall that at all.                        03:02PM

Page 277

1  Q. Your -- the basis of your involvement was
2  that you received some material in an email saying
3  that the P&T committee was going to consider this,
4  do you have a view on it?
5  A. Do I have a view on it, and I also talked         03:02PM
6  with other people who took care of pain patients and
7  talked with my department, and so it was through
8  conversation and through my own personal view.
9  Q. And at the time you had had positive
10 experience with using Neurontin for reflex            03:02PM
11 sympathetic dystrophy?
12     MR. SOBOL: Objection.
13     MS. NUSSBAUM: Objection.
14     THE WITNESS: At the time I felt like there
15 was some evidence that suggested it might help.       03:02PM
16 It's a terribly difficult condition to treat. And I
17 thought, well, it looks like there's some evidence
18 in certain cases. Based on the judgment of the
19 treating doctor, they should have the -- they should
20 be able to use their own judgment about it.           03:03PM
21 BY MR. CHEFFO:
22 Q. And if you believe that there was no
23 evidence whatsoever, you wouldn't have recommended
24 it; isn't that right?
25 A. I think that's true.                               03:03PM

70 (Pages 274 to 277)

Page 282

1  restriction limiting to neurologists. In 1997, you
2  were asked through an email whether you would agree
3  with or suggest that the -- as it says here, the
4  formulary restrictions be expanded to include
5  treatment of RSD with gabapentin; correct?        03:06PM
6      A.  Again, yes.
7      Q.  Okay.  Now -- and it says here:
8          "I'm informed and believe that the
9      P&T committee adopted certain" --
10     A.  I'm sorry.  What did you say?  I thought I  03:06PM
11  heard you say something else.  Go ahead.
12     Q.  It says here:
13         "I'm informed and believe that the
14      P&T committee adopted this recommendation."
15     A.  Okay.  Yes.                                03:07PM
16     Q.  You weren't at the commit- -- the P&T
17  committee meeting; right?
18     A.  I was not a member.
19     Q.  You didn't provide any information directly
20  to them?                                          03:07PM
21         MR. SOBOL:  Objection.
22         THE WITNESS:  In the form -- if you
23  consider email as a direct -- that's the extent,
24  email and discussions.  The same -- just what I said
25  before.                                           03:07PM

Page 283

1   BY MR. CHEFFO:
2      Q.  Was it a yes-or-no email, or was it a
3   dialogue?
4      A.  I don't recall what the exact email was,
5   but the options were absolutely for dialogue.      03:07PM
6   There's no -- it was not a yes or no type of
7   question.
8      Q.  Do you remember what you did?
9      A.  I said I supported it.  I know that.  And I
10  don't remember if I included reasons for it, but I  03:07PM
11  did say I supported it.
12     Q.  So -- and then -- and you don't know who
13  else, if anyone else, supported that recommendation;
14  right?
15         MR. SOBOL:  Objection.                      03:07PM
16         THE WITNESS:  Not -- no, I don't remember.
17  BY MR. CHEFFO:
18     Q.  You don't know if anyone dissented from it?
19     A.  I don't remember.  No, I don't know.
20     Q.  Do you remember how you found out that the  03:08PM
21  committee adopted it?
22     A.  The P&T committee has a regular information
23  download that they give, and that's how I found out
24  about it.
25     Q.  And do you have any information about what  03:08PM

Page 284

1   went on at that P&T committee, the discussion about
2   it?
3      A.  No.
4      Q.  Do you have any idea about what information
5   they reviewed or talked about?                     03:08PM
6         MR. SOBOL:  Objection.
7         THE WITNESS:  I don't recall any -- being
8   told or I -- it was a long time ago.  I don't really
9   remember.
10  BY MR. CHEFFO:                                     03:08PM
11     Q.  Did you ever ask after the fact?
12     A.  I don't remember asking, no.  I already
13  supported it, so if it happened, then I wouldn't
14  be -- I'm busy enough.  I wouldn't be running
15  afterwards to figure out why did they support      03:08PM
16  something I supported.
17     Q.  And in -- it says here:
18         "In or around 1999, I recommended
19      removal of all formulary restrictions
20      and guidelines for Neurontin."                 03:08PM
21         Do you see that?
22     A.  Yes.
23     Q.  Was that the same process that you went
24  through in 1997.  In other words, you were asked to
25  comment on a recommendation?                       03:09PM

Page 285

1          MR. SOBOL:  Objection.
2          THE WITNESS:  By that time, I think I was
3   already -- you know, I don't recall exactly,
4   although I remember that I was being asked more and
5   more, not by them, but just in general about pain.  03:09PM
6   By that time, it was known that I was a pain doctor,
7   and so I was being asked more about it.
8   BY MR. CHEFFO:
9      Q.  But I want to talk specifically about the
10  declaration --                                     03:09PM
11     A.  Uh-huh.
12     Q.  -- okay?
13         This says in or around September 1999, you
14  made a recommendation; right?
15         Are you with me?                            03:09PM
16     A.  Yes.
17     Q.  And then it also says in the next sentence,
18  that in the same month, "in or around
19  September 1999, the P&T committee adopted this
20  recommendation."                                   03:09PM
21     A.  Yes.
22     Q.  Okay.
23     A.  It was the same process of -- you're asking
24  about the process.  Yes.
25     Q.  I'm going to show you them in a few         03:09PM

72 (Pages 282 to 285)

Page 334

1   MR. SOBOL: I instruct you not to answer.
2  BY MR. CHEFFO:
3   Q. Do you recognize this page?
4   MR. SOBOL: I instruct you not to answer.
5  BY MR. CHEFFO:                           04:05PM
6   Q. Have you ever seen this page before?
7   MR. SOBOL: I instruct you not to answer.
8   And I don't know what you mean when you're
9  saying "this page." Are you pointing at some
10 screen, or are you pointing --              04:05PM
11  MR. CHEFFO: Yes.
12  MR. SOBOL: -- at an exhibit?
13  MR. CHEFFO: Let's look at it with the
14 video. The screen.
15 BY MR. CHEFFO:
16  Q. Doctor, there's a screen that says
17 Https//memberskaiserpermanente, and it goes on.
18  Have you ever seen that screen before?
19  MR. SOBOL: I instruct him not to answer.
20  MR. CHEFFO: I really think what you're  04:05PM
21 doing is sanctionable, Tom, but you can continue
22 doing it.
23  MR. SOBOL: I think it's a waste of time.
24  MR. CHEFFO: You know what, that's not a
25 basis to instruct not to answer, but you're really  04:06PM

Page 335

1  at your peril here. But if you're going to do it --
2  I'm trying to authenticate the website and the
3  document. Instructing the witness to ask -- to
4  ans- -- not to answer whether he's ever seen a page?
5  I've never in my entire career had a lawyer do that. 04:06PM
6   So I respect you. You're a good lawyer.
7  But again, I'm putting you on notice that we're
8  going to have him come back if you won't let him
9  answer these questions about what this website says.
10   So is this the final time you're going   04:06PM
11 to -- you're not going to let him talk about
12 anything on the website or authenticate it?
13  MR. SOBOL: Is there a question before the
14 witness?
15  MR. CHEFFO: I'm asking you.             04:06PM
16  MR. SOBOL: Is there a question before the
17 witness?
18 BY MR. CHEFFO:
19  Q. Okay. Doctor, what does that web -- what
20 does that website say?                     04:06PM
21  MR. SOBOL: What are you pointing at right
22 now?
23  MS. NUSSBAUM: Well, let's just see if he
24 can read English.
25  What does it say? Go ahead. Can you read  04:06PM

Page 336

1  English? What does it say?
2   MR. CHEFFO: Which one of you is
3  representing the witness?
4   MR. SOBOL: I want to know what the "that"
5  is in the question. You're talking about --   04:06PM
6   MR. CHEFFO: The video is pretty clear.
7   MR. SOBOL: -- the screen or the exhibit?
8   MR. CHEFFO: No, it's the screen. I'm
9  pointing to the screen.
10  MR. SOBOL: I instruct him not to answer.  04:06PM
11 BY MR. CHEFFO:
12  Q. Okay. If you wanted to go online, Doctor,
13 to find the Kaiser Permanente web --
14  You can put it back on the doctor, please.
15  If you wanted to go online to find the    04:07PM
16 Kaiser Permanente website, how would you do it?
17  A. I would type in KP.org.
18  Q. KP.org?
19  A. In the -- in --
20  Q. Where?                                 04:07PM
21  A. In the address.
22  Q. So it would be a --
23  A. Just KP.org. You can erase all -- you can
24 delete all that. No -- okay.
25  Q. Is it www?                             04:07PM

