UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF
<u>DR. JOHN ABRAMSON, M.D.</u>**

854384.1

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 1

LEGAL STANDARD .............................................................................. 6

ARGUMENT ....................................................................................... 6

I.   Dr. Abramson's Methods Are Sound and Require Expertise. ............... 6

II.  Dr. Abramson's Proposed Testimony is Relevant and Not Prejudicial. ...... 8

III. Dr. Abramson's Opinions Are Not Based On Speculation or *Ipse Dixit.* ......... 10

IV.  Dr. Abramson's Proposed Testimony Does Not Usurp the Role of the Jury. ....... 12

     A.   Dr. Abramson Has Synthesized a Large Amount of Technical, Scientific Information and Will Assist the Trier of Fact. ........ 12

     B.   Dr. Abramson's Opinions Are Not Focused On "Intent." ........ 15

V.   Dr. Abramson's Proposed Testimony Does Not Usurp the Role of the Court. ....... 17

VI.  Dr. Abramson Does Not Propose to Testify Regarding the "Thoughts" of Non-Party Doctors. ....... 19

CONCLUSION ................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Nat'l Fire Ins. Co. v. Mirasco, Inc.,*
265 F. Supp. 2d 240 (S.D.N.Y. 2003) ............................................................................ 18

*B.F. Goodrich v. Betkoski,*
99 F.3d 505 (2d Cir. 1996) ............................................................................................ 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)..................................................................................................... 6, 19

*In re Fosamax Prods. Liab. Litig.,*
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ............................................................................ 15

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig,*
2007 WL 1964337 (D. Minn. Jun. 29, 2007) ................................................................. 13

*In re Neurontin Sales & Marketing Litig.,*
2010 WL 53568 (D. Mass. Jan. 8, 2010) ......................................................................... 9

*In re Rezulin Prods. Liab. Litig.,*
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................ 13, 14, 15, 17

*In re Welding Fume Prods. Liab. Litig.,*
2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) .......................................................... 14, 17

*In re Zyprexa Prods. Liab. Litig.,*
493 F. Supp. 2d 571 (E.D.N.Y. 2007). ............................................................................ 2

*Natchitoches Parish Hosp Service Dist. v. Tyco Int'l, Ltd.,*
2009 WL 3053855 (D. Mass. Sept. 21, 2009) (Saris, J.) ................................................... 6

*Olindo Enterprises, Inc. v. City of Rochester,*
2008 WL 686259 (W.D.N.Y. Mar. 7, 2008) .................................................................. 20

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.,*
161 F.3d 77 (1st Cir. 1985) ............................................................................................. 6

*Steinhilber v. McCarthy,*
26 F. Supp. 2d 265 (D. Mass. 1998) ............................................................................. 18

*Tuli v. Brigham & Women's Hosp., Inc.,*
592 F. Supp. 2d 208 (D. Mass. 2009) ........................................................................... 10

*U.S. v. Garcia-Pastrana,*
584 F.3d 351 (1st Cir. 2009)............................................................................................ 9

*United States v. Fosher,*
590 F.2d 381 (1st Cir. 1979)......................................................................................... 10

**TABLE OF AUTHORITIES**
(continued)

Page

**Rules**

Fed. R. Evid. 702 ................................................................................................................... 6, 14

## PRELIMINARY STATEMENT

A physician, academic, and widely published author, Dr. John Abramson has performed a critical analysis of how Defendants produced and disseminated scientific knowledge about Neurontin.  Applying his expertise in primary care, statistics, epidemiology, and medical communications, Dr. Abramson's testimony will assist the trier of fact in understanding the complex and varied ways that Defendants manipulated the scientific information that physicians rely on to make informed decisions.  His testimony draws on a review of the highly technical issues and processes were part of the campaign of misinformation about Neurontin.  His opinions are relevant and based on sound methodology and should be admitted.

## BACKGROUND

Dr. John Abramson is a medical doctor licensed to practice in Massachusetts since 1982. A *cum laude* graduate of Harvard College, he attended Dartmouth Medical School and graduated with a degree in Medicine from Brown Medical School in 1976.  He completed his internship at the University of North Carolina, and his residency at Case Western Reserve University from 1979 to 1981.  He earned a Robert Wood Johnson Fellowship in Family Medicine at Case Western, and a Master of Science in Family Practice degree.  His Fellowship included the study of epidemiology, statistics, research design, health policy and interpretation of scientific data. He served as Chair of the Department of Family practice at Lahey Clinic in Burlington Massachusetts from 1994 to 2001 and has been a clinical instructor at Harvard Medical School since 1997.  (*See* Exh. A to accompanying Declaration of Elana Katcher ("Decl."), Expert Report of John Abramson, MD ("Report") at 5.)  As a member of the faculty at Harvard Medical School, he has taught medical students how to critically interpret medical literature and data into a risk/benefit analysis for prescribing drugs to patients.  (Report at 6-7.)