Page 337

1  A. You're asking me the way I would do it. I
2  would have a whole blank section. I would type in
3  KP.org. That's how I would do it. It's not maybe
4  the best way, but that's the way I'd do it.
5  Q. Let's try that.                         04:07PM
6  A. Release -- no.
7  Q. KP dot --
8  A. You -- okay.
9  Q. -- org.
10  Okay. Is that the screen that you usually  04:08PM
11 see when you type that in?
12  MR. SOBOL: I instruct him not to answer.
13 BY MR. CHEFFO:
14  Q. Doctor, you understand that if we move to
15 compel this and Mr. Sobol is wrong, that you're    04:08PM
16 going to have to come back and answer these
17 questions; right?
18  MR. SOBOL: No, he's not going to have to
19 come back because if there's something on the record
20 that you want to do --                      04:08PM
21  MR. CHEFFO: I am on the record.
22  MR. SOBOL: -- with him --
23  I haven't finished what I'm saying.
24  If there's something you want to do with
25 him on the record with a document in front of him  04:08PM

85 (Pages 334 to 337)

Page 338

1  that he can read, you can do that, which you already
2  have.  If you're concerned about a foundational
3  issue about what appears in the website today, you
4  can speak to the lawyers.  You don't need him to do
5  it.                                              04:08PM
6       MR. CHEFFO:  That's not the way it works,
7  but that's fine.
8       MR. SOBOL:  Well, it is the way it works --
9  BY MR. CHEFFO:
10   Q.  Doctor, you have on the screen --
11       MR. SOBOL:  -- in Boston because you don't
12  have to waste this doctor's time making a foundation
13  for what exists in the website.  Judge Saris and
14  every other judge in Boston would say don't waste
15  people's time with that --                        04:09PM
16       MR. CHEFFO:  Okay.
17       MR. SOBOL:  -- Counsel.  Make a --
18       MR. CHEFFO:  I'm asking you then right now
19  to stipulate.  We have the witness here.  We're in
20  California.  If you stipulate that these are       04:09PM
21  authentic, I won't need to do it.
22       MR. SOBOL:  And you don't have to waste his
23  time today doing that, is my point.
24       MR. CHEFFO:  Okay.  But I'm asking you
25  then.  Will you stipulate?                        04:09PM

Page 339

1       MR. SOBOL:  If it's on the web, I'll
2  stipulate with you, but I don't know whether it is,
3  and I'm not doing stipulations today.  We're doing a
4  deposition of this Doctor.
5       MR. CHEFFO:  Okay.  But I want to find out  04:09PM
6  if it's on the web, and he can help us find that
7  out.
8       MR. SOBOL:  No, he doesn't have to take his
9  time, is my point.
10       MR. CHEFFO:  I don't know why you're so    04:09PM
11  scared of your own client's website.  It's stunning.
12       MR. SOBOL:  It's not a matter of being
13  scared.  It's a matter of not wasting his time.
14       MR. CHEFFO:  Do you care -- well, he's
15  still going to be here.  Okay, Tom?  I can use my  04:09PM
16  time.  Okay?  I'm using my time.
17  BY MR. CHEFFO:
18   Q.  I'd like you to go and log in --
19       MR. SOBOL:  You're using his time and our
20  time also.                                        04:09PM
21  BY MR. CHEFFO:
22   Q.  I'd like to log in, use your user ID and
23  log in and find out if you can find how you'd find
24  anticonvulsants for cancer pain and low back pain.
25       MR. SOBOL:  I instruct you not to be       04:09PM

Page 340

1  engaging in this, Doctor.
2       He's following his counsel's advice.
3       THE WITNESS:  I'm following my counsel's --
4       MR. CHEFFO:  Okay.
5       THE WITNESS:  -- advice.                    04:10PM
6  BY MR. CHEFFO:
7   Q.  If he had allowed you to do it, you could
8  log in to the website, couldn't you?
9       MR. SOBOL:  What website?
10  BY MR. CHEFFO:                                   04:10PM
11   Q.  The Kaiser Permanente website?
12   A.  I imagine I could have.  I don't remember
13  my user name and password, but I could have
14  probably, you know, gotten on somehow on some parts
15  of it.                                           04:10PM
16   Q.  Right.  And you could have accessed it, and
17  we could have been able to look and find out if
18  those things are on the website or not; right?
19   A.  We could -- I imagine so, yeah.
20   Q.  Okay.  Have you ever been to the part of   04:10PM
21  the -- in case you reconsider, we'll leave that
22  there for a few minutes.
23       Have you ever been to the part of the
24  website that has those listings?
25   A.  I've never seen these listings.            04:10PM

Page 341

1   Q.  Your lawyer's never showed you those?
2   A.  No.
3       MR. SOBOL:  Objection and instruct him not
4  to answer.  Actually, I move to strike.
5       What you discuss with your --
6  BY MR. CHEFFO:
7   Q.  This is the first time --
8       MR. SOBOL:  Wait a second.
9       What you discussed with the lawyers one way
10  or the other is privileged, Doctor.              04:11PM
11       THE WITNESS:  Thank you.
12  BY MR. CHEFFO:
13   Q.  That's the first time you've ever seen
14  those documents; right?
15   A.  Yes.                                        04:11PM
16   Q.  Are you surprised to see them?
17       MR. SOBOL:  Objection.
18       THE WITNESS:  What does it matter?  I'm
19  seeing them.  That's fine with me.
20  BY MR. CHEFFO:                                   04:11PM
21   Q.  Based on your testimony earlier today, are
22  you surprised to see those documents?
23       MR. SOBOL:  Objection.
24       THE WITNESS:  I don't -- I don't have any
25  kind of emotional reaction about them at all.  I'm 04:11PM

86 (Pages 338 to 341)

Page 342

1  just waiting to find out what you want me to tell
2  you about them.
3  BY MR. CHEFFO:
4     Q.  Are they consistent with your testimony?
5         MR. SOBOL:  Objection.                04:11PM
6         THE WITNESS:  What part of my testimony?
7  BY MR. CHEFFO:
8     Q.  Are the documents that say that
9  anticonvulsants and Neurontin can be used for
10 chronic pain, neuropathic pain and other syndromes,  04:11PM
11 are they consistent with your testimony earlier
12 today?
13        MR. SOBOL:  Objection.
14        THE WITNESS:  This is not data.  This is
15 not true data.  It -- so it has no bearing on any of  04:11PM
16 the testimony I gave you.
17 BY MR. CHEFFO:
18    Q.  What's the -- what -- does it have any use
19 or meaning whatsoever?
20    A.  Not -- no.  Not to me.                 04:12PM
21    Q.  What about to patients?
22    A.  It may.  I think the only use it would
23 have -- it would generate questions.  And then I
24 could -- you know, just like it says here.  In fact,
25 what does it say?

Page 343

1         It says somewhere here -- where does it say
2  it?
3         "This information is not intended to
4  replace the advice of a doctor."
5         So this usually is just to generate       04:12PM
6  questions.  This is not accurate information.  It's
7  not -- it's just -- it's generic basically to
8  stimulate -- and, in fact, I don't even know who
9  Healthwise is.  But like I told you before,
10 Healthwise, it's not Kaiser.                 04:12PM
11    Q.  But Kaiser -- you know who Kaiser is;
12 right?  That's on the top left of the document,
13 isn't it?
14        MR. SOBOL:  Which document?
15 BY MR. CHEFFO:                              04:12PM
16    Q.  Kaiser -- on every one of them.  Kaiser
17 Permanente --
18    A.  Are you asking me if I know what Kaiser is?
19    Q.  Well, no.
20    A.  Are you actually asking me that?       04:12PM
21    Q.  You said it says Healthwise, but it's
22 printed out on the Kaiser Permanente document;
23 right?
24    A.  It appears to be.
25    Q.  Okay.