Dr. Abramson has 28 years of practice as a physician in multiple arenas.  As a treating physician, he has been responsible for the evaluation, care, and treatment of numerous patients for well care, as well as disease diagnosis, treatment, and management.  He has firsthand experience of the type and content of information a physician needs to make informed prescribing decisions, performing risk/benefit analysis and evaluating safety and efficacy of drugs for his patients.  He carefully reads medical journals both as part of his responsibilities as a practicing physician and as a researcher evaluating the quality of the scientific evidence presented in these journals.  (Report at 6.)

Since 2003, Dr. Abramson has published widely on health policy and commercial bias in the scientific evidence that doctors rely on to guide their clinical practice, including several articles in peer-reviewed medical journals and a book published by HarperCollins in 2004. (Report at 7; Exhibit 1 to Report.)  He is a highly sought after speaker on these subjects at medical schools, hospital grand rounds, and health insurers.  In an opinion admitting his testimony in the Zyprexa litigation in 2007, Judge Weinstein called Dr. Abramson "a distinguished scientist whose expertise probably will be helpful in deciding relevant scientific and economic issues."  *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 580 (E.D.N.Y. 2007).

In his expert report, Dr. Abramson discusses the sources of information about prescription drugs that are available to and relied upon by doctors, and assesses whether Defendants "impeded physician access to accurate, balanced and complete information concerning Neurontin's effectiveness in treating certain off-label conditions."  (Report at 3.)  To do this, Dr. Abramson has drawn on his unique mixture of specialized knowledge in patient care and how pharmaceutical company-sponsored research and marketing affects doctors' decisions.

This task requires Dr. Abramson's understanding not only of the information physicians rely on, but of, among other things, the design of clinical trials, the technical and often subtle ways in which bias can be introduced into those trials and the results affected, and what information those trials provide to a pharmaceutical company. He is then able to compare that raw information with what Defendants allowed to be presented and actually packaged and presented to physicians and to the public.

Dr. Abramson concludes that Defendants manipulated and distorted scientific information as to each of the off-label uses at issue in this case, as well as to dosing. Dr. Abramson's opinion is that Defendants disseminated "inaccurate, incomplete or misleading scientific evidence to physicians and payers through a number of means, including" the "[c]ontrol and manipulation of research design, analysis, and publication of clinical trials… [w]ithholding of material scientific evidence from physicians and payers," presentation of inaccurate or incomplete information at continuing medical education events, and other means. (Report at 4.)

Dr. Abramson sets forth the bases for these opinions in detail. Dr. Abramson first shows how commercial interests have come to dominate the sources of scientific information that doctors rely on to make treating decisions, including the design, analysis, and publication of clinical trials, review articles, and continuing medical education. (Report ¶¶ 21-59.) As he states,

> Between two-thirds and three-quarters of the clinical studies published in even the most prestigious journals are now commercially funded. Among the highest quality published studies (those deemed good enough to be included in Cochrane Reviews), the odds are 5.3 times greater that commercially funded studies will conclude that the sponsor's drug is the treatment of choice compared to non-commercially funded studies of exactly the same drugs. This means that the "scientific evidence" produced by commercially sponsored studies is effectively and systematically biased in favor of the sponsor's drug.

*Id.* ¶ 39.

Dr. Abramson goes on to show how pharmaceutical marketing, including the use of drug sales representatives speaking directly to physicians, works to counteract accurate and clear scientific evidence. (Report ¶¶ 60-66.) For example, he cites a review published in *JAMA* in which the authors wrote:

> Interactions with pharmaceutical representatives were also found to impact the prescribing practice of residents and physicians in terms of prescribing cost, nonrational prescribing, awareness, preference and rapid prescribing of new drugs, and decreased prescribing of generic drugs.

(*Id.* ¶ 66.) In other words, as Dr. Abramson writes, "The more a doctor sees drug reps, the less likely the doctor is to identify false claims about the drug and the greater the doctor's tendency to prescribe more drugs overall." (*Id.* ¶ 66.)

Dr. Abramson then reviews internal documents from both Parke-Davis and Pfizer, revealing their strategy to break through Neurontin's low ceiling for on-label sales through off-label sales. (Report ¶¶ 68-79.) For example, Pfizer developed "key messages" which drove their pursuit and publication of scientific evidence, rather than the other way around. (*Id.* ¶¶ 105-121.) Going painstakingly through the underlying research reports and clinical trials conducted by Pfizer and Parke-Davis on Neurontin's use in treating bipolar disorder, neuropathic pain, and for migraine prophylaxis, Dr. Abramson shows how Defendants distorted the evidence known to them so that it appeared more favorable to Defendants by the time it reached physicians, who were not able to see the underlying information suppressed by Defendants. (*See, e.g.*, *id.* ¶¶ 134-35 and 138 (as to bipolar studies). Defendants suppressed unfavorable studies, (*id.* ¶ 140-47 (Gorson study on neuropathic pain); ¶¶ 163-71 (Reckless study on neuropathic pain)) and ignored severe methodological problems with other studies. (*Id.* ¶ 148-62.) Dr. Abramson yet another study where a *post hoc* change in primary analyses "led to opposite conclusions in the

Defendants' study report and the article published in *Headache*," a peer-reviewed journal.  (*Id.* ¶ 181, ¶¶ 177-87.)