Page 344

1     A.  Sure.
2     Q.  And is there any information that you
3  disagree with in any of the five or six exhibits
4  that I put before you and gave you a chance to read?
5         MR. SOBOL:  Objection.                04:13PM
6         Do you want him to read each one and go
7  through it that way?
8         MR. CHEFFO:  Well, I thought he did read
9  them.
10        THE WITNESS:  I reviewed them.  I mean, I   04:13PM
11 didn't -- you know --
12        MR. SOBOL:  Are you withdrawing the last
13 question?  Yes or no.  Because then he would have to
14 go through each exhibit line-by-line and make a
15 decision about whether or not he agrees or disagrees  04:13PM
16 with it.
17        MR. CHEFFO:  Okay.  Let's go off the
18 record.
19        THE VIDEOGRAPHER:  Off the record, 4:14.
20        (Discussion off the record.)          04:14PM
21        THE VIDEOGRAPHER:  Back on the record 4:16.
22        THE WITNESS:  I don't want to read these
23 all over again.  I -- if there's a -- the question
24 is so general about all of them.  If there's
25 something specific --                        04:14PM

Page 345

1         MR. CHEFFO:  Okay.
2         THE WITNESS:  -- I'm happy to look at it.
3  BY MR. CHEFFO:
4     Q.  Let's take them one at a time.
5         Read the one for cancer pain and tell me if  04:14PM
6  there's anything wrong or inaccurate in it.
7     A.  There's something misleading about it.
8     Q.  Misleading?
9         MS. NUSSBAUM:  Do you have another copy of
10 that one for counsel?                        04:15PM
11        MR. CHEFFO:  I think he has them all.
12        MS. NUSSBAUM:  No.
13        MR. SOBOL:  Hold on a second.  Before he
14 answers the question, can we have a copy of the
15 cancer one, please.                          04:15PM
16        MS. NUSSBAUM:  We only have chronic low
17 back and restless leg.
18        MR. CHEFFO:  I think I gave you all of
19 them.
20        THE WITNESS:  I don't have a second copy of  04:15PM
21 it.
22        MS. NUSSBAUM:  Doctor, you have the
23 exhibits.
24        MR. CHEFFO:  You can look at mine.
25        THE WITNESS:  Here's another one here,   04:15PM

87 (Pages 342 to 345)

Page 346

1     MR. CHEFFO: Oh, I thought I didn't give it
2  to you?
3     THE WITNESS: Here's one for --
4  BY MR. CHEFFO:
5     Q.  Okay. So what's misleading in the cancer    04:16PM
6  pain?
7     A.  It's this -- it suggests that
8  anticonvulsants are sometimes used generally for
9  cancer pain. It's like saying using your heels stop
10 a car.                                              04:16PM
11    MR. CHEFFO: I'm sorry. Could you read
12 that back?
13    (Record read as follows:
14    "ANSWER: It suggests that
15    anticonvulsants are sometimes used              04:16PM
16    generally for cancer pain. It's like
17    saying using your heels stop a car.")
18 BY MR. CHEFFO:
19    Q.  So that's a misleading statement on the
20 Kaiser Permanente website?                         04:16PM
21    A.  Well, it's a misleading statement by
22 Healthwise, if this is by Healthwise. I'm assuming
23 it is. But it's misleading to suggest that
24 anticonvulsants are generally used for cancer pain.
25    Q.  Okay. What else is misleading on the        04:16PM

Page 347

1  Kaiser Permanente website regarding anticonvulsants
2  for cancer pain, if anything?
3     MS. NUSSBAUM: Objection.
4     THE WITNESS: You keep saying that -- the
5  Kaiser Permanente website, and I'm only speaking   04:17PM
6  about this particular document. I can't possibly
7  speak to the entire website.
8  BY MR. CHEFFO:
9     Q.  Well, we're talking about that -- okay?
10    A.  Okay. I just -- whenever you say -- you    04:17PM
11 keep mentioning --
12    Q.  What's the exhibit number there?
13    A.  I don't have it. Oh, 17.
14    Q.  Okay. In Exhibit 17, what, if anything,
15 else is misleading?                                04:17PM
16    A.  It's misleading to have a list of
17 medications that appear to have equal prominence as
18 if all of them are equal to the other.
19    It's misleading to suggest that there's
20 something specific about the way anticonvulsants   04:17PM
21 work in regard specifically to cancer pain.
22    It's misleading to suggest that it is
23 commonly used in the section, "Why It is Used."
24    It's misleading to use the word "well" in
25 "How Well It Works."                               04:18PM

Page 348

1     The side effect profile seems relatively
2  accurate. And the USDA -- FDA warning seems
3  accurate.
4     It's misleading to use the word "drug
5  encyclopedia" when we don't really -- we don't --  04:18PM
6  it's a language that's not usually our website
7  language, so it looks like it's something from
8  somewhere else. I don't know if we have a drug
9  encyclopedia, but it's not a term I've used with
10 ours.                                              04:18PM
11    It's misleading to put the Tegretol at the
12 top of the list in the beginning examples and at the
13 end say, it's not generally used in cancer pain. It
14 seems contradictory, and it seems to reflect a lack
15 of care that's taken with this overall.            04:19PM
16    It's misleading to -- well, that's enough.
17 That's enough misleading stuff.
18    Q.  Do you know who any of the people listed
19 are?
20    A.  Only one, the citation.                     04:19PM
21    Q.  Who's that?
22    A.  Kathleen Foley. She's a well-respected
23 cancer pain doctor.
24    Q.  Anybody else listed on the credits or the
25 medical review?                                    04:19PM

Page 349

1     A.  I don't know them.
2     Q.  Do you know who Anne Poinier is?
3     A.  No.
4     Q.  Do you know who Shannon Erstad is?
5     A.  No.                                         04:19PM
6     Q.  Okay. What's the next exhibit that you
7  have? Why don't you look at the low -- chronic low
8  back pain.
9     A.  Okay.
10    Q.  What, if anything, is misleading on that    04:19PM
11 exhibit, talking about anticonvulsants and chronic
12 low back pain?
13    A.  It's -- some of them are similar.
14    It's misleading to suggest that
15 anticonvulsants for chronic low back pain is a     04:20PM
16 standard and common treatment.
17    It's misleading, again, to order the
18 examples in the way they are, as if they have equal
19 emphasis.
20    It's misleading to describe a sentence "How    04:20PM
21 It Works" when the topic is titled "Chronic Low Back
22 Pain," but then the description of how it works
23 talks about brain electrical activity.
24    It's just another example of how poorly
25 conceived and lacking they are in any real         04:20PM

88 (Pages 346 to 349)

12a34797-d1b4-4842-88ce-84b30d0c9d39

Page 350

1  expectation that this would be used in any kind of
2  significant way.
3      It's misleading that -- the comment about
4  persistent low back pain with fewer side effects
5  is -- suggests that all anticonvulsants can reduce          04:21PM
6  some persistent low back pain to the advantage of
7  all tricyclic antidepressants with fewer side
8  effects than all anti- -- tricyclic antidepressants.
9      It's misleading to use the phrase "How Well
10 It Works" when it doesn't work very well.  It may           04:21PM
11 work, but it gives a false sense that it works very
12 well, especially when it -- the title of the
13 paragraph is "How Well It Works" and the third
14 sentence says, "This type of medicine is not
15 well-studied as a chronic pain treatment."  So             04:21PM
16 that's contradictory.  In addition --
17    Q.  Are there any half truths in there, Doctor?
18       MR. SOBOL:  Objection.  Had he finished his
19 answer?
20       THE WITNESS:  I -- no, I -- there's many             04:21PM
21 other things that were --
22 BY MR. CHEFFO:
23    Q.  No, you can keep going.
24    A.  Okay.  The pregabalin can cause swelling in
25 some people, including swelling of the face or lips.       04:22PM

Page 351

1      Really, the thing that bothers most people
2  is the leg swelling, which can be really
3  devastating.
4      And the other thing is that the -- what's
5  misleading is that the citations are from the              04:22PM
6  American Geriatric Society, which presumably is
7  something that discusses chronic low back pain for
8  geriatric patients, and it's misleading to put this
9  without identifying that -- at least in the title,
10 that this is primarily based on geriatric patients,       04:22PM
11 and it's misleading that there's no geriatrician in
12 the credits for the reviews when the citation is
13 from the American Geriatric Society.
14     And it's also misleading that there is no
15 pain doctor or physiatrist or anybody who actually        04:22PM
16 prominently sees low back pain as a primary part of
17 their practice.
18     And it's also misleading to not identify --
19 well, it's okay.  The Healthwise issue is another
20 one -- no one would be reasonably -- would               04:23PM
21 reasonably think that it wasn't a Kaiser document.
22 It's a little misleading to me.  I know when I look
23 at things, I see Healthwise, it seems like a strange
24 name to me.  So I know, but a patient wouldn't think
25 that.  They would think somehow if -- it's an            04:23PM

Page 352

1  imprimatur of some type, which it's not.
2      So those are the misleading things.
3      And you asked me if there were any half
4  truths, and I would say if there are, that means
5  there's half lies, in which case it's, as we say,         04:23PM
6  gornisht anyway.  It's nothing.
7     Q.  Are there any half truths or half lies?
8        MR. SOBOL:  Objection.
9        THE WITNESS:  I don't know how to measure a
10 truth.                                                    04:23PM
11 BY MR. CHEFFO:
12    Q.  Can you look at the next exhibit that you
13 haven't reviewed and --
14    A.  Headache cluster.
15    Q.  Yes, sir.                                          04:23PM
16    A.  Okay.
17    Q.  Doctor.  Excuse me.
18    A.  That's okay.
19    Q.  And just so we're clear, the question I'm
20 asking you is, are there any misleading or                04:24PM
21 misrepresentations in that exhibit?
22       MR. SOBOL:  Which exhibit are we on now?
23       THE WITNESS:  Headache cluster.
24 BY MR. CHEFFO:
25    Q.  Which is the number there, Doctor?                 04:24PM