Dr. Abramson focuses on Cochrane Review articles as a particularly trusted source for physicians, representing "the totality of acceptable quality evidence reasonably available to prescribers and payers… presented independent of regulatory authorities' approval or lack of approval for the indications reviewed."  (Report ¶ 188.)  Through a careful review of Defendants' internal data, unpublished studies, and internal communications, he shows how Defendants withhold these unpublished studies and internal data from the Cochrane Review in articles about Neurontin's use for treatment of migraines, bipolar disorder, and neuropathic pain.  (*Id.* ¶¶ 190-208.)  As a result, treating physicians did not have the information they needed to make informed prescribing decisions.  Dr. Abramson similarly analyzes the gap between what was known to Defendants and what was known to the authors of other review articles evaluating Neurontin's use for off-label indications.  (*Id.* ¶¶ 209-37.)

Dr. Abramson's report goes on to discuss the role of continuing medical education (CME) as a crucial source of information about evolving therapies for practicing physicians, and the expectation among physicians that CME is a noncommercial venue.  (Report ¶¶ 238-39.)  Dr. Abramson shows how Defendants treated CME as just another marketing device, developing incomplete and misleading messages about the state of research into Neurontin's efficacy for treating various diseases.  (*Id.* ¶¶ 240-82.)  Again after an intensive review of Defendants' messages about this research, Dr. Abramson concludes that "Defendants controlled the impact of (from their point of view) good and bad news about Neurontin, and their control led to misrepresentation of the scientific evidence in order to maximize sales."  (*Id.* ¶ 304.)  Dr. Abramson concludes by showing how Defendants' suppression of negative studies extended to

the formulary dossier distributed to third party payers and managed care organizations. (*Id.* ¶¶ 305-14.)

## LEGAL STANDARD

Defendants do not state the standard for the admission of expert testimony under Rule 702 of the Federal Rules of Evidence.  Rule 702 provides, "If scientific, technical, or specialized knowledge will assist the trier of fact to understand a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may" offer opinion testimony.  The testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods" applied "reliably to the facts of the case."  Fed. R. Evid. 702. As the First Circuit has stated, "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1985) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993)).

## ARGUMENT

I.   **Dr. Abramson's Methods Are Sound and Require Expertise.**

Dr. Abramson's testimony is based on sound methodology and requires expertise.  Dr. Abramson's expertise is in critically analyzing the production and dissemination of scientific, and specifically, medical knowledge.[1]  This is a well-developed field whose leaders, such as

---

[1] Defendants' innuendo-filled attacks on Dr. Abramson's credentials on the first page of their brief aside, any questions about Dr. Abramson's qualifications and credentials go to the weight and not the admissibility of his testimony.  *See, e.g., Natchitoches Parish Hosp Service Dist. v. Tyco Int'l, Ltd.*, 2009 WL 3053855, at *3 (D. Mass. Sept. 21, 2009) (Saris, J.).

Dr. Abramson, routinely publish works in mainstream peer-reviewed journals.[2] Here,

Dr. Abramson set out to analyze clinical trials from both a medical and statistical point of view

to determine what the pre-specified outcomes showed, to track the publication (or lack thereof)

of the findings, and then to analyze whether the published findings were consistent with research

protocols and the study data to determine whether physicians, patients, and payors had the best

information available to them to make prescribing decisions.  This requires the application of

several intersecting forms of expertise, including epidemiology, statistics, research design,

pharmacology, scientific publication processes, primary care, health policy, and medical

communications.  Dr. Abramson's training and expertise allow him to understand and explain

the complex nexus of clinical research and marketing strategies in creating the impression, as

Defendants did here, of safety and efficacy for indications that the FDA had not approved.

Specifically, to write his 123-page report, Dr. Abramson reviewed hundreds of

documents, including 91 published articles concerning gapabentin, Defendants' unpublished

research reports, numerous scientific websites, and 133 separate documents produced in this

litigation.  Science does not speak for itself, and a jury cannot perform this primary analysis

without assistance.  Defendants cannot dispute that the effort to provide transparency to

Defendants' otherwise opaque research and marketing decisions is a valid one,[3] and they offer no

methodology that would have been preferable to the painstaking review of relevant materials that

---

[2] Illustrative examples of scholarship examining the role of commercial bias in scientific research are attached as Exhibit C to the declaration accompanying this motion, including Ashley Wazana, "Physicians and the Pharmaceutical Industry: Is a Gift Ever Just a Gift," published in JAMA and cited at footnote 83 of Dr. Abramson's report.

[3] Defendants' expert Elizabeth A. Field undertook a similar analysis, albeit through the review of a much smaller set of documents than Dr. Abramson reviewed.  (*See* Decl., Exh. D (Appendix H to Dr. Field's expert report).)