Page 353

1    A.  15.
2    Q.  What's the heading -- what's the title of
3  it, just for the record?
4    A.  "Headache, cluster."
5    Q.  Okay.                                               04:24PM
6        MS. NUSSBAUM:  I don't have it.
7        THE WITNESS:  What's misleading -- I won't
8  go over the things that are similarly misleading as
9  in the other one, but the new misleading things --
10       MR. SOBOL:  Hold on.  Before you answer the        04:24PM
11 question, may we have a copy of the exhibit.
12       MR. CHEFFO:  You did this to me last time.
13 I threw two for everyone.  She told me that you
14 don't have it and then it's in there.  So before you
15 tell me again it's not there, let's look.                 04:24PM
16       THE WITNESS:  You're being punished.
17       MR. SOBOL:  I don't see it.
18       THE WITNESS:  I have Headache, Cluster
19 here.
20       MS. NUSSBAUM:  Yeah, these are all original        04:24PM
21 exhibits.
22       THE WITNESS:  Yeah, I know, but I have only
23 one Headache, Cluster here because last time I had
24 the second one.
25 BY MR. CHEFFO:

89 (Pages 350 to 353)

Page 354

1  Q.  Put Headache, Cluster aside for a minute.
2  A.  Okay.
3  Q.  I want to see if we have another one.  See
4  if you can --
5  A.  Burning Mouth --                         04:25PM
6  Q.  -- use the next one.
7  A.  Burning Mouth Syndrome.
8  Q.  Yeah.
9      MR. SOBOL:  I don't have that one either.
10     THE WITNESS:  Maybe it's over here.       04:25PM
11     MS. NUSSBAUM:  No.  You only have exhibits.
12 There are no more -- you don't have anymore.
13     THE WITNESS:  Primary Orthostatic Tremor,
14 do you have that one?
15 BY MR. CHEFFO:                                04:25PM
16 Q.  Do Burning Mouth.  I have Burning Mouth.
17 A.  Okay.  Burning -- we have a second Burning
18 Mouth there, please.
19     MR. SOBOL:  I do not have a Burning Mouth.
20     MR. CHEFFO:  He's going to give it to you.
21     THE WITNESS:  Thank God.
22 BY MR. CHEFFO:
23 Q.  Okay.  What's the number there, what
24 exhibit number?
25 A.  18.                                       04:25PM

Page 355

1  Q.  Okay.  What's -- what, if anything, is
2  misleading about the Exhibit 18?
3  A.  What's misleading is --
4      MR. SOBOL:  Objection.
5      Go ahead.                                  04:25PM
6      THE WITNESS:  What's misleading is that the
7  title is -- under Healthwise is "National
8  Organization for Rare Disorders, Inc."  It sounds as
9  if it's some kind of benevolent society for rare
10 disorders, maybe even NIH related.  It has a similar  04:25PM
11 ring to some of the more official government, and my
12 impression is -- I don't know who they are.  I don't
13 know if they're a patient support organization or
14 not.  It doesn't sound like the ones that I know.
15 So that's a little bit misleading.              04:26PM
16     The other things that are misleading about
17 it.
18     The symptom -- the general discussion and
19 the symptoms section are actually -- I think they're
20 quite clear, and that -- those actually are           04:26PM
21 informative to a general person.  I think that
22 the -- I think that the causes are informative.  I
23 think that the affected population section is
24 informative.  I don't know if it's accurate.
25 Whenever I say informative -- most of it is, up      04:26PM

Page 356

1  until now, I would say is probably pretty accurate
2  just on a quick read.
3      Related disorders seems informative.
4      The standard therapies are informative
5  until you get to the medications, because even with   04:27PM
6  Elavil and Klonopin, including Neurontin, those
7  are -- really there is no good study for any of
8  them.  And there's no -- it's hard to say any of
9  them would help except for helping people sleep.
10     So it's deceiving in the sense that, you     04:27PM
11 know, it might help do more things than is
12 suggested, although they seem to be clear about that
13 they're designed to reduce pain or the perception of
14 pain.  But mostly, really, they're more sedation,
15 and the -- one of the proofs of that is that they     04:27PM
16 all have to be taken at bedtime.  And many patients
17 with this disorder have problems at bedtime, and so
18 it's really mostly for sleep and for anxiety.
19 BY MR. CHEFFO:
20 Q.  I think you're doing this, Doctor, but for    04:28PM
21 the purpose of time, I would just ask you to focus
22 on either half truths or misstatements or things
23 like that.
24     I think that's what you've been doing;
25 right?                                                04:28PM

Page 357

1  A.  Uh-huh.
2  Q.  Okay.
3  A.  It's interesting to me also that the --
4  it's -- combined with the misleading National
5  Organization for Rare Disorders, Inc., is that when   04:28PM
6  they look in their resources, the National
7  Organization for Rare Disorders is not one of the
8  resources that they use, which means that it's not
9  really a resource, even though it appears to be.
10     What's next?                                  04:28PM
11 Q.  Do you have the headaches?
12 A.  No.  I have Anticonvulsants For Chronic
13 Pain, for Hot Flashes.
14 Q.  Yeah, why don't we do the Hot Flashes?
15 A.  Hot Flashes.                                  04:28PM
16     MR. SOBOL:  May I have a hot flash, please.
17     MR. CHEFFO:  Gladly.
18     THE WITNESS:  I can't comment on this in
19 any way other than as just as a patient because I
20 don't treat hot flashes.                              04:29PM
21     MR. SOBOL:  What number is this?
22     THE WITNESS:  That is number 14.
23     But what's misleading about it is that the
24 only name there is Neurontin, and yet how it works
25 is clearly something different.  And how it works to  04:29PM

90 (Pages 354 to 357)

Page 358

1  improve hot flashes is not fully understood.  It's
2  misleading because you could put almost anything in
3  there, you know, how clouds work to improve hot
4  flashes is not fully understood.  I mean, how
5  anything -- so it's a little misleading.           04:29PM
6       And then, after it tells you it's not
7  understood and it's misleading, then it tells you it
8  may be used to treat it.  Well, again, holy water
9  may be used to treat it.  Good conversation may be
10 used to -- so it's a little misleading.  Anything    04:29PM
11 can be -- you know, anything is treat- -- baldness
12 is treatable, you know, it's not curable.
13      So -- but otherwise, I don't have much to
14 say.  I just do notice that Anne Poinier is -- again
15 seems to be active here.  I wonder if -- I mean is   04:30PM
16 Anne Poinier on the Pfizer speaker -- speakers
17 bureau?
18 BY MR. CHEFFO:
19    Q.  Why don't you continue answering --
20    A.  I mean, I was on the speakers bureau for     04:30PM
21 Pfizer.
22    Q.  Why don't you just continue answering my
23 question.
24    A.  Oh, okay.  Because, I mean, that's the
25 first -- I start looking at this all over the place, 04:30PM

Page 359

1  and I think, oh, maybe she's -- but I don't know
2  her, so I would never suggest that that was true,
3  but it's just what's on my mind.
4       Next is Anticonvulsants For Chronic Pain.
5  I have all the same misleading statements.         04:30PM
6    Q.  I'm sorry, Doctor.  Which one are you on?
7    A.  16.
8    Q.  Which one is that, the heading?
9    A.  "Anticonvulsants For Chronic Pain."
10   Q.  That's in your area of expertise; right?    04:31PM
11   A.  Uh-huh.
12   Q.  Okay.
13      THE REPORTER:  Is that yes?
14      THE WITNESS:  Yes.
15 BY MR. CHEFFO:                                      04:31PM
16   Q.  What, if anything, is false, misleading or
17 untruthful in this document?
18      MR. SOBOL:  I'm sorry.  Which one are we
19 on?
20      THE WITNESS:  16, Anticonvulsants For       04:31PM
21 Chronic Pain.
22      It's misleading -- the part that's
23 misleading is that chronic pain encompasses any
24 single type of pain that may last for longer than a
25 certain period of time.                             04:31PM

Page 360

1       It's misleading to think that anyone --
2       (Discussion off the record.)
3       THE WITNESS:  It's misleading because the
4  title suggests that anticonvulsants can be used for
5  any type of pain of any dura- -- of any long       04:31PM
6  duration of any type.  So from -- who knows what it
7  means.  It could mean from my shoulder that's been
8  hurting for three months to my headache, to my
9  cancer around my pancreas, to my prostate.  I have
10 no idea what "Anticonvulsants For Chronic Pain"    04:31PM
11 means.  So it's very misleading.  It suggests that,
12 hey, if you have pain, you know, we welcome all
13 comers.
14      And why it is used -- very sketchy.  It's
15 not very -- it's not very -- it's misleading in the 04:32PM
16 sense that it's suggested it's commonly being used
17 and appropriate for essentially any pain.
18      And more specifically, what's wrong about
19 it is that, you know, is the pregabalin -- the
20 pregabalin stuff.  That's just misleading because  04:32PM
21 pregabalin has been shown to not be as effective as
22 tricyclics in some studies.  So -- and has had
23 negative studies that weren't published.  So that I
24 know from Robert Dworkin, who's one of the big
25 Pfizer guys who told me that personally.  So that's 04:32PM