Dr. Abramson undertook, nor do they point to a single document Dr. Abramson overlooked in doing his review.

Further, Dr. Abramson's report is not advocacy. Defendants mischaracterize Dr. Abramson's testimony on his drafting process for his report and the degree of assistance received from Plaintiffs' counsel, which was minimal. Dr. Abramson testified that he was provided "a description of the neuropathic pain studies that was, I think, done for expediency as I was getting up to snuff . . . ." (*See* Exh. B to accompanying Declaration, Deposition of Dr. John A. Abramson ("Dep.") at 87:2-4.) "We're talking about, I think, a handful of paragraphs at most where there was a contribution, but, again, those paragraphs were edited, revised, cut, and then added to by me." (*Id.* at 87:16-19.) Dr. Abramson made clear, "Anything that's in the report … – regardless of what its source was – I researched and stand by." (*Id.* at 83:21-23.)

## II.     Dr. Abramson's Proposed Testimony is Relevant and Not Prejudicial.

Defendants' argument that there is "no demonstrated nexus between the conduct [Dr. Abramson] describes – manipulation of clinical trials, journal articles, CME events, and advisory boards – and Kaiser's harm," is frivolous. Dr. Abramson's report details Defendants' campaign of misrepresentation and the huge growth in sales for off-label uses in the years that followed. Dr. Abramson did not set out to address the separate issue of individual causation or the quantity of prescriptions that Defendants' misconduct caused to be written; as he explained in his deposition, "I'm going to leave that to the economists." (Dep. at 224:16-17.) Instead, his focus was on his areas of expertise – analyzing what scientific information was available to Defendants versus what information was disclosed by Defendants to doctors and the public. As he testified, "What I'm opining is that the activities of Parke-Davis and Pfizer caused physicians not to be able to function in their role as learned intermediaries," (*Id.* at 224:20-22) and that "these activities caused physicians to write more prescriptions, caused them to believe that the drug was

more effective than the science really showed . . . ." (*Id.* at 227:24-228:3.)  Defendants do not say – because they cannot – how the misinformation that went to physicians nationwide through, for example, misleading publications, was any different for the doctors who prescribed Neurontin to Kaiser insureds, or what information Dr. Abramson should or could have reviewed to address this question.[4]

Instead, after acknowledging the failed *Daubert* motion to exclude Dr. Abramson in the Zyprexa litigation, Defendants try to tie the later grant of summary judgment in that case to the testimony provided by Dr. Abramson, citing no authority for the novel proposition that a subsequent grant of summary judgment somehow negates an earlier denial of a *Daubert* motion, let alone how it bears on a *Daubert* motion in a separate case where summary judgment has been *denied*.  Defendants assert that the grounds for summary judgment in the Zyprexa litigation, unexplained by Defendants, are "equally applicable here," but the Zyprexa decision was focused on the use of aggregate proof, and had nothing to do with any purported defect in Dr. Abramson's proposed testimony.

Finally, Defendants do not provide any support for their assertion that if presented with Dr. Abramson's opinions, jurors would "inevitably" infer that Pfizer may be held liable regardless of whether doctors were exposed to or relied upon the sources of information distorted by Defendants.  Dr. Abramson's focus is on what Defendants did; it is for others to testify to reliance, to the extent that is necessary to do so to prove Kaiser's claims.  Jurors will be instructed as to the elements of liability here, and courts are to "presume[] that jurors follow instructions." *U.S. v. Garcia-Pastrana*, 584 F.3d 351, 379 (1st Cir. 2009).  Defendants do not

---

[4] The Court has already found there is sufficient evidence of "direct interaction" between Pfizer and Kaiser to survive summary judgment. *In re Neurontin Sales & Marketing Litig.*, 2010 WL 53568, at *11 (D. Mass. Jan. 8, 2010).

explain how a jury would be confused by Dr. Abramson's testimony, or even how Pfizer would be unfairly prejudiced by it. Additionally, their reliance on the pre-*Daubert* case of *United States v. Fosher*, 590 F.2d 381, 382 (1st Cir. 1979) for the assertion of juror confusion is misplaced. There, the proposed expert testimony, on the perception and memory of eyewitnesses, was unconnected to the eyewitnesses offering testimony in that case. Here, Dr. Abramson's opinions are based on an extensive review of Defendants' documents.

## III.   Dr. Abramson's Opinions Are Not Based On Speculation or *Ipse Dixit*.

Dr. Abramson provides documentary support for the opinions throughout his report, and Defendants' attacks on his opinions as speculation and *ipse dixit* are baseless. While Pfizer complains that Dr. Abramson drew conclusions based on his review of Defendants' documents (Br. at 5), they do not point to any part of the record he should have looked at that might have altered his conclusions.[5] Instead, ignoring the substance of Dr. Abramson's report, Defendants select a handful of disconnected excerpts from Dr. Abramson's two days of deposition and label them all "speculation." But Defendants' examples of purported speculation, from page 6 of their brief, do not withstand scrutiny.