Page 361

1  something that's -- is misleading.
2       It's misleading that the F- -- it says FDA
3  has issued an warning anticonvulsants --
4       THE REPORTER:  You'll have to read slower.
5       THE WITNESS:  I'm sorry.  It's             04:33PM
6  misleading -- no, I take that back.  Oh, and Anne
7  Poinier is here again.  She must be quite an expert
8  in many, many areas.  I'm saying that sarcastically.
9  But I, again -- she's the primary reviewer, and now
10 it makes me -- she may very well have a full pain   04:33PM
11 practice of patients with chronic pain, tremors and
12 hot flashes.  I don't know.  But I just -- all of a
13 sudden, I'm seeing her name everywhere.  Unless
14 she's very ambitious and wants to be on everything,
15 I would start to think about it.  You know, I       04:33PM
16 honestly don't know her at all.  I don't even know
17 who she is.
18      And then Primary Orthostatic Tremor.  The
19 same kinds of problems.  National Organization for
20 Rare Disorders, Inc., that's Exhibit 13.  The       04:34PM
21 general discussion is more or less -- well, it's not
22 necessarily rare.  It's uncommon.  And the inf- --
23 some of the information is, I think, on mark.  Some
24 of the related disorders, I think, that's
25 informative.                                        04:34PM

91 (Pages 358 to 361)

Page 362

1  Standard therapies, it's misleading because
2  the way that it's worded suggests that people who
3  haven't responded to anything suddenly respond
4  favorably to gabapentin. I think it would have been
5  more accurate if they had simply included it in    04:35PM
6  additional drug therapies, which I think, you know,
7  maybe would have not been accurate or been kind of
8  borderline accurate, but it would have been
9  borderline accurate equally about primidone and
10 about valproic acid and other things. In fact, it   04:35PM
11 helps some people. It doesn't help some.
12     It's odd to me that it was singled out for
13 a separate sentence on its own, describing some
14 affected individuals responded favorably after being
15 treated with an anti-seizure drug called gabapentin,  04:35PM
16 as if it's this thing we didn't know anything about
17 it and now -- it's just -- it differentiates in a
18 way that's misleading.
19     And then otherwise, I think that, you know,
20 it's information that's available elsewhere. And so  04:35PM
21 that part is not misleading.
22     And again, the other misleading part is
23 this -- this corporation that has -- National
24 Organization for Rare Disorders, Inc., and yet is
25 not one of the resources. That's very suspicious.   04:36PM

Page 363

1  Why aren't they one of the resources? What -- why
2  do they call themselves that and what do they do?
3  Why are they in this? And they do have a email
4  there, and I don't know anything more about them.
5     And that would be it.   04:36PM
6  BY MR. CHEFFO:
7     Q.  Okay. You mentioned holy water a few
8  times.
9     A.  Yes.
10    Q.  Who do you mean by that, just so the   04:36PM
11 record's clear?
12    A.  I meant a treatment that has no evidence.
13    Q.  Something that's ineffective or a
14 superstition, something like that?
15    A.  No. A treatment that has no evidence and  04:36PM
16 yet there's strong belief about it.
17    Q.  You said you were on the -- Pfizer's
18 speakers bureau?
19    A.  I was.
20    Q.  In what capacity?   04:36PM
21    A.  As a -- I spoke for -- as a speaker.
22    Q.  What product?
23    A.  Neurontin.
24    Q.  When was that?
25    A.  1996, I think. It was '96. Just before I   04:37PM

Page 364

1  joined Kaiser.
2     Q.  What were your responsibilities?
3     A.  My responsibilities were to give a talk on
4  pain.
5     Q.  You gave one talk?   04:37PM
6     A.  I gave one talk.
7     Q.  Who did you give it to?
8     A.  To a group in San Jose on a boat. I don't
9  remember exac- -- I think they were family
10 practitioners. I don't remember exactly. My   04:37PM
11 contact person there was -- it was a woman, but I
12 don't -- also don't remember her name.
13    Q.  Do you remember -- do you have the
14 materials that you used?
15    A.  No.   04:37PM
16    Q.  Did you use any materials?
17    A.  Yes.
18    Q.  Who gave them to you?
19    A.  Some of them I did myself, and others, they
20 were given to me by the -- it was part of a slide   04:37PM
21 set from the company.
22    Q.  And do you remember the sum and substance
23 of what you talked about?
24    A.  Yes. It was a general pain talk, and in it
25 I talked about the different -- some different   04:38PM

Page 365

1  disorders. It was the typical talk I gave at that
2  time, which was introduction to disorders and some
3  of the treatments.
4     Q.  And how did Neurontin come up, or what did
5  you talk about with respect to Neurontin?   04:38PM
6     A.  Neurontin came up because I had -- well,
7  first of all, I had been detailed for -- you know,
8  for a long time about it, so I had gotten a lot of
9  information. And then I was -- I had come out of my
10 fellowship and so the -- I forgot who asked --   04:38PM
11 somebody asked me if I wanted to be on the speakers
12 bureau. It wasn't the person in San Jose, but
13 somebody asked me, and somehow I got to be on it,
14 and I don't remember how.
15     And then I was asked to talk about it, and   04:38PM
16 one of the things that I always did -- I'd given
17 other lectures. You know, obviously in fellowship
18 you give a lot of lectures and afterwards, newly
19 started, you market yourself. You give lectures.
20 And I'd always -- my first statement was always,   04:39PM
21 well, you know, I just -- I need to be honest about
22 the -- I want to be even-handed, so I don't want to
23 emphasize one thing or another in the lecture. So
24 that was always the thing that I started out with.
25     So the idea of a lecture was to -- well,   04:39PM

Page 382

1  people remove the restriction?  It's not without
2  meaning, is it?
3       MR. SOBOL:  Objection.
4       THE WITNESS:  The reason that this happens
5  is if anesthesia doctors who are treating pain are    04:54PM
6  seeing more of these kinds of patients than the
7  other department which had previously been given the
8  restriction, they simply want to be included so
9  that, should a patient come where they think they
10 might want to use it, they would like to use it       04:54PM
11 without having to waste the patient's time by having
12 an additional consult go to the neurologist who at
13 that time were the ones who had the restriction --
14 who had the formulary right, and not waste the
15 patient's time because the neurologists weren't       04:55PM
16 seeing those kind of pain patients.
17      So it -- really, the intent was to smooth
18 patient care, remove barriers to care, and to give
19 options to doctors.  It doesn't in any way mean that
20 it was a -- there was -- in any way had -- it didn't  04:55PM
21 in any way have a permissive intent.
22 BY MR. CHEFFO:
23    Q.  So you don't think it had -- you don't
24 think there was any indication -- you can't read any
25 stamp of approval regarding efficacy from the P&T     04:55PM

Page 383

1  committee?
2     A.  No.  You can only read that somehow that
3  there -- the people thought that they wanted to be
4  able to use it without having to send it to the
5  neurologist as --                                     04:55PM
6     Q.  And the P&T was blind --
7       MR. SOBOL:  He hasn't finished answering
8  the question.
9       THE WITNESS:  -- to send it to the
10 neurologist because they were the ones who were       04:55PM
11 seeing more of these patients.  And if it was going
12 to start to be used in the patients they were
13 seeing, then they didn't have to have to waste the
14 time.
15 BY MR. CHEFFO:                                        04:56PM
16    Q.  Then why do they have a section here on
17 efficacy?  Is that irrelevant?
18    A.  It's a standard section.
19    Q.  Well, it's not blank, is it?
20    A.  It's a standard section in all             04:56PM
21 medication -- of monographs that we have -- the P&T
22 has.
23    Q.  If there was no efficacy, do you think the
24 P&T would have approved it?
25      MR. SOBOL: Objection.                         04:56PM

Page 384

1       THE WITNESS:  If there was no efficacy,
2  they still would have this section, which is the
3  question you were asking.
4  BY MR. CHEFFO:
5     Q.  Would they have approved it, do you          04:56PM
6  believe?  Do you believe they would have -- if this
7  said, efficacy, absolutely none, do you think the
8  P&T would have approved the medicine --
9     A.  No.
10    Q.  -- that costs about 10 times --              04:56PM
11      MR. SOBOL:  Objection.
12 BY MR. CHEFFO:
13    Q.  -- more?
14      MR. SOBOL:  Objection.
15      THE WITNESS:  I don't think so.                04:56PM
16 BY MR. CHEFFO:
17    Q.  Okay.  So they considered efficacy?
18    A.  They considered --
19      MR. SOBOL:  Objection.
20      THE WITNESS:  I think that they considered   04:56PM
21 all the factors including efficacy and perhaps even
22 that anesthesiologists, who were trying to keep up
23 with the literature, wanted to have a tool that they
24 thought was forward thinking.
25 BY MR. CHEFFO:                                        04:56PM