First, Dr. Abramson does not (and does not need to) speculate that Pfizer "controlled the content of misleading articles." Instead, his report documents multiple instances in which data from Defendants either delayed or suppressed negative studies and data (Report ¶¶ 163-71, 190, 207-08), or where clinical trials were published, with Defendants' knowledge, in ways that were

---

[5] In their own display of *ipse dixit*, Defendants assert without explanation that the Court excluded expert testimony in *Tuli v. Brigham & Women's Hosp., Inc.*, 592 F. Supp. 2d 208 (D. Mass. 2009) on "grounds equally applicable here." (Mem. at 5-6.) The expert whose testimony was excluded in that case was offered as an "experiential witness," rather than the "traditional scientific sort," but, as the Court pointed out, did not possess any relevant experience. *Id.* at 213. Here, Dr. Abramson is addressing technical issues and has a wealth of relevant, cross-cutting experience and expertise as a physician, academic, and peer-reviewed author.

incomplete or misleading. (*Id.* ¶¶ 183, 218-36)  In his deposition, Dr. Abramson acknowledged that in two instances he could think of (of the many described in his report), he had assumed certain links between the distorted manner in which data from Defendants' clinical trials appeared in their published form, but emphasized that his opinion – that Defendants were aware of the misrepresentation of the science and did nothing to correct – was unchanged.  (Dep. at 137:11-24.)  These opinions are not speculation.

Next, Defendants complain that Dr. Abramson does not rely on "direct evidence" that Pfizer controlled the content of CME events, but do not explain why direct evidence is required (or define it).  In his report, Dr. Abramson points to exactly such evidence, showing how the materials Defendants produced in connection with CME events they sponsored did not include negative studies known to Defendants on neuropathic pain (Report ¶¶ 242, 252).  He notes that Pfizer was explicit about its use of CME's as just another venue to grow off-label sales, pointing to one document that stated, "Sponsorship of medical initiatives in neuropathic pain for [primary care physicians] will continue to grow Neurontin's use in this area." (*Id.* ¶ 251.)  Dr. Abramson shows Defendants' own slides and CME materials making misleading and incomplete claims about Neurontin's efficacy for bipolar disorder and migraine prophylaxis.  (*See id.* ¶¶ 255-65; 276-82.)  There is no need to speculate.

Defendants also fault Dr. Abramson for not being present at the many CME's and advisory boards where the misleading material he reviewed was presented and for therefore being unable to report exactly what was said in these venues.  Defendants' complaint is outside the scope of Dr. Abramson's report, which necessarily focused on the misleading materials prepared by Defendants.  Dr. Abramson draws on his experience as a presenter and attendee of CME's to note in his deposition that it is unlikely that a presenter would mention a clinical trial

omitted from the slide set.  (Dep. at 323:19-324:3.)  He did not need to, and did not, speculate on

the messages found in the materials he reviewed.

Similarly, Defendants criticize Dr. Abramson for being unable to go back in time to be

present for sales calls and so being unable to recite what sales representatives said.  This is also

outside the scope of the report.  Defendants quote a portion of Dr. Abramson's deposition

transcript on sales calls but tellingly omit the context, which is Defendants' detailing to

psychiatrists after September 1997 during a time when, as Dr. Abramson points out, there was no

"on-label use for psychiatrists… unless they were providing adjunctive seizure therapy, which is

unlikely; not impossible, but unlikely."  (Dep. at 408:11-19.)  Defendants do not identify that is

untrue about Dr. Abramson's next statement: "I don't know what the drug rep said to the

psychiatrists that coincided with the 23-fold increase in prescribe, [but] whatever they said, short

of recommending Neurontin for adjunctive therapy for seizure disorder, would have been off-

label and scientifically unjustified."  (*Id.* at 408:23-409:4.)

## IV.   Dr. Abramson's Proposed Testimony Does Not Usurp the Role of the Jury.

### A.   Dr. Abramson Has Synthesized a Large Amount of Technical, Scientific Information and Will Assist the Trier of Fact.

As the Court itself has stated, this is an unusually complex case, involving nearly a

decade of conduct by Defendants reaching back to the mid-1990s.  The case encompasses every

stage in Defendants' development of Neurontin, from research to marketing, from interactions

with the FDA to publication decisions to Defendants' communications with scientific leaders.

The synthesis that Dr. Abramson's testimony offers – just as to sources of medical knowledge

and Defendants' manipulation of those sources – will assist the trier of fact in digesting the

extensive factual record in this case.  Further, Dr. Abramson's horizontal expertise, reaching

across primary care to epidemiology and statistics, makes him uniquely qualified to provide that assistance.