Page 385

1     Q.  Okay.  Do you think the anesthesiologists
2  would ask for something they thought had no
3  efficacy?
4       MR. SOBOL:  Objection.
5       THE WITNESS:  I can't -- at the same time    04:57PM
6  that I can't presuppose to think for what
7  anesthesiologists wanted, at the same time I'm
8  surprised that there would be any other alternative
9  to that answer than why would anyone ask for
10 something that has no efficacy.                       04:57PM
11 BY MR. CHEFFO:
12    Q.  I agree, Doctor.
13      Can we mark that?
14    A.  Are we taking that break soon?
15    Q.  Oh, we can do it now if you need to.  Let's  04:57PM
16 go off the record.
17      THE VIDEOGRAPHER:  Off the record, 4:59.
18      (Recess taken.)
19      (Deposition Exhibit 21 was marked for
20 identification.)                                      05:06PM
21      THE VIDEOGRAPHER:  Back on the record.  The
22 time is 5:08.
23      MR. SOBOL:  Before we begin, I just wanted
24 to put on the record that it's my understanding that
25 the court has ordered that the deposition go for    05:07PM

97 (Pages 382 to 385)

Page 386

1  seven hours.  The plaintiff's position is that that
2  time should be split in half, three and a half hours
3  each.
4        As in the accommodation to counsel for
5  Pfizer, the plaintiffs have been permitting the        05:07PM
6  questioning to go after three and a half hours.
7  We're now somewhat over six hours, and our position
8  is that the deposition -- the questioning of -- by
9  Pfizer has slightly less than an hour left.
10       I would suggest to counsel that some of         05:07PM
11 that time be reserved if they want any opportunity
12 to undertake a redirect after we have questioned the
13 witness, which we intend to do when you're at the
14 end of the next hour.
15       MR. CHEFFO:  We'll take that under             05:07PM
16 advisement.  I want to use our time appropriately on
17 the record, so let's just go.
18 BY MR. CHEFFO:
19   Q.  You had a chance to look at what we've
20 marked as Exhibit 21, Doctor?                         05:08PM
21   A.  Yes.
22   Q.  It's also got a 24 sticker, but you --
23 we'll ignore that.  That's from a prior deposition.
24       Have you ever seen this document before?
25   A.  No.                                            05:08PM

Page 387

1   Q.  It's from a chief of neurology meeting
2  June 17th, 1999; right?
3   A.  Yes.
4   Q.  And it's a Kaiser document?
5   A.  It doesn't -- there's a stamp that says KIS     05:08PM
6  confidential, which I think means it is a Kaiser
7  document.
8   Q.  And Debbie Kubota, she's a drug information
9  services person?
10  A.  Yes, she is.                                    05:08PM
11  Q.  The -- we know from your declaration that
12 the P&T committee took up the issue of guidelines
13 and restrictions of gabapentin in or about
14 September of 1999; is that correct?
15  A.  Yes.                                            05:08PM
16  Q.  So this is approximately three or four
17 months before.
18  A.  It was in June 1999.
19  Q.  Okay.  And under gabapentin, there is a --
20 information here from this chief of neurology         05:09PM
21 meeting regarding removal of restrictions; right?
22  A.  Yes.
23  Q.  And it says that:
24       "Family Practice and Internal
25    Medicine people have asked to expand              05:09PM

Page 388

1    the restriction to include prescribing
2    for neuropathies and/or with guidelines
3    or consultation with neurology."
4       Right?
5   A.  That's the first sentence, yes.                 05:09PM
6   Q.  And then in the next paragraph, it says:
7       DI/SPS, which is the Kaiser DIS
8    service, "is recommending to remove
9    prescription restrictions and add
10   guidelines for the use of gabapentin to            05:09PM
11   discourage overprescribing with
12   resultant significant cost impact."
13      Did I read that correctly?
14  A.  More or less.
15  Q.  Okay.  Were you aware this was going on on      05:09PM
16 or about the time of June 17th, 1999?
17  A.  I don't recall if I was aware right then.
18 I mean, I was aware at some point in 1999.  I don't
19 know about that moment.
20  Q.  Were you aware that there was -- that the      05:10PM
21 family practice and internal medicine folks had
22 asked to remove the guidelines or restrictions or
23 alter them?
24  A.  I'm not surprised, but I don't remember.
25 It makes sense to me that they would.                05:10PM

Page 389

1   Q.  And is it a fair reading that this was then
2  being presented to the chief of -- chiefs of
3  neurology to consider that request so they could
4  weigh in?
5   A.  Weighing is in the important point.  Yes,      05:10PM
6  they were asked for their opinion.
7   Q.  And they would be one of a group that would
8  then ultimately give a recommendation to the P&T
9  committee?
10  A.  That's usually the -- my understanding is      05:10PM
11 that's the way it happens.  That's the way it works.
12  Q.  Okay.  And back here in 1999, there was a
13 concern about overprescriptions and possible
14 significant cost impact of gabapentin?
15  A.  That's what's stated.                          05:10PM
16  Q.  And, in fact, they had tracked unrestricted
17 use in Northern California and determined that, in
18 the past year, there were 30,384 prescriptions for
19 gabapentin?
20  A.  Right.  You're reading the document.  I --     05:11PM
21 that's exactly what it says.
22  Q.  Right.  Well, remember I asked you earlier
23 if there were ways of figuring out how many
24 prescriptions were written.
25      Is it fair to say that someone went back       05:11PM

98 (Pages 386 to 389)

Page 406

1 example. We saved many lives precisely with the
2 DUAT organization, doing what we do best, which is
3 quality utilization. So I have reason to trust
4 that.
5     I don't necessarily have every reason to         05:26PM
6 trust the -- Pfizer, who had been detailing me for
7 years, telling me all this stuff, and then giving me
8 a lecture somewhere and then insinuating that I
9 hadn't talked enough about Neurontin and feeling,
10 you know -- you know, all those things and then    05:26PM
11 being dropped from it, thinking to myself, well,
12 gee, I must -- I guess I must be a bad speaker, but
13 then realizing that wasn't the case. That's the
14 track record I have with Pfizer.
15     The track record I have with Pfizer is a        05:26PM
16 well-publicized, well-known marketing snafu where
17 they got sued, has been in the papers all over the
18 place. I didn't -- that's a track record.
19     You know, as far as I'm concerned, you
20 know, what's the difference between -- I mean, why  05:26PM
21 do we need a Pfizer? We could have just one guy in
22 a room creating medical papers and, you know, why --
23 as long as -- it's a slippery slope. As long as you
24 are, you know, being a little bit -- you know, you
25 can kind of do what you want, then why not just     05:27PM

Page 407

1 write what you want. I don't understand why Pfizer
2 needs to have buildings all over the place. Just
3 have one guy in a room. That -- you know, it's
4 really irritating as a physician, as someone who
5 other people depend on for opinions, to be -- it    05:27PM
6 feels like --
7 BY MR. CHEFFO:
8   Q. This is our use of time?
9   A. It feels like it's being mocked. Well, you
10 know, I -- you know, it's been --                   05:27PM
11   Q. I'm not going to interrupt you, Doctor.
12 You go on --
13   A. You just did.
14   Q. Well --
15   A. You just did.
16   Q. -- I think you've gone on for -- I let you
17 go for -- you know, rambling on.
18   A. Right. And you know what, I feel like I've
19 been here --
20   Q. Okay. I'm going to move to strike. Do you  05:27PM
21 want to keep talking? I'll let you.
22   A. I can't unless you let me. Will you?
23   Q. You know what, I'm not going to interrupt
24 you.
25   A. I feel that that kind of evidence cooking  05:27PM

Page 408

1 and that kind of marketing is mocking of a whole
2 medical organization. I think it destroys the trust
3 that people have. I think when a patient comes to
4 me, if anything like this comes out or when
5 gabapentin came out and there was a big problem, I  05:28PM
6 look like an idiot. I don't like to look like an
7 idiot with my patients. I don't like to look like
8 an idiot with my colleagues.
9   Q. Are you --
10   A. So that's why it has an effect on me.      05:28PM
11   Q. Are you done?
12     MR. SOBOL: Yeah, he's done.
13     THE WITNESS: I'm done. I'm done, and I'm
14 done politely.
15     MR. CHEFFO: I'm going to move to strike   05:28PM
16 that entire response.
17     THE WITNESS: You look like you might have
18 a little tremor. Do you maybe -- do you need a
19 little gabapentin there?
20     MR. SOBOL: Let's go, guys.               05:28PM
21 BY MR. CHEFFO:
22   Q. Now, do you -- just -- I'm not going to ask
23 you specifics about the Abramson report or any of
24 the other reports, but do you know whether you were
25 the only doctor at Kaiser who received that        05:29PM

Page 409

1 information?
2   A. I don't know.
3   Q. You don't know if it was widely
4 disseminated or to anybody else in Kaiser, do you?
5   A. I don't know. I know Mitch Cohen, who's at  05:29PM
6 Kaiser Health Plan, had it. So -- but I don't know.
7 I assume that it was, but I don't know.
8   Q. You assumed it was?
9   A. I assumed it was, yes.
10     MR. SOBOL: Motion to strike.             05:29PM
11 BY MR. CHEFFO:
12   Q. And if you assumed it was, that would mean
13 it's -- people other than you know about it; right?
14     MR. SOBOL: Objection.
15     THE WITNESS: I don't know.
16     MR. SOBOL: Motion to strike the last
17 answer about the last assumption.
18     THE WITNESS: I don't know specifically. I
19 don't have specific knowledge of it.
20 BY MR. CHEFFO:                                  05:29PM
21   Q. So when you wrote here -- when you wrote
22 here in your sworn declaration that you recommend
23 removal of all formulary guidelines and restrictions
24 for Neurontin under oath --
25     Do you remember that?