Far more than providing a "narrative," Dr. Abramson painstakingly details the steps Defendants took to manipulate the scientific information about Neurontin. In one example, Dr. Abramson shows that a study on bipolar disorder found no significant benefit on the "intent-to-treat group." The "per protocol population," analyses on which are more subject to bias, fared better. The published version of this study focused only on the per protocol group, but did not mention this, a change Pfizer never addressed. (Report ¶ 138.) In another, he shows in detail how Defendants' decisions on study design introduced potential bias into another study. (*Id.* ¶ 148-62.) In another, he shows how the primary outcome measure in Defendants' research report changed to another when published, again with no subsequent intervention from Pfizer. (*Id.* ¶ 177-83.)

Dr. Abramson's testimony is thus no mere "narrative" of the events in this case.[6] As one court has pointed out, in distinguishing the *Rezulin* opinion heavily relied on by Defendants, an expert's synthesis of a complicated factual record can help the trier of fact. It is only when, as in *In re Rezulin,* the expert provides "purely 'a repetition of the factual allegations in plaintiffs' complaint,' involving 'nothing technical or scientific,' that a court might find the expert testimony unhelpful, because the expert is providing only 'simple inferences drawn from

---

[6] To the extent Abramson recites voluminous facts in his report, it is to provide adequate support for his opinions. *Daubert* and Rule 702 require experts to have considered all pertinent evidence before rendering their opinions, yet Defendants fault Dr. Abramson for having reviewed *too* much material. There is no authority for such an argument. Dr. Abramson will help the fact-finder understand a very technical and complicated record. *See In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig,* 2007 WL 1964337, at *7 (D. Minn. Jun. 29, 2007) (expert's testimony "would assist the trier of fact to understand the evidence or to determine fact issues given the allegations by the Plaintiffs, the purported defenses of the Defendants, *and the overall factual record in the case.*") (emphasis added).

uncomplicated facts.'" *In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at *17 (N.D.

Ohio Aug. 8, 2005) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551

(S.D.N.Y. 2004)).  In allowing the proposed expert testimony, the *Welding Fume* court went to

state, in terms wholly applicable here:

> In this case, the great majority of the documents and articles that Dr. Levy is
> reviewing and comparing are complicated, and the inferences those documents
> may or may not support are not at all simple. **It is through the application of his
> expertise that Dr. Levy may allow the trier of fact to better understand what
> the documents do (and don't) mean, and, thus, what the defendants did (or
> didn't) know.** It is not the case that "the untrained layman [is] qualified to
> determine intelligently and to the best possible degree the[se] particular issue[s]
> without enlightenment" from experts.

*Id.* (quoting Fed. R. Evid. 702 (Advisory Committee Notes to 1972 Proposed Rule)) (emphasis

added).

The *Rezulin* opinion is further distinguishable.  In *Rezulin*, the plaintiffs designated one

expert witness to testify about suppression of internal studies, and only one part of the opinion

addressed that expert.  309 F. Supp. 2d at 553-54.  The *Rezulin* court, which performed a

separate analysis for each expert, described the type of scientific suppression at issue there as

"non-technical," such as emails showing in-house scientists' access to computer servers was

being blocked.  *Id.* at 554.  As Dr. Abramson repeatedly shows in his detailed assessments of

Defendants' conduct with respect to multiple studies, publications, and promotional materials,

the suppression here was not through such brute methods as that, but through the manipulation of

science.

The narrative excluded in *Rezulin*, called a "history of *Rezulin*" in the opinion, was,

unlike Dr. Abramson's testimony, merely a recitation of "selected regulatory events concerning

Rezulin, including Advisory Committee meetings, labeling changes, 'Dear Doctor' letters, and

approval and withdrawal decisions by regulators in the United States and abroad."  *In re Rezulin*

*Prods. Liab. Litig.*, 309 F. Supp. at 551 (S.D.N.Y. 2004).   Whether or not it was true, as the *Rezulin* court held, that a lay juror was "equally capable" of constructing a narrative of the case, it is not true here that a juror can construct a narrative of Defendants' years-long, multifaceted conduct.  Dr. Abramson's testimony will be of help to the trier of fact.

### B.   Dr. Abramson's Opinions Are Not Focused On "Intent."

Defendants mischaracterize Dr. Abramson's proposed testimony when they argue that he will opine on Defendants' "intent."  Dr. Abramson has reviewed Defendants' documents, which announce on their face Defendants' intentions to take the actions that other documents, which Dr. Abramson also reviewed, show they did take.  Dr. Abramson's task, using those documents, was to evaluate scientific information as known to Defendants at key time periods, and opine as to whether Defendants accurately disseminated and allowed to be disseminated the information that ended up in sources on which doctors rely.  Courts have excluded proposed expert testimony about motive and intent because it requires speculation,[7] but Dr. Abramson did not speculate.  He does not need to opine on Defendants' mental state or unspoken intentions because the documents show the distortion of scientific evidence happening – not by accident, but through a series of decisions made and documented by Defendants.