103 (Pages 406 to 409)

Page 410

1  A. I think I've said yes.
2  Q. That's wrong, isn't it?
3  A. Why was -- why is it wrong?
4  Q. Well, doesn't this say that they're going
5  to be recommending the removal of formulary          05:30PM
6  restrictions but adding guidelines?
7     MR. SOBOL: Objection, asked and answered.
8  BY MR. CHEFFO:
9  Q. Go ahead.
10 A. The formulary restrictions, like I said,        05:30PM
11 when I looked -- when I read that, my reading of it
12 was in relationship to the restrictions. And my --
13 I knew there were guidelines because I was, you
14 know -- I was involved in DUAT, working with the
15 guidelines. So I knew that there had been          05:30PM
16 guidelines there.
17 Q. Well, Doctor, you went through a whole
18 litany of things that are misleading. I mean, isn't
19 it misleading, don't you think, to say, in or about
20 September 1999, I recommended removal of all       05:30PM
21 formulary restrictions and guidelines, no caveats
22 for Neurontin -- hold on -- and you also said, I am
23 informed and believe that in or about
24 September 1990, the P&T committee accepted this
25 recommendation?                                    05:31PM

Page 411

1     MR. SOBOL: Objection. There's no question
2  before you yet.
3  BY MR. CHEFFO:
4  Q. Is that accurate?
5     MR. SOBOL: Objection.                            05:31PM
6     You may answer.
7  BY MR. CHEFFO:
8  Q. You can answer.
9  A. I recommend removal of all formulary
10 restrictions, comma, and guidelines for Neurontin.  05:31PM
11 That's one way to read it.
12 Q. Where's the comma?
13 A. There isn't. But I'm just saying that in
14 reading it, that's what -- I -- again, what I told
15 you before about the grammar element.               05:31PM
16    Another way to read it is --
17    THE REPORTER: I'm sorry. About the?
18    THE WITNESS: Another way to read it --
19    THE REPORTER: What I told you before about
20 the?
21    MR. SOBOL: Grammar element.
22    THE WITNESS: Element.
23    Another way to read it is I recommend
24 removal of all formulary restrictions and
25 guidelines, guidelines related to how the formulary 05:31PM

Page 412

1  restrictions are -- what's the word?
2     MS. NUSSBAUM: Enforced?
3     THE WITNESS: No. I'll find it.
4     How the guidelines are implemented. And
5  that's the way I read it -- as I told you before,  05:32PM
6  that's the way I read it before, was that it related
7  to the guidelines for formulary restrictions. So
8  when I read it the first time, that's what I was
9  looking at.
10    So in other words, we're not going to      05:32PM
11 restrict it any -- we're not going to have
12 guidelines anymore that a neurologist has to do it
13 or guidelines anymore that -- because, as I told you
14 when you first asked me, guidelines is a very
15 nebulous word. It applies to many, many things.    05:32PM
16 And that's the way I originally read it.
17 BY MR. CHEFFO:
18 Q. Doctor, it's not nebulous in terms of
19 Kaiser; right? I mean, they use "guidelines" very
20 specifically, don't they?
21    MR. SOBOL: Objection.
22    THE WITNESS: They use it in a different
23 way, in a specific way.
24 BY MR. CHEFFO:
25 Q. So you're telling me that you -- when you  05:32PM

Page 413

1  use "guidelines" in your sworn declaration, you're
2  using it differently than the way Kaiser does?
3     MR. SOBOL: Objection.
4     THE WITNESS: I said at the beginning,
5  earlier today, many hours ago, that when I read it,  05:32PM
6  my reading of it -- my understanding when I signed
7  it was that there are certain guidelines for
8  formulary restrictions. It was the guidelines
9  related to formulary restrictions, not clinical
10 guidelines about how to use medications. That was  05:32PM
11 my -- when I had talked about it, that was my
12 reading.
13    I can absolutely see where you could add a
14 different interpretation to it, but that -- I don't
15 recall that that was my interpretation at the time.  05:33PM
16 My interpretation was strictly, in this case, about
17 the guidelines related to formulary --
18 BY MR. CHEFFO:
19 Q. What -- what guidelines --
20 A. -- formulary restrictions.                      05:33PM
21 Q. What guidelines --
22    THE REPORTER: Wait a minute.
23 BY MR. CHEFFO:
24 Q. -- relate --
25    MR. SOBOL: You can't talk over him.             05:33PM

104 (Pages 410 to 413)

Page 446

1  that you have that suggests that somehow Kaiser and
2  this are linked in a way that's more than just as
3  a -- the computer is a vehicle for this information.
4  That's my only concern.
5      Q.  Well, but you're saying it's misleading,    06:10PM
6  and I'm asking you is there a way to ameliorate
7  that?
8      A.  Yes.  If it was said that, you know, this
9  information was reviewed by the regional pain group,
10 something to that effect, and that it said that     06:10PM
11 there was a Kaiser imprimatur on it, the people who
12 actually work at Kaiser, not that it was simply
13 downloaded from the web for your -- you know, for
14 your availability.
15     Q.  Okay.  Can you look at the next exhibit,    06:10PM
16 please?
17         MR. SOBOL:  Make a note we're over the time
18 now --
19         THE WITNESS:  Can we stop now?
20         MR. SOBOL:  -- and we have been.           06:10PM
21         THE WITNESS:  Is it possible to stop?
22 BY MR. CHEFFO:
23     Q.  I don't think it's po- -- I need about
24 another five or ten minutes, if we can just
25 continue, and then I'll actually be done.          06:10PM

Page 447

1      A.  Can we actually time it because I have
2  dinner.  I have a whole -- I mean, is it possible?
3      Q.  You need to just answer my questions,
4  Doctor, we'll be done.  So --
5          MR. SOBOL:  Well, he's been doing that all  06:10PM
6  day.
7          MR. CHEFFO:  I don't think so.
8          MR. SOBOL:  That's not fair.  We'll go for
9  another five minutes, and then that's it.
10         THE WITNESS:  Can we --
11 BY MR. CHEFFO:
12     Q.  Number 23.
13     A.  I'd like to time it, though.
14         MR. SOBOL:  I am timing it, Doctor.
15         THE WITNESS:  Thank you.                   06:11PM
16 BY MR. CHEFFO:
17     Q.  This is a regional formulary, No. 23?
18     A.  I have 22 in front of me.
19     Q.  Didn't I give it to you?  This one.
20     A.  You held back -- oh, here it is.  Okay.  I 06:11PM
21 got it.
22     Q.  Regional Formulary and Therapeutics
23 Committee Meeting Minutes from --
24         THE REPORTER:  I'm sorry.  I didn't --
25         MR. CHEFFO:  I'm sorry.  That was too fast. 06:11PM

Page 448

1  BY MR. CHEFFO:
2      Q.  Regional Formulary and Therapeutics
3  Committee Meeting Minutes, October 13, 2005.
4          Do you see that?
5      A.  Yes.                                      06:11PM
6      Q.  Does this look like -- to be like a Kaiser
7  document?
8      A.  It does.
9      Q.  And it talks about the attendees at the
10 meeting; right?                                    06:11PM
11     A.  Yes.
12     Q.  Can you look at the --
13         Do you know when this lawsuit was filed?
14 Did I ask you that earlier?
15         MR. SOBOL:  Yes, you did.                  06:11PM
16         THE WITNESS:  You did, and you told me, but
17 I didn't know exactly when.  But you told me, and I
18 forgot it.
19 BY MR. CHEFFO:
20     Q.  When did you start with the DUAT initiative 06:11PM
21 with respect to Neurontin?
22         MR. SOBOL:  Objection, asked and answered.
23         THE WITNESS:  I answered that earlier.  I
24 said I thought it was around 2003, 2004, but I don't
25 remember exactly how many years I've been doing it. 06:11PM