In his deposition, Dr. Abramson repeatedly rejected suggestions that he was commenting on Defendants' intent.  For example, in discussing Defendants' campaign "to lead doctors to believe that Neurontin for these off-label uses and unapproved doses was supported by high quality evidence," Dr. Abramson testified, "I can't comment on their state of mind.  I can comment that they did, in fact, do that."  (Dep. at 207:19-21.)  Rather than speculating about intent or motive, Dr. Abramson explained that Defendants'

---

[7] Or, as one court recently put it, "the ability to read minds."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

> own statements say… after they had been informed by the FDA and their own
> advisors… that the scientific evidence did not support the broad indication of
> neuropathic pain, their own reports say that their marketing is effectively
> increasing those prescriptions and that their goal is to continue to increase the use
> of those drugs by a multiplicity of activities that exaggerate the benefits and I
> think – I opine misrepresent the scientific evidence.

(*Id.* at 209:13-23.)  Asked again whether he was opining on the intent of the corporation,

Dr. Abramson answered, "[T]hey stated that their intention was to increase off-label sales." (*Id.*

at 210:12-13.)  Asked the question yet again, Dr. Abramson testified, "I'm stating what the

corporation did… on the one hand we've got the misrepresentation of science… on the other

hand we have the statements by the corporation that their goal was to do that, and that their

activities were successfully accomplishing that." (*Id.* 210:20-211:2.)  As he made clear

throughout his deposition, he does not need to speculate about Defendants' motive and intent to

misrepresent scientific evidence. He can apply his expertise to the interpretation of technical

documents through the complicated series of events that make up the production and

dissemination of medical knowledge without opining on intent.

One of Dr. Abramson's statements that Defendants cite is illustrative.  Defendants

criticize Dr. Abramson for saying that it was Defendants' "intention to delay the publication of

Reckless," referring to a negative study on neuropathic pain (Br. at 11, quoting Dep. at 412:7-

13.)  Dr. Abramson's report, however, quotes Neurontin Team Leader Michael Rowbotham

writing to Angela Crespo, a senior marketing manager about the Reckless study, "I think we can

limit the potential downsides of the [Reckless] study by delaying the publication for as long as

possible . . . ." (Report ¶ 167.)  The report then notes that Crespo writes about the Reckless

study, "This is the negative study that we were talking about … As you can imagine, I am not in

a hurry to publish it," and cites other examples of Defendants' stating their agreement with the

strategy of delay. (*Id.* ¶ 168.)  It requires no speculation on the part of Dr. Abramson to opine

that these actions are consistent with an intent to delay.

**V.**     **Dr. Abramson's Proposed Testimony Does Not Usurp the Role of the Court.**

Dr. Abramson's testimony does not usurp the role of the Court because he is not putting

forth a personal standard for Pfizer's behavior that would compete with or contradict any legal

standard.  Instead, he is opining as to the expectations of prescribing physicians as to the sources

and the quality of the information they receive from the pharmaceutical companies who control

that information, and how Defendants corrupted the information in those sources.  Whether

Pfizer will argue, as it remarkably does in its brief, that it has no reciprocal obligation to doctors,

does not affect the admissibility of Dr. Abramson's testimony.[8]  Dr. Abramson's testimony goes

to whether the information withheld by Defendants was of the type relied on by doctors.  In so

testifying, he does not judge Pfizer's conduct against some free-floating standard of personal

ethics, or opine as to the duties of pharmaceutical companies generally.[9]  Instead, he can testify

to the "assumption that there's a standard of care in the physician community that drug

companies will not systematically withhold negative information …."  (Dep. at 385:6-10.)  Pfizer

---

[8] *See* Br. at 15 ("Dr. Abramson has no basis to testify that **doctors'** purported expectations dictate a reciprocal standard of care for **pharmaceutical companies**.") (emphasis in original). Defendants also note, apparently disapprovingly, Dr. Abramson's testimony that Pfizer "had an obligation to the medical community and the public at large to share scientific evidence that it had" and that "it is imperative for a drug company that knows the results of a negative trial to make that information known."  (Br. at 11.)

[9] Unlike Dr. Abramson's testimony, the expert testimony excluded by the *Welding Fume* and *Rezulin* courts was explicitly about the defendant companies' breach of ethics.  In *Welding Fume*, the excluded expert was a professor of philosophy and ethics who, after setting out "seven ethical principles" for all businesses, was to testify "about business ethics generally and also whether the defendants acted ethically in this case."  *In re Welding Fume*, 2005 WL 1868046, at *18.  Similarly, two of the experts in *In re Rezulin* indicated in their reports that they intended to testify that Warner-Lambert had acted unethically.  *See In re Rezulin*, 309 F. Supp. 2d at 542.

can still argue that it is or should be allowed to do so, and Dr. Abramson can testify to the import of Pfizer's actions to doctors.

This testimony, which relates to standard of care, is a proper subject of expert testimony. *See, e.g., Steinhilber v. McCarthy*, 26 F. Supp. 2d 265, 275 (D. Mass. 1998) (stating that elements of duty of care in medical malpractice case include proving that "the information subject to disclosure is known or reasonably should have been known by the doctors," something "ordinarily … established with expert testimony") (internal quotations omitted); *American Nat'l Fire Ins. Co. v. Mirasco, Inc.*, 265 F. Supp. 2d 240, 252 (S.D.N.Y. 2003) ("[E]xperts may testify as to the customary practices in an industry or profession."). Defendants wrongly characterize Dr. Abramson's proper testimony about what information doctors rely on as simply an expression of Dr. Abramson's personal views.[10] However, the only example Defendants provide of Dr. Abramson supplanting the prevailing standard of care for his personal views is his deposition testimony in which he was asked why Pfizer might have a policy "of not providing unpublished data outside the company." (Dep. at 378:5-8.) Dr. Abramson answered that he is aware that the company "may be reluctant to make the data available for fear that it will be misinterpreted and used in ways that are inappropriate, and I have some sympathy with that." (*Id.* at 378:10-14. But, he added, when the data are not subject to misinterpretation, there are no such concerns, and the information should be disclosed. (*Id.* at 378:14-379:1.) Pfizer does not explain how this is simply an expression of personal opinion, nor does the testimony express, as Pfizer asserts, a willingness to "ignore[]" industry standards regarding the confidentiality or trade

---

[10] As noted in Kaiser's opposition to Defendants' motion to exclude the testimony of Kaiser's expert on publication bias, Dr. Kay Dickersin, the need to publish *all* clinical trial data is a generally accepted principle. Kaiser's opposition to exclude Dr. Dickersin's testimony also notes that Pfizer has proffered only the testimony of Dr. Field in support of its right to selectively publish information, but Dr. Field's own published work on this point contradicts her proposed, paid-for testimony here.

secrecy of unpublished data." (Br. at 14.)  Nor does Pfizer explain why it matters whether Dr.

Abramson is an expert on "promotional activities" if he is tracking the path of scientific

information from Pfizer's possession to what should be non-promotional venues, such as peer-

reviewed publications or CME events in academic settings.  Dr. Abramson's discussion of

doctors' needs to receive accurate disclosure from pharmaceutical companies should be

admitted.

**VI.**     **Dr. Abramson Does Not Propose to Testify Regarding the "Thoughts" of Non-Party**
            **Doctors.**

Defendants object to Dr. Abramson's statement that Pfizer's "comprehensive campaign

caused physicians to believe that Neurontin was in their patient's best interests when, in fact, a

full and unbiased look at the science would have led to a difference conclusion."[11]  Defendants

miscast this as speculation on the thoughts of doctors.  This opinion is based on an assessment of

the quality and reliability of evidence that was shared with and withheld from doctors.  As noted

above, Dr. Abramson may testify to the customs of the medical profession; Dr. Abramson opines

on the sources of information trusted by physicians, and how Defendants corrupted those sources

of information.  Defendants' characterization of such testimony as speculation about others'

beliefs would render all such expert testimony invalid.

Defendants' complaints about Dr. Abramson's lack of firsthand knowledge of CME

events is misplaced.  Dr. Abramson is an expert, not percipient witness. *See Daubert*, 509 U.S. at

592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based

on firsthand knowledge or observation.").  Their complaints about Dr. Abramson's not having

---

[11] Defendants incorrectly assert that this statement is not in Dr. Abramson's report.  The
conclusion says just that: "Prescribers needed – but were not provided – balanced, accurate and
reasonably complete information, critical and material to their determination of Neurontin's
efficacy for the off-label uses at issue, in order to adequately fulfill their role as learned
intermediaries."  (Report at 123; *see also, e.g.*, ¶ 304.)

conducted his own research to test his conclusions are equally misplaced. *See, e.g., B.F. Goodrich v. Betkoski*, 99 F.3d 505, 524 (2d Cir. 1996) (experts do not need to conduct their own tests); *Olindo Enterprises, Inc. v. City of Rochester*, 2008 WL 686259, at *5 (W.D.N.Y. Mar. 7, 2008) (same).

Dr. Abramson's report painstakingly details Defendants' thoroughgoing corruption of trusted scientific sources of information about Neurontin.  In light of this, Defendants' complaints that Dr. Abramson chose to rely on Defendants' own documents detailing their actions, rather than speak to some unspecified number of prescribing prescriptions who consumed Defendants' campaign of misinformation, show genuine hubris.  Defendants point to nothing that Dr. Abramson reviewed or should have reviewed indicating that Defendants have corrected the scientific record, or that there are "fully informed doctors" to interview who would have had access to the accurate information denied the rest of the physician community.  In neither his report nor his deposition testimony did Dr. Abramson testify that doctors should be ignored.  Instead, his testimony will provide the context – Defendants' comprehensive campaign – for what doctors will say about what led them to prescribe Neurontin.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude Dr. Abramson's testimony should be denied.

Dated:  January 22, 2010

Respectfully submitted,

By:   */s/ Linda P. Nussbaum*
        Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, NY  10022

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA  02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142

*Of Counsel*

854384.1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on January 22, 2010.

/s/ Elana Katcher
Elana Katcher