Page 449

1  Maybe later, maybe earlier.
2  BY MR. CHEFFO:
3      Q.  Okay.  And in part -- and part of the issue
4  was to stop new prescriptions of Neurontin?  That
5  was one of the initiative?                        06:12PM
6      A.  That's part of the initiative, part of the
7  total initiative, yes.
8      Q.  Okay.  Look at the second page, which is
9  -045030 on Bates.
10         There's a gabapentin titration?           06:12PM
11     A.  Yes.
12     Q.  And it says here:
13         "Criteria-based prescribing was
14 removed for gabapentin at the
15 September 2005 meeting, at which time             06:12PM
16 gabapentin was also put back to the
17 formulary."
18     A.  Uh-huh.
19     Q.  Do you see that?
20     A.  I read that.                              06:12PM
21     Q.  So that's after your initiative; right?
22     A.  Yes.
23     Q.  And then it says here:
24         "The effective dose should be
25 individualized" --                                06:12PM

Page 454

1  people in Florida or people in Italy, and I would
2  have the same reaction.  I don't know why people
3  elsewhere do the things they do.
4  BY MR. CHEFFO:
5      Q.  This isn't -- well, this isn't just        06:15PM
6  anybody.  These are -- this was a Kaiser affiliated
7  entity; right?
8      A.  We're not connected with them.  We're not
9  officially connected with them.
10     Q.  Is your -- is Kaiser Health connected with  06:16PM
11 them?
12     A.  I don't know.
13         MR. SOBOL:  Actually, I'm going to
14 interject now because we have gone over the five
15 minutes.                                            06:16PM
16         MR. CHEFFO:  I'm just -- I'm asking -- this
17 is my last document.
18 BY MR. CHEFFO:
19     Q.  Now --
20         MR. SOBOL:  Well, I understand it.  It's    06:16PM
21 your last document.  It's also your last question.
22 I made a commitment to the doctor that I would time
23 the five minutes.  I've timed the five minutes.
24 We're way after seven hours.  In fact, we're way
25 over three and a half hours.  So you're pushing --  06:16PM

Page 455

1          MR. CHEFFO:  Let me just ask two more
2  questions.
3  BY MR. CHEFFO:
4      Q.  Doctor, do the P&T committees talk to each
5  other about best practices?                        06:16PM
6      A.  I don't know.
7      Q.  Do you have any explanation why the
8  Northwest Therapeutic Committee -- Therapeutics
9  Committee in October 2005 would put gabapentin back
10 on the formulary and indicate that doses of up to   06:16PM
11 3,600 milligrams may be needed in some patients?
12     A.  I don't know why.
13     Q.  Okay.
14         MR. SOBOL:  Those are two questions.  All
15 right.  Let's take a break.                         06:17PM
16         THE VIDEOGRAPHER:  We're off the record,
17 6:18.
18         (Recess taken.)
19         THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 6:27.                          06:26PM
21
22                   EXAMINATION
23 BY MR. SOBOL:
24     Q.  Good evening, Doctor.
25     A.  Hello.                                     06:26PM

Page 456

1      Q.  Can you please sit up for the jury, please.
2      A.  Sure.
3      Q.  Thank you.
4          Good evening.  My name's Tom Sobol.  I'm a
5  lawyer in Boston.  I work for the law firm called   06:26PM
6  Hagens Berman Sobol Shapiro.  Now, that's based in
7  Cambridge.  And I represent Kaiser, a plaintiff --
8  the plaintiff in this case.
9          You and I didn't meet until yesterday;
10 correct?                                            06:26PM
11     A.  That's right.
12     Q.  We had never met before in our life; right?
13     A.  Right.
14     Q.  We did meet yesterday for a few hours;
15 correct?                                            06:26PM
16     A.  Yes.
17     Q.  Along with Ms. Nussbaum and another
18 gentleman, Mr. Cohen; correct?
19     A.  Yes.
20     Q.  Okay.  Now, I'd like to turn your attention 06:26PM
21 to the time of the early 1990s.  This is almost 20
22 years ago.
23         Do you have in mind about 20 years ago?
24     A.  I do.
25         MR. CHEFFO:  Objection.                    06:26PM

Page 457

1  BY MR. SOBOL:
2      Q.  You had graduated from medical school;
3  correct?
4      A.  Yes.
5      Q.  In -- when?                                06:26PM
6      A.  '87.
7      Q.  And so by early 1990s, you had been out of
8  medical school a couple years, a few years?
9      A.  I -- yes.
10     Q.  Okay.  And you went into practice --       06:27PM
11 private practice in 1993; correct?
12     A.  Yes.
13     Q.  You had done something, though, before
14 that, a pain fellowship of some sort?
15     A.  Yes, I did.                                06:27PM
16     Q.  Please tell the jury what a pain fellowship
17 was at the time.
18     A.  A pain fellowship at the time was the
19 advanced education related to treatment of pain
20 disorders.  The -- there is no -- at the time and   06:27PM
21 even now, there is no specific education within
22 residency that identifies it as a -- as anything
23 more than an equal field of study with many other
24 things that a resident might have for use in his own
25 particular specialty.  A pain fellowship is a       06:27PM

115 (Pages 454 to 457)

Page 522

1  with this, but I can tell you that it made sense to
2  me, when I read this, when I heard that Pfizer had
3  done this with another drug that's -- Lyrica is
4  similar to Neurontin.  And so when I heard that the
5  same thing was being done, I said, oh, that sounds          07:49PM
6  familiar.  That was, you know, made me more sure
7  that, you know, this is something I really need to
8  worry about.  So --
9          MR. CHEFFO:  I move to strike the comments
10 about Lyrica.                                                07:49PM
11 BY MR. SOBOL:
12    Q.  You testified in your declaration about
13 whether or not you would have made the same
14 recommendations back in 1997 and 1999 that you did.
15    A.  Right.  I would absolutely not have had I        07:49PM
16 known what I know now.
17    Q.  Why not?
18         MR. CHEFFO:  Objection.
19         THE WITNESS:  The reason why is because it
20 would lead to -- I don't need to be definitive about    07:49PM
21 it, about -- and to look at every detail of the
22 evidence with a fine-tooth comb to know that it
23 poses serious questions about the evidence.  That
24 alone is a reason to hold back.
25 BY MR. SOBOL:                                           07:49PM

Page 523

1    Q.  Is that the -- particularly the case when
2  the drug has not been approved by the FDA for the
3  particular indication?
4          MR. CHEFFO:  Objection.
5          THE WITNESS:  If a drug isn't approved but    07:50PM
6  has a lot of evidence -- people were using aspirin
7  for a long time before really good evidence came
8  about.  That evidence was good.  And so the FDA
9  alone isn't the key to allowing us to use it,
10 obviously, because we do.  It's the strength of the    07:50PM
11 evidence and how much you trust the evidence.
12 That's really what it comes down to.
13         And you know, there has to be a certain
14 level of trust in where the evidence is -- where the
15 evidence is coming from.  And if there's a question   07:50PM
16 about it, then you have to hold off.
17         MR. SOBOL:  Nothing further.
18         MR. CHEFFO:  I have a few questions,
19 Doctor.
20         MR. SOBOL:  No.  We're done.                  07:50PM
21         THE WITNESS:  No, I can't.  I'm exhausted,
22 actually.
23         MR. CHEFFO:  I have about five minutes.
24         MR. SOBOL:  No.  We're done.
25         THE WITNESS:  You -- I -- I honestly --       07:50PM

Page 524

1          MR. CHEFFO:  I have an opportunity to ask
2  five minutes of redirect questions.
3          THE WITNESS:  I'm leaving.  I have a kid
4  who's waiting for me.  I don't know what to tell
5  you.  I mean, I --                                    07:51PM
6          MR. CHEFFO:  You just sat through these
7  entire questions.  You're not dismissed.  I can't
8  stop you physically from doing it, but I'm entitled
9  to ask -- you asked categories --
10         MR. SOBOL:  He's instructed not to answer    07:51PM
11 anything further.
12         THE WITNESS:  I'm exhausted, and you
13 know --
14         MR. CHEFFO:  You weren't exhausted five
15 minutes ago.                                          07:51PM
16         THE WITNESS:  You know it's --
17         MR. CHEFFO:  Doctor, I don't want to --
18 we're not going to engage with you.  You're going to
19 leave.  You can leave.  I'm stating my position for
20 the record.                                           07:51PM
21         My position is the deposition is not done.
22 I have five to ten minutes' worth of questions.
23 You're not going to allow them or you're not going
24 to stay for them.  I'll make a motion.
25         THE VIDEOGRAPHER:  This will conclude the    07:51PM

Page 525

1  deposition for today.  We've had five DVD media
2  used.  We're off the record at 7:53.
3
4         (TIME NOTED: 7:53 p.m.)

132 (Pages 522 to 525